# EXHIBIT E

0001
1      IN THE UNITED STATES DISTRICT COURT FOR THE
2            DISTRICT OF MASSACHUSETTS
3   IN RE:              ) MDL Docket No.
4                       )  1456
5   PHARMACEUTICAL INDUSTRY       ) Civil Action
6   AVERAGE WHOLESALE PRICE       ) 01CV12257-PBS
7   LITIGATION                )
8                - - - -
9        DEPOSITION OF:  REBECCA ANNE HOPKINS
10               - - - -
11           DATE:   November 15, 2005
12               Tuesday, 9:30 a.m.
13           LOCATION:   AKF Reporters, Inc.
14               150 East Eight Street
15               Erie, Pennsylvania
16         TAKEN BY:  Defendants,
17               Bristol-Myers Squibb,
18               Apothecon, and
19               OTN
20         REPORTED BY:   Kristina Kircher
21               Notary Public
22               AKF Reference No. KK91330
0002
1        DEPOSITION OF REBECCA ANNE HOPKINS,
2   a witness, called by the Defendants, Bristol-Myers
3   Squibb, Apothecon, and OTN, for examination, in
4   accordance with the Federal Rules of Civil Procedure,
5   taken by and before Kristina Kircher, a Court
6   Reporter and Notary Public in and for the
7   Commonwealth of Pennsylvania, at the offices of AKF
8   Reporters, Inc., 150 East Eighth Street, Erie,
9   Pennsylvania, on Tuesday, November 15, 2005,
10  commencing at 9:30 a.m.
11               - - - -
12  APPEARANCES:
13
14      FOR THE PLAINTIFFS:
15  Adam S. Levy, Esq.
16  LAW OFFICES OF ADAM S. LEVY
17  P.O. Box 88
18  Oreland, PA  19075
19  267-994-6952
20
21     -and-
22
0003
1   William J. Molinari III, Esq.
2   KLINE & SPECTER
3   The Nineteenth Floor
4   1525 Locust Street
5   Philadelphia, PA  19102
6   215-772-1000

```
 7
 8
 9      FOR THE DEFENDANTS, BRISTOL-MYERS SQUIBB,
10        APOTHECON, and OTN:
11  Thomas J. Sweeney III, Esq.
12  HOGAN & HARTSON
13  875 Third Avenue
14  New York, NY  10022
15  212-918-3523
16
17
18
19
20
21
22
0004
```

```
 1              * I N D E X *
 2
 3  Examination by Mr. Sweeney  - - - - - - - - - -   6
 4  Examination by Mr. Levy - - - - - - - - - - - -  141
 5  Re-Examination by Mr. Sweeney - - - - - - - - -  146
 6  Certificate of Court Reporter - - - - - - - - -  150
 7
 8        * INDEX OF EXHIBITS *
 9
10  Exhibit Hopkins 001, HOPKINS0001 to 0003  - - -   26
11  Exhibit Hopkins 002, HOPKINS0255  - - - - - - -   37
12  Exhibit Hopkins 003, HOPKINS0223 to 0241  - - -   37
13  Exhibit Hopkins 004, HOPKINS0222  - - - - - - -   41
14  Exhibit Hopkins 005, HOPKINS0242 to 0252 - - - -   43
15  Exhibit Hopkins 006, HOPKINS0256 to 0262  - - -   46
16  Exhibit Hopkins 007, HOPKINS0113 to 0121  - - -   48
17  Exhibit Hopkins 008, Third Amended Master
18           Consolidated Class Action
19           Complaint  - - - - - - - -   61
20  Exhibit Hopkins 009, HOPKINS0009 to 0014  - - -   85
21  Exhibit Hopkins 010, HOPKINS0016 to 0046  - - -   95
22  Exhibit Hopkins 011, HOPKINS0047 to 0048  - - -   97
0005
 1        INDEX OF EXHIBITS (Continued)
 2  Exhibit Hopkins 012, HOPKINS0171 to 0192  - - -   98
 3  Exhibit Hopkins 013, HOPKINS0090 to 0097  - - -  102
 4  Exhibit Hopkins 014, HOPKINS0098 to 0100  - - -  102
 5  Exhibit Hopkins 015, HOPKINS0101 to 0104  - - -  106
 6  Exhibit Hopkins 016, HOPKINS0108 to 0110  - - -  109
 7  Exhibit Hopkins 017, HOPKINS0149 to 0152  - - -  110
 8  Exhibit Hopkins 018, HOPKINS0158 to 0162  - - -  113
 9  Exhibit Hopkins 019, HOPKINS0163 - - - - - - - -  114
10  Exhibit Hopkins 020, HOPKINS0165 - - - - - - - -  116
11  Exhibit Hopkins 021, HOPKINS0052 to 0054  - - -  118
12  Exhibit Hopkins 022, HOPKINS0051 - - - - - - - -  119
13  Exhibit Hopkins 023, HOPKINS0067 - - - - - - - -  121
14  Exhibit Hopkins 024, HOPKINS0193 to 0205  - - -  122
```

15  Exhibit Hopkins 025, HOPKINS0206 to 0221  - - - 123
16  Exhibit Hopkins 026, HOPKINS0041b to 0043b - - - 124
17  Exhibit Hopkins 027, HOPKINS0047b, 0048b, 0049 to
18              0050 - - - - - - - - - - -  126
19  Exhibit Hopkins 028, HOPKINS0016b to 0039b - - - 127
20
21
22
0006
1              REBECCA ANNE HOPKINS,
2               having been duly sworn,
3          was examined and testified as follows:
4
5              EXAMINATION
6  BY MR. SWEENEY:
7     Q.  Would you state your name and your address
8  for the record, please?
9     A.  Rebecca Ann Hopkins, 10262 East Lake Road,
10  North East, Pennsylvania, 16428.
11     Q.  And how long have you lived at that
12  address?
13     A.  Eleven years.
14     Q.  Have you ever had your deposition taken
15  before?
16     A.  No.
17     Q.  Well, let me explain a few basic ground
18  rules. I'm going to ask you a series of questions,
19  and when you answer them, you have to answer verbally
20  yes or no or I don't know, whatever the appropriate
21  response is.
22         Nods, the court reporter can't take down
0007
1  or hand motions.  You have to respond verbally.  It's
2  a good idea if you let me finish the question so
3  we're not talking over each other because the court
4  reporter will have difficulty getting the question
5  and answer if that happens.
6         And as far as breaks, any time you need a
7  break, just let me know.  I'd rather not be in the
8  middle of a question.  But any time you need a break,
9  let me know, and we will take regular breaks.
10         Now, before you lived at the North East,
11  Pennsylvania address that you just gave, where did
12  you live?
13     A.  8126 Utah Street, Oakland, California.
14     Q.  And how long did you live in Oakland,
15  California?
16     A.  Six years.
17     Q.  So you moved to North East in 1994?
18     A.  Yes.
19     Q.  And you lived in Oakland before that since
20  1988?
21     A.  Yes.
22     Q.  Have you ever lived in Massachusetts?

0008
1    A.  No.
2    Q.  Do you own any property in Massachusetts?
3    A.  No.
4    Q.  Have you had any medical treatment in
5  Massachusetts?
6    A.  No.
7    Q.  Have you ever visited Massachusetts?
8    A.  Yes.
9    Q.  On how many occasions?
10    A.  Maybe five.
11    Q.  And at those times, you didn't get any
12  medical treatment in Massachusetts?
13    A.  No.
14    Q.  Did you buy any prescription drugs in
15  Massachusetts?
16    A.  No.
17    Q.  Have you ever testified in court before?
18    A.  No.
19    Q.  Have you ever been involved in any criminal
20  legal proceeding?
21    A.  I was on a jury once.
22    Q.  Okay, what kind of case?
0009
1    A.  It was involving drug pushers having a
2  fall-out.
3    Q.  Have you ever been involved in a civil
4  legal proceeding?  Have you ever been a plaintiff or
5  a defendant in a civil proceeding?
6    A.  Yes.
7    Q.  And what kind of proceeding was that?
8    A.  Well, I sued a woman who hit -- I was
9  bicycling, and she hit me with her car.  And she
10  wasn't going to -- she wasn't going to pay anything.
11    Q.  Any other little lawsuits you've been
12  involved in?
13    A.  I took the county of Alameda County to
14  court, federal court, in San Francisco.  I sued them
15  for discrimination.  It was dismissed.
16    Q.  What kind of discrimination?
17    A.  Employment discrimination.
18    Q.  Sex discrimination?
19    A.  No.
20    Q.  What kind of discrimination did you allege?
21    A.  Hiring discrimination.
22    Q.  How did you allege they had discriminated
0010
1  against you?  What was the motive for their
2  discrimination?
3    A.  I was working as a contract employer --
4  employee there, and there were other people who were
5  also hired as a contract employee.  And when the
6  opportunities came up, they were moved into permanent
7  positions at the specialist level, and I was offered

8  to go from the specialist position I was in to the
9  technician level.
10         And I declined and I felt that it was due
11  to discrimination, that they were -- that they had
12  been hired at the specialist level, but yet I was
13  being offered the position at a lesser level.
14     Q.  Okay, and this was while you lived in
15  Oakland?
16     A.  Yes.
17     Q.  Any other civil proceedings that you've
18  been a party to?
19     A.  No.
20     Q.  You haven't filed any tax returns in
21  Massachusetts in the past 15 years, have you?
22     A.  No.
0011
1     Q.  Have you filed any tax returns in any state
2  besides Pennsylvania in the last 15 years -- in the
3  last 11 years?
4     A.  Not in the last 11 years, no.
5     Q.  Now, could you tell me what your education
6  was beginning with high school?
7     A.  I have a high school degree from Athens
8  Area High School in Athens, Pennsylvania.  I have a
9  bachelor's degree from Mansfield University in
10  Mansfield, Pennsylvania.  I have a graduate degree
11  from Syracuse University in Syracuse, New York.
12     Q.  In what field?
13     A.  Communications.
14     Q.  Okay.
15     A.  Actually public relations.
16     Q.  Okay, anything beyond that?
17     A.  No.
18     Q.  Okay, are you employed?
19     A.  My husband and I have our own small
20  business, Oakland Consulting Group.  He goes to
21  various manufacturing facilities.  He's a
22  manufacturing consultant.  I do background, do health
0012
1  care, and keep track of the day-to-day operations.
2     Q.  Okay, and how long have the two of you run
3  that business?
4     A.  Off and on, since about 12 years.
5     Q.  So pretty much ever since you've been in
6  North East?
7     A.  Yes.
8     Q.  Have you had any other employment during
9  that period?
10     A.  No.
11     Q.  And what was the name of the firm?  Oakland
12  --
13     A.  Oakland Consulting.
14     Q.  Have you ever been worked for the federal
15  government?

16    A.  No.
17    Q.  Have you ever worked for a city or state
18  government?
19    A.  Yes.
20    Q.  And when was that?
21    A.  I worked for -- let's see.  City or state
22  government?
0013
1    Q.  Yes, either.
2    A.  Not a county government?
3    Q.  Tell me about the counties you worked for.
4    A.  Okay, I worked for Dauphin Residencies,
5  Dauphin County in Harrisburg, Pennsylvania.  Dauphin
6  Residencies was a resident -- I was a resident
7  advisor for mentally retarded adults, and then I
8  worked for the Bi-County Office of the Aging in
9  Williamsport, Pennsylvania.  I had a -- that was a
10  Meals on Wheels and senior citizens center, and I
11  worked for Alameda County for the Housing and
12  Community Development Program.
13    Q.  Okay, did you grow up in Pennsylvania?
14    A.  Yes.
15    Q.  Okay, are you eligible for Medicare?
16    A.  No.
17    Q.  Have you ever received any payments from
18  Medicare?
19    A.  No.
20    Q.  Are you eligible for Medicaid?
21    A.  No.
22    Q.  Have you ever received any payments from
0014
1  Medicaid?
2    A.  No.
3    Q.  Are you eligible for any Pennsylvania state
4  medical assistance program?
5    A.  I currently am on the Access program.
6    Q.  Can you spell that for me?
7    A.  A-c-c-e-s-s.
8    Q.  Okay, and what is that?
9    A.  It's through the Pennsylvania Welfare
10  Department.
11    Q.  Okay, and what kind of benefits do you
12  receive from that?
13    A.  My health insurance.
14    Q.  Okay, and who pays for that health
15  insurance?
16    A.  Pennsylvania Welfare Department.
17    Q.  Okay, and how long have you had your
18  medical insurance through the welfare department?
19    A.  Two years.
20    Q.  Okay, and what are the -- do you have any
21  documents that relate to that health insurance?
22    A.  Yes.
0015

1        MR. LEVY:  Objection to the form.
2   BY MR. SWEENEY:
3        Q.   At home?  Do you have those documents at
4   home?
5        A.   Yes.
6        Q.   What kind of documents do you have?
7        A.   Documents telling about what the program is
8   about, what it consists of, what I'm eligible for,
9   what I'm not eligible for.
10        Q.   Description of the benefits and the
11   program?
12        A.   Yes.
13        Q.   And how did you come to qualify for that
14   insurance?
15        A.   Various medical problems.  2002, I was
16   septic with my leg and some medical problems.
17        Q.   The insurance includes medical benefits,
18   major medical?
19        A.   Yes.
20        Q.   Of doctors' fees?
21        A.   Yes.
22        Q.   Hospital stays?
0016
1        A.   Yes.
2        Q.   Surgery?
3        A.   Yes.
4        Q.   Prescription drugs?
5        A.   Yes.
6        Q.   Does it include prescription drugs that you
7   get at pharmacies?
8        A.   Yes.
9        Q.   Does it include prescription drugs that are
10   administered by doctors?
11        A.   Yes.
12        Q.   Okay, and do you have to pay some portion
13   of the fees from the doctors?
14        A.   Yes.
15        Q.   Okay, what portion?
16        A.   I believe it's a standard co-pay.
17        Q.   Okay, it's a flat co-pay?
18        A.   Ah-huh.
19        MR. LEVY:  Objection.
20   BY MR. SWEENEY:
21        Q.   Do you recall the amount?
22        MR. LEVY:  You can answer.
0017
1        A.   No, not offhand.
2   BY MR. SWEENEY:
3        Q.   Is it $10?  $20?  $30?  Something like
4   that?
5        A.   I think it's 20.
6        Q.   Okay, if your lawyer objects, you still
7   have to answer the question unless he instructs you
8   not to.

