# EXHIBIT F

0001
1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF MASSACHUSETTS
3
4  IN RE PHARMACEUTICAL INDUSTRY
5  AVERAGE WHOLESALE PRICE
6  LITIGATION
7  _____  MDL No. 1456
8  THIS DOCUMENT RELATES   CIVIL ACTION: 01-CV-12257-PBS
9  TO ALL CLASS ACTIONS.   Judge Patti B. Saris
10 ----------------------------------------------------
11
12        DEPOSITION OF ROBERT A. HOWE
13       TAKEN ON BEHALF OF DEFENDANTS
14          NOVEMBER 16, 2005
15              - - -
16  BE IT REMEMBERED THAT, pursuant to the Federal Rules
17  of Civil Procedure, the deposition of ROBERT A. HOWE
18  was taken before Laurie A. Volker, Registered
19  Professional Reporter, on November 16, 2005,
20  commencing at the hour of 10:21 a.m., the proceedings
21  being reported at 66 East Sixth Avenue, Eugene,
22  Oregon.
0002
1  APPEARANCES
2
3  KENT M. WILLIAMS, ESQUIRE
4    Giebel, Gilbert, Williams & Kohl
5    1300 Godward Street NE, Suite 6200
6    Minneapolis, Minnesota 55413
7    651.633.9000
8    Appearing on behalf of all Plaintiffs
9
10  CARLOS M. PELAYO, ESQUIRE
11   Davis Polk & Wardwell
12   450 Lexington Avenue
13   New York, New York 10017
14   212.450.4000
15   Appearing on behalf of Defendant AstraZeneca
16   Pharmaceuticals, LP
17
18
19
20
21
22
0003
1       E X H I B I T  I N D E X
2
3  NO.        DESCRIPTION           PAGE
4  Exhibit Howe 001  Third Amended Master
5           Consolidated Class Action
6           Complaint          94

7  Exhibit Howe 002  CMS Medicare Summary Notices    174
8  Exhibit Howe 003  Copies of Checks              187
9  Exhibit Howe 004  Documents from the Peace
10           Harbor Hospital            194
11  Exhibit Howe 005  Documents from the Oncology
12              Associates of Oregon         203
13  Exhibit Howe 006  Documents from the Oregon
14           Urology Specialists         205
15  Exhibit Howe 007  "Prescription History-
16           Detailed"               217
17  Exhibit Howe 008  Documents Mr. Howe brought
18              to the deposition        200
19
20
21
22
0004
1         MR. PELAYO:  Why don't we start by
2  designating the transcript highly confidential
3  pursuant to the protective order that's in effect in
4  the AWP litigation.
5         Agree, Kent?
6         MR. WILLIAMS:  I agree that you can make
7  that designation without waiving our right later to
8  challenge that designation, depending on what is
9  testified to.  But -- in other words, I'm not going
10  to stipulate that the transcript is confidential,
11  but --
12         MR. PELAYO:  Okay.
13         MR. WILLIAMS:  -- we're not going to hold
14  anything up because of that.
15         The other thing is, if I could, is let the
16  record reflect that Mr. Howe produced some additional
17  documents this morning to defense counsel.
18         If I could, I'll just describe them for the
19  record.
20         MR. PELAYO:  Yeah.  Go ahead and describe
21  them.
22         MR. WILLIAMS:  Sure.  There's a cancelled
0005
1  check, Check No. 4196, dated 9-27-05 in the amount of
2  $631.79.
3         There's a stub in the amount of $1,458.09
4  that the payee is unidentified, but there's a
5  handwritten note that says, "Paid 11-4-05, Check
6  No. 4217."
7         There is a CMS Medicare summary notice that
8  states, "This is a summary of claims processed from
9  10-14-2005 through 11-01-2005."  That appears to
10  be -- oh, okay.  Appears to be two pages, but they're
11  double-sided.
12         There's another CMS Medicare summary
13  notice.  This one is dated November 8th, 2005.  It
14  states, "This is a summary of claims processed from

15  10-13-2005 through 10-28-2005."  It is one page,
16  double-sided.
17       And last, there is what appears to be a
18  computer printout for Account No. 57836.  States,
19  "All open items, Howe" at the top, and there are
20  handwritten notes in red on that document.
21       Those are the documents that were produced
22  to counsel this morning.
0006
1       Have I stated them accurately, or described
2  them accurately?
3       MR. PELAYO:  Okay.  Well, obviously, I just
4  got them, so I'll take it under advisement that they
5  are what you say they are.  I'll try to look at them
6  at a break, and we can try to talk about them later,
7  perhaps.
8       MR. WILLIAMS:  And just so the record is
9  clear, I'm not trying to testify as to what they are.
10  I was merely trying to describe them facially so that
11  we have a clear record as to what was produced.
12       MR. PELAYO:  Fine.
13       MR. WILLIAMS:  All right.
14  ROBERT A. HOWE,
15  having been first duly sworn, was examined
16  and testified as follows:
17  EXAMINATION
18  BY MR. PELAYO:
19    Q.  Mr. Howe, good morning.
20    A.  Good morning.
21    Q.  My name is Carlos Pelayo.  I gave you my
22  card with my name on it.
0007
1    A.  Right.
2    Q.  I represent one of the defendants in this
3  case.
4       Would you please state your full name for
5  the record.
6    A.  Robert Arden Howe.
7    Q.  Have you ever been deposed before,
8  Mr. Howe?
9    A.  Yes.  A number of years ago.
10    Q.  And could you describe the case that you
11  were deposed in or for?
12    A.  It was a consumer class action suit.
13    Q.  And when was that?
14    A.  Approximately in the early 1980s.
15    Q.  And do you remember the caption of the case
16  or the name of the case?
17    A.  I do not.
18    Q.  Do you remember what the case was about?
19    A.  Yes.
20    Q.  And what was that?
21    A.  It was a discrimination suit against the
22  bank that I worked for, for -- I guess the word would

0008
1  be red-lining consumer applicants for the purchase of
2  furniture and appliances.
3      Q.  Okay.  And what was your role in the case?
4      A.  I was a liaison between the bank and the
5  law firm that was representing the bank.
6      Q.  So you were deposed on behalf of the
7  defendants in the case?
8          MR. WILLIAMS:  Do you understand the
9  question?
10          THE DEPONENT:  Yeah, I do.
11      A.  I can't recall exactly, but -- I don't know
12  for sure.
13  BY MR. PELAYO:
14      Q.  Yeah.  Let me phrase it this way:  Were you
15  a plaintiff in the case, were you suing, or were you
16  being sued, if you know?
17      A.  Well, I personally was not.
18      Q.  Right.  Not you.
19      A.  But the bank was the defendant.
20      Q.  And were you suing the bank?  Were you
21  among the group that was suing the bank?
22      A.  No.
0009
1      Q.  Okay.  And what was the outcome of that
2  case?
3      A.  It was settled.
4      Q.  And do you remember when it was settled?
5      A.  Again, sometime in the early '80s.
6      Q.  Okay.
7       Have you been deposed in connection with
8  any other proceeding or case?
9      A.  No.  Not to my knowledge.
10      Q.  Have you been involved in any other
11  criminal proceeding in your life?
12          MR. WILLIAMS:  Well, I'll object to the
13  word "other."  He hasn't identified any.
14          MR. PELAYO:  Fair enough.
15  BY MR. PELAYO:
16      Q.  Have you ever been involved in any criminal
17  proceeding?
18      A.  Well, I'm not quite sure how to answer
19  that.
20      Q.  Why don't you tell me what you're --
21      A.  I served on a jury that was involved in a
22  criminal case.
0010
1      Q.  Okay.  Fair enough.
2          Were you ever a defendant in a criminal
3  action?
4      A.  No.
5      Q.  Okay.  So since you've been deposed before,
6  I'll just refresh you a little bit on sort of the
7  ground rules on this deposition.

8          First, I'll start by saying we're just
9      going to have a conversation today, and the most
10     important thing to remember is you're under oath.
11             And you know what that means; right?
12         A.  Yes, I do.
13         Q.  And it's important to give verbal
14     responses, because the court reporter can't record a
15     nod of the head or an "uh-huh," so if you could just
16     make an effort.  I know it's hard sometimes to say
17     "yes" or "no" or articulate your verbal responses.
18             It's probably best to just let me finish a
19     question, so that the record is clear, primarily, and
20     I'll, of course, do the same.  I'll extend the
21     courtesy and let you finish your answers.
22             Throughout the deposition, your counsel,
0011
1      Kent, and I may have a dialogue.  You know, he may
2      object.  Unless he instructs you not to answer, you
3      are free to answer my questions, and I would like you
4      to do that.
5              Do you understand?
6          A.  Yes.
7          Q.  Okay.  Good.
8              Also, Mr. Howe, I just want to reiterate,
9      that we're going to be flexible with respect to
10     breaks today; okay?  So if at any time you feel like,
11     you know, you need to take a break, or you're tired,
12     whatever, or a comfort break, let me know.  I'd be
13     more than happy to accommodate that.  I think the
14     only thing I'd like is to just, if we're in the midst
15     of a question, let's just finish the question; okay?
16         A.  Yes.
17         Q.  Is that fair?  Okay.
18             Is there -- do you think -- is there any
19     reason you wouldn't be able to testify truthfully
20     today?
21         A.  No.
22         Q.  Okay.  So you're not on any medication
0012
1      today that would impair your ability to testify
2      truthfully today?
3          A.  No.
4          Q.  Okay.  Good.
5              Mr. Howe, what did you do to prepare for
6      today's deposition?
7          A.  I met with my attorney last evening.
8          Q.  Okay.  And when you say your attorney,
9      you're referring to Mr. Williams?
10         A.  Yes.
11         Q.  Did you -- where did you meet?
12         A.  In my home.
13         Q.  Okay.  Was anyone else present?
14         A.  No.
15             MR. WILLIAMS:  Well, your dogs were

16  present.
17      A.  Yeah.  My dogs were present.
18  BY MR. PELAYO:
19      Q.  But no one else was in the room when -- and
20  how long did you meet for?
21      A.  I guess an hour and a half, two hours, max
22      Q.  Okay.
0013
1       Have you spoken to anyone other than
2   Mr. Williams about this deposition?
3       A.  No.
4       Q.  Okay.  In anticipation of this deposition,
5   did you --
6       MR. PELAYO:  Can we go off the record for a
7   moment?
8           MR. WILLIAMS:  Sure.
9           (Pause in the proceedings.)
10          MR. PELAYO:  Back on the record.
11      Could you read back my question.
12          (Whereupon the partial question was read
13  back.)
14  BY MR. PELAYO:
15      Q.  -- did you review any documents?
16          MR. WILLIAMS:  You mean other than, for
17  example, the documents that he just produced to you?
18  BY MR. PELAYO:
19      Q.  Well, let me ask the question this way:
20          Did you review any documents during your
21  meeting last night with your lawyer?  With Kent?
22      A.  I don't recall specifically that we
0014
1   reviewed any specific documents.  It was more a
2   conversation.
3       Q.  Okay.  What about prior to your meeting
4   with Mr. Williams on your own?  Did you review any
5   documents or look for any documents in anticipation
6   of this deposition?
7       A.  Yes.
8       Q.  Okay.  And what documents did you look for?
9       A.  Cancelled checks, Medicare reports,
10  doctors' billings.  That type.
11      Q.  Anything else?
12      A.  No.  I think that --
13      Q.  Okay.
14          And did you -- I take it you found some of
15  those documents?
16      A.  Yes.
17      Q.  And are these -- is this -- the documents
18  you gave me this morning, is that the sum total of
19  the documents you were able to find?
20      A.  No.
21      Q.  Are there others?
22      A.  Yes.
0015

1    Q.   And have you -- where are those documents
2 now?
3    A.   They're at my home.
4    Q.   Okay.  So you did not give them to
5 Mr. Williams?  Or copies of them?
6    A.   Yeah.  I sent copies of them to my
7 attorneys, Kline & Specter.
8    Q.   Okay.  So just to make sure I understand
9 what you're telling me about these documents, does
10 Kline & Specter have a copy of every single document
11 that you looked for and found with regard to this
12 litigation?
13    A.   As far as I know, they do.
14        MR. WILLIAMS:  Except --
15        THE DEPONENT:  Except for these.
16 BY MR. PELAYO:
17    Q.   Except for these that you gave me this
18 morning?
19    A.   Yes.
20    Q.   Okay.  And just to go back to one thing,
21 did you -- you told me you didn't discuss any
22 specific documents with your counsel last night.
0016
1        Did you discuss these documents that you
2 handed me this morning?
3    A.   I think I discussed a couple of them that I
4 had found prior to our meeting last night, and then I
5 found some after he had already left.
6    Q.   I see.  So after he left, there were
7 documents that you found, and are those the documents
8 included in this pile that you handed me?
9    A.   Specifically, the check, and one of the
10 Medicare forms that came in the mail yesterday.
11    Q.   Okay.  So just so the record is clear, is
12 it your statement that you have handed over every
13 single document that is relevant to this case to your
14 lawyers, whether it be Mr. Williams or your lawyers
15 Kline & Specter?
16    A.   To the best of my knowledge, all that I
17 could find.
18    Q.   Okay.  And you searched at your home?
19    A.   Yes.
20    Q.   Is that the only place where the documents
21 would be?
22    A.   Yes.
0017
1    Q.   Okay.
2        Mr. Howe, how did you learn about this
3 lawsuit?
4    A.   I learned about it from an Internet -- on
5 the Internet.
6    Q.   On the Internet.  What was the web site?
7 Do you remember?
8    A.   Actually, the web site had to do with

9  medication I was receiving at the time called Lupron.
10      Q.  And what was the web site?
11      A.  I don't recall.
12      Q.  Okay.  Were you -- why were you looking on
13  the Internet?
14      A.  I think it just popped up as Lupron, and I
15  was in -- receiving the medication, so it struck an
16  interest chord.
17      Q.  When was this?
18      A.  This was several years ago.
19      Q.  Was it after 2000?
20      A.  Yeah.  2000, 2001.
21      Q.  Okay.  So you encountered -- let me see if
22  I understand what you are saying.
0018
1          You were taking Lupron, and did you, on
2  your own initiative, go and search on the Internet
3  for information about Lupron?
4      A.  I don't recall specifically doing that, but
5  I recall seeing the name Lupron, and because I was
6  being medicated with it, I opened it up.
7      Q.  Sure.  Did you look on the Internet,
8  though, on your own initiative?
9      A.  Yes.
10      Q.  Okay.  And what did this web site say?
11      A.  Well, I don't recall specific -- is that
12  me?
13          MR. WILLIAMS:  It's not me.
14      (Pause in the proceedings.)
15  BY MR. PELAYO:
16      Q.  Talking about the web site.  What did the
17  web site say?
18      A.  Well, I don't at this moment specifically
19  remember, but I think it was asking for people who
20  were taking Lupron or were in some kind of drug
21  program.
22      Q.  Was this web site sponsored or hosted by
0019
1  the Kline & Specter firm?
2      A.  To the best of my knowledge, yes.
3      Q.  Okay.  And so you read the web site, and
4  what did you do next?
5      A.  I indicated that I would be interested in
6  participating, and whatever information they had.
7      Q.  Did the web site ask you to complete any
8  form or submit any information?
9      A.  As I recall, I think they -- if I was
10  interested, then they were going to mail me some
11  forms to complete.
12      Q.  Right.  But you say -- how did you express
13  to them that you were interested?  Did you call them
14  or did you -- well, did you call them?
15      A.  No.
16      Q.  Did you submit information right online?

17    A.  Yes.
18    Q.  Do you remember what information you
19  submitted?
20    A.  At this moment, I don't.
21    Q.  Okay.  So you submitted information in
22  response to the request online, and what happened
0020
1  next?
2    A.   As I recall, I received some forms in the
3  mail which I completed and returned to Kline &
4  Specter.
5    Q.   And then what happened?
6        MR. WILLIAMS:  Objection.  Vague.
7  BY MR. PELAYO:
8    Q.   After you submitted the -- after you
9  returned the information that you had received in the
10  mail, after you completed it, did anything happen
11  next?
12        MR. WILLIAMS:  Same objection.  It's vague
13  BY MR. PELAYO:
14    Q.   Did you receive a response to what you
15  submitted?
16    A.  I believe so.
17    Q.  Okay.  And what did you receive?
18    A.   To the best of my recall, I received
19  something in the mail.
20    Q.  Okay.  And did you -- can you describe
21  generally what it was?
22        MR. WILLIAMS:  Yeah.  And at this point I'd
0021
1  caution the witness not to divulge anything that
2  would be the substance of a communication between
3  yourself and your lawyers.
4        So you can describe generally what it was
5  that you received, but don't get into the content of
6  it.
7    A.   I believe what it was, was a -- was my
8  consent to become a party of the suit against Lupron.
9  BY MR. PELAYO:
10    Q.   And did you sign that consent?
11    A.   To the best of my knowledge, I did.
12    Q.   Okay.
13        Now, did you subsequently speak with --
14  without telling me what you talked about, did you
15  subsequently talk with any lawyers?
16    A.  I believe I did.
17    Q.  Okay.  Do you remember their names?
18    A.  Don Haviland.
19    Q.  Anyone else?
20    A.  I believe the -- oh.  Molinari.
21    Q.  Okay.
22    A.  And Bert -- oh, I'm terrible with names.
0022
1  Bertilini.

2     Q.   Bertilini?

3     A.   Bert something.

4     Q.   Could it have been Benedetto?

5     A.   Benedetto.  I'm sorry.

6     Q.   Okay.  I appreciate that you're trying.  I

7 really do.

8         Okay.  So now you said that this was --

9 this inquiry, this consent that you signed, was all

10 in connection with Lupron.

11           Was there, to your knowledge, a lawsuit

12 relating to Lupron?

13     A.   I believe that was the gist of the

14 communiquT was -- had to do with a lawsuit.

15     Q.   Did you participate in any lawsuit related

16 to Lupron?

17     A.   If the forms that I signed were asking to

18 be a part of the class, yes.

19     Q.   Okay.  So now let me just go back to a

20 question that I asked at the beginning, and it may

21 have been confusing.

22           When I asked you if you had been

0023

1 involved -- and "involved," I meant it in the

2 broadest sense.

3         When I asked you if you had ever been

4 involved in any civil litigation, you told me about

5 the class -- consumer class action involving the

6 bank.

7         Would this be a second case now that you

8 were involved with?

9     MR. WILLIAMS:  I'm going to object to that

10 question.  I think it misstates your prior question.

11     My notes show you asked him if he had ever

12 been deposed before, not if he had ever been involved

13 in another lawsuit.  So I object that it

14 mischaracterizes the record.

15 BY MR. PELAYO:

16     Q.   Okay.  So you were not deposed in the

17 Lupron case?

18     A.   No.

19     Q.   Okay.

20         Were you ever involved or associated with

21 any other lawsuit?  Let me rephrase it.

22           Is it -- is my understanding correct that

0024

1 you've been involved in at least two civil lawsuits:

2 One, the bank case we talked about; and two, the

3 Lupron case we are now talking about; is that

4 correct?

5     A.   I believe so.

6     Q.   Okay.  Are there any other cases, civil

7 cases, that you've been involved or participated in?

8     A.   I -- if you are talking about the Zolodex,

9 the Medicare Class B, I'm a part of that.

10     Q.  Okay.  And that's, of course, the reason
11  you're being deposed today.
12     A.  Being deposed for that.
13     Q.  All right.  We'll get to that.  Good.
14         Now -- so you were not deposed -- now just
15  talking about the Lupron case for a moment.  Going
16  back to that one --
17     A.  Okay.
18     Q.  -- you were not deposed in that case;
19  correct?
20     A.  Correct.
21     Q.  What was your role in the case?
22     A.  Just as a member of the class.
0025
1     Q.  Were you a plaintiff in the case?
2     A.  If being a plaintiff, you mean was I a
3  member of the class, that would be yes.
4     Q.  Okay.  Do you know, were you a class
5  representative?
6     A.  I would presume so.
7     Q.  Okay.
8         And what is your understanding of the
9  status of the Lupron case?
10     A.  That it has been settled.
11     Q.  So your claims have been resolved in that
12  case?
13     A.  I've not been specifically advised as such,
14  no.
15     Q.  Okay.  Were you satisfied with the outcome
16  of that case?
17     A.  Satisfied?  If the unconscionable charges
18  for the medication are brought within better limits,
19  I would be satisfied.
20     Q.  All right.  We'll talk more about that.
21      But the case has been settled; correct?
22     A.  To my understanding.
0026
1     Q.  Okay.  Was it settled to your satisfaction?
2     A.  I don't know.
3     Q.  You don't know yet?  You don't know -- have
4  you received any information about the settlement?
5     A.  I have not.
6     Q.  So you're not familiar with the terms of
7  the settlement?
8     A.  No, I'm not.
9     Q.  And how do you know that there was a
10  settlement?
11     A.  I think my lawyers advised me of such.
12     Q.  Okay.
13         Now, let's talk about this case that
14  we're -- the reason that -- for today's deposition.
15         What claims are you bringing against the
16  defendants in this case?
17         MR. WILLIAMS:  I'll object to the extent

18  you're asking the witness for a legal conclusion or
19  opinion.
20  BY MR. PELAYO:
21      Q.  Go ahead and answer.  What claims are you
22  bringing against the defendants in this case?
0027
1       A.  I'm a member of the class which is asking,
2  again, that the price of these medications is
3  extremely high.
4       Q.  Okay.  So you -- let me ask the question a
5  different way.
6           How have you been harmed by the defendants
7  in this case?
8           MR. WILLIAMS:  Same objection.  Calling for
9  a legal conclusion.
10  BY MR. PELAYO:
11      Q.  Go ahead.  You can answer.
12      A.  Well, as a recipient of Zolodex and seeing
13  the prices that are being billed to my insurance
14  company and the prices that the insurance
15  companies actually -- Medicare actually pays, I'm
16  involved in having to pay the residual.
17      Q.  Okay.  And so what is your -- what harm
18  have you suffered?  I'm still not following.
19          MR. WILLIAMS:  Objection.  Asked and
20  answered.  He just told you how he was injured.
21  BY MR. PELAYO:
22      Q.  Let me ask it this way:  Is it your claim
0028
1  that drug prices are too high?
2       A.  Yes.
3       Q.  Okay.  Do you know how drug prices are set?
4       A.  No, I don't.
5       Q.  What do you -- why are the drug prices too
6  high?  Do you know?
7       A.  I wish I did.
8       Q.  So are you in this case because it is your
9  goal to lower the price of the medications that you
10  allegedly took?
11      A.  That would be one of my goals, yes.
12      Q.  Okay.  What are your other goals?
13      A.  Well, if the drug prices are too high, then
14  maybe out of this class action I can get some
15  compensation back to reduce what it's cost me out of
16  pocket.
17      Q.  Okay.  So one of the objectives in this
18  case is for you to get some money back; correct?
19      A.  Correct.
20      Q.  And how much money do you hope to get back?
21      A.  Oh, I have no idea.
22      Q.  Are you seeking money just for yourself?
0029
1       A.  No.  I'm seeking for myself and my other
2  class members.

3      Q.   Okay.  Is -- do you have an amount in mind
4   that you'd be willing to settle this case for?
5      A.   Not specifically, no.
6      Q.   Have you given that any thought?
7      A.   Not a lot, no.
8      Q.   Okay.  But at all?
9      A.   The only thought that I have is every time
10  I see a Medicare claim, and I see the cost of what
11  they're being billed for, and what Medicare allows
12  for that medication, there seems to be a disparity.
13     Q.   Okay.  So again, your concern is that the
14  price of the medications that you take is too high?
15     A.   Yes.
16     Q.   Okay.  Are you seeking anything other than
17  money out of this case?
18         MR. WILLIAMS:  I'm going to object as asked
19  and answered.  I believe he testified he also wants
20  to bring pricing down.
21         MR. PELAYO:  Okay.
22  BY MR. PELAYO:
0030
1      Q.   Other than bringing pricing down and money,
2   do you want anything else out of this case?  Do you
3   hope to attain anything else?
4      A.   No.  Well, maybe some satisfaction that
5   there is a truer price being charged for the
6   medication that we patients are being charged.
7      Q.   Okay.
8          Now, let's talk about the medications.  You
9   said that -- I think you said that the reason -- and
10  I'm paraphrasing -- the reason you're in this case is
11  because the price of the medications you took was too
12  high.
13         What are the medications that you're
14  bringing this case -- let me withdraw that.
15         What are the medications that you are
16  basing your claims on?
17         MR. WILLIAMS:  I'll object again that
18  you're asking for a legal conclusion.  And as counsel
19  knows, there's a complaint in this matter that sets
20  forth the medications that Mr. Howe took.  And so at
21  this point you're asking him to engage in a memory
22  test, so I object to that particular question without
0031
1   having him review the complaint and reciting for you
2   the medications that are listed.
3          MR. PELAYO:  All right.
4   BY MR. PELAYO:
5      Q.   Let me rephrase the question.
6          Without it being a memory test, what are
7   the medications that you believe, as you sit here
8   right now, this case is about?
9      A.   Zolodex.
10     Q.   Okay.

