0001
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF MASSACHUSETTS
3  -------------------------------
4  In Re: Pharmaceutical Industry: MDL No. 1456
5  Average Wholesale Price     : Civil Action
6  Litigation         : 01CV12257-PBS
7  ------------------------------- Judge Patti B. Saris
8  This Document relates to:  :
9  All Class Actions      :
10  -------------------------------
11     DEPOSITION OF MARJORIE JOYCE HOWE
12     TAKEN ON BEHALF OF DEFENDANTS
13      FRIDAY, MARCH 31, 2006
14      "HIGHLY  CONFIDENTIAL"
15
16  BE IT REMEMBERED THAT, pursuant to the Oregon Rules
17  of Civil Procedure, the deposition of Marjorie Joyce
18  Howe was taken before Janette Dukic, Court Reporter
19  and Notary Public, on Friday, March 31, 2006,
20  commencing at the hour of 9:25 a.m., the proceedings
21  being reported at Hilton Hotel and Conference
22  Center, 66 East Sixth Avenue, Eugene, Oregon.
0002
1  APPEARANCES
2
3     PAMELA MACER, ESQ.
4     and NICHOLAS P. MIZELL, ESQ.
5     Shook, Hardy & Bacon LLP
6     2555 Grand Boulevard
7     Kansas City, MO  64108
8     816.474.6550
9       Appearing on behalf of
10       Aventis
11
12     KELLEEN McGINNIS SCOTT, ESQ.
13     Hogan & Hartson LLP
14     555 Thirteenth Street, NW
15     Washington, DC  20004
16     202.637.5600
17       Appearing on behalf of
18       Amgen, Inc.
19       (Telephonic)
20
21
22   (CONTINUED)
0003
1  APPEARANCES  (CONTINUED)
2
3     BRIAN J. MURRAY, ESQ.
4     Jones Day
5     77 West Wacker Drive
6     Suite 3500

```
 7    Chicago, IL  60601
 8    312.269.1570
 9        Appearing on behalf of
10        Abbott Laboratories
11        (Telephonic)
12
13    JASON M. BRUNO, ESQ.
14    Dickstein Shapiro Morin & Oshinsky LLP
15    2101 L Street, NW
16    Washington, DC  20037
17    202.777.2591
18        Appearing on behalf of
19        Baxter
20        (Telephonic)
21
22    (CONTINUED)
0004
 1  APPEARANCES  (CONTINUED)
 2
 3    CARLOS M. PELAYO, ESQ.
 4    Davis Polk & Wardwell
 5    450 Lexington Avenue
 6    New York, New York  10017
 7    212.450.4916
 8        Appearing on behalf of
 9        AstraZeneca Pharmaceuticals LP
10        (Telephonic)
11
12    SHELLI L. CALLAND, ESQ.
13    Sonnenschein Nath & Rosenthal LLP
14    1301 K Street, NW
15    Suite 600, East Tower
16    Washington, DC  20005
17    202.408.9163
18        Appearing on behalf of
19        Sicor, Inc.
20        (Telephonic)
21
22    (CONTINUED)
0005
 1  APPEARANCES  (CONTINUED)
 2
 3    DOUGLAS B. FARQUHAR, ESQ.
 4    Hyman, Phelps & McNamara, PC
 5    700 Thirteenth Street, NW
 6    Suite 1200
 7    Washington, DC  20005
 8    202.737.9624
 9        Appearing on behalf of
10        Watson Pharmaceuticals, Inc.
11        (Telephonic)
12
13    DONALD E. HAVILAND, JR., ESQ.
14    Kline & Specter, PC
```

15    1525 Locust Street
16    19th Floor
17    Philadelphia, PA  19102
18    215.772.1000
19        Appearing on behalf of
20        the Plaintiff Class
21
22
0006
1                    I N D E X
2
3    WITNESS: MARJORIE JOYCE HOWE
4    EXAMINATION BY:                        PAGE
5     MS. MACER...................................... 008
6
7           E X H I B I T   I N D E X
8        (ALL EXHIBITS STRICTLY CONFIDENTIAL)

9    NUMBER             DESCRIPTION          PAGE
10   Exhibit J Howe 001 - Fourth Amended Master
11                Consolidated Class Action
12                Complaint................... 070
13   Exhibit J Howe 002 - Proposed Consolidated Order
14                RE:  Motion for Class
15                Certification Track 2....... 092
16   Exhibit J Howe 003 - Letter, 11-28-05, Re:
17                NAS FOIA Case No. 8508350044,
18                HOWE 0070 - 0074 and
19                HOWE 0228 - 0230............ 115
20   Exhibit J Howe 004 - Miscellaneous Checks,
21                HOWE 0001 - 0013, and
22                attachments................. 122
0007
1           E X H I B I T   I N D E X  (CONTINUED)
2    NUMBER             DESCRIPTION          PAGE
3    Exhibit J Howe 005 - Medicare Summary Notice,
4                11-4-05.................... 127
5    Exhibit J Howe 006 - Oncology Associates of
6                Oregon Ledgers, HOWE 0034 -
7                HOWE 0051................... 136
8    Exhibit J Howe 007 - Statement, Willamette Valley
9                Cancer Center.............. 150
10   Exhibit J Howe 008 - Statement, PeaceHealth...... 151
11   Exhibit J Howe 009 - PeaceHealth Medical Records. 192
12
13        (ALL EXHIBITS ARE STRICTLY CONFIDENTIAL)
14
15
16
17
18
19
20
21
22

0008
1  EUGENE, OREGON
2  FRIDAY, MARCH 31, 2006
3  9:25 A.M.
4          MARJORIE JOYCE HOWE
5  Having first been duly sworn, was examined and
6  testified as follows:
7
8          EXAMINATION
9          MS. MACER:  We will start by designating
10  the transcript as "Highly Confidential," pursuant to
11  the Protective Order in effect in the AWP
12  Litigation, and we would also like to note for the
13  record that Mrs. Howe has brought with her some
14  documents this morning.
15          Counsel, you wanted to put that on the
16  record for us?
17          MR. HAVILAND:  Let me first respond to
18  counsel's comment about the deposition being
19  confidential.  We will ask counsel to designate the
20  appropriate portions as confidential under the
21  Protective Order.
22          Counsel accurately says that we produced
0009
1  documents this morning.  Mrs. Howe had some recent
2  bills sent to her home.  We will have these Bates
3  numbered and produced in the ordinary course,
4  picking up from the last sequence.
5          Just for the record, there are what I
6  believe are two separate bills from PeaceHealth.
7  One is a one-page document with the top date of
8  service of 12-19-2005.  The second is a two-page
9  document with a statement date of 3-26-2006; and
10  then a multiple-page document relating to a
11  statement date of 3-21-2006, all from Willamette
12  Valley Cancer Center.
13          Did I pronounce that right?
14          THE WITNESS:  Yes.
15          MR. HAVILAND:  And that's a total of five
16  pages -- total of eight pages being produced today.
17          MS. MACER:  Okay.  Further for the record,
18  if we could, the statements for PeaceHealth, they're
19  dated from 12-14-2005.  The transactions are through
20  it looks like 3-13-2006.  In full, it lists payments
21  from Medicare and adjustments from Medicare.  There
22  is not really any J codes or anything further listed
0010
1  on this that would identify what drugs were at issue
2  on this.
3          The one from Willamette -- is that how you
4  said it?
5          THE WITNESS:  Willamette.
6          MS. MACER:  Willamette.
7          THE WITNESS:  Yeah, I had trouble with

8   that when I first moved here, too.  Willamette.
9        MS. MACER:  I will probably say it wrong
10  throughout the deposition.
11       THE WITNESS:  And I'll know what you mean.
12       MS. MACER:  On those statements, let me go
13  quickly through it and give people a heads-up as to
14  the J codes that we see here.  There's a J 0880, J
15  9170, J 1100, J 1626, J 9293, J 9202, and I believe
16  those are all of the J codes that I see on it.
17  Okay.
18       Can we ask counsel on the phone to state
19  their names for the record, please.
20       MR. HAVILAND:  And if you could, who they
21  represent.  Thank you.
22       MR. MURRAY:  This is Brian Murray from
0011
1   Jones Day, on behalf of Abbott.
2        MR. FARQUHAR:  Doug Farquhar, on behalf of
3   Watson Pharmaceuticals.
4        MR. BRUNO:  Jason Bruno, on behalf of
5   Baxter.
6        MS. CALLAND:  Shelli Calland, on behalf of
7   Sicor, Inc.
8        MR. PELAYO:  Carlos Pelayo, on behalf of
9   AstraZeneca Pharmaceuticals LLP.
10       MS. SCOTT:  Kelleen Scott, on behalf of
11  Amgen.
12       MS. MACER:  Do we have everybody?  Okay.
13       Here present in the room, I am Pam Macer.
14       And, Mrs. Howe, we met earlier.  I am here
15  on behalf of Aventis.
16       MR. MIZELL:  This is Nick Mizell.  I'm
17  also here for Aventis.
18       MR. HAVILAND:  This is Don Haviland, Kline
19  & Specter, for the witness and the Class. BY-
20  MS.MACER:
21     Q.  Mrs. Howe, for the record, would you
22  please state your full name.
0012
1      A.  Marjorie Joyce Howe.
2      Q.  Okay.  And would you spell your last name.
3      A.  H-O-W-E.
4      Q.  Mrs. Howe, have you ever been deposed
5   before?
6        Have you ever had your deposition taken
7   before?
8      A.  No.  I don't -- I don't remember.  I have
9   served on juries, and I don't recall if that was
10  involved or not.
11     Q.  Okay.
12     A.  So right now I will say I don't remember.
13     Q.  That's fine.  It would not be involved in
14  serving on a jury.  It is if you were involved in a
15  lawsuit, if that helps, okay?

16    A.  Okay.
17    Q.  Okay.  Let me go over a few rules then for
18  the deposition that will just, hopefully, make
19  things go a little bit smoother for us today.
20        First of all, as you notice, we have a
21  reporter here and she's going to be taking down
22  everything that we say, so it is important that when
0013
1  you give your answers, you speak your answers.  A
2  nod or shaking of your head is not going to make the
3  record.
4        Also, it is hard for her to distinguish
5  "uh-huh" and "huh-huh," so if you would give a "yes"
6  or "no."
7        And the other thing, as you notice, we
8  have a lot of counsel on the phone, and sometimes it
9  is difficult to hear over the phone, so if you would
10  speak up as a courtesy to them, that would be
11  appreciated.
12        Again, there are not going to be any trick
13  questions today, not intentionally, so if I ask --
14        MR. HAVILAND:  Not today.  You are
15  special.
16        MS. MACER:  But if I do ask something that
17  you don't understand, please let me know.  Just tell
18  me you don't understand it and I will try and
19  rephrase it for you, so that we have a clear
20  understanding of what the question is and what your
21  answer is, and at the same time, if I don't
22  understand your answer, I may ask you to explain a
0014
1  little further for me.
2        The other thing again, because we have a
3  court reporter, it helps if you let me finish my
4  question before you answer, and I will attempt to do
5  the same. Sometimes in conversation, it is kind of
6  habit to pre-guess what somebody is going to say,
7  but we need to try and avoid that.
8        And then, also, there will be times when I
9  ask a question and your counsel will make an
10  objection -- hopefully not too often, but if he
11  does, that's fine that's his job -- we need you to
12  go ahead and answer the question unless he instructs
13  you not to.  Okay?
14        And then at any time, if you need a break,
15  you want to step out, get a drink of water,
16  whatever, just let us know.  Okay?  Whatever.  We
17  will absolutely accommodate you on that.
18        Is that all clear?
19    A.  Thank you.  Yes.
20    Q.  Okay.  Great.  Okay.  Are you currently
21  under the influence of any medication or drugs that
22  would limit or impair your ability to answer
0015

1  truthfully or recollect or participate in this
2  deposition today?
3    A.  No.
4    Q.  Okay.  Are there any medications that you
5  are currently taking?
6    A.  Yes.
7    Q.  What are those medications?
8    A.  I happen to have a list in my purse that I
9  carry at all times.
10   Q.  Oh, you are well prepared.
11   A.  Because sometimes I feel like I am a
12  walking pharmacy.
13       I mainly take hay fever and allergy
14  medications.
15   Q.  Uh-huh.
16   A.  And since a lot of this has occurred, I
17  have been -- I think one of these is a -- is like a
18  tranquilizer.
19   Q.  Right.
20   A.  I should have had this -- I am lucky I
21  even have it with me somewhere.
22       Excuse me.  That's Velcro ripping.  Sorry.
0016
1  We can go on to something else if you wish.
2       MR. HAVILAND:  Do you remember?  Why don't
3  you see if you can remember some of the things you
4  are taking?  How about that?
5       THE WITNESS:  Oh --
6       MS. MACER:  That's fine.
7       THE WITNESS:  You know, Bob used to just -
8  - he used to do all of the pill containers, Monday
9  through Sunday, and he would just fill up what
10  needed to be filled, and I very seldom had anything
11  to do with any of it.  I trusted him completely,
12  naturally.
13       Well, I am very sorry.  I do have this,
14  but we should continue.
15       MS. MACER:  That's fine.  We will move on.
16       MR. HAVILAND:  Okay.  We will come back to
17  that.
18       THE WITNESS:  All right.
19       MS. MACER:  Yeah, that's fine.
20       THE WITNESS:  But in the meantime, I will
21  dig.
22       MS. MACER:  You are fine.
0017
1  BY MS. MACER:
2    Q.  Did you speak with anyone in preparation
3  for this deposition?
4    A.  Yes.
5    Q.  And who did you speak with?
6    A.  I spoke with Mr. Haviland.
7    Q.  Anyone else?
8    A.  No.

9     Q.  Okay.  And when did you speak with Mr.
10  Haviland?
11     A.  Yesterday.
12     Q.  About how long did you confer with him?
13     A.  One hour.
14     Q.  One hour.  Okay.  And he was the only one
15  present?
16     A.  Yes.
17          MR. HAVILAND:  Except for the dogs.
18          THE WITNESS:  Jasper and Joey were there.
19  BY MS. MACER:
20     Q.  Jasper and Joey?
21     A.  Jasper and Joey, yes, tiny toy poodles.
22     Q.  Oh, how fun.
0018
1           Did you review any documents with your
2   attorney in preparation for this deposition?
3      A.  Yes.
4      Q.  And did you review them on your own?
5      A.  Did I review them on my own?
6      Q.  Right.
7      A.  Yes.
8      Q.  Or did you also review them with Mr.
9   Haviland?
10          MR. HAVILAND:  Mrs. Howe was indicating to
11  the folder that I produced earlier.  We did go
12  through those to make sure that they were responsive
13  to outstanding requests, so --
14          MS. MACER:  Okay.
15  BY MS. MACER:
16     Q.  Is that all that you went over with Mr.
17  Haviland?
18     A.  Yes, that's all.
19     Q.  Okay.  Have you or Mr. Howe given your
20  attorney a copy of every single document that you
21  think is relevant to this litigation?
22     A.  As far as I know.
0019
1      Q.  Okay.
2      A.  Yes.
3      Q.  Okay.  You are fine.
4           What is your current address, Mrs. Howe?
5      A.  88187 Riverview Avenue, Mapleton, Oregon
6   97453.
7      Q.  Okay.  And then I understand you have a
8   different mailing address?
9      A.  P.O. Box 1, Mapleton, Oregon 97453.
10     Q.  Have you had any other addresses since
11  1991?
12     A.  1991?
13     Q.  Uh-huh.
14     A.  No.
15     Q.  Okay.  Did you not live in California at
16  some point during that time?

17    A.  Yes.  Yes, we did.  We lived in
18  Coarsegold, California.
19    Q.  Okay.  Do you know approximately what
20  years those were?
21    A.  We lived there for approximately three
22  years, three and a half.
0020
1    Q.  Do you know when that was?  I am sorry.  I
2  interrupted you.
3    A.  That's all right.
4    Q.  Do you know when that was?
5    A.  We moved up here from there, so it had to
6  be in the late, in the late '80s.
7    Q.  Okay.
8    A.  I have trouble with dates.
9    Q.  That's fine.  We are just trying to get
10  some ballparks here.
11    A.  Okay.
12    Q.  Okay.  I want to take a look at your
13  educational background.  Can you tell me where you
14  received your high school education?
15    A.  Fremont High School, Oakland, California.
16    Q.  Okay.  And, Mrs. Howe, did you attend
17  college?
18    A.  No, I did not.
19    Q.  And from 1991 to the present, were you
20  employed?
21    A.  No, I was not.
22    Q.  What was your last place of employment?
0021
1    A.  TJ Jewelers in Walnut Creek on Newell
2  Avenue.
3    Q.  When was that?
4    A.  That was part time.  I have only worked
5  part time since I left the bank.
6    Q.  When did you leave the bank?
7    A.  In I would say October of '55.
8      MR. HAVILAND:  Is that when you left?  She
9  said "left," when you stopped working at the bank.
10      Is that when you started?
11      THE WITNESS:  Well, I was thinking of the
12  time frame.  We weren't allowed to work together at
13  the bank in those days, Bob and I.
14      MR. HAVILAND:  Okay.
15      THE WITNESS:  And we were married in
16  January of '56.
17      MR. HAVILAND:  But when did you stop
18  working at the bank was the question she asked.
19      THE WITNESS:  I know.
20      MR. HAVILAND:  Okay.  Then maybe the
21  answer is unclear.
22      MS. MACER:  It is ballpark.  That's fine.
0022
1      MR. HAVILAND:  You think it was around

2  '55?
3      THE WITNESS:  I didn't know that was one
4  of the answers.
5      MR. HAVILAND:  Well, that's a cousin of
6  guessing, but we will let that one go.
7  BY MS. MACER:
8      Q.  Okay.  And then the part-time jobs you
9  had, I assume at the jewelers, were you perhaps as a
10  sales clerk?
11      A.  Yes.
12      Q.  Okay.  Can you tell me what your annual
13  income was from 1991 to the present?
14      A.  No.
15      Q.  Do you know what the source of your income
16  was?
17      A.  Robert's retirement from Wells Fargo Bank,
18  Social Security, and my Social Security.
19      Q.  Do you have an idea as to what portion of
20  your annual income was from Social Security?
21      A.  What it was?
22      Q.  Either the amount or was the greater part
0023
1  of it from Social Security or from the pension?
2      MR. HAVILAND:  Can I just clarify?  You
3  say "you" a couple of times.  Are you including Bob
4  and Joyce in your "you" and "your" questions?
5      MS. MACER:  That's a fair question and you
6  may have trouble with this today.
7      MR. HAVILAND:  Okay.
8      MS. MACER:  I will try and make it clear.
9  BY MS. MACER:
10      Q.  The combined Social Security income, was
11  that the greater portion of you and your husband's
12  income?
13      A.  Yes.
14      Q.  And you don't have an idea as to what that
15  figure might have been for the Social Security?
16      A.  No.
17      Q.  Joint?
18      A.  Mr. Howe just took care of all of the
19  finances.
20      Q.  Okay.  When did your husband apply for
21  Social Security?
22      A.  As soon as he was allowed to.
0024
1      Q.  So, when he turned 65?
2      A.  Yes.
3      Q.  Okay.  And what about you?  When did you
4  apply?
5      A.  The same.
6      Q.  Okay.  Did Mr. Howe ever apply for Social
7  Security in connection with a disability?
8      A.  No.
9      Q.  And did you?

10    A.  No.
11    Q.  Okay.  And were your Social Security
12 benefits sent to the addresses that you have
13 provided to us since 1991?
14    A.  Yes.
15    Q.  Okay.  Have you or your husband ever
16 received benefits from Medicaid?
17    A.  No.
18    Q.  Mrs. Howe, have you ever been party to any
19 other lawsuit?
20    A.  No.
21    Q.  Have you ever been a witness in any other
22 lawsuit?
0025
1    A.  No.
2    Q.  Have you ever been convicted of a felony?
3    A.  No.
4       MR. HAVILAND:  Lawyers feel compelled to
5 ask that question.  I always marvel at it.
6       MS. MACER:  Please don't take it
7 personally.
8       THE WITNESS:  All in the job.
9       MS. MACER:  Right.
10 BY MS. MACER:
11    Q.  Have you ever been charged with any crime
12 involving you giving a false statement --
13    A.  No.
14    Q.  -- or not telling the truth --
15    A.  No.
16    Q.  -- such as forgery or passing a bad check?
17    A.  No.
18    Q.  Okay.  Did you or your husband receive any
19 publications about the Medicare program?
20    A.  Yes.
21    Q.  Can you describe those publications?
22    A.  Things that ordinarily come in the mail,
0026
1 once they know that you are a certain age.  And I
2 think that's what they were about.  I mean, Mr. Howe
3 did most of that, anyway.
4    Q.  Okay.  Do you know?
5    A.  He tried to shield me from a lot of this
6 goings on.
7    Q.  Okay.  Do you know if perhaps you received
8 an annual booklet from Medicare?
9    A.  No, I don't.  I don't know.
10    Q.  Okay.  Did you ever review those
11 publications that came in?
12    A.  No.
13    Q.  Do you know if you still possess any of
14 those publications?
15    A.  No, I don't, no.
16    Q.  Okay.  And I believe you said those
17 publications just came in the mail?

