# EXHIBIT G

0001
1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF MASSACHUSETTS
3
4
5
6   ----------------------------------X
7   IN RE PHARMACEUTICAL INDUSTRY      : MDL No. 1456
8   AVERAGE WHOLESALE PRICE            :
9   LITIGATION                : CIVIL ACTION:
10  ---------------------------------- 01-CV-12257-PBS
11  THIS DOCUMENT RELATES TO           :
12  ALL CLASS ACTIONS            : Judge Patti B.
13  ----------------------------------X Saris
14
15         Deposition of VIRGINIA NEWELL, taken by the
16  Defendant, at Robinson, Bradshaw, Hinson, 101 North
17  Tryon Street, Charlotte, North Carolina, on the 15th
18  day of November, 2005, at 11:20 a.m., before Jackie
19  Johnson, Court Reporter and Notary Public.
20
21  Reported by:  Jackie Johnson
22           Court Reporter, Notary Public
0002
1   For the Plaintiff:
2
3       TERRI ANNE BENEDETTO, Esq.
4       KILA B. BALDWIN, Esq.
5       Kline & Specter
6       1525 Locust Street
7       The Nineteenth Floor
8       Philadelphia, Pennsylvania  19102
9       E-mail:  terrianne.benedetto@klinespecter.com
10
11
12  For the Defendant AstraZeneca:
13
14      KRISTI T. PRINZO, Esq.
15      Antoinette Greenaway Ellison
16      Davis, Polk & Wardwell
17      450 Lexington Avenue
18      New York, New York  10017
19      E-mail:  kristi.prinzo@dpw.com
20           antoinette.elison@dpw.com
21
22
0003
1   For the Defendant Bristol-Myers Squibb:  (via phone)
2
3       SANDHYA KAWATRA, Esq.
4       Hogan & Hartson
5       555 13th Street, N.W.
6       Washington, D.C.  20004

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
0004
1          C O N T E N T S
2  The Witness:  VIRGINIA NEWELL          Examination

3  By Ms. Prinzo. . . . . . . . . . . . . . . . . . .6
4  By Ms. Kawatra. . . . . . . . . . . . . . . . 151

5
6      I N D E X   O F   T H E   E X H I B I T S
7  For the Defendant                    Page
8

9  Exhibit Newell 001    Third Amended Master
10                 Consolidated Class Action
11                 Complaint Amended to Comply
12                 with Court's Class
13                 Certification Order. . . . . 15
14  Exhibit Newell 002    Records from Urology
15                 Specialists. . . . . . . . 78
16  Exhibit Newell 003    Records from Lake Norman
17                 Hematology. . . . . . . . .93
18  Exhibit Newell 004    Cancelled Check #3438 dated
19                 February 24, 2004. . . . . .130
20  Exhibit Newell 005    Cancelled Check #3451 dated
21                 March 22, 2004. . . . . . . 134

22
0005

1  Exhibit Newell 006    Cancelled Check #3457 dated
2                 March 4, 2004. . . . . . . .135
3  Exhibit Newell 007    Cancelled Check #3458 dated
4                 March 4, 2004. . . . . . . .136
5  Exhibit Newell 008    Cancelled Check #3480 dated
6                 May 27, 2004. . . . . . . . 138
7  Exhibit Newell 009    Cancelled Check #3560 dated
8                 January 3, 2004. . . . . . .139
9  Exhibit Newell 010    Cancelled Check #3573 dated
10                 January 27, 2005. . . . . 141
11  Exhibit Newell 011    Cancelled Check #3576 dated
12                 February 4, 2005. . . . . . 142
13  Exhibit Newell 012    Cancelled Check #3584 dated
14                 March 4, 2005. . . . . . . .144

15  Exhibit Newell 013    Cancelled Check #3071 dated
16              December 4, 2001. . . . . . 145
17
18
19
20
21
22
0006
1              P R O C E E D I N G S
2              Whereupon,
3              VIRGINIA NEWELL,
4            having been duly sworn,
5        was examined and testified as follows:
6         EXAMINATION BY COUNSEL FOR THE DEFENDANT
7         MS. PRINZO:  Good morning, Mrs. Newell.  My
8  name is Kristi Prinzo.  I represent one of the
9  Defendants in this matter.
10        EXAMINATION BY COUNSEL FOR THE DEFENDANT
11         BY MS. PRINZO:
12   Q.    Could you please state your name for the
13  Record?
14   A.    Virginia Newell.
15   Q.    Have you ever been deposed before?
16   A.    No.
17        MS. PRINZO:  Let me just go over the rules
18  of a deposition.
19         I'll ask questions, and you will be
20  required to answer truthfully.  You will need to
21  answer verbally so that the court reporter can take
22  down your response, rather than just an uh-huh.
0007
1         If there's any question that is unclear,
2  please ask that I rephrase it, and I will endeavor to
3  do so.
4         Please let me finish asking the question,
5  before you answer, so the court reporter can take
6  both my question and your answer down.
7         At times, your attorney may object to
8  certain questions that I ask.  Unless your attorney
9  instructs you not to answer the question, you're
10  required to answer the question posed.
11         If at any time you need to take a break,
12  just let me know, and I'll be happy to do so.
13         BY MS. PRINZO:
14   Q.    Are you currently taking any medications
15  that would affect your ability to testify today?
16   A.    No.
17   Q.    In the last week?
18   A.    No.
19   Q.    Did you do anything to prepare for this
20  deposition?
21   A.    I collected the medications of my husband
22  and sent it to my attorney.

0008
1      Q.    And what do you mean when you say you
2   collected the medications?
3      A.    Well, I listed all of his medications.
4      Q.    And how did you go about compiling that
5   information?
6      A.    From the receipts.
7      Q.    Which receipts did you have?
8      A.    From the pharmacies, hospital.  I think
9   that's it.
10     Q.    Which pharmacies?
11     A.    Wal-Mart.
12     Q.    Any others?
13     A.    ADV Care.
14     Q.    Is that a local pharmacy?
15     A.    No.  It's a Canadian.
16     Q.    Was that through the mail?
17     A.    Yes.
18     Q.    And is Wal-Mart a local pharmacy?
19     A.    Yes.
20     Q.    What about the hospital, which hospitals?
21     A.    Lake Norman Regional Medical Center.
22     Q.    Any others?
0009
1      A.    University.
2      Q.    Is that the full name?
3      A.    Just University Hospital.
4      Q.    Where is Lake Norman Regional Medical
5   Center located?
6      A.    Mooresville.
7      Q.    And that's in North Carolina?
8      A.    Yes.
9      Q.    And what about University Hospital?
10     A.    It's in Charlotte.
11     Q.    Any other hospitals?
12     A.    CMS, Carolinas Medical.
13     Q.    Where is that located?
14     A.    It's in Charlotte.
15     Q.    Thank you.
16          MS. BENEDETTO:  You're stepping on the back
17   end of her questions a little bit.  So just wait a
18   little bit before you answer.
19          THE WITNESS:  Okay.
20          BY MS. PRINZO:
21     Q.    Beside collecting receipts, was there
22   anything else that you did to prepare for this
0010
1   deposition?
2      A.    I met with my attorney to go over the
3   Complaint, the Amended Complaint.
4      Q.    Which attorney did you meet with?
5      A.    (Indicating).
6      Q.    Terri Benedetto?
7      A.    Yes.  Yes.

8    Q.    When did you meet?
9    A.    Yesterday.
10   Q.    For how long did you meet?
11   A.    A couple of hours.
12   Q.    Was that the first time you met Miss
13  Benedetto?
14   A.    Yes.
15   Q.    Was that the first time you spoke with Miss
16  Benedetto?
17   A.    No.
18   Q.    When did you first speak with Miss
19  Benedetto?
20   A.    A couple of weeks ago.
21   Q.    Was that the first time you spoke with any
22  attorney in this case?
0011
1    A.    I'm sorry?
2    Q.    Was that the first time that you spoke with
3  any attorney in this case?
4    A.    In this state?
5    Q.    This case?
6    A.    This case.  No.
7    Q.    When was the first time that you spoke with
8  an attorney in this case?
9    A.    A couple of months ago.
10   Q.    And who did you speak with?
11   A.    Molinari.  Is it Bill?
12   Q.    I'm sorry.  You said Bill Molinari?
13   A.    Yes.
14   Q.    Do you know which firm Mr. Molinari --
15   A.    At Kline Specter.  Is that correct?
16       MS. BENEDETTO:  You can't ask me questions.
17  That's okay.
18       THE WITNESS:  Well.  That's the only name I
19  remember.
20       BY MS. PRINZO:
21   Q.    And how did you come to speak with Mr.
22  Molinari?
0012
1    A.    Apparently my husband had contacted him in
2  2002 or '03 about the Lupron overcharge.
3       MS. PRINZO:  Can you please read back that
4  answer.
5            (The answer referred to was thereupon
6             read by the reporter as above
7             recorded.)
8       BY MS. PRINZO:
9    Q.    Just so the Record is clear, your husband
10  contacted Mr. Molinari or vice versa?
11   A.    No.  My husband --
12   Q.    Contacted Mr. Molinari?
13   A.    Yes.
14   Q.    And how did it come about that your husband
15  contacted Mr. Molinari?

16    A.   I assume he saw -- read about it.
17         MS. BENEDETTO:  If you know.
18         THE WITNESS:  I don't really know.
19         BY MS. PRINZO:
20    Q.   Was your husband involved in the Lupron
21  litigation?
22         MS. BENEDETTO:  I'm going to let you answer
0013
1   yes or no to that question.
2          THE WITNESS:  I don't know.
3          BY MS. PRINZO:
4     Q.   So let me just back up for a moment.
5          So a couple of months ago Mr. Molinari from
6   Kline & Specter contacted you; is that correct?
7     A.   Yes.
8     Q.   Why don't we come back to this line of
9   questioning a little bit later.
10         A moment ago you said that you collected
11  some receipts.  Did you produce those receipts to
12  your attorneys?
13    A.   Yes.
14    Q.   Did you give your attorneys anything else
15  regarding this case?
16    A.   No.
17    Q.   Did you speak to anyone, other than your
18  lawyers, in preparation for this deposition?
19    A.   No.
20    Q.   You didn't speak to any family or friends
21  regarding the deposition?
22    A.   They knew I had to appear.
0014
1     Q.   Beside the receipts from the pharmacies,
2   was there anything else that you reviewed in
3   preparation for this deposition?
4          MS. BENEDETTO:  Objection to the form.
5   Misrepresents prior testimony.
6          MS. PRINZO:  Please correct me if --
7          MS. BENEDETTO:  You can answer the
8   question.
9          MS. PRINZO:  -- if that does
10  mischaracterize your testimony.
11         THE WITNESS:  What is the question again?
12         BY MS. PRINZO:
13    Q.   I believe earlier you said that you looked
14  at some receipts in preparation for this deposition?
15    A.   Yes.
16    Q.   Is that correct?
17    A.   Yes.
18    Q.   Was there anything else that you looked at
19  in preparation for this deposition?
20    A.   Only the Complaint.
21    Q.   When was the first time that you saw the
22  Complaint?
0015

1    A.   A couple of weeks ago.
2    Q.   Was it mailed to you?
3    A.   Yes.
4    Q.   Was it mailed to you by your attorneys?
5    A.   Yes.
6    Q.   Did you read the Complaint?
7    A.   Yes.
8    Q.   Did you read the entire Complaint?  I
9  realize it is a long Complaint.
10    A.   I glanced at it, didn't understand a lot of
11  it.
12    Q.   Were there particular parts that you
13  focused on more than others?
14    A.   Yes.
15       MS. PRINZO:  Why don't we look at the
16  Complaint now.  We'll mark it as Exhibit Newell 001.
17            (The document referred to was
18            thereupon marked Exhibit Newell 001
19            for Identification.)
20       BY MS. PRINZO:
21    Q.   Mrs. Newell, do you recognize this
22  document?
0016
1    A.   Yes.
2    Q.   And what is that document?
3    A.   This is the Amended -- the Third Amended
4  Consolidated Class Action Complaint.
5    Q.   And is this the document that your attorney
6  sent to you?
7    A.   Yes.
8    Q.   Could you look through it and tell me if
9  there are parts that you read?
10    A.   20.
11    Q.   When you say 20, are you referring to --
12    A.   Page 9.
13    Q.   -- Paragraph 20?  Is that the paragraph
14  that references your husband?
15    A.   Yes.
16    Q.   Did you read any other paragraphs in the
17  Complaint?
18    A.   Not specifically any one.  I just at random
19  looked at them.
20    Q.   Do you know which paragraphs you looked at?
21    A.   Not really.
22    Q.   Mrs. Newell, what is your current address?
0017
1    A.   151 Seagrove Lane, Mooresville, North
2  Carolina.
3    Q.   And how long have you lived at that
4  address?
5    A.   13 years.
6    Q.   Where did you live prior to that address?
7    A.   Ohio.
8    Q.   Where in Ohio?

9    A.   Akron, Canton.
10   Q.   Do you recall the year that you moved from
11 Ohio to North Carolina?
12   A.   1992.
13   Q.   Do you know which month?
14   A.   October.
15   Q.   Why did you move from Ohio to North
16 Carolina?
17   A.   My husband retired.
18   Q.   What did your husband retire from?
19   A.   He was a civil engineer.
20   Q.   Where was he employed?
21   A.   Beaver Excavating Company.
22   Q.   How long was he employed at Beaver
0018
1 Excavating Company?
2    A.   About 12 years, I think.
3    Q.   Mrs. Newell, what is your date of birth?
4    A.   February 12, 1929.
5    Q.   And is it correct that your spouse's name
6 is William Newell?
7    A.   Yes.
8    Q.   What was his date of birth?
9    A.   November 23, 1927.
10   Q.   Are you representing his estate in this
11 litigation?
12   A.   Yes.
13   Q.   Since 1991, did your husband reside at the
14 same address as you?
15   A.   Same as me?
16   Q.   Yes.
17   A.   Yes.
18   Q.   Is it accurate to say that since 1991, your
19 husband never lived in Massachusetts?
20   A.   Yes.
21   Q.   Since 1991, did your husband ever receive
22 medical attention in Massachusetts?
0019
1    A.   No.
2    Q.   Did your husband ever purchase medication
3 in Massachusetts?
4    A.   No.
5    Q.   Did your husband ever work in
6 Massachusetts?
7    A.   No.
8    Q.   Did your husband ever own property in
9 Massachusetts?
10   A.   No.
11   Q.   Have you ever owned property in
12 Massachusetts?
13   A.   No.
14   Q.   In the past 15 years, did your husband ever
15 go to Massachusetts?
16   A.   Yes.

17  Q.  When was that?
18  A.  About five, six years ago.
19  Q.  Where did you go?
20  A.  We were on a tour.
21  Q.  What were you on a tour of?
22  A.  Just sightseeing.
0020
1  Q.  How long were you there for that tour?
2  A.  About a week.
3  Q.  Were you only in Massachusetts or in other
4  states?
5  A.  No, other states.
6  Q.  A moment ago we spoke about your husband's
7  job as a civil engineer at Beaver Excavating Company.
8  What was his job title there?
9  A.  He was sales manager.
10  Q.  What were your husband's job
11  responsibilities there?
12  A.  To contact other companies and try to get
13  on the bidders' list for construction.
14  Q.  And what do you mean by try to get on the
15  bidders' list?
16  A.  Well, you have to be invited to bid on
17  large jobs, and it was his job to contact the private
18  sector and try to become a bidder.
19  Q.  Did your husband ever work for the federal,
20  state or any local government?
21  A.  No.
22  Q.  Was your husband ever in the military?
0021
1  A.  No.
2  Q.  Has your husband ever been a party to any
3  lawsuit?
4  A.  Yes.
5  Q.  Which lawsuit?
6  A.  It was an accident.
7  Q.  What type of accident?
8  A.  Auto, car accident.
9  Q.  Was he injured in a car accident?
10  A.  No, no.  I was.
11  Q.  Could you please explain a little bit about
12  that lawsuit?
13  A.  I was rear-ended, and we sued them for the
14  medical damages.
15  Q.  When you say we sued them, who is the them?
16  A.  The young man who hit us -- who hit me.
17  Q.  Were you injured in that accident?
18  A.  No, only slightly.
19  Q.  Was your husband a party to any other
20  lawsuit?
21  A.  No.
22  Q.  Were you a party to any other lawsuit?
0022
1  A.  No.

