# EXHIBIT I

0001
1             UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF MASSACHUSETTS
3                  -o0o-
4
5
6  IN RE PHARMACEUTICAL    MDL No. 1456
7  INDUSTRY AVERAGE PRICE
8  LITIGATION          CIVIL ACTION: 01-CV-12257-PBS
9             Judge Patti B. Saris
10 _____
11
12
13
14           DEPOSITION OF
15
16       JAMES E. SHEPLEY
17
18       Friday, November 11, 2005
19
20           Reno, Nevada
21
22  Reported by:  Lesley A. Clarkson, CCR #182
0002
1           A P P E A R A N C E S
2
3  For the Plaintiffs: DONALD E. HAVILAND, JR., ESQ.
4            KLINE & SPECTER, P.C.
5            1525 Locust Street, 19th Floor
6            Philadelphia, Pennsylvania  19102
7
8            KENT M. WILLIAMS, ESQ.
9            GIEBEL GILBERT WILLIAMS & KOHL
10            1300 Godward Street NE, Suite 6200
11            Minneapolis, Minnesota  55413
12
13  For the Defendants: TRISHA LAWSON, ESQ.
14            DAVIS POLK & WARDWELL
15            450 Lexington Avenue
16            New York, New York  10017
17
18  (By telephone)    ADEEL MANGI, ESQ.
19            PATTERSON BELKNAP WEBB & TYLER
20            1133 Avenue of the Americas
21            New York, New York  10036
22
0003
1             I N D E X
2
3  Examination by Ms. Lawson ............  Page  4
4  Examination by Mr. Haviland ..........  Page 87
5  Further Examination by Ms. Lawson ....  Page 88
6

7
8
9   EXHIBITS:                              PAGE:
10  Exhibit Shepley 001 - Third Amended Master
11                   Consolidated Class
12                   Action Complaint Amended
13                   to Comply with Court's Class
14                   Certification Order -
15                   Redacted Version ............80
16
17
18
19
20
21
22
0004
1         BE IT REMEMBERED that on Friday, November
2   11, 2005, at the hour of 10:35 a.m. of said day, at
3   the Eldorado Hotel-Casino, 345 North Virginia Street,
4   3rd Floor Board Room, Reno, Nevada, before me, Lesley
5   A. Clarkson, certified court reporter, personally
6   appeared JAMES E. SHEPLEY, who was by me first duly
7   sworn and was examined as a witness in said cause.
8                   -o0o-
9
10            JAMES E. SHEPLEY,
11   having been duly sworn, testified as follows:
12
13            EXAMINATION
14  BY MS. LAWSON:
15     Q   Mr. Shepley, we met before the deposition
16  got started, but I'm Trisha Lawson.  I'm one of the,
17  a lawyer --
18     A   Excuse me, you'll have to talk a little
19  louder.  I've got a little hearing problem.
20     Q   I'm Trisha Lawson.  I'm a lawyer for one
21  of the defendants in this case.  I'll be taking your
22  deposition today.
0005
1         If you could just state your name, please.
2     A   Excuse me?
3     Q   Could you state your name for the record.
4     A   James E. Shepley.
5     Q   What is your current address, Mr. Shepley?
6     A   1490 Clemson Road in Reno, Nevada.
7     Q   Have you lived at that address since 1991?
8     A   Yes.
9     Q   You have had no other addresses since
10  1991?
11    A   No.
12    Q   Do you receive social --
13        MR. HAVILAND:  Let me just caution, let's
14  try to let her get her question out before you

15  answer, because sometimes she may ask something
16  different than what you expect.  It's good to get
17  that started right now, just so we can be clear
18  about that.  Good pace.
19  BY MS. LAWSON:
20      Q   Mr. Shepley, have you ever been deposed
21  before?
22      A   In where?
0006
1      Q   Have you ever had your deposition taken?
2      A   No.
3      Q   Have you ever testified in a trial?
4      A   No.
5      Q   Have you ever been involved in any other
6  civil litigation?
7      A   No.
8      Q   Criminal litigation?
9      A   No.
10      Q   So let me just go over some of the ground
11  rules.  I'm sure your lawyer has gone over this with
12  you, but just so we are on the same page.
13          I'm going to ask you questions.  If, as
14  Mr. Haviland said, you would wait until I'm finished
15  asking the question to answer, that would be very
16  helpful.  The court reporter can't get everything
17  down if we are talking over each other.
18      A   Okay.
19      Q   Plus you want to make sure you hear my
20  whole question to make sure you understand it.  If
21  at any point you don't understand one of my
22  questions, please let me know, and I'll try and
0007
1  rephrase it in a way that you can understand it.
2  Okay?
3          MR. HAVILAND:  If you don't hear the
4  question, make sure you ask again, okay?  I want to
5  make sure you hear everything.
6          THE WITNESS:  Okay.
7  BY MS. LAWSON:
8      Q   Can you hear me as I'm speaking now?
9      A   Yes, I can.
10      Q   And you will also have to answer my
11  questions audibly.  The court reporter can't record
12  nods of the head.
13      A   Okay.
14      Q   Okay?
15      A   Yes.
16      Q   If at any point you want to take a break,
17  just let me know, we can take a break at any time.
18  If at any point you need to talk to your lawyer,
19  just say you need a break and we will take a break.
20          Is there any reason that you feel today
21  you are not up to testifying?
22      A   No.

0008
1    Q   Are you taking any medication that would
2  impair your ability to understand or respond to my
3  questions?
4    A   No.
5    Q   Okay.  You understand that you are
6  testifying under oath today?
7    A   Uh-huh.
8    Q   And that means you have a legal obligation
9  to tell the truth?
10   A   Yes.
11   Q   Great.
12      MR. HAVILAND:  The first time you went
13  uh-huh.  Make sure it's yes.  She picks it up as
14  uh-huh, but sometimes that could be huh-uh.  So yes
15  and no.
16      THE WITNESS:  Yes.
17      MS. LAWSON:  Great.
18      MR. HAVILAND:  I'm going to try and keep
19  on that so we can make sure and keep a clear record.
20  BY MS. LAWSON:
21   Q   Are you currently employed, Mr. Shepley?
22   A   Retired.
0009
1    Q   What year did you retire?
2    A   1985.
3    Q   Who was your employer immediately prior to
4  your retirement?
5    A   Lincoln Fitzgerald at Nevada Club.
6    Q   I'm sorry, Lincoln Fitzgerald?
7    A   Fitzgerald, yeah.  He owned Fitzgeralds
8  Hotel here.
9    Q   What was your job then?
10   A   What was what?
11   Q   What was your job at the time you retired?
12   A   Slot manager.
13   Q   And how long had you been employed with
14  Lincoln Fitzgerald?
15   A   30 years.
16   Q   30 years?  Since 1985, since you retired,
17  have you had any employment part-time or otherwise?
18   A   No.
19   Q   Have you received social security since
20  1985?
21   A   Yes.
22   Q   As Mr. Haviland said, I know you can
0010
1  anticipate my questions, they may be obvious
2  sometimes, but if you just let me finish so the
3  record can be clear.
4      MR. HAVILAND:  It will take time to get
5  the skill.  We will get there.
6  BY MS. LAWSON:
7    Q   Yes.  It's not the natural conversation

8  sort of tone here, but we will get it.
9        MR. HAVILAND:  By the way, so you are
10  clear, it's the Nevada Club, and his boss was
11  Lincoln Fitzgerald, okay?
12        I was shown the parking lot across the
13  street where it used to be, right?  The parking lot
14  is the old Nevada Club.
15        THE WITNESS:  Yeah.
16        MS. LAWSON:  Okay.
17  BY MS. LAWSON:
18    Q   So you had worked at the Nevada Club for
19  30 years up until 1985?
20    A   Yes.
21    Q   During the time that you worked at the
22  Nevada Club, did you have other employment?
0011
1    A   Other employment?
2    Q   Yes.
3    A   No.
4    Q   When you retired from the Nevada Club, did
5  you have health care coverage?
6    A   Yeah, New York Life, I think it was.
7    Q   So you think New York Life covered you up
8  until the time you were --
9    A   I don't think so.  I mean he had insurance
10  with New York Life, but I don't exactly know what it
11  was.
12    Q   Let's start with the period after you
13  retired, so 1985 after.  Did you have health
14  insurance retirement benefits after you retired?
15    A   Yes.
16    Q   Can you tell me what, who provided
17  coverage?
18    A   Medicare A and B, New York Life at
19  retirement.
20    Q   Was New York Life supplemental coverage
21  you had following retirement, or did you have New
22  York Life at the time you were employed?
0012
1    A   I had it at the time I was employed.
2    Q   Okay.  I'm just trying to make sure I
3  understand.  So when you retired you no, so after
4  you were no longer employed at the Nevada Club, then
5  you didn't have coverage with New York Life anymore;
6  is that correct?
7    A   Yes.
8    Q   So 1985 on you were covered by Medicare A
9  and B, right?
10    A   A and B, yes.
11    Q   Was there -- strike that.
12        After you retired did you apply for
13  Medicare coverage around the time you retired?
14    A   Oh, yeah.
15    Q   Was your coverage granted?  Was your

