# EXHIBIT J

0001
1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF MASSACHUSETTS
3    ----------------------------------X
4    IN RE:  PHARMACEUTICAL INDUSTRY    )
5    AVERAGE WHOLESALE PRICE LITIGATION  )
6    ----------------------------------X
7            File No. 01-CV-12257 PBS
8            Hon. PATTI B. SARIS
9
10           HIGHLY CONFIDENTIAL
11
12        DEPOSITION OF HUNTER G. WALTERS,
13   held on  March 28, 2006, at 58138 M-40, Jones,
14   MI, before Mary B. Howland, Certified Shorthand
15   Reporter, CSR-0078 and Notary Public, pursuant
16   to Notice at 10:00 a.m.
17
18
19
20
21
22
0002
1    APPEARANCES:
2
3    FOR THE PLAINTIFF:
4
5       ADAM S. LEVY, ESQ.
6       THE LAW OFFICE OF ADAM S. LEVY
7       P.O. Box 88
8       Oreland, PA  19075
9
10      WILLIAM J. MOLINARI, III, ESQ.
11      KLINE & SPECTER, PC
12      1525 Locust Street
13      19th Floor
14      Philadelphia, PA  19102
15
16      ADAM WRIGHT, ESQ.
17       (via telephone)
18      ROPES & GRAY LLP
19      One International Place
20      Boston, MA  02110-2624
21
22   (CONTINUED)
0003
1    APPEARANCES:   (CONTINUED)
2
3    FOR THE DEFENDANT:
4
5      PHILIP D. ROBBEN, ESQ.
6      KELLEY DRYE & WARREN LLP

7    101 Park Avenue
8    New York, NY  10178-0002
9
10
11  Also appearing: Sung W. Kim
12
13
14
15
16
17
18
19
20
21
22
0004
1               I N D E X
2   WITNESS:  HUNTER G. WALTERS              PAGE
3     Examination by Mr. Robben..................... 006
4
5               E X H I B I T S
6   NUMBER          DESCRIPTION          PAGE

7   Exhibit Walters 001, Box labeled DEY Albuterol
8               Sulfate; Fill Date 01/07/04. 054
9   Exhibit Walters 002, Top flap of box labeled
10              DEY Albuterol Sulfate; Fill
11              Date 12/10/03............... 054
12  Exhibit Walters 003, Package insert for the
13              prescribing information that
14              was included in the box
15              marked Exhibit Walters 001.. 054
16  Exhibit Walters 004, WALTERS 0011 - 0012......... 073
17  Exhibit Walters 005, Fourth Amended Master
18              Consolidated Class Action
19              Complaint, Unredacted
20              Version..................... 115
21  Exhibit Walters 006, WALTERS 0015................ 139
22    (CONTINUED)
0005
1         E X H I B I T S  (CONTINUED)
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Walters 007, WALTERS 0001 - 0003......... 153
4   Exhibit Walters 008, WALTERS 0007 - 0008......... 158
5
6
7   NOTE:
8    ALL EXHIBITS DESIGNATED HIGHLY CONFIDENTIAL.
9    All exhibits were marked prior to the start
10       of the proceedings.
11
12
13
14

```
15
16
17
18
19
20
21
22
```

0006
```
 1            P R O C E E D I N G S
 2  (Witness sworn)
 3              HUNTER G. WALTERS,
 4  the witness herein, being duly sworn, was examined
 5  and testified as follows:
 6
 7              EXAMINATION
 8  BY MR. ROBBEN:
 9      Q.  Good morning, Mr. Walters.
10      A.  Good morning.
11      Q.  My name is Philip Robben.
12      A.  My name is Hunter G.  Walters, Senior.
13      Q.  Could you spell your last name for the
14  record?
15      A.  W-A-L-T-E-R-S.
16      Q.  Thank you.
17          Thank you for being here today.  I know it
18  is not the typical everyday experience to come down
19  and give a deposition, particularly at a bed and
20  breakfast such as this.  But we do appreciate you
21  coming down.
22          Have you ever been deposed before?
```
0007
```
 1      A.  I beg your pardon?
 2      Q.  Have you ever given testimony in a setting
 3  like this?
 4      A.  Yes, I have.
 5      Q.  You have.  How many times?
 6      A.  Oh, I would say about five or six.
 7      Q.  Can you just generally describe for me
 8  what those -- what those instances were?  Can you
 9  describe the cases that you gave the testimony in?
10      A.  It is with the Post Office Department.  I
11  was with the Post Office Department about 28 years,
12  so I have been on different cases of Post Office out
13  of the regional, out of Chicago.
14      Q.  These were cases that came up in
15  connection with your employment?
16      A.  Yes.
17      Q.  Were you a litigant in the cases?
18      A.  No.
19          MR. LEVY:  Objection.
20      Q.  You were just testifying as an employee of
21  the Postal Service?
22      A.  Most of them I was sitting in.
```

0008
1      Q.  You were just -- did you give the
2  testimony or were you just there?
3      A.  No, I was just there.
4      Q.  Okay.  And so is all of your prior
5  experience that type of experience, your deposition
6  experience?
7           MR. LEVY:  Objection.
8           When I object, I am going to let you
9  answer the question, unless I say, Mr. Walters,
10  don't answer that question, okay.  So you can answer
11  that question.
12      A.  Okay.  Now, what was your question,
13  please?
14      Q.  My question was:  Is all of the times you
15  have been involved with depositions before today
16  been as an employee of the Post Office?
17      A.  No, it was mostly a labor relation deal,
18  as a union representative.
19      Q.  Okay.  Now, have you ever been a party to
20  a lawsuit before?
21           MR. LEVY:  Objection.  The reason I am
22  objecting is just we use words that I want to make
0009
1  sure he understands what you mean by party,
2  litigant, things like that.
3  BY MR. ROBBEN:
4      Q.  That's fair.  Do you understand what I
5  mean when I say a party to a lawsuit?
6      A.  Do I have to answer that, attorney?
7           MR. LEVY:  Yes, you do.  Yes.
8      A.  Yes, I have been a party of a lawsuit.
9      Q.  Okay.  So you have been -- you have sued
10  somebody or somebody has sued you?
11      A.  I was suing somebody.
12      Q.  Okay.  How long ago was that?
13      A.  About ten years ago.
14      Q.  Was that the only time?
15      A.  Yes, that's the only time.
16      Q.  What was the -- just very general, what
17  was the -- what were the circumstances?
18      A.  Labor relation, as I said.  A firing
19  charge.
20      Q.  A firing charge?
21      A.  I was fired, and it was a firing charge.
22      Q.  I see so you brought an action?
0010
1      A.  Yes, I did.
2      Q.  Okay.  So as you might remember, but I
3  will go over just some procedural points just so we
4  are all on the same page.  You are under oath today.
5  That means you have to tell the truth, I am sure you
6  understand.
7           You need to make a verbal response to any

8  questions, so that the court reporter can take it
9  down in writing.  If there is a question that I ask
10  you that you don't understand, please let me know
11  and I will try and rephrase it, because I want you
12  to be responding to questions that you understand.
13       If you respond to a question that you
14  haven't asked for clarification, I am going to
15  assume that you understood it and anybody who reads
16  the transcript will make the same assumption I
17  think.
18       Please let me finish my question before
19  you make your answer and I will try and do the same,
20  so that your answers are not cutoff.
21       And as Mr. Levy said, he might sometimes
22  object to a question if I bollix it up.  I ask you
0011
1  answer it unless he directs you not to answer.  And
2  if you need a break at any time to use the
3  facilities, to get a drink of water, whatever,
4  please let us know and we will accommodate you.
5      A.  May I -- may I interject one question to
6  you?  I am hard of hearing, and I have my hearing
7  aid in, but even at that, it is still, I have back
8  noises coming in around it.  So you have to talk a
9  lot louder and clearer in asking me a lot of those
10  questions.
11      Q.  Okay.  I will try and do that.
12      A.  Okay.
13      Q.  My daughter is actually deaf, so I am used
14  to hearing aids and the whole problem.
15       MR. LEVY:  Thank you.
16  BY MR. ROBBEN:
17      Q.  No problem.
18       If at any point I ask you a question and
19  you answer it and a little while later you remember
20  something or you want to correct your answer, please
21  let me know.  This isn't a test.
22       I want you to give your best recollection.
0012
1  And if that comes later, you know, let us know,
2  okay.
3       And at some point I might ask you
4  questions that involve your medical history, your
5  medical background, I don't mean to embarrass you or
6  put you on the spot, it's just sort of the nature of
7  the case.  If you think a question is too personal
8  or presents a problem for you to answer, just
9  because you think it's a sensitive subject, let me
10  know and we will try and work around that, okay?
11      A.  I will ask my attorney.
12       MR. LEVY:  That's fine.
13      Q.  Okay.  Are you -- did you take any
14  medication today or within the past day that you
15  think might affect your ability to remember?

16    A.  Yes.
17    Q.  What medication did you take?
18         MR. LEVY:  Let him -- make sure he
19  finishes his question.  He asked you whether you
20  think it affects your ability to remember or be able
21  to speak from your memory.
22         MR. ROBBEN:  Correct.
0013
 1         MR. LEVY:  Could you rephrase the question
 2  please?
 3  BY MR. ROBBEN:
 4    Q.  Yeah.  Sure.
 5         Have you taken any medication today that
 6  you think might affect your ability to testify
 7  truthfully or to recall things from your memory?
 8    A.  No.
 9    Q.  Okay.  Do you take any medications
10  regularly?
11    A.  Yes.
12    Q.  What medications do you take?
13    A.  I take medication for my cardiac.  I take
14  medication for my breathing.  I also take medication
15  for my -- I have low blood pressure, so I also take
16  -- I am just an old-timer taking a lot of vitamins
17  and medicine that is prescribed for me.
18    Q.  Okay.  But none of those medications
19  affect your memory?
20    A.  No.
21    Q.  Okay.  Did you speak to anybody in
22  preparing to come and testify today?  I don't want
0014
 1  to know what you said, I just want to know if you
 2  spoke with anybody before coming here today about
 3  the deposition?
 4    A.  Yes, I've been with my attorney.
 5    Q.  Would that be Mr. Levy?
 6    A.  Yes.
 7    Q.  I am sorry, I forgot your name.
 8         MR. MOLINARI:  Mr. Molinari.
 9    Q.  Did you also speak with Mr. Molinari?
10    A.  Yes.
11    Q.  When did you meet with them?
12    A.  I beg your pardon.
13    Q.  When did you meet with them, before today,
14  to prepare for the deposition?  Did you meet with
15  them for, say yesterday?
16    A.  Yesterday.
17    Q.  How long did you meet with them, would you
18  say?
19    A.  I would say about a couple hours.
20    Q.  Was anybody else there other than you and
21  the attorneys?
22    A.  Yes, my wife and my daughter.
0015

1     Q.  Okay.  Did they participate in the
2  meeting?
3     A.  No.
4     Q.  So they were just in the house?
5     A.  Yes.
6     Q.  Didn't participate?
7     A.  Yes.
8     Q.  Did you speak to anybody other than
9  lawyers about the deposition today?
10     A.  No.
11     Q.  Did you review any documents in preparing
12  for testimony today?
13     A.  Yes.
14     Q.  Were those documents that your lawyers
15  asked you to review?
16     A.  Would you repeat that?
17     Q.  Sure.  Were the documents that you
18  reviewed, were those documents that your lawyer
19  asked you to look at?
20     A.  Well, some of them were and some of them
21  weren't.
22     Q.  Okay.  What documents -- so you looked at
0016
1  documents that your lawyers didn't specifically ask
2  you to look at?
3     A.  Yes.
4     Q.  Okay.  Can you tell me what those
5  documents were?
6        MR. LEVY:  Do you recall what you looked
7  at yesterday?
8     A.  Yes.  I looked up -- most of them was
9  financial records that I looked up today.
10        MR. LEVY:  He is asking what you did
11  yesterday, what you looked at yesterday when we
12  prepared for the deposition.
13     A.  Oh, yesterday.  I just looked up generally
14  their retainer clause and the medication and took an
15  inventory of what medication that I still have left
16  over.
17        MR. LEVY:  And for the record, we produced
18  some documents yesterday late afternoon, which was a
19  result of records that Mr. Walters found while we
20  were there.
21        I think, as I told you over the phone, we
22  were going to try to find records when we were with
0017
1  him.  So that is what we did.  Including, just for
2  the record, we brought actually we made copies of
3  this and it is contained within -- the labels are
4  contained within the documents produced.  But we
5  have actually brought the physical evidence, as it
6  were, of the DEY product, the Albuterol from fill
7  dates is 12/10/03 and 1/07/04 as well as the product
8  insert for the DEY Albuterol Sulfate.  And of course

9  you are free to review this.  We are going to take
10  custody of that and take back to our legal offices
11  to hold on to custody. But you are free to review
12  this and use it as you wish in the deposition.
13       MR. ROBBEN:  If we mark that today, can we
14  mark that and you send a copy of it to us?  Because
15  we have some copies, they are not particularly
16  clear, at least the copies that I have.  If we could
17  mark that actual box, if Mr. Molinari takes it,
18  perhaps we can get copies of it once it is marked.
19       MR. LEVY:  I don't see a problem with
20  marking the evidence and we will keep it in our
21  physical custody.
22       MR. ROBBEN:  As long as you preserve it.
0018
1       MR. LEVY:  Okay.  I think that is
2  acceptable.
3  BY MR. ROBBEN:
4    Q.  Okay.  The documents that you found
5  yesterday or at any point, have you turned all of
6  those documents over to your lawyers?
7    A.  I turned --
8       MR. LEVY:  Objection.
9  BY MR. ROBBEN:
10    Q.  Well, let me rephrase it.  The documents
11  that you looked for in connection with this case,
12  did you turn all of those documents that you found
13  over to your lawyers?
14    A.  The lawyers choose what they wanted out of
15  them.  So if you are asking did I turn them over,
16  they took what they needed and the rest of it I
17  still have.
18    Q.  Okay.  So you showed them a bunch of
19  documents?
20    A.  Yes.
21    Q.  And they made a selection?
22    A.  Yes.
0019
1    Q.  Okay.  Fair enough.
2       When you were looking for the documents or
3  documents in your possession about this case, what
4  was your understanding of what you should be
5  searching for?
6       MR. LEVY:  Objection.  His only
7  understanding would come through advice of counsel.
8       MR. ROBBEN:  Okay.
9    Q.  When you were looking for documents, where
10  did you look for them?
11    A.  Well, I have everything at the house in
12  boxes and labels and things of that nature.
13    Q.  Okay.  So you were looking in places where
14  you file your personal papers?
15    A.  Yes, that is correct.
16    Q.  Did you at any point request any documents

17 from any of your -- any of your medical providers?
18 Do you understand what I mean by "providers"?
19    A.  I beg your pardon?
20    Q.  When I use the term "providers," I mean
21 your doctors' offices, pharmacist where you might
22 buy medications, any home care pharmacy.  Did you
0020
1 contact any of those types of organizations and ask
2 them for documents related to your care?
3       MR. LEVY:  In preparation for this
4 deposition?
5       MR. ROBBEN:  Well, in responding to
6 document request.  Well, in responding to --
7       MR. LEVY:  As part of this case?
8       MR. ROBBEN:  Yes, as part of this case.
9    A.  No, I left that all up to the attorneys.
10 So whatever the attorney take, that is what it was.
11 But as far as me actually preparing this case and
12 everything, I did not.  It is all done by the
13 attorneys.
14    Q.  I reviewed the documents that were
15 produced in this case in connection with your
16 deposition, and none of those documents contain any
17 cancelled checks.  I can represent that to you.  Do
18 you pay for medications by check?
19    A.  I do.
20    Q.  You do.  Do you keep copies of those
21 checks?
22    A.  I do.
0021
1    Q.  Is it possible that you would have copies
2 of those checks among your papers at home?
3    A.  I have some.
4    Q.  Okay.  I would just make a request for
5 those types of documents.
6       MR. LEVY:  In fact that was one area that
7 we didn't get to look at yesterday, and so we intend
8 to try to do a better search.  And if we can come up
9 with some stuff in his checks, we will make whatever
10 we find that is relevant available.
11 BY MR. ROBBEN:
12    Q.  Okay.  Are you -- I guess this is more a
13 question for you.  I guess there is a continuing
14 search for Mr. Walters' records?
15       MR. LEVY:  I wouldn't say continuing,
16 because I think with what we found out this morning,
17 we know the universe of what he has.  And my
18 anticipation is that any checks we find would be the
19 last of what we get from Mr. Walters.
20       MR. ROBBEN:  Okay.
21       MR. LEVY:  At least I don't expect at this
22 time to find additional relevant documentation.
0022
1 With that said, we are going to make another good

2  faith effort to make sure we have gotten you
3  everything that is relevant.
4       MR. ROBBEN:  Okay.  Fair enough.
5  BY MR. ROBBEN:
6    Q.  Do you pay for any of your medical care by
7  credit card?
8    A.  No, I pay by -- I pay by checks.
9    Q.  Do you ever pay for -- do you ever pay for
10 your medical care, your prescriptions, in cash?
11   A.  No.
12       MR. LEVY:  You have anticipated his
13 question. He asked you a yes/no question.
14   Q.  Do you ever pay for your medical care,
15 your prescriptions through anything other than
16 checks or cash or credit cards?
17   A.  That is correct.  I don't have credit
18 cards to pay for that type of stuff.  I pay by
19 check, personal check at that.
20   Q.  Okay.  So is it fair to say you always pay
21 by check?
22   A.  That's correct.
0023
1    Q.  Okay.  What is your current address?
2    A.  What?
3    Q.  Your address?
4    A.  My current address is 60615 Christian
5  Street, but my mailing address is Post Office Box
6  281, Vandalia, Michigan, 49095 dash 0281.
7    Q.  Okay.  That's pretty good.  I don't know
8  the zip plus four for my own address.
9       MR. LEVY:  I don't know my four digit zip
10 code at the end.
11 BY MR. ROBBEN:
12   Q.  How long have you -- at your physical
13 address, where your house is, how long have you
14 lived at that address?
15   A.  Over 40 years.
16   Q.  Have you had any other address during that
17 time?
18   A.  Yes, I am originally from Kansas.
19   Q.  Okay.  But since you have lived in your
20 house in Vandalia, have you had another house
21 anywhere else?
22   A.  No.
0024
1    Q.  What is your date of birth?
2    A.  March the 8th, 1914.  92 years old.
3    Q.  Ninety-two.  Congratulations.
4    A.  Old sheep.
5    Q.  Have you ever been married?
6    A.  I've been married 30 years this past June
7  the 22nd.
8    Q.  Congratulations again.
9    A.  My wife is still living.

