# EXHIBIT K

0001
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3        * * * * *
4  IN RE:  PHARMACEUTICAL INDUSTRY    )
5  AVERAGE WHOLESALE PRICE       )
6  LITIGATION              ) MDL DOCKET NO.
7                 ) CIVIL ACTION
8                 )) 01CV12257-PBS
9  D              ))
10  THIS DOCUMENT RELATES TO:     )
11  ALL ACTIONS            )
12              )
13  D             ))
14       * * * * *
15
16        HIGHLY CONFIDENTIAL
17       DEPOSITION OF LARRY YOUNG
18      TAKEN ON BEHALF OF THE DEFENDANTS
19    ON NOVEMBER 9, 2005, BEGINNING AT 10:06 A.M.
20       IN OKLAHOMA CITY, OKLAHOMA
21       * * * * *
22  REPORTED BY:  JANE McCONNELL, CSR, RPR, RMR, CRR
0002
1  APPEARANCES:
2
3     MR. KEITH M. WILLIAMS, Attorney at Law, of the
4  firm Giebel, Gilbert, Williams & Kohl, 1300 Godward
5  Street, NE, Suite 6200, Minneapolis, Minnesota 55413,
6  appearing on behalf of the PLAINTIFF LARRY YOUNG.
7
8     MR. MARK YOUNG, MR. NIRAJ PAREKH and MR. ERIK
9  HAAS, Attorneys at Law, of the firm Patterson,
10  Belknap, Webb & Tyler, 1133 Avenue of the Americas,
11  New York, New York 10036, appearing on behalf of the
12  DEFENDANT JOHNSON & JOHNSON.
13
14     MR. TOM SWEENEY, Attorney at Law, of the firm
15  Hogan & Hartson, 875 Third Avenue, New York, New York
16  10022, appearing by telephone on behalf of the
17  DEFENDANTS BRISTOL-MEYER, APOTHECON and OTN.
18
19
20
21
22
0003
1          CONTENTS
2  Direct Examination by Mr. Young.......... 4
3  Cross-Examination by Mr. Sweeney....... 163
4
5       * * * * *
6

7          Exhibits
8  Exhibit Young 001, Complaint (no Bates)  62
9  Exhibit Young 002, YOUNG0001 to 0011    90
10  Exhibit Young 003, YOUNG0012 to 0053    97
11  Exhibit Young 004, YOUNG0054 to 0069   125
12  Exhibit Young 005, YOUNG0106 to 0205   126
13  Exhibit Young 006, YOUNG0070 to 0105   152
14
15          * * * * *
16
17
18
19
20
21
22
0004
1  WHEREUPON,
2          LARRY YOUNG,
3  after having been first duly sworn, deposes and
4  says in reply to the questions propounded as
5  follows, to-wit:
6          DIRECT EXAMINATION
7  BY MR. YOUNG:
8    Q    Good morning, Mr. Young.
9    A    Good morning.
10    Q    You and I met just a moment ago.  My
11  name is Mark Young.  I'm an attorney at
12  Patterson, Belknap, Webb and Tyler.  I represent
13  Johnson & Johnson and several of its subsidiaries
14  in this lawsuit.
15          Can you state your full name for the
16  record, please.
17    A    Larry Lynn Young.
18    Q    Where do you live, Mr. Young?
19    A    Enid, Oklahoma.
20    Q    How long have you lived at Enid,
21  Oklahoma?
22          MR. SWEENEY:  This is Tom Sweeney.
0005
1  Can we get the microphone closer to the speakers
2  because I'm having trouble hearing it.
3          (Discussion off the record.)
4    A    Around nine years.
5    Q    (BY MR. YOUNG)  Prior to -- where did
6  you live before you lived in Enid?
7    A    Ponca City, Oklahoma.
8    Q    How long did you live there?
9    A    Approximately six years.
10    Q    So you've been in Enid since about 1996;
11  is that fair?
12    A    Yeah.
13    Q    And you were in Ponca City?
14    A    Ponca City, Oklahoma.

15    Q    Since about 1990?
16    A    Yeah, around there.
17    Q    Have you lived anywhere else?  Have you
18  lived outside of Oklahoma City at any time?  I'm
19  sorry, outside of Oklahoma?
20    A    No.
21    Q    And you're not married, correct?
22    A    No.
0006
1    Q    You were married?
2    A    Right.
3    Q    How long were you married?
4    A    Just a little over 20 years to Patricia.
5    Q    Did Patricia live with you for the nine
6  years in Enid and the six years in Ponca City?
7    A    Most of the time.  There was part of the
8  time when I was working in Alva, Oklahoma.  I
9  would just return on weekends for about -- it was
10  probably a little over a year until I got
11  transferred.
12    Q    When was that?
13    A    That was in about '92, something like
14  that.
15    Q    By the way, is there a way you would like
16  for me to refer to your wife?
17    A    Do what?
18    Q    Shall I refer to Patricia as your wife?
19    A    Yes.
20    Q    Has your wife ever lived outside of
21  Oklahoma?
22    A    No.
0007
1    Q    What is your occupation?
2    A    I'm retired.
3    Q    What was your occupation before you
4  retired?
5    A    I worked for Southwestern Bell.
6    Q    What did you do for Southwestern Bell?
7    A    I started out as an installer in December
8  of 1963.  I worked as an installer for about two
9  years, and then I went to an assignment job in
10  Guthrie, Oklahoma.  This was insulation in Alva.
11  I was there about two years, left to be a cross bar
12  switchman which is the central office.  I was there
13  for four, about four to five years.  I left at that
14  point and went to Chandler, Oklahoma as a
15  manager wire chief they called us.  I was over the
16  outside and inside for Chandler, Wellston, Luther
17  and Carney.
18    Q    That's a different company?
19    A    No.  This was with Southwestern Bell, but
20  that was what they called us, wire chiefs.
21        MR. WILLIAMS:  He just gave you the list
22  of towns that he covered.

0008
1     A    Yeah.  That was the towns.  At that
2  point --
3     Q    (BY MR. YOUNG)  Let me cut you off a
4  second.  I don't know that we need to go through
5  the fine details, but just to understand, you
6  worked with Southwestern Bell in various
7  capacities?
8     A    Yes.
9     Q    For about the last 30 years?
10     A    For 33 years and three months and a
11  couple days or so.
12     Q    Was your wife employed?
13     A    Yes.
14     Q    How was she employed?
15     A    She worked for Southwestern Bell too as a
16  drafting clerk.
17     Q    Do you know approximately when she
18  started with Southwestern Bell?
19     A    I think it must have been in the '70s
20  sometime.  I'm not for sure.
21     Q    Do you know when -- how long did she
22  work with Southwestern Bell?
0009
1     A    It was about -- I think it was about 17
2  years until she had a stroke, and she was given
3  medical leave for over a year, and then she was
4  able to get medical disability retirement.
5     Q    When did she have the stroke?
6     A    Let's see, it was '93, I think, somewhere
7  in there.
8        MR. YOUNG:  Did somebody just join?
9        MR. HAAS:  This is Erik Haas with
10  Patterson Belknap.
11     Q    (BY MR. YOUNG)  So in approximately
12  1993 is when your wife stopped working?
13     A    Yeah, around in that area, yeah.
14     Q    You said she got medical disability from
15  that point forward?
16     A    Yes.  She got also disability through the
17  government.
18     Q    So she got medical disability through
19  Southwestern Bell?
20     A    Right.
21     Q    And through the government?
22     A    Right.
0010
1     Q    Do you know what disability she got
2  through the government?
3     A    Well, her Social Security, she got
4  Medicare, partial Social Security.
5     Q    What medical disability did she get from
6  Southwestern Bell?
7     A    Do what?

8    Q    What medical disability did she get from
9  Southwestern Bell?
10    A    It was full.
11    Q    What do you mean by full?
12    A    That means she was unable to perform
13  her job.
14    Q    What benefits did she get?
15    A    She got a partial retirement making up
16  the difference between her Social Security and her
17  retirement pay to equal her salary that she would
18  have been making.  She got her insurance which
19  would be supplemental and all the benefits a
20  regular retired person from Southwestern Bell
21  would have.
22    Q    You said she got insurance?
0011
1        MR. HAAS:  Can I interrupt for a second
2  here.  This is Erik Haas on the line here.  I can't
3  hear anything the witness is saying.  Is there a
4  way to move the --
5        (Discussion off the record.)
6        (Whereupon the court reporter read back
7  the pending question.)
8    Q    (BY MR. YOUNG)  What insurance did she
9  get?
10    A    She got supplemental.
11    Q    What do you mean by she got
12  supplemental insurance?
13    A    Well, the Medicare covered the first
14  portion and she got the supplemental on anything
15  under what Medicare would pay for, and then
16  there was a deductible on that.
17        MR. YOUNG:  Erik, can everybody hear
18  that on the phone?
19        MR. HAAS:  I can't hear anything.
20    Q    (BY MR. YOUNG)  I'll have to ask you to
21  speak up.
22    A    Okay.
0012
1    Q    What treatments did she receive after she
2  had her stroke?
3        MR. WILLIAMS:  I'm going to object as
4  vague.  You can answer to the best of your ability.
5        THE WITNESS:  Just to my --
6        MR. WILLIAMS:  You can testify to the
7  best of your ability.  I just objected.  The question
8  was vague.
9    A    She received physical therapy.  She also
10  -- for how long?  Until she passed away are you
11  talking about?
12    Q    (BY MR. YOUNG)  That's a fair question.
13  I was thinking in the time frame shortly after she
14  had the stroke.
15    A    Okay.  It was mainly the physical

16   therapy, and her neurologist kept track of her
17   arthritis medication and along with
18   rheumatologist, Bone & Joint.
19       Q    Who was her neurologist at that time?
20       A    To my -- I think it was Hulsey with the
21   Bone & Joint in Oklahoma City.
22       Q    Is Dr. Hulsey -- Hulsey is his last name?
0013
1        A    Yes, or it could have been in Norman.  I'm
2    not for sure, but it was through the Bone & Joint.
3        Q    Is that the name of the practice?
4        A    That was the name of the hospital, Bone
5    & Joint Clinic, McBride.
6        Q    So the McBride Bone & Joint Hospital?
7        A    Yes, in Oklahoma City.
8        Q    Was Dr. Hulsey -- so Dr. Hulsey was --
9        A    One of the doctors in rheumatology.
10       Q    He was the rheumatologist, her
11   rheumatologist?
12       A    Yes.
13       Q    How long did he see Dr. Hulsey?  How
14   long did she see Dr. Hulsey?
15       A    Approximately two or three years.
16       Q    Did she see a different rheumatologist
17   after seeing Dr. Hulsey?
18       A    Yes.  Dr. Carson.
19       Q    When did she start seeing Dr. Carson?
20       A    Let's see, it was in 2001, 2001, I think,
21   somewhere around in there.  I'm not for sure.
22       Q    And when did she start seeing Dr.
0014
1    Hulsey?
2        A    She seen him for about three or four
3    years, and before that she was seeing another
4    rheumatologist with the same Bone & Joint.  She
5    had been seeing -- she had had rheumatoid
6    arthritis for quite a few years, since she was
7    probably 23 or somewhere around in there.
8        Q    Do you know if Dr. Hulsey ever prescribed
9    her medication for her arthritis?
10       A    Yes.
11       Q    Is that the only thing he would -- any
12   condition he would have prescribed medicine for
13   her?
14            MR. WILLIAMS:  Object, lack of
15   foundation.
16            THE WITNESS:  Do I need to answer?
17            MR. WILLIAMS:  Yes.  Unless I instruct
18   you not to answer, answer to the best of your
19   ability if you know.
20       A    As far as I know, that's all the medication
21   he would give her is for her rheumatoid arthritis.
22       Q    (BY MR. YOUNG)  Do you know what
0015

1  medication Dr. Hulsey prescribed your wife?
2      A   I'm not for sure.  It's all in the medical
3  records.
4      Q   I'm sorry, it's all in the medical records?
5      A   Yeah.
6      Q   You said there was a rheumatologist that
7  your wife saw prior to seeing Dr. Hulsey.  Do you
8  remember the name of that rheumatologist?
9      A   Prior to?
10     Q   Dr. Hulsey.
11     A   It's a woman doctor, I think.  She retired.
12  I can't think of what her name would be.
13     Q   Do you recall if there was a reason she
14  stopped seeing Dr. Hulsey?
15     A   Yeah, there's a reason.
16     Q   What was that reason?
17     A   To my knowledge I think that the
18  medication that he was giving her was Imuran and
19  he had upped the dosage.  I think it finally was
20  200 milligrams.
21         After awhile she became real sick.  Well,
22  she would start eating something and she would
0016
1  just throw up, and this went on for a while.  Her
2  local family physician got her set up with an
3  internist for upper and lower GI and all that to
4  make sure that she didn't have anything wrong in
5  her stomach or in her intestines.
6         There was nothing wrong after all the
7  tests.  So I got to thinking it could be her
8  medication.  I talked to the doctor about it,
9  Hulsey, and he said it wouldn't cause this, and
10  that was the only thing that we could think of that
11  might be causing her problems.
12         So I told my family physician that I
13  thought that she ought to lower the dosage and
14  keep checking her blood to make sure no buildup
15  in her blood.  The doctor reduced it and give her
16  some Prednisone, I think it was, and it wasn't but
17  a short period, like a week or two she cleared
18  right up.
19     Q   Which doctor gave her Prednisone?
20     A   It was the family physician.  She may
21  have been taking a light dosage of it before.  I'm
22  not for sure.
0017
1      Q   Who is this family physician?
2      A   Dr. Kang.  It's to keep her -- she wanted
3  to keep her SED rate down.
4      Q   I beg your pardon?
5      A   They wanted to keep her SED rate down.
6      Q   What's a SED rate?
7      A   It's the amount of particles in her blood
8  is what I get out of it and to keep her from having

9   a blockage or a stroke, which that's what caused
10  the stroke to begin with was a blockage.
11      Q   As I understand your testimony, it was
12  you who spoke to Dr. Hulsey about her -- the
13  dosage she was receiving?
14      A   Yeah.  And asked him if there was any
15  side effects to this that could be causing this
16  because I was getting pretty worried at this point
17  because she was laying around a lot and pretty
18  weak.
19      Q   Did your wife participate in that
20  conversation?
21      A   She may have talked -- I can't remember
22  now whether she talked to him and told him how
0018
1   she felt and stuff.
2       Q   Just so that I'm clear, when did your wife
3   start seeing Dr. Hulsey?
4       A   It was right after -- I can't remember the
5   rheumatologist now that she had before that, that
6   he was transferred or he went to a clinic in Texas
7   somewhere, head of the arthritic clinic, and
8   Hulsey was given as the one to take over.
9           MR. WILLIAMS:  Mr. Young, Mr. Young
10  just asked you when did Mrs. Young start seeing
11  Dr. Hulsey.  Try to keep your answers responsive
12  to the question.
13          THE WITNESS:  Okay.
14          MR. WILLIAMS:  Thank you.  I'm sorry,
15  Counsel.
16      Q   (BY MR. YOUNG)  Well, in that vein, can
17  you give me a time frame when your wife started
18  seeing Dr. Hulsey?
19          MR. WILLIAMS:  Can you recall?  Either
20  you can or you can't.
21      A   I can't recall how many years she seen
22  him.
0019
1       Q   (BY MR. YOUNG)  Can you recall when
2   you spoke to Dr. Hulsey when the conversation
3   you testified about a moment ago, when that
4   occurred?
5       A   It was right after the test results come
6   back on her upper and lower GI and they couldn't
7   find anything causing her problem.
8       Q   Was that in 2000, 2001, 2002?
9       A   I think it was 2001 I think it was.
10      Q   It was at that point I think you testified
11  that she started to see Dr. Carson?
12      A   His name was given to us by her liver
13  doctor.
14      Q   I think you testified a moment ago that
15  she also saw a neurologist; is that correct?
16      A   This was during when she had the stroke.

