0172
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3                  * * * * *
4    ----------------------------x
5    IN RE PHARMACEUTICAL INDUSTRY )
6    AVERAGE WHOLESALE PRICE      ) MDL NO. 1456
7    LITIGATION                   ) CIVIL ACTION:
8    ----------------------------) 01-CV-12257-PBS
9    THIS DOCUMENT RELATES TO     ) Judge Patti B. Saris
10   ALL CLASS ACTIONS            )
11   ----------------------------x
12                 * * * * *
13
14         DEPOSITION OF LARRY LYNN YOUNG
15       TAKEN ON BEHALF OF THE DEFENDANTS
16    ON MARCH 24, 2006, BEGINNING AT 10:40 A.M.
17            IN OKLAHOMA CITY, OKLAHOMA
18                  VOLUME II
19
20                 * * * * *
21
22       REPORTED BY:  LAURA L. ROBERTSON, CSR, RPR
0173
1    APPEARANCES:
2
3        MR. J. RYAN MITCHELL, ESQ.
4        Jones Day
5        77 West Wacker
6        Chicago, Illinois 60601-1692
7          Appearing on behalf of the
8          DEFENDANT-ABBOTT LABORATORIES
9
10       MR. DANIEL Z. HERBST, ESQ.
11       MR. ANDREW C. BERNASCONI, ESQ.
12       Reed Smith
13       1301 K Street, N.W.
14       Suite 1100, East Tower
15       Washington, D.C. 20005
16         Appearing on behalf of the
17         DEFENDANT-FUJISAWA HEALTHCARE, INC.
18         and FUJISAWA USA, INC
19
20     (CONTINUED)
21
22
0174
1    APPEARANCES:  (CONTINUED)
2
3        MR. NICHOLAS P. MIZELL, ESQ.
4        MS. PAMELA MACER, ESQ.
5        Shook, Hardy & Bacon LLP
6        2555 Grand Boulevard

```
 7     Kansas City, Missouri 64108-2613
 8       Appearing on behalf of the
 9       DEFENDANT-AVENTIS
10
11     MR. WILLIAM J. MOLINARI, III, ESQ.
12     Kline & Specter, PC
13     The Nineteenth Floor
14     1525 Locust Street
15     Philadelphia, Pennsylvania 19102
16        Appearing on behalf of the PLAINTIFFS
17
18     MR. ADAM S. LEVY, ESQ.
19     The Law Office of Adam S. Levy
20     P.O. Box 88
21     Oreland, Pennsylvania 19075
22        Appearing on behalf of the PLAINTIFFS
0175
 1   APPEARANCES:   (CONTINUED)
 2
 3     MR. PRESTON PUGH, ESQ.
 4     Sonnenschein Nath & Rosenthal LLP
 5     7800 Sears Tower
 6     233 South Wacker Drive
 7     Chicago, Illinois 60606-6404
 8        Appearing on behalf of the DEFENDANT-SICOR
 9
10     MR. KEVIN McCULLOCH, ESQ.
11     Morgan, Lewis & Bockius
12     1701 Market Street
13     Philadelphia, Pennsylvania 19003
14       Appearing on behalf of the
15       DEFENDANT-PHIZER-PHARMACIA
16
17     MS. KELLEEN MCGINNIS SCOTT, ESQ.
18     Hogan & Hartson LLP
19     555 Thirteenth Street, NW
20     Washington, DC 20004
21        Appearing on behalf of the DEFENDANT-AMGEN
22   (CONTINUED)
0176
 1   APPEARANCES:   (CONTINUED)
 2
 3     MR. NIRAJ PAREKH, ESQ.
 4     Patterson Belknap Webb & Tyler LLP
 5     1133 Avenue of the Americas
 6     New York, New York 10036
 7       Appearing on behalf of the
 8       DEFENDANTS-JOHNSON & JOHNSON
 9
10     MR. DOUGLAS FARQUHAR, ESQ.
11     Hyman, Phelps & McNamara, PC
12     700 Thirteenth Street, NW
13     Suite 1200
14     Washington, D.C. 20005
```

15      Appearing on behalf of the
16      DEFENDANTS-WATSON PHARMACEUTICALS
17
18      MR. JASON M. BRUNO, ESQ.
19      Dickstein Shapiro Morin & Oshinsky LLP
20      2101 L Street, NW
21      Washington, D.C. 20037-1526
22      Appearing on behalf of the DEFENDANT-BAXTER
0177
1                I N D E X
2
3   WITNESS:  LARRY LYNN YOUNG                    PAGE
4   Direct-examination by Mr. Mitchell............. 181
5   Cross-examination by Mr. Bernasconi........... 250
6   Cross-examination by Mr. Mizell............... 252
7   Cross-examination by Mr. Farquhar............. 268
8   Cross-examination by Mr. Bruno................ 269
9   Cross-examination by Ms. Scott................ 277
10  Cross-examination by Mr. Pugh................. 280
11  Cross-examination by Mr. McCulloch............ 282
12  Redirect-examination by Mr. Mitchell.......... 284
13
14              E X H I B I T S
15  NUMBER          DESCRIPTION          PAGE
16  Exhibit Young 005, (Previously marked) YOUNG 0106
17              to YOUNG 0205................ 274
18  Exhibit Young 006, (Previously marked) YOUNG 0070
19              to YOUNG 0105................ 227
20  Exhibit Young 007, Signature page and errata from
21              11/09/2005 deposition of
22              Larry Young.................. 186
0178
1       E X H I B I T S  (CONTINUED)
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Young 008, YOUNG 0238 TO YOUNG 0244...... 197
4   Exhibit Young 009, YOUNG 0245 TO YOUNG 0248...... 198
5   Exhibit Young 010, YOUNG 0249 TO YOUNG 0252...... 199
6   Exhibit Young 011, YOUNG 0253 TO YOUNG 0316...... 202
7   Exhibit Young 012, Fourth Amended Master
8               Consolidated Class Action
9               Complaint, Unredacted Version. 209
10  Exhibit Young 013, YOUNG 0206 TO YOUNG 0208...... 237
11  Exhibit Young 014, YOUNG 0471 TO YOUNG 0486...... 256
12  Exhibit Young 015, YOUNG 0012 TO YOUNG 0013...... 261
13  Exhibit Young 016, YOUNG 0470................... 263
14  Exhibit Young 017, [Proposed] Consolidated Order
15               Re: Motion for Class
16               Certification Track 2
17               [Version 1].................. 264
18  Exhibit Young 018, YOUNG 0209 TO YOUNG 0211...... 270
19  Exhibit Young 019, YOUNG 0439 TO YOUNG 0440...... 272
20
21
22

0179
1           P R O C E E D I N G S
2 WHEREUPON,
3           LARRY LYNN YOUNG
4 after having been first duly sworn, deposes and says
5 in reply to the questions propounded as follows, to-
6 wit:
7           MR. MITCHELL:  Good morning, Mr. Young, I
8 introduced myself before, but I will just do it
9 again for the record.  My name is Ryan Mitchell, I
10 represent Abbott Laboratories.
11           And before we start, why don't we just get
12 kind of a roll call of everyone who is here.  Why
13 don't we start with plaintiff's counsel.
14           MR. LEVY:  Here for the plaintiff as Adam
15 Levy.
16           MR. MOLINARI:  Bill Molinari, also for the
17 plaintiff.
18           MR. LEVY:  Plaintiff and the Class.
19           MR. MACER:  Pamela Macer, on behalf of
20 Aventis.
21           MR. MIZELL:  Nicholas Mizell, Shook, Hardy
22 & Bacon, on behalf of Aventis.
0180
1           MR. HERBST:  Dan Herbst, on behalf of
2 Fujisawa.
3           MR. MIZELL:  Andrew Bernasconi, on behalf
4 of Fujisawa as well.
5           MR. MITCHELL:  And for those of you on the
6 phone, why don't you make your appearance.
7           MR. PUGH:  Preston Pugh, at Sonnenschein,
8 Nath & Rosenthal, for Sicor.
9           MR. MITCHELL:  Hold on for just one
10 second, guys. The court reporter is having a hard
11 time hearing.
12           MR. McCULLOCH:  Kevin McCulloch, M-c-C-u-
13 l-l-o-c-h at Morgan Lewis & Bockius, for Pfiser
14 Pharmacia.
15           MR. PAREKH:  And Niraj Parekh, N-i-r-a-j
16 P-a-r-e-k-h from Patterson, Belknap, Webb & Tyler,
17 for Johnson and Johnson.
18           MS. SCOTT:  This is Kelleen Scott from
19 Hogan and Hartson, on behalf of Amgen.
20           MR. FARQUHAR:  This is Douglas Farquhar,
21 F-a-r-q-u-h-a-r, from Hyman, Phleps and McNamara,
22 representing Watson Pharmaceutical.
0181
1           MR. BRUNO:  This is Jason Bruno, from
2 Dickstein, Shapiro, Morin & Orinsky, representing
3 Baxter.
4           MR. MITCHELL: All right, I think that's
5 it.  If you guys on the phone have any problems
6 hearing us, just let us know and we will try to
7 speak up.

8      Also, why don't we have this marked as
9  Highly Confidential.
10      MR. LEVY:  That's my agreement, and that's
11  fine.
12           * * * * * * *
13         DIRECT-EXAMINATION
14  BY MR. MITCHELL:
15    Q.  Mr. Young, will you please state your full
16  name for the record?
17    A.  Larry Lynn Young.
18    Q.  And I know you were deposed in this matter
19  last November, other than that deposition, have you
20  ever been deposed before?
21    A.  No.
22      MR. LEVY:  I would like to just make a
0182
1  comment real quickly for the record, since you
2  brought the topic up.
3        Everybody here knows, or should know that
4  Mr. Young spoke on behalf of his wife's estate
5  previously, and that the court has already found the
6  estate to be an adequate Class representative with
7  respect to Remicade the Track 1 case.
8        We have made some -- through
9  correspondence, we have made our position clear
10  through co-lead counsel, Don Haviland's firm, Kline
11  & Specter, that this is not a redeposition. We are
12  not going to permit questioning on topics that were
13  already covered, or could have been covered by
14  counsel during that first deposition.
15        Of course, we are free to talk about
16  additional medication, in particular, the
17  Solucortef, but this is not a redeposition by the
18  plaintiffs' point of view, and we are not going to
19  allow an open field to go over topics that have
20  already been gone over, which includes the Rule 23
21  issues that have already been covered with this
22  gentleman, and obviously the issues relating to the
0183
1  other drugs that have been covered.
2      MR. MITCHELL:  My position would be, and I
3  don't know if it is different from the other
4  defendants, that I'm not planning on retreading all
5  of the old ground that you covered in your first
6  deposition.  That was a Track 1 deposition, we are
7  all Track 2 defendants.  If not present at the first
8  deposition, we reserved our rights to take this
9  deposition and be here.
10        While my goal is not to, you know, ask the
11  same questions that were asked last time, that I
12  think were adequately covered, I am planning on
13  asking, I know there is a new complaint, there is a
14  lot of Track 2 drugs that were maybe not relevant
15  for all of the Track 1 plaintiffs that may be

16   relevant to us, but, you know, to the extent I can,
17   I'm not going to try to ask the same questions that
18   were asked last time, and I guess if we run into
19   objections, we will deal with them.
20        MR. LEVY:  That's fine, and I understand
21   your position.  Just one item with respect to having
22   reserved your right to appear at the other
0184
1   deposition, and this doesn't sound like it is going
2   to be a major issue since you don't plan to retread
3   over issues.
4        But to the extent that someone didn't
5   appear, my understanding is that all of the defense
6   counsel, including Track 2 representatives, had been
7   noticed and had an opportunity to attend and
8   participated in those depositions, to the extent
9   they wished.
10        So anybody who didn't isn't going to get a
11   second bite at the apple today, based on the ground
12   that they didn't attend the first deposition.
13   That's the plaintiff's position.
14        MR. MITCHELL:  All right, let's move on
15   and see how it goes.
16   Q.   (BY MR. MITCHELL) Just a couple of ground
17   rules before I go.  You understand you're under
18   oath, just like if you were before a court or a
19   judge?
20   A.   Yes.
21   Q.   You know, we have got a court reporter
22   here, so in common everyday, you know,
0185
1   conversations, you will see where I'm going with my
2   question before I'm done, and, you know, if we can
3   just wait to make sure that I'm finished with my
4   question, and also if you will make sure that I'm,
5   you know, wait until you're done with your answer,
6   that way we can get down a clean record.
7        Also, I see you're nodding your head right
8   now, make sure our answers are verbal so we get them
9   down, a record.  I would hate for a nod or a shake
10   to be guessed wrong against you.  If you need a
11   break at any time, just let me know.
12   A.   Okay.
13   Q.   If you don't understand my question, just
14   let me know and I will try to make it so we both
15   understand.
16   A.   Thank you.
17   Q.   Are you currently on any medications that
18   would in any way affect your ability to testify here
19   today, affect your memory?
20   A.   No.
21        MR. MITCHELL:  Can we have this marked,
22   and should we just start with Exhibit Young 007?
0186

