# EXHIBIT Q

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION**

_____
                                            )
IN RE COUNTRYWIDE FINANCIAL          )      No.: 3:08-md-001998-TBR
CORP. CUSTOMER DATA SECURITY         )      MDL No. 1998
BREACH LITIGATION                    )
                                            )      Honorable Thomas B. Russell
_____)      United States District Judge
                                            )
This Document Relates to:            )
     All Actions                     )
                                            )
_____)

**SETTLING PLAINTIFFS' REPLY TO THE HOLMES OBJECTORS'
RESPONSE IN SUPPORT OF THEIR MOTION
FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND
PUBLISHING OF NOTICE, AND SETTING OF A FINAL FAIRNESS HEARING**

Plaintiffs Cody M. Dragon, Laila Elkhettab, Jay B. Gaumer, Scott Gregg, Matthew B.

Martin, Harold L. Mooney, Edmond Moses, Thomas A. Munz, Michael J. Rich, and Kim

Wickman (the "Settling Plaintiffs"), by and through counsel, hereby submit this Reply in support

of Settling Plaintiffs' Motion For and Memorandum in Support of Motion For Preliminary

Approval of Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness

Hearing, and in support thereof, state as follows:

**INTRODUCTION**

Forty-eight (48) law firms, along with fifty-five (55) named plaintiffs, endorse the

proposed class action settlement before the Court.[1] Those firms and attorneys have vast

experience in the law, including many class actions of significant magnitude. The proposed

---

[1] The names of the firms and attorneys appear in Settling Plaintiffs' papers. See Plaintiffs' Motion for and Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness Hearing ("Plaintiffs' Motion for Approval") [D.E. #7]; Notice of Filing of Join-In Forms at Exhibit 1. [D.E. #21]; Notice of Filing of Join-In Form at Exhibit 1. [D.E. #33]. The CV's of most of them have also been filed as part of the record. See Plaintiffs' Motion for Approval, Group Exhibit B [D.E. #7]; Notice of Filing of Join-In Forms at Group Exhibit 2. [D.E. #21].

settlement, which deals with the theft of personal identifier information, brings with it the attorneys who clearly have superior experience in this type of litigation. The settlement delivers a real and substantial remedy, which fairly, reasonably, and adequately deals with the situation confronting the members of the proposed Settlement Class. Two other settlements dealing with data security breaches, which are believed to be the two largest data loss cases and settlements in legal history, *In re TJX Companies Retail Sec. Breach Litig.* (the "*TJX Litigation*"), MDL Docket No. 1838, No. 07-10162 (D. Mass.) (Young, J.), and *Lockwood v. Certegy Check Services, Inc.* (the "*Certegy Litigation*"), No. 8:07-cv-01434-SDM-TGW (M.D. Fla.) (Merryday, J.), were brought to resolution through settlement by members of Settling Plaintiffs' counsel.

Both an earlier filing and the renewed filing by the Holmes Objectors attempt to denigrate the efforts of Settling Plaintiffs' counsel in achieving the proposed settlement. Those papers are without substance, and do not alter the clear conclusion that the proposed settlement is within the range of fair, reasonable, and adequate. While "within the range of fair, reasonable and adequate" is the standard the Court is required to measure the settlement against for preliminary approval, the proposed settlement is an extraordinary and excellent one and goes beyond that threshold requirement.  The Holmes Objectors' complaints either fail to accurately deal with the proposed settlement or fail to correctly apply applicable law and, in any event, fall far short of impeaching the settlement. Of thirty-eight (38) filed lawsuits before the Court, only the ninth, sixteenth, twentieth, and thirty-seventh filed cases, all grouped between only two sets of attorneys, attempt to stand in the way of preliminary approval.

Contrary to the Holmes' objection, the number and identity of all persons whose private, personal and confidential financial information ("Private Information") was sold by Rene L. Rebollo, Jr. is not known with absolute certainty, and the Settlement Class is appropriately

defined and sized. To shrink the coverage of the settlement, as the Holmes Objectors would have the Court do, is contrary to the interest of consumers and members of the proposed Settlement Class. The Holmes Objectors' challenge to the adequacy of Settling Plaintiffs is without merit, and demonstrates a fundamental misunderstanding and/or misstatement of the facts and law at issue in this case. Further, the proposed Notice Plan in this litigation is the best practicable and is reasonably calculated to apprise all interested persons of this action. The Holmes Objectors state that they believe a "settlement is achievable." Holmes Br. at 2. A settlement has been achieved, and it is well within the range of fair, reasonable, and adequate. As such, Settling Plaintiffs' Motion for Preliminary Approval should be granted.

## I.      THE SETTLEMENT CLASS IS APPROPRIATELY DEFINED AND SIZED.

The definition and size of the Settlement Class comports with the facts of this case and applicable precedent. Contrary to the Holmes Objectors' assertions, the number and identities of all persons whose Private Information was stolen and sold by Rebollo is not known for certain, and likely never will be. It is not reasonable to believe that anyone will be able to determine with 100% certainty the number and identities of all persons whose Private Information was stolen and sold. Nothing the Holmes Objectors states contradicts this fact. Though the number of persons is believed to be approximately 2.4 million, and Countrywide sent letters to those it concluded were affected by the breach, this figure and the identity of all those affected are not certain. Additionally, given that Rebollo has pled not guilty, and the fact that he downloaded the stolen data to flash drives, many of which he sold directly to third parties, it is reasonable to believe that this information may never be known. The Holmes Objectors' unsupported contention that such information is "entirely knowable" is incorrect. Thus, the inclusion in the Settlement Class of all persons placed at risk as a result of the security breach was a victory for

Countrywide customers, and is appropriate.  The Holmes Objectors' complaints about the size of the Settlement Class are without merit.

