# EXHIBIT R



FAIR PRICES
CONSUMER EDUCATION
INDUSTRY ACCOUNTABILITY

## LAWSUITS & SETTLEMENTS

Current Lawsuits

Past Lawsuits

Settlements

Suggest a New Case

FAQ

Amicus Briefs

Cy Pres

Get updates on drug lawsuits,
settlements and PAL news.

Your Email here 



## Current Lawsuits

### Norvir

To receive updates about this case please click here!

**About Norvir**
Norvir (ritonavir) is a Protease Inhibitor (PI), and is an essential component of one of the three types of antiretroviral drug "cocktails" used to treat HIV and AIDS. Norvir was developed as a standalone PI, with some funding from the National Institutes of Health. However, today Norvir is primarily used in low dosages in combination with one of several other PIs to "boost" the effectiveness of the other PI being taken. Eight out of the nine PIs on the market commonly use Norvir as a booster. One of these is Kaletra, a combination product manufactured by Abbott that combines Norvir with Abbott's own PI, lopinavir .

**Background**
In December 2003, Abbot raised the wholesale price of Norvir from $205.74 to $1,028.71 for 120 capsules - an increase of over 400%. However, Abbott did not increase the price of Kaletra. The result is that all the other PI regimens using Norvir are significantly more expensive than Kaletra. PAL charges that Abbott has effectively raised the price of its competitors' products, forcing patients to either pay much more for their life-saving medications or to switch to Kaletra, which may not be medically appropriate for them. The different protease inhibitors currently available are not interchangeable-each has its own properties and side effects, and patients must switch PIs as their disease progresses.

**PAL Member Litigation
Update October 1,  2008: Proposed Settlement**
The plaintiffs in the case, PAL coalition member SEIU Health & Welfare Fund and two individuals, reached a proposed settlement with Abbott on August 13, 2008. Under the settlement, Abbott will pay between $10 Million and $27.5 Million in exchange for the case being dismissed, depending on how the 9th Circuit Court of Appeals rules on three questions that the parties agreed to seek its review of.

The federal District Court hearing the case issued preliminary approval of the proposed settlement on August 19, 2008. On August 27, 2008 the court certified three issues (that have been essential to plaintiff's anti-trust claims so far) and allowed the parties to immediately seek their appeal.  The amount Abbott will pay into the settlement fund depends upon whether the Ninth Circuit Court of Appeals accepts, and how it decides, the appeal.  For instance:

- If the Ninth circuit accepts at least two of the issues or questions upon appeal, Abbott will pay $10 Million which will be distributed as a cy pres award to non-profit organizations serving HIV/AIDS patients.
- If the Ninth circuit decides in favor of the plaintiffs, Abbott must make a second payment of $17.5 Million. The resulting settlement fund of $27.5 million will be divided so that 70% ($19.25 Million) goes to a nationwide cy pres award, and 30% ($8.25 Million) is awarded to consumers and third party payors (health

**CURRENT LAWSUITS**

Average Wholesale Price

Celebrex

First Databank McKesson Medispan

Ketek

Neurontin Off-Label Promotions Case

Nexium

Norvir

OxyContin

Protonix

Provigil

Seroquel

Vioxx

Vytorin-Zetia

Zyprexa

plans, union benefit funds and others) in California.

- However, if the Ninth Circuit remands (sends back to the District court) any question or issue for further fact-finding, then Abbott must make a second payment of only $4.375 Million more, with the total $14.375 million to be allocated 70% to cy pres, and 30% to California consumers and third party payors.
- Finally, if Abbott wins any of the questions on appeal, they only need to pay the initial $10 Million, all of which is to be used for the nationwide cy pres award.

Whatever amount is allocated to a cy pres award will be distributed equally to 13 different non-profit organizations that benefit people with HIV/AIDS. (See a list here).

While confusing, the settlement is a creative resolution of the lawsuit, taking into account the obstacles that the plaintiffs would have faced at trial and the appeal that Abbott would likely have filed if it lost at trial.
A notice of the settlement will be distributed to class members as soon as the Ninth Circuit accepts the appeal. Consumers and third party payors who paid for Norvir will then have the option to opt out of the settlement (if they want to pursue their own individual lawsuits against Abbott), object to the terms of the settlement, or file claims (if they are located in California).

### Update: December 18, 2008

The Ninth Circuit Court of Appeals accepted the appeal on December 18, 2008, in a one-page order.

**Courts:** U.S. Court of Appeals for the Ninth Circuit
U.S. District Court, Northern District of California (Judge Wilken)
Circuit Court of Cook County, Illinois, Chancery Division (Judge Jaffe)

### Press Releases/Blog Entries

- PAL Announces Norvir Settlement (blog entry, August 15, 2008)
- Newly Unsealed Documents Shed Light on Abbott Labs' 400% Norvir Price Hike (May 12, 2008)
- Court's decision deals setback to Abbott Laboratories
- PAL Blog Entry on Class Certification

### Resources

- Ninth Circuit Court of Appeals order **accepting the appeal (December 18, 2008)**
- Norvir Proposed Settlement **(filed August 13, 2008)**
  - List of 13 proposed organizations to receive *cy pres* funds
- Norvir - Summary Judgment Order **(May 16, 2008)**
- Norvir - Judge's Order on Motion to Seal Documents **(April 16, 2008)**
- Norvir Order Granting in Part Plaintiffs' Motion for Class Certification **(June 11, 2007)**
- Norvir Denial of Motion on Summary Judgement
- Norvir CA Complaint
- Norvir Frequently Asked Questions

