# EXHIBIT S



**Get Your Case Reviewed**

CLICK HERE

HOME / ABOUT US / NEWS & ARTICLES / LEGAL COMMUNITY / CONTACT US /    April 21, 2009

Selecting a drug litigation attorney for your legal case is a very important decision. Please enter a zip code to find an attorney that serves your area:

Zip Code: [ Search ]

**⊐ Massachusetts Drug Litigation Lawyers**　　**⊐ Latest News**　　**⊐ Hot Topics**

< Back to Massachusetts Drug Litigation Resources

## National Consumer Coalition Objects To $63.8 Million Settlement Of PAXIL Pediatric Class Action

Prescription Access Litigation says Illinois state court settlement not "fair or reasonable"

Boston, MA, [February 27] Prescription Access Litigation (PAL) on Friday filed an objection to a proposed class-action settlement involving GlaxoSmithKline (GSK) [NYSE: GSK] and the drugs Paxil® and Paxil CR™. PAL is the largest national coalition of consumer groups fighting illegal drug industry tactics.

The settlement, approved recently in Illinois state court (Madison County) resolves one of several nation-wide class actions alleging that GSK, the maker of Paxil, knew the drug was dangerous and ineffective when taken by children under the age of 18.  The case was brought on behalf of a nationwide class of adults who paid for Paxil on behalf of a child under 18 anytime during a period of more than a dozen years.

Under the agreement, which involves only claims for economic damages from Paxil, GSK will set aside $63.8 million into a settlement fund to pay class members' out-of-pocket expenses and attorneys' fees and expenses.

The Judge in a class action case must review a settlement before it takes effect, and must find that the settlement is "fair, reasonable and in the best interests of the class." Class members who feel that it does not meet these criteria are permitted to object to the settlement. The Judge reviews the objections submitted before deciding whether or not to approve the settlement. If the Judge decides not to approve a class action settlement, the settlement is terminated and the lawsuit proceeds.

PAL and an individual member of the class filed an objection to the settlement, because of concerns about several of its provisions:

- In order to get full reimbursement for their Paxil payments, class members are required to submit documentation of those payments (e.g. receipts, pharmacy records). This is in contrast to other recent settlements of pharmaceutical class actions, which did not require documentation but instead only required sworn affidavits from class members. Because Paxil was approved in 1992, some class members will be required to find records that are more than a decade-old in order to recover their full out-of-pocket expenses.
- Although class members who cannot find records can sign an affidavit swearing that they purchased Paxil, those class members will only receive up to $15.
- The settlement arbitrarily caps payments for such "undocumented" claims at $300,000 total, less than

### ⊐ Latest News

**FTC's Bureau of Competition Issues Summary of...**
*FTC, Jul 25, 2008*
Nearly Half Involved Payment to Generic Firms, Restricted Generics' Ability to Enter the Market...

Read more >

**San Francisco Health Plan, Herrera Sue McKess...**
*State of San Francisco, Jul 11, 2008*
City Program is First Government Plaintiff in Federal Suit Alleging Multimillion Dollar Conspiracy to Hike Prices on Consumers, Providers...

Read more >

**Walgreens to Pay $35 Million to U.S., 46 Stat...**
*U.S. Department of Justice, Jun 17, 2008*
The United States will not tolerate pharmacies or any other health care providers that attempt to manipulate the Medicaid program at the taxpayers...

Read more >

**More Drug Litigation News >**

### ⊐ Regional Resources

Alabama        Missouri
Alaska         Montana
Arizona        Nebraska
Arkansas       Nevada
California      New Hampshire
Colorado       New Jersey
Connecticut     New Mexico
DC             New York
Delaware       North Carolina
Florida        North Dakota
Georgia        Ohio
Hawaii         Oklahoma
Idaho          Oregon
Illinois        Pennsylvania

### ⊐ Hot Topics

- **Crestor Litigation**
- **Celebrex Litigation**
- **Bextra Litigation**
- **FDA and Drug Recalls**
- **Vioxx Litigation**
- **Prescription Drug Fraud**

### Did You Know?

**Every Single Drug That Affects The Body Will Have Some Side Effects**

Since the Food and Drug Administration (FDA) considers both the benefits and risks of all medications before approval, side effects are generally not serious. For every drug FDA approves, the benefits are balanced against its risks.

½ of 1% of the total settlement, despite the fact that it is possible that a majority of class members will not have payment record and thus would have to submit such an "undocumented" claim.

- If more than 20,000 class member submit undocumented claims, they will each receive a pro rata share of the $300,000 (less than $15), regardless of how much they spent on Paxil.
- Neither the notice nor the settlement agreement say what will happen to any unclaimed funds remaining at the end of the claims period. The objection strenuously opposes returning any of the funds to GSK, and instead recommends that the court award any remaining money as a cy pres distribution to non-profit organizations doing work that benefits the members of the class.
- No matter how small the amount of money that actually goes to class members, the lawyers bringing the case will get paid before any consumer receives their money. The lawyers could get the full amount of attorneys' fees they've requested - $16 million even if the class members receive significantly less.

"Class action lawsuits remain the most important tool available to compensate consumers for corporate wrongdoing," said Alex Sugerman-Brozan, director of Prescription Access Litigation, "But the Paxil Pediatric settlement is a bad apple in the class action barrel, and should not be approved as currently designed."

Prescription Access Litigation and its members have been involved in seven settlements of pharmaceutical class action lawsuits with a combined total of $438 million in settlement funds, including in three cases against GSK (concerning the drugs Augmentin, Relafen, Zofran, Kytril and others). PAL advocates for such settlements to include provisions that make it easier for consumers to learn about the settlement and submit claims for payment, including making published notices easier to understand, allowing consumers to submit claims online, setting minimum payment amounts that consumers will receive to make submitting a claim worthwhile, and others.

"There have been numerous innovations in recent class actions to make sure that the money owed to consumers actually gets into their pockets," added Sugerman-Brozan, "But the Paxil Pediatric settlement incorporates none of these and represents a low-water mark in recent prescription drug cases."

PAL's full objection can be found at prescriptionaccess.org/docs/PALPaxilObjection.pdf. The objection will be heard by the Court at a fairness hearing scheduled for April 25, 2007, at 9 a.m. in the Madison County Courthouse in Edwardsville, IL. Details about the settlement, including instructions and forms for class members wishing to file claims, can be found at www.paxilpediatricsettlement.com

CONTACT: Mark Snyder - (617) 275-2931, msnyder@communitycatalyst.org

**Contact a Drug Litigation Lawyer now for a free case review.**

## Contact Massachusetts Drug Litigation Attorneys

Contact a Drug Litigation Attorney for the following Massachusetts cities:

- Amherst
- Attleboro
- Beverly
- Boston
- Brighton
- Brockton
- Chelsea
- Everett
- Malden
- Marlborough
- Medford
- Methuen
- New Bedford
- Peabody
- Pittsfield
- Plymouth

| | |
|---|---|
| Indiana | Rhode Island |
| Iowa | South Carolina |
| Kansas | South Dakota |
| Kentucky | Tennessee |
| Louisiana | Texas |
| Maine | Utah |
| Maryland | Vermont |
| Massachusetts | Virginia |
| Michigan | Washington |
| Minnesota | West Virginia |
| Mississippi | Wisconsin |
| | Wyoming |

**Browse Map >**

- Fitchburg
- Framingham
- Holyoke
- Lawrence
- Leominster
- Lynn

- Quincy
- Revere
- Salem
- Taunton
- Westfield
- Woburn

**Contact a Drug Litigation Lawyer** now for a free case review.

## Legal Disclaimers

All attorney listings are a paid attorney advertisement, and do not in any way constitute a referral or endorsement by an approved or authorized lawyer referral service. The information provided on Drug Litigation Lawyers.com is not intended to be legal advice, but merely conveys general information related to legal issues commonly encountered. Please contact a local attorney in your area for official legal and law information. Your access to and use of this website is subject to additional Terms and Conditions.

