# EXHIBIT U-1

# The Role of the False Claims Act in Combatting Medicare & Medicaid Fraud by Drug Manufacturers: An Update

TABLE 2. Recoveries in Whistleblower Cases Against Pharmaceutical Manufacturers (Settlements as of September 30, 2006)

| Manufacturer (settlement date) | Total Recovery | Criminal Fine | Medicare Recovery | Total Medicaid Recovery | Federal Medicaid Recovery | State Medicaid Recovery | Whistleblower's Share |
|---|---|---|---|---|---|---|---|
| AstraZeneca (6/20/03) | $355 million | $63.9 million | $266.1 million[55] | $24.9 million | $13.7 million | $11.2 million | $47.6 million |
| Baxter (6/12/06) | $8.5 million[56] | None | None | $8 million | $4.8 million | $3.2 million | $1.7 million |
| Bayer I (1/23/01) | $14 million | None | None | $14 million | $7.8 million | $6.2 million | $1.6 million |
| Bayer II (4/16/03) | $257 million[57] | $5.6 million | None | $242.1 million | $133.2 million | $108.9 million | $34.2 million |
| Dey (6/11/03) | $18.5 million[58] | None | None | $16.2 million | $9.2 million | $7.0 million | $3.2 million |
| GlaxoSmithKline I (4/16/03) | $88 million[59] | None | None | $85.1 million | $46.8 million | $38.3 million | None |
| GlaxoSmithKline II (9/20/05) | $149 million | None | $125.9 million | $24 million | $13.72 million | $10.35 million | $26 million |
| King Pharm. (10/30/05) | $124.1 million[60] | None | None | $124.1 million | $73.4 million | $50.6 million | $7.5 million |
| Pfizer I (10/28/02) | $49 million | None | None | $49 million | $27.9 million | $21.1 million | $5.9 million |
| Pfizer II (5/13/04) | $430 million[61] | $240 million | None | $152 million | $83.6 million | $68.4 million | $24.6 million |
| Roxane (11/25/05) | $10.1 million[62] | None | None | $7.1 million | $4.2 million | $2.9 million | $1.6 million |
| Schering-Plough I (Warrick) (5/3/04) | $27 million[63] | None | None | $20 million | $12 million | $8 million | $4.6 million |

55. This amount includes payments to settle claims by TRICARE and Department of Defense.
56. This amount includes payment of $500,000 in costs and fees to relator and state of Texas.
57. This amount includes Bayer payments of $9.5 million to PHS entities.
58. This amount includes payment of $2.3 million in costs and fees to relator and to state of Texas.
59. This amount includes GSK payments of $2.6 million to PHS entities.
60. This amount includes an unreported amount of King Pharmaceuticals payments to PHS entities.
61. This amount includes Pfizer payments of $8 million to states for harm to consumers and to fund remediation program.
62. The amount includes $3.0 million payment for costs and fees to relator and state of Texas.
63. This amount includes $7.0 million payment for costs and fees to relator and state of Texas.

| Manufacturer (settlement date) | Total Recovery | Criminal Fine | Medicare Recovery | Total Medicaid Recovery | Federal Medicaid Recovery | State Medicaid Recovery | Whistleblower's Share |
|---|---|---|---|---|---|---|---|
| Schering-Plough II (7/29/04) | $345.5 million[64] | $52.5 million | None | $282.4 million | $165.3 million | $117.1 million | $31.7 million |
| Schering-Plough III (8/29/06) | $435 million[65] | $180 million | $30.2 million | $203.6 million | $112 million | $91.6 million | Not resolved |
| Serono (10/17/05) | $704 million | $136.9 million | None | $567.1 million | $305.1 million | $262.0 million | $51.9 million |
| TAP Pharmaceuticals (10/3/01) | $875 million | $290 million | $528.3 million | $56.7 million | $31.2 million | $25.5 million | $95.1 million |
| Totals | $3.89 billion | $968 million | $950 million | $1.88 billion | $1.04 billion | $833 million | $337 million |

Source: Settlement agreements on file at TAF Education Fund library; Joyce Branda, Deputy Director, Commercial Litigation Branch, Civil Division, DOJ (9/6/06); Patrick O'Connell, Assistant Attorney General, State of Texas (9/4/06).

Note: Columns do not add across. Medicare Recovery, and Federal and State Medicaid Recovery columns present gross recoveries, not amounts net of whistleblower's share.

