# EXHIBIT V

| State of Alabama<br>Unified Judicial System<br>Form C-50   Rev 10/86 | **JURY VERDICT** | Case Number<br>CV-2005-219PR |
|---|---|---|

**In Circuit Court of** _____ Montgomery _____ **County**

| **Plaintiff** | vs. | **Defendant** |
|---|---|---|

STATE OF ALABAMA                     ASTRAZENECA

___✓___ We the jury find in favor of the Plaintiff, State of Alabama and against

Defendant, AstraZeneca on the claims of:

_____ ✓ _____ Misrepresentation

_____ X _____ Fraudulent Concealment

_____ Wantonness

and award damages as follows:

_____40,000,000.00_____ Compensatory

_____ Interest

_____175,000,000.00_____ Punitive

_____215,000,000.00_____ Total

JUDGEMENT IS HEREBY ENTERED
IN ACCORDANCE WITH THE
VERDICT OF THE JURY.

_____
Circuit Judge

Date Filed _Feb 21 - 08_

Richard Edwards
Name of Foreman (please print)

Richard Edwards
Foreman Signature

_____ By:_____
Clerk of Circuit Court

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

**In the Matter of:**

**ALABAMA MEDICAID PHARMACEUTICAL
AVERAGE WHOLESALE PRICE LITIGATION**

**Master Docket No.
CV – 2005-219**

**This Document Relates To:**

*State of Alabama v. Novartis Pharms. Corporation*
No. 2005-219.52

## JURY VERDICT

WE, THE JURY find in favor of the Plaintiff State of Alabama and against Defendant

Novartis Pharms. Corporation on the claims of:

_____✓_____ Misrepresentation

_____ Fraudulent Concealment

_____ Wantonness

And award damages as follows:

___33,257,694___ Compensatory

___0___ Punitive

___33,257,694___ TOTAL

JUDGEMENT IS HEREBY ENTERED
IN ACCORDANCE WITH THE
VERDICT OF THE JURY.

_____
Circuit Judge

_____ WE, THE JURY, find for Defendant Novartis Pharms. Corporation.

Date Filed: __1 July__, 2008

*Karen R. Hooks*
NAME OF FOREPERSON (Please Print)

*Karen R. Hooks*
FOREPERSON SIGNATURE

_____ By: _____
Clerk of Circuit Court

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

In the Matter of:

ALABAMA MEDICAID PHARMACEUTICAL
AVERAGE WHOLESALE PRICE LITIGATION

Master Docket No.
CV – 2005-219

This Document Relates To:

*State of Alabama v. SmithKline Beecham Corp.*,
No. 2005-219.68

FILED IN CLERK'S OFFICE OF MONTGOMERY COUNTY 2008 JUL -1 PM 4: 09

### JURY VERDICT

WE, THE JURY find in favor of the Plaintiff State of Alabama and against Defendant

SmithKline Beecham Corporation d/b/a GlaxoSmithKline on the claims of:

_____ ✓ _____ Misrepresentation

_____ Fraudulent concealment

_____ Wantonness

And award damages as follows:

_80,989,539_ Compensatory

_0_ Punitive

_80,989,539_ TOTAL

JUDGEMENT IS HEREBY ENTERED
IN ACCORDANCE WITH THE
VERDICT OF THE JURY.

_____
Circuit Judge

_____ WE, THE JURY, find for Defendant GlaxoSmithKline.

Date Filed: _1 July_, 2008

Karen R. Hooks
NAME OF FOREPERSON (Please Print)

Karen R. Hooks
FOREPERSON SIGNATURE

_____ By: _____
Clerk of Circuit Court

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

|  |  |
|---|---|
| ) | |
| *State of Alabama* ) | |
|    Plaintiff ) | **Case Number** |
| *vs.* ) | **CV-2005-219.65** |
| ) | |
| *Sandoz, Inc.,* ) | |
|    Defendant ) | |
| ) | |

### JURY VERDICT

WE, THE JURY find in favor of the Plaintiff State of Alabama and against Defendant

☒ Sandoz, Incorporated on the claims of:

    ☒ Fraudulent Misrepresentation

    ☒ Fraudulent concealment

And award damages as follows:

$28,443,572 _____ Compensatory

$50,000,000 _____ Punitive

$78,443,572 _____ TOTAL

☐ WE, THE JURY, find for Defendant Sandoz, Incorporated.

Date Filed: 24ᵗʰ of _FEBRUARY_, 2009

                    _Carrow Thomas_
                    NAME OF FOREPERSON (Please Print)

                    _____
                    FOREPERSON SIGNATURE

                    _____ By: _____
                    Clerk of Circuit Court



| STATE OF WISCONSIN | CIRCUIT COURT<br>BRANCH 9 | DANE COUNTY |
|---|---|---|

STATE OF WISCONSIN,

        Plaintiff,

    v.                                  **Case No. 04 CV 1709**

PHARMACIA CORPORATION,

        Defendant.

FILED

FEB 16 2009

STATE OF WISCONSIN
CIRCUIT COURT FOR DANE COUNTY

**SPECIAL VERDICT**

We, the jury, duly impaneled and sworn to try the issues in the above-entitled matter, find for our special verdict as follows:

Question No. 1.   After June 3, 2001, did defendant Pharmacia Corporation directly or indirectly cause untrue, deceptive or misleading representations to be made, published, disseminated or placed before the public in Wisconsin concerning its prescription drug prices?

                   Answer:      <u>Yes</u>

                                 (Yes or No)

Question No. 2:  **If you answered Question No. 1 "yes", then answer this question.  Otherwise do not answer it.**  Were such representations a cause of monetary loss to the plaintiff State of Wisconsin?

Answer:     ___Yes___
(Yes or No)

Question No. 3:  **If you have answered Question No. 2 "yes", then answer the following question.  Otherwise do not answer it.**  What sum of money, if any, will fairly and reasonably compensate plaintiff State of Wisconsin for its monetary losses caused by such representations?

Answer:   $ 2,000,000 ___

Question No. 4:  After June 3, 1994, did defendant Pharmacia Corporation knowingly make, or knowingly cause to be made, any false statement or representation of material fact for use in determining rights to a Wisconsin Medicaid payment?

Answer:     ___Yes___
(Yes or No)

Question No. 5:  **If you answered Question No. 4 "yes", then answer this question.  Otherwise do not answer it.**  How many such false statements or representations of material fact for use in determining rights to a Wisconsin Medicaid payment did Pharmacia Corporation knowingly make or cause to be made?

Answer:   *1,440,000*

Question No. 6   **If you answered Question No. 4 "yes", then answer this question.  Otherwise do not answer it.**   Were such false statements or representations a cause of monetary loss to the plaintiff State of Wisconsin?

Answer:   *Yes*
(Yes or No)

Question No. 7:  **If you have answered Question No. 6 "yes", then answer the following question.  Otherwise do not answer it.**  What sum of money, if any, will fairly and reasonably compensate plaintiff State of Wisconsin for its monetary losses caused by such false statements or representations?

Answer:     $ 7, 000, 000

Dated at Madison, Wisconsin this 16 day of February, 2009.

_Anthony W. Schumacher_
Foreperson

Dissenting Jurors, if any:

_Richard Klump_ #9 ___ as to question(s) 3 AND 7

_Anthony W. Schumacher_ as to question(s) 1, 2, 3, 4, 5, 6, 7



## ATTORNEY GENERAL OF TEXAS
### GREG ABBOTT

**FOR IMMEDIATE RELEASE**
June 12, 2006
www.texasattorneygeneral.gov
Subscribe to E-News

**CONTACT**
Press Office at
(512) 463-2050

## Attorney General Abbott Wins $8.5 Million Settlement In Civil Medicaid Fraud Case
### *Baxter Healthcare Corp. agrees to pay damages in drug-pricing scheme*

**AUSTIN - Texas Attorney General Greg Abbott** today announced the recovery of $8.5 million from Baxter Healthcare Corp. as a result of the company's scheme to falsely report the prices of certain drugs in order to defraud the Texas Medicaid program.

The case is another in a series of state "whistleblower" cases with several defendants that have been settled since 2003. To date, these cases have resulted in the Attorney General's recovery in excess of $64 million for Texas.

"This case further proves we will effectively use the legal system to retrieve funds wrongly taken from the Medicaid program for the needy," said Attorney General Abbott. "We are pleased this company chose to cooperate instead of fighting the state, but regardless, those who ignore the law in the pursuit of illegal profits must pay for the error of their ways."

The Attorney General sued Baxter, an Illinois company, as well as Abbott Laboratories and B. Braun Medical in May 2004. The suit alleged the three schemed to falsely report the prices of intravenous fluids and injectable medications to the state's Vendor Drug Program, a part of the Medicaid system. The lawsuit against the other two defendants continues.

Baxter manufactures and markets generic and brand-name drugs and products that are dispensed to Medicaid patients, and it competed with Abbott and B. Braun for these sales. As early as 1995, the three began to falsely report prices of the products, guaranteeing profits for their pharmacy customers at the expense of the taxpayer-funded health care program.

Drug manufacturers, including these defendants, who want their drugs to be eligible for Medicaid reimbursement must report prices that are currently and generally available on the market to the Medicaid program.

The defendants' false price reports led Medicaid to reimburse pharmacies at rates vastly above current market prices. This windfall induced the defendants' customers to favor business relations with these companies, creating a long-term, but illegal, market niche.

Ven-a-Care of the Florida Keys Inc. brought the scheme to the state's attention, as it did in

Case 1:01-cv-12257-PBS   Document 6026-27   Filed 04/24/09   Page 11 of 58

1999 with drug giant Schering-Plough Corp., which resulted in the nation's first state lawsuit of this type filed in September 2000. Schering-Plough settled its lawsuit with the state in May 2004 for $27 million. Co-defendants Dey Inc. settled in June 2003 for $18.5 million, and Boehringer Ingelheim Corp. and subsidiary Roxane Laboratories settled last November for $10 million.

Texas continues to be a leader among states in pursuing these schemes that harm the Medicaid program. Attorney General Abbott is actively investigating fraud in the marketplace and companies that defraud Medicaid.

With the passage of stronger amendments to the Texas Medicaid Fraud Prevention Act, the Texas Legislature in 1997 paved the way for whistleblower lawsuits involving credible industry insiders such as Ven-a-Care. Under the law, whistleblowers may be eligible for a percentage of the damages recovered.

FOR OTHER ITEMS ASSOCIATED WITH ATTORNEY GENERAL ANNOUNCEMENTS, ACCESS OAG NEWS RELEASES ONLINE AT WWW.TEXASATTORNEYGENERAL.GOV.

POST OFFICE BOX 12548, AUSTIN, TEXAS 78711-2548 TEL (512) 463-2100 WEB WWW.TEXASATTORNEYGENERAL.GOV.

