# EXHIBIT W-1

# ⊐ABBOTT

**FROM:** Donald C. Robertson
Vice President & General Manager
Alternate Site

**INTEROFFICE CORRESPONDENCE**     **DEPT:** D-H50 **BLDG:** J14 **EXT:** 7-9984

**TO:** Kris Kringel

**DATE:** June 14, 1991

**CC:** Ginny Tobiason
Chris Begley
Bill Dempsey
Mike King
John Ward

**RE:** PROPOSED RULES CHANGES PUBLISHED BY HCFA

Attached are the proposed rules changes published by HCFA regarding the reimbursement for drugs "incident to" patient treatment in the physician's office or dialysis center. These rules are being published within the larger context of a re-examination of the entire system and allocation of physician reimbursement. The changes are intended to effect drugs administered by injection or infusion. This would include Pain Management drugs, Oncolytics, Lupron, and Calcijex. Rationale for a 15% reduction in reimbursement is that physicians should be able to achieve a 15% discount from manufacturers and wholesalers and that AWP is a poor indicator of actual drug acquisition cost.

Several professional groups have vested interests in resisting these changes. They include the American Society of Clinical Oncology (ASCO), the PMA, the American Society of Nephrology (ASN), and the Alliance for Infusion Therapy. These groups are being contacted by appropriate Alternate Site and Abbott Washington personnel to determine a response to the proposed rules changes. As these responses take shape, we will discuss them with you. The HCFA proposal has significant momentum, and we believe that some form of reimbursement reduction has a high probability of occurring. Our efforts are to ensure that these changes are as small as possible. The abandonment of AWP as a good indicator of product acquisition cost and the statement in the proposal that "wholesale price guidelines substantially overstate the true cost of drugs" as well as the statement that "ultimately there should be a national drug fee schedule" have significant implications for our business. The framework for a downward spiral of drug prices is laid through these rules.

We will keep you informed of progress regarding the industry responses and our response both as supplier and manufacturer.

Don

MEMOS.DOC/4

ABT212056



JUN 27 1995

June 21, 1995

## CONFIDENTIAL

To:      Don Patton                    From:      Alan MacKenzie

cc:      Yasu Hasegawa
         Doug Durand
         Don Meek
         Karen Howard

Subject:   Meeting with Ann Vickery of Hogan and Harston

### Tuesday June 20th
Don Meek, David Landsidle and myself met with Ann Vickery of Hogan & Harston for nearly 3 hours. I called this meeting to review the following issues with Ann:

1.   Application of Lupron Reimbursement White Paper
     Now that the paper is complete we discussed the use of this argument with payors. Another H & H attorney, Bob Brady (a former FDA enforcement lawyer) gave us his opinion on whether or not we should be concerned for regulatory (labeling) review of this document. The conclusion... the paper is written in fair balance, and risk is low. Next step, put paper in final form, review with Dean Sundberg and have available as a ready document for situations where medical therapy is limited or excluded for advanced prostate cancer due to payor policy.

2.   HCFA initiative to set guidelines for GnRH AGONIST use
     Ann has had very recent discussions with the top HCFA Policy Director who indicated that there is no further effort at this time to set new policy in this area. However, HCFA remains concerned at the "extraordinary costs" of this class of medicine and would like to see AUA active in setting guidelines in PCA treatments. Hogan and Harston will continue to monitor.

DD 0081

O:\ALAN\CORRESP\H&H.DOC



3.   <u>Estimated Acquisition Cost Policy</u>
Good news here!  Ann just spoke with the Senior Director on payment policy
told her the following:
"HCFA does not have the manpower to meet all the requirements of the OMB to
statistically validate the drug survey process".  Thus Ann call this a "Bureaucratic
Mexican Standoff", OMB will not budge on its policy and HCFA can not put the
resources toward it.  Thus no action is in place to move the survey process
ahead.  Ann believes we are at least a year away (if ever) from any EAC activity.
She did mention that congress could include EAC into the Medicare Reform Bill
as an add-on.  H & H will closely monitor this in bill mark ups.

4.   <u>Future of Medicare Program</u>
For certain, the Medicare Budget will be cut from $250-$300 billion over the
next five years.  Both Republican and Democratic sponsored bills call for
incentives to move beneficiaries into managed care programs.  Another
possibility is a voucher option, where a beneficiary receives a voucher for the
cash value of their Medicare benefits and then goes out to the market place to
purchase private health insurance.  The voucher plan would also push people
toward managed care to get the perceived biggest bang for their buck.  In all
scenarios, TAP can expect continued acceleration of managed care delivery of
Medicare.

5.   <u>3 Month Depot</u>
We informed Ann of our imminent 3 month approval and the absolute need to
have a smooth reimbursement process at launch.  Ann thought that providing
there are no significant changes in the cost for an equivalent month of therapy,
we should expect no difficulty.  H & H provides expert guidance in the
applications for codes/reimbursement from HCFA.  Both Don Meek and I agree
to retain H& H for this use.

Finally we reviewed the overall relationship between TAP and Hogan and Harston.
Practically, it makes sense to set up 2 billing entities at TAP, one in Marketing for
retainer and policy monitoring and the other in Operations for day to day support of our
reimbursement services

Hogan and Harston continues to provide expert counsel for TAP and as you can tell
from the above notes, this was a most productive meeting.

DD 0082

O:\ALAN\CORRESP\H&H.DOC



# ABBOTT

1710 Rhode Island Avenue
Washington, D.C.   20036



Phone: 202-659-8524
Fax: 202-466-8386



**F A C S I M I L E**
ABBOTT – WASHINGTON OFFICE

---

_Alan MacKenzie_ _____

_____

_____

_____

_____

_____

( FROM:   David Landsidle

Dolly Hanrahan   ✓

Rosemary Haas

Lorna Huff

Lee Harp

Sandie Preiss

DATE: ___5/5/94___

ADDITIONAL COMMENTS:

# OF PAGES INCLUDING COVER ___6___

_Please call me with your reaction(s) to this and I will update you on other companies responses._



**EXHIBIT**
_Hanrahan-5_

TAP00096098

# H T A

Health
Technology
Associates, Inc.

555 Thirteenth Street, NW
Suite 700 East
Washington, DC 20004

Telephone: (202) 637-6070
FAX: (202) 637-6690

## MEMORANDUM

**TO:** HTA Clients

**FROM:** Wayne Roe

**RE:** HCFA Transmittal on Estimated Acquisition Cost (EAC) Reimbursement

**DATE:** May 4, 1994

---

I am passing along for your information a recent transmittal from HCFA to the regional offices (and then on to carriers) providing them with a methodology to develop EAC reimbursement screens for Medicare reimbursed injectable drugs and biologics. The policy applies to drugs billed to carriers; typically through physicians offices or selected infusion therapy companies. The memorandum is self-explanatory, and I will not take the time to analyze it here.

I have discussed the document with the lead senior policy staff at HCFA, and they indicate that this is intended to be a clear signal to carriers to implement the national policy of reimbursing the lesser of average wholesale price (AWP) or EAC. (Most carriers have been reimbursing at AWP.) HCFA does recognize some drugs involve practice costs that exceed EAC (e.g., Medicare bad debt, mixing, inventory, etc.). Carriers may pay separately for these costs, but HCFA expects the basis for any extra charge to be documented on a drug by drug basis.

This policy will certainly take time to filter down across the country. Not all carriers will likely take action immediately, and they need cooperation of physicians in providing invoices. Nevertheless, it does signal more pressure on physicians' margins for providing therapies, and we need to plan responses on a product by product basis.

Please call me if you want to discuss the implications of the transmittal, next steps, etc. I can be reached at 202-637-6872.

TAP00096099



DEPARTMENT OF HEALTH & HUMAN SERVICES

Health Care
Financing Administration

## Memorandum

Refer to: FQA-541

Date: MAR 15 1994

From: Director
Office of Payment Policy, BPD

Subject: Determination of Acquisition Cost of Drugs--INFORMATION

To: All Associate Regional Administrators
for Medicare

Medicare regulations (42 CFR 405.517) provide for payment for drugs based on the lower of the estimated acquisition cost or the national average wholesale price (AWP) of the drug. The purpose of this memorandum is to provide instructions on the determination of the acquisition cost of drugs and to provide additional information on other aspects of drug pricing.

We are requesting each carrier to ascertain the acquisition costs for certain high volume drugs for which expenditures exceed $10 million in 1992, including low osmolar contrast materials used in radiology procedures, colony stimulating factors, and EPO (for non-ESRD uses). (See attached listing.) These drugs account for the majority of the total expenditures for drugs. Carriers may, of course, extend their determination of acquisition costs to any other drugs they deem appropriate. Also, carriers who have made cost determinations for drugs need not alter their methodology for determining costs.

<u>Acquisition costs is the cost of that drug to the physician.</u> The invoice from the supplier is the best source of information about how much the drug costs. Sometimes the invoice shows discounts on the purchase of the drugs. However, sometimes discounts are received at the end of a period of time or after a specified number of purchases rather than for each purchase and this is not shown on each invoice.

To help carriers determine acquisition costs for high volume drugs, <u>we suggest that they request copies of the most current invoice from a sample of 5 - 10 physicians who bill for the drugs in question.</u> The sample can be for the entire carrier area, i.e., separate samples are not needed for each locality. Physicians should be asked whether there are any discounts not reflected on the invoices. <u>The median price (net of any discounts) paid by the sampled physicians should be considered the estimated acquisition cost.</u>

TAP00096100

Carriers should complete these calculations within 60 days of their receiving these instructions. When the carrier has accumulated this information and has determined the estimated acquisition cost, it can start paying claims under the lower of the AWP or estimated acquisition cost policy after first providing physicians with 30 days notice. Carriers should send their payment amounts for the drugs (indicate whether AWP or cost) to their regional offices. You should forward this information to us.

Please remind carriers that in the interim, while they are determining the estimated acquisition cost of the drug, in no case should drugs be paid at an amount greater than AWP. This policy was announced in an All ARA memorandum dated January 14, 1992 (Q and A 18). This survey should be repeated at least annually, or more frequently if there are indications that prices have changed substantially.

Additional Issues:

Determination of AWP - To determine the AWP, calculate the median price of the generic form of the most frequently administered dosage of the drug as reflected in sources such as the Red Book, Blue Book, or Medispan. In calculating the median price, use the price of the smallest unit of packaging offered by the manufacturer that includes the most frequently administered dosage of the drug. Also, brand name products are not included in the array of prices used to determine the cost of multiple source drugs. Only prices for the generic form of the drug are to be used in the calculation of the median price.

Multiple source situations - When calculating the median price for all sources of the generic form, use the payment per dose amount of all sources to determine the median price. If there is a difference in strengths, array that difference separately.

Single source situations - Use the payment per dose amount of the drug. If there is a difference in strengths array that difference separately.

Payment per dose for single dose vials - If a physician uses less than the amount of drug in a single use vial, pay for the cost or AWP of the vial, not the amount actually used. The difference between what is paid for and what is used is the waste. By paying for the cost or AWP of the vial, we are paying for waste directly.

TAP00096101

MAY 04 '94 04:44 FROM HCFA BPO 966-0681          TO          912025376690   PP.5/6

3

<u>Payment per dose for multiple use vials</u> - The carrier should
estimate the "usual" or "average" number of doses that can be
extracted routinely from a multiple use vial and divide this
number into the cost or AWP of the vial to arrive at the
payment per dose.

<u>Additional Costs</u> - Section 405.509 of the regulations permits
the carriers to consider additional costs when determining the
estimated acquisition costs of a drug. <u>We have been told that
for some drugs, notably chemotherapy drugs, physicians may
incur additional costs related to the drugs.</u> These costs have
been described as <u>overhead costs and include storage, waste,
spoilage, breakage, and handling.</u> Some physicians do not
incur costs for handling drugs in their offices because they
use a drug dispensing service. In addition to the estimated
acquisition costs, consider allowing an additional fee for the
overhead of handling or dispensing drugs. <u>However, in no case
can the payment for the drug plus a dispensing fee exceed the
AWP for the drug.</u>

Charles R. Booth

Attachment

cc:
Stewart Streimer, BPO
Field Operations
Office of Issuances

FQA-541:Stan Weintraub/x64498
DATE:February 3, 1994/FINAL:Joan 2/9;2/15;3/15/94
DISC:J11/DOC:PricDrug.sw/FILE CODE:D
Additional Information:Inc BPO's comments;
    ARAs via PROFS only

TAP00096102

Attachment

| | |
|---|---|
| J0640 | Injection, leucovorin calcium, per 50 mg vial (Wellcovorin) |
| J7190 | Factor VIII (anti-hemophilic factor (human)) per IU, (Hemofil M, Koate-HP, Monoclate-P) |
| J9010 | Doxorubicin HCL, 50 mg vial, (Adriamycin PFS, Adriamycin RDF, Rubex) |
| J9045 | Carboplatin, 50 mg (Paraplatin) |
| J9182 | Etoposide, 100 mg (VePesid) |
| J9202 | Goserelin acetate implant, per 3.6 mg (Zoladex) |
| J9217 | Leuprolide acetate (for depot suspension), 7.5 mg (Lupron) |

## Colony Stimulating Factors

| | |
|---|---|
| J1440 | Injection, filgrastim (G-CSF), 300 (Neupogen) |
| J1440 | Injection, filgrastim (G-CSF), 480 (Neupogen) |
| J2820 | Injection, sargramostim (GM-CSF), 250 mcg (Leukine, Prokine) |

## EPO

| | |
|---|---|
| Q9930 | Erythropoietin per 1000 units, at patient Hct of 30 |

## Low Osmolar and Paramagnetic Contrast Materials

| | |
|---|---|
| A4644 | Supply of low osmolar contrast material (100 - 199 mg of iodine) |
| A4645 | Supply of low osmolar contrast material (200 - 299 mg of iodine) |
| A4646 | Supply of low osmolar contrast material (300 - 399 mg of iodine) |
| A4647 | Supply of paramagnetic contrast material (e.g., gadolinium) |

TAP00096103

# EXHIBIT "35"

11/5 (c) Jordan Schatz

In house reimbursement people -- question
Don Snulberg

EXHIBIT
Abbott
8/24/04

361 - 455

est'd sequestor cost → reg...

11/25/91

RBRVS Medicare

Physician Payment Regs 42 CFR 405.5
For a drug lower of e.a.c. or
AWP
equi to ask
e.ae.c → based on surveys
in calculating, waste &
spoilage...

F&A
Safe
Harbors

"incident to physicians service"

Carrier can recalculate cost...

Confidential
Subject to Protective Order

TAP 6500408

factual + accurate - but may undermine
reimbursement...

EXHIBIT
33
Greisman
8/24/04

Don't know whether Medicare allows
injection fee...

In calculating est'd ac. cost,

AWP is a thing of past...

Program helps the selling process, but
I loved boomerang to get HCFA to
recalculate...

A physician who got paid $55 for 36/...
can blow the whistle...

Present reimbursement rules.

Confidential
Subject to Protective Order

$90 differential not as dramatic as in
some other areas...

TAP 6500409

Knowledge of manufacturer...

If a doctor submits AWP to Medicare
program, Medicare is supposed
to determine based on difference

between c.oe.cott + AWC, they
are entitled to go for lower.
If they have no information
then they'll pay AWP

That's OK ...

Physician billing at AWP not a
problem

F & A Guidelines → true, only report
the "discount", but disc. doesn't
have to give $ back ...

"Discount" in Frame -- Really a
(price) difference ...
→ (PRICE DIFFERENCE)

doesn't
have
reductions
in price
used to
be
reported
under
M/M
programs

"Discount" in F&A safe harbors: off
Remuneration is being provided to
induce

Does plup or mfgr in Schultory
on invoice for L.D., have to
report ...
"directly or indirectly"

Confidential
Subject to Protective Order

TAP 6500410

① Ayerst settlement $825K

(BONUS PTS) egregious

O16 concurred

✳ as a matter of consistent policy, the
potential for highlighting this
inappropriately

when something
looks like a discount
where can reasonably
be reduced reimbursed, we
need to protect it !

✳ on invoice or other
statement

so long as it's billing, etc.
as fair and not misleading/deceptive
in terms of discount

Mfgr is resp for "DISCLAIMA"
the discount ... so disclosure
protection is good

TAP 6500411
**Confidential**
**Subject to Protective Order**

✳ FDA is increasingly sensitive to costs of product
but takes them into uncharacteristic waters...

part of consultative selling process...

" Add a screen saying Not sole
determinant"

↳ would calm FDA down
maybe wouldn't calm down
HCFA (cuz #'s are still
there... ① phy should decide clinically
is best for patients...
② only projections - actual paymnt
can vary not guar
GS = No financial disclaimer? needs one
These are numbers the doctor
provides

" These are projections based on
physician provided information.
There are no guarantees... TAP 6500412

availability or amts of return only
+ facilitate understanding reimbursmnt

Confidential
Subject to Protective Order

* Recommends leaving a hard copy behind w/ disclaimers...

↓

helpful; prevent inappropriate reliance on part of physicians

So this kind of documentation conducive to drop the price...

Other issue → Medicare rebates like OBRA rebates...

(1927(k)(3))

as part of incident to in any setting

* for which

Confidential
Subject to Protective Order

PHS needs broadly so that if anything is being directly billed to Medicaid, it is rebatable

TAP 6500413

Sterling/Winthrop
Panadine/Anapol

TAP 6500414

Confidential
Subject to Protective Order

(Federal) Medicaid

Medicaid Fraud (Enforcement)

TAP 6500415

Confidential
Subject to Protective Order

(Medicare)   exempt items

Marsha Alvarez — CMS — letter — Vogue
⨯ Sent out to refers on 1927(k)(3)

O couple of aveats — habitual client memo —

Relations between J + PMA

" Disclosure of Discount
Language Helpful "

Confidential
Subject to Protective Order

TAP 6500416



TAP has embarked upon a program
– laptop computer – program
that walks doc thru
– # of patients on L. Depot
– ? $ for orchectomy

– Shows doctor
he can make more $ on
L.D. than orchetomy

Reimbursement Program
Need computer/ $80 – 80% reimb – Gov't put down
look at program – copay reimb. orchectomy
D.B + TRH say it + Dr has declined
loved it...)

– Thrust of financial sell
Gov't reimb
can get back PV + Reimb
Net Net
will make more $$

– 80% of office visits

Confidential
Subject to Protective Order

TAP 6500417

0001
1               UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2
3  In re: PHARMACEUTICAL INDUSTRY )
   AVERAGE WHOLESALE PRICE       )
4  LITIGATION              ) MDL No. 1456
   _____ ) Civil Action No. 01-12257
5                          )
   THIS DOCUMENT RELATES TO:    ) Judge Patti B. Saris
6  _____ )
                           )
7  United States of America,    )
   ex res. Ven-A-Care of the     )
8  Florida Keys, Inc. v. Abbott  )
   Laboratories, Inc.         )
9  CIVIL ACTION NO. 06-11337-PBS )
                           )
10                         )
11
12        VIDEO DEPOSITION OF DONALD C. ROBERTSON
13
14        DATE TAKEN:   Thursday, September 13, 2007
15        TIME:       8:54 a.m. to 4:28 p.m.
16        BEHALF OF:    The United States
17        PLACE TAKEN:   United States Attorney's Office
                    2110 First Street,
18                    Fort Myers, Florida
19        REPORTER:    Lisa L. Rios, Court Reporter,
                    and Notary Public, State of
20                    Florida at Large
21 _____
22
           MARTINA REPORTING SERVICES
23        Courtney Building, Suite 201
             2069 First Street
24        Fort Myers, Florida  33901
             (239) 334-6545
25        FAX  (239) 332-2913
0002
1
2        A P P E A R A N C E S
3
4  ANN ST. PETER-GRIFFITH, Attorney at Law,
   Special Attorney for the Attorney General
5  99 N.E. 4th Street, 3rd Floor,
   Miami, Florida  33132
6  representing the United States Attorney,
   Southern District of Florida
7
8  DONALD E. HAVILAND, JR., Attorney at Law,
   The Haviland Law Firm, LLC,
9  740 S. Third Street, Third Floor

Philadelphia, Pennsylvania  19147
10  representing the Commonwealth of Pennsylvania
11
     TONI-ANN CITERA, Attorney at Law,
12  Jones Day,
     222 East 41st Street
13  New York, New York  10017-6702
     representing Abbott Laboratories, Inc.
14
15   DAVID J. STETLER, Attorney at Law,
      Stetler & Duffy, Ltd.,
16  11 South LaSalle Street, Suite 1200
     Chicago, Illinois  60603;
17  representing the Witness, Donald C. Robertson
18
     C. JARRETT ANDERSON, Attorney at Law,
19   Anderson, LLC
      1300 Guadalupe, Suite 103
20  Austin, Texas  78701
     representing the Relator, Ven-A-Care of the Florida
21                  Keys, Inc.
22
23   ELISEO SISNEROS, Deputy Attorney General,
      State of California Department of Justice
24   110 West A Street, #1100
      San Diego, California  92101
25
0003
 1
 2          A P P E A R A N C E S  (Continued)
 3
 4   Appearing via Telephone:
 5
 6       Gejaa T. Gobena, Attorney at Law,
        Department of Justice,
 7       P.O. Box 261
        Ben Franklin Station
 8       Washington, D.C.  20044;
        representing the United States
 9
10       AMBER NESBITT, Attorney at Law,
        Wexler, Toriseva, Wallace,
11       55 West Monroe Street, Suite 3300
        Chicago, Illinois  60603;
12       representing MDL and the State of Arizona
13
14   Also Present:
15
16   Mike Sturdevant, Videographer
17   John Lockwood, Ven-A-Care of the Florida
      Keys, Inc., Relator
18
19

20 _____
21              I N D E X
22                          PAGE
23
24 Direct Examination by Ms. St. Peter-Griffith        6
25
0004
1
                I N D E X (Continued)
2
              E X H I B I T S
3
4  ROBERTSON            DESCRIPTION            PAGE
5  1      One-page Interoffice Correspondence
          dated March 21, 1991 from Mark Gorman
6         stamped ABT22027                    165
7  2      23-page document with first page being an
          Interoffice Correspondence dated June 1,
8         1991 from Donald C. Robertson stamped
          ABT212056                           169
9
   3      Five-page document with first page being an
10        Interoffice Correspondence dated June 11,
          1991 from Virginia Tobiason stamped
11        ABT212051                           177
12 4      32-page document with first page being an
          Interoffice Correspondence dated June 13,
13        1996 from Lynn E. Leone stamped BR 02430    245
14 5      One-page Interoffice Correspondence dated
          December 22, 1994 from Chris Snead stamped
15        TXABT249849                         248
16 6      One-page Interoffice Correspondence dated
          February 9, 1995 from Tim Harris previously
17        marked as Sebree Exhibit No. 2 stamped
          CA ABT 07895                        251
18
   7      Four-page document previously marked
19        Sellers #362 stamped CA ABT 08044   255
20 8      One-page memo from dated May 26, 1994 from
          Steve Kipperman previously marked Lotz
21        Exhibit No. 61 stamped ABT006333    273
22 9      44-page document with first page being a
          memo dated May 26, 1994 from Steve Kipperman
23        previously marked Kipperman Exhibit No. #480
          stamped ABT006333                   280
24
   10     51-page document with first page being a
25        memo dated July 14, 1995 from John V. Ward
          stamped ABT 278110                  282
0005
1      VIDEOGRAPHER:  We are here today, September 13,
2  2007, at 8:54 a.m. for the videotape deposition of Don
3  Robertson, located at the United States Attorney's
4  Office, 2110 First Street, Fort Myers, Florida, in the

5    case styled, United States of America versus Abbott
6    Laboratories.
7        The videographer is Mike Sturdevant; the reporter is
8    Lisa Rios, both from Martina Reporting.
9        Would counsel please state their appearances for the
10   record.
11       MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith from
12   the United States Attorney's Office, Southern District
13   of Florida on behalf of the United States.
14       MR. ANDERSON:  Jarrett Anderson, counsel for the
15   Relator.
16       MR. SISNEROS:  Eliseo Sisneros, Deputy Attorney
17   General, State of California.
18       MR. LOCKWOOD:  John Lockwood with Ven-A-Care of the
19   Florida Keys, and I'm not an attorney.
20       MR. HAVILAND:  Don Haviland, the Haviland Law Firm,
21   for the Commonwealth of Pennsylvania.
22       MS. CITERA:  Toni Citera for the Defendants from
23   Jones Day.
24       MR. STETLER:  Dave Stetler for the Witness.
25       MR. GOBENA:  Gejaa Gobena, Department of Justice on
0006
1    behalf of the United States.
2        MS. NESBITT:  Amber Nesbitt of Wexler, Toriseva,
3    Wallace on behalf of the MDL and the State of Arizona.
4        THE WITNESS:  I'm Don Robertson, the Witness.
5        VIDEOGRAPHER:  And would the court reporter swear in
6    the witness.
7        MS. CITERA:  Just before we start, I just want to
8    get my objection on the record to Miss Nesbitt's
9    appearance at the deposition and the fact that the MDL
10   discovery is closed.
11       MS. NESBITT:  And we obviously disagree.
12       MR. STETLER:  Ignore all that stuff.
13       THE WITNESS:  Okay.
14   Thereupon,
15              DONALD C. ROBERTSON,
16    called as a witness by the United States, having been
17    first duly sworn, was examined and testified as
18    follows:
19              DIRECT EXAMINATION
20   BY MS. ST. PETER-GRIFFITH:
21    Q    Good morning, Mr. Robertson.
22    A    Good morning.
23    Q    My name is Ann St. Peter-Griffith and, as I just
24   said, I'm from the United States Attorney's Office for the
25   Southern District of Florida in Miami, and I'm here today on
0007
1    behalf of the United States in the matter of the AWP, MDL
2    litigation in the federal lawsuit that has been filed by the
3    United States against Abbott.
4        Sir, can you state your full name, please, for the
5    record?
6    A    Donald C. Robertson.

7    Q    And Mr. Robertson, where do you live?
8    A    Fort Myers, Florida.
9    Q    How long have you lived in Fort Myers, Florida?
10   A    Since 2001.
11   Q    I hope by now, you're a Red Sox fan.
12   A    Never.
13   Q    Oh, dear.
14        Sir, where did you live prior to moving to Fort
15   Myers in 2001?
16   A    Libertyville, Illinois.
17   Q    And how long were you in Libertyville, Illinois?
18   A    From 1988 until 2001.
19   Q    And where did you live prior to Libertyville,
20   Illinois in '88?
21   A    In Kronberg, West Germany - at that time it was
22   West Germany.
23   Q    Okay.
24        And how long did you live in West Germany?
25   A    Two and a half years.
0008
1    Q    And where did you live prior to that?
2    A    Libertyville, Illinois.
3    Q    And how long did you live in Libertyville?
4    A    At that time - oh, gosh - from '79 to '85.
5    Q    Okay.
6        Sir, have you ever had your deposition taken
7    before?
8    A    No.
9    Q    What I'd like to do is go through a few ground
10   rules on the process just so that we - everyone understands.
11   A    Sure.
12   Q    The first is that when I ask a question and when
13   you give an answer, we need to try to avoid talking over
14   each other because we have a court reporter over there who's
15   taking down everything we say, and if you're talking and I'm
16   talking at the same time, she can only take down one of us.
17        Okay?
18   A    Yes.
19   Q    If there's a question that I ask that you don't
20   understand, if you could let me know that because,
21   otherwise, what happens is she's taking down the question
22   and you're giving a response and it appears that your
23   response is responsive to my question.  Okay?  Fair enough?
24   A    Yes.
25   Q    If there's anything you don't understand, just stop
0009
1    me and let me know.
2    A    Mm-hmm.
3    Q    If you need to take a break, you can also let us
4    know that, as well.  My only request is if that if there's a
5    question pending, I would like for you to answer the
6    question before we take the break.  Fair enough?
7    A    Yes.
8    Q    Okay.

9        Sir, have you ever given any sworn testimony at all
10 before?
11    A   No.
12    Q   Have you ever been involved in litigation?
13    A   Not to my knowledge.
14    Q   Okay.
15        Sir, what did you do to prepare for today's
16 deposition?
17    A   I read the Subpoena and, other than that, nothing
18 more than that - other than a discussion with Mr. Stetler,
19 nothing more.
20    Q   Okay.
21        How long did you meet with Mr. Stetler?
22    A   I met with him yesterday from nine o'clock to about
23 two o'clock.
24    Q   Did you do anything else to prepare for today's
25 deposition?
0010
1    A   Nothing.
2    Q   Now, as you just stated, you received a Subpoena,
3 correct?
4    A   I received an e-mail copy of the Subpoena.
5    Q   Of the Subpoena which Mr. Stetler had accepted for
6 you.
7    A   Right.
8    Q   Okay.
9        Sir, did you look for any documents in response to
10 the Subpoena?
11    A   Yes; to see if I had any of the documents that were
12 requested.
13    Q   Did you?
14    A   I have none.
15    Q   Okay.
16        So you have no documents that you brought with you
17 here today.
18    A   No, ma'am.
19    Q   In preparing for today's deposition, did you review
20 any documents?
21    A   Other than my discussions with Mr. Stetler, I
22 didn't do any other preparation for today's testimony.
23    Q   Okay.
24        Did Mr. Stetler show you any documents?
25    A   No.
0011
1    Q   Okay.
2        Did Mr. Stetler read you any documents?
3    A   No.
4    Q   Sir, could you take us through your educational
5 background starting with when you graduated from high
6 school?
7    A   I graduated from high school in 1963; attended
8 Adelphi University in Garden City, New York, graduated in
9 1967 with a degree in business.
10    Q   And where's Delphi?

11    A    Adelphi's in Garden City, New York.
12    Q    Okay.
13         And did you receive a BA?
14    A    Bachelor's in Business - a BBA.
15    Q    BBA.
16    A    Mm-hmm.
17    Q    Okay.
18         Any post-graduate work?
19    A    I started at the University of Buffalo on a
20  master's degree and didn't finish.
21    Q    On a master's degree?
22    A    In business, and did not finish.
23    Q    And when was that?
24    A    Oh, golly, that was in the early 70's.  Between '71
25  and '73; that's when I lived in Buffalo.
0012
1    Q    Any other course work that you've taken?
2    A    At a university or college?  No.
3    Q    Okay.
4         Sir, starting with your graduation from college,
5  can you take us through your employment history?
6    A    Yes.
7         From 1967 to 1971, I was in the United States
8  Marine Corps; went through infantry and officer school,
9  artillery officer school, served in the Republic of Vietnam.
10  When I returned I was on recruiting duty; I recruited for
11  officer programs for the Marine Corps in my final two years,
12  and was released from active duty a captain in 1971.
13    Q    Okay.
14         And after you were released from active duty in
15  '71, what was your next position?
16    A    I went to work for Xerox Corporation in Buffalo.
17    Q    For Xerox?
18    A    Yes, ma'am.
19    Q    And what was position there?
20    A    I was a salesperson.  My final job there was
21  manager of major accounts for Western New York in 1971 -
22  correction, 1974, I left Xerox.  I joined them in '71.
23    Q    So you were with Xerox for three years.
24    A    Yes ma'am.
25    Q    Okay.
0013
1         And why did you leave Xerox?
2    A    I liked the opportunity that had been presented and
3  I thought it would be a better fit for me.
4    Q    Okay.
5         I assume that your next position then was with
6  Abbott?
7    A    I was a salesperson with Abbott in Manhattan.
8    Q    And what products did you sell?
9    A    I worked for the Diagnostics Division and sold
10  diagnostic products to clinical laboratories to diagnose
11  such states as hepatitis, thyroid function, infectious
12  diseases, that sort of thing.

13    Q   Prior to joining Abbott, did you have any
14  background in either medicine or pharmaceuticals?
15    A   No, ma'am.
16    Q   Okay.
17       Did you receive any training when you assumed the
18  salesperson position?
19    A   Yes.  I was trained for a number of weeks - three
20  or four - I can't recall - in Chicago on these diagnostic
21  products, and then ongoing training with the sales force
22  over the course of the time I had that responsibility.
23    Q   And how long were you a salesperson in Manhattan
24  for the diagnostic products?
25    A   From 19- - let's see, this is long time ago - 1974
0014
1  to 1975; about 15 months, I believe.
2    Q   Okay.
3       And first let me ask, did you stay with Abbott from
4  approximately '74 through to your departure --
5    A   Yes, I did.
6    Q   -- in about 2000?
7    A   Yes.
8    Q   Okay.
9    A   Twenty-six years.
10    Q   And after you were a salesperson, what was your
11  next position at Abbott?
12    A   I was a sales manager in Chicago handling sales of
13  diagnostic products in six midwestern states.
14    Q   And what were the states?
15    A   Illinois, Indiana, Minnesota, Iowa, North and South
16  Dakota.
17    Q   And who was your supervisor?
18    A   At that time, a gentleman named Bob Heeble.
19    Q   And was he -- How long were you a sales manager?
20    A   About a year, 14 months.
21    Q   So approximately until mid '76?
22    A   At the beginning of '76; in that time frame
23  someplace.
24    Q   And did you supervise anyone?
25    A   There were 11 sales reps and one technician.
0015
1    Q   Do you remember who the sales reps were?
2    A   No, ma'am.
3    Q   Do you remember who the technician was?
4    A   Mary Jo Larr was a technician; Ralph Stever was one
5  of the technicians; Jim Jones was one of the salesmen;
6  Dennis McConnell; Carrie Garner - that's - it's been a long
7  time, that's the best I can do.
8    Q   And what were your job responsibilities as a sales
9  manager of the diagnostic products in Chicago?
10    A   To make sure that our people represented Abbott in
11  a professional way and achieved their sales numbers.
12    Q   And how would you determine whether people achieved
13  their sales numbers?
14    A   We were given goals and objectives and then we were

15   given actual numbers related to those goals and objectives.
16     Q    Who would set the goals and objectives?
17     A    Generally the upper level of management within the
18   corporation.
19     Q    Okay.
20         Which division --
21     A    Well, within the division - excuse me.
22     Q    I'm sorry.
23         Okay.
24         Which division were you in when you were the sales
25   manager?
0016
1     A    Diagnostics.
2     Q    Was that a separate division?
3     A    Yes, ma'am.
4     Q    Okay.
5         There was a division of Abbott just called
6   Diagnostics.
7     A    That's correct.
8     Q    Okay.
9         And how long was there --
10     A    It exists through -- It exists today.
11     Q    It exists today.
12         And in '76, did you transition to another position?
13     A    Yes.
14     Q    What was that position?
15     A    I became country manager of Brazil.
16     Q    Contract manager of --
17     A    Country manager, Brazil.
18     Q    Oh, country manager.
19     A    I was a general manager of the Diagnostic Division
20   in Brazil.
21     Q    Did you live in Brazil?
22     A    Yes.
23     Q    How long were you in that position?
24     A    From February, '76 to September, '79.
25     Q    And who was your superior?
0017
1     A    First one was a gentleman named Jaime Ocampo and
2   the seconds boss I had was named Alain Gilbert.
3     Q    Can you spell those names?
4     A    J-a-i-m-e, new word, O-c-a-m-p-o, and the second
5   gentleman's name is Alain, A-l-a-i-n, Gilbert,
6   G-i-l-b-e-r-t.
7     Q    And what products were you responsible for --
8     A    The diagnostic products.
9     Q    Same products that you were responsible for when
10   you were a sales manager in Chicago?
11     A    Yes, ma'am.
12     Q    What types of products are those?
13     A    As I said, they were products that were used to
14   diagnose various clinical conditions; cancer, thyroid
15   function, thetical chemistry conditions; infectious
16   diseases, and we sold the reagents and chemicals and devices

17   used to measure these clinical conditions.
18      Q   Do you remember what some of the names of the
19   reagents and the devices were?
20      A   Names of the devices?  Yes.  Clinical chemistry
21   device, one was named the ABA 100; one was the VP; the - oh
22   gosh - Logic was a counter of gamma radiation which was used
23   to measure the various chemicals; CEA was one of the
24   carcinomemoryonic (sp.) antigen determined the level of that
25   substance in a person's serum; thyroid function, Thyroxin,
0018
1   T3, TSH - those sorts of products.
2      Q   Okay.
3         When you were the general manager in Brazil - or
4   the country manager in Brazil, did you have any subordinates
5   who worked under you?
6      A   I think that in our group there were 30 some-odd
7   individuals.
8      Q   Do you remember who they were?
9      A   Oh, my --
10      Q   I don't mean this to be a memory game, but I'm just
11   trying to find out who worked you under you.
12      A   Well, they were all nationals - Brazilian
13   nationals.
14      Q   Okay.
15         So no - no --
16      A   There were no --
17      Q   -- Americans?
18      A   There were no Americans --
19      Q   Okay.
20      A   -- there.
21         I don't know if the names would be useful, but I
22   can try to recall, if you wish.
23      Q   Okay.  Why don't we come back to that at a later
24   point in time.
25      A   Okay.
0019
1      Q   When you returned -- I assume you returned to the
2   United States in '79?
3      A   Yes.
4      Q   What position did you assume in Abbott?
5      A   I became general manager of the Physiological
6   Diagnostics Business Unit.
7      Q   And how long did you hold that position?
8      A   Until 1980 - oh, correction - from 1983 -- 1979 to
9   1983 I was in Physiological Diag- -- I'm trying -- Wait a
10   minute - hold on now --
11      Q   Take your time.
12      A   I came -- No - I'm sorry, I left out a step -
13   forgive me.
14         From '79 to '83 I was area manager of Latin America
15   for Abbott Laboratories Diagnostics Division.
16         Forgive me; I skipped a three-and-a-half-year
17   period in there.
18      Q   And where was that position based, the area

19  manager --
20      A    In Chicago.
21      Q    -- for Latin America?
22      A    In North Chicago, Illinois.
23      Q    And was that still with the Diagnostics Unit?
24      A    Yes, ma'am.
25      Q    Or Diagnostics Division?
0020
1      A    Mm-hmm.
2      Q    And who was your supervisor?
3      A    Jack Schuler, who was my first one, division
4  president - and he was my supervisor most of the time I was
5  there; I think Jack Davis - another gentleman named Jack
6  Davis for a time Mr. Schuler was promoted, and then a person
7  named Tom Vogel, V-o-g-e-l.
8      Q    Okay.
9          And what were your responsibilities?
10      A    In the area manager --
11      Q    As the area manager for Latin America.
12      A    I had P and O responsibility for the sales and
13  profitability of Abbott diagnostic products in Latin America
14  and the Caribbean.
15      Q    Did you have any responsibility with regard to
16  developing products?
17      A    No, ma'am.
18      Q    And who were your subordinates?
19      A    The country managers of - we had one in the
20  Caribbean; one in Mexico; one in Venezuela; one in Colombia;
21  one in Brazil, and one in Argentina.
22      Q    And do you remember what their names were?
23      A    They changed over time, but the - I remember in
24  Caribbean, Mark Miller was one of the gentleman; in Mexico,
25  Pat Shannon - I think the gentleman's name; in Argentina,
0021
1  gentleman's name was Raul Mazzolla; in Brazil, gentleman's
2  name was Luiz Antonio Cosmo, and in Venezuela, his name was
3  Enrique Pazmino.
4      Q    Are you fluent in Spanish, sir?
5      A    I can defend myself in Spanish.
6      Q    Okay.
7          What about Portugese, Brazilian Portugese.
8      A    I'm fluent in Brazilian Portugese.
9      Q    Okay.
10          Is that something you developed while you worked
11  for Abbott?
12      A    I don't miss many meals, and if you didn't want to
13  starve, you learned the language.
14      Q    Sir, what was your next position?
15      A    I became general manager of the Physiological
16  Diagnostics Business Unit.
17      Q    And was that still under the Diagnostic's Division?
18      A    Yes, ma'am, it was.
19      Q    Okay.
20          And how long did you hold that position?

21   A   Until 1986.
22   Q   Why did you leave the area manager for Latin
23 America position?
24   A   The general manager of the Physiological
25 Diagnostics Business Unit was a promotion.
0022
1   Q   Okay.
2       And what were your job responsibilities in that
3 position?
4   A   To supervise the development and marketing programs
5 for Physiological Diagnostics that included thyroid
6 function, it included fertility - those sorts of diagnostics
7 states; to supervise the development of those products with
8 R and D group; to supervise the manufacturing of those
9 products in our own little factories, and to supervise the
10 marketing crew that was responsible for their successful
11 marketing.
12   Q   Did you have a marketing plan or did you develop
13 marketing plans?
14   A   Yes, ma'am.
15   Q   What was the nature of that business?
16       Who was your market?
17   MS. CITERA:  Objection to form.
18   THE WITNESS:  Pardon?
19   MS. CITERA:  I'm going, from time to time, interpose
20 objections to her questions.
21       If you understand the question, you can answer it.
22   MR. STETLER:  Let me just say this:  If she makes an
23 objection, unless I say something afterwards, just
24 ignore it and go on.
25   THE WITNESS:  Very well.
0023
1   MS. ST. PETER-GRIFFITH:  And I would ask that
2 Counsel limit her objections to form objections.
3 BY MS. ST. PETER-GRIFFITH:
4   Q   Sir, what was the nature of your business?
5       Who were your clients?
6   MS. CITERA:  Same objection.
7   THE WITNESS:  Clinical laboratories and hospitals
8 and independent or private clinical laboratories.
9   Q   Were you all involved with either Medicare or
10 Medicaid reimbursement, or Medicaid or Medicare issues when
11 you held that position?
12   MS. CITERA:  Objection to form.
13   THE WITNESS:  No.
14   Q   And who were your subordinates?
15   A   It's -- We had a marketing manager named Joe Martin
16 and various product managers - I'm sorry, I can't recall all
17 the names.
18   Q   Approximately how many people worked under you?
19   A   In the Business Unit, if one were to count the R
20 and D and manufacturing, perhaps 110, 120, something like
21 that.
22   Q   And do you recall what some of the products were?

23    A   I thought we just discussed that matter.
24    Q   Well, the names of them, though.
25    A   Oh, the trade names, I'm afraid I don't recall.  I
0024
1  can describe the clinical states that they were meant to
2  detect --
3    Q   Which you just did.
4    A   -- thyroid function, either elevated or depressed
5  thyroid function; pregnancy - let's see - fertility; LH,
6  FSH, HCG - a little of acronyms in industry, as well, I
7  think --
8    Q   Okay.
9    A   -- Americans like acronyms.
10   Q   Sir, what position did you hold after you were the
11  general manager of the Physiological Drug Unit?
12   A   I was director of Marketing and Strategic Planning
13  for Europe, Africa and the Middle East for the Diagnostics
14  Division.
15   Q   Is that when you were in Germany?
16   A   Yes, ma'am.
17   Q   And how long did you have that position?
18   A   From the beginning of '86 'til the end of '88.
19   Q   Okay.
20       And who was your supervisor?
21   A   The gentleman's name was Eric Hornaess,
22  H-o-r-n-a-e-s-s.
23   Q   And was he your supervisor during that entire time?
24   A   Yes, he was.
25   Q   And - I'm sorry - I might need to go back.
0025
1       Did I ask you who your supervisor was when you were
2  in the general manager of the Physiological?
3    A   No, you didn't.
4    Q   Okay.
5       Who were or who were your supervisors?
6    A   The gentleman's name was Harry Hixson, H-i-x-s-o-n.
7    Q   Okay.
8       And you returned to the United States in '88?
9    A   Late '88; yes, ma'am.
10   Q   And did you have any subordinates when you were the
11  director of marketing for Europe and Africa?
12   A   Yes; I had people who did the -- A gentleman named
13  James Jones; a gentleman named Ad, A-d, Habraken,
14  H-a-b-r-a-k-e-n - oh, boy, I just can't recall the names
15  now.
16       Were I to sit down and think about it for a while,
17  I could probably make a list for you, if you wish.
18   Q   Okay.
19       When you returned to the United States in late '88,
20  what position did you assume with Abbott?
21   A   I was responsible for what was called a Business
22  Unit Group general manager, which comprehended multiple
23  business units; Physiological Diagnostics, I regained as one
24  of those; Cancer Diagnostics was another of those; Abused

25  Drug Diagnostics was another of those; I don't know if I
0026
1  mentioned Cancer Diagnostics was another of those, and
2  mental illness and neurological disease, we were going to
3  find a diagnostic for Alzheimer's.  Unfortunately, it proved
4  to be a dry hole, we weren't able to help people.
5    Q   Okay.
6         And was that still within the Diagnostics Unit?
7    A   Yes.
8    Q   Okay.
9         And so you were responsible then for overseeing
10  development of product or --
11   A   The individual --
12   Q   -- diagnostic product?
13   A   The individuals who developed the products reported
14  to me.
15   Q   Okay.
16        And when you headed were -- When you headed that
17  business unit, who was your supervisor?
18   A   That was Art Collins.
19   Q   Okay.
20        And how long did you hold that position?
21   A   Perhaps two years.
22   Q   So '88 --
23   A   In 1990, I changed again.
24   Q   Okay.
25        And who were your subordinates in that business
0027
1  unit, do you recall?
2    A   Yeah.  The business unit general managers, a man
3  named Freddie Richard, R-i-c-h-a-r-d, Richard; a gentleman
4  named Isao Ikeda, I-s-a-o, I-k-e-d-a; a person named Carol
5  Cox; a person named Jim Koziarz, K-o-z-i-a-r-z, and a woman
6  named Victoria Bannister, two N's.
7    Q   Okay.
8         And what were your primary responsibilities in that
9  position?
10   A   To supervise the development, manufacture and
11  marketing of the products included in those responsibilities
12  - Cancer; Physiological Diagnostics; Mental Illness;
13  Neurological Disease; Phys- - those various business units.
14   Q   And you said you changed jobs in - or changed
15  positions in '90.
16   A   Yes, ma'am.
17   Q   To what?
18   A   Vice president and general manager of Alternate
19  Site Products, Hospital Products Division.
20   Q   Had you ever worked in the Hospital Products
21  Division up until that point in time?
22   A   No, ma'am.
23   Q   Okay.
24        Why the switch?
25   A   It was a promotion.
0028

1    Q    And you ever worked with the Alt Site products
2  before?
3       MS. CITERA:  Objection --
4       THE WITNESS:  No, ma'am.
5       MS. CITERA:  -- to form.
6    Q    Do you understand what I mean when I say, "Alt
7  Site"?
8    A    I never worked with any hospital product before.
9    Q    Is it fair to say you had a learning curve?
10      MS. CITERA:  Objection to form.
11      THE WITNESS:  It's fair to say I had a very steep
12  learning curve.
13   Q    And how did you go about learning the position?
14   A    Brute force and awkwardness.  I studied as hard as
15  I could.
16   Q    Did anybody help you?
17   A    Yes; the individuals in marketing, the
18  manufacturing people, the research and development people
19  were very kind in terms of their extension of help to me.
20   Q    Did you work with anybody in the Reimbursement
21  Department?
22      MS. CITERA:  Objection to form.
23      THE WITNESS:  No.
24   Q    Okay.
25       Did you work with anyone in terms of learning --
0029
1    A    To learn the products, did I work with anybody in
2  the reimbursement department; is that your question?
3    Q    No; that's not my question.
4    A    Okay.
5    Q    Just, in general, did you work with anybody in the
6  reimbursement department to learn about reimbursement?
7    A    No --
8    Q    Okay.
9        Did you --
10   A    -- not that I recall.
11   Q    The individuals who you worked with in the
12  marketing department, do you remember who they were?
13   A    I worked with the general managers of the three
14  businesses that were involved in Alternate Site; Renal Care,
15  Alternate Site Product Sales and Home Infusion Services.
16   Q    Okay.
17       And who were they?
18   A    The first general manager of Home Infusion Services
19  was Bill Dempsey; the first general manager of Alternate
20  Site Product Sales was John Ward; the first general manager
21  of Renal Care was Mike King.
22   Q    And did they help you learn the business?
23   A    Yes.
24   Q    What did they teach you about the Alt Site market?
25      MS. CITERA:  Objection to form.
0030
1       THE WITNESS:  They taught me the various aspects in
2  market segments.  They taught me about distributors,

3   home infusion companies, renal dialysis centers; what
4   services they provided for their customers and what
5   products they used.
6   Q   Okay.
7        And what did they teach you about the distributors?
8   A   Well, how we dealt with them; we contracted with
9   them; we - many of the customers in Alternate Site are very
10  small, so they buy their products through distributors
11  rather than through manufacturers.
12       So I had never dealt -- Diagnostics never dealt
13  with distributors, so it was new - it was something new for
14  me.
15  Q   Okay.
16       What about home infusion companies, what did you
17  learn about them?
18  A   Various products that they provided; the services
19  they provided; some things about the clinical states of the
20  patients; how Abbott products fulfilled the needs of these
21  various and sundry market segments for total parenteral
22  nutrition, I.V. antibiotics, chemotherapy - that kind of
23  thing.
24  Q   Okay.
25       And what about renal dialysis centers, what did you
0031
1   learn about them?
2   A   I learned about the various conditions that caused
3   end-stage renal disease.  I learned about a specific
4   product - we really only had one product that we sold to
5   them; we sold peritoneal dialysis solutions to renal
6   dialysis centers.  There were others who were more
7   competent.  We had no specific technical advantage, so we
8   sold the business, which left us with one product - a very
9   important product, however.
10       When people's kidneys shut down they are unable to
11  make bone and if their phosphorus levels get too high, their
12  bones will fill with phosphorus instead of calcium and that
13  will cause a state known as renal osteodystrophy - it's a
14  terrible state; fundamentally, their skeletons collapse.
15       Well, we had a drug that enabled them to make bone,
16  replace the natural calcitriol in their bodies, enable them
17  to make bone and prevented the skeletal collapse.  It was
18  really a terrific drug.
19  Q   And what was the name of that drug?
20  A   Calcijex.
21  Q   Okay.
22       And what did you learn about the products used in
23  the Alt Site or by Alt Site customers?
24  A   What did I learn about the products?
25  Q   Yes.
0032
1        MS. CITERA:  Objection to form.
2        THE WITNESS:  How they were used and what they did.
3   Q   Okay.
4        Do you remember specifically what you learned?

5      A   I remember --
6         MS. CITERA:  Objection to form.
7         THE WITNESS:  I remember reading about why one would
8    use Rocephin, you know which is a Roche drug for - that
9    was used in Lyme's disease, why - you know, just
10    fundamentally what it was about, what did we do, what
11    was our business.
12     Q   Did you understand that there was a difference
13   between branded drugs and generic drugs?
14     A   Yes, ma'am.
15     Q   Okay.
16        What was your understanding of that difference?
17     A   The difference?  A branded drug is a drug
18   fundamentally which I assume to be proprietary where there
19   are no others available; a generic drug is multi-source.
20     Q   And what did you learn about the nature of the
21   products sold in the Alt Site unit?
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  I don't understand your question.
24     Q   Okay.
25        Did you have an understanding as to whether Alt
0033
1    Site sold proprietary drugs, generic multi-source drugs or
2    both?
3      A   Yes.  There -- Some companies sold proprietary
4    drugs.  I mentioned the drug Rocephin, that was proprietary,
5    it was a third-generation cephalous-borne, a great drug for
6    Lyme's disease, a good drug for bone infections - that was
7    proprietary.
8        The drugs that we sold - Abbott, specifically in
9    that milieu were multi-source - a lot of people had those
10    drugs.
11        Calcijex was sole source --
12     Q   Was that a branded product?
13     A   Would you define the term "branded"?
14     Q   Well, was it a proprietary product --
15     A   Yes, ma'am.
16     Q   -- that Abbott had?
17     A   Yes, ma'am.
18     Q   Okay.
19        Sir, during this initial phase when you were
20   learning about the Alt Site Business Unit, were you given
21   any information about our education concerning the pricing
22   for Abbott products sold by the Alt Site Unit?
23        MS. CITERA:  Objection to form.
24        THE WITNESS:  I - I saw documents indicating the
25    average unit price of our various products - what we
0034
1    were selling products for, if that's - if that --
2     Q   Well, did you --
3        THE WITNESS:  -- answers your question.
4     Q   Let me ask a more specific question.
5        Did you have an understanding as to how Alternate
6    Site products - products sold by the Alternate Site Unit

7  were priced?
8   A   Yes, ma'am.
9   Q   Okay.
10      What was that understanding?
11   A   They were priced based upon negotiations which we
12  had with the distributors, wholesalers; those who sold the
13  products.
14      Home infusion services was priced in a different
15  way.  We provided not only product, but we provided
16  pharmacies, we provided billing and reimbursement, and we
17  were reimbursed - or our price to go them - excuse me - was
18  a function of how much we did and it would be a percent of
19  collections.
20      The --
21   Q   Percent of whose collections?
22   A   Percent of the money that we collected for them -
23  we did billing and reimbursement for them, so a percent of
24  what we collected - we would provide pharmacy; we would
25  provide billing and reimbursement; we would provide
0035
1  training; we would ship - we would compound the product in
2  our pharmacies and we would ship the product.  They would
3  provide the nursing care and they would provide the
4  patients.
5      And Abbott was compensated by receiving a
6  percentage of collections.
7   Q   Did Abbott have its own pharmacies?
8   A   Yes, ma'am.
9   Q   Okay.
10      For how long?
11   A   I don't -- I can't answer that.  They were there
12  when I got there in 1990, they were there when I left in 19-
13  in -- 2000.
14   Q   Okay.
15      Did you have an understanding that at some point in
16  time the Abbott pharmacies were phased out?
17   A   Ma'am, I tried to close that business the day I got
18  there.
19   Q   Okay.
20      Why?
21   A   It was a horrible business.
22   Q   How so?
23   A   We're manufacturers of product; we are not patient
24  care providers.
25      And, also, when we provided compounding and billing
0036
1  and reimbursement services, some of our customers would
2  believe that we were competing against them.  Competing
3  against your customers is not a good way to make a living.
4  So they became angry by that.  The business was not
5  profitable.
6      We have a -- We have a responsibility, a fiduciary
7  responsibility to our shareholders to invest their money to
8  provide them with the best possible reasonable return.  Home

9   infusion services didn't do that, and I wanted out of the
10  business.
11    Q   When you say, "the business," and when you said it
12  was a horrible business, you mean the Home Infusion Unit,
13  itself.
14    A   Home Infusion Services.
15    Q   Home Infusion Services.
16    A   Yes, ma'am.
17    Q   And what did you do in terms of your efforts to try
18  and close the home infusion business?
19      MS. CITERA:  Objection to form.
20      THE WITNESS:  We just didn't renew contra -- You
21    know, we'd try not no renew contracts.  We tried to get
22    the customer to take over billing and reimbursement for
23    themselves.  We tried to get the customer to take over
24    pharmacy for themselves.  And we would try to get out of
25    the business of competing with our own customers.
0037
1       We -- Abbott is a manufacturing company, a provider
2    of product; that's what we do best.
3       This was thought to be initially a good outlet for
4    Abbott product; it proved not to be.
5     Q   Who initially thought that it was a good outlet for
6   business for Abbott product?
7     A   I don't know that specifically.
8       I know who was there when the business started and
9   I know who ran the business initially.
10    Q   And who was that?
11    A   A gentleman named Kris Kringel, K-r-i-s,
12  K-r-i-n-g-e-l, who was president of the Hospital Products
13  Division, and the first general manager of Home Infusion
14  Services was - I will recall --
15    Q   Okay.
16    A   -- the lady's name.
17    Q   Now, was Mr. Kringel your boss?
18    A   Yes, he was.
19    Q   Okay.
20      Did you have any other -- I assume that you held
21  this position until your retirement.
22    A   Ten years; yes, ma'am.
23    Q   And who were your supervisors during this period of
24  time?
25    A   I had two.
0038
1     Q   Okay.
2     A   Mr. Kringel retired, I believe in '97, and then a
3   gentleman named Rick Gonzalez became my supervisor.  He was
4   president of the Hospital Products Division.
5     Q   And did you talk with them about closing the Home
6   Infusion Unit?
7     A   Yes, I did.  There was no graceful exit.
8     Q   Okay.
9     A   It was very difficult to get out of the business,
10  but we continued to try to do that and we ultimately did - I

11  think it's closed down now - I don't know - I have not
12  spoken to him.
13      Q    And were Mr. Kringel and Mr. Gonzalez receptive
14  towards closing that business unit?
15          MS. CITERA:  Objection to form.
16          THE WITNESS:  Yes.  I mean, they were receptive
17  to -- I mean, they were good business people, they
18  understood the argument.  The argument was rationale, it
19  was logical and based on fact.
20      Q    Did you receive any resistance to closing the
21  business unit?
22          THE WITNESS:  From the customers.
23          MS. CITERA:  Objection to form.
24      Q    From the customers?
25      A    Mm-hmm.
0039
1   Q    What about within Abbott?
2          MS. CITERA:  Objection to form.
3          THE WITNESS:  Within Abbott, people objected to
4   closing the business?
5          No.  I mean the people who were in the business were
6   going to be redeployed, they were not going to be
7   dismissed.
8          This was a bad decision by the chiefs, the Indian
9   shouldn't pay for it.  The people would be redeployed to
10  different areas of the corporation.
11      Q    And who were the chiefs, to your knowledge, that
12  made the bad decision?
13          MS. CITERA:  Objection to form.
14          THE WITNESS:  They made it -- You know, hindsight is
15  20/20 --
16          MS. ST. PETER-GRIFFITH:  I know.
17          THE WITNESS:  -- it probably looked like a good
18  decision 1987 or '86, when they went into it.
19          But I guess the people - Mr. Kringel and - decided
20  to get in it and thought it would be a good outlet for
21  Abbott product.
22  BY MS. ST. PETER-GRIFFITH:
23      Q    Are you familiar with the name Virginia Tobiason?
24      A    Yes.
25      Q    Okay.
0040
1        Who is Miss Tobiason?
2      A    She was an employee in Home Infusion Services.
3      Q    Do you know whether she had any opinions regarding
4   the continuation of the Home Infusion Business Unit?
5          MS. CITERA:  Objection to form.
6          THE WITNESS:  Miss Tobiason left that business in
7   about 1997, I believe - I would have to check.  She went
8   to work in a corporate function.
9          So I wouldn't want to speculate on her feelings.
10      Q    Okay.
11          Do you know of anyone who articulated any concerns
12  about closing the Hospital - about closing the Home Infusion

13  Business Unit?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  Some people may have felt threatened,
16  but we obviously did our best to redeploy the people so
17  they were doing something else.
18      But some people may have had an apostolate and
19  thought this was a great business, when, in fact, it was
20  a bad business.
21      I don't - I don't know how to respond to your
22  question.  Some may have thought it was a good idea.
23  Q    But are you aware of anyone making --
24  A    No.
25  Q    -- any comments either to you personally or
0041
1  otherwise voicing objection to closing the Home Infusion
2  Business Unit?
3  A    No, ma'am.
4      MS. CITERA:  Objection to form.
5  Q    Are you familiar with the CHIPS product?
6  A    Yes, ma'am, I am.
7  Q    What is it?
8  A    Once again, in our love for acronyms, that stands
9  for Customer Home Infusion - the P confounds me - I don't
10  remember.
11  Q    Okay.
12  A    That was a device that did billing and
13  reimbursement and set up orders and kind of cued things up
14  in pharmacy for a home infusion company.
15  Q    Was it proprietary software developed by Abbott?
16  A    We paid for the development; yes, ma'am.
17  Q    Okay.
18      In your contemplation of closing the Home Infusion
19  Business Unit, did you have any opinions as to whether
20  licensure of the CHIPS software should continue?
21      MS. CITERA:  Objection to the form.
22      THE WITNESS:  I recall conversa- -- Part of your job
23  in business is to make lemonade out of lemons.  If we
24  had anything that was a viable product and those
25  customers who were Home Infusion Services customers
0042
1  could use that system and found value in that system, we
2  would have a financial responsibility to our
3  shareholders to sell that system.
4  Q    Okay.
5      And was there such a market?
6  A    I don't know that.  I mean, I don't think we had
7  sold any by the time I left.
8  Q    Okay.
9      Sir, going back to your initial training, or your
10  initial learning curve concerning the Alt Site Business
11  Unit, did you receive any formal or informal instruction or
12  training concerning either Medicare or Medicaid billing,
13  pricing or reimbursement?
14      MS. CITERA:  Objection to form.

15   THE WITNESS:  We must have had discus- -- I don't
16   recall specific discussions or training on that, but
17   reimbursement is an important part of the business so we
18   must have had conversations on that.
19   Q   Did you have an understanding as to how Medicaid
20   and Medicare reimbursement worked?
21   MS. CITERA:  Objection to form.
22   THE WITNESS:  I would characterize my knowledge as
23   vague.
24   I mean, it's a very complex system.  As I understand
25   it, people make careers out of this, billing and
0043
1   reimbursement systems.  I was, you know, a neophyte.
2   Q   What was your understanding?
3   A   My understanding of - although incomplete, was that
4   was that Medicare in the hospital reimbursed based upon a
5   system called DRGs - that may still be around, I don't know
6   - and that in the Alternate Site it reimbursed based upon a
7   percentage of charges or something like that - I don't
8   recall, it was a long time ago.
9   Q   Any other understanding as regarding Medicare
10   reimbursement?
11   A   No, ma'am.  That's my understanding.
12   Q   Okay.
13   What about Medicaid reimbursement?
14   A   I have no knowledge of Medicaid reimbursement.
15   My only knowledge of Medicaid reimbursement is that
16   the State of Illinois would pay you in 187 days, no matter
17   how clean your bill was, no matter how well the patient was,
18   but it took a long time to get your money and that's my
19   recollection of - my only recollection of Medicaid; it was
20   tough to collect.
21   Q   Who would you go to if a question arose concerning
22   either Medicaid or Medicare reimbursement or billing?
23   MS. CITERA:  Objection to form.
24   THE WITNESS:  I would ask the general manager; those
25   were the people with whom I dealt --
0044
1   Q   Okay.
2   THE WITNESS:  -- if I had a question.  I'm not
3   saying I had any questions, but if I had a question,
4   that's the person to whom I'd go.
5   Q   Would you deal with any other subordinates?
6   A   Oh, I may have had conversations with subordinates
7   like - you know, you mentioned Miss Tobiason, she was
8   involved in reimbursement.  I spoke to her - I mean, I know
9   I spoke to her on numerous occasions, reimbursement was
10   probably the subject of one or more of those conversations.
11   I don't recall.
12   Q   Do you remember any conversations that you had with
13   Miss Tobiason concerning reimbursement?
14   A   Specifically?
15   Q   Yes.
16   A   No.

17   Q   Do you remember any - receiving - either receiving
18   any correspondence or generating any correspondence
19   concerning Medicare or Medicaid reimbursement?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  I may have, but I don't recall
22   specifically.
23       I --
24   Q   Okay.
25       Before --
0045
1        THE WITNESS:  If there were going to be changes in
2    Medicare or Medicaid reimbursement, it would be
3    incumbent upon our group to communicate those changes.
4    Q   Who within your group was responsible for ensuring
5    compliance with Medicare and Medicaid statute and
6    regulations?
7        MS. CITERA:  Objection to form.
8    Q   Hold on just a second.
9        MS. ST. PETER-GRIFFITH:  What's wrong with that
10   form?
11       MS. CITERA:  First of all, it's a compound question
12   because you're asking about Medicare and Medicaid.
13   Second of all, I think it's over broad, vague.
14       MS. ST. PETER-GRIFFITH:  Okay.
15   Sir, can you answer the question?
16       THE WITNESS:  Would you repeat it, please.
17       MS. ST. PETER-GRIFFITH:  Sure.
18   Can you read it back?
19       (The question was read back as previously recorded
20   by the court reporter)
21       MS. CITERA:  Let me just add also it asks for
22   speculation.
23   BY MS. ST. PETER-GRIFFITH:
24   Q   Who would you go to if you had a question about
25   Medicare or Medicaid reimbursement compliance?
0046
1        MS. CITERA:  Same objections.
2        THE WITNESS:  I would go to the general manager,
3    probably.  And if there were -- Our objective was to
4    comply with all regulations.
5    Q   And how would you ensure that that was done?
6    A   Continue -- You'd just have to continue to
7    reinforce this with people, you know?
8    Q   Who would you reinforce it with?
9    A   The general managers.  I mean, you were just there
10   to comply with the regulation.  You have to do it.  If you
11   vary from that...
12   Q   Would the general managers be responsible for
13   ensuring compliance with Medicare and Medicaid statutes and
14   regulations?
15   A   Yes - Yeah.
16       They had day-to-day contact with the people who
17   were involved in these affairs.
18   Q   Would the buck stop with any particular person with

19  regard to who was responsible for compliance with Medicare
20  or Medicaid regulations?
21      MS. CITERA:  Objection to form.
22      THE WITNESS:  Ma'am, our responsibility was to
23   comply with appropriate regulations.  If we didn't,
24   there was enough powder to blow everybody up.
25      I mean, we were all responsible, but I guess at the
0047
1   end of the day the general managers and I were the ones
2   responsible to make sure that that was done.
3   Q   Okay.
4      Would you consult with anyone in particular to
5  ensure that that was done?
6   A   I would consult my reports; general managers.
7   Q   Anybody else?
8   A   No -- I -- I -- Miss Tobiason was responsible for
9  reimbursement.  It's doubtful that I would not have, at one
10  time, mentioned to her that, Hey, you know, you've got to
11  follow the regs, but I don't remember specific conversation
12  in that regard.
13   Q   What about outside of the Alternate Site Business
14  Unit, do you recall discussing compliance with anyone -
15  compliance with Medicare or Medicaid statutes and
16  regulations with anybody outside of Alt Site?
17      MS. CITERA:  Objection to form.
18      THE WITNESS:  Specifically, no.
19   Q   Okay.
20      What were your -- You indicated the general
21  memories of conversations concerning reimbursement.
22      Do you remember --
23   A   I have no general memory.
24      I indicated that it would be doubtful that I would
25  not have had such a conversation because the individual's
0048
1  responsible for that.
2   Q   Would you -- Okay.
3      Which general manager would you go to on
4  reimbursement issues?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  There were two general managers who
7   dealt with the service business; one would be Bill
8   Dempsey, who was responsible for Home Infusion Services,
9   and the other, John Ward, who was responsible for
10   Alternate Site Product Sales - we called it - those were
11   sales of Alternate Site products that anyone who did not
12   have a business development agreement with us.
13   Q   Let me go back.
14      Who were your -- During your entire tenure, can you
15  just take us through historically who were the general
16  managers of the three components?
17   A   Certainly.
18      The general managers for the Renal Business Unit
19  were Mike King, Rich Ganz, G-a-n-z, Laurie Mershimer,
20  M-e-r-s-h-i-m-e-r, and Susan Rodriguez.

21      The general managers for Alternate Site Product
22  Sales were - hold on - Mike Sellers, John Ward and Peter
23  Baker.
24      The general managers for Home Infusion Services
25  were Bill Dempsey and then Mike Sellers.  Sellers was GM -
0049
1  the final name of GM when I left.
2    Q   Were there any non-GM subordinates who you would
3  deal with on a regular basis in your position as vice
4  president?
5    A   Many.
6    Q   Who would they be?
7    A   I would go in and discuss sales with the sales
8  managers; I would discuss, you know, contracting for the
9  customers - when are we going to get this business - from
10  the national account managers.
11      I think every manager has an informal group of
12  contacts with which one deals to see where the business is
13  going or how things are progressing.
14    Q   Okay.
15      MS. ST. PETER-GRIFFITH:  Is now a good time to take
16  a break?
17      MR. HAVILAND:  It would be for me just --
18      MS. ST. PETER-GRIFFITH:  Okay.
19      MR. HAVILAND:  -- for calling the office.
20      VIDEOGRAPHER:  Okay.
21      We're going off the record.
22      (Whereupon, a brief recess was taken)
23      VIDEOGRAPHER:  We're back on the record.
24  BY MS. ST. PETER-GRIFFITH:
25    Q   Sir, what I'd like to do is go back to the Alt Site
0050
1  Business Unit.  But before we do that, I'd like to kind of
2  take you through what you did after your retirement in 2000.
3      Did you retire in 2000?
4    A   Yes.
5    Q   Okay.
6      After 26 years with Abbott?
7    A   Yes.
8    Q   And what have you been doing since your retirement?
9    A   I moved out of Chicago.
10    Q   Okay.  It's a little cold; understandable.
11    A   And all our children --
12      MR. STETLER:  I object.
13      MS. ST. PETER-GRIFFITH:  I would just like to note
14    for the record that Mr. Stetler requested that we take
15    this deposition in January.
16      MR. STETLER:  Yes, I did.
17    A   All of our children moved away from Chicago.  So in
18  January of 2001, I said to my wife, Sweetheart - we had a
19  condo here in Fort Myers - I said, Sweetheart, I'm leaving
20  and I'm not coming back.
21      And she sold our house, packed it up and we've been
22  down here ever since.

23    Q    Now, are some of your former colleagues down here
24  from Abbott?
25    A    No.  I don't see any colleague -- I know that there
0051
1  are one specifically, Barry Gerber, whom I knew from Abbott,
2  he lives in Sarasota; a person named Ray Earl lives in
3  Sarasota.  That's about it.  No one locally whom I see or
4  who I'm in contact with.
5    Q    I need to round back to a question that I forgot to
6  ask you before which is have you - other than speaking with
7  Mr. Stetler, have you had any other conversations with
8  anybody about your deposition here today?
9    A    No.
10    Q    Okay.
11         Do you have much contact with other Abbott
12  employees?
13    A    I told my wife I would be here --
14    Q    Okay.
15    A    -- to give a deposition, so I misspoke.
16    Q    That's fine.
17         Have you spoken with any other Abbott employees?
18    A    No.
19    Q    Okay.
20         And since your retirement, have you been completely
21  retired or are you involved in any other, either employment
22  or business ventures?
23    A    No, ma'am.  I'd had enough fun.
24    Q    Oh, you're a smart man.
25    A    I do charity work, I play golf and I fish.
0052
1    Q    Fantastic.  What kind of charity work do you do?
2    A    I work with the Slough - the Six Mile Cypress
3  Slough, which is a sort of, it filters water that goes out
4  in Estero Bay and try and stop people from paving it, and I
5  work with my church.
6    Q    Okay.
7         Sir, if we could go back to where we started our
8  discussion in terms of your taking over as vice president --
9    A    Yes, ma'am.
10    Q    -- back in '90.
11    A    Mm-hmm.
12    Q    Can you just walk me through the three different
13  business units of Alt Site and what, generally, their
14  products were, their marketing plan, their market?
15    A    Okay.
16         MS. CITERA:  Objection to form.
17         THE WITNESS:  There were three.
18         One was Alternate Site Product Sales.  That was the
19    sales of everything that the hos- - well, the products
20    that Hospital Products produced and anything that was
21    not a hospital; home infusion companies, physicians'
22    offices, cancer treatment centers, nursing homes,
23    anything that was not a hospital.
24         Home Infusion Services entered into business

25      development agreements with hospitals to help them get
0053
1       into the home infusion services business.  We would do
2       pharmacy for them; we would bill for them; we would do
3       reimbursement for them.  The patients came from those
4       hospitals and went home and they would do the nursing
5       and whatever other services were required.
6          In Renal Care, initially we sold peritoneal dialysis
7       solutions - peritoneal dialysis is an alternative to,
8       you know, using blood where solutions are injected into
9       the peritoneal cavity and detoxify the person.  We had
10      no specific advantage of competence there, so we sold
11      that business to Frazaneous (sp.) in, perhaps, '93.  And
12      our sole business there was Calcijex, which I've
13      articulated earlier the usefulness of that in helping
14      the people in end-stage renal disease make bone.  It's a
15      great drug.
16      Q   Was the Renal Department also responsible for
17      developing another product?
18      A   Yes.  There's a - one of the -- Yes, ma'am - the
19      answer to your question is yes.
20      Q   Okay.
21          What was that?  Can you explain that?
22      A   The name of the product was Zemplar.
23          There are people who don't respond well to Calcijex
24      - it can me idiopathic - they just don't respond, and there
25      are people who come in with very elevated levels of
0054
1       phosphorus that you want to get down quickly.
2          In conjunction with the University of Wisconsin,
3       which is world-renowned in these renal osteodystrophy drugs,
4       they had another drug which they felt would bring down the
5       levels of phosphorus faster so that bone deterioration
6       wouldn't go on as long and that the people would respond
7       better to.  We licensed that drug.  Our experience in
8       clinicals and post-approval studies indicate that it is a
9       much better drug, so we've - Zemplar is replacing Calcijex
10      as the drug of choice for renal osteodystrophy.
11      Q   Okay.
12          So is it fair to say that that was a successful
13      then project or product development R and D-wise?
14          MS. CITERA:  Objection to form.
15          THE WITNESS:  You're asking for my opinion.
16      Q   You were the vice president, so, yeah, I'd like
17      your thoughts.
18      A   The drug works better.
19          MS. CITERA:  Objection.
20      Q   Okay.
21          THE WITNESS:  But based upon data that I saw, which
22      are old data now, being seven years, since the drug -
23      Zemplar is still out there and, as I understand it,
24      continue to perform well, it's a good second-generation
25      drug.
0055

1    Q   When you -- For the ten years that you were the
2  vice president of the division, were you actively marketing
3  Zemplar or were you still in the development stage?
4    A   We were developing the product.
5        The product wasn't launched until, perhaps, late
6  '99 maybe.
7    Q   Okay.
8        So it was launched on your tenure then.
9    A   It was launched while I was there; yes, ma'am.
10   Q   Other than Zemplar and Calcijex did the Renal
11 Department have any other either products or business other
12 than the sale of Calcijex?
13   A   Yes, they did.
14       They promoted nutritionals for -- They promoted
15 nutritionals for Ross Division.  They would show the
16 benefits --
17   Q   I believe that's yours (handing).
18   A   Thank you very much.
19       (Continuing) They would show the benefits of Ross
20 nutritional products to the people involved in nutrition at
21 the various renal care centers.
22       And one of the problems with people in end-stage
23 renal disease is malnutrition, so Ross nutritional products
24 were useful.
25   Q   How did the Renal Department interact with the Ross
0056
1  Division; how was that -- How did that relationship develop
2  and how was it presented to customers?
3      MS. CITERA:  Objection to form.
4      THE WITNESS:  How was it presented to customers?
5      Really, to a customer, Abbott is Abbott, I think in
6  large part.
7      Abbott has a Ross Division and Abbott had a Renal
8  Division, that's how it was presented to our --
9    Q   Did the Renal Division have a sales force dedicated
10 to promoting Ross products?
11   A   No.
12   Q   Okay.
13       How would the introduction of Ross products occur
14 to the renal clients?
15   A   Our sales force would provide them literature.  And
16 if they wanted to speak to an expert, they had to speak to
17 someone in Ross.
18       Merely we were trying to provide entree -- We
19 thought that these nutritional products would be useful -
20 that it was a marketing opportunity and it was an
21 opportunity for better patient care.
22       And we would provide the nutritionists in the renal
23 care centers with literature.
24   Q   Okay.
25       And was that literature that was developed by --
0057
1  A   By Ross.
2  Q   -- Ross?

3        Okay.
4        Other than the sale or other than the promotion of
5  the Ross products and the sale of Calcijex and development
6  of Zemplar, did the Renal Department have any other either
7  business or did it serve any other business function?
8     A   No; not to my knowledge.
9     Q   Okay.
10        Was it a relatively small unit?
11     A   I think, as I recall, in sales it may have been
12  100, $120M, something like that.
13     Q   Annually?
14     A   Yes, ma'am.
15     Q   Was that during the entire ten-year tenure that you
16  were there?
17     A   No.  It grew significantly.
18     Q   Okay.
19        When did it grow?
20     A   During the entire time I was there.
21     Q   Do you know what the reason for the growth was?
22     A   Lamentably, more people with end-stage renal
23  disease who could use the drug --
24     Q   Okay.
25     A   -- longer survival.
0058
1        Obviously, if -- I don't want to -- We don't have
2  to get into great detail; people were living longer because
3  they were getting better care.
4     Q   Okay.
5        In part, because of the Calcijex?
6     A   We like to think so; yes, ma'am.
7        So they're living longer.  Then, lamentably, there
8  are more people coming on to - diabetics and hypertensives
9  who now need renal dialysis.  Well, when you get a faster
10  growth rate and you get people living longer, you get more
11  utilization of the drug.
12     Q   Do you recall what the renal - how much renal - the
13  Renal Department was taking in when you first started?
14     A   No.  No, ma'am.  Renal pro- -- No, ma'am, I don't
15  recall specifically.
16     Q   Do you remember when it reached approximately the
17  100 to $120M mark?
18     A   Probably toward the end of my tenure.
19     Q   And is it fair to say that most of that revenue was
20  generated from the sale of Calcijex?
21     A   Yes, ma'am.  Mm-hmm.
22     Q   Okay.
23     A   There are some great drugs out there.  Epo (sp.) is
24  a really terrific drug for --
25     Q   Was that something that was sold by the Hospital --
0059
1     A   No.  No.  No.
2     Q   -- by Alt Site?
3     A   No.  No.  No.
4     Q   Okay.

5     A    That's sold by Amgen.

6     Q    Okay.

7     A    But there have been a lot of -- My point is these
8  people were living longer because of a lot of good drugs to
9  help them.

10     Q    What I'd like to do is circle back to the Alt
11  Site -- Oh, let me ask you first.  For Renal Care, were
12  there marketing plans for Renal Care?

13     A    How would you -- What do you mean by marketing
14  plan?

15     Q    Meaning did the Alt Site Business Unit have written
16  marketing plans for the Renal - for its renal operation?

17     A    We had sales plans which articulated how much we
18  expected them to sell; we had marketing plans to the extent
19  we told them how do you - you know, how one would use the
20  data to approach a customer where clinical conditions were
21  useful; when to put people on the drug; when to take them
22  off the drug.

23     Q    And can you take me through how you, as sort of the
24  head, the vice president, understood the sales force did
25  that; how they would implement that sales plan?

0060

1     A    Well, how they would implement the sales plan.
2        As one implements a sales plan, you articulate the
3  benefits and usefulness of your drug; you find out the
4  numbers of patients, and you talk -- They really were the
5  only ones in our groups that talked to practitioners - they
6  talked to nephrologists - the other folks talked to business
7  people mostly, contracted for -- But they talked to
8  practitioners and they convince - what pharmaceutical reps
9  do, they convinced the physician based upon data of the
10  utility of the drug.  Many of them had -- Many of the
11  physicians obviously had experience with the drug, they knew
12  what patients could benefit from it.

13        That's what we did.

14     Q    Did you have an understanding as to how the pricing
15  worked for Calcijex?

16        And when I say, "pricing," I mean how Abbott
17  determined how it would price Calcijex.

18        MS. CITERA:  Objection to form.

19        THE WITNESS:  How we would price it?

20        I guess it's as one prices anything; what clinical
21  benefit does it provide to the patient, what is that
22  clinical benefit worth, and price it as a function of
23  that.

24     Q    Did you have an understanding as to whether
25  Calcijex was a drug that was reimbursed by Medicaid or

0061

1  Medicare?

2     A    My -- As I recall, Calcijex is reimbursed by
3  Medicare --

4     Q    Is that because it's a renal product?

5     A    -- in the end-stage --

6        MS. CITERA:  Objection to form.

7    A   -- renal disease program.  That's my understanding.

8    Q   Okay.

9        Sir, I'd like to take you back to -- We've talked a

10 little bit about Home Infusion, but we haven't talked that

11 much about Alt Site --

12   A   Product Sales.

13   Q   -- Product Sales.

14       I guess I'd just like for you to give me, as sort

15 of the vice president, what was Alt Site Product Sales?

16       MS. CITERA:  Objection to form.

17       THE WITNESS:  It was the sales of the products that

18       Hospital Products Division produced in non-hospital

19       settings.

20       There was -- There was and it continues to be a

21       trend in this country to send people out of hospital

22       quicker, to want to treat people at home, if possible.

23       There -- People say there are data - and this

24       information may not be true, that people recover better

25       at home.

0062

1        We do now that there are large numbers of nosocomial

2        infections that people who go into hospitals to get

3        their tonsils out end up with catastrophic staph

4        infections - we know that.

5        So if we can get people out of the hospital, treat

6        them home, it's felt that they'll recover better and

7        it's less costly - it's a less costly environment than

8        having them in the hospital.

9        So taking advantage of this trend and the products

10       in Abbott's portfolio, we said, Well, why can't these -

11       You know, these people can be infused by antibiotics at

12       home.  Others saw this, they opened home infusion

13       companies and then that's how the industry evolved.

14   Q   Who generally were the clients that you sold to or

15 that the Alt Site Products Sales sold to?

16   A   Wholesalers and distributors of -- Well, one has to

17 be aware that this was a line of nondifferentiable generic

18 drugs.

19       You -- You --

20   Q   Can you explain that to me?

21   A   Well, that they were multi-source, that they were

22 off-patent.

23       As I understand, the patent is intended to teach

24 you how to make something, and if it doesn't teach you how

25 to make it, the patent's no good.

0063

1        So many, many people could make this drug; many,

2 many people could marketed it.

3        It was felt that we had a position where we had a

4 broad array of these products which we used in hospitals, so

5 we would have an opportunity as these procedures moved out

6 of the hospital to sell them in the home market.

7    Q   And was there a marketing plan for Alt Site Product

8 Sales, or were there marketing plans that were developed for

9    Alt Site Product Sales?

10    A    You know, one man's marketing is another man's

11  sales --

12    Q    Okay.

13    A    -- the terms, by some, are interchangeable.

14         Were there plans for these business units?  Yes,

15  they were.  There were marketing plans for products; there

16  were marketing plans for product lines, and there are sales

17  and income plans for businesses.

18         And we had those.

19    Q    And how were the sales and income plans developed

20  for Alt Site Product Sales?

21         MS. CITERA:  Objection to form.

22         THE WITNESS:  You know, the same way everyone

23    develops the first plan.  You have a market of a

24    specific size; you have capture versus losses; you have

25    new customers; you have new products; you have the

0064

1    effect of customers you lost last year.

2         You throw this all up in a hat, a number comes out

3    and that's your plan.

4    Q    Who was responsible for developing the sales and

5  income plans for Alt Site Product Sales?

6    A    The marketing managers and general managers of the

7  individual business, and then we would confer and - we would

8  confer and then we would present these numbers to the

9  division --

10    Q    Okay.

11    A    - for their approval.

12    Q    Okay.

13         When you say the marketing manager --

14    A    The marketing managers and the general managers

15  within the business units; they conferred, they came up with

16  a number or they came up with a plan, you know, and then I

17  talked to them, we'd reach an agreement, we'd go to the

18  division, ask to the division's agreement and then that was

19  our plan.

20    Q    Okay.

21         When you say the individual businesses, do you mean

22  the individual businesses within the Alt Site?

23    A    That's correct.

24    Q    Okay.

25         So would the general managers then develop the

0065

1  sales plan?

2    A    I'd meet with Mike King and we would talk about

3  what his plan's going to be for next year, we'd come to a

4  agreement on what it would be; I'd meet with Bill Dempsey

5  and his staff and we would discuss it and come to an

6  agreement, and I'd meet with Mike Sellers or John Ward and

7  their staff and they would go through the logic of the new

8  plan.

9    Q    Okay.

10         Would these be written proposals?

11    A    Sales plans for subsequent year are written; yes,
12  ma'am.
13    Q    And who would maintain the sales plans?
14    A    I don't understand the word "maintain."
15    Q    Where would they been kept?  Would they be
16  physically --
17    A    They would be kept --
18    Q    -- filed somewhere?
19    A    -- by the division, they would be kept by the
20  individual business and they would be kept by me.
21        MR. STETLER:  Dan, make sure you let her finish her
22    question.  You're cutting her off quite a bit.
23    A    I'm sorry.  I apologize for that.
24    Q    That's okay.
25        When you say, "kept by me" --
0066
1        MR. STETLER:  Apologize to her (indicating).
2        THE WITNESS:  Excuse me, ma'am.
3        COURT REPORTER:  It's okay.  Thank you.
4  BY MS. ST. PETER-GRIFFITH:
5    Q    When you say, "kept by me," did you have a file or
6  file cabinets where you -- Well, I want to find out,
7  understand where you physically maintained the records or
8  kept the records --
9    A    Oh --
10    Q    -- of the sales plans.
11    A    -- they would be in a file cabinet in my office.
12    Q    And when you retired, do you know what happened to
13  the file cabinet?
14    A    No, ma'am.
15    Q    Okay.
16        Let me ask you.  As -- Did you -- I understand that
17  as the chief you probably had a wide variety of
18  responsibilities, but can you identify what your
19  responsibilities were as the divisional vice president?
20    A    To supervise each of the three individual
21  businesses and to ensure that we maximized the opportunity
22  that those businesses provided to Abbott shareholders, and
23  to do it, you know, obviously in a forthright and with
24  integrity -- In a forthright way and with integrity.
25    Q    Did you have any direct responsibility for pricing
0067
1  of products either - well, within any of the three business
2  units in Alt Site.
3    A    Direct responsibility?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  We would look -- I would look at
6    pricing.
7        My concern was -- When you talk about pricing there
8    are large numbers of what does pricing mean.
9        My concern was the prices to end customers because
10    that's what comes on the check, what the customer paid
11    you for the product; to ensure that they were fair, that
12    they were within the limits of our competitive

13   environment and that they would allow us to gain share.
14    Q   How would you gauge what was within the limits of
15   your competitive environment?
16    A   Well, people would tell me what competitors - you
17   know, we'd have some competitive pricing and customers were
18   forthcoming, generally, with prices that our competitors
19   were charging them.
20    Q   How would the sales of Alt Site products --
21       MS. ST. PETER-GRIFFITH:  Strike that.
22    Q   How would you compete with your competitors in
23   terms of pricing Alt Site products?
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  We had a wide variety or a wide array
0068
1    of products.  We had a very high quality product line
2    and we tried to take advantage of the high quality of
3    our products and the broad array of our line to make it
4    beneficial for a customer to do business with us.
5     Q   You mentioned before that Renal sold - actually
6   sold directly to physicians.
7        MS. CITERA:  Object to the form.
8        THE WITNESS:  Renal Care salespeople called on
9    physicians --
10       MS. ST. PETER-GRIFFITH:  Okay.
11       THE WITNESS:  -- and, you know, who the ultimate
12    decision maker was - you may have eight physicians in a
13    practice, only one of them decides.
14       MS. ST. PETER-GRIFFITH:  Okay.
15       THE WITNESS:  So, yes, we called on physicians, but
16    we may not have always called on decision makers.
17   BY MS. ST. PETER-GRIFFITH:
18    Q   For Alt Site Product Sales, who would your sales
19   folks call upon?
20    A   Well, hopefully, decision makers, people within
21   the --
22    Q   Okay.
23    A   -- distributors or wholesalers who resolved with
24   whom they were going to have contracts - that sort of thing.
25        We -- We didn't call on practitioners or
0069
1   physicians.
2     Q   How did the relationships with the distributors and
3   the wholesalers work in terms of sales?
4        MS. CITERA: Objection to form.
5        THE WITNESS:  Once again, we would take array --
6    We'd try to take advantage of our broad array of
7    products and present a whole package to the distributor
8    or wholesaler or pharmaceutic benefit manager, which our
9    competitors couldn't do because we had a broad array of
10    products.
11        Now, these products are generic, and you need to
12    understand that wholesalers don't create demand --
13       MS. ST. PETER-GRIFFITH:  Okay.
14       THE WITNESS:  -- distributors don't create demand.

15   The demand is there - these are generic products.  A
16   doctor knows why amoxicillin is used; we didn't go out
17   and call on doctors and tell them why amoxicillin is a
18   good drug.
19       We just -- We merely provided these
20   well-characterized, well-known products in a broad array
21   to distributors and wholesalers who then sold to
22   physicians in this milieu.
23   BY MS. ST. PETER-GRIFFITH:
24       Q   How would you go about creating then demand for
25   Abbott products - Abbott generic products?
0070
1       A   We did not create demand for Abbott generic
2   products.
3       Q   Would pricing of products by Abbott impact the
4   demand for an Abbott product?
5           MS. CITERA:  Objection to form.
6           THE WITNESS:  Demand for an Abbott product?
7           MS. ST. PETER-GRIFFITH:  Yes; as opposed to, for
8   example, a Baxter comparable product.
9           MS. CITERA:  Objection to form.
10          THE WITNESS:  An individual product, I don't know.
11   I don't know that - I don't know the answer to that.
12          That was not our strength.  It was not our desire to
13   sell very low prices.
14   BY MS. ST. PETER-GRIFFITH:
15       Q   Okay.
16          What do you mean by that?
17       A   Well, our products were costly to make, they were
18   of quality, and, sometimes, you have to get out there and
19   sell that quality and sell better patient care as averse to
20   selling price.
21          I didn't want to sell price.  We didn't have to.
22   We had good products.
23       Q   Okay.
24          Sir, in Alt Site, as I understand it - and I'm
25   still learning this and you know that's why I'm looking to
0071
1   you a little bit to teach me - how was the sales force
2   divided up; were there national accounts and then regional
3   accounts?
4       A   We did have national accounts and we had local
5   salespeople.
6       Q   And how was the sales force division of labor
7   broken up?
8       A   National accounts managers were responsible for
9   contracting with national accounts; the local sales reps
10   were responsible for going in and implementing these
11   contracts.
12          Now, an account could have had contracts with
13   multiple companies --
14       Q   Okay.
15       A   -- for example, we had a line of ambulatory
16   infusion pumps which were really great - you know, the

17 patient doesn't have to have this big old pole and, you
18 know, a pump the size of this desk (indicating) and be stuck
19 to a hospital bed; they can clip it on their belt and be
20 ambulatory and walk around with a little bag - it's really
21 great for them, and we had a line of those pumps.
22       But these home infusion companies had contracts
23 with many companies, so it was the local rep's
24 responsibility to go in and make sure they articulated the
25 benefits of our product and that we - they used our pump
0072
1 instead of somebody else's.
2   Q   Okay.
3       Can you remember what some of the large national
4 accounts were?
5   A   Oh, golly.
6   Q   I don't mean this to be a memory exercise, but to
7 the extent you remember.
8   A   You know, the names specifically - and what happens
9 is they tend to - this industry tended to consolidate and
10 the customers were getting bigger - but if I recall some of
11 the names, Coram was a big customer of ours - golly, I don't
12 - Cardinal, Medco - you know these sorts of companies, PBMs
13 - they're a lot of them.
14       I'm sorry.  I can't remember them by name.
15   Q   Would Alt Site products sell to GPOs?
16   A   Group Purchasing Organizations; yes, they were
17 customers.
18   Q   Okay.
19       And do you remember what some of the GPOs were?
20   A   No, ma'am, I don't.
21       I remember one was in Little Rock, Arkansas - gosh,
22 it was a big one, I wish I could remember the name of it.
23       I don't remember the names of the GPOs.
24   Q   And I'd like to circle back to the explanation --
25   A   Now, once again, the customer could be a member of
0073
1 multiple GPOs - a customer could be a customer of multiple
2 GPOs, too.
3   Q   Okay.
4       And so that actually leads into my next question.
5       For the local sales force, was it their
6 responsibility to ensure that Abbott's products were being
7 purchased over other products because these local customers
8 might be involved in several GPOs?
9       MS. CITERA:  Objection to form.
10       THE WITNESS:  Yes; that is job for a salesman --
11       MS. ST. PETER-GRIFFITH:  Okay.
12       THE WITNESS:  -- yes, ma'am.
13 BY MS. ST. PETER-GRIFFITH:
14   Q   And that's -- Those were the responsibilities for
15 the regional sales force?
16   A   For the local salespeople, yeah; to ensure that
17 they bought off our contract first versus the contract that
18 they may have had with another.

19    Q   Were there any just regional sales contracts as
20  opposed to national accounts?
21    A   There may have been, but I don't recall
22  specifically.
23    Q   Was it a large segments of the business, do you
24  recall?
25    A   I don't know.  I don't remember.
0074
1    Q   Okay.
2        Is it fair to say that primarily Abbott Alt Site
3  Product Sales sold on to national accounts?
4    A   That if one were to add up the sales to national
5  accounts versus local accounts, I don't have those data -
6  I'm sure this data could be made available to you.
7        But I don't specifically recall what the split was
8  national accounts versus local accounts versus regional
9  accounts.  I don't recall that.
10    Q   Do you recall in general how much the annual
11  revenue was for Alt Site Product Sales during your tenure?
12    A   It may have gotten to 150 million when I left - not
13  big numbers by Abbott's standards of a $20B corporation, but
14  we were kind of proud of it.
15    Q   Okay.
16        When you came on do you recall approximately what
17  the annual dollar volume was for Alt Site Product Sales?
18    A   Maybe 20 million, if I remember.
19    Q   Wow.  So that's a pretty big jump then --
20    A   Well --
21    Q   -- while you were --
22    A   Well, DRGs were very helpful.
23        MS. CITERA:  Objection to the form.
24    Q   When you say, "DRGs were very helpful," what do you
25  mean?
0075
1    A   Well, people left the hospital early and needed
2  treatment at home.  And then this became their regardant;
3  let people out of the hospital earlier, get them out of
4  here.
5        So the treatment at home became important, so
6  therefore, the market for high quality, reliable products
7  outside the hospital grew significantly.
8    Q   Other than a shift from hospital markets to more of
9  an in-home care arrangement or alt sites, can you provide
10  any explanation as to how in ten years a $20M business can
11  grow into a $150M?
12    A   New products, ma'am.
13    Q   New products?  Okay.
14    A   Yes.
15        And, once again, I don't remember the break out
16  specifically.
17    Q   Was vancomycin a new product?
18    A   Vancomycin?  No, that was one of our generics, I
19  believe, one of our generic products.
20    Q   Okay.

21      Do you recall whether the vancomycin market grew in
22  Alt Site Product Sales during your tenure?
23      A    Vancomycin market grew.
24        For a specific drug, without going back and
25  reviewing the clinic- -- What you've got to do is review the
0076
1  clinical states, ma'am.  If those clinical states increased
2  or if the claims for the drug increased -- In other words,
3  if you don't have a claim for a drug, you don't sell
4  anything for that disease.  If you go out and do the
5  clinical study and get a claim for that drug, the sales of
6  the drug can grow significantly, although it's the same -
7  you know, you have to have a claim.
8      Q    Okay.
9        What do you mean by that, "you have to have a
10  claim"?
11      A    If, for example, you get - let's use some
12  ridiculous example - that vancomycin works again- -- You
13  don't have a claim that it works against E. coli, it will
14  not be used for that.
15      Q    Okay.
16      A    You don't sell off-label claims.
17        So if we go out and do the clinicals and suddenly
18  we get a claim that vancomycin works against E. coli and now
19  we have a new claim for that, we can go out and sell that
20  and sales will increase for the same product because you
21  have a new market fundamentally.
22      Q    Do you remember what some of the claims were for
23  the utility of vancomycin?
24      A    No, ma'am.
25      Q    Do you remember vancomycin being an important
0077
1  product for the Alt Site Product Sales?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  I remember it being one of them.
4      Q    Okay.
5        What were some of the other products that were
6  important?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  You know, once again, I apologize.
9     After so many years and clinical medicine's not my
10     deal --
11        MS. ST. PETER-GRIFFITH:  Okay.
12        THE WITNESS:  -- If one were to artic -- I have a
13     latent memory of these things.  If you mention a drug
14     like vanco, sure, I remember; if - some of the others,
15     if you were to mention them, I'm sure I'd remember them.
16  BY MS. ST. PETER-GRIFFITH:
17      Q    Okay.
18        Were sales of -- Well, we've already established
19  that sales of Calcijex were very important to the Renal
20  Department --
21        MS. CITERA:  Objection to form.
22        THE WITNESS:  But that was all they sold.

23   Q   Huh?  That's all they sold.  Yeah.
24   A   Yes, ma'am.
25   Q   But they did so successfully, it sounds like.
0078
1        MS. CITERA:  Objection to form.
2    Q   I mean, you developed a market and by the end, you
3  said --
4    A   No, ma'am.  No, ma'am.  We didn't develop a market.
5        This is a good drug.  Renal osteodystrophy is a
6  dreadful disease.  We spent the money.  We got the claim.
7  We marketed the drug.
8    Q   And I misspoke.  I apologize.
9        You were very successful in developing a product to
10  meet a need.
11   A   Right.  The need was there and we met it with a
12  good drug.
13       I don't mean to be a nitpicker, but --
14   Q   No.  No.
15   A   -- that's what happens.
16   Q   Believe me, I want you to clarify my questions for
17  me.  Okay?
18       Were there large volume products that you can
19  recall that Alt Site Product Sales sold?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  Individual products, no, ma'am.
22   Q   What about dextrose solutions, do you recall those?
23   A   Yes, ma'am; the bane of my existence.
24   Q   Oh, how so?
25   A   Did you ever try to go out and sell sugar water?
0079
1    Q   Well, Starbucks does it pretty successfully?
2    A   They do.
3        We were selling -- You know, we'd sell a litre of
4  sodium chloride sterile solution for less than a liter of
5  Perrier, and Perrier had benzene in it, and our stuff was
6  less expensive.
7        Yes, ma'am, I'm familiar with dextrose and I'm
8  familiar with sodium chloride.
9    Q   Were dextrose and sodium chloride large volume
10  sales --
11   A   They're diluents.
12   Q   -- for Alt Site products?
13   A   They're diluents.
14       These are injectable drugs.  You inject the drug
15  into the I.V. bag, and then in the diluted form, the drug is
16  infused in the individual.
17   Q   Okay.
18       So they were important for that dilutent purpose.
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  As I understand it, ma'am, clinically
21  the drug has to be diluted in the solution.
22   Q   And it was something that the Alt Site market or
23  the Alt Site customers would use with some frequency?
24   A   To my --

25      MS. CITERA:  Objection to form.
0080
1       THE WITNESS:  -- In my -- As I recall, yes.
2    Q   Okay.
3       And is it fair to say that Abbott Alt Site had
4    competitors in the alt site market for dextrose and sodium
5    chloride?
6    A   Yes, ma'am.
7    Q   Okay.
8       How would Abbott go about or how would the Alt Site
9    Unit go about determining how it was going to compete for
10   the dextrose or sodium chloride market?
11      MS. CITERA:  Objection to form.
12      THE WITNESS:  The products are undifferentiable.
13   You try to take advantage of your relationship with the
14   customer - if you have a good relationship; if your
15   service has been good and you've always performed well
16   for them in that regard; if your product line is broad
17   and they can satisfy many of their requirements with
18   you, and you just try to satisfy that customer as best
19   you can with service and quality product.
20      MS. ST. PETER-GRIFFITH:  Okay.
21      THE WITNESS:  And you had to keep your service
22   levels up and you had to provide quality product all the
23   time, you know.
24      In this life, if you want loyalty, buy a cocker
25   spaniel.  Customers left if you had a product problems,
0081
1    customers left if you had supply issues, so you had to
2    make sure that you did a better job than your
3    competitors of these - especially with these
4    multi-source, undifferentiable drugs of doing a good job
5    of service and availability.
6    BY MS. ST. PETER-GRIFFITH:
7    Q   And I'm assuming doing that good job, you always
8    did that with an aim towards your responsibility to the
9    shareholders to try and maximize as best you could the
10   profits for your units?
11   A   Well, ma'am, there are a lot of people who are
12   stakeholders at Abbott; the patient who receives the drug,
13   the customer that buys this drug, the people who make the
14   product - there are a lot of stakeholders.
15      Our goal is high quality health care and to provide
16   a reasonable return to our shareholders, and I don't think
17   you have to apologize for that - that's what we do - --
18   Q   Okay.
19   A   -- otherwise, they'd invest someplace else and our
20   company, you know, doesn't do well.
21   Q   Other than the --
22      MS. ST. PETER-GRIFFITH:  Strike that.
23   Q   Let me go on a different route.
24      We've talked a little about Alt Site Product Sales.
25   What was your understanding of the business model for the
0082

1 Home Infusion Unit; can you explain in a little bit more
2 detail than what we've discussed already how that worked?
3    A   There were hospitals who were releasing patients to
4 third-party home infusion companies - in other words,
5 Children's Hospital in Chicago would release a young patient
6 to a home infusion company - and Children's is maybe an
7 extreme example because they get really sick kids - and
8 they'd do the best they could and then they'd turn them over
9 to this third party.
10       Well, it was their desire to treat this patient to
11 make sure that the clinical progress of this patient was
12 steady and that they were treated well, so they decided they
13 wanted to be in the home infusion business, but they didn't
14 have a pharmacy, they didn't know how to bill or reimburse
15 for it, they didn't have contracts for product.
16       So we would go to them and say, Well, we'll
17 compound the product for you; we'll do the billing and
18 reimbursement for you; we'll provide all the products you
19 need, including non-Abbott product, and you do what you do
20 best, provide clinical care to these sick kids.  So that
21 model developed.
22       And then, as I articulated to you before, this
23 business is - this is bad business, so we would try to
24 off-load, as soon as it was practical, some of the other
25 responsibilities - some of the responsibilities back onto
0083
1 Children's Hospital.
2       They opened up their pharmacy - their own pharmacy
3 - thank God - in the northwest suburbs and we're able to
4 compound and provide these drugs to the kids.  We still gave
5 them all the drugs.  And then what would happen when they
6 started doing the compounding, our percentage of the
7 collections would go down and then, hopefully, at some point
8 in time they would take over billing and reimbursement and
9 then we would merely provide them product.
10       So our goals were to wean them off our services
11 because these are very unprofitable and just get them using
12 our product and, perhaps, the CHIP system that I mentioned
13 before, if there were an opportunity to sell that.
14    Q   Why was this business model unprofitable?
15    A   The business model was unprofitable because it was
16 a very easy-in business so that people -- You know, you
17 could set up a pharmacy - it's a service business so it
18 wasn't very costly.  And many very good organizations got
19 into it because since it was so easy to get in, there may
20 have been more schlak (sp.) artists in this business than
21 others.  So you'd want -- If you wanted quality patient care
22 you either did it yourself or signed up with an organization
23 that you knew provided quality.  So that's how it happened.
24    Q   And --
25    A   And once you let them out, you don't want them --
0084
1 The hospitals, once they let them out, they don't want them
2 back - they don't want them getting infected by the port

3  sites or their I.V.s, especially, as an example, like
4  children, you've worked so hard to get these kids well; if
5  they're on chemo at home, you don't want them back with
6  infections and those sorts of things.
7     Q   Okay.
8        Now, you said that the Home Infusion Business Unit
9  sold even products that were not Abbott products?
10    A   Yes, ma'am.
11    Q   How would that work?
12    A   Our agreement was to get a percentage of
13  collections.
14       So we would buy, for example, Rocephin; if a person
15  had Lyme's disease, it was required that they be infused
16  with Rocephin.  We didn't buy that -- We didn't manufacture
17  that product, it was a proprietary product of Roche, we
18  would buy it.
19    Q   Would you buy it as part of a group purchasing
20  organization?
21    A   Yeah; I mean I'm sure we were part of various group
22  purchasing organizations where we bought the drug.
23    Q   Okay.
24       What about other products from Abbott -
25  manufactured by Abbott affiliates, like TAP and Lupron;
0085
1  would the Home Infusion Unit provide Lupron?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  I don't ever recall having provided
4     Lupron.
5     Q   Do you recall whether the Alt Site Business Unit
6  ever priced or sold Lupron?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  To my -- No, we never sold -- To my
9     knowledge, we never sold Lupron.  It's been a long time,
10    but I don't ever recall selling Lupron.
11       We didn't -- They did that themselves.
12    Q   Who's they?
13    A   TAP.
14    Q   Oh, TAP.  Okay.
15       How would the customer, the home infusion customers
16  be approached by Home Infusion; did --
17       MS. ST. PETER-GRIFFITH:  Let me strike that.
18    Q   Did Home Infusion have a sales force?
19    A   A very small sales force; yes.
20    Q   And did they have a contract marketing division?
21    A   Not contract marketing; no, ma'am.  There were
22  individuals responsible for working out the contracts, you
23  know, to make sure they were viable.
24       I mean, we made proposals to these folks.
25    Q   Did Alt Site Products Sales have a contract
0086
1  marketing department?
2     A   Yes; we had a small contracting group.  I don't
3  remember how many people were there.
4        One of the things that was important was that the

5  pricing would be proper for customers or you couldn't get
6  business - as I said before - with multi-source injectable
7  pharmaceuticals.
8     Q   Okay.
9        In terms of the Home Infusion sales force, would
10  they just make cold calls upon hospitals to discuss
11  developing the home infusion --
12     A   Home infusion services?
13     Q   Yes.
14     A   No.  They -- How they prospected, I don't really
15  recall.  You know, obviously you go to the big dogs, the big
16  hospitals that don't have their own home infusion business
17  and they're sending out to others and approach them on it.
18     Q   Do you recall whether there were some clients that
19  were like that?
20     A   Oh, yeah.  We did that.
21     Q   Do you remember the names of the hospitals?
22     A   I don't -- I'm sure many of the large hospitals.  I
23  remember going on calls - Lahey Clinic in Boston was in, you
24  know, many large customers wanted to do this.
25        But, once again, my concern was getting the
0087
1  profitability, that business up, and getting our customers
2  to do their own stuff - you know, their own ancillary
3  services.
4     Q   Let me circle back to an issue that we just touched
5  upon.
6        Do you recall whether Abbott either Home Infusion
7  or Abbott's Home Infusion pharmacies would dispense Lupron?
8     MS. CITERA:  Objection to form.
9     THE WITNESS:  I believe TAP had an organization
10  named TAP Care which did that.  We didn't do that.
11     Q   Okay.
12        Would Abbott Home Infusion work with TAP Care?
13     A   Not my knowledge.
14     Q   Do you know whether Abbott Home Infusion would seek
15  reimbursement for Lupron?
16     MS. CITER:  Objection to form.
17     THE WITNESS:  Seek reimbursement for Lupron?  I
18  can't imagine a reason why.
19        No, ma'am; I don't think so.
20     Q   Okay.
21        With regard to the Alt Site pharmacies - the
22  pharmacies, themselves, who were the Home Infusion Services
23  clients for those pharmacies?
24     A   Hospitals.
25     Q   Okay.
0088
1        Just hospitals?
2     A   Generally just hospitals; yes, ma'am.
3     Q   Would you ever have a situation where physicians
4  would, you know, have patients work directly with Abbott's
5  pharmacies?
6     A   The only patients I recall dealing directly with

7  were those whose lifetime benefit had expired, and we had
8  several of those.  Specifically, those were total parenteral
9  nutrition patients; their lifetime benefits had expired and
10  we couldn't get paid any longer, so we continued to do it
11  pro bono, and we dealt directly with them.
12     Q   When you say, "lifetime benefits had expired," what
13  do you mean?
14     A   That means a lifetime benefit, what their insurance
15  companies would pay - it may be $200,000, it may be $250,000
16  and their lifetime benefit expired - they had surpassed that
17  number and the insurance company would no longer pay; well,
18  we would deal with the patient and continue to
19  provide the product.
20     Q   Okay.
21        Do you recall whether there were sales plans or
22  marketing plans for the Alt Site Home Infusion business?
23     A   Yes, ma'am, there were.
24     Q   There were?
25        Were those similarly reviewed by you - developed by
0089
1  the general manager and then reviewed by you?
2     A   The sales plans?  Yes; that would be how we would
3  do it.
4     Q   Did you keep copies in your office?
5     A   Of their sales plans?
6     Q   Yes.
7     A   Yeah.
8     Q   Okay.
9        Sir, do you ever remember receiving memoranda,
10  either a memorandum or memoranda asking you to retain
11  documents because litigation was ongoing?
12     A   I may have - I don't specifically remember, but I
13  may have.
14     Q   If you did receive that, what would you do with
15  your records or documents?
16        MS. CITERA:  Objection to form.
17        THE WITNESS:  If I had received that?
18        MS. ST. PETER-GRIFFITH:  Yeah.
19        THE WITNESS:  I'd retain them.
20        MS. ST. PETER-GRIFFITH:  Okay.
21        THE WITNESS:  Compliance with the requests of my
22  supervisor at Abbott was not optional.
23        MS. ST. PETER-GRIFFITH:  Okay.
24        THE WITNESS:  If they were to be retained, they were
25  retained.
0090
1  BY MS. ST. PETER-GRIFFITH:
2     Q   Okay.
3        What about do you recall as you sit here today
4  furnishing any documents to - incident to one of those
5  memos?
6     A   Any -- No, ma'am, I don't.  But any document that I
7  had with regard to a sales plan are - my supervisor would
8  also have had.

9    Q   Oh, okay.
10        So do you send all the sales plans up to the
11   president?
12   A   Well, he would have had copies of those; yes,
13   ma'am.
14   Q   Okay.
15        So Mr. Kringel, initially, and then Mr. Gonzalez?
16   A   Yes; they would have copies of our sales plans.
17   Q   Would you discuss the sales plans with either
18   Mr. Kringel or Mr. Gonzalez?
19   A   Either Mr. Kringel or Mr. Gonzalez would approve
20   our sales plan and then we would present it to the
21   corporation, and after corporate approval it would become
22   cast in stone as our sales plan.
23   Q   Okay.
24        Who would -- And would this be done on an annual
25   basis?
0091
1    A   The sales plan would be done on an annual basis and
2    it would be updated.
3    Q   How frequently would it be updated?
4    A   In April and August.
5    Q   In April and August?
6        And who in corporate would sign off on the sales
7    plans for your business units?
8    A   As I recall, Hodgson, the president of the
9    corporation.
10   Q   Mr. Hodgson would?
11   A   Mr. Hodgson, yes.
12   Q   Okay.
13        And who else was the president of the corporation
14   while you were there?
15   A   While I worked for the corporation?  Boy, there
16   must have been - there were a lot of them; Kirk Robb, Jim
17   Vincent, Jack Schuler - there were at least four.
18   Q   Okay.
19        Did you ever work with Miles White?
20   A   No.
21   Q   Okay.
22        Did you work with Mr. White when you were in
23   Diagnostics at all?
24   A   No -- Oh - hold on - yes; I made a sales call with
25   Mr. White probably in 1983 on the largest customer we had -
0092
1    he was in national accounts then and I had Physiological
2    Diagnostics - we made a sales call on MetPath in Teterboro,
3    New Jersey, and Mr. White accompanied me on that call.
4    Q   Okay.
5        Do you recall when Mr. White took over as president
6    of the company?
7    A   Probably in 1999 or --
8    Q   Okay.
9    A   -- 2000.
10   Q   Do you remember who preceded him?

11    A   Who preceded him as president?  It may have been
12  Jack Schuler - I don't even remember - Mr. Schuler as
13  president?
14    Q   Okay.
15       So when Mr. White --
16    A   No - excuse me - Tom Hodgson was president.
17    Q   Tom Hodgson; okay.
18    A   Yeah.
19    Q   So when Mr. White took over in '99 and 2- --
20    A   Mr. White is CEO.
21    Q   Is CEO.
22    A   Right.
23    Q   Okay.
24       Would he sign off on the plans?
25    A   I don't know if he dealt in the level of detail
0093
1  that would include a business like Alternate Site Product
2  Sales or Home Infusion Services.
3       I am sure that, as president -- Well, the president
4  was a gentleman named Bob Parkinson - Mr. White was
5  chairman.  Mr. Parkinson, I'm sure would -- But whether
6  Mr. White as chairman would sign off at that level of
7  detail, I doubt -- I don't know.
8    Q   Okay.
9       What about you talked earlier about trying to phase
10  out of the Home Infusion Business Unit --
11    A   Yes, ma'am.
12    Q   -- would that be a decision that would need to be
13  made above you?
14    A   Yes, it would.
15    Q   Who would you expect would need to be consulted and
16  conferred with and ultimately make that decision?
17    A   Mr. Kringel or Mr. Gonzalez, and then probably
18  Mr. Hodgson or Mr. Parkinson.
19       COURT REPORTER:  Give me one second.
20       MS. ST. PETER-GRIFFITH:  Okay.
21       Why don't we take a brief break.
22       VIDEOGRAPHER:  Going off the record.
23       (Whereupon, a brief recess was taken)
24       VIDEOGRAPHER:  We're back on the record.
25  BY MS. ST. PETER-GRIFFITH:
0094
1    Q   Mr. Robertson, I'd like to talk with you about
2  different folks that you worked with, but before I did that,
3  I have to tell you, I don't have a business background, and
4  you've sold product all over the world on behalf of Abbott.
5       I wanted to understand a little bit more about how
6  Alt Site went about differentiating its product - its
7  hospital products from those of its competitors - are you
8  with me?
9    A   Mm-hmm.
10    Q   You mentioned earlier that, you know, dextrose is -
11  I think you used the word loss leader?
12    A   No, ma'am --

13   Q   Oh, I'm sorry.
14   A   -- I didn't use that word.
15       It's sugar water.
16   Q   Okay.  It's sugar water.
17   A   Yes, ma'am.
18   Q   I mean, are there different qualities of sugar
19 water?
20       MS. CITERA:  Objection to form.
21   Q   You know, like is Abbott's product that different
22 from, say, you know Baxter's product on sodium chloride or
23 dextrose?
24   A   Not highly different; no, ma'am.
25   Q   Okay.
0095
1       How do you go about then sort of as the head or how
2 did Alt Site as a business unit go about differentiating its
3 product so that it was competitive?
4       MS. CITERA:  Objection to the form.
5       THE WITNESS:  Well, the product was always
6   competitive.  It's a good product; it's just difficult
7   to differentiate.
8       Once again, we tried to accentuate the quality of
9   our product, the constant availability of our product,
10   our service and the breadth of product line.
11   Q   Okay.
12       So you've got service.
13   A   Mm-hmm.
14   Q   Now, was the profitability to the customer an
15 important factor in how Abbott went about selling these sort
16 of large volume hospital products?
17       MS. CITERA:  Objection to form.
18       THE WITNESS:  Profitability to the customer was - we
19   couldn't do anything about that.  I mean, our
20   profitability was - that's a competitive milieu there,
21   and our concern was our profitability versus our
22   competitors.
23       MS. ST. PETER-GRIFFITH:  Okay, I got you.  Okay.
24       THE WITNESS:  If we're out there -- If we're out
25   there trying to sell a liter of dextrose for two bucks
0096
1   and our competitor's out there for 40 cents, there will
2   be no profitability --
3       MS. ST. PETER-GRIFFITH:  I got you.  I got you.
4       THE WITNESS:  -- we have to be competitive with
5   them.
6 BY MS. ST. PETER-GRIFFITH:
7   Q   Is it fair to say that sort of the -- But -- Was
8 the benefit of using your product to the customer an
9 important consideration for Alt Site Product Sales?
10       MS. CITERA:  Objection to the form.
11       THE WITNESS:  The benefit of using our product was
12   the service and breadth of product line.
13       You know, these products are very inexpensive --
14       MS. ST. PETER-GRIFFITH:  Okay.

15      THE WITNESS:  -- right?
16          In a home infusion environment, if you've got a
17      nurse whose fully burdened cost is $60 an hour, whether
18      you're paying a dollar and a quarter or a dollar-forty
19      for an injectable pharmaceutical is not going to make or
20      break.
21          What could make or break is the fact that when that
22      I.V. being gets to the customer's house, it hasn't
23      broken; when the vial of injectable drug gets there, it
24      opens properly and doesn't snap; that the person that
25      you order this from is pleasant and professional -
0097
1      that's what matters.  And we couldn't impact the
2      profitability of our customers.  These drugs are -
3      indiluents are trivial --
4          MS. ST. PETER-GRIFFITH:  Okay.
5          THE WITNESS:  -- in their overall situation.
6   BY MS. ST. PETER-GRIFFITH:
7      Q    But in terms of differentiating your product from,
8   say, Baxter's product for sodium chloride or dextrose, for
9   example, you mentioned that price --
10      A   We --
11      Q   -- was one way --
12      A   -- we --
13      Q   -- to differentiate.
14      A   We would not do that, ma'am.
15      Q   Oh, you wouldn't.  Okay.
16      A   Baxter doesn't have a line of injectable
17   pharmaceuticals.
18          We'd say, We're a one-stop shop here.  Why would
19   you do business with Baxter and have to make two orders when
20   you can call us and make one?
21      Q   Oh, okay.
22          So it was the nature of the product line?
23      A   Nature of the product line, the breadth of the
24   product line and our ability to fulfill more of the
25   customer's needs their our competitors.
0098
1      Q   Okay.
2      A   We tended to use those specific competences and
3   advantages to gain business.
4      Q   Well, then would there then be a direct price
5   competition between, say, sodium chloride bags or dextrose
6   bags that Abbott sold as compared to those that Baxter sold
7   or were they just completely different products?
8          MS. CITERA:  Object to the form.
9          THE WITNESS:  Well, would there be a direct --
10      Customers would want to say, Well, Baxter will charge me
11      this and you're charging me that.
12          And we would have to say, Yeah, but if you do
13      business with Baxter, you're going to get two delivery
14      charges; it's costing you 11 bucks to cut an invoice;
15      it's costing you another 15 bucks to cut the check.
16      Those charges go away if you do it with us because

17    you've got one bill, you know, one purchase order, one
18    invoice, and our service tended to be superior because
19    we paid a lot of attention to that.  So we tried to
20    differentiate in that regard.
21        THE WITNESS:  Price -- I'm not trying to downgrade
22    price - price is important - but our products were
23    trivial in the total cost picture of these companies.
24    We were not -- If someone was inefficiently dealing with
25    a $60.00 an hour fully-loaded nurse, whether he was
0099
1    paying a buck-forty or a buck-twenty-five for an
2    injectable was not going to solve his problem of
3    profitability.
4    Q   Well, would reimbursement for Abbott products be
5  something that factored into an Abbott customer's analysis
6  of whether to go with an Abbott product as opposed to a
7  Baxter product?
8        MS. CITERA:  Objection to the form.
9        THE WITNESS:  Would reimbur- -- I -- There would be
10    many issues that would lead them to one product or
11    another - I don't know -- I don't know.  I don't believe
12    that a customer would say that -- I don't know the
13    answer to your question.  Perhaps, perhaps not; I --
14    Q   Well, let me ask it more generally.
15        In developing marketing plans for initiatives or
16  sales plans for initiatives overall for Alt Site --
17    A   Mm-hmm.
18    Q   -- would reimbursement at all be a factor - would
19  reimbursement to the customer at all be a factor in how Alt
20  Site developed its plans?
21        MS. CITERA:  Objection to form.
22        THE WITNESS:  Well, we would have to have
23    reimbursement.  I mean, there would have to reimburse
24    for the --
25    Q   So it would have to be a reimbursable product.
0100
1    A   Reimbursable product.
2    Q   What about the level of reimbursement, was that a
3  consideration?
4    A   I don't -- I don't think we considered that a
5  market based upon a level of reimbursement.
6        I mean, our problem was what our competitors
7  charged versus what we charged and whether or not we could,
8  you know, get the business.
9        I -- They had to be reimbursed for the product.
10    Q   Okay.
11        So reimbursement was important if that regard.
12        MS. CITERA:  Objection to form.
13        THE WITNESS:  Well, if the customer didn't get
14    reimbursed for the product there would be no utilization
15    of the products so the problem goes away.
16    Q   Do you know whether there were different
17  reimbursement levels between Abbott products and comparable
18  Baxter products?

19    A   No.  It was the same product.
20    Q   Do you know whether there were different
21 reimbursement rates, though, by other third-party payors or
22 states or the Medicare program?
23    A   There -- As I re- -- There may have been - I mean,
24 I'm sure there were.  There were probably different levels
25 of reimbursement for product.  If product is a function of
0101
1 cost or charges - if there are different charges for
2 different product, there's going to be different levels of
3 reimbursement
4    Q   Okay.
5       Do you know whether that was - the different levels
6 of reimbursement factored into the Alt Site's customer base
7 in terms of making a decision as to whether to go with
8 Abbott products as compared to Baxter products?
9       MS. CITERA:  Objection to form.
10      THE WITNESS:  I -- Ma'am, you'd have to ask the
11    customers that.  We marketed based on our -- You know, I
12    don't know what the customers are thinking.  We market a
13    product based upon a competitive environment.
14      MS. ST. PETER-GRIFFITH:  Well --
15      THE WITNESS:  We never marketed to a customer by
16    saying, You'd make more money with this product - is
17    that your question?
18 BY MS. ST. PETER-GRIFFITH:
19    Q   In part.
20      Did, you know, the reimbursement to the customer
21 factor into the sales plans developed by Alt Site?
22      MS. CITERA:  Objection to form.
23      THE WITNESS:  No.
24    Q   Not at all?
25    A   The reimbursement to the customer --
0102
1       MS. CITERA:  Objection to form.
2       THE WITNESS:  -- we never discussed that.
3       We marketed based upon the quality of our products.
4    Q   You never discussed reimbursement?
5    A   I never did --
6       MS. CITERA:  Objection to form.
7       THE WITNESS:  -- personally.  I don't know if others
8    did, but I didn't.
9    Q   Do you know whether the sales forces at all did?
10    A   Not -- Not to my knowledge.
11    Q   Do you know whether Medicaid or Medicare
12 reimbursement at all was considered by Alt Site customers in
13 making decisions about whether to go with Abbott products as
14 compared to a competitor's generic?
15      MS. CITERA:  Objection to form.
16      THE WITNESS:  It may have been; I don't know.  I
17    can't speak for them.
18    Q   Did anyone bring reimbursement issues to your
19 attention as being a factor that customers considered?
20    A   No --

21     MS. CITERA:  Objection to form.
22     THE WITNESS:  -- not that I remember.
23        But, once again, these drugs are trivial in their
24     total cost picture.  It may very well -- You know, it
25     may very well have been, I just don't recall.
0103
1     Q   Do you whether other -- We're talking about
2  sodium -- When you say, "trivial," I take it you're talking
3  about the sodium chloride and dextrose?
4     A   And I'm talking about the drugs.
5     Q   Okay.
6        Including like, for example, vancomycin?
7     A   The drugs aren't a big -- I don't recall what the
8  pricing was.  But these drugs, based upon their total cost
9  basis for providing patient care, were trivial.
10    Q   Okay.
11    A   I mean --
12    Q   Do you know --
13    A   -- do you access to those data?  I don't know.
14    Q   Well, do you know whether --
15       MS. CITERA:  Could you guys not speak over each
16    other?
17       You're both doing it.
18       MS. ST. PETER-GRIFFITH:  I'm sorry.
19       MS. CITERA:  Thank you.
20       MR. STETLER:  Wait for her to finish her question.
21       THE WITNESS:  Okay.
22  BY MS. ST. PETER-GRIFFITH:
23    Q   Do you know whether reimbursement, for example, of
24  vancomycin - reimbursement levels of vancomycin was an
25  important consideration to Abbott Alt Site customers who
0104
1  were purchasing vancomycin?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  It may have been.  Reimbursement is a
4     critical issue, so I assume that reimbursement for vanco
5     was important to the customer.
6     Q   Okay.
7        When you say, "reimbursement was a critical issue,"
8  what do you mean?
9     A   I didn't say it was a critical issue, ma'am, I said
10  it was important --
11    Q   Okay.
12    A   -- to a customer because they want to recover their
13  cost, I assume.
14    Q   Okay.
15       Do you know whether they want to recover more than
16  their cost?
17       MS. CITERA:  Objection to form.
18       THE WITNESS:  Once again, I can't speak for them.
19       I mean, they want to make money - I know - I would
20    know that; yes, they would.
21    Q   Do you know whether the Alt Site sales force when
22  working with customers would discuss levels of reimbursement

23    for Abbott products?
24        MS. CITERA:  Objection to form.
25        THE WITNESS:  Levels of reimbursement for Abbott
0105
1     products were never a way we sold - were not a way we
2     sold.  No one of told them to sell that way, to my
3     knowledge.  They were told to sell based upon the
4     quality of our products.
5     Q    But do you know whether they may have used
6     reimbursement levels as a way to market Abbott products?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  I have -- I don't know that.  They
9     were never instructed to do that.
10        I don't know that, that anybody did.
11    Q    They could have but you just don't know?
12        MS. CITERA:  Objection to form.
13        THE WITNESS:  I don't know whether they - whether
14    they ever did that.  I mean, I don't know.
15    Q    Okay.
16        Sir, you testified earlier -- I'd like to go over
17    sort of a list of names of folks to see if you've worked
18    with them or are familiar with them.
19        Did you work with Mr. White at all when he - after
20    he assumed the helm in '99?
21    A    No.
22    Q    Do you know whether the Home Infusion Business Unit
23    was ever formally shut down?
24    A    No --
25    Q    Okay.
0106
1     A    -- I have not spoken to anybody in that business,
2     you know?
3     Q    Okay.
4        Are you aware that the Hospital Products Division
5     spun off to another company called Hospira?
6     A    Hospira; yes, ma'am.
7     Q    Okay.
8        How are you familiar with that?
9     A    I read it in the newspaper.
10    Q    Mr. Gonzalez; what was your day-to-day interaction
11    with him?
12    A    Mr. Gonzalez --
13        MS. CITERA:  Objection to form.
14        THE WITNESS:  -- I reported to Mr. Gonzalez.
15    Q    Okay.
16        How much -- What would you -- What would reporting
17    to go him involve?
18    A    I would submit plans and updates on my business to
19    Mr. Gonzalez.  I would see him infrequently.
20    Q    Okay.
21    A    If he had any questions, he would ask them of me -
22    I had an occasional one-on-one conversation with him.  And
23    we would run the business based on the numbers.  If I had a
24    problem and needed his help, I would contact him.

25    Q    What do you mean when you say you ran the business
0107
1   based upon the numbers?
2     A   He looked at my numbers and if they were according
3   to the plan and there were no questions provoked by these
4   numbers or by my commentary on the numbers on a monthly
5   basis, then if he had questions - which was pretty frequent,
6   he would call me and ask me or I'd have a one-on-one with
7   him and I would talk to him about that.
8     Q    So Mr. Gonzalez reviewed numbers for the Alt Site
9   Products Division on a - or Alt Site Product Sales on a -
10  I'm sorry.
11       For Alt Site, would Mr. Gonzalez receive numbers
12  concerning your sales on a monthly basis?
13    A   Sure.  Yes.
14    Q    Would he ever come to you with questions about
15  those?
16    A   Yes.
17    Q    How frequently?
18    A   Whenever there was a discrepancy between what I had
19  agreed to and what the numbers came in at.
20    Q    How would those discrepancies arise?
21    A   He, seldom, if ever called me if they exceeded his
22  expectation --
23    Q    Okay.
24    A   -- if they did not achieve his expectation, I heard
25  from him every time.
0108
1     Q    How frequently would you hear from him on numbers
2   that didn't exceed - that failed to meet his expectations?
3     A   We reported monthly.  If they meet his
4   expectations, I'd hear from him monthly.
5     Q    Okay.
6        Did you hear from him every month?
7     A   No, ma'am.  We made our numbers pretty well.  We
8   had to -- We made our numbers pretty well.  If there was a
9   good opportunity, we made the numbers pretty well.
10    Q    Did you take any problems to Mr. Gonzalez seeking
11  his assistance?
12       MS. CITERA:  Objection to form.
13       THE WITNESS:  Specific problems that we had that we
14    weren't able to solve, no.  But we'd come to him and ask
15    him for -- If there was a product opportunity, we'd ask
16    him to fund it so that the manufacturing group would do
17    it.  But specific -- That's a problem - if you need a
18    product and you don't have it, it's a problem - I would
19    define it as a problem - so we'd do that.
20    Q    Okay.
21       So when you say "product opportunity," what do you
22  mean?
23    A   If there was line extension - a product line
24  extension; a new product; a new drug; a change in a current
25  product that would make it better suited to Alt Site - that
0109

1  kind of thing.

2    Q   Other than the Zemplar sort of R and D that you
3  discussed earlier, what other products would Alt Site be
4  involved with developing?

5    A   I think we requested a line of injectable
6  pharmaceuticals be developed - you know, once again, it was
7  a long time ago.  I can recall going to him and asking him
8  to develop some specific product for us.

9    Q   Do you recall which those were?

10   A   No, ma'am, I don't.  I'm sorry.

11   Q   Does the Advantage line, does that ring a bell?

12   A   The Advantage line was developed for the hospitals.
13  That was in place well before Alternate Site Product Sales
14  became -- The Advantage line, I don't know how much of that
15  we used in Alternate Site.  We may have sold some to
16  distributors, I don't know - I don't remember specifically.

17        That's the little gizmo you'd dial into the
18  diluent --

19   Q   Okay.

20   A   -- Advantage, I guess that's -- You'd dial it into
21  the diluent and it makes pharmacy operations more efficient
22  - is that the product line you're discussing?

23   Q   You know, I'm not sure.

24        MR. STETLER:  If I could interrupt a minute.

25        Keep your voice up all the way through your answer -

0110

1    she's having a real hard time hearing you.

2        THE WITNESS:  Oh, I'm sorry.

3        MR. STETLER:  You tend to drop your voice at the
4    end and kind of go like this (indicating).

5        So just all the way through, keep it up.

6    Q   Any other -- Other than for sales - the monthly
7  sales reports, sales plans and going to Mr. Gonzalez for his
8  assistance with problems, did you have any other interaction
9  with Mr. Gonzalez?

10       MS. CITERA:  Objection to form.

11       THE WITNESS:  Not really.

12       I mean, he was my supervisor; he would review my
13  performance with me and I saw him on annual reviews, and
14  that was our relationship - I mean, he was my boss.

15   Q   Did you have a good relationship with Mr. Gonzalez?

16   A   Yes.

17   Q   Okay.

18   A   He's a good guy.

19   Q   What about Mr. Kringel, what was your --

20   A   He was my supervisor.

21   Q   -- involvement with him?

22   A   He preceded Mr. Gonzalez as my supervisor.

23   Q   And would your interaction with Mr. Kringel be
24  comparable to your interaction with Mr. Gonzalez?

25   A   We had the same reporting relationship; yes, ma'am.

0111

1    Q   Okay.

2        Did you have any other relationship with

3  Mr. Kringel?
4      A   Other than professional?
5      Q   Well, yeah - I'm sorry, that was poorly-phrased
6  question.
7          Other than what you described in terms of your
8  interaction with Mr. Gonzalez, with Mr. Kringel, would you
9  have more interaction with him than you would with
10  Mr. Gonzalez?
11     A   In the beginning I had more because I was new to
12  the job and he was - wanted to make sure I could do it, but
13  then he let me do my job and Mr. Gonzalez would let me do my
14  job.
15         So did I see them every week and discuss plans and
16  activities?  No.
17         I reported to them.  If there were discrepancies, I
18  would explain them.  If we were - and that was our
19  relationship, just a professional relationship.
20     Q   What about Mr. Begley?
21     A   Mr. Begley, as I recall, he worked in Hospital
22  Products Division.  He had - his responsibility was the
23  large solutions business.  And I also worked with Mr. Begley
24  and he was one of the people that worked out in San Diego
25  and had a line of ambulatory infusion pumps - that was his
0112
1  responsibility and I - we sold those pumps.
2          And I guess he's currently CEO of Hospira.
3      Q   Okay.
4          Where did you learn that?
5      A   From the newspaper.
6      Q   Tom Hodgson; what was your involvement with
7  Mr. Hodgson?
8      A   He was president of the corporation.
9      Q   Okay.
10         Did you interact with him?
11     A   We presented plans and updates to him.
12     Q   Would you do that in a meeting?
13     A   Yes, ma'am.
14     Q   How often?
15     A   Three times a year.
16     Q   And you would also -- Would you also present
17  written plans?
18     A   They were always written.
19     Q   Okay.
20         And what was his interaction with the plans?
21     A   He would challenge our reasoning, challenge the
22  numbers.  We would explain how we got there.  If he agreed
23  with our explanation, if he agreed with our assumptions for
24  coming year, he would approve the plan.  If not, he would
25  change them.
0113
1      Q   And how would he -- How frequently would he change
2  plans?
3      A   Well, I mean, there's so many issues, he's bound to
4  change one issue or another.

5    Q    In each plan?
6    A    Oh, yeah; absolutely.  I mean, that's - that's his
7  job --
8    Q    How would he --
9    A    -- to challenge our reasoning, and numbers change
10  from time to time based upon his input.
11    Q    How would he know how to change the plan?
12        MS. CITERA:  Objection to form.
13        THE WITNESS:  We would discuss assumptions and he
14    would either agree or disagree with those assumptions.
15        Numbers are generated by assumptions; growth rates
16    of markets, volume increases, new customers coming on
17    board - that sort of things.
18    Q    Would you have any of these comparable
19  presentations with Mr. White at all?
20    A    I never --
21        MS. CITERA:  Objection to form.
22        THE WITNESS:  -- did that with Mr. White.
23    Q    Would you have any other action - interaction with
24  Mr. Hodgson?
25    A    No.  I'd see him at the plan and update meetings
0114
1  and that was all.
2    Q    Okay.
3        Mr. Heggie, does that name ring a bell?
4    A    Michael Heggie?
5    Q    Yes.
6    A    Mm-hmm.
7    Q    Who is Mr. Heggie?
8    A    He - Mr. Heggie worked in our Renal Care area.
9    Q    Okay.
10        Other than working in your Renal Care area, did you
11  interact with Mr. Heggie?
12    A    Yeah; I knew him.  I -- You know, I've -- I -- I
13  mean, we'd go to meetings and I'd see him in there and, you
14  know, he'd be there.
15        And I remember going out for a couple martinis one
16  night with Mr. Heggie.  He's a martini connoisseur --
17    Q    Okay.
18    A    -- I am not.  I regret the experience.
19    Q    I'd like to go back to the meetings that you
20  discussed having with Mr. Hodgson.
21        Who would be present at those meetings?
22    A    Mr. Kringel; all of the accounting and finance
23  people in the division and the manufacturing people would be
24  there; all of our group would be there; sometimes
25  representatives of other business groups; the large Hospital
0115
1  Solutions business would be there; the marketing people from
2  the division whose products we sold would be there.  The
3  room would be occupied by, perhaps, 30 to 40 people.
4    Q    Okay.
5        Would you ever discuss pricing at these meetings?
6        MS. CITERA:  Objection to form.

7      THE WITNESS:  Yes, we did.
8   Q   Okay.
9        What would the discussions about pricing be?
10   A   Averaging and selling prices.
11   Q   Okay.
12        Any other pricing discussions?
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  No.
15   Q   Do you recall whether a decision was made to add
16   acyclovir to the Generic Hospital Products Division?
17   A   Acyclovir?
18   Q   Acyclovir, it begins with an A- --
19   A   Yeah.
20   Q   -- c-y- --
21   A   To Hospital Products Division?
22   Q   Yeah.
23   A   I've heard that word before.  I don't know what the
24   product does, I don't know what claims it has or what it's
25   intended to do --
0116
1   Q   Do you know --
2   A   -- but I have heard the name before.  I --
3   Q   Do you what do you about the product?
4   A   I've heard the name before; that's all I can tell
5   you --
6   Q   That's it?
7   A   -- I don't --
8   Q   Do you know whether it was generic or branded?
9   A   I have no idea - I'm sorry.  And I don't know in
10   what context I've heard the name, but I know I've heard the
11   word "acyclovir" before.
12   Q   At these meetings with Mr. Hodgson, would there be
13   any discussions about adding generic products to the
14   Hospital Products Division listing of products?
15   A   In those discussions with Mr. Hodgson, most of the
16   time the - we would ask for funding to develop a new product
17   and he would have to approve that funding.
18   Q   Okay.
19        What about -- Well, let ask you this.
20        Who within the Hospital Products Division would
21   have to sign off on a decision to add a new generic product?
22   A   Mr. Kringel, the division president, because he was
23   the one that divided up the R and D resources.
24   Q   Okay.
25        What about Mr. Gonzalez; would he -- When he
0117
1   succeeded Mr. Kringel, would he have to sign off --
2   A   Mr. Gonzalez had identical responsibilities to
3   Mr. Kringel, so, yes, he would.
4   Q   Okay.
5        Would anyone else be involved in the decision
6   making about whether to approve a generic product?
7   A   Approve a generic product --
8       MS. CITERA:  Objection to form.

9       THE WITNESS:  -- for research and development; is
10    that your question?
11    Q   Well, yeah, to make -- To make and ultimately sell
12   a generic product.
13    A   No.  If it was proposed by the --
14       MS. CITERA:  Objection to form.
15       THE WITNESS:  If it was proposed by our organization
16    and we had the R and D resources available and we were
17    willing to pay for it, Mr. Kringel would approve it and
18    then it would be done.
19    Q   Okay.
20       Mr. Kringel or Mr. Gonzalez after him?
21    A   If the funds were available, Mr. Kringel divvied up
22   the funds.  If we're asking for incremental funds, then
23   Mr. Gonzalez or Mr. Hodgson would have to approve that
24   increment.
25    Q   Okay.
0118
1       Mike Sellers --
2    A   Yes, ma'am.
3    Q   -- do you know who Mike Sellers is?
4    A   Yes, ma'am.
5    Q   Who is Mr. Sellers?
6    A   He was general manager of Alternate Site Product
7   Sales when it started, then he went over to the division and
8   worked as director of contract marketing for the division,
9   then he came back as general manager of Home Infusion
10   Services, and now, I believe, Mr. Sellers works for
11   Hospira - I don't know.
12    Q   Do you know -- Were you -- Did you bring
13   Mr. Sellers back to work in - to be the general manager of
14   Home Infusion?
15    A   Yes; that would have been my decision.
16    Q   Why did you decide to do that?
17    A   He's a good guy, he's professional, he works hard,
18   he works with integrity, he's smart, and I thought he was a
19   good person to have that responsibility to try to figure out
20   some way to help us extricate ourselves from the business.
21    Q   Well, was he tasked with the responsibility of
22   trying to figure out how to close down the Home Infusion
23   business?
24    A   Specifically, yes.
25       I mean, we got to get out of this business.  I
0119
1   mean, he knew that it was not gaining resources.  We just -
2   ma'am, we just wanted out.
3    Q   Who did he succeed as the general manager of
4   Home --
5    A   I believe --
6    Q   -- Infusion?
7    A   -- Bill Dempsey was in there before him.
8    Q   Okay.
9       Why did you make the change?
10    A   Mr. Dempsey was promoted.

11   Q   Okay.
12        Did Mr. Dempsey similarly have the responsibility
13   of trying to figure out how to extricate Abbott from the
14   home infusion business?
15   A   Mr. Dempsey's a bulldog, and he tried very hard.
16        Toward the end of his tenure, I believe he was
17   coming around to my way of thinking.
18   Q   Okay.
19        When you say, "he tried very hard," you mean he
20   tried very hard to keep the business unit?
21   A   He tried very hard to make it successful.
22        You know, he's a hard worker, he was also very
23   smart and he had good people that were working.  It was
24   just -- I don't think the model -- I don't think there was a
25   stainable business model - no matter how we tried to manage
0120
1   it, I don't think it would have been successful, so.
2   Q   Okay.
3        What about David Brinks, does that name ring a
4   bell?
5   A   I think he was a contract analyst in that business,
6   David Brinks.  As I recall, he was a contract analyst in
7   that business.
8   Q   Okay.  Let me go back to Mr. Sellers.
9        What was your day-to-day interaction with
10   Mr. Sellers when he was the general manager of Alt Site
11   Product Sales or the general manager of Home Infusion?
12   A   Day-to-day?
13        MS. CITERA:  Objection to form.
14        THE WITNESS:  They reported to me.  I would see them
15   as needed.
16   Q   Okay.
17        Would they -- What would their job responsibilities
18   be as -- What would --
19        MS. ST. PETER-GRIFFITH:  Strike that.
20   Q   What were Mike Sellers' job responsibilities as the
21   general manager of Alt Site Product Sales?
22   A   After we had discussed the plans and updates, his
23   responsibility was to direct his people in the achievement
24   of those plans and updates.
25   Q   What about as the general manager of Home Infusion?
0121
1   A   It's the same job; once you've come to an agreement
2   with the people to whom you report, your job is to manage
3   your resources to the accomplishment of those goals.
4   Q   Okay.
5        And one of the goals for Home Infusion was to
6   figure out a way to extricate Abbott from home infusion?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  Initially, it's how can we --
9   Initially, the goals are, Is this a proper business for
10   us; Can we be useful; Can we be helpful; Can we be
11   profitable; Is there a future?
12        And when it became obvious that we should have been

13   out of that business, we just sort of denied it
14   resources and it went its way.
15     Q   Cynthia Sensibaugh or Cindy Sensibaugh, did you
16   interaction with her?
17     A   You know, I can't remember if she -- Is that the
18   name she used for the entire tenure of our - of her work
19   there?
20     Q   I'm not sure.  I don't know.
21        I'm just asking you if that's a name you're
22   familiar with.
23     A   No, ma'am, I don't remember that person.
24     Q   Okay.
25        David Landsidle, is that a name familiar to you?
0122
1     A   Oh, the name is familiar, but the person I can't
2   picture.
3     Q   Okay.
4        You gave a sigh.  Do you have a specific
5   recollection of Mr. Landsidle?
6     A   No.  No.  No.
7        I mean, when you hear a name that you recall and
8   the name comes to mind and you can't picture the face or the
9   person's responsibility - I mean, you know, I'm here to
10   answer your questions --
11     Q   Sure.
12     A   -- I just can't answer that question.
13     Q   Sure.
14        MR. STETLER:  We just thought there was a good story
15   behind it.
16        THE WITNESS:  There's a good story behind everybody.
17        MR. STETLER:  Well, forget I said anything.
18   BY MS. ST. PETER-GRIFFITH:
19     Q   Do you have any recollection whatsoever of
20   Mr. Landsidle?
21     A   Landsidle, if you could tell me what he did I might
22   be able to.
23     Q   Well, do you recall interacting with any government
24   relations folks or lobbying folks?
25     A   Oh, we had a group in Washington, D.C., as I
0123
1   recall.
2     Q   Okay.
3        What do you recall about that group?
4     A   That they were - you know, the major responsibility
5   seemed to be to take people to lunch - I don't know what
6   they did.  You know, to report to us on government
7   activities and actions and that sort of thing.
8        I don't think it was anything you couldn't read in
9   the Federal Register - I don't know.  I remember those - we
10   had a group there.
11     Q   As part of your responsibilities, would you review
12   the Federal Register?
13     A   Not my responsibilities; no, ma'am.
14     Q   Okay.

15      Would you review state or federal regulations or
16  statutes?
17      A   No, ma'am.
18      Q   Who within Alt Site would do that?
19      A   I don't think we had anybody --
20      MS. CITERA:  Objection to form.
21      THE WITNESS:  We didn't have anybody with that
22  specific responsibility.
23      That was sort of - since it impacted the whole
24  corporation, that may have been a corporate
25  responsibility, I don't know.  But we didn't have
0124
1  anybody to do that.
2      Q   Do you recall if a question arose concerning state
3  or federal statutes or regulations who the question would be
4  directed to from Alt Site?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  No -- State or federal regulation?
7  No, I don't think we had anybody -- I know we didn't
8  have anybody specifically responsible for regulation.
9  We could ask the corporation - I'm sure they had great
10  interest in that and somebody there would have done
11  that.
12      Q   Do you recall who within the corporation you would
13  go to?
14      A   I'm sure there's a regulatory affairs organization
15  within the corporation would have been the people.  I don't
16  recall specifically.
17      Q   Okay.
18      What about Jerry Eikorn, is that a name that rings
19  a bell?
20      A   Jerry Eikorn I thought was a national accounts
21  person - Jerry Eikorn - Jerry Eikorn - Oh, I think he worked
22  in HPD - big, robust fellow worked in HPD, and I don't
23  recall what his specific responsibilities were.
24      Q   Okay.
25      Let me ask you just physically where was Alt Site's
0125
1  office?
2      A   Initially we were in a commercial office building
3  about two miles away from Abbott Park.  Subsequent to that
4  we moved onto the Abbott facility but were in a building
5  about 500 yards south of where the Hospital Products
6  Division was located.  We were in a separate building.
7      Q   Okay.
8      So Alt Site was contained in one building and the
9  other components of the Hospital Products division was in
10  another building?
11      A   That's correct.
12      Q   Okay.
13      Trudy Bucheri, does that name ring a bell?
14      A   Yes, ma'am.
15      Q   Okay.  Who is Miss Bucheri?
16      A   She was originally sort of a technical person in

17  our Alternate Site Products Sales Group in California, I
18  believe - yeah, it is - it's California.  That's what I
19  remember of Miss --
20    Q   Do you recall any other responsibilities that Miss
21  Bucheri would have?
22    A   Not in the -- No.
23    Q   Let me ask you, as part of Alt Site would there be
24  a formal training program for the different components of
25  Alt Site?
0126
1    A   Yes.  We hired -- We hired people to come in and
2  they'd have to be trained.
3    Q   Okay.
4        And who would do the training?
5    A   Someone within each of the individual business
6  units - maybe that's Miss Bucheri's responsibility - that's
7  where we're going - maybe she was a trainer.
8    Q   Okay.
9        Do you know what component like, for example, in
10  Alt Site Product Sales, what would the training programs be?
11    A   Selling skills and how the products worked and the
12  technical aspects of the product performance and function.
13    Q   Any other training programs?
14    A   No; just how to sell and what our products did.
15    Q   Were there manuals?
16    A   There may have been training in planning and
17  organization, as well.
18    Q   Okay.
19        Would there be manuals that would be used to assist
20  in the training?
21    A   I don't know that specifically, but it's reasonable
22  to assume that there were.
23    Q   Are you familiar with any manuals that discussed in
24  Alt Site Product Sales selling or marketing concerning the
25  Alt Site Product Sales product lines?
0127
1    A   No, ma'am; not specifically.
2    Q   What about for Home Infusion, do you recall what
3  the training program was there, if there was one?
4    A   I believe there it was -- Training is very
5  expensive unless - and in that business, probably not
6  affordable, so we hired people who were experienced in the
7  business.
8    Q   Do you recall who you hired?
9    A   Oh, wow.
10        We had a young woman from California - that was
11  early on.  As the - and the others -- We didn't hire very
12  many people.
13        Once again, the business was not that profitable,
14  so I don't think we were anxious - I know we weren't anxious
15  to hire a bunch more people to be in that business.
16    Q   What about Don- - is it Donald Buell, B-u-e-l-l, do
17  you recall that name?
18    A   Buell, B-u-e-l-l?

19   Q   Or B-e-u-l-l, but I believe it's B-u-e-l-l.
20   A   No, ma'am.
21   Q   Okay.
22        Mike Trutel, does that name ring a bell?
23   A   No.
24   Q   Kathy Babington.
25   A   The name is very familiar, but I - not in the
0128
1  context of working for Alternate Site, I thought she worked
2  for the corporation in some public affairs or some kind
3  of --
4    Q   Did you have interaction with her at all that you
5  can recall?
6    A   I know the name and I'm sure I've met the person.
7  I know the name - Babington's not a common name, so I've
8  heard the name and I - and it's reasonable to assume that
9  some point in the past I met her, but I don't know this
10 person.  If the person were to walk in, I might recognize
11 her, I might not.  I don't know.
12   Q   Do you recall working with Public Affairs at all?
13   A   Seldom, if ever, did I personally work with Public
14 Affairs.
15   Q   Do you remember those occasions when you might have
16 had occasion to work with Public Affairs?
17   A   No, I can't remember specifically any occasion when
18 I worked with them.
19   Q   What about Guy Wiebking?
20   A   Oh, yes, I know Guy Wiebking; yeah.
21   Q   How do you know Mr. Wiebking?
22   A   He was the vice president of sales of Hospital
23 Products Division when I joined HPD.  And then he was -
24 worked in contract marketing, I believe, after that.  And
25 subsequent to that, I don't know what Guy did.  I think he
0129
1  retired in like 2002, 2003.
2    Q   Did you have interact with Mr. Wiebking?
3    A   Yes.
4    Q   How?  What would that interaction be?
5    A   He was part of our update and plan process.  He was
6  also part of our plan reviews, so I would see him at those
7  meetings.
8    Q   Would Alt Site Product Sales or Alt Site, the
9  business unit, in general, have interaction with his
10 business unit?
11   A   We had a --
12      MS. CITERA:  Objection to form.
13      THE WITNESS:  -- That was a very large corporate - I
14 mean hospital marketing group - contract marketing -
15 pardon me - group within hospital products and we would
16 - they would approve our contracts to ensure that the
17 pricing that we provided, the terms and conditions we
18 provided made sense in the larger context of the
19 division.
20   Q   So would all Alt Site Product Sales contracts have

21  to be approved by HBS?
22      A   That doesn't seem rationale because I'm sure there
23  were certain parameters we were allowed to do.  And --
24      Q   Okay.
25          Do you remember what they were?
0130
1       A   No, ma'am.
2           (Continuing) -- and it wouldn't make sense just to
3   go every time if there were certain parameters we could
4   arrange, so.  But I'm sure that they would have copies of
5   our contracts and that they would have to grant their
6   blessing to these contracts before we could implement them,
7   I mean.
8       Q   Are you aware of anyone else who would need to
9   review the contr- - the Alt Site contracts?
10      A   Not to my knowledge.
11      Q   Would the general counsel's office need to review
12  them?
13      A   Oh, absolutely.
14      Q   Was there someone in particular that you worked
15  with in Alt Site for contract review?
16      A   Each of the business units was assigned an
17  individual, and I can see the faces but can't recall the
18  names.
19      Q   Okay.
20          Do you have any recollection whatsoever as to
21  identifying information?
22      A   I don't know --
23          MS. CITERA:  Wait a second.
24          I just want to instruct you to the extent - I'm not
25      sure about your question, but not to reveal any
0131
1   conversations that you had with counsel.
2       I'm not sure that that what you're asking, but I
3   just want to make that clear.
4           THE WITNESS:  Yes, ma'am.
5           MS. CITERA:  Okay.
6   BY MS. ST. PETER-GRIFFITH:
7       Q   Do you recall any identifying features about the --
8       A   There was a young -- Is that -- There's a young,
9   curly-haired fellow who was very cooperative and hard
10  working and - I mean, the division had a person and her name
11  was Honey Lynn Goldberg - I remember that - I remember her -
12  she also worked in Diagnostics for a year, so I remembered
13  name, we'd work with her all the time.  I can't remember the
14  name of the young man who - with whom we dealt.
15          But, yeah, it was important to us that the
16  contracts have the approval of our legal department.
17      Q   Lorene Mershimer --
18      A   Yes, ma'am.
19      Q   Who is Miss Mershimer?
20      A   Miss Mershimer is - oh, I don't know what she does
21  now.  Miss Mershimer was general manager of the renal
22  business.

23   Q   Okay.
24      And she succeeded Mr. Sellers?
25   A   She succeeded --
0132
1      MS. CITERA:  Objection to form.
2      THE WITNESS:  -- Mike King.
3   Q   Oh, Mike King.  I'm sorry.
4   A   Mr. Sellers was never involved in Renal.
5   Q   Right.  Okay.
6      And so you were her direct supervisor?
7   A   Yes, ma'am.
8   Q   For how many years?
9   A   Two or three; I can't recall.
10   Q   And did Miss Mershimer then move on to something
11 else after?
12   A   She was promoted into the Hospital Products
13 Division in responsibility there.
14   Q   How was your interaction with Miss Mershimer?
15   A   She reported to me.
16   Q   Okay.
17      How often would she report to you?
18   A   I saw Miss Mershimer daily.  We would have
19 conversations probably weekly.
20   Q   How was she as an employee?
21   A   As an employee?
22      MS. CITERA:  Objection to form.
23      MS. ST. PETER-GRIFFITH:  Yes.
24      THE WITNESS:  As a colleague -- Do you -- I cannot
25   answer, you know, as an employee.
0133
1      As a colleague --
2      MS. ST. PETER-GRIFFITH:  Okay.
3      THE WITNESS:  -- she was bright, articulate,
4   aggressive, smart, and I believe she did very well in
5   the Renal Care business.
6 BY MS. ST. PETER-GRIFFITH:
7   Q   Virginia Tobiason, is that a name that rings a
8 bell?
9      We had already talked about her earlier.
10   A   Yeah, I know Miss Tobiason.
11   Q   How do you know Miss Tobiason?
12   A   She worked in Home Infusion Services.
13   Q   Okay.
14      And did she work there during part of your tenure?
15   A   Oh, yes.
16   Q   Okay.
17      For how many years, do you recall?
18   A   It may have been five or six.  It was quite a
19 while.
20   Q   What was her role in Home Infusion?
21   A   She administratival (sp.) the part of Home Infusion
22 that did the billing and reimbursement piece, I believe.
23   Q   Did Miss Tobiason have any other responsibilities
24 beyond that reimbursement area in Home Infusion?

25    A   She may have, but I don't recall them.
0134
1    Q   Okay.
2        Do you recall whether she had any particular
3    expertise with regard to reimbursement issues?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  She was in charge of the department.
6    I would have to assume that she was competent.
7    Q   Okay.
8        Was she consulted on reimbursement issues that
9    transcended or that went beyond the Home Infusion area?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  I think she may have been; yes.
12   Q   Okay.
13       Did you rely upon her for those, for reimbursement
14   issues --
15   A   I personally -- I relied on her --
16       COURT REPORTER:  Did you rely on her --
17       MS. ST. PETER-GRIFFITH:  For reimbursement issues
18   beyond or outside of Home Infusion?
19       MS. CITERA:  Object to the form.
20       THE WITNESS:  I personally do not recall ever having
21   done that; no.
22   BY MS. ST. PETER-GRIFFITH:
23   Q   Okay.
24       How was Miss Tobiason as an employee?
25       MS. CITERA:  Objection to form.
0135
1        THE WITNESS:  As a colleague, as a person that
2    worked there, I saw her infrequently but I heard no
3    complaints about her competence, her performance.
4    Q   How about her interaction with her colleagues or
5    subordinates, were there any problems?
6    A   Any problems?
7        Serious problems that I recall, no.  But that
8    doesn't mean they didn't exist but I just don't know of
9    them.
10   Q   Do you know whether she was well liked by her
11   staff?
12       MS. CITERA:  Object to the form.
13       THE WITNESS:  I don't know that.  I don't know
14   whether she was or was not.
15       I know that no one came to complain to me about
16   her - I don't believe anybody came - I don't recall
17   anybody ever coming to me to complain, so.
18   Q   Did you hear any complaints about her at all?
19   A   No.
20   Q   Okay.
21   A   No.
22   Q   We touched upon a little bit earlier litigation
23   hold memos.
24       Do you recall that I asked you whether you received
25   memos?
0136

1    A    And I think my answer was I may have received them;
2  if I received them I would have complied.
3         I have no specific recollection of having received
4  them.
5    Q    If the memo directed you to distribute the memo to
6  others within your business unit, would you have done that?
7         MS. CITERA:  Objection to form.
8         THE WITNESS:  Yes, ma'am.  I believe we've covered
9    this ground; that compliance with directives of my
10   superior was not optional.
11   Q    Okay.
12        Do you recall for Alt Site - for products that Alt
13 Site sold whether annual price increases were taken?
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  Whether annual price increases were
16   taken.
17        Our objective was, once again, to fulfill our
18   responsibility to the shareholders and get as high an
19   average unit selling price for the product as we could;
20   that was our responsibility --
21        MS. ST. PETER-GRIFFITH:  Okay.
22        THE WITNESS:  -- similar to anyone's responsibility
23   to be as productive as possible for their employer.
24 BY MS. ST. PETER-GRIFFITH:
25   Q    Do you recall whether average unit selling prices
0137
1  would go down?
2    A    It would depend upon the level of competition.
3         Do I remember specific products going down?  No,
4  but it would depend upon the level of competition, the
5  numbers of competitors.
6         I do have a specific example; isoflorane, we went
7  from one competitor to four and the prices in that one
8  specifically went down.
9         When you get generic competition, the prices
10 invariably go down.
11   Q    Sir, how much interaction did you have with
12 Abbott's legal department?
13   A    As needed.
14   Q    Okay.
15        And what --
16   A    I mean, they --
17   Q    -- would be the nature - I don't want you to
18 discuss with me the discussions you had with the legal
19 department, but what were the general natures of your
20 interaction with --
21   A    As I recall, the legal department at Abbott wanted
22 to make sure our contracts were correctly written, that we
23 followed all legal requirements.
24        I found them to be cooperative, I found them to be
25 professional, and my relationship to them is what they said
0138
1  went - there really was no discussion after a decision was
2  made; they made a decision, this is the way it's going to be

3  done, end of story --
4    Q   Okay.
5    A   -- and I have no complaints with that.  I mean, we
6  want to comply.
7    Q   What Abbott - the Abbott corporate office, what
8  would your interaction with them be?
9      MS. CITERA:  Objection to form.
10     THE WITNESS:  The corporate -- Do you mean Mr. -- Do
11    you mean specific individuals, which specific functions?
12    Q   Well, let me ask you this:  Would there be an area
13  in Abbott called Abbott Corporate?
14    A   No, ma'am.
15    Q   No?
16      Okay.
17    A   Not -- Not to -- Abbott Corporate, someone may use
18  that term.  To me, the term is meaningless.
19      Does it mean that all the chiefs sitting around in
20  their offices up in AP6?  Does it mean everyone in that
21  building?  Does it comprehend everybody who works for a
22  corporate department?  It's sort of a - to me, a meaningless
23  term.
24      If you'd talk about a specific department, I'd be
25  happy to relate my relationship with that department.
0139
1    Q   Okay.
2      Well, I wanted to ask you whether you had an
3  understanding as to whether there was a corporate
4  department.
5    A   Oh, there was corporate.  We used to get the
6  allocations.
7    Q   Okay.
8      And would you interact with anyone in what you
9  perceive to be the corporate department?
10    A   As needed.
11      For example, Mr. Hodgson, who would approve our
12  plans and updates was corporate --
13    Q   Okay.
14    A   -- corporate is - let's use for this context anyone
15  who's not part of a division, does that work?
16    Q   Okay.
17    A   Sure.  Our contacts would be frequent.  The legal
18  people were corporate - they may assigned to a division, but
19  they were corporate.
20      So in that context, yes, ma'am.
21    Q   What about Hospital HBS; that was another division
22  within the Hospital Products Division or Business Unit?
23    A   HBS, is that the acronym that you were given, HBS?
24    Q   Yeah.
25    A   Do you know what the words are?
0140
1      Does that mean --
2    Q   The Hospital Business Sector.
3    A   Okay.  That would be - yeah.  That would be
4  Mr. Begly's responsibility --

5    Q   Okay.
6    A   -- HBS.
7    Q   Did you have interaction with HBS?
8    A   Sure.  They were part of our division.  We were in
9    their updates, they were in ours.  We knew their results,
10   their activities and their plans.
11   Q   Go ahead.
12   A   But I just remembered the name of the person whom I
13   replaced - and this was very early on in the conversation -
14   the person's name is Joy Amundson.
15   Q   Okay.
16   A   That's why it's so frustrating to have these
17   conversations after such a long time; you can't remember the
18   names of some people.
19   Q   Sir, what I'd like to do right now is go over with
20   you some terms that have come up in this litigation --
21   A   Mm-hmm.
22   Q   -- and I'd like to get your understanding of the
23   terms.
24   A   Mm-hmm.
25   Q   They're primarily related to pricing, okay?
0141
1        MS. CITERA:  Objection to the form.
2    Q   What --
3        MS. ST. PETER-GRIFFITH:  Well, I haven't asked the
4    question.
5        MS. CITERA:  Well, I mean or objection to the
6    commentary, I should say.
7        MR. STETLER:  Object to what you're thinking about
8    asking.
9    BY MS. ST. PETER-GRIFFITH:
10   Q   Sir, have you ever heard the term "WAC"?
11   A   I've heard the term WAC, yes, ma'am.
12   Q   What is WAC?
13   A   The term, as I understand it, mean Wholesale
14   Acquisition Cost.
15   Q   And how did that -- What did you understand the
16   purpose of WAC?
17   A   I have absolutely no idea.
18   Q   Would it be something that you would be familiar
19   with or interact with on a day-to-day basis?
20   A   No.
21   Q   Do you know whether WAC was important to Alt Site
22   at all?
23   A   No --
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  -- I don't remember it as being
0142
1    important.
2    Q   Rx link.
3    A   Rx link?
4    Q   Mm-hmm.
5    A   I've heard that term before, and it maybe involved
6    the Hospital Business Sector.

7        I don't remember its connection to Alternate Site,
8   though.
9     Q   Catalog price.
10    A   Catalog price is, I assume, a list price for a
11  product.
12    Q   And what is a list price?  That was my next term.
13    A   Catalog price.
14        It's the price that appears in published material
15  from a company or organization of the list price that they
16  charge or --
17    Q   That who charges?
18    A   The company publishing the pricing charges.  That's
19  their list price.
20    Q   Would Abbott have list prices?
21    A   Yes, ma'am.
22    Q   What would be the purpose of the list price?
23      MS. CITERA:  Objection to form.
24      THE WITNESS:  Well, list price is sort of a
25    negotiating - a start of a negotiating position with a
0143
1   customer - not sort of, it is --
2       MS. ST. PETER-GRIFFITH:  Okay.
3       THE WITNESS:  -- the start of a negotiating position
4   with a customer.
5   BY MS. ST. PETER-GRIFFITH:
6     Q   Would Alt Site charge list price to anybody?
7       MS. CITERA:  Objection to form.
8       THE WITNESS:  Very few, if any, people paid list
9     price for product.
10    Q   How come?
11    A   It was very -- It was highly competitive and
12  people, through buying groups, or -- You know, we sold
13  mainly through contracts - buying groups or distributors or
14  wholesalers - and they would negotiate a price and people
15  would become members of those buying groups and have
16  privilege to access those prices.
17        Very few people part were part of no group, and
18  therefore, coming up and paying list price.  It was
19  infrequent.  I'm sure it happened, but just not very
20  frequent.
21    Q   Okay.
22        Do you understand under what circumstances it might
23  happen?
24    A   If I wanted to -- I don't -- No, I can't -- I don't
25  know what circumstances it might happen.  Someone just -
0144
1   someone is starting a business who has no affiliation or an
2   individual wants a solution for a specific reason - I don't
3   know.
4         Certainly, and individuals, if they didn't have the
5   proper licenses wouldn't be able to acquire drugs.
6         But very few, if any, people bought off list price.
7         Just, once again, it was a start of a negotiating
8   position with customers.

9    Q   Other than being the start of a negotiating
10  position, did you have any understanding as to what purpose
11  a list price might have served?
12    A   Well, I mean --
13       MS. CITERA:  Object to form.
14       THE WITNESS:  -- it's part of the start of a
15  negotiation.
16    Q   Do you know why Abbott published a catalog that
17  listed these prices?
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  To give our customers a starting point
20  for negotiation.
21    Q   Okay.
22       Resource file, is that a term you've ever heard?
23    A   I have no idea what that term means.
24    Q   Okay.
25       Direct price.
0145
1    A   I don't know what that term means.
2        It may have been used, I may have heard it in the
3  past but I don't recall what it means.
4    Q   ASP.
5    A   Is Average Selling Price.
6    Q   And what is Average Selling Price?
7    A   Average Selling Price is the total units shipped
8  out the door, divided by the total revenue received for
9  those products - oh, excuse me - the total revenue received
10  divided by the number of units that went out the door -
11  pardon me, I had that backwards, didn't I?
12       What I gave you was the Reciprocal of Average
13  Selling Price.
14    Q   I got you.
15       What would the purpose of an Average Selling Price
16  be or why would Abbott be concerned or Abbott Alt Site be
17  concerned about Average Selling Price?
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  Well, directionally, it tells you many
20  things.  It's not always bad news to have an average
21  unit selling price go down.  That mean - That may mean
22  you're getting larger customers who may pay less per
23  unit but buy a potload of units and so the Average
24  Selling Price will go down.
25       It allows you, by examining that, to challenge your
0146
1  assumptions on the plan of who is going to buy it, how
2  much they're going to pay for it and where the market's
3  going directionally or where you're going in the market
4  directionally.
5    Q   You'd referenced before in your earlier testimony
6  average unit selling price.
7    A   Right.
8    Q   Is ASP what you're talking about?
9    A   Average unit selling price, I -- The difference
10  between Average Selling Price and average unit selling price

11   is Average Selling Price to me is how many units you - the
12   revenue received divided by the units you sold.
13        Average unit selling price is all the revenue
14   received divided by the units you sold plus any samples or
15   free goods you send out the door.
16     Q   Let's discuss that.
17        Under what circumstances would you provide samples
18   or free goods?
19     A   Samples, you would -- Samples just to make sure
20   that people knew how to use the drug or knew how to use the
21   product --
22     Q   Okay.
23     A   -- free goods and samples is sort of identical.  As
24   I recall, they weren't big numbers in our business because
25   people knew how to use these, these were commonly used
0147
1   things.
2     Q   Do you know whether Abbott customers were permitted
3   to seek reimbursement from third-party payors for free
4   goods?
5     A   Permitted, no.
6        MS. CITERA:  Objection to form.
7        THE WITNESS:  No.  I -- No.
8     Q   Okay.
9        How else would Abbott Alt Site use Average Selling
10   Price?
11     A   Oh, pardon me, you have to give me one more --
12     Q   Sure.
13     A   -- one more common use of free goods or samples; if
14   we had shipped product and it was damaged in transit and the
15   product was not suitable for the function which the customer
16   intended, we would replace it and that would be free - we
17   would not bill them again --
18     Q   Okay.
19     A   -- or --
20     Q   But that's just fulfilling a contract obligation,
21   isn't it?
22     A   Yeah.  I mean, if you send somebody a product that
23   they can't use, you can't make them pay for it.  So we'd
24   send them the product.
25     Q   AMP.
0148
1     A   AMP, you mean ampule?
2     Q   No.  A-M-P.
3     A   I don't know what that term means.
4     Q   Okay.
5        Best price.
6     A   It should mean what it says; best price.
7     Q   Was it a term that was used --
8     A   In our context --
9     Q   Yes.
10     A   -- of Alternate Site?
11     Q   In Alt Site.
12     A   I may have heard the term but it was not a term

13   that I recall hearing frequently.
14      Q    AWP.
15      A    I bel- -- That's Average Wholesale Price.
16      Q    And what is the purpose of Average Wholesale Price?
17      A    I believe that was - Average Wholesale Price was
18   used to determine reimbursement in certain market segments.
19      Q    Okay.
20         Do you remember which market segments?
21      A    I believe it was used to determine - I think
22   Medicare used Average Wholesale Price.
23      Q    Okay.
24         What about Medicaid program?
25      A    I have no knowledge of that.  I don't know.
0149
1      Q    Do you know whether the Medicaid programs or some
2   of them would use WAC?
3      A    I'm sorry --
4      Q    Does that refresh your recollection at all on what
5   WAC might mean?
6      A    I'm sorry.  No, I don't.
7      Q    Okay.
8         How would Average Wholesale Price be determined?
9      A    Once again, we sold to distributors and wholesalers
10   and they sold - they to the end-user through buying
11   contracts that they had.
12         So my knowledge of how these terms would be used is
13   limited.
14      Q    Okay.
15         Well, did Average Wholesale Price have a
16   significance to Alt Site?
17         MS. CITERA:  Objection to form.
18         THE WITNESS:  Well, as we discussed before, there's
19   a reimbursement responsibility.  You asked me if,
20   before, I believe, if Miss Tobiason know that - did you
21   not?
22         MS. ST. PETER-GRIFFITH:  Yeah.
23         THE WITNESS:  Yeah.
24         So if it's part of reimbursement and she were
25   competent in reimbursement, she would have to know what
0150
1   that term meant.
2   BY MS. ST. PETER-GRIFFITH:
3      Q    Outside of -- Well, did you understand what the
4   term meant?
5      A    No.  I knew that it was part of reimbursement and
6   that it was a component of reimbursement.
7      Q    Outside of Home Infusion was AWP important, for
8   example, to Alt Site Product Sales?
9         MS. CITERA:  Objection to the form.
10         THE WITNESS:  Well, we had no way of knowing where
11   the products were going.  But I don't know; may have.  I
12   mean, we've talked -- You know, this reimbursement issue
13   has recurred --
14         MS. ST. PETER-GRIFFITH:  Okay.

15    THE WITNESS:  -- so it may have been important to
16  our customers.
17  BY MS. ST. PETER-GRIFFITH:
18    Q   Do you know how it was important to your customers?
19      MS. CITERA:  Objection to the form.
20      THE WITNESS:  Well, the reimbursement's import- -- I
21  mean, they get paid, it's important.
22        But, once again, I'd like to reiterate that the cost
23  of these drugs is trivial and the overall profitability
24  wasn't impacted by these drugs.
25    Q   By which drugs?
0151
1    A   By the drugs that we sold.
2    Q   Including vancomycin?
3      MS. CITERA:  Objection to form.
4      THE WITNESS:  I don't think vancomycin was a very
5  expensive drug.
6    Q   What about the term "spread," have you heard that
7  term?
8    A   Spread is -- Spread is the difference between
9  Average Wholesale Price and reimbursement level; am I right?
10    Q   Well, was spread a term that was used in Alt Site?
11    A   Seldom.  I mean, I know what the term means, but
12  not a term that we would use frequently.
13    Q   How do you know what the term means?
14    A   Because I've heard it.
15    Q   Okay.
16      In what context have you heard it?
17    A   I mean, I don't recall.
18      Over the years, this term has come up, spread, the
19  difference between reimbursement and the price of a drug.
20    Q   Did you have an understanding as to whether spread
21  was important to Abbott customers?
22      MS. CITERA:  Objection to form.
23      THE WITNESS:  It may have been.  But that's not how
24  we marketed it; we marketed that drug based on the
25  quality of the drug.
0152
1    Q   Do you know whether the spread differ- -- The
2  spread between an Abbott product and as compared to a Baxter
3  product factored into decision making for some of Abbott's
4  customers as to whether to purchase a product?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  I don't know that.  It may have; I
7  don't know.
8      I mean, I guess if you -- I don't know.  I don't
9  know that.
10    Q   Do you know whether Abbott Alt Site Product Sales
11  customers considered spread in evaluating whether to award
12  contracts --
13      MS. CITERA:  Object- --
14    Q   -- to Abbott Alt Site?
15      MS. CITERA:  Objection to form.
16      THE WITNESS:  You mean the broad contract?

17   Q   Any contract.
18     MS. CITERA:  Same objection.
19     THE WITNESS:  They may have, I -- You know, once
20   again, they may have, I don't know.
21       That's one product out of 4,000 in the catalog.
22   Whether that would tip the contract, I don't know.
23   Q   Do you know whether, for example, an organization
24   like Gerimed evaluated AWP and spread in considering who to
25   award a contract to?
0153
1     MS. CITERA:  Objection to the form.
2     THE WITNESS:  They could have.  They may have.
3   Q   If AWP and spread was important to a customer like
4   Gerimed, would that be something that Abbott Alt Site would
5   carefully evaluate in putting together its proposal to
6   Gerimed?
7     MS. CITERA:  Objection to form.
8     THE WITNESS:  That would be marketing on spread.
9     We never marketed on spread, to my knowledge.
10   Q   Okay.
11     What do you consider marketing on spread?
12   A   Going out and promoting that with customers.
13   Q   Were there any policies concerning marketing on
14   spread?
15     MS. CITERA:  Objection to form.
16     THE WITNESS:  I don't know.  I -- You know, this
17   isn't -- Not to my knowledge.  I mean, other than we
18   didn't market that, we didn't market on the total
19   product line.
20   Q   Was there any formal policy that say said that you
21   didn't market on spread?
22   A   I think I've had this discussion with Ward and Ward
23   never marketed on spread.  We did not market on spread.
24   That's not the way we did it.
25     Is there a written policy that I can find?  I doubt
0154
1   it.
2   Q   In what context -- When you say "Ward," do you
3   mean --
4   A   John Ward.
5   Q   -- John Ward?
6   A   Mm-hmm.
7   Q   In what context did you have a discussion about
8   this issue with Mr. Ward?
9   A   Well, you just -- You know, they would -- This
10   issue of spread, I think we had discussed -- I mean, if you
11   wanted to do that, you'd end up with 100 percent market
12   share - you wouldn't do that.
13     We didn't want to do that.  We wanted to market
14   based upon the quality of our products and keep marketing
15   that way.
16   Q   Okay.
17     When you say you would have, "100 percent market
18   share," what do you mean?

19     A   Well, that might gain you a competitive advantage,
20  as you've articulated what it means.
21         We didn't want to do that.  We wanted to market
22  based upon the quality of our product.
23         I don't remember anybody ever marketing on - or
24  gaining market share on the basis of - on that basis.
25         It's a small product, I think.  It's just one of a
0155
1  number.
2     Q   What do you mean, "it's just one of a number,"
3  which product?
4     A   You were talking about vancomycin.
5     Q   I'm talking about at any time.  I'm sorry, I should
6  have clarified.  Not just for vancomycin.
7         Was spread for any Abbott product that Alt Site
8  sold --
9     A   Not to my -- No; not to my knowledge.
10        MS. CITERA:  You need to let her finish her
11  question.
12        THE WITNESS:  I thought the question was finished.
13    A   Did you have more to ask?
14    Q   That's okay.  You answered my question.
15        But let me go back and make sure.
16        For any product that Alt Site sold --
17    A   Mm-hmm.
18    Q   -- was AWP or spread ever a consideration in how
19  Abbott Alt Site marketed the product?
20    A   Ever.  You used the word "ever."
21    Q   Ever.
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  Our policy was not to market on the
24  basis of spread.  We didn't discuss spread.
25        If there were an aberration in the pricing, I
0156
1  can't -- I can't ex- -- We did not market on the basis
2  of spread.  We'd market on the basis of being
3  competitive with the selling prices of individual
4  competitors.
5     Q   If customers would has you for spread information
6  or AWP information, how would you respond?
7     A   No one ever asked me for that personally.
8     Q   What about your sales force that you were
9  responsible for?
10    A   We had a sales force within the organization.  I
11  don't know of anybody asking for information on that --
12    Q   You're not aware --
13    A   -- I personally -- I personally don't know about
14  that.
15        I mean, once again, I may have been -- This is a
16  long time ago, they may have been asked, I may have gotten
17  the information, but to the best of my recollection, I don't
18  recall it.
19    Q   Do you know whether spread or differentials between
20  AWP and contract prices is one way to differentiate between

21   generic products that otherwise are, for the most part, the
22   same product --
23        MS. CITERA:  Objection to form.
24    Q   -- as between competitors?
25        MS. CITERA:  Objection to the form.
0157
1         THE WITNESS:  It may be.  I mean, if they make more
2    money, it may be.  That may have tipped it.
3         We just didn't market in that fashion.
4    Q   Are you aware of any government investigations into
5    Average Wholesale Price or spread during your tenure at --
6    A   Not that I --
7    Q   -- Abbott?
8    A   Not during my tenure.  Not during my tenure.
9        I wasn't -- Not that I remember.
10   Q   Okay.
11        Do you recall in 1996 Abbott being served with an
12   Investigative Demand from the Department of Justice?
13   A   No.  I mean, it may well have happened, but I don't
14   recall.
15   Q   What about any litigation concerning AWP and
16   Lupron; do you recall any issues associated with that?
17   A   I remember that -- I remember that there was a suit
18   involving the marketing of Lupron and that I believe Abbott
19   was fined and Takeda, the joint venture partner, was fined.
20   Q   What's the basis of your information?  Where did
21   you learn that?
22   A   Newspaper.
23   Q   Anyplace else?
24   A   Well, I know some people over there.
25   Q   Over where?
0158
1    A   I know people at TAP.
2    Q   Oh, that actually takes me back to a question.
3        What was your interaction with TAP or TAP
4    employees?
5    A   Well, we -- I know several of the individuals who
6    were there who worked there, and my son worked there.
7    Q   Okay.
8        And who's your son?
9    A   His name is Don Robertson.
10   Q   And what was his role at TAP?
11   A   He was a salesperson, then he managed TAP Care, he
12   was a sales manager.
13   Q   Did you discuss the TAP litigation with him at all?
14   A   I must have, but not in any detail.
15   Q   Do you know whether he was at all involved in --
16   A   No.
17   Q   -- the litigation?
18   A   No; not to my knowledge.
19   Q   Okay.
20   A   He was well down in the organization.
21   Q   Did he have a particular sales region?
22   A   He was a salesperson in Illinois and then he moved

23  to Des Moines, Iowa and he was a sales manager there, I
24  believe.
25      Q    How long did he work for TAP?
0159
1       A    Twelve years.
2       Q    From what period to what period, do you recall?
3       A    You know, I -- He left there three or four years
4   ago.
5       Q    Okay.
6            And now what's he doing?
7       A    He works for Sepricore in Boston.
8       Q    And you're still not a Red Sox fan?
9       A    Well, they play the Yankees, so I like them to that
10  point.
11      Q    Oh, okay.
12      A    I'm a Mets fan.
13      Q    Not only do they play the Yankees, they beat the
14  Yankees.
15      A    Yes, ma'am.
16           MS. ST. PETER-GRIFFITH:  Why don't we take a lunch
17  break.
18           VIDEOGRAPHER:  We're going off the record.
19           (Whereupon, a lunch recess was taken from 12:15 p.m.
20  until 1:06 p.m.)
21           VIDEOGRAPHER:  We're back on the record.
22  BY MS. ST. PETER-GRIFFITH:  (Continued.)
23      Q    Mr. Robertson, before the break, there were a
24  couple of areas that we were talking about that I want to
25  kind of revisit.
0160
1            First, you indicated that your son is at TAP?
2       A    No; he was at TAP.
3       Q    Oh, he was at TAP --
4       A    Yes, ma'am.
5       Q    -- I'm sorry.  He was at TAP.
6            Now he's in Boston and you're still not a Red Sox
7   fan.  That's right.
8            Sir, are you conversant with or friendly with other
9   either current or former employees of TAP?
10      A    I know many former or current employees of TAP.
11      Q    Do you speak with them on a regular basis?
12      A    No.
13      Q    Are there some TAP employees that have retired to
14  the Naples/Fort Myers that you're aware of?
15      A    No.
16      Q    No?  Okay.
17           Sir, the other more substantive issue that we were
18  discussing before - although, that's not to say the Red Sox
19  aren't substantive because they are - was marketing the
20  spread, and what I'd like to find out from you is, first,
21  the policy that you were talking about, was that something
22  that was implemented when you came onto Alt Site?
23           MS. CITERA:  Object to the form.
24           THE WITNESS:  I don't know that.

25    Q   Do you know what the origin of the policy was?

0161

1    A   The origin of the policy when it began, I don't
2  know that.
3    Q   And do you know whether it's written down anywhere?
4    A   It may be, but I don't know of anywhere that it's
5  written down.
6    Q   How are you aware of the policy?
7    A   We didn't market the spread.  We knew that that
8  existed.  We didn't market our products in that way.
9    Q   So --
10    A   It was brought to my attention by someone.
11    Q   What I'm trying to ascertain is is this a formal
12  corporate Abbott policy or is this more of an informal
13  practice?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  I can't comment on whether or not it
16    was an Abbott policy.  I don't recall ever having seen a
17    document that said it was.  I don't know that.
18    Q   Okay.
19      What -- How do you define marketing the spread or
20  what activities do you consider to be marketing the spread
21  activities?
22    A   If you're talking to a doctor about - or an
23  organization that - and due to the reimbursement the doctor,
24  would make more money using your product than someone else's
25  product and you'd talk to them about that, that would be

0162

1  marketing the spread.
2    Q   What's wrong with that?
3      MS. CITERA:  Object to the form.
4      THE WITNESS:  It's just not the way we marketed our
5    products.  We chose not to do it in that fashion; we
6    chose to market on our own merits.
7    Q   Is there anything wrong with doing that?
8    A   I -- I don't -- I don't know because that's -- Is
9  there anything wrong with doing that?  I don't -- You know,
10  I don't know - I don't have a moral judgment on that.  I
11  know we didn't do it.
12    Q   Okay.
13    A   Other organizations may have done it.  We didn't do
14  it.
15    Q   Are there any other activities other than talking
16  to physicians comparing, you know, spreads that you would
17  consider marketing the spread?
18    A   Talking to them about other marketing activities;
19  do you have an examples?
20      I --
21    Q   Sure.
22      Do you consider or would you consider discussing
23  with Abbott customers Abbott's AWPs as a marketing the
24  spread activity?
25      MS. CITERA:  Objection to form.

0163

1    THE WITNESS:  You know, I -- I don't know.  It
2  may -- All of these things are context - you know, what
3  the objectives of the people are.
4    It may be marketing the spread.  I mean, people may
5  have spoken - within my organization, people may have
6  spoken to other about the spread, there may have been
7  information about the spread.  But it was our policy not
8  to market our products in that fashion.  We didn't do
9  it.
10   Q   Okay.
11    And did you -- Was that policy something that you
12  instituted?
13    MS. CITERA:  Objection to form.
14    THE WITNESS:  Well, the general manager would
15   probably institute the - you know, the policy.
16    I have no specific knowledge of any communications
17   with the sales force.  But that would be something the
18   general manager instituted.
19   Q   So that wasn't a policy that you would institute.
20   A   That I did institute.
21    MS. CITERA:  Objection to form.
22   Q   Or that you did institute.
23   A   No; I don't remember ever communicating to the
24  sales force regarding that.
25   Q   Do you whether that was a policy that your
0164
1  predecessor instituted?
2   A   I have no knowledge of that.
3   Q   Okay.
4    Why were you talking with Mr. Ward about the
5  marketing the spread issue?
6    MS. CITERA:  Objection to form.
7    THE WITNESS:  We talked about marketing all the
8   time; how we, you know, market our product contracts all
9   the time.
10    This issue may have come up, or probably did come
11   up, and I didn't consider it a huge issue at that - you
12   know, at the time, as I recall, but it evidently has
13   become a big issue.
14    I can't remember the context.
15   Q   What I'm trying to ascertain from you is is or are
16  spread marketing activities a prohibited activity, at least
17  with regard to Abbott's Alt Site, or is it just not a
18  marketing tool that you would use?
19   A   It's something that -- It's something that we
20  didn't really want to do.
21    If you look back seven or eight years ago it wasn't
22  a huge issue.
23    Because something that comes can go away.  If
24  you're not marketing based upon the quality and utility of
25  your products, things like that can go away, and it's just
0165
1  not a good marketing tool.  Things can change.
2   Q   Sir, I'd like to show you what's been previously

3   marked in another Texas deposition as Exhibit --
4       MS. ST. PETER-GRIFFITH:  Is it 766?
5       MR. ANDERSON:  Yes.
6   Q   And what I'd like to do is mark it as the first
7   exhibit in your deposition.
8   A   Mm-hmm.
9   Q   First, I'm going to have the court reporter mark
10  it.
11      (Whereupon, Robertson Exhibit No. 1 was marked for
12  identification.)
13  Q   Sir, if you could take a look at this document --
14  Actually before you do, can I ask a question?
15      How would spreads potentially go away?
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  Spread would go away if reimbursement
18  changed.
19      MS. ST. PETER-GRIFFITH:  Okay.
20      THE WITNESS:  And if you remember the era 1991,
21  1992, there was an awful lot of talk about changing the
22  health care delivery system in this country - I believe
23  it was about that time the DRGs came in for Medicare and
24  hospitals.  And that may be why it gained greater
25  attention on, you know -- And it's - doing that is not a
0166
1   substantial advantage of your product.  It's just not a
2   long-term good thing.
3       (Referring.)
4       Okay.
5   Q   Sir, do you recognize this document?
6   A   No.
7   Q   It says, Interoffice Correspondence, Abbott, do you
8   see that at the top?
9   A   Mm-hmm.
10  Q   Do you know who Mr. Gorman is?
11  A   Yeah.  Mark Gorman was a fellow who worked in Home
12  Infusion Services, and I believe he was one of the
13  salespeople over there.
14  Q   Okay.
15      And you notice there are several people who this
16  memo is directed to --
17  A   Mm-hmm.
18  Q   -- from Mr. Gorman?
19  A   Mm-hmm.
20  Q   Including Mr. Dempsey and Mr. Ward?
21  A   Mm-hmm.
22  Q   And Mr. Karas and Miss Tobiason?
23  A   Mm-hmm.
24  Q   And there's a cc listed that says, D. Robertson.
25  A   Mm-hmm.
0167
1   Q   Do you have any reason to doubt that that's
2   referencing you?
3   A   No.  That's me.
4   Q   Okay.

5       Do you have any reason to doubt that you received
6   this memorandum?
7   A    No, I don't doubt that I received this.
8   Q    Okay.
9        Sir, if you could look at the second paragraph --
10  A    Mm-hmm.
11  Q    -- it says, Conspicuous in its absence from the
12  list is Baxter.
13       Do you see that?
14  A    Mm-hmm.
15  Q    What significance does that have?
16  A    Well, if it --
17      MS. CITERA:  Objection to the form.
18      THE WITNESS:  I mean, if you look at the first
19   paragraph, it says if they didn't sign up for the rebate
20   program they wouldn't be eligible to sell the drugs to
21   organizations who were billing Medicaid.
22  Q    Would that put Abbott in a better position for the
23  products that it competes with Baxter?
24      MS. CITERA:  Objection to form.
25      THE WITNESS:  It would certainly put Baxter at a
0168
1    disadvantage.
2   Q    Okay.
3        Would it put Abbott at an advantage?
4       MS. CITERA:  Objection to form.
5       THE WITNESS:  It would put everybody who competed
6    with Baxter at an advantage.
7   Q    Do you see the last sentence of that paragraph, We
8   certainly can use this as a competitive selling advantage,
9   do you see that?
10  A    Yes, ma'am.
11  Q    How would Abbott's sales force use the fact that
12  Baxter was not listed for Medicaid reimbursement as a
13  competitive selling advantage?
14      MS. CITERA:  Objection to the form.
15      THE WITNESS:  Well, I don't think we would have to
16   use it, ma'am.
17       When people tried to bill for Baxter products and
18   didn't get paid, they would convert.  It wouldn't be up
19   to us.  We wouldn't have to do anything.
20  Q    Okay.
21       Well, do you know whether your sales force used the
22  fact that Baxter was not listed to their selling advantage?
23  A    No, I don't specifically know.
24  Q    Do you recall anything about this issue?
25  A    No, ma'am.
0169
1        I also have to be honest; I received a lot of
2   documents every day, and if I was not an addressee or cc'd,
3   chances are it went -- I didn't read it.
4        But I did receive it.  Whether I read it or not is
5   not - you know, is another issue.
6       MS. ST. PETER-GRIFFITH:  Mark the next exhibit,

7   please.
8       (Whereupon, Robertson Exhibit No. 2 was marked for
9   identification.)
10  A    (Referring.)
11      Mm-hmm.
12      MR. HAVILAND:  Could you identify it for the record,
13  please?
14      MS. ST. PETER-GRIFFITH:  Sure.
15      What we've marked as Robertson Exhibit 2 is the June
16  14th, 1991 memorandum from Mr. Robertson to Kris Kringel
17  with cc's to Virginia Tobiason; Chris Begley; Bill
18  Dempsey; Mike King and John Ward.
19  BY MS. ST. PETER-GRIFFITH:
20  Q    Sir, do you recognize this document?
21  A    No, I don't.  But I assume I wrote it and sent it
22  to them.
23  Q    Why do you assume that?
24  A    Because my name's on the top of it.
25  Q    Do you have any doubt that you sent this memorandum
0170
1   out?
2   A    No, ma'am.  That's my signature on the bottom.
3   Q    Okay.
4       And, sir, did you draft this memoranda?
5       MS. CITERA:  Objection to form.
6       THE WITNESS:  I don't -- I don't know that.  I
7   know -- I don't know that.
8   Q    Well, if you didn't draft this memorandum, who
9   would have?
10      MS. CITERA:  Objection to form.
11      THE WITNESS:  I don't know.  You know, I really
12  don't know.
13  Q    When you sent out memoranda as the vice president
14  and general manager of Alt Site, would you generally draft
15  the memoranda that you sent out?
16  A    Most of the time -- Now, I didn't say I disagreed
17  with what this said --
18  Q    Okay.
19  A    -- you know, because I sent it out.  But I'm saying
20  did I write the thing, and I'm saying I don't remember
21  writing the thing.
22  Q    But you could have?
23  A    Oh, yes, I could.
24  Q    Okay.
25      This is a memorandum from you; correct --
0171
1   A    Mm-hmm.
2   Q    -- at the top?
3       And Mr. Kringel, we've already established, was at
4   the time the president of the Hospital Products Division?
5   A    Mm-hmm.
6   Q    And, sir, in June of '91 you testified earlier that
7   you assumed the position of vice president and general
8   manager in 1990 --

9    A   Mm-hmm.

10   Q   -- were you still, so to speak, learning the ropes

11 in '91?

12   A   Hopefully we always continue learn.

13      I assume I was still learning; yes, ma'am.

14   Q   Okay.

15      Do you see where it says, Proposed rules changes

16 published by HCFA, do you see that in the Re: line?

17   A   Right.

18   Q   Do you know why you were - or can you tell us why

19 you were writing concerning proposed rule changes published

20 by HCFA?

21      MS. CITERA:  Objection to the form.

22      THE WITNESS:  Well, I think it -- My job would be to

23   inform my supervisor of any change which would impact or

24   affect our group, and proposed reimbursement changes

25   would impact and affect our group, so.

0172

1    Q   Who would proposed reimbursement changes impact and

2 affect your group?

3    A   Well, if they were to go down significantly - if

4 reimbursement went down significantly, that would impact our

5 group.

6    Q   How so?

7    A   The market would probably shrink or we would have

8 to make significant price reductions or the products

9 wouldn't be used.

10      Physicians don't like to lose money --

11   Q   Okay.

12   A   -- so they would -- The price would come out of

13 someplace - you know, the money would come out of someplace.

14   Q   Sir, do you see that first sentence attached here,

15 The proposed rule changes published by HCFA regarding the

16 reimbursement for drugs incident to patient treatment in

17 physician's offices or dialysis center?

18   A   I see that.

19   Q   Sir, can you look at the attachment to this

20 document?

21   A   (Witness complies.)

22   Q   Can you tell me is that the attachment that was

23 attached to your memorandum?

24   A   Probably.  Undoubtedly.  I mean, I have no reason

25 to doubt that it is.

0173

1    Q   Okay.

2      MS. ST. PETER-GRIFFITH:  And I will just represent

3   that this document was produced in this sequence by

4   Abbott.

5    A   I guess it was Victoria Shain?

6      No one claims authorship, do they?

7      MR. STETLER:  She's really supposed to be asking you

8   the questions.

9    Q   Sir, let me ask you, do you know what the

10 Reimbursement Task Force is?

11   A   Based -- No.
12   Q   Okay.
13   A   For sure, no.
14   Q   If you could turn to the very last page of this
15   document at ABT21078, do you see your name where it says,
16   Home Care, at the top?
17   A   (Referring.)
18       Yeah.
19   Q   Do you know what that means?
20   A   I assume it's a department -- Let me look at the
21   (referring).  It makes me part of a distribution list of the
22   Federal Health Issues Report.
23   Q   Okay.
24       Do you have any doubt that the D. C. Robertson
25   listed there is you?
0174
1    A   No.
2    Q   You received a copy of this, it appears.
3    A   Yeah.
4    Q   Okay.
5        Sir, that first sentence, what did you mean by that
6    sentence?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  Well, it refers to this document
9    (indicating).
10   Q   Okay.
11       Hold on just a second.
12       (Discussion off the record.)
13   Q   Sir, do you recall in '91 proposed changes to HCFA
14   rules concerning reimbursement for inpatient - for drugs
15   incident to patient treatment in a physician's office or
16   dialysis center?
17   A   Well, that's what this document deals with.
18   Q   Okay.  I'm just asking you without looking at the
19   document --
20   A   Oh, do I recall --
21   Q   Yeah.  Do you recall that?
22   A   No.
23   Q   Do you know why you would have sent this memorandum
24   to Mr. Kringel?
25       MS. CITERA:  Objection to form.
0175
1        THE WITNESS:  Just to keep him informed.  It was
2    something that was generated evidently by our Washington
3    office because that's where Victoria Shain worked.
4    Q   Okay.
5        Who is Miss Shain?
6    A   She was a person who worked in Abbott Washington, I
7    guess.  Once again, we talked about that group earlier and
8    what they did and what they were responsible for.
9        I guess she was keeping her ear to the ground on
10   all issues of health care for Abbott.
11   Q   Now, it says, These rules are being published
12   within the larger context of a re-examination of the entire

13  system and allocation of physician reimbursement, do you see
14  that as your second sentence?
15    A   Yes.
16    Q   What did you mean by that?
17      MS. CITERA:  Objection to form.
18      THE WITNESS:  I remember that in the early 90s,
19    there was - people were looking - or the federal
20    government, specifically, was dealing with the subject
21    of how health care was provided, how it was billed for
22    and reimbursed specifically at the federal level - their
23    Medicare responsibility.
24      And I remember DRGs, I think, came out about that
25    point in time and there was a relook at the whole issue
0176
1   of reimbursement.
2      And of forwarding this, I thought it might be of
3   interest to Mr. Kringel what our Washington office
4   thought, so I forwarded it.
5    Q   Okay.
6      What do you recall about these rules?
7    A   About the rules?  As I recall, not much happened.
8    Q   Okay.
9      Why do you have that recollection?
10    A   Because I can't remember -- I can't remember
11  anything happening now.  I can't remember any specific
12  change that occurred, you know, as a function of this relook
13  by the government and others at this.  I don't remember
14  anything important or big issues happening.
15      We don't have national health care now.
16    Q   Okay.
17      I'm going to mark ask that this be marked as the
18  second exhibit, and, sir, I'd like you to --
19      MR. ANDERSON:  Third.
20    Q   Oh, third - I'm sorry, the third exhibit, and it is
21  a memorandum dated June 11th, '91.
22      And, sir, I'd like you to flip to the last two
23  pages, okay --
24    A   Sure.
25    Q   -- first because we're going to talk about Exhibit
0177
1   2.
2      (Whereupon, Robertson Exhibit No. 3 was marked for
3    identification.)
4    Q   But we're going to talk about the last two pages
5   and the context of Exhibit 2.
6      If you could just flip to the last two pages first.
7    A   (Witness complies.)
8    Q   Sir, I'll represent to you that sequentially this
9   is how these documents were produced to us and these -- No,
10  just if you could look at the last two pages, please.
11    A   Okay.
12    Q   And the pages are labeled ABT212053, 212054 and
13  then there's the final page that is - that doesn't have a
14  label on it --

15   A    Mm-hmm.
16   Q    -- with an ABT prefix.
17        And then there's 212056.
18        And, sir, I'm going to ask you to look at these two
19   pages which, at the top, are proposed rules and ask you
20   whether --
21   A    The first two pages.
22   Q    No.  The last two pages --
23   A    I don't have --
24   Q    I'm sorry.  The last three pages.
25   A    I don't have a 2056 --
0178
1    Q    No.  Down here (indicating).
2    A    I have 54, 53.
3    Q    53 and 54, okay?
4    A    Right.
5    Q    And then do you see the 212056.
6         My question concerns these two pages --
7    A    Oh, okay.
8    Q    -- okay?
9         MS. CITERA:  I think you're talking about another
10   document.  I think that's his confusion.
11        MR. HAVILAND:  I think you're talking about Exhibit
12   2.
13        MS. CITERA:  Yeah.
14   A    Oh, this one (indicating).
15   Q    Yes, I'm talking about - yes - Exhibit 2.
16   A    Okay.
17   Q    My question to you is, sir, could these two pages
18   have been the regulations that you attached to this memo --
19        MS. CITERA:  Objection to the form.
20   Q    -- because it references, These rules are being
21   published.
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  I have no idea.
24   Q    Okay.
25        Well, for Exhibit 2, if you flip the next page, do
0179
1    these appear to be proposed rules or is this a report?
2         MS. CITERA:  Objection to form.
3         THE WITNESS:  This seems to be a report
4    (indicating).
5    Q    Okay.
6         Is it fair to infer that from the context of the
7    second sentence of your June 14th, '91 memorandum that you
8    attach rules published?
9         MS. CITERA:  Objection to form.
10        THE WITNESS:  Are these rules attached?
11    (Referring.)
12        Well, I may have misspoken in the memo because the
13   rules don't appear to be attached.
14        The summary of the rules may be attached, but the
15   rules are not attached.
16   Q    Okay.

17        Then my next question to you is if you could turn
18  again --
19     A    Yes, ma'am.
20     Q    -- and we're going to leave these open because I
21  have questions for you about this.
22     A    Okay.
23     Q    For 212053 and 54, sir, are those the proposed
24  rules that were being published that you are referencing in
25  that second sentence?
0180
1        MS. CITERA:  Objection to form.
2        THE WITNESS:  They may be; I don't know.
3     Q    Well, take a look --
4     A    If you look at chronologically, they're pretty
5  close in time.  They may be.
6        (Referring.)
7     Q    Sir, if you could move on to the next sentence, the
8  third sentence in the June 14th, '91 memorandum --
9     A    Yes, ma'am.
10     Q    -- it says, Changes are intended to effect drugs
11  administered by injection or infusion, do you see that?
12     A    Yes, ma'am.
13     Q    Where did you get that information from?
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  Oh, probably from -- If -- Probably
16    from -- If it's a drug incident to treatment, probably
17    from that sentence, I don't know where I got that.
18     Q    Okay.
19        Then it says, This would include pain management
20  drugs, Oncolytics - do you see that - Lupron and Calcijex?
21     A    Oncolytics.
22     Q    Oncolytics; thank you.
23     A    Those are cancer drugs.
24     Q    Okay.
25        Lupron and Calcijex?
0181
1     A    Mm-hmm.
2     Q    Where did you get that information from?
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  Because those are injection or
5    infusion.
6     Q    Okay.
7        Do the regulations specifically speak to those
8  drugs?
9        MS. CITERA:  Objection to form.
10        THE WITNESS:  I would have to reread the regulation
11    to find out --
12     Q    Why don't you take some time to do that.
13     A    -- if they're drugs incident to treatment.
14        Okay.  Then I'll take the time and look through
15    here.  It may take a while for me to find that, but I will
16    give it my best shot.
17        MR. STETLER:  Wouldn't it be easier for us to agree
18    whether it's in there or not?

19    MS. ST. PETER-GRIFFITH:  Okay.  I mean, we're
20  welcome to.  I don't think it is in there and I want him
21  to feel comfortable as to that.
22    MS. CITERA:  Well, I would object --
23    MR. STETLER:  And I would like to know -- It looks
24  like Jones Day may have just produced the documents out
25  of sequence, the way I read it, but I'd like to
0182
1  establish whether or not the memo's referring to the
2  document that the Witness is looking at just so we don't
3  have an issue down the road about it.
4    MS. CITERA:  Well, first of all, there's zero
5  foundation for the memo because he doesn't remember it.
6  So whether or not he's going to remember --
7    MS. ST. PETER-GRIFFITH:  He admitted to publishing
8  it.
9    MS. CITERA:  He admitted that he must have sent it
10  around but he doesn't recall the document or the issue,
11  so there's no foundation for this document nor could
12  there be any foundation as to whether this (indicating)
13  was attached to this document.
14    MR. STETLER:  Maybe I could back to what I -- The
15  only thing I suggested - and I realize you guys have a
16  purpose and a right to inquire, but it ought to be easy
17  between the two sides to say whether or not there's a
18  reference to those drugs in that very small print that
19  is going to take him about ten minutes to go through.
20    MR. HAVILAND:  It should be except Jones Day just
21  said they're not going to stipulate to the authenticity
22  and admissibility that this is a document authored by
23  the Witness here, we've got a problem for using this at
24  trial.  And if we can't do it with this witness, who are
25  we going to do it with?  That's my problem.
0183
1    MS. ST. PETER-GRIFFITH:  That's my problem, too.
2    MR. HAVILAND:  So if it's a foundation objection and
3  foundation has to be laid, you know how that is,
4  Counsel, sometimes it takes a long time to establish
5  that.
6    I, for one, would like to have a foundation for this
7  document.
8    MR. SISNEROS:  Well, maybe we can take a five-minute
9  break and you review all three documents.
10    THE WITNESS:  Do you want me to read this
11  (indicating) and read this?
12    MS. ST. PETER-GRIFFITH:  These two pages and that,
13  yes.
14    THE WITNESS:  I'm afraid it will take me more than
15  five minutes, and I'd like Mr. Stetler to read it, too,
16  and I'd like to review it in detail if this is very
17  important.
18    MR. HAVILAND:  Ann, what is 55 - let me ask on the
19  record.  The document that breaks between the memo and
20  the rules is one document.

21      MS. ST. PETER-GRIFFITH:  I don't have that.
22      MR. HAVILAND:  Isn't there a 55?
23      MS. ST. PETER-GRIFFITH:  No, I don't have that.
24      MR. HAVILAND:  Sometimes documents get produced out
25   of sequence.
0184
1       MS. ST. PETER-GRIFFITH:  Why don't we take a few
2   minutes so you can look at that.
3       I don't want to confuse the issue.  We could start
4   here.
5       THE WITNESS:  This starts in mid-sentence.  I don't
6   know what -- This page starts in mid-sentence.
7       Do you have a specific part of this page you want me
8   to look at?  I mean --
9       MS. CITERA:  Are we still on the record?
10      MR. SISNEROS:  Yes.
11      MS. CITERA:  Okay.  Good.
12      THE WITNESS:  This starts in mid-sentence.  What --
13   Should I just read this and then what do I do then?
14      MS. ST. PETER-GRIFFITH:  Why don't we go off the
15   record for a few minutes.
16      VIDEOGRAPHER:  Off the record.
17      (Whereupon, a brief recess was taken)
18      VIDEOGRAPHER:  We're back on the record.
19   BY MS. ST. PETER-GRIFFITH:
20      Q   Sir, can you identify whether or not the
21   regulations that you were referencing in the first paragraph
22   of this memo imparted information concerning the page, Pain
23   Management Drugs, that are listed?
24      MS. CITERA:  Objection to the form.
25      THE WITNESS:  No.  I look at the drugs specifically
0185
1   mentioned here, I can't find them in here (indicating).
2    Q   Okay.
3       If you could look at that next sentence, Rationale
4  for a 15% reduction, do you see that?
5    A   Yeah.
6    Q   What did you mean by that?
7       MS. CITERA:  Objection to form.
8       THE WITNESS:  Someone may have communicated to me
9   that that was why it was going to happen.
10      Q   Do you know who would have communicated that to
11  you?
12      A   I have no idea.
13      Q   Okay.
14          What do you mean by the phrase, And that AWP is a
15  poor indicator of actual drug acquisition cost?
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  AWP is an average.  An average is
18   wrong 100 percent of the time.
19      Q   Okay.
20          Is that what you meant by that phrase?
21      MS. CITERA:  Objection to form.
22      THE WITNESS:  Well, that's what I was told and that

23   seems to me -- You know, I have no idea.  If I look at
24   it 16 years after the fact it seems a reasonable -
25   reasonable to me, but I don't - I don't remember.
0186
1   Q   Do you have any recollection as to why you wrote
2   that phrase?
3   A   No.
4   Q   Okay.
5       The next sentence in the second paragraph reads,
6   Several professional groups have vested interests in
7   resisting these changes, do you see that?
8   A   Mm-hmm.
9   Q   And then the following sentence is, They include
10   ASCO, PMA, ASN and the Alliance for Infusion Therapy, do you
11   see that sentence?
12   A   Mm-hmm.
13   Q   Sir, how do you know that several professional
14   groups had a invested interest in resisting the proposed
15   changes?
16   A   I must --
17      MS. CITERA:  Objection to the form.
18      THE WITNESS:  -- have believed it at the time, but I
19   don't remember why.
20   Q   Did you confer with any of these professional
21   groups?
22   A   No.
23   Q   What is the American Society of Clinical Oncology?
24   A   A professional organization.
25   Q   Did you interact with them in your capacity as vice
0187
1   president and general manager of Alt Site?
2   A   No.
3   Q   Do you know whether anyone at Alt Site did interact
4   with them?
5   A   No.
6   Q   Do you have any knowledge of how Alt Site would
7   have learned that ASCO had an interest in resisting the HCFA
8   changes?
9   A   No.
10   Q   What about PMA, what's PMA?
11   A   Pharmaceutical Manufacturers Association.
12   Q   Did you interact with the Pharmaceutical
13   Manufacturers Association when you were the vice president
14   and general manager of Alt Site?
15   A   I didn't personally; no.
16   Q   Do you know if someone in Alt Site did?
17   A   No.  I don't remember.
18   Q   Do you know what the basis of the assertion is that
19   PMA had an interest in resisting the published HCFA changes?
20      MS. CITERA:  Objection to form.
21      THE WITNESS:  I can conjecture, but I don't know
22   specifically.
23   Q   What's your conjecture?
24   A   They have an interest in drug pricing.  But I don't

25  know specifically.
0188
1     Q    What about the American Society of Nephrology, ASN,
2  do you see that?
3     A    Mm-hmm.
4     Q    Did you interact with ASN when you were the vice
5  president and general manager of Alt Site?
6     A    I knew people at the ASN.
7     Q    Who did you know at ASN?
8     A    I don't remember their names.
9     Q    Did you confer with them concerning the proposed
10  changes --
11    A    No.
12    Q     -- published by HCFA?
13       COURT REPORTER:  Let her finish for me.
14       THE WITNESS:  Oh, I'm sorry.
15    Q    What about the Alliance -- Do you know if anyone
16  else within Alt Site interacted with the American Society of
17  Nephrology?
18    A    Not my knowledge.
19    Q    And the Alliance for Infusion Therapy, did you
20  interact with them when you were the vice president and
21  general manager of Alt Site?
22    A    No.
23    Q    Do you have any knowledge as to whether anyone else
24  in Alt Site would have interacted with them?
25    A    They may have, but I don't have specific knowledge
0189
1  of that.
2     Q    Okay.
3        Do you know in what context they would have
4  interacted with them?
5     A    It was a trade group that may have interacted, but
6  I have no specific knowledge.
7     Q    How did you learn that these particular groups may
8  have had an interest in resisting the HCFA changes proposed
9  in '91?
10    A    I think these --
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  These may be -- These appear to be
13    groups that are incident to patient treatment, but I
14    don't -- That would be the only thing I could think of.
15    They used drugs instead of the patient treatment.
16    Q    Sir, the next sentence reads, These groups are
17  being contacted by appropriate Alt Site and Abbott
18  Washington personnel to determine a response to the proposed
19  rule changes, do you see that?
20    A    Mm-hmm.
21    Q    What do you mean by that sentence?
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  Once again, it would be conjecture.  I
24    have no specific knowledge of what we would have done or
25    told them.
0190

1    Q   Did you direct anybody to determine --
2    A   I don't recall that.
3        MR. STETLER: You've got to let her finish.
4        She really wasn't done.
5    A   Pardon me again.
6    Q   Okay.
7        Did you direct anyone to determine whether a
8    response was necessary to the proposed rule changes?
9    A   I don't remember --
10       MS. CITERA: Objection to form.
11       THE WITNESS: -- doing that.
12   Q   In that sentence, who are the appropriate Alternate
13   Site and Abbott Washington personnel?
14       MS. CITERA: Objection to form.
15       THE WITNESS: The Alternate Site people would be the
16   Home Infusion GM, the Alternate Site Product Sales GM,
17   and Washington would be these individuals who were in
18   the Abbott Washington office who were charged with
19   acting in our behalf, whatever they did.
20   Q   I asked you a name before and you couldn't quite
21   place it, David Landsidle.
22       Do you know whether Mr. Landsidle was based in
23   Washington?
24   A   As -- Yes, I -- Yes.
25   Q   And would he have been some of the Abbott
0191
1    Washington personnel - one of the Abbott Washington
2    personnel that you were referencing in this memo?
3    A   As I recall now, yeah.  Yes.  He, and the other
4    name is Miss Shaine here (indicating).
5    Q   Okay.
6        And, sir, are the general managers of Alt Site and
7    Home Infusion that you referenced addressed as cc's on this
8    memorandum?
9    A   (Referring.)
10       Yes, ma'am.
11   Q   Was this letter -- Was this memorandum directing
12   them to make those inquiries --
13       MS. CITERA: Objection to form.
14   Q   -- or intended to direct them to make these
15   inquiries?
16   A   It doesn't appears so, does it?  It appears that
17   this merely an informational copy for them and we may have
18   had a separate conversation directing them to do that; I
19   don't recall.
20   Q   Do you have any recollection of having such a
21   conversation?
22   A   No, ma'am.
23   Q   Do you know why you would have had such a
24   conversation?
25   A   I think --
0192
1        MS. CITERA: Objection to form.
2        THE WITNESS: -- reimbursement was an issue that

3    everyone was interested in; health care reform was an
4    issue that everybody was interested in.  We were in the
5    health care business; it seems to me natural that we
6    would be interested in that.
7        Q    As these responses take shape, we will discuss them
8    with you, do you see that, it's the next sentence?
9        A    (Referring.)
10            Yes, ma'am.
11       Q    What responses are you talking about?
12           MS. CITERA:  Objection to form.
13           THE WITNESS:  It appears the responses from our
14       Washington group; what they came up with, I don't know.
15       Q    Do you recall any discussions with either
16   Mr. Kringel or any of the cc's concerning any responses?
17       A    No, ma'am.
18       Q    The next sentence reads, The HCFA proposal has
19   significant momentum and we believe that some form of
20   reimbursement reduction has a high probability of occurring,
21   do you see that?
22       A    Mm-hmm.
23       Q    What did you mean by that?
24           MS. CITERA:  Objection to form.
25           THE WITNESS:  My assumption is that I meant what I
0193
1    said in there.
2        Q    What do you recall about the HCFA proposal having
3    specific momentum?
4            MS. CITERA:  Objection to form.
5            THE WITNESS:  Nothing.
6        Q    Why did Abbott care whether the HCFA proposal had
7    significant momentum?
8            MS. CITERA:  Objection to form.
9            THE WITNESS:  As I said before, we were in the
10       health care business.  Health care reform was a very hot
11       topic and, being in the health care business, such an
12       interest would have been appropriate.
13       Q    Well, do you know whether your interest was in
14   support of or against the proposed changes?
15           MS. CITERA:  Objection to form.
16           THE WITNESS:  I don't know specifically; no.  I'd
17       have to read the - once again, the changes that are
18       proposed.  I don't have much memory what - you know,
19       this was 16 years ago.  I'm sorry.
20       Q    The next part of that sentence says, And we believe
21   that some form of reimbursement reduction has a high
22   probability of occurring, do you see that?
23       A    Mm-hmm.
24       Q    Do you know why you believed that?
25           MS. CITERA:  Objection to form.
0194
1    Q    Or why you wrote, We believe that?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  Once again, it would be conjecture on
4    my part.  Because I have no specific recollection, it

5     would be conjecture because we believed it because we
6     believed it.
7         The environment - the health care environment may
8     have been such that we believed it but I have no
9     specific recollection of facts or reasons why.
10    Q   Why would Abbott care about reimbursement
11    reduction?
12        MS. CITERA:  Objection to form.
13        THE WITNESS:  Reimbursement reduction reduces the
14    utilization of drugs.
15    Q   Why does it?
16    A   Why does it?
17    Q   Mm-hmm.
18    A   Because physicians will use less drug if the
19    reimbursement's inadequate, I assume.
20    Q   How do you define inadequate?
21    A   If they lose a lot of money in - in - in - in
22    treating patients, I mean, they might lower the level of
23    patient care.
24    Q   Is it would that occur only if they lost money?
25        MS. CITERA:  Objection to form.
0195
1         THE WITNESS:  You know, I don't - I don't know - I
2     don't know specifically.
3         I know that - that it's evident here -- I don't
4     recall specific facts.  It was evident here that
5     lowering of reimbursement would have a negative impact
6     on patient care, so.
7     Q   And do you have any recollection as to why that is
8     or why you conclude that?
9     A   No, ma'am.
10        MS. CITERA:  Objection to form.
11        THE WITNESS:  I mean...
12    Q   The next sentence reads, Our efforts are to ensure
13    these changes are as small as possible, do you see that?
14    A   Mm-hmm.
15    Q   Do you recall what efforts you were talking about?
16        MS. CITERA:  Objection to form.
17        THE WITNESS:  Our efforts were generally to try to
18    explain - although, I haven't - to explain what the
19    impact might be to appropriate individuals not within -
20    within our organization.  We didn't deal with people
21    outside our organization.
22    Q   Well, do you know whether any lobbying efforts were
23    undertaken with regard to the proposed HCFA changes in 1991?
24    A   They may have been by our Washington group - I
25    assume they got paid for something, but I don't know
0196
1     specific actions that they took.
2     Q   Do you recall discussing lobbying efforts
3     concerning the '91 HCFA changes with anyone?
4     A   No, ma'am.
5     Q   Why would Abbott have an interest in seeing that
6     the changes are as small as possible?

7       MS. CITERA:  Objection to form.
8       THE WITNESS:  Once again, I have no specific
9   recollection but I do know that disruption and change
10  muddies the waters, slows the market and just is
11  disruptive to businesses - change is disruptive to
12  businesses.  But I can't remember specific facts in that
13  regard.
14  Q   But can change at times be for the good?
15      MS. CITERA:  Objection to the form.
16      THE WITNESS:  I can only speak experientially.
17      MS. ST. PETER-GRIFFITH:  Okay.
18      THE WITNESS:  That -- I just know that it's
19  disruptive.  Over the long period of time change
20  certainly has to be positive or people wouldn't make it
21  but it can be very disruptive.
22      But I have no specific recollection of the facts of
23  these issues here (indicating).
24  BY MS. ST. PETER-GRIFFITH:
25  Q   The next sentence, which is a longer one, reads,
0197
1   The abandonment of AWP as a good indicator of product
2   acquisition cost and the statement in the proposal that
3   wholesale price guidelines substantially overstate the true
4   cost of drugs, as well as the statement that ultimately
5   there should be a national drug fee schedule have
6   significant implications for our business, do you see that?
7   A   Mm-hmm.
8   Q   What did you mean by that?
9       MS. CITERA:  Objection to form.
10      THE WITNESS:  My assumption is that I meant what I
11  said; that they were using AWP and they were going --
12      COURT REPORTER:  I'm sorry.  They were --
13      THE WITNESS:  -- using AWP here and they -- The
14  sentence says that the - whoever's making these changes
15  was dissatisfied with it.
16  Q   Did you believe in your capacity as vice president
17  and general manager of Alt Site that AWP was a good
18  indicator of product acquisition cost?
19  A   No; probably not a good at product acquisition
20  cost.  No; there were differences between acquisition cost
21  and AWP.
22  Q   Okay.
23      And what were those differences?
24  A   Once again, an average is always wrong - you know,
25  by definition an average is always wrong.  So it can change
0198
1   and it would probably discriminate against small customers
2   and customers who didn't have access or a membership in the
3   large buying groups.
4   Q   Do you know why you wrote that, The abandonment of
5   AWP is a good indicator product acquisition cost would have
6   significant implications --
7       MS. CITERA:  Objection.
8   Q   -- on Abbott's outside business?

9        MS. CITERA:  Objection to form.

10       THE WITNESS:  Because that's -- Although I don't

11    remember specifically, I do know that there would be -

12    if you abandon one system and go to another it causes

13    change and it would be a bureaucratic change, it would

14    take a long time and it would be disruptive to our

15    business.

16    Q    How would it be disruptive to your business?

17    A    Because would have to understand it, understand the

18    changes, and changes in our system are always disruptive.

19    Q    But if the change proposed was to base

20    reimbursement upon a more reliable indicator of product

21    acquisition cost, wouldn't that, in the long run, be more

22    beneficial to the overall reimbursement scheme?

23       MS. CITERA:  Objection to form.

24       THE WITNESS:  Forgive me, ma'am, but in my

25    experience, federal government would create a

0199

1     bureaucracy that would take everybody 16 months to get

2     paid for and half the places would be out of business by

3     the time it got done.

4        I was concerned about disruption in the business,

5     not the level of reimbursement.

6     Q    Were you at all concerned about the possibility

7     that a reduction in reimbursement could impact the interests

8     of Abbott's customers in purchasing product from Alt Site?

9     A    A reduction in reimbursement --

10       MS. CITERA:  Objection to form.

11       THE WITNESS:  -- could impact the interest of our

12    customers; I believe that to be correct.

13    Q    Okay.

14       Why do you believe that to be correct?

15    A    Because, once again, it's a change.

16       If the reimbursement went up, it would have one

17    change; if the reimbursement went down, it would have

18    another change.  It would just be disruptive.

19       Does that answer your question?

20    Q    Okay.  Let me ask this -- Let me move on to the

21    next part of the sentence.

22       You wrote, And the statement in the proposal that

23    wholesale price guidelines substantially overstate the true

24    cost of drugs.

25       Do you think that that was an inaccurate statement?

0200

1     A    I don't know where I got the -- It's in quotes.

2     Does the quote come out of here?

3        If that's true, I quote someone else's opinion.  I

4     have no specific knowledge of where I got that from.

5     Q    Well, do you think that AWP -- When you served in

6     your capacity as vice president and general manager of

7     Alternate Site, did you have any understanding as to whether

8     the AWP reimbursement scheme or the wholesale price

9     guidelines caused a substantial overstatement of true drug

10    costs?

11   A   They could.  I believe they could.
12      But I don't -- Once again, in my memory, I believe
13   they could, I don't have any specific facts in that regard.
14      I don't have any numbers or specific facts in that
15   regard.
16   Q   As an average, did AWP sometimes underestimate
17   provider acquisition cost while it sometimes also
18   overestimated provider acquisition cost?
19   A   That's a computed number, and I don't know how the
20   number was computed.  We didn't -- We didn't compute it, I
21   don't think.
22      I would just have to take a look at the formula
23   that was used to compute AWP and we could tell whether it
24   did or it did not, and also the -- There are probably
25   invoices available from the period of time that would tell
0201
1   you whether it did or did not.
2   Q   Other than the overall business disruption that you
3   described as being a concern, were there any other
4   significant implications for Abbott's Alt Site business that
5   you were concerned about?
6      MS. CITERA:  Objection to form.
7      THE WITNESS:  Well, I was probably concerned that
8   the reimbursement rate would be significantly lowered so
9   that the drug might not be used, but I have no specific
10   regulation of - recollection of that.
11      A prudent person might be concerned that the
12   government would make a decision that was ill-based and
13   impact the health care of the patient and the
14   utilization of the drug.
15   Q   But if the drug reimbursement was lowered so that
16   physicians were still recovering their cost and, perhaps, a
17   little bit more, why would that have an impact on
18   utilization?
19      MS. CITERA:  Objection to form.
20      THE WITNESS:  I -- Once again, I'm -- I -- I don't
21   know.  I don't recall the specific -- There are more
22   costs that are incremental to drug acquisition cost that
23   are associated with treating patients which makes -
24   which dwarf the drug cost - someone has - you know, a
25   nurse or someone - someone who is highly paid on an
0202
1   hourly basis has to inject the drug.  There are all
2   sorts of costs that are associated with that, so - and
3   in addition to records keeping, so the drug is a portion
4   of the issue.
5      But I don't remember specifically why I did that.
6   Q   Do you know whether the HCFA 15 -- the HCFA
7   proposed rule changes impacted anything other than physician
8   reimbursement for actual drugs?
9      MS. CITERA:  Objection to form.
10      THE WITNESS:  I don't remember what the proposed
11   HCFA rule changes impacted; sorry.
12      I mean, I don't remember any of this.  This is a

13   long time ago.
14     Q   Well, let me ask you this: If the proposed
15   regulations reduced reimbursement but the physicians were
16   made whole, would there be any concern with the physicians
17   being made whole and not losing any money and being able to
18   recover what they needed to recover to continue to maintain
19   their practices, would there still be a concern in your mind
20   that drug utilization would be reduced?
21       MS. CITERA: Objection to form.
22       THE WITNESS: I don't -- You know, I don't -- I
23   don't know what the impact would be on them.  I just was
24   concerned - you know, we were concerned about
25   disruption.
0203
1       Whether or not the physicians make money or not was
2   not my concern; my concern was whether or not we could
3   market these drugs effectively in the appropriate
4   markets.  I'm not -- A physician's income is - they get
5   paid for treating patients, not for drugs.
6     Q   Well, how would a change --
7       MR. SISNEROS:  Excuse me.  I think that speaker's
8   on.
9       COURT REPORTER:  No.  It's the person next door.
10       MS. CITERA:  Are you having trouble hearing, because
11   I see you leaning.
12       MS. ST. PETER-GRIFFITH:  If we could hold on just a
13   second, I'm going to go outside and make sure that
14   they're not outside.
15       Let's take a quick break.
16       VIDEOGRAPHER:  Off the record.
17       (Whereupon, a brief recess was taken)
18       VIDEOGRAPHER:  We're back on the record.
19       THE WITNESS:  Okay.  These issues were a long time
20   ago, and I apologize if I can't be more helpful, but I,
21   frankly, don't remember.
22   BY MS. ST. PETER-GRIFFITH:
23     Q   Okay.
24       Was AWP or government reimbursement by HCFA rooted
25   in an AWP formula important to Alt Site marketing?
0204
1       MS. CITERA:  Objection to form.
2       THE WITNESS:  How -- How the cost of the drug was
3   recovered by a physician or a physician group, or how
4   health care was paid for - how cancer patients or
5   Medicare patients or whomever, how they got care and
6   whether or not this care was adequate, yes, was a
7   concern to us.
8     Q   Well, did physicians make money by providing drugs
9   or treating patients?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  As I recall, they're in business for
12   treating patients.
13       I don't know how much money they made -- I don't --
14   You know, I understand, I've heard of instances where

15    physicians have made money selling drugs.
16    Q    Well, can we agree that it's probably not a good
17    health care practice overall for physicians to be making
18    their money selling drugs?
19        MS. CITERA:  Objection to form.
20        THE WITNESS:  I'm not a commenter on health care
21    policy, but in some countries, that's how they make most
22    of their money.
23    Q    Okay.
24        Do you think that that's a fair practice or are
25    there problems with that practice?
0205
1        MS. CITERA:  Objection to form.
2        THE WITNESS:  There are problems with every
3    practice, but I'm not qualified to comment on the health
4    care delivery systems of other countries.
5    Q    If you look at the final sentence of that second
6    paragraph --
7    A    Yes, ma'am.
8    Q    -- - do you see that - The framework for a downward
9    spiral of drug prices is laid through these rules, do you
10   see that?
11   A    Mm-hmm.
12   Q    What did you mean by that statement?
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  As I recall, if you -- If this
15   elaborate bureaucracy were set up to find out what the
16   actual cost of drugs were, and if they were low - now,
17   it could be an upward spiral, too, but the upward spiral
18   - for the upward spiral to happen, doctors would have to
19   lose money for two or three years on buying these drugs.
20   But if the prices were downward, then they would take a
21   look at the actuals and then it would be a downward
22   spiral - they'd replace it with new actuals and new
23   actuals if physicians refused to - maybe to ultimately
24   refuse to use the drugs, I believe.  So that was what I
25   - that was kind of the thing.
0206
1        And, once again, this is all conjecture and things
2    that are going to happen in the future and things we
3    were discussing 16 years ago.  I wish it could be more
4    helpful with regard to specifics.
5    Q    The final sentence of this memorandum say, We will
6    keep you informed of progress regarding the industry
7    responses and our response, both as supplier and
8    manufacturer, do you see that?
9    A    Mm-hmm.
10   Q    What did you mean by that?
11   A    I believe --
12       MS. CITERA:  Objection to the form.
13       THE WITNESS:  -- that we had the opportunity to give
14   input into the PMA, which is the lobbying
15   organization --
16   Q    Sir, I can tell you, I'm going to have to ask you

17  to slow down because I can barely --
18     A   Oh, okay.
19     Q   -- hear you and I know the court reporter is --
20        COURT REPORTER:  If you could just take a breath
21  because she keeps objecting and I can't - it's three
22  people I'm trying to get, so.
23        THE WITNESS:  Okay.  It's that New York upbringing.
24  I will slow down.
25        MR. STETLER:  You can tell when the machine starts
0207
1  to smoke like this, (indicating) you're going too fast.
2        THE WITNESS:  I apologize.  Forgive me.
3        MR. STETLER:  Slow down.
4        THE WITNESS:  Your question again?
5        MS. ST. PETER-GRIFFITH:  If you could read it back.
6        Okay.  Why don't I just re-ask it.
7        COURT REPORTER:  You were asking if he saw the last
8  sentence and then --
9     A   The last sentence --
10        COURT REPORTER:  -- What do you mean by that?
11  BY MS. ST. PETER-GRIFFITH:
12     Q   Yeah.  What do you mean by the last --
13        MS. CITERA:  Same objection.
14        THE WITNESS:  (Referring.)
15        We will keep you informed of progress to the
16  industry; the -- There's -- The PMA would respond to
17  proposed changes - would probably be asked to respond to
18  proposed changes, our lobbying group in Washington would
19  probably be given the opportunity through the PMA to
20  respond to these.
21        And I was -- It appears to me that I meant what I
22  said; that I would keep Mr. Kringel and those copied on
23  this memo informed of anything that I knew regarding the
24  potential of health care reimbursement reform or --
25  Yeah, I mean, that's --
0208
1     Q   Okay.
2        Do --
3        THE WITNESS:  -- what I appear to be saying, ma'am.
4     Q   Go ahead.
5        THE WITNESS:  That's what I appear to be saying.
6     Q   Sir, do you recall what you did to keep Mr. Kringel
7  or the others informed of the progress regarding industry
8  responses?
9     A   No, I --
10        MS. CITERA:  Objection to form.
11        THE WITNESS:  No, I don't.
12     Q   And you write at the very end, And our response,
13  both as supplier and manufacturer, do you see that?
14     A   Mm-hmm.
15     Q   Did Abbott -- Would Abbott have had different
16  responses as a supplier as compared to as a manufacturer?
17     A   I don't know why I wrote that.  Perhaps it was one
18  was going to go through the PMA and one was going - one

19   response was going to go through an industry organization.
20      Q   Okay.
21          Well, do you know whether Abbott, itself, made any
22   response to the proposed published HCFA changes?
23      A   I don't -- I don't know and I have no knowledge of
24   that.  I don't remember that.
25      Q   Sir, what I'd like you to do is turn to Exhibit -
0209
1    what we've marked as Exhibit 3, the first two pages.
2           I've had you concentrate on --
3       A   This is 2; this is 3.
4       Q   Right there (indicating).
5           MS. ST. PETER-GRIFFITH:  And, for the record, this
6       is a June 11, '91 memo from Virginia Tobiason,
7       Interoffice Correspondence to Mr. Dempsey, Mr. Heggie,
8       Mr. King, D. Robertson and J. Ward.
9       A   Mm-hmm.
10          (Referring.)
11   BY MS. ST. PETER-GRIFFITH:
12      Q   Sir, do you recall seeing this memorandum?
13      A   No, ma'am.
14      Q   It says at the top that it's from Virginia
15   Tobiason, Manager of Reimbursement?
16      A   Yes.
17      Q   And then on the To list, do you see the D.
18   Robertson?
19      A   Mm-hmm.
20      Q   Do you have any doubt that that's you?
21      A   Oh, no, ma'am.
22      Q   And do you have any doubt that you received this
23   memorandum?
24      A   I probably received this; yes, ma'am.
25      Q   Let me ask you, based upon the content of this
0210
1    memorandum, do you believe that you might have obtained
2    information from Miss Tobiason that informed your June 14th,
3    '91 memorandum?
4       A   That --
5           MS. CITERA:  Objection to form.
6           THE WITNESS:  That may be; I don't know.  You know,
7       once again, it may be; I don't know.
8       Q   Okay.
9           Well, if you see the first sentence of Miss
10   Tobiason's memorandum, it says, On June 5th, HCFA
11   published --
12      A   Right.
13      Q   -- the proposed --
14      A   Right.
15      Q   -- rule on physician payment reform, do you see
16   that?
17      A   Yes, ma'am.
18      Q   Was that June 5th HCFA publication the proposed
19   rule changes that you're referencing in your June 14th, '91?
20      A   I don't --

21      MS. CITERA:  Objection to form.

22      THE WITNESS:  -- know that, ma'am.  I don't know

23   that.

24      They talk about renal care here.  I don't -- I don't

25   know that.  I'm sorry.

0211

1    Q   Okay.

2       The second sentence reads, This rule included a

3   proposal to lower the payment for drugs incident to a

4   physician's services to Average Wholesale Price, AWP minus

5   15%, do you see that?

6    A   Yes, ma'am.

7    Q   Do you understand what Miss Tobiason was

8   referencing there?

9       MS. CITERA:  Objection to form.

10      THE WITNESS:  She was probably referencing these

11   pages here, (indicating) but I - once again, I have not

12   read them in detail and don't know whether that's what

13   she's articulating in this memo.

14   Q   Well, what does AWP minus 15% mean to you?

15   A   It means Average Wholesale Price minus 15%.

16      But this rule - the published rule - I don't know

17   where it says in here what she notes in front; I don't see

18   that in the back here (indicating).

19      Once again, I haven't had an opportunity to read

20   it.

21   Q   Well, why don't we do this.  Why don't we go off

22   the record so you that you've got an opportunity to do read

23   it, okay?

24      And what I can try and do, sir, is, if you want me

25   to, I can try and blow that up on our copier if that would

0212

1   be easier for you.

2    A   I'll do my best to read this.

3       And you could be helpful; the question you asked me

4   on AWP minus 15%, are you talking about a specific place in

5   here where it says that that you can show me or send me to?

6    Q   Let me see if I can find it.

7    A   Thank you.

8       MR. HAVILAND:  Third column, carry-over paragraph.

9       THE WITNESS:  Third column.

10      (Referring.)

11   Q   Right here, (indicating) 85%.

12      MS. CITERA:  What page are you looking on?

13      MS. ST. PETER-GRIFFITH:  53.

14      MS. CITERA:  Are we on the record?

15      COURT REPORTER:  Yes.

16   A   Okay.  And it says here -- (referring) Yeah, that's

17   the same statement, Average Wholesale Price minus 15%.

18      You know, I mean is there a reason for me to doubt

19   that that's what she's referencing is Column 3?  I don't

20   know.

21   Q   Well, what -- What significance would that have for

22   Abbott's Alternate Site if the AWP reimbursement-based

23  system was changed to AWP minus 15%?
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  What impact would it have?
0213
1        Well, if it was based on AWP and then it's going to
2   be based on AWP minus 15%, it could go down, stay the same
3   or remain.
4        And the memo here articulates some reimbursement on
5   AWP, some reimbursement on AWP plus, some reimbursement on
6   AWP minus - I mean, I don't know what -- Does it talk about
7   a specific impact?  I don't know.
8    Q   Well, what I'm asking, sir, is does it have any
9   significance for you as the former vice president and
10  general manager of Alternate Site?
11   A   It would appear here that the proposed rule would
12  reduce reimbursement
13   Q   Okay.
14       And if physicians are still made whole, why would
15  Abbott care about a transition to an AWP minus 15%
16  reimbursement?
17   A   The biggest --
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  Excuse me, ma'am.
20       The biggest word in the English language, "if."
21       As I articulated earlier, we are always concerned
22   about the disruption due to reimbursement.  If
23   physicians are made whole; we had no way of knowing
24   that, we had no way of knowing how any of these rules
25   changed proposed could impact the business.
0214
1        So if you were to ask me to make a determination,
2   certainly based on this memo, Miss Tobiason isn't much
3   of a prophet.  This was definitely the start of a
4   national drug pricing control policy - well, it's 16
5   years later and that hasn't happened.
6        So as a prophet, she doesn't have much credibility.
7   I don't know if this memo has much more credibility.
8    Q   Well, let me ask you this:  Do you know whether
9   Abbott could determine whether physicians were made whole
10  based upon an AWP minus 15% reimbursement?
11   A   I don't know if -- We could -- We probably could
12  take an effort at it, but I don't know if we could do that
13  definitively.
14   Q   Well, you knew, didn't you, how much they were
15  paying for Abbott drugs, didn't you?
16   A   Right.
17   Q   And AWP was a published figure, wasn't it?
18   A   I guess it was; yes, ma'am.  I never -- Personally,
19  I never looked at the Red Book and saw it.  I'm taking on
20  faith that it was a published number.
21   Q   What is the Red Book?
22   A   It's some -- I guess it's a book where you send in
23  prices and it's some sort of published book of pricing.
24   Q   And how do you know that?

25    A   I've heard the term.

0215

1    Q   Have you ever reviewed a Red Book?

2    A   Never.

3    Q   Well, if Abbott knew how much it was selling or how

4   much physicians were paying for its products and Abbott was

5   able to ascertain how much the AWP was, couldn't you

6   determine whether or not physicians would be made whole on

7   Abbott products?

8       MS. CITERA:  Objection to form.

9       THE WITNESS:  A reasonable person could assume that.

10   I don't know for a fact.

11    Q   Okay.

12       Sir, do you see the third sentence of the first

13   paragraph, In effect, this rule will change reimbursement

14   for all Medicare Part B injectable drugs including renal,

15   pain management and chemotherapy?

16    A   Yes, I do.

17    Q   Do you know what Miss Tobiason meant when she said

18   that?

19       MS. CITERA:  Objection to form.

20       THE WITNESS:  Well, evidently, this AWP minus 15% is

21    not the rule that's being followed - was not the rule

22    that was being followed at the time this memo was

23    published.  So if it went from something to this, it

24    would change the reimbursement.

25    Q   Okay.

0216

1       And would that be -- Why would that be of

2   significance to Abbott's Alternate Site?

3       MS. CITERA:  Object to the form.

4       THE WITNESS:  As I said before, all reimbursement

5    changes, all conditions of client, customer practice are

6    of interest to providers of drugs.

7    Q   If we could move down to the next paragraph where

8   it says, Current policy, if you could just read those two

9   sentences, please, sir?

10    A   (Referring.)

11       Medicare currently reimburses drugs either based --

12       THE WITNESS:  Oh, excuse me, ma'am.  I'll slow down.

13    A   Medicare currently reimburses drugs either based on

14   reasonable charges or the drug cost based on AWP as

15   published in the Red Book.  Each Medicare intermediary

16   carrier has discretion to determine the reimbursement level

17   with some paying below AWP and others paying above AWP

18    Q   Sir, did you understand that in June of 1991 that

19   was the current Medicare reimbursement policy?

20    A   I don't remember.

21    Q   Let me just ask you this general question:  Do you

22   know how AWP was calculated?

23    A   No.

24       MS. CITERA:  Objection.

25    Q   Do you know whether there was a formula for

0217

1  determining AWP?
2      A   One would assume there was a formula, but I don't
3  know it.
4      Q   Do you know who calculated AWP?
5      A   No.
6      Q   Sir, do you know how Medicare knew to reimburse
7  either at a reasonable charge or the drug cost based upon
8  AWP as published in the Red Book?
9      A   Frankly, I don't know how they did that.
10     Q   Do you know whether it was determined by the amount
11  of charge reported to Medicare on the HCFA 1500 Form?
12         MS. CITERA:  Objection to form.
13         THE WITNESS:  I'm not familiar with the HCFA 1500
14  Form.  Is that is a cost report?
15     Q   No.
16     A   Well, then I don't know how they would know what it
17  cost if that's not a cost report.
18     Q   Okay.
19         Are you aware that charges for drugs administered
20  by physicians could be billed to Medicare if they were
21  Medicare reimbursable on a HCFA 1500 Form using a J code?
22     A   I have no idea what had a 1500 Form or a J code is.
23     Q   Okay.
24         Do you know whether Abbott's reimbursement
25  department would have handled that?
0218
1          MS. CITERA:  Objection to form.
2          THE WITNESS:  Anything that had to do with, you
3   know, reimbursement - dealing with Medicare, dealing
4   with any reimbursement would be done by -- Now, there
5   was only - please realize there was only one department
6   in my little bailiwick that had a reimbursement
7   department, and that was Home Infusion Services.
8          How the corporation or how Hospital Products would
9   have dealt with government reimbursement, you'd have to
10  speak to people more qualified than I who were in that
11  department, and I don't know who they are.
12     Q   Okay.
13         Sir, the next sentence reads, Major Issues, do you
14  see that --
15     A   Yes, ma'am.
16     Q   -- the next section?
17         The first bullet point reads, There is a question
18  whether HCFA has authority to limit reimbursement for these
19  drugs through regulation, do you see that?
20     A   Yes, ma'am.
21     Q   Were you aware of any question concerning HCFA's
22  authority to limit reimbursement through regulation?
23     A   No, ma'am.
24     Q   Are you aware of any initiative or effort by Abbott
25  or Abbott's Washington unit to challenge the authority of
0219
1  HCFA to limit reimbursement through regulation?
2          MS. CITERA:  Objection to form.

3      THE WITNESS:  I personally never saw Abbott's
4  Washington organization challenge anybody.
5     Q    Do you know whether they lobbied anybody?
6     A    I don't know if they spoke to anybody in that
7  regard.
8     Q    The next bullet point reads, that, In the proposed
9  rule, HCFA indicates that they are going to consider
10 establishing national drug fee screens in the future.  This
11 is definitely a start towards national drug pricing
12 controls, do you see that?
13    A    Yes, ma'am.
14    Q    Was that of concern to Abbott?
15      MS. CITERA:  Objection to form.
16      THE WITNESS:  Evidently it was a concern to the
17 author of this memo, but I don't know -- Drug control,
18 would it be -- Would it impact the organization?  Yes,
19 it would.
20      What was the likelihood that that was going to
21 happen?  Probably small.
22      And was it a concern of the corporation - a large
23 concern of the corporation?  Probably not.
24    Q    Okay.
25      It was a concern to Alt Site?
0220
1     A    Once again, it was -- I guess it was a concern to
2  this person.  But she was so far off the mark in terms of
3  where things were going - she talks about this is definitely
4  the start of national drug policy; a person could not have
5  been more incorrect from the standpoint of what happens, or
6  the standpoint of what happened over the course of the last
7  16 years, at least.
8     Q    Okay.
9      Why do you see that?
10    A    We don't have national drug controls -- National
11 controls on prices in this country.
12      And this individual indicated this is definitely
13 the start of national drug control.  That is -- That is --
14 That's totally incorrect.
15    Q    The next bullet point reads, Also included in this
16 rule is a proposal to reduce even further the payment for
17 very high volume drugs, do you see that?
18    A    Yes, ma'am.
19    Q    What were the high volume drugs that you can recall
20 for Alt Site?
21    A    For us?  Well, they would probably be - Calcijex
22 was a high one because, you know, most renal care - renal
23 dialysis patients are on Calcijex; that was a high volume
24 drug.  And, I apologize, I can't remember specifically, I'd
25 have to see some documents from this point of time that had
0221
1  volumes on them.
2     Q    Well, if you could -- Okay.
3      What about vancomycin, was that a high volume drug
4  to your recollection?

5      MS. CITERA:  Objection to form.
6      THE WITNESS:  Vancomycin, as I recall, was a pretty
7   commonly used - commonly used antibiotic, but I don't
8   have any specific numbers for you.
9   Q   Okay.
10       Sir, the next bullet point reads, HCFA is seeking
11   comments on the level of discount, do you see that?
12   A   Mm-hmm.
13   Q   And then Miss Tobiason writes, I believe there are
14   a number of arguments we can use in response?
15   A   Mm-hmm.
16   Q   Do you know whether Abbott made any arguments in
17   response or made any comments to HCFA concerning these
18   proposed rule changes.
19   A   Not that I -- No, I don't know of any responses
20   made formally to HCFA.
21   Q   The next sort of sub-bullet point is an example of
22   an argument that Miss Tobiason is proposing could be made
23   and it reads, Discounts counts vary among purchasers.  Some
24   providers may pay full AWP and others may get discount but
25   not a full 15% due to manufacturer discounting practices, do
0222
1   you see that?
2   A   Yes, I do.
3   Q   Do you know which Abbott Alt Site customers paid
4   full AWP for their products?
5   A   No, I don't.
6   Q   Okay.
7       Do you know what Miss Tobiason - or how did you
8   interpret Miss Tobiason's comment that others may get a
9   discount but not a full 15% due to manufacturers discounting
10   practices?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  Some people may belong to small
13   purchasing groups, others may belong to larger
14   purchasing groups, and volume generally drives -- Volume
15   drives the discount level.
16       So there may be differences in pricing there, or at
17   least that was industry practice.  I can only assume
18   that that's what she means.
19   Q   Okay.
20       It says, Manufacturers discounting practices.
21       Did Abbott Alt Site have any, or did Abbott,
22   itself, have any discount practices with regard to products
23   sold by Abbott Alt Site?
24   A   I'm sure we had --
25       MS. CITERA:  Objection to form.
0223
1       THE WITNESS:  -- guidelines with regard to
2   discounting, but I don't remember what they were
3   specifically.
4   Q   Do you know who would have been responsible for
5   developing those guidelines?
6   A   The discounting guidelines would be the contract

7   marketing people in the division, our fellows in Alternate
8   Site Product Sales and - yeah, those would be the people.
9   They're working together to try to make sure that across the
10  customer segments and market segments that the pricing made
11  sense.
12     Q   When you say contract marketing within the
13  division, which contract marketing do you mean?
14     A   We have a big con- -- the Hospital Products
15  Division had a huge contract marketing organization.
16     Q   Okay.
17     A   We had a very small Hospital -- We had a very small
18  contract marketing organization, so we would go to the
19  Division to make sure that any actions we took in terms of
20  discounting and pricing would make sense versus the large
21  Hospital Products division that was -- Well, we were a
22  smaller business, they were the larger business so we
23  wouldn't -- This is my sense, I don't remember this
24  specifically, but a reasonable person would not let the tail
25  wag the dog and we would go to them and make sure that our
0224
1   discounting practices made sense.
2      Q   Are you aware of any Alt Site customer who paid
3   full AWP price for any products?
4      A   List -- AWP price --
5      Q   As published in the Red Book or another comparable
6   compendia?
7      A   I don't know of any; no.  I don't know of any.
8      Q   Okay.
9      A   It's been a long time and I don't have the
10  customers list.  But I'm sorry.
11     Q   If you could flip to the next page.
12     A   Yes, ma'am.
13     Q   Okay.
14         The next bullet point is a proposed argument by
15  Miss Tobiason which is, Actual drug costs are not the only
16  costs to be considered when establishing drug fee screen, do
17  you see that?
18     A   Yes.
19     Q   What is a drug fee screen?
20     A   One would assume, based upon reading this memo or
21  based upon reading this bullet point, that a drug fee
22  screen, which would be an attempt at saying how much should
23  we pay for this and we're talking about other costs -
24  wastes, breakage, inventory cost, drug procurement cost, bad
25  debts; that these are other things that should be considered
0225
1   when considering the cost of a drug to a provider of health
2   care.
3      Q   So if a provider of health care was reimbursed for
4   drug costs plus a little extra that covered these
5   contingencies concerning bad debt and possible waste and
6   breakage, would there be any concern to Alt Site as to a
7   loss in either physician utilization or market share?
8         MS. CITERA:  Objection to the form.

9       THE WITNESS:  You know, it's hard to come up with an
10   answer for that.
11       If physicians are adequately reimbursed for what
12   they do and what their costs are, one would assume
13   that -- But I - once again, I can't do that, I can't
14   speak for the physicians, I'm not a physician.
15   Q   Okay.
16       The next argument says, There are disincentives to
17   use higher cost, more effective drugs because of
18   reimbursement limits, do you see that?
19   A   Mm-hmm.
20   Q   Do you understand what Miss Tobiason was - meant
21   there?
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  It appears to me that Miss Tobiason is
24   saying that if you lose money per unit you don't make it
25   up in volume, and if you lose money per unit in high
0226
1   volume drugs you specifically don't get whole in volume
2   - that's what it says to me, just reading it here today.
3       Perhaps Miss Tobiason could explain better than I.
4   Q   Okay.
5       And then it says, This could have a serious impact
6   on patient care, do you see that?
7   A   Mm-hmm.
8   Q   I think TAP or Renal could use this argument
9   effectively, do you see that?
10   A   Mm-hmm.
11   Q   Do you know why TAP - or she was arguing that TAP
12   or Renal could use that argument effectively?
13       MS. CITERA:  Objection to form.
14       THE WITNESS:  That it would have been an impact on
15   patient care?
16       If physicians lost money - if they change the
17   reimbursement and physicians lost money on drugs - --
18       MS. ST. PETER-GRIFFITH:  Okay.
19       THE WITNESS:  -- is that your question?
20   Q   No.  My question is a little bit simpler than that.
21       Do you know why Miss Tobiason believed that or
22   did --
23       MS. ST. PETER-GRIFFITH:  Strike that.
24   Q   Did you think that TAP or Renal could use that
25   argument effectively?
0227
1       MS. CITERA:  Objection to form.
2       THE WITNESS:  I believe that if providers lose large
3   amounts of money treating patients that patient care
4   will suffer.
5       I believe that, suddenly, a phosphorus level in
6   bone, which was - which was unacceptable yesterday may
7   be acceptable today and that patient care will suffer if
8   physicians lose money on drugs.
9       These patients can benefit from these drugs.  The
10   physicians will not go out of business extending them to

11    patients.  And I believe if they lose money on drugs - I
12    know this was a concern, they begin to lose large
13    amounts of money or a drug that patient care would
14    suffer.
15    Q   Well, was the concern that they would lose,
16 actually lose money or was the concern that they wouldn't
17 make as much as money?
18    A   Oh, that they would lose money.
19       MS. CITERA:  Objection to form.
20    Q   That was the concern, that they would actually come
21 out of pocket money for drugs that they distributed to their
22 clients.
23    A   That was --
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  -- the problem that was articulated to
0228
1    me, as I recall.
2       COURT REPORTER:  I'm sorry.  She keeps objecting and
3    it's hard to hear all three of you at once.
4       THE WITNESS:  Yes, ma'am.  I'm sorry.
5       COURT REPORTER:  "That they would lose money; that
6    was the concern, that they would actually" --
7       MR. STETLER:  You know, it may help her if we took a
8    break.
9       MS. ST. PETER-GRIFFITH:  Yeah.  Why don't we take a
10    break.
11       MR. HAVILAND:  Why don't you just do the question so
12    we don't have to come back to it.  You want to do that
13    again; question, objection, answer and...
14       COURT REPORTER:  "Or they wouldn't make as much
15    money"; you said, "They would lose money," and you said,
16    "That was the concern, that they would" --
17       MS. CITERA:  And I said, "Objection," and then --
18       MR. STETLER:  "They would lose money," she said --
19       MS. ST. PETER-GRIFFITH:  That they would lose money.
20       MR. STETLER:  -- Objection.
21       COURT REPORTER:  Okay.  Thank you.
22       THE WITNESS:  If physicians, especially with high
23    cost drugs, lose money that patient care will suffer.
24 BY MS. ST. PETER-GRIFFITH:
25    Q   Okay.
0229
1       And did you interpret lose money to mean that they
2 would actually be out of pocket money?
3    A   Yes, ma'am.
4       MS. CITERA:  Objection to form.
5    Q   Okay.
6       And not that they would not receive as high of a
7 profit above their cost.
8       MS. CITERA:  Objection to form.
9       THE WITNESS:  I don't recall the specific
10    conversations.  The conversations centered around losing
11    money and the impact that that would have on patient
12    care.

13    Q   Okay.
14        MS. ST. PETER-GRIFFITH:  Why don't we take a break.
15        VIDEOGRAPHER:  Okay.  We're going off the record.
16        (Wherefore, a brief recess was taken)
17        VIDEOGRAPHER:  We're back on the record.
18   BY MS. ST. PETER-GRIFFITH:
19    Q   Sir, we just got back from a break.
20        Before I ask you a few more questions - and I'm
21   going to try and move away a little bit from the documents
22   so that we can have a dialogue here.
23        MS. ST. PETER-GRIFFITH:  I just want to state I've
24        got some 82 documents, and as I predicted, somewhat
25        accurately, I think, to Mr. Stetler, I don't think that
0230
1    the government is going to finish its examination today
2    and I just wanted, for planning purposes, for everybody
3    to know that and I know that the Relator has questions
4    and I believe that Mr. Haviland may have questions after
5    that, so I just wanted to put that on the record,
6    because we've got probably, maybe at best, another two
7    hours to go.
8        MR. SISNEROS:  Well, California probably has some
9    questions.
10        MS. ST. PETER-GRIFFITH:  Okay.  And California does,
11    as well.
12        MS. CITERA:  And then just before we start with your
13    questioning, I just want to get our agreement on the
14    record which is, in order to assist the court reporter,
15    going forward, if I have an objection to form, I will
16    simply say, Objection.  If anyone has a problem with
17    that and does not agree to that deal, please speak up or
18    else I will assume that my objection counts for
19    objection to form.
20        MS. ST. PETER-GRIFFITH:  The government has no
21    problem with that.
22        MR. STETLER:  Agreed.
23        MR. SISNEROS:  Agreed.
24        MR. HAVILAND:  Is there a - I don't want to belabor
25    the topic but given the timing that was just laid out,
0231
1    we're not coming back tomorrow?
2        MS. ST. PETER-GRIFFITH:  Yes; we are not because --
3        MR. HAVILAND:  We're going to try to get another
4    date that may work for the Witness and everybody else.
5        MS. ST. PETER-GRIFFITH:  And we just ask Mr. Stetler
6    to work with Mr. Robertson.  I know we kind of want to
7    close this out as quickly as possible.
8        MR. STETLER:  December.
9        MR. HAVILAND:  The snowbirds are back.
10        MR. STETLER:  Oh.
11        MS. ST. PETER-GRIFFITH:  Yeah.  The traffic will be
12    much heavier then.
13   BY MS. ST. PETER-GRIFFITH:  (Continued.)
14    Q   Sir, we've talked a little bit about the content of

15  Miss Tobiason's document.
16      As the former vice president responsible for
17  Alternate Site, I'd like to come at my questions this way:
18  You have an understanding that with regard to reimbursement,
19  if physicians lose money they're not going to utilize Abbott
20  products or drugs, in, general right?
21      A   My impression -- Yes, and that patients who could
22  benefit the drugs - for the use of the drugs won't get that
23  drug.
24      Q   Because the doctors lose money on it.
25      A   Yes.
0232
1       Q   Okay.
2           What I'd like to ask you is what -- How should
3   doctors be made whole under a reimbursement scheme --
4           MS. CITERA:  Objection.
5       Q   -- should they been paid for the cost of the
6   product?
7           MS. CITERA:  Objection.
8           THE WITNESS:  I'm unqualified to answer that.  I'm
9       not a health care planner.
10          But I know that no ideal system exists, but I'm not
11      a health care planner.  I don't know how they should be
12      reimbursed.
13          A lot smarter people than I have tackled that issue
14      and broken their pick on it.
15      Q   But, sir, as when you were the vice president of
16  Alt Site, for Abbott's marketing purposes, what level of
17  reimbursement impacted Abbott's ability to sell its
18  products --
19          MS. CITERA:  Objection.
20      Q   -- in Alt Site?
21          MS. CITERA:  Objection.
22          THE WITNESS:  I -- You know, specific recollection,
23      I don't have.
24          But would you -- I mean, you're asking the
25      questions.  It would seem intuitively correct that if
0233
1   physicians lost money, they wouldn't use the drug.
2       Q   Okay.
3           How would physicians lose money?
4       A   If -- Physicians would lose money if the costs of
5   administering - of buying, storing, administering,
6   accounting for and notating, including nursing notes, were
7   significantly higher than what they get paid for.
8           I mean, physicians are human beings.  A marginal
9   loss, fine.  But if they're going to bleed money, I don't
10  think they'd use the drug.  I have no data to support this.
11          It was a hypothetical question and I answered it
12  hypothetically.
13      Q   Okay.
14          Well, did Abbott, when it was pricing its drugs,
15  factor in the possibility of physician losses?
16          MS. CITERA:  Objection.

17    THE WITNESS:  We priced our drugs -- We're talking
18  about two different prices.  We priced our drugs based
19  upon competitive environment - now - you know, what our
20  competitors charge versus what we charge.  There's a
21  difference between reimbursement and pricing.
22    MS. ST. PETER-GRIFFITH:  Okay.
23    THE WITNESS:  We based our pricing on competitive
24  environment, as I recall.
25  BY MS. ST. PETER-GRIFFITH:
0234
1    Q   Well, do you know whether Abbott had any ability to
2  influence reimbursement?
3    MS. CITERA:  Objection to the form -- Oh, objection.
4    THE WITNESS:  I have no knowledge of that.
5    Q   Do you know whether Abbott's reporting of list
6  prices impacted reimbursement?
7    MS. CITERA:  Objection.
8    THE WITNESS:  You know, I don't know.
9    If - If - If AWP is a calculated number off list
10  price, it would affect it.
11    MS. ST. PETER-GRIFFITH:  Okay.
12    THE WITNESS:  I didn't -- I didn't determine those
13  prices; I don't know how that whole process worked.
14  BY MS. ST. PETER-GRIFFITH:
15    Q   Do you know who did?
16    A   The division.
17    Q   When you say, "the division," who do you mean?
18    A   Hospital Products Division.
19    Q   Any particular unit within the Hospital Products
20  Division?
21    A   The contract marketing people seemed to do
22  everything else - they did all the contracting, so I assume
23  it would be their responsibility to establish list prices.
24    Q   In terms of making physicians whole for their
25  administration of drugs, should the overall reimbursement
0235
1  received by physicians take into account bad debt and the
2  possibility that Medicare patients might not be able to pay
3  their 20% co-pay?
4    MS. CITERA:  Objection.
5    THE WITNESS:  I think what -- If you're talking
6  about in the context of this memo, I think what Miss
7  Tobiason was trying to articulate was that cost
8  transcends just what you pay for this vial, and that the
9  presentation of an inclusive versus a narrow view of
10  cost should be considered when dealing with authorities
11  that reimburse, be they private or governmental.
12    MS. ST. PETER-GRIFFITH:  Can you repeat that?  Can
13  you read back that answer, please.
14    (The question was read back as previously recorded
15  by the court reporter)
16  BY MS. ST. PETER-GRIFFITH:
17    Q   Well, what would be inclusive?
18    As the former divisional vice president for Alt

19   Sites, what would be inclusive?
20        MS. CITERA:  Objection to form.
21        THE WITNESS:  Well, I don't know what else should be
22   included.  But cost would comprehend the - there are
23   some other costs included in here.  And the fact that
24   sometimes things break there's administrative
25   responsibilities, et cetera, some sort of attempt should
0236
1   be made to determine what those costs are.
2   Q   Well, would those total inclusive costs be more
3   than 100% of the actual drug cost, do you anticipate?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  It's impossible for it to be less.
6   Q   What do you mean it's impossible for it to be less?
7   A   I'm having trouble articulating.
8        If you have -- If you're paying for a vial and you
9   have more costs associated with that vial, how it could be
10   less than the cost of the vial.
11   Q   And I'm sorry, I misspoke.
12        Let's say -- I meant to say 200% of the drug cost.
13        Do you think that if physicians were reimbursed for
14   200% of the drug cost that that would be inclusive?
15   A   I'm sorry --
16        MS. CITERA:  Objection.
17        THE WITNESS:  -- I have no way of knowing what would
18   be adequate to cover physician's cost.  A worthy
19   objective would be for somebody to try to find out,
20   though.
21   Q   Well, do you think there becomes a point in time
22   when reimbursement above the cost of the product plus the
23   other, you know, intangibles such as breakage that are
24   inclusive in the physician's cost, do you think that there
25   reaches a point that reimbursement might be higher than
0237
1   those inclusive costs plus the cost of the product?
2        MS. CITERA:  Objection.
3        THE WITNESS:  It could be.  Could be.
4   Q   Do you know, for example, if a physician were
5   reimbursed at a 1000% of the drug cost, that would be
6   unreasonable?
7        MS. CITERA:  Objection.
8        THE WITNESS:  You know, I'm sorry, I have no way of
9   knowing that, it's all conjecture, but tools exist to be
10   able to examine cost and determine what would be fair
11   and adequate for reimbursement.
12   Q   Did Alt Site ever employ those tools to make that
13   evaluation?
14   A   I think we probably had some informal efforts to
15   determine that because - but I can't produce documentation
16   that articulates what we did or how we tried to do it.
17   Q   Why do you think that there were informal efforts?
18   A   We had a lot of things to do and that may not have
19   been one of the highest priorities.  I don't know.  I don't
20   recall.

21    Q   If physicians were making money above their cost of
22  the product plus the inclusive costs that you described,
23  would that surprise you if they were being reimbursed at an
24  amount higher than the inclusive costs plus --
25    A   If --
0238
1       MS. CITERA:  Objection.
2       THE WITNESS:  -- If the physicians -- Could you
3   repeat it?
4       I don't -- I'm sorry.  Please forgive me.
5     Q   Sure.
6       If the physician were reimbursed at an amount that
7   exceeded the cost of the product plus the inclusive costs
8   that you just described, do you think that that's
9   reasonable?
10      MS. CITERA:  Objection.
11      THE WITNESS:  Is your question -- Is your question
12  should physicians make money on drugs as a philosophical
13  question or --
14      MS. ST. PETER-GRIFFITH:  That's one way to ask it,
15  so, yes --
16      MS. CITERA:  Objection.
17      MS. ST. PETER-GRIFFITH:  -- that's my question.
18      THE WITNESS:  That's your question.
19      I don't believe that the use of drugs should be an
20  incentive for any physician to use it.  They should use
21  it based upon specific care plans and patient status, I
22  mean --
23  BY MS. ST. PETER-GRIFFITH:
24    Q   Do you know whether, as a matter of policy,
25  physicians -- Or do you have an opinion as to whether as a
0239
1   matter of policy physicians should be making money on the
2   drugs that they are prescribing that they purchase from
3   Abbott?
4       MS. CITERA:  Objection.
5       THE WITNESS:  As a -- You know, once again, that's a
6   health care planning issue.
7       They -- You know, they should make the majority of
8   their money treating patients; that's what they should
9   do.
10    Q   Okay.
11      Sir, I want to read a statement that Virginia
12  Tobiason wrote in here, and I want to ask you if you believe
13  as the former vice president - as the former divisional vice
14  president of Alt Site if you believe this statement is true,
15  and the statement is, Discounts vary among purchasers.  Some
16  providers may pay full AWP and others get a discount but not
17  the full 15% due to manufacturers discounting practices.
18      Is that a true statement?
19      MS. CITERA:  Objection.
20      THE WITNESS:  That's probably correct.
21    Q   Why do you say that?
22    A   Because if manufacturers won't discount more than

23  50% -- 15%, they're not going to be able to buy the drug.
24  In other words, if a manufacturer's discounts stop at 85% of
25  list price and you want to pay 80% of list price and the
0240
1  manufacturer refuses to sell it at that price?
2      I don't get it.
3    Q   Sir, earlier you made reference to the HPD contract
4  marketing and not wanting to have the tail wag the dog.  Do
5  you remember that?
6    A   What I meant by that - and let me please
7  explain - --
8    Q   Okay.
9    A   -- we were a smaller organization, the Hospital
10  Products Division - significantly smaller.  So it's prudent
11  to ensure that a smaller organization doesn't take pricing,
12  credit decisions, terms and conditions of delivery decisions
13  that the larger organization cannot live with or don't make
14  sense strategically, economically or from doing a good job
15  for your customers.
16    Q   Do you know whether reimbursement issues that were
17  important to the Alternate Site Division influenced or
18  impacted list pricing that was determined by the Hospital
19  Products Division contract marketing?
20    A   I have no knowledge of that.
21      MS. CITERA:  Objection.
22    Q   What was your understanding as to how list prices
23  were arrived at?
24    A   I had no curiosity about list prices.  They were
25  set by the division.
0241
1    Q   When you say, "they were set by the division," who
2  do you mean?
3    A   I assume they were set by the contract marketing
4  people.
5      Once again, I had no curiosity.  I don't know how
6  they were set.
7    Q   Sir, I'd like to go to the home - to ask you some
8  questions about the home infusion business, which you've
9  articulated earlier was not probably your favorite.
10    A   No, ma'am.
11    Q   Was it important for Abbott's Home Infusion Unit
12  that reimbursement for Abbott products be at a particular
13  level?
14      MS. CITERA:  Objection.
15      THE WITNESS:  That reimbursement be at a particular
16  level?
17      We were getting a percentage of collections and to
18  say that that impacted the percentage of -- That the
19  price of the drug would impact, that's just arithmetic.
20      So the answer to your question is yes; it had to.
21    Q   Is it fair to say that if reimbursement on Abbott
22  products was higher and Abbott's consignment partners or
23  revenue share partners in home infusion business collected
24  higher reimbursement for Abbott product that then Abbott

25  would share in that higher reimbursement?
0242
1        MS. CITERA:  Objection.
2        THE WITNESS:  That meant that -- Yes.  That also is
3    just arithmetic.
4        It would mean that -- It would even be worse - that
5    would mean we would lose less money and get out of the
6    business more slowly.
7        It would be a catastrophe if the reimbursement
8    increased.
9    Q    Sir, let me ask you, we discussed Lupron a little
10   bit earlier.
11   A    Mm-hmm.
12   Q    You indicated that you learned about the TAP Lupron
13   litigation from the newspapers?
14   A    Mm-hmm.
15   Q    Did you have any concern about Lupron distribution
16   by Alt Site?
17       MS. CITERA:  Objection.
18       THE WITNESS:  I don't know whether they used our
19    pharmacies or not.  I know they had their own
20    pharmacies.  I don't know if we ever distributed the
21    material for them.
22       If it needed compounding, we may have compounded for
23    them on a fee for service basis - I don't recall - until
24    they built their own pharmacies, because I understand
25    they had their own pharmacies - I know they had their
0243
1    own pharmacies.
2    Q    What was your understanding of the TAP litigation?
3    A    My understanding of the TAP litigation, very
4    frankly, was that doctors who had been to medical school
5    through their formal training in urology and had practiced
6    for many years were convinced by a 28-year-old Phys. Ed.
7    major to charge for a drug that the doctor didn't pay for.
8    I -- That's my understanding; I thought the doctors -- That
9    was my understanding of the litigation, that they said that
10   the doctors were billing for a drug they didn't pay for or
11   something like that, and I couldn't believe that a doctor
12   would do that.
13   Q    Who was the 28-year-old that --
14   A    A salesperson --
15   Q    Okay.
16   A    -- would go in and convince a man who had been to
17   university, to medical school, through urology training and
18   establish a successful practice, and this 28-year-old Phys.
19   ED. major walks in and says, You can bill Medicare for
20   products you didn't pay for?  And the person was wrong.
21        And I don't -- I can't believe a physician would
22   bill for -- That's just incomprehensible to me.
23   Q    Did you have an understanding as to whether or not
24   Abbott was criminally charged with regard to --
25   A    I understand that several individuals were charged;
0244

1  yes.
2     Q    Okay.
3         Do you know whether TAP pled guilty to any criminal
4  charges?
5     A    No; I'm unaware of that.  I don't know.
6     Q    As the divisional vice president for Alt Site,
7  would it be important to you to ensure that if Abbott or an
8  affiliated joint venture like TAP engaged in criminal
9  conduct that your division not be tainted by that criminal
10  conduct?
11        MS. CITERA:  Objection.
12        THE WITNESS:  That's -- We would not want to be
13    tainted in any way by any conduct - negative conduct or
14    unprofessional contact by TAP or anyone else.
15    Q    Did you have an understanding as to whether or not
16  your division engaged in increased pricing for Lupron
17  product that was sold by the Alternate Site Unit?
18        MS. CITERA:  Objection.
19        THE WITNESS:  Once again, the sales of Lupron by the
20    Alternate Site Unit, I don't even remember being in that
21    business.  I'm sorry.
22        MS. ST. PETER-GRIFFITH:  Let's mark this as the next
23    exhibit.
24        And I'm just going to ask him about the first page
25    for right now.
0245
1     (Whereupon, Robertson Exhibit No. 4 was marked for
2  identification.)
3        MS. CITERA:  I'm just going to object because these
4    are not sequential; they're stapled together but they're
5    not sequential.
6        MS. ST. PETER-GRIFFITH:  Okay.  Well, you can state
7    your objection.
8        MS. CITERA:  Okay.
9        MS. ST. PETER-GRIFFITH:  I mean, 48,000 pages that
10    Mr. Rodman produced, so.
11        I'm just asking him about the first page.
12  BY MS. ST. PETER-GRIFFITH:
13    Q    Sir, all I need you to do is look at the first
14  (indicating).
15    A    Mm-hmm.
16    Q    Sir, does this -- Are you familiar with this
17  document?
18    A    No.
19    Q    Who is Miss Lynn Leone?
20    A    She was one of the administrative people in Home
21  Infusion Services.
22    Q    Does this refresh your recollection as to whether
23  or not Lupron may have been a product that was sold by the
24  Home Infusion Services?
25    A    The product was not sold by anybody in Home
0246
1  Infusion Services.  We didn't sell Lupron.
2        Somebody who sold it had to turn the order over to

3   us, and if they turned the order over to us we would fill
4   the order because there was some problem with a pharmacy
5   marketing it.
6          But we didn't -- Nobody in our organization sold
7   Lupron.
8          I mean this is the -- If they want -- If people
9   came and wanted -- I guess what I'm telling you, ma'am, is
10  we didn't have any salesman out there pitching Lupron.
11   Q   Okay.
12          But was Lupron distributed by Abbott pharmacies?
13   A   Evidently, based upon this document --
14          MS. CITERA:  Objection.
15          THE WITNESS:  -- it was.
16          (Referring.)
17          I don't know how large the sales were or how many of
18   these things were done.
19   Q   Sir, if you could just look at the first page.
20   A   Sure.
21   Q   I don't want you to be distracted by the other
22   pages.
23   A   Right.
24   Q   Sir, if you can look at this memorandum, in the
25   third sentence it says, Because of these increases - Because
0247
1   of these increases our list price on the 50 should be
2   adjusted, do you see that?
3   A   Yeah.
4   Q   Do you know what list prices are being referenced
5   as our least prices?
6   A   No.
7   Q   Do you remember any issues arising concerning
8   Lupron pricing through the Home Infusion Services?
9   A   No, ma'am.  I don't even remember ever selling
10   Lupron or having anything to do with it.  I apologize.
11   Q   Do you know whether - why list prices would be
12   impacted by increases in AWPs?
13          MS. CITERA:  Objection.
14          THE WITNESS:  No.
15   Q   Sir, did you have an understanding as to whether
16   there was a formula for AWP that was at 25% markup on drug
17   costs?
18          MS. CITERA:  Objection.
19          THE WITNESS:  No.
20   Q   Did you have an understanding with regard to any
21   product sold by Alt Site that there was a standard industry
22   markup?
23   A   No.
24          MS. ST. PETER-GRIFFITH:  Mark this as the next
25   exhibit.
0248
1          (Whereupon, Robertson Exhibit No. 5 was marked for
2   identification.)
3          MS. ST. PETER-GRIFFITH:  And just for the record,
4   this is a December 22nd, 1994 memorandum from Chris

5     Snead to Don Carson, cc, John Ward.
6   BY MS. ST. PETER-GRIFFITH:
7     Q   Sir, do you recognize this document?
8     A   No.
9     Q   Have you had a chance to review it?
10    A   Yes.
11    Q   This appears to be a memorandum from Chris Snead to
12  Don Carson, do you see that?
13    A   Yes.
14    Q   With a cc to John Ward?
15    A   Mm-hmm.
16    Q   Who is Don Carson?
17    A   I have no idea.
18    Q   Who is John Ward?
19    A   John Ward's a former general manager of Alternate
20  Site Product Sales.
21    Q   Now, this says, Interoffice Correspondence.  Do you
22  have any reason to doubt that Mr. Carson was within the
23  Alternate Site Product Sales?
24        MS. CITERA:  Objection.
25        THE WITNESS:  I don't know who the individual is;
0249
1   I'm sorry.
2     Q   Okay.
3         Is it possible that he could have been an employee
4   of Alt Site Product Sales?
5     A   I couldn't tell you --
6         MS. CITERA:  Objection.
7         THE WITNESS:  -- I don't know the individual.
8     Q   Okay.
9         And it's dated December 22nd, 1994?
10    A   Mm-hmm.
11    Q   Do you remember a Coram RFP coming out in or about
12  December or November of '94?
13    A   No.  But it's referenced here, so it probably
14  happened.
15    Q   And I believe you referenced Coram earlier.  Can
16  you remind us again, what is Coram?
17    A   Coram is a company that provided home infusion
18  services - a home infusion service provider, and we would
19  sell them product.
20    Q   Okay.
21        And what is a Coram RFP?
22    A   RFP is a common term indicating request for
23  proposal.
24    Q   Okay.
25        And what is a request for proposal?
0250
1     A   It's a request to quote on business.
2     Q   Okay.
3         In the second paragraph, Miss Snead notes, you'll
4   note that they are asking for WAC, AWP, price if line item
5   award and price for bundled award, do you see that?
6     A   Mm-hmm.

7   Q   What does that sentence tell you?

8   A   That sentence tells me -- You know, again, it's
9   tough to know - Miss Snead is a very nice young lady - it's
10  another gentleman - that they wanted to know what the
11  wholesale acquisition cost for each drug was, but they
12  wanted to know what the AWP for each drug was; they wanted
13  to know what the price would be if a specific line item was
14  the only drug they ordered for us, and they wanted to know
15  what the price would be for each drug if they gave us all of
16  their business.

17  Q   Was there any policy at Abbott that you're aware of
18  or within Abbott Alt Site prohibiting the distribution of
19  AWP information for RFPs from potential customers?

20  A   The AWPs were, as I understand it, were available
21  to the customers, themselves.

22      Why they would ask us to do it would mean we're
23  doing the work that they don't have to do.

24  Q   Would Abbott provide that information?

25      MS. CITERA:  Objection.

0251

1       THE WITNESS:  I don't know.  Here -- It doesn't say
2   we wouldn't, here.

3       If it's public information - the average wholesale
4   price of the drug is public information, I don't know
5   why we wouldn't provide it.

6       But I have no specific knowledge of having provided
7   and not providing - I mean having not provided the
8   information in this instance.

9   Q   Okay.

10      THE WITNESS:  Am I slowing down enough?

11      COURT REPORTER:  Yes.  Thank you.

12      THE WITNESS:  Thank you, ma'am.

13      MR. STETLER:  You're doing fine.

14      Since I yelled at you when you were bad, I'll tell
15  you you're doing good.

16      MS. ST. PETER-GRIFFITH:  If you could mark this as
17  the next exhibit.

18      (Whereupon, Robertson Exhibit No. 6 was marked for
19  identification.)

20      MS. ST. PETER-GRIFFITH:  For the record, this is a
21  February 9th, 1995 memorandum from Tim Harris regarding
22  catalog price increases.

23  BY MS. ST. PETER-GRIFFITH:

24  Q   Sir, do you recognize this document?

25  A   No.

0252

1   Q   It appears to be a memorandum from Tim Harris --

2   A   Mm-hmm.

3   Q   -- and it lists on the, To, list Ed Hayman, Pete
4   Karas, Chris Kolber, Sean Murphy, Randy Prozeller and Bill
5   Welch, do you see that?

6   A   Mm-hmm.

7   Q   and then listed on the cc, among others, is D.
8   Robertson, do you see that?

9    A   Mm-hmm.

10   Q   Do you have any reason to doubt that's you?

11   A   No.

12   Q   Do you have any reason to doubt that you received

13 this memorandum?

14   A   No.

15   Q   Sir, the Re: indicates that this memorandum

16 concerns catalog price increases and then the first sentence

17 indicates that attached to the memorandum is the first pass

18 of the '95 catalog price increase worksheets, do you see

19 that?

20   A   Yes.

21   Q   Do you recall receiving catalog price increase

22 worksheets in the normal course as your - in your - hold on,

23 let me finish - in your capacity --

24       MS. STETLER:  Just when you were getting good.

25   Q   -- as the divisional vice president of Alt Site?

0253

1    A   No.

2    Q   Do you know why you received this memo?

3        MS. CITERA:  Objection.

4        THE WITNESS:  I -- No.

5    Q   Do you know whether -- Do you recall receiving

6 either this memo or any memo like for forwarding catalog

7 price increase worksheets?

8    A   No, ma'am.

9        That was not my responsibility to do the catalog

10 pricing worksheets.

11   Q   Do you know whether Abbott took a catalog price

12 increase on its products each year?

13       MS. CITERA:  Objection.

14       THE WITNESS:  No, I don't know that specifically,

15   whether catalog prices were increased -- Well, no, I

16   don't know.

17   Q   Do you know whether Pete Baker would comment upon

18 the catalog price increase worksheets?

19       MS. CITERA:  Objection.

20       THE WITNESS:  Yeah; it would probably be Pete's

21   responsibility to do that.  I mean, in '96, was he

22   general manager?  John Ward was.

23       You know, these are the names down here of the

24   people who have to submit them, and Pete Baker's name is

25   on there, isn't it?

0254

1        MS. ST. PETER-GRIFFITH:  Mm-hmm.

2        THE WITNESS:  So I guess Pete would be the guy that

3   would fill them out.

4 BY MS. ST. PETER-GRIFFITH:

5    Q   Would Abbott's Alternate Site personnel have

6 influence over the catalog price increases on list price

7 that Abbott made?

8        MS. CITERA:  Objection.

9        THE WITNESS:  In the HPD catalog?

10   Q   Yes.

11    A    I don't know that, but probably not.

12    Q    Why do you say, probably not?

13    A    Because as I've articulated before, the division

14  was much larger and things were done there that suited the

15  division, not that suited our organization.

16        Yes, I mean, I - that's my recollection.  I mean, I

17  don't know - I don't know the -- I remember getting that as

18  an objection a lot of times when we tried do things.

19    Q    What do you mean by that?

20    A    Well, I was told to make sure that everything we

21  did made sense from a divisional standpoint.  I didn't do

22  things solely of my organization.  I was encouraged to do

23  that; mm-hmm, and that's appropriate.

24        MS. ST. PETER-GRIFFITH:  If we can mark this next

25  exhibit.

0255

1        (Whereupon, Robertson Exhibit No. 7 was marked for

2    identification.)

3  BY MS. ST. PETER-GRIFFITH:

4    Q    First, sir, before we move on to this document, can

5  I ask how were the annual list price increases determined?

6        MS. CITERA:  Objection.

7        THE WITNESS:  I have no idea.

8    Q    Do you know whether they were routinely taken?

9    A    No.

10    Q    Do you know whether when list price increases were

11  taken whether there was a corresponding increase in contract

12  prices?

13    A    I know that price increases were very important to

14  us and that we took price increases every chance we got, and

15  I think price increases we did take whenever we had the

16  opportunity.

17        Was it routine?  I don't know.

18        Once again, you can have a -- The truth is

19  difficult to come by, because if you take price increases

20  and sign one monstrous customer your Average Selling Price

21  is going to go down, but you have, in fact -- And that's

22  customer mix, having a larger customer.

23        Our goal was to take price increases whenever we

24  could.

25    Q    When you say, "price increases," do you mean list

0256

1  price increases --

2    A    Oh, no, ma'am.

3    Q    -- or contract --

4    A    No, ma'am.

5    Q    -- price increases?

6    A    List price increases don't feed the cat.  You need

7  to get the customer to buy at a higher price.

8    Q    Why do you say, "list price increases don't feed

9  the cat"?

10    A    Well, as I've said before, that this is a place

11  where you start your negotiation - okay - the list price is

12  where you start your negotiation.

13      Our costs went up consistently - plastics for
14  resins, for cardboard, for labor, and we changed the
15  starting point for our negotiation and attempted to get
16  price increases as much as we could because our costs were
17  increasing, as well.
18      Q   Sir, if you could just take a look at this document
19  that's been marked as Exhibit 7 - Robertson Exhibit 7,
20      A   7?  Oh, okay.
21          Because it's Sellers 362 also.
22      Q   Yes.  And I will note that that's the Exhibit 362
23  from the Texas litigation, and we are, as was pointed out
24  before, we're not in Texas anymore.
25          MS. STETLER:  Or Kansas.
0257
1       A   Okay.
2       Q   Sir, do you - and I will ask you the question as
3   you flip through the document.  Do you recognize any of the
4   pages of this document?
5       A   No.
6       Q   If you could flip first to the third page which has
7   the PostIt fax note?
8       A   This one here, (indicating) Page 1?
9       Q   Yes.
10      A   Okay.
11      Q   And do you see where it says on the PostIt fax note
12  Dave Brinks?
13      A   Mm-hmm.
14      Q   And it says, From G - and it looks like an
15  ampersand, E or GTE, do you see that?
16      A   Mm-hmm.
17      Q   And do you know who GTE or G, ampersand, E might
18  be?
19      A   No.
20          MS. CITERA:  Objection.
21      Q   Sir, this appears to be --
22          THE WITNESS:  You can find out by looking at the
23  phone extension, though.
24      Q   Okay.
25          So is it fair to say that's probably someone within
0258
1   Abbott?
2       A   Most of the phone extensions ended with 7, or
3   started with 7, so it might be, yeah.
4       Q   If you could go up to the chart, do you see at the
5   top of the page?
6       A   Yes, ma'am.
7       Q   Sir, do you see where it says, List Price?
8       A   Mm-hmm.
9       Q   And, Rx link acquisition price?
10      A   Mm-hmm.
11      Q   Do you know what Rx link acquisition price is?
12      A   No.
13      Q   Do you know what Rx link customer price is?
14      A   No.

15   Q   Do you know what Old awp is?

16   A   No.

17   Q   What about awp/gram?

18   A   That would -- If this is -- This is evidently a 500

19 milligrams (referring) - yeah, this is a 500 mg. vial.   So

20 the AWP per gram - if this is a 500 mg. vial, will be double

21 the old AWP.

22   Q   Okay.

23       And awp/gram?

24   A   Yes, ma'am.  This is a 500 mg. vial --

25   Q   Oh, I see.  I got you.

0259

1   A   -- so to get to a gram, you'd double the 500 mg.

2 price.

3   Q   Got you.

4       And then there's awp as percentage of list, do you

5 see that?

6   A   Yes, ma'am.

7   Q   Do you understand what that means?

8   A   Well, if you've got -- It's just, once again,

9 arithmetic; AWP as a percentage of list.

10       It means AWP is 1.1875 x list.

11   Q   Okay.

12   A   It would appear to me.  I don't know.  I don't have

13 a calculator.

14   Q   Let me ask you this:  First of all, do you know

15 whether GTE could mean Gerry Eikorn?

16       MS. CITERA:  Objection to form.

17       THE WITNESS:  I have no -- I don't know.

18   Q   Were you ever aware of a request that was made from

19 Home Infusion Contract Marketing to Gerry Eikorn to lower

20 the vancomycin price - list price?

21   A   No, I'm not aware of that.

22   Q   Were you aware of any changes in vancomycin that

23 were requested - in vancomycin pricing that were requested

24 by Home Infusion or anyone else at Alternate Site?

25   A   No.

0260

1   Q   Would that have been something -- If such a request

2 had been made, would that have been something that you would

3 have expected to have been advised about concerning?

4       MS. CITERA:  Objection.

5       THE WITNESS:  No, ma'am.  My concern was the selling

6 price and what we sold it for.

7       If they requested a price reduction, that would be a

8 marketing decision that they would make.

9       My concern was what we sold it to the customer for.

10   Q   But when you say, "they," who are they?

11   A   The Alternate Site Home Infusion Services people or

12 the Alternate Site Product Sales people.  That's something

13 the general managers there would do.

14   Q   Okay.

15       So you would defer to the general managers as to

16 whether requests should be made --

17    A    Well --
18    Q    -- for changing in pricing?
19    A    -- they knew the marketing -- They knew the markets
20  much better than I did.
21    Q    Okay.
22        Do you see there's a text that says, Dave, my
23  suggested list price is 5% over Rx link?  Do you see that?
24    A    Dave - (referring) --
25    Q    Right here (indicating).
0261
1    A    Right here?
2        Oh, yeah.  Excuse me.
3        (Referring.)
4        I see that.
5    Q    Does this refresh your recollection as to what Rx
6  link might mean?
7    A    No.
8    Q    Did you have any understanding at all --
9    A    I've heard the term before - I've heard the term Rx
10  link before.
11        It's obviously a customer pricing - a customer
12  pricing mechanism, but I don't remember what it was or - I
13  do remember hearing the term now.
14    Q    The next text line says, I will copy Jerry C. and
15  ask her to make the change, do you see that?
16    A    Yes, ma'am.
17    Q    Do you know what that means?
18    MS. CITERA:  Objection.
19    THE WITNESS:  I don't know who Jerry C. is.
20    Q    Okay.
21        Had you ever heard the name Jerry Ciserali?
22    A    No.
23    Q    Do you know whether rebate issues impacted the
24  Alternate Site or Home Infusion market?
25    MS. CITERA:  Objection.
0262
1        THE WITNESS:  Is your question did we provide
2    rebates to customers; is that your question?
3    Q    You know, what I'm going to withdraw my question
4  for right now.  We'll get into that in a second.
5        If you could go to the page that preceded this
6  page.
7    A    Mm-hmm.
8    Q    It says, NDC Information, Product Name, and then,
9  Manufacturer, Strength, AWP, and AWP gram, do you see that?
10    A    Mm-hmm.
11    Q    Sir, what does this appear to you to be?
12    MS. CITERA:  Objection.
13    THE WITNESS:  What it appeared to me to be?
14    MS. ST. PETER-GRIFFITH:  Mm-hmm.
15    MS. CITERA:  Objection.
16    THE WITNESS:  It appears to me to be a comparison of
17    average unit prices per gram among various competitors
18    within this business.

19   Q   And do you know whether Abbott Alternate Site
20   routinely would compare pricing among its competitors?
21      MS. CITERA:  Objection.
22      THE WITNESS:  I don't know -- Pricing, yeah, but I
23   don't recall if they ever did comparisons with AWP.
24      I sense they compared selling prices with their
25   various competitors, but not AWP.  This is -- This is
0263
1   news -- I mean, this is something I have not seen.
2   BY MS. ST. PETER-GRIFFITH:
3   Q   Did you have an understanding as to whether, for
4   example, Eli Lilly's AWP price for vancomycin was
5   substantially less than Abbott's AWP price for vancomycin?
6      MS. CITERA:  Objection.
7      THE WITNESS:  I didn't know that.  I mean, it is
8   here.
9   Q   It is substantially lower here --
10   A   Mm-hmm.
11      MS. CITERA:  Objection.
12   Q   -- on this chart?
13      And it's also -- Abbott's vancomycin AWP is also
14   higher than the vancomycin for Schein and Elkins-Sinn, do
15   you see that?
16   A   Mm-hmm.
17      MS. CITERA:  Objection.
18   Q   Do you know why that is?
19   A   No.
20   Q   Had you ever heard that Abbott's vancomycin AWP was
21   much higher than its competitors?
22   A   I have now.  It's a lot higher than competitors.
23      I mean, I -- We've always tried to get - I mean,
24   tried to get a premium for our products.  But I don't
25   understand; this is way different.
0264
1   Q   Do you have any understanding as to why it might be
2   way different?
3   A   Well, the AWP -- If you take a look at the AWP per
4   gram, it's still significantly different.
5   Q   Is this the first time that you're learning that --
6   A   No.  It's the first time I've ever seen data like
7   this.  I've heard in the past, but I've never seen -- I
8   can't recall having seen the data.
9   Q   Sir, would comparisons of AWP for an Abbott product
10   versus a competitor's product be inappropriate?
11      MS. CITERA:  Objection.
12      THE WITNESS:  For -- Be inappropriate?  I don't
13   know.
14      This is some kind of pricing aberration, I mean -- I
15   don't know.
16   Q   Can you explain the pricing aberration?
17   A   No.
18   Q   Were you aware at all prior to today of that
19   pricing aberration?
20   A   I was aware that it was higher.  I was aware that

21  it was higher, I believe - that our AWP was high.

22    Q   Do you know how much higher?

23    A   No, I didn't how much higher.

24    Q   Okay.

25       Would a comparison between Abbott's AWP versus a

0265

1   competitor's AWP constitute spread marketing activity?

2       MS. CITERA:  Objection.

3       THE WITNESS:  No, I don't believe so.  You're

4    just -- You're reviewing it.

5    Q   Do you know why --

6    A   I don't know why it's so much higher.  I can't

7   explain that.  I don't know.

8    Q   Was there any either official or unofficial policy

9   prohibiting the comparisons of Abbott's AWPs versus a

10   competitor's AWPs?

11    A   I don't recall having a policy printed making any

12   comparison we made of our competitors.  I don't remember

13   that.

14    Q   What would be the purpose of comparing AWPs?

15       MS. CITERA:  Objection.

16       THE WITNESS:  To determine -- You know, to determine

17    where you were in the market, I assume.

18    Q   Sir, were you aware that Eli Lilly's vancomycin was

19   a brand drug?

20    A   A brand drug?

21    Q   Mm-hmm.  That it was proprietary?

22    A   I don't understand how vancomycin can be

23   proprietary.

24       You can have a delivery system that's proprietary,

25    but I don't understand how you can have a generic drug,

0266

1   vancomycin - that's of the chemical structure of vancomycin

2   and have a proprietary.  That would have to be explained to

3   me.

4    Q   Well, if Abbott was the first to develop vancomycin

5   and then it went off patent and became a generic --

6    A   Mm-hmm.

7    Q   -- okay, if Eli Lilly had the - you know,

8   originally had the patent --

9    A   Mm-hmm.  That means they were the innovator; yeah.

10    Q   Okay.

11       And then do you have an explanation as to why

12   Abbott's AWP might be so much higher than the vancomycin

13   that Lilly was selling that was the original - you know,

14   that was the original innovated product?

15       MS. CITERA:  Objection.

16       THE WITNESS:  I don't know why.

17    Q   Do you know when Abbott became aware that the its

18   vanco AWPs were substantially higher?

19    A   No.

20       MS. CITERA:  Objection.

21    Q   Do you recall when you learned that the AWPs were

22   higher?

23      MS. CITERA:  Objection.

24      THE WITNESS:  No.  I did know that the AWP was

25  higher, but I didn't know how much.

0267

1      Once again -- Okay.

2  Q   What time is it?

3  A   Quarter to four.

4      MS. ST. PETER-GRIFFITH:  Is now a time for a quick

5  break before we round out the day?

6      VIDEOGRAPHER:  Okay.  We're going off the record.

7      (Whereupon, a brief recess was taken)

8      VIDEOGRAPHER:  We're back on the record.

9  BY MS. ST. PETER-GRIFFITH:

10     Q   Sir, do you have any recollection as to who might

11  have told you about the difference between the vancomycin

12  AWPs for Abbott's generic product as compared to its

13  competitors?

14     A   The only person I would have conversed with on this

15  subject would have been either been John Ward or Peter

16  Baker.

17      So I don't know who told me that there was a

18  difference.  I don't remember if I was ever told about the

19  magnitude of the difference.

20     Q   Do you remember whether there was any -- Do you

21  remember the context in which it was discussed?

22     A   No.

23     Q   Do you know whether Abbott's contract price for

24  vancomycin was substantially higher than that of its

25  competitors?

0268

1  A   I don't remember pricing on specific product; no.

2  Q   Is it fair to say that if Abbott's contract price

3  was significantly higher than its competitors that Abbott

4  likely wouldn't get the market on that, that customers would

5  go to its competitors at the lower contract price?

6      MS. CITERA:  Objection.

7      THE WITNESS:  That would depend on availability and

8  many other things.

9      But being higher priced is not always -- It's not a

10  always an advantage with a generic drug.

11     Q   What do you mean?

12     A   Well, being higher priced, you know, you'd have to

13  defend it in some way --

14     Q   Okay.

15     A   -- so - or, you know, explain to the customer why

16  your value is greater than someone.

17     Q   If, say, Abbott's contract price for its vancomycin

18  was at or about the same as Eli Lilly's contract price for

19  vancomycin, if you were a customer would the fact that

20  Abbott's AWPs are substantially higher than Eli Lilly's

21  influence, do you think, your decision making with regard to

22  which product you're going to purchase?

23      MS. CITERA:  Objection.

24      THE WITNESS:  That's kind of contextual.

25      How many products does Eli Lilly have to compete

0269

1    with the Abbott injectable line?

2    Q   All I wanted to find out about is just for the

3    vancomycin product.

4        MS. CITERA:  Objection.

5        THE WITNESS:  And I'm telling you I can't answer

6    your question because I don't know how many products Eli

7    Lilly has to compete in this product line, why people

8    would - whether there would be such great differences,

9    why one company would choose to trash a product line,

10   which is not unknown.

11       The question really can't be asked in a vacuum.  The

12   question is if this is the only product that Eli Lilly

13   has and they don't provide any support for it, they just

14   fired out there at bargain basement prices and see what

15   happens.

16       If we are -- If this product is part of an

17   80-product portfolio that we have, that we support, the

18   market dynamics are different.  I'm not trying to be,

19   you know, offuscate, I'm just saying in a vacuum, that's

20   difficult for me to answer that question.

21   Q   Well, let's --

22       THE WITNESS:  Is cheap better than expensive in

23   life?

24       Not always.

25   Q   Well, let me ask you this:  If reimbursement for a

0270

1    particular vancomycin product is tied to its AWP, and if AWP

2    for Abbott's vancomycin product is much higher than its

3    competitors, don't you think it would be attractive to

4    Abbott's customers to purchase the Abbott product over the

5    Eli Lilly product if the reimbursement is higher?

6    A   If you just do the --

7        MS. CITERA:  Objection.

8        THE WITNESS:  Once again, ma'am - excuse me - but if

9    you just do the arithmetic, sure --

10       MS. ST. PETER-GRIFFITH:  Okay.

11       THE WITNESS:  -- if you just do the arithmetic.

12       Here are so many more things that enter into

13   customer relations and product lines and product

14   offerings and contractual relationships that, in a

15   vacuum, it's really hard to say.

16   Q   Well, did reimbursement differences between

17   Abbott's products and its competitors products factor into

18   Abbott's Alternate Site customer's decision making?

19       MS. CITERA:  Objection.

20       THE WITNESS:  We didn't market it in that way,

21   ma'am.

22   Q   Well, I'm not asking whether you marketed in that

23   way, what I'm asking is would it factor into their decision.

24   A   I don't know that.

25       MS. CITERA:  Objection.

0271

1     THE WITNESS:  I mean, you know, once again, I can't
2  tell that.
3    Q   Did you ever learn -- Go ahead.
4     THE WITNESS:  You know, what leads me to believe
5  it's an aberration or it's a mistake, is if you had
6  higher AWPs on all your - or higher AWPs, you'd have
7  100% market share, if that were our objective.  I don't
8  think that was our objective.  This looks like some sort
9  of aberration to me.
10    Q   Is there something wrong -- Would there be
11  something wrong with having a higher AWP --
12     MS. CITERA:  Objection.
13    Q   -- which would afford you to get 100% of the market
14  share?
15     MS. CITERA:  Objection.
16     THE WITNESS:  Well, what I'm talking about, we've
17  got 20 products.  Why would the AWP be higher on this
18  one and not higher on others?  I don't understand.  It
19  seems to be an aberration.  I don't know and I can't
20  explain it.  I apologize.
21    Q   Do you have any sense as to what the root cause of
22  that aberration would be?
23     THE WITNESS:  No.
24     MS. CITERA:  Objection.
25    Q   Do you know whether this aberration coincided with
0272
1  a significant increase in utilization of Abbott's vancomycin
2  products by its Alt Site customers?
3     MS. CITERA:  Objection.
4     THE WITNESS:  On byproduct sales, no, ma'am, I don't
5  know.  I don't know.
6    Q   Did you ever learn at any time that vancomycin
7  utilization increased among Abbott's Alt Site customers?
8    A   We -- I don't know if I remember looking at it on a
9  line-by-line basis.  These were reported as injectables.  If
10  you want me to go back to our records, I think these are
11  reported as injectables.  I don't know if I got line item
12  reporting.  I don't remember.  And this would require line
13  item reporting for - to notice one significant spike in a
14  particular product.
15    Q   Well, would -- If Abbott's Alternate Site personnel
16  were making requests concerning vancomycin pricing one way
17  or another, other seeking higher AWP or list price or lower
18  list price reporting, would that be something that you would
19  learn about if that was - if the genesis for that request
20  came from Alt Site?
21    A   If it were just --
22     MS. CITERA:  Objection.
23     THE WITNESS:  -- one product, probably not.  I don't
24  know.
25    Q   How come?
0273
1    A   Once again, I didn't -- I don't -- This tells you
2  what the AWP is.

3      What the magnitude of the sales are, I don't know -
4  I mean, how big the sales are, what the numbers are, I don't
5  know.
6      Q    Do you recall whether in or around the mid- to
7  late-90s vancomycin represented a significant product that
8  constituted a chunk of Alt Site business?
9      MS. CITERA:  Objection.
10     THE WITNESS:  I don't remember specifically the
11  sales of vancomycin - what the specific sales of
12  vancomycin were.
13     I know that injectable pharmaceuticals were -- And I
14  know that vancomycin is a commonly used one, injectable
15  pharmaceutical.
16  Q    Okay.
17     MS. ST. PETER-GRIFFITH:  Mark the next exhibit.
18     (Whereupon, Robertson Exhibit No. 8 was marked for
19  identification.)
20  Q    Sir, do you recognize this document?
21  A    No.
22  Q    It appears to be a memo from Alternate Site
23  Contract Marketing, do you see that?
24  A    (Referring.)
25     It's from Steve Kipperman; yeah.
0274
1  Q    Okay.
2     And who's Mr. Kipperman?
3  A    Kipperman used to work in Alternate Site in this
4  organization.
5  Q    Okay.
6     And it's a memo directed to the field sales force,
7  is it not?
8  A    Yes.
9  Q    As well as the district managers?
10  A    Mm-hmm.
11  Q    And who is Cindy Dawson?
12  A    She's one of the administrative people.
13     The other people (indicating) were national account
14  people, as I recall.
15  Q    Okay.
16     And the memo concerns current Red Book AWPs, do you
17  see that?
18  A    Mm-hmm.
19  Q    It was previously marked as Exhibit 61 in the Lotz,
20  Texas deposition at the bottom.
21  A    Mm-hmm.
22  Q    Sir, do you recall in or around May of 1994 Abbott
23  taking a list price increase?
24  A    No.
25  Q    No?
0275
1     The second sentence of this paragraph reads, This
2  also has an effect on our AWP, Average Wholesale Price,
3  which Red Book quotes for reimbursement purposes, do you see
4  that?

5     A    Mm-hmm.
6     Q    Therefore, Mike Heggie was able to get Red Book to
7  send a listing of all new AWPs for all of our products which
8  would be effective through next April, do you see that?
9     A    Yes.
10     Q    And the last sentence says, I hope this information
11  is helpful and if you have any questions feel free to
12  contact me.
13     A    Mm-hmm.
14     Q    What was the point of sending out this memorandum
15  to the field sales force?
16        MS. CITERA:  Objection.
17        THE WITNESS:  I don't know.
18     Q    Do you know whether it was appropriate for the
19  field sales force to discuss with customers AWP increases?
20        MS. CITERA:  Objection.
21        THE WITNESS:  Well, this was sent for their
22  information, but they may have discussed it with
23  customers; I don't know.
24        Why they would need AWP information or changes in
25  AWP?  I don't know, but they don't need that.
0276
1     Q    Who doesn't need that?
2        MR. ANDERSON:  Objection.  Nonresponsive.
3     A    The field sales force doesn't need that.
4     Q    The field sales force doesn't need AWP information.
5     A    Why would they?  No.
6     Q    Okay.
7        Now, all these individuals that are on the cc list
8  and the To list, are they within your chain of command?
9     A    Yeah.
10     Q    Is Mr. Kipperman within your chain of command?
11     A    Mm-hmm.
12     Q    Do you have any idea why Mr. Kipperman would be
13  sending this information to the field sales reps?
14        MS. CITERA:  Objection.
15        THE WITNESS:  No.
16     Q    At this point in time, was Mr. Heggie in Alt Site,
17  as well?
18     A    He was -- He was in the Renal Care area, Michael
19  Heggie.
20     Q    Was it -- Would it have been improper for the field
21  sales force to discuss AWP increases with their customers?
22        MS. CITERA:  Objection.
23        THE WITNESS:  They may have discussed that, but
24  that's not part -- They may have discussed it; I don't
25  know -- Improper?  I don't know.
0277
1     Q    Well, was there any policy against it?
2     A    Well, what I guess we're trying to lash up here is
3  AWP and spread, we didn't sell on spread.
4     Q    Would it have been improper for the field sales
5  force to discuss spread with Abbott customers?
6        MS. CITERA:  Objection.

7    THE WITNESS:  I don't know that the field sales
8  force had to do that.  I mean, the customers had access
9  to these data, without our -- Without our --
10   Why would we be doing this?  These customers had access
11  to these data.
12   Q   Well, would the customers have access to the data
13  if they didn't subscribe to Red Book or one of the other
14  pricing compendia?
15    MS. CITERA:  Objection.
16    THE WITNESS:  I don't know if there were other
17  sources other than Red Book.
18   Q   Do you know whether the field sales force or
19  members of the field sales force discussed spread with
20  Abbott customers?
21    MS. CITERA:  Objection.
22    THE WITNESS:  I don't know that, whether they did or
23  didn't.
24   Q   Is it possible that they could have?
25    MS. CITERA:  Objection.
0278
1    THE WITNESS:  I imagine, but I have no knowledge of
2  them doing that.
3   Q   If Abbott's reimbursement for its drugs was
4  advantageous, would it be an appropriate sales tool or
5  practice for field sales reps to discuss Abbott's AWP
6  pricing or spread with Abbott customers?
7    MS. CITERA:  Objection.
8    THE WITNESS:  You're asking -- Is that my opinion,
9  you'd like, whether -- We didn't sell on spread.  We
10   were -- And I received assurances from Ward we didn't
11  sell on spread.  So why would they be discussing AWPs?
12   Q   When you say you received assurances from Ward on
13  spread, what do you mean?
14   A   That we didn't sell on spread; that that issue
15  didn't, you know, don't arise.  It never arose with me and
16  - between me and John that this would be a marketing tool.
17  We didn't do that.
18   Q   Did Mr. Ward affirmatively tell you, We don't sell
19  on spread?
20   A   I don't recall any specific conversation in that
21  regard.  We just we tried to sell the whole package.  I
22  never recall that we sold on anything other than that.
23   Q   Would it have been of concern to you if Abbott's
24  Alternate Site field sales force sold product based upon
25  spread in part?
0279
1    MS. CITERA:  Objection.
2    THE WITNESS:  Once again, I don't recall having had
3  to confront this issue.
4    I think we sold on the base -- The way to sell is on
5  the basis on the value and the quality of your products,
6  not on spread.
7    What they did, if they sold in other ways, it would
8  be inappropriate.

9    Q   It would be inappropriate?

10   A   We sell on the -- It would be against our marketing

11   or how the way we market our products.

12   Q   Is there a policy written out any where?

13      MS. CITERA:  Objection.

14      THE WITNESS:  As we discussed earlier, that policy

15   isn't written.

16   Q   Then why would it be wrong?

17      MS. CITERA:  Objection.

18      THE WITNESS:  Because we had a marketing plan to

19   market based upon breadth of product line quality and

20   availability; that's how we sold our products.

21   Q   Sir, do you condone Mr. Kipperman's efforts to

22   advise the field sales force of AWPs?

23      MS. CITERA:  Objection.

24      THE WITNESS:  I don't think -- I just think it's

25   unnecessary.

0280

1    Q   But do you condone his sending out a memorandum

2    like this?

3    A   Well, I don't --

4       MS. CITERA:  Objection.

5       THE WITNESS:  I don't think this is a great idea.

6       Do you have the same data available on other of

7    Abbott products?  Because I believe this vanco thing may

8    be an aberration - I don't know why and I can't explain

9    it.

10   Q   Well, do you believe that that memorandum is

11   limited to vancomycin?

12      MS. CITERA:  Objection.

13      THE WITNESS:  Oh, no.  No.  No.  No.

14      What I'm talking about is the difference.

15      And once again --

16   Q   Hold on just a second, sir.

17   A   Mm-hmm.

18      MS. ST. PETER-GRIFFITH:  Okay.

19      What I'd like to do is show this to Counsel first,

20   and this is the complete exhibit from the Kipperman

21   deposition (handing).

22      MS. CITERA:  That's 9?

23      MS. ST. PETER-GRIFFITH:  Why don't we mark this as

24   the next Robertson exhibit.

25      (Whereupon, Robertson Exhibit No. 9 was marked for

0281

1    identification.)

2    BY MS. ST. PETER-GRIFFITH:

3    Q   Before I have you look at that, I just want to get

4    an answer to my question concerning Mr. Kipperman's

5    memorandum.

6       Would you condone Mr. Kipperman sending out a

7    memorandum like this to the field sales force?

8       MS. CITERA:  Objection.

9       THE WITNESS:  I think that if Mr. Kipperman came to

10   me and asked me, Should I send it to the fields sales

11   force, the answer would be no.
12     Q   Did you ever prohibit him from sending that
13   information to the field sales force?
14     MS. CITERA:  Objection.
15     THE WITNESS:  I never knew anything about him
16   sending this to the field sales force.
17     Q   Sir, if you could take a look at that complete
18   document --
19     A   Mm-hmm.
20     Q   -- does that appear to be a listing for the entire
21   Hospital Products Division catalog?
22     MS. CITERA:  Objection.
23     THE WITNESS:  (Referring.)
24     I don't know.  I don't -- I don't know.  It doesn't
25     even -- It doesn't say what the drugs are, it's just
0282
1    some number here.
2      Q   Well, are there NDC numbers listed?
3      A   Yeah.
4      Q   Okay.
5        So don't NDC numbers indicate what the drugs are?
6      A   Not to me, ma'am.
7      Q   Okay.
8      A   You'll have to have a name on them.
9      Q   I understand.
10     A   Yeah; this is a pretty complete list, though.
11     Q   Okay.
12       So does it appear to you that Mr. Kipperman sent
13   the entire catalog to the field sales force identifying what
14   the AWPs were?
15     MS. CITERA:  Objection.
16     THE WITNESS:  He sent a large number of AWPs to the
17     field.  Whether or not this is the entire catalog, I
18     don't know, but he sent a potload of these to the field.
19     Q   Okay.
20     MS. ST. PETER-GRIFFITH:  Let's mark this document.
21     (Whereupon, Robertson Exhibit No. 10 was marked for
22     identification.)
23     Q   Sir, I'm going to ask you to look at the first
24   memorandum, and then there are certain pages that I'll point
25   you to.  You don't have to flip through each and every page
0283
1    of the exhibit.
2      A   Mm-hmm.  Okay.
3      Q   Sir, do you remember who Gerimed is?
4      A   It's a -- Here, it says it's a closed-door pharmacy
5    and long term care nursing home.
6      Q   And do you remember who MedEcon is?
7      A   MedEcon's a buying group, I believe.
8      Q   Sir, do you recall receiving the first two pages of
9    this exhibit, the memorandum which is a July 14th memorandum
10   from D. Walker, it appears, to you?
11     MS. CITERA:  Objection.
12     THE WITNESS:  From Ward to me?

13     Do I remember receiving this?  No.

14     Q   I'm sorry, from John Ward.  I apologize.

15     A   No, ma'am.

16        Your question is do I remember receiving it on

17  Bastille Day in '95?  No, ma'am.

18     Q   Sir, do you remember an issue concerning Gerimed

19  and MedEcon's possible merger?

20     A   No.

21     Q   Do you recall whether Gerimed and MedEcon were -

22  either had contracts with Alternate Site or were customers

23  of Alternate Site Product Sales?

24     A   Gerimed probably was.  MedEcon was a GPO in the

25  acute care market.  That's hospital, GPO's -- the acute care

0284

1  was Hospital.

2        So that wouldn't be in our area.  If they'd merge,

3  we'd have to make some sort of accommodation, I guess.

4     Q   Well, is that, in part, what this memorandum is

5  about?

6     A   Mm-hmm.

7        MS. CITERA:  Objection.

8        THE WITNESS:  Although, I haven't, you know, studied

9   it, gone through the number if they (referring) - yeah,

10    all right, you know, what do we do?

11        Isn't that what it says?

12        (Referring.)

13        Same market - right - as the PBI, mm-hmm.

14     Q   Now, does it appear that in the middle of the memo

15  it says, Additional information on Gerimed, do you see that?

16     A   Mm-hmm.

17     Q   And it says, 1994 Abbott sales to Gerimed $600,

18  could that be 600 million?

19     A   No.  That's dollars in thousands.

20     Q   Dollars in thousands.  Okay.

21        And 1995 projected 650, is that thousands?

22     A   Yes.

23     Q   Okay.

24        And then it appears that Baxter sales to Gerimed

25  excluding med-surg were $3.4M --

0285

1     A   That's correct.

2     Q   -- in '94.

3     A   Mm-hmm.

4     Q   Is it fair to say that Gerimed may have been a

5   customer that Abbott wanted to lure more business from?

6        MS. CITERA:  Objection.

7        THE WITNESS:  It may have been, yes; depends on what

8    the sales were if we had products in competing areas.

9        If they were selling products which we didn't

10    compete in, we would have no way of knowing that.

11     Q   Sir, if I could have you flip to one, two, three,

12  four, five pages into this packet, and hopefully it says,

13  ABT 278115.

14     A   Yes.

15    Q    And it says -- And I'll represent to you that this
16    was produced - if you look at the page before it - as part
17    of a Gerimed file, and I don't seem to have the 278114 page.
18    A    Well, I don't have it, either.
19    Q    Okay.
20         I don't think any of us do.
21    A    13 is blank.
22    Q    13 says - it has a file folder at the top, do you
23    see that?
24    A    Oh, yes; I see.  Okay.
25    Q    Sir, do you recognize this document that's 278115?
0286
1     A    No.
2     Q    It says at the top, A Cost Containment Program for
3     Home Infusion Therapy Providers, do you see that?
4     A    Mm-hmm.
5     Q    And at the bottom, there's an address 9707
6     Shelbyville Road, Louisville, Kentucky?
7     A    Mm-hmm.
8     Q    Do you know whether that is a Gerimed address?
9     A    I don't -- I'm sorry, I don't remember.
10    Q    Do you know whether Gerimed made its awards of
11    contracts to manufacturers based upon the consideration of
12    low bids and AWP spreads which reflect reimbursement
13    potential?
14        MS. CITERA:  Objection.
15        THE WITNESS:  I have no knowledge that have.
16    Q    Did you ever hear of that?
17    A    No.
18    Q    If I could have you flip to page 278131, and,
19    actually, to the next page, 278132.
20    A    (Witness complies.)
21         Yes, ma'am.
22    Q    Do you see where it says, Reimbursement Assistance?
23    A    (Referring.)
24         Reimbursement Assistance, yes.
25    Q    Did you ever hear of a product that was either
0287
1     developed or maintained by Gerimed called the Gerimed Binder
2     and also the EmphaSys system?
3     A    No, ma'am.
4     Q    Were you at all familiar as to whether Gerimed had
5     a way to identify the lowest cost product and the best
6     spread for any particular state?
7     A    I was not aware of that.
8     Q    Sir, if you could go next to page, 278136.
9     A    (Witness complies.)
10         Mm-hmm.
11    Q    Do you see where it says, Gerimed Request for Quote
12    Instructions?
13    A    Mm-hmm.
14    Q    Would it have been your expectation as the
15    divisional vice president for Alternate Site that when
16    submitting a quote Abbott's Alternate Site division would

17  follow the instructions of the customer concerning that
18  proposal?
19      MS. CITERA:  Objection.
20      THE WITNESS:  I'm sorry, I didn't understand your
21  question.  Forgive me.
22  Q   Sure.
23      If you have a customer like Gerimed --
24  A   Right.
25  Q   -- who's putting out an RFP or an RFQ, a request
0288
1  for a quote, and you anticipated that Alternate Site would
2  respond to that Request for Quote --
3  A   Right.
4  Q   -- would you expect that the Alternate Site
5  personnel putting together the quote would follow the
6  instructions?
7      MS. CITERA:  Objection.
8      THE WITNESS:  If they could.
9  Q   What do you mean by, if they could?
10  A   If they were capable of following the instructions
11  or if they were permitted to follow the instructions.
12  Q   Okay.
13      Why wouldn't they be permitted to follow the
14  instructions?
15  A   If the instructions asked them for a manufacturing
16  cost on a product-by-product basis, we would not provide
17  that.
18  Q   Okay.
19      If you could flip to page 278142, which I'll
20  represent to you is still part of this Requirement for Bid
21  submission from Gerimed --
22  A   42?
23      (Witness complies.)
24  Q   42.
25  A   Okay.
0289
1  Q   And I'd like you to look at and read Section H, if
2  you could.
3  A   (Referring.)
4      Okay.
5  Q   Sir, the first sentence of Section H reads, Low
6  price and best spreads contract pricing will be evaluated on
7  lowest price and/or best spread --
8  A   Mm-hmm.
9  Q   -- between AWP and the contract price for
10  multisource products, do you see that?
11  A   Mm-hmm.
12  Q   Does this inform you as to whether Gerimed, as an
13  Abbott customer, was concerned about spreads?
14      MS. CITERA:  Objection.
15      THE WITNESS:  Yes.
16  Q   Okay.
17      What does it tell you?
18      MS. CITERA:  Objection.

19      THE WITNESS:  Well, I think the language is plain in
20    black lettering that's what they were interested in.
21      Q    Were you aware of any other customers of Abbott's
22    Alt Site that were concerned about spread or interested in
23    spread?
24      A    No.
25      Q    No?
0290
1      A    (Shaking head.)
2      Q    If Abbott's customers, as part of their RFQ
3    required Abbott Alt Site to provide information so that
4    spread could be calculated, would there be any prohibition
5    for the Alt Site personnel - or would there be any
6    prohibition prohibiting the Alt Site personnel from
7    furnishing that information?
8        MS. CITERA:  Objection.
9        THE WITNESS:  Would there be any prohibition?
10        That would rest with the general managers, and I
11    don't know what their response would be.  But I would
12    rather not be -- I would rather not do that.
13      Q    Okay.
14        You would rather not do that, but do you know
15    whether your general managers would have prohibited it?
16      A    In this particular case --
17        MS. CITERA:  Objection.
18        THE WITNESS:  -- I don't know what happened to it.
19      Q    Okay.
20        Well, would it be fair to say that if you're
21    looking to get the contract and Gerimed is requiring the
22    information that it's likely that the Alt Site person not
23    provided the information?
24        MS. CITERA:  Objection.
25        THE WITNESS:  That may be; I have no way of knowing
0291
1    that.  I mean, I don't know that.
2      Q    Did you ever express to anyone that you would
3    prefer that Alt Site personnel not provide information so
4    that customers could calculate spread?
5        MS. CITERA:  Objection.
6        THE WITNESS:  Once again, spread was not something
7    which we commonly discussed.  I mean, I -- It's just not
8    how we marketed our product.
9      Q    But if your customers were asking for the
10    information, would you provide it to them?
11        MS. CITERA:  Objection.
12        THE WITNESS:  If they asked for information on this,
13    I don't know.  I'd prefer not to and I probably would
14    not.
15        It's $3.4M - that's a lot of money, but our sales
16    were only $600,000; there's not a lot of downside there.
17      Q    Okay.
18        So would it be then your opinion that Alt Site
19    should forego bidding on the Gerimed project?
20        MS. CITERA:  Objection.

21      THE WITNESS:  I don't know.  I don't know.  This
22  seems to be if they're asking to market products through
23  spread and that was not our orientation, that was not
24  our goal, that was not the way we wanted to do it.
25   Q    But you think it's possible that the Alt Site
0292
1  personnel may have provided that information.
2      MS. CITERA:  Objection.
3      THE WITNESS:  When I see this information, it's
4  poss- --  If all the information's been provided, it's
5  possible.
6      MS. ST. PETER-GRIFFITH:  What time do we have?
7      MS. CITERA:  4:25.
8      MS. ST. PETER-GRIFFITH:  You know what, why don't we
9  stop here for the day.  We've got to pack up.
10      And then if we could get another date from you,
11  Mr. Robertson, as to when you might be available,
12  perhaps in early October, if everyone could check their
13  schedules, that would be great.
14      MR. STETLER:  Yeah.  I'll check.
15      VIDEOGRAPHER:  That includes the deposition.
16      The time is 4:28 p.m.
17      (Whereupon, at about 4:28 p.m., the deposition was
18  adjourned.)
19      (The Witness waived reading and signing the
20  transcript.)
21
22
23
24
25
0293
1  STATE OF FLORIDA    )
2  COUNTY OF LEE      )
3
4      I, Lisa L. Rios, Court Reporter, and Notary Public,
5  State of Florida at Large, do certify that I was authorized
6  to and did stenographically report the foregoing deposition
7  of DONALD C. ROBERTSON, and that the foregoing typewritten
8  transcript, consisting of pages 1 through 292, is a true
9  record of the testimony given by the witness.
10      I further certify that I am not a relative, employee,
11  attorney or counsel of any of the parties, nor am I a
12  relative or employee of any of the parties' attorney or
13  counsel connected with the action, nor am I financially
14  interested in the action.
15
16
17      Dated this 19th day of September, 2007.
18
19
20      _____
            Lisa L. Rios
21              Court Reporter

Notary Public
22          State of Florida at Large
23
24
25
0294
1
2                    CERTIFICATE OF OATH
3
4    STATE OF FLORIDA    )
5    COUNTY OF LEE        )
6      I, Lisa L. Rios, Court Reporter, and Notary Public,
7    State of Florida at Large, certify that DONALD C. ROBERTSON
8    appeared before me and was duly sworn.
9      WITNESS my hand and official seal this 19th day of
10   September, 2007.
11
12
13       _____
           Lisa L. Rios
14          Court Reporter
           Notary Public
15          State of Florida at Large
16
17
18
19
20
21
22
23
24
25

0001
1          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2
3  In re: PHARMACEUTICAL          )
   INDUSTRY AVERAGE WHOLESALE        ) MDL No. 1456
4  PRICE LITIGATION              ) Civil Action No.
                      )   01-12257-PBS
5                     )
   THIS DOCUMENT RELATES TO:        )
6                     )
   United States of America,         ) Hon. Patti Saris
7  ex rel. Ven-a-Care of the       )
   Florida Keys, Inc., v.        )
8  Abbott Laboratories, Inc.,      )
   and Hospira, Inc.            )
9  CIVIL ACTION NO. 06-11337-PBS     )
10
   ***************************************************
11
          UNITED STATES DISTRICT COURT
12          DISTRICT OF MASSACHUSETTS
13
   IN RE:  PHARMACEUTICAL         )
14  INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
   PRICE LITIGATION            ) Civil Action No.
15                   )   01-CV-12257-PBS
                   )
16  THIS DOCUMENT RELATES TO:      )
                   ) Judge Patti B. Saris
17  State of Arizona v. Abbott       )
   Labs., et al.             )
18  Civil Action No. 06-CV-11069-PBS   )
19
20  ***************************************************
          ORAL AND VIDEOTAPED DEPOSITION OF
21          VIRGINIA TOBIASON
22          HIGHLY CONFIDENTIAL
23          March 28, 2007
24          Volume 1
25  ***************************************************
0002
1          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2
3  IN RE:  PHARMACEUTICAL         )
   INDUSTRY AVERAGE WHOLESALE        ) MDL No. 1456
4  PRICE LITIGATION            ) Civil Action No.
                      )   01-CV-12257-PBS
5                     )
   THIS DOCUMENT RELATES TO:        ) Judge Patti B. Saris
6  ALL CASES               )
7  ***************************************************

8          NO. D-1-GV-04-001286
9  THE STATE OF TEXAS          ) IN THE DISTRICT COURT
                               )
10  ex rel.                    )
     VEN-A-CARE OF THE         )
11    FLORIDA KEYS, INC.,      )
          Plaintiffs,          )
12                             )
     VS.                       ) TRAVIS COUNTY, TEXAS
13                             )
     ABBOTT LABORATORIES INC.,    )
14  ABBOTT LABORATORIES, and      )
     HOSPIRA, INC.,               )
15       Defendant(s).       ) 201ST JUDICIAL DISTRICT
16  *****************************************************
17        IN THE COMMONWEALTH COURT OF PENNSYLVANIA
18
     COMMONWEALTH OF PENNSYLVANIA   )
19  by Thomas W. Corbett, Jr.,      )
     in his capacity as Attorney    )
20  General of the Commonwealth     )
     of Pennsylvania,               ) Dkt. No. 212 MD 2004
21       Plaintiff,            )
                               )
22  VS.                        )
                               )
23  TAP PHARMACEUTICAL PRODUCTS,   )
     INC., et al.,             )
24       Defendants.           )
25
0003
1     ORAL AND VIDEOTAPED DEPOSITION OF VIRGINIA
2  TOBIASON, produced as a witness at the instance of the
3  Plaintiffs, and duly sworn, was taken in the
4  above-styled and numbered causes on the 28th of March,
5  2007, from 9:16 a.m. to 4:21 p.m., before CYNTHIA
6  VOHLKEN, CSR in and for the State of Texas, reported
7  by machine shorthand, at the offices of Jones Day, 77
8  W. Wacker, Suite 3500, Chicago, Illinois, pursuant to
9  the Texas Rules of Civil Procedure and the provisions
10  attached previously.
11
12
13
14
15
16
17
18
19
20
21
22
23

24
25
0004
1           A P P E A R A N C E S
2   FOR THE PLAINTIFF THE STATE OF TEXAS:
3        Ms. Margaret Moore
         Assistant Attorney General
4        Office of the Attorney General
         State of Texas
5        Post Office Box 12548  (78711-2548)
         300 W. 15th Street, 9th Floor
6        Austin, Texas  78701
7
    FOR THE PLAINTIFF UNITED STATES OF AMERICA:
8
         Ms. Ann M. St. Peter-Griffith
9        Assistant U.S. Attorney
         United States Attorney's Office
10        Southern District of Florida
         99 N.E. Fourth Street
11        Miami, Florida  33132
12
    FOR THE PLAINTIFFS THE STATE OF ARIZONA AND MDL
13  PLAINTIFFS:
14        Ms. Amber M. Nesbitt
         Wexler Toriseva Wallace LLP
15        One North LaSalle Street, Suite 2000
         Chicago, Illinois  60602
16
17  FOR THE PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:
18        Mr. Donald E. Haviland, Jr.
         The Haviland law Firm, LLC
19        740 S. Third Street
         Third Floor
20        Philadelphia, Pennsylvania  19147
21
    FOR THE RELATOR:
22
         Mr. James Joseph Breen
23        The Breen Law Firm, P.A.
         P. O. Box 297470
24        Pembroke Pines, Florida 33029-7470
25
0005
1   FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
    HOSPIRA, INC.:
2
         Ms. Tina M. Tabacchi
3        Jones Day
         77 West Wacker, Suite 3500
4        Chicago, Illinois  60601-1692
5
    ALSO PRESENT:
6

```
        Mr. Luis Cobo,
 7          Ven-A-Care of the Florida Keys
        Mr. Gabriel Scannapieco,
 8          Jones Day
        Mr. Bruce Witty, Videographer
 9
10
                *-*-*-*-*
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0006
```

```
 1                INDEX
 2  Appearances...................    4
 3  VIRGINIA TOBIASON
        Examination by Ms. Moore...............   12
 4      Examination by Mr. Breen...............   94
 5  Signature and Changes........................ 224
    Reporter's Certificate........................ 226
 6
 7  VIDEOTAPE NUMBER
 8      1 ..................................    8
        2 ..................................   64
 9      3 ..................................  118
        4 ..................................  183
10
11                EXHIBITS
12  NO.  DESCRIPTION                    PAGE
13      (Previous Exhibits)
14  45 ..........................    28
    294..........................    33
15  295 ..........................    54
    298..........................    73
16  299..........................    70
17      (New Exhibits)
18  545..........................   13
```

```
    Deposition of Virginia Tobiason taken
19    June 2, 2005 in State of West Virginia
      against Warrick Pharmaceuticals, et al.
20    (ABT014-1386-1409) (ABT-DOJ 0189881-189904)
      (ABT AWP/MDL 249385-249408) Highly
21    Confidential (Texas Abbott 60222-60382)
```

546........................................... 48
22    Composite of documents (ABT 52704-53349)
       (TXABT 673723-674367) Confidential Subject
23    to Protective Order
547........................................... 84
24    11/16/2004 E-mail from Joseph Fiske to
       Karen Peterson, Cathy Ackerman, Subject:
25    Gengraf Reimbursement - Medicare
0007
1  NO.  DESCRIPTION                          PAGE
2  548........................................... 88
       E-mail string; 08/10/2005 E-mail from
3    Virginia Tobiason to Joseph Fiske, Debra
       DeYoung, Subject:  Follow up to yesterday's
4    HCRRC meeting (TXTABT-E 0047464-47465)
       Confidential
5  549........................................... 91
       Composite of documents
6    (TXABT 673508-673722) Confidential
       (ABT-DOJ 0228265-0193116) Confidential
7  550........................................... 94
       Log of Abbott's Document Hold Memoranda in
8    United States of America, et al. V. Abbott
       Laboratories, Inc.
9  551........................................... 118
       OIG News, April 28, 2003, Voluntary
10    Compliance Guidance Issued for
       Pharmaceutical Manufacturers
11    (AZ0524193-524250) Highly Confidential
552........................................... 150
12    Corporate Integrity Agreement Between The
       Office of Inspector General of the
13    Department of Health and Human Services
       And Abbott Laboratories
14  553........................................... 205
       October 29, 1997 Interoffice Correspondence
15    from Jose E. Rivera, Jr. to various
       Individuals, Re:  U.S. Department of Health
16    and Human Services Subpoena
       (ABT-DOJ 0228271-228273)
17
18
19
20
21
22
23
24
25
0008
1         THE VIDEOGRAPHER:  Here begins the
2   videotaped deposition of Virginia Tobiason taken in
3   the matter of the State of Texas versus Abbott
4   Laboratories, Incorporated, et al.  Filed in the

5  District Court of Travis County, Texas, 201st Judicial
6  District.  Case Number D-1-GV-04-001286.
7          The videographer today is Bruce Witty
8  representing Complete Litigation Support, 3701 Kirby
9  Drive, Houston, Texas.
10          Today's deposition is taking place at 77
11  West Wacker Drive, Chicago, Illinois.  The date is
12  March 28th, 2007.  And the time on the video monitor
13  is 9:16 a.m.
14          Would counsels please identify
15  themselves for the video record.
16          MS. MOORE:  Margaret Moore from the
17  Attorney General's Office for the State of Texas.
18          MR. BREEN:  Jim Breen.  I represent the
19  Relator, Ven-A-Care of the Florida Keys.  With me
20  today is Ven-A-Care's corporate officer, Luis Cobo,
21  who's here at the deposition as a Ven-A-Care
22  representative.
23          And, also, just for the record, this
24  case has been cross -- this deposition has been cross
25  noticed.  In addition to the Texas, ex rel. Ven-A-Care
0009
1  versus Abbott matter, also in the United States, ex
2  rel. Ven-a-Care versus Abbott matter currently pending
3  before the multidistrict litigation panel in Boston,
4  Judge -- United States District Court, Judge Saris.
5  And counsel will also identify the third case that
6  this matter has been cross noticed in as they make
7  their appearances.
8          MS. ST. PETER-GRIFFITH:  Ann
9  St. Peter-Griffith from the United States Attorney's
10  Office on behalf of the United States in the MDL
11  litigation.
12          MR. HAVILAND:  This is Don Haviland for
13  the Commonwealth of Pennsylvania.  We also cross
14  noticed this case in -- this deposition in the case of
15  Commonwealth of Pennsylvania versus TAP
16  Pharmaceuticals.
17          MR. COBO:  I'm Luis Cobo with
18  Ven-A-Care.
19          MS. NESBITT:  Amber Nesbitt from Wexler
20  Toriseva Wallace on behalf of the MDL plaintiffs and
21  the State of Arizona.
22          MS. TABACCHI:  Tina Tabacchi on behalf
23  of the defendants.
24          THE VIDEOGRAPHER:  Will the court
25  reporter please identify herself and swear in the
0010
1  witness.
2          THE REPORTER:  Cynthia Vohlken with
3  Fredericks-Carroll Court Reporters in Austin, Texas.
4          (At this time the witness was sworn.)
5          THE VIDEOGRAPHER:  Please proceed.
6          MS. TABACCHI:  Margaret, may I make a

7    statement --
8            MS. MOORE:  Certainly.
9            MS. TABACCHI:  -- briefly on the record?
10           Before the deposition counsel agreed and
11   I just want to confirm for the record that Abbott will
12   reserve all objections and no one will consider us to
13   have waived an objection by not stating it
14   specifically as we endeavor to follow the rules of
15   various jurisdictions here present today.  Is that
16   agreed?
17           MS. MOORE:  Agreed.
18           MR. BREEN:  But you'll make your basic
19   form objection?
20           MS. TABACCHI:  I'll make a form
21   objection, but no other objections.  All other
22   objections will be reserved.
23           And we have agreed to disagree with
24   counsel for the MDL plaintiffs that this deposition is
25   being taken for purposes of the AMCC as we believe the
0011
1    deposition was noticed after the close of discovery.
2            MS. NESBITT:  This notice or this
3    deposition was cross noticed and we received no
4    objection, so we'll fight that battle another day.
5            MS. TABACCHI:  We are making our
6    objection, as we have made for all other notices sent
7    after the close of discovery, but we won't debate that
8    here on the record.
9            MR. BREEN:  But you're also here on the
10   Arizona case, correct?
11           MS. NESBITT:  Right.
12           MS. TABACCHI:  Yes.
13           MR. BREEN:  I should know this.  Is
14   Arizona still pending in the MDL?
15           MS. NESBITT:  Correct.
16           MS. TABACCHI:  Yes.  The objection is as
17   to the AMCC class action.
18           MR. BREEN:  Just as the amended class --
19   consolidated class complaint.
20           MS. TABACCHI:  That's correct.
21           MR. BREEN:  Okay.
22           MS. MOORE:  Done?
23           MS. TABACCHI:  I'm finished.  Thanks,
24   Margaret.
25           MS. MOORE:  Sure.
0012
1            VIRGINIA TOBIASON,
2    having been first duly sworn, testified as follows:
3                EXAMINATION
4    BY MS. MOORE:
5        Q.  Good morning, Ms. Tobiason.  My name is
6    Margaret Moore, as you've heard, and I am here on
7    behalf of the State of Texas.  You and I have never
8    met before; is that correct?

9    A.  Yes.
10    Q.  I'm leading off in this deposition and so we
11  are going to talk just a little bit about some ground
12  rules.  We do have court -- a court reporter here
13  trying to take down the testimony and we want it to be
14  accurate, so I'm going to ask you to let me completely
15  finish my question and allow Ms. Tabacchi an
16  opportunity to make any objections she may have before
17  you begin your answer so that we're not stepping on
18  each other.  All right?
19    A.  Yes.
20    Q.  Have you been deposed before?
21    A.  Yes.
22    Q.  As a matter of fact, you were deposed in a
23  cause of action in West Virginia; is that correct?
24    A.  Yes.
25    Q.  All right.  We need to mark this.  I'm going
0013
1  to hand you an exhibit we are marking as Exhibit 545
2  for this cause of action.  Ask you to take a look at
3  it.  Do you agree with me that Exhibit 545 is, in
4  fact, a transcript of the testimony you gave in West
5  Virginia, or would appear to be?
6    A.  (Witness reviewing document).
7        MS. MOORE:  While she's looking at it,
8  for the record, this represents Texas Abbott 60222
9  through 60382.
10    A.  Yes.
11    Q.  (BY MS. MOORE)  Thank you.  If you'll just
12  put that aside for now.
13    A.  Sure.
14    Q.  Have you been deposed at any other time?
15    A.  Yes.
16    Q.  When was that?
17    A.  There -- there was a renal -- on -- on a
18  renal matter with Abbott.  I think it was in the
19  1990s.  I've been deposed -- I was president of our
20  condo association.  And also there was a contractual
21  matter with our diagnostics division.
22    Q.  So one of those was a personal matter but
23  two --
24    A.  Yes.
25    Q.  -- the two -- there were two other occasions
0014
1  when you testified in an Abbott lawsuit, correct?
2    A.  Yes.
3    Q.  All right.  When you say a renal matter,
4  generally what was it about?
5    A.  You know, it was so long ago, I don't
6  remember.
7    Q.  All right.  And as to the contractual matter
8  in diagnostics, was that when you were a manager of
9  reimbursement for diagnostics?
10    A.  Yes.

11    Q.   What was the nature of that lawsuit?
12    A.   It was a contract with our equipment, our
13   equipment and reagents.  It was a -- with a physician.
14    Q.   All right.  Dispute between Abbott and a
15   physician?
16    A.   Yes.
17    Q.   Well, since you -- have you ever testified
18   under oath in court?
19    A.   No.
20    Q.   All right.  How long have you known that you
21   were to be a witness in this cause of action?
22         MS. TABACCHI:  Object to the form.
23    A.   In --
24    Q.   (BY MS. MOORE)  In the --
25    A.   Could you clarify?
0015
1     Q.   -- one you're testifying in today where Texas
2    is the plaintiff against Abbott, how long,
3    approximately, have you been on notice that you would
4    be a witness?
5     A.   I believe about six months.
6     Q.   Okay.  During that time what have you done to
7    prepare to testify today?
8     A.   I met with counsel.
9     Q.   On how many occasions?
10    A.   Yesterday and the day before.
11    Q.   Only those two times?
12    A.   Yes.
13    Q.   Did you meet with anyone else?
14    A.   No.
15    Q.   Did you talk to anyone on the phone at Abbott
16   about getting ready for this?
17    A.   No.
18    Q.   Did you review any documents?
19    A.   I reviewed my West Virginia deposition.
20    Q.   All right.  Did you review the documents that
21   were attached to it?
22    A.   Yes.
23    Q.   Did you review any other documents besides
24   those?
25    A.   No.
0016
1     Q.   Did you read any other depositions that have
2    been given in this case?
3     A.   No.
4     Q.   Did you talk to Mike Sellers?
5     A.   No.
6     Q.   Did you talk to Mike Heggie?
7     A.   No.
8     Q.   Thank you.  I know from reading your
9    deposition in the West Virginia case that you have a
10   long history at Abbott and we are going to talk about
11   it a little bit today, but I would like to begin with
12   your present title.  What -- what is your position

13 today at Abbott?
14   A.  Senior director of corporate reimbursement.
15   Q.  Did you recently acquire that title?
16   A.  About two years ago.
17   Q.  So this is 2007.  Would that be approximately
18 2005?
19   A.  I think 2004.
20   Q.  All right.  I have seen a title of director
21 of corporate reimbursement and health policy.  Have
22 you held that title, also?
23   A.  Yes.
24   Q.  Do you presently hold that title?
25   A.  No.
0017
1   Q.  When did that change?
2   A.  In 2004.
3   Q.  So from 2004 to the present you have the
4 director of corporate -- I'm sorry.  Would you restate
5 it?
6   A.  Senior director of corporate reimbursement.
7   Q.  All right.  What -- first of all, to whom do
8 you report in that position?
9   A.  Elaine Leavenworth.
10   Q.  What is her title?
11   A.  Vice-president, federal and state government
12 affairs.
13   Q.  Do you have a staff that works for you?
14   A.  Yes.
15   Q.  How many people?
16   A.  Three.
17   Q.  What are their titles?
18   A.  Director, medical products group
19 reimbursement and director, reimbursement.
20   Q.  Are there two directors of reimbursement then
21 or --
22   A.  Yes.
23   Q.  That makes a total of three?  One director of
24 medical products reimbursement?
25   A.  Yes.  Yes, three.
0018
1   Q.  And two directors of reimbursement?
2   A.  There's -- there's director, medical products
3 reimbursement and a director, reimbursement.
4   Q.  All right.  Who is the third person?
5   A.  My secretary.
6   Q.  Could you tell us briefly the difference
7 between a director of medical products reimbursement
8 and the director of reimbursement?
9   A.  They handle different product lines, business
10 units at Abbott.
11   Q.  Roughly how are they divided?
12   A.  The medical products director handles
13 vascular and spine.  And the director of reimbursement
14 handles our diabetes.

15     Q.  I'm going to return to this topic perhaps
16  later, but in the meantime, would you describe for us
17  the various duties that you perform as the senior
18  director of corporate reimbursement?
19     A.  As senior director I monitor and track
20  changes in legislation and regulations on
21  reimbursement in our -- perhaps in packing our
22  business units.  I also assist with obtaining coverage
23  and coding for our medical -- many of our medical
24  device product lines.
25     Q.  Would you give the jury a few examples of
0019
1  your medical device lines?
2     A.  Our Abbott diabetes, our corroded stenting,
3  our Point of Care i-STAT devices, our diagnostic
4  devices.
5     Q.  Thank you.  Immediately prior to this
6  position I believe you have already testified that
7  your title was director of corporate reimbursement and
8  health policy, correct?
9     A.  Yes.
10     Q.  For how -- what length of time did you hold
11  that position?
12     A.  Three years.  Oh, yeah, three years.
13     Q.  Three years?
14     A.  (Nodded head affirmatively).
15     Q.  So you began it in approximately 2001, would
16  that be correct?
17     A.  Yes.
18     Q.  At that time to whom did you report?
19     A.  Charles Brock.
20     Q.  What was his title?
21     A.  Chief ethics and compliance officer.
22     Q.  Did you have a staff that worked for you
23  then?
24     A.  No.
25     Q.  What were your duties at that time?
0020
1     A.  My duties at that time were to assist in
2  developing reimbursement policy, implementing
3  reimbursement policy, and also assisting divisions in
4  reimbursement issues on coding and coverage.
5     Q.  Could you explain to me briefly where this --
6  to whom did Mr. Brock report?
7     A.  In which time period?
8     Q.  During the time period that you reported to
9  him.
10     A.  He reported to the general counsel and -- and
11  our chairman.
12     Q.  What is your chairman's name?
13     A.  Miles White.
14     Q.  Did you report directly to Mr. Brock?
15     A.  Yes.
16     Q.  Prior to your tenure in that position what

17  was your title at Abbott?
18     A.  Manager, Abbott diagnostics division,
19  reimbursement.
20     Q.  What were the approximate dates that you held
21  that position?
22     A.  1999 to 2001.
23     Q.  At that time to whom did you report?
24     A.  Paul Landauer.
25     Q.  What was his title?
0021
 1     A.  Manager, external affairs, Abbott Diagnostics
 2  Division.
 3     Q.  All right.  So what -- under what division is
 4  the Abbott Diagnostics Division in the -- I know -- I
 5  have seen the listing of Abbott divisions as a
 6  number -- six divisions including HPD, PPD and others,
 7  and I do not know which one -- is diagnostics its own
 8  division?
 9     A.  Yes.
10     Q.  One of the six?
11        MS. TABACCHI:  Object to the form.
12     Q.  (BY MS. MOORE)  Is that correct?
13     A.  During what time period?
14     Q.  During the time period that you worked there.
15     A.  I don't remember the number of divisions.
16     Q.  To whom did Mister -- did you say Landauer?
17     A.  Yes.
18     Q.  To whom did he report?
19     A.  Sue Widner.
20     Q.  What was her title?
21     A.  I don't remember.
22     Q.  All right.  And prior to your tenure -- did
23  you have a staff?
24     A.  No.
25     Q.  Prior to your tenure there, I believe your
0022
 1  testimony is then that you were the manager of
 2  reimbursement for Home Infusion; is that correct?
 3     A.  Yes.
 4     Q.  Would you give us the approximate dates that
 5  you held that position?
 6     A.  1984 through 1998.
 7     Q.  So approximately 16 years --
 8     A.  Yes.
 9     Q.  -- is that correct?  During that time did
10  your duties stay approximately the same or did they
11  change over time?
12        MS. TABACCHI:  Object to the form.
13     A.  They did change.
14     Q.  (BY MS. MOORE)  All right.  Then let's
15  begin -- let me finish this first though.
16        I believe you have testified previously
17  that you began with Abbott in May of 1982; is that
18  correct?

19    A.  Yes.
20    Q.  And your first position was as a financial
21  analyst; is that right?
22    A.  Yes.
23    Q.  All right.  What division was -- were you
24  working in at that time?
25    A.  Hospital Products Division.
0023
1    Q.  To whom did you report then?
2    A.  Tom Miekina.
3    Q.  And what was his title?
4    A.  Manager of financial planning.
5    Q.  All right.  I believe you have also testified
6  that you have a Bachelor's in Economics; is that
7  correct?
8    A.  Yes.
9    Q.  And an MBA --
10    A.  Yes.
11    Q.  -- from, I believe, Fordam; is that right
12    A.  New York University.
13    Q.  New York University.  Was Abbott your first
14  position after you finished the MBA?
15    A.  Yes.
16    Q.  Correct me if I'm wrong, but I thought that I
17  had seen somewhere that you are also an RN; is that
18  correct?
19    A.  Yes.
20    Q.  All right.  When did you get your nursing
21  degree?
22    A.  1969.
23    Q.  Where?
24    A.  St. Luke's School of Nursing.
25    Q.  And in what city is St. Luke's?
0024
1    A.  New York City.
2    Q.  Did you practice nursing?
3    A.  Yes.
4    Q.  What type of nursing did you practice?
5    A.  Oncology.
6    Q.  Where did you work?
7    A.  I worked at University of Pennsylvania,
8  Jefferson Medical Center and Sloan-Kettering.
9    Q.  For how many years did you work as a -- as a
10  registered nurse?
11    A.  Off and on maybe 13 years.
12    Q.  Did you at any time perform duties related to
13  the business side of -- of medicine?
14    A.  No.
15        MS. TABACCHI:  Object to the form.
16    Q.  (BY MS. MOORE)  So how did you decide to
17  return to -- assuming you returned to school to get
18  the economics degree; is that correct?
19    A.  Yes.
20    Q.  How did you decide to go into the business

21 area?
22     A.  I just thought it would be interesting.
23     Q.  All right.  Let's talk about Home Infusion
24 and you testified now that your duties did change over
25 the years.  Let's start at the beginning.  How is it
0025
1 that you were -- what experience did you have as a
2 financial analyst, or otherwise, that caused you to
3 apply to be, or however you came to be, the manager of
4 reimbursement?
5          MS. TABACCHI:  Object to the form.
6     A.  I -- there was an open position in Home
7 Infusion.
8     Q.  (BY MS. MOORE)  Who was the head of Home
9 Infusion at that time, the manager?
10     A.  You know, I don't remember.
11     Q.  Was Home Infusion an existing section or
12 division when you joined it?
13     A.  Yes.
14     Q.  How long had it been in existence, do you
15 know?
16     A.  Going to give a guess.  Maybe a year.
17     Q.  Had you had any exposure to reimbursement as
18 a financial analyst?
19     A.  No.
20     Q.  When you entered into Home Infusion and
21 became the manager of reimbursement, did you have a
22 staff working under you?
23     A.  No.
24     Q.  What were your duties then at the very
25 beginning?
0026
1     A.  Manager, reimbursement for commercial payers.
2     Q.  Would you explain to the jury what you mean
3 by commercial payers?
4     A.  I mean nongovernment payers.
5     Q.  Was there anyone who handled government
6 payers at that time?
7     A.  Yes.
8     Q.  Who was it?
9     A.  Alice Bonick and Judy Nicolosi.
10     Q.  And in what division were they employed?
11          MS. TABACCHI:  Object to the form.
12     A.  Hospital Products Division.
13     Q.  (BY MS. MOORE)  Did you interact with them at
14 that time as you learned about reimbursement?
15     A.  Yes.
16     Q.  Did they help train you?
17     A.  Yes.
18     Q.  How long did you work in -- with
19 reimbursements to commercial payers as your sole duty?
20          MS. TABACCHI:  Object to the form.
21     A.  To the best of my knowledge, maybe two years.
22     Q.  (BY MS. MOORE)  What changed at that time?

23    A.   The other managers gradually left.
24    Q.   What do you mean by graduated?
25    A.   Gradually.
0027
1    Q.   Oh, I thought you said graduated --
2    A.   Gradually.
3    Q.   -- and left.  The other managers being the
4    two ladies that you had mentioned?
5    A.   Yes.
6    Q.   Did their duties then get assigned to you?
7    A.   Yes.
8    Q.   To whom did you report at that time?
9    A.   Janice Lindbloom.
10    Q.   What was her title?
11    A.   Director, reimbursement services, I believe.
12    Q.   And to whom did she report?
13    A.   She reported to the gentleman who ran Home
14    Infusion Services.
15    Q.   So you're still under Home Infusion Services,
16    but you've acquired duties that were being performed
17    in hospital products; is that correct?
18          MS. TABACCHI:  Object to the form.
19    A.   Say that again.
20    Q.   (BY MS. MOORE)  All right.  The two ladies
21    that you mentioned earlier that were handling
22    government reimbursement, you testified that they
23    worked for Hospital Products Division, correct?
24    A.   Yes.
25    Q.   All right.  You were in Home Infusion, which
0028
1    is a subgroup of Hospital Product -- or was at that
2    time, correct?  My --
3          MS. TABACCHI:  Objection, form.
4    Q.   (BY MS. MOORE)  We are going to go a little
5    forward in time, but maybe this will be helpful.  I'm
6    going to hand you what's been marked in this cause as
7    Exhibit Number 45.
8    A.   Uh-huh.
9    Q.   This is a -- an organization chart that's
10    been produced to us by Abbott Laboratories --
11    A.   Uh-huh.
12    Q.   -- which is -- represents to be accurate as
13    of September 1995.  Do you see that on the front page?
14    A.   Yes, I do.
15    Q.   TXABT 00081.  If you'll turn to the next
16    page, which is TXABT 00082.  This is a schematic of
17    the organization of Alternate Site, correct?
18    A.   Yes.
19    Q.   On the previous page we see that Alternate
20    Site is one division under Hospital Products Division.
21    A.   Yes.
22    Q.   Correct?  All right.  And in the middle of
23    the page there's Home Infusion Services with Mike
24    Sellers as the general manager at that time in 1995.

25  Do you see that?

0029

1     A.   Yes.
2     Q.   And if you come down the boxes under that --
3  under Mr. Sellers, we had the manager of reimbursement
4  services, V.C. Tobiason, which I'm assuming is you; is
5  that correct?
6     A.   Yes.
7     Q.   All right.  What I was trying to get at is
8  when you testified that these two women who handled
9  the reimbursement, government payors worked for
10  Hospital Products Division, under what division in
11  Hospital Products did they work?
12            MS. TABACCHI:  Objection --
13     A.   Hospital Products was the division.
14     Q.   (BY MS. MOORE)  All right.  Which of these --
15  what do you call these subdivisions of Hospital
16  Products?
17     A.   Business units.
18     Q.   Business unit.  All right.  In which business
19  unit did our -- these two women work that handled the
20  government payors?
21     A.   Homecare.
22     Q.   Homecare.  And what -- what was Homecare?
23  It's not -- I don't believe Homecare is on here in
24  1995.  Did that turn into Alternate Site?
25     A.   Yes.

0030

1     Q.   All right.  So you were in Home Infusion,
2  which was a subsection of Homecare, which later became
3  known as Alternate Site, would that be correct?
4            MS. TABACCHI:  Object to the form.
5     A.   No.
6     Q.   (BY MS. MOORE)  Okay.  What -- what was the
7  organization at that time?
8            MS. TABACCHI:  Object to the form.
9     A.   Well, when I joined the group in 1984, it was
10  known as Abbott Homecare.
11     Q.   All right.  When you say "the group" --
12     A.   The business unit.
13     Q.   And what ultimately -- what did that business
14  unit become known as next?
15            MS. TABACCHI:  Object to the form.
16     Q.   (BY MS. MOORE)  Go ahead.
17     A.   Abbott Home Infusion Services.
18     Q.   How did Home Infusion Services relate to
19  Alternate Site?
20            MS. TABACCHI:  Object to the form.
21     Q.   (BY MS. MOORE)  Was it like this as
22  represented here?
23     A.   This is 1995.  Abbott Home Infusion
24  Services -- the organization evolved.
25     Q.   That's right.  Were you working on a

0031

1  day-to-day basis in the same office with the two women
2  who were handling the government payors?
3     A.  Yes.
4     Q.  As they left and you assumed those duties,
5  did you acquire staff to work with you?
6     A.  Yes.
7     Q.  All right.  How many people did you
8  ultimately acquire?
9           MS. TABACCHI:  Object to the form.
10    A.  What time?
11    Q.  (BY MS. MOORE)  Let's start with you began
12  there in '84.  You said for about two years you had
13  the duty of working with commercial payors.  That
14  would get you to '86.  The two ladies -- they left by
15  that time and you took on additional duties.  So how
16  many people were working for you in 1987?
17    A.  It's hard to remember.  I would think maybe
18  10 to 12.
19    Q.  So this section is growing during that time?
20    A.  Yes.
21    Q.  All right.  Why?
22           MS. TABACCHI:  Object to the form.
23    A.  We got more business.
24    Q.  What kind of business did you get?
25           MS. TABACCHI:  Object to the form.
0032
1     A.  I actually wasn't involved in the sales
2  effort.
3     Q.  (BY MS. MOORE)  All right.  Did you acquire
4  some knowledge as to who your clients were?
5     A.  Yes.
6     Q.  All right.  Let's -- let's talk about what --
7  what you did.  Would it be correct to characterize
8  your duties by that time where you have 10 or 12
9  people working for you in reimbursement as handling
10  reimbursement paid for by government payors and
11  commercial payors?
12           MS. TABACCHI:  Object to the form.
13    Q.  (BY MS. MOORE)  Would that be correct?
14    A.  Yes.
15    Q.  So you've gone from three people who handled
16  those duties to 10, 12, 13 people counting you, would
17  that be correct?
18    A.  No.
19    Q.  All right.  Correct me.
20    A.  There were the other managers had people
21  working for them.
22    Q.  Who were the other managers?
23    A.  Judy Nicolosi and Alice Bonick.
24    Q.  All right.  So they had people working for
25  them.  Did you become their supervisor?
0033
1     A.  Yes.
2     Q.  All right.  So that gave you initially how

3  many people?
4          MS. TABACCHI:  Object to the form.
5      A.  During what time period?
6      Q.  (BY MS. MOORE)  When you acquired their
7  duties.
8      A.  Best of my knowledge, it was probably the 10
9  or 12 people.
10     Q.  All right.  I'm going to hand you an exhibit
11  that's been marked in this cause as Exhibit Number
12  294.
13         MS. MOORE:  For the record, that's going
14  to be TXABT 193770 to 193787.
15     Q.  (BY MS. MOORE)  Have you ever seen this
16  document before, Ms. Tobiason?
17     A.  Not to my recollection.
18     Q.  If you'll turn to -- the first page, 193.  I
19  don't see a Bates label on it, but I'm going to assume
20  it was TXABT 193770.  It appears to be a cover page,
21  correct?  And it says, "Providing for the Fully
22  Integrated System."  Have I read that correctly?
23     A.  Yes.
24     Q.  All right.  Now, if you'll turn to the next
25  page.  See in -- on the left-hand side of the page
0034
1  there's large type that reads, "Abbott Home Infusion
2  Services"; is that correct?
3      A.  Yes.
4      Q.  Is that the name of the business unit for
5  which you worked?
6      A.  Yes.
7      Q.  Would you take a look at that first page?
8      A.  (Witness reviewing document).
9      Q.  Have you read it?
10     A.  Yes.
11     Q.  Does that appear to be a description of the
12  program or business unit known as Abbott Home Infusion
13  Services as you recall it?
14         MS. TABACCHI:  Object to the form.
15     A.  Well, I wasn't in sales and marketing, but
16  yes.
17     Q.  (BY MS. MOORE)  On the -- in the third
18  paragraph on that page, "On your behalf, Abbott brings
19  over a dozen years of experience in home infusion and
20  more than a century-long history of healthcare
21  innovation."
22         When you joined Home Infusion you said
23  it had been in existence for about a year and this
24  document, I believe, is dated February '96.  If you
25  will look, there's little tiny print on Texas Abbott
0035
1  193774.
2          MS. TABACCHI:  Is there a question --
3      Q.  (BY MS. MOORE)  Do you see --
4          MS. TABACCHI:  -- Margaret?

5    Q.  (BY MS. MOORE)  Do you see that date,
6  February '96?
7    A.  No.
8    Q.  On Texas Abbott 193774.
9    A.  I'm sorry, I don't --
10   Q.  On the bottom right-hand page -- of the page
11  do you see the Bates label 193 --
12   A.  771.
13   Q.  -- 771.  If you will turn to 774.
14   A.  Okay.  Yes.
15   Q.  And immediately above it there is a date of
16  February '96.  Do you see that?
17   A.  Yes.  It says it on this page.
18   Q.  So were you still in Home Infusion when this
19  document was apparently created in '96?
20   A.  I was in Home Infusion Services in 1996.
21   Q.  All right.  So you were with Home Infusion
22  for almost all of the dozen years that this document
23  refers to.  By that time you had been there about
24  10 -- 10 years; is that correct?  No.  You had already
25  been -- you had been there the whole dozen years.
0036
1  Would that be right?
2    A.  I was in Homecare and then Home Infusion
3  Services since 1984.
4    Q.  Correct.  All right.  And then continuing on
5  in that paragraph.  "Abbott is a worldwide leader."
6  And then the last sentence reads, "This background
7  enables Home Infusion Services to offer a full range
8  of products and services including clinical training
9  programs, quality assurance, compounding, finance,
10  information systems, reimbursement and more."
11        You -- we know that you were manager of
12  reimbursement, so the offering of that service was the
13  service that was within your management and control,
14  correct?
15        MS. TABACCHI:  Object to the form.
16   A.  Yes.
17   Q.  (BY MS. MOORE)  And how -- how did you
18  interact with the rest of the business unit that
19  provided these other product -- these other services?
20        MS. TABACCHI:  Object to the form.
21   A.  Could you be more specific?
22   Q.  (BY MS. MOORE)  Yes.  Did you meet -- did
23  these other -- these other areas have their own
24  managers?
25        MS. TABACCHI:  Object to the form.
0037
1    Q.  (BY MS. MOORE)  Clinical training, for
2  instance?
3    A.  Yes.
4    Q.  All right.  What about quality assurance, was
5  there a quality assurance manager?
6    A.  Yes.

7    Q.   Compounding.  That's putting drugs together,
8  right?
9    A.   Pharmacy manager.
10    Q.   Pharmacy manager.  What about the finance
11  piece, who -- who was in charge of that?
12    A.   That was accounting.
13    Q.   And the information systems, what was -- is
14  that the computer system or --
15    A.   Yes.
16    Q.   All right.  Who was in charge of that?
17    A.   Chris Blandford.
18    Q.   All right.  Did you meet with these people?
19    A.   Yes.
20    Q.   Did you discuss ways that you could work
21  together to deliver a better product for your clients?
22          MS. TABACCHI:  Object to the form.
23    A.   We discussed issues of implementing our
24  services and working with -- and working with
25  customers, yes.
0038
1    Q.   (BY MS. MOORE)  All right.  In the last
2  paragraph on this page, "As your program evolves and
3  grows, we will work closely with you to extend your
4  market, expand your staff's capabilities, improve your
5  bottom line and strengthen your ability to manage the
6  total healthcare of your patients."
7          Did I read that correctly?
8    A.   Yes.
9    Q.   When you see the phrase "improve your bottom
10  line," does that mean that Abbott will help these
11  customers realize greater profits for their business?
12          MS. TABACCHI:  Object to the form.
13    A.   I think it was more than that.  It was to be
14  more efficient and effective.
15    Q.   (BY MS. MOORE)  All right.  Does efficiency
16  and effective usually result in greater profits?
17          MS. TABACCHI:  Object to the form.
18    A.   It can.
19    Q.   (BY MS. MOORE)  I would like you to turn to
20  the next page, Texas Abbott 193772.
21    A.   Uh-huh.
22    Q.   And there is a section that is labeled
23  "Products and Services."  Do you see that?
24    A.   Yes.
25    Q.   All right.  Under -- next to that heading
0039
1  there are some bullets and dropping down slightly
2  below the middle you'll see "Billing and reimbursement
3  services" bulleted.  Do you see that?
4    A.   Yes.
5    Q.   Does that describe the responsibilities that
6  you were -- had in the Abbott Home Infusion group?
7          MS. TABACCHI:  Object to the form.
8    A.   Yes.

9    Q.   (BY MS. MOORE)  And if you'll turn to the
10  following page, Texas Abbott 193773.  This is a
11  section that's labeled "Our Partners Speak."  Do you
12  believe that "partners" refers to your clients or
13  customers in Home Infusion?
14    A.   Well, according to this document, these were
15  our customers.
16    Q.   Correct.  And there are some selected quotes
17  from them, are there not, on this page?
18    A.   Yes.
19    Q.   You will see that one of them is from Ken
20  Trowbridge, director Intermountain Health Care Home
21  Services.  Do you see that?
22    A.   Yes.
23    Q.   Do you recall that as being a client of Home
24  Infusion?
25    A.   Yes.
0040
1    Q.   All right.  And below that is Shay Fields
2  from Baylor Home Care.  Was that one of your clients?
3    A.   Yes.
4    Q.   There's also listed an Audrey Belk from
5  Presbyterian Home Care.  Was that a client?
6    A.   Yes.
7    Q.   The next one is Jennifer Huppenthal.  That's
8  H-u-p-p-e-n-t-h-a-l.  LHS Home Community Care.  Is
9  that a client?
10    A.   Yes.
11    Q.   And finally Renee Myers, M-y-e-r-s, from
12  Spohn, S-p-o-h-n, Home Care Services in Corpus
13  Christi, Texas.  Is that one of your clients?
14          MS. TABACCHI:  Object to the form.
15    Q.   (BY MS. MOORE)  Was that at that time one of
16  your clients?
17    A.   I don't remember that client, but according
18  to this it looks like it was.
19    Q.   I would like you now to turn -- no page
20  numbers, so we have to work off the Bates number.  I
21  would like you to look at Texas Abbott 193783.
22    A.   Yes.
23    Q.   You'll see at the very top of the page is a
24  black bar with the heading "Reimbursement," correct?
25    A.   Yes.
0041
1    Q.   And then dropping down the page we have the
2  text, "In today's complex reimbursement environment -
3  characterized by extended receivables, case-by-case
4  price negotiations, overall pricing pressures, and
5  complicated billing requirements - Abbott provides the
6  experience and expertise needed to maximize your
7  collection revenues."
8          Do you believe that to be an accurate
9  characterization of the services that you were
10  responsible for in your position as manager of

11  reimbursement?
12          MS. TABACCHI:  Object to the form.
13    A.  This was -- this explains the reimbursement
14  environment.
15    Q.  (BY MS. MOORE)  All right.  Do you believe
16  that paragraph to be an accurate characterization of
17  your environment --
18          MS. TABACCHI:  Object to the form.
19    Q.  (BY MS. MOORE)  -- and the services that you
20  provide -- provided to your clients?
21          MS. TABACCHI:  Same objection.
22    A.  This doesn't refer to our services.
23    Q.  (BY MS. MOORE)  All right.  I'll read it
24  again.  I'll read the last phrase.  "Abbott provides
25  the experience and expertise needed to maximize your
0042
 1  collection revenues."
 2          Ms. Tobiason, this is obviously a
 3  representation to some potential customer about what
 4  you can provide them that they'll be willing to pay
 5  for; isn't that correct?
 6          MS. TABACCHI:  Object to the form.
 7    A.  I didn't create this document and I'm not in
 8  sales and marketing, so ...
 9    Q.  (BY MS. MOORE)  All right.  Ms. Tobiason,
10  were you aware of the business environment that Home
11  Infusion Services was attempting to operate in?
12          MS. TABACCHI:  Object to the form.
13    A.  Yes.
14    Q.  (BY MS. MOORE)  All right.  So is it not true
15  that Abbott was going out to -- to hospitals and other
16  types of providers and saying, "You -- you need to set
17  up a home infusion pharmacy and we have all the
18  expertise needed to help you do that and you should
19  pay us" --
20          MS. TABACCHI:  Object --
21    Q.  (BY MS. MOORE)  "-- to help you do that";
22  isn't that correct?
23          MS. TABACCHI:  Object to the form.
24    A.  I know we were -- we were making available to
25  clients home infusion services.  I did not
0043
 1  specifically go out and talk to customers about sales
 2  and marketing efforts.
 3    Q.  (BY MS. MOORE)  Were you aware that there
 4  were people in Abbott going out and marketing
 5  expertise in reimbursement?
 6          MS. TABACCHI:  Object to the form.
 7    Q.  (BY MS. MOORE)  Were you aware of that at the
 8  time that you held the position of manager of --
 9    A.  Yes.
10    Q.  -- reimbursement?
11    A.  Yes.
12    Q.  You were aware that Abbott was relying upon

13   your expertise when they represented to clients that
14   they could do collections for them and handle
15   reimbursement issues for them for money, right?
16          MS. TABACCHI:  Object to the form.
17   A.  Yes.
18   Q.  (BY MS. MOORE)  All right.  Did you ever talk
19   to your supervisor about your responsibilities to
20   collect as efficiently and as completely as you
21   possibly could for the clients that contracted with
22   you for these reimbursement services, did you ever
23   discuss that with your manager?
24          MS. TABACCHI:  Object to the form.
25   A.  Well, we discussed how to make our services
0044
1   efficient and effective.
2   Q.  (BY MS. MOORE)  All right.  Was it true that
3   Abbott had this expertise?
4          MS. TABACCHI:  Object to the form.
5   A.  Abbott had an ability to provide -- to secure
6   reimbursement for Home Infusion Services, yes.
7   Q.  (BY MS. MOORE)  Is it not true that you were
8   considered -- you, yourself, were considered to be an
9   expert in reimbursement by the time this pamphlet was
10   generated in 1996?
11          MS. TABACCHI:  Object to the form.
12   A.  I was considered to be proficient in securing
13   reimbursement for Home Infusion Services.
14   Q.  (BY MS. MOORE)  All right.  Was there another
15   person to whom you would point as being the expert
16   that this pamphlet refers to?
17          MS. TABACCHI:  Object to the form.
18   A.  No.
19   Q.  (BY MS. MOORE)  All right.  Isn't it
20   reasonable to assume it was, in fact, you and the
21   people working under you that had this expertise; is
22   that not correct?
23          MS. TABACCHI:  Object to the form.
24   A.  Yes.
25   Q.  (BY MS. MOORE)  When you talk about
0045
1   "efficient collections," what -- what do you mean?
2   A.  Efficient means that you can -- you have an
3   ability to submit the claim, put the correct
4   information on the claim, understand the coverage
5   requirements, handle the receivables.
6   Q.  Would not -- would not expertise in the area
7   of reimbursement include a thorough knowledge of how
8   products get reimbursed by different payors, would
9   that be included in that expertise?
10          MS. TABACCHI:  Object to the form.
11   A.  It would include products and services, yes.
12   Q.  (BY MS. MOORE)  So did you in that -- in the
13   course of this dozen years that you were working in
14   this area before this pamphlet was generated, did you

15  become familiar with how government payors, including
16  Medicare and Medicaid, pay for the different products
17  and services within Home Infusion?
18          MS. TABACCHI:  Object to the form.
19    A.  I became familiar with the general
20  requirements, yes.
21    Q.  (BY MS. MOORE)  Did you not become, in fact,
22  an expert on those requirements?
23          MS. TABACCHI:  Object to the form.
24    A.  I became -- I did not become familiar with
25  all the specific payer requirements.
0046
1    Q.  All right.  During the time period that we
2  are discussing right now, which is the period of time
3  that you were manager of reimbursement for Abbott Home
4  Infusion Services, who at Abbott, besides you, was an
5  expert in Medicare and Medicaid reimbursement?
6          MS. TABACCHI:  Object to the form.
7    A.  I wouldn't know.  There's a lot of divisions.
8    Q.  (BY MS. MOORE)  Was there anyone to whom you
9  would turn to answer questions about Medicare or
10  Medicaid reimbursement?
11    A.  I would use outside resources.
12    Q.  What -- all right.  What outside resources?
13    A.  We belong to some trade associations, we
14  belong to some coalitions, or if I had a specific
15  question, I might refer to a reimbursement legal
16  advisor.
17    Q.  Would you name the associations with which
18  you worked at that time?
19    A.  Health Industry Manufacturers Association,
20  the National Alliance For Infusion Therapy.  I think
21  that was it.
22    Q.  Did you avail yourselves of materials
23  provided by what was at that time HCFA?
24          MS. TABACCHI:  Object to the form.
25    A.  Yes.
0047
1    Q.  (BY MS. MOORE)  Did you read opinions issued
2  by the Office of the Inspector General?
3          MS. TABACCHI:  Object to the form.
4    A.  I don't remember.  There were some documents.
5  I can't -- I don't remember.  You need to be more
6  specific.
7    Q.  (BY MS. MOORE)  Well, did you read, for
8  instance, a report by the Office of the Inspector
9  General regarding reimbursement issues with nebulizer
10  products?
11          MS. TABACCHI:  Object to the form.
12    A.  No, I doubt it.  We didn't do nebulizer.
13    Q.  (BY MS. MOORE)  Did you read a report by the
14  Office of the Inspector General regarding changes in
15  the way that Medicare would reimburse for different
16  products as to actual cost versus AWP?

17          MS. TABACCHI:  Object to the form.
18     A.  I don't have any -- I don't remember
19 specifically anything on it.
20     Q.  (BY MS. MOORE)  To whom would you call upon
21 as a legal advisor?
22          MS. TABACCHI:  I'm going to caution the
23 witness not to reveal any attorney-client
24 communications.  You may answer without doing so.  You
25 can identify the name of the person, if you recall.
0048
1     A.  God, I don't -- I don't absolutely recall.
2 Could have been Gordon Schatz at Reed Smith.
3          MR. BREEN:  I'm sorry.  I didn't get
4 that name.
5          THE WITNESS:  Gordon Schatz at Reed
6 Smith.
7          MR. BREEN:  Reed Smith?
8          THE WITNESS: Uh-huh.
9     Q.  (BY MS. MOORE)  One of the services that
10 Abbott specifically referred to as being available to
11 its clients under contract was resources that kept
12 abreast of legislative issues and changes in
13 regulations and the laws regarding reimbursement; is
14 that correct?
15          MS. TABACCHI:  Object to the form.
16     A.  We do keep apprised of general, you know,
17 reimbursement trends and issues.
18     Q.  (BY MS. MOORE)  Well, you specifically had
19 responsibilities related to that, did you not?
20          MS. TABACCHI:  Object to the form.
21     A.  I had responsibilities related to Home
22 Infusion Services.
23     Q.  (BY MS. MOORE)  I'm handing you an exhibit
24 that is marked in this cause now as 546.
25          MS. MOORE:  I told you I was going to
0049
1 share.
2          THE WITNESS:  Could you --
3          MS. TABACCHI:  I didn't know it was one
4 exhibit.
5          THE WITNESS:  Can we take a break for a
6 second?
7          MS. MOORE:  Certainly.
8          THE VIDEOGRAPHER:  We are going off the
9 record at 10:14 a.m.
10          (Recess from 10:14 to 10:26)
11          THE VIDEOGRAPHER:  Going back on the
12 record at 10:26 a.m.  Please proceed.
13     Q.  (BY MS. MOORE)  All right, Ms. Tobiason.  We
14 are back from our break and just marked Exhibit Number
15 546.
16          MS. TABACCHI:  546.
17     Q.  (BY MS. MOORE)  Six.  I'm not going to ask
18 you to review that whole thing.  I'm really not going

19   to question you about that at length right now, but I
20   would like to ask you, do you recall serving on a
21   Medicare working group in your duties at Abbott Lab?
22       A.   I don't recall Medicare working group.
23       Q.   Would you take a look at the very first page?
24       A.   Top page?
25       Q.   Very top page.  Right there that you're
0050
1   looking at right now.
2       A.   Yes.
3       Q.   It's TXABT 673723.  Do you see that?
4       A.   Yes.
5       Q.   It appears to be a copy of a note,
6   apparently.  At the bottom of the copy there it says,
7   "From:  Richard P. Rieger."  Do you recognize that
8   name?
9       A.   I don't remember that name.
10       Q.   All right.  Do you see that in the
11   handwritten portion of this page, 673723, it says,
12   "Marie Please fax this document to Don Buell, Don
13   Conway."  Do you recognize Don Buell?
14       A.   Yes.
15       Q.   What was his position?  If this is --
16       A.   I don't remember.
17       Q.   Okay.  For a minute there -- you'll see
18   there's a handwritten note "Faxed 1-29-97."  Do you
19   see that?
20       A.   I'm sorry.  Say that again.
21       Q.   There's a handwritten note out next to
22   Mr. Buell and --
23       A.   Oh, yeah.
24       Q.   -- Mr. Conway's name.
25       A.   Yes.
0051
1       Q.   Has a date of 1-29-97?
2       A.   Yeah.
3       Q.   So I'm asking you at the time of that date do
4   you know what Mr. Buell's position was?
5       A.   I don't remember.
6       Q.   What about Mr. Conway?
7       A.   I don't know Mr. Conway.
8       Q.   All right.  Paul Landauer.  You referred to
9   him earlier.
10       A.   He was in diagnostics.
11       Q.   Dave Olson?
12       A.   I don't remember what his position was.
13       Q.   Ginny Tobiason, is that you?
14       A.   Yes.
15       Q.   Mike Tootell?
16       A.   Mike Tootell was in Ross.
17       Q.   John Campbell?
18       A.   Don't remember that name.
19       Q.   David Landsidle?
20       A.   He was in charge of our Washington office.

21    Q.  And Cindy Sensibaugh?
22    A.  And Cindy worked for our Washington office.
23    Q.  Behind this page do you see a fax
24  transmission at the top?
25    A.  I do.
0052
1    Q.  All right.  This is TXABT 673724.  And it
2  says at the top, "To:  Medicare Working Group," "From:
3  Richard P. Rieger," dated January 29th, 1997.  Do you
4  see that?
5    A.  Yes.
6    Q.  Does this help refresh your recollection
7  about a Medicare working group?
8    A.  I really don't remember this Medicare working
9  group.
10    Q.  All right.  We'll talk more about that later.
11        I'm going to -- a little while ago you
12  testified that if you had questions about
13  reimbursement, you would either go to outside
14  resources, meaning outside of Abbott, I presume?
15    A.  Yes.
16    Q.  Or you might go to Abbott legal; is that
17  correct?
18        MS. TABACCHI:  Object to the form.
19    A.  No, not Abbott legal.
20    Q.  (BY MS. MOORE)  All right.  Who was
21  Mr. Schatz then?
22    A.  With another law firm.  The law firm.
23    Q.  Oh, I see.
24    A.  An external, Reed Smith.
25    Q.  An external law firm.  All right.  Did you
0053
1  ever consult in-house, the general counsel's office at
2  Abbott?
3        MS. TABACCHI:  Object to the form.  I'm
4  going to caution the witness not to reveal any
5  attorney-client communications.
6    A.  Not that I -- not that I recall.
7    Q.  (BY MS. MOORE)  Do you recall their ever
8  consulting you?
9        MS. TABACCHI:  Same objection.
10    A.  Not that I recall.
11    Q.  (BY MS. MOORE)  Do you remember ever speaking
12  during the time that you were manager of
13  reimbursement, let's confine it to that time period,
14  do you recall ever speaking to Abbott in-house
15  counsel?
16        MS. TABACCHI:  Object to the form.
17    A.  I don't remember any details.  I could have
18  discussed -- I could have had conversations with
19  Abbott legal.
20    Q.  (BY MS. MOORE)  Do you remember any names to
21  whom you might have spoken?
22        MS. TABACCHI:  Object to the form.

23   A.  I may have spoken with David Fishman.
24   Q.  (BY MS. MOORE)  Any other names?
25   A.  Not that I recall.  I just don't remember
0054
1  specifics.
2   Q.  Hand you an exhibit marked in this cause as
3  295, I believe.  Exhibit 295.  And I believe that this
4  is one of the exhibits that was used in the West
5  Virginia deposition, so I'm assuming you have seen
6  this before, correct?
7   A.  Yes.
8   Q.  All right.  It is a document dated December
9  10th, 1996 on Abbott Home Infusion Services letterhead
10  of some kind, logo of some kind, correct?
11   A.  According to -- yes.
12   Q.  And it is addressed to Care Partners,
13  Morgantown, West Virginia.  Would that be right?
14   A.  Yes.
15   Q.  All right.  Would you turn to Page 1, which
16  is titled "Executive Summary"?
17   A.  Uh-huh.
18   Q.  Do you see that?
19   A.  Yes.
20   Q.  And I would like you to look -- you will see
21  a shaded box that begins the bottom of the first
22  column and continues to the top of the second column.
23  Do you see that?
24   A.  Yes.
25   Q.  And that purports to be a list of clients of
0055
1  the Abbott Home Infusion Services, is that correct?
2   A.  Yes.
3   Q.  Do you recognize those as being, in fact,
4  clients of Abbott Home Infusion Services?
5   A.  Yes.
6   Q.  All right.  Do you know approximately how
7  many contracts Abbott had with various clients over
8  the course of time that you were working as the
9  manager of reimbursement services?
10         MS. TABACCHI:  Object to the form.
11   A.  Well --
12   Q.  (BY MS. MOORE)  Let me ask it slightly
13  differently.  I asked how many contracts.  I'm sorry.
14         MS. TABACCHI:  That's okay.
15   Q.  (BY MS. MOORE)  I didn't mean to really ask
16  that.  I meant to ask how many different clients.  Do
17  you recall how many different clients you served
18  during the time that you were manager of reimbursement
19  services?
20   A.  That I can't -- I can't recall how many.
21   Q.  Well, if I were to tell you that other
22  representations have been that it was as many as 50
23  different clients, would that comport with your
24  recollection?

25        MS. TABACCHI:  Object to the form.
0056
1     A.  That could be correct.
2     Q.  (BY MS. MOORE)  That could be correct?
3     A.  That could be correct.
4     Q.  All right.  I believe your testimony has been
5  in the past that not all of the clients contracted for
6  the reimbursement services; is that correct?
7     A.  That's correct.
8     Q.  Do you know approximately what percentage did
9  contract for your services?
10     A.  You know, I wasn't in sales and marketing, so
11  I don't -- I would be hazarding a guess here.  It
12  would just be a guess.
13     Q.  All right.  Well, let's hear your guess.
14        MS. TABACCHI:  Object to the form.
15     A.  Maybe -- I don't know, maybe -- well, it
16  would be based on -- numbers of clients?
17     Q.  (BY MS. MOORE)  Yes.
18     A.  The number of clients.  I guess maybe --
19  maybe 60, 70 percent.  But that's a guess.
20     Q.  The ones who did not contract for the
21  reimbursement services, how did they pay for the
22  products and services that they did receive, do you
23  know?
24        MS. TABACCHI:  Object to the form.
25     A.  I believe they paid us on a percentage basis
0057
1  or they could have paid on product.  There were
2  different -- different -- and I wasn't involved in
3  setting up the contract, so it could have been
4  different -- different -- different methods.
5     Q.  (BY MS. MOORE)  Were you ever involved in
6  financial analysis of how well your program was doing
7  as far as making money for Abbott Labs?
8        MS. TABACCHI:  Object to the form.
9     A.  I was not in the accounting area, no.
10     Q.  (BY MS. MOORE)  Did you participate in any
11  way as the manager of reimbursement services in the
12  analysis of your -- your area as to how well it was
13  contributing to the bottom line at Abbott Labs?
14        MS. TABACCHI:  Object to the form.
15     A.  No.
16     Q.  (BY MS. MOORE)  Not in any way?
17     A.  Not that I recall.
18     Q.  Did you ever review any analyses like that?
19        MS. TABACCHI:  Same objection.
20     A.  I don't remember anything like that.
21     Q.  (BY MS. MOORE)  All right.  Okay.  I would
22  like you to look at the -- on Page 1 that we have just
23  been discussing, TXABT 60316, the last paragraph of
24  the right-hand column, "Abbott's compensation will be
25  based on a percentage of Care Partners's collected
0058

1  revenue."
2    A.  Uh-huh.
3    Q.  Is that your understanding of the business
4  model that was in place for at least those clients
5  that contracted for your reimbursement services?
6          MS. TABACCHI:  Object to the form.
7    A.  Yes.
8    Q.  (BY MS. MOORE)  All right.  Now, if you turn
9  to the next page, Page 2.  TXABT 60317.  There's a box
10  labeled "How Abbott Supports Your Program"?
11    A.  Yes.
12    Q.  And the second topic in that box is
13  "Reimbursement"?
14    A.  Uh-huh.
15    Q.  Correct?
16    A.  Yes.
17    Q.  All right.  "Abbott will perform all billing
18  and collection services for Care Partners's patients."
19  Is that right?
20    A.  Yes.
21    Q.  All right.  Would you describe for the jury
22  the different operations that are included in all
23  billing and collection services?
24    A.  Okay.  We would check the reimbursement
25  coverage.  We would verify that the patient had
0059
1  insurance coverage or not and verify what that
2  coverage was.  We do a verification process.  We would
3  put the information in the computer system.  The
4  patient's policy number, their Medicare number, all
5  the patient insurance information.
6    Q.  Would that -- I hate to interrupt you, but
7  would that also include Medicaid and medication --
8    A.  Yes.
9    Q.  -- Medicaid ID numbers?
10    A.  Yes.
11    Q.  Thank you.  Go on.
12    A.  If the patient had them.  We would then
13  generate the claim form.  We would submit the claim
14  information either electronically or hard copy to the
15  various payers.  We would -- we would then generate
16  any secondary claims, the patient had secondary
17  insurance, or we would send the patient a bill for
18  their co-payments.
19    Q.  Uh-huh.
20    A.  We would do any appeals.  We would -- if
21  patients had questions about their insurance, we would
22  answer questions.  We would make sure we got the
23  medical necessity forms from the physicians, if
24  required.  We'd also -- if there was -- we would write
25  off the amounts of money if there was write-offs.  I
0060
1  think that's -- I mean, there were a lot of steps --
2    Q.  Correct.

3      A.  -- so I'm trying to give you the overall.
4      Q.  Did each insurance company have its own set
5  of requirements for filing a claim?
6      A.  Insurance company?
7      Q.  Yeah.
8      A.  Private insurance company?
9      Q.  Correct.
10      A.  Well, it depended if there was a contract or
11  not.
12      Q.  I'm just saying, you said you would verify
13  coverage and you would make sure that the claim was
14  submitted correctly.  I assume that means that you
15  would become familiar with whatever that payor
16  required and --
17      A.  Yes.
18      Q.  -- generate the proper amount of information,
19  right?
20      A.  Uh-huh.  Yes.
21      Q.  Okay.
22           MS. TABACCHI:  I'm going to ask
23  Ms. Tobiason to allow Ms. Moore to finish her question
24  before --
25           THE WITNESS:  Oh, I'm sorry.  Yeah,
0061
1  you're right.  Thank you.
2      Q.  (BY MS. MOORE)  All right.  And it follows,
3  then that you would also have to know the different
4  Medicaid requirements for filing a claim.
5           MS. TABACCHI:  Object to the form.
6      Q.  (BY MS. MOORE)  Would that be correct?
7      A.  Yes.  The reimbursement person filing a claim
8  generally had to be familiar with the requirements.
9      Q.  Is it true that Medicaid claims are filed
10  with each of the different states?
11      A.  Yes
12      Q.  Did you have clients who were all around the
13  country?
14           MS. TABACCHI:  Object to the form.
15      A.  Yes.  We have clients in different areas of
16  the country.
17      Q.  (BY MS. MOORE)  Did that necessitate your
18  becoming familiar with the requirements of many
19  different states?
20           MS. TABACCHI:  Object to the form.
21      A.  I was manager.  I didn't become -- I did not
22  become familiar with all the state requirements.
23      Q.  (BY MS. MOORE)  But did someone in your shop
24  have to do that?
25      A.  Yes.
0062
1           MS. TABACCHI:  Object to the form.
2      Q.  (BY MS. MOORE)  I believe you testified that,
3  in fact, there were teams within your -- under your
4  supervision that you formed teams; is that correct?

5        MS. TABACCHI:  Object to the form.
6    A.  Yes.
7    Q.  (BY MS. MOORE)  And I believe you've
8  testified that sometimes a team -- in some way the
9  team was organized geographically.  Would that be
10  correct?
11        MS. TABACCHI:  Object to the form.
12    A.  No.
13    Q.  (BY MS. MOORE)  All right.  How did -- what
14  were these teams and how were they organized then?
15    A.  They were organized by customer.
16    Q.  I see.  You also had to become familiar with
17  Medicare rules for reimbursement; is that not correct?
18        MS. TABACCHI:  Object to the form.
19    A.  Yes.
20    Q.  (BY MS. MOORE)  I would like for you to look
21  at Page 3 of this document, which is TXABT 60318.  I
22  would like you to look -- it says "Home Infusion
23  Proposal" at the top of the left-hand column.  Do you
24  see that?
25    A.  Yes.
0063
1    Q.  All right.  If you drop down to the second
2  paragraph.  "Abbott Home Infusion Services is the
3  business unit that will be working with Care
4  Partners."  And if you'll see, there's a sentence
5  shortly after that, "Abbott Home Infusion began
6  operations over 10 years ago by accepting direct
7  patient referrals from hospitals across the country."
8  Was that a practice while you were working for Home
9  Infusion?
10    A.  Yes.
11    Q.  All right.  Did you handle the -- did your --
12  you and your department, your -- the people under you,
13  handle the submission of claims for reimbursement for
14  the pharmacies that were operated by Abbott Labs?
15        MS. TABACCHI:  Object to the form.
16    A.  By Abbott Homecare, yes.
17    Q.  (BY MS. MOORE)  So these were three operating
18  pharmacies that actually provided services to
19  patients, correct?
20    A.  Yes.
21    Q.  And you and people under you submitted those
22  claims for reimbursement to the various payors for
23  those patients; is that correct?
24    A.  Yes.
25    Q.  And in those particular instances Abbott
0064
1  actually received the reimbursement for products and
2  services provided by Abbott, correct?
3        MS. TABACCHI:  Object to the form.
4    A.  Yes.
5        MS. MOORE:  We have to stop and change
6  the tape.

7        THE VIDEOGRAPHER:  This marks the end of
8  Tape 1 in the deposition of Virginia Tobiason.  Going
9  off the record.  The time is now 10:46 a.m.
10         (Discussion off the record)
11        THE VIDEOGRAPHER:  This marks the
12  beginning of Tape 2 in the deposition of Virginia
13  Tobiason.  Going on the record.  The time is now 10:50
14  a.m. Please proceed.
15     Q.  (BY MS. MOORE)  All right.  Ms. Tobiason, I
16  would like you to turn to Page 4 of the same document
17  labeled TXABT 604319.  In the upper right-hand corner,
18  the beginning paragraph of the second column is
19  labeled "Computer System."  Do you see that paragraph?
20     A.  Yes.
21     Q.  And within that paragraph is -- or is in bold
22  type, "Abbott has designed a comprehensive computer
23  system called the Client Home Infusion Program (CHIP
24  system)."  Do you see that?
25     A.  Yes.
0065
1     Q.  Are you familiar with that system?
2     A.  Yes.
3     Q.  What was it?
4     A.  It was a software program.
5     Q.  What did it do?
6     A.  Well, it included a pharmacy module
7  inventory, clinical outcomes, reimbursement and
8  financial.
9     Q.  What was included in the reimbursement --
10  first of all, let me ask you this:  Is this a computer
11  system with which you and your employees worked to
12  collect reimbursement, file and collect reimbursement?
13     A.  Yes.
14     Q.  All right.  Was it also available to clients
15  for them to use, is that how it worked?
16     A.  If a client decided to use it, yes.
17     Q.  The -- I believe -- if you'll turn to Page
18  15, which is TXABT 60330, there is a box labeled
19  "Abbott Reimbursement Services" and it contains a
20  subsection entitled "Operation."
21     A.  Yes.
22     Q.  And the text reads, "Our centralized
23  operation is facilitated with an extensive data base,
24  a sophisticated computer system and a core of
25  specialists with practical in-depth understanding of
0066
1  home infusion reimbursement."  Is this referring to
2  the CHIP system where it says, "a sophisticated
3  computer system"?
4     A.  Yes.
5     Q.  And is it referring to you and your staff
6  when it refers to "a core of specialists"?
7     A.  Yes.
8     Q.  Now, when it refers to the extensive

9   database, could you give us a summary of what was
10  included in that database for reimbursement purposes?
11          MS. TABACCHI:  Object to the form.
12      A.  Well, the patient's name, the patient's
13  insurance information.
14      Q.  (BY MS. MOORE)  Well, let me make this a
15  little shorter.
16      A.  Yeah.
17      Q.  It would include patient information in the
18  reimbursement piece of it.  I'm really -- I'm really
19  trying to hone in on what was in your database that
20  assisted in -- in the reimbursement piece
21  specifically.
22          MS. TABACCHI:  Object to the form.
23      A.  Well, it was an integrated database.
24      Q.  (BY MS. MOORE)  Right.
25      A.  So ...
0067
1       Q.  What would you consider to be key components
2   that allowed you to make these claims for
3   reimbursement?
4           MS. TABACCHI:  Object to the form.
5       A.  There would be the patient insurance
6   information.
7       Q.  (BY MS. MOORE)  All right.
8       A.  The patient's orders.  That would include the
9   equipment.  The certificate of medical necessity.  The
10  forms tracking system.  The HCFA 1500 claim form.  The
11  accounts receivable system.
12      Q.  All right.  Did you -- did you have some way
13  within that computer of ascertaining how a particular
14  product or service would be reimbursed?
15          MS. TABACCHI:  Object to the form.
16      Q.  (BY MS. MOORE)  For instance, did you -- did
17  it -- did it separate those that had to be submitted
18  by procedure from those that are submitted by product
19  code, for instance, was that contained in this
20  database?
21          MS. TABACCHI:  Object to the form.
22      A.  It would contain the procedure coding system.
23  There were procedure codes that were attached if an --
24  if an insurer wanted a procedure code, yes.
25      Q.  (BY MS. MOORE)  And what about the codes for
0068
1   Medicare reimbursement and Medicaid reimbursement?
2       A.  It did capture the Medicare reimbursement
3   codes.
4       Q.  All right.  Did it have in it -- I know
5   you've testified that it also had a Redbook database
6   or access to the Redbook database; is that correct?
7           MS. TABACCHI:  Object to the form.
8       A.  Yes.  We contracted with the drug -- with the
9   drug database.
10      Q.  (BY MS. MOORE)  And for what purpose was that

11 information used?
12    A.  If a payer requested information on average
13 wholesale price or even the description, it would pick
14 that information up.
15    Q.  When you say "even the description," what do
16 you mean?
17    A.  To make sure that it -- you know, product
18 description.
19    Q.  Ah.  What payors requested AWP information?
20        MS. TABACCHI:  Object to the form.
21    A.  To be honest with you, I'm not -- I don't
22 know all the details, but there were commercial payers
23 and some Medicaids, I believe.
24    Q.  (BY MS. MOORE)  I have one other sentence on
25 this page that I would like you to take a look at and
0069
1 it's the last sentence of that paragraph next to
2 "Operation."
3    A.  Uh-huh.
4    Q.  "The combination of medical and financial
5 expertise is often the key to receiving
6 reimbursement."  Do you agree with that statement?
7    A.  I did not prepare this statement, so I
8 really -- for me to respond to that would be
9 speculation.
10    Q.  Do you agree with it?
11    A.  I agree that having -- that the medical is
12 important and having reimbursement expertise is often
13 the key to receiving reimbursement.  I don't know what
14 it means by "financial."
15    Q.  Would you turn now to Page 16, the next page.
16 TXABT 60331.  You'll see at the top of the page it,
17 once again, refers to "Abbott Reimbursement Services,"
18 correct?
19    A.  Yes.
20    Q.  And the last box, the last section of the box
21 underneath that title is "Legislative Representation";
22 is that right?
23    A.  Yes.
24    Q.  I know you've read this before.  "Abbott
25 employs a full-time legislative representative in
0070
1 Washington DC," and it goes on to talk about keeping
2 abreast of legislative changes.  Did you consider that
3 to be part of your responsibilities as the manager of
4 reimbursement for Home Infusion?
5        MS. TABACCHI:  Object to the form.
6    A.  Yes, I believe it was part of my
7 responsibility to make sure that if there was a change
8 in legislation regulations, that we incorporated it.
9    Q.  (BY MS. MOORE)  All right.  And in fact, one
10 of the things that you-all offered to your clients was
11 information about these matters through a newsletter;
12 isn't that right?

13          MS. TABACCHI:  Object to the form.
14     A.  You know, I vaguely recall a newsletter.
15     Q.  (BY MS. MOORE)  I'm going to hand you an
16  exhibit that's been marked in this cause as Exhibit
17  Number 299.  Ask you to take a look at that.
18     A.  Uh-huh.
19     Q.  You see it's a document entitled "Home
20  Infusion topics" and it's dated summer of 1995?
21     A.  Yes.
22          MS. MOORE:  All right.  It's, for the
23  record, TXABT 193694 through 697.
24     Q.  (BY MS. MOORE)  I'm not going to belabor this
25  point, but I would like you to turn to the last page,
0071
1  193697.  And would you read to us what's written at
2  the top of the right-hand column?
3     A.  "News From the Hill."
4     Q.  And who's the author of it?
5     A.  I am.
6     Q.  All right.  Do you recall writing this?
7     A.  I don't specifically recall writing this --
8  this piece, but it's got my name on it, so I'm sure I
9  wrote it.
10     Q.  Did you -- do you feel that you wrote it
11  personally?
12     A.  Say that again.
13          MS. TABACCHI:  Object to the form.
14     Q.  (BY MS. MOORE)  Do you feel that you probably
15  wrote it yourself?
16     A.  Oh, yes.
17     Q.  All right.  And do you recall -- do you want
18  to take a minute to --
19     A.  Yeah.  Let me --
20     Q.  -- read it --
21     A.  -- look at it.
22     Q.  -- since you don't remember it?
23     A.  No, I don't remember it.  (Witness reviewing
24  document).
25     Q.  Now that you have re-read that does that
0072
1  refresh --
2     A.  I haven't finished it.
3     Q.  Oh, I'm sorry.
4     A.  (Witness reviewing document).  I finished.
5     Q.  All right.  Now that you have read that
6  column, does it refresh your recollection?
7     A.  Not a lot, but yeah.  Yes.
8     Q.  Okay.  Do you recall the issues about which
9  you wrote?
10     A.  There's been so many legislative issues, yes.
11     Q.  By your answer do you -- do you mean to
12  indicate that over the course of your career in
13  reimbursement that you have kept abreast of
14  legislative issues the entire time?

15          MS. TABACCHI:  Object to the form.
16     A.  I keep abreast of certain legislative issues,
17  yes.
18     Q.  (BY MS. MOORE)  And when did you begin doing
19  that?
20     A.  Oh, I can't remember exactly.  Probably in
21  the -- in the 1980s.
22     Q.  Did you -- did you consider staying abreast
23  of legislative issues part of being an expert on
24  reimbursement?
25          MS. TABACCHI:  Object to the form.
0073
1     A.  I kept track of legislative issues to
2  understand the reimbursement environment.
3     Q.  (BY MS. MOORE)  All right.  I'll hand you now
4  an exhibit that's been marked in this cause as Exhibit
5  298.  Would you agree with me that this is another
6  issue of the "Home Infusion topics" newsletter?
7     A.  Appears to be, yes.
8     Q.  All right.  And it's dated winter of 1995,
9  right?
10     A.  Yes.
11     Q.  All right.  And if you'll look on Page 2 as
12  it was produced to us, it has "News From the Hill"
13  again, right?
14     A.  Yes.
15     Q.  So does this refresh your recollection as to
16  whether or not this was a regular duty that you
17  performed to advise the clients of Home Infusion about
18  legislative issues and changes?
19          MS. TABACCHI:  Object to the form.
20     A.  It appears to be, yes.
21     Q.  (BY MS. MOORE)  All right.  Did you -- in the
22  course of performing the duties that Abbott contracted
23  with clients to deliver, did you meet with the
24  clients?
25     A.  Yes.
0074
1     Q.  What did you do when you met with them?
2          MS. TABACCHI:  Object to the form.
3     Q.  (BY MS. MOORE)  For what purpose did you meet
4  with them?
5     A.  Well, we -- in many cases the clients -- we
6  talk about specific reimbursement.  We might go over
7  the aging report, talk about specific issues.  Perhaps
8  we'd go over some contracts they may have had with
9  commercial payers.
10     Q.  Did you assist the clients in setting up
11  their systems?
12          MS. TABACCHI:  Object to the form.
13     A.  The clients were ultimately responsible for
14  setting up the information in the computer system.
15          MS. MOORE:  Objection, nonresponsive.
16     Q.  (BY MS. MOORE)  Did you assist them in

17 setting up their -- their system?
18          MS. TABACCHI: Object to the form.
19   A.  We provided -- we provided training and, if
20 necessary, we would train them and provide some
21 assistance, yes.
22   Q.  (BY MS. MOORE)  Did you personally answer
23 some of their questions about different issues that
24 would arise in implementing this system?
25          MS. TABACCHI: Object to the form.
0075
1    A.  I had people working for me who helped.  I
2 may have -- I don't have details about specifics, but
3 I may have -- I answered questions, yes.
4    Q.  (BY MS. MOORE)  Did you discuss with them the
5 various advantages or disadvantages of using Abbott
6 product over other competitors' product?
7          MS. TABACCHI: Object to the form.
8    A.  That would not have been my responsibility.
9 That was sales.
10   Q.  (BY MS. MOORE)  All right.  Do you know if
11 under these contracts the Abbott products were -- were
12 given to the clients to use on consignment; is that
13 not correct?
14          MS. TABACCHI: Object to the form.
15   A.  Yes.
16   Q.  (BY MS. MOORE)  Would you explain what that
17 means?
18   A.  I wasn't in the inventory area, but my
19 understanding is that clients would be given certain
20 Abbott products in their facility to use for providing
21 patient services.  The patients' products, yes.
22   Q.  And how did the products that were supplied
23 to the clients get paid for to Abbott?
24          MS. TABACCHI: Object to the form.
25   A.  Say that again.
0076
1    Q.  (BY MS. MOORE)  All right.  You're providing
2 products to Abbott.  These are the same products that
3 other providers are actually paying you for, correct,
4 under -- under various distributor and wholesale and
5 GPO contracts?
6          MS. TABACCHI: Object to the form.
7    Q.  (BY MS. MOORE)  Same products, right?
8    A.  They were Abbott products that we sold to a
9 number of customers.
10   Q.  Yes.  So how did the Home Infusion clients
11 pay for the product?
12   A.  It depended on the contract.
13   Q.  Did the contract include a payment for a
14 product in addition to the percentage of the
15 collections?
16          MS. TABACCHI: Object to the form.
17   A.  I am not privy to all the arrangements.  I
18 mean, I wasn't involved in contract marketing.  And my

19  understanding is that they paid a percentage of the
20  revenue share.  The collections.
21      Q.  (BY MS. MOORE)  And that constituted their
22  entire payment to Abbott?
23          MS. TABACCHI:  Object to the form.
24      Q.  (BY MS. MOORE)  Did it?
25      A.  The clients would pay for the services and
0077
1  products.
2      Q.  All right.  But did their provision of a
3  share of the revenue constitute payment in full for
4  both products and services?
5          MS. TABACCHI:  Object to the form.
6      A.  No.
7      Q.  (BY MS. MOORE)  All right.  How did they pay
8  for the products?
9          MS. TABACCHI:  Object to the form.
10     A.  The products and services were part of the
11  revenue share.  There may have been additional payment
12  for specific services.
13     Q.  (BY MS. MOORE)  Was there additional payment
14  for product?
15         MS. TABACCHI:  Object to the form.
16     A.  I don't -- I don't know the details.  There
17  could have been.  I -- my understanding was products
18  were included in the revenue share.
19     Q.  (BY MS. MOORE)  All right.  And then they
20  also were given the opportunity to acquire products of
21  other manufacturers through a buying group; isn't that
22  correct?
23         MS. TABACCHI:  Object to the form.
24     A.  Well, customers could acquire non-Abbott
25  products.  It was up to the customer.
0078
1      Q.  (BY MS. MOORE)  I refer you back to Exhibit
2  295, which is that Care Partner executive summary.
3      A.  Yes.
4      Q.  And you'll see at the top of that page it
5  says --
6      A.  Which page?  I'm sorry.
7      Q.  I'm sorry.  I didn't tell you, did I?  You're
8  going to have to guess.
9      A.  No.  I'm looking.
10     Q.  It's Page 13, which is Bates labeled TXABT
11  60328.
12     A.  Yes.
13     Q.  All right.  And that contains a box that's
14  labeled "Product Support," correct?
15     A.  Yes.
16     Q.  All right.  You'll see that the second box
17  down it says, "Abbott Products" and then next to that
18  label is a list and with the bullet points next to it.
19  Do you see?
20     A.  Yes.

21    Q.  And it includes "General I.V. Solutions,
22  Administration Equipment, Nutritional Solutions,
23  Partial Fills, The ADD" - A -- that's capital A,
24  capital D, capital D - "-Vantage system, Abbott
25  FirstChoice" - one word capital C - "Injectables, I.V.

0079
1  Pumps," et cetera.
2            Is that an accurate description of the
3  products and equipment that was available to Abbott
4  clients that contracted through Home Infusion?
5    A.  I wasn't in the inventory area or the
6  product, but it appears to be.
7    Q.  All right.  Then there's a box that's labeled
8  "Consigned Inventory."  And then the last box it's
9  labeled "Non-Abbott Product."  You'll see the text
10  that's next to that label says, "Abbott can typically
11  satisfy a significant percentage of the total products
12  used in infusion therapy.  To access other
13  manufacturer's products, we will enroll Care Partners
14  in a purchasing program at no additional cost."  Have
15  I read it correctly?
16    A.  Yes.
17    Q.  Do you know what that purchasing program was?
18    A.  No.
19    Q.  And then it goes on to say, "90+% of all
20  products needed for home infusion can be attained
21  through our program at the lowest cost in the
22  industry."  Is that a correct reading?
23    A.  Yes.
24    Q.  Would the prices for these products be
25  available in the database that you've described?

0080
1            MS. TABACCHI:  Object to the form.
2    A.  You have to clarify that.
3    Q.  (BY MS. MOORE)  All right.  Abbott is saying
4  that if the client doesn't want to use the Abbott
5  product, Abbott will help them find the best deal for
6  that product, even from another manufacturer, by using
7  a buying group, right?  That's what they're saying
8  here, correct?
9            MS. TABACCHI:  Object to the form.
10    A.  Yes, I guess.  Yes.
11    Q.  (BY MS. MOORE)  Well, was there a database in
12  this computer system that assisted Abbott personnel to
13  do that for these clients?
14            MS. TABACCHI:  Object to the form.
15    A.  I was not -- that part of the database wasn't
16  my responsibility.
17    Q.  (BY MS. MOORE)  Do you know if this
18  information was in the database?
19    A.  No.
20    Q.  Do you have any idea what prices were entered
21  in that -- in the computer, if any?
22            MS. TABACCHI:  Object to the form.

23    A.   Customers would put the information in the
24  computer system on the prices and their cost.  It was
25  the customers' responsibility.
0081
1    Q.   (BY MS. MOORE)  So Abbott didn't enter the
2  prices available through this purchasing program in
3  the computer?
4          MS. TABACCHI:  Object to the form.
5    A.   I don't know.  I know the customer was
6  responsible.
7    Q.   (BY MS. MOORE)  All right.  Have you had
8  continuing -- well, let's back up.  Was it a practice
9  for people outside of Home Infusion to from time to
10  time call you and ask for information about
11  reimbursement?
12          MS. TABACCHI:  Object to the form.
13    Q.   (BY MS. MOORE)  During the time that you were
14  manager of reimbursement.
15    A.   I don't recollect conversations, but it
16  probably did happen.
17    Q.   All right.  Then let's move forward in time a
18  little bit.  You -- you did perform some duties
19  regarding reimbursement and -- in diagnostics.  What
20  kind of -- I believe you testified that that was for
21  like laboratory tests; is that correct?
22    A.   Clinical laboratory testing.
23    Q.   All right.  And I believe you said that for
24  that and for some of the devices, like the
25  cardiovascular stents, that you had to obtain coding?
0082
1  Would you --
2    A.   There are products --
3          MS. TABACCHI:  If you could allow
4  Ms. Moore to complete her --
5          THE WITNESS:  Sorry.
6          MS. TABACCHI:  -- question, please.
7          THE WITNESS:  Sorry.
8    Q.   (BY MS. MOORE)  Would you explain what you
9  mean by that?
10    A.   Could you repeat the question?
11    Q.   You have testified that for some of your
12  duties, including obtaining coding for either a
13  product or device -- is that correct?  Or a service?
14  Would lab tests be a service?
15          MS. TABACCHI:  Object to the form.
16    A.   Yes.
17    Q.   (BY MS. MOORE)  I just want you to explain
18  what coding is.
19    A.   Yes.  I'll give you an example.
20    Q.   Okay.
21    A.   We have a Point of Care device and --
22    Q.   A what?
23    A.   A Point of Care device, which tests blood in
24  a physician's office, and we needed a code from the

25  American Medical Association to distinguish it.
0083
1      Q.  Did you ever interact with HCFA, later CMS,
2  to obtain coding for Medicare reimbursement --
3              MS. TABACCHI:  Object to the form.
4      Q.  (BY MS. MOORE)  -- for an Abbott product or
5  service?
6              MS. TABACCHI:  Object to the form.
7      A.  Yes, we do interact with -- well, CMS.
8      Q.  (BY MS. MOORE)  Did you yourself perform that
9  function for Abbott?
10             MS. TABACCHI:  Object to the form.
11     A.  I have recently done that, yes.
12     Q.  (BY MS. MOORE)  What about the Medicaid
13  carriers?
14             MS. TABACCHI:  Object to the form.
15  What's the question?
16     Q.  (BY MS. MOORE)  I'm sorry.  I said Medicaid.
17  Medicare carriers.
18             MS. TABACCHI:  Object to the --
19     Q.  (BY MS. MOORE)  Have you interacted with the
20  Medicare carriers to get coding or coverage for an
21  Abbott product or service?
22             MS. TABACCHI:  Object to the form.
23     A.  I do interact with the Medicare carriers on
24  coverage issues.
25     Q.  When did you begin performing those duties
0084
1  for Abbott?
2              MS. TABACCHI:  Can we -- are we talking
3  about Medicare?  I just want to be clear because I
4  don't --
5              MS. MOORE:  Yeah.  The Medicare
6  carriers.
7              MS. TABACCHI:  -- want to be confused.
8  Medicare carriers.  Okay.  I'm sorry.
9      Q.  (BY MS. MOORE)  Yes.
10     A.  Medicare.  For Medicare, I do interact with
11  the carriers.  Timing.  Probably starting in the
12  late -- when I started in diagnostics.
13     Q.  I'm going to hand you just -- this is a
14  document that is much more recent and I'm going to
15  have to label it.  Will be Exhibit Number 547.  I'm
16  sorry.
17     A.  That's okay.  (Witness reviewing document).
18     Q.  Have you read it now?
19             MS. TABACCHI:  I have a copy, too.
20     A.  Yes.
21     Q.  (BY MS. MOORE)  Do you -- this is a -- an
22  e-mail that purports to be from Joseph E. Fiske.  Do
23  you know Mr. Fiske?
24     A.  Yes.
25     Q.  How do you know him?
0085

1    A.  He's over in our pharmaceutical division.
2    Q.  All right.  Do you work with him?
3    A.  Yes.
4    Q.  All right.  In what capacity do you work with
5  him?
6    A.  Joe and I work together on our ASP reporting.
7    Q.  All right.  Would you tell the jury what ASP
8  stands for?
9    A.  Average selling price.
10    Q.  Would you describe briefly what that means?
11        MS. TABACCHI:  Object to the form.
12    A.  Average selling price is a methodology in
13  this -- in this -- when we are talking about Medicare
14  that CMS requires us to report quarterly on certain
15  Part B drugs.
16    Q.  How is ASP calculated?
17        MS. TABACCHI:  Object to the form.
18    A.  I actually don't do the actual calculation.
19    Q.  (BY MS. MOORE)  Are you familiar with the
20  Medicare regulation that establishes how -- how ASP
21  should be calculated?
22    A.  I'm familiar with the regulation.  I don't
23  know all the details.
24    Q.  This is dated 11/16/2004.  Do you recall
25  having a conversation with Mr. Fiske around that time
0086
1  about this subject?
2    A.  No, I don't remember.
3    Q.  All right.  It says, "Finally was able to
4  follow up with Ginny Tobiason regarding Gengraf
5  Medicare Reimbursement rates."  Would you typically be
6  a person that Mr. Fiske would turn to to find out
7  information like a Medicare reimbursement rate?
8        MS. TABACCHI:  Object to the form.
9    A.  Yes, he might call me.
10    Q.  (BY MS. MOORE)  All right.  Who might he call
11  other than you?
12    A.  He --
13        MS. TABACCHI:  Object to the form.
14    A.  For Medicare he might call outside counsel.
15  He could always look at the CMS website.  It's
16  published on the CMS website.
17    Q.  (BY MS. MOORE)  Okay.  He says, "Good news
18  with no downside to Plan."  Do you know what plan he
19  refers to?
20        MS. TABACCHI:  Object to the form.
21    A.  I have no idea.
22    Q.  (BY MS. MOORE)  Then goes on to say,
23  reimbursement levels are actually quite high - 100
24  milligrams is $4.07 versus ASP of $2.07.  Do you see
25  that?
0087
1    A.  Yes.
2    Q.  Does that mean that a provider would be

3   reimbursed $4.07 when, in fact, the real cost of the
4   product would be $2.07 --
5           MS. TABACCHI:  Object to the form.
6     Q.  (BY MS. MOORE)  -- to the provider?
7           MS. TABACCHI:  Objection.
8     A.  That's -- the ASP for immunosuppressants is a
9   median of all the drugs in that category.
10    Q.  (BY MS. MOORE)  How do you know that?
11    A.  Well, because that's what's in the
12  regulation.
13    Q.  And what does -- to what products does that
14  regulation apply?
15    A.  Well, that regulation applies to all drugs
16  that are covered under the ASP.
17    Q.  So all drugs for which you calculate ASP have
18  their price, their reimbursement calculated on a
19  median?
20    A.  No.
21          MS. TABACCHI:  Object to the form.
22    Q.  (BY MS. MOORE)  I didn't think you meant
23  that.  What types of drugs have their prices
24  calculated on a median?
25          MS. TABACCHI:  Object to the form.
0088
1     A.  I'm not -- I'm going to give you the best to
2   my knowledge.  I'm not familiar with all the details,
3   but multisource drugs.
4     Q.  (BY MS. MOORE)  Right.  However, is it not
5   true that he is saying here that the good news is that
6   Medicare will reimburse $4.07 versus an average
7   selling price calculated in your company as $2.07 --
8           MS. TABACCHI:  Object --
9     Q.  (BY MS. MOORE)  -- is that not what he's
10  saying?
11          MS. TABACCHI:  Object to the form of the
12  question.  I also object to your continuing
13  questioning of this witness about a document that she
14  says she hasn't prepared or seen in an area that she
15  doesn't recall.
16    A.  I don't actually know what he's referring to
17  with ASP versus.
18    Q.  (BY MS. MOORE)  Reimbursement?
19    A.  Uh-huh.
20    Q.  Okay.  I'm going to hand you an exhibit which
21  I'm marking as Number 548 in this cause.
22          MS. MOORE:  For the record, it's
23  TXTABT-E 0047464 and 5.
24    Q.  (BY MS. MOORE)  Would you please read this
25  document?
0089
1     A.  (Witness reviewing document).
2           MS. TABACCHI:  This is 548, Margaret?
3           MS. MOORE:  Yes, ma'am.
4     Q.  (BY MS. MOORE)  Do you -- I'm sorry.

5     A.  Uh-huh.
6     Q.  Do you -- are you done?
7     A.  Yes.
8     Q.  Do you recall this communication?
9     A.  I don't recollect it, but my name -- yes.  It
10 looks like I sent it, yes.
11    Q.  All right.  So it is a document that purports
12 to be a copy of an e-mail from Virginia C. Tobiason
13 dated 8/10/2005, correct?
14    A.  Yes.
15    Q.  And you apparently sent it to Joseph E. Fiske
16 and Debra DeYoung, correct?
17    A.  Yes.
18    Q.  Do you know -- do you know Debra DeYoung?
19    A.  Yes.
20    Q.  And who is she?
21    A.  Debra DeYoung works for Joe Fiske.
22    Q.  What is BIO or B-I-O?
23    A.  It's the Biotechnology Industry Organization.
24    Q.  Yeah.  Well, I could read that, but I was
25 wondering if you could describe what it is.
0090
1     A.  Well, it's a trade organization.
2     Q.  All right.  What is its purpose?
3         MS. TABACCHI:  Object to the form.
4     A.  Well, they -- they're the trade organization
5 of the -- in the biotechnology area that deal with
6 issues for biotechnology companies.
7     Q.  (BY MS. MOORE)  I'm going to return to your
8 earlier testimony about contact with the general
9 counsel's office at Abbott and ask you if -- do you
10 recall ever communicating with them about the
11 collection of documents with regards to various
12 matters being litigated by Abbott Labs, do you recall
13 that?
14        MS. TABACCHI:  Object to the form.
15    A.  Say that again.
16    Q.  (BY MS. MOORE)  Do you recall being contacted
17 by the general counsel of Abbott Labs, by the office,
18 someone in that office, regarding the collection or
19 retention of documents related to litigation against
20 Abbott Labs, in particular the matters which we are
21 discussing today?
22        MS. TABACCHI:  Object to the form.
23    A.  I receive a number -- you know, I received
24 communications from the general counsel asking to
25 preserve forms, yes.  Do I specifically remember this?
0091
1 No.
2     Q.  All right.  We have here today -- wait a
3 minute.  That's different.
4         MR. BREEN:  Well, no.
5         MS. ST. PETER-GRIFFITH:  That should all
6 go together.

7         MS. MOORE:  That should all go together?
8         (Discussion off the record)
9    Q.  (BY MS. MOORE)  All right.  I'm going to hand
10  you a document that I am marking now as Exhibit Number
11  549.  My bag is going to be lighter going home.
12         MR. HAVILAND:  That's the goal.
13   A.  Need to fax.
14   Q.  (BY MS. MOORE)  If only I had that much lead
15  time.
16         I will represent to you, Ms. Tobiason,
17  that Exhibit 549 is a copy of some documents that were
18  produced to Texas just last week.
19         MS. MOORE:  And for the record, they are
20  TXABT 673508 - let me make sure this continues -
21  through 673722.
22   Q.  (BY MS. MOORE)  And I'm not going to ask you
23  to read every page, but I can refer you --
24         MS. TABACCHI:  That's good.
25   Q.  (BY MS. MOORE)  Yeah.  Right here and now.
0092
1          I'm going to refer you -- if you would
2   look at -- I'm going to give you a different -- you
3   see down at the bottom right hand of the page there
4   are two Bates numbers?  One is the TXABT number --
5    A.  Yes.
6    Q.  -- and the other is the ABT-DOJ number?
7    A.  Yes.
8    Q.  Okay.  Would you look at zero -- the ABT-DOJ
9   number 0228359 or -- yeah.  273 is first.
10   A.  273.
11   Q.  Yeah. 022273.
12         MS. TABACCHI:  0228273?
13         MS. MOORE:  Correct.
14   Q.  (BY MS. MOORE)  Do you find it?
15   A.  Yes.
16   Q.  And is your name on that page?
17   A.  Yes.
18   Q.  All right.  Do you recall receiving
19  communication?
20   A.  No.
21   Q.  What's the date on it?
22         Well, I would be surprised if you did.
23   A.  There is no date on this page.
24   Q.  Would you look at the page immediately prior
25  to it?
0093
1          MS. TABACCHI:  Two pages prior.
2    Q.  (BY MS. MOORE)  Two pages.  Sorry.
3          MR. BREEN:  273.
4          MS. ST. PETER-GRIFFITH:  No, 271.
5    Q.  (BY MS. MOORE)  One?
6          MS. ST. PETER-GRIFFITH:  271.
7    Q.  (BY MS. MOORE)  0228271.
8    A.  Yes.

9    Q.  And what's the date on it?
10   A.  October 29th, 1997.
11   Q.  Do you recall receiving this communication
12 around that time?
13   A.  No.
14       MS. MOORE:  I'm going to pass the
15 witness at this time.
16       MS. TABACCHI:  Can we -- is this a good
17 time to take a quick break?
18       MR. BREEN:  Sure.  A quick one.
19       MS. TABACCHI:  Quickly.
20       THE VIDEOGRAPHER:  Going off the record
21 at 11:36 a.m.
22       (Recess from 11:36 to 11:45)
23       THE VIDEOGRAPHER:  Going back on the
24 record at 11:45 a.m.  Please proceed.
25
0094
1            EXAMINATION
2  BY MR. BREEN:
3    Q.  Ready?  Okay.
4    A.  Hold on one sec.
5    Q.  All right.
6    A.  It's in the wrong spot.  Okay.
7    Q.  You ready?
8    A.  Yes.
9    Q.  Okay.  Hello, Ms. Tobiason.  I'm Jim Breen.
10 We've never met, have we?
11   A.  No.
12   Q.  And I represent Ven-A-Care of the Florida
13 Keys.  My client, known as the Relator in these cases.
14 I'm going to be asking you questions initially, at
15 least, and follow up to some of the questions the
16 Attorney General's Office of Texas asked you with
17 respect to the Ven-A-Care -- Texas, ex rel. Ven-A-Care
18 matter.  Because we are here on a lot of matters
19 today.
20       So have you ever heard of Ven-A-Care
21 before?
22   A.  I have heard of Ven-A-Care recently in the
23 newspaper -- somewhere.  I don't remember exactly.
24   Q.  Okay.  Before -- just a housekeeping matter.
25 I've had marked Exhibit 550, which I'm going to hand
0095
1  to you, to your counsel, and I'll just ask one
2  question.  Have you ever seen that before?
3    A.  (Witness reviewing document).
4    Q.  The question is:  Have you ever seen that
5  before?
6    A.  This document?
7    Q.  Yes.
8    A.  No.
9        MR. BREEN:  Okay.  I'll just represent
10 for the record it was provided by Abbott counsel along

11  with the version that was provided to the United
12  States that has now been marked as Exhibit 549.  And I
13  don't believe one was provided to the State of Texas,
14  so I just want to because anybody may want to be
15  referring to this chart.
16     Q.  (BY MR. BREEN)  Now, let me -- let me move
17  on.  I'll ask if you look at Exhibit 548 again, which
18  was the next to the last exhibit that Ms. Moore asked
19  you about.  This was your e-mail to Joe Fiske dated
20  8/10/2005 at 7:54 p.m.  Do you see that?
21     A.  Yes.
22     Q.  Now, it's got your title.  That's your
23  current title, correct, director of corporate
24  reimbursement?
25            MS. TABACCHI:  Object to the form.
0096
1     A.  No.
2     Q.  (BY MR. BREEN)  That was your title back in
3  August of '05?
4     A.  Yes.
5     Q.  Okay.  So let's go back to August of '05
6  then.  You're director of corporate reimbursement,
7  correct?
8     A.  Yes.
9     Q.  Now, that was a promotion from where you had
10  been earlier when you were manager of reimbursement
11  for Home Infusion Services, correct?
12            MS. TABACCHI:  Object to the form.
13     A.  This was a promotion from when I was in
14  diagnostics.
15     Q.  (BY MR. BREEN)  Okay.  But the position you
16  have as director of corporate reimbursement on August
17  10, 2005, is that higher or lower or the same level as
18  when you were manager of reimbursement in the Home
19  Infusion Services?
20     A.  Higher.
21     Q.  How much higher?
22            MS. TABACCHI:  Object to the form.
23     A.  In grade level, maybe three.
24     Q.  (BY MR. BREEN)  Maybe three -- three
25  positions in grade?  Okay.  Does it carry more
0097
1  compensation?
2     A.  Yes.
3     Q.  Does it carry more responsibility?
4     A.  Yes.
5     Q.  So is it -- is it safe to say that Abbott was
6  pleased with your performance in the area of
7  reimbursement?
8            MS. TABACCHI:  Object to the form.
9     A.  I -- I fulfilled the job responsibilities in
10  this position.
11     Q.  (BY MR. BREEN)  So does that mean you just
12  performed adequately or did that mean that you

13 performed well?

14          MS. TABACCHI:  Object to the form.

15    A.  My performance reviews were good.

16    Q.  (BY MR. BREEN)  Okay.  How many other

17 directors of corporate reimbursement were employed by

18 Abbott in August of 2005?

19    A.  To the best of my knowledge, I was the only

20 one.

21    Q.  Only one.  And you reported to whom at this

22 time?

23    A.  Charlie Brock.

24    Q.  Charlie Brock, correct?  Now, he reported to

25 the president of the company, correct?

0098

1    A.  At this time I believe he reported to Miles.

2    Q.  Miles White?

3    A.  Yes.

4    Q.  Okay.  Now, how long have you known Miles

5 White?

6    A.  I don't know Miles White.

7    Q.  Ever seen him?

8    A.  Yes.

9    Q.  Know who he is?

10    A.  Yes.

11    Q.  But you don't know him?

12    A.  No.  Miles and I have never had a

13 conversation.

14    Q.  Okay.  But your boss reported to him?

15    A.  Yes.

16    Q.  So you were just two steps away from the head

17 guy at Abbott?

18          MS. TABACCHI:  Object to the form.

19    A.  Well, I was reporting to Charlie, who

20 reported to Miles.

21    Q.  (BY MR. BREEN)  Okay.  Now, look under --

22 where it says director of corporate reimbursement,

23 there is something else under there.  What's that?

24 What does that say?  Right underneath.

25    A.  Ethics and compliance.

0099

1    Q.  What's that?

2    A.  This was the office that Charlie Brock ran.

3    Q.  That he ran.  How long did Office of Ethics

4 and Compliance exist at Abbott Laboratories to your

5 knowledge?

6    A.  Maybe -- I really don't remember because I

7 joined it after it was formed.  Probably a couple of

8 years.

9    Q.  Couple of years?  Okay.  Now, did your

10 responsibilities as director of corporate

11 reimbursement, do they include any specific

12 responsibilities that were -- that were different from

13 your job as a manager of reimbursement in the Home

14 Infusion Services that were in any way related to the

15  fact that you were now in the ethics and compliance
16  office?
17          MS. TABACCHI:  Object to the form.
18     A.  They were different.
19     Q.  (BY MR. BREEN)  How were they -- and did
20  that -- were they different due to the fact that you
21  now worked in ethics and compliance?
22          MS. TABACCHI:  Object to the form.
23     A.  Well, they were different -- different -- had
24  different tasks.
25     Q.  (BY MR. BREEN)  Well, did you have any
0100
1   responsibility for -- for ethics or compliance when
2   you worked in the Home Infusion group as a manager of
3   reimbursement?
4          MS. TABACCHI:  Object to the form.
5      A.  As manager of reimbursement services I was
6   responsible for overseeing the reimbursement services
7   for Home Infusion.
8      Q.  (BY MR. BREEN)  Did you have any
9   responsibility that in any way related to ethics?
10         MS. TABACCHI:  Object to the form.
11     A.  Well, we always -- our goal was to -- it
12  wasn't -- the specifics of ethics and compliance
13  are -- were a department.  There was no ethics and
14  compliance department in Home Infusion at the time.
15     Q.  (BY MR. BREEN)  So you had no duty to be --
16  with respect to ethics at all or no duty with respect
17  to compliance at all when you worked as manager of
18  reimbursement --
19         MS. TABACCHI:  Object --
20     Q.  (BY MR. BREEN) -- is that correct?
21         MS. TABACCHI:  Object to the form.
22     A.  I think -- we had a responsibility to act
23  according to Abbott's Code of Conduct and to act
24  responsibly.
25     Q.  (BY MR. BREEN)  Abbott's Code of Conduct,
0101
1   correct?
2      A.  Well, Abbott's Code of Conduct and to be
3   responsible, yes.
4      Q.  Okay.  All right.  So you had a
5   responsibility at all times when you were manager of
6   reimbursement to act in accordance with Abbott's Code
7   of Conduct and to act responsibly; is that correct?
8      A.  Yes.
9      Q.  Was Abbott's Code of Conduct in writing?
10     A.  At that -- you know, I don't -- yes.  I
11  believe so, yes.
12     Q.  Did you have a copy of it when you worked as
13  manager of reimbursement?
14     A.  I may have.  I don't remember.
15     Q.  Ever recall reading it?
16     A.  I recall reading our -- reading a Code of

17   Conduct for Abbott.  Did I read a specific one at that
18   time?  I don't remember.
19       Q.   When that -- when you say "that time," you
20   were manager of reimbursement for several years,
21   correct?
22       A.   Yes.
23       Q.   And what were those years again?
24       A.   I was manager of reimbursement for Home
25   Infusion Services from 1982 to 1998, I believe.
0102
 1       Q.   And so from 1992 -- 1982 to 1998 when you
 2   were manager of Home Infusion -- reimbursement for
 3   Home Infusion Services, you don't recall specifically
 4   reading Abbott's Code of Conduct; is that correct?
 5       A.   No.
 6       Q.   You don't recall anybody ever telling you to
 7   read Abbott's Code of Conduct, correct?
 8       A.   No, I wouldn't recall that.
 9       Q.   How long is Abbott's Code of Conduct?  How
10   many pages?
11       A.   I don't -- I don't remember the details.
12       Q.   Is it more than five pages?
13       A.   The current one?
14       Q.   No.  The one that was in place from '82 to
15   '98.
16       A.   I don't recall the details.
17       Q.   Okay.  Do you recall whether one even existed
18   between '82 and '98?
19           MS. TABACCHI:  Object to the form.
20       A.   I just don't recall.
21       Q.   (BY MR. BREEN)  How many pages is Abbott's
22   Code of Conduct currently?
23       A.   Oh, I don't recall.  It's quite a few pages.
24       Q.   It's more than five pages?
25       A.   I would think so, yes.
0103
 1       Q.   Okay.  Is it in a -- have you seen one in --
 2   a bound copy or --
 3       A.   I have seen a written copy.
 4       Q.   Written copy?  Okay.  And did you -- were you
 5   required to read it in connection with your
 6   responsibilities as director of corporate
 7   reimbursement in the ethics and compliance office?
 8       A.   Yes.
 9       Q.   Okay.  But you don't ever recall being
10   required to read the Abbott Code of Conduct in
11   connection with your responsibilities as manager of
12   reimbursement for Home Infusion Services, correct?
13       A.   Yes.  But that doesn't mean that we weren't
14   required.
15       Q.   You just don't recall.
16       A.   I just don't recall.
17       Q.   Okay.  Well, let me ask this question:  When
18   did you get your Master's in Business Administration?

19   A.   1982.
20   Q.   MBA in 1982.  From where?
21   A.   New York University.
22   Q.   And that was right before you went to work
23  for Abbott?
24   A.   Yes.
25   Q.   And were you working when you -- when you
0104
1  went to school for your Master's in Business
2  Administration?
3   A.   Yes.
4   Q.   What were you doing?
5   A.   I was a nurse.
6   Q.   You were a nurse.  And where were you working
7  as a nurse?
8   A.   Long Island College Hospital.
9   Q.   Long Island College Hospital.  Now, did your
10  MBA, was that part of your resume when you applied to
11  work for Abbott?
12   A.   Yes.
13   Q.   Okay.  Now, did you have any -- concentrate
14  in any specific area of study in the Master's of
15  Business Administration program at NYU?
16   A.   Yes.
17   Q.   What was the emphasis?
18   A.   Finance.
19   Q.   Finance.  Okay.  So you emphasized finance.
20  Now, did you take any courses in economics to get your
21  Master's in Business Administration?
22   A.   Yes.
23   Q.   Did you take any courses in econometrics to
24  get your Master's in Business Administration?
25   A.   What do you mean econometrics?
0105
1   Q.   Do you know what econometrics are?
2   A.   No.
3   Q.   Okay.  Did you take any courses in financial
4  analysis?
5   A.   Yes.
6   Q.   Did you take any courses in securities
7  analysis?
8   A.   No.
9   Q.   Did you take any courses in organizational
10  behavior?
11   A.   Yes.
12   Q.   Did you take any courses in management?
13   A.   I think we took management sciences, but I
14  can't remember.
15   Q.   Did you take any courses in leadership?
16   A.   Not that I remember.
17   Q.   How about business -- how about business law?
18   A.   Not that I remember.
19   Q.   Okay.  So you got your MBA and you went to
20  work for Abbott and your first job at Abbott was in

21  the -- what department again?
22      A.  Hospital Products Division.
23      Q.  Hospital Products Division.  Okay.  And what
24  year did you actually go into the home infusion
25  business?
0106
1       A.  I think it was either 1984 or 1985.
2       Q.  1984 or 1985.  Now, when did you first learn
3   about average wholesale price in connection with
4   pharmaceutical products?
5       A.  I don't recall an exact date.
6       Q.  Okay.  I'm not asking you for an exact date.
7   Did you learn it in your MBA program?
8       A.  No.
9       Q.  Did you know about it before you went to work
10  for Abbott?
11      A.  Not that I recall.
12      Q.  Okay.  So is it safe to say that it was
13  sometime after going to work for Abbott that you first
14  became conscious of the concept of average wholesale
15  price in connection with pharmaceutical products?
16      A.  Yes.
17      Q.  Okay.  Now, I notice you keep referring to a
18  document.  What is the document you have in your hand?
19      A.  Oh.  This is 548.
20      Q.  Okay.  And that was the -- that was the
21  exhibit I asked you questions about several questions
22  ago?
23      A.  No.
24      Q.  Okay.  Now, you first learned about average
25  wholesale price in connection with pharmaceutical
0107
1   products after you went to work for Abbott and has
2   your understanding of what that term meant changed
3   over time?
4       A.  Yes.
5       Q.  Okay.  How has it changed?
6       A.  I -- I've learned what's been written about
7   it in newspapers.
8       Q.  In the newspapers?
9       A.  Uh-huh.
10      Q.  Okay.  Only -- you only have learned about
11  average wholesale price based upon what's been written
12  in the newspapers?
13      A.  No.
14      Q.  Okay.  So what other sources of information
15  have you had about average wholesale price?
16          MS. TABACCHI:  Mr. Breen is not asking
17  you, I assume, to reveal communications with counsel.
18  Are you, Mr. Breen?
19      Q.  (BY MR. BREEN)  Absolutely not.  I don't want
20  to know anything your lawyers told you during this
21  whole deposition, unless I specify.  I want to know
22  what you know as a person that worked at Abbott that

23   when they went there they had a Master's in Business
24   Administration and learned about average wholesale
25   price after they went to work for Abbott and has been
0108
1   there for all these years, and I would like to know
2   the sources of information that you became aware of
3   that caused your understanding of average wholesale
4   price to change.
5      A.  Well, I'm aware that average wholesale price
6   was -- was in drug databases, like Redbook.  They had
7   a column that said AWP at the top and they had numbers
8   associated with it underneath.  I understand as I've
9   worked at Abbott that AWP stands for average wholesale
10   price and that it reflects a price that the drug
11   database has put in their -- in their documents.  And
12   we had access to the drug databases through our
13   computer system.
14      Q.  So how has your understanding then of average
15   wholesale price changed?
16      A.  Well, I really -- I think I have an
17   understanding that it's -- that there is some -- that
18   the drug databases have a methodology for establishing
19   average wholesale price.
20      Q.  When did you learn that?
21      A.  Oh, in the last few years.
22      Q.  Last few years.
23      A.  And I don't remember exactly.
24      Q.  So when you were -- it's your testimony,
25   then, that when you were the manager of reimbursement
0109
1   for Home Infusion Services that you had no knowledge
2   whatsoever as to how AWPs were determined; is that
3   your testimony?
4      A.  I had some general knowledge, but I didn't
5   know the details.
6      Q.  What was the general knowledge that you had
7   when you were the manager of reimbursement services
8   for Home Infusion Services about how AWPs were
9   determined?
10      A.  I believe that contract marketing and
11   Hospital Products provided some information to the
12   drug databases and the drug databases then established
13   average wholesale price.
14      Q.  Okay.  Based upon the information supplied by
15   Abbott, correct?
16      A.  I don't know that.  I know that Abbott
17   supplied something to the drug databases and the drug
18   databases established a number.
19      Q.  So you didn't know that the drug databases
20   even used the information Abbott supplied, correct?
21      A.  Exactly.
22      Q.  Okay.  So as far as you knew, Abbott
23   supplying information to the drug databases had
24   nothing to do with average wholesale price, correct?

25    A.  That would be speculation.  I don't know.
0110
1     Q.  Well, then why did you say that it was your
2  understanding that Abbott provided some information to
3  drug databases in connection with average wholesale
4  price?
5     A.  I'm sorry.  I'm missing --
6           MS. TABACCHI:  Object to the form.
7     Q.  (BY MR. BREEN)  Let me go back.  You just
8  testified that at some point in time when you were
9  involved with -- as manager of Home Infusion -- of
10  reimbursement services that you became aware that
11  Abbott supplied some information to the drug
12  databases, I think you said?
13    A.  Yes.
14    Q.  And somehow they determined average wholesale
15  price, correct?
16    A.  Yes.
17    Q.  Why -- why did you connect Abbott's supplying
18  information to the drug databases with the drug
19  databases establishing average wholesale price?
20           MS. TABACCHI:  Object to the form.
21    Q.  (BY MR. BREEN)  You just connected it in your
22  testimony.  Why did you connect one with the other?
23    A.  Oh.  I -- I'm not necessarily connecting it.
24  I mean, there's -- there's other information in the
25  drug databases, like direct price and other things.
0111
1  That information could have been used for that.  I
2  don't know.
3     Q.  Where do they get direct price from?
4     A.  I have no idea.
5     Q.  You have no idea?
6     A.  No idea.
7     Q.  Okay.  As far as you know, they can get it
8  from Abbott, correct?
9     A.  Yeah.  Anywhere.  I don't know.
10    Q.  Anywhere.  Okay.  What do you mean anywhere?
11    A.  Take that back.  I don't mean anywhere.  That
12  was -- I misspoke.
13    Q.  Okay.  All right.  So you don't know whether
14  they get direct price from Abbott or not, do you?
15    A.  I don't know.
16    Q.  And you were the manager of Home Infusion
17  Services reimbursement services for how long?
18    A.  For 12 years.
19    Q.  12 years.  And as of this day, even though
20  you are the director of reimbursement in the ethics
21  and compliance office for Abbott Laboratories, or you
22  were, you still have no idea whether or not Abbott
23  Laboratories supplies direct price information to the
24  drug databases, do you?
25           MS. TABACCHI:  Object to the form.
0112

1    A.  I am not responsible for submitting anything
2   to the drug databases.  I don't know if we still do --
3   we do.  I just don't know.
4    Q.  (BY MR. BREEN)  You don't know.
5    A.  I don't know.
6    Q.  You don't know.  All right.  You know what
7   the term "AWP spread" means, don't you?
8           MS. TABACCHI:  Object to the form.
9    A.  I've heard the word "spread," yes.
10   Q.  (BY MR. BREEN)  And you heard that word when
11   you were involved as the manager of reimbursement
12   services for the Home Infusion Services group, didn't
13   you?
14           MS. TABACCHI:  Object to the form.
15   A.  What -- what I remember about where I learned
16   that from is from the OIG guidance on compliance for
17   pharmaceutical manufacturers.  The word was referred
18   to in there.
19   Q.  (BY MR. BREEN)  Okay.  So it's your testimony
20   that prior to becoming aware -- aware of the term
21   "spread" in the OIG compliance guidelines, you had
22   never heard the word and you never even knew what it
23   meant; is that correct?
24           MS. TABACCHI:  Object to the form.
25   A.  I may have been aware of the word.  I
0113
1   honestly -- I remember specifically being aware that
2   it was stated in the OIG compliance.
3    Q.  (BY MR. BREEN)  And what is your
4   understanding of what "AWP spread" means then?
5    A.  Well, my understanding of "spread," I'm not
6   referring to AWP because my understanding of "spread,"
7   because I work mostly on the device side, is
8   there's -- it's the difference between reimbursement
9   and the cost of the product.  The cost of the item.
10   Q.  And so is it your testimony that until seeing
11   the OIG compliance guidelines, you never had any
12   consciousness of there being a -- a -- a difference
13   between AWP and the cost of the product?
14           MS. TABACCHI:  Object to the form.
15   A.  Well, yes, there is a difference between AWP
16   and the cost of the product.
17   Q.  (BY MR. BREEN)  So prior to reading the OIG
18   compliance guidelines, what did you call that
19   difference between AWP and the cost of the product?
20           MS. TABACCHI:  Object to the form.
21   A.  I don't think it would have come up.  It was
22   just that there was an AWP and there was the cost of
23   the product.  They weren't necessarily connected.
24   Q.  (BY MR. BREEN)  Oh.  It never came up in your
25   entire time as the manager of reimbursement services
0114
1   for the Home Infusion Services group?
2    A.  Are you asking was it --

3      Q.  I'm asking a question.  Is it your testimony
4  that the concept of the difference between AWP and the
5  cost of a drug product never came up, is that your
6  testimony?
7            MS. TABACCHI:  Object to the form of the
8  question.
9      Q.  (BY MR. BREEN)  And I'll be happy to have the
10  question read back if you don't understand it.
11     A.  Read back the question.
12           (Requested portion was read)
13           MS. TABACCHI:  Object to the form.
14     A.  Not -- not that I recall.
15     Q.  (BY MR. BREEN)  Not that you recall.
16     A.  No.
17     Q.  And your testimony right now is based upon
18  the entire time that you were manager of reimbursement
19  for Home Infusion Services; is that correct?
20           And if you need some time to take a
21  break and think about this, I'll be happy to give it
22  to you.
23     A.  No, I don't need a break.  I know there was
24  an AWP.  I know there's cost of product.  I don't
25  necessarily -- you're -- you're connecting them.  I'm
0115
1  not -- I don't recall me ever having a conversation
2  about -- or even a recollection of that.
3      Q.  So let me -- let me just make sure I
4  understand what you're saying.  You got an MBA in
5  finance in 1982.  You worked as the manager of
6  reimbursement for Abbott Home Infusion Services for 12
7  years and it's your testimony that you never even --
8  you were -- never even thought about, conscious of,
9  had a discussion about the difference between average
10  wholesale price and the cost of the pharmaceutical
11  product to an Abbott customer?
12           MS. TABACCHI:  Object to the form.
13     A.  Oh.  To an Abbott customer?
14     Q.  (BY MR. BREEN)  Correct.
15     A.  No.  Not that I recall.  I was not -- I was
16  not involved with sales.  I wasn't involved with
17  marketing.  I wasn't involved with setting prices.  I
18  wasn't involved in that.
19     Q.  Were you involved with the Medicare working
20  group?
21     A.  I don't remember that group.
22     Q.  Don't remember that group?
23     A.  No.
24     Q.  Well, if you look in front of you right now,
25  you are going to see the exhibit that Ms. Moore put
0116
1  into evidence -- not into evidence, in your
2  deposition, and I believe it's Exhibit -- you are
3  looking at it right now.  That is Exhibit what?
4      A.  546.

5    Q.   546.
6    A.   Yes.
7         MS. TABACCHI:  Do you have a question,
8   Jim, on it?
9    Q.  (BY MR. BREEN)  Now, looking at Exhibit 546,
10  and which I will represent to you was provided by
11  Abbott's counsel to us just last week --
12   A.   Yeah.
13   Q.   -- and I went through it last night and
14  counted your name on the correspondence in that -- in
15  that document, which is approximately four inches
16  sitting in front of you, and I counted your name 37
17  times and saw correspondence from you about Medicare
18  and Medicaid reimbursement.
19        MS. TABACCHI:  I'm going to ask that the
20  witness --
21   Q.  (BY MR. BREEN)  Now --
22        MS. TABACCHI:  -- be given an
23  opportunity to review these documents.
24   Q.  (BY MR. BREEN)  I'm going to ask the witness,
25  and I think we should take a break and let her do
0117
1   that, to review that document in front of you, because
2   that's how it was provided to us, and I'll be happy to
3   go through each and every page where your name is
4   either now or on the record, but I think you should
5   take some time to look at that, if we could, and let's
6   take a break right now.  It's a good time.  We can
7   take a lunch break now, if you would like, or we could
8   wait.
9         MS. TABACCHI:  Do you want to take a
10  break for lunch or do you want to review the documents
11  now?
12        THE WITNESS:  Let's review the
13  documents.
14        MS. TABACCHI:  Okay.  We'll sit here and
15  review them.
16        MR. BREEN:  All right.  Let's go off the
17  record and let me know when you're ready.
18        MS. TABACCHI:  Why are we going off the
19  record?
20        MR. BREEN:  Because I'm not going to sit
21  here while the witness reviews hundreds of pages, if
22  you want her to review the document.
23        MS. TABACCHI:  Well, you can't ask her
24  questions about four inches of documents when she has
25  no recollection and not give her an opportunity to
0118
1   review the documents.
2         MR. BREEN:  I'm going to give her -- I'm
3   going to give her all the time she wants to review the
4   document.  I just don't think we need to sit here on
5   the record and do it and look at each other.  If she
6   wants to take her time to review the document, I'm

7  more than happy to let her do that --
8           MS. TABACCHI:  All right.
9           MR. BREEN:  -- if this is the first time
10  she's seen it, let her look at the document.
11           MS. TABACCHI:  Then let's take a break.
12           MR. BREEN:  Very good.
13           THE VIDEOGRAPHER:  Going off the record
14  at 12:13 p.m. at the conclusion of Tape 2 in the
15  deposition of Virginia Tobiason.
16           (Recess from 12:13 to 1:23)
17           THE VIDEOGRAPHER:  This marks the
18  beginning of Tape 3, Volume 1 in the deposition of
19  Virginia Tobiason.  Going on the record.  The time is
20  now 1:23 p.m.  Please proceed.
21           MR. BREEN:  Okay.  Could we have marked
22  the next exhibit, please?
23           MS. MOORE:  551.
24           MR. BREEN:  551.  And if you could
25  provide the marked copy to the witness and a copy to
0119
1  counsel.
2      Q.  (BY MR. BREEN) I've handed you what purports
3  to be the Office of Inspector General's Voluntary
4  Compliance Guidance Issued for Pharmaceutical
5  Manufacturers dated April 28, 2003.  It's a multipage
6  document.  The Bates labeling on it is AZ0524193
7  through AZ0524250.
8           MS. TABACCHI:  Jim, can I ask where this
9  document came from?  It appears to have been marked
10  highly confidential by a third party.
11           MR. BREEN:  I don't know why it would be
12  marked highly confidential.  I for a fact know that
13  these are the OIG public compliance guidelines.
14           MS. TABACCHI:  I'm not going to debate
15  you on that, but --
16           MR. BREEN:  I know.  In the --
17           MS. TABACCHI:  -- it's not my document
18  and I didn't mark it, so I just want to raise --
19           MR. BREEN:  I got a copy of this as a
20  courtesy from counsel.  This was used at some point, I
21  imagine, in the MDL?
22           MS. NESBITT:  I believe it was produced
23  by actions.
24           MS. TABACCHI:  I mean, I understand what
25  you're saying, but it's not for me to decide that it's
0120
1  not highly confidential if it's been marked highly
2  confidential.  I hear your point.
3           MR. BREEN:  Right.
4           MS. TABACCHI:  Is there another copy --
5           MR. HAVILAND:  Well, there is no other
6  copy for today's purposes.  But it was also marked and
7  used as a trial exhibit in the trial that was publicly
8  held last year, so --

9        MS. TABACCHI:  So you can represent that
10   this designation doesn't stand?
11        MR. HAVILAND:  I'm not going to
12   represent what Davis Pope might say about it, but I
13   can tell you that the document was made public in the
14   proceeding that was last year.  So if we had a
15   different copy of the public document we would use it,
16   but this is the one we have for today's purpose.
17        MR. BREEN:  Plus the protective orders,
18   at least all the ones that I'm -- I'm familiar with,
19   specifically except documents that are already in the
20   public domain, which this one certainly is.  I'm
21   willing to risk it.  I'm the one putting it in, so --
22   and certainly I'm not representing that counsel for
23   Abbott gave me this document today.  I was just
24   looking for a clean copy, if I could find one, of the
25   OIG guidelines for the purpose of just establishing a
0121
1    date with this witness.
2        MS. TABACCHI:  Okay.
3    Q.  (BY MR. BREEN)  So if -- earlier,
4    Ms. Tobiason, you had testified about becoming aware
5    of the concept of spread based upon reading the OIG
6    Compliance Guidelines for Pharmaceutical
7    Manufacturers.  Do you recall that?
8    A.  Yes.
9    Q.  And I handed you what's now been marked
10   Exhibit 251 --
11        MS. MOORE:  No, 551.
12   Q.  (BY MR. BREEN)  -- 551, I'm sorry, 551, and
13   I'll ask that you look at that and if you'll go to
14   Page 26, the page numbers being in the upper
15   right-hand corner.
16   A.  Yes.  What page?
17   Q.  Go to Page 26.
18   A.  Yes.
19   Q.  And you'll see subparagraph "(c) Average
20   Wholesale Price" there?
21   A.  Page 26?
22   Q.  Correct.
23   A.  Which page?  There's two page numbers.
24   Q.  Upper right-hand corner.  I'm sorry.  The one
25   that's actually printed on the document.  Not the fax
0122
1    page.  You're right, there's two page numbers in the
2    upper right-hand corner.  I apologize.
3    A.  Okay.
4    Q.  Do you see subparagraph "(c) Average
5    Wholesale Price"?
6    A.  Yes.
7    Q.  And could you read the first sentence,
8    please?
9    A.  "The 'spread' is the difference between the
10   amount a customer pays for a product and the amount

11 the customer receives upon resale of the product to
12 the patient or other payer."
13    Q.   And if you'll go down to the second paragraph
14 you'll see the term "average wholesale price" is there
15 and in parentheses there is "AWP," do you see that?
16    A.   Yes.
17    Q.   All right.  Now, I'll ask you, when you were
18 testifying earlier that you became aware of the
19 concept of the spread in reviewing the OIG compliance
20 guidelines, were these the guidelines you were talking
21 about?
22    A.   Yes.
23    Q.   And you'll see the date on the front of it
24 purports to be April 28, 2003.  And I'll just
25 represent for the record that is my understanding of
0123
1 when the pharmaceutical voluntary compliance
2 guidelines were issued to pharmaceutical
3 manufacturers.  And I'll ask if that refreshes your
4 recollection when you first -- the time frame in which
5 you first became conscious of the term "spread"?
6    A.   Yes.  To the best of my recollection, yes.
7    Q.   Okay.  So -- thank you.  Now, when were you
8 placed in the position of director of reimbursement
9 for Abbott?
10         MS. TABACCHI:  Object to the form.
11    Q.   (BY MR. BREEN)  I'm sorry.  Director,
12 corporate reimbursement for Abbott?
13    A.   I believe it was 2001.
14    Q.   Okay.  Now, do you recall, and I'm -- if you
15 would like to take the time to read the OIG compliance
16 guidelines, I'll be happy to let you do that, but my
17 next question is back to 2001, which predates these
18 guidelines.  Do you recall when in 2001?
19    A.   Oh, I have -- no, not -- maybe toward the end
20 of the year.
21    Q.   Towards the end of the year?  Okay.
22    A.   Yeah.
23    Q.   So it would have been the latter part of
24 2001?
25    A.   Yes.
0124
1    Q.   So is it then correct that when you were
2 placed in the position of director of corporate
3 reimbursement at Abbott in the ethics and compliance
4 office, that you had no consciousness of what the term
5 "spread" meant as it related to AWP reimbursement?
6    A.   Well, I do understand there was a difference
7 between what payers reimbursed versus what customers
8 paid, but the term "spread" is not a term that I was
9 familiar with.
10    Q.   So you were conscious that there was a
11 difference between reimbursement amounts and the
12 amounts customers actually paid?

13   A.  Oh, yes.
14   Q.  How long have you had that consciousness?
15   A.  Well, I was aware of that for a while.
16   Q.  A while.  How long?
17   A.  Oh, I don't know.
18   Q.  Well, you weren't aware of it --
19   A.  A few years.
20   Q.  -- when you were manager of reimbursement for
21  Home Infusion Services, correct, because you testified
22  to that?
23        MS. TABACCHI:  Object to the form.
24   A.  Well, there's -- there was -- when you -- the
25  cost of product versus what people paid, typically
0125
 1  there was a difference, yes.
 2   Q.  (BY MR. BREEN)  And what -- and what did you
 3  call that difference?
 4        MS. TABACCHI:  Object to the form.
 5   A.  A difference.
 6   Q.  (BY MR. BREEN)  A difference.
 7   A.  Yeah.
 8   Q.  You never had any other word for it other
 9  than a difference?
10   A.  Not that I recall.
11   Q.  Okay.  So what is the earliest point in time
12  that you recall having some degree of consciousness
13  that there was a difference between what your
14  customers -- home infusion customers were being
15  reimbursed and what they were paying Abbott for the
16  product?
17        MS. TABACCHI:  Object to the form.
18   A.  I -- I really don't -- not that I -- I don't
19  recall.  There was -- you paid -- there was a cost to
20  the product and then the products -- and services and
21  then there was a reimbursement amount.  There was an
22  amount they were paid.
23   Q.  (BY MR. BREEN)  Did you do anything at
24  lunchtime to refresh your recollection as to whether
25  or not while you were manager of reimbursement for
0126
 1  Home Infusion Services you had any degree of
 2  consciousness of there being a difference between
 3  reimbursement amounts and the amounts customers paid
 4  for your product?
 5        MS. TABACCHI:  Object to the form.
 6   A.  No.  No.
 7   Q.  (BY MR. BREEN)  Okay.  Did you ever have any
 8  degree of consciousness while you were manager of
 9  reimbursement for Home Infusion Services that there
10  was a difference between average wholesale price and
11  the amount that your customers were paying for the
12  product -- for the drug products?
13        MS. TABACCHI:  Object to the form.
14   A.  I was aware that customers paid for our --

15  our products and services and that there was a
16  reimbursement amount.  There was a difference between
17  that amount.
18     Q.  (BY MR. BREEN)  Okay.  And you were aware of
19  that the entire time you were manager of
20  reimbursement?
21     A.  I was also aware that there were usual and
22  customaries and a number of different -- different
23  terms in that reimbursement was an amount, customers
24  paid for products and services that amount and there
25  was -- there was -- and there could be -- customers
0127
1  would establish usual and customaries.  There were
2  contracted amounts.  There were all sorts of different
3  amounts.
4     Q.  What are usual and customaries?
5     A.  Usual and customaries are what customers
6  establish as a -- as a price.
7     Q.  Did Abbott establish usual and customaries?
8     A.  No.
9     Q.  How about when Abbott was running its own
10  home infusion pharmacies?
11     A.  Yes, we did then.
12     Q.  And how long did --
13     A.  When we were Abbott Homecare.
14     Q.  Okay.  When did Abbott stop operating, if
15  ever, its own home infusion pharmacies?
16     A.  Well, Abbott operated its own pharmacies.
17     Q.  I know.
18     A.  Until --
19     Q.  To this day?
20     A.  No.
21     Q.  When did it stop doing it?
22     A.  When we -- when we stopped Home Infusion
23  Services.
24     Q.  When was that?
25     A.  Oh, I -- I left Home Infusion Services in
0128
1  1990 -- 1998.
2     Q.  In 1998.  So as of 1998 Abbott was actually
3  submitting claims for reimbursement for products like
4  Vancomycin and IV fluids, correct?
5     A.  On behalf of our customers.
6        MS. TABACCHI:  Object to the form.
7     Q.  (BY MR. BREEN)  Well, let me go back and
8  earlier on I thought I heard you testify that at some
9  point in time Abbott Laboratories was actually running
10  its own home infusion pharmacies.
11     A.  Yes.
12     Q.  Not for customers, for itself; is that
13  correct?
14        MS. TABACCHI:  Object to the form.
15     A.  At a time period, yes.
16     Q.  (BY MR. BREEN)  All right.  That's what I'm

17 talking about right now.
18     A.  What's the question?
19     Q.  During what time period did Abbott actually
20 operate its own home infusion pharmacies?
21     A.  We operated our own home infusion pharmacies
22 from when we first started -- when Home Infusion
23 started -- Homecare started through when they closed.
24     Q.  When did they close?
25     A.  I don't remember offhand.  I was -- I was
0129
1 gone from then.  I don't know when they closed the
2 pharmacies.
3     Q.  All right.  So as of 1998 Abbott Laboratories
4 was submitting claims for reimbursement on behalf of
5 its own pharmacies, correct?
6     A.  No.
7           MS. TABACCHI:  Object to the form.
8     Q.  (BY MR. BREEN)  So then how did the -- all
9 right.  Let me go back.  Maybe I'm confused by -- by
10 your answers.  When you say Abbott operated its own
11 pharmacies, what do you mean?
12     A.  Abbott operated pharmacies.  We had
13 pharmacies that compounded product.
14     Q.  Who owned those pharmacies?
15     A.  Abbott.
16     Q.  Okay.  And who submitted the claims for
17 reimbursement for those pharmacies?
18     A.  We could or our customers could.
19     Q.  If it was your pharmacy, Abbott's pharmacy,
20 if they owned it, who was the customer?
21     A.  Customers would subcontract for pharmacy
22 services.
23     Q.  Let me back up.  Let's just get this -- let's
24 just go back to the very beginning.
25     A.  Uh-huh.
0130
1     Q.  When you say Abbott owned its own pharmacies,
2 what kind of pharmacies are you talking about?
3     A.  Home infusion pharmacies.
4     Q.  Specialty pharmacies, correct?
5     A.  Specialty -- well, home infusion, yes.
6     Q.  Were they closed pharmacies?
7           MS. TABACCHI:  Object to the form.
8     A.  I don't know what a closed pharmacy is.
9     Q.  (BY MR. BREEN)  Did they have a -- a -- a
10 drug store that anybody could walk into and get a --
11 the pills that their children needed for a cold
12 filled?
13     A.  No.
14     Q.  You've been to pharmacies, haven't you, where
15 you've gone in --
16     A.  Yeah.
17     Q.  -- and taken a prescription?
18     A.  Sure.

19   Q.  Okay.  Maybe CVS, maybe Walgreens, maybe an
20  independent pharmacy.
21   A.  Uh-huh.
22   Q.  Okay.  Was it that kind of pharmacy?
23        MS. TABACCHI:  Object to the form.
24   A.  It was a licensed pharmacy, but it wasn't
25  a -- like a CVS.
0131
1   Q.  (BY MR. BREEN)  Okay.  What was it like then?
2   A.  They -- they -- they were a pharmacy that
3  provided infusion compounded products.
4   Q.  Did you ever visit one of those pharmacies?
5   A.  Sure.  Yes.
6   Q.  And -- and before you went to work for Abbott
7  did you ever work for one of those pharmacies?
8   A.  No.
9   Q.  An IV pharmacy?
10   A.  No.
11   Q.  Okay.  So it was only in connection with your
12  working for Abbott that you actually visited an IV
13  pharmacy; is that correct?
14        MS. TABACCHI:  Object to the form.
15   A.  Well, when I worked in hospitals we had IV
16  pharmacies.
17   Q.  (BY MR. BREEN)  Okay.  Were they outpatient
18  pharmacies or in-patient pharmacies?
19   A.  Both.
20   Q.  Both.  Okay.  So were those -- the outpatient
21  IV pharmacies that you experienced when you worked for
22  hospitals, were those the same kind of pharmacies that
23  Abbott owned?
24        MS. TABACCHI:  Object to the form.
25   A.  They were -- they were pharmacies that
0132
1  compounded products.  They were similar because
2  hospital outpatient pharmacies could include the oral
3  forms, too.
4   Q.  (BY MR. BREEN)  Okay.
5   A.  So we didn't do oral drugs.
6   Q.  All right.  You only did drugs that were
7  administered by IV or injection; is that correct?
8   A.  Yes, correct.
9   Q.  How about nebulizer drugs?
10   A.  No.
11   Q.  All right.  So all of the drugs that Abbott's
12  pharmacies provided were administered by either an IV
13  line or by injection; is that correct?
14        MS. TABACCHI:  Object to the form.
15   A.  Yes.  I would believe that -- well, that was
16  the majority.  There could have been, but it was --
17  the majority was IV.
18   Q.  (BY MR. BREEN)  How about total parenteral
19  nutrition, did Abbott provide total parenteral
20  nutrition through its own pharmacies?

21   A.  Yes.
22   Q.  And was that administered by an IV line or
23   was that administered in some other manner?
24          MS. TABACCHI:  Object to the form.
25   A.  IV.
0133
1    Q.  (BY MR. BREEN) IV.  Okay.  When you say
2    "IV," you mean in the patient's arm or leg; is that
3    correct?
4          MS. TABACCHI:  Object to the form.
5    A.  It would be through a central catheter.
6    Q.  (BY MR. BREEN) A central catheter.  That
7    would be --
8    A.  Now, we also did provide enteral nutrition,
9    which is not an IV.
10   Q.  All right.  Okay.  When you say a central
11   line, do you mean something inserted in the patient's
12   chest?
13   A.  Yes.
14   Q.  All right.  And that's how what would be
15   administered?
16          MS. TABACCHI:  Object to the form.
17   A.  What would be administered.  It would be what
18   the doctors -- what the prescription was.
19   Q.  (BY MR. BREEN) All right.  Did Abbott ever
20   administer any drugs through its infusion pharmacies
21   that were administered through an IV line in the
22   patient's arm?
23   A.  Yes.
24          MS. TABACCHI:  Object to the form.
25   Q.  (BY MR. BREEN) Okay.  What kind of drugs
0134
1    would they administer in the IV line in the patient's
2    arm versus in a central line in the patient's chest or
3    central catheter in the patient's chest?
4          MS. TABACCHI:  Object to the form.
5    A.  Well, many drugs that are peripheral could be
6    administered through a central line.  It depended on
7    the patient's access device.
8    Q.  (BY MR. BREEN) Okay.  So is it -- is it
9    correct, then, that any -- any drug that could be
10   administered through an IV line in the patient's arm
11   could be administered in a central line in the
12   patient's chest with some drugs you needed to
13   administer through the chest; is that correct?
14          MS. TABACCHI:  Object to the form.
15   A.  In general that's true except I wasn't the
16   pharmacist or the physician, so I'm giving you to the
17   best of my knowledge.
18   Q.  (BY MR. BREEN) Okay.  And as a nurse you
19   never administered IVs?
20   A.  Oh, yes.
21          MS. TABACCHI:  Object to the form.
22   Q.  (BY MR. BREEN) Did you ever administer drugs

23  through a central -- central line in the chest?
24     A.  Yes.
25     Q.  Okay.  So were those the same types of drugs
0135
1   that Abbott administered through the pharmacies it
2   owned?
3              MS. TABACCHI:  Object to the form.
4      A.  Yes.  Hospitals probably do more drugs than
5   we did.
6      Q.  (BY MR. BREEN) Okay.  All right.  Now,
7   let's -- let's talk about the pharmacy -- the IV
8   pharmacies that Abbott owned.
9      A.  Uh-huh.
10     Q.  How many pharmacies did Abbott own to your
11  knowledge?
12     A.  In what time period?
13     Q.  During the time that you were manager of
14  reimbursement.
15             MS. TABACCHI:  Object to the form.
16     A.  Well, we had four and then it went to three.
17     Q.  (BY MR. BREEN) Where were the four located?
18     A.  Los Angeles, Chicago, New Jersey and Atlanta.
19     Q.  Okay.  And which -- which one did -- how did
20  it go to three?  Which one was lost?
21     A.  Atlanta.
22     Q.  The one in Atlanta.  What happened to the one
23  in Atlanta?
24     A.  I don't know.
25     Q.  All right.  So Abbott -- did Abbott -- Abbott
0136
1   had these four pharmacies and it actually owned them,
2   correct?
3              MS. TABACCHI:  Object to the form.
4      A.  They were Abbott employees.  Abbott -- Abbott
5   property.  I mean, Abbott rented the property, yeah.
6      Q.  (BY MR. BREEN) Okay.  And did -- when a
7   claim was made for reimbursement for IV solutions or
8   medications were administered in those pharmacies,
9   either intravenously or by injection, was it Abbott
10  that submitted the claim for reimbursement?
11             MS. TABACCHI:  Object to the form.
12     A.  Sometimes.
13     Q.  (BY MR. BREEN)  For those four pharmacies?
14     A.  Sometimes.
15     Q.  Sometimes.  Okay.  Who was -- if it was a
16  HCFA 1500 form, who was the provider for those four
17  pharmacies?
18             MS. TABACCHI:  Object to the form.
19     A.  It could -- say that again.  Ask me that
20  question again.
21     Q.  (BY MR. BREEN)  You testified earlier that
22  you were familiar with a form called a HCFA 1500 form,
23  correct?
24     A.  Yes.

25    Q.  And that's how a provider of IV services and
0137
1  products request payment from the Medicare program,
2  correct?
3    A.  Yes.
4    Q.  And some state Medicaid programs, correct?
5    A.  I don't know.
6    Q.  All right.  But at least you know about the
7  Medicare program, correct?
8    A.  Yes.
9    Q.  And you know the HCFA 1500 form was submitted
10  in order to get reimbursed by the Medicare program for
11  IV pharmaceutical services and products, correct?
12    A.  For the ones it covered.
13    Q.  For the ones it covered, correct?
14    A.  Yes.
15    Q.  Okay.  That would be under Medicare Part B?
16    A.  Medicare Part B, durable medical equipment.
17    Q.  Durable medical equipment.  Okay.  And when
18  you say durable medical equipment, that would include
19  IV pumps, correct?
20    A.  Yes.
21    Q.  All right.  Now, when a claim for
22  reimbursement was submitted to the United States
23  Medicare program for IV products or services provided
24  at one of those Abbott-owned pharmacies, one of those
25  four pharmacies you testified about, did the HCFA 1500
0138
1  form have to disclose who the provider was that
2  provided the goods and services that reimbursement was
3  being sought for?
4         MS. TABACCHI:  Object to the form.
5    A.  The provider would be identified on the claim
6  form with their Medicare number.
7    Q.  (BY MR. BREEN)  Okay.  And if it was an
8  Abbott pharmacy that provided the goods and services,
9  who or what entity would be indicated on the HCFA 1500
10  form as the provider?
11         MS. TABACCHI:  Object to the form.
12    A.  It would have been the provider.  Abbott
13  pharmacies subcontracted to some of our -- to our
14  clients.  So sometimes the products were provided as a
15  subcontracted service.  The provider of services would
16  have been the customer.
17    Q.  (BY MR. BREEN)  So is it your testimony,
18  then, that these four pharmacies that Abbott owned,
19  Abbott would have some other customer indicate that it
20  was the provider on the HCFA 1500 form?
21    A.  Yes.
22         MS. TABACCHI:  Object to the form.
23    Q.  (BY MR. BREEN)  All right.  So it would not
24  disclose to the Medicare program that Abbott was
25  actually the owner of the pharmacy --
0139

1          MS. TABACCHI: Object to the form.
2     Q.  (BY MR. BREEN) -- is that correct?
3          MS. TABACCHI: Object to the form.
4     A.  We never -- the form requires that the
5  provider -- the provider who provided the products and
6  services that had the Medicare number be the entity
7  they bill.
8     Q.  (BY MR. BREEN) So Abbott would sell the
9  product -- let's take Vancomycin, for example.  Was
10  Vancomycin one of the drugs that was administered by
11  these four pharmacies?
12          MS. TABACCHI: Object to the form.
13    A.  Well, if it was used in a compounded product,
14  yes.
15    Q.  (BY MR. BREEN) Do you have a -- do you
16  recall that Vancomycin was a drug that was
17  administered by these IV pharmacies -- strike that.
18  Not administered, but dispensed by these IV
19  pharmacies, compounded by these IV pharmacies,
20  administered to Medicare beneficiaries and
21  reimbursement was sought from the Medicare program?
22          MS. TABACCHI: Object to the form.
23    A.  During what time period?
24    Q.  (BY MR. BREEN) During the time period that
25  you were the manager of reimbursement.
0140
1     A.  Vancomycin was reimbursed by Medicare for a
2  time period and then Medicare stopped coverage of
3  Vancomycin.
4     Q.  When did they stop coverage of Vancomycin?
5     A.  I don't -- I don't remember, but I think it
6  was in the early '90s.
7     Q.  In the early '90s?
8     A.  I don't recall.  Sometime, I think, in the
9  '90s.
10    Q.  So is it your testimony that these four
11  pharmacies never billed the Medicare program for
12  Vancomycin?
13          MS. TABACCHI: Object to the form.
14    A.  No, I'm not -- I'm not -- no, I'm not saying
15  that at all.
16    Q.  (BY MR. BREEN) All right.  Is it your
17  testimony that these four pharmacies did at some time
18  bill the Medicare program for Vancomycin?
19          MS. TABACCHI: Object to the form.
20    A.  I don't have details that we did, but I would
21  assume so, yes.
22    Q.  (BY MR. BREEN) Okay.  Did these four
23  pharmacies bill the Medicare program for IV solutions?
24          MS. TABACCHI: Object to the form.
25    A.  If it was a covered service.
0141
1     Q.  (BY MR. BREEN) Did these four pharmacies
2  bill the Medicare program for IV solutions when they

3  were administered in connection with a covered
4  service?
5        MS. TABACCHI:  Object to the form.
6    A.  When -- repeat that question again.  I'm
7  sorry.
8        MR. BREEN:  Would you please read the
9  question back?
10       (Requested portion was read)
11       MS. TABACCHI:  Same objection.
12   A.  Well, if -- if it was -- if it was done on
13  behalf of Abbott Home Infusion Services, Abbott
14  Homecare, we would have -- the billing would have been
15  in Abbott with Abbott's provider number.
16   Q.  (BY MR. BREEN)  My question is:  Do you
17  recall that the Medicare program was billed by these
18  four pharmacies for IV solutions when they were
19  administered in connection with a covered service?
20       MS. TABACCHI:  Object to the form.
21   A.  Yes.
22   Q.  (BY MR. BREEN)  All right.  Now, I'm still
23  confused about who the provider was for these four
24  pharmacies that Abbott owned.
25   A.  Uh-huh.
0142
1    Q.  Was Abbott ever noted on a HCFA 1500 form as
2  a provider in a form that was submitted to the
3  Medicare program for reimbursement?
4    A.  Yes.
5    Q.  Okay.  When?  Under what circumstances?
6    A.  When we were Abbott Homecare.
7    Q.  And when did you stop being Abbott Homecare?
8    A.  When we transitioned to Abbott Home Infusion
9  Services.
10   Q.  And when was that?
11   A.  It was -- I don't remember the exact date.  I
12  think it was late '80s.
13   Q.  The late '80s.
14   A.  I think, really.  I don't remember.
15   Q.  Okay.  Was it about the time that the
16  Medicare/Medicaid anti-kickback statute was enacted?
17       MS. TABACCHI:  Object to the form.
18   A.  I have no idea when the anti-kickback statute
19  was enacted.
20   Q.  (BY MR. BREEN)  Have you ever been conscious
21  that there is a statute known as the federal
22  anti-kickback statute that governs providers under the
23  Medicare/Medicaid programs?
24   A.  Yes, I'm familiar.  I'm not aware of the
25  details, but I'm familiar that there is a statute.
0143
1    Q.  You just know it exists, but you have no idea
2  what it says or what the requirements are?
3        MS. TABACCHI:  Object to the form.
4    A.  I don't know the details.

5    Q.  (BY MR. BREEN)  Well, when you say you don't
6  know the details, you mean you don't know how it
7  applies or if it applies to Abbott Laboratories?
8            MS. TABACCHI:  Object to the form.
9    A.  I -- I assume if there's provisions in there
10  that apply for fraud and abuse, that they apply to --
11  if we were a provider of service, they applied.
12    Q.  (BY MR. BREEN)  But you've never done
13  anything to educate yourself as to how it applies to
14  any of the areas of Abbott Laboratories that you've
15  worked in, have you?
16            MS. TABACCHI:  Object to the form.
17    A.  I don't look at the specific provisions, no.
18    Q.  (BY MR. BREEN)  You've never even looked at
19  the general provisions, have you?
20            MS. TABACCHI:  Object to the form.
21    A.  Well, I'm -- I'm aware of some of the general
22  principles, I think, or general, yes.
23    Q.  (BY MR. BREEN)  What are the general
24  principles that you're aware of?
25    A.  That -- that there's penalties associated
0144
1  with -- with fraud and there's certain situations that
2  are considered abusive, certain situations that maybe
3  if you submit a false claim or things like that, that
4  those things are not -- that there's penalties
5  associated with it.  And -- basically.
6    Q.  That's it, right?
7    A.  Well, yeah, basically I think that's what I'm
8  aware of.
9    Q.  Okay.  And so based upon all of your
10  experience as the manager of reimbursement for Home
11  Infusion Services and based upon your experience as
12  the director of reimbursement or director of corporate
13  reimbursement for Abbott, that is your comprehension
14  of the anti-kickback statute; is that correct?
15            MS. TABACCHI:  Object to the form.
16    A.  Yes.
17    Q.  (BY MR. BREEN)  Okay.  And -- now, when you
18  were put in this position in late 2001 as director,
19  corporate reimbursement for Abbott, were you conscious
20  that Abbott, a partially owned company -- that was
21  partially owned by Abbott known as TAP had been
22  involved in a major fraud abuse case?
23            MS. TABACCHI:  Object to the form.
24    A.  Yes.
25    Q.  (BY MR. BREEN)  It was both criminal and
0145
1  civil?
2    A.  I'm aware we were involved in a case.
3    Q.  You just knew it was a case.  You had no idea
4  what it was about, right?
5    A.  I only knew what I read in the newspapers.
6    Q.  Only knew what you read in the newspapers.

7    And this department, this Office of Ethics and
8    Compliance that you were assigned to, did you know
9    whether or not that office was established as a result
10   of a criminal plea agreement or a corporate integrity
11   agreement that had been entered between TAP and Abbott
12   and the United States?
13          MS. TABACCHI:  Object to the form.
14     A.  No.
15     Q.  (BY MR. BREEN)  Did you ever become aware
16   that Abbott was involved in a fraud and abuse case
17   involving its Ross division?
18     A.  Yes.
19     Q.  And what -- and what was your understanding
20   of that case --
21          MS. TABACCHI:  I'm going to caution --
22     Q.  (BY MR. BREEN) -- or that matter?
23          MS. TABACCHI:  -- caution the witness
24   not to reveal any communications that you have had
25   with counsel on this issue.  If you can answer without
0146
1    disclosing communications with counsel you may; if
2    not, I will instruct the witness not to answer.
3      A.  I think I would have to not be able to
4    disclose.
5      Q.  (BY MR. BREEN)  Prior to being -- prior to --
6    so what you're saying is you don't have any knowledge
7    whatsoever about the Ross matter other than what you
8    heard from the lawyers, correct?
9      A.  I have some knowledge of what I saw in the
10   newspapers, that we did pay a fine.
11     Q.  So other than what you saw in the newspapers
12   or heard from the lawyers, you didn't hear one word
13   about this any time you worked for Abbott around
14   Abbott Laboratories, correct?
15          MS. TABACCHI:  Object to the form.
16     A.  Well, of course, I was involved with -- no,
17   I -- we had some -- we had discussions because I was
18   down at Ross.
19     Q.  (BY MR. BREEN)  You were down at Ross.  What
20   were -- what were you doing at Ross?
21     A.  Well -- well, I was at a Ross sales meeting
22   where there was, you know, where their sales reps were
23   informed about the -- the fines and --
24     Q.  Why were you there?
25          MS. TABACCHI:  I'm just going to caution
0147
1    the witness again not to disclose any attorney-client
2    communications.  If we need to discuss whether this
3    involves a privilege issue --
4          THE WITNESS:  Yeah.
5          MS. TABACCHI:  -- let me know.
6          THE WITNESS:  I would like to discuss --
7          MR. BREEN:  I think we do -- you know
8    what, I think we do because --

9          THE WITNESS: I think --
10          MR. BREEN: Hold on. Let me -- let me
11 just state this on the record. I think we need to
12 take a break. I think you need to talk to the witness
13 and I think you need to evaluate the waivers of the
14 attorney-client privilege that Abbott made in
15 connection with the Ross matter and that both Abbott
16 and TAP made in connection with the TAP settlement
17 because I'm going to go into this area and I do plan
18 on finding out everything I possibly can from this
19 witness based upon her knowledge of what was
20 communicated to her about the reasons for those
21 payments and what, if anything, was done in connection
22 with educating her as a reimbursement manager in
23 connection with that. So I think the privilege has
24 been waived, but I would ask that you talk to the
25 witness and then, you know, we will just -- you can
0148
1 instruct her as appropriate and I will ask my
2 questions as appropriate.
3          MS. TABACCHI: All right. Very good.
4          THE VIDEOGRAPHER: Going off the record
5 at 1:55 p.m.
6          (Recess from 1:55 to 2:20)
7          THE VIDEOGRAPHER: Going back on the
8 record at 2:20 p.m. Please proceed.
9    Q.  (BY MR. BREEN) Okay. We were -- when we
10 broke we were talking about a visit you made down --
11 over at Ross when there was a meeting or some other
12 event at which you were provided with certain
13 information regarding the Ross matter, I understand,
14 and counsel objected and there was a caucus, correct?
15 So my question -- let me just kind of tee this up.
16          MS. TABACCHI: Sure.
17    Q.  (BY MR. BREEN) Why is it that you attended
18 this meeting at Ross that you were describing before
19 the break?
20          MS. TABACCHI: Object to the form of the
21 question.
22    A.  I attended some meetings at Ross with legal
23 counsel.
24    Q.  (BY MR. BREEN) Okay. That wasn't my
25 question. Why? What was your role?
0149
1          MS. TABACCHI: I'm going to caution the
2 witness not to reveal any communications with counsel
3 with respect to the Ross settlement.
4    Q.  (BY MR. BREEN) All right. Well, let's --
5 let me -- let me change the question. Let's see if I
6 can back this up a little bit.
7          Approximately when was this meeting that
8 you're talking about?
9    A.  God. I don't know. Maybe 2002, perhaps.
10    Q.  Okay. So at that point you were the director

11  of corporate reimbursement, correct?
12      A.  Yes.
13      Q.  Okay.  In the ethics and compliance office,
14  correct?
15      A.  Yes.
16      Q.  All right.  And were you aware at that time
17  that Abbott had entered a settlement agreement with
18  the United States Department of Justice and a
19  corporate integrity agreement with the Office of
20  Inspector General of the United States Department of
21  Health and Human Services?
22          MS. TABACCHI:  Object to the form.
23      A.  For the Ross?
24      Q.  (BY MR. BREEN)  Correct.
25      A.  Yes.
0150
 1      Q.  All right.  When did you become aware of
 2  that?
 3      A.  After we signed -- after we signed the
 4  agreement.
 5      Q.  And do you recall approximately what year
 6  that was, that the agreement was signed?
 7      A.  2002, maybe.
 8          MR. BREEN:  Let's mark this as the next
 9  exhibit.
10          MS. MOORE:  It's 552.
11          MR. BREEN:  Go ahead and show it to the
12  witness.  I've got -- I don't think I've got another
13  copy.  We'll have one for you in a second, Tina.
14          MS. TABACCHI:  Thank you.  This is 552?
15          MS. MOORE:  Correct.
16      Q.  (BY MR. BREEN)  And just to assist the
17  witness, on the bottom in the middle of the page of
18  each -- of this document we'll see page numbers.  And
19  if we go to Page 31, we'll see some signatures and
20  some dates.
21      A.  Uh-huh.  31.
22      Q.  And after you've had a chance to -- to look
23  at Exhibit 552, which purports to be a document
24  entitled Exhibit D as in delta, Corporate Integrity
25  Agreement Between the Office of Inspector General of
0151
 1  the Department of Health and Human Services and Abbott
 2  Laboratories.  It's a multipage document with one --
 3  at least one attachment, Attachment A.  It appears to
 4  be a 32-page document with a separate seven-page
 5  attachment.  I'll ask if you've ever seen this before?
 6      A.  (Witness reviewing document).
 7      Q.  Ever seen this document before?
 8      A.  I've seen parts of it, yes.
 9      Q.  Okay.  And what parts have you seen?
10      A.  Page 8.
11      Q.  Page 8?
12      A.  Uh-huh.

13    Q.  All right.  And what about Page 8, which
14 begins with a subparagraph -- mine begins with
15 subparagraph h at the top, is that --
16    A.  Yeah.
17    Q.  And then what about Page 8 do you recall
18 seeing?
19    A.  I.
20    Q.  I and what is i?
21    A.  Do you want me to read it?
22    Q.  Yes, please.
23    A.  "The requirement that individual Abbott
24 enteral nutritional sales representatives shall not
25 provide reimbursement recommendations related to
0152
1 medical necessity determinations and that if
2 reimbursement information relating to the enteral
3 nutrition business is to be provided by Abbott, it
4 shall be provided from and/or controlled by a
5 centralized location or department, such as a
6 toll-free call center for customers and/or an Abbott
7 website."
8    Q.  Okay.  Is that the only item in this document
9 that you have any present recollection of?
10            MS. TABACCHI:  Object to the form.
11    A.  I -- I may be aware of some others.
12    Q.  (BY MR. BREEN)  How about -- look at Page 9.
13 Requirements for training and education.  Have you
14 ever --
15    A.  Yes.
16    Q.  -- seen that before or been -- or been aware
17 of the requirement?
18            MS. TABACCHI:  I'm going to object to
19 the form.  I caution the witness not to reveal any
20 communications with counsel --
21            THE WITNESS:  Uh-huh.  Yeah, I --
22            MS. TABACCHI:  -- to your understanding.
23 Apart from communications with counsel you may answer
24 the question.
25            MR. BREEN:  Well, you're not saying that
0153
1 the witness can't tell when she's ever seen this
2 before?  Let me break it down.
3    Q.  (BY MR. BREEN)  Have you ever seen the
4 training and education requirement that appears at
5 Page 9 before?  Seen, not heard of, but seen.
6    A.  Have not seen.
7    Q.  Okay.  Have you ever heard of it before?
8    A.  I think I'm going --
9            MS. TABACCHI:  Let me caution the
10 witness not to reveal any communications with counsel.
11    A.  -- that I can't reveal any --
12    Q.  (BY MR. BREEN)  All right.
13    A.  -- communications with counsel.
14    Q.  So is it your testimony, then, that the only

15  thing you've heard in connection with training and
16  education as it relates to Exhibit 552 is what you've
17  heard from counsel; is that correct?
18    A.  Yes.
19    Q.  All right.  So you've never attended any
20  actual training or education events, have you, that
21  relate to this agreement?
22        MS. TABACCHI:  Object to the form of the
23  question.  The witness may testify -- may answer the
24  question "yes" or "no," but not reveal the details of
25  any training or education program she may have
0154
1  attended, if she did.
2        MS. ST. PETER-GRIFFITH:  Wait a second.
3  You're saying in general that she cannot identify any
4  training, any training initiatives that she attended?
5        MR. BREEN:  Let's break it down.
6        MS. TABACCHI:  We can break it down.
7  It's my understanding that there are privilege issues
8  involved in this.
9        MR. BREEN:  Okay.  Well --
10        MS. TABACCHI:  So I reserve the
11  privilege.
12        MR. BREEN:  There may be privilege
13  issues, so let me do it -- see if I can do a better
14  job of articulating the questions.  Okay?
15        MS. TABACCHI:  Sure.
16        MR. BREEN:  So that you can -- you can
17  give your instructions or insert your objections.
18    Q.  (BY MR. BREEN)  Ms. Tobiason, when you are
19  ready, let me know, and I will direct my next question
20  to you.
21    A.  You can direct -- yes, I'm ready.
22    Q.  Have you ever attended, either as a trainee
23  or as an observer or as a teacher or instructor or
24  presenter, any training and education events since
25  you've been employed by Abbott Laboratories?
0155
1        MS. TABACCHI:  Object to the form.
2    A.  Any training?
3    Q.  (BY MR. BREEN)  Training or education events.
4    A.  On anything?
5    Q.  Right.  And it has -- my question has nothing
6  to do with the document you're looking at right now,
7  by the way.
8    A.  Yes.
9    Q.  Okay.  Have any of those training and
10  education events ever been conducted by Abbott
11  counsel, either in-house counsel or outside counsel?
12    A.  In-house counsel.
13    Q.  Okay.  Have you ever attended any training
14  and education events while being employed by Abbott
15  that were not conducted by Abbott's in-house counsel?
16    A.  Yes.

17   Q.   Okay.  Do you have a present recollection as
18   to whether or not the majority of the training and
19   education events you've attended have been conducted
20   by Abbott in-house counsel?
21              MS. TABACCHI:  Object to the form.
22   A.   The majority have not been.
23   Q.   (BY MR. BREEN)  The majority have not been.
24   A.   Huh-uh.
25   Q.   Okay.  Can you -- do you recall how many
0156
1   you've attended that have been conducted by Abbott
2   in-house counsel?
3   A.   I don't recall.
4   Q.   Can you -- do you have a present recollection
5   of any one or more training and education events
6   conducted by Abbott in-house counsel?
7   A.   Say that again.
8   Q.   Do you have a present recollection of any
9   specific training and education event that was
10  conducted by Abbott in-house counsel, any one specific
11  or more than one, do you have a present recollection
12  of any such event?
13  A.   Not specifics, no.
14  Q.   Now, when I say "a present recollection," I
15  mean, you remember being there and you remember it was
16  conducted by in-house counsel --
17  A.   Yes.
18  Q.   -- that's my question.
19  A.   Yes.
20  Q.   I'm not asking you every word that was said
21  there.
22  A.   Okay.  Yes, I remember attending.
23  Q.   All right.  How many times do you recall a
24  training and education event -- let me know when you
25  are done with that document, ma'am, and I'll finish my
0157
1   question.
2              How many -- how many training and
3   education events do you recall being conducted by
4   Abbott in-house counsel?
5   A.   Two.
6   Q.   Two.  In the entire time that you've been
7   employed by Abbott, correct?
8   A.   That I recall, yes.
9   Q.   All right.  When were they?
10  A.   2003, maybe.  2005.
11  Q.   All right.
12  A.   Maybe.
13  Q.   Maybe.
14  A.   You want an answer, but I'm not sure those
15  are the exact dates.
16  Q.   Could it have been sometime in the 1990s?
17  A.   No.
18  Q.   You're sure it was sometime in the 2000s?

19   A.  As best as I can recall.
20   Q.  All right.  Well, I'm going to see if I can't
21 help you recall perhaps a little bit better.  And you
22 keep looking at Exhibit 552.  If you would like to
23 take some time to read Exhibit 552, you may, otherwise
24 I ask you to put it back on the table so I can direct
25 my questions to you, which right now don't involve
0158
1 Exhibit 552.
2           Now, of the two training and education
3 events that you recall attending that were conducted
4 by Abbott in-house counsel, one of which you recall
5 may have been in 2003 and one may have been in 2005,
6 but you're not sure, can you recall where those events
7 were conducted?
8   A.  Yes.
9   Q.  Where were they conducted?
10   A.  One was at Ross, sales meeting, and one was
11 in Puerto Rico.
12   Q.  And the one in Puerto Rico, was that the
13 later event or the earlier event?
14   A.  Later event.
15   Q.  The later event.  So that would have been the
16 one that perhaps occurred in 2005, if your
17 recollection is correct.
18   A.  Yes.
19   Q.  All right.  Now, the one that occurred in
20 Puerto Rico, was that at some kind of a national sales
21 meeting or some other type of event such as that?
22           MS. TABACCHI:  Object to the form.
23   A.  It was not a national sales meeting.
24   Q.  (BY MR. BREEN) What kind of event was it?
25           MS. TABACCHI:  Object to the form.
0159
1   A.  It was --
2           MS. TABACCHI:  I'm going to caution the
3 witness not to reveal any attorney-client
4 communication.  If the witness needs to consult with
5 counsel about privilege, I ask that you do so.
6   A.  I will, yes.
7   Q.  (BY MR. BREEN) All right.  How did you get
8 to Puerto Rico?
9   A.  On an airplane.
10   Q.  What was the airplane?
11   A.  United Airlines.
12   Q.  Did this event occur inside a building?
13   A.  Yes.
14   Q.  Was it a hotel?
15   A.  No.
16   Q.  Was it an office?
17   A.  Yes.
18   Q.  Whose office was it?
19   A.  Our Abbott facility in Puerto Rico.
20   Q.  Your Abbott facility.  And what kind of

21  Abbott facility do you have in Puerto Rico?
22      A.  We have an office and a manufacturing plant.
23      Q.  All right.  And was this at the manufacturing
24  plant or was it at the office?
25      A.  The office.
0161
1       Q.  And who attended this meeting or this event?
2       A.  Abbott legal counsel was there.
3       Q.  In-house counsel?
4       A.  Yes.
5       Q.  All right.  So was this in a conference room?
6       A.  Yes.
7       Q.  And you were in the conference room, correct?
8       A.  Yes.
9       Q.  And Abbott legal counsel was in the
10  conference room?
11      A.  Yes.
12      Q.  How many representatives of Abbott legal
13  counsel were in the conference room?
14      A.  At least two.
15      Q.  And who were they?
16          MS. TABACCHI:  You can answer who was
17  there.
18      A.  Cliff Berman and Steve Gersten.
19      Q.  Cliff Berman and Steve Gersten.
20          MS. TABACCHI:  Jim, I understand that
21  you're laying a foundation, but I would appreciate a
22  moment to talk to the witness because I don't know
23  what the privilege issue is that surrounds this
24  meeting.
25          MR. BREEN:  Why don't you do that and
0161
1   then I'm going to ask this -- and I apologize for the
2   simplistic questions --
3           MS. TABACCHI:  Or you can skip this and
4   we can talk about something else and come back.
5           MR. BREEN:  Well, let's just get it all
6   done at once and I'll be happy to leave the room so
7   she doesn't have to keep getting up and leaving.  But
8   I want to -- I'm going to do the same foundation on
9   the Ross meeting, just so we can figure out what the
10  heck is going on here and then I can ask questions
11  correctly.
12          MS. TABACCHI:  That's fine.
13          MR. BREEN:  Since this is news -- I
14  mean, since you're not sure about this one, go ahead
15  and take --
16          MS. TABACCHI:  Okay.
17          MR. BREEN:  -- take your time.
18          THE VIDEOGRAPHER:  Going off the record
19  at 2:37 p.m.
20          (Recess from 2:37 to 2:43)
21          THE VIDEOGRAPHER:  Going back on the
22  record at 2:43 p.m.  Please proceed.

23   Q.  (BY MR. BREEN)  All right.  Other than
24   yourself and the two representatives of Abbott legal
25   counsel --
0162
1    A.  There was a third representative.
2    Q.  Who was that?
3    A.  Sujata Dayol.
4    Q.  Sujata?
5    A.  S-u-j-a-t-a, Dayol, D-a-y-o-l.
6    Q.  All right.  And that is another
7    representative of Abbott legal counsel?
8    A.  Yes.
9    Q.  Okay.  So it was just the four of you in the
10   room?
11   A.  No.  There were others.
12   Q.  Who else was in the room?
13   A.  Representatives of our Puerto Rico facility.
14   Q.  And your position at Abbott at the time of
15   this meeting was what?
16   A.  Director, corporate reimbursement.
17   Q.  Okay.  So this meeting involved your --
18   your -- strike that.
19         Your participation in this meeting was
20   as a result of your position as director of corporate
21   reimbursement?
22         MS. TABACCHI:  Object to the form.
23   A.  Yes.
24   Q.  (BY MR. BREEN)  Okay.  And the --
25   approximately how many other people were at the
0163
1    meeting besides yourself and Abbott -- the three
2    members of Abbott corporate legal counsel?
3    A.  Maybe 40 people.
4    Q.  40 people.  And what were their roles --
5         MS. TABACCHI:  Object to the --
6    Q.  (BY MR. BREEN)  -- in Abbott?
7         MS. TABACCHI:  -- form.
8    Q.  (BY MR. BREEN)  At Abbott.  What did they do
9    for Abbott?
10   A.  There was a variety of -- of representations.
11   They were from sales, marketing, general manager,
12   operations, manufacturing.
13   Q.  Other than yourself and the corporate legal
14   folks, were they all based in Puerto Rico, all these
15   other people?
16   A.  Yes.
17   Q.  Okay.  And what was the highest -- who was
18   the highest ranking person there that was based in
19   Puerto Rico?
20         MS. TABACCHI:  Object to the form.
21   A.  Well, I'm not -- I don't remember the details
22   of how the Puerto Rican operation is structured.
23   Q.  (BY MR. BREEN)  Did this meeting involve
24   training or compliance in the area of corporate

25  compliance?
0164
1           MS. TABACCHI:  I would caution the
2  witness not to reveal any attorney-client
3  communications.  The witness may answer whether the
4  meeting involved training in a "yes" or "no" answer.
5      A.  It involved training.
6      Q.  (BY MR. BREEN)  Training.  Okay.  Did it
7  involve training on any legal topic?
8           MS. TABACCHI:  Instruct the witness not
9  to answer the question.
10     A.  It involved training.
11          MR. BREEN:  All right.  And what is the
12  basis for your instructing the witness not to answer
13  the question?
14          MS. TABACCHI:  Attorney-client
15  privilege.
16          MR. BREEN:  I don't think that -- the
17  answer to whether it involved a legal topic I think
18  goes to whether there exists an attorney-client
19  privilege.
20          MR. HAVILAND:  Agreed.
21          MR. BREEN:  The fact that the lawyers
22  were there doesn't make it privileged.
23          MS. ST. PETER-GRIFFITH:  Exactly.
24          MR. BREEN:  So if you can't make a
25  record that it involved a legal topic at least, then
0165
1  there's no basis for an attorney-client privilege.
2           MS. TABACCHI:  I don't know what you
3  mean by a legal topic.  I don't know how the witness
4  is to answer that.  This is training that was
5  conducted by counsel and the subject matter of the
6  training is privileged.
7           MS. ST. PETER-GRIFFITH:  Well, if the
8  subject matter of the training even remotely touched
9  upon any of the issues or subjects at issue, which
10  were pretty broad in the CIAs, we've got a huge
11  problem because the United States will be inquiring
12  about that and we have every right to inquiry about
13  compliance with and conduct in conformity with CIAs
14  and settlement agreements with the United States.
15          Are you making the representation that
16  the -- that the subject matter at issue at this
17  meeting had nothing to do with any compliance-related
18  issues that are the subject of the CIAs that the -- or
19  the settlement agreements that Abbott has entered into
20  with the United States?
21          MS. TABACCHI:  Today for purposes of
22  this deposition I will instruct the witness not to
23  answer the question on the grounds of attorney-client
24  privilege.  If the United States in connection with
25  its powers and enforcement of the corporate integrity
0166

1    agreement wish to inquire outside of the course of
2    this deposition about matters that they think are
3    involved in the corporate integrity agreement, that's
4    a different matter.  But this is a Puerto Rican
5    training session conducted by legal counsel.  It has
6    nothing to do with the issues related in the Texas
7    litigation which involves the State of Texas.
8              MS. ST. PETER-GRIFFITH:  We are here
9    also as a cross-noticed deposition of the United
10   States.
11             MS. TABACCHI:  This is a training
12   program --
13             MS. ST. PETER-GRIFFITH:  He represents
14   Ven-A-Care.
15             MS. TABACCHI:  -- that was conducted in
16   2005, according to the witness's best recollection of
17   the date.
18             MR. BREEN:  Well, right now we don't
19   even know if this was a corporate compliance type
20   training or not.  So let me -- let me -- can I see if
21   I can lay --
22             MS. ST. PETER-GRIFFITH:  Sure.
23             MR. BREEN:  -- a foundation on this?
24      Q.  (BY MR. BREEN) Let me go a little bit
25   broader again.  Have you ever participated, either as
0167
1    a student, an instructor, an observer, presenter, any
2    way whatsoever, in your entire time that you worked
3    for Abbott in any kind of training or education event
4    that resulted from Abbott's entry into a corporate
5    integrity agreement with the United States Department
6    of Health and Human Services Office of Inspector
7    General?  And the reporter can read that question back
8    if you need her to because it was a long one, but I
9    asked it the way I did for a specific reason.
10             MS. TABACCHI:  Object to the form of the
11   question.
12             MR. BREEN:  Could the reporter read the
13   question back?
14      A.  I --
15             MS. TABACCHI:  She's going to read the
16   question back for you.
17             THE WITNESS:  Okay.  Read the question
18   back.
19             (Requested portion was read)
20      A.  I -- I wouldn't know.
21      Q.  (BY MR. BREEN)  Okay.
22      A.  I'm not familiar with the corporate integrity
23   agreement.
24      Q.  All right.  So then is it -- has anybody at
25   Abbott ever made you aware or conscious that you were
0168
1    receiving any kind of training or education as a
2    result of Abbott's entry into a corporate integrity

3  agreement with the United States Department of Health
4  and Human Services Office of Inspector General?
5    A.  No.
6            MS. TABACCHI:  Object to the form of the
7  question.
8            MR. BREEN:  Please read the question
9  back.
10           (Requested portion was read)
11   A.  Not to my knowledge, no.
12   Q.  (BY MR. BREEN) Okay.  As the Abbott director
13  of corporate reimbursement have you ever been aware of
14  any training or education that Abbott ever made
15  available to any of its employees as a result of its
16  entry into a corporate integrity agreement with the
17  Department of Health and Human Services Office of the
18  Inspector General of the United States of America?
19   A.  Yes, I was aware that there were training
20  requirements for Ross employees under the corporate
21  integrity agreement.
22   Q.  The one that you looked at a moment ago,
23  correct?
24   A.  Yes.
25   Q.  All right.  Did you ever attend any of those
0169
1  training sessions?
2    A.  Not to my knowledge, no.
3    Q.  Did you ever participate in preparing them?
4    A.  No.
5    Q.  Did you ever have any role whatsoever in
6  connection with those training or education events?
7            MS. TABACCHI:  Object to the form.
8    A.  I don't -- see, I don't know if any training
9  was connected to the corporate -- corporate integrity
10  agreement.  I just don't know.
11   Q.  (BY MR. BREEN) All right.  This meeting that
12  you were testifying about in Puerto Rico, did it
13  involve, to your knowledge, training or education of
14  Abbott employees as a result of a corporate integrity
15  agreement with the HHS Department OIG?
16   A.  No.
17   Q.  What was the general subject matter of the
18  meeting?
19   A.  It was training.
20   Q.  Okay.  And what was the general subject
21  matter of the training?
22           MS. TABACCHI:  I'm going to caution the
23  witness not to reveal any attorney-client
24  communications.  She can answer if you'll agree that
25  it doesn't constitute a waiver.
0170
1            MR. BREEN:  I absolutely agree with
2  that.  That her answering that question does not
3  constitute a general waiver.
4            MS. TABACCHI:  You may answer of the

5   general subject matter very briefly.
6      A.   Just discussion with Abbott's policies.
7      Q.   (BY MR. BREEN)  Policies about -- I mean,
8   just generally what topic area?  When you say
9   "policies," that's very broad.
10     A.   Well, and also an overview of -- there was --
11  there was -- I believe we had an overview of general
12  Medicare and payer information.
13     Q.   Okay.  That was with legal counsel present?
14     A.   Exactly.
15     Q.   All right.  So let's put that aside for a
16  second and let's go back to the other event that you
17  testified about, you said there were only two, where
18  legal counsel was present at a training and education
19  event.  Do you remember that?
20     A.   Yes.
21     Q.   You said one you believe occurred in 2003.
22     A.   Yes.
23     Q.   All right.  And that took place where?
24     A.   I think it took place in Columbus.
25     Q.   Columbus, Ohio?
0171
1      A.   Yes.
2      Q.   Okay.  What is in Columbus, Ohio?
3      A.   Our Ross facility.
4      Q.   Your Ross facility.  And you attended that?
5      A.   Yes.
6      Q.   Why did you attend a training event at your
7   Ross facility in Columbus, Ohio?
8      A.   There was a presentation.
9      Q.   Okay.  But why did you -- why were you at
10  this presentation?
11     A.   Because I presented.
12     Q.   You presented.  Okay.  And were you the only
13  presenter?
14     A.   No.
15     Q.   How many presenters were there?
16     A.   I have no idea.
17     Q.   How many -- well, did you see any other
18  presenters while you were there?
19     A.   I attended my presentation.
20     Q.   And you were the one giving the presentation,
21  right?
22     A.   With others.
23     Q.   Other people were helping you give this
24  presentation?
25     A.   Yes.
0172
1      Q.   All right.  How long did the presentation
2   that you participated in last?
3      A.   I don't remember.
4      Q.   How many days were you in Columbus for this
5   meeting?
6      A.   A day.

7   Q.  Did you -- did you stay overnight?
8   A.  I think so, yes.
9   Q.  Okay.  How many nights did you stay?
10   A.  I don't remember.
11   Q.  All right.  And who did you -- other than
12  yourself, did anybody from Abbott headquarters go to
13  Columbus?
14   A.  Yes.
15   Q.  Who?
16   A.  There were definitely -- there were
17  representatives from Abbott legal.
18   Q.  Who?
19   A.  I don't remember.  Maybe Catherine Sazdanoff.
20  Charlie Brock was there.
21   Q.  Charlie Brock's position was what?
22   A.  He was the chief ethics and compliance
23  officer.
24   Q.  For Ross?
25   A.  No.
0173
1   Q.  Who was the chief compliance officer for
2  Ross?
3         MS. TABACCHI:  Object to the form.
4   Q.  (BY MR. BREEN)  If anybody.
5   A.  I can't remember his name.
6   Q.  Somebody else?
7   A.  I think so, yeah.  I don't know if it was at
8  this time, but I think so, yes.
9   Q.  Did you attend any presentations given by
10  Mr. Brock?
11   A.  No.
12   Q.  So you participated in the presentation that
13  you were involved in and you didn't observe anything
14  else about this meeting?
15   A.  I may have.  I don't recall.
16   Q.  You don't recall.
17   A.  I just don't remember.
18   Q.  Who -- who was your co-presenters?
19   A.  Julie Tomlinson.  Julie Shonk.
20   Q.  I'm sorry, Julie?
21   A.  Shonk.
22   Q.  S-h-a-n-k?
23   A.  O-n-k.
24   Q.  S-h-o-n-k.  And you said Tomlinson.  Was that
25  her maiden name?
0174
1   A.  That's her married name now.
2   Q.  Okay.  And what is Ms. Tomlinson's position
3  at Abbott, or what was it at that time, rather?
4   A.  She was in the Ross ethics and compliance
5  area.
6   Q.  Was she in charge of reimbursement?
7   A.  Yes.
8   Q.  So she was your counterpart at Ross?

9    A.  Yes.
10    Q.  So why did -- why did you participate in this
11  presentation?
12    A.  We work together.
13    Q.  Are you -- at this time were you -- was one
14  of your roles to provide assistance and information to
15  the Abbott's divisions' compliance people involving
16  reimbursement matters?
17        MS. TABACCHI:  Object to the form.
18        MR. BREEN:  Let me restate the question.
19  That was a terrible question.  I object to my own
20  question, how's that?
21        MS. TABACCHI:  Jim has never agreed with
22  me before.  That's a moment to savor.
23        MR. HAVILAND:  Mark the day.
24        MR. BREEN:  Object to that question.
25    Q.  (BY MR. BREEN)  All right.  You were the
0175
1  director of corporate reimbursement, correct?
2    A.  Yes.
3    Q.  All right.  And Ms. Tomlinson was involved
4  with reimbursement in the ethics and compliance office
5  at Ross, correct?
6    A.  Yes.
7    Q.  And Ross is a division of Abbott, correct?
8    A.  Yes.
9    Q.  So you were -- at least your particular
10  office is -- is, in terms of an organizational
11  structure, above the Ross organization, correct?
12    A.  We were corporate, yes.
13    Q.  You were corporate.  All right.  Did you have
14  any supervisory responsibilities for
15  Ms. Shonk-Tomlinson?
16    A.  No.
17    Q.  Did you -- did you ever -- did you have any
18  responsibility to provide her with any kind of
19  assistance?
20        MS. TABACCHI:  Object to the form.
21    A.  No.
22    Q.  (BY MR. BREEN)  Any kind of information?
23        MS. TABACCHI:  Object to the form.
24    A.  No.
25    Q.  (BY MR. BREEN)  Did all of Abbott's divisions
0176
1  have their own reimbursement person like --
2    A.  No.
3        MS. TABACCHI:  Object to the form.
4  That's okay.
5    Q.  (BY MR. BREEN)  No?
6    A.  No.
7    Q.  Okay.  Which ones did as of the time of this
8  meeting?
9    A.  In -- in what area?
10    Q.  Corporate ethics and compliance.

11    A.   Maybe three.

12    Q.   Which were they?

13    A.   Hospital Products.  I don't remember.  Ross.

14  I don't remember.  There may have been another.

15    Q.   Okay.  Now, the person that was at HPD, was

16  that your successor?

17    A.   No.

18         MS. TABACCHI:  Object to the form.

19    Q.   (BY MR. BREEN)  It wasn't?

20    A.   No.

21    Q.   Was it a person that was in the same role

22  that you had been in?

23         MS. TABACCHI:  Object to the form.

24    A.   The role as what?

25    Q.   (BY MR. BREEN)  Well, let me ask you this

0177

1  question:  When you were the manager of reimbursement

2  for Home Infusion Services, did HPD have its own

3  manager or director of reimbursement?

4         MS. TABACCHI:  Object to the form.

5    A.   No.

6    Q.   (BY MR. BREEN)  So when did HPD get a

7  reimbursement manager or director?

8         MS. TABACCHI:  Object to the form.

9    A.   I don't know.

10    Q.   (BY MR. BREEN)  But you know that they had

11  one as of 2003?

12    A.   They had people working on -- in the ethics

13  and compliance area on reimbursement.

14    Q.   Who was that?

15    A.   I think the gentleman who was in charge of

16  their ethics and compliance.

17    Q.   Who was that?

18    A.   I don't remember his name.

19    Q.   You don't remember his name.  Okay.

20    A.   No.

21    Q.   All right.  So who were you providing

22  services for as a director of reimbursement at Abbott

23  corporate?

24         MS. TABACCHI:  Object to the form.

25    Q.   (BY MR. BREEN)  When I say "who," I mean what

0178

1  divisions?

2    A.   I was responsible to provide -- to assist all

3  the divisions.

4    Q.   Including Ross?

5    A.   Yes.

6    Q.   So if you would assist Ross with

7  reimbursement information or reimbursement issues, who

8  would you communicate with at Ross?

9    A.   Depends.

10    Q.   On what?

11    A.   On what information they need and what was

12  required.

13   Q.   Okay.  Why didn't they just go to
14  Ms. Shonk-Tomlinson?  Why did they need you for that?
15        MS. TABACCHI:  Object to the form.
16   Q.   (BY MR. BREEN)  Ross, that is.
17        MS. TABACCHI:  Same objection.
18   A.   Well, they had a -- as -- a help line.  So
19  Julie and I would review the scripts for the help
20  line.
21   Q.   Scripts for the help line?
22   A.   Yes.  Concerning reimbursement.
23   Q.   Okay.  So you would work with Julie, then --
24   A.   Yes.
25   Q.   -- in connection with Ross?
0179
1   A.   Yes.
2        MS. TABACCHI:  I'm going to ask
3  Ms. Tobiason to please allow Mr. Breen to finish his
4  question before you answer.
5   Q.   (BY MR. BREEN)  All right.  Now, getting back
6  to this -- this presentation that you and
7  Ms. Tomlinson gave at Ross in Columbus that you think
8  was sometime 2003, but you're not sure.  How many
9  folks attended that presentation?
10   A.   I think approximately 500.
11   Q.   500.  Okay.
12   A.   It was a full -- full room, auditorium.
13   Q.   And did you -- did you prepare any written
14  materials for this presentation?
15   A.   Yes.
16   Q.   And do you still have copies of those written
17  materials?
18   A.   No.
19   Q.   What did you do with them?
20   A.   I probably threw them out.
21   Q.   Were they distributed?
22   A.   I don't know.
23   Q.   Did you hand out copies to the 500 people
24  that were there?
25   A.   That would have been the sales organization's
0180
1  responsibility.  I don't know.
2   Q.   Did those materials involve Medicare or
3  Medicaid reimbursement?
4   A.   When you mean Medicare and Medicaid
5  reimbursement, what are -- what are you referring to?
6   Q.   For Ross products or anybody's pharmaceutical
7  products.
8   A.   You mean coverage and coding guidelines?
9   Q.   I mean Medicare and Medicaid reimbursement.
10  Let me ask you this question.  You've been a manager
11  for reimbursement now or director of reimbursement for
12  a long time, right?
13        MS. TABACCHI:  Object to the form.
14   Q.   (BY MR. BREEN)  I mean, for -- for the better

15  part of the career?
16    A.  Yeah.
17          MS. TABACCHI:  Object to the form.
18    Q.  (BY MR. BREEN)  What does Medicare and
19  Medicaid reimbursement mean to you?
20    A.  Well, Medicare and Medicaid reimbursement
21  means to me the overall regulations, the coverage, the
22  coding, the nuts and bolts, the payment levels.
23    Q.  How about the payment methodology, such as
24  was discussed in that -- in your working group papers?
25          MS. TABACCHI:  Object to the form.
0181
 1    A.  Well, yes, there's -- yes, reimbursement
 2  includes methodology.
 3    Q.  (BY MR. BREEN)  Okay.  So now my question
 4  again.  Your presentation at the Ross facility in
 5  2003, in or about 2003, maybe with Ms. Tomlinson, did
 6  it involve Medicare or Medicaid reimbursement?
 7          MS. TABACCHI:  Object to the form.
 8    A.  Well, we didn't do Medicare/Medicaid
 9  training, no.
10    Q.  (BY MR. BREEN)  Did it involve -- did your
11  presentation involve in any way, shape or form
12  Medicare or Medicaid reimbursement?
13          MS. TABACCHI:  Objection to the form,
14  asked and answered.
15    A.  No.
16    Q.  (BY MR. BREEN)  Did your presentation at any
17  time use the word "Medicare" or any time use the word
18  "Medicaid"?
19    A.  It may have.
20    Q.  Okay.  And did you retain copies of your
21  presentation in accord with the litigation hold memos
22  that your corporate counsel served on you and provided
23  you with?
24    A.  I -- if I received a hold on reimbursement
25  materials, I always abided by them.
0182
 1    Q.  But you don't have a present recollection of
 2  ever having received a hold memo on reimbursement
 3  materials, do you?
 4          MS. TABACCHI:  Object to the form.
 5    A.  Oh, yes, I remember receiving holds on
 6  reimbursement materials, yes.
 7    Q.  (BY MR. BREEN)  All right.  Did you hold your
 8  materials that you provided at this presentation in
 9  response to a litigation hold memo?
10    A.  No.
11    Q.  Okay.  Now, this presentation you gave, did
12  it involve training or education in connection with
13  compliance?
14          MS. TABACCHI:  Do you have a privilege
15  question?
16          THE WITNESS:  Yes.

17          MS. TABACCHI:  We won't leave.
18     Q.  (BY MR. BREEN)  There's 500 people there.  Of
19   those 500 people, how many did the corporate counsel
20   rely upon for information and advice in order to
21   render legal services?
22          MS. TABACCHI:  Hang on.  What is your
23   question?
24     Q.  (BY MR. BREEN)  Of the 500 people who were at
25   this conference that you're about to assert
0183
 1   attorney-client privilege on, how many of those folks
 2   did legal counsel rely upon for advice or information
 3   in order to render legal advice or services?  In other
 4   words, who was in the core group, not the 500?
 5          MS. TABACCHI:  Okay.  Before you asked
 6   that question we were going to have a consultation
 7   about privilege.  Can I --
 8          MR. BREEN:  All right.  Why don't we do
 9   that.  Let's do that.
10          MS. TABACCHI:  I won't -- we won't
11   leave.  Just remove your mic.
12          MR. BREEN:  I'll step out for a minute.
13          THE VIDEOGRAPHER:  Do you want to change
14   tapes?
15          MR. BREEN:  Sure.  That will be fine.
16          THE VIDEOGRAPHER:  This marks the end of
17   Tape 3 of the deposition of Virginia Tobiason.  Going
18   off the record at 3:09 p.m.
19          (Recess from 3:09 to 3:18)
20          THE VIDEOGRAPHER:  This marks the
21   beginning of Tape 4 in the deposition of Virginia
22   Tobiason.  Going on the record.  The time is now 3:18
23   p.m.
24          MR. BREEN:  All right.  Could you read
25   my last question back, please?
0184
 1          MS. TABACCHI:  Well, let me
 2   short-circuit this, Jim.  I think we can try to
 3   navigate through the privilege minefield here if you
 4   want to ask a subsequent question as opposed to your
 5   which of the 500 people question.  You can ask it if
 6   you want, but I don't think we're going to -- that's
 7   going to be particularly productive.
 8          MR. BREEN:  Well, I was only asking that
 9   question to figure out if it was a privilege, but
10   okay.  Let me -- let me ask another question there.  I
11   will try to ask a better one.
12     Q.  (BY MR. BREEN)  What was your presentation
13   about specifically?
14     A.  My presentation was about the information,
15   for example, where -- like for -- okay.  Give you an
16   example.  That if a sales rep was asked a question
17   about -- something about codes, or whatever, they
18   could refer them to the CMS website.  It was basically

19 about trying to help the sales reps meet some of the
20 requirements on reimbursement information.
21       For example, rather than answer
22 reimbursement questions, that they could refer the
23 customer to the central reimbursement department, the
24 help desk.
25    Q.  Okay.  And so then your presentation -- what
0185
1 kind of reimbursement?  Essential reimbursement for --
2 for Aetna?
3       MS. TABACCHI:  Object to the form.
4    A.  No.  It would have been mostly Medicare.
5    Q.  (BY MR. BREEN)  So your presentation was
6 about Medicare reimbursement then?
7    A.  It was about sales reps and how to -- I did
8 say that it had a Medicare -- like, for example, going
9 to the CMS website.
10    Q.  Was your whole presentation about
11 Medicare/Medicaid reimbursement?
12    A.  Not about Medicaid.
13    Q.  Was your whole presentation about Medicare
14 reimbursement?
15    A.  When you say "reimbursement," what are you
16 meaning?
17    Q.  Now, was your -- was your -- was your
18 presentation, did it involve anything other than
19 Medicare reimbursement?
20       MS. TABACCHI:  Object to the form.
21    A.  Well, it included private insurance, too.
22    Q.  (BY MR. BREEN)  Okay.  So is your -- does
23 your presentation tell them they could not talk about
24 private insurance reimbursement?
25       MS. TABACCHI:  Object to the form.
0186
1    A.  It -- it told them that if there -- they gave
2 out reimbursement information, it had to be publicly
3 available information, but there are -- were external
4 resources available to customers to check
5 reimbursement information.
6    Q.  (BY MR. BREEN)  Okay.  So you -- your
7 presentation instructed the Ross personnel that they
8 could only give out reimbursement information if it
9 was publicly available, correct?
10    A.  You know, I don't recall the exact on the
11 presentation.  I'm just -- that -- that they couldn't
12 give out -- they had to be -- that the information
13 should have been -- I believe it was that we did
14 include that in there.  To be honest with you, it's
15 quite a few years ago.
16    Q.  Well, you were the director of
17 reimbursement -- corporate reimbursement for all of
18 Abbott Laboratories, right?
19    A.  Well, I was director of corporate
20 reimbursement, yes, for Abbott.

21    Q.  So of the entire Abbott Laboratories, what
22  person was senior to you in the specialty of
23  reimbursement --
24              MS. TABACCHI:  Object to the form.
25    Q.  (BY MR. BREEN)  -- when you were director of
0187
1  corporate reimbursement?
2    A.  Well, I think I was the senior person, yes.
3    Q.  All right.  So here's my question then.  Did
4  you instruct Ross employees that they were prohibited
5  from discussing reimbursement with customers?
6              MS. TABACCHI:  Object to the form.
7    A.  No.
8    Q.  (BY MR. BREEN)  Okay.  You didn't tell them
9  that?
10    A.  No.
11    Q.  Did you tell them that they were allowed to
12  discuss Medicare reimbursement with customers?
13    A.  They were allowed to -- we encourage them to
14  have the customers call the Abbott help desk, the Ross
15  help desk if they had questions about reimbursement.
16    Q.  You encourage them to.  Did you tell them
17  they were prohibited from discussing Medicare
18  reimbursement with customers?
19    A.  No.  Not that I recall.
20    Q.  Did you tell them they were prohibited from
21  providing reimbursement recommendations related to
22  medical necessity determinations?
23    A.  We -- I don't remember.  It wasn't the exact
24  presentation, but we told them not to provide
25  diagnosis codes to -- to customers.
0188
1    Q.  Okay.  Let me ask this question:  Did you
2  tell them that they were required to -- strike that.
3          Did you tell them they were not
4  permitted to provide reimbursement information related
5  to enteral nutrition and that they were required to
6  refer the customer to the help desk?
7    A.  I don't --
8              MS. TABACCHI:  Object to the form.
9    A.  I don't recall the exact.  I really don't.
10    Q.  (BY MR. BREEN)  Now, this -- whatever
11  instructions you gave Ross about whatever they could
12  or couldn't say to customers about reimbursement, did
13  that instruction apply to other divisions, like HPD?
14    A.  Yes.
15              MS. TABACCHI:  Object to the form.
16    Q.  (BY MR. BREEN)  Pardon?
17              MS. TABACCHI:  Object to the form.
18              You may answer.
19    A.  Yes.  I don't know.  Was Hospira spun off by
20  then?
21    Q.  (BY MR. BREEN)  I don't know.  But at least
22  up until the time that Hospira was spun off, was

23  that -- was that Abbott's policy?
24     A.  Abbott's -- Abbott's policy was consistent
25  across all divisions.
0189
1     Q.  Was what?
2     A.  Was across all divisions.
3     Q.  Okay.  And -- and did there come a point in
4  time when Abbott's policy changed to become what
5  you've now testified it was?
6           MS. TABACCHI:  Object to the form.
7     A.  Well, Abbott has certain policies regarding
8  reimbursement, yes.
9     Q.  (BY MR. BREEN)  So did the policy ever change
10  or has it always been what you just testified to?
11          MS. TABACCHI:  Object to the form.
12     A.  Well, policies evolve over time.
13     Q.  (BY MR. BREEN)  So has it ever been okay for
14  Abbott sales and marketing people to discuss Medicare
15  and Medicaid reimbursement with customers?
16          MS. TABACCHI:  Object to the form.
17     Q.  (BY MR. BREEN)  Based upon Abbott policy?
18          MS. TABACCHI:  Object to the form.
19     A.  Well, Abbott -- Abbott employees can talk
20  about Medicare and Medicaid reimbursement.
21     Q.  (BY MR. BREEN)  Okay.  Has it always been --
22  has it been okay as long -- let me ask the question
23  this way:  Is it okay for Abbott employees to discuss
24  the difference between the Medicaid reimbursement rate
25  and the cost of an Abbott product and compare it with
0190
1  the Medicaid reimbursement rate and the cost of the
2  competitor's product?
3          MS. TABACCHI:  Object to the form.
4     A.  That would be a violation of our policy.
5     Q.  (BY MR. BREEN)  Okay.  Why would that be a
6  violation of your policy?
7          MS. TABACCHI:  Object to the form.
8     A.  We don't think it's appropriate to discuss
9  competitors versus our products.
10     Q.  (BY MR. BREEN)  I'm not talking about the
11  product, I'm talking about the reimbursement.  The
12  fact that you can make more money on an Abbott product
13  than a competitor's product.  That's not okay to talk
14  about that?
15     A.  It's a violation of our policy.
16     Q.  Okay.  Is it the same -- the same go for
17  Medicare reimbursement?
18     A.  It's a violation of our policy.
19     Q.  So the answer is the same for Medicare
20  reimbursement as it is for Medicaid reimbursement,
21  correct?
22     A.  Correct.
23     Q.  Okay.  Has that always been Abbott's policy?
24          MS. TABACCHI:  Object to the form.

25    A.  I know it's our policy today.

0191

1    Q.  (BY MR. BREEN)  Well, was it Abbott's policy
2  for all those years that you were the manager of
3  reimbursement for Home Infusion Services?
4         MS. TABACCHI:  Object to the form.
5         Please re-read the question.
6         THE WITNESS:  Will you re-read the
7  question?
8         (Requested portion was read)
9         MS. TABACCHI:  Object to the form.
10    A.  I wouldn't have knowledge if it was a policy
11  at that time.
12    Q.  (BY MR. BREEN)  The manager of reimbursement
13  services would not have knowledge if that was the
14  policy or not?
15         MS. TABACCHI:  Object to the form.
16    A.  I was not in sales.
17    Q.  (BY MR. BREEN)  Were you in sales when you
18  were the director of corporate reimbursement in 2003?
19    A.  I was not in sales.
20    Q.  So how did you know the policy then?
21    A.  We -- I -- I believe the written policy was
22  established in 2004.
23    Q.  So -- what was it -- okay.  So --
24    A.  But I don't remember.
25    Q.  All right.

0192

1    A.  I just don't remember.
2    Q.  So there was a written policy established at
3  some point that says you're not -- you shouldn't
4  compare the reimbursement versus the cost of Abbott's
5  product with the reimbursement versus the cost of a
6  competitor's product and that was reduced to some
7  written policy at some point in or about 2004,
8  correct?
9         MS. TABACCHI:  Object to the form.
10    Q.  (BY MR. BREEN)  Is that what you just said?
11    A.  There was a written policy regarding that in
12  2000 -- I believe in 2004, yes.
13    Q.  Okay.  And prior to that -- whatever point in
14  time this written policy was adopted, had there ever
15  been a written policy speaking to that issue before?
16    A.  There could have been.  I don't know.
17    Q.  Well, as the -- why did you become aware of
18  the policy that you just testified about that went
19  into effect in writing in or about 2004?  You weren't
20  in sales and marketing.
21    A.  There was a policy created at that time.
22    Q.  Did you run over to the sales and marketing
23  department and read their policy?
24         MS. TABACCHI:  Object to the form.
25    Q.  (BY MR. BREEN)  Or did you get it in your

0193

1  corporate ethics and compliance office?
2    A.  It was created with the corporate ethics and
3  compliance office, yes.
4    Q.  It came out of your office, correct?
5    A.  In conjunction with others.
6    Q.  All right.  Did you have any -- did you
7  participate in any way in writing that policy?
8    A.  Yes.
9    Q.  Or preparing it?
10    A.  Yes.
11    Q.  Okay.  And what part did you work on?
12          THE WITNESS:  Would that be --
13          MS. TABACCHI:  You can testify as to
14  what you did if it does not --
15    A.  I participated --
16          MS. TABACCHI:  -- reveal communications
17  with counsel.
18    A.  Okay.  I --
19          MS. TABACCHI:  If you need to ask me a
20  question, let me know.
21    A.  Okay.  I participated in discussions creating
22  the policy, yes.
23    Q.  (BY MR. BREEN)  Did you review any materials?
24    A.  Yes.
25    Q.  Okay.  And have you ever worked on policies
0194
1  before in your whole life?
2    A.  Yes.
3    Q.  Okay.  Have you ever worked on changes in
4  policies before in your whole life?
5    A.  Yes.
6    Q.  All right.  And when you work on changes in
7  policies, what's the first thing you usually look at?
8          MS. TABACCHI:  Object to the form.
9    A.  If there's an existing written policy.
10    Q.  (BY MR. BREEN)  Right.  Exactly.  So when you
11  worked on this policy that came out in or about 2004,
12  did you look at any existing policies about the same
13  topic?
14          MS. TABACCHI:  Object to the form.
15    A.  I didn't, but others may have.
16    Q.  (BY MR. BREEN)  Anybody tell you that they
17  had seen some policy that you had never seen before
18  that spoke to this issue?
19          MS. TABACCHI:  Object to the form.
20    A.  No.
21    Q.  (BY MR. BREEN)  Okay.  All right.  So when
22  you -- when the corporate compliance and ethics
23  department prepared this policy that we've been
24  discussing now about not talking to customers about
25  this difference between the reimbursement amount and
0195
1  the cost of an Abbott product versus a competitor's,
2  was that policy provided to HPD?

3    A.  Yes.
4    Q.  Was it provided to Alternate Sites?
5         MS. TABACCHI:  Object to the form.
6    Q.  (BY MR. BREEN)  To your knowledge?
7    A.  Well, I don't think Alternate Site was in
8  existence.
9    Q.  All right.  Because of the Hospira spinoff,
10  correct?
11    A.  And also they closed.
12    Q.  Okay.  So Home Infusion, was that in
13  existence anymore by the time this policy came down?
14    A.  No.
15    Q.  All right.  Did -- as far as you know, did
16  Abbott take action to make sure that any of its
17  reimbursement managers didn't get a copy of this
18  policy?
19         MS. TABACCHI:  Object to the form.
20    A.  Repeat that.
21    Q.  (BY MR. BREEN)  Let me state the question
22  this way.  Once your corporate ethics and compliance
23  department got this policy done, did you only give it
24  to the sales and marketing people at Abbott?
25    A.  No.
0196
1         MS. TABACCHI:  Object to the form.
2    Q.  (BY MR. BREEN)  Did you only give it to sales
3  and marketing?
4    A.  No.
5    Q.  Why?  Why did you give it to anybody other
6  than sales and marketing?
7    A.  They were made available to all Abbott
8  employees.
9    Q.  But it only applies to sales and marketing,
10  right?
11         MS. TABACCHI:  Object to the form.
12    A.  It applies -- the policy applies to all
13  Abbott employees.
14    Q.  (BY MR. BREEN)  All right.  Based -- is it
15  your understanding that these types of policies, to
16  the extent they have been in existence during your
17  entire employment at Abbott, applies to everybody, not
18  just selective people?
19         MS. TABACCHI:  Object to the form.
20    A.  There could be policies that apply to certain
21  people and others that don't.  I --
22    Q.  (BY MR. BREEN)  Well, here's the reason for
23  that question.  Let me -- let's get right down --
24  right down to the issue.
25    A.  Could we take a break for a second?
0197
1    Q.  Sure you can.
2    A.  I do need a --
3    Q.  Any time you need a break, you just tell me.
4    A.  Thanks.

5          THE VIDEOGRAPHER:  Going off the record
6   at 3:34 p.m.
7          (Recess from 3:34 to 3:49)
8          THE VIDEOGRAPHER:  Going back on the
9   record at 3:49 p.m.  Please proceed.
10          MR. BREEN:  Okay.  We are going to try
11  to finish up an area of questioning today.  The
12  witness is getting more uncomfortable because of her
13  foot and so we're going to try to wrap up an area as
14  quickly as possible and not go to the complete end of
15  the day with the understanding that there's other
16  folks to -- and myself that need to inquire and we are
17  going to cooperate coordinating through Ms. Moore, the
18  AG's office, and Ms. Tabacchi to try to get another
19  day certain as soon as possible to finish this
20  deposition.  So with that let's kind of press on and
21  get this area done, if possible.
22      Q.  (BY MR. BREEN)  How many other folks were
23  working with you on the policy that you participated
24  in crafting that came out in or about 2004?
25          MS. TABACCHI:  Object to the form.
0198
1       A.  Well, probably eight to 10, but it -- but it
2   did get reviewed by others, so the discussions,
3   really, initially between eight to 10.
4       Q.  (BY MR. BREEN)  So there was an initial
5   working group of eight to 10 folks --
6       A.  Yes.
7       Q.  -- that was expanded as the -- as the work
8   product became -- got closer to a final form, is that
9   an accurate statement?
10      A.  Yes.
11      Q.  Okay.  And those eight to 10 people were who?
12      A.  Legal counsel.
13      Q.  Okay.
14      A.  OEC.
15      Q.  Who?
16      A.  Office of Ethics and Compliance.
17      Q.  Okay.  That's Mr. Brock, correct?
18      A.  People who work for Mr. Brock.
19      Q.  Okay.
20      A.  Some divisional people.
21      Q.  Okay.
22      A.  I think that's it.
23      Q.  Now, the -- the -- were there files created
24  of this -- of these materials, the working materials?
25          MS. TABACCHI:  Object to the form.
0199
1       A.  I have no idea.
2       Q.  (BY MR. BREEN)  Pardon me?
3       A.  I have no idea.
4       Q.  Did you create a file on your -- on your work
5   product?
6       A.  No.

7    Q.  Which divisional people were working with you
8  on this?
9    A.  I think there was somebody from HPD.
10   Q.  Who was that?
11   A.  I don't remember.  I don't remember who the
12  divisional people were.
13   Q.  Who from legal counsel did you work with?
14   A.  Cliff Berman.
15   Q.  Cliff Berman.  Anybody else?
16   A.  I remember Cliff, I don't remember others.
17  There were --
18   Q.  The -- I'm sorry.
19   A.  No.  That's all right.
20   Q.  The aspect of the part of the policy that we
21  were discussing before the break, which I would
22  articulate is the -- the -- the prohibition against
23  comparing an Abbott reimbursement versus an Abbott
24  cost with a competitor's reimbursement versus a
25  competitor's cost and you indicated that would be
0200
1  prohibited by this policy, correct?
2    A.  Yes.
3    Q.  Okay.  That aspect of the policy, and I
4  realize there was probably a lot more to the policy
5  than just that, correct?
6    A.  Yes.
7    Q.  That aspect of the policy, did you
8  incorporate that in your presentation that you gave to
9  the Ross folks in Columbus, Ohio that you testified
10  about earlier?
11        MS. TABACCHI:  Object to the form.
12   A.  I don't remember.
13   Q.  (BY MR. BREEN)  Okay.  Now, who was in
14  charge, aside from legal counsel, but as far as the
15  Abbott corporate, who was in charge of getting this
16  policy written?
17        MS. TABACCHI:  Object to the form.
18   A.  Well, it was Abbott legal.
19   Q.  (BY MR. BREEN)  Abbott legal.
20   A.  Yes.
21   Q.  So Mr. Brock didn't take a role -- didn't
22  have a role in this?
23        MS. TABACCHI:  Object to the form.
24   A.  Well, yes, Charlie had a responsibility.
25   Q.  (BY MR. BREEN)  Okay.  Did he write any part
0201
1  of it, to your knowledge?
2    A.  He definitely reviewed it.
3    Q.  Okay.  Now, did -- the placement of your
4  position as director of corporate reimbursement within
5  the ethics and compliance office, was the
6  reimbursement function that you performed when you
7  were Home Infusion, were you ever either supervised or
8  did you ever get any guidance from anybody that worked

9   in the ethics and compliance area of the company?
10              MS. TABACCHI:  Object to the form of the
11  question.
12              Would you mind reading the question --
13              MR. BREEN:  Let me restate the question.
14              MS. TABACCHI:  Okay.
15              THE WITNESS:  Yeah.  I don't --
16      Q.  (BY MR. BREEN)  Okay.  When you were director
17  of corporate reimbursement in 2003, you were in the
18  Office of Ethics and Compliance, correct?  You were
19  working for the director of ethics --
20      A.  Yes.
21      Q.  -- and compliance, correct?  The compliance
22  office, correct?
23      A.  Yes.
24      Q.  Okay.  When you were the manager of
25  reimbursement, was there anybody either over you in a
0202
1   supervisory capacity or anybody that you got guidance
2   from that may not have been in a supervisory capacity
3   over you that performed an ethics and compliance role?
4              MS. TABACCHI:  Object to the form.
5       A.  I don't believe when I was manager of Home
6   Infusion Services that there was an ethics and
7   compliance officer.
8       Q.  (BY MR. BREEN)  For the company at all?
9       A.  There could have been, but I don't recall
10  anyone.
11      Q.  Okay.  You don't recall interfacing with
12  anybody in your role as a manager of reimbursement?
13      A.  With anybody who was considered an ethics and
14  compliance officer, no.
15      Q.  Okay.  Now, back preparing this policy, did
16  you -- did you type anything on a computer in
17  performing your part of it?
18              MS. TABACCHI:  Object to the form.
19      A.  I don't remember.
20      Q.  (BY MR. BREEN)  Did you write on any pieces
21  of paper?
22              MS. TABACCHI:  Object to the form.
23      A.  I just don't remember.
24      Q.  (BY MR. BREEN)  Okay.  Do you remember ever
25  reading anything?
0203
1       A.  Yes.
2       Q.  What do you remember reading and seeing?
3       A.  I remember reading the drafts of the policy.
4       Q.  Okay.  The drafts.  And who prepared them?
5       A.  Well, we had -- we had discussions and Cliff
6   Berman was in charge of writing them down --
7       Q.  Okay.
8       A.  -- and making the drafts.
9       Q.  And what did you do with the drafts after you
10  read them?

11   A.  Brought them -- I probably shredded them.
12   Q.  Okay.  Were you ever told to hold on to any
13  drafts in response to the litigation hold memos that
14  you had been provided with?
15           MS. TABACCHI:  Object to the form.
16   A.  Which hold would that have been?
17   Q.  (BY MR. BREEN)  You tell me.  Do you recall
18  being subject to any litigation hold memos that may
19  have touched upon the work you were doing in
20  connection with this policy?
21   A.  Not that I recall.
22   Q.  Okay.  So you don't recall being subject to
23  any of those?
24   A.  I don't remember any specific request to hold
25  documents that would have included those.
0204
1   Q.  Okay.  Do you recall Abbott being served with
2  a subpoena by the Office of Inspector General back in
3  the latter part of 1997 that resulted in Abbott's
4  legal department assembling documents to respond to
5  the subpoena?
6   A.  No.
7   Q.  Do you ever -- have any recollection of
8  Abbott's legal department assembling information in
9  response to a subpoena or request for information from
10  any government that related to how Abbott reports
11  pricing that's used for Medicare or Medicaid
12  reimbursement?
13           MS. TABACCHI:  Object to the form.
14           Can you read the question back for the
15  witness, please?
16           THE WITNESS:  Yeah.  I don't know.  It's
17  late in the day.
18           (Requested portion was read)
19           MR. BREEN:  That was subpoena or
20  request.
21           THE REPORTER:  I'm sorry.
22   A.  Not that I recall, but that doesn't mean that
23  they didn't do that.
24           MR. BREEN:  Let me have this exhibit
25  marked.  I'm going to have the reporter mark what's
0205
1  been Bates labeled ABT-DOJ 228271, 272 and 273.
2           MS. MOORE:  It will be Exhibit 553.
3           Well, Jim, do you have any other copies?
4           MR. BREEN:  Pardon?
5           MS. MOORE:  Any other copies?
6           MS. TABACCHI:  It's okay because I have
7  it as part of the --
8           MR. BREEN:  Yeah.  You've got it as part
9  of the --
10           MS. TABACCHI:  This earlier whole thing,
11  I'll just -- I'll just double up.
12           MR. BREEN:  Okay.  Now --

13          MS. TABACCHI:  It's just these -- I'm
14 sorry.  It's these three pages?
15          MR. BREEN:  Yeah.  It's three pages that
16 I just read the Bates labels off of.  It's part of the
17 earlier composite exhibit.  But I wanted the witness
18 to have the benefit of just seeing this three page,
19 because if you'll go to the last page, you'll see her
20 name is on it.
21          MS. TABACCHI:  She's already testified
22 about this particular document.
23     Q.  (BY MR. BREEN)  Now, do you have any
24 recollection of having received the document that
25 you're now holding?
0206
 1     A.  No.
 2     Q.  Now, do you -- but in October of 1997 you
 3 were still the manager of reimbursement for Home
 4 Infusion Services, correct?
 5     A.  Yes.
 6     Q.  Now, if -- if you had received that
 7 document -- well, strike that.
 8          When you were -- when you were manager
 9 of Home Infusion Services, do you recall receiving
10 litigation hold memos, even if you can't recall
11 specifically what they were about?
12     A.  Yes.
13     Q.  And was there a procedure you followed
14 whenever you got one of those?
15     A.  Yes.
16     Q.  What did you do?
17     A.  I would look at this and see if they had any
18 records.
19     Q.  Okay.  What else would you do?
20     A.  Then I would notify legal.
21     Q.  Did you ever meet with the legal folks?  Did
22 they ever come and visit you in connection with the
23 litigation hold memo?
24     A.  Yes.
25     Q.  Okay.  Now, do you have any recollection --
0207
 1 well, strike that.
 2          Do you know what this case is about that
 3 you're deposed -- you're being deposed here today on?
 4          MS. TABACCHI:  I'm going to caution the
 5 witness not to reveal any communications with counsel.
 6 To the extent that the witness has an independent
 7 understanding, she may answer.
 8     A.  Well, I've seen information about this.
 9     Q.  (BY MR. BREEN)  Okay.  You remember ever
10 reading anything in the newspapers about it?
11     A.  Yes.
12     Q.  What do you recall reading?
13     A.  That -- that we're being sued for --
14 regarding AWP.

15     Q.  And do you know why -- what the lawsuit is
16  about regarding AWP?
17     A.  I believe it's felt that we have inflated or
18  provided information to the government that inflated
19  AWP.
20     Q.  Now, part of your duties when you were
21  manager of reimbursement services or infusion
22  services, infusion pharmacy services -- I'm sorry.
23  I'm misstating.  Home -- Home Infusion Services.  It's
24  late in the day.
25              Part of your duties when you were
0208
1  manager of reimbursement services for Home Infusion
2  Services was to meet with other Abbott personnel and
3  industry groups that were interested in Medicare
4  reimbursement, correct?
5              MS. TABACCHI:  Object to the form of the
6  question.
7              Can you please read the question back
8  for the witness?  Well, the whole question or the last
9  part of the question, I guess -- read the whole
10  question back.  I think he rephrased the question
11  several times
12              MR. BREEN:  Let me just restate -- let
13  me restate the question.  My questions are getting
14  worse as the day gets on.
15     Q.  (BY MR. BREEN)  When you were manager of
16  reimbursement services, did you at any time have
17  responsibility for working with Abbott corporate folks
18  or any outside industry groups in connection with the
19  Medicare reimbursement policy?
20              MS. TABACCHI:  Object to the form.
21     A.  Yes.
22     Q.  (BY MR. BREEN)  Okay.  And was there anybody
23  else from Abbott that worked in the reimbursement area
24  that had responsibilities that included that, included
25  what you were doing with outside industry groups or
0209
1  other Abbott -- or Abbott corporate folks in the area
2  of Medicare reimbursement issues?
3              MS. TABACCHI:  Object to the form.
4     A.  Yes.
5     Q.  (BY MR. BREEN)  Who -- who else that was in
6  the reimbursement area participated in that?
7     A.  Well, there was Paul Landauer in diagnostics.
8     Q.  Okay.
9     A.  There was Mike Tootell at Ross.
10     Q.  Okay.
11     A.  There was our federal government office.
12     Q.  Okay.
13     A.  And there could be others.  I'm giving you
14  some that I was aware of.  There could have been many
15  others.
16     Q.  There was someone from TAP, too, wasn't

17  there?
18         MS. TABACCHI:  Object to the form.
19     A.  I -- I don't know.  I didn't work closely
20  with TAP.
21     Q.  (BY MR. BREEN)  Okay.  So -- and how far back
22  did this -- did this role that you participated in go?
23  Was it something that you did just towards the end of
24  your tenure as the manager of reimbursement services
25  or do you recall doing it early in your tenure as the
0210
1  manager of reimbursement services?
2         MS. TABACCHI:  Object to the form.
3     A.  I think it was during probably the beginning
4  of the '90s.
5     Q.  (BY MR. BREEN)  Beginning of the '90s.  Okay.
6  And do you recall in 2001 the United States House of
7  Representatives Committee on Energy and Commerce
8  having hearings about Medicare reimbursement issues
9  similar to what Abbott -- your understanding of why
10  Abbott is being sued in this case?
11         MS. TABACCHI:  Object to the form.
12     A.  Not specifically, no.
13     Q.  (BY MR. BREEN)  Generally do you recall?
14     A.  No.  No.
15     Q.  Do you recall ever reading anything in The
16  Wall Street Journal about the Department of Justice
17  investigations or state attorney general litigation
18  against drug companies relating to their reporting of
19  average wholesale prices or wholesaler acquisition
20  cost?
21     A.  I recall there's newspaper articles, but --
22  about AWP issues.
23     Q.  Now, in -- in seeing those newspaper
24  articles, did it cause you to think that there was --
25  that you should gather any information or learn
0211
1  anything since you were the director of corporate
2  reimbursement?
3         MS. TABACCHI:  Object to the form.
4     Q.  (BY MR. BREEN)  Let me ask the question this
5  way:  During the time you were director of corporate
6  reimbursement, which began in 2001, correct?
7     A.  Yes.
8     Q.  And went all the way up to 2004, correct, or
9  2005?
10     A.  2004, I think, yes.
11     Q.  Okay.  2004 was it?
12     A.  I think, yes.
13     Q.  All right.  So for about three years you're
14  director of corporate reimbursement for Abbott
15  Laboratories, right?
16     A.  Uh-huh.
17     Q.  And -- and my question is:  The whole time
18  you were director of corporate reimbursement for

19  Abbott Laboratories, did it ever occur to you that --
20  that there's information you're seeing in the news
21  media about investigations into how drug companies,
22  including Abbott, report average wholesale price or
23  other prices that have impact on Medicare/Medicaid
24  reimbursement and that maybe you ought to learn about
25  something about what's going on on this area -- on
0212
1  this issue?
2         MS. TABACCHI:  Object to the form.
3     A.  Well, I did read newspaper articles, but I
4  was not responsible for handling those issues.
5     Q.  (BY MR. BREEN)  You weren't responsible for
6  keeping Abbott informed about what was going on with
7  Medicare reimbursement?
8         MS. TABACCHI:  Object to the form.
9     A.  I was responsible for many things in Medicare
10  reimbursement and I mostly was involved on the device
11  side.
12    Q.  (BY MR. BREEN)  So for all those years that
13  you were the manager of Home Infusion Services --
14  reimbursement manager for Home Infusion Services,
15  you're saying you were mainly involved on the device
16  side?
17    A.  No.
18         MS. TABACCHI:  Object to the form.  That
19  mischaracterizes the witness' testimony.
20    A.  It does.
21    Q.  (BY MR. BREEN)  All right.
22    A.  You were -- you were talking about when I was
23  director of corporate reimbursement --
24    Q.  All right.  When you were director --
25    A.  -- not when I was manager of Home Infusion
0213
1  Services.
2     Q.  All right.  Let me ask -- let me ask this
3  then.  When you were director of corporate
4  reimbursement for Abbott Laboratories, you're saying
5  you were primarily involved on the device -- the
6  devices?
7     A.  Yes, because that's where the issues were.
8     Q.  That's where the issues were.
9     A.  For reimbursement coverage and coding.
10    Q.  Okay.  What devices are you talking about?
11    A.  Our vascular devices, our diabetes meters,
12  our diagnostic equipment --
13    Q.  Okay.
14    A.  -- Point of Care.  Those -- those items.
15    Q.  All right.  Back when you were --
16    A.  Molecular diagnostics.
17    Q.  How about PPD drugs, were you the director of
18  reimbursement for anything to do with PPD drugs?
19    A.  No.
20    Q.  Did they have their own director of

21  reimbursement?
22    A.  I -- they could have.  I wasn't -- I never
23  worked in PPD.
24    Q.  Okay.  Are you saying that your only role as
25  director of corporate reimbursement with Abbott
0214
1  corporate had to do with reimbursement for devices?
2    A.  I'm saying I worked on things that need my
3  attention and at that time devices, we had -- I worked
4  on devices primarily.
5    Q.  All right.  So when you -- when you learned
6  from the newspaper, or whatever, that -- that Abbott's
7  being sued and there's these investigations going on
8  in Congress and by the government and the Justice
9  Department about Abbott's reporting of prices used for
10  reimbursement services involving drugs that you used
11  to be interested in when you were the manager of
12  reimbursement for Home Infusion Services, didn't it
13  cause you to stop and think that maybe you ought to
14  figure out what's going on there and why that is?
15        MS. TABACCHI:  Object to the form.
16    A.  We were not a provider of services at that
17  time.
18    Q.  (BY MR. BREEN)  At what time?
19    A.  When I was director of corporate
20  reimbursement.
21    Q.  Okay.  So back when you were a provider of
22  services, either you were provided the services or you
23  were paying somebody else to provide the services
24  because Abbott stopped submitting its own provider
25  claims in late -- in the late '80s, correct?
0215
1    A.  No.
2        MS. TABACCHI:  Object to the form.
3    Q.  (BY MR. BREEN)  Didn't you testify earlier
4  that at some point in the late '80s Abbott stopped
5  being the provider of HCFA 1500 forms and -- and --
6    A.  Yes.
7        MS. TABACCHI:  If you could allow
8  Mr. Breen to finish his question.
9    Q.  (BY MR. BREEN)  -- and allow -- allowed
10  contractors to be the providers, isn't that your
11  testimony?
12    A.  You're mischaracterizing my testimony.
13    Q.  All right.  Then correct me.
14    A.  Abbott provided -- billed for services in the
15  '80s as Abbott Homecare.
16    Q.  Right.
17    A.  Then after that our customers became
18  providers of service.  We provided subcontracted
19  services to them.  They were the providers of
20  services.
21    Q.  But you still had the four pharmacies, right?
22    A.  Yes.

23    Q.  Okay.  So they were Abbott pharmacies, but
24  you were -- you had providers that were billing in
25  those pharmacies, correct?
0216
1         MS. TABACCHI:  Object to the form.
2    A.  I don't understand the question.
3    Q.  (BY MR. BREEN)  Well, then maybe I didn't
4  understand your earlier testimony.  The four
5  pharmacies, remember?
6    A.  Yes.
7    Q.  The ones that were owned by Abbott all the
8  way up until the time you left Home Infusion Services
9  in 1998, those four pharmacies.
10    A.  Three pharmacies.
11    Q.  They became three at some point.  The one in
12  Atlanta, it was gotten rid of, right?
13         MS. TABACCHI:  Object to the form.
14    Q.  (BY MR. BREEN)  But you don't recall when
15  that happened, do you?
16    A.  I think it was in the '80s.
17    Q.  Sometime in the '80s.  All right.  There was
18  three pharmacies then that Abbott owned all the way
19  through the '90s, at least up until '98.  When it
20  billed the Medicare program in the '90s, was Abbott
21  identified as the provider on the HCFA 1500 form?
22         MS. TABACCHI:  Object to the form.
23    A.  No.
24    Q.  (BY MR. BREEN)  Okay.  Who was?
25    A.  The customer.
0217
1    Q.  Who owned the pharmacy?
2    A.  We did.
3    Q.  So you owned the pharmacy, Abbott did, and
4  had somebody called a customer that was a what, a
5  pharmacist?
6         MS. TABACCHI:  Object to the form.
7    Q.  (BY MR. BREEN)  Who was the customer?  If
8  Abbott owned the pharmacy, who was the customer for
9  the three pharmacies?
10    A.  It would have been one of our clients.  Could
11  have been one of our clients.
12    Q.  A client.  Okay.
13    A.  In some cases, yes.
14    Q.  We only have three pharmacies here.  So let's
15  just talk about those three pharmacies, okay?  Just
16  those three pharmacies.  Who had the license for those
17  pharmacies?
18    A.  Abbott.
19    Q.  Abbott did.  So Abbott had three licensed
20  infusion pharmacies in the '90s up until 1998 when you
21  left, at least, correct?
22    A.  Yes.
23    Q.  All right.  So Abbott was on the license.
24  Who did the pharmacist work for?

25    A.  Abbott.

0218

1    Q.  Abbott.  So the pharmacist is running the

2  pharmacy, works for Abbott, Abbott holds the license.

3  Now, when that pharmacist dispensed IV therapy that

4  was reimbursed by Medicare, somebody submitted a HCFA

5  1500 form, correct?

6    A.  Yes.

7            MS. TABACCHI:  Object to the form.

8    Q.  (BY MR. BREEN)  Who did that?  Who submitted

9  the 1500 form?

10    A.  Whoever --

11            MS. TABACCHI:  Object to the form.

12    A.  Whoever was doing the reimbursement services.

13    Q.  (BY MR. BREEN)  And who did -- who did that

14  person work for?

15    A.  It would have been --

16            MS. TABACCHI:  Object to the form.

17    A.  It could have been the customer or it could

18  have been Abbott.

19    Q.  (BY MR. BREEN)  Was Abbott ever the provider

20  at any time in the '90s on those 1500 forms?

21            MS. TABACCHI:  Object to the form.

22    A.  We could have been.

23    Q.  (BY MR. BREEN)  If Abbott owned the pharmacy

24  and Abbott hired the pharmacist and the pharmacist

25  dispensed the IV medications and fluids, who was the

0219

1  customer?

2            MS. TABACCHI:  Object to the form.

3    A.  A customer that had a contract with us.

4    Q.  (BY MR. BREEN)  What kind of customer?  What

5  kind of business?

6    A.  A hospital.

7    Q.  A hospital.  So how could the hospital be the

8  provider on a HCFA 1500 form if Abbott owned the

9  license to the pharmacy and Abbott employed the

10  pharmacist?

11            MS. TABACCHI:  Object to the form of the

12  question.  These questions also call for a legal

13  conclusion.

14            MR. BREEN:  I don't think they do.  She

15  was the manager of reimbursement.

16    Q.  (BY MR. BREEN)  How could Abbott own the

17  pharmacy, license the pharmacy, hire the pharmacist,

18  pay the pharmacist and have some hospital submit

19  the -- submit the claim --

20            MS. TABACCHI:  Object --

21    Q.  (BY MR. BREEN)  -- to Medicare on a HCFA 1500

22  form?

23            MS. TABACCHI:  Same objections.

24    A.  While the customer may be providing services

25  and pharmacy, the compounded product was one of the

0220

1  services.
2    Q.  (BY MR. BREEN)  I thought Abbott hired the
3  pharmacist.  I asked you that question --
4    A.  Yes.
5    Q.  -- who did the pharmacist work for.  You said
6  Abbott.
7    A.  Yes.
8    Q.  So how is the customer providing the
9  pharmacist --
10         MS. TABACCHI:  Object to the --
11   Q.  (BY MR. BREEN)  -- if the pharmacist worked
12  for Abbott?
13         MS. TABACCHI:  Object to the form.
14   A.  I don't think that's what I said.
15   Q.  (BY MR. BREEN)  All right then.  I did ask
16  you who did the pharmacist work for and you said
17  Abbott.  So are you saying this is a hospital
18  pharmacist that was working at an Abbott pharmacy?
19   A.  No.  I said the customer was the hospital.
20  The customer we had a contract with was the hospital.
21   Q.  And did that customer provide the pharmacist?
22         MS. TABACCHI:  Object to the form.
23   A.  No.  If we were doing compounding services.
24   Q.  (BY MR. BREEN)  So other than -- if Abbott
25  had the license on the pharmacy and Abbott employed
0221
1  the pharmacist, what was the customer providing other
2  than the patient?
3         MS. TABACCHI:  Object to the form.
4    A.  The customer may have been providing the
5  clinical management, the nursing services, the order
6  entry services.  There were a number -- there were a
7  number of services the customer may have provided.
8    Q.  (BY MR. BREEN)  Were these three pharmacists
9  located in hospitals?
10   A.  No.
11   Q.  So then how could the hospital be a customer?
12         MS. TABACCHI:  Object to the form.
13  Could I also say, this is a whole new area of
14  testimony and I thought that we were -- inquiry and I
15  thought we were going to try to wrap it up.
16   Q.  (BY MR. BREEN)  Was Ross products -- one more
17  question and then we can -- we can recess.
18         Was Ross products included in the
19  products that these three pharmacies were
20  dispensing --
21         MS. TABACCHI:  Object to --
22   Q.  (BY MR. BREEN)  -- in the '90s?
23         MS. TABACCHI:  Object to the form.
24   A.  Yes.
25         MR. BREEN:  All right.  Well, I thank
0222
1  you for your patience.  I hope your -- your foot gets
2  better fast.

3            THE WITNESS:  Thank you.
4            MS. ST. PETER-GRIFFITH:  Before we go
5   off the record though, the government has a statement.
6            We have outstanding discovery requests
7   to Abbott and obviously -- and we took the deposition
8   of Ms. Klaus a couple of weeks ago concerning the
9   litigation hold on those -- on the various requests
10  that have been -- that have been served upon Abbott by
11  the government dating back to 1986.  To the extent
12  that this -- that this witness discussed the shredding
13  of documents, in addition, you know, just the general
14  production of this policy we have not seen and I would
15  ask that Ms. Tabacchi look into -- look into that
16  issue.
17           Additionally, this -- this witness
18  testified to the federal government office, which
19  obviously just from its title sounds like it might be
20  an entity that has documents responsive to our
21  production request, and I would ask that you look into
22  the production from that particular office as well.
23           MS. TABACCHI:  Any other statements from
24  anyone?
25           MR. HAVILAND:  Have a nice day.
0223
1            MR. BREEN:  Yeah.  Have a nice day and I
2   hope the weather gets better.
3            THE VIDEOGRAPHER:  This is the end of
4   Tape 4 in the deposition of Virginia Tobiason.  Going
5   off the record.  The time is now 4:21 p.m.
6
7            (Deposition closed at 4:21 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0224
1                 CHANGES AND SIGNATURE
2   PAGE    LINE          CHANGE          REASON
3
4

```
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

0225

```
 1    I, VIRGINIA TOBIASON, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5
 6              VIRGINIA TOBIASON
 7
 8
 9  THE STATE OF                )
10  COUNTY OF                   )
11    Before me,                 , on this day
12  personally appeared VIRGINIA TOBIASON, known to me (or
13  proved to me under oath or through
14                 ) (description of identity
15  card or other document) to be the person whose name is
16  subscribed to the foregoing instrument and
17  acknowledged to me that they executed the same for the
18  purposes and consideration therein expressed.
19    Given under my hand and seal of office this
20        day of                , 2007.
21
22
23
                  NOTARY PUBLIC IN AND FOR
24                    THE STATE OF
25
```

0226

```
 1        NO. D-1-GV-04-001286
 2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                              )
 3  ex rel.                   )
      VEN-A-CARE OF THE       )
```

```
4    FLORIDA KEYS, INC.,       )
         Plaintiffs,          )
5                             )
     VS.                      ) TRAVIS COUNTY, TEXAS
6                             )
     ABBOTT LABORATORIES INC.,     )
7    ABBOTT LABORATORIES,          )
     HOSPIRA, INC., and B. BRAUN   )
8    MEDICAL INC.,                 )
         Defendant(s).        ) 201ST JUDICIAL DISTRICT
9
```

10          REPORTER'S CERTIFICATION
         DEPOSITION OF VIRGINIA TOBIASON

11              March 28, 2007

12      I, Cynthia Vohlken, Certified Shorthand Reporter
13   in and for the State of Texas, hereby certify to the
14   following:
15      That the witness, VIRGINIA TOBIASON, was duly
16   sworn by the officer and that the transcript of the
17   oral deposition is a true record of the testimony
18   given by the witness;
19      That the deposition transcript was submitted on
20   April 2, 2007, to the witness or to the attorney for
21   the witness for examination, signature and return to
22   me by April 25, 2007;
23      That the amount of time used by each party at the
24   deposition is as follows:
25          Ms. Margaret Moore - 02:01

0227

1      That pursuant to information given to the
2    deposition officer at the time said testimony was
3    taken, the following includes counsel for all parties
4    of record:
5          MS. MARGARET MOORE, Attorney for Plaintiff
                State of Texas;
6          MR. JAMES JOSEPH BREEN, Attorney for the
                Relator;
7          MS. TINA TABACCHI, Attorney for Defendants
                Abbott Laboratories, Inc. and Hospira, Inc.
8          MS. ANN M. ST. PETER-GRIFFITH, Attorney for
                Plaintiff United States of America
9          MS. AMBER M. NESBITT, Attorney for Plaintiff
                State of Arizona and MDL Plaintiffs
10          MR. DONALD E. HAVILAND, JR., Attorney for
                Plaintiff Commonwealth of Pennsylvania
11
12      I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties or
14   attorneys in the action in which this proceeding was
15   taken, and further that I am not financially or
16   otherwise interested in the outcome of the action.
17      Further certification requirements pursuant to
18   Rule 203 of TRCP will be certified to after they have
19   occurred.

20
21
22
23
24
25
0228
1     Certified to by me this 2nd day of April, 2007.
2
3
4
5
          Cynthia Vohlken, Texas CSR 1059
6          Expiration Date:  12/31/2008
          Firm Registration No. 82
7          Fredericks-Carroll Reporting
          7719 Wood Hollow Drive, Suite 156
8          Austin, Texas 78731
          Telephone: (512) 477-9911
9               (800) 234-3376
          Fax:     (512) 345-1417
10
11   JOB NO. 2272
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0229
1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
2     The original deposition was/was not returned to
3   the deposition officer on              , 2007;
4     If returned, the attached Changes and Signature
5   page contains any changes and the reasons therefor;
6     If returned, the original deposition was delivered
7   to Ms. Margaret Moore, Custodial Attorney;
8     That $         is the deposition officer's
9   charges to the Plaintiff(s) for preparing the original
10   deposition transcript and any copies of exhibits;
11     That the deposition was delivered in accordance
12   with Rule 203.3, and that a copy of this certificate
13   was served on all parties shown herein on and filed
14   with the Clerk.
15     Certified to by me this        day of
16            , 2007.

17

18

19

20
Cynthia Vohlken, Texas CSR 1059
Expiration Date: 12/31/2008

21
Firm Registration No. 82
Fredericks-Carroll Reporting

22
7719 Wood Hollow Drive, Suite 156
Austin, Texas 78731

23
Telephone: (512) 477-9911
(800) 234-3376
Fax:     (512) 345-1417

24   JOB NO. 2272

25