# EXHIBIT X

# House Committee on Ways and Means

Statement of Herb B. Kuhn, Director, Centers for Medicare and Medicaid Services, U.S.
Department of Health and Human Services

Testimony Before the Subcommittee on Health
of the House Committee on Ways and Means

July 13, 2006

Chairman Johnson, Representative Stark, distinguished members of the Subcommittee, thank
you for the opportunity to discuss with you the way Medicare pays for drugs covered under Part
B. These drugs are not covered under the new Part D prescription drug benefit. As you are
aware, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA)
substantially revised Medicare payment both for Part B drugs and their administration. The
goals of the MMA changes were to have Medicare pay appropriately for both Part B drugs and
their administration, and to create a choice for physicians about buying and billing for Part B
drugs or having those drugs furnished to a physician upon submission of a prescription order.
We believe that those goals have largely been accomplished.

**Medicare Part B Drugs**

Part B of Medicare covers a limited number of prescription drugs. These Part B drugs generally
fall into three categories: drugs furnished incident to a physician's service; drugs used as a
supply to durable medical equipment (DME); and certain statutorily covered drugs. Medicare
Part B drug coverage has not been changed by implementation of the new Medicare Part D drug
program. Drugs that were covered by Medicare Part B before the Part D prescription drug
program became operational continue to be covered under Medicare Part B.

Drugs covered under the "incident to" benefit are injectable or intravenous drugs that are
administered as part of or "incident to" a physician's service. The statute limits Part B coverage
to drugs that are not usually self-administered unless the physician participates in the
Competitive Acquisition Program (CAP) for Part B drugs. Under the "incident to" provision, the
physician must incur a cost for the drug, and must bill for it. Examples include injectable
prostate cancer drugs (lupron acetate for depot suspension (Lupron & Eligard), goserelin acetate
implant (Zoladex)), injectable drugs used in connection with treatment of cancer (epoetin alpha
(Procrit) and darbepoetin alfa (Aranesp)), intravenous drugs used to treat cancer (paclitaxel
(Taxol)) and docetaxel (Taxotere)) and to treat non-Hodgkin's lymphoma (rituximab (Rituxan)),
injectable drugs used to treat rheumatoid arthritis (infliximab (Remicade), injectable anti-emetic
drugs used to treat the nausea resulting from chemotherapy, and other drugs furnished by
physicians, such as intravenous immune globulin (IVIG).

Part B also covers drugs that are administered through a covered item of DME such as a
nebulizer or pump. Inhalation drugs, such as albuterol sulfate and ipratropium bromide, are
frequently administered through a nebulizer. The Medicare statute requires Part B to cover

certain other specific drugs, including immunosuppressive drugs for beneficiaries with a Medicare covered organ transplant; hemophilia blood clotting factor; certain oral anti-cancer drugs; oral anti-emetic drugs; pneumococcal, influenza and hepatitis vaccines; antigens; erythropoietin for trained home dialysis patients; certain other drugs separately billed by end stage renal disease (ESRD) facilities (for example, iron dextran, vitamin D injections); osteoporosis drugs; and home infusion of intravenous immune globulin for Primary Immune Deficiency.

In 2005, the preliminary estimate of allowed charges for the approximately 550 drugs paid for by Medicare Part B carriers is $10 billion. The majority of these expenditures were for drugs administered incident to a physician's service and drugs furnished in conjunction with DME. Much of the current spending for carrier paid drugs is concentrated in relatively few of the approximately 550 covered drugs. For example, of the $10 billion for carrier paid drugs, 11 drugs account for 50 percent of spending, 27 drugs account for 75 percent of spending, and 65 drugs account for 90 percent of spending. The top two drugs, darbepoetin alfa (Aranesp) and epoetin alpha (Procrit), account for 17 percent of carrier spending. Three prostate cancer drugs, lupron acetate for depot suspension (Lupron and Eligard) and goserelin acetate implant (Zoladex), account for four percent of carrier spending. Infliximab injection (Remicade), for rheumatoid arthritis treatment, accounts for five percent of spending. Rituximab (Rituxan), for cancer treatment accounts for eight percent of carrier spending. Inhalation drugs account for eight percent of carrier paid drugs (not taking into account the inhalation drug dispensing fee). Spending of $161 million for intravenous immune globulin accounts for 1.6 percent of carrier paid drugs; the total for IVIG increases to approximately $378 million when preliminary data for hospital outpatient departments are included. In 2005, roughly 50 percent of spending for carrier paid drug went to oncologists. Another five percent went to urologists and four percent went to rheumatologists.

Intermediaries rather than carriers, process claims from both ESRD facilities and hospital outpatient departments including for Part B covered drugs. The figures discussed in the previous paragraph do not include spending for drugs paid for by intermediaries to hospital outpatient departments, or to ESRD facilities for drugs paid outside the ESRD composite rate. The preliminary estimate of 2005 allowed charges for separately billed Part B covered drugs paid to ESRD facilities is $2.9 billion and $2.0 billion for hospital outpatient departments.

**Payment for Medicare Part B Drugs**

Prior to the MMA, Medicare paid 95 percent of the Average Wholesale Price (AWP) for Part B drugs as reflected in published compendia. Numerous reports by the Office of the Inspector General and the General Accountability Office indicated that Medicare's payment was significantly higher than physician acquisition costs for the drugs. The difference between Medicare's payment and acquisition costs has come to be referred to as "spread." Physicians have long indicated that they used the spread to cross-subsidize payments for administering drugs.

The MMA revised the system, changing Medicare's payment both for Part B drugs and their administration. The MMA created two choices for physicians for payment of Part B drugs.

First, a physician may choose not to buy and bill Part B drugs, but rather obtain such drugs from a competitively selected vendor upon submission of a prescription order for specific drugs for a particular beneficiary. This Competitive Acquisition Program became operational on July 1, 2006. Second, a physician may choose to purchase drugs in the market and bill Medicare for them, in which case the MMA specifies that Medicare's payment for most Part B drugs be 6 percent above the Average Sales Price (ASP). The ASP-based payment rates became effective January 1, 2005.

**ASP**

The ASP is the average sales price from a manufacturer to all entities who purchase the drug from the manufacturer (such as wholesalers and distributors), except for certain low price sales. The ASP is net of discounts, rebates and other price concessions. The ASP is calculated from data submitted by manufacturers on a quarterly basis. CMS takes the manufacturer's reported average sales price for each specific National Drug Code (NDC) in a billing code (billing codes, known as HCPCS codes, frequently include more than one NDC) and weights it by the volume of sales to determine the ASP for the billing code for a drug. The statute requires that the Medicare payment amounts are updated each quarter based on data from the second previous quarter. For example, Medicare ASP payments for the quarter beginning July are based on manufacturers' average sales prices during the January to March quarter submitted by April . After receiving data by April , CMS has just a few weeks to compile the data, calculate the rates, check potentially erroneous data submissions with manufacturers, make corrections, publicize the rates, and load the new pricing files into each of the claims processing contractors' systems. The ASP system represents the only Medicare payment system where rates are updated as frequently as quarterly and this allows the Medicare payment rate to more accurately reflect the most current market conditions. We continue to work closely with manufacturers to expedite data submission and ensure adherence with ASP guidance.

