```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


 IN RE:                          )
                                 )  CA No. 01-12257-PBS
 PHARMACEUTICAL INDUSTRY AVERAGE )
 WHOLESALE PRICE LITIGATION      )  Pages 1-88
                                 )




                       SETTLEMENT HEARING

             BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE






                      United States District Court
                      1 Courthouse Way, Courtroom 19
                      Boston, Massachusetts
                      April 27, 2009, 2:15 p.m.






                      LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
                 United States District Court
                 1 Courthouse Way, Room 3205
                      Boston, MA  02210
                       (617)345-6787
```

1    A P P E A R A N C E S:

2         STEVE W. BERMAN, ESQ. and SEAN R. MATT, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 1301 Fifth Avenue,
3    Suite 2900, Seattle, Washington, 98101, for the
     Plaintiffs.

4
          EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
5    LLP, One Main Street, Cambridge, Massachusetts, 02142,
     for the Plaintiffs.

6
          MARC H. EDELSON, ESQ., Edelson & Associates,
7    45 West Court Street, Doylestown, Pennsylvania, 18901,
     for the Plaintiffs.

8
          KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
9    55 W. Monroe Street, Suite 3300, Chicago, Illinois, 60603,
     for the Plaintiffs.

10
          JEFFREY L. KODROFF, ESQ., Spector & Roseman,
11   1818 Market Street, Suite 2500, Philadelphia, Pennsylvania,
     19103, for the Plaintiffs.

12
          RICHARD W. COHEN, ESQ., Lowey, Dannenberg, Cohen &
13   Hart, P.C., White Plains Plaza, One North Broadway, White
     Plains, New York, 10601-2310, for the Third-Party Payors.

14
          STEVEN F. BARLEY, ESQ., Hogan & Hartson, LLP,
15   111 South Calvert Street, Suite 1600, Baltimore, Maryland,
     21202, for AmGen Corporation.

16
          PETER W. MORGAN, ESQ., Dickstein Shapiro, LLP,
17   1825 Eye Street, N.W., Washington, D.C., 20006-5403,
     for Baxter International, Inc.

18
          JAMES P. MUEHLBERGER, ESQ., Shook, Hardy & Bacon, LLP,
19   2555 Grand Boulevard, Kansas City, Missouri, 64108-2613,
     for Aventis Pharmaceuticals, Inc.

20
          J. CLAYTON EVERETT, JR., ESQ., Morgan, Lewis & Bockius,
21   LLP, 1111 Pennsylvania Avenue, N.W., Washington, D.C.,
     20004, for Pharmacia Corporation.

22
          TINA M. TABACCHI, ESQ., Jones Day,
23   77 West Wacker, Chicago, Illinois, 60601-1692,
     for Abbott Laboratories.

24
          SARA JANE SHANAHAN, ESQ., Sherin and Lodgen, LLP,
25   101 Federal Street, Boston, Massachusetts, 02110,
     for Watson Pharmaceuticals, Inc.

1

A P P E A R A N C E S:   (Continued)

2

3       RICHARD D. RASKIN, ESQ., Sidley Austin, LLP,
   One South Dearborn, Chicago, Illinois, 60603,
   for Bayer Corporation.

4

5       MICHAEL C. OCCHUIZZO, ESQ., Kirkland & Ellis, LLP,
   655 Fifteenth Street, N.W., Washington, D.C., 20005,
   for Sicor, Inc.

6

7       CHRISTOPHER C. PALERMO, ESQ., Kelley Drye & Warren,
   LLP, 101 Park Avenue, New York, New York, 10178,
   for Dey, Inc.

8

9       KATHLEEN H. McGUAN, ESQ., Reed Smith, LLP,
   1301 K Street, N.W., Suite 1100, East Tower, Washington,
   D.C., 20005, for Fujisawa USA, Inc.

10

11       MICHAEL DeMARCO, ESQ., K & L Gates,
   State Street Financial Center, One Lincoln Street, Boston,
   Massachusetts, 02110, for Sanofi-Aventis.

12

13       GARY M. RONAN, ESQ., Goulston & Storrs,
   400 Atlantic Avenue, Boston, Massachusetts, 02110-3333,
   for Immunex Corporation.

14

15       JOHN J. PENTZ, ESQ., Class Action Fairness Group,
   2 Clock Tower Plaza, Maynard, Massachusetts, 01754,
   for Corinna Connick, Connie Pentz, and John Pentz.

16

17       EDWARD W. COCHRAN, ESQ., Cochran & Cochran,
   20030 Marchmont Road, Shaker Heights, Ohio, 44122,
   for Corinna Connick, Connie Pentz, and John Pentz.

18

19       RICHARD F. LANDRIGAN, ESQ., Costello & Landrigan,
   421 Highland Avenue, Davis Square, Somerville,
   Massachusetts, 02144, for Patricia Weatherly.

20

21       DONALD E. HAVILAND, JR., ESQ., The Haviland Law Firm,
   LLC, 111 S. Independence Mall East, Suite 1000,
   Philadelphia, Pennsylvania, 19106, for Reverend David

22    Aaronson, M. Joyce Howe, Larry Young, Therese Shepley,
   Harold Carter, Roger Clark, Ethel Walters, Katie Bean, James

23    Monk, Virginia Newell, Oral Roots, Rebecca Hopkins, and
   George Baker Thomson.

24

25       AUSTIN J. FREELEY, ESQ., 221 Lewis Wharf, Boston,
   Massachusetts, 02110l, for James King.

1             P R O C E E D I N G S

2             THE CLERK:  In Re:  Pharmaceutical Industry

3   Average Wholesale Price Litigation, Civil Action 01-12257,

4   will now be heard before this Court.  Will counsel please

5   identify themselves for the record.

6             MR. BERMAN:  Good afternoon, your Honor.  Steve

7   Berman on behalf of plaintiffs.

8             MR. MATT:  Good afternoon, your Honor.  Sean Matt

9   on behalf of plaintiffs.

10            MR. NOTARGIACOMO:  Good afternoon.  Ed

11  Notargiacomo on behalf of plaintiffs.

12            MR. LANDRIGAN:  Good afternoon, your Honor.

13  Richard Landrigan on behalf of Patricia Weatherly.

14            MR. PENTZ:  Good afternoon, your Honor.  John

15  Pentz on behalf of the Pentzes and Corinna Connick,

16  objectors.

17            MR. COCHRAN:  Your Honor, Edward W. Cochran on

18  behalf of objector Corinna Connick and the Pentzes.

19            MR. MUEHLBERGER:  Good afternoon, your Honor.  Jim

20  Muehlberger on behalf of Aventis Pharmaceuticals.

21            MR. MORGAN:  Good afternoon, Your Honor.  Peter

22  Morgan for Baxter.

23            MR. BARLEY:  Steve Barley for Amgen.

24            MR. WEXLER:  Good afternoon, your Honor.  Ken

25  Wexler for the plaintiffs.

1          MR. EDELSON:  Good afternoon, your Honor.  Marc

2     Edelson for the plaintiffs.

3          MR. KODROFF:  Jeffrey Kodroff, also for the

4     plaintiffs, your Honor.

5          MR. HAVILAND:  Good afternoon, your Honor.  Don

6     Haviland for the named consumer plaintiffs.

7          MR. FREELEY:  Good afternoon, your Honor.  Austin

8     Freeley for James Wilson, the objector.

9          MR. RASKIN:  Good afternoon, your Honor.  Richard

10    Raskin for defendant Bayer Corporation.

11         MR. COHEN:  Your Honor, Richard Cohen, TPP

12    allocation counsel.

13         MR. EVERETT:  Clay Everett for Pharmacia.

14         MS. SHANAHAN:  Good afternoon, your Honor.  Sara

15    Shanahan for Watson.

16         MR. PALERMO:  Good afternoon, your Honor.  Chris

17    Palermo for Dey.

18         MS. TABACCHI:  Tina Tabacchi, your Honor, for

19    Abbott Laboratories.

20         MR. DeMARCO:  Michael DeMarco for Aventis.

21         MR. OCCHUIZZO:  Mike Occhuizzo for Sicor.

22         MR. RONAN:  Gary Ronan for Immunex.

23         MS. McGUAN:  Kathleen McGuan for Fugisawa.

24         THE COURT:  All right, so have you worked together

25    to figure out essentially an order for presentation?  You

1  should probably present the settlement first.  I hadn't

2  quite realized -- I've received a lot of briefs, so there

3  are one or two key issues I want to discuss, but there are

4  also other multiple issues that I know have been raised in

5  the pleadings.  Have you discussed a timetable?

6          MR. BERMAN:  We haven't, your Honor.

7          THE COURT:  All right, we're going to go straight

8  through till 4:00.  I have a conference call, and then if I

9  need to, I'll come back out.  And then if we can't do that,

10 then we'll have to set it up for maybe tomorrow morning or

11 something, in other words, or whatever time, but I'm trying

12 to get as much as I can done.

13          The two key issues -- actually, the number one

14 most important issue in my mind that's worried me enormously

15 is the cash payors.  There is at least an argument -- well,

16 first, I want to hear whether everybody here intends for

17 them to be included, something I did not focus on at the

18 time of the preliminary approval, and, if everyone agrees

19 they should be included, whether or not a supplemental

20 notice is necessary.  That's a big issue for me.  We also

21 need to discuss attorneys' fees, and then there are myriad

22 other things that have come up along the way.  But I'm sure

23 you will present all of this and more.

24          MR. BERMAN:  I have some slides.  If I might

25 approach, your Honor?

1          THE COURT:  Is the mike on so everyone can hear?

2          MR. BERMAN:  Good afternoon, your Honor.  Steve

3   Berman on behalf of the class.

4          THE COURT:  I think they probably can't hear, and

5   there are so many people back there, so --

6          MR. BERMAN:  Can you hear me back there?

7          THE COURT:  No.  At least two said they couldn't.

8   Anyone who's got a serious problem is welcome to come and

9   sit up in the jury box if you'd like to, but go ahead.

10          MR. BERMAN:  What I thought I would do, your

11   Honor, is to run through why we think the settlement should

12   be approved, address the cash issue, and then address what I

13   think are the highlights of the objections in my opening

14   remarks, if that's okay with your Honor.  Also,

15   procedurally, we're going to have to do -- this can't be the

16   final hearing because the Class 1 Part B class members have

17   not gotten the individual notice yet.  CMS --

18          THE COURT:  There's no way they can hear you.

19          (Discussion off the record.)

20          MR. BERMAN:  As I'm saying, there will have to be

21   another approval hearing.

22          THE COURT:  Everyone's nodding.  It may be the

23   only time I get that in this room.

24          (Laughter.)

25          MR. BERMAN:  There will have to be another

1   approval hearing, so the best that we can do is to present

2   the record as it exists today.  And we will know more this

3   week when we'll get the data, and we'll be in touch with the

4   Court on that.

5            THE COURT:  Well, do you have some sense of it,

6   how many months?

7            MR. BERMAN:  Well, they said they were going to

8   get us the data this week, and then the question is whether

9   it's adequate.  We have already got it once; it wasn't

10  adequate.  So we're hoping that we can get it and we can get

11  the process going shortly.

12           THE COURT:  And that's only Class 1?

13           MR. BERMAN:  That's correct.

14           So I thought I'd start off by talking about the

15  reasonableness of the settlement amount of $125 million.

16  Prior to the trial -- and I'm talking about the trial we had

17  of the Massachusetts class -- we had Dr. Hartman do a damage

18  study for all the defendants, and his number came out at

19  $1.2 billion.  It seems like a large number, but the trial

20  altered the landscape.

21           So if you look at the defendants in the Track Two

22  settlement, we have Amgen --

23           THE COURT:  Is that all the defendants in

24  Track Two or all the defendants in Track One and Track Two?

25           MR. BERMAN:  Track Two only.  And if you break

cbac3204-2187-45fe-a572-e9859ff8ab23

1   those defendants down into the brand-name drug defendants

2   and the multi-source defendants, Dr. Hartman estimated

3   $316 million in damages from Amgen, Aventis, and Watson, and

4   then roughly $800 million from the remaining defendants.

5   All are multi-source drugs.

6           So we had the trial, and we learned the road map

7   from the trial.  One of the important points in evaluating

8   liability was evidence of spread marketing, and you recall

9   the do-the-math type of documents that we spent a lot of

10  time on at the trial.  With respect to the multi-source

11  defendants, there were no such documents.  We had very

12  little evidence that the multi-source defendants were busy

13  marketing the spread.  So we had a liability hole, a

14  significant liability hole.

15          The other issue that we had to overcome, and which

16  was really the big issue here, was the median issue, and

17  I'll show you how that dramatically changes damages in this

18  case.  What I did in this slide here, Page 5, your Honor, is

19  to take the original trial request of Bristol-Myers.  We

20  asked for $4.9 million.  You applied the median analysis,

21  and you awarded $388,000.  For Class 3, it's a similar kind

22  of result, 5 percent.

23          So if we then analyzed the -- and, of course, on

24  Schering, we got nothing.  So we looked at the possible

25  results of another trial on Track Two.  If we could be

cbac3204-2187-45fe-a572-e9859ff8ab23

1    zeroed out on some defendants, we might get 7 percent of

2    what we thought the damages were, and BMS came out at about

3    5.  So if you use this as a guide, the range of damages for

4    Track Two is somewhere between zero and $40 million, not a

5    big number.

6              Now, if you look at the settlement --

7              THE COURT:  Just on the multi-source, right?

8              MR. BERMAN:  Yes.  If you look at the settlement

9    and you apply percentages to the actual damages, the

10   brand-name settlement of $100 million is roughly 31 percent

11   of Dr. Hartman's damage estimate.  That's a very healthy

12   number under the case law, where you see courts approving

13   settlements 5 percent, 8 percent, and 10 percent.

