# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
IN RE PHARMACEUTICAL INDUSTRY     )
AVERAGE WHOLESALE PRICE          )    MDL No. 1456
LITIGATION                              )    Civil Action No. 01-12257-PBS
_____)    Subcategory No: 03-10643
)
)    Judge Patti B. Saris
THIS DOCUMENT RELATES TO:     )
)
*City of New York v. Abbott Labs., et al.*    )
(S.D.N.Y. No. 04-CV-06054)         )
*County of Suffolk v. Abbott Labs., et al.*   )
(E.D.N.Y. No. 03-CV-229)           )
*County of Westchester v. Abbott Labs., et al.* )
(S.D.N.Y. No. 03-CV-6178)          )
*County of Rockland v. Abbott Labs., et al.*  )
(S.D.N.Y. No. 03-CV-7055)          )
*County of Dutchess v. Abbott Labs., et al.*  )
(S.D.N.Y. No. 05-CV-06458)         )
*County of Putnam v. Abbott Labs., et al.*   )
(S.D.N.Y. No. 05-CV-04740)         )
*County of Washington v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00408)         )
*County of Rensselaer v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00422)         )
*County of Albany v. Abbott Labs., et al.*   )
(N.D.N.Y. No. 05-CV-00425)         )

[Caption Continues on Next Page]

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' "FUL FRAUD" CLAIMS

*County of Warren v. Abbott Labs., et al.*                              )
(N.D.N.Y. No. 05-CV-00468)                                             )
*County of Greene v. Abbott Labs., et al.*                             )
(N.D.N.Y. No. 05-CV-00474)                                             )
*County of Saratoga v. Abbott Labs., et al.*                           )
(N.D.N.Y. No. 05-CV-00478)                                             )
*County of Columbia v. Abbott Labs., et al.*                           )
(N.D.N.Y. No. 05-CV-00867)                                             )
*Essex County v. Abbott Labs., et al.*                                 )
(N.D.N.Y. No. 05-CV-00878)                                             )
*County of Chenango v. Abbott Labs., et al.*                           )
(N.D.N.Y. No. 05-CV-00354)                                             )
*County of Broome v. Abbott Labs., et al.*                             )
(N.D.N.Y. No. 05-CV-00456)                                             )
*County of Onondaga v. Abbott Labs., et al.*                           )
(N.D.N.Y. No. 05-CV-00088)                                             )
*County of Tompkins v. Abbott Labs., et al.*                           )
(N.D.N.Y. No. 05-CV-00397)                                             )
*County of Cayuga v. Abbott Labs., et al.*                             )
(N.D.N.Y. No. 05-CV-00423)                                             )
*County of Madison v. Abbott Labs., et al.*                            )
(N.D.N.Y. No. 05-CV-00714)                                             )
*County of Cortland v. Abbott Labs., et al.*                           )
(N.D.N.Y. No. 05-CV-00881)                                             )
*County of Herkimer v. Abbott Labs. et al.*                            )
(N.D.N.Y. No. 05-CV-00415)                                             )
*County of Oneida v. Abbott Labs., et al.*                             )
(N.D.N.Y. No. 05-CV-00489)                                             )
*County of Fulton v. Abbott Labs., et al.*                             )
(N.D.N.Y. No. 05-CV-00519)                                             )
*County of St. Lawrence v. Abbott Labs., et al.*                       )
(N.D.N.Y. No. 05-CV-00479)                                             )
*County of Jefferson v. Abbott Labs., et al.*                          )
(N.D.N.Y. No. 05-CV-00715)                                             )
*County of Lewis v. Abbott Labs., et al.*                              )
(N.D.N.Y. No. 05-CV-00839)                                             )
*County of Chautauqua v. Abbott Labs., et al.*                         )
(W.D.N.Y. No. 05-CV-06204)                                             )
*County of Allegany v. Abbott Labs., et al.*                           )
(W.D.N.Y. No. 05-CV-06231)                                             )
*County of Cattaraugus v. Abbott Labs., et al.*                        )
(W.D.N.Y. No. 05-CV-06242)                                             )

*County of Genesee v. Abbott Labs., et al.*        )
(W.D.N.Y. No. 05-CV-06206)                          )
*County of Wayne v. Abbott Labs., et al.*          )
(W.D.N.Y. No. 05-CV-06138)                          )
*County of Monroe v. Abbott Labs., et al.*         )
(W.D.N.Y. No. 05-CV-06148)                          )
*County of Yates v. Abbott Labs., et al.*          )
(W.D.N.Y. No. 05-CV-06172)                          )
*County of Niagara v. Abbott Labs., et al.*        )
(W.D.N.Y. No. 05-CV-06296)                          )
*County of Seneca v. Abbott Labs., et al.*         )
(W.D.N.Y. No. 05-CV-06370)                          )
*County of Orleans v. Abbott Labs., et al.*        )
(W.D.N.Y. No. 05-CV-06371)                          )
*County of Ontario v. Abbott Labs., et al.*        )
(W.D.N.Y. No. 05-CV-06373)                          )
*County of Schuyler v. Abbott Labs, et al.*        )
(W.D.N.Y. No. 05-CV-06387)                          )
*County of Steuben v. Abbott Labs., et al.*        )
(W.D.N.Y. No. 05-CV-06223)                          )
*County of Chemung v. Abbott Labs., et al.*        )
(W.D.N.Y. No. 05-CV-06744)                          )
                                        AND         )
*County of Nassau v. Abbott Labs., et al.*         )
(E.D.N.Y. No. 04-CV-5126)                           )
_____)

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ............................................................................1

**BACKGROUND** .............................................................................................2

    A.    CMS Rarely Based Federal Upper Limits on the Lowest Published Price Available.................................................................................................4

    B.    CMS Routinely Deviated from Other Regulatory Requirements When Establishing FULs. ..................................................................................6

    C.    CMS Exercised Substantial Discretion in Setting FULs to Accomplish Competing Policy Objectives. ....................................................................7

    D.    In 2006, Congress Mandated that FULs Be Set Based on 250% of AMP, Rather than Published Prices, but CMS Never Implemented that Change Because It Created Such Significant Access Issues. ...............................10

    E.    When CMS Adopted the FUL Regulation in 1987, It Recognized that There Was a Difference Between the Prices Published in the National Pricing Compendia and Actual Transaction Prices...........................................11

    F.    New York Medicaid Also Knew the Difference Between Published Prices and Transaction Prices and, Nevertheless, Chose to Reimburse for All Multisource Drugs for Which a FUL Had Been Set on the Basis of that FUL. .......................12

**ARGUMENT** .................................................................................................14

I.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING CAUSATION.................................................................................................14

    A.    Causation Is an Essential Element of Each of Plaintiffs' Remaining Causes of Action. .................................................................................................14

    B.    The Undisputed Record Precludes a Showing of Causation. ...................15

    C.    Plaintiffs Cannot Avoid Summary Judgment by Proffering an Alternative Theory of Causation. ..............................................................................18

II.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING DECEPTION AND, THEREFORE, CANNOT ESTABLISH LIABILITY. ...........................19

    A.    Deception Is an Essential Element of Each of Plaintiffs' Remaining Causes of Action. .................................................................................................19

    B.    The Undisputed Evidence Shows that Neither CMS Nor New York Medicaid Thought that Published Prices Were Equivalent to Transaction Prices. .................20

**CONCLUSION** ................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Channel Master Corp.* v. *Aluminium Ltd. Sales, Inc.*,
  4 N.Y.2d 403, 151 N.E.2d 833 (1958)....................................................................19

*Gaidon* v. *Guardian Life Ins. Co. of Am.*,
  94 N.Y.2d 330, 725 N.E.2d 598 (1999)...................................................................14

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  339 F. Supp. 2d 165 (D. Mass. 2004) .....................................................................19