9        MR. LEVY:  That's correct.
10        THE WITNESS:  Okay.
11        MR. LEVY:  Just give me a moment to get
12   my full objection out, and then you can continue.
13   BY MR. SWEENEY:
14        Q.  Do you receive any Social Security
15   benefits?
16        A.  No.
17        Q.  Do you have disability insurance?
18        A.  Well, I receive the Pennsylvania Access.
19        Q.  Okay, so that's in the nature of disability
20   insurance?
21        A.  Yes.
22        Q.  Now, other than the standard co-payment
0018
1   that you testified about, do you pay anything else
2   out of your own pocket for your medical services?
3        A.  I receive various bills for various
4   services that aren't covered by that.
5        Q.  Okay, what bills are not covered?
6        MR. LEVY:  Are you talking presently
7   right now?
8        MR. SWEENEY:  I'm talking in the last
9   three years since she had the insurance through the
10   State.
11        MR. LEVY:  I believe she said two years.
12        Did you say two or three?
13        MR. SWEENEY:  I thought she said three,
14   but why doesn't she clarify.
15   BY MR. SWEENEY:
16        Q.  Is it two years or three years, ma'am?
17        A.  It's been two, maybe two and a half.
18        Q.  Okay.
19        A.  I think it started in May.
20        Q.  May 2003?
21        A.  Yes.
22        Q.  Okay, now, did you have to fill out an
0019
1   application to apply for this insurance?
2        A.  Yes.
3        Q.  Okay, and do you still have a copy of that
4   application?
5        A.  Yes, I believe so.
6        Q.  Okay, did you have to give an interview to
7   anybody in order to get this insurance?
8        A.  Yes.
9        Q.  Who did you interview with?
10        A.  Well, it wasn't exactly an interview.  It
11   was a doctor's -- a meeting with a doctor and a
12   physical.
13        Q.  Okay, and did the doctor work for the
14   State? Did he work for the Pennsylvania Welfare
15   Department?
16        A.  I was sent his name by the welfare

17  department when I sent in the application.
18      Q.  Okay, what was the doctor's name?
19      A.  I'm sorry, I can't remember.
20      Q.  Okay, had you ever seen him before?
21      A.  No.
22      Q.  Have you ever seen him again?
0020
1       A.  No.
2       Q.  Okay, and he approved your application?
3       A.  Yes.  I may have seen him a second time,
4   twice, a follow-up I had.
5       Q.  Okay, did you have to provide him or the
6   State with any of your medical records?
7       A.  Yes.
8       Q.  Okay, what medical records did you provide?
9       A.  My 2002 medical records.
10      Q.  Now, you said there were some services that
11  are not covered by the insurance through the
12  Pennsylvania Welfare Department.  What services are
13  those?
14      A.  Can you clarify that?
15      Q.  Perhaps I misunderstood, but I thought you
16  testified there were certain bills you had to pay
17  yourself because they weren't covered by this health
18  insurance.  We're still talking about this health
19  insurance in the last two and a half years?
20      A.  Okay, some of them may be bills from prior
21  to my receiving the Pennsylvania Access.
22      Q.  Okay, but since you got this insurance
0021
1   through Pennsylvania welfare -- and perhaps we should
2   just call it Access.  Is that okay?
3       A.  Okay.
4       Q.  Since you've had the Access insurance, you
5   only pay standard co-pays of 10 or $20?
6       A.  Actually that's not true.  I received the
7   bills from Cleveland Clinic for doctors' visits and
8   for my CAT scans.
9       Q.  Okay, and do any of the bills from
10  Cleveland Clinic relate to physician-administered
11  drugs?
12      A.  I'm not sure if the dates of the -- the
13  dates, if I was just seeing the doctor or whether it
14  was when the drugs were being administered.
15      Q.  Okay, well, let's try it this way.  Since
16  you've had the Access health insurance, have you had
17  to pay any amounts out of your own pocket for drugs
18  that have been administered to you by doctors?
19      A.  I pay co-pays.
20      Q.  Okay, other than the flat co-pays.
21      A.  I have a bill at home that gives various
22  dates when I've seen the doctors.  It does not
0022
1   specify that the dates in question are dates that I

2  received the drugs.
3     Q.  And are these bills for services that you
4  received since May 2003?
5     A.  Yes.
6     Q.  Did you give some of these, some or all of
7  these, bills to counsel to be produced to us?
8        MR. LEVY:  Objection.  She can answer the
9  question, but I'll just remind her that she's not to
10 disclose any discussions or conversations with
11 counsel.
12    A.  Can you repeat the question?
13 BY MR. SWEENEY:
14    Q.  The bills that you were just referring to,
15 did you give those to your counsel to be produced to
16 us in this litigation?
17        Let's try it this way.  Did you give
18 those bills to your counsel?
19    A.  I gave them many bills.
20    Q.  Including these?
21    A.  Not the latest one.
22    Q.  Okay, and what's the date of the latest
0023
1  one? Was it this year?
2     A.  Yes, this summer.
3        MR. SWEENEY:  Okay, I'm going to make a
4  request for any documents that haven't been produced
5  relating to this Access insurance, and if the bills
6  that she's just been referred to haven't been
7  produced, I'm going to request those as well.
8        MR. LEVY:  I'll say that we believe that
9  we complied with our discovery obligations.  As you
10 know, it's not open field for written discovery, but
11 with that said, I would say, if you want to make a
12 request, I would do it formally by way of letter or
13 request to lead counsel, and they'll take it under
14 advisement.
15        MR. SWEENEY:  I will write you a letter
16 after the deposition which summarizes all the
17 requests that I make during the deposition.
18        MR. LEVY:  I would direct it to lead
19 counsel.
20        MR. SWEENEY:  That's fine.  That's Mr.
21 Berman?
22        MR. LEVY:  Mr. Berman, Mr. Haviland, one
0024
1  of the lead counsel.
2        MR. SWEENEY:  There are several things
3  that you said in your statement I don't agree with,
4  but so we don't waste the witness' time, I won't
5  respond to all of them.
6        MR. LEVY:  Fine.
7  BY MR. SWEENEY:
8     Q.  Now, ma'am, I want to take you back to
9  1991, and I want you to describe for me any medical

10   insurance you had from 1991 forward.  Can you do that
11   as best you can?
12          Let's start with 1991.  Did you have
13   medical insurance in 1991?
14      A.   Yes.
15      Q.   And who did you have that medical insurance
16   with?
17      A.   Through my husband's employment, New United
18   Motors in Fremont, California.
19      Q.   What was the name again?
20      A.   New United Motors.
21      Q.   And what kind of company was that?
22      A.   A Toyota/GM joint venture.
0025
1       Q.   Okay, is your husband an engineer?  You
2    said he worked on manufacturing processes.  What kind
3    of training did he have?
4       A.   Manufacturing.
5       Q.   Okay, and was that insurance with a health
6    insurance company?
7       A.   Yes.
8       Q.   What was the name of the health insurance
9    company?
10      A.   I imagine it was Blue Cross/Blue Shield.
11      Q.   Okay, and this was while you were in
12   Oakland?
13      A.   Yes.
14      Q.   Now, while you had that insurance, did it
15   cover physician-administered drugs?
16      A.   Yes, I imagine.  I don't know.  I didn't
17   have any.
18      Q.   You weren't administered any physician-
19   administered drugs during this period, beginning of
20   1991?
21      A.   I was in the hospital in June, and I had my
22   surgery.  But I don't know what -- I had pain
0026
1    medications, but I don't know if that's considered a
2    physician-administered drug.
3       Q.   Did you have chemotherapy at that time?
4       A.   No, I did not.
5          (Exhibit Hopkins 001 marked for
6    identification.)
7          MR. SWEENEY:  We've marked as Exhibit
8    Hopkins 001 what appears to be a medical summary for
9    Ms. Hopkins.
10   BY MR. SWEENEY:
11      Q.   Is this a medical summary relating to you?
12      A.   Appears to be.
13      Q.   And do you know who prepared this?
14      A.   This might be from my husband.
15      Q.   Okay, counsel has represented to us that it
16   was prepared by your husband.
17      A.   Yes.

18    Q.  Do you know how he did this?
19    A.  Kept track and just put it in the computer
20  as things were going on.
21    Q.  Over time?
22    A.  Yes, over a period of time.
0027
1    Q.  All right, have you ever reviewed this to
2  see if it's accurate?
3    A.  If this is the same one he did, yes, I
4  have.
5    Q.  Okay, there have been various versions of
6  this over time?
7    A.  As we've updated it.
8    Q.  Yes?
9    A.  Yes.
10    Q.  Now, take a look at No. 1 on the first
11  page.
12    A.  Okay.
13    Q.  Is that an accurate description of the
14  treatment you got in June of 1991?
15    A.  Ah-huh.
16    Q.  Was that a yes?
17    A.  Yes.
18    Q.  I'm sorry, you can't say ah-huh.
19    A.  I'm sorry, yes.
20    Q.  And that indicates you didn't have any
21  chemotherapy or any other cancer treatment other than
22  the surgery?
0028
1    A.  No.
2    Q.  Okay, now, in 1994, you moved to North
3  East, and when you moved to North East, what type of
4  medical insurance did you have?
5    A.  I was -- when we moved to North East, I was
6  not -- my insurance did not cover my cancer.  It was
7  for accidents.  I was going to be picked up again in
8  June of '95.
9    Q.  And beginning in February of 1995, you
10  started to have treatment for cancer?
11    A.  Yes.
12    Q.  Okay, and that treatment was not covered by
13  insurance?
14    A.  No.
15    Q.  Okay, and how long was that for?
16    A.  Just one month.
17    Q.  Okay, I think I've seen a document that
18  said you've had insurance beginning April 1, 1995?
19    A.  Yes.
20    Q.  Is that correct?
21    A.  Yes.
22    Q.  Okay, and who was that insurance from, the
0029
1  insurance that began April 1, 1995?
2    A.  Alliance.

3     Q.   Alliance?
4     A.   (Witness nods head up and down.)
5     Q.   Okay, and was that through your husband's
6  employment?
7     A.   It was through our Oakland Consulting
8  Group.
9     Q.   So Oakland Consulting Group has a contract
10  with Alliance for you and your husband's medical
11  insurance?
12     A.   At that time, we did.
13     Q.   And you still have a copy of that contract
14  at home?
15     A.   I may have sent that.
16     Q.   Okay, do you have a copy of the description
17  of the medical insurance that you got from Alliance
18  in that period?
19     A.   I may have.
20     Q.   And how long did you have the insurance
21  with Alliance?
22     A.   Two years, it may have been two or three
0030
1  years.
2     Q.   So until 1996 or 1997?
3     A.   May have been.
4     Q.   Okay, and did that insurance cover major
5  medical?
6     A.   Yes.
7     Q.   Hospital stays?
8     A.   Yes.
9     Q.   Did it cover physician-administered drugs?
10     A.   Yes.
11     Q.   Did you have to make any payments for
12  doctors' visits or physician-administered drugs?
13     A.   Yes.
14     Q.   What kind of payments did you make?
15     A.   Co-pays.
16     Q.   Were they flat co-pays, 10 or $20?
17     A.   I believe so.
18     Q.   Or some other flat amount?
19     A.   (Witness nods head up and down.)
20     Q.   Yes, okay.  Now, after the insurance with
21  Alliance, who did you have medical insurance through?
22     A.   Blue Cross.
0031
1     Q.   Now, can you be more specific about the
2  Blue Cross company?
3     A.   Blue Cross/Blue Shield.
4     Q.   Of Pennsylvania?
5     A.   Of Pennsylvania.
6     Q.   Okay, is that a company that has come to be
7  called Highmark?
8     A.   Yes.
9     Q.   And how did you get that insurance?
10     A.   Through our company.

11    Q.  Oakland Consulting had a contract with Blue
12  Cross/Blue Shield of Pennsylvania?
13         MR. LEVY:  Could you we state that
14  question?  I'm sorry.
15  BY MR. SWEENEY:
16    Q.  Did Oakland Consulting have a contract with
17  Blue Cross/Blue Shield of Pennsylvania for your
18  medical insurance?
19    A.  Actually I don't believe so.  That may have
20  been when my husband was working for another company.
21    Q.  Which company was that?  Let me see if I
22  can help you.  I've seen references to two different
0032
1  companies, Aerotek and Allegious Group.
2    A.  Aerotek.
3    Q.  So you think the insurance may have been
4  through Aerotek?
5    A.  Yes.
6    Q.  And how long did you and your husband have
7  that insurance?
8    A.  I'm sorry, it may have been two years.
9    Q.  How long was your husband with Aerotek?
10    A.  It may have been two years.
11    Q.  Was there a gap between the Alliance
12  Insurance and the Blue Cross/Blue Shield insurance?
13    A.  No.
14    Q.  And what kind of insurance was the Blue
15  Cross/Blue Shield insurance?  Was it major medical?
16    A.  Yes.
17    Q.  Covered doctors' visits and hospital stays?
18    A.  Yes.
19    Q.  And did it cover physician-administered
20  drugs?
21    A.  Yes.
22    Q.  Did it cover pharmacy, drugs you got at the
0033
1  pharmacy?
2    A.  Yes.
3    Q.  And what kind of payments did you have to
4  make under this insurance?
5    A.  Co-pays.
6    Q.  And flat co-pays, 10 or 20?
7    A.  I believe so.
8    Q.  Okay, and you think that this insurance
9  lasted for about two years?
10    A.  Possibly.
11    Q.  So that would get us up until 1999 or 2000?
12    A.  Okay.
13    Q.  Do you recall, or are you just agreeing
14  with me to be nice?  Don't agree with me to be nice.
15  Testify to what you recall, okay?
16    A.  I don't recall the exact dates.
17    Q.  Okay, that's fair enough.  That's going to
18  happen, and I have a few documents I can show you

19 that may help later on, okay?  But I want to get
20 through this chronology first, okay?
21    A.  Ah-huh.
22    Q.  After the Blue Cross/Blue Shield of
0034
1 Pennsylvania insurance, what insurance did you have
2 through Aerotek?
3    A.  Aerotek might have been Blue Cross/Blue
4 Shield of Ohio.  I'm not sure.
5    Q.  Okay.
6       MR. LEVY:  If you don't know the answer
7 to a question, say I don't know rather than guess.
8       THE WITNESS:  I don't know.  You're
9 right.  I don't know.
10 BY MR. SWEENEY:
11    Q.  What made you say you thought it might have
12 been Blue Cross/Blue Shield of Ohio?
13    A.  I shouldn't have said that.  My husband was
14 working in Ohio at the time.
15    Q.  For Aerotek?
16    A.  Yes.
17    Q.  Okay, now, after he stopped working for
18 Aerotek, where did you get your medical insurance?
19    A.  I don't know.  It could have been Cobra.
20 Is that --
21       MR. LEVY:  Whatever you recall.
22 BY MR. SWEENEY:
0035
1    Q.  Was the Cobra with Blue Cross/Blue Shield
2 of Pennsylvania?
3    A.  Yes, I believe, if it was Cobra.
4    Q.  And how long did that last?
5    A.  Until we picked up insurance.
6    Q.  Until Access?
7    A.  No; until he went to work at another
8 organization.
9    Q.  What is the name of that organization?
10    A.  Nuvo/Cybsonics.
11    Q.  You're going to have to spell that one for
12 us, I think.
13    A.  I think it's N-u-v-o, slash, C-y-b-s-o-n-i-
14 c-s.
15    Q.  Can we just call that Nuvo?
16    A.  Yes.
17    Q.  And when did he start working for Nuvo?
18    A.  I can't tell you exact dates.
19    Q.  Let me ask you this.  The insurance that
20 you had through Nuvo, did that go up until you got
21 the Access insurance?
22    A.  No.
0036
1    Q.  Was there a name of a company that you had
2 the Nuvo insurance through?  Was there an insurance
3 company that you recall?

4      A.  I believe it was Blue Cross/Blue Shield.
5      Q.  Okay, and did that cover major medical,
6  doctors' visits?
7      A.  Yes.
8      Q.  Did it cover hospital stays?
9      A.  Yes.
10     Q.  And physician-administered drugs?
11     A.  Yes.
12     Q.  And drugs you get at the pharmacy?
13     A.  Yes.
14     Q.  And what kind of payments did you have to
15  make under that insurance?
16     A.  Co-pays.
17     Q.  What type of co-pays?  Flat co-pays?
18     A.  Flat co-pays, yes.
19     Q.  All right, now, after the insurance you got
20  through Nuvo, what insurance did you have?
21     A.  Cobra.
22     Q.  Okay, again, with Blue Cross/Blue Shield of
0037
1  Pennsylvania?
2      A.  I would assume.
3      Q.  Do you assume, or do you recall whether it
4  was?
5      A.  I don't recall.
6      Q.  You don't, okay.
7          MR. LEVY:  Do you need a break?
8          THE WITNESS:  No.
9          (Exhibit Hopkins 002 and Exhibit Hopkins
10  003 marked for identification.)
11         MR. SWEENEY:  We marked as Exhibit
12  Hopkins 002 a document that was produced by Ms.
13  Hopkins. It's Hopkins 0255.  It appears to be an
14  Aerotek 2000 Contract Employee Benefit Enrollment
15  Confirmation Statement.
16  BY MR. SWEENEY:
17     Q.  Do you recognize this document, ma'am?
18     A.  Yes.
19     Q.  And does this reflect that, during 1999,
20  you and your husband had medical insurance from Blue
21  Cross/Blue Shield?
22         MR. LEVY:  Objection to the form.
0038
1      A.  What exactly are you asking?
2  BY MR. SWEENEY:
3      Q.  Does this refresh your recollection that
4  you had medical insurance from Blue Cross/Blue Shield
5  through Aerotek for the time period reflected in
6  here?
7      A.  Okay, yes.
8          MR. LEVY:  You can't agree with him if
9  you -- it's okay to answer the question yes or no,
10  but the okay is what gave me pause.  Go ahead and
11  answer the question.