11      A.  And other Medicare-approved medications.
12      Q.  So is this case about every single case --
13  every single medication that Medicare pays for?
14      A.  I believe that it has to do with everything
15  that Medicare Class B covers.
16      Q.  Okay.  So does this case involve any
17  medications that you would take in the form of a
18  pill?
19      A.  I'm not quite sure I understand.
20      Q.  Is it your understanding that medications
21  that you would -- that are in the form of a pill are
22  at issue in this case?
0032
1       A.  That's not my understanding that pills are
2   involved.
3       Q.  Okay.  Is it your understanding, then --
4   you mentioned Class B or Part B of Medicare.
5       A.  Part B, yeah.
6       Q.  That's okay.
7           So Part B, what types of medications does
8   Part B cover?
9       A.  Well, I know it covers some of the
10  medications that I'm receiving.
11      Q.  Okay.  And which medications are those?
12      A.  Zolodex, and I'm not sure I can pronounce
13  the names of some of the others that I see on the
14  Medicare forms.
15      Q.  Okay.  So we'll get to that.
16          But at the moment the only one you remember
17  is Zolodex?
18      A.  Yeah.
19      Q.  What about Lupron?  Is Lupron in this case?
20      A.  I don't believe so.
21      Q.  Okay.
22      A.  I don't know.
0033
1       Q.  Okay.  Who are the defendants in this case?
2       A.  To the best of my knowledge, they are
3   manufacturers of drugs.
4       Q.  And do you contend that you suffered harm
5   from manufacturers of drugs that you did not take?
6           MR. WILLIAMS:  I'll object again to the
7   extent you're asking for a legal conclusion.
8               Also, lack of foundation factually.
9   BY MR. PELAYO:
10      Q.  Did you understand the question?
11      A.  No, I guess not.
12      Q.  Are you -- is it your allegation -- let me
13  strike that.
14          There are many drugs that are potentially
15  in this case that you did not take; correct?
16      A.  Correct.
17      Q.  Are you seeking -- are you making
18  allegations as against manufacturers of those drugs

19   that you did not take?
20        MR. WILLIAMS:  Same objection.  Lack of
21   foundation.
22        A.   Only as it applies to the members of the
0034
1    class.
2    BY MR. PELAYO:
3        Q.   And what do you mean by that?
4        A.   Well, there are a number of individuals in
5    the class, and they all are taking various
6    medications, some of which I'm taking, and many of
7    which I am not.
8        Q.   Okay.  I think we'll come back to that
9    point.
10        Mr. Howe, what's your date of birth?
11        A.   March 5th, 1926.
12        Q.   So you are 80 years old?  No.  79 years
13   old?
14        A.   79.
15        Q.   And what is your current address?
16        A.   Mailing address or street address?
17        Q.   Why don't you give me your street address
18   first.
19        A.   88187 Riverview Avenue, Mapleton, Oregon.
20        Q.   And you have another address for mail; is
21   that right?
22        A.   Yes.
0035
1        Q.   And what is that address?
2        A.   Post Office Box 1.
3        Q.   Okay.  Two separate addresses?
4        A.   Two separate addresses.
5        Q.   Okay.  And why do you have two separate
6    addresses?
7        A.   Mail is delivered to the post office box,
8    not to my home.
9        Q.   Is that because you live in a rural area?
10        A.   Correct.
11        Q.   Okay.  And how long have you lived on
12   Riverview Avenue?
13        A.   12 years.
14        Q.   12 years.  So if my math is right, since
15   1993 --
16        A.   Correct.
17        Q.   -- possibly?  And where did you live prior
18   to 1993?
19        A.   In Coarsegold, C-o-a-r-s-e-g-o-l-d,
20   California.
21        Q.   Sounds lovely.
22        And how long did you live in Coarsegold,
0036
1    California?
2        A.   About seven years.
3        Q.   Have you ever lived in Utah?

4      A.  No.
5      Q.  Okay.
6          Have you ever lived in Massachusetts?
7      A.  No.
8      Q.  Have you ever received medical care in
9  Massachusetts?
10     A.  No.
11     Q.  Have you ever purchased any medications in
12  Massachusetts?
13     A.  Not to my knowledge.
14     Q.  I'll take it that's a "no"?
15     A.  No.
16     Q.  Okay.
17         Did you ever work in Massachusetts?
18     A.  No.
19     Q.  Did you ever own property in Massachusetts?
20     A.  No.
21     Q.  Have you ever been to Massachusetts?
22     A.  Yes.
0037
1      Q.  Okay.  When did you go to Massachusetts?
2      A.  1975, approximately.
3      Q.  Okay.
4          And, Mr. Howe, your lawyer probably told
5  you this, but this case is pending in a court in
6  Massachusetts, in Boston, and there's a chance that
7  you might have to travel to Boston at some point in
8  the future.
9          Did you know that?
10         MR. WILLIAMS:  Well, object.  You're asking
11  him to speculate now.
12  BY MR. PELAYO:
13     Q.  Let me ask it this way:  If this case
14  required you to travel to Massachusetts, would you be
15  willing to do so?
16     A.  Yes.
17     Q.  Would you be able to do so?
18     A.  Yes.
19     Q.  Okay.
20         Mr. Howe, have you been -- ever been
21  married?
22     A.  Yes.
0038
1      Q.  How many times?
2      A.  Twice.
3      Q.  Okay.  And are you married still?
4      A.  Yes.
5      Q.  Okay.  And what's your wife's name?
6      A.  Marjorie Joyce.
7      Q.  Howe?
8      A.  Yes.
9      Q.  And how long have you been married to
10  Mrs. Marjorie Joyce Howe?
11     A.  49 years-plus.

12    Q.  Wow.  That's great.
13         And how old is Marjorie Joyce Howe?
14    A.  76.
15    Q.  Do you have any children?
16    A.  Yes.
17    Q.  How many?
18    A.  Daughter.
19    Q.  And is your daughter -- does she receive
20  health care benefits through your insurance?
21    A.  No.
22    Q.  How old is your daughter?
0039
1    A.  She is -- God.  42.
2    Q.  Okay.
3    A.  Close.
4    Q.  Let's talk a little bit about your
5  employment background.
6    A.  Okay.
7    Q.  What -- and I don't want to go into --
8  we're going to talk about it briefly.  If we need to
9  talk about it in more depth, we'll explore it as we
10  go; okay?
11    A.  Okay.
12    Q.  Do you have -- in general, what is your
13  background or education or training?  Do you have a
14  training or a skill or a profession?
15    A.  Well, that's a multiple question.
16    Q.  It is.  It is.  And that's my fault.
17         What is your educational background?
18         MR. WILLIAMS:  After high school?
19  BY MR. PELAYO:
20    Q.  After high school.  And just interested
21  briefly.
22    A.  I graduated from the California College of
0040
1  Arts and Crafts.
2    Q.  And what year was that?
3    A.  That would have been about 1950.
4    Q.  Okay.  You lived -- I note that you lived
5  in California prior to moving to Oregon.  Are you a
6  native Californian?
7    A.  Yes.
8    Q.  Okay.
9         Now, what did you study at the California
10  College of Arts and Crafts?
11    A.  Art.  Painting.
12    Q.  Commercial art or --
13    A.  No.  Fine art.
14    Q.  Fine art.  And do you have any other
15  educational background?  Any other advanced learning?
16    A.  No.
17    Q.  So now fast forward to 1991 or so.  Where
18  were you working in 1991?
19    A.  I had been -- I wasn't working in 1991.

20     Q.  What were you doing in 1991?
21     A.  I was on semi-retirement from the bank that
22  I worked for.
0041
1     Q.  Right.  So when -- let's start with the
2  bank, then, if you don't mind.
3     A.  Okay.
4     Q.  When did you start working at that bank,
5  and -- when did you start working at the bank?
6     A.  1952.
7     Q.  And what was the name of the bank?
8     A.  That I originally worked for?
9  Anglo-California National Bank.
10     Q.  And then it subsequently had a lot of name
11  changes?
12     A.  A lot of name changes.
13     Q.  And then you worked at that bank through
14  when?  1952 through what?
15     A.  35 years.
16     Q.  Okay.  So 1987 or so?
17     A.  Yes.
18     Q.  And in 1987 did you retire?
19     A.  They retired me officially.
20     Q.  And what was the name of the bank in 1987?
21     A.  Wells Fargo.
22     Q.  And what was your role at the bank?  What
0042
1  was your job?
2     A.  I was an administrator in a regional
3  office.
4     Q.  You mean a branch?
5     A.  No.  It was a regional office that had many
6  branches that it was responsible for.
7     Q.  And what -- you were an administrator of
8  what?  Let me ask the question this way:  Was it
9  personnel?
10     A.  No, no.
11     Q.  That's what I'm asking.  What were you
12  doing?
13         MR. WILLIAMS:  You want him to describe his
14  duties generally?
15         MR. PELAYO:  Yeah.  Just generally.
16     A.  The region that I was in had branches that
17  stretched from Bakersfield to Yreka in California,
18  and through the central valleys, and it was my
19  responsibility to take care of all of the statistical
20  information for the manager of the region so that he
21  was apprised of what the branches were doing.  That
22  type of thing.
0043
1  BY MR. PELAYO:
2     Q.  Okay.
3     A.  It was recordkeeping.
4     Q.  So you retired in 1987.  Did you forego

5  your art career?
6      A.  I paint as a hobby.
7      Q.  Okay.  So you weren't working in the art
8  field?
9      A.  No.
10     Q.  What happened after 1987 when you
11 semi-retired?
12     A.  We stayed in Coarsegold for a few years,
13 and the weather was so hot that we started looking
14 for someplace that was cooler, and my daughter lives
15 in Washington.
16     Q.  Washington State?
17     A.  Yes.
18     Q.  Let me ask you differently.  After 1987 --
19     A.  Yeah.
20     Q.  -- when you left Wells Fargo, who did you
21 work for next?
22     A.  I did not work -- have not worked since.
0044
1      Q.  Okay.  I think -- and forgive me if I'm
2  misremembering.  I thought you said you were
3  semi-retired.  What did you mean by semi-retired?
4      A.  No.  They -- actually, they put me out to
5  pasture, if you will, in 1985, and told me they had
6  no job for me.  Wells had purchased the bank that I
7  worked for, and I didn't fit into their
8  administrative scheme, so they -- I went home, and
9  they paid me for two years, and then I retired
10 officially.
11     Q.  So from 1985 to 1987 you were paid for
12 being home?
13     A.  Yes.
14     Q.  You didn't have any actual job
15 responsibilities?
16     A.  None whatsoever.
17     Q.  Did they pay your full salary?
18     A.  Absolutely.
19     Q.  And was this pursuant to an agreement?
20     A.  I guess they call it a golden parachute or
21 something.
22     Q.  And was there any litigation involved with
0045
1  that agreement?
2      A.  No.
3      Q.  Okay.  So if I'm understanding what you're
4  telling me, since 1987 you've really not had any
5  employment?
6      A.  Well, actually, since 1985.
7      Q.  I understand.
8      A.  Yeah.  I have not had any employment.
9      Q.  I understand.
10         Have you -- were you a member of a union?
11     A.  As a banker?
12     Q.  Yes, sir.

13     A.  No.
14     Q.  Okay.
15         Have you ever worked for the Federal
16 government?
17     A.  Only as a member of the United States
18 Marine Corps.
19     Q.  Okay.  When were you in the Marines?
20     A.  1943 to 1946.
21     Q.  Did you serve overseas?
22     A.  Yes.
0046
1      Q.  Were you ever employed by any state
2 government?
3      A.  No.
4      Q.  Were you ever employed by any local
5 government?
6      A.  No.
7      Q.  Okay.
8          Can you tell me, again, from 1991 forward,
9 about Mrs. Marjorie Joyce Howe's employment.
10     A.  She has not been employed.  She's been a
11 housewife.
12     Q.  So --
13     A.  Which is a big job.
14     Q.  It certainly is.  But her whole life --
15     A.  No.  She was a teller in the bank when I
16 first joined the bank.  That's where we met.
17     Q.  I see.  You met at the bank?
18     A.  Yes.
19     Q.  But since 1990 she's been a housewife?
20     A.  Yes.
21     Q.  At least -- okay.
22         So over the last 15 years or so, since
0047
1 1990 -- that's my launching point --
2      A.  Okay.
3      Q.  -- what have been your source -- have
4 you -- you have not been employed?
5      A.  No.
6      Q.  Have you had any other sources of income?
7      A.  Just my retirement.
8      Q.  And that's through Wells Fargo?
9      A.  Yeah.  And Social Security when I became
10 eligible.
11     Q.  Okay.  What about any military pension?
12     A.  No.
13     Q.  Okay.
14         I'd like to talk now about your health care
15 coverage a little bit.
16     A.  Okay.
17         MR. WILLIAMS:  Before we get to that, it
18 sounds like we're going into another area now.
19         How are you doing on breaks?  Are you okay?
20     THE DEPONENT:  I'm okay.

21        MR. WILLIAMS:  You're okay?
22        THE DEPONENT:  Uh-huh.
0048
1            MR. WILLIAMS:  You mind if we take two
2  minutes --
3            MR. PELAYO:  Yes.  Absolutely.
4            (Pause in the proceedings.)
5  BY MR. PELAYO:
6      Q.  So I'd like to talk to you a little bit
7  about your health care coverage.
8      A.  Okay.
9      Q.  Now, you're 79 years old, so you've been on
10  Medicare for some time; is that right?
11      A.  Yeah.  Like since I was 65.
12      Q.  Okay.  And you turned 65, I guess, in 1991
13  Does that sound about right?
14      A.  I guess.
15      Q.  Okay.
16          So do you -- are you covered by Medicare?
17      A.  Yes, I am.
18      Q.  Okay.  And do you know whether your health
19  insurance plan through Medicare -- can I withdraw
20  that?
21          What type of health care insurance plan do
22  you have through Medicare?
0049
1      A.  Both A and B.
2      Q.  Okay.  So is it -- it's -- if you know, is
3  it the original Medicare plan?  Is it called the
4  original Medicare plan?
5      A.  I don't know.
6      Q.  Don't know.  Let me ask it this way:  You
7  have a Medicare card?  Yes?
8      A.  Yes.
9      Q.  Do you have it with you, by chance?
10      A.  Yes, I do.
11      Q.  Do you mind if I see it?  Just kind of a
12  shortcut as to what --
13          MR. WILLIAMS:  Let me see it first.
14          THE DEPONENT:  It's getting a bit tattered
15        (Pause in the proceedings.)
16          MR. WILLIAMS:  I have no objection to you
17  seeing it.  The question that I have is whether we
18  need to mark it as an exhibit or not.
19          MR. PELAYO:  I really was just going to
20  describe it and refer to it.
21          MR. WILLIAMS:  That's fine.  Can you please
22  not --
0050
1          MR. PELAYO:  His private information?
2          MR. WILLIAMS:  Well, his Social Security
3  number, appears to have it on there.  Can you please
4  not write that down or say that for the record?  I
5  think we're redacting that from the materials.

6       MR. PELAYO:  Yeah.  It's, actually, in the
7  documents, just so you know.
8       MR. WILLIAMS:  Okay.  Let the record
9  reflect I'm tendering to counsel Mr. Howe's Medicare
10  card.
11       MR. PELAYO:  Okay.
12  BY MR. PELAYO:
13       Q.   And the reason I wanted to see it is, and
14  let's see if we can agree, it's a red, white and blue
15  card.
16       You agree?
17       A.   Yes.
18       Q.   And it says that, "Mr. Howe is entitled to"
19  -- and then it says, "Hospital, Part A," and next to
20  that, it says the date, "3-1-91."
21       A.   Okay.
22       Q.   And then it says, "Medical, Part B," and
0051
1  then there's a date, and it says, "3-1-91."
2       A.   Okay.
3       Q.   And -- okay.  And then it's signed by you.
4       MR. WILLIAMS:  And counsel has now handed
5  Mr. Howe back his medical -- his Medicare card.
6  BY MR. PELAYO:
7       Q.   Thank you for that.
8       It seems from the card that you enrolled in
9  Part A of Medicare in 1991.  Does that sound right?
10       A.   Sounds right.
11       Q.   And it sounds like you -- and from the
12  card, I gather, you enrolled in Part B on the same
13  date --
14       A.   Same date.
15       Q.   -- in 1991.  You agree with that?
16       A.   I agree.
17       Q.   Has Medicare ever declined coverage for
18  you?
19       A.   I don't recall at this moment just sitting
20  here whether they have or not.
21       Q.   Okay.
22       A.   Any specific declination.
0052
1       Q.   So as best you recall right now, you do not
2  believe they've ever denied coverage?
3       A.   No.
4       Q.   Has -- have you ever dropped your Medicare
5  coverage?
6       A.   No.
7       Q.   Okay.
8       Has your Medicare coverage ever been
9  terminated or cancelled for any reason?
10       A.   No.
11       Q.   Okay.
12       Do you receive information in the mail
13  about the Medicare program?

14     A.  Yes.
15     Q.  Okay.  What kind of information do you
16 receive?
17     A.  I receive a booklet each year showing the
18 Medicare -- you know, a thick book.
19     Q.  Right.  What about -- do you receive
20 explanations of benefits?  Do you know what I mean by
21 that?
22     A.  You talking about those forms (indicating)?
0053
1        MR. PELAYO:  Mr. Howe is pointing to the
2 set of documents he handed to me this morning.
3     A.  The CMS forms?
4 BY MR. PELAYO:
5     Q.  Yes.  There are CMS forms.  That is what
6 I'm talking about.
7     A.  Yes.
8     Q.  So you receive those from time to time in
9 the mail?
10     A.  Yes.
11     Q.  What do you typically do with those?
12     A.  Cringe at the price that I'm being charged
13     Q.  What I meant was, do you read them?
14     A.  Oh, yes.
15     Q.  And do you throw them away?  Do you keep
16 them?
17     A.  No, I keep them.
18     Q.  You keep them?  Where do you keep them?
19     A.  Normally with my income tax filings.
20     Q.  So --
21     A.  Year to year.
22     Q.  And you keep pretty much all of them?
0054
1     A.  Yeah.  To the best of my knowledge, I keep
2 them all.
3     Q.  And have you produced all of your
4 explanations of benefits that you have in your files
5 to your lawyers?
6     A.  Now, what do you mean by "all"?
7     Q.  When you receive these explanations of
8 benefits, these --
9     A.  Yes.
10     Q.  -- CMS forms as you've described them --
11     A.  Yes.
12     Q.  -- my understanding is you read them and
13 file them in the cabinet with your IRS materials;
14 correct?
15     A.  Right.  Correct.
16     Q.  And I think you stated you probably kept
17 most of them?
18     A.  Over the years.
19     Q.  No one's recordkeeping is perfect, I
20 suppose.
21        When -- in connection with this litigation,

22  have you looked through that cabinet where those
0055
1  documents are?
2      A.  Yes, I did.
3      Q.  And did you give any of those CMS forms, as
4  you're calling them, to your lawyers?
5      A.  Yes.
6      Q.  The ones that you selected, why did you
7  select those?
8      A.  Because they seemed to relate to the
9  Zolodex medication and the urology treatment and the
10  chemotherapy that I was receiving.
11      Q.  Okay.  So are those the only ones you were
12  looking for?
13      A.  Yes.
14      Q.  And did you produce every single CMS
15  form -- when I say "produce," I mean give to your
16  lawyers -- every single of these CMS forms that
17  related to your CMS and cancer treatment?
18          MR. WILLIAMS:  Hold on.  That relates to
19  his CMS and cancer treatment?
20          MR. PELAYO:  I probably -- I'll state it
21  again.
22          MR. WILLIAMS:  Take another run at that
0056
1  one.
2  BY MR. PELAYO:
3      Q.  Did you give to your lawyers every one of
4  these so-called CMS forms in your cabinet that
5  related to Zolodex and the related cancer treatment?
6      A.  To the best of my knowledge, yes.
7          MR. PELAYO:  I'll just, at this point,
8  state for the record that we would expect that all
9  CMS forms for Zolodex-related treatment since 1991 to
10  have been produced in connection with this
11  litigation, and I just ask that counsel perform a
12  diligence search for those documents.
13          MR. WILLIAMS:  You don't have to respond to
14  that.  I think the witness has testified that he did
15  exactly what counsel is requesting.
16  BY MR. PELAYO:
17      Q.  Did you look -- still talking about these
18  CMS documents.  Is -- do I understand your statement
19  to be that you were only looking for Zolodex-related
20  documents?
21      A.  That's what I was looking for.
22      Q.  Okay.  Let's talk about your Medicare
0057
1  coverage.
2          How does -- can you describe how the
3  reimbursement works?
4          MR. WILLIAMS:  I'll object as vague.
5  BY MR. PELAYO:
6      Q.  How does your health care insurance plan

7  through Medicare work?
8      MR. WILLIAMS:  Same objection.  You mean
9  today?
10  BY MR. PELAYO:
11     Q.  Has your insurance plan changed -- has your
12  Medicare health insurance coverage changed since 1990
13  to the present?
14      MR. WILLIAMS:  Same objection.  Also, lack
15  of foundation.
16     THE DEPONENT:  Do I answer?
17      MR. WILLIAMS:  If you can.
18     A.  I -- to my knowledge it hasn't changed.
19  BY MR. PELAYO:
20     Q.  It hasn't changed?  Okay.
21      And do you -- what is your understanding of
22  how it covers you?  How you get reimbursed through
0058
1  that plan?
2      MR. WILLIAMS:  Same objection.  Vague.
3  BY MR. PELAYO:
4     Q.  If you understand my question.  If not,
5  I'll give it a shot to rephrase it.
6     A.  Well, as I understand your question, when I
7  see a doctor, I present my Medicare form to them.
8     Q.  Right.
9     A.  And they do whatever they're going to do to
10  me, and then they bill Medicare.
11     Q.  Okay.  And then how much does -- how -- can
12  I withdraw that?
13      And how -- what is your understanding of
14  how much Medicare pays versus how much you pay?
15     A.  My understanding is that Medicare pays
16  80 percent of the amount that they approve.
17     Q.  Okay.  And does that mean that the
18  remaining 20 percent is your responsibility?
19     A.  Well, I have supplemental insurance.
20     Q.  Okay.  And we'll talk about that, but what
21  is your understanding about the Medicare plan itself?
22  The remaining 20 percent?  Is that your --
0059
1     A.  That would be my responsibility.
2     Q.  Okay.
3      How do you pay for your Medicare coverage?
4     A.  My Medicare coverage is deducted from my --
5  let me see.  It seems to me it's deducted from my
6  pension.
7     Q.  Your pension from Wells Fargo?
8     A.  Yes.
9     Q.  And how much is deducted?  Do you know?
10  I'll just add that I don't need a specific amount.
11  If you can ballpark it for me, that would be fine.
12     A.  Right off the top of my head, I can't
13  remember at this moment.
14     Q.  Is it a -- is it a premium?  An insurance

15   premium?
16       A.   That's the way I view it.
17       Q.   And is it -- do you pay for it monthly?
18   yearly?
19       A.   Monthly.
20       Q.   Okay.  Do you know whether it's for Part A
21   or for Part B?
22       A.   I assume it's for both.
0060
 1       Q.   Has the amount that you pay changed over
 2   the course of the last 15 years?
 3       A.   Yes.
 4       Q.   Okay.  And do you pay this premium whether
 5   or not you receive any medical treatment?
 6       A.   Correct.
 7       Q.   Do you have -- with respect to Medicare
 8   now, do you have any yearly deductible?
 9       A.   Yes.
10       Q.   Okay.  And what is the deductible?
11       A.   As I recall, it's $750.
12       Q.   And what does that mean?  What is your
13   understanding of what that means?
14       A.   My understanding is that in the initial
15   billings of any given calendar year, that the first
16   $750 of such billings are my responsibility.
17       Q.   And is that with respect to -- are you
18   talking about hospital stays, or are you talking
19   about -- are we talking about Part A coverage or
20   Part B coverage?  Do you know?
21       A.   I assume it's for both.
22       Q.   Okay.
0061
 1          MR. WILLIAMS:  But you don't know?
 2       A.   But I don't know.
 3          MR. WILLIAMS:  Don't assume.
 4          THE DEPONENT:  Yeah, I know what that means
 5   in the dictionary.
 6   BY MR. PELAYO:
 7       Q.   You mentioned that you have supplemental
 8   coverage for the 20 percent that Medicare doesn't
 9   pay; correct?
10       A.   Correct.
11       Q.   And who is your supplemental coverage
12   provider?
13       A.   United Health Care.
14       Q.   Is it just United Health Care, or is it
15   United Health Care of some state?
16       A.   I don't recall.  I always viewed it as
17   United Health Care.
18       Q.   Okay.
19       A.   I know where their office is, but...
20       Q.   Where is their office?
21       A.   I believe it's in Utah.
22       Q.   Do you know why you have -- why someone in