18   A.   As far as I know.

19   Q.   And was there any other manner that you

20  received them?

21   A.   No.

22   Q.   Okay.  Did you or your husband ever

0027

1  challenge or question Medicare's allowed charges for

2  physician administered drugs?

3   A.   Question?  Yes.

4   Q.   Did you ever challenge them, and by that I

5  guess I would mean, did you ever contact anybody at

6  Medicare to discuss it?

7   A.   I personally did not.  If Mr. Howe did, I

8  am not aware of it.  I do not know.

9   Q.   Okay.  Do you know if your husband relied

10  on the federal government to set those appropriate

11  allowed charges for drugs after he enrolled in

12  Medicare?

13      MR. HAVILAND:  Well, I just want -- I want

14  to interject an objection to the extent that you are

15  asking Mrs. Howe to speak about what Mr. Howe may

16  have known or not known.  There is a full deposition

17  in this case of Mr. Howe, so I think there is a lack

18  of foundation.

19      But if you can answer the question, Mrs.

20  Howe, please you can.

21      THE WITNESS:  I would like to have her

22  repeat it, please.

0028

1      MS. MACER:  Could you read it back,

2  please.

3      (Record read as follows:

4      "Question:  Do you know if your husband

5  relied on the federal government to set those

6  appropriate allowed charges for drugs after he

7  enrolled in Medicare?")

8      THE WITNESS:  No, I don't know.

9  BY MS. MACER:

10   Q.   Did you rely on the federal government to

11  set those charges?

12      MR. HAVILAND:  I am sorry.  I assume that

13  "those charges" relates to an earlier part of your

14  first question.

15      MS. MACER:  I am sorry.  The allowed

16  charges.

17      MR. HAVILAND:  For?

18      MS. MACER:  For drugs.

19      THE WITNESS:  What was the question again?

20      MR. HAVILAND:  That's why it was unclear -

21  -

22      MS. MACER:  Okay.

0029

1      MR. HAVILAND:  -- because of the strength

2  of the first one, so why don't we try again?

3      MS. MACER:  Sure.
4   BY MS. MACER:
5      Q.  Did you allow the federal government to
6   set appropriate charges for drugs?
7          MR. HAVILAND:  Objection to the form.
8          Go ahead.
9          THE WITNESS:  I never thought about it --
10  rely on 'em.
11         MS. MACER:  Okay.
12  BY MS. MACER:
13     Q.  Did you or your husband explore options
14  other than Medicare, such as Blue Cross plans
15  specifically for those 65 and older?
16     A.  No.
17         MR. HAVILAND:  I just want to interpose an
18  objection, so I don't have to do it every time, that
19  if you continue to ask about you and your husband,
20  my standing objection, and, hopefully, you will give
21  it to me, is that Mrs. Howe is not qualified to talk
22  about what Mr. Howe may or may not have done, if you
0030
1   don't lay a foundation for that.
2          So I don't want to have to do it every
3   time. Fair enough?
4          MS. MACER:  Fair enough.
5          THE WITNESS:  That's fine.  I don't know.
6          MR. HAVILAND:  Okay.
7   BY MS. MACER:
8      Q.  Mrs. Howe, are you familiar with the term
9   "coinsurance"?
10     A.  Yes.
11     Q.  Can you tell me what you understand that
12  to be?
13     A.  Other than what you are allowed, why, you
14  can have a secondary, it is a secondary insurance
15  back-up, if you may.  That's what I understand it to
16  be.  It is a copay, a coinsurance.
17     Q.  Okay.  Do you know if your husband had
18  coinsurance with Medicare?
19     A.  Yes.
20     Q.  Did he have coinsurance with Medicare?
21     A.  I don't know what you mean by --
22         MR. HAVILAND:  Let me object, because I am
0031
1   vague about that, too.  They had Medicare.  I am not
2   following.
3          Do you want to know if there is a
4   supplemental carrier?
5          MS. MACER:  Yes.
6          THE WITNESS:  With Medicare?
7          MR. HAVILAND:  Yeah.  That was my problem
8   as well.
9          She wants to know if you had a
10  supplemental insurance plan with, in addition to

11    Medicare?
12          Is that right?
13          MS. MACER:  Okay.
14          THE WITNESS:  Yes.  I thought -- Caremark.
15    No, that's who we went through.
16    BY MS. MACER:
17       Q.   Would it have been United Healthcare?
18       A.   That's it.
19          Thank you very, very much.
20       Q.   To your knowledge, did your husband
21    consider any other supplemental policies other than
22    United Healthcare?
0032
1       A.   No.
2       Q.   Do you know, did your husband sign up for
3    the supplemental insurance when he turned 65?
4       A.   I really don't know.
5       Q.   Did the supplemental insurance also cover
6    you?
7       A.   I don't know.
8       Q.   Do you know what type of supplemental
9    insurance your husband had through United
10    Healthcare?
11          MR. HAVILAND:  Type.
12    BY MS. MACER:
13       Q.   Generally, I understand there are
14    supplemental plans, A through J.  Do you know which
15    one of those plans he had?
16       A.   No, I don't.
17          MR. HAVILAND:  You know, can I ask on the
18    record?
19          I was made aware yesterday that some
20    records had come in from United Healthcare.  Are
21    they available? Perhaps they could answer some of
22    your questions.  I just know that some documents
0033
1    were produced recently, what had been subpoenaed.
2          MS. MACER:  The information that I have
3    does not answer these questions.
4          MR. HAVILAND:  I assume we have them
5    somehow -- the plaintiffs, we, being the plaintiffs.
6          MS. MACER:  I understood from cocounsel
7    that they had been forwarded to you, yes.
8          MR. HAVILAND:  I don't have them.  I just
9    wanted to see if you could enlighten us on some
10    issues today about that.  Okay.
11    BY MS. MACER:
12       Q.   Do you know what Mr. Howe's supplemental
13    insurance covered?
14          By that, did it cover hospital visits,
15    physicians, physician administered drugs?  Do you
16    know what it covered?
17       A.   I think all of the things that you said.
18       Q.   Okay.  Do you know if his supplemental

19  insurance covered the entire amount that was not
20  covered by Medicare?
21      A.  No.
22      Q.  No, you do not know or, no, it didn't
0034
1   cover it?
2       A.  I don't think it did, no.
3       Q.  Okay.  Let me -- do you know, did your
4   husband's supplemental insurance cover a portion of
5   the payment, requiring him to make a flat copayment?
6       A.  Would you repeat that?
7           MR. HAVILAND:  Uh-huh.
8           MS. MACER:  Sure.
9   BY MS. MACER:
10      Q.  Do you know, did your husband's
11  supplemental insurance cover a portion of the
12  payment, requiring him to pay a flat copayment?
13          MR. HAVILAND:  Was the coinsurance a flat
14  copayment?
15          Was that the question?
16          MS. MACER:  Yes.
17          MR. HAVILAND:  Do you know what she means
18  by that?
19          THE WITNESS:  No, I don't understand the
20  question.
21  BY MS. MACER:
22      Q.  You don't understand a flat copayment?
0035
1       A.  I understand the term "flat copayment,"
2   but the rest of it was what?
3       Q.  Okay.  The insurance, the supplemental
4   insurance, that your husband had.
5       A.  Yes.
6       Q.  It picked up at least a portion of the
7   amount of charges that were not covered by Medicare.
8   The portion that was left for your husband to pay,
9   was it a flat copayment amount?
10      A.  I think so.  Yes.
11          MS. MACER:  Okay.
12          MR. HAVILAND:  That's all right.  Well,
13  Counsel didn't give you the admonition.
14          If you don't know something or if you want
15  to correct an answer, please do so.  We don't want
16  you to guess, and the record has already been
17  established by your husband about the percentage of
18  copayments.
19          I just don't think that it makes sense to
20  try to undermine that with things she just doesn't
21  know.
22          THE WITNESS:  Because that last one I
0036
1   should have said "I don't know," because I don't.
2   BY MS. MACER:
3       Q.  Mrs. Howe, truly I am not trying to trick

4  you or anything.
5     A.  No, I understand that.
6     Q.  I am just trying to understand what your
7  degree of knowledge is.  If you don't know, please,
8  that's an acceptable answer.
9     A.  You are going to get a lot of those.  I am
10  sorry.
11    Q.  Please don't apologize.  We are just here
12  to get what you know, and that's fine.
13    A.  As I said, Mr. Howe did most all, you
14  know, 90 percent of it.
15    Q.  All right.  That's fine.
16        Do you know, was there any period since
17  1991 when your husband was not covered by his
18  supplemental insurance?
19    A.  No.
20    Q.  No, he was not covered or, no, you don't
21  know?
22    A.  I know, but he -- there was no other -- he
0037
1  was covered all the time.
2        Is that it, what she's saying?
3     MR. HAVILAND:  Yes.
4     MS. MACER:  Yes.
5     THE WITNESS:  Okay.
6  BY MS. MACER:
7     Q.  Do you know if your husband ever received
8  a document that detailed or explained the health
9  insurance benefits offered by his supplemental
10  insurance carrier?
11    A.  No, I don't know.
12    Q.  You don't know?
13    A.  He would have opened that and he would
14  have known.
15    Q.  So then is it fair to say if -- well, that
16  you are not aware of ever having reviewed this
17  document yourself?
18    A.  No.
19    Q.  Okay.  Again, we are going to get into
20  trouble with the questions.
21        Are you saying that, no, you didn't review
22  it?
0038
1     A.  That's right.  I did not review it.
2        MR. HAVILAND:  Well, the problem I have
3  with the question is the "it" assumes that there was
4  an "it," and we didn't establish that.
5  BY MS. MACER:
6     Q.  Okay.  If your husband received one, did
7  you ever review it?
8        MR. HAVILAND:  Calls for speculation.
9        THE WITNESS:  No.
10  BY MS. MACER:
11    Q.  Do you know if your husband ever received

12  any other documents from his supplemental insurance
13  carrier?
14      A.  No.
15      Q.  No, you don't know?
16      A.  Well, he didn't receive any that -- no.
17  All right.  I don't know.
18          MR. HAVILAND:  It is all right.
19          MS. MACER:  That's fine.
20  BY MS. MACER:
21      Q.  Do you have a copy of your husband's
22  supplemental insurance carrier's plan, outlining his
0039
1  coverage and provisions?
2      A.  If I do, I don't know where it would be.
3  I don't know.  I would have to search for it.
4          MS. MACER:  Okay.  If you have that, we
5  would like to request a copy.
6          MR. HAVILAND:  I think it was requested by
7  Mr. Pelayo, as I recall, on the last go-round, but I
8  will double check and we will check again.
9          MS. MACER:  Thank you.
10          MR. HAVILAND:  If I could ask -- this is
11  just a point of order.  All of the requests that are
12  made today -- I assume that there may be some more -
13  - could you just put them in a letter for us, so we
14  could keep track of it?
15          MS. MACER:  Absolutely.
16          MR. HAVILAND:  Okay.
17  BY MS. MACER:
18      Q.  Mrs. Howe, did your husband have a choice
19  of health plans to join?
20      A.  Yes.
21      Q.  Do you know which plans were included in
22  those choices?
0040
1      A.  Blue Cross.  That's about the only one I
2  can remember -- just the regular ones.  I don't
3  know.  He just -- there must have been a list, but I
4  am not aware of it.  I don't know.
5      Q.  Do you know why he chose United
6  Healthcare?
7      A.  My only thought would be because he
8  thought they were probably the most fair and gave
9  the best return, and whatever that may be, I don't
10  know.
11      Q.  Okay.
12      A.  Those were his decisions.
13      Q.  Okay.  For 1991 to the present, were there
14  any changes in your husband's supplemental insurance
15  carrier coverage?
16      A.  No.
17      Q.  Did your husband's supplemental insurance
18  carrier have a required yearly deductible?
19      A.  I don't know.

20    Q.  Mrs. Howe, was your husband ever eligible
21  for Medicaid?
22    A.  No.
0041
1    Q.  Do you know why your husband didn't avail
2  himself of the A insurance coverage?
3        MR. HAVILAND:  I believe that was fully
4  covered at the last deposition, from my read of it.
5        THE WITNESS:  Why he didn't avail himself
6  of that?
7        MS. MACER:  Yes, ma'am.
8        THE WITNESS:  I have no idea, unless there
9  was a rule against having both.  I don't know.
10  BY MS. MACER:
11    Q.  Did your husband have any other health
12  insurance coverage during the last 15 years, other
13  than the Medicare and United Health that we are
14  talking about?
15    A.  No.
16    Q.  Okay.  Has any other entity or person paid
17  or helped pay for your husband's medical bills,
18  including his prescription Medicare -- or excuse me,
19  prescription medications, since 1991?
20        MR. HAVILAND:  Anyone other than whom?
21        MS. MACER:  Anyone other than Medicare and
22  United Health.
0042
1        MR. HAVILAND:  And the Howe's?
2        MS. MACER:  And the Howe's.
3        THE WITNESS:  Yes.
4        MR. HAVILAND:  So the question is, did
5  anyone other than Medicare and United Healthcare and
6  yourselves pay for any of Bob's care?
7        THE WITNESS:  No.
8  BY MS. MACER:
9    Q.  Do you know what medical services Medicare
10  paid for on your husband's behalf?
11    A.  Prescription drugs, injections, any
12  required hospital stay.  Just about everything that
13  would involve a condition of this sort, but that's
14  about it.
15    Q.  Okay.  Mrs. Howe, when you said
16  prescription drugs, do you mean drugs that your
17  husband would buy from a pharmacy?
18    A.  Or through Caremark.
19    Q.  You mentioned Caremark.
20    A.  Or pharmacy, either one, but usually we
21  got our prescriptions through Caremark and sent to
22  San Antonio, Texas, for them.
0043
1    Q.  Those prescriptions that you got through
2  Caremark, is it your understanding -- are you
3  testifying today that Medicare also helped pay for
4  those?  Is that your understanding?

5      MR. HAVILAND:  What time frame?
6      MS. MACER:  From 1991 forward.
7      MR. HAVILAND:  To today?
8      MS. MACER:  To today.
9      THE WITNESS:  I don't know.
10  BY MS. MACER:
11      Q.   What medical services did United
12  Healthcare pay for on your husband's behalf?
13          MR. HAVILAND:  What time frame, please?
14          MS. MACER:  From '91 forward.
15          THE WITNESS:  You want to repeat the
16  services?
17          Would you repeat the question, please?
18          MS. MACER:  Yes.
19             (Record read as follows:
20          "Question:  What medical services did
21  United Healthcare pay for on your husband's
22  behalf?")
0044
1          MR. HAVILAND:  From 1991 forward.
2          THE REPORTER:  ". . .from 1991 forward."
3          THE WITNESS:  I believe that's what I just
4  stated.  There's office visits, prescriptions, and
5  that sort of thing.
6  BY MS. MACER:
7      Q.   Do you know who determines how much of
8  your medical expenses Medicare covers?
9      A.   No.
10      Q.   Or of your husband's medical expenses?  I
11  am sorry.
12      A.   No, I don't know.
13      Q.   Do you know who determines how much of
14  your husband's medical expenses United Healthcare
15  covers?
16      A.   No.
17      Q.   Just as a point of clarification, I want
18  to explain that when I use the word "provider"
19  throughout the rest of this deposition, that's going
20  to be a shortcut for anyone who provides medical
21  services, such as a doctor, nurse, clinic, medical
22  hospital.  All right?
0045
1      A.   Uh-huh.
2      Q.   If you do need clarification when I use
3  that term, just let me know.  Okay?
4      A.   All right.
5      Q.   Mrs. Howe, would you expect different
6  providers to charge different amounts for the same
7  services?
8          MR. HAVILAND:  Calls for speculation.
9  BY MS. MACER:
10      Q.   Do you understand the question?
11      A.   Would I expect them to charge different
12  amounts?

13    Q.  Right, different providers to charge
14  different amounts for the same service.
15    A.  It happens, so I guess so.
16    Q.  Okay.  Would you expect different
17  insurance companies to reimburse different amounts
18  for those services?
19        MR. HAVILAND:  Calls for speculation.
20        THE WITNESS:  When you say expect, I
21  wouldn't expect 'em to, but I guess it happens, so
22  there you are. There is the answer, but who knows.
0046
1        MS. MACER:  Thank you, Mrs. Howe.
2  BY MS. MACER:
3    Q.  Would you expect different providers to
4  charge different amounts for the same medications?
5        MR. HAVILAND:  Calls for speculation.
6        THE WITNESS:  I have no idea.  I don't
7  know.
8  BY MS. MACER:
9    Q.  And would you expect different insurance
10  companies to reimburse different amounts for those
11  medications?
12        MR. HAVILAND:  Foundation; calls for
13  speculation.
14        THE WITNESS:  I don't know.
15  BY MS. MACER:
16    Q.  Mrs. Howe, do you have an understanding of
17  how direct prices are determined?
18    A.  No, I don't.
19    Q.  Do you have an understanding of who
20  determines drug prices?
21    A.  No.
22    Q.  Mrs. Howe, at the time that your husband
0047
1  was prescribed the drugs that are subject to this
2  litigation, was it your expectation that the amounts
3  charged to your husband for drugs was determined by
4  his physician or his provider?
5        MR. HAVILAND:  Lack of foundation; calls
6  for speculation.
7        THE WITNESS:  I have no idea.  No, I don't
8  know.
9  BY MS. MACER:
10    Q.  Do you have any understanding of who
11  determines the amount that your husband's providers
12  charged him for his drugs?
13    A.  No, I don't know.
14    Q.  At the time that your husband was
15  prescribed these drugs, was it your expectation that
16  the amounts charged your husband for the drugs
17  represented the amount that the drug manufactures
18  charged your husband's providers for their product?
19        MR. HAVILAND:  Lack of foundation;
20  speculation.

21        THE WITNESS:  That was a very long
22  question.
0048
1         MS. MACER:  Would you like me to --
2         THE WITNESS:  Please repeat.
3         MS. MACER:  Okay.
4  BY MS. MACER:
5    Q.  I am asking, at the time that your husband
6  was receiving the drugs that are the subject of this
7  litigation --
8    A.  Yes.
9    Q.  -- did you expect that the amount that the
10  doctors were charging your husband for his drugs
11  represented the amount that the drug manufactures
12  were charging his doctors?
13        MR. HAVILAND:  Same objections.
14        THE WITNESS:  I would have no idea.  I
15  never thought about it.
16        MS. MACER:  Okay.
17  BY MS. MACER:
18    Q.  At the same time period, did you have any
19  expectations that your husband's doctors might add a
20  mark-up to the drugs?
21        MR. HAVILAND:  Same objections.
22        THE WITNESS:  No idea.
0049
1  BY MS. MACER:
2    Q.  Do you have any current idea now as to
3  whether or not your husband's doctors are adding a
4  mark or added a mark-up to his drugs?
5    A.  I don't know how the medical profession
6  works. I just know that when you get a bill, you pay
7  it.  At least, that's what I do.
8         And I can't question it, because sometimes
9  in my mind I question it, but it is there and if you
10  don't pay it, then your credit goes down the tubes,
11  and we have excellent, excellent credit, because I
12  pay my bills -- right, wrong or whatever.  When they
13  come in, I pay 'em.
14    Q.  Well, you and your husband were former
15  bankers.
16    A.  That's right.
17    Q.  As a former banker, I will tell you what
18  you just said does not surprise me at all.
19    A.  Okay.  There you go.
20        Yes, we have been there, done that one.
21    Q.  Right.
22        Mrs. Howe, are you familiar with the term
0050
1  "Average Wholesale Price"?
2    A.  Yes.
3    Q.  Or "AWP"?
4    A.  Yes.
5    Q.  What is your understanding of that term?

6     A.  Well, that term, to me, means that when a
7  product is introduced on the market that there is an
8  average price that is charged for it on the
9  wholesale level.
10    Q.  Who sets that price?  Do you know?
11    A.  Who sets that price?  'hum.  No, I do not
12  know.
13        Thank you.
14        MR. HAVILAND:  Okay.
15  BY MS. MACER:
16    Q.  Do you know how AWP is calculated?
17    A.  No, I don't.
18    Q.  The next series of questions is going to
19  be fun, because I have to pronounce a long list of
20  drug names --
21    A.  Okay.
22    Q.  -- so feel free to laugh.
0051
1     A.  I won't know if you are doing it right.  I
2  won't know if they are right or wrong, anyway.  If
3  you get beyond aspirin, you out of my realm.
4        MS. MACER:  I appreciate your
5  understanding as we go through this.
6        MR. HAVILAND:  Go right ahead.
7        THE WITNESS:  Okay.
8  BY MS. MACER:
9     Q.  Mrs. Howe, do you know what the AWP is or
10  was at any time for Docetaxel?
11        MR. HAVILAND:  You have to answer
12  verbally.
13        THE WITNESS:  Oh, no.  Excuse me.
14  BY MS. MACER:
15    Q.  Do you know what the AWP is or was at any
16  time for Dexamethasone sodium phosphate?
17    A.  No.
18    Q.  Gentimycin sulfate?
19    A.  No.
20    Q.  Granisetron?
21    A.  No.
22    Q.  Novatrone?
0052
1     A.  No.
2     Q.  Pegfilgrastim?
3     A.  No.
4     Q.  Do you know what the AWP is or was at any
5  time for any drug in this litigation?
6     A.  No.
7     Q.  Did you ever have any expectation as to
8  the relationship between AWP and the actual cost of
9  any drug in this litigation?
10        MR. HAVILAND:  Calls for speculation.
11        You can answer if you can.
12        THE WITNESS:  Would you repeat it again,
13  please?