2    Q.   At what age did your husband retire?
3    A.   65.
4    Q.   That would have been 1992?
5    A.   Yes.
6    Q.   What type of insurance did your husband
7  have in 1991?
8    A.   His company insurance.
9    Q.   And what was that?
10   A.   I don't remember.
11   Q.   Were you, also, covered under that
12 insurance?
13   A.   Yes.
14   Q.   Starting in 1992, was your husband's
15 primary insurance Medicare?
16   A.   Yes.
17   Q.   What type of Medicare coverage did he have?
18   A.   Do they call it Plan B or something?
19   Q.   That is one of the types of Medicare
20 coverage, Part B.
21   A.   I think it was Part B.
22   Q.   Could you explain how that coverage worked?
0023
1    A.   It paid 80 percent.  It did not pay
2  medication.  80 percent of hospital visits.
3    Q.   And who was required to pay the remaining
4  20 percent?
5    A.   AARP.
6    Q.   Was AARP your husband's supplemental
7  insurer?
8    A.   Yes.
9    Q.   Do you know if he had any other coverage
10 through Medicare, such as Part A?  It's okay if you
11 don't know.
12   A.   I don't know for sure.
13   Q.   So is it correct that your husband enrolled
14 in Medicare when he turned 65?
15   A.   Yes.
16   Q.   And that would have been on November 23,
17 1992?
18   A.   Yes.
19   Q.   How did he enroll in Medicare?
20   A.   I think he just signed something and mailed
21 it in.
22   Q.   So he submitted an application?
0024
1    A.   Yes, I think so.
2    Q.   Did Medicare ever decline coverage?
3    A.   No.
4    Q.   Did your husband ever drop out of Medicare?
5    A.   No.
6    Q.   Was his Medicare coverage ever terminated
7  or cancelled?
8    A.   No.
9    Q.   Do you know if your husband received any

10  publications regarding Medicare?

11      A.   Periodically.  I mean, they send you stuff
12  all the time.

13      Q.   And what would be the content, to the best
14  of your memory?

15      A.   Just their rules and the programs that were
16  available.

17      Q.   Do you still possess those publications?

18      A.   Pardon me?

19      Q.   Do you still have those publications?

20      A.   I might have.  I don't know.

21          MS. PRINZO:  I would request if Mrs. Newell
22  does have those publications, if they could be

0025

1   produced.

2          MS. BENEDETTO:  I think we'll take that
3   under advisement.  There's been a lot of issues as to
4   what the scope of document production is required to
5   be.  So we'll take that under advisement.

6          BY MS. PRINZO:

7       Q.   Did your husband pay a yearly contribution
8   to Medicare?

9       A.   Yes.

10      Q.   What was the approximate amount of that
11  yearly contribution?

12      A.   I don't know.

13      Q.   How was the contribution made?

14      A.   Every January they would usually increase
15  it, and it was an automatic deduction.  We just had
16  it set up for like electronic funds.

17      Q.   Through your bank account?

18      A.   Yes.

19      Q.   So it wasn't necessary for you to send a
20  check to Medicare?

21      A.   No, it was not necessary.

22      Q.   Do you know if the yearly contribution was

0026

1   mandatory in order to get coverage?

2       A.   Yes.

3       Q.   Did your husband pay the yearly
4   contribution regardless of whether he received
5   medical services for that year?

6       A.   Oh, yes.

7       Q.   Do you know if Medicare has a yearly
8   deductible?

9       A.   Yes.

10      Q.   And what amount is that?

11      A.   It changes every year.  It seemed like -- I
12  think it was 250, but I'm not real sure.

13      Q.   At what time period do you believe it was
14  250?

15      A.   January 1st of every new year.

16      Q.   So since your husband turned 65 and onward,
17  you believe the deductible was 250?

18   A.   Yes.
19   Q.   And what do you understand a deductible to
20 be?
21   A.   When you meet your deductible, then their
22 services kick in.
0027
1   Q.   How did your husband pay the deductible?
2       MS. BENEDETTO:  Objection.  Asked and
3 answered.  You can answer it again.
4       THE WITNESS:  We had everything --
5 everything was electronic.  We didn't like the check
6 coming in the mail.
7       BY MS. PRINZO:
8   Q.   What do you mean by you didn't like the
9 check coming in the mail?
10   A.   Well, when they send you your check every
11 month, there's a risk of someone stealing it.  So we
12 had it automatically deposited in our bank, and any
13 funds that needed to come out were automatically
14 deducted.
15   Q.   When you refer to the check, are you
16 referring to your Social Security check?
17   A.   Yes.  Yes.
18   Q.   Now, you also said that your husband had
19 AARP, supplemental insurance.  Did he obtain that
20 insurance at the same time as he obtained Medicare,
21 when he turned 65?
22   A.   I believe you're allowed to become an AARP
0028
1 member sooner than that.  I think it was 55.
2   Q.   Do you know if he obtained the AARP
3 insurance at the same time he became a member of
4 AARP?
5   A.   I don't believe so.
6   Q.   Do you know if he obtained the AARP
7 insurance at the time that he turned 65?
8   A.   Yes.
9   Q.   How did it come about that your husband
10 obtained this AARP insurance?
11   A.   His company insurance no longer covered us.
12   Q.   How did he choose AARP?
13   A.   They were the only ones who would insure
14 him.
15   Q.   Why is that?
16   A.   His health.
17   Q.   What were his health problems at that time?
18   A.   Let's see.  That was '92.  He had had a
19 triple bypass.
20   Q.   When did he have a triple bypass?
21   A.   In '85.
22   Q.   Do you recall what types of medications, if
0029
1 any, he was on at that time?
2   A.   I don't recall.

3      Q.   And were you living back in Ohio at that
4  time?
5      A.   Yes.
6      Q.   So is it correct that you believe your
7  husband obtained the supplemental insurance through
8  AARP when he turned 65?
9      A.   Yes.
10     Q.   And that would have been in 1992?
11     A.   I'm not sure.
12     Q.   I can represent to you that I did the math.
13  I believe it was 1992.
14         MS. BENEDETTO:  I think we're confused.
15         Are you saying you're not sure that your
16  husband turned 65 in 1992?
17         THE WITNESS:  No, no, no, no.
18         MS. BENEDETTO:  Maybe you want to clear
19  that up.
20         MS. PRINZO:  Sure.
21         BY MS. PRINZO:
22     Q.   What are you not sure about, when you
0030
1  obtained the supplemental insurance?
2      A.   Yes, because I think you could start it
3  sooner than that, and I'm not sure when he did.
4      Q.   But do you believe that it was either 1992
5  or prior?
6      A.   Yes.
7      Q.   Did the supplemental health insurance also
8  cover you?
9      A.   Yes.
10     Q.   Do you know what type of supplemental
11  insurance he had through AARP?
12     A.   Plan J.
13     Q.   And what did Plan J cover?
14     A.   No medication.  No -- I'm sorry.  50
15  percent of medication, and it covered his hospital
16  visits.  They would sometimes pick up a portion of
17  what Medicare did not, not always.
18     Q.   Anything else?
19     A.   I don't think so.
20     Q.   So it's your understanding that that AARP
21  did not cover all the medications?
22     A.   We had out-of-pocket expenses.
0031
1      Q.   What out-of-pocket expenses did you have?
2      A.   Well, they paid 50 percent of his
3  medication.
4      Q.   Do you know if this changed throughout the
5  time period?
6      A.   No.
7         MS. BENEDETTO:  I'm sorry.  Just so we're
8  clear on that question.  Are you saying -- could you
9  read the question back?
10            (The question referred to was

11          thereupon read by the reporter as
12          above recorded.)
13      MS. BENEDETTO:  I'm sorry.  So is it that
14 no you don't know, or no it did not change?
15      THE WITNESS:  No, it did not change.  It
16 was always 50 percent.
17      BY MS. PRINZO:
18   Q.   Did you have to pay any co-payment with
19 regard to the supplemental insurance?
20   A.   The balance of the 50 percent.
21   Q.   But when you went to the doctors, you
22 didn't have to pay a $10.00 or $20.00 fee every time
0032
1 you went?
2      MS. BENEDETTO:  Objection to the form.  You
3 can answer.
4      THE WITNESS:  Sometimes a doctor would not --
5 didn't want to do the paperwork, and you had to pay
6 the full amount, and then AARP would reimburse us,
7 but not too many doctors did that.
8      BY MS. PRINZO:
9   Q.   Do you recall when that happened?
10   A.   No.
11   Q.   How would you pay the out-of-pocket
12 expenses you incurred?
13   A.   Usually by check.
14   Q.   When you say usually by check, were there
15 any other methods?
16   A.   No.
17   Q.   Do you have copies of all the checks for
18 the out-of-pocket expenses you incurred?
19   A.   Yes.
20   Q.   Were they all produced in this matter?
21   A.   No.
22   Q.   Which ones weren't?
0033
1   A.   For the Lake Norman Family Practice.
2      MS. BENEDETTO:  Did you understand her
3 question?
4      THE WITNESS:  She wanted to know the checks
5 that I didn't produce.
6          This one particular doctor was the one we
7 always had to pay up front.
8      BY MS. PRINZO:
9   Q.   Which doctor was that?
10   A.   Doctor Kerecman.
11   Q.   So you had to pay him up front, and then
12 AARP would reimburse you?
13   A.   Yes.
14   Q.   How would you pay Doctor Kerecman?
15   A.   By check.
16   Q.   Do you have copies of those checks?
17   A.   Not with me.  I have them.
18      MS. PRINZO:  And I would request that those

19  documents be produced, copies of the checks to Doctor
20  Kerecman.
21      MS. BENEDETTO:  We'll, also, take that
22  under advisement.
0034
1       BY MS. PRINZO:
2       Q.   And you said that Doctor Kerecman was
3   affiliated with Lake Norman Family Practice?
4       A.   Yes.
5       Q.   Why was it that your husband chose AARP J
6   insurance?
7       A.   It was the top -- the highest plan they
8   had.
9       Q.   And what do you mean by the highest plan?
10      A.   It had the most benefits.
11      Q.   Do you know if any of the other plans
12  offered by AARP paid for the medications in full?
13      A.   For my husband?
14      Q.   Yes.
15      A.   No.  He never had anything but Plan J.
16      MS. BENEDETTO:  Listen to the question.
17      BY MS. PRINZO:
18      Q.   Let me just clarify.
19          Do you know -- there's Plans A through J
20  for AARP insurance.  Do you know if any of those
21  plans -- if your husband chose, instead of J, one of
22  the other insurance plans, whether that would have
0035
1   covered his medication in full?
2       A.   No.
3       Q.   No, they wouldn't have?
4       A.   No, they wouldn't.
5       Q.   Do you know if there was any time, from
6   when your husband turned 65 on, that he was not
7   covered by the supplemental insurance?
8       A.   No.
9       Q.   Do you know if your husband ever received a
10  document that explained the health insurance benefits
11  that were offered by AARP?
12      A.   Yes.
13      MS. BENEDETTO:  I think we're getting --
14  just because you're prefacing the question with do
15  you know.  So I think her answer is to the latter
16  part of the question and not the do you know.
17          Actually, could you just read back the last
18  two questions for clarification.
19              (The questions referred to were
20              thereupon read by the reporter as
21              above recorded.)
22      BY MS. PRINZO:
0036
1       Q.   Do you know when he received those
2   documents?
3       MS. BENEDETTO:  I'm going to object to the

4   form.  You can answer.
5        THE WITNESS:  Every year they send you a
6   booklet.
7        BY MS. PRINZO:
8    Q.   And do you still have those documents?
9    A.   Maybe.  I don't know.
10       MS. PRINZO:  And I would ask if Mrs. Newell
11  does have these documents, that they be produced.
12       MS. BENEDETTO:  We will, also, take that
13  under advisement.
14       BY MS. PRINZO:
15   Q.   Do you know if your husband ever received
16  benefit manuals from AARP?
17   A.   Yes.
18   Q.   Do you still have those documents?
19   A.   I don't know.
20   Q.   I believe you testified about this earlier,
21  but let me just make sure the Record is clear as to
22  this point.
0037
1        From when your husband turned 65 on, were
2   there any changes to his AARP coverage?
3        MS. BENEDETTO:  Objection to the form.  But
4   you can answer.
5        THE WITNESS:  Still Plan J.
6        BY MS. PRINZO:
7    Q.   Who paid for your husband's insurance plan
8   with AARP?
9    A.   We did.
10   Q.   And did you have to pay a yearly
11  contribution to AARP?
12   A.   The amount that it cost.
13   Q.   Do you recall, approximately, what that
14  amount was?
15   A.   It changed every year.  It went up every
16  year.
17   Q.   And approximately --
18   A.   200, 250.
19   Q.   Is that per month?
20   A.   Yes.
21       Now, that also included mine, which was
22  minimal.  Mine was like $30.00, something like that.
0038
1   I don't know exactly how much.
2    Q.   And do you believe it was around 250, in
3   1992, per month?
4    A.   I don't remember.
5    Q.   How did your husband pay this amount?
6    A.   By check.
7    Q.   Was that the only method that he used to
8   pay?
9    A.   No.  When the electronic funding came into
10  existence, we opted to go with that, and it was
11  automatically deducted.

12    Q.    Where was it automatically deducted from?
13    A.    At the bank.
14    Q.    Do you know, approximately, when you
15  switched to electronic funding?
16    A.    No.
17        MS. BENEDETTO:  You're cutting off the tail
18  end of her questions just a little bit there.  Give
19  it a second after she finishes.  Okay?
20        THE WITNESS:  I'm sorry.
21        BY MS. PRINZO:
22    Q.    Was the yearly contribution mandatory to
0039
1  get coverage?
2    A.    Yes.
3    Q.    And was he required to pay this yearly
4  contribution whether he received any medical services
5  for that year?
6    A.    Yes.
7    Q.    Did AARP have a yearly deductible?
8    A.    Yes.
9    Q.    And what was that amount?
10    A.    I'm not sure.
11    Q.    Do you have a ballpark range of what the
12  amount is?
13    A.    100.
14    Q.    And would that have been the same amount
15  throughout, from 1992 on?
16    A.    Yes.
17    Q.    Did your husband pay this deductible?
18    A.    Well, when you would buy a prescription or
19  something or go to a doctor, you paid full price
20  until you met your deductible.
21    Q.    And how did your husband pay the
22  deductible?
0040
1    A.    Because he paid for his office call or
2  whatever with a check.
3    Q.    Do you know if any of the health insurance
4  options offered by AARP had a lower deductible?
5    A.    No.
6    Q.    No, you don't know?
7    A.    I don't know.
8    Q.    Have you looked for documents that relate
9  to your AARP health insurance?
10    A.    Pardon me?
11    Q.    Have you looked for documents that relate
12  to your husband's AARP health insurance?
13    A.    Yes.
14    Q.    When did you look for those documents?
15    A.    I don't understand what you're asking.
16    Q.    I'm asking, after you became part of this
17  lawsuit, if you looked for documents you had with
18  regard to AARP health insurance?
19    A.    Yes.  I went through all of our records.