16   application approved?
17      A   Uh-huh.
18         MR. HAVILAND:  Yes or no?  Yes?
19         THE WITNESS:  Yes.
20   BY MS. LAWSON:
21      Q   So from 1985 to today, 2005, have you been
22   covered by Medicare A and B throughout that entire
0013
1   period?
2      A   Yes.
3      Q   So there was no time where your coverage
4   was terminated or canceled for a period.
5      A   No.
6      Q   After you retired in 1985 and got Medicare
7   coverage, did you also get supplemental insurance
8   coverage?
9      A   Yes.
10      Q   In 1985?
11      A   Yes.
12      Q   Who provided your supplemental insurance
13   coverage?
14      A   Senior Care Plus.
15      Q   Was Senior Care Plus affiliated in any way
16   with the Nevada Club where you had worked?
17      A   I don't understand.
18      Q   Okay.  Then I'll rephrase.  I had asked
19   you before if you had retirement benefits, and I
20   think you said no.  So let me ask this differently.
21         Did you apply for coverage with Senior
22   Care Plus?
0014
1      A   Yeah, I applied with them, yeah.
2      Q   And it wasn't part of any retirement
3   package --
4      A   No.
5      Q   -- from the Nevada Club.  Okay.  So you
6   applied for Senior Care Plus in 1985, and were you
7   approved immediately?
8      A   Yes.
9      Q   How long did you have supplemental health
10   care coverage with Senior Care Plus?
11      A   How long?
12      Q   Do you still have it today?
13      A   No.  I got United American now.
14      Q   Do you recall when you switched from --
15   well, when your coverage with Senior Care Plus
16   ended?  Approximately.  It doesn't have to be an
17   exact date.
18      A   I don't know.  My wife keeps, she takes
19   care of all those dates and everything.  I don't
20   remember.
21      Q   Let me ask differently, ballpark here.  Do
22   you know whether you had Senior Care Plus around
0015

1  1991?  Did you keep it for six years or so, do you
2  know?
3     A   Did we?  Yes, I think so.
4     Q   Okay.  If you don't remember, it's fine to
5  just say --
6     A   I don't remember.
7     Q   -- "I don't remember."  That's all right.
8     A   I don't remember.
9     Q   Don't stress if you don't remember.  I'm
10  not trying, this isn't a memory test, and I'm not
11  trying to pin you down to a particular date.
12     A   Okay.
13     Q   I'm just trying to get the background the
14  best we can.
15     A   Okay.
16     Q   As your lawyer knows, we have requested
17  documents, some of which would help us get at this,
18  and your lawyer is still in the process of gathering
19  documents, I understand.
20        MR. HAVILAND:  Actually, counsel, one of
21  the documents does reflect I think the time frame
22  for the switch.  It's the billing statement we
0016
1  produced for Alpine.  There's a note in there that
2  talks about it.
3        MS. LAWSON:  Okay.
4  BY MS. LAWSON:
5     Q   Is Senior Care Plus -- did a company
6  called Hometown Health Plan ever provide you with
7  supplemental insurance coverage?
8     A   I don't remember.
9     Q   Okay.
10        MS. LAWSON:  Let's just go off the record
11  for one minute.
12        MR. HAVILAND:  Let's do that.
13        (Off the record.)
14        MS. LAWSON:  We can go back on the record.
15  BY MS. LAWSON:
16     Q   Mr. Shepley, we just went off the record
17  to clarify and let me look at some documents about
18  your supplemental coverage.  I'm going to back up a
19  little bit to talk about your Medicare coverage.  In
20  1985 did you enroll in a Medicare Plus Choice plan?
21     A   No.
22     Q   No?  So it was just --
0017
1     A   In nineteen eighty what?
2        MR. HAVILAND:  Be careful.  Make sure you
3  hear.
4  BY MS. LAWSON:
5     Q   I'll represent there are different
6  coverage options available under Medicare.  Are you
7  familiar with that?
8     A   No.

9     Q   Okay.  Are you familiar with the
10  difference between what is called the original
11  Medicare coverage and what is called a Medicare Plus
12  Choice plan?  Did you hear me?
13          MR. HAVILAND:  Did you understand?
14          THE WITNESS:  I heard you, but I don't
15  understand it.  I was familiar with Medicare A and
16  B, you know, when I retired, period.
17  BY MS. LAWSON:
18    Q   All right.  We can come back to that if
19  necessary.
20          Your supplemental insurance that you got
21  when you retired, whether calling it Senior Care
22  Plus or Hometown Health Plan, which is a name we
0018
1  have seen in some of your, or I have seen in some of
2  your medical records, is that the, did you have
3  coverage with only one supplemental insurer until
4  the time you switched to United American, or did you
5  switch around a few times?
6    A   I switched around to Senior -- I don't
7  remember the name of the company.  Then we went back
8  to Senior Care Plus.  It was only for a few months,
9  then we went back to Senior Care Plus, until we got
10  on United American.
11    Q   We can come back to this if necessary.
12          Do you recall whether for the period from
13  1991 until the time you switched to United American
14  whether the terms of your supplemental coverage
15  generally stayed the same?
16    A   I don't, I don't remember.
17    Q   When you first got supplemental insurance
18  coverage --
19              (cell phone ringing.)
20          MR. HAVILAND:  I'm sorry.
21  BY MS. LAWSON:
22    Q   When you first got supplemental insurance
0019
1  coverage after your retirement in 1985, did you pay
2  a deductible, do you recall?
3    A   I don't remember.  My wife took care of
4  all this stuff now.  She took care of all that
5  stuff, and I wasn't, so I don't know.
6    Q   Okay.  What about now, do you know whether
7  you have, whether your supplemental insurance with
8  United American includes a deductible?
9    A   Yes.  I know I got the insurance.
10    Q   Okay.  Do you know whether with your
11  United American supplemental insurance you have to
12  pay any copayments?
13    A   No.
14    Q   You don't pay any copayments, or you don't
15  know?
16    A   I don't know.

17    Q   Do you pay premiums?
18    A   Yes.
19    Q   For your United American insurance.
20    A   Yes.
21    Q   Do you pay those each month?
22    A   Monthly.
0020
1     Q   So you pay a monthly premium?
2     A   Yes.
3     Q   Is the premium the same amount even if you
4  don't go to a doctor that month?
5     A   I don't know.
6     Q   Do you recall how much the monthly premium
7  is now?
8     A   No.
9     Q   I'll assume I know the answer, but just to
10  make the record clear, for any time from 1991 to
11  today, do you recall what your premiums were for
12  supplemental insurance?
13    A   No.
14    Q   And just to go through it for the record,
15  I think you testified presently you don't know
16  whether your supplemental insurance involves the
17  deductible; is that right?
18    A   Yes.
19    Q   For the period 1991 'til today, do you
20  know whether your supplemental insurance coverage
21  involved a deductible at any point in that time?
22    A   I don't remember.
0021
1     Q   When you see a doctor now, how much of the
2  bill, if anything, do you have to pay out of pocket,
3  you and your wife?
4     A   I don't know.  I mean that's, that's a --
5  I don't know.
6     Q   Is it a percentage of the charge, whatever
7  the charge may be, do you know?
8     A   I don't know.
9     Q   Do you have to pay some out of pocket
10  expense every time you see a doctor?
11    A   Now?
12    Q   Yes, now.
13    A   I don't know.
14       MRS. SHEPLEY:  I think he needs a break.
15       MS. LAWSON:  That's fine.
16       MR. HAVILAND:  Sure, half hour, it would
17  probably help.
18       MS. LAWSON:  We will take a break.  Off
19  the record.
20          (Recess taken.)
21  BY MS. LAWSON:
22    Q   Mr. Shepley, we have been talking about
0022
1  your supplemental insurance coverage, and I asked

2   whether you recalled premiums you've paid, you may
3   have paid over the last 15 years roughly for
4   supplemental insurance coverage.  I just want to ask
5   a slightly different way.  Are you familiar with the
6   term contribution in the context of supplemental
7   insurance coverage?
8     A   No.
9     Q   Okay.  So if I asked if you made any
10  contributions for your supplemental insurance
11  coverage, would you know what I meant?
12    A   No.
13    Q   Other than premiums, are you familiar with
14  any other payments you could have made, you might
15  have made -- withdraw.  Strike that.
16        Other than through premiums, did you make
17  payments for supplemental insurance coverage since
18  1991?
19    A   I don't know.
20    Q   Turning to your Medicare coverage now,
21  separate from your supplemental insurance coverage,
22  do you understand those to be two different things?
0023
1     A   Yes.
2     Q   Do you pay premiums for your Medicare
3   insurance coverage?
4     A   Yes.
5     Q   Are those monthly premiums?
6     A   I don't know.
7     Q   In 1991 did you pay -- withdraw.
8         From 1991 through today have you always
9   paid premiums for Medicare coverage?
10    A   I don't know.
11    Q   From 1991 through today, have the, has the
12  coverage that Medicare provides for the health
13  services that you obtain changed at all?
14    A   I don't know.
15    Q   Let's talk briefly, let's talk for now,
16  let's focus on the last five years, okay?  So we are
17  talking roughly 2000 through 2005.  So I'm going to
18  ask you some questions about that time period.
19        In that time period do you know whether --
20  withdraw.
21        In the 2000 to 2005 time period did you
22  pay copayments with your Medicare coverage?
0024
1     A   I don't know.  I don't know.
2     Q   In the 2000 to 2005 time frame have you
3   been treated by a doctor?
4     A   Would you repeat that, please?
5     Q   Sure.  Between 2000 and 2005 did you go to
6   a doctor ever?
7     A   Oh, sure.
8     Q   Okay.
9     A   A lot of them.