10     Q.   What is her name?
11     A.   Her name is Ethyl Mae.
12     Q.   I think you said before that you -- when
13  you had your meeting with your attorneys, your
14  daughter was present?
15     A.   My wife and my daughter.
16     Q.   How many children do you have?
17     A.   I had five hard heads and one soft head.
18  Five boys and one girl.
19     Q.   That's a good one, I have never heard that
20  before.  It is apt.
21          What are their names?
22     A.   Beg your pardon?
0025
1      Q.   What are their names, the children's
2  names?
3      A.   The oldest name is Howard.  Howard.  And
4  the second one is Stanley Edward.  And my daughter
5  is Karen Anita. And another son Hunter, Junior --
6  Hunter G.  Junior. Then Larry and then Roger.
7      Q.   Thank you.  Have you ever lived in
8  Massachusetts?
9      A.   No.
10     Q.   Did you ever receive any medical care in
11  Massachusetts?
12     A.   Not that I know of.
13     Q.   Okay.
14     A.   I don't know where my medication sometimes
15  comes from.
16     Q.   Okay.  Have you ever been to the
17  Commonwealth of Massachusetts?
18     A.   No.
19     Q.   You have never traveled there?
20     A.   No.
21     Q.   Do you own any property in Massachusetts?
22     A.   I don't know a thing about Massachusetts.
0026
1      Q.   Okay.
2      A.   It is north of one of the states.
3      Q.   Okay.  Now, I take it from your documents
4  that I have seen, that you are enrolled in the
5  Medicare program?
6      A.   Yes.
7      Q.   Do you remember when you enrolled in the
8  Medicare program for the first time?
9      A.   My Medicare took affect June of 1979 --
10  no, March of 1979.
11     Q.   So that was -- was that the year you
12  turned 65?
13     A.   It wasn't when I turned 65.  See I filed
14  when I was 62, but I had -- I had a disability and
15  therefore two years ahead of time.  I have never
16  stopped to figure it up. All I know is I got my card
17  in 1979.

18    Q.  What was the disability related to?

19    A.  I have cardiac and I have bronchial

20  asthma.

21    Q.  Do you remember how you enrolled in

22  Medicare, the actual --

0027

1        MR. LEVY:  Objection.

2  BY MR. ROBBEN:

3    Q.  Do you remember the actual enrollment

4  process?  Strike that.  Did you file an application

5  to enroll in Medicare?

6    A.  I imagine I must have, to have gotten a

7  card, because I never heard tell of them sending you

8  nothing themselves.

9    Q.  Now, during the time that you have been

10  enrolled in the Medicare program, have they ever

11  declined to cover any service or medication?

12    A.  Not that I know of.

13    Q.  Did there ever come a time that you

14  dropped out of the Medicare program and then re-

15  enrolled?

16    A.  No.

17    Q.  Okay.  Actually let me step back for a

18  minute.  Can you just tell me a little bit about

19  your employment history?

20    A.  My employment history?

21    Q.  Yes.

22    A.  Well, when I come out of the service back

0028

1  in 1943, I started in work for the Post Office

2  Department.  I was a railway mail clerk at first.

3  And then when they took the trains off, why then I

4  went in to the Post Office into the terminal.  And I

5  worked in the terminal.  And then when they closed

6  up the terminal, I went into the regular Post Office

7  as a clerk.  And I ended up being Post Master of

8  Vandalia Post Office.

9    Q.  Okay.  Was -- when did -- how long were

10  you in the service?

11    A.  In service.

12    Q.  Yes.

13    A.  Fifteen months and twenty-seven days.

14    Q.  Okay.  And that was in 1941/42?

15    A.  1942.

16    Q.  1942.

17    A.  '42 to '43.

18    Q.  What branch of the military were you in?

19    A.  The Army Air Corps.  All blacks were

20  segregated back then, so that is what most of them

21  were put in either Quarter Master or different labor

22  outfits.

0029

1    Q.  I see.  It was not a good time.

2        Now, was the Post Office the job that was

3  -- was working for the Post Office the job that you
4  were in when you retired?
5      A.  Yes.
6      Q.  So you worked in the army, you were in the
7  army 1942 to '43?
8      A.  Yes.
9      Q.  And then you worked at various positions
10  for the Post Office or the Post Office Department?
11      A.  Post Office.  And then I -- I had a break
12  of a couple of years there that I was laid off, and
13  I worked for an office supply place.  But that is
14  the way I earned Social Security.
15      Q.  I see.
16      A.  For to get Medicare.
17      Q.  So now do you remember what year you
18  retired from the Post Office finally?
19      A.  1976.
20      Q.  1976.  Now, after you left the Post
21  Office, did you -- did you take any other jobs?
22      A.  For about seven months I was a forklift
0030
1  operator, but otherwise than that, no.
2      Q.  Okay.  And then after the job as the
3  forklift operator you just --
4      A.  I worked on the Senior Citizen Green
5  Thumb.
6      Q.  Is that a volunteer-type of thing?
7      A.  That was a -- one of these for senior
8  citizens that was an excuse just to give them
9  something to do, which was minimum wage.
10      Q.  I see.
11      A.  So I went on that.
12      Q.  Okay.  Since you enrolled in -- or since
13  you became enrolled in Medicare in March of 1979,
14  has that been your primary medical insurance?
15      A.  Yes, that is when I got A&B.
16      Q.  That is when you got A&B coverage?
17      A.  Yes.
18      Q.  Do you have an understanding of what is
19  covered by Medicare Part A?
20          MR. LEVY:  Objection.
21      A.  Would you explain that again?
22  BY MR. ROBBEN:
0031
1      Q.  Sure.  Do you know what type of medical
2  care, Medicare Part A provides you insurance
3  coverage for?
4          MR. LEVY:  Objection.  You can answer, if
5  you know.
6      A.  What?
7          MR. LEVY:  You can answer the question if
8  you know.
9      A.  Do not answer?
10          MR. LEVY:  No, you can answer him.

11      A.  Oh, all I know is one of them is for
12  physician and the other one is for hospitalization.
13  And which one is which -- I know there is an A and a
14  B.
15      Q.  That is fair enough.  Do you ever get any
16  publications from the Medicare program?
17      A.  Yes.  I get everything everybody else get.
18  I get how much I paid in.  I get how much they going
19  to give on increase or decrease each year.  So I get
20  -- and the regular book telling what is going to be
21  for each year, what the deductible and all of that
22  is going to be.  So I am a regular -- regular member
0032
1  of Medicare.
2      Q.  Do you save those publications?
3      A.  Not necessarily.  Nothing but what I need.
4      Q.  Okay.
5      A.  For taxes and things like that.
6          MR. ROBBEN:  I guess to the extent those
7  things haven't already been produced, I would just
8  ask that we get copies of them.
9          MR. LEVY:  To the extent they exist, I
10  will take your request under advisement.
11          One thing I would suggest however, and I
12  say this to you at all of the depositions, is that
13  the best way to follow up for what you are asking
14  for in these depositions, is to send a letter to the
15  Kline and Specter firm, and as co-lead counsel, you
16  can address it to Don Haviland.
17          MR. ROBBEN:  Okay.
18          MR. LEVY:  Thank you.
19  BY MR. ROBBEN:
20      Q.  Do you remember getting something you
21  might call an annual booklet from Medicare?
22      A.  Yes, I get that.
0033
1      Q.  Okay.
2      A.  A great big book, yes, I get that.
3      Q.  And do you read that when you get it?
4      A.  No.
5      Q.  Do you ever refer to it for specific
6  topics?
7      A.  Not necessarily.
8      Q.  Do you mean you might have and you just
9  don't remember or that you, as a general practice,
10  you don't?
11          MR. LEVY:  Objection.
12      A.  No, it is just another piece of mail that
13  comes in.  Unless I need to look up something like
14  that, that would be the only time I would look it
15  up.  But ordinarily I don't sweat that type of stuff
16  out.
17      Q.  That is why you are 92.
18      A.  Yeah.

19    Q.  Do you pay a premium for your Medicare
20  coverage?
21    A.  Yes.
22    Q.  Do you know the amount of the contribution
0034
1  for this year?
2    A.  What is it?  I think it's 60 some odd
3  dollars, isn't it, for this year?  I don't know, but
4  I think it is about 60 some odd dollars a month.
5    Q.  Okay.  Do you -- do you remember what the
6  amount was for each year you have been enrolled in
7  Medicare?
8        MR. LEVY:  Since 1979?  Objection.
9    Q.  Did you say no?
10    A.  Beg your pardon?
11    Q.  Did you say no?
12        MR. LEVY:  Can you --
13    A.  No, I am just shaking my head.  Why would
14  you ask a question like that.  I am not interested
15  in how much they take out each month like that.
16    Q.  Fair enough, I will withdraw the question.
17  Can you tell me how you paid your premium
18  contribution each year?
19        MR. LEVY:  Objection.
20    Q.  Well, how about for the past few years.
21  How have you paid your premium to Medicaid?
22    A.  They take it out.
0035
1    Q.  Out of your Social Security?
2    A.  Yeah.  My Social Security goes to -- goes
3  to deposit at the bank and they just take it out, I
4  don't worry about that type of stuff.
5    Q.  Does your Medicare coverage have a
6  deductible?
7    A.  I didn't understand that.
8        MR. LEVY:  Objection.
9    Q.  Do you understand what a deductible is?
10    A.  Yes.
11    Q.  Does your coverage under Medicare have a
12  deductible?
13    A.  Yes.
14    Q.  Do you know how much it is?
15    A.  I think it is a hundred dollars or so.
16    Q.  Okay.
17    A.  I am just like everybody else on Medicare.
18    Q.  Now, do you know if you are eligible for
19  Veteran's Administration benefits?
20    A.  Yes.
21    Q.  Yes, you are eligible?
22    A.  Yes.
0036
1    Q.  Have you enrolled to receive those
2  benefits?
3        MR. LEVY:  You can answer the question.

4      A.  I am a total disabled, one hundred
5  percent, veteran.
6      Q.  Okay.
7      A.  So I am one hundred percent disability.
8      Q.  Have you ever -- have you ever obtained
9  medical care from a Veteran's Administration doctor?
10     A.  I get it every day.
11     Q.  What type of medical care has the
12  Veteran's Administration provided?
13     A.  May I explain that?
14        MR. LEVY:  Just answer his question, to
15  the best of your ability.
16     A.  Well, I am one hundred percent total
17  disabled.  So that means I get everything a veteran
18  can get.
19     Q.  Do you -- have you been -- strike that.
20  Do you ever obtain medications from the Veteran's
21  Administration?
22     A.  I do.
0037
1      Q.  What medications do you -- what
2  medications have you obtained from the Veteran's
3  Administration?
4      A.  All my medication.
5        MR. LEVY:  Objection.
6      Q.  Do you actually receive the medications
7  from the Veteran's Administration facility?
8        MR. LEVY:  Objection.  You can answer the
9  question if you know.
10     A.  What?
11        MR. LEVY:  You can answer.
12     A.  Yes, I get medications except on like on
13  my breathing and stuff like that.  Well, I have
14  gotten that on the -- see that is pretty complicated
15  question that you asked me.  When you ask -- when
16  they tell you that they are one hundred percent
17  total disabled veteran, that means that he is unable
18  to work and the Veteran's give them one hundred
19  percent compensation.  So all the medications is
20  free.  Hospitalization is free, with the exception
21  of I go to an outside doctor, well then that is the
22  way I come in on getting other medication that the
0038
1  VA may not have or do not have for you to get.  Now
2  do you follow me?
3      Q.  I think so.  Let me ask you some follow up
4  questions, just to see if I am getting it.  When you
5  say if you go to an outside doctor, do you mean a
6  doctor that is not employed by the VA?
7      A.  That's right.
8      Q.  Do you see doctors that are not employed
9  by the VA?
10     A.  That's right.
11     Q.  And you see doctors that are employed by

12  the VA?
13      A.  That's right.
14      Q.  The doctors that you see that are employed
15  by the VA, what medical conditions do they treat for
16  you?
17      A.  They treat me for everything, even the
18  medication that the doctors that is not with the VA.
19  See, due to me being over 30 miles from the nearest
20  VA hospital, I formerly went to VA Lakeside in
21  Chicago, which was 108 miles an hour -- I mean a
22  hundred and eight miles.  And so they gave me an
0039
1  outpatient medical card, whereby if I ever got sick
2  or I needed local medication, I go to a local
3  doctor, and if he -- if he would subscribe to that,
4  why then he is my local doctor.  And he and the VA
5  work together.  And if I should happen to get sick
6  and they take me to a hospital, like right now if I
7  get sick here and they take me to a local hospital,
8  say in Three Rivers, they would take me there.  Then
9  they would call the nearest VA and the VA would find
10  out what my condition would be.  And they would ask
11  them whether or not I could be moved, and if not,
12  they would tell them to go on and treat me or they
13  would send an ambulance and pick me up and take me
14  to the nearest VA hospital.  So that is what I mean
15  when I say I am a total disabled veteran with a
16  outpatient VA doctor card for any condition.
17      Q.  Okay.  So for example, you say that you
18  have cardiac problems?
19      A.  Yes.
20      Q.  Now, when you visit your Doctor for
21  cardiac care, is that a local doctor?
22      A.  Usually I go to the VA, unless I have a
0040
1  flare up.  See I have congestive heart failure.  And
2  you have heard tell of people having diabetes and
3  things like that, whereby they have edema builds up
4  in the ankles.  Well, my edema builds up in my
5  chest.  You may hear me when I am talking here, my
6  voice changes from time to time. That is fluid that
7  builds up from my heart.  And when it builds up like
8  that, it stops me from talking or something like
9  that, well, then I go to the nearest hospital.
10      Q.  Okay.
11      A.  So being 92 years old, you have your ups
12  and downs.
13      Q.  So for -- is it fair to say for emergency
14  care you go to any local hospital that you can get
15  treatment at?
16      A.  Yes.
17      Q.  But for more routine matters, you go to a
18  VA facility?
19      A.  I go right there.

20      MR. LEVY:  Objection.
21     Q.  Now, do you see a VA Doctor for your
22  asthma care?
0041
1      A.  Yes.
2          MR. LEVY:  Objection.
3      A.  Oh.
4          MR. LEVY:  That's all right.
5      Q.  Do you travel to a VA facility to obtain
6  treatment for your asthma care?
7          MR. LEVY:  Objection.  You can answer.
8  You can answer that question.
9      A.  What?
10         MR. LEVY:  You can answer.
11     A.  Yeah, I travel there.  But he asks what my
12  local doctor has done or something like that.  But
13  on the other hand, why that is all it is.  One just
14  take over in the absence of the other.
15     Q.  Where do -- when you -- when you obtain
16  treatment from the VA, do you go to the same place
17  every time?
18     A.  I go to Battle Creek up here from this
19  vicinity now.  I transferred from Lakeside in
20  Chicago to Battle Creek because I got tired of
21  fighting the Dan Ryan Highway going back and forth.
22  Now that they have closed up Lakeside in Chicago,
0042
1  you got to go to Westside, which is over on
2  California and -- Damon on California down way up
3  through the Loop.
4          So I transferred to Battle Creek up here.
5  And the only reason why I didn't go to Battle Creek
6  in the beginning, Battle Creek didn't treat no one
7  but mental, alcohol and -- mental -- mental, drug --
8  drug, mental and alcohol patients.  Now that they
9  made it a full-time VA hospital, they take all --
10  all types of medication in there now.  That is the
11  difference between different VA hospitals.
12         MR. LEVY:  Mr. Walters, I am going to ask
13  you to try to limit your answer to the specific
14  question he asks, okay.
15     A.  Okay.
16         MR. LEVY:  You're doing fine, I just want
17  to make sure you answer his question.
18     A.  Okay.
19  BY MR. ROBBEN:
20     Q.  So when you go to the VA facility in
21  Battle Creek, that is a VA hospital?
22     A.  Yes.
0043
1   Q.  Okay.
2          MR. LEVY:  Do you need a break?
3      A.  May I interject one question?
4          MR. LEVY:  No.  Do you need a break?