17    Q   And returning to the discussion about the
18  stroke for just a moment, you testified a moment
19  ago that she received physical therapy; is that
20  correct?
21    A   Yes.
22    Q   Did she receive any medication in
0020
1  connection with the stroke?
2        MR. WILLIAMS:  Objection, lack of
3  foundation.
4    A   I don't recall.  I don't know what they
5  give them in the hospital when you have a stroke.
6    Q   (BY MR. YOUNG)  So you don't recall
7  whether she received any medication?
8    A   Well, I imagine she did.
9        MR. WILLIAMS:  Don't imagine.  Do you
10  know if she received the medication?
11        THE WITNESS:  I don't know.
12        MR. WILLIAMS:  Answer his question.
13        THE WITNESS:  I don't know.
14    Q   (BY MR. YOUNG)  Mr. Young, what's your
15  educational background?
16    A   Graduation from high school, part of a
17  semester of college, then quit because of getting
18  married and not enough money to continue.
19    Q   And have you ever worked for the state,
20  federal or local government?
21    A   No.
22    Q   Did your wife ever work for the state,
0021
1  federal or local government?
2    A   No.
3    Q   Were you in the military?
4    A   No.
5    Q   Was your wife in the military?
6    A   No.
7    Q   I believe you testified earlier that you've
8  always lived in Oklahoma; is that correct?
9    A   True.
10    Q   And your wife also lived in Oklahoma?
11    A   True.
12    Q   So you never lived in Massachusetts?
13    A   No.
14    Q   Have you ever received medical care in
15  the state of Massachusetts?
16    A   No.
17    Q   Have you ever purchased medication in
18  the state of Massachusetts?
19    A   No.
20    Q   Did your wife ever received medical care
21  in Massachusetts?
22    A   No.
0022
1    Q   Did your wife ever purchase medication in

2   Massachusetts?
3     A   No.
4     Q   Have you ever worked in Massachusetts?
5     A   No.
6     Q   Has your wife ever worked in
7   Massachusetts?
8     A   No.
9     Q   Do you own property in Massachusetts?
10    A   No.
11    Q   Did your wife own property in
12  Massachusetts?
13    A   No.
14    Q   Have you ever been in Massachusetts in
15  the last 15 years?
16    A   No.
17    Q   Was your wife in Massachusetts in the
18  last 15 years?
19    A   No.
20    Q   When did you retire from Southwestern
21  Bell?
22    A   '65 -- 1965 or '95.
0023
1     Q   You retired in 1995?
2     A   Yeah.
3     Q   Have you had any employment since
4   1995?
5     A   No.
6     Q   No?
7     A   Just helping my son out in his business
8   is the only thing.
9     Q   Prior to your retirement in 1995, did you
10  have health insurance?
11    A   Yes.
12    Q   What health insurance did you have
13  before you retired?
14    A   Major medical.
15    Q   Who was your carrier?
16    A   United Healthcare.
17    Q   And after you retired did you have health
18  insurance?
19    A   Yes.
20    Q   What insurance did you have after you
21  retired?
22    A   The same.
0024
1     Q   Was your wife covered under that policy?
2     A   No.
3     Q   She had her own policy?
4     A   Yes.
5     Q   What insurance did your wife have?
6     A   United Healthcare.
7     Q   When did she -- when did her coverage
8   start with United Healthcare?
9     A   I'm not for sure what the date was that

10  United Healthcare took over the medical for
11  Southwestern Bell.  We also before that had
12  Prudential, and before that we had Blue Cross &
13  Blue Shield.
14      Q   Do you know approximately when you
15  switched from Prudential to -- or her coverage
16  switched from Prudential to United Healthcare?
17      A   This was done through the company.  So
18  it would have been -- I don't recall the year that
19  they took over.
20      Q   Do you know what type of coverage your
21  wife had with United Healthcare?
22          MR. WILLIAMS:  Objection, vague.
0025
1       A   Only coverage that Medicare didn't cover
2   and it was only on -- it had a deductible on it
3   which is a supplemental.
4       Q   (BY MR. YOUNG)  You testified earlier
5   she had the stroke in 1993; is that correct?
6       A   Somewhere around in there, yes.
7       Q   And she had -- she's had -- did she have
8   United Healthcare prior to her stroke in 1993?
9       A   I'm not for sure whether -- how long we've
10  had it.
11      Q   Whether it was United Healthcare or
12  Prudential or the other company you mentioned,
13  did she have health insurance coverage prior to
14  her stroke in 1993?
15      A   Say that again.
16      Q   I'm trying to understand what insurance
17  she had prior to her stroke.
18      A   She had company insurance which the
19  company negotiates whether -- who gets to cover
20  the paperwork, cover the medical and stuff for
21  them.  Southwestern Bell is self-insured by my
22  understanding.
0026
1       Q   Other than United Healthcare from 1993
2   forward did she have any other insurance?
3       A   She had prescription.  She also had a
4   Medical Plus which was anything that would cover
5   new and upcoming techniques that would cost a
6   large amount of money.
7       Q   Any others?
8       A   Medicare.
9       Q   Any others?
10      A   No.
11      Q   You said she had prescription coverage.
12  What do you mean by that?
13      A   We can order our medication and pay a
14  co-pay.  We can get a three months' supply, and if
15  we're taking it a long period of time it can be
16  ordered with three refills.
17      Q   Who provided this benefit?

18    A    Southwestern Bell through Care Mart.
19    Q    Did you have to pay a fee for that?
20    A    Not directly.
21    Q    How did you pay it indirectly?
22    A    Well, the union dues, the union
0027
1    negotiates for benefits.  So these benefits, if we
2    didn't get them, then we would be getting a higher
3    salary.
4    Q    So you were a member of a union?
5    A    Yes.
6    Q    Was your wife a member of a union?
7    A    Yes.
8    Q    What union were you a member of?
9    A    CWA.
10    Q    Was your wife a member of the same
11    union?
12    A    Yes.
13    Q    That's Communication Workers of
14    America?
15    A    Right.
16    Q    You said we can order.  So each of you
17    had that same benefit?
18    A    True.
19    Q    Separately?
20    A    Yes.
21    Q    What medications could you order?
22       MR. WILLIAMS:  I'll object on foundation
0028
1    grounds.
2    A    Mainly prescribed medications.
3    Q    (BY MR. YOUNG)  When you say mainly,
4    what do you mean?
5    A    That's what it was is for prescribed
6    medications.
7    Q    Did you, yourself, order any such
8    medications?
9    A    The doctor would give me a prescription
10    so I could order it, yes.  I would send it in for me.
11    Q    And what about your wife?
12    A    And the same.  The doctor would give her
13    prescriptions and she would mail them in.
14    Q    What medications did your wife mail in,
15    as you say?
16       MR. WILLIAMS:  Objection, vague, also a
17    lack of foundation.
18    A    Just medications prescribed by a doctor
19    for an illness.
20    Q    (BY MR. YOUNG)  Do you recall any
21    specific medications?
22    A    There was a lot of them.  Imuran was one
0029
1    of them, Prednisone.  There was different pain
2    medications.  I don't remember the names of them.

3 There was quite a few pills, I think.
4    Q   Is it correct that any of the medications
5 she ordered or you ordered would not have been
6 administered by a physician; they were taken by
7 you or her?
8    A   Yes.
9    Q   You mentioned a co-pay.  How much
10 co-pay did you pay?
11   A   It's negotiated by the union.  At one time
12 it was $20 and it's now up to 40.
13   Q   When did it change from 20 to 40?
14   A   2004, I think it was.
15   Q   2004?
16   A   I think that's right.
17   Q   And how long was it did you pay 20?
18   A   I think since we had the prescription
19 card.
20   Q   Do you recall when you first received that
21 prescription card?
22   A   I sure don't.  I can't recall.
0030
1    Q   Was it within the last few years?
2    A   We've had prescription benefits the last
3 10 or 12 years.  I don't know.  We've had it
4 awhile.
5    Q   Just so that I understand, you would pay
6 $20?
7    A   For a three months' supply.
8    Q   That's of any drug that you ordered
9 through that program?
10   A   True.
11   Q   You also mentioned that your wife had
12 Medical Plus.  Can you tell me more about that?
13      MR. WILLIAMS:  Objection, vague.  What
14 more do you want to know?  Can you answer that?
15   A   I think it was for real expensive
16 procedures that families couldn't afford.
17   Q   (BY MR. YOUNG)  Who provided -- would
18 you call this a benefit?
19   A   A benefit.
20   Q   Who provided this benefit?
21   A   Southwestern Bell.
22   Q   Did they have any -- did they administer
0031
1 it or did somebody else administer it?
2    A   I don't know because I've never had to
3 use it.
4    Q   Did your wife have to use it?
5    A   No.
6    Q   Do you know -- I think you started to tell
7 me a little bit about what that benefit entailed.
8 They would cover new and upcoming techniques; is
9 that correct?
10   A   I think that's what it was.  It's for

11  something that's real expensive our other
12  insurance coverage wouldn't cover.
13      Q    And, again, did you pay -- did you pay for
14  that benefit?
15          MR. WILLIAMS:  Objection, vague.
16          MR. YOUNG:  Strike that. I'll ask it a
17  different way.
18      A    I think there --
19          MR. WILLIAMS:  He struck the question.
20  He's going to ask another question.
21      A    Re-ask it.
22      Q    (BY MR. YOUNG)  Did you pay that
0032
1  indirectly the way you paid the prescription
2  benefit in that it was negotiated by the union and
3  you pay a certain fee if you used the service?
4          MR. WILLIAMS:  I'll object that it's
5  vague.  I think it misstates his prior testimony.
6  Go ahead and answer it if you can.
7      A    I don't know.  I think this is -- it was a
8  benefit by the company, and I'm not sure whether
9  there was a small monthly charge or not.
10      Q    (BY MR. YOUNG)  Did you receive any
11  documentation about -- did you or your wife ever
12  receive any documentation about this Medical Plus
13  benefit?
14      A    We get a benefit book usually every
15  contract.
16      Q    What do you mean you get it every
17  contract?  When the contract starts you get a new
18  benefit book?
19      A    Yes, seeing what they cover and what's
20  been negotiated, what our benefits are.
21      Q    And you received that from Southwestern
22  Bell?
0033
1      A    Yes.
2      Q    Do you receive updates to that benefit
3  book?
4      A    Yes.
5      Q    How often do you receive updates?
6      A    Whenever one comes out.
7      Q    Do you keep copies of the contract?
8      A    What contract?
9      Q    Well, you indicated --
10      A    The union's contract or the benefit
11  contract?
12      Q    The benefit contract.
13      A    What benefits I receive, I keep a book of
14  it.
15      Q    Did your wife keep a book of those
16  benefits?
17      A    I think we just kept one book because it's
18  got the same information in it.  So there was no

19  sense of keeping two books.
20      Q   And did you also keep the updates when
21  they came?
22      A   Yes.
0034
1       Q   And would that benefit book include the
2   prescription benefit that you talked about, we
3   talked about a moment ago?
4       A   To my knowledge it probably did.  It's
5   part of the benefits.
6       Q   And this benefit book would also talk
7   about the supplemental insurance, that benefit?
8       A   Yes.
9           MR. WILLIAMS:  Counsel, is this a
10  convenient time for a break?
11          MR. YOUNG:  That's fine.
12          MR. WILLIAMS:  If you're moving onto
13  another area.  If not, if you want to finish this
14  area, that's fine.  When there's a convenient
15  breaking point I would like a break.
16          MR. YOUNG:  We can take one now.
17          MR. WILLIAMS:  Thank you.
18          (Break taken from 11:01 a.m. to 11:07
19  a.m.)
20      Q   (BY MR. YOUNG)  Just returning just for
21  a moment to the prescription benefit we talked a
22  little bit earlier about.  Did that benefit have a
0035
1   deductible?
2       A   Prescription?
3       Q   Yes.
4       A   No.
5       Q   Did it have a cap?
6       A   No.
7       Q   You testified that your wife also had
8   Medicare, correct?
9       A   True.
10      Q   Do you know what type of Medicare she
11  had?
12      A   Medicare Part B I think is what was
13  covered.
14      Q   That's the only coverage she had?
15      A   (Witness nodded affirmatively.)
16          MR. WILLIAMS:  I'll object on foundation
17  grounds.
18      A   I really -- alls I know is Medicare and
19  Medicare Part B.
20      Q   (BY MR. YOUNG)  I understand your
21  answer to mean that you think of them as being
22  two different things or they are being two different
0036
1   type of Medicare coverage.
2           MR. WILLIAMS:  Is there a question
3   pending?  Hold on, there's no question pending.

4      Q   (BY MR. YOUNG)  What did you mean
5   when you said you think of it as Medicare and
6   Medicare Part B?
7          MR. WILLIAMS:  Do you want to know
8   what he meant by that?
9          MR. YOUNG:  Yes.
10     A   As far as I know, that's what it is.  She
11   had to have it along with her other supplemental.
12     Q   (BY MR. YOUNG)  So you know she had
13   Medicare Part B?
14     A   Yes.
15     Q   How old was your wife when she passed
16   away?
17     A   64.
18     Q   Did she start receiving Medicare in 1993;
19   is that correct?
20     A   I'm not for sure on the year.  All I know
21   is it was right after she had the stroke.
22     Q   Do you know if she applied for Medicare?
0037
1      A   My understanding of it is that she had to
2   apply because of her disability.
3      Q   Do you know if Medicare ever declined
4   coverage for your wife?
5      A   I don't know for sure, no.
6      Q   Did she receive Medicare from 1993 till
7   she passed away?
8      A   Yeah.  It was '93 when she had the
9   stroke.  So whenever she was approved for
10   disability is when she received it.
11     Q   Was there ever any breaks in service?
12     A   Ask again.
13     Q   Were there any periods within that time
14   where she was not covered by Medicare?
15     A   No.
16     Q   Do you or did she pay a yearly
17   contribution to Medicare?
18     A   No.
19         MR. WILLIAMS:  I'll object on vagueness
20   grounds, lack of foundation.
21     Q   (BY MR. YOUNG)  Does Medicare have a
22   deductible?
0038
1          MR. WILLIAMS:  Again, I'll object to lack
2   of foundation.
3      A   I'm not for sure but I think it's 80
4   percent.
5      Q   (BY MR. YOUNG)  What do you mean when
6   you say you think it's 80 percent?
7      A   I know they pay and then my 20 percent
8   is what my supplemental will cover after the
9   deductible.
10     Q   After the deductible?
11     A   Right.

12    Q    What's the deductible?

13        MR. WILLIAMS:  If you know.

14    A    Right now it's 1500.  Before, I don't

15  know.

16    Q    (BY MR. YOUNG)  How long has it been at

17  1500?

18    A    I don't know.  I have no knowledge how

19  long it's been that way.

20    Q    And just so we're clear, this is the

21  deductible that would apply for your wife; is that

22  correct?

0039

1        MR. WILLIAMS:  I'll object, vague.  I

2  don't even know what deductible you're talking

3  about.  Are you talking about the Medicare

4  deductible or the supplemental insurance

5  deductible?

6        MR. YOUNG:  I think we're fairly clear we

7  have been talking about the Medicare deductible.

8    A    No.  Medicare, I'm not for sure if they pay

9  80 percent or not.

10        MR. WILLIAMS:  Do you know what he

11  means by a deductible?

12        THE WITNESS:  No.

13        MR. WILLIAMS:  Maybe you can define

14  the term "deductible" and get somewhere.

15    Q    (BY MR. YOUNG)  You're not familiar with

16  the term "deductible"?

17        MR. WILLIAMS:  Well, I think the

18  problem is that he doesn't know what you mean by

19  the term "deductible".

20        MR. YOUNG:  I'm just asking him if he

21  knows what the word "deductible" is.  He can

22  answer the question.

0040

1    A    Yes, I know what deductible is.

2    Q    (BY MR. YOUNG)  What is a deductible?

3    A    It's how much you have to pay past what

4  they will give you.  Wait just a second.  You have

5  to meet a criteria of an amount before the

6  company or before the rest is paid.

7    Q    A moment ago you mentioned that right

8  now your deductible is 1500; is that correct?

9        MR. WILLIAMS:  I'll object on vagueness

10  grounds because I think there was some confusion

11  about which deductible you're talking about.

12        MR. YOUNG:  I'm trying to clear that up.

13        MR. WILLIAMS:  All right.  Fair enough.

14    A    On the supplemental.

15    Q    (BY MR. YOUNG)  So that's the deductible

16  you pay for your supplemental insurance?

17    A    True.

18    Q    Is currently 1500?

19    A    Right.

20    Q    Is that -- is the amount you paid
21  reflected in any documentation you received from
22  your supplemental insurance provider?
0041
1    A    Ask it again.
2        MR. YOUNG:  Can you read it?
3        (Whereupon the court reporter read back
4  the question.)
5        MR. WILLIAMS:  Objection, vague.
6        MR. YOUNG:  Let me strike that last one.
7    Q    (BY MR. YOUNG)  How is it you know
8  your current deductible is 1500?
9    A    By the receipts we receive from our
10  supplemental insurance company.
11    Q    How often do you receive those receipts?
12    A    After each medical procedure --
13    Q    So it's --
14    A    -- billing, after each billing.
15    Q    So if you don't have any treatment, then
16  you don't receive one of these receipts?
17    A    Right.
18    Q    And this is from your supplemental
19  insurance company?  This is from United
20  Healthcare; is that correct?
21    A    True.
22    Q    What is average wholesale price?
0042
1        MR. WILLIAMS:  Objection, lack of
2  foundation.
3    A    My understanding is it's actual price
4  that's put on a product.
5    Q    (BY MR. YOUNG)  What product?
6    A    Medication.
7    Q    What is the basis for your understanding
8  of what average wholesale price is?
9        MR. WILLIAMS:  At this time I'll caution
10  the witness to exclude from your answer any
11  communications you may have had with counsel.
12    A    What I've read in the Complaint.
13    Q    (BY MR. YOUNG)  Is there anything else
14  that forms the basis of your understanding of
15  what average wholesale price is other than
16  conversations with counsel?
17    A    No.
18    Q    No?
19    A    (Witness shook head negatively.)
20    Q    When did you first read this Complaint?
21        MR. WILLIAMS:  Let's put some
22  parameters on it.  What Complaint are you talking
0043
1  about?  Because there have been several
2  complaints.
3        MR. YOUNG:  Fair enough.
4    Q    (BY MR. YOUNG)  What Complaint did you

5   read?
6      A   The Complaint of the suits that's being
7   brought.  Ask that again.  Could you repeat that?
8        (Whereupon the court reporter read back
9   the question.)
10       MR. WILLIAMS:  Can you describe it to
11   him?
12      A   Well, there's a lot of law terms and I
13   don't understand all of it.  So it's mainly me, as a
14   consumer, the medications that were given by a
15   physician under Medicare Part B and supplemental
16   insurance also and non-insured.
17      Q   (BY MR. YOUNG)  Mr. Young, the question
18   I asked you was what Complaint did you read.  Let
19   me strike that and ask another question.
20       Are you aware that there are multiple
21   complaints in this lawsuit, the plaintiffs have
22   filed multiple complaints?
0044
1      A   My understanding there is.  I never read
2   all of them.
3      Q   Which one did you read?
4      A   The one that pertained to me.
5      Q   When did you read that?
6      A   I got a copy of it in the mail from the
7   lawyers.
8      Q   When did you receive that copy in the
9   mail from the lawyers?
10      A   I can't recall the date.
11      Q   Can you recall, was it this year?
12      A   Oh, yes.
13      Q   Was it within the last several weeks?
14      A   I'm not for sure.  I've had a lot go on in
15   my life.  So it probably was within the last month
16   or --
17      Q   Last few months?
18      A   Last month or so.
19      Q   So you have not read any of the other
20   previous complaints?
21      A   I may have.  I've looked at them.  But as
22   far as pertaining to me, I didn't really take notice
0045
1   too much of it.
2      Q   So you received the other ones, you just
3   haven't read them?
4      A   I've read part of it but mainly the
5   Complaint, the first few pages, you know.
6      Q   This is what you've read, the first few
7   pages of the Complaint?
8      A   I read part of it, yeah.
9      Q   How much of it have you not read?
10      MR. WILLIAMS:  Well, at this point I'm
11   going to object to questioning the witness about a
12   300 plus page document that's not in front of him