1          MR. LEVY:  Is that where --
2          MR. MITCHELL:  We ended with Exhibit Young
3  006, that way it seems to make sense to me just to
4  keep going with the exhibit numbers, or do you want
5  to start all over on 1?
6          MR. LEVY:  I guess I have no preference.
7          MR. MITCHELL:  Why don't we start with
8  Exhibit Young 007, just so we are not -- there is
9  not two Young 1 depositions.
10          (Exhibit Young 007 marked for
11  identification)
12     Q.  (BY MR. MITCHELL) Mr. Young, I have handed
13  you what's been marked as Exhibit Young 007, do you
14  recognize this document?
15     A.  Yes.
16     Q.  Could you tell me what this is?
17     A.  This is corrections in the first
18  deposition.
19     Q.  And on the first page of Exhibit Young
20  007, is that your signature?
21     A.  Yes.
22     Q.  And the second page, with the date of 12-
0187
1  9-2005, is that your handwriting?
2     A.  Yes.
3     Q.  So this is from your first deposition, you
4  actually reviewed it?
5     A.  And corrected it.
6     Q.  And made corrections for any inaccuracies?
7     A.  Yes.
8     Q.  Now, let's talk just a minute about your
9  preparation for this deposition.  Tell me what you
10  did to prepare for this deposition.
11     A.  I just went over the complaint that I had
12  received on the new information, putting the two
13  different categories of clients.
14     Q.  Could you explain that.  What do you mean
15  the two different categories of clients?
16     A.  Well, the Class -- or the Group 1, and
17  then you all are Group 2.
18     Q.  Okay.
19     A.  It was new information that was sent to me
20  here the first of the month.
21     Q.  Was it a new complaint?
22     A.  No.
0188
1     Q.  What was sent to you at the first of the
2  month?
3     A.  It was the -- the way the new setup of the
4  different drug companies, which one was in Group 1,
5  Group 2s, and the complaint stayed the same.
6     Q.  Was it a sheet that someone had prepared
7  for you saying who was the Group 1 -- was it a
8  document that someone had prepared for you, saying

9    who was the Track 1 defendants and who were the
10   Track 2 defendants?
11         MR. LEVY:  Objection.
12         THE WITNESS:  No.  As far as I could tell,
13   it was the same as the information I had before.
14     Q.  (BY MR. MITCHELL)  Okay.  Did you speak
15   with your attorneys in preparing for today's
16   deposition?
17     A.  I set up dates --
18         MR. LEVY:  Don't tell him what you talked
19   about. His question was whether you spoke with your
20   attorneys.
21         THE WITNESS:  Yes.
22     Q.  (BY MR. MITCHELL) How many times?
0189
1      A.  I think twice.
2      Q.  Do you recall when the first time was?
3      A.  Here about a week ago.
4      Q.  How long did you speak with them the first
5    time?
6      A.  Oh, maybe a couple minutes.
7      Q.  Did you talk about or go over any
8    documents at that time?
9      A.  No.
10     Q.  When was the second time you spoke with
11   your attorneys?
12     A.  Here this week.
13     Q.  Was that in person or by phone?
14     A.  By phone.
15     Q.  How long did that last?
16         Probably not more than, I don't know, 10,
17   15 minutes or less.
18     Q.  Did you go over any documents?
19     A.  No.
20     Q.  Did you do anything else to prepare for
21   today's deposition?
22     A.  Just looked over the complaint of my wife,
0190
1    which was -- that was it.
2      Q.  The complaint of your wife, the one you
3    looked over, do you know if it was the third amended
4    complaint, or if it was the fourth amended
5    complaint?
6      A.  I don't know for sure which one you mean.
7      Q.  Was it the same -- did you review the same
8    complaint that you reviewed prior to your first
9    deposition, or was it a different one?
10     A.  It was the new documents that was sent to
11   me, and to me it read the same.
12     Q.  Okay.  What is your current address?
13     A.  1717 East Maple, Enid, Oklahoma.
14     Q.  And what is your date of birth?
15     A.  3-22-1942.
16     Q.  And are you still retired?

17    A.  Yes.

18    Q.  Now, in your first deposition, you said

19  you were doing some work for your son?

20    A.  Yes.

21    Q.  Are you still doing that?

22    A.  No.

0191

1    Q.  Have you been a party to any other

2  lawsuits?

3    A.  No.

4        MR. LEVY:  Objection, asked and answered.

5    Q.  (BY MR. MITCHELL)  Was your wife?

6        MR. LEVY:  Objection, asked and answered.

7        THE WITNESS:  Do what?

8        MR. LEVY:  You can answer the question. If

9  you don't remember, have him rephrase it for you.

10    Q.  (BY MR. MITCHELL)  Do you know if your wife

11  was ever a party to any lawsuit, other than this

12  one?

13    A.  It would have had to have been before I

14  ever met her.  I don't know that she was.

15    Q.  What is your wife's Social Security

16  number?

17        MR. LEVY:  Objection, don't provide that

18  information.

19        MR. MITCHELL:  Counsel, maybe we can work

20  it out this way.  In trying to get some medical

21  records and billing from United Healthcare, they

22  have told us that they need that information.

0192

1        MR. LEVY:  Okay.

2        MR. MITCHELL:  If you guys are willing to

3  provide that to them, I don't care if you don't

4  provide it to us, but as long as we can work out

5  that you send it to them.

6        MR. LEVY:  Here is how we will handle

7  that.  That's a decision that's made by co-lead

8  counsel, Klein & Specter, so if you could present

9  that to them in a letter, they will take care of

10  that for you, and however they decide to resolve it.

11        MR. MITCHELL:  All right, fair enough.

12    Q.  (BY MR. MITCHELL)  Now, I just want to make

13  sure, without really going into it, I just want to

14  make sure I understand your testimony about your

15  wife's health insurance coverage.

16        My understanding from your testimony is

17  that after your wife had her stroke, in

18  approximately 1993 -- let me just go back.  I just

19  want to confirm that I understand your understanding

20  of your wife's health insurance.

21        After your wife had her stroke in '93 that

22  she received Medicare.

0193

1        MR. LEVY:  Counsel, this question has

2   already been covered.
3       MR. MITCHELL:  I'm not trying to cover it,
4   I'm just trying to make sure I understand what his
5   testimony was, because my understanding, it was kind
6   of -- I don't know if he was sure about it.
7       MR. LEVY:  Counselor, I will give you a
8   little leeway here, but frankly all of the questions
9   out of the gate so far are ones that were within the
10  rubric of the first deposition.
11      MR. MITCHELL:  I disagree with that.
12      MR. LEVY:  So far we are rehashing old
13  ground.  So you're using up your hours in your
14  quiver, as far as I'm concerned, but I will let him
15  answer the question.
16      MR. MITCHELL:  That's fine, go ahead.
17      THE WITNESS:  Restate the question.
18      Q.  (BY MR. MITCHELL)  Your wife had Medicare
19  after '93 when she had her stroke?
20      A.  No, it was after -- after she had her
21  stroke, it was a -- a year she was on disability
22  with the phone company, and then they approved her
0194
1   for disability to get Medicare.
2       Q.  And so after she had Medicare, she had
3   Medicare, and then she had the company-sponsored
4   supplemental --
5       A.  Right.
6       Q.  -- plan through United?
7       A.  Yes.
8       Q.  And my understanding of your testimony was
9   that with the supplemental, the only thing that you
10  or your wife had to pay on that, was the yearly
11  deductible of approximately $1500?
12      A.  Yes.
13      Q.  And 20 dollar, or up to 40 dollar co-pays
14  for prescription insurance that you mail ordered?
15      A.  Yes.
16      Q.  But no other co-pays or percentage pays?
17      MR. LEVY:  Objection, asked and answered.
18      Q.  (BY MR. MITCHELL) Right?
19      MR. LEVY:  I'm going to have a continuing
20  objection for all of these questions as asked and
21  answered.
22      THE WITNESS:  As far as I know, no, they
0195
1   don't. That's it.
2       Q.  (BY MR. MITCHELL) Did you or your wife
3   ever challenge Medicare or your providers for their
4   charges for physician-administered drugs?
5       A.  No.
6       Q.  Did you, or did your wife to your
7   knowledge, ever talk to any of her doctors or
8   providers about the charges they made for
9   prescription drugs?

10       MR. LEVY:  Objection.  Counsel, you need
11   to move on.
12       MR. MITCHELL:  I don't think that was ever
13   asked.
14       MR. LEVY:  This was an area that was
15   already covered in his deposition, and I'm not going
16   to permit you to continue asking questions that have
17   been covered or could have been covered.  This all
18   goes to -- if it is going to the adequacy, he's
19   already been considered a Class representative.
20       If you want to ask questions about your
21   drug for your client that brings him here
22   specifically based on that type of information, or
0196
1   information that's arising after, that could have
2   arisen after the first deposition of this client,
3   you're free to do that.  But I'm going to draw the
4   line right here, we need to move on.
5       MR. MITCHELL:  I disagree with that
6   completely.  Any question could have been answered.
7   I'm -- I don't think that question was asked.  I
8   think it is perfectly appropriate.  Nobody in this
9   room was here at the first deposition.  I understand
10   your position, but I'm going to ask the questions.
11   If you want to object, that's fine.
12       MR. LEVY:  I'm glad you clarified your
13   position, because now I understand exactly what it
14   is you're doing, and it is exactly what we are not
15   going to allow.
16       Your co-counsel in the case took the
17   deposition, you had an opportunity to be there.  You
18   don't like your co-counsel's, the fact of your co-
19   counsel didn't ask the questions you wanted, frankly
20   that's something you need to raise with somebody
21   else, but not here, it is not our problem.
22       My understanding is there are no motions
0197
1   that have been filed to repave over old ground that
2   could have been covered, we are not going to do it
3   here, and you need to move on, he's not going to
4   answer the question.
5       Move on to something relevant to this
6   deposition.
7       MR. MITCHELL:  Are you going to follow
8   your counsel's advice and not answer these
9   questions?
10       THE WITNESS:  Yes.
11       (Exhibit Young 008 marked for
12   identification)
13   Q.   (BY MR. MITCHELL) Mr. Young, I'm handing
14   you what has been marked Exhibit Young 008. Do you
15   recognize this?
16   A.   Yes, it is a benefit update that we
17   usually get from our company on different programs

18   that we have, and this is one of them.
19      Q.   And just for the record, this is Bates
20   Stamped 0238 through 0244; is that right?  Just look
21   at the bottom. I just want to make sure you have got
22   the same document I've got.
0198
1      A.   Where is it at?  Oh, okay.
2           MR. LEVY:  Mr. Young, you take the time
3   necessary to look at this document, so that you feel
4   comfortable, because he's going to ask you questions
5   from it; okay?
6           THE WITNESS:  Okay.
7           MR. MITCHELL:  And I'm just going to ask
8   you a couple, but take your time.
9           MR. LEVY:  This is exhibit what?
10          MR. MITCHELL:  Exhibit Young 008.
11          THE WITNESS:  Go ahead, and if I have a
12   question, I'll --
13      Q.   (BY MR. MITCHELL) Now, Mr. Young, is
14   Exhibit Young 008, is the CarePlus Program, is that
15   the MedicalPlus coverage you were referring to in
16   your first deposition?
17      A.   Yes.
18           (Exhibit Young 009 marked for
19   identification)
20      Q.   Okay.  I just wanted to make sure of that.
21   Mr. Young, I'm handing you what's been marked as
22   Exhibit Young 009.  Do you recognize this document?
0199
1      A.   I believe this is the -- part of the
2   benefits out of our benefit book.
3      Q.   Just for the record, this is Young 0245
4   through Young 0248.  You said this is part of it out
5   of the benefit book.  Do you know -- do you have a
6   copy of the rest of your benefit book?
7      A.   Yes, but -- yes.
8      Q.   Have you produced all of --
9      A.   Yes.
10      Q.   -- that information to your counsel?  And
11   I have got a little bit more, and maybe we will go
12   through and make sure it is the entire thing.
13           But if you will look on the second page,
14   which is Young 0246, down in the bottom right-hand
15   corner there is a date of 7-96.
16      A.   Yes.
17      Q.   Do you know if Exhibit Young 009 is still
18   in affect, or if it has been replaced by any
19   subsequent iterations?
20      A.   The documents I give is up to date.
21           (Exhibit Young 010 marked for
22   identification)
0200
1      Q.   Mr. Young, I'm handing you what's been
2   marked as Exhibit Young 010, Young 0249 through

3   0252. Do you recognize this document?

4       A.  Yes.

5       Q.  What is it?

6       A.  It is also part of the benefit information

7   that was -- comes with the benefit booklet that we

8   have.

9       Q.  Now, if you will look at the very first

10  page, the paragraph says, "This summary of material

11  modifications is an update to the summary plan

12  description for the SBC medical and group life

13  insurance plan."

14          Do you have a copy of that summary plan

15  description?

16      A.  I have given all of the information that I

17  have got to my attorneys.

18      Q.  Okay.

19          MR. MITCHELL:  Counsel, we don't have a

20  copy of the summary plan description.  We have got

21  copies of the -- these material modifications, a

22  couple of them, but I assume you guys have produced

0201

1   to us everything that he produced to you.

2           MR. LEVY:  I can't speak to that, since

3   I'm personally not involved in the discovery

4   process.  If you have a question that you would like

5   to raise -- this will get old, but if you have a

6   question you want to raise because you have a

7   thought in your mind about something, you're going

8   to need to direct that, I would say by way of

9   correspondence, to Klein & Specter.