The Settlement Class is similar in scope to those involved in settlements certified, and found to be fair, reasonable and adequate, by federal courts in the two other consumer data breach class actions referenced above. In the *Certegy Litigation*, the plaintiffs' claims arose from an employee's theft and sale of private information stored on the defendant's databases, and the federal district court certified a Class including "all persons whose credit card, debit card, checking or demand deposit account numbers or information was included in the [databases from which the former employee had stolen the information]".  *See* Order, *Certegy Litigation* (M.D. Fla. Mar. 21, 2008) (Merryday, J.) (preliminarily approving settlement and certifying settlement class); Order (M.D. Fla. Sept. 3, 2008) (Merryday, J.) (granting final approval of settlement), attached hereto as Group Exhibit A. In the *TJX Litigation*, the plaintiffs' claims arose from computer hackers' theft of the private information of consumers that had shopped or returned items at TJX Stores, and the federal court certified a settlement class including all persons who made a purchase or return at TJX Stores in the United States, Puerto Rico or Canada. *See* Order, *TJX Litigation* (D. Mass. Jan. 9, 2008) (Young, J.) (preliminarily approving settlement and certifying settlement class); Order, *TJX Litigation* (Sept. 2, 2008) (Young, J.) (granting final approval of settlement), attached hereto as Group Exhibit B.  In those cases, as here, the number and identities of all persons whose private information was accessed and stolen from the defendants were not known with 100% certainty. The proposed Settlement Class definition comports with applicable precedent.

Finally, in support of their position, the Holmes Objectors cite two prior Western District of Kentucky cases. A review of these cases confirms that the Holmes Objectors mischaracterize

the holdings of both *Taber v. McCracken County*, 2008 WL 5101684 (W.D. Ky. Nov. 26, 2008) and *Adams v. Federal Materials Co.*, No. 5:05-CV-90-R, 2006 WL 3772065 (W.D. Ky. Dec. 19, 2006). Contrary to their representations, neither of these actions involved the court holding that a proposed Class was overbroad. *See Taber*, 2008 WL 5101684, *6 (declining to certify a damages class on typicality grounds and an injunctive relief class because the named representatives were not members of the Class they sought to represent); *Adams*, 2006 WL 3772065, at *10 (denying plaintiffs' motion for failure to satisfy Rule 23(b)(3)'s predominance requirement).

## II. PROPOSED CO-LEAD SETTLEMENT CLASS COUNSELS' KNOWLEDGE OF THE FACTS AND LAW IN THIS CASE SUPPORTS PRELIMINARY APPROVAL OF THE SETTLEMENT.

Over four months of negotiations by highly experienced counsel with substantial experience in consumer class actions, including litigation involving claims similar to those at issue here, along with a factual investigation and informal discovery, support the fact that Proposed Co-Lead Settlement Class Counsel were well-informed at the time of settlement. "That the parties conducted their investigation through informal discovery, or based on information assembled in a related case, is not unusual or problematic, so long as they and the court have adequate information in order to evaluate the parties' relative positions." *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) (citations omitted); *D'Amato v. Deutsche Bank,* 236 F.3d 78, 87 (2d Cir. 2001) (same). In fact, "informal discovery designed to develop a settlement's factual predicate is encouraged because it expedites the negotiation process and limits costs which could potentially reduce the value of the settlement." *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267 (S.D.N.Y. May 1, 2008) (citation omitted).

Proposed Co-Lead Settlement Class Counsel participated in over four months of arm's-length negotiations with counsel for Countrywide prior to entering into the Settlement Agreement. During that time, Proposed Co-Lead Settlement Class Counsel pursued and received from Countrywide informal discovery directly relevant to the claims at issue, the facts and circumstances involved in this litigation, and the settlement. Proposed Co-Lead Settlement Class counsel also collected and reviewed publicly-available information regarding the parties and claims at issue, including documents related to the criminal actions brought against Rebollo and Wahid Siddiqi. Additionally, Settling Plaintiffs' counsel has significant experience in data breach consumer class actions such as this,[2] and are thus well informed of the legal claims at issue and the risks of this case. The members of the Proposed Plaintiffs' Executive Committee and numerous other Plaintiffs' counsel have reviewed the settlement and endorsed it, along with their respective clients.

Pursuant to the settlement agreement, confirmatory discovery is being conducted by Proposed Co-Lead Settlement Class Counsel, including discovery specifically related to the corrective actions taken by Countrywide to prevent such incidents from occurring in the future, and the steps taken to enhance the security of consumers' Private Information that is entrusted to Countrywide.[3]

---

[2] Mr. Barnow and Ms. Savett were two of the three Settlement Class Co-Lead Counsel in the *TJX Litigation*. Mr. Barnow, Mr. Finkelstein, Ms. Savett, Mr. Harke, and Mr. Drury, are attorneys in the *Lending Tree Litigation*. In the *Certegy Litigation*, Mr. Barnow and Mr. Harke were Co-Lead Settlement Class Counsel, along with Mr. Phalen. Mr. Girard was also on the Executive Committee in the *Certegy Litigation*.