### Abbott Documents Unsealed bythe Court (see Judge's Order on Motion to Seal, above)

- Exhibit 1 (Rebuttal Expert Report of Joel W. Hay, PHD.)
- Exhibit 4 (08-09-2004 Depisition of Abbott executive Jesus Leal)
- Exhibit 5 (08-11-2004 Deposition of John Leonard)
- Exhibit 8 (12-19-2005 Deposition of Jodi Devlin)
- Exhibit 14 (9-3-03 Strategic Plan)
- Exhibit 18 (09-12-2003 Email from Jesus Leal re three pricing options for norvir)
- Exhibit 20 (07-13-2003 Email from Michelle Jones re 07-13-2003 PR article regarding Reyataz efficacy with Norvir)
- Exhibit 27 (09-10-2004 Deposition of Abbott executive Heather Mason)
- Exhibit 28 (09-22-2003 Email from Dr. John Leonard re Kaletra's decline and Norvir's growth with introuction of competitor pi's)
- Exhibit 29 (08-04-2003 Emails from William Dempsey and John Thomas)
- Exhibit 32 (09-10-2003 Email from Joseph Serio Jr re decline in Kaletra market share)
- Exhibit 38 (Notice of Rescheduled meeting dated 09-25-2003)
- Exhibit 39 (09-29-2003 Email from Jesus Leal re Slide list)
- Exhibit 45 (2006 Jan Monthly Market Research Report re HIV drugs)
- Exhibit 47 (03-24-2006 Declaration of Michael P. Hannan, Product Director, Protease Inhibitors, Glaxo-Smith-Kline)

- Exhibit 49 (12-14-2007 Deposition of Douglas F. Greer, PHD re Profitability of PI's developed for use with Norvir)
- Exhibit 50 (08-08-2007 Deposition of Dale Kempf re Patent issues)
- Exhibit 51 (07-24-2007 Deposition of Dr. John M. Leonard, Abbott VP)

To receive updates about this case please click here!

## SETTLEMENT AGREEMENT

It is hereby stipulated by and among the undersigned, subject to approval by United States District Court for the Northern District of California, Oakland Division ("District Court") and other express conditions, that the settlement of this Action (defined below) shall be effectuated pursuant to the terms and conditions set forth in this agreement ("Settlement Agreement") and Exhibits (attached hereto).

## PREAMBLE

WHEREAS, on April 19, 2004, plaintiffs John Doe 1 ("Doe") and John Doe 2 ("Doe 2" and together with Doe, the "Individual Plaintiffs"), in their individual capacities and on behalf of a putative class, sued defendant Abbott Laboratories ("Abbott") in the District Court, under the caption *John Doe 1 et al., v. Abbott Laboratories*, No. 04-cv-1511 (the "Doe Action"); and

WHEREAS, on October 4, 2004, plaintiff Service Employees International Union Health and Welfare Fund ("SEIU"), in its individual capacity and on behalf of a putative class, sued Abbott in the District Court under the caption *SEIU v. Abbott Laboratories*, No. 04-cv-4203 (the "SEIU Action"); and

WHEREAS, on May 2, 2005, the District Court consolidated the Doe Action and the SEIU Action under the caption *In re Abbott Laboratories Norvir Antitrust Litigation,* No. C 04-1511 (the "Action"); and

WHEREAS, on June 11, 2007, the District Court granted, in part, the motion of Individual Plaintiffs and SEIU (together, "Plaintiffs") for class certification, and certified a nationwide Class (defined below) for injunctive relief under federal antitrust law and for equitable relief under California Business & Professions Code §§ 17200, *et seq.* and the unjust enrichment laws of 48 states; and

WHEREAS, on May 16, 2008, the District Court, inter alia, granted Abbott's Motion for Summary Judgment dismissing Plaintiffs' restitution claims based on the unjust enrichment laws of 48 states; and

WHEREAS, on June 11, 2007, the District Court appointed Doe and SEIU as the Class Representatives (defined below), but held that Doe 2 could not serve as a Class Representative; and

WHEREAS, the District Court also created two subclasses, appointing Doe as the Class Representative for a subclass of individual Class Members comprised of consumers of Norvir (the "Individual Class Members") and SEIU as the Class Representative for a subclass of institutional Class Members comprised of third-party payors who paid in whole or in part for Norvir (the "Institutional Class Members," together with the Individual Class Members, the "Class Members"); and

WHEREAS, on March 14, 2008, the District Court approved a plan for providing notice to the Class and, pursuant to that plan, Class Members were notified of the Action and the certification thereof as a class action, and allowed Class Members until June 15, 2008 to request exclusion from the Class;

WHEREAS, the Class Representatives and Class Counsel (defined below) believe that all of Plaintiffs' claims are meritorious, but they have concluded that, in light of the costs, risks, and delay of litigation and likely post-trial appeal of the matters in dispute, particularly in complex class action proceedings, and in light of the desire to provide a benefit to Class Members sooner rather than later, this Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Class; and

WHEREAS, Abbott denies any liability and asserts various defenses to liability that it believes are meritorious, but it has concluded that, in light of the costs, disruption, and risks of litigation, that this Settlement Agreement is fair, reasonable, and in its best interests;

**NOW THEREFORE**, without any admission or concession whatsoever on the part of the Class Representatives of any lack of merit in the Action, and of all of the claims asserted therein, and without any admission or concession whatsoever of any liability or wrongdoing or lack of merit in its defenses by Abbott, it is hereby stipulated and agreed that, in consideration of the agreements, promises and covenants set forth in this Settlement Agreement, which is subject to the approval of the District Court pursuant to Rule 23 of the Federal Rules of Civil Procedure and the other conditions set forth in this Settlement Agreement, the Action shall be fully and finally settled under the following terms and conditions:

## ADDITIONAL DEFINITIONS

1.     As used in this Settlement Agreement and the related documents attached hereto as Exhibits, the following terms shall have the meanings set forth below:

a.     "Class Counsel" or "Co-Lead Counsel" means Berman, DeValerio, Pease, Tabacco, Burt & Pucillo and Labaton Sucharow LLP.

b.     "Class" means:

All persons or entities throughout the United States and its territories who purchased or paid for, or who reimbursed another person or entity who purchased or paid for, Norvir as a booster to other protease inhibitors intended for consumption by themselves, their families, or their members, employees, plan participants and beneficiaries or insureds, and who paid all or part of the cost of Norvir during the period December 3, 2003 through July 30, 2008 ("Settlement Class Period"). Excluded from the Class are: (1) persons or entities that excluded themselves from the Class; (2) Abbott and its subsidiaries and affiliates; (3) all government entities (except for government-funded employee benefit funds); and (4) all persons or entities that purchased Norvir: (i) for purposes of resale, or (ii) directly from Abbott.

3

c. "Class Notice" means the notice of the terms of this Settlement Agreement to be provided to the Class, which the Parties (defined below) shall jointly submit to the District Court for its approval.

d. "Conditions Precedent" means the events specified in Paragraph 2 of this Settlement Agreement that must occur before the Settlement becomes effective as set forth herein.

e. "Defendant" or "Abbott" means Abbott and its subsidiaries, parents, affiliates, successors, predecessors, officers, directors, employees, agents, principals, attorneys, successors-in-interest and assigns.

f. "Defendant's Counsel" or "Abbott's Counsel" means Winston & Strawn LLP and Munger, Tolles & Olson LLP.

g. "Direct Actions" means the following cases and claims by direct purchasers and competitor alleged in connection with those cases: (a) Meijer, Inc. & Meijer Distribution, Inc. v. Abbott Laboratories, C 07-5985 CW, (b) Rochester Drug Cooperative, Inc. v. Abbott Laboratories, C 07-6010 CW, (c) Louisiana Wholesale Drug Company, Inc. v. Abbott Laboratories, C 07-6118 CW, (d) Safeway Inc., et al. v. Abbott Laboratories, C 07-5470 CW, (e) Rite Aid Corporation, et al. v. Abbott Laboratories, C 07-6120 CW, and (f) Smithkline Beecham Corporation d/b/a/ GlaxoSmithKline v. Abbott Laboratories, C 07-5702 CW, all pending in the District Court.

h. "Effective Date" means the first day on which all Conditions Precedent have been satisfied.

i. "Final Approval Hearing" means the hearing at which the District Court shall determine whether to grant final approval of this Settlement Agreement.

j.      "Final Approval Order" means the order, substantially in the form attached as Exhibit A, in which the District Court grants final approval of this Settlement Agreement and authorizes the entry of a final judgment and dismissal of the Action ("Final Approval").

k.      "Final Payment" means the $17.5 million payment Abbott is obligated to make if Plaintiffs are the Prevailing Party (defined below) on appeal.

l.      "Initial Payment" means the non-refundable $10 million payment Abbott is obligated to make if the Ninth Circuit (defined below) grants interlocutory appeal with respect to two or more issues, or the Ninth Circuit grants interlocutory appeal on only one issue and Abbott declines to terminate the Settlement Agreement.

m.     "Net Final Payment" means the Final Payment net of any court-ordered attorneys' fees, costs, and incentive award payments to Plaintiffs.

n.      "Net Initial Payment" means the Initial Payment net of any court-ordered attorneys' fees, costs, and incentive award payments to Plaintiffs.

o.      "Ninth Circuit" means the United States Court of Appeals for the Ninth Circuit.

p.      "Parties" means Doe and SEIU (together, the "Class Representatives"), Defendant and Doe 2.

q.      "Preliminary Approval Order" means the order, substantially in the form attached as Exhibit B, in which the District Court grants preliminary approval to this Settlement Agreement.

r.      "Released Claims" means any claims, demands, actions, causes of action or liability of any nature, whether known or unknown, derivative or direct, suspected or

unsuspected, accrued or unaccrued, asserted or unasserted, whether in law or in equity including, without limitation, claims which have been asserted or could have been asserted in the Action, or any litigation against Abbott arising out of the matters alleged in the Action that any Releasor (defined as any Plaintiff or any Class Members) now has, ever had, could have had or may have had as of the date this Settlement Agreement is executed (whether or not such Releasor objects to the settlement and whether or not he/she or it makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively or in any other capacity), and that all Abbott shall be forever released and discharged from any and all liability in respect of the Released Claims.  Notwithstanding the above, no claims alleging damages and/or seeking non-monetary relief caused by the failure of Norvir to be safe and/or effective or alleging other conduct not related to, or arising from, claims of the type alleged or argued in the Action including, without limitation, claims asserted in the Direct Actions, personal injury claims, product defect claims, securities claims, breach of contract claims, breach of warranty claims, negligence claims, tort claims, are Released Claims.

        s.      "Subclass" means the Individual Class Members and the Institutional Class Members.