Powered by the **experthub** network

Local Professional? Generate new business today
Call 866-227-9356 or contact a sales rep

This site is part of the LawFirms.com Network
©2009 ExpertHub, wholly owned subsidiary of MoxyMedia, Inc.

## IN THE CIRCUIT COURT
## THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| TERI HOORMANN, MARY KOPSIE and BONITA HELFER and MARK HELFER individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 04-L-715 |
| vs. | ) ) | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE, | ) ) ) | CLASS ACTION |
| Defendant. | ) ) | |

---

### OBJECTIONS TO THE PROPOSED CLASS ACTION
### SETTLEMENT BY CLASS MEMBER DOUGLAS BOWMAN
### AND THE PRESCRIPTION ACCESS LITIGATION PROJECT

---

Jennifer Soble, # 6287446
Bonnie I. Robin-Vergeer
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, N.W.
Washington, D.C. 20009
Phone: (202) 588-7733
Fax:    (202) 588-7795

Alex Sugarman-Brozan
Renée Markus Hodin
PRESCRIPTION ACCESS LITIGATION PROJECT
30 Winter St., 10th Floor
Boston, MA 02108
Phone: (617) 338-6035

## TABLE OF CONTENTS

INTRODUCTION.........................................................................................................1

SUMMARY OF ARGUMENT ......................................................................................3

ARGUMENT.................................................................................................................7

I.   THE SETTLEMENT IS UNFAIR. ..........................................................................7

    A. The Failure to Inform This Court and Objectors About the Size of
       the Class and the Likelihood that Class Members Will Be Able to
       Submit Documented Claims Requires Rejection of the Settlement.... .........8

    B. The Settlement Agreement Does Not Set Forth Clear Guidelines
       for Proving Out-of-Pocket Expenses.............................................................12

    C. The $300,000 Cap Is Unfair to the Class......................................................15

    D. A Better Means of Disbursing Funds to Class Members Is Available
       and Has Been Used Before by GlaxoSmithKline. .........................................17

II. THE SETTLEMENT AGREEMENT DOES NOT EXPLAIN
    WHAT HAPPENS TO ANY REMAINING FUNDS. .............................................19

    A. Any Money Remaining in the Settlement Fund Should Be Awarded
       as a *Cy Pres* Distribution. ..............................................................................19

    B. Alternatively, If the Remaining Fund Is Not Awarded as a *Cy Pres*
       Distribution and Were to Revert to GlaxoSmithKline, the Settlement
       Will Be Unfair and Should Not Be Approved for that Reason..................22

    C. The Attorneys' Fee Award Is Unreasonable Without More
       Information About the Actual Value of the Settlement. .............................23

       1.  Attorneys' fees should be awarded after the value of the
           settlement is assessed. .......................................................................26

       2.  Delaying the fee award creates good incentives and protects the
           class.....................................................................................................28

III. THE RESTRICTION ON OPT-OUT CLASS MEMBERS' RIGHTS TO
    BRING CLASS ACTIONS IS UNENFORCEABLE. .............................................28

CONCLUSION ...........................................................................................................31

**CERTIFICATION**..........................................................................................................32

**CERTIFICATE OF SERVICE** .....................................................................................33

## OBJECTIONS TO THE PROPOSED CLASS ACTION
## SETTLEMENT BY CLASS MEMBER DOUGLAS BOWMAN
## AND THE PRESCRIPTION ACCESS LITIGATION PROJECT

Class member Douglas Bowman[1] and the Prescription Access Litigation Project[2] (PAL) hereby object to the approval of the settlement agreement. As noted in their Motion to Intervene and Notice of Intention to Appear, Objectors intend to appear at the fairness hearing through counsel and present argument in support of their objections.

### INTRODUCTION

In July 2004, plaintiffs Teri Hoormann, Mary Kopsie, Bonita Helfer, and Mark Helfer filed this class action against GlaxoSmithKline, the manufacturer of paroxetine hydrochloride, a popular psychotropic drug sold under the name Paxil. The amended complaint alleged that GlaxoSmithKline knew that Paxil was ineffective and dangerous when given to children under 18 and that GlaxoSmithKline misled plaintiffs and the health care community as a whole. First Amended Complaint ¶¶ 3-4. The complaint sought actual and punitive damages, attorneys' fees, and costs. First Amended Complaint ¶¶ A-B. By October 6, 2006, settlement negotiations between class counsel and GlaxoSmithKline resulted in a proposed settlement agreement. After an in-chambers hearing that same day, this Court preliminarily approved the settlement.

Pursuant to the settlement agreement, GlaxoSmithKline agreed to set aside more than $63.8 million in a settlement fund, from which all claims, costs, and fees would be paid. Settlement ¶ 7(a). The fund provides for two types of recovery. First, class members who provide sufficient documentation of their out-of-pocket expenses will be

---

[1] Douglas Bowman's address is 7102 Crystal Ct., Middletown, MD 21769. His phone number is (301) 371-4607.
[2] The Prescription Access Litigation Project's address is 30 Winter St., 10th Floor Boston, MA 02108. Its phone number is (617) 338-6035.

reimbursed for those expenses.  Settlement ¶ 8(a).  Although the agreement states that

pharmacy records or "other sufficient medical records" may be used to establish out-of-

pocket expenses, it does not provide guidance as to what other records will be deemed

sufficient.   For class members who are unable to provide sufficient documentation,

$300,000 has been set aside.  Settlement ¶ 8(b).  Each class member unable to document

out-of-pocket expenses can receive up to $15 from the $300,000 account.  *Id.*  If the

number of class members seeking recovery from this account exceeds 20,000, each class

member will receive a *pro rata* share of the $300,000.  The settlement agreement also

requires that $500,000 from the fund be set aside for late claims.  Settlement ¶ 8(f).

Any attorneys' fee award will come from the same settlement fund as the class

members claims.  Settlement ¶ 7(a).  Regardless of how many class members make

claims, or of how much of the fund goes to the class, class counsel will seek 26% of the

stated  $63.8  million  fund—more  than  $16.5  million.    Settlement  ¶  8(d).

GlaxoSmithKline has agreed not to oppose class counsel's fee request.  Settlement ¶ 8(e).

The settlement provides that attorneys' fees and costs will be paid within ten business

days of final approval.  *Id.*

The settlement agreement does not say what will happen to any money remaining

in the $63.8 million fund at the conclusion of the claims period.  It does make clear that

any  money  remaining  in  the  $500,000  fund  for  late  claims  will  revert  to

GlaxoSmithKline.  Settlement ¶ 8(f).  Furthermore, neither the settlement agreement nor

the parties' Joint Motion for Preliminary Approval provides estimates as to the size of the

class, the average class member's out-of-pocket expense, or the amount of the fund the

parties expect to be used by the class.

The parties have attempted to notify the class by placing advertisements in newspapers and magazines, and by establishing a website at www.paxilpediatricsettlement.com. According to the notice, class members have until February 23, 2007, to seek the advice of counsel; evaluate the settlement; decide whether to file a claim or opt-out; and if necessary, to prepare and file objections with this Court.