---

64. This amount includes Schering-Plough payments of $10.6 million to PHS entities.

65. This amount includes Schering-Plough payments of $3.9 million to PHS entities and $17.3 million in disgorgement payments to the federal government.

66. This amount includes payments to settle claims by TRICARE and FEHBP.



# Department of Justice

**FOR IMMEDIATE RELEASE**
**MONDAY, SEPTEMBER 10, 2007**
**WWW.USDOJ.GOV**

CIV
(202) 514-2007
TDD (202) 514-1888

## Aventis Pays More Than $190 Million to Settle Drug Pricing Fraud Matters

WASHINGTON – Aventis Pharmaceuticals Inc. has paid the United States and a number of states, as well as the District of Columbia, over $190 million to resolve allegations that the company caused false claims to be filed with Medicare and other federal health programs as a result of the company's alleged fraudulent pricing and marketing of drugs, the Justice Department announced today. Aventis is now known as sanofi-aventis U.S. Inc. and sanofi-aventis U.S. LLC. Aventis, one of the world's largest pharmaceutical manufacturers, has agreed to settle False Claims Act allegations concerning its pricing and marketing of Anzemet, an antiemetic drug used primarily in conjunction with oncology and radiation treatment to prevent nausea and vomiting. The government alleged that the pharmaceutical company engaged in a scheme to set and maintain fraudulent and inflated prices for Anzemet knowing that federal health care programs established reimbursement rates based on those prices.

The United States alleged that Aventis used the difference between the inflated prices that it reported, which were used by federal programs to set reimbursement rates for health care providers, and the actual prices for the drugs charged to its customers in order to market, promote and sell Anzemet to existing and potential customers. The difference between the reimbursement rate of the federal health care programs and the actual price paid by health care providers is commonly known as the "spread." The larger the spread on a drug, the larger the profit or return on investment for the provider. Because reimbursement from federal programs was based on the fraudulent, inflated prices, the United States contended that Aventis caused false and fraudulent claims to be submitted to federal health care programs.

"Marketing drugs to doctors based on potential profits undermines confidence in the integrity of our health care system because it treats beneficiaries like commodities instead of patients," said Assistant Attorney General Peter D. Keisler. "The Justice Department will continue to hold drug companies accountable for fraudulent pricing schemes designed to give windfalls to drug companies and doctors at the expense of federal health care programs for the poor and the elderly."

The investigation commenced after the filing of a False Claims Act suit by Ven-A-Care of the Florida Keys Inc., a home-infusion company. The Act allows for private persons to file a qui tam or whistleblower suit on behalf of the government. If the government is successful in resolving or litigating its claims, the whistleblower may receive a share of the recovery. As part of this settlement, the Ven-A-Care whistleblowers will receive approximately $32 million as their share of the settlement.

"Again, a corporation has been caught fraudulently inflating the cost of a drug used primarily to reduce the side effects of cancer treatments without regard to the increased costs borne by government health care programs or elderly and indigent patients," said U.S. Attorney R. Alexander Acosta of the Southern District of Florida. "Corporations cannot continue to mislead the government into paying vastly exaggerated prices by exploiting a health care system based on trust and fair play."

As part of a condition for continuing to work with providers who do business with the Medicare and Medicaid programs, Aventis agreed to enter into a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services that, among other things, will require the company to report accurate average sales prices and average manufacturer's prices for its drugs covered by Medicare and other federal health care programs.

"Fraudulent drug pricing and marketing schemes divert scarce Medicare and Medicaid resources away from patient care," said Daniel R. Levinson, HHS Inspector General. "One of OIG's top priorities is to root out pharmaceutical fraud and hold companies liable for their actions."

"One of the essential elements in administering federal health programs is the need to protect taxpayers and the millions of elderly and low-income Americans who depend on these programs," said Kerry Weems, Acting Administrator for the Centers of Medicare and Medicaid Services. "This settlement reinforces our commitment to protect the integrity of Medicare and Medicaid."

#07-694: 09-10-07 Aventis Pays More Than $190 Million to Settle Drug Pricing Fraud Matters        Page 2 of 2

Of the more than $190 million settlement, the federal recovery is $179,787,726, and the states' and District of Columbia's recovery for their share of Medicaid is $10,645,600.

The investigation was conducted by the Civil Division of the Department of Justice, the U.S. Attorney's Offices for the Southern District of Florida and the District of Massachusetts, the Office of Inspector General for the Department of Health and Human Services, the Office of Program Integrity of TRICARE Management Activity, and the National Association of Medicaid Fraud Control Units.

###

07-694