2 of 2                                                                                      4 17 2009 12:24 PM

Case 1:01-cv-12257-PBS   Document 6026-27   Filed 04/24/09   Page 12 of 58



ATTORNEY GENERAL OF TEXAS

GREG ABBOTT

**FOR IMMEDIATE RELEASE**
September 9, 2008
www.texasattorneygeneral.gov
Subscribe to E-News

**CONTACT**
Press Office at
(512) 463-2050

## Attorney General Abbott Reaches $28 Million Settlement With Abbott Labs

**AUSTIN** – Texas Attorney General Greg Abbott today reached a $28 million civil settlement with Chicago-based Abbott Laboratories Inc. The settlement resolves the state's May 2004 enforcement action, which charged the drug manufacturer with falsely reporting drug prices to the state and federal Medicaid programs. Under today's agreement, the state of Texas will receive approximately $7.5 million in damages and $4.6 million in attorneys' fees and costs.

State and federal law requires that drug manufacturers report the prices at which they sell their products to various providers, including pharmacies, wholesalers and distributors. The Texas Medicaid program uses this pricing information to estimate the costs Medicaid providers pay to acquire the drug manufacturers' products. Medicaid providers bill the state-run program for these costs, plus prescription dispensing fees, and Medicaid reimburses the providers. When a manufacturer reports inflated prices to the Medicaid program, as happened in this case, the taxpayer-funded program vastly overpays providers for their products. The difference between what a provider actually pays to purchase a drug and what is reimbursed by Medicaid is called the "spread."

As a result of the illegal spreads created by Abbott Laboratories, Texas Medicaid over-reimbursed providers for Abbott's drugs. The windfall profits from these inflated reimbursements, which date back to the early 1990s, induced providers to favor Abbott Laboratories over other manufacturers. The result was a long-term, but unlawful, market niche for the company.

Acting on information provided by industry insider Ven-a-Care of the Florida Keys Inc., the Attorney General's civil Medicaid fraud enforcement efforts have resulted in drug-pricing scheme settlements with numerous pharmaceutical companies. These include Schering-Plough/Warrick Pharmaceuticals in May 2004 ($27 million); Dey Inc. in June 2003 ($18.5 million); Boehringer Ingelheim/Roxane Laboratories in November 2005 ($10 million); and Baxter Healthcare Corp. in June 2006 ($8.5 million).

Enforcement actions against several other manufacturers, including Alpharma Inc., Barr Pharmaceuticals Inc., B Braun Medical Inc., Parr Pharmaceutical Inc. and Watson Pharmaceuticals Inc. are pending.

In May 2004, at about the time the Attorney General announced the lawsuit against Abbott

Laboratories, the defendant spun off its generic pharmaceuticals business unit and created Hospira Inc. The agreement with Hospira will govern its price-reporting practices in the future.

The Abbott Labs enforcement action reflects Attorney General Abbott's continuing crackdown on waste, fraud and abuse in the Medicaid system. In 2006 alone, the Texas Medicaid program cost more than $17 billion. To save taxpayer dollars, Attorney General Abbott has dramatically expanded both the Civil Medicaid Fraud Section and the Medicaid Fraud Control Unit. Since Attorney General Abbott took office, the civil and criminal Medicaid fraud sections have recovered more than $200 million.

With the passage of amendments to the Texas Medicaid Fraud Prevention Act in 1997, the Texas Legislature paved the way for whistleblower lawsuits involving industry insiders, such as Ven-a-Care of the Florida Keys Inc. Under the law, whistleblowers may be eligible for a percentage of damages recovered.

To obtain more information about the Attorney General's efforts to fight Medicaid fraud, access the agency's Web site at www.texasattorneygeneral.gov

FOR OTHER ITEMS ASSOCIATED WITH ATTORNEY GENERAL ANNOUNCEMENTS, ACCESS OAG NEWS RELEASES ONLINE AT WWW.TEXASATTORNEYGENERAL.GOV.

# Dey, L.P. Reaches Settlement with State of Ohio on Pricing Litigation

*Settlement involving cash and donation of drugs resolves all Ohio pricing claims against DEY*

Napa, CA (November 28, 2006) - Dey, L.P. announced today that it has reached a settlement with the Attorney General of the State of Ohio regarding pricing litigation that had been filed against DEY. John Kling, Senior Vice President of Legal Affairs at DEY, stated, "We are pleased that this settlement achieves a resolution to the pricing litigation brought by the State of Ohio. The net amount of cash paid to the State of Ohio, after legal fees and the Federal government's share of the settlement, is $952,925. In addition, Dey will donate respiratory pharmaceuticals to certain Ohio health care centers for four years. Medically underserved populations of patients in Ohio will receive these donated drugs."

DEY has consistently participated legally and ethically within National and various State reimbursement systems, Kling continued. "When virtually an entire industry is sued – as has been the case with the pricing lawsuits similar to this one in Ohio that have been filed around the country by dozens of attorneys general – it indicates that the real issue is not the industry's conduct, but rather the government's own reimbursement system. The claims against DEY in Ohio and elsewhere derive from a government reimbursement model that relied on published Average Wholesale Prices (AWP). For more than three decades, the Federal and State governments have known about the AWP-based reimbursement model, understood its limitations, and accepted its use as a way to gain the voluntary participation of pharmacists and other healthcare providers in the public healthcare entitlement program Medicaid. The 'spread' between dispensers' acquisition costs and Medicaid reimbursements provided the mechanism whereby pharmacists and other healthcare professionals could recapture their actual dispensing costs.

"The problems with the AWP-based reimbursement model are a primary reason why Congress and the Administration reformed the pricing system under the Medicare Modernization Act of 2003. Many in the pharmaceutical industry, including DEY, supported those reforms."

Kling noted, "DEY is settling this litigation as a pragmatic solution to avoid the costs of continuing litigation and the vagaries inherent in it. Reaching this relatively modest settlement allows us now to put this litigation behind us and move forward with what we do best – manufacturing and marketing high-quality pharmaceuticals for the people of Ohio and the rest of the country."

As part of the settlement, the State of Ohio acknowledges that the settlement does not constitute an admission of fault, liability, or unlawful conduct by DEY or its affiliates. This settlement releases DEY and any other Merck KGaA companies by the State of Ohio.

**About Dey, L.P.**

Dey, L.P. is a specialty pharmaceutical company focused on the development, manufacturing and marketing of prescription drug products for the treatment of respiratory diseases and respiratory-related allergies. Since 1978, patients have benefited from DEY's commitment to innovative and affordable health care solutions. The Web sites for DEY include www.dey.com, www.accuneb.com, www.curosurfusa.com, www.duoneb.com, www.epipen.com.

###

Media contacts:
DEY, L.P. Media Line 1-800-755-5560 ext. 8363
OR
Harriet Ullman, Feinstein Kean Healthcare, 617-761-6776

< Back to Press Releases

<< Back to Press Room



DEPARTMENT OF THE ATTORNEY GENERAL

# News Release

**LINDA LINGLE**
GOVERNOR

Mark J. Bennett, Attorney General
Phone:   (808) 586-1500
Fax:      (808) 586-1239

For Immediate Release:  March 21, 2007                News Release No. 2007-06

### Hawaii Reaches Million Dollar Medicaid Reimbursement Settlement In AWP Litigation

Drug manufacturer Dey, Inc. has agreed to pay the State of Hawaii more than one million dollars in a settlement to resolve claims relating to the marketing and selling of prescription drugs and Dey's reporting of "average wholesale price" Attorney General Mark Bennett said.

Dey, located in Napa, California, develops, manufactures and markets prescription drugs for the treatment of respiratory diseases and respiratory related allergies. The company's products include Albuterol, Cromolyn Sodium, Duoneb, Epipen and Ipratroprium.

"We are pleased that Dey voluntarily engaged in discussions with the State to resolve this dispute," Attorney General Bennett said. "The taxpayers are harmed when the State's Medicaid payments are based on published prices that are false or misleading. I hope that other drug manufacturers will see Dey's action as the proper one and join us in eliminating unfair costs to Hawaii's taxpayers."

Lillian Koller, Director of the Hawaii Department of Human Services stated:  "We are pleased with this first settlement.  The State brought this lawsuit because of practices that damage Hawaii and its citizens." Hawaii's Medicaid Fee-For-Service (FFS) program is administered by the Department of Human Services to provide health care services, including prescription drugs, to low-income residents who are elderly and/or disabled.

Hawaii Medicaid uses average wholesale prices as a basis for the reimbursement of the cost of pharmaceutical products. Inflated or false average wholesale prices can result in taxpayers, through Medicaid, paying more for pharmaceutical products than they should.  For example, Medicaid paid $73,000 for Albuterol in 2003. In 2003 Dey

News Release No. 2007-06
Hawaii Reaches Million Dollar Medicaid Reimbursement Settlement In AWP Litigation
Page 2

published an average wholesale price of $0.403 for Albuterol but the Attorney General believes the true average wholesale price was $0.043, a market price spread of 838%.

Under the settlement agreement, Dey will provide certain confidential pricing information to the Hawaii's Medicaid program and pay the State of Hawaii $1,150,000 for restitution, compensatory damages, attorneys' fees, and costs. Of this amount, approximately $200,000 will go for attorneys' fees and costs.

Dey did not admit any liability or wrongdoing. The State of Hawaii brought claims against 44 drug manufacturers in April 2006. Claims against the remaining drug companies continue before Circuit Court Judge E. Eden Hifo.

Background

Pharmaceutical costs are recognized as a major cause of the U.S. health care crisis. In Hawaii, the cost of prescription drugs in the Medicaid program have soared from $45 million in 1999 to $117 million in 2004, an increase of 160%. Conversely from 1999 to 2004, the number of Medicaid FFS clients using prescription drugs has remained relatively stable rising only 20%, from approximately 36,000 to 43,000. The State pays all prescription drug costs for Medicaid patients.

The average wholesale price for a drug is determined by the drug's manufacturer and is a significant factor in determining the amount of money that Medicaid will pay for a drug. Investigation by the State of Hawaii, other state attorneys general and the U.S. Department of Justice has revealed that the reported average wholesale price frequently has little relationship to the actual price paid for the drug and that inflated or false average wholesale prices is widespread in the prescription drug industry.

Drug companies sell drugs to health care providers such as pharmacies, physicians, hospitals, and long-term care facilities who dispense drugs. Hawaii's Medicaid FFS program reimburses the providers based upon an estimate of the provider's acquisition cost of the drug. Hawaii, and most other states, use the average wholesale price reported by the drug's manufacturer to estimate the acquisition cost. False average wholesale price reporting has the effect of increasing the profitability of an individual drug for the provider and stimulates the demand for that drug, resulting in more sales for the drug company. Drug companies profit from inflated average wholesale prices by increasing the quantity of drugs they sell to providers.

Attorney General Mark J. Bennett
Department of the Attorney General
Phone:  (808) 586-1282

Dana Viola
Special Assistant to the Attorney General
Department of the Attorney General
Phone No.: (808) 586-1284

Lawyers and Settlements     Lawsuit News
Home Page >> Settlements >> Inflated Drug Prices

Settlements and Verdicts

Inflated Drug Prices
Helena, MT: (Dec-19-07) Montana Attorney General Mike McGrath brought charges against California-based Dey LP, a pharmaceutical manufacturer, alleging that the company was overcharging inflated prices to Medicare and Medicaid. Sources stated that Dey manufactures drugs such as Albuterol used to treat asthma and other lung diseases, along with the pain reliever hydrocodone. As part of a settlement reached, the pharmaceutical manufacturer agreed to pay the AG's office $198,000 to resolve allegations. McGrath and Department of Public Health and Human Services director Joan Miles stated that the settlement money will go to 14 health centers around the state. [BILLINGS GAZETTE: DRUG PRICES]


Legal Help
If you have a similar problem and would like to be contacted by a lawyer at no cost or obligation, please click the link below.