Comparing the July 2006 and January 2005 quarters for the top 50 drugs, Medicare payment amounts (ASP plus six percent) are higher for 36 drugs, lower for 13 and the same for one. Payments for five drugs increased by ten percent or more, while payments for six drugs decreased by ten percent or more. The biggest decrease, 93 percent, was for carboplatin, a drug with many generic entrants since 2004. Two competitor drugs, Aranesp and Procrit, experienced decreases in payments of 14.6 percent and 11.3 percent respectively. There were double digit increases and decreases for a number of inhalation drugs (duoneb: -17.5 percent; budesonide: 12.7 percent; levalbuterol: 17.7 percent; albuterol: 26.2 percent; ipratropium bromide: -27.5 percent). Other double digit payment increases occurred for bortezomib injection (Velcade) (12.4 percent) used to treat multiple myeloma, and epoprostenol injection (Flolan) (12.8 percent) used to treat pulmonary hypertension. Milrinone lactate injection, another drug with new generic offerings which is used to treat congestive heart failure, was the only other drug that experiences a double digit payment decrease (-13.9 percent).

Overall, Medicare payments for drugs did not change substantially between January 2005 and July 2006. The weighted average payment change was negative-four percent. Payment decreases, both among drugs for which there were new generic entrants and among other drugs that had direct competitors, accounted for much of this decrease. If recent generic drugs

carboplatin, paclitaxel, and milrinone are eliminated from the total, the weighted average payment change was -1.3 percent. In addition, if competitor drugs Procrit and Aranesp are also eliminated from the total overall Medicare payments actually increased by two percent between January 2005 and July 2006.

**CAP**

The MMA established an alternative method for physicians to obtain many drugs covered under Part B, called the Competitive Acquisition Program for Part B drugs. Beginning in July of this year, physicians have the option of making an annual election ast to whether they wish to purchase these drugs on their own, and be paid based on the ASP rate, or obtain them from a vendor who will then be responsible for supplying the drug to the physician, billing Medicare for the drug, collecting the coinsurance from the beneficiary, and coordinating secondary payer issues. Participation in CAP is voluntary and physicians who elect into CAP must abide by their choice for the year, except for certain rare exceptions. The benefit of participating for physicians is that they do not incur the expense of purchasing and billing for these medications. Nor do they have to concern themselves with the Medicare payment rate for these products and trying to acquire them at the best possible prices in the market.

Vendors who bid to participate in CAP must meet certain criteria outlined in the statute and CMS regulations. These include among other things, issues of: management and operations; experience and capabilities; licensure; record of integrity; adequacy of internal controls; and financial performance and solvency.

Potential vendors are required to bid on a particular category of drugs within a given geographic region. For the first round of CAP, CMS determined through regulation that there would be only one competitive acquisition geographic area, which includes all 50 states and territories, and one category of drugs comprised of approximately 180 of the most common physician administered drugs. Potential vendors' bids could not exceed the volume weighted average ASP plus six percent of the full list of drugs. The actual payment rates under CAP are based on the median of the successful bids. For the first round of CAP, CMS contracted with BioScrip, Inc. as the CAP vendor.

The first physician election for CAP began in May and concluded at the end of June. Elections are effective either July 1, or August 1, depending on when the completed election form was received by the physician's local carrier, and extends through the remainder of this calendar year. For 2007 and subsequent years, the physician election will occur for 45 days in the fall for elections effective for the subsequent calendar year.

Once a physician has elected to participate in CAP, they must obtain all drugs on the CAP drug list from their chosen drug vendor with exceptions in emergency situations and for prescriptions where the physician explicitly requests that it be furnished as written. Physicians continue to purchase and bill Medicare under the ASP system for those drugs that are not furnished by the physician's CAP vendor.

CMS has established a number of information sources for physicians and other prescribing professionals who have the opportunity to participate in the CAP.  CMS also conducted outreach to the physician community working with national and local organizations and specialty societies.  On May 11 and again on June 12, CMS hosted national "Ask the Contractor" conference calls during which providers had the opportunity to learn more about the CAP and ask questions about participation.  Local carriers were also required to provide information to physicians in their regions.

This initial phase of CAP is providing CMS with the opportunity to gain valuable experience as a launching pad for future enrollment.  We look forward to expanding the CAP to more categories of drugs in the future and widening the pool of vendors and interested physicians.

**Payments for Administration of Drugs**

The MMA required four permanent changes in the data and methodology used to determine Medicare payments to physicians for administering drugs.  These changes, all implemented on January 1, 2004, permanently affect Medicare's payment for drug administration services.   In addition to these permanent changes, MMA also provided for transition payments increasing the underlying drug administration payment by 32 percent in 2004 and 3 percent in 2005.

- One significant change was to require use of data from a survey conducted by the American Society of Clinical Oncologists (ASCO) on the costs of running a practice. These data are now used in the methodology to calculate Medicare payments for drug administration services.  MMA excluded these increased expenditures from the budget neutrality requirement so that these changes did not reduce payments for other services under the physician fee schedule.
- Another MMA change required the Secretary to set work relative value units for drug administration services at the same level as the lowest level office visit billed by a physician.
- Still another MMA change required use of data on compensation of oncology nurses from the ASCO survey in the methodology to calculate practice expense relative value units for drug administration services.
- Finally, MMA required the Secretary to review and make appropriate changes in payment for multiple chemotherapy drugs furnished on a single day through the push technique.

In addition to the above changes, in order to ensure that drug administration codes accurately reflect services furnished, the MMA required prompt evaluation of existing codes used by physicians to bill for administering drugs to patients.  The MMA also required the Secretary to use existing processes and authority to expedite consideration of coding changes and new relative value units.  Changes in expenditures resulting from this review of codes were exempt from the budget-neutrality requirement that would otherwise apply.  Because Medicare uses the American Medical Association's Current Procedural Terminology (CPT) system for coding of physicians' services, the CPT Editorial Panel undertook an expeditious review of drug administration codes.  The CPT Editorial Panel adopted some new drug administration codes and

refined several existing codes. The AMA's Relative Value Update Committee (RUC) made recommendations to CMS on the relative values for new drug administration codes.

The new codes made changes to address concerns that physicians had raised about the drug administration codes. In particular, a new code was established to reflect the higher resource costs associated with infusing a second cancer drug on the same day. In addition, oncologists and other physicians can now bill Medicare for more than one administration of a non-chemotherapy drug as they can do currently for chemotherapy drugs.

These new and refined CPT codes became operational in 2006. However, in order to make them operational in 2005, in advance of their formal inclusion in the CPT system, we established temporary codes that were used during 2005. We used the RUC recommended values for the new and refined drug administration codes. The MMA specified that the changes in expenditures resulting from this review of codes were exempt from the budget-neutrality requirement that would otherwise apply.

Overall, as a result of all these changes, Medicare payments for drug administration in 2006 are 117 percent higher than they were in 2003. Payment amounts for four oncology drug administration codes in 2006 are more than 200 percent higher than in 2003. In addition, payment is 192 percent higher for the code accounting for the most spending -- chemotherapy administration, intravenous infusion technique; up to one hour, single or initial substance/drug.

**Other Changes Affecting Payments to Oncologists**

Concurrent with implementation of the ASP system and increased payments for drug administration codes, we also made other changes and clarifications affecting oncologists and other physicians. Prior to 2005, injections furnished on the same day as other physician fee schedule services were bundled in to payment for the medical visit and not paid separately. Beginning with 2005, Medicare made separate payment for injections furnished on the same day as other physician fee schedule services.