14             If you look at the real multi-source damages where

15   we have $25 million allocated to that group, we're at

16   62 percent of damages using a BMS type of analysis.  That

17   doesn't account for the fact that we might be zeroed out by

18   some of these defendants, and we were pretty confident we

19   would be on some of them.

20             So the settlement is a worthwhile settlement.  It

21   certainly meets the criteria as to the amount.

22             Now, let me turn to some of the objections because

23   they go to fairness of the settlement.  The first objection

24   we got is that -- well, let me back up.  From a consumer's

25   standpoint, what does the settlement look like?  Well, the

1    consumers in this case don't get damages.  They get

2    out-of-pocket expenses, so they get the entire amount they

3    spent on the drug, which is a far greater amount than the

4    actual damages.  For the Class A drugs, for the strongest

5    case, they get three times out-of-pocket expenses.  And,

6    again, as we went through in the AstraZeneca case, it's a

7    very rare situation where a consumer gets three times not

8    only of damages but three times of expenses.

9             THE COURT:  Class A are the heartland drugs?

10            MR. BERMAN:  Yes.

11            THE COURT:  So between 1997 and 2003, roughly?

12            MR. BERMAN:  Correct.  So it's an extraordinary

13    result.

14            One of the things the courts look at is the

15    reaction of the class.  We mailed out 41,000 notices to the

16    TPPs.  There are no TPP objections, and there are eighteen

17    opt-outs.  That's a very low number.

18            We mailed here something unusual.  We mailed

19    890,000 notices directly to Class 3 consumers.  You may

20    recall that you ordered the TPP defendants to identify the

21    people who made the co-pays, and then we made a direct

22    mailing to them, so 890,000 notices went out.  We have four

23    objections represented by the people in this courtroom, and

24    we have 240 opt-outs.  Again, that's a very small number.

25    So the reaction of the class was positive.

1        So then we turned to some of the objections.  The

2   first objection we got was, Mr. Haviland claimed that we

3   were harming the consumers because we were releasing drugs

4   that they had not sued on.  It's just not true.  The Section

5   2-JJ of the settlement agreement makes it clear that

6   consumers release only drugs identified in the complaint.

7   The TPPs gave a broader release.  They're big boys, and if

8   they wanted to be part of the settlement, they had to

9   bargain for a broader release, but we protected the

10  consumers.  So before Mr. Haviland makes accusations --

11       THE COURT:  When you say consumers, who do you

12  mean?

13       MR. BERMAN:  Class 3 and Class 1 only released the

14  claims that were --

15       THE COURT:  No, but is this -- it's the later

16  issue -- people who only paid cash?

17       MR. BERMAN:  Everyone.  The cash and co-pay

18  release applies to everyone.  It was limited to the drugs in

19  the complaint for the consumers.

20       THE COURT:  So when you say consumer, you're

21  referring to Medicare Part B consumers, people who make

22  co-pays.

23       MR. BERMAN:  Correct.

24       THE COURT:  And at least your position is, it

25  includes people who --

1        MR. BERMAN:  Paid cash.

2        THE COURT:  -- just paid cash, even though there's

3   some serious argument that that wasn't clear on the notice.

4        MR. BERMAN:  Yes, and I'll turn to that right now,

5   okay?

6        THE COURT:  Yes.

7        MR. BERMAN:  Our position on the cash is the

8   following:  If you look at the definition of the class as

9   defined in the settlement agreement -- and I have this on

10  Slide 11 -- it says "All natural persons in the United

11  States who made or incurred an obligation to make a payment

12  for a drug."  So that is different than the definitions in

13  the prior settlements, which are expressly limited to

14  co-pay.  So the definition of the settlement agreement

15  includes cash payors, in our view and in the view of the

16  defendants.

17       THE COURT:  Well, actually, just so I can see, is

18  there anyone objecting to the fact that people who just paid

19  cash, apart from whether the notice is a good notice, that

20  they're included in this definition?  Is anyone here

21  objecting to that?  I don't think I've seen an objection on

22  that point, so the issue really goes to the sufficiency of

23  the notice.

24       MR. BERMAN:  Okay, and let me talk a little bit

25  about that because if you look at Slide 12, I've gone

cbac3204-2187-45fe-a572-e9859ff8ab23

1    through the chronology.  The press release which was on the

2    Web sites announcing the settlement clearly makes it, in our

3    view, plain that cash is included.  It says "full payment."

4    The claim form itself, when a claimant is filling out the

5    information, it says that you can make a claim for all

6    out-of-pocket expenses.  So the claim form we think is

7    pretty clear:  all out-of-pocket expenses.  And to date,

8    CCS, the claim service, has paid all people who were cash

9    payors and who wanted to make a claim.

10           THE COURT:  You make those good points in your

11   briefs, but the notice -- I think someone attached the

12   notice to remind me -- makes it seem as if it's only people

13   who made co-payments.  So the point I'm saying is, is it

14   clear enough, and do I need to supplement?

15           MR. BERMAN:  Well, here's what we know so far:

16   There are 14,000 claims that have been made from consumers

17   to date.  We have not gotten any calls from anyone saying --

18           THE COURT:  How many of those only paid cash?

19           MR. BERMAN:  We don't know that number yet.

20           THE COURT:  I am deeply worried.  What would it

21   cost -- I'm sure you've looked at this -- to send out a

22   supplemental notice?

23           MR. BERMAN:  It depends on how deep we go.  For

24   example, if we do two publications that are nationwide

25   publications, it would cost $500,000.  If we add

1    USA Today --

2              THE COURT:  What are those two publications?

3              MR. BERMAN:  What were they, Sean?

4              MR. MATT:  USA Weekend and Parade.

5              MR. BERMAN:  USA Weekend and Parade.  Those are

6    the ones that Kinsella targets as very consumer-friendly.

7    And if we added two more to increase the reach, we're

8    talking about $800,000.  But, as I was saying, your Honor,

9    the --

10             THE COURT:  What has received the biggest hit so

11   far?  I don't know if anyone is here from Kinsella.

12             MR. BERMAN:  No one is here from Kinsella.

13             THE COURT:  So I know that they were everywhere

14   because for the first time ever people said to me, you know,

15   "This your suit."  So the TV ads, were those more effective

16   than the back of Parade, or were the Web sites effective and

17   that sort of thing?

18             MR. BERMAN:  I will ask, and we'll file a

19   supplemental report on that.  I don't want to --

20             THE COURT:  How long would that take?  In other

21   words, would it be commensurate with the amount of time it

22   took to sort of send out the CMS stuff and get that back?

23             MR. BERMAN:  We could, yes.  But in terms of who

24   the notice is going to and why -- first of all, if you read

25   it carefully, yes, there is ambiguity created by the words

1    at the top of the claim form, but not in the claim form

2    where you fill it out.  It says "all out-of-pocket

3    expenses."

4              THE COURT:  But you wouldn't know to ask for a

5    claim form if you thought you weren't covered.

6              MR. BERMAN:  I understand that, but enough cash

7    people read it and felt they were covered -- well, we know

8    that --

9              THE COURT:  Well, we don't know that because I

10   just asked you for those numbers.

11             MR. BERMAN:  But we know that there are cash

12   payors making claims, but I'll try to find out how many.

13             THE COURT:  I think we need to figure that out.

14             MR. BERMAN:  Right.  And then on the issue of the

15   notice, let's focus in on who this is going to because it's

16   a very small group of people.  The Class 1 people aren't

17   affected by this.  The co-payors for Class 3 have already

18   gotten for the most part their notice, and they're not cash

19   payors.

20             THE COURT:  Right.

21             MR. BERMAN:  So we're talking about class members

22   in the $25 million segment of the case, a part of those

23   class members, because some of those class members will be

24   insurance people and some are cash.  So it's a very small

25   part of the case.  Also, the drug --

cbac3204-2187-45fe-a572-e9859ff8ab23

1           THE COURT:  It means I can't approve Class 3 until

2     I know.

3           MR. BERMAN:  Okay.

4           THE COURT:  Because, as I understand it, there's

5     at least an argument that -- everyone seems to be agreeing

6     that cash payors are covered by the plain terms of the

7     class, which is fine, but we don't know whether they could

8     get full compensation or partial compensation or treble.  I

9     mean, it just depends on how many people put in a request,

10    right?

11          MR. BERMAN:  That's correct, correct.

12          THE COURT:  So the only thing I could approve

13    today would be what, Class 2?

14          MR. BERMAN:  You could approve Class 2 today.

15          THE COURT:  The only thing that could possibly

16    happen, right?

17          MR. BERMAN:  That's correct.  That's completely

18    noticed and finished.

19          Now, another issue that's been raised is whether

20    the allocation between consumers and TPPs was reasonable,

21    and I'd like to address that.  First, your Honor, as you

22    know, as we have done in every case, we obtained independent

23    allocation counsel, Mr. Goldenberg and Mr. Sugerman-Brozan

24    for the consumers; Mr. Cohen, who's here in court today; and

25    Mr. Fischer for the third-party payors.  And the allocation

1  process was mediated by Professor Greene.  And the

2  allocation lawyers, at least the consumers' lawyers, made

3  sure that Class 1 received three times the dollars that

4  actually were utilized.  In other words, we had how much

5  this class spent on this drug from Dr. Hartman, and

6  eventually the lawyer was able to negotiate to get three

7  times that amount to be put in the pool.  And the Class 2

8  received two times utilization at this hearing, and Class 3,

9  no multiple.  And the process was keyed off your trial

10  rulings.  We had your trial rulings.  We knew where the

11  strengths and weaknesses were, and the allocation counsel

12  argued those and came up with this allocation.

13              THE COURT:  Now, the independent settling health

14  plans, they come out of Class 2 and 3, right?

15              MR. BERMAN:  No.  They just come out of Class --

16  well, yes, Class 2 and 3.

17              THE COURT:  Because some of them were the

18  supplemental insurers, right?

19              MR. BERMAN:  That's correct, that's right.

20              THE COURT:  Aetna, whatever?

21              MR. BERMAN:  That's correct.

22              One of the objectors complains that the consumer/

23  TPP split should be more like the McKesson case, and in

24  fact, interestingly enough, they're identical.  In the

25  McKesson case, the TPPs wound up with 82 percent of the

1    settlement.  In this case, they wound up with 82 percent of

2    the settlement.  So there's nothing from those two cases

3    that would indicate the allocation was improper.

4           All of the objectors who deal with this issue

5    point to GSK because in GSK the consumers got 30 percent.

6    But GSK was a different story.  At the time of the GSK

7    settlement, we had not yet had a trial on this case.  The

8    consumers, and I as their lawyer, were vigorously advocating

9    that there be a zero percent threshold, and therefore their

10   damages were much bigger and the threshold for proving

11   liability was easier.  You ruled against us on that, so that

12   has changed.

13          In addition, at the first allocation process where

14   GSK was in play, the consumer lawyers did a fantastic job of

15   having the third-party payor lawyers very worried that they

16   would lose the case based on their knowledge that AWP wasn't

17   AWP.  Well, after the Massachusetts case, in subsequent

18   negotiation, the third-party payors say, "We took the best

19   shot that was thrown at us, and we won.  We're not going to

20   discount our allocation based on that."

21          So the trial ruling changed things and explains

22   why the GSK allocation is not a path or a paradigm for this

23   case.

24          Consumer representation, there's been challenges

25   on the standing of the class representatives in this case.

1   Mr. Haviland claims that Ms. Tonacchio is not a valid

2   representative.  First, he claims -- well, actually he --

3              THE COURT:  Can we just wait and go through the

4   specific things one by one, and Mr. Haviland will give his

5   argument and et cetera.

6              MR. BERMAN:  Then I will yield, I think, unless

7   you want -- what I think -- I don't know --

8              THE COURT:  There is no requirement for cy pres

9   here, right?

10             MR. BERMAN:  That's correct.

11             THE COURT:  And so what happens at the end of the

12  day if there is extra funds, or do we think that's not

13  realistic?

14             MR. BERMAN:  We don't know, but the settlement

15  provides that every party is free to make a submission to

16  you.

17             THE COURT:  I see.

18             MR. BERMAN:  So I think I'll rest then, your

19  Honor, and let the objectors --

20             THE COURT:  And then as each objector makes an

21  argument, then I'll go -- but let me just talk to you for a

22  minute about attorneys' fees.

23             MR. BERMAN:  Sure.

24             THE COURT:  I think one of the arguments that you

25  make is, I should make a one-third of the common fund

1   including the independent settling health plans.  Typically

2   they were separate settlements, and I don't usually have to

3   get involved with that.  I would only think of a third of

4   the class settlement.  So why should I do that differently

5   here?

6            MR. BERMAN:  Well, we're doing it in the same way

7   that we've done in every settlement, GSK and AstraZeneca.

8   We created a common fund for those ISHPs, a common fund of

9   $125 million.  The case law we think is pretty clear that

10  we're entitled to, and we would otherwise litigate that

11  issue.  And the ISHPs agree that -- it's coming out of their

12  pocket, and so it's 30 percent no matter which way you look

13  at it, whether we had a separate agreement with them or not.

14  So we think that it's the cleanest way to do it.

15           THE COURT:  It's possible, and I don't remember,

16  that's happened in others.  We've had so many settlements in

17  this, and I've had two other major drug trials, not to

18  mention McKesson.  I don't know that I've ever had a

19  full-blown objection to it.

20           MR. BERMAN:  I could check, but I believe you did

21  in the --

22           THE COURT:  I did in Serono, but it was a

23  different -- I don't remember if it's your firm that was

24  involved in that?