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  No. 01-12257-PBS, 2007 WL 1051642 (D. Mass. Apr. 2, 2007) ...........................14

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
  460 F. Supp. 2d 277 (D. Mass. 2006) .....................................................................14

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
  No. 01-CV-12257-PBS, MDL No. 1456 (D. Mass. Sept. 14, 2007) .........................3

*Kuriansky* v. *Orvieto*,
  236 A.D.2d 592 (N.Y. App. Div. 1997) ...................................................................14

*Massachusetts* v. *Mylan Labs.*,
  No. 03-11865-PBS, 2008 WL 5650859 (D. Mass. Dec. 23, 2008) .........................14

*New York* v. *Kelly*,
  (*In re Kelly*), 155 B.R. 75 (Bankr. S.D.N.Y. 1993) ...............................................14

*People* v. *Brooklyn Psychosocial Rehab. Inst.*,
  185 A.D.2d 230 (N.Y. App. Div. 1992) ...................................................................14

*State* v. *Stokols*,
  234 A.D.2d 222 (N.Y. App. Div. 1996) ...................................................................14

*Wall St. Transcript Corp.* v. *Ziff Commc'ns Co.*,
  225 A.D.2d 322 (N.Y. App. Div. 1996) ......................................................14, 15, 16

STATUTES AND REGULATIONS

42 U.S.C. § 1396r-8(b)(2)(A) ......................................................................................9

42 U.S.C. § 1396r-8(k)(1)..............................................................................................9

N.Y. Gen. Bus. Law. § 349........................................................................................14, 19

N.Y. Soc. Serv. Law § 145-b ........................................................................................14, 20

N.Y. Soc. Serv. Law § 367-a(9)(b)(i) (McKinney 1994) ..............................................13

42 C.F.R. § 447.332 (2006) .......................................................................................2, 22

42 C.F.R. § 447.504 ........................................................................................................20

**OTHER AUTHORITIES**

51 Fed. Reg. 29,560 (Aug. 19, 1986).............................................................................11

52 Fed. Reg. 28,648 (July 31, 1987).................................................................11, 12, 21, 23

## PRELIMINARY STATEMENT

Defendants are entitled to the entry of summary judgment in their favor as to all claims that New York Medicaid reimbursed (or that it should have reimbursed) on the basis of a Federal Upper Limit ("FUL") because plaintiffs cannot establish causation or liability as to any of these claims.  In their Revised First Amended Consolidated Complaint ("RFACC"), plaintiffs allege that "had defendants submitted accurate prices to the pricing compendia, the FULs set by CMS would have been lower and the New York State Medicaid Program would have paid less." RFACC ¶ 14.  However, the undisputed record evidence demonstrates that the Centers for Medicare and Medicaid Services ("CMS"), which set FULs, exercised considerable discretion for sound policy reasons, routinely choosing to disregard lower published prices and to deviate from the FUL regulatory requirements in other meaningful ways when establishing FULs.  In light of this undisputed record evidence, plaintiffs cannot possibly demonstrate that CMS would have used the lower Average Wholesale Prices ("AWPs") and Wholesale Acquisition Costs ("WACs") that plaintiffs claim defendants should have submitted to the national pricing compendia when setting FULs.  Accordingly, plaintiffs cannot possibly meet their burden of proving causation.

Similarly, plaintiffs cannot establish liability.  For the entire relevant period, CMS, which set FULs, received Average Manufacturer Price ("AMP") on an NDC-by-NDC basis.  Moreover, the FUL regulatory history makes plain that CMS (then HCFA) well understood the relative relationship between the prices at which pharmacies acquired drugs and the AWPs, WACs, and Direct Prices published in the national pricing compendia.  For its part, in 1986, New York Medicaid commented on the then-proposed FUL regulation and urged CMS not to base FULs on published prices, but rather to use lower transaction prices when setting FULs.  Under these circumstances, plaintiffs cannot prove that either CMS or New York Medicaid was deceived – an

essential element of each of plaintiffs' remaining causes of action.  For these reasons as set forth more fully below, summary judgment should enter in defendants' favor as to all Medicaid claims that were reimbursed (or that should have been reimbursed) on the basis of a FUL.

## BACKGROUND

The manner in which CMS is ostensibly supposed to establish FULs is relatively straightforward:  When there are three or more "therapeutically equivalent" products available in the marketplace, the FUL regulation provides that CMS is supposed to establish a FUL based on the lowest published price appearing in any of the three "national pricing compendia" (*i.e.*, Redbook, Bluebook, or Medispan) for the 100-count package size (or the most commonly available package size) of that group of therapeutically equivalent products.  *See* 42 C.F.R. § 447.332(a) (2006).  The national pricing compendia publish AWPs, WACs, and Direct Prices ("DPs").  (56.1 Stmt., ¶ 1.)  According to the regulation, CMS is supposed to select the lowest of these published prices for the 100-count package size for a given group of "therapeutically equivalent" products and set the FUL by multiplying that price by 150%.[1]  *See* 42 C.F.R. § 447.332(b) (2006).  A product is considered "therapeutically equivalent" if it is "A-rated" by the Food and Drug Administration ("FDA") in its publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book."  (56.1 Stmt., ¶ 2.)

When this Court was considering defendants' renewed motion to dismiss the alleged "FUL fraud" claims, the United States Department of Justice submitted an amicus brief that

---

[1]  For example, if three different drug manufacturers each made identical versions of ibuprofen, which they sold in bottles of 25, 50, 100, and 1,000 pills, and each submitted AWPs and WACs to Redbook, Bluebook, and Medispan for each of their products, then, according to the regulation, CMS should (i) review the AWPs and WACs published in each of the three national pricing compendia for each of the three manufacturers' 100-count bottle of ibuprofen; (ii) select the lowest from among these published prices; and (iii) multiply that lowest published price by 150% to establish a FUL for all ibuprofen products.  The resulting FUL is expressed in, and reported on, a per-unit basis so that the FUL can be applied across all package sizes of a given product.

suggested CMS mechanically followed the requirements of the FUL regulation when establishing FULs.  *See* Brief of the United States on Federal Upper Limit, *In re Pharm. Indus. Avg. Wholesale Price Litig.*, No. 01-CV-12257-PBS, MDL No. 1456 (filed June 28, 2007) [Docket No. 4413].  However, in declining to dismiss plaintiffs' "FUL fraud" allegations at that time, the Court sounded a more cautionary note, and suggested that each side choose five drugs and "at least figure out the methodology" that CMS uses to establish FULs.[2]  *See* July 26, 2007 Hearing Tr., at 28:10 – 28:17 (attached to the Declaration of Kim B. Nemirow ("Nemirow Decl.") as Ex. C).  The "targeted" FUL discovery that the Court ordered has been very revealing.

The undisputed empirical evidence and uncontradicted deposition testimony show overwhelmingly that CMS did not follow any simple or predictable rule when establishing FULs.  Rather, CMS (and its predecessor, HCFA) exercised considerable discretion in setting FULs (and, indeed, in deciding whether or not to set a FUL at all).  The undisputed record evidence shows further that, in setting FULs, CMS sought to balance two sometimes competing policy objectives – achieving a significant cost savings by promoting the increased use of generic drugs, while at the same time ensuring that Medicaid beneficiaries had sufficient access to prescription drugs.  Accordingly, the FULs that CMS set cannot be explained by any simple rule such as the one set forth in the regulation, nor is it possible to predict (or, more importantly, manipulate) FULs in any meaningful way.