12    A.  Yes.
13  BY MR. SWEENEY:
14    Q.  And this indicates that the coverage became
15  effective -- look in the upper right -- on April 1,
16  2000?
17    A.  Ah-huh.
18    Q.  Is that correct?
19    A.  Ah-huh.
20    Q.  You need to say yes or no, please.
21    A.  Yes.
22    Q.  Sorry.  And the medical coverage you got is
0039
1  described here as BCBS comprehensive; is that right?
2    A.  Yes.
3    Q.  And were there deductions from your
4  husband's paycheck for this insurance?
5    A.  Yes.
6    Q.  Okay, and was there a portion of the
7  insurance that was also paid by Aerotek?  The fee for
8  the insurance, was that also paid by Aerotek?
9    A.  Yes, I believe so.
10    Q.  Now, turn to Exhibit Hopkins 003 which is
11  also a document produced by the witness.  These are
12  Bates Nos. 223 through 241, and this is an Aerotek
13  1999 Contract Employee Benefit Guide.
14        Do you recognize this document, ma'am?
15    A.  Yes.
16    Q.  Okay, and what is it?
17    A.  It is the choice of insurance.
18    Q.  Okay, turn to Page 228.  Under Option No. 1
19  where it says Blue Cross/Blue Shield comprehensive,
20  is that the coverage that you and your husband had?
21    A.  Yes.
22    Q.  Okay, and Option 2, catastrophic, that's
0040
1  crossed out; is that right?
2    A.  Ah-huh.
3    Q.  Who crossed that out?
4    A.  It would have been me.
5    Q.  Okay, and there's a box around
6  comprehensive and handwriting.  Is that your
7  handwriting?
8    A.  Probably.
9    Q.  And is this an accurate description of the
10  coverage that you had from Blue Cross/Blue Shield in
11  this time period?
12    A.  I would say it must have been.
13    Q.  Now, look at the notation at the bottom
14  which says: You will not receive a physician listing
15  with either plan.  You have the freedom to choose any
16  physician or provider when utilizing these benefits.
17  If you choose a physician that participates with Blue
18  Cross/Blue Shield, that physician has agreed to file
19  your claims directly to Blue Cross/Blue Shield, and

20  you will not be balance-billed for any charges over
21  reasonable and customary.
22          During the time you had this insurance,
0041
1  were any of the physicians you got services from not
2  participating providers with Blue Cross/Blue Shield?
3      A.  No.
4      Q.  Can you tell me what the coverage was for
5  physician-administered drugs under this plan?
6      A.  What the -- can you repeat that, please?
7      Q.  What was the coverage for physician-
8  administered drugs under this plan?
9      A.  No, I can't.
10     Q.  Now, I notice that there's an out-of-pocket
11  maximum sort of the third entry down under
12  comprehensive.  Did you ever reach your out-of-pocket
13  maximum on this insurance?
14     A.  I'm not sure.
15     Q.  Okay.
16         (Exhibit Hopkins 004 marked for
17  identification.)
18         MR. SWEENEY:  We've marked as Exhibit
19  Hopkins 004 another document produced by the witness.
20  This one is Bates numbered 0222, and this is a 2000
21  to 2001 Contract Employee Benefit Confirmation
22  Statement.
0042
1  BY MR. SWEENEY:
2      Q.  Do you recognize this document?
3      A.  It appears to be our insurance coverage.
4      Q.  Okay, now, would you take a look at Exhibit
5  Hopkins 002?  And you'll notice on Exhibit Hopkins 002
6  the coverage started on April 1, 2000, and on this
7  document, Exhibit Hopkins 004, coverage starts on May
8  1, 2000.
9          So is it correct that the coverage that's
10  reflected in Exhibit Hopkins 002 was only in effect
11  for one month?
12     A.  It would appear to be, yes.
13     Q.  Okay, and on Exhibit Hopkins 004, your
14  medical plan is that Blue Cross/Blue Shield Preferred
15  Provider Organization; is that correct?
16     A.  Pardon?
17     Q.  If you look down in the middle next to
18  medical, see where it says benefit type, and then
19  under that, it says medical.  And next to that under
20  coverage plan selected, it says Blue Cross/Blue
21  Shield Preferred Provider Organization; is that
22  correct?
0043
1      A.  Yes.
2          MR. LEVY:  Off the record for a moment.
3          MR. SWEENEY:  Sure.
4          (There was a discussion off the record.)

5          (Exhibit Hopkins 005 marked for
6  identification.)
7          MR. SWEENEY:  We've marked as Exhibit
8  Hopkins 005 another document produced by the witness.
9  This one is Bates numbered 242 through 252, and this
10  appears to be a 2000 Contract Employee benefit for
11  Aerotek.
12  BY MR. SWEENEY:
13    Q.  Do you recognize this document, ma'am?
14    A.  Yes, I believe so.
15    Q.  And what is this?
16    A.  It's the Aerotek open enrollment for the
17  insurance.
18    Q.  And look at Page 245.  Do you see it says
19  on the left medical benefit options, Blue Cross/Blue
20  Shield Preferred Provider Organization?
21    A.  Ah-huh.
22    Q.  Is that the coverage that you had in this
0044
1  time period?
2    A.  Possibly.
3    Q.  Is that what you recall, that it was a PPO?
4    A.  It's my writing at the top.
5    Q.  List of doctors, comma, hospitals, that's
6  your writing?
7    A.  Yes.
8    Q.  And the underlining of various things under
9  that, do you think that's your underlining?
10    A.  Yes.
11    Q.  Okay, so from that, do you conclude that
12  the PPO plan was the plan you had?
13    A.  Yes.
14    Q.  And that indicates that the deductible --
15  that the co-insurance for at least in-network claims
16  is 100 percent paid by Blue Cross/Blue Shield; is
17  that right?
18          MR. LEVY:  I'm sorry, could you say the
19  line again, please?
20          MR. SWEENEY:  Yes, it's the line under
21  co-insurance, and it indicates 100 percent paid by
22  Blue Cross/Blue Shield for in-network.
0045
1    A.  Ah-huh.
2  BY MR. SWEENEY:
3    Q.  That's correct?
4    A.  That's what it says.
5    Q.  Okay, is that what you recall?
6    A.  Yes.
7    Q.  During the period you had this insurance,
8  did you go to any out-of-network medical providers?
9    A.  I don't believe so.
10    Q.  And can you tell me what the coverage was
11  for physician-administered drugs under this plan?
12    A.  No, I can't.

13    Q.  Well, look in the lower right hand of the
14  second column where it says prescription drugs, the
15  advance paradigm.  Is this the coverage for drugs
16  that you got from the pharmacy?  It's on the right-
17  hand side, ma'am, in the lower right.
18    A.  Okay.
19        MR. LEVY:  You are on Page 0245?
20        MR. SWEENEY:  I am.
21        MR. LEVY:  Could you restate the
22  question, please?
0046
1         MR. SWEENEY:  Yes.
2  BY MR. SWEENEY:
3     Q.  Do you see the coverage there for
4  prescription drugs through advance paradigm?  And
5  there's a $15 co-pay for formulary drug, for
6  instance. Is this the coverage for drugs you get at a
7  pharmacy?
8     A.  I believe so.
9     Q.  Okay, is it your recollection that, when
10  you had drugs administered by a doctor, for instance,
11  in his or her office, that you -- that that was 100
12  percent covered by Blue Cross/Blue Shield?
13    A.  I believe so.
14        MR. SWEENEY:  Okay, we've been going for
15  a while.  Why don't we take a short break.
16        (There was a recess in the proceedings.)
17        (Exhibit Hopkins 006 marked for
18  identification.)
19        MR. SWEENEY:  We've marked as Exhibit
20  Hopkins 006 another document produced by the witness.
21  This one is Hopkins 0256 through 0262.  And this is
22  the Alliance Health Network, how to use your
0047
1  prescription drug program.
2  BY MR. SWEENEY:
3     Q.  Does this describe the prescription drug
4  coverage that you had from Alliance when that was
5  your insurance?
6     A.  I don't remember.
7     Q.  Okay, would you look at Page 258, please?
8  And this is Roman Numeral 8.  It says there that is a
9  rider to your group health contract.  Do you recall
10  you had a group health contract with Alliance?
11    A.  Yes.
12    Q.  Okay, do you still have a copy of that
13  contract?
14    A.  Actually, no, I don't recall that we had a
15  group.
16    Q.  Do you recall that there was some kind of
17  document to describe the coverage that you had from
18  Alliance?
19    A.  Yes, we did have a document that described
20  the coverage that we had from Alliance.

21    Q.  But you don't recall if it was called a
22  group health contract?
0048
1    A.  No, I don't.
2    Q.  Okay, do you still have that document?
3    A.  No.
4    Q.  Still looking at Page 258, this indicates
5  you were going to an $8 co-payment for prescription
6  drugs; is that right?
7    A.  That's what it says.
8    Q.  Is that consistent with your recollection?
9    A.  I don't remember paying an $8 co-payment
10  for prescription drugs.
11    Q.  Do you recall what you paid?
12    A.  Not specifically.
13        (Exhibit Hopkins 007 marked for
14  identification.)
15  BY MR. SWEENEY:
16    Q.  We've marked as Exhibit Hopkins 007 a
17  series of billing statements from the Cleveland
18  Clinic Foundation addressed to Rebecca
19    A.  Young-Hopkins.  The page numbers on these
20  documents are 113 through 117, 118, 119, through 120
21  through 121.
22        Are these billing statements that you got
0049
1  from the Cleveland Clinic now?
2    A.  Well, they have my writing on them.
3    Q.  Okay, if you look at the first one which is
4  dated December 1999, it shows that your insurance
5  provider is Alliance Health Network, if you look on
6  the left-hand side?
7    A.  Yes.
8    Q.  Okay, and this states that you owe the
9  Cleveland Clinic $10; is that correct?
10    A.  Yes.
11    Q.  Is that a co-payment?
12    A.  Yes.
13    Q.  Okay, and how did you pay that $10?
14    A.  It says here Check 5703.
15    Q.  That's your handwriting?
16    A.  Yes.
17    Q.  If we go over to Page 115, which is dated
18  May 17th, 2000, that also indicates that Alliance
19  Health Network was your insurer?
20    A.  Yes.
21    Q.  And that you owed $10?
22    A.  Yes.
0050
1    Q.  And how did you pay that $10?
2    A.  Well, it says paid Check 5876.
3    Q.  Do you still have your canceled checks from
4  this period?
5    A.  I have a lot of canceled checks.  I don't

6  know if I have these particular ones, but I imagine I
7  do.
8     Q.  Do you make it a practice to throw out
9  canceled checks?
10    A.  No.  I have a box of checks.
11    Q.  And take a look at Page 117.  This is a
12  March 17, 2001 billing statement.  Now, this
13  indicates you had two insurance providers; is that
14  correct?
15    A.  Must be one was just being picked up.
16    Q.  You think you went from one to the other
17  during this period of time?
18    A.  Yes.
19    Q.  And this also indicates you owe a $10 co-
20  pay, and you paid for that with Check 6216?
21    A.  Yes.
22    Q.  Okay, and then the next one is on Page 119,
0051
1  and that also indicates that you have two insurance
2  providers, Blue Cross/Blue Shield of Pennsylvania
3  Highmark and Alliance; is that correct?
4    A.  I don't remember having two insurance
5  providers at any one time.
6    Q.  Blue Cross/Blue Shield of Pennsylvania
7  picked up from Alliance; is that correct?  It came
8  after Alliance?
9    A.  Yes.
10    Q.  And this reflects you owed the Clinic $20,
11  and did you pay that with Check No. 1160?
12    A.  That's what it says.
13    Q.  All this handwriting is your handwriting,
14  right?
15    A.  Yes.
16    Q.  Now, you testified that there was a period
17  of time in 1995 that you didn't have health insurance
18  and that the health insurance picked up on April 1 of
19  1995. Has there been any time since April 1 of 1995
20  that you haven't had health insurance of some type?
21    A.  I don't believe so.  Excuse me, there was a
22  period of time.
0052
1    Q.  When was that?
2    A.  2000 -- I think it was 2003.
3    Q.  For how long?
4    A.  Only a month.
5    Q.  And were you --
6    A.  We were not aware that the coverage was --
7    Q.  Please finish your answer.  What was it
8  that you were not aware of?
9    A.  The coverage dropped before we picked up
10  another coverage.
11    Q.  Okay, what was the coverage that lapsed?
12    A.  It was Blue Cross of Northeast,
13  Pennsylvania.

14      Q.   And what coverage did you then get one
15  month later?
16      A.   Northeast, Pennsylvania --
17      Q.   Access?
18      A.   No; Blue Cross/Blue Shield of Northwest
19  Pennsylvania.
20      Q.   Okay, perhaps I heard you wrong, but you
21  said first you had Blue Cross/Blue Shield of
22  Northeast, Pennsylvania, and that that lapsed, and
0053
1   then you got Blue Cross/Blue Shield of Northwest
2   Pennsylvania?
3       A.   In 2002, we moved to Wilkes-Barre, to
4   Exeter, Pennsylvania.  We were there for five months.
5       Q.   Okay, do you have any documents relating to
6   the insurance that you had with Blue Cross of
7   Northeast, Pennsylvania?
8       A.   Yes.
9       Q.   Do you have descriptions of the benefits?
10      A.   Yes.
11      Q.   And then at the end of the five months, you
12  moved back to North East?
13      A.   Yes.
14      Q.   And at that time, you went back to Blue
15  Cross/Blue Shield of Northwest Pennsylvania,
16  Highmark?
17      A.   Yes.
18      Q.   And did you get this insurance through
19  Oakland Consulting?
20      A.   Yes.
21      Q.   Both of them?
22      A.   No.  The Northeast, Pennsylvania, was
0054
1   through Pride Mobility Corporation.
2       Q.   Pride --
3       A.   Mobility.
4       Q.   -- Mobility, okay.  And was your husband
5   working for them?
6       A.   Yes.
7       Q.   And what kind of company is Pride Mobility?
8       A.   Manufacturers of wheelchairs and the
9   motorized carts for people.
10      Q.   Okay, and he worked for them for
11  approximately five months?
12      A.   Yes, six months.
13      Q.   Okay, now, during the period when you had
14  no insurance -- and I think you said that was about
15  one month?
16      A.   Yes.
17      Q.   -- were you treated with any physician-
18  administered drugs?
19      A.   Yes.
20      Q.   Where did you get those drugs?
21      A.   Here.