0062
1  Oregon would be covered by a plan that's in Utah?  Do
2  you have any idea?
3      A.  Well --
4          MR. WILLIAMS:  I object to the form of the
5  question.
6      A.   The United Health Care is provided by the
7  bank as a supplement to Medicare.
8  BY MR. PELAYO:
9      Q.   Okay.  I wanted to ask you about that.
10          So is this -- this United Health Care
11  supplemental coverage, you say, is provided by the
12  bank.  I assume you mean Wells Fargo?
13      A.   Wells Fargo.
14      Q.   So have you had United as your supplemental
15  provider -- can we use that term, supplemental
16  provider?
17      A.  Sure.
18      Q.   Have you had United Health Care as your
19  supplemental provider since you left Wells Fargo in
20  1991?
21      A.  I think the name has changed somewhere
22  along the line, but -- I don't recall what the
0063
1  original name, but it's been --
2      Q.   Actually, I should probably clarify.
3       You left the bank in 1987; correct?  1985,
4  and then you had this two-year period where you were
5  at home.
6      A.  Right.  Right.
7      Q.   During that two-year period at home, did
8  you have health care -- health insurance coverage?
9      A.   Yeah.  I was covered by the bank's
10  insurance as an employee.
11      Q.   Okay.  Still as a full-time employee?
12      A.   Still as a full-time employee.
13      Q.   And was that with United Health Care,
14  however it may have been called at the time?
15      A.   No.  I think the employees' coverage was
16  something different.  I don't recall exactly.
17      Q.   Okay.  Then you formally retired on what
18  date?
19      A.   It was in 1987.
20      Q.   Time of year?  Spring?  Summer?
21      A.   It would probably be summer.  In the
22  summer.
0064
1      Q.   Okay.  And at that point you say you
2  switched health care providers?
3      A.   Well, then I became a retired --
4      Q.   Okay.
5      A.   -- member of Wells Fargo, and whatever the
6  retirees' insurance package was, that's what I had.
7      Q.   And I think you said -- and again, I'm

8   paraphrasing -- that since that time it's been United
9   Health Care, although the name may have changed?
10      A.  Yes.
11      Q.  Okay.  So just so that we're on the same
12  page, since 1987 to the present, your health
13  insurance provider, supplemental health insurance
14  provider, has been United Health Care?
15      A.  Correct.
16      Q.  Now, of course, you became eligible for
17  Medicare in 1991; correct?  I -- that's my guess when
18  you turned 65.
19      A.  Yes.
20      Q.  So from 1987 until approximately 1991 when
21  you turned 65, you did not have Medicare?
22      A.  No.
0065
1       Q.  And you only had this health insurance
2   coverage through United Health Care?
3       A.  Correct.  To the best of my knowledge.  You
4   know, that's --
5       Q.  I appreciate that.
6       A.  I'm not quite sure.
7       Q.  So now when you became eligible for
8   Medicare, what happened to the relationship between
9   Medicare and United Health Care?
10         MR. WILLIAMS:  Objection.  Lack of
11  foundation.
12         MR. PELAYO:  I'll rephrase that.
13  BY MR. PELAYO:
14      Q.  When you became eligible for Medicare, did
15  Medicare become your primary insurer?
16      A.  Yes.
17         MR. WILLIAMS:  Well, hold on.  Let me
18  object.  Again, lack of foundation.
19  BY MR. PELAYO:
20      Q.  Did you understand my question?
21      A.  Medicare was the only insurance I had.
22      Q.  Okay.  But you still had United Health
0066
1   Care; correct?
2       A.  Correct.
3       Q.  Did you have to -- did your United Health
4   Care coverage end?
5       A.  You mean when I retired?
6       Q.  When you became Medicare eligible, did your
7   United Health Care coverage end?
8       A.  No.
9       Q.  Did it become secondary to Medicare?  Do
10  you know?
11      A.  Yes.  That was my supplement.
12      Q.  Okay.
13         Who pays for your supplemental health care
14  coverage with Medicare?
15      A.  I pay a premium out of my retirement.

16    Q.  Out of your pension from the bank?
17    A.  Yes.  Yes.
18    Q.  And again, how much is --
19    A.  It's around $80.
20    Q.  $80 per month?
21    A.  Yes.
22    Q.  Okay.  Can you describe to me, please, how
0067
1  your supplemental insurance works?  And I'm asking in
2  the same way that we talked about how Medicare works,
3  and you explained the 80/20.  How does your
4  supplemental insurance work?
5         MR. WILLIAMS:  Objection.  Vague.  You can
6  answer.  I just objected to it for the record.
7  Answer to the best of your ability.
8     A.  Okay.  My understanding is that at the same
9  time that I provide my doctor, or whatever, my
10  Medicare form, I also give them my United Health Care
11  card, and they, at the expiration of whatever
12  treatment I have, bill not only Medicare, but they
13  also bill the supplement insurance.
14  BY MR. PELAYO:
15    Q.  Okay.  And with respect to reimbursement,
16  how does your United Health Care coverage work?
17    A.  They cover 80 percent of the 20 percent
18  that Medicare doesn't cover.
19    Q.  Okay.  So, then, it's my understanding
20  that -- can I withdraw that?
21        So, then, with respect to the 20 percent
22  that Medicare didn't cover, you're paying 20 percent
0068
1  of that 20 percent?
2     A.  I'm not sure.
3     Q.  I can rephrase.
4     A.  Please.
5     Q.  Medicare doesn't pay for 20 percent;
6  correct?
7     A.  Correct.
8     Q.  United Health Care pays for 80 percent of
9  that 20 percent?
10    A.  Correct.
11    Q.  So your remaining portion is 20 percent --
12    A.  Yes.
13    Q.  -- of the 20 percent?
14    A.  Of the 20 percent.
15    Q.  Okay.
16        Does your United Health Care supplement pay
17  for hospital care?
18    A.  I believe --
19        MR. WILLIAMS:  If -- go ahead.  I was going
20  to say if you know.  Lack of foundation.
21    A.  I believe that there is a -- that they
22  cover whatever is the 20 percent that Medicare
0069

1  doesn't cover, whether it be A or B.
2  BY MR. PELAYO:
3      Q.  Okay.  Would -- are physician-administered
4  drugs such as Zolodex covered?
5      A.  According to the bills I get, yes.
6      Q.  Okay.
7          Do you have a deductible with respect to
8  your supplemental health care coverage, United Health
9  Care?
10      A.  Not to my knowledge.
11      Q.  Do you have a cap on the amount that your
12  supplemental insurance will pay?
13      A.  Yes.
14      Q.  And what is that cap?
15      A.  150,000.
16      Q.  $150,000.  Is that lifetime?
17      A.  Cumulative, yeah.
18      Q.  So that means, as I understand it, that
19  your supplemental provider will pay up to $150,000
20  over the life of the policy?
21      A.  That's my understanding.
22      Q.  That's your -- okay.
0070
1          Mr. Howe, do you receive any documents from
2  your supplemental insurance provider that would
3  explain the details of that coverage from them?
4      A.  Yes, sir, I do.
5      Q.  What kind of documents do you receive?
6      A.  Similar to the Medicare documents.
7      Q.  So you have a document that describes the
8  plan details?
9          MR. WILLIAMS:  I'll object to that as
10  vague.
11          MR. PELAYO:  I'll ask it again.
12  BY MR. PELAYO:
13      Q.  Have you ever received a document from
14  United Health Care that describes the details of your
15  plan?
16      A.  No.
17      Q.  So you don't have such a document in your
18  possession at home?
19      A.  Not from United Health Care.
20      Q.  From whom do you have it?
21      A.  From Wells Fargo.
22      Q.  Okay.  So you received a document from
0071
1  Wells Fargo that relates to United Health Care?
2      A.  Yes.
3      Q.  Okay.  And it describes the details of the
4  plan?
5      A.  Yes.
6      Q.  Okay.  And you have that at home?
7      A.  Yes.
8      Q.  Okay.

9        Do you receive documents -- which I'll call
10  explanations of benefits, like the CMS documents that
11  we talked about earlier -- do you receive such
12  explanations of benefits with respect to United
13  Health Care?
14      A.  Yes, I do.
15      Q.  And do you have those at home?
16      A.  Yes.
17      Q.  And would those be in the same cabinet
18  where you keep the Medicare CMS documents?
19      A.  I keep -- yes.
20      Q.  Okay.
21        And would you say that you have
22  approximately the same level of recordkeeping for
0072
1  United Health Care that you do for Medicare?
2      A.  Yes.
3      Q.  Okay.  So -- and this is a compliment --
4  you've pretty much kept most of these records?
5      A.  Yes.
6      Q.  Okay.
7        Have you -- in connection with this
8  litigation, have you given any of these documents
9  we've just been describing with respect to United
10  Health Care to your lawyers?
11      A.  I believe I have.
12      Q.  Okay.  And this is not a question for you,
13  this is just a statement for the record.
14      MR. PELAYO:  Mr. Williams, we will request
15  formally that we receive all the documents relating
16  to Mr. Howe's supplemental insurance coverage which
17  he has testified he has in his possession and has
18  given to counsel.  We'd like those produced
19  immediately, and we've documented this request in
20  several letters to counsel.
21        We believe that these documents are urgent
22  to our ability to prepare for the upcoming class cert
0073
1  submission as they bear directly upon his coinsurance
2  payment, and whether or not it's related to AWP.
3      MR. WILLIAMS:  I'll note the request, and I
4  have no response other than we'll take it under
5  advisement.
6        As you know, this is a broader issue that
7  covers other deponents, other documents, and we're
8  not going to resolve it today, but you've stated your
9  request on the record, and I've noted it.
10      MR. PELAYO:  Okay.
11  BY MR. PELAYO:
12      Q.  Mr. Howe, did -- I think I know the answer
13  to my own question.
14        Your wife has been a home -- let me
15  withdraw it.
16        Your wife has not worked since at least

17  1990; correct?
18      A.  Correct.
19      Q.  So does she have any insurance coverage of
20  her own?
21      A.  She has Medicare A and B.
22      Q.  Okay.  Does she have a supplemental
0074
1  insurance provider?
2          MR. WILLIAMS:  I'm going to object to this
3  line of questioning, because Mr. Howe's wife has not
4  been submitted as a class representative.  She, if
5  anything, is an absent class member in this matter,
6  and so I think it's improper for you to seek
7  discovery through Mr. Howe of Mrs. Howe's coverage
8  unless you can show me how it relates to his claim.
9          MR. PELAYO:  And I will.
10  BY MR. PELAYO:
11      Q.  All I'm interest in knowing, really, is
12  whether you have had the opportunity to be insured
13  through any insurance coverage that your wife may
14  have had.
15          So, for instance, if she were employed --
16  which she was not -- I would like to know whether you
17  had had the opportunity to be on her insurance plan?
18      A.  No.
19          MR. WILLIAMS:  I don't understand the
20  question because you just answered it.
21          MR. PELAYO:  I did.  And that's why I said
22  I think I know the answer to my own question.
0075
1  BY MR. PELAYO:
2      Q.  So let me ask it again and ask it simply.
3          Has your wife had any employer-provided
4  coverage since -- insurance coverage since 1990 to
5  the present?
6          MR. WILLIAMS:  That covers him?
7  BY MR. PELAYO:
8      Q.  I'm just asking since 1990 to the present,
9  your wife has not been employed?
10      A.  No.
11      Q.  Okay.  I'll just drop it.  I think I know
12  the answer to the question.
13          Other than United Health Care, have you had
14  any other supplemental coverage?  Insurance coverage?
15      A.  No.
16      Q.  Since 1990 to the present?
17      A.  No.
18      Q.  Okay.
19          Do you know, Mr. Howe, whether there is any
20  difference in reimbursement under your United Health
21  Care plan whether you use a physician provider who
22  is, quote, in network, or, quote, out of network?
0076
1      A.  I don't understand the question.

2          MR. WILLIAMS:  Object to the form of the
3  question.
4  BY MR. PELAYO:
5      Q.  Let me start by saying that by "provider,"
6  I'm referring to a physician, or any person from whom
7  you receive medical treatment or services; okay?
8      A.  Okay.
9      Q.  Do you know whether United Health Care
10  reimburses a different amount whether the medical
11  provider that you use is in their network versus out
12  of their network?
13      A.  I have no knowledge of that.
14      Q.  Okay.
15          Mr. Howe, have you ever received Medicaid?
16      A.  No.
17      Q.  Okay.
18          Now, you mentioned that you were a veteran?
19      A.  Yes.  I was in the Marines.
20      Q.  You were in the Marines in the early 1940s?
21      A.  Yes.
22      Q.  Do you receive any health insurance
0077
1  coverage through the military?
2      A.  I have not availed myself of any of that.
3      Q.  You have not availed yourself of that?
4      A.  No.
5      Q.  And what -- so it sounds like you've had
6  the opportunity to -- let me withdraw that.
7          What have you not availed yourself of?
8      A.  Whatever medical through the Veterans
9  Administration that would be available to me.
10      Q.  And do you know what medical that is?
11      A.  No, I don't.
12      Q.  Have you ever heard of something called
13  Tricare?  T-r-i-c-a-r-e.
14      A.  No.
15      Q.  Have you ever heard of something called
16  CHAMPUS?
17      A.  I've heard of CHAMPUS, yes.
18      Q.  Okay.  What is -- what do you believe
19  CHAMPUS to be?
20      A.  A military insurance plan.
21      Q.  Okay.  Why have you not -- why have you
22  decided not to avail yourself of military insurance,
0078
1  health insurance coverage?
2          MR. WILLIAMS:  Objection.  Argumentative.
3  BY MR. PELAYO:
4      Q.  Did you earlier tell me that you decided
5  not to avail yourself of military insurance coverage?
6      A.  Yes, I did.
7      Q.  Okay.  Why?  Why did you decide not to
8  pursue that?
9      A.  Because I had adequate coverage where I was

10 employed.
11     Q.  Okay.
12        Have you -- when you made that decision
13 that you had adequate coverage where you were
14 employed -- let me withdraw that.
15        What about after you retired and you were
16 no longer employed?  Did you revisit the question
17 whether or not you should available yourself of the
18 military health insurance coverage?
19     A.  No, I did not.
20     Q.  And why not?
21        MR. WILLIAMS:  Same objection.
22 Argumentative.
0079
1     A.  Again, I still had medical coverage as a
2 retired employee of Wells Fargo.
3 BY MR. PELAYO:
4     Q.  Fine.
5        Did you, in making this analysis -- and
6 this is my word, "analysis" -- did you give any
7 consideration to how prescription medications were
8 reimbursed to you under the military plan versus your
9 existing plan with United Health Care?
10     A.  No.
11        MR. WILLIAMS:  Objection.  Vague and lacks
12 foundation.
13        Also, just give me a moment to get my
14 objection in before you answer.
15     A.  Okay.  Sorry.
16        MR. WILLIAMS:  That's all right.
17 BY MR. PELAYO:
18     Q.  I'll ask it again.  When you decided to
19 stick with United Health Care, did you give any
20 thought to how prescription medications were
21 reimbursed under United Health Care versus the
22 military plan?
0080
1     A.  No.
2        MR. WILLIAMS:  Same objection.  Lack of
3 foundation, ambiguous.
4        Go ahead and answer it if you can.
5 BY MR. PELAYO:
6     Q.  Go ahead.
7     A.  No.  I didn't give it any such thought.
8     Q.  Okay.
9        Mr. Howe, I -- you've taken Lupron and then
10 Zolodex, I believe you said; right?
11     A.  Yes.
12     Q.  Was -- did you take those medications for
13 cancer?
14     A.  Yes.
15     Q.  Okay.  When were you diagnosed with cancer?
16     A.  I believe it was 2001.  Thereabouts.  In
17 that year.  2000, 2001.

18    Q.  Okay.  Prior to 2001, did you receive any
19  medical services -- let me withdraw that.
20        Prior to 2001, did Medicare pay for any
21  prescription medicines that are at issue in this case
22  on your behalf?
0081
1        MR. WILLIAMS:  Objection.  Lack of
2  foundation.
3    A.  I'm not aware of anything prior to my
4  receiving Lupron and Zolodex.
5  BY MR. PELAYO:
6    Q.  Let me ask the question this way:  Do you
7  believe -- when -- sorry.  I'll withdraw that.
8        You've testified that you were overcharged
9  for prescription medications, which is why you're
10  pursuing this litigation.
11    A.  That's my belief.
12    Q.  When was the first time that you believe
13  this happened to you?
14    A.  The first bill I received from Medicare
15  showing the price for a Lupron shot.
16    Q.  Okay.  And when was that?  Approximately
17  2001?
18    A.  Yes.
19    Q.  Okay.
20        I'd like to focus the next series of
21  questions on what we'll call Medicare Part B, or
22  Part B, which are medical services under Medicare;
0082
1  agreed?
2    A.  Okay.
3    Q.  Okay.
4        MR. WILLIAMS:  Counsel, I'd like to take a
5  10-minute break here.  We've been going for about an
6  hour and a half.
7        THE DEPONENT:  Yeah.  I could use a break.
8        MR. PELAYO:  All right.  Sure.
9        MR. WILLIAMS:  All right.  Thank you.
10      (Whereupon a break was taken.)
11  BY MR. PELAYO:
12    Q.  Okay.  We were picking up with -- I believe
13  you said -- can I withdraw that question before the
14  break?
15        I believe you said that your first
16  treatment of Lupron was in 2001; correct?
17    A.  To the best of my recollection.
18    Q.  Was that in -- what time of year?  Or if
19  you have an exact date, I'll take an exact date.
20    A.  Seems to me it was at the beginning of the
21  year.  January, February.
22    Q.  And who diagnosed -- was it prostate
0083
1  cancer?
2    A.  Yes.

3    Q.  Okay.  And who diagnosed it?
4    A.  Dr. Peter Bergreen.
5    Q.  Peter --
6    A.  Bergreen.  B-e-r-g-r-e-e-n.
7    Q.  And where is his practice?
8    A.  Here in Eugene.
9    Q.  Does the practice have a name?
10   A.  Oregon Urology Specialists.
11   Q.  So he's a urologist?
12   A.  He's a urologist.
13   Q.  Okay.  And it's -- since that time you've
14  been receiving Lupron, and then, subsequently,
15  Zolodex, I gather?
16   A.  Yes.
17   Q.  Prior to 2001, did you receive any other
18  medications that would have been covered by Part B?
19       MR. WILLIAMS:  Objection.  Asked and
20  answered.
21       You can answer it if you can.
22   A.  I would presume so, because I've received
0084
1  medication for other things other than before cancer
2  was diagnosed.
3  BY MR. PELAYO:
4    Q.  Okay.  Do you know whether the medications
5  you received prior to 2001 -- which of those
6  medications was reimbursed under Part B?
7    A.  Most of the medications that -- before the
8  injections would be pill form, which would be covered
9  under the supplement through Caremark.
10   Q.  Okay.  So it wasn't until -- so isn't it
11  true that it wasn't until 2001 that you started on
12  any injections that would have been covered by
13  Part B?
14   A.  I believe so.
15       MR. WILLIAMS:  Objection.  Foundation.
16  BY MR. PELAYO:
17   Q.  Okay.  Do you know who determines how much
18  of your medical expenses Medicare will cover?
19   A.  I -- please --
20   Q.  Sure.  I'll repeat it.
21   A.  -- repeat the question.
22   Q.  Do you know who determines how much of your
0085
1  medical expenses are going to be covered by Medicare?
2    A.  I would presume Medicare does.
3       MR. WILLIAMS:  Don't assume.
4    A.  I presume.
5       MR. WILLIAMS:  Don't presume, either.
6    A.  Don't presume.
7       MR. WILLIAMS:  You either know or you don't
8  know.
9    A.  I don't know.
10  BY MR. PELAYO:

11     Q.  They're cousins.
12          Do you know who determines how much -- how
13  medical expenses at United Health Care of Utah will
14  be covered?
15     A.  I don't know.
16     Q.  Okay.
17      Do you know whether every medical
18  provider -- and you remember what I mean by that
19  term; right? -- do you know whether every medical
20  provider charges the same amount for their services?
21          MR. WILLIAMS:  Objection.  Lack of
22  foundation.
0086
1          You can answer, if you can.
2      A.  From a review of the bills I receive, I
3  notice that there are differences in -- for the same
4  medication charged by different providers.
5  BY MR. PELAYO:
6      Q.  Okay.  Do you know whether different
7  insurance companies reimburse differently for
8  different medications?
9          MR. WILLIAMS:  Same objection.
10     A.  I have no knowledge.
11  BY MR. PELAYO:
12     Q.  You have no knowledge of that?
13          Do you know how medical providers determine
14  what amount they're going to charge for prescription
15  medications?
16          MR. WILLIAMS:  Same objection.
17     A.  No, I don't.
18  BY MR. PELAYO:
19     Q.  That is, you have no idea how providers
20  charge for their medications?
21     A.  I do not.
22     Q.  Okay.
0087
1          Mr. Howe, what is your understanding as to
2  how drug prices are determined?
3          MR. WILLIAMS:  Same objection.
4  BY MR. PELAYO:
5      Q.  I'll ask it differently.
6          Do you have an understanding as to how drug
7  prices are determined?
8      A.  I do not.
9      Q.  Do you have an understanding as to who
10  determines drug prices?
11     A.  I do not.
12     Q.  Are you familiar with the term, average
13  wholesale price, or AWP?
14     A.  I am now.
15     Q.  When you say --
16     A.  But I -- before this case I had no idea
17  what that was.
18     Q.  Okay.  So when you say, "before this case,"

19  when do you mean?  What date?
20      A.  Before the Zolodex or the Part B suit in
21  which I became involved.
22      Q.  Are you talking about the Lupron case?
0088
1      A.  No.
2      Q.  You're talking about the litigation that
3  brings you here today?
4      A.  Yes.
5      Q.  And when did you first get involved in that
6  litigation -- this litigation that brings you here
7  today?
8      A.  To the best of my recollection, I became
9  involved when my attorneys informed me that there was
10  such an action on Zolodex.
11      Q.  Okay.  And we'll explore that, but when --
12  can you give me a timeframe of when that was?
13      A.  I can't right off the top of my head.
14      Q.  Was it within the last month or two?
15      A.  Oh, no.  Before that.
16      Q.  Was it in 2005?
17      A.  I'm not sure.
18      Q.  Would you say it was more than six months
19  ago or less?
20      A.  More than six months.
21      Q.  Okay.  And which attorneys told you about
22  this Zol- -- what you call the Zolodex litigation?
0089
1          MR. WILLIAMS:  Objection.  Misstates his
2  testimony.  Go ahead and answer.
3  BY MR. PELAYO:
4      Q.  What did you call this litigation?  I'm
5  sorry.
6      A.  The Part B Medicare class that I'm a part
7  of.
8      Q.  Okay.  What attorney told you about it?
9      A.  I believe it was Attorney Don Haviland.
10      Q.  Okay.  So we're not sure when you first
11  learned about it, it was, you think, more than six
12  months ago, and you learned about it from Attorney
13  Don Haviland; correct?
14      A.  Correct.
15      Q.  And that's the first time you heard the
16  term average wholesale price?
17      A.  Yes.
18      Q.  And based on what -- -- strike that.
19          What is your current understanding of what
20  AWP means, or average wholesale price?
21      A.  My understanding now is that's the price
22  set by drug companies for their product; that they
0090
1  set the average wholesale price and publish it.
2      Q.  And how do you know that?  What is the
3  basis of that belief?