14        MS. MACER:  Sure.
15  BY MS. MACER:
16      Q.  Did you ever have any expectation as to
17  the relationship between AWP and the actual cost of
18  any drug --
19      A.  No.
20      Q.  -- in this litigation?  Okay.
21          Mrs. Howe, is AWP related to the claims
22  that you have made in this litigation?
0053
1       A.  Is it what?  Excuse me.
2       Q.  Is it related to the claims that you have
3   made in this litigation?
4       A.  I imagine so, yes.
5       Q.  Can you tell me how it is related?
6       A.  Well, it seems that the average wholesale
7   price and the price that the consumer ends up
8   paying, that there seems to be quite a difference,
9   to my understanding.
10      Q.  Can you tell me where you got that
11  understanding?
12      A.  By reading the -- reading.  By reading the
13  --
14          MR. HAVILAND:  Do you want to describe it?
15          The big thing?  Do you want her to
16  describe the document?
17          MS. MACER:  That would be fine.
18          MR. HAVILAND:  She is troubled over the
19  name.
20          MS. MACER:  I think we both know it, but
21  we don't want to prompt her.
22  BY MS. MACER:
0054
1       Q.  Let me -- tell you what.  Let go ahead and
2   show you a document and ask you if this would help,
3   if that's agreeable to everyone.
4           MR. HAVILAND:  Yes.
5           Counsel is showing the Fourth Amended
6   Master Consolidated Class Action Complaint.
7           THE WITNESS:  Well, how was I supposed to
8   remember all of that?
9           MR. HAVILAND:  Most lawyers don't remember
10  that.
11          THE WITNESS:  So is that my answer then?
12  Okay.
13          MR. HAVILAND:  The question is --
14          THE WITNESS:  Yes.  Please repeat it.
15          MR. HAVILAND:  Yeah.
16          MS. MACER:  Okay.
17  BY MS. MACER:
18      Q.  I was asking where you got your
19  understanding of AWP.
20          You said it was by reading a document.  Is
21  this the document that you read that gave you an

22  understanding of AWP?
0055
1      A.  I didn't read anything this large, no.
2          MR. HAVILAND:  There may be a confusion
3  between the two.
4          THE WITNESS:  Yes, there is, because I
5  didn't read anything that was nearly as large.
6          MS. MACER:  Okay.
7  BY MS. MACER:
8      Q.  Do you have any idea then what it was that
9  gave you your understanding of AWP?
10         I guess we are back to trying to see if
11  you can come up with either a description or a name
12  of the document that helped you.
13         Let me ask you this.  Was the document
14  that helped you something that is related to this
15  litigation?
16     A.  I don't suppose I have had it before this,
17  so I would have to say yes.
18         MS. MACER:  So can I ask that whoever on
19  the phone is not on mute, if you would put yourself
20  on mute? We are getting some background noise.
21  BY MS. MACER:
22     Q.  Did you do any outside reading on AWP?
0056
1          For instance, have you read about it in
2  some magazine or something?
3      A.  No.
4      Q.  Okay.  Now you said that there was a
5  difference in the price paid by the consumer and the
6  AWP.  Did the consumer pay less or more than AWP --
7      A.  More.
8      Q.  -- in your understanding?  Okay.
9          Mrs. Howe, are you familiar with the term
10  "Wholesale Acquisition Cost --
11     A.  No.
12     Q.  -- or WAC?
13     A.  No.
14     Q.  Have you ever heard of Red Book, Blue
15  Book, Medi-Span or First DataBank?
16     A.  Blue Book.
17     Q.  Can you tell me what Blue Book is?
18     A.  Blue Book is a set of prices that I have
19  mainly had to relate to automobiles.
20     Q.  Your banker background is coming out
21  again.
22     A.  Yes.  There you go.  The loan department.
0057
1      Q.  Yeah.
2      A.  Yeah.  The Blue Book is the estimated or
3  the set, I should say, set price that is more of a
4  general scale that helps you to go from the lowest
5  price, average into the highest price that is
6  allowed for a certain, be it automobile or anything

7  else.  It is the low, medium and high that is
8  allowed, and that is their gauge, I guess is the
9  word.
10    Q.  Okay.  Have you ever heard of the Blue
11 Book in conjunction with drug pricing?
12    A.  No, I haven't.
13    Q.  Okay.  Mrs. Howe, do you know what the
14 term "least costly alternative" means in the context
15 of drug pricing?
16    A.  The least costly alternative.
17    Q.  Yes, ma'am.
18    A.  It is self-explanatory.
19    Q.  Can you give me what you think it means?
20    A.  Well, if there is another way of getting
21 to a point, I guess that you get it the least, what
22 would be the least cost in doing so.
0058
1    Q.  I am getting ready to go into another
2  topic. Would you like to take a few minutes break?
3    A.  Yeah, I think I will.
4      MS. MACER:  We will go off the record for
5  a while.
6        (A brief recess was taken.)
7  BY MS. MACER:
8    Q.  Mrs. Howe, I want to ask you a couple of
9  questions about the lawsuit itself.  Okay?
10    A.  Okay.
11    Q.  Can you tell me when you first learned
12 about this lawsuit?
13      MR. HAVILAND:  When?
14      MS. MACER:  Yes.
15      THE WITNESS:  I can't give you an exact
16 date, but it was quite recently.
17 BY MS. MACER:
18    Q.  Would it be in the last couple of months,
19 the last year, last six months?
20    A.  The last couple of months, I would say.
21    Q.  How did you learn about this lawsuit?
22      MR. HAVILAND:  Let's be careful here,
0059
1  because I don't want you to reveal any substantive
2  communications with counsel.
3      The "how" question is what I have a
4  problem with.  If you learned about it from anyone
5  other than counsel, then go ahead.
6      THE WITNESS:  Well, I was contacted by
7  you.
8      MS. MACER:  Okay.
9      MR. HAVILAND:  Okay.
10      THE WITNESS:  Meaning Mr. Haviland.
11      MR. HAVILAND:  Meaning me.
12      MS. MACER:  Right.
13 BY MS. MACER:
14    Q.  Were you aware that your husband was

15  involved in this lawsuit?
16      A.  Yes.
17      Q.  When did you become aware of that?
18      A.  Because he was the one having most of the
19  drugs prescribed to him, and we got a couple of
20  bills and we just couldn't believe the amount for
21  some of these injections.  I mean, thousands of
22  dollars, and we just -- whoa.
0060
1           MR. HAVILAND:  This is the first time
2   where I don't think you really listened.  She said,
3   when did you become aware that Bob was involved --
4           THE WITNESS:  Yeah.
5           MR. HAVILAND:  -- in the lawsuit?
6       Do you know when?
7           THE WITNESS:  Yeah.  Not a date.  Do you
8   want a date?
9   BY MS. MACER:
10      Q.  I guess my confusion is that you just
11  testified that you learned about it in the last
12  couple of months, but your husband actually was
13  deposed back in November.
14      A.  Yes.
15      Q.  So I am trying to understand if you knew
16  about the lawsuit.
17      A.  Oh, yes, I did know about it, yes, back
18  then, of course.  Yes.
19      Q.  Okay.
20      A.  I did not understand you.
21          You are right.
22      Q.  That's fine.  Thank you.
0061
1           You said you were contacted by Mr.
2   Haviland -- and don't give me the content of the
3   discussions -- but after Mr. Haviland contacted you,
4   then did you subsequently speak with any lawyers
5   about the lawsuit?
6       A.  No.
7       Q.  Did you speak with -- I believe you
8   testified earlier you spoke with Mr. Haviland, at
9   least yesterday, about it?
10      A.  Yes.
11      Q.  So after you learned about it, have you
12  had any conversations with any attorneys discussing
13  the lawsuit?
14      A.  No.
15      Q.  Other than Mr. Haviland yesterday?
16      A.  No.
17      Q.  Okay.  You have not had any phone
18  conversations?
19      A.  No.
20      Q.  Have you had any written communication --
21      A.  No.
22      Q.  -- from the attorneys?

0062
1          MR. HAVILAND:  You have to listen to the
2   question.
3          THE WITNESS:  Sorry.
4          MS. MACER:  Okay.
5   BY MS. MACER:
6      Q.  Let me make sure we have a clear record
7   then.
8          What I am understanding from your
9   testimony is that Mr. Haviland contacted you, and
10  that was the first you knew about the lawsuit, and
11  then the only subsequent conversation you had with
12  any attorney was yesterday discussing -- about the
13  lawsuit was yesterday when you discussed it with Mr.
14  Haviland?
15         MR. HAVILAND:  Well, let me object to the
16  extent it tries to mischaracterize the testimony.
17  Although she earlier testified it was a contact, a
18  discussion with me, she then clarified that, that
19  she was aware of her husband's involvement.
20         MS. MACER:  Right, but I am trying to
21  determine what conversations and when they took
22  place that she had with attorneys.
0063
1          MR. HAVILAND:  For Mrs. Howe?
2          MS. MACER:  For Mrs. Howe, right.
3          MR. HAVILAND:  Okay.
4          THE WITNESS:  Yes.
5   BY MS. MACER:
6      Q.  So is it correct, just the one yesterday?
7      A.  Just the one yesterday.
8      Q.  And the phone call?
9      A.  Yes.
10     Q.  That may have been my fault, not
11  understanding what you were testifying, so I
12  appreciate your patience.
13         Can you tell me, who are the defendants in
14  this action?
15     A.  Drug companies.
16     Q.  Is it all drug companies?
17     A.  As far as I know.  Manufacturers.
18     Q.  Are there any doctors that are defendants?
19     A.  Possibly.  I don't know.
20     Q.  Do you know if any insurance companies are
21  defendants?
22     A.  I don't know.
0064
1      Q.  In your own words, can you tell me what
2   claims you have brought against the defendants in
3   this lawsuit?
4      A.  The overpricing of drugs, of
5   prescriptions.
6      Q.  So your claim is that -- and I don't want
7   to misstate it, so tell me if I don't get it right -

8   - but your claim is that drug manufacturers
9   overprice their drugs?
10      A.  Yes.
11      Q.  Do you have any other claims?
12      A.  No.
13      Q.  Can you tell me the names of the
14  medications that you are basing your claims on?
15      A.  I should have looked for my list.
16          MR. HAVILAND:  The confusion here is when
17  you say "you."  Now I think you have changed gears.
18          MS. MACER:  Okay.
19          MR. HAVILAND:  If you want to clarify.
20  BY MS. MACER:
21      Q.  Well, can you tell me the medications that
22  the claims in the lawsuit are based on?
0065
1       A.  They are the medications that were
2   prescribed for my husband through his illness for
3   cancer.
4       Q.  Okay.  Are there any other drugs that are
5   involved?
6       A.  Not to my knowledge.
7       Q.  Do you know what those drugs are that your
8   husband received for his cancer?
9       A.  No.  I would have to look up the list.  I
10  have them somewhere written down, because I was --
11          MR. HAVILAND:  Is this your list?
12          THE WITNESS:  It is the list that comes
13  from the medications that my husband ordered, that
14  Bob ordered whenever the prescription was expiring.
15  There were just a few that were mine.
16          MR. HAVILAND:  Okay.
17          THE WITNESS:  Most were his.
18          MS. MACER:  I am sorry.
19  BY MS. MACER:
20      Q.  You were looking through your purse.  Do
21  you have a list in your purse of these drugs?
22          Is that what you are looking for?
0066
1       A.  Yes.  So if you want to go ahead and
2   question something while I am looking, it is up to
3   you what you want to do.
4       Q.  That's fine.
5           Do you know who manufactured any of the
6   drugs that your husband took that are subject to
7   this litigation?
8       A.  Offhand, I can't remember the names.  No.
9       Q.  Do you know, does this litigation make any
10  allegations against manufacturers of drugs that your
11  husband did not make?
12          I think I already asked you that but --
13          MR. HAVILAND:  Asked and answered.
14          THE WITNESS:  Could you repeat it again?
15          Do you want me to answer it?

16        Would you please repeat it?
17            (Record read as follows:
18        "Question:  Do you know, does this
19   litigation make any allegations against
20   manufacturers of drugs that your husband did not
21   make?")
22            THE WITNESS:  That my husband did not
0067
1   take.
2            MR. HAVILAND:  Do you know, she asked.
3            MS. MACER:  If that's not clear, I am
4   pretty sure I already asked that and you answered
5   it.
6            THE WITNESS:  Good.  I am glad I answered
7   it.
8   BY MS. MACER:
9      Q.  Do you know if this case is about --
10   strike that.
11            Do you know if this litigation involves
12   any medications that are taken in the form of a
13   pill?
14      A.  Yes.
15      Q.  It does involve them?
16      A.  Yes.
17      Q.  Okay.  Do you know which medications that
18   would be?
19      A.  No.
20      Q.  Can you tell me how you first became aware
21   that you had a claim against the defendants in this
22   lawsuit?
0068
1      A.  I was.
2            MR. HAVILAND:  Well, I want to caution you
3   about -- in answering that question.
4            THE WITNESS:  Okay.
5            MR. HAVILAND:  Let me see if I can clarify
6   with counsel.  You are asking about Mrs. Howe,
7   right?
8            MS. MACER:  Right, how she became aware
9   that she had any claim.
10            MR. HAVILAND:  How she became aware.
11            Mrs. Howe, can you answer that question in
12   terms of whether or not you became aware other than
13   through counsel, discussions with counsel?
14            THE WITNESS:  You want me to tell you how
15   I became aware?
16            MR. HAVILAND:  No, I don't want you to
17   answer that question.
18            THE WITNESS:  Oh.
19            MR. HAVILAND:  I want to try and clarify
20   if in answering that question, there is an answer
21   that you can give that is other than about
22   communications with counsel, with my office or with
0069

1  any of the other lawyers in the case.
2      THE WITNESS:  And what was the question
3  again?
4      MR. HAVILAND:  She wants to know how you
5  became aware of your particular claims in this case.
6      Was that through counsel?
7      THE WITNESS:  Yes.
8      MR. HAVILAND:  Okay.  Then I will instruct
9  her not to answer.
10      THE WITNESS:  Huh?
11      MR. HAVILAND:  I am just going to instruct
12  you not to answer the question that was posed on the
13  grounds of attorney/client privilege.
14      MS. MACER:  Okay.
15  BY MS. MACER:
16      Q.  Mrs. Howe, are you aware that the original
17  complaint in this matter was filed in 2001?
18      A.  Yes.
19      Q.  Okay.  I am going to show you a document.
20      I would like it marked Exhibit J Howe 001.
21  For the record, this is the Fourth Amended Master
22  Consolidated Class Action Complaint, as filed on
0070
1  March 1, 2006.
2      Counsel, I did only bring one copy, for
3  purposes of not wanting to carry more.
4      MR. HAVILAND:  Fine.  I will take a look
5  at that and we will be fine.
6      MS. MACER:  I assumed you might have a
7  copy back at your office.
8      MR. HAVILAND:  You would be correct.
9      (Whereupon, Fourth Amended Master
10  Consolidated Class Action Complaint, was marked
11  Exhibit J Howe 001 for identification.)
12      MR. HAVILAND:  For the record, the exhibit
13  marked as Exhibit J Howe 001, it is the redacted
14  version of the Fourth Amended Complaint without the
15  schedules. Okay.
16  BY MS. MACER:
17      Q.  When you are ready, Mrs. Howe, if you
18  would take just -- no rush.
19      A.  No, I should be.
20      Q.  When you are ready, take a look at this,
21  and just to reassure you, I am not going to ask you
22  questions about every page on this.  If you could
0071
1  just kind of glance at it and tell me if you
2  recognize this document.
3      A.  Yes.
4      Q.  Okay.
5      A.  I recognize what it is for.
6      Q.  Okay. Mrs. Howe, did you review this
7  document before it was filed on March 1, 2006?
8      A.  No.

9     Q.   Okay.  If you would, I do want to call
10  your attention to page 8, paragraph 18.
11         MR. HAVILAND:  Take a look at the bottom.
12         Do you want her to read it?
13         MS. MACER:  If you want to familiarize
14  yourself.
15         THE WITNESS:  All right.
16         MS. MACER:  If you want to take a minute
17  and review that paragraph, just paragraph 18.
18         THE WITNESS:  Yes.  That's what I am
19  reading.
20         MS. MACER:  Take all the time you want.
21         THE WITNESS:  Okay.
22  BY MS. MACER:
0072
1     Q.   Mrs. Howe, did you have any role in
2  drafting that paragraph?
3     A.   None at all, no.
4     Q.   Did you propose any revisions to it?
5     A.   No.
6         MR. HAVILAND:  Well, for the record,
7  counsel has proposed a revision that I think was
8  codified in the letter to defendants, that the
9  paragraph will be amended.  I thought this had been
10  done before today, but not to include Mrs. Howe
11  individually and on behalf of the estate her husband
12  as from January of 2006.
13         So there will be that if the provision has
14  not already been, done for the record.
15         MS. MACER:  You lost me there.
16         Mrs. Howe is going to be individually and
17  as a representative?
18         MR. HAVILAND:  Yes.  I think it was just a
19  mistake on the part of the Hagens' firm in
20  processing this.  The language wasn't tailored
21  specific to the class order.  It will read exactly
22  like the January order, Mrs. Howe, individually and
0073
1  on behalf of the estate of her husband.
2         MS. MACER:  Thank you for making that
3  clarification.  I appreciate it.
4         MR. HAVILAND:  Uh-huh.
5  BY MS. MACER:
6     Q.   Did you at some point review this
7  paragraph after the document was filed?
8     A.   No.
9     Q.   I am sorry.  You said "no"?
10     A.   No.
11     Q.   Okay.  Can you tell me now if the
12  information in the paragraph is accurate?
13     A.   Yes.  As far as the drug names, that is
14  something that I don't keep up with, but I am sure
15  that there are -- but the rest of it is, yes, that's
16  -- he was treated for prostate cancer.

17    Q.  Can you tell me what the basis is for your
18  allegation in this paragraph that your husband was
19  charged for physician administered drugs based on
20  AWP?
21        MR. HAVILAND:  Calls for a legal
22  conclusion.
0074
1        You can answer.  Do you know the answer?
2        THE WITNESS: Pardon me?
3        MS. MACER:  I am sorry.  I was waiting for
4  you to answer my question.
5        Could you read the question back to her?
6        THE WITNESS: I am sorry.
7        MS. MACER:  That's fine.
8        THE WITNESS:  We had a mix-up here.  What
9  was the question again?
10        MS. MACER:  That's fine.  Would you repeat
11  it back to her, please.
12        (Record read as follows:
13        "Question:  Can you tell me what the basis
14  is for your allegation in this paragraph that your
15  husband was charged for physician administered drugs
16  based on AWP?")
17        MR. HAVILAND:  I object to that, since she
18  didn't have a role in drafting it, there is a lack
19  foundation and the question calls for a legal
20  conclusion.
21        But you can answer it.
22  BY MS. MACER:
0075
1    Q.  Do you see the sentence that makes that
2  statement?
3        Look at the second sentence in the
4  paragraph is what I am asking you about.  I am
5  asking you for the basis for that sentence.
6    A.  Yeah.
7        MR. HAVILAND:  No, no, during the
8  applicable time period, right?
9        THE WITNESS: Yes.
10        MS. MACER:  I am sorry.  The third one.  I
11  am sorry.  The third sentence.
12        MR. HAVILAND:  Yeah.
13        THE WITNESS:  That is very true.
14        MS. MACER:  Okay.
15  BY MS. MACER:
16    Q.  Are you referring to the third sentence?
17  I misspoke earlier.  I wasn't questioning the second
18  sentence, the third sentence that starts "during the
19  applicable time period."
20    A.  Yes.
21    Q.  Okay.
22    A.  That's true, yes.
0076
1    Q.  Can you tell me the basis for your

2  statement here that he was prescribed and charged
3  for drugs, physician administered drugs that were
4  based in whole or in part on AWP?
5      MR. HAVILAND:  Same objection.  It is a
6  statement of counsel, but go ahead.
7      Can you answer it?
8      THE WITNESS:  What did you say?
9      MR. HAVILAND:  I said it is the same
10  objection as before, that since she didn't have a
11  role in drafting the paragraph, I will object that
12  it is calling for you to talk about something that
13  you didn't have a role in drafting, but you can
14  answer it, if you can.
15      THE WITNESS:  What was your question
16  again?  I lost it.  Excuse me.
17      What was your question again?
18  BY MS. MACER:
19    Q.  What is your basis for that statement that
20  your husband's drugs were based in whole or in part
21  on AWP?
22    A.  Just this litigation, I guess.  I don't
0077
1  know.
2    Q.  Okay.  That's fine.
3    A.  I am sorry.
4    Q.  Please don't apologize.  You are doing
5  fine.
6      Mrs. Howe, do you have any personal
7  knowledge about any of the allegations in the rest
8  of this complaint?
9    A.  No.
10    Q.  Do you have any personal knowledge about
11  rebates that medical providers may have received
12  from manufacturers?
13    A.  Personal knowledge?
14    Q.  Yes, ma'am.
15      MR. HAVILAND:  Things you know, see, have
16  heard.
17      THE WITNESS:  Some, yeah.
18      MS. MACER:  Okay.
19  BY MS. MACER:
20    Q.  What can you tell me about those rebates,
21  based on your personal knowledge?
22      MR. HAVILAND:  Rebates he asked about.
0078
1      THE WITNESS:  Rebates.  Then, no, I don't
2  know.  Sorry.  I changed my --
3      MS. MACER:  That's fine.  Okay.  We are
4  going to have a little bit more fun, because I have
5  to say the name of a drug again.
6  BY MS. MACER:
7    Q.  Can you tell me, looking at that
8  complaint, do you recognize the name of a drug
9  called Dexamethasone sodium phosphate?