20    Q.   Did you produce those documents to your
21  attorneys?
22    A.   Yes.
0041
1         MS. PRINZO:  And I would request that those
2  documents be produced to us.  We haven't received any
3  documentation from AARP.
4         MS. BENEDETTO:  We will, also take that
5  under advisement.
6         BY MS. PRINZO:
7    Q.   Was your husband ever eligible for
8  Medicaid?
9    A.   No.
10    Q.   And I believe you testified before that
11  your husband was not in the military?
12    A.   That's correct.
13    Q.   So he was never a veteran?
14    A.   No.
15    Q.   Besides the health insurance that we spoke
16  about, that being Medicare and AARP health insurance,
17  in the past 15 years, did your husband have any other
18  health insurance?
19    A.   No.
20         MS. PRINZO:  Do you want to take a quick
21  break?
22         MS. BENEDETTO:  Sure.
0042
1             (Thereupon, a brief recess was taken,
2             after which the following proceedings
3             were had:)
4         BY MS. PRINZO:
5    Q.   Mrs. Newell, what medical services did
6  Medicare pay on your husband's behalf?
7         MS. BENEDETTO:  Objection to the form.  You
8  can answer.
9         THE WITNESS:  Medicare, you said?
10         BY MS. PRINZO:
11    Q.   That's correct.
12    A.   Hospital surgeries, hospital visits.
13    Q.   Anything else?
14    A.   Partial radiology.
15    Q.   Anything else that you can think of?
16    A.   No.
17    Q.   What drugs did Medicare pay on your
18  husband's behalf?
19    A.   When?  Throughout his --
20    Q.   Throughout the time period that he had
21  Medicare?
22    A.   Well, whatever they gave him in the
0043
1  hospital when he had surgeries, and then AARP would
2  pick up the balance sometimes.  The chemo, which was
3  Taxotere and Procrit.  I can't think of what that's
4  called, Zoladex, Lupron.  I can't think of any

5  others.  There probably are.
6    Q.   If at any time during the deposition you
7  recall any others, just let me know.
8    A.   Do you want like Furosemide?
9    Q.   Any others?
10   A.   You want that?
11   Q.   Yes.  Whatever drugs --
12   A.   Oh, my.
13   Q.   -- that Medicare paid on your husband's
14  behalf?
15   A.   There was a whole list that I can't
16  remember.  Glucophage, partial of his insulin.  I
17  just can't recall them.
18   Q.   And a little later we'll go through a list
19  of drugs, and maybe that will refresh your
20  recollection.
21   A.   If you said that -- I can tell you if you
22  told me the names.  I've blocked that out.
0044
1    Q.   You had said that your husband had some
2  surgeries.  What surgeries did he have?
3    A.   Well, he had his triple bypass.  He had
4  seven angioplasties.  He had a knee replacement.  He
5  had ankle surgery.  He had his fingers cut, and they
6  replaced them.
7        MS. BENEDETTO:  I'm sorry.  I'm just
8  clarifying the time frame.  Is this all after he went
9  on Medicare?
10       THE WITNESS:  No.
11       BY MS. PRINZO:
12   Q.   What did he have after he went on Medicare?
13   A.   Insulin, Glucophage.
14   Q.   No.  I'm sorry.  With regard to surgeries?
15   A.   Oh, surgeries.  Well, the angioplasties.
16  He had -- I can't -- the dilation of the throat, and
17  I can't think of the name.
18   Q.   Tracheotomy?
19   A.   No, no.  I can't -- endo something.
20   Q.   That's fine if you can't remember.
21   A.   I can't think of any more right now.
22   Q.   And that's fine.  What medical services did
0045
1  AARP pay on your husband's behalf, to the best of
2  your recollection?
3    A.   They normally picked up what Medicare
4  wouldn't pay.
5    Q.   So it would be the same list that you had
6  just talked about?
7    A.   Yes.
8    Q.   And the same for the drugs that AARP paid
9  on your husband's behalf?
10   A.   They paid 50 percent of the drugs.
11   Q.   Do you know who determines how much of your
12  husband's medical expenses Medicare covered?

13      MS. BENEDETTO: Objection to the form. But
14  you can answer.
15      THE WITNESS: No, I don't know who
16  determines that.
17      BY MS. PRINZO:
18   Q.   What about who determines how much of your
19  medical expenses AARP covers?
20      MS. BENEDETTO: Objection to the form. But
21  you can answer.
22      THE WITNESS: I don't know. I suppose they
0046
1  have a chart. I don't know.
2      BY MS. PRINZO:
3   Q.   Throughout the deposition, I'm going to use
4  the term provider, and when I use that term, it's
5  going to be a shorthand for doctor, nurse or clinic,
6  basically, anyone who provides medical services.
7      Do you know whether every medical provider
8  charges the same amount for services?
9   A.   I don't know.
10   Q.   Do you know whether different providers and
11  different insurance companies charge or reimburse
12  different amounts for the same medication?
13   A.   I don't know.
14   Q.   Do you know how medical service providers
15  determine the amount they're going to charge for
16  services?
17   A.   No.
18   Q.   No, you don't know?
19   A.   I don't know.
20   Q.   Do you know how medical service providers
21  determine the amount they're going to charge for
22  prescription medication?
0047
1   A.   Something about the Red Book in that
2  Complaint. Is that what you mean?
3   Q.   What do you mean by the Red Book?
4   A.   Well, from reading that.
5   Q.   And by that, you're referring to the
6  Complaint?
7   A.   The Complaint. I understood that the
8  pharmaceuticals arrive at a figure and put it in the
9  Red Book.
10   Q.   And when you say the pharmaceuticals,
11  you're saying the pharmaceutical manufacturers?
12   A.   Yes.
13   Q.   Is your only basis for that understanding
14  what you read in the Complaint?
15   A.   Yes.
16      MS. BENEDETTO: Object to the extent that
17  that would require you to divulge attorney/client
18  communications.
19      BY MS. PRINZO:
20   Q.   Do you know how drug prices are determined?

21   A.   No.
22   Q.   Are you familiar with the term average
0048
1   wholesale price?
2   A.   Just a little bit (indicating).
3   Q.   And when you're pointing, you're referring
4   to the Complaint?
5   A.   Uh-huh.
6       MS. BENEDETTO:  You have to say yes.  She
7   can't take down --
8       THE WITNESS:  Okay.
9       MS. BENEDETTO:  -- uh-huh.  So you have to
10   say yes or no.  So is that a yes?
11       THE WITNESS:  Yes.
12       BY MS. PRINZO:
13   Q.   What is your understanding of the average
14   wholesale price?
15   A.   My understanding is that it's what the
16   pharmaceutical companies arrive at the price, and
17   they put it in that Red Book.
18   Q.   And is the basis for this understanding
19   what you read in the Complaint?
20   A.   Yes.
21   Q.   Did you ever hear of the term average
22   wholesale price, prior to reading the Complaint?
0049
1   A.   No.
2   Q.   How is AWP calculated?
3   A.   Pardon me?
4   Q.   How is average wholesale price calculated?
5   A.   I don't know.
6   Q.   Do you know what the average wholesale
7   price was at any time for any drug taken by
8   Mr. Newell?
9   A.   No.
10   Q.   Is AWP -- and I'll use that for now as
11   shorthand for average wholesale price -- is that
12   related to the claims you've made in this litigation?
13   A.   No.
14   Q.   What are the claims that you're making?
15   A.   I'm hoping to represent some of the other
16   people who have been overcharged for their drugs.
17       MS. BENEDETTO:  Listen to the question.
18       THE WITNESS:  Okay.
19       BY MS. PRINZO:
20   Q.   Do you believe that Mr. Newell was
21   overcharged for his drugs?
22   A.   Yes.
0050
1   Q.   And what do you mean by overcharged?
2   A.   Well, I think his Lupron, he was
3   overcharged for that.
4   Q.   Why do you say that?
5       MS. BENEDETTO:  And when you answer this

6  question, I just want to direct you not to divulge
7  any attorney/client privileged communications with
8  respect to that.
9        THE WITNESS:  I know that we had to finally
10  get Canadian drugs to be able to pay for his
11  medication.
12        BY MS. PRINZO:
13    Q.   So when you say overcharged, does that mean
14  too expensive?
15    A.   Yes.
16    Q.   Do you know if the AARP deductible was in
17  any way related to AWP?
18    A.   I don't know.
19    Q.   Do you have any reason to believe that it
20  was?
21    A.   I don't know.
22    Q.   Are you familiar with the term wholesale
0051
1  acquisition cost?
2    A.   No.
3    Q.   Do you believe that a large amount of the
4  cost of a drug goes into research and development?
5        MS. BENEDETTO:  Objection to the form.  But
6  you can answer the question.
7        THE WITNESS:  I don't know.
8        BY MS. PRINZO:
9    Q.   Do you understand what I mean by research
10  and development?
11    A.   Yes.
12    Q.   When did you first learn about this
13  lawsuit?
14    A.   In the summer sometime.
15    Q.   How did you first learn about the lawsuit?
16        MS. BENEDETTO:  I just want to direct you,
17  in answering this question, not to divulge
18  attorney/client privileged information and
19  communications.
20        In fact, I'm going to direct you not to
21  answer this question.  I think it does -- it's
22  attorney/client information.
0052
1        BY MS. PRINZO:
2    Q.   Well, let me ask it so that it can require
3  a yes or no answer.  I don't want you to reveal any
4  attorney/client communications, but I would like to
5  learn a little about how you first learned about the
6  suit.
7        Did you hear about the suit through
8  correspondence with your attorney?  You can just
9  answer yes or no.
10    A.   No.
11    Q.   No?
12        MS. BENEDETTO:  You've answered yes or no.
13  That's fine.  There's no pending question.

14        THE WITNESS:  Okay.
15        BY MS. PRINZO:
16    Q.   But Mrs. Newell, it seems as if you're not
17   too sure if that's the correct answer.
18    A.   Can I ask are you talking about the Lupron
19   or the other medications?
20    Q.   Why don't we take them in two steps.
21         First, I want to learn a little bit more
22   about how you learned about this suit.  By that, I
0053
1   mean this Complaint that we were talking about.
2    A.   I read about them.
3    Q.   Where do you read about them?
4    A.   Newspaper, magazines, the AARP magazine.
5    Q.   So you've read about the AWP case in the
6   newspaper?
7    A.   Yes.
8    Q.   Do you know which newspaper?
9    A.   Probably the Charlotte Observer.
10    Q.   Did you do anything after reading about the
11   suit in the newspaper?
12    A.   Not really.  Just got a little angry.
13    Q.   Did you contact any attorneys at that
14   point?
15    A.   I don't remember how I got into that.  I'll
16   say no.
17    Q.   Did there come any point in time that you
18   contacted any attorneys about this case?
19    A.   I don't think so.
20    Q.   Did you call anyone to become a class
21   representative for this case?
22    A.   No.
0054
1    Q.   Did anybody call you to become a class
2   representative?
3        MS. BENEDETTO:  And at this point, I'm
4   going to object and direct the witness not to answer
5   to the extent that that would implicate an
6   attorney/client privileged communication.  So I'm
7   going to direct you not to answer.
8        BY MS. PRINZO:
9    Q.   If you could just answer yes or no.  I
10   don't think that we -- can you read that back.
11         (The question referred to was
12          thereupon read by the reporter as
13          above recorded.)
14        MS. BENEDETTO:  Yes, I believe that does
15   invade the attorney/client privilege.  So I'm going
16   to instruct the witness not to answer.
17        MS. ELLISON:  Just to clarify.  We're not
18   asking about the substance of the conversation, but
19   whether or not you contacted --
20        MS. BENEDETTO:  The question in and of
21   itself implicates an attorney/client relationship,

22  asking whether someone was called to become a

0055

1   representative.  So I'm going to instruct the witness

2   not to answer the question.

3        MS. PRINZO:  I agree.  We don't want to ask

4   any of the substance, but I think that we have a

5   right to learn about how Mrs. Newell became part of

6   this suit.

7        MS. BENEDETTO:  Well, I'm directing the

8   witness not to answer that particular question.  If

9   you want to try a different question, I'll evaluate

10  that.

11        MS. PRINZO:  Could you read back the

12  question, please.

13             (The question referred to was

14             thereupon read by the reporter as

15             above recorded.)

16        MS. BENEDETTO:  And I'm going to stand by

17  my instruction.

18        BY MS. PRINZO:

19   Q.   Mrs. Newell, earlier in the deposition, you

20  had said that your husband had contacted Bill

21  Molinari from Kline & Specter with regard to the

22  Lupron case?

0056

1    A.   I believe so.

2    Q.   What is your basis for that belief?

3    A.   I never did it.  So he must have.

4    Q.   Did your husband ever tell you that he

5   contacted Mr. Molinari?

6    A.   He mentioned something about the Lupron.

7    Q.   And what did he mention?

8    A.   That there was to be a lawsuit.  Normally,

9   he took care of those things.

10   Q.   Did your husband tell you his involvement

11  with regard to the Lupron matter?

12   A.   No.

13   Q.   Do you know if he had any involvement with

14  regard to the Lupron matter?

15   A.   I'm not sure.

16   Q.   Did your husband ever receive any

17  settlement money with regard to the Lupron matter?

18        MS. BENEDETTO:  And you can answer that yes

19  or no.

20        THE WITNESS:  No.

21        BY MS. PRINZO:

22   Q.   Was your husband hoping to receive

0057

1   settlement money from the Lupron matter?

2    A.   I don't know.

3    Q.   Do you know if he was a class plaintiff for

4   the Lupron matter?

5    A.   I don't believe so.

6    Q.   What makes you say that?

7     A.   I think I would have known.
8     Q.   Do you know if your husband was ever
9  deposed in the Lupron matter?
10     A.   No, he never was.
11     Q.   Is your involvement in this case related to
12  the Lupron matter?
13     A.   I beg your pardon?
14     Q.   Is your involvement in this case related to
15  the Lupron matter?
16        MS. BENEDETTO:  And I'll allow you to
17  answer that yes or no.
18        THE WITNESS:  Would you ask that again?
19        BY MS. PRINZO:
20     Q.   Is your involvement in this case related to
21  the Lupron matter?
22     A.   No.
0058
1        MS. BENEDETTO:  If you just want me to
2  shortchange.  The Newells have been a client of Kline
3  & Specter since 2003.  So I don't know if that
4  shortchanges the issue.
5        MS. KAWATRA:  I'm sorry.  Could you
6  actually repeat that?  I didn't hear it.
7        MS. BENEDETTO:  Can you read it back.
8           (The objection referred to was
9            thereupon read by the reporter as
10            above recorded.)
11        BY MS. PRINZO:
12     Q.   Did the Lupron matter that you were
13  speaking of involve drug pricing?
14     A.   Yes, I believe so.
15     Q.   Mrs. Newell, who are the Defendants in this
16  action?  Who are the Defendants in this action?
17     A.   I'm not sure.  I'm not sure.
18     Q.   Are you asserting any claims against your
19  husband's doctors?
20     A.   Pardon me?
21     Q.   Are you asserting any claims against your
22  husband's doctors?
0059
1     A.   No.
2     Q.   How did you first become aware that you had
3  a claim against the Defendants in this lawsuit?
4        MS. BENEDETTO:  I'm going to object and
5  direct the witness not to answer that.  It implicates
6  attorney/client privileged communications.
7        BY MS. PRINZO:
8     Q.   Aside from any communication you've had
9  with your attorneys, were you aware of any claims
10  against the Defendants in this action?
11        MS. BENEDETTO:  And that's a yes or no.
12        THE WITNESS:  No.
13        BY MS. PRINZO:
14     Q.   When did you decide to become part of this