10    Q    Did you get bills from doctors for your
11  visits?
12    A    I don't know.
13    Q    Okay.  Shifting gears a little bit.  When
14  did you first learn about this lawsuit?
15        MR. HAVILAND:  This being the AWP lawsuit.
16        MS. LAWSON:  Yes.
17        MR. HAVILAND:  When did you first learn
18  about it?  Okay.  I just want to be careful when you
19  answer that question, I don't want you to reveal
20  communications you have had with lawyers.  If you
21  can answer the question as to the time frame.
22  BY MS. LAWSON:
0025
1    Q    Yeah, I'm just asking roughly the time,
2  the date that you learned about this litigation, AWP
3  litigation.
4    A    Yeah.  I don't remember.
5    Q    Do you think it was within the last month
6  that you first learned about it?
7        MR. HAVILAND:  If you know.  Don't guess.
8  She's asking was it within the last month, if you
9  know.
10        THE WITNESS:  I don't understand that.
11  BY MS. LAWSON:
12    Q    Okay.  I'm just trying to get a sense of
13  the time frame.
14    A    Okay.
15    Q    I'm going to assume you didn't learn about
16  this case for the first time today.
17        MR. HAVILAND:  That's a safe assumption.
18  BY MS. LAWSON:
19    Q    Is that correct?
20    A    Yes.
21    Q    Did you know about this lawsuit two years
22  ago?
0026
1    A    No.
2    Q    Okay.  We are narrowing now.  What about
3  say six months ago, in May, June, did you know about
4  this lawsuit then?
5    A    I don't know.
6    Q    Okay.  That's okay.
7    A    My dates are lousy.
8    Q    That's okay.  What do you understand your
9  role in this lawsuit?  Again when I say this
10  lawsuit, I mean the AWP litigation.  What do you
11  understand your role in this lawsuit to be?
12    A    Well, I understand that I have been
13  overpaid, I mean overcharged, I should say,
14  overcharged for prescriptions, and I'm trying to
15  help other people that are in the same fix as I am,
16  overcharged.
17    Q    What prescription medication are you

18   claiming you were overcharged for?
19      A   Lupron.
20      Q   Anything else?
21      A   I don't know.
22      Q   Who are you asserting claims against in
0027
1   this litigation?
2      A   Would you repeat that?
3      Q   Sure.  Who are you asserting claims
4   against?  Who are you saying overcharged you for
5   Lupron?
6      A   I don't know.
7      Q   Are you asserting claims against any of
8   your doctors in this case?
9      A   No.
10     Q   Did you ever pay for Lupron?
11     A   Yes.
12     Q   Okay.  Who did you pay for the Lupron?
13     A   I don't know.
14     Q   Do you want to take a break?
15         MR. HAVILAND:  How are you feeling?
16         THE WITNESS:  I'm all right.  I'm just
17   trying to remember.
18   BY MS. LAWSON:
19     Q   Sure.
20     A   The doctor's office, I think.  I don't
21   know.
22     Q   So you think you paid a doctor's office
0028
1   for Lupron.
2      A   Yeah.
3      Q   Is that correct?
4      A   Yes.
5      Q   Okay.  If you paid the doctor's office for
6   the drug that you are asserting a claim on --
7   withdraw.
8          Why aren't you asserting claims against a
9   doctor if it's the doctor who you paid for the drug?
10         MR. HAVILAND:  Objection to the form,
11   argumentative.  The claims are what the claims are
12   in this case.
13         THE WITNESS:  I don't know.
14   BY MS. LAWSON:
15     Q   Okay.  So you don't know why you are not
16   asserting a claim against a doctor?
17     A   Huh-uh.
18     Q   Do you want to assert a claim against your
19   doctor for overcharging you for any drugs?
20     A   No.
21         MR. HAVILAND:  Objection to the form.
22         MS. LAWSON:  But the answer was no?  I'm
0029
1   sorry, we were talking.
2          MR. HAVILAND:  Yes.

3          MS. LAWSON:  Let's take a two-minute break
4   while they bring in coffee.
5              (Off the record.)
6          MS. LAWSON:  Back on the record.
7   BY MS. LAWSON:
8      Q   Are you familiar with the term "average
9   wholesale price"?
10     A   No.
11     Q   Just to make that clear, you said you are
12  not familiar with the term "average wholesale
13  price"; is that correct?
14     A   Yes.
15     Q   Are you familiar with the term "wholesale
16  acquisition cost"?
17     A   No.
18     Q   Are there other drugs that, other than
19  Lupron, that a doctor has given to you?
20     A   Prescribed?
21     Q   No, let's, we will clarify here.  I'm not
22  asking just about, I'm not asking about someone
0030
1   writing a prescription for you and you or your wife
2   or someone else going and filling it in a pharmacy.
3   I'm asking about drugs that the physician
4   administered or the physician's nurse or someone in
5   the doctor's office gave you an injection of the
6   drug or otherwise administered it to you in either
7   his office or in the hospital.
8          So with that background, are there drugs
9   other than Lupron that a physician has administered
10  to you?
11     A   Yes.
12     Q   Okay.  What else?
13     A   Zoladex.
14     Q   Anything else?
15     A   I don't remember.
16     Q   When were you given Lupron?
17     A   I don't know.
18         MR. HAVILAND:  Do you want to know the
19  first time?
20         MS. LAWSON:  I'll ask that.
21         MR. HAVILAND:  He's currently on it.
22  BY MS. LAWSON:
0031
1      Q   Are you currently taking Lupron?
2      A   Yes.
3      Q   Are you currently taking Zoladex?
4      A   No.
5      Q   Do you recall when the first time you took
6   either Zoladex or Lupron was?
7      A   No.
8      Q   I assume that you are being treated with,
9   that you have been treated with Zoladex and that you
10  are being treated with Lupron for prostate cancer;

11  is that correct?
12      A    Yes.
13      Q    Do you recall approximately when you were
14  diagnosed with prostate cancer?
15      A    Approximately 1991.  Approximately, yeah,
16  1991.
17      Q    So approximately 14 or so years ago, 14,
18  15 years ago.  Were you immediately treated for
19  prostate cancer after you were diagnosed?
20      A    I don't remember.
21      Q    Do you recall the doctor, who the doctor
22  was who told you you had prostate cancer?
0032
1   A    Yes.
2   Q    Who was it?
3   A    Kletsky.
4   Q    I'm sorry?
5   A    Dr. Kletsky.
6   Q    Kletsky?
7   A    Yeah.
8   Q    Do you know how to spell that?  Kletsky --
9   A    Starts with a K.
10      Q    K-o-l-e-s-k-y roughly?
11          MR. HAVILAND:  Kletsky, K-l-e-t-s-k-y.
12          THE WITNESS:  I think he's a Polish
13  doctor.
14          MR. HAVILAND:  His name is somewhere in
15  here.
16  BY MS. LAWSON:
17      Q    Was Dr. Kletsky your primary care doctor?
18      A    Yes.
19      Q    When Dr. Kletsky concluded that you had
20  prostate cancer -- and I'm sorry, is Dr. Kletsky a
21  female or a male, a he or a she?
22      A    I don't understand.
0033
1   Q    Is it a woman or a man doctor?
2   A    Oh, man.
3   Q    I'm just -- okay.
4   A    Okay.
5   Q    When Dr. Kletsky determined that you had
6   prostate cancer, did he suggest that you see a
7   specialist?
8   A    Yes.
9   Q    Did you see a specialist?
10      A    Yes.
11      Q    Who was that?
12      A    Dr. Moss.
13      Q    Is Dr. Moss a urologist?
14      A    Yes.
15      Q    And you believe you began seeing Dr. Moss
16  around 1991; is that right?
17      A    Yes.
18      Q    Have you ever been seen by any other

19  urologist?
20    A   Yes.
21        MR. HAVILAND:  By the way, Kletsky is on
22  the last page of what I gave you this morning.  It's
0034
1  K-l-e-t-s-k-y.
2        MS. LAWSON:  Okay.
3  BY MS. LAWSON:
4    Q   Let me back up actually.  In approximately
5  1991 you were diagnosed with prostate cancer, and
6  your primary care doctor, Dr. Kletsky, suggested you
7  see a urologist, right?
8    A   Right.
9    Q   Okay.  And then you went to see Dr. Moss
10  around 1991 for the first time.
11    A   Yes.
12    Q   Okay.  Did you discuss treatment options
13  with Dr. Moss when you first saw him?
14    A   I don't remember.
15    Q   Did you ever discuss with Dr. Moss
16  possibly having surgery for prostate cancer?
17    A   Yes.  Do you want me to explain to you?
18  He told me he loved to operate, but in my case he
19  was going to treat it.  He loved to operate, and I
20  wasn't too keen on an operation anyway.
21    Q   Okay.  So did he -- withdrawn.
22        So you didn't want to have an operation,
0035
1  and he said there were other treatment alternatives?
2    A   (Witness nods head.)
3    Q   Is that yes?
4    A   Yes.
5    Q   Do you recall what the treatment
6  alternatives he told you about were?
7    A   No.
8    Q   Do you recall whether the cost of
9  different treatment alternatives was ever something
10  you talked about with Dr. Moss?
11    A   No.
12    Q   No, you don't remember, or no, you didn't
13  talk?
14    A   No, I don't remember.
15    Q   How long did you see Dr. Moss?
16        MR. HAVILAND:  You mean from the time, the
17  start?
18        MS. LAWSON:  Okay.  I'll ask it
19  differently.
20  BY MS. LAWSON:
21    Q   Do you still see Dr. Moss?
22    A   No.
0036
1    Q   When did you stop seeing Dr. Moss?
2    A   I don't remember.
3    Q   Do you remember why you stopped seeing