5     A.  What?  No.
6         MR. LEVY:  Okay.
7             (Conference between attorney and
8  witness.)
9         MR. LEVY:  We will let him ask a question.
10  If there is a problem, I will tell you not to
11  answer. You provided your answer so.
12  BY MR. ROBBEN:
13     Q.  During the past 15 years, have you had any
14  insurance coverage from an insurance company?
15     A.  No.
16     Q.  Has any person or agency or organization
17  helped you pay for your medical bills in the past 15
18  years?
19     A.  No.
20     Q.  I mean other than the Medicare and VA and
21  the other --
22     A.  No.
0044
1     Q.  -- organizations we talked about?
2     A.  No.
3     Q.  Now, you said before that you have asthma.
4  When were you diagnosed with asthma?
5     A.  I don't know whether it is asthma or
6  whether it is emphysema.  I do know though I do have
7  some kind of a -- what do you call it -- it is -- a
8  respiratory, all I know I have a respiratory
9  ailment.
10     Q.  Okay.  Do you know -- do you remember the
11  name of the Doctor that first diagnosed whatever
12  that respiratory ailment is?
13     A.  You are stepping back on the army.  It
14  happened in the VA.
15     Q.  Okay.  Is this -- I am sorry?
16     A.  It happened, started out while I was in
17  the army.
18     Q.  Okay.  So this is a condition you have had
19  for many, many years?
20     A.  Yes.
21     Q.  Since you have been enrolled in Medicare,
22  have you been treated for that ailment?
0045
1     A.  Yes.
2     Q.  Can you remember the names of the doctors
3  that have treated you for it?
4         MR. LEVY:  Since when?
5  BY MR. ROBBEN:
6     Q.  Well, let's say since 1991.
7     A.  I don't have one outside Doctor other than
8  Doctor Schimnoski up here in Three Rivers.
9     Q.  So Doctor Schimnoski, he is in Three
10  Rivers?
11     A.  Yes, he is at the Three Rivers Hospital.
12     Q.  Now, when you visit him, do you actually

13  go to the hospital itself?
14      A.  I go to his office.  He has an office.
15      Q.  Is his office adjacent to the hospital?
16      A.  His office is part of the hospital.
17      Q.  Okay.
18      A.  See Three Rivers is a hospital up here,
19  that has a whole medical conclave that takes up
20  several acres, and all these doctors in there work
21  for the hospital.
22      Q.  Oh, I see.  Okay.  Now, have you visited a
0046
1  doctor at the VA Hospital in Battle Creek for your
2  respiratory condition?
3      A.  Yes, I go to the regular respiratory
4  department.
5      Q.  Okay.  Do you usually see the same doctor?
6      A.  Yes, I see the same doctor, unless they
7  rotated them around.
8      Q.  Who is the doctor there that currently
9  treats you?
10      A.  I don't know.
11      Q.  You don't remember his or her name?
12      A.  No.
13      Q.  Okay.
14      A.  No.
15      Q.  Have you visited the VA facility in
16  Chicago for your respiratory illness?
17      A.  Yes.
18      Q.  How often do you see a doctor for your
19  respiratory problem?
20      A.  I would say about every -- every three or
21  four months.
22      Q.  And do you see Doctor -- I think it was
0047
1  Schimnoski?
2      A.  I go to him every two months.
3      Q.  Every two months, period.
4      A.  I go to him every two months.
5      Q.  Is Doctor --
6      A.  For a checkup.
7      Q.  Is Doctor Schimnoski your general
8  physician?
9      A.  Yes, he is my regular doctor.
10          MR. LEVY:  Schimnoski is spelled S-C-H-I-
11  M-O -- I am sorry, S-C-H-I-M-N-O-S-K-I, Schimnoski.
12  Schimnoski.  That is what is written on the box.  It
13  could be wrong.
14  BY MR. LEVY:
15      Q.  I guess what I am trying to understand is,
16  you see Doctor Schimnoski every two months or so for
17  a checkup, right?
18      A.  Yes.
19      Q.  And sometimes you go to the VA facility?
20      A.  I go to the VA on regular appointment.

21  The VA give me an appointment and I go -- I see my
22  regular doctor there every six months.  And they
0048
1  refer you to these other different clinics or other
2  doctors.  And then after you go to them, why then
3  each one of them give you a different appointment to
4  come back.
5           Now they are going into a new system
6  whereby you call in when you want to come to the VA
7  hospital, and we have so many of these guys coming
8  back from Iraq and different things that is injured.
9     Q.  So your appointment every six months at
10  the VA hospital is a regular appointment that you
11  make regardless of how you are feeling?
12     A.  Yeah, you go every six months, yeah.
13  Because you have to have your medication -- your
14  medicine renewed.
15     Q.  So it is like a checkup?
16     A.  Yeah.
17     Q.  So they, every two months that you go to
18  Doctor Schimnoski, that is also a checkup?
19     A.  Yes.
20     Q.  Okay.
21     A.  Unless I have -- I come down with
22  something, then I go there inbetween times.
0049
1     Q.  Okay.  Why do you need to see Doctor
2  Schimnoski and the VA hospital?
3     A.  Because the VA has given me that card and
4  I have been using that card for the last ten or
5  twelve years, so it is not costing me nothing to go.
6     Q.  So when you see Doctor Schimnoski locally,
7  that is covered as if you went to the VA hospital?
8     A.  That's right.
9           MR. LEVY:  Objection, that
10  mischaracterizes his testimony.
11     A.  That hasn't got nothing to do with this
12  case though.
13     Q.  Okay.  Could you go to Doctor Schimnoski
14  for all of your medical care?
15     A.  If a emergency comes up, yes, I go to him
16  first because I am over 30 miles to run all the way
17  to a VA hospital. So I go to the nearest doctor.
18     Q.  When you said that one of the reasons that
19  you go to the VA hospital is to get your
20  prescriptions renewed?
21     A.  That's right.
22     Q.  What prescriptions do they issue to you?
0050
1     A.  They prescribe my heart medicine, all of
2  my regular medicines.
3     Q.  So what -- other than your heart medicine,
4  you also take medicine for asthma, correct?
5     A.  Yes, I take different types of medicine

6  for different things.

7      Q.  Does the medicine that you get for your
8  asthma or your respiratory condition, is that
9  prescribed by the VA hospital?

10         MR. LEVY:  Objection.  Do you know what he
11  means by asthma medicine.

12     A.  What?

13         MR. LEVY:  Do you know what he means by
14  asthma medicine?

15     A.  Well, I told him I don't know whether I
16  have asthma.  I have tried to instill that to you
17  all along.  I told you I have a respiratory ailment.
18  Now, some call it emphysema some call it asthma.  I
19  don't know what it is.  All I know is that it may
20  come from my congestive heart condition.  But I do
21  have a respiratory thing. And I go to whichever one
22  of them that it flares up from.  So you keep asking

0051

1  that.  I told you it has nothing to do with this
2  case, because the reason why I am taking this
3  medication for that is because Doctor Schimnoski
4  prescribed that and the VA said I started taking it,
5  let's continue on taking it.

6         MR. LEVY:  For the record, the witness
7  pointed to the Albuterol box on the table.

8      Q.  I want to make sure I understand the
9  medication you take for your respiratory condition.
10  Is that prescribed by Doctor Schimnoski?

11     A.  Yes, it was, because I had --

12         MR. LEVY:  Objection.  Foundation.  I
13  think you should ask him, instead of talking in
14  terms of respiratory, you should ask him
15  specifically what medications does he receive.  You
16  are using a broad term.

17         MR. ROBBEN:  He said he doesn't remember.

18         MR. LEVY:  I think it is confusing the
19  witness.  It is confusing me.

20         MR. ROBBEN:  I think he said he doesn't
21  know what medications he takes.  He says he takes a
22  variety of them.

0052

1         MR. LEVY:  You haven't gone through with
2  him what he takes.

3  BY MR. ROBBEN:

4      Q.  What medications -- let's try that.  What
5  medications do you take for the respiratory
6  condition?

7      A.  I take this Albuterol, ipratropium, that
8  is one of them, and then I have salves that I rub on
9  my chest that the VA give me, that is something like
10  Vick's, that puts out a vapor.

11     Q.  Anything else?

12     A.  No, that is --

13         MR. LEVY:  Objection.

14     A.  -- that is just when it flares up.  I

15   don't have that every day.

16     Q.  Okay.  Now, when you said that you take

17   the Albuterol, you pointed to the box on the table.

18   Does all of the Albuterol you take come out of a box

19   that looks like that?

20     A.  Yes.  This and ipratropium or whatever

21   that other one is called.  I have to mix them to

22   take both -- to take it, another medicine goes with

0053

1   that.  And I have thrown away all the other boxes of

2   that stuff like that.  But it is two of those that

3   goes together and I put them in a nebulizer and I

4   inhale that.

5     Q.  Is the other medication you are referring

6   to, is it ipratropium?

7     A.  It is a twin to that Albuterol.

8     Q.  Is the other medication that you are

9   referring to called ipratropium bromide?

10     A.  Yes, that's it.

11     Q.  So the two medications that go together

12   are Albuterol sulfate?

13     A.  Yes.

14     Q.  And ipratropium bromide?

15     A.  Yes.

16        MR. ROBBEN:  Maybe we should mark that

17   box?

18        MR. LEVY:  That is fine.

19        MR. ROBBEN:  Talk a little bit about the

20   box.

21        MR. LEVY:  Okay.  There are three

22   components to this.  How would you feel about --

0054

1   let's go off the record a moment.

2        (Off the record)

3        MR. LEVY:  We can go back on.  For the

4   record, we have marked Exhibit Walters 001 through

5   Exhibit Walters 003 some material.  I will let you

6   ask some questions about it, but specifically the

7   first item Exhibit Walters 001 is a box that is

8   still intact and it says DEY, D-E-Y, Albuterol

9   sulfate.  And it has a fill date, according to the

10   label that is the Med-4-Home Pharmacy prescription,

11   label of 1/7/2004.  And there is some handwriting on

12   there as well.

13        And what's been marked as Exhibit Walters

14   002 is just the top flap of a similar box.  And that

15   has a fill date of 12/10/2003.  Under the label

16   which is hard to see but bleeds through says DEY, D-

17   E-Y and appears to be the same type of Albuterol

18   sulfate.  The third document that we have marked is

19   Exhibit Walters 003, is the package insert for the

20   prescribing information for the drug that came out

21   of the box that is intact for the DEY Albuterol

22  sulfate.
0055
1  BY MR. ROBBEN:
2     Q.   This is really a question for counsel I
3  think.  Was that box -- did that box have anything
4  in it when you found it, or was it just empty?
5         MR. LEVY:  Can we go off the record
6  please?
7         MR. ROBBEN:  Yes.
8           (Off the record)
9         MR. ROBBEN:  I guess we should say counsel
10  has conferred about Exhibit Walters 001 off the
11  record, and we have agreed that we can stipulate
12  that at the time the box was located in Mr. Walters'
13  home, it did not have any DEY Albuterol sulfate
14  within it.
15        MR. LEVY:  I so stipulate.
16        MR. ROBBEN:  Okay.  Now, I will work off
17  my copy so that Mr. Walters can look at the box.
18        MR. LEVY:  Sure.
19        MR. ROBBEN:  If I can't make something
20  out.
21        MR. LEVY:  There is black on black.  His
22  writing may not have come through on some of the
0056
1  black part, just so you are aware.
2  BY MR. ROBBEN:
3     Q.   Mr. Walters, on the box on the label
4  portion of the box?
5         MR. LEVY:  Speaking of Exhibit Walters 001
6  or Exhibit Walters 002?
7  BY MR. ROBBEN:
8     Q.   Exhibit Walters 001, correct.  I am sorry.
9  Right now we are speaking about Exhibit Walters 001.
10        There is some writing in black.  Looks
11  like magic marker.  It looks like it says "Box 2 X,
12  1 dash 10 dash 2004 and it looks like there is some
13  more writing in the dark blue area that I can't make
14  out on my copy, but perhaps you can.
15     A.   Use this -- see --
16        MR. LEVY:  He didn't ask you a question
17  yet. You answered his question.  It says use this.
18     Q.   Do you know who made those markings?
19     A.   I did.
20     Q.   Why did you mark this box up like this?
21     A.   I told you, I am a perfectionist.  Any
22  time I get anything, I label it, I date it when I
0057
1  got it.  So I have always removed the old stock
2  first.  So I label it so I don't have to have stock
3  left over.  That is the reason why I say "use this."
4     Q.   These were notes to yourself?
5     A.   Yeah, that is my own personal.
6     Q.   Now, at sort of the middle portion of the

7 box it looks like it says Med-4-Home Pharmacy and
8 then an address in Kansas City, Missouri.  I can't
9 make out the address, but it looks like there is an
10 address in Kansas City, Missouri?
11      A.  10800 North Congress Avenue.
12      Q.  Is that where you obtained this Albuterol
13 sulfate?
14      A.  That is the number that they send.
15      Q.  Is Med-4-Home a company that you deal with
16 through the mail or by telephone?
17      A.  Yeah, they call me.
18      Q.  They call you?
19      A.  Um-hum.
20      Q.  Do they call you to solicit orders?
21      A.  Yes.
22      Q.  And so do you -- do you obtain Albuterol
0058
1 sulfate from any other source?
2      A.  No.
3      Q.  So Med-4-Home is where all of your
4 Albuterol sulfate comes from?
5      A.  Yes.
6      Q.  Okay.  Now, you had testified before that
7 you also take a medication called ipratropium
8 bromide.  Do you get your ipratropium bromide from
9 Med-4-Home as well?
10      A.  All my respiratory medicine comes from Med
11 Home.
12      Q.  How did you -- how did you learn about
13 Med-4-Home?
14      A.  I had an attack and I was in the hospital
15 and I was first on oxygen and everything.  And then
16 I don't know whether there was an agent in the
17 hospital, came by, but anyway when I -- I was
18 wanting oxygen tent or tank rather, and so they told
19 me about taking something like this, Doctor
20 Schimnoski wrote it up or something like that.  It's
21 been so long, I have forgotten how I first got
22 acquainted with it.
0059
1      Q.  How long have you been doing business with
2 Med-4-Home?
3      A.  Oh, I say about 2000 -- about 2002 or '3.
4      Q.  Now, just so I am clear, your first -- the
5 first product you purchased with them was an oxygen
6 -- was an oxygen product?
7      A.  Yeah, I got that from Linde out of
8 Seattle, Washington.
9      Q.  And later on you began to use them for
10 this Albuterol medication?
11      A.  Yes.
12      Q.  Do you remember approximately when you
13 started to obtain Albuterol from Med-4-Home?
14      A.  Not for sure, but I think it was around

15 about 2003, around December of 2003 or 2002, which
16 went over to 2003 for December.
17     Q.   Had you taken Albuterol sulfate before
18 that?
19     A.   No, never heard of it.
20     Q.   So when you started taking it in December
21 of 2002 into the next year, that was the first time
22 you had been taking Albuterol sulfate?
0060
 1     A.   Yes.
 2     Q.   Okay.  At the time you started taking
 3 Albuterol sulfate, did you also start taking
 4 ipratropium bromide?
 5     A.   Yes, I had to.
 6     Q.   They go together?
 7     A.   You don't take one unless you take the
 8 other.
 9     Q.   Now, was that the first time you had ever
10 taken ipratropium bromide?
11     A.   That's right.
12     Q.   Had you ever -- strike that.  Have you
13 ever been administered Albuterol sulfate or
14 ipratropium bromide in a doctor's office?
15     A.   Not that I -- not that I can remember.
16     Q.   Okay.  So now, since you started taking
17 the Albuterol sulfate and the ipratropium bromide, I
18 will try to treat those together since it sounds
19 like you take them together.  Since you started
20 taking those in December of 2002, have you continued
21 taking them?
22         MR. LEVY:  Objection.
0061
 1         MR. ROBBEN:  Do you understand what I
 2 mean?
 3         MR. LEVY:  You can answer the question.
 4     A.   What?
 5         MR. LEVY:  You can answer.
 6     A.   I have slacked off.  I was taking, when I
 7 first started, I was supposed to take it four times
 8 a day and sometimes I was taking it six to eight
 9 times.  But now all of the sudden they quit mailing
10 it to me, so I just slacked off this year.
11     Q.   So Med-4-Home has stopped supplying it?
12         MR. LEVY:  You can answer that question.
13     A.   Yes.
14     Q.   Is that because they just don't sell it
15 anymore?
16     A.   No, they sell it.
17         MR. LEVY:  Objection.  Go ahead.
18     A.   They said something about I took and
19 changed some kind of Medicare insurance company.
20 But I found out that I didn't need that and I
21 cancelled that under this new senior citizen.  I
22 thought I was supposed to take and get some kind of

0062

1  carrier to represent me for getting prescription.
2  But due to me not getting prescription through
3  Medicare, they told me they cancelled it.  But they
4  was under the impression that I had changed my
5  Medicare people or whatever it was.
6      Q.  Okay.  When would you say the last time
7  you received a shipment of Albuterol sulfate --
8  well, let me back up.
9          MR. LEVY:  Hold on.  He is going to ask
10  you a new question.  He didn't like his question.
11  He is going to ask you a new question.
12  BY MR. ROBBEN:
13      Q.  How did you place the orders for Albuterol
14  sulfate with Med-4-Home?
15          MR. LEVY:  Objection.  You can answer.  Go
16  ahead.
17      A.  Okay?
18          MR. LEVY:  Um-hum.
19      A.  They usually call me out of the bed in the
20  morning and asking me how was my supply running out,
21  did I need anything.  And I would tell them, yes, it
22  was getting low, and they would just ship it.