13  and have him testify as to what he hasn't read
14  from the document from memory.  I don't think it's
15  fair to the witness.
16     Q   (BY MR. YOUNG)  I would like you to
17  answer that question.
18       MR. WILLIAMS:  Can you answer that
19  question?
20       MR. YOUNG:  I'd like you to stop cueing
21  the witness.
22       MR. WILLIAMS:  Counsel, I'm entitled to
0046
1  make sure that we have a clear record here, and
2  I'm entitled to make sure that my witness
3  understands the question that you're asking.
4       MR. YOUNG:  If he doesn't understand
5  the question, he will tell me.  You don't need to
6  tell him.  You can just make your objection for the
7  record.
8       MR. WILLIAMS:  I've done so.
9       MR. YOUNG:  And you are giving a
10  speaking objection cueing him.
11       MR. WILLIAMS:  No, I haven't.
12     Q   (BY MR. YOUNG)  How much of this
13  Complaint have you not read?
14       MR. WILLIAMS:  Now I'm going to, for the
15  record, ask the court reporter to reflect the fact
16  that counsel has motioned and tapped a document
17  that from across the table appears to be the Third
18  Amended Consolidated Complaint but has not been
19  put in front of the witness, and I object on the
20  grounds as previously stated.
21     A   I can't tell you how much I haven't.
22     Q   (BY MR. YOUNG)  Who are the defendants
0047
1  in this action?
2       MR. WILLIAMS:  Same objections as
3  before.
4     A   Me as a consumer.
5     Q   (BY MR. YOUNG)  Who are the defendants
6  in this action?
7     A   Oh, the defendants, the drug companies.
8  I don't know all of them by name.
9     Q   Do you know any of them by name?
10     A   I know some of them by name, yes.
11     Q   Which ones do you know by name?
12     A   Bayer.
13       MR. WILLIAMS:  I'm going to object
14  again.
15       MR. YOUNG:  Counsel, let him answer the
16  question.
17       MR. WILLIAMS:  I'm entitled to object
18  and I'm objecting right now.  I'm trying to.  If you
19  would stop cutting me off I would state my
20  objection.  May I proceed with my objection?

21      My objection is you're submitting the
22  witness to what amounts to a memory test.  It's
0048
1  not called for under the rules.  It's improper.
2      I object again that you're asking him
3  about the contents of a document and you're
4  asking him to identify the names of 20 some
5  defendants in this lawsuit without putting the
6  document in front of him.  It's absolutely of no
7  utility whatsoever and I object.  It's unfair to the
8  witness.
9      Q   (BY MR. YOUNG)  Would you please
10  answer my question?
11      A   I can't recall all of the names.
12      Q   My question was can you recall any
13  names?
14      A   Yeah, I can remember you're Johnson &
15  Johnson.
16      Q   Can you recall any others?
17      A   No.
18      Q   I think a moment ago you referred to --
19  strike that.
20      Who are the plaintiffs in this case?
21      MR. WILLIAMS:  Same objections as
22  before.
0049
1      A   My wife for one and the consumers,
2  medication given by a physician that's covered
3  under Medicare Part B with supplemental
4  insurance and those that don't have insurance.
5      MR. YOUNG:  Would you read that back,
6  please.
7      (Whereupon the court reporter read back
8  the answer.)
9      Q   (BY MR. YOUNG)  Just so that I'm clear,
10  it's your understanding of the plaintiffs is
11  consumers of medication given by physicians that
12  is covered under Part B, that is also covered by
13  supplemental insurance and also consumers of
14  medication given by physicians that is covered by
15  Medicare Part B that is not covered by
16  supplemental insurance?
17      MR. WILLIAMS:  I'll object that it's
18  ambiguous.
19      A   To those that don't have insurance, yes,
20  other than Medicare Part B.
21      MR. YOUNG:  Can you read the answer?
22      (Whereupon the court reporter read back
0050
1  the answer.)
2      Q   (BY MR. YOUNG)  What do you mean by
3  that?
4      MR. WILLIAMS:  Objection, vague.
5      Q   (BY MR. YOUNG)  I don't understand your

6  answer.
7      A   My understanding is that in this
8  Complaint that inflated prices, pricing of the
9  actual wholesale price that Medicare covers and
10  our insurance, supplemental insurance covers part
11  of the rest and after the deductible and those that
12  are not insured that does not have a supplemental
13  insurance.
14      Q   So your understanding of the plaintiffs in
15  this litigation, your understanding of who the
16  plaintiffs are in this litigation are people who --
17  strike that.
18          Do you have an understanding of whether
19  the plaintiffs in this litigation include people
20  other than Medicare Part B beneficiaries?
21      A   No.
22      Q   You understand that you have been
0051
1  offered as a class representative?  Strike that.
2          Do you understand what a class action
3  is?
4      A   Not a full understanding, no.
5      Q   What's your understanding?  Do you
6  understand that this is a class action?
7      A   Yes.
8      Q   What is your understanding of a class
9  action?
10      A   To this case or to any case?
11      Q   Why don't we start with this case and
12  then you can tell me any case.
13      A   Let's see, overpricing by --
14      Q   Let me stop you.  I'm not asking what the
15  claims are.  I'm asking what do you understand
16  what a class action is?
17          MR. WILLIAMS:  I'll object because I
18  thought you agreed to narrow your question to
19  this case.  So I object to you cutting off the
20  witness' answer.
21      Q   (BY MR. YOUNG)  You don't understand
22  my question?
0052
1      A   No.
2      Q   My question is do you understand what a
3  class action is?  I see the confusion.
4          MR. WILLIAMS:  You just asked the same
5  question again.  Are you going to clarify it or do
6  you want him to answer that question?
7          MR. YOUNG:  I want him to answer that
8  question.
9          MR. WILLIAMS:  First of all, I'm going to
10  object to the extent that you're asking for a legal
11  conclusion.  If you're asking for a lay person's
12  understanding of what class action is --
13          MR. YOUNG:  That's what I asked.

14       MR. WILLIAMS:  Fair enough.  Give it
15  your best shot as to what a class action is.
16       A   It's consumers like me that pay for
17  services that's over inflated and the group gets
18  together and files on these companies.
19       Q   (BY MR. YOUNG)  And you understand
20  that certain specific individuals or entities will
21  represent a larger group of people; is that true?
22       A   Uh-huh.
0053
1          MR. WILLIAMS:  You have to say yes or
2   no.
3       A   Yes.
4       Q   (BY MR. YOUNG)  And you understand
5   you have been proposed as a representative of a
6   certain class of people?
7       A   True, yes.
8       Q   What is that class of people you have
9   been offered to represent?
10      A   I told you awhile ago.
11         MR. WILLIAMS:  I'll object as asked and
12  answered but give it to him again.
13      A   It's consumers that are given medication
14  by a doctor that's over-inflated prices that has
15  Medicare Part B and has co- -- or has
16  supplementary insurance and those that don't
17  have insurance that's covered under Medicare Part
18  B.
19      Q   (BY MR. YOUNG)  Does this class include
20  individuals who live outside of the state of
21  Oklahoma?
22      A   To my -- as far as I know they do.
0054
1       Q   Does it include individuals who live
2   throughout the United States?
3       A   True.
4       Q   Does this class include insurance
5   companies?
6       A   No.
7       Q   It does not.  Does it include the
8   government?
9       A   No.
10      Q   Does it include individuals who have no
11  insurance at all?
12      A   Yes, except for Part B of Medicare.  Say
13  the question again.  Maybe I misunderstood you.
14      Q   Does it include individuals with no
15  insurance at all?
16         MR. WILLIAMS:  I'll object as vague.  Are
17  you counting Medicare as insurance or are you
18  talking about private insurance?
19         MR. YOUNG:  I'm talking no insurance at
20  all.
21         MR. WILLIAMS:  Including Medicare?

22      MR. YOUNG:  Including Medicare.
0055
1           MR. WILLIAMS:  So not Medicare Part B.
2      A   No.
3      Q   (BY MR. YOUNG)  So I gather from your
4  answer, is it fair to say you understand that
5  you're in a different position than somebody who
6  has no insurance at all?
7           MR. WILLIAMS:  I'll object.  It misstates
8  his testimony.  It's vague and ambiguous, lack of
9  foundation.
10     A   I don't know what you're talking about.
11     Q   (BY MR. YOUNG)  Let me ask it this way.
12  Why are people with no insurance at all not
13  included in the class?
14          MR. WILLIAMS:  Lack of foundation.  If
15  you know.
16     A   I don't know.
17     Q   (BY MR. YOUNG)  And the same question,
18  why do you think insurance companies are not in
19  this class?
20          MR. WILLIAMS:  Same objection, lack of
21  foundation.
22     A   I don't know.
0056
1      Q   (BY MR. YOUNG)  Do you think insurance
2  companies are in the same situation as you are?
3           MR. WILLIAMS:  Objection, lack of
4  foundation, vague and ambiguous.
5      A   I have no idea.
6      Q   (BY MR. YOUNG)  Do you think people
7  who have absolutely no insurance at all are in the
8  same position as you are with respect to paying
9  over-inflated prices for drugs?
10          MR. WILLIAMS:  Same objections.
11     A   I don't know.
12     Q   (BY MR. YOUNG)  What do you
13  understand the responsibilities of a class
14  representative to be?
15     A   To me it's to give the information and
16  documents that I have that covers Part B and
17  supplementary insurance.
18     Q   Are there any other responsibilities that
19  you have as a class representative?
20     A   Other than giving information of what I've
21  got.
22     Q   And spending a few wonderful hours with
0057
1  me.
2           Why do you want to be a class
3  representative?
4      A   To get some of my money back, plus
5  maybe controlling pricing on drugs that are
6  administered by doctors.

7    Q   Are there any other reasons you want to
8  be a class representative?
9    A   To keep the overcharging down, Medicare
10  Part B and my insurance which ended up I'm
11  having to pay for.
12    Q   I did not hear the end of that sentence.
13        (Whereupon the court reporter read back
14  the answer.)
15    Q   (BY MR. YOUNG)  What do you mean you
16  ended up having to pay?
17    A   I pay the deductible on my supplementary
18  and also through my negotiations on our
19  supplementary insurance that we actually pay for
20  through our union representing us to get these
21  benefits.
22    Q   Your understanding of the
0058
1  responsibilities of class representative are to
2  provide certain documents, sit here in this
3  deposition?
4    A   True.
5    Q   And you're not -- are you aware of any
6  other responsibilities as a class representative?
7    A   And to do what's asked of me by my
8  lawyers, like being here, give a deposition or be at
9  trial or whatever, my availability.
10    Q   So you -- I'm sorry.  Please finish your
11  answer.
12    A   That's it.
13    Q   So I understand that you may be called to
14  testify at trial?
15    A   True.
16    Q   And you think you're in a position to
17  serve as a class representative in this litigation?
18    A   I think so.
19    Q   Why do you think so?
20        MR. WILLIAMS:  I'm going to object to
21  the extent it calls for a legal conclusion.
22    A   Because I'm representing my wife and the
0059
1  medication that she took.
2    Q   (BY MR. YOUNG)  I understand this is a
3  very emotional area, but I think the question I
4  need to ask you is why do you think you are --
5  why do you think you are in a position to serve as
6  a representative of the class of other plaintiffs in
7  this lawsuit?
8        MR. WILLIAMS:  Same objection.  I also
9  object that it's vague.
10    A   I don't know.
11    Q   (BY MR. YOUNG)  I'm sorry, I did not
12  hear the answer.
13    A   I don't know.
14    Q   What is your understanding of the claims

15  in this litigation?
16      MR. WILLIAMS:  I'll object it's vague and
17  I'll object to the extent it calls for a legal
18  conclusion, lack of foundation.
19      Q   (BY MR. YOUNG)  Would you please
20  answer my question?
21      A   Ask it again.
22      MR. YOUNG:  Can you repeat the
0060
1  question?
2      (Whereupon the court reporter read back
3  the question.)
4      A   My understanding is that me, as a
5  consumer, the medication that has been inflated
6  which is given by a physician at the wholesale
7  price average, part of this is covered under
8  Medicare Part B, and that my supplemental
9  insurance covers part of it that Medicare Part B
10  does not cover and that it's costing me money as a
11  consumer.
12      Q   Is there anything else you understand
13  that the plaintiffs are claiming in this litigation?
14      A   No.
15      Q   Do you understand whether or not
16  plaintiffs in this litigation are claiming that
17  certain drug manufacturers committed fraud?
18      MR. WILLIAMS:  I'll object to the extent
19  it calls for a legal conclusion, vague as to the
20  meaning of the term "fraud".
21      A   I don't understand it.  I don't know.
22      Q   (BY MR. YOUNG)  So you don't know
0061
1  whether plaintiffs in this action are claiming that
2  the pharmaceutical manufacturers committed
3  fraud?
4      A   No.
5      Q   Do you think the pharmaceutical
6  manufacturers committed fraud, committed fraud
7  in connection with the pricing of their drugs?
8      MR. WILLIAMS:  Objection, lack of
9  foundation, calls for speculation.
10      A   I don't know.
11      Q   (BY MR. YOUNG)  Prior to reading the
12  Complaint, had you ever heard of the term average
13  wholesale price or AWP before?
14      A   No.
15      Q   Have you done any additional research on
16  what average wholesale price or AWP is aside from
17  any communication with your attorneys?
18      A   No.
19      Q   Do you know how AWP is calculated?
20      A   No.
21      Q   Do you know who calculates AWP?
22      A   No.

0062
1    Q    Do you know how it's used?
2    A    No, not really, no.
3    Q    Do you know who uses AWP?
4    A    I'm not for sure.
5    Q    So that's no?
6    A    No.
7         (Exhibit Young 001 marked for
8    identification.)
9    Q    (BY MR. YOUNG)  I'm going to ask the
10   court reporter to hand you what's been marked as
11   Exhibit Young 001.  Do you recognize this
12   document?
13   A    Yeah.
14   Q    Is this the Complaint that you received
15   from your lawyers and read portions of?
16        MR. WILLIAMS:  Just for the record,
17   Counsel, I'm not going to take the time to go
18   through page by page, but can you represent that
19   this is a complete copy of it?
20        MR. YOUNG:  I can represent this is a
21   complete copy, yes.
22   A    If it's a complete copy, I received it.
0063
1    Q    (BY MR. YOUNG)  Turn to Pages 8 and 9,
2    please.  Do you see Paragraph 19?
3    A    Yes.
4    Q    This is the paragraph that pertains to you
5    and your wife, correct?
6    A    True.
7    Q    And if you look down towards the bottom
8    of the page it says, "During the applicable time
9    period, Mrs. Young was prescribed, and was
10   charged for, the following physician-administered
11   prescription drugs manufactured and sold by the
12   defendant companies, based in whole or in part on
13   AWP."  Do you see that?
14   A    Yeah.
15   Q    Do you have any knowledge of the
16   allegation made in that statement, in that
17   sentence?
18        MR. WILLIAMS:  I'll object as vague.
19   A    Ask it again.
20        (Whereupon the court reporter read back
21   the question.)
22   A    She was administered these drugs, yes.
0064
1    Q    (BY MR. YOUNG)  Let me narrow it a
2    little bit.  What knowledge do you have about the
3    allegation that certain physician-administered
4    prescription drugs -- I'm sorry, that your wife was
5    charged for the following physician-administered
6    drugs based in whole or in part on AWP?
7         MR. WILLIAMS:  Objection, vague and

8   ambiguous.
9       A   I don't know.
10      Q   (BY MR. YOUNG)  You have no knowledge
11  that these drugs were charged based on AWP?
12          MR. WILLIAMS:  Same objection.
13      A   No, I don't.
14      Q   (BY MR. YOUNG)  Following the sentence
15  I just read here --
16          MR. SWEENEY:  What was the answer to
17  the question?  I couldn't hear that.
18          MR. YOUNG:  She'll read it back.
19          (Whereupon the court reporter read back
20  the answer.)
21      Q   (BY MR. YOUNG)  I'm sorry.  I started to
22  ask you, after the sentence I just read you there's
0065
1   a list of a whole number of drugs; is that correct?
2   Do you see that?
3       A   Yeah.
4       Q   Do you know the very first one is
5   azathioprine sodium?  Do you see that?
6       A   Yes.
7       Q   Do you know what that drug -- do you
8   know what your wife received that drug in
9   connection, what treatment your wife received that
10  drug in connection with?
11      A   I don't have any idea.
12      Q   And then it says in parentheses, the
13  Boehringer Group.  Do you see that?
14      A   Yeah.
15      Q   What does that mean?
16          MR. WILLIAMS:  Objection, foundation.
17      A   It looks like the drug company.  I don't
18  know.
19      Q   (BY MR. YOUNG)  Do you know whether or
20  not the Boehringer Group manufactures
21  azathioprine sodium?
22      A   I don't know.
0066
1       Q   Do you know whether if any -- strike
2   that.
3           Do you know whether any azathioprine
4   sodium that your wife might have received would
5   have been manufactured by the Boehringer Group?
6       A   If her medical records show that she
7   received it and the company that made this is on
8   there, that's who done it.
9       Q   The next drug listed is cytoxan.  Do you
10  see that?
11      A   Yeah.
12      Q   Do you know what drug -- do you know
13  whether your wife received that drug?
14      A   Yes, by the medical records if it showed
15  that she took it, she took it, yeah.