10          I'm not trying to be an obstructionist, I

11  simply do not know.

12          MR. MITCHELL:  I got it.

13      Q.   (BY MR. MITCHELL) Mr. Young, take a look

14  at the last page, which is Young 0252.  You will

15  notice these black boxes.  Do you recall, from

16  looking at these plans, if that's how they appear in

17  the original you have got, or if there was, you

18  know, typewritten information in these black boxes?

19  I was trying to figure out if the copy we have is

20  legible, or if we just didn't get a good copy.

21          I mean, these ones appear to be black.

22  There will be a couple later that appear to have

0202

1   typewriting on them.

2           MR. LEVY:  So what is your question, I'm

3   sorry?

4           MR. MITCHELL:  I'm trying to figure out if

5   these copies -- if we just have bad copies.

6           MR. LEVY:  Does he know whether there was

7   writing in here that cannot be seen in this copy?

8           MR. MITCHELL:  Yes, from his recollection

9   of having the original plans.

10          MR. LEVY:  Simply whether you know or not.

11        THE WITNESS:  I'm not for sure.  I would
12  have to look back at the original copies.
13        Q.  (BY MR. MITCHELL) Okay.
14        A.  The original book, you know.  These is
15  updates to the main benefit book.
16            (Exhibit Young 011 marked for
17  identification)
18        Q.  Mr. Young, I'm handing you what has been
19  marked as Exhibit Young 011, it is Young 0253
20  through 316.  Do you recognize this document?
21        A.  Yes.
22        Q.  What is it?
0203
1         A.  This is part of the benefit book and
2   appendix, you know, the add to.
3         Q.  Now, other than the three exhibits we have
4   just looked at, Exhibit Young 009, Exhibit Young 010
5   and Exhibit Young 011, do you have in your
6   possession any other SBC medical and group life
7   insurance documents?
8         A.  I have sent everything to them.
9         Q.  And I guess my question is, is what you
10  sent to them, does it appear to be any different
11  than these three exhibits, with regard to your
12  medical plan documents?
13        A.  Do you mean as far as looks?
14        Q.  Yes.  As far as looks or, boy, I think I
15  may have sent them more than this?
16        A.  I sent them -- I have sent them
17  everything, and as far as, you know, this blacking
18  out, I don't -- you know.
19        Q.  Okay.  Now, turn to Young 0255, if you
20  will.  Now, this chart appears to reference certain
21  employee or retiree groups.  Do you know which group
22  your wife fell into?
0204
1         MR. LEVY:  Objection.
2         THE WITNESS:  Would be this Retired-Core,
3   I think, CWA.
4         Q.  (BY MR. MITCHELL) Okay.  Is that the same
5   group you're in, or do you know if you're in a
6   different group?
7         A.  I'm in the same group, yes.
8         Q.  Okay.  Now, if you will turn to page Young
9   0278.
10        MR. LEVY:  278?
11        MR. MITCHELL:  Yes.
12        Q.  (BY MR. MITCHELL) Again, I guess I will
13  have to raise this with counsel, but it appears in
14  those black boxes that there is typewritten words
15  that are not legible in the copy that I have.
16        MR. LEVY:  I would agree that that is
17  true, and to the extent that hinders the witness's
18  ability to understand it, as it might hinder your

19  ability to understand it, we will make that
20  objection, but I understand your concern.
21      Q.  (BY MR. MITCHELL) And if you look, if you
22  look at Young 278, which is page 8 of 13, and the
0205
1  next page, which is Young 279, which is 10 of 13, do
2  you know where page 9 of 13 is?
3      A.  No.  Everything was sent to them.
4      Q.  I'm sure it was just copying.  Do you know
5  if on your United Healthcare plan if there were a
6  difference in charges between in-network and out-of-
7  network providers?
8      A.  Yes.
9      Q.  There was a difference?
10     A.  Yes.
11     Q.  Do you know what that difference was?
12     A.  As far as me and my wife, we were non-
13  network.  We were in a town that didn't have, like
14  an HMO, or that type of deal.  They get better
15  benefits, as far as I'm concerned, than a non-
16  network, you know the network does.
17     Q.  If you're in network, you get better
18  benefits?
19     A.  Yes, I mean, you pay less.
20     Q.  And does non -- you said you and your wife
21  were non-network.  Now, does non-network, in-
22  network, does that refer to the providers you see,
0206
1  or does that actually refer to you and your wife?
2      MR. LEVY:  Objection.
3      THE WITNESS:  Non-network is an area that
4  the employees are in.  Like if they are in the
5  network, they are in a bigger town usually, and non-
6  networks are in a smaller town, as far as I know.
7      Q.  (BY MR. MITCHELL) When you came in to
8  Oklahoma City to see, like at Bass Baptist Hospital,
9  where I know your wife stayed, do you know, was that
10  an in-network provider or was that an out-of-network
11  provider for your wife?
12     MR. LEVY:  Objection.
13     THE WITNESS:  I don't know for sure.
14     Q.  (BY MR. MITCHELL) How about with Dr.
15  Dexeus, do you know if he was an in-network provider
16  for United or out-of-network?
17     A.  He was a non-network.
18     Q.  He was non-network?
19     A.  Yes.
20     Q.  How about the Oklahoma Arthritis Center,
21  was that in-network or out-of-network?
22     MR. LEVY:  Objection.
0207
1      THE WITNESS:  That I'm not for sure.  I
2  just don't know for sure.
3      Q.  (BY MR. MITCHELL) How about the McBride

4  Clinic, do you know if that was in-network or out-
5  of-network?
6      MR. LEVY:  Objection.
7      THE WITNESS:  I'm not for sure on that,
8  too.
9   Q.  (BY MR. MITCHELL) Do you know, you said it
10  was more expensive to be an out-of-network, can you
11  explain that more, how much more expense it, or why
12  it was more expensive?
13      MR. LEVY:  Objection.
14      THE WITNESS:  I don't know how much more,
15  but I knew -- you know, by what we -- benefits we
16  got, you know, we had to pay more.
17   Q.  (BY MR. MITCHELL) You had to pay more, was
18  that more of a deductible or more of a --
19   A.  Yes.
20      MR. LEVY:  Objection.
21   Q.  (BY MR. MITCHELL) More of a deductible.
22  But you don't know how much more?
0208
1   A.  No.
2   Q.  After your wife retired, did she continue
3  to pay union dues?
4   A.  No.
5   Q.  Did you?
6   A.  No.
7   Q.  Did you make, after you retired, or after
8  your wife retired, did you have to continue to make
9  any contributions toward your insurance, your
10  supplemental insurance through SBC?
11      MR. LEVY:  Counsel, how does this relate
12  to something other than was covered or could have
13  been covered in the first deposition?
14      MR. MITCHELL:  Well, I believe it does.
15  And if he can answer.
16      MR. LEVY:  I would like to hear your
17  basis.  I would like to see how we are treading new
18  ground here, as opposed to old ground.
19      MR. MITCHELL:  I don't think -- we didn't
20  have any of these documents at his first deposition.
21      MR. LEVY:  These questions aren't relative
22  necessarily to new documents.
0209
1      MR. MITCHELL:  Instruct him not to answer
2  or not. That's my question.  I don't need to explain
3  the basis for my questions.
4      MR. LEVY:  You're talking about union
5  dues, am I correct?
6      MR. MITCHELL:  Yes, as they relate to how
7  his insurance was covered.
8      MR. LEVY:  Wasn't that part of what we
9  were talking about in the first deposition, ground
10  that should have been covered.
11      MR. MITCHELL:  I don't believe.

12        MR. LEVY:  I will let him answer the
13  question, and you need to move on.
14        THE WITNESS:  Could you re-ask that?
15        (Record read)
16        MR. MITCHELL: Read back the question.
17        (Record read)
18        MR. LEVY:  Go ahead.  You can answer if
19  you know.
20        THE WITNESS:  I don't think so.
21        (Exhibit Young 012 marked for
22  identification)
0210
1    Q.  (BY MR. MITCHELL) Mr. Young, showing you
2  what's been marked as Exhibit Young 012.  Have you
3  ever seen this document before?
4        MR. LEVY:  I just object for the record,
5  in that it is the fourth amended complaint, so it is
6  -- it is a big document, and it looks a lot like
7  some other documents that have been involved in this
8  case.
9    Q.  (BY MR. MITCHELL)  Yes.  And just to clear
10  this up, I know you said in your first deposition
11  that you saw the third amended complaint in about
12  October of 2005.
13        Did you ever receive the fourth amended
14  complaint?
15    A.  That was a new one, yes.
16    Q.  Are these the documents you were talking
17  about earlier when, the difference between the
18  classes of defendants?
19    A.  Right.  True.
20    Q.  When did you first see the fourth amended
21  complaint?
22    A.  I think I got that sometime the first week
0211
1  of March, I think it was.
2    Q.  Did you read the entire thing?
3    A.  No.
4    Q.  Can you tell me what you read?
5    A.  I just read part of the complaint and what
6  involved the part -- the part that involved my wife.
7    Q.  Let's turn to page 9, paragraph 21.  Is
8  paragraph 21 the paragraph you talked about that
9  relates to your wife?
10    A.  Yes.
11    Q.  I just want to go through a couple of
12  things.  I know this is similar to the third amended
13  complaint, but it is different in some ways, and I'm
14  not exactly sure of all of the differences.
15        But it says, about the fourth line down,
16  "She received medication for rheumatoid arthritis,
17  Hepatitis C and lymphoma.  Do you know what drugs
18  your wife received for Hepatitis C?
19    A.  No, I don't.

20    Q.    How about for lymphoma?
21    A.    No.
22    Q.    And it says "During the applicable time
0212
1    period, Mrs. Young was prescribed, and was charged
2    for, among others, the following physician-
3    administered prescription drugs manufactured and
4    sold by the defendant companies, based in whole or
5    in part on AWP."
6            What is your basis, or do you have any
7    understanding for the basis for that statement, that
8    the charges were based in whole or in part on AWP?
9            MR. LEVY:  Are you talking other than the
10    drug that his wife, the estate has already been
11    regarded by the court as an adequate representative?
12           MR. MITCHELL:  I'm talking for the fourth
13    amended complaint for the Track 2.
14           MR. LEVY:  Well, he doesn't know
15    difference between Track 1 and Track 2, probably.
16           MR. MITCHELL:  Okay.
17           THE WITNESS:  I really don't.
18    Q.    (BY MR. MITCHELL) You don't have any basis
19    that the drugs were sold based in part on AWP?
20           MR. LEVY:  Objection, mischaracterizes
21    testimony.
22    Q.    (BY MR. MITCHELL) If I mischaracterize it,
0213
1    let me know.  But do you have any basis that any of
2    these drugs listed in paragraph 21 were sold in any
3    part based on AWP?
4            MR. LEVY:  These are the allegations that
5    have been put together by his counsel.
6            MR. MITCHELL:  Now, counsel don't testify.
7            MR. LEVY:  This is a legal document.
8            MR. MITCHELL:  That's fine, I can ask him
9    his -- he's a class rep.  Don't testify for him.
10           MR. LEVY:  We are not retreading ground
11    what he's already been regarded by the court as a
12    class representative, I will tell you that much.
13           MR. MITCHELL:  I don't think you guys have
14    the fourth complaint for Track 2 defendants on this
15    one, so I think that's a perfectly legitimate
16    question.
17           THE WITNESS:  All I can tell you is it
18    looks like it is -- it says here that it was sold
19    defendants companies based in whole, in part of
20    AWPs.
21    Q.    (BY MR. MITCHELL) Do you have any personal
22    knowledge that any of the drugs were purchased or
0214
1    sold based on AWP?
2            MR. LEVY:  Objection.  You can answer.
3            THE WITNESS:  Not that I know of, no.
4    Q.    (BY MR. MITCHELL) Now, I know some of

5  these drugs have changed in this paragraph, so I
6  want to do a little bit what you did in your last
7  deposition, just to make sure with this complaint I
8  have got your complete testimony.
9        If you will just review this paragraph,
10  and let me know if you recognize any of the drugs in
11  here that you could say I know what these drugs are
12  and that my wife took them.
13        MR. LEVY:  Just point out to the witness
14  that it continues from page 9 to page 10.
15        THE WITNESS:  Okay.
16     Q.  (BY MR. MITCHELL) Okay.  Go ahead and
17  review that.
18     A.  Which drugs I recognize?
19     Q.  Yes.
20        MR. LEVY:  I will object to the question,
21  you can answer.
22        THE WITNESS:  Heparin sodium, I think
0215
1  that's blood thinner.
2     Q.  (BY MR. MITCHELL) And you have talked
3  about that one in your last deposition, so I won't
4  go back over that.
5     A.  Infliximab, which is actually Remicade.
6     Q.  Infliximab, is that --
7     A.  Yes.
8        MR. LEVY:  I will further object, only in
9  that some of the representations of the drugs in
10  here are -- might be a generic type of statement of
11  the drug, as opposed to their brand name statement,
12  a chemical statement.
13        THE WITNESS:  Right offhand, that's it.
14     Q.  (BY MR. MITCHELL) And other than the
15  Infliximab, which you said is also known as
16  Remicade, do you know if any of these other
17  formularies have any other different brand names?
18        MR. LEVY:  Objection.
19        THE WITNESS:  I have no idea.
20     Q.  (BY MR. MITCHELL) Do you know what any of
21  these drugs would have been used for?
22     A.  I do on the Remicade.
0216
1     Q.  Other than the Remicade, which I think you
2  testified about at your last deposition, do you know
3  what any of the other drugs were used for?
4     A.  Other than Heparin, no, sure don't.
5     Q.  And Heparin, you also testified.
6     A.  Yes.
7     Q.  So other than Heparin and the Remicade, do
8  you know who prescribed these drugs for your wife?
9        MR. LEVY:  Objection.
10        THE WITNESS:  The Remicade I know that our
11  arthritic doctor.
12     Q.  (BY MR. MITCHELL) And I'm just going to -