[3] Settling Plaintiffs' counsel have already received over four thousand pages of confirmatory discovery from Countrywide, and have caused copies of these documents to be made available to the attorneys from the Holmes and Martin attorneys. *See* Letter from Ben Barnow to Stacey A. Blankenship and Ron R. Parry (March 6, 2009), attached hereto as Exhibit C.

III.     **SETTLING PLAINTIFFS ARE ADEQUATE CLASS REPRESENTATIVES.**

Settling Plaintiffs adequately represent the interests of the Settlement Class. "What constitutes adequate representation is a question of fact that depends on the circumstances of each case." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 637 (1997) (Breyer. J., concurring) (quoting 7A Wright, Miller, & Kane, Federal Practice and Procedure § 1765, at 271). All Settlement Class members have an interest in being reimbursed for identity theft losses suffered as a result of the Rebollo theft – the settlement comports to this in providing for them to, *inter alia*, submit claims until October 31, 2012, and in providing for $5 million that can be drawn from until that date. Thus, the adequacy requirement of Rule 23(a)(4) is satisfied.

The Holmes Objectors incorrectly analogize this action to *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  The two are readily distinguishable. *Amchem* involved a proposed settlement encompassing present and future claimants personally injured as a result of asbestos exposure attributable to certain defendants. *Id.* at 597. The proposed settlement included the claims of hundreds of thousands, and perhaps millions, of Class members that suffered, or that "some day may suffer", personal injuries as a result of asbestos exposure. *Id.* at 597. Thus, in addition to including the claims of persons having suffered personal injuries as a result of asbestos exposure, that settlement also included those not yet suffering injury, many of whom were unaware they had even been exposed to asbestos, as the latency period between asbestos exposure and manifestation of injury can be as long as forty (40) years. *Id.* at 597–98. As a result, the Court held that the named plaintiffs there failed to satisfy Rule 23(a)(4)'s adequacy requirement because:

> Named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payment. That goal tugs

7

against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.

*Id.* at 626.

In raising *Amchem,* the Holmes Objectors have demonstrated their misinterpretation of this case and the proposed settlement. They argue that those who have not suffered identity theft "have not themselves been identified as persons who suffered injury as a result of the Countrywide data breach." Holmes Br. at 23. Their position is akin to what defendants defending these cases would generally say. Their position is incorrect, and if taken literally, would foreclose the rights of millions of Settlement Class members in this litigation. The argument minimizes, if not denigrates, the harm of the increased risk of identity theft suffered by all Class members.

One of the significant problems with the Holmes Objectors' argument is their failure to appreciate the difference between those whose Private Information has been or may have been stolen, and those who have actually suffered an identity theft as a result of the stolen Private Information. To Settling Plaintiffs' knowledge, at this time, only a limited (and small) number of proposed Settlement Class members have alleged, and none are known to have proven, that they have suffered an actual identity theft as a result of the Rebollo theft. If one accepts the Holmes Objectors' argument, only those few who actually suffered an identify theft would be proper members of the Class, all others being possible future claimants.

To the contrary, all those identified as Class members have been injured, even if they have not yet suffered an identity theft. In addition to the argument of an increased risk of identity theft, the claims asserted against Countrywide include, *inter alia*, intentional violations of the Fair Credit Reporting Act ("FCRA"), negligent violations of the FCRA, negligence, breach of implied contract, and violations of various consumer protection statutes. Thus, all

8

proposed Settlement Class members have been injured as a result of the Rebollo theft. The Holmes Objectors' statement to the contrary illustrates either a basic misunderstanding or a blatant disregard of the claims at issue in this litigation. That they are willing to redefine harm contrary to the settlement that Settling Plaintiffs' counsel have been able to properly negotiate for the Class is, at a minimum, troublesome.

Indeed, the Holmes Objectors' "future victims" argument is inconsistent with their own pleadings. In the *Holmes* Amended Class Action Complaint, filed on February 13, 2009, they seek a proposed class that includes customers of Countrywide who had their "Personal Confidential Information accessed and disseminated by Defendant Rebollo" and a subclass of certain former customers of Countrywide who had their "Personal Confidential Information accessed and disseminated by Defendant Rebollo" Amended Class Action Complaint ¶ 39 (Feb. 13, 2009). Noticeably, contrary to their attack here, their proposed classes do not exclude those who have yet to suffer "actual losses" resulting from identity theft. Their Amended Complaint also includes as proposed class representatives both plaintiffs who allege to have suffered damages as a result of identity theft stemming from the breach (*see, e.g., id.* ¶ 22), and plaintiffs who do not allege such damages (*see, e.g, Id.* ¶¶ 24, 25). They also allege that these "Plaintiffs have no interests that conflict with or are antagonistic to the interests of the Class or Sub-Class members." *Id.* ¶ 43. That allegation is diametrically opposed to the argument they raise here.

In essence, the Holmes objection operates to strip consumers of the right to successfully bring an action for a data breach, absent suffering damages from identity theft as a result of the Rebello theft. Such a position is not in the best interest of, and is directly antagonistic to, the millions of consumers affected by this litigation.