## **CONDITIONS PRECEDENT**

2.    Before this Settlement Agreement becomes effective, each of the following Conditions Precedent must occur, subject to the termination provisions set forth in paragraphs 23 through 28:

        a.      Entry of the Preliminary Approval Order;

        b.      The District Court must enter one or more orders that:

i)  stay all current deadlines in this Action, including the trial date, pending Final Approval;

ii)  certify for interlocutory appeal under 28 U.S.C. § 1292(b) the following three issues (described with an initial paragraph for context) addressed in the District Court's rulings on dispositive motions and related orders in this Action:

> In this case, Plaintiffs have alleged that Abbott's pricing decisions in December 2003 violated the Sherman Act under a monopoly-leveraging theory, and California Unfair Competition Law under Business & Professions Code §§ 17200, et seq., and, further, that such conduct unjustly enriched Abbott. Plaintiffs claim that Abbott raised the price of a patented drug (Norvir) by 400% (representing a $6.84 increase per 100 mg daily dose) in one alleged market (the Booster Market) in an effort to create or maintain a monopoly for another Abbott drug known as Kaletra in a separate alleged market (the Boosted Market).  Norvir's active ingredient is called "ritonavir."  Kaletra is a co-formulated product that includes both ritonavir and a protease inhibitor known as "lopinavir."  The three proposed interlocutory issues are:
>
> **Issue One**:  Whether, as a matter of law, a plaintiff can establish antitrust injury based on the payment of an increased price for a patented product in the leveraging market, where the plaintiff contends the price increase was designed to maintain or create a monopoly in the leveraged market?
>
> **Issue Two**:  Whether, as a matter of law, a plaintiff can potentially establish monopoly power – in a case where the defendant allegedly used exclusionary pricing to slow a market share decline – where some existing competitors have increased both their market share and prices since the challenged pricing decision?
>
> **Issue Three**:  Whether the Ninth Circuit's decision in *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883 (9th Cir. 2008), mandates judgment against a monopoly leveraging claim based on unilateral pricing conduct where there is no allegation of below-cost pricing?

c.  The Ninth Circuit must permit an interlocutory appeal on the merits of at least two issues certified by the District Court, or if only one issue is accepted by the Ninth Circuit, Abbott must not exercise its right to withdraw from the Settlement Agreement; and

d.  Final Approval.

## RIGHTS AND OBLIGATIONS

3.     Upon execution of this Settlement Agreement, the Parties will file the following documents in the District Court:

      a.     A motion for entry of the Preliminary Approval Order and to continue the stay of all current deadlines in this Action pending Final Approval; and

      b.     A joint motion requesting certification, under 28 U.S.C. § 1292(b), of an interlocutory appeal, consistent with paragraph 2.b.(ii).

### *The District Court Proceedings*

4.     If the District Court certifies all three issues for interlocutory appeal, Abbott will file an unopposed petition with the Ninth Circuit for interlocutory appeal.

5.     Plaintiffs agree they will:

      a.     fully support the petition, subject to a right of qualification where there is language in the petition that (i) operates as an admission by Plaintiffs to their detriment and/or (ii) exceeds the scope of what Plaintiffs have agreed to under the terms of this Settlement Agreement;

      b.     agree that the controlling standard for Section 1292(b) appeals is satisfied; and

      c.     agree that circumstances of this case warrant the exercise of the Ninth Circuit's discretion to accept the interlocutory appeal for all three issues.

6.     Plaintiffs also authorize Abbott to represent their agreements as recited above in paragraph 5 to the Ninth Circuit in Abbott's brief seeking an interlocutory appeal.

7.     Within 5 business days of Abbott's filing its petition in the Ninth Circuit, Plaintiffs will file a responsive brief in the Ninth Circuit that is limited to 5 pages confirming their representations in paragraph 5 and urging the Ninth Circuit to accept the interlocutory

appeal on all issues presented in the petition while making it clear that Plaintiffs reserve their rights to oppose the substance of Abbott's arguments.

8.      The Parties will cooperate to make whatever filings are necessary, as expeditiously as possible, including filing a joint appendix, to facilitate the Ninth Circuit's acceptance of the interlocutory appeal.

### *The Ninth Circuit Proceedings*

9.      If the Ninth Circuit accepts at least two issues for interlocutory appeal (or only one issue and Abbott declines to terminate this Settlement Agreement), Abbott will, within 10 business days of the Ninth Circuit's order granting permission, make the Initial Payment to the Class to be held in an interest bearing account by Citibank, a third-party escrow agent, that will hold the Initial Payment until the appellate process is complete, except as provided in paragraph 29 herein.  If the District Court does not enter a Final Approval Order at the Final Approval Hearing, Abbott shall receive its Initial Payment back, minus the Class Notice costs and administration as provided in paragraph 29.  This payment otherwise shall be non-refundable as provided herein.

10.     If the Ninth Circuit does not accept at least two of the proposed issues for interlocutory appeal, Abbott may terminate the Settlement Agreement pursuant to the provisions herein.

11.     The Parties agree to reasonably cooperate to expedite the interlocutory appeal, including filing a joint motion to expedite the appeal under the following briefing schedule, and voluntarily filing their briefs on this schedule in any event:

a.      Abbott will provide Plaintiffs with a substantially finalized draft of its brief (*i.e.*, it includes in substance every Abbott argument) no later than 15 days prior to filing its brief (which will be held in confidence, which will not waive the work-product privilege, and

will never be quoted in public or to a court); and then file its opening brief no later than 10 days after the appellate record is filed;

        b.    Plaintiffs will file their opposition brief within 30 days after receiving Abbott's filed brief; and

        c.    Abbott will file its reply brief within 12 days of receiving Plaintiffs' filed opposition brief.