Objector Douglas Bowman is a class member. His minor daughter was prescribed Paxil in 2002 and 2003. Bowman purchased Paxil for his daughter for $15 per prescription at least twenty-one times. *See* Affidavit of Douglas Bowman, attached hereto as Exh. A.[3] Objector Prescription Access Litigation Project is a national coalition of more than 125 organizations, including consumer, senior citizen, heath care, labor, legal services, and women's health advocacy organizations in 36 states and the District of Columbia. The members of the PAL coalition have a combined membership of over 13 million. PAL estimates that hundreds of the class members are dues-paying constituents of organizations in the PAL coalition. *See* Affidavit of Renée Markus Hodin of Prescription Access Litigation Project, attached hereto as Exh. B.[4]

## SUMMARY OF ARGUMENT

As the guardian of the absent class members' interests, *Waters v. City of Chicago*, 95 Ill. App. 3d 919, 924, 420 N.E.2d 599, 603 (Ill. App. Ct. 1981), this Court has an independent obligation to determine whether the settlement agreement is fair, reasonable, and in the best interests of the class. Because the settlement agreement is none of those things, it should be rejected. Before discussing the settlement's defects, it is worth focusing this Court's attention on its most troubling feature. Even though the parties

---

[3] Exh. A includes Objector Bowman's Notice of Intention to Appear.
[4] Exh. B includes Objector PAL's Notice of Intention to Appear.

3

have provided this Court with no information about the amount of the settlement they expect to be recovered by the class, the settlement agreement does not set forth what will happen to any money that remains in the settlement fund at the conclusion of the claims period. The parties' failure to specify what is to happen to the remainder of the settlement fund leaves this Court with one of two options—either to distribute the remainder as a *cy pres* award or to allow the fund to revert to GlaxoSmithKline. As discussed in greater detail below, this Court should award the remainder of the settlement fund as a *cy pres* distribution. Reversion of the settlement fund to GlaxoSmithKline would significantly undermine the value of the settlement and would require this Court to reject the requested amount and manner of distribution of attorneys' fees.

To understand the implications of reversion, it is necessary to examine several key provisions of the settlement agreement. Most obvious, the parties have not informed this Court and the class members about the size of the class or the amount of money they expect the class to claim. The actual value of the settlement to the class depends on the amount of money that class members spent on Paxil and the number of class members who are able to take full advantage of the settlement agreement by documenting their out-of-pocket expenses. Given that this Court's most important consideration in evaluating the fairness of the settlement agreement is the strength of the plaintiffs' case compared to the amount of the settlement, *City of Chicago v. Korshak*, 206 Ill. App. 3d 968, 972, 565 N.E.2d 68, 71 (Ill. App. Ct. 1990), it is crucial that this Court be able to estimate the amount of the fund that will be recovered by class members. Without this information, this Court cannot evaluate the fairness of the settlement agreement and, thus, cannot approve it.

4

Next, the settlement agreement is unfair because its notice requirements create arbitrary and unnecessary barriers to recovery. Class members must provide proof of their out-of-pocket expenses. Settlement ¶ 8; Class Notice ¶ 14. The notice to the class recommends that members look to their pharmacy, doctor, or tax records for proof of those expenses. Class Notice ¶ 14. These records may be extremely difficult for some class members to obtain, however, especially those members who purchased Paxil in the 1990s. Although there are a number of ways in which class members should be able to prove their out-of pocket expenses, the settlement agreement and notice are silent about what kind of proof will be acceptable absent receipts or pharmacy records. Settlement ¶ 8(a). The hurdles to recovering records of out-of-pocket expenses will compound the overall problem that class action settlements like this one have extremely low take-up rates. Because asking consumers to document their pharmaceutical purchases often acts as an obstacle to consumer recovery, settlements of pharmaceutical class actions should not require class members to provide such documentation, but rather should require only that class members indicate and certify how much money they spent on the relevant prescription drug. *See Nichols v. SmithKlineBeecham*, No. 00-CV-6222, 2005 WL 950616, at *8 (E.D. Pa. Apr. 22, 2005). Moreover, other methods of distribution have been adopted that would allow class members to recover their out-of-pocket expenses without the problems associated with claims-based distribution. *See In re Relafen Antitrust Litig.*, 01-CV12239-WGY (D. Mass.), Order Granting Preliminary Approval of Settlement, Certifying Class for Purposes of Settlement, Directing Notice to the Class and Scheduling Fairness Hearing, Nov. 24, 2004, at 7-8, attached hereto as Exh. C.

Because of the difficulty some class members will have in obtaining proof of their out-of-pocket expenses and the low take-up rate for claims-based class action settlements, it is reasonable to expect that many class members will not be able to recover their full out-of-pocket expenses. The recovery for class members who are unable or unwilling to locate the necessary documentation will be limited to the lesser of $15 or a *pro rata* share of $300,000. Settlement ¶ 8(b). The small amount of money set aside for those unable or unwilling to obtain sufficient documentation renders the settlement unfair, especially when compared to the size of the primary settlement fund, which is more than 200 times greater. The significance of the cap on recovery for undocumented claims is highlighted by the possibility that the remainder of the settlement fund could revert to GlaxoSmithKline.

The settlement agreement's defects not only render the settlement fatally unfair, but they magnify the problems created by the settlement's failure to address what will happen to any funds remaining at the conclusion of the claims period. In the absence of any information about the value of the settlement of the class, and because class members will likely encounter difficulties achieving their full recovery, it is possible that a large portion of the settlement fund will remain at the conclusion of the claims period. Because the settlement agreement and the notice to the class is silent regarding the distribution of any money remaining in the settlement fund, this Court should award the remainder as a *cy pres*. But if this Court disagrees and finds that the agreement requires the remaining funds to revert to GlaxoSmithKline, this Court should find the settlement unfair for this additional reason, especially in light of the $300,000 cap on undocumented claims. All these points are discussed below. At a minimum, if this Court concludes that

the fund reverts to GlaxoSmithKline and nonetheless approves the settlement, the Court should reserve making a fee award until the conclusion of the claims period, so that the Court can ensure that the fee is a reasonable percentage of the *actual* value of the settlement to the class. *Bowling v. Pfizer*, 927 F. Supp. 1036, 1044 (S.D. Ohio), *aff'd*, 103 F.3d 128 (6th Cir. Dec. 16, 1996).

Finally, the settlement agreement purports to restrict the right of those class members who opt out of the settlement agreement to pursue their own class actions. This Court does not have jurisdiction over those class members who opt out of the settlement, making any restriction on their rights unenforceable. *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods.*, 369 F.3d 293 (3d Cir. 2004). Because the provision restricting opt-out class members' rights serves no purpose other than to discourage those class members from opting out or pursuing their own lawful litigation in the future, this Court should decline to approve the settlement if that provision is included.

## ARGUMENT

## I.   THE SETTLEMENT IS UNFAIR.

In approving a class settlement, this Court's primary obligation is to the class. Thus, this Court must initially determine whether a settlement is fair to absent class members. *Waters v. City of Chicago*, 95 Ill. App. 3d 919, 924, 420 N.E.2d 599, 603 (Ill. App. Ct. 1981) (court must consider whether settlement is "fair, reasonable, and in the best interest of all affected").   It is crucial that this Court evaluate the settlement independent of the assurances of class counsel, because this Court is the "guardian of the interests of the absent class members." *Id.* (citation omitted).

7

In determining whether the proposed settlement is fair, this Court must analyze the factors set forth in *City of Chicago v. Korshak*, 206 Ill. App. 3d 968, 972, 565 N.E.2d 68, 70-71 (Ill. App. Ct. 1990). Specifically, this Court should consider

> (1) the strength of the case for plaintiffs on the merits, balanced against the money or other relief offered in settlement; (2) the defendant's ability to pay; (3) the complexity, length and expense of further litigation; (4) the amount of opposition to the settlement; (5) the presence of collusion in reaching the settlement; (6) the reaction of members of the class to the settlement; (7) the opinion of competent counsel; and (8) the stage of the proceedings and amount of discovery completed.