Please click here for a free evaluation of your case


Posted on Dec-26-07

# NEWSInferno.com

Home    Hot Topics    Categories    Partnerships    Contact Us

?

4/21/2009  12:04 PM

SEARCH THE INFERNO

NEWS CATEGORIES

Accident (89)

Bus Accident (3)

Cellular Phone (9)

Class Action Lawsuits (7)

Construction Accidents (9)

Consumer Fraud (77)

Defective Medical Devices (233)

Defective Products (735)

Discrimination (5)

Food Poisoning (577)

Health Concerns (1566)

Legal News (4136)

Pharmaceuticals (1060)

Press Releases (4)

Product Recalls (521)

Stock Fraud (134)

HOT NEWS TOPICS

Vioxx

Zyprexa

Asbestos

GOVERNMENT NOTICES

FDA

FTC

CPSC

EPA

NHTSB

FAA

ARCHIVES

April 2009

March 2009

February 2009

January 2009

December 2008

November 2008

October 2008

September 2008

August 2008

July 2008

June 2008

May 2008

April 2008

March 2008

February 2008

January 2008

December 2007

November 2007

## Dey Pharmaceuticals Settles with State of Massachusetts in Pricing Fraud Case

Date Published: Wednesday, April 25th, 2007

California-based generic-drug manufacturer Dey LP has reached a $2.9 million settlement with the state of Massachusetts with regard to accusations of price inflation and defrauding of the Commonwealth's Medicaid program. The company has already reached similar settlements with a slew of other states, including Missouri, Ohio, Connecticut, Nevada, West Virginia, Hawaii, and Idaho, but has never acknowledged any wrongdoing in any of the cases.

The origins of the pricing litigation date back to the middle of last decade, when Dey was accused of inflating their wholesale prices when reporting them to the industry, meaning that state and federal Medicaid programs were reimbursing the company at much higher rates than they should have been. The alleged scam allows the company to increase its profits while keeping the costs of their pharmaceuticals low for consumers.

"We will not allow pharmaceutical companies to unfairly game the Medicaid price reporting system," said Massachusetts Attorney General Martha Coakley in a statement. "Even in a time when health care costs are skyrocketing nationwide, we are committed to aggressively ensuring that taxpayer dollars are protected." In addition to the cash settlement, the state will receive a 5 percent rebate on its drug purchases from Dey for five years.

The company is quick to point out that "the Commonwealth of Massachusetts acknowledges that the settlement does not constitute either an admission of, or evidence of, fault, liability, or unlawful conduct by Dey or its affiliates." For its part, Dey is blaming flaws in the governmental's average wholesale prices (AWP) reimbursement model.

The Taxpayers Against Fraud Education Fund (TAFEF), a nonprofit, public interest organization dedicated to combating fraud against the federal government, has conducted significant research into the pricing policies of the pharmaceutical industry. In a report released earlier this year, the group noted that "as of September 2004, seven pharmaceutical manufacturers, including three of the top five U.S. drug companies by sales volume, had settled cases with the Department of Justice (DOJ) involving allegations by whistleblowers of pricing or marketing fraud against Medicare and Medicaid. These settlements resulted in criminal fines of $652 million (over $2.4 billion in civil fines to the federal government, and payments of $413 million to state governments to compensate them for losses incurred by their Medicaid programs." They also reported that "additional settlements would follow, noting that there were under seal in the fall of 2004 in the neighborhood of 100 whistleblower cases involving allegations against over 200 drug manufacturers with respect to 500 different products."

TAFEF also explains, "the drug manufacturer settlements have also prompted a Congressional reexamination of Medicaid policies vis-à-vis drug rebates and drug price disclosure. Under the Deficit Reduction Act of 2005 (DRA), the Secretary of HHS is required to promulgate a regulation by July 1, 2007, clarifying how average manufacturer prices (AMP) are determined for purposes of calculating the Medicaid rebate."

The watchdog group noted that a June 2005 study by the Office of Inspector General found that average sale prices (ASPs) were 68 percent below average wholesale prices (AWPs) for generic drugs. "Unlike average wholesale price (AWP) or wholesale acquisition cost (WAC), both of which are 'catalogue' or 'sticker' prices published by manufacturers, AMP, to a large extent, reflects actual transactions."

To defend against fraudulent price reporting, the Secretary of Health and Human Services is now required to provide and make public AMP reports on a monthly basis. "Under or or law," TAFEF says, "disclosure of AMP data was prohibited. State Medicaid programs are now able to use this data to more closely align the prices they pay to pharmacists for drugs with the pharmacists' actual acquisition costs." According to a recent Congressional Budget Office statement, AWPs "are not good predictors of actual transaction prices for generic drugs." "Thus," adds TAFEF, "the availability of AMP data should be especially helpful to states in determining what to pay pharmacists for generic drugs."

This entry was posted on Wednesday, April 25th, 2007 at 8:14 am and is filed under Consumer Fraud, Legal News.

Both comments and pings are currently closed.

« New York Times: Medicare Privatization a "Scam"

Comments are closed.

Study: Lethal Injection Violates Eighth Amendment »

SUFFER FINANCIAL LOSS DUE TO THE BERNARD MADOFF PONZI SCHEME?
Are you a victim of the Bernard Madoff Ponzi Scheme? Did you lose money because of this fraud? We can help!
www.bernard-madoff-ponzi-scheme.com

NUMBNESS ARMS LEGS-TINGLING DENTURES-MUSCLE WEAKNESS?
Do you have these symptoms and use denture cream? You may have serious side effects? Get the facts!
DENTURECREAMLAWYER.COM

DENIED A SOCIAL SECURITY CLAIM?
If you've been denied a social security claim, we can help.
SS-DISABILITY-LAW-FIRM.COM

DENTURE CREAM NEUROPATHY
Super Poligrip or Fixodent May Cause Nerve Damage. POLI-GRIP-FIXODENT-NEUROPATHY-DENTAL-CREAM.COM

Victim of SECURITIES FRAUD?
Many people have lost money due to securities fraud. Are you one of them? Get the facts!
SECURITIES-FRAUD.COM

Nuva Ring
The Nuva Ring can cause Blood Clots, Strokes and more.
www.yourlawyer.com/nuva-ring

VICTIM OF THE BERNARD MADOFF PONZI SCHEME?
Large and small clients have lost millions of dollars due to Bernard Madoff's Ponzi Scheme. Are you one of them? We can help! Contact us today.
www.bernard-madoff-ponzi-scheme.com

INJURED IN FLORIDA?
If you've been injured in a car accident, truck accident, pedestrian accident, slip and fall, dog bite or any type of personal injury, we can help you. Contact us today.
www.florida-personal-injury-law-firm.com

Whistle Blower
Stand up and say what you think is right. See something, say something.
www.whistleblowersadvisor.com

Gadolinium MRI Contrast
Talk to NSF from MRI or Metal Contrast Attorneys Today.
www.gadolinium-mri.com

VA MORTGAGE REFINANCE
VA REFINANCE Now is the perfect time to refinance into a lower-cost loan. Get started right now!
www.va-mortgages-refinanced.com



# OFFICE OF THE ATTORNEY GENERAL

Catherine Cortez Masto, *Attorney General*
Randal R. Munn, *Assistant Attorney General*

100 N. Carson Street
Carson City, Nevada 89701-4717
Telephone - (775) 684-1100
Fax - (775) 684-1108
Web - http://ag.state.nv.us

**FOR IMMEDIATE RELEASE**
**DATE: Thursday March 29, 2007**

**CONTACT:   Tim Terry (775) 684-1185**
**Nicole Moon (775) 684-1114**
**cell (775) 230-3360**
**njmoon@ag.state.nv.us**

## ATTORNEY GENERAL ANNOUNCES $670K SETTLEMENT WITH PHARMACEUTICAL MANUFACTURER

Carson City, NV - Attorney General Catherine Cortez Masto announced today that her office has reached a settlement with Dey, Inc. concerning allegations that Dey misrepresented the average wholesale price ("AWP") for drugs reimbursed by the Nevada Medicaid program.  The alleged misrepresentations caused the Medicaid program, and other Nevada consumers, to overpay for Dey's prescription products.  Dey is paying a total of $670,000.00 to resolve the issue.

Dey is one of many pharmacy manufacturers that Nevada, and several other states, have sued over the issue of misrepresenting AWP.  Last year Nevada reached a settlement with GlaxoSmithKline in which GSK paid $740,000.00 to settle identical allegations.

The AWP litigation is taking place primarily in U. S. Federal District Court in Boston, MA before Judge Patti Saris.  Nevada is being represented by Tim Terry of the Nevada Attorney General's Medicaid Fraud Control Unit ("MFCU") and special counsel Steve Berman of the law firm of Hagens, Berman, Sobol & Shapiro headquartered in Seattle.

"The Nevada Attorney General's Office is committed to rooting out fraud on behalf of all Nevada citizens and will vigorously pursue that fight wherever necessary," said Attorney General Masto.

For more information on fighting fraud or consumer protection go to the Attorney General's website at: *www.ag.state.nv.us*.

#####



## ATTORNEY GENERAL OF TEXAS
### GREG ABBOTT

**FOR IMMEDIATE RELEASE**
November 28, 2005
www.texasattorneygeneral.gov
Subscribe to E-News

**CONTACT**
Press Office at
(512) 463-2050

### Attorney General Abbott Wins $10 Million In Medicaid Fraud Case
*Settlement with Boehringer Ingelheim completes a series of settlements totaling $56 million*

**AUSTIN - Texas Attorney General Greg Abbott** today won a big victory in a Medicaid fraud case against a major drug company. This is the last in a series of lawsuits against several drug companies, resulting in almost $56 million in recoveries for the state. The prolonged whistleblower litigation shined a light on drug-pricing schemes designed to enrich the companies while systematically defrauding the state Medicaid system.

In today's settlement, Boehringer Ingelheim Corp. of Connecticut and its subsidiaries agreed to pay the state $10 million in damages to dismiss a lawsuit originally filed in September 2000 after whistleblower Ven-a-Care of the Florida Keys revealed the fraud to the state. The Attorney General's suit claimed the companies falsified the wholesale prices of several dozen prescription drugs, particularly inhalants, causing the Texas Medicaid program to overpay the companies for these drugs.

"We will not tolerate big pharmaceutical companies that ignore the laws of Texas and bilk Texas taxpayers in the race for profits," said Attorney General Abbott. "We will make sure these companies pay for their wrongdoing and give back money that rightfully belongs to Texas."

The settlement with Boehringer and its subsidiaries -- Roxane Laboratories Inc., Boehringer Ingelheim Pharmaceuticals Inc. and Ben Venue Laboratories Inc. -- returns money to the state that the companies pocketed over time as they falsely reported their wholesale drug prices to the Medicaid program.

The close relationship enjoyed by all of these companies with the parent company made possible the climate of wrongdoing in which the companies marked up prices by as much as 500 percent to wholesalers, distributors, pharmacies, group purchasing organizations, home health care providers and others delivering prescriptions to Medicaid patients.