Considerable physician effort may be required to monitor and attend to patients who develop significant adverse reactions to chemotherapy drugs, or otherwise have complications in the course of chemotherapy treatment. Some physicians are not aware of their ability to bill for these services. We clarified that these services can be billed appropriately using existing CPT codes, including, depending on the services involved: billing for a physician visit; billing for a higher level physician visit; billing using a prolonged service code; and billing using a critical care service. Billing for services relating to a significant adverse reaction to chemotherapy drugs would be in addition to billing normally allowed for the physician's care of a cancer patient. We issued coding guidance to assure appropriate billing for these services, potentially providing additional revenues for practices that had not used these billing codes appropriately in the past.

In order to assess the quality of care for cancer patients undergoing chemotherapy, Medicare initiated a one-year nationwide demonstration project during 2005. The demonstration collected data on three patient assessment elements for each day that chemotherapy was administered. We established 12 new billing codes, four in each of three patient status categories: (i) nausea and/or

vomiting; (ii) pain; and (iii) fatigue. Physicians reported one of the four different levels in each of these three categories. The demonstration project was open to all oncologists. Payment of $130 was made to physicians who submitted the three codes in conjunction with each day of chemotherapy administration. We are using a contractor to evaluate this demonstration and the evaluation is ongoing.

For 2006, we are conducting a one-year demonstration where physicians treating cancer patients are routinely consulting clinical practice guidelines, and comparing management of their patients to that recommended in the guidelines. As part of this demonstration they are also reporting on the patient's disease status, and the focus of their visit with the patient – all data not routinely captured in the claims processing system. Participating oncologists and hematologists qualify for additional payments if they submit data from each of the three categories when they bill for an evaluation and management (E&M) visit of level 2, 3, 4, or 5 for established patients. Practices reporting data on all three categories qualify for an additional payment of $23 in addition to the E&M visit.

The evaluation of the 2006 demonstration will use a combination of quantitative and qualitative methods to examine the impact of the demonstration on: Medicare spending; beneficiary outcomes; physician practice adherence to clinical guidelines; and financial status of physicians' practice. In addition, through field assessments and physician surveys, the evaluation will examine how the demonstration impacted the way physicians delivered care to beneficiaries, and the types of modifications they needed to make in order to be able to report the data. The evaluation will include a validation study of physician-reported adherence to guidelines developed by the American Society of Clinical Oncology and the National Comprehensive Cancer Network. The evaluation of the 2006 demonstration is being managed jointly by CMS' Office of Research, Development and Information (ORDI) and the National Cancer Institute (NCI). Contractor bids have been submitted for the evaluation and an award is expected to be made by Fall 2006.

**IVIG**

CMS and other components of the Department of Health and Human Services (HHS) have heard concerns from some providers and beneficiary groups about the adequacy of the intravenous immune globulin (IVIG) supply and Medicare reimbursement for these products. Access to care is very important to the Medicare program and we are concerned about these reports.

During the past year, we have taken several actions to refine Medicare payment rates for IVIG that could be accomplished within our existing authorities. We established separate payment amounts for liquid and powder IVIG beginning April 2005. For 2006, we created special pre-administration handling fees of about $72 for physicians and $75 for hospital outpatient departments that administer IVIG. At the same time we have continued to work with manufacturers to ensure that they accurately calculate the ASPs that they report to us since these data are used to determine Medicare's payment amounts. The Medicare payment rate for IVIG is updated quarterly based on the most recent data reported by manufacturers. For the third quarter of 2006, the Medicare payment amount increased 11.9 percent for lyophilized IVIG (powdered form) and 3.5 percent for liquid IVIG.

The current IVIG market involves a complex set of demand, supply and other factors. Demand for IVIG has grown significantly in recent years, as off-label use of the product has increased. Because IVIG is a product derived from human plasma, supply increases require significant start-up time. Supply availability for IVIG has historically been cyclical. IVIG production capacity contracted somewhat in 2004 but increased again in 2005, and manufacturers indicated that they expect supply to increase further in 2006. The industry barometer of supply adequacy for May 2006 indicates that "inventory levels are between 2-5 weeks and supply is still adequate."

In addition, there are a number of other factors contributing to the complex IVIG situation. Manufacturer consolidations and changes in business practices have occurred, such as placing IVIG on allocation. Allocation means that a substantial portion of the IVIG distributed in the United States is not for sale on the open market, but has been obligated for delivery to Group Purchasing Organizations (GPOs), distributors, and end-users based on long-term contracts with manufacturers. There are also reports of some IVIG product being diverted to the secondary (resale) market where product is reportedly being sold with extremely high markup.

A number of components of HHS continue to work together, and with manufacturers, providers, patient groups, and stakeholders to understand the present situation and to assess potential actions that will help to ensure an adequate supply of IVIG and patients receiving appropriate and high quality care. To better understand the market for IVIG and evaluate access and reimbursement concerns from patients and physicians, HHS has commissioned an independent, expert study to assess these factors. We want to maintain access to IVIG, but it is important to determine the causes of the current concerns so we can implement appropriate measures to achieve this goal. We plan to continue to work with all stakeholders to understand the forces causing IVIG concerns and to help craft effective solutions.

**Summary**

The intentions of the MMA changes were to rationalize how Medicare pays for both Part B drugs and their administration, and also to create options for physicians to either buy and bill for Part B drugs, or to have those drugs furnished to a physician from a qualified vendor upon submission of a prescription order. Payments for drug administration codes have increased significantly from levels under the AWP payment system.

Studies by MedPAC, the Office of the Inspector General (OIG) and the Government Accountability Office suggest that oncologists can generally purchase drugs for the treatment of cancer at less than the Medicare payment amount. Furthermore, the OIG study found that this was true for both large and small practices. These studies suggest that the ASP system has helped Medicare payments for oncology drugs covered under Part B move closer to actual market prices. We are hopeful that the initial success of the CAP program will encourage additional physician enrollment.

The Department plans to continue monitoring payment for and access to Part B drugs. CMS and other agencies within HHS are continuing to work with manufacturers, providers, patient groups,

and stakeholders to ensure that patients receive appropriate and high quality care.  I look forward to answering any questions you may have.

# **ELIGARD®** 7.5 mg, 22.5 mg, 30 mg, 45 mg
(leuprolide acetate for injectable suspension)

## DESCRIPTION

ELIGARD® is a sterile polymeric matrix formulation of leuprolide acetate for subcutaneous injection. It is designed to deliver leuprolide acetate at a controlled rate over a one-, three-, four- or six-month therapeutic period.

Leuprolide acetate is a synthetic nonapeptide analog of naturally occurring gonadotropin releasing hormone (GnRH or LH-RH) that, when given continuously, inhibits pituitary gonadotropin secretion and suppresses testicular and ovarian steroidogenesis. The analog possesses greater potency than the natural hormone. The chemical name is 5-oxo-L-prolyl-L-histidyl-L-tryptophyl-L-seryl-L-tyrosyl-D-leucyl-L-leucyl-L-arginyl-N-ethyl-L-prolinamide acetate (salt) with the following structural formula:

ELIGARD® is prefilled and supplied in two separate, sterile syringes whose contents are mixed immediately prior to administration. The two syringes are joined and the single dose product is mixed until it is homogenous. ELIGARD® is administered subcutaneously, where it forms a solid drug delivery depot.

One syringe contains the ATRIGEL® Delivery System and the other contains leuprolide acetate. ATRIGEL® is a polymeric (non-gelatin containing) delivery system consisting of a biodegradable poly (DL-lactide-co-glycolide) (PLGH or PLG) polymer formulation dissolved in a biocompatible solvent, *N*-methyl-2-pyrrolidone (NMP).