25           MR. BERMAN:  Yes, Mr. Sobol.

1          THE COURT:  But it was a different agreement, I

2     think.  So I did research on it in that context, but I'm not

3     sure on the other AWP cases that we've had an objection, but

4     we have one now.

5          MR. BERMAN:  Yes, and I think our position is that

6     because we've created the common fund -- no one disputes

7     that -- the objectors don't dispute it -- the ISHPs don't

8     dispute it -- that taking a percentage of that common fund

9     is appropriate.

10          THE COURT:  Have you thought at all about, given

11     the fact that we've had different classes, having -- as you

12     say Class 1 is easiest to prove because it's statutory, and

13     Class 3 is harder to prove -- different percentages for

14     different classes?

15          MR. BERMAN:  No, we haven't because we think we've

16     obtained an excellent result for every single class.  What

17     that would mean is, we would ask for more for Class 1.

18          THE COURT:  That's the easiest one.

19          MR. BERMAN:  But why would we want to take more

20     from the consumers?  So that kind of formula --

21          THE COURT:  No, you'd take less.

22          MR. BERMAN:  Well, we did better for the consumers

23     than we did for the TPPs.

24          THE COURT:  No, but I'm talking about it's the

25     easiest because it's statutory.  I'm thinking a lot about

1   this because this is coming up backwards for me.  Normally

2   30 percent -- as I've said before, you took a lot of risk in

3   this litigation, and I gave 30 percent in GSK, but normally

4   this was the tagalong piece of it, that the heavy lifting

5   was the Track One, and you all chose -- the lodestar is

6   useless to me, just useless, because you've aggregated

7   everything across all the cases.  So it's hard for me to

8   parse what's fairly -- I know this case, I hardly did

9   anything in this case compared to the other one where I

10  spent half my life doing it in Track One.  So this was

11  the -- I don't even think I ever ruled on any of the

12  dispositive motions.  I don't think I've certified a class.

13  I mean, I've done almost nothing in this case, and it's all

14  been derivative of what happened in Track One essentially.

15  You settled before I had to do all that.

16          So I'm trying to figure out what's fair.  I don't

17  know yet what's going to happen on appeal.  None of us do.

18  And I'm just worried about what the right percentage is and

19  whether it should be the same per class.  And 30 percent is

20  what I did in GSK and I think I did in one of the other

21  ones --

22          MR. BERMAN:  Right, AstraZeneca.

23          THE COURT:  -- which were early on, which I

24  thought was fair enough.  But at some point, you know, even

25  the recent issuance of the manual says, the more the money,

cbac3204-2187-45fe-a572-e9859ff8ab23

1    the lower the percentage, and I'm just trying to figure it

2    out.

3            MR. BERMAN:  Right, and I still think that

4    generally the benchmark courts recognize, 25 to 30 percent,

5    is reasonable contingent fee.  There has been nothing easy

6    about this case.  When you say Class 1 was the easiest,

7    well, to get up to the trial for the first Class 1 case was

8    four or five years of enormous work, and it certainly wasn't

9    easy.  We didn't win every Class 1 trial.  Behind the scenes

10   there's been enormous amount of work going on as to these

11   defendants.

12           THE COURT:  I'm talking about legally it's the

13   easiest because you have a statute that supports you, the

14   plain language of the statute.

15           MR. BERMAN:  Yes.

16           THE COURT:  Anyway, I'm thinking about that one.

17   I didn't want you to get off -- in terms of expenses, are

18   the expenses being allocated to the independent settling

19   health plans, the expenses of the litigation?

20           MR. BERMAN:  Well, we're not asking for the

21   reimbursement in this settlement.  We're just taking our

22   expenses in that 30 percent.

23           THE COURT:  I see, so I don't have to separately

24   worry about those?

25           MR. BERMAN:  That's correct.  And the expenses to

1    date are $10 million.

2            THE COURT:  In the Track Two or --

3            MR. BERMAN:  Total, some of which we got back,

4    some of which we got back.  We've got back about $4 million,

5    so we have $6 million that's included within our 30 percent

6    fee request.  And we're continuing to incur expenses in the

7    case, so expenses keep growing.

8            THE COURT:  Okay, thank you.  All right, so who

9    wants to be the first of the objectors?  Do you want to

10   start there?

11           MR. PENTZ:  Thank you, your Honor.  John Pentz,

12   I'll go first.  I'm certainly happy to hear class counsel

13   concede the point that my clients and other cash payors are

14   included in the settlement.  I would only raise, you know,

15   my --

16           THE COURT:  Well, obviously someone made a mistake

17   when they talked to you, but what you did flag for me is

18   that it's unclear at best in the notice.

19           MR. PENTZ:  Right, correct, your Honor.  The only

20   reason why I question their story now is because they didn't

21   contact us immediately after the objection was filed letting

22   us know that our clients were included.  That could have

23   saved a lot of time and effort.  Our clients may not have

24   needed to be deposed on that issue, which they were.  And

25   also the corrective notice could have gone out by now if

1    class counsel had come forward or called us up earlier to do

2    that, although I understand now that there's a problem with

3    Class 1 as well, so that we do possibly have time to correct

4    this as well.

5              THE COURT:  We do, we do.

6              MR. PENTZ:  So I won't spend any more time --

7              THE COURT:  What do you think the correct way of

8    notifying -- you don't want to spend too much money because

9    then it drills down the amount that's available to the

10   class, but you have to make it reasonable notice.  So have

11   you thought?  I don't know if you're experienced at this,

12   but I do think that you don't want to make it so pervasive

13   that, given especially we've flood the market already,

14   people have been aware of this, that you're going to spend a

15   fortune on it.

16             MR. PENTZ:  Right, I agree with that.  I guess, if

17   USA Today is an extra $300,000, I think that's read by

18   enough people that it might make it worth it, but I think

19   Parade and USA Weekend are the probably the best places to

20   put it for consumers.

21             THE COURT:  All right, so doesn't this just

22   basically take care of your problem?

23             MR. PENTZ:  Well, if corrective notice is done,

24   yes, that takes care of that problem.  The only ambiguity

25   with regard to this issue is whether the full-payor

1    consumers will participate in the consumer fund, or whether

2    they will be sharing the fund with the TPPs because they're

3    part of Class 3.  That wasn't clear to me.

4              THE COURT:  They're in Class 3, aren't they?

5              MR. BERMAN:  Correct, Class 3.

6              THE COURT:  Class 1 is just the Medicare

7    beneficiaries.  Class 2 are just the, as I remember it,

8    third-party payors who paid supplemental Medicare insurance,

9    the gap insurance.  And Class 3 are all TPPs and consumers

10   who made co-pays, and, I guess, although it is different

11   from the other one, all consumers who made cash payments.

12             MR. PENTZ:  Right.  So I assume that full cash

13   payors will also get the benefit of the three-times damages

14   for the heartland period, and we'll take advantage of the

15   fact that they have --

16             THE COURT:  I'm not sure, whatever -- I don't

17   know, whatever the --

18             MR. PENTZ:  Because in our objection we argued

19   that they should be treated the same as the third-party

20   payors who paid in full, and it sounds now like they may be

21   treated similar to the Class 1 consumers instead.  But, in

22   any event, that --

23             THE COURT:  I don't remember.

24             MR. PENTZ:  It would actually be in their interest

25   if they were treated like the consumers because they do get

1    the treble damages and the TPPs don't.

2           THE COURT:  Do you remember what the -- cash

3    payors get treated like the consumers who made co-pays,

4    right?

5           MR. BERMAN:  It depends on what drug they took.

6    If they took a Class A drug, they're in the heartland, they

7    get three times.

8           THE COURT:  Right.

9           MR. BERMAN:  If they're not, they get treated like

10   all other multi-source consumers.

11          THE COURT:  Okay?

12          MR. PENTZ:  Right, that clarifies that.

13          THE COURT:  Thank you.

14          MR. PENTZ:  And the only other objection I guess

15   remaining, Mr. Cochran will speak to the issue of the

16   exclusion of branded drugs.  Certain branded drugs were

17   not --

18          THE COURT:  Well, let me ask you on this.  I tried

19   to read all this.  I was off college hopping with my kid;

20   you know, I'm reading it between Williams and Middlebury.

21   So let me just ask you this:  There is some ambiguity here.

22   Why can't this all be worked out with the claims

23   administrator, and if there's a challenge -- I mean, some

24   sort of meet-and-confer?  That happens often in these class

25   actions.  This is whether or not the brand name is the same

1    as the generic?

2              MR. COCHRAN:  Right, the generic.

3              THE COURT:  There was one particular drug.  Can't

4    that be worked out?

5              MR. NOTARGIACOMO:  I can speak with respect to

6    that particular drug, your Honor.  I mean, Exhibit B defines

7    the drugs that are released by the consumers and the drugs

8    that the claims recognize.

9              THE COURT:  But if one is the branded name of the

10   generic, that raises it.  As a policy matter, does the same

11   thing happen with that drug?

12             MR. NOTARGIACOMO:  Well, if the Exhibit B, which

13   is the exhibit at issue here, lists the generic version and

14   there's a name brand, then generally, no, it wouldn't be --

15             THE COURT:  Well, how often has this come up?

16   Can't you work this out?

17             MR. NOTARGIACOMO:  It hasn't come up, your Honor.

18             THE COURT:  Well, then work it out, you know?

19   Just work it out.  I mean, if we were talking -- if this was

20   something that was going to cut into huge amounts of the

21   benefits available to the class and it turns into a more

22   pervasive problem, maybe I should address it as a policy

23   matter; but it strikes me it was ambiguous anyway, and so

24   you'll work that out.  Okay?  Thank you.

25             MR. PENTZ:  Thank you, your Honor.

1        THE COURT:  Who's the next objector?  Go ahead.

2        MR. COCHRAN:  Edward Cochran, your Honor.  Would

3   you like me to pass on further comment on the branded issue?

4        THE COURT:  Yes.  My view is, I don't -- did we

5   set up a dispute resolution mechanism in the --

6        MR. COCHRAN:  Well, certainly we can --

7        THE COURT:  Ideally, the theory behind it is, I

8   shouldn't be the first stop.  Things should be worked out,

9   unless it has such a big impact on the class that I as a

10  policy matter have to do it or it will cut into someone

11  else's payments.  So is there anything else that you need to

12  address?

13       MR. COCHRAN:  Yes, one thing on the branded drugs,

14  your Honor, since you raised it.  Personally we believe it

15  will be significant.  There are quite a few brand-name drugs

16  manufactured by settling defendants that are not on this

17  list.  Now, how many people take them without --

18       THE COURT:  You know what?  Let's deal with it --

19  if a lot of people come in with the problem and it turns

20  into a huge drain on the class resources, maybe I will have

21  to deal with it; but right now it was unclear enough to me

22  that maybe you can just meet and confer, and if there's a

23  problem, you bring it back to me.

24       MR. COCHRAN:  And I might add that I think my

25  brief that we filed sets forth everything I would say.

1        THE COURT:  Thank you.

2        MR. COCHRAN:  Your Honor, I only wanted to make

3   then one comment on the question of fees from the ISHP

4   common fund.  I don't understand this, your Honor, for a

5   separate but related reason.  There's a common fund here of

6   $125 million, and it's being divided between the consumers

7   and these ISHPs.  And the same group of attorneys is trying

8   to get 30 percent from those people, trying to get those

9   people to agree, as they said they have, to pay them

10  30 percent while they are also participating in the

11  allocation one way or another, let's face it.  And I know

12  you have the question of allocation counsel, which I don't

13  believe is anywhere near sufficient.  It's not really truly

14  an independent attorney.  In the larger scheme, they've been

15  having, I'm sure, conversations with the ISHPs for some

16  time, and they've had considerable conversations, and

17  they've got these clients to agree to give them 30 percent,

18  while at the same time --

19        THE COURT:  They would have to or I would -- I

20  think that's what happened in Serono, I'm trying to remember

21  back, is that the ISHPs were freeloading, and I was

22  concerned about that.  So if they had suggested not having

23  the ISHPs pay any money, I would have rejected the

24  settlement because they've got to pay at least as much as

25  the class members because otherwise they're free riding off

1   the class.  So they have to pay.  My biggest question is

2   whether or not I need to charge them more somehow.  But, in

3   any event, under the San Juan case, I have the right to

4   treat it as one big common fund.  I, frankly, think the flip

5   side of what you say is that I don't charge them anything,

6   which I actually think would be terrible for the class.

7               MR. COCHRAN:  I understand, your Honor.  I

8   understand your feeling.  May I say, I want to make a record

9   for my own benefit --

10              THE COURT:  I don't understand what the problem

11  is.

12              MR. COCHRAN:  Well, I don't think that the

13  determination of that fee --

14              THE COURT:  What would you charge them, the

15  independent settling health plans?

16              MR. COCHRAN:  Well, I don't have an answer today,

17  but I'd love to participate in that.

18              THE COURT:  Today is the day.  Today is the day.

19  I mean, so what would I -- in other words, I think it's a

20  problem.  I was greatly concerned about this in another case

21  that I think Mr. Sobol was involved with:  How do you think

22  about the attorneys' fees for these independent settling

23  health plans?  You can't have them free ride off the class.

24  They have to pay their fair share.

25              MR. COCHRAN:  Personally, and I think we've

1   applied this in our objection papers, we think that they

2   should pay less and that that money should go to the

3   consumers.

4           THE COURT:  Who should pay less?

5           MR. COCHRAN:  The ISHPs.

6           THE COURT:  Should pay less than the --

7           MR. COCHRAN:  And they would give less money.

8           THE COURT:  Say it again?

9           MR. PENTZ:  Your Honor, could I --

10          THE COURT:  You think the independent settling

11   health plans shouldn't pay a third?