---

[2]  Perhaps recognizing the various impediments to plaintiffs' "FUL fraud" claims, the Court established a schedule for "targeted" FUL-related discovery.  *See* CMO 33, *In re Pharm. Indus. Avg. Wholesale Price Litig.*, No. 01-CV-12257-PBS, MDL No. 1456 (D. Mass. Sept. 14, 2007) [Docket No. 4745].  The Court ordered each side to select five drugs for targeted discovery.  Because both sides chose enalapril maleate, there were nine drugs, identified by the Generic Code Number or GCN, which is assigned by First Databank to a "therapeutically equivalent" group of drugs, that became of the subject of the targeted FUL discovery:  (1) albuterol 0.083% solution (GCN 5309); (2) albuterol 90 MCG. inhaler (GCN 5037); (3) cefadroxil 500 mg. (GCN 9089/48268); (4) clonazepam 0.5 mg. tablet (GCN 4560); (5) enalapril maleate 20 mg. tablet (GCN 386); (6) isosorbide mononitrate 60 mg. tablet SA (GCN 17927); (7) lorazepam 1 mg. tablet (GCN 3758); (8) metroprolol tartrate 100 mg. tablet (GCN 5131); and (9) ranitidine 150 mg. tablet (GCN 11673).

A.     **CMS Rarely Based Federal Upper Limits on the Lowest Published Price Available.**

Although the FUL regulation provides that CMS is supposed to mechanically select the lowest published price available as the basis for the FUL, in practice, the undisputed evidence shows that CMS rarely based FULs on the lowest published price available.  (56.1 Stmt., ¶¶ 7-9.)  Instead, exercising substantial discretion, CMS routinely passed over existing, published prices that, if used, would have resulted in lower FULs.  (*Id.*)  CMS announced the FULs that it set for particular drugs in formal transmittals to state Medicaid agencies.  In these transmittals, CMS specified the precise date of the published prices that it used as the basis for the FULs announced in that transmittal.  (*Id.* at ¶ 4.)  Thus, while CMS did not identify the particular published price on which it based any particular FUL, the universe of published prices that CMS had available to it when it set a particular FUL is known.  (*Id.*)  For the nine GCNs or drugs that were the subject of the targeted FUL discovery, between 1997 and 2005 (the discovery period specified by the Court in CMO 33), CMS established 31 different FULs.  (*Id.* at ¶ 6.)  Dr. Sumanth Addanki studied the 31 FULs that CMS set during this period and the published prices that were available to CMS when it set each FUL.  Dr. Addanki's examination shows that, of the 31 FULs that CMS established for the target drugs during the relevant time period, CMS would have established a lower FUL in 23 out of 31 cases (***nearly 75% of the time***) had CMS followed the rule set forth in the FUL regulation – *i.e.*, had CMS established the FUL by multiplying the ***lowest*** available published price by 150%.  (*Id.* at ¶ 7.)  In other words, nearly 75% of the time, CMS chose to disregard a lower available published price and set a higher FUL.  (*Id.*)  If CMS had chosen to use any of these existing lower published prices, then the resulting FUL would have been lower.

CMS's actions are even more striking if one considers all of the lower prices that were published and in effect during the periods for which the 31 FULs remained in effect.  CMS, of

- 4 -

course, was free to change its FULs at any time and did update them periodically.  (56.1 Stmt., ¶ 3.)  Nevertheless, Dr. Addanki's analysis shows that, for all but two of the FULs at issue here (*i.e.*, for 29 out of 31 FULs), during the period for which the FUL remained in effect, there existed at least one published price that, if used, would have resulted in a lower FUL for some portion of, and many times the entire period for which the FUL was in effect.  (*Id.* at ¶ 8.)  In fact, for 25 out of the 31 FULs at issue here, during the entire period for which the FUL remained in effect, there was ***always*** a lower published price in effect upon which a lower FUL could have been set.[3]  (*Id.* at ¶ 9.)

The deposition testimony from the two CMS witnesses who were directly responsible for setting FULs during the discovery period confirms what this empirical evidence makes plain – that CMS routinely disregarded lower published prices when setting FULs.  In practice, CMS had a computer program – the "FULs System" – that gathered the published prices (AWPs, WACs, and DPs) from the national pricing compendia for a particular group of therapeutically equivalent products and calculated a FUL based on 150% of the lowest price that the program identified.  (56.1 Stmt., ¶ 15.)  However, as the CMS testimony reveals, this was only the beginning of the process of setting FULs.  In the words of the CMS witnesses, the output from the FULs System was the ***starting point*** for a "manual review" process that included, among other tasks, taking steps to ensure that the drug for which the FUL was being set would be widely enough available in the marketplace at prices below the FUL.  (*Id.* at ¶¶ 15-16.)  The documents produced by CMS in this case show the formulaic FULs calculated by CMS's computer program routinely being crossed-out and higher FULs established based on the results

---

[3]  Because FULs were set in advance of their effective date, sometimes new lower prices were published even before the FUL became effective.

of CMS's manual review process.[4]  (*See, e.g.*, *id.* at ¶¶ 17, 19, 21, 23.)  And the testimony from the CMS witnesses directly confirms that lower published prices were overridden in setting several of the actual FULs for clonazepam, lorazepam, cefadroxil, and metroprolol tartrate, drugs that were selected for targeted discovery in this case.[5]  (*Id.* at ¶¶ 17-25.)

> **B.     CMS Routinely Deviated from Other Regulatory Requirements When Establishing FULs.**

In addition to very often deliberately disregarding the lowest published price available, CMS routinely adjusted the regulatory requirements in a number of other meaningful ways when setting FULs.  For instance, CMS departed from the strictures of the FUL regulation in those instances when:  (1) FULs were based on prices for products that were not A-rated by the FDA in its Orange Book (*i.e.*, not "therapeutically equivalent" for purposes of the FUL regulation) (*e.g.*, when setting a FUL for the 90 MCG albuterol inhaler); (2) FULs were based on prices for products that were neither the 100-count, nor the most commonly available package size (*e.g.*, when setting a FUL for cefadroxil); (3) FULs were set using prices that were not published in any of the national pricing compendia, but rather were obtained by calling a particular manufacturer for pricing information (*e.g.*, when setting a FUL for isosorbide mononitrate); (4) FULs were based on prices that were outdated – that had been flagged as "obsolete" by the national pricing compendia (*e.g.*, when setting a FUL for cefadroxil); and (5) CMS declined to set FULs (or even removed FULs) at times when all of the regulatory criteria for establishing a FUL were satisfied (*e.g.*, when removing the FULs for the 90 MCG albuterol inhaler, the .083% albuterol solution, and lorezepam).  (56.1 Stmt., ¶¶ 26-33.)  In particular, CMS declined to set a

---

[4]  Attached hereto as Exhibit A are some examples of the many printouts from CMS's FULs System showing that the FUL that had been calculated by the computer program was subsequently adjusted upwards as a result of the manual review process.

[5]  Notably, the CMS witnesses confirmed that there was nothing "unique" about the drugs selected by the parties for targeted discovery – that the same approach was followed in establishing FULs for all drugs.  (56.1 Stmt., ¶ 14.)

FUL if it knew that there was a shortage of the drug's raw material or that the drug was not widely enough available in all of the states.  (*Id.* at ¶¶ 31 & 33.)  In fact, for 25 out of the 31 FULs that were the subject of the targeted discovery (more than 80% of the time), a different FUL would have resulted if CMS had complied with all of the regulatory requirements.  (*Id.* at ¶ 10.)

Moreover, CMS's deviations from the FUL regulatory requirements did not follow any discernable pattern.  (56.1 Stmt., ¶ 11.)  Rather, CMS's conduct in setting FULs reflects its substantial exercise of discretion.  Further reflecting this broad discretion, CMS's policies and procedures for setting FULs were not documented in any formal way.  (*Id.* at ¶ 35.)  Rather, empirical analysis demonstrates, and CMS deposition testimony confirms, that CMS made discretionary decisions on a case-by-case basis.  (*Id.*)  CMS officials were taught informally by other CMS officials how to set FULs manually to accomplish the twin goals of maintaining access and achieving cost savings.  (*Id.* at ¶ 36.)