22    Q.  Which facility?
0055
1     A.  Lakeshore Family Practice.
2     Q.  Say that again, please.
3     A.  Lakeshore Family Practice.
4     Q.  Okay, can you go back and take a look at
5  Exhibit Hopkins 001 which is your medical summary?
6  And tell me -- and I think you're going to want to
7  turn to the bottom of Page 2 or the top of Page 3.
8  Tell me which treatment you're referring to.
9         MR. LEVY:  Objection to the form.
10    A.  Would you repeat the question, please?
11 BY MR. SWEENEY:
12    Q.  Yes.  The treatment that you just referred
13 to at Lakeshore Medical Care, can you tell me
14 where that is discussed on Exhibit Hopkins 001?
15    A.  It would have been my daily Tamoxifen --
16 No. 14, No. 14.
17    Q.  Tamoxifen and Lupron, L-u-p-r-o-n.  Okay,
18 well, this indicates that the Tamoxifen was oral.  It
19 was pills, correct?
20    A.  Yes.
21    Q.  And the Lupron was injections?
22    A.  Was a monthly shot.
0056
1     Q.  Okay, did you have any involvement in the
2  Lupron litigation in Boston?
3     A.  Yes.
4     Q.  What was your involvement?
5     A.  We sent my information that I --
6         MR. LEVY:  I'm going to instruct the
7  witness not to answer any question that requires a
8  discussion or a communication with counsel.
9         MR. SWEENEY:  Okay, I'm not asking for
10 any communication with counsel.  I'm just asking what
11 she did.
12        MR. LEVY:  I don't understand your
13 question.
14 BY MR. SWEENEY:
15    Q.  Did you submit a claim in the Lupron MDL to
16 the Court?
17    A.  We filled out --
18        MR. LEVY:  You can answer -- you can
19 answer the question, but don't provide information
20 about what you provided your attorneys.
21    A.  Can you repeat the question?
22 BY MR. SWEENEY:
0057
1     Q.  Yes.  Did you submit a claim in the Lupron
2  litigation in Boston?
3     A.  I believe so.
4     Q.  Okay, and did you receive a payment?
5     A.  No.
6     Q.  And did any attorneys assist you with

7  making that claim?
8      A.  We filled out a --
9          MR. LEVY:  That's not his question. His
10  question is whether any attorney assisted you with
11  any claim you may have made in the Lupron case.
12      A.  Yes.
13  BY MR. SWEENEY:
14      Q.  Which attorneys?
15      A.  (Indicating Mr. Levy.)
16      Q.  Mr. Levy?
17      A.  Mr. Levy.
18          MR. LEVY:  And to your recollection, do
19  you remember the name of the law firm?
20          THE WITNESS:  Kline & Specter.
21  BY MR. SWEENEY:
22      Q.  And who did you deal with at Kline &
0058
1  Specter?
2      A.  Mr. Levy or Mr. Molinari.
3      Q.  Mr. Levy was then at Kline & Specter?
4      A.  I'm sorry, I guess I'm trying to --
5  confused at this point.
6      Q.  Well, Mr. Levy's card doesn't say he's at
7  Kline & Specter now.  Was he at Kline & Specter when
8  you were dealing with him on the Lupron litigation?
9      A.  I don't recollect.
10      Q.  Okay, fair enough.  Who else besides Mr.
11  Levy did you deal with?
12      A.  The only two gentlemen I can think of are
13  Mr. Levy and Mr. Molinari.
14      Q.  Okay, were you a plaintiff in any other
15  Lupron litigation outside of the one in Boston?
16      A.  No, I don't believe so.
17      Q.  Did you ever have health insurance from a
18  company called Keystone?
19      A.  It may have been a Blue Cross/Blue Shield
20  division.
21      Q.  Okay, do you recall when that was?
22      A.  No.
0059
1      Q.  Now, the litigation you're testifying in
2  today, how did you find out about that litigation?
3      A.  Through my attorney.
4          MR. LEVY:  Again, I'm going to instruct
5  the witness not to discuss any communications, the
6  substance of any communications that you had with
7  your attorneys in any regard in any case.
8  BY MR. SWEENEY:
9      Q.  Which attorneys?  I'm looking for names.
10      A.  Kline & Specter.
11      Q.  Okay, who at Kline & Specter?
12      A.  The people I've had most dealings with are
13  Mr. Levy and Mr. Molinari.
14      Q.  Okay, but who was the first person who told

15  you about this litigation?
16      MR. LEVY:  Objection.  Go ahead, you can
17  answer.
18      A.  I can't recollect.
19  BY MR. SWEENEY:
20      Q.  Okay, but it was a lawyer who first told
21  you about this litigation?
22      MR. LEVY:  Objection.  Do not answer that
0060
 1  question.  It goes to the substance of the
 2  communications.
 3      MR. SWEENEY:  I'm entitled to know how
 4  she found out about the lawsuit, and I need to
 5  establish that.  I'm not asking for the substance of
 6  any communications.
 7      MR. LEVY:  Your question in and of itself
 8  is asking for the substance of the communications.
 9  You're asking what she was seeking.  You need to
10  restate your question.
11  BY MR. SWEENEY:
12      Q.  Did you read about this litigation in the
13  newspaper?
14      A.  No.
15      Q.  Did you read about it on the web?
16      A.  I believe so.
17      Q.  Before -- that's the first time you found
18  out about this lawsuit, you read about it on the web?
19      A.  I'm not sure if that was the first time.
20  I've been in communication with the attorneys for --
21      Q.  For how long?
22      A.  Two years.
0061
 1      Q.  Okay, and the first contact that was made,
 2  did you contact them?
 3      A.  Yes.
 4      Q.  How did you contact them?
 5      A.  Through a website.
 6      Q.  Kline & Specter website?
 7      A.  I believe so.
 8      Q.  Okay, and how did you find out about that
 9  website?
10      A.  My husband.
11      Q.  Okay, do you know how he found out about
12  it?
13      A.  He's very knowledgeable about the internet
14  and the web, and he --
15      Q.  Did he do a search on Lupron?
16      A.  He searched the website for medical
17  information.
18      Q.  Who contacted you about becoming a class
19  representative in this case?
20      A.  Either Mr. Levy or Mr. Molinari.
21      Q.  Okay.
22      (Exhibit Hopkins 008 marked for

0062
1  identification.)
2  BY MR. SWEENEY:
3      Q.  We've marked as Exhibit Hopkins 008 the
4  Third Amended Master Consolidated Class Action
5  Complaint amended to comply with Court's Class
6  Certification Order in the case, In Re,
7  Pharmaceutical Industry Average Wholesale Price
8  Litigation, MDL, No. 1456.
9          Have you seen this before, ma'am?
10     A.  I've seen something similar.
11     Q.  Well, this has several pages on one page.
12 Have you seen a document that looks like this that
13 also looks like a telephone book?
14     A.  More like a telephone book, yes.
15     Q.  Okay, have you read this document?
16     A.  Not in its entirety.
17     Q.  Okay, what portions have you read?
18     A.  Basically about myself, the page that --
19 you know, a little bit.
20     Q.  Paragraph 52?
21     A.  Is that on Page 22?
22     Q.  It is.  So you reviewed Paragraph 52 for
0063
1  accuracy?
2      A.  Yes.
3      Q.  And is it accurate?
4      A.  Yes.
5      Q.  Now, in Paragraph 52, it says that:  During
6  the applicable time period, Mrs. Hopkins was
7  prescribed and was charged for the following
8  physician-administered drugs based in whole or in
9  part on AWP.
10          What is your basis for your alleging that
11 you paid for here based in whole or in part on AWP?
12     A.  Can you repeat that?
13     Q.  Yes.  What is your basis, your factual
14 basis, for stating in this paragraph that you paid
15 for the various drugs listed here in whole or in part
16 on AWP, based on AWP?
17     A.  I've received those various drugs, and
18 through my insurance or through co-pays or through
19 various billings, I've paid for things, paid for
20 those drugs.
21     Q.  So you've made payments that included
22 paying for those drugs?
0064
1      A.  I can't specifically say that what I --
2  what my payments have been made were just for those
3  drugs or not for those drugs.
4      Q.  It may have been for other things, for
5  medical procedures?
6      A.  Possibly.
7      Q.  Okay, do you know whether any of those

8  payments that you made were based in any way on AWP?
9      A.   And how would I know if it was based on
10  AWP?
11      Q.   That's what I'm asking you.  Do you know
12  whether it was or not?
13          MR. LEVY:  You need to answer his
14  question to the best of your ability.
15      A.   Can you repeat the question?
16  BY MR. SWEENEY:
17      Q.   Yes.  What is your basis for saying that
18  you paid for the drugs listed here in whole or in
19  part based on AWP?  Do you have any factual basis for
20  saying that?
21      A.   I have never -- I've paid bills that I have
22  received, but whether they were specifically for the
0065
1  AWP listing, that, I don't know.
2      Q.   Have you ever gotten a medical bill that
3  made any reference to AWP?
4      A.   No, not that I'm aware of.
5      Q.   Do you know what AWP is?
6      A.   Average wholesale price.
7      Q.   And what kind of price is that?
8      A.   It's an inflated price that was just chosen
9  by the manufacturer to -- it's not the manufacturer's
10  cost or the cost of the drug, and it's not the price
11  that they are selling it to the medical
12  establishments.
13          It's my understanding that it's the price
14  that they have told medical establishments they can
15  charge and charge the consumers and insurance
16  companies.
17      Q.   Before you became involved in this
18  litigation, have you ever heard of AWP before?
19      A.   I don't believe so.
20      Q.   And the statement you just made -- you made
21  a variety of statements.  The information, that
22  information, where did you get that information from?
0066
1          MR. LEVY:  Objection.  Do not reveal any
2  substance of any communications between attorney --
3  the question has substance within the question.
4  BY MR. SWEENEY:
5      Q.   Excluding discussions with your lawyers,
6  where did you get that information from?
7      A.   I don't know if I've ever heard that
8  excluding communications with my lawyers.
9      Q.   Okay, do you know how AWP is calculated?
10      A.   It's my understanding it's just a
11  fictitious number or a number that is chosen.
12      Q.   By whom?
13      A.   By the manufacturers, that they can -- that
14  the medical establishment can sell to -- can use to
15  charge the consumers and the insurance companies.

16    Q.  Okay, has any medical provider ever told
17  you that they were charging you for physician-
18  administered drugs based on AWP?
19    A.  I know they've charged a lot.  I get
20  charged a lot for the drugs.  If I look at the
21  billing like when I get the bills from the hospitals
22  and it says thousands of dollars for this and
0067
1  thousands of dollars for that --
2    Q.  Has any of your medical providers ever
3  discussed AWP with you?
4    A.  No.
5    Q.  And do you know whether the bills that you
6  have received for physician-administered drugs are
7  based on AWP?
8    A.  From documents I have seen, it appears so.
9    Q.  You have documents that indicate that the
10  bills you've received for physician-administered
11  drugs are based on AWP?
12    A.  I, myself, do not have documents of that
13  nature.
14    Q.  You've never seen any such documents?
15    A.  Within the lawsuit that I received, it does
16  reflect that.
17    Q.  Are you talking about the Complaint?
18    A.  Yes.
19    Q.  Exhibit Hopkins 008, okay.  Are you talking
20  about anything else besides the Complaint?  Are you
21  talking about anything else besides the Complaint?
22    A.  No.
0068
1    Q.  Okay, so besides the Complaint, you know of
2  no documents that discuss you being charged for
3  physician-administered drugs based on AWP; is that
4  correct?
5        MR. LEVY:  I'll instruct you not to
6  answer any question that involves discussions or
7  communications between you and your attorneys to
8  answer that question.
9  BY MR. SWEENEY:
10    Q.  Do you need it back?
11    A.  Pardon?
12    Q.  Do you need the question back?
13    A.  Yes.  What was the question?
14        MR. SWEENEY:  Read it to her, please.
15        (The record was read back by the
16  Reporter.)
17    A.  I have seen documents reflecting it in the
18  Complaint.
19  BY MR. SWEENEY:
20    Q.  But nothing else?
21    A.  No.
22    Q.  Literally, there are no other documents
0069

1  besides the Complaint that reflect that; is that
2  correct?
3      A.  I don't believe so.  I don't believe so.
4      Q.  Okay, do you know what the AWP was at any
5  point in time for any of the drugs that are listed in
6  Paragraph 52?
7      A.  No.
8      Q.  Do you know what wholesale acquisition cost
9  is, sometimes called WAC?
10     A.  No.
11     Q.  Do you know how WAC is calculated?
12     A.  No.
13     Q.  Do you know who calculates WAC?
14     A.  No.
15     Q.  Do you know how WAC is used?
16     A.  No.
17     Q.  Do you know who uses WAC?
18     A.  No.
19     Q.  Now, I thought you said earlier that you
20  had read on the web about AWP; is that correct?
21     A.  I guess what I was saying was I had read
22  about the lawsuit.
0070
1      Q.  Okay, and where did you read that?
2      A.  On the web.  My husband called me over and
3  said:  Do you want --
4      Q.  Do you remember what website that was?
5      A.  No, I don't, sir.
6      Q.  Was it the Kline & Specter website?
7      A.  Yes, I think it was.
8      Q.  Any other websites where you read about
9  AWP?
10     A.  You know, we may have -- we do a lot of
11  checking on the websites for medical, for drugs and
12  studies for my particular type of cancer, so I may
13  have come across it someplace there.
14     Q.  Research relating to the drugs that you're
15  being administered?
16     A.  Research relating to the drugs that I may -
17  -
18     Q.  Relating to the drugs that might be helpful
19  to you given your conditions?
20     A.  Yes, yes.
21     Q.  And there's a wealth of information on the
22  web about that?
0071
1      A.  Yes.
2      Q.  If you plug in the name of a drug, you'll
3  get a huge number of hits?
4      A.  Yes.
5      Q.  Now, I want to talk about some of the drugs
6  that are listed in Paragraph 52.  You produced a
7  large number of documents relating to your medical
8  treatment, and as to some of the drugs that are

9   listed here, I see references in the medical records,
10  but as to some of them, I don't.
11          So I want to clarify as to some of these
12  drugs when you were treated with them. The first one
13  is Azithromycin.  Do you recall when you were
14  treating with that drug?
15      A.  It would have been 2002.
16      Q.  Okay, and what medical facility were you
17  treated with that drug?
18      A.  2002, I was treated at Regional Cancer
19  Center, Hamot Health Center, HealthSouth, Guthrie
20  Clinic, Robert Packer Hospital.
21      Q.  Do you recall which of those?
22      A.  No.
0072
1       Q.  Okay, I've seen references in your records
2   that you're allergic to that drug.  Is that true?
3       A.  I guess that's one I'm allergic to.  In
4   which case, it would have been Hamot.
5       Q.  In which case what?
6       A.  It would have been Hamot.
7       Q.  H-a-m-o-t?
8       A.  Hamot Health?
9       Q.  Right.  And what is Hamot Health?
10      A.  It's the hospital I went to when I became
11  septic.  They sent me to Hamot Health.
12      Q.  Now, another drug that I've seen no
13  reference to in your medical records is Minocycline.
14  Can you tell me where you were treated with that
15  drug?
16      A.  I think that's the one they gave me at
17  Guthrie Clinic.  No.  That could be -- can you repeat
18  the name again?
19      Q.  It's Minocycline.
20      A.  That may be what I was given from the
21  infectious disease doctor in Erie, Pennsylvania, for
22  six months.
0073
1       Q.  That's Infectious Diseases Consultants of
2   Erie?
3       A.  Yes.
4       Q.  And what kind of treatment did you get at
5   that facility?
6       A.  I believe it was pills.
7       Q.  Okay, was that outpatient?
8       A.  Outpatient.
9       Q.  Okay, and how long were you treated there?
10      A.  Six months.
11      Q.  Okay, and who were your doctors there?
12      A.  I think his name was Doctor Newell.
13      Q.  Can you spell it?
14      A.  I believe it was W -- I'm sorry, N-e-w-e-l-
15  l.
16      Q.  Okay, and what were you being treated for?

17      A.  I had gone septic in January, and I was in
18  the hospital for -- that's a blood infection in my
19  body.  I was in the hospital for three weeks in
20  intensive care and a week in the step-down unit and
21  two weeks at HealthSouth.
22              I came out, and within about two weeks, I
0074
1  started experiencing pain in my left ankle.  And they
2  thought that the infection had moved, had spread to
3  my ankle.
4      Q.  Okay, so the Minocycline was to treat that
5  infection?
6      A.  Yes.
7      Q.  And you took that in pill form?
8      A.  Yes.
9      Q.  Okay, and did you get that at a pharmacy?
10      A.  Yes.
11      Q.  And what kind of payments did you make for
12  it, for that drug out of pocket?
13      A.  Co-pay.
14      Q.  Flat co-pay?
15      A.  There were periods of time where I was
16  receiving -- I was having different payments for
17  different drugs, I believe.  Things were not being
18  met.  I'm not sure if that was flat co-pays at that
19  time or not.
20      Q.  There were some pharmacy drugs that you
21  have made flat co-pays for; is that correct?
22      A.  Yes.
0075
1      Q.  Okay, was any of the Minocycline covered by
2  insurance?
3      A.  Some was.  I believe I also had Minocycline
4  in November and December at Guthrie Clinic -- Robert
5  Packer Hospital.
6      Q.  What year?
7      A.  2002.
8      Q.  Okay, going back to Azithromycin for the
9  moment, how was that administered to you?  Do you
10  recall?
11      A.  Azithromycin, is that the one that starts
12  with a Z?
13      Q.  A-z-i-t-h-r-o-m-y-c-i-n.  It's the first on
14  the list on Page 52.
15      A.  That would have been intravenous.
16      Q.  Okay, do you know how much your provider
17  charged you for Azithromycin?
18      A.  No, I do not.
19      Q.  Do you know how much you paid for
20  Azithromycin?
21      A.  No, I do not.
22      Q.  Okay, do you have any documents that
0076
1  reflect any payments you made for Azithromycin?