4      A.   From my reading of the documents.
5      Q.   Okay.  Have you done any other research on
6   that topic?
7      A.   No, I have not.
8      Q.   Okay.
9         And do you happen to know what the AWP was
10   at any point in time for any of the drugs that you
11   believe are in this litigation?
12      A.   I have no knowledge of that.
13      Q.   Okay.  And can you elaborate further on how
14   AWP relates the claims that you're making in this
15   litigation?
16         MR. WILLIAMS:  I'll object to the form of
17   the question.  It's vague, ambiguous and overbroad.
18      A.   I'm not sure how to answer you.
19   BY MR. PELAYO:
20      Q.   You've read some documents in connection
21   with this case and now have an understanding of what
22   AWP is; correct?
0091
1      A.   Correct.
2      Q.   Okay.  How is AWP relevant to this
3   litigation?
4         MR. WILLIAMS:  Well, I'll have the same
5   objection.  It's overbroad.  Also, it asks for a
6   legal conclusion.  You haven't laid a foundation for
7   that.
8   BY MR. PELAYO:
9      Q.   Do you have an answer to the question?
10      A.   Just that it's an arbitrary number set by
11   the drug companies and published by the drug
12   companies for their particular product.
13      Q.   So it's your understanding that the AWP is
14   published by the drug companies for each product?
15      A.   That's my understanding.
16      Q.   Okay.
17         Prior to the time that you had this
18   conversation with Mr. Haviland, had you ever
19   considered taking any legal action based on --
20   relating to AWP?
21         MR. WILLIAMS:  Object to the form of the
22   question.
0092
1      A.   I did not know what AWP was.
2   BY MR. PELAYO:
3      Q.   Okay.
4         Are you familiar with the term, wholesale
5   acquisition cost, or WAC?
6      A.   No.
7      Q.   Are you familiar with that term today?
8   Have you ever heard that term before?
9      A.   Not to my -- I don't recall hearing that
10   before.
11      Q.   Do you have a -- any understanding as to

12   the amount of the cost for a drug that goes into
13   research and development?
14       A.  No, I don't.
15       Q.  Do you believe that any amount of drug cost
16   goes to research and development?
17       MR. WILLIAMS:  Objection.  Lack of
18   foundation.
19       I just objected that he has not laid a
20   foundation for that question.  You can give it
21   whatever response you think is appropriate.
22       A.  I'm not sure.
0093
1   BY MR. PELAYO:
2       Q.  Based on what you know, do you believe that
3   when you pay for a drug, that any amount of what you
4   pay goes towards research and development?
5       MR. WILLIAMS:  Objection.  He's just
6   testified he doesn't know anything.  You prefaced
7   your question with, "based on what you know," so it's
8   an improper question.  Lack of foundation.
9   BY MR. PELAYO:
10       Q.  Do you have any understanding as to what
11   the relationship is between what you pay versus how
12   much --
13       A.  No, I don't.
14       MR. WILLIAMS:  Just let him finish his
15   question before you answer.
16       THE DEPONENT:  Okay.
17   BY MR. PELAYO:
18       Q.  Have you ever heard of something called red
19   book?
20       A.  I don't recall hearing that before.
21       Q.  Have you ever heard of something called
22   blue book?
0094
1       A.  Only to the extent that it -- I used it in
2   my loan business to get the value of an automobile.
3       Q.  Fair enough.
4       Ever heard of anything called medispan?
5       A.  No.
6       Q.  Ever heard of anything called first
7   databank?
8       A.  No.
9       Q.  Okay.
10       Do you know what the term "least costly
11   alternative" means in the context of drug pricing?
12       A.  No.
13       Q.  Okay.  Let's go to Exhibit Howe 001.
14       (Whereupon Exhibit Howe 001 was
15       marked for identification.)
16   BY MR. PELAYO:
17       Q.  Mr. Howe, I'm going to hand you a document
18   that's been marked Exhibit Howe 001.
19       MR. PELAYO:  I actually have a copy for

20  you, Kent.
21      MR. WILLIAMS:  I was afraid you were going
22  to say that.
0095
1       MR. PELAYO:  Don't think you need that,
2   but...
3       MR. WILLIAMS:  One more thing you're
4   pawning off on me, huh, to carry home.
5   BY MR. PELAYO:
6       Q.  This is a document that's been marked as
7   Exhibit Howe 001.  I'll give you a second to take a
8   look at it.
9           (Pause in the proceedings.)
10      A.  Okay.
11      Q.  Now, I know you didn't read the whole thing
12  just now, you just perused it, but --
13      A.  I -- I just found where my name was.
14      Q.  Okay.  Do you recognize this document?
15      A.  Yes.
16      Q.  What is it?
17      A.  It's the filing of the class action
18  complaint.
19      Q.  That's right.  I'll just add to that and
20  represent to you that this is a redacted version of
21  the Third Amended Master Consolidated Class Action
22  Complaint that was filed in connection with this
0096
1   litigation.
2       MR. WILLIAMS:  And, actually, I'd like to
3   correct counsel's statement.  It's the unredacted
4   version, according to the title page.  At least
5   that's what you handed to me.
6       MR. PELAYO:  Oh, that's interesting.  My
7   copy is --
8       MR. WILLIAMS:  Oh, yours is redacted?
9       THE DEPONENT:  This is unredacted.
10      MR. PELAYO:  It doesn't matter.
11      MR. WILLIAMS:  Fine.
12      MR. PELAYO:  We can -- actually, if we can
13  just go off the record for a moment.
14          (Pause in the proceedings.)
15      MR. PELAYO:  So we'll leave the -- for the
16  record, we'll note that the exhibit we're marking is
17  the unredacted version, and we will -- counsel has
18  agreed to treat it as highly confidential.
19      MR. WILLIAMS:  Yes, along with all my other
20  copies of the unredacted versions.
21      A.  Can I ask what you mean by redacted and
22  unredacted?
0097
1   BY MR. PELAYO:
2       Q.  It simply means that some information that
3   was private or proprietary --
4       MR. WILLIAMS:  That's a publicly-filed

5   document you have there; okay?  This is the document
6   that was filed under seal.
7        THE DEPONENT:  Okay.
8        MR. WILLIAMS:  That's just a lesser version
9   of this.
10  BY MR. PELAYO:
11       Q.  I'm not going to ask you to look at those
12  portions of the document that were redacted.
13       A.  All right.
14       MR. WILLIAMS:  Be an interesting Q and A if
15  you do.
16  BY MR. PELAYO:
17       Q.  So you've seen a version of this document?
18       A.  Yes, I have.
19       Q.  A similar version of this document before?
20       A.  Yes.
21       Q.  And you recognize it as the complaint in
22  the case?
0098
1        A.  Yes.
2        Q.  Did you review this document before it was
3   filed?
4        MR. WILLIAMS:  Objection.  Foundation.
5   BY MR. PELAYO:
6        Q.  Do you know whether this document was ever
7   filed in connection with this lawsuit?
8        A.  I believe I know that it was filed.
9        Q.  Okay.  Do you have a sense of when that
10  was?
11       A.  Recently, but I don't know when.
12       Q.  I'll just point out that at the top there,
13  there's a date.  You see where it says, "E-service"?
14  It says October -- my copy, anyway, says, "October
15  17th."
16       MR. WILLIAMS:  His copy doesn't.
17  BY MR. PELAYO:
18       Q.  I'll represent to you that it was filed
19  October 17, 2005, and you said recently.
20       A.  Yes.
21       Q.  So that sound about right?
22       Did you review it before it was filed?  Do
0099
1   you know?  That would be before October 17th.
2        A.  I'm not sure when I received a copy.
3        Q.  Did you ever review it?
4        A.  I did review it, yes.
5        Q.  Okay.  Can you describe for me in your own
6   terms what are the allegations contained in this
7   document?
8        MR. WILLIAMS:  Hold on.  You just want him
9   to answer without looking at it, or what?
10  BY MR. PELAYO:
11       Q.  You're a plaintiff in this case; right?
12       A.  Yes.

13    Q.  Okay.  And this document is a complaint in
14  this case which contains a number of allegations.
15    A.  Yes.
16    Q.  I'd like you to, in your own words,
17  describe the essence of these allegations.
18       MR. WILLIAMS:  So, basically, what the
19  lawsuit's about?
20       MR. PELAYO:  Yes.
21     MR. WILLIAMS:  All right.
22    A.  Well, my understanding is that the lawsuit
0100
1  is against the pharmaceutical industry who
2  arbitrarily sets this average wholesale prices,
3  published, which is for all of the medications under
4  Part B of -- that Medicare will cover and at times
5  are set for providers to make a profit.
6  BY MR. PELAYO:
7    Q.  So when you say for providers to make a
8  profit, who do you mean by that?
9    A.  The doctors that are giving me the
10  injections.
11    Q.  Okay.
12       Now, regarding those allegations that you
13  just summarized, did you ever contact Medicare to
14  complain about those concerns you had?
15    A.  No, I didn't.
16       MR. WILLIAMS:  Objection.  You're
17  misstating his testimony now.
18       Go ahead and answer if you can.
19    A.  No, I never contacted Medicare.
20  BY MR. PELAYO:
21    Q.  Did you ever contact your supplemental
22  insurer, United Health Care of Utah?
0101
1    A.  No.
2    Q.  Did you ever contact any state or local
3  government agency?
4    A.  No.
5    Q.  Did you ever contact any Federal agency?
6    A.  No.
7    Q.  Did you ever contact any politician with
8  respect to the concerns you described?
9       MR. WILLIAMS:  Object to the form of the
10  question.
11    A.  But no, I've never contacted a politician.
12  BY MR. PELAYO:
13    Q.  So have you ever contacted anyone other
14  than your lawyers concerning these allegations?
15    A.  The only recollection I have is that I did
16  mention to the doctors when I saw one of the bills on
17  the price of these medications.
18    Q.  Okay.  And what doctor was that?
19    A.  Dr. Bergreen.
20    Q.  Dr. Bergreen.  And when was this?

21      A.  Oh, that would have been, I guess, in
22  '91 -- or 2001 when I received the first indication
0102
1  that the Lupron was $2300 a shot.
2      Q.  And what did you say to Dr. Bergreen?
3      A.  That I thought the price was pretty high,
4  and he agreed.
5      Q.  Did he -- what did he -- so you said you
6  thought the price for Lupron was pretty high.
7          Did you say anything else?
8      A.  No.
9      Q.  And what did he say in response?  He -- you
10  said he agreed?
11      A.  Just some very little -- noncommittal.
12  Just, yeah, they're high.
13      Q.  And did -- what did you -- what did you
14  make of his comment?
15          MR. WILLIAMS:  Objection to the form of the
16  question.
17  BY MR. PELAYO:
18      Q.  Did you -- were you upset by his answer?
19          MR. WILLIAMS:  Objection.  Relevance.  Also
20  to the form of the question, vague.
21      A.  To answer you, no, I was not upset.  I just
22  assumed that was the price of doing business.
0103
1  BY MR. PELAYO:
2      Q.  And what is the business you're talking
3  about?
4      A.  Trying to control my cancer.
5      Q.  Did you ever raise it with him again?
6      A.  No.
7      Q.  Did you ever raise it with any other
8  physician?
9      A.  Not specifically for Lupron or Zolodex, but
10  I recently received the billing for the chemotherapy
11  that I'm undergoing and saw the price that they were
12  billing for that.
13      Q.  And you --
14      A.  And that about knocked me off my chair.
15      Q.  Did you ever try to negotiate a price with
16  Dr. Bergreen or any other doctor?
17      A.  No, I did not.
18      Q.  Okay.  I'll ask you to turn to the
19  paragraph that mentioned you.
20      A.  Okay.  Page 7.
21      Q.  And I'll give you a moment to review it.
22  It is page 7.  It's paragraph 17.
0104
1      A.  Yep.
2      Q.  Just let me know when you've had a chance
3  to look at it.
4      A.  Okay.
5      Q.  Okay.  Did you review this paragraph before

6   the document was filed?

7        MR. WILLIAMS:  Objection.  Asked and

8   answered.

9        A.  I have no knowledge --

10  BY MR. PELAYO:

11       Q.  Okay.

12       A.  -- of that.

13       Q.  Someone else put together this paragraph;

14  correct?

15       A.  Yes.

16       Q.  Did you ever review it?

17       A.  Only when I received the package.

18       Q.  Okay.  Is the information contained in this

19  paragraph accurate and true, as you understand it?

20       MR. WILLIAMS:  Yeah.  I'm going to object

21  on foundational grounds.

22       Go ahead and answer.

0105

1        A.  Yeah.  To the best of my knowledge, it's

2   true.  Some of the medication, the medical terms I

3   don't recognize.  Some I do.

4   BY MR. PELAYO:

5        Q.  Okay.  Now, I'll draw your attention to --

6   there's an allegation in here that says -- and I'll

7   read it for the record.

8            "During the applicable time

9        period, Mr. Howe was charged" -- was --

10  excuse me.  "Was prescribed and was charged for," and

11  then it lists a series of drugs.  Excuse me.

12       "The following physician-administered

13       drugs, based in whole or in part on

14       AWP," and then it has a colon and lists a

15  number of drugs; correct?

16       Do you see that?

17       A.  Yes, I do.

18       Q.  Okay.

19       What is the basis for your allegation here

20  that you were charged for physician-administered

21  drugs based on AWP?

22       MR. WILLIAMS:  All right.  And I'm going to

0106

1   lay a foundation objection here.

2        As counsel is aware, and I believe himself

3   has noted for the record, this paragraph was drafted

4   by lawyers based on their investigation and -- which

5   Mr. Howe is perfectly entitled to rely upon.

6        And so you can ask him about his knowledge,

7   but I'm objecting that you have not laid a proper

8   foundation for the question.

9        So with that, go ahead and answer to the

10  best of your ability.

11       A.  Well, I -- during the applicable period, I

12  had no knowledge of AWP.

13  BY MR. PELAYO:

14    Q.  Okay.  And so -- I'll withdraw that.
15         So as you sit here today, are you able to
16  say whether or not the charges -- based on your
17  understanding, are you able to say whether the
18  charges were based in whole or in part on AWP?
19         MR. WILLIAMS:  Same objection as before.
20  Lack of foundation.
21    A.  I really don't know how the physicians set
22  their billing prices.
0107
1  BY MR. PELAYO:
2    Q.  Okay.  So you don't know how AWP relates to
3  the charges as alleged here?
4    A.  I don't understand the question.
5    Q.  So when it says that the charges were based
6  in whole or in part on AWP, as you sit here today,
7  you don't know what that means?
8         MR. WILLIAMS:  Objection.  Misstates his
9  testimony.
10  BY MR. PELAYO:
11    Q.  Do you know what that means?
12    A.  I did not know it before.
13    Q.  Okay.  But you know it now?
14    A.  But I know what I read now.
15    Q.  Okay.  Good.
16         So now you see it, and it says that your
17  charges were based in whole or in part on AWP.
18    A.  Correct.
19    Q.  And I'm asking you, what do you believe
20  that means?
21    A.  Knowing what I know now, I believe that
22  the -- that the billings from the physicians were
0108
1  based on what Medicare Part B would cover, and I'm
2  not sure that's even clear in my own mind, but I know
3  it has something to do with the way the prices are
4  set by the drug manufacturers.
5    Q.  Is that all?
6    A.  Yeah.  I can't -- I don't know how to
7  elaborate any more than that.
8    Q.  Okay.
9    A.  I just know that I see a bill, and I know
10  what I'm being charged.
11    Q.  And the price is very high.  I understand.
12    A.  In my mind it is high.
13    Q.  I know.  I understand that.
14         There's another -- let's read down a little
15  further.  I believe this goes on to the next page,
16  and it says the following.  It says:
17         "Although Mr. Howe had
18         supplemental insurance coverage,
19         the coverage required him to make
20         percentage copayments."
21         Do you see where it says that?

22     A.  Yes.

0109

1       Q.  What is your understanding of what that
2  sentence means?
3       A.  Well, that means that whatever is not
4  covered by either Medicare Part B or United Health
5  Care, that I'm responsible for, and I've been making
6  payments to the urology group, anyway, evidenced by
7  the checks that I've submitted.
8       Q.  Right.
9       A.  And they're getting bigger.
10      Q.  And do you know how that relates to AWP?
11      A.  No, I don't.
12      Q.  By the way, I can't remember if I asked you
13  this before, but with respect to your supplemental
14  insurance coverage with United Health Care --
15      A.  Yes.
16      Q.  -- do you have any copayments that you have
17  to pay?  Do you know what I mean by a copayment?
18      A.  Yes.  I just pay a premium.
19      Q.  Okay.  So you only pay the premium?
20      A.  Yes.
21      Q.  So when you go for a visit in a doctor's
22  office, you don't have to pay anything for that

0110

1  visit; correct?
2       A.  No.
3           MR. WILLIAMS:  Well, other than what he's
4  testified about.
5           MR. PELAYO:  Yes.
6  BY MR. PELAYO:
7       Q.  Because I believe you testified that there
8  was some deductible, as well.
9       A.  Under Medicare there is.
10      Q.  But not under United Health Care?
11      A.  No.
12          MR. WILLIAMS:  Hold on.  But he also
13  testified that he had to pay percentage copayments.
14  I'm not sure about the vocabulary that you're using
15  here, but --
16          MR. PELAYO:  Yeah.
17          MR. WILLIAMS:  The 20 percent of --
18  BY MR. PELAYO:
19      Q.  What I'm talking about is, when you go to a
20  doctor's office visit, you don't pay anything for
21  that visit; correct?
22      A.  Correct.

0111

1       Q.  There's no out-of-pocket cost at that
2  moment?
3       A.  At that moment.
4           MR. WILLIAMS:  Oh, just for the second.
5  You're saying yes?
6       A.  No.

7        MR. WILLIAMS:  Okay.
8   BY MR. PELAYO:
9        Q.   And the only other payment that you make is
10  the 20 percent remaining that United Health Care
11  doesn't pay?
12       A.   Yes.
13       Q.  I understand.  Okay.
14            All right.  Now I'd like to turn the page
15  back, and there is a list of drugs, which, according
16  to the sentence, you were charged for based in whole
17  or in part on AWP.  I'd like to just briefly talk
18  about each one.  The first one you'll see there is
19  called dexamethasone --
20       A.   Yes.
21       Q.   -- sodium phosphate.
22       A.   Yes.
0112
1        Q.   Can you tell me, how do you know that the
2   charges for that drug were based on AWP?
3            MR. WILLIAMS:  Same objection as before.
4   Lack of foundation.  It is based on lawyers'
5   investigation.  Lawyers drafted this.  You can ask
6   based on his personal knowledge, but other than that,
7   I object on foundational grounds.
8   BY MR. PELAYO:
9        Q.   Fine.  Do you know whether the charges for
10  this particular drug, dexamethasone sodium phosphate,
11  were based on AWP at any point in time?
12       A.   I do not.
13       Q.   Okay.  Do you know -- this seems to be a
14  chemical name.
15            Do you know whether this particular
16  formulation, dexamethasone sodium phosphate, has any
17  other commercial or brand name?
18       A.   I do not.
19       Q.   Okay.  The document suggests that -- I'll
20  withdraw that.
21            Do you know whether you were ever
22  prescribed this drug?
0113
1        A.   I know it's administered to me.
2        Q.   Okay.  What is it for?
3        A.   It's a premedication prior to my
4   chemotherapy.
5        Q.   And what does it treat?  What does it do
6   for you?
7        A.   It's a preparation for receiving the poison
8   that is --
9        Q.   The chemo?
10       A.   The chemo.
11       Q.   Okay.  Who prescribed it?
12       A.   You want the name of the doctor?
13       Q.   Yes.
14       A.   Dr. Glen -- oh, God.

15    Q.   Someone other than Dr. Bergreen?
16    A.   Yes.
17    Q.   Is it also at this urology center?
18    A.   No.
19    Q.   Where is this doctor?
20    A.   At the Willamette Cancer Center.  It's
21 Dr. Buchanan.  Dr. Glen Buchanan.
22    Q.   Buchanan.  Okay.
0114
1         Is does he -- does he -- is this an
2 injection?  Is this an infusion?
3    A.   It's an infusion.
4    Q.   And is it administered in an office or a
5 hospital when you receive it?
6    A.   It's in the doctor's office.
7    Q.   Okay.  And is it administered by
8 Dr. Buchanan himself or by one of his nurses?
9    A.   By one of his nurses.
10    Q.   And do you know who manufactures this
11 product?
12    A.   Other than the names that are after the
13 product, no.
14    Q.   Okay.  So you're right to point out that
15 there are a number of pharmaceutical companies listed
16 as, I guess, purportedly manufacturing that drug.
17    A.   Yeah.
18    Q.   Would it surprise you if I told you that
19 several different manufacturing pharmaceutical
20 companies manufacture this product?
21         MR. WILLIAMS:  Objection.  Use of the word
22 "surprise."  Calls for speculation.  Are you telling
0115
1 him that?
2 BY MR. PELAYO:
3    Q.   Do you know that other -- that several
4 pharmaceutical companies make this drug?
5         MR. WILLIAMS:  I'll object as asked and
6 answered.
7    A.   I -- only because I see the other names
8 listed.
9 BY MR. PELAYO:
10    Q.   Okay.  Okay.  Now, can you tell me how you
11 know that -- I'll withdraw that.
12         Is it -- so you started taking this drug
13 only when you started doing the chemotherapy;
14 correct?
15    A.   Correct.
16    Q.   Which was approximately from 2001 forward;
17 correct?
18    A.   No.
19    Q.   When was that?  Why no, sir?  Was it before
20 2001?
21    A.   Are you classifying Lupron and Zolodex as
22 chemotherapy?

0116
1         MR. WILLIAMS:  Just tell him when you
2    started taking this dexamethasone.
3         A.  September the 7th.
4    BY MR. PELAYO:
5         Q.  Of?
6         A.  This year, 2005.
7         Q.  Oh.  So you never took it prior to -- okay
8             And let's focus on the list of companies
9    that, in this paragraph 17, supposedly made this
10   drug.
11            The first is, according to this, is Baxter
12   Do you know whether you ever took dexamethasone
13   sodium phosphate that was manufactured by Baxter?
14        A.  No.
15        Q.  Do you know whether you ever took
16   dexamethasone sodium phosphate manufactured by the
17   Fujisawa Group?
18        A.  I'm not aware of who made the medication.
19        Q.  Do you know whether you ever took it, the
20   dexamethasone sodium phosphate, made by the SICOR
21   Group?
22        A.  No.
0117
1         Q.  Do you know if you ever took dexamethasone
2    sodium phosphate made by Watson --
3         A.  No.
4         Q.  -- Pharmaceuticals?
5             Have you ever seen -- you said it was an
6    infusion; correct?
7         A.  Yes.
8         Q.  Did you ever look at the package where the
9    drug is contained?
10            MR. WILLIAMS:  Objection.
11   BY MR. PELAYO:
12        Q.  It's a pouch, I think.
13        A.  Yeah.
14            MR. WILLIAMS:  Hold on.  Objection.
15   Foundation.  Assumes facts not in evidence.
16   BY MR. PELAYO:
17        Q.  You said the drug is administered by a
18   drip; right?
19        A.  Yes.
20        Q.  And so the nurse administers it, I think
21   you said.
22        A.  Yes.
0118
1         Q.  And the drug is a liquid?  Yes?
2         A.  Yes.
3         Q.  Is it in some sort of a pouch?
4         A.  Yes.
5         Q.  Did you ever look at the label on the
6    pouch?
7         A.  No.

8    Q.  So -- withdraw that.
9         Would you have any -- I'll withdraw it.
10        Let's go to -- please, let's turn to the
11   next drug on the list, which is a drug with the
12   chemical name docetaxel.
13        Can you tell me, what is your understanding
14   as to whether you were charged and paid for this drug
15   based on the AWP?
16   A.  I don't recognize the drug and don't know
17   how it was applied.
18   Q.  Okay.  And that leads to my next question.
19        So you have no knowledge of when the first
20   time you took this drug was?
21   A.  No.
22   Q.  Do you know what it's for?
0119
1    A.  I do not.
2    Q.  Do you know who prescribed it?
3    A.  I do not.
4    Q.  Okay.  Do you know whether -- whether the
5    version of -- strike that.
6         Do you know whether you've received it
7    administered in an office or versus a hospital?
8    A.  I do not.
9    Q.  Okay.  So how would -- strike that.
10        Do you know how you paid for this drug?
11   A.  Specifically, no.  I would assume through
12   Medicare --
13        MR. WILLIAMS:  Don't assume.
14   A.  -- billing.  No assume.  Through Medicare
15   billings.
16   BY MR. PELAYO:
17   Q.  Okay.
18   A.  And supplement.
19   Q.  And how do you know that Aventis
20   manufactured the docetaxel that you took?
21   A.  I don't.
22   Q.  Okay.  Let's go to the next drug on the
0120
1    list.  It's called -- and forgive my pronunciation --
2    gentamicin sulfate.  What is the -- you see that?
3    A.  Yes, I do.
4    Q.  What is the basis -- and I'll just call it
5    gentamicin for short.
6         What is the basis -- what is your
7    understanding of the allegation that you took
8    gentamicin based on and were charged for that drug
9    based on AWP?
10   A.  I do not recognize the drug.
11   Q.  You don't?  So, again, you don't remember
12   the first time you took this particular drug?
13   A.  No, I do not.
14   Q.  Do you know what it's for?
15   A.  I do not.