10      A.  I have heard the name, yes.

11      Q.  Do you know if it is a generic or a brand

12  name?

13      A.  No, I do not.

14      Q.  And do you know if Dexamethasone sodium

15  phosphate is manufactured by more than one

16  pharmaceutical company?

17      A.  No.

18      Q.  Do you know who manufactures that drug?

19      A.  No.

20      Q.  Would it surprise you that more than one

21  company manufactures that drug?

22          MR. HAVILAND:  Calls for speculation.

0079

1           THE WITNESS:  Yeah.

2  BY MS. MACER:

3      Q.  I am sorry.  Did you answer?

4      A.  Would it surprise me?

5      Q.  Yes, to learn that there is more than one

6  manufacturer of that drug.

7      A.  No, I guess not.  No.

8      Q.  Okay.  Do you know if your husband took a

9  drug called Dexamethasone sodium phosphate?

10      A.  Yes.

11      Q.  Do you know how it was administered?  Was

12  it an IV, pill form?

13      A.  I don't -- I am afraid -- I have an idea,

14  but I am afraid.  I think I will just say I don't

15  know.

16      Q.  That's fine.  That's fine.

17          MR. HAVILAND:  She has asked all the time

18  if you know.

19          THE WITNESS:  If I know, yes.  I don't

20  know.  Sorry.

21          MS. MACER:  No, that's fine.

22  BY MS. MACER:

0080

1      Q.  Do you know which company manufactured the

2  Dexamethasone sodium phosphate --

3      A.  No.

4      Q.  -- that your husband took?

5          MR. HAVILAND:  You have to listen to the

6  question.

7          THE WITNESS:  Huh.

8          MR. HAVILAND:  You have to.  You didn't

9  get the tail end, which actually had some more

10  information.

11          MS. MACER:  That's fine.

12  BY MS. MACER:

13      Q.  I asked you if you knew which company

14  manufactured -- and you are making me same that name

15  again.

16      A.  Yeah.

17      Q.  Which company manufactured the

18  Dexamethasone sodium phosphate?
19     A.   And were you finished then?
20        MR. HAVILAND:  That your husband took.
21        MS. MACER:  That your husband took.
22        THE WITNESS:  Oh, sorry.  No.
0081
1         MS. MACER:  That's fine.
2         THE WITNESS:  No, I did not know that.
3  BY MS. MACER:
4     Q.   If Mr. Howe took that drug, do you know if
5  he paid for it?
6     A.   He paid for it somehow or he wouldn't have
7  been able to take it.
8     Q.   Okay.  Do you recall what amount?
9     A.   No, I don't.
10    Q.   Okay.  Do you know if the amount that your
11  husband paid for Dexamethasone sodium phosphate -- I
12  am trying for a clear record, so I keep throwing it
13  out there.
14        Do you know if the amount he paid for that
15  was based on AWP?
16    A.   No, I don't.
17    Q.   Okay.  Do you recognize the name of a drug
18  called Gentimycin sulfate?
19    A.   No.
20    Q.   Do you know if this is a generic name or a
21  brand name drug?
22    A.   No.
0082
1     Q.   Do you know if Gentimycin sulfate is
2  manufactured by more than one pharmaceutical
3  company?
4     A.   No.
5     Q.   Do you know who manufactures Gentimycin
6  sulfate?
7     A.   No.
8     Q.   Would it surprise you that more than one
9  company manufactures Gentimycin sulfate?
10    A.   No.
11    Q.   Do you know if your husband took
12  Gentimycin sulfate?
13    A.   No.
14    Q.   You don't know if he took it?
15    A.   No.
16    Q.   Okay.  If your husband took it, would you
17  know which company manufactured it?
18    A.   No.
19    Q.   If your husband took it, do you know if he
20  would have paid for it?
21    A.   He would have had to pay for it or he
22  wouldn't be able to take it.
0083
1     Q.   Okay.  That's fine.  And if he paid for
2  that drug, would you know if the amount he paid was

3  based on AWP?
4      A.  No, I don't know that.
5      Q.  Okay.  Can you tell me who the attorneys
6  are that represent you in this action?
7          MR. HAVILAND:  Who are your attorneys?
8          THE WITNESS:  Who are my attorneys?
9          MR. HAVILAND:  Who are your attorneys?
10         THE WITNESS:  Who are my attorneys?
11  Donald E. Haviland, Jr.
12         MR. HAVILAND:  I know.  Go ahead.
13  BY MS. MACER:
14     Q.  Can you tell me how you came into contact
15  with Mr. Haviland?
16     A.  Well --
17     Q.  I guess I am asking -- I think you have
18  mentioned already you had received a phone call from
19  him.
20     A.  Yes.
21     Q.  But did you see a newspaper ad or anything
22  of that sort?
0084
1      A.  No.
2      Q.  Okay.  Mrs. Howe, did you ever hear of AWP
3  before being solicited to be a plaintiff in this
4  case?
5          MR. HAVILAND:  Objection to the form of
6  the question.
7          THE WITNESS:  Excuse me.
8          MS. MACER:  Okay.  You need to answer out
9  loud.  I am sorry.
10         MR. HAVILAND:  Go ahead.
11         THE WITNESS:  No.
12         MR. HAVILAND:  She said "no."
13         THE WITNESS:  No.
14  BY MS. MACER:
15     Q.  Okay.  Prior to being contacted by the
16  attorneys in this case, were you planning on
17  bringing a lawsuit concerning drug pricing?
18         MR. HAVILAND:  Hold on.  I am going to
19  object that you built a house of cards foundation,
20  which I don't think is sustainable, considering the
21  record that Mr. Howe testified to was that his
22  original contacts with the lawyers was in the
0085
1  litigation.
2          I cut you off at the point in time when
3  you talked about contacts with Mrs. Howe, because
4  it's clear, I think, from the obvious record how a
5  relationship with her came about, so I want to
6  object to that question on the grounds that I think
7  that you have got no foundation for making a claim
8  that this was not a lawsuit in existence at the time
9  Mrs. Howe got involved.
10  BY MS. MACER:

11     Q.  Did you have any plans of bringing a
12  different lawsuit involving pricing of drugs?
13     A.  No.
14     Q.  Did you contact your husband's doctors to
15  get their view as to whether you should be part of
16  this suit?
17     A.  No.
18     Q.  Then I believe you previously testified
19  that you have only had one meeting with these
20  attorneys and that was yesterday with Mr. Haviland?
21     A.  That's correct, yes.
22     Q.  Okay.  Do you have a retention agreement
0086
1  with the attorneys for this case?
2     A.  No.
3     Q.  If you would, the document in front of
4  you, which is Exhibit J Howe 001, the Fourth Amended
5  Master Consolidated Complaint, would you look at the
6  lawyers listed on page 275 through 279?
7     A.  At the very back?
8        MR. HAVILAND:  Yes.  Let's do this.
9        THE WITNESS:  Yes.  Here is 275.  Is that
10  where you want to start?
11        MS. MACER:  Yes, ma'am.
12        THE WITNESS:  All right.
13  BY MS. MACER:
14     Q.  What I would like you to do is go ahead
15  and take a minute to look at the attorneys listed
16  there and on the subsequent pages, and if you would
17  go through and identify for me if you have a
18  relationship with any of the attorneys listed or
19  which ones you have a relationship with.
20        MR. HAVILAND:  A relationship?
21        THE WITNESS:  None of them.
22        MS. MACER:  Any contact with.
0087
1        THE WITNESS:  No, none of them.
2  BY MS. MACER:
3     Q.  What about the subsequent pages?
4        MR. HAVILAND:  What is the question?
5        MS. MACER:  If she has had any contact
6  with them.
7        MR. HAVILAND:  Okay.
8        THE WITNESS:  Donald E. Haviland, Jr. pops
9  up again.
10        MR. HAVILAND:  There he is.
11        THE WITNESS:  With Kline and Specter.
12        MR. HAVILAND:  Do you want her to keep
13  going?
14        MS. MACER:  Yes.  Look through them all
15  and just let me know, please.
16        MR. HAVILAND:  I think the attorneys are
17  on the top of all of the boxes.
18        THE WITNESS:  Pardon me?

19       MR. HAVILAND:  The attorneys names are all
20  at the top of each of these.
21       THE WITNESS:  Yes.  That's what I am going
22  by are those.
0088
1       MR. HAVILAND:  Okay.
2       THE WITNESS:  No.
3  BY MS. MACER:
4    Q.   So Mr. Haviland is the only one with whom
5  you have had any contact?
6    A.   That's correct.
7    Q.   Is he the only one with whom you have a
8  relationship?
9    A.   The case, yes.
10    Q.   Okay.  Mrs. Howe, do you know how your
11  lawyers are going to be paid?
12    A.   No.
13    Q.   Are you paying your lawyers?
14    A.   No.
15    Q.   Do you know how the litigation costs are
16  being paid?
17    A.   No.
18    Q.   Mrs. Howe, do you know whether the suit
19  that you have brought has anything to do with what
20  your husband's doctors paid for the drugs that they
21  administered to your husband?
22    A.   Repeat that, please.
0089
1    Q.   Sure.  Do you have any idea whether the
2  suit that you have brought has anything to do with
3  what the doctors paid for the medications that they
4  administered to your husband?
5    A.   I would, yes.
6       THE REPORTER:  I would, yes?
7       THE WITNESS:  Yes, I am sorry.  I was
8  thinking.
9  BY MS. MACER:
10    Q.   Can you explain how the prices that those
11  physicians or providers paid is related to this
12  lawsuit?
13    A.   Explain it, huh?  Not really.
14    Q.   Okay.
15    A.   It is difficult to -- for me, anyway.
16       MR. HAVILAND:  For a lot of people.
17       MS. MACER:  Okay.
18  BY MS. MACER:
19    Q.   In your understanding, Mrs. Howe, what is
20  a class action?
21       MR. HAVILAND:  What is a class action?
22       THE WITNESS:  What is a class action?
0090
1       MS. MACER:  Yes, ma'am.
2       THE WITNESS:  More than one individual
3  suing over the same case.

4          MS. MACER:  Okay.
5     BY MS. MACER:
6          Q.  Can you tell me what the class is that you
7     represent?
8          A.  What the class is?
9          Q.  Can you tell me who the members of that
10    class are?
11         A.  No.
12         Q.  Okay.  Do you know if it is limited to
13    Oregon residents?
14         A.  No.
15         Q.  No, you don't know?
16         A.  I do not know.
17         Q.  Okay.  Then I am going to assume perhaps
18    you don't also know whether it includes the whole
19    United States?
20         A.  No, I do not know.
21         Q.  Okay.  Do you know if your class includes
22    only individuals who paid for their medications?
0091
1          A.  No.
2          Q.  No, you don't know?
3          A.  I do not know.
4          Q.  Okay.  Does the class you represent
5     include insurance companies?
6          A.  I will have to say I don't know, because I
7     would have to make an assumption, and that isn't
8     what I want to do.
9          Q.  No.  No, you don't need to make any
10    assumptions.
11             Does the class that you represent include
12    Medicare beneficiaries?
13         A.  Yes.
14         Q.  Does it include Medicare beneficiaries?
15             MR. HAVILAND:  Medicaid.
16             THE WITNESS:  Medicaid?  I have no idea. I
17    don't know.
18    BY MS. MACER:
19         Q.  Do you know if it includes only
20    individuals who were covered by United Healthcare of
21    Utah?
22         A.  Only individuals?  No.
0092
1              MR. HAVILAND:  From the insurance is what
2     she is asking.
3              THE WITNESS:  No.
4     BY MS. MACER:
5          Q.  No, you don't know?
6          A.  I don't know.
7          Q.  Do you know if it includes the government?
8          A.  I do not know.
9          Q.  Does it include people without insurance?
10         A.  I don't know.
11         Q.  Okay.

12          MS. MACER:  Would you mark this as Exhibit
13  J Howe 002.
14          For the record, I am asking the reporter
15  to mark the Proposed Consolidated Article Regarding
16  Motion for Class Certification for Track 2, Version
17  1, as Exhibit J Howe 002.
18          (Whereupon, Motion for Class
19  Certification, was marked Exhibit J Howe 002 for
20  identification.)
21          MR. HAVILAND:  Do you want to call these
22  J. Howe?
0093
1           MS. MACER:  Okay.  J. Howe.
2           MR. HAVILAND:  We will call them J. Howe.
3   BY MS. MACER:
4      Q.  Mrs. Howe, would you take a moment and
5   read the definition for Class 1.  I am not going to
6   make you read the whole document, just the Class 1
7   definition.
8           THE WITNESS:  Even reading that --
9           MR. HAVILAND:  You get lost.
10          The question?
11  BY MS. MACER:
12     Q.  Are you finished?
13     A.  Yes.  It is just --
14          MR. HAVILAND:  A lot of legalese.
15          THE WITNESS:  Yeah, a little overwhelming
16  to want to be able to answer it correctly.
17          MR. HAVILAND:  Well, what is the question?
18          I didn't know if there was a question.  I
19  am sorry.
20          MS. MACER:  No, there isn't.  There is not
21  one outstanding.
22          MR. HAVILAND:  She wanted you to read it.
0094
1   Now explain it.
2           MS. MACER:  That's my first question.  No,
3   I am teasing.
4           MR. HAVILAND:  She just wanted you to read
5   it and now you are going to get a question.
6   BY MS. MACER:
7      Q.  Mrs. Howe, do you understand that the
8   estate of Howe is a proposed representative for this
9   class?
10     A.  Yes.
11     Q.  Do you understand that you are also a
12  proposed representative individually?
13     A.  Yes.
14     Q.  From what you have read, does the class
15  definition exclude physicians?
16          MR. HAVILAND:  From the class?
17          MS. MACER:  Yes.
18  BY MS. MACER:
19     Q.  Do you see any language in there that says

20   physicians would be excluded from the class?
21      A.   No.
22      Q.   Do you see any language in there that says
0095
1   that pharmacists would be excluded?
2      A.   No.
3      Q.   Do you see any language that says
4   healthcare workers would be excluded from the class?
5      A.   No.
6      Q.   Do you see any language that generally
7   excludes individuals with a sophisticated knowledge
8   of pharmaceutical pricing?
9          MR. HAVILAND:  Object to the form.
10         THE WITNESS:  Would you repeat the
11   question, please?
12         MS. MACER:  Would you read it back.
13            (Record read as follows:
14         "Question:  Do you see any language that
15   generally excludes individuals with a sophisticated
16   knowledge of pharmaceutical pricing?")
17         THE WITNESS:  No.
18   BY MS. MACER:
19      Q.   Mrs. Howe, do you want to be a class
20   representative?
21      A.   Yes.
22      Q.   What do you understand a class
0096
1   representative to be?
2      A.   To take part in the action of trying to
3   legally lower the price of these -- the charges of,
4   outrageous charges of these drugs, so that more
5   people can take advantage of their existence of
6   them, actually.
7      Q.   Thank you.
8      A.   It is leaving out a lot of people with the
9   high prices.
10      Q.   What do you understand the
11   responsibilities of a class representative to be?
12      A.   To answer honestly what that person knows,
13   any questions that are asked, to them honestly, to
14   the best of their knowledge.
15      Q.   Are there any other responsibilities?
16      A.   Not that I can think of, no.
17      Q.   Okay.
18         Mrs. Howe, why do you think that you are
19   in a position to serve as a class representative in
20   this action?
21         MR. HAVILAND:  Calls for a legal
22   conclusion.
0097
1         THE WITNESS:  Well, I no longer have a
2   husband, number 1.  That's a good reason.  Nothing
3   has helped him, really.
4         MS. MACER:  Why don't we take a break and

5   go off record for a few minutes.
6           (A brief recess was taken.)
7   BY MS. MACER:
8      Q.  Mrs. Howe, do you know, does your
9   situation differ from someone who does not have
10  supplemental insurance?
11     A.  Yes.
12     Q.  Can you tell me how?
13     A.  Supplemental insurance is a great help if
14  you can -- if you have it, if you can afford to have
15  it, so it is a back-up.
16     Q.   And do you feel that you are able to
17  represent the interests of people who don't have
18  supplemental insurance?
19     A.   Repeat that last part?  If I am --
20     Q.   Do you feel that you are able to represent
21  the interests of people who don't have supplemental
22  insurance?
0098
1      A.  The interests of people.  I guess, yes.
2      Q.  Okay.  Do you expect to be compensated for
3   your services as a class representative?
4      A.  Yes.
5      Q.  How much compensation are you expecting?
6      A.  No idea.
7      Q.  Do you have -- we will go back to that
8   ballpark from earlier.  Do you have a ballpark?
9      A.  No, I don't.
10     Q.  Okay.
11     A.  First time -- in fact --
12         MR. HAVILAND:  Keep your voice up.
13         THE WITNESS:  I am talking to you.
14         MR. HAVILAND:  Oh.
15  BY MS. MACER:
16     Q.  Would you expect it to be based on perhaps
17  the time that you put in or is there some other?
18     A.  That's why I should go back and say, no, I
19  don't expect to be compensated for it, because of
20  that reason.  No idea.
21     Q.  Well, you don't --
22     A.  It is my duty.
0099
1      Q.  You don't expect or you have no idea?
2      A.  I don't expect.
3      Q.  Okay.  If this case required you to travel
4   to Massachusetts, would you be willing to do that?
5      A.  Yes.
6      Q.  Would you be able to do that?
7      A.  Yes.
8      Q.  Do you understand that you have been named
9   as a class representative for defendant AstraZeneca?
10         Actually, I am not sure if now it is you,
11  your estate or your husband.
12         MR. HAVILAND:  The judge ordered named

13  Joyce Haviland individually for a Class 1 --
14        MS. MACER:  Okay.
15        MR. HAVILAND:  -- against AstraZeneca.
16  BY MS. MACER:
17     Q.  Okay.  Do you understand that you have
18  been named class representative?
19     A.  Yes.
20     Q.  Do you also understand that you are a
21  proposed class representative for nine other
22  defendants?
0100
1     A.  Yes.
2     Q.  And do you understand that each defendant
3  will have a separate trial?
4     A.  No.
5     Q.  Are you willing and able to travel to
6  Boston for 10 different trials, if needed?
7        MR. HAVILAND:  Well, that's a little ahead
8  of the curve here.  I don't think the judge has set
9  more than three, but, obviously, she will discuss
10  that with her counsel.
11        You can answer that.
12  BY MS. MACER:
13     Q.  If there are going to be 10 trials, would
14  you be willing and available to travel to Boston for
15  10 trials?
16        MR. HAVILAND:  Calls for speculation.
17        THE WITNESS:  Yeah.  Really, I don't know.
18  BY MS. MACER:
19     Q.  So you don't know if you would be willing
20  to?
21     A.  For 10?  I really don't know that I would.
22     Q.  Okay.  Mrs. Howe, did your husband have a
0101
1  will?
2     A.  Yes.
3     Q.  Okay.  Can you tell me where the will is?
4     A.  Safety deposit box.
5     Q.  Has it been probated?
6     A.  Yes.
7     Q.  And has an estate been opened for your
8  husband?
9     A.  Yes.
10     Q.  When was that estate opened?
11     A.  Upon his death.  Upon his death.
12     Q.  Do you have a month or can you tell me a
13  little bit more specifically when that might have
14  been?
15     A.  Well, he died December the 28th, 19 --
16  2005.  And I didn't do anything about it, so I
17  imagine -- I wasn't interested in money and probate.
18  I was interested in getting my life back together.
19     Q.  All right.  That's fine.  I really hate to
20  push this, but I do need to know.  Do you have an

21  attorney handling his will at this point?