15  lawsuit?
16      A.   A couple of months ago, I think.
17      Q.   And that would have been in the summer?
18      A.   Yes, probably.
19      Q.   What is a class action?
20      A.   It's a few going to bat for a group of
21  people.
22      Q.   What is the class that you purport to
0060
1  represent?
2      A.   Pardon me?
3      Q.   What class do you want to represent?
4      A.   The people who have been overcharged for
5  their meds.
6      Q.   And again, by overcharged, you're referring
7  to the fact that they're expensive?
8      A.   Yes.
9      Q.   In your last answer, you said the people
10  that have been overcharged.  Does that include only
11  residents of North Carolina?
12      A.   Oh, I don't think so.
13      Q.   Does it include people throughout the
14  United States?
15      A.   Yes.
16      Q.   What prescriptions do you believe that your
17  husband was overcharged for?
18          MS. BENEDETTO:  Objection.  Asked and
19  answered, I believe, but you can answer it again.
20          THE WITNESS:  I think the chemo, the
21  Taxotere, the Zoladex, the Lupron, Procrit.
22          BY MS. PRINZO:
0061
1      Q.   Anything else that you can think of?
2      A.   I can't think of anything right now.
3      Q.   Does the class you represent include
4  insurance companies?
5      A.   Pardon me?
6      Q.   Does the class you represent include
7  insurance companies?
8      A.   I don't know.
9      Q.   Does it include people without insurance?
10      A.   I don't know.
11      Q.   Does it include the government?
12      A.   I don't know.
13      Q.   What do you understand the responsibilities
14  of a class representative to be?
15      A.   To try to compile records and present the
16  original charges.
17      Q.   Do you think that your situation and that
18  of your husband's differs from someone who doesn't
19  have insurance?
20      A.   No.
21      Q.   Why is that?
22      A.   Well, everyone who needs a medication, they

0062
1  find -- they all pay the same thing, same prices.  Is
2  that what you mean?
3     Q.   What I'm asking is whether, as a class
4  representative, someone who had supplemental
5  insurance, whether your situation is similar to
6  someone who didn't have insurance?
7     A.   I think it is -- was.
8     Q.   Do you believe that someone who didn't have
9  insurance paid the same amount for drugs --
10    A.   I do.
11    Q.   -- as you and your husband?
12    A.   I do.
13    Q.   What is your basis for that understanding?
14    A.   I don't have a basis.  I just assume that
15  everyone had to pay the high price.
16    Q.   Do you expect to be compensated for
17  services as a class representative?
18    A.   No.
19    Q.   Who are the attorneys who represent you in
20  this action?
21    A.   The Kline Specter.
22    Q.   How did you come into contact with them?
0063
1        MS. BENEDETTO:  I'm going to object to
2  asked and answered.  But I'll let you answer it
3  again.
4        THE WITNESS:  I'm not sure if I read about
5  it or what.
6        BY MS. PRINZO:
7     Q.   Do you think it was through a newspaper ad?
8     A.   I think so.  There again, my husband
9  initiated it.
10    Q.   Did you call them after reading about the
11  AWP --
12    A.   No.
13    Q.   -- litigation?
14        Did you contact your husband's doctors to
15  get their view as to whether you should be part of
16  this suit?
17    A.   No.
18    Q.   Do you have a retention agreement with the
19  attorneys in this case?
20    A.   No.
21        MS. BENEDETTO:  Do you understand what that
22  means?
0064
1        THE WITNESS:  No.
2        BY MS. PRINZO:
3     Q.   Do you have any sort of contractual
4  relationship with the attorneys in this case?
5     A.   No, I don't think so.  I don't think so.
6  No, if I understand it correctly, no.
7     Q.   Were you asked to look for documents for

8  this matter?
9      MS. BENEDETTO:  And you can answer that yes
10 or no.
11     THE WITNESS:  Yes.
12     BY MS. PRINZO:
13 Q.  Which documents did you look for?
14 A.  The medications, the slips from the
15 pharmacy.
16 Q.  The receipts?
17 A.  Yes, the receipts.
18 Q.  Anything else?
19 A.  No.
20 Q.  Did you look for your policies with AARP?
21 A.  No.
22 Q.  Did you look for Medicare publications?
0065
1      MS. BENEDETTO:  Objection to the form.  You
2  can answer.
3      THE WITNESS:  I suppose I did.  I mean,
4  they send you one every year, a new one, and you read
5  through them.  I don't know that I looked for it.
6      BY MS. PRINZO:
7  Q.  Mrs. Newell, if you can flip through to
8  Page 299 of the Complaint, and if you can look from
9  Page 299 and to 303, and if you can tell me if you
10 know any of the lawyers listed on those pages?
11 A.  No.  I think that name Haviland, I think
12 I've heard you speak of that.
13     MS. BENEDETTO:  I don't want you to talk
14 about anything that I've spoken of.
15     THE WITNESS:  No.  I mean that's the only
16 name that -- but I haven't had any contact with them.
17     BY MS. PRINZO:
18 Q.  So far, that's the only name, Donald
19 Haviland, that you recognize on these pages?
20 A.  Yes.
21 Q.  Take your time to go through the rest.
22 A.  No.
0066
1  Q.  Are you finished?
2  A.  Uh-huh.
3  Q.  So beside Donald Haviland of Kline &
4  Specter, there's no other attorneys on these pages
5  that you recognize?
6  A.  I didn't recognize any.  I don't think so.
7  No.
8  Q.  Are your lawyers being paid?
9  A.  I don't know.
10 Q.  Are you paying your lawyers?
11 A.  No.
12 Q.  Was Mr. Newell diagnosed with prostate
13 cancer?
14 A.  Yes.
15 Q.  When was that?

16    A.   In '88.
17    Q.   And that's when you lived back in Ohio?
18    A.   No.  I'm wrong.  It was '98.
19    Q.   Who made this diagnosis?
20    A.   Let me think.  Doctor Gajewski,
21  G-A-J-E-W-S-K-I.
22    Q.   Is Doctor Gajewski affiliated with a
0067
1  particular clinic?
2    A.   He is.  I think it's Lake Norman --
3  University Urology.  I'm not real sure.  He's the
4  urologist, and I'm not sure what the --
5    Q.   It's at Lake Norman, though?
6    A.   No.  He's with University.  I can't think
7  of what it was.
8    Q.   Was he Mr. Newell's primary doctor?
9    A.   No.
10    Q.   He's a urologist?
11    A.   Yes.
12    Q.   How did it come about that Mr. Newell
13  sought the advice of a urologist?
14    A.   He was referred by Doctor Kerecman.
15    Q.   How do you spell that doctor's name?
16    A.   K-E-R-E-C-M-A-N.
17    Q.   Is that --
18    A.   He's our primary doctor.
19         MS. BENEDETTO:  I know it's sometimes easy
20  to anticipate the tail end of her question, but if
21  you let her finish, that way, it will be clear, and
22  the court reporter can get it down.
0068
1         BY MS. PRINZO:
2    Q.   So that I understand.  Doctor Kerecman is
3  the primary doctor?
4    A.   Yes.
5    Q.   And he referred your husband to Doctor
6  Gajewski, the urologist?
7    A.   Gajewski.
8    Q.   Gajewski?  I'm sorry.
9    A.   Yes.  Yes.
10    Q.   I'll try not to mispronounce it again, but
11  I can't promise that I won't.
12    A.   Just call him Doctor G.  That's what we do.
13    Q.   So your husband first saw Doctor Gajewski
14  in 1998?
15    A.   I think so.
16    Q.   Did your husband see any other urologists?
17    A.   Only at the very end.
18    Q.   Who was that?
19    A.   I knew you'd ask me, and I can't think of
20  his name.
21    Q.   Let me say some names and see if any of
22  that refreshes your memory.  Doctor Ensor?
0069

1   A.   No.
2   Q.   Doctor Vick?
3   A.   No.
4   Q.   Doctor Eagle?
5   A.   No.
6   Q.   Doctor Mitchell, Bill Mitchell?
7   A.   He was on call.  No, that wasn't the
8  urologist.
9   Q.   And if, throughout the deposition, the name
10  of the other doctor, you remember it, please just let
11  me know.
12   A.   He just was on the case when Bill could no
13  longer go to Doctor Gajewski.  He came to the
14  hospital to see him.  It was very brief.  I can't
15  think of his name.
16   Q.   And that's fine.  You said Doctor Gajewski
17  is affiliated with the University?
18   A.   Yes.
19   Q.   Where, again, is that located?
20   A.   It's Harris Boulevard, that University
21  Hospital here in Charlotte.
22   Q.   Beside Doctor Gajewski and this other
0070
1  doctor whose name you just can't remember at this
2  point, are there any other doctors who treated your
3  husband for prostate cancer?
4   A.   No.
5   Q.   Did your husband talk with these doctors
6  about possible treatment for prostate cancer?
7       MS. BENEDETTO:  Objection to the form.  But
8  you can answer it.
9       THE WITNESS:  Yes.
10       BY MS. PRINZO:
11   Q.   What was he told?
12       MS. BENEDETTO:  Objection to the form.  But
13  you can answer.
14       THE WITNESS:  Well, surgery was out,
15  because of his health condition.  So they opted to
16  use the Lupron every three months.
17       BY MS. PRINZO:
18   Q.   Do you know why he used Lupron?
19   A.   No.
20   Q.   Do you know if he started using Zoladex
21  first?
22   A.   No.  Lupron first.  Then Zoladex.
0071
1   Q.   Why was there a switch?
2   A.   The PSA kept going up higher, and he
3  thought if he changed medication, it might be more
4  effective.
5   Q.   And was it?
6   A.   For a short time.
7   Q.   Beside providing either Lupron or Zoladex,
8  did your husband consider any alternative treatments?

9    A.   No.
10    Q.   What is your view of your husband's
11  doctors?
12    A.   Pardon me?
13    Q.   What is your view of your husband's
14  doctors?
15        MS. BENEDETTO:  Objection to the form.  You
16  can answer.
17        THE WITNESS:  We were satisfied with them.
18        BY MS. PRINZO:
19    Q.   Do you believe they had your husband's best
20  interests in mind?
21    A.   We hoped so.
22        MS. BENEDETTO:  Objection to the form.
0072
1        BY MS. PRINZO:
2    Q.   Do you believe that your husband's doctors
3  prescribed him medication based on how much money
4  they would make?
5    A.   I don't know.
6    Q.   Are you suing any of your husband's doctors
7  in this case?
8    A.   No.
9    Q.   When it comes to the trial of this case,
10  are you willing to travel to Massachusetts?
11    A.   No.
12    Q.   When it comes to the trial of this case,
13  are you planning to assert that your husband's
14  doctors conspired with drug manufacturers?
15        MS. BENEDETTO:  Objection to the form.  But
16  you can answer.
17        THE WITNESS:  No.
18        BY MS. PRINZO:
19    Q.   Do you know when your husband was
20  prescribed Zoladex for his cancer treatment?
21    A.   I don't remember.
22    Q.   It would have been sometime after 1998,
0073
1  when he was diagnosed?
2    A.   Yes.
3    Q.   Do you know how often his physician
4  administered Zoladex?
5    A.   I'm not certain, but it was probably a six
6  to nine month period.  He got the shot every three
7  months, and it wasn't very long that they decided
8  that it was not working any better.
9        MS. BENEDETTO:  Okay.  Just answer the
10  question that she's asked.
11        THE WITNESS:  Okay.
12        BY MS. PRINZO:
13    Q.   Just so the Record is clear.  You had said
14  that he started out with Lupron and then switched to
15  Zoladex, I believe.  Is it the other way around?
16    A.   No.  Lupron first, I thought, was my

17   understanding.
18          MS. PRINZO:  If we could just go off the
19   Record for one moment.
20              (Thereupon, a brief recess was taken,
21              after which the following proceedings
22              were had:)
0074
1          BY MS. PRINZO:
2     Q.   Mrs. Newell, before we broke for lunch, we
3   were talking about your husband's prescription of
4   Zoladex.  Who administered the Zoladex injections?
5     A.   Doctor Gajewski.
6     Q.   Did he do it himself or a nurse?
7     A.   No.  He had to mix the drug, is what I
8   understand.  Sometimes the nurse did it.
9     Q.   What dosage of Zoladex did he receive, what
10   dosage?
11    A.   I don't know.
12    Q.   Was it one month or three months?
13    A.   Three months.
14    Q.   And you said you believed that your husband
15   was on Zoladex for about a six to nine month period?
16    A.   I really don't know.  I'm just guessing at
17   that.
18    Q.   Do you know, approximately, when he stopped
19   receiving Zoladex?
20    A.   No.
21    Q.   Do you know how much the Zoladex cost?
22    A.   I have no idea.
0075
1     Q.   Do you know if your husband conducted any
2   research into the cost of Zoladex?
3          MS. BENEDETTO:  Objection to the form.  But
4   you can answer.
5          THE WITNESS:  No, I --
6          BY MS. PRINZO:
7     Q.   No, you don't know or no --
8     A.   I don't think he did.
9     Q.   Did your husband discuss the cost of
10   Zoladex with any of his doctors?
11    A.   No.
12    Q.   Did your husband know how much his provider
13   charged for Zoladex?
14          MS. BENEDETTO:  Objection to the form.  But
15   you can answer.
16          THE WITNESS:  It seems it was listed on the
17   copy of the bill that we would get.
18          BY MS. PRINZO:
19    Q.   Do you have copies of those bills?
20    A.   Probably.
21          MS. PRINZO:  And I would request that any
22   bills that weren't produced be produced.
0076
1          MS. BENEDETTO:  We'll take that under

2    advisement.
3          BY MS. PRINZO:
4     Q.    Did Mr. Newell know how his provider
5    determined the price for Zoladex?
6     A.    No.
7     Q.    Did any Defendant prevent your husband from
8    inquiring from his doctors the cost of Zoladex?
9     A.    No.
10    Q.    Did Mr. Newell ever ask his doctors if
11   there was a drug that was less expensive than
12   Zoladex?
13    A.    I believe he did.
14    Q.    Who did he ask?
15    A.    Doctor Gajewski.
16    Q.    Do you know what Doctor Gajewski told him?
17    A.    No, I don't.
18    Q.    What makes you believe that he inquired
19   about the cost of Zoladex?
20    A.    We always worried that maybe our maximum
21   would be reached, and they would cut us off or
22   something, Medicare.
0077
1     Q.    What was the maximum that you were allowed
2    to bill to Medicare?
3     A.    I don't know what Medicare was.  AARP was
4    3,000.
5     Q.    And what do you mean by 3,000?
6     A.    When his medications would reach 3,000,
7    then it was one hundred percent out of our pocket.
8     Q.    Before, you had stated that AARP paid for
9    50 percent of your medications.
10    A.    Yes.
11    Q.    It's my understanding that under the AARP
12   policy that you had, that they paid for all of the
13   medications.
14    A.    Oh, no, 50 percent.
15          MS. BENEDETTO:  Objection to the form.
16          BY MS. PRINZO:
17    Q.    Are you absolutely positive about that?
18    A.    Oh, I'm pretty sure.
19    Q.    Are you one hundred percent certain that
20   they paid for 50 percent of the medications?
21          MS. BENEDETTO:  Objection to the form.
22   Argumentative.  You can answer it.
0078
1          THE WITNESS:  I'm not absolutely sure.
2          BY MS. PRINZO:
3     Q.    Did your husband ever discuss the cost of
4    Zoladex with AARP?
5     A.    I don't know.
6     Q.    Do you know if any Defendant prevented him
7    from doing this?
8     A.    No.
9     Q.    No, they didn't?

10   A.   No, they didn't, to my knowledge.
11       MS. PRINZO:  If you could mark that Exhibit
12  Newell 002, please.
13           (The document referred to was
14           thereupon marked Exhibit Newell 002
15           identification.)
16       BY MS. PRINZO:
17   Q.   I'm going to take the Complaint away from
18  you and put in front of you what has been marked as
19  Exhibit Newell 002.
20       Do you recognize this document,
21  Mrs. Newell?
22   A.   No.

0079
1        MS. BENEDETTO:  You have to speak up.
2        THE WITNESS:  No.
3        BY MS. PRINZO:
4    Q.   Did you provide this document to your
5   attorneys?
6    A.   No, not to my -- I never saw it.
7    Q.   Have you ever seen this document before?
8    A.   No.
9    Q.   If you look to the first page -- and I'm
10  going to refer to at the bottom what's called a bates
11  number where you see Newell 23.
12       On that page, if you look all the way to
13  the top, it says Urology Specialists.
14       Do you know if this is a bill from Urology
15  Specialists?
16   A.   I never saw a document like this.
17   Q.   In looking through it now, do you believe
18  it's a bill from Urology Specialists?
19   A.   Probably.
20   Q.   Can you tell me, again, who your husband's
21  doctors were at Urology Specialists?
22   A.   Doctor Gajewski.