4  Dr. Moss?
5     A   No.
6        MR. HAVILAND:  Maybe if you go through the
7  urologists you can help.
8  BY MS. LAWSON:
9     Q   You testified earlier you started seeing a
10  different urologist at some point.  Was that
11  Dr. Schiff?  Is that it?
12     A   No, I saw Dr., what was his name before
13  Schiff?  Dr --
14     Q   If you don't remember, just say you don't
15  remember.  Unfortunately we are not allowed to help.
16     A   Okay.
17        MR. HAVILAND:  I want to be helpful.
18        THE WITNESS:  What's that doctor's name?
19        MRS. SHEPLEY:  Kanellos.
20        MR. HAVILAND:  Kanellos.
21        THE WITNESS:  See, I don't remember
22  Kannelos.  Dr. Kannelos.
0037
1        MS. LAWSON:  C-a-n-e-l-l-i-s, roughly?
2        MR. HAVILAND:  Close.  I think that's
3  about right.
4  BY MS. LAWSON:
5     Q   Okay.  Do you remember what year it was
6  when you saw Dr. Kannelos?
7     A   No, I don't.
8     Q   Do you remember whether you saw
9  Dr. Kannelos for many times or just a couple of
10  times?
11     A   I don't know.
12     Q   Okay.  So after Dr. Kannelos there was a
13  different urologist that you saw?
14     A   Yes.
15     Q   Is that right?
16     A   Yes.
17     Q   And that doctor is who?
18     A   Schiff, S-c-h-i-f-f, Schiff.  I don't know
19  what his nationality is, but I know Kletsky is a
20  Polish guy.
21        MR. HAVILAND:  That's good to know.
22  BY MS. LAWSON:
0038
1     Q   Okay.  And is Dr. Schiff, do you still see
2  Dr. Schiff?
3     A   Yes.
4     Q   Do you recall why you switched from
5  Dr. Kannelos to Dr. Schiff?
6     A   No, I don't recall.  No, I don't.
7     Q   Okay.  Did you like Dr. Kannelos?
8     A   Yes.
9     Q   Did you think he was a good doctor?
10     A   Yes.
11     Q   Did you think that he had your best

12  interests in mind when he treated you?
13      A   Yes.
14      Q   What about Dr. Moss, did you like
15  Dr. Moss?
16      A   Yes.
17      Q   Did you think, do you think he had your
18  best interests in mind when he treated you?
19      A   I don't know.
20      Q   You don't know?
21      A   I don't know.
22      Q   Okay.  What about Dr. Schiff, do you like
0039
1  him?
2      A   Yes.
3      Q   Do you think he has your best interests in
4  mind when he treats you?
5      A   Yes.
6      Q   So why don't you know about Dr. Moss?  You
7  just don't know him as well?
8      A   I didn't know him, that's right.
9      Q   I apologize if I asked this already.  Do
10  you recall whether you saw Dr. Moss just a few
11  times, or did you see him a lot of times?
12      A   What do you mean by a lot?
13      Q   I guess I mean did you see him, you know,
14  three times, or were you seeing him, you know,
15  multiple times over the course of a couple of years?
16      A   Yeah.  Yes.
17      Q   Multiple times?
18      A   Yes.
19          MS. LAWSON:  Why don't we take a few
20  minute break here.
21          MR. HAVILAND:  Yes.
22              (Recess taken.)
0040
1  BY MS. LAWSON:
2      Q   Do you have any documents -- withdrawn.
3          Does Dr. Schiff ever give you any
4  documents relating to your treatment, any pieces of
5  paper?
6      A   No.
7      Q   And I think I already asked, you don't
8  know whether he sends you bills, correct?
9      A   Correct.
10      Q   Do you know whether you or your wife ever
11  send Dr. Schiff checks for payment?
12      A   I don't know.
13      Q   What about whether you ever pay him by
14  credit card?
15      A   I don't know.
16      Q   I don't want to keep you here longer than
17  you need to be, I think this was clear on the record
18  before, but you don't know whether you pay
19  Dr. Schiff anything out of your own pocket, correct?

20     A   Yes.
21     Q   Okay.  What about Dr. Kannelos, do you
22   recall whether you paid Dr. Kannelos anything out of
0041
1   your own pocket?
2     A   I don't know.
3     Q   Just so the record is clear, do you
4   understand what I mean when I ask if you pay
5   anything out of your own pocket?
6     A   Yes.
7     Q   What do you think I mean?
8     A   You mean if I pay anything out of my own
9   pocket.
10     Q   So separate from insurance?
11     A   Yes.
12     Q   Or Medicare coverage?
13     A   Yes.
14     Q   Correct.  Okay.  What about when you saw
15   Dr. Moss, do you recall whether you paid anything
16   out of your own pocket when you visited Dr. Moss?
17     A   I don't remember.
18     Q   You don't remember?
19     A   I don't remember.
20     Q   Okay.  Is Dr. Kletsky still your primary
21   care doctor?
22     A   No.
0042
1     Q   Who is your primary care doctor now?
2     A   Dr. Lorenzen.
3     Q   Dr. Lorenzen?  And that's a she.  She's a
4   female, right?
5     A   Yes.
6     Q   Do you recall approximately how long you
7   have been seeing Dr. Lorenzen?
8     A   I don't recall.  I don't know the date and
9   all.
10     Q   Okay.  Do you recall who -- withdrawn.
11       Do you recall who gave you Dr. Kannelos's
12   name, who said why don't you go see this
13   Dr. Kannelos?
14     A   I don't recall.  I don't know.
15     Q   How about Dr. Schiff, do you know how you
16   came to go see Dr. Schiff?
17     A   I don't know.
18     Q   You are here with Mr. Haviland, so I
19   assume you have spoken with him before.  Have you
20   spoken with any other lawyers regarding this
21   lawsuit?
22     A   No.
0043
1     Q   So Mr. Haviland --
2       MR. HAVILAND:  Other than Mr. Williams,
3   too.
4   BY MS. LAWSON:

5     Q   And Mr. Williams.  I'm sorry.
6   Mr. Williams is here also.
7         Other than Mr. Haviland and Mr. Williams,
8   you have not spoken with any other plaintiff, any
9   other lawyers regarding this lawsuit?
10     A   No.
11     Q   Did you do anything to prepare for this
12   deposition?
13     A   No.
14     Q   Before coming here today did you meet with
15   Mr. Haviland or Mr. Williams?
16         MR. HAVILAND:  You can answer that yes or
17   no.
18         THE WITNESS:  I don't know.  I mean.
19         MR. HAVILAND:  She wants to know about our
20   meeting.
21         THE WITNESS:  He drove me over here.
22         MR. HAVILAND:  Okay.
0044
1   BY MS. LAWSON:
2     Q   He drove you over.  Did he pick you up at
3   your house?
4     A   Yes.
5     Q   And I'm not asking what you spoke about,
6   but did he come in your house?
7     A   Yes.
8     Q   Or did he just pick you right up?
9     A   Yes.
10     Q   How long did you spend together this
11   morning?
12     A   An hour, I guess.
13     Q   Okay.  Did you look at any documents?
14     A   No.
15     Q   Before this morning, had you ever met Mr.
16   Haviland in person?
17     A   Yes.
18     Q   More than one time?
19     A   No.
20     Q   So before this morning, you had met Mr.
21   Haviland in person one time.
22     A   Yes.
0045
1     Q   Do you recall when that was?
2     A   Yesterday.
3     Q   Yesterday.  Do you recall for
4   approximately how long?
5     A   An hour and a half.
6     Q   Did you look at any documents with Mr.
7   Haviland yesterday?
8     A   What was that?
9     Q   Did you look at any documents when you met
10   with Mr. Haviland yesterday?
11     A   No.
12     Q   Before today had you met Mr. Williams?

13     A    No.  Yesterday I met him.
14     Q    So you met Mr. Williams for the first time
15 yesterday also.  Had you spoken with Mr. Haviland on
16 the phone before yesterday?
17     A    No.  My wife has.
18     Q    Okay.  So yesterday was the first time you
19 had ever spoken with Mr. Haviland.
20     A    Yes.
21     Q    Was yesterday also the first time you had
22 ever spoken with Mr. Williams?
0046
1     A    Yes.
2     Q    I know you said you hadn't talked to any
3 other lawyers in this case.  What about anyone that
4 may work with Mr. Williams or Mr. Haviland, did you
5 speak with anyone from their offices?
6     A    No.
7     Q    You said a minute ago that your wife had
8 talked to Mr. Haviland before yesterday.
9     A    Yes.
10     Q    Is that right?
11     A    Yes.
12     Q    Let's try not to talk over each other.
13        Do you know how many times your wife had
14 talked to Mr. Haviland?
15     A    No.
16     Q    Do you know when the first time your wife
17 talked to Mr. Haviland was, approximately?
18     A    No.
19     Q    Do you know whether your wife, I apologize
20 if I asked this already, do you know whether your
21 wife has spoken with anyone from Mr. Haviland's
22 office, other than Mr. Haviland?
0047
1     A    I don't know.
2     Q    What about Mr. Williams, do you know if
3 your wife has spoken with Mr. Williams before
4 yesterday?
5     A    I don't know.
6     Q    Do you know if she's spoken with anyone
7 who may work for Mr. Williams?
8     A    I don't know.
9     Q    Is it, was it your wife who first talked
10 to you about potentially getting involved in this
11 lawsuit?
12     A    Yes.
13     Q    Okay.  Do you recall when that was?
14     A    No.
15     Q    Do you know any of the lawyers --
16 withdraw.
17        Other than having met them yesterday, do
18 you know any of the lawyers involved in this case
19 through other means?
20     A    No.