0063

1      Q.  Okay.  So they -- they solicit an order
2  from you by phone?
3      A.  Yeah.  They subscribe for it.  They would
4  call me.  I didn't -- I didn't have to call and tell
5  them about sending me anything.  For awhile they was
6  sending me a shipment every other -- every other
7  week looked like.
8      Q.  When they ship the product to you, when --
9  strike that.  When they make a -- when they send a
10  package to your home, what -- how much do they send
11  you?
12      A.  Usually four boxes.  It is four of these
13  to a carton.  Two -- see four Albuterol and then four
14  ipratropium.  So they send me a box that would hold
15  eight of these or four of these.
16      Q.  Okay.  But would you -- is it fair to say
17  your order was usually split, so you got an even
18  amount of ipratropium?
19      A.  They have to send me both of them.  The
20  last time they call me, they told me that they had a
21  new dealer that was making this stuff, making it
22  together.  And from here after I wouldn't have to

0064

1  get the Albuterol.  And when I put it in my
2  nebulizer, I have to put one in and then put the
3  other and then it mixes it up, and that is the way I
4  inhale it.  So they said they had a new druggist
5  that was supplying them whereby this was already
6  mixed.  And so they never did send it.  I told them
7  to send me a supply and they never did send it.

8    Q.  Do you remember approximately when that
9  conversation was where they told you about this new
10  product?
11    A.  About two months ago.
12    Q.  Okay.  Okay.  Now the date, there is a
13  small date on the top left-hand corner of the label
14  that is attached to Exhibit Walters 001.  And it
15  looks like it says fill date, a colon, 01 dash 07
16  slash 2004.  Did you receive this box around that
17  date?
18    A.  I got it on the 10th.  That 1/10/2004
19  means the day I received it.  Now, this is their
20  fill date up there.  And then I always, when I
21  receive medication, I put the date that I receive it
22  on there.  And that 1/10 means I got this on the
0065
1  10th.
2    Q.  Okay.  Now, looking at Exhibit Walters
3  002, Exhibit Walters 002, it is a flap of a box with
4  a label that is similar to the label on Exhibit
5  Walters 001.  It has a written notation across the
6  middle portion that says 12 dash 19 dash 04?
7        MR. LEVY:  Objection, actually you can ask
8  him a question about whether that is a '04 or
9  another date.
10        MR. ROBBEN:  Okay.  Fair enough.
11        MR. LEVY:  Because your version is black
12  and the writing -- you don't see the rest of the
13  writing in that back section.
14  BY MR. ROBBEN:
15    Q.  Okay.  Can you tell me about what the
16  date, the handwritten date is, or the handwritten
17  notation is in the middle of the exhibit?
18    A.  Well, this was -- this was filled by them
19  on the 10th of December, 2003 and I received it on
20  the 19th of December, 2004.
21        MR. LEVY:  Is that a four or a three?
22    A.  Yeah, this -- this was a -- this was an
0066
1  old shipment.  See this -- they had this -- yeah, but
2  that four, that is when I got it.
3        MR. LEVY:  Sir, I am asking you, is that a
4  four or a three?  Are you sure that is a four?
5        For the record -- let the record reflect
6  it looks like a three to me.  I will hand it to
7  counsel.
8    A.  I would have to have the original.
9        MR. LEVY:  It doesn't look like a four
10  right there on Exhibit Walters 001.  It doesn't look
11  like your four.
12    A.  Yeah, but --
13        MR. LEVY:  Looks like it is written like a
14  three on the side.
15    A.  Yeah, because lots of times I have noticed

16  those numbers up there at the top didn't correspond
17  with what it was.  So they just send you whatever
18  they had in stock.
19       MR. LEVY:  But, Mr. Walters, what I am
20  asking you is, is that possible that that is a three
21  written on its side?  Because it doesn't look
22  anything like your four that is written on this box.
0067
1     A.  Well, this is a three.
2        MR. LEVY:  Yes.
3     A.  Yes.  That is my error that is 12/19/03.
4        MR. LEVY:  Thank you, sir.  I will pass it
5  over to counsel to take a look at.
6     A.  Yeah.  That is a three laying on its side.
7        MR. ROBBEN:  I agree.
8        MR. LEVY:  That is a lot for a little.  I
9  just want the record to be clear.
10     A.  I was in a hurry in the morning.
11       MR. ROBBEN:  We've been going about an
12  hour.  Do you want to take a break?
13       MR. LEVY:  I would like to take a break.
14  I would like to get water and have the witness
15  stretch his legs.
16       (A break was taken)
17  BY MR. ROBBEN:
18     Q.  Over the time that you have been receiving
19  Albuterol sulfate and ipratropium bromide, do you
20  know -- actually, strike that.  Do you know what
21  manufacturers manufacture Albuterol sulfate?
22     A.  Never paid any attention.
0068
1     Q.  Okay.  I will ask for the record, do you
2  know what companies manufacture ipratropium bromide?
3     A.  (Witness shaking head.)
4        MR. LEVY:  You need to say yes or no.
5     A.  No, I don't -- I don't pay any attention
6  to who manufactures this.  The medicine is all I was
7  interested in.
8     Q.  Okay.  Now, the box -- the box and the
9  flap that we have marked as Exhibit Walters 001 and
10  Exhibit Walters 002 are boxes that are labeled DEY,
11  D-E-Y.  Do you see that?
12       MR. LEVY:  He is asking whether you see
13  this this D-E-Y?
14     A.  Yeah.
15     Q.  Okay.
16     A.  What about it?
17     Q.  Now, over the course of the time that you
18  were receiving ipratropium bromide and Albuterol
19  sulfate from Med-4-Home, did all of the boxes with
20  the medicine in them look like those, like that box?
21     A.  The boxes look alike, but they were
22  packaged by different firms.
0069

1      Q.  When you say they were packaged by
2  different firms, what do you mean?
3      A.  I mean it was brought to my attention that
4  different firms, if they changed their medication
5  from one firm to another.
6      Q.  Okay.  So when you say they changed from
7  firm, do you mean different manufacturers?
8      A.  It must be, whatever this -- I don't know
9  what this DEY stand for, unless that is DEY that
10  packages it or something like that.  But, no, some
11  of them say Ansolo and Golden somebody.  But I don't
12  pay no attention. All I go by is what the medicine
13  was.  But they brought it to my attention --
14      MR. LEVY:  Objection.  That is okay.  You
15  are not going to have any discussions about what you
16  and I spoke about, okay.
17      MR. ROBBEN:  Don't tell me what your
18  attorneys told to you or what you told to them.
19      MR. LEVY:  I am sorry, I didn't mean to be
20  rude.  I wanted to stop that before you talk
21  anymore.
22  BY MR. ROBBEN:
0070
1      Q.  Can you tell me how many times the
2  ipratropium bromide or the Albuterol sulfate
3  received came in a box that said DEY on it?
4      A.  No.
5      Q.  Do you think that it was more than just
6  this box and the other box that that flap came from?
7      A.  Oh, yeah.  I have throwed away a lot of
8  boxes.
9      Q.  The boxes that you threw away, do you
10  specifically remember that they said DEY on them?
11      A.  No.
12      Q.  Can you give me an estimate of how many
13  boxes of Albuterol sulfate and ipratropium bromide
14  you obtained from Med-4-Home during the entire
15  course of time that you were obtaining medication
16  from them?
17      A.  What do you mean by box?  Do you mean
18  these kind of cartons or do you mean the cartons
19  that they come in and then these cartons?  Some of
20  them is different size boxes.  See they come -- I
21  have gotten these boxes down there whereby this kind
22  of box is made twice that size or been cut half in
0071
1  two.
2      Q.  So over time you haven't received only
3  that size of box, referring to Exhibit Walters 001?
4      A.  Yeah.  I have got boxes whereby I tell you
5  that they come different sizes.
6      Q.  Okay.
7      A.  I wouldn't know about that.
8      Q.  Do you know how much it costs to

9  manufacture ipratropium bromide?
10     A.  (Witness shaking head.)
11     Q.  Do you know how much it costs to
12  manufacture Albuterol sulfate?
13         MR. LEVY:  Objection.  Are those two
14  separate questions you are asking?  Or did you
15  strike the first one?
16         MR. ROBBEN:  They actually were -- that is
17  a good point.  He shook his head no to the first
18  point.
19         MR. LEVY:  I didn't pick that up.
20  BY MR. ROBBEN:
21     Q.  I will ask again.  Do you know how much it
22  costs to manufacture Albuterol sulfate?
0072
1     A.  No.
2         MR. LEVY:  You need to say yes or no or I
3  don't know.
4     A.  No.
5     Q.  Do you know how much it costs to
6  manufacture ipratropium bromide?
7     A.  No.
8     Q.  Did you ever discuss with any of your
9  physicians or -- with any of your physicians, how
10  the costs for your Albuterol sulfate would be
11  reimbursed?
12     A.  No.
13     Q.  Did you ever discuss with your physicians
14  how the costs for your ipratropium bromide would be
15  reimbursed?
16     A.  No.  Why should I?
17     Q.  Okay.  Did you ever discuss reimbursement
18  for either Albuterol or ipratropium with Med-4-Home?
19     A.  They sent me a contract.
20         MR. LEVY:  Object.
21  BY MR. ROBBEN:
22     Q.  Let's have this marked as Walters -- let's
0073
1  have this marked as Walters Exhibit, I guess we are
2  up to Exhibit Walters 004. This will be Exhibit
3  Walters 004.  It is two documents stapled together.
4  I am not sure if they are related or not, but they
5  are Bates numbers Walters 0011 and Walters 0012.
6         MR. LEVY:  He is going to have you look at
7  this now.
8  BY MR. ROBBEN:
9     Q.  Mr. Walters, can you take a look at this
10  document for as long as you need to, to familiarize
11  yourself with it and let me know when you are ready?
12     A.  Yeah.
13         MR. LEVY:  Two pages.
14     A.  Yeah.
15     Q.  Are you ready?
16     A.  Yes.

17   Q.  Now, you said before that Med-4-Home had
18  sent you a contract.  Are either of the pages of
19  this exhibit that contract?
20   A.  I didn't understand you.
21   Q.  Oh, okay.  You didn't hear me or you
22  didn't understand the question?
0074
1   A.  I didn't hear you.
2   Q.  Oh, okay.  That's fair.  You had said that
3  Med-4-Home had sent you a contract.  And what I am
4  asking is, is either page of this exhibit, Exhibit
5  Walters 004, the contract that they sent you?
6   A.  That is correct.
7   Q.  Is it both pages?
8   A.  Yes, it came together.
9   Q.  Okay.  Looking at the first page of the
10  exhibit, which says Walters 0011 at the bottom, did
11  you fill this out with your handwriting?
12   A.  Yes.
13   Q.  And is that your signature towards the
14  bottom?
15   A.  That is correct.
16   Q.  Okay.  And then it is stamped with a date
17  stamp, it says December 16th, 2003.  Did you affix
18  that stamp?
19   A.  Yes.
20   Q.  And then flipping over to the next page,
21  which is the page to your right.  At the bottom,
22  towards the bottom of the page, it is signed in pen
0075
1  or looks like pen, Hunter G.  Walters, Senior.  Is
2  that your signature?
3   A.  That is correct.
4   Q.  And then to the right of that there is a
5  stamp that says December 16th?
6   A.  That is correct.
7   Q.  You affixed that stamp?
8   A.  Yes, that is my stamp.
9   Q.  Okay.  So this is the contract that you
10  entered into with Med-4-Home?
11   A.  That's correct.
12   Q.  Is this the entire contract or are there
13  some pages missing?
14   A.  As far as I can remember, this is the only
15  thing I got.
16   Q.  Okay.  Now, did you enter into the
17  contract with Med-4-Home at the start of the time
18  that you were ordered medicine from them -- well,
19  let me strike that. Let me explain to you what I am
20  getting at.  You had said that you thought you had
21  started getting medicine Albuterol and ipratropium
22  from Med-4-Home in December of 2002.  But this
0076
1  document shows that you entered into a contract with

2  them in December of 2003.  My question is, is it
3  possible you actually started ordering from them in
4  December of 2003 instead of 2002?
5        MR. LEVY:  I will just object, because the
6  record he actually used two different dates.  He
7  said both December '03 and December '02.  But with
8  that objection, he certainly can answer this
9  question.
10       Do you remember what his question was or
11  do you need to have her read it back?  Do you want
12  to hear the question again?
13    A.  Yes.
14        MR. LEVY:  Could you read back the
15  question please?
16        (Question was read back as follows)
17        "Okay.  Now, did you enter into the
18  contract with Med-4-Home at the start of the time
19  that you were ordered medicine from them -- well,
20  let me strike that. Let me explain to you what I am
21  getting at.  You had said that you thought you had
22  started getting medicine Albuterol and ipratropium
0077
1  from Med-4-Home in December of 2002.  But this
2  document shows that you entered into a contract with
3  them in December of 2003.  My question is, is it
4  possible you actually started ordering from them in
5  December of 2003 instead of 2002?"
6    A.  Well, they sent me a shipment of stuff
7  before I signed this contract.
8  BY MR. ROBBEN:
9    Q.  Is it possible that they sent that
10  shipment in December of 2003 before you signed this
11  contract?
12    A.  Yeah.  The first part of December of '03,
13  before the 16th.  I had received a shipment by the
14  time I got this thing.  But I had the shipment
15  already.  See they sent me -- they were so anxious,
16  I imagine, to get rid of it, they sent me -- well,
17  they did.  Might as well quit beating around the
18  bush.  They were so anxious, they come loading me up
19  with it.  And then they sent me this contract,
20  because I told them, I said, no, according to the
21  way they talked to me over the phone about what it
22  was going to cost, I told them no, I couldn't pay
0078
1  that kind.  So they sent me this and I signed it.
2    Q.  Okay.  Let's -- let's try and structure
3  this a little bit.  Okay.  So they sent -- you are
4  saying they sent you some product?
5    A.  Yes.
6    Q.  Before you actually signed this contract?
7    A.  That's right.
8    Q.  Was it -- can you estimate how many days
9  before?

10    A.  About 15 days, around the first, right
11  after Thanksgiving.
12    Q.  Okay.  Now, was that shipment that you got
13  about fifteen days before you entered -- before you
14  signed the contract that is Exhibit Walters 004, was
15  that the first shipment you had obtained from Med-4-
16  Home?
17    A.  Yes.
18    Q.  So since the Exhibit Walters 004 is dated
19  December, 2003, is it fair to say that you started
20  obtaining your ipratropium and your Albuterol from
21  Med-4-Home in 2003?
22        MR. LEVY:  Objection.  You can answer if
0079
 1  you know.
 2    A.  What?
 3        MR. LEVY:  You can answer him.
 4    A.  Would you repeat that again?
 5  BY MR. ROBBEN:
 6    Q.  Sure.  Maybe I can make it better.  As I
 7  understand it, you are saying that you obtained your
 8  first shipment of medication from Med-4-Home about
 9  fifteen days before you signed the contract that is
10  Exhibit Walters 004, correct?
11    A.  Yes.
12    Q.  Now, since Exhibit Walters 004 is dated
13  December 16th, 2003, are you -- is it fair to say
14  that your first shipment of medication that you
15  obtained from Med-4-Home was shipped around
16  December, 2003?
17        MR. LEVY:  Objection.  You can answer his
18  question.
19    A.  Are you saying 2003 or what?
20        MR. LEVY:  He said 2003.
21    A.  What?
22        MR. LEVY:  He said 2003.
0080
 1    A.  Wasn't that the one I said where it came
 2  right around -- right after Thanksgiving, around the
 3  first of 2003?
 4        MR. LEVY:  I think you need try one more
 5  time in a different way.  He is confused by your
 6  question.
 7  BY MR. ROBBEN:
 8    Q.  Okay.  The shipment of medicine that you
 9  received from Med-4-Home around December 1st, 2003,
10  was that the first shipment of medicine that you had
11  received from Med-4-Home?
12    A.  Yes.
13        MR. LEVY:  Objection.
14  BY MR. ROBBEN:
15    Q.  Now, if I could just refer you just
16  quickly to the Exhibit, Exhibit Walters 002.  On the
17  top of that exhibit, and we already talked about

18  this exhibit, it says fill date December 10, 2003
19  and then you testified that you had written December
20  19th, 2003 on the exhibit in your own handwriting to
21  signify that you had obtained it.  Was this -- was
22  this shipment -- strike that.  Looking at Exhibit
0081
1  Walters 002 which you dated December 19th --
2        MR. LEVY:  Objection -- I am sorry -- I
3  got confused.  I got confused by the question.
4  BY MR. ROBBEN:
5     Q.  Let me start over.
6        MR. LEVY:  Sure.
7  BY MR. ROBBEN:
8     Q.  Looking at Exhibit Walters 002, in the
9  center of the exhibit, you testified that you had
10  marked December 19th, 2003 or 12/19/03 as the date
11  you received that package of Albuterol sulfate.  Was
12  that shipment that you received, that particular
13  box, distinct or separate from the shipment that you
14  received toward the beginning of December, 2003?
15        MR. LEVY:  Objection.  You can answer.
16     A.  In fact, this is the first shipment that I
17  received from them.  This is the first shipment.  So
18  whatever date is on that, that is the first one I
19  got.  Now, if it says 2003 -- but this is the first
20  shipment that came, was in that.  Our mail said it
21  came on the first, right after Thanksgiving.  But
22  this is the first shipment I got, and that number
0082
1  one up there, Exhibit Walters 001 that -- that is
2  the first box that I received of that shipment.
3     Q.  Okay.  So there is a --
4     A.  So that clears that up.  That the whole
5  thing started out on the 19th.
6     Q.  Okay.  So just to -- so the record is
7  clear, on Exhibit Walters 002, there is a horizontal
8  line then there is a one.  I just want to point that
9  out.
10        MR. LEVY:  Next to the word open.
11        MR. ROBBEN:  Next to the word open.
12     A.  Yeah.
13        MR. LEVY:  Right.
14  BY MR. ROBBEN:
15     Q.  So this particular package was part of the
16  first shipment that you received?
17     A.  That's right.
18     Q.  Okay.  Now going back to Exhibit Walters
19  004.  Now, you started to say before -- you started
20  to describe before, the circumstances under which
21  you filled out this first page.  I will just say for
22  the record that the first page at the top says
0083
1  "Confidential Financial Worksheet" and then it has
2  Mr. Walters' name and his address beneath it.  Now,