16   Q   Do you know what treatment she took it
17 in connection with?
18   A   I have no idea.
19   Q   Do you know when she took cytoxan?
20   A   No.
21   Q   Do you know when she took azathioprine
22 sodium?
0067
1   A   No.
2   Q   Following the word cytoxan it lists the
3 BMS Group, Pfizer and the Pharmacia Group.  Do
4 you see that?
5   A   Yes.
6   Q   Do you know whether those three
7 companies manufacture cytoxan?
8   A   It says here that's who they are.
9   Q   I'm asking you do you know that?
10       MR. WILLIAMS:  He's asking for your
11 personal knowledge.
12   A   No, my personal knowledge, I don't.
13   Q   (BY MR. YOUNG)  Do you know -- do you
14 know which company manufactured the cytoxan
15 that your wife was administered?
16   A   No, I sure don't.
17   Q   Do you have any documentation which
18 would reflect that?
19       MR. WILLIAMS:  Objection, lack of
20 foundation.
21   A   No.
22       MR. WILLIAMS:  Also vague and
0068
1 ambiguous.
2   Q   (BY MR. YOUNG)  You do not?
3   A   Only her medical records that you
4 probably have received.
5   Q   Do you know what the AWP for cytoxan
6 is?
7       MR. WILLIAMS:  Objection, vague.
8   A   No.
9   Q   (BY MR. YOUNG)  Do you know what the
10 wholesale acquisition cost is?
11   A   No.
12   Q   Have you ever heard that term before?
13   A   No.
14   Q   I think I know the answer to these
15 questions, but I'm just going to ask them.  Do you
16 know how WAC or wholesale acquisition cost is
17 calculated?
18   A   No.
19   Q   You don't know who calculates it?
20   A   No.
21   Q   Just so that it's clear, I think I asked a
22 negative and you answered in a negative.
0069

1      Do you know who calculates WAC?
2   A   No.
3   Q   Do you know how WAC is used?
4   A   No.
5   Q   And do you know who uses WAC?
6   A   No.
7   Q   Do you know any -- strike that.
8      Do you know what treatments any of the
9   drugs listed in Paragraph 19 -- strike that.  Let
10  me try that one more time.
11     Do you know what treatments your wife
12  would have received any of the drugs listed in
13  Paragraph 19 for?
14     MR. WILLIAMS:  Do you want to take a
15  moment and look at the paragraph.  It's kind of a
16  long paragraph.
17     MR. YOUNG:  Absolutely.  I can go
18  through this painstakingly or we can short circuit
19  it.
20     MR. WILLIAMS:  That's fine.  Let me
21  make a suggestion.  Can we just have the witness
22  take a couple of moments to go through the
0070
1   paragraph to see if any of these ring a bell in
2   terms of the illness or treatment that they would
3   have applied to and he can attempt to answer your
4   question.  Would that be all right?
5      MR. YOUNG:  That's fine by me.
6      MR. WILLIAMS:  Is that okay with you?
7      THE WITNESS:  Yes.  Do you want me to
8   go down here and tell you?
9      MR. WILLIAMS:  Just look at the
10  paragraph, and if there are any that you think you
11  know what they were for.  Counsel, do you mind if
12  he makes a little check on the exhibit as to the
13  ones he thinks he may know?
14     MR. YOUNG:  That's fine by me.
15     MR. WILLIAMS:  Just make a check by it
16  if you think you know what it's for, and then we'll
17  go back on and give an answer to counsel's
18  question.
19     (Break taken from 12:14 p.m. to 12:18
20  p.m.)
21     (Whereupon the court reporter read back
22  the question.)
0071
1   A   There's a couple here that I recognize
2   that I think I know what it is.  Heparin which I
3   think that was for blood thinner, and she probably
4   received this when she had her stroke.
5      The other is Prednisone.  I know she was
6   given this to keep her SED rate down, and this
7   was used on her rheumatoid arthritis.
8   Q   (BY MR. YOUNG)  Let me stop you there

9  for a second.  When would she have received
10  Prednisone or when did she receive Prednisone if
11  you know?
12       MR. WILLIAMS:  I will object on the
13  foundation grounds.
14    A   I have no idea as far as dates.  Whenever
15  the doctor prescribed it, her SED rate was
16  probably high and she needed this Prednisone to
17  bring it down.  That's my understanding of it.
18    Q   And Prednisone is a
19  physician-administered drug?
20       MR. WILLIAMS:  Objection, foundation.
21    A   I think that it can be given by pill or by
22  injection.  I'm not for sure.
0072
1    Q   (BY MR. YOUNG)  Do you know how your
2  wife received Prednisone?
3    A   I know she had -- one way she had it is a
4  pill.
5    Q   Do you know whether she had it as an
6  injection?
7    A   To my knowledge I don't know because
8  you would have to look at the medical records.
9    Q   Was Prednisone one of the drugs she
10  would have ordered by mail?  Strike that.
11       Was Prednisone a drug she ordered by
12  mail?
13       MR. WILLIAMS:  Objection, vague.  Which
14  form?
15    A   By pill only.
16    Q   (BY MR. YOUNG)  Earlier we talked about
17  how you have the prescription benefit.
18    A   Right.
19    Q   You said you and your wife would order
20  drugs and they would send them in the mail?
21    A   Yes.
22    Q   Is Prednisone one of those drugs that
0073
1  your wife orders in the mail?
2    A   True.
3    Q   Did she order it any other way?
4    A   No.  Well, if the doctor changed her
5  amount and she needed to go up or something for
6  just a little bit she would get it at the drugstore.
7    Q   What records do you have of her
8  purchases of Prednisone?
9       MR. WILLIAMS:  Objection, vague.  Are
10  you talking about just the drugstore   ones?
11    A   Pills or injections or what?
12    Q   (BY MR. YOUNG)  Anything.
13       MR. WILLIAMS:  I'll object as vague.
14    A   The only thing I know is if it's in her
15  medical records.
16    Q   (BY MR. YOUNG)  Do you have any

17   records of the drugs she ordered by mail -- do you
18   have any records of Prednisone she ordered by
19   mail?
20      A   We didn't keep a record of it.
21      Q   Did you keep records of the payments you
22   made for the drugs, the Prednisone she received
0074
1   by mail?
2      A   No.
3      Q   Do you keep a checkbook?
4      A   Yes.
5      Q   Do you keep records of your cancelled
6   checks?
7      A   Yes.
8      Q   Do you know how far back you still have
9   your cancelled checks?
10      A   I think 2003.  I think that's as far back
11   as I kept them.
12      Q   How did your wife receive the heparin?
13         MR. WILLIAMS:  Objection, foundation,
14   vague.
15      A   I don't know.  I presume by injection.  I
16   don't know.
17      Q   (BY MR. YOUNG)  Why do you presume by
18   injection?
19      A   She probably was in -- from what I
20   understand heparin is, after she had her stroke I
21   think they had to have a blood thinner.  That was
22   probably what they used.  I don't know.
0075
1      Q   And after heparin sodium it lists five
2   companies.  Do you see that?
3      A   Yeah.
4      Q   Do you have any way of knowing of those
5   companies -- strike that.
6         Do you have any way of knowing whether
7   any of those companies manufactured the heparin
8   that your wife received?
9         MR. WILLIAMS:  Objection, vague.
10      A   No.
11      Q   (BY MR. YOUNG)  Do you have any way of
12   knowing which of those companies manufactured
13   the heparin your wife received?
14         MR. WILLIAMS:  Same objection.
15      A   No.
16      Q   (BY MR. YOUNG)  Do you have any way of
17   knowing with respect to all the drugs listed in
18   Paragraph 19 which you've now had a chance to
19   review which company -- strike that.
20         With respect to all the drugs in 19 which
21   you've now had a chance to review, do you have a
22   way of knowing which company manufactured that
0076
1   drug that your wife received?

2        MR. WILLIAMS:  I'll object on
3  foundational grounds.  The question is vague.
4     A    As far as drug companies, no, I don't
5  know which ones produced what medicines.
6     Q    (BY MR. YOUNG)  I don't know if anybody
7  is still listening, but remember to keep your voice
8  up.
9     A    Okay.
10     Q    I gather nobody is since nobody has
11  yelled in awhile.
12        MR. SWEENEY:  Some of us are still here.
13        (Discussion off the record.)
14     Q    (BY MR. YOUNG)  You had mentioned two
15  drugs that you recognized, heparin and
16  Prednisone, and then I interrupted you.  Are there
17  any other drugs from this list that you recognize
18  what treatment your wife would have received it
19  for?
20     A    Not that I know of.  My recollection of --
21  she took a lot of medications.  So I don't know
22  what.  It would have to be looked at her medical
0077
1  records.  So I might be able to -- if somebody had
2  a medical record saying what it was, I might know.
3     Q    So just to summarize, other than those
4  two drugs, you can't connect any of the other
5  drugs listed in Paragraph 19 with the specific
6  treatment your wife received?
7     A    These are the ones that come to my mind
8  that I know the name and probably what it was
9  used for.
10     Q    By these two, you mean heparin sodium
11  and Prednisone?
12     A    Yes.
13     Q    Do you know how this list of drugs was
14  compiled?
15     A    Through her medical records.
16     Q    I'm going to draw your attention to a drug
17  listed infliximab.  Do you see that?  It's eight
18  lines down from the top of Page 9.
19     A    Yeah.
20     Q    Do you know what drug that is?
21     A    I don't know for sure.  So I'd hate to say.
22     Q    Let me represent to you that that's
0078
1  Remicade.
2     A    Okay.  They should have said Remicade.
3     Q    You wrote the Complaint, not me.
4        MR. WILLIAMS:  Actually, he didn't write
5  the Complaint.
6     A    That's probably what come off the medical
7  records as such.  I don't know.
8     Q    (BY MR. YOUNG)  Do you know what your
9  wife received Remicade for?

10    A   For rheumatoid arthritis.
11    Q   Do you know when she received Remicade
12  for her rheumatoid arthritis?
13    A   I know about what period.  I think it was
14  in 2002 right after she started to go to Dr.
15  Carson.
16    Q   Did she ever receive Remicade prior to
17  2002 that you know of?
18    A   If it wasn't from Dr. Carson, no.
19    Q   And as you said, she didn't see Dr.
20  Carson until 2002?
21    A   I think that's about when she started
22  seeing Dr. Carson.
0079
1    Q   How long did she receive Remicade?
2    A   2002 till June of '04.  I think her last
3  injection or infusion was in, I'm not for sure, in
4  June or July or May or somewhere in there and
5  that was the last one.
6    Q   Of 2004?
7    A   Yeah.
8    Q   Is there a reason she stopped taking
9  Remicade at that time?
10        MR. WILLIAMS:  I'll object, lack of
11  foundation.
12    A   She became ill.
13    Q   (BY MR. YOUNG)  How often did she
14  receive Remicade?  Would you like a break?
15    A   Yeah.
16        (Break taken from 12:33 p.m. to 12:46
17  p.m.)
18    Q   (BY MR. YOUNG)  Mr. Young, I think
19  there was a question pending before we took the
20  break.
21    A   Would you repeat?
22        (Whereupon the court reporter read back
0080
1  the question.)
2    A   Her doctor had her set up on a schedule,
3  to my knowledge, when she first started taking
4  Remicade it was one or two, probably about three
5  weeks apart for two doses, and then it went to I
6  think six weeks or eight weeks.  I'm not for sure.
7    Q   Did Remicade help with your wife's
8  rheumatoid arthritis?
9        MR. WILLIAMS:  Objection, relevance,
10  lack of foundation, vague.
11    A   It seemed to.
12    Q   (BY MR. YOUNG)  Did you accompany
13  your wife for the infusions of Remicade?
14    A   Most of the time I did.
15    Q   Can you describe the infusion process?
16        MR. WILLIAMS:  Counsel, I'm sorry, why
17  is this relevant?

18          MR. YOUNG:  Just trying to get some
19  background.
20          MR. WILLIAMS:  What does this have to
21  do with drug pricing?  The manner of the infusion
22  process, what's this relevant to?  This is a drug
0081
1  pricing case.
2          MR. YOUNG:  Well, in the course of
3  receiving the drug there's a lot of other services
4  that accompany it.
5          MR. WILLIAMS:  All right.  And?
6          MR. YOUNG:  And her insurance paid for
7  some or all those services.
8          MR. WILLIAMS:  I'm going to object.  The
9  question is irrelevant.  It calls for information
10  that is not discoverable or related to anything
11  relevant to this case.  It also assumes facts not in
12  evidence based on counsel's statement.
13          You can go ahead and answer the
14  question for now.
15      A   She was administered this through IV.
16      Q   (BY MR. YOUNG)  How long did the
17  process take?
18      A   I think approximately an hour I waited on
19  her.
20      Q   Did Dr. Carson participate -- or did Dr.
21  Carson participate in the infusion?
22      A   No.
0082
1      Q   Who in Dr. Carson's office did the
2  infusion?
3      A   Her nurse, his nurse.
4      Q   Just one, just one nurse?
5      A   Yeah.
6      Q   Did you discuss, you personally, did you
7  discuss with Dr. Carson his recommendation for
8  treatment with Remicade for your wife?
9      A   Ask that again.
10          (Whereupon the court reporter read back
11  the question.)
12          MR. WILLIAMS:  I'll object as vague.
13      A   I was in there when he was talking to my
14  wife about it.
15      Q   (BY MR. YOUNG)  This is prior to when
16  she started treatment?
17      A   Yes.
18      Q   Do you recall what he told her?
19      A   Part of it; some of the reactions and what
20  could be caused, what it could cause, also how it
21  might help her with the deterioration of her
22  joints.
0083
1      Q   Anything else?
2      A   And that she might not have to have as

3    much pain medication.
4        Q    Prior to receiving Remicade was your wife
5    receiving lots of pain medication?  Strike that.
6            Prior to receiving Remicade in 2002 what
7    pain medication was your wife receiving?
8            MR. WILLIAMS:  Objection, foundation.
9        A    I think it was Tylenol 3.  I'm not for sure.
10       Q    (BY MR. YOUNG)  Did Dr. Carson, during
11   the conversation that he had with your wife in
12   your presence about Remicade, did he tell you and
13   your wife anything else?
14       A    Speak up a little more.
15       Q    With respect to the conversation that Dr.
16   Carson had with you and your wife about
17   Remicade, did he mention anything else that you
18   recall?
19           MR. WILLIAMS:  I'll object that it
20   misstates his prior testimony.  It's also vague.
21       A    I can't recall anything.
22       Q    (BY MR. YOUNG)  Do you recall whether
0084
1    he discussed the price of Remicade with you and
2    your wife?
3        A    No.  I think that he did discuss how it
4    could be paid for, you know, and all this.  He
5    never said a price or anything on it that I
6    understood at that time.
7        Q    Do you recall whether you raised any --
8    you or your wife raised any concerns with Dr.
9    Carson at that time?
10           MR. WILLIAMS:  Objection, vague.
11       A    About what?
12       Q    (BY MR. YOUNG)  About the treatment,
13   about the drug.
14           MR. WILLIAMS:  Same objection.
15       A    I don't recall anything else.
16       Q    (BY MR. YOUNG)  What did he tell you
17   about how it could be paid for?
18       A    I never got into that with his bookkeeper.
19   My wife did.  They discussed how it would be
20   covered, a certain amount, I think, by Medicare
21   and by our supplementary insurance, plus we had
22   to pay a certain amount, and they was setting it
0085
1    up on a schedule where we would be able to afford
2    it.
3        Q    What was the amount that you had to
4    pay?
5        A    My wife is the one that -- she usually
6    paid all the bills until she got where she couldn't,
7    and we had -- I think I was writing checks I think
8    for $141 they had it set up every so often, and
9    then we decided it would be better to give them a
10   credit card, and that way they could automatically

11 take it out when it was due.

12     Q   I'll just draw your attention to Page 9

13 again, Paragraph 19.  On the fourth line it lists

14 epoetin alfa.  Do you see that?

15     A   Where?

16     Q   The fourth line.

17     A   What's the name of it?

18     Q   Epoetin alfa.

19     A   Right here, okay.

20     Q   Do you know what your wife received that

21 for?

22     A   No.

0086

1     Q   At times you've testified to the effect that

2 prices for prescription drugs are over inflated; is

3 that correct?

4     A   Yes.

5     Q   What is your basis for that statement?

6     A   By the Complaint.

7     Q   Anything else?

8     A   No.

9     Q   Again, you indicated that you read the

10 Complaint for the first time a month or so ago?

11     A   Whenever I received it, yes, the part of it.

12 I didn't read it all.

13     Q   So there's nothing else other than the

14 Complaint that forms the basis for your opinion

15 that drug prices are over inflated?

16         MR. WILLIAMS:  Well, I'm going to object

17 to the extent you're calling for an opinion now.

18 The witness is testifying as to his personal

19 knowledge as he has throughout this deposition.

20         So if you have any information to give to

21 counsel, feel free to give it.  You should give it.

22     A   I don't.

0087

1     Q   (BY MR. YOUNG)  So to be clear, the only

2 information you have leads you to believe that

3 pharmaceutical products are over inflated is the

4 Complaint?

5     A   Yes.

6     Q   Do you know how drug prices are

7 determined?

8     A   No.

9     Q   What in particular in the Complaint leads

10 you to believe that the drug prices are over

11 inflated?