13   - for this purpose, I'm going to exclude the
14   Remicade and the Heparin, which I think you
15   specifically talked about last time.  But other than
16   those, do you recognize --
17      A.  No.
18      Q.  Do you know whether, other than the
19   Remicade and the Heparin, whether these would have
20   been given by an injection or a pill or infusion?
21         MR. LEVY:  Objection.
22         THE WITNESS:  I have no idea.
0217
1      Q.  (BY MR. MITCHELL) Do you know where any of
2   these drugs were administered to your wife, whether
3   at a hospital, in a doctor's office, or by pill?
4         MR. LEVY:  Objection.
5         THE WITNESS:  I do not know.
6      Q.  (BY MR. MITCHELL) Do you know for any of
7   these drugs listed in paragraph 21 of the fourth
8   amended complaint who manufactured any of the drugs
9   that were provided to your wife?
10     A.  Other --
11        MR. LEVY:  Objection.
12     Q.  (BY MR. MITCHELL) Other than Remicade?
13     A.  No.
14     Q.  Do you know if your wife ever took a drug
15   that was manufactured by Abbott Laboratories?
16        MR. LEVY:  Objection.
17        THE WITNESS:  I have no idea.
18     Q.  (BY MR. MITCHELL) Do you know if your wife
19   ever took a drug that was manufactured by Amgen?
20        MR. LEVY:  Objection.
21        THE WITNESS:  I have no idea.
22     Q.  (BY MR. MITCHELL) Do you ever know if your
0218
1   wife ever took a drug that was manufactured by
2   Aventis?
3      A.  I have no idea.
4         MR. LEVY:  Objection.
5      Q.  (BY MR. MITCHELL) Do you ever know if your
6   wife ever took a drug that was manufactured by
7   Baxter?
8         MR. LEVY:  Objection.
9         THE WITNESS:  Not that I know of.
10     Q.  (BY MR. MITCHELL) Do you know if your wife
11   ever took a drug that was manufactured by Fujisawa?
12        MR. LEVY:  Objection.
13        THE WITNESS:  No idea.
14     Q.  (BY MR. MITCHELL) Do you know if your wife
15   ever took a drug that was manufactured by Immunex?
16        MR. LEVY:  Objection.
17        THE WITNESS:  I have no idea.
18     Q.  (BY MR. MITCHELL) Do you know if your wife
19   ever took a drug that was manufactured by Pfiser?
20        MR. LEVY:  Objection.

21      THE WITNESS:  I have no idea.
22      Q.  (BY MR. MITCHELL) Do you know if your wife
0219
1  ever took a drug that was manufactured by Pharmacia?
2          MR. LEVY:  Objection.
3          THE WITNESS:  I have no idea.
4      Q.  (BY MR. MITCHELL) Do you know if your wife
5  ever took a drug that was manufactured by Sicor?
6          MR. LEVY:  Objection.
7          THE WITNESS:  I have no idea.
8      Q.  (BY MR. MITCHELL) Do you know if your wife
9  ever took a drug that was manufactured by Watson --
10          MR. LEVY:  Objection.
11      Q.  (BY MR. MITCHELL)  -- Pharmaceuticals?
12          THE WITNESS:  No, sir, I have no idea.
13      Q.  (BY MR. MITCHELL) Other than the Remicade
14  that we have talked -- that you have talked about on
15  paragraph 21, do you know if your wife ever paid any
16  amount for any drug that's listed in paragraph 21?
17          MR. LEVY:  Objection.
18          THE WITNESS:  Read that again.
19          (Record read)
20          THE WITNESS:  If my supplemental, or if
21  Medicare B and supplemental did not cover it, I
22  probably paid for it.
0220
1      Q.  (BY MR. MITCHELL) But can you specifically
2  recall paying for any drug?
3      A.  No.
4      Q.  If you would have had to pay for the drug,
5  do you know how you would have paid for it?
6          MR. LEVY:  Objection.
7          THE WITNESS:  Cash, check or credit card,
8  one or the other.
9      Q.  (BY MR. MITCHELL) Do you have any receipts
10  for any of the drugs that you may have paid for?
11      A.  I have given all of that to my attorneys.
12      Q.  So everything you have got, you have given
13  to your attorneys?
14      A.  Yes.
15      Q.  You don't have any personal knowledge for
16  any of the allegations in the complaint, do you?
17          MR. LEVY:  Objection.
18          THE WITNESS:  Read that again.
19          (Record read)
20      Q.  (BY MR. MITCHELL) And by "the complaint,"
21  I mean the fourth amended complaint that we have
22  been looking at.
0221
1      A.  No.
2          MR. LEVY:  Same objection.
3      Q.  (BY MR. MITCHELL) Do you have any
4  knowledge about any type of rebates that medical
5  providers may have received from any drug

6   manufacturers?

7          MR. LEVY:  Objection.

8          THE WITNESS:  No.

9     Q.  (BY MR. MITCHELL) Do you have any personal

10   knowledge about any alleged kickbacks that medical

11   providers would have received from pharmaceutical

12   manufacturers?

13          MR. LEVY:  You're talking about medical --

14   let me clarify.  You're talking about the drugs that

15   are listed in paragraph 21, that are the Track 2

16   defendants?

17          MR. MITCHELL:  Yes, in paragraph 21 for

18   the Track 2 defendants.

19          THE WITNESS:  No.

20     Q.  (BY MR. MITCHELL) Do you have any personal

21   knowledge about any purported conspiracy between any

22   of the drug manufacturers listed in paragraph 21 of

0222

1   the fourth amended complaint?

2          MR. LEVY:  Objection, calls for legal

3   conclusion. You can answer if you know.

4          THE WITNESS:  No, I don't know.

5     Q.  (BY MR. MITCHELL) How about any personal

6   knowledge regarding any conspiracy between any drug

7   manufacturers?

8          MR. LEVY:  Objection.

9          THE WITNESS:  No.

10    Q.  (BY MR. MITCHELL) Look at page 276 through

11   279 of the fourth amended complaint.

12          MR. LEVY:  What was the page number,

13   please?

14          MR. MITCHELL:  276 through 279.

15    Q.  (BY MR. MITCHELL) My question is, do you

16   know any of the lawyers listed on these pages?

17    A.  Personally?

18    Q.  Well, have you ever heard their names

19   before?

20          MR. LEVY:  Take your time.  This isn't a

21   race.

22          THE WITNESS:  I know Specter, you know, I

0223

1   don't know what his first name is.

2     Q.  (BY MR. MITCHELL) The Shanin Specter?

3     A.  Donald Haviland, I don't actually know

4   Shanin Specter.

5     Q.  Do you personally know Donald Haviland?

6     A.  I have talked to him.

7     Q.  In person or on the telephone?

8     A.  On the telephone.

9     Q.  Do you know how many times?

10    A.  Maybe twice.

11    Q.  And what time period, in the last six

12   months, in the last --

13    A.  I can't recall.  It has been a while.

14    Q.  How long did those conversations with him
15  last, and I don't want you to tell me what was said,
16  just --
17    A.  Yes.  Probably not more than two or three,
18  four minutes.  That's about it.
19    Q.  Would that be each call or total?
20    A.  Probably each call, yes.
21    Q.  So about two to four minutes for each
22  call?
0224
1    A.  Yes, something like that.
2        MR. LEVY:  Counsel, he hasn't had an
3  opportunity to finish the pending question, it is
4  still open.
5    Q.  (BY MR. MITCHELL)  Keep going, see if you
6  know any of the other.
7        MR. LEVY:  Flip through the page and see
8  if you recognize any of the other attorneys.  Also
9  object, because there could be additional attorneys
10  that aren't specifically identified as being from a
11  particular firm.
12        THE WITNESS:  Kent Williams.
13        MR. LEVY:  Page 278, top.
14    Q.  (BY MR. MITCHELL) And he represented you
15  in your last deposition, in November?
16    A.  Yes.
17    Q.  Have you spoken with him since that
18  deposition?
19    A.  Yes.
20    Q.  How many times?
21    A.  Twice.
22    Q.  Approximately how long did each call last?
0225
1  I guess I should step back.  Were communications
2  with him in person or by phone?
3    A.  By phone.
4    Q.  Approximately how long did each call last?
5    A.  Not more than four or five minutes or so.
6    Q.  Okay.  Keep going.
7    A.  Adam Levy.
8    Q.  Who is here with us today?
9    A.  Yes.  Looks like all I can recognize.
10    Q.  Are you paying your lawyers?
11        MR. LEVY:  Objection.
12    Q.  (BY MR. MITCHELL) For representing you?
13    A.  No.
14    Q.  Do you know how they are being paid?
15        MR. LEVY:  Objection.
16        THE WITNESS:  No.
17    Q.  (BY MR. MITCHELL) Do you know how the
18  litigation costs are being covered?
19        MR. LEVY:  Objection.  Don't answer that
20  question. This is clearly open field in the first
21  deposition, and if you want to ask him whether

22  anything has changed since the first deposition, you
0226
1  can ask him that question.
2          MR. MITCHELL:  I don't think these
3  questions -- I mean, any question could have been
4  asked in the first one, these ones clearly weren't.
5  I think it is a perfectly legitimate question.
6          MR. LEVY:  It is part of the class of --
7  it's subsumed within the class, the Rule 23
8  questions, I assume, and certainly was fair game
9  within the first deposition.  It is redeposing him
10  on the issue.
11          MR. MITCHELL:  Are you instructing him not
12  to answer?
13          MR. LEVY:  I am instructing him not to
14  answer.
15      Q.  (BY MR. MITCHELL) Are you going to follow
16  your counsel's advice?
17      A.  Yes.
18          MR. LEVY:  With the proviso that you could
19  have asked him the question which I said you could
20  ask him.
21          MR. MITCHELL:  Which was?
22          MR. LEVY:  Has anything changed since the
0227
1  time of your first deposition and your agreement
2  with your counsel.
3      Q.  (BY MR. MITCHELL) Has anything changed
4  between the time of your first deposition?
5      A.  No.
6      Q.  I guess in your agreement, whatever it is,
7  with your counsel, and your answer is no?
8      A.  That's right.
9          MR. MITCHELL:  We have been going about an
10  hour, let's take a five minute break.
11          (Short break)
12      Q.  (BY MR. MITCHELL) Mr. Young, going back on
13  the record.  I'm going to show you what was marked
14  in your first deposition as Exhibit Young 006.  It
15  is Bates range Young 0070 through 105.
16          MR. LEVY:  This is now being marked as
17  what?
18          MR. MITCHELL:  We are going to keep it as
19  Exhibit Young 006, we are not going to remark it.
20      Q.  (BY MR. MITCHELL) Have you seen this
21  document before, or these documents, I should say?
22          MR. LEVY:  Objection, asked and answered.
0228
1  Are there some specific questions in this document
2  that are related to Track 2 drugs?
3          MR. MITCHELL:  Yes.
4          MR. LEVY:  Which are different, or
5  couldn't have been asked the first time around?
6          MR. MITCHELL:  I don't think they -- I

7   mean, anything could have been asked.  You guys
8   said, and the CMO orders say that you guys are going
9   to put up the class reps for depositions for Track
10  2.
11          And the -- you know, the brief you guys
12  filed yesterday, you said you were putting up the
13  class reps for Track 2 deposition.
14          I'm not -- these questions were not asked
15  at the first deposition.  Whether they could have
16  been is a completely irrelevant question.  I think
17  the question I'm going to ask him, there is not
18  going to be a ton, but I think they are specifically
19  tailored toward the Track 2, they are proper.
20          MR. LEVY:  I disagree entirely with your
21  statement.  Now we are looking at a document that
22  not only could have been, but was used in the first
0229
1   deposition as Exhibit Young 006, and your first
2   question out of the gate is clearly one that had --
3   that was within the rubric of the first deposition,
4   have you seen this document before.
5          I mean, obviously that deposition, we have
6   already established that he's seen it.  So, you
7   know, what are you going to go over with his medical
8   records?
9          MR. MITCHELL:  Go to Young 0077.
10          MR. LEVY:  Sorry, say again.
11          MR. MITCHELL:  0077.
12     Q.  (BY MR. MITCHELL) Have you seen this
13  document before?
14     A.  I don't recall this.
15     Q.  Look with me at the second paragraph, the
16  second sentence, it says "She used Methotrexate only
17  briefly until she discovered she had Hepatitis."
18     A.  Where was this?
19     Q.  The second sentence of the second
20  paragraph.
21     A.  Okay.
22     Q.  Do you remember when your wife developed
0230
1   Hepatitis?
2     A.  As far as a year, I'm not for sure.  It
3   was caused from a blood transfusion that she had --
4          MR. LEVY:  Objection, he asked you whether
5   you remember --
6          THE WITNESS:  Oh.
7          MR. LEVY:  Keep your answers responsive to
8   the question.
9     Q.  (BY MR. MITCHELL) You said you didn't
10  remember the specific year.  Do you remember the
11  decade?  Was it in the '80s or the '90s?
12     A.  It was in the '90s.
13     Q.  Flip forward a few pages to Young 0088
14  through 90. Are you at Young 0088?  Okay, take a