The future claimant issue raised in *Amchem* was based on facts far different than those at issue here.  This is a consumer class action, not a mass tort case. As noted by Justice Breyer in *Amchem*, such a conflict of interest "is a problem that often exists in toxic tort cases." *Amchem*, 521 U.S. at 637 (Breyer, J., concurring) (citing J. Weinstein, Individual Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and Other Multiparty Devices, at 64 (1995) (noting that conflict "between present and future claimants" "is almost always present in some form in mass tort cases because long latency periods are needed to discover injuries"); Judicial Conference Report 34-35 ("Because many of the defendants in these cases have limited assets that may be called upon to satisfy the judgments obtained under current common tort rules and remedies, there is a 'real and present danger that the available assets will be exhausted before those later victims can seek compensation to which they are entitled'"(citation omitted)). This action does not involve thousands of claimants that have already suffered serious physical injury, or thousands of "future" claimants that may not discover that they have been so injured for forty (40) years. Rather, it involves an objectively based Class comprised of consumers with economic damages and a carefully constructed remedy developed and tailored to the facts of this case.

Finally, the Holmes Objectors' statement that "a class that includes persons with only future injures along with presently-injured plaintiffs is driven by inherently conflicting interests," exemplifies their misunderstanding of *Amchem* and *Ortiz*.  Holmes Br. at 20. In addition to having no application here, even if there were a connection, as noted in *Denney v. Deutsche Bank AG*, 443 F.3d 253, 269 (2d Cir. 2006), no such *per se* prohibition exists. *See also In re Prudential Ins. Co. America Sales Practice Litigation Agent*, 148 F.3d 283, 313 (3d Cir. 1998); McLaughlin On Class Actions: Law And Practice § 4.02 ("There is no *per se* prohibition against

10

certifying a single class including both presently injured and future claimants."). As shown

above, the Holmes Objectors recklessly, if not willingly, disregard the injuries involved here.[4]

## IV.   THE NOTICE PLAN WILL PROVIDE SETTLEMENT CLASS MEMBERS WITH THE BEST NOTICE PRACTICABLE AND REASONABLY DIRECTS NOTICE TO SETTLEMENT CLASS MEMBERS.

The proposed Notice Plan satisfies due process requirements and those outlined by

Federal Rule of Civil Procedure 23.  As noted in *Phillips Petroleum Co. v. Shutts*, "notice must

be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested

parties of the pendency of the action and afford them an opportunity to present their objections.'"

472 U.S. 797, 811-12 (1985) (quoting *Mullane,* 339 U.S. at 314−15); *see also* Fed. R. Civ. P.

23(e)(1)(B) ("The court must direct notice in a reasonable manner to all class members who

would be bound by a proposed settlement . . . ."). The language of Rule 23(e) provides trial

courts with "virtually complete discretion" in selecting the kind of notice to employ in order to

inform class members of a settlement hearing. *Franks v. Kroger Co.*, 649 F.2d 1216, 1222-23

(6th Cir. 1981) (collecting cases).

The Notice Plan is reasonable and the best practical considering the facts of this case. It is

by any measure, very comprehensive. Due process does not require a mailing to each party

intended to be bound by the adjudication of a representative action. *See Fidel v. Farley*, 534 F.3d

508, 514 (6th Cir. 2008) (citing *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306,

313−14 (1950)); *see also In re Integra Realty Res., Inc*., 262 F.3d 1089, 1110-11 (10th Cir.

---

[4] It is perhaps ironic that the Holmes Objectors would oppose a settlement that provides a Class member with reimbursement for identity theft losses through the multiple avenues of recovery that are provided for by the proposed settlement. Even if the Holmes plaintiffs do not get the credit monitoring and identity theft insurance that comes with it, or the $1 million guarantee of product, they still have the mediation process available where the cost of JAMS/Endispute is paid for by Countrywide, and they get 110% of their claim found to be valid, plus reasonable attorney's fees, costs, and expenses if they prevail at mediation. One could see fair-minded counsel viewing and advising their clients that such a benefit is better than the opposition, expense, and delay that would be confronted in the standard litigation arena.

2001); *Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994). Rather, due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 313. Accordingly, the Sixth Circuit has accepted alternative forms of notice to direct-mail. *See, e.g., Lindsey v. Memphis-Shelby County Airport Authority*, 229 F.3d 1150 (Table), at *6 (6th Cir. 2000)(publication); *Fidel*, 534 F.3d at 514 (notice to brokers holding shares in street name; magazines, Internet); *Franks*, 649 F.2d at 1223 (publication and bulletin board posting); *Todd v. Retail Concepts, Inc*., No. 3:07-0788, 2008 WL 3981593, at *2 (M.D. Tenn. 2008) (defendant's website, in-store posting, email).

The Notice Plan was designed by Hilsoft Notifications, an experienced and highly regarded notice provider, to be efficient and targeted to reach the greatest number of Settlement Class members practicable.[5] The Notice Plan calls for direct mail notice to the approximately 2.4 million Settlement Class members whose Private Information Countrywide concluded was accessed and sold by Rebollo, a publication effort geared specifically towards reaching Settlement Class members, an informational press release, and a settlement website. The scope of the Notice Plan is consistent with those approved by federal courts in both the *Certegy Litigation* and the *TJX Litigation*. Thus, the Notice Plan satisfies due process and all other requirements. Also, though apparently not of concern to the Holmes Objectors, the cost of mailing over 17 million letters to Class members would likely eviscerate the settlement and the benefits it provides to the Class, which is certainly not a reasonable alternative. *See Green v. American Express*, 200 F.R.D. 211, 212 (S.D.N.Y. 2001) (notice is not required "when the cost of notice would risk eviscerating the settlement agreement").

---

[5] Settling Plaintiffs also anticipate that data-breach-dedicated websites will report on the settlement.