12.    The Parties agree that absent a mutual agreement in writing, no Party shall request from the Ninth Circuit or the Ninth Circuit's clerk additional time for any filing during the course of the appellate process, whether by motion or otherwise.

13.    Subject to performance of the Conditions Precedent specified in paragraph 2, the Net Initial Payment will be distributed on a *cy pres* basis equally to the 501(c)(3) nonprofit institutions identified in Exhibit C. Abbott shall have 5 business days from execution of this Settlement Agreement to give its consent, which shall not be unreasonably withheld, to each of the institutions identified in Exhibit C. Neither the dissemination of the Class Notice nor Final Approval is a condition precedent to Abbott's making the Initial Payment pursuant to paragraph 9.

14.    Abbott agrees that the Initial Payment will not reduce, or otherwise operate as a credit or substitute, toward other charitable giving that Abbott would otherwise have made to the same types of organizations.

15.    If Abbott is the Prevailing Party on appeal, as described in paragraphs 18 and 20, the Parties agree that Abbott shall be entitled to final judgment in the District Court, with prejudice, on all individual and class-wide claims in the Action. In that circumstance, after all

available appellate rights permitted under this Settlement Agreement have been exhausted, the Parties will jointly move for entry of final approval consistent with this paragraph.

16.     If Plaintiffs are the Prevailing Party as defined in paragraph 21, or if Abbott is the Partially Prevailing Party as defined in paragraph 19, Abbott will make the Final Payment, or, if Abbott is deemed the Partially-Prevailing Party pursuant to paragraph 19, one-fourth of the Final Payment, to the Class to be held in an interest bearing account by Citibank within 10 business days of the conclusion of all proceedings relating to the Ninth Circuit appeal.  The Net Initial Payment and Net Final Payment, the amount of which is governed by ¶¶ 1 and 18-21, will be allocated as follows: (1) 70% shall be distributed on a *cy pres* basis equally among the institutions listed on Exhibit C; and (2) 30% shall be distributed pursuant to a plan of allocation to Individual Class Members who reside in California and Institutional Class Members who have reimbursed or paid in whole or in part for the cost of Norvir for patients residing in California during the Settlement Class Period, with any remaining unclaimed residue being contributed to back to the *cy pres* portion.

17.     In return for Abbott's payment of the funds specified above, including any payments made in accordance with paragraphs 9 and 16 above – regardless of who is the Prevailing Party – Plaintiffs will dismiss their individual and class-wide claims in the Action with prejudice upon the exhaustion of all appellate rights (including, if appropriate, any petition for rehearing and/or petition for writ of certiorari), and the Parties will enter into mutual releases as discussed below upon Final Approval.  The District Court will retain jurisdiction to enforce the Settlement, subject to paragraph 47.

## PREVAILING PARTY STATUS

18.    For Abbott to be the "Prevailing Party," the Ninth Circuit must accept the substance of Abbott's position on at least one of the issues accepted by the Ninth Circuit on appeal. The following is further clarification of what will qualify Abbott as the prevailing party:

a.    For Issue One, Abbott shall be deemed the Prevailing Party if the Ninth Circuit holds, in substance, that Plaintiffs cannot establish antitrust injury under the law based on the price increase for Norvir;

b.    For Issue Two, Abbott shall be deemed the Prevailing Party if the Ninth Circuit holds that, under the appropriate legal standard, Plaintiffs cannot establish monopoly power under the circumstances of this case; and

c.    For Issue Three, Abbott shall be deemed the Prevailing Party if the Ninth Circuit holds that a showing of below-cost pricing is necessary for the type of Sherman Act claims alleged in the Action.

19.    Abbott shall be deemed to be the "Partially-Prevailing Party" if, without reaching a decision on the merits of any of the issues it has accepted for appeal falling within paragraph 18 (a), (b), or (c) above, the Ninth Circuit reverses or vacates any challenged ruling or order by the District Court and remands any matter or issue to the District Court for reconsideration or further review based upon a legal or factual standard enunciated by the Ninth Circuit that differs from any standard applied by the District Court. In this circumstance, Abbott will pay one-fourth of the Final Payment to be distributed in accordance with paragraph 16.

20.    Abbott reserves the right to seek panel rehearing and/or rehearing *en banc* of any adverse ruling by the Ninth Circuit. A determination of Prevailing Party status is contingent upon the final decision from the Ninth Circuit, including, if any, a rehearing decision. The question of whether Abbott is the Prevailing Party under paragraph 18 or a Partially-Prevailing

Party under paragraph 19 turns solely on the final decision of the Ninth Circuit after the appellate process is complete.  Nothing in this Agreement shall be construed to preclude Abbott from seeking a writ of certiorari in the United States Supreme Court from the final decision of the Ninth Circuit.

21.     To the extent Abbott is not a Prevailing Party or a Partially-Prevailing Party under paragraphs 18 through 20, then Plaintiffs shall be deemed the Prevailing Party.

<h3 align="center">COURT APPROVAL OF SETTLEMENT</h3>

22.     The Parties shall use their respective best efforts to obtain District Court approval of this Settlement Agreement.   The process for obtaining District Court approval of this Settlement Agreement shall be as follows:

a.     <u>Preliminary Approval</u>.  By August 13, 2008, or such other date as ordered by the District Court, Class Counsel and Defendant's Counsel shall jointly apply for entry of the Preliminary Approval Order.

b.     <u>Final Approval Hearing</u>.  Class Counsel and Defendant's Counsel shall jointly request that the District Court, on a date approved by the Court, which shall be approximately 45 days after the estimated completion of the dissemination of Class Notice, conduct a Final Approval Hearing to determine whether to grant final approval to this Settlement Agreement. At the Final Approval Hearing, the Parties shall seek Final Approval.  If the District Court grants Final Approval, then the Parties shall jointly request the District Court to enter a Final Approval Order.