*Id.*; *Steinberg v. Sys. Software Assoc., Inc.*, 306 Ill. App. 3d 157, 163, 713 N.E.2d 709, 713 (Ill. App. Ct. 1999). The first factor is the most important factor in this Court's analysis. *Steinberg*, 306 Ill. App. 3d at 170, 713 N.E.2d at 717. To compare the strength of the plaintiffs' case with the relief offered in the settlement agreement, this Court must determine how valuable the settlement agreement is to the class. *San Antonio Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 460 (W.D. Tex. 1999) ("In determining whether the settlement is reasonable in light of the range of possible recovery factor, the Court is to 'determine the value of the settlement in light of the potential for recovery.'") (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 563 (E.D. La. 1993)); *Ballard v. Martin*, 79 S.W.3d 838, 847 (Ark. 2002). If this Court concludes that the settlement agreement is not fair or not in the best interests of the class because it does not confer enough value to the class members, it should reject the agreement.

### A. The Failure to Inform This Court and Objectors About the Size of the Class and the Likelihood that Class Members Will Be Able to Submit Documented Claims Requires Rejection of the Settlement.

To determine whether the settlement is fair, this Court must assess the value of the settlement to the class, based on the class's size and the strength of the plaintiffs' case

on the merits. *Ballard*, 79 S.W.3d at 847. GlaxoSmithKline's liability not only depends on the merits of the case, but on the number of patients under the age of 18 who were prescribed Paxil and the number of times the class members paid for the drug. Without some sense of the size of the class and the average class member's out-of-pocket expense, this Court cannot determine how much the settlement agreement will be worth to the class. *Duhaime v. John Hancock Mutual Life Ins.*, 989 F. Supp. 375, 378 (D. Mass. 1997); *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1284 (S.D. Ohio 1996). In this case, without knowing how valuable the settlement agreement is to the class, there is no way to determine whether the agreement is fair, reasonable, or in the class's best interests.

Unfortunately, neither the Joint Motion for Preliminary Approval nor its supporting documents indicates how large the parties believe the class size to be, nor do they provide an estimate of how many members of the class may be able to document their out-of-pocket expenses, even though the parties presumably possess that information.[5] Without some estimate of the number of class members and their average out-of-pocket expenses, this Court cannot evaluate whether the settlement agreement is fair. For example, in *Roberts v. Bausch & Lomb*, No. CV-940C-1144-W (N.D. Ala.), the defendant set aside $67 million into a fund for class members, slightly more than GlaxoSmithKline has set aside here. Despite the size of the settlement fund, the amount of money that was actually collected by the class was only $9.2 million. Deborah Hensler & Thomas Rowe, Jr., *Beyond "It Just Ain't Worth It": Alternative Strategies for*

---

[5] Pharmaceutical manufacturers routinely purchase the kind of data that would be relevant here, collected from pharmacies nationwide, from companies such as IMS Health and Verispan, and use that data in their sales visits to individual physicians. Such data includes a variety of demographic information concerning the prescriptions written and dispensed for particular drugs. It is possible, and even likely, that GlaxoSmithKline possesses data concerning the size of the class, data which the Court should require it to disclose to facilitate the Court's review.

9

*Damage Class Action Reform*, 64 L. & Contemp. Probs. 137, 149 (Summer 2001) (citing Deborah Hensler et al., *RAND, Class Action Dilemmas: Pursuing Public Goals for Private Gain* 145-68 (2000)).  As in *Roberts*, the value of the fund to the class in this case depends entirely on how many class members take advantage of the settlement.  *See also Strong v. Bellsouth Telecomm.*, 137 F.3d 844, 852 (5th Cir. 1998) (the value of the settlement depends on how many class members take advantage of the agreement, not the total amount of money theoretically available to the class).

The number of class members and the amount of their out-of-pocket expenses is particularly important to know given the traditionally low rates at which class members take advantage of settlements.  Claims-based settlements in class actions typically result in low take-up rates.  *See, e.g., Strong v. Bellsouth Telecomm., Inc.*, 173 F.R.D. 167, 169 (W.D. La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998) (4.3% of class members participated in claims process offering payments of $12 to $20).  Even when class members are offered significantly higher minimum payments than those in the settlement agreement here, participation remains low.  *See, e.g., Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 44 (D. Me. 2005) (because take-up rates are generally below 10%, take-up rate of 19% was "above average").  Take-up rates in pharmaceutical cases are even lower than in consumer class action settlements generally, because consumers' recollection of their pharmaceutical purchases is much poorer than with other consumer products.  Given the difficulty that some class members will have recovering documentation of their out-of-pocket expenses, as discussed below, it is reasonable to expect that take-up rates of class members in this case will be very low.

Cases such as *Strong* and *Sylvester* demonstrate a very strong probability, and perhaps inevitability, of low consumer claims submission rates. A treatise on class action litigation and settlements that examined response rates in different types of proof-of-claim settlements supports this conclusion. *See* 2 Newberg on Class Actions, app. 8-4 (3d ed. 1992). Of the 17 antitrust and consumer class action settlements examined by Newberg, all had claims rates under 50% and the overwhelming majority (13 out of 17) had claims rates under 20%. *Id.* at app. 8-187 to 8-190, 8-194. Given the practical problems with the documentation requirement here, it is highly likely that the overwhelming majority of the class will receive no relief from this settlement. Because Paxil was approved in 1992, some class members will be required to obtain records of fifteen-year old prescriptions to recover their out-of-pocket expenses. Given the combination of (a) the difficulty of obtaining the necessary documentation, (b) the length of time that has passed between some adolescent Paxil use and the settlement agreement, and (c) the pattern of low claims rates in similar cases, there is no reason to believe that class participation in this case will exceed the abysmally low rate typical of claims-based settlements.

As discussed at greater length below, the value of the settlement to the class members would be far lower still if the remainder of the settlement fund reverted to GlaxoSmithKline at the conclusion of the claims period. The settlement agreement provides that class counsel will seek attorneys' fees equaling 26% of the settlement fund, or approximately $16.5 million, which is to come out of the settlement fund. Settlement ¶ 8(e). After subtracting attorneys' fees, as well as the $300,000 fund for undocumented claims, the $500,000 fund for late claims, and about $1.5 million in administrative costs,

approximately $45 million will remain in the settlement fund.  Suppose that the average

class member's out-of-pocket expenses were $100.  (Again, the parties have so far

provided no information regarding the average class member's out-of-pocket expenses.)

In that case, 450,000 class members would have to make claims to deplete the fund,

which would be a remarkably high number of claims.  As the low take-up rates in class

settlements demonstrate, the amount of the settlement fund is unlikely to reveal the true

value of the settlement to the class.  *See, e.g., Colson v. Hilton Hotels Corp.*, 59 F.R.D.

324, 327 (N.D. Ill. 1972) ($5.9 million settlement fund paid out merely $18,980.03 in

damages on 165 claims to plaintiffs—a claims rate of 0.32%.).  In sum, there is a very

strong likelihood that even after the submitted consumer claims are paid, most of the

settlement fund will remain.

### B. The Settlement Agreement Does Not Set Forth Clear Guidelines for Proving Out-of-Pocket Expenses.

Unlike other settlements that have allowed recovery as long as class members

indicate and certify how much money they spent on a prescription drug, *see Nichols v.