The litigation settled today represents the culmination of thousands of hours of effort from both the Attorney General and the Vendor Drug Program of the Texas Health and Human Services Commission.

Not only has the litigation resulted in the recovery of millions of dollars for the state, the discovery of the false pricing from Boehringer Ingelheim, Roxane and the other companies

has resulted in significant changes in the way Texas reimburses pharmacists and physicians. These changes will save the state of Texas hundreds of millions of dollars in the future.

In addition, the Attorney General's Office has shared information with many other states working to recover funds wrongfully paid, as well as to preempt future losses. Attorney General Abbott's office has also assisted the U.S. Department of Justice and Congress in their efforts to eradicate this fraud. These efforts are expected to result in a wholesale change in the way drugs will be reimbursed by Medicaid across the country, which could result in savings of billions of dollars in the future.

Attorney General Abbott successfully concluded other lawsuits through settlements over the past two years that grew out of the original Ven-a-Care lawsuit. Dey Inc. settled for $18.5 million in 2003, and Schering-Plough Inc. and its subsidiaries settled last year for $27 million.

Attorney General Abbott's Civil Medicaid Fraud team continues to investigate other drug companies for similar pricing schemes affecting the state's health care program for the needy.

---

FOR OTHER ITEMS ASSOCIATED WITH ATTORNEY GENERAL ANNOUNCEMENTS, ACCESS OAG NEWS RELEASES ONLINE AT WWW.TEXASATTORNEYGENERAL.GOV.

---



## ATTORNEY GENERAL OF TEXAS
### GREG ABBOTT

**FOR IMMEDIATE RELEASE**
June 11, 2003
www.texasattorneygeneral.gov
Subscribe to E-News

**CONTACT**
Press Office at
(512) 463-2050

### Attorney General Recovers $18.5 Million In Medicaid Fraud Case
*California-based company to reimburse state and federal governments*

**AUSTIN - Texas Attorney General Greg Abbott** today announced that the State has reached a settlement with a pharmaceutical company that deliberately falsified price reports to the Texas Medicaid program for its products. Under terms of the agreement, Dey, Inc. will pay a total of $18,500,000, with more than $9 million going to the State. The remaining portion of the settlement will go to the federal government, which jointly funds the Texas Medicaid program and has reached its own settlement with the company.

Dey, a subsidiary of German pharmaceutical giant Merck KGaA, manufactures and markets inhalant products that are generally prescribed for persons suffering from respiratory illnesses. Under Texas law, drug manufacturers are required to report the prices at which they sell their products to wholesalers and distributors. The Texas Medicaid program then uses this pricing information as a basis for calculating provider cost and reimburses Medicaid providers accordingly. The attorney general's Civil Medicaid Fraud Section found that Dey deliberately falsified its pricing reports for the benefit of its customers, which directly led to overpayments by the Texas Medicaid program.

"Texas citizens will not tolerate this kind of behavior by those who wish to do business in the State," Attorney General Abbott said. "Our evidence against Dey was overwhelming, and we were more than prepared to go to court if necessary. I'm satisfied with the agreement because the State is going to get back every cent it overpaid as a result of unethical practices made at the expense of Texas taxpayers. In fact, under the settlement, the State will recover more than two times its damages, as well as all costs and attorneys' fees."

The State's case is based on information provided by industry insider Ven-a-Care of the Florida Keys, Inc., which initiated the action as a Relator under the Texas Medicaid Fraud Prevention Act. Ven-a-Care has also assisted the State and the federal government in obtaining previous settlements with Bayer Corp. and TAP Pharmaceuticals, Inc.

In addition to the monies recovered from Dey for its past violations, the Texas Medicaid program will save millions of dollars in the future as a result of evidence the attorney general's office uncovered in its investigation. The attorney general's lawsuit against two other drug manufacturers - Warrick Pharmaceuticals and Roxane Laboratories - is still pending before Travis County District Judge Suzanne Covington. The case is set for trial in August.

FOR OTHER ITEMS ASSOCIATED WITH ATTORNEY GENERAL ANNOUNCEMENTS, ACCESS OAG NEWS RELEASES ONLINE AT WWW.TEXASATTORNEYGENERAL.GOV.



## ATTORNEY GENERAL OF TEXAS
### GREG ABBOTT

**FOR IMMEDIATE RELEASE**
December 7, 2006
www.texasattorneygeneral.gov
Subscribe to E-News

**CONTACT**
Press Office at
(512) 463-2050

## Attorney General Abbott Recovers $15.7 Million In Medicaid Costs Under National Settlement
*Agreement with pharmaceutical firm resolves dispute over drug prices charged to Medicaid*

**AUSTIN - Texas Attorney General Greg Abbott** today announced Texas will receive more than $15.7 million under a national settlement with one of the nation's largest pharmaceutical companies. Texas and 49 other states alleged that Schering-Plough Corp. failed to provide the Medicaid program with the lowest drug prices as is required by law, costing taxpayers millions of dollars in fraudulent payments for drug benefits.

Schering-Plough Corp., a New Jersey-based company that manufactures several well-known pharmaceuticals, including the allergy drugs Claritin and Clarinex, has been at the center of a complex investigation involving the federal government, Texas and 49 other states. The multi-million dollar settlement resolves allegations that the company used deceptive marketing and sales pitches to influence physicians; as a result, the Medicaid system was charged inflated prices.

The national settlement is valued at more than $255 million in civil damages.

"Texans will not tolerate waste or fraud in the Medicaid system," said Attorney General Abbott. "Taxpayers expect Medicaid providers to give accurate information about the cost of their medications. We will not tolerate price manipulation that bilks the taxpayers and threatens the integrity of the Medicaid system or the well-being of Texans that depend on it for much-needed healthcare."

Today's settlement with Schering-Plough addresses several tactics used by the company, including "off-label" marketing of certain brain tumor and bladder cancer drugs. Investigators contended that Schering-Plough sales representatives induced physicians to prescribe the drugs for unapproved uses, medically unnecessary in some cases, in exchange for lucrative "consulting" bonuses.

The states asserted that the company also excluded certain price discounts from a formula used to calculate Medicaid reimbursement rates, resulting in significant losses to the Medicaid program. The settlement now ensures that each state that paid for prescriptions of Claritin RediTabs and K-Dur, a potassium supplement, will obtain the benefit of the best

prices the company offers to commercial purchasers.

As part of today's agreement, Schering-Plough also pleaded guilty in Massachusetts federal court to criminal charges related to this conduct, resulting in criminal fines of at least $180 million.

Approximately $6.5 million of the $15.7 million settlement in Texas will be refunded to the Texas Health and Human Services Commission, with the balance returned to the federal government on a cost-share basis. The civil settlement was negotiated by the National Association of Civil Medicaid Fraud Control Units.

In 2005 alone, the costs of the Medicaid program in Texas totaled more than $17 billion. As the state's chief law enforcement official, Attorney General Abbott remains committed to protecting the Texas Medicaid program from fraud and abuse. He has dramatically expanded both the Civil Medicaid Fraud Section and Medicaid Fraud Control Unit to save more taxpayer dollars.

His Civil Medicaid Fraud Section has become a leader among states in aggressive utilization of state laws to pursue companies and individuals defrauding Texas taxpayers. Since Attorney General Abbott took office, this team has collected almost $150 million in settlements of this type for Texas.

The Medicaid Fraud Control Unit, which handles criminal cases of fraud and abuse, has established field offices in Corpus Christi, Dallas, El Paso, Houston, Lubbock, McAllen, San Antonio and Tyler. This was accomplished through authorization and funding from the 77th Texas Legislature. Attorney General Abbott's Medicaid Fraud Control Unit works with state and local agencies across the state to identify and prosecute those who defraud Medicaid.

Attorney General Abbott's Medicaid Fraud Control Unit was honored in 2004 by the U.S. Department of Health and Human Services with the Inspector General's State Fraud Award for effectiveness and efficiency during federal fiscal year 2003 in combating fraud, patient abuse and neglect in the Medicaid program.

To obtain more information about the Attorney General's efforts to fight Medicaid fraud, access the agency's Web site at www.oag.state.tx.us.

FOR OTHER ITEMS ASSOCIATED WITH ATTORNEY GENERAL ANNOUNCEMENTS, ACCESS OAG NEWS RELEASES ONLINE AT WWW.TEXASATTORNEYGENERAL.GOV.

Case 1:01-cv-12257-PBS   Document 6026-27   Filed 04/24/09   Page 26 of 58

## STATE OF MISSISSIPPI



## JIM HOOD
ATTORNEY GENERAL

### MISSISSIPPI SETTLES WITH DEY LABS
January 07 2009

**FOR IMMEDIATE RELEASE**

Jackson, MS-Attorney General Jim Hood today announced that the State of Mississippi will collect $3.9 million in a settlement with Dey Labs of Napa Valley, California for overcharges to the state's Medicaid program.

Contact: **Jan Schaefer,
Public Information
Officer**
601/359.2002

The agreement is the first in the Average Wholesale Price litigation ("AWP") against 54 named defendants.

"This lawsuit was initiated by my office to stop the pharmaceutical industry from overcharging the Mississippi Division of Medicaid for drugs prescribed and dispensed to this state's most needy citizens, the elderly, the poor and the disabled. And also to recoup all of the lost tax dollars Mississippi citizens were wrongly forced to pay to the pharmaceutical companies as a result of their fraudulent sales practices on our Division of Medicaid," said Attorney General Hood.

This settlement reimburses the state of Mississippi's Division of Medicaid for all overcharges by Dey Lab pharmaceuticals and all expenses associated with this portion of litigation. All attorneys' fees have been paid by Dey Labs separate and above the $3.9 million agreement.

Mississippi is one of approximately 26 states, in addition to the federal government, that are pursuing these fraud claims against the pharmaceutical companies for reporting false prices to the state and federal government—prices that were known to be relied upon by the

Case 1:01-cv-12257-PBS   Document 6026-27   Filed 04/24/09   Page 27 of 58

state and federal Medicaid programs when reimbursing pharmacies for Medicaid drug prescriptions. The evidence in these cases has revealed that the pharmaceutical manufacturers reported prices inflated as much as 1200% over their actual costs. There is further evidence that $ .78 of every dollar spent on pharmaceutical drugs landed in the pockets of the pharmaceutical companies, not the pharmacists or the hospitals that dispensed these drugs. This resulted in millions of dollars in overcharges to the Mississippi Division of Medicaid.

Mississippi is continuing to pursue the fraud claims against the remaining Defendants.

**Click Here** to view the DEY complaint.

**Click Here** to view the DEY settlement.

WALTER SILLERS BUILDING · POST OFFICE BOX 220 · JACKSON, MISSISSIPPI 39205-0220
TELEPHONE (601) 359-3680



**Home** | **Contact Us**

# State of Idaho
# Office of Attorney General Lawrence Wasden

About the Office |
News Releases |
Internet Safety |
Publications |
Consumer Protection |
Victim Assistance |
Living Wills |
Resource Links |
Idaho Statutes |
Tobacco |
Medicaid Fraud |
Photo Gallery |
Concealed Weapons |
En Español |
Search |
Medal of Honor |
ICAC Task Force |



***FOR IMMEDIATE RELEASE***

Date:  November 14, 2006
Media Contact:  Bob Cooper
(208) 334-4112

---

**Wasden Reaches Million Dollar Medicaid Reimbursement Settlement**

(Boise) – Drug manufacturers Dey, Inc. and Dey, L.P. have agreed to pay the State of Idaho more than one million dollars in a settlement resolving claims relating to the marketing and selling of prescription drugs and Dey's reporting of "average wholesale price," Attorney General Lawrence Wasden said.