Refer to Table 1 for the delivery system composition and constituted product formulation for each ELIGARD® product.

**Table 1. ELIGARD® Delivery System Composition and Constituted Product Formulation**

| | | ELIGARD® 7.5 mg | ELIGARD® 22.5 mg | ELIGARD® 30 mg | ELIGARD® 45 mg |
|---|---|---|---|---|---|
| ATRIGEL® Delivery System Syringe | Polymer | PLGH | PLG | PLG | PLG |
| | Polymer description | Copolymer containing carboxyl endgroups | Copolymer with hexanediol | Copolymer with hexanediol | Copolymer with hexanediol |
| | Polymer DL-lactide to Glycolide Molar Ratio | 50:50 | 75:25 | 75:25 | 85:15 |
| Constituted Product | Polymer delivered | 82.5 mg | 158.6 mg | 211.5 mg | 165 mg |
| | NMP delivered | 160.0 mg | 193.9 mg | 258.5 mg | 165 mg |
| | Leuprolide acetate delivered | 7.5 mg | 22.5 mg | 30 mg | 45 mg |
| | Approximate Leuprolide free base equivalent | 7.0 mg | 21 mg | 28 mg | 42 mg |
| | Approximate administered formulation weight | 250 mg | 375 mg | 500 mg | 375 mg |
| | Approximate injection volume | 0.25 mL | 0.375 mL | 0.5 mL | 0.375 mL |

## CLINICAL PHARMACOLOGY

Leuprolide acetate, an LH-RH agonist, acts as a potent inhibitor of gonadotropin secretion when given continuously in therapeutic doses. Animal and human studies indicate that after an initial stimulation, chronic administration of leuprolide acetate results in suppression of testicular and ovarian steroidogenesis. This effect is reversible upon discontinuation of drug therapy.

In humans, administration of leuprolide acetate results in an initial increase in circulating levels of luteinizing hormone (LH) and follicle stimulating hormone (FSH), leading to a transient increase in levels of the gonadal steroids (testosterone and dihydrotestosterone in males, and estrone and estradiol in premenopausal females). However, continuous administration of leuprolide acetate results in decreased levels of LH and FSH. In males, testosterone is reduced to below castrate threshold (≤ 50 ng/dL). These decreases occur within two to four weeks after initiation of treatment. Long-term studies have shown that continuation of therapy with leuprolide acetate maintains testosterone below the castrate level for up to seven years.

## PHARMACODYNAMICS

Following the first dose of ELIGARD®, mean serum testosterone concentrations transiently increased, then fell to below castrate threshold (≤ 50 ng/dL) within three weeks for all ELIGARD® concentrations.

Continued monthly treatment with ELIGARD® 7.5 mg maintained castrate testosterone suppression throughout the study. No breakthrough of testosterone concentrations above castrate

threshold (> 50 ng/dL) occurred at any time during the study once castrate suppression was achieved (Figure 1).

One patient received less than a full dose of ELIGARD® 22.5 mg at baseline, never suppressed and withdrew from the study at Day 73.  Of the 116 patients remaining in the study, 115 (99%) had serum testosterone levels below the castrate threshold by Month 1 (Day 28).  By Day 35, 116 (100%) had serum testosterone levels below the castrate threshold.  Once testosterone suppression was achieved, one patient (< 1%) demonstrated breakthrough (concentrations > 50 ng/dL after achieving castrate levels) following the initial injection; that patient remained below the castrate threshold following the second injection (Figure 2).

One patient withdrew from the ELIGARD® 30 mg study at Day 14.  Of the 89 patients remaining in the study, 85 (96%) had serum testosterone levels below the castrate threshold by Month 1 (Day 28).  By Day 42, 89 (100%) of patients attained castrate testosterone suppression.  Once castrate testosterone suppression was achieved, three patients (3%) demonstrated breakthrough (concentrations > 50 ng/dL after achieving castrate levels) (Figure 3).

One patient at Day 1 and another patient at Day 29 were withdrawn from the ELIGARD® 45 mg study.  Of the 109 patients remaining in the study, 108 (99.1%) had serum testosterone levels below the castrate threshold by Month 1 (Day 28).  One patient did not achieve castrate suppression and was withdrawn from the study at Day 85.  Once castrate testosterone suppression was achieved, one patient (< 1%) demonstrated breakthrough (concentrations > 50 ng/dL after achieving castrate levels) (Figure 4).

Leuprolide acetate is not active when given orally.

## PHARMACOKINETICS

*Absorption:*

*ELIGARD® 7.5 mg*

The pharmacokinetics/pharmacodynamics observed during three once-monthly injections in 20 patients with advanced prostate cancer is shown in Figure 1.  Mean serum leuprolide concentrations following the initial injection rose to 25.3 ng/mL ($C_{max}$) at approximately 5 hours after injection.  After the initial increase following each injection, serum concentrations remained relatively constant (0.28 – 2.00 ng/mL).

**Figure 1 Pharmacokinetic/Pharmacodynamic Response (N=20) to ELIGARD® 7.5 mg – Patients Dosed Initially and at Months 1 and 2**



A reduced number of sampling timepoints resulted in the apparent decrease in $C_{max}$ values with the second and third doses of ELIGARD® 7.5 mg (Figure 1).

*ELIGARD® 22.5 mg*

The pharmacokinetics/pharmacodynamics observed during two injections every three months (ELIGARD® 22.5 mg) in 22 patients with advanced prostate cancer is shown in Figure 2. Mean serum leuprolide concentrations rose to 127 ng/mL and 107 ng/mL at approximately 5 hours following the initial and second injections, respectively. After the initial increase following each injection, serum concentrations remained relatively constant (0.2 – 2.0 ng/mL).

*Figure 2 Pharmacokinetic/Pharmacodynamic Response (N=22) to ELIGARD® 22.5 mg – Patients Dosed Initially and at Month 3*

*ELIGARD® 30 mg*

The pharmacokinetics/pharmacodynamics observed during injections administered initially and at four months (ELIGARD® 30 mg ) in 24 patients with advanced prostate cancer is shown in Figure 3. Mean serum leuprolide concentrations following the initial injection rose rapidly to 150 ng/mL ($C_{max}$) at approximately 3.3 hours after injection. After the initial increase following each injection, mean serum concentrations remained relatively constant (0.1 – 1.0 ng/mL).

*Figure 3 Pharmacokinetic/Pharmacodynamic Response (N=24) to ELIGARD® 30 mg – Patients Dosed Initially and at Month 4*

*ELIGARD® 45 mg*

The pharmacokinetics/pharmacodynamics observed during injections administered initially and at six months (ELIGARD® 45 mg) in 27 patients with advanced prostate cancer is shown in Figure 4. Mean serum leuprolide concentrations rose to 82.0 ng/mL and 102 ng/mL ($C_{max}$) at approximately 4.5 hours following the initial and second injections, respectively. After the initial increase following each injection, mean serum concentrations remained relatively constant (0.2 – 2.0 ng/mL).

*Figure 4 Pharmacokinetic/Pharmacodynamic Response (N=27) to ELIGARD® 45 mg - Patients Dosed Initially and at Month 6*

There was no evidence of significant accumulation during repeated dosing. Nondetectable leuprolide plasma concentrations have been occasionally observed during ELIGARD® administration, but testosterone levels were maintained at castrate levels.

*Distribution:* The mean steady-state volume of distribution of leuprolide following intravenous bolus administration to healthy male volunteers was 27 L.[1] In vitro binding to human plasma proteins ranged from 43% to 49%.