12          MR. COCHRAN:  Your Honor, in our analysis, in my

13   analysis, some of that money from that fee should actually

14   be going to the class.  That's the bottom line.

15          MR. PENTZ:  Your Honor, the attorneys' fees for

16   the ISHPs have been withheld.  They've only received

17   $25 million.  They don't expect to receive anything further.

18   That amount could stay in the settlement fund and be

19   allocated between the TPPs and the consumers, and a total

20   fee could be awarded out of that amount, which would be, you

21   know, roughly -- I don't know what it is -- $70 million plus

22   the $15 million that's been held back, or actually more than

23   that, $25 million that's been held back.  The point is that

24   the ISHPs don't expect to receive any more money from this

25   settlement.

cbac3204-2187-45fe-a572-e9859ff8ab23

1        THE COURT:  Have they already -- you've set aside

2   a third, right?

3        MR. PENTZ:  Right, that's been set aside, and it

4   remains part of this settlement fund that the consumers

5   could claim against.  In other words, the entire fund could

6   be increased for everybody remaining in this settlement.

7        MR. COCHRAN:  That's correct.

8        MR. NOTARGIACOMO:  If I could just clarify, your

9   Honor?  In the way that things are structured, there is a

10  percentage of the TPP pot, if you will.  The 82.7 percent

11  that's set aside or 82.5 percent was initially allocated

12  50 percent to the class TPPs and 50 percent to the ISHPs.

13  Of that 50 percent, they received, I think, 75 percent of

14  that as a quick pay.  The rest remains for a period after

15  all of the claims, including ISHPs and class TPPs have

16  submitted claims, there will be a true-up so that

17  everyone --

18        THE COURT:  But I'm assuming that if some of the

19  true-up goes back to the ISHPs, that they pay a third of

20  that for the attorneys' fees, not the class.

21        MR. NOTARGIACOMO:  That is true.

22        THE COURT:  So let's say an extra $10 million, to

23  make a round number, $12 million goes back to the

24  independent settling health plans, they're paying the

25  $4 million from attorneys' fees, not the class.

1          MR. NOTARGIACOMO:  That's correct.  They get taxed

2    dollar for dollar, whether it's attorneys' fees or

3    administrative fees for notice, they get taxed dollar

4    important dollar the same as the class members.  They're not

5    paying any less.

6          MR. COCHRAN:  Well, they are asking your Honor to

7    approve that as part of the settlement.

8          THE COURT:  Right.

9          MR. COCHRAN:  And all we're --

10         THE COURT:  That makes some sense as long as the

11   class isn't paying for the amount that then reverts back.

12         MR. COCHRAN:  The class would receive more money

13   if the ISHP fee were reduced and rolled over to the consumer

14   class.  That's all I'm saying, your Honor.  I understand

15   you're not enamored of that idea, but that's for the

16   record --

17         THE COURT:  All right, thank you.  All right,

18   who's the next objector?  Thank you.

19         MR. LANDRIGAN:  Your Honor, if I could?

20         THE COURT:  Yes.

21         MR. LANDRIGAN:  Richard Landrigan representing

22   Patricia Weatherly.  As opposed to my brother's clients, my

23   client is a co-payment person.  She doesn't pay cash.  She

24   belonged to a health care plan.  She was hospitalized in

25   Texas and had an operation and received -- and I have the

1    drugs laid out here that she received.  So she has standing

2    in that particular aspect of the Class 3 class.

3            Your Honor, I came into this, and you may remember

4    I was here in December, and I was concerned about the cost

5    of records, the records that would be needed to substantiate

6    a claim under the Class 3.

7            THE COURT:  Yes.

8            MR. LANDRIGAN:  And we spoke with you, and

9    Mr. Notargiacomo and I spoke after that, and we didn't come

10   to any conclusion.  And I did have conversation with him in

11   a few e-mails, but we didn't come to a specific conclusion.

12   And in the process of looking at this further, I began to

13   realize that the sufficiency of notice is the real issue

14   here, not so much the cost of records, and if I could

15   explain that briefly.

16           THE COURT:  So it's not really the cost of

17   records.  It's the notice to the --

18           MR. LANDRIGAN:  To the consumers.

19           THE COURT:  I thought it did lay out what you

20   could do because you can notarize it, you can -- there are

21   all these different ways of doing it.  What wasn't clear?

22           MR. LANDRIGAN:  Well, your Honor, in the notice

23   itself, there is no mention of that simple notarization.

24           THE COURT:  But the notice just triggers -- that's

25   why they might have a problem with their notice.  Notice

cbac3204-2187-45fe-a572-e9859ff8ab23

Page 37

1    just triggers the sending of a claim form, right?

2              MR. LANDRIGAN:  It does.

3              THE COURT:  So why isn't that good enough?

4              MR. LANDRIGAN:  But a consumer will look at the

5    two options, the $35 easy payment, or the other option,

6    which is the categorizing of their individual claims.  And

7    based on the notice, they'll have no inkling that they can

8    do this using a simple notary, notarization form or

9    notarized statement.  In fact, the notice form itself

10   specifies having to come up with records, no mention of this

11   other --

12             THE COURT:  Could you read me the language that

13   you're referring to?

14             MR. LANDRIGAN:  Well, I could, your Honor.  The

15   notice itself -- I'm looking at Page 3 of the notice, your

16   Honor, towards the bottom -- it says you can either get the

17   $35 easy payment, or you may complete the attached claim

18   form to provide documentation of your percentage of

19   co-payments for covered drugs.

20             THE COURT:  And doesn't that claim form, isn't

21   that the one that says you can do it in these four different

22   ways?

23             MR. LANDRIGAN:  Yes, but where it says you must

24   provide documentation of your percentage of co-payments for

25   the covered drugs, it does not specify therein that you can

1   simplify that by attaching a notarized statement.

2          THE COURT:  Yes, but then when you turn to the

3   claim form, it tells you that, right?

4          MR. LANDRIGAN:  Well, your Honor, you have to wade

5   through ten pages, and on the last page at the very bottom,

6   it mentions in the fourth out of five subsets that you can

7   get a notarized statement to take care of this whole thing.

8   Now, my point is that you should have included that option

9   right up front in this notice to the consumers without

10  putting them off to the point where they would not even

11  bother to go to the next level, which is downloading the

12  claim form.

13         THE COURT:  All right, thank you.  I understand

14  your point, but I think at this point, since you have to go

15  to the claim form and it's clear enough there, I'm not sure

16  I think it was a defective notice.

17         MR. LANDRIGAN:  Well, your Honor, I think if

18  you're going to defer on this form, notice to the consumers,

19  it could certainly be added to the --

20         THE COURT:  I understand your point.  Unlike the

21  other one where it says "co-pay" in the notice and so

22  someone might be deflected, this is documentation without

23  saying what it would be; and then you go to the claim form,

24  and it's clear as can be what you have to do.  So that's not

25  misleading the way I was worried that the co-pay thing was,

cbac3204-2187-45fe-a572-e9859ff8ab23

1    that someone would say, "Oh, I don't make co-pays.  I don't

2    have insurance.  I'm not going to go any further."  I didn't

3    catch it.  No one seemed to catch that co-pay thing at the

4    time.  Whoever saw that, it was a good catch, but at this

5    one, I don't think it's unclear.  But thank you very much.

6            MR. LANDRIGAN:  Well, your Honor, going back to

7    the initial point of entry in this case, that was the issue

8    of having records.  We still haven't addressed that.  The

9    consumers do have to come up with records if they don't have

10   this notarization.

11           THE COURT:  Well, let me just say this:  I'm not

12   convinced, once you say you just have to sort of sign

13   something, I'm not convinced it's as burdensome as actually

14   having to go and get the records.  But do you have any proof

15   that -- well, let me ask you this:  If there's extra money

16   at the end, would there be any problem with going back and

17   reimbursing people --

18           MR. BERMAN:  Well, so far --

19           THE COURT:  -- if they put in a bill for how much

20   it cost them?

21           MR. BERMAN:  We haven't had this issue come up.

22   People call and we talk to them, and we say, "Look, if you

23   don't have the records, here's what you need to do:  Call

24   your doctor's office.  They'll write a letter."  That's not

25   very burdensome.  The doctor will say, "So-and-so was on

cbac3204-2187-45fe-a572-e9859ff8ab23

1    this drug for this period of time."  You can calculate it.

2    People say, "Okay, that's good."  Or you can do it the best

3    based on your recollection and do it under penalty of

4    perjury, which is at the back of the claim form, and people

5    say, "Okay, that's great."

6         Most doctors' offices we know and we've asked a

7    few questions, they don't charge.  If you're a lawyer

8    working on a file and you call and say, "I want the records

9    of Mr. Matt," they charge.  If you're a patient saying you

10   want your -- they don't charge you.

11        THE COURT:  Well, is the claims administrator

12   here?

13        MR. BERMAN:  No.

14        THE COURT:  I think the instruction can go out

15   that if someone says it's a hardship for them and they're

16   being charged money, that I think it wouldn't be a terrible

17   thing if at the end of this whole process there was extra

18   money, we could go back and reimburse those people.  Does

19   anyone have a problem with that?

20        MR. BERMAN:  No.

21        THE COURT:  I mean, if everyone is paid fully as

22   the notice provides and there's some left over and you

23   hear -- you should keep records of it -- we can pay out,

24   rather than to a cy pres fund, to these people who have to

25   maybe spend 50 bucks to order their records, if there are

Page 41

1    such people.  So I think we can do that.

2           MR. LANDRIGAN:  Thank you, your Honor.  If I can

3    continue, I had a few other aspects --

4           THE COURT:  Okay.  I just want to make sure

5    everyone has their day in court.  What else is the issue?

6           MR. LANDRIGAN:  Well, your Honor, one of the

7    alternatives we had to the idea of the easy payment was to

8    increase the flat fee, the flat sum of money from the $35

9    that's on present notice to something close to $100 or $150,

10   and note that there was a case cited --

11          THE COURT:  So once we've paid it out -- I thought

12   it was interesting point -- once we've paid it out and maybe

13   paid for anyone who has a hardship in terms of records, one

14   possibility would be to have plaintiffs come back to me and

15   say, "There's this extra money.  Let's double it to $70 a

16   person."  Would you have a problem with that?

17          MR. BERMAN:  Once if there's money left over, we

18   anticipated that everyone would be able to come and make

19   suggestions on what to do.  That could be one suggestion,

20   absolutely.

21          THE COURT:  Does that make some sense?

22          MR. LANDRIGAN:  That does make sense, your Honor,

23   but that's not included in the notice, and I think a

24   consumer might benefit from having that information added to

25   the notice.

1          THE COURT:  Why are you -- I think this is a fair

2    settlement, let me just start there, and I think $35 may --

3    you raised a good point about, well, do records cost this

4    much?  And then I saw you can just notarize it or make a

5    call to your doctor and get a letter, so it struck me that

6    that was probably an excessive amount of records for most

7    people.  I could see some awful doctor's office just saying,

8    "You send me 50 bucks.  It's our flat fee."  We should pay

9    for that.

10          If on top of -- if after we've paid everything out

11   there's money left over, I think one decent proposal would

12   be to increase the $35 per person who's put in for that

13   pro rata, if we can do it.  So maybe what we should do is

14   have a hearing at the end to see what to do with that money.

15   We'll see how much money there are and how many claimants

16   and proponents, and I think it's a good suggestion, and why

17   don't we do that, we'll just consider that.  But I don't

18   think I need to send out a new notice for that.

19          MR. LANDRIGAN:  One final thing, your Honor, if I

20   may?

21          THE COURT:  Yes.

22          MR. LANDRIGAN:  I raised the issue of direct

23   payments versus a claims-based payment, and since I was here

24   the last time and the class plaintiff has indicated that

25   they have sent out notices to the 60 percent of the

cbac3204-2187-45fe-a572-e9859ff8ab23

1  individuals that we're talking about through the ISHPs -- in

2  other words, the ISHPs came up with a list of 1,000,700

3  individuals -- they boiled that down to 897,000 individuals

4  to whom they have mailed notice.

5          Now, my point is that instead of waiting for those

6  people to file a claim, do a claims-based payment directly

7  to these individuals based on what the ISHPs know to be

8  their monetary claims, the amounts that they spent through

9  the ISHPs.  Now, this doesn't require going to every

10  pharmacy in the country or even the ten largest pharmacies

11  as was done in Relafen.  You now have 60 percent plus,

12  according to plaintiff counsel, of the covered lives in the

13  U.S. included in that 897,000 people.  If you can find out

14  what they spent, and I'm sure that the ISHPs have that, and

15  a subpoena would certainly deduce that information, you

16  would have --

17          THE COURT:  It would be like the Center for

18  Medicare and Medicaid Services, what we're doing with --

19          MR. LANDRIGAN:  Exactly.

20          THE COURT:  In this particular settlement, are we

21  making people make claims or just paying out what CMS says?

22          MR. NOTARGIACOMO:  Just paying out what CMS says.

23          THE COURT:  So why would that not be applicable as

24  he's arguing for the independent settling health plans?

25          MR. NOTARGIACOMO:  CMS is one place to go.  They

1   have one system to provide us with information going back to

2   1991, the beginning of the class period.  Not so for even

3   the ISHPs.  There's a number of different clients.  They

4   have differing computer systems.

5              THE COURT:  Well, how many are we talking about?

6   Aren't there just like five or six big ones?

7              MR. NOTARGIACOMO:  There are five or six big ones,

8   but they have individual funds.  So Aetna, for instance, is

9   not just one plan.  There are multiple plans and different

10  clients underneath that umbrella.

11             THE COURT:  But is it reasonably discernible how

12  much they spent in a way that we could calculate it easily?