### C.  CMS Exercised Substantial Discretion in Setting FULs to Accomplish Competing Policy Objectives.

Although CMS's deviations from the regulatory requirements do not follow any systematic pattern, the undisputed CMS deposition testimony makes plain that CMS chose to deviate from the simple rule set forth in the regulation to achieve a particular objective:  In setting FULs, CMS wanted states to realize a cost savings by promoting the increased use of generic drugs, while at the same time continuing to ensure that Medicaid beneficiaries had adequate access to prescription drugs consistent with Medicaid's statutorily-mandated access requirement.  (56.1 Stmt., ¶¶ 37-38.)

According to Sue Gaston, the CMS employee responsible for setting FULs between 1991 and 2003, striking this balance between lower cost and sufficient access was an important objective for CMS:

> Q.     So, as we've kind of seen throughout, CMS is trying to establish a FUL that's not too low and not too high to achieve a cost savings, but also not set it too low to create an access issue; that's the balance CMS is trying to strike?
>
> A.     Correct.
>
> Q.     And you did that – the balance was struck, sometimes the computer program worked as it was supposed to and that balance was struck by the computer program, but other times it was the result of manual intervention?
>
> A.     Correct.

(*Id.* at ¶ 38.) (Transcript of Deposition of Sue Gaston ("Gaston Dep.") at 498:16 – 499:6.).

With an eye toward achieving its twin objectives, CMS routinely monitored pharmacy acquisition costs to ensure that it was not setting FULs that were too low to ensure access.  (56.1 Stmt., ¶¶ 40-43.)  As described above, FULs were set only after a manual review process that involved gathering information from manufacturers, wholesalers, pharmacies, and state Medicaid agencies to determine whether "the FUL prices . . . were correctly on the FUL list," whether "the pricing appears to be either too low or too high," and whether a drug was available at a certain price in the marketplace.  (*Id.* at ¶ 40.) (Gaston Dep. at 433:14 – 434:8, 435:6 – 435:21.) Sometimes CMS even chose not to establish a FUL at all, despite the availability of three therapeutically equivalent sources of that drug, because CMS concluded that the drug might not be widely enough available in the marketplace at a price less than or equal to the FUL that CMS would have established.  (*Id.* at ¶¶ 31-32.)

The undisputed record evidence shows that CMS had more than adequate access to information about the prices of transactions occurring in the marketplace from several different

sources.  Of course, CMS has received AMPs for all drugs reimbursed by Medicaid on an NDC-by-NDC basis quarterly since 1991.  *See* 42 U.S.C. § 1396r-8(b)(2)(A).[6]  Moreover, the CMS deposition testimony in this case confirms that AMP information ***was*** available to the CMS officials who were responsible for setting FULs.  (56.1 Stmt., ¶ 39.) (Gaston Dep. at 528:1 – 528:3 ("Q.  Would you have had access to that AMP information?  A.  Yes.").)  CMS also informally called drug manufacturers to determine "at what price" the drug was available because the drug "could have had a lower wholesaler acquisition cost than the prices that were shown" in the compendia, and to determine whether a particular product was available in every state. (*Id.* at ¶¶ 41-42.) (Transcript of Deposition of Gail Sexton ("Sexton Dep.") at 60:18 – 61:18, 62:2 – 62:9, 116:15 – 117:11.) (Gaston Dep. at 426:3 – 427:20, 429:9 – 429:17.)  CMS routinely received, and responded to, feedback from pharmacies about adjusting or removing FULs.  (56.1 Stmt., ¶¶ 40-42.) (Gaston Dep. at 434:19 – 435:21.) (Sexton Dep. at 110:3 – 112:6.).  And, finally, CMS considered state MACs when deciding whether a FUL was "realistic" and "in the ballpark."  (56.1 Stmt., ¶ 43.) (Gaston Dep. at 478:11 – 482:14.)

At the same time, although AWP is among the prices published by the national pricing compendia, the empirical evidence shows, and CMS testimony confirms, that CMS never based FULs on AWPs.  (56.1 Stmt., ¶ 34.)  Ms. Gaston explained CMS's decision never to base a FUL on an AWP as follows:  "Setting a FUL using the AWP wouldn't achieve the cost savings." (56.1 Stmt., ¶ 34.) (Gaston Dep. at 457:20 – 459:7.)  States' "regular reimbursement methodology would be a percentage off of AWP," so no cost savings would be achieved by marking up an AWP by 150% to set a FUL.  (56.1 Stmt., ¶ 34.) (Gaston Dep. at 456:12 – 456:20,

---

[6]  AMP is the average price paid by wholesalers to a manufacturer for drugs distributed to the retail pharmacy class of trade, including discounts and rebates.  42 U.S.C. § 1396r-8(k)(1).  More simply put, AMP is a Medicaid-defined measure of a manufacturer's average selling price for a drug.

458:22 – 459:7.) (Sexton Dep. at 58:15 – 59:22.)  Again, Ms. Gaston's explanation is telling of

CMS's twin objectives and the process that, in practice, CMS followed when establishing FULs.

> **D.     In 2006, Congress Mandated that FULs Be Set Based on 250% of AMP, Rather than Published Prices, but CMS Never Implemented that Change Because It Created Such Significant Access Issues.**

In 2006, Congress passed the Deficit Reduction Act ("DRA"), which sought to reduce

drug reimbursement costs for multisource and generic drugs by setting a FUL based on AMPs,

rather than published prices.  (56.1 Stmt., ¶¶ 44-45.)  Despite substantially increasing the mark-

up from 150% of the lowest published price to 250% of AMP, Congress and others (correctly)

thought that shifting to FULs based on an average of transaction prices would greatly reduce

reimbursement amounts.  (*Id.* at ¶ 46.)  That was, after all, Congress's objective in passing the

DRA.  (*Id.* at ¶ 45.)  The resulting reimbursement rates, however, proved to be far too low to

satisfy other critical policy objectives such as ensuring adequate access.

Both the Department of Health and Human Services, Office of the Inspector General

("OIG") and the Government Accountability Office ("GAO") studied the proposed change and

concluded that it was simply not viable.  (56.1 Stmt., ¶¶ 47-49.)  Even with the increased mark-

up, OIG concluded that, for 19 of the top 25 drugs reimbursed by Medicaid (in dollar terms), the

FUL calculated using 250% of the lowest reported AMP would be ***less than*** the average

pharmacy acquisition cost for that drug.  (*Id.* at ¶ 49.)  In other words, OIG concluded that

pharmacies would lose money each time they dispensed one of these drugs to a Medicaid

beneficiary.  (*Id.*)  GAO reached very similar conclusions in its study.  (*Id.* at ¶¶ 47-48.)

Based in part on these studies, in 2006, when CMS sought to change its methodology for

setting FULs from one based on published prices to one based on AMPs, the National

Association of Chain Drug Stores sued CMS and succeeded in obtaining an injunction

prohibiting CMS's implementation of this new methodology for calculating FULs.  (56.1 Stmt.,

¶¶ 51-55.)  Subsequently, Congress rescinded the "250 percent of AMP" rule as a result of concerns about access.  (*Id.* at ¶ 56.)  As a result, CMS has not changed its methodology for setting FULs.  (*Id.* at ¶¶ 53, 56.)