2      A.  I have itemized documents from the
3   hospitals, but I've never gone down through them to
4   see --
5      Q.  Okay.
6      A.  -- what they charged the hospital or what
7   the hospital charged me.
8      Q.  Did you do a search through your records
9   for documents to be produced to us for this
10  litigation?
11     A.  No.
12     Q.  Did you provide any documents to your
13  lawyers to be provided to us in this litigation?
14     A.  I provided documents to my lawyers, yes.
15     Q.  Okay, and what documents did you provide to
16  your lawyers?
17     A.  Bills, canceled checks, itemized billings
18  from the hospitals, prescription scripts.
19     Q.  How did you decide what to give to your
20  lawyers and what not to give to your lawyers?
21         MR. LEVY:  I instruct the witness not to
22  answer any question that the answer would require you
0077
1   to disclose communications that you've had with your
2   attorneys.
3         You can discuss what it is that you
4   collected or looked at.  You can discuss the fact of
5   what you have, but you cannot reveal any information
6   about instructions or communications from your
7   attorneys about what documents to provide them, what
8   documents not to provide, if any instructions like
9   that even occurred.
10  BY MR. SWEENEY:
11     Q.  Okay, how did you decide what to give to
12  your lawyers?
13     A.  Primarily dates.  I looked at the dates of
14  a lot of things.
15     Q.  And what was the relevancy of the dates?
16     A.  Well, if it was '88, I didn't bother
17  sending it.
18     Q.  Okay, did you give them all your medical
19  records and documents reflecting payments for drugs
20  between 1991 and the present?
21     A.  No.
22     Q.  So you have other documents at home
0078
1   relating to that that you haven't given to them?
2      A.  I have more documents at home.
3      Q.  Okay, why didn't you give them the other
4   documents --
5         MR. LEVY:  Don't answer that question--
6   BY MR. SWEENEY:
7      Q.  -- the ones that you didn't give them?
8         MR. LEVY:  Don't answer that question if
9   it's as a result of you discussing something with

10   your attorney.
11      A.  I have many, many documents at home.  I
12   gave them about half of what I have.
13   BY MR. SWEENEY:
14      Q.  And what does the other half consist of?
15   What kind of documents?
16      A.  Bills, canceled checks, insurance
17   information, prescriptions.
18      Q.  Okay, is there any particular reason why
19   you didn't give them the rest of the information?
20      A.  Some of it is not necessarily located at
21   this time.  I know I've got things still in boxes. I
22   just haven't --
0079
1      Q.  In boxes at home?
2      A.  Ah-huh.
3      Q.  Okay, you didn't go and look in those
4   boxes?
5      A.  I didn't go and look in all the boxes.
6      Q.  How many boxes have you got?
7      A.  Many, seven, eight.
8      Q.  Okay, how many boxes did you look at?
9      A.  I went to information that was easily
10   accessible first.
11      Q.  And why was it easily accessible?
12      A.  It hadn't necessarily been boxed up again,
13   boxed away.
14      Q.  What's your understanding of the claims
15   you've brought against the Defendants in this action?
16      A.  My understanding?
17      Q.  Yes, ma'am.
18      A.  Can you rephrase the question, please?
19      Q.  Do you have an understanding of the nature
20   of the claims that you brought against the various
21   Defendants in this action?
22      A.  Basically.  I'm one of a group of people,
0080
1   many people, who feel that they have been overcharged
2   for drugs by these various manufacturers of drugs.
3      Q.  And what's your basis for believing that?
4      A.  Because they cost a lot of money, and they
5   put people into bad financial binds because of the
6   cost of a lot of these drugs.  And it came to my
7   attention that there were people out there who were
8   upset about feeling that they were being overcharged
9   for drugs, and I certainly felt the same way myself.
10      Q.  Who brought that to your attention?
11         MR. LEVY:  Do not answer that question if
12   it reveals any discussions you've had with your
13   attorneys.  You can talk about discussions you've had
14   with others or information you've learned but nothing
15   about what you've learned in the course of this
16   litigation between discussions between you and your
17   attorneys.

18     A.  I've read articles about people losing
19  their homes and their livelihoods due to the cost of
20  medical treatments that they have gone through, and I
21  became aware that there was a class action suit being
22  brought in regards to it.
0081
1  BY MR. SWEENEY:
2     Q.  Can you describe for me the class that you
3  purport to represent?
4     A.  The class of people who have been
5  overcharged or feel they have been overcharged by
6  drug manufacturers.
7          Some of them are dead.  Some of them are
8  the spouses or the family members of these people.
9  Some are just people who don't keep their records as
10  well as I do or aren't interested in coming and
11  sitting here in front of you listening and answering
12  questions.
13     Q.  Does the class include only people who live
14  in Pennsylvania?
15     A.  No, I don't believe so.
16     Q.  Does it include people who live throughout
17  the United States?
18     A.  I believe so, yes.
19     Q.  Does it include people who purchase drugs
20  outside of Pennsylvania?
21     A.  Yes.
22     Q.  Does it include people -- only people who
0082
1  have insurance?
2     A.  No.
3     Q.  Okay, does it include people who are
4  Medicare beneficiaries?
5     A.  Does it include them?
6     Q.  Yes.
7     A.  It may.
8     Q.  Does it include insurance companies?
9     A.  Yes.
10     Q.  Does it include the government?
11     A.  It may.
12     Q.  Do you know?
13     A.  Not offhand.
14     Q.  Okay, does it include the State of
15  Pennsylvania?  Do you know?
16     A.  I don't know.
17     Q.  Does it include people who have no
18  insurance?
19     A.  Ah-huh, I'm sure.
20     Q.  Okay, do you think you are in the same
21  position as someone who had no insurance?
22     A.  At times.
0083
1     Q.  In what way?
2     A.  Because I didn't have insurance, but I'm

3  lucky that that's only been very briefly.
4      Q.  Do you think you're in the same position as
5  someone who is a Medicare beneficiary?
6      A.  If I'm being overcharged for drugs and they
7  are being overcharged for drugs, then, yes, we're in
8  the same position.
9      Q.  Do you think you're in the same position as
10  an insurance company?
11      A.   Again, if I'm being overcharged for drugs
12  and I have an insurance company who is paying for
13  those drugs, then they're obviously being overcharged
14  for drugs as well.
15      Q.  Okay, why do you think you're in a position
16  to serve as a class representative in this case?
17      A.  Can you repeat that, please?
18      Q.  Why do you believe that you're in a
19  position to serve as a class representative in this
20  action?
21      A.   Because I'm one of those people who have
22  been overcharged for drugs.  And I'm willing to come
0084
1  here and sit for the deposition, and I'm willing to
2  provide documents to my attorneys. I'm willing to
3  discuss with them other things that need to be done
4  for the case to go forward.
5      Q.  Okay, giving the deposition and --
6      A.  Perhaps going to court.
7      Q.  Okay, testify in court?
8      A.  Yes.
9      Q.  And testifying in court and giving a
10  deposition and providing documents, you understand
11  those are the responsibilities of the class
12  representative?
13      A.  Yes, some of the responsibilities.
14      Q.  What are the other responsibilities?
15      A.  I don't know all the responsibilities.
16  There may be going to get coffee.
17          MR. SWEENEY:  I think this is a good time
18  for a break.  What I would propose is go for maybe
19  another hour and break for lunch?
20          MR. LEVY:  How long do you think you're
21  going to be?
22          MR. SWEENEY:  I've got all the documents
0085
1  to go through, and hopefully that will be fast.  I'll
2  have a better idea when we break for lunch.
3          MR. LEVY:  Do you want to take a small
4  break now?
5          MR. SWEENEY:  Yeah.
6          MR. LEVY:  And then break for lunch
7  around when?
8          MR. SWEENEY:  12:30, is that good?
9          MR. LEVY:  Whatever is good for you,
10  Rebecca.

11          THE WITNESS:  Fine.
12          MR. SWEENEY:  If she wants to break
13  earlier than that, I'll break earlier than that.
14          MR. LEVY:  No problem.
15          (There was a recess in the proceedings.)
16          (Exhibit Hopkins 009 marked for
17  identification.)
18          MR. SWEENEY:  We've marked as Exhibit
19  Hopkins 009 some documents produced by the witness.
20  These are Hopkins 0009, 10, 11, through 14.
21  BY MR. SWEENEY:
22      Q.   Can you tell me what these documents are,
0086
 1  ma'am?
 2      A.   Bills that I've received talking about how
 3  much the insurance covered and how much I owed for
 4  various -- different services.
 5      Q.   And who did you receive these from?
 6      A.   This one is from the Regional Cancer
 7  Center. This is from Robert Packer.
 8      Q.   Don't these come from Blue Cross/Blue
 9  Shield? Look in the upper right-hand corner.
10      A.   Yes, they do.
11      Q.   And you'll see that, on the first page, it
12  says Page 8 of 12?
13      A.   Okay.
14      Q.   The second page says Page 7 of 12?
15      A.   Ah-huh.
16      Q.   And both those pages are dated March 29,
17  2002?
18      A.   Ah-huh.
19      Q.   So there are other pages to this document
20  that you have at home that you haven't produced to
21  us?
22      A.   Yes, I would say so.
0087
 1      Q.   And besides these pages in this exhibit --
 2  I think there are six of them -- do you have other
 3  documents like this at home that you haven't
 4  produced?
 5      A.   Oh, yes.
 6      Q.   And why didn't you produce the other ones?
 7          MR. LEVY:  Again, I will instruct her not
 8  to divulge any communications between counsel and
 9  herself.
10      A.   I just boxed up some items.
11  BY MR. SWEENEY:
12      Q.   Okay, on the first page, if we would look
13  at the remarks section, there's a reference there to
14  T5555. Can you tell me what that means?
15      A.   No.
16      Q.   Okay, do you recall that there was an
17  explanation of what that meant in the documents that
18  you received from Blue Cross/Blue Shield?

19     A.   It says:  See last section.
20     Q.   I don't think that page was produced,
21  ma'am.
22     A.   Perhaps it would be like the very last page
0088
1  which does not give you a T5555 but gives you two
2  other remarks.
3     Q.   So you have at home documents that explain
4  that remark?
5     A.   Probably.
6     Q.   Now, if you look in the column that says,
7  amount you owe provider, do you recall whether you
8  paid that amount to the Regional Cancer Center, 2124?
9     A.   I don't recall.
10     Q.   During this period in 2002, do you recall
11  what your insurance required you to pay the
12  providers?
13     A.   I don't recall offhand.
14     Q.   Take a look at Page 0011.  You'll see here
15  in the right-hand column it says amount you owe
16  provider, and in each instance, it's zero.  Do you
17  see that?
18     A.   Yes.
19     Q.   And that's also true on the next page?
20     A.   Ah-huh.
21     Q.   And on the next page?
22     A.   Ah-huh.
0089
1     Q.   And is that consistent with your
2  recollection that you weren't required to pay any
3  amounts to Robert Packer Infusion for these services?
4        MR. LEVY:  Could you restate the
5  question, please, or could you read it back?
6  BY MR. SWEENEY:
7     Q.   I'll restate it.  Is it consistent with
8  your recollection that the services that are covered
9  here for Robert Packer Infusion you were not required
10  to pay for?
11     A.   I believe so.
12     Q.   So the insurance covered all of it?
13        MR. LEVY:  And you're referring to the
14  particular services on which page?
15        MR. SWEENEY:  Pages 11, 12, and 13.
16     A.   What was your question?
17  BY MR. SWEENEY:
18     Q.   Did you have to pay anything for these
19  services that are reflected in this document
20  beginning on Page 11, Page 12, Page 13?
21     A.   It doesn't appear so here, but I have
22  received bills from the Robert Packer Hospital.
0090
1     Q.   And have you paid amounts to them?
2     A.   Yes, I have.
3     Q.   And what were those amounts for?

4    A.  It was not specified.  It said I owed.
5    Q.  Okay, did it include charges for physician-
6  administered drugs?
7    A.  I don't know.
8    Q.  You don't know?
9    A.  I don't know.
10    Q.  What were you treated for at Robert Packer?
11    A.  The infection in my ankle.  I had stopped
12  taking the Minocycline and moved to the Wilkes-Barre
13  area, and the infection came back in my ankle.  I had
14  to have surgery.
15        The surgeon cleaned out the ankle and put
16  the Minocycline beads in there, and that went for two
17  weeks and then went in and took them out.  What was
18  it?  A month.  Went in and took them out and inserted
19  a pin in my ankle, and then I was on a different kind
20  of drug.
21    Q.  The surgery -- the surgery didn't occur at
22  Robert Packer?
0091
1    A.  Yes, it did.
2    Q.  It did, okay.  And where are they located?
3    A.  Sayre, Pennsylvania.
4    Q.  And that's near Wilkes-Barre?
5    A.  Well, it's -- yes.  It's near my parents'
6  home?
7    Q.  Were you satisfied with the services you
8  got at Robert Packer?
9    A.  Yes.
10    Q.  Is it fair to say that you're satisfied
11  with the medical services you've gotten from all your
12  medical providers?
13    A.  No.
14    Q.  Which medical providers' services have you
15  not been happy with?
16    A.  Regional Cancer Center.
17    Q.  Any others?
18    A.  My current doctor.
19    Q.  Your current doctor, is that what you said?
20    A.  Ah-huh.
21    Q.  Who is that?
22    A.  In Cleveland Clinic.
0092
1    Q.  Why were you not happy with the Regional
2  Cancer Center?
3    A.  Because, due to their in competence, I went
4  septic and nearly died.  I spent three weeks in the
5  intensive care at Hamot Hospital, one week in the
6  step-down unit, and two weeks at HealthSouth.  And I
7  also ended up with a pin in my leg.
8    Q.  And why are you not happy with Cleveland
9  Clinic?
10        MR. LEVY:  Objection to the form.
11    A.  It's not necessarily Cleveland Clinic.

12  BY MR. SWEENEY:
13      Q.   Is it a particular doctor at Cleveland
14  Clinic?
15      A.   I'm just, I guess I've had -- my doctor,
16  when I started at Cleveland Clinic, has since
17  retired, and I had a new doctor come in, and now, I'm
18  on another new doctor.  And I had several
19  chemotherapies this summer and radiation, and he
20  wanted to put me on another chemotherapy, and so I
21  just was not happy with it.
22      Q.   Do you believe that the physicians who have
0093
1   treated you have usually had your best medical
2   interests in mind?
3       A.   The majority of them.
4       Q.   Okay, and who were the exceptions to that?
5       A.   The Regional Cancer Center.
6       Q.   And your current doctor?
7       A.   And that may just be maybe very concerned.
8   I don't know.
9       Q.   Do you believe that any of the chemotherapy
10  that he's prescribing you he's doing for financial
11  gain?
12      A.   I don't know.  That, I don't know.  I don't
13  care to speculate on it.
14      Q.   Do you have a preference for receiving
15  chemotherapy in a clinic or doctor's office as
16  against a hospital?
17      A.   No.
18      Q.   Have you received chemotherapy in both
19  places, in a hospital and in a clinic or a doctor's
20  office?
21      A.   Yes.
22      Q.   You don't find one more or less convenient
0094
1   than the other?
2       A.   The chemotherapies or regimens that I've
3   gone through are different.  The first time was 72
4   hours straight.  I was hooked up to machines every 20
5   days for 6 months.
6           And the second time, it was eight months,
7   and I only had two different chemos at that time.
8   And I was there for about 42 hours, and those were
9   both in the hospitals.
10          Then the Lupron, of course, is a shot
11  that I would get at my family -- my local physician.
12  The Tamoxifen, of course, was a pill I would take
13  while at home.
14          Then when I'd go to Cleveland Clinic, I
15  was more in the doctor's office, and it was more
16  personable and less time consuming.  I was only there
17  for a couple hours.  And at the doctor's office, it
18  was more one on one.
19      Q.   Anything else?