16    Q.  Do you know who prescribed it for you?
17    A.  I do not.
18    Q.  Do you know whether you received it in a
19  hospital versus a doctor's office?
20    A.  I do not.
21    Q.  Do you know who manufacturers it?
22    A.  I do not.
0121
1    Q.  Do you know whether it's a pill?
2    A.  I don't know.
3    Q.  You don't know whether it's an injectable
4  or anything?
5    A.  No, I don't.
6    Q.  Okay.  This is another drug that is
7  manufactured by a number of companies, and I'll just
8  ask you quickly as to each.
9        Do you know whether the drug that you took
10  was manufactured by Abbott?
11    A.  I do not.
12    Q.  Do you know whether it was manufactured by
13  Baxter?
14    A.  I do not.
15    Q.  Do you know whether it was manufactured by
16  B. Braun?
17    A.  I do not.
18    Q.  Do you know whether it was manufactured by
19  Fujisawa?
20    A.  I do not.
21    Q.  Do you know whether it was manufactured by
22  Watson Pharmaceuticals?
0122
1    A.  I do not.
2    Q.  Okay.  I'll turn to the next drug on your
3  list.  It's called goserelin acetate.
4    A.  Yes.
5    Q.  What is your understanding of the
6  allegation that you were prescribed and charged for
7  goserelin acetate based on the AWP?
8    A.  I believe that's Zolodex.
9    Q.  Okay.  And what is your understanding of
10  how you paid for Zolodex based on AWP?
11    A.  I don't have any understanding as -- that
12  what I was charged was based on AWP.
13    Q.  And when was the first time that you took
14  Zolodex?
15    A.  My best recollection would be in 2004.
16    Q.  And who -- what is Zolodex for?
17    A.  For prostate cancer.  It's a hormonal
18  treatment.
19    Q.  Is this what you were previously taking
20  Lupron for?
21    A.  Correct.
22    Q.  And why did you switch from Lupron to
0123

1  Zolodex?
2      A.  The doctors --
3          MR. WILLIAMS:  Objection.  Lack of
4  foundation.
5  BY MR. PELAYO:
6      Q.  Did you switch -- did you stop taking
7  Lupron when you started taking Zolodex?  I can start
8  over.  Withdraw that.
9          My recollection from your testimony is you
10  said you were taking Lupron starting in 2001;
11  correct?
12      A.  Something like that, yeah.
13      Q.  Did you take Lupron from 2001 through 2004?
14      A.  That seems too long a time.  I believe I
15  took Lupron for a year, so I may be wrong on the
16  exact date on when I first received my first
17  injection of Lupron.  And then there -- there was a
18  period when they stopped the injections of Lupron.
19          Then when my PSA started rising, they went
20  to Zolodex.
21      Q.  Okay.  And that, you think, was in 2004?
22      A.  Yeah, I think -- I believe so.
0124
1      Q.  And do you know why your -- well, let me
2  strike that.
3          Why did you switch to Zolodex?
4          MR. WILLIAMS:  Same objection as before.
5  Lack of foundation.
6      A.  I had nothing to do with the choice.  It
7  was the doctor's choice.
8  BY MR. PELAYO:
9      Q.  Okay.  And had the Lupron been successful
10  in lowering your PSA levels?
11      A.  Yes.
12      Q.  Did you ever -- did you ask your doctor why
13  he didn't keep you on the Lupron?
14      A.  I don't recall ever asking him
15  specifically.
16      Q.  At the time -- so when your doctor said to
17  you, you know, Mr. Howe, we're now going to put you
18  on Zolodex, did you ask why?
19      A.  No.  I assumed that was the treatment
20  that -- can't assume.  I --
21          MR. WILLIAMS:  He didn't ask why.  That was
22  his question.
0125
1      A.  I did not ask why.
2  BY MR. PELAYO:
3      Q.  Okay.  Did you wonder why, given that
4  Lupron had been successful in controlling your PSA
5  levels?
6          MR. WILLIAMS:  Objection.  Relevance.
7      A.  I don't recall going through that thought
8  process, no.

9  BY MR. PELAYO:
10      Q.  Okay.  So is it safe to say you trusted
11  your doctor's judgment?
12      A.  Yes.
13      Q.  Okay.
14       So you started taking Zolodex in
15  approximately 2004, and who prescribed it?
16      A.  Dr. Bergreen.
17      Q.  Also the doctor that prescribed Lupron; is
18  that correct?
19      A.  Correct.
20      Q.  Okay.  And do you remember whether you were
21  administered Zolodex in an office, doctor's office,
22  or in a hospital?
0126
1      A.  In the doctor's office.
2      Q.  Were you ever administered Zolodex in a
3  hospital?
4      A.  Not to my knowledge.
5      Q.  And who administered -- who actually
6  administered it?  Was it the doctor himself, or was
7  it a nurse?
8      A.  It was a nurse.
9      Q.  And do you know who manufactures Zolodex?
10      A.  Do I know now?
11      Q.  Yes.
12      A.  I know now because of what it says here
13  who -- AstraZeneca.
14      Q.  It says Astra --
15      A.  Before that I had no knowledge of who made
16  it.
17      Q.  Before this very moment when you read it
18  or --
19      A.  Before I saw it in here, I did not know who
20  the manufacturer was.
21      Q.  Okay.  So when you saw this complaint
22  sometime, a month or two ago, was the first time you
0127
1  saw it?
2      A.  (No audible response.)
3      Q.  You've never received Zolodex in a
4  hospital; is that right?
5      A.  No.
6      Q.  Okay.  Would you -- if you had to receive
7  it in a hospital versus an office, where do you think
8  you'd rather receive it?  In a doctor's office or in
9  a hospital?
10          MR. WILLIAMS:  Objection.  Calls for
11  speculation, relevance.
12  BY MR. PELAYO:
13      Q.  Well, you've been in a hospital before.
14  Where do you think you might rather --
15          MR. WILLIAMS:  Objection.  He's not
16  testified he's been in a hospital before.

17     MR. PELAYO:  I've seen documents, Counsel.
18  BY MR. PELAYO:
19     Q.  Let me ask you a question.
20        MR. WILLIAMS:  Objection.  Ask a proper
21  question.
22        Hold on.  Hold on.  Why is this relevant,
0128
1  whether he would rather take it in a hospital or at a
2  doctor's office?  I mean, you know, come on.
3        You know, you say you've got documents to
4  go through.  I understand you're going through the
5  allegations, but why is this relevant?  A man's taken
6  time out of his day to come and testify, so, you
7  know, what's this relevant to?
8        MR. PELAYO:  Reimbursement is different
9  whether it's in a hospital or an office.
10        MR. WILLIAMS:  I understand that.
11        MR. PELAYO:  I'm entitled to ask him that
12  simple question.
13        MR. WILLIAMS:  No, no, no.
14        MR. PELAYO:  You may object --
15        MR. WILLIAMS:  I am objecting because he
16  has testified, Counsel, that he never got it in a
17  hospital.  Now you're asking him where he'd rather
18  take it.
19        MR. PELAYO:  I'm entitled to ask him to
20  give his opinion on it.
21        MR. WILLIAMS:  Well, his opinion as to
22  where he would rather have it is not relevant.
0129
1        MR. PELAYO:  Are you going to instruct him
2  not to answer, or can he answer?
3        MR. WILLIAMS:  No, I'm not going to
4  instruct him, but come on.  Let's just move it along.
5        MR. PELAYO:  I'm trying to move it along.
6  You were 30 minutes late.
7        MR. WILLIAMS:  We were not 30 minutes late,
8  Counsel; okay?  We were 15 minutes late because of
9  the confusion caused by you in changing the
10  deposition time.
11        MR. PELAYO:  Kent, I did not change the
12  deposition time.
13        MR. WILLIAMS:  You changed it from 9:30 to
14  10:00 because you yourself stated that the notice was
15  incorrect.
16        MR. PELAYO:  Kent, check the correspondence
17  to Terry Benedetto.  You'll see it was 10:00.
18        MR. WILLIAMS:  I don't want to argue about
19  it.
20        MR. PELAYO:  I don't, either.
21        MR. WILLIAMS:  Fine.  Ask the question
22  again.
0130
1  BY MR. PELAYO:

2      Q.   The question is, have you ever been in a
3   hospital before?
4      A.   Yes.
5      Q.   Okay.  If I said to you that you had to
6   receive Zolodex in a hospital as opposed to a
7   doctor's office, where would you prefer to receive
8   it?
9          MR. WILLIAMS:  Objection.  Lack of
10   foundation, calls for speculation.
11          Go ahead and answer the question.
12      A.   Wouldn't make any difference to me.
13   BY MR. PELAYO:
14      Q.   Wouldn't make any difference whether you --
15      A.   Whether it's the hospital or a doctor's
16   office.
17      Q.   Fair enough.  That's fine.
18          Do you have any idea what it costs to
19   administer Zolodex?
20          MR. WILLIAMS:  Objection.  Lack of
21   foundation and form of the question.  Costs whom?
22   BY MR. PELAYO:
0131
1      Q.   Do you have any idea what it costs a
2   medical provider to administer Zolodex?
3      A.   No.
4      Q.   Okay.
5      A.   I don't.
6      Q.   Do you have any idea what it costs a
7   medical provider to store Zolodex?
8      A.   I do not.
9      Q.   Do you think that a medical provider should
10   be obligated to tell you what their costs are for
11   storing Zolodex?
12          MR. WILLIAMS:  Object to the form of the
13   question.
14      A.   I have no opinion.
15   BY MR. PELAYO:
16      Q.   Do -- in other words, do you think a
17   medical provider should tell you what their costs are
18   for storing Zolodex?
19          MR. WILLIAMS:  Same objection, and also
20   relevance.
21      A.   (No audible response.)
22   BY MR. PELAYO:
0132
1      Q.   No view on that?
2      A.   No view.
3      Q.   Do you think a medical provider should be
4   obligated to tell you what they paid for Zolodex?
5          MR. WILLIAMS:  Same objection.  Foundation,
6   relevance.
7      A.   No, I don't.
8   BY MR. PELAYO:
9      Q.   No, you don't?

10    A.  I don't -- restate the question, please.
11    Q.  Do you think that a medical provider should
12  be obligated to tell you what they paid for Zolodex?
13        MR. WILLIAMS:  Same objections.
14    A.  No.
15  BY MR. PELAYO:
16    Q.  What dosages of Zolodex do you receive?
17    A.  I don't know.
18    Q.  Don't know?  How many -- you started taking
19  it into 2004.  How many times have you received
20  injections?
21    A.  I get it every three months.
22    Q.  Is it always at Dr. Bergreen's office?
0133
1     A.  They -- the office in Florence.  His
2  medical practice is in Springfield, but he comes over
3  to Florence once a week.
4     Q.  Okay.  But it's affiliated with his
5  practice?
6     A.  Yes.
7     Q.  And what is the name of the practice?
8     A.  Urology Specialists of Oregon, or Oregon
9  Urology Specialists.
10    Q.  Okay.  And you're currently on Zolodex
11  still?  You're currently on Zolodex?
12    A.  I have not had a shot of either Lupron or
13  Zolodex since September the 7th.
14    Q.  '05?
15    A.  '05.
16    Q.  But you're scheduled -- are you scheduled
17  to take a future shot?
18    A.  Not at this time.
19    Q.  It will depend on your levels?  You don't
20  have to answer that.
21        Have you ever conducted any research into
22  the cost of Zolodex on your own?
0134
1     A.  I have not.
2     Q.  Did you ever discuss the price of Zolodex
3  with Dr. Bergreen?
4     A.  No.
5     Q.  You ever discuss it with any other doctors?
6     A.  No.
7     Q.  Did you ever negotiate with Dr. Bergreen
8  the cost of Zolodex --
9     A.  I did not.
10    Q.  -- or any other doctor?
11    A.  No.
12    Q.  Did your -- did Dr. Bergreen or any other
13  doctor ever discuss with you alternative treatments
14  besides Zolodex?
15        MR. WILLIAMS:  Object to the form of the
16  question.
17    A.  No.

18  BY MR. PELAYO:
19      Q.  Did any doctor -- I'll state it again.
20          Did any doctor ever discuss with you an
21  alternative treatment for prostate cancer besides
22  Zolodex and besides Lupron which you previously took?
0135
1       A.  They added Casodex to the Zolodex, which is
2   a pill.
3       Q.  Okay.  Let me ask it this way, then:
4           Did you ever talk about surgery as an
5   alternative with any of your doctors?
6       A.  Yes.
7       Q.  Okay.  And did you consider surgery as an
8   option for you?
9       A.  No.
10      Q.  Why not?
11      A.  Because the cancer had already spread
12  outside of the prostate.
13      Q.  Did you consider any other alternative
14  treatments besides surgery?  Radiation, for example?
15      A.  No.  No.  Not at the time.
16      Q.  Okay.
17      A.  I have had radiation, because the cancer
18  had spread from one bone to another bone, and that's
19  when I did radiation localized to the two spots where
20  it was already outside the prostate.
21      Q.  So that was part of your overall cancer
22  treatment in addition to Zolodex?
0136
1       A.  Yes.
2       Q.  Do you believe that doctor -- you said
3   Dr. Bergreen prescribed Zolodex; right?
4       A.  Yes.
5       Q.  Do you believe he did so with your best
6   interests in mind?
7           MR. WILLIAMS:  Objection.  Foundation.
8       A.  I would have to -- no, I can't do that.
9           MR. WILLIAMS:  Do you know?
10  BY MR. PELAYO:
11      Q.  I'm asking what you believe.
12      A.  I believe that --
13          MR. WILLIAMS:  Hold on.  Don't answer that
14  question.  If you're asking him what he believes, I'm
15  going to object on foundational grounds.  If you want
16  to ask him what he knows, if you want his personal
17  knowledge -- which is what you should be asking him
18  for -- that's a fair question.  But I believe calls
19  for speculation.  You have not laid a proper
20  foundation.
21  BY MR. PELAYO:
22      Q.  You said before you trusted Dr. Bergreen.
0137
1       A.  Yes.
2       Q.  Do you believe that he prescribed Zolodex

3  with your best interest in mind?
4      MR. WILLIAMS:  Same objection.
5      A.  Yes.
6  BY MR. PELAYO:
7      Q.  Have the Zolodex treatments been effective?
8      MR. WILLIAMS:  Objection.  Lack of
9  foundation.
10     A.  No.
11 BY MR. PELAYO:
12     Q.  Why not?  Because you still have the
13 cancer?  Is that --
14     A.  It's not -- the hormonal treatment failed
15 to work after a while.
16     Q.  Okay.  Let's go to the next -- return to
17 paragraph 17.
18     MR. WILLIAMS:  Hold on, Counsel.  I've got
19 1:00.  Why don't we -- if this is a good time, if
20 you're going to another subject, why don't we break
21 for lunch, and we can come back and finish up with
22 what you've got.
0138
1      MR. PELAYO:  That's okay.
2      MR. WILLIAMS:  I'm assuming you've got more
3  than an hour left.
4      MR. PELAYO:  Yes.
5      MR. WILLIAMS:  Okay.  Then let's break for
6  lunch.
7      MR. PELAYO:  About 30 minutes?  Is that
8  okay?
9      MR. WILLIAMS:  I'd rather take an hour.
10 Give the witness a break, if that's okay.
11     MR. PELAYO:  Okay.
12     MR. WILLIAMS:  Okay.  All right.
13     (Whereupon a lunch break was taken.)
14     MR. PELAYO:  Welcome back, everyone, from
15 lunch.
16     Over lunch I had an opportunity to take a
17 look at the copies of the documents that you guys
18 handed me this morning.
19     Our court reporter, Laurie, was kind enough
20 to get us some copies, and I'm now going to return
21 the originals to you.  Thank you for that.
22     THE DEPONENT:  Thank you.
0139
1      MR. PELAYO:  I believe that the copies are
2  true and correct.
3      MR. WILLIAMS:  Okay.
4      THE DEPONENT:  You know, I was thinking
5  over one of the questions that you asked me about my
6  Medicare -- how I was paying for Medicare, and I
7  think I said it came out of my pension, and I was
8  wrong.  It -- it's deducted from my Social Security
9  payment.
10 BY MR. PELAYO:

11      Q.  I understand.  You're talking about way
12  back when, when we were talking about your premiums?
13      A.  Yeah.  Yeah.  And I think I stumbled, and I
14  said it was out of my paycheck that I got from the
15  bank, but it wasn't.
16      Q.  Okay.  I remember you said that.
17      A.  It's out of Social Security.
18      Q.  Okay.
19      A.  They deduct the Medicare premium.
20      Q.  Good.  Is everything else that you said
21  about your Medicare insurance coverage correct, as
22  best as you know?
0140
1       A.  Yeah.  As best as I know.
2           The only other thing that I think I may
3   have answered incorrectly was, you asked me if I had
4   knowledge of CHAMPUS, and I said -- I think I said
5   yes, and it was not because I could join CHAMPUS, but
6   my daughter was married to a man in the Army, and
7   they had CHAMPUS.
8       Q.  I see.  So --
9       A.  So I knew the name.
10      Q.  But you are a veteran?
11      A.  Yes, I am.
12      Q.  And you do, as a veteran, have the
13  opportunity to participate in health insurance
14  provided by the government to veterans; correct?
15      A.  I would assume -- I would think that as a
16  veteran I could go to the VA Hospital.
17      Q.  Okay.  But you --
18      A.  But I've chosen not to do that.
19      Q.  And you've never been treated at a VA
20  Hospital?
21      A.  No, I have not.
22      Q.  And you never pursued the opportunity to be
0141
1   covered by the veteran health insurance program?
2       A.  No, I have not.
3       Q.  Okay.  I appreciate you clarifying those
4   two things.
5           Is there anything else you need to clarify?
6       A.  No.  I think that -- those two, as I was
7   going over the testimony with those, I think I was a
8   little vague on.
9       Q.  Okay.
10          Before the break, we were talking about
11  different drugs that are referenced in paragraph 17.
12      A.  Right.
13      Q.  I'd like to just continue with what I
14  believe are the two remaining drugs that you name --
15  that the complaint names, I should say.
16          MR. WILLIAMS:  What page is that, again?
17      THE DEPONENT:  Page 8.
18          MR. PELAYO:  Page 8.

19  BY MR. PELAYO:
20      Q.  You'll see there's a drug reference there
21  called -- on the second line called granisetron?
22      A.  Yes.
0142
1       Q.  Do you believe that you were charged for
2   granisetron in whole or in part based on AWP?
3       A.  I don't know who -- what granisetron is.  I
4   don't --
5       Q.  Okay.
6       A.  -- have any recollection of the drug.
7       Q.  Okay.  So do you know what it's for?
8       A.  No, I do not.
9       Q.  Do you know when you were prescribed it?
10      A.  I do not.
11      Q.  Do you know who prescribed it to you?
12      A.  I do not.
13      Q.  Do you know whether you had ever taken it
14  or not?
15      A.  I don't.
16      Q.  Do you know whether -- do you know how you
17  paid for it?
18      A.  (No audible response.)
19      Q.  Do you know whether you paid for it?
20      A.  No, I don't.  I don't.  I have no knowledge
21  of this particular drug.
22      Q.  Okay.  Do you know whether it has any other
0143
1   commercial names other than granisetron?
2       A.  I do not.
3       Q.  Okay.
4          Do you know who manufacturers it?
5       A.  No.
6       Q.  Now, granisetron, I'll represent to you, is
7   a product that's manufactured by more than one
8   pharmaceutical company.
9          Do you know whether the granisetron that
10  you allegedly took was manufactured by GSK, which I
11  gather is GlaxsoSmithKline?
12      A.  I do not know.
13      Q.  Do you know whether the granisetron you
14  allegedly took was manufactured by Hoffman-LaRoche?
15      A.  I do not know.
16      Q.  Okay.
17         Turning to the next and final drug
18  mentioned in this paragraph 17, it's a drug called
19  pegfilgrastim?
20      A.  Yes.
21      Q.  Do you see that?
22      A.  Yes.
0144
1       Q.  Do you believe you were charged for
2   pegfilgrastim based on AWP?  In whole or in part
3   based on AWP?

4    A.  I don't have any knowledge of that, no.
5    Q.  Do you know what pegfilgrastim is?
6    A.  I believe I do.
7    Q.  What is pegfilgrastim?
8    A.  Neulasta.  N-e-u-l-a-s-t-a.
9    Q.  And what is Neulasta?  What is it for?
10    A.   To build white blood cells, stimulate the
11 bone marrow to stimulate the growth of white blood
12 cells.
13    Q.  And who prescribed Neulasta to you?
14    A.  Dr. Buchanan.
15    Q.  He's at the cancer center?
16    A.  Yes.
17    Q.  What's the full name of that facility?
18    A.  Willamette Cancer Center.
19    Q.  And is that -- where is that?
20    A.  Here in Eugene.
21    Q.  Do you remember when the first time you
22 took Neulasta was?
0145
1    A.  Let me see.  Approximately the 27th, 28th
2 of September.
3    Q.  Okay.  So around the same time that you
4 last took your treatment for Zolodex?
5    A.  Three weeks after.
6    Q.  I see.  Is it part of the same treatment?
7    A.  It's -- I would -- yes.  Part of the same
8 treatment.
9    Q.  Okay.  And did you take Neulasta in an
10 office?  In a doctor's office?
11    A.  No.
12    Q.  Where did you take it?
13    A.  At the Florence hospital.  Peace Harbor
14 Hospital.
15    Q.  And was that the only time you've ever
16 taken Neulasta?
17    A.  Yes.
18    Q.  And how is it?  How is it administered?
19    A.  Injection.
20    Q.  And you said it was administered in
21 Florence Hospital, it's called?
22    A.  It's called Peace Harbor Hospital.
0146
1    Q.  Did you have the option to have it
2 administered in the -- in a doctor's office, or does
3 it have to be administered in a hospital?
4        MR. WILLIAMS:  Objection.  Foundation.
5 BY MR. PELAYO:
6    Q.  Do you know?  Were you given the choice?
7    A.  No.
8    Q.  And do you happen to know whether you can
9 take it in a doctor's office?
10    A.  It was a week -- almost a week after my
11 chemotherapy, and the doctors were not in Florence,

12  they're only there one day a week.
13      Q.  And is it just one injection or is it --
14  was it one injection or was it --
15      A.  One injection.
16      Q.  And how long was your hospital stay?
17          MR. WILLIAMS:  Object to the form of the
18  question.
19  BY MR. PELAYO:
20      Q.  How long was your hospital stay for this?
21      A.  I didn't stay in the hospital.  I went into
22  the emergency room, had the shot given by the E.R.
0147
1  nurse, and then I left.
2      Q.  Thank you for clarifying.  So it was
3  just -- I'll withdraw that.
4          How long did the whole experience take at
5  the hospital?
6      A.  30 minutes.
7      Q.  Okay.  Do you know who manufacturers
8  Neulasta?
9      A.  I did not at the time, no.
10     Q.  Do you know now?
11     A.  Yes, because it says it's Amgen.
12     Q.  Okay.
13         And do you know how you paid for Neulasta?
14  Let me ask the question differently.  I'll let you
15  think about that, but I'll ask it a little bit
16  differently.
17         When you went to the hospital for this
18  purpose --
19     A.  Yeah.
20     Q.  -- to receive this injection --
21     A.  Right.
22     Q.  -- did you have to make any sort of
0148
1  out-of-pocket payment at that time?
2      A.  No.
3      Q.  Were you subsequently billed for the
4  fees -- excuse me -- for the Neulasta service?  I'll
5  call it the Neulasta service.
6      A.  Me personally?
7      Q.  Yes.
8      A.  No.
9      Q.  Was your doctor billed for it?
10     A.  No.
11     Q.  Did you have to pay for Neulasta for that
12  treatment in the hospital that day --
13     A.  No.
14     Q.  -- as far as you know?
15         MR. WILLIAMS:  Object to form.
16         MR. PELAYO:  I'll ask it again.
17  BY MR. PELAYO:
18     Q.  As far as you know, did you have to pay for
19  that treatment in the hospital that day what you took

20 the Neulasta?
21     A.  You talking about me personally?
22     Q.  Yes.  Did you have to pay for that?
0149
1     A.  No.
2     Q.  Now, we've gone over paragraph 17 in some
3 detail.  We've talked about each of the drugs that
4 you specifically reference.
5         Is it your testimony that you paid -- that
6 you received and paid for each of the drugs listed
7 here, except for Neulasta, for which you didn't pay?
8         MR. WILLIAMS:  Objection to the form of the
9 question.
10        MR. PELAYO:  I'll ask it again.
11 BY MR. PELAYO:
12     Q.  You've testified Neulasta is one -- is a
13 drug you didn't pay for; correct?
14        MR. WILLIAMS:  Object to the form of the
15 question.
16     A.  I think my answer was I did not pay for it
17 personally at the time that the injection was given
18 to me.
19 BY MR. PELAYO:
20     Q.  Have you paid for it since?
21     A.  Again, me personally?
22     Q.  Uh-huh.
0150
1     A.  No.
2     Q.  Right.  Have you paid for it?
3     A.  No.
4     Q.  Who has paid for it?  How did it get paid?
5 Do you know?
6     A.  The hospital billed my insurance.
7     Q.  And there was no other charge to you for
8 that Neulasta treatment?
9     A.  No.
10     Q.  Okay.  So returning to my question, with
11 the exception of Neulasta for which you have not paid
12 personally, as you just testified, is it your
13 testimony that you have personally paid for each and
14 every of these other drugs?
15        MR. WILLIAMS:  Objection to form.
16     A.  No, I have not personally paid anything for
17 those drugs.
18 BY MR. PELAYO:
19     Q.  Maybe we're getting confused.  You pay a 20
20 percent coinsurance; correct?
21     A.  Correct.
22     Q.  Did you pay a 20 percent coinsurance with
0151
1 respect to whenever you took dexamethasone sodium
2 phosphate?  Did you ever pay 20 percent of that
3 charge?
4     A.  I don't know.