22     A.  Handle what, dear?

0102

1     Q.  Handling his will.

2     A.  No.

3     Q.  Probating it for you.

4     A.  No, no.

5     Q.  So then is the will still sitting in the

6  safe deposit box?

7     A.  You know, I don't -- I read something the

8  other day at home.  My table is just full of papers,

9  and it is hard for me to separate.

10    Q.  That's okay.

11    A.  It was just I was leaving everything to --

12  I was leaving the home and things to him, and he was

13  leaving things to me, and that was it.  And in the

14  event of the other spouse's death or preceded in

15  death, then our daughter was to receive everything,

16  and that's as simple as it is.

17    Q.  Okay.

18    A.  And if that's a will, that's a will, but

19  that's the way it is set up.

20       MR. HAVILAND:  There had been no formal

21  probate.

22       THE WITNESS:  Yeah.  Thank you.

0103

1        MS. MACER:  Okay.

2  BY MS. MACER:

3     Q.  Do you know -- and I really do apologize -

4  -

5     A.  Sorry.  That's all right.

6     Q.  -- to you, but I do need to know this.

7        Do you know if your husband's will names

8  you as the administrator --

9     A.  Yes.

10    Q.  -- or executrix of the estate?

11    A.  Yes.

12    Q.  Do you share that role with anyone?

13    A.  No.

14    Q.  Are you perhaps co-executrix with your

15  daughter?

16    A.  Yes.

17    Q.  Yes, you --

18    A.  Well, I don't know how you term that.  I

19  am the sole executor, but in the case something

20  happens to me, then Nancy, our daughter, but I think

21  we do share that.  It is in our name.  I have seen

22  both our names on some documents, but I can't tell

0104

1  you which ones.

2     Q.  It sounds like there may be a little bit

3  of a need to explain some terms.

4     A.  All right.

5     Q.  An executor or administrator is the one

6   who handles getting everything taken care of.  The
7   beneficiary is the person who receives --
8       A.  Right.
9       Q.  -- the assets of the estate.  Does that
10  help clarify it?
11      A.  Yes.
12      Q.  Okay.  Are you the one who is the
13  administrator of his will?
14      A.  No.
15      Q.  Okay.  Do you know who might be -- okay.
16          Could we request a copy of the will?  That
17  might make it easier.
18      A.  I didn't bring it.
19      Q.  Oh, that's fine.  We would like to go
20  ahead and request a copy of that, and maybe we can
21  just get past a lot of these questions.
22          MR. HAVILAND:  Noted, yes.
0105
1           MS. MACER:  Okay.
2   BY MS. MACER:
3       Q.  You already stated that since you have
4   survived your husband, you are to receive
5   everything?
6       A.  Yes.
7       Q.  Right?  Okay.
8           Mrs. Howe, when was your husband diagnosed
9   with prostate cancer?
10      A.  I believe it was back in 1990 -- it was in
11  the early '90s.  That's when he first had got a
12  treatment for it, so I imagine he went in for
13  treatment as soon as he found out.
14      Q.  Okay.  And that was in the early '90s?
15      A.  Yes.
16      Q.  I am sorry.  Did I interrupt you?
17      A.  No.
18      Q.  Okay.  Do you know who made the diagnosis?
19      A.  I believe it was Dr. Peter Bergreen.
20      Q.  Who is he associated with?
21      A.  He is associated -- well, he is retired
22  now. He is associated with Peace Harbor Hospital,
0106
1   and with the urology.  He was a urologist.
2       Q.  Was he with Oregon Urology Specialists?
3       A.  Yes.
4       Q.  Have any other doctors other than Dr.
5   Bergreen treated your husband?
6       A.  Yes.
7       Q.  For his prostate cancer?  I should
8   clarify.
9       A.  Yes.
10      Q.  Can you tell me who that would be?
11      A.  Dr. Shearer, Ronald Shearer.
12      Q.  Okay.
13      A.  Let's see.  Who was the cancer specialist

14   there?
15        That was his regular M.D., but the
16   oncologist was -- I am sorry.
17     Q.  That's fine.  Was his oncologist, Dr.
18   Glenn Buchanan?
19     A.  There you go.
20     Q.  Okay.  And was Dr. Buchanan affiliated
21   with the --
22        MR. HAVILAND:  Willamette.
0107
1        THE WITNESS:  Willamette, yeah.
2    BY MS. MACER:
3      Q.  Willamette Cancer center?
4      A.  Willamette is what I want to call it.  It
5    sounds much nicer Willamette than Willamette.
6        MS. MACER:  That's where I am trying to go
7    with it, too.
8        THE WITNESS:  I understand.
9    BY MS. MACER:
10     Q.  Was he associated with the Willamette
11   Cancer Center?
12     A.  Yes.
13     Q.  Was he associated with any other group or
14   practice?
15     A.  I have no idea.
16     Q.  Would he have been -- would it help -- was
17   he associated perhaps with the Oregon Oncologist
18   Associates?
19     A.  I wouldn't be surprised.  I don't know for
20   sure.
21     Q.  That's fine.  What about a Dr. Julie
22   Gemmel? Was she one of your husband's doctors?  Do
0108
1    you know?
2      A.  Yes.
3      Q.  Okay.  Do you know what she did?
4      A.  She took over after Dr. Bergreen retired
5    or -- had cancer.
6      Q.  What about a Dr. Mehlhaff?  Was he one of
7    your --
8      A.  Yes.  I recognize that name, yes.
9      Q.  Do you know what kind of doctor he was?
10     A.  No, I don't.
11     Q.  Okay.  That's fine.  Can you tell me where
12   your husband's doctors' offices were located?
13     A.  Some were in Florence, some were in
14   Eugene.
15     Q.  Okay.
16     A.  Some main headquarters were in Eugene, and
17   they would come to Florence once or twice a week to
18   the Peace Harbor Hospital there to practice, and, of
19   course, that's where we preferred to go rather than
20   drive here.
21        MS. MACER:  Well, it is a beautiful drive.

22        THE WITNESS:  It is.

0109

1          MR. HAVILAND:  Except for when it is

2    raining.

3          THE WITNESS:  Yes.

4    BY MS. MACER:

5      Q.  Mrs. Howe, did you go with your husband to

6    his doctor appointments?

7      A.  No, not really.  One, I think.

8      Q.  Just one.  Okay.  Did you or your husband

9    talk with his doctors about the possible treatments?

10     A.  No.

11     Q.  Okay.  Do you know what treatment

12   alternatives your husband considered; for example,

13   surgery, radiation, that type of thing?

14     A.  Radiation.

15     Q.  Okay.  Go ahead.

16     A.  And he came into Eugene for that, and then

17   there came the time that it was no longer working.

18     Q.  Okay.  Did your husband ever have surgery

19   for it?

20     A.  No.

21     Q.  So was it mostly radiation and

22   chemotherapy that your husband had?

0110

1      A.  Yes.

2      Q.  Did you ever ask Mr. Howe's doctors why

3    they prescribed a certain medication?

4      A.  I have never questioned his doctors.

5      Q.  Okay.  Did you ever ask his providers what

6    their formula was for calculating the submitted

7    charges?

8      A.  No.

9      Q.  Did you ever try to negotiate a lower

10   charge for any of his medication?

11     A.  No.

12     Q.  Okay.  Was Mr. Howe ever given a

13   prescription for a Medicare Part B drug in one state

14   while living in another?

15     A.  I don't know.  I have -- I am not aware of

16   anything.  I don't know.

17        Living in what?

18     Q.  Well --

19     A.  Like California?

20     Q.  Were his doctors in the same state that he

21   was in?

22     A.  Yes.

0111

1      Q.  Was he ever given a prescription in a

2    state other than the state where he lived?

3      A.  No.

4      Q.  Mrs. Howe, what is your view of your

5    husband's doctors?

6        Basically, I am asking, were you satisfied

7  with the care they gave your husband?
8      A.  Very capable.
9      Q.  Did you believe that they had his best
10  interests in mind?
11      A.  Yes.
12      Q.  Do you believe that any of your husband's
13  doctors prescribed his medicine based on how much
14  money they would make?
15      A.  No.
16      Q.  And when it comes to the trial of this
17  case, will you assert that your husband's doctors
18  conspired and colluded with the defendant drug
19  manufacturers?
20          MR. HAVILAND:  Calls for a conclusion as
21  to what is going to happen at the trial in these
22  matters.
0112
1          THE WITNESS:  Yeah, I don't know.
2  BY MS. MACER:
3      Q.  Do you know, was your husband prescribed
4  Docetaxel for his cancer treatment?
5      A.  Docetaxel.
6      Q.  And I will tell you that there is another
7  name for it, Taxotere, which I prefer, because I can
8  say it easier.
9      A.  I don't know.
10      Q.  Okay.  Would you know if he did receive
11  that, did he ever receive it prior to 2005?
12      A.  Again, I don't know.
13          MS. MACER:  Okay.  Let me have just one
14  moment.
15              (Discussion off the record.)
16  BY MS. MACER:
17      Q.  Mrs. Howe, do you know, did your husband
18  know how much Taxotere cost?
19      A.  I have no idea if he knew.
20      Q.  Do you know if he conducted any research
21  into the cost of Taxotere?
22      A.  I don't know.
0113
1      Q.  Do you know if he discussed the cost of
2  Taxotere with any doctors?
3      A.  I don't know.
4      Q.  Do you know if your husband knew how much
5  his provider charged for Taxotere?
6      A.  No.
7      Q.  No, you don't know or no?
8      A.  No, I don't know.
9      Q.  That's fine.  Thanks.
10          Do you know if he knew how his provider
11  determined their price --
12      A.  No.
13      Q.  -- for Taxotere?
14          No.

15    Q.  You don't know?
16    A.  No, I don't know.  I should be answering
17  that differently, I guess.  No, I don't know.
18    Q.  I have to ask you if you know.
19    A.  That's all right.
20    Q.  That leads to a confusing answer if I
21  don't clarify, but you are fine.
22    A.  That's all right.
0114
1    Q.  Do you know if any defendant prevented
2  your husband from asking his doctor about the price
3  of his medication?
4    A.  No.
5    Q.  No, you don't know?
6      MR. HAVILAND:  She asked, do you know?
7      THE WITNESS:  No, I don't know.
8  BY MS. MACER:
9    Q.  Do you know if it did prevent him?  Is
10  that what your answer is?
11    A.  Do you want to read the question again,
12  please.
13    Q.  Sure.  Do you know if any defendant
14  prevented your husband from asking his doctor about
15  the price of his medication?
16    A.  No, I don't know.
17    Q.  Okay.  Did your husband discuss the cost
18  of alternative treatments other than Taxotere with
19  any of his doctors?
20    A.  I don't know.
21    Q.  Did Mr. Howe elect to receive Taxotere
22  based on any representation made to him about the
0115
1  cost of the drug?
2    A.  I don't know.
3    Q.  Okay.  Do you know if he ever asked if
4  there was a less expensive drug than Taxotere?
5    A.  No.
6    Q.  No, you don't know?
7    A.  I don't know.  Excuse me.  Here we go
8  again.
9    Q.  No, you are fine.  You are fine.
10      Do you know if he discussed the cost of
11  Taxotere with United Health, United Healthcare?
12    A.  No, I don't know.
13    Q.  Do you know if any defendant prevented him
14  from discussing the cost of his drugs with United
15  Healthcare?
16    A.  No, I don't know.
17      MS. MACER:  Would you mark this as Exhibit
18  J Howe 003, please -- I am sorry -- Exhibit J Howe
19  003.
20        (Whereupon, Letter, 11-28-05, Re: NAS
21  FOIA Case No. 8505350044, HOWE 0070 - 0074 and HOWE
22  0228 - 0230, was marked Exhibit J Howe 003 for

0116
1  identification.)
2       MS. MACER:  For the record, we are marking
3  Bates No. HOWE 0070 through 74 and HOWE 0228 - 0230
4  as Exhibit J Howe 003.
5       MR. HAVILAND:  Two documents.
6  BY MS. MACER:
7    Q.  Mrs. Howe, would you take a moment to just
8  review those document.  Mrs. Howe, would you take a
9  moment to review Exhibit J Howe 003.
10       MR. HAVILAND:  Do you want to pose the
11  question and then --
12       MS. MACER:  Sure.
13       MR. HAVILAND:  She can review it with that
14  in mind.
15  BY MS. MACER:
16    Q.  Mrs. Howe, do you recognize these
17  documents?
18       Have you ever seen them before?
19    A.  No.
20    Q.  Can you tell from either reading the cover
21  letter or looking at the documents what they appear
22  to be?
0117
1    A.  Well, I have to turn my direction here.
2       MR. HAVILAND:  It is impossible to ask a
3  witness about a document she has never seen before
4  what it appears to be, but --
5       THE WITNESS:  It appears to be billing.
6  It says:  Medicare Part B Claim Summary.
7       MS. MACER:  Okay.
8       THE WITNESS:  That means billing.
9       MS. MACER:  Okay.
10       THE WITNESS:  That's all I know about it.
11  BY MS. MACER:
12    Q.  Can you take a moment to look through
13  there and look for any entries that show a CPT?
14       There is a column marked CPT procedures.
15    A.  Yes.
16    Q.  Okay.  Would you look through that column
17  and see if you can find procedures where your drug
18  or -- I am sorry -- your husband was administered
19  the drug Docetaxel?  It's spelled D-O-C-T-A-L-X-E-L.
20    A.  CPT.  Is that patient -- what does the CPT
21  stand for?
22    Q.  To tell you the truth, I don't know.  I
0118
1  just know that it is in that column.
2       MR. HAVILAND:  What does HIKVA stand for?
3       THE WITNESS:  Let's see.  You want to look
4  for the drug?  What now?
5       MS. MACER:  Docetaxel.
6       THE WITNESS:  There is one.  Glenn
7  Buchanan.

8          And then there is two.  There is two for
9   Glenn Buchanan.
10          MS. MACER:  I just wanted to know how many
11   and then the dates.
12          THE WITNESS:  If ever --
13   BY MS. MACER:
14      Q.   As you are going through, tell me the
15   dates that you see those.
16      A.   All right.  The date, the first one there
17   is October 25th of '05, with Glenn S. Buchanan, M.D.
18      Q.   Okay.
19      A.   And the next one is October the 4th, 2005,
20   the same doctor.
21          I guess we are going backwards.  I am
22   going from 5 to 4.
0119
1          MR. HAVILAND:  Yes.
2          THE WITNESS:  But we will just keep going.
3          Chemotherapy.  September 7th, '05, the
4   same doctor.
5          Oh, my poor dear.  That's all.
6          MR. HAVILAND:  That's it.
7          MS. MACER:  Okay.
8   BY MS. MACER:
9      Q.   So then you found three dates --
10      A.   Three.
11      Q.   -- that he received?
12      A.   With Dr. Buchanan.
13      Q.   Okay.  Do you need a moment?
14      A.   I am sorry.
15      Q.   Please don't apologize.
16      A.   He went through so much and smiled through
17   it all.  Excuse me.
18      Q.   You are fine.
19      A.   We can go on.  I am just --
20      Q.   Okay.
21      A.   Sorry.
22      Q.   No, you are fine.
0120
1          Mrs. Howe, are you aware of any other
2   dates on which Docetaxel was administered to your
3   husband?
4      A.   No, not aware of any.
5      Q.   Okay.  Are you aware of any chemotherapy
6   treatments that he had prior to 2005?
7      A.   Oh, I think it is in here.  Prior to 2005.
8   I will look back in here.
9      Q.   Did you see any dates in there for
10   Docetaxel that predated 2005?
11      A.   I thought you were asking me about
12   chemotherapy.
13      Q.   I pinned it down to make it easier for
14   you. Docetaxel actually is a chemotherapy.
15      A.   Because there is a lot of chemotherapies

16  here, but I have given you the other.
17      Q.  Let's limit the question to Docetaxel.  Do
18  you see any administration of Docetaxel prior to
19  2005?
20      A.  Prior to 2005?
21      Q.  Let's make it easier.  Do you have any
22  personal knowledge that your husband received
0121
1  Docetaxel prior to 2005?
2      A.  No.
3      Q.  Okay.  That's fine.
4      A.  Sorry.  That's a lot to --
5      Q.  No, you are fine.
6         Do you know if Mr. Howe received Docetaxel
7  from any doctor other than the Dr. Buchanan you
8  notice that's listed there?
9      A.  Do I know if he did?
10      Q.  Yes.
11      A.  No, he did not.
12      Q.  Okay.  Thank you.
13         MS. MACER:  Would you please mark for
14  Exhibit J Howe 004 -- and, for the record, these are
15  documents Bates Numbers HOWE 0001 through 0013.  If
16  you would just take a moment to glance at those,
17  Mrs. Howe.
18         MR. HAVILAND:  Do you know what the
19  reference number was on Mr. Howe's deposition, so we
20  can cross reference that?  This was marked at his
21  deposition.
22         MS. MACER:  Okay.
0122
1         MR. HAVILAND:  Just so we can keep a clear
2  record on it.
3         MS. MACER:  Let me see if we can find out.
4         MR. HAVILAND:  It is Exhibit J Howe 001.
5         MS. MACER:  Exhibit J Howe 003, perhaps.
6         MR. HAVILAND:  Exhibit J Howe 003.  Thank
7  you.  This will be Exhibit J Howe 004.
8         (Whereupon, Miscellaneous Checks,
9  HOWE 0001 - 0013, was marked Exhibit J Howe 004 for
10  identification.)
11  BY MS. MACER:
12      Q.  Mrs. Howe, can you just take a moment --
13      A.  Yes.
14      Q.  -- to look at these documents?
15      A.  Okay.
16      Q.  Do you recognize them?
17      A.  Yes.
18      Q.  Can you tell me what they are?
19      A.  They are payments that he made.
20      Q.  Payments to whom, please?
21      A.  Well, to different doctors, institutions,
22  and -- and drug companies.
0123

1    Q.  Do you see any checks there to anybody
2  other than the -- I am sorry -- other than to Oregon
3  Neurology and Willamette Valley Cancer?
4    A.  Oh, I have got -- some of these are.
5      MR. HAVILAND:  Hard to read.
6      THE WITNESS:  I am just --
7      MS. MACER:  Okay.
8      THE WITNESS:  I can't decipher.  I can see
9  specialists here.
10      MR. HAVILAND:  Oregon Neurology.
11      THE WITNESS:  You have better eyes than I
12  have.  Of course, you have got glasses on.
13      MR. HAVILAND:  I do.
14      THE WITNESS:  I should probably put mine
15  on, but I don't use them most of the time.
16        Are we looking for something other than?
17  BY MS. MACER:
18    Q.  Other than Oregon Neurology or Willamette.
19      MR. HAVILAND:  Willamette.
20      THE WITNESS:  Well, better yet, I can just
21  go by doctor.
22      MR. HAVILAND:  Bergreen.
0124
1      THE WITNESS:  There is a wonderful doctor,
2  that Dr. Bergreen.  I can't say enough good stuff
3  about him.  He's a little Irishman.
4        No, it is all.  It is all -- what do we
5  say?
6      MR. HAVILAND:  Willamette.
7      THE WITNESS:  It is all to the Willamette.
8  BY MS. MACER:
9    Q.  Willamette or Oregon Neurology?
10    A.  Or Oregon Neurology, yes.
11    Q.  Do you see anything in there to Willamette
12  other than the one on --
13    A.  One on what?
14    Q.  If you look at page 12 at the bottom,
15  that's the only check I am aware of in there that is
16  to Willamette.
17        Can you tell me the date on that check
18  when you find that page?
19    A.  What were we looking for?
20    Q.  The one to Willamette.
21    A.  Okay.  The date on the check is August
22  23rd of '05.
0125
1      MS. MACER:  Okay.  I will represent for
2  the record that these are all of the check copies
3  that defendants have received.
4  BY MS. MACER:
5    Q.  Mrs. Howe, do you know if you have copies
6  of any other checks to any of your husband's
7  providers?
8    A.  No.