0080
1    Q.   Anyone else?
2    A.   No.
3    Q.   There are a couple of doctors referenced in
4   this document.  I just want to run through them and
5   see if you have any familiarity with them.
6        Doctor Ensor, E-N-S-O-R?
7    A.   He was at the hospital.
8    Q.   Was he one of your husband's doctors?
9    A.   I think he -- yes.
10   Q.   Was he a urologist?
11   A.   Yes.  Sometimes he filled in when Doctor
12  Gajewski was unavailable.  He would be on call.
13   Q.   Do you recall how many times,
14  approximately, he met with your husband?
15   A.   No.
16   Q.   Doctor Kerecman is referenced on this
17  document.  Is that who you referred to as your primary

18  physician?
19      A.   Yes.
20      Q.   And your husband's primary physician?
21      A.   Yes.
22      Q.   Doctor Vick, V-I-C-K, are you familiar with
0081
1   that name?
2       A.   No.  I've heard the name, and it may have
3   been someone at the hospital.  I'm not familiar with
4   him.
5       Q.   If you can turn now to what's marked as
6   Newell 24, which is the second page in.  If you look
7   approximately four lines up from the bottom of the
8   document, it says the word goserelin; do you see
9   that?
10      A.   I see it.
11      Q.   That's another word for Zoladex.
12      A.   I wasn't aware of that.
13      Q.   Nor should you be expected to.  By looking
14  at these records, do you know if it states how much
15  your husband personally paid for Zoladex?
16          MS. BENEDETTO:  I'm going to object just
17  based on the fact that the witness has testified that
18  she hasn't seen the document before and based on the
19  fact that the document speaks for itself.  But you
20  can answer the question, if you can.
21          THE WITNESS:  I wasn't aware.
22          BY MS. PRINZO:
0082
1       Q.   So you don't know if the document shows how
2   much he personally paid?
3       A.   No, I don't.
4       Q.   On the same page, six lines up from the
5   bottom, there's a series of numbers starting with
6   1644.00, 924.43; do you see those?
7       A.   Yes.
8       Q.   Do you know what any of those numbers refer
9   to?
10      A.   No.
11      Q.   Did your husband know if his doctors were
12  paying the same amount for Zoladex as they were
13  billing him and his insurance company?
14          MS. BENEDETTO:  Objection to the form.  You
15  can answer the question.
16          THE WITNESS:  No.
17          BY MS. PRINZO:
18      Q.   No, he did not know?
19      A.   He did not know.
20      Q.   Did your husband know if the clinic was
21  charging his insurance company the same amount as it
22  paid for Zoladex?
0083
1           MS. BENEDETTO:  Objection to the form.  You
2   can answer.

3      THE WITNESS:  No.
4      BY MS. PRINZO:
5      Q.   No, he did not know?
6      A.   He did not know.
7      Q.   Do you believe your husband's doctors
8  overcharged him for Zoladex?
9      A.   I don't know.
10     Q.   Is that one of the claims that you're
11  asserting in this case, is that your husband's
12  doctors overcharged him for Zoladex?
13     A.   That was one of several medicines.  So I
14  can't pinpoint that that's one of the claims.
15     Q.   Who are you claiming overcharged your
16  husband?
17     A.   The Procrit.
18     Q.   Not the medicines.  Who?
19     A.   Pardon me?
20     Q.   Person, the entity?  Who are you claiming
21  overcharged your husband?
22     A.   I guess the pharmaceutical companies.
0084
1      Q.   And what makes you say that?
2      A.   When we got our medicines from Canada, they
3  were so much cheaper than in the U.S., and I thought
4  that all reverted back to the companies who supplied
5  the medications.
6      Q.   And what made you think that?
7      A.   I knew that because I compared prices.
8      Q.   Do you think that the doctors overcharged
9  for Zoladex?
10     A.   I don't know.
11     Q.   Do you have any cancelled checks that
12  reflect payments for Zoladex?
13     A.   No.
14     Q.   Do you have any bank statements that
15  reflect purchases of Zoladex?
16     A.   I don't think so.
17     Q.   Did your husband receive his injections for
18  Zoladex in the doctor's office or in the hospital?
19     A.   In the doctor's office, until the very end.
20     Q.   Did your husband prefer to be treated in
21  the doctor's office, as opposed to the hospital?
22     A.   Prefer, did you say?
0085
1      Q.   Yes.
2      A.   In the doctor's office?
3      Q.   Yes.
4      A.   Yes.
5      Q.   Why was that?
6      A.   Well, he was able to go to the doctor's
7  office at that time.
8      Q.   So it was more convenient for him to be
9  treated at the doctor's office, as opposed to the
10  hospital?

11   A.   It was just the way it was.  You went to
12   the doctor's office to receive the treatment.
13   Q.   Before, you said that he preferred being
14   treated in the doctor's office, for injections of
15   Zoladex, over the hospital.  I'm just wondering why
16   that was?
17   A.   There was no choice.  He went to the
18   doctor's office, except when he was confined to the
19   hospital.
20   Q.   If, given a choice between the hospital and
21   a doctor's office, do you know if your husband would
22   prefer one or the other?
0086
1       MS. BENEDETTO:  Objection to the form.  You
2   can answer it.
3       THE WITNESS:  Well, sure.  Who wants to be
4   in the hospital?
5       BY MS. PRINZO:
6   Q.   Before you had mentioned that there was
7   some mixing involved with Zoladex; is that correct?
8   A.   Well, that's my understanding.  They always
9   said they had to have a doctor there before they
10   could give the shot.
11   Q.   Do you know what costs are involved to
12   administer Zoladex?
13   A.   No.
14   Q.   Do you know what costs are involved to
15   store Zoladex?
16   A.   No.
17   Q.   Do you think there's an obligation for the
18   doctor to tell you that the reimbursement received
19   for a drug is not only used to cover the cost of the
20   drug but also to cover other costs, such as
21   administering the drug?
22       MS. BENEDETTO:  Objection to the form.  You
0087
1   can answer it.
2       THE WITNESS:  You said he had an obligation
3   to tell us.  I say no to that.
4       MS. BENEDETTO:  Are you answering the
5   question you think she asked?
6       MS. PRINZO:  Why don't we have the court
7   reporter read back that question, so that way we make
8   sure that you understood it.  I think that you did.
9           (The question referred to was
10           thereupon read by the reporter as
11           above recorded.)
12       THE WITNESS:  No.
13       BY MS. PRINZO:
14   Q.   Do you think there's an obligation by your
15   doctor to tell you if there's a difference between
16   what they're paying for a drug and what they charge
17   for the medicine?
18       MS. BENEDETTO:  Objection to the form.  But

19   you can answer it.
20        THE WITNESS:  No.
21        BY MS. PRINZO:
22    Q.   Do you have any understanding whether for
0088
1   Part B injections, such as Zoladex, the doctor is
2   paying a price to the manufacturer or wholesaler that
3   is lower than the price being charged to Medicare?
4    A.   No.
5    Q.   Okay.  Mrs. Newell, if you'd look, again,
6   at Newell 24 there on the bottom, the second page in.
7   Before I represented that goserelin referred to
8   Zoladex.
9        If you then turn to the next page, Newell
10   25, you will see that the next few lines, if you
11   look, it says 70699.  There, again, it refers to
12   goserelin.  Then if you look down at the next
13   paragraph, do you see that, again, it says goserelin,
14   also; do you see those?
15    A.   Uh-huh.
16    Q.   Then, again, the next line says goserelin?
17    A.   Uh-huh.
18        MS. BENEDETTO:  Paragraph you mean?
19        MS. PRINZO:  Exactly.  Next paragraph.
20        BY MS. PRINZO:
21    Q.   If you look down where it says 4/12/00,
22   that bunch refers to a drug called leuprolide, which
0089
1   I'll represent to you is Lupron.
2        In going through this what I believe to be
3   a billing statement, the next pages continue to refer
4   to Lupron, which seems to suggest that Zoladex was
5   first administered, and then Lupron.
6    A.   Uh-huh.
7    Q.   Could that be correct?
8    A.   It could be.
9    Q.   If you turn back to Newell 24, if you look
10   to the middle of the page where it says goserelin, it
11   seems to say that the price is 1,626.00.
12        If you look back, again, to Newell 25, the
13   second paragraph from the bottom, where it says
14   8/11/00, it refers to Lupron and says that the price
15   is 1,935.00.
16    A.   Uh-huh.
17    Q.   Were you aware that Lupron was more
18   expensive than Zoladex?
19    A.   No.
20        MS. BENEDETTO:  Objection to the form.
21   Objection to the fact that the witness has indicated
22   that she hadn't seen the document before.  The
0090
1   document speaks for itself.  I think you already got
2   your answer in there, though.
3        BY MS. PRINZO:

4     Q.   Mrs. Newell, before you stated that there
5  was a switch from one drug to the other, because your
6  husband's PSA was high; is that correct?
7     A.   Yes.
8     Q.   Was cost a factor in deciding whether your
9  husband would switch to one drug from the next?
10    A.   No.
11          MS. BENEDETTO:  Objection to the form.  But
12  you can answer the question.
13          THE WITNESS:  I'm sorry?
14          BY MS. PRINZO:
15    Q.   Is it correct that your husband did not
16  consider that Lupron was a more expensive drug than
17  Zoladex?
18          MS. BENEDETTO:  Objection to the form.  You
19  can answer.
20          THE WITNESS:  How did you say that?  He
21  didn't object?
22          MS. PRINZO:  Let's have the court reporter
0091
1  read it back, to make sure I get it right.
2               (The question referred to was
3               thereupon read by the reporter as
4               above recorded.)
5          MS. BENEDETTO:  Objection to the form.
6          THE WITNESS:  It's correct that he did not
7  consider.
8          BY MS. PRINZO:
9     Q.   Do you know how many shots of Lupron your
10  husband received?
11    A.   No.
12    Q.   Before, you had stated that Zoladex was in
13  three month dosages.
14         Do you know if Lupron was, also, in the
15  same dosage?  How frequently did your husband receive
16  Lupron?
17    A.   Every three months.
18    Q.   Do you have any understanding of how much
19  your husband personally paid for Lupron?
20    A.   No.
21    Q.   Do you know if your husband had a
22  preference for Zoladex or Lupron?
0092
1     A.   No.
2          MS. BENEDETTO:  To be clear, you don't know
3  or he didn't have a preference?  The question was
4  prefaced do you know.
5          THE WITNESS:  I do not know if he had a
6  preference.
7          BY MS. PRINZO:
8     Q.   Do you know if Lupron is injected
9  differently than Zoladex?
10    A.   No, I don't know.
11    Q.   Before, you had mentioned that one of the

12  drugs that your husband took was Procrit; is that
13  correct?
14     A.   Yes.
15     Q.   Do you know what that drug is used for?
16     A.   Yes.
17     Q.   What is that?
18     A.   He was -- had no energy at all.  The
19  Taxotere -- he just was lifeless, and they thought
20  that would perk him up and help.
21     Q.   Did that help?
22     A.   Yes, for a time.
0093
1      Q.   Do you know, approximately, when he started
2  using Procrit?
3      A.   I would say late 2004 sometime.
4      Q.   Do you know where your husband obtained the
5  Procrit that he used?
6      A.   From the oncologist, when he was receiving
7  chemo.
8      Q.   Did he also receive that as an injection?
9          MS. BENEDETTO:  Objection to the form.
10         THE WITNESS:  I believe -- he had a port.
11  I believe it was injected IV.  No.  I'm wrong.  It
12  was a shot, because they put it under the arm.  It
13  was a shot.
14         BY MS. PRINZO:
15     Q.   Do you know how many shots of Procrit your
16  husband received?
17     A.   No.
18         MS. PRINZO:  Let's mark this as Exhibit
19  Newell 003.
20             (The document referred to was
21             thereupon marked Exhibit Newell 003
22             for Identification.)
0094
1          BY MS. PRINZO:
2      Q.   Mrs. Newell, the court reporter just handed
3  you what has been marked as Exhibit Newell 003.  Do
4  you recognize this document?
5      A.   No.
6      Q.   Have you ever seen this document before?
7      A.   No.
8      Q.   If you look at the top of page Newell 2, it
9  states Lake Norman Hematology.  Was that one of the
10  clinics that your husband went to?
11     A.   Yes.
12     Q.   Does this appear to be a bill --
13         MS. BENEDETTO:  Objection to the form.
14         BY MS. PRINZO:
15     Q.    -- from Lake Norman Hematology?
16         MS. BENEDETTO:  Objection to the form.  You
17  can answer, if you know.
18         THE WITNESS:  I don't know.
19         BY MS. PRINZO:

20    Q.   At the top of Newell 2, it refers to
21  Doctors Eagle and Doctors Mitchell.  Are you familiar
22  with those doctors?
0095
1    A.   Yes.
2    Q.   Who were they?
3    A.   Doctor Eagle is the oncologist.  Doctor
4  Mitchell was the on call -- he would see him in the
5  hospital when Doctor Eagle was not available.
6    Q.   Can you describe for me, in a little bit
7  more detail, when your husband would go to Urology
8  Specialists and when he would go to Lake Norman?
9         MS. BENEDETTO:  Objection to the form.  But
10  you can answer.
11         THE WITNESS:  He would go to the oncologist
12  until he had congestive heart failure or something,
13  and when he was in the hospital for something other
14  than the prostate, then these doctors would see him
15  in the hospital.  He became anemic.  They admitted
16  him for blood.  He had blood transfusions and things
17  like that.
18         MS. PRINZO:  Can you just read back the
19  answer, please.
20             (The answer referred to was thereupon
21             read by the reporter as above
22             recorded.)
0096
1         BY MS. PRINZO:
2    Q.   I think I'm still a little unclear of the
3  two separate entities, Lake Norman Hematology and
4  Urologist Specialists.  So maybe we can start from
5  the beginning.
6         Your husband was diagnosed with prostate
7  cancer, and his primary doctor referred him to a
8  urologist; is that correct?
9    A.   That's correct.
10    Q.   And he went to see Doctor Gajewski, who was
11  his urologist?
12    A.   Yes.
13    Q.   And Doctor Gajewski is affiliated with
14  which entity?
15    A.   University Hospital.
16    Q.   And is that also known as Urology
17  Specialists?
18    A.   Yes.
19    Q.   So if your husband was treated for prostate
20  cancer, he would go to Urology Specialists?
21    A.   Yes.
22    Q.   Would he go to Urology Specialists for
0097
1  anything other than the prostate cancer?
2    A.   No.
3    Q.   And then for Lake Norman Hematology, would
4  he go there for any other problems he had?

5    A.   For his chemotherapy.
6    Q.   Anything else?
7    A.   No.
8    Q.   Did Urology Specialists also do
9  chemotherapy?
10    A.   No.
11    Q.   And that's why there was a need to go to
12  Lake Norman?
13    A.   You mean the Hematology?
14    Q.   Exactly.
15    A.   Yes.
16    Q.   Thank you for clarifying that.
17    A.   It is a part of Lake Norman Hospital.
18    Q.   What is a part?
19    A.   The Oncology Department is connected to the
20  hospital in offices.
21    Q.   Is connected to the Urology Specialists?
22    A.   Yes.
0098
1       MS. BENEDETTO:  Objection to the form.  I'm
2  sorry.
3       THE WITNESS:  Lake Norman Hospital is here,
4  and adjacent to it is the urologist, Lake Norman
5  Urology, Hematology and Urology.
6       BY MS. PRINZO:
7    Q.   Lake Norman Hematology is connected to?
8    A.   Lake Norman Hospital, yes.
9    Q.   And is that a separate entity from Urology
10  Specialists?
11    A.   Yes.
12    Q.   Is it correct that Lake Norman is in
13  Mooresville?
14    A.   Yes.
15    Q.   And where is Urology Specialists located?
16    A.   We would go on Thursday to Huntersville.
17  He was there, from University, on Thursdays, and it
18  was closer for us to go to Huntersville.
19    Q.   And Huntersville is in North Carolina?
20    A.   Yes.
21    Q.   Is Urology Specialists also in Charlotte?
22    A.   Yes.
0099
1    Q.   Would you ever go there?
2    A.   Not when he got -- opened an office in
3  Huntersville.
4    Q.   And Urology Specialists is not affiliated
5  with Lake Norman Oncology?
6    A.   No.
7    Q.   Mrs. Newell, if you turn to what is marked
8  as Newell 0005, if you look eight lines down -- I'm
9  sorry -- eight lines from the bottom, where it says
10  10/12/04 --
11    A.   Uh-huh.
12    Q.   -- and it refers to Procrit?