21    Q   Does your wife know any of the lawyers
22  involved in this case?
0048
1    A   I don't know.
2    Q   What is your understanding of how Mr.
3  Haviland came to talk to your wife first about being
4  involved in this lawsuit?
5        MR. HAVILAND:  Now, Mr. Shepley, I want to
6  be careful here when you answer that question to not
7  reveal communications that either you or your wife
8  have had with counsel, and even in the conversations
9  you have had with your wife that relate to those
10  conversations, I want to be careful.  So I want to
11  make sure that you understand that in answering the
12  question.
13        Counsel wants to I think understand when
14  and how our relationship began, if I'm right about
15  that.
16        THE WITNESS:  I don't understand.  You
17  know, I don't understand the question.
18  BY MS. LAWSON:
19    Q   Did you get a letter in the mail saying
20  that there was this lawsuit out there and that you
21  could potentially be a plaintiff?
22        MR. HAVILAND:  Well, I'm going to instruct
0049
1  not to answer until we establish the starting point
2  for the relationship.
3        And I'll represent for the record,
4  counsel, that Mr. Shepley and his wife have been
5  clients of the firm for a number of years.
6  Mr. Shepley has been a client in the Lupron case,
7  your competitor's case, so until we establish that,
8  communications between counsel and the witness, our
9  client, are privileged.
10  //
11  BY MS. LAWSON:
12    Q   Mr. Shepley, I think I asked you when we
13  started this deposition this morning if you had ever
14  been involved in any other civil litigation; is that
15  correct?
16    A   Yes.
17    Q   And I thought you told me that you hadn't
18  been involved in any other.
19    A   Yes.
20    Q   Were you involved in litigation relating
21  to Lupron?
22        MR. HAVILAND:  Objection to the form.  I
0050
1  think it's just vague as to involvement.
2  BY MS. LAWSON:
3    Q   You testified earlier that in this case
4  you are asserting a claim that you were overcharged
5  for Lupron, right?

6    A   Yes.
7    Q   Has there ever been another case that you
8  asserted that you were overcharged for Lupron?
9    A   I don't know.
10    Q   We talked about your contact with Mr.
11  Haviland directly.  He works at a law firm where
12  there are other lawyers, you probably know that.  Do
13  you know the name of Mr. Haviland's law firm?
14    A   No, not offhand.
15    Q   Okay.  I'll represent to you that I
16  believe it's called Kline and Specter.
17       MR. HAVILAND:  With an E.
18       MS. LAWSON:  Specter with an E.
19  BY MS. LAWSON:
20    Q   Are you familiar with the law firm called
21  Kline and Specter?
22    A   Familiar, no.
0051
1    Q   In the last five years, leaving aside
2  Mr. Williams and Mr. Haviland, have you spoken with
3  any other lawyer?  I'm not asking what you spoke
4  about, just whether you have spoken with another
5  lawyer.
6    A   No.
7    Q   Do you know whether in the last five years
8  your wife has spoken with a lawyer other than
9  Mr. Williams or Mr. Haviland on your behalf?
10    A   No.
11    Q   No, you don't know, or no, she has not?
12    A   She has not, and I don't know.
13    Q   If your wife had contacted a lawyer on
14  your behalf, do you think she would tell you about
15  it?
16       MR. HAVILAND:  Object to the form of the
17  question.
18       THE WITNESS:  Yes.
19  BY MS. LAWSON:
20    Q   In this case are you bringing, asserting
21  claims -- withdraw.  Strike that.
22       In this lawsuit are you claiming that you
0052
1  were overcharged for a drug called Procrit?
2    A   No.
3    Q   In this lawsuit are you claiming that you
4  were overcharged for Zoladex?
5    A   No.
6       MR. HAVILAND:  Do you understand her
7  questions?  Do you understand what she's asking you?
8       THE WITNESS:  Yes.
9       MR. HAVILAND:  Okay.
10  BY MS. LAWSON:
11    Q   You were sitting here before when Mr.
12  Haviland said that his law firm had, that you were a
13  client of his law firm in connection with another

14  litigation, right?

15      A   I don't know.

16          MS. LAWSON:  Can you read back the portion

17  of the record where Mr. Haviland was cautioning

18  Mr. Shepley not to reveal privileged communi --

19  conversations between him and Mr. Shepley and his

20  wife that reveal discussions with lawyers.

21          (Record read as follows:

22          "Mr. Haviland:  Now, Mr. Shepley, I want

0053

1  to be careful here when you answer that question to

2  not reveal communications that either you or your

3  wife have had with counsel, and even in the

4  conversations you have had with your wife that relate

5  to those conversations, I want to be careful.  So I

6  want to make sure that you understand that in

7  answering the question.

8          "Counsel wants to I think understand when

9  and how our relationship began, if I'm right about

10  that.

11          "The Witness:  I don't understand.  You

12  know, I don't understand the question.

13          "Question by Ms. Lawson:  Did you get a

14  letter in the mail saying that there was this lawsuit

15  out there and that you could potentially be a

16  plaintiff?

17          "Mr. Haviland:  Well, I'm going to instruct

18  not to answer until we establish the starting point

19  for the relationship.

20          "And I'll represent for the record,

21  counsel, that Mr. Shepley and his wife have been

22  clients of the firm for a number of years.  Mr.

0054

1  Shepley has been a client in the Lupron case, your

2  competitor's case, so until we establish that,

3  communications between counsel and the witness, our

4  client, are privileged.")

5  BY MS. LAWSON:

6      Q   Now I you want to ask you, when did Mr.

7  Haviland or his law firm first begin representing

8  you in any case?

9      A   I don't remember.

10      Q   But sitting here today, you don't recall

11  Mr. Haviland or his law firm ever representing you

12  in any way other than in this lawsuit?

13      A   Yes.

14      Q   And just so we are clear, the answer is

15  yes, you do not recall them ever representing you in

16  any other matter.

17      A   Yes.

18      Q   So I'm going to ask again, did you receive

19  a letter informing you of this lawsuit and asking,

20  and indicating that you could potentially become

21  involved as a plaintiff?

22        MR. HAVILAND:  Now, Mr. Shepley, I'm going

0055

1  instruct you not to answer that question on the
2  grounds of attorney-client privilege.
3        MS. LAWSON:  How can you instruct him to
4  answer that on that?
5        MR. HAVILAND:  Because you haven't
6  established that there's, you have not established
7  the date for the relationship.
8        MS. LAWSON:  That's exactly what --
9        MR. HAVILAND:  Counsel, just because you
10  haven't established when it began doesn't give you
11  the right to come into the relationship after it's
12  started.  That's the problem I have with your
13  question.  You are asking a substantive question.
14        MS. LAWSON:  According to Mr. Shepley
15  there was no relationship prior to this lawsuit.
16        MR. HAVILAND:  That's not what he
17  testified.
18  BY MS. LAWSON:
19    Q   Mr. Shepley, can you tell me what if
20  any -- withdraw.
21        Prior to this lawsuit, did you have a
22  relationship, an attorney-client relationship with

0056

1  either Mr. Haviland or his law firm?
2    A   No.
3    Q   Do you know whether your wife first
4  learned about this lawsuit, the AWP, this lawsuit,
5  which is called In Re Pharmaceutical Industry
6  Average Wholesale Price Litigation, which, as Mr.
7  Haviland and I have done today, we refer to as the
8  AWP litigation for short, do you recall whether your
9  wife first learned about the AWP litigation, this
10  lawsuit, through a telephone call?  Was it a
11  telephone call?
12    A   I don't remember.
13    Q   Was it a letter?
14    A   I don't remember.
15    Q   Have you ever received a letter relating
16  to this AWP lawsuit?
17        MR. HAVILAND:  You can answer that yes or
18  no.
19        THE WITNESS:  Yes.
20        MR. HAVILAND:  If you know.
21        THE WITNESS:  Yes.
22  BY MS. LAWSON:

0057

1    Q   Who was the letter from?
2    A   I don't know.
3    Q   Do you have that letter?
4    A   I don't know.  I don't know.
5    Q   You don't know if you still have it?
6    A   No.