3   to the right of that, there is a sticker with a,
4   like a fancy W in a circle and your address.
5       A.   Yes.
6       Q.   Did you put that there?
7       A.   Yes.
8       Q.   Now, what were the circumstances that led
9   you to fill out this first page?
10          MR. LEVY:  Objection.  You can answer.
11      A.   Well, that is just part of my -- part of
12  my taking a stamping thing.  I will put -- for fear
13  -- I make a photostatic copy of this and I put that
14  on that so that if I sent my original it would be
15  mailed back to me. This is one of my return stamp
16  stickers.
17      Q.   Okay.
18      A.   And that is the reason why that is on
19  there.  I have a queer way.  But that is just the
20  thing.  I label everything.  And that was it.  Just
21  a return.  If I got the wrong one, why I could write
22  and tell them would you please return that back to
0084
1   me.
2       Q.   Okay.  What I would like to know is what -
3   - what was your purpose in actually filling out this
4   worksheet?
5       A.   Reason why I fill it out, they wanted to
6   know how was I going to pay for it.  And they told
7   me on the phone it is going to cost way up in the
8   money and all like that. And I told them I couldn't
9   afford that kind.  And so they said -- wanted a
10  financial statement.  And that is what this is.
11      Q.   Okay.
12      A.   Back there then.
13      Q.   Let's back up.  At some point did you have
14  a discussion with somebody at Med-4-Home?
15      A.   I talked back and forth from Kansas City.
16  Kansas City used to bug me from the first thing in
17  the morning before I even woke up, calling me,
18  trying to sell this and trying to sell that.  I
19  didn't -- I didn't start out bugging them.  They
20  bugged me about getting in on this and that.
21  Because I was already started out with Linde out of
22  Seattle, Washington and they had oxygen tanks at the
0085
1   house.  And all of the sudden they started calling
2   me, trying to sell this and sell that and I said,
3   well, just go ahead and send it.
4       Q.   Okay.  When you said just go ahead and
5   send it, do you mean the Albuterol and the
6   ipratropium?
7       A.   Yeah.  Yeah.
8       Q.   Now, at some point, did you have a
9   discussion with them about -- or strike that.  I
10  take it from your prior statement that at some point

11  you had a discussion with them about paying for the
12  Albuterol and the ipratropium?
13      A.  That is right.
14      Q.  Do you remember about when that
15  conversation was?
16      A.  That was sometime right after -- before I
17  -- before I got it, before I signed this.  Because
18  they said they would send me a financial statement
19  to make out and sign.  So I made it out and sent it
20  back in to them.  And that is what it was.  I mailed
21  it back on the 16th.
22      Q.  Okay.  Now, do you remember what they said
0086
1  to you on the phone?
2      A.  No.  No more than just saying we will do
3  this and we will do that.  And I didn't like what
4  they said.  So I said I couldn't afford it like
5  that.  And they said, well then, we will see that
6  you get help on it.
7      Q.  Do you remember what price they wanted to
8  charge?
9      A.  I don't have the least idea.  I know it
10  was up in the -- up in the hundreds of dollars
11  almost.
12      Q.  Okay.  So they called up, they -- strike
13  that?
14      A.  I wouldn't know exactly what that price
15  would be.  All I know is it was more than what I
16  wanted to or what I could afford to pay.
17      Q.  Okay.  So when you told them that, they
18  then said that they would send you this work sheet?
19      A.  Yes.
20      Q.  Did they tell you what the -- what the --
21  strike that. Did they tell you what the worksheet
22  was for?
0087
1      A.  They just sent this and told me to fill it
2  out.  And I filled it out to the best of my
3  knowledge back there then.
4      Q.  Okay.  Now, so you filled out the
5  worksheet and you sent it back right?
6      A.  It wasn't no worksheet.  This is it.
7      Q.  Okay.  I am calling it a worksheet,
8  because up at the top, it titles itself a worksheet.
9      A.  Yeah.
10      Q.  But whatever Exhibit Walters 004 is, you
11  filled it out?
12      A.  Yeah.
13      Q.  You signed it and on December 16th or
14  thereabouts, you mailed it back in?
15      A.  Yeah.
16      Q.  What happened next?
17      A.  They agreed to it.
18      Q.  Did they ever send you any kind of notice

19  or any type of letter about this?
20      A.  They sent me a -- sent me a statement that
21  I had to pay for it.
22      Q.  Do you remember what the statement said?
0088
1       A.  No, I don't know.  I just know -- they
2  sent me a statement to pay.  I got a statement from
3  them every time they sent shipments.
4       Q.  Do you remember how much the statement --
5  the first statement you received was?
6       A.  I don't remember what it was.
7       Q.  Okay.  Do you remember how much the
8  statement -- any of the statements were?
9       A.  I know it was more than I wanted to pay
10  back there then.
11      Q.  Can you give me an estimate of how much
12  the statement asked for?
13      A.  No, I would have to go look back through
14  my blank stubs and my bank book to find out exactly.
15      Q.  So you think that maybe that might be in
16  your cancelled checks?
17          MR. LEVY:  Objection.
18  BY MR. ROBBEN:
19      Q.  Strike that.  Do you think maybe the
20  payments that you made to Med-4-Home might be in
21  your cancelled checks?
22      A.  Oh, yes.
0089
1       Q.  Now, if you look on Exhibit Walters 004,
2  there is numbered paragraphs sort of a questionnaire
3  type format.  Number five, if you could just read
4  that yourself.  If you could read that to yourself?
5          MR. LEVY:  I am sorry, which paragraph are
6  you having him read?
7          MR. ROBBEN:  Five.
8  BY MR. ROBBEN:
9       Q.  You ever read it?
10      A.  Yes.
11      Q.  It asks:  "Are you financially able to pay
12  for any portion of your monthly medical bills that
13  are incurred through our company?"  Question mark.
14  And then it says:  "Please indicate the monthly
15  payment amount below."  And there is a colon, and it
16  is a select number of choices.
17          Now, it appears that the box, or the oval
18  next to up to $25 per month is filled in?
19      A.  That's correct.
20      Q.  Did you fill that oval in?
21      A.  That is correct.
22      Q.  Now, just so I understand, I am trying to
0090
1  understand what they were offering for you.  Was
2  Med-4-Home, in sending you this application and you
3  sending it back, were they intending to offer you a

4  plan where you would pay only a certain amount?

5     A.  That is correct.

6        MR. LEVY:  Objection.

7  BY MR. ROBBEN:

8     Q.  And did they in fact enroll you in that

9  plan?

10        MR. LEVY:  Objection.  You can answer if

11  you know.  You can answer whatever you know.

12     A.  What did you say?

13        MR. LEVY:  You can answer his question.

14     A.  Oh, yeah.  That is what, because I told

15  them I couldn't go over $25 a month.

16  BY MR. ROBBEN:

17     Q.  Okay.  And they from that point forward

18  charge, you know, more than $25 per month?

19        MR. LEVY:  Objection.  Whatever you think.

20     A.  Where do the $80 come in at?

21        MR. LEVY:  I can't answer that question

22  for you.  You can try to answer him as best you can

0091

1  and without guessing.

2     A.  Yeah, they enroll me for that amount.  I

3  suppose, because they sent medicine from then on.

4  BY MR. ROBBEN:

5     Q.  Okay.  So they sent -- after you sent in

6  this form --

7     A.  Yeah.  After they -- after they

8  acknowledged this.

9     Q.  They started sending you ipratropium and

10  Albuterol?

11     A.  Yes.

12        MR. LEVY:  Objection.  That

13  mischaracterizes his former testimony.

14  BY MR. ROBBEN:

15     Q.  When you were talking with Med-4-Home --

16  strike that. I think your testimony was that you had

17  made it known to Med-4-Home -- someone for Med-4-

18  Home that the price they were intending to charge

19  you was more than you wanted to pay or could pay,

20  correct?

21     A.  You started back grumbling again.

22     Q.  I am sorry.  I do tend to do that.  I am

0092

1  sorry. I think you testified before that at some

2  point early on in your relationship with Med-4-Home,

3  that you had made it known to them that you didn't

4  want to pay more?

5     A.  I couldn't.

6     Q.  Or that you couldn't pay more than a

7  certain amount for the Albuterol?

8     A.  That's right.

9     Q.  And the ipratropium?

10        MR. LEVY:  Objection.  Objection.

11  BY MR. ROBBEN:

12    Q.  Is that fair?
13        MR. LEVY:  He answered the question.  Go
14  ahead.
15    A.  I couldn't.
16  BY MR. ROBBEN:
17    Q.  Did you ever raise the issue of the cost
18  of the medication you were going to obtain with
19  Medicare?
20    A.  Come again?
21    Q.  Okay.  Did you ever contact anybody at --
22  in the Medicare program about the cost of the
0093
 1  Albuterol?
 2    A.  I never contacted Medicare about nothing.
 3  That's always been done by the doctors or whoever do
 4  it.  But I have never contacted Medicare for
 5  anything.
 6    Q.  Okay.  Did you ever ask anyone if there
 7  was a less expensive alternative to Albuterol or
 8  ipratropium?
 9    A.  No.
10    Q.  Okay.  Did you ever consider asking
11  anybody whether there was a less expensive
12  alternative?
13        MR. LEVY:  Objection.  You can answer.
14    A.  No.  Because I would be a fool to talk
15  about wanting something cheap.  That isn't going to
16  help you just because it is cheaper.  So I want the
17  best medicine you can get.  So why would I ask
18  somebody about something cheaper like that?
19    Q.  Nobody prevented you from asking if there
20  was a less expensive alternative?
21    A.  I just don't believe in it.
22    Q.  Do you have any understanding of how the
0094
 1  prices for drugs are determined?
 2    A.  Least of my worries.
 3    Q.  Do you have any understanding of who
 4  determines how much drugs cost?
 5    A.  As long as they are not charging me, I am
 6  not interested in it.
 7    Q.  Have you ever heard the term "average
 8  wholesale price"?  Have you ever heard the term
 9  average wholesale price?
10    A.  I have.
11    Q.  It is sometimes referred to as AWP?
12    A.  I have.
13    Q.  What is your understanding of that term?
14    A.  I understand that is the agreement that
15  they make between one another that after they take
16  out their expenses and everything, why they come to
17  an agreement of what kind of price they think they
18  can get for it and what kind of price they actually
19  do get.  So they call it an average wholesale price.

20     Q.  Okay.  When you say "they," who are you
21  referring to?
22     A.  I mean -- I mean druggists and the
0095
1  pharmacists and the doctors and everybody else,
2  since we are talking about medicine here.  So I
3  imagine that is what the whole conversation is about
4  medicine, so I would say it would be them come to an
5  agreement what they think that they can make a
6  profit off of.
7     Q.  Do you know how AWP is arrived at?
8     A.  I beg your pardon?
9     Q.  Do you know how AWP is calculated?
10    A.  No, I don't have the least idea.
11    Q.  Do you know whether Albuterol sulfate has
12  an AWP?
13    A.  I never heard of Albuterol until I started
14  getting it. So therefore I wouldn't know anything
15  about that.
16    Q.  Okay.
17    A.  That procedure.
18    Q.  Okay.  So if a particular Albuterol
19  sulfate had an AWP, you wouldn't know what it is,
20  correct?
21    A.  No.
22    Q.  If a particular manufacturer's ipratropium
0096
1  bromide would have an AWP, would you know what it
2  is?
3     A.  I wouldn't know.
4     Q.  Now, did you ever -- strike that.  Have
5  you ever heard the term "wholesale acquisition
6  cost"?  Wholesale acquisition cost, it is sometimes
7  abbreviated WAC.  WAC?
8     A.  Wholesale what?
9     Q.  Acquisition cost.
10    A.  No.
11    Q.  So you wouldn't know how -- you have never
12  heard of it at all?
13    A.  That I can recollect.
14    Q.  Okay.
15    A.  May have heard tell of it, but in a
16  different form from the way you just tell me --
17  using that term like that. But I may have heard or
18  seen it as far as that. But I don't know just
19  according to the way you just said.
20    Q.  Well, okay, that is fair.  Have you ever
21  heard the term WAC or wholesale acquisition cost in
22  connection with drug pricing or drug sales?
0097
1     A.  No.
2     Q.  Have you ever heard of a book called Red
3  Book.  It is a pharmaceutical pricing book.  Red
4  Book?

5      A.   Yeah.  I have had a pharmaceutical
6    statement of what the VA feels and they put down
7    there how much all of their different prescriptions
8    run at.
9      Q.   Okay.  We will get to that I think.
10     A.   Yeah.
11     Q.   Have you ever heard of a book.  It is -- I
12   can represent to you it is about as big as a
13   magazine, maybe a little bigger, and it says across
14   the top Red Book and it is red.  Have you ever seen
15   that?
16     A.   Huh huh. (No)
17     Q.   Have you ever heard of a book called
18   Bluebook?
19     A.   I have on automobiles, but not for
20   medicine.
21     Q.   Different Bluebook.  Good point though.
22         MR. LEVY:  Very good.
0098
1
2    BY MR. ROBBEN:
3      Q.   Have you ever heard of a company called
4    MediSpan, M-E-D-I --
5      A.   Who.
6      Q.   MediSpan?
7      A.   No.  I know there is a bunch of firms down
8    in Florida that comes up with all of that different
9    kind of stuff. MediSpan.  No.
10     Q.   What --
11     A.   Don't ring a bell with me.
12     Q.   When did you first learn about this
13   lawsuit?
14     A.   I beg your pardon?
15     Q.   When did you first learn about this
16   lawsuit?
17     A.   I didn't.  When you say first learned, I
18   didn't know more than it was prescribed by the
19   Doctor.
20     Q.   Maybe I am --
21     A.   I said I was in the hospital.  I had an
22   attack and everything and that then is when I was
0099
1    released from the hospital and the doctor suggested
2    that try this and then try that.  That is where I
3    first heard about it. And that is the way I started
4    in on it.
5      Q.   Okay.  What I am referring to is this
6    legal proceeding. When did you first learn about the
7    lawsuit that you are testifying in?
8      A.   Lawsuit?
9      Q.   Yes.
10     A.   What lawsuit?
11         MR. LEVY:  The case that you are
12   testifying in.

13    A.  Oh, this.  Oh, I took -- I saw an ad in
14  the paper several years ago pertaining to Lupron.  I
15  have cancer in the prostate and I was taking Lupron
16  and therefore I contacted them and told them that I
17  wanted to get in on that because I was paying for
18  the Lupron --
19        MR. LEVY:  I am going to stop you there.
20  He is talking about discussions he had with counsel
21  about his Lupron case, and I am not going to let him
22  talk about the substance of those communications.
0100
1        MR. ROBBEN:  Okay.
2  BY MR. ROBBEN:
3    Q.  Okay.  So you first learned about the
4  Lupron lawsuit?
5    A.  Yeah.
6    Q.  From a -- did you say a newspaper ad?
7    A.  Yeah.
8    Q.  I don't remember if you said newspaper ad
9  or not?
10    A.  Yes.  Yes.
11    Q.  So you contacted the lawyers about the
12  Lupron suit?
13    A.  Yes.
14    Q.  And you had some discussions with them
15  about that, correct?
16    A.  Yes.
17    Q.  Do you remember any of the lawyers' names
18  that you spoke to?  I don't want to know what you
19  told them, I want to know if you remember any of
20  their names?
21        MR. LEVY:  Are you talking about Lupron?
22        MR. ROBBEN:  When you responded to the ad
0101
1  on the Lupron.
2        MR. LEVY:  He wants to know if you know
3  any of the names of the lawyers you spoke to
4  regarding Lupron?
5    A.  I remember one of them was Kline.  The
6  first name.  And one of the lawyers name was Kline,
7  isn't there a Kline in there?
8        MR. LEVY:  In the name of the law firm?
9    A.  The law firm.
10    Q.  Are you referring to the law firm of Kline
11  and Specter?
12    A.  Yeah, something like that.
13    Q.  Okay.  Are you aware of the fact that the
14  Lupron related lawsuit settled?
15    A.  I --
16        MR. LEVY:  Objection.
17    A.  I hadn't heard nothing about it.
18    Q.  Have you ever received in the mail a
19  claims form in connection with the Lupron lawsuit?
20        MR. LEVY:  Objection.  You can answer if

21  you know.  Whatever you remember.  Did you answer
22  no?
0102
1      A.  What?
2          MR. LEVY:  I am sorry.  Did you give an
3  answer to that question?
4      A.  No.  What did you ask?
5  BY MR. ROBBEN:
6      A.  I can't --
7          MR. LEVY:  Are you having trouble hearing
8  him?
9      A.  He is letting his voice drop.
10     Q.  I will try not to do that.  Did you
11 remember ever receiving a claims form from the
12 Lupron lawsuit?
13     A.  Yes.
14     Q.  Did you fill that out and send it in?
15         MR. LEVY:  Objection.  You can answer if
16 you know.
17     A.  What?
18         MR. LEVY:  You can answer.  His answer --
19 his question is whether you filled out and sent in a
20 claim form?
21     A.  No, I didn't.
22 BY MR. ROBBEN:
0103
1      Q.  Okay.  Now, turning from the Lupron
2  lawsuit to this lawsuit, which is not about Lupron.
3  When did you first learn about this lawsuit?
4      A.  Oh, I would say probably about last --
5  probably 2005 -- last year sometime, if I can
6  remember straight.
7      Q.  Do you remember if it was in the earlier
8  part of the year or the later part of the year?
9      A.  No.
10     Q.  Okay.  But you think it was in 2005?
11         MR. LEVY:  Objection.  Asked and answered.
12     A.  I don't know whether it was '05 or '04.
13     Q.  Okay.  Have you discussed this lawsuit
14 with any of your relatives or your friends?
15     A.  No.
16     Q.  Do you know who the defendants in this
17 case are?
18     A.  Beg your pardon?
19     Q.  Do you know who the defendants in this
20 case are?
21     A.  No.
22     Q.  Do you know whether there are any doctors
0104
1  that are defendants in this lawsuit?
2      A.  No.
3      Q.  Do you know whether there are any
4  insurance companies that are defendants?
5      A.  No.