12     A   Well, of course, Medicare doesn't cover it

13 all.

14     Q   How does the fact that Medicare doesn't

15 cover it all relate to your view that drug prices are

16 over inflated?

17     A   I'm assuming they go by whatever the

18 average pricing is.

19     MR. YOUNG:  Can you read that answer
20  back for me, please?
21     (Whereupon the court reporter read back
22  the answer.)
0088
1     A   Wholesale pricing.
2     Q   (BY MR. YOUNG)  Why do you assume
3  that?
4     A   Because they don't cover it all.
5     Q   How does the fact that they don't cover it
6  all bear in any way on whether Medicare uses
7  average wholesale pricing?
8     MR. WILLIAMS:  I'm going to object to
9  that question on various grounds; lack of
10  foundation, to the extent you're asking him to
11  recite allegations in the Complaint, you're really
12  seeking hearsay testimony.  I would say the
13  Complaint speaks for itself and the question,
14  other than that, is vague and ambiguous.
15     A   Repeat.
16     (Whereupon the court reporter read back
17  the question.)
18     A   I don't know.
19     Q   (BY MR. YOUNG)  I think you just
20  testified a moment ago that you assume that
21  "they".  Who's "they" go by whatever the average
22  pricing is?
0089
1     MR. WILLIAMS:  Objection, vague and
2  ambiguous.  Now you're taking statements out of
3  context.
4     A   I would say Medicare.  I don't know.
5     Q   (BY MR. YOUNG)  What is the basis for
6  your assumption that Medicare uses average
7  wholesale pricing?
8     A   I don't know what they go by.
9     Q   You don't?
10     A   Not really, no.
11     Q   One or two more questions and we can
12  break for lunch.
13     I'll return just for a moment to a topic we
14  discussed much earlier this morning which is your
15  benefit for the prescription drugs.  Do you recall
16  that we talked about that earlier?
17     A   Yes.
18     Q   I think you testified that under that
19  benefit you and your wife purchased prescription
20  drugs by mail and paid a $20 fixed co-pay; is that
21  correct?
22     A   Yeah, until it changed here in 2004.
0090
1     Q   Changed in 2004?
2     A   Yeah.
3     Q   And I think you told me it's $40?

4    A   Yeah.
5    Q   If I've asked this I apologize, but who is
6  the carrier who provides that benefit?
7    A   Care Mart.
8    Q   Care Mart?
9    A   Yes.
10       MR. YOUNG:  I think this would be a fine
11  time to break for a short lunch, is that okay?
12       MR. WILLIAMS:  Sure.
13       (Lunch break taken from 1:09 p.m. to
14  1:52 p.m.)
15    Q   (BY MR. YOUNG)  We're going to begin.
16  Back on the record.  Good afternoon, Mr. Young.
17    A   Good afternoon.
18       (Exhibit Young 002 marked for
19  identification.)
20    Q   (BY MR. YOUNG)  I've had the court
21  reporter hand you what's been marked Exhibit
22  Young 002.  Take a look at that quickly, not
0091
1  quickly.  Take your time.
2       MR. YOUNG:  While you're doing that,
3  why don't I just for the record designate this
4  transcript as highly confidential.
5       MR. WILLIAMS:  Designating the whole
6  thing as highly confidential or just a part of it?
7       MR. YOUNG:  Let's designate the whole
8  thing highly confidential.
9       MR. WILLIAMS:  So designated, reserving
10  our right to later seek to have the confidentiality
11  designation removed.
12    Q   (BY MR. YOUNG)  Have you had a chance
13  to review these?
14    A   Yes.
15    Q   I'll have a few quick questions about
16  these.  What are these?
17    A   This is payments to Dr. Carson for the
18  Remicade infusions.  It's part of the -- this was
19  set up with the bookkeeper, an amount that
20  Medicare Part B, how much it would cover, and
21  then our supplementary insurance would kick in,
22  and this is part of the deductible on our
0092
1  supplementary that we have to pay out of pocket.
2    Q   And just for the record, this is a group
3  exhibit, it's Young 0001 through Young 0011.
4       At the very top of the very first page
5  you'll see there's a line that says 10-14-2005.  Do
6  you see that?
7    A   Oh, yeah.
8    Q   In the middle it says CFCU B12.  Do you
9  see that?
10    A   Yeah.
11    Q   What is CFCU B12, if you know?

12     A   I think that's my bank, Communications
13 Federal Credit Union.
14     Q   So these are documents that were faxed
15 from your bank?
16     A   Yes.
17     Q   Were they faxed to you?
18     A   They were faxed to the bank in Enid and I
19 picked them up.
20     Q   Did you not have your own records of
21 these check payments?
22     A   Some of them I had and some of them I
0093
1 couldn't find, and I knew it was there.
2     Q   Turn to Page -- the third page.  The check
3 is made out to CitiBank.  Do you see that?
4     A   Page 4?
5     Q   At the top it's Page 4, at the very bottom
6 you'll see it's Young 0003 and that's what I'm
7 going by.
8     A   Okay.
9     Q   Why have you -- what is this payment to
10 CitiBank for?
11     A   CitiBank is the credit card that we set up
12 with Dr. Carson's office to be able to pull this
13 amount out when it was due on certain times.
14         This one here may have been just put on
15 it when we was there.  My wife might have just
16 used the credit card.
17     Q   So you would have paid Dr. Carson by
18 credit card and then you would have paid --
19     A   CitiBank.
20     Q   -- CitiBank a check to cover that payment
21 by credit card?
22     A   Yes.
0094
1     Q   Do you have your credit card receipts?
2     A   I don't know that I have these, no.
3     Q   So if you look at the sixth page it also
4 says Citi.
5     A   Okay.
6     Q   That would have been the same process?
7     A   Yes.
8     Q   Just flip to the end, the last page, 0011,
9 the date of that check is January 6, 2003,
10 correct?
11     A   Yeah.
12     Q   Your wife continued to receive treatment
13 from Dr. Carson for beyond that, correct?
14     A   Since when?
15     Q   After January of 2003.
16     A   Yeah.
17     Q   Did you continue to pay Dr. Carson after
18 January of 2003?
19     A   That's what these documents show here

20   that we did.
21      Q   The documents that are marked Exhibit
22   Young 001 show payments from March, I'm sorry,
0095
1   April of 2002 to January 2003.
2         MR. WILLIAMS:  Objection.  It's stated in
3   the exhibit.
4      A   There's 7-03 right there.
5         MR. WILLIAMS:  Page 6, there's a
6   payment after January of '03.
7      Q   (BY MR. YOUNG)  So between January of
8   '03, I guess what I'm trying to get at, quite
9   simply, what other records do you have showing
10   payments after January '03 other than 06?  I just
11   would like to know what records you have
12   reflecting those payments.
13      A   I think they were put on our credit card
14   after that point.  The credit card number was
15   given to the doctor's office, so we didn't have to
16   write a check or give them a card or anything else.
17   So the credit card company would probably have a
18   record of it maybe.
19      Q   Do you have your own credit card
20   statements?
21      A   I don't keep all of them.
22      Q   Do you keep any of them?
0096
1      A   I think I've got -- I might have some,
2   maybe the last two or three payments I think they
3   sent me a record showing it had been paid.
4      Q   I'll just state for the record that we
5   request any and all documents that you still have
6   in your possession reflecting payments to Dr.
7   Carson or the Oklahoma --
8      A   Arthritis.
9      Q   Yes.
10         MR. WILLIAMS:  Let me just say I'm not
11   agreeing to the request.  My understanding is this
12   is a broader issue and it goes beyond really this
13   deposition.
14         Our position is we complied with our
15   obligations and we'll resolve that another day,
16   whether or not your position is the correct one or
17   the plaintiff's position is.
18         MR. SWEENEY:  Could the court reporter
19   read back counsel's statement because I couldn't
20   hear it.
21         (Whereupon the court reporter read back
22   Mr. Williams' statement.)
0097
1         (Exhibit Young 003 marked for
2   identification.)
3      Q   (BY MR. YOUNG)  Why don't you take a
4   minute to review that, and for the record I'll just

5   state that this is a composite exhibit Young 0012
6   to Young 0053.
7        I realize that these are -- let me draw
8   your attention to exhibit, the first two pages,
9   Young 12 and Young 13.
10      A   Okay.
11      Q   Do you recognize this document?
12      A   Yep.
13      Q   What is this?
14      A   This is a copy of the Medicare payment.
15      Q   Who is Dr. Pamela Allen?
16      A   I don't know.
17      Q   Looking at Page Young 0013, there's a
18  table.
19      A   Did you say 0013?
20      Q   The second page.
21      A   Okay.
22      Q   It's sort of a large square, at the very
0098
1   bottom of that big square it contains the word
2   "redacted" inside of it.
3       A   Yes.
4       Q   Do you see the line item for 9-16-02 it
5   says 30 infliximab injection.  Do you see that?
6       A   Yeah.
7       Q   And it indicates the amount charged is
8   $1,996.80.  Do you see that?
9       A   Yes.
10      Q   And then it says Medicare approved
11  $1,996.80.  Then the next column is Medicare
12  provider $1,597.44.  Do you see that?
13      A   Yes.
14      Q   You may be billed 399.36.  Do you see
15  that?
16      A   Yes.
17      Q   Is there anything on this document that
18  reflects that the amount that -- let me back up.
19        Do you know what the column the
20  "amount charged" reflects?
21      A   No.
22      Q   You do not?
0099
1   A   No.
2       Q   Do you know what the column "Medicare
3   approved" reflects?
4       A   You mean by this statement you mean?
5       Q   In that heading in that column, it says,
6   "Medicare approved."
7       A   I can see where it was charged, where it
8   was approved.
9        MR. WILLIAMS:  He's asking do you know
10  what it means, the words "Medicare approved".
11      A   That's what they will pay.
12      Q   (BY MR. YOUNG)  The fourth column

13   where it says, "You may be billed," do you see
14   that?
15      A   Yes.
16      Q   Were you billed $399.36 for that injection
17   on September 16, 2002?
18         MR. WILLIAMS:  Objection, foundation.
19      A   I don't remember.  It would either be
20   billed to my supplemental or on my -- as long as I
21   paid my deductible.
22      Q   (BY MR. YOUNG)  So is your answer you
0100
1   were not billed that amount?
2         MR. WILLIAMS:  Objection, misstates his
3   testimony.
4      A   They didn't bill me.  They might have
5   billed the insurance company.  I don't know.
6      Q   (BY MR. YOUNG)  My question is were you
7   billed?
8         MR. WILLIAMS:  I'll object as asked and
9   answered.
10      A   No.
11      Q   (BY MR. YOUNG)  Is there anything on
12   this chart that indicates that the amount charged
13   for the infliximab injection on that date was based
14   on AWP?
15         MR. WILLIAMS:  I'll object, lack of
16   foundation.  The document speaks for itself.
17      A   I don't know.
18      Q   (BY MR. YOUNG)  Can you review that
19   document and see if you can find anything that
20   reflects, that indicates the amount charged is
21   based on AWP?
22         MR. WILLIAMS:  Same objection.
0101
1      A   I have no idea whether the drug company
2   was charging them for that or what.
3      Q   (BY MR. YOUNG)  Let me just ask you a
4   very simple question.
5      A   Okay.
6      Q   To your knowledge is there anything on
7   this page that indicates that the amount charged
8   for the infliximab injection on September 16 was
9   based on AWP?
10         MR. WILLIAMS:  Same objection, lack of
11   foundation.  The document speaks for itself.
12      A   I don't know.
13      Q   (BY MR. YOUNG)  Is there anything on
14   this page or on this document that indicates that
15   the amount you may be billed is based on AWP?
16         MR. WILLIAMS:  Objection, lack of
17   foundation, calls for speculation.  The document
18   speaks for itself.
19      A   I don't know that either.
20      Q   (BY MR. YOUNG)  Let me ask you to turn

21  to the page that's marked Young 0029, please.
22  Can you tell me what this document is, please?
0102
1  It's 0029 and 0030, please.
2     A   Huh?
3        MR. WILLIAMS:  He's talking about 29
4  and 30.
5     Q   (BY MR. YOUNG)  29 and 30.
6     A   It's billing that Dr. Carson charged and
7  received payment for.
8     Q   Is this a document that you or your wife
9  received?
10    A   No.
11    Q   Have you seen this document?
12    A   I asked for it.
13    Q   Let me ask.  You answer my question
14  then.  Have you seen this document before?
15    A   Yes.
16    Q   When did you see it?  You asked for it
17  from the company and they sent it to you?
18    A   No.  I asked the doctor to send me the
19  payments and the date that she received her
20  infusions and all that.
21    Q   You had to ask for this document?
22    A   I think so, yes.
0103
1     Q   They didn't send it to you in the ordinary
2  course of business?
3     A   No.
4        MR. WILLIAMS:  Objection, foundation.
5     Q   (BY MR. YOUNG)  Why did they not send
6  this to you?
7        MR. WILLIAMS:  Objection.  He just
8  testified they did send it to him.
9     Q   (BY MR. YOUNG)  Why did they not send
10  it to you until you asked for it?
11       MR. WILLIAMS:  Now I'll object for lack
12  of foundation.
13    A   Because they wasn't billing me.
14    Q   (BY MR. YOUNG)  If I've asked you this I
15  apologize.  So why did you want this statement
16  sent to you if they weren't billing you?
17    A   For legal matters.
18    Q   I did not hear you.  I'm sorry?
19    A   I said for legal matters.
20    Q   For legal matters.  When did you ask for
21  these documents?
22    A   Let's see, it was in November, from my
0104
1  recollection I think it was November of 2004.
2     Q   What legal matters were you
3  contemplating when you requested these
4  documents in November of 2004?
5        MR. WILLIAMS:  I'm going to object to

6  the extent it's calling for an attorney-client
7  privileged communication or work product.
8        Do you mind if I ask a couple
9  foundational questions before I decide whether or
10  not to instruct him?
11        MR. YOUNG:  Go ahead.
12        MR. WILLIAMS:  Sir, was the legal matter
13  that you were contemplating in November of 2004
14  the matter at hand in this lawsuit or was it a
15  different one?
16        THE WITNESS:  It was a different matter.
17        MR. WILLIAMS:  Is that matter in suit
18  currently?
19        THE WITNESS:  It's being looked into.
20        MR. WILLIAMS:  But it is not in suit
21  currently?
22        THE WITNESS:  No.
0105
1        MR. WILLIAMS:  Then I'm objecting and
2  instructing him not to answer.
3        MR. SWEENEY:  Can you read back the
4  last two or three questions and answers?
5        (Whereupon the court reporter read back
6  the questions and answers between Mr. Williams
7  and the witness.)
8        MR. YOUNG:  For the record, what
9  question are you objecting to and instructing him
10  not to answer?
11        MR. WILLIAMS:  The legal matter he was
12  looking into in November of 2004.
13        MR. YOUNG:  On what basis is that
14  attorney-client privileged?
15        MR. WILLIAMS:  He was doing this
16  because it's a legal issue.
17        MR. YOUNG:  That's fine.  I'm not going
18  to ask him about his communications with his
19  lawyer.  I just want to know what lawsuit he's
20  contemplating.
21        MR. WILLIAMS:  It's not currently in suit
22  and it's a confidential thing.  If it becomes a
0106
1  lawsuit, then obviously it's not confidential
2  anymore.  But at this point I'm instructing him
3  not to answer.
4        MR. YOUNG:  You've just invoked a
5  second reason, not attorney-client privilege, that
6  you're talking confidentiality.  I just want to know
7  the nature of his lawsuit.
8        MR. WILLIAMS:  You're not going to get
9  it.  It doesn't relate to this matter.  It's
10  confidential.  He just testified it didn't relate to
11  this matter.  He's testified it doesn't relate to this
12  matter.  It's a different matter.  It's not currently
13  in suit.  It involves a legal issue.  He's not getting

14   into it.  That's my instruction.
15         MR. YOUNG:  You started off by objecting
16   on the basis of attorney-client privilege, and then
17   you've totally backed away and interposed a
18   relevance objection.  What's your objection?
19         MR. WILLIAMS:  I haven't backed away
20   from anything.  It obviously implicates
21   attorney-client privileged issues.
22         MR. YOUNG:  That's fine.  A lot of this
0107
1   stuff does and still we asked about it.
2         MR. WILLIAMS:  And I'm not letting him
3   testify about a legal matter that he is currently
4   contemplating that is not in suit.  It doesn't relate
5   to this lawsuit.  It's a different matter.  It's
6   confidential.  He's not going to testify to it.
7         MR. YOUNG:  I think it clearly relates to
8   this lawsuit in all sorts of ways.
9         MR. WILLIAMS:  How do you know?
10         MR. YOUNG:  Well, I assume it involves a
11   potential lawsuit, malpractice lawsuit against the
12   provider.
13         MR. WILLIAMS:  Why do you think that?
14         MR. YOUNG:  Can I at least ask him that?
15         MR. WILLIAMS:  No, you cannot, because
16   you're not getting into the legal matter that he's
17   contemplating.
18         MR. YOUNG:  I'm going to ask the
19   question and you can state your objection.
20     Q   (BY MR. YOUNG)  Does the legal matter
21   that you've contemplated and are contemplating
22   back in November of 2004 concern a potential
0108
1   malpractice lawsuit against the doctor?
2         MR. WILLIAMS:  I have a multitude of
3   objections.  It calls for privileged information.
4         MR. YOUNG:  What's privileged about
5   that?
6         MR. WILLIAMS:  The legal matter that
7   he's contemplating.
8         MR. YOUNG:  What is privileged?  What
9   communications do you claim are privileged?
10         MR. WILLIAMS:  The legal matter that he
11   is contemplating is privileged; whether he
12   considers it to be a legal matter today, could be
13   the product of communications with his counsel,
14   the type of legal matter that it is, whether it
15   involves his health care provider or anybody else
16   or whether it even involves a malpractice action.
17         The fact of the matter is, we don't know
18   what it's about and we're not going to know
19   because he has testified that it doesn't relate to
20   this matter.
21         MR. YOUNG:  He didn't testify.