15  look at that for a second, and let me know if you
16  have ever seen this document before.
17      A.  Through what was it?
18      Q.  Through 90.
19      A.  I can't -- I don't recall.
20          MR. LEVY:  I'm sorry.  What was your
21  question again?
22          MR. MITCHELL:  I just wanted to know if he
0231
1  had ever seen it before.
2          MR. LEVY:  Okay.  Have you ever seen this
3  document before?
4          THE WITNESS:  I don't think I have, no.
5      Q.  (BY MR. MITCHELL) Take a look with me
6  under "Medical History," which is the second
7  paragraph.
8      A.  Okay.
9      Q.  It is about the fourth line down, where it
10  starts "The patient states," do you see that?
11      A.  Oh, "Patient status."
12      Q.  "States."  Just let me read it, "The
13  patient states that she did not take Methotrexate
14  because of the possibility she may have had
15  Hepatitis.  The patient states that approximately 18
16  years ago her appendix ruptured and she required a
17  blood transfusion, and she thinks that she might
18  have Hepatitis at this time."
19          Is that your recollection of how your wife
20  developed Hepatitis?
21          MR. LEVY:  Objection.
22          THE WITNESS:  I believe that that was the
0232
1  time that she was probably contracted with it, yes.
2      Q.  (BY MR. MITCHELL) Does this refresh your
3  recollection that your wife may have had Hepatitis
4  approximately 18 years prior to this document, which
5  was dated in 2004, so which would make it
6  approximately 1986?
7          MR. LEVY:  Objection.
8          THE WITNESS:  Yes.  They didn't test her
9  for it until later, though.  I mean, come up with
10  the findings.
11      Q.  (BY MR. MITCHELL) Do you know when they
12  came up with the findings?
13      A.  It was in the '90s.
14      Q.  Do you know early '90s, mid '90s, late
15  '90s?  Can you do any better than that?
16      A.  I believe it was in the early '90s, yes.
17      Q.  Now, do you know if your wife ever took
18  Methotrexate?
19      A.  That, I don't know.
20      Q.  Where the doctor wrote "She did not take
21  Methotrexate," do you have any reason to believe she
22  did?

0233
1    A.  I have no idea.
2        MR. LEVY:  Objection.
3    Q.  (BY MR. MITCHELL) Assuming your wife took
4  Methotrexate at any time, do you know what company
5  would have manufactured that?
6        MR. LEVY:  Objection.
7        THE WITNESS:  I have no idea.
8    Q.  (BY MR. MITCHELL) Do you know whether
9  Methotrexate is a multi-source product? Do you know
10  what a multi-source product is?
11   A.  No.
12   Q.  It is a product that's, just for our
13  understanding here, it is -- so we can understand
14  each other, it is a drug product that's made by
15  multiple, same drug products, or same compound made
16  by multiple different manufacturers.
17        Do you know if Methotrexate was a multi-
18  brand drug?
19        MR. LEVY:  Objection.
20        THE WITNESS:  I don't know.
21   Q.  (BY MR. MITCHELL) Now, let's look at Young
22  0094. Have you ever seen this document before?
0234
1    A.  Not that I can recall.
2    Q.  Do you know who this document would have
3  been prepared by or came from then?
4    A.  No.
5    Q.  If you will look at the top where it says,
6  right under date, it says "Neupogen"?
7    A.  Yes.
8    Q.  Do you know what Neupogen is?
9    A.  No --
10        MR. LEVY:  Hold on a moment.  I just want
11  to make sure I see where you're referring to
12  Neupogen.
13        MR. MITCHELL:  Right there.
14        MR. LEVY:  I'm sorry, thank you.
15   Q.  (BY MR. MITCHELL) How about Filgrastim?
16        MR. LEVY:  What is your question?
17   Q.  (BY MR. MITCHELL) Have you ever heard of
18  Filgrastim, F-i-l-g-r-a-s-t-i-m?
19   A.  No, I haven't.
20   Q.  Do you know what Neupogen is used to
21  treat?
22        MR. LEVY:  Objection.
0235
1        THE WITNESS:  Not really, no.
2    Q.  (BY MR. MITCHELL) Do you know who
3  manufactures Neupogen?
4    A.  No.
5        MR. LEVY:  Objection.
6    Q.  (BY MR. MITCHELL) Also look at page Young
7  0099. Towards the middle of that page on the left-

8 hand column, there is some typewritten words that
9 says "meds," and then it has got handwritten under
10 that, do you see that?
11    A.  Yes.
12    Q.  Do you recognize any of the medications
13 listed under there as any of the medications that
14 your wife took?
15       MR. LEVY:  Objection.  First of all, they
16 are hard to read.
17    Q.  (BY MR. MITCHELL) Yes, I can't read all of
18 them.
19       MR. LEVY:  Then --
20    Q.  (BY MR. MITCHELL)  Can you read any of
21 them?
22    A.  Yes.  Heparin, Tylenol.
0236
1    Q.  Let's start with Heparin.  Do you know who
2 manufactured the Heparin that your wife was
3 prescribed, or took?
4    A.  No.
5    Q.  How about if you look at Number 10, it
6 says "Cytoxan," do you know what Cytoxan is?
7    A.  No.
8    Q.  Do you know if your wife ever took
9 Cytoxan?
10    A.  I don't.
11    Q.  If she did, do you know if she -- what
12 company manufactured the Cytoxan your wife took?
13    A.  No, I don't.
14    Q.  How about under that 11, it appears to be
15 Epirupicin, do you know what that is?
16    A.  No, I don't.
17    Q.  Do you know if your wife ever took it?
18    A.  No.
19    Q.  Do you know what company would have
20 manufactured the Epirupicin that your wife would
21 have taken?
22    A.  No, I don't.
0237
1       (Exhibit Young 013 marked for
2 identification)
3    Q.  Mr. Young, handing you what's been marked
4 as Exhibit Young 013, which is Bates stamped Young
5 0206 through 0208.  Have you ever seen this document
6 before?
7    A.  No.
8    Q.  If you look at the first page in the
9 right-hand corner, it says page 2 of 4, do you know
10 where page 1 is?
11       MR. LEVY:  Objection.
12       THE WITNESS:  I have never seen it.
13    Q.  (BY MR. MITCHELL) If you also look in the
14 left-hand corner, it says 12-2-05, these were not
15 sent to you, never faxed to you?

16    A.  No, nor by me.

17    Q.  If you'll look at injection "Ketorolac

18  Tromethamine," which is the second listed drug

19  there?

20    A.  Yes.

21    Q.  Do you know what Ketorolac is?

22    A.  No, I don't.

0238

1    Q.  Do you know what it is used to treat?

2    A.  No, I don't.

3    Q.  Do you know if your wife ever took

4  Ketorolac?

5        MR. LEVY:  Objection.

6        THE WITNESS:  Sure don't.

7    Q.  (BY MR. MITCHELL) If your wife -- assuming

8  your wife ever did take Ketorolac, do you know who

9  manufactured the Ketorolac that your wife took?

10        MR. LEVY:  Objection.

11        THE WITNESS:  No.

12    Q.  (BY MR. MITCHELL) Do you know how the

13  price for Ketorolac is determined?

14    A.  No, I don't.

15        MR. LEVY:  Objection.

16    Q.  (BY MR. MITCHELL) Look at the second page

17  with me, Young 207.  In the left-hand corner it says

18  "AETNA," was AETNA ever your or your wife's insurer?

19    A.  Not that I know.

20    Q.  Do you know what, in the left-hand column,

21  the chart, what McBride Clinic, Inc. is?

22    A.  Do I know what?

0239

1    Q.  What McBride Clinic is?

2    A.  Yes.

3    Q.  What is that?

4    A.  That's a Bone & Joint.

5    Q.  Did your wife receive treatment there?

6    A.  Yes.

7    Q.  What for?

8    A.  Her rheumatoid arthritis.

9    Q.  Was this before she went to the Oklahoma

10  Arthritis Center?

11    A.  Yes.

12    Q.  Do you know approximately the time period

13  that your wife had treatments, treatments there?

14    A.  Gosh, I have no idea.

15    Q.  Do you know who her doctors were there?

16    A.  I believe one of them was a Halsey, and I

17  can't remember the one before that.  She was

18  retired.  I don't know anymore.

19    Q.  Do you know how many years she was getting

20  treatment at the McBride Clinic?

21    A.  I believe she was in her early 30s when

22  they diagnosed her with rheumatoid arthritis, and

0240

1   they are the ones that tested her and found it, what
2   she had.
3      Q.  The McBride Clinic?
4      A.  Yes.
5      Q.  So essentially, from the time in her 30s
6   when she was diagnosed with rheumatoid arthritis
7   until she started seeing Dr. Carson?
8      A.  Right.
9      Q.  She was at the McBride Clinic?
10     A.  Right.
11     Q.  I believe you testified in your first
12  deposition that she began seeing Dr. Carson in
13  approximately 2001; does that sound right?
14        MR. LEVY:  Objection, asked and answered.
15        THE WITNESS:  Somewhere in that period,
16  2001, 2002, something like that.
17     Q.  (BY MR. MITCHELL) And how old would your
18  wife have been at that time?
19     A.  She would have been 53 or four, I think.
20     Q.  If you look down at the bottom of Young
21  207, do you see where it says "Total net pay, zero
22  dollars and zero cents"?
0241
1      A.  Now, where is this?
2      Q.  Kind of right towards the bottom, under
3   the chart.
4      A.  Oh, okay.
5        MR. LEVY:  He asked you whether you see
6   whether it says "zero dollars."
7        THE WITNESS:  Yes.
8      Q.  (BY MR. MITCHELL) Do you know what that
9   means?
10        MR. LEVY:  Objection.
11        MR. LEVY:  Do you know what zero dollars
12  on that document means?
13        THE WITNESS:  That means zero I paid,
14  payment.
15     Q.  (BY MR. MITCHELL) That means you paid?
16        MR. LEVY:  Objection.
17     Q.  (BY MR. MITCHELL) Do you know if you ever
18  paid, other than what your insurance paid, to the
19  McBride Clinics, did you make any out-of-pocket
20  payments?
21        MR. LEVY:  Objection.
22        THE WITNESS:  I don't think so.  I mean, I
0242
1   can't recall anything.  My wife took care of most of
2   the payments anyway.
3      Q.  (BY MR. MITCHELL) Did she keep records of
4   the payments she made?
5      A.  Depends on whether it was through a check
6   or, you know, that would be the only thing, credit
7   card.
8      Q.  Have you searched for records of any

9 payments that you or your wife may have made for any
10 prescription drugs?
11    A.  I went through all that I have, and I have
12 sent them to my lawyers, yes.
13    Q.  Okay.  Have you or your wife ever had any
14 communications with Abbott Laboratories?
15       MR. LEVY:  Are we done with this document?
16       MR. MITCHELL:  Yes.
17       THE WITNESS:  No.
18    Q.  (BY MR. MITCHELL) How about any drug
19 manufacturer, have you had any communications, you
20 or your wife, with any drug manufacturer?
21    A.  No.
22    Q.  How about any sales representatives of
0243
1 Abbott Laboratories?
2    A.  No.
3    Q.  How about have you or your wife ever had
4 any communications with any sales representative for
5 any drug manufacturer?
6    A.  Do you mean like casual conversation, if
7 we met them on the street or in an office.
8    Q.  I'm talking at a provider's office, where
9 you actually talked to them about, you know, one of
10 their drug products?
11    A.  No.
12    Q.  Did your wife ever seek any information,
13 or did you ever seek any information from any drug
14 manufacturer regarding any of their prescription
15 drugs?
16       MR. LEVY:  Objection.  Are you talking
17 about the Track 2 defendant drugs?
18       MR. MITCHELL:  I'm just kind of talking
19 generally about any manufacturer.  If you can
20 separate it out to any of the Track 2 defendants,
21 too, that would be fine.
22       THE WITNESS:  Do you mean information
0244
1 that's on a particular drug, are you talking about?
2    Q.  (BY MR. MITCHELL) Or any company
3 information, or information about any of their
4 drugs?
5    A.  Yes.
6       MR. LEVY:  I'm going to ask that the
7 question be limited to the Track 2 defendants in
8 this case.  This is what this deposition is about.
9 We are not revisiting Track 1 defendants.
10       THE WITNESS:  Okay, no.
11    Q.  (BY MR. MITCHELL)  None of the Track 2
12 defendants?
13    A.  No.
14    Q.  Did Abbott or any of the other Track 2
15 defendants ever provide you with information about
16 the way their drugs are priced?