As noted above, the Holmes Objectors' "future victims" argument mischaracterizes the nature of the claims at issue.  Holmes Br. at 25 ("one who has not manifested any present injury lacks the basic information needed to make an intelligent decision about whether to remain in the class or to pursue a tort action that has not yet accrued, and might not ever accrue").  A plaintiff-oriented position instructs that each and every Settlement Class member has suffered injury (i.e. an increased risk of identity theft), and each such person will be able to ascertain whether they are a member of the Settlement Class through the clear definition of the Class or, if needed, after reasonable inquiry. The settlement even provides for a settlement website maintained in compliance with W3C Worldwide Web Content Accessibility Guidelines (Version No.1), Priorities 1 and 2, which are designed to help make web content accessible to people with disabilities. Settlement Agreement ¶ 3.3.  Thus, the Holmes Objectors' assertion that the Notice Plan will violate the constitutional rights of any Settlement Class member is incorrect, and inappropriately made.[6]

The Holmes Objectors misconstrue the language of the *In re: Pharma. Indus. Average Wholesale Price Litig.* ("*AWP*"), court. Tr. at 26-28, MDL 1456 (D. Mass. March 14, 2008) (Saris, J.), attached as Exhibit D to the Holmes Brief.  The *AWP* court's statement that it wanted "to know everything right now, so I'm not sending out notices to people and then I later find out that I may or may not agree with who's in the class", relates to questions Judge Saris had regarding the starting and ending dates of the proposed Class period the plaintiffs were attempting to get certified, not the limits of the notice plan, as the Holmes Objectors mistakenly suggest. *Id.*

---

[6] The Holmes Objectors' articulations and citations regarding constitutional rights, jury trials, etc. (citing, *inter alia*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803)), are puzzling.  By their very nature, settlements compromise, or "settle", various rights, and involve give and take.

The Holmes Objectors' statement that "[t]he proper use of the 'media blitz' in the *AWP* case resulted in an inordinate number of opt-outs" is also incorrect, and is contradicted by their own Exhibits. The large number of opt-outs in *AWP* was attributed to the fact that:

> Many of the consumers returning the exclusion form were confused by the presence of the exclusion form, and believed that by signing and returning the form they were either filing a claim for money, affirming their interest in participating as a class member, or returned the form under the mistaken belief that if they did not, they would be required to actively participate in the litigation in the form of testimony or deposition.

*AWP* Plaintiffs' Motion For Approval of Further Communications, attached as Exhibit C to the Holmes Brief.

Finally, the statement that the *AWP* court rejected an "ambitious publication plan" similar to the Notice Plan at issue here is incorrect. The *AWP* court preliminarily approved a settlement that contained a substantial publication element. Order, *AWP* (D. Mass. June 27, 2008) (Saris, J.), attached hereto as Exhibit D.

## V.  THE RANGE OF POSSIBLE OUTCOMES

"A fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 73 (D. Mass. 2005) (citations omitted). The settlement offers substantial and timely relief to Settlement Class members. Contrary to the Holmes Objectors' unsupported assertions, Settling Plaintiffs need not provide a mathematical breakdown of the range of possible outcomes of this case. On its face, the mere suggestion that such a pro/con analysis is required at this time, or any other, illustrates either that they are inexperienced in this kind of litigation or are simply willing to deride, derail and destroy an excellent settlement. The motion for preliminary approval sets forth the value of the benefits accessible under the settlement. As noted herein, Settling Plaintiffs' counsel are knowledgeable of the facts and law relating to the settlement, and taking into account the risks of

cases such as this, assert and maintain the position that the settlement is an excellent one that certainly satisfies the requirement of fair, reasonable, and adequate, and is entirely consistent with similar settlements approved by federal courts.

## VI.   THE HOLMES OBJECTIONS DO NOT APPEAR MOTIVATED BY CONSIDERATIONS DESIGNED TO BENEFIT THE CLASS.

As shown above, there is no substance to the Holmes objections. Nonetheless, a serious issue remains for the Holmes Objectors, and one that is believed important if justice is to be administered for the Class. It is also the right of the Class to be able to identify its attackers.[7] The origin of the objection impacts the weight of the objection.

The record shows that a serious issue exists as to whether the Holmes objection lies in the best interests of Class members or is lawyer-created and driven. As recently as March 2, 2009, at approximately 6:15 EST, on a call between Mr. Haviland, Mr. Williams,[8] and members of Settling Plaintiffs' counsel, Mr. Haviland, by his own words, made it clear that he did not understand an important and valuable element of the settlement. *See* Declaration of Burton H. Finkelstein (March 9, 2009), at ¶ 5, attached hereto as Exhibit F. Mr. Haviland, who stated that he had read the settlement agreement more than once, contended that Settlement Class members would have to pay JAMS/Endispute mediation costs to challenge a denial of their claim by

---

[7] The traditional class action settlement review process contemplates that objectors may present their views, and be confronted, at a final fairness hearing. The objectors here, both the Holmes Objectors and the Martin Objectors, did not want to wait for that standard opportunity to set forth their views. In the *Certegy Litigation*, each of the objectors who were represented by counsel withdrew their objections after being hailed for deposition (or, in one instance, after he had his deposition taken). There were only three (3) such objections from an estimated 37 million class members and a mailing of approximately six (6) million notices.  The Holmes and Martin objectors' counsels' approach has effectively avoided that process at this time.  However, timeliness is an important element offered by the settlement and, thus, as previously stated, the importance of a timely preliminary approval hearing.  As a result, the Class benefits from the Court's preliminary approval of the settlement, the publication of notice, and the setting of a final fairness hearing.