<h3 align="center">TERMINATION OF AGREEMENT</h3>

23.     Except as otherwise provided in this Settlement Agreement, and subject to Paragraphs 9 and 13 with regard to the Initial Payment, this Settlement Agreement will

13

automatically terminate without penalty to any Party if either (a) the District Court declines to enter the Preliminary Approval Order or Final Approval Order; or (b) the Final Approval is reversed by an appellate court ruling.

24.     The Settlement Agreement will also automatically terminate without penalty to any Party if either the District Court or the Ninth Circuit rejects all issues for interlocutory appeal.

25.     Abbott, at its election, may terminate this Settlement Agreement without penalty to any Party if:

a.     the District Court does not stay all proceedings in this Action pending Final Approval;

b.     the District Court does not certify all three issues identified in paragraph 2.b.2. for interlocutory appeal under 28 U.S.C. § 1292(b);

c.     either the District Court or the Ninth Circuit materially modifies one or more of the three proposed issues for interlocutory appeal;

d.     the Ninth Circuit accepts only one of the three proposed issues for interlocutory appeal; or

e.     the District Court orders that the Class Notice provides an opportunity for Class Members to opt out of the Settlement and if a specified number of Class Members, set forth in a separate letter agreement between Co-Lead Counsel and counsel for Abbott, choose to opt out of the Settlement.   The separate letter agreement shall be maintained as Highly Confidential under the Protective Order and will not be filed with the District Court unless ordered by the District Court.

26.     Except otherwise provided in paragraph 25(e), Abbott must exercise any right to terminate this Settlement Agreement within 7 business days of the date of the relevant court order by sending written notice to the other Parties pursuant to paragraph 31 exercising this right of termination.

27.     If Abbott elects to terminate within seven (7) business days under the circumstances set forth in paragraph 25 subsections (c)-(d), after the Ninth Circuit accepts the interlocutory appeal, the parties agree to cooperate to voluntarily dismiss the appeal and Abbott will not have the obligation to make any payments under the Settlement Agreement.

28.     If this Settlement Agreement is terminated for any reason, then, except as otherwise expressly provided:  (a) this Settlement Agreement shall be rendered null and void; (b) this Settlement Agreement and all negotiations and proceedings relating hereto shall be of no force or effect, and without prejudice to the rights of the Parties; (c) all Parties shall be deemed to have reverted to their respective status in the Action as of the date and time immediately preceding the execution of this Settlement Agreement and the Parties shall stand in the same position and shall proceed in all respects as if this Settlement Agreement and any related orders had never been executed, entered into, or filed, except that the Parties shall not seek to recover any fees, costs or expenses incurred in connection with this Settlement (except as provided in paragraph 29); and (d) the Parties agree that they will cooperate in promptly making a joint request to the District Court to have trial reset on the next available trial date convenient to the District Court, on the basis of the pretrial proceedings that have already occurred.

## CLASS NOTICE AND ADMINISTRATION OF THE SETTLEMENT

29.     If the Ninth Circuit accepts at least two issues on appeal (or if the Ninth Circuit accepts one issue and/or modifies one or more issues and Abbott does not exercise its right to

terminate the Settlement Agreement) the Parties shall in good faith cooperate with each other to draft a mutually agreeable Class Notice and shall provide the Court with a proposed plan of notice to the Class of the Settlement Agreement.  Class Notice and administration of this proposed Settlement will be given as approved by the District Court, shall be paid for out of the Initial Payment and shall be non-refundable.

30.     The Parties shall select, subject to District Court approval, an independent third-party administrator to arrange for publication and other distribution of Class Notice, to administer any payments required under this Settlement Agreement, to maintain a website containing pertinent documents and to respond to Class Member inquiries.  Class Counsel will have the right to oversee and monitor the settlement administrator and the settlement administration.  The settlement administrator shall be subject to the authority and continuing jurisdiction of the District Court.

## NOTICES

31.     All notices that any Party to this Settlement Agreement may be required or may wish to give in connection with this Settlement Agreement may be given by the Party desiring to give such notice or notices by addressing them to the other Parties at the addresses set forth below (or at such other addresses as may be designated by written notices given in the manner designated herein).  Notice by email shall be sufficient.  The addresses of the Parties until further notice are:

**For: Abbott**

James F. Hurst, Esq.
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
jhurst@winston.com

**For: Plaintiffs**

Joseph J. Tabacco, Jr., Esq.
BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO
425 California Street, Suite 2100
San Francisco, CA 94104-2205
jtabacco@bermanesq.com

Hollis Salzman, Esq.
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
hsalzman@labaton.com

## ATTORNEYS' FEES AND COSTS

32.    Class Counsel may petition the District Court for an award of attorneys' fees, costs and incentive awards to plaintiffs (the "Fee Petition") from the Initial Payment, or, at their option, Class Counsel may defer filing a Fee Petition until after the Action has been concluded, or bring a second Fee Petition.   Depending on the outcome of the interlocutory appeal contemplated by this Settlement Agreement, Class Counsel may also file a Fee Petition with respect to the Final Payment as a consequence of Plaintiffs either being deemed the Prevailing Party or Abbott being deemed to be a Partially-Prevailing Party.  Abbott will take no position on either or both of those petitions.