SmithKline Beecham Corp.*, No. 00-CV-6222, 2005 WL 950616, at *8 (E.D. Pa. Apr. 22,

2005); *see also Nichols* Claim Form, http://paxilclaims.com/pdfs/detailed_notice.pdf (last

visited Feb. 21, 2007), class members can recover the full value of their economic loss in

this proposed settlement only if they can prove their out-of-pocket expenses. The notice

does not set forth how class members might do that; although the settlement agreement

states that class members may "submit pharmacy records or other sufficient records"

showing that they purchased Paxil prescribed to a person under the age of eighteen and

the total amount of out-of-pocket expenses they paid, Settlement ¶ 8(a), the agreement

does not propose meaningful or practical ways for class members to recover those

records dating back to 1992.  Laws requiring pharmacies to make and retain records documenting a consumer's out-of-pocket prescription expenses vary greatly from state to state, but the settlement agreement does not establish an alternate procedure for class members to show how much they are entitled to recover.  In all likelihood, a significant percentage of class members will be unable to recover their full out-of-pocket expenses because the task of proving those expenses under the settlement agreement may be extremely onerous, if not impossible, especially for those class members who purchased Paxil in the 1990s, used more than one pharmacy, moved significant distances from their pharmacies, or used independent pharmacies that have since gone out of business.

The Claim Form asks class members to state the amount they paid out-of-pocket for Paxil and requires them to attach copies of records.  The form instructs class members to "consult [their] doctor, pharmacy or income tax records for documentation of [their] purchase."  Although the pharmacy is the most obvious source for records of a class member's out-of-pocket expenses, those records may not be available from the pharmacy.  Pharmacy record-keeping is a matter of state law, and the requirements placed on pharmacists vary significantly from jurisdiction to jurisdiction.  For example, in Illinois, pharmacists are required to keep records regarding patient prescriptions for only five years, *see* 68 Ill. Admin. Code § 1130.91(b)(6)(C), whereas in Alaska, those records need only be kept for two years, Alaska Admin. Code tit. 12 § 52.450.  *See also* N.C. Admin. Code § 46.2302 (three years); N.J. Admin. Code § 13:39-7.6 (five years); Or. Admin. R. 855-041-0060 (three years); 49 Pa. Code § 27.18 (two years).  And although pharmacists in Alabama are required to include in their records information about the consumer's out-of-pocket expense, Ala. Admin. Code r. 20-2-182, pharmacists

in Illinois and Alaska are not required to document or keep records of out-of-pocket expenses, but are required only to record information related to the dosage, the prescribing doctor, and the patient's identity. *See* Alaska Admin. Code tit. 12 § 52.450; 68 Ill. Admin. Code § 1130.91(b)(6)(C)21; *see also* 21 N.C. Admin. Code § 46.2302 (no requirement to document out-of-pocket expense); N.J. Admin. Code § 13:39-7.6 (same); Or. Admin. R. 855-041-0060 (same); 49 Pa. Code § 27.18 (same). Even in those jurisdictions requiring pharmacists to keep records of a consumer's out-of-pocket expenses, pharmacists need not do so indefinitely.

The Claim Form suggests alternatively that class members may rely on their tax records to prove their out-of-pocket Paxil expenses. There are two primary reasons why tax records will likely not provide class members with that information. Under the current tax laws, taxpayers can deduct their medical expenses only if they exceed 7.5% of their income, 26 U.S.C. § 213(a), a high threshold that removes the incentive for almost all class members to save their receipts. *See* Benjamin P. Falit, *The Bush Administration's Health Car Proposal: The Proper Establishment of A Consumer-Driven Health Care Regime*, 34 J. L. Med. Eth. 632, 633 n.18 (2006) (4.8% of taxpayers take the medical expenses deduction). Furthermore, it is common practice to retain tax documents only for the preceding seven years.[6] Because Paxil obtained FDA approval in 1992, even those class members who retained documentation of their Paxil purchases for tax purposes would almost certainly be unable to find records of those expenses before 1999.

---

[6] The statute of limitations for most tax actions is three years. When fraud is involved, the statute of limitations is extended for another three years. For that reason, most taxpayers are advised to retain tax records for seven years, one year beyond the most generous statute of limitations.

14

Finally, the Claim Form recommends that class members request records from their doctors. As with pharmacies, however, there is no reason to believe that doctors would have any information about a patient's out-of-pocket expenses, as opposed to the simple fact that a prescription was written. And because patients almost never buy medication from their physicians, it is unlikely that a doctor would ever know how much a patient paid out-of-pocket for a particular prescription drug. Thus, although a physician will likely have information about a patient's prescription history, he or she will not have the records required under the settlement agreement. Further, some class members will have paid for prescriptions issued by more than one physician, making it even more onerous for class members to gather records.

Ultimately, many class members, especially those who do not rely on large pharmacy chains such as CVS or Walgreens for their prescriptions, will not be able to document their out-of-pocket expenses in the ways proposed by the settlement agreement. Although there may be alternative ways for class members to prove their out-of-pocket expense, neither the notice nor the settlement agreement specifies what other types of proof will be sufficient for recovery. Given the difficulty class members will have in obtaining the necessary records, many will be unable to avail themselves of the settlement agreement's provision allowing for recovery of out-of-pocket expenses.

### C. The $300,000 Cap Is Unfair to the Class.

Although no subclass has been designated by this Court, the settlement agreement has the effect of creating a subclass of class members who do not document their out-of-pocket expenses. The recovery for each individual member of the subclass is capped at $15, although in fact each member actually may receive far less, because the total

15

recovery for the subclass is capped at $300,000. Settlement ¶ 8(b). Class members may fall into this subclass for any number of reasons. If the prescriptions are more than two years old, certain class members may be unable to recover adequate records. Other obstacles to retrieving required documentation are discussed above. Many class members will simply be unwilling to complete the onerous, time-consuming steps necessary to gather the required documentation. Even class members who submit records may have their documentation deemed inadequate, but whether they will have an opportunity to cure such defects or supplement their information is unspecified in the settlement.

This Court not only has an obligation to assess the fairness of the settlement to the class, but it also has an obligation to any subclasses. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 819 (1999). Capping the total recovery for class members who are unable to document their claims at $300,000 is unfair and not in the best interests of the subclass. Depending on the overall class size, the age of the claims, and the stringency of the proof requirement, the number of class members who are unable to document their expenses may be quite large. Should more than 20,000 subclass members attempt to recover some remuneration, however, they will not receive $15, but will be limited to their *pro rata* share of the $300,000 fund. Settlement ¶ 8(b). That means that if more than 20,000 class members cannot gather the required records, the recovery of each individual subclass member could plummet. The limited recovery for the subclass is all the more stunning when compared to the amount of requested attorneys' fees—$16.5 million.

Until the parties are able to project the size of the class and the estimated percentage of that class that is likely to document their out-of-pocket expenses, there is no way to assess the number of class members that may fall into the subclass, and thus no

way to determine how much each subclass member will benefit from the agreement. Even if the size of the subclass were known, however, the settlement would still be unfair to the subclass. The $300,000 cap arbitrarily limits the subclass's recovery to $15 despite the subclass's best efforts at documentation.

Notwithstanding the approximately $45 million fund nominally available to the class, it is obvious that the true value of the fund will not be anywhere near the amount suggested by the settlement agreement, because there is a significant possibility that the class members will end up competing for recovery out of the $300,000 fund for undocumented claims. It is understandable that the parties might wish to give priority to those class members who document their out-of-pocket expenses and thus that they would seek to ensure that those class members' claims are paid in full. But there is no justification for preventing the undocumented class members who submit affidavits to share, on a *pro rata* basis, any funds that remain after the documented claims have been disbursed. Because the parties have limited the recovery of the class members who are unable to provide records to $300,000, despite the availability of an additional $45 million, the settlement agreement is unfair.

### D. A Better Means of Disbursing Funds to Class Members Is Available and Has Been Used Before by GlaxoSmithKline.

In this case, notice to the class is being provided by publication notice pursuant to a notice plan prepared by Kinsella-Novak Communications, Ltd (KNC). *See* Joint Motion for Preliminary Approval, Exh. C. The unfair elements of the settlement outlined above, together with the traditionally low "take-up" rates for claims-based class action settlements, mean that a traditional approach to notice will be insufficient in this case. To ensure that the class actually benefits from the settlement fund in this case, any settlement

17

agreement should provide for direct payment to class members, based on records subpoenaed from the country's largest pharmacies.