Dey, located in Napa, California, develops, manufactures and markets prescription drugs for the treatment of respiratory diseases and respiratory related allergies. The company's products include Accuneb, Albuterol and Epipen.

"I applaud Dey for stepping forward to resolve this dispute voluntarily," Attorney General Wasden said. "Where published prices are false or misleading, the taxpayers are significantly harmed by excessive Medicaid reimbursements. I hope that others in the industry will follow Dey's lead in order to eliminate unfair costs to Idaho taxpayers."

Under the agreement, Dey voluntarily agreed to provide certain confidential pricing information to Idaho Medicaid and to pay the State of Idaho $1,072,700 for restitution and compensatory damages, the Attorney General's fees and costs. Dey did not admit any liability or wrongdoing. The settlement agreement has been approved by Fourth District Judge Cheri Copsey.

Idaho Medicaid uses average wholesale prices as a basis for the reimbursement of the cost of pharmaceutical products. Idaho Medicaid is a program, administered by the Idaho Department of Health and Welfare, which provides health care services to low income Idahoans. Inflated or false average wholesale prices can result in taxpayers, through Medicaid, paying more for pharmaceutical products than they should.

For example, in 2005, Dey published an average wholesale price of $10.08 for a package of Albuterol. The Attorney General believes that a true average wholesale price was 93 cents a package. In the same year, Dey reported an average wholesale price of $42.24 for Ipratropium. The Attorney General believes the true average wholesale price was $3.16.

**BACKGROUND**

In fiscal year 2000, Idaho Medicaid reimbursed health care providers approximately $76 million for prescription drugs. In fiscal year 2005, the amount reimbursed exceeded $166 million, an increase of nearly 118%. The number of Idaho residents receiving Medicaid paid prescription drugs increased only 64%, comparing the same two fiscal years.

The average wholesale price for a drug is determined by the drug's manufacturer and is a significant factor in determining the amount of money that Medicaid will pay for that drug. Investigation by Attorney General Wasden's office, other state attorneys general and the U.S. Department of Justice has revealed that the reported average wholesale price frequently has little relationship to the actual price paid for the drug and that such practices are widespread in the prescription drug industry.

Drug companies do not profit directly from inflated average wholesale prices. Drug companies sell drugs to health care providers such as physicians, hospitals, pharmacies and long term care facilities. The providers dispense the drugs to Medicaid recipients. Medicaid then reimburses the provider for the drug, based upon the "average wholesale price" reported by the drug's manufacturer.

Office of Attorney General
700 W. State Street
P.O. Box 83720
Boise, ID 83720-0010
Phone (208) 334-2400
Fax (208) 854-8071

For example, a pharmacy that dispensed Ipratropium to a Medicaid patient would have paid $3.16 for the drug. Medicaid would have reimbursed the pharmacy using the published average wholesale price of $42.24 as a basis for its reimbursement decision. The difference between the actual price paid by the provider and the average wholesale price often results in profit for the provider.

Drug companies benefit from inflated average wholesale prices by increasing the quantity of drugs they sell to providers. False average wholesale price reporting has the effect of increasing the profitability of an individual drug for the provider and stimulates demand for that drug, resulting in more sales for the drug company.

- End -

Home | Contact Us | Privacy Policy | Linking Policy | State of Idaho | PDF Information

Kentucky.gov: - Attorney General Conway Announces Multi-Million...     http: migration.kentucky.gov Newsroom ag amgensettlement.htm

Case 1:01-cv-12257-PBS   Document 6026-27   Filed 04/24/09   Page 30 of 58

Agencies   Services   Forms   Resize Text: A⁻ A⁺   Translate   Help

Search     Go

**Government**   **Residents**   **Education**   **Business**   **Recreation & Travel**   **Health & Safety**   **Employment**   **Facts & History**   **eDemocracy**

Kentucky.gov > News Center > Office of the Attorney General > **Press Release**

## Office of the Attorney General

Recent Headlines
News by Agency
News by Topic
All Headlines
Archived News
Subscription Information
Frequently Asked Questions
Governor Steve Beshear
First Lady's Office
Lt. Governor's Office
**Office of the Attorney General**
  Recent Headlines
  All Headlines
  Archived News

**Attorney General Conway Announces Multi-Million Dollar Settlement With Pharmaceutical Company**

**Press Release Date:** Wednesday, March 11, 2009
**Contact Information:** Allison Martin, Press Secretary
Communications Director
502-696-5651 (office)

Attorney General Jack Conway today announced a $2.4 million dollar settlement with Amgen, Inc., a California-based biotechnology and pharmaceutical company with a subsidiary in Louisville.

The lawsuit, filed by the Office of the Attorney General in Franklin Circuit Court, alleges that Amgen and 47 other pharmaceutical companies defrauded the Kentucky Medicaid Program and violated Kentucky consumer protection laws by publishing significantly inflated average wholesale prices (AWPs) for prescription drugs – knowing that the Kentucky Medicaid Program would rely on these inflated AWPs to calculate pharmacy reimbursement rates. These inflated AWPs bore no relationship to any prices that Amgen actually charged its customers. The lawsuit alleges that Amgen marketed the "spread" between the inflated AWPs and the real prices as a means of maximizing its own profits and those of pharmacists who were being reimbursed at the higher Medicaid rate.

"I am pleased that we were able to recover these funds for Kentucky taxpayers who are tired of some pharmaceutical companies that try to increase profits by gaming the system," General Conway said. "I appreciate Amgen's cooperation in this investigation."

Amgen is a Fortune 500 company that manufactures Aranesp, Enbrel, EPOGEN, Kineret, Neulasta, NEUPOGEN and Sensipar.

A settlement is not an admission of liability in a civil case.

Site Map   Contact Us   About   Resources
Privacy   Security   Disclaimer   Accessibility Statement

Copyright © 2008 Commonwealth of Kentucky
All rights reserved.

Pfizer Unit Bilked Wisconsin Medicaid, Owes Damages (Update2)

Email | Print | A A A

By Cary O'Reilly

Feb. 17 (Bloomberg) -- Pfizer Inc.'s Pharmacia unit was found by a jury to have illegally overcharged Wisconsin's Medicaid program and may have to forfeit tens of millions of dollars in profits, the state's attorney general said.

Jurors in Madison, Wisconsin, found that Pharmacia should pay $9 million to compensate the state for its losses. A hearing to determine the amount of forfeitures hasn't been scheduled, Attorney General J. B. Van Hollen said today in an interview.

Pharmacia violated Wisconsin's Medicaid Fraud law more than 1.4 million times, the jury ruled late yesterday. Van Hollen said that under state law, the judge in the case may award from $100 to $15,000 per violation, or as much as $21 billion.

"Rest assured we will be making a recommendation at the low end," Van Hollen said. "It's not my goal or my duty to put the death penalty" on any company or industry, he said. Pfizer can continue to participate in the state's Medicaid program, Van Hollen said.

Even if the judge awards only $100 per violation, "that's still $144 million, plus court costs and interest, for the people of Wisconsin," he said.

The case against the unit of Pfizer, the world's largest drugmaker, is the latest round of litigation over the AWP system. At least 27 states have sued dozens of drugmakers over the practice, with Alabama having already secured jury verdicts worth about $330 million against three companies.

Artificially Inflated

The companies are accused of posting artificially inflated AWP prices and then "marketing the spread" to win business by encouraging pharmacies and doctors to seek reimbursement from state Medicaid programs at the full AWP price. The wider the spread, the more likely a doctor or pharmacy was to prescribe or promote the company's product, lawyers for the state said in opening arguments of the Wisconsin trial that began Feb. 4.

Wisconsin alleged Pharmacia reported an AWP of $241.36 for a 20 milligram dose of the cancer drug Adriamycin in April 2000 when the medicine was actually selling at wholesale for as low as $33.43. Doctors were told they could keep the difference. The state requested $9 million in compensatory damages.

"This verdict confirms that Pharmacia knew when it published false average wholesale prices for its drugs it would cause the state to grossly overpay for prescription drugs," Van Hollen said in a statement.

Pfizer, based in New York, said it will appeal the verdict.

"As we have maintained all along, the reimbursement rates paid to Wisconsin pharmacists were the result of deliberate decisions by the state of Wisconsin about how best to serve its Medicaid population," Chris Loder, a spokesman for Pfizer, said in an e-mailed statement.

First Wisconsin Trial

The case against Pharmacia, a Peapack, New Jersey-based, unit of Pfizer, is the first AWP claim to go to trial in Wisconsin. The outcome may influence the resolution of Wisconsin's 33 other pending cases against drugmakers, analysts said. Amgen Inc. and Immunex Corp. agreed in December to pay $1.7 million to settle AWP claims in the state.

"It is an industrywide phenomenon of pharma running afoul of Medicaid rules because the rules are so complicated and also part of it is because pharma wants to get every dollar they can," said Les Funtleyder, an analyst with Miller Tabak & Co. in New York. "It really hasn't gotten the attention of Wall Street yet, but you would think if there are enough checks written it will."

While Medicare and many state Medicaid programs have moved away from the AWP system, it is still used by some insurers, including those providing so-called Medigap coverage for drugs not paid for by the government programs.

Pfizer fell 33 cents, or 2 percent, to $14.25 in New York Stock Exchange composite trading. The shares have declined 20 percent this year.

The case is State of Wisconsin v. Amgen, 04-cv-1709, Wisconsin Circuit Court (Madison).

To contact the reporter on this story: Cary O'Reilly in Madison, Wisconsin, at caryoreilly@bloomberg.net.

*Last Updated: February 17, 2009 16:51 EST*

Agencies  Services  Forms  Resize Text A⁻ A⁺  Translate  Help

Search          Go

Government  Residents  Education  Business  Recreation & Travel  Health & Safety  Employment  Facts & History  eDemocracy

Kentucky.gov > News Center > Office of the Attorney General > **Press Release**

## Office of the Attorney General

**Recent Headlines**
**News by Agency**
**News by Topic**
**All Headlines**
**Archived News**
**Subscription Information**
**Frequently Asked Questions**
**Governor Steve Beshear**
**First Lady's Office**
**Lt. Governor's Office**
**Office of the Attorney General**
  Recent Headlines
  All Headlines
  Archived News

**Attorney General Conway Announces Bristol-Myers Squibb Settlement**

**Press Release Date:** Tuesday, July 15, 2008
**Contact Information:** Allison Gardner Martin
                         Communications Director
                         502-696-5651 (office)

The National Association of Medicaid Fraud Control Units announced on July 15, 2008 that 43 states, the District of Columbia, and the federal government have settled with Bristol-Meyers Squibb Company (BMS) and its former wholly-owner subsidiary Apothecon, Inc., to resolve allegations of illegal drug marketing and pricing of prescription medication paid by the participating states' Medicaid programs totaling $389 million plus interest. The federal portion of the settlement was concluded last fall. The Commonwealth of Kentucky will receive $3,078,211.78 of the settlement amount. The settlement addresses allegations that BMS engaged in a number of improper marketing and pricing practices, including:

  Reporting inflated prices for various prescription drugs knowing that Medicaid and various federal health care programs would use these reported prices to pay for BMS and Apothecon products used by their recipients.