*Metabolism:* In healthy male volunteers, a 1-mg bolus of leuprolide administered intravenously revealed that the mean systemic clearance was 8.34 L/h, with a terminal elimination half-life of approximately 3 hours based on a two compartment model.[1]

No drug metabolism study was conducted with ELIGARD®. Upon administration with different leuprolide acetate formulations, the major metabolite of leuprolide acetate is a pentapeptide (M-1) metabolite.

*Excretion:* No drug excretion study was conducted with ELIGARD®.

*Special Populations:*

*Geriatrics:*  The majority of the patients (approximately 70%) studied in the clinical trials were age 70 and older.

*Pediatrics:*  The safety and effectiveness of ELIGARD® in pediatric patients have not been established (see **CONTRAINDICATIONS**).

*Race:*  In patients studied, mean serum leuprolide concentrations were similar regardless of race.  Refer to Table 2 for distribution of study patients by race.

Table 2.  Race Characterization of Study Patients

| Race | ELIGARD® 7.5 mg | ELIGARD® 22.5 mg | ELIGARD® 30 mg | ELIGARD® 45 mg |
|---|---|---|---|---|
| White | 26 | 19 | 18 | 17 |
| Black | - | 4 | 4 | 7 |
| Hispanic | 2 | 2 | 2 | 3 |

*Renal and Hepatic Insufficiency:*  The pharmacokinetics of ELIGARD® in hepatically and renally impaired patients have not been determined.

*Drug-Drug Interactions:*  No pharmacokinetic drug-drug interaction studies were conducted with ELIGARD®.

**CLINICAL STUDIES**

One open-label, multicenter study was conducted with each ELIGARD® formulation (7.5 mg, 22.5 mg, 30 mg, and 45 mg) in patients with Jewett stage A though D prostate cancer who were treated with at least a single injection of study drug (Table 3).  These studies evaluated the achievement and maintenance of castrate serum testosterone suppression over the duration of therapy (Figures 5-8).

During the AGL9904 study using ELIGARD® 7.5 mg, once testosterone suppression was achieved, no patients (0%) demonstrated breakthrough (concentration >50 ng/dL) at any time in the study.

During the AGL9909 study using ELIGARD® 22.5 mg, once testosterone suppression was achieved, only one patient (< 1%) demonstrated breakthrough following the initial injection; that patient remained below the castrate threshold following the second injection.

During the AGL0001 study using ELIGARD® 30 mg, once testosterone suppression was achieved, three patients (3%) demonstrated breakthrough.  In the first of these patients, a single serum testosterone concentration of 53 ng/dL was reported on the day after the second injection. In this patient, castrate suppression was reported for all other timepoints.  In the second patient, a serum testosterone concentration of 66 ng/dL was reported immediately prior to the second injection.  This rose to a maximum concentration of 147 ng/dL on the second day after the second injection.  In this patient, castrate suppression was again reached on the seventh day after

the second injection and was maintained thereafter. In the final patient, serum testosterone concentrations > 50 ng/dL were reported at 2 and at 8 hours after the second injection. Serum testosterone concentration rose to a maximum of 110 ng/dL on the third day after the second injection. In this patient, castrate suppression was again reached eighteen days after the second injection and was maintained until the final day of the study, when a single serum testosterone concentration of 55 ng/dL was reported.

During the AGL0205 study using ELIGARD® 45 mg, once testosterone suppression was achieved, one patient (<1%) demonstrated breakthrough. This patient reached castrate suppression at Day 21 and remained suppressed until Day 308 when his testosterone level rose to 112 ng/dL. At Month 12 (Day 336), his testosterone was 210 ng/dL.

**Table 3. Summary of ELIGARD® Clinical Studies**

| | | 7.5 mg | 22.5 mg | 30 mg | 45 mg |
|---|---|---|---|---|---|
| Study number | | AGL9904 | AGL9909 | AGL0001 | AGL0205 |
| Total Number of patients | | 120 (117 completed) | 117[2] (111 completed[3]) | 90 (82 completed[4]) | 111 (103 completed[5]) |
| Jewett Stages | Stage A | - | 2 | 2 | 5 |
| | Stage B | - | 19 | 38 | 43 |
| | Stage C | 89 | 60 | 16 | 19 |
| | Stage D | 31 | 36 | 34 | 44 |
| Treatment | | 6 monthly injections | 1 injection (4 patients) | 1 injection (5 patients) | 1 injection (5 patients) |
| | | | 2 injections, one every three months (113 patients) | 2 injections, one every four months (85 patients) | 2 injections, one every six months (106 patients) |
| Duration of therapy | | 6 months | 6 months | 8 months | 12 months |
| Mean testosterone concentration (ng/dL) | Baseline | 361.3 | 367.1 | 385.5 | 367.7 |
| | Day 2 | 574.6 (Day 3) | 588.0 | 610.0 | 588.6 |
| | Day 14 | Below Baseline (Day 10) | Below Baseline | Below Baseline | Below Baseline |
| | Day 28 | 21.8 | 27.7 (Day 21) | 17.2 | 16.7 |
| | Conclusion | 6.1 | 10.1 | 12.4 | 12.6 |
| Number of patients below castrate threshold (≤ 50 ng/dL) | Day 28 | 112 of 119 (94.1%) | 115 of 116 (99%) | 85 of 89 (96%) | 108 of 109 (99.1%) |
| | Day 35 | - | 116 (100%) | - | - |
| | Day 42 | 119 (100%) | - | 89 (100%) | - |
| | Conclusion | 117[1] (100%) | 111 (100%) | 81 (99%) | 102 (99%) |
| | | | | | |

1. Two patients withdrew for reasons unrelated to drug.

2. One patient received less than a full dose at Baseline, never suppressed, and was withdrawn at Day 73 and given an alternate treatment.

3. All non-evaluable patients who attained castration by Day 28 maintained castration at each timepoint up to and including the time of withdrawal.

4. One patient withdrew on Day 14. All 7 non-evaluable patients who had achieved castration by Day 28 maintained castration at each timepoint, up to and including the time of withdrawal.

5. Two patients were withdrawn prior to the Month 1 blood draw. One patient did not achieve castration and was withdrawn on Day 85. All 5 non-evaluable patients who attained castration by Day 28, maintained castration at each timepoint up to and including the time of withdrawal.

*Figure 5  ELIGARD® 7.5 mg Mean Serum Testosterone Concentrations (n=117)*



*Figure 6  ELIGARD® 22.5 mg Mean Serum Testosterone Concentrations (n=111)*



*Figure 7 ELIGARD® 30 mg Mean Serum Testosterone Concentrations (n = 90)*



Figure 8 ELIGARD® 45 mg Mean Serum Testosterone Concentrations (n=103)

Serum PSA decreased in all patients in all studies whose Baseline values were elevated above the normal limit. Refer to Table 4 for a summary of the effectiveness of ELIGARD® in reducing serum PSA values.

**Table 4 Effect of ELIGARD® on Patient Serum PSA Values**

| ELIGARD® | 7.5 mg | 22.5 mg | 30 mg | 45 mg |
|---|---|---|---|---|
| Mean PSA Reduction at Study Conclusion | 94% | 98% | 86% | 97% |
| Patients with Normal PSA at Study Conclusion* | 94% | 91% | 93% | 95% |

*Among patients who presented with elevated levels at Baseline

Other secondary efficacy endpoints evaluated included WHO performance status, bone pain, urinary pain and urinary signs and symptoms. Refer to Table 5 for a summary of these endpoints.