13             MR. BERMAN:  We addressed this in the McKesson

14  case, and the McKesson case was the first time we were going

15  to do this kind of direct payment to co-payors.  And the

16  reason we were able to do it in the McKesson case is that

17  one of the independent providers agreed to set up a

18  specialized state-of-the-art computer that would be able to

19  make these calculations, that may cost about $4 million to

20  $5 million to run these calculations.  We're talking about

21  millions of transactions.  The databases are all different,

22  we're told.  And so they were willing to do it for McKesson

23  because they were getting so much money, $288 million, that

24  spending $4 million was a trade-off.  We don't have that

25  kind of money here.

1          THE COURT:  Yes, we do not have that kind of money

2     here, but who's that TPP?

3          MR. BERMAN:  Rawlings and Associates, Mr. Fischer.

4          THE COURT:  That's a law firm, isn't it?

5          MR. BERMAN:  No.  It's a -- how would you describe

6     Rawlings?

7          FROM THE FLOOR:  They're a subrogation practice.

8     There is a law firm, but there's also a separate subrogation

9     practice.

10         THE COURT:  Well, why don't you see if it's

11    reasonable to transfer that technology to this case, and if

12    it is, it's not a bad suggestion.  If it's not, we can't

13    afford to spend that amount of money out of the class fund

14    to do it.

15         MR. LANDRIGAN:  Your Honor, just this final point.

16    I would point out that in the Relafen case, with this sort

17    of direct payment operation, based on subpoenas from

18    inactive pharmacies, you had an increase of up to 92 percent

19    increase --

20         THE COURT:  By the way, I like the claims made.

21    I'm not fighting you on this, but we have hundreds of pills

22    here as opposed to one, so the big issue is cost.  If we

23    can -- I'm sure they didn't -- they were the Relafen

24    lawyers, as I understand it, and they were more than willing

25    to do it in this other case.  So if it's cost effective,

1    it's a good idea.  If it's not cost effective, we've got a

2    problem, right?  I mean, you don't want to take $5 million

3    out of the fund to do this, right?  I mean, there's not

4    enough money there, so ideally speaking, we would --

5              MR. LANDRIGAN:  Well, your Honor, I really

6    believe, based on what I've heard talking to class counsel,

7    that where you have sick and elderly patients, there's going

8    to be a very low uptake in this case because of the nature

9    of the clientele, the nature of the patients.

10             THE COURT:  I agree with you.  I was I guess went

11   with Professor McGovern at one point, and we were very

12   concerned about the percentage claims, and so we looked into

13   an alternative way of doing it.  I agree, if we can do this,

14   we will try.  But if it's hugely expensive and not

15   transferrable, then I'm not willing to spend another

16   $5 million out of the fund to do it.  So you're going to

17   look into that, right?

18             MR. NOTARGIACOMO:  We will, your Honor.

19             THE COURT:  Because if I had to do it all today,

20   it would be one thing, but, you know -- you've done this

21   before.  You have no principled objection to doing this,

22   right?

23             MR. BERMAN:  Yes, we'll look into it, and we'll

24   report back to you.

25             THE COURT:  Good idea.

Page 47

1        MR. LANDRIGAN:  Thank you, your Honor.

2        THE COURT:  All right, so who's -- I know,

3    Mr. Haviland, that you want to do this, but I just got this

4    notice that I have to take this call upstairs.  So since

5    we've been going since 3:00, why don't I go make this call,

6    and I'll be back in about fifteen minutes.

7        Now, we have Mr. Haviland, and who else is there?

8        MR. FREELEY:  Mr. Freeley on behalf of James King,

9    who represents an objector, James Wilson.

10       THE COURT:  And what's his objection based on?

11   I'm sorry, I don't remember.

12       MR. FREELEY:  Excessive attorneys' fees.

13       THE COURT:  Aha, all right.  So I'm going to go do

14   this phone call which I just got the message about, and it

15   shouldn't be longer than fifteen minutes.  Then I'll come

16   back, okay?  And we will definitely reach you.  All right.

17       THE CLERK:  All rise.  Court is in recess.

18       (A recess was taken, 3:05 p.m.)

19       (Resumed, 3:20 p.m.)

20       MR. FREELEY:  On behalf of Mr. James King, who

21   represents James Wilson, the objector, Mr. King would just

22   point out that the attorneys' fees are excessive, as the

23   Court has already --

24       THE COURT:  How would you do it, though?  I mean,

25   the reality is, unlike some other settlements I've seen, the

cbac3204-2187-45fe-a572-e9859ff8ab23

1    independent settling health plans are paying a third of

2    whatever they get, or whatever percentage.

3          MR. FREELEY:  I think, you know, it would require

4    obviously -- I think that this should be resolved by way of

5    an alternative dispute resolution where --

6          THE COURT:  Why?  I mean, I'm just -- it may not

7    be a third.  Maybe it will be 25 percent because it's sort

8    of a tagalong kind of case, but why -- in other cases

9    I've -- under the San Juan case, I'm allowed to treat it, I

10   think, under a common fund theory.  That's a First Circuit

11   case.  I think I'm allowed to.  So I had to look at this in

12   another context.  So then the other question is, I suppose I

13   could award different percentages for different classes,

14   depending on the degree of difficulty of the case, or I

15   could just reduce the amount; but, in any event, the ISHPs

16   are being lopped off as well for attorneys' fees, right, the

17   same percentage?

18         MR. FREELEY:  Right, and I think that whatever the

19   ISHPs have paid should go to the consumers, and it should

20   be --

21         THE COURT:  Say it again?

22         MR. FREELEY:  It should reduce the amount that

23   ultimately is paid for attorneys' fees.

24         THE COURT:  Say it again?  What should happen?

25   What should happen?

1        MR. FREELEY:  I believe that the --

2        THE COURT:  You're making the same point that your

3   brother did?

4        MR. FREELEY:  Yes.

5        THE COURT:  Essentially that whatever the ISHPs

6   would have paid in attorneys' fees should go into the class

7   pot?

8        MR. FREELEY:  Right.

9        THE COURT:  Why?

10       MR. FREELEY:  So that the class could benefit.

11       THE COURT:  But that's not --

12       MR. COCHRAN:  Well, in fairness, your Honor, I

13   said part of it, but --

14       THE COURT:  Anyway, okay, thank you.

15       Is this the -- Mr. Haviland, you --

16       MR. HAVILAND:  A shorter version of Friday's

17   filing, your Honor.

18       THE COURT:  Okay, because you didn't send me a

19   courtesy copy of that?  Or at least we haven't been able to

20   open it yet.

21       MR. HAVILAND:  We got to ECF this morning, and

22   you'll have a courtesy copy of the filing this afternoon.

23   I'm going to walk through it so you can see what it was.

24       THE COURT:  So you only want me to look at this --

25   there was a huge filing on Friday that I don't think I got a

Page 50

1    courtesy copy of, so we haven't downloaded it all.  In fact,

2    other than the cover memo, I don't know that I've read any

3    of the attachments.

4              MR. HAVILAND:  I can walk through it, your Honor.

5    There are a few additions to the record, but let me begin

6    by --

7              THE COURT:  Have you given one to Mr. Berman?

8              MR. HAVILAND:  They have a copy of the ECF as

9    well, your Honor.

10             THE COURT:  No, but whatever you just handed me?

11             MR. HAVILAND:  That is everything from Tab 2 down

12   from Exhibit L.  The answer is "no," I haven't given them a

13   copy.

14             What I want to do is explain, what Friday's filing

15   was is an evidentiary submission for today's fairness

16   hearing.  Given the record of it, we didn't want to

17   overburden the Court with all these copies here, but in the

18   Category 1 --

19             THE COURT:  Then how is he going to follow it?  Do

20   you have it?

21             MR. BERMAN:  I do not.

22             MR. HAVILAND:  They have our declaration, your

23   Honor.

24             THE COURT:  It's a thousand pages, isn't it?  So

25   do we have a way of putting this up on the screen?  Do you

1    have an extra copy?  Is someone with you right now who has

2    an extra copy that at least he can read along?

3              MR. HAVILAND:  We could do that, your Honor, yes.

4    If we could get that copy from your Clerk, we could --

5              THE COURT:  Yes, I think that's what's going to

6    happen here because otherwise he won't be able to follow

7    along.

8              MR. HAVILAND:  Certainly.  That's fine, yes.

9    Thank you.

10             THE COURT:  If you've got an extra copy, then

11   Mr. Berman can just follow along with it.  Okay.

12             MR. BERMAN:  For the record, your Honor, we're

13   going to start with the material that was submitted on

14   Friday, the day before the hearing, when this matter has

15   been fully briefed for some time.  I object on the grounds

16   of timeliness.

17             THE COURT:  All right, I don't even know what -- I

18   haven't even heard it yet.  Let me hear it.

19             MR. HAVILAND:  Well, it's a prefiling what we're

20   citing today, your Honor.  If this were a trial, we'd be

21   preparing and submitting everything.  Most of the stuff

22   that's cited is in the record.

23             THE COURT:  Just make your argument.  What's wrong

24   with the class?

25             MR. HAVILAND:  We've got five principal

1    objections, your Honor.  And, number one, I need to address

2    the issue of the challenge to my clients' standing, which is

3    a new argument.  All of a sudden the folks that came into

4    the case now no longer have standing to appear before the

5    Court to object.  The class counsel claimed that somehow,

6    simply because this Court made some comments about their

7    payments around 2004 --

8            THE COURT:  Just remind me.  So your clients, what

9    did they do?  They paid for --

10           MR. HAVILAND:  Well, my clients, your Honor, are

11   the named class representatives.

12           THE COURT:  What class they're in?  They're the

13   consumer --

14           MR. BERMAN:  Can I shorten this?  We don't attack

15   his clients' standing.

16           MR. HAVILAND:  Okay, that's fair enough.  In the

17   papers, it wasn't so clear, your Honor.  So that's the

18   reason for the deposition transcripts, so that you can see

19   that every one of these people was deposed by the defendants

20   in the context of the Track Two class certification.

21           THE COURT:  Okay, so that's no longer in play.

22           MR. HAVILAND:  That's right.

23           Now, another preliminary matter is, we had

24   propounded discovery of the proffered consumer

25   representatives, the associations, the Prescription Action

cbac3204-2187-45fe-a572-e9859ff8ab23

1   Litigation Project, Community Catalyst, and Ms. Tonacchio.

2   There were inopposed motions to quash and motions for

3   protective order which haven't been ruled upon.  They've

4   been fully briefed.  And we asked today to have

5   Ms. Tonacchio appear so we could ask her questions.  I don't

6   see her in the courtroom, and I don't know if a

7   representative is here from PAL.  What we want --

8           THE COURT:  As I understand it, there are no

9   cy pres funds.  I clarified that.  So that whatever conflict

10  you perceive there to be with the associations, why does it

11  exist now?

12          MR. HAVILAND:  Well, your Honor, it's a multilayer

13  problem here.  You've got associations who have no standing.

14  This Court already ruled they have no standing to be

15  plaintiffs.

16          THE COURT:  They have no standing with respect to

17  the damage claims.  They're actually asking me to reconsider

18  that, but putting that aside, they have no standing with

19  respect to the damage claims.

20          MR. HAVILAND:  That's right, and they also have no

21  standing with respect to an injunctive claim because there

22  is none.  So the one thing that you'd expect them to stand

23  in for the class, Class 1, I think this Court has ruled

24  there is no need for an injunction because of the change in

25  CMS's rules.  And so there is no vehicle by which the

1   associations can stand as a plaintiff with standing under

2   Article III or typical or adequate under Rule 23(a)(4).  So

3   they can't do it.

4          THE COURT:  But just walk me through.  There are

5   individual reps, right?

6          MR. HAVILAND:  Not for Class I, your Honor, and

7   I'll get to Ms. Tonacchio.  And we asked some basic

8   information.  We asked to have her appear for a deposition.

9   We didn't think that was all that controversial, but

10  apparently it was.  A motion for a protective order was

11  filed.  All of the objectors were deposed.  Ms. Tonacchio

12  refused to appear.  She is being represented by counsel.  We

13  saw a proffer of an affidavit from last summer where

14  Ms. Tonacchio was being put forward as the sole

15  representative for Class 1, if you take the associations

16  out, which I think you have to.

17         THE COURT:  Let me ask you, why are you trying

18  to -- assume for a minute she has -- it's unusual.  It's

19  usually the defendants who are here trying to eviscerate

20  some class rep.  Why do you care in terms of -- she's

21  apparently willing to serve.  What do you think just -- you

22  don't like to -- what do you think is the problem here?

23         MR. HAVILAND:  I think the problem is, she doesn't

24  have standing, your Honor.

25         THE COURT:  But what's the problem?

cbac3204-2187-45fe-a572-e9859ff8ab23

Page 55

1      MR. HAVILAND:  And I'm not trying to do anything

2  other than make sure there's a plaintiff.  The device we're

3  operating under, Rule 23 --

4      THE COURT:  Do you have someone you want to

5  substitute?  Is that --

6      MR. HAVILAND:  Well, no, I had twelve people.

7  They weren't good enough.  They were told that they weren't

8  allowed to be in the case anymore.

9      THE COURT:  They were in Class 3, right?

10     MR. HAVILAND:  Class 1, your Honor, all Class 1.

11  They were all deposed in service of this case.

12     THE COURT:  Just help me remember, that's all.  I

13  have thousands of these issues, okay?

14     MR. HAVILAND:  Certainly, your Honor.  All right,

15  let's go through --

16     THE COURT:  Your people were what?  When did they

17  purchase?

18     MR. HAVILAND:  Class 1.

19     THE COURT:  Are they the ones who purchased after

20  2003?