> **E.   When CMS Adopted the FUL Regulation in 1987, It Recognized that There Was a Difference Between the Prices Published in the National Pricing Compendia and Actual Transaction Prices.**

The hasty retreat from the DRA formula (250% of AMP) is only the latest illustration in a long line that demonstrates conclusively that CMS has, at all relevant times, understood the difference between the published prices appearing in the national pricing compendia and transaction prices.  The FUL regulation in effect today was promulgated in 1987.  The proposed rulemaking and final statement of reasons published in the Federal Register make plain that HCFA (CMS's predecessor) understood – even then – this significant difference.  In adopting the FUL regulation, HCFA considered, and expressly rejected, the idea of basing FULs on pharmacies' actual acquisition cost.  *See* Medicare and Medicaid Programs; Limits on Payments for Drugs, 52 Fed. Reg. 28,648, 28,648-50 (July 31, 1987).  Instead, the FUL program was designed to use published prices with the express recognition that Medicaid would be reimbursing for drug ingredients at a rate higher than provider cost, thus "building into our rates for ingredients, a ***profit margin*** for pharmacists."  52 Fed. Reg. at 28,656 (emphasis added); *see also* Medicare and Medicaid Programs; Limits on Payments for Drugs, 51 Fed. Reg. 29,560, 29,562 (Aug. 19, 1986) ("[P]harmacists would be encouraged to purchase as prudently as possible because . . . they would retain the difference between what they pay for the drug product and the upper limit of payment established by HCFA for the particular drug.").

Over and over again, the regulatory history recites HCFA's knowledge that the published prices appearing in the national pricing compendia are higher than providers' actual acquisition

costs and that states can and should vary providers' profit levels on individual drugs to influence

prescribing and dispensing patterns.  The following discussion is emblematic:

> States will be free to make payments for individual drugs on any reasonable basis
> as long as total payments for each group of drugs [multisource or "other"] do not
> exceed the aggregate limit on that group. . . . We would not expect a State agency
> to adopt directly the upper limit methodology as a payment method [for individual
> drugs] *because it does not gear payments to markups appropriate to the actual
> costs of acquiring and dispensing these drugs* . . . . Since we are not placing
> maximum payment limits on individual drugs, *drugs with high compendia prices
> could generate extremely high payment levels*.  Unless an agency's payment
> methodology ensured otherwise, *a Medicaid agency could end up paying
> inappropriately high rates for some drugs* . . . .

52 Fed. Reg. at 28,655 (emphasis added).  HCFA encouraged the states to do the research and

develop their own state "mini-MAC programs" to insure that FULs based on the published

compendia prices did not become the default payment rate for all multisource and generic drugs.

*Id.* at 28,653.  Such rates, HCFA warned, could generate "extremely high payment levels" for

certain drugs.  *Id.* at 28,655.

Nevertheless, the rationale behind basing FULs on published prices was simple.  HCFA

was seeking to lower overall cost by encouraging the substitution of generic drugs for brands

while at the same time not too severely limiting a state's flexibility to provide access to all

Medicaid beneficiaries:  "We expressed the hope that States would recognize the advantage of

providing pharmacists with an incentive to participate in the Medicaid program and to stimulate

pharmacists to engage in prudent purchasing practices and the substitution of lower cost

therapeutically equivalent products."  52 Fed. Reg at 28,656.

>**F.**  **New York Medicaid Also Knew the Difference Between Published Prices and
>     Transaction Prices and, Nevertheless, Chose to Reimburse for All
>     Multisource Drugs for Which a FUL Had Been Set on the Basis of that FUL.**

New York Medicaid has also long understood that "a pharmacy's acquisition cost for a

drug is likely to be lower than the prices quote[d] in third-party pricing compendia such as the

- 12 -

Red Book or First DataBank." (56.1 Stmt., ¶ 62.) (Affidavit of Cesar A. Perales, at ¶ 3.). In fact, during the notice-and-comment period in 1986, the New York State Department of Social Services ("NYDSS," the predecessor to the New York Department of Health, which currently administers the New York Medicaid Program) commented on the three proposed alternatives for establishing a federal upper limit, and specifically urged HCFA not to adopt a FUL based on published prices because it believed that setting a FUL based on published prices was not likely to result in any significant cost savings. (56.1 Stmt., at ¶¶ 58-61.) In particular, in a 1986 letter to HCFA, the then-Commissioner of NYDSS, Cesar Perales, wrote, "the advertised price found in the Red Book or the Blue Book may not reflect the actual purchase price" and, therefore, if HCFA chooses to base FULs on the published prices, "the Medicaid program may not realize savings in an appreciable amount since the markup of the acquisition costs will be significant." (*Id.* at ¶¶ 60-61.) (Affidavit of Cesar A. Perales, at ¶ 2 & Ex. A.)

Nevertheless, once HCFA adopted the regulation that based FULs on published prices, and despite New York Medicaid's knowledge that such FULs were unlikely to result in any appreciable cost savings, beginning in 1994, New York Medicaid chose to reimburse all multisource and generic drugs for which CMS had established a FUL at the upper limit set by CMS. *See* N.Y. Soc. Serv. Law § 367-a(9)(b)(i) (McKinney 1994). As plaintiffs concede, "New York statute provides that when a FUL is in place, New York Medicaid reimburses at the FUL" – not on the basis of some "lesser of" formula that takes into account other (possibly lower) measures of reimbursement. *See* Pls.' Sur-Reply Mem. in Further Support of Their Opp'n to Defs.' Joint Mot. to Compel the Production of Claims Data, *In re Pharm. Indus. Avg. Wholesale Price Litig.*, No. 01-CV-12257-PBS, MDL No. 1456, at 2 (D. Mass. Apr. 2, 2008) [Docket No. 5194-3] (hereinafter, "Pls.' 4/2/08 Sur-Reply").

## ARGUMENT

Defendants are entitled to summary judgment as to all Medicaid claims that were

reimbursed on the basis of FULs (or that should have been reimbursed on the basis of FULs)

because, as to those claims, plaintiffs cannot establish causation or liability.  There is simply "an

absence of evidence to support [plaintiffs'] position."  *In re Pharm. Indus. Avg. Wholesale Price*

*Litig.*, 460 F. Supp. 2d 277, 284 (D. Mass. 2006) (internal quotation marks omitted); *see also*

*Massachusetts* v. *Mylan Labs.*, No. 03-11865-PBS, 2008 WL 5650859, at *10 (D. Mass. Dec.

23, 2008).

## I.   PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING CAUSATION.

### A.   Causation Is an Essential Element of Each of Plaintiffs' Remaining Causes of Action.

Plaintiffs' remaining causes of action are Count II, deceptive acts and practices, N.Y.

Gen. Bus. Law. § 349; Count III, obtaining public funds by false statements, N.Y. Soc. Serv.

Law § 145-b; and Count VII, common law fraud.  *See In re Pharm. Indus. Average Wholesale*

*Price Litig.*, No. 01-12257-PBS, 2007 WL 1051642, at *17 (D. Mass. Apr. 2, 2007) (hereinafter

"4/2/07 Order").  Causation is an essential element of each of these remaining causes of action.

*See Gaidon* v. *Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 344, 725 N.E.2d 598, 604 (1999)

(injury must occur "by reason" of § 349 violation); N.Y. Soc. Serv. Law § 145-b (2008);[7] *Wall*

---

[7]  Causation is an essential element of a § 145-b claim.  In the entire universe of cases finding liability under N.Y. Soc. Serv. Law § 145-b, violations of §145-b have been established only if either there was a prior criminal conviction for acts which constitute a violation of § 145-b, or, in one case, where defendant perpetrated a "billing fraud" on Medicaid by seeking reimbursement for services that were not rendered.  *See, e.g., Kuriansky* v. *Orvieto*, 236 A.D.2d 592, 593-94 (N.Y. App. Div. 1997) ("[D]efendant's criminal conviction [for submitting false Medicaid claims] constitutes conclusive proof of the facts establishing his violation of Social Services Law § 145-b . . . ."); *State* v. *Stokols*, 234 A.D.2d 222, 222-23 (N.Y. App. Div. 1996) (finding that defendant was collaterally estopped from contesting the amount of civil damages under N.Y. Soc. Serv. Law § 145-b, since defendant had not contested guilt in the criminal case); *People* v. *Brooklyn Psychosocial Rehab. Inst.*, 185 A.D.2d 230, 234 (N.Y. App. Div. 1992) (finding a violation of § 145-b where defendant "designed, supervised, and implemented BPRI's 'home visit' billing fraud on Medicaid"); *New York* v. *Kelly (In re Kelly)*, 155 B.R. 75, 79 (Bankr. S.D.N.Y. 1993) (holding that

*St. Transcript Corp*. v. *Ziff Commc'ns Co*., 225 A.D.2d 322, 322 (N.Y. App. Div. 1996)

(misrepresentation must be the direct and proximate cause of the injury).  Plaintiffs cannot meet

their burden of proving causation in this case.