20    A.  No.
21    Q.  Okay, why don't we look back at the
22  Complaint again, Paragraph 52.
0095
1    A.  Okay.
2    Q.  Now, looking at these various drugs that it
3  says here were administered to you --
4          MR. LEVY:  You are looking at Paragraph
5  52?
6          MR. SWEENEY:  Paragraph 52.
7          MR. LEVY:  You need to go to Page 22.
8          THE WITNESS:  Okay, yes.
9  BY MR. SWEENEY:
10    Q.  The Azithromycin that was administered to
11  you, do you know that that was manufactured by
12  Pfizer?
13    A.  I have no idea who manufactured it.
14    Q.  Is that true for all these drugs, that you
15  don't know who manufactured any of the medications
16  that were given to you?
17    A.  True.
18          MR. SWEENEY:  Okay, off the record.
19          (There was a discussion off the record.)
20          (Exhibit Hopkins 010 marked for
21  identification.)
22  BY MR. SWEENEY:
0096
1    Q.  We've marked as Exhibit Hopkins 010 some
2  documents that appear to come from the Cleveland
3  Clinic Foundation.  Document numbers are Hopkins 0016
4  through Hopkins 0046.
5          Can you tell me how you got these
6  documents?
7    A.  The CAT scan?
8    Q.  All the documents that are in here, all of
9  these pages, how did you get those?  Where did you
10  receive them from?
11    A.  The doctors would send us the copy of the
12  CAT scans.  Is that what you're asking?
13    Q.  Well, there's more in here than just CAT
14  scans. I mean, this is your medical records, and it
15  reflects the appointments that you had with various
16  doctors.  Does the Clinic routinely send you this
17  type of information?
18    A.  No.  Some of this was probably retrieved
19  from the Foundation from the various different
20  hospitals.
21    Q.  By whom?
22    A.  The law firm, I would imagine.
0097
1    Q.  Okay, so you didn't ask the Cleveland
2  Clinic for these documents?
3    A.  No.
4    Q.  You don't have copies of these documents at

5 home?
6    A.  I have copies of the CAT scans, and I have
7 copies of some information, yes.
8    Q.  What do you mean by you have copies of the
9 CAT scans?
10    A.  We asked them to send us a copy of -- not
11 the actual CAT scan but the information, the blurb at
12 the beginning where the doctor has assessed the CAT
13 scan, the findings and --
14    Q.  The results?
15    A.  Yes.
16    Q.  Did you contact any of your medical
17 providers in order to get documents relating to this
18 lawsuit?
19    A.  No.
20       MR. SWEENEY:  11.
21       (Exhibit Hopkins 011 marked for
22 identification.)
0098
1 BY MR. SWEENEY:
2    Q.  We've marked as Exhibit Hopkins 011 a two-
3 page document which is captioned at the top Hospital
4 Bill. These are Hopkins 47 and 48.
5       Can you tell me what this is, ma'am?
6    A.  Itemized billing of the different drugs.
7    Q.  Okay, have you seen this before?
8    A.  No, I have not.
9    Q.  Do you know where this came from?
10    A.  Cleveland Clinic.
11    Q.  Okay, now, this reflects charges for
12 various drugs; is that correct?
13    A.  Yes.
14    Q.  Have you made any payments for any of these
15 drugs out of pocket?
16    A.  Not that I'm aware of.
17       MR. SWEENEY:  12.
18       (Exhibit Hopkins 012 marked for
19 identification.)
20 BY MR. SWEENEY:
21    Q.  We've marked as Exhibit Hopkins 012 some
22 documents which appear to come from the Hamot Medical
0099
1 Center in Erie, Pennsylvania.  These are Hopkins 171
2 through 192.
3       Are you okay, ma'am?
4    A.  I'm fine.
5    Q.  Have you seen these documents before?
6    A.  This, I know I boxed up some itemized
7 statements.  I don't know if it was Hamot.
8    Q.  Okay, if you look at the dates on this,
9 this appears to relate to January and early February
10 of 2002?
11    A.  Ah-huh.
12    Q.  This is the period when you were in the ICU

13   at Hamot?
14      A.  Ah-huh.
15      Q.  And you'll see that there's a column.  This
16   lists the description, and then they list total
17   charges.  And next to that is a column that says EST,
18   period, coverage, insurance, INS, period, co, No. 1.
19          And there are amounts there, and the
20   amounts in all cases are the same as the amount on
21   the left-hand column.  Do you see that?
22      A.  Ah-huh.
0100
1      Q.  And then if you would, look at the last
2   page, Page 0192.  You'll see it says at the bottom,
3   totals $121,796.90 in both columns?
4      A.  Ah-huh.
5      Q.  And then it says:  Pay this amount.  And
6   the amount is zero, do you see that?
7      A.  Ah-huh.
8      Q.  Is it your recollection that insurance
9   covered all of your stay at Hamot during this period?
10      A.  Possible.
11      Q.  Is that what you recall?
12      A.  I don't necessarily recall that.
13      Q.  Do you have any information that's
14   inconsistent with that?
15      A.  No.
16      Q.  Okay, and this was Blue Cross/Blue Shield?
17      A.  Okay.
18      Q.  Is that correct?
19          MR. LEVY:  Rebecca, you need to listen to
20   the question, and you need to give your recollection.
21   If you don't know the answer, you have to say, I
22   don't know, but you can't just agree with his
0101
1   question because it was a nice question.
2          THE WITNESS:  Okay, I was not agreeing
3   because it was a nice question.
4          MR. LEVY:  Okay.
5   BY MR. SWEENEY:
6      Q.  Well, look at the first page, and you'll
7   see, under insurance company name towards the top, it
8   says Blue Cross?
9      A.  Yes, okay.
10      Q.  During this period, you were covered by
11   Blue Cross?
12      A.  If that's what it says.
13      Q.  Well, you were living in North East at this
14   point?
15      A.  Yes.
16      Q.  And Hamot is in Erie, Pennsylvania?
17      A.  Yes.
18      Q.  Okay, so was that Blue Cross/Blue Shield of
19   Northwest Pennsylvania?
20      A.  Yes.

21   Q.   Sometimes called Highmark?
22   A.   Yes.
0102
1        MR. SWEENEY:  I think this would be a
2   good time to break for lunch.
3        MR. LEVY:  That's fine.  Are you ready
4   for lunch?
5        THE WITNESS:  Yes.
6        (There was a lunch recess in the
7   proceedings from 12:10 to 1:18 p.m.)
8        (Exhibit Hopkins 013 and Exhibit Hopkins
9   014 marked for identification.)
10  BY MR. SWEENEY:
11   Q.   Good afternoon.
12   A.   Good afternoon.
13   Q.   We've marked as Exhibit Hopkins 013 and
14  Exhibit Hopkins 014 some records from the Roswell
15  Park Cancer Institute. Exhibit Hopkins 013 has Bates
16  Nos. 0090 through 0097, and Exhibit Hopkins 014 has
17  Bates Nos. 0098 through 0100.
18        Take a look at Exhibit Hopkins 013,
19  please. Have you seen these records before?
20   A.   I'm not sure.
21   Q.   Do you recall how Roswell Park Cancer
22  Institute billed you for the services that you were
0103
1   given there?
2   A.   What exactly do you mean?  Do you recall
3   how I was billed?
4   Q.   Yeah.  What kind of piece of paper?  Did
5   they send you a piece of paper?
6   A.   They sent me itemized billing.  I'm not
7   sure if this exactly is it.
8   Q.   Did you give documents that looked like
9   this to your counsel?
10   A.   I'm not sure if I gave them these or
11  whether they had them themselves.
12   Q.   Is it related to the surgery that you had
13  in February 1995?
14   A.   Yes.
15   Q.   You see in here there's various reference
16  to other medications?
17   A.   Yes.
18   Q.   Can you tell me what those other
19  medications are?
20   A.   No, I cannot.
21   Q.   You didn't have any chemotherapy when you
22  were in the hospital for the surgery, did you?
0104
1   A.   I don't believe so.
2   Q.   You had chemotherapy later?
3   A.   Yes.  I went home for a week, and then I
4   had chemotherapy.
5   Q.   Okay, that's all I have on that.

6       Look at Exhibit Hopkins 014.  Now, this
7   is also from Roswell Park Cancer Institute.  Have you
8   seen these before?
9       A.  I don't believe so.  These are itemized of
10  the drugs that I used, and I don't believe.
11      Q.  This relates to the chemo?
12      A.  Ah-huh.  The Etoposide, E-t-o-p-o-s-i-d-e,
13  and Bleomycin.
14      Q.  Who was the doctor who treated you for
15  that?
16      A.  Doctor Ronald Hempling.
17      Q.  And were you satisfied with his services?
18      A.  Yes.
19      Q.  And do you believe he prescribed you any
20  drugs for the purposes of financial gain?
21      A.  No, I don't believe so.
22      Q.  Okay, do you know how the charge for the --
0105
1   look at the first page about seven lines down.
2   There's a charge for Bleomycin 15 units.  Do you know
3   how that charge was calculated?
4       A.  How they determined 15 units?
5       Q.  How they determined how much to charge you.
6       A.  No, I do not know.
7       Q.  Did you pay for this out of pocket?
8       A.  Yes.  If you look down at the fifth line --
9   fourth line from the bottom, it says payments,
10  patient, $3,067.
11      Q.  All right, and how did you pay for that?
12  By check?
13      A.  Yes.
14          MR. SWEENEY:  I don't think I've seen
15  that check, so I would request production of that
16  check.
17          MR. LEVY:  I'll just restate what I said
18  previously.  But you can make that as part of your
19  request, and we'll consider it.
20  BY MR. SWEENEY:
21      Q.  Okay, two lines below the Bleomycin is
22  Etoposide 100 milligrams?
0106
1       A.  Ah-huh.
2       Q.  How was that administered to you?
3       A.  Intravenously.
4       Q.  And do you know how the charge for
5   Etoposide was calculated?
6       A.  No, I don't.
7          (Exhibit Hopkins 015 marked for
8   identification.)
9          MR. SWEENEY:  Exhibit Hopkins 015 is also
10  composed of documents produced to us by the witness,
11  and these are Hopkins 0101 through 0104.
12  BY MR. SWEENEY:
13      Q.  Now, the first two pages consist of checks,

14   that this is the front and back of two checks?
15      A.  Ah-huh.
16      Q.  And did you sign these checks?
17      A.  Yes.
18      Q.  And the first check is No. 849 which is for
19   $10, and if you'd look at Page 104, which is the last
20   page of this exhibit, the Check 849 that appears on
21   the first page, is that the check you used to pay the
22   bill that's on Page 104?
0107
1       A.  It would appear so.
2       Q.  Okay, that's your handwriting there on 104?
3       A.  Yes.
4       Q.  It indicates Check 849, right?
5       A.  Yes.
6       Q.  You need to let me finish the question.
7       A.  I'm sorry.
8       Q.  I realize you're trying to be helpful, and
9   I really do, but you need to let me finish.
10         What was this bill for?
11      A.  I'm not sure.  I can't read it.
12      Q.  Take a look at the third page of exhibit
13   which is 103.  Can you tell me what services were
14   rendered to you here?
15      A.  IV solutions, chemistry lab, hematology
16   lab.
17      Q.  What were you being treated for?
18      A.  Roswell Park, cancer.
19      Q.  Did you have surgery?
20      A.  Yes, I did.
21      Q.  What was the surgery?
22      A.  I had a complete hysterectomy.
0108
1       Q.  Does this relate back to February?
2       A.  Yes, it does.
3       Q.  Okay, because you only paid a $10 co-pay
4   here?
5          MR. LEVY:  Objection to the form.
6   BY MR. SWEENEY:
7       Q.  Let me start over.  You see where it says
8   up at the top confinement?
9       A.  No, I don't.
10      Q.  Okay, it's to the right of your husband's
11   name, and there's a box.  And it says confinement,
12   and then it says 9-25-95.  Do you see that?
13         THE WITNESS:  Is that confinement here?
14   BY MR. SWEENEY:
15      Q.  Does that suggest to you you were in the
16   hospital on that date?
17         MR. LEVY:  Objection to the form.  If you
18   know the answer.
19      A.  Yes, I believe it's when I had my gruchon
20   taken out, removed.
21      Q.  Okay, thank you.  That's all I have on

22  that.
0109
1           (Exhibit Hopkins 016 marked for
2  identification.)
3           MR. SWEENEY:  I believe Exhibit Hopkins
4  016 consists of three pages that the witness produced
5  to us, Hopkins 108, 109, and 110.
6  BY MR. SWEENEY:
7     Q.  If you look at each of these pages, ma'am,
8  the question I have is whether you paid a $10 co-
9  payment for each of these bills.
10    A.  It appears that I did.
11    Q.  And you wrote a check for each of these,
12  and that's reflected in your handwriting on each of
13  the pages?
14    A.  Actually the one that says Wells-Fargo,
15  first page, that's my husband's handwriting.
16    Q.  Oh.
17    A.  Second page, that's his handwriting.
18    Q.  Okay, do you recognize his handwriting?
19    A.  And the third page, that's his handwriting.
20    Q.  Okay, how long have you been married?
21    A.  Seventeen years.
22    Q.  You know his handwriting after 17 years
0110
1  then?
2     A.  Well, let me say it's not my handwriting.
3     Q.  But you believe it's his?
4     A.  I believe it's his.
5          Exhibit Hopkins 014, can I draw your
6  attention to Page 0099 at the bottom?  It reflects
7  payment, a patient payment, of $771.75.
8     Q.  Okay.
9     A.  And Exhibit Hopkins 014 on the third page
10  shows, please pay this amount $1873.
11          (Exhibit Hopkins 017 marked for
12  identification.)
13  BY MR. SWEENEY:
14    Q.  Exhibit Hopkins 017 is a statement from
15  Robert Packer Hospital, and these are Hopkins 0149
16  through 0152.  Is this a statement you received from
17  Robert Packer Hospital?
18    A.  It would appear so.
19    Q.  Was this treatment for the infection in
20  your ankle?
21    A.  Yes.
22    Q.  And you'll see on the first page that there
0111
1  is reference to total adjustments $10,571.60.  Do you
2  know what that represents?
3     A.  No, I don't.
4     Q.  And then further down, do you see it says
5  NEPA Blue Cross, $6307.15?
6     A.  Ah-huh.

7     Q.   Is that a payment by Northeastern
8  Pennsylvania Blue Cross?
9         MR. LEVY:  Objection to the form, calls
10  for speculation.
11     A.   Could you repeat the question, please?
12  BY MR. SWEENEY:
13     Q.   The $6307.15, does that reflect a payment
14  by Northeastern Pennsylvania Blue Cross?
15     A.   I do not know.
16     Q.   Did you have insurance from them at this
17  time?
18     A.   Yes, I did, and I have received various
19  bills from the Robert Packer and the Guthrie Clinic
20  since that time asking for payments.  And I have sent
21  them on to the insurance, and the insurance has told
22  me that they paid them.  And I don't know whether
0112
1  they paid them or not, but I know that I am receiving
2  bills saying that I need to pay.
3     Q.   Have you paid any money to Robert Packer
4  for these services?
5     A.   Yes.
6     Q.   How much?
7     A.   I currently am paying a credit bureau $50 a
8  month for Robert Packer.  I'm also currently paying a
9  credit bureau $50 a month for the Guthrie Clinic.
10     Q.   And are you doing that by check?
11     A.   Yes.
12     Q.   Have you produced those checks?
13     A.   I've produced the billing statements.
14     Q.   Are these the billing statements that
15  you're referring to this and others?
16     A.   When you say this and others, you mean this
17  --
18     Q.   Exhibit Hopkins 017, Exhibit Hopkins 017.
19     A.   No.
20     Q.   What do the billing statements look like
21  that you're referring to?
22     A.   Statements that say I owe so much a month.
0113
1     Q.   Okay, and when did you receive those?
2     A.   Within the last -- I've been paying on them
3  at least a year.
4     Q.   Could you give those documents to your
5  counsel?
6     A.   I believe those were part of the documents.
7         MR. SWEENEY:  Well, if those documents
8  don't appear to me to have been produced, then I'd
9  request their production.
10         MR. LEVY:  I repeat what I said earlier
11  on the record.
12  BY MR. SWEENEY:
13     Q.   What's the total amount that Robert Packer
14  said that you owed them?  Do you recall that?