5    Q.  Did you ever pay any amount for the balance
6  owed for when you took docetaxel?
7    A.  I don't know.
8    Q.  Did you ever pay for any amount of the
9  balance owed on gentamicicin?
10    A.  I don't know.
11    Q.  What about, do you know whether you ever
12  paid, based on balance owed, for goserelin acetate,
13  which is Zolodex?
14    A.  Yes.  I'm confused as to your questions
15  because I don't know how to respond to it.
16    Q.  I don't intend to confuse you.  I really
17  don't.  Let me see if I can explain it.
18        As I understand the way we talked about
19  earlier this morning about how your insurance
20  works --
21    A.  Yes.
22    Q.  -- you have supplemental insurance through
0152
1  United Health Care; correct?
2    A.  Correct.
3    Q.  And that pays -- you pay premiums for that
4  supplemental insurance?
5    A.  Yes, I do.
6    Q.  And that pays 80 percent of the 20 percent
7  that Medicare has not covered?
8    A.  That's my understanding.
9    Q.  And you are responsible for 20 percent;
10  correct?
11    A.  Yes.
12    Q.  Okay.  So what I'm asking you is, did you
13  ever pay that 20 percent specifically for any of
14  these drugs that are listed in this paragraph?
15        MR. WILLIAMS:  As far as you know.
16    A.  As far as I know, if a doctor bills me for
17  an amount that a patient owes over and above the
18  insurance claims, I pay that.
19  BY MR. PELAYO:
20    Q.  Okay.  Except for Neulasta, I gather,
21  because you said Neulasta you never paid that amount
22  for?
0153
1        MR. WILLIAMS:  You know you never paid for
2  Neulasta?  Is that right or --
3    A.  No, I don't know.  Again, it would be the
4  billing process from the hospital through Medicare
5  and United Health Care.
6  BY MR. PELAYO:
7    Q.  Okay.  Other than these drugs that are
8  listed in paragraph 17 which is the paragraph
9  associated with you --
10    A.  Right.
11    Q.  -- are there any other drugs upon which you
12  base your claims in this lawsuit?

13         MR. WILLIAMS:  Objection to form.  Lack of
14  foundation.
15      A.   Again, I'm not sure I understand the
16  question.
17  BY MR. PELAYO:
18      Q.   You claim you -- I think your testimony
19  earlier, and I'm paraphrasing, was that you've
20  overpaid for medications; correct?
21      A.   I think my testimony was that I think the
22  drug costs were exorbitant.
0154
1       Q.   Okay.  And the drug costs were exorbitant,
2  I take it, with respect to each of the drugs listed
3  in this paragraph; correct?
4         MR. WILLIAMS:  Objection to form.
5       A.   I can't identify all of the drugs so I
6  can't answer that.
7  BY MR. PELAYO:
8       Q.   Are there any other drugs that are not
9  named in this paragraph for which -- that you think
10  should be named in this paragraph?
11         MR. WILLIAMS:  Objection to form.
12      A.   Not to my knowledge.
13  BY MR. PELAYO:
14      Q.   Okay.  With respect to -- this is a lengthy
15  document.
16      A.   Yes.
17      Q.   With respect -- do you have any personal
18  knowledge about any of the allegations in the rest of
19  this document?
20         MR. WILLIAMS:  You talking about the
21  complaint now?
22         MR. PELAYO:  Yeah.
0155
1         MR. WILLIAMS:  All right.
2  BY MR. PELAYO:
3       Q.   Do you have any personal knowledge about
4  any of the allegations in the rest of this complaint?
5         MR. WILLIAMS:  Outside of paragraph --
6      A.   17?
7         MR. WILLIAMS:  Yeah.
8         MR. PELAYO:  17.
9      A.   No, except there are other class members
10  named in the complaint.
11  BY MR. PELAYO:
12      Q.   No.  I understand that.  But as far as the
13  allegations in the rest of the complaint, do you have
14  any personal knowledge about them?
15      A.   No.
16      Q.   Okay.  Do you have any personal knowledge
17  about rebates that medical providers may receive from
18  manufacturers?
19      A.   No.
20      Q.   Do you have any personal knowledge about

21  any alleged kickbacks that medical providers may have
22  received?
0156
 1      A.  No.
 2      Q.  Do you have any personal knowledge with
 3  respect to whether or not there has been any
 4  conspiracy between the drug manufacturers?
 5      A.  No.
 6          MR. WILLIAMS:  Personal knowledge.
 7      A.  No.
 8  BY MR. PELAYO:
 9      Q.  Do you know anything about that?
10      A.  No.
11      Q.   You have any instance where you can say
12  that you observed or heard about a conspiracy among
13  the drug manufacturers?
14          MR. WILLIAMS:  Exclude from your answer
15  conversations you may have had from counsel.
16          I take it you're still asking for personal
17  knowledge?
18          MR. PELAYO:  Uh-huh.
19          MR. WILLIAMS:  Yes.
20      A.  No personal knowledge other than what I've
21  read in the complaint.
22  BY MR. PELAYO:
0157
 1      Q.  Okay.
 2       Mr. Howe, what is a -- in your own
 3  understanding, what is a class action?  What do you
 4  understand a class action lawsuit be?
 5      A.  It's a suit brought by a group of people
 6  with a common complaint.
 7      Q.  Okay.  And could you articulate for the
 8  record what exactly is the class that you will
 9  represent in this lawsuit?
10          MR. WILLIAMS:  And I'll object to the
11  extent you're asking for a legal conclusion.
12  BY MR. PELAYO:
13      Q.  What do you understand the class to be that
14  you represent?
15      A.  These are a class of cancer victims who are
16  receiving medication for their cancer treatment, and
17  I believe some of the members of the class are widows
18  or widowers of cancer victims.
19      Q.  Are members of the class only Oregon
20  residents?
21      A.  No.
22      Q.  What does the -- what geographic area does
0158
 1  the class include?
 2      A.  The United States.
 3      Q.  So the class, as you understand it,
 4  includes the entire United States; is that right?
 5      A.  To the best of my knowledge.

6    Q.  And does the class only include individuals
7  who actually paid for their what you called cancer
8  medications?
9         MR. WILLIAMS:  Objection to form.
10    A.  No, because I understand that there are
11  three different classes of plaintiffs in the action.
12  The class which are consumers like myself; unions who
13  pay for medical and insurance --
14  BY MR. PELAYO:
15    Q.  Uh-huh.
16    A.  -- and one other class, and I can't recall
17  what it is.
18    Q.  Okay.  So do you understand, though, that a
19  requirement to be in the class is that the class
20  member must have paid for the medication?
21         MR. WILLIAMS:  Objection to form.
22    A.  And I assume I --
0159
1         MR. WILLIAMS:  Do you know?
2         THE DEPONENT:  No.
3  BY MR. PELAYO:
4    Q.  Does the class include insurance companies?
5         MR. WILLIAMS:  Objection to form.
6    A.  I don't know.
7  BY MR. PELAYO:
8    Q.  Does the class include Medicare
9  beneficiaries?
10    A.  Medicare beneficiaries?  Yes.
11    Q.  Uh-huh.
12        Does the class include Medicaid
13  beneficiaries?
14    A.  I don't know.
15    Q.  Does the class only include individuals who
16  are covered through United Health Care of Utah or
17  United Health Care?
18         MR. WILLIAMS:  Objection to form.
19    A.  I have no idea.
20  BY MR. PELAYO:
21    Q.  Do you know whether the class includes
22  people that don't have insurance?
0160
1    A.  I do not have that knowledge.
2    Q.  Do you know whether the class includes the
3  government?
4    A.  I do not know.
5    Q.  Mr. Howe, can you tell me why it is that
6  you would like to be a class representative in this
7  case?
8    A.  Why do I want to be a class representative?
9    Q.  Well, do you know what it means to be a
10  class representative?
11    A.  I believe I do.
12    Q.  Can you tell me what you think it means?
13    A.  That I have joined with my other class

14  participants who are, I guess, for the most part
15  Medicare -- insured by Medicare and are receiving
16  benefits through Medicare for the drugs that their
17  doctors or providers are giving them for cancer
18  treatment.
19      Q.  Okay.  And what are your -- so I'll repeat
20  my first question.  So why do you want to be a class
21  representative?
22      A.  I believe it's an opportunity for me to see
0161
1   if drugs can be brought down to a more reasonable
2   level price-wise.
3       Q.  Do you believe you're an advocate somehow?
4          MR. WILLIAMS:  Objection to form.
5       A.  I don't know what you mean by "advocate."
6   BY MR. PELAYO:
7       Q.  Can you tell me what you understand your
8   responsibilities will be as a class representative?
9       A.  Yes.  I have to stay the course as a class
10  member, do nothing to cause anything to happen to the
11  validity of the class.
12      Q.  Anything else?
13      A.  Be supportive of the class.
14      Q.  I'd like to break that down.
15          When you say -- is there anything else?
16      A.  No.
17      Q.  I want to break that down.
18          When you say you understand your
19  responsibility as a class rep to be -- to stay the
20  course as a class member, what do you mean by, "stay
21  the course"?
22      A.  Well, I signed up to be a member of the
0162
1   class, and I can't arbitrarily withdraw my membership
2   in the class.  That's what I mean.
3       Q.  What if you believe that the case had no
4   merit?
5          MR. WILLIAMS:  Objection.  Calls for
6   speculation, assumes facts definitely not in
7   evidence.
8   BY MR. PELAYO:
9       Q.  Would you have to stay the course if you
10  believed the case had no merit?
11          MR. WILLIAMS:  Objection.  Same objections
12      A.  I don't know how to answer you.
13  BY MR. PELAYO:
14      Q.  When you say you -- one of your
15  responsibilities is to not cause anything to happen
16  to the validity of the class, and I paraphrasing --
17  I'm trying to get it as close as you --
18      A.  Yeah.
19      Q.  What did you mean by that?
20      A.  I just feel that I have a responsibility to
21  the class that I've joined.

22    Q.  That's what I'm trying to get at.  What is
0163
1  that responsibility?
2         MR. WILLIAMS:  I'll object as asked and
3  answered now.
4  BY MR. PELAYO:
5     Q.  Is there anything that you're supposed to
6  do or not do -- well, I'll retract that.
7      Is there anything that you're specifically
8  supposed to do as a class representative?
9         MR. WILLIAMS:  Objection.  Vague.  Also, to
10  the extent that now you're calling for a legal
11  conclusion, I object.
12  BY MR. PELAYO:
13    Q.  Is there anything that you understand you
14  believe you're supposed to specifically do as a class
15  representative?
16    A.  Provide documents that are asked of me.
17    Q.  Okay.  Good.  Anything else?
18    A.  No.
19    Q.  Okay.
20      Do you think you'll be a good class
21  representative?
22    A.  I hope so.
0164
1     Q.  So -- and why will you be a good class
2  representative?
3     A.  I'm willing to come and give a deposition
4  to express whatever views I have.
5     Q.  Okay.  Do you think that your situation is
6  different from someone who does not have supplemental
7  insurance like you do?
8         MR. WILLIAMS:  Objection.  Form, vague,
9  lack of foundation.
10    A.  I can't answer for someone else's
11  insurance.
12  BY MR. PELAYO:
13    Q.  But you have supplemental insurance;
14  correct?
15    A.  Yes, I do.
16    Q.  Do you believe you are able to represent
17  the interests of people who do not have supplemental
18  insurance?
19        MR. WILLIAMS:  Same objections.
20  BY MR. PELAYO:
21    Q.  I just want to know --
22    A.  I don't know.
0165
1     Q.  You don't know?  Okay.
2         Do you expect to be compensated for your
3  service as a class representative?
4         MR. WILLIAMS:  Objection.  Form.
5     A.  I'm not looking for compensation per se.
6  If there happens to be some reimbursement for

7  overcharges of medication, that would be fine.
8  BY MR. PELAYO:
9      Q.  Okay.  I believe you said that your lawyers
10  in the case -- I'll withdraw that.
11          I believe you said earlier that you are
12  represented by Kline & Specter; correct?
13      A.  Correct.
14      Q.  And are you also represented by
15  Mr. Williams' firm?
16      A.  Yes.
17      Q.  Okay.  Are there any other lawyers that
18  represent you?
19      A.  In the back of the document there's a list
20  of the lawyers that are all involved.
21      Q.  Let's take a look at that, if you would,
22  for a second.  I think it's at page 299, if our
0166
1  documents are the same.  299 to 304, -03.  I'll just
2  go through them in order.
3          And I'd just like to know if you know any
4  of these individuals.
5          Do you see on page 299 the list of lawyers
6  there?  On --
7          MR. WILLIAMS:  299.
8      A.  I don't see anybody yet.
9          MR. WILLIAMS:  Rather than read all the
10  names, that would take forever, I mean, I don't see
11  how --
12  BY MR. PELAYO:
13      Q.  That's fine.  If you just flip from page
14  299 to 303 --
15          MR. WILLIAMS:  When you come across a name,
16  why don't you say who it is, and he can ask whatever
17  questions he wants.  Just start here, and run through
18  the list, and see if there's anyone you recognize.
19      A.  Kent Williams --
20  BY MR. PELAYO:
21      Q.  Right.
22      A.  -- on page 302.
0167
1          MR. WILLIAMS:  I was hoping you'd find that
2  one.
3  BY MR. PELAYO:
4      Q.  I'm sure he's the best of the group.
5          MR. WILLIAMS:  It should be in bold.
6      A.  Other than --
7  BY MR. PELAYO:
8      Q.  He paid for lunch, I should add; right?
9      A.  Yes.
10          Other than that, I don't recognize any of
11  the other names.
12          MR. WILLIAMS:  Can I just let the record
13  reflect that also on the list, perhaps the witness
14  missed it, on page 301 at the top there is --

15  BY MR. PELAYO:
16      Q.  Don Haviland?
17        MR. WILLIAMS:  Don Haviland.
18      A.  Oh, yeah.  I missed that.  Yes.
19  BY MR. PELAYO:
20      Q.  What about the name underneath that,
21  Elizabeth Fegan?  Do you know that person?
22      A.  Not to my knowledge.
0168
1       Q.  What about on page 300, the opposite page.
2  Just scan that for me, and let me know if you know
3  any of those people.
4       A.  No.  No, I don't.
5       Q.  If you could just scan 302 and 303 and let
6  me know if you recognize any of them.
7       A.  Again, Kent Williams.
8       Q.  Right.
9       A.  No.
10      Q.  Okay.  That's it.  Do you have a retention
11  agreement with any of your attorneys in this case?
12        MR. WILLIAMS:  Objection to form.
13      A.  I don't understand.
14  BY MR. PELAYO:
15      Q.  Do you have any written agreement with any
16  of your attorneys in this case?  In connection with
17  their representation of you?
18      A.  I don't know.
19      Q.  Do you remember ever signing an agreement
20  about how or whether they would represent you in this
21  case?
22      A.  I recollect signing some papers originally
0169
1  with the Lupron.
2       Q.  With the Lupron case.
3         Do you know whether you've signed any
4  document subsequently in connection with this case?
5         MR. WILLIAMS:  Objection to form.
6  BY MR. PELAYO:
7       Q.  Any similar agreement in connection with
8  this case?
9         MR. WILLIAMS:  Same objection.
10      A.  I don't remember.
11  BY MR. PELAYO:
12      Q.  Are you paying your lawyers anything?
13      A.  No.
14      Q.  Do you know how the costs of this
15  litigation are being paid?
16      A.  No.
17      Q.  I'd like to talk to you a little bit now --
18  switching topics -- about your doctors.  We've talked
19  a little bit about them.
20        Can you just give me a list of the main
21  doctors that have treated you since 2001 for your
22  cancer?

0170
1      A.   Specifically just my cancer?
2      Q.   Just -- let's start with that.  I think
3  that will be sufficient, but let's start with that.
4      A.   Peter Bergreen.
5      Q.   And if you could, I'm sorry, just let me
6  know what the name of their practice is, and where
7  it's located.
8      A.   Oregon Urology Specialists in Eugene.
9      Q.   Okay.
10     A.   Dr. Melhoff.  I think that's M-e-l-h-a-u-f
11  [sic].  I'm not quite sure of the spelling.
12     Q.   And where is he?
13     A.   Same.  Same organization.
14          Dr. Julie Gemmell, G-e, double m, e, double
15  l, and that's the Willamette Cancer Center.
16          And Dr. Glen Buchanan, also the cancer
17  center.
18     Q.   Okay.  Is there a Dr. Ronald Sheerer
19  (phonetic)?
20     A.   He's my general practitioner.  He's my
21  internist.
22     Q.   Okay.  So -- and where is he?
0171
1      A.   In Florence.
2      Q.   And does his practice have a name?
3      A.   He's with the Peace Harbor Hospital clinic
4      Q.   It's a clinic that's actually in the
5  hospital?
6      A.   It's a separate building.
7      Q.   Separate building connected by a walkway or
8  something?
9      A.   No.  Completely separate building.
10     Q.   Physically separate building.
11          And Pete -- let's go one at a time.
12        Dr. Bergreen is a urologist?
13     A.   Yes.
14     Q.   And he treats you for the prostate cancer?
15     A.   Yes.
16     Q.   What about Dr. Melhoff?  Also a urologist?
17     A.   Yes.
18     Q.   Also for prostate cancer?
19     A.   Yes.
20     Q.   Dr. Gemmell, same?
21     A.   Radiologist.
22     Q.   And Dr. Buchanan?
0172
1      A.   Oncologist.
2      Q.   Okay.  Do you like these doctors?  Are you
3  happy with their care?
4          MR. WILLIAMS:  Objection to form.
5  BY MR. PELAYO:
6      Q.   I'm just asking, are you happy with their
7  care?

8        MR. WILLIAMS:  Objection to form.
9  Relevance.
10      A.  Yes.  I'm happy with them.
11  BY MR. PELAYO:
12      Q.  Do you believe that they prescribe
13  medications to you with your best interests in mind?
14        MR. WILLIAMS:  Now I'm objecting as
15  irrelevant and asked and answered.  We've been over
16  this.  And it calls for speculation.
17  BY MR. PELAYO:
18      Q.  I'm just asking whether you believe --
19  whether you believe, your understanding, is that
20  they've treated you with your best interests in mind?
21        MR. WILLIAMS:  I know what you're asking,
22  and it's an improper question.
0173
1      A.  Yes.
2        MR. WILLIAMS:  Give it to him again.
3  BY MR. PELAYO:
4      Q.  Did you consult with any of these doctors
5  concerning your participation in this litigation?
6      A.  No.
7      Q.  Do you believe that any of these doctors
8  ever prescribed a medication based on how much money
9  they would make?
10      A.  I have no idea.
11        MR. WILLIAMS:  Objection -- hold on.  Let
12  me object.
13      THE DEPONENT:  Sorry.
14        MR. WILLIAMS:  That's all right.  Lack of
15  foundation, calls for speculation.
16        You may answer.
17      A.  I have no idea.
18  BY MR. PELAYO:
19      Q.  Do you believe that these doctors conspired
20  with defendant manufacturers?
21        MR. WILLIAMS:  Objection.  Calls for
22  speculation, lack of foundation, also to the extent
0174
1  it's asking for a legal conclusion.
2      A.  I have no idea.
3  BY MR. PELAYO:
4      Q.  You have no idea?  Okay.
5        I'd like to go over some documents now, and
6  I'm going to hand you a document that's been marked
7  Exhibit -- I'll describe it as a collection of
8  documents which I believe are portions of
9  explanations of benefits which are marked as
10  Exhibit Howe 002, and they also bear the Bates stamps
11  range Howe 0014 through Howe 0025.
12        (Whereupon Exhibit Howe 002 was
13        marked for identification.)
14  BY MR. PELAYO:
15      Q.  And that's just for the record I'm saying

16  that.
17      A.  I see.  Okay.
18      Q.  Familiarize yourself a little bit with
19  these documents.  These were --
20      A.  Okay.
21      Q.  Okay.  Do you recognize these?
22      A.  Yes.
0175
1      Q.  Okay.  Are these documents documents that
2  you provided to your lawyers in this case?
3      A.  Yes.
4      Q.  Okay.  You know, one question that I have
5  about these documents is that they seem incomplete
6  sometimes.  I'll give you an example.
7          Take a look at the document that bears
8  Bates stamp 0024.
9      A.  Okay.
10     Q.  And you'll see at the top, above where it
11  says, "Medicare Summary Notice, it says page 1 of 5,
12  and then 0025, which is the next document, doesn't
13  seem to relate, and I'll just represent to you that
14  there are no other documents.
15         My question is, simply, do you -- did you
16  produce all of the pages that you had to your
17  lawyers?
18         MR. WILLIAMS:  Hold on.  I'm going to
19  object to counsel's characterization of the document
20  as not relating, or the two pages not relating to
21  each other.
22         I'll just note for the record that there's
0176
1  some numbers here at the top of these two pages that
2  seem to be consecutive.  Howe 0024 has a number in
3  the upper right-hand corner that says "513," and 0025
4  has "514," so I object to counsel's characterization
5  for that reason, but the documents speak for
6  themselves.
7          MR. PELAYO:  Yeah.
8  BY MR. PELAYO:
9      Q.  Perhaps I'll just clarify.  I really have
10  no -- I'm really just trying to find the rest of the
11  pages.  They are related.  It does appear to be
12  consecutive documents.  This is how I received them.
13         What I'm wondering is, it says, "page 1 of
14  5," and I don't see on -- if this is page 2 of 5,
15  where are pages 3 of 5, 4 of 5 and 5 of 5?  Do you
16  know?
17     A.  They must be at my house.
18     Q.  Did you give your lawyers all of the pages
19  that you had?
20     A.  I gave pages that referred to my cancer
21  treatment.
22     Q.  Okay.  So does that mean that perhaps you
0177

1  picked -- and this is my word -- you selected pages
2  out of the --
3      A.  Out of the 5?
4      Q.  Yes.  The --
5      A.  The other pages may have been treatment for
6  my wife.
7      Q.  Okay.
8      A.  Or things unrelated to the cancer
9  treatment.
10     Q.  Okay.  All right.
11     A.  And I didn't include all of those.
12     Q.  All right.  I'll tell you why it matters.
13  I'll give you just one example.
14         Turn, for example, to Howe 0022.  And this
15  is similar to the one we just looked at.  This one
16  says page 1 of 3 at the top, so this would have been
17  a set of 3.  And it does have, as Kent --
18  Mr. Williams will note, the following page is 0023
19  which is sequential, but I don't have pages 2 of 3 or
20  3 of 3, and the reason I think it matters is, if you
21  look at the entry for the service on 11-30-04, you
22  see where it says, "goserelin implant"?
0178
1      A.  Yes.
2      Q.  The column on the right says, "See note
3  section," and there's a little c there.
4      A.  Yes.
5      Q.  And my question is really simply that I
6  don't have the corresponding page to this that would
7  tell me what note c is.
8      A.  Ah.
9      Q.  So that's really more of an explanation.
10        MR. PELAYO:  And what I'll do at this
11  point, and I'll just request to Mr. Williams on the
12  record, could you, please, just go back and search
13  Mr. Howe's files and make sure I get complete
14  records.
15        MR. WILLIAMS:  The request is noted.
16        MR. PELAYO:  If you have to redact from
17  Mrs. Howe's, that would be fine.
18     A.  Okay.
19        MR. PELAYO:  Okay.
20  BY MR. PELAYO:
21     Q.  I'd like to stay on document 0022.
22     A.  Okay.
0179
1      Q.  And sticking with the service on
2  11-30-04 --
3      A.  All right.
4      Q.  -- you see there's a column that says,
5  "Amount charged," and there's a figure there,
6  "$1,339.47."
7      A.  Wait.  I'm --
8        MR. WILLIAMS:  Amount charged.