9    Q.  Okay.  You don't know if you have any
10  others?
11        THE WITNESS:  I have no others, do I?
12        MR. HAVILAND:  At the deposition of Mr.
13  Howe, I believe he produced one other draft that I
14  am aware of, and I think there will be drafts
15  returning on the payments that I provided this
16  morning.
17        MS. MACER:  I should have noted the one
18  that he provided in his deposition is also included.
19        MR. HAVILAND:  Right.
20        MS. MACER:  It is on the second to last
21  page of this exhibit.
22        MR. HAVILAND:  And I was just going to say
0126
1  that the handwriting on the bills that I received
2  last night do reference some check numbers, and I
3  don't think it cleared yet, so we will certainly
4  provide those as soon as they come through.
5        MS. MACER:  Thank you.  Okay.
6  BY MS. MACER:
7    Q.  Mrs. Howe, the only check that we have
8  seen in there that was to Willamette Valley Cancer
9  Center was that one on page 12.  That was 8-23-05.
10        THE WITNESS:  The only check in here that
11  went to Willamette Valley Cancer Center?
12        MS. MACER:  Right.
13        THE WITNESS:  All right.
14  BY MS. MACER:
15    Q.  Would you agree that a check written on 8-
16  25 -- I am sorry -- 8-23-05 to Willamette would not
17  have been payment for the administration of
18  Docetaxel that you just saw on the prior exhibit,
19  dated -- those administrations being dated October
20  4th, 2005, October 25, 2005 and September 7th, 2005?
21    A.  What do you want regarding?
22        MR. HAVILAND:  I will stipulate to that.
0127
1        MS. MACER:  Okay.  That's good enough
2  then.
3        MR. HAVILAND:  All right.
4        MS. MACER:  Would you mark this as Exhibit
5  J Howe 005, please.
6        (Whereupon, Medicare Summary Notice,
7  11-4-05, was marked Exhibit J Howe 005 for
8  identification.)
9        For the record, we are now marking as
10  Exhibit J Howe 005, a three-page Medicare Summary
11  Notice, dated 11-4-05, with no Bates number.
12        MR. HAVILAND:  Where did this come from?
13        MS. MACER:  This was one of the documents
14  produced by Mr. Howe at his deposition.
15        MR. HAVILAND:  They weren't processed by
16  my office.

17        MS. MACER:  I have not received a
18  processed one.
19        MR. HAVILAND:  Okay.
20        If it is all right with counsel, I would
21  like to substitute this exhibit with one with the
22  proper Bates number, so we can track it better, once
0128
1  the transcript gets processed.
2        MS. MACER:  All right.
3  BY MS. MACER:
4     Q.  Mrs. Howe, do you recognize this document?
5        MR. HAVILAND:  The question?
6  BY MS. MACER:
7     Q.  The question was if you recognize this
8  document, Mrs. Howe.
9     A.  Do I recognize the document?  No, I do
10  not.
11     Q.  Have you ever seen a document of that type
12  that's titled, a CMS Medicare Summary Notice?
13     A.  No, I have not.
14     Q.  Okay.  Can you see anywhere on that form
15  that indicates the entity that rendered the services
16  listed on this summary?
17        MR. HAVILAND:  You mean under services
18  provided?
19        MS. MACER:  Yes, please.  It is your turn
20  to say that name, if you can.
21        MR. HAVILAND:  Willamette.
22        THE WITNESS:  You wanted to know what, if
0129
1  I saw what?
2  BY MS. MACER:
3     Q.  If the entity that the services were
4  rendered are the subject of this summary notice.
5     A.  What about them?  If they are what?
6     Q.  Can you tell me the name of the entity?
7     A.  Oh, Willamette.
8     Q.  Okay.  And that's Willamette Valley Cancer
9  Center?
10     A.  Willamette Valley Cancer Center, yes.
11     Q.  Okay.  Can you tell me what physician is
12  listed as the administrating physician?
13     A.  Dr. Mehlhaff and Dr. Buchanan.
14     Q.  Okay.  Do you know if Dr. Buchanan
15  administered Docetaxel to your husband at the
16  Willamette Valley Cancer Center?
17     A.  If it says so here, that's where the
18  record came from.  I guess yes.
19     Q.  Okay.  Can you tell from looking at this
20  what date the Docetaxel was administered to your
21  husband?
22     A.  October 4th of '05.
0130
1     Q.  Okay.  Mrs. Howe, do you know if you have

2  produced all of the Medicare Summary Notices that
3  you have for Mr. Howe?
4      A.  To my knowledge, yes.
5      Q.  Okay.  In looking at this form, do you see
6  the column that is marked "amount charged"?
7      A.  Yes, right at the beginning.  Yes.
8      Q.  Okay.  From looking at this form, can you
9  tell how much was billed for Docetaxel -- or I am
10  sorry -- the amount charged for Docetaxel?
11      A.  Yes.  $5,544.
12      Q.  Okay.  And can you tell if that amount was
13  based on AWP?
14      A.  I don't know.
15      Q.  Do you see anything on the form that
16  would?
17      A.  Indicate that?
18      Q.  Yes.
19      A.  Well, it is just the amount charged, and
20  that's one of those that Bob and I, we were looking
21  over these things, we went "whoa."
22      Q.  Looking at the "Medicare approved" column,
0131
1  do you see that column?
2      A.  Yes.
3      Q.  Do you see anything that would tell you
4  whether those charges, those amounts are based on
5  AWP?
6      A.  I have no idea.  I do not know.
7      Q.  Okay.  The column that is marked "Medicaid
8  paid provider"?
9          MR. HAVILAND:  Medicare?
10          MS. MACER:  I am sorry.  Medicare.
11          THE WITNESS:  I do not know.
12  BY MS. MACER:
13      Q.  And you can't tell if anything in that
14  column is based on AWP?
15      A.  No.
16      Q.  And the next column, you may be billed,
17  can you tell if any of those amounts are based on
18  AWP?
19      A.  Not, no.
20      Q.  Okay.
21          MR. HAVILAND:  Can I just ask a question -
22  -
0132
1          MS. MACER:  Sure.
2          MR. HAVILAND:  -- when you are done with
3  this exhibit.
4  BY MS. MACER:
5      Q.  Can you tell from looking at this how
6  much, if anything, Mr. Howe actually paid personally
7  for the Docetaxel that he received on October 4,
8  2005?
9      A.  How much he paid personally?

10    Q.  Yes, ma'am.
11    A.  It says, you may be billed, and then
12  that's what he paid.
13    Q.  Do you know from personal knowledge that
14  he did, in fact, pay that?
15    A.  I would have to look up the check records.
16    Q.  Okay.  Is it possible that a portion of
17  that may have been paid by his secondary insurance?
18    A.  It is possible.
19    Q.  Okay.  Mrs. Howe, do you know if your
20  husband received invoices from Willamette Valley
21  Cancer Center?
22    A.  From Willamette Valley Cancer Center?
0133
1    Q.  I am sorry.  From Willamette Valley Cancer
2  Center.
3    A.  Couldn't resist.
4    Q.  You got me.  Willamette.
5    A.  What, dear?
6    Q.  If he received any invoices from
7  Willamette Valley Cancer Center.
8    A.  I believe he did.
9    Q.  Have you produced copies of all of those,
10  if you know?
11    A.  If we had 'em, they have been produced.
12        MR. HAVILAND:  Including the one today?
13        THE WITNESS:  Including the one today,
14  yes.
15  BY MS. MACER:
16    Q.  Looking at those amounts that are on there
17  again, the amount charged, the Medicare approved
18  amounts, the Medicare provider amounts, and the you-
19  may-be-billed amounts, can you tell if any of those
20  figures might be the physician's cost, plus some
21  margin --
22    A.  No.
0134
1    Q.  -- of profit?
2    A.  I can't tell by looking, no.
3    Q.  Did you have any expectation in September
4  of 2005 as to what a possible margin of mark up
5  might have been from your husband --
6    A.  No.
7    Q.  -- from your husband's provider?
8        Would you expect that margin, if there was
9  one, to vary from doctor to doctor?
10        MR. HAVILAND:  Lacks foundation; asked and
11  answered.
12        THE WITNESS:  I have no idea, no.
13  BY MS. MACER:
14    Q.  Would you expect that margin, if there was
15  one, to vary from time to time?
16        MR. HAVILAND:  Same objections.
17        THE WITNESS:  I don't know.

18  BY MS. MACER:
19     Q.  That's fine.  If there is a margin, would
20  you expect to vary from drug to drug?
21         MR. HAVILAND:  Same objections.
22         THE WITNESS:  I don't know that, either.
0135
1          MS. MACER:  Okay.  You said you had a
2   question.  Do you want to address that?
3          MR. HAVILAND:  The exhibit that you marked
4   as Exhibit J Howe 005 had some what looked to be
5   highlighting on the "Dexamethasone," and then there
6   is some handwriting on page 2.  I just wanted to
7   know where that came from, because when I substitute
8   what should be the Bates number, I didn't want to
9   substitute an exhibit that -- can you explain what
10  that is?
11         THE WITNESS:  That is writing.
12         MR. HAVILAND:  Handwriting.  Would you
13  agree to just have the exhibit not have that?
14         Do you see what I am saying?
15         MS. MACER:  Yes, I do.
16         MR. HAVILAND:  Someone wrote there, and I
17  don't know if that came from plaintiff's counsel.  I
18  doubt it would, but --
19         MS. MACER:  You know, I truthfully do not
20  know.  I couldn't find a clean copy that didn't have
21  this.
22         MR. HAVILAND:  Okay.
0136
1          MS. MACER:  Everything that I got had
2   this, but I can't --
3          MR. HAVILAND:  If we can agree --
4          MS. MACER:  -- represent to you --
5          MR. HAVILAND:  -- that when we substitute
6   Exhibit J Howe 005, we put in an exhibit that
7   doesn't have highlighting or handwriting.
8          MS. MACER:  If the original did not have
9   it, I am perfectly comfortable with that.
10         MR. HAVILAND:  Okay.  That's on my hit
11  list.
12         MS. MACER:  Okay.
13         Would you please mark this as Exhibit J
14  Howe 006.
15             (Whereupon, Ledgers, Oncology
16  Associates of Oregon, HOWE 0034 - 0051, was marked
17  Exhibit J Howe 006 for identification.)
18         MS. MACER:  For the record, we are marking
19  Bates Numbers Howe 0034 through 0051 as J. Howe
20  Bates -- I am sorry -- Exhibit J Howe 006.
21         MR. HAVILAND:  Was this marked at Mr.
22  Howe's deposition?  I believe it was.  We could
0137
1   cross reference the exhibit.  34.  Howe 34.
2          MS. MACER:  It might have been.  It might

3   have been Exhibit J Howe 005.
4       MR. HAVILAND:  Collection.  All right.
5       MS. MACER:  It looks like it.
6       MR. HAVILAND:  Before we change the
7   subject on Exhibit J Howe 005, I intend to redact
8   out the Medicare numbers, as they are really not a
9   matter of public record.
10      MS. MACER:  That's fine.  Okay.
11  BY MS. MACER:
12      Q.  Mrs. Howe, do you recognize this document?
13      A.  No.
14      Q.  Can you tell by looking at it today what
15  it is?
16      MR. HAVILAND:  She doesn't want you to
17  guess.
18      THE WITNESS:  I'm not gonna guess.  I am
19  looking.  I am reading.
20      Tell you what it is?
21      MS. MACER:  If you can from looking at it.
22      MR. HAVILAND:  Do you know what it is?
0138
1       THE WITNESS:  No.
2   BY MS. MACER:
3       Q.  Do you see at the top where it says,
4   Oncology Associates of Oregon ledgers?
5       A.  Yes.
6       Q.  Does that help you understand what this
7   document is?
8       A.  It has something to do with cancer
9   treatment, oncology.
10      Q.  Okay.  Mrs. Howe, do you see anything on
11  this document that indicates Docetaxel was
12  administered by Dr. Buchanan to Mr. Howe?
13      A.  No.
14      Q.  The only entry we found in looking for it
15  is on the last page.
16      A.  Of this?
17      Q.  Of this whole document.
18      A.  Exhibit J Howe 006 on the last page?
19      MR. HAVILAND:  Perhaps that is explained
20  on the date that says:  Printed September 28th,
21  2005.
22      MS. MACER:  Yes.
0139
1       THE WITNESS:  So we are looking for?
2       MR. HAVILAND:  Docetaxel.
3       MS. MACER:  Actually, it is listed as
4   Taxotere here, which is the other name for it.
5       THE WITNESS:  That's what I see. September
6   8th '05.
7       MS. MACER:  Yes, ma'am.
8       THE WITNESS:  That's the only one I see.
9       MS. MACER:  Okay.  The date posted.
10  BY MS. MACER:

11     Q.  Can you tell from looking at this how much
12 Dr. Buchanan charged for the dose of Taxotere?
13     A.  No, I cannot.
14        MR. HAVILAND:  Because it is hard to read.
15        THE WITNESS:  No, no.
16        MS. MACER:  I know.
17        THE WITNESS:  I don't see his name. Dr.
18 Buchanan?  Is he listed here?
19        MR. HAVILAND:  Actually, it says
20 physicians.
21 BY MS. MACER:
22     Q.  Can you tell how much your husband was
0140
1 charged for the Docetaxel on that day?
2     A.  $7,120.
3     Q.  From looking at this form, can you tell if
4 that amount is based on AWP?
5     A.  No.
6     Q.  Can you tell if it might be based on the
7 provider's cost, plus a profit margin?
8     A.  No.
9     Q.  If this amount were cost plus margin, do
10 you know what your expectation would have been in
11 September of 2005 as to what the margin should have
12 been?
13        MR. HAVILAND:  Lacks foundation;
14 speculation.
15        You can answer.
16        THE WITNESS:  No.
17 BY MS. MACER:
18     Q.  Would you expect that margin, if there was
19 one, to vary from doctor to doctor?
20        MR. HAVILAND:  Same objections.
21        THE WITNESS:  I don't know.
22 BY MS. MACER:
0141
1     Q.  Would you expect it to vary from time to
2 time?
3     A.  I don't know.
4     Q.  Would you expect it to vary from drug to
5 drug?
6        MR. HAVILAND:  Same objections.
7        THE WITNESS:  Don't know.  Duh.
8 BY MS. MACER:
9     Q.  Mrs. Howe, do you know?
10        MR. HAVILAND:  That's D-U-H.
11        THE WITNESS:  That's it.
12        MR. HAVILAND:  That's my contribution.  So
13 that way you don't have to call her, how do you
14 spell that?
15 BY MS. MACER:
16     Q.  Mrs. Howe, do you know if you or Mr. Howe,
17 personally paid anything for the Taxotere that Mr.
18 Howe received on September 7, 2005?

19   A.   If we ever paid anything for that?

20   Q.   Yes, ma'am.

21   A.   I imagine we did.

22   Q.   If he did pay, would it have been by

0142

1   check?

2   A.   Yes.

3   Q.   Okay.  Is that the only way he ever paid

4   for these services?

5   A.   I don't know.

6   Q.   So there might be credit card receipts or

7   something out there?

8   A.   No.  Really, no.  I will check.

9   Q.   Again, we would request copies of checks

10   made to Willamette or Dr. Buchanan.

11        MR. HAVILAND:  I know there is another

12   least a couple that we will get you by the

13   references in the exhibits now.

14   BY MS. MACER:

15   Q.   Do you know, again, if you have a copy of

16   the Medicare Summary Notice relating to this

17   September administration of Taxotere?

18   A.   If he ever had a what?  Excuse me.

19        MR. HAVILAND:  Medicare Summary Notice.

20   BY MS. MACER:

21   Q.   The Medicare Summary Notice.

22   A.   I don't know.

0143

1        MS. MACER:  Okay.  If you have that, again

2   we would request a copy?

3        MR. HAVILAND:  Are you writing all of this

4   down?

5        MR. MIZELL:  We will pull all of that out.

6        MS. MACER:  Okay.

7        MR. HAVILAND:  Can't mark those, because

8   they are still bills.

9        MS. MACER:  Okay.

10        (Discussion off the record.)

11   BY MS. MACER:

12   Q.   Mrs. Howe, did your husband receive his

13   injections of Taxotere at the doctor's office or the

14   hospital?

15   A.   I believe it was at the doctor's office.

16   Q.   Okay.  Do you know if he preferred to

17   receive them at the doctor's office or the hospital?

18   A.   The doctor's office.

19   Q.   Okay.  Do you know what it cost to

20   administer Taxotere?

21   A.   No.

22   Q.   Do you know what it cost to store the

0144

1   drug?

2   A.   No.

3   Q.   Do you think there is an obligation for

4  the provider to tell you that the reimbursement
5  received for this drug is used not only to cover the
6  cost of the drug, but also to cover other costs
7  associated with administering the drug?
8       MR. HAVILAND: Calls for a legal
9  conclusion, and speculation.
10      You can answer. Go ahead if you can. It
11  was a long question.
12      THE WITNESS: Yeah.
13 BY MS. MACER:
14   Q. Let me see if I can make it shorter. What
15  I am asking is if you think that your husband's
16  doctors had an obligation to tell you what all went
17  into the price they set for the drug. If, for
18  instance, it included, in addition to the costs of
19  the drug, the cost of administering the drug, the
20  cost of storing the drug, the cost of overhead for
21  the drug, et cetera.
22   A. Where would they have revealed this on a
0145
1  document or verbally or what?
2   Q. That's my question. Do you think they had
3  an obligation to do any of that, to reveal it to you
4  verbally or on the document?
5       MR. HAVILAND: Same objections.
6       Go ahead.
7       THE WITNESS: I don't -- I don't really --
8  they are obligated?
9       Doctors usually do what they want to do,
10  obligated or not, whatever they can get away with.
11 BY MS. MACER:
12   Q. But do you think that they had an
13  obligation to share with you what those costs were?
14   A. Yeah. I think they would, yes.
15      Finally, I got the answer.
16   Q. Okay. Do you have an understanding
17  whether for Part B injections, the doctor is paying
18  a price to the manufacturer that is lower than the
19  price being charged to Medicare?
20   A. The price being paid to the manufacturer.
21      MR. HAVILAND: Can I get the lead in
22  again?
0146
1       Do you know is the question?
2       MS. MACER: Do you have any understanding?
3       MR. HAVILAND: Any understanding.
4       THE WITNESS: That they might know. I
5  lost my track. Do I have any understanding that the
6  price -- pardon me?
7       MS. MACER: That the price that the doctor
8  is paying to the manufacturer --
9       THE WITNESS: Yes.
10      MS. MACER: -- is lower than the price
11  that he is charging to Medicare.

12      THE WITNESS:  I have no idea.  No, I don't
13  know.
14  BY MS. MACER:
15      Q.   Do you know if that price he is paying for
16  the drug is lower than the price that he is charging
17  to the insurance company?
18      A.   I don't know.
19      Q.   Did either you or your husband ask his
20  providers whether there were differences in prices
21  between what he was paying for the drug and what he
22  was charging for it?
0147
1       A.   Did we, you say?
2       Q.   Yes.
3       A.   I don't know.
4       Q.   Do you think the physician had an
5   obligation to tell you if there was a difference?
6       A.   No.
7       Q.   At the time your husband was being
8   treated, did you have any expectation of what the
9   difference might be, if there was one, between what
10  the doctor paid for the drug and what he charged
11  your husband for the drug?
12      MR. HAVILAND:  Lacks foundation; calls for
13  speculation.
14      THE WITNESS:  Well, once we saw these
15  numbers, I think that it certainly came to mind.
16  Until then, why, it was SOP.
17      MS. MACER:  So just to make sure --
18      MR. HAVILAND:  What is SOP?
19      THE WITNESS:  Standard operating
20  procedure.
21      MR. HAVILAND:  You were going to get a
22  phone call on that one, I am sure.
0148
1       THE WITNESS:  Sorry.  That's like "duh."
2   I should remember that.  Excuse me.
3       MS. MACER:  That's fine.
4   BY MS. MACER:
5       Q.   The question I am asking you, though, is,
6   did you have an expectation as to what -- for ease
7   of the question, what the mark up should have been
8   between what he paid for it --
9       A.   No.
10      Q.   -- and what he charged your husband?
11      A.   No.
12      Q.   Okay.  Do you think that there is anything
13  wrong with a physician charging more than he paid
14  for a drug?
15      MR. HAVILAND:  Calls for a legal
16  conclusion.
17      THE WITNESS:  Within reason.  Now I don't
18  know how you are gonna answer that.  Is that yes,
19  no, I don't know, maybe?  I don't know.

20       MR. HAVILAND:  That is an answer.  That is
21  an answer.
22       THE WITNESS:  Within reason, okay.
0149
1  BY MS. MACER:
2     Q.  Do you think your husband's doctors
3  overcharged him for his medications?
4     A.  I don't know.  Until now, I had no idea
5  what they were charging.
6     Q.  Okay.
7     A.  It seems rather exorbitant, but not
8  knowing the wholesale and all of that, I don't know,
9  so I --
10       MR. HAVILAND:  Exorbitant.
11       THE WITNESS:  Yes, exorbitant.
12       MR. HAVILAND:  I was making sure she
13  understood what you said.  You said it this way.
14  She got it.  She is on.
15  BY MS. MACER:
16     Q.  Mrs. Howe, did you or your husband do
17  anything to determine whether or not your husband
18  had been overcharged for these medications?
19     A.  No.
20     Q.  Do you have in your mind, an idea of how
21  much your husband was overcharged --
22     A.  No.
0150
1     Q.  -- if he was?
2     A.  No.
3     Q.  Okay.
4     A.  Sorry.  If he was.  I thought you were
5  finished.  I am sorry.
6     Q.  No, that's fine.
7       MS. MACER:  Would you go ahead and mark
8  these for exhibits.  I think we are up to 7.
9       Thank you.
10       For the record, we are marking the
11  Willamette Valley Cancer Center statements that Mrs.
12  Howe provided today as Exhibit J Howe 007.
13       MR. HAVILAND:  Again, with the agreement
14  of counsel, I would like to substitute with a Bates
15  version of that and a "confidential stamp."
16       (Whereupon, Valley Cancer Center
17  Statements, were marked Exhibit J Howe 007 for
18  identification.)
19       MS. MACER:  We are also marking patient
20  account statements from PeaceHealth that were
21  produced today, three pages, as Exhibit J Howe 008,
22  and we do agree to have them substituted with a
0151
1  Bates number.
2       MR. HAVILAND:  Okay.
3       (Whereupon, PeaceHealth Statements,
4  were marked Exhibit J Howe 008 for identification.)