13    A.   Uh-huh.
14    Q.   It says 10/12/04.  In looking at this bill,
15  there doesn't seem to be another reference to
16  Procrit.  Do you know if this was the first time he
17  received this injection?
18        MS. BENEDETTO:  Objection to the form.
19        THE WITNESS:  I don't know.
20        BY MS. PRINZO:
21    Q.   Does the date seem about right, 10/12/04?
22        MS. BENEDETTO:  Objection to the form.  You
0100
1   can answer.
2         THE WITNESS:  Probably.
3         BY MS. PRINZO:
4     Q.   And what makes you say probably?
5     A.   Well, he started going downhill then.
6     Q.   And at that time is when you're saying his
7   energy wasn't very high?
8     A.   That's right.
9     Q.   Who administered the Procrit injection?
10    A.   One of the nurses in the oncology clinic.
11    Q.   Was it always the same nurse?
12    A.   No.
13    Q.   Do you know if these records reflect how
14  much Medicare paid for the shots of Procrit?
15        MS. BENEDETTO:  Objection to the form.  You
16  can answer.
17        THE WITNESS:  I don't know.
18        BY MS. PRINZO:
19    Q.   Do you know if these records reflect how
20  much AARP paid for the shots of Procrit?
21        MS. BENEDETTO:  Objection to the form.  You
22  can answer, if you know.
0101
1         THE WITNESS:  I don't know.
2         BY MS. PRINZO:
3     Q.   Do you know how much, if anything, your
4   husband personally paid for Procrit?
5     A.   I don't know.
6     Q.   As best as I can tell, from looking at
7   these records, there does not appear to be any
8   charges to your husband for Procrit; do you know if
9   that's correct?
10        MS. BENEDETTO:  Objection to the form.
11        BY MS. PRINZO:
12    Q.   Do you know if the amount your husband
13  paid, if any, for Procrit was based on AWF?
14    A.   I don't know.
15    Q.   Do you have any documents that reflect
16  payments by your husband for Procrit?
17    A.   I can't think of any.
18    Q.   Did your husband know how his doctor
19  arrived at the price for Procrit?
20        MS. BENEDETTO:  Objection to the form.

21      THE WITNESS:  No.
22      BY MS. PRINZO:
0102
 1      Q.   Do you know if any Defendant prevented your
 2  husband from asking his doctor this?
 3      A.   No.
 4          MS. BENEDETTO:  Objection to the form.
 5          THE WITNESS:  No.
 6          BY MS. PRINZO:
 7      Q.   No Defendant prevented your husband?
 8      A.   No.
 9      Q.   Do you know if your husband conducted any
10  research into the cost of Procrit?
11      A.   No.
12      Q.   No, he didn't conduct research?
13      A.   No, not to my knowledge.  He was too sick.
14      Q.   Did your husband discuss the cost of
15  Procrit with AARP?
16      A.   No.
17      Q.   Did any Defendant prevent him from doing
18  this?
19      A.   No.
20      Q.   Mrs. Newell, the Complaint that we spoke
21  about earlier states that one of the drugs your
22  husband took is granisetron; are you familiar with
0103
 1  that drug?
 2      A.   Is there another name for it?  I'm not
 3  familiar with it, no.
 4      Q.   As best as I can tell, from looking through
 5  the two billing records that we've discussed, Exhibit
 6  Newell 002 and Exhibit Newell 003, there's no
 7  reference to granisetron in there.  Do you have any
 8  documents showing that Mr. Newell took granisetron?
 9      A.   No.
10      Q.   Do you know if Mr. Newell purchased
11  granisetron on the basis of AWP?
12      A.   I don't know that.
13      Q.   The Complaint says that Mr. Newell
14  purchased granisetron from GSK Group and
15  Hoffman-LaRoche; how do you know that?
16      A.   I don't know.  I don't know what
17  granisetron is.
18      Q.   Do you know if your husband took a drug by
19  the name of Kytril or Kytril?
20      A.   How do you spell that?
21      Q.   K-Y-T-R-I-L.
22      A.   No, I don't know.
0104
 1      Q.   Is it fair to say that you don't know which
 2  manufacturer made the granisetron your husband
 3  allegedly took?
 4          MS. BENEDETTO:  Objection to the form.  But
 5  you can answer.

6       THE WITNESS:  It's fair to say I don't
7   know.
8       BY MS. PRINZO:
9    Q.   I'm just going to run through a list of the
10  drugs that are mentioned in the Complaint, just like
11  we just did right now.
12       MS. BENEDETTO:  Are you finished with this
13  exhibit?
14       MS. PRINZO:  For now, yes.
15       BY MS. PRINZO:
16    Q.   The Complaint alleges that your husband
17  took sodium chloride; is that correct?
18    A.   I don't know it by that name.
19    Q.   And again, this drug is not referenced in
20  any of the billing statements.  Do you have any
21  documents showing that Mr. Newell took sodium
22  chloride?
0105
1    A.   No.
2    Q.   Do you know whether Mr. Newell purchased
3   sodium chloride on the basis of AWP?
4    A.   No.
5    Q.   No, you don't know?
6    A.   I don't know.
7    Q.   Do you have any reason to believe that he
8   did?
9       MS. BENEDETTO:  Objection to the form.  You
10  can answer.
11       THE WITNESS:  No.
12       BY MS. PRINZO:
13    Q.   Do you have any documents showing that he
14  paid for sodium chloride?
15    A.   I don't think so.
16    Q.   The Complaint says that he purchased sodium
17  chloride from Abbott, Aventis, Baxter, Boehringer,
18  B.Braun, Schering-Plough and Sicor.  How do you know
19  that he purchased sodium chloride from these
20  manufacturers?
21    A.   I don't know.
22    Q.   Do you have any documentation showing he
0106
1   purchased sodium chloride from these manufacturers?
2    A.   I don't think so.
3    Q.   Is it fair to say that you do not know
4   which manufacturer made the sodium chloride your
5   husband allegedly took?
6    A.   It's fair to say that.
7    Q.   The Complaint proposes you as a class
8   representative for a drug manufacturer by the name of
9   Aventis.  Do you know what drugs, if any, were
10  manufactured by Aventis that your husband took?
11    A.   No.
12    Q.   The Complaint also alleges that your
13  husband took a drug by the name of vinorelbine

14   tartrate.  Are you familiar with that drug?
15      A.   No.
16      Q.   This drug is also not referenced in any of
17   the billing statements.  Do you have any documents
18   showing that Mr. Newell took vinorelbine tartrate?
19      A.   No.
20      Q.   Is it fair to say that you do not know
21   whether Mr. Newell purchased vinorelbine tartrate on
22   the basis of AWP?
0107
1      A.   I do not know.
2      Q.   Do you have any documents showing that he
3   paid for vinorelbine tartrate?
4      A.   No.
5      Q.   The Complaint also alleges that your
6   husband took dexamethasone sodium phosphate.  Do you
7   know what that is?
8      A.   No.
9      Q.   Again, this drug isn't referenced in any of
10   the billing statements.  Do you have any documents
11   showing that your husband took this drug?
12      A.   No.
13      Q.   Do you have any documents showing that he
14   purchased this drug on the basis of AWP?
15      A.   No.
16      Q.   Do you have any documents showing that he
17   paid for dexamethasone sodium phosphate?
18      A.   No.
19      Q.   The Complaint alleges that this drug was
20   manufactured by Baxter, Fujisawa, Sicor and Watson.
21   Do you have any documentation showing who he
22   purchased this drug from?
0108
1      A.   No.
2      Q.   Is it fair to say that you do not know
3   which manufacturer made the dexamethasone sodium
4   phosphate that your husband allegedly took?
5      A.   It's fair to say that.
6      MS. PRINZO:  Do you want to take a couple
7   minute break?
8      MS. BENEDETTO:  Yes.
9      MS. PRINZO:  I'm going to go through this
10   list.  So maybe just to take a pause will be helpful.
11            (Thereupon, a brief recess was taken,
12            after which the following proceedings
13            were had:)
14      MS. BENEDETTO:  I just want to say that I
15   believe that Mrs. Newell is a little bit confused
16   respecting -- she didn't know that sodium chloride
17   was, in fact, saline solution.  So I think if you ask
18   her those questions again -- and I believe also
19   reflecting some of the other common names for the
20   drugs she's more familiar with than she is the
21   chemical scientific name for the drugs.

22      BY MS. PRINZO:

0109

1      Q.   Why don't we start with sodium chloride.
2  Is it correct that your husband took sodium chloride,
3  also known as saline?
4      A.   Yes.
5      Q.   Do you know when?
6      A.   When he was taking chemo.
7      Q.   Do you have any documents showing that he
8  took sodium chloride?
9      A.   I probably do.  I spent a good deal of time
10  when I was compiling the list of things he took.  So
11  I probably have that record.  I just am not familiar
12  with the terms you're using.
13          MS. PRINZO:  Those are the terms that are
14  in the Complaint, and that's why I'm using them.  I
15  tried, to the best of my ability, to see what the
16  more common name is for some of these drugs.  Some
17  I've been successful with, for instance, Kytril, I
18  had referenced, but others I just don't know.
19          For the saline, we would request that any
20  documents that Mrs. Newell has regarding her
21  husband's use of this be produced.
22          MS. BENEDETTO:  There is, on Exhibit Newell

0110

1  003.
2          MS. PRINZO:  And in addition to that, we
3  would request any other documents that Mrs. Newell
4  has.
5          MS. BENEDETTO:  We will take that under
6  advisement.
7          BY MS. PRINZO:
8      Q.   What is the basis for your allegation in
9  the Complaint that your husband purchased sodium
10  chloride on the basis of AWP?
11      A.   I thought it was a part of his chemo
12  treatment.
13      Q.   In the Complaint, it references that you
14  believe that he purchased this, in part, on AWP.  Do
15  you know what the basis for that statement is?
16          MS. BENEDETTO:  Objection to the form.  But
17  you can answer it, unless it would involve reveal
18  attorney/client privileged communications.
19          THE WITNESS:  I don't know.
20          BY MS. PRINZO:
21      Q.   Do you know which manufacturer made the
22  sodium chloride that your husband used?

0111

1      A.   No.
2      Q.   So you don't know whether it's Abbott,
3  Aventis, Baxter, Boehringer, B.Braun,
4  Schering-Plough, Sicor or any other Defendant?
5      A.   No.
6      Q.   Or any other manufacturer?

7     A.   No.
8     Q.   Do you have any documentation which shows
9   which manufacturer made the sodium chloride that your
10  husband took?
11    A.   I'm not sure if it's on the billings that I
12  compiled.  It could possibly be on there.  I'm not
13  sure.
14    Q.   Sitting here today, you're not aware of the
15  manufacturer who made the sodium chloride that your
16  husband took?
17    A.   No.
18    Q.   The Complaint alleges that your husband
19  took heparin sodium.  Are you familiar with that
20  drug?
21    A.   Heparin is familiar, but I'm not familiar
22  with the other.
0112
1     Q.   What do you know about heparin?
2     A.   I don't know anything about it.
3     Q.   Do you know if that's one of the drugs your
4   husband took?
5     A.   I've heard it referred to.  I would assume,
6   possibly.
7     Q.   What makes you say that you would assume?
8     A.   Because they tried everything with him.
9     Q.   Do you know what heparin is used for?
10    A.   No, I don't even know that.
11    Q.   Is it fair to say that you're not one
12  hundred percent positive whether your husband took
13  heparin?
14        MS. BENEDETTO:  Objection to the form.  But
15  you can answer.
16        THE WITNESS:  I really don't know.
17        BY MS. PRINZO:
18    Q.   As far as I can tell, this drug is not
19  referenced in any of the billing statements that we
20  were provided.  Do you have any documents showing
21  that Mr. Newell took heparin sodium?
22    A.   Under that name, I can't say for sure.
0113
1     Q.   What about under heparin?
2     A.   I really don't know.
3     Q.   Is it fair to say that you do not know
4   whether your husband purchased heparin sodium on the
5   basis of AWP?
6     A.   I don't know.
7     Q.   You don't know whether he purchased it --
8     A.   No.
9     Q.   -- on the basis of AWP?
10    A.   No, I don't know.
11    Q.   Do you know if you have any documents
12  showing that he paid for heparin sodium?
13    A.   I'm not sure.  I don't know.
14    Q.   Do you know which manufacturer he would

15  have purchased the heparin sodium from?
16     A.   No.
17     Q.   So you don't know if it was Abbott, Baxter,
18  B. Braun, Phizer, Pharmacia or any other
19  pharmaceutical manufacturer?
20     A.   No.
21     Q.   Do you know if you have any documentation
22  showing which manufacturer he purchased the heparin
0114
 1  sodium from?
 2     A.   I'm not sure.  I can't say that.  I don't
 3  know.
 4     Q.   So it's fair to say that you don't know
 5  which manufacturer made the heparin sodium that your
 6  husband allegedly took?
 7     A.   It's fair to say.
 8     Q.   Another drug mentioned in the Complaint is
 9  warfarin sodium.  Are you familiar with that drug?
10     A.   Is there another name?
11     Q.   I believe it's also referred to as
12  Coumadin.
13     A.   Yes, I'm familiar with Coumadin.
14     Q.   Do you know what Coumadin is used for?
15     A.   Thinning the blood.
16     Q.   Do you know when your husband took this
17  drug?
18     A.   Several times after the angioplasties.
19     Q.   When would that have been?
20     A.   I can't say for sure without -- there were
21  seven of them.  I can't just -- I don't know the
22  dates.
0115
 1     Q.   Approximately when was the first time that
 2  your husband had an angioplasty?
 3     A.   Probably six years ago.
 4     Q.   So approximately in 1999?
 5     A.   Approximately.
 6     Q.   Do you know if your husband purchased the
 7  Coumadin from the drugstore?
 8     A.   Yes, at times.  If he were in the hospital,
 9  they would furnish it, and then they'd give him a
10  prescription for the druggist.
11     Q.   What drugstore did he obtain the Coumadin
12  from?
13     A.   Probably Wal-Mart.
14     Q.   And is Coumadin administered in pill form?
15     A.   In pardon?
16     Q.   Pill form?
17     A.   Yes.
18     Q.   It's not injected?
19     A.   No.  It could be.  I'm not aware of that.
20     Q.   The billing statements that were produced
21  also do not reference warfarin sodium or Coumadin.
22  Do you have any documents showing that Mr. Newell