7   Q   Did you read the letter yourself?
8   A   I don't recall.
9   Q   Sitting here today, do you have a belief
10  as to whether you read the letter or not?
11      MR. HAVILAND:  Objection to the form.
12      THE WITNESS:  Yeah, I read it, but I don't
13  remember what was in it or what time or anything.  I
14  don't remember.
15  BY MS. LAWSON:
16   Q   Had you discussed this lawsuit with anyone
17  prior to the time that you received that letter?
18      MR. HAVILAND:  Yes or no.
19      THE WITNESS:  No.
20  BY MS. LAWSON:
21   Q   No, you had not discussed this lawsuit
22  with anyone prior to receiving that letter?
0058
1   A   No, I have not.
2   Q   I assume you don't recall the name of the
3  person who signed the letter; is that correct?
4   A   No.  No.
5   Q   No, you don't recall?
6   A   No, I don't recall.
7   Q   Do you recall whether the name, the person
8  who sent the letter, was familiar to you?
9   A   I don't remember.
10   Q   So you don't know whether it was a
11  stranger who sent the letter or someone that you
12  knew.
13   A   Uh-huh.
14   Q   I'm sorry, you have to say yes or no for
15  the record.
16   A   Yes.
17   Q   So yes, you don't know whether it was
18  someone --
19   A   Yes, I don't know.
20   Q   What did the letter say?
21      MR. HAVILAND:  Don't answer that question
22  on the grounds of attorney-client privilege,
0059
1  Mr. Shepley, I don't want you to answer that.
2      MS. LAWSON:  How can you assert
3  attorney-client privilege if he doesn't, if it
4  wasn't for purposes, according to him, since he
5  doesn't know who sent it, for obtaining or receiving
6  legal advice?
7      MR. HAVILAND:  You have not established
8  that, counsel.
9      MS. LAWSON:  I don't have to prove the
10  negative.
11      MR. HAVILAND:  Well, I don't have to waive
12  the attorney-client privilege because you have a
13  belief.
14      MS. LAWSON:  I'm going to request

15  production of the letter.
16        MR. HAVILAND:  You can request it all you
17  want, counsel, but you are not going to get it.
18  I'll take it under advisement, I'll respond.
19        MR. MANGI:  Are you representing it's a
20  letter from your law firm?
21        MR. HAVILAND:  I'm not representing
22  anything.  There was questions asking about a
0060
 1  letter.  If there's been communications between
 2  counsel and us, they are not going to be produced.
 3        MR. MANGI:  Are you representing that it's
 4  a communication between you as counsel and the
 5  witness.
 6        MR. HAVILAND:  There have been
 7  communications between me and counsel, as counsel,
 8  and the witness, yes.
 9        MS. LAWSON:  There have been letters that
10  you wrote to the witness, you or your law firm.
11        MR. HAVILAND:  We have communicated with
12  our clients, yes.
13        MS. LAWSON:  By letter.
14        MR. HAVILAND:  We have communicated by
15  letter.
16        MS. LAWSON:  Okay.  I believe Mr. Shepley
17  has testified that he received a letter about this
18  case and informing him of the possibility of being a
19  plaintiff in this case.
20        MR. HAVILAND:  That's not what he
21  testified.
22        MS. LAWSON:  Can you -- let me ask again.
0061
 1  BY MS. LAWSON::
 2    Q   The letter that we have been talking
 3  about, did it relate to this case?
 4        MR. HAVILAND:  Don't answer the question
 5  on the grounds of attorney-client privilege.
 6        Counsel, you can't get into the substance
 7  of a communication.  That's what you are doing.  The
 8  fact of the letter --
 9        MS. LAWSON:  I can ask, I can't ask about
10  the content, but I can ask about the subject.
11        MR. HAVILAND:  What's the question?
12        MS. LAWSON:  The question is, this letter
13  which he has already testified related to this case.
14        MR. HAVILAND:  He has not.  But go ahead,
15  what's your question?
16  BY MS. LAWSON:
17    Q   Have you ever received a letter relating
18  to this lawsuit?
19        MR. HAVILAND:  You can answer that yes or
20  no.
21        THE WITNESS:  Yes.  Yes.
22  BY MS. LAWSON:

0062
1      Q   Have you ever received a letter relating
2  to this lawsuit -- withdraw.
3          Have you received more than one letter
4  relating to this lawsuit?
5          MR. HAVILAND:  You can answer that yes or
6  no.
7          THE WITNESS:  Yes.
8  BY MS. LAWSON:
9      Q   How many letters relating to this lawsuit
10  have you received?
11      A   I don't know.
12      Q   More than five?
13      A   I don't know.
14      Q   But you know it was more than one.
15      A   Yes.
16      Q   When was the last time you received a
17  letter relating to this lawsuit?
18      A   I don't know.
19      Q   When was the first time you received a
20  letter relating to this lawsuit?
21      A   I don't know.
22      Q   Have you received any letters relating to
0063
1  this lawsuit that didn't come from a lawyer or a law
2  firm?
3      A   No.  No.
4      Q   So when I asked you before if you knew who
5  sent the letter, and you said I don't know, correct?
6      A   Yes.
7      Q   But you know it was a lawyer?
8          MR. HAVILAND:  Well, you asked a better
9  question this time, counsel, and that's why he gave
10  you a better answer.
11          MS. LAWSON:  You can keep your comments to
12  yourself.
13          MR. HAVILAND:  I just want it to be clear
14  that he testified accurately on both counts.
15          MS. LAWSON:  He also testified he wasn't
16  familiar with, he didn't know whether he was
17  familiar with the person or not.
18  BY MS. LAWSON:
19      Q   How do you know the person or persons who
20  sent the letters were lawyers or law firms?
21      A   I don't know.
22      Q   Okay.  Do you remember I asked you before
0064
1  if the name on the letter was someone who was
2  familiar to you or someone who was a stranger, do
3  you remember that?
4      A   Yes.
5      Q   And you testified that you didn't know.
6      A   Yes.
7          MR. HAVILAND:  Asked and answered.

8      THE WITNESS:  Yes.
9  BY MS. LAWSON:
10     Q    And you have now testified that it's your
11  recollection that the letters you received relating
12  to this case were from a lawyer or a law firm; is
13  that correct?
14     A    Yes.
15     Q    Okay.  How do you know that the letters
16  were from a lawyer or a law firm?
17         MR. HAVILAND:  Asked and answered.
18         THE WITNESS:  I don't know.
19         MR. HAVILAND:  Could we just try and take
20  breaks every 30 minutes or so.
21         MS. LAWSON:  Has it been 30 minutes?
22         MR. HAVILAND:  If you find --
0065
1          MS. LAWSON:  No, we can take a break now.
2  That's fine.
3          MR. HAVILAND:  If you want to close
4  something off.
5          MS. LAWSON:  No.
6              (Recess taken.)
7  BY MS. LAWSON:
8      Q    Mr. Shepley, have you ever lived in the
9  state of Massachusetts?
10     A    No.
11     Q    Have you ever been treated at a hospital
12  in Massachusetts?
13     A    No.
14     Q    Have you ever been to the state of
15  Massachusetts?
16     A    No.
17     Q    So I assume you never bought prescription
18  drugs in the state of Massachusetts.
19     A    No.
20     Q    Have you ever been, seen a doctor, well,
21  talked to a doctor in Massachusetts?
22     A    No.
0066
1      Q    You testified earlier that you have been
2  treated with both Lupron and Zoladex for prostate
3  cancer, right?
4      A    Yes.
5      Q    We will take one at a time.  With Lupron,
6  were you treated in a doctor's office or in the
7  hospital?
8      A    Doctor's office.
9      Q    What about Zoladex, were you treated in a
10  doctor's office?
11     A    Yes.
12     Q    Do you prefer to be treated in a doctor's
13  office rather than a hospital?
14         MR. HAVILAND:  Objection to form.
15         THE WITNESS:  Yes.

16  BY MS. LAWSON:
17      Q   Why?
18      A   Because I don't care too much about
19  hospitals.
20      Q   In the last 15 years have you been treated
21  in a hospital for anything?
22      A   Yes.
0067
1      Q   Okay.  And you didn't like being treated
2  in the hospital?
3      A   No.
4      Q   Is it more convenient for you to be
5  treated in a doctor's office?
6      A   Yes.
7      Q   Have you authorized your lawyers in this
8  case to obtain copies of any records or billing
9  statements from the, your urologists -- withdrawn.
10          Have you authorized your lawyers in this
11  case to obtain any medical records?
12      A   Yes.
13      Q   Have you authorized them to obtain billing
14  records related to medical treatment?
15      A   I don't know.
16      Q   Have either you or your wife looked in
17  your home to see if you have any records, medical
18  records related to Zoladex or Lupron?
19      A   I don't know.  She does all that.
20      Q   Have either you or your wife looked to see
21  if you have any billing records in your home related
22  to Zoladex or Lupron?
0068
1      A   I don't know.
2      Q   Have you personally looked in your home or
3  any files you may have to gather documents for this
4  case regardless of the drug?
5      A   No.
6      Q   Are you familiar with the term "class
7  action"?
8      A   Vaguely.
9      Q   What do you understand it to mean?  What
10  do you understand the term "class action" to mean?
11      A   It's a lawsuit.  It's a lawsuit for the
12  people, the class, for the people, I guess.
13      Q   A lawsuit for a group of people?
14      A   For what?
15      Q   On behalf of a group of people?
16      A   Yes.  Yeah.
17      Q   Is this lawsuit a class action?
18      A   Yes.
19      Q   Who is the group of people that this class
20  action, that this lawsuit is being brought on behalf
21  of?
22      A   I don't know.
0069

1    Q   Are you one of the people this lawsuit is
2  being brought on behalf of?
3    A   Yes.
4    Q   Do you know what makes you part of the
5  group that this lawsuit is being brought on behalf
6  of?
7    A   No, I -- no.
8    Q   Are you familiar with the term "class
9  representative"?
10    A   No.
11    Q   Are you familiar with the term
12  "representative plaintiff"?
13    A   No.
14    Q   What do you -- withdraw.
15       Do you know the names of any of the
16  defendants in this case?
17    A   No.
18    Q   Do you know whether retail pharmacies are
19  defendants in this case?
20    A   No.
21    Q   Do you know whether wholesalers that sell
22  prescription drugs are defendants in this case?
0070
1    A   I don't know.
2    Q   Do you know whether doctors are defendants
3  in this case?
4       MR. HAVILAND:  Asked and answered.
5       THE WITNESS:  I don't know.
6  BY MS. LAWSON:
7    Q   Do you know whether companies that
8  manufacture prescription drugs are defendant in this
9  case?
10    A   Repeat that, please.
11    Q   Do you know whether companies, do you know
12  if companies that manufacture prescription drugs are
13  defendants?
14    A   I don't know.
15    Q   Do you know who the plaintiffs are in this
16  case?
17    A   No.
18    Q   Are you a plaintiff in this case?
19       MR. HAVILAND:  Asked and answered.
20       THE WITNESS:  Yes.
21  BY MS. LAWSON:
22    Q   Are you a class representative in this
0071
1  case?
2    A   I don't know.
3    Q   As a plaintiff in this case, what do you
4  understand your -- withdraw.
5       As a plaintiff in this case, do you have
6  any responsibilities?
7    A   I don't know.
8    Q   Do you know whether you have a

9  responsibility to provide documents?