6    Q.  Do you know what claims you are bringing
7  in this lawsuit?
8         MR. LEVY:  Objection.  You might need to
9  restate that.
10  BY MR. ROBBEN:
11    Q.  Do you have an understanding of the claims
12  in this lawsuit?  Do you understand what I mean by
13  claims?
14    A.  What is he saying?
15         MR. LEVY:  He is asking you whether you
16  know what the claims are in this case.  But he is
17  also asking you whether you know what he means when
18  he says claims.
19    A.  Oh, what do you mean by claims?
20  BY MR. ROBBEN:
21    Q.  Okay.  Let me see.  Maybe I can ask it
22  this way.  What are you trying to -- what is the
0105
1  relief you are trying to obtain in this lawsuit?
2         MR. LEVY:  Objection to the term relief.
3  Do you know what he means?
4    A.  What?
5         MR. LEVY:  Do you know what he means when
6  he says relief?
7  BY MR. ROBBEN:
8    Q.  I will withdraw it.  I will withdraw it.
9  Why are you involved in this lawsuit?
10    A.  Well, I am involved because I am
11  representing me as a class action claim and
12  everything and I am here for all these other poor
13  devils that couldn't make it and everything.  So
14  therefore I come forth and represent all the rest of
15  them.
16    Q.  Okay.  So what is your understanding --
17  you are a class representative?
18    A.  Yes.
19    Q.  What is your understanding of what that
20  means?
21    A.  Well, my understanding is we have all been
22  fleeced and carried on so by different things of
0106
1  this nature, and therefore if I can stand up and
2  defend them, why that is what I understand about it.
3    Q.  Okay.  When you say "we have all been
4  fleeced," who is the "we"?
5    A.  Well, just like these high prices of
6  medicine that we have been paying for and that and
7  everything.  And we can't afford it and therefore we
8  have a chance to have a class action suit, whereby
9  somebody can get up there and represent you on that.
10  And that is the reason why I make a volunteer to
11  step forward and try to represent the rest of them.
12    Q.  Okay.  Now, who is it that you understand
13  you are representing?

14    A.  I am representing everybody that is taking
15  this medicine and was under a Medicare and didn't --
16  wasn't able to pay for it out of their own pocket.
17  And if there had been -- if they have been fleeced,
18  why.  That is what I am talking about.
19    Q.  Okay.  Now, do you understand the class to
20  include -- do you understand that you are
21  representing people even if they didn't take the
22  same medications that you do?
0107
1          MR. LEVY:  Objection.
2    A.  Yes.
3    Q.  Do you know what the Medicaid program is?
4    A.  Medicaid?
5    Q.  Yes.
6    A.  Medicaid is supposed to be a program
7  prescribed by the state or the city, but it is
8  funded by the federal government.  And therefore the
9  states or the city, they can pay for your medicine
10  and everything.  That is for indigent people that
11  don't have any hospitalization or insurance to fall
12  back on themselves, so therefore the state takes
13  over for them.
14    Q.  Are you representing Medicaid
15  beneficiaries as part of the class?
16          MR. LEVY:  Objection.
17    A.  I am representing any poor devil that
18  haven't got the money to pay for something like
19  that.  But yet he -- he needs the service and he
20  paid the best he could out of it for those that are
21  taking it.
22    Q.  Are you representing people who don't live
0108
1  in the State of Michigan?
2          MR. LEVY:  Objection.  Can you rephrase
3  that question?
4  BY MR. ROBBEN:
5    Q.  Is it your understanding that you are
6  representing people who do not live in the State of
7  Michigan?
8    A.  I don't know who they all are.  All I know
9  is anybody that can't afford it, that is who I
10  represent.
11    Q.  Okay.
12    A.  It is more than just people in Michigan
13  that has been charged off like that.
14    Q.  Does the class that you are representing
15  include insurance companies?  Strike that.  Is it
16  your understanding that the class that you represent
17  includes insurance companies?
18          MR. LEVY:  Objection.
19    A.  I would think that the average one didn't
20  have insurance and it is us that is on Medicare.
21    Q.  Okay.  But what I am asking is does the

22  class that you are representing, do you understand
0109
1  that it includes insurance companies as class
2  members?
3        MR. LEVY:  Objection.  You can answer.  Go
4  ahead, answer.
5     A.  Why sure it is.  It is Medicare that I am
6  representing. I don't know nothing about the
7  insurance companies.
8     Q.  Do you understand the class to include the
9  Medicare program?
10        MR. LEVY:  Objection.
11     A.  Yeah, yes.
12  BY MR. ROBBEN:
13     Q.  Do you understand the class to include
14  people who don't have insurance?
15     A.  Yes.
16     Q.  Do you want to be a class representative?
17     A.  Do I what?
18     Q.  Want to be a class representative?
19     A.  I wouldn't have had a retainer fee if I
20  didn't.
21     Q.  What do you understand your duties as a
22  class representative to be?
0110
1     A.  My duties are to come forth and represent
2  them for and to tell the truth of all of this and
3  help them out any way I can.
4     Q.  If there is a trial in this case, will you
5  travel to Massachusetts to give testimony?
6     A.  If it come to that, yes.
7     Q.  Why do you think you are in a position to
8  serve as a class representative?
9        MR. LEVY:  Objection.
10     A.  Well, I feel honored to be chosen, first
11  thing.  And if I was chosen, why that is the reason
12  why I am in it.
13     Q.  Now, do you understand that some people
14  have supplement -- what is called supplemental
15  insurance?
16     A.  I do.
17     Q.  What is your understanding of what
18  supplemental insurance is?
19     A.  I am not supposed to be representing those
20  type of people.  I am supposed to be representing
21  the people that don't have insurance, period.
22     Q.  Why do you feel you are not supposed to be
0111
1  representing people with supplemental insurance?
2     A.  Well, I would think that they would --
3  they would have their own claim on that.  They would
4  go for the insurance company.
5     Q.  Well, do you feel that your situation
6  somehow differs from that of a person who has

7  supplemental insurance?
8      A.  It is.
9      Q.  How so?
10     A.  I am different because if I don't have --
11  if I don't have insurance, why I am just -- I am out
12  in the cold. The insurance companies got their own
13  representative, the way I look at it.
14     Q.  Do you -- does the class or do you
15  understand the class that you represent to include
16  people who have benefits from the Veteran's
17  Administration?
18         MR. LEVY:  Objection.
19     A.  Beg your pardon?
20     Q.  Do you understand the class that you
21  represent to include people who obtain benefits from
22  the Veteran's Administration?
0112
1          MR. LEVY:  Objection, vague.
2      A.  That has nothing to do with the Veteran
3  Administration.
4      Q.  Are you expecting to be compensated in any
5  way for being a class representative?
6      A.  If it comes down to that, I would expect
7  to be compensated.
8      Q.  Well, do you expect to be compensated any
9  different than the other class members?
10         MR. LEVY:  Objection.
11     A.  Come again.
12     Q.  Do you expect to receive any compensation
13  different than what the other class members might
14  obtain in the lawsuit?
15         MR. LEVY:  Objection.
16     A.  It is a class action, so therefore
17  wouldn't -- when you have a class action like that,
18  wouldn't it all be split right down how many it
19  would be.  At least that is the way my arithmetic
20  says it.
21     Q.  So --
22     A.  So I wouldn't be no different from nobody
0113
1  else when it comes to saying it is a class action.
2      Q.  Okay.  So no one has told you that you are
3  going to get anything in addition because you served
4  as a class representative?
5          MR. LEVY:  Objection.
6      A.  No, that is right.
7      Q.  Now, are you hoping that the class will
8  obtain a monetary award, an award of money damages?
9          MR. LEVY:  Objection.  You can answer.
10     A.  Hum?
11         MR. LEVY:  You can answer.
12     A.  What did you say?
13         MR. ROBBEN:  I think I know the answer.
14     A.  Say what?  Are you saying what now?

15      Q.  Are you hoping that the class that you
16  represent obtains a monetary award in this lawsuit?
17      A.  Everybody can use something and everybody
18  has a price, so therefore, yes, everybody can wish
19  for a monetary award.
20      Q.  Do you have any -- do you have any beliefs
21  on as to how large that award should be?
22      A.  No.
0114
1          MR. LEVY:  Objection.
2      Q.  Do you have any sense as to how that award
3  should be calculated?
4          MR. LEVY:  Objection.
5      A.  I what?
6      Q.  How should that -- if money damages are to
7  be awarded, how should those damages be calculated?
8          MR. LEVY:  Objection.
9      A.  I wouldn't have any side on this, that
10  would be up to the judge and the way the case comes
11  out.
12      Q.  Other than money damages, is there
13  anything else that you want to achieve in this
14  lawsuit?
15      A.  Will let the public know that these firms,
16  let them know that people was dissatisfied with the
17  way that they was being ripped off about it.
18      Q.  When you say "these firms," do you mean --
19      A.  The big drug stores -- druggists and
20  pharmacists and all them.
21      Q.  Okay, so --
22      A.  Pharmaceutical.
0115
1      Q.  Do you mean -- let me make sure I
2  understand.  When you say "them" you mean drug
3  stores, pharmacists, and drug companies?
4          MR. LEVY:  Objection.  Go ahead.
5      A.  They fall in the same category.
6      Q.  Okay.  Why don't we mark this as the next
7  exhibit.  It will be Exhibit Walters 005.
8          MR. LEVY:  What is that?
9          MR. ROBBEN:  The complaint.
10         MR. LEVY:  The fourth amended?
11         MR. ROBBEN:  The fourth amended.
12         MR. LEVY:  Okay.
13  BY MR. ROBBEN:
14      Q.  We have marked as Exhibit Walters 005, the
15  fourth amended master consolidated class action
16  complaint in this case.  It is a large document.  It
17  comprises over 207 pages.  Mr. Walters, feel free to
18  look through that if you would like.
19      A.  These are mostly pharmaceutical firms,
20  mostly.  These are all the firms that is in on this?
21         MR. LEVY:  Let him ask you a question.
22  Just take a look and he will ask you some questions

0116
1  in a moment.  Is there a page you want to refer him
2  to?
3        MR. ROBBEN:  First, I want to ask if he's
4  ever seen it.
5        MR. LEVY:  That's okay.
6  BY MR. ROBBEN:
7     Q.  Have you ever seen this document before?
8     A.  No.
9        MR. LEVY:  Turn to the first page and read
10  the title.
11     A.  Oh, yes, I have seen -- this is the
12  complete case that has been bound and everything.  I
13  have seen it -- wait a minute, I will tell you for
14  sure.
15        MR. LEVY:  I think I can help you out
16  here.
17     A.  Yes, I have seen this before.
18  BY MR. ROBBEN:
19     Q.  Have you seen the whole thing or just
20  portions of it?
21     A.  I have seen -- it is 280 pages, should be.
22  BY MR. ROBBEN:
0117
1     Q.  Yes, it is.
2     A.  Yeah, I have seen the whole thing.
3     Q.  Okay.
4     A.  Yep.
5     Q.  Do you know when you saw it, when you
6  first received it?
7     A.  I was sent one of them.
8     Q.  Do you know when around you received it?
9     A.  About a week or so ago.
10     Q.  So I can represent to you that this was
11  filed with the court on March 1st of this year.  So
12  is it fair to say that you didn't see it before it
13  was filed?
14     A.  No.
15        MR. LEVY:  Objection.
16     Q.  Didn't see the whole thing, at least
17  before it was filed?
18     A.  No.
19     Q.  Do you understand that this document
20  contains allegations?  Do you know what an
21  allegation is?
22     A.  Yes.
0118
1     Q.  So do you understand that this document
2  contains allegations?
3     A.  Contains what?
4     Q.  Allegations.
5     A.  Yes.
6     Q.  Can you describe in your own words what
7  those allegations are?

8        MR. LEVY:  Objection.
9    A.  What?
10        MR. LEVY:  I am just objecting to his
11  question.  Do you know what he is asking you?
12    A.  No.
13  BY MR. ROBBEN:
14    Q.  You said no?
15    A.  Huh huh.
16        MR. LEVY:  Were you saying no to his
17  question or no to my question?  Can you rephrase the
18  question?
19    A.  No, to his answer.
20        MR. LEVY:  Okay.
21    A.  He said allegation, didn't he?  Didn't he?
22  BY MR. ROBBEN:
0119
1    Q.  Yes, right.  Strike whatever was pending.
2  Do you understand what an allegation is?
3    A.  Yes, allegation means something that you
4  are representing and you -- something that you are
5  defending what it would be, certain firms in here,
6  defending their products, that would be allegation.
7  This word allegation means defend.
8    Q.  Do you understand that this complaint
9  makes allegations of fraud?
10        MR. LEVY:  Objection.
11    Q.  Or -- strike that.  Do you understand that
12  among the allegations in this complaint, it makes
13  allegations of fraud?
14        MR. LEVY:  Objection.  You can answer.
15    A.  Yeah.
16    Q.  You do?
17    A.  Do I understand the allegation in the
18  complaint?
19    Q.  Well, do you understand that amongst the
20  allegations in the complaint, it alleges that the
21  defendants committed fraud?
22    A.  Yes.
0120
1    Q.  You understand that?
2    A.  Yes.
3    Q.  Now, when you looked -- when you obtained
4  the complaint, did you read it?
5    A.  I read some of it.
6    Q.  Okay.
7    A.  I haven't looked at the whole thing.
8    Q.  Neither have I.  I've been involved with
9  this case now for years, and I have never read one
10  front to cover -- cover to cover.  When you received
11  it, did you ever contact anybody about the fraud
12  that is alleged in the complaint?
13    A.  No.
14    Q.  You didn't contact Medicare?
15    A.  No.

16   Q.  Did you contact any public official?
17   A.  No.
18   Q.  Did you contact Med-4-Home?
19   A.  No.  I still haven't contacted nobody.
20   Q.  Okay.
21   A.  This don't concern me.  So why should I
22  run and shout to the world and tell everybody I got
0121
1  a citation there.
2        MR. LEVY:  When you are at a good spot for
3  a break, I would like to take one.
4        MR. ROBBEN:  Okay.  We can take it now.
5        MR. LEVY:  That would be great.  Thanks.
6          (A break was taken)
7        MR. LEVY:  I'd like to designate for the
8  record that this is a highly confidential, that both
9  the text of the deposition and the deposition
10  exhibits.  And so I don't forget, we are going to
11  reserve our right to read and sign this deposition.
12  BY MR. ROBBEN:
13   Q.  All right.  Mr. Walters, could you turn to
14  paragraph 24 of that complaint?  My copy, that is on
15  page 11.
16        MR. LEVY:  I am going to look over your
17  shoulder if you don't mind.
18        MR. ROBBEN:  There is another copy.
19        MR. LEVY:  That's all right.  I am cool.
20  BY MR. ROBBEN:
21   Q.  Have you had a chance to review it?
22   A.  Yes, I have.
0122
1   Q.  Okay.
2   A.  I have a correction.  You called it
3  Bandalia, it should be Vandalia.
4   Q.  Have you had a chance to review this
5  paragraph before this was filed?
6   A.  Yes, I have.
7   Q.  Did you have a chance to review it before
8  the complaint was filed?
9   A.  No.
10   Q.  Okay.  I thought maybe we would go through
11  this paragraph and just go line by line and I will
12  ask you some questions.
13   A.  Okay.
14   Q.  The first sentence with your correction
15  today says, "Plaintiff, Hunter G. Walters resides in
16  Vandalia, Michigan and is a Medicare recipient with
17  no supplemental insurance."  That is correct?
18   A.  That is correct.
19   Q.  Then it says:  "Mr. Walters receives
20  medication for emphysema and prostate cancer."  Now,
21  is that correct?
22   A.  Well, the emphysema was -- that should be
0123

1  changed to respiratory ailment, because they don't
2  know whether it is emphysema or whether it is
3  asthma.  But I do have the prostate cancer.
4    Q.  The next sentence says: "During the
5  applicable time period, Mr. Walters was prescribed
6  and was charged for, among others, the following
7  physician administered drugs based in whole or in
8  part on AWP."  And then it says:  "Albuterol
9  sulfate," and in parentheses it says: "DEY, the GSK
10  Group, and the Schering Plough Group," and then it
11  says:  "And ipratropium bromide," and then it says,
12  "DEY" in parentheses.  Do you see that?
13    A.  Yes.
14    Q.  What is the basis for the statement that
15  your payments or that the charges for those
16  medications were based in whole or in part on AWP?
17      MR. LEVY:  Objection.  You can answer.
18  Whatever you know, you can answer.
19    A.  The payments was because of Medicare pays
20  so much, why then I am charged the difference of
21  what Medicare don't pay.  That is the reason why I
22  was charged payments for the foregoing drugs.
0124
1    Q.  Okay.  So just so I am clear, is it your
2  understanding that Medicare -- that the amount that
3  Medicare is paying, that you pay a part of, that
4  that charge or that payment is based on AWP?
5      MR. LEVY:  Objection.  I was confused by
6  that question.
7    Q.  Do you understand the question?
8    A.  No, I don't understand the question.
9    Q.  Okay.  Is it your understanding that the
10  amount that Medicare pays to reimburse providers for
11  the Albuterol sulfate and the ipratropium bromide
12  that you take, is it your understanding that that
13  charge or that payment is based on AWP?
14      MR. LEVY:  Objection.
15    A.  Based on your what?
16    Q.  AWP.
17    A.  I wouldn't have the least idea what the
18  wholesale price would be.  So I wouldn't know.
19    Q.  Well, the complaint says that your charges
20  for Albuterol sulfate and ipratropium bromide were
21  based in whole or in part on AWP.  And what I am
22  trying to understand is what the --
0125
1    A.  I didn't know what the wholesale price
2  would have been in the beginning.  So I don't know
3  about that.
4    Q.  Did anybody ever tell you that your
5  charges for Albuterol sulfate --
6    A.  No.
7    Q.  Let me finish.
8      MR. LEVY:  Let him finish.