22        MR. WILLIAMS:  Yes, he did.  I asked him

0109

1   that directly several times.

2        MR. YOUNG:  It's your conclusion that it

3   doesn't relate.  I disagree.  I am not coming

4   anywhere close to attorney-client privilege.

5        MR. WILLIAMS:  I just asked the witness

6   that three times whether it relates to this matter

7   and he said no.

8        MR. YOUNG:  It doesn't relate to this

9   litigation, but it's clearly relevant material.

10        MR. WILLIAMS:  Whether it relates to

11   this matter, that's exactly what I asked him.

12        MR. YOUNG:  It's clearly relevant and

13   that's the standard.  You can't articulate a

14   legitimate attorney-client privilege.  We're

15   nowhere near attorney-client privilege at this

16   point.

17        MR. WILLIAMS:  Absolutely we are.  He

18   has testified that there was a legal matter he was

19   contemplating, that apparently is still being

20   contemplated today.

21        MR. YOUNG:  Let me ask him this

22   foundation question.

0110

1        Q   (BY MR. YOUNG)  Have you spoken to a

2   lawyer about this legal matter that you're

3   contemplating?

4        MR. WILLIAMS:  You can give him that, if

5   you spoke to a lawyer.

6        A   Yes.

7        MR. YOUNG:  It's probably not worth the

8   fight.

9        MR. WILLIAMS:  Probably not.  You have

10   been asking the guy about transfusional processes

11   and conversations with doctors and everything.

12   I've let you do that because I wanted to get

13   through this.

14        But now you're getting into what the

15   witness has testified as to an unrelated legal

16   matter.  If you want to know where he got the

17   documents from, fine, but we're not going to get

18   into other legal issues that aren't involved in this

19   lawsuit that haven't even been brought to suit and

20   may never be brought to suit.  We're not going

21   down that road.

22        Q   (BY MR. YOUNG)  We talked earlier about

0111

1   your role as a class representative, correct?  Do

2   you remember that?

3        A   Yes.

4        Q   You understand that there's certain

5   requirements that you have to meet as a class

6   representative?

7    A   Yes.
8    Q   Some of those requirements include the
9  fact that your claims need to be similar to other
10  plaintiffs.  Do you understand that?
11    A   Yes.
12       MR. WILLIAMS:  I'm going to object to
13  your recommendation of what he believes the
14  requirements are.  Answer to the best of your
15  ability.  I'll object to the extent that he's trying to
16  draw a legal conclusion.
17       MR. YOUNG:  I think the point I'm trying
18  to establish, Counselor, is that the fact that your
19  client was a proposed class representative may
20  have a malpractice against a provider, it seems to
21  be very relevant to go to the question of
22  suitability as a class representative.
0112
1       MR. WILLIAMS:  Well, we disagree about
2  that.  If that's your basis for getting into this
3  then --
4       MR. YOUNG:  I think that's not the only
5  basis.  I think there are plenty of reasons that
6  this comes -- it's a very relevant topic of inquiry.
7       MR. WILLIAMS:  First of all, you're
8  assuming that that's the matter at hand, and that
9  has not been established.
10       MR. YOUNG:  At least let me establish
11  that.
12       MR. WILLIAMS:  No.  You're not going to
13  get into what the legal matter was or is or may be.
14  He's testified it doesn't relate to this matter.  I
15  can ask it a different way.
16       Sir, does it relate to drug pricing?
17       THE WITNESS:  No.
18    Q   (BY MR. YOUNG)  Does it relate to drugs?
19       MR. WILLIAMS:  Don't answer that.
20  Don't answer that.
21       MR. YOUNG:  How is that attorney-client
22  privilege?  The only basis for you to instruct him
0113
1  not to answer is attorney-client, and there's
2  nothing attorney-client privileged in that.
3       MR. WILLIAMS:  Now you're harassing
4  him.  You're getting into confidential information
5  that I believe runs afoul of the attorney-client
6  privilege.  It's certainly implicated by it because
7  he's already testified that he's discussed this
8  matter with his counsel, and now you're asking
9  him to testify today what the legal matter is.  It's
10  obviously going to be the product of
11  communications he's had with counsel, whatever
12  the answer is.
13       You're not going to get it, Counsel.  I
14  believe you indicated earlier you don't think it's

15  worth the fight or may not be worth the fight.  I
16  tend to agree with you.
17      MR. YOUNG:  I would like to find out
18  whether it's worth the fight, and I don't have
19  enough information to know that at this point.
20      MR. WILLIAMS:  I'm sorry, but you're not
21  going to get any more.  I'm instructing him not to
22  answer, and we're wasting time on the continued
0114
1  questioning about this unrelated legal matter and
2  is now becoming harassing.
3      MR. YOUNG:  It's not harassing.
4    Q    (BY MR. YOUNG)  When did you say you
5  received this statement for professional services?
6    A    I'm thinking it was in November of 2004
7  when I requested the breakdown because I owed
8  some money still that was coming off of the credit
9  card, and I needed to know how much it was and
10  when the final payment was.
11      MR. YOUNG:  Can you read that back,
12  please?
13      (Whereupon the court reporter read back
14  the answer.)
15    Q    (BY MR. YOUNG)  If you look at Page 32
16  and 33, Young 32 and 33.
17      MR. WILLIAMS:  These are Bates
18  numbers?
19      MR. YOUNG:  Yes.
20    Q    (BY MR. YOUNG)  That's also a statement
21  for professional services and that has a billing
22  date of June 27, 2002.  Do you see that?
0115
1    A    Where is this?
2    Q    In the top right box.
3    A    Okay.
4    Q    Is this a document you also received in
5  November when you requested these statements?
6    A    Yes.
7    Q    I basically just want to understand.  I
8  think in the packet of documents that's Exhibit --
9  the Exhibit Young 003 there are several of these
10  statements, and I just want to understand that all
11  of the statements in this packet you received in
12  November of 2004 when you asked for them from
13  the Oklahoma Arthritis Center; is that correct?
14    A    I received --
15      MR. WILLIAMS:  Do you need to go
16  through the exhibit and look at them?
17    Q    (BY MR. YOUNG)  Let me back up.  Let me
18  strike that.  Let me turn your attention to Exhibit
19  Young 16.
20    A    Okay.
21      MR. SWEENEY:  Is that Bates number 16?
22      MR. YOUNG:  Yes.

0116
1     Q   (BY MR. YOUNG)  What is this document?
2  Let me strike that.  Do you recognize this
3  document?
4     A   Yeah.
5     Q   What is this document?
6     A   This is activities and billing from -- I
7  can't read it.  I can't read the dates on them.
8     Q   The dates on the left column are cut off,
9  correct?
10    A   Yeah.
11    Q   If you look just above that, that box,
12 there's a series of six tabs, seven tabs.  I'm sorry,
13 six tabs.
14    A   Yeah.
15    Q   There's a statement date.
16    A   6-01, okay.
17    Q   Is this a statement you received from
18 Oklahoma Arthritis Center?
19    A   Yes.
20    Q   On or around that date?
21    A   It was all -- these were asked for from
22  when we started with Dr. Carson.
0117
1     Q   I don't --
2     A   Charges and services provided by him and
3  amount paid and what we paid.
4     Q   When did you receive this statement?
5     A   With the rest of them.
6     Q   When you asked for them from Dr. Carson
7  in November of 2004?
8     A   They sent the whole packet.
9     Q   Did you receive this statement on or
10 about June 1, 2004?
11       MR. WILLIAMS:  Objection, lack of
12 foundation.
13    A   No.
14    Q   (BY MR. YOUNG)  You did not.  Turn to
15 the next -- turn to the next page, Young 0017.
16 You will see there this reflects a statement date of
17 August 2, 2004?
18    A   Yes.
19    Q   Did you receive this statement on or
20 about August 2, 2004?
21       MR. WILLIAMS:  Objection, lack of
22 foundation.
0118
1     Q   (BY MR. YOUNG)  You're nodding your
2  head?
3     A   No.
4     Q   You're making it very clear to me which is
5  not getting through quick enough, all of these
6  documents, these statements, Young Exhibit 16,
7  17, 18, 19, 20, 21, and then these statements for

8  professional services, Young 22 through 33, you
9  all received in November 2004?
10      MR. WILLIAMS:  Hold on.  Counsel, I
11  think it was an unintended error on your part, but
12  all those numbers you just ticked off you referred
13  to as exhibits.  You meant Bates numbers?
14      MR. YOUNG:  Correct.  Thank you.
15      MR. WILLIAMS:  Same foundation
16  objection as before with that clarification.
17    A   It looks like that up to 003 is what I was
18  -- what they sent me.  This other is Medicare or
19  United Healthcare and all that and they didn't.
20    Q  (BY MR. YOUNG)  Very good.  Thank you
21  for that correction.
22      And the reason that you didn't receive
0119
1  them, the reason you didn't receive the document
2  that's marked Young Exhibit 16 which reflects a
3  statement date of 6-01-04 is because they weren't
4  billing you, correct?
5      MR. WILLIAMS:  Same objection as
6  before, lack of foundation.  You said exhibit
7  again.
8      MR. YOUNG:  I mean Bates.
9    A   They set us up on a billing and we paid
10  so much based on what they had calculated that
11  the charges would be, and this was due to the
12  deductible on our supplementary insurance which
13  we had to pay out.
14      MR. SWEENEY:  Can you read that
15  answer back, please.
16      (Whereupon the court reporter read back
17  the answer.)
18    Q  (BY MR. YOUNG)  Do you know how the
19  figure of 141 was arrived at?
20    A   No.
21    Q   This conversation occurred between your
22  wife and the bookkeeper; is that correct?
0120
1    A   Yes.
2    Q   Did she ever tell you how that figure was
3  arrived at?
4    A   No.
5    Q   But your understanding is that it was
6  related to the deductible you paid?
7    A   Right.
8    Q   Was the deductible you paid in any way
9  connected to the AWP of Remicade?
10      MR. WILLIAMS:  Objection, lack of
11  foundation, also vague and ambiguous.
12    A   I have no idea.
13    Q  (BY MR. YOUNG)  Do you have any reason
14  to think it was?
15      MR. WILLIAMS:  Objection, same

16   objection, lack of foundation.
17      A   No.
18      Q   (BY MR. YOUNG)  Let me ask you to turn
19   to the documents that are Bates numbered 29 and
20   30, I'll ask you about that.
21      A   29 and 30?
22      Q   Yes.  You see that there's a black, thick
0121
1   black bar on the left, there's a marking for date,
2   do you see that on the left of the column right
3   here?
4      A   Okay.
5      Q   About the fifth item down, do you see
6   dates 9-16-02?  Do you see that?
7      A   Yes.
8      Q   It has a line, a charge for an established
9   patient, one hour, IV infusion, additional hour,
10   and then down below it indicates Remicade.  Do
11   you see that?
12      A   Yes.
13      Q   If you turn back to Young Exhibit --
14   Bates numbered Young 13.  Take a look.
15      A   Okay.
16      Q   You can see that Young 13 reflects a
17   charge on 9-16-02 for an outpatient visit which
18   indicates the Medicare approved as 18.17.  Do you
19   see that?
20          MR. WILLIAMS:  18.70, where are you
21   getting that?
22          MR. YOUNG:  18.17.
0122
1          THE WITNESS:  Where is that?
2          MR. WILLIAMS:  On the top.
3      Q   (BY MR. YOUNG)  Let's make it simple.
4   Let's go to the bottom.
5          MR. WILLIAMS:  Cut to the chase.
6      A   18.17, okay.
7      Q   (BY MR. YOUNG)  Let me cut to the
8   chase.  The bottom one again is the infliximab, the
9   Remicade infusion.
10      A   Okay.
11      Q   That indicates Medicaid approved
12   $1,996.80, correct?
13      A   Yes.
14      Q   If you'd flip back to 29.
15      A   Okay.
16      Q   It indicates that the charge for Remicade
17   on 9-16-02 was $1,996.80.
18      A   Okay.
19      Q   Then going back to Young 13, it indicates
20   the claim, the bolded amount at the very bottom
21   for the Medicare paid provider is $1,668.67.  Do
22   you see that?
0123

1     A    Yeah.
2     Q    Flip back to 29 there's an item on 10-15,
3  payment Medicare, $1,668.67, correct, which
4  matches what's on Young 13?
5     A    Okay.
6     Q    And if you just look two lines above that
7  line you'll see on 10-22 there's a United
8  Healthcare Claim No. 347642 filed.
9     A    Yeah.
10     Q    I'd like you to flip to the next page, the
11  very bottom line item is November 14, '02,
12  payment by United Healthcare of 417 and that's
13  for Claim 347642, correct?
14     A    United Healthcare 347642.
15     Q    That's for an amount 417.17?
16     A    Yes.
17     Q    Then again if you flip back to Young 13
18  the amount you may be billed is $417.17.  Do you
19  see that?
20     A    Yeah.
21     Q    These documents reflect that United
22  Healthcare paid that amount; is that correct?
0124
1     A    Yeah.
2     Q    Can I ask you to quickly turn to Page
3  Young 31.  Have you seen this document before?
4     A    Yeah.
5     Q    Did you receive this document on or
6  about August 9, 2002?
7     A    Around that probably when they sent it to
8  us.
9     Q    Did you receive this explanation of
10  benefits?  How often did you receive an
11  explanation of benefits like this?
12     A    Whenever they would pay for medical.
13     Q    There's a box sort of towards the bottom
14  of the page.  There's a heading ONA deductible.
15  Do you see that?
16     A    Yes.
17     Q    Do you know what ONA deductible is?
18     A    It's not covered -- my understanding, I
19  think this is a service that's not covered under
20  the plan, but it's out of pocket.
21     Q    The next column says ONA out of pocket,
22  what does that mean?
0125
1     A    That's the amount that we paid out, the
2  deductible.
3     Q    Is that figure of $1,190 the number that
4  was used to calculate the payment of $141 on a
5  monthly basis?
6         MR. WILLIAMS:  Objection, foundation.
7     A    I have no idea.
8         (Exhibit Young 004 marked for

9  identification.)
10   Q   (BY MR. YOUNG)  The court reporter has
11  handed you what has been marked as Exhibit
12  Young 004, which for the record, it appears to be
13  a single document Bates stamped Young 54
14  through Young 69.
15       MR. WILLIAMS:  Counsel, do you have an
16  extra copy?
17       MR. YOUNG:  I do.
18   Q   (BY MR. YOUNG)  I have a very quick
19  question for you on this.  Is this also a document
20  you received in November of 2004?
21   A   Yes.
22   Q   You did not receive this prior to
0126
1  November of 2004?
2   A   No.
3       (Exhibit Young 005 marked for
4  identification.)
5   Q   (BY MR. YOUNG)  I'll hand you what has
6  been marked as Exhibit Young 005 which is a
7  grouping of documents Bates numbered Young 106
8  through Young 205.  Do you recognize these
9  documents?
10   A   I think this is the information I requested
11  from the hospital.
12   Q   When did you request this information
13  from the hospital?
14   A   I believe it was in January or February of
15  '05.
16   Q   Why did you request these documents
17  from the hospital in January or February of '05?
18       MR. WILLIAMS:  I'll counsel you not to
19  reveal anything that might be privileged or
20  confidential for legal reasons.
21       MR. SWEENEY:  I'm sorry.  I didn't hear
22  counsel's statement.  Would you read it back,
0127
1  please.
2       (Whereupon the court reporter read back
3  counsel's statement.)
4       MR. WILLIAMS:  I counseled the witness
5  not to reveal anything that might be privileged or
6  confidential for legal reasons.
7   A   I would think this would be.
8   Q   (BY MR. YOUNG)  Did you request these
9  documents in connection with a legal matter?
10       MR. WILLIAMS:  You may answer that yes
11  or no.
12   A   Yes.
13   Q   (BY MR. YOUNG)  Did you request these
14  documents in connection with the same legal
15  matter that you contemplated in November of
16  2004?