17     A.   No.
18     Q.   Did you ever seek any of that information
19  from them?
20     A.   No.
21     Q.   Did you ever seek any information from any
22  of your medical providers on the way that they price
0245
1  their drugs?
2     A.   No.
3     Q.   Have you searched through all of your
4  documents that you have in your possession or
5  custody that relate in any way to the claims in this
6  lawsuit?
7          MR. LEVY:  Objection.
8          THE WITNESS:  Yes.
9     Q.   (BY MR. MITCHELL) Have you provided all of
10  those to your counsel?
11          MR. LEVY:  Objection.
12          THE WITNESS:  Yes.
13     Q.   (BY MR. MITCHELL) Now, Mr. Young, in your
14  first deposition you testified about in 2005, early
15  2005, I believe it was, you went to Klein & Specter
16  about a legal matter you were contemplating; is that
17  correct?
18          MR. LEVY:  Objection.  Do not answer the
19  question, it has already been asked and answered.
20          MR. MITCHELL:  I don't think it has.  I
21  want to know the status of it.
22          MR. LEVY:  You want to know the status of
0246
1  --
2          MR. MITCHELL:  Whether he's --
3          MR. LEVY:  Why don't you ask him the
4  question whether anything has changed in the status
5  of his lawsuit since he's last testified in his
6  first deposition.
7          MR. MITCHELL:  I will ask him the question
8  I want to ask him.
9     Q.   (BY MR. MITCHELL) You testified in your
10  first deposition that you approached him about a
11  legal matter that hadn't been filed.  Have you filed
12  a lawsuit regarding that legal matter?
13     A.   No.
14     Q.   Do you know why you haven't?
15          MR. LEVY:  Objection.
16     Q.   (BY MR. MITCHELL) Is it in any way
17  relating to your acting as a class representative in
18  this litigation?
19          MR. LEVY:  Objection.  I'm not going to
20  permit him to answer it on the basis of the same
21  objection that was provided by counsel in the first
22  deposition.  The basis have not changed.  We went
0247
1  through this pretty hard in the first deposition,

2 and counsel made it clear for Mr. Young at that time
3 that the bases on which he was standing to not
4 answer those questions, and those same bases are
5 forwarded here.
6     A.  (BY MR. MITCHELL)  Are you going to follow
7 your counsel's advice?
8     A.  Yes, I am.
9     Q.  On the same line, you had also talked
10 about that you had had conversations with your son
11 and relatives about this purported legal matter; is
12 that correct?
13         MR. LEVY:  Are you asking him whether he
14 already testified about that?
15         MR. MITCHELL:  Yes.
16         MR. LEVY:  Objection, asked and answered.
17         THE WITNESS:  Yes, I answered that.
18     Q.  (BY MR. MITCHELL) Were any lawyers present
19 during those conversations?
20     A.  No.
21     Q.  I would like you to tell me about those
22 conversations you had with your son and relatives.
0248
1         MR. LEVY:  Objection, this has already
2 been covered.
3         MR. MITCHELL:  I want to know how that's
4 privileged.
5         MR. LEVY:  You want to know how that's
6 privileged?
7         MR. MITCHELL:  Yes.
8         MR. LEVY:  You're asking the same
9 questions that were already covered in the same
10 deposition.  I laid down the ground rules pretty
11 clearly.  This is most definitely an area that was
12 covered in length at his first deposition.
13         MR. MITCHELL:  It wasn't covered by us,
14 and I think the grounds then and grounds now are
15 completely inappropriate and that is --
16         MR. LEVY:  What is the question?
17         MR. MITCHELL:  He testified that he had
18 conversations with his son and with relatives where
19 no lawyers were present about this legal matter.
20 And I want to know about those conversations.  That
21 is not attorney-client privilege, there is no
22 privilege for those conversations.
0249
1         MR. LEVY:  Well, this was covered in the
2 first round, and it was covered by Mr. Williams, and
3 he made his objections, and I stand by the
4 objections, and I'm instructing him not to answer
5 the question.
6         MR. MITCHELL:  Are you going to follow
7 your counsel's objection?
8     A.  Yes, I am.
9     Q.  (BY MR. MITCHELL) Mr. Young, do you have

10   any criminal convictions?
11      A.  No.
12      Q.  Have you ever been charged with a crime
13   involving false statements or dishonesty?
14      A.  No.
15         MR. LEVY:  Objection.
16      Q.  (BY MR. MITCHELL) Have you been promised
17   any compensation for your role as a class
18   representative?
19      A.  No.
20      Q.  I'm probably done.  I would like to go
21   through my notes.  But should we let these guys go
22   on?
0250
1          MR. LEVY:  Absolutely.
2          MR. BERNASCONI:  I have some questions.
3
4            CROSS-EXAMINATION
5   BY MR. BERNASCONI:
6      Q.  Mr. Young, we met earlier.  For the record
7   again, my name is Andrew Bernasconi from the law
8   firm of Reed Smith, on behalf of Fujisawa Entities.
9          I wanted to ask you first, have you ever
10   heard the name Fujisawa Healthcare Incorporated?
11      A.  No.
12      Q.  Have you ever heard the term or the name
13   Fujisawa U.S.A., Incorporated?
14      A.  No.
15      Q.  To your knowledge, was your ever
16   prescribed a drug that was manufactured by Fujisawa?
17      A.  I have no idea.
18      Q.  Your counsel made a reference in passing
19   earlier today to the term "generic drug." Are you
20   familiar with the term "generic drug"?
21      A.  I think I do know what it is.
22      Q.  What is your understanding of that term?
0251
1      A.  It is made by another company similar to
2   what the original manufacturer made.
3      Q.  Okay.  Have you ever heard of a drug named
4   Aristocort?
5      A.  No.
6      Q.  Have you ever heard of a drug named
7   Triamcinolone?
8      A.  No.
9      Q.  Do you know if your wife ever took a drug
10   named Aristocort?
11      A.  No.
12      Q.  Do you know if your wife ever took a drug
13   named Triamcinolone?
14      A.  I have no idea.
15      Q.  Do you know if your wife ever paid for a
16   drug named Aristocort?
17      A.  I have no idea.

18     Q.  Do you know if your wife ever paid for a
19  drug named Triamcinolone?
20     A.  I have no idea.
21     Q.  Have you ever heard of a drug named
22  Dexamethasone Sodium Phosphate?
0252
1     A.  No.
2     Q.  Do you know if your wife ever took a drug
3  named Dexamethasone Sodium Phosphate?
4     A.  No.
5     Q.  Do you know if your wife ever paid for a
6  drug named Dexamethasone Sodium Phosphate?
7     A.  No.
8         MR. BERNASCONI:  I believe that's all I
9  have for now.  Thank you.
10
11          CROSS-EXAMINATION
12  BY MR. MIZELL:
13     Q.  Mr. Young, we met at the beginning of the
14  day, I'm Nick Mizell, with Shook Hardy & Bacon, on
15  behalf of Aventis Pharmaceuticals.
16     A.  Yes.
17     Q.  Was an estate opened by probate court for
18  your wife?
19     A.  No.
20         MR. SPEAKER:  We are having a hard time
21  hearing the questions, could you speak up, please?
22         MR. MIZELL:  Yes, I will, thanks.
0253
1     Q.  (BY MR. MIZELL)  Have you been appointed
2  by a probate court as the administrator or
3  representative for the estate of Young?
4     A.  No, just being her husband.  There was no
5  estate, as far as, you know, splitting up or
6  whatever, you know, profits.
7     Q.  Okay.  Did you or your wife at any time
8  subscribe to Barons?
9         MR. LEVY:  Sorry?
10     Q.  (BY MR. MIZELL) Did you or your wife ever
11  subscribe to Barons?
12         MR. LEVY:  Objection.
13         THE WITNESS:  Barons?
14     Q.  (BY MR. MIZELL) Barons?
15     A.  No.
16     Q.  How about the Wall Street Journal?
17         MR. LEVY:  Objection.
18         THE WITNESS:  No.
19     Q.  (BY MR. MIZELL) New York times?
20         MR. LEVY:  Objection.
21         THE WITNESS:  No.
22     Q.  (BY MR. MIZELL) Business Week --
0254
1         MR. LEVY:  Counsel, I'm going to stop you
2  for a moment.  Are these Rule 23 questions to garner

3  whether he is an adequate representative, which the
4  Court has already concluded that he is, for the
5  Track 1 people, Track 1 defendants?
6        MR. MIZELL:  That's my question.
7        MR. LEVY:  Are you going to answer my
8  question?
9        MR. MIZELL:  No.
10        MR. LEVY:  You're not going to answer,
11  then he's not going to answer either.  Move on.
12        MR. MIZELL:  On what basis?
13        MR. LEVY:  On this same basis that I
14  provided to counselor who is leading this deposition
15  today.
16        MR. MIZELL:  I understand your position,
17  but of course, as we cited in our Motion to Enforce,
18  CMO 14, the Court provided that the plaintiffs, or
19  parties identified as Track 2 class representatives
20  would be produced for deposition by the Track 2
21  defendants.
22        And in your filing yesterday, in
0255
1  opposition to that motion, you acknowledged that you
2  would produce these representatives for deposition
3  by the Track 2 defendants. This is the deposition,
4  that's my question.
5        MR. LEVY:  He's been produced.
6        MR. MIZELL:  And he's answered questions.
7        MR. LEVY:  He's answered all of those
8  questions.
9        MR. MIZELL:  We understand your position,
10  it has been stated over and over, but he needs to
11  answer our questions.
12     Q.  (BY MR. MIZELL) And my question right now
13  is, did you or your wife ever subscribe to business
14  week?
15     A.  No.
16     Q.  Okay.  The fourth amended complaint that
17  you received after March 1st, that we talked about
18  earlier and was previously marked as Exhibit Young
19  012, did you have any role in drafting that
20  paragraph about your wife?
21     A.  No.
22     Q.  Did you offer any suggested changes to it?
0256
1        MR. LEVY:  Objection.
2        THE WITNESS:  No.
3     Q.  (BY MR. MIZELL) Okay.  You have previously
4  testified that you haven't received any compensation
5  for your time or expenses acting as a class
6  representative, but do you expect to receive in the
7  future any compensation for your time and expenses?
8        MR. LEVY:  Objection.
9        THE WITNESS:  If we win a case against
10  them, I expect to be reimbursed for what I have paid

11   out, you know.
12     Q.  (BY MR. MIZELL) And what is the basis for
13   that belief?
14       MR. LEVY:  Objection.
15     Q.  (BY MR. MIZELL) And I'm not talking about
16   what was paid for the drugs, I'm talking about just
17   participating, coming to the deposition,
18   participating in the lawsuit, anything like that?
19     A.  No, I don't expect to be paid for that.
20       (Exhibit Young 014 marked for
21   identification)
22     Q.  Okay.  Mr. Young, I just handed you what
0257
1   has been previously marked Young 471, 486.  Have you
2   seen that before?
3     A.  Page what?
4     Q.  Should start with 471, beginning, and end
5   with 486.
6     A.  No.
7     Q.  Could you read the top two lines on the
8   first page?
9     A.  "Francisco H. Dexeus, M.D., Inc., Patient
10   Ledger."
11     Q.  Okay.  I notice at the bottom of the page,
12   do you see that it is printed on February 2nd of
13   2006?
14     A.  Yes.
15     Q.  Did you request this ledger from Dr.
16   Dexeus?
17     A.  No.
18     Q.  Could you take a few minutes and review it
19   and tell me what it appears to be to you?
20       MR. LEVY:  Objection.
21       THE WITNESS:  Looks like billing Medicare,
22   or paid for and United Healthcare paid for it.  CK
0258
1   TEXT.
2     Q.  (BY MR. MIZELL) And I would like to direct
3   your attention to pages marked Young 483?
4       MR. LEVY:  83, 483?
5       MR. MIZELL:  Yes, 483.
6     Q.  (BY MR. MIZELL) Are you there?
7     A.  Yes.
8     Q.  Okay.  And let's say in the middle of the
9   page, slightly lower than that, there is an entry
10   there at December 24th, 2004 for Patricia Young,
11   showing a payment for $4.48 by check, do you see
12   that?
13       MR. LEVY:  Objection, foundation, calls
14   for speculation.  I'm sorry, I'm not sure what --
15   there are some line items on the left-hand side.  If
16   you could give me the number you're referring to.
17       MR. MIZELL:  I'm looking at entry number
18   1663408. It may be ease easier to see the date, 12-

19   24-04.
20        MR. LEVY:  What was the number again, one
21   more time, I'm sorry?
22        MR. MIZELL:  1663408.
0259
 1        MR. LEVY:  I'm sorry, I was looking at the
 2   wrong 12 date, I'm sorry.
 3     Q.   (BY MR. MIZELL) And do you also see four
 4   lines down, "That amount was refunded to patient"?
 5        MR. LEVY:  Same objections.
 6        THE WITNESS:  Yes, I see that.
 7     Q.   (BY MR. MIZELL) And could you please
 8   review the document and tell me if there are any
 9   other indications here that Patricia Young made any
10   other payments to Dr. Dexeus?
11        MR. LEVY:  Objection.  Do you want him to
12   look through the entire document?
13        MR. MIZELL:  Well, you previously
14   testified back in November that you don't recall
15   making any payments to Dr. Dexeus.  Does this
16   confirm your previous testimony?
17        MR. LEVY:  Objection.
18        THE WITNESS:  I don't -- you know, as far
19   as I know, I didn't make any payments.
20        MR. LEVY:  I think the question is unfair.
21   He said he's never seen it before and --
22        MR. MIZELL:  If you would like to review
0260
 1   it.  It is not that long of a document, you can
 2   review it and tell me if there are any other
 3   payments --
 4        MR. LEVY:  Same objection, I take issue,
 5   it is long, it is actually 16 pages, with about 30
 6   line items per page.  My multiplication probably
 7   isn't so good, I left my abacus at home, but that
 8   adds to a lot of lines, and it is a document he's
 9   not asked about, he's seen, and I think it is an
10   unfair question, and I think we all know it is, too.
11        MR. MIZELL:  I think we can do without
12   speaking objections.
13     Q.   (BY MR. MIZELL) It is a 15 page document.
14   Do you see any other payments from Patricia Young to
15   Dr. Dexeus?
16        MR. LEVY:  Same objections.
17        THE WITNESS:  I don't see any.
18     Q.   (BY MR. MIZELL) Great, thanks.  On the far
19   right column in the ledger, you see various amounts
20   for charges from Dr. Dexeus.  Can you tell from
21   looking at the ledger alone whether or not he is
22   just simply passing on his charges to you, or to Ms.
0261
 1   Young?
 2        MR. LEVY:  Objection.
 3        THE WITNESS:  I don't know.