[8] Mr. Haviland's letter of March 6, 2009, states that Mr. Larusso was also on the call. *See* Exhibit E. None of Settling Plaintiffs' counsel recall Mr. Larusso being introduced or on the call, and there is no recollection that Mr. Larusso announced his presence. *See* Exhibit F.

Countrywide. Mr. Haviland's attention was called to page 16, ¶ 2.1(d)(iii) of the Settlement Agreement, specifically the second to last sentence, which states that "[a]ll fees and expenses of JAMS/Endispute shall be the sole obligation of and paid for by Countrywide." *Id.* Mr. Haviland was also informed that if a Settlement Class member prevails at the mediation level, not only do they get their claim as awarded, but also receive an additional 10% on top of the face value of that award, and reasonable attorney's fees, costs, and expenses incurred by the Settlement Class member.

Mr. Haviland did not give up his view lightly, if at all. *Id.* Mr. Haviland was again told that under the settlement, mediation costs would be borne by Countrywide even if a Settlement Class member loses, and that the provision he referenced, that each party would be responsible for their own attorney's fees, costs, and expenses if they lost, was entirely consistent with the American legal system practice that plaintiffs pay for their own representation. *Id.* Here, under the proposed settlement, if the Class member prevails, Countrywide pays those. Mr. Haviland did not acknowledge a change of view. He should have known and understood that valuable and important provision before he filed the original Holmes objection on February 9, 2009. *Id.* One has to wonder when, if ever, his plaintiffs were so advised. If Mr. Haviland was not aware of this important provision until the evening of March 2, 2009, it is likely that none of the plaintiffs Mr. Haviland sets forth, whether the original husband and wife or those subsequently added, have properly been advised of the settlement terms.[9] *Id.*

---

[9] With Mr. Haviland's cunning and calculated enlargement of his plaintiff-objectors from two (2) to twenty-four (24), his after-the-fact reach is apparent. Had the multitude of attorneys supporting this settlement chosen to add additional plaintiffs to support the settlement, it would have been, barring other matters, easy to do. Adding plaintiffs to oppose is likely aided by a failure to fully advise said consumers of the benefits provided pursuant to the proposed Settlement Agreement.

Left with no applicable law or facts to support the objection he presides over, Mr. Haviland returns to an attack on Settling Plaintiffs' counsel. In his February 27, 2009 letter, [10] a copy of which he has attached to his current objection, and which is attached hereto as Exhibit G, to which he says he never got a response, the Court will see that he again proceeds with his expanded discovery attempts. *See* Tr. at 60 l. 7-9 (Russell, J. Feb. 17, 2008), the relevant pages of which are attached hereto as Exhibit H (noting that "usually discovery on the decision-making process, there's not much of that going on until there's been some preliminary showing of some time of collusion that took place. I mean, more than just an allegation of collusion."). It was clear that these potential objectors' counsel, if not objectors' counsel, were not given leave to launch their discovery attempts just because they raised the concept of collusion and recklessly threw it against Settling Plaintiffs' counsel. *Id.* He was invited to call, or send a letter or email, regarding topics to be dealt with as a part of confirmatory discovery. Mr. Haviland was unable to keep himself within those bounds. Nonetheless, more than 4,000 pages of documents have been made available for his and his colleagues' review. *See* Exhibit C.

Mr. Haviland's willingness to attack Settlement Class counsel appears to be part of his typical practice in challenging settlements.  Indeed, on the same day that Mr. Haviland likely drafted the February 27, 2009 letter, in what could be described as a fateful event, the Order of the Honorable Steven T. O'Neill, Court of Common Pleas, Montgomery County, Pennsylvania, issued in another case, stating in part:  "Mr. Haviland appears to have been trying to seek this information in support of a 'wild goose chase' to prove a self-created theory that the Settlement Agreement was the product of collusion, a theory that has absolutely no basis in fact. Mr.

---

[10] *See* Email from Stacy Blankenship to Ben Barnow (Mar. 2, 2009) (acknowledging that Settling Plaintiffs' counsel did not receive the letter dated February 27, 2009, until March 2, 2009, when it was finally faxed), attached hereto as Exhibit I; Letter from Ben Barnow to Stacey Blankenship (Mar. 2, 2009), attached hereto as Exhibit J.

Haviland had no basis to support such an outrageous and manufactured allegation". *See* Order, *In Re Bridgeport Fire Litig.*, Master File No. 05-20924 (Court of Common Pleas, Montgomery County, Pa., Feb. 27, 2009), attached hereto as Exhibit K.  That Court went on to note that "the subpoenas Mr. Haviland sought to issue represented yet another example of his improper interference in the class action proceedings. He had no right or basis to demand documents from various parties and non-parties. Mr. Haviland has continuously, operated to delay and disrupt these proceedings . . . ." *Id.*