33.    In no event shall Abbott be responsible for the direct payment of attorneys' fees or costs, including costs associated with the administration of the Settlement beyond what is contemplated to be paid under this Settlement Agreement.  Any payment of attorneys' fees, costs, and incentive awards including costs associated with the administration of the Settlement and the provision of Notice to the Class, shall be made from the Initial Payment and/or the Final Payment as requested by Class Counsel and approved by the District Court.

34.     The Parties agree that the rulings of the District Court regarding the amount of attorneys' fees, costs, and incentive awards will be separate from the remaining matters to be considered by the District Court at the Final Approval Hearing as provided for in this Settlement Agreement.  If the District Court approves the fairness of the Settlement, then the Settlement will become final regardless of any subsequent appeal directed solely to the ruling of the District Court pertaining to a Fee Petition.

**RELEASES**

35.     Upon the occurrence of the Effective Date the Releasors shall be deemed to have covenanted and agreed, and each Plaintiffs' Counsel, as agent for its respective Class Representative, hereby covenants and agrees and the Final Approval Order provide that each Releasor hereby is forever barred from instituting, assigning, maintaining, collecting or prosecuting against Abbott any and all Released Claims.

36.     With respect to the above releases and all Released Claims, the Parties and Class Members shall be deemed to have, and by operation of this Settlement Agreement shall have, waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code § 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

**SETTLEMENT AGREEMENT RESTRICTIONS**

37.     Neither the acceptance by Abbott of the terms of the Settlement Agreement nor any of the related negotiations or proceedings is or shall be argued, construed as or deemed to be

18

evidence of any violation of any statute or law or an admission of any liability or wrongdoing or damages by Abbott, or of the merits of the claims alleged in the Action.  Abbott expressly denies legal liability or any wrongdoing of any sort toward Plaintiffs and Class Members.

38.    This Settlement Agreement and related documents shall not be used, offered or received into evidence in the Action for any purpose other than to enforce, construe or finalize the terms of the Settlement Agreement and/or to obtain the Preliminary and Final Approval by the District Court of the terms of the Settlement Agreement.

## MUTUAL NON-DISPARAGMENT

39.    As part of this Settlement Agreement, Doe in his individual capacity and on behalf of the Individual Class Members he represents, John Doe 2 individually, and SEIU in its individual capacity and on behalf of the Institutional Class Members, along with Class Counsel, agree individually and collectively that they will not disparage in any way Abbott or its products (including but not limited to its patented drugs) and will refrain from any tortious interference with Abbott's contracts, relationships and prospective economic advantage.  Likewise, Abbott, along with Abbott's Counsel, will not disparage in any way Plaintiffs, individually or collectively, and will refrain from any tortious interference with their contracts, relationships and prospective economic advantage.

## MISCELLANEOUS PROVISIONS

40.    No Assignment.  Each Party represents, covenants and warrants that he, she or it has not directly or indirectly assigned, transferred, encumbered or purported to assign, transfer, or encumber to any person or entity any portion of any liability, claim, demand, cause of action or rights that he or she releases in this Settlement Agreement.

41.    Binding On Assigns.  This Settlement Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, trustees, executors, successors and assigns.

42.    Construction.  The Parties agree that the terms and conditions of this Settlement Agreement are the result of lengthy, intensive arm's-length negotiations between the Parties and that this Settlement Agreement shall not be construed in favor or against any Party by reason of the extent to which any Party, or his, her or its counsel, participated in the drafting of this Settlement Agreement.

43.    Counterparts.  This Settlement Agreement, and any amendments hereto, may be executed in any number of counterparts, and any Party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

44.    Governing Law.  Construction and interpretation of the Settlement Agreement shall be determined in accordance with the laws of the State of California.

45.    Integration Clause.  This Settlement Agreement, including the referenced Exhibits, which form an integral part of this Settlement Agreement, contains the entire understanding of the Parties in respect of the subject matter of this Settlement Agreement.  This Agreement may not be changed, altered or modified, except in a writing signed by the Parties.

46.    Incorporation of Exhibits.  All Exhibits are incorporated into this Settlement Agreement by reference.  Any inconsistency between the Settlement Agreement and the Exhibits attached to this Settlement Agreement shall be resolved in favor of this Settlement Agreement.

47.    Dispute Resolution.  To the extent permitted by law, all disputes arising under or relating to this Settlement Agreement, including whether Abbott or Plaintiffs are the Prevailing Party, shall be resolved by binding arbitration through Judicial Arbitration Mediation

20

Services (JAMS) by one of three arbitrators selected by the Honorable Edward A. Infante (Ret.). Upon receiving a list of three potential mediators from Judge Infante, the Parties will seek to reach an agreement on one arbitrator.  Absent an agreement, they will each have the opportunity to strike one arbitrator with the remaining arbitrator to decide any issue.  Judge Infante will resolve any disputes about this procedure.  If Plaintiffs initiate the arbitration, the Parties will evenly split the cost and fees of the arbitrator.  If Abbott initiates the arbitration, Abbott will be solely responsible for the costs and fees of the arbitrator.

48.    Parties' Authority.  The signatories to this Settlement Agreement represent that they are fully authorized to enter into this Agreement and bind the Parties to the terms and conditions hereof.

49.    Receipt Of Advice Of Counsel.  The Parties acknowledge, agree, and specifically warrant to each other that they have read this Settlement Agreement, have received legal advice with respect to the advisability of entering into this Settlement, and fully understand its legal effect.