Although this approach to claims administration may sound unusual, it has been successful in another class action settlement involving GlaxoSmithKline. In *In Re Relafen Antitrust Litigation,* 01-CV-12239-WGY (D. Mass.), plaintiffs alleged that GlaxoSmithKline used illegal tactics to prevent generic versions of the brand-name drug Relafen from entering the market, thereby causing consumers and other purchasers of the drug to pay too much. The parties settled the case for $75 million; $50 million was allocated to a nationwide sub-class of third-party payors and $25 million was allocated to a nationwide sub-class of consumers. In addition to a more traditional notice plan that included a website and publication in a variety of news sources, the Court authorized the plaintiffs to issue subpoenas to the ten largest chain drug stores and the five largest mail order pharmacies in the country for access to the records containing the contact and expenditure information for consumer class members. *See* Exh. C. Using that information, the claims administrator provided direct payment to Relafen consumers.

Comparing the number of class members who made claims as opposed to those that were identified by subpoena highlights the efficacy of the *Relafen* approach. There, 2,761 class members submitted claims in response to the traditional notice. Not surprisingly, their average claim was high, about $394.96. An additional 250,905 class members, nearly 92 times more than those who submitted claims, were identified through the pharmacy subpoenas, and were paid an average of $59.03. *See* Affidavit of Thomas R. Glenn Regarding Allocation and Distribution of the Net Settlement Funds ¶¶ 25, 42, attached hereto as Exh. D.

As a result of this innovative plan, the consumer portion of the settlement funds was distributed in full, providing a full benefit to the Relafen Consumer Sub-class. Objectors believe that a plan akin to the Relafen direct payment plan should be used here in conjunction with the traditional publication notice plan. A direct payment plan would help address some of the deficiencies of the settlement agreement outlined above.

## II. THE SETTLEMENT AGREEMENT DOES NOT EXPLAIN WHAT HAPPENS TO ANY REMAINING FUNDS.

The settlement agreement is silent regarding what is to happen to any money remaining in the settlement fund at the conclusion of the claims period. Objectors Bowman and PAL believe that this Court should exercise its equitable power to award any remaining funds as a *cy pres* distribution, because that resolution would best protect the interests of the class. Should this Court determine that the remaining fund must revert to GlaxoSmithKline, however, this Court should proceed with even more caution in its evaluation of fairness to the class. Moreover, if the fund reverts, this Court should refrain from awarding attorneys' fees until the conclusion of the claims period, because it will be impossible before that time to determine the actual value of the settlement to the class.

### A. Any Money Remaining in the Settlement Fund Should Be Awarded as a *Cy Pres* Distribution.

Generally, settlement agreements do not allow any unused portion of the settlement fund to revert back to the defendant, but rather, require that any undistributed portion be awarded to a *cy pres* recipient. *See, e.g., Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002). When an agreement does not provide for a distribution of the remainder of a settlement fund, the absent class members will benefit from an award of those funds to a cause related to the injury addressed by the litigation. This principle,

known as the *cy pres* doctrine, "is based on the idea that the settlor would have preferred a modest alteration in the terms of the trust to having the corpus revert to his residuary legatees." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004). The concept has been applied to class actions on countless occasions; the principle recognizes that distribution to individual class members is not always possible, but that the benefits of the settlement can and should inure to the benefit of the class indirectly. *See In re Folding Carton Antitrust Litig.*, 744 F.2d 1252, 1254 (7th Cir. 1984); *Powell*, 843 F. Supp. at 499; *Superior Beverage*, 827 F. Supp. at 479.

When a settlement is silent as to the remainder of the settlement fund, it is up to the court to decide how to disburse that money. 3 Newberg on Class Action § 10:15 (4th ed. 2006). Until the funds have been fully disbursed, this Court retains equitable control over the fund. *Superior Beverage Co., Inc. v. Owens-Illinois, Inc.*, 827 F. Supp. 477, 479 (N.D. Ill. 1993); *see also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 362 F. Supp. 2d 574, 576 (E.D. Pa. 2005); *Powell v. Ga. P. Corp.*, 843 F. Supp. 491, 499 (W.D. Ark. 1994). Because this Court retains control of the settlement fund until it is fully disbursed, it is free to allocate any remainder of the fund in a way that it deems appropriate. *Superior Beverage*, 827 F. Supp. at 480 (noting that a court's broad equitable powers allow the allocation of funds for a variety of purposes).

In other pharmaceutical class action settlements in which GlaxoSmithKline was the defendant, settlement agreements have provided that the remainder of the settlement fund be distributed as part of a *cy pres* award. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, MDL No. 1456, No. 01-CV-12257-PBS (D. Mass), Settlement Agreement and Release ¶ 22, attached hereto as Exh. E; *In re Relafen Antitrust Litig.*, No.

20

01-CV-12339-WGY (D. Mass.) (Exh. C)[7]; *Ryan-House v. GlaxoSmithKline*, No. 2:02-CV-442 (E.D. Va.), Final Order and Judgment Approving Settlement and Awarding Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs ¶ 8, attached hereto as Exh. F.

The settlement agreement is silent regarding the intended disposition of any money remaining in the settlement fund at the end of the claims period. *Compare* Settlement ¶ 7 (establishing $63.8 million fund with no mention of reversion), *with* Settlement ¶ 8(f) (establishing $500,000 fund for late claims which reverts to GlaxoSmithKline). Equally significant, the notice to the class states that "[a] $63.8 million fund will be established" and that the "balance" of the fund after fees, expenses, and costs "will be used to pay consumers who submit valid claim forms in cash for the total amount they paid out of pocket." Class Notice ¶ 10. The notice provides no information about the fate of any remaining funds after claims are paid. Furthermore, the settlement agreement states that the agreement is fully integrated. *See* Settlement ¶ 28 ("This Agreement and attachments thereto contains an entire, complete, and integrated statement of each and every term and provision agreed to by and among the parties."); *id.* (Preamble) ("Whereas, this Settlement Agreement is intended to incorporate all previous negotiations and agreements, written or oral, between Plaintiffs and Defendant."). Based on the language of the settlement agreement, if any money remaining in the settlement fund were to revert to GlaxoSmithKline, the notice to the class would not satisfy 735 ILCS5/2-803 or due process because it does not apprise the class of the settlement's terms. *See Boggess v. Hogan*, 410 F. Supp. 433, 442 (D.C. Ill. 1975). Furthermore, as

---

[7] A more comprehensive discussion of the *cy pres* award in that case can be found in Judge Young's Memorandum, entered on September 28, 2005, which is available on PACER.

Objector Colin Connare argues, the integrated agreement's silence regarding the disposition of the unused funds means that GlaxoSmithKline has waived any claim to that money. *See Schwartz*, 362 F. Supp. 2d at 576.

### B. Alternatively, If the Remaining Fund Is Not Awarded as a *Cy Pres* Distribution and Were to Revert to GlaxoSmithKline, the Settlement Would Be Unfair and Should Not Be Approved for that Reason.

As discussed above, Objectors believe that the class would benefit most if this Court awarded any remaining funds as a *cy pres* distribution. If this Court decides that it cannot make a *cy pres* award, the parties will likely argue that any money remaining from the $63.8 million fund should revert to GlaxoSmithKline, like any remainder of the $500,000 reserved for untimely claims. Settlement ¶ 8(f). Given the problems inherent in the settlement's proof requirements, as discussed above, a significant percentage of class members will not be able to obtain a meaningful recovery from the settlement agreement, and thus will not recover claims against the primary settlement fund, as opposed to the $300,000 fund for undocumented claims. After deducting attorneys' fees and expenses, administrative fees, and the funds for late and undocumented claims, about $45 million remains to pay class members' out-of-pocket expenses. Should this Court determine that the agreement permits a reverter, there is a significant likelihood that GlaxoSmithKline would recover millions of dollars, perhaps the bulk of the fund.