  Paying illegal remuneration to physicians, health care providers, and pharmacies to introduce them to purchase BMS and Apothecon products;

  Promoting the sale and use of Abilify, an antipsychotic drug, for pediatric use and for treatment of dementia-related psychosis, uses which the federal Food and Drug Administration has not approved; and

  Misreporting sales prices for Serzone, an anti depressant, resulting in the improper reduction of the amount of rebates paid to the state Medicaid programs.

The settlement reimburses the federal government and the participating states for excessive amounts paid by Medicaid programs as a result of this conduct. As a part of the settlement, BMS has also entered into a Corporate Integrity Agreement with the Office of the Inspector General of the U.S. Department of Health and Human Services, under which BMS will be required to report accurately its average sales prices and average manufacturers process in the future.

A team from the National Association of Medicaid Fraud Control Units participated in the investigation and represented the states' interests in the settlement negotiations. Team members include Unit Directors from Ohio and Vermont as well as Assistant Attorneys General form Massachusetts, New York, and New Mexico.

Attorney General Jack Conway praised the settlement, stating "I am pleased that auditors and attorneys from our Medicaid Fraud Division, working in close cooperation with this team, have recouped these state Medicaid funds. In these tight budget times, it is more important than ever that we be diligent in our efforts to recoup state funds that have been obtained improperly."

Copyright © 2008 Commonwealth of Kentucky
All rights reserved

 # Missouri Attorney General

## Attorney General's News Release

April 25, 2006

# Pharmaceutical company to pay $2.9 million to settle Medicaid provider fraud lawsuit filed by Nixon

**Jefferson City, Mo.** — A pharmaceutical company sued by Attorney General Jay Nixon will pay $2,932,000 to settle allegations it engaged in a pricing scheme that resulted in the Medicaid program paying too much for certain generic prescription drugs. Nixon filed the settlement with Dey Inc. today in St. Louis City Circuit Court.

"Obtaining $3 million to reimburse taxpayers shows we will continue to be aggressive with real action - not just words - in going after waste, fraud and abuse by providers against the Medicaid system," Nixon said.

Under the settlement terms, Dey will pay $2,732,000 to the Medicaid Fraud Reimbursement Fund and $200,000 to the Merchandising Practices Revolving Fund, which is used to fund consumer protection litigation and education.

Nixon's lawsuit, filed last May, said Dey did not accurately report the prices of drugs sold to pharmacies participating in the Medicaid program. The prices reported to pharmaceutical trade publications, referred to as the average wholesale price (AWP) or the wholesale acquisition cost (WAC), often were substantially higher than the prices paid by the providers for the drugs, which were primarily generic brand inhalants used by patients with respiratory conditions. The AWP and the WAC are two of the bases used by the Missouri Medicaid program to determine the reimbursement paid to the providers when they submit claims to Medicaid.

If a pharmacy knew it would receive a greater reimbursement from Medicaid if it dispensed a generic prescription drug sold by Dey, it would be more likely to dispense that drug, the lawsuit alleged. As a result, Nixon said, Dey was able to artificially increase its market share through a scheme that cost Missouri

taxpayers.

Nixon's lawsuit also raised concerns that Dey hid the true costs of its drugs by giving providers free samples and by giving rebates and other inducements as a way of lowering the price providers paid. Those alleged inducements increased the spread between the AWP that Dey reported and the actual price paid by the providers.

Nixon had also sued a second company, Warrick Pharmaceutical Corp., at the same time he sued Dey, alleging Warrick engaged in the same scheme. That lawsuit is still pending. Last December, Nixon filed lawsuits against several other pharmaceutical companies, alleging they also manipulated the AWP to increase their market share and cost taxpayers more money. Those lawsuits are pending as well.

Inquiries from consumers should be directed to consumer@ago.mo.gov or **1-800-392-8222** (from within Missouri) or 573-751-3321 (outside Missouri).

All media inquiries should be directed to the Communications Office.

E-mail     Phone: 573-751-8844        Fax: 573-751-5818

# CT Attorney General

## Connecticut Attorney General's Office

## Press Release

### State Announces $2.5 Million Settlement Over
### Improperly Inflated Drug Prices

July 19, 2005

Attorney General Richard Blumenthal today announced that Dey Inc. has agreed to pay the state $1.7 million and donate $800,000 worth of pharmaceuticals to be used at free clinics, settling charges of illegally inflating drug costs.

On behalf of the state, the attorney general sued Dey and six other pharmaceutical companies for artificially inflating the average wholesale prices (AWP) of pharmaceuticals. The state and federal government use AWP to determine reimbursement rates for health care programs such as Medicaid and ConnPace.

When the AWP were artificially inflated, health care providers could increase their profits by prescribing or dispensing drugs from those companies because of the greater difference between the prices they paid for the drugs and the price the state reimbursed.

The price manipulation – inducing the distribution of drugs where the artificially inflated prices provided greater profit – was designed to increase the pharmaceutical companies' market shares.

"Dey overcharged for medicine necessary to help children breathe – and now will pay back both taxpayers and children," Blumenthal said. "Our message is clear to pharmaceutical drug companies: We will be relentless in fighting inflated and manipulated drug prices. Dey callously overcharged patients and taxpayers along with other companies that we've sued. These companies manipulated the market – illegally inflating the published cost of critical prescriptions that children need for asthma and other ailments. We will continue to fiercely pursue other companies in our ongoing lawsuit."

Blumenthal negotiated the settlement with cooperation from the Department of Consumer Protection (DCP) Commissioner Edwin R. Rodriguez, Department of Public Health (DPH) Commissioner Dr. J. Robert Galvin and Department of Social Services (DSS) Commissioner Patricia A. Wilson-Coker.

Wilson-Coker said, "We hope today's important announcement is heard loud and clear in any venue where state and federal tax dollars, intended for children's health initiatives or treatments for seniors needing breathing treatments, are wrongly manipulated to bolster profits."

"This settlement will provide medications to underserved children and adults with certain respiratory diseases who access health services through Community Health Centers statewide," Galvin said. "We are pleased that this settlement addresses health disparities, which is a priority goal for both the state of Connecticut and the federal government."

Rodriguez said, "What this case illustrates is fraudulent behavior, where the price structure was dictated not by competition or market-driven forces, but by Dey forcing inflated prices upon consumers."

The $1.7 million will be divided primarily among state and federal medical assistance

programs. The state's costs will also be covered.

Dey will also donate 404,296 vials of DuoNeb, 709,488 vials of Albuterol and 1,574,307 vials of Ipratroprium Bromide – all treatments for respiratory ailments such as asthma.

The donated pharmaceuticals will be distributed to certain community health care clinics, which operate under the auspices of DPH, as well as the AmeriCares Free Clinics in Norwalk, Danbury and Bridgeport. The drugs will be available to these clinics over three years.

Lawsuits against the other six defendants – Schering-Plough Corporation, GlaxoSmithKline, Aventis, Roxane Laboratories Inc., Warrick Pharmaceuticals, and Pharmacia Corporation – are pending.

Content Last Modified on 7/27/2005 11:56.25 AM

Case 1:01-cv-12257-PBS   Document 6026-27   Filed 04/24/09   Page 38 of 58

https://www.nbc.com/id/27477556

## Missouri AG, Schering-Plough reach $31M settlement

By The Associated Press | 31 Oct 2008 | 04 28 PM ET                    †T Text Size  −  +

ST. LOUIS - Missouri Attorney General Jay Nixon reached a $31 million settlement with a pharmaceutical company in a Medicaid fraud case on Friday.

New Jersey-based Schering-Plough Corp. agreed to the settlement of a 2005 lawsuit to resolve allegations that its former Warrick Pharmaceuticals Corp. division inflated its prices, said Nixon spokesman Scott Holste. Lawyers for the state argued the deception cost Missouri taxpayers millions of dollars.

The settlement is the largest amount Missouri has ever obtained in a case against a pharmaceutical company, Holste said. On Thursday, a St. Louis jury found the company liable for $7.3 million in compensatory damages. The jury had not yet decided on punitive damages when the settlement was reached. The $31 million settlement resolves Missouri's claims.

Schering-Plough spokesman Steve Galpin said, "The company had intended to appeal the jury's preliminary ruling but elected to settle in order to avoid additional litigation expenses and the uncertainty inherent in the legal process."

He said the company believed the initial jury findings were incorrect and that it had followed all necessary regulations and laws related to Missouri Medicaid reimbursement.

The lawsuit had alleged the company did not accurately report the prices of drugs sold to pharmacies participating in the Missouri Medicaid program.

Nixon's office said the prices reported to pharmaceutical trade publications often were higher than the prices actually paid by the provider for the drugs. It said the drugs were primarily generic brand inhalants used by patients with respiratory conditions.

Nixon said he was proud of the lawyers and staff in his office who had worked for three years on the case. "This is a tremendous day for Missouri taxpayers in the fight against fraud by pharmaceutical companies," he said in a statement.

*Copyright 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

4/24/2009 5:02 PM

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
by THOMAS W. CORBETT, JR. in his capacity as
Attorney General of the Commonwealth of
Pennsylvania.

PLAINTIFF,

v

No.  212 M.D. 2004

TAP PHARMACEUTICAL PRODUCTS, INC., ET AL.,

DEFENDANTS.

## SETTLEMENT AGREEMENT AND RELEASE

### PARTIES

This Settlement Agreement (this "Agreement") is entered into between the

Commonwealth of Pennsylvania. through Thomas W. Corbett, Jr., Attorney General of the

Commonwealth of Pennsylvania (collectively referred to as the "Commonwealth"). and Abbott

Laboratories ("Abbott"), (hereinafter referred to as "the Parties ")

### PREAMBLE

A.    On or about March 10, 2004, the Commonwealth of Pennsylvania initiated a

lawsuit against Abbott, and against other pharmaceutical company defendants, in the

Commonwealth Court of Pennsylvania. captioned *Commonwealth of Pennsylvania v. TAP*

*Pharmaceutical Products, Inc., et. al.,* No. 212 M.D. 2004 (hereinafter referred to as the

"Lawsuit"). On or about March 10, 2005, the Commonwealth of Pennsylvania filed a Corrected

Amended Civil Action Complaint in the Lawsuit, (hereinafter referred to as the "Amended

Complaint") which named Abbott and other pharmaceutical companies as Defendants.

B.    The Amended Complaint makes certain allegations and claims concerning

pharmaceutical prices for Abbott products, including that Abbott caused certain published

"Average Wholesale Prices" ("AWPs") for certain Abbott products, to be artificially inflated. The Commonwealth claims that Abbott caused the Pennsylvania Medicaid Program, as well as other state-funded and/or state administered medical assistance programs, such as the Pharmaceutical Assistance Contract for the Elderly ("PACE") Program, as well as the Pennsylvania Employees Benefit Trust Fund ("PEBTF"), to make excessive net reimbursements for Abbott products (together, Pennsylvania Medicaid, PACE and PEBTF are sometimes referred to hereinafter as the "Pennsylvania Programs"). The Commonwealth further claims that Abbott caused persons in the Commonwealth of Pennsylvania who made co-payments (including Medicare Part B co-payments) for Abbott products based on published AWPs to pay excessive amounts for those products (the "Parens Patriae/Consumer Restitution and Penalty Claims").