**Table 5 Secondary Efficacy Endpoints**

| | | ELIGARD® 7.5 mg | ELIGARD® 22.5 mg | ELIGARD® 30 mg | ELIGARD® 45 mg |
|---|---|---|---|---|---|
| Baseline | WHO Status = 0[1] | 88% | 94% | 90% | 90% |
| | WHO Status = 1[2] | 11% | 6% | 10% | 7% |
| | WHO Status ≥ 2[3] | | | | 3% |
| | Mean Bone Pain[4] (range) | 1.22 (1-9) | 1.20 (1-9) | 1.20 (1-7) | 1.38 (1-7) |
| | Mean Urinary Pain (range) | 1.12 (1-5) | 1.02 (1-2) | 1.01 (1-2) | 1.22 (1-8) |
| | Mean Urinary Signs and Symptoms (range) | Low | 1.09 (1-4) | Low | Low |
| | Number of Patients with Prostate Abnormalities | 102 (85%) | 96 (82%) | 66 (73%) | 89 (80%) |
| | | Month 6 | Month 6 | Month 8 | Month 12 |
| Follow-up | WHO Status = 0 | Unchanged | 96% | 87% | 94% |
| | WHO Status = 1 | Unchanged | 4% | 12% | 5% |
| | WHO Status ≥ 2 | | | 1% | 1% |
| | Mean Bone Pain (range) | 1.26 (1-7) | 1.22 (1-5) | 1.19 (1-8) | 1.31 (1-8) |
| | Mean Urinary Pain (range) | 1.07 (1-8) | 1.10 (1-8) | 1.00 (1-1) | 1.07 (1-5) |
| | Mean Urinary Signs and Symptoms (range) | Modestly Decreased | 1.18 (1-7) | Modestly Decreased | Modestly Decreased |
| | Number of Patients with Prostate Abnormalities | 77 (64%) | 76 (65%) | 54 (60%) | 60 (58%) |

1. WHO Status = 0 classified as "fully active."

2. WHO Status = 1 classified as "restricted in strenuous activity but ambulatory and able to carry out work of a light or sedentary nature."

3. WHO Status ≥ 2 classified as "ambulatory but unable to carry out work activities."

4. Pain score scale: 1 (no pain) to 10 (worst pain possible).

## INDICATIONS AND USAGE

ELIGARD® is indicated for the palliative treatment of advanced prostate cancer.

**CONTRAINDICATIONS**

1. ELIGARD® is contraindicated in patients with hypersensitivity to GnRH, GnRH agonist analogs or any of the components of ELIGARD®. Anaphylactic reactions to synthetic GnRH or GnRH agonist analogs have been reported in the literature.[2]

2. ELIGARD® is contraindicated in women and in pediatric patients and was not studied in women or children. Moreover, leuprolide acetate can cause fetal harm when administered to a pregnant woman. Major fetal abnormalities were observed in rabbits but not in rats after administration of leuprolide acetate throughout gestation. There were increased fetal mortality and decreased fetal weights in rats and rabbits. The effects on fetal mortality are expected consequences of the alterations in hormonal levels brought about by this drug. The possibility exists that spontaneous abortion may occur.

**WARNINGS**

ELIGARD® 7.5 mg 22.5 mg 30 mg, like other LH-RH agonists, causes a transient increase in serum concentrations of testosterone during the first week of treatment. ELIGARD® 45 mg causes a transient increase in serum concentrations of testosterone during the first two weeks of treatment. Patients may experience worsening of symptoms or onset of new signs and symptoms during the first few weeks of treatment, including bone pain, neuropathy, hematuria, or bladder outlet obstruction. Isolated cases of ureteral obstruction and or spinal cord compression, which may contribute to paralysis with or without fatal complications, have been observed in the palliative treatment of advanced prostate cancer using LH-RH agonists (see **PRECAUTIONS**).

If spinal cord compression or ureteral obstruction develops, standard treatment of these complications should be instituted.

**PRECAUTIONS**

*General:* Patients with metastatic vertebral lesions and or with urinary tract obstruction should be closely observed during the first few weeks of therapy (see **WARNINGS** section).

*Laboratory Tests:* Response to ELIGARD® should be monitored by measuring serum concentrations of testosterone and prostate specific antigen periodically.

In the majority of patients, testosterone levels increased above Baseline during the first week, declining thereafter to Baseline levels or below by the end of the second or third week. Castrate levels were generally reached within two to four weeks.

Castrate testosterone levels were maintained for the duration of the treatment with ELIGARD® 7.5 mg. No increases to above the castrate level occurred in any of the patients.

Castrate levels were generally maintained for the duration of treatment with ELIGARD® 22.5 mg.

Once castrate levels were achieved with ELIGARD® 30 mg, most (86/89) patients remained suppressed throughout the study.

Once castrate levels were achieved with ELIGARD® 45 mg, only one patient (< 1%) experienced a breakthrough, with testosterone levels > 50 ng/dL.

Results of testosterone determinations are dependent on assay methodology. It is advisable to be aware of the type and precision of the assay methodology to make appropriate clinical and therapeutic decisions.

*Drug Interactions:* See **PHARMACOKINETICS**.

*Drug/Laboratory Test Interactions:* Therapy with leuprolide acetate results in suppression of the pituitary-gonadal system. Results of diagnostic tests of pituitary gonadotropic and gonadal functions conducted during and after leuprolide therapy may be affected.

*Carcinogenesis, Mutagenesis, Impairment of Fertility:* Two-year carcinogenicity studies were conducted with leuprolide acetate in rats and mice. In rats, a dose-related increase of benign pituitary hyperplasia and benign pituitary adenomas was noted at 24 months when the drug was administered subcutaneously at high daily doses (0.6 to 4 mg/kg). There was a significant but not dose-related increase of pancreatic islet-cell adenomas in females and of testicular interstitial cell adenomas in males (highest incidence in the low dose group). In mice, no leuprolide acetate-induced tumors or pituitary abnormalities were observed at a dose as high as 60 mg/kg for two years. Patients have been treated with leuprolide acetate for up to three years with doses as high as 10 mg/day and for two years with doses as high as 20 mg/day without demonstrable pituitary abnormalities. No carcinogenicity studies have been conducted with ELIGARD®.

Mutagenicity studies have been performed with leuprolide acetate using bacterial and mammalian systems and with ELIGARD® 7.5 mg in bacterial systems. These studies provided no evidence of a mutagenic potential.

*Pregnancy, Teratogenic Effects:* Pregnancy category X (see **CONTRAINDICATIONS**).

*Pediatric Use:* ELIGARD® is contraindicated in pediatric patients and was not studied in children (see **CONTRAINDICATIONS**).

## ADVERSE REACTIONS

The safety of all ELIGARD® formulations was evaluated in clinical trials involving patients with advanced prostate cancer. In addition, the safety of ELIGARD® 7.5 mg was evaluated in 8 surgically castrated males (Table 7). ELIGARD®, like other LH-RH analogs, caused a transient increase in serum testosterone concentrations during the first one to two weeks of treatment. Therefore, potential exacerbations of signs and symptoms of the disease during the first weeks of treatment are of concern in patients with vertebral metastases and/or urinary obstruction or

hematuria. If these conditions are aggravated, it may lead to neurological problems such as weakness and/or paresthesia of the lower limbs or worsening of urinary symptoms (see **WARNINGS** and **PRECAUTIONS**).