21     MR. HAVILAND:  Some purchased in 2003, some

22  purchased in 2004, yes.

23     THE COURT:  Right, that was the problem, which

24  is it was after --

25     MR. HAVILAND:  Why is that a problem today?

cbac3204-2187-45fe-a572-e9859ff8ab23

1        THE COURT:  Excuse me.  It was after -- and that

2   doesn't mean that Ms. Tonacchio has standing.  It just is,

3   the problem with your people is that it's a less strong

4   claim because it was after Congress fixed the problem, as I

5   remember it.

6        MR. HAVILAND:  Okay.

7        THE COURT:  Remember, we've been through this.  It

8   was after the statute was changed.  So that while there may

9   be some claims, and some of these classes have gone all the

10  way to the current time, we've always given more money to

11  the people in the heartland.

12        MR. HAVILAND:  Right.

13        THE COURT:  So I'm not saying they have no claim.

14  They just have a lot less strong claim because the statute

15  changed.  So if any of them predated that and you wanted to

16  substitute them, that would be something I'd be willing to

17  do.  Do you want these people to be class reps?

18        MR. HAVILAND:  Your Honor, I thought that they

19  were class reps.

20        THE COURT:  Well, maybe they are.

21        MR. HAVILAND:  There was a complaint filed in

22  February of 2009.

23        THE COURT:  Are they class reps?

24        MR. HAVILAND:  No, they're not.

25        THE COURT:  Are they class representatives at all?

cbac3204-2187-45fe-a572-e9859ff8ab23

1    MR. BERMAN:  We have to go back in history, your

2    Honor.  We were working with Mr. Haviland.  This goes back

3    to the AstraZeneca settlement.  You disqualified him because

4    the class representatives in that class threatened to

5    withdraw.

6         THE COURT:  I remember that whole scenario, but

7    did they withdraw?

8         MR. HAVILAND:  They didn't, your Honor.

9         THE COURT:  They did not?

10        MR. HAVILAND:  No, they didn't.

11        THE COURT:  Okay, so in this case, are they

12   seeking to be class representatives?

13        MR. HAVILAND:  There is pending before the Court a

14   litigation class motion with their names on it to be class

15   reps.  During the pendency of that, which I argued with

16   Mr. Sobol some years ago, they settled.  They didn't talk to

17   us, they didn't talk to the clients.  They just settled.

18   They settled without a class rep.

19        THE COURT:  I think I've made it clear throughout

20   this litigation, because it's a dying class, by definition

21   in Class 1, it's a dying class -- they're old and they tend

22   to have illnesses, they are dying -- that I would be more

23   liberal about allowing addition of class representatives, so

24   that as people got old or sick or senile or dead, died, I'd

25   allow the addition.  So when did you propose adding these

1    people?

2           MR. HAVILAND:  Your Honor, they were brought in --

3    let me give you the history.  They were asked to be brought

4    in by class counsel in 2005 when counsel said to you they

5    had people waiting in the wings, okay, they said, "We've got

6    consumers waiting in the wings."  Your August, 2005 decision

7    made clear you have to have a representative per defendant,

8    okay?  We were asked to intervene at that point and come in

9    with these clients.  And you don't have to tell me about

10   dying cancer patients.  I represent them.  I talk to their

11   wives and their husbands --

12          THE COURT:  Sure, so just remind me.  I don't

13   remember.  Did you ask to add them to Track Two as the

14   Class 1 representatives?

15          MR. HAVILAND:  They came in in the August, 2005

16   time frame with the -- I think it was the third amended

17   complaint.  They all came in, yes.

18          THE COURT:  So why aren't they still class reps?

19          MR. HAVILAND:  I don't know.

20          THE COURT:  I don't know either, so maybe I ask

21   Mr. Berman if he remembers.

22          MR. BERMAN:  Sure, I remember exactly.  At the

23   time that we were litigating the class, they did not have

24   standing.  They were beyond your cutoff when you said things

25   have been changed.  We asked Mr. Haviland over and over

1  again, "Can you help us?"  At one hearing, I think it was

2  the BMS, you turned to him and said, "The problem I have

3  about your clients is they're not within the time period."

4  And you said, "I want you to go get more class reps," and we

5  went out and we did.

6          THE COURT:  All right, so --

7          MR. HAVILAND:  Well, your Honor, in fairness, the

8  answer is this:  The settlement before you today includes up

9  through 2005.  Whether or not it's a bigger or better claim

10  when you're in 2004 or 2005, these folks have standing.

11  That's never been questioned.  They had standing when they

12  filed suit.

13          THE COURT:  Is there a proposal here today to add

14  them?  Is that what the standing is?

15          MR. HAVILAND:  Your Honor, I can't have them jump

16  in on a settlement that they haven't been privy to.  That's

17  the problem.

18          THE COURT:  So you're not proposing to add them?

19          MR. HAVILAND:  I don't know their status because

20  class counsel unilaterally decided to exclude them.  So all

21  I have when I explain to my clients this case, when they

22  say, "Mr. Haviland, why were we deposed, why did we step up

23  in this case --"

24          THE COURT:  Have they put in claims?

25          MR. HAVILAND:  Have they put in claims?  They

cbac3204-2187-45fe-a572-e9859ff8ab23

Page 60

1  expect to.

2              THE COURT:  Okay.  All right, so --

3              MR. HAVILAND:  But they also object, your Honor,

4  because the problem is, the settlement is not fair,

5  reasonable, or adequate, and I understand that you think it

6  is.

7              THE COURT:  Why?

8              MR. HAVILAND:  Well, because you start from the

9  premise, your Honor, that you don't have a client there, so

10  you don't have anybody advocating.  You just have lawyers.

11  That's number one, and that's an important issue for us.

12              THE COURT:  Hold on.  So Tonacchio you think

13  doesn't -- they've supplemented with all these affidavits,

14  so what are the remaining issues as to why she isn't --

15  they've cleaned up a bunch of it, so what's left?

16              MR. HAVILAND:  Okay, there's one simple issue.  If

17  you accept Ms. Tonacchio's affidavit at face value -- she

18  wasn't deposed.  She didn't produce anything more than two

19  pages of a seven-page record from last spring, which was

20  just gotten, which deals with an Anzemet injection, one

21  injection for Aventis.  Now, of the eleven defendants here,

22  at best, she could be a representative for that defendant.

23  You don't have one for the other ten.  And that would

24  abrogate your Honor's rulings from the beginning of this

25  case that you need a representative for each defendant.

1          THE COURT:  All right, so I don't need a

2    deposition.  So the gist of it is, with all these -- you

3    know, a lot of this has gone away; the brothers and the

4    sisters agreed to the suit, all this.  So the gist of it is,

5    there's a legal question, which is, because she only would

6    be a good class rep with respect to -- which defendant?

7          MR. HAVILAND:  Aventis.

8          THE COURT:  Aventis -- that she can't represent

9    the rest of the class for settlement purposes.  That's the

10   gist of it?

11         MR. HAVILAND:  That's right.  And then --

12         THE COURT:  Okay, okay, it's a legal --

13         MR. HAVILAND:  -- if you focus on Aventis, then

14   you can look at the specifics of her situation to see if she

15   has standings on that.  But let me --

16         THE COURT:  I did make that ruling, and so then

17   the question would come about the associations and whether

18   or not --

19         MR. HAVILAND:  Right, and that --

20         THE COURT:  So that's the legal question.

21         MR. HAVILAND:  That's right, that's the legal

22   question.

23         THE COURT:  You don't need a deposition to resolve

24   that.

25         MR. HAVILAND:  Well, I do for this reason, and

1    I'll get to that in a moment.  Before we move off of our

2    clients who are in the case, remember in GSK you had one

3    consumer class representative.  It was the Aaronsons, my

4    clients.  You never heard this challenge, okay?  So now

5    you've got the problem legally that class counsel is saying

6    that the Aaronsons are not adequate for Aventis, and that's

7    why this is important.  The Aaronsons, at the same time they

8    got their chemotherapy, were getting some Kytril and Zofran,

9    the GSK drugs, and Anzemet.

10           THE COURT:  Were they within the class period?

11           MR. HAVILAND:  They bought in 2004.

12           THE COURT:  So they're another 2004 --

13           MR. HAVILAND:  For that drug.

14           THE COURT:  -- but did we allow them in for

15    settlement purposes for Glaxo?  Is that what we did?

16           MR. HAVILAND:  In Glaxo they were the litigation

17    class rep certified in January of 2006 and then the

18    settlement class rep.

19           THE COURT:  The settlement class rep.

20           MR. HAVILAND:  Yes.  So we're undermining one of

21    the legs of the stool of GSK by saying they don't have

22    standing and they can't represent a class here, Judge.

23    That's the problem I've got.  All of a sudden you've got a

24    class rep --

25           THE COURT:  Excuse me, excuse me.

1          MR. HAVILAND:  Yes, yes.

2          THE COURT:  This case has changed hugely from when

3     it began.  It's just evolved and changed.  There are

4     different -- now, as you point -- but what I haven't heard

5     you say is whether or not you wanted to add your people.

6     You're saying "no" because --

7          MR. HAVILAND:  Well, I'm saying, your Honor --

8          THE COURT:  -- even though they're going to put in

9     claims, because you say you're not sure that the settlement

10    is fair.  That's the gist of what you're saying, because it

11    may well be that now that the -- for settlement purposes as

12    opposed to what I was willing to certify a class as, right,

13    what you're arguing is, you don't want your people to be

14    class reps because you don't think the settlement is fair.

15         MR. HAVILAND:  Well, no.  I would like to have had

16    the opportunity to have my clients involved in that

17    settlement because I think they bring a lot to the table.

18    If you read those depositions, you'll see they're just not

19    dying cancer patients, your Honor.  They're very

20    knowledgeable, they're smart.  You ask them the question

21    that Mr. Berman posed to you --

22         THE COURT:  What do you want?  Why don't you think

23    it's fair?  I mean --

24         MR. HAVILAND:  Well, let me get to that, your

25    Honor, because --

1      THE COURT:  -- the truth is that a multi-source

2   case is a very difficult case, and have you given me

3   somewhere in here an alternative damage calculation?

4      MR. HAVILAND:  Sure have.

5      THE COURT:  Where is it?

6      MR. HAVILAND:  If you can go to Category 4, which

7   is Tab 4 for your Honor, you'll see there's a couple of

8   charts here because you remember back in February, 2005,

9   when class certification was argued, you had a couple of

10  Attorneys General representatives appear here.  The Attorney

11  General from Pennsylvania's representative was here, and so

12  was Illinois, and there was a question posed, "Well, why

13  don't you just do a carve-out for the states?  Let the

14  states run with their own cases, they can do well by their

15  consumers, and let the class have what's left."  And class

16  counsel objected to that and said, "No, no, no, let's run in

17  tandem because --"

18     THE COURT:  Do these class settlements that I'm

19  looking at now include Medicaid?

20     MR. HAVILAND:  These are AG settlements, your

21  Honor.  They're not class settlements.  Yes, they are

22  Medicaid.

23     THE COURT:  That's a whole different --

24     MR. HAVILAND:  Right, and that's the point I want

25  to make, your Honor.  The Medicaid cases are much more

cbac3204-2187-45fe-a572-e9859ff8ab23

1    difficult.  You've got knowledge --

2            THE COURT:  A lot more money.

3            MR. HAVILAND:  Well, arguably not, your Honor,

4    because the bottom line is, the Medicaid programs don't

5    necessarily track what the consumers' payments are or the

6    TPPs in the various states.

7            THE COURT:  These are parens -- these are --

8            MR. BERMAN:  Can you show me what you're looking

9    at?

10            MR. HAVILAND:  It's under Tab -- we're looking at

11    T, Tab T.  There you go.

12            THE COURT:  So I may not be looking at the right

13    thing.

14            MR. HAVILAND:  Well, there's two charts, and I'll

15    walk through, your Honor.  You've got the verdicts sheet,

16    and then you've got the settlement sheet.  So I want to look

17    at it from both standpoints because you've got Track Two

18    defendants that have not been tested in this court in a

19    trial.  Take the state of Wisconsin that tried a case.  They

20    came to a verdict on February 17, 2009.  Do you see that?

21    That represents less than two percent of the population.

22    They got $9 million.  If you extrapolate from that, you're

23    looking at $450 million as a potential outcome for Pharmacia

24    alone.

25            THE COURT:  But I'm not even --

cbac3204-2187-45fe-a572-e9859ff8ab23

1        MR. HAVILAND:  Tab T, your Honor.

2        THE COURT:  Wisconsin, $9 million verdict against

3    Pfizer.  What kind of drug was it for?

4        MR. HAVILAND:  It's for all their drugs, as far as

5    I can tell, all the ones that are included in the

6    settlement.

7        THE COURT:  And it was an Attorney General suit,

8    and it involved -- was it parens patriae as well as

9    Medicaid?

10       MR. HAVILAND:  I don't believe so.  It was just

11   for their program costs, your Honor.

12       THE COURT:  And do you know what the statute was a

13   to whether or not it was --

14       MR. HAVILAND:  Well, it was a Medicaid claim, so I

15   think they had the statutory claims that allow the Attorney

16   General to recover for the Medicaid dollars.  But if you

17   just extrapolate from that to what the country could have

18   gotten, which is what you have here today, you've got the

19   whole country, you're looking at $450 million based on a

20   verdict.

21       What I'm suggesting, your Honor, is, under

22   Reynolds analysis, you've got to look at what are the

23   potentials that we could have recovered here?  Okay, you

24   just can't say $125 million is a lot of money.  Amchem

25   was $200 million, and in retrospect, I'm sure everyone

1   wonders why the Supreme Court said "not good enough,"

2   because you had problems with adequacy, you had problems

3   with structure.  That's a lot of money.  There's no question

4   about it.  It came out of Philadelphia, and then our Third

5   Circuit judge, Ed Becker, overturned it, and it went to the

6   Supreme Court.  There's a reason for that.  You've got to

7   have the traction there to make sure you've got litigants

8   that are actually looking out for this.