      **B.**      **The Undisputed Record Precludes a Showing of Causation.**

      Plaintiffs' theory of causation is premised on the assumption that, had defendants

submitted lower AWPs and/or WACs (at the levels calculated and prescribed by their putative

expert), CMS (and its predecessor, HCFA) would have set lower FULs (equal to 150% of these

lower amounts), and, ultimately, New York Medicaid would have reimbursed less for the claims

that it paid on the basis of FULs.  *See* RFACC ¶ 14 (alleging that "had defendants submitted

accurate prices to the pricing compendia, the FULs set by CMS would have been lower and the

New York State Medicaid Program would have paid less").  This theory of causation must fail in

light of the undisputed record evidence demonstrating that CMS routinely disregarded lower

published prices in order to achieve important (and competing) policy objectives.

      As the empirical evidence plainly shows, CMS did not mechanically base FULs on the

lowest published price available.  Rather, exercising substantial discretion, CMS very often

chose to disregard lower published prices that, if used, would have resulted in CMS setting a

lower FUL.  In fact, for the 31 FULs that CMS set during the relevant time for the nine products

that were the subject of the targeted discovery, CMS disregarded at least one existing, lower

published price in setting the FUL ***nearly 75% of the time*** (for 23 out of 31 FULs).  (56.1 Stmt.

¶ 7.)  For all but two FULs (29 out of 31), there was at least one lower published price in effect at

some point during the period for which the FUL remained in effect (*id.* at ¶ 8), and for 25 out of

the 31 FULs, there was ***always*** at least one lower published price in effect throughout the entire

<hr />

due to the debtor's criminal conviction for grand larceny for submitting false Medicaid claims, "the State is entitled
to a judgment against the debtor for treble damages" under § 145-b).

period for which the FUL remained in effect (*id.* at ¶ 9).[8]  Moreover, the CMS witnesses testified

unambiguously that there was nothing "unique" about the GCNs that the parties had selected for

targeted discovery.  (*Id.* at ¶ 14.)  On the basis of this evidence alone, plaintiffs' theory of

causation – that had defendants submitted lower prices to the compendia, CMS would have set

lower FULs – must fail.  This evidence, however, is only the beginning.

The CMS officials responsible for setting FULs for the vast majority of the period at

issue in this case, and the only witnesses CMS was willing to make available to defendants

through the *Touhy* process, candidly acknowledged in their deposition testimony that they

routinely decided not to use the lowest published prices when setting FULs.  (56.1 Stmt. ¶¶ 18,

20, 24-25, 29, 33.)  These witnesses testified about several specific instances in which they

decided to disregard existing, lower published prices when setting FULs for clonazepam,

lorazepam, cefadroxil, and metroprolol tartrate – four of the drugs that were the subject of the

targeted FUL discovery – but did not limit their testimony in any way to only those three drugs.

(*Id.* at ¶¶ 14, 17-20, 23-24.)

Moreover, the CMS witnesses explained that CMS routinely disregarded lower published

prices as a part of the manual review process employed by CMS when setting FULs in order to

achieve its twin goals of controlling costs and ensuring access.  Ms. Gaston's testimony on this

point provides an enlightening summary of CMS's rationale:

> Q.    So, as we've kind of seen throughout, CMS is trying to
>       establish a FUL that's not too low and not too high to
>       achieve a cost savings, but also not set it too low to create
>       an access issue; that's the balance CMS is trying to strike?
>
> A.    Correct.

(56.1 Stmt. ¶ 38.) (Gaston Dep. at 498:16 – 498:22.).

---

[8] In at least two instances, a lower price was published between the date the FUL was set by CMS and the date the
FUL became effective.

As the empirical evidence shows, and the CMS testimony confirms, CMS also deviated from other of the FUL regulatory requirements in the furtherance of its twin objectives.  (56.1 Stmt. ¶ 26-31, 34.)  Sometimes CMS used an outdated price, the price for a non-"A-rated" product, a price obtained directly from a manufacturer (that did not appear in the national pricing compendia at all), or a price for the incorrect package size because (when multiplied by 150%) the price that CMS chose to use produced a FUL that "made sense" in light of what CMS was trying to achieve.  (*Id.* at ¶¶ 26-31.)

In light of this overwhelming body of evidence, even plaintiffs' putative expert, Mr. Harris Devor, concedes that he would be "speculating" about what CMS would have done had defendants submitted the lower "AWPs" and "WACs" that he ascribes to them.  (56.1 Stmt. ¶ 65.)  He acknowledges that there is evidence in the record showing that sometimes CMS did not use the lowest published price available when setting FULs.  (*Id.* at ¶ 64.)  Pushed further, Mr. Devor testified as follows:  "I don't want to go where – what CMS would have done with it [referring to one of the lower prices that he had calculated].  They [CMS] ***may have chosen not to use it***."  (*Id.* ¶ 65.) (Transcript of Deposition of Harris Devor ("Devor Dep.") at 469:2 – 469:4.)  "Speculating" about what CMS would have done with lower published prices, Mr. Devor testified repeatedly, was beyond the scope of his assignment – and rightfully so.  (56.1 Stmt., at ¶¶ 65-66.) (Devor Dep. at 460:13 – 460:14; 469:13 – 469:17.).  In light of the overwhelming and undisputed record evidence described above, plaintiffs cannot possibly prove what CMS would have done had defendants submitted lower prices to the compendia, as plaintiffs allege they should have done.  For the same reasons, it is impossible for plaintiffs to prove causation and, therefore, each of their remaining counts should be dismissed at least as to

the claims that New York Medicaid reimbursed (or should have reimbursed) on the basis of FULs.

### C.   Plaintiffs Cannot Avoid Summary Judgment by Proffering an Alternative Theory of Causation.

Plaintiffs cannot salvage their "FUL fraud" allegations by altering their theory of causation now.  Plaintiffs cannot claim that, had defendants submitted lower prices to the compendia, New York Medicaid would have reimbursed on the basis of those lower prices rather than FULs.  As plaintiffs concede, when CMS established a FUL, New York Medicaid was required by statute to reimburse all drugs subject to that FUL on the basis of that FUL – not the lesser of the FUL or some other, lower reimbursement measure.  *See* Pls.' 4/2/08 Sur-Reply, at 2. New York Medicaid made its decision to reimburse for multisource and generic drugs in this manner knowing full well that CMS set FULs based on published prices, not lower transaction prices.  (56.1 Stmt. ¶¶ 60-62.)  In short, New York Medicaid's reimbursement formula precludes a showing of causation here, even on a different theory than the one alleged in the current version of plaintiffs' complaint.

Similarly, plaintiffs cannot establish causation by claiming that, had the entire array of published prices been lower, CMS would have set lower FULs.  This theory of causation too is precluded by the undisputed record evidence.  Leaving aside that there is no evidence in the record to show what that "hypothetical" array of prices might have been,[9] it is indisputable that, in setting FULs, CMS had available to it an entire array of lower (albeit, unpublished) prices – AMPs.  (56.1 Stmt. ¶ 39.)  Moreover, the record shows that, when CMS was instructed to begin using this array of lower prices, even with a substantial increase in the percentage mark-up, the

---

[9]  In fact, plaintiffs' putative expert, Mr. Devor, analyzed only about 13% of the NDCs in the relevant GCNs with published prices during the period at issue.  (56.1 Stmt. ¶ 67.)

resulting FULs proved too low to be viable from the perspective of ensuring adequate access, and the implementation of FULs calculated in this manner was enjoined and subsequently abandoned by Congress.  (*Id.* at ¶¶ 47-49, 53-56.)