15    A.  I don't recall, no.
16    Q.  Was it more than a thousand dollars?
17    A.  I don't recall.
18        (Exhibit Hopkins 018 marked for
19  identification.)
20  BY MR. SWEENEY:
21    Q.  We've marked as Exhibit Hopkins 018 another
22  statement by Robert Packer.  This one has Hopkins
0114
1  Bates Nos. 0158 through 0162.
2        Do you recognize this statement?
3    A.  No.
4    Q.  Okay do you believe you've ever seen this
5  before?
6    A.  I may have.
7    Q.  Okay, what's the amount -- what's the visit
8  balance left on this bill?
9    A.  The visit balance is zero.
10    Q.  Okay, and does this reflect that
11  Northeastern Pennsylvania Blue Cross paid $6844.73 on
12  this bill?
13        MR. LEVY:  Objection, calls for
14  speculation.  You can answer it if you know.
15    A.  I don't know.
16        (Exhibit Hopkins 019 marked for
17  identification.)
18  BY MR. SWEENEY:
19    Q.  Exhibit Hopkins 019 is a one-page document
20  which appears to be a statement from Hamot Health
21  Foundation. Have you seen this document before,
22  ma'am?
0115
1    A.  Possibly.
2    Q.  Did this come from your files?
3    A.  Actually it's my handwriting, so I must
4  have seen it.
5    Q.  And your handwriting indicates what?
6    A.  That I paid it, Check 6320 on 8-3-2001.
7    Q.  Okay, and this reflects you were paid --
8  you were charged three $10 co-pays for these
9  services?
10    A.  Ah-huh.
11    Q.  What were the services you were getting
12  from Hamot Health at this time?
13    A.  These may have been -- although they're --
14  I'm not sure.
15    Q.  Well, take a look at Exhibit Hopkins 001.
16    A.  Exhibit Hopkins 001.
17    Q.  That's your medical statement that your
18  husband prepared.
19    A.  Exhibit Hopkins 001, all the way back here,
20  okay, and it's for 2000.
21    Q.  April of 2001 you were getting Doxycycline
22  injections?

0116
1    A.   Not from Doctor Ray.
2    Q.   What was Doctor Ray treating you for?
3    A.   That may have been when I was receiving
4  Lupron, my Lupron shots, but I'm unsure because of
5  the dates, 3-30, 6-15, 6-22.
6    Q.   Actually if you'll look on the next page,
7  No. 10, that indicates that you were getting Lupron
8  injections in March of 2002?
9    A.   So I might have been seeing her due to
10 infection which kept in 2001 -- see December 2000, I
11 began Thorentisis every 90 days for pleural cavity
12 fluid fill.
13   Q.   Were there any drugs associated with that
14 treatment?
15   A.   I was using -- I was getting Zithromax
16 which was an antibiotic.  That may be when I was
17 getting the antibiotic.
18   Q.   Okay how was that administered?
19   A.   Orally.
20        (Exhibit Hopkins 020 marked for
21 identification.)
22   A.   Going back to Exhibit Hopkins 013 --
0117
1  BY MR. SWEENEY:
2    Q.   Ma'am, if your lawyer wants to ask you some
3  questions about that, he can do it.  Right now I'm
4  asking the questions?
5    A.   Okay.
6    Q.   Take a look at Exhibit Hopkins 019 ?
7  Exhibit Hopkins 020, Exhibit Hopkins 020. Is that a
8  check you wrote to the Guthrie Clinic?
9    A.   Ah-huh.
10   Q.   Do you recall what this was for?
11   A.   No, I don't.
12   Q.   It's for $20, right?
13   A.   Yes it's for $20.
14   Q.   What treatment did you get from Doctor
15 Kahn?
16   A.   Oh, that must have been put in there.  I
17 must have accidentally thrown that in there.  That
18 was my son's doctor.
19   Q.   Okay, so anything I see referring to Doctor
20 Kahn I can ignore?  It doesn't have anything to do
21 with you?
22   A.   Or if it's North East Lakeshore.  Kahn is
0118
1  his doctor, K-a-h-n.
2    Q.   Yes, ma'am.  Let's take a short break.  The
3  witness told me I need to do some surgery on one of
4  my exhibits.
5        (There was a recess in the proceedings.)
6  BY MR. SWEENEY:
7    Q.   Okay, we've had a discussion off the record

8   about Doctor Kahn.  That made it necessary for me to
9   ask some for questions about him or her. Maybe we can
10  cut through it this way, ma'am. Did Doctor Kahn ever
11  prescribe to you any prescription drugs?
12      A.   Is this Doctor Kahn from North East Family
13  Practice?
14      Q.   I really don't know.  But I'll show you a
15  document, and maybe it will help you.
16          (Exhibit Hopkins 021 marked for
17  identification.)
18          MR. SWEENEY: Exhibit Hopkins 021 is a
19  three-page document produced by the witness, Hopkins
20  0052, 53, and 54 by Doctor Kahn, whose first name is
21  Milly?
22      A.   Yes.  I believe this is something that just
0119
1   went into the box when I was --
2   BY MR. SWEENEY:
3       Q.   Is it fair to say you can't recall whether
4   Doctor Kahn ever treated you, this Doctor Kahn?
5       A.   No.  She was basically -- my son went to
6   her. But when my doctor was out of the office,
7   perhaps I saw her for something.
8       Q.   Look at this document.  You wrote checks
9   for each of these bills?
10      A.   That's not my handwriting.  I think it's my
11  husband's.
12      Q.   Well, you made a practice when you wrote
13  checks to write the number of the check on the bill,
14  correct?
15      A.   Yes.
16      Q.   And does your husband do that as well?
17      A.   Yes.
18      Q.   And this reflects payment for a number of
19  $10 co-pays?
20      A.   Yes.
21          MR. SWEENEY: 22.
22          (Exhibit Hopkins 022 marked for
0120
1   identification.)
2   BY MR. SWEENEY:
3       Q.   Exhibit Hopkins 022 is a one-page document.
4   It appears to be from Regional Cancer Center, and
5   it's Hopkins 0051.
6       A.   Okay.
7       Q.   Can you tell me what services this was for?
8       A.   Well, it would be dealing with my cancer.
9       Q.   And what payment did you make for this
10  bill?
11      A.   It says balance due $144.
12      Q.   And what does the handwriting indicate?
13      A.   It says OCG 2-8, Check 1200.
14      Q.   1200 or $12?
15      A.   I don't know.  I don't know whether that's

16  a $12 or whether it's Check 1200.
17          MR. SWEENEY:  Okay, well, I'd appreciate
18  it if we could get a copy of that check.
19          MR. LEVY:  I'll just make the continuing
20  statement that I made previously.
21  BY MR. SWEENEY:
22      Q.  Is Doctor Allquist a doctor who treated
0121
1  you?
2      A.  My family care physician, yes.
3      Q.  Did he treat you for your cancer?
4      A.  No.  He referred me on.  He was my
5  referring doctor.
6      Q.  Okay?
7      A.  Primary care physician.
8          (Exhibit Hopkins 023 marked for
9  identification.)
10          MR. SWEENEY:  Okay, Exhibit Hopkins 023
11  is a one-page document produced to us by the witness,
12  Hopkins 0067.
13  BY MR. SWEENEY:
14      Q.  Can you tell me where this came from, what
15  facility?
16      A.  Thoracentesis, that may have come from -- I
17  was going to two different places in Erie.  I can't
18  tell you the time, the doctor's name.  Doctor Lee was
19  the person who referred me, and I had my surgery.
20  But I can't remember.
21      Q.  Okay, how much did you pay on this bill?
22      A.  Well, let's see.  It says $214.
0122
1      Q.  And what is the handwriting?
2      A.  It says up here paid 5-1-2001, Check No.
3  6218, $50.  This was probably from Hamot.
4      Q.  From who?
5      A.  Hamot Health.  My doctor would drain my
6  pleural cavity at the hospital, and this looks like
7  things they would use to do that.  As a matter of
8  fact, down here, the fourth row -- the third line up,
9  it says Hamot patient accounts, so it was Hamot.
10      Q.  So it does.
11          (Exhibit Hopkins 024 marked for
12  identification.)
13  BY MR. SWEENEY:
14      Q.  Exhibit Hopkins 024 are some records from
15  Hamot Medical Center.  The Bates numbers on these are
16  0193 through 0205.  Ma'am, look at the date in the
17  upper right-hand corner which is 10-20-05?
18      A.  Ah-huh.
19      Q.  Did you recently request these records from
20  Hamot?
21      A.  My attorneys did.
22      Q.  Okay, and this covers treatment back in
0123

1  2001; is that correct?
2      A.  It appears to.
3      Q.  And you had insurance coverage then?
4      A.  Yes.
5      Q.  That's all I have on that one.
6          (Exhibit Hopkins 025 marked for
7  identification.)
8  BY MR. SWEENEY:
9      Q.  Exhibit Hopkins 025 is another statement
10  from Hamot. These are Hopkins 0206 through 0221.  And
11  were these documents also requested from Hamot by
12  your counsel?
13     A.  Must have been.
14     Q.  Why do you say that?
15     A.  I didn't request them.  I gave them the
16  authorization to request what they wanted.
17     Q.  Okay, now, take a look at the first page of
18  this.  That reflects some payments by Blue cross at
19  the bottom?
20     A.  Blue Cross payment, okay.
21     Q.  Do you know what CRA-Blue Cross means?
22     A.  No, I don't.
0124
1      Q.  Okay, and then take a look at Page 0212.
2  And at the top of the page, there are some payments
3  by you here; is that correct?
4      A.  That's what it says.
5      Q.  $50, $30, and $30?
6      A.  And 104.
7      Q.  Right.  And at the bottom, it says refund
8  patient.  Do you have any recollection of what that's
9  for?
10     A.  No, I don't.
11         (Exhibit Hopkins 026 marked for
12  identification.)
13  BY MR. SWEENEY:
14     Q.  Exhibit Hopkins 026 is a statement from
15  Chest Diseases of Northwest Pennsylvania?
16     A.  Yes.
17     Q.  What were you being treated for?  What does
18  this reflect you were being treated for?
19     A.  Part of my ovarian cancer, tumors, one of
20  them had gotten into the pleural cavity, the lower
21  portion of my right lung, and it would fill with
22  fluids.  And so there was a period of time reflected
0125
1  on my husband's statement.
2          Go back to Exhibit Hopkins 001, and you
3  can see -- where is Exhibit Hopkins 001 here?  And
4  you'll see the Thorentisis every 90 days.  I was
5  having it drained, and it was the doctor from Chest
6  Diseases of Northwest Pennsylvania.
7      Q.  Okay, were there any physician-administered
8  drugs associated with that treatment?

9    A.  Not until they -- they tried to -- they put
10  Doxycycline in there to try to dry it out, and that
11  was Doctor Lee.  I believe I saw --
12      Q.  Doctor Lee wasn't at Chest Diseases, was
13  he?
14      A.  No.
15      Q.  He was at Hamot?
16      A.  He was at -- I think it was called
17  Flagship. He was right off of Hamot, office building
18  next to Hamot.
19      Q.  Where did you get the treatment for the
20  Doxycycline?  Was that at Hamot?
21      A.  Yes, Hamot.  And I think I saw it was
22  reflected in one of the bills that you just showed me
0126
1   for Hamot.
2       Q.  Okay, that's all I have on 26.
3           (Exhibit Hopkins 027 marked for
4   identification.)
5   BY MR. SWEENEY:
6       Q.  Exhibit Hopkins 027 is some statements from
7   the Regional Cancer Center.  These are Bates Nos.
8   47b, 48b, 49, and 50.  Now, the first page which is
9   dated March 1998.  That reflects that you had
10  insurance from Alliance Health Network?
11      A.  This first page, let's see.  Yes.
12          MR. SWEENEY:  And Counsel, I'd request a
13  better copy of this just because we can't read the
14  pay this amount.
15          MR. LEVY:  Yeah, I know your office--
16          MR. SWEENEY:  We requested some payments,
17  but we didn't identify this one.  And I'm quite sure
18  we didn't get it.
19          MR. LEVY:  Okay.
20  BY MR. SWEENEY:
21      Q.  And then if you'd look at the next page?
22      A.  Ah-huh.
0127
1       Q.  And if you could, read for me into the
2   record the handwriting that's on the next page.
3       A.  Per Kimberly on 1-12, Alliance paid on 1-8.
4   I only have co-payment of $10.
5       Q.  Is that your handwriting?
6       A.  Yes.
7       Q.  Who is Kimberly?
8       A.  Somebody from Alliance.
9       Q.  Did you ever discuss drug prices with
10  anybody from Alliance or any of your other health
11  plans?
12      A.  I don't believe so.
13          (Exhibit Hopkins 028 marked for
14  identification.)
15          MR. SWEENEY:  Exhibit Hopkins 028, these
16  documents were also produced to us by the witness'

17  counsel.
18  BY MR. SWEENEY:
19      Q.   And this appears to be 0016b through 34b,
20  also 37b, 38b, and 39b.  Now, if you'd look at the
21  first page, does this reflect you got a prescription
22  for Kytril tablets from Buffalo Pharmacies?
0128
1      A.   Yes.
2      Q.   Okay, and what co-pay did you pay?
3      A.   I don't know.
4      Q.   What does it say in the little box?
5      A.   Co-pay, zero.
6      Q.   Then turn to Page 0019b, that's the fourth
7  page.  Does this reflect a prescription you got for
8  Neupogen?
9      A.   I guess.
10      Q.   Do you recall --
11          MR. LEVY:  No guessing.
12      A.   No.
13  BY MR. SWEENEY:
14      Q.   Do you recall being prescribed Neupogen?
15      A.   I've been prescribed many drugs in the past
16  several years, and I can't tell you all the names of
17  all the drugs that I've been prescribed.
18      Q.   Okay.
19      A.   So I would say yes since it says Young-
20  Hopkins and my address that it came to me.  And it
21  says charge, and I don't know what that means because
22  it also says co-payment zero.
0129
1      Q.   Okay, turn to Page 22b.  Is this a receipt
2  from Eckerd Drugs?
3      A.   Page 22?
4      Q.   22b; they're all Bs.
5      A.   Yes, Eckerd Drug.
6      Q.   And that reflects two charges for $25 each?
7      A.   Yes.
8      Q.   Whose signature is this?
9      A.   The KMD-T?  I don't know who that is.
10      Q.   Does this relate to drugs that were
11  prescribed to you?
12      A.   Well, I'm pretty sure that W, Wells-Fargo,
13  is my husband's.  I don't know.  That's not my
14  husband's signature, nor is it mine.
15      Q.   Take a look at the next page.  Maybe we can
16  throw a little light on this.  You see the next page
17  reflects two co-pays at $25 for Tamoxifen?
18      A.   Tamoxifen yes.
19      Q.   And these are dated 3-13-02?
20      A.   Ah-huh.
21      Q.   And Page 22b is also dated March 13, 2002,
22  so you think this receipt relates to the Tamoxifen
0130
1  prescriptions on page 23?

2     A.  If it's the same date, I would say yes.

3     Q.  And you were paying two $25 co-pays for

4   these prescriptions?

5     A.  It's a duplicate receipt, so I only paid

6   for one, I think.

7     Q.  Do you know what it refers to on 23b where

8   it says paid, dash, ALL PLN?  Do you know what that

9   refers to?

10     A.  Where are we?

11     Q.  We're still on 23.

12     A.  How far down?

13     Q.  Either one or the other of the receipts

14   here. It's just above the co-pay.

15     A.  Paid all.

16     Q.  Yeah, do you know what that refers to?

17     A.  No, I don't.  But I saved $99.29 by using

18   my plan.

19     Q.  This was covered by insurance?

20          MR. LEVY:  Objection.

21   BY MR. SWEENEY:

22     Q.  Is that correct?

0131

1     A.  Except for the co-pay.

2          MR. SWEENEY:  Okay, I have a few more

3   questions.  Let me look at my notes.  We'll take a

4   short break.

5          (There was a recess in the proceedings.)

6   BY MR. SWEENEY:

7     Q.  Have you ever been discussed drug prices by

8   any of your doctors?

9     A.  I don't believe so.

10     Q.  Have you ever discussed with any of your

11   doctors how they were charging you for drugs?

12     A.  No, I don't believe so.

13     Q.  Have you ever had any contact of any type

14   with Bristol-Myers Squibb?