9    A.  Yeah.

10       MR. WILLIAMS:  And that --

11    A.  Oh, this number down below.

12  BY MR. PELAYO:

13    Q.  Yeah.

14    A.  Okay.

15    Q.  And then there's a column that says,

16  "Medicare approved"?

17    A.  Right.

18    Q.  And that says zero dollars.  There's a --

19  the following column says, "Medicare paid provider,"

20  and that says zero dollars, and then it says, "You

21  may be billed," and that says zero dollars.

22       And my question is, can you explain why

0180

1  that says -- these entries say zero dollars?

2    A.  No, I cannot.

3    Q.  Okay.  Let's turn to document 0014.  It's

4  the first one in your set.

5    A.  Okay.

6    Q.  Now, this one is -- it looks like it's also

7  service, the service that was provided was goserelin

8  acetate implant, which I guess is the Zolodex

9  injection; is that right?

10    A.  I think so.

11    Q.  Okay.  And it looks like, if we can agree,

12  the date of service for this was December 2, 2003;

13  right?

14    A.  Right.

15    Q.  Okay.

16     Now, this one has the same amount charged

17  as the one we just looked at -- that is, $1,339.47 --

18  but this one also has some amounts in the other

19  columns, "Medicare approved" --

20    A.  Right.

21    Q.  -- "Medicare paid provider," and, "you may

22  be billed"?

0181

1    A.  Right.

2    Q.  Does this document -- what does this

3  document reflect with respect to your service?  Do

4  you know?  Let me strike that.  Let me strike that.

5  I'll restate the question.

6       How did you -- how did you pay for this

7  service on December 2nd, 2003?

8       MR. WILLIAMS:  Objection to form.

9       MR. PELAYO:  Let me restate it.

10  BY MR. PELAYO:

11    Q.  As I understand this explanation of

12  benefits for Medicare, Medicare approved and paid

13  $1,339.47.

14       MR. WILLIAMS:  Objection.  Misstates the

15  document.

16  BY MR. PELAYO:

17    Q.  Well, would you explain to me how -- why
18  don't you explain it to me.  Do you know how much
19  Medicare paid?  Can you tell me how much Medicare
20  paid based on this document?
21        MR. WILLIAMS:  Objection.  The document
22  speaks for itself.
0182
1     A.  You want me to read the numbers?
2  BY MR. PELAYO:
3     Q.  Yeah.  I'd like you to tell me, based on
4  this document, how much you think Medicare paid for
5  this service?
6        MR. WILLIAMS:  Objection.  Foundation.
7  Documents speaks for itself.
8     A.  $1119.06.
9  BY MR. PELAYO:
10    Q.  And you're reading under the column that
11  says, "Medicare paid provider"; right?
12    A.  Correct.
13    Q.  So that's the amount that you think that
14  based on this document Medicare paid to your
15  provider, which would be Dr. Sheerer?
16    A.  No.  This would have been --
17    Q.  Dr. Bergreen.  Excuse me.
18    A.  Yes.
19    Q.  And then it says, "you may be billed
20  279.76"; correct?
21    A.  Correct.
22    Q.  Now I'm just asking here, based on the
0183
1  testimony we've received today, that represents the
2  20 percent that Medicare wouldn't pay?
3        MR. WILLIAMS:  Objection to form.
4  BY MR. PELAYO:
5     Q.  Is that right?
6     A.  That would be my understanding.
7     Q.  Okay.  And so United Health Care of Utah
8  would pay 80 percent of this?
9     A.  If they were billed at the same time,
10  right.
11    Q.  Correct.  And you would be responsible for
12  the remaining 20 percent?
13    A.  Yes.
14    Q.  Do you have any evidence that you paid the
15  remaining 20 percent?
16        MR. WILLIAMS:  Objection.  Form.
17        MR. PELAYO:  Let me restate it, then.
18  BY MR. PELAYO:
19    Q.  How would you have paid for the remaining
20  20 percent?  Would you have written a check?
21    A.  Yes.
22    Q.  Okay.  And have you produced that check for
0184
1  this date of service to your lawyers?

2      MR. WILLIAMS:  Objection.  Form.

3      A.  I have provided the checks that I have paid
4  to the -- Dr. Bergreen's office in the documents that
5  I provided the lawyers.

6  BY MR. PELAYO:

7      Q.  Okay.  And I'll show you those checks in a
8  moment.  My problem is, and I'm hoping you can help
9  me with this, is none of those checks seem to
10  correspond to any of these explanation of benefits,
11  and so I'd like to know, simply, if you had -- if I
12  asked you, do you have the check that reflects this
13  particular date of service, could you get it?

14      MR. WILLIAMS:  Objection to form.

15      A.  No.

16  BY MR. PELAYO:

17      Q.  Why not?  You don't keep cancelled checks?

18      A.  Yes, I do.

19      Q.  So why wouldn't you have the cancelled
20  check that reflects this -- payment for this service?

21      MR. WILLIAMS:  Objection to form.

22      A.  I pay what I am billed by the doctor's

0185

1  office.  Whatever that amount is that it says the
2  patient owes, I pay that.

3  BY MR. PELAYO:

4      Q.  Right.  That's what I'm asking about.  Do
5  you have a check, that check, that would reflect that
6  payment?

7      MR. WILLIAMS:  Objection to form.

8      A.  I have no idea.

9  BY MR. PELAYO:

10      Q.  Did you keep all your cancelled checks?

11      A.  Yes, I do.  To the best of my knowledge, I
12  keep all of my checks.  There has been one I could
13  not find.

14      Q.  Right.  We all do our best.

15          So is it your testimony, then, that you
16  have provided every single cancelled check that
17  relates to these explanation of benefits?

18      MR. WILLIAMS:  Objection to form.

19      A.  I have provided checks that were payable to
20  the Oregon Urology Center.

21  BY MR. PELAYO:

22      Q.  Have you provided --

0186

1      A.  Whatever there was.  Whatever they were.

2      Q.  And you provided all of them?

3      A.  To the best of my knowledge.

4      Q.  This document, 00 -- Howe 0014 refers to a,
5  "Litin McDuffie and Berg."  Do you know where that
6  is?

7      MR. WILLIAMS:  Where are you indicating,
8  Counsel?

9      THE DEPONENT:  It's here (indicating).

10          MR. PELAYO:  It's in the box that's in
11  bold.
12          MR. WILLIAMS:  I see.  Under the claim
13  number?
14          MR. PELAYO:  Yes, sir.
15      A.  That was the former partnership of the
16  Oregon Urology Specialists.
17  BY MR. PELAYO:
18      Q.  So this is Oregon Urology Specialists?
19  Okay.
20          MR. PELAYO:  I guess this is as good a time
21  as any.  I'll state for the record, Counsel, to the
22  extent that you have not searched out and/or produced
0187
1  any evidence of payment associated with these
2  explanations of benefits, we'd ask that you ask
3  Mr. Howe for them and supply them.
4          MR. WILLIAMS:  Okay.  I'm not sure now what
5  you're talking about.
6          As you know, our position is that we've
7  complied with the court's order and produced that
8  which we are required to produce.  But, again, this
9  is a dispute that goes beyond this deposition and is
10  being argued about by people who are much more
11  knowledgeable and experienced than us.  So your
12  request is noted.
13  BY MR. PELAYO:
14      Q.  I'm going to go ahead and hand you a
15  document that has been marked Exhibit Howe 003.
16          (Whereupon Exhibit Howe 003 was
17          marked for identification.)
18          MR. WILLIAMS:  Do you have a copy?
19          MR. PELAYO:  I have plenty of copies.  I
20  have a good legal assistant.
21          MR. WILLIAMS:  Oh, you were expecting
22  company today?
0188
1          MR. PELAYO:  I didn't know.
2      A.  Okay.
3  BY MR. PELAYO:
4      Q.  I'll just state for the record, I've handed
5  Mr. Howe a collection of documents which I will
6  characterize as selected cancelled checks.  All of
7  the checks -- excuse me.  They are stamped with Bates
8  range Howe 0001 through Howe 00 -- excuse me.  0013.
9          And you can double-check me on this real
10  quick, but all of the checks are made to the payee,
11  Oregon Urology Specialists, save for one, and that is
12  the last one, and that one is made to Willamette
13  Valley Cancer Center.
14      A.  Yes.
15      Q.  Okay.  These are your checks; correct?
16      A.  Yes, they are.
17      Q.  Copies of your checks?

18     A.  Yes.
19     Q.  And why -- let's talk about the one made
20  out to Willamette Valley Cancer Center.
21     A.  Yes.
22     Q.  What is that a payment for?
0189
1          MR. WILLIAMS:  Objection to form.
2  Foundation.
3  BY MR. PELAYO:
4     Q.  What services -- and I think we talked
5  about this, and I apologize.  Just remind me.  What
6  service did you receive at Willamette Valley Cancer
7  Center?
8     A.  Initially, radiation.
9     Q.  Okay.  And --
10    A.  With Dr. Gemmell.
11    Q.  -- did you receive any medications in
12  connection with that medication?
13    A.  No.
14    Q.  So it was just radiation?
15    A.  Yes.
16    Q.  And when was that?
17    A.  It was five days a week for four and a half
18  weeks in July/August '05.
19    Q.  And, I'm sorry, you said that it was just
20  radiation treatment?  You didn't receive any
21  injections with that?
22    A.  No.
0190
1     Q.  The remaining checks are all made out to
2  Oregon Urology.
3     A.  Correct.
4     Q.  What are these checks?  Generally, what do
5  they relate to?
6     A.  They relate to a billing that I received
7  from Oregon Urology saying, patient owes this amount.
8     Q.  Got it.
9        So is it safe to say that every single
10  check you've supplied relates to -- let me withdraw
11  that.
12         Have you produced every single check that
13  you've written to Oregon Urology?
14         MR. WILLIAMS:  Objection.  Asked and
15  answered.
16  BY MR. PELAYO:
17    Q.  Well, I'm asking for a different reason.
18  Have you produced every single check you've made to
19  Oregon Urology?
20    A.  To the best of my knowledge.  And I
21  provided a couple more today.
22    Q.  Okay.  So -- was your cut-off that you were
0191
1  only producing checks relating to cancer treatments?
2  Let me strike that.

3        So is the only reason you've seen doctors
4  at Oregon Urology for your cancer treatment?
5        A.   No.
6        Q.   What else have you been seeing them for?
7        A.   A bladder condition.
8        Q.   Okay.  Do you receive any medications for
9  that condition that are administered by a physician?
10       A.   Just a prescription for a pill.
11       Q.   A pill.  Okay.
12            Mr. Howe -- and here I really am asking for
13  your help.
14            Let's just take, as an example, the
15  document that was marked as Exhibit Howe 002, the set
16  of documents, the explanations of benefits?
17       A.   Yeah.
18       Q.   Let's take the top one, which is marked
19  Howe 0014.
20       A.   Correct.
21       Q.   And there was a date of service on
22  December 2nd, 2003.
0192
1        A.   That's what it says.
2        Q.   Can you look now at Exhibit Howe 003 which
3  I gave you, which are the set of cancelled checks,
4  and show me which check reflects your payment for
5  that service?
6        A.   I cannot.
7        Q.   That's fine.  Have you produced the
8  cancelled check that would reflect your payment for
9  that service on December 2nd, 2003?
10            MR. WILLIAMS:  Objection to form.
11       A.   I don't know, because I don't get billed
12  from Oregon Urology Specialists with any specific
13  numbers that tie to this.
14  BY MR. PELAYO:
15       Q.   I see.  So when you think of your payments,
16  you think of what your payment looks like, your
17  invoice looks like, from Oregon Urology?
18       A.   Correct.
19       Q.   And do you have all of those invoices?
20  Have you kept those?
21       A.   I believe I have.
22       Q.   And have you provided -- have you given
0193
1  those to your lawyers in connection with this
2  litigation?
3        A.   I'm not sure.
4        Q.   Okay.
5            MR. PELAYO:  I'll just make a statement on
6  the record, Kent.  These are invoices from his
7  medical provider that reflect billing for
8  physician-administered drugs, and we ask that you
9  provide those as soon as possible.
10            MR. WILLIAMS:  Duly noted.

11  BY MR. PELAYO:
12     Q.  So just going back to this -- and we won't
13  go through the chore of it, because I think I know
14  what your answer's going to be -- but is it safe to
15  say that to ask you to try to match up the cancelled
16  checks with these explanation of benefits, it would
17  not be possible for you because you don't think of
18  them in this way, you think of them in terms of the
19  invoices you receive from Oregon Urology?
20     A.  Right.  Correct.
21     Q.  Okay.  That's helpful.
22        I'm going to give you now a document that's
0194
1  been marked as Exhibit Howe 004.
2        (Whereupon Exhibit Howe 004 was
3        marked for identification.)
4  BY MR. PELAYO:
5     Q.  I'll give you a few minutes to familiarize
6  yourself with it.
7        (Whereupon a break was taken.)
8     MR. PELAYO:  I'll just note for the record
9  that the Bates range associated with the documents
10  that I've compiled and given to Mr. Howe as Exhibit
11  Howe 004, which I will characterize as medical records
12  from Peace Harbor Hospital, are Howe 0026 through Howe
13  0033.
14  BY MR. PELAYO:
15     Q.  Okay?
16     A.  Okay.
17     Q.  Did you -- have you ever seen these
18  documents before?
19     A.  No.
20     Q.  Are these documents that you had in your
21  possession at your home?
22     A.  No.
0195
1     Q.  Do you know how -- let me strike that.
2        So you did not give these documents to your
3  lawyers?
4     A.  No.
5     Q.  And this -- these records that -- they
6  appear to be medical records -- are for a stay at --
7  let me strike that.
8        Do you know what these medical records
9  relate to?
10     A.  No.
11     MR. WILLIAMS:  Objection.  Lack of
12  foundation.
13  BY MR. PELAYO:
14     Q.  You testified earlier, I think, that you
15  had an injection of -- I'm forgetting the name of the
16  drug.  Neulasta?
17     A.  Yes.
18     Q.  At Peace Harbor Hospital?

19      A.  Yes.
20      Q.  This document, which I'm looking at, which
21  is Bates numbered Howe 0026 at the top, says it's
22  from Peace Harbor Hospital; correct?
0196
1       A.  Yes.
2       Q.  And the date on it at the top right says,
3  "September 16th, 2005"; correct?
4       A.  I was looking for the date.  I don't see
5  the date.
6       Q.  It's on -- you see at the top where it
7  says, "Peace Harbor Hospital"?
8       A.  Yeah.
9       Q.  Just to the right of that, it says,
10  "Account create date."  It's abbreviated, but I think
11  it means account create date, 16th September.
12      A.  Oh, oh, oh.  I see it.
13      Q.  Do you think that's the date when you had
14  the -- what is it again? -- Neulasta?
15      A.  No.
16      Q.  That's not the date when you had the
17  Neulasta injection?
18      A.  No.
19      Q.  You had your Neulasta injection at some
20  point before that date?
21      A.  No.
22      Q.  After that date?
0197
1       A.  Yes.
2       Q.  Did you go in and preregister or something?
3          MR. WILLIAMS:  Objection to form.
4       A.  No.
5  BY MR. PELAYO:
6       Q.  I'm just wondering why this document would
7  reflect an account creation date before the date you
8  went in for service.
9          MR. WILLIAMS:  If you know.  Lack of
10  foundation.
11      A.  Because it wasn't for Neulasta.
12  BY MR. PELAYO:
13      Q.  What was this for?
14      A.  Neupogen.
15      Q.  Okay.  Now, why did you receive Neupogen?
16      A.  Because the doctor prescribed it.
17      Q.  Okay.  Which doctor?
18      A.  Buchanan.
19      Q.  And what is Neupogen for?
20          MR. WILLIAMS:  Objection.  Lack of
21  foundation.
22  BY MR. PELAYO:
0198
1       Q.  Do you know what Neupogen for?
2       A.  Yes.
3       Q.  And what is Neupogen for?

4     A.   To build up new white blood cells.
5     Q.   And did you -- was this in connection --
6  was this in treatment for -- I'll say that again.
7          Did you receive Neupogen in connection with
8  your treatment for prostate cancer?
9     A.   Yes.
10    Q.   And is it an injection or a pill?
11    A.   It's an injection.
12    Q.   Did you -- were you admitted to the
13 hospital to receive it?
14    A.   No.
15    Q.   Was it administered at the hospital?
16    A.   Yes.
17    Q.   Who was it administered by?
18    A.   An E.R. nurse.
19    Q.   All right.  And how long were you in the
20 hospital for this injection?
21    A.   No more than a half hour, depending on how
22 long it took the nurse to get to me.
0199
1     Q.   And do you know who manufactures Neupogen?
2     A.   No, I do not.
3     Q.   And did you yourself pay any money for your
4  administration of Neupogen?
5     A.   No.
6          MR. WILLIAMS:  Objection to form.
7     A.   No.
8  BY MR. PELAYO:
9     Q.   Were you ever billed for Neupogen?
10    A.   Me personally?
11    Q.   Yes.
12    A.   No.
13    Q.   Was your provider ever -- who was billed
14 for your injection of Neupogen?
15         MR. WILLIAMS:  Objection.  Lack of
16 foundation.
17 BY MR. PELAYO:
18    Q.   Do you know who was billed for your
19 injection of Neupogen?
20    A.   Yeah.  Medicare.
21    Q.   Medicare.  And did Medicare pay 100
22 percent?
0200
1     A.   I'm not sure.  It's one of the documents I
2  provided today.
3     Q.   Okay.  Why don't you show me.  I'll hand
4  you what has not been marked yet, a set of documents
5  which are copies of the documents you guys gave me
6  this morning.
7          THE REPORTER:  That would be Exhibit Howe 008.
8  BY MR. PELAYO:
9     Q.   Exhibit Howe 008 has not been Bates
10 stamped.  It was handed to me by counsel this morning.
11 At the outset counsel described the documents, but

12   they are one, two, three, four, five, six, seven
13   pages, and I'll let you mark it.
14        (Whereupon Exhibit Howe 008 was
15        marked for identification.)
16   BY MR. PELAYO:
17        Q.   When you're ready, show me which document
18   in Exhibit Howe 008 here relates to the treatment for
19   the Neupogen.
20        A.   (Indicating.)
21        Q.   Okay.  You're showing me an explanation of
22   benefits document from CMS, and it says -- it's dated
0201
1   November 8th, 2005; correct?
2        A.   Yes.
3        Q.   At the top right?
4        A.   Yes.
5        Q.   Okay.  It's the second-from-last document.
6        MR. WILLIAMS:   Thank you.
7   BY MR. PELAYO:
8        Q.   And now, I don't see Neupogen on here?
9        A.   It's the filgrastim.
10        Q.   Filgrastim.  So it's your understanding
11   that filgrastim is Neupogen?
12        A.   Neupogen.
13        Q.   I'm looking at this document that you
14   pointed out to me dated November 8th, 2005, and there
15   are a number of injection -- excuse me.  A number of
16   entries that say filgrastim.
17        A.   Right.
18        Q.   There are three?
19        A.   Right.
20        Q.   And there's a column that says, "Amount
21   charged," and for each of them, it says, "$405.76";
22   correct?
0202
1        A.   Correct.
2        Q.   And then it says, "Noncovered charges," and
3   it says zero; correct?
4        A.   Correct.
5        Q.   Is it -- is it your understanding that that
6   means that all of these charges for filgrastim were
7   paid by Medicare?
8        MR. WILLIAMS:   Objection to form.  Lack of
9   foundation.
10        A.   I don't know.
11   BY MR. PELAYO:
12        Q.   Okay.  But I'll ask it again.  Did you pay
13   for -- did you personally pay any money for this
14   administration?
15        A.   No.
16        Q.   These administrations of filgrastim?
17        A.   No.  No.
18        Q.   Okay.
19        Could you go back to Exhibit Howe 001,

20  please.  That's the complaint that we looked at some
21  time ago.
22       And if you'll go to paragraph 17 just --
0203
1  which is on page 7 and 8 --
2     A.  Right.
3     Q.  -- and just tell me, is Neupogen among the
4  drugs listed in the paragraph?
5        MR. WILLIAMS:  Objection.  The document
6  speaks for itself.
7     A.  I do not see it listed.
8  BY MR. PELAYO:
9     Q.  Okay.  I'll go ahead and hand you a
10  document that's been marked as Exhibit Howe 005.
11     A.  Okay.
12        (Whereupon Exhibit Howe 005 was
13        marked for identification.)
14        MR. WILLIAMS:  Thank you.
15  BY MR. PELAYO:
16     Q.  And I'll note for the record that Exhibit
17  Howe 005 is a collection of documents which I will
18  characterize as ledger records from Oncology
19  Associates of Oregon, and they bear Bates range Howe
20  0034 through Howe 0051, and I'll give you a minute to
21  familiarize yourself with these documents.
22        (Pause in the proceedings.)
0204
1     A.  I'm ready.
2     Q.  You ready?
3     A.  Sure.
4     Q.  Have you ever seen this document before?
5     A.  No.
6     Q.  Did you give this document to your lawyers?
7     A.  No.
8     Q.  Do you know what this document is?
9     A.  Only from what I read.
10     Q.  Okay.  And let's read it together.  I'll
11  withdraw that.
12        There is a -- who is Dr. Brian -- is it
13  Hekleff?  I'm looking, for example, at Howe 0040.
14     A.  40.
15     Q.  Yeah.  You're on that page.
16     A.  No, not yet.  I'm getting there.  Okay.
17     Q.  Lower left.  It says, "Referring physician,
18  Brian" --
19        MR. WILLIAMS:  That's Melhoff.
20     A.  Melhoff.
21  BY MR. PELAYO:
22     Q.  That's Melhoff?
0205
1     A.  That's Melhoff.
2     Q.  That's the oncologist?
3     A.  No.  He's a urologist.
4     Q.  Urologist.  Excuse me.  Okay.  He's

5   associated with Oregon Urology Specialists?
6       A.  Yes.  I spelled it wrong, I guess.
7       Q.  That's okay.
8           All right.  I'll give you a document now
9   that's been marked Exhibit Howe 006.
10          (Whereupon Exhibit Howe 006 was
11          marked for identification.)
12          MR. PELAYO:  And I'll note for the record
13  I've just handed Mr. Howe a collection of documents
14  which I will characterize as selected financial
15  records from Oregon Urology Specialists bearing Bates
16  range Howe 0052 through 0057.
17  BY MR. PELAYO:
18      Q.  Did you have take a look at that?
19      A.  Yes, I did.
20      Q.  Have you ever seen these documents before?
21      A.  No.
22      Q.  Did you ever -- so you did not produce
0206
1   these documents to your lawyers --
2       A.  No.
3       Q.  -- is that correct?
4           Could you turn to page 0055, please.
5       A.  Okay.
6       Q.  Okay.  If you look on the left-hand column,
7   it's organized by what appears to be date order.
8       A.  Okay.
9       Q.  If you go down to June 23rd -- excuse me.
10  6-03-03.
11      A.  Okay.
12      Q.  And then if you read from left to right,
13  you'll see that there's an entry for Zolodex.
14      A.  Yes.
15      Q.  Now, what I'm wondering is, for example, if
16  you scan above and look at the entry for 8-13-02 --
17      A.  Yes.
18      Q.  -- it says -- and then scan to the right,
19  it says, "Lupron Depot"?
20      A.  Yes.
21      Q.  And then even above that, it says, "April
22  16th, '02," and it says, if you scan to the right,
0207
1   "Lupron Depot"?
2       A.  Yes.
3       Q.  But then going back down, it says, "June 3,
4   '03, Zolodex"?
5       A.  Yes.
6       Q.  So what I'm wondering is, earlier you
7   said that -- and it was based on your memory, the
8   first time you remember taking Zolodex was 2004.
9   Could it be that it was earlier?  Could this be the
10  first time?
11      A.  I think so, yes.
12      Q.  Okay.  All I'm asking is, does June 3rd,

13  2003, generally comport to when you took Zolodex?
14      A.  According to this, it has to be.
15      Q.  Okay.  And I just want to make sure I
16  understand what you said about the switch to Zolodex.
17          Did you say it was recommended by your
18  doctor?
19      A.  Yes.
20      Q.  Which doctor was that?
21      A.  Dr. Bergreen.
22      Q.  Bergreen.
0208
 1          And did -- when you made the switch, did
 2  you talk to him about the medical efficacy, about the
 3  two drugs?
 4          MR. WILLIAMS:  I'm going to object as asked
 5  and answered.  He's already testified about what
 6  Dr. Bergreen didn't say.
 7  BY MR. PELAYO:
 8      Q.  I'm just asking you to help me remember
 9  what you said.  Did you say that he testified -- --
10  strike that.  I just want to remember what you said.
11          Did you discuss the medical efficacy for
12  switching?
13          MR. WILLIAMS:  Objection.  Asked and
14  answered.
15      A.  No.
16  BY MR. PELAYO:
17      Q.  In other words, did he say to you, I want
18  to switch you over to Zolodex because I think it's
19  better for your treatment?
20          MR. WILLIAMS:  Objection.  Asked and
21  answered.  Repetitious.
22      A.  I don't recall the conversation
0209
 1  specifically.
 2  BY MR. PELAYO:
 3      Q.  Okay.  Reading -- strike that.
 4          Could you turn to Howe 0056.
 5      A.  Okay.
 6      Q.  And you'll see at the top next to the date
 7  3-02-04 --
 8      A.  Yes.
 9      Q.  -- if you read across, it says, "Lupron
10  Depot"?
11      A.  Yes.
12      Q.  And again, 6-01-04, it says, if you read
13  across, "Lupron Depot"?
14      A.  Yes.
15      Q.  And then if you go to 8-31-04 below, you
16  read, "Zolodex."
17      A.  Yes.
18      Q.  And so what I'm wondering is, why would
19  this reflect the charge for Lupron, if you know,
20  after you had already started on Zolodex?