5    BY MS. MACER:
6        Q.   Mrs. Howe, you are looking now at Exhibit
7    J Howe 007.
8        A.   Yes.
9        Q.   Can you identify that for us?
10           First of all, have you ever seen it
11   before?
12       A.   I think I did, yes.  Just very recently,
13   yes.
14       Q.   And aren't those the documents you
15   produced today?
16       A.   Yes.
17       Q.   Just very quickly, can you tell us why
18   these have not been produced before today?
19           MR. HAVILAND:  Because they just came in.
20   I can answer that.  And the statement date, it
21   speaks for itself.
22   BY MS. MACER:
0152
1        Q.   So you just received those from the
2    provider?
3        A.   Yes, absolutely.
4        Q.   All right.  Thank you.
5            There is a column on there marked
6    "charges."
7        A.   Yes.
8        Q.   In looking there or anywhere else on those
9    statements, can you tell if those charges were based
10   on AWP, in whole or in part?
11       A.   I don't know.
12       Q.   Do you see any?
13       A.   It seems like an awfully lot of money.
14       Q.   Do you see anything at all that tells you
15   that those charges are based on AWP?
16       A.   I would have no way of knowing.  I don't
17   know.
18       Q.   Can you tell from looking if those charges
19   were based on something called ASP?
20       A.   Average.  What does that mean?
21       Q.   It stands for Average Sale Price.
22       A.   Average Sale Price.  No, I would have any
0153
1    way of knowing that, either.
2        Q.   Okay.  That's all we have on that
3    document.
4            If you wanted to move to document Exhibit
5    J Howe 008, and it looks like that is a statement
6    from PeaceHealth Care Center; is that right?
7        A.   Yes, I recognize it.
8        Q.   And the amounts showing there for charges?
9        A.   Yes.
10       Q.   Can you tell by looking at them whether or
11   not any of those charges were based, in whole or in
12   part, on AWP?

13    A.  No.
14    Q.  Can you tell if any of them were based on
15 ASP?
16    A.  No.
17    Q.  And were these documents also just
18 produced today because you just received them?
19    A.  Yes.
20    Q.  Okay.  Mrs. Howe, can you tell me what you
21 are wanting out of this lawsuit, what your goals
22 are?
0154
1     A.  I would like some fairness out of it,
2 fairness in the future, fairness for price, prevent
3 price gouging by the drug companies, which I feel
4 they are doing.
5     Q.  Okay.
6     A.  I cannot see any reason whatsoever why
7 they should charge -- well, this is the one -- seven
8 thousand and something for -- I mean, if it came
9 down to really critiquing the amount that the drug
10 is manufactured for versus the amount that the
11 doctors are selling it for or other drug companies,
12 there is a great expanse there that I think is
13 unnecessary, and the average person maybe can get
14 it, but I think of the people that don't have
15 insurance.  I think of the people that just can't
16 afford drugs that are dying.
17    Q.  Okay.  Mrs. Howe, is it your understanding
18 that 7,000 figure that you mentioned that bothered
19 you -- is it your understanding that that's the
20 price the manufacturers are charging for the drug?
21    A.  I think that's what it said, isn't it?
22    Q.  It says the amount charged, I believe is
0155
1 what you saw.
2       MR. HAVILAND:  It was over here.
3       THE WITNESS:  It just bounced out at me is
4 all.  Yes.
5 BY MS. MACER:
6     Q.  But is that --
7     A.  Taxotere, 20 milligram.
8     Q.  But is it your understanding that that
9 figure represents what the drug company is charging
10 for that drug?
11    A.  Yes.
12    Q.  Okay.
13    A.  And Zoladex, 2900, almost $3,000, yeah.
14    Q.  And it is your understanding then that
15 also that 2900 is what the drug company is charging
16 for it?
17    A.  Yes, that's my understanding.
18    Q.  Okay.  Mrs. Howe, are you hoping to get
19 any money back as a result of this lawsuit?
20    A.  That's a difficult question.

21      I think Bob deserves it, and since I am
22  his other half, yes, I do --
0156
1      Q.  Okay.
2      A.  -- hope that I can get some money back,
3  just for his suffering, the time that he spent doing
4  all of this.
5      Q.  Okay.  Do you have an idea of how much
6  money --
7      A.  No.
8      Q.  -- you are wanting?
9      A.  No.
10      Q.  Okay.  Have you given any thought to how
11  much?
12      A.  No.
13      Q.  Okay.
14      A.  I don't think of those things.
15      Q.  Are you interested in seeking damages only
16  for the drugs that your husband took or I should say
17  seeking money back, if that makes it clearer, only
18  for the drugs that your husband took?
19      A.  Isn't that what we are talking about or
20  not?
21          Yes, I guess.
22      Q.  Okay.  Do you have any thoughts as to how
0157
1  much money you would be willing to accept to settle
2  the case?
3      A.  No.
4      Q.  Have you given any thought to that?
5          MR. HAVILAND:  If defendant wants to make
6  an offer, we will consider it at that time.
7          MS. MACER:  Okay.
8  BY MS. MACER:
9      Q.  Is there anything else in -- I believe you
10  talked about fairness and that you would like some
11  money back.  Is there anything else that you are
12  hoping to get out of this lawsuit?
13      A.  No.  Well, I will have gotten some peace
14  of mind, and, hopefully, for the future for other
15  people.
16          I mean, I am not a flag waver or a sign
17  carrier, but it is very obvious that there are
18  people in this world that would be getting better,
19  better care, medical care, were the drugs cheaper,
20  and I do think that the drug prices are outrageous.
21          We can underline that.
22      Q.  Okay.  I just have a little bit more.  Are
0158
1  you doing okay?
2      A.  No, I am fine.  I am better now.  Just
3  certain things trigger it.
4      Q.  Okay.  That's fine.
5          Mrs. Howe, have you or your husband ever

6  had any relationship with any of the defendant drug
7  manufacturers?
8      A.  No.
9      Q.  Have you or your husband ever had any
10  contact with any of the defendant drug
11  manufacturers?
12     A.  No.
13     Q.  Have you or your husband ever had any
14  written communication with any of the defendant drug
15  manufacturers?
16     A.  No.
17     Q.  To your knowledge, have you or your
18  husband ever had any contact or communication with
19  an employee of any of the defendant drug
20  manufacturers?
21     A.  No.
22     Q.  Did you or your husband ever see or talk
0159
1  to a sales representative of any of the defendant
2  drug manufacturers?
3      A.  No.
4      Q.  Okay.  Did you or your husband ever
5  contact any of the customer service lines of any of
6  the defendant drug manufacturers?
7      A.  Repeat, please.
8      Q.  Sure.  Did you or your husband ever call
9  any of the defendant drug manufacturers's customer
10  service lines?
11     A.  No.
12     Q.  Okay.  Did you or your husband ever seek
13  any information on any of his medications from any
14  of the defendant drug manufacturers?
15     A.  No.
16     Q.  Did any of the defendant drug
17  manufacturers ever make any representations to you
18  or your husband?
19     A.  No.
20         MR. HAVILAND:  Just so we are clear, the
21  entire line of questioning that you and your husband
22  is subject to my standing objection, lacks
0160
1  foundation as it pertains to Mr. Howe.
2         MS. MACER:  Okay.
3  BY MS. MACER:
4      Q.  Did any of the drug manufacturers ever
5  make any statements to you or your husband?
6      A.  No.
7      Q.  And did any of the defendant drug
8  manufacturers ever provide you or your husband with
9  any information about any of their drugs?
10     A.  No.
11     Q.  Did you or your husband rely on any
12  information from any of the defendant drug
13  manufacturers in paying for Mr. Howe's medications?

14    A.  Did we rely on what?

15    Q.  Any information from any of the drug

16  manufacturers --

17    A.  No.

18    Q.  -- in paying for his medication.

19    A.  No.

20    Q.  Okay.  Mrs. Howe, have you made any

21  subsequent searches for any documents relevant to

22  this litigation?

0161

1    A.  No.

2         MR. HAVILAND:  Well, yes.

3         THE WITNESS:  Have we?

4         MR. HAVILAND:  We did.  We found these

5  yesterday.

6         THE WITNESS:  Oh.

7         MR. HAVILAND:  Exhibit J Howe 007 and

8  Exhibit J Howe 008.

9         THE WITNESS:  Oh, well that's just -- I

10  thought that was included in what she was saying.

11  These are new then?

12        MR. HAVILAND:  I wanted to make it clear

13  that that was the product of a subsequent search.

14  BY MS. MACER:

15    Q.  Did you go back and look through any file

16  cabinets?

17    A.  No.

18    Q.  Do any search other than what has --

19    A.  No.

20    Q.  -- come in?

21    A.  No.

22        MS. MACER:  Thank you.

0162

1         I would like to take a minute just to make

2  sure I have everything.  If you want, at this point,

3  we can let the other defendants ask questions that

4  are on the phone.

5         MR. HAVILAND:  Please.

6         MS. MACER:  Okay.  I am going to turn it

7  over to those of you on the phone, if you would like

8  to ask some questions.

9         MR. HAVILAND:  To the extent they have not

10  been covered.

11        MR. FARQUHAR:  I would like to go first.

12  This is Doug Farquhar speaking, for the benefit of

13  the court reporter.

14  BY MR. FARQUHAR:

15    Q.  Mrs. Howe, I have asked you to look at the

16  exhibit that was the copy of the most recent amended

17  complaint.  I forget what number that was.

18        MS. MACER:  Exhibit J Howe 001.

19        MR. FARQUHAR:  Okay.  And paragraph 18,

20  which I think is the paragraph that you were looking

21  at before.

22          I represent Watson Pharmaceuticals, and I
0163
1  just wanted to check and make sure --
2          MR. HAVILAND:  Paragraph 18, Counsel?
3          MR. FARQUHAR:  That's what I have got.
4          MR. HAVILAND:  Go ahead.
5  BY MR. FARQUHAR:
6     Q.  The two drugs that your husband took, as I
7  see it, that may have been manufactured by Watson
8  are Dexamethasone sodium phosphate and what is
9  described as Gentimycin sulfate; is that correct?
10         MR. HAVILAND:  That's what it looks like.
11         THE WITNESS:  That's what it says.
12         MR. FARQUHAR:  I am sorry.
13         THE WITNESS:  That's what this paragraph
14  says.
15         MR. FARQUHAR:  Okay.
16  BY MR. FARQUHAR:
17     Q.  And you are not alleging, at least at this
18  point, that there were any other drugs that may have
19  been taken by your husband that may have been
20  manufactured by Watson that would be relevant to
21  this case; is that correct?
22     A.  Yes.
0164
1     Q.  All right.
2          Now I would ask you to look at what has
3  been marked as Exhibit J Howe 003, I think, the
4  Medicare claim forms -- I am sorry -- not claim
5  forms -- the Medicare Claim Summaries, Part B.
6          MR. HAVILAND:  Yes.
7          THE WITNESS:  I have it.
8          MR. FARQUHAR:  Thank you.
9  BY MR. FARQUHAR:
10     Q.  You are not aware, are you, of any other
11  Medicare Part B Claim Summaries for you or your
12  husband, are you?
13     A.  No.
14     Q.  All right.  Now I would like to ask you to
15  look at the second page of this exhibit, which is
16  Howe 0071, and I see, of the two drugs that were
17  named for Watson, that is Dexamethasone and
18  Gentimycin, I see those listed on this page twice.
19  Actually, just Dexamethasone is listed twice -- once
20  on October 4th, 2005, once on October 25th, 2005; is
21  that correct?
22     A.  October the 4th, 2005, and October 25th,
0165
1  2005.
2     Q.  Okay.  Looking at the October 25th, 2005,
3  if you read across for that, it looks like on that
4  particular drug, Medicare paid $1.74.
5     A.  Yes.
6     Q.  And the deductible or coinsurance amount

7  was 44 cents?
8      A.  Yes.
9      Q.  Okay.  Now of the 44 cents, a portion of
10  that drug cost probably was paid by United
11  Healthcare, the supplementary insurance coverer;
12  isn't that correct?
13      A.  I suppose.  I have no idea.  I don't know.
14      Q.  Okay.  Is it your understanding that
15  United Healthcare would pay a portion of the costs
16  for services and drugs that Medicare did not pay?
17      A.  Yes.
18      Q.  All right.  Then looking at the October
19  4th administration of Dexamethasone sodium
20  phosphate, it has basically got the same numbers
21  there, right?
22      A.  Yes.
0166
1      Q.  All right.  Now, did your husband -- he
2  did not suffer from what is called end stage renal
3  disease or kidney failure, did he?
4      A.  No.
5      Q.  And you are not familiar with how -- well,
6  your husband didn't have to go to undergo dialysis
7  treatment?
8      A.  No.
9      Q.  So you are not familiar, I would assume,
10  with how dialysis drugs are reimbursed; is that
11  correct?
12      A.  That's right, yes.
13      Q.  And I am sure I know what the answer to
14  this question is also, but I just want to double
15  check.  You are not familiar with how there was
16  discussion in the federal government in mid 2000
17  about whether the reimbursement rate for dialysis
18  drugs should be reduced and the federal government
19  decided not to reduce it?
20          You are not familiar with any of that
21  history, correct?
22          MR. HAVILAND:  Foundation.
0167
1          THE WITNESS:  I am not familiar, yes.
2          MR. FARQUHAR:  All right.  I don't have
3  any -- actually, let me back up a second.
4  BY MR. FARQUHAR:
5      Q.  Looking at the price that was charged for
6  Dexamethasone sodium phosphate on page 0071, it
7  lists the charge there of $20 for each time that
8  that drug was administered.
9      A.  Yes.
10      Q.  Do you consider that $20 charge to be
11  exorbitant?
12          MR. HAVILAND:  Calls for speculation.
13          THE WITNESS:  Well, based on the other
14  charges, no.

15      MR. FARQUHAR:  Okay.
16  BY MR. FARQUHAR:
17      Q.   And then looking at the third page of that
18  same exhibit or fourth page of that same exhibit
19  that is numbered 0073, do you see that there is a
20  charge at the bottom for Gentimycin injection on
21  December 12, 2001?
22      MR. HAVILAND:  Yes.
0168
1      THE WITNESS:  Yes.
2      MR. FARQUHAR:  Okay.
3  BY MR. FARQUHAR:
4      Q.   And do you see that the charge there is,
5  at least it appears on my copy, to look like $6.00?
6      A.   Yes.
7      Q.   Do you consider that to be an exorbitant
8  charge --
9      A.   No.
10     Q.   -- for Gentimycin?
11         MR. FARQUHAR:  All right.  I have no
12  further questions.  Thank you.
13         MS. SCOTT:  This is Kelleen Scott.  I have
14  some questions, if that's okay.
15         MR. HAVILAND:  Counsel for who?
16         MS. SCOTT:  Amgen, Inc.
17         MR. HAVILAND:  Thank you.
18  BY MS. SCOTT:
19     Q.   First I want to point the witness back to
20  what I believe was marked Exhibit J Howe 008, which
21  is the PeaceHealth document that we received today.
22         MR. HAVILAND:  Yes, give me one second.
0169
1  Got it.
2  BY MS. SCOTT:
3      Q.   Ms. Howe, while your counsel is looking
4  for that document --
5          MR. HAVILAND:  We have it.
6          THE WITNESS:  We have it.
7          MS. SCOTT:  I am going to ask you a
8  question that doesn't relate to the document first.
9          MR. HAVILAND:  Okay.
10  BY MS. SCOTT:
11     Q.   I am not trying to ask a trick question.
12  So far, we have not received any documents that
13  indicate or show that your husband took the drug
14  Pegfilgrastim -- I am not the only one that cannot
15  say it -- also known as Neulasta.
16          Do you know if there are any documents in
17  your possession that reflect your husband having
18  received that drug?
19          MR. HAVILAND:  Well, Counsel, to be clear,
20  I recall from the Bob Howe deposition that there was
21  documents produced and discussed with Mr. Howe that
22  reflected Neulasta.

0170
1        MS. SCOTT:  There was a discussion.  I do
2  not believe there were documents produced.
3        MR. HAVILAND:  Okay.  I hear your
4  representation.  Okay.
5  BY MS. SCOTT:
6     Q.  Ms. Howe, are you aware of any documents
7  that relate to that?
8     A.  No.
9     Q.  Okay.  I believe your husband testified in
10  his deposition that he received a single injection
11  of Neulasta at PeaceHealth Hospital.  Are you aware
12  of any other injections your husband may have had of
13  Neulasta?
14     A.  No.
15        MS. SCOTT:  Okay.  Let's go to Exhibit J
16  Howe 008.
17        MR. HAVILAND:  Got it.
18  BY MS. SCOTT:
19     Q.  Based on this document, can you tell
20  whether charges for Neulasta are included within the
21  charges indicated here?
22     A.  On this particular --
0171
1     Q.  The three pages that I, at least,
2  received, yes.
3     A.  Yes.  Yes, there is nothing on here.
4     Q.  Okay.  I just want to make sure I wasn't
5  missing anything.
6     A.  No.
7     Q.  Do you know whether the charges for
8  Neulasta are included within the charges indicated
9  here?
10     A.  No.
11     Q.  You don't know or those are not?
12     A.  I do not know.  I do not know.
13     Q.  Okay.  I just want to make sure that the
14  record is clear.
15     A.  All right.
16     Q.  If you turn to the third page of this
17  exhibit --
18     A.  Yes.
19     Q.  -- it indicates payments made by your
20  husband for or payment made of $87.06.
21     A.  Yes.
22     Q.  Do you know who paid that amount?
0172
1     A.  I imagine we did.
2        In fact, I have a note above it -- when I
3  pay bills, I put "paid," and I put the date it was
4  paid, and I have my personal check number 2394.
5     Q.  You do have that document?
6     A.  That's right.  And that's the banker
7  coming out in me.

8      Q.   Okay.

9          MS. SCOTT:  Could we, Counsel, please have

10   a copy of that document, please?

11         MR. HAVILAND:  As soon as it comes back,

12   Counsel, I have said that.

13         MS. SCOTT:  I just want to put it on the

14   record.  Thank you very much.

15         MR. HAVILAND:  Okay.

16   BY MS. SCOTT:

17     Q.   Do you know, Ms. Howe --

18     A.   Yes.

19     Q.   -- if any of the amount paid of 87.06 was

20   applied to any Neulasta charges?

21     A.   It was applied to whatever was on --

22   whatever the charges were incurred on these three

0173

1   pages.

2      Q.   Okay.

3      A.   I paid the amount.

4      Q.   Do you have any specific knowledge that

5   this was applied towards Neulasta charges?

6      A.   Not the specific, no.

7      Q.   I have the same question about the first

8   page, which talks about an amount of $111.54.

9      A.   Yes.

10     Q.   Do you know whether that amount was paid

11   by you or your husband?

12     A.   I am looking in my checkbook register.

13   Excuse me.

14     Q.   No problem.

15     A.   I see the 87.06.  If it is recent, I can

16   do that.

17         MR. HAVILAND:  Here is your answer.

18         THE WITNESS:  I haven't paid it yet.

19         MR. HAVILAND:  That's what I am saying.

20         THE WITNESS:  Yes, this just came.

21         MR. HAVILAND:  Right.

22         THE WITNESS:  Well, there is another $111

0174

1   that are going to have to go.

2          There is a bill that just came yesterday,

3   I assume, for $111.54 that I have yet to pay,

4   according to the balance due.

5          MR. HAVILAND:  It is due on April 10th.

6          THE WITNESS:  Due on April 10th.

7   BY MS. SCOTT:

8      Q.   Do you know if any of that amount was

9   applied or will be applied towards Neulasta charges?