0116
1  took warfarin sodium?
2     A.   Yes.
3     Q.   What documents are those?
4     A.   Just my receipts from the prescriptions.
5     Q.   Did you provide those receipts to your
6  attorneys?
7     A.   Yes, I believe so.
8        MS. PRINZO:  And I would ask that those
9  documents be produced.  We don't have any reference
10  to Coumadin being taken by Mr. Newell in the billing
11  statements that were produced.
12        MS. BENEDETTO:  We will take that under
13  advisement.
14        BY MS. PRINZO:
15     Q.   Besides the receipts, do you have any other
16  documentation showing that Mr. Newell took warfarin
17  sodium?
18     A.   I might have some receipts from the
19  hospital.  I can't say for sure, but I could possibly
20  have some.
21        MS. PRINZO:  And we would also request that
22  those documents, to the extent that they reference
0117
1  any of the drugs asserted in the Amended Complaint,
2  be produced.
3        MS. BENEDETTO:  We will also take that
4  under advisement.
5        BY MS. PRINZO:
6     Q.   Is it fair to say that you do not know
7  whether Mr. Newell purchased warfarin sodium on the
8  basis of AWP?
9     A.   It's fair to say that.
10     Q.   The next drug that's referenced in the
11  Complaint is levofloxacin, I believe, also sometimes
12  known as Levaquin.  Are you familiar with that drug?
13     A.   Yes.
14     Q.   What is that drug used for?
15     A.   I forget.
16     Q.   Do you know if it's an antibiotic?
17     A.   It could be.
18     Q.   It's okay if you don't remember.
19     A.   I don't remember.
20     Q.   This drug, also, isn't referenced in any of
21  the billing statements that were produced.  Do you
22  have any documents showing that Mr. Newell took
0118
1  levofloxacin?
2     A.   I might have.  I'm not sure.
3     Q.   What documents do you think you would have?
4     A.   Receipts from a pharmacy.
5        MS. PRINZO:  Again, we would just request
6  that these receipts be produced.
7        MS. BENEDETTO:  We'll take that under

8   advisement.
9       BY MS. PRINZO:
10      Q.   Is it fair to say that you do not know
11  whether Mr. Newell purchased levofloxacin on the
12  basis of AWP?
13      A.   Yes.
14      Q.   Do you know which Defendant manufactured
15  the levofloxacin that your husband allegedly took?
16      A.   No.
17      Q.   So you don't know whether it was Abbott,
18  J&J or another Defendant?
19      A.   No.
20      Q.   So is it fair to say that you don't know
21  which manufacturer made the levofloxacin your husband
22  allegedly took?
0119
1       A.   Yes.
2       Q.   The next drug mentioned is azithromycin, I
3   believed, also referred to as Zithromax.  Are you
4   familiar with that drug?
5       A.   It sounds familiar.
6       Q.   Do you know what it's used for?
7       A.   It could be an antibiotic, but I'm not
8   sure.
9       Q.   Do you know if your husband took
10  azithromycin?
11      A.   He took a lot of medicine, and that may
12  have been one of them.  I'm not sure.
13      Q.   This drug is, also, not referenced in any
14  of the billing statements.  Do you have any documents
15  showing that he took azithromycin?
16      A.   I don't know.
17      Q.   Is it fair to say that you do not know
18  whether he purchased azithromycin on the basis of
19  AWP?
20      A.   Yes.
21      Q.   Do you have any documents showing that he
22  paid for azithromycin?
0120
1       A.   I'm not sure.
2       Q.   The next drug is clindamycin phosphate.
3   Are you familiar with that drug?
4       A.   No.  Is there another name?
5       Q.   Not that I know of.  I believe it's an
6   antibiotic, though.
7       A.   It's possible.  I don't know.  I'm not
8   familiar with the name.
9       Q.   This drug is, also, not referenced in any
10  of the billing statements that were produced.  Do you
11  know if you have any documents showing that Mr.
12  Newell took clindamycin phosphate?
13      A.   I do not know.
14      Q.   Is it fair to say that you don't know
15  whether he purchased clindamycin phosphate on the

16  basis of AWP?
17      A.  No.
18      Q.  Is it fair to say that you don't know which
19  manufacturer made the clindamycin phosphate that your
20  husband allegedly took?
21      A.  Yes.
22      Q.  So you don't know whether it's Abbott,
0121
1  Phizer, Pharmacia or any other manufacturer?
2      A.  No.
3      Q.  The next drug is fentanyl citrate.  Are you
4  familiar with that drug?
5      A.  Is there another name?
6      Q.  I don't know another name, but I believe
7  it's a painkiller.  Does that sound familiar?
8      A.  Fentanyl sounds like a painkiller.  It's
9  very possible he took that.
10      Q.  Do you know for certain whether he took
11  that?
12      A.  I'm not certain.
13      Q.  This drug is, also, not referenced on any
14  of the billing statements that were provided.  Do you
15  know if you have any documents showing that Mr.
16  Newell took fentanyl citrate?
17      A.  I do not know.
18      Q.  Is it fair to say that you do not know
19  whether Mr. Newell purchased fentanyl citrate on the
20  basis of AWP?
21      A.  Yes.
22      Q.  Is it fair to say that you do not know
0122
1  which manufacturer made the fentanyl citrate that
2  your husband allegedly took?
3      A.  Yes.
4      Q.  So you don't know whether it was Abbott,
5  AstraZeneca, Baxter or any other manufacturer?
6      A.  No.
7      Q.  The next drug referenced in the claim is
8  furosemide.
9      A.  Furo -- how do you spell that?
10      Q.  F-U-R-O-S-E-M-I-D-E.  Are you familiar with
11  that drug?
12      A.  Yes.
13      Q.  What is that drug used for?
14      A.  I believe it pertained to the fluid buildup
15  with congestive heart failure, but I could be
16  mistaken, but I believe that's what it was for.
17      Q.  So you believe it's a water pill?
18      A.  I think so, yes.
19      Q.  And that would be to reduce swelling?
20      A.  Yes.
21      Q.  So do you believe that your husband took
22  furosemide?
0123

1    A.   Yes.
2    Q.   This drug is, also, not referenced in any
3  of the billing statements that were provided.  Do you
4  have any documents showing that Mr. Newell took
5  furosemide?
6    A.   Is it F-U --
7    Q.   F-U-R-O --
8    A.   Yes, he did.  I would have reference to
9  that.
10       MS. PRINZO:  Again, we would request that
11  any references to this drug be produced.
12       MS. BENEDETTO:  We will take that under
13  advisement.
14       BY MS. PRINZO:
15    Q.   Is it fair to say that you do not know
16  whether Mr. Newell purchased furosemide on the basis
17  of AWP?
18    A.   Yes.
19    Q.   Is it fair to say you do not know which
20  manufacturer made the furosemide --
21    A.   Yes.
22    Q.   -- that your husband allegedly took?
0124
1    A.   Yes.
2    Q.   So it's fair to say that you do not know
3  whether it's Abbott, Aventis, Baxter or any other
4  manufacturer?
5    A.   Yes.
6       MS. PRINZO:  We're coming close to the end.
7       BY MS. PRINZO:
8    Q.   The next drug is methylprednisolone.  Are
9  you familiar with that drug?
10       MS. BENEDETTO:  Can you pronounce that
11  again?
12       MS. PRINZO:  Sure.  I can spell it, too.
13  M-E-T-H-Y-L-P-R-E-D-N-I-S-O-L-O-N-E.
14       THE WITNESS:  Is there another name?
15       BY MS. PRINZO:
16    Q.   I believe it's sometimes referred to, also,
17  as methylprednisolone, Medrol.
18    A.   I'm not familiar with it.
19    Q.   So you do not know if it's correct whether
20  your husband took that drug?
21    A.   I do not know.
22    Q.   This drug is, also, not referenced in any
0125
1  of the billing statements.  Do you have any documents
2  showing that he took that drug?
3    A.   I don't know.
4    Q.   And is it fair to say that you do not know
5  whether your husband purchased methylprednisolone on
6  the basis of AWP?
7    A.   Yes.
8    Q.   Is it fair to say that you do not know

9   which manufacturer made the methylprednisolone that
10  your husband allegedly took?
11     A.   Yes.
12     Q.   So you don't know whether it's Abbott,
13  Phizer, Pharmacia or any other manufacturer?
14     A.   I do not know.
15     Q.   The next drug is triamcinolone acetonide
16  which, I believe, is also referred to as Nasacort.
17  Are you familiar with that drug?
18     A.   Yes.
19     Q.   How are you familiar with that drug?
20     A.   The pulmonary doctor prescribed that for
21  the fluid buildup around his heart.
22     Q.   Do you know if that was administered in
0126
1   pill form?
2      A.   I believe it was an inhaler type.  They
3   did, in the office, administer it in another way, but
4   we used the inhaler type.
5      Q.   What do you mean by the inhaler type?
6      A.   Just like an asthma type.
7      Q.   So you believe that your husband did take
8   triamcinolone acetonide or Nasacort?
9      A.   Yes.
10     Q.   This drug is, also, not referenced in any
11  of the billing statements provided.  Do you know if
12  you have any documents showing that he took this
13  drug?
14     A.   Possibly.  I'm not sure.
15     Q.   Is it fair to say that you do not know
16  whether your husband purchased this drug on the basis
17  of AWP?
18     A.   Yes.
19     Q.   Do you know if you have any documents
20  showing that he paid for this drug?
21     A.   I'm not sure.
22     Q.   Before, you had mentioned that one of the
0127
1   drugs your husband took was Taxotere; is that
2   correct?
3      A.   Yes.
4      Q.   What is that drug used for?
5      A.   It was for the chemo, the cancer.
6      Q.   Do you know who manufactured the Taxotere
7   that your husband took?
8      A.   No.
9      Q.   Do you know approximately when your husband
10  was prescribed Taxotere?
11     A.   Late last fall, I think.  I'm not sure.
12     Q.   I'm sorry.  You said you believe last fall?
13     A.   Possibly, yes.
14     Q.   Do you know what physician prescribed
15  Taxotere?
16     A.   Doctor Eagle.

17    Q.   Is Doctor Eagle affiliated with Lake Norman
18  Hematology?
19    A.   Yes.
20    Q.   Is Taxotere a drug that was injected?
21    A.   Through the port, in the IV.
22    Q.   Do you know how many times your husband was
0128
1  prescribed Taxotere?
2    A.   No.
3    Q.   Did you go with him when he received his
4  Taxotere injections?
5    A.   Yes.
6    Q.   Who administered the Taxotere?
7    A.   A nurse.
8    Q.   Was it always the same nurse?
9    A.   No.
10    Q.   Do you know what dosage he received?
11    A.   Pardon me?
12    Q.   What dosage?
13    A.   No.
14    Q.   Is it fair to say that you do not know
15  whether your husband purchased the Taxotere based, in
16  whole or part, on AWP?
17    A.   It's fair to say that.
18    Q.   Do you know when he stopped receiving the
19  Taxotere?
20    A.   Late in the spring of 2005.
21    Q.   Did your husband discuss the cost of
22  Taxotere with his doctors?
0129
1    A.   No.
2    Q.   Do you know why he did not discuss the cost
3  of Taxotere with his doctors?
4    A.   At that point, you don't question how much.
5  You do whatever you think will help.
6    Q.   Did your husband know how much his provider
7  charged for Taxotere?
8    A.   I think all we knew was it was expensive.
9  We didn't know the exact amount.
10    Q.   Did your husband know how his provider
11  determined the price for Taxotere?
12    A.   No.
13    Q.   Do you know who manufactured the Taxotere
14  that your husband took?
15    A.   No.
16    Q.   Do you know if any Defendant prevented your
17  husband from inquiring about the cost of Taxotere?
18    A.   No.
19    Q.   Beside any of the drugs that we've already
20  discussed, are there any other drugs that you can
21  think of that you're asserting claims in this case
22  for?
0130
1    A.   They must all be injected, and I can't

2   think of any other.
3      Q.   Did your husband ever discuss the cost of
4   Taxotere with AARP?
5      A.   No.
6      Q.   Did any Defendant prevent him from doing
7   that?
8      A.   No.
9            MS. PRINZO:  I'd like to -- this morning
10  your counsel produced some copies of checks that you
11  had, and I'd just like to run through those for a
12  moment.
13           MS. BENEDETTO:  You want to go off the
14  Record.
15               (Discussion off the record.)
16               (The document referred to was
17               thereupon marked Exhibit Newell 004
18               for Identification.)
19           MS. PRINZO:  Back on the Record.
20           BY MS. PRINZO:
21      Q.   Mrs. Newell, the court reporter has handed
22  you what has been marked as Exhibit Newell 004, which
0131
1   is bates stamped Newell 36.  Do you recognize this
2   document?
3      A.   It's my check.
4      Q.   Do you know why this check was made out to
5   Lake Norman?
6      A.   No, I don't remember.
7      Q.   If you look back on what has been marked
8   Exhibit Newell 003, which are the billing statements
9   for Lake Norman, there's no reference on the billing
10  statement to a receipt of this check.  Do you know
11  why that is?
12      A.   No, I don't.
13      Q.   Who was the doctor --
14           MS. BENEDETTO:  I'm just going to object to
15  the characterization of Exhibit Newell 003 as a
16  billing statement.
17           BY MS. PRINZO:
18      Q.   Who was the doctor that you had referenced
19  earlier that required you to make checks to the
20  clinic rather than to AARP?
21      A.   It was not a clinic.  It was his office.
22  Doctor Kerecman.
0132
1      Q.   And how do you spell his name again?
2      A.   K-E-R-E-C-M-A-N.
3      Q.   And is he affiliated with Lake Norman?
4      A.   No.
5      Q.   Who is he affiliated with?
6      A.   It's his own private practice.
7      Q.   So to the best of your recollection, you do
8   not know what Exhibit Newell 004, the check for 26.75
9   to Lake Norman, was used for?

10   A.   I don't know.
11   Q.   So you don't know whether it was used to
12   pay for any of the drugs --
13   A.   I have no recollection.
14   Q.   -- for which you're asserting claims?
15   A.   I have no recollection.
16   Q.   Did you ever attend any, you personally,
17   any services such as grief counseling at Lake Norman?
18   A.   Myself, yes.
19   Q.   Yes.
20   A.   But I always marked mom on the check.
21   Q.   You always marked?
22   A.   Mom.  It was my charge.
0133
1   Q.   Referring to yourself as mom?
2   A.   Yes.  Yes.
3        MS. BENEDETTO:  Just so we're clear on the
4   Record.  Was that only with respect to grief
5   counseling that you marked mom on a check that
6   pertained to you?
7        THE WITNESS:  Possibly, or if I had to see
8   someone at the hospital for an x-ray or something.
9        MS. BENEDETTO:  Okay.
10        BY MS. PRINZO:
11   Q.   Besides grief counseling, were there any
12   other services that you went for at Lake Norman?
13   A.   It would have been radiology for me.
14   Q.   And what would you have gone there for?
15   A.   I had some back problems.
16   Q.   Is it possible that this check could have
17   been used for your radiology?
18   A.   I don't know.
19   Q.   Were there any other services that you had
20   at Lake Norman?
21   A.   No.
22   Q.   So the grief counseling and the radiology
0134
1   were the two services that you personally had at Lake
2   Norman?
3   A.   Probably, yes.
4        (The document referred to was
5        thereupon marked Exhibit Newell 005
6        for Identification.)
7        BY MS. PRINZO:
8   Q.   Mrs. Newell, the court reporter has just
9   handed you what has been marked as Exhibit Newell
10   005.  Do you recognize this document?
11   A.   Only that it's my check.
12   Q.   Do you know what this check was made out
13   to?
14   A.   Lake Norman Regional Medical Center.
15   Q.   Do you know what it was for?
16   A.   No.
17   Q.   This check is also not referenced on what

18  appears to be billing statements from Lake Norman.
19  Do you know why that is?
20      MS. BENEDETTO:  Objection to the form.  You
21  may answer.
22      THE WITNESS:  No, I don't know.
0135
1      BY MS. PRINZO:
2      Q.   Is it possible that this check was used for
3  the services you obtained at Lake Norman for
4  radiology or grief counseling?
5      MS. BENEDETTO:  Objection to the form.
6      THE WITNESS:  I don't think so.
7      BY MS. PRINZO:
8      Q.   And why don't you think so?
9      A.   Because they were always mailed to
10  radiology and not Lake Norman Regional Medical
11  Center.
12      Q.   Do you know if this check was used to pay
13  for any of the drugs in which you've made claims for
14  in this case?
15      A.   I don't know.
16      Q.   Do you know if this check was used to pay
17  for any drugs that were based, in whole or in part,
18  on AWP?
19      A.   I don't know.
20          (The document referred to was
21          thereupon marked Exhibit Newell 006
22          for Identification.)
0136
1      BY MS. PRINZO:
2      Q.   Mrs. Newell, the court reporter has just
3  handed you what has been marked as Exhibit Newell
4  006, which is bates stamped Newell 0038.  Do you
5  recognize this document?
6      A.   Only that it's my check.
7      Q.   Again, this payment of 102.81 is not
8  reflected on the billing statements that were
9  produced in this case.  Do you know why that is?
10      A.   I do not.
11      Q.   Do you know if --
12      MS. BENEDETTO:  I'm sorry, a belated
13  objection to the form.  Sorry.
14      BY MS. PRINZO:
15      Q.   Do you know if this check was used to pay
16  for any drugs for which you assert claims for in this
17  case?
18      A.   I don't know.
19      Q.   Do you know whether this check was used for
20  any drugs based, in whole or in part, on AWP?
21      A.   I don't.
22          (The document referred to was
0137
1          thereupon marked Exhibit Newell 007
2          for Identification.)