10     A   No.

11     Q   You don't know, or no, you don't have any?

12     A   I don't know.

13     Q   Do you know whether you have a

14  responsibility to testify in a trial if there is

15  one?

16     A   I don't know.

17     Q   If asked to in connection with this case,

18  would you be willing to travel to Boston,

19  Massachusetts?

20     A   Not really.

21        MR. HAVILAND:  He will consult with his

22  counsel about that when the time comes.

0072

1  BY MS. LAWSON:

2     Q   But your answer to my question was that

3  you are not really willing to travel to Boston?

4     A   No.

5     Q   I'm sorry, I have too many papers here.

6  It will be just one minute.

7        When you were treated with, you are

8  currently being treated with Lupron, correct?

9     A   Yes.

10     Q   Who pays for the Lupron that you are being

11  treated with?

12     A   I don't know.

13        MR. HAVILAND:  Currently?

14        MS. LAWSON:  Yes.

15  BY MS. LAWSON:

16     Q   When you were given Zoladex -- withdraw

17  that.

18        I apologize if I have asked this already,

19  but do you remember approximately what year you were

20  given Zoladex?

21     A   No.

22     Q   But it would have been sometime between

0073

1  1991 and now, correct?

2     A   Yes.

3     Q   Who paid for the Zoladex you were given?

4     A   I don't know.

5     Q   Do you know whether, taking Zoladex now,

6  do you know whether your doctor who gave you the

7  Zoladex charged your, charged Medicare for that?

8     A   I don't know.

9     Q   Do you know if the doctor owned the

10  Zoladex that he administered to you?

11        MR. HAVILAND:  Objection to the form.

12  BY MS. LAWSON:

13     Q   What I'm trying to get at is, was the

14  Zoladex you were being given, when you were given

15  Zoladex, was it purchased from your doctor, leaving

16  aside who paid, but was it purchased from your

17  doctor?
18      A   I don't know.
19      Q   And what about Lupron, is that purchased
20  from your doctor now?
21      A   I don't know.
22      Q   Do you know at any time whether the Lupron
0074
1  you received was purchased from your doctor?
2          MR. HAVILAND:  Objection to the form.
3          THE WITNESS:  No.
4          MR. HAVILAND:  Vague.  Are you asking
5  whether he bought it, bought it from the doctor?
6  I'm just not clear about that question.  You said
7  purchased.
8          MS. LAWSON:  Mr. Shepley has testified
9  that he doesn't know whether he made any payments
10  for it, so I'm just asking.
11  BY MS. LAWSON::
12      Q   Do you know whether the doctor owned the
13  medication he was giving to you, do you know that?
14      A   No.
15      Q   Either for Zoladex or Lupron?
16      A   I don't know.
17      Q   So you don't know, we can all assume that
18  any Lupron or Zoladex that you were given, somebody
19  had to pay for it somewhere along the lines,
20  correct?
21          MR. HAVILAND:  Objection to the form.
22          THE WITNESS:  Yes.
0075
1  BY MS. LAWSON:
2      Q   And it had to be, there had to be a buyer
3  and a seller; is that consistent with your
4  understanding?
5      A   Yes.
6      Q   And for Zoladex or Lupron, do you know
7  during the time period you were given either, so we
8  can say 1991 to today, do you know for any time
9  period who the seller and buyer of Zoladex or
10  Lupron --
11      A   I don't know.
12      Q    -- that was given to you?
13          Do you know whether this lawsuit and the
14  group of plaintiffs on whose behalf this lawsuit is
15  being asserted, do you know whether that's limited
16  to people in the state of Nevada?
17      A   I don't know.
18      Q   Just to make the record clear, do you know
19  whether people in the state of Illinois are included
20  as plaintiffs in this case?
21      A   I don't know.
22      Q   Last question on this topic.  Do you know
0076
1  whether people from the state of Massachusetts are

2  included?
3      A   I don't know.
4      Q   It's a slightly different topic.  Do you
5  know whether insurance companies are included as
6  plaintiffs in this lawsuit?
7      A   I don't know.
8      Q   Does Medicare -- withdrawn.
9          When you receive a drug in a physician's
10  office, so when the physician administers it, as
11  opposed to getting a prescription and buying it in a
12  retail pharmacy, when you receive a drug in a
13  physician's office, does Medicare pay the physician
14  for that?
15     A   I don't know.
16     Q   So I'll assume -- if we -- withdraw that.
17         Do you know how it is that Medicare
18  determines what it will pay your doctors?
19     A   No, I don't.
20     Q   What about United American, do you know
21  how it determines what it will pay your doctors?
22     A   No.
0077
1      Q   Have you ever spoken with any of your
2  doctors, and I'm talking from the period 1991 to
3  today, have you ever spoken with any of your doctors
4  about the cost of a medical treatment?
5      A   No.
6      Q   What about with someone from Medicare,
7  have you ever had a conversation with anyone from
8  Medicare about coverage or reimbursement?
9      A   No.
10     Q   What about United American, have you ever
11  talked to United American about your coverage or
12  reimbursement?
13     A   No.
14     Q   And lastly, it was Senior Care Plus,
15  Hometown Health Plan, have you ever spoken with
16  anyone from Senior Care Plus or Hometown Health Plan
17  about your coverage or reimbursement?
18     A   No.
19     Q   Have you ever spoken with any of your
20  doctors about drug prices?
21     A   No.
22     Q   Anyone from any of your insurers?
0078
1      A   No.
2      Q   Have you ever spoken with anyone from
3  Medicare about drug prices?
4      A   No.
5      Q   You said earlier that you were bringing a
6  claim in this case that you were charged too much
7  for Lupron, right?
8      A   Yes.
9      Q   Why do you think you were charged too much

10  for Lupron?
11      A   Why?  Because they sent me a bill, and I
12  had to pay out of my own pocket.  I mean, insurance,
13  Medicare and insurance didn't cover it, and I had to
14  pay the balance.
15      Q   Okay.  So when did you pay for Lupron?
16      A   When?
17      Q   Uh-huh.
18      A   When I first started getting it, I
19  believe.
20      Q   And do you recall when that was?
21      A   Probably 1991.
22      Q   You testified earlier that you didn't
0079
1   remember whether you paid anything out of pocket for
2   Lupron, and I think now you are saying you do
3   remember paying out of pocket for Lupron; is that
4   right?
5       A   Yes.
6       Q   Did you pay -- withdraw.
7           Do you currently pay anything out of
8   pocket for Lupron?
9       A   I don't know.
10      Q   Okay.  So you remember that in 1991 -- in
11  or around 1991 you paid something out of pocket for
12  Lupron; is that right?
13      A   I don't know.  I don't remember.
14      Q   What about for Zoladex, do you remember
15  ever paying anything out of pocket for Zoladex?
16      A   No, I don't remember.
17      Q   Assuming that you did pay something out of
18  pocket for Lupron in or around 1991, why do you
19  think that you were overcharged?
20          MR. HAVILAND:  Asked and answered.
21          THE WITNESS:  Because they sent me a bill,
22  that's why.
0080
1   BY MS. LAWSON:
2       Q   So I'm just trying to understand your
3   testimony.  Is it if you pay anything out of pocket,
4   then you think you are being overcharged?
5       A   Correct.
6       Q   Does that go for all drugs?
7       A   Yes.
8           MS. LAWSON:  I'd like to mark this
9   document as Shepley deposition Exhibit Shepley 001.
10          (Exhibit Shepley 001 marked.)
11  BY MS. LAWSON:
12      Q   Mr. Shepley, the court reporter has just
13  handed you what's been marked as Shepley deposition
14  Exhibit Shepley 001.  Have you seen this document
15  before, or something -- withdrawn.
16          If you would take a look at it, just the
17  first page.  You can just look at the cover page

18  just for now.
19          MR. HAVILAND:  That page.
20          MR. MANGI:  Which one is that document?
21          MS. LAWSON:  This is the third amended
22  master consolidated class action complaint, a
0081
1  redacted version.
2          MR. MANGI:  Okay.
3  BY MS. LAWSON:
4      Q   Have you seen anything that looks like
5  this document before?
6      A   Not really.  No.
7      Q   Do you recall anyone ever giving --
8  withdrawn.
9          Are you familiar with the term "complaint"
10  as it's used in a lawsuit, like filing a complaint?
11     A   No.
12     Q   I'll represent to you, and your lawyer
13  will correct me if I am wrong, but for the piece of
14  paper that articulates what the plaintiffs, at least
15  to some extent, what the plaintiffs in a case are
16  alleging was wrong is put in a document, that's
17  called the complaint.  Have you ever seen the
18  complaint in this case?
19     A   No.
20     Q   Okay.  And I should clarify.  There's been
21  more than one complaint filed in this case.  So have
22  you seen any complaint filed in this case?
0082
1      A   No.
2      Q   I'll represent for you that what has been
3  marked as Shepley Deposition Exhibit Shepley 001 is a
4  version of the third amended complaint in this case.
5  It redacts certain information.
6      A   I don't understand.
7      Q   Okay.  That's what's been put in front of
8  you, is the third, a version of the third amended
9  complaint.  And the third amended complaint is, your
10  lawyer will again correct me if he thinks I'm
11  misdescribing, the complaint that's operative right
12  now, like right now in November 2005.
13          Just sitting here today, and you can flip
14  through it if you want to, the question is, have you
15  ever seen this third amended complaint before?
16     A   No.
17          MS. LAWSON:  If we could take five
18  minutes, and then we will wrap up.
19          MR. HAVILAND:  Sure.
20              (Recess taken.)
21  BY MS. LAWSON:
22     Q   Mr. Shepley, you've testified that you
0083
1  have been given both Zoladex and Lupron over the
2  years.  Do you have a preference for one or the

3 other?