9  BY MR. ROBBEN:
10     Q.  Did anybody ever tell you that your
11  charges for Albuterol sulfate or ipratropium bromide
12  were based on AWP?
13     A.  No.  No.
14        MR. LEVY:  Objection.
15     Q.  Now, do you see in that same line that I
16  just read, there is parentheses after the names of
17  the drugs.  For example, it says Albuterol sulfate,
18  it says parentheses, DEY, the GSK Group, and the
19  Schering Plough Group?
20        MR. LEVY:  He is asking if you see that.
21     A.  Yes.
22  BY MR. ROBBEN:
0126
1     Q.  I want to make sure we are in the same
2  spot.  I will represent to you that is an indication
3  or an allegation that that drug, Albuterol sulfate,
4  was manufactured by one of these three companies.
5        MR. LEVY:  Objection.
6  BY MR. ROBBEN:
7     Q.  Now, do you know if you have ever taken
8  Albuterol sulfate manufactured by the Schering
9  Plough Group?
10     A.  No.
11     Q.  Do you know whether you have ever taken
12  Albuterol sulfate manufactured by the GSK Group?
13     A.  Can I answer that?
14        MR. LEVY:  You need to say whatever you
15  think.
16     A.  As I said in the beginning, I have never
17  paid attention to the manufacturers on any of these.
18  So I wouldn't have known whether it was by DEY or by
19  Plough or anybody else.  All I know is I am looking
20  for the medication.
21     Q.  Okay.  And so where -- and at the end of
22  that sentence it says ipratropium.  And it says DEY,
0127
1  do you know if you ever took ipratropium bromide
2  manufactured by DEY?
3     A.  I wouldn't have the least idea.
4     Q.  Okay.  Now, the only two drugs that are
5  named in this particular paragraph are ipratropium
6  bromide and Albuterol sulfate.  Are there any other
7  drugs that you have taken that you believe should be
8  added to that paragraph?
9        MR. LEVY:  Objection.
10     A.  Should I answer that?
11        MR. LEVY:  If you have an answer to it.
12     A.  No.
13        MR. ROBBEN:  Okay.
14     A.  You sent me a list --
15        MR. LEVY:  Objection, don't answer any
16  question that is not his question.

17    A.  That is what I didn't understand what you
18  said.
19        MR. LEVY:  That is okay, you are done with
20  that.
21  BY MR. ROBBEN:
22    Q.  Okay.  Now, other than the allegations in
0128
1  this particular paragraph, do you have any
2  knowledge, personal knowledge, of the allegations in
3  the rest of the document?  Do you understand what I
4  mean?
5    A.  No.
6    Q.  Other than the facts or the allegations of
7  fact made in this paragraph 24, which are all about
8  you, do you have personal knowledge of the facts or
9  the background of the allegations in any of the
10  other parts of the complaint?
11    A.  No.
12    Q.  Now, the sentence after the one we just
13  talked about says:  "Mr. Walters has made payments
14  for the foregoing drugs."  And by that I think the
15  meaning is Albuterol sulfate and ipratropium
16  bromide.  What is the basis for that statement?
17        MR. LEVY:  Objection.  You can answer.
18    A.  What?
19        MR. LEVY:  You can answer that.  You can
20  try to answer that question.
21    A.  I don't have nothing for that.  What did
22  you say it was?
0129
1    Q.  Well, what is your -- what is your basis
2  for that statement?
3        MR. LEVY:  Which statement was it?
4  BY MR. ROBBEN:
5    Q.  It was the sentence --
6        MR. LEVY:  Mr. Walters has made payments
7  for the foregoing drugs?
8        MR. ROBBEN:  Yeah.
9        MR. LEVY:  Okay.
10    A.  I told him in the beginning I didn't know
11  one DEY from one other.  I just made payment, which
12  I was supposed to have made.
13    Q.  Okay.
14    A.  I didn't --
15        MR. LEVY:  That is okay.  You have
16  answered his question.
17  BY MR. ROBBEN:
18    Q.  Do you have any knowledge, personal
19  knowledge, about any discounts that Med-4-Home might
20  have received from manufacturers?
21    A.  Do I have what?
22    Q.  Do you have any personal knowledge about
0130
1  any discounts that Med-4-Home might have received

2  from any manufacturer of drugs?
3      A.  Knowledge of what now?
4          MR. LEVY:  Is your hearing aid working
5  okay?  Are you hearing him okay?
6      A.  What?
7          MR. LEVY:  Are you hearing me okay?
8      A.  Am I doing what?
9          MR. LEVY:  Can you hear us right now --
10  can we go off the record a moment?
11         MR. ROBBEN:  Yes.
12             (Off the record)
13      A.  Now, you are asking me about on this last
14  here --
15         MR. LEVY:  Let's go back on the record and
16  he is going to reask the question for you and he is
17  going to ask you loud.
18  BY MR. ROBBEN:
19      Q.  It doesn't necessarily have anything to do
20  with this document, so I am not asking any questions
21  about this document right now.
22      A.  You said you are not asking any question
0131
1  about it?
2      Q.  Not about this particular document right
3  now.
4      A.  Okay.
5      Q.  I am just asking in general.
6      A.  Okay.
7      Q.  Now, do you have any personal knowledge of
8  any discounts that Med-4-Home received from any
9  manufacturer of pharmaceutical products?
10      A.  I wouldn't have the least idea.
11      Q.  Okay.  Now, would you have any knowledge
12  of any rebates that Med-4-Home received?
13      A.  I wouldn't have the least idea.
14      Q.  Now, do you have any personal knowledge as
15  to whether or not there has been a conspiracy
16  between drug manufacturers?
17         MR. LEVY:  Objection.
18      A.  I wouldn't have the least idea about that.
19      Q.  I should say, do you have personal
20  knowledge of a conspiracy between drug manufacturers
21  to overcharge for the drugs in this complaint?
22         MR. LEVY:  Objection.
0132
1      A.  All I go by is what the daily newspapers
2  and the radio and TV comes on about, seeing it
3  advertised out of them.  Otherwise than that, I
4  don't know personally what their set up is.
5      Q.  Have you seen a report in the newspapers
6  or on the radio about a conspiracy between drug
7  manufacturers?
8          MR. LEVY:  Objection.  You can answer --
9  Mr. Walters, I am going to keep saying objection.

10    A.  Okay.
11        MR. LEVY:  I want you to just keep
12  answering until I tell you don't answer, okay.
13    A.  Oh, okay.  Okay.  Don't answer.  Okay.
14        Yes, I have seen that in -- on the news
15  like that.
16  BY MR. ROBBEN:
17    Q.  Before, you said that you thought that
18  people were -- I think the term you used was
19  fleeced.  You thought people were being fleeced?
20    A.  Um-hum.
21    Q.  On the price of drugs that they need.
22  Now, do you believe that if Medicare pays for drugs
0133
1  that Medicare is being over charged?
2        MR. LEVY:  Objection.
3    A.  All I know is from what I hear on TV and
4  read about, that these pharmacist and everybody send
5  the statements in to Medicare, Medicare pays for it.
6  We have had several doctors that they have called on
7  the carpet right in this area here where they said
8  that they had over charged.  So that is all I can go
9  by, just what the news says about it.
10    Q.  So you have seen stories where they talked
11  about doctors that had been over charging?
12    A.  I have seen -- I have seen and knew a
13  personal doctor that was convicted from this area
14  for that.
15    Q.  Okay.
16    A.  My wife was a patient of his.
17    Q.  Do you remember that doctor's name?
18    A.  No.
19    Q.  Well, if an insurance company pays for
20  drugs, do you think the insurance company is being
21  over charged?
22    A.  I wouldn't have the least idea.
0134
1    Q.  Okay.  Have you ever -- since your
2  involvement with this lawsuit started, have you
3  contacted Med-4-Home to ask about the price you are
4  paying for --
5    A.  No.
6    Q.  For drugs?
7    A.  No, I haven't contacted them or anything.
8    Q.  I think you mentioned before that you had
9  a retention agreement in connection with this case?
10    A.  Yes.
11    Q.  Do you know what law firm that retention
12  agreement is with?
13    A.  I said it was Specter and Kline or
14  something like that.
15    Q.  Kline and Specter?
16    A.  Kline and Specter.
17        MR. ROBBEN:  I would just ask for it to be

18   produced.
19        MR. LEVY:  We would object to that.
20        MR. ROBBEN:  We will fight that another
21   time.
22        MR. LEVY:  We have no intention of
0135
1   producing any retainer agreement.
2        MR. ROBBEN:  I am still going to request
3   it.
4        MR. LEVY:  That is fine, you may request
5   away.
6     Q.   Can you turn in this Exhibit Walters 005,
7   the complaint?  Can you turn to page 275?  It is
8   almost at the end.
9        MR. LEVY:  What page, I am sorry?
10        MR. ROBBEN:  275.
11        MR. LEVY:  Okay.
12   BY MR. ROBBEN:
13     Q.   You say it starts, it says "by" and it
14   says "Steve W. Birman."  If you go to the next page
15   and the next page, there is a list.  And these are I
16   think some of the plaintiffs lawyers in this case.
17   Can you just look through that list and let me know
18   if you recognize any of those?
19     A.   No, I don't know none of them.  I see the
20   word Specter, but and Haviland, yes, I recognize
21   those.  Haviland and who else.
22        MR. LEVY:  You can flip to the next page
0136
1   too.
2     A.   Oh, there is more.
3        MR. LEVY:  It continues.
4     A.   Piper, Goldstein, Kreiden.  Williams
5   Ground.  Adam S. Levy is sitting to my left.
6        MR. LEVY:  I think that is all of them.
7     A.   Yes, that is all I can -- I have seen
8   about three here.
9   BY MR. ROBBEN:
10     Q.   Okay.  So just for the record, the three
11   you recognize, I think I can make it out, you
12   correct me if I am wrong, would be the Kline and
13   Specter firm?
14     A.   Yes.
15     Q.   Okay.
16     A.   Kline and Specter.
17        MR. LEVY:  He is mixing up the Specters.
18   There is two.
19     A.   There is another Specter.
20        MR. ROBBEN:  His is the Haviland firm.
21     A.   Here is a Specter here too.  And I saw the
22   word Haviland I saw that somewhere.  There you are,
0137
1   there.
2     Q.   Okay.  So you recognize Mr. Levy?

3     A.  Levy, yes.  Oh, that is the Specter, not
4  that one up there.
5     Q.  Okay.  So the Specter that you recognize
6  is the one that is Kline and Specter?
7     A.  Who is this one?
8        MR. LEVY:  You have already testified to
9  that -- let's not mark that.  She is needs to use
10  that in the case.
11     A.  Oh, okay.  Okay.  Okay.  Now I have seen
12  that.
13        MR. LEVY:  He is going to ask you another
14  question.
15  BY MR. ROBBEN:
16     Q.  I am going to try to summarize it.  I
17  think the lawyers that you said you recognize were
18  Kline and Specter, that law firm and Mr. Levy's
19  firm, those two.  Now, are there any other lawyers
20  in that list that you recognize?  I think you said
21  you might have recognized three?
22     A.  Technically you want to know a
0138
1  technicality, Mr. Levy is the only one I actually
2  recognize.  The rest of them I have seen their names
3  before pertaining to this case, but he is the only
4  one that I actually recognize, because I met him
5  personally.
6     Q.  Mr. Levy is like me, we get to do the
7  field work.
8     A.  That is a technicality.
9        MR. LEVY:  That is one way to call it.
10     A.  That is right.  I don't know the rest of
11  them.
12     Q.  Okay.
13        MR. LEVY:  They send me to the trenches.
14  BY MR. ROBBEN:
15     Q.  Okay.  That is fine.  That is fine.  Thank
16  you.  Do you have an understanding of how the costs
17  of this litigation are being paid?
18     A.  Have I an understanding how the what?
19     Q.  The costs of the litigation are being
20  paid, the plaintiffs' costs?
21     A.  No.
22     Q.  Okay.
0139
1        MR. LEVY:  Phil, are we done with the
2  complaint for now?
3        MR. ROBBEN:  I think so, yes.
4        MR. LEVY:  I think we are done with this
5  one.
6        MR. ROBBEN:  Why don't we mark as the next
7  exhibit, which I guess is Exhibit Walters 006 this
8  document that is Walters 0015.
9  BY MR. ROBBEN:
10     Q.  Take a look at that and for as long as you

11  need, and can you let me know if you have seen that
12  document before?
13          MR. LEVY:  For the record, this is Walters
14  0015 it is an April 20 -- it is a letter dated April
15  20, 2004 from Med-4-Home and there is a second stamp
16  up at top saying June 12, 2004 on it.
17  BY MR. ROBBEN:
18      Q.  Have you had a chance to look at it?
19      A.  Yes.
20      Q.  Do you recognize it?
21      A.  Yes.
22      Q.  As Mr. Levy said, the document is dated in
0140
1  the typeface, the letter is written in, April 20,
2  2004. But there is a little stamp above the O and M
3  in home that says J-U-N, 12?
4      A.  That is when I received it.
5      Q.  That is your stamp?
6      A.  That is my stamp.
7      Q.  Indicating when you got it?
8      A.  When I actually received it.
9      Q.  Do you remember how you received it?
10      A.  A regular letter from them, like I get my
11  statement from them.
12      Q.  It came in the mail?
13      A.  Yeah.  It come in a regular envelope from
14  Med Home.
15      Q.  Okay.  Now, the first sentence -- the
16  first sentence of the body of the letter says: "Our
17  records indicate that you are currently
18  participating in our financial hardship program."
19  Now, do you see that?
20      A.  Yes.
21      Q.  Is that the program that you testified you
22  applied for by filling out and sending in Exhibit
0141
1  Walters 004?
2      A.  That was supposed to have been it, yes.
3      Q.  That is your understanding of what it was?
4      A.  Yes.
5      Q.  Now, it says that beginning May first your
6  financial responsibility under the financial
7  hardship program will be adjusted to a minimum of
8  $15 per month towards your co-pay or 100 percent of
9  non-covered charges that are less than $15 a month.
10  Now, what was -- what is your understanding of that?
11          MR. LEVY:  Objection.
12      Q.  Let me ask you this, I will withdraw the
13  question.  The letter talks about a minimum of $15
14  being implemented for certain charges.  Prior to
15  this time had you been paying a different minimum
16  charge?
17          MR. LEVY:  Objection.  You can answer
18  whatever you think.

19  A.  Yes.
20  Q.  Do you remember how much it was?
21     MR. LEVY:  Objection.
22  A.  Can I tell him?
0142
1     MR. LEVY:  Whatever you think it is.
2  A.  Well, they found --
3     MR. LEVY:  Hold on a moment.
4  A.  Okay.
5     MR. LEVY:  Without speaking about what you
6  and your attorneys have done, you can just say what
7  you think, okay.
8  A.  Oh, okay.
9     MR. LEVY:  Do you understand what I am
10  saying?
11  A.  Yeah.  But what was your question now
12  again?
13  BY MR. ROBBEN:
14  Q.  My question is the letter says that your
15  financial responsibility is being adjusted to a
16  minimum of $15 per month for certain charges.  And
17  what I am asking is what was the charge prior to the
18  implementation of the $15 charge.
19  A.  It was more than $15.
20  Q.  So your recollection is that under the
21  financial hardship program, prior to the
22  implementation of this change, you were paying more
0143
1  than $15 per month, but you don't remember -- do you
2  remember how much the charge was?
3  A.  No.
4  Q.  Do you know what the circumstances were
5  under which you would be charged the minimum?
6     MR. LEVY:  Objection.  Are you talking
7  about before this -- the date of this letter or
8  after the date of this letter.
9  BY MR. ROBBEN:
10  Q.  Well, that is a good point.
11  A.  Yeah.
12  Q.  Prior to receiving this letter, were you -
13  -
14  A.  What.
15  Q.  Prior to receiving this letter, were you
16  participating in Med-4-Home's financial hardship
17  program?
18  A.  I was supposed to have been.  I had signed
19  my original retainer with them.
20  Q.  Okay.
21  A.  Back then, December.
22  Q.  Now, at the time you signed up, do you
0144
1  know what the terms were that you were supposed to
2  be getting?
3  A.  Well, that was the reason why I signed up,

4  because I didn't have any terms, just whatever they
5  wanted to charge me.
6      Q.  Well, on -- in Exhibit Walters 004 that we
7  looked at before, you indicated that you were able
8  to pay up to $15 per month?
9      A.  Twenty-five.
10     Q.  Excuse me.  Correct.  Up to 25?
11         MR. LEVY:  Very good.
12     A.  Yeah.
13     Q.  Now, after -- after submitting that
14  application, were you paying more than $25 per
15  month?
16         MR. LEVY:  Objection.  Asked and answered.
17     A.  I am trying to see the date.  This is the
18  16th.
19         MR. LEVY:  You want to restate your
20  question. You want to say it again.
21  BY MR. ROBBEN:
22     Q.  When you submitted Exhibit Walters 004 and
0145
1  checked the box that said you could pay up to $25
2  per month, did Med-4-Home thereafter limit their
3  charges to you to $25 per month or less?
4      A.  I can't remember the date.  Yes.
5         MR. LEVY:  He said he couldn't remember
6  the date.
7         MR. ROBBEN:  When they started to limit
8  them.
9      A.  Yes.
10     Q.  But they did at some point limit the
11  charges to $25?
12     A.  Yes.
13         MR. LEVY:  Objection.
14     Q.  Did they ever charge you less than 25?
15     A.  Oh, yes.
16     Q.  Did they ever charge you after
17  implementing the program more than $25?
18     A.  I can't remember the date on that.
19     Q.  I guess I am confused.  Are you saying
20  that at some point they did charge you more than
21  $25?
22     A.  That is right.
0146
1      Q.  You don't remember when?
2      A.  I don't remember when.
3      Q.  Okay.  But it was after?
4      A.  I don't know whether it was after or
5  before.  I know they did charge me though.
6      Q.  Okay.  I just want to make sure I
7  understand it, because I am a little confused.
8      A.  Is that in a hidden discovery?
9         MR. LEVY:  It is not a hidden discovery.
10  We just can't talk about what you and I talked
11  about.