17     A   Yes.
18     Q   Who is your -- are you currently
19   represented by anyone in connection with that
20   lawsuit?
21     A   Yes.
22     Q   Who are you represented by?
0128
1     A   The office of Kline and Specter.
2         MR. SWEENEY:  I'm sorry, what was the
3   answer?
4         (Whereupon the court reporter read back
5   the answer.)
6     Q   (BY MR. YOUNG)  But you have not filed
7   a lawsuit yet?
8     A   No.
9     Q   Who is the attorney at Kline and Specter
10   you contacted?
11     A   Cheryl Jacobs.
12     Q   When was the last time you spoke to Ms.
13   Jacobs?
14         MR. WILLIAMS:  About this matter or the
15   matter that we're not talking about?
16         MR. YOUNG:  Yes.
17     A   I can't remember, it was last week, I
18   think.
19     Q   (BY MR. YOUNG)  Is Kline and Specter a
20   firm that's representing plaintiffs in this lawsuit,
21   this lawsuit that we're -- the AWP litigation?
22     A   I think they work out of there.  I'm not
0129
1   for sure.
2     Q   I'm sorry, I did not hear your answer.
3     A   I'm not for sure.
4     Q   Who are your attorneys in this matter?
5     A   Kent Williams and Mr. Haviland.
6     Q   What firm is Mr. Haviland with?
7     A   I don't remember.
8     Q   When did you learn about the AWP
9   litigation?
10     A   It was brought to my attention.
11         MR. WILLIAMS:  He asked you when.
12         THE WITNESS:  Huh?
13         MR. WILLIAMS:  He asked you when.
14         MR. SWEENEY:  Read that answer back,
15   please.
16         MR. YOUNG:  He hasn't given it yet.
17     A   I think it's been a couple of months.
18     Q   (BY MR. YOUNG)  How did you learn
19   about this lawsuit, the AWP litigation?
20     A   It was brought to my attention while I
21   was seeking legal counsel.
22     Q   This legal counsel you were seeking, was
0130
1   it in connection with this lawsuit we talked about

2  in November and January?
3      (Whereupon the court reporter read back
4  the question.)
5      A   Yes.
6      Q   (BY MR. YOUNG)  When was the first time
7  you spoke to Ms. Jacobs or any other attorney at
8  Kline and Specter?
9      A   I believe it was in February or March,
10  somewhere in there.
11     Q   February or March in 2005?
12     A   Yes.
13     Q   Prior to your conversations -- so the first
14  time you spoke with Ms. Jacobs or anyone else at
15  Kline and Specter was in February or March of
16  2005?
17     A   I'm not for sure of the dates, but it was
18  the proximity, somewhere in there.
19     Q   Prior to speaking to Ms. Williams in
20  February or March of 2005, did you speak to
21  anybody else about your lawsuit that you were
22  contemplating in November of 2004?
0131
1      MR. WILLIAMS:  I believe you meant Ms.
2  Jacobs, not Ms. Williams.
3      A   Yeah, Ms. Jacobs.  Did I talk to -- say it
4  again.
5      (Whereupon the court reporter read back
6  the question.)
7      MR. WILLIAMS:  I'm going to object.  It's
8  misstating his prior testimony to the extent he
9  says he was thinking about a lawsuit.  I believe
10  the witness has characterized it as a legal matter.
11     A   Legal matter, yes.
12     Q   (BY MR. YOUNG)  Fair enough.
13     A   I talked to a paralegal.  I can't remember
14  her name.  I talked to a paralegal and she took
15  some of the information down for me.
16     Q   Is this a paralegal at Kline and Specter?
17     A   Right.
18     Q   Have you spoken to anybody, any
19  non-lawyers about this legal matter?
20     MR. WILLIAMS:  Well --
21     A   A broad area.
22     MR. WILLIAMS:  Hold on.  Hold on.  I'm
0132
1  going to object to that question, again, as calling
2  for confidential information.  It's also overbroad.
3      Q   (BY MR. YOUNG)  It's a simple yes or no
4  question, Mr. Williams.
5      Have you spoken to anybody else about
6  the legal matter that you were contemplating in
7  November of 2004?
8      MR. WILLIAMS:  I still think it's
9  overbroad.  Spoken to anyone?  Spoken to a

10  lawyer?
11      A   Broad area.
12          MR. WILLIAMS:  When?  I think it's
13  overbroad.
14      A   I talked to my son about it.
15      Q   (BY MR. YOUNG)  Anyone else?
16      A   Mainly my relatives, some of my relatives
17  and that's about it.
18      Q   What did you tell your son?
19          MR. WILLIAMS:  Objection.  We're not
20  getting into it.
21      A   It's a legal matter that I was going to
22  look into.
0133
1       Q   (BY MR. YOUNG)  That's what you told
2   him?
3           MR. WILLIAMS:  To the extent it would
4   require you to reveal the substance of the legal
5   matter, I would instruct you not to answer.
6       A   I won't get into it.
7       Q   (BY MR. YOUNG)  Have you ever brought
8   a lawsuit?
9       A   No.
10      Q   Besides Mr. Williams and Mr. Haviland,
11  who are your attorneys in this AWP litigation?
12      A   I don't know.
13      Q   You said the AWP litigation was brought
14  to your attention when you were seeking -- I forget
15  the word.
16      A   Legal matters.
17      Q   Who brought it to your attention?  Who
18  brought the AWP litigation to your attention?
19      A   My lawyer.
20      Q   Who?
21      A   Cheryl Jacobs.
22      Q   Do you know if she is an attorney
0134
1   involved in this AWP litigation?
2       A   No.
3       Q   Turning back to Exhibit Young 005, I
4   think you testified you received these in January
5   or February of 2005?
6       A   Somewhere in there, whenever I asked for
7   them, yeah.
8       Q   Was the legal matter you were considering
9   in January, February of 2005 when you requested
10  these documents connected to prescription drugs?
11      A   No.
12          MR. WILLIAMS:  Wait a minute.  Read
13  that back.
14          (Whereupon the court reporter read back
15  the question.)
16      A   No.
17          MR. WILLIAMS:  Don't answer the

18  question.  Just strike that answer.  I'm
19  instructing the witness not to answer.
20       Counsel, I've told you several times now
21  that I'm not going to allow the witness to testify
22  about the substance of that legal matter, and I'm
0135
1  not very appreciative of the fact that you keep
2  coming back to it, notwithstanding my instruction.
3  So I would ask you to refrain from doing so.
4       If you want to take it up in some other
5  fashion, we can do that.  But I don't think it's
6  appropriate for you to keep peppering the witness
7  with variations of the same question which I had
8  told you I instructed him not to answer.  I don't
9  think it's fair.
10       MR. YOUNG:  Counsel, I happen to think
11  you have a completely wrong analysis of your
12  instruction for him not to answer.
13       I think the question we can contemplate
14  is whether we take this to the magistrate to
15  resolve this.  You have provided 100 pages of
16  documents in connection with this litigation, the
17  AWP litigation, and now he's telling me that he
18  didn't -- that he got these in connection with
19  other -- a lawsuit he's contemplating.
20       I think the very fact of that clearly
21  establishes their relevance and their relation, and
22  if that's your basis it's clearly unfounded and you
0136
1  can't articulate the attorney-client privilege
2  because right now I'm not asking any substance of
3  any communication he's had.
4       MR. WILLIAMS:  You're entitled to your
5  view.
6       MR. YOUNG:  That's right.
7       MR. WILLIAMS:  I happen to disagree
8  with it.
9       MR. YOUNG:  I disagree with yours so I'm
10  going to keep on asking.
11       MR. WILLIAMS:  You keep on asking the
12  question a different way.  I'm going to keep
13  instructing him not to answer.  We can sit here
14  and do this all afternoon if you like.
15       The fact, as the witness has testified,
16  that he's got these documents for one reason but
17  produced them to you for another reason does not
18  entitle you to inquire into this unrelated legal
19  matter.
20       If he had gotten these in the mail as part
21  of the ordinary course of a hospital billing, that
22  would be a different reason than getting them as
0137
1  part of his discovery obligations in this lawsuit.
2       The fact that the two are not connected

3  has nothing at all to do with whether or not you
4  can get into -- with whether or not you can get
5  into the matter at hand.  We just disagree about
6  it.
7        Like I said before, I've stated my
8  position, you've stated your position.  I would ask
9  you to respect the fact that I have counseled him
10  and instructed him not to answer that question,
11  the questions going to the substance of this
12  unrelated legal matter, and you're free to disagree
13  with it.
14        You can take whatever relief you think is
15  appropriate but it doesn't entitle you to keep
16  asking the same question over and over again.
17    Q    (BY MR. YOUNG)  These documents
18  reflect, do they not, that your wife received a
19  series of treatments at Integris Baptist Health
20  Center?
21    A    It does.
22    Q    When did she receive these treatments?
0138
1    A    During her illness.
2    Q    And when did her illness start?  Let's
3  back up a second.  What illness are you referring
4  to?
5    A    It started out as numbness from her neck
6  down a little bit and pain in her neck.  She
7  thought she had rolled a muscle.  So it got so bad
8  that we went to the emergency room.  The first
9  time they thought it was a pinched nerve in the
10  neck.  The doctor on duty said no, check with the
11  family physician.
12        It got worse and we had to take her into
13  the emergency a day or two later and my
14  recollection is they give her an MRI and I think
15  they done a CT scan.  I don't know what all they
16  did.
17        And they come up with the conclusion
18  that she had swelling in the lymph, in the neck, in
19  the neck area, and in the lower abdomen.
20    Q    When was she taken -- when did you take
21  her to the emergency room the first time?
22    A    I don't know.  I would just have to look
0139
1  through the records, 9, 8, I think the 8th month of
2  '04.
3    Q    Were you billed for that emergency room
4  visit?
5    A    Yes.
6    Q    Were there any prescription drugs
7  included in your treatment for her on that visit to
8  the emergency room?
9    A    I wouldn't know.
10    Q    So you indicated you received a bill?

11    A    Yes.

12    Q    Did you pay that bill?

13    A    Medicare and supplemental insurance

14  covered I think most of it because we already paid

15  the deductible out.

16    Q    You testified earlier that the drugs listed

17  in Paragraph 19 of the Third Amended

18  Consolidated Complaint were pulled from your

19  medical records.  Do you recall that testimony?

20    A    Yes.

21    Q    Do you know which medical records all

22  these drugs that are listed here were pulled from?

0140

1        MR. WILLIAMS:  Objection, lack of

2  foundation.  Why don't you go to the paragraph

3  he's talking about.  Which page is it on?

4        MR. YOUNG:  8 and 9.

5        MR. WILLIAMS:  Which drugs are you

6  talking about?

7        MR. YOUNG:  I'm talking about all of

8  them.

9        MR. WILLIAMS:  All the drugs, okay.

10  What was the question again?

11        (Whereupon the court reporter read back

12  the question.)

13        MR. WILLIAMS:  I'll object on foundation

14  grounds.

15    A    No, not for sure.

16    Q    (BY MR. YOUNG)  Are any of the drugs --

17  strike that.

18        Are all of the drugs to your knowledge

19  that are listed in Paragraph 19, do they either

20  appear in what's been marked Exhibit Young 005

21  or Exhibit Young 003?

22        MR. WILLIAMS:  Same objection, lack of

0141

1  foundation.  The documents speak for themselves.

2        MR. YOUNG:  Counsel, if you want to

3  stipulate that all of these drugs appear in either

4  one of these two documents, I'm happy to have you

5  stipulate that.

6        MR. WILLIAMS:  I'm not going to

7  stipulate to anything.

8        MR. YOUNG:  You just said the

9  documents speak for themselves.

10        MR. WILLIAMS:  That doesn't mean I

11  stipulate to anything.  What it means, Counsel, if

12  you want to take the time to do that kind of

13  comparison, feel free to do so, but I do object to

14  your having the witness do it in this deposition.  I

15  don't think it's fair questioning, and I don't think

16  you've laid the proper foundation for him to

17  testify about it without doing that kind of

18  analysis.

19    I mean, there are dozens of drugs listed
20  and there are hundreds of pages in the two
21  exhibits that you described.
22          MR. YOUNG:  I'm trying to understand
0142
1  where we're going to find billing records and
2  payment records for all of these drugs listed.
3  That's what I'm getting at.
4          MR. WILLIAMS:  I understand.  I
5  understand what you're getting at.  What I'm
6  objecting to is the form in which you are trying to
7  do that in this deposition.
8          MR. YOUNG:  Counsel, I thought I was
9  trying to do it in a painless and easy way.  If you
10  want, I can go through them one by one.
11          MR. WILLIAMS:  What I want is for you to
12  put questions to the witness that aren't improper
13  that he can answer or, if you can't, to tell him.
14          But I don't think it's appropriate to take
15  literally hundreds of pages of exhibits setting
16  forth medical reports and ask the witness to agree
17  with you that a paragraph, which he has not
18  drafted, pulled all of the drugs listed in that
19  paragraph out of these hundreds of pages of
20  exhibits.  I just don't think it's an appropriate
21  thing to do and I'm objecting to it.  But you do
22  your deposition however you think you should.
0143
1          MR. YOUNG:  Can you read back the
2  original question?
3
4    Q   (BY MR. YOUNG)  If you can answer it,
5  you can answer it.  If you can't --
6          (Whereupon the court reporter read back
7  the question.)
8          MR. WILLIAMS:  He hasn't asked you to
9  do anything, Mr. Young.  Can you answer that
10  question?
11    A   I don't know whether they would or not.
12  I'm leaving it up to my attorney, that the
13  information I give them is what they put on here.
14    Q   (BY MR. YOUNG)  So you gave them -- let
15  me back up.  Did you give them the information
16  that azathioprine sodium, your wife took
17  azathioprine sodium?
18          MR. WILLIAMS:  Objection, lack of
19  foundation.
20    Q   (BY MR. YOUNG)  You just told me that
21  you trusted the information you give them they
22  put in.  I'm trying to establish, did you give them
0144
1  that information?
2          MR. WILLIAMS:  I'm also going to object
3  to the extent that it calls for attorney-client

4  communication, and it does actually.  So I'm
5  instructing you not to answer that question.
6      Q    (BY MR. YOUNG)  Let's do it this way.
7  Look at Young 106.
8          MR. WILLIAMS:  What exhibit is that in?
9          MR. YOUNG:  Exhibit Young 005.
10          MR. WILLIAMS:  Do you have Exhibit
11  Young 005 in front of you?
12          THE WITNESS:  Yes.
13      Q    (BY MR. YOUNG)  Towards the bottom of
14  the page there's a item dexamethasone.  Do you
15  see that?
16      A    Yes.
17      Q    Is that one of the drugs that you alleged
18  was overpriced in your Complaint?
19          MR. WILLIAMS:  Do you want him to refer
20  to the Complaint to answer that question?
21          MR. YOUNG:  Sure.
22          MR. WILLIAMS:  That's on the list of
0145
1  drugs.
2      A    Yes.
3      Q    (BY MR. YOUNG)  Does this document
4  reflect who manufactured the dexamethasone that
5  apparently was given to your wife?
6          MR. WILLIAMS:  You're talking about
7  Young 106 now?
8          MR. YOUNG:  Yes.
9      A    No.
10          MR. WILLIAMS:  Hold on.  I'm objecting
11  because the document speaks for itself.  Go ahead
12  and answer the question.
13      Q    (BY MR. YOUNG)  Below that are
14  hydrocodone.  Is that listed in Paragraph 19?
15      A    I can't find it.
16      Q    Do you know why it's not included in
17  Paragraph 19?
18          MR. WILLIAMS:  Objection, lack of
19  foundation.
20      A    No.
21      Q    (BY MR. YOUNG)  I'm sorry to ask this
22  again.  Did you testify that you only received
0146
1  these in January or February?
2          MR. WILLIAMS:  These being?
3          MR. YOUNG:  The documents that are
4  collected in Exhibit Young 005.
5          MR. WILLIAMS:  I'll object to foundation
6  grounds.
7      A    I believe it was January or February that
8  I asked for them.
9      Q    (BY MR. YOUNG)  And on the top of
10  Young 106 it has a date of bill of 9-24-04.  Do you
11  see that?

12    A    Yes.  9-2-04.
13         MR. WILLIAMS:  This here.
14    A    Oh.
15    Q    (BY MR. YOUNG)  As I understand it, you
16  did not receive this document on or around
17  9-21-04; is that correct?
18         MR. WILLIAMS:  Same objections as
19  before, lack of foundation.
20    A    No.
21    Q    (BY MR. YOUNG)  You did not receive
22  this, correct?
0147
1    A    No.
2    Q    It's not correct that -- did you receive
3  this document on or around 9-21-04?
4    A    I didn't receive this.
5         MR. WILLIAMS:  Same objection on
6  foundation grounds.  Go ahead.
7    Q    (BY MR. YOUNG)  You did not receive it?
8    A    No.
9    Q    Did you receive anything, any bill or
10  statement from Integris Baptist Health Care on or
11  around that time?
12         MR. WILLIAMS:  Same objection, also
13  vague.
14    A    Only amounts paid by the insurance that
15  show how much was paid and if I owed anything,
16  that's what I received, a bill from Integris, if I
17  owed anything.
18         MR. YOUNG:  Can you read that back,
19  please.
20         (Whereupon the court reporter read back
21  the answer.)
22    A    They would only send me a bill if I owed
0148
1  and the amount that the Medicare would pay, they
2  would send me a sheet.  The amount that United
3  Healthcare would pay, they would send me
4  information.
5    Q    (BY MR. YOUNG)  Who is they?
6    A    The insurance company, United
7  Healthcare and Medicare.
8    Q    So United Healthcare and Medicare each
9  sent you a statement concerning the treatment
10  that your wife received?
11    A    Just the amounts of paid and not paid.
12         MR. YOUNG:  We don't have those
13  documents.  We would request that you produce
14  those documents to us.
15         MR. WILLIAMS:  Is that a question or a
16  request?
17         MR. YOUNG:  It's a request to you.
18         MR. WILLIAMS:  All right.  I'll take it
19  under advisement.

20     Q    (BY MR. YOUNG)  Do you still have those
21  documents?
22     A    I don't recall.  This is something that I
0149
1   never had to pay anything other than part of a
2   ambulance when she was transferred from St.
3   Mary's to Integris.  Everything else was covered.
4   So there's no reason to keep any records because I
5   didn't owe anything at the time.
6         MR. WILLIAMS:  Yes, you've got the
7   records.
8         MR. SWEENEY:  Can you read that back
9   for me?
10        (Whereupon the court reporter read back
11  the question and answer.)
12     Q    (BY MR. YOUNG)  So is it fair to say that
13  any of the items listed in what's been marked
14  Exhibit Young 005, you didn't pay any amount for
15  any of those items, is that fair, unless it reflects
16  the ambulance transfer?
17        MR. WILLIAMS:  I would object for
18  foundational reasons, lack of foundation.  The
19  question is vague and it calls for speculation.
20     A    I don't believe I did.
21     Q    (BY MR. YOUNG)  You didn't pay for
22  anything; is that correct?
0150
1         MR. WILLIAMS:  Same objection.
2     A    No.
3     Q    (BY MR. YOUNG)  I need to be clear.  Let
4   me ask you.  Did you ask, did you pay for
5   anything, any of the charges that are reflected in
6   Exhibit Young 005?
7         MR. WILLIAMS:  Same objection as
8   before, lack of foundation, calls for speculation
9   and the question is vague and ambiguous.
10     A    As far as I know, I didn't pay for any of
11  it.
12     Q    (BY MR. YOUNG)  Thank you.
13     Q    Who was Dr. Francisco Dexeus?
14     A    He's an oncologist.
15     Q    Did he treat your wife?
16     A    Yes.
17     Q    When did you start seeing Dr. Francisco
18  Dexeus?
19     A    When she was diagnosed with cancer.
20        MR. WILLIAMS:  Counsel, we've been
21  going for about an hour and a half now.  Do you
22  mind if we take a break?
0151
1         MR. YOUNG:  That's fine.
2         (Break taken from 3:28 p.m. to 3:36 p.m.)
3         (Whereupon the court reporter read back
4   the question and answer.)