4    Q.  (BY MR. MIZELL) Can we tell whether the
5  charges for these drugs are simply what he charged
6  last year, plus an inflation adjustment?
7         MR. LEVY:  Objection.
8         THE WITNESS:  I would have no idea.
9    Q.  (BY MR. MIZELL) Could we tell whether it
10  is maybe his acquisition costs plus some percentage?
11         MR. LEVY:  Objection.
12         THE WITNESS:  I still have no idea.
13    Q.  (BY MR. MIZELL) Can we tell whether they
14  are based on AWP?
15         MR. LEVY:  Objection.
16         THE WITNESS:  No.
17    Q.  (BY MR. MIZELL) Okay.
18         MR. LEVY:  Are you finished with that
19  exhibit?
20         MR. MIZELL:  Yes.
21         MR. LEVY:  Thanks.
22            (Exhibit Young 015 marked for
0262
1  identification)
2    Q.  (BY MR. MIZELL) Mr. Young, I just handed
3  you what was previously marked Young, I think it was
4  0012, 0013, is that marked as Exhibit Young 015?
5    A.  Yes.
6    Q.  Okay.  And on the second page, do you see
7  the column for the charges from the provider, the
8  column on the left?
9    A.  Yes.
10    Q.  And can you tell from looking at this
11  document whether or not those charges are based or
12  simply reflect the cost that the physician had from
13  acquiring those drugs?
14         MR. LEVY:  Objection.
15         THE WITNESS:  I have no idea.
16    Q.  (BY MR. MIZELL) Can we tell from looking
17  at this document if those charges were his costs
18  last year, plus maybe an inflation adjustment for
19  the year?
20         MR. LEVY:  Objection.
21         THE WITNESS:  I have no idea.
22    Q.  (BY MR. MIZELL) Can we tell whether it was
0263
1  a physician's cost, plus some degree of markup?
2         MR. LEVY:  Objection.
3         THE WITNESS:  I have no idea.
4    Q.  (BY MR. MIZELL) Can we tell if it is a
5  charge based on AWP?
6         MR. LEVY:  Objection.
7         THE WITNESS:  I have no idea.
8            (Exhibit Young 016 marked for
9  identification)
10    Q.  (BY MR. MIZELL) Okay.  Mr. Young, we just
11  handed you a document that was previously stamped

12  Young 470, and it has been marked as Deposition
13  Exhibit Young 016.  Have you seen this before?
14      A.  No, I haven't.
15      Q.  Can you identify it?
16      A.  Looks like --
17          MR. LEVY:  Objection.
18          THE WITNESS:  -- it's a payment set up
19  from Dr. Carson to my wife, Pat.
20      Q.  (BY MR. MIZELL) Does it memorialize the
21  agreement that you had to pay a flat sum for the
22  year that you previously testified about back in
0264
1  November?
2          MR. LEVY:  Objection.
3          THE WITNESS:  Say that again.
4             (Record read)
5          THE WITNESS:  Yes.
6      Q.  (BY MR. MIZELL) And is that the only time
7  you made an arrangement like that, or is that
8  something you did more than once?
9      A.  No, this is what she done.
10     Q.  Okay.  But your understanding was that
11  after paying this amount, neither you nor your wife
12  paid any other out-of-pocket costs?
13         MR. LEVY:  Objection.
14         THE WITNESS:  Not that I know of, no.
15            (Exhibit Young 017 marked for
16  identification)
17     Q.  (BY MR. MIZELL) Okay.  Mr. Young, I have
18  just handed you Plaintiff's Proposed Consolidated
19  Order regarding Motion for Class Certification Track
20  2, Version 1, and marked it as Deposition Exhibit
21  Young 017.  Have you seen this before?
22     A.  No.
0265
1      Q.  Could you please read to yourself the
2  class definition that starts at the bottom of the
3  first page and it carries over to the second page,
4  and tell me when you're done?
5          MR. LEVY:  Where it starts "A Class 1:
6  Medicare Part B," is that what you're referring to?
7          MR. MIZELL:  Yes.
8          MR. LEVY:  Then one class definition.
9          MR. MIZELL:  Yes, and the definition
10  itself.
11         THE WITNESS:  Yes.
12     Q.  (BY MR. MIZELL) Is this a class that you
13  understand that you are serving as a class
14  representative for?
15     A.  Yes.
16         MR. LEVY:  Objection.
17     Q.  (BY MR. MIZELL) From what you just read,
18  does the definition exclude physicians that the
19  defense Medicare Part B drugs?

20        MR. LEVY:  Objection, calls for a legal
21  conclusion.
22        THE WITNESS:  Doesn't say it, so I guess
0266
1  it does.
2        MR. LEVY:  Don't guess.
3        THE WITNESS:  Then I don't know.
4     Q.  (BY MR. MIZELL) Well, from what you read,
5  do you see any text in that definition excluding
6  physicians that dispense Medicare part B drugs?
7        MR. LEVY:  Objection.
8        THE WITNESS:  No.
9     Q.  (BY MR. MIZELL) Just for the reporter, is
10  that a no?
11     A.  No.
12     Q.  And from the definition you just read,
13  does the text exclude administrators of supplemental
14  insurance programs for people enrolled in Medicare?
15        MR. LEVY:  Objection.
16        THE WITNESS:  What?  Read that again.
17           (Record read)
18        THE WITNESS:  I don't know.
19     Q.  (BY MR. MIZELL) That text is not in that
20  definition; right?
21     A.  No.
22     Q.  And it doesn't exclude persons that have
0267
1  processed claims for reimbursing drugs covered by
2  Medicare?
3        MR. LEVY:  Objection.
4        THE WITNESS:  No, it doesn't.
5     Q.  (BY MR. MIZELL) Okay.  For any of the
6  treatments in which your wife was provided a
7  physician-administered drug, did you ask the
8  physician about whether there was any difference
9  between the price you were paying and the price they
10  paid for the drug?
11     A.  No.
12     Q.  Did you have any expectation at that time
13  what that difference might be?
14        MR. LEVY:  Objection.
15        THE WITNESS:  No.
16     Q.  (BY MR. MIZELL) For any of the treatments?
17        MR. LEVY:  Objection.
18        THE WITNESS:  No.
19        MR. MIZELL:  All right.  That's all I
20  have.
21        MR. MITCHELL:  Anyone on the phone have
22  anything?
0268
1           CROSS-EXAMINATION
2  BY MR. FARQUHAR:
3     Q.  This is Doug Farquhar, representing
4  Watson. Mr. Young, are you aware that you are being

5  offered as a class representative for claims against
6  Watson Pharmaceuticals?
7      MR. LEVY:  Objection.
8      THE WITNESS:  If it is on the list, it
9  would be.
10     Q.  (BY MR. FARQUHAR) And are you aware that
11  among the drugs that the claims in the fourth
12  amended consolidated complaint are listed for
13  Watson, there are two drugs Ferrlecit, F-e-r-r-l-e-
14  c-i-t, and Infed, I-n-f-e-d, are you aware that
15  those two drugs are among the drugs that you have
16  listed as being offered as the class representative
17  for?
18     MR. LEVY:  Objection.
19     THE WITNESS:  If they are in there, yes.
20     Q.  (BY MR. FARQUHAR) Are you aware that those
21  two drugs are primarily administered to in-stage
22  renal disease for dialysis patients?
0269
1      MR. LEVY:  Objection.
2      THE WITNESS:  I have no idea.
3      Q.  (BY MR. FARQUHAR) All right.  And then I
4  assume it would be correct that you have no idea as
5  to how dialysis drugs are reimbursed, and whether
6  that may be different from other physician-
7  administered drugs; is that correct?
8      MR. LEVY:  Objection.
9      THE WITNESS:  That is correct.
10     Q.  (BY MR. FARQUHAR) And I would assume also
11  that you're not aware of any discussions at the
12  Federal level about whether there should be a change
13  in the reimbursement for dialysis drugs back in the
14  late '90s and early 2000, 2001 period; is that
15  correct?
16     MR. LEVY:  Objection.
17     THE WITNESS:  That's correct.
18     MR. FARQUHAR:  I have no further
19  questions.
20
21             CROSS-EXAMINATION
22  BY MR. BRUNO:
0270
1      Q.  This is Jason Bruno for Baxter.  I have a
2  few questions.  Is that okay?
3      A.  Sure, absolutely.
4      Q.  Okay.  Mr. Young, I'm not quite sure how
5  we are going to do this, but I want you to take a
6  look at some documents that have been previously
7  marked.  Do you have documents there in front of
8  you?
9      MR. LEVY:  Yes.
10     MR. BRUNO:  Okay.
11     Q.  (BY MR. BRUNO) I would like you to look at
12  the documents marked Young 0209 through Young 0211.

13     MR. MITCHELL:  Did we mark that as an
14 exhibit?
15     MR. BRUNO:  What exhibit is that?
16     MR. MITCHELL:  No, did we mark it as an
17 exhibit?
18     MR. BRUNO:  No, I don't believe we did.
19     MR. MITCHELL:  What was that again?
20     MR. BRUNO:  0209.  0209 through 0211.
21     MR. MITCHELL:  Okay.  The witness has it.
22         (Exhibit Young 018 marked for
0271
1 identification)
2     Q.  (BY MR. BRUNO) Mr. Young, do you recognize
3 this document?  Take your time.
4     A.  No, I haven't seen this.
5     Q.  You haven't?
6     A.  No.
7     Q.  Do you know what it is?
8         MR. LEVY:  One moment, Counsel, I'm sorry.
9 He only looked at the first page, so he needs time
10 to look beyond.
11         THE WITNESS:  I haven't seen it.
12     Q.  (BY MR. BRUNO) Okay.  Do you know what it
13 is, sir?
14         MR. LEVY:  Objection.
15         THE WITNESS:  I think -- well, it is a
16 request for documentation, or of drugs that my wife
17 took.
18     Q.  (BY MR. BRUNO) Thank you.  Do you know,
19 this is from -- it appears to be from Integris; is
20 that correct?
21     A.  Yes.
22     Q.  Okay.  Do you know if Integris has sent
0272
1 any more documents naming the manufacturers for
2 drugs that your wife took?
3     A.  I have no idea.
4         (Exhibit Young 019 marked for
5 identification)
6     Q.  Okay, thank you.  I want to direct you to
7 another set of documents, it is 0439 and 0440. Let
8 me know when you have had a chance to take a look at
9 that.
10     A.  Okay.
11     Q.  This appears to be a letter from the
12 Oklahoma Arthritis Center, naming manufacturers for
13 certain drugs your wife took; is that correct?
14     A.  Looks like that, yes.
15     Q.  Okay.  On the bottom line of the first
16 page, under manufacturer for Heparin Sodium?
17     A.  Yes.
18     Q.  Can you read what the manufacturer is?
19     A.  Yes.  "Not given."
20     Q.  Do you know if you have received any other

21  correspondence from Oklahoma Arthritis Center
22  notifying you that she took Heparin Sodium?
0273
1        MR. LEVY:  Objection.
2        THE WITNESS:  No.
3     Q.  (BY MR. BRUNO) If you turn the page for --
4  second line down on the page 0440, manufacturer for
5  normal saline solution, that also says "not
6  available;" is that correct?
7     A.  Yes.
8        MR. LEVY:  Objection, mischaracterizes
9  testimony.
10    Q.  (BY MR. BRUNO) Do you know if your wife
11  was ever given normal saline solution at the
12  Oklahoma Arthritis Center?
13       MR. LEVY:  Objection.
14       THE WITNESS:  I have no idea.
15    Q.  (BY MR. BRUNO) Do you know if the second
16  line down, if she was given Sodium Chloride there?
17       MR. LEVY:  Objection.
18       THE WITNESS:  Still, no.
19    Q.  (BY MR. BRUNO) And do you know if you have
20  received any other correspondence from Oklahoma
21  Arthritis Center, regarding the manufacturers of
22  drugs that she took?
0274
1     A.  No, I have not received any.
2     Q.  Okay.  If you could turn to the document
3  marked Young 0105 through, gees, 0205.
4        MR. LEVY:  0105 to 0205.
5        MR. BRUNO:  Yes, sir.
6        MR. MITCHELL:  I'm missing 105.
7        MR. BRUNO:  105 looks different.  It looks
8  like a cover page.
9        MR. MITCHELL:  105 is part of Exhibit
10  Young 006 that was marked previously.
11       MR. BRUNO:  In the previous --
12       MR. MITCHELL:  Deposition.  Let me just
13  see.  This may have been -- we have got -- 106
14  through 205 was marked as Exhibit Young 005 in the
15  first deposition.  Do you just want to stick with
16  that?
17       MR. BRUNO:  Sure.
18       MR. MITCHELL:  Okay.  Let's stick with
19  that.
20       MR. LEVY:  So we are 106 to 205 as Exhibit
21  Young 005?
22       MR. MITCHELL:  As Exhibit Young 005,
0275
1  correct.
2     Q.  (BY MR. BRUNO) And 105 you said was
3  Exhibit Young 006?
4        MR. MITCHELL:  Yes, that was the first
5  page of Exhibit Young 006.