Past history is a significant indicator of Mr. Haviland's tactics and objectives.  In the *AWP* case, cited above, Mr. Haviland was chastised by the Court for his actions and ethics. Among other transgressions, the Court found: (1) that Mr. Haviland's failure to disclose that he was concurrently seeking a national Class in a separate court, despite his express representations to the contrary "to the Court or fellow counsel [was] a breach of trust as class counsel"; (2) that Mr. Haviland made a "material misrepresentation" to a New Jersey court; (3) that Mr. Haviland's filing of declarations from his clients, in which they threatened to withdraw if Mr. Haviland were not appointed as class counsel, were akin to "threats to take his toys and go home if the Court declined his request. Mr. Haviland intended to coerce the Court into appointing him as Co-Lead Class Counsel or risk losing class representatives in a class action involving the sick and elderly. Both the nature and the timing of these declarations raised concerns about Haviland's loyalty to the class."; and, (4) that "Mr. Haviland breached a duty of care by publicly placing on the docket sensitive negotiating positions of plaintiffs."  So egregious was his conduct, that Judge Saris stated at one point, "truthfully, at this point, I don't trust you." *In re: Pharma. Indus. Average Wholesale Price Litig.*, MDL 1456, 2008 WL 53278, at **3-5 (D. Mass. Jan. 3, 2008), attached hereto as Exhibit L. Judge Saris took the unusual step of asking Mr. Haviland's former Co-Class

counsel to submit briefs and declarations as to why Mr. Haviland should be removed as Class counsel. After reviewing those submissions, Judge Saris entered her Order of January 3, 2008, removing him as a Class counsel. *Id.*

In *In re: Lupron Marketing and Sales Practices Litigation*, 228 F.R.D. 75 (D. Mass. 2005), Mr. Haviland was found to have sent letters containing vital misrepresentations, thereby misleading the class about a proposed settlement. Order (D. Mass. Jan. 26, 2005), attached hereto as Exhibit M.

While many of the false and scurrilous accusations against Settling Plaintiffs' counsel contained in the Holmes Objectors' first objection do not appear in their current filing, their assault has re-emerged by accusing certain Settling Plaintiffs' counsel of, *inter alia*, refusing to give them information related to the cost of the Notice Plan.[11] First, the point from which the Holmes Objectors launch this attack on the integrity of others gives them no reasonable platform. The Holmes Objectors' counsel claim to be experienced class action counsel. They had copies of the Notice Plan. Not only was the Notice Plan timely filed with the Court, but at Settling Plaintiffs' counsels' expense, copies were forwarded to them. The Holmes Objectors should be familiar with the fine and complete work performed by Hilsoft Notifications, indisputably one of the premier class action notice firms in the country, if not the world. Also, it is illogical to think that they would not, or should not, have known that the cost of the Notice Program would be in the millions, or that any of Settling Plaintiffs' counsel would be reluctant to tell them. The fact is

---

[11] Although the current Holmes objection removes the accusatory generalities that were in the first-filed objection (e.g. "willful blindness" and "rushing to settle for a nominal value"), Mr. Haviland reasserts those false accusations in his letter of March 6, 2009, wherein he states that nothing in the earlier objection was inappropriate. *See* Exhibit E.

that none of the Settling Plaintiffs' counsel on the call had the exact number.[12] *See* Exhibit F.

Their aggressive statement that they "inquired of the Barnow Group about the costs of the

proposed Notice Plan, but the Barnow Group refused to divulge these figures" is false. *See Id.*;

Holmes Br. at 13 n.8. They were told that the exact number was not known to the counsel on the

call, but that the cost was in the millions and that when the exact number was finalized, it would

be supplied. *Id.*

While it is regretful that any time should have to be spent on this point, it is necessary, as

Mr. Haviland has chosen to attack the integrity of counsel, something he should know he should

not do, yet nonetheless does with apparent disregard.  It is worth referencing Judge O'Neill's

statement regarding the veracity of Mr. Haviland:

> Mr. Haviland has made various misrepresentations to this Court, which raise
> questions concerning the law of perjury, 18 Pa. C.S.A. § 4902. These include
> misrepresentations that he never sent professional announcements regarding the
> formation of the Haviland Law Firm and that Mr. Otis initiated contact with him
> concerning settlement negotiations.

Order, *In re Bridgeport Fire Litig.*, No. 05-20924, ¶ 39 (Court of Common Pleas, Montgomery

County, Pa. May 16, 2008) (O'Neill, J.), attached hereto as Exhibit N.

In an effort to remove that improper attack from the record and to stop a sideshow,

Settling Plaintiffs' counsel wrote a letter to one of the Holmes Objectors' counsel, Stacey A.

Blankenship, asking that she correct the inaccurate statements contained therein. *See* Letter from

Ben Barnow to Stacey A. Blankenship (March 5, 2009), attached hereto as Exhibit O.  Mr.

Haviland, adamant in his position, forwarded a response on March 6, 2009, apparently on behalf

of Ms. Blankenship and his other colleagues. *See* Exhibit F; Exhibit E.

---

[12] On March 10 and 11, 2009, Settling Plaintiffs, as part of confirmatory discovery, received copies of
documents showing that the total cost of the Notice Plan and Claims Administration amounted to
approximately $4,049,986.  The total estimated cost of Claims Administration from Epiq amounts to
$2,179,750, and the total estimated cost of the Notice Plan from Hilsoft amounts to $1,870,236.

Mr. Finkelstein and Mr. Barnow have been practicing law for a combined total of over seventy-five (75) years. But attacking the veracity of others is not ever something Mr. Haviland does carefully. Judge O'Neill found him not reliable when he testified contrary to the testimony of another experienced member of the bar. *See* Exhibit N: Order, *In re Bridgeport Fire Litig.* (May 16, 2008) ("Mr. Haviland earlier testified that it was Mr. Otis who initiated telephone contact. . . . Mr. Otis is an attorney of over thirty-five (35) years, with an impeccable ethics record. Mr. Haviland's testimony on this point, especially when viewed in light of the other evidence of Mr. Haviland initiating settlement discussions in this litigation, simply is not credible.").