50.    Agreement To Cooperate.  All Counsel and the Parties agree to cooperate fully with one another in seeking the Preliminary Approval Order and to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval by the District Court of the Settlement.

**IN WITNESS WHEREOF**, the undersigned counsel, on behalf of their respective clients, have executed this Settlement Agreement, intending to be legally bound hereby if each of the conditions precedent occur or as otherwise stated herein:

**ABBOTT LABORATORIES INC.**

By: _____

James F. Hurst
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601

Date: _____8 - 13 - 08_____

**JOHN DOE 1 and JOHN DOE 2**, on behalf of themselves and others similarly situated

By: _____
    Joseph J. Tabacco, Jr.
BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO
425 California Street, Suite 2100
San Francisco, CA 94104-2205

Date: _____8-13-08_____

**SERVICE EMPLOYEES INTERNATIONAL UNION HEALTH AND WELFARE FUND**, on behalf of itself and others similarly situated

By: _____
    Hollis Salzman
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005

Date: _____8·13-08_____

22

## EXHIBIT C

## PROPOSED LIST OF *CY PRES* RECIPIENTS

**AIDS Action Foundation, DC (www.aidsaction.org).**  The AIDS Action Foundation is the 501(c)(3) research and education arm of AIDS Action, and conducts federal HIV policy analysis, research and training, as well as leadership development experiences for young adults through the Pedro Zamora Public Policy Fellowship program.  The Foundation develops and disseminates educational materials on the latest public policies and programs, the demographic impact of HIV, and medical research.

**AIDS Foundation of Chicago (www.aidschicago.org).** The AIDS Foundation of Chicago is a 501(c)(3) public charity that provides funding to and coordinates the activities of local AIDS service providing agencies and engages in public education and policy analysis.

**AIDS Resource Center of Wisconsin (www.arcw.org).** The AIDS Resource Center of Wisconsin provides a vast array of health and social services to over 3,000 Wisconsin residents living with HIV.  Through a wide variety of aggressive AIDS prevention programs, it makes over 150,000 prevention contacts every year with people who are at risk for contracting HIV.

**Atlanta AIDS Partnership Fund (www.aidsfundatlanta.org).**  The AIDS Fund invests in the strongest HIV prevention, support, residential, and advocacy programs.  Since its inception over one decade ago, the AIDS Fund has awarded more than $9.5 million in grants to help care for people living with HIV/AIDS and to fight the spread of the disease.

**Bienestar Human Services Inc. (www.bienestar.org).**  Bienstar is committed to enhancing the health and well-being of the Latino community and other underserved communities.  Bienestar accomplishes this through community education, prevention, mobilization, advocacy, and the provision of direct social support services.

**Black AIDS Institute (www.blackaids.org).**  The Black AIDS Institute is the first Black HIV/AIDS policy center dedicated to reducing HIV/AIDS health disparities by mobilizing Black institutions and individuals in efforts to confront the epidemic in their communities.  It is a non-profit, 501(c)(3) charitable organization based in Los Angeles, California.

**Brownsville Multi-Service Family Health Center (www.bmsfhc.org).**  The Brownsville Community Development Corporation offers a wide variety of services to the residents of Brownsville, New York and surrounding neighborhoods. It provides for and seeks to inspire the cultural, economic, medical, and educational well-being of every individual and family in its communities.  Among the services it provides is the Brownsville Community Awareness Program - which consists of six highly integrated

HIV and AIDS services, including the award-winning Community Follow-up Program and Positive Options.

**Latino Commission on AIDS (www.latinoaids.org).**   The Latino Commission on AIDS is a nonprofit membership organization dedicated to fighting the spread of HIV/AIDS in the Latino community.  The Commission realizes its mission by spearheading health advocacy for Latinos, promoting HIV education, developing model prevention programs for high-risk communities, and by building capacity in community organizations. Since 1995, the Commission has steadily expanded its services outside New York to meet the emerging needs of Latino communities in more than 40 States and Puerto Rico.

**New Orleans AIDS Task Force (www.noaidstaskforce.org).**  The New Orleans AIDS Task Force works to reduce the spread of HIV infection, provide services, advocate empowerment, safeguard the rights and dignity of HIV-affected individuals, and provide for an enlightened public.  In the past year, it has answered 1,455 hotline calls, held 3,024 HIV test sessions, and prepared and delivered over 37,795 meals.

**South Florida AIDS Network (www.jhsmiami.org).**  The South Florida AIDS Network was the first organization in Miami-Dade County to provide client advocacy/case management and related support services to people with HIV/AIDS.  SFAN is now the single largest comprehensive HIV/AIDS service provider in Miami-Dade County.

**UCSF AIDS Health Project (www.ucsf-ahp.org).**   The UCSF AIDS Health Project is a program of the University of California San Francisco's Department of Psychiatry and San Francisco General Hospital – both ranked among the best HIV programs in the United States.  It has championed HIV emotional and psychological support services since 1984.

**UCSF Center for AIDS Prevention Studies (www.caps.ucsf.edu).**  The mission of the Center for AIDS Prevention Studies is to conduct domestic and international research to prevent the acquisition of HIV and to optimize health outcomes among HIV-infected individuals.

**Whitman Walker Clinic (www.wwc.org).**  The Whitman-Walker Clinic is a non-profit community-based health organization serving the Washington, DC metropolitan region. Established by and for the gay and lesbian community, the Clinic is comprised of diverse volunteers and staff who provide or facilitate the delivery of high quality, comprehensive, accessible health care and community services.  Whitman-Walker Clinic is especially committed to ending the suffering of all those infected and affected by HIV/AIDS.