When a settlement provides that unclaimed funds revert to the putative wrongdoer, that reversion is an indication that the settlement is suspect. *Mirfasihi*, 356 F.3d at 785. Any argument that the fund should revert would be even more troubling in this case because the class has not been notified that reversion is even a possibility. In comparison to the settlement agreement's provision providing for reversion of the

$500,000 fund for late claims, Settlement ¶ 8(f), the agreement is entirely silent as to the intended disposition of any money left in the primary settlement fund.  In fact, class members have been told that GlaxoSmithKline will provide the class with $63.8 million.  *See* Class Notice ¶ 10; "Frequently Asked Questions" at 2, http://paxilpediatricsettlment.com/pdfs/FAQ/pdf ("The settlement provides a $63.8 million fund from which class members who file valid, timely claims will be paid.").

If reversion were a possibility, it would be especially critical to determine the full value of the class's claims, because the extremely low cap on recovery for those who are unable to provide documentation means that GlaxoSmithKline might pay out far less money than the value of future litigation.  In *Reynolds*, the Seventh Circuit noted that a settlement agreement providing for reversion of the remaining fund was especially suspect because the settlement agreement capped class members' recovery at $15.  288 F.3d. at 283.  The court emphasized that, given the settlement's suspicious features, the trial court erred by failing to quantify the expected net value of the class members' claims.  *Id.* at 284-85.  So, too, here, because there is a cap on the recovery of a significant number of class members, if the parties argue that the funds should revert, it is all the more critical that this Court take steps to quantify the value of the litigation in order to determine whether the settlement is fair.

### C. The Attorneys' Fee Award Is Unreasonable Without More Information About the Actual Value of the Settlement.

Given the speculative value of the settlement to the class, a fee award of 26%—in excess of $16.5 million—is unreasonable.  Neither this Court nor the objectors have a sense of the class size, the amount of the average class member's out-of-pocket expenses, or the number of class members that will take advantage of the settlement agreement

given the imprecise proof requirements.   Even though there is no way to value the settlement fund at this point, class counsel will seek approximately $16.5 million in attorneys' fees, to be paid in full immediately after final approval of the settlement.   Such a large up-front fee award, paid without regard to the number of claims filed or the amount of funds disbursed, is unreasonable.   Objectors' concerns regarding the large attorneys' fee are heightened if the remainder of the settlement fund would revert to GlaxoSmithKline.   If the remainder of the fund were to revert, it is possible that attorneys' fees would far exceed the actual recovery, a result that in and of itself would render the settlement unfair.

Attorneys' fees must reflect the actual value recouped by the class members.   *In re Excess Value Ins. Coverage Litig.*, No. M-21-84RMB, MDL-1139, 2004 WL 1724980, at *13 (S.D.N.Y. July 30, 2004).   Although it is axiomatic that an attorney who recovers a common fund for the benefit of the class is entitled to a portion of that fund in fees, it is equally well established that the reasonableness of the fee depends on the benefit the common fund actually confers on the class.   *See Strong,* 137 F.3d at 853; *Bowling,* 927 F. Supp. at 1041-42; *Duhaime,* 989 F. Supp. at 379.   Basing the fee award on the stated value of the settlement fund—as opposed to the *actual* value of the settlement agreement to the class—is especially troubling in this case.   Because the value of the settlement to the class will remain undetermined until class members actually apply for and obtain benefits, there is no way for this Court to compare the fee award to the benefit to the class before the end of the claims period.

Additionally, the settlement agreement has two key features that make the requested fee award especially suspicious.   First, the settlement agreement contains a

"clear sailing" provision, under which "GSK agrees that it will take no position, either publicly or in the court, with respect to any application by Class Counsel for an award of attorneys' fees and costs in accordance with this agreement." Settlement ¶ 8(e). When the process for awarding attorneys' fees is non-adversarial, courts must be particularly diligent in comparing the value of the settlement with the fee award. *See Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991) ("We believe it to be self-evident that the inclusion of a clear sailing clause in a fee application should put a court on its guard, not lull it into aloofness."). Because the defendant does not act as an adversary in that context, the reactions of class members (like Objectors) to the fee award are extremely important. *Bowling*, 927 F. Supp. at 1044-45 (objector provided only alternative view of the settlement because defendant failed to participate in litigation about attorneys' fees).

Second, the agreement provides that the attorneys' fees and expenses will be distributed from the settlement fund *before* any distribution to the class is made. Settlement ¶ 8(c). This Court must carefully assess the fee award because when an award comes from the common fund, class counsel's interests may differ significantly from those of the class. *Bowling v. Pfizer*, 102 F.3d 777, 781 n.3 (6th Cir. 1996) (noting that "[t]he risk that counsel has been some way been 'bought off'" requires scrutiny at the approval stage when the fee award comes from the common fund). *See also Weinberger*, 925 F.2d at 524 ("[T]he conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery . . . ."); *Democratic Cent. Comm. of Dist. of Columbia v.*

25

*Wash. Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993); *In re Nucorp Energy, Inc*., 764 F.2d 655, 661 (9th Cir. 1985).

### 1. Attorneys' fees should be awarded after the value of the settlement is assessed.

"Upon settlement of a class action lawsuit, the district court has a responsibility to assess the reasonableness of the requested attorneys' fees[.]" *Strong*, 173 F.R.D. at 170. In evaluating the fee request, this Court must consider the benefits conferred upon the class. *Id.* at 172 (citing *In re FPI/Agretech Secur. Litig.*, 105 F.3d 469, 473 (9th Cir. 1992)). Because it is impossible to assess the true value of the settlement agreement to the class until claims are actually submitted and validated if the fund reverts, this Court should not award more than a fraction of the requested attorneys' fees up-front. Even if the parties were able to estimate the size of the class for the Court, the actual value of the settlement will depend on that number of class members able to sufficiently document their out-of-pocket expenses. Moreover, like in *Strong*, the settlement agreement may be of "conditional value" if any amount remaining in the settlement fund reverts to GlaxoSmithKline at the end of the claims period.

Objectors Bowman and PAL do not argue that an attorneys' fee award comprising 26% of the actual value of a settlement would necessarily be unreasonable. *See, e.g., Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005). Rather, Objectors' concerns are based on the fact that class counsel will seek fees based on the putative settlement fund, "regardless of whether an individual Class member claims their benefits." Settlement ¶ 8(d). As discussed above, the experience with claims-based settlements has shown that only a small percentage of class members can be expected to take advantage of the settlement. Because of this difficulty, numerous courts have recognized that when the

value of the settlement is conditional or speculative, the fairest way to award attorneys'
fees is after the conclusion of the claims peiord. For example, in *Duhaime*, 989 F. Supp.
at 379, the court was unable to assess the value of the fund before the class members had
taken advantage of the settlement. Because the court could not determine whether the
estimated value and the actual value of the settlement were the same, it declined to
"guess, when experience will shortly answer the crucial question." *Id.* Instead, the court
awarded the attorneys approximately half of their requested fee, and placed the remainder
in escrow, to be distributed after one year. *Id.*

The approach to allocating attorneys' fees followed by *Duhaime* has been used by
other courts as well. *See, e.g., Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1283-84 (S.D.
Ohio) (holding back large proportion of fee award until additional "future" benefits to
class were actually paid into class fund), *aff'd*, 103 F.3d 128 (6th Cir. 1996). Others have
refused to award fees that did not align with the settlement's actual value to the class.
*Strong*, 173 F.R.D. at 172 (W.D. La. 1997) (denying fee petition in entirety because
actual value of settlement fund based on credits sought by class members was $2 million,
whereas class counsel had estimated its value beforehand at $64.5 million); *Voege v.
Ackerman*, 70 F.R.D. 693, 695 (S.D.N.Y. 1976) (awarding plaintiffs' counsel a smaller
fee than requested because shareholder participation in settlement had been minimal and
actual financial benefit to them was "almost zero"); *Voege v. Ackerman*, 67 F.R.D. 432,
436-37 (S.D.N.Y. 1975) (reserving fee determination until all claims of shareholders
entitled to participate in settlement had been filed and adjudged because extent of
settlement's benefit to class could not be determined with any degree of exactitude

beforehand).  This Court should adopt this prudent solution to the complicated problem of valuation and delay the fee award until the conclusion of the claims period.