C.     The Commonwealth seeks various forms of relief against Abbott, including restitution, damages, injunctive relief, civil forfeiture, civil penalties, costs and/or attorneys' fees.

D.     The Abbott drugs that are the subject of this Agreement are collectively referred to hereafter as the Covered Drugs, and include all drugs that Abbott manufactured, marketed, co-marketed, co-promoted, distributed or sold at any time prior to this Agreement's Effective Date (as defined in Paragraph 14, below).

E.     Abbott's alleged conduct and transactions referenced in Paragraph B, above, are hereinafter referred to as the "Covered Conduct." The Covered Conduct is expressly limited to: (i) such conduct that occurred prior to the date of the execution of this Agreement; (ii) conduct as alleged or as could have been alleged in the Amended Complaint and any preceding complaint in the Lawsuit as though such conduct has been alleged with respect to all of the Covered Drugs, and (iii) such conduct as alleged or as could have been alleged in any of the Commonwealth's

2

responses to discovery in the Lawsuit as though such conduct has been alleged with respect to all of the Covered Drugs.

F.      Abbott denies the Commonwealth's claims and allegations as set forth in the Amended Complaint in the Lawsuit, has asserted various defenses to the Commonwealth's claims, and denies that it has any liability relating to such claims and allegations.

G.      To avoid the delay, expense, inconvenience and uncertainty of protracted litigation of these disputed claims, the Parties mutually desire to reach a full and final settlement, including a settlement and dismissal of the Lawsuit, as set forth below.

H.      This Agreement does not constitute an admission of fault or liability by Abbott or evidence of any liability or unlawful conduct on the part of Abbott, and the Commonwealth will not urge or seek to admit this Agreement as evidence of any fault or liability of Abbott or its predecessors, current and former subsidiaries, affiliates, successors and assigns, and its current and former directors, officers and employees in any investigation, administrative proceeding, or federal or state court or arbitration proceeding.

I.      The Attorney General expressly represents and warrants that he has authority to enter into this settlement on behalf of the Commonwealth, in general, and on behalf of Pennsylvania Medicaid, PACE and PEBTF to compromise the claims against Abbott for the Covered Conduct (as defined in Paragraph E above).

J.      The Commonwealth represents to Abbott that no interest in any claim herein released has been assigned by the Commonwealth to any third party.

K.      The Commonwealth has concluded that this settlement is in the public interest.

## TERMS AND CONDITIONS

NOW THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants and obligations in this Agreement, and for good

and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

      1.      The foregoing Preamble is incorporated herein and forms express terms of this Agreement.

## The Settlement Payment

      2.      Within five (5) business days from the Effective Date of this Agreement (as defined in Paragraph 14), Abbott shall pay the Commonwealth the sum of $6,950,000 (six million nine hundred fifty thousand dollars), consisting of $5,791,750 (for the Commonwealth) and $1,158,250 (for plaintiff attorneys' fees and costs), by electronic funds transfer pursuant to signed written instructions to be provided to Abbott by the Commonwealth promptly after this Agreement is executed by the Commonwealth. This payment, together with the other consideration set forth in this Agreement, is intended to and does fully resolve all claims relating to the Covered Conduct as set forth above in Paragraph E above. The settlement payment includes full and final settlement of all claims that the Commonwealth has the right to pursue relating to the Covered Conduct and all of plaintiff attorneys' fees and costs.

      3.      Within five (5) business days after the Effective Date of this Agreement (as defined in Paragraph 14), the Commonwealth will file the order of dismissal with prejudice attached hereto as Exhibit A along with the Settlement Agreement with the Court in the Lawsuit, and will take all steps necessary to cause the prompt dismissal with prejudice of all claims against Abbott in the Lawsuit. Pursuant to the terms of the Novation of Contract for Legal Services effective September 8, 2006 between the Commonwealth of Pennsylvania and The Haviland Law Firm, LLC, and paragraph 2 of the Contract for Legal Services effective November 5, 2003 between the Commonwealth of Pennsylvania and Kline & Specter, the Commonwealth's attorneys will file appropriate papers with the Commonwealth Court seeking

4

approval of their fees and costs to be paid by Abbott as set forth in Paragraph 2 of this

Agreement. In accordance with the aforesaid agreements, "the Court's determination shall be

conclusive of the amount of fees, costs and expenses" payable to the plaintiff attorneys in this

case, except that in no case will Abbott be required to pay more than the total amount

(6,950,000) set forth in Paragraph 2, above, and the release set forth in Paragraph 4 and the

dismissal of the action with prejudice required by this paragraph shall take effect in accordance

with the provisions of Paragraph 2 and 3.

**The Commonwealth's Release of Abbott**

4.      In consideration of this Agreement, upon receipt by the Commonwealth of the

payments set forth in Paragraph 2 above, and subject to the exceptions from release set forth in

Paragraph 5 below, the Commonwealth on behalf of itself, its officers, employees, agents,

attorneys, agencies and departments shall:

> (a)    release and forever discharge Abbott, its predecessors,
> subsidiaries, divisions, affiliates, successors and assigns (but excluding
> TAP Pharmaceutical Products, Inc. and its successors), and its current and
> former directors, officers and employees, from any and all civil or
> administrative claims for restitution, damages, interest, punitive damages,
> injunctive relief, civil forfeiture, civil penalties, fines, costs, attorneys'
> fees and other relief, known or unknown, that the Commonwealth has
> asserted, could have asserted, or may assert under any source of law for
> the Covered Conduct, up to the Effective Date of this Agreement (as
> defined in Paragraph 14); and
>
> (b)    withdraw, with prejudice, all pending notices of deposition
> and forego any depositions in the Lawsuit or otherwise of any current or

former officers, directors or employees of Abbott, its predecessors, subsidiaries, divisions, affiliates, successors and assigns, including but not limited to the depositions of Duane L. Burnham, Paul Clark, William G. Dempsey, Thomas Hodgson, Peter Karas, John G. Kringel, J. Duncan McIntyre, Henry Pietraszek and Miles White, or the depositions of any current or former in-house counsel, including but not limited to Stacey Chronis, Honey Lynn Goldberg, and Maureen McShane. As for the depositions of Abbott's former outside counsel, including but not limited to Joseph Young, Donna Boswell and Ann Vickery, the Commonwealth agrees to limit its depositions of such witnesses to issues pertaining to the liability of parties other than Abbott.

## Limitations on Release

5    Notwithstanding any term of this Agreement, the Commonwealth specifically does not herein release Abbott, its predecessors, subsidiaries, affiliates, successors or assigns, or their current and former directors, officers, and employees from any and all of the following:

(a)    any potential criminal, civil or administrative claims arising under the Commonwealth of Pennsylvania revenue codes,

(b)    any criminal, civil or administrative liability to the Commonwealth (or its agencies) for any conduct other than the Covered Conduct,

(c)    any claims based upon such obligations as are created by this Agreement,

(d)     any express or implied warranty claims, claims for product

liability, or other claims for defective or deficient products or services,

including quality of goods and services;

(e)     any claims for personal injury or property damage or for

other consequential damage, or

(f)     any claims based on a failure to deliver items or services

due, including such claims for breach of contract.

Nothing in the Agreement shall be deemed to prohibit the Commonwealth of Pennsylvania or its

attorneys from commenting on the MDL No. 1456 Track 2 Class Settlement.

6.      In consideration of the obligations of Abbott set forth in this Agreement,

conditioned upon Abbott's payment of the amount set forth in Paragraph 2 above, and except as

reserved in Paragraph 5 above, the Commonwealth agrees to release and refrain from instituting,

directing or maintaining any civil or administrative claim or any action seeking exclusion from

the Commonwealth's Medicaid Program against Abbott, its predecessors, subsidiaries, affiliates,

successors or assigns for the Covered Conduct or seeking to impose a Corporate Integrity

Agreement on Abbott as a result of the Covered Conduct. Nothing in this Agreement precludes

the Commonwealth from taking action against Abbott in the event that Abbott is excluded by the

federal government or for conduct and practices other than the Covered Conduct.

**Abbott's Release of the Commonwealth**

7       At the time the release set forth in Paragraph 4 above becomes effective as to

Abbott, Abbott shall fully and finally release the Commonwealth, its agencies, employees,

servants, and agents from any claims (including attorneys fees, costs, and expenses of every kind

and however denominated) which Abbott has asserted or could have asserted, against the

Commonwealth, its agencies, officers, employees, servants, or agents that are related to or

7

arising from the investigation and prosecution of the Covered Conduct, up to the Effective Date of this Agreement (as defined in Paragraph 14).

## Future Price Reporting

8.      Abbott shall comply with the following:

(a)      Within thirty days after the last day of each calendar quarter (the "Reporting Quarter"), Abbott shall report to Pennsylvania Medicaid in electronic form the average manufacturer's price ("AMP"), as defined by 42 U.S.C. § 1396r-8 or by other federal law in the future, of each Abbott drug for which Abbott reports an AMP to CMS. If not enough time has elapsed for a new NDC to have an AMP during the Reporting Quarter, Abbott will report that NDC's AMP to Pennsylvania Medicaid when Abbott first reports it to the Federal Government.

(b)      Abbott recognizes that the Commonwealth may at some point in the future change its reimbursement methodology from one which uses AWP to one which uses some other pricing information, such as AMP, Actual Acquisition Cost ("AAC") or other price. Abbott agrees that if the Commonwealth institutes a change in its reimbursement methodology by law or regulation, and the law or regulation is enacted and becomes effective, Abbott will provide pricing information in accordance with the law or regulation. The pricing information Abbott provides shall be reported electronically at the time intervals the Commonwealth requires by law or regulation.