During the clinical trials, injection sites were closely monitored. Refer to Table 6 for a summary of reported injection site events.

**Table 6 Reported Injection Site Adverse Events**

| | 7.5 mg | 22.5 mg | 30 mg | 45 mg |
|---|---|---|---|---|
| Study Number | AGL9904 | AGL9909 | AGL0001 | AGL0205 |
| Number of patients | 120 | 117 | 90 | 111 |
| Treatment | 1 injection every month up to 6 months | 1 injection every 3 months up to 6 months | 1 injection every 4 months up to 8 months | 1 injection every 6 months up to 12 months |
| Number of injections | 716 | 230 | 175 | 217 |
| | | | | |
| Transient burning/stinging | 248 (34.6%) injections:84% reported as mild | 50 (21.7%) injections: 86% reported as mild | 35 (20%) injections: 100% reported as mild | 35 (16%) injections: 91.4% reported as mild[3] |
| Pain (generally brief and mild) | 4.3% of injections (18.3% of patients) | 3.5% of injections (6.0% of patients) | 2.3% of injections[2] (3.3% of patients) | 4.6% of injections[4] |
| Erythema (generally brief and mild) | 2.6% of injections (12.5% of patients) | 0.9% of injections[1] (1.7% of patients) | 1.1% of injections (2.2% of patients) | |
| Bruising (Mild) | 2.5% of injections (11.7% of patients) | 1.7% of injections (3.4% of patients) | | 2.3% of injections[5] |
| Pruritis | 1.4% of injections (9.2% of patients) | 0.4% of injections (0.9% of patients) | | |
| Induration | 0.4% of injections (2.5% of patients) | | | |
| Ulceration | 0.1% of injections (< 0.8% of patients) | | | |

1. Erythema was reported following 2 injections of ELIGARD® 22.5 mg. One report characterized the erythema as mild and it resolved within 7 days. The other report characterized the erythema as moderate and it resolved within 15 days. Neither patient experienced erythema at multiple injections.

2. A single event reported as moderate pain resolved within two minutes and all 3 mild pain events resolved within several days following injection of ELIGARD® 30 mg.

3. Following injection of ELIGARD® 30 mg, three of the 35 burning stinging events were reported as moderate.

4. Transient pain was reported as mild in intensity in nine of ten (90%) events and moderate in intensity in one of ten (10%) events following injection of ELIGARD® 45 mg.

5. Mild bruising was reported following 5 (2.3%) study injections and moderate bruising was reported following 2 (< 1%) study injections of ELIGARD® 45 mg.

These localized adverse events were non-recurrent over time. No patient discontinued therapy due to an injection site adverse event.

The following possibly or probably related systemic adverse events occurred during clinical trials with ELIGARD®, and were reported in > 2% of patients (Table 7).  Often, causality is difficult to assess in patients with metastatic prostate cancer.  Reactions considered not drug-related are excluded.

**Table 7 Summary of Possible or Probably Related Systemic Adverse Events Reported by > 2% of Patients treated with ELIGARD®**

| | | 7.5 mg | 7.5 mg | 22.5 mg | 30 mg | 45 mg |
|---|---|---|---|---|---|---|
| Study Number | | AGL9904 | AGL9802 | AGL9909 | AGL0001 | AGL0205 |
| Number of patients | | 120 | 8 | 117 | 90 | 111 |
| Treatment | | 1 injection every month up to 6 months | 1 injection (surgically castrated patients) | 1 injection every 3 months up to 6 months | 1 injection every 4 months up to 8 months | 1 injection every 6 months up to 12 months |
| Body System | Adverse Event | Number (Percent) | | | | |
| Body as a Whole | Malaise and Fatigue | 21 (17.5%) | | 7 (6.0%) | 12 (13.3%) | 13 (11.7%) |
| | Weakness | | | | | 4 (3.6%) |
| Nervous System | Dizziness | 4 (3.3%) | | | 4 (4.4%) | |
| Vascular | Hot flashes/sweats | 68 (56.7%)* | 2 (25.0%)* | 66 (56.4%)* | 66 (73.3%)* | 64 (57.7%)* |
| Renal/Urinary | Urinary frequency | | | 3 (2.6%) | 2 (2.2%) | |
| | Nocturia | | | | 2 (2.2%) | |
| Gastrointestinal | Nausea | | | 4 (3.4%) | 2 (2.2%) | |
| | Gastroenteritis/colitis | 3 (2.5%) | | | | |
| Skin | Pruritis | | | 3 (2.6%) | | |
| | Clamminess | | | | 4 (4.4%)* | |
| | Night sweats | | | | 3 (3.3%)* | 3 (2.7%)* |
| | Alopecia | | | | 2 (2.2%) | |
| Musculoskeletal | Arthralgia | | | 4 (3.4%) | | |
| | Myalgia | | | | 2 (2.2%) | 5 (4.5%) |
| | Pain in limb | | | | | 3 (2.7%) |
| Reproductive | Testicular atrophy | 6 (5.0%) | | | 4 (4.4%)* | 8 (7.2%)* |
| | Gynecomastia | | | | 2 (2.2%)* | 4 (3.6%)* |
| | Testicular pain | | | | 2 (2.2%) | |
| Psychiatric | Decreased libido | | | | 3 (3.3%)* | |

*Expected pharmacological consequences of testosterone suppression.

In the patient populations studied with ELIGARD® 7.5 mg, a total of 86 hot flashes/sweats adverse events were reported in 70 patients. Of these, 71 events (83%) were mild; 14 (16%) were moderate; 1 (1%) was severe.

In the patient population studied with ELIGARD® 22.5 mg, a total of 84 hot flashes/sweats adverse events were reported in 66 patients. Of these, 73 events (87%) were mild; 11 (13%) were moderate; none were severe.

In the patient population studied with ELIGARD® 30 mg, a total of 75 hot flash adverse events were reported in 66 patients. Of these, 57 events (76%) were mild; 16 (21%) were moderate; 2 (3%) were severe.

In the patient population studied with ELIGARD® 45 mg, a total of 89 hot flash adverse events were reported in 64 patients. Of these, 62 events (70%) were mild; 27 (30%) were moderate; none were severe.

In addition, the following possibly or probably related systemic adverse events were reported by < 2% of the patients treated with ELIGARD® in these clinical studies.

| Body System | Adverse Event |
|---|---|
| General | Sweating, insomnia, syncope, rigors, weakness, lethargy |
| Gastrointestinal | Flatulence, constipation, dyspepsia |
| Hematologic | Decreased red blood cell count, hematocrit and hemoglobin |
| Metabolic | Weight gain |
| Musculoskeletal | Tremor, backache, joint pain, muscle atrophy, limb pain |
| Nervous | Disturbance of smell and taste, depression, vertigo |
| Psychiatric | Insomnia, depression, loss of libido* |
| Renal/Urinary | Difficulties with urination, pain on urination, scanty urination, bladder spasm, blood in urine, urinary retention, urinary urgency, incontinence, nocturia, nocturia aggravated |
| Reproductive/ Urogenital: | Testicular soreness/pain, impotence*, decreased libido*, gynecomastia*, breast soreness/tenderness*, testicular atrophy*, erectile dysfunction, penile disorder*, reduced penis size |
| Skin | Alopecia, clamminess, night sweats*, sweating increased* |
| Vascular | Hypertension, hypotension |

* Expected pharmacological consequences of testosterone suppression.