9        The Reynolds analysis of the Seventh Circuit

10  requires us to look at what could have happened.  I give you

11  that one verdict as a way to look at where the Track Two

12  case could have gone.  By the way, all the assumptions about

13  how difficult it is, there is a verdict, okay?  Look at the

14  settlements.  That's another way to look at it too.  You can

15  go to the next chart which is U, and there you've got a host

16  of settlements by a number of these defendants.  Look at

17  Dey.

18        Now, I want to try to break it down for us, your

19  Honor, because what you were told was, $100 million of

20  $125 million is paid for by three companies.  Okay, you've

21  got Aventis, Amgen, and Warrick.  That means the balance of

22  the eight paid $25 million.  Now, you're not given the

23  shares as to know who's paid what, so we can assume

24  $3 million a head gets us to about $24 million of the

25  $8 million.  So at $3 million a head, Dey is in there, they

Page 68

1   paid $34 million so far to the states; Abbott, $35 million

2   so far to the states.

3           THE COURT:  Do you know how many drugs were

4   involved?

5           MR. HAVILAND:  All the same drugs as here, your

6   Honor.  I don't think there's much --

7           THE COURT:  Was it the same Medicaid -- like, in

8   Massachusetts, they have their own -- it's a WAC-based

9   claim, and there are just all these idiosyncrasies as to how

10  they do it.

11          MR. HAVILAND:  They're very difficult cases, yes,

12  because you've got, first of all --

13          THE COURT:  See, I don't know if I'm comparing

14  apples and apples is the thing.

15          MR. HAVILAND:  Well, and I'm trying to give you

16  some apples because all you're getting is a number that's

17  pulled out and says, okay, here is a fair number.  I mean,

18  take $800 million for instance.  You're talking 3 percent is

19  what they got, Hartman's total number.  Now, Mr. Berman

20  discounts that down to $40 million by putting his layers on

21  top of it.  This is the reality of these cases in the world

22  out there.  And you can look at this chart and see what Dey

23  has paid, Abbott has paid, Amgen has paid, Bayer has paid,

24  Baxter has paid, real dollars with more difficult cases.

25  The Attorney General here in Massachusetts got $2.9 million

1  for Dey.  Arguably more difficult cases.  That establishes a

2  better floor for us to understand, what is a range of

3  possible approval, if you're actually pushing the cases?

4          Now, admittedly, maybe they're not all that good.

5  Maybe the Pharmacia case is better.  They tried to verdict

6  in Wisconsin and they won.  But we're being asked to accept

7  an all-in settlement here blind.  They tell you it had to be

8  a blind settlement.  Well, this tells you it didn't have to

9  be.  Texas and Pennsylvania settled with Abbott.  It didn't

10  have to be a blind settlement.  They didn't say, "No, no, we

11  have twenty other companies or states that are suing us."

12  They settled.  And the issue is whether or not we had the

13  litigation traction here.  There was not a consumer class

14  representative until after the settlement.

15          Ms. Tonacchio wasn't proffered until the spring of

16  last year, after it was all said and done, and that's the

17  problem I have.  Our folks were on the sidelines over here,

18  weren't involved, weren't asked their opinions.  The lawyers

19  settle it.  Then they bring in a Ms. Tonacchio to say

20  rubber-stamp this.  Now, her mother arguably bought Anzemet

21  for one time.  Now, the claim form or the affidavit actually

22  shows that the TPP failed to pay the amount that was due.

23  All other injections for her cancer agents over the two

24  years of her mother's life were paid for by Medicare and the

25  TPP.

1          THE COURT:  We've always allowed that.  You just

2     needed to have some.  But you're right that we've said, at

3     least in a litigation context, I needed a class rep per

4     defendant.  But the question is, this is settlement, and so

5     their argument is whether it should be different.

6          MR. HAVILAND:  I don't know if Amchem allows us to

7     do a shortcut like that because you know the problem, Judge?

8     Now is the last time we look at it, whereas in litigation

9     you have the chance to fix it.

10          THE COURT:  What about the argument that, you

11     know, as a practical matter, these associations are actually

12     more proactive than an individual whose mother took an

13     injection would be.  So assuming they only have standing for

14     a limited purpose, not for damages but for injunction or

15     declaratory relief when I originally put them in, won't they

16     be proactive for consumers?

17          MR. HAVILAND:  Well, one would hope so, but the

18     problem we have with Prescription Action Litigation, it was

19     a group that was in part founded by the lawyers in this

20     room.  The mission statement that we put before the Court

21     demonstrates that one of their five missions in life is to

22     get cy pres.  Now, your Honor made the comment earlier

23     there's not cy pres in this case, but think about this case

24     in totality.  In AstraZeneca, there was a set-aside for

25     cy pres, a guarantee.  One of the objections, frankly, the

1   principal objection --

2          THE COURT:  I think I rejected it.

3          MR. HAVILAND:  Well, no, you didn't, your Honor.

4   You scaled it back, and we appreciated that.

5          THE COURT:  Dramatically, dramatically.

6          MR. HAVILAND:  We appreciated that.  Mrs. Howe saw

7   that, my client, as an impediment to her getting her full

8   due under the settlement.  But there's still that built-in

9   set-aside which is buttressing that settlement from getting

10  what we're getting here.  Today, your Honor, I hear, if

11  there's money left over, we'll give it back to the

12  consumers.  Let's do that in AstraZeneca.  Let's not have a

13  set-aside for cy pres.

14         THE COURT:  I'm not talking about AstraZeneca.

15         MR. HAVILAND:  I understand, but that's the

16  problem I have with PAL.  You asked the question, why

17  shouldn't PAL be a good proxy?  Well, in that case, your

18  Honor, the record that you have before you shows the

19  set-aside was for PAL.  That's what it says in the e-mails

20  that were filed of record with you.  So that's a conflict,

21  your Honor.  The problem is, when lawyers --

22         THE COURT:  Aren't there like six other consumer

23  associations?

24         MR. HAVILAND:  They're all PAL members.  Our

25  papers demonstrate they're all PAL.  I mean, in essence

cbac3204-2187-45fe-a572-e9859ff8ab23

Page 72

1    it's --

2           THE COURT:  So you're saying, so I get the legal

3    argument, and I need to get to Mr. Berman, the legal

4    argument is, regardless of what I say, the associations

5    under that Second Circuit case do not have standing, and

6    Tonacchio only does with respect to one defendant, and

7    therefore that isn't enough at best?

8           MR. HAVILAND:  If you find that she in fact made a

9    payment or had an amount due and owing.

10          THE COURT:  And, in any event, you would say it's

11   not a fair and reasonable amount?

12          MR. HAVILAND:  Because if you look at the reality

13   of what's been happening in these cases --

14          THE COURT:  With the Attorney Generals as a

15   comparison.

16          MR. HAVILAND:  Correct, your Honor.

17          THE COURT:  Okay, thank you, I understand.

18          MR. HAVILAND:  The last point, if I may, because

19   Mr. Berman made the point that we were somehow saying

20   something false about what's in this case.  Mr. Monk and

21   Mr. Thomson, my clients, were added to the complaint in

22   2005.  Mr. Monk bought Eligard, and Mr. Thomson bought

23   Trelstar.  Now, your Honor ruled in response to defendants'

24   motions that they were out; those drugs were not in the

25   case, they were new drugs newly added, and they were

Page  73

1    dismissed.  My clients were then sent packing.  Now they're

2    back in.  So if you look at the record, you're going to see

3    those drugs in there under the second B.

4              THE COURT:  But not for consumers, just for TPPs.

5              MR. HAVILAND:  No, they're in there for consumers,

6    your Honor, and there's a full release happening.  And our

7    problem is, Aventis doesn't look like that it paid any money

8    for Eligard because it's in Class B.  Aventis, according to

9    the record that I see, says they paid it in Class A.  They

10   paid nothing on Eligard.  Why is that important?  If you

11   look under the tab, your Honor, you're going to see that's

12   Lupron.  Eligard and Trelstar are Lupron.

13             THE COURT:  Okay, now you're losing me again.  I

14   missed this point in all the filings, so --

15             MR. HAVILAND:  Well, they're brand drugs, number

16   one, so they don't belong below that line in the Class B

17   drugs.  Aventis makes Eligard, and they're above the line in

18   Class A.  But they haven't paid any money for that drug.

19   It's just kind of lumped in there.  And Mr. Monk says to

20   himself, "Why is that?  I was told years ago by the Court

21   that there's no drug that I can represent a class for."  So

22   he's kicked out.  Then it comes back in the settlement.  The

23   same thing with Trelstar.

24             THE COURT:  Does he want to come back as a class

25   rep?

cbac3204-2187-45fe-a572-e9859ff8ab23

1          MR. HAVILAND:  Well, I'd like to have that

2     actually decided, your Honor, because think about what we've

3     done with Lupron.  $150 million --

4          THE COURT:  I don't even understand this point,

5     I'm sorry.  I understood --

6          MR. HAVILAND:  We're adding drugs.  "No new drugs"

7     was a bright-line rule twice ruled by the Court.  We're

8     adding drugs.  Okay, that's it, that's the objection.  We'd

9     ask you to carve those drugs out.  And they also add an

10    additional defendant in.  G.D. Searle was never in this

11    case.  They got added in too.  It's in our papers, so I

12    won't belabor the point.

13         THE COURT:  The problem is the papers --

14         MR. HAVILAND:  We think the release is overbroad,

15    your Honor, because it includes drugs that violated the

16    "no new drugs" rule, and it added at least one defendant in

17    that we know was never litigated.

18         THE COURT:  Okay, thank you.

19         So, Mr. Berman?

20         MR. BERMAN:  Yes, thank you, your Honor.

21         THE COURT:  Let me, first of all, did you object

22    to putting -- when was there a request for a deposition for

23    this woman who is the class rep?  Was there one?

24         MR. BERMAN:  Yes, there was.

25         THE COURT:  How long ago?

1          MR. BERMAN:  Recently, the last month or two?

2     Eight weeks ago.

3          THE COURT:  So you didn't want to make her

4     available for a deposition?

5          MR. BERMAN:  I did not, I mean, and the reason is

6     simply that we have put forth a good-faith basis, sworn

7     statements, a letter which is Exhibit A to my declaration

8     from the clinic saying that she paid for a Part B Medicare

9     drug.  So she's made a showing.  Now, Mr. Haviland has asked

10    for lots of discovery.  He's asked for deposition of PAL and

11    every --

12         THE COURT:  No, no, no, no, we're not doing that,

13    but the deposition of the class rep is a pretty standard

14    thing.

15         MR. BERMAN:  It is when the defendant asks for it.

16    But when this woman has made a showing, including a letter

17    from the hospital saying that she is part of the class, why

18    would we subject her to a deposition?

19         THE COURT:  All right, assume for a minute she's a

20    class rep for purposes of one defendant.  We had as a

21    general matter just talked about a class rep for each

22    defendant, so help me through this.

23         MR. BERMAN:  Okay, we did, and then we went and we

24    had an argument on Bristol-Myers' class certification, and

25    some of the other class certifications were also before your

cbac3204-2187-45fe-a572-e9859ff8ab23

1   Honor for the Track Two defendants.  At that hearing it

2   turned out that you examined Mr. Haviland's clients, who

3   were at that time involved in the case.  They were all

4   outside of your liability cutoff.

5          THE COURT:  Right.

6          MR. BERMAN:  We told you we had another plaintiff

7   that we were going to proffer, which we did for BMS, and you

8   said, "Going forward, this is a dying class, I may consider

9   one Part B representative being good enough for a group of

10  defendants, so go make sure you find at least one," and we

11  did, Ms. Tonacchio.  In addition, when we're talking about a

12  settlement --

13         THE COURT:  Do you have the transcript where I

14  said that?

15         MR. BERMAN:  I don't, but I will go get it.

16         THE COURT:  Because I probably could never find it

17  again.  But the concern is, for settlement purposes, the

18  question -- I insisted for the Track One that there be a

19  separate class rep for each, and that while I would allow

20  third-party payors to represent their own beneficiaries,

21  that for Class 1, that that wouldn't work.

22         MR. BERMAN:  Right, and --

23         THE COURT:  And so you're saying that I made an

24  early -- I'm not sure I --

25         MR. BERMAN:  You didn't make a ruling.  You said

cbac3204-2187-45fe-a572-e9859ff8ab23

1    you were thinking about the problems, and you said, "I may

2    get there."

3              THE COURT:  So I'm at the point now where I really

4    need to make a ruling.

5              MR. BERMAN:  Yes, yes.

6              THE COURT:  I haven't actually written on this,

7    right?

8              MR. BERMAN:  That's correct.

9              THE COURT:  I did for the Track One in nauseating

10   detail, but what you're saying is that I should think about

11   it in the context of a settlement class for Class 1 as to

12   whether or not a class rep for one of the drugs would be

13   sufficient with respect to all of the drugs.  You're saying

14   I haven't written on that.

15             MR. BERMAN:  That's correct.  I mean, as you point

16   out, things have changed.  So, for example, Mr. Haviland

17   says, well, the GSK class rep had bought a drug in 2004,

18   2005; that was good enough then; why is it not good enough

19   now?  Well, because you in the interim had this ruling that

20   by a certain period of time, there were no litigation

21   claims.  So Mr. Haviland's clients who bought post-

22   litigation ruling were no longer good representatives for

23   the litigation class.