Even looking only at the nine products that were the subject of the targeted discovery, it is clear from the undisputed record evidence that this modified theory of causation must fail.  In about 46% of the instances for which plaintiffs' putative expert Mr. Devor reports a published WAC for one of the drug that was the subject of the targeted discovery, that published WAC was already low enough that, had CMS chosen to use it, it would have produced a lower FUL.  (*Id.* at ¶ 68.)  In light of this evidence, even morphing their stated causation theory now cannot save plaintiffs' "FUL fraud" allegations.  In short, defendants are entitled to summary judgment as to the claims that New York Medicaid reimbursed (or should have reimbursed) on the basis of FULs because plaintiffs cannot prove causation as to any of these claims.

## II.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING DECEPTION AND, THEREFORE, CANNOT ESTABLISH LIABILITY.

Defendants are entitled to summary judgment as to plaintiffs' allegations of "FUL fraud" for a second and completely independent reason.  Plaintiffs cannot meet their burden of showing that either CMS or New York Medicaid was deceived as to the significance of basing FULs on published prices, as opposed to lower transaction prices.  Because deception is an essential element of each of plaintiffs' remaining causes of action, defendants are entitled to summary judgment for this reason as well.

### A.    Deception Is an Essential Element of Each of Plaintiffs' Remaining Causes of Action.

To establish liability for each of the three remaining causes of action, it is plaintiffs' burden to show that CMS or New York Medicaid was somehow deceived either when choosing to set FULs based on published prices or when deciding to reimburse multisource or generic

drugs for which CMS had established a FUL exclusively at that FUL set by CMS.  Deception is

an essential element of each of plaintiffs' remaining causes of action.  *See In re Pharm. Indus.*

*Average Wholesale Price Litig.*, 339 F. Supp. 2d 165, 182 (D. Mass. 2004) (violation of N.Y.

Gen. Bus. Law § 349 requires a showing that defendants' actions were "likely to mislead a

reasonable consumer acting reasonably under the circumstances"); *Channel Master Corp.* v.

*Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 151 N.E.2d 833, 835 (1958) (common law fraud

requires proof that the plaintiff was "deceived and damaged" by the alleged misrepresentation);

4/2/07 Order at *14 (under N.Y. Soc. Serv. Law § 145-b, plaintiffs must show that they were

deceived by defendants' "false statements" or "deliberate concealments").  As discussed next,

plaintiffs cannot establish that defendants' published prices deceived CMS into setting higher

FULs or New York Medicaid into using them.

> **B.      The Undisputed Evidence Shows that Neither CMS Nor New York Medicaid
> Thought that Published Prices Were Equivalent to Transaction Prices.**

Neither CMS nor New York Medicaid was deceived as to the significance of basing

FULs on published prices, as opposed to lower transaction prices.  CMS has received AMPs on

an NDC-by-NDC basis from every drug manufacturer whose products are eligible for

reimbursement by state Medicaid programs quarterly since 1991.  CMS has been solely

responsible for defining how AMPs are to be calculated, provides guidance to drug

manufacturers on how to do their AMP calculations, and undoubtedly understands (and has long-

understood) the significance of AMPs as a measure of the average price realized by a drug

manufacturer after discounting for sales of its products that are likely to result in later

reimbursements by state Medicaid programs.  *See* 42 C.F.R. § 447.504 (regulation promulgated

by CMS further defining AMP).  The undisputed testimony is that CMS had access to AMP

information when setting FULs, even if it chose not to use it.  (56.1 Stmt. ¶ 39.)

The fact that CMS defines a measure of average selling price, which must be reported to the Medicaid program quarterly, shows that CMS (and its predecessor, HCFA) understands (and has long understood) that the prices published in the national pricing compendia are not equal to any average of the prices of transactions occurring in the marketplace.  More than that, however, having access to AMP on an NDC-by-NDC basis meant that CMS knew, or could have known, at the most granular level the precise differences between the published prices on which it was basing FULs and the manufacturer's average discounted prices for sales of those drugs to the retail pharmacy class of trade.  That CMS has received AMPs on a quarterly basis for every NDC reimbursed by the Medicaid program, standing alone, forecloses any possibility of plaintiffs making a sufficient showing as to deception.  Accordingly, summary judgment should enter in defendants' favor.

As discussed above, CMS had access to other sources of information which must have informed CMS that the prices published in the national pricing compendia were higher (and sometimes much higher) than the prices at which transactions were occurring in the marketplace. FULs were set only after a manual review process and only after CMS gathered information from manufacturers, wholesalers, pharmacies, and state Medicaid agencies to determine whether "the FUL prices . . . were correctly on the FUL list," whether "the pricing appears to be either too low or too high," and whether a drug was available at a certain price in the marketplace. (56.1 Stmt. ¶ 40.) (Gaston Dep. at 433:14 – 434:8, 435:6 – 435:21.)  Access to these sources of information too precludes a showing by plaintiffs that CMS was somehow deceived as to the relative relationship between the prices published in the national pricing compendia and lower transaction prices.

The regulatory history for the FUL regulation also makes plain that CMS (then HCFA) understood from the outset that the AWPs, WACs, and DPs appearing in the national pricing compendia were often higher (and sometimes much higher) than the prices at which transactions were occurring in the marketplace.  By way of illustration, in a relevant passage from the regulatory history, which is set forth more fully above, CMS warns that because FULs "do[] not gear payments to markups appropriate to the actual cost of acquiring . . . these drugs," "drugs with high compendia price could generate extremely high payment levels."  52 Fed. Reg. at 28,665.  Put simply, the undisputed record evidence shows that, even as early as 1986, CMS (then HCFA) was not fooled into thinking that the AWPs, WACs, and DPs published in the national pricing compendia were representative of average transaction prices.  This same point was made abundantly clear in 2006 when Congress passed the DRA, directing that the FUL methodology should be based on AMPs (not the published compendia prices) and at the same time directing that the percentage mark-up be substantially increased from 150% (of the lowest published price) to 250% (of AMP).

Similarly, New York Medicaid understood as early as 1986 that there was a significant difference between transaction prices, on the one hand, and the AWPs, WACs, and DPs published in the national pricing compendia, on the other hand.  On this point, the then-Commissioner of the NYDSS, Cesar Perales, avers in his Affidavit submitted in support of Defendants' Joint Motion for Summary Judgment that, "as of 1986," NYDSS understood that "the pharmacist's acquisition cost is likely to be lower than the prices quote[d] in third-party pricing compendia such as the Red Book or First Databank."  (56.1 Stmt. ¶ 60.) (Affidavit of Cesar A. Perales, at ¶ 3.)  In fact, for this very reason, Mr. Perales submitted comments on behalf of New York Medicaid urging CMS not to base FULs on published prices.  (*Id.* at ¶ 58-59.)

Nevertheless, once CMS (then HCFA) adopted a procedure for setting FULs based on published prices, and notwithstanding what it knew and expected about the relationship between published prices and actual transaction prices, New York Medicaid chose to set its reimbursement rate for multisource and generic drugs for which CMS had set a FUL at the FUL – without any "lower of" concept built into the reimbursement formula.  *See* Pls.' 4/2/08 Sur-Reply, at 2.  This was a deliberate policy decision.  The FUL regulation did not require states to adopt FULs as their reimbursement rate.  *See* 42 C.F.R. § 447.332 (2006) (establishing a cap on reimbursement "in the aggregate").  To the contrary, CMS has always encouraged states to implement their own "mini-MAC" programs and take other steps to control drug reimbursement costs.  *See* 52 Fed. Reg. at 28,655.  Regardless of the merits of New York Medicaid's decision, however, there can be no doubt, in light of Cesar Perales's Affidavit and the letter that he wrote to CMS in 1986 commenting on the proposed FUL regulation, that the decision was made knowingly and that New York Medicaid was not deceived as to the significance of reimbursing for multisource and generic drugs using FULs that were set by CMS based on published compendia prices, not lower transaction prices.[10]

---

[10] Plaintiffs also could not prove damages even if they overcame all of these hurdles because damages would be too speculative with the discretion exercised by CMS in setting the FULs.