15     A.  No, I don't believe so.

16     Q.  With Schering?

17     A.  No.

18     Q.  With GlaxoSmithKline?

19     A.  I don't believe so.

20     Q.  With Astrazeneca?

21     A.  I don't believe so.

22     Q.  With Johnson & Johnson?

0132

1     A.  I don't believe so.

2     Q.  Or any Johnson & Johnson subsidiary to your

3   knowledge?

4     A.  None to my knowledge.

5     Q.  Do you claim you've been defrauded by the

6   Defendants in this case?

7     A.  I certainly feel they've overcharged me.

8     Q.  Do you also feel they've committed fraud?

9          MR. LEVY:  Objection.  The Complaint

10  speaks for itself.  You can answer the question.
11      A.  I certainly feel that they have overcharged
12  not only myself but other people as well, and the
13  insurance company, if that they're inflating the
14  prices of their drugs to make a large spread from the
15  doctors, from the medical establishments to the
16  consumers, then, yes, that's wrong.
17  BY MR. SWEENEY:
18      Q.  Have you ever complained about the conduct
19  by the Defendants to any federal agency?
20      A.  No.
21      Q.  To any state agency?
22      A.  No.
0133
1      Q.  To anybody else other than your lawyers?
2      A.  No.
3      Q.  Okay, do you believe you've been harmed by
4  the Defendants?
5      A.  Yes.
6      Q.  How?
7      A.  If they have overcharged me and my
8  insurance, it falls -- when I'm overcharged, my
9  insurance is overcharged, so then my insurance goes
10  higher, the premiums that I have to pay.  At this
11  point, I am uninsurable.  That's why I'm insured by
12  the Pennsylvania Welfare Department, because I can't
13  even get insurance because of all of my medical
14  problems.
15      Q.  But you are insured by the Pennsylvania
16  Access plan?
17      A.  Yes.
18      Q.  So one of the ways you think you've been
19  harmed is that the price of insurance has gone up?
20      A.  Yes.  And I've taken all of these drugs,
21  and I've taken drugs to combat the effects of drugs I
22  had to take.  And then I had to take other drugs to
0134
1  combat those drugs and constantly. Both myself and my
2  insurance --
3      Q.  Well, the Defendants don't have anything to
4  do--
5      A.  Both myself and my insurance are paying for
6  these drugs, and these drugs, if they're being given
7  to medical establishments to use on patients, the
8  patients are paying a lot more for them than what the
9  medical establishments are paying.
10          And myself, being in the group of
11  patients who has to pay and whose insurance, has to
12  pay, so the premiums go higher, so we have less money
13  to spend.  We're spending it on all these bills.
14      Q.  Have you finished your answer?
15      A.  Yes.
16          MR. SWEENEY:  Would you read that back?
17  Because there were times we were talking at the same

18  time.
19       (The record was read back by the
20  Reporter.)
21  BY MR. SWEENEY:
22     Q.  Is part of your claim here that you were
0135
1  prescribed drugs that you were unnecessary?
2     A.  No.  I'm not qualified to determine which
3  of the drugs that I have been prescribed which were
4  necessary and which were not necessary.  And if I'm
5  taking one set of drugs that make me nauseated, then
6  I have to take another set of drugs, for example, to
7  help combat that nausea.
8     Q.  But that's not part of your claim?
9        MR. LEVY:  Objection.
10    A.  I don't understand.
11  BY MR. SWEENEY:
12    Q.  Do you believe you've been prescribed
13  unnecessary drugs?
14    A.  I'm not qualified to make that.
15    Q.  Do you believe you've been overprescribed
16  drugs?
17    A.  I'm not qualified to make that comment.
18    Q.  Do you believe you were prescribed drugs
19  that did you harm?
20    A.  Yes.
21    Q.  Which drugs?
22    A.  I don't know.
0136
1     Q.  What was the harm?
2        MR. LEVY:  Objection, calls for a legal
3  conclusion.  You can answer the question if you have
4  an answer.
5     A.  Well, for an example, the Tamoxifen, I
6  received an infection in my mediport.  I don't
7  believe that's what it's medically called at that
8  point, but mediport.
9        It's a port where they inject drugs into
10  your body.  And it became infected, and I went
11  septic.  And I ended up in the hospital for three
12  weeks in intensive care, a week in the step-down
13  unit, and two weeks at HealthSouth where I had to
14  relearn how to walk again.
15       Two weeks to a month after that, I got an
16  infection in my left leg, my left ankle, which now
17  has resulted in my having further surgery and having
18  a seven-inch pin in my ankle.
19  BY MR. SWEENEY:
20    Q.  Have you finished your answer?
21    A.  And I had to take a lot of drugs to get
22  over that infection.  Now I'm finished.
0137
1     Q.  And is that part of your claim in this
2  action, that you got that infection?

3     A.   To the drugs?

4     Q.   You blame the infection on getting

5   Tamoxifen, correct?

6     A.   Yes.

7     Q.   Okay, and is that part of your claim in

8   this action?

9          MR. LEVY:  Objection.  Her claims are

10  contained in the Complaint which have been made an

11  exhibit in this case.  That's what she's claiming in

12  this case.

13  BY MR. SWEENEY:

14    Q.   Please answer the question, ma'am.

15    A.   I'm not specifically claiming that in the

16  case.

17    Q.   Are you generally claiming it?

18         MR. LEVY:  Objection to the form.

19  BY MR. SWEENEY:

20    Q.   Does it play any part of your claim in this

21  action?

22    A.   Maybe in my heart, but I can't -- if that

0138

1   is not permitted in the court case, then I'm claiming

2   what the court case will allow.

3     Q.   Do you expect to get damages from the

4   Defendants in this action from the infection that you

5   suffered?

6     A.   It would certainly be nice.

7     Q.   Do you expect to get that?  Are you seeking

8   those damages, and do you expect to get them? Can you

9   answer my question?

10    A.   I hadn't thought about it.

11    Q.   What is it you want to get out of this

12  lawsuit?

13    A.   Obviously money would be nice, satisfaction

14  that the drug manufacturers are not going to be able

15  to charge so much for their drugs so that more people

16  are able to use the drugs without -- while being able

17  to pay for their medical treatments.  Perhaps we

18  would be able to change the medical establishment,

19  the insurance for the future.

20    Q.   One of your goals in this lawsuit is to

21  change the medical establishment?

22         MR. LEVY:  Objection to the form.

0139

1   BY MR. SWEENEY:

2     Q.   Is one of your goals to change the

3   insurance system?

4          MR. LEVY:  Object to the form.

5     A.   One of my goals personally?

6   BY MR. SWEENEY:

7     Q.   In this lawsuit, yes.

8     A.   Yes.

9     Q.   Okay, do you believe you've suffered harm

10  from Defendants who manufactured drugs that you

11  didn't take?
12      A.  That I didn't take?
13      Q.  Yes, ma'am.
14      A.  Yes, because they helped cause the inflated
15  price.
16      Q.  How did they help cause the inflated price
17  of drugs you didn't take?
18      A.  Once again, everybody else is being also --
19  let me gather my thoughts.  If across the board
20  people are being charged inflated prices for their
21  drugs, either some that I have taken or some that I
22  have not taken, insurance costs go up to meet those
0140
1  charges.
2      Q.  Okay.
3      A.  So in that respect, I guess I would be
4  affected by them.
5          MR. SWEENEY:  Okay, let's take a short
6  break.  I'll look at my notes.  I think I'm almost
7  done.
8          (There was a recess in the proceedings.)
9  BY MR. SWEENEY:
10      Q.  Have you brought any legal action against
11  any of your doctors?
12      A.  No.
13      Q.  Have you contemplated bringing legal action
14  against any of your doctors?
15      A.  No.
16          MR. SWEENEY:  That's all the questions I
17  have at the moment.  We will reserve the right to
18  resume this deposition after additional production of
19  documents, although, I understand we need to talk
20  about that.
21          MR. LEVY:  Exactly.  And I'll just
22  restate that counsel said he's going to forward a
0141
1  letter, and we're sticking by the statements that
2  have been made in prior depositions about further
3  discovery, written discovery, and the contemplated
4  discovery under Judge Sayre's order.  But with all
5  that said we will take his letter under advisement.
6          I do have several questions for the
7  witness.
8
9              EXAMINATION
10  BY MR. LEVY:
11      Q.  Ms. Hopkins, today you testified about Mr.
12  Sweeney took you through and you looked at your
13  insurance documents and through your medical records,
14  and you often testified that you had a flat co-pay
15  for the various insurances that you went over.
16          My question is whether you have continued
17  to receive further bills from any of your medical
18  providers even after you may have paid a flat co-pay

19  or after you received insurance documents saying you
20  owed a zero balance.
21      A.  Yes.
22      Q.  Okay, and do you recall ever making
0142
1   payments to medical providers that were not simply
2   flat co-payments?
3           MR. SWEENEY:  Object to the form.
4   BY MR. LEVY:
5       Q.  You can answer.
6       A.  Yes.
7       Q.  And would that include payments you've made
8   during the period of time that Mr. Sweeney went over
9   with you today for your medical treatment?
10          MR. SWEENEY:  Object to the form.
11      A.  Yes.
12  BY MR. LEVY:
13      Q.   And during the time of your treatment that
14  Mr. Sweeney went over today with you, were there
15  periods where you had to satisfy portions or all of
16  the deductibles for your insurance?
17          MR. SWEENEY:  Object to the form.
18      A.  Yes.
19  BY MR. LEVY:
20      Q.  I'd like to look back at Exhibit Hopkins
21  006.  It was the Alliance Health Network, how to use
22  your prescription drug program.
0143
1       A.  Okay.
2       Q.  Do you recall whether this program
3   pertained just to prescription drugs that you filled
4   at a pharmacy?
5       A.  As opposed to --
6       Q.  Physician-administered drugs that you
7   received during hospital visits or doctors' offices.
8       A.  No, I don't.
9       Q.  You don't recall?
10      A.  No, I don't.
11      Q.  Earlier today, you testified that you
12  thought you might have seven or eight boxes of
13  documents in your possession.  Do you recall that?
14      A.  Yes.
15      Q.  Is it fair to say that many of the
16  documents contained in those boxes have nothing to do
17  with medical records?
18      A.  Yes.
19      Q.  Things like telephone bills, et cetera?
20      A.  Yes.
21      Q.  I'd like to look back at Exhibit Hopkins
22  013.
0144
1           MR. SWEENEY:  What's that?
2           MR. LEVY:  Exhibit Hopkins 013 was
3   Hopkins 0090 to 0097.

4  BY MR. LEVY:

5      Q.  And I'd like you to take a look at that

6  document.

7      A.  Okay.

8      Q.  Now, if you recall, this was a document

9  that you were looking at when -- and you had

10  something you wanted to say about this document, but

11  counsel said, if I had a question, to ask it, but for

12  you not to continue answering about this document.

13          So I'd like you to look back at this

14  document.  I believe there were some things you

15  wanted to point out about the document.

16      A.   Yes.  It mentions patient payments on Page

17  0090, it shows 199.28 on 3-14.  On 0091, it shows

18  $5,000.  That's 2-16, and Page 0095 -- I'm sorry, 96

19  shows payments from the patient 2-23, $8,265.56.  It

20  also shows 5-10-95, patient payments in the amount of

21  $841.75, same page, and 5-10-95, it shows on the next

22  page on 0097, it shows patient payments of $70.

0145

1      Q.  And 0096 there's also a line that says

2  patient payment $199.28; is that correct?

3      A.  Yes, yes.

4      Q.  And I believe on Exhibit Hopkins 028 which

5  was a number of pharmacy records, in particular Page

6  0025b, there was something that you wanted to point

7  out to counsel.  However, we were off the record at

8  the time, and we didn't go back on record.

9      A.  I was just unclear about the --

10      Q.  Let me ask you the question.  Do you

11  believe that Page 0025b is actually two separate

12  prescriptions and not just a double prescription?

13      A.  No.  That says duplicate receipt.

14      Q.  Maybe I'm not referring to what it was that

15  you wanted to bring to our attention at that time.

16      A.  Well, the records reflected two charges of

17  $25.

18      Q.  I see, okay.

19      A.  And the bill is dated 3-13.

20      Q.  That's 0024b, that page, is that what

21  you're referring to?

22      A.  No.

0146

1      Q.  What page are you referring to?

2      A.  22, I believe it is.

3      Q.  Oh, okay.  22b, is that what you're

4  referring to?

5      A.  Yes, that was two charges, but yet I didn't

6  know what the other --

7      Q.  Fair enough.

8          MR. LEVY:  That's all I have.

9

10              RE-EXAMINATION

11  BY MR. SWEENEY:

12    Q.  On Exhibit Hopkins 013, can you get that
13 back, please?
14    A.  Yes.
15    Q.  This was the hospital stay for your
16 surgery, correct?
17    A.  Yes, some of it.
18    Q.  And I believe you testified that you didn't
19 receive any chemotherapy on this hospital stay?
20    A.  However, you were mentioning before about
21 other medications, do I know what those other
22 medications were, so I don't know what those other
0147
1 medications were.  So anything that was prescribed
2 during that period of time should -- I don't know if
3 it's chemotherapy necessarily or antibiotics or --
4    Q.  Were you prescribed during the hospital
5 stay any of the drugs mentioned in Paragraph 52 in
6 the Complaint?
7    A.  During the hospital stay?
8    Q.  Yes, ma'am.
9    A.  See, I don't know as you were pointing out,
10 to say other medications or just say antibiotics, so
11 I don't know what those were.
12    Q.  Okay, that's all I have on that.  Why don't
13 you put it aside, ma'am, and we can finish up.
14         What insurance did you have deductibles
15 on?
16    A.  Various insurances.
17    Q.  Which ones?
18    A.  Well, the Alliance, and I had deductibles.
19 I can't tell you.
20         MR. SWEENEY:  Okay, well, I would request
21 production of any documents that establish that she
22 had deductibles on any insurance including Alliance
0148
1 where we have gotten no information about what
2 medical insurance she had.
3         MR. LEVY:  We'll take that under
4 advisement.
5         MR. SWEENEY:  The only deductibles I've
6 seen relate to one month when she had Blue Cross/Blue
7 Shield insurance.
8 BY MR. SWEENEY:
9    Q.  The bills that you testified you got from
10 providers after you paid flat co-pays --
11    A.  Yes.
12    Q.  -- have you provided those bills to your
13 counsel?
14    A.  Some have been sent on.
15    Q.  Are there others that you still have in
16 your possession that you haven't provided?
17    A.  Perhaps.
18    Q.  Okay, and you clearly have other medical
19 records including billing records that you haven't

20  given to your counsel; is that correct?
21    A.  Yes.
22    Q.  And you have canceled checks that relate to
0149
1  payments for medical services that you haven't
2  produced?
3    A.  Yes.
4        MR. SWEENEY:  That's all I have.
5        MR. LEVY:  We will reserve the right to
6  read and sign the deposition transcript.
7        MR. SWEENEY:  Okay, thank you, ma'am.
8        (The proceedings were concluded at 3:51
9  p.m.)
10
11        _____
12              REBECCA ANNE HOPKINS
13
14  Subscribed and sworn to and before me
15  this _____ day of _____, 20____.
16
17
18  _____
19        Notary Public
20
21
22
0150
1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2  COUNTY OF ALLEGHENY        )    SS:
3      I, Kristina Kircher, a Court Reporter and
4  Notary Public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the witness,
6  REBECCA ANNE HOPKINS, was by me first duly sworn to
7  testify to the truth; that the foregoing deposition
8  was taken at the time and place stated herein; and
9  that the said deposition was recorded
10  stenographically by me and then reduced to printing
11  under my direction, and constitutes a true record of
12  the testimony given by said witness.
13
14      I further certify that the inspection, reading
15  and signing of said deposition were NOT waived by
16  counsel for the respective parties and by the
17  witness.
18
19      I further certify that I am not a relative or
20  employee of any of the parties, or a relative or
21  employee of either counsel, and that I am in no way
22  interested directly or indirectly in this action.
0151
1      IN WITNESS WHEREOF, I have hereunto set my hand
2  and affixed my seal of office this 1st day of
3  December, 2005.
4

5
6      _____
       Notary Public
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22