21      MR. WILLIAMS:  Objection.  Lack of
22  foundation.
0210
1       Do you know?
2  BY MR. PELAYO:
3       Q.  Do you know why -- if you started on -- and
4  I know it's hard to remember, but if you think you
5  started on Zolodex in June of '03 --
6       A.  Yeah.
7       Q.  -- do you have any idea why, in March of
8  '04, you were getting billed for Lupron?
9       A.  To the best of my recollection, the
10  conversation was that the Zolodex was not working as
11  effective as Lupron did in the very beginning of my
12  treatment, so he went back to Lupron to see if it
13  would act as it did the first time I started
14  receiving Lupron.
15      Q.  Okay.  And so who did you have this
16  conversation with?
17      A.  Dr. Bergreen.
18      Q.  And did you talk at that time about the
19  price of the two drugs?
20      A.  No.
21      Q.  And then -- so if you look at, again, page
22  0056, you go back to 8-31-04?
0211
1       A.  Right.
2       Q.  It looks like you switched back to Zolodex;
3  correct?
4       A.  Correct.
5       Q.  So was there another conversation?
6       A.  I don't recall specifically, but,
7  evidently, the Lupron wasn't doing what it did the
8  first time, so they went back to Zolodex.
9       Q.  Okay.
10      A.  And I have no medical knowledge or reason
11  why.
12      Q.  And have you been on Zolodex ever since?
13      A.  I believe I had one more injection of
14  Lupron.
15      Q.  Okay.  And do you know how much Lupron
16  costs?
17      MR. WILLIAMS:  Objection.  Vague.  Lack of
18  foundation.
19      A.  Only what I see on these -- on this paper
20  that you just gave me.
21  BY MR. PELAYO:
22      Q.  Let me ask it this way:  Do you know how
0212
1  much your medical provider pays for Lupron?
2       MR. WILLIAMS:  Same objection.  Lack of
3  foundation.  Vague.
4       A.  No.
5  BY MR. PELAYO:

6    Q.  Do you know how much your medical provider
7  pays for Zolodex?
8         MR. WILLIAMS:  Same objection.
9    A.  No.
10 BY MR. PELAYO:
11   Q.   Do you know whether the cost to the medical
12 provider is more or less for Lupron versus Zolodex?
13        MR. WILLIAMS:  Same objection.
14   A.  I don't know.
15 BY MR. PELAYO:
16   Q.  Okay.
17        Now, Mr. Howe, this document, which is a --
18 according to the title of the document is a financial
19 history of DT service by Oregon -- from Oregon
20 Urology Specialists.
21       Do you know what DT service means?
22   A.  I have no idea.
0213
1    Q.   And I know that you didn't have this
2  document in your possession.
3    A.  No.
4    Q.   But I'm hoping you can help me understand.
5         MR. WILLIAMS:  Well, hold on.  He's also
6  testified he never even saw it before today, meaning
7  that he didn't generate it, so I don't know how the
8  witness can understand it and help you, Counsel.
9         MR. PELAYO:  I understand.  He might have
10 familiarity from dealing with this office.
11        MR. WILLIAMS:  Well, look, I object to any
12 question about documents which he has never seen
13 before today.
14        MR. PELAYO:  Okay.  Well, let's see if he
15 can help.
16 BY MR. PELAYO:
17   Q.  Let's take a look on page 055, Mr. Howe.
18   A.  Okay.
19   Q.  At the entry for 6-03-03 for Zolodex?  You
20 see it?
21   A.  6 -- okay.
22   Q.  It says 6-03-03, I'll read it, all the way
0214
1  across.
2    A.  Yeah.  I got it.
3    Q.  And it says, "Zolodex."  And if you read it
4  all the way to the far right --
5    A.  Yeah.
6    Q.  -- it says, "Amount $1,339.47"?
7    A.  Right.
8    Q.  Then a couple of lines below on the date
9  8-5-03 --
10   A.  Yes.
11   Q.  -- it says, "Check payment, 3635, patient."
12       You see that?
13   A.  6-3.

14          MR. WILLIAMS:  Hold on.  Oh, the date is
15 8-5-03?
16      A.  Oh, 8-5 -- okay.  I got it.  Yeah.
17 BY MR. PELAYO:
18      Q.  I know there are a lot of entries.
19      A.  Okay.
20      Q.  So that's a check payment 3635, and then it
21 says, "patient"; correct?
22      A.  Right.
0215
1       Q.  And then if you read it all the way across,
2 it says, "$140.93"?
3       A.  Right.
4       Q.  Do you know if that 3635, would that be a
5 check number on one of your checks?
6       A.  Yes.  Could be.
7          MR. WILLIAMS:  Do you know that?
8 BY MR. PELAYO:
9       Q.  Do you know that?
10      A.  Sounds like it.
11         MR. WILLIAMS:  Well --
12      A.  But I don't know.
13 BY MR. PELAYO:
14      Q.  I mean -- go back to Exhibit Howe 008 for
15 a minute, which has a statement at the very top of
16 the page which has a sample of one of your -- a
17 check that you wrote in September of '05?
18      A.  Yeah.
19      Q.  You see that?  And it looks like you wrote
20 the check number 4196, right, in the upper right?
21      A.  Yes.
22      Q.  Okay.
0216
1          So now going back to Howe 055 --
2       A.  Okay.
3       Q.  -- which was August 5th, 2003, so, you
4 know, two years ago, you agree that it's probable
5 that that 3635 is a check number from you; right?
6          MR. WILLIAMS:  I'll object as calling for
7 speculation, lack of foundation.
8       A.  I really don't know.
9 BY MR. PELAYO:
10      Q.  Okay.  Then the next line says, "Patient,"
11 and the patient here is you.
12      A.  Yes.
13      Q.  And then it says, "$140.93"?
14      A.  Right.
15      Q.  So what I'm wondering is, let's go now to
16 Exhibit Howe 002 which I showed you earlier.
17      A.  Exhibit Howe 002?
18      Q.  No.  The checks -- is it Exhibit --
19      A.  It's not Exhibit Howe 002.
20         MR. WILLIAMS:  Exhibit Howe 003.
21 BY MR. PELAYO:

22    Q.  Exhibit Howe 003.  I apologize.

0217

1       Now, I'd like you to flip through each of

2  these copies of cancelled checks, and tell me if you

3  see Check No. 3635.

4    A.  No, I don't.

5    Q.  Okay.  I don't, either.  Do you think that

6  you would have a copy of check 3635 at home?

7    A.  I would hope I do.

8    Q.  Okay.  Have you looked for it?

9    A.  Not specifically that number.

10    Q.  Right.  Okay.

11      So let me ask the question this way:  Have

12  you produced any evidence that -- let me strike that

13  question.  I'll strike that question.

14      (Pause in the proceedings.)

15    Q.  Okay.  Let me hand you now, Mr. Howe, a

16  document that has been marked Exhibit Howe 007.

17      (Whereupon Exhibit Howe 007 was

18        marked for identification.)

19      MR. PELAYO:  And for the record, I've

20  handed Mr. Howe a document that is -- I'll

21  characterize as a prescription history for Mr. Howe,

22  and the name Caremark is on the bottom right-hand

0218

1  corner, and it bears Bates range Howe 0058 through

2  Howe 0067.

3    A.  Okay.

4  BY MR. PELAYO:

5    Q.  Okay.  Have you ever seen this document

6  before?

7    A.  No.

8    Q.  Did you give this document to your lawyers?

9    A.  No, I did not.

10    Q.  Do you know why they -- strike that.

11      Do you -- I know you've never seen the

12  document.  Do you have any idea what it's about?

13    A.  If it's from Caremark, it has to be my

14  prescription history.

15    Q.  Okay.  You buy your prescriptions through

16  Caremark?

17    A.  Yes, I do.

18    Q.  Okay.  What kinds of prescriptions do you

19  buy through Caremark?

20    A.  My blood pressure medication, water pills,

21  Hiprex for my bladder condition.  That kind of --

22    Q.  Okay.  Are they all pills?

0219

1    A.  Yes.

2    Q.  Do you buy any medicines that are

3  administered by a physician --

4    A.  No.

5    Q.  -- through Caremark?

6    A.  No.

7    Q.  Have you ever bought any medicines that are
8  administered by a physician through Caremark?
9    A.  No.
10    Q.  If you could just flip through all the
11  pages and take a look at all the drugs that are
12  listed here.  Just familiarize yourself with them.
13    A.  Okay.  They're pretty much repetitious.
14    Q.  Right.  Is it your testimony -- well,
15  strike that.
16      Do your purchases of any of these documents
17  that are listed in the document form the basis of
18  your claims in this case?
19      MR. WILLIAMS:  Objection.  Lack of
20  foundation, calling for a legal conclusion, calling
21  for speculation.
22    A.  I don't know.
0220
1      MR. PELAYO:  Okay.  Let me ask it a little
2  differently.
3  BY MR. PELAYO:
4    Q.  Is it your understanding that any of these
5  drugs are involved in this case?
6      MR. WILLIAMS:  Same objection.
7    A.  Not to my --
8      MR. WILLIAMS:  Also vague as to the meaning
9  of "involved."
10    A.  Not to my knowledge.
11  BY MR. PELAYO:
12    Q.  Are you -- strike that.
13      These are all -- these documents are --
14  these drugs listed on these pages are all pills;
15  correct?
16    A.  They are all pills.
17    Q.  Is it your understanding that this case is
18  about pills?
19    A.  No.
20    Q.  Mr. Howe, do you regularly -- strike that.
21      Do you generally read the newspaper?
22      MR. WILLIAMS:  Objection.  Vague.
0221
1  BY MR. PELAYO:
2    Q.  Are you a newspaper reader?
3    A.  Sunday.
4    Q.  Sunday only?  Okay.
5      What newspaper do you read?
6    A.  The Register Guard, which is the Eugene
7  newspaper.
8    Q.  Do you watch news programs on TV?
9    A.  Sometimes.
10    Q.  What kind of news programs do you watch?
11  Did you watch the evening news?
12      MR. WILLIAMS:  Objection.  Vague.
13  BY MR. PELAYO:
14    Q.  I'll give you an example.  Do you watch --

15      A.  Yeah.  Evening news is fine.
16      Q.  Do you watch other news programs.  For
17  example, do you watch Sunday morning talk shows?
18      A.  No.
19      Q.  Okay.  Do you follow politics at all?
20      A.  Very rarely.
21      Q.  Have you seen any articles or television
22  programs recently regarding any of the defendants in
0222
1  this case?
2          MR. WILLIAMS:  Objection.  Vague,
3  overbroad.
4      A.  No.
5  BY MR. PELAYO:
6      Q.  Do you remember reading any article or
7  watching any television -- do you reading any
8  newspaper article regarding any of the defendants in
9  this case?
10         MR. WILLIAMS:  Same objection.
11      A.  Not to my knowledge.
12  BY MR. PELAYO:
13      Q.  Do you recall watching any television shows
14  regarding the defendants in this case?
15         MR. WILLIAMS:  Same objection.
16      A.  Not to my knowledge.
17  BY MR. PELAYO:
18      Q.  Do you remember reading any articles about
19  average wholesale price in the newspaper?
20      A.  No.
21      Q.  You remember watching any television
22  programs that talked about average wholesale price?
0223
1      A.  No.
2      Q.  Have you read any articles in the newspaper
3  about the price of prescription drugs in the last
4  year?
5          MR. WILLIAMS:  Objection.  Overbroad,
6  vague, relevance.
7      A.  The only articles I may have read would
8  have been those involved with buying drugs in Canada
9  because they were cheaper.
10  BY MR. PELAYO:
11      Q.  Have you read any articles -- strike that.
12          I'd like to return to Exhibit Howe 008.
13  These are the documents you handed me this morning?
14      A.  Yes.
15      Q.  They're not numbered.  And I'd like to go,
16  please, to the third page --
17      A.  Okay.
18      Q.  -- which is a copy of -- oh, how would you
19  describe this?  Some sort of invoice?  And just to
20  identify it, it's dated on the lower left with the
21  date 10-27-05.
22      A.  Right.

0224
1     Q.  And it says, "Account No. 57836"?
2     A.  Correct.
3     Q.  And just to further try to identify it, all
4  the way to the right there's an entry that says, "Due
5  from patient" --
6     A.  Right.
7     Q.  "1,458.09"?
8     A.  Correct.
9     Q.  Can you tell me what this is?
10    A.  It's an invoice from Oregon Urology
11 Specialists.
12    Q.  Okay.
13    A.  And there's a top part that you tear off
14 and return with your check.
15    Q.  I see.
16        And it says that there was a -- it says --
17 in handwriting, what does it say above, "Due from
18 patient"?  Is there a handwritten notation there?
19    A.  Yeah.  It says, "Paid 11-4-05, Check
20 No. 4217."
21    Q.  Okay.  Now, the check that you provided to
22 me this morning is numbered 4196.
0225
1     A.  Correct.
2     Q.  Have you provided check 4217?
3     A.  It's not cleared the bank yet.
4     Q.  Not cleared the bank yet?  Okay.
5        Now, it looks like the -- what are these
6  charges for?  Let me back up.
7        It says, "Balance forward" at the top, and
8  then it says, "3,973.66."
9     A.  Yep.
10    Q.  Do you know what that's for?
11    A.  I assume that's what I owed.
12       MR. WILLIAMS:  Don't assume.  Do you know
13 what it's for?
14    A.  No.
15 BY MR. PELAYO:
16    Q.  Do you have any idea what it's for?  Is it,
17 for example, for Zolodex-related treatment?
18       MR. WILLIAMS:  Objection.  Lack of
19 foundation.  He said he doesn't know.
20 BY MR. PELAYO:
21    Q.  Well, let me ask it this way:  Why did you
22 produce this to me?
0226
1     A.  It has to do with the billing from Oregon
2  Urology Specialists where I get my cancer treatment,
3  or did, with injections of Lupron and Zolodex.
4     Q.  Okay.  And so does this -- how do I know
5  from this doc- -- can you tell me from this document
6  what amount is for Lupron or Zolodex, as you say?
7     A.  No, I can't.

8     Q.   And did you pay 1,458.09?

9     A.   Yes, I did.

10    Q.   And do you know how much of that amount was

11  for Lupron or Zolodex?

12    A.   I do not.

13    Q.   And do you know what the basis was for

14  charging you 1,458.09?

15         MR. WILLIAMS:  Objection.  Lack of

16  foundation.

17    A.   No, I don't.

18  BY MR. PELAYO:

19    Q.   You don't know how that number was

20  calculated?

21    A.   I could figure it out.

22    Q.   Would you do that for me?  How do you --

0227

1     A.   You take "insurance pending" and "due from

2   patient" and add them together, and you get account

3   balance, 3,341.87.

4     Q.   Right.  But how much of this would Medicare

5   have paid?

6          MR. WILLIAMS:  Objection.  Lack of

7   foundation.

8     A.   I have no idea.

9   BY MR. PELAYO:

10    Q.   No idea?

11         Do you have other invoices like this at

12  home?

13    A.   Yes, I think I do.

14    Q.   Okay.  I've already asked for those.

15         Is it your testimony that -- let me start

16  over.  Strike that.

17         How does AWP relate to this charge,

18  $1,459.49?

19         MR. WILLIAMS:  Object.  This is repetitive

20  now.  He just said he didn't know.

21    A.   I have no idea.

22  BY MR. PELAYO:

0228

1     Q.   You have no idea.  How is it that -- strike

2   that.  I'm sorry, Laurie.

3          You're alleging in this case that your

4   payments for drugs are based in whole or in part on

5   AWP; correct?  We talked about that earlier in

6   connection with paragraph 17 in the complaint.  You

7   remember that?

8     A.   Yes.

9     Q.   Can you then tell me, here's a specific

10  example of a drug charge that you've paid to Oregon

11  Urology.

12         Can you tell me how this is based on AWP?

13         MR. WILLIAMS:  Objection.  Repetitive.  He

14  already said he does not know -- I'm sorry, but,

15  Mr. Howe, let me get my objection the record.

16        THE DEPONENT:  Oh, I thought you were
17  through.
18        MR. WILLIAMS:  I'm not through.
19        He's already testified he doesn't know how
20  the number was calculated, so if he doesn't know how
21  it was calculated, he doesn't know whether or not it
22  was based on the AWP.  You've asked him that three or
0229
1  four times now, Carlos.
2  BY MR. PELAYO:
3      Q.  So your answer is you don't know?
4      A.  I have no idea.
5      Q.  You have no idea.  Okay.
6        If you could turn to the next page, again
7  unnumbered, but it's a bunch of these explanations of
8  benefits from Medicare.  It's November 4th, 2005, in
9  the upper right?
10      A.  Yep.
11      Q.  It says, "Willamette Valley Cancer Center,"
12  but then it has an address in -- is that California?
13      A.  Yeah.  I see that.  I don't understand
14  that.
15      Q.  Have you ever been to California for
16  treatment?
17      A.  No.
18      Q.  Okay.  And I'll just -- you see below where
19  it describes the services on October 4th, 2005?
20      A.  October 4th?  Yes.
21      Q.  There's a charge for a drug called
22  docetaxel?
0230
1      A.  Yes.
2      Q.  And then there's a charge for chemotherapy,
3  and then there are three charges for the office
4  service?
5      A.  Right.
6      Q.  And then there's also a charge for
7  dexamethasone sodium phosphate?
8      A.  Correct.
9      Q.  Is this typical of a bill that you -- an
10  explanation of benefits that you might receive where
11  it would reflect both drugs and also office charges?
12        MR. WILLIAMS:  Objection.  Vague.
13  BY MR. PELAYO:
14      Q.  Have you ever seen other explanations of
15  benefits like this where it has both the drug and the
16  office charge on it?
17      A.  Yes.
18      Q.  And do you know when you pay your 20
19  percent of the 20 percent that we've talked about all
20  day, do you know what percentage goes towards the
21  office service versus the drug?
22        MR. WILLIAMS:  Objection to the form of the
0231

1  question.  Compound.
2      A.  No idea.
3      MR. PELAYO:  Why don't we take a short
4  break, collect my thoughts, and then we'll we done.
5      MR. WILLIAMS:  That's fine.
6      (Whereupon a break was taken.)
7  BY MR. PELAYO:
8      Q.  There's just one other thing, Mr. Howe, I
9  want to understand.
10      Your -- your bills go to your medical
11  provider; is that correct?  Do all -- let me -- --
12  strike that.  Sorry.  I know I've been doing that.
13      Do all of your -- are all of your bills
14  assigned to your medical provider?  Do you know what
15  I mean by that?
16      MR. WILLIAMS:  Objection to form.
17      A.  No, I don't.
18  BY MR. PELAYO:
19      Q.  Do you know whether your Medicare bills
20  go -- do they go to you, or do they go to your
21  medical provider?
22      MR. WILLIAMS:  Objection to form.  Medicare
0232
1  bills?
2  BY MR. PELAYO:
3      Q.  When you receive -- let's talk about your
4  supplemental insurance.
5      A.  Okay.
6      Q.  Do your charges -- when you're billed by
7  your doctor's office, do you know who they bill?  Do
8  they bill you directly, or do they bill your
9  insurance company?
10      A.  They bill my insurance company.
11      Q.  And then what do you receive in the mail?
12      A.  I receive in the mail the forms that I've
13  given you, the Medicare forms and the United Health
14  Care form after the fact --
15      Q.  Right.
16      A.  -- to show that they have been billed.
17      Q.  Okay.  I think I understand.
18      MR. PELAYO:  I think we're done.
19      I'll just state a couple things on the
20  record.
21      Mr. Howe has testified today as to a couple
22  of documents that we'd like to have produced.  I'll
0233
1  try to collect my thoughts here so that they're in
2  one place, but this is, by no means, an exhaustive
3  list.  I'll follow up in writing.
4      He testified that he has -- that there are
5  invoices in his possession from Oregon Urology that
6  relate to his physician-administered medications and
7  payments for those medications.  We'd like those.
8      I think he said that he has documents,

9  including plan description from Wells Fargo, as well
10  as explanation of benefits from his supplemental
11  insurer, United Health Care.  We'd like those.
12          To the extent that he has any other records
13  that relate to payments or charges for
14  physician-administered drugs during the class period,
15  we'd like those.
16          And I'll note that there are some documents
17  which Mr. Howe did not produce, had never seen, such
18  as ledger records from Oregon Urology and financial
19  statements, I think, also in that medical practice
20  and possibly from a hospital, Peace Harbor Hospital.
21  We'd like to reserve the right to speak with the
22  administrators at those facilities to the extent we
0234
1  need to understand those documents better.
2          And then, in light of all those what we
3  view as deficiencies in the document production to
4  date, we'll reserve the right to continue this
5  deposition of Mr. Howe at a later date to the extent
6  to -- hopefully that can be avoided -- if we receive
7  the necessary documents.  But our position is the
8  documents we have received to date are insufficient
9  pursuant to Judge Saris' order.
10          MR. WILLIAMS:  Okay.  I'm going to raise my
11  voice not because I'm angry or anything, but because
12  somebody is blowing leaves outside.
13          I just want the record to reflect that
14  counsel is shouting because he has to be heard.
15          But your requests are duly noted.  I object
16  to the statement, because I think it mischaracterizes
17  the witness's testimony.
18          But our position, of course, is that we
19  have complied with the court's class certification
20  order by producing the records that we did produce.
21          With respect to counsel's reservation of
22  the right to take testimony from the various health
0235
1  care providers, I don't have a response to that.  We
2  don't control those entities, and I assume that if
3  counsel want to take testimony from those entities,
4  they will attempt to do so, and we will respond to
5  that however we feel is appropriate to do so.
6          With respect to counsel's statement that he
7  is seeking to continue the deposition, our position
8  is that the deposition of Robert Howe is concluded,
9  and we will exercise our right to read and sign the
10  transcript.
11          MR. PELAYO:  That's sounds fair, and we'll
12  enforce our rights, if necessary.
13          MR. WILLIAMS:  All right.  We're done.
14          THE REPORTER:  And, Counsel, you are
15  ordering this transcript?  The original?
16          MR. PELAYO:  Yes.

17      THE REPORTER:  And you wanted a rough
18  draft?
19      MR. PELAYO:  Yes.
20      THE REPORTER:  Counsel, did you want a copy
21  of the transcript?
22       MR. WILLIAMS:  Yeah.  There's a -- isn't
0236
1  there a protocol or something of how this is working?
2      THE REPORTER:  Like a standard order?
3       MR. PELAYO:  Yes.
4      MR. WILLIAMS:  So just follow that.
5      THE REPORTER:  Okay.
6      (Whereupon the within proceedings were
7  adjourned at 4:16 p.m.)
8
9
10
11
12      _____
13          ROBERT A. HOWE
14
15  Subscribed and sworn to and before me
16  this _____ day of _____, 20_____.
17
18
19  _____
20      Notary Public
21
22
0237
1          CERTIFICATE
2
3       I, Laurie Volker, do hereby certify
4  that pursuant to the Rules of Civil Procedure, the
5  witness named herein appeared before me at the
6  time and place set forth in the caption herein;
7  that at the said time and place, I reported in
8  stenotype all testimony adduced and other oral
9  proceedings had in the foregoing matter; and that
10  the foregoing transcript pages constitute a full,
11  true and correct record of such testimony adduced
12  and oral proceeding had and of the whole thereof.
13
14       IN WITNESS HEREOF, I have hereunto set
15  my hand this 25th day of November, 2005.
16
17  _____   _____
18  Signature        Expiration Date
19
20
21
22