10     A.   No.

11         MR. HAVILAND:  If you know.

12         THE WITNESS:  No, I don't know.

13         MS. SCOTT:  Okay.

14   BY MS. SCOTT:

15     Q.   And you are not aware -- I just want to

16  reconfirm that you've testified that you're not
17  aware of any other or any -- let me put it this way.
18      Other than Peace Harbor Hospital, are you
19  aware of any entity that has provided Neulasta to
20  your husband?
21      A.  No.
22      Q.  All right.  Do you have any knowledge how
0175
1  your husband's provider determined the charges for
2  Neulasta?
3      MR. HAVILAND:  Counsel, that has been
4  asked before multiple times.
5      MS. SCOTT:  Particularly as it relates to
6  Neulasta, it hasn't been asked.  I just want make
7  sure.
8      MR. HAVILAND:  Okay.
9      THE WITNESS:  No.
10  BY MS. SCOTT:
11      Q.  Do you know how your provider determined
12  his price for Neulasta?
13      A.  No.
14      Q.  Do you know if the charges for the drug
15  were based on AWP?
16      A.  No.
17      Q.  Did your husband or you discuss the
18  treatment alternatives with his provider in relation
19  to Neulasta?
20      A.  No.
21      Q.  Did he or you, to your knowledge, discuss
22  the cost of Neulasta with his providers?
0176
1      A.  No.
2      MR. HAVILAND:  Let me just interject my
3  standing objection as to questions about Mr. Howe
4  and Mrs. Howe's lack of foundation at this point to
5  testify about what he may or may not have done,
6  unless you want to lay that foundation.
7  BY MS. SCOTT:
8      Q.  To your knowledge, Mrs. Howe --
9      MR. HAVILAND:  Yes.
10  BY MS. SCOTT:
11      Q.  -- do you know if you or your husband ever
12  discussed the cost of Neulasta with his providers?
13      A.  No.
14      Q.  Do you know if he ever asked for a cheaper
15  drug to be used?
16      A.  No.
17      Q.  Did you ever ask?
18      A.  No.
19      Q.  Okay.  At the time of treatment, do you
20  know if you or your husband ever questioned his
21  providers concerning whether there was a margin
22  between the price of Neulasta, as charged to your
0177

1  husband, and what the provider paid?
2      A.  No.
3      Q.  Did you or your husband ever try to find
4  out the price of Neulasta or how it was determined?
5      A.  Not to my knowledge, no.
6      Q.  Okay.  Thank you very much.
7          I want to direct you at this time back to
8  the complaint, paragraph 18.
9          MR. HAVILAND:  Wait a minute.  Yes.
10  BY MS. SCOTT:
11      Q.  I know you have read paragraph 18 several
12  times in relation to this deposition.  Correct me if
13  I am wrong that the only drug here that relates to
14  Amgen would be Pegfilgrastim, which is otherwise
15  known as Neulasta; is that correct?
16      A.  The only drug what?  Would you repeat
17  that, please?
18      Q.  Sure.  The only drug listed there --
19      A.  Yes.
20      Q.  -- connected with Amgen would be the drug,
21  Pegfilgrastim.
22      A.  Yes.
0178
1      Q.  Okay.  Are you alleging that Mr. Howe took
2  any other drug manufactured by Amgen, other than
3  Neulasta, that would be relevant or included in this
4  lawsuit?
5          MR. HAVILAND:  Counsel, I will answer
6  that, because I realize that the statement that was
7  produced recently does have Filgrastim, so we will
8  add that when we amend this paragraph in here, just
9  so -- I don't want you to feel surprised.
10          MS. SCOTT:  Are you going to add any other
11  drugs?
12          MR. HAVILAND:  Well, not at this point in
13  time, but I do notice that the documents that were
14  revealed to the witness today reflect Filgrastim on
15  December 13, '05.
16          MS. SCOTT:  If the documents reflect other
17  drugs given by Amgen, is that gonna change as well?
18          MR. HAVILAND:  It could, but I don't think
19  of that at this moment.
20          MS. SCOTT:  Okay.  We want to reserve our
21  right to the extent that if anything other than
22  Filgrastim is going to be added to the complaint
0179
1  that we have a right to discuss those newly included
2  drugs with Mrs. Howe.
3          MR. HAVILAND:  Well, you can reserve what
4  you will.  I will take it up at that time.
5          MS. SCOTT:  Okay.  With that said, I would
6  like to give you notice that they were within the
7  documents for Willamette.  Is that correct?
8          MR. HAVILAND:  I am sorry.  I was just

9   stopping handwriting.  What was the question?
10         MS. SCOTT:  I just want to make sure I
11  understand what documents you were referring to in
12  relation to Filgrastim.
13         MR. HAVILAND:  Exhibit J Howe 003.  I
14  noticed on the last page has Filgrastim.
15         MS. SCOTT:  Could you remind me what pages
16  they are.
17         THE WITNESS:  It is mine.
18         MR. HAVILAND:  It is not yours.  Howe 230.
19  I will give you one.
20         Counsel, I am warning you, let's get this
21  done.
22         THE WITNESS:  Yes.  We want to get going.
0180
1   Sorry.
2          MR. HAVILAND:  Do you have that page?
3          MS. SCOTT:  I do.
4          MR. HAVILAND:  All right.
5   BY MS. SCOTT:
6      Q.  I also would like to point you to Howe 71.
7          MR. HAVILAND:  What exhibit is that?
8          MS. SCOTT:  I am sorry.  No.  I just
9   pointed you to the wrong page.  Excuse me.  I am
10  getting my drugs confused here.
11         MR. HAVILAND:  Yes.
12         MS. SCOTT:  Give me one moment.
13         MR. HAVILAND:  Are you looking for
14  Darbepoetin alpha?
15         MS. SCOTT:  Just one moment, please.
16         I would also like to refer you -- and I am
17  again not sure whether these have been included in
18  the exhibit or not -- Howe 27, 29, and 30 through
19  32.
20         MR. HAVILAND:  What exhibit number?
21         MS. SCOTT:  Again, I am not sure whether
22  they have been included in an exhibit as of yet.
0181
1          MS. MACER:  What pages?
2          MS. SCOTT:  27, 29 through 32, and page
3   230, as counsel has already pointed out.
4          MR. HAVILAND:  They are not in the exhibit
5   currently, that I am aware of.
6          MS. SCOTT:  230 is.
7          MS. MACER:  27, and what else?
8          MS. SCOTT:  29 through 32.
9          Counsel, this is what you were referring
10  to as Filgrastim, correct?
11         MR. HAVILAND:  No, I just showed you the
12  one page, 230.
13         MS. SCOTT:  230 relates to Filgrastim.
14         MR. HAVILAND:  Fine.
15         MS. SCOTT:  I just want to make sure we
16  are all on the same page here.

17          Are you also referring to Aranesp, which
18   is included within the documents that we just sent
19   you -- oh, you just sent us -- which Darbepoetin
20   alpha?
21          MR. HAVILAND:  Well, Darbepoetin alpha is
22   also in the Exhibit J Howe 003.
0182
1          What is your question?
2          MS. SCOTT:  I think I am getting confused
3   here.  Filgrastim.
4          MR. HAVILAND:  If your question is --
5   you're right -- Darbepoetin alpha is not in
6   paragraph 18, either.  That will be added, and I can
7   assure you that I will bag someone's head at Hagens
8   Berman for not including it.  It was sent to them
9   that way, but it also did include Mrs. Howe, so we
10   need to make a correction to that paragraph.
11          MS. SCOTT:  Well, that's what I was trying
12   to figure out is how many documents exactly were
13   being included here.
14          MR. HAVILAND:  Well, that's --
15          MS. SCOTT:  How many drugs.  Sorry.
16          MR. HAVILAND:  Darbepoetin alpha is right.
17   That's Aranesp.  That's Amgen's drug, yes.
18   Pegfilgrastim and Filgrastim.  That covers it.  I am
19   quite certain that covers it.
20   BY MS. SCOTT:
21      Q.  Aranesp is, I believe, Darbepoetin alpha.
22          MR. HAVILAND:  Okay.
0183
1          MS. SCOTT:  And Neopogen is Filgrastim.
2          MR. HAVILAND:  Okay.
3          MS. SCOTT:  So that's why I was getting
4   confused.  There's two different ones here.
5          Aranesp is what is listed on the documents
6   that came in most recently, where 230 is Neopogen.
7          MR. HAVILAND:  Only.
8          MS. SCOTT:  So let's just pull out all of
9   the documents relating to all of these drugs, and we
10   will go from there.
11          The two sets of documents that relate to
12   Aranesp, just so we are all clear, are the five
13   pages from the Willamette Valley Cancer Center that
14   we just received today, as well as document Howe
15   0071.
16          MS. MACER:  I think that's included in one
17   of our exhibits.
18          MR. HAVILAND:  Is there a question?
19          MS. SCOTT:  I am just trying to make sure
20   that all exhibits are out, so that we can deal with
21   this.
22          MR. HAVILAND:  Can you direct me to an
0184
1   exhibit?

2          MS. SCOTT:  Again, I don't know what the
3    exhibit numbers are.  The page that I am referencing
4    is Howe 0071.
5          MR. HAVILAND:  Okay.  I have got that.
6          MS. SCOTT:  Okay.  And then, again, in
7    relation to Neopogen, it's 27, 29 through 32, and
8    page 230.
9          MR. HAVILAND:  I don't have -- I don't
10   have any of the ones you reference other than 230.
11         MS. MACER:  27 through 32 has not been
12   marked as an exhibit.  Did you want it marked?
13         MS. SCOTT:  Why don't we go ahead and do
14   that.
15         MR. HAVILAND:  I think that was marked in
16   Mr. Howe's deposition, though.  I recognize that.
17         MS. MACER:  I don't have page 30.  Does
18   anybody have page 30?
19         MR. HAVILAND:  No.
20         Counsel, we have 71 in front of us and
21   230.  Why don't you ask questions as to those.
22         MS. SCOTT:  All right.  We will go from
0185
1    there.
2    BY MS. SCOTT:
3       Q.  Let's start with page 71.  On the document
4    that counsel is putting in front of you, I hope,
5    document 71, as well as the five pages from the
6    Willamette Valley Cancer Center.
7          MR. HAVILAND:  We don't have those yet,
8    but go ahead.
9          MS. SCOTT:  Okay.
10   BY MS. SCOTT:
11      Q.  Are you aware whether or not your husband
12   received injections of Aranesp beyond what is
13   reflected on these documents?
14         MR. HAVILAND:  Do you know?
15         THE WITNESS:  No.  I -- do I know?  No.
16         MR. HAVILAND:  When you are saying
17   Aranesp, you are relating to Darbepoetin alpha,
18   because that's what it says?
19         MS. SCOTT:  Right.
20   BY MS. SCOTT:
21      Q.  Do you know who manufactured this
22   medication?
0186
1       A.  No.
2       Q.  Do you know what the brand name for
3    Darbepoetin alpha is?
4       A.  No.
5       Q.  Okay.  Do you know what your husband was
6    prescribed Darbepoetin alpha for?
7       A.  No.
8       Q.  Do you know what Darbepoetin alpha is used
9    for?

10    A.  No.
11    Q.  Do you know who prescribed the Darbepoetin
12 alpha for your husband?
13        MR. HAVILAND:  I am sorry?
14        THE WITNESS:  Who prescribed it?
15        MS. SCOTT:  Correct.
16        THE WITNESS:  And what was the drug again?
17        MS. SCOTT:  Darbepoetin alpha.
18        THE WITNESS:  It was Douglas S. Buchanan,
19 M.D.
20        MR. HAVILAND:  That's reflected on Howe
21 71.
22        MS. SCOTT:  Okay.
0187
 1  BY MS. SCOTT:
 2    Q.  And he is with the Willamette Valley
 3 Cancer Center, correct?
 4    A.  Willamette Valley Cancer Center, yes.
 5    Q.  I am sorry.
 6    A.  We know what you mean.
 7    Q.  Okay.  Do you know whether this drug was
 8 given as an injection, an infusion or pill?
 9        MR. HAVILAND:  Do you know?
10        THE WITNESS:  No, I don't.
11        MS. SCOTT:  Okay.
12 BY MS. SCOTT:
13    Q.  Do you know if your husband's treatment
14 involving Darbepoetin alpha were while he was
15 staying inpatient at Willamette -- I just messed it
16 up again -- Valley Cancer Center?
17    A.  It is all right.
18    Q.  Was he staying in the hospital when he got
19 these?
20        And I believe the dates he received these
21 injections are November 1st, '05, November 15th,
22 '05, October 18th, '05, October 4th, '05.
0188
 1    A.  When you mean in the hospital, you mean
 2 physically to go to the doctors at the hospital or
 3 to be a patient in the hospital?
 4    Q.  Let me clarify.  I mean a patient in the
 5 hospital.
 6    A.  No.
 7    Q.  Okay.  So, to your knowledge, these drugs
 8 were given in an outpatient setting --
 9    A.  Yes.
10    Q.  -- where he went to the center, was given
11 the drug and then left?
12    A.  Yes.
13    Q.  Do you know how much your husband's
14 provider charged for Darbepoetin alpha?
15    A.  No.
16    Q.  Other than the -- I am not trying to trip
17 you up.  There are charges listed on document 71.

18   As far as you know, these are the charges that were
19   charged?
20        You don't have any other information about
21   that, do you?
22     A.  No.
0189
1     Q.  Do you know how your husband's providers
2   determined the price for Darbepoetin alpha?
3     A.  No.
4     Q.  Okay.  Do you know if charges for this
5   drug were based on AWP?
6     A.  No.
7     Q.  Do you know if you or your husband
8   discussed treatment alternatives with your provider
9   relating to Darbepoetin alpha?
10    A.  No.
11    Q.  Do you know if you or your husband
12   discussed the costs of Darbepoetin alpha with his
13   providers?
14        MR. HAVILAND:  Asked and answered.
15        MS. SCOTT:  Not as to Darbepoetin alpha.
16        MR. HAVILAND:  Counsel, could you just ask
17   a generic question?  I thought we already asked
18   about treatment options with Mr. Howe.
19        MS. SCOTT:  As to Neulasta, we did.
20        MR. HAVILAND:  Can we short change this?
21        MS. SCOTT:  As to Darbepoetin alpha.
22        MR. HAVILAND:  Can we short change it?
0190
1   This is really becoming -- I have been very patient,
2   I thought.  You know, it has been asked five
3   different ways.  It is getting harassing at this
4   point to ask the same question and then substituting
5   a different drug in.
6        Can you ask a generic question on the
7   behalf of all defendants?  I think you will get the
8   answer that we have already given four or five
9   times.  It is asked and answered.
10   BY MS. SCOTT:
11    Q.  Did you and your husband ever discuss the
12   cost of any Amgen drug with his provider?
13        MR. HAVILAND:  Thank you.
14        THE WITNESS:  No.
15   BY MS. SCOTT:
16    Q.  Did you or your husband ever ask for a
17   cheaper drug to be substituted for any Amgen drug he
18   received?
19    A.  Not that I am aware of, no.
20    Q.  Okay.  At the time of his treatment, did
21   you or your husband ever question his provider as to
22   whether there was going to be a margin between the
0191
1   price of any Amgen drug given to your husband and
2   what the provider paid?

3    A.  No.
4    Q.  Do you know if -- let me -- give me a
5  moment, please.
6        Do you know if you or your husband were
7  ever charged personally for Darbepoetin alpha?
8    A.  No.
9    Q.  You don't know?
10   A.  No, I do not know.
11   Q.  Okay.  Thank you.
12       MS. MACER:  Counsel, I do have those
13  documents 27 through 31 now, if you want them.
14       MS. SCOTT:  Okay.  We will go there now
15  then.
16       MR. HAVILAND:  Counsel, you have a short
17  leash, because I know for a fact that Mr. Howe was
18  asked about these documents, but go right ahead.
19       MS. MACER:  I think she needs them in,
20  entered as an exhibit.
21       MR. HAVILAND:  Okay.  Do want these as an
22  exhibit?
0192
1        MS. SCOTT:  Yes, please.
2        (Whereupon, PeaceHealth Medical
3  Records, were marked Exhibit J Howe 009 for
4  identification.)
5        MR. HAVILAND:  We got it.
6        MS. SCOTT:  Let's look specifically at
7  Howe 32.
8        MR. HAVILAND:  I am sorry?
9        THE WITNESS:  Howe 32.
10       MR. HAVILAND:  We don't have 32.  Or do
11  we? We don't.  We go to 31.
12       MS. MACER:  Let me look again.
13       MS. SCOTT:  I am sorry.  The ones I was
14  looking for was 29 through 32.
15       MR. HAVILAND:  I will just add it.  So
16  Exhibit J Howe 009 will be -- Howe Bates number 27
17  through 32. Got it.
18       MS. SCOTT:  Okay.  Thank you.
19  BY MS. SCOTT:
20   Q.  Do you know, Ms. Howe, what your husband
21  was prescribed Filgrastim for?
22   A.  No.
0193
1    Q.  Do you know who manufactures this
2  medication?
3    A.  No, I don't.
4    Q.  Do you know any brand name for this
5  medication?
6    A.  No.
7    Q.  Do you know what Filgrastim is used for?
8    A.  No.
9    Q.  Do you know who prescribed Filgrastim?
10   A.  No.

11     Q.  Do you know if this drug is an injection
12  or infusion or a pill?
13     A.  Repeat, please.
14     Q.  Do you know if this drug is given to your
15  husband through an injection, an infusion or pills?
16     A.  No.
17     Q.  Okay.  According to document Howe 32, it
18  appears your husband received Filgrastim on the
19  16th, 17th, and 18th of September.
20     A.  Yes.
21     Q.  Do you know if he was an inpatient or
22  staying in the hospital during that period?
0194
 1     A.  No, he was not.
 2     Q.  Okay.  Thank you.
 3         So you believe that these administrations
 4  of Filgrastim occurred in an outpatient status?
 5     A.  Yes.
 6     Q.  Okay.  Do you know how your husband's
 7  provider determined its price for Filgrastim?
 8     A.  No.
 9     Q.  Do you know if the charges for the drug
10  were based on AWP?
11     A.  No.
12     Q.  Okay.  Do you know if your husband or you
13  were ever personally charged for Filgrastim?
14     A.  No.
15     Q.  No, you don't know?
16     A.  No.
17         MS. SCOTT:  Okay.  Thank you.  I think
18  that's all I have.
19         MR. HAVILAND:  Thank you.  Next.  Anyone
20  else?
21         MR. FARQUHAR:  This is Doug Farquhar
22  again. Can you hear me?
0195
 1         MS. MACER:  Yes.
 2         MR. FARQUHAR:  I just wanted to confirm
 3  that I heard Mr. Haviland say correctly that he is
 4  intending to correct part of the Fourth Amended
 5  Master Consolidated Class Action Complaint to add
 6  new drugs.  Is that what I heard?
 7         MR. HAVILAND:  You heard what I said.  I
 8  said that we have indicated to counsel we are going
 9  to correct that paragraph in a number of ways, and I
10  indicated to counsel for Amgen we intend to list the
11  drugs as reflected on the documents.
12         MR. FARQUHAR:  I am sorry, but there are
13  additional drugs to what is in the complaint now?
14         MR. HAVILAND:  There will be the two drugs
15  that I identified to counsel added to that
16  paragraph, yes.
17         MR. FARQUHAR:  Thank you.
18         MR. HAVILAND:  Next?

19      MS. MACER:  Does anybody else have any

20  questions?  Okay.

21      At this time, defendants would like to

22   note that we reserve the right to continue this

0196

1  deposition to such time as Mr. Howe's estate

2  produces documents in accordance with the court's

3  August 16th order.  We also reserve the right to

4  continue this deposition in light of Mr. Haviland's

5  representation today that plaintiffs intend to amend

6  paragraph 18 of the Fourth Amended Master

7  Consolidated Complaint to include Mrs. Howe as a

8  class rep individually and to add drugs not

9  previously included in this paragraph.  And with

10  that, I have no further questions.

11      MR. HAVILAND:  In response to that, our

12  position is that we've fully complied with the

13  court's order in terms of producing documents as

14  they come in. We consider the deposition closed, no

15  need to debate it now.

16      Thank you very much, Counsel.

17      MS. MACER:  Thank you.

18      MR. HAVILAND:  Off the record.

19      (The deposition was concluded at 1:13

20  p.m.)

21

22

0197

1

2

3

4      _____

5      MARJORIE JOYCE HOWE

6

7  Subscribed and sworn to and before me

8  this _____ day of _____, 20_____.

9

10

11  _____

12      Notary Public

13

14

15

16

17

18

19

20

21

22

0198

1      CERTIFICATE

2

3      I, Janette I. Dukic, do hereby certify that

4  pursuant to the Rules of Civil Procedure, the witness
5  named herein appeared before me at the time and place
6  set forth in the caption herein; that at the said
7  time and place, I reported in stenotype all testimony
8  adduced and other oral proceedings had in the
9  foregoing matter; and that the foregoing transcript
10  pages constitute a full, true and correct record of
11  such testimony adduced and oral proceeding had and of
12  the whole thereof.

13

14       IN WITNESS HEREOF, I have hereunto set  my
15  hand this 2nd day of April, 2006.

16

17

18  _____  _____
19  Janette I. Dukic          Commission Expiration
20

21

22