3        BY MS. PRINZO:
4     Q.   Mrs. Newell, the court reporter has just
5  handed you what has been marked Exhibit Newell 007
6  bates stamped Newell 039.  Do you recognize this
7  document?
8     A.   Just that it's my check.
9     Q.   And do you recognize who the check is made
10  out to?
11     A.   Lake Norman Regional Medical Center.
12     Q.   Do you know what this check was for?
13     A.   No.
14     Q.   Again, this check is not referenced on any
15  of the billing statements that were provided.  Do you
16  know why that is?
17        MS. BENEDETTO:  Objection to the form.  You
18  can answer.
19        THE WITNESS:  No.
20        BY MS. PRINZO:
21     Q.   Do you know if this check was used to pay
22  for any drugs for which claims are asserted in this
0138
1  case?
2     A.   I have no idea.
3     Q.   Is it fair to say that you do not know
4  whether this check was used to pay for any drugs, in
5  whole or in part, on AWP?
6     A.   It's fair to say that.
7           (The document referred to was
8            thereupon marked Exhibit Newell 008
9            for Identification.)
10        BY MS. PRINZO:
11     Q.   Mrs. Newell, the court reporter has just
12  handed you what has been marked as Exhibit Newell
13  008, Newell 0040.  Do you recognize this document?
14     A.   It's my check.
15     Q.   And who is the check made out to?
16     A.   Lake Norman Regional Medical Center.
17     Q.   Do you know what this check is made out
18  for?
19     A.   No.
20     Q.   Lake Norman --
21     A.   No.
22        MS. BENEDETTO:  Just wait until she
0139
1  finishes the question.  I know it's hard.
2        BY MS. PRINZO:
3     Q.   This check is, also, not referenced on any
4  of the billing statements that were produced in this
5  case.  Do you know why that is?
6        MS. BENEDETTO:  Objection to form.  You can
7  answer.
8        THE WITNESS:  No.
9        BY MS. PRINZO:
10     Q.   Do you know if this check was used to pay

11  for any drugs for which claims are asserted in this
12  case?
13    A.   I have no idea.
14    Q.   So it's fair to say that you do not know
15  whether this check was used to pay for any drugs, in
16  whole or in part, based on AWP?
17    A.   Yes.
18         (The document referred to was
19         thereupon marked Exhibit Newell 009
20         for Identification.)
21       BY MS. PRINZO:
22    Q.   Mrs. Newell, the court reporter has just
0140
1  handed you what has been marked as Exhibit Newell 009
2  bates stamped Newell 0041.  Do you recognize this
3  document?
4    A.   It's my check.
5    Q.   And who is it made out to?
6    A.   Lake Norman Regional Medical Center.
7    Q.   On the for line, do you recognize what that
8  number is for?
9    A.   I really don't know.
10    Q.   This check is, also, not referenced in the
11  billing statements that were provided.  Do you know
12  why that is?
13       MS. BENEDETTO:  Objection to the form.  You
14  can answer.
15       THE WITNESS:  No, I don't.
16       BY MS. PRINZO:
17    Q.   Do you know if this check was used to pay
18  for any drugs for which claims are asserted in this
19  case?
20    A.   I don't know.
21    Q.   Is it fair to say that you do not know
22  whether this check was used to pay for any drugs, in
0141
1  whole or in part, based on AWP?
2    A.   Yes.
3         (The document referred to was
4         thereupon marked Exhibit Newell 010
5         for Identification.)
6       BY MS. PRINZO:
7    Q.   Miss Newell, the court reporter has just
8  handed you what has been marked Exhibit Newell 010
9  bates stamped Newell 0042.  Do you recognize this
10  document?
11    A.   It's my check.
12    Q.   And who is it made out to?
13    A.   Lake Norman Regional Medical Center.
14    Q.   Do you know what this check was used for?
15    A.   No, I don't.
16    Q.   Do you know what the reference on the for
17  line refers to?
18    A.   No.

19    Q.   This check is, also, not referenced in any
20  of the billing statements that were produced in this
21  matter.  Do you know why that is?
22          MS. BENEDETTO:  Objection to the form.  You
0142
1  can answer.
2          THE WITNESS:  No.
3          BY MS. PRINZO:
4    Q.   Do you know if this check was used to pay
5  for any drugs for which claims are asserted in this
6  case?
7    A.   I don't know.
8    Q.   Is it fair to say that you do not know
9  whether this check was used to pay for any drugs,
10  based in whole or in part, on AWP?
11    A.   Yes.
12          (The document referred to was
13          thereupon marked Exhibit Newell 011
14          for Identification.)
15          BY MS. PRINZO:
16    Q.   Mrs. Newell, the court reporter has just
17  handed you what has been marked as Exhibit Newell
18  011.  It's bates stamped 0043.  Do you recognize this
19  document?
20    A.   It's my check.
21    Q.   And is it made out to Lake Norman Regional
22  Medical Center?
0143
1    A.   Yes.
2    Q.   Do you know what this check was used for?
3    A.   No.
4    Q.   This check is, also, not referenced in any
5  of the billing statements that were produced in this
6  matter.  Do you know why that is?
7          MS. BENEDETTO:  Objection to the form.  You
8  can answer.
9          THE WITNESS:  No.
10          BY MS. PRINZO:
11    Q.   Do you know if this check was used to pay
12  for any drugs for which claims are asserted in this
13  case?
14    A.   No.
15    Q.   Is it fair to say that you do not know
16  whether this check was used to pay for any drugs,
17  based in whole or in part, on AWP?
18    A.   That's true, correct.
19    Q.   We've just gone through so far a series of
20  checks, and they're all signed by you.  Did you,
21  generally, do the banking in your family?
22    A.   Yes.
0144
1    Q.   Did your husband ever do the banking?
2    A.   Rarely.
3    Q.   On what occasions would he do the banking?

4     A.    When we were first married.
5     Q.    And that came to a quick end.  So is it
6  fair to say that in the past 15 years, you've
7  generally done the banking?
8     A.    Yes.
9              (The document referred to was
10             thereupon marked Exhibit Newell 012
11             for Identification.)
12          BY MS. PRINZO:
13    Q.    Mrs. Newell, the court reporter has just
14  handed what you has been marked as Exhibit Newell 012
15  bates stamped 0044.  Who is this check made out to?
16    A.    Lake Norman Regional Medical Center.
17    Q.    And do you know what this check was used
18  for?
19    A.    No.
20    Q.    Do you know whether this check was used to
21  pay for any drugs for which claims are asserted in
22  this case?
0145
1     A.    No.
2     Q.    Is it fair to say that you do not know
3  whether this check was used to pay for any drugs, in
4  whole or in part, based on AWP?
5     A.    Yes.
6              (The document referred to was
7              thereupon marked Exhibit Newell 013
8              for Identification.)
9          BY MS. PRINZO:
10    Q.    Mrs. Newell, the court reporter has just
11  handed what you has been marked as Exhibit Newell 013
12  bates stamped Newell 0035.  Are you familiar with
13  this document?
14    A.    It's my check.
15    Q.    And who is it made out to?
16    A.    Urology Specialists.
17    Q.    Do you know why you made out this check to
18  Urology Specialists?
19    A.    No.
20    Q.    Did you obtain personally any services from
21  Urology Specialists, such as grief counseling?
22    A.    No.
0146
1     Q.    Did you obtain any services from Urology
2  Specialists?
3     A.    No.
4     Q.    Do you know whether this check was used to
5  pay for any drugs for which claims are asserted in
6  this case?
7     A.    I don't know.
8     Q.    And did you state that you did not know
9  what this check was used for?
10    A.    I do not know.
11    Q.    Do you know if this check was used to pay

12  for any drugs, in whole or in part, based on AWP?
13      A.   I do not know.
14      Q.   What do you hope to get out of bringing
15  this lawsuit?
16      A.   I hope that I can represent the other
17  people who have been overcharged for their
18  medications.
19      Q.   So you're hoping to lower the price of
20  drugs?
21          MS. BENEDETTO:  Objection to the form.
22  Misstates prior testimony.
0147
1          MS. PRINZO:  Let me restate it.
2          BY MS. PRINZO:
3      Q.   Are you hoping to lower the price of drugs?
4      A.   That's not my objective.  I just would like
5  to -- I don't think I can.  I'd just like to
6  represent the people who have been overcharged.
7      Q.   Are you hoping to get monetary damages?
8      A.   No.
9      Q.   When you say you're hoping to represent the
10  people who were overcharged, is there anything that
11  you're hoping to obtain for them?  Is there anything
12  you're hoping to obtain for them?
13      A.   I can't think of -- no, I don't want to
14  obtain anything for them.  I just think it's unfair
15  that we've all been overcharged, and if they can --
16  if we can do anything to reduce, for future people
17  who are in this situation, if they can cut the costs
18  somehow for them.
19      Q.   So when you say overcharged, you're
20  referring to paying an expensive amount for drugs?
21      A.   Yes.
22      Q.   Are you asserting that there's any fraud in
0148
1  this case?
2      A.   I can't answer that.  I don't know.
3      Q.   Have you or your husband ever had any
4  relationship with any drug manufacturer?
5      A.   No.
6      Q.   Have you or your husband had any contact
7  with any drug manufacturer?
8      A.   No.
9      Q.   Have you or your husband ever called any
10  drug manufacturers' customer service line?
11      A.   I don't recall.
12      Q.   Have you authorized your lawyers in this
13  case to obtain your husband's medical records?
14      A.   I think I gave my permission.
15      Q.   Have you authorized the lawyers in this
16  case to obtain your husband's billing records?
17      A.   Yes, I think so.
18          MS. PRINZO:  Why don't we take a couple
19  minutes break, and I think we can wind up in the next

20  few minutes.
21          (Thereupon, a brief recess was taken,
22          after which the following proceedings
0149
1          were had:)
2          MS. PRINZO:  Mrs. Newell, I just have a
3  couple more questions for you, and then I believe one
4  of the attorneys on the phone just has a few more.
5  So we should be wrapping up shortly.
6          BY MS. PRINZO:
7      Q.   Are you familiar with the term least costly
8  alternative?
9      A.   No.
10          MS. PRINZO:  For the Record, I would just
11  like to request to depose someone who's familiar with
12  the billing statements, so we can get a better
13  understanding of these bills and the checks that Mrs.
14  Newell has produced.
15          MS. BENEDETTO:  We'll take that under
16  advisement.  Obviously, we differ as to whether or
17  not that's necessary, and certainly that that does
18  not excuse the Defendants, in our view, from having
19  to conclude the discovery by the 17th.
20          MS. PRINZO:  And then we'd also reserve the
21  right to continue the deposition as soon as
22  additional documents are produced.
0150
1          MS. BENEDETTO:  And obviously, Plaintiffs'
2  position is that the deposition will be concluded as
3  of today, but obviously that's for another day, that
4  issue.
5          MS. PRINZO:  I'm finished with my
6  questions.
7          Sandhya, do you have additional questions?
8          MS. KAWATRA:  Yeah.  Sorry.  I was just
9  getting back on the line.
10          Hi, Mrs. Newell, this is Sandhya Kawatra
11  from Hogan and Hartson.  I represent Bristol-Myers
12  Squibb, one of the Defendants in the case.
13          MS. KAWATRA:  Can you hear me?
14          THE WITNESS:  No.
15          MS. KAWATRA:  Did you say no?
16          THE WITNESS:  I can hear you now.
17          MS. KAWATRA:  I just picked up the phone.
18  I was on speaker before.  I'm sorry.
19          I'm Sandhya Kawatra from Hogan & Hartson.
20  We represent Bristol-Myers Squibb, one of the
21  Defendants in the action.
22
0151
1      EXAMINATION BY COUNSEL FOR THE DEFENDANT
2          BY MS. KAWATRA:
3      Q.   I actually just wanted to follow-up -- it
4  might only be one question -- something that you had

5  said earlier.  It relates to warfarin.  Now, you

6  testified that your husband took warfarin?

7     A.   Yes.  Isn't that another name for Coumadin?

8     Q.   Yes.  I apologize.

9     A.   Yes.  Yes.

10    Q.   Coumadin is one other name for warfarin.

11  Warfarin is, also, the generic.  So we're clear about

12  that.  It's not only sold, I think, as Coumadin.

13  Which brings me to my next question.

14         Now, you testified that he took this or he

15  purchased it at the pharmacy?

16         MS. BENEDETTO:  Objection to the form, but

17  I'll allow her to answer.

18         THE WITNESS:  Yes, because they would

19  prescribe it in the hospital, and then when he would

20  go home, we would have to pick it up at the pharmacy.

21         BY MS. KAWATRA:

22    Q.   So he would take it at the hospital, as

0152

1  well?

2     A.   Yes.  I don't know how they administered

3  it.

4     Q.   You knew my next question.  So you never

5  saw how they administered it?

6     A.   No.

7     Q.   Do you know -- I think you might have been

8  already asked, and I apologize.

9         But you do you know who manufactured the

10  Coumadin or the drug warfarin that your husband took,

11  either in the hospital or through the pharmacy?

12    A.   No.

13         MS. KAWATRA:  Okay.  Those are all my

14  questions, Mrs. Newell.  I appreciate you taking the

15  time.

16         THE WITNESS:  Okay.

17         MS. PRINZO:  As do we appreciate your time.

18         THE WITNESS:  Thank you.

19         MS. BENEDETTO:  I don't have any questions.

20         (Thereupon the taking of the

21         deposition was concluded at 3:50 p.m.)

22         - - - - - - - - -

0153

1

2         I, VIRGINIA NEWELL, do hereby certify that

3  I have read the foregoing deposition and that the

4  same is a true and accurate transcript of my

5  testimony, except for attached amendments, if any.

6         ----------------------------------

7         The signature above of VIRGINIA NEWELL was

8  subscribed and sworn to before me this ____ day of

9  ____ 2005.

10

11

12         -----------------------------------

13          Notary Public
14          My commission expires
15
16
17
18
19
20
21
22
0154
1
2                    CERTIFICATE
3   STATE OF NORTH CAROLINA        )
4
5   COUNTY OF CLEVELAND            )
6          I, JACKIE JOHNSON, the officer before whom
7   the foregoing deposition was taken, do hereby certify
8   that the witness whose testimony appears in the
9   foregoing deposition was duly sworn by me; that the
10  testimony of said witness was taken by me to the best
11  of my ability and thereafter reduced to typewriting
12  under my direction; that I am neither counsel for
13  related to, nor employed by any of the parties to the
14  action in which this deposition was taken, and
15  further that I am not a relative or employee of any
16  attorney or counsel employed by the parties thereto,
17  nor financially or otherwise interested in the
18  outcome of the action.
19
20
21          _____
22                    JACKIE JOHNSON
0155
1
2          Court Reporter
3          Notary Public in and for
4          County of Cleveland
5          State of North Carolina
6   My commission expires August 30, 2006
7
8
9
10
11
12
13
14
15
16
17
18
19
20

21
22
0156
 1