4    A   Lupron.

5    Q   You prefer Lupron?  Why?

6    A   I thought it was doing a better job for

7 the prostate.

8    Q   So you thought it was more effective in

9 treating your prostate cancer?

10   A   Yes.

11   Q   Am I correct that Lupron and Zoladex are

12 injected differently?

13   A   Yes.

14   Q   Okay.  Zoladex into your abdomen; is that

15 correct?

16   A   Yes.

17   Q   And Lupron into your back side.

18   A   Yes.

19       MR. HAVILAND:  Or your leg.

20       THE WITNESS:  You can say buttocks, that's

21 all right.

22 BY MS. LAWSON:

0084

1    Q   Do you have a preference for the abdominal

2 or leg, back side injection?

3    A   Yes.

4    Q   Which one?

5    A   Back side.

6    Q   So Lupron.

7    A   Lupron, yes.

8    Q   Do you have an understanding as to whether

9 Zoladex is more expensive than Lupron?

10   A   I don't know.

11   Q   So the price of Zoladex versus Lupron

12 hasn't really been what drove your decision to use

13 Lupron?

14       MR. HAVILAND:  Objection to the form.

15       THE WITNESS:  I don't know.

16 BY MS. LAWSON:

17   Q   Let me rephrase.

18   A   Okay.

19   Q   Do you use Lupron because it's cheaper

20 than Zoladex?

21   A   I don't know.

22   Q   Would it surprise you if Lupron was more

0085

1 expensive than Zoladex?

2    A   No.

3    Q   So is it fair to say that the price of

4 Lupron relative to the price of Zoladex -- I see

5 your lawyer shaking his head already.

6       MR. HAVILAND:  You just lost your

7 foundation.

8 BY MS. LAWSON:

9    Q   You have testified you prefer Lupron?

10   A   Yes.

11      Q    Is price a reason why you prefer Lupron?
12          MR. HAVILAND:  Asked and answered.
13          THE WITNESS:  No.
14  BY MS. LAWSON:
15      Q    If Zoladex were cheaper than Lupron, would
16  you switch to Zoladex?
17          MR. HAVILAND:  Calls for speculation.
18          THE WITNESS:  I don't know.
19  BY MS. LAWSON:
20      Q    I think, I'm pretty sure you have already
21  testified that you have not discussed with any of
22  your doctors the cost of Zoladex or Lupron, right?
0086
1       A    That's right.  Yes.
2       Q    If, when I asked you if you would switch
3  to Zoladex if it was cheaper than Lupron, your
4  answer was "I don't know," right?
5       A    Yes.
6       Q    So if you might switch if it's cheaper,
7  how come you haven't asked your doctor?
8          MR. HAVILAND:  Speculation, argumentative.
9          Can you answer that?
10          THE WITNESS:  Like I said, I prefer
11  Zola -- or Lupron.
12  BY MS. LAWSON:
13      Q    That's fine.  I'm just trying to make, get
14  clear, is you prefer Zol -- I'm sorry, I did the
15  same thing.  Let me rephrase, say that again.
16          I'm just trying to make clear.  What I
17  understand you to be saying is that you prefer
18  Lupron because you think it treats your prostate
19  cancer better and you prefer the injection over the
20  Zoladex abdominal injection?
21      A    Yes.
22      Q    Is it correct that you prefer Lupron
0087
1  irrespective of the price?
2       A    Yes.
3          MR. HAVILAND:  Objection to form.
4  BY MS. LAWSON:
5       Q    So even if Lupron is more expensive than
6  Zoladex, you still prefer it.
7       A    Yes.
8          MS. LAWSON:  I have no further questions.
9          MR. HAVILAND:  Mr. Shepley, I just have
10  one question for you.
11              EXAMINATION
12  BY MR. HAVILAND:
13      Q    The document that was put in front of you,
14  this Shepley 1, you were asked some questions about
15  that earlier.
16      A    Yes.
17      Q    Do you have another document at home that
18  is a bigger document than this that you have

19   reviewed?
20      A   Yes.
21      Q    So were you confused when you were asked
22   questions about this particular document?
0088
1       A   Yes, I thought this was different.
2       Q   Okay.  I just want to be clear about this.
3       A   Yes.  I thought this was a different one.
4          MS. LAWSON:  Because this one is double
5   sided and so thinner?
6          THE WITNESS:  I think so.
7          MS. LAWSON:  I just have a couple of more
8   questions.
9              FURTHER EXAMINATION
10   BY MS. LAWSON::
11      Q    Did you, your version of the complaint,
12   which isn't double sided like mine, I was trying to
13   save some trees and my back --
14          MR. HAVILAND:  Very admirable of you.
15   BY MS. LAWSON:
16      Q    -- and my back from carrying it.  Your
17   version of the complaint, did you read it?
18      A   No.
19      Q   Did you read any part of it?
20      A   Yes.
21      Q   What part did you read?
22      A   The first part.
0089
1       Q   By the first part --
2       A   Yeah, first part.  I don't know.
3       Q   Can you show me?
4       A   Yeah.
5       Q   Can you show me which, whether the first
6   part, I mean it's broken up into sections.  And I'm
7   not trying to be difficult here.  The first several
8   pages are a table of contents, and then on the first
9   numbered page 1 it turns to an introduction.
10      A   Yeah.
11      Q   Did you read that?
12      A   Introduction.  Yes.
13      Q   Okay.  The introduction goes on for a few
14   pages, and then we get to pages --
15      A   No, I didn't read that.
16      Q   So the headings on these pages that I was
17   just showing you --
18          MR. HAVILAND:  Let me be clear.  He said
19   he didn't read the jurisdiction.
20          MS. LAWSON:  I know, that's what I'm going
21   to make sure.
22   BY MS. LAWSON:
0090
1       Q   Page 4 is called Jurisdiction and Venue,
2   and you said you didn't read that page, correct?
3       A   Yes.

4      Q   And the top of page 5 is called Parties,
5   the heading is Parties.  Did you read that section?
6      A   No.
7      Q   Parties goes all the way to approximately
8   page 42.  Did you read beyond the Parties section?
9   At page 42 we have General Allegations.  Did you
10  read that section?
11     A   No.
12     Q   I'm trying to short circuit this.  Did you
13  read --
14     A   My wife read it.  That was good enough for
15  me.
16     Q   Did you and your wife -- so your wife read
17  the whole complaint?
18     A   I think so.
19     Q   Okay.  That would be admirable, all 200, I
20  feel bad for you.
21         MR. HAVILAND:  War and Peace.
22  BY MS. LAWSON:
0091
1      Q   Did you talk to your wife about what the
2   complaint said?
3      A   Yes, we talked a little bit about it, yes.
4      Q   Do you know whether the complaint talks,
5   mentions you?
6      A   Yes.
7      Q   Okay.  And does it?
8      A   On the first page I think it was.
9      Q   So you didn't read the, you think you read
10  the first few pages, but, and you think your wife
11  read the rest of the complaint.
12     A   Yes.
13         MS. LAWSON:  I don't have any further
14  questions.
15         MR. HAVILAND:  Okay.  We are done.  Thank
16  you.
17         MS. LAWSON:  Thank you, Mr. Shepley.
18             (12:55 p.m., deposition
19             concluded.)
20                  -o0o-
21
22
0092
1          I do hereby swear or affirm under penalty of
2   perjury that the answers and/or assertions in this
3   deposition are true.
4
5
6          _____
7          JAMES E. SHEPLEY
8
9   Signed:
10  this_____day of _____,2005.
11

12
13
14
15
16
17
18
19
20
21
22
0093
1  STATE OF NEVADA,    )
2                      ) ss.
3  COUNTY OF WASHOE.   )
4
5        I, LESLEY A. CLARKSON, Certified Court Reporter
6  for the State of Nevada, do hereby certify:
7        That on Friday, November 11, 2005, at the Eldorado
8  Hotel-Casino, 345 North Virginia Street, 3rd Floor Board
9  Room, Reno, Nevada, I was present and took stenotype notes
10 of the deposition of JAMES E. SHEPLEY, who personally
11 appeared and was duly sworn by me, and thereafter
12 transcribed the same into typewriting as herein appears;
13        That the foregoing transcript is a full, true and
14 correct transcript of my stenotype notes of said deposition.
15        Dated at Reno, Nevada, this 14th day of November,
16 2005.
17
18        _____
19             Lesley A. Clarkson, CCR #182
20
21
22