12      A.   Oh.
13           MR. LEVY:  If you want to say you found
14   something in your records, you can go ahead and say
15   that.  I just don't want you to tell them what you
16   and I talked about, okay.
17      A.   Oh.
18           MR. LEVY:  So.
19      A.   I did find I have been charged more than
20   $25 -- I mean $15.
21      Q.   Okay.  So you found a document that
22   reflects charges more than $15?
0147
1       A.   Yes.
2       Q.   Do you know if that document has been
3    produced?
4            MR. LEVY:  For the record, I will say it
5    wasn't.  He found it this morning.  We are going to
6    go back to his house after this deposition and try
7    to collect anything more that he's found, be up
8    front about what it is, because we are going to
9    produce it. He found some checks, some old cancelled
10   checks for his payments to Med-4-Home.  We are going
11   to produce them, but we have to go back and make
12   sure we have collected everything.  We didn't find
13   out about them until this morning.
14   BY MR. ROBBEN:
15      Q.   Can we get an agreement now that we can
16   have Mr. Walters back?
17           MR. LEVY:  No.
18           MR. ROBBEN:  So you are not producing the
19   documents?
20           MR. LEVY:  Incorrect.  I will produce the
21   documents.  We just found them today or he just
22   found them today.  I haven't found them.
0148
1            MR. ROBBEN:  Okay.
2            MR. LEVY:  I went to pick him up.  And I
3    am not making any agreement on the record one way or
4    the other about it.  What I am telling you is we
5    will produce the relevant material, responsive
6    material. Whatever additional items he found this
7    morning and I do know that he told me that he's
8    found some cancelled checks.  We will produce the
9    cancelled checks so far as they are responsive to
10   the discovery and relevant to the discovery and
11   anything that is obviously not privileged.  I am not
12   making any agreement on this record for Mr. Walters'
13   re-deposition or continued deposition.
14           MR. ROBBEN:  Well, we are going to, you
15   know, we are going to reserve the right to have Mr.
16   Walters back.  I don't really want to but, you know,
17   the documents concerning Mr. Walters' purchase of
18   drugs and his prescriptions were due to be produced
19   at the beginning of March, March 1st, when all the

20  other documents in the case of this type were
21  produced.  The plaintiffs made a small production of
22  documents, 16 pages of documents in the third week
0149
1  of March only when we asked for them yet again.
2  Yesterday you produced 42 pages of documents on the
3  night before the deposition. Those documents were
4  produced 27 days late.  Now you are telling me you
5  have additional documents that you had this morning.
6          MR. LEVY:  I didn't have them this
7  morning, Mr. Carter had them.
8          MR. ROBBEN:  Who is Mr. Carter?
9          MR. LEVY:  Mr. Carter -- Mr. Walters. Mr.
10  Carter is a deposition I was at last week, another
11  state, another time zone.
12          MR. ROBBEN:  If its Tuesday, it must be
13  Jones.  I understand.  You have -- the documents
14  haven't been produced on time.  We have tried to
15  work with the production the plaintiffs have made.
16  And, you know, now, there is additional documents
17  out there that we are entitled to and, you know, we
18  just want to get the discovery we are entitled to.
19  And you are telling me while you are producing the
20  documents, I can't have the witness back to talk
21  about the documents.  So we are going to reserve the
22  right to have Mr. Carter back for deposition and we
0150
1  will continue today and do what we can, but that is
2  our position.
3          MR. LEVY:  Since we are making speeches, I
4  will just say that you live in a theoretical world.
5  I live in a practical world.  We have taken
6  Herculean efforts to get this gentleman's records to
7  you.  In fact, we came out here early.  We met with
8  Mr. Walters all day.  Mr. Walters is indigent.  We
9  went through a house that had items everywhere
10  throughout the house. I can't even tell you how long
11  we spent looking for documents that Mr. Walters yet
12  continued the search tonight in good faith, after
13  our already good faith effort to get you this stuff.
14  And he continued through the night and found some
15  more stuff, is simply testament to Mr. Walters'
16  efforts.  And frankly the inference that we are
17  playing around, withholding documents, that we
18  haven't -- that we have waited until the last
19  moment, your inference, although not explicitly
20  stated of some type of sand bagging, couldn't be
21  farther from the truth.  I would be hard pressed to
22  say of another time where I have tried so hard,
0151
1  including going through a man's house and his
2  personal belongs to find documents.  So your
3  inferences are not particularly taken very well by
4  me.

5          And the record is going to stand that we
6    will produce whatever we find.  We will continue to
7    do that. And as you said, I am not making any
8    agreement whatsoever to continue this man's
9    deposition over a few stray documents that we happen
10   to find because we looked in a cookie cupboard and
11   under boxes and did everything we could to find
12   documents.
13         MR. ROBBEN:  First of all, there is no
14   inference.  Certainly I haven't said that Mr.
15   Walters has done anything wrong.  I have no doubt
16   that he made good faith efforts to find the
17   documents.
18         MR. LEVY:  As did his counsel.
19         MR. ROBBEN:  That's fine.  I'm just saying
20   that the documents were produced in an untimely
21   fashion and, you know, I'm not -- I'm not asking for
22   anything unreasonable.  I am just asking for another
0152
1    chance to ask him questions about documents that I
2    don't have today.
3    BY MR. LEVY:
4       Q.  Now, going back to Exhibit Walters 006,
5    which is this April 20th, 2004 letter.  Was this --
6    was the adjustment of the minimum of $15 per month
7    increase in the minimum or a decrease?
8         MR. LEVY:  Objection.  You can answer if
9    you know.  You can try to answer his question again.
10   I am going to make some objections.  And you're just
11   going to continue to answer his questions.
12      A.  Okay.  Well, after this came out, I
13   imagine it was below the $15.  But before this, it
14   had been increased.
15         MR. LEVY:  I will object to the extent he
16   is guessing on a document he didn't create.  He is
17   using language suggestive that he is guessing.
18   BY MR. ROBBEN:
19      Q.  Were you guessing?
20      A.  What?
21      Q.  Are you guessing in giving your answer?
22      A.  I am just giving what I found.
0153
1       Q.  Why don't we mark as Exhibit Walters 007
2    document with control numbers Walters 0001 through
3    0003.
4         MR. LEVY:  Do you have extra copy?
5         MR. ROBBEN:  We have extra copies.
6         MR. LEVY:  What are the Bates?
7         MR. ROBBEN:  One through three.
8         MR. LEVY:  Okay.
9    BY MR. ROBBEN:
10      Q.  Just familiarize yourself with that.
11         MR. LEVY:  I think he is ready for your
12   question.

13  BY MR. ROBBEN:
14     Q.  We have marked Exhibit Walters 007 Bates
15  0001 to 0003 entitled Medicare Summary Notice, and
16  it is dated May 18, 2004 and it has a small stamp at
17  the top that says May 27, 2004?
18     A.  That is mine.
19     Q.  That is yours?
20     A.  Yes.
21     Q.  I take it you have seen this document
22  before?
0154
1      A.  I received it on the 27th.
2      Q.  Did you receive documents like this from
3  Medicare during the time that you have been
4  enrolled?
5      A.  Yes, I receive summary notes.
6      Q.  If you look all the way to the bottom of
7  the document, there is a line that goes across the
8  page.  And under it, it says in large letters:
9  "This is not a bill, dash, keep this notice for your
10  records."  Do you see that?
11     A.  Yes.
12     Q.  Now, was it -- strike that.  After you
13  received this notice or concurrently with receiving
14  this notice, did you also receive a bill for the
15  services and pharmaceuticals reflected on it?
16     A.  Yes, I always used it then.
17     Q.  I will represent to you there is no
18  invoice in the documents you produced that concern
19  charges for albuterol sulfate or ipratropium
20  bromide.  Do you know if you have documents,
21  invoices reflecting charges for ipratropium bromide
22  and Albuterol in your possession?
0155
1      A.  I am not sure.  I'm almost sure I do have
2  whatever it says here.  I have some mention of it in
3  these letters.  I always just file them and write on
4  them and put them away.
5      Q.  Let me make sure I understand.
6      A.  But I don't know -- I don't know one, you
7  know, one from the other of where they would be
8  until after this all come forth.  That is the reason
9  why I am coming up with all this different stuff.
10  Because I didn't have --
11         MR. ROBBEN:  Let me ask you this.
12         MR. LEVY:  Go ahead.
13         MR. ROBBEN:  In looking through his
14  documents, were you able to find invoices that
15  reflected charges for Albuterol sulfate and
16  ipratropium bromide?
17         MR. LEVY:  No.
18         MR. ROBBEN:  Okay.
19         MR. LEVY:  We found all kinds of stuff,
20  but nothing related to these medications.

21    MR. ROBBEN:  Okay.

22    MR. LEVY:  Other than what we have already

0156

1  produced to you.

2    Q.   Okay.  If you look, there is a box in the

3  middle of the document, Exhibit Walters 007, do you

4  see the box?  It has at the top headings, date of

5  service, services provided, et cetera?

6    A.  Yes.

7    Q.   Then there is a gray line that goes

8  through the middle.  And below that line, there is a

9  claim number and it says Med-4-Home, Inc., gives

10  their address.  And then for several dates or one

11  date in May of 2004 there is line items and it says

12  300 Albuterol INH, SOL, UD and some sort of code.

13  And below that, it says 60 ipratropium brom, INH,

14  SOL, UD and then a code and then has some figures to

15  the right of that.  Would you agree with me that

16  judging just by what is written on this paper it is

17  impossible to tell who manufactured those drug

18  products?

19    MR. LEVY:  Objection.  Go ahead and

20  answer.

21    A.  Hum?

22    MR. LEVY:  You can answer his question.

0157

1    A.  I didn't get your question.

2    Q.  Maybe I wasn't speaking loud enough?

3    A.  Yeah.

4    Q.  Okay.  Do you see where we are referring -

5  -

6    A.  I am looking at that.

7    Q.  Okay.  Based on what is written there,

8  just on this document?

9    A.  Yes.

10    Q.   Can you tell whether or not the Albuterol

11  and ipratropium bromide listed there were

12  manufactured by any particular company?

13    A.  No, I wouldn't know one from the other.

14    Q.   Now, you see to the right of those there

15  is some numbers with dollar signs?

16    A.  Yes.

17    Q.   And then it says on the -- on one of the

18  columns says Medicare paid provider?

19    A.  Yes.

20    Q.  To the right it says you may be billed?

21    A.  Yes.

22    Q.  Do you know what the basis is for those

0158

1  figures?

2    A.  Yes.  That is the 80 percent that Medicare

3  paid and that leaves 20 percent for me.

4    Q.  Okay.  Do you know whether or not those

5  numbers are based on AWP?

6      A.  I don't know.

7      Q.  Okay.

8      A.  I don't do their bookwork.

9      Q.  Why don't we mark as Exhibit, I guess, 8,
10  Exhibit Walters 008, two documents that have Med-4-
11  Home written at the top.  They are Bates number
12  Walters 0007 and Walters 0008.  We will take them
13  together.  I will just say for the record, they say
14  they are invoices -- two invoices dated November 10,
15  2004 and December 10, 2004. Can you just take a look
16  at that and let me know when you are ready?

17          MR. LEVY:  Take your time and just let us
18  know when you are ready.

19          Are you ready?

20      A.  Um-hum.

21          MR. LEVY:  He is ready for your question.

22  BY MR. ROBBEN:

0159

1      Q.  Okay.  I take it that this is a document
2  you have seen before?

3      A.  Yes.

4      Q.  Is this an invoice from Med-4-Home or
5  excuse me --

6      A.  Yes.

7      Q.  Are these invoices for Med-4-Home?

8      A.  Those are invoices.

9      Q.  Okay.  The only question I have is on the
10  first page, the one that has -- is dated November
11  10, 2004, under the part of the invoice where it
12  itemizes charges.  It says:  "Customer beginning
13  balance 15," and then it later on in that list says:
14  "Payment. "Thank you $15."  Do you remember what
15  that payment -- what that $15 charge concerned?

16      A.   It is some kind of aid that they rented me
17  in which my nebulizer --

18      Q.   So -- the $15, at least to the best of
19  your knowledge, is for the rent?

20      A.   That is what they took off.

21          MR. LEVY:  The $15 is on this line.  This
22  has a line here for two ninety-six.  If you are not

0160

1  -- you tell him what you think it is.

2  BY MR. ROBBEN:

3      Q.  I don't want you to guess.  If you don't
4  remember or you are not sure, let me know.

5          MR. LEVY:  Honestly, I think that is the
6  problem.  He's been through a lot of documents, but
7  the record speaks for itself.

8      A.  All I know is I always pay what is left in
9  the right-hand corner.  As soon as I pay the check
10  at the top, check number 5019 for $2.96 which is at
11  the bottom.

12          MR. ROBBEN:  Okay.  All right.  I think we
13  are probably about done.  I want to take a little

14  break.
15      MR. LEVY:  Sure.
16          (A break was taken)
17  BY MR. ROBBEN:
18    Q.  I have a couple more questions.
19          Have you ever had any discussions or had
20  any contact with somebody who works for the company
21  of DEY, Inc.?
22    A.  Did I have contact with who?
0161
1    Q.  Someone who works for DEY, Inc.?
2    A.  I don't know.  I have never heard tell of
3  DEY until this case came up.
4    Q.  Okay.  Let me ask you for the record, have
5  you ever had any contact or discussions with anybody
6  who works for Schering Plough?
7    A.  I haven't had no contact with no medical
8  firm.
9    Q.  So you have not had any contact with any
10  pharmaceutical manufacturer?
11    A.  No.
12    Q.  In making the payments you made for your
13  Albuterol sulfate and your ipratropium bromide, did
14  you rely on any statements or any representations
15  that you saw or were made to you by DEY?
16      MR. LEVY:  Objection.  You can answer.  Go
17  ahead.
18    A.  I didn't -- come again.
19    Q.  I am sorry.  In making payments that you
20  made over time for your Albuterol sulfate and your
21  ipratropium bromide, did you rely on any
22  representations by DEY?
0162
1      MR. LEVY:  Same objection.
2    A.  What kind of representation?
3    Q.  Did they say anything to you that you
4  relied on?
5    A.  No.  No more than I just write them a
6  check and send it to them.
7    Q.  Okay.  So if I asked you the same question
8  for Schering Plough, the answer would also be no?
9    A.  Yes, same.
10    Q.  Before I conclude, are there any answers
11  to my questions that you have given today that you
12  remembered something different and you would like to
13  supplement or change?
14      MR. LEVY:  Objection.
15    A.  No.
16    Q.  Okay.  Is there anything that I asked you
17  about that you didn't remember before that you now
18  remember?
19      MR. LEVY:  Objection.
20    A.  Huh huh.
21      MR. ROBBEN:  I think that is it.

22        MR. LEVY:  Thank you.
0163
1              MR. ROBBEN:  Subject to my reservation
2  before, I think that is it.  I understand your
3  position.
4              MR. LEVY:  And my position has not
5  changed.
6      A.  Okay.
7              MR. ROBBEN:  Adam?
8      MR. WRIGHT:  Yes.
9      MR. ROBBEN:  Any questions?
10      MR. WRIGHT:  No, I don't.
11      MR. ROBBEN:  Okay.  We are going to wrap
12  it up.
13              (Deposition concluded at 1:25 P.M.)
14                  * * * *
15
16          _____
17              HUNTER G. WALTERS
18  Subscribed and sworn to and before me
19  this _____ day of _____, 20_____.
20
21  _____
22        Notary Public
0164
1              CERTIFICATE
2  STATE OF MICHIGAN)
3                  )
4  COUNTY OF BARRY  )
5
6              I certify that this transcript is a complete,
7  true, and correct record of the testimony of
8  HUNTER G. WALTERS held in this case on
9  March 28, 2006.
10              I also certify that prior to taking this
11  deposition the deponent was duly sworn to tell the
12  truth.
13              I also certify that I am not a relative or
14  employee of or an attorney for a party; or a relative
15  or employee or an attorney for a party; or financially
16  interested in the action.
17
18  March 30, 2006
19          _____
20              MARY B. HOWLAND, CSR0078, CM
21              Notary Public, BARRY COUNTY, MI
22              My commission expires: 5/12/2007