5   Q   (BY MR. YOUNG)  When was that?
6   A   The 8th month of '04.
7   Q   Is Dr. Dexeus affiliated with a hospital?
8   A   He has a clinic.
9   Q   Where is his clinic?
10   A   In Enid.
11   Q   How did it come about that your wife was
12   treated by Dr. Dexeus?
13   A   He was one of the cancer doctors that she
14   was referred to.
15   Q   Who referred her?
16   A   I don't remember for sure.
17         MR. SWEENEY:  Read back the last two
18   questions and answers.
19         MR. YOUNG:  He's still in the middle of
20   the answer.
21         MR. SWEENEY:  I apologize.
22   A   If I'm not mistaken, he's the only
0152
1   oncologist there in Enid.
2         MR. YOUNG:  Would you read that back.
3         (Whereupon the court reporter read back
4   the previous two questions and answers.)
5         (Exhibit Young 006 marked for
6   identification.)
7   Q   (BY MR. YOUNG)  The court reporter has
8   just handed you what's been marked Exhibit
9   Young 006 which is a composite set of documents
10   Bates stamped Young 0070 to Young 0105.
11         I'd like to turn your attention to Page
12   Young 0087 for a moment.  Do you recognize that
13   document ?
14   A   Yes.
15   Q   What is that?
16   A   That is a document that allows
17   permission to treat Pat with Remicade.
18   Q   And it's dated April 26, 2002?
19   A   Yes.
20   Q   Is that when you first saw Dr. Carson?
21   A   No.  I think it was before that, talked to
22   her and get her evaluation and see what
0153
1   medication she was on, and then see if he could
2   help her in any other way because he was --
3   because of her hepatitis C, she was referred by
4   that doctor to Dr. Carson because of another
5   patient he had.
6   Q   Who treated her for her hepatitis C?
7   A   I don't remember his name.  He was head
8   of the liver transplant at Bass Hospital in
9   Oklahoma City.
10   Q   Do you know whether her treatment for
11   hepatitis C required any prescription drug
12   medication ?

13    A    As far as I know, no.

14    Q    It did not?

15    A    No, at this time because of the

16  medication she was on he didn't want to give her

17  any medication at that time to treat her for

18  hepatitis C.

19    Q    Do you know what medications he was

20  concerned about?

21    A    No, I sure don't.

22    Q    Do you recall approximately when the

0154

1  decision you just referred to about -- strike that.

2        You just mentioned a moment ago at that

3  time or at this time, what time frame were you

4  referring to?

5    A    It was before she seen Dr. Carson and

6  was able to get her on medication that might be

7  suitable with the treatment that he would have to

8  give her.  He was more concerned about her

9  arthritis since they took the biopsy and it didn't

10  show any damage.

11    Q    Again, the doctor you're referring to there

12  is the head of the liver transplant at --

13    A    (Witness nodded affirmatively.)

14        MR. WILLIAMS:  Say yes or no.

15        THE WITNESS:  Yes.

16    Q    (BY MR. YOUNG)  I'll ask you to turn,

17  please, to Young 98.  Have you had a chance to

18  review that?

19    A    Do what?

20    Q    Have you had a chance to review that?

21    A    Okay.

22    Q    Have you seen this document before?

0155

1    A    I probably have.  I don't recall.

2    Q    Do you know where this is from?

3    A    It looks like it's from Dr. Dexeus.

4    Q    Just out of curiosity, what makes you say

5  that?

6    A    This other, all this other information is

7  from Dr. Dexeus.

8    Q    Do you know what this sheet is?

9    A    What?

10    Q    Young 98.

11    A    Young 98, it's giving her medication.

12    Q    Do you know what medication?

13    A    It says Procrit.

14    Q    Do you know what Procrit is?

15    A    No.

16    Q    Do you know what it's used to treat?

17    A    No.

18    Q    Do you know who manufactures Procrit?

19    A    No.

20    Q    Did you receive a bill from Dr. Dexeus for

21  -- have you received any bills from Dr. Dexeus?
22     A   Not that I can think of.
0156
1     Q   Is that because the amounts for these
2  services were paid by Medicare and by your
3  supplemental insurance?
4         MR. WILLIAMS:  Objection to the form of
5  the question, vague and ambiguous, lack of
6  foundation.
7     A   I would say they probably was but I don't
8  know.
9     Q   (BY MR. YOUNG)  Did you produce -- did
10  you provide this document, Young 98, to your
11  attorneys?
12     A   I don't know for sure whether it was in
13  the packet that I received from Dr. Dexeus.  He
14  give me the packet of what was given to Pat in her
15  progression and all this, her files.
16     Q   When did Dr. Dexeus give you this
17  packet?
18     A   I think it was in January or somewhere in
19  there.
20         MR. SWEENEY:  I'm sorry, I couldn't hear
21  that.
22         THE WITNESS:  I think it was in January
0157
1  or February after Pat had passed away.
2         MR. SWEENEY:  Thank you.
3     Q   (BY MR. YOUNG)  Did you request these
4  documents from Dr. Dexeus?
5     A   Yes, I did.
6     Q   Is this also in connection with the legal
7  matter you were contemplating?
8     A   Yes.
9     Q   Mr. Young, what did you do in
10  preparation for this deposition?
11         MR. WILLIAMS:  I'll just advise the
12  witness to exclude from his answer any
13  conversations that he had with counsel.  Go ahead
14  and answer.
15     A   I went over the documents in the
16  Complaint that pertained to me.
17     Q   (BY MR. YOUNG)  Did you meet with your
18  attorneys?
19     A   Yes.
20     Q   Did you meet with Mr. Williams?
21     A   Yes.
22     Q   How often did you meet with Mr.
0158
1  Williams?
2     A   One, yesterday maybe an hour and a half.
3     Q   Have you met with Mr. Williams on any
4  other occasions?
5     A   No.

6    Q   Have you spoken to Mr. Williams on the
7  telephone?
8    A   Yes.
9    Q   How often have you spoken with Mr.
10 Williams on the telephone?
11    A   One time to set up the meeting.
12    Q   How long did that conversation last?
13    A   About two or three minutes or something
14 like that.
15    Q   Did you speak to any other attorneys in
16 preparation for this deposition?
17    A   No.
18    Q   You said you reviewed some documents.
19 Do you recall what documents you reviewed?
20    A   The Complaint.
21    Q   Any others?
22    A   That's about all we went over.
0159
1    Q   I'm sorry, I did not hear you.
2    A   It was mainly just on the Complaint that
3  I've been involved with.
4    Q   We'll switch gears just for a moment.  Do
5  you know how certain, how medical service
6  providers, and by that I mean doctors and
7  hospitals, determine the amount that they're going
8  to charge for their services?
9    A   No.
10    Q   Do you know how medical service
11 providers determine the amount that they are
12 going to charge for a prescription medication?
13    A   I sure don't.
14    Q   Do you know how insurance companies
15 determine the amount they will pay for medical
16 services?
17    A   No.
18    Q   Can you speak up.
19    A   No.
20    Q   Do you know how insurance companies
21 determine the amount they will pay for a
22 prescription medication?
0160
1    A   No.
2    Q   I just want to turn just for a moment to
3  Exhibit Young 006.  What is St. Mary's Regional
4  Medical Center?
5        MR. WILLIAMS:  Are you referring to a
6  page, Counsel, or just asking?
7        MR. YOUNG:  I'm just asking.
8    A   Which one now?
9        MR. WILLIAMS:  He's just asking you
10 about St. Mary's.
11    A   St. Mary's is a hospital.
12    Q   (BY MR. YOUNG)  In Enid?
13    A   In Enid.

14   Q   Is that where Dr. Dexeus -- is Dr. Dexeus
15   affiliated with St. Mary's Hospital?
16       MR. WILLIAMS:  Objection, foundation.
17   A   Not that I know of.
18   Q   (BY MR. YOUNG)  Is Dr. Dexeus affiliated
19   with any hospital that you know of?
20   A   Not that I know of.
21   Q   You said he works out of a clinic?
22   A   Yes, cancer treatment.
0161
1    Q   If you would turn to Page Young 88, do
2    you see at the very top it indicates St. Mary's
3    Regional Medical Center?
4    A   Yes.
5    Q   This Young 88 through Young 90 appears
6    to be a consultation report.  If you look at Page 90
7    there's a space for Dr. Dexeus' signature.  Do you
8    see that?
9    A   Yes.
10       MR. WILLIAMS:  I'll object to the
11   characterization to what the document is.  I'm
12   just making an objection for the record.
13   Q   (BY MR. YOUNG)  Does this indicate that
14   Dr. Dexeus was affiliated with St. Mary's Regional
15   Medical Center?
16       MR. WILLIAMS:  Same objection, the
17   document speaks for itself.
18   A   I don't know.
19   Q   (BY MR. YOUNG)  I beg your pardon?
20   A   I don't know.
21   Q   I think I asked this but just so that I'm
22   clear, do you recall receiving any bills or
0162
1    statements from St. Mary's Regional Medical
2    Center?
3        MR. WILLIAMS:  Same objection,
4    foundation.
5    A   Not that I'm aware of, no.
6    Q   (BY MR. YOUNG)  Did you receive a bill
7    or a statement directly from Dr. Dexeus?
8        MR. WILLIAMS:  Same objection.
9    A   No.
10       MR. SWEENEY:  What was the answer?
11       MR. YOUNG:  No.
12   Q   (BY MR. YOUNG)  Again, I think you
13   testified that you don't recall receiving any bills
14   or statements from Integris Bass Baptist; is that
15   correct?
16   A   No.
17       MR. WILLIAMS:  Same objection.
18   Q   (BY MR. YOUNG)  Mr. Young, I think I
19   have come to the end of my examination.  I don't
20   know if Mr. Sweeney has some questions for you.
21       MR. SWEENEY:  I have a few questions.

22                    CROSS-EXAMINATION
0163
1  BY MR. SWEENEY:
2     Q   Could I please ask the witness to speak
3  up because the last couple minutes I've had a lot
4  of trouble hearing it.
5         What was Dr. Dexeus treating your wife
6  for?
7     A   Lymphoma.
8     Q   And did he prescribe some chemotherapy
9  drugs to her?
10    A   Yes.
11    Q   And did he send you any bills for those
12  drugs?
13         MR. WILLIAMS:  Object as asked and
14  answered.
15    A   I'm not aware of it, no.
16    Q   (BY MR. SWEENEY)  So just to make it
17  clear, you made no payments to Dr. Dexeus for the
18  treatment that he gave your wife for lymphoma?
19         MR. WILLIAMS:  I'll object that it
20  misstates his testimony.  It lacks foundation.
21    Q   (BY MR. SWEENEY)  You can answer, sir.
22    A   Repeat that.
0164
1     Q   Is it true that you made no payments to
2  Dr. Dexeus for the treatment that he gave your
3  wife for lymphoma?
4         MR. WILLIAMS:  You have my objections.
5     A   Not that I'm aware of.
6     Q   (BY MR. SWEENEY)  So it is true that you
7  made no payments?
8         MR. WILLIAMS:  Same objections.
9     A   I don't remember.
10    Q   (BY MR. SWEENEY)  You don't remember
11  making any payments?
12    A   No.
13    Q   Now, could the witness be shown Exhibit
14  Young 006, please.
15    A   What page?
16    Q   Would you look, sir, at the beginning of
17  Page 0099 and look at Page 100 and Page 101 and
18  tell me, sir, whether you know where those
19  documents came from, any of those pages?
20         MR. WILLIAMS:  Do you know where they
21  came from?
22    A   These come from Dr. Dexeus' office.
0165
1     Q   (BY MR. SWEENEY)  So these are part of
2  the documents that you received from Dr. Dexeus
3  in January or February of 2005?
4     A   Right.
5     Q   If you would look on Page 99.  Hello?
6     A   Yes.

7    Q   I'm sorry.  Further down the page there
8  are some numbers on the left, 1 through 14.  If
9  you look at No. 10, that refers to cytoxan?
10    A   Yes.
11    Q   I believe that indicates that your wife was
12  given cytoxan by Dr. Dexeus.  Were you aware of
13  that, that he prescribed cytoxan to your wife?
14    A   I don't know all the medication that she
15  was being given.
16    Q   Do you know whether you ever made any
17  payments for the cytoxan that was prescribed to
18  your wife?
19       MR. WILLIAMS:  Same objections as
20  before, foundation.
21    A   I didn't actually pay any.  My insurance
22  did, and that's part of my benefits which --
0166
1    Q   (BY MR. SWEENEY)  Did they pay the full
2  amount that was due to Dr. Dexeus?
3       MR. WILLIAMS:  Same objections,
4  foundation.
5    A   I believe what Medicare Part B didn't
6  cover my supplemental did.
7    Q   (BY MR. SWEENEY)  Thank you, sir.
8       Do you believe that any of your wife's
9  medical providers prescribed drugs to her based
10  on any conversation other than her best medical
11  interest?
12       MR. WILLIAMS:  I'll object.  It calls for
13  speculation, lack of foundation.
14    A   I would hope not.
15    Q   (BY MR. SWEENEY)  Do you think they
16  did, sir?
17       MR. WILLIAMS:  Same objection.
18    A   I don't think they did.
19    Q   (BY MR. SWEENEY)  Thank you, sir.  One
20  final topic.  If the witness could be shown the
21  Complaint, Exhibit Young 001, Paragraph 19.
22       On Page 9 I'd like you to look at the
0167
1  second to the last sentence in Paragraph 19 which
2  reads, "Although Mrs. Young had supplemental
3  insurance coverage, the coverage required her to
4  make percentage co-payments."
5       Is it true, sir, that your wife was required
6  to make a percentage co-payment under her
7  supplemental insurance?
8    A   She had a deductible she had to pay for.
9    Q   Other than the deductible, did she have
10  to also make percentage co-payments?
11       MR. WILLIAMS:  I'll object to the form of
12  the question.  It's vague and ambiguous.
13    A   Repeat.
14       (Whereupon the court reporter read back

15  the question.)
16        MR. WILLIAMS:  Other than the
17  deductible.
18      A   Not that I'm aware of, no.
19        MR. WILLIAMS:  Did you get that,
20  Counsel?
21        MR. SWEENEY:  "Not that I'm aware of"
22  he said?
0168
1         MR. WILLIAMS:  Yes.
2         MR. SWEENEY:  Thank you.  That's all
3   the questions I have.  Thank you very much, sir.
4         THE WITNESS:  Thank you.
5         MR. YOUNG:  Any questions?
6         MR. WILLIAMS:  No, I do not.
7         MR. YOUNG:  The only thing I'd like to
8   say is you testified earlier about a booklet of
9   benefits you received from I think it's United
10  Healthcare that had updates, and I would just
11  request that document, those documents be
12  produced to us.
13        MR. WILLIAMS:  We'll take that under
14  advisement along with the other requests you
15  made.
16        MR. YOUNG:  And we reserve the right to
17  continue the deposition at such time as Mr. Young
18  produces the documents in accordance with the
19  court's order.
20        MR. WILLIAMS:  That's your position.
21  Our position is that the deposition -- unless you
22  have further questions.  Do you have further
0169
1   questions?
2         MR. YOUNG:  I do not have any further
3   questions at this time.
4         MR. WILLIAMS:  Our position is that the
5   deposition of Mr. Young is concluded and we will
6   read and sign.
7         (DEPOSITION ADJOURNED AT 4:07 P.M.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

0170
1          I, LARRY YOUNG, do hereby state under
2    oath that I have read the above and foregoing
3    deposition in its entirety and that the same is a
4    full, true and correct transcription of my
5    testimony so given at said time and place.
6
7
8          _____
9          Signature of Witness
10
11
12         Subscribed and sworn to before me, the
13   undersigned Notary Public in and for the State of
14   Oklahoma by said witness, on this _____ day of
15   _____, 2005.
16
17
18         _____
19         NOTARY PUBLIC
20         MY COMMISSION EXPIRES:
21
22
0171
1                 CERTIFICATE
2    STATE OF OKLAHOMA   )
3                     ) SS:
4    COUNTY OF OKLAHOMA   )
5
6          I, Jane McConnell, Certified Shorthand
7    Reporter within and for the State of Oklahoma, do
8    hereby certify that the above-named LARRY YOUNG
9    was by me first duly sworn to testify the truth,
10   the whole truth, and nothing but the truth, in the
11   case aforesaid; that the above and foregoing
12   deposition was by me taken in shorthand and
13   thereafter transcribed; and that I am not an
14   attorney for nor relative of any of said parties or
15   otherwise interested in the event of said action.
16         IN WITNESS WHEREOF, I have hereunto
17   set my hand and official seal this 16th day of
18   November, 2005.
19
20
21         _____
22         Jane McConnell, CSR RPR RMR CRR