6        MR. BRUNO:  Was Exhibit Young 006 three
7    pages in all?
8        MR. MACER:  106 through 205 was Exhibit
9    Young 005 previously.  105 the last page of
10   Exhibit Young 006.
11       Q.  (BY MR. BRUNO) Sir, do you have these in
12   front of you?
13       MR. LEVY:  He has in front of him
14   currently 106 to the --
15       MR. BRUNO:  To 205?
16       MR. LEVY:  To 205.  He does not have 105
17   in front of him, does he need that?
18       MR. BRUNO:  Yes, please.
19       MR. LEVY:  Okay.
20       THE WITNESS:  Okay.
21       Q.  (BY MR. BRUNO) Sir, to your knowledge --
22   okay. Well then I'm going to stick with 106 to 205,
0276
1    which was marked as Exhibit Young 005.  Do you
2    recognize this document, sir?
3        A.  Looks like charges from the hospital to my
4    -- for my wife.
5        Q.  Do all of these charges, are they from an
6    in-patient hospital stay that your wife took?
7        A.  Yes.
8        Q.  Take your time to look through it.
9        MR. LEVY:  Objection, there is a lot of
10   pages here.
11       Q.  (BY MR. BRUNO) I can break this up into a
12   couple of questions.  First, do you know off the top
13   of your head whether or not your wife did any
14   extended in-patient stays at Integris Bass Baptist
15   health?
16       A.  Again?
17          (Record read)
18       THE WITNESS:  Yes, she was there for a
19   long time. Three months, I think.
20       Q.  (BY MR. BRUNO) All right.  Well, I can --
21   it appears from these documents that they are
22   charges from September 2nd, '04, and that's starting
0277
1    on page 106, through the end of November '04?
2        A.  That's when she passed away, on the 23rd.
3        Q.  Yes, sir.  Do you know, was your wife in
4    the hospital during this time?
5        A.  Yes.
6        Q.  Did she ever come home, or did she stay in
7    the hospital the entire time?
8        A.  Part of the time she come home.
9        Q.  Do you remember if she had any physician-
10   administered drugs while she was at home?
11       A.  She did not.
12       Q.  She did not.  So these charges then for
13   the drugs are charges for in-patient administration

14  of drugs?
15      A.  Yes.
16      Q.  Okay.  If I can just have a moment, I
17  think I'm done, but I want to review my notes.
18          MR. BRUNO:  Okay.  I believe that's it.
19
20          CROSS-EXAMINATION
21  BY MS. SCOTT:
22      Q.  This is Kelleen Scott, I have a couple of
0278
1  questions as well.  Can you hear me?
2          MR. LEVY:  One moment, we are just
3  cleaning up here, so to speak.
4          MS. SCOTT:  Well, don't clean up Exhibit
5  Young 018 that we just looked at a moment ago.
6          MR. LEVY:  We already put it in the trash.
7          MR. MITCHELL:  All right, he's got Exhibit
8  Young 018.
9      Q.  (BY MS. SCOTT) Mr. Young, do you know if
10  your wife was ever administered a drug named
11  Epoetin?
12      A.  I have no idea.
13      Q.  Do you know if you or your wife ever paid
14  for a drug named Epoetin?
15      A.  Not to my knowledge.
16      Q.  I'm sorry, I didn't hear you.  Did you say
17  not to my knowledge?
18      A.  True.
19      Q.  Okay.  Look at Exhibit Young 018, if you
20  would, the second page on 210.
21      A.  Okay.
22      Q.  The fourth line down, it says manufacturer
0279
1  for Epoetin Alfa, do you see that?
2      A.  Yes.
3      Q.  And it lists -- the manufacturer listed is
4  Amgen, Inc.; is that correct?
5      A.  Yes.
6      Q.  Do you have any information beyond this
7  entry by Integris Bass Baptist Health Center that
8  any Epoetin Alfa administered to your wife was
9  manufactured by Amgen?
10      A.  Not to my knowledge.
11      Q.  Do you know what Epoetin Alfa is?
12      A.  No.
13      Q.  Do you know why your wife would have
14  received that drug?
15          MR. LEVY:  Objection.
16          THE WITNESS:  No.
17      Q.  (BY MS. SCOTT) Do you know how your wife
18  doctors arrived at the price that was charged for
19  Epoetin?
20          MR. LEVY:  Objection.
21          THE WITNESS:  No.

22     Q.  (BY MS. SCOTT) Do you know how your wife's
0280
1  doctors arrived at the price charged for Epoetin
2  Alfa?
3     A.  No.
4          MR. LEVY:  Objection.
5     Q.  (BY MS. SCOTT) Do you know how your wife's
6  doctors arrived at the price charged for Neupogin?
7          MR. LEVY:  Objection.
8          THE WITNESS:  No.
9          MS. SCOTT:  That's all I have.
10          MR. MITCHELL:  Anyone else on the phone
11  have any questions?
12
13          CROSS-EXAMINATION
14  BY MR. PUGH:
15     Q.  Yes, this is Preston Pugh from
16  Sonnenschein, representing Sicor, briefly.  Sir, do
17  you have any idea if your wife ever took a drug
18  manufactured by Gensia?
19          MR. LEVY:  Say that again, please, the
20  name that you just said.
21          MR. PUGH:  Gensia, G-e-n-s-i-a.
22          THE WITNESS:  I have no idea.
0281
1     Q.  (BY MR. PUGH) And if you will recall, you
2  were asked about the drugs that were in paragraph 21
3  of the fourth amended complaint?
4     A.  Yes.
5     Q.  Do you have any knowledge of whether
6  Gensia manufactured any of the drugs in that
7  paragraph?
8     A.  I would have to look to see if there was.
9     Q.  Please do.
10          MR. MITCHELL:  I'm handing him the exhibit
11  now, paragraph 21.
12          MR. PUGH:  Yes, sir.
13          THE WITNESS:  Okay, by who?
14     Q.  (BY MR. PUGH) By Gensia, G-e-n-s-i-a.
15          MR. LEVY:  Could you read that question
16  back?
17          (Record read)
18          THE WITNESS:  I don't see it.
19     Q.  (BY MR. PUGH) So does that mean that you
20  don't have any knowledge whether Gencia ever
21  manufactured any of those drugs?
22     A.  Right.
0282
1          MR. PUGH:  Okay, Thank you, sir.  That's
2  it for me.
3
4          CROSS-EXAMINATION
5  BY MR. MCCULLOCH:
6     Q.  This is Kevin McCulloch, I have a couple

7  of brief questions.
8      A.  Okay.
9      Q.  I was just wondering if, Mr. Young, if you
10  had any knowledge that your wife had ever been
11  administered Hydrocortisone Sodium Succinate?
12     A.  No.
13     Q.  And the same question, but for a drug
14  known as Solucortef, or Hydrocortisone Sodium
15  Phosphate?
16     A.  No.
17     Q.  And have you any knowledge that your wife
18  was ever prescribed Vincristine Sulfate?
19     A.  No.
20     Q.  As for these three drugs, do you have any
21  knowledge that you or your wife ever paid for any of
22  those three drugs?
0283
1      A.  No.
2      Q.  Do you know who manufactured any of those
3  three drugs?
4      A.  No, I sure don't.
5      Q.  Do you have any knowledge that if your
6  wife was prescribed these drugs, and if you did pay
7  for these drugs, how the price was arrived at for
8  those drugs?
9      A.  No.
10     MR. LEVY:  Objection.
11     THE WITNESS:  No, I do not.
12     Q.  (BY MR. MCCULLOCH) And one just final
13  question, Do you have any knowledge, other than what
14  is stated in the complaint, that you or your wife
15  ever received or paid for any of those three drugs
16  that I have named for you?
17     MR. LEVY:  Objection.
18     THE WITNESS:  No.
19     MR. McCULLOCH:  Thank you, Mr. Young.
20     THE WITNESS:  Yes.
21     MR. MITCHELL:  Anyone else?  All right.  I
22  have just got two follow-up questions.
0284
1          REDIRECT-EXAMINATION
2  BY MR. MITCHELL:
3      Q.  Look back at paragraph 21 again.  Other
4  than Remicade, for any of the drugs listed in
5  paragraph 21, are you aware of either you or your
6  wife ever paying for any of the drugs listed in
7  paragraph 21?
8      A.  Not to my knowledge, no.
9      Q.  One last question.  You have talked about
10  the deductible you believe you have paid for your
11  supplemental insurance was approximately $1500 a
12  year.  Let's take just 2004, for instance.
13          Do you know how far into the year it was
14  before you reached your deductible; in other words,

15   what month was it that you satisfied your deductible
16   amount?
17      MR. LEVY:  Objection.
18      THE WITNESS:  They started the payments
19   out the first of the year, so it was averaged out
20   over a full year, so that would be paid out.  And
21   even when she wasn't able to take the drug in 2004,
22   after July, I was still billed for that supplemental
0285
1   upfront.
2      Q.   (BY MR. MITCHELL)  Are you talking about
3   for the Remicade, or were you billed for --
4      A.   Remicade.
5      Q.   Is that the only drug you were ever billed
6   for that you can recall?
7      A.   As far as I know.
8      MR. LEVY:  Objection.
9      THE WITNESS:  There may be some other
10   stuff in there.
11      Q.   (BY MR. MITCHELL) But you have produced
12   all of the records you have on that?
13      A.   Yes.
14      MR. MITCHELL:  I don't have any other
15   questions.
16      MR. MIZELL:  We would note --
17      MR. MITCHELL:  Yes.  I don't have any
18   other questions at this time.  Depending on what
19   documents we receive from providers, and based upon
20   your objections today, we may seek leave from the
21   Court to continue this deposition.
22      So at this time we would close the
0286
1   deposition with that proviso, that we are not -- may
2   not be finished.
3      MR. LEVY:  And we consider the deposition
4   closed. I understand your proviso, so it has been
5   stated on the record. We would like to reserve
6   reading and signing for this deposition. And I think
7   we are done.
8      (DEPOSITION CONCLUDED AT 1:00 P.M.)
9      * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22

0287

1          IN RE PHARMACEUTICAL INDUSTRY
2                  PR. FILE #9304
3   STATE OF OKLAHOMA    )
4                      )SS
5   COUNTY OF OKLAHOMA    )
6          I, LARRY LYNN YOUNG, do hereby state under
7   oath that I have read the above and foregoing
8   deposition in its entirety and that the same is a
9   full, true and correct transcription of my testimony
10  so given at said time and place, except for the
11  corrections noted.
12         _____
13              LARRY LYNN YOUNG
14
15          Subscribed and sworn to before me, the
16  Notary Public in and for the State of Oklahoma, by
17  said witness, _____, on
18  this, the ___ day of _____, 2006.
19         _____
20              NOTARY PUBLIC
21              My Commission Expires:_____
22     (LLR)    PR FILE #9304

0288

1              CERTIFICATE
2   STATE OF OKLAHOMA    )
3                      )SS
4   COUNTY OF OKLAHOMA    )
5          I, LAURA L. ROBERTSON, Certified Shorthand Reporter,
6   within and for the State of Oklahoma, do hereby certify that
7   the above-named LARRY LYNN YOUNG, was by me first duly sworn
8   to testify the truth, the whole truth, and nothing but the
9   truth, in the case aforesaid; that the above and foregoing
10  deposition was by me taken in shorthand and thereafter
11  transcribed; that the same was taken the March 24, 2006, in
12  the City of Oklahoma City, County of Oklahoma, State of
13  Oklahoma, pursuant to agreement, and under the stipulations
14  hereinbefore set out; and that I am not an attorney for nor
15  relative of any of said parties or otherwise interested in
16  the event of said action.
17          IN WITNESS WHEREOF, I have hereunto set my hand and
18  official seal this 27th of March, 2006.
19
20         _____
21              LAURA L. ROBERTSON, CSR, RPR
22              State of Oklahoma, No. 01472