The Holmes objections are not guided by law, fact, or valid reason. Sections I through V make that clear. Section VI points out Mr. Haviland's techniques being applied against this settlement and against the interests of the Settlement Class. His approach, which the attached Orders of other judges condemn, and the objection he leads his plaintiffs with here, are contrary to the interests of the consumers involved, the proposed Settlement Class, and the pursuit of justice.

## VII.   PUBLICATION OF NOTICE AND SETTING OF A DATE FOR A FINAL FAIRNESS HEARING ARE THE TIME AND EXPERIENCE-PROVEN METHODS OF DETERMINING VALID OBJECTIONS.

While it surely was not the intent of the Holmes Objectors, their objections support preliminary approval of the proposed settlement, publication of the notice plan, and the setting of a final fairness hearing.  One of the tests for whether a settlement should be approved is the objections of the class members.  *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 631 (W.D. Ky. 2006).  Obviously, the Holmes Objectors are not the only ones that get to react to and express their views on the settlement.  One could fairly

argue that with their attorneys' vested interests in their pending lawsuits, that the view expressed by them, or as theirs, may be distinguishable from the millions of other Class members. Regardless of their motivations, the critical factor for the Court in deciding whether to grant final approval is to gauge the reaction of the Class members.

In accordance with law and practice, the Settlement Agreement provides for just such a process that fairly obtains the reaction of the Class to the settlement.[13]  This is the same or similar objection procedure routinely authorized in class actions.  Indeed, it is the same language approved and followed by Judge Merryday.  Under the accepted, time and experience-proven objection process, the validity of objections can be properly and fairly tested.  For example, in the *Certegy Litigation*, three objections were received by objectors represented by counsel. Three subpoenas for deposition were served, one for each of those objectors.  One objector filed a motion to quash the deposition; Judge Merryday denied his motion to quash.  A second objector appeared for his deposition; his testimony indicated that he knew little about the settlement.  The third objector's counsel apparently gave further review to the situation, and likely the proposed settlement agreement.  All three objections were, from those points, promptly withdrawn.

Granting of preliminary approval here, as requested, facilitates the Class' right to give its opinion regarding the proposed settlement and allows the Court to be fully advised from absentee Class members.  Essentially, the granting of preliminary approval opens the polls and allows the affected Class members to cast their ballot (by objecting or not).  The Court should grant preliminary approval so the process can proceed as it was designed.

---

[13] *See* Settlement Agreement ¶ 5.1.

## CONCLUSION

For all the foregoing reasons and the reasons stated in Plaintiffs' Motion for and Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness Hearing ("Settling Plaintiffs' Motion For Preliminary Approval"), it is respectfully requested that the Court enter its Order in accordance with the Proposed Order attached as Exhibit 4 to Settling Plaintiffs' Motion For Preliminary Approval granting preliminary approval to the proposed Settlement Agreement.

Dated: March 11, 2009

Settling Plaintiffs, on behalf of themselves and the proposed Settlement Class,

_____/s/ Ben Barnow_____

Ben Barnow
Barnow and Associates, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL  60602
(312) 621-2000

Burton H. Finkelstein
Finkelstein Thompson LLP
The Duvall Foundry
1050 30th Street, N.W.
Washington, D.C. 20007
(202) 337-8000

*Proposed Co-Lead Settlement Class Counsel*

Mark K. Gray
Franklin Gray & White
505 W. Ormsby Ave.
Louisville, KY 40203
(502) 637-6000

*Proposed Plaintiffs' Liaison Counsel*

Daniel C. Girard
Girard Gibbs, LLP
601 California Street, 14th Floor
San Francisco, CA 94108

Larry D. Drury
Larry D. Drury, Ltd.
205 West Randolph, Suite 1430
Chicago, IL 60606

Justin G. Witkin
Aylstock Witkin Kreis & Overholtz PLLC
803 N. Palafox Street
Pensacola, FL 32501

Lance A. Harke
Harke & Clasby, LLP
155 South Miami Avenue, Suite 600
Miami, FL 33130

Sherrie R. Savett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

Ralph K. Phalen
Ralph K. Phalen, Attorney At Law
1000 Broadway, Suite 400
Kansas City, MO 64105

Mark A. Maasch
Turner & Maasch, Inc.
550 West C Street, Suite 1150
San Diego, CA 92101

Frank E. Piscitelli, Jr.
Frank Piscitelli Co., L.P.A.
55 Public Square, Suite 1950
Cleveland, Ohio 44113

E. Kirk Wood
Wood Law Firm, LLC
2900 1st Avenue South, Suite A
Birmingham, AL 35233

*Proposed Plaintiffs' Executive Committee*

## Certificate of Service by Electronic Means

I, Ben Barnow, hereby certify that Settling Plaintiffs' Reply To The Holmes Objectors'
Response In Support Of Their Motion For Preliminary Approval Of Class Action Settlement
And Publishing Of Notice, And Setting Of A Final Fairness Hearing was caused to be served
electronically this 11th day of March, 2009, pursuant to ECF as to Filing users, and that I shall
cause to be served a copy of same via U.S. Mail to any party who is not a filing user or
represented by a filing user.


_____ /s/   Ben Barnow_____