### 2. Delaying the fee award creates good incentives and protects the class.

Class counsel's obligations to the class do not end with the final approval of the settlement, but rather continue through disbursement of the settlement fund.  By delaying the disbursement of a portion of the fees until after the conclusion of the claims period, this Court can ensure that class counsel has a financial incentive to diligently monitor the status of class members' claims.  Delaying the fee award assures that "Counsel are not paid until they have rendered their services, and places the Court in the best possible position for making an award that fairly compensates Counsel and assures that the Class only pays for what it gets."  *Bowling*, 927 F. Supp. at 1044.

By delaying a fee award, this Court will better align the interests of the class members and class counsel and thus increase the likelihood that the class members will be fully compensated.  By basing a delayed fee award on the amount of money actually recovered by the class, this Court will provide an incentive to the class members to closely monitor the notice and claims process and promote the maximum depletion of the settlement fund by the class.  Moreover, a delayed award will give class counsel an incentive to diligently represent class members whose claims are in dispute.  *Duhaime*, 989 F. Supp. at 380.

## III. THE RESTRICTION ON OPT-OUT CLASS MEMBERS' RIGHTS TO BRING CLASS ACTIONS IS UNENFORCEABLE.

The opt-out restriction is unenforceable and thus can serve no purpose other than to discourage those class members who opt out of the agreement from later vindicating

their litigation rights. This Court should either disapprove the settlement because it contains that unlawful restriction or at least interpret the settlement agreement as not binding the rights of opt-out class members to bring future class actions. *See In re Gen. Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 846 F. Supp. 330, 341 (E.D. Pa. 1993).

The right to opt out of a damages class action is constitutionally required. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). Because class members who opt out threaten to undermine the defendant's objective of obtaining global peace, however, settlement agreements often attempt to minimize the effect of opt-outs—either by reducing the number of class members who opt out or by restricting their rights after the settlement. Richard A. Nagareda, *Closure in Damage Class Settlements: The Godfather Guide to Opt-Out Rights*, 2003 U. Chi. L. F. 141, 142 (2003). Such is the case here; the settlement agreement purports to prohibit the opted-out class members from pursuing their own class action. *See* Settlement ¶ 14(c) ("The right to opt out may be used only to pursue an individual action and not a class action.").

This restriction on the rights of the opt-out class members is unenforceable. As a general rule, "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996) (quotation omitted). The same is true in the context of a class action; any court's jurisdiction over an absent class member is based on that class member's implicit consent to that court's jurisdiction. *Shutts*, 472 U.S. at 811-12; *see also* 735 ILCS 5/2-804 ("Any class member seeking to be excluded from a class action may request such exclusion and any judgment entered in the action

shall not apply to persons who properly request to be excluded."). Thus, when class members exercise their right to opt out, those class members are no longer within this court's jurisdiction, and no injunction issued in association with the class settlement can be enforced against them. *See Mortimer v. River Oaks Toyota, Inc.*, 278 Ill. App. 3d 597, 603, 663 N.E.2d 113 (Ill. App. Ct. 1996) (class members could have "opted out of the class, in which case the judgment entered in this action would not apply to them") (citing 735 ILCS 5/2-804(b)); *see also Drelles v. Metro. Life Ins. Co.*, 357 F.3d 344, 347 (3d Cir. 2003) (declining to enforce an injunction against plaintiffs "who consciously and purposefully refused to join a class action settlement"). Numerous courts have recognized that because a court does not have jurisdiction over class members who opt out entirely from a class action, a class action settlement cannot affect the rights of those members to seek compensatory damages. *See, e.g., Sandpiper Vill. Condo. Ass'n, Inc. v. Louisiana-Pacific Corp.*, 428 F.3d 831, 849 (9th Cir. 2005); *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods.*, 369 F.3d 293, 315 (3d Cir. 2004).

Any argument that allowing the opt-outs to pursue their own class action will undermine the viability of the present action is without merit. Class actions brought by opt-out plaintiffs are common, and there is no evidence that opt-out class actions have undermined the continued viability of class actions generally. *See, e.g., Achem Prods. v. Windsor*, 521 U.S. 591, 605 (1997); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2006 WL 3332917 (N.D. Ill. Nov. 13, 2006). Furthermore, an opt-out class action large enough to undermine the primary settlement is a strong indication that the settlement is not fair and should not have been approved in the first place. *See*

*Steinberg*, 306 Ill. App. 3d at 163, 713 N.E.2d at 713 (the class members' reaction to the settlement agreement is a factor in determining whether it is fair).

Not only does the opt-out restriction violate the opt-out class members' right to try their own cases, but it threatens to interfere with the judicial process in other jurisdictions, and thus should be excluded from the settlement for reasons of comity. Should a class member seek certification before another court of an opt-out class, this Court's order, if enforceable, would prevent that court from exercising jurisdiction over that individual's claim.  This Court's order threatens to "remove from the [] judge a whole panoply of decisions that he or she would normally be authorized—indeed obliged—to make." *In re Diet Drugs*, 369 F.3d at 316-17.  Just as this Court may not strip those class members who opt out of the settlement agreement of their right to bring a class action in the future, it should not issue orders that improperly undermine the authority of foreign courts.

## CONCLUSION

For the foregoing reasons, this Court should deny final approval of the proposed class action settlement.

Respectfully submitted,

Alex Sugarman-Brozan
Renée Markus Hodin
PRESCRIPTION ACCESS LITIGATION
  PROJECT
30 Winter Street, 10th Floor
Boston, MA 02108
Phone: (617) 338-6035

Jennifer Soble, # 6287446
Bonnie I. Robin-Vergeer
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, N.W.
Washington, D.C. 20009
Phone: (202) 588-7733
Fax:    (202) 588-7795

## CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, 735 ILSC 5/1-109, the undersigned certifies that the statements set forth in this affidavit are true and correct, except as to matters therein stated to be on information and belief and as such to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

_____
Jennifer Soble

Subscribed and sworn to before me, a Notary Public, this ___ day of February, 2006.

_____
Notary Public

32

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this day served a copy of the foregoing Objections to the Proposed Class Action Settlement by Class Member Douglas Bowman and the Prescription Access Litigation Project via first class U.S. Mail and Federal Express overnight delivery to:


Stephen M. Tillery, Esq.
Aaron M. Zigler, Esq.
KOREIN TILLERY, LLC
701 Market Street
Suite 200
St. Louis, MO 63101
*Attorneys for Plaintiffs*

Stephen A. Swedlow, Esq.
Swedlow & Associates
205 N. Michigan Avenue
Suite 1940
Chicago, IL 60601
*Attorney for Plaintiffs*

Dwight J. Davis
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
*Attorney for Defendant GlaxoSmithKline*



Dated February 22, 2007                    _____

                                           Jennifer Soble