(c)      The Parties agree that the Pennsylvania Programs will not disclose the Abbott AMPs (or AAC or other pricing information), if

8

Abbott prominently identifies all such information as "Confidential pursuant to the Settlement Agreement with Abbott in Commonwealth v. TAP Pharmaceuticals et al. Docket No. 212 M.D. 2004" and identifies the corporate official to whom notice should be given, including contact information, in the event that a Pennsylvania Program receives a request for disclosure. The Pennsylvania Programs agree to notify Abbott when a request for disclosure is made. The parties agree that the act of declaring the information to be confidential constitutes a good faith representation by Abbott that the information is a trade secret, is confidential proprietary information, or is otherwise protected by law. Abbott agrees that the Pennsylvania Programs can and will rely on Abbott's good faith representation as a basis for refusing a request for disclosure but have no obligation to make argument or present evidence in support of that representation. The failure of Abbott to identify the information as described above will absolve the Pennsylvania Programs of their obligation to not disclose the information. If Abbott produces the same pricing information to any other state or to the United States Government on a non-confidential basis, then such information may be subject to disclosure under the federal Freedom of Information Act or the Pennsylvania Right to Know Law or a similar law of any other state. Abbott agrees, however, that Pennsylvania Medicaid may share Abbott's AMP information (or AAC or other price information if required to be submitted by law or regulation in the future) with PACE and PEBTF (and

PACE and PEBTF will likewise keep the information confidential) and

that the Pennsylvania Programs may use Abbott's AMP information (or

AAC or other price information, if required to be submitted by law or

regulation) as a basis for reimbursement on the following conditions:

> (i)     For a multi-source pharmaceuticals, the Pennsylvania Programs will only use the Abbott AMP, AAC or other pricing information to reimburse for Abbott's pharmaceuticals if the Commonwealth sets the same reimbursement methodology for the therapeutic equivalent(s) of the Abbott pharmaceutical, or
>
> (ii)    For an Abbott-branded pharmaceutical, the Pennsylvania Programs will only use the Abbott AMP, AAC or other pricing information to reimburse for an Abbott-branded pharmaceutical in the event that the Pennsylvania Programs adopt an AMP, AAC or other price-based reimbursement methodology for (a) all branded pharmaceuticals, or (b) all branded pharmaceuticals in the same therapeutic category as the Abbott-branded pharmaceuticals.
>
> (iii)   Therapeutic equivalents for multi-source drugs shall be based on the Generic Sequence Code as determined by First DataBank.  Therapeutic category for a branded pharmaceutical shall be determined based on the information available from First DataBank.
>
> (iv)    Notwithstanding anything to the contrary in this subparagraph 8(c), the Pennsylvania Programs may use Abbott's AMP (or AAC or other pricing information, if required to be submitted by law or regulation) as a basis for reimbursement for Abbott's drugs where:
>
>> (A)   Abbott agrees in writing or
>>
>> (B)   Any of the Pennsylvania Programs agree to reimburse for Abbott's drugs as the exclusive drug within a given therapeutic category.

(d)    Abbott agrees to submit AMP information to Pennsylvania

Medicaid in accordance with this paragraph for a period of seven years

from this Agreement's Effective Date (as defined in Paragraph 14)

> Subject to the provisions of this Agreement, the Pennsylvania Programs
>
> agree to not disclose the Abbott AMP (or AAC or other pricing
>
> information) for a period of seven years from the date of receipt of the
>
> Abbott AMP (or AAC or other pricing information)

9    The Commonwealth covenants that, provided Abbott reports to Pennsylvania Medicaid its AMP information (or AAC or other pricing information that may be required by law or regulation in the future) in accordance with Paragraph 8 of this Agreement, the Commonwealth will not at any time sue or seek to hold Abbott liable under any law or regulation for falsely reporting prices during the seven year reporting period defined in Paragraph 8(d) of this Agreement.

**No Admission**

10    This Agreement does not constitute an admission by any person or entity, and shall not be construed as an admission by any person or entity, with respect to any issues of law or fact.

**Costs and Revenue Recognition**

11    Except as otherwise provided herein, each Party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement. Nothing in any provision of this Agreement constitutes an agreement by the Commonwealth concerning the characterization of any payment for purposes of state internal revenue laws.

**Authorization**

12    The Parties have read the foregoing Agreement and accept and agree to the provisions contained herein and hereby have caused this Agreement to be signed as of the day and date adjacent to their respective signatures. The undersigned persons signing this Agreement

11

on behalf of Abbott represent and warrant that they are authorized by Abbott to execute this

Agreement. The undersigned Commonwealth signatories represent that they are signing this

Agreement in their official capacities and that they are authorized to execute this Agreement.

**Notification**

13.     In the event of an alleged breach of this Agreement or a dispute between or

among the Parties in connection with the performance of this Agreement, the Parties shall be

required first to provide notice and an opportunity to cure. The Parties shall provide notice to

persons identified below. The responding party shall be given fifteen (15) business days to

respond to the notice, including curing any alleged breach. Unless otherwise stated in writing

subsequent to the Effective Date of this Agreement (as defined in Paragraph 14), and except for

reporting AMP, which should be pursuant to the normal course of business between Abbott and

Pennsylvania Medicaid, all notifications and communications made pursuant to this Agreement

shall be submitted to the entities listed below:

(a)     Commonwealth for all purposes:

Office of the Attorney General
Alexis L. Barbieri, Esquire
Executive Deputy Attorney General
Commonwealth of Pennsylvania
Office of Attorney General
Public Protection Division
Strawberry Square, 14th Floor
Harrisburg, PA 17120

Copy to:
Donald E. Haviland, Jr. Esquire
The Haviland Law Firm, LLC
740 S. Third Street, Third Floor
Philadelphia, PA 19147

12

> (b)  Abbott for all purposes.
>
>> Office of the General Counsel
>> Abbott Laboratories
>> 100 Abbott Park Place
>> Abbott Park, IL 60064
>>
>>
>> Copy to:
>> James R. Daly, Esquire
>> Jones Day
>> 77 West Wacker Drive
>> Chicago, IL  60601

## Effective Date

14.   The Effective Date of this Agreement is the date of signature of the last signatory to this Agreement.

## Choice of Law

15.   This Agreement is governed by the laws of the Commonwealth of Pennsylvania.

## Protective Orders and Future Use of Evidence

16.   Nothing in this Agreement shall be deemed to prohibit the Commonwealth of Pennsylvania or its attorneys in an action brought by the Commonwealth of Pennsylvania from using documents, data and other information produced (the "Produced Material") by Abbott in the prosecution of the Commonwealth's claims against other parties in the Lawsuit. The parties shall continue to abide by the provisions of the Final Protective Order with respect to the Produced Material, except that within six (6) months after the Effective Date of this Agreement, the Commonwealth shall (i) identify the documents it intends to so use and (ii) return to Abbott or destroy (and certify the destruction of) Confidential Produced Material that it does not intend to so use.

**Complete Agreement**

     17.     This Agreement constitutes the complete agreement between the Parties with regard to the settlement and dismissal of the Lawsuit. This Agreement may not be amended except by written consent of the Parties.

**Counterparts**

     18.     Each Party agrees to perform any further acts and to execute and deliver any further documents reasonably necessary to carry out this Agreement. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

**Captions are for Convenience Only**

     19.     The bold-faced paragraph captions in this Agreement are for convenience only and do not add to, detract from or change the substantive language or terms of this Agreement.

**Miscellaneous Provisions**

     20.     This Agreement shall not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties, it being recognized that this Agreement is the result of arm's-length negotiations between the Parties and all Parties have contributed substantially and materially to the preparation of this Agreement.

     21.     The Parties agree that should any nonmaterial portion or portions of this Agreement be found to be void, unenforceable or otherwise invalid by any court of competent jurisdiction after the exhaustion of all rights to appeal, this entire Agreement shall not be nullified and such invalid portion or portions shall be severed from the remainder of this Agreement as if they had never been entered into and the remainder of this Agreement shall be enforced.

22.     Nothing in this agreement shall be construed to be a waiver of the sovereign immunity of the Commonwealth of Pennsylvania.

23.     This Agreement shall be binding on all successors, transferees, heirs and assigns of the Parties.

**IN WITNESS WHEREOF** the Parties do hereunto set their hands and seals on the dates set forth below:

## FOR THE COMMONWEALTH OF PENNSYLVANIA

By: _____       Dated: _____

Alexis L. Barbieri, Esquire
Executive Deputy Attorney General
Commonwealth of Pennsylvania
Office of Attorney General
Public Protection Division
Strawberry Square, 14th Floor
Harrisburg, PA 17120

By: _____       Dated: _____

Donald E. Haviland, Jr., Esquire
The Haviland Law Firm, LLC
740 South Third Street
Third Floor
Philadelphia, PA 19147

Counsel for the Commonwealth of Pennsylvania

**IN WITNESS WHEREOF** the Parties do hereunto set their hands and seals on the dates set forth below:

## FOR THE COMMONWEALTH OF PENNSYLVANIA

By: _____     Dated _____
    Alexis L. Barbieri, Esquire
    Executive Deputy Attorney General
    Commonwealth of Pennsylvania
    Office of Attorney General
    Public Protection Division
    Strawberry Square, 14th Floor
    Harrisburg, PA  17120


By: _____     Dated _____
    Donald E. Haviland, Jr., Esquire
    The Haviland Law Firm, LLC
    740 South Third Street
    Third Floor
    Philadelphia, PA 19147


    Counsel for the Commonwealth of Pennsylvania

**FOR ABBOTT LABORATORIES**

By: _____                Dated: _____9/11/08_____
James R. Daly, Esquire
Jones Day
77 Wacker Drive
Chicago, IL  60611

Counsel to Abbott Laboratories





**ATTORNEY GENERAL TOM CORBETT**



September 19, 2008

### Attorney General Corbett announces $6.95 million settlement with Abbott Labs in drug pricing lawsuit



HARRISBURG - Attorney General Tom Corbett today announced a $6.95 million settlement with Illinois-based Abbott Laboratories, which had been accused of artificially inflating the price of drugs purchased by state-funded prescription drug programs.

Corbett said the settlement, filed on September 18th in Commonwealth Court, requires Abbott to pay the Commonwealth of Pennsylvania $6,950,000. The money, which must be paid within five days, will be distributed to the Pennsylvania Medicaid Program, along with the PACE program (Pharmaceutical Assistance Contract for the Elderly) and the Pennsylvania Employees Benefit Trust Fund, which provides medical and prescription benefits to state employees.

Corbett said the settlement provides full restitution to those agencies and programs for the artificially inflated drug prices allegedly charged by Abbott, plus an additional payment of $1.3 million - for a total recovery of $5,791,750 for state medical programs. The settlement also includes full recovery of the state's attorneys' fees and other costs associated with this lawsuit, totaling $1.1 million.

"This lawsuit was aimed at reversing a scheme that overcharged the taxpayers of Pennsylvania and Commonwealth agencies millions of dollars for prescription drugs," Corbett said. "This settlement returns that money to the Pennsylvania Medicaid Program and other prescription drug plans, where it will immediately be put back to work helping care for lower income residents, senior citizens and retirees."

Corbett said that nearly 70% of the settlement will be paid to the Pennsylvania Department of Public Welfare, which oversees the Pennsylvania Medicaid Program. The remaining balance of the settlement will be divided between the PACE prescription drug program for seniors and the PEBTF state medical benefits program. The settlement has already been approved by all three of those agencies.

Additionally, Corbett said the settlement requires Abbott to provide detailed drug pricing information to the Pennsylvania Medicaid Program, PACE and PEBTF for the next seven years.

The original lawsuit, filed in 2004, accused Abbott Labs and 12 other major drug companies of participating in an unfair and deceptive marketing scheme and conspiracy that provided improper incentives to medical providers to gain market share - forcing consumers and state agencies to pay significantly higher prices for prescription drugs as drug companies purposefully inflated the cost of those drugs.

Earlier settlements with two other drug companies, TAP and GlaxoSmithKline, resulted in payments to Pennsylvania of $1.8 million and $1.3 million, respectively. Other drug-related lawsuits are continuing.

Corbett noted that since 2005, the Attorney General's Office has recovered more than $70 million in lawsuits against drug companies, medical providers and other organizations in cases involving overbilling, price manipulation and other violations.

# # #