**Changes in Bone Density:** Decreased bone density has been reported in the medical literature in men who have had orchiectomy or who have been treated with an LH-RH agonist analog.[3] It can be anticipated that long periods of medical castration in men will have effects on bone density.

Post-Marketing

Pituitary apoplexy: During post-marketing surveillance, rare cases of pituitary apoplexy (a clinical syndrome secondary to infarction of the pituitary gland) have been reported after the administration of gonadotropin-releasing hormone agonists. In a majority of these cases, a pituitary adenoma was diagnosed with a majority of pituitary apoplexy cases occurring within 2 weeks of the first dose, and some within the first hour. In these cases, pituitary apoplexy has presented as sudden headache, vomiting, visual changes, ophthalmoplegia, altered mental status, and sometimes cardiovascular collapse. Immediate medical attention has been required.

## OVERDOSAGE

In clinical trials using daily subcutaneous injections of leuprolide acetate in patients with prostate cancer, doses as high as 20 mg/day for up to two years caused no adverse effects differing from those observed with the 1 mg/day dose.

## DOSAGE AND ADMINISTRATION

ELIGARD® is administered subcutaneously and provides continuous release of leuprolide acetate over a one-, three-, four- or six-month treatment period (Table 8). The injection delivers the dose of leuprolide acetate incorporated in a polymer formulation.

**Table 8 ELIGARD® Recommended Dosing**

| Dosage | 7.5 mg | 22.5 mg | 30 mg | 45 mg |
|---|---|---|---|---|
| Recommended dose | 1 injection every month | 1 injection every 3 months | 1 injection every 4 months | 1 injection every 6 months |

Once mixed, ELIGARD® should be discarded if not administered within 30 minutes.

As with other drugs administered by subcutaneous injection, the injection site should vary periodically. The specific injection location chosen should be an area with sufficient soft or loose subcutaneous tissue. In clinical trials, the injection was administered in the upper- or mid-abdominal area. Avoid areas with brawny or fibrous subcutaneous tissue or locations that could be rubbed or compressed (i.e., with a belt or clothing waistband).

### Mixing Procedure

**IMPORTANT:** Allow the product to reach room temperature before using. **Once mixed, the product must be administered within 30 minutes.**

Follow the instructions as directed to ensure proper preparation of ELIGARD® prior to administration:

ELIGARD® is packaged in either thermoformed trays or pouches. Each carton contains:

- One sterile Syringe A pre-filled with the ATRIGEL® Delivery System

- One Syringe B pre-filled with leuprolide acetate powder

- One long white plunger rod for use with Syringe B

- One sterile needle

- Desiccant pack(s)

1.  On a clean field, open all of the packages and remove the contents.  Discard the desiccant pack(s).



Figure 9                    Figure 10

2.  **Pull out the blue-tipped short plunger rod and attached stopper from Syringe B and discard (Figure 9).**  Gently insert the long, white replacement plunger rod into the gray primary stopper remaining in Syringe B by twisting it in place (Figure 10).



Figure 11                    Figure 12

3.  Unscrew the clear cap from Syringe A (Figure 11).  Remove the gray rubber cap from Syringe B (Figure 12).



Figure 13

4.  Join the two syringes together by pushing in and twisting until secure (Figure 13).



Figure 14

5. Inject the liquid contents of Syringe A into Syringe B containing the leuprolide acetate. Thoroughly mix the product by pushing the contents of both syringes back and forth between syringes (approximately 45 seconds) to obtain a uniform suspension (Figure 14). (7.5 mg PI, 22.5 mg PI, 30 mg PI, 45 mg PI) When thoroughly mixed, the suspension will appear light tan to tan (ELIGARD® 7.5 mg) or colorless to pale yellow (ELIGARD®, 22.5 mg, 30 mg and 45 mg) in color. **Please Note: Product must be mixed as described; shaking will not provide adequate mixing of the product.**

Figure 15

6. Hold the syringes vertically with Syringe B on the bottom. The syringes should remain securely coupled. Draw the entire mixed product into Syringe B (short, wide syringe) by depressing the Syringe A plunger and slightly withdrawing the Syringe B plunger. Uncouple Syringe A while continuing to push down on the Syringe A plunger (Figure 15). **Note: Small air bubbles will remain in the formulation – this is acceptable.**

Figure 16

Figure 17

Figure 18

7. Hold Syringe B upright. Remove the cap on the bottom of the sterile needle cartridge by twisting it (Figure 16). Attach the needle cartridge to the end of Syringe B (Figure 17) by pushing in and turning the needle until it is firmly seated. Do not twist the needle onto the syringe until it is stripped. Pull off the clear needle cartridge cover prior to administration (Figure 18).

**Administration Procedure**

**IMPORTANT:**  Allow the product to reach room temperature before using.  **Once mixed, the product must be administered within 30 minutes.**

1. Choose an injection site on the abdomen, upper buttocks, or anywhere with adequate amounts of subcutaneous tissue that does not have excessive pigment, nodules, lesions, or hair.  Since you can vary the injection site with a subcutaneous injection, choose an area that hasn't recently been used.

2. Cleanse the injection-site area with an alcohol swab.



3. Using the thumb and forefinger of your nondominant hand, grab and bunch the area of skin around the injection site.



4. Using your dominant hand, insert the needle quickly at a 90° angle. The approximate angle you use will depend on the amount and fullness of the subcutaneous tissue and the length of the needle. After the needle is inserted, release the skin with your nondominant hand.

5. Inject the drug using a slow, steady push.  Press down on the plunger until the syringe is empty.

6. Withdraw the needle quickly at the same angle used for insertion.

7. Discard all components safely in an appropriate biohazard container.

**HOW SUPPLIED**

ELIGARD® is available in a single use kit. The kit consists of a two-syringe mixing system, a sterile needle (Table 9), a silicone desiccant pouch to control moisture uptake, and a package insert for constitution and administration procedures. Each syringe is individually packaged. One contains the ATRIGEL® Delivery System and the other contains leuprolide acetate. When constituted, ELIGARD® is administered as a single dose.

**Table 9. ELIGARD® Needle specifications**

| ELIGARD® formulation | Gauge | Length |
|---|---|---|
| 7.5 mg | 20-gauge | ½-inch |
| 22.5 mg | 20-gauge | ½-inch |
| 30 mg | 20-gauge | 5/8-inch |
| 45 mg | 18-gauge | 5/8-inch |

ELIGARD® 7.5 mg – NDC 0024-0793-75
ELIGARD® 22.5 mg – NDC 0024-0222-05
ELIGARD® 30 mg – NDC 0024-0610-30
ELIGARD® 45 mg - NDC 0024-0605-45

**Rx only**

Store at 2 - 8 °C (35.6 – 46.4 °F)

Manufactured by: Tolmar, Inc
Fort Collins, CO 80526
for: QLT USA, Inc.
Fort Collins, CO 80525
Distributed by: sanofi-aventis U.S. LLC
Bridgewater, NJ 08807

44380, Rev 1 2/08 Printed in USA Revised 02 2008

[1] Sennello LT et al. Single-dose pharmacokinetics of leuprolide in humans following intravenous and subcutaneous administration. J Pharm Sci 1986; 75(2): 158-160.

[2] MacLeod TL et al. Anaphylactic reaction to synthetic luteinizing hormone releasing hormone. Fertil Steril 1987 Sept; 48(3): 500-502.

[3] Hatano T et al. Incidence of bone fracture in patients receiving luteinizing hormone-releasing hormone agonists for prostate cancer. BJU International 2000 86: 449-452.