24             THE COURT:  Right.

25             MR. BERMAN:  So this has been evolving.  And, now,

cbac3204-2187-45fe-a572-e9859ff8ab23

1    we took your comments, and we acted as prudently as we could

2    to protect this dying class.  And we went and we got

3    Ms. Tonacchio, and we negotiated the settlement with the

4    full participation -- and you know the people, the

5    organizations, the health care organizations are motivated

6    to protect their consumers -- with their input into how to

7    obtain a settlement.  We've briefed the issue, and we do

8    believe --

9            THE COURT:  You've urged me to change my mind on

10    the impact of that Second Circuit case.  Has any court done

11    that when it involves damages per person, that you actually

12    need to have --

13            MR. BERMAN:  Well, the case we cite to you, the

14    Bano case, suggests that when you're no longer worried about

15    individual damage allocations or proof of individual damage

16    and injury, that the associational issues, that third prong

17    goes away, can go away at the court's discretion.  In other

18    words, when you're at the settlement stage, an association

19    can have standing because you're not worried about the issue

20    of having to prove individual --

21            THE COURT:  Has anyone ever ruled that?  I mean, I

22    know you're arguing that I extend it, that language, and

23    interpret it and have different rules for litigation classes

24    as for settlement classes for associations.

25            MR. BERMAN:  Let me check on that.

1          THE COURT:  I think, in general, the First

2   Circuit -- well, that's wrong -- the Supreme Court has said

3   that the same standing rules apply for standing purposes.

4          MR. BERMAN:  Well, that court calls the third

5   prong a prudential rule, not a standing rule.

6          THE COURT:  So that's where you would say I should

7   make it --

8          MR. BERMAN:  That's where I'm coming out, correct.

9   And we're also coming out with the point that Ms. Tonacchio

10  can represent this class because she's typical for the

11  settlement.  She took a drug that was inflated, just like

12  any other consumer would have taken a drug, and she paid for

13  it.

14          There's two other things I'd like to address that

15  Mr. Haviland raised, one Mr. Haviland raised, and one is

16  going back to the attorneys' fees comment.

17          On the damage model of what the world should have

18  been, now, Mr. Haviland has been involved in this litigation

19  since 2004 or 2005, or even earlier.  He comes into court

20  today and he says this is what the case could be like.  He

21  could have retained an expert because this is not this case.

22  This is the Medicaid case.  In the Medicaid case, an

23  Attorney General argues that the statute says AWP, and if

24  it's a penny over AWP, we win.  They're arguing a statutory

25  definition, zero threshold.  They're getting instructions to

Page 80

1    that, and they're winning.  We don't have that case in this

2    court.  We have the median/mean issue, and that's a far

3    different case.  They don't have it.

4            In addition, those cases include civil penalties,

5    False Claims Act claims, and a host of self-administered

6    drugs that are not in this case.  So to wave around this map

7    and say, "This is what the case is worth," that's not a

8    basis for rejecting the settlement as fair.

9            THE COURT:  And what about this one I understand

10   the least well, is that drugs were added and Searle was

11   added?

12           MR. BERMAN:  Well, again, Mr. Haviland -- we laid

13   this out in our papers -- he's wrong.  Drugs were added for

14   third-party payors.

15           THE COURT:  Well, that's what I just said, and he

16   said --

17           MR. BERMAN:  Drugs were not added for consumers.

18   The Exhibit B list was taken from the Fifth Amended

19   Complaint.

20           THE COURT:  Okay.  And what about the Searle

21   issue?

22           MR. BERMAN:  Searle, you know, the defendants

23   wanted as broad a release as possible, and that included all

24   their predecessors.  And so if Searle was not sued and

25   they're in the list of companies, then they're a new

Page 81

1    company.  And if your Honor thinks that's overbroad, I think

2    you should address that to them.

3              THE COURT:  Who is -- yes?

4              MR. EVERETT:  Your Honor, this is Clay Everett for

5    Pharmacia.  Searle is a wholly owned subsidiary of

6    Pharmacia, has been since the mid-'90s, so throughout this

7    case.  And the release identifies them as a released

8    company, but that release only extends for the consumers

9    that Mr. Haviland represents to the named drugs, and so

10   there's no extension of the release to any claims for Searle

11   that Mr. Haviland may represent.  The reason that they're

12   specifically identified in the releasees and not just

13   brought in in the general category of subsidiaries is that

14   every iteration of --

15             THE COURT:  Well, is Searle still in existence?

16             MR. EVERETT:  It is, but it's a wholly owned sub

17   of Pharmacia, and some of its products were identified as

18   Pharmacia products and continued through the case.

19             THE COURT:  But is the release of Searle for any

20   non-named drugs?

21             MR. EVERETT:  Only as to the third-party payors,

22   who have a broader release.

23             THE COURT:  And with respect to the named drugs,

24   there is a release against Searle for consumers too?

25             MR. EVERETT:  Well, none of the named drugs are

1    Searle drugs, so the consumer release doesn't specifically

2    apply to any Searle drugs specifically.  It's only

3    Pharmacia.

4              THE COURT:  So the TPPs are doing the broader

5    release?

6              MR. EVERETT:  That's right.

7              MR. BERMAN:  And the last point, your Honor, on

8    attorneys' fees, I want to go back just two minutes, and

9    then I'll be done.  And I apologize, I didn't do a good

10   enough job in reminding you of the fee issue, and that is,

11   there's a lot that's gone on that I don't think your Honor

12   remembers.

13             Let me go back.  We've been here eight years.

14   When we started this case, we had no division between

15   Track One and Track Two, and what that meant was -- for a

16   while -- and that we proceeded to do a liability workup with

17   the Track Two defendants just like we did with the Track One

18   defendants.  You may not have seen it, but they each

19   produced millions of documents.  Each defendant's production

20   could have been a litigation for most lawyers by itself.  We

21   took depositions of Bayer and Baxter, all these people.

22   There was a whole army of people doing work.  We fully

23   briefed class certification, we fully briefed summary

24   judgment, and you know the enormity of the pleadings.

25             THE COURT:  I ruled on nothing, right?

cbac3204-2187-45fe-a572-e9859ff8ab23

1          MR. BERMAN:  You just kept, you know, focusing on

2    Track One.

3          THE COURT:  Right.

4          MR. BERMAN:  But we were working, okay?

5          THE COURT:  No, but the problem is, you've put me

6    in a terrible position, not you personally but your firm,

7    because you haven't divided up in any meaningful way the

8    work that was overlapping versus the work that was unique to

9    each company.  You just have glommed it all together into

10   this big, "Well, this is our lodestar for the entire case."

11   Whereas I know, because I've been here with you, that some

12   of it was overlapping and some of it was unique to each

13   company document.  So I'm in an awkward position that I'm

14   not looking at attorneys' fees all at once.  You essentially

15   want a third of the entire recovery, or 30 percent, of the

16   entire recovery for the entire amount over the span of the

17   GSK settlement, the AstraZeneca settlement, the Class 1

18   settlement, 30 percent of the whole thing, which is a lot of

19   money.

20         MR. BERMAN:  It's not.  Let me tell you why it's

21   not.  And I'm sorry if you feel you're in an uncomfortable

22   position to look at this.

23         THE COURT:  I mean, because usually I get a

24   settlement at one time.

25         MR. BERMAN:  I understand.  We have been awarded

cbac3204-2187-45fe-a572-e9859ff8ab23

1   so far $30 million in fees.  We've gotten paid $21 million

2   because Mr. Haviland, who purports to represent the poor

3   sick people, is appealing the AstraZeneca case, a settlement

4   where people are getting three times what they suffered in

5   damages, so we can't -- we haven't distributed those fees.

6   So since 2001, we've taken down $21 million.  We have

7   $80 million in expenses and lodestar not paid, not paid.  So

8   no matter what way you look at it, if you awarded a third of

9   this settlement, we almost come out even.  So there's no way

10  we're being overpaid here.  I understand your concern, but

11  those are the numbers.

12          THE COURT:  Maybe.  We'll see.

13          So let me ask you this one last thing.  So it's

14  quite clear that I'm not doing this today.  There are three

15  big outstanding issues:  One is, you've got to send out

16  notice for the Center for Medicare and Medicaid Services.

17          MR. BERMAN:  Correct.

18          THE COURT:  Second, you're going to check the

19  technology from the McKesson suit and see if we can do

20  claims made.  It's a much better way.  We've been through

21  this before, because otherwise I get tiny numbers of people

22  who put in requests; they're sick, they're dying, they're

23  old, they're afraid of this stuff.  I mean, I just remember

24  the way my mother-in-law used to be.  I mean, it's just not

25  going to happen.  So if we can do a claims made, if it's

cbac3204-2187-45fe-a572-e9859ff8ab23

1  feasible and not too expensive, that would be a lovely way

2  to do it.

3           And, third, we need to send out a supplemental

4  notice.  I think it makes sense to do it through Parade or

5  USA Today or something, and just make sure that we can in a

6  cost-effective way send out notice.  So I think what you

7  need to do is actually give me a schedule as to how doable

8  that is.  I have to think about the legal question with

9  respect to Tomaselli, or whatever her name is, and whether

10  or not I should basically -- and you make a powerful

11  argument that she should be fair and adequate for the way

12  this has played out for a settlement class.

13           So when can you get me that schedule?

14           MR. BERMAN:  By the end of next week.

15           THE COURT:  Okay.  And what are we talking about

16  as a practical matter?

17           MR. BERMAN:  About when we may be able to have a

18  fairness hearing?  End of July.

19           THE COURT:  All right.  And one last question is,

20  and I've never posed this to you before is, does it make any

21  sense at all to have different percentages for different

22  classes, given the ease of proof?

23           MR. BERMAN:  Since you haven't posed it to me

24  before, rather than shoot from the cuff, can I file

25  something on that very short?

cbac3204-2187-45fe-a572-e9859ff8ab23

1    THE COURT:  And the other question along that line

2  is, does it make sense -- what's making me so uneasy is, it

3  drifts along.  As you say, I awarded for Glaxo.  I never

4  know what gets paid and what doesn't.  I didn't know you had

5  essentially settled that and resolved the First Circuit

6  case.  I don't know what money comes in for the Glaxo case.

7  I don't know what you have, what you haven't.  I don't know,

8  and so I've got eight different settlements at different

9  stages on appeal.  How much attorneys' fees did I award in

10 Track One?  I don't even remember.  How much did I award?

11    MR. BERMAN:  For which defendant, your Honor?  For

12 GSK?

13    THE COURT:  No, for Track One for the trial.

14    MR. BERMAN:  Oh, the trial.

15    THE COURT:  See, I don't remember.

16    MR. BERMAN:  None.

17    THE COURT:  I haven't even gone that far yet.

18    MR. BERMAN:  Right, right.  So we could do a

19 chart.

20    THE COURT:  I mean, that's the one where if you

21 were to actually -- that's where you killed yourself.  I

22 mean, that one was fully litigated, fully briefed, very

23 challenged.  This one was more of the follow-on, at least

24 after we tracked them.  And so that's what I'm worrying

25 about.

1          MR. BERMAN:  Again, but everything here short

2     of -- we were prepared in this case short of trial.  In

3     fact, I was in here asking for a trial date against Amgen

4     and Aventis and Watson.  That's how far along we were.

5          THE COURT:  That may be, but that's not what I see

6     in the pleadings.

7          MR. BERMAN:  Okay.

8          THE COURT:  Because I saw almost nothing.  I

9     remember Mr. DeMarco came along, and we had an oral

10     argument, and then it just, boom, settled.  I think I got

11     one of those phone calls through Mr. Alba:  Don't write on

12     this, you know, like, it's going to settle.  So I have not

13     had the involvement in this case that I did in Track One.  I

14     know very much how high-risk and how much work went into

15     Track One, and the question is, how much do you take out of

16     Track One versus Track Two?  Should there be differential

17     percentages?

18          MR. BERMAN:  We'll address that.

19          THE COURT:  That's worth it.  So you'll give me a

20     schedule.  Thank you very much.  There shall be no new

21     objections, the time deadline has gone, except with respect

22     to these three issues:  Can I possibly do a claims made with

23     the technology?  Is the notification process reasonable for

24     the pure cash payors?  And I guess those are the only two

25     issues left because -- with the Center for Medicare and

1    Medicaid Services.  And the question is only should I set up

2    another hearing or do this on the papers?  Maybe I'll see

3    the pleadings and see how it comes in and --

4              MR. BERMAN:  Why don't we see what kind of

5    objections we get, and then we could decide after that.

6              THE COURT:  And I have to address Mr. Haviland's

7    legal question, so, okay, thank you very much.

8              MR. PENTZ:  Your Honor, we also had a motion to

9    intervene, and I was going to suggest that we hold that in

10   abeyance.

11             THE COURT:  No, denied.  It's too late, it's too

12   late.  But you've objected.  It's too late.  I've got to go

13   now.

14             THE CLERK:  All rise.  Court is in recess.

15             (Adjourned, 4:00 p.m.)

16

17

18

19

20

21

22

23

24

25

cbac3204-2187-45fe-a572-e9859ff8ab23

1                    C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court

8    Reporter, do hereby certify that the foregoing transcript,

9    Pages 1 through 88 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Civil

11   Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry

12   Average Wholesale Price Litigation, and thereafter by me

13   reduced to typewriting and is a true and accurate record of

14   the proceedings.

15           In witness whereof I have hereunto set my hand

16   this 11th day of May, 2009.

17

18

19

20

21           /s/ Lee A. Marzilli
                                     _____
22           LEE A. MARZILLI, CRR
             OFFICIAL FEDERAL COURT REPORTER
23

24

25

cbac3204-2187-45fe-a572-e9859ff8ab23