## CONCLUSION

For the foregoing reasons, defendants are entitled to summary judgment with regard to all Medicaid claims reimbursed (or that should have been reimbursed) by New York Medicaid on the basis of a FUL established by CMS (or its predecessor, HCFA).

Respectfully submitted,


 /s/ John P. Bueker
John T. Montgomery (BBO#352220)
John P. Bueker (BBO#636435)
Kim B. Nemirow (BBO# 663258)

ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*On Behalf of All Defendants*

Dated:  May 15, 2009


## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2009, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

 /s/ Kim B. Nemirow
Kim B. Nemirow

Exhibit A

# Federal Upper Limit System

*(handwritten note in box: NY Counties / Defendants 2 / 3/19/08  JW)*

Product Group : 1067
Strengths : 100MG
Routes : ORAL
Ingredients : METOPROLOL TARTRATE

Package Size : 100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.06180 | B | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.06180 | R | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.18460 | R | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.21110 | B | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.67410 | 0.00000 | R | 55370/0821/07 | MOVA LABORATORIES INC. | |
| | 0.00000 | 0.67860 | 0.00000 | B | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | M | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | R | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | M | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | R | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | B | 64376/0503/01 | BOCA PHARMACAL, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | R | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.00000 | 0.73850 | 0.00000 | M | 64376/0503/01 | BOCA PHARMACAL, INC. | |
| T | 0.00000 | 0.73850 | 0.05690 | B | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| | 0.00000 | 0.73990 | 0.00000 | M | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.00000 | 0.73990 | 0.00000 | M | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.76100 | 0.08440 | R | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.76100 | 0.00000 | M | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| T | 0.00000 | 0.76300 | 0.06090 | B | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| T | 0.00000 | 0.76300 | 0.00000 | R | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| T | 0.00000 | 0.76300 | 0.06090 | R | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.76300 | 0.08600 | M | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.80100 | 0.00000 | B | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | M | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.80100 | 0.00000 | M | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | R | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| T | 0.00000 | 0.80100 | 0.07250 | R | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | B | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.94280 | 0.00000 | M | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 0.94280 | 0.78570 | R | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 0.94284 | 0.78570 | B | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 1.15260 | 0.00000 | M | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.00000 | 1.15260 | 0.90050 | B | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| T | 0.00000 | 1.15260 | 0.96050 | R | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.00520 | 0.73990 | 0.05440 | B | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.10500 | 0.69750 | 0.09880 | B | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.55070 | 0.65400 | 0.00000 | M | 59772/3693/02 | APOTHECON INC | |
| | 0.55070 | 0.65400 | 0.52320 | B | 59772/3693/02 | APOTHECON INC | |
| | 0.55070 | 0.65400 | 0.52320 | R | 59772/3693/02 | APOTHECON INC | |

*(handwritten annotations: "Notes 8th soon", "new", "(Yes) called", "discontinued", "(they no longer manufacture)")*

FULs Price : .0816
Percent Difference : -36.74
High Price : 1.15260

Prior FULs Price : .1290
Source Code : R
Low Price : .05440

*(handwritten calculations at bottom:)*

8/22 - FUL looks ok - 4 WAC'S are less than our price

.05440 X Geneva NDC 8
.05440 X
X 150
.0816  New FUL

10/17/0
.0609
X 150 %
.0914
New FUL
Seg

# Federal Upper Limit System

**EXHIBIT**
NY Counties
Defendants 5
3/19/08
DW

Product Group : 349
Strengths : 0.5MG
Routes : ORAL
ients : CLONAZEPAM

Package Size :. 100
Dosage : TABLET
Exclusion Code :

| Exc. CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.69230 | 0.00000 | M | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | B | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | R | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.71370 | 0.00000 | B | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | B | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | B | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | M | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | M | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | M | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | R | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | R | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74910 | 0.00000 | R | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74910 | 0.16370 | B | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74910 | 0.16370 | R | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74950 | 0.00000 | M | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74950 | 0.00000 | M | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74950 | 0.18400 | R | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.84768 | 0.70640 | B | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.84770 | 0.70640 | B | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.00000 | 0.84770 | 0.70640 | M | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| T | 0.09890 | 0.74900 | 0.09310 | R | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.59990 | 0.68390 | 0.56090 | B | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.59990 | 0.71237 | 0.56990 | R | 62269/0353/24 | INVAMED, INC. | |
| | 0.59990 | 0.71240 | 0.00000 | M | 62269/0353/24 | INVAMED, INC. | |
| | | | | | 62269/0353/24 | INVAMED, INC. | |

FULs Price : .1199 .2455
Percent Difference : -56.56
High Price : .84770

Prior FULs Price : .2760
Source Code : R
Low Price : .07990

8/15 - 4 WACs are less than NF FUL - 100lb ok

.1637 ( Purepac NDJR
X 150

.2455 ) New FUL

NYCo Def
5

08/01/2001

## Federal Upper Limit System

**EXHIBIT**
NY Counties
Defendants 6
3/19/08

Product Group : 959
Strengths : 1MG
Routes : ORAL
Ingredients : LORAZEPAM

Package Size :  100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.82950 | 0.00000 | M | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.82950 | 0.19990 | B | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.82950 | 0.19990 | R | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.83770 | 0.00000 | B | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.00000 | B | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.00000 | 0.83770 | 0.00000 | M | 59911/5812/01 | ESI LEDERLE INC. | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | M | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| P | 0.00000 | 0.83770 | 0.00000 | R | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | R | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.38120 | B | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.38120 | R | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.00000 | R | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.00000 | 0.88000 | 0.00000 | B | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | M | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | R | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88250 | 0.00000 | M | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88250 | 0.00000 | M | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | B | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | R | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.40200 | B | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88750 | 0.00000 | R | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.45770 | 0.83770 | 0.38190 | B | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.86770 | 1.08460 | 0.00000 | M | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08460 | 0.00000 | R | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08462 | 0.86770 | B | 00008/0064/02 | WYETH LABORATORIES | |

Price : .2999  .5718
Current Difference : -47.55
High Price : 1.08462

Prior FULs Price : .5718
Source Code : B
Low Price : .19990

**\*\*\*FULs Price not greater than another supplier\*\*\***

8/1 → FUL 100b ok - five suppliers are less than or price

.38120 (URL NDC)R

$\times$ 150

.5718 → New FUL



Product Group : 250
Strengths : 500MG
Routes : ORAL
Ingredients : CEFADROXIL/CEFADROXIL HEMIHYDRATE

Package Size :  100
Dosage : CAPSULE
Exclusion Code :

EXHIBIT
NY Counties
Defendants 7
dw        3/19/08
PENGAD 800-631-6989

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 2.84650 | 0.84990 | B | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.84990 | B | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 2.29950 | R | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 3.19950 | 0.00000 | M | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 0.00080 | R | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 2.12330 | B | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.27950 | 0.00000 | M | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 0.00000 | B | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 1.93300 | B | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 1.95500 | R | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 2.12900 | B | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 2.12900 | R | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 2.56840 | 3.05000 | 0.00000 | M | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | B | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | R | 59772/7271/04 | APOTHECON INC | |

FULs Price : 1.2749  2.9000
Percent Difference : 0.00
High Price : 3.27950

Prior FULs Price : .0000
Source Code : B
Low Price : .84990

***FULs Price not greater than another supplier***

7/25- FUL was too low at 1.2749, but when I raised it, it
became = to Major's awp - delete for now

(5)