# Exhibit A

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - -

        (cross captions appear on following pages)




        Videotaped deposition of SUE GASTON

                    Volume I



                    Washington, D.C.

                    Thursday, January 24, 2008

                    9:00 a.m.

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                     Washington, DC

| Page 2 | Page 4 |
|---|---|

**Page 2**

1          UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - - -
4    IN RE: PHARMACEUTICAL      )  MDL NO. 1456
5    INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION
6    PRICE LITIGATION          ) 01-CV-12257-PBS
7                              ) Judge Patti B. Saris
8    THIS DOCUMENT RELATES TO   ) Chief Magistrate
9    ALL CASES IN MDL NO. 1456  ) Judge Marianne B.
10   - - - - - - - - - - - - - - - Bowler
11
12
13    IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
14       THIRD JUDICIAL DISTRICT AT ANCHORAGE
15   - - - - - - - - - - - - - - -
16   STATE OF ALASKA,          )
17       Plaintiff,    )
18       vs.          ) Case No.
19   ALPHARMA BRANDED PRODUCTS   ) 3AN-06-12026 CI
20   DIVISION, INC., et al.   )
21       Defendants.      )
22   - - - - - - - - - - - - - - -

**Page 3**

1       IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
2                STATE OF HAWAII
3    - - - - - - - - - - - - - - -
4    STATE OF HAWAII,         )
5        Plaintiff,    ) Case No.
6        vs.          ) 06-1-0720-04 EEH
7    ABBOTT LABORATORIES, INC., )
8    et al.,         ) JUDGE EDEN
9        Defendants.   ) ELIZABETH HIFO
10   - - - - - - - - - - - - - - -
11
12
13    IN THE FOURTH JUDICIAL DISTRICT OF THE STATE OF
14     IDAHO, IN AND FOR THE COUNTY OF ADA
15   - - - - - - - - - - - - - - -
16   STATE OF IDAHO,         )
17       Plaintiff,    )
18       vs.          ) Case No.
19   ALPHARMA USPD, INC., et al., ) CV 0C 0701847
20       Defendant.   )
21   - - - - - - - - - - - - - - -
22

**Page 4**

1    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
2       COUNTY DEPARTMENT, CHANCERY DIVISION
3    - - - - - - - - - - - - - - -
4    THE PEOPLE OF THE STATE OF  )
5    ILLINOIS,          )
6        Plaintiff,    ) Case No. 05 CH 02474
7        vs.          )
8    ABBOTT LABORATORIES, et al., )
9        Defendants.   )
10   - - - - - - - - - - - - - - -
11
12
13       COMMONWEALTH OF KENTUCKY
14     FRANKLIN CIRCUIT COURT - DIV. I
15   - - - - - - - - - - - - - - -
16   COMMONWEALTH OF KENTUCKY, ex rel. )
17   GREGORY D. STUMBO, ATTORNEY GENERAL)
18       Plaintiff,    ) Civil Action
19       vs.          ) NO. 04-CI-1487
20   ALPHARMA USPD, INC., et al.,    )
21       Defendants.      )
22   - - - - - - - - - - - - - - -

**Page 5**

1          COMMONWEALTH OF KENTUCKY
2        FRANKLIN CIRCUIT COURT - DIV. II
3    - - - - - - - - - - - - - - -
4    COMMONWEALTH OF KENTUCKY,      )
5        Plaintiff,    ) Civil Action
6        vs.          ) NO. 03-CI-1134
7    ABBOTT LABORATORIES, INC.,     )
8        Defendants.      )
9    - - - - - - - - - - - - - - -
10
11       COMMONWEALTH OF KENTUCKY
12     FRANKLIN CIRCUIT COURT - DIV. II
13   - - - - - - - - - - - - - - -
14   COMMONWEALTH OF KENTUCKY, ex rel. )
15   GREGORY D. STUMBO, ATTORNEY GENERAL)
16       Plaintiff,       ) Civil Action
17       vs.          ) NO. 03-CI-1135
18   WARRICK PHARMACEUTICALS CORP.,   )
19   et al.          )
20       Defendants.      )
21   - - - - - - - - - - - - - - -
22

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                    Washington, DC

---

Page 6

1  STATE OF NEW YORK
2  SUPREME COURT: COUNTY OF ERIE
3  - - - - - - - - - - - - - - - -
4  COUNTY OF ERIE,            )
5          Plaintiff,        )
6     vs.              ) Index No. 05-2439
7  ABBOTT LABORATORIES, INC.,   )
8  et al.,                )
9          Defendants.      )
10 - - - - - - - - - - - - - - - -
11
12
13        STATE OF WISCONSIN CIRCUIT COURT
14            DANE COUNTY  Branch 9
15 - - - - - - - - - - - - - - - -
16 STATE OF WISCONSIN,        )
17          Plaintiff,       )
18     vs.            ) Case No. 04-CV-1709
19 AMGEN INC., et al.,         )
20          Defendants.      )
21 - - - - - - - - - - - - - - - -
22

---

Page 7

1          UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3  - - - - - - - - - - - - - - -
4  IN RE: PHARMACEUTICAL        ) MDL NO. 1456
5  INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION
6  PRICE LITIGATION          )  01-CV-12257-PBS
7  THIS DOCUMENT RELATES TO    )
8  U.S. ex rel. Ven-a-Care of  )  Judge Patti B. Saris
9  the Florida Keys, Inc., et al)
10     v.           )  Chief Magistrate
11 Boehringer Ingelheim       )  Judge Marianne B.
12 Corporation, et al.,       )  Bowler
13 No. 07-CV-10248-PBS        )
14 - - - - - - - - - - - - - - -
15
16     Videotaped deposition of SUE GASTON, held at
17 the law offices of Jones Day, 51 Louisiana Avenue,
18 N.W., Washington, D.C. 20001-2113, the proceedings
19 being recorded stenographically by Jonathan Wonnell,
20 a Registered Professional Court Reporter and Notary
21 Public of the District of Columbia, and transcribed
22 under his direction.

---

Page 8

1    A P P E A R A N C E S   O F   C O U N S E L
2
3  On behalf of the United States of America:
4
5        ANA MARIA MARTINEZ, ESQ.
6        United States Department of Justice
7        99 N.E. 4th Street
8        Miami, Florida 33132
9        (305) 961-9431
10       ana.maria.martinez@usdoj.gov
11
12 On behalf of the U.S. Department of Health and
13 Human Services:
14
15       LESLIE M. STAFFORD, ESQ.
16       U.S. Department of Health & Human
17        Services
18       Office of General Counsel, CMS Division
19       7500 Security Boulevard
20       Mail Stop C2-05-23
21       Baltimore, Maryland 21244
22       (410) 786-9655

---

Page 9

1        A P P E A R A N C E S  (Cont'd)
2
3  On behalf of the State of Alabama:
4
5        SCARLETTE M. TULEY, ESQ. (via phone)
6        Beasley, Allen, Crow, Methvin, Portis &
7         Miles, P.C.
8        218 Commerce Street
9        Montgomery, Alabama 36104
10       (800) 898-2034
11       scarlette.tuley@beasleyallen.com
12
13 On behalf of the State of Florida:
14
15       MARY S. MILLER, ESQ. (via phone)
16       Office of the Attorney General of Florida
17       PL-01, The Capitol
18       Tallahassee, Florida 32399-1050
19       (850) 414-3600
20       mary_miller@oag.state.fl.us
21
22 (Cont'd)

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                             January 24, 2008
                      Washington, DC

---

Page 10

1            A P P E A R A N C E S (Cont'd)
2
3    On behalf of the City of New York and all New
4    York Counties other than Nassau and
5    Orange; the States of Wisconsin,
6    Illinois, Kentucky, Idaho, Alaska and
7    Hawaii:
8
9            MICHAEL WINGET-HERNANDEZ, ESQ.
10           Winget-Hernandez, LLC
11           3112 Windsor Road, Suite 228
12           Austin, Texas 78703
13           michael@winget-hernandez.com
14
15   On behalf of Ven-A-Care of the Florida Keys, Inc.:
16
17           MARJORY P. ALBEE, ESQ.
18           Mager & Goldstein LLP
19           1818 Market Street, Suite 3710
20           Philadelphia, Pennsylvania 19103
21           (215) 640-3280
22           malbee@magergoldstein.com

---

Page 11

1            A P P E A R A N C E S (Cont'd)
2    On behalf of Abbott Laboratories, Inc.:
3
4            DAVID TORBORG, ESQ.
5            SEAN P. MALONE, ESQ.
6            Jones Day
7            51 Louisiana Avenue, N.W.
8            Washington, D.C. 20001-2113
9            (202) 879-3939
10           dstorborg@jonesday.com
11           spmalone@jonesday.com
12
13   On behalf of Aventis Pharmaceuticals and
14   Sanofi Synthelabo:
15
16           JENNIFER H. MCGEE, ESQ.
17           Shook, Hardy & Bacon, LLP
18           600 Fourteenth Street, N.W.
19           Suite 800
20           Washington, D.C. 20005-2004
21           (202) 783-8400
22           jmcgee@shb.com

---

Page 12

1            A P P E A R A N C E S (Cont'd)
2
3    On behalf of Bristol-Myers Squibb:
4
5            DIANNE M. PETERSON, ESQ. (via phone)
6            Hogan & Hartson
7            875 Third Avenue
8            New York, New York 10022
9            (212) 918-3000
10           dmpeterson@hhlaw.com
11
12   On behalf of Dey, Inc., Dey, L.P. and Mylan:
13
14           SARAH L. REID, ESQ.
15           Kelley, Drye & Warren LLP
16           101 Park Avenue
17           New York, New York 10178
18           (212) 808-7720
19           sreid@kelleydrye.com
20
21
22   (Cont'd)

---

Page 13

1            A P P E A R A N C E S (Cont'd)
2
3    On behalf of Roxane Laboratories and
4    Boehringer Ingelheim:
5
6            ERIC GORTNER, ESQ.
7            Kirkland & Ellis
8            200 East Randolph Drive
9            Chicago, Illinois 60601
10           (312) 861-2285
11           egortner@kirkland.com
12
13   On behalf of Sandoz, Inc.:
14
15           DAVID L. KLEINMAN, ESQ. (via phone)
16           White & Case LLP
17           1155 Avenue of the Americas
18           New York, New York 10036-2787
19           (212) 819-2567
20           dkleinman@whitecase.com
21
22

---

                                          4  (Pages 10 to 13)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                        January 24, 2008
                        Washington, DC

---

Page 14

1          A P P E A R A N C E S (Cont'd)
2
3      On behalf of Schering-Plough Corporation,
4      Schering Corporation and Warrick
5      Pharmaceuticals Corporation:
6
7          JOHN P. BUEKER, ESQ.
8          Ropes & Gray
9          One International Place
10         Boston, Massachusetts 02110-2624
11         (617) 951-7050
12         john.bueker@ropesgray.com
13
14         -- and --
15
16         GINGER APPLEBERRY, ESQ. (via phone)
17         Locke, Lord, Bissell & Liddell
18         2200 Ross Avenue, Suite 2200
19         Dallas, Texas 75201
20         (214) 740-8459
21         gappleberry@lockeliddell.com
22

---

Page 15

1          A P P E A R A N C E S (Cont'd)
2
3      On behalf of Endo Pharmaceuticals:
4
5          VICTOR RORTVEDT, ESQ.
6          Arnold & Porter
7          555 Twelfth Street, N.W.
8          Washington, D.C. 20004
9          (202) 942-5000
10
11     On behalf of Ethex Corporation:
12
13         CLARA VONDRICH, ESQ.
14         Arnold & Porter
15         555 Twelfth Street, N.W.
16         Washington, D.C. 20004
17         (202) 942-5000
18
19
20     ALSO PRESENT:
21         EMILY WATSON, legal assistant
22         CONWAY BARKER, videographer

---

Page 16

1                C O N T E N T S
2      WITNESS NAME                    PAGE
3      SUE GASTON
4          Examination By Mr. Torborg................. 022
5
6
7                E X H I B I T S
8      NUMBER         DESCRIPTION         PAGE
9      Exhibit Abbott 453, VAC MDL 86162 THROUGH 86175 097
10     Exhibit Abbott 454, VAC MDL 64417 through 64427 139
11     Exhibit Abbott 455, HHD 101-1266 through 1285.. 146
12     Exhibit Abbott 456, HHD 042-0164.............. 151
13     Exhibit Abbott 457, HHC 008-0083.............. 167
14     Exhibit Abbott 458, OIG report entitled Cost of
15              Dialysis Related Drugs
16              (no Bates refs)............ 187
17     Exhibit Abbott 459, VAC MDL 45005 through 31... 206
18     Exhibit Abbott 460, HCFA Review article
19              entitled "State Medicaid
20              Pharmacy Payments and Their
21              Relation to Estimated Costs"
22              (no Bates refs)............ 206

---

Page 17

1          I N D E X   O F   E X H I B I T S (Cont'd)
2      NUMBER         DESCRIPTION         PAGE
3      Exhibit Abbott 461, HHC 992-0856 through 0858.. 222
4      Exhibit Abbott 462, HHC 902-0446.............. 231
5      Exhibit Abbott 463, Section 4401 of the Omnibus
6              Budget Reconciliation Act
7              of 1990 (no Bates refs).... 263
8      Exhibit Abbott 464, NYSHD-FOIL 01682 through
9              01683..................... 271
10     Exhibit Abbott 465, HHC 004-0054.............. 276
11     Exhibit Abbott 466, HHD 006-0103 through 0108.. 279
12     Exhibit Abbott 467, US' Second Supplemental
13              Response to Defendant
14              Abbott's Fourth Set of
15              Interrogatories
16              (no Bates refs)............ 284
17
18
19
20
21
22

---

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

---

Page 18

1              P R O C E E D I N G S
2                 (9:35 a.m.)
3          THE VIDEOGRAPHER:  In the United States
4    District Court for the District of Massachusetts, In
5    Re: Pharmaceutical Industry Average Wholesale Price
6    Litigation, related to U.S. ex rel. Ven-A-Care of
7    the Florida Keys, Incorporated versus Abbott
8    Laboratories Incorporated et al., Case Number 01 CV
9    12257 PBS, and other cases cross noticed.  This is
10   the deposition of Sue Gaston.
11         Today's date is January 24th 2008.  The
12   location of the deposition is Jones Day, 51
13   Louisiana Avenue, Northwest, Washington, D.C.  Will
14   counsel please identify yourselves and state whom
15   you represent?
16         MR. TORBORG:  David Torborg from Jones
17   Day representing Abbott Laboratories.
18         MR. GORTNER:  Good morning.  Eric Gortner
19   from Kirkland & Ellis representing Roxane
20   Laboratories, Inc. and entities affiliated with
21   Boehringer Ingelheim Corporation.
22         MR. RORTVEDT:  Victor Rortvedt, Endo

---

Page 19

1    Pharmaceuticals.
2          MS. REID:  Sarah Reid from Kelley, Drye &
3    Warren representing Dey and on the cross-noticed
4    deposition also representing Mylan Laboratories.
5          MS. McGEE:  Jennifer McGee from Shook,
6    Hardy & Bacon representing Aventis Pharmaceuticals
7    and Sanofi Synthelabo.
8          MR. BUEKER:  John Bueker from Ropes &
9    Gray on behalf of Schering-Plough Corporation,
10   Schering Corporation and Warrick Pharmaceuticals
11   Corporation.
12         MS. VONDRICH:  Clara Vondrich on behalf
13   of Ethex Corporation.
14         MR. WINGET-HERNANDEZ:  Michael Winget-
15   Hernandez.  I'm here on behalf of the City of New
16   York and the New York Counties in the MDL 1456
17   except for Orange and Nassau.  Also on behalf of the
18   states of Wisconsin, Illinois, Kentucky, Alaska,
19   Idaho and Hawaii.
20         MS. ALBEE:  Marjory Albee from the law
21   firm of Mager & Goldstein on behalf of Ven-A-Care of
22   the Florida Keys, Inc.

---

Page 20

1          MS. STAFFORD:  Leslie Stafford on behalf
2    of the Centers for Medicare and Medicaid Services.
3          MS. MARTINEZ:  Ani Martinez on behalf of
4    the United States.  And I just like to ask, David,
5    at a particular point I'd like to make a comment
6    before you begin regarding cross notices.
7          MR. TORBORG:  Perhaps it makes sense to
8    have the people on the phone identify themselves
9    before we go into the preliminary matters.
10         Would those on the phone please state
11   your name and who you represent?
12         MS. MILLER:  Yes, this is Mary Miller for
13   the attorney general on behalf of the State of
14   Florida on the cross noticed matter filed by Mylan.
15         MS. APPLEBERRY:  Ginger Appleberry from
16   Locke, Lord, Bissell & Liddell representing
17   Schering, Schering-Plough and Warrick
18   Pharmaceuticals.
19         MS. MILLER:  Joining Mary Miller for the
20   State of Florida is Kirk Rogers.
21         MS. TULEY:  This is Scarlette Tuley from
22   the law firm of Beasley Allen for the state of

---

Page 21

1    Alabama.
2          MR. KLEINMAN:  This is David Kleinman
3    from White & Case for Sandoz, Inc.
4          MS. PETERSON:  Diane Peterson from the
5    firm of Hogan & Hartson on behalf of Bristol-Myers
6    Squibb.
7          THE VIDEOGRAPHER:  Is there anyone else
8    on the phone?  Okay.
9          The court reporter is Jon Wonnell.  The
10   video camera operator is Conway Barker, both on
11   behalf of Henderson Legal Services.  This deposition
12   commences at 9:37.  Please swear in the witness.
13              * * * * *
14         Whereupon,
15              SUE GASTON,
16         called as a Witness, was duly sworn by
17   Jonathan Wonnell, a Notary Public in and
18   for the District of Columbia , and was
19   examined and testified as follows.
20              * * * * *.
21         THE VIDEOGRAPHER:  Your may proceed.
22         MR. TORBORG:  Ani, you had some

---

6 (Pages 18 to 21)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                        Washington, DC

Page 22

1  preliminary comments?
2          MS. MARTINEZ: Yes. This is Ani
3  Martinez. My comment is with respect to any state
4  cross notices of this deposition. And it's just to
5  say that the United States is agreeable to you all
6  cross noticing this and being here. However, only
7  subject to the way that it was contemplated by the
8  MDL judge, Judge Saris. And what she contemplated
9  is that if you all participate in these depositions
10 any issues that may arise regarding it would be
11 resolved by her.
12         And so I just wanted to say that the
13 United States is in no way offering Ms. Gaston as a
14 witness in response to those notices in any way that
15 would lead to the United States having to go to
16 state court on any issue or having state
17 jurisdiction over this particular deposition.
18 That's all.
19 EXAMINATION BY COUNSEL FOR THE ABBOTT LABORATORIES
20         BY MR. TORBORG:
21 Q.   Good morning, Ms. Gaston.
22 A.   Good morning.

Page 23

1  Q.   Could you please state your full name for
2  the record?
3  A.   It's see Susan E. Gaston.
4  Q.   Thank you. My name is David Torborg and
5  I'm an attorney from the law firm of Jones Day. And
6  we represent Abbott Laboratories in this case. And
7  we've never spoken before today; is that right?
8  A.   Correct.
9  Q.   What is your current address?
10 A.   Home address?
11 Q.   Yes, please.
12 A.   9011 Thrugmorton Road, Baltimore,
13 Maryland, 21234.
14 Q.   And what is your current business
15 address?
16 A.   7500 Security Boulevard.
17 Q.   And is that the offices of CMS?
18 A.   The Center for Medicare and Medicaid
19 Services.
20 Q.   Thank you. Do you have any plans to move
21 your personal residence in the near future?
22 A.   No.

Page 24

1  Q.   Do you have any plans to take a different
2  job?
3  A.   No.
4  Q.   Have you ever been deposed before?
5  A.   Yes.
6  Q.   How many times have you been deposed?
7  A.   Once.
8  Q.   Can you give me just a general background
9  or what the nature of the deposition was and the
10 case? I'm sorry. The nature of the case.
11 A.   It was -- from my recollection it was the
12 Federal Trade Commission and Mylan Labs.
13 Q.   Do you recall what the nature of that
14 litigation was?
15 A.   Yes. It was my understanding that the
16 Federal Trade Commission was looking into Mylan Labs
17 because they -- there was an indication that they
18 have purchased some of the bulk material for some of
19 their generic drugs so the other competitor
20 companies that also made that same product, they
21 were unable to obtain the bulk materials in order to
22 make the competitive product. So sort of cornering

Page 25

1  the market kind of --
2  Q.   Antitrust type matter?
3  A.   Correct.
4  Q.   Have you ever testified at a trial or
5  hearing?
6  A.   Yes.
7  Q.   Can you tell me about that?
8  A.   It was testifying to the grand jury in
9  Boston.
10 Q.   And when was that?
11 A.   When?
12 Q.   Yes.
13 A.   I can't recall.
14 Q.   Was it within the last two years?
15 A.   It was prior to that.
16 Q.   What's your best guess of when it was? I
17 don't need an exact date, but your best guess at
18 when it was?
19 A.   Early 2000. Maybe the end of 1999. I'm
20 really not sure.
21 Q.   And did that relate in any way to
22 prescription drugs?

                                    7 (Pages 22 to 25)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 26

1     A.   Yes.
2     Q.   How did you come to testify before the
3  grand jury in Boston in early 2000 relating to
4  prescription drugs?
5     A.   Did you want to know what the issue was?
6     Q.   Yes.
7     A.   It was concerning repackagers,
8  manufacturers that were considered repackagers.
9     Q.   And what is a repackager?
10     A.   A repackager is a company that repackages
11  a drug under their own NDC number.
12     Q.   Do you recall which manufacturers were
13  involved?
14     A.   No, I don't.
15     Q.   Do you recall any of the ones that were
16  involved?
17     A.   I know Kaiser was an issue.
18     Q.   And how long did you testify before the
19  grand jury?
20     A.   I appeared twice.
21     Q.   For how long were you on the stand?
22     A.   I don't remember.

Page 27

1     Q.   Did this testimony have anything to do
2  with issues regarding average wholesale price?
3     A.   No, not that I'm aware of.
4     Q.   Did it have anything to do with the
5  pricing of drugs?
6     A.   Not that I'm aware of.
7     Q.   Have you given any other testimony
8  besides what you told me already?
9     A.   No.
10     Q.   Have you ever testified before
11  Congress?
12     A.   No.
13     Q.   -- or any congressional committee?
14     A.   No.
15     Q.   Have you ever met with any congressional
16  committees?
17     A.   Not that I remember.
18     Q.   Were you aware of any others in your
19  office meeting with congressional committees
20  regarding issues on drug pricing?
21     A.   I can't specifically remember if they
22  did.

Page 28

1     Q.   Do you have any general recollection at
2  all about whether those types of meetings took
3  place?
4     A.   They could have occurred.
5     Q.   And why do you see that they could have
6  occurred?  Do you have a general recollection about
7  that or --
8     A.   No.  Just the nature of the program.
9     Q.   Okay.  Before we get too far along I'd
10  like to go over some guidelines about how I'd like
11  to proceed today.  First -- and you've done a great
12  job of this so far -- you'll need to respond
13  verbally to my questions so the court reporter can
14  pick it up.  And the most important guideline is
15  this.  Please tell me if you don't understand any
16  question that I ask.  Otherwise I'll assume that you
17  understand the question and are able to provide a
18  response.
19        If it helps us get on the same
20  wavelength, feel free to ask me a question.  You've
21  already done that once today.  That's fine.  I'm
22  just trying to get your -- I just want us to be on

Page 29

1  the same wavelength so you understand what I'm
2  asking.  Okay?
3     A.   Okay.
4     Q.   From time to time Ms. Martinez may say
5  objection after I ask a question.  The objections
6  are being made for purposes of the record.  Unless
7  Ms. Martinez specifically tells you not to answer my
8  question you are to answer my question.  Okay?
9     A.   Okay.
10     Q.   And we've had an agreement with counsel
11  in previous depositions that one objection for that
12  side of the table will suffice for all cases so we
13  don't have a chorus of objections.  Is that
14  agreement acceptable to everyone here today?
15        MR. WINGET-HERNANDEZ:  Actually, I think
16  the agreement applies so both sides of the table.
17        MR. TORBORG:  That's fine.
18        MS. ALBEE:  Is there also an agreement
19  that objection form suffices as an objection to the
20  form without further articulation?
21        MR. TORBORG:  Yes.  That would be
22  preferred under the rules.

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                        Washington, DC

Page 30

1        MS. MARTINEZ:  I just want to state for
2   the record I think it's possible that there's some
3   people on this side that are not sort of plaintiff.
4   So I just wanted to -- I think there's two at the
5   end that are representing defendants.  So we'll just
6   say that objections either by Mr. Winget, Ms. Albee
7   or myself -- I don't expect Ms. Stafford -- Ms.
8   Stafford will probably rely on me to make the
9   objections -- will count for the plaintiff's side,
10  shall we said.
11       MR. TORBORG:  But I thought Ms. Hernandez
12  says it doesn't matter.
13       MS. MARTINEZ:  Excuse me?
14       MR. TORBORG:  I think Mr. Hernandez said
15  it doesn't matter if you're plaintiff or defendant.
16       MR. WINGET-HERNANDEZ:  I hate that we're
17  having to go down this rabbit trail, but my
18  understanding of the agreement is that if one of the
19  defendants' counsel raises an objection that
20  objection is good for all of defense counsel.  The
21  same is true on the plaintiff's side.  If one of
22  plaintiff's counsel raises an objection then the

Page 31

1   objection is good for all the plaintiffs' counsel.
2   That's my understanding of it.  Do you agree?
3        MR. TORBORG:  I agree for Abbott Labs.
4   That's all I can agree for.  If anyone has an
5   objection, please raise it.
6        BY MR. TORBORG:
7        Q.   Ms. Gaston, you may have wondered what's
8   next to you and Ms. Martinez.  There's a couple
9   boxes of binders that have orange covers.  What
10  those are are copies of documents that have been
11  marked as exhibits in previous depositions that have
12  come before you.
13       I will ask you -- fortunately I will not
14  be asking you questions about all of those, but I
15  will be asking you questions about some of them.
16  And I will tell you the exhibit number.  And on the
17  front of each binder is a sticker that will tell you
18  which exhibits are in that binder.  It will be say
19  Abbott Exhibit 25 through whatever, 50, and I'm
20  going to ask you to pull that out when I get those.
21       But that's what those are and Ms.
22  Martinez has been kind enough in the past to help us

Page 32

1   do that.  She has copies as well.  We're trying to
2   save some trees here, but of course not all trees.
3        MR. WINGET-HERNANDEZ:  You should be
4   struck by lightning for saying that.
5        BY MR. TORBORG:
6        Q.   Finally, I will try to take a break about
7   every hour or what otherwise makes sense.  Let me
8   know if you need to take a break at any time.
9        A.   Okay.
10       Q.   Do you have any questions before we get
11  started?
12       A.   No.
13       Q.   First I'd like to walk through your
14  professional career starting with college.  And did
15  you attend college?
16       A.   No.
17       Q.   Have you taken any post high school
18  educational courses?
19       A.   Yes.
20       Q.   Can you tell me about those?
21       A.   Specifically, no.  I'm not -- I can't
22  remember.  I know there was an English course.  But

Page 33

1   other than that, unless they were job-related
2   courses, which I really can't remember exactly which
3   courses I took.  Are you talking specifically
4   college or are you talking --
5        Q.   Any educational courses after high
6   school.  That's what I'm asking about.  And what you
7   recall is taking some English-related courses?
8            (Telephone objection.)
9        MR. TORBORG:  Excuse me a second.
10  There's something odd going on on the phone.
11       MR. WINGET-HERNANDEZ:  We're going to go
12  off the record and see if we can't fix this.
13       THE VIDEOGRAPHER:  Off the record at
14  9:49.
15           (Recess.)
16       THE VIDEOGRAPHER:  On the record at 9:15.
17       BY MR. TORBORG:
18       Q.   I'm sorry about that, Ms. Gaston.  Where
19  was I?  We were talking about courses you've taken
20  after high school.  And you indicated that you've
21  taken some English-related courses; is that right?
22       A.   Yes, but I can't remember any other

                                    9  (Pages 30 to 33)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                January 24, 2008
                    Washington, DC

Page 34

1   specific courses.
2       Q.   And where did you take those courses?
3       A.   The location was at Social Security.  But
4   it was through one of the local colleges.
5       Q.   Have you taken any educational courses in
6   the area of pharmacy?
7       A.   No.
8       Q.   Have you taken any educational courses
9   relating to health care in general?
10      A.   Not that I can remember.
11      Q.   Have you ever worked at a pharmacy?
12      A.   No.
13      Q.   Is it fair to say that what you know
14  about the world of pharmacy is what you've learned
15  on the job at HCFA?
16      A.   Correct.
17      Q.   What was your -- did you graduate from
18  high school?
19      A.   Yes.
20      Q.   What was your first job after graduating
21  from high school?
22      A.   I worked for a moving and storage

Page 35

1   company.
2       Q.   What year did you graduate from high
3   school?
4       A.   '73.
5       Q.   And how long did you work for the moving
6   company?
7       A.   Until '79.
8       Q.   And then what did you do after that?
9   What was your next job?
10      A.   I started with the Social Security
11  Administration.
12      Q.   When did you start with the Social
13  Security Administration?
14      A.   In a typing pool.
15      Q.   Excuse me?
16      A.   A typing pool.
17      Q.   A typing pool.  And when did you start
18  that job?
19      A.   In '79.
20      Q.   How long did you serve in that job?
21      A.   Can I ask you a question?
22      Q.   Sure.

Page 36

1       A.   The paper that Ani gave you, on the top
2   it says EOD date.
3       Q.   Yes.
4       A.   What does that say?
5       Q.   1/30/1974?
6       A.   Okay.  I want to correct myself.  It's
7   '74, not '79.
8       Q.   That's when you started with Social
9   Security in the typing pool?
10      A.   Yes.
11      Q.   Thank you.  So you worked in the moving
12  company until 1974; is that right?
13      A.   Correct.
14      Q.   And how long did you work in the typing
15  pool at the Social Security Administration?
16      A.   I really don't know how long that was.
17      Q.   Ten years, more than ten years?
18      A.   No.  It wasn't that long.
19      Q.   What was your next job?
20      A.   I worked for Office of the General
21  Counsel.  It was a clerical job.
22      Q.   Was that within the Social Security

Page 37

1   Administration?
2       A.   Correct.
3       Q.   Who did you work with?  Who was your
4   boss?
5       A.   I don't recall.
6       Q.   How long did you work in that position?
7       A.   I don't recall.
8       Q.   More than ten years?
9       A.   No.  Less.
10      Q.   After that what was your next job?
11      A.   I worked for Office of the Actuary.
12      Q.   And was that still within the SSA?
13      A.   Correct.
14      Q.   What did you do in that job?
15      A.   Clerical.
16      Q.   Do you know how long you had that job?
17      A.   No, I don't.
18      Q.   What was your next job after that?
19      A.   Division of classification.
20      Q.   That's still within the SSA?
21      A.   Correct.
22      Q.   What was the nature of your job in that

10 (Pages 34 to 37)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 38

1  division?
2      A.  Clerical.
3      Q.  After that what did you do?
4      A.  Disability operations in Social Security.
5      Q.  What was the nature of your job in that?
6      A.  Processing foreign claims.  Social
7  Security claims.
8      Q.  Was that a clerical or a --
9      A.  I was a benefit authorizer.
10     Q.  Okay.  So that's more than clerical?
11     A.  Correct.
12     Q.  So you were to look at the forms and
13 decide whether or not to -- or make recommendations
14 on whether or not to authorize benefits?
15     A.  No.  We just -- we did more of --  we
16 didn't determine or authorize claims.  But we
17 processed the claims after the authorization
18 occurred.
19     Q.  What was the next job you had after that?
20     A.  With HCFA.
21     Q.  Okay.  Was this your first job with HCFA?
22     A.  Yes.

Page 39

1      Q.  And what was your position there?
2      A.  I don't recall the job title at that
3  time.
4      Q.  On the resume that you created for
5  purposes of this deposition -- I appreciate that --
6  the last one I have on the page runs the dates May
7  1988 to April 1991, post entitlement technical
8  expert, Social Security Administration, Office of
9  Disability and International Operations.  Have we
10 talked about that one yet?
11     A.  Well, I went in there as a benefit
12 authorizer and then I was promoted to the post
13 entitlement technical expert.  But it was still
14 foreign claims and it was -- from benefit authorizer
15 to the post entitlement job, it was all within those
16 years.
17     Q.  And you worked at the Social Security
18 Administration until April of 1991; is that right?
19     A.  Correct.
20     Q.  During your time at the SSA did you
21 confront issues relating to pharmacy?
22     A.  No.

Page 40

1      Q.  From 1991 to February of 2003 you were
2  health insurance specialist at HCFA; is that right?
3      A.  Yes.  Our actual title when I first
4  started was different than health insurance
5  specialist.  But it was all basically the same job.
6  They changed the name of the job.
7      Q.  But your duties and responsibility in
8  this job were the same from April of 1991 through
9  February of '03; is that right?
10     A.  Correct.
11     Q.  And tell me about your job at that time.
12 What were you doing?
13     A.  I was working with the Medicaid drug
14 rebate program pharmacy reimbursement and coverage
15 issues.
16     Q.  When you say pharmacy reimbursement, what
17 do you mean by that?
18     A.  It's drug reimbursement with the -- we
19 did state plan amendments and covered issues that
20 came up for drug coverage under Medicaid.
21     Q.  And when you say drug coverage under
22 Medicaid, you mean what drugs would be covered under

Page 41

1  Medicaid, correct?
2      A.  Right.
3      Q.  Not necessarily, in that category at
4  least, the level of payment to be paid; is that
5  right?
6      A.  Both.  Whether a drug was covered under
7  Medicaid and also any of the payment issues that
8  would come up, what states would pay by the state
9  planned amendments.
10     Q.  You also referenced the Medicaid drug
11 rebate program; is that right?
12     A.  Correct.
13     Q.  What was the nature of your involvement
14 in that during this time?
15     A.  The Medicaid drug rebate program
16 determines if drugs are covered under Medicaid.
17     Q.  What was the nature of your job with
18 respect to the Medicaid drug rebate program?  What
19 did you do?
20     A.  Overseeing the policy.
21     Q.  When you say overseeing policy, what do
22 you mean by that?

11 (Pages 38 to 41)

Gaston, Sue                                    January 24, 2008
Washington, DC

---

Page 42

1    A.   Working on any policy-related issues
2  concerning the Medicaid drug rebate program.
3    Q.   With respect to state plan amendments and
4  drug reimbursement, what was the nature of your work
5  in that area?
6    A.   Working with the regional office and
7  reviewing the state plan amendments that are
8  submitted by the states.
9    Q.   We'll talk about that a little bit more
10 today.  Who was your boss during this time from
11 April 1991 through February of 2003?
12   A.   Larry Reed.
13   Q.   What was Mr. Reed's title?  Do you know?
14   A.   In the beginning he was a branch chief.
15 At times he was a technical director.  Other times
16 he was a director.
17   Q.   Was there anyone sort of in the chain of
18 command between Mr. Reed and yourself or did you
19 report directly to Mr. Reed?
20   A.   I don't quite understand your question.
21   Q.   Have you seen an organizational chart
22 before that has little boxes and lines?

---

Page 43

1    A.   Yes.
2    Q.   Would there be a box between you and Mr.
3  Reed?
4    A.   A box between us?  No.
5    Q.   Or did you report directly to Mr. Reed?
6    A.   To Larry Reed.
7    Q.   Okay.  Who else did you work with --
8  well, let me strike that and back up.
9         On your resume you indicate that you
10 worked for CMS/CMSO.
11   A.   Correct.
12   Q.   Can you tell us what that means?
13   A.   Center for Medicaid and State Operations.
14   Q.   So as I understand it there are two broad
15 divisions within CMS, one for Medicare and one for
16 Medicaid; is that right?
17   A.   Correct.
18   Q.   And you worked in the Medicaid side?
19   A.   Correct.
20   Q.   Was that previously referred to as the
21 Medicaid Bureau, do you know?
22   A.   At one time.

---

Page 44

1    Q.   And CMSO is the predecessor name for the
2  Medicaid Bureau; is that right?
3    A.   Correct.
4         MS. MARTINEZ:  Objection, form.  I think
5  you said it backwards.
6         MR. TORBORG:  Yes.  Successor name.
7  You're right.
8         MS. MARTINEZ:  Okay.
9         BY MR. TORBORG:
10   Q.   Just so we're clear, CMSO is the
11 successor name to the Medicaid Bureau?
12   A.   Right.
13   Q.   And in February of 2003 you switched
14 jobs; is that right?
15   A.   Correct.
16   Q.   And that's your current job, right?
17   A.   Yes.
18   Q.   And what is the nature of your job there?
19   A.   I'm the team lead for dispute resolution
20 of the Medicaid drug rebate program.
21   Q.   Do you work on state plan amendments
22 anymore?

---

Page 45

1    A.   No.
2    Q.   I wanted to ask one other thing.  From
3  1991 to 2003, the previous job, did you work on
4  federal upper limits?
5    A.   Yes.
6    Q.   And can you tell us what those are?
7    A.   The federal government sets an upper
8  limit reimbursement amount on certain drugs.
9    Q.   What was the nature of your involvement
10 with the federal upper limit program?
11   A.   I took care of setting the upper limit
12 reimbursement amount on the drugs.
13   Q.   For all drugs?
14   A.   No.  There were just -- the regulations
15 indicate that they're set on -- there are certain
16 criteria, and they're the drugs that we would set an
17 upper limit reimbursement amount on.
18   Q.   I asked the wrong question.  What I meant
19 to ask was for drugs that HCFA did establish a
20 federal upper limit, you would have been involved in
21 that?
22   A.   Correct.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 46

1    Q.   And did you work with anyone else in that
2  area at HCFA?
3    A.   Yes.
4    Q.   Who else was involved in that?
5    A.   When I first started, Pete Rodler.
6         MR. WINGET-HERNANDEZ:  Could you spell it
7  for us?
8         THE WITNESS:  Rodler, R-o-d-l-e-r.
9    Q.   Anyone else?
10   A.   Cindy Bergin.  I mentored her later.
11   Q.   Her last name is spelled out?
12   A.   B-e-r-g-i-n.
13   Q.   Is she still with HCFA?
14   A.   Yes.
15   Q.   Is her name still Cindy Bergin?
16   A.   Yes.
17   Q.   Who else?
18   A.   That was it.
19   Q.   Can you recall anyone else during your
20  time from 1991 to February of 2003 who was involved
21  in the federal upper limit program?
22        MS. MARTINEZ:  Objection, form.

Page 47

1         Oh, you can answer.  I make these little
2  form objections.  Don't worry.
3         THE WITNESS:  Okay.
4    A.   Not that I can remember.
5    Q.   What was the nature of Mr. Reed, your
6  boss', involvement with the FULs, as we'll call
7  them?  Federal upper limits, FULs, is that correct?
8    A.   Correct.
9    Q.   What was the nature of his involvement in
10  the FULs?
11   A.   Well, he had last say on anything that
12  was sent out or published.
13   Q.   So did you discuss issues related to the
14  FUL program with Mr. Reed?
15   A.   Yes.
16   Q.   Anyone else besides Mr. Reed you recall
17  having discussions about the FUL program with?
18   A.   Can you be more specific with your
19  question?
20   Q.   Is there anyone else within HCFA that you
21  discussed issues relating to the federal upper limit
22  program with?

Page 48

1    A.   Relating to the work that I did on FULs?
2    Q.   Yes.
3         MS. MARTINEZ:  Objection, form.
4    A.   Only the people that I worked with, Pete
5  Rodler or Cindy Bergin.
6         MR.COOK:  What is the nature of the form
7  objection?  Maybe I'm missing something.
8         MS. MARTINEZ:  Time period.  Just for the
9  record, I think you're only addressing during the
10  1991 to 2003.
11        MR. TORBORG:  Correct.
12        MS. MARTINEZ:  And I just -- if that's
13  the period of time that you're referring to I have
14  no objection.
15        MR. WINGET-HERNANDEZ:  My objection was
16  lack of foundation.  I don't think you've
17  established that there was anything called a FUL
18  program.
19        BY MR. TORBORG:
20   Q.   In your job today are you still working
21  on issues relating to the FUL program?
22   A.   No.

Page 49

1    Q.   Do you know who's handling those issues
2  today?
3    A.   Gail Sexton.
4    Q.   Anyone else?
5    A.   Not that I'm aware of.
6    Q.   Did you talk with anyone else about the
7  federal upper limit program from April 1991 through
8  February 2003 besides those within HCFA?
9    A.   When you say talk to anyone else --
10   Q.   About issues relating to the FUL program
11  besides those within HCFA.
12        MS. MARTINEZ:  Objection, form.
13   A.   Do you mean for establishing the price --
14  for doing --
15   Q.   Anything.
16   A.   For anything.
17   Q.   I'm starting broad and hope to narrow it
18  down.
19        MR. WINGET-HERNANDEZ:  Objection, form.
20        MS. MARTINEZ:  My objection is to the
21  breadth, so you know.  Difficult to answer.
22   A.   Yeah.  I find it difficult to answer.

13 (Pages 46 to 49)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 50

1  There's times when I would call various states to go
2  ahead some feedback from them on availability of
3  drugs or various questions like that.
4      Q.   Do you recall discussing issues relating
5  to the federal upper limit program with anyone else
6  besides those within HCFA and states,
7  representatives of states?
8          MS. MARTINEZ:  Objection, form.
9      A.   Here again, I'm not sure what you mean by
10 discussing.  But I would call drug manufacturers to
11 verify pricing that's published in compendia.
12     Q.   All right.  Tell me about those
13 conversations.
14         MS. MARTINEZ:  Objection, form.
15     Q.   Who were they with and what you recall
16 being discussed?
17         MS. MARTINEZ:  Objection, form.
18     A.   I don't recall who it would be with.  I
19 can just answer in general terms that if something
20 was questionable in the pricing compendia then we
21 would try to call the manufacturer to verify
22 availability.

Page 51

1      Q.   Did you discuss with drug manufacturers
2  anything other than availability of the drugs?
3      A.   Sometimes we would try to verify the
4  price that's published in the compendia if it was
5  still current.
6      Q.   And by price, are we talking about
7  average wholesale price or something more than that?
8      A.   Average wholesale price, direct price or
9  wholesale acquisition cost.
10     Q.   Do you recall any discussions with anyone
11 from Abbott Laboratories concerning pricing?
12     A.   I don't recall.
13     Q.   Why would you be making those contacts
14 with drug manufacturers?
15     A.   To verify that the information in the
16 drug compendia was accurate in order to be able to
17 set an accurate federal upper limit amount.
18     Q.   And when you say accurate, what do you
19 mean by that?
20     A.   Following federal guidelines on setting
21 the upper limit reimbursement amount, we used the
22 compendia.  So we wanted to make sure the

Page 52

1  information was current.
2      Q.   Did you believe that the average
3  wholesale prices in the compendia represented the
4  average amount at which people could buy drugs from
5  wholesalers?
6          MS. MARTINEZ:  Objection, form.
7      A.   I couldn't make that statement.
8      Q.   You weren't -- when you were having
9  conversations with drug manufacturers, you weren't
10 asking them something like is this the average price
11 at which you sell drugs to wholesalers?
12     A.   No.
13     Q.   Okay.  As you probably have guessed
14 already, given the nature of this suit and where you
15 worked at CMS, my questions will largely focus on
16 the topic of state Medicaid programs payment to
17 providers for dispensing drugs to Medicaid
18 beneficiaries.  Do you understand that topic?
19     A.   Yes.
20     Q.   As well as issues relating to the federal
21 upper limit program.  In your experience at CMS what
22 was CMS's role when it came to the amounts that

Page 53

1  state Medicaid programs reimburse for drugs?
2          MS. MARTINEZ:  Objection, form.
3      A.   Could you explain your question?
4      Q.   Yeah.  What I'm trying to get is you
5  worked on what state Medicaid programs paid
6  providers for dispensing drugs.  Is that right?
7      A.   We looked at their state plan amendments.
8  That would have that information in there.
9      Q.   Okay.  Besides reviewing state plan
10 amendments what else did HCFA, now CMS, do when it
11 came to the topic of state Medicaid programs payment
12 for drugs?
13         MS. ALBEE:  Objection.
14         MS. MARTINEZ:  Objection, form.
15     A.   Could you give me some more detail?
16     Q.   I'm just trying to figure out what CMS's
17 role was when it came to what state Medicaid
18 programs paid for drugs, apart from approval of the
19 state plan amendments.
20     A.   We would encourage the states to set
21 reimbursement amounts that follow federal guidelines
22 and that were reasonable and supportable.

14  (Pages 50 to 53)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 54

1    Q.   And how did you encourage states to do
2  that?
3         MS. MARTINEZ:  Objection, form.
4    Q.   What was the nature of your acts in
5  encouraging the states to set reimbursement amounts
6  consistent with federal guidelines?
7    A.   We would provide that information in the
8  program releases.  It's general guidance.
9    Q.   Were you involved in any conversations,
10  in-face meetings or phone calls with states to
11  encourage them to set reimbursement amounts
12  consistent with federal guidelines?
13        MS. MARTINEZ:  Objection, form.
14    A.   I can't specifically remember particular
15  conversations.  I would assume that a conversation
16  like that would occur if you're discussing a state
17  plan amendment with a state.
18    Q.   And you recall having discussions with
19  representatives from states concerning state plan
20  amendments; is that right?
21    A.   Correct.
22    Q.   Were those conversations typically over

Page 55

1  the phone or were they in person?
2    A.   Generally over the phone.
3    Q.   And did you have a set territory of the
4  country or a certain number of states that you were
5  involved with with state plan amendments?
6    A.   I don't recall exactly.  I think at one
7  time we had particular states that we serviced.  But
8  I don't recall what states they were or what period
9  of time that occurred.
10    Q.   Did you have primary authority for a
11  certain number of states and then backup
12  responsibility for other states?  Is that how it
13  worked?
14        MS. MARTINEZ:  Objection, form.
15    A.   From what I remember, during a period of
16  time that's how we processed the state plan
17  amendments.
18    Q.   And you referred to federal guidelines.
19  What did you mean by that?
20    A.   Federal regulations.
21    Q.   Which regulations did you have in mind?
22    A.   The regulations in the C.F.R.

Page 56

1    Q.   Code of federal --
2    A.   Yes.
3    Q.   This is a broad question.  I'm sure we'll
4  get into it more today.  But did you find it
5  difficult to get states to reimburse at amounts
6  consistent with federal regulations?
7         MS. ALBEE:  Objection.
8         MS. MARTINEZ:  Objection, form.
9    A.   Generally, no.
10    Q.   And there are -- as I understand it,
11  there is a regulation for federal upper limits,
12  correct?
13    A.   Correct.
14    Q.   As well as a regulation that governs the
15  payments for all other drugs?
16    A.   Correct.
17    Q.   And those to your understanding would be
18  drugs that are not covered by the federal upper
19  limit program; is that right?
20    A.   That's my understanding.
21    Q.   It could be sole source drugs or multiple
22  source drugs; is that right?

Page 57

1    A.   Yes.
2    Q.   Did you find it difficult to -- let me
3  strike that.
4         And the regulation governing all other
5  drugs not covered by a FUL required the states to
6  reimburse drugs such that in the aggregate they were
7  reimbursing at their best estimate of what providers
8  could generally and currently purchase those drugs
9  in the marketplace; is that right?
10        MS. MARTINEZ:  Objection, form.
11    A.   Are you saying that's not for federal
12  upper limit?
13    Q.   Yes.  There's a regulation that covers
14  drugs that are within the federal upper limit,
15  correct?
16    A.   Correct.
17    Q.   And there's a regulation that covers
18  drugs that are not covered by the federal upper
19  limit?
20    A.   Correct.
21        MR. WINGET-HERNANDEZ:  Objection to form.
22    Q.   Correct?

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                            January 24, 2008
                        Washington, DC

Page 58

1    A.   Correct.
2    Q.   And what is the regulation covering drugs
3 not covered by the upper limit program?
4         MS. MARTINEZ:  Objection, form.
5    Q.   Do you know that?
6    A.   You mean the methodology in the
7 regulation?
8    Q.   Yes.
9    A.   You're asking me to repeat that?
10   Q.   Your understanding of what it is.
11   A.   Generally it's the lower of the estimated
12 acquisition cost or what is generally paid -- here
13 again, I'm not going to remember the exact words,
14 and I haven't been working in that area for a while.
15 But it's either the estimated acquisition cost or
16 the cost that's to the general public.  I can't
17 remember exactly what it is.  But it's in the
18 regulation.
19        What you were talking about before in the
20 aggregate sounded more like what's in the federal
21 upper limit regulation.
22   Q.   Okay.  We'll look at the regulations in

Page 59

1 particular later.  Do you recall having difficulty
2 getting states to abide by the federal regulations
3 covering drugs not covered by the federal upper
4 limit program?
5         MS. MARTINEZ:  Objection, form.
6    A.   No.  Generally not.
7    Q.   You don't recall any difficulties with
8 that at all?
9    A.   I can't recall specifically.
10   Q.   You don't recall that being a discussion
11 within your office?
12        MS. MARTINEZ:  Objection, form.
13   A.   Can you explain --
14   Q.   The difficulty getting states to set a
15 reimbursement methodology for drugs not covered by
16 the federal upper limit program so that it met
17 federal regulations?
18        MS. MARTINEZ:  Objection, form.
19   A.   I'm sure that it was discussed.  I don't
20 remember the specifics, when, or exactly what was
21 discussed.
22   Q.   And some of these events took place some

Page 60

1 time ago; is that fair to say?
2    A.   Correct.
3    Q.   And your recollection has -- you've
4 forgotten some things; is that fair to say?
5    A.   Very -- yes.
6    Q.   You were going to say something about
7 "very"?
8    A.   My recollection, yes.  No.  I'm agreeing
9 with you.
10   Q.   It's very much diminished; is that fair
11 to say?
12        MS. MARTINEZ:  Objection, form.
13   A.   I can't remember everything.
14   Q.   Do you think there are a lot of things, a
15 lot of detail, that you don't remember?
16   A.   Maybe.
17        MS. MARTINEZ:  Objection.
18        MR. WINGET-HERNANDEZ:  Objection, form.
19   Q.   Ms. Gaston, do you belong to any
20 professional organizations?
21   A.   No.
22   Q.   Have you attended in the past meetings or

Page 61

1 seminars relating to state Medicaid pharmacy issues?
2        MS. MARTINEZ:  Objection, form.
3    A.   Can you be more specific?  Do you have
4 any examples?
5    Q.   I've heard meetings held of the PTAG,
6 Pharmacy Technical Advice Commission, or whatever it
7 is.  I can't remember what it is.  Group.
8    A.   It's been a long time since I've been to
9 a PTAG meeting.
10   Q.   But you've attended PTAG meetings in the
11 past?
12   A.   Yes.
13   Q.   Have you attended any other meetings
14 where the issue of state pharmacy payment was
15 discussed?
16        MR. WINGET-HERNANDEZ:  Objection, form.
17   A.   And are you saying any period of time or
18 a specific period of time?
19   Q.   1991 through 2001.
20   A.   Yes.
21   Q.   What other meetings do you recall
22 attending?

16  (Pages 58 to 61)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                           January 24, 2008
                        Washington, DC

Page 62

1      A.   Some of the pharmacy associations have
2  meetings.  I attended one in Boston.  They're more
3  or less conferences.  I think one was in Raleigh,
4  North Carolina.
5      Q.   When you say pharmacy association, what
6  is that?  Is that a group of pharmacists or a group
7  of state people, state administrators, who work in
8  the pharmacy area?
9      A.   It's my recollection they were state
10 pharmacy folks and then some manufacturers would
11 also attend.
12     Q.   Was the topic of average wholesale price
13 discussed at those meetings?
14     A.   I can't recall.
15     Q.   Did you receive any materials at those
16 meetings?
17     A.   I may have.
18     Q.   Did you keep those?
19     A.   No.
20     Q.   Do you recall what type of topics were
21 discussed at the meetings of the state pharmacy
22 personnel?

Page 63

1          MS. MARTINEZ:  Objection, form.
2      A.   I do remember that some of the states
3  that are present, they would go around the table
4  just talking about what's happening in their states
5  relating to their Medicaid programs.  I presented at
6  those conferences discussing various issues
7  concerning the rebate program.
8      Q.   Did you keep any materials relating to
9  that, to your presentations?
10     A.   No.
11     Q.   Did you prepare any materials for these
12 presentations?
13     A.   Yes.
14     Q.   Do you recall any other meetings that
15 you've had apart from meetings with state pharmacy
16 personnel and the PTAG group at which the issue of
17 state pharmacy payment for drugs was discussed?
18          MS. MARTINEZ:  Objection, form.
19     A.   I can't specifically remember any
20 particular meetings.
21     Q.   But you believe that there may have been
22 others?

Page 64

1      A.   There may have been.
2      Q.   You just can't recall those given the
3  passage of time; is that fair to say?
4          MS. MARTINEZ:  Objection, form.
5      A.   Correct.
6      Q.   At the meetings that you recall, was the
7  issue of adequacy of dispensing fees ever discussed?
8          MS. MARTINEZ:  Objection, form.
9      A.   I can't recall.
10     Q.   And do you know what I'm asking you about
11 there with the adequacy of dispensing fee?
12     A.   Do I know --
13     Q.   Yeah.  You know what I'm talking about?
14     A.   Yes, I do.
15     Q.   The dispensing fee is what?
16     A.   That it's reasonable.
17     Q.   Is that a topic that you recall coming up
18 quite a bit during your time at CMS?
19          MR. WINGET-HERNANDEZ:  Objection, form.
20          MS. ALBEE:  Objection, form.
21          MS. MARTINEZ:  Objection, form.
22     A.   The issue comes up in the discussion of

Page 65

1  state plan amendments, but other than that I don't
2  recall it being a big issue.
3      Q.   And how does it come up in the context of
4  state plan amendments?
5      A.   Because in the state plan amendment
6  generally states will have something in there about
7  their dispensing fee.  And then they have to provide
8  sufficient documentation or justification for their
9  dispensing fee.
10     Q.   Do you recall there being discussion that
11 the dispensing fee as set by the states was not
12 adequate to cover a pharmacy's cost?
13          MS. MARTINEZ:  Objection, form.
14     A.   Can you repeat that?
15          MR. TORBORG:  Would you mind reading it
16 back, Jon?
17          (Whereupon, the requested portion was
18 read by the reporter.)
19     A.   I don't recall specific conversations.
20     Q.   And is that because of the passage of
21 time?
22          MR. WINGET-HERNANDEZ:  Objection, form.

17 (Pages 62 to 65)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                        Washington, DC

---

Page 66

1    A.   Correct.
2    Q.   Did you attend meetings with the Office
3  of Inspector General relating to state pharmacy
4  issues?
5    A.   Yes.
6    Q.   Can you approximate how many such
7  meetings you've attended?
8    A.   No, I could not.
9    Q.   More than five?
10   A.   I really can't recall.
11   Q.   Do you recall who you met with at OIG?
12   A.   Ben Jackson.  From Little Rock I think
13  there were two individuals from Little Rock, but I
14  can't remember their names at this time.
15   Q.   Paul Chesser?  Is that --
16   A.   Correct.
17   Q.   Was he from Little Rock?
18   A.   Correct.  It's my understanding.
19   Q.   Gordon Sato.  Does that sound familiar?
20   A.   That name does not sound familiar.
21   Q.   No?
22   A.   No.

---

Page 67

1    Q.   How about William Shrigley?
2    A.   Yes.
3        MS. MARTINEZ:  I'm sorry.  Was your
4  question does she recall that name or does she
5  recall meeting with Mr. Shrigley?
6    Q.   Do you recall meeting with Mr. Shrigley?
7    A.   Yes.
8    Q.   Anyone else?
9    A.   I can't recall any other names at this
10  time.
11   Q.   Did you ever meet with a Mr. Robert Vito?
12   A.   Yes.
13   Q.   Do you recall the nature of that meeting
14  at all?
15   A.   No, I don't recall.
16   Q.   How about David Tawes?  Do you remember
17  meeting with him?
18   A.   Yes.
19   Q.   Do you recall the nature of your
20  discussions with him?
21   A.   It might have been for a federal upper
22  limit OIG report or study they were doing.

---

Page 68

1    Q.   Do you remember meeting with a woman by
2  the name of Linda Ragone?
3    A.   That name doesn't sound familiar.
4    Q.   Did you review any professional
5  literature in connection with your job, Ms. Gaston?
6    A.   Can you be more specific?
7    Q.   Magazine articles, things of that nature.
8    A.   Generally no.
9    Q.   Is it fair to say that from April 1991
10  through February of 2003 your job was focused on
11  pharmacy-related issues?  Is that right?
12   A.   Correct.
13   Q.   And did you review any publications
14  relating to pharmacy issues?
15   A.   Yes.
16   Q.   Which ones do you recall reviewing?
17   A.   The Pink Sheets -- and you're talking
18  about that specific time?
19   Q.   Yes.  Did your office have a subscription
20  to Pink Sheets?
21   A.   Yes.
22   Q.   Did other people in the office read it?

---

Page 69

1    A.   Yes.
2        MS. MARTINEZ:  Objection, form.
3    Q.   Did you circulate interesting articles
4  from Pink Sheets around the office?
5        MS. MARTINEZ:  Objection, form.
6    A.   The Pink Sheet was circulated around the
7  office.
8    Q.   Any other publications you recall
9  reviewing?
10   A.   I can't recall other publications.
11   Q.   How about Drug Topics?  Did you ever
12  review that one?
13   A.   It sounds familiar, but I don't remember.
14   Q.   How about Eli's Home Week?  Do you recall
15  that publication?
16   A.   I don't recall that.
17   Q.   How about Modern Health Care?
18   A.   I don't recall that.
19   Q.   How about something called the Medicaid
20  Pharmacy Bulletin?
21   A.   That sounds familiar, but I don't recall
22  the bulletin.

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
Washington, DC

Page 70

1     Q.   Do you recall if your office had a
2  subscription to that publication?
3     A.   I don't know.
4        MR. TORBORG:  Why don't we take a ten
5  minute break here.
6        THE VIDEOGRAPHER:  This is the end of
7  tape 1.  Off the record at 10:32.
8        (Recess.)
9        THE VIDEOGRAPHER:  This is the beginning
10  of tape 2 in the deposition of Ms. Gaston.  On the
11  record at 10:47.
12        BY MR. TORBORG:
13     Q.   Welcome back, Ms. Gaston.  Did you do
14  anything to prepare for today's deposition?
15     A.   Yes.
16     Q.   Did you meet with counsel?
17     A.   Yes.
18     Q.   Did you do anything else to prepare for
19  today's deposition other than meet with counsel?
20     A.   Could you explain what you mean?
21     Q.   Did you review any documents, anything
22  else that you did to get ready for today?

Page 71

1     A.   No.
2     Q.   Who did you meet with?
3     A.   I met with Ani and Leslie.
4     Q.   And when was that meeting or meetings?
5     A.   Last Friday.  I don't have the date.  And
6  one other time.  I don't know which date that was.
7     Q.   Was it before last Friday or after last
8  Friday?
9     A.   Before last Friday.
10     Q.   And do you recall how long the initial
11  meeting was approximately?
12     A.   I'm just thinking about last Friday.  I
13  could be wrong.  It was a Friday.  I think it was
14  last Friday.  But I could ask Ani what date it was.
15     Q.   Okay.
16     A.   Do you want me to do that?
17     Q.   No.  It's not necessary.  How long did
18  you meet last Friday?
19     A.   About three hours.
20     Q.   Did you review any documents in that
21  meeting?
22     A.   No.

Page 72

1     Q.   Either in that session, the other session
2  or otherwise, have you reviewed any documents to
3  refresh your recollection to prepare for this
4  deposition?
5     A.   No.
6     Q.   You indicated you met with counsel
7  another time, correct?  How long was the other
8  meeting?
9     A.   A couple hours.
10     Q.   That was in person?
11     A.   Yes.
12     Q.   Have you discussed the fact that you're
13  being deposed with anyone else besides counsel?
14     A.   Yes.
15     Q.   Who?
16     A.   My division director.
17     Q.   Who is that?
18     A.   Rick Friedman.
19     Q.   Do you know that others at CMS have been
20  deposed in this litigation?
21     A.   Yes.
22     Q.   Who are you aware of who's been deposed?

Page 73

1     A.   Larry Reed, Deirdra Duzor.
2     Q.   Anyone else?
3     A.   No.
4     Q.   Have you discussed those depositions with
5  either of those people?
6     A.   No.
7     Q.   Have you discussed the substance of their
8  testimony in anywhere way with counsel?
9        MS. MARTINEZ:  Objection.
10     Q.   For example, did counsel indicate, well,
11  Mr. Reed said this or anything of that nature?
12     A.   No.
13        MS. MARTINEZ:  Counsel, asking
14  specifically about discussions with counsel is
15  privileged.
16        MR. TORBORG:  I'm not asking for the
17  contents of the discussion.
18        MS. MARTINEZ:  Yes, you are.
19        MR. TORBORG:  No.  I didn't ask about the
20  content.  Listen to the question carefully.
21        MR. WINGET-HERNANDEZ:  Objection to the
22  form.

19 (Pages 70 to 73)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Page 74

1      MS. MARTINEZ: Object to the form. She
2  answered the question. I'm just saying if you put
3  the content in your question and then ask did you
4  talk about this then you are asking about the
5  content of a discussion with counsel.
6      BY MR. TORBORG:
7      Q.   Prior to the meetings you've had with
8  counsel, Ms. Gaston, have you had any other
9  discussions with any lawyers on the subject of AWP
10 or Medicaid payment for drugs?
11     A.   Could you give me more detail?
12     Q.   I'm just asking if you've had any --
13 apart from these meetings preparing for this
14 deposition, have you had any other meetings with
15 attorneys concerning the subject of average
16 wholesale price or Medicaid reimbursement of drugs?
17     MS. MARTINEZ: Objection, form.
18     A.   Do you have like a specific period of
19 time? Anytime?
20     Q.   Not at this point. I'm just asking if
21 there are any. It sounds like there may be.
22     A.   There may have been. But I don't know

Page 75

1  specifically.
2      Q.   Why do you believe there may have been?
3      A.   Because that would be a subject when I
4  worked in policy that was something that could have
5  been discussed with our general counsel.
6      Q.   Who is your general counsel?
7      A.   Mary Salhus.
8      Q.   Have you provided -- do you recall in any
9  of those discussions have you provided any factual
10 information to counsel?
11     MR. WINGET-HERNANDEZ: Objection, form.
12     A.   I don't remember those specific
13 discussions.
14     Q.   Do you recall providing -- it sounds like
15 you recall there may have been some general
16 discussions in the course of your work. Is that
17 right?
18     MS. MARTINEZ: Objection, form.
19     A.   The reason I'm saying that is because of
20 the nature of the work in policy, that those
21 discussions could have occurred. But I don't
22 remember any of those specific discussions.

Page 76

1      Q.   Do you have any recollection regarding
2  the general nature of those conversations?
3      MR. WINGET-HERNANDEZ: Objection, form.
4      MS. MARTINEZ: Objection, form.
5      A.   I can't say.
6      Q.   You can't say at all what you may have
7  talked about with attorneys; is that right?
8      MS. MARTINEZ: Objection, form.
9      A.   Your question is too broad. I'd have to
10 know specifically what an issue would have been.
11 And here again, I don't recall those specific
12 conversations. So it's hard for me to give you an
13 answer on that.
14     Q.   And my question is more general than
15 that. And that is, do you recall the general
16 subject matter of any conversations that you've had
17 with counsel?
18     MS. MARTINEZ: Objection, form.
19     A.   I don't know how to answer that. I need
20 something more from you. I don't know where you're
21 going with it. If you could explain what you're
22 saying.

Page 77

1      Q.   I'm trying to figure out just if you've
2  had discussions with counsel what the nature of the
3  discussions was. That's all I'm trying to figure
4  out.
5      MS. MARTINEZ: Objection to form.
6      A.   It could have been anything. We discuss
7  a lot of things with counsel in policy. It could
8  have been concerning a state plan amendment. It
9  could -- it's -- I don't know specifically, so I
10 can't be that specific in my response.
11     Q.   Have you ever discussed litigation
12 related to average wholesale price with the
13 Department of Justice?
14     MS. MARTINEZ: Objection, form.
15     A.   I don't recall. If they were involved
16 in -- if they were involved in the other deposition,
17 which I don't think they were, or if they were
18 involved with the grand jury, I'm not sure. So I
19 really can't say that it occurred.
20     Q.   Ms. Gaston, do you understand that you're
21 here today in connection with lawsuit that the
22 United States Government has brought against Abbott

Gaston, Sue                                           January 24, 2008
                          Washington, DC

Page 78

1  Laboratories?
2      A.   Yes.
3      Q.   Do you have an understanding of what the
4  United States alleges that Abbott did wrong?
5      A.   I have a basic understanding.
6      Q.   What is your basic understanding?
7      A.   My basic understanding is there's
8  concerns that there were certain drugs that the
9  prices of those particular drugs may be higher than
10 what they should be for purposes of reimbursement.
11     Q.   Do you have an understanding of what
12 prices in particular are at issue?
13     A.   What do you mean by what prices?
14     Q.   Average wholesale price, things like
15 that.
16     A.   Average wholesale price I think is one of
17 the issues.
18     Q.   Do you have an understanding of -- when
19 you say that the prices for certain drugs were
20 higher than they should be, do you have an
21 understanding of what it is the government contends
22 they should have been?

Page 79

1      A.   No.
2      Q.   Do you have an understanding of the
3  nature of the drugs at issue in this case?
4      A.   You mean what type of drugs?
5      Q.   Yes.  The type of drugs.
6      A.   In the Abbott case?
7      Q.   Yes.
8      A.   I think they're just injectables.
9      Q.   And when you say injectables, what do you
10 mean by that?
11     A.   Drugs that are injectables.  They're not
12 tablets or capsules.
13     Q.   Do you know which specific injectables
14 are at issue?
15     A.   No, I don't.
16     Q.   I'd like to ask you to take out Exhibit
17 19 in those binders there, Ms. Gaston.  Were you
18 able to find it, Ms. Gaston?
19     A.   Yes.
20     Q.   For the record, Exhibit 19 is a copy of
21 the initial complaint filed by the United States
22 against Abbott Labs.  After you've had a chance to

Page 80

1  peruse that, Ms. Gaston, my question will be whether
2  or not you have ever seen this document before.
3      A.   I don't recall seeing this.  I don't
4  recall seeing this document.
5      Q.   Let me ask you to go to page 10 of the
6  complaint.  Specifically paragraph 31.  There's --
7  after the first paragraph there's a couple columns
8  titled drug and NDC.  Do you see that?
9      A.   Yes.
10     Q.   And there are some various NDC numbers
11 listed.  Do you see that?
12     A.   Yes.
13     Q.   Included within here are NDCs for sodium
14 chloride, water for injection, vancomycin and then
15 some dextrose-type solutions.  Do you see that?
16     A.   Yes.
17     Q.   Does that refresh your recollection at
18 all regarding what types of drugs are at issue in
19 this case?
20     A.   I guess I don't -- it's not that I don't
21 remember what drugs were included in this case --
22     Q.   You've never known?

Page 81

1      A.   -- I really don't -- I'm not aware of --
2  I may have read it, but I don't remember which drugs
3  were included in this case.  So this doesn't really
4  refresh my memory.  I just don't remember
5  specifically which drugs are included in this case.
6          MS. MARTINEZ:   And just for the record,
7  I mean, there is an amended complaint that the
8  United States filed that includes an additional
9  drug, acyclovir.
10         MR. TORBORG:  An additional NDC?
11         MS. MARTINEZ:  An additional drug and
12 NDC, yeah.  Right.  An injectable version of
13 acyclovir.
14         MR. TORBORG:  Well, that complaint is
15 still pending before Judge Saris whether or not you
16 can file that, but --
17         MS. MARTINEZ:  You mean your motion to
18 dismiss is pending.  The complaint has been filed.
19         MR. TORBORG:  The motion for lead is also
20 pending.
21         BY MR. TORBORG:
22     Q.   Ms. Gaston, regardless of whether or not

21 (Pages 78 to 81)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                           January 24, 2008
                        Washington, DC

---

Page 82

1   you are familiar with these particular -- or that
2   you knew these NDCs were at issue in the case, have
3   you run across these drugs in your work at all?
4       A.   I may have.  I don't specifically
5   remember.
6       Q.   You don't recall any specific issues
7   arising with any of these drugs?
8       A.   Specifically, I can't remember.
9       Q.   Do you know how these drugs are dispensed
10  to Medicaid beneficiaries?
11      A.   You mean how -- can you explain yourself?
12      Q.   Do you know how these drugs are dispensed
13  by providers to Medicaid beneficiaries such that the
14  Medicaid program would reimburse them?
15          MR. WINGET-HERNANDEZ:  Objection, form.
16      A.   Are you asking are they provided in a
17  pharmacy or a physician's office or --
18      Q.   Correct.  That's what I'm getting at.
19  Yes.
20      A.   Okay.  I wouldn't know specifically how
21  they're dispensed.
22      Q.   Do you know what types of providers would

---

Page 83

1   have submitted claims to seek reimbursement for
2   these NDCs?
3       A.   No.  I would not know.
4       Q.   Do you know why the government decided to
5   bring suit regarding these particular drugs?
6       A.   It's my understanding that the suit is
7   because the federal government is concerned about
8   the prices that -- the prices that the
9   manufacturer -- they felt that the prices were
10  higher on some of the drugs for reimbursement
11  purposes.
12      Q.   Higher than what?
13      A.   Than what I guess they felt was
14  reasonable.
15      Q.   Do you have a view on what price would be
16  reasonable, Ms. Gaston?
17      A.   You mean a specific price?
18      Q.   Generally.
19          MR. WINGET-HERNANDEZ:  Objection, form.
20      Q.   Across drugs.
21      A.   Are you saying a money amount?
22      Q.   A money amount, yeah.

---

Page 84

1       A.   No.  I would not know.
2       Q.   I'm going to ask you to go to paragraph
3   38 of the initial complaint.  Do you see there it
4   says "No governmental payor knew of or sanctioned
5   Abbott's conduct as set forth in this complaint;
6   i.e., its deliberate manipulation of its published
7   prices for certain of its products to induce the
8   customers to purchase those products."
9           Ms. Gaston, were you asked whether or not
10  you personally were aware of whether or not
11  published prices were consistent with acquisition
12  cost?
13          MS. MARTINEZ:  Objection, form.
14      Q.   Have you ever been asked that question?
15      A.   Can you repeat that?
16      Q.   Have you ever done asked during your time
17  at CMS whether or not you knew that published prices
18  did not equal acquisition costs?
19          MS. MARTINEZ:  Objection, form.
20      Q.   Is that a topic that has come up in
21  conversations?
22          MS. MARTINEZ:  Objection, form.

---

Page 85

1       A.   When you say the estimated acquisition
2   cost, do you mean -- okay.  What do you mean by
3   that?  Do you mean what the states are paying?
4       Q.   No.  I'm asking what providers are paying
5   for the drugs.
6           MS. MARTINEZ:  Objection, form.
7       A.   So that's what the state --
8       Q.   Let me back up and try this a different
9   way.
10      A.   Okay.
11      Q.   Do you understand what damages the
12  government is seeking in this case?
13      A.   What do you mean damages?
14      Q.   You know in civil litigation someone is
15  suing for an amount of money.
16      A.   Okay.
17      Q.   Do you know generally speaking -- not
18  numbers -- what types of damages the government is
19  seeking in this case?
20      A.   No, I don't.
21      Q.   Are you familiar with the term "spread"
22  as used in the context of pharmacy issues.

22 (Pages 82 to 85)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                        Washington, DC

Page 86

1    A.   I've heard the term.  I'm not really
2  familiar with it.
3    Q.   When have you used the term?
4    A.   It just sounds familiar to me.  I don't
5  know when.
6    Q.   You don't know what the term the spread
7  means in connection with prescription drugs?
8    A.   It's really not a term that I use.
9    Q.   We sent you a subpoena for your
10  appearance here today.  Did you see that?
11    A.   Yes.
12    Q.   It called for certain types of documents
13  in your personal possession?
14    A.   Yes.
15    Q.   Did you make a search of your personal
16  files for any such documents?
17    A.   Yes.
18    Q.   Did you have any?
19    A.   Whatever I had was previously obtained by
20  counsel.  I have no other further documents.
21    Q.   Did you have documents at your home or --
22    A.   No.

Page 87

1    Q.   -- in your car?
2    A.   No.
3    Q.   Did you have documents in your office
4  relating to -- that would have been responsive to
5  the subpoena?
6    A.   To the subpoena?
7    Q.   Yes.
8    A.   No.
9    Q.   Did you have your own office at HCFA from
10  1991 through 2001?
11    A.   I had a cube.
12    Q.   And what types of -- did you have files
13  that related to the FUL program?
14    A.   Yes.
15    Q.   What types of files did you have?  Can
16  you describe them for me?
17    A.   You mean the paper that -- I mean, they
18  were just files.  They were paperwork.  They might
19  have been correspondence, copies of the old FUL
20  publications.  It could have been any kind of
21  general information, correspondence.
22    Q.   Can you give me an idea for the magnitude

Page 88

1  of those paper files?
2    A.   I really can't remember.
3    Q.   Was it one box, five boxes, a file
4  cabinet?  Do you have any idea?
5    A.   It wouldn't be a file cabinet.  It would
6  be less than a file cabinet.  Yeah.  A couple
7  folders, from my recollection.
8    Q.   And were those documents turned over to
9  counsel in response to discovery taken in this or
10  another case?
11    A.   Those documents -- the ones that I'm
12  referencing are the ones for the period of time when
13  I worked in policy.  And they stayed in the policy
14  area when I moved in 2003.
15    Q.   So you had possession of the files prior
16  to 2003 in your cube?
17    A.   Correct.
18    Q.   And then after you moved over to the new
19  office you left those behind?
20    A.   Correct.
21    Q.   Did you switch offices in your new job?
22    A.   Yes.

Page 89

1    Q.   You referred to something called the
2  policy area.  What is that?
3    A.   That was where I worked from '91 through
4  2003.
5    Q.   And do you know specifically where your
6  files relating to the federal upper limit program
7  went?
8    A.   No.
9    Q.   Did you have files at your previous job,
10  the policy job, relating to approval of state plans,
11  state plan amendments?
12    A.   Yes.
13    Q.   And did you take those with you when you
14  switched jobs?
15    A.   No.
16    Q.   So those are back somewhere in the policy
17  area?
18        MS. MARTINEZ:  Objection, form.
19    A.   Yeah.  As far as I know.  I don't know
20  where they are now.
21    Q.   When you switched office did you have to
22  sign out your files or put them someplace like in an

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                            January 24, 2008
Washington, DC

Page 90

1  archives or something like that?
2      A.   No.
3      Q.   Or just leave them behind in your office
4  and move on?
5      A.   I left them behind.
6      Q.   You don't know who they went to?
7      A.   No.
8      Q.   Can you give me a sense for the volume of
9  documents you had relating to approval of state plan
10 amendments?
11     A.   I really wouldn't have any idea.
12     Q.   Would it be a file cabinet?
13     A.   If -- probably less than that.
14     Q.   Compared to the volume of the federal
15 upper limit documents, more or less?
16     A.   That's really hard to say.
17     Q.   Did you have any documents -- when you
18 switched jobs, did you keep the same computer or did
19 you switch? Files that were on your hard drive
20 originally, did they stay there?
21     A.   Correct.
22     Q.   So you still had access to all the same

Page 91

1  documents when you moved jobs; is that right?
2          MS. MARTINEZ:  Objection, form.
3      A.   I didn't keep all of those documents. I
4  got rid of a lot of those documents when I moved.
5      Q.   And when you say you got rid of, what do
6  you mean by that?
7      A.   I mean, just deleted them off my hard
8  drive because I didn't need the information, didn't
9  need the information any longer.
10     Q.   Are you familiar with something called a
11 document hold notice?
12         MS. MARTINEZ:  Objection to form.
13     A.   Can you explain that?
14     Q.   A notice for you to retain any files you
15 may have related to a specific subject.
16     A.   Yes.
17     Q.   Have you ever received a document hold
18 notice during your work at CMS?
19     A.   Yes.
20     Q.   Tell me about that. When did you get it
21 and what did it cover?
22     A.   I can't remember the date on it, but it

Page 92

1  was probably -- I can't remember the date on the
2  document. But we received it and it was asking us
3  to not destroy any documents.
4      Q.   Related to what subject?
5      A.   I can't remember.
6      Q.   Did you get this notice while you were
7  working in the new position?
8      A.   Yes.
9      Q.   Was it a notice you received within the
10 last year or prior to that?
11     A.   Prior to that.
12     Q.   Prior to getting that document hold
13 notice did you make any efforts to keep documents
14 that might relate to Medicaid payment for drugs?
15     A.   Can you I guess explain -- can you
16 restate that?
17     Q.   I don't think I can.
18     A.   Can you repeat that?  Yeah.  Prior to
19 getting the notice to not destroy documents, did you
20 take any evidence to consciously maintain documents
21 that related to Medicaid payment for drugs.
22         MS. MARTINEZ:  Objection, form.

Page 93

1      A.   Medicaid payment for drugs is kind of
2  broad. So are you saying state plan amendments? I
3  mean --
4      Q.   In your view what all would fall in the
5  category of Medicaid payment for drugs, other than
6  state plan amendments obviously that you indicated.
7      A.   You're asking me that?
8      Q.   Yes.
9      A.   Okay.  I don't know.  We have -- any kind
10 of correspondence that maybe I replied to.  So --
11     Q.   Did you make any efforts to retain any
12 documents relating to state plan amendments prior to
13 getting the hold notice?
14     A.   Well, the notice that -- I was in my new
15 area so I didn't have the state plan amendment
16 information with me.
17     Q.   Okay.  Prior to getting the litigation
18 hold notice and back during the time you were
19 working on state plan amendment stuff --
20     A.   Okay.
21     Q.   -- did you make any conscious efforts to
22 retain any of those documents?

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                           January 24, 2008
                    Washington, DC

Page 94

1        MS. MARTINEZ:  Objection, form.
2     A.  I retained the documents.
3     Q.  All of them?
4     A.  I can't say all of them.  What was
5  pertinent to what I was working on at that time.
6     Q.  But if it didn't relate to what you were
7  working on at the time, you didn't make an effort to
8  keep them; is that right?
9        MS. MARTINEZ:  Objection, form.
10    A.  I can't answer that.
11    Q.  Did you use e-mail?
12    A.  Yes.
13    Q.  When did you start using e-mail?
14    A.  I can't remember.
15    Q.  Was it during the time that you were
16  working on state plan amendments and federal upper
17  limits?
18    A.  Yes.
19    Q.  Did you have e-mail correspondence on
20  those subjects with anyone?
21    A.  Yes.
22    Q.  Was that something that you did

Page 95

1  regularly?
2     A.  Yes.
3     Q.  And where are those e-mails today?
4        MS. MARTINEZ:  Objection, form.
5     A.  I don't know.
6     Q.  Did you take any efforts to keep any
7  e-mails?
8        MS. MARTINEZ:  Objection, form.
9     A.  From that period?
10    Q.  Yes.
11    A.  I really -- I'm not sure.
12    Q.  Do you have a sense on your computer --
13  what is the approximate date of the oldest e-mail
14  that you have access to on your computer?
15    A.  I have no idea.
16    Q.  Did you correspond by e-mail with people
17  who administered the state Medicaid programs?
18    A.  Yes.
19    Q.  Relating to the way in which they paid
20  for drugs?  Is that a topic you e-mailed them about?
21    A.  Are you saying relating to state plan
22  amendments?

Page 96

1     Q.  That and anything else dealing with
2  payment of drugs.
3        MS. MARTINEZ:  Objection, form.
4     A.  Yes.
5     Q.  Is that something that you did regularly?
6     A.  When it was necessary.
7     Q.  Do you recall being asked to search for
8  documents relating to drug pricing litigation on or
9  around 2003?
10    A.  I wouldn't -- I can't remember
11  specifically that time frame.
12    Q.  But you recall an effort being made to
13  search for documents relating to drug pricing
14  litigation; is that fair to say?
15    A.  Correct.
16    Q.  And what involvement did you have in that
17  search?
18    A.  I just searched my folders to see if I
19  had any information that was relevant to the
20  request.  And generally the request would come
21  through Larry's division, through policy, and they
22  would copy me to see if we had any documents.  And

Page 97

1  if I did I would share them back with the policy
2  folks and they would submit the document request.
3     Q.  Did you have any documents?
4     A.  I may have.
5     Q.  You don't recall?
6     A.  I don't recall.
7     Q.  Did you search your hard drive in your
8  computer for documents that may have been responsive
9  to the document requests?
10    A.  I may have.
11       MR. TORBORG:  Okay.  We'll mark this as
12  our next exhibit.  I think I have ten copies of
13  these, of the newly marked exhibits.  I'll let you
14  all fight about who gets the copies and who has to
15  share.
16            (Exhibit Abbott 453 was
17             marked for
18             identification.)
19       MS. MARTINEZ:  There's only four on the
20  plaintiff's side.  Could we have one more on the
21  plaintiff's side?  Thanks.
22       MR. TORBORG:  Now, when you say

                              25  (Pages 94 to 97)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 98

1  plaintiff's side, what do you mean?
2         MS. MARTINEZ:  What I mean --
3         MR. TORBORG:  That was a joke.
4         MR. WINGET-HERNANDEZ:  What are we
5  calling this?
6         MR. TORBORG:  Abbott Exhibit 453.  For
7  the record, what I've marked as Abbott Exhibit 453
8  bears the Bates numbers VAC MDL 86162 through 75.
9         BY MR. TORBORG:
10     Q.   And Ms. Gaston, for purposes of my
11  questioning here today if I ask you to flip to a
12  Bates number or a reference number or some number,
13  I'll be referring to the number that's printed on
14  the bottom right corner of the document.
15     A.   Okay.
16     Q.   Do you see that?
17     A.   Yes.
18     Q.   Okay?  First I'd like you to review the
19  entirety of this document and tell me whether or not
20  you recall it.
21     A.   Did you say do I recall it?
22     Q.   Yes.

Page 99

1      A.   (Reading.)  I don't specifically recall
2  it.  It may look familiar, but -- because of the
3  names on the front it shows that there was a meeting
4  and I attended the meeting.  So there could be a
5  recollection, but I don't have much of a
6  recollection at all.
7      Q.   You don't have much of a recollection of
8  the meeting or the document?
9      A.   Either.
10     Q.   Okay.  If I could ask you to go to the
11  second page of the document, Bates ending 163, this
12  appears to be an sign-in sheet titled Ven-A-Care
13  meeting, dated 9/14/95.  Do you see that?
14     A.   Yes, I do.
15     Q.   And is your name listed on this document?
16     A.   Yes.
17     Q.   And you're listed next to number 16,
18  right?
19     A.   Correct.
20     Q.   Is that your handwriting?
21     A.   Yes, it is.
22     Q.   And then under affiliation you wrote

Page 100

1  HCFA/MB?
2      A.   Yes.
3      Q.   Does that mean HCFA Medicaid Bureau?
4      A.   Correct.
5      Q.   And was there anyone else from the HCFA
6  Medicaid Bureau in attendance?
7      A.   Larry Reed.
8         MS. MARTINEZ:  Objection, form.  Is your
9  question whether she recalls or is your question for
10  her to read the document?
11        MR. TORBORG:  Read the document.
12     A.   Yeah.  I'm reading the document.  And
13  from what I can see here, Larry Reed.
14     Q.   Are there any other names on this list
15  that were on the Medicaid side of CMS?
16     A.   I can't say because I don't know what OBI
17  or -- you know, but for my purposes I recognize
18  Medicaid Bureau.  I don't know what the WBB is.
19     Q.   If we go through the document a bit, on
20  the next page, 164, it says "the false AWP
21  multibillion dollar machine."  Do you see that?
22     A.   Yes.

Page 101

1      Q.   The next page is titled "manufacturer's
2  false AWPs versus provider's true cost," do you see
3  that?
4      A.   Yes.
5      Q.   And the next page, "manufacturers are
6  also wholesalers - use false AWPs to promote drug
7  sales to providers," do you see that?
8      A.   Yes.
9      Q.   The next page, "HCFA defrauded into
10  directing DMERCs to pay higher reimbursement based
11  on false AWP," do you see that?
12     A.   Yes.
13     Q.   We'll skip a couple pages to the Bates
14  page ending 171.  It says "Medicaid defrauded."  Do
15  you see that?
16     A.   Yes.
17     Q.   The first column is "AWP drives Medicaid
18  reimbursement $8 billion in 1993."  "Medicaid
19  victimized by false AWPs."  "Medicaid victimized by
20  Medicare paying false AWPs."  Do you see that?
21     A.   Yes.
22     Q.   Do you recall this meeting, Ms. Gaston?

26 (Pages 98 to 101)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                      Washington, DC

| Page 102 |
| --- |

1    A.   No, I don't.
2    Q.   Do you recall anything at all about this
3  meeting?
4    A.   No, I don't.
5    Q.   Do you recall at some point meeting with
6  representatives from Ven-A-Care?
7    A.   Yes.
8    Q.   Tell me what you remember about those
9  meetings.
10       MS. MARTINEZ:  Objection, form.
11   A.   I remember -- I remember them coming to
12 CMS and discussing their issues.  But I don't
13 remember specifically anything more than that.
14   Q.   When you say to discuss their issues,
15 what do you mean by that?
16   A.   From what I remember, they were concerned
17 about pricing on certain drugs and Medicaid and
18 Medicare reimbursing at higher levels than they felt
19 were right.
20   Q.   And do you recall approximately when this
21 meeting was?
22   A.   I don't recall, but it says on the paper

| Page 103 |
| --- |

1  '95.
2    Q.   So you do recall a little bit about the
3  '95 meeting?
4        MS. MARTINEZ:  Objection to form.
5    A.   No.  I don't remember this meeting.
6    Q.   But you recall Ven-A-Care coming to you
7  in Baltimore to discuss their issues and concerns
8  about pricing of certain drugs; is that right?
9        MS. ALBEE:  Objection, form.
10   A.   Coming to CMS.
11   Q.   Mm-hmm.  And when I asked you when the
12 meeting was you referred to this document, correct?
13   A.   No.  I can't -- there could have been
14 several meetings.  I don't know if this is when they
15 came to Baltimore.
16   Q.   You said there could have been several
17 meetings.  Do you recall more than one meeting with
18 Ven-A-Care?
19   A.   There was another meeting in D.C.
20   Q.   Was that before or after the meeting in
21 Baltimore?
22   A.   I don't know.

| Page 104 |
| --- |

1    Q.   Who was in attendance at that meeting, to
2  your recollection?
3    A.   I don't know all the parties involved.
4  Larry Reed was there.  I don't know if Mary Salhus
5  was there.  And it may have been the administrator
6  at that time.  Other than that I don't remember
7  anybody else.
8    Q.   Do you recall what was the nature of that
9  meeting, what was discussed?
10   A.   I don't recall.
11   Q.   Do you recall where it was in D.C.?
12   A.   Specifically, no.
13   Q.   Do you recall the number of attendees
14 generally?
15   A.   No.
16   Q.   Was it you and Mr. Reed and people from
17 Ven-A-Care or was it larger than that?
18   A.   I don't recall.
19   Q.   Do you recall anything about the meeting
20 at all?
21   A.   No.
22   Q.   That's because it's been some time; is

| Page 105 |
| --- |

1  that correct?
2        MS. MARTINEZ:  Objection, form.
3    A.   Correct.
4    Q.   You memory would have been better had I
5  been able to ask you about this meeting five years
6  ago; is that fair to say?
7        MS. MARTINEZ:  Objection, form.
8    A.   I can't say.
9    Q.   Do you recall any other meetings with
10 Ven-A-Care?
11   A.   No.
12   Q.   Do you recall any other conversations
13 with Ven-A-Care on the phone?
14   A.   There may have been.  I don't recall.
15   Q.   You say that there may have been.  Is
16 that because you think that there were?
17       MS. MARTINEZ:  Objection, form.
18   Q.   You just don't recall the details of it?
19       MS. MARTINEZ:  Objection, form.
20   A.   Correct.
21   Q.   And who was in attendance on these phone
22 calls?

27 (Pages 102 to 105)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 106

1       MS. ALBEE:  Objection, form.
2       MS. MARTINEZ:  Objection, form.
3    A.  I don't remember the phone calls.  There
4  may have been, but I don't -- I don't know because I
5  don't remember.
6    Q.  Did you take notes of the meetings with
7  Ven-A-Care, either of the meetings with Ven-A-Care?
8    A.  I don't remember.
9    Q.  Would it have been your pattern and
10 practice to take notes?
11      MS. MARTINEZ:  Objection, form.
12   A.  It just depends.
13   Q.  Depends on what?
14   A.  What meeting I was attending.
15   Q.  Would it have been your pattern and
16 practice to take notes of a meeting of the type with
17 Ven-A-Care?
18      MS. ALBEE:  Objection, form.
19      MS. MARTINEZ:  Objection, form.
20   A.  I can't say.
21   Q.  I'm going to ask you to go back to the
22 Bates page ending 171.  This is the slide for a page

Page 107

1  titled Medicaid defrauded.  Do you see that?
2    A.   Yes.
3    Q.   And in the middle column there, if you
4  would look at that for a second and let me know if
5  you have an understanding of what that chart is
6  portraying.
7    A.   I can't see it.  Do you have bigger
8  print?
9    Q.   Not at this time.
10   A.   Okay.
11   Q.   Do you see that -- can you read the top?
12 Medicaid drug cost?  Can you read that?
13   A.   That's it.  Yup.
14   Q.   Can you read the next column?  NDC
15 number?
16   A.   Barely.  This is like an eye exam.
17   Q.   How about drug?  Do you see that?
18   A.   Okay.
19   Q.   And then AWP, the next column?
20   A.   Okay.
21   Q.   I won't ask you to read the next
22 column --

Page 108

1    A.   Please.
2    Q.   -- because I can't either.  Then the next
3  column, VAC cost and then percentage difference?  I
4  think that's what it says, but I won't swear by it.
5       MS. MARTINEZ:  That's not legible.
6    Q.   Do you recall reviewing charts that
7  compared AWP with Ven-A-Care's cost?
8    A.   No, I don't.
9       MS. MARTINEZ:  Objection, form.
10   Q.   But it appears as though these were
11 presented in a meeting; is that fair to say?
12      MS. MARTINEZ:  Objection, form.
13   A.   I don't know.
14   Q.   Do you recall when you met with
15 Ven-A-Care being surprised at what they were telling
16 you?
17   A.   I don't really recall the meetings.
18   Q.   Did you have an understanding of why you
19 would have been asked to attend a meeting with
20 Ven-A-Care to discuss their concerns with drug
21 pricing?
22      MR. WINGET-HERNANDEZ:  Objection, form.

Page 109

1       MS. MARTINEZ:  Objection, form.
2    A.   As part of the division we would attend
3  meetings just for educational purposes.
4    Q.   And what do you mean when you say
5  educational purposes?  What does that mean?
6    A.   Just to learn what's going on.  And
7  basically I think that's what my attendance here as
8  part of the division -- just to, I guess, educate
9  ourselves on what's happening.
10   Q.   And why would you need to be educated
11 about what was happening?
12   A.   Because that's part of the job.
13   Q.   And was the idea to do something about
14 the facts as presented by Ven-A-Care?
15      MS. MARTINEZ:  Objection, form.
16   A.   For me?
17   Q.   Yes.
18   A.   No.
19   Q.   Why would you need to know this
20 information if you wouldn't use it?
21      MR. WINGET-HERNANDEZ:  Objection, form.
22   Q.   Was it just to sort of know about it or

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  was there a plan that you would do something about
2  it?
3         MR. WINGET-HERNANDEZ:  Same objection.
4         MS. MARTINEZ:  Objection to form.
5   A.   I can't say.  Just to educate myself.
6   Q.   Education just for education's sake?
7         MS. MARTINEZ:  Objection, form.
8   Q.   I'm trying to figure out why you were at
9  the meeting, why you're educating yourself about
10  these issues.  Was it just to satisfy your --
11   A.   Because my supervisor probably asked me
12  to go to meeting.
13   Q.   And do you have an understanding of why
14  you would be asked to go to meeting?
15         MR. WINGET-HERNANDEZ:  Objection, form.
16   A.   To learn more about the program.
17   Q.   And then to do something about what you
18  learned; is that right?
19         MR. WINGET-HERNANDEZ:  Objection to form
20  23450 objection, form.
21         MS. MARTINEZ:  Objection, form.
22   A.   No.

**Page 111**

1   Q.   So it was just to learn, it wasn't to
2  give you any knowledge base to do something; is that
3  your testimony?
4         MR. WINGET-HERNANDEZ:  Objection, form.
5         MS. MARTINEZ:  Objection, form.
6   A.   To do something on this case?
7   Q.   To do something about this situation as
8  presented by Ven-A-Care?
9         MS. MARTINEZ:  Objection, form.
10   A.   No.
11   Q.   So what was the answer no to?  My
12  question of was it just for curiosity's sake?  Is
13  that what the answer no was to?
14   A.   It wasn't for curiosity.
15   Q.   It was to learn information so that you
16  would do something with the information you learned;
17  is that correct?
18         MS. MARTINEZ:  Objection, form.
19   A.   It was to educate myself.
20   Q.   Do you recall taking any action in
21  response to the information presented by Ven-A-Care?
22         MS. MARTINEZ:  Objection, form.

**Page 112**

1         MS. ALBEE:  Objection to form.
2   A.   No.
3   Q.   Do you recall any discussion or
4  consideration of doing anything about the facts as
5  presented by Ven-A-Care?
6         MS. MARTINEZ:  Objection, form.
7   A.   No.
8   Q.   Did you make any efforts to inform your
9  colleagues in the state Medicaid programs about the
10  information presented by Ven-A-Care?
11         MS. MARTINEZ:  Objection, form.
12   A.   No.
13   Q.   Why not?
14   A.   Why not?  Can you explain?
15   Q.   Well, isn't one of HCFA's rules to help
16  educate states regarding pharmacy issues?
17         MS. MARTINEZ:  Objection, form.
18   A.   This was a litigation case.
19   Q.   So is it your understanding that you were
20  in attendance at these meetings with Ven-A-Care in
21  connection with a litigation case?
22         MS. MARTINEZ:  Objection, form.

**Page 113**

1   A.   A potential litigation case, yes.
2   Q.   Did you ever discuss with Mr. Reed or
3  anyone else what the Medicaid Bureau might do with
4  this information to save money for the government?
5   A.   I can't say that.  I don't know.
6   Q.   Do you recall ever contacting
7  manufacturers to discuss the concerns raised by
8  Ven-A-Care on drug pricing issues?
9         MS. MARTINEZ:  Objection, form.
10   A.   No.
11   Q.   Do you recall any discussion or
12  consideration within the Medicaid Bureau to contact
13  manufacturers about those issues?
14         MS. MARTINEZ:  Objection, form.
15   A.   No.
16   Q.   Were you given any instructions not to
17  contact manufacturers about those issues?
18         MS. MARTINEZ:  Objection, form.
19   A.   I don't recall.
20   Q.   If I can ask you to take out Exhibit 24
21  from the binders.  For the record, this is a
22  document dated October 2nd 1996 addressed to Mr.

29 (Pages 110 to 113)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 114

1  Vladek from Zack Bentley and Mark Jones. I ask you
2  to take a look at that first, Ms. Gaston, and then
3  I'll have some questions for you.
4      A.   (Reading.) I'm sorry. I'm looking at
5  the wrong thing.
6      Q.   Exhibit 24.
7      A.   Oh, I'm looking at -- yeah. Okay.
8           MS. MARTINEZ: It's upside-down. Here.
9  Do you want to use my book? Because my book is not
10 upside-down. There's a problem with that exhibit.
11          MR. TORBORG: There's what?
12          MS. MARTINEZ: There's a problem. It's
13 upside-down in my book so I'm giving her mine. Let
14 me see if I can follow this one that's backwards. I
15 can follow it backwards.
16          BY MR. TORBORG:
17     Q.   Again, my first question, Ms. Gaston, is
18 whether or not you recall this document.
19     A.   No, I don't.
20     Q.   At the top of the first page there's a
21 handwritten notation. Do you see that?
22     A.   Yes.

Page 115

1      Q.   It appears to say BO something backslash
2  MB. Do you know whose handwriting that is?
3      A.   No, I don't.
4      Q.   Do you know what MB stands for within
5  HCFA?
6           MR. WINGET-HERNANDEZ: Objection, form.
7      Q.   What is your understanding of the term?
8  When you see MB there what does it mean to you?
9      A.   I could guess that it's Medicaid Bureau.
10     Q.   Let me direct you to the first paragraph
11 of the letter. It says "Ven-A-Care of the Florida
12 Keys Inc. has attempted for more than seven years to
13 assist the Health Care Financing Administration and
14 the state Medicaid programs in limiting infusion and
15 inhalation pharmaceutical reimbursements to the
16 reasonable levels contemplated by the enabling
17 legislation." And this is dated October 2nd 1996.
18          Do you recall any efforts, any contacts,
19 with Ven-A-Care starting in the early 1990s or late
20 1980s, regarding the subject matter that I just
21 read?
22          MS. MARTINEZ: Objection, form.

Page 116

1      A.   No, I don't recall.
2      Q.   Is that because it's been some time that
3  you may have had those contacts?
4           MS. MARTINEZ: Objection, form.
5      A.   It could be.
6      Q.   The second paragraph refers to two
7  volumes of exhibits that "substantiate and support
8  the fact that Medicare and Medicaid programs are
9  continuing to make excessive reimbursements to
10 providers for infusion and inhalation
11 pharmaceuticals. These reimbursements are many
12 multiples over and above the amount that the
13 programs ever intended to pay."
14          Do you recall having a set of two volumes
15 of exhibits that had been prepared by Ven-A-Care?
16          MS. MARTINEZ: Objection, form.
17     A.   I don't recall.
18     Q.   Do you recall ever getting pricing
19 catalogs, pricing information from Ven-A-Care in the
20 form of pricing catalogs?
21     A.   I don't recall.
22     Q.   I'd like to ask you to go to the next

Page 117

1  page. I'm going to read in a paragraph that starts
2  after the indentation there. "Over a year ago."
3  Are you with me?
4      A.   Yes.
5      Q.   Ven-A-Care wrote "Over a year ago we
6  traveled to the HCFA in Baltimore and met with
7  various representatives of your agency and made a
8  detailed presentation regarding these excessive
9  reimbursements and their impact on the health care
10 delivery system. Unfortunately for the Medicare and
11 Medicaid programs as well as the American public to
12 date, no meaningful action has been either proposed
13 or implemented by your agency to deal with these
14 issues. We find this fact not only disconcerting
15 but potentially the source of a major embarrassment
16 to both your agency and to the administration." Do
17 you see that?
18     A.   Yes, I do.
19          MS. MARTINEZ: Objection, form.
20     Q.   Do you recall any action that CMS,
21 including the Medicaid Bureau, took to respond to
22 information that Ven-A-Care presented at the

                              30 (Pages 114 to 117)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                        Washington, DC

---

Page 118

1  Baltimore meeting in 1995?
2         MS. ALBEE:  Objection, form.
3     A.  No.
4     Q.  So as far as you know, Ven-A-Care was
5  correct that no meaningful action had been either
6  proposed or implemented by your agency to deal with
7  these issues?
8         MS. MARTINEZ:  Objection, form.
9     A.  I can't say that.
10    Q.  But you as you sit here today don't know
11 of any meaningful action that had been taken?
12    A.  I personally don't know, but that doesn't
13 mean that it didn't occur.
14    Q.  Sure.  And I'm just asking for your
15 personal knowledge as one of the two Medicaid
16 officials that was at the meeting?
17        MS. MARTINEZ:  Objection, form.
18    Q.  Do you recall discussing the possibility
19 of establishing federal upper limits for specific
20 drugs that Ven-A-Care had identified there being a
21 large difference between AWP and their cost?
22        MS. MARTINEZ:  Objection, form.

---

Page 119

1     A.  No, not on those specific drugs.  No.
2     Q.  Do you know why not?
3         MS. MARTINEZ:  Objection, form.
4     A.  I don't recall that being discussed.
5     Q.  Regarding Ven-A-Care's comment that "We
6  find this fact" -- the fact that no meaningful
7  action had been taken -- "not only disconcerting,
8  but potentially the source of a major embarrassment
9  to both your agency and to the administration," do
10 you recall that being a discussion within HCFA that
11 the Medicare and Medicaid programs paying above
12 acquisition cost could be a major source of
13 impairment for HCFA?
14        MS. MARTINEZ:  Objection, form.
15    A.  Do I recall a specific comment or -- is
16 that what you're saying?
17    Q.  Generally speaking do you recall that
18 sentiment being expressed ever?
19    A.  No, I don't.
20    Q.  I'd like to ask you to go to 483.  The
21 first full paragraph in the middle of the page
22 states "The drug manufacturers are further

---

Page 120

1  exploiting their ability" --
2     A.  I'm sorry.  Where are you.
3     Q.  I'm at page 483?
4         MS. MARTINEZ:  It's page 5 of the letter
5  and he's referring to the Bates label at the bottom
6  that says 483.
7         THE WITNESS:  Thank you.  Okay.
8     Q.  The first full paragraph starts with "the
9  drug manufacturers."  Are you with me?
10    A.  Uh-huh.
11    Q.  Ven-A-Care wrote "The drug manufacturers
12 are further exploiting their ability to falsify
13 pricing information by using their falsifications of
14 AWP as a marketing tool."  Do you have an
15 understanding of what Ven-A-Care is saying there?
16        MS. MARTINEZ:  Objection to form.
17        MS. ALBEE:  Objection to the form.
18    A.  You're asking me to interpret this?
19    Q.  I'm asking if you have any understanding
20 of what they're getting at there?
21        MS. MARTINEZ:  Objection, form.
22    A.  No.

---

Page 121

1     Q.  You have no understanding of what they're
2  saying about --
3     A.  Are you asking me what I feel this is
4  saying?
5     Q.  Yes.  Your understanding as someone who
6  might read this letter.
7         MS. MARTINEZ:  Objection, form.
8     A.  It's saying that they're falsifying their
9  AWP, their pricing, as a marketing tool.  So, I
10 mean, I don't know what more --
11    Q.  Do you have an understanding of how
12 pricing information could be used as a marketing
13 tool?
14        MS. MARTINEZ:  Objection, form.
15    Q.  Do you understand that concept?
16        MS. MARTINEZ:  Objection, form.
17    A.  Are you saying for just general sales or
18 are you talking about for Medicare and Medicaid for
19 reimbursement?
20    Q.  Do you think I'm talking about general
21 sales or do you think I'm talking about pharmacy
22 issues?

---

                 Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                    January 24, 2008
                              Washington, DC

Page 122

1     A.   That's what I'm asking you for
2 clarification.
3     Q.   The latter.  My questions are focused
4 on --
5     A.   Medicaid.
6     Q.   Medicaid pharmacy issues.  Yes.
7     A.   You want me to interpret what this
8 statement says --
9     Q.   I'm asking -- I'm trying to get your
10 understanding of what that sentence is.
11        MS. MARTINEZ:  Objection, form.
12     A.   I mean, I'm just interpreting this and it
13 could be completely wrong.  But it sounds like
14 they're falsifying the AWP.  If marketing -- if
15 they're talking about for Medicaid and Medicare,
16 it's for the reimbursement that's going to occur to
17 Medicare and Medicaid and that it's going to be a
18 higher reimbursement rate.
19     Q.   And are you familiar with the phrase
20 "marketing the spread"?
21     A.   I've heard of it.
22     Q.   And how have you heard of it?

Page 123

1     A.   We hear of it on the news.
2     Q.   In connection with Medicaid pharmacy
3 issues?
4     A.   I don't really get involved with that, so
5 it doesn't really mean much to me.
6     Q.   Are you familiar with the concept of
7 allegations that a drug manufacturer would market
8 the difference between AWP and acquisition price to
9 their customers to induce them to purchase their
10 drugs?  Is that a concept that you're familiar with?
11     A.   Yes.
12     Q.   When did you first learn about that
13 potential -- that that potentially was going on?
14     A.   Oh.  I don't know.  You asked me if I was
15 familiar with the term, which I am.  But --
16     Q.   But you're familiar with the concept,
17 correct?
18     A.   Yes.
19     Q.   And you don't recall when you first
20 learned about that potentially was going on; is that
21 right?
22     A.   I'm talking about the term, though.  I'm

Page 124

1 familiar with the term.  I don't know when I learned
2 the term.  I don't -- I don't have any dates for
3 that.  I don't know when I learned that.
4     Q.   Are you familiar with the concept?
5     A.   I'm familiar with the concept.
6     Q.   And do you know when you first learned of
7 the concept?
8     A.   No.
9     Q.   And is that because it's been some time
10 ago since you first learned about the concept?
11     A.   I can't say.
12     Q.   Because it's been so long ago; is that
13 right?
14        MS. MARTINEZ:  Objection, form.
15     A.   I guess.
16     Q.   To put a fine point on it, you can't tell
17 me when you first learned of the concept that drug
18 manufacturers are marketing spread because it's been
19 so long ago you can't remember; is that right?
20        MS. MARTINEZ:  Objection, form.
21        MS. ALBEE:  Objection, form.
22     A.   It could be, but it could also be that

Page 125

1 it's so vague.  It's not one particular thing that
2 occurred to put a date to.  It's a concept that's
3 used.  So it's hard to put a date on when you first
4 heard of the concept.
5        MR. TORBORG:  I'm going to do a couple
6 more and then -- do you guys want to take lunch at
7 12:00 or 1:00?  What do you guys want to do?  What's
8 your preference.
9        MS. MARTINEZ:  Let's ask the witness.  Do
10 you prefer lunch at 12:00 or 1:00?  Do you feel like
11 the boss for a moment?
12        MR. WINGET-HERNANDEZ:  It really is
13 entirely up to you.  You should do what you feel
14 comfortable doing.
15        THE WITNESS:  So you have enough to go to
16 1:00?
17        MR. TORBORG:  Oh, yes.  I have enough to
18 go all day.
19        THE WITNESS:  I mean, but is this a good
20 break time?
21        MR. WINGET-HERNANDEZ:  Yes.  If you want
22 to take a break it's a good time.

                                  32 (Pages 122 to 125)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

| Page 126 |
|---|

1        MS. MARTINEZ:  If you need a break you
2   tell us and if you want to take lunch at 12:00 you
3   tell us and if you want to take it at 1:00 you tell
4   us.
5        MR. TORBORG:  We can take a break now and
6   then talk about it if you'd like.  Let's take a
7   little break and then I'll make a decision.
8        THE VIDEOGRAPHER:  This is the end of
9   tape 2.  Off the record at 11:50.
10       (Recess.)
11       THE VIDEOGRAPHER:  This is the beginning
12  of tape 3 in the deposition of Ms. Gaston.  On the
13  record at 12:06.
14       BY MR. TORBORG:
15       Q.   Welcome back, Ms. Gaston.  I've asked you
16  to get out Abbott Exhibit 163.
17       MS. MARTINEZ:   And your servant, Ani
18  Martinez, is getting it for you.
19       MR. TORBORG:  Thank you, Ani.
20       Q.   For the record, Abbott 163 is a July 10th
21  1997 letter addressed to Mr. Vladek from Zachary
22  Bentley, T. Mark Jones and John Lockwood.

| Page 127 |
|---|

1        Ms. Gaston, if you would take a look at
2   that document and let me know if you've seen it
3   before.
4        A.   I don't recall.
5        Q.   Do you recall receiving any letters from
6   Ven-A-Care or being copied on or receiving a copy
7   of?
8        A.   I don't recall.
9        Q.   I take it you didn't have a file for
10  correspondence from Ven-A-Care?
11       A.   I may have.  I don't recall.
12       Q.   You just don't recall because it's been
13  so long ago?
14       MS. MARTINEZ:  Objection, form.
15       A.   Yes.
16       Q.   I'd like to ask you to go to the second
17  paragraph of Ven-A-Care's July 10th 1997 letter to
18  Mr. Vladek.  They wrote "We have been closely
19  monitoring your agency's recommended legislation.
20  No markup on drugs directed at remedying these
21  abuses in the Medicare program.  We have recently
22  been advised by Congressman Stark's office that this

| Page 128 |
|---|

1   proposal did not survive the House Ways and Means
2   markup session.
3        "Additionally you should be aware that
4   the Health Care Financing Administration failed to
5   offer or propose any recommendations that would have
6   addressed these abuses in the states' Medicaid
7   programs."  Do you see that?
8        A.   Yes.
9        Q.   And in the Medicaid Bureau of CMS,
10  correct?
11       A.   Correct.
12       Q.   Then known as HCFA, correct?
13       A.   Correct.
14       Q.   And were you aware of any recommendations
15  to address the issues raised by Ven-A-Care
16  concerning drug pricing that would affect the state
17  Medicaid programs?
18       MS. MARTINEZ:  Objection, form.
19       A.   I don't recall.
20       Q.   Do you recall any discussion of proposing
21  any recommendations?
22       A.   I don't recall.

| Page 129 |
|---|

1        Q.   Did you have individuals within the
2   Medicaid Bureau who worked on proposed regulations
3   or legislation?
4        A.   Yes.
5        Q.   Who were those people?  Do you recall?
6        A.   Estelle Chisholm and Mike Keough.
7        Q.   Anyone else?
8        A.   That's all I remember.
9        Q.   Do you recall ever CMS proposing any
10  legislation concerning how much state Medicaid
11  programs would pay for drugs?
12       MS. MARTINEZ:  Objection, form.
13       A.   I don't recall.
14       Q.   I'd like to ask you to flip to the next
15  page.  Ven-A-Care wrote "It would appear that HCFA's
16  vested attempt at a partial remedy has failed.
17  Nevertheless, HCFA has a duty and an obligation to
18  protect the integrity of the Medicare and states'
19  Medicaid programs to ensure that these programs are
20  'prudent purchasers' of health care goods and
21  services."
22       Do you agree with that, Ms. Gaston?

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 130

1       MS. MARTINEZ: Objection, form.
2    A.   What are you asking me to believe to?
3    Q.   Do you believe that HCFA had a duty and
4  obligation to protect the integrity of the Medicare
5  and states' Medicaid programs?
6       MS. MARTINEZ: Objection, form.
7    A.   Are you just asking me my opinion?
8    Q.   Yes.
9    A.   I would say yes.
10   Q.   And is it your understanding that Mr.
11  Reed shared that view?
12   A.   I can't speak for him.
13   Q.   Ms. Gaston, what is your view on what
14  HCFA's duty was when it came to the amount that
15  state Medicaid programs should be paying for
16  providers to dispense drugs to Medicaid
17  beneficiaries?
18      MS. ALBEE: Objection, form.
19      MS. MARTINEZ: Objection to form.
20   A.   Can you repeat the question?
21      MR. TORBORG: Would you repeat it?
22      (Whereupon, the requested portion was

Page 131

1  read by the reporter.)
2    A.   Are you asking me what HCFA's duty -- I
3  mean, what we did, we had state plan amendments that
4  we reviewed and we worked with the states.
5    Q.   Anything else?
6    A.   Like what?
7    Q.   I mean, was it HCFA's obligation to
8  enforce the federal regulations governing how much
9  states could pay for drugs?
10   A.   HCFA had the federal regulations. And we
11  worked with the states to assure this they were
12  adhering to the federal regulations.
13   Q.   Was it HCFA's obligation to ensure that
14  that was done?
15      MS. MARTINEZ: Objection, form.
16   A.   I can't answer that.
17   Q.   I'm going to ask you to go to Abbott
18  Exhibit 56. It would be a different orange binder.
19      MS. MARTINEZ: In the future you know
20  what would be awesome is that when you had an
21  exhibit if you actually knew the volume -- because
22  you've got almost like 20 volumes.

Page 132

1       MR. TORBORG: Yeah. I had actually asked
2  that that be done this morning, so we're working on
3  it.
4       MS. MARTINEZ: Okay.
5    Q.   For the record, Abbott Exhibit 56 is a
6  January 5th 1998 letter from Ven-A-Care addressed to
7  Janet Reno, June Gibbs-Brown and Donna Shalala. Ms.
8  Gaston, I'd ask that you take a look at that
9  document.
10   A.   (Reading.)
11   Q.   And let me know if you have ever seen
12  that document before.
13   A.   I don't recall seeing this.
14   Q.   I'd like to ask you to go to page 4 of
15  the letter has the Bates page ending 048.
16   A.   Okay.
17   Q.   The last paragraph -- let me read it into
18  the record and then ask you some questions about it.
19  Ven-A-Care wrote "Be advised that we continue to be
20  appalled and shocked by recent and past public
21  statements made by members of the executive branch
22  that the grossly excessive payments made by the

Page 133

1  Medicare and states' Medicaid programs for the
2  pharmaceuticals at issue are somehow legal waste and
3  are the result of some kind of 'loophole'." Do you
4  see that?
5    A.   Yes.
6    Q.   Do you recall that sentiment being
7  expressed in connection with Medicaid reimbursement
8  of drugs?
9       MS. MARTINEZ: Objection, drugs.
10   A.   I don't recall.
11   Q.   Do you recall the term "loophole" being
12  used in connection state Medicaid reimbursement of
13  drugs?
14      MS. MARTINEZ: Objection, form.
15   A.   I can't say.
16   Q.   You can't say because it's been some
17  time?
18   A.   I can't say because it's a word. A word
19  can be used. I can't say.
20   Q.   Do you recall the terms legal waste or
21  waste being used in connection with Medicare or
22  Medicaid payment for drugs?

Henderson Legal Services, Inc.

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                        January 24, 2008
                        Washington, DC

| Page 134 |
|---|

1       MR. WINGET-HERNANDEZ:  Objection, form.
2       MS. MARTINEZ:  Objection, form.
3   A.  I can't say.
4   Q.  You can't say because it's been some time
5  since the events on these issues transpired?
6       MS. MARTINEZ:  Objection.
7   A.  No.  I can't say just because of the
8  words.  They're very general in nature and I can't
9  say.
10   Q.  I'd like to ask you to flip one back, to
11  Abbott Exhibit 55.  This is a document titled
12  "remarks by the President in radio address to the
13  nation."  It appears to be from the White House
14  Office of the Press Secretary.  I'd ask you to take
15  a look at that and let me know if you're familiar
16  with these remarks.
17   A.  (Reading.)  I'm not familiar with this.
18   Q.  If I can direct you to the fourth
19  paragraph, it starts with "but we must do more."  Do
20  you see that?
21   A.  Yes, I do.
22   Q.  Mr. Clinton stated "But we must do more.

| Page 135 |
|---|

1  Sometimes the waste and abuses aren't even illegal;
2  they're just embedded in the practices of the
3  system.  Last week the Department of Health and
4  Human Services confirmed that our Medicare program
5  has been systemically overpaying doctors and clinics
6  for prescription drugs, overpayments that cost
7  taxpayers hundreds of millions of dollars.
8       "Such waste is simply unacceptable.  Now,
9  these overpayments occur because Medicare reimburses
10  doctors according to the public average wholesale
11  price, the so-called sticker price for drugs.  Few
12  doctors, however, actually pay the full sticker
13  price.  In fact some just pay one-tenth of the
14  published price."  Do you see that?
15   A.  Yes, I do.
16   Q.  Does that refresh your recollection at
17  all about whether or not you've seen --
18   A.  No.  It doesn't look familiar to me.
19   Q.  Do you recall any discussions at HCFA or
20  with state representatives that basing payment on
21  average wholesale price was something that was not
22  illegal; it was just embedded in the practice of the

| Page 136 |
|---|

1  system?
2       MS. MARTINEZ:  Objection, form.
3   A.  Are you asking if I've heard that term
4  or --
5   Q.  Have you heard that sentiment expressed?
6   A.  No.  I can't say.
7   Q.  With respect to the last sentence, "In
8  fact some pay just one-tenth of the published
9  price" -- do you see that?
10   A.  Yes, I see it.
11   Q.  Did you become aware of the fact that
12  there were times that the average wholesale price
13  could be ten times or more higher than what
14  providers were paying to acquire drugs?
15       MS. MARTINEZ:  Objection, form.
16   A.  Are you asking me specifically if I'm
17  aware of that?
18   Q.  Yeah.  Did you become aware of that?
19       MS. MARTINEZ:  Objection, form.
20   A.  I couldn't say.  It would depend on the
21  situation.
22   Q.  And what do you mean by that, depend on

| Page 137 |
|---|

1  the situation?
2   A.  I mean, I wouldn't -- unless it was
3  brought to my attention, I'm not aware of it.
4   Q.  But if there are documents that you
5  reviewed -- you may have reviewed documents that
6  would have expressed that information; is that
7  right?
8   A.  No, not that I'm aware of.
9   Q.  You don't recall?
10   A.  No, I don't recall.
11   Q.  Okay.  But you may have.  You just don't
12  recall because it's been some time.  Is that fair to
13  say?
14       MS. MARTINEZ:  Objection, form.
15   A.  I don't know.
16   Q.  Why don't you know?
17   A.  Because I don't know if that even
18  occurred.
19   Q.  Because it's been some time; is that
20  correct?
21   A.  Yes.
22   Q.  If you became aware of fraud in the

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

Gaston, Sue                                          January 24, 2008
                      Washington, DC

| Page 138 | Page 140 |
|---|---|

**Page 138**

1  Medicaid system are there steps that you're supposed
2  to take, Ms. Gaston?
3          MS. MARTINEZ:  Objection, form.
4      A.   Can you give me an example?
5      Q.   Have you received training or any
6  guidance about what someone in your position is
7  supposed to do if they learn of fraud in the
8  Medicaid system?
9      A.   I haven't received training.  I know that
10  the regional office have offices that deal with
11  fraud and CMS has an office that deals with fraud.
12      Q.   But are you aware of any guidance to you
13  about what you're supposed to do if you learn about
14  fraud in the Medicaid system?
15      A.   No.
16      Q.   Do you recall ever raising an issue
17  during your time at CMS about drug pricing being
18  fraudulent?
19      A.   Can you be more specific?
20      Q.   I'm asking a very broad question.
21      A.   Just general?
22      Q.   Yeah.

**Page 139**

1      A.   I don't recall specifically.
2      Q.   Do you recall anything generally?
3      A.   No.
4          MR. TORBORG:  Okay.  I'd like to mark
5  this as our next exhibit.
6              (Exhibit Abbott 454 was
7              marked for
8              identification.)
9      BY MR. TORBORG:
10      Q.   For the record, what I've marked as
11  Abbott Exhibit 454 bears the Bates numbers VAC MDL
12  64417 through 27.  Ms. Gaston, I ask you to take a
13  look at that document and tell me whether or not you
14  recall it.
15      A.   (Reading.)
16      Q.   For the record, this is a fax cover sheet
17  dated January 22nd 1998 from Zack Bentley and Mark
18  Jones to Congressman Pete Stark attaching a letter
19  of the same date from Ven-A-Care to Congressman
20  Stark.
21          MR. WINGET-HERNANDEZ:  David, do you
22  contend that this is all one document?

**Page 140**

1          MR. TORBORG:  I contend it's been
2  produced in the same Bates range.  I'm not here to
3  make contentions about documents.  I'm here to ask
4  questions of witnesses about documents.
5          MR. WINGET-HERNANDEZ:  Well, okay.  But
6  you have --
7          MR. TORBORG:  You can reserve your
8  objection if this gets made at trial.  Otherwise
9  don't interrupt my questioning.
10          MR. WINGET-HERNANDEZ:  You've marked a
11  document which you have attached the pages together
12  as though it's a single document when on its face it
13  shows that it's an eight page fax.  The document has
14  eleven pages in it.  I'm just asking you to clarify
15  that apparent mistake or confusion if you can.  If
16  you can't then that's fine.
17          MR. TORBORG:  I can't.  I didn't produce
18  them.
19          MR. WINGET-HERNANDEZ:  But did you attach
20  them?  Apparently you did.
21          MS. MARTINEZ:  Right.  Are you saying
22  these --

**Page 141**

1          MR. TORBORG:  I'm not making contentions
2  about documents.  I'm asking the witness about
3  documents.  You can reserve your objections on this
4  stuff.  It's wasting time.
5          MR. WINGET-HERNANDEZ:  Well, I object to
6  the attachment of this document to the deposition in
7  the form that it's been provided based upon the fact
8  that on the its face it shows it's supposed to be an
9  eight page document and it has more than eight pages
10  in it.  That's my objection.
11          MS. MARTINEZ:  Obviously the objection is
12  good for everybody on the plaintiff's side and the
13  United States has the same objection.
14      BY MR. TORBORG:
15      Q.   Ms. Gaston, are you familiar with this
16  document?
17      A.   No, I'm not.
18      Q.   If I can ask you to go to the Bates page
19  ending 419, there's a re: line titled "Suggested
20  Course of Action for You to Encourage HCFA to Take
21  Concerning the 22 Drugs Identified in the OIG Report
22  Entitled 'Excessive Medicare Payments for

                   Henderson Legal Services, Inc.
202-220-4158                     www.hendersonlegalservices.com

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 142

1  Prescription Drugs.'"  And it gives a number and a
2  date.
3          In the first paragraph, Ven-A-Care wrote
4  "As you may be aware, in September 1995 we met with
5  representatives from the OIG and HCFA in Baltimore
6  to discuss and present evidence of the fact that the
7  Medicare and states' Medicaid programs were
8  unwittingly making excessive reimbursements for
9  certain infusion, injectable and inhalation drugs."
10         That's the meeting we saw earlier that
11 looked like you attended; is that right?
12         MS. MARTINEZ:  Object to form.
13     A.  That meeting was in '95.
14     Q.  It goes on, "During that meeting we were
15 shocked by certain statements made by certain HCFA
16 officials concerning their understanding that the
17 term 'AWP' had never been legislatively or
18 administratively defined by the federal government."
19         Ms. Gaston, does that refresh your
20 recollection at all regarding any conversation about
21 that subject that occurred in the Baltimore meeting
22 with Ven-A-Care in 1995?

Page 143

1      A.  No.
2      Q.  Do you recall that subject ever being
3  discussed within HCFA, the fact that AWP, that term,
4  had never been legislatively or administratively
5  defined?
6      A.  I don't recall.
7      Q.  You don't recall any discussions about
8  that issue?
9      A.  I don't recall.
10     Q.  And is that because it's been some time
11 since both the September 1995 meeting as well as
12 your time dealing with these issues?
13         MS. MARTINEZ:  Objection, form.
14     A.  It could be.
15     Q.  If I could ask you to go to the next
16 page.  Ven-A-Care wrote "We contacted an official at
17 the Bureau of Labor Statistics, Department of
18 Commerce, whose branch of government also uses the
19 words average wholesale price and the term AWP.
20 When we asked if the Commence Department had ever
21 defined the words 'average wholesale price' or the
22 term 'AWP,' the official stated 'Mr. Bentley, I

Page 144

1  don't mean to be rude, but what is it exactly that
2  you don't understand about the words average,
3  wholesale, and price and/or the words average
4  wholesale price put together as AWP?'"  Do you see
5  that?
6      A.  Yes, I do.
7          MS. MARTINEZ:  Objection, form.
8      Q.  Do you recall there ever being any
9  discussion of any issue within HCFA about what the
10 term AWP meant?
11         MS. MARTINEZ:  Objection, form.
12     A.  Can you be more specific?  Just what it
13 means?
14     Q.  Yeah.
15     A.  There may have been discussions.  I don't
16 remember any specific discussions.
17     Q.  Do you remember -- when you used the word
18 or the phrase "average wholesale price," what did
19 you understand it to mean?
20         MS. ALBEE:  Objection, form.
21     A.  Average wholesale price was a price that
22 we used along with the direct price or the WAC price

Page 145

1  for determining the FULs.  It really wasn't our
2  place -- for me when I'm working on the FULs -- to
3  get into defining it.  I'm looking at it for FULs
4  purposes.
5      Q.  And where did you look to get average
6  wholesale prices?
7          MS. MARTINEZ:  Objection, form.
8      A.  The three prices the average wholesale
9  price, direct price and the wholesale acquisition
10 cost, was provided to us by the compendia sources.
11     Q.  That would be Blue Book, Red Book and
12 Medi-Span?
13     A.  Correct.
14     Q.  And when you use the term average
15 wholesale price and when you saw it used by others
16 such as in state plans, that's what you understood
17 the term to meant; is that right?
18         MS. MARTINEZ:  Objection, form.
19     A.  You mean to mean -- not defining it, but
20 how I use it?
21     Q.  Yeah.  It meant what was in Blue Book,
22 Red Book and other compendia?

37 (Pages 142 to 145)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                     January 24, 2008
                    Washington, DC

Page 146

1    A.   It's a price that's provided in the
2  compendia.
3    Q.   And that's what you understood the term
4  to mean; is that right?
5        MS. MARTINEZ:  Objection, form.
6    A.   I wasn't defining it.  It's a price.
7    Q.   I'm not asking you to define it.  I'm
8  asking you to tell me what was your understanding of
9  what AWP meant.
10        MS. MARTINEZ:  Objection, form.
11    A.   It was a price that was submitted by the
12  manufacturers and -- just like direct price and
13  wholesale acquisition cost.
14    Q.   And it was something that you found in
15  the compendia?
16    A.   Correct.
17        MR. TORBORG:  We'll mark this as our next
18  exhibit.
19             (Exhibit Abbott 455 was
20              marked for
21              identification.)
22        BY MR. TORBORG:

Page 147

1    Q.   Ms. Gaston, what I've marked as Abbott
2  Exhibit 455 bears the Bates numbers HHD 101-1266
3  through 85.  It appears to be a letter dated
4  September 27th 2001 from Janet Rehnquist, Inspector
5  General, to Thomas Scully, subject: OIG final
6  report, "Medicaid's use of revised average wholesale
7  prices."  And then it attaches a copy of that
8  report, as well as some other documents I'll be
9  asking you about.
10        I ask you to take a look at that and let
11  me know if you're familiar with this document.
12    A.   (Reading.)  Okay.
13    Q.   Ms. Gaston, do you recall this particular
14  OIG report?
15    A.   It looks familiar.
16    Q.   Do you recall an effort that the
17  Department of Justice made in connection with NAMFCU
18  to develop revised average wholesale pricing for
19  certain prescription drugs that occurred in the time
20  period of the late '90s and early 2000, 2001?
21        MS. MARTINEZ:  Objection, form.
22    A.   Yes.

Page 148

1    Q.   Do you have a name you use for that
2  project that you and I can understand each other if
3  we talk about it later?
4    A.   No.
5    Q.   If I call it the DOJ AWP project will you
6  understand what I'm talking about?
7    A.   You can call it that.  That would be
8  fine.
9    Q.   That's not a term you used, but it's a
10  term if I use it today you'll understand what I
11  mean?
12    A.   That's fine.
13    Q.   I'd ask you if you would to go to the
14  second-to-last page in the document, Bates page
15  ending 284.  It's a page titled "action item number
16  6."  Then it also says "record of sign-offs."  And I
17  see your name there.
18    A.   Correct.
19    Q.   Can you tell me what this document is and
20  what it's signifying?
21    A.   My recollection, this is probably a cover
22  sheet to a control.  And you sign off if -- I

Page 149

1  guess -- to the response, I'm guessing.  It could be
2  to the response to the OIG report.
3    Q.   And does the fact that your name is
4  listed there under cleared by, or next to cleared
5  by -- what does that mean?
6    A.   It means that I probably had some input
7  into the response.
8    Q.   Into the response to the OIG report?
9    A.   Correct.
10    Q.   And other people are -- is the next one
11  Reed?
12    A.   Correct.
13    Q.   Any idea what the other ones are, based
14  on either your ability to read handwriting better
15  than me and your knowledge of who the people would
16  be?
17    A.   I'm not sure of the next one.  The other
18  one says PCPG, which is -- generally they do more
19  the administrative work.  And OCD would be I would
20  say the center director's office.  But I don't know
21  whose names they were.
22    Q.   What is the center -- what does OCD --

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 150

1    A.   I would say OCD. I'm guessing. But I
2  would say that it would be the center director. So
3  it could be maybe up to the Medicaid directors.
4    Q.   Medicaid directors within HCFA?
5    A.   Within CMSO. And here again, I'm not
6  sure. Office center director.
7    Q.   So that could be someone like Dennis
8  Smith maybe?
9    A.   It could be.
10   Q.   Do you know what the CMSO/FCHPG would be?
11   A.   Family and Children's Health Programs
12  Group.
13   Q.   Any idea --
14   A.   That's the group that Larry was under.
15  The policy area was under that group.
16   Q.   Any idea who that name might be next to
17  it?
18   A.   No.
19   Q.   Do you recall attending the -- do you
20  recall that there were exit and entrance conferences
21  for various OIG reports?
22   A.   Yes.

Page 151

1    Q.   Do you recall ever attending those?
2    A.   Yes.
3              (Exhibit Abbott 456 was
4              marked for
5              identification.)
6         BY MR. TORBORG:
7    Q.   For the record, what I've marked as
8  Abbott Exhibit 456 bears the Bates number HHD
9  042-0164. Do you have an understanding of what this
10  document is, Ms. Gaston?
11   A.   It looks like a meeting participant list.
12   Q.   And you're familiar with these type of --
13  this type of document in your work?
14   A.   Yes.
15   Q.   And is your name listed there third from
16  the bottom?
17   A.   Yes.
18   Q.   Is that your handwriting?
19   A.   Yes, it is.
20   Q.   Do you recall attending the exit
21  conference for the OIG project Medicaid's use of
22  revised AWP?

Page 152

1    A.   I don't recall.
2    Q.   You indicated earlier that you believe
3  that the Bates page ending 1284 on Abbott Exhibit
4  455 may indicate you had some input into the
5  comments to the report; is that right?
6    A.   Correct.
7    Q.   Tell me about how that process works, how
8  comments are made, what review they undergo, that
9  practice.
10   A.   The process?
11   Q.   Yes.
12   A.   If we receive an OIG report and we have
13  to review it and make comments on it, whoever it's
14  assigned to, we would do whatever research needed to
15  be performed and do a draft of our comments and then
16  give it to Larry Reed for him to review. And then a
17  final will be prepared and forwarded up through the
18  channels up to -- generally up to the center
19  director's office.
20   Q.   And the center director's office would
21  be --
22   A.   Like a Dennis Smith.

Page 153

1    Q.   -- a Dennis Smith type?
2         When did Dennis Smith start at the
3  Medicaid Bureau or at CMSO?
4    A.   I don't recall.
5    Q.   But you recall the comments would
6  initially be drafted by someone at your level and
7  then they would be forwarded up to Mr. Reed?
8    A.   Correct.
9    Q.   You don't recall Mr. Reed doing a first
10  draft of any comments; is that fair to say?
11        MS. MARTINEZ:  Objection to form.
12   Q.   That wasn't the practice?
13        MS. MARTINEZ:  Objection to form.
14   A.   That wasn't the practice.
15   Q.   Then Mr. Reed would review it and approve
16  it; is that right? And then he would send it on to
17  the center director's office?
18   A.   I think there were other offices that we
19  had to -- the group. And sometimes I guess it
20  would -- I'm not sure because my recollection isn't
21  that clear. But generally if something filters up
22  to the center director's office, it has to go to the

39 (Pages 150 to 153)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                       January 24, 2008
                    Washington, DC

Page 154

1  next channel, which would be the group director.
2  And then from the group director up to the center
3  director's office.
4     Q.   So is it fair to say a lot of steps go
5  into the process of the comments that CMS provides
6  to an OIG report?
7     A.   Correct.
8     Q.   A lot of review is done for the accuracy
9  and appropriateness of the comments; is that fair to
10 say?
11         MR. WINGET-HERNANDEZ:  Objection, form.
12         MS. MARTINEZ:  Objection, form.
13    A.   I couldn't say.
14    Q.   But in your view it was something that
15 CMS took pretty seriously?
16         MR. WINGET-HERNANDEZ:  Objection, form.
17         MS. MARTINEZ:  Objection, form.
18    A.   I can only speak for myself.
19    Q.   Okay.
20    A.   I take it seriously.
21    Q.   Now, if we look at the comments -- and
22 let me make sure I get this straight.  The process

Page 155

1  that you were talking about, that relates to the
2  comments that were given to a draft report?  That's
3  when you first get the opportunity to do comments,
4  right?  You get a copy of OIG's draft report, you
5  make comments and OIG may modify its report based on
6  your comments?
7     A.   Correct.
8     Q.   Right?  If we go to Bates page 1281 of
9  Abbott Exhibit 455, can you tell us what this
10 document is?  This and the next page.
11    A.   It looks like a letter to the OIG from
12 our -- is it deputy administrator? -- with the draft
13 comments.
14    Q.   When you say draft comments, what do you
15 mean by that?  You mean comments on a draft report?
16    A.   Correct.
17    Q.   And do you remember a man by the name of
18 Reuben King-Shaw Jr.?
19    A.   Yes.
20    Q.   He was a deputy administrator?
21    A.   Correct.
22    Q.   Chief operating officer?

Page 156

1     A.   Yes.
2     Q.   So did he work underneath Dennis Smith?
3     A.   No.  He was the deputy to the
4  administrator.
5     Q.   So he was above Dennis Smith?
6     A.   Correct.
7     Q.   Did you ever meet with Mr. King-Shaw?
8     A.   No.
9     Q.   And here he's providing CMS's comments to
10 this report; is that right?
11    A.   That's what it appears to be.
12    Q.   And you're -- let me ask you this.  Do
13 you recall drafting comments, at least a draft
14 version of comments, to this particular OIG report?
15    A.   I don't remember.
16    Q.   But you believe that you may have had
17 input into it?
18    A.   I may have.
19    Q.   Okay.  Why don't with you look at this a
20 second.  Mr. King-Shaw's memo states "Thank you for
21 the opportunity to review and comment on the
22 above-referenced draft report regarding state

Page 157

1  Medicaid's use of revised average wholesale prices
2  (AWPs) for certain prescription drugs.
3  Investigative findings by the Department of Justice
4  and the National Association of Medicaid Fraud
5  Control Units (NAMFCU) reveal that some drug
6  manufacturers were reporting inflated average
7  manufacturer prices for certain drug products.
8         "As a result, actual wholesale pricing
9  data were collected for approximately 400 national
10 drug codes representing 51 drugs."  And you recall
11 that project, right?
12         MS. MARTINEZ:  Objection, form.
13    A.   It looks familiar, but I don't recall --
14 I don't recall the details.
15    Q.   The second paragraph states "While there
16 were no recommendations noted in this report, the
17 Centers for Medicare and Medicaid Services agreed
18 with OIG's conclusion that reliance on the reported
19 AWPs by drug manufacturers as a basis for drug
20 reimbursement is problematic."  Do you see that?
21    A.   Yes, I do.
22    Q.   And that something that you agreed with

Henderson Legal Services, Inc.

Gaston, Sue                                    January 24, 2008
                    Washington, DC

---

**Page 158**

1  at the time?
2      A.   I can't remember.
3      Q.   The next sentence says "Additionally, we
4  acknowledge OIG's comments and earlier reports
5  regarding the shortcomings of using AWPs as a basis
6  for reimbursement and will continue to look for
7  administrative and legislative solutions to this
8  problem."  Do you recall efforts that the Medicaid
9  Bureau or CMSO took in looking for administrative
10 and legislative solutions to this problem?
11     A.   I don't remember.
12     Q.   Let's go to the next page, if you would.
13 The paragraph states "The OIG concludes that because
14 most states base their reimbursement for drugs on
15 AWPs, inflated AWPs have 'caused Medicaid to overpay
16 for these products.'"  And it says, paren, "See
17 pages little I conclusion and 9 first paragraph."
18 You understand that that's referring to language
19 that was in a draft report?
20     A.   If you say so.
21     Q.   Well, I'm just asking your interpretation
22 of that.  That's what it looks like to you?  This

---

**Page 159**

1  memo --
2      A.   Yeah.  It appears that's what it's
3  referencing.
4      Q.   And let's go back to the first paragraph
5  of the letter.  It says "Thank you for the
6  opportunity to review and comment on the above-
7  referenced draft."  Do you see that?
8      A.   Okay.
9      Q.   Does that suggest to you the language
10 here that we just talked about was contained in a
11 draft OIG report?
12     A.   Yes.
13     Q.   And then it continues on "Since the
14 regulations and relevant state plans authorize
15 payment for drugs based on AWPs, regardless of
16 whether those prices are inflated, we have concerns
17 with the statement that states and Medicaid have
18 'overpaid for drugs.  We therefore recommend that
19 the sentence on pages little I, penultimate
20 paragraph, second sentence, and 9, first paragraph,
21 second sentence, be deleted."  Do you see that?
22     A.   I do.

---

**Page 160**

1      Q.   Did I read it correctly?
2      A.   Yes.
3      Q.   Do you recall being involved in drafting
4  this language?
5      A.   I don't recall.
6      Q.   Do you have an understanding of what it's
7  saying?
8      A.   Yes.
9      Q.   Can you tell me in your words what you
10 understand it to be saying?
11     A.   That the comments are saying they have a
12 concern over the statement saying overpaid and they
13 wanted it deleted from the comments, from that part
14 of the OIG report.
15     Q.   And why did CMS have a concern with use
16 of the term overpayment or overpay?
17         MS. ALBEE:  Objection, form.
18     A.   Yeah.  I can't speak for them.  I don't
19 know if this was language I prepared or who
20 prepared.  So I can't speak to it.
21     Q.   As you read it here today what do you
22 take it to mean?

---

**Page 161**

1      A.   That they have an objection to the word
2  overpaid and they don't want that in the report.
3      Q.   Because the regulations in the relevant
4  state plans authorize payment for drugs based upon
5  published average wholesale prices, correct?
6          MS. ALBEE:  Objection, form.
7          MS. MARTINEZ:  Objection, form.
8      Q.   That's when it says, right?  I'm not
9  making that up.
10         MS. MARTINEZ:  No.  That's not what it
11 says.
12     A.   Yeah.  The state plans say --
13         MS. MARTINEZ:  I just want to say for the
14 record --
15         MR. TORBORG:  No.
16         MS. MARTINEZ:  You misread it.  The word
17 "published" is not in there.  The word "published"
18 is not in there.  And you read it into it.
19         MR. TORBORG:  Okay.
20         BY MR. TORBORG:
21     Q.   When you saw the words AWPs there, you
22 thought it referred to published AWPs, did you not?

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                        Washington, DC

Page 162

1    A.   Yes.
2    Q.   And it says that "The regulations and
3  relevant state plans authorize payment for drugs
4  based on AWPs regardless of whether those prices are
5  inflated."  Do you see that?
6    A.   Yes.
7    Q.   And what did you understand the term
8  "inflated" to mean?
9    A.   Inflated?  Higher than what they should
10  be.
11    Q.   And this particular inflation -- this
12  particular project relates to some 400 national drug
13  codes that were part of the DOJ AWP effort, correct?
14       MS. MARTINEZ:  Objection, form.
15    A.   Yes.
16    Q.   And this is saying, is it not, that even
17  though prices for these NDCs may be inflated, state
18  Medicaid programs are not "overpaying" for these
19  drugs because the regulations and state plans
20  authorize payment for these drugs based upon the
21  inflated AWPs for those drugs, is it not?
22       MS. MARTINEZ:  Objection, form.

Page 163

1       MS. ALBEE:  Objection, form.
2    A.   Are you waiting for me?
3    Q.   Yes.
4    A.   I'm sorry.  Can you repeat that?
5    Q.   And this is saying, is it not, that even
6  though prices for these NDCs may be inflated, state
7  Medicaid programs are not "overpaying" for these
8  drugs because the regulations and state plans
9  authorize payment for these drugs based upon the
10  inflated AWPs for those drugs, is it not?
11    A.   And you're saying that's what this is
12  saying?
13    Q.   Yes.  Is that how you interpret it?
14       MS. MARTINEZ:  Objection, form.
15       MS. MILLER:  Objection, form.
16    A.   I'd prefer not to answer that because
17  you're asking me to interpret this.
18    Q.   I'm asking for your interpretation as
19  someone who appears to have been involved in the
20  drafting of the document.
21       MS. MARTINEZ:  Objection, form.
22    A.   Right.  But you're asking me -- this has

Page 164

1  been so long ago that --
2    Q.   I'm asking for your interpretation today.
3       MR. WINGET-HERNANDEZ:  Objection, form.
4    A.   I have to ask you to read your question
5  again.
6    Q.   This is saying, is it not, that even
7  though prices for these NDCs may be inflated, state
8  Medicaid programs are not "overpaying" for these
9  drugs because the regulations and state plans
10  authorize payments for these drugs based upon the
11  inflated AWPs for those drugs, is it not?
12       MS. MARTINEZ:  Objection, form.
13       MS. ALBEE:  Objection, form.
14    A.   I don't think they were saying they were
15  overpaying.  I think they want that word "overpaid"
16  in there to imply that.  But I don't think it's
17  coming out and saying that they weren't overpaying.
18    Q.   Why is your objection to the word
19  "overpaid"?
20    A.   I don't know.  They're saying it in here
21  they want it removed.  So I'm just repeating what's
22  said in the document.

Page 165

1    Q.   What do you understand the term
2  "overpaid" to mean?
3    A.   Paying too much.
4    Q.   Paying too much based upon the relevant
5  law at the time?
6       MS. MARTINEZ:  Objection, form.
7    A.   You want to say law.  Maybe.  I don't
8  know.  I can guess.  Paying -- I can't say
9  specifically.  I can't interpret this.  But
10  overpaying --
11    Q.   I'm asking for your interpretation here
12  today.
13    A.   Paying more than what they should be
14  paying.
15    Q.   And this comment is saying that in
16  essence OIG's report should not say that paying for
17  these drugs based on inflated AWPs was paying more
18  than they should be paying, is it not?
19       MS. MARTINEZ:  Objection, form.
20       MS. ALBEE:  Objection to form.
21    A.   It may be saying that, but it sounds like
22  they just want the word "overpaid" removed from

42 (Pages 162 to 165)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
               Washington, DC

Page 166

1  there because the comments have more in there than
2  just that one sentence.
3      Q.   You indicated earlier -- you can put that
4  away.
5          You indicated earlier that in your work
6  at CMS you understood the term average wholesale
7  price to mean prices published in Blue Book, Red
8  Book or other compendia, correct?
9          MS. MARTINEZ:  Objection, form.
10     A.   Correct.
11     Q.   And that is in fact how many state plans
12  specifically defined the term average wholesale
13  price; am I right?
14         MS. MARTINEZ:  Objection, form.
15     A.   I don't know what you mean by defined it.
16  They use AWP in their pricing.
17     Q.   And when you saw states using AWP in
18  their pricing you understood them to be referring to
19  prices in Blue Book, Red Book or other compendia,
20  correct?
21         MS. MARTINEZ:  Objection, form.
22     A.   I don't know whether they get their AWPs

Page 167

1  from.  I know where I get the AWPs, direct price and
2  wholesale acquisition cost, from those three
3  compendia sources.  But I don't know specifically if
4  the states use those sources also.
5      Q.   You're familiar with -- let me mark a
6  document.
7          (Exhibit Abbott 457 was
8              marked for
9              identification.)
10     BY MR. TORBORG:
11     Q.   Ms. Gaston, I've handed you a copy of
12  what's been marked HHC 008-0083.  It's titled "state
13  plan under title 19 of the Social Security Act."
14  The state is indicated as Tennessee.  And there's
15  language in the upper right-hand corner that says
16  attachment 4.19B.
17         My question to you, Ms. Gaston, is
18  whether or not you're familiar with this type of
19  document.
20     A.   Yes.
21     Q.   And what is this type of document?
22     A.   It's a page from a state's state plan

Page 168

1  amendment.
2      Q.   And what is a state plan amendment?
3      A.   A state plan amendment is sort of a
4  snapshot of the state's Medicaid program.  And they
5  submit this to CMS.
6      Q.   If we look at section 12 under prescribed
7  drugs there's a paragraph B there.  Do you see that?
8      A.   Yes.
9      Q.   It says "EAC is defined as Blue Book
10  published average wholesale price (AWP) minus 8
11  percent for legend drugs except for DEA schedule II
12  drugs which shall be Blue Book published AWP."  Do
13  you see that?
14     A.   Yes.
15     Q.   So in this state plan they specifically
16  defined AWP in reference to the Blue Book, correct?
17     A.   Right.
18     Q.   And when you reviewed state plans at
19  HCFA, when you saw the term AWP you believed they
20  were referring to what was in Blue Book or other
21  compendia, correct?
22         MS. ALBEE:  Objection, form.

Page 169

1          MS. MARTINEZ:  Objection, form.
2      A.   Like I said, I don't know where they get
3  their AWP from.  It doesn't -- it wouldn't concern
4  me if they detail it in a state plan
5  amendment, that's fine.  But what we're looking at
6  is their methodology they're submitting to CMS.
7      Q.   Okay.  You can put that to the side.
8          When you started working in the pharmacy
9  area, Ms. Gaston, of CMS starting in 1991, had you
10  had any prior experience with Medicaid's payment for
11  drugs?
12     A.   No.
13     Q.   Did you receive any reports or other
14  information to educate yourself about the issues
15  that you would be confronting in your new job?
16     A.   No.
17     Q.   You can say for certain that you did not
18  review any background material at all?
19     A.   When I was interviewed by Larry he gave
20  me a copy of -- it was like the law, but it
21  wasn't -- it was the new legislation, so it was
22  something pertaining to the law.  That was it.

                            43 (Pages 166 to 169)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                      Washington, DC

Page 170

1    Q.   Do you recall reviewing any reports from
2  the Office of Inspector General?
3    A.   No, I don't.
4    Q.   Can you say for certain that you did not
5  review them?
6    A.   Is this before I was hired?
7    Q.   After you were hired and started working
8  in your job.
9    A.   Oh.  Then what was your question?
10   Q.   Did you review reports from the Office of
11 Inspector General relating to reimbursement of
12 drugs?
13   A.   Yes.
14        MS. MARTINEZ:  Objection, form.  Are you
15 asking about the entire '91 to 2003 period, or
16 specifically right in '91 when she started?  Because
17 you were going to that early period and then you
18 seemed to open it up.
19   Q.   I'd like to ask you to go to Exhibit 307
20 in your book.
21        MS. MARTINEZ:  Counsel, you're planning
22 on breaking maybe within the next 10 or 15 minutes

Page 171

1  or something?
2        MR. TORBORG:  Why don't we just go ahead
3  and take our lunch break now.  Would you like to do
4  that, Ms. Gaston?
5        THE WITNESS:  Sure.
6        MR. TORBORG:  Why don't we take our lunch
7  break now.
8        THE VIDEOGRAPHER:  This is the end of
9  tape 3.  Off the record at 1:02.
10       (Whereupon, at 1:02 p.m. a lunch recess
11 was taken.)
12
13
14
15
16
17
18
19
20
21
22

Page 172

1       A F T E R N O O N   S E S S I O N
2            (2:04 p.m.)
3          *  *  *  *  *
4    Whereupon,
5            SUE GASTON,
6    the witness testifying at the time of
7  recess, having been previously duly sworn,
8  was further examined and testified as
9  follows.
10         *  *  *  *  *
11        THE VIDEOGRAPHER:  This is the beginning
12 of tape 4 in the deposition of Ms. Gaston.  On the
13 record at 2:04.
14      EXAMINATION RESUMED BY COUNSEL FOR THE
15            ABBOTT LABORATORIES
16      BY MR. TORBORG:
17   Q.   Welcome back, Ms. Gaston.
18   A.   Thank you.
19   Q.   At the time we broke I had asked you to
20 flip to Abbott Exhibit 307 in the orange binders.
21 And this appears to me to be an action transmittal
22 that contains a report from the HHS Office of

Page 173

1  Inspector General.  And have you had a chance to
2  look at this document to tell me whether or not you
3  have seen this before?
4    A.   I've glanced at it, and it doesn't look
5  familiar.
6    Q.   If I could ask you to go then to Abbott
7  Exhibit 81 in the orange binders.  Ms. Gaston, I ask
8  that you take a look at that document.  It's titled
9  "Prescription Drug Prices: Are We Getting Our
10 Money's Worth?  A Majority Staff report of the
11 Special Committee On Aging in the United States
12 Senate," dated in 1989.
13   A.   (Reading.)  This doesn't look familiar.
14   Q.   I'd like to ask you to go to page 10 of
15 the study.  There's no Bates numbers on it but I
16 think you'll see the page number is on the actual
17 document if you go in a few pages.  Were you able to
18 find it?
19   A.   Yes.
20   Q.   Specifically I draw your attention to
21 finding 7.  Do you see that at the bottom of the
22 page?

                              44 (Pages 170 to 173)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

---

Page 174

1    A.  Yes.
2    Q.   Where it states "There are two markets in
3  the United States for most big-selling prescription
4  drugs: a price competitive market characterized by
5  deep discounts off the published list price, and a
6  high-priced market where retail customers, Medicare
7  and Medicaid purchase those prescription drugs."  Do
8  you have an understanding of what that finding is
9  saying, Ms. Gaston?
10   A.  No.
11   Q.   If we go, please, to page 11, under the
12 first bullet there is a bullet that's discussing the
13 Department of Veterans Affairs.  Do you see that?
14   A.  Yes, I do.
15   Q.   The first paragraph under that bullet, I
16 guess subparagraph, states "DVA" -- which is defined
17 above as the Department of Veterans Affairs --
18 "achieves an average discount of 41 percent off the
19 manufacturer's published 'average wholesale price'
20 for single source drugs (those still under patent),
21 and an average of 67 percent off the published AWP
22 for multiple source drugs."  Do you see that?

---

Page 175

1    A.  Yes.
2    Q.   Do you recall becoming aware of that
3  finding during the course of your work at CMS?
4    A.  No, I don't.
5    Q.   Did your office receive copies of reports
6  prepared by the General Accounting Office or other
7  congressional committees?
8        MS. MARTINEZ:  Objection, form.
9    Q.   Or congressional committees?
10       MS. MARTINEZ:  Objection, form.
11   A.  We received GAO reports.
12   Q.   And was it your practice to review those
13 reports?
14       MS. MARTINEZ:  Objection, form.
15   A.  At times.  Not every report.
16   Q.   If it related to Medicaid payment for
17 prescription drugs, would that be something that in
18 your practice you would have reviewed?
19   A.  It's possible.
20   Q.   Finally in the last paragraph, page 11,
21 the last bullet states "Hospitals, health
22 maintenance organizations and nursing homes that

---

Page 176

1  contract with wholesalers to purchase prescription
2  drugs from a predetermined list are able to achieve
3  discounts of up to 99 percent off manufacturer's
4  published 'average wholesale price' even for brand
5  name drugs."  Do you see that?
6    A.  Yes, I do.
7    Q.   Did you become aware of that during your
8  work at CMS?
9    A.  No.
10   Q.   How do you know that you did not become
11 aware of it, as opposed to just you may have known
12 about it but forgot about it?
13       MS. MARTINEZ:  Objection, form.
14   A.  It doesn't sound familiar to me.
15   Q.   But you may have become aware of it, you
16 just don't remember today?
17       MR. WINGET-HERNANDEZ:  Objection, form.
18       MS. MARTINEZ:  Objection, form.
19   A.  It doesn't sound familiar to me.
20   Q.   Did you at some point learn that
21 hospitals, health maintenance organizations and
22 nursing homes received deeper discounts in

---

Page 177

1  purchasing drugs?
2    A.  I'm not aware of that.
3    Q.   That's not something you recall being
4  discussed in any OIG reports?
5    A.  I don't recall.
6    Q.   I'd like to ask you to go to Abbott
7  Exhibit 129.  Abbott Exhibit 129 is an OIG report
8  titled "Comparison of Reimbursement Prices for
9  Multiple Source Prescription Drugs in the United
10 States and Canada" bearing the report number
11 OEI-03-91-00470.  Do you have an understanding of
12 what that number signifies, Ms. Gaston?
13   A.  The report number?
14   Q.   Yes.
15   A.  No.
16   Q.   If you would go to the last page of this
17 document, the second-to-last page, there's a comment
18 there, a memo from Richard Kusserow dated March 12th
19 1991.  Do you see that?
20   A.  Yes.
21   Q.   I just wanted to put a time frame in mind
22 regarding this report.  Would you take a look at

---

45 (Pages 174 to 177)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                          Washington, DC

| Page 178 | Page 180 |
|---|---|

**Page 178**

1  this report and let me know if it's something that
2  you recall reviewing?
3      A.   You said to Kusserow? Okay. And you're
4  talking about the one from Kusserow?
5      Q.   I'm sorry. I'm asking you to take a look
6  at the actual OIG report that starts at the
7  beginning of the document. Does the front page of
8  your document say "comparison of reimbursement
9  prices"?
10     A.   Yes.
11     Q.   If you would take a look at this OIG
12  report and let me know if you recall reviewing it
13  before, the actual report, not just the memo.
14     A.   (Reading.) No. I don't remember this
15  report.
16     Q.   From your glance does the document appear
17  to compare government reimbursement prices for
18  multiple source drugs in the United States and
19  Ontario, Canada?
20     A.   That's what it appears to be doing.
21     Q.   And does it appear to relate to the
22  Medicaid program?

**Page 179**

1      A.   Yes.
2      Q.   That is not something that you recall at
3  all; is that right?
4      A.   Correct.
5      Q.   Do you recall in your work at CMS any
6  discussion of drug pricing information available in
7  Canada?
8      A.   Yes.
9      Q.   Tell me what you recall about that.
10     A.   I just remember that we had someone, a
11  visitor, come in and talk about how Canada -- the
12  drug pricing in Canada.
13     Q.   Do you recall who that visitor was?
14     A.   No.
15     Q.   Do you recall when that visit happened?
16     A.   No.
17     Q.   Do you recall who else was at the
18  meeting?
19     A.   Larry Reed.
20     Q.   Anyone else?
21     A.   I don't recall.
22     Q.   So at least yourself and Larry Reed,

**Page 180**

1  correct?
2      A.   Correct.
3      Q.   This is something that happened before
4  2003, correct, when you were working --
5      A.   Correct.
6      Q.   -- not in the current job?
7      A.   Correct.
8      Q.   And can you give me any estimate of
9  whether that visit happened at the beginning of your
10  tenure in that job, middle or end?
11     A.   No.
12     Q.   It's been too long ago for you to
13  remember those details?
14     A.   Correct.
15     Q.   And do you recall where the visitor was
16  from? Was he affiliated with any organization in
17  particular?
18     A.   I can't remember.
19     Q.   Was he from Canada?
20     A.   I can't remember.
21     Q.   Did he supply you with any information,
22  like any actual written information?

**Page 181**

1      A.   I can't remember.
2      Q.   Do you recall what the purpose of the
3  meeting was? Why was he coming to visit you?
4      A.   From my recollection, we would have
5  visitors come in sometimes just to discuss how
6  they -- I guess how they handled their health care
7  and what they do in their countries. Just an
8  overview.
9      Q.   Do you recall in this particular visit
10  was something that HCFA had requested or was just
11  someone approached you about a possible visit?
12     A.   My recollection is they contacted us for
13  a visit.
14     Q.   And was it an in-person meeting, you
15  said?
16     A.   Excuse me?
17     Q.   Was it an in-person meeting?
18     A.   Correct.
19     Q.   And how long was the meeting?
20     A.   I can't say. I can't recall.
21     Q.   And do you recall anything you did as a
22  result of this meeting? Any steps you took or

                     Henderson Legal Services, Inc.
202-220-4158                              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

---

Page 182

1  anything else you did?
2      A.   No.  Don't recall.
3      Q.   Was it an informational type meeting?
4      A.   From what I remember, it was an
5  information sharing meeting.
6      Q.   Do you recall sharing any information or
7  advising state and Medicaid programs of this visit?
8      A.   You're saying advising any --
9      Q.   Advising any state Medicaid officials of
10  this visit?
11      A.   No.  In the that I remember.
12      Q.   Okay.  Could I ask you to go to Abbott
13  Exhibit 79?  For the record, this starts with a
14  letter dated November 6th 1992 from Bryan Mitchell
15  to William Toby, subject: physician's cost for
16  chemotherapy drugs.  And attached is a copy of the
17  report.  Ms. Gaston, if you would take a look at
18  that document and let me know if this is a document
19  you recall getting.
20      A.   (Reading.) This report does not look
21  familiar.
22      Q.   If I could ask you to go to the Bates

---

Page 183

1  page ending 324.  Is there a page on there or no?
2  Is there a Bates page on that copy?  There may not
3  be.
4          MS. MARTINEZ:  No.
5      Q.   Why don't I ask you to go to -- if you go
6  to the actual fifth page in to the document, it'll
7  say "Page 2 - William Toby Jr." at the top.
8      A.   Okay.
9      Q.   The first paragraph there OIG wrote "Our
10  results indicate that for the physicians surveyed
11  the 13 chemotherapy drugs can be purchased at
12  amounts below AWP and that AWP is not a reliable
13  indicator of the cost of a drug to physicians."  Do
14  you see that?
15      A.   Yes.
16      Q.   And was that something that you came to
17  know at some point during your time at CMS that AWP
18  was not a reliable indicator of a cost of a drug to
19  a physician or a pharmacy?
20          MS. MARTINEZ:  Objection, form.
21      A.   I can't answer that.
22      Q.   Why not?

---

Page 184

1      A.   Because, I mean, you're asking --
2  generally -- well, this focuses on Medicare.  But I
3  don't know what physicians pay for drugs and I don't
4  get involved in that.
5      Q.   You were focused on pharmacies in
6  Medicaid; is that right?
7      A.   Well, and setting prices for the state
8  Medicaid agencies for Medicaid purposes.
9      Q.   Okay.  And Medicaid purposes you were
10  focused on pharmacies; is that right?
11      A.   Well, yeah, basically.
12      Q.   And physicians as well?
13      A.   For the retail class of trade, I think
14  it's a general term that we used.  But prices that
15  we set I don't know what pharmacies are going to be
16  paying or what physicians are going to be paying.
17      Q.   Did you come to learn at some point that
18  AWP was not a reliable indicator of what pharmacies
19  paid to acquire drugs?
20          MS. MARTINEZ:  Objection, form.
21      A.   It was my understanding that AWP is one
22  of the higher of the prices that are in the

---

Page 185

1  compendia.
2      Q.   Did you believe it was a reliable
3  indicator of what a pharmacy would pay for a drug?
4          MS. MARTINEZ:  Objection, form.
5      A.   I used the compendia source and that's
6  what I used for making my judgment for setting FUL
7  prices.
8      Q.   And the FUL prices -- your understanding
9  of the regulations with the FUL is that you're
10  required to use the prices contained in the
11  compendia, correct?
12      A.   Correct.
13      Q.   My question is a little bit different.
14  That is, did you believe that the AWP prices
15  listed in the compendia were a reliable indicator of
16  the cost to providers to purchase drugs?
17          MS. MARTINEZ:  Objection, form.
18      A.   When you say a reliable indicator -- so
19  are you saying -- can you explain that to me?
20      Q.   Do you know what the term "reliable"
21  means?
22      A.   Yeah.

---

Henderson Legal Services, Inc.

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                        January 24, 2008
                        Washington, DC

Page 186

1    Q.   What is your understanding of what the
2  term reliable means?
3    A.   That it would be something that somebody
4  could rely on.
5    Q.   And "indicator." Do you have an
6  understanding of what indicator means?
7    A.   Yes.
8    Q.   What is your understanding of what that
9  means?
10    A.   That it's something that somebody could
11  use I guess to judge, to base a judgment on.
12    Q.   Okay. So my question I guess restated
13  would be did you believe AWPs in the compendia were
14  something that could be relied upon to provide an
15  indication of what a pharmacy paid for a drug?
16        MS. MARTINEZ: Objection, form.
17    A.   I couldn't say that, because I don't
18  know -- I don't know what pharmacies pay for drugs
19  and every pharmacy pays something different for
20  drugs. So I couldn't make that statement.
21    Q.   And because every -- well, did you learn
22  that pharmacies paid different amounts for the same

Page 187

1  drug? Is that something that you learned?
2    A.   It was my understanding depending on the
3  state, depending on the pharmacy, depending if it's
4  a big pharmacy or a small pharmacy, that they
5  probably purchased things in different ways and pay
6  different prices.
7    Q.   Did you have any expectation at all, Ms.
8  Gaston, of whether or not the AWP prices published
9  in the compendia would be a reliable indication of
10  what a pharmacy paid for that drug?
11        MS. MARTINEZ: Objection, form.
12    A.   I wouldn't know that.
13    Q.   Let me ask you to go to Exhibit 82.
14  Exhibit 82 contains an OIG report titled Cost of
15  Dialysis Related Drugs. I'll ask if you could take
16  a look at that document, Ms. Gaston, and let me know
17  if you're familiar with that one.
18    A.   (Reading.) I'm not familiar with this
19  report.
20              (Exhibit Abbott 458 was
21              marked for
22              identification.)

Page 188

1        BY MR. TORBORG:
2    Q.   All right, Ms. Gaston. I've handed you
3  as what has been marked Abbott Exhibit 458 a March
4  1993 GAO report titled Outpatient Drug Costs and
5  Reimbursements for Selected Pharmacies in Illinois
6  and Maryland. And it also says at the top Medicaid.
7        MS. MARTINEZ: I'm sorry. Aren't we on
8  Exhibit 458?
9        MR. TORBORG: Correct. You can put that
10  aside. I'm done with that.
11        THE WITNESS: You didn't ask me any
12  questions about this.
13        MR. TORBORG: I just wanted to know if
14  you saw it and you didn't. If you want I could go
15  back and --
16        THE WITNESS: No. That's all right.
17        BY MR. TORBORG:
18    Q.   And before you tell me you don't
19  recognize it, I'm going to ask you questions about
20  it anyway. So you might as well fess up on this
21  one.
22    A.   I have been fessing up. Okay? Don't do

Page 189

1  that. You'll have me in jail.
2        (Reading.) This report does not look
3  familiar to me.
4    Q.   Do you recall and was it your practice to
5  review at least some GAO reports; is that right?
6    A.   Correct.
7    Q.   And how would your office get copies of
8  these reports? GAO reports, how would your office
9  get copies of them?
10    A.   I really don't know. If they get them
11  directly from GAO I really don't know, unless they
12  come down as a control.
13    Q.   When you say as a control --
14    A.   It could come down from maybe the center
15  director's office if they receive it and it filters
16  down to our level.
17    Q.   Let me ask you to turn toward the end of
18  the document. Specifically page 17, which is the
19  third to the last page.
20    A.   In the document?
21    Q.   In the document, yes. The title of the
22  page is "major contributors to this fact sheet"?

48 (Pages 186 to 189)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 190

1    A.   Okay.
2    Q.   On the right it says "Human resources
3  division" in Washington, D.C., and it lists two
4  names there. John Hansen and Joel Hamilton. Do you
5  know who those two individuals are?
6    A.   No.
7    Q.   And have you ever spoken with or met any
8  of the people listed below from the Chicago regional
9  office, Karyn Bell, Patricia Barry, Joseph Klauke or
10 Susan Thillman?
11   A.   Not that I remember.
12   Q.   How about a woman by the name of Janet
13 Skiles? Do you remember that name?
14   A.   No.
15   Q.   Okay. If I could ask you to page 1 of
16 the report, the first paragraph discusses the
17 Omnibus Budget Reconciliation Act of 1990. Then
18 skipping on a couple sentences this refers to a
19 provision that required GAO to "conduct a study of
20 drug purchasing and billing practices of hospitals,
21 other institutional facilities, health maintenance
22 organizations and retail pharmacies."

Page 191

1       Do you recall there being a provision in
2  OBRA requiring the GAO to do some studies of what
3  these kind of organizations were paying for drugs?
4    A.   I'd have to see the statute that was out
5  there at that time. There were some provisions in
6  the back of statute, but I can't remember what they
7  required.
8    Q.   Let's go to the next sentence. The next
9  paragraph indicates that they are comparing -- I'm
10 paraphrasing here. That they are comparing drug
11 purchase cost and Medicaid reimbursements in two
12 states, Illinois and Maryland, and that also -- the
13 last sentence of that paragraph states "We also
14 compared the prices that pharmacies paid to the
15 drugs' average wholesale prices (AWP). AWP
16 represents the price pharmacies would pay if they
17 did not receive discounts from manufacturers."
18      I'd ask you to take a look at, to see if
19 it refreshes your recollection at all, some
20 attachments at the end of the document, appendix 2
21 on page 12 of the report. And there's a paragraph
22 that precedes a table that goes from this page to

Page 192

1  the next page. And that paragraph indicates "The
2  following table shows the prices that each of the
3  five pharmacies, two hospital outpatient pharmacies
4  and three nursing home pharmacies, paid per unit for
5  those drugs on the state Medicaid program's top 50
6  list of outpatient drugs for the year ending October
7  31, '91. And then it goes on.
8       And the last sentence says it compares
9  each drug's average -- it also shows each drug's
10 average wholesale price. Do you see that?
11   A.   Correct.
12   Q.   Do you recall seeing tables like this in
13 reports that would compare what somebody paid for a
14 drug versus its AWP?
15   A.   I don't recall.
16   Q.   Is it possible you would have reviewed
17 such material, you just don't recall it here today?
18      MR. WINGET-HERNANDEZ:  Objection, form.
19   A.   It's possible, but I just don't recall.
20   Q.   And do you have an understanding of what
21 this table is showing?
22   A.   I mean, a basic understanding, but --

Page 193

1    Q.   What is your understanding of what it's
2  showing?
3    A.   It's showing what it says up in the
4  wording, but it has AWP on the right-hand side. And
5  it's doing comparisons of two hospital outpatient
6  pharmacies and three nursing home pharmacies and
7  what they paid per unit for drugs that are listed on
8  the left-hand side.
9    Q.   So if you look at number 3, for
10 example -- do you know how to pronounce that?
11   A.   No. You can do a good job of that.
12   Q.   Diphenhydramine shows a 1.03 per unit.
13 Is that how you're reading it?
14   A.   If that's what they're saying, yeah.
15   Q.   And then it says one outpatient pharmacy
16 purchased that drug at 46 cents and one in-home
17 nursing home purchased it for 30 cents per unit; is
18 that right?
19   A.   That's what it's saying.
20   Q.   Compared to an AWP price of $1.03 per
21 unit?
22   A.   That's what it's saying.

                          49 (Pages 190 to 193)

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 194

1     Q.   So this is telling the reader of this
2  report that for this drug one nursing home is paying
3  less than one-third of the price of the AWP; is that
4  right?  Am I reading that right?
5     A.   I'm just reading the numbers here, so
6  whatever the numbers reflect, that's what it's
7  saying.
8     Q.   But as it appears, one nursing home paid
9  less than one-third of the AWP for this drug?
10    A.   I'm just going by the numbers.  I'm not
11 putting percentages on it.
12    Q.   Okay.  30 cents versus $1.03?
13    A.   That's what the chart is saying.
14    Q.   And you don't recall charts like this?
15    A.   It doesn't look familiar to me.
16    Q.   I'm going to ask you, if you would, to go
17 to page 6 of this document?
18    A.   To this last part of it?
19    Q.   To the actual report.
20        MS. MARTINEZ:  Counsel, I just want to
21 state this objection.  If you have a clarification,
22 that's fine.  But it just seems like you have

Page 195

1  attached a separate document to this.  At the back
2  there's some other document called state Medicaid --
3        MR. TORBORG:  That's a copy error.
4        MS. MARTINEZ:  It's a copy error?
5        MR. TORBORG:  Yeah.  You can remove that.
6  I did not want this as part of this exhibit.  I'll
7  mark it later.  I don't know what's going on there.
8  If you all would take off that document.
9        MS. MARTINEZ:  I think it begins here?
10       MR. TORBORG:  Yeah.
11       MS. MARTINEZ:  It begins at the page
12 that said "state Medicaid pharmacy payments and
13 their relation to estimated costs."  So that's a
14 separate document that seems to be from the Health
15 Care Financing Review.
16       MR. TORBORG:  Yes.
17       BY MR. TORBORG:
18    Q.   Okay.  Sorry about that.  I'll ask you to
19 go to page 6 of the actual report.
20       The first full paragraph, the GAO wrote
21 "Although total Medicaid reimbursements exceeded the
22 pharmacies' total drug purchase costs for the drugs

Page 196

1  we reviewed, whether this represents unreasonable
2  benefits for the pharmacies is not clear.  Neither
3  HCFA nor the states have determined what would be an
4  appropriate margin between reimbursements and
5  costs."
6        Do you recall there being discussion at
7  HCFA or at the states of when an appropriate margin
8  would be between reimbursements and costs?
9        MS. MARTINEZ:  Objection, form.
10    A.   I don't remember, no.
11    Q.   Now, you were from 1991 to 2003 you were
12 the Medicaid Bureau?
13    A.   Correct.
14    Q.   In the policy side, right?
15    A.   Correct.
16    Q.   And the policy side was involved in
17 determining how much states should be paying for
18 drugs; is that right?
19    A.   Correct.
20    Q.   And you don't recall any conversations in
21 your position about what an appropriate margin would
22 be between reimbursements and cost?

Page 197

1     A.   No, I don't.
2     Q.   Do you think any of those conversations
3  may have happened and you just don't recall them
4  here today?
5        MS. MARTINEZ:  Objection, form.
6        MR. WINGET-HERNANDEZ:  Objection, form.
7     A.   They may have happened.
8     Q.   Let's go to the next sentence.  GAO wrote
9  "Further, representatives of all nine pharmacies
10 contended that because of insufficient dispensing
11 fees they used the excess reimbursements to cover
12 the drugs' dispensing costs."  Do you see that?
13    A.   Yes, I do.
14    Q.   Do you have an understanding of what that
15 is saying?
16    A.   My understanding, yeah.
17    Q.   And what is your understanding?
18    A.   It sounds like they're trying to say that
19 because the dispensing fees were not high enough,
20 that they were using the ingredient cost of the drug
21 to compensate for the dispensing fee.
22    Q.   And is that issue something that you

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                        Washington, DC

Page 198

1   recall discussing within HCFA and with state
2   Medicaid programs?
3           MS. MARTINEZ:  Objection, form.
4      A.   Yes, when it concerns state plan
5   amendments.
6      Q.   Tell me what you recall about that topic.
7      A.   Well, the state plan amendment, states
8   are required to set prices on the ingredient cost of
9   the drug and the dispensing fee should be kept
10  separate.  So that was one of the issues that we had
11  to make sure that states were keeping those two
12  separate.
13     Q.   And you recall there being issues with
14  states not necessarily keeping them separate; is
15  that fair to say?
16     A.   I can't say that.
17     Q.   But you recall discussions about using
18  the excess on the ingredient reimbursement to make
19  up for alleged insufficiencies on the dispensing
20  side; is that right?
21          MR. WINGET-HERNANDEZ:  Objection, form.
22     A.   The conversations that I recall are

Page 199

1   concerning the state plan amendments.  And when we
2   review state plan amendments we need to be assured
3   that the methodology they're using is keeping the
4   ingredient cost and the dispensing fee separate.
5      Q.   But do you recall states responding that
6   one reason they were not lowering reimbursement on
7   the ingredient cost was because of a belief that
8   dispensing fees were not adequately?
9           MS. ALBEE:  Objection, form.
10          MS. MARTINEZ:  Objection, form.
11     A.   I can't say is that.
12     Q.   Do you recall any --
13     A.   I don't recall any states saying that.
14     Q.   Do you recall any written correspondence
15  about that issue with your colleagues at state
16  Medicaid programs?
17     A.   I don't recall, no.
18     Q.   Was that an issue that came up quite a
19  bit in connection with your work on state plan
20  amendments?
21          MS. ALBEE:  Objection to form.
22          MS. MARTINEZ:  Objection, form.

Page 200

1      A.   That question -- that would be something
2   routine that you would look at when you were
3   reviewing a state plan amendment.
4      Q.   We'll look at some documents later today.
5   Perhaps it will refresh your recollection on that
6   topic.
7           MR. WINGET-HERNANDEZ:  Objection to the
8   side-bar remark.
9      Q.   If you would look at the next paragraph,
10  it states "From 1976 to 1987 HCFA required states to
11  periodically conduct surveys to gather data on
12  pharmacies' dispensing costs so that they could be
13  used by the states to set dispensing fees.  However,
14  in 1987 HCFA rescinded this requirement when it
15  became clear that most states were not conducting
16  the surveys.  Because of the fiscal constraints and
17  competing budget priorities, HCFA officials noted
18  that states considered the surveys too expensive.
19          "HCFA officials also noted that because
20  states focused on reducing Medicaid costs, most
21  state programs were not willing to increase
22  dispensing fees regardless of survey results."  Do

Page 201

1   you see that?
2      A.   Yes, I do.
3      Q.   Okay.  Do you recall anyone making that
4   observation?
5      A.   I'm not familiar with that, no.
6      Q.   Do you know what HCFA officials would
7   have made this note that I just read?
8      A.   I'm not aware.
9      Q.   Do you have any idea who it would have
10  been?
11     A.   No.
12     Q.   Would it have likely been someone who
13  worked with Larry Reed, in that department?
14          MS. MARTINEZ:  Objection, form.
15     A.   Don't know.
16     Q.   Is there any other place in the HCFA
17  hierarchy where one could expect to find someone who
18  was commenting to GAO on these issues?
19          MS. MARTINEZ:  Objection, form.
20     A.   This is before my time.  They're saying
21  from '76 to '87.  And I don't know what was
22  occurring in HCFA at that time.

51 (Pages 198 to 201)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                          Washington, DC

Page 202

1    Q.   Well, the report is dated 1993, correct?
2    A.   But they're talking about the surveys and
3  all of this going on during this period of time.  So
4  isn't that what you're asking me?
5    Q.   Well, let me ask you this.  Is there
6  anyone else within the HCFA hierarchy who would have
7  been making comments to GAO employees regarding
8  issues like adequacy of dispensing fees, and
9  adequacy of reimbursement?
10   A.   I don't know.  I just know what we did in
11 our area.
12   Q.   Would it be appropriate for states not to
13 increase dispensing fees regardless of survey
14 results?
15        MS. MARTINEZ:  Objection, form.
16   A.   I don't know.
17   Q.   Who would be able to answer that
18 question?
19        MS. MARTINEZ:  Objection, form.
20   A.   I don't know.  You could ask Larry.
21   Q.   Well, you were in the policy department
22 for 12, 13 years, correct?

Page 203

1    A.   Correct.
2    Q.   And part of your job was to review what
3  states were paying for dispensing fees; is that
4  right?
5    A.   That's part of it, yes.
6    Q.   And what was your understanding of what
7  the federal guidelines were with respect it
8  dispensing fees?
9    A.   That it needs to be reasonable and it's
10 up to the states to prove whether their dispensing
11 fees are reasonable.
12   Q.   And if the survey indicated that
13 dispensing fee was below cost, would that be
14 reasonable?
15        MR. WINGET-HERNANDEZ:  Objection, form.
16        MS. MARTINEZ:  Objection, form.
17   A.   I can't answer that.
18   Q.   Would you need more information to answer
19 that?
20   A.   No, because I don't know -- I know from
21 my recollection -- when we did state plan
22 amendments, we would address situations where the

Page 204

1  dispensing fees were higher.  But generally from my
2  recollection I don't remember responding to an issue
3  of a dispensing fee being too low.
4    Q.   The next paragraph states "HCFA and state
5  Medicaid officials agreed that pharmacies must often
6  use excess Medicaid reimbursements to cover their
7  dispensing costs."  Do you see that?
8        MS. MARTINEZ:  Objection, form.
9    A.   Yes.
10   Q.   Do you recall that sentiment being
11 expressed during your time at CMS?
12        MS. MARTINEZ:  Objection, form.
13   A.   No.
14   Q.   And do you know who at HCFA would have
15 made this comment?
16   A.   No, I don't.
17   Q.   Do you have any guess who it would be?
18        MS. MARTINEZ:  Objection, form.
19   A.   No.
20   Q.   Do you know anyone outside of the
21 department you worked at from 1991 to 2003 who would
22 have been making these comments?

Page 205

1        MS. MARTINEZ:  Objection to form.
2    A.   Outside of the policy area?
3    Q.   Yes.
4    A.   I don't know.
5    Q.   Do you recall if CMS commissioned any
6  studies to determine the adequacy of dispensing
7  fees?
8    A.   Like an official study?
9    Q.   Any study at all, then we'll talk about
10 official versus unofficial.
11   A.   There may have been unofficial canvassing
12 of the states for dispensing fees.
13   Q.   When you say canvassing of the states, do
14 you remember to remember to looking to what other
15 states are --
16   A.   Soliciting states to get a feel for what
17 their dispensing fees are.
18   Q.   What do you recall about that?
19   A.   That's all I recall.
20   Q.   I'm going to hand you two documents at
21 the same time here.  They're two different forms of
22 the same document.

52 (Pages 202 to 205)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                           January 24, 2008
                        Washington, DC

Page 206

1           (Exhibit Abbott 459 and
2           Exhibit Abbott 460 were
3           marked for identification.)
4       BY MR. TORBORG:
5       Q.   What I've marked as Abbott Exhibit 459
6   bears the Bates numbers VAC MDL 45005 through 31.
7   What I've marked as Abbott Exhibit 460 does not have
8   Bates numbers.
9           Ms. Gaston, Abbott Exhibit 459 starts out
10  with a cover page from Dr. John and Zack on
11  Ven-A-Care letterhead to T. Reed Stephens, trial
12  attorney with the Department of Justice.  And it
13  attaches a document called -- starting at Bates page
14  ending 007 Health Care Financing Review, spring of
15  '94, which appears to be an article attached at the
16  next page titled State Medicaid Pharmacy Payments
17  and Their Relation to Estimated Costs.
18          And the second document I've handed you,
19  Abbott Exhibit 460, is a I think better copy of the
20  actual survey document in that it's not cut off at
21  the side.  I'd like to tell me whether or not you've
22  seen -- ever reviewed the actual survey.  And while

Page 207

1   you're taking a look at that, these are some
2   comments for counsel.
3           MR. TORBORG:  It's disserving to me that
4   this document was not produced by the United States
5   Government.  It did not come up in HCFA's document
6   collection.  The best I can tell doing due diligence
7   on our side it appears as though the document was
8   housed at some point at the Office of Research and
9   Demonstrations at HCFA, something that -- I was not
10  aware of that office before, nor do I know whose
11  this is.
12          But I would request you search that
13  particular location for any other documents.  I
14  think if you would review the document you would see
15  it is quite relevant to the issues at play in this
16  case.  So either it didn't come up in your search or
17  it was -- just didn't exist anymore for whatever
18  reason.  And as well as any other documents that may
19  pertain to this time.  I'll follow up with a letter.
20          MS. MARTINEZ:  I'm sure we could have
21  just talked about that outside Ms. Gaston's
22  testimony.

Page 208

1           MR. TORBORG:  Which I'm sure we will,
2   particularly since the document apparently has been
3   in DOJ's possession for ten years.
4           MS. MARTINEZ:  I'm going to object to
5   that.  And I'm also objecting to your discussion
6   being part of the record of Ms. Gaston's deposition.
7           MR. TORBORG:  Okay.
8       A.   So this is what's in here?
9           BY MR. TORBORG:
10      Q.   It's a subset, yes.  It doesn't have the
11  cover pages on it.
12      A.   What was the date of this?
13      Q.   If you look at the bottom of Exhibit
14  460 --
15      A.   Okay.
16      Q.   -- it says Health Care Financing Review,
17  spring of 1994.
18      A.   This looks a little familiar, but that's
19  all I can really say about it.
20      Q.   If we work off -- well, first, let me ask
21  you are you familiar with something called the
22  Health Care Financing Review?

Page 209

1       A.   I'd have to see it to know.  Is it a
2   publication?
3       Q.   It appears to me as though it is.
4       A.   Excuse me?
5       Q.   It appears to me as though it is, but
6   that's why I'm asking a little bit more about it to
7   you.
8       A.   If I could visually see it it might look
9   familiar.
10      Q.   I don't have a copy of one.
11      A.   Okay.  I'm not familiar with it then.
12      Q.   Okay.  Do you know a Kathleen Gondeck?
13      A.   Yes.
14      Q.   Okay.  Who is she?
15      A.   She used to work in ORD, Office of
16  Research and Development.  I don't think they're
17  call ORD any longer.
18      Q.   Do you know what they're called now?
19      A.   No.
20      Q.   Is it Office of Research and
21  Demonstrations?
22      A.   Demonstrations, yeah.  See?  You know.

53 (Pages 206 to 209)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 210

1    Q.   I know what this document tells me.
2    A.   Okay.
3    Q.   Nothing more.  What was Ms. Gondeck's
4  role at HCFA?
5    A.   I just know that she worked in ORD.  I
6  think she might have worked on some research in the
7  drug area.  That's all I know.
8    Q.   Was it something that she worked on more
9  than one report on, to your knowledge?
10   A.   I don't know.
11   Q.   And is she still with HCFA today?
12   A.   It's my understanding she's not.
13   Q.   Do you know what she's doing today?
14   A.   Years ago she left.  I think she's
15  working for a pharmaceutical company.
16   Q.   Do you know which one?
17   A.   No.
18   Q.   If you would take a quick look at this
19  document and just see if it helps refresh your
20  recollection at all on its contents.  The document
21  is titled "State Medicaid Pharmacy Payments and the
22  Relation to Estimated Costs."  Do you have an

Page 211

1  understanding as you review this what this study is
2  attempting to do?
3    A.   No, unless I read through the study.  I
4  don't recall that.
5    Q.   If you go to the third sentence of the
6  introductory section of the article, it states
7  "Congress mandated a study of the adequacy of
8  Medicaid payments to pharmacies.  In this study
9  several data sources were reviewed to develop 1991
10  estimates of average pharmacy ingredient and
11  dispensing costs.  A simulation was used to estimate
12  the amounts states pay.  Nationally simulated
13  payments averaged 96 percent of estimated costs
14  overall, but were lower for dispensing cost (79
15  percent) and higher for ingredient costs (102
16  percent)."
17       Do you recall a study that sought to look
18  at the reimbursement paid to providers on a
19  combined basis, both on the ingredient cost side and
20  on the dispensing cost side?
21       MS. MARTINEZ:  Objection, form.
22   A.   No.

Page 212

1    Q.   But do you agree that's what this study
2  appears to be showing?
3       MS. ALBEE:  Objection, form.
4       MS. MARTINEZ:  Objection, form.
5    A.   Without reading the whole study, it
6  appears that what they're saying here in the
7  introduction is what they're trying to address.
8    Q.   Do you recall how this study was used at
9  all in HCFA's administration of the Medicaid
10  program?
11       MS. MARTINEZ:  Objection, form.
12       MS. ALBEE:  Objection, form.
13   A.   No.
14   Q.   I'm going to ask you to go to page 28 of
15  the study.  The little page number.  It starts on
16  page 25 of the total publication, but specifically
17  page 28 of the publication.
18   A.   It says data?
19   Q.   Yeah, data.
20       This refers to the fact that a
21  significant amount of information was drawn from
22  databases available through IMS America.  Do you see

Page 213

1  that?
2    A.   Yes.
3    Q.   Do you know what that is, what IMS is?
4    A.   I've heard of them.  I can't say
5  specifically what they do.
6    Q.   Have you ever discussed the availability
7  of IMS data with anyone else in HCFA?
8    A.   Not that I recall.
9    Q.   Do you know if this data was available
10  for purchase?
11   A.   I'm not that familiar with IMS.
12   Q.   Are you familiar with a publication
13  called the Lily Digest?
14   A.   No.
15   Q.   Okay.  I'd like to ask you -- you can put
16  that aside.  I'm going to be asking you next about
17  Abbott Exhibit 284.
18       Okay.  Ms. Gaston, after you've had a
19  chance to take a look at this document which is some
20  pages from the Federal Register dated July 31, 1987,
21  in particular it is a final rule titled Medicare and
22  Medicaid Programs Limits on payments for Drugs.  And

54 (Pages 210 to 213)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                          Washington, DC

Page 214

1   as you might guess from this document, I'm now
2   moving to the subject of federal upper limits for
3   the series of questions for you on this exhibit.
4           My first question will be if you're
5   familiar with this regulation.
6      A.   I've seen it before.  I'm not that
7   familiar with it at this point.
8      Q.   But it's something that you would have
9   reviewed in connection with your role in the federal
10  upper limit program; is that fair to say?
11         MS. MARTINEZ:  Objection, form.  I just
12  want to clarify.  The document, the Federal Register
13  has the regulation at the end and the beginning part
14  is the preamble and the issuance of it.  The
15  regulation is towards the end.
16     A.   I would be more familiar with the reg.
17  I'm sure that I probably had the preamble available
18  to me.  But working on the federal upper limit we
19  would actually use the reg.
20     Q.   Okay.  So if I could ask you to go to
21  page 687 --
22     A.   What?

Page 215

1      Q.   687.  The Bates page 687 in the bottom
2   right-hand corner.
3      A.   Okay.
4      Q.   The second column there is a section
5   called part 447, payments for services?
6      A.   Correct.
7      Q.   And there's the rest of that page and
8   then the next page, is that the actual federal upper
9   limit regulation --
10     A.   Yes.
11     Q.   -- amongst other things?
12     A.   Right.
13     Q.   I take it you had no involvement in the
14  drafting of this regulation prior to its issuance.
15  Is that fair to say?
16     A.   Correct.
17     Q.   The summary, if you go back to the first
18  page of Abbott Item 284, there's a section in the
19  first column that says "background of the existing
20  system."  Do you see that?
21     A.   Yes.
22     Q.   The second paragraph there says "The

Page 216

1   department rules are intended to ensure that the
2   federal government acts as a prudent buyer for drugs
3   under certain federal health programs."  Do you see
4   that?
5      A.   Yes, I do.
6      Q.   And is it your understanding that federal
7   upper limits applied to certain multiple source
8   drugs that satisfy criteria; is that right?
9      A.   Correct.
10     Q.   And why would you need to establish an
11  upper limit for multiple source drugs?
12         MR. WINGET-HERNANDEZ:  Objection, form.
13         MS. MARTINEZ:  Objection, form.
14     Q.   Do you have an understanding of what the
15  purpose of the FUL program was?
16     A.   Yes.
17     Q.   What was your understanding?
18     A.   To set a reimbursement amount for states
19  to achieve savings for states and Medicaid.
20     Q.   Why not just use the average wholesale
21  price of these multiple source drugs to set the
22  reimbursement amount?

Page 217

1          MS. MARTINEZ:  Objection, form.
2      A.   Because the regulations say to use the
3   lowest price in the published compendia.
4      Q.   Do you have an understanding of why this
5   regulation existed, why you didn't just use the
6   average wholesale price as published in the
7   compendia?
8          MR. WINGET-HERNANDEZ:  Objection to form.
9          MS. MARTINEZ:  Objection, form.
10     A.   I don't understand the rationale.  I had
11  nothing to do with the development of the
12  regulation.
13     Q.   So in your work on federal upper limits
14  you had no idea of what the purpose of the program
15  was?
16     A.   The purpose of the program is to achieve
17  savings.  I don't know the purpose of the statement
18  you made before, of the pricing, you know, what was
19  involved in the methodology.  I understand the
20  purpose of the program.
21     Q.   And it was to achieve savings on payment
22  for multiple source drugs, correct?

                              55 (Pages 214 to 217)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 218

1    A.   Yes.
2    Q.   And did you understand that the average
3  wholesale price for multiple source drugs in
4  particular was not a reliable indicator of the cost
5  at which pharmacies and physicians purchased drugs?
6         MS. MARTINEZ:  Objection to form.
7         MS. ALBEE:  Objection to the form.
8         MR. WINGET-HERNANDEZ:  Objection, form.
9    A.   As I stated before, my understanding is
10  that I looked at average wholesale price, direct
11  price, wholesale acquisition costs, the prices that
12  were available in the compendia, and generally
13  speaking the average wholesale price was a higher
14  price at that point others.
15    Q.   Did you have an understanding that the
16  difference between average wholesale price published
17  in the compendia and what people were buying the
18  drugs for was particularly variable when it came to
19  multiple source drugs as opposed to sole source
20  drugs?
21         MR. WINGET-HERNANDEZ:  Objection, form.
22         MS. ALBEE:  Objection, form.

Page 219

1         MS. MARTINEZ:  Objection, form.
2    A.   I can't say that.
3    Q.   Is that something that you were made
4  aware of in multiple OIG reports?
5         MS. MARTINEZ:  Objection, form.
6    A.   It's mentioned in the OIG reports, yes.
7    Q.   Let me ask you to look at page 685 of
8  this document, the Bates page ending in 685.  The
9  last column, the first full paragraph starts with
10  "stage agencies."  Do you see that?
11    A.   Yes.
12    Q.   It says "State agencies should determine
13  independent of the 150 percent formula appropriate
14  payment levels for the listed multiple source drugs.
15  We would not expect a state agency to adopt directly
16  the upper limit methodology as a payment method
17  because it does not gear payments to markups
18  appropriate to the actual costs of acquiring and
19  dispensing these drugs."  Do you see that?
20    A.   Yes, I do.
21    Q.   Do you have an understanding of what that
22  means?

Page 220

1    A.   Just what they're saying.
2    Q.   What are they saying?
3    A.   So independently I guess states on their
4  own shouldn't apply the 150 percent markup.
5    Q.   If you go to the next paragraph, the
6  second full sentence starts with "since."  Do you
7  see that?
8    A.   No.
9    Q.   "Since we are not placing" --
10    A.   Where are you?
11    Q.   The next paragraph down about eight lines
12  down.
13    A.   The next paragraph down?
14    Q.   Yeah.
15    A.   Okay.  "Since we are not"?  Okay.
16    Q.   "Since we are not placing maximum payment
17  limits on individual drugs, drugs with high
18  compendia prices could generate extremely high
19  payment levels.  Unless an agency's payment
20  methodology ensured otherwise, a Medicaid agency
21  could end up paying inappropriately high rates for
22  some drugs while still being in compliance with the

Page 221

1  aggregate upper limit.
2         "Nevertheless, we believe states may
3  establish maximum payment limits in order to offset
4  the minimum payment levels necessary to ensure
5  reasonable compensation for very low priced drugs."
6  Do you see that?
7    A.   Yes.
8    Q.   Do you have an understanding of what that
9  last sentence means, establishing minimum payment
10  levels necessary to ensure reasonable compensation
11  for very low priced drugs?
12    A.   Well, my understanding of what they're
13  trying to say is that states have the flexibility to
14  set a MAC on drugs that they feel are not priced
15  appropriately.
16    Q.   Do you know what they're talking about or
17  how do you interpret the comment reasonable
18  compensation for very low priced drugs?
19    A.   That if they feel that the drug cannot be
20  obtained in their state because the price is low,
21  that they have the flexibility to set a MAC on a
22  drug so that it will be obtainable within their

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                      Washington, DC

Page 222

1  state.
2           (Exhibit Abbott 461 was
3           marked for
4           identification.)
5        MR. TORBORG: I'm told that we have five
6  minutes left on the tape and it's within about an
7  hour. So let's go ahead and take a break here.
8        THE VIDEOGRAPHER: This is the end of
9  tape 4. Off the record at 3:17.
10       (Recess.)
11       THE VIDEOGRAPHER: This is the beginning
12 of tape 5 in the deposition of Ms. Gaston. On the
13 record at 3:43.
14       MR. TORBORG: Welcome back, Ms. Gaston.
15       THE WITNESS: Thank you.
16       MR. TORBORG: I wanted to cover
17 something, some housekeeping matters on the record
18 very quickly. I understand from Ms. Martinez that
19 there are some additional documents from Ms.
20 Gaston's files or legacy files that are yet to be
21 produced. Is that right?
22       MS. MARTINEZ: Yes.

Page 223

1        MR. TORBORG: And those are ones that
2  you're working on currently and we intend to
3  schedule a second day with Ms. Gaston so that we can
4  go over those documents.
5        MS. MARTINEZ: I believe what you told me
6  is that you'd look at them and see if you need an
7  additional day.
8        MR. TORBORG: That's true.
9        MS. MARTINEZ: But naturally --
10       MR. TORBORG: I will need an additional
11 day anyway.
12       MS. MARTINEZ: Okay. That's what I
13 thought.
14       MR. TORBORG: Okay.
15       BY MR. TORBORG:
16    Q.   Okay. Going back to the subject of
17 federal upper limits, Ms. Gaston, I want to ask just
18 a few very general background questions about how
19 the process worked at HCFA, who was involved in what
20 aspects and things of that nature. Earlier you
21 testified or you identified three people at CMS who
22 were involved in establishing the FULs. I believe

Page 224

1  you said from 1991 through 2003 when you were doing
2  that, correct?
3     A.   Correct.
4     Q.   And those three people were -- three
5  additional people were Peter Rodler, Cindy Bergin
6  and Gail Sexton?
7     A.   Gail Sexton worked on the FULs after
8  2003.
9     Q.   Did she have any involvement with FULs
10 prior to 2003?
11    A.   No.
12    Q.   What was she doing prior to 2003?
13    A.   I'm not sure. She was employed by CMS
14 around that time, but I don't know exactly when she
15 started.
16    Q.   And Mr. Rodler I understand was somebody
17 who had been at HCFA and the Medicaid Bureau prior
18 to you being there?
19    A.   Correct.
20    Q.   And then at some point he retired or
21 moved on?
22    A.   Correct.

Page 225

1     Q.   Do you know when he retired or moved on?
2     A.   No.
3     Q.   Can you give me a sense? Was it early
4  '90s, late '80s?
5     A.   I'm guessing it was in the '90s. Not in
6  the late '90s, but I'm not sure.
7     Q.   And Cindy Bergin, when did she work at
8  CMS on the FUL issues?
9     A.   She was hired -- I'm not sure exactly the
10 date -- probably eight or nine years ago. And I
11 mentored here on the FULs until I left in 2003.
12    Q.   So she would have been someone that was
13 working on FUL issues starting in the mid to late
14 '90s; is that fair to say?
15    A.   That's fair to say.
16    Q.   And did you work with Mr. Rodler on the
17 federal upper limit issues or did you sort of
18 succeed his duties?
19    A.   He taught me how to handle the federal
20 upper limit program. And then when he left I took
21 it over.
22    Q.   And did Cindy Bergin take it over from

57 (Pages 222 to 225)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 226

1   you --
2       A.   Yes.
3       Q.   And then at some point is it your
4   understanding that Gail Sexton took it over from
5   Cindy Bergin or were they both working on it?
6       A.   She -- Cindy trained Gail and then Gail
7   took it over when Cindy left the area.
8       Q.   So it sounds to me -- and please tell me
9   if I'm mischaracterizing this or misunderstanding
10  this -- that the mechanics of the FUL program were
11  handled primarily by one person, but there was some
12  overlap in training.  Is that right?
13           MS. MARTINEZ:  Objection, form.
14      A.   Generally speaking.  There were periods
15  when it was just one person.  And then when there
16  were two, even though one was training they were
17  both working on it.
18      Q.   And did you first get involved -- is it
19  your recollection that a transition between yourself
20  and Mr. Rodler happened in the early '90s; is that
21  fair to say?
22      A.   When Pete retired then I took it over.

Page 227

1       Q.   And was there anyone else working on the
2   FUL issues besides yourself from that point until
3   Cindy Bergin came on in the mid to late '90s?
4       A.   There was a period of time where I
5   trained Altamease Arnold, but --
6       Q.   Was she in your office?
7       A.   She was in our office.  But she was
8   never -- she never really worked on the program per
9   se.
10      Q.   When you say per se, what do you mean by
11  that?  Officially or what does that mean?
12      A.   She never really learned the program to
13  work on it.
14      Q.   What does it mean to learn the program?
15      A.   When you try to teach someone the program
16  but they choose not to absorb what you're teaching.
17      Q.   Got it.  Is she still working at CMS?
18      A.   No.
19      Q.   When did she leave CMS?
20      A.   She retired last year.
21      Q.   What was her position at CMS?
22      A.   Health insurance specialist.

Page 228

1       Q.   Was that the same position that you had?
2       A.   Yes.
3       Q.   So you were equals, so to speak?
4       A.   Most of the analysts in our area are all
5   health insurance specialists.
6       Q.   Okay.  And you indicated that Mr. Reed
7   would have some input into the FULs and I think you
8   used the word even the final say.
9       A.   Correct.
10      Q.   What does that mean?
11      A.   He's the division director.
12      Q.   So what would the extent of his
13  involvement be with FULs?  When would he get
14  involved?
15      A.   Throughout -- whenever necessary he was
16  there to discuss issues that might need to be
17  discussed.  The final publication he was aware of
18  and would have to give his okay in order to send it
19  through or any letters that would go through
20  generally were from an authority higher than me.
21      Q.   Can you tell me what kind of issues would
22  come up in the FUL program that would necessitate

Page 229

1   his involvement?
2       A.   Maybe just general discussion.
3   Especially when I was the only one working on the
4   FUL program, just a general discussion of maybe
5   particular drugs, the pricing just somebody to have
6   an open discussion about how we're setting the
7   prices, because there's manual review involved.
8       Q.   What do you mean when you say there's
9   manual review involved?  And we'll get into a little
10  bit more the mechanics, but generally speaking what
11  do you mean by that?
12      A.   Generally you have paper that you work
13  from.  You have the compendia with all the drug
14  numbers on it and the pricing.  And sometimes you
15  have to make determinations if it looks like a drug
16  is truly available or not, whether you should follow
17  up and see if it's available.  Sometimes it's better
18  to discuss it with someone to see that you're
19  looking at it the same way that they might be
20  looking at it.
21      Q.   When you say truly available, do you
22  remember is the product available from a particular

58 (Pages 226 to 229)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                         January 24, 2008
                        Washington, DC

Page 230

1  manufacturer, whether it be because they quit making
2  the drug or they have a shortage of the drug?  Is
3  that what you're talking about?
4      A.  I think what I'm talking about, at least
5  preliminarily, is we have printouts from the
6  compendia.  And just looking at the printouts,
7  sometimes there might be pricing that looks like
8  it's not updated in the compendia source.  So you
9  might want to discuss and say does this look like
10  it's maybe old pricing, maybe we should follow up
11  and see if it's still available.  Has the pricing
12  been updated, is the drug still out there, because a
13  lot of times the compendia might not be totally up
14  to date.
15      Q.  How much of your time, if you could
16  estimate, in your position as a health insurance
17  specialist from '91 to 2003, roughly, did you spend
18  on the FUL program?
19      A.  I really can't say.  There was a period
20  of time when we were trying to get a publication out
21  where I could spend the majority of my time working
22  on it.  I had other duties, so the FULs couldn't

Page 231

1  take up all of my time every day.  It just depended
2  on what activity occurred.  You would stop.  You
3  would work on the FULs.  Then I would go back to my
4  other areas.
5      Q.  Did you work -- are you a five-day
6  employee every week or did you work part time during
7  this time?
8      A.  During the 2003 --
9      Q.  During the '91 through 2003 time period?
10      A.  I was an eight hour a day, five day --
11      Q.  Five day a week employee?
12      A.  Correct.
13      Q.  All right.  Could you walk me through
14  the -- let me see if it helps facilitate the
15  discussion to find a document here that might help
16  us talk about this a bit.
17              (Exhibit Abbott 462 was
18              marked for
19              identification.)
20      BY MR. TORBORG:
21      Q.  For the record, what I've marked as
22  Abbott Exhibit 462 bears the Bates numbers HHC

Page 232

1  902-0446.  Ms. Gaston, if you would take a look at
2  that document and let me know if that's a document
3  that you're familiar with.
4      A.  Yes.  I am familiar with it.
5      Q.  Could you tell us what this document is?
6      A.  It looks like it's just an overview of
7  the federal upper limit program.
8      Q.  Did you play a part in drafting this
9  document?
10      A.  I may have.  I'm not sure.
11      Q.  Ms. Gaston, can you walk me through
12  basically what you did to establish federal upper
13  limits for drugs?  Can you just walk me through the
14  process?
15      A.  Do you want me to use this exhibit?
16      Q.  If it helps --
17      A.  Okay.
18      Q.  -- that would be fine.  I'm just trying
19  to have you -- put me back in your office back in
20  the mid-'90s or whenever you were working on this
21  and tell me what you did.
22      A.  Well, first of all we have an

Page 233

1  application.  I'm going to talk about it in
2  reference to the application that's used that houses
3  this information.  But our systems folks when it's
4  time to set a FUL or put out a new list of FUL
5  drugs, the system folks will obtain the FDA Orange
6  Book data and they'll pull that into their system.
7  And there are some standards within that program
8  that look for the criteria that's sort of detailed
9  in this handout here.
10          Once that criteria is met then the system
11  will pull in the latest compendia data and then
12  they'll merge the two.  And the compendia data,
13  there's some criteria in there too.  But they try to
14  match the compendia data to the drugs pulled from
15  the FDA.  And they match them together and then the
16  application -- and I'm simplifying this -- but the
17  application will have in there FUL groups, which
18  include like all NDC numbers, and it will have the
19  FUL group, the drug names, the NDC number and then
20  the compendia and the compendia pricing in there.
21          So it will have the source, if it's Red
22  Book, Blue Book, Medi-Span, and then it will have

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                      Washington, DC

Page 234

1   the prices.  It will have an AWP price, a direct
2   price or WAC price.  If there's not a price it'll
3   just be blank in any of those categories.  And then
4   the system, the application itself -- from my
5   recollection -- it's been a while since I've used
6   it.  But it will determine a FUL price where it can.
7            Then we apply some manual review just to
8   assure we have -- there's some edits and I can't
9   remember all of those.  But we want to make sure
10  that it's using -- because it's supposed to use the
11  lowest price in published compendia, and we want to
12  make sure that that lowest price is a true price,
13  that it's using a true price to establish a FUL.
14           So there's a manual review that's applied
15  to some of the drugs where the pricing might not
16  look right in there or there's missing pricing.  But
17  basically there's a lot of manual review that's
18  included before the final FUL listing will come out.
19      Q.   Okay.  I appreciate that.  I'm going to
20  try to follow up on each of those steps as best I
21  can.  You indicated that there was a system
22  involved.

Page 235

1       A.   It's an application.
2       Q.   I think I've seen some documents that
3   indicate the FUL process was computerized?
4       A.   Correct.
5       Q.   Right?  Is that what you're talking about
6   when you talk about the system?
7       A.   Yeah.  It's an application that they use.
8       Q.   And what kind of application is it?
9       A.   I'm not a techie person.  I don't know.
10  It's on the computer.  It's an application.  I don't
11  know what more -- how to describe it.
12      Q.   Was the application set up before you
13  started working on it or did you --
14      A.   No.
15      Q.   -- take part in setting it up?
16      A.   When I first started working on FULs it
17  was in our mainframe.  The activity would occur in
18  our mainframe.  They took it from the mainframe and
19  put it into an application that they can use on the
20  computer, if that helps.
21      Q.   And do you recall -- was there someone --
22  you mentioned systems folks.  Was there somebody at

Page 236

1   CMS in the systems department that was involved in
2   this?
3       A.   In the switch to the new application?
4       Q.   Yeah.  And basically the FUL program in
5   general.  Who was involved in loading data --
6       A.   The systems support was Dona Kaufman.
7   D-o-n-a.
8       Q.   Was there anyone else you recall or was
9   she the primary person?
10      A.   There was someone before her, but he no
11  longer works for CMS and I can't remember his name.
12  But she was the main one for the new application.
13      Q.   Do you know if she's still there today?
14      A.   Yes.
15      Q.   Do you recall when the new application --
16  when you moved from the mainframe to the new
17  application?
18      A.   Time?
19      Q.   Yes.  When that happened.
20      A.   After '95.
21      Q.   Prior to 1995 was the process still
22  computerized bringing in information from the

Page 237

1   compendia and that kind of information?
2       A.   It was brought into the mainframe.
3       Q.   Just brought into a different computer in
4   other words?  I'm not a techie either.
5       A.   I'm just saying mainframe because that's
6   what I know.
7       Q.   And do you know what the application is
8   called?
9       A.   FULs.
10      Q.   FULs.  Now, the Orange Book has a place
11  in this process, correct?
12      A.   Right.
13      Q.   And could you tell us what the Orange
14  Book is and what impact it had?
15      A.   The FDA Orange Book.  It lists the drugs
16  that are grouped by the FDA.  If you have an Orange
17  Book available, I think they have on the front
18  page -- yeah -- the Orange Book can explain it much
19  better than I can.  But -- yeah.
20      Q.   I'm handing you our only copy of the
21  Orange Book.
22      A.   But they get this electronically and it

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                    Washington, DC

Page 238

1  just has drugs by ingredient names.  And they don't
2  have NDC numbers or anything in here.  But they pull
3  data from the Orange Book where the criteria that's
4  in the regulation -- so it meets that criteria.  And
5  they just pull what they can from there.  There's
6  other type of system criteria in there that picks
7  the drugs that are selected for the FULs.  But it
8  pulls it from the Orange Book first.
9      Q.   So they have an electronic version of the
10  Orange Book?
11     A.   They -- it's my understanding they do
12  now.
13     Q.   Do you know when they first started using
14  an electronic version of the Orange Book versus some
15  other method of getting the Orange Book data into
16  this computer?
17     A.   I really don't know.
18     Q.   Do you recall at some point somebody had
19  to go through the manual copy of the Orange Book --
20     A.   Oh, no.  They wouldn't go through the
21  manual.  They would just request the data from FDA.
22  I think the data now is available and they could go

Page 239

1  on the Web or someplace in FDA's website and obtain
2  the data now.
3      Q.   But it was all done to your knowledge --
4  as far as you can recall it was done electronically
5  in some way?
6      A.   Correct.
7      Q.   Somebody would set up a program that
8  would, say, identify the drugs that meet the FUL
9  criteria and then down those into a file, something
10  called Orange Book or something like that?  Is that
11  how it worked?
12     A.   You would have to talk to our systems
13  folks.  I just know that they would get -- they had
14  the criteria set in there and however it works, you
15  know.  I mean, we're simplifying it, but I'm not a
16  data person.  We just tell them what we need from
17  the Orange Book and they set up their criteria on
18  how they're going to get it and how it's selected.
19     Q.   And do you recall what the criteria was
20  for a drug to qualify for the FUL program?
21     A.   I'm going to read it from here.  But it
22  says -- well, all the formulations of the drug

Page 240

1  products approved by the FDA are A-rated which are
2  therapeutically equivalent and then there must be
3  two rated A in the Orange Book.  And then there's
4  another criteria where they can also allow a B-rated
5  drug when the A-rated drug products -- when there's
6  three A-rated drug products in the Orange Book.
7      Q.   Okay.  So if not all the drugs within a
8  drug product group are rated A, then you have to
9  have three that are rated A?
10     A.   Correct, to allow a B-rated product.
11     Q.   Now, would the B-rated product or a
12  product that's not rated A, would that still be
13  governed by the FUL?
14     A.   If it's included in this, yes.
15     Q.   What involvement would you have in the
16  review of the Orange Book data and what gets on the
17  Orange Book lists in the computer?
18     A.   I have nothing to do with that.
19     Q.   Who was involved in that?
20     A.   If you're saying reviewing it --
21     Q.   Just who was involved in deciding which
22  drugs from the Orange Book, whether it be manual or

Page 241

1  electronic, get put into your FUL computer?
2      A.   The system folks would download the drugs
3  from the Orange Book.  If further review is needed,
4  if some of the drugs are questionable, if they met
5  the criteria and maybe weren't on there before, then
6  we would look at those drugs to verify that they did
7  meet the criteria.
8      Q.   Let me ask you a specific question here.
9  And I'll give you my copy of this.
10         MR. TORBORG:  And Ms. Martinez, you can
11  look on with her if you'd like.
12         MS. MARTINEZ:  I'm going to try to stay
13  away from that videotape.
14         THE WITNESS:  Thanks.
15         BY MR. TORBORG:
16     Q.   Specifically, on this top page, the right
17  column is a drug under the prescription drug product
18  list by the name vancomycin hydrochloride.
19         MS. MARTINEZ:  Give me one second just to
20  glance at what it is.
21         Counsel, would you like to lay out a
22  little bit of foundation, like maybe the date of the

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 242

1  book or something?
2       MR. TORBORG:  I think it's dated on the
3  side 1996.
4       MS. MARTINEZ:  Right.  I'm just saying
5  for the record, we're not going to have an exhibit,
6  so --
7       MR. TORBORG:  Sure.  That's a good idea.
8  I'll do that.
9       BY MR. TORBORG:
10     Q.   Ms. Gaston, do you recognize that book?
11     A.   Yes.
12     Q.   Okay.  Could you tell us what it is?
13     A.   It's the FDA Orange Book.
14     Q.   It's a hard copy version dated 1996?
15     A.   Correct.
16     Q.   And the FDA publishes its Orange Book
17  once every year; is that right?
18     A.   I'm not sure.
19     Q.   Okay.  In any event, this one at the side
20  says it's 1996?
21     A.   Correct.
22     Q.   And is it your understanding that the

Page 243

1  Orange Book has different sections, one of which is
2  titled Product Drug Cost Listing or something like
3  that?  If you look at the top page there.
4       A.   Are you talking about in here?  It's been
5  years since we've I've looked at one of these books,
6  so --
7       Q.   If you look at the spot that I showed
8  you, where your finger is, what does the top of that
9  say?  I can't remember exactly.
10      A.   "Prescription drug product list."
11      Q.   Do you know what that means?
12      A.   Prescription drug product list.
13      Q.   So that's a list of prescription products
14  in the Orange Book --
15      A.   Okay.
16      Q.   -- by alphabetical order?  Is that what
17  it looks like?
18      A.   That's what it looks like.
19      Q.   And looking at vancomycin hydrochloride
20  there, there are a number of different manufacturers
21  listed; is that right?
22      A.   Correct.

Page 244

1       Q.   Which manufacturers are there?
2            MS. MARTINEZ:  Excuse me.  Just for the
3  record, could we have -- again, since we have no
4  exhibit, could we have the page that she's looking
5  at, page number for the record?
6            THE WITNESS:  3-302.
7       A.   Fujisawa, Lilly and I think that's it.
8       Q.   Can I take a look at that real quick?
9       A.   Mm-hmm.
10      Q.   Did you see one for Abbott?
11      A.   Oh, okay.  You're over here too.  It's
12  also on page 3-303.  Is this a continuation over
13  here of this?
14      Q.   That's the way that I read it, but --
15           MS. MARTINEZ:  Since we can't see what --
16      A.   Okay.  Ledderle, it looks like they're in
17  here too.  Abbott, Elkins.  Okay.  That's it.
18      Q.   Now, based on your understanding, are
19  there any of those vancomycin products that are not
20  rated A?
21      A.   It doesn't appear that way.
22      Q.   So under the regulatory and statutory

Page 245

1  criteria vancomycin hydrochloride would qualify as a
2  drug product that would satisfy the FUL criteria; is
3  that right?
4            MR. WINGET-HERNANDEZ:  Objection, form.
5            MS. MARTINEZ:  Objection, form.
6       A.   I would say no, because -- just because
7  it's A-rated.  This is an injection.
8       Q.   Okay.
9       A.   So I don't know if this product -- if
10  this is an injectable, then there are certain
11  products that are in the included on the FUL.
12      Q.   And we'll talk about that in a bit.  Why
13  don't we talk about it now.  Why are not injectable
14  products included on the FUL?
15           MR. WINGET-HERNANDEZ:  Objection, form.
16      A.   When I started to work on the FULs
17  injectable products were not included.  And it's my
18  understanding that the purpose of the FUL program is
19  to set reimbursement rates on drugs that are
20  generally used by the Medicaid population in an
21  outpatient-type, like a pharmacy-type setting, most
22  commonly used products.  And it's my understanding

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 246

1    that injectables and other products many times are
2    provided in a physician's office and other type of
3    settings where they might not be claimed separately.
4    They might be included in a payment, like a
5    physician payment.
6          Also, injectables, many times when
7    they're billed on the claim form they're not --
8    they're billed with codes rather than NDC numbers,
9    which means that the states may not be paying for
10   them through their pharmacy benefit but through
11   another means, such as a physician's visit or a
12   hospital or something like that.
13         So many times what we're trying to do
14   with the FULs is use most commonly used drugs and
15   covered outpatient drug type, so like tablets and
16   capsules.
17   Q.   Is there anything in the regulations or
18   statutes that limit the FUL program to tablets or
19   capsules or other drugs that are commonly
20   administered in the outpatient setting?
21   A.   Not that I know of.
22   Q.   That was just the -- when you started

Page 247

1    working on the FULs that was just the way that HCFA
2    approached it, you did not establish FULs on the
3    injectables?
4    A.   Correct.
5    Q.   And did you ever receive any explanation
6    about why that was?
7    A.   I can't say specifically there was an
8    explanation. I think you learn this as you work
9    with the program.
10   Q.   But you would agree with me that the
11   Orange Book page that I showed you does show that in
12   1996 there were at least two versions of vancomycin
13   that were rated A in the Orange Book?
14   A.   Correct.
15         MS. MARTINEZ: Objection, form.
16   Q.   And so -- I want to get back to this
17   computer business. Was the computer program
18   specifically designed to not include injectables or
19   how did that work?
20   A.   You'd have to talk to the data folks. We
21   were not including injectables. I don't know what
22   criteria they put in there.

Page 248

1    Q.   Because if the initial identification of
2    drugs that satisfied the criteria was just two or
3    more A-rated drugs or three or more A-rated drugs if
4    one of them was not A-rated, and that was done by
5    computer presumably that would bring in injectable
6    drugs like vancomycin, right?
7          MS. ALBEE: Objection.
8    A.   No. There are still more criteria. You
9    still have the Orange Book criteria, but there are
10   still criteria that the systems folks put in to look
11   for the type of drugs that the FUL prices are set
12   on.
13   Q.   So is it your understanding that HCFA
14   specifically set up the computer program to identify
15   and exclude injectable drugs?
16         MS. MARTINEZ: Objection, form.
17   A.   In one part of the process, yes.
18   Q.   And do you know in what part of the
19   process that was done?
20   A.   No, I don't.
21   Q.   Did you have any part in that process of
22   either manually excluding the injectables drugs or

Page 249

1    setting up a computer program such that those drugs
2    would be moved aside?
3    A.   The basic criteria for the system was
4    developed before I got there.
5    Q.   Who would be the best person to ask about
6    why it was that injectables were specifically
7    excluded from the FUL program?
8          MR. WINGET-HERNANDEZ: Objection, form.
9          MS. MARTINEZ: Objection, form.
10   A.   I don't know. Pete Rodler was the first
11   one I know that worked on FULs. That's the only
12   person I could think of.
13   Q.   Are these other -- now, we've talked a
14   little bit about Exhibit 462 that talks about the
15   Orange Book data. And we talked about the criteria
16   already, correct? And now you've identified I think
17   another criteria, which is to exclude injectable
18   drugs, right?
19         MS. MARTINEZ: Objection, form.
20   A.   Correct.
21   Q.   Is that criteria written down anywhere?
22         MR. WINGET-HERNANDEZ: Objection, form.

                                    63 (Pages 246 to 249)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

---

Page 250

1    A.   I don't know.
2    Q.   Have you ever seen a policy memorandum or
3  any other memorandum that discusses why injectables
4  are specifically excluded from the FUL program?
5        MS. MARTINEZ:  Objection, form.
6    A.   I'm not aware of that.
7    Q.   Are you aware of any other criteria that
8  HCFA has used to eliminate drugs that might
9  otherwise satisfy the regulatory or statutory
10 criteria?
11   A.   I think unit dose.
12   Q.   Can you explain a little bit -- that unit
13 stuff always makes my head spin.
14   A.   Just the little individual unit dose
15 packets, like little individual blister tablets that
16 might be in the little blister pack that are
17 generally distributed within a hospital setting.
18   Q.   And why are those -- do you understand
19 why those are excluded?
20   A.   Here again, what I think they're trying
21 to focus on is what's the drugs that are commonly
22 used and dispensed by the pharmacies.

---

Page 251

1    Q.   Any other exclusion criteria that you're
2  aware of?
3    A.   They may not want to capture the infusion
4  bags because here again that's generally used in an
5  impatient setting and not dispensed at the pharmacy.
6    Q.   Do you know if that's the fact that the
7  FUL program does not cover infusion bags?  Is that
8  something that you're aware of?
9    A.   As far as I know they don't.
10   Q.   And infusion bags would be what type of
11 products?
12   A.   I really can't say at this point.
13   Q.   Saline solution?
14   A.   Okay, fine.
15   Q.   Is that one?
16   A.   Yeah.
17   Q.   Dextrose-type solutions?
18   A.   That's my understanding.
19   Q.   And the rationale for exclusion of those
20 is the same as the rationale for excluding the
21 injectable drugs?
22   A.   Correct.

---

Page 252

1    Q.   Any other criteria you're aware of?
2    A.   That's all I can think of.
3    Q.   And do you know if the blister pack or
4  the infusion bag exclusions are written down
5  anywhere?
6    A.   I'm not aware of that.
7    Q.   Are -- I'm sorry.
8    A.   The systems folks, they might have
9  written criteria.  I really don't know and I can't
10 speak for them.  But I'm not aware of any.
11   Q.   Do you recall any discussions about --
12 apart here today in the deposition, of course --
13 about why infusion bags, blister packs and
14 injectable drugs are not included in the FUL list?
15   A.   You mean specific discussions?
16   Q.   Or general discussions.  Anything you
17 recall.
18   A.   I'm sure that it was discussed over the
19 years just within the process of working on the
20 FULs.
21   Q.   Do you know if HCFA has since changed the
22 way that it does FULs so that any of those three

---

Page 253

1  categories' exclusions are no longer excluded?
2    A.   I have no idea.
3    Q.   Okay.  I think that the next step you
4  discussed was the pulling in of the compendia
5  data --
6    A.   Correct.
7    Q.   -- into the mainframe or later the
8  application, correct?
9    A.   Correct.
10   Q.   And was that done with electronic copies
11 of the compendia data?
12   A.   I don't know.  I don't know how they
13 obtained that data.  I would assume it's electronic,
14 but I don't know.
15   Q.   But you did not sit down with a copy of
16 the Red Book or the Blue Book, a manual copy, and
17 input things into a computer?
18   A.   No.
19   Q.   Right?  What you know is that by the time
20 you got involved somebody had already loaded the
21 data into the system?
22   A.   Correct.

                                64 (Pages 250 to 253)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                         January 24, 2008
Washington, DC

Page 254

1    Q.   Is that fair to say?
2    A.   Yup.
3    Q.   Do you know which compendia they used?
4    A.   Red Book, Blue Book and Medi-Span.
5    Q.   They Would use all three?
6    A.   Correct.
7    Q.   Do you know if they used all three from
8  1991 when you got involved through 2003?
9    A.   I can't remember.  I know there was a
10 time when I think Medi-Span and First Databank might
11 have merged.  But I would still -- from my
12 recollection I think there was still separate
13 pricing under both of them.  So from my recollection
14 it was always three.
15   Q.   Did you have a hard copy of the Red Book
16 or the Blue Book on your desk or in your cubicle?
17   A.   Red Book I would have a copy.  Just
18 their -- I think it's a monthly publication.
19   Q.   Did you have a copy of the Orange Book?
20   A.   At times.
21   Q.   And then -- so you've got the Orange Book
22 data loaded.  Is it fair to say that that's in one

Page 255

1  file or one spot on the computer but then you've got
2  the compendia data loaded in another spot?
3    A.   I can't speak for the systems aspect of
4  it.  We just -- we see it -- in the application we
5  see the end result of the Orange Book and the
6  compendia merged together.
7    Q.   Okay.  So there's a program that merges
8  the two together and automatically identifies drugs
9  that meet the Orange Book criteria, any other
10 criteria we've discussed and also have available
11 information in the compendia data; is that right?
12   A.   Correct.
13   Q.   And that's when you get involved; is that
14 fair to say?
15   A.   Correct.
16   Q.   You don't get involved before that?
17   A.   Correct.
18   Q.   Can you take me from that point in time
19 through the publication of the FUL list to the
20 public?
21   A.   From what I remember what we would do is
22 just go through the various groups.  I think there

Page 256

1  were -- I can't remember exactly, but there were
2  certain drug groups that might show up that need to
3  be manually looked at because there might not be
4  enough suppliers or there might not be enough
5  pricing.  And I can't remember what else might be
6  said in there.
7         But we would go through.  And then when
8  instances like that would occur that what we would
9  do is sometimes print off that information and then
10 research to see if the information in the compendia
11 was incorrect or if it is correct then we can sort
12 of go in there and work with what -- you know, try
13 to make a decision whether it should be included or
14 not.
15   Q.   How did you become aware of potential
16 issues that may arise?  Did people contact you and
17 you looked at things in response to their concerns
18 or was there a methodology that you followed to spot
19 issues?
20        MS. MARTINEZ:  Objection, form.
21   A.   Are you asking me -- when you say
22 potential issues, you mean raised by individuals

Page 257

1  or -- I don't know when you mean by potential
2  issues.
3    Q.   Well, we talked about there was a manual
4  review of this.  You wouldn't just take whatever the
5  computer spat out and make that the FUL list?
6    A.   Correct.
7    Q.   There was a manual review involved to
8  identify some issues.  I think you've talked about
9  some of them here today.  Availability of the drug,
10 whether the pricing information was still correct.
11 Any other issues that you recall?
12   A.   They are the two main ones, yeah.
13   Q.   How would you go about identifying those
14 issues?  Like how do you -- there's a lot of drugs
15 on the FUL list.  How would you go about figuring
16 that stuff out?
17   A.   I can't remember exactly, because I
18 haven't dealt with the application for years.  But
19 there was something in the application that would
20 alert us to certain drugs that needed the manual
21 review.  Maybe it was the fact that the system
22 couldn't come up with a price because something

65 (Pages 254 to 257)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                     Washington, DC

Page 258

1  wasn't right in the application itself, something
2  didn't look right, so then we would have to go
3  through and verify the information that we had in
4  our system.
5      Q.   The computer system that did this was all
6  housed within HCFA?
7      A.   CMS.
8      Q.   It's CMS.
9      A.   Yes.
10     Q.   And then the computer program would
11 select the lowest price of the reported prices in
12 there and then would it multiply it by 150 percent
13 and spit out a price?
14     A.   Correct.
15     Q.   And which prices in the compendia would
16 be included in that analysis that the computer did?
17     A.   Are you saying from the compendia
18 sources?
19     Q.   Yes.  Average wholesale price?
20     A.   Average wholesale price, direct price,
21 wholesale acquisition cost.
22     Q.   Are there any other prices that you're

Page 259

1  aware of?
2      A.   Not that I remember.
3      Q.   But the computer did all that and then
4  you came in and looked at some issues afterwards,
5  correct?
6      A.   Correct.
7           MR. WINGET-HERNANDEZ:  Objection, form.
8      Q.   Okay.  I handed you before Abbott
9  exhibit -- I forget the number of it.  It was a
10 document that has a handwritten notation at the top,
11 September 15, 1993.  Do you see that?
12     A.   461?
13     Q.   461, yes.
14          And I note that your name is listed at
15 the bottom of the document in a chart as well as at
16 the end of the document.  There's something that
17 says at Bates page 858, FME 32, Sue Gaston, 60488.
18     A.   Right.
19     Q.   Let me ask you first if you remember this
20 document?
21     A.   It looks familiar.
22     Q.   And what does that information on the

Page 260

1  last page mean?
2      A.   That was the document where it was
3  saved -- well, that I prepared it.  The FME was our
4  identification.  And then it has the typist and the
5  disk that the typist placed it on.
6      Q.   What does FME 32 mean?
7      A.   I'm not sure.
8      Q.   What does the 60488 number mean?
9      A.   My extension.
10     Q.   Your phone number?
11     A.   Yes.
12     Q.   So this indicates that you were the one
13 that prepared this memorandum?
14     A.   Correct.
15     Q.   The second paragraph -- let me ask you
16 also, if I could, the chart at the bottom of the
17 first page of this document, that little box next to
18 file copy, what does this mean?
19     A.   It's a sign-off for correspondence.
20     Q.   So your name is first.  That means I
21 guess you were the first one involved?  Is that
22 that means?

Page 261

1      A.   Well, I was the one -- I prepared this,
2  the document.  Larry Reed approved it.
3      Q.   And then there's another name after that
4  which I can't read.
5      A.   Yeah.  I don't know who that is.
6      Q.   And the last one is Abato.
7      A.   Okay.
8      Q.   Rozanne Abato; is that correct?
9      A.   Correct.
10     Q.   What was her position?
11     A.   I don't know if we were Medicaid Bureau
12 then.  But I think she was the director.  And I'm
13 guessing at the title.
14     Q.   The second paragraph of this document you
15 wrote "Section 1927(e)(1) and (4) of the act as
16 amended by OBRA '93 mandates that HCFA establish a
17 federal upper limit for multiple source drugs that
18 meet specific criteria."  Do you see that?
19     A.   Yes.
20     Q.   What is the reference to the act?  Is
21 that the Social Security Act?
22     A.   Yes.

66  (Pages 258 to 261)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 262

1    Q.   And OBRA '93, that would be referencing
2  what?
3    A.   It's the Social Security Act.  It amended
4  the Social Security Act, just like OBRA '90
5  established section 1927, OBRA '93 made amendments
6  to section 1927.
7    Q.   OBRA was a statute passed by Congress?
8    A.   Yes.
9    Q.   Omnibus Reconciliation Act?
10   A.   Correct.
11       MS. MARTINEZ:  Maybe Omnibus Budget
12  Reconciliation Act?
13       MR. TORBORG:  Did I not say that?
14       MS. MARTINEZ:  It has OMB.
15       MR. TORBORG:  Oh.  I'm sorry.  Omnibus
16  Budget Reconciliation Act.
17       BY MR. TORBORG:
18   Q.   And was it your understanding that
19  Congress had mandated HCFA to establish federal
20  upper limits for any multiple source drugs that met
21  specific criteria?
22       MS. MARTINEZ:  Objection, form.

Page 263

1    Q.   Right?
2    A.   Correct.
3    Q.   Congress had told HCFA you must do this?
4        MS. MARTINEZ:  Objection, form.
5    Q.   Is that right?
6    A.   Congress amended the law to include this.
7    Q.   But the mandates means that HCFA was
8  mandated by law to establish federal upper limits
9  for multiple source drugs that met specified
10  criteria, correct?
11       MS. MARTINEZ:  Objection to form.
12   A.   If that's what the legislation does, yes.
13   Q.   Have you ever reviewed the legislation?
14   A.   What do you mean reviewed?
15   Q.   Have you looked at it?
16   A.   Yes.
17   Q.   The actual statute itself?
18   A.   Yes.
19               (Exhibit Abbott 463 was
20               marked for
21               identification.)
22       BY MR. TORBORG:

Page 264

1    Q.   Let me explain what this document is.
2  This is a section of the Omnibus Budget
3  Reconciliation Act of 1990.  And I've included a
4  cover page which has the title as well as a section
5  4401 titled Reimbursement of Prescribed Drugs.
6  That's what this is.  I have not given you the
7  entire OBRA 1990.
8        I'd like you, if you would, to go eight
9  more pages from the page you're at now.  I'm sorry
10  it doesn't have page numbers on this.  But it would
11  be a section F, pharmacy reimbursement.  Were you
12  able to find it?
13   A.   Yes.
14   Q.   And under section 2 it says establishment
15  of upper payment limits.  Do you see that?
16   A.   Yes.
17   Q.   And then it says "HCFA shall establish a
18  federal upper reimbursement limit for each multiple
19  source drug for which the FDA has rated three or
20  more products therapeutically equivalent and
21  pharmaceutically equivalent, regardless of whether
22  all such additional formulations are rated as such

Page 265

1  and shall use only such formulations when
2  determining any such upper limit."  Do you recall
3  reviewing this language before?
4    A.   Yes.
5    Q.   Now, this statutory criteria does not
6  discuss any criteria relating to injection drugs or
7  infusion drugs; is that right?
8    A.   It doesn't specify any drugs in
9  particular.
10   Q.   It just says "all multiple source drugs
11  for which the FDA has rated three or more products
12  therapeutically and pharmaceutically equivalent,"
13  correct?
14       MR. WINGET-HERNANDEZ:  Objection to form.
15  You've misread it, Counsel.
16       MR. TORBORG:  I'm sorry.  I'll read it
17  again.
18       BY MR. TORBORG:
19   Q.   "HCFA shall establish a federal upper
20  reimbursement limit for each multiple source drug
21  for which the FDA has rated three or more products
22  therapeutically and pharmaceutically equivalent."

                        67 (Pages 262 to 265)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                January 24, 2008
                    Washington, DC

Page 266

1  Did I read that right?
2      A.   Yes, you did.
3      Q.   Now, this indicates that HCFA shall
4  establish it for each multiple source drug.  And I
5  think we saw earlier in looking at a copy of the
6  1996 Orange Book that for vancomycin there were
7  three or more drugs that were therapeutically and
8  pharmaceutically equivalent, correct?
9          MS. MARTINEZ:  Objection to form.
10     A.   Correct.
11     Q.   And you indicated that if that was an
12 injection drug it would not have met the -- it would
13 have been knocked out of the FUL process by the
14 computer; is that right?
15     A.   Correct.
16     Q.   And is that consistent with the statutory
17 language here?
18         MR. WINGET-HERNANDEZ:  Objection, form.
19         MS. MARTINEZ:  Objection, form.
20     A.   The language doesn't go into that type of
21 detail in the statute.
22     Q.   It doesn't talk about excluding injection

Page 267

1  or infusion drugs, does it?
2      A.   No, it doesn't.
3      Q.   Do you recall any discussions about that
4  issue while you were at HCFA, whether or not the
5  statutory or regulations governing the federal upper
6  limit allowed HCFA to exclude injectable or infusion
7  drugs?
8      A.   I don't -- no.  I don't remember specific
9  discussions like that.
10     Q.   You just know that for as long as you've
11 been working on it it's just been something that's
12 been excluded at the outset?
13     A.   Exactly.  Yes.
14     Q.   And you have some understanding of why
15 that is, but you weren't there originally when the
16 decision was made?
17     A.   Correct.
18     Q.   You've just been told about this
19 rationale over time?
20     A.   Right.  I understand the rationale.  It's
21 been explained to me.
22         MR. TORBORG:  What time do people want to

Page 268

1  end today?  We've been going for I think an hour or
2  more.  I could continue to go until 5:00 if people
3  want to stop at 5:00.  And that's what I would
4  recommend that we do, go another 25 minutes.  Or
5  since we started a little bit late, if people want
6  to go past 5:00 I could take a break now.
7          MR. WINGET-HERNANDEZ:  I would prefer to
8  go to 5:00 for what it's worth.
9          MR. TORBORG:  I think that probably makes
10 more sense.
11         MS. MARTINEZ:  Yeah.  I vote for going to
12 5:00 and stopping, cutting out the break if
13 everybody can take it.
14         THE WITNESS:  That's fine.
15         MR. TORBORG:  Is that okay?
16         THE WITNESS:  Mm-hmm.
17         MR. TORBORG:  Okay.
18         THE VIDEOGRAPHER:  I have 25 minutes
19 remaining.
20         MR. WINGET-HERNANDEZ:  That's enough.
21 That takes us to 5:00.
22         MR. TORBORG:  That will be perfect.  All

Page 269

1  things are coalescing into a decision to go.
2          MS. MARTINEZ:  Counsel, could I just
3  request that at some point you make a copy of the
4  pages that the witness looked at in the FDA drug
5  book and we can just --
6          MR. TORBORG:  Mark it as an exhibit
7  maybe?
8          MS. MARTINEZ:  Well --
9          MR. TORBORG:  Let's talk about it and
10 deal with it at the end of the deposition.
11         MS. MARTINEZ:  Yeah.  But if you could
12 PDF that or something.
13         MR. TORBORG:  Yes.
14         BY MR. TORBORG:
15     Q.   Now, is it your understanding that the
16 federal regulations for FULs had an aggregate test?
17 Do you understand what I mean by that?
18     A.   I do.  The test point confuses me.
19     Q.   The states' compliance with federal upper
20 limits was measured in the aggregate, correct?
21     A.   Yes.  Correct.
22     Q.   Could you explain to us as best you can

68 (Pages 266 to 269)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                        Washington, DC

Page 270

1  in plain English what that means?
2     A.   The federal government sets prices on the
3  federal upper limit drugs.  And we release those
4  prices to the states.  The states have the
5  flexibility to adjust those prices so that in the
6  aggregate the same savings is achieved.  So they can
7  raise one price and lower another price.  But they
8  have to be able to validate doing that.
9     Q.   And what types of auditing does HCFA do
10 on the states' compliance with federal upper limits?
11        MS. MARTINEZ:  Objection, form.
12    A.   I'm not familiar with CMS's auditing.
13    Q.   You don't recall yourself doing any work
14 to see if states were actually complying with the
15 FUL regulations; is that fair to say?
16    A.   Correct.
17    Q.   Your involvement with the FULs was to
18 take the primary lead in getting the list published
19 in the first instance, but not necessarily -- or not
20 at all with dealing with whether or not the states
21 complied with the limits?
22        MS. MARTINEZ:  Objection to form.

Page 271

1     A.   Correct.
2     Q.   Do you know anyone that was involved in
3  doing that?
4     A.   No.
5        MR. TORBORG:  Okay.  I'd like to mark
6  this as our next exhibit, if we could.
7               (Exhibit Abbott 464 was
8               marked for
9               identification.)
10       BY MR. TORBORG:
11    Q.   For the record, what I've marked as
12 Abbott Exhibit 464 bears the Bates numbers
13 NYSHD-FOIL 01682 through 83, a document dated
14 October 2nd 1990.  I ask if you'd take a look at
15 that, Ms. Gaston, and tell me whether or not you
16 recall it.
17    A.   No.  I've never seen this before.
18    Q.   Let me ask you some questions about some
19 language in the document to see if you can help me
20 understand some things.  The second paragraph states
21 "Over the past year, several state operations
22 letters have been sent to you removing upper limits.

Page 272

1  This has been done for a variety of reasons.  The
2  most prevalent reason, however, is the discovery by
3  the FDA that a specific manufacturer of a generic
4  drug has not been totally accurate in its
5  formulation of the drug.
6        "When one of these inaccurately
7  formulated generics is discovered, HCFA is required
8  to remove all formulations of the generic from the
9  upper limits listing, primarily due to problems in
10 identifying the manufacturer of any particular
11 generic item."
12       Do you recall this issue at all?
13    A.   No, not at all.
14    Q.   Do you recall HCFA taking steps to
15 affirmatively remove items from the federal upper
16 limit list?
17    A.   During the period of time that I --
18    Q.   Yes.
19    A.   We would remove drugs if they didn't meet
20 the criteria.
21    Q.   Apart from not meeting that statutory
22 criteria, were there other reasons why drugs were

Page 273

1  removed?
2     A.   No.  I'm not aware of other reasons to
3  remove them.
4     Q.   One other -- well, were there instances
5  where you learned that there was an availability
6  problem with the drug?
7     A.   Correct.
8     Q.   And in those instances would a FUL be
9  removed?
10    A.   Yes.  So that maybe I should clarify.
11 When you said statutory, also regulatory and
12 statutory.  So --
13    Q.   Another background question I had was how
14 were drugs -- was there a code that was used to
15 group all generic drugs of the same type and dose
16 into one category so those can be put together for
17 establishing a FUL?
18    A.   We had FULs -- FUL groups.
19    Q.   FUL groups?
20    A.   Yeah.  That's in the application.  It
21 would be a FUL group.  But I can't go into exactly
22 what my recollection of establishing those FUL

69 (Pages 270 to 273)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 274

1    groups.  But that's what we would work with on the
2    application, the FUL group, and then it would have
3    all the NDC numbers and the compendia information.
4        Q.    Who established the FUL groups?
5        A.    It's in the system.  The system
6    establishes it.
7        Q.    Is it done electronically by a computer
8    without any manual review?
9        A.    The information that's pulled down from
10   the Orange Book in the compendia, once it's joined
11   together it has to be placed into a FUL group in
12   order to be into the application.  Once it's in the
13   application there may be some manual review
14   required.
15       Q.    But the FUL groups were set up in the
16   system and then drugs were taken from the Orange
17   Book list and the compendia list and put together
18   this FUL group list, right?
19       A.    Yeah.
20       Q.    And any FUL that was established for any
21   FUL group would then limit the reimbursement that
22   could be paid for any drug in that group; is that

Page 275

1    right?
2            MS. MARTINEZ:  Objection, form.
3        Q.    The FUL --
4        A.    It applies to a FUL group.
5        Q.    Yeah.
6        A.    Yes.
7        Q.    Okay.
8        A.    That's my recollection.
9        Q.    And it may be that the FUL would apply
10   even if a particular drug was not rated A in Orange
11   Book?
12       A.    As long as it met the basic criteria then
13   that FUL price would apply to all of the drugs in
14   that group.
15       Q.    And the drugs in the group, would those
16   include drugs that were not rated A in Orange Book,
17   do you know?
18       A.    Correct.
19       Q.    It would?
20       A.    It would be my understanding.  As long as
21   it meets the basic criteria, then all the other
22   drugs would still be subject to the FUL.  That's my

Page 276

1    recollection.
2        Q.    And what is the basic criteria?
3        A.    The criteria in the Orange Book that we
4    discussed earlier and the criteria in the compendia
5    for the suppliers.
6                    (Exhibit Abbott 465 was
7                     marked for
8                     identification.)
9            BY MR. TORBORG:
10       Q.    Ms. Gaston, we've marked as Abbott
11   Exhibit 465 a document bearing the Bates number HHC
12   004-0054.  It appears to be an e-mail from Cindy
13   Pelter to a distribution that includes "C. Thompso,"
14   which I believe is Cheryl Thompson, and an
15   organization called the American Society of Health
16   Systems Pharmacists.  Do you see that?
17       A.    Yes.
18       Q.    If you could take a quick glance at that
19   document and tell me whether or not you recall it.
20       A.    I don't recall it.
21       Q.    Who was Cindy Pelter?
22       A.    That's Cindy Bergin.

Page 277

1        Q.    That's Cindy Bergin?
2        A.    Yes.
3        Q.    That's what I suspected.  That why I
4    asked you earlier if she was still named -- what's
5    her current name?
6        A.    You didn't ask me if she was still --
7        Q.    It's Cindy Pelter now?
8        A.    No.  It's Cindy Bergin now.  It's Bergin
9    now.  It was Pelter when she was hired.  You're
10   confusing me.  This is the hardest question.
11       Q.    It's been a long day.  Cindy Pelter is
12   now Cindy Bergin?
13       A.    Correct.
14       Q.    And her name is spelled B-e-r-g-i-n?
15       A.    Correct.
16       Q.    I had that suspicion.  And who is Cheryl
17   Thompson?  Do you know her?
18       A.    No.
19       Q.    Do you know what the American Society of
20   Health Systems Pharmacists is?
21       A.    I'm really not familiar with them, no.
22       Q.    In any event, Cheryl Thompson asked

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 278

1  Ms. Pelter a question on June 19th that was "Do the
2  prices listed in" -- this release which I won't read
3  into the record -- "reflected information recently
4  provided by First Databank."  Do you see that?
5      A.   Right.
6      Q.   And then she responds saying "No.  The
7  new federal upper limit prices do not reflect the
8  new AWP prices recently published by First Databank.
9  Those new AWP prices pertain mostly to injectable
10  drugs that are not subject to FUL prices at this
11  time.  Therefore we do not need to consider the new
12  AWPs while we were compiling the new FUL list.  If
13  you have any more questions please feel free to
14  e-mail me."
15          Does this refresh your recollection at
16  all about any conversations that arose within HCFA
17  or elsewhere about the fact that there were no FUL
18  prices on injectable drugs?
19          MS. MARTINEZ:  Objection, form.
20      A.   I could be wrong.  And here again, this
21  isn't my e-mail.  But what was the period of time
22  when that MFCU thing occurred?

Page 279

1      Q.   I believe around 2000.
2      A.   This inquiry might have come about
3  because of the MFCU issue and they were probably
4  asking this question because of that.
5      Q.   And the MFCUs would have new -- they were
6  having First Databank publish new AWPs for certain
7  drugs?  Is that your recollection?
8      A.   Right.
9          MS. MARTINEZ:  Objection, form.
10     Q.   Which might impact the FULs that you were
11  setting at HCFA?
12     A.   I think that's what they were asking.
13     Q.   And Ms. Pelter was saying that is not
14  going to be an issue because these new AWP prices
15  pertain mostly to injectable drugs, correct?
16     A.   That's what she's saying.
17     Q.   Do you recall any other discussion about
18  this issue?
19     A.   There may have been.  I don't remember
20  any further discussion.
21          (Exhibit Abbott 466 was
22            marked for

Page 280

1          identification.)
2      BY MR. TORBORG:
3      Q.   For the record, what I've marked as
4  Abbott Exhibit 466 bears the Bates numbers HHD
5  006-0103 through 108.  And I can represent to you,
6  Ms. Gaston, that this was a document that was pulled
7  from the OIG working paper files for their work on
8  the DOJ AWP effort, the report we looked at earlier.
9          I would ask you just to look at the first
10  page and just let me know if you've seen this.  I
11  doubt you have.
12     A.   (Reading.)  And what was this pertaining
13  to again?
14     Q.   This was a document that we found in the
15  working paper files for the OIG report concerning
16  the DOJ AWP effort?
17          MS. MARTINEZ:  Objection, form.
18     A.   Is this the MFCU?
19     Q.   Yes.
20     A.   Okay.  I changed that term on you.
21     Q.   That's fine.  And my understanding,
22  deposing the individual who sent forth this

Page 281

1  document, this contains some comments that states
2  had made to OIG concerning those NAMFCU AWPs.
3          MS. MARTINEZ:  Objection, form.  Or
4  objection to your comment.  Let me ask you, this
5  hasn't been marked as an exhibit before, then, in
6  another deposition?
7          MR. TORBORG:  I think it may have been.
8  If it has, I don't have that.
9          BY MR. TORBORG:
10     Q.   In any event, I want to ask you about a
11  comment that's contained in the first page, the
12  third one down, the state NC.  I'm assuming it's
13  North Carolina.  The second line says "At a meeting
14  about the new prices, asked Larry Reed why not put
15  these prices on a FUL.  HCFA responded that they
16  couldn't do that."  Do you see that?
17     A.   Yes.
18     Q.   Do you recall attending any meetings
19  concerning the NAMFCU AWPs?
20          MR. WINGET-HERNANDEZ:  Objection, form.
21     Q.   In particular between the states and
22  HCFA.

                                71 (Pages 278 to 281)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 282

1    MR. WINGET-HERNANDEZ:  I have to object,
2  Counsel, to your manner of taking.  You are using
3  this document to imply that it is notes of a meeting
4  that occurred at which this witness might have
5  attended when you know full well exactly where this
6  document came from, who produced it and the fact
7  that this witness would not have had anything to do
8  with it.  It's improper for you to use the document
9  in this way.
10    MR. TORBORG:  How do you know that she
11  wasn't at the meeting?
12    MR. WINGET-HERNANDEZ:  You've already
13  received sworn testimony about how this information
14  was obtained from David Tawes, from the Office of
15  the Investigator General with which she has
16  absolutely no connection.
17    MR. TORBORG:  Well, we established that
18  she was at the exit conference for this report.  So
19  clearly she has a connection.
20    MR. WINGET-HERNANDEZ:  And you
21  established in sworn testimony that this information
22  was the result of a telephone survey that was

Page 283

1  conducted by Mr. Tawes in which he was on the line
2  with a state person from North Carolina.
3    MR. TORBORG:  That doesn't mean that was
4  the only meeting that discussed this issue.  It's
5  clear this document suggests otherwise.
6    MR. WINGET-HERNANDEZ:  I'm not objecting
7  to your question in the abstract.  I'm objecting to
8  the manner in which you've used this document in
9  this instance.  I think it's outrageous.
10    MR. TORBORG:  Okay.
11    BY MR. TORBORG:
12    Q.   Do you recall attending any meetings with
13  states concerning the NAMFCU AWPs?
14    A.   I don't remember attending a meeting with
15  states on the NAMFCU.
16    Q.   Do you recall any discussion of HCFA
17  stating that they could not put injectable drugs or
18  other drugs on the NAMFCU list on a FUL?
19    MS. MARTINEZ:  Objection to form.
20    Q.   Do you recall that being an issue of
21  discussion at any time?
22    A.   No.  I don't remember that being a

Page 284

1  discussion at that time.
2    Q.   We'll do one more document quickly.  This
3  will be Abbott Exhibit 467.
4             (Exhibit Abbott 467 was
5             marked for
6             identification.)
7    BY MR. TORBORG:
8    Q.   For the record, what I've marked as
9  Abbott Exhibit 467 is a interrogatory response that
10  was provided by the United States in response to an
11  interrogatory issued by Abbott Laboratories.  And I
12  ask you to take a look at that and let me know if
13  you are familiar with this document.
14    A.   Yes, I am.
15    Q.   Have you reviewed this before today?
16    A.   Yes.
17    Q.   Now, this document has been signed or
18  what we call in legal terminology verified by
19  someone named William Lasowski?
20    A.   Yes.
21    Q.   Do you know who that is?
22    A.   He worked with Dennis Smith.

Page 285

1    Q.   How long has he been with HCFA?  Do you
2  know?
3    A.   I have no idea.
4    Q.   Has he been there since you started?
5    A.   I'm not sure.
6    Q.   Do you know what his involvement has been
7  with the federal upper limit program?
8    A.   I would say no involvement.  Unless it
9  was prior to my time.
10    MR. TORBORG:  We have one minute left on
11  the tape so why don't we go ahead and take a break
12  here and we'll adjourn at a time and place to be
13  decided later.  Thank you for your time.
14    THE WITNESS:  Okay.  You're welcome.
15    THE VIDEOGRAPHER:  This deposition
16  adjourns at 5:01 and consists of five tapes.
17    (Whereupon, at 5:01 p.m. the statement of
18  counsel was concluded.)
19             * * * * *
20
21
22

72 (Pages 282 to 285)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                      Washington, DC

Page 286

```
 1        SIGNATURE OF WITNESS
 2
 3
 4
 5
 6
 7
 8        _____
 9             SUE GASTON
10
11   Subscribed and sworn to and before me
12   this _____ day of _____, 20_____.
13
14
15   _____
16        Notary Public
17
18
19
20
21
22
```

73 (Page 286)

Gaston, Sue - Vol. II                          March 19, 2008
                       Washington, DC

Page 287

                UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

     v.                        )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - -

     (cross captions appear on following pages)


        Videotaped deposition of SUE GASTON


               Volume II


               Washington, D.C.

               Wednesday, March 19, 2008

               9:00 a.m.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

| Page 288 | Page 290 |

Page 288

1         UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF MASSACHUSETTS
3    - - - - - - - - - - - - - -
4    IN RE: PHARMACEUTICAL    ) MDL NO. 1456
5    INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION
6    PRICE LITIGATION        ) 01-CV-12257-PBS
7                            ) Judge Patti B. Saris
8    THIS DOCUMENT RELATES TO  ) Chief Magistrate
9    ALL CASES IN MDL NO. 1456  ) Judge Marianne B.
10   - - - - - - - - - - - - - -  Bowler
11
12
13     IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
14       THIRD JUDICIAL DISTRICT AT ANCHORAGE
15   - - - - - - - - - - - - - -
16   STATE OF ALASKA,         )
17        Plaintiff,     )
18        vs.            ) Case No.
19   ALPHARMA BRANDED PRODUCTS   ) 3AN-06-12026 CI
20   DIVISION, INC., et al.    )
21        Defendants.      )
22   - - - - - - - - - - - - - -

Page 290

1    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
2        COUNTY DEPARTMENT, CHANCERY DIVISION
3    - - - - - - - - - - - - - -
4    THE PEOPLE OF THE STATE OF )
5    ILLINOIS,            )
6        Plaintiff,   ) Case No. 05 CH 02474
7        vs.            )
8    ABBOTT LABORATORIES, et al., )
9        Defendants.     )
10   - - - - - - - - - - - - - -
11
12
13         COMMONWEALTH OF KENTUCKY
14       FRANKLIN CIRCUIT COURT - DIV. I
15   - - - - - - - - - - - - - -
16   COMMONWEALTH OF KENTUCKY, ex rel. )
17   GREGORY D. STUMBO, ATTORNEY GENERAL)
18        Plaintiff,    ) Civil Action
19        vs.            ) NO. 04-CI-1487
20   ALPHARMA USPD, INC., et al.,    )
21        Defendants.     )
22   - - - - - - - - - - - - - -

| Page 289 | Page 291 |

Page 289

1      IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
2             STATE OF HAWAII
3    - - - - - - - - - - - - - -
4    STATE OF HAWAII,        )
5        Plaintiff,    ) Case No.
6        vs.            ) 06-1-0720-04 EEH
7    ABBOTT LABORATORIES, INC., )
8    et al.,             ) JUDGE EDEN
9        Defendants.   ) ELIZABETH HIFO
10   - - - - - - - - - - - - - -
11
12
13     IN THE FOURTH JUDICIAL DISTRICT OF THE STATE OF
14       IDAHO, IN AND FOR THE COUNTY OF ADA
15   - - - - - - - - - - - - - -
16   STATE OF IDAHO,         )
17        Plaintiff,     )
18        vs.            ) Case No.
19   ALPHARMA USPD, INC., et al., ) CV 0C 0701847
20        Defendant.      )
21   - - - - - - - - - - - - - -
22

Page 291

1         COMMONWEALTH OF KENTUCKY
2       FRANKLIN CIRCUIT COURT - DIV. II
3    - - - - - - - - - - - - - -
4    COMMONWEALTH OF KENTUCKY,       )
5        Plaintiff,   ) Civil Action
6        vs.            ) NO. 03-CI-1134
7    ABBOTT LABORATORIES, INC.,      )
8        Defendants.       )
9    - - - - - - - - - - - - - -
10
11         COMMONWEALTH OF KENTUCKY
12       FRANKLIN CIRCUIT COURT - DIV. II
13   - - - - - - - - - - - - - -
14   COMMONWEALTH OF KENTUCKY, ex rel. )
15   GREGORY D. STUMBO, ATTORNEY GENERAL)
16        Plaintiff,       ) Civil Action
17        vs.            ) NO. 03-CI-1135
18   WARRICK PHARMACEUTICALS CORP.,   )
19   et al.            )
20        Defendants.       )
21   - - - - - - - - - - - - - -
22

2 (Pages 288 to 291)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                      Washington, DC

Page 292

1  STATE OF NEW YORK
2  SUPREME COURT: COUNTY OF ERIE
3  - - - - - - - - - - - - - - -
4  COUNTY OF ERIE,              )
5          Plaintiff,           )
6      vs.                      ) Index No. 05-2439
7  ABBOTT LABORATORIES, INC.,   )
8  et al.,                      )
9          Defendants.          )
10 - - - - - - - - - - - - - - -
11
12
13        STATE OF WISCONSIN CIRCUIT COURT
14             DANE COUNTY  Branch 9
15 - - - - - - - - - - - - - - -
16 STATE OF WISCONSIN,          )
17          Plaintiff,          )
18      vs.                     ) Case No. 04-CV-1709
19 AMGEN INC., et al.,          )
20          Defendants.         )
21 - - - - - - - - - - - - - - -
22

Page 293

1          IN THE CIRCUIT COURT FOR
2          MONTGOMERY COUNTY, ALABAMA
3  - - - - - - - - - - - - - - -
4  ITMO: ALABAMA MEDICAID        )
5  PHARMACEUTICAL AVERAGE        ) MASTER DOCKET NO.
6  WHOLESALE PRICE LITIGATION    ) CV-2005-219
7  - - - - - - - - - - - - - - -)
8  THIS DOCUMENT RELATES TO:     )
9  STATE OF ALABAMA  v.          )
10 ABBOTT LABORATORIES, INC.     )
11 - - - - - - - - - - - - - - -
12
13
14
15
16
17
18
19
20
21
22 (CONTINUED)

Page 294

1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3  - - - - - - - - - - - - - - -
4  IN RE: PHARMACEUTICAL      ) MDL NO. 1456
5  INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION
6  PRICE LITIGATION           ) 01-CV-12257-PBS
7  THIS DOCUMENT RELATES TO   )
8  U.S. ex rel. Ven-a-Care of ) Judge Patti B. Saris
9  the Florida Keys, Inc., et al)
10     v.            ) Chief Magistrate
11 Boehringer Ingelheim       ) Judge Marianne B.
12 Corporation, et al.,       ) Bowler
13 No. 07-CV-10248-PBS        )
14 - - - - - - - - - - - - - - -
15
16     Continued videotaped deposition of SUE GASTON,
17 held at the law offices of Jones Day, 51 Louisiana
18 Avenue, N.W., Washington, D.C. 20001-2113, the
19 proceedings being recorded stenographically by
20 Jonathan Wonnell, a Registered Professional Court
21 Reporter and Notary Public of the District of
22 Columbia, and transcribed under his direction.

Page 295

1      A P P E A R A N C E S   O F   C O U N S E L
2
3   On behalf of the United States of America:
4
5       ANA MARIA MARTINEZ, ESQ.
6       United States Department of Justice
7       99 N.E. 4th Street
8       Miami, Florida 33132
9       (305) 961-9431
10      ana.maria.martinez@usdoj.gov
11
12      -- and --
13
14      JAMES J. FAUCI, ESQ. (via phone)
15      United States Attorney's Office
16      John Joseph Moakley Building
17      1 Courthouse Way
18      Boston, Massachusetts 02210
19      (617) 748-3298
20
21
22

                          3 (Pages 292 to 295)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

| Page 296 | Page 298 |
|---|---|

**Page 296**

1    A P P E A R A N C E S (Cont'd)
2
3  On behalf of the U.S. Department of Health and
4  Human Services:
5
6      LESLIE M. STAFFORD, ESQ.
7      U.S. Department of Health & Human Services
8      Office of General Counsel, CMS Division
9      7500 Security Boulevard
10     Mail Stop C2-05-23
11     Baltimore, Maryland 21244
12     (410) 786-9655
13
14  On behalf of the State of Alabama:
15
16     PAUL LYNN, ESQ. (via phone)
17     Beasley, Allen, Crow, Methvin, Portis &
18      Miles, P.C.
19     218 Commerce Street
20     Montgomery, Alabama 36104
21     (800) 898-2034
22     paul.lynn@beasleyallen.com

**Page 297**

1    A P P E A R A N C E S (Cont'd)
2
3  On behalf of the State of Florida:
4
5     MARY S. MILLER, ESQ. (via phone)
6     Office of the Attorney General of Florida
7     PL-01, The Capitol
8     Tallahassee, Florida 32399-1050
9     (850) 414-3600
10     mary_miller@oag.state.fl.us
11
12  On behalf of the City of New York and all New York
13  Counties other than Nassau and Orange; and the
14  States of Alaska, Hawaii, Idaho, Illinois, Kentucky,
15  South Carolina and Wisconsin:
16
17     MICHAEL WINGET-HERNANDEZ, ESQ.
18     Winget-Hernandez, LLC
19     3112 Windsor Road, Suite 228
20     Austin, Texas 78703
21     (512) 858-4181
22     michael@winget-hernandez.com

**Page 298**

1    A P P E A R A N C E S (Cont'd)
2
3  On behalf of Ven-A-Care of the Florida Keys, Inc.:
4
5     MARJORY P. ALBEE, ESQ.
6     Mager & Goldstein LLP
7     1818 Market Street, Suite 3710
8     Philadelphia, Pennsylvania 19103
9     (215) 640-3280
10     malbee@magergoldstein.com
11
12  On behalf of Abbott Laboratories, Inc.:
13
14     DAVID TORBORG, ESQ.
15     SEAN P. MALONE, ESQ.
16     Jones Day
17     51 Louisiana Avenue, N.W.
18     Washington, D.C. 20001-2113
19     (202) 879-3939
20     dstorborg@jonesday.com
21     spmalone@jonesday.com
22

**Page 299**

1    A P P E A R A N C E S (Cont'd)
2
3  On behalf of Aventis Pharmaceuticals and Sanofi
4  Synthelabo:
5
6     MICHAEL L. KOON, ESQ.
7     Shook, Hardy & Bacon, LLP
8     2555 Grand Boulevard
9     Kansas City, Missouri 64108-2613
10     (816) 474-6550
11     jkoon@shb.com
12
13  On behalf of Bristol-Myers Squibb:
14
15     DIANNE M. PETERSON, ESQ. (via phone)
16     Hogan & Hartson
17     875 Third Avenue
18     New York, New York 10022
19     (212) 918-3000
20     dmpeterson@hhlaw.com
21
22

Henderson Legal Services, Inc.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                              March 19, 2008
                        Washington, DC

---

Page 300

1      A P P E A R A N C E S (Cont'd)
2
3   On behalf of Dey, Inc., Dey, L.P. and Mylan:
4
5          SARAH L. REID, ESQ.
6          Kelley, Drye & Warren LLP
7          101 Park Avenue
8          New York, New York 10178
9          (212) 808-7720
10         sreid@kelleydrye.com
11
12  On behalf of Roxane Laboratories and Boehringer
13  Ingelheim:
14
15         JARED T. HECK, ESQ.
16         Kirkland & Ellis
17         200 East Randolph Drive
18         Chicago, Illinois 60601
19         (312) 469-7087
20         jheck@kirkland.com
21
22

---

Page 301

1      A P P E A R A N C E S (Cont'd)
2
3   On behalf of Sandoz, Inc.:
4
5          MILANA SALZMAN, ESQ. (via phone)
6          White & Case LLP
7          1155 Avenue of the Americas
8          New York, New York 10036-2787
9          (212) 819-8711
10         msalzman@whitecase.com
11
12  On behalf of Schering-Plough Corporation,
13  Schering Corporation and Warrick
14  Pharmaceuticals Corporation:
15
16         JOHN P. BUEKER, ESQ.
17         Ropes & Gray
18         One International Place
19         Boston, Massachusetts 02110-2624
20         (617) 951-7050
21         john.bueker@ropesgray.com
22

---

Page 302

1      A P P E A R A N C E S (Cont'd)
2
3   On behalf of Ethex Corporation:
4
5          CLARA VONDRICH, ESQ.
6          Arnold & Porter
7          555 Twelfth Street, N.W.
8          Washington, D.C. 20004
9          (202) 942-5000
10
11
12  ALSO PRESENT:
13
14         CONWAY BARKER, Videographer
15
16
17
18
19
20
21
22

---

Page 303

1            C O N T E N T S
2   WITNESS NAME: SUE GASTON              PAGE
3   Examination By Mr. Torborg................. 310
4   Examination By Mr. Bueker.................. 402
5   Examination By Ms. Reid.................... 535
6   Examination By Mr. Heck.................... 545
7   Examination By Mr. Koon.................... 548
8
9          E X H I B I T S
10  NUMBER          DESCRIPTION          PAGE
11  Exhibit Abbot 752, excerpt from rough
12          transcript of deposition of
13          Zachary Bentley............ 315
14  Exhibit Abbot 753, HHC004-0191 - 0192......... 385
15  Exhibit Abbot 754, HHD 180-0034 - 0039....... 391
16  Exhibit Abbot 755, KY_DMS_0000000125919 - 5921 398
17
18          E X H I B I T S
19  NUMBER          DESCRIPTION          PAGE
20  Exhibit NY Counties 001, excerpt from the CFR
21          Section 447.332....... 406
22  Exhibit NY Counties 002, HHD175-0849........... 412

                                    5 (Pages 300 to 303)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 304

EXHIBITS (CONTINUED)

NUMBER          DESCRIPTION          PAGE
Exhibit NY Counties 003, FUL Drug List
        Transmittal No. 37
        dated 11/20/01........ 416
Exhibit NY Counties 004, HHD175-0850 - 0852.... 431
Exhibit NY Counties 005, HHD175-1492........... 440
Exhibit NY Counties 006, HHD175-2110........... 445
Exhibit NY Counties 007, HHD175-0009........... 453
Exhibit NY Counties 008, HHD175-0276........... 459
Exhibit NY Counties 009, FUL Drug List
        Transmittal No. 37
        dated 6/27/04......... 466
Exhibit NY Counties 010, HHD170-1050 - 1053.... 469
Exhibit NY Counties 011, HHD175-1065 - 1071.... 473
Exhibit NY Counties 012, HHD175-0557 - 0559.... 491
Exhibit NY Counties 013, HHD175-1073 - 1077.... 499
Exhibit NY Counties 014, ALMED 304072 - 304141. 508
Exhibit NY Counties 015, Spreadsheet entitled
        Albuterol .083%
        Solution As of June
        1997................. 511

Page 305

EXHIBITS (CONTINUED)

NUMBER          DESCRIPTION          PAGE
Exhibit NY Counties 016, Excerpt from the FDA's
        Orange Book, 1997..... 513
Exhibit NY Counties 017, Excerpt from the FDA's
        Orange Book, 1998..... 515
Exhibit NY Counties 018, HHD175-1059 - 1063.... 519

EXHIBITS

NUMBER          DESCRIPTION          PAGE
Exhibit Dey 136, Excerpt from the FDA's Orange
        Book, 2000.................... 537
Exhibit Dey 137,  HHC 0160123 - 0125........... 541

EXHIBITS

NUMBER          DESCRIPTION          PAGE
Exhibit Aventis 001, Medicaid Drug Rebate
        Program Release No. 18.... 554
Exhibit Aventis 002, Document entitled HCFA's
        Medicaid Drug Rebate Staff 555
Exhibit Aventis 003, Medicaid Drug Rebate
        Program Release No. 29.... 567

Page 306

EXHIBITS (CONTINUED)

NUMBER          DESCRIPTION          PAGE
Exhibit Aventis 004, Chart entitled AMP/Best
        Price Calculations........ 570
Exhibit Aventis 005, CMS carrier release number
        47 dated 7/13/00.......... 580
Exhibit Aventis 006, Chart entitled Exclusions
        from Rebate Program....... 582

Page 307

                    PROCEEDINGS
                    (9:24 a.m.)
        THE VIDEOGRAPHER:  In the United States
District Court for the District of Massachusetts
In Re: Pharmaceutical Industry Average Wholesale
Price Litigation, related to the United States of
America ex rel. Ven-A-Care of the Florida Keys
Incorporated versus Abbott Laboratories
Incorporated et al., Case Number 01-CV-12257 PBS,
this is the deposition of Sue E. Gaston, volume
2.
        Today's date is March 19th 2008.  The
location of the deposition is Jones Day, 51
Louisiana Avenue, Northwest, Washington, D.C.
Will counsel please identify yourselves and state
whom you represent?
        MR. TORBORG:  David Torborg from Jones
Day on behalf of Abbott Laboratories.
        MR. BUEKER:  John Bueker from Ropes &
Gray on behalf of Schering Corporation, Schering-
Plough Corporation and Warrick Pharmaceuticals
Corporation.

                              6 (Pages 304 to 307)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

| Page 308 | Page 310 |
|---|---|

**Page 308**

1      MS. REID:  Sarah Reid from Kelley Drye
2  on behalf of the Dey defendants and also Mylan
3  Laboratories.
4      MR. HECK:  Jared Heck with Kirkland &
5  Ellis LLP on behalf of the Roxane defendants.
6      MS. MARTINEZ:  Ani Martinez on behalf
7  of the United States.
8      MS. STAFFORD:  Leslie Stafford on
9  behalf of the Centers for Medicare and Medicaid
10  Services.
11      MS. ALBEE:  Marjory Albee from Mager &
12  Goldstein on behalf of Ven-A-Care.
13      MR. WINGET-HERNANDEZ:  Michael Wingate-
14  Hernandez.  I'm here on behalf of the City of New
15  York and the New York Counties in MDL 1456 except
16  for Orange and Nassau.  Also on behalf of the
17  states of Wisconsin, Illinois, Kentucky, South
18  Carolina, Hawaii, Alaska, Idaho, to the extent
19  that they have been cross noticed.
20      THE VIDEOGRAPHER:  Those on the phone,
21  could you please identify yourselves, please?
22      MR. LYNN:  My name is Paul Lynn.  I

**Page 309**

1  represent the state of Alabama.
2      MS. MILLER:  Mary Miller on behalf of
3  the State of Florida office of the attorney
4  general, in the cross noticed matter by Dey and
5  Mylan.
6      MS. SALZMAN:  Milana Salzman from White
7  & Case representing Sandoz, Inc.
8      MS. VONDRICH:  Clara Vondrich from
9  Arnold & Porter representing Ethex.
10      MR. FAUCI:  Jeff Fauci with the United
11  States.
12      MS. PETERSON:  Dianne Peterson with
13  Hogan & Hartson representing Bristol-Myers
14  Squibb.
15      THE VIDEOGRAPHER:  Anyone else?
16      The court reporter is Jon Wonnell.  The
17  video camera operator is Conway Barker, both on
18  behalf of Henderson Legal Services.  That
19  deposition commences at 9:27.  Please swear in
20  the witness.
21
22  Whereupon,

**Page 310**

1          SUE GASTON,
2  called as a Witness, was duly sworn by Jonathan
3  Wonnell, a Notary Public in and for the District
4  of Columbia, and was examined and testified as
5  follows.
6
7      EXAMINATION BY COUNSEL FOR ABBOTT
8  LABORATORIES
9  BY MR. TORBORG:
10      Q.  Good morning, Ms. Gaston.
11      A.  Good morning.
12      Q.  And welcome back.  Okay.  My name is
13  David Torborg from Jones Day.  And we represent
14  Abbott Laboratories in this case.  Before we get
15  started continuing with the questioning I'd like
16  to go over a few ground rules that we talked
17  about last time just as a reminder to you.
18  First, you'll need to respond verbally to my
19  questions so that Jon, the court reporter, can
20  put down your response.
21      Most importantly, if you don't
22  understand any question that I ask please ask me

**Page 311**

1  to clarify.  My goal today is not to slip in any
2  trick questions or try to confuse you.  It's to
3  try to get your best recollection of the facts.
4  Okay?
5      A.  Fine.
6      Q.  From time to time Ms. Martinez or
7  others may say objection after I ask a question.
8  Often it's a good idea to allow a short pause
9  after I ask the question in case there are any
10  objections.  But unless you're instructed not to
11  answer the question you can go ahead and answer
12  my question.  Okay?
13      A.  Fine.
14      Q.  Similar to the last time that we went
15  through this process there are some binders to
16  your left that have orange covers on them.  Those
17  are documents that have been marked as Abbott
18  exhibits in depositions that came before you.  So
19  if I ask you to go to Abbott Exhibit 520 or
20  something of that nature, I'll ask that we find
21  the binder and Ms. Martinez has usually been
22  helpful in doing that.

                              7 (Pages 308 to 311)

Gaston, Sue - Vol. II                          March 19, 2008
                      Washington, DC

Page 312

1          I'll try to take a break after an hour
2    or so.  But let me know if you need to take a
3    break before that.  Okay?
4          A.  Okay.
5          Q.  Okay.  Since the last time that you
6    were deposed here in this case have you been
7    deposed in any other AWP-related litigation?
8          A.  No.
9          Q.  Have you met with counsel for the
10   United States or CMS since your last deposition?
11         A.  Yes.
12         Q.  Can you tell me about that?
13         A.  I met with Leslie and Jeff.  Is it
14   Fauci? Last week, I think it was.
15         Q.  Was that an in-person meeting?
16         A.  What do you mean, in-person?
17         Q.  Was it in-person?
18         A.  Yes.
19         Q.  And how long was the meeting?
20         A.  Probably approximately two hours.
21         Q.  And did you review any documents at
22   that meeting?

Page 313

1          A.  Yes.
2          Q.  Did any of those documents refresh your
3    recollection at all about the subject matters
4    contained within those documents?
5          A.  Yes.
6          Q.  Tell me what documents refreshed your
7    recollection.
8          A.  They were sheets used when determining
9    federal upper limit prices.  They were copies of
10   -- copies from the application, the federal upper
11   limit application.
12         Q.  Was it your understanding that those
13   documents were being produced in AWP-related
14   litigation?
15         A.  Yes.
16         Q.  And that you would be asked about them?
17   That was your expectation?  That's why you were
18   reviewing them, I take it?
19         A.  Yes.
20         Q.  Any other conversations apart from this
21   morning that you've had with counsel?
22         A.  No.

Page 314

1          Q.  Have you had a chance to review your
2    deposition transcript from the first day of the
3    deposition?
4          A.  Yes.
5          Q.  Did you notice anything that needed
6    correcting?
7          A.  There were some typos, just minor
8    things that I annotated on the sheet.
9          Q.  But nothing substantive that you
10   recall?
11         A.  No.
12         Q.  Have you discussed anyone else's
13   testimony in AWP litigation?
14         A.  No.
15         Q.  Do you have on idea of who else from
16   your office, state Medicaid programs or
17   otherwise, has been deposed in the case?
18         A.  I understand that Larry and Deirdra and
19   Dennis Smith.
20         Q.  Anyone else?
21         A.  Not that I'm aware of, no.
22         Q.  I'd like to mark as the next exhibit,

Page 315

1    which I believe will be Abbott Exhibit 752 some
2    testimony that was provided in this case by an
3    individual by the name of Zachary Bentley.  This
4    is for the record a copy of the rough transcript
5    because that's what I had available to me at this
6    time.  It's pages 156 through 164 of that
7    transcript.
8              (Exhibit Abbott 752 was marked for
9    identification.)
10             MS. MARTINEZ:  Excuse me.  Did you say
11   156?
12             MR. TORBORG:  Page 256 through 264.
13             MS. MARTINEZ:  Okay.
14   BY MR. TORBORG:
15         Q.  Ms. Gaston, I'd like you to read to
16   yourself the line that starts from page 256 lines
17   17 through the remainder of the exhibit and then
18   I'll have some questions for you.
19         A.  (Reading.)
20             MS. MARTINEZ:  Just for the record, I
21   object to the use of these rough transcripts as
22   well as the attachment as an exhibit to the case,

                              8 (Pages 312 to 315)

Gaston, Sue - Vol. II                                     March 19, 2008
                        Washington, DC

Page 316

1  or to the deposition.
2       MR. TORBORG:  What would you have me
3  do, Ms. Martinez?  Would you like me to question
4  about the testimony without providing her a copy
5  of it?  Would that be your preference?
6       MS. MARTINEZ:  No.  I'm going to object
7  to form either way.
8       MR. TORBORG:  Okay.  But would you ask
9  me to not show her that transcript because it's a
10 rough form?
11      MS. MARTINEZ:  No.  I'm just saying
12 both are improper.  So I'm going to object to
13 form.  The court can rule.  If you want to use
14 another approach just in case so you have the
15 opportunity to maintain whatever answers the
16 witness gives, you can use another approach.
17 It's your own judgment.
18      MR. TORBORG:  Is it your position that
19 -- would you have an objection if I showed her a
20 final copy of the transcript?
21      MS. MARTINEZ:  Yes.
22      MR. TORBORG:  Why?  I want to see if I

Page 317

1  can cure whatever the objection is.
2       MS. MARTINEZ:  I just don't think it's
3  a proper question.
4       MR. TORBORG:  It's not a proper
5  question to ask someone about a deposition
6  transcript?
7       MS. MARTINEZ:  I would object to the
8  form of your question when you ask one witness
9  about what another witness said.
10      MR. TORBORG:  You think that's
11 improper?
12      MS. MARTINEZ:  Yeah.  I would object to
13 it.
14      MR. TORBORG:  Okay.
15 BY MR. TORBORG:
16  Q.  You can go ahead and continue
17 reviewing.
18  A.  Do you want me to read the whole thing?
19  Q.  Yeah.  Through the end.
20  A.  Okay.  (Reading.)
21      Okay.  I'm finished.
22  Q.  Ms. Gaston, I believe we covered this

Page 318

1  last time, but you recall an individual by the
2  name of Zack Bentley, correct?
3   A.  Yes.
4   Q.  He's affiliated with the company called
5  Ven-A-Care?
6   A.  Yes.
7   Q.  And for the period 1991 through 2003
8  you were involved with the federal upper limit
9  program for Medicaid drugs; is that right?
10  A.  Correct.
11  Q.  And you recalled attending a meeting
12 with Ven-A-Care on or about -- you didn't
13 remember the exact date, but on or around the
14 date November 14th of 1995.  Is that fair to say?
15  A.  I don't remember the exact date.
16  Q.  You remember having a meeting with
17 representatives of Ven-A-Care in the mid-1990s;
18 is that fair to say?
19  A.  Yes.
20  Q.  That was a meeting in Baltimore that
21 was attended by a number of people, correct?
22  A.  Yes.

Page 319

1   Q.  Do you recall having conversations with
2  Mr. Bentley prior to that meeting?
3   A.  I know I had conversations with Zachary
4  Bentley.  I don't know if it was prior to the
5  meeting, after the meeting.  I don't know the
6  time period.
7   Q.  Do you recall what the substance of
8  those meetings was?
9   A.  The meetings or the calls?
10  Q.  I'm sorry.  The calls with Mr. Bentley.
11 Do you recall what was being discussed?
12  A.  I don't recall.
13  Q.  Do you recall Mr. Bentley advising you
14 of -- either in a meeting that you attended or in
15 a telephone call -- that there was a large
16 difference between acquisition costs and AWPs for
17 certain injectable and infusion drugs?
18      MS. MARTINEZ:  Objection, form.
19  A.  I don't remember Zachary Bentley
20 telling me that.
21  Q.  Do you recall becoming aware of that?
22  A.  Yes.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                     Washington, DC

Page 320

1    Q.   How did you become aware of that?
2    A.   Because of the Ven-A-Care litigation.
3    Q.   And you recall becoming aware of the
4  Ven-A-Care litigation in the mid-1990s; is that
5  fair to say?
6    A.   Yes.
7    Q.   And you may have had conversations with
8  Mr. Bentley or others at Ven-A-Care prior to the
9  1995 meeting; is that fair to say?
10   A.   It's fair to say.
11   Q.   During the period in the mid-1990s --
12  or -- I'm sorry.  In the period from 1991 to,
13  say, 1997, did you have discretion on whether or
14  not to set a federal upper limit on drugs?
15         MS. MARTINEZ:  Objection, form.
16   A.   Yes.
17   Q.   So if you wanted to set a federal upper
18  limit on the injectable and infusion drugs that
19  Ven-A-Care advised you of a large difference
20  between acquisition cost and AWP, you were able
21  to do so; is that fair to say?
22         MS. ALBEE:  Objection, form.

Page 321

1    A.   No.
2    Q.   Why not?
3    A.   Because we didn't set federal upper
4  limit prices on injectable drugs or infusion
5  drugs.  We set them on drugs that were the most
6  commonly used such as tablets, capsules, creams.
7    Q.   But you're not aware of any written
8  statutory or regulatory guidance that prohibited
9  you from setting a FUL on infusion and injectable
10  drugs; is that right?
11   A.   That's right.
12   Q.   It was a policy of HCFA at the time you
13  started administering the FUL program not to set
14  FULs on those drugs; is that correct?
15         MS. MARTINEZ:  Objection, form.
16   A.   I think I would rather say that it was
17  the criteria that was established before I
18  started doing the federal upper limit program.
19   Q.   And when you say criteria, could you
20  explain what you mean by that?
21   A.   The criteria is how they determined
22  what federal upper limit prices would apply to

Page 322

1  what type of drugs and the criteria basically was
2  drugs that were considered outpatient drugs,
3  generally dispensed at the pharmacy level.
4    Q.   And we talked about this last time.
5  But you were aware that you specifically took
6  steps to exclude infusion and injectable drugs
7  from the mechanism by which the FULs were
8  calculated, correct?
9         MS. MARTINEZ:  Objection, form.
10   A.   Correct.
11   Q.   Do you recall any discussions about
12  perhaps changing the HCFA policy or criteria not
13  to establish FULs for injectable and infusion
14  drugs at any point in time?
15   A.   I know that the conversation was
16  probably discussed.  I don't know when.  But no
17  steps were taken to do that.
18   Q.   Can you tell me why not steps were
19  taken to do that?
20   A.   It's my understanding that the criteria
21  we were using is to set federal upper limit
22  prices on drugs that were most commonly used.

Page 323

1  When we stepped into the arena of injectable
2  drugs or other drugs that weren't most commonly
3  used, I think it was a little more difficult to
4  capture those drugs for various reasons.  So
5  that's why we stuck with the basic criteria that
6  we used.
7    Q.   But you believe that there were
8  discussions about possibly moving injectable
9  infusion drugs into the FUL program; is that fair
10  to say?
11   A.   I wouldn't say that specifically.
12  There could have been conversations.  I wouldn't
13  say that the conversations went as far as to say
14  let's move them into the FUL arena.  But the
15  conversations were there.  And I can only answer
16  that generally, because I only remember short
17  conversations maybe discussing the issue.
18   Q.   If there has been testimony from Mr.
19  Bentley that he -- his best recollection is that
20  he advised you of the large differences between
21  acquisition cost and AWPs for certain injectable
22  infusion drugs at least as early as 1990, could

10 (Pages 320 to 323)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                      Washington, DC

Page 324

1  you say that Mr. Bentley's recollection is
2  incorrect?
3        MS. ALBEE:  Objection, form.
4        MS. MARTINEZ:  Objection, form.
5     A.  I can't answer to his statements.
6     Q.  You just -- it's your testimony that
7  the conversations may have happened; you just
8  don't recall?
9     A.  I don't recall conversations like that
10  with Zachary Bentley.
11    Q.  But you recall conversations with Mr.
12  Bentley?
13    A.  Correct.
14    Q.  You just don't recall one way or the
15  other what the substance of the conversations
16  was, correct?
17    A.  Correct.
18    Q.  What other types of conversations would
19  you have had with Mr. Bentley apart from the
20  federal upper limit program?
21    A.  I don't remember the conversations that
22  I had with Zachary Bentley.  Specifically the

Page 325

1  conversations, I don't remember.
2     Q.  And my question is a touch different.
3     A.  Okay.
4     Q.  And it's based on what you were doing
5  at HCFA, what your responsibilities were and your
6  knowledge of how Mr. Bentley fit into the story.
7     A.  Okay.
8     Q.  Do you have a sense for -- apart from
9  the federal upper limit program, what other
10  topics you would have been discussing with Mr.
11  Bentley?
12        MS. ALBEE:  Objection, form.
13        MS. MARTINEZ:  Objection, form.
14    A.  I worked on state plan amendments.  If
15  he had an issue about something that was
16  occurring in Florida or another state, he could
17  have called me about that, what was in the state
18  plan amendment.  I don't even know if I was
19  handling Florida at the time.  Or whatever states
20  he might have questioned.  He could have asked
21  any kind of general questions about the Medicaid
22  drug rebate program or any kind of pharmacy

Page 326

1  reimbursement issues.
2     Q.  Do you recall Mr. Bentley ever raising
3  issues about the Medicaid drug rebate program?
4     A.  I can't remember specifically what I
5  discussed with Zachary Bentley.
6     Q.  Do you have any -- what is your best
7  guess about the substance of the conversations
8  that you had with Mr. Bentley and yourself?
9        MS. MARTINEZ:  Objection, form.
10    Q.  Do you believe it related to the FUL
11  program or something else?
12        MS. MARTINEZ:  Objection, form.
13    A.  My best guess would say it probably
14  related to the FUL program.
15    Q.  Ms. Gaston, is it your testimony that
16  even though you became aware of the large
17  differences between acquisition costs and AWPs
18  for certain injectable and infusion products, you
19  did not believe you had the authority or
20  discretion to place FULs on those drugs?
21        MS. MARTINEZ:  Objection, form.
22    Q.  Is that a fair summary of your

Page 327

1  testimony?
2        MS. MARTINEZ:  Objection, form.
3     A.  We did not set FUL prices on those
4  types of drugs.  Is it would be a matter of
5  changing the criteria.  And that wouldn't be
6  strictly my place to do that.
7     Q.  Okay.  Fair point.  Who had the
8  authority or whose place was it to change the
9  criteria?
10    A.  Specifically, I don't know.  I know I
11  would have to go to Larry.  I don't know whether
12  he would have to get authority from someone else
13  to do that.
14    Q.  And Mr. Reed was in attendance in at
15  least one of the meetings you had with Ven-A-Care
16  where they discussed the large difference between
17  acquisition cost and AWPs with Ven-A-Care,
18  correct?
19        MS. MARTINEZ:  Objection, form.
20    A.  He was present at the Ven-A-Care
21  meetings.
22    Q.  Do you recall any steps that were taken

11 (Pages 324 to 327)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

---

Page 328

1  at all to attempt to get FULs established for
2  infusion or injectable drugs?
3      A.  No, I don't.
4      Q.  Do you recall, Ms. Gaston, yourself
5  thinking in the mid-1990s when you were becoming
6  aware of the large differences between
7  acquisition cost and AWP for infusion and
8  injectable drugs why aren't we establishing FULs
9  for these drugs?
10      MS. MARTINEZ:  Objection, form.
11      Q.  Do you recall having that thought in
12  your head?
13      A.  I had the thought in my head.  But the
14  thought in my head is just trying to capture more
15  drugs for savings to the states.  Whether it was
16  injectables or unit dose or anything outside of
17  the basic criteria, I thought about trying to
18  expand it to include additional drugs just for
19  cost saving purposes.
20      Q.  Do you recall becoming aware of any
21  other classes of drugs outside of infusion and
22  injectable drugs where you were becoming aware of

---

Page 329

1  the large differences between acquisition cost
2  and AWPs?
3      MS. MARTINEZ:  Objection, form.
4      MS. ALBEE:  Objection, form.
5      A.  Here again, when I'm working with the
6  FUL program I'm looking at it just to try to
7  include more drugs.  I'm not looking at it -- at
8  a class of drugs and where there might be a
9  difference in the pricing.
10      Q.  You testified a second ago that you
11  were concerned or you wanted to try to achieve
12  more cost savings for Medicaid, correct?
13      A.  Correct.
14      Q.  And the FUL program was a tool that CMS
15  could use to do that, correct?
16      A.  Correct.
17      Q.  And you understood the purpose of the
18  FUL program was to mitigate against certain
19  manufacturers having high AWPs, correct?
20      MS. MARTINEZ:  Objection, form.
21      A.  Can you repeat that?
22      Q.  You understood that the purpose of the

---

Page 330

1  FUL program was to mitigate against certain
2  manufacturers having high AWPs on their drugs?
3      MS. MARTINEZ:  Objection, form.
4      A.  The purpose of the FUL program was to
5  set a reasonable reimbursement rate for states.
6      Q.  And do you have an understanding about
7  -- as the person who was in charge of the FUL
8  program from the early '90s through I think 2003,
9  2004 -- is that about --
10      A.  2003.
11      Q.  2003.  Do you have an understanding of
12  why was this program created?  Why not just take
13  the AWPs for each manufacturer's drugs straight
14  from the compendia?
15      A.  It was in regulations.  The FUL program
16  was in regulations.
17      Q.  But did you have an understanding of
18  the purpose behind it?
19      A.  Yes, I did.
20      Q.  And your understanding was what?
21      A.  It's to set -- the federal government
22  sets a reimbursement rate for states and is

---

Page 331

1  trying to achieve savings.  We're trying to set
2  reasonable reimbursement rates for certain
3  generic drugs.
4      Q.  Do you recall taking any steps, whether
5  it be merely a conversation with Mr. Reed or
6  someone else in your office to establish federal
7  upper limits for infusion and injectable drugs?
8      A.  The conversation could have come up.  I
9  know it was discussed about including those in
10  FULs, but it was just a conversation.
11      Q.  And the conversation, was that with Mr.
12  Reed?
13      A.  I can't say.  It probably included Mr.
14  Reed, because he was my supervisor.
15      Q.  Who else would have been included in
16  that?
17      A.  I don't know.  It depends on who I was
18  mentoring at the time.
19      Q.  Did you have conversations with anyone
20  outside of CMS about setting federal upper limits
21  for infusion and injectable drugs?
22      A.  I don't recall that, no.

12 (Pages 328 to 331)

Gaston, Sue - Vol. II                          March 19, 2008
Washington, DC

| Page 332 |
|---|
| 1    Q.  For example, to see if it triggers your |
| 2  memory, do you recall conversations with provider |
| 3  advocacy groups about whether or not to set a FUL |
| 4  on injectable or infusion drugs? |
| 5       MS. MARTINEZ:  Objection, form. |
| 6    A.  I don't remember that, no. |
| 7    Q.  So what you recall is you believe there |
| 8  were conversations that would have included Mr. |
| 9  Reed about the possibility of putting a FUL on |
| 10  injectable and infusion drugs, correct? |
| 11    A.  Correct. |
| 12    Q.  Where did it go from there? |
| 13    A.  It didn't go any further. |
| 14    Q.  Do you know why not? |
| 15    A.  I think the way that from my |
| 16  recollection to try to include those drugs was it |
| 17  was -- it was more complicated because those |
| 18  types of drugs aren't most commonly used |
| 19  generally at the pharmacy level.  A lot of them |
| 20  aren't identified by NDC numbers.  They would |
| 21  have J codes or HCPCS codes.  So it made it much |
| 22  more difficult to be able to identify.  And a lot |

| Page 333 |
|---|
| 1  of them, again, are not generic drugs.  A lot of |
| 2  them are single-source drugs. |
| 3       So it was, I think, an area that didn't |
| 4  seem to work well for the federal upper limit |
| 5  program.  And again, we go back to -- when we |
| 6  decide not to include something in the FULs, we |
| 7  still go back to the fact that the states can set |
| 8  reimbursement rates that they feel are |
| 9  reasonable. |
| 10    Q.  Do you recall if Ven-A-Care actually |
| 11  supplied you with NDC numbers for certain of the |
| 12  injectable and infusion drugs for which they |
| 13  informed you of a large difference between |
| 14  acquisition cost and AWPs? |
| 15       MS. ALBEE:  Objection, form. |
| 16    A.  I can't remember that.  I know that |
| 17  they brought materials when they met with us. |
| 18  But I can't remember if NDC numbers were in the |
| 19  materials they brought. |
| 20    Q.  I'd like to ask you to take out Exhibit |
| 21  453. |
| 22       MS. MARTINEZ:  Do you know the binder? |

| Page 334 |
|---|
| 1       MS. ALBEE:  Could you give the Bates |
| 2  numbers? |
| 3       MR. TORBORG:  I do not.  VAC MDL 86162 |
| 4  through 175. |
| 5  BY MR. TORBORG: |
| 6    Q.  We looked at this document last time. |
| 7  Do you recall that?  I asked you some questions |
| 8  earlier. |
| 9    A.  I can't remember. |
| 10    Q.  Would you please go to the Bates page |
| 11  ending 170?  This is a page titled "Generics more |
| 12  expensive than brand."  Do you see that? |
| 13    A.  Yes. |
| 14    Q.  If you look down at the bottom of the |
| 15  first column there's J 3370 Vancocin.  Do you see |
| 16  that? |
| 17       MR. WINGET-HERNANDEZ:  Could you repeat |
| 18  the number, please? |
| 19       MR. TORBORG:  Bates page ending 170. |
| 20  BY MR. TORBORG: |
| 21    Q.  I'm making you get out another pair of |
| 22  glasses. |

| Page 335 |
|---|
| 1    A.  Yup. |
| 2       MR. WINGET-HERNANDEZ:  Yeah.  That's |
| 3  the part I was hoping you would tell us again. |
| 4  Why don't you say exactly what's on the page |
| 5  you're looking at. |
| 6       MR. TORBORG:  The page I'm looking at? |
| 7       MR. WINGET-HERNANDEZ:  Maybe I |
| 8  misunderstood you.  I thought you were trying to |
| 9  direct our attention to a particular part of this |
| 10  page. |
| 11       MR. TORBORG:  Yes.  Left column below J |
| 12  3370. |
| 13       MR. WINGET-HERNANDEZ:  I see.  Thank |
| 14  you. |
| 15  BY MR. TORBORG: |
| 16    Q.  Do you recall that Lilly was the brand |
| 17  name maker of Vancocin? |
| 18    A.  I don't recall that. |
| 19    Q.  And do you see that on the right-hand |
| 20  side of the page there's a column for generic? |
| 21  Do you see that? |
| 22    A.  Correct. |

13 (Pages 332 to 335)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                      March 19, 2008
                    Washington, DC

| Page 336 |
|---|

1    Q.  And then below toward the bottom of the
2  page there's a section that says "vancomycin
3  hydrochloride."  Do you see that?
4    A.  Yes.
5    Q.  And here does it appear as though Ven-
6  A-Care has provided you with specific NDC numbers
7  for vancomycin hydrochloride that fall under the
8  heading of instances where generics are more
9  expensive than brands?
10     MS. MARTINEZ:  Objection, form.
11    A.  I mean, I see NDC numbers, yes.  Okay,
12  under -- yes.
13    Q.  So is it a fair summary of your
14  testimony -- and please tell me if it's not.  I'm
15  not trying to put words in your mouth -- that
16  when it came to infusion and injectable drugs you
17  knew that there was an issue with there being a
18  large difference between acquisition cost and
19  AWP, correct?
20     MS. MARTINEZ:  Objection, form.
21    Q.  You learned that from Ven-A-Care?
22     MS. MARTINEZ:  Objection, form.

| Page 337 |
|---|

1     MS. ALBEE:  Objection, form.
2    A.  That's what they're stating, yes.
3    Q.  And you had conversation -- you believe
4  you had conversations about moving those classes
5  of drugs into the FUL list, correct?
6     MS. MARTINEZ:  Objection, form.
7    A.  There was conversation, yes.
8    Q.  And you didn't do so because you
9  thought it would be too difficult?
10     MS. MARTINEZ:  Objection, form.
11    A.  I'm sure there were other reasons too.
12    Q.  What other reasons do you believe there
13  may have been?
14    A.  I can't think of those at this time.
15  But I'm sure that it was more than just that it's
16  too difficult.  It might not be reasonable.
17    Q.  Now, when you say might not be
18  reasonable, can you tell me when you mean by
19  that?
20    A.  What I mean by that is many of these
21  drugs -- or not many, but some of these drugs
22  could be single-source drugs, might not have

| Page 338 |
|---|

1  generic versions.
2    Q.  Let's take apart the --
3    A.  Some of them could have HCPCS codes or
4  J codes and they don't have NDC numbers when
5  they're submitted on the claim form.  So they're
6  -- that complicates matters.
7    Q.  But you understand that for every drug
8  there's an NDC number, correct?
9    A.  Correct.
10    Q.  And you knew that there were infusion
11  and injectable drugs that were being reimbursed
12  through Medicaid pharmacy programs, correct?
13     MS. MARTINEZ:  Objection, form.
14    A.  Correct.
15    Q.  And you knew based on your experience
16  that generally speaking Medicaid pharmacy
17  reimbursement was tied to NDC codes, correct?
18    A.  Correct.
19    Q.  Would it be fair to say -- strike that.
20  I'm done with that.
21     I'd like to hand you what we marked
22  previously in this case as Abbott Exhibit 582.

| Page 339 |
|---|

1     MR. TORBORG:  Ani, this is one of those
2  I showed Mr. Reed yesterday.  So it should be in
3  your stack.
4     MS. MARTINEZ:  Could you describe it
5  for a second to see if -- I don't have a number
6  on this one.
7     MR. TORBORG:  It is a document bearing
8  the Bates number HHD 021-0121 through 22.
9     MS. MARTINEZ:  I found it.  What's the
10  exhibit number?
11     MR. TORBORG:  582.
12  BY MR. TORBORG:
13    Q.  Ms. Gaston, if you would take a look at
14  that document?
15     MR. WINGET-HERNANDEZ:  Dave, is that
16  the one you borrowed from us?
17     MR. TORBORG:  It is.  Thank you for
18  letting me borrow it.
19     MR. WINGET-HERNANDEZ:  No problem.
20  BY MR. TORBORG:
21    Q.  For the record, this is a record of
22  discussion dated September 27 through 28, 1995

                              14 (Pages 336 to 339)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

| Page 340 |
| --- |

1    indicating the place was the Radisson Hotel in
2    Richmond, Virginia.
3        Ms. Gaston, have you had a chance to
4    look through this to the extent necessary to tell
5    me if you recall this particular document?
6        A.  I don't remember this document.
7        Q.  And my question from counsel for
8    the United States is this was a document that was
9    produced from OIG in connection with some of the
10   work they had done in that area.  Do you recall
11   that there was an effort by OIG in the mid-1990s
12   to do a survey of states to compare invoice cost
13   to AWP?  Do you recall that effort?
14       A.  I recall it, but I don't recall the
15   details.
16       Q.  Okay.  Do you recall attending a
17   meeting in Richmond, Virginia on or around
18   September 27th and 28th 1995 with members of OIG
19   and state pharmacy administrators to talk about
20   OIG's work in this area?
21       A.  Yes.
22       Q.  And your -- at least this document

| Page 341 |
| --- |

1    indicates that Mike Keough and Estelle Chisholm
2    from HCFA were also there; is that correct?
3        A.  That's correct.
4        Q.  And they were -- and I believe you
5    testified to this last time -- in the policy area
6    of the Medicaid Bureau; is that right?
7        A.  Correct.
8        Q.  Tell me what you recall about the
9    meeting in Virginia.
10       A.  I don't recall.  I recall the meeting,
11   but I don't recall the discussion.  I really
12   don't recall anything of the meeting.
13       Q.  You recall the meeting.  Do you recall
14   that it was attended by representatives from
15   state Medicaid programs?
16       A.  Correct.
17       Q.  And you recall that the meeting was to
18   discuss the difference between acquisition cost
19   and AWP?
20       MS. MARTINEZ:  Objection, form.
21       A.  I recall that the meeting was to
22   discuss some issues the OIG had.  But I can't

| Page 342 |
| --- |

1    remember specifically except for what this report
2    says.
3        Q.  Okay.  The last paragraph on the first
4    page -- actually, the second to the last
5    paragraph, the second sentence, states "The
6    states officials believed that the report should
7    include the following disclaimer:  Our review was
8    limited to ingredient acquisition costs and did
9    not address other areas such as: The effect of
10   Medicaid business as a contribution to other
11   store sales."  And let me stop there.
12       Do you recall the state Medicaid
13   representatives raising concerns regarding the
14   impact of OIG's work in this area?
15       A.  No.
16       Q.  Do you have an understanding of what is
17   meant by "the effect of Medicaid business as a
18   contribution to other store sales"?  Do you know
19   what they're talking about there?
20       A.  Not really.  It's not clear to me.
21       Q.  Do you recall there being discussion at
22   any time at HCFA regarding the fact that medicate

| Page 343 |
| --- |

1    patients in general may not provide as much
2    ancillary business to a pharmacy than non-
3    Medicaid patients?  Is that an issue you recall
4    being discussed?
5        MS. MARTINEZ:  Objection, form.
6        A.  I don't remember that, no.
7        Q.  Have you thought about that issue ever
8    before, that consideration?
9        A.  I don't know.
10       Q.  The other -- the rest of the disclaimer
11   the states officials wanted to have in the report
12   continues "the cost to provide professional
13   services other than dispensing a prescription,
14   such as therapeutic interventions."  Do you have
15   an understanding of what's being talked about
16   there, Ms. Gaston?
17       A.  It appears that they're talking about
18   other services that the pharmacist -- other than
19   the dispensing of the drugs, if they have --
20   other than consulting, I think sometimes they
21   could offer other services.
22       Q.  What other kind of services are

15 (Pages 340 to 343)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                      March 19, 2008
Washington, DC

Page 344

1  possible in this area?
2      A.  I'm not that familiar with it and it's
3  been a long time since I've been involved.  But
4  there's been some -- I think -- sort of like
5  management type services.  They might help
6  individuals with asthma.  So they might have some
7  other I guess maybe testing they might perform or
8  counseling or guidance that the pharmacist might
9  do above and beyond just the dispensing of the
10  drug.
11      Q.  And do you recall whether or not state
12  Medicaid pharmacy programs were providing
13  reimbursement for those types of services?
14      A.  It's my recollection that those types
15  of services if they were being paid for would
16  have to be under another type of service.  It
17  would have to be -- it wouldn't be included in
18  the dispensing fee.  It would be a separate
19  payment.
20      Q.  And do you recall if states were
21  providing that payment?
22      A.  I don't recall.  I know that some

Page 345

1  states have asked to have that in their state
2  plan amendment.  But again, I don't know what
3  other service -- what other service category that
4  would fall under.
5      Q.  Do you recall any conversations or
6  learning at all that those types of services, the
7  above and beyond the typical dispensing, were
8  being paid for by profits being made on the
9  ingredient side?  Do you recall those
10  discussions?
11          MS. MARTINEZ:  Objection, form.
12      A.  I don't recall that.
13      Q.  What interactions apart from obviously
14  this meeting did you have with state Medicaid
15  officials?
16      A.  Are you talking about this meeting, the
17  '95 meeting?
18      Q.  Just generally speaking.  Let me see if
19  I can move things along.  You did meet with them
20  in connection with state plan amendments,
21  correct?
22      A.  Correct.

Page 346

1      Q.  And those were typically over the phone
2  or through this written correspondence?
3      A.  Yes.
4      Q.  And then obviously you attended this
5  meeting?
6      A.  Yes.
7      Q.  Apart from those two categories of
8  discussions with state pharmacy administrators,
9  did you have any other interactions with them?
10      A.  Yes.
11      Q.  Okay.  Can you tell me about that?
12      A.  I attended other conferences.  I
13  mentioned those in the last deposition.  Some of
14  the pharmacy associations would have conferences
15  that I attended.  I received phone calls,
16  inquiries about the rebate program.  Any kind of
17  general work-related questions.
18      Q.  If I could ask you to go to the next
19  page of this document.  It states "The state
20  officials were concerned that without the above
21  disclaimer that uninformed state officials might
22  overreact to our report and adjust pharmacy

Page 347

1  reimbursement without considering the other
2  aspects of reimbursement."  Do you see that?
3      A.  Yes.
4          MS. MARTINEZ:  Objection, form.
5      Q.  Do you recall that sentiment being
6  expressed either at this meeting or at any other
7  time?
8      A.  No.
9      Q.  Do you have an understanding of what
10  they're talking about there?
11      A.  Yes.
12      Q.  What is your understanding?
13      A.  It's my understanding that they're
14  trying to say that they want to make sure that
15  state officials -- they want to make sure that
16  they're setting reimbursement rates that are what
17  they feel is, I guess, correct reimbursement
18  rates and they're not influenced by other
19  factors.
20      Q.  Is it fair to say that the state
21  officials were worried that other uninformed
22  state officials might cut ingredient cost

16 (Pages 344 to 347)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 348

1   reimbursement?
2           MS. MARTINEZ:  Objection, form.
3       A.   It appears from this report the OIG
4   must have felt that way.
5       Q.   And do you recall conversations at any
6   time, Ms. Gaston, that state officials were
7   concerned that cutting back or decreasing
8   ingredient cost reimbursement might necessitate
9   increases to other aspects of reimbursement, such
10  as the dispensing fee?
11          MS. MARTINEZ:  Objection, form.
12      A.   I can't specifically remember
13  conversations like that.
14      Q.   Can you recall general conversations
15  along those lines?
16      A.   I don't.
17      Q.   I'd like to ask you to take out Exhibit
18  327.  Ms. Gaston, this is a cover letter that
19  attaches an OIG's study in the mid-'90s comparing
20  invoice cost to AWP.  And this one covers
21  Montana, I believe.  Let me ask you first, Ms.
22  Gaston, if you recall reviewing any of the OIG's

Page 349

1   reports that resulted from their work in the mid-
2   '90s?
3       A.   I don't remember.
4       Q.   Would it have been your pattern and
5   practice to review OIG reports that related to
6   Medicaid pharmacy issues?
7       A.   Correct.
8       Q.   Yes, it would have been?
9       A.   Yes.
10      Q.   And you would agree that this does
11  relate to Medicaid pharmacy issues?
12      A.   It does.  But it's a state-specific
13  report.  I don't know if we received every state-
14  specific report from the OIG.
15      Q.   If we go down to the third paragraph on
16  the first page, the third sentence, it states
17  "The overall estimate of the extent that AWP
18  exceeded pharmacy purchase invoice prices was
19  16.2 percent for brand name drugs and 48.5
20  percent for generic drugs.  The national
21  estimates are 18.3 percent and 42.5 percent
22  respectively."  Do you see that?

Page 350

1       A.   Yes.
2           MS. MARTINEZ:  Objection, form.
3       Q.   Do you recall learning of discounts of
4   AWP along those lines that came from OIG's work
5   in the mid-'90s?
6       A.   Can you explain your question?
7       Q.   Do you recall generally speaking that
8   OIG found differences between AWP and invoice
9   costs of approximately 18 percent for brand name
10  drugs and 42 and a half percent for generic
11  drugs?
12      A.   I can't remember percentages.
13      Q.   But you recall that they found a higher
14  difference for generic drugs; is that fair to
15  say?
16          MS. MARTINEZ:  Objection, form.
17      A.   I can't say.
18      Q.   But you would agree that a reader of
19  this report could see that OIG found that there
20  was an 18.3 percent discount off of AWP for brand
21  name drugs and 42.5 percent for generic drugs,
22  correct?

Page 351

1       A.   Yes.
2       Q.   And it would have been your pattern and
3   practice to review this type of report in your
4   position at HCFA?
5           MS. MARTINEZ:  Objection, form.
6       A.   As I said before, I don't know if we
7   got state-specific OIG reports.
8       Q.   Would you have reviewed the combined --
9   strike that.
10          Do you recall that OIG prepared a
11  combined set of reports that consolidated the
12  results from all the states?
13          MS. MARTINEZ:  Objection, form.
14      A.   I may have.  I'm not sure.  It sounds
15  familiar, but I can't remember it specifically.
16      Q.   You do recall attending the meeting in
17  Richmond in '95, correct?
18      A.   In Richmond?
19      Q.   Yes.
20      A.   Yes.
21      Q.   And do you recall that OIG at that
22  meeting presented the results of their review?

17 (Pages 348 to 351)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 352

1    A.  I don't remember that.
2    Q.  You have no doubt or no reason to
3  disagree that as indicated in Abbott Exhibit 582
4  that OIG did present the results of their AWP
5  review in that Richmond meeting in 1995?
6        MS. MARTINEZ:  Objection, form.
7    A.  That's what the report indicates.
8    Q.  And you have no reason to believe
9  that's not correct; is that fair to say?
10   A.  That's fair to say.
11   Q.  If I could ask you to go to the last
12 two pages of the Montana report, which is Abbott
13 Exhibit 327, I'd like to direct your attention to
14 the second paragraph of the Montana letter where
15 they state in part "It is important to note that
16 the study did not investigate the payment of
17 these services by Medicaid, only the confident of
18 acquisition of the drug by the providers."  Do
19 you see that?
20   A.  Yes.
21   Q.  Do you recall that sentiment ever being
22 expressed in any discussion of an OIG report

Page 353

1  ever?
2    A.  You're talking about services?
3    Q.  The fact that OIG is only looking at
4  the acquisition cost side of the equation.  Do
5  you recall that being discussed ever at any
6  meeting?
7    A.  I don't quite understand your question.
8  I mean, they do various reports.  So are you
9  saying -- I don't understand your question.  They
10 could look at that in one report.
11   Q.  Do you recall that OIG prepared a
12 number of reports throughout the 1990s where they
13 compared acquisition cost to AWP?
14   A.  Yes.
15   Q.  Do you recall ever having discussion
16 with anyone that in their reports they were
17 focusing just on that aspect of reimbursement and
18 not on any other aspects?
19       MS. ALBEE:  Objection, form.
20   A.  I don't recall that.
21   Q.  The conversations may have happened;
22 you just don't recall?

Page 354

1    A.  Correct.
2    Q.  It's been some time since those reports
3  were issued?
4    A.  Yes.
5    Q.  Your memory has faded?
6    A.  Excuse me?
7    Q.  Your memory has faded?
8    A.  Yes.
9    Q.  In the third paragraph, third sentence,
10 it starts with "in Montana," it states "In
11 Montana we currently believe that the dispensing
12 fee is below the cost to dispense because of the
13 cap on dispensing fees that is currently in place
14 and has been for many years."  Do you see that?
15       MS. MARTINEZ:  Objection, form.
16   A.  Yes.
17   Q.  Do you recall learning in the mid-1990s
18 or earlier that there were some concerns across
19 the state Medicaid programs that dispensing fees
20 might be inadequate?
21       MS. ALBEE:  Objection to form.
22   A.  I don't specifically recall it, but

Page 355

1  it's possible.
2    Q.  Do you recall general conversations
3  along those lines?
4    A.  I don't recall.
5    Q.  What work did CMS do to assess the
6  adequacy of state Medicaid programs' dispensing
7  fees?
8        MS. MARTINEZ:  Objection, form.
9    A.  Does it pertain to state plan
10 amendments? Is that what you're --
11   Q.  Generally speaking.
12   A.  I mean, generally --
13   Q.  At all.
14   A.  If states tried to adjust their
15 dispensing fees then we would work with them to
16 make sure that they can justify that their
17 dispensing fee is adequate.
18   Q.  And that was something you did in
19 connection with state plan amendments?
20   A.  Correct.
21   Q.  So as you sit here today you don't
22 recall any specific or even general conversations

18 (Pages 352 to 355)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                     Washington, DC

Page 356

1  with anyone regarding the fact that dispensing
2  fees at state Medicaid programs might be
3  inadequate; is that a fair summary of your
4  testimony?
5      A.  What I'm saying is that I don't recall
6  specific conversations like that.  They could
7  have come up, but I don't recall that.
8      Q.  Would you agree as a general matter,
9  Ms. Gaston, that in reviewing the subject of
10 Medicaid payment for drugs and the adequacy of
11 that amount, one should look at more than just
12 the ingredient side of the equation?
13     MS. MARTINEZ:  Objection, form.
14 A.  Yes.
15     Q.  And so in this case when -- in this
16 litigation where we're looking at the question of
17 whether or not Medicaid programs overpaid
18 providers to dispense drugs to beneficiaries, it
19 wouldn't be appropriate to look just at the
20 ingredient side of the equation; would you agree
21 with that?
22     MS. MARTINEZ:  Objection, form.

Page 357

1      A.  I can't answer that.
2      Q.  Why not?
3      A.  Because it's not my place to answer
4  that.
5      Q.  Well, I'm asking for your view on that
6  question today.
7      A.  Can you repeat the question?
8      MR. TORBORG:  Would you mind reading it
9  back, Jon.
10     (Whereupon, the requested portion
11 was read by the reporter.)
12     MS. MARTINEZ:  Objection, form.
13     A.  I guess the way I want to answer that
14 is from my perspective, working with a state,
15 they want to set a reimbursement rate.  We want
16 them to justify that their reimbursement rate is
17 reasonable.  And they want to set dispensing
18 fees.  And we ask them to provide that those
19 dispensing fees are reasonable.  That's how I
20 look at it.  And the burden of proof is on the
21 state.
22     Q.  Could you answer my question yes or no

Page 358

1  that I asked you?  Do I need to read it back?
2      A.  Yup.
3      MR. TORBORG:  Jon, would you read it
4  back for her?
5      (Whereupon, the requested portion
6  was read by the reporter.)
7      A.  Yes.
8  BY MR. TORBORG:
9      Q.  If I could ask you to take out Abbott
10 Exhibit 84.  For the record, this is another one
11 of OIG's reports in the mid-1990s reviewing
12 invoice cost with AWPs.  This one is for the
13 State of Florida.  Ms. Gaston, my guess is that
14 you don't recall if you reviewed this particular
15 report.  Is that fair to say?
16     A.  That's correct.
17     Q.  Could you go to the last two pages of
18 the exhibit?  This is the letter from Florida.
19     MR. WINGET-HERNANDEZ:  Dave, could you
20 give us the date on that, please?
21     MR. TORBORG:  Sure.
22     MR. WINGET-HERNANDEZ:  The date of the

Page 359

1  report, that is.
2      MR. TORBORG:  August of 1996.
3      MR. WINGET-HERNANDEZ:  Thank you.
4  BY MR. TORBORG:
5      Q.  Ms. Gaston, do you remember this
6  letter?
7      A.  No, I don't.
8      Q.  Do you remember an individual by the
9  name of Jerry Wells?
10     A.  Yes, I do.
11     Q.  And how have you come to know Mr.
12 Wells?
13     A.  He worked in the pharmacy area for the
14 state.
15     Q.  Of Florida?
16     A.  Of Florida.
17     Q.  And you got to know him through
18 meetings that you attended of pharmacy
19 administrators?
20     A.  Yes.  And conversations.
21     Q.  What other conversations did you have
22 with --

19 (Pages 356 to 359)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                            Washington, DC

---

Page 360

1     A.  I don't know specifically.  I've known
2  him for years.
3     Q.  Did you have conversations with Mr.
4  Wells when Ven-A-Care was also in the room?
5     A.  I don't know.
6     Q.  If I could ask you to go to the third
7  paragraph of Mr. Cook's letter where he wrote in
8  part "Comparing acquisition costs for Florida
9  pharmacies to AWP as an academic exercise proves
10  that pharmacies, like almost all retail
11  businesses, purchase goods at some discount below
12  suggested list prices, but does not provide an
13  indication of need to change current
14  reimbursement policy."  Do you see that?
15        MS. MARTINEZ:  Objection, form.
16     A.  Yes.
17     Q.  Do you have an understanding as to sit
18  here today of what Mr. Cook was saying there?
19        MS. ALBEE:  Objection, form.
20        MS. MILLER:  Florida joins that
21  objection.
22     A.  No.

---

Page 361

1     Q.  If we go to the last paragraph on the
2  page, third sentence, Mr. Cook wrote "Restricting
3  reimbursement to actual costs" -- I'm sorry.  Let
4  me go one sentence before that.
5        "In most cases the products are multi-
6  source.  Restricting reimbursement to actual
7  costs might have the unintended effect of
8  discouraging purchase of promotional products and
9  eventually shifting the market to single-source
10  products, which are universally much more
11  costly."  Do you see that?
12        MS. MARTINEZ:  Objection, form.
13     A.  Yes.
14     Q.  Do you have an understanding of what
15  Mr. Cook is saying in those two sentences?
16        MS. ALBEE:  Objection, form.
17        MS. MILLER:  Florida.  Objection, form.
18     A.  I could just repeat what says.  That's
19  --
20     Q.  Could you paraphrase that?
21        MS. ALBEE:  Objection, form.
22        MS. MILLER:  Florida.  Objection, form.

---

Page 362

1     A.  They're just saying that restricting
2  the reimbursement to actual cost, which I guess
3  is what they pay -- I don't know -- might have an
4  unintended effect on discouraging purchases of
5  promotional products and eventually soliciting
6  the market to single-source products.
7        You know, I'd rather just read it.  I
8  don't -- in other words, you're asking me to
9  interpret something that somebody else wrote and
10  --
11     Q.  But you do understand what he's talking
12  about; is that fair to say?
13        MS. MARTINEZ:  Objection, form.
14     A.  Basically.  I'm not sure exactly, but,
15  you know, I could --
16     Q.  Fair enough.
17     A.  Yeah.
18     Q.  Do you recall the topic of not wanting
19  to restrict payment for generic drugs to
20  acquisition cost because it might encourage the
21  use of brand name drugs to be something that came
22  up?

---

Page 363

1     A.  No, I don't remember that.
2     Q.  Would you read Mr. Cook's letter today
3  as indicating that Florida did not want to pay
4  the actual acquisition cost for multi-source
5  products because it might discourage the use of
6  those products?
7        MS. ALBEE:  Objection, form.
8        MS. MARTINEZ:  Objection, form.
9        MS. MILLER:  Florida.  Objection, form.
10     A.  That's what it sounds like they're
11  saying in the letter.
12     Q.  In the next page Mr. Cook wrote
13  "injectable products and associated intravenous
14  fluids also continue to be problematic.
15  Manufacturers offer contracts to most vendors
16  providing very favorable pricing and terms, but
17  manufacturers continue to market small quantities
18  of these through conventional sources and report
19  single unit pricing through the national data
20  sources."  Do you see that?
21     A.  Yes.
22        MS. MARTINEZ:  Objection, form.

---

20 (Pages 360 to 363)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                        Washington, DC

Page 364

1     Q.  And by this point in time you had
2  already met with Ven-A-Care where they had
3  indicated to you that for injectable and
4  intravenous fluids there was a large difference
5  between acquisition cost and AWP; is that fair to
6  say?
7           MS. ALBEE:  Objection, form.
8           MS. MARTINEZ:  Objection, form.
9     A.  That's fair to say.
10    Q.  You know, I asked a pharmacy
11 administrator about this language last week and
12 asked him to give me his view on what Mr. Cook
13 was saying.  And he stated that it looked to him
14 as though Florida was asking the federal
15 government to put a federal upper limit on these
16 drugs.  Do you read that the same way?
17          MS. ALBEE:  Objection, form.
18          MS. MARTINEZ:  Objection, form.
19          MS. MILLER:  Florida.  Objection, form.
20    A.  Like I said before, I don't -- I'm not
21 interpreting that -- I don't know what the
22 intention was meant here.  I can't take that read

Page 365

1  from it, no.
2     Q.  Do you recall having any discussions
3  with state Medicaid pharmacy personnel where they
4  requested HCFA to put a federal upper limit on
5  any injectable or infusion drug?
6           MS. MARTINEZ:  Objection, form.
7     A.  I don't recall that.
8     Q.  Those conversations may have happened;
9  you just may not recall them as you sit here
10 today?
11    A.  I don't recall.
12    Q.  So they may have happened; you don't
13 recall?
14    A.  They may have happened, but I don't
15 recall.
16    Q.  I'd like to ask you to go to Abbott
17 Exhibit 16?
18          MR. WINGET-HERNANDEZ:  While we're
19 doing that, will you tell us again what that last
20 exhibit number was, please?
21          MR. TORBORG:  84.
22          MR. WINGET-HERNANDEZ:  Thank you.

Page 366

1  BY MR. TORBORG:
2     Q.  We'll do one more document and then
3  we'll take a break.  Is that okay, Ms. Gaston?
4     A.  That's fine.
5     Q.  For the record, Abbott Exhibit 16 is a
6  June 25th 1996 fax cover sheet from Zack Bentley
7  to a Mr.  Keith Lynn of the Senate Finance
8  Committee attaching an article from Barron's
9  Magazine dated June 10, 1996 entitled "Hooked On
10 Drugs."
11          Ms. Gaston, if you would take a look at
12 that document to the extent necessary to tell me
13 whether or not you recall this particular
14 document?
15    A.  I don't remember seeing this.
16          MR. TORBORG:  Why don't we take our
17 first break here.
18          THE VIDEOGRAPHER:  This is the end of
19 tape 1.  Off the record at 10:35.
20          (Recess.)
21          THE VIDEOGRAPHER:  Thi is the beginning
22 of tape 2 in the deposition of Ms. Gaston.  On

Page 367

1  the record at 10:56.
2  BY MR. TORBORG:
3     Q.  Welcome back, Ms. Gaston.
4     A.  Thank you.
5     Q.  While we were on the break I showed you
6  Abbott Exhibit 381.  I put it in front of you.
7  This is an August 30th 2004 report prepared by
8  ABT Associates entitled "Medicaid and Medicare
9  drug pricing, strategy to determine market
10 prices, final report."  My question for you on
11 this one is very simple, and that is do you
12 recall this document?
13    A.  I was aware of it.  I've never read it
14 completely.
15    Q.  You've read portions of it?
16    A.  I may have.  It looks a little
17 familiar.  But this was after I left the policy
18 area.
19    Q.  Ms. Gaston, if I could ask you to take
20 out Abbott Exhibit 326.  Ms. Gaston, I don't
21 recall if I asked you about these last time,
22 quite frankly.  But this is a collection of pages

                              21 (Pages 364 to 367)

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

| Page 368 | Page 370 |
|---|---|

**Page 368**

1  from National Pharmaceutical Council reports from
2  the time period 1990 through 2005, 2006.  Are you
3  familiar with the publication that's put out by
4  the National Pharmaceutical Council?
5      A.  Yes.
6      Q.  Are you familiar with the pages in this
7  exhibit?
8      A.  Yes.
9      Q.  Now, we saw earlier in one of the
10 exhibits that we looked at that OIG's mid-1990s
11 were comparing acquisition cost and AWP showed
12 discounts for generic drugs of on a nationwide
13 basis of AWP minus 42.5 percent.  Do you recall
14 that?
15         MS. MARTINEZ:  Objection, form.
16     A.  In their report?
17     Q.  Yes.
18     A.  Yes.
19     Q.  And those were findings that it appears
20 as though you were made aware of in September of
21 1995; is that correct?
22         MS. MARTINEZ:  Objection, form.

**Page 369**

1          MS. ALBEE:  Objection, form.
2      A.  You said that I was made aware of?
3      Q.  At the meeting in Richmond.  We looked
4  at the document earlier.  There was a record of
5  discussion from the Richmond meeting.
6      A.  Right.  But they didn't have those
7  percentages in that document.
8      Q.  But they indicated in the document it
9  presented the findings of their work.  Do you
10 recall that?
11     A.  Correct.  Yes.
12     Q.  And do you have any reason to believe
13 that they did not present their findings?
14     A.  No.
15     Q.  Now, if I could ask you to go to the
16 NPC report for 1996?  If you flip through they're
17 in chronological order.  Now, this page indicates
18 for each of the 50 states and the District of
19 Columbia the dispensing fee, the ingredient
20 reimbursement basis and the copayment for the
21 year 1996; is that right?
22     A.  Yes.

**Page 370**

1      Q.  And if you look at the ingredient
2  reimbursement basis column, they either have a
3  WAC plus something or an AWP minus something.
4  And then in the case of Delaware it says AAC.  Do
5  you see that?
6      A.  Yes.
7      Q.  And you were familiar that most states
8  at this time were discounting off of AWP some
9  amount, correct?
10     A.  Correct.
11     Q.  And is it consistent with your general
12 recollection that that amount was around 5 to 10
13 percent?
14     A.  That's what it appears to be.
15     Q.  And you knew that this reimbursement
16 basis would be applied to calculate the payment
17 amount for any generic drug for which a state had
18 not established a maximum allowable cost, HCFA
19 had not established a FUL, correct, potentially?
20         MS. ALBEE:  Objection, form.
21     A.  Potentially.
22     Q.  And you knew at the time that for

**Page 371**

1  generic drugs OIG had told you the discount was
2  above 40 percent, right?
3          MS. MARTINEZ:  Objection, form.
4      Q.  For generic drugs.
5      A.  That was in that report that you showed
6  me.
7      Q.  And here we see that the states here
8  are not -- there's no reimbursement basis to
9  reduce -- for generic drugs of any of that kind
10 of discount; is that fair to say?
11     A.  This -- correct.  It doesn't show that.
12     Q.  Do you recall discussions regarding the
13 fact that the states reimbursement amounts for
14 generic drugs, the EAC formula -- let me strike
15 that and start again.
16         Do you recall discussions about the
17 fact that the EAC formula that the states were
18 using was reimbursing generic drugs at higher
19 than the amount that OIG had found providers
20 paid?
21         MS. MARTINEZ:  Objection, form.
22         MS. ALBEE:  Objection, form.

                        22 (Pages 368 to 371)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

| Page 372 |
|---|

1     A.  I can't say that I remember that
2  specifically.
3     Q.  Do you recall any efforts that HCFA
4  took to have states provide a separate
5  reimbursement basis for generic drugs?
6     A.  Outside of the FULs or the MAC?
7     Q.  Yes.
8     A.  Not specifically, no.
9     Q.  Do you recall anything generally.
10    A.  I do know that sometimes in a state
11 plan amendment a state may have a reimbursement
12 rate for a generic that might be different than a
13 branded drug and they might specify that in their
14 state plan amendment.
15    Q.  And is it your general recollection
16 that that's something that's happened more
17 recently?
18    A.  I can't say.
19       MS. ALBEE:  Objection, form.
20    Q.  Later on in your time in the policy
21 area?
22    A.  I can't say.

| Page 373 |
|---|

1     Q.  I'd like to ask you to take out Abbott
2  Exhibit 329.  For the record, Abbott Exhibit 329
3  is a cover letter dated March 14th 2002 that
4  attaches a OIG report dated March 2002 titled
5  "Medicaid pharmacy actual acquisition cost of
6  generic prescription drug products."
7        Ms. Gaston, if you would take a look at
8  that to the extent necessary to tell me whether
9  or not you recall this document.
10    A.  (Reading.)  The report does look
11 familiar.
12    Q.  If you would go to the bottom of the
13 first page, the last sentence that carries over
14 on the next page.  OIG wrote "We estimated that
15 nationally actual drug acquisition cost was an
16 average of 65.93 percent below AWP.  Our previous
17 estimate based on calendar year 1994 pricing data
18 showed a discount of 42.45 percent below AWP for
19 generic drugs."  Do you see that?
20    A.  Yes.
21    Q.  Do you recall becoming aware of that
22 finding?

| Page 374 |
|---|

1     A.  I can't specifically unless I read it
2  in this report.
3     Q.  Do you know why this particular report
4  stands out?
5        MS. MARTINEZ:  Objection, form.
6     A.  I would guess because it's in 2002,
7  which is a little more recent than reports in the
8  '90s.
9     Q.  If I could ask you to take out Abbott
10 Exhibit 370.  I'm sorry.  I may not have that
11 binder in front of you at this point, and I
12 apologize for that.  For the record, Abbott
13 Exhibit 370 is a page titled "Staff action, cover
14 sheet, August 24, 2001."  Ms. Gaston, if you would
15 take a look at that and let me know if you recall
16 this document.
17    A.  Yes.
18    Q.  Can you tell us what this document is?
19    A.  It looks like a control sheet.  And it
20 looks like it was for the OIG report that came
21 in.  And it looks like it was forwarded to me.
22    Q.  Does it look like this is forwarding a

| Page 375 |
|---|

1  draft copy of the report that we looked at as
2  Abbott Exhibit 329?
3     A.  Yes.
4     Q.  And is that your handwritten note in
5  the bottom right-hand corner?
6     A.  Yes.
7     Q.  And you're sending that to Kim, Larry
8  and Cindy?
9     A.  If that's Cindy.  It's kind of blurred.
10 Scratched out.
11    Q.  And there was a woman by the name of
12 Cindy Pelter who was working in your office?
13    A.  Correct.
14    Q.  Do you think that's who that is?  If
15 it's Cindy it's Cindy Pelter?
16    A.  Yes.
17    Q.  And Kim would be Kim Howell?
18    A.  Yes.
19    Q.  Larry would be Larry Reed?
20    A.  Yes.
21    Q.  Could you read the handwritten note
22 that you have at the bottom of the page into the

                              23 (Pages 372 to 375)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 376

1    record?
2       A.  It says "Please review and give me any
3    comments since this is a biggie I wanted to get
4    your input.  Please note page 6."
5       Q.  Do you no why you wrote that this
6    report was a biggie?
7       A.  No.  I don't recall.
8       Q.  Okay.  As you sit here today do you
9    have any understanding of what you would have
10   meant by that?
11      A.  It could have been something that was
12   overdue.  It could have been something that has
13   been an issue that in our division we needed to
14   comment on quickly.  I really don't know.
15      Q.  Is it fair to say that at the time you
16   wrote that note your comments suggests that you
17   thought this was an important report?
18          MS. MARTINEZ:  Objection, form.
19      A.  I can't say that.  It could be a matter
20   of timing on this too that could have made it a
21   biggie.  Sometimes when something is due they
22   want it right away.  You know, it's hard for me

Page 377

1    to say since it's been since 2001 on this one.
2       Q.  If I could ask you to go back to
3    Exhibit 326, which is the collection of National
4    Pharmaceutical Council reports --
5       A.  I'm sorry.  What was that number?
6       Q.  I'm sorry.  Did you need to be looking
7    through that?
8       A.  I was just looking at what page 6 was.
9       Q.  Why don't we do that.  A spot on page 6
10   of the final that states CMS -- well, that
11   wouldn't be in the draft anyway, would it?  CMS's
12   response?
13      A.  Correct.
14      Q.  As you look at this page range, is
15   there anything in particular you think you would
16   have been directing those individuals to?
17      A.  No.  Just the -- I guess maybe the
18   conclusion and recommendations, because if this
19   was something that was needed, a quick turnover,
20   or a quick turnaround, and you just want them to
21   review it you ask them to go right to the
22   conclusions to review it.

Page 378

1       Q.  Okay.  Let's look at page 6 of the
2    final report that you're at.  Under conclusions
3    and recommendations it says "Based on our review
4    we have determined that there is a significant
5    difference between pharmacy acquisition cost for
6    generic drugs and AWP."  Do you recall, Ms.
7    Gaston, that there was discussion of the
8    significant difference between AWP and
9    acquisition cost for generic drugs?
10      A.  I can't remember specific discussions.
11      Q.  Do you recall that becoming a general
12   topic of conversation in your office?
13      A.  I can't say specifically.  It may have.
14   But it's been so long I can't remember
15   specifically.
16      Q.  Then the report goes on "We have also
17   estimated that changing reimbursement policy
18   consistent with the findings of our report could
19   have resulted in savings of as much as $470
20   million for the 200 most reimbursed generic drugs
21   in calendar year 1999.  We recognize that these
22   calculations do not incorporate all of the

Page 379

1    complexities of pharmacy reimbursement and that
2    acquisition cost is just one factor in pharmacy
3    reimbursement policy.  However, we also believe
4    that the results of this report are significant
5    enough to warrant a review of pharmacy
6    reimbursement policy."  Do you see that?
7       A.  Yes.
8       Q.  Did you agree with OIG at the time that
9    the results of this review were significant
10   enough to warrant a review of pharmacy
11   reimbursement policy?
12      A.  I can't say specifically, but it looks
13   like CMS did because in their comments they make
14   a statement that they want to go out and notify
15   the states of this report.
16      Q.  And then CMS also says in the response
17   "The CMS also stated that it will strongly
18   encourage states to reevaluate their
19   reimbursement methodology for drugs and will
20   continue to encourage states to look for
21   alternative bases for reimbursement.  The CMS
22   plans to share our final report with the states,

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 380

1  strongly encourage states to review their
2  estimates of acquisition costs, and follow up to
3  ensure that their actions take our findings into
4  account." Do you see that?
5      A.  Yes.
6      Q.  Do you recall what efforts CMS took to
7  strongly encourage states to review their
8  estimates of acquisition cost for generic drugs?
9      A.  It's my recollection that they put a
10 statement in one of the state releases, program
11 releases, that identified this particular OIG
12 report.
13     Q.  Other than advising the states of the
14 report do you recall anything else that CMS did?
15     A.  No.  I can't remember.
16         MR. WINGET-HERNANDEZ:  Objection, form.
17     Q.  Go back to the conclusions and
18 recommendations from OIG.  It indicates, reading
19 further down in that paragraph from where I
20 stopped, "Per federal Medicaid regulations,
21 states are required to reimburse pharmacies'
22 ingredient drug portion of the reimbursement

Page 381

1  based on EAC.  Therefore we recommend that CMS
2  require the states to bring pharmacy
3  reimbursement for generic drugs more in line with
4  the acquisition cost that we identified as being
5  65.93 percent below AWP."  Do you see that?
6      A.  Yes, I do.
7      Q.  Do you recall that OIG was recommending
8  to CMS that they should required states to change
9  the reimbursement methodology to get closer to
10 the acquisition cost for generic drugs?
11     A.  I don't remember that.  But I do from
12 this report.
13     Q.  What do you recall about that topic?
14     A.  I don't know what you're -- what do you
15 mean what do you recall?
16     Q.  Do you recall -- OIG is telling you in
17 this report that you want to go require the
18 states to reduce reimbursement on generic drugs;
19 is that fair to say?
20     A.  Correct.
21     Q.  And did CMS do that?
22     A.  It appears that CMS said that they were

Page 382

1  notifying the states.  And from my recollection
2  they notified the states and encouraged the
3  states to look at their reimbursement methodology
4  by sending information out in a state program
5  release.
6      Q.  And that's not quite the same thing as
7  requiring states to change the amounts they're
8  paying; is that fair to say?
9          MS. ALBEE:  Objection, form.
10     A.  I can't say that.
11     Q.  Well, you see a difference between
12 encouraging someone to do something and requiring
13 them to do something, right?
14     A.  See, at my level I just reply to the
15 OIG reports.  If anything is going to be required
16 it's going to be required from somebody above my
17 level.
18     Q.  Do you have children?
19         MS. MARTINEZ:  Objection, form.
20         THE WITNESS:  Do I have to answer that
21 question?
22         MS. MARTINEZ:  No.  You don't have to

Page 383

1  answer that question.  And that's just as a
2  courtesy.
3          MR. TORBORG:  Okay.  Fine.
4  BY MR. TORBORG:
5      Q.  Have you ever been in a situation in
6  your job where you were encouraged to do
7  something?
8      A.  Yes.
9      Q.  And have you been in a situation where
10 you have been required to do something?
11     A.  Yes.
12     Q.  Two different things?
13     A.  Okay.
14     Q.  Right?
15     A.  Mm-hmm.
16     Q.  You agree?
17     A.  I said yes.
18     Q.  And is it the case that CMS did not
19 require the states to lower reimbursement on
20 generic drugs?
21     A.  I guess it all depends on what you mean
22 by require.  I know that they notified them.  It

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 384

1  doesn't appear that a requirement was put in
2  place.
3      Q.  Do you know why not?
4      A.  No.
5      Q.  Who would know the answer to that?
6      A.  I don't know.  You could start with
7  Larry Reed.
8      Q.  If I could ask you to look at Abbott
9  Exhibit 328, which is the document -- it's on the
10 top of the binder there, the single page.  Ms.
11 Gaston, if you would take a look at that to the
12 extent necessary to let me know if you recall
13 that document.
14     MS. VONDRICH:  I'm sorry.  Which
15 exhibit are we looking at?
16     MR. TORBORG:  Exhibit 328.
17     A.  (Reading.)  It doesn't look familiar to
18 me.
19 BY MR. TORBORG:
20     Q.  Ms. Gaston, do you recall discussion in
21 or around 2002, 2003 -- strike that.  Let me back
22 up one step.

Page 385

1      Do you recall that in 2002 or
2  thereabouts that CMS changed the state approval
3  process -- approval of state plan amendment
4  process so that the approvals were being done by
5  the central office as opposed to the regional
6  offices?
7      A.  I remember that that happened.  I don't
8  know if I was still there at the time.
9      Q.  At some point you ceased having
10 involvement in approving state plan amendments;
11 is that fair to say?
12     A.  Correct.
13     Q.  And can you give me a time frame about
14 when that was?
15     A.  Well, I left the policy area in early
16 2003.
17     Q.  That's all I have on that document.
18     (Exhibit Abbott 753 was marked for
19 identification.)
20 BY MR. TORBORG:
21     Q.  I'd like to mark as Abbott Exhibit 753
22 a document that bears the Bates numbers HHC 004-

Page 386

1  0191 through 92.  At the top it says in
2  handwritten notes "GAO questions - call on
3  4/13/01."  And then it also says "Questions for
4  HCFA - Larry Reed/Sue Gaston."
5      Take a look at that document, Ms.
6  Gaston, and let me know if you're familiar with
7  it.
8      A.  (Reading.)  It doesn't look there are
9  to me even though my name is on it.
10     Q.  Whose handwriting is that at the top?
11     A.  It looks like Cindy Bergin's.
12     Q.  And her name was eventually changed to
13 Cindy Pelter or was it the other way?
14     A.  It was Cindy Pelter and now it's Cindy
15 Bergin.
16     Q.  And is it the other handwriting on the
17 document also hers, to your best guess?
18     A.  Yes.
19     Q.  In the -- why is it, Ms. Gaston, that
20 you would be fielding questions from GAO?
21     MR. WINGET-HERNANDEZ:  Objection, form.
22     Q.  Do you know?

Page 387

1      A.  We would field questions from GAO, OIG,
2  organizations like that.
3      Q.  And you were the person along with
4  Larry Reed that was asked to addressed those?
5      A.  It appears that way.
6      Q.  In paragraph 5 it states "In regard to
7  a recommendation in a May 8th 1998 audit report
8  entitled 'Need to establish connection between
9  the calculation of Medicaid drug rebates and
10 reimbursement for Medicaid drugs' (A-06-97-
11 00052), HCFA said that it agreed that changing
12 from average manufacturer price (AMP) to AWP
13 would reduce the administrative burdens involved
14 in the AMP recalculations.
15     "HCFA said that it was 'planning a
16 thoughtful, comprehensive study of issues such as
17 how AWP is defined; how to safeguard against
18 manipulation of AWPs to maximize reimbursement or
19 minimize rebates; how to verify the accuracy of
20 AWPs; the need for an indexing factor; and
21 differences in AWPs for brand name versus generic
22 drugs.

26 (Pages 384 to 387)

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 388

1       "What is the status of that study and,
2   if completed, can you provide us a copy?"  Do you
3   see that?
4       MS. MARTINEZ:  Objection, form.
5       A.  Yes.
6       Q.  Do you recall that the OIG had made a
7   recommendation to HCFA to attempt to seek
8   legislation that was to tie Medicaid rebates to AWP
9   as opposed to AMP?
10      A.  I don't recall the legislation.
11      Q.  Well, do you recall that suggestion
12  from OIG?  Or that thought at all ever being
13  floated?
14      A.  I might have read that, but I don't
15  specifically remember where.
16      Q.  So there's not a whole lot more you can
17  tell me about that proposal; is that fair to say?
18      A.  Right.  Correct.
19      Q.  Do you recall HCFA planning a
20  thoughtful and comprehensive study of AWP,
21  including how AWP is defined?
22      A.  I don't recall that.

Page 389

1       Q.  Do you recall any efforts to seek
2   regulations or legislation on the subject of
3   defining AWP?
4       A.  I don't recall that.
5       Q.  And in your practice, in your
6   experience, AWP was an undefined measure; is that
7   correct?
8       MS. MARTINEZ:  Objection, form.
9       A.  It was defined in many ways.  So I
10  wouldn't say undefined.
11      Q.  How was it defined in many ways?
12      A.  It just depended on what source you
13  went to to look.  The compendia defined it one
14  way.  Just different literature, whatever you
15  would read, it would be defined in different
16  ways.
17      Q.  Have you ever seen it defined as
18  something else, as something apart from what was
19  contained in the compendia as it relates to
20  prescription drugs?
21      A.  I don't understand what you mean,
22  compendia.  The compendia --

Page 390

1       Q.  Drug compendia.
2       A.  Right.  The drug compendia would define
3   it.  But there's other pieces of literature that
4   you could read that would define AWP.  And I
5   think the OIG report at times tried to define AWP
6   in their terms.
7       Q.  In what terms did they define it?
8       A.  I don't know.  I'm just saying in
9   general.  I'm speaking in general.
10      Q.  As you sit here today are you aware of
11  any definition of AWP apart from drug prices that
12  were contained in the compendia?
13      MS. MARTINEZ:  Objection, form.
14      A.  Any other definition?
15      Q.  Yes.
16      A.  Other than the compendia?
17      Q.  Yes.
18      A.  Yes.  But I can't specifically say
19  where.
20      Q.  And you testified last time, if my
21  recollection serves, that when you used the term
22  AWP in your work you believed it referred -- or

Page 391

1   you understood it referred to prices in the
2   compendia?
3       A.  Correct.
4       And that -- I just wanted to clarify on
5   that one too.  And the reason I said that is
6   because in processing the FULs, that's what I
7   used.
8       Q.  But when you heard the term AWP in your
9   work, you believed it related to what was in the
10  compendia, correct?
11      MS. MARTINEZ:  Objection, form.
12      MS. ALBEE:  Objection, form.
13      A.  For FULs purposes, yes.
14      (Exhibit Abbott 754 was marked for
15  identification.)
16  BY MR. TORBORG:
17      Q.  For the record, what I've marked as
18  Abbott Exhibit 754 is a document bearing the
19  Bates numbers HHD 180-0034 through 39.  Ms.
20  Gaston, if you would take a look at that and let
21  me know if you recall this document.
22      A.  I recall the glossary.  I don't recall

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                      Washington, DC

---

Page 392

1  the e-mail.
2      Q.  And the glossary is the document ending
3  with Bates 36 through 39; is that right?
4      A.  Correct.
5      Q.  Do you recall getting a request from a
6  Sharman Leinwand for definitions of various
7  pricing acronyms that were used in Medicaid
8  pharmacy?
9      A.  I don't recall that, no.
10     Q.  In any event, it looks like on March
11 20th 2002 you sent Jessie Spillers -- maybe
12 it's Leinwand Sharman.  I'm in the sure which way
13 it is -- a glossary that contained definitions of
14 various terms that were used in the Medicaid
15 pharmacy area; is that right?
16     A.  Correct.
17     Q.  And you would not have sent them that
18 if you thought that any of the definitions in
19 there were incorrect; is that fair to say?
20         MR. WINGET-HERNANDEZ:  Objection, form.
21         MS. MARTINEZ:  Objection, form.
22     A.  I can't say that.  This document was

---

Page 393

1  prepared -- the glossary was prepared for
2  training purposes.  We did a training session for
3  our regional office folks and Jessie Spillers is
4  one of the regional office folks.  So the terms
5  are put together to just assist those folks with
6  the terminology that's used in the rebate
7  program.
8      Q.  If you would go to the Bates page
9  ending 37, do you see there listed as the term
10 "average wholesale price (AWP)."  Do you see
11 that?
12     A.  Yes.
13     Q.  Would you read that into the record,
14 please?
15     A.  It says --
16         MR. WINGET-HERNANDEZ:  Objection, form.
17     A.  "The published suggested wholesale
18 price of a drug as reported by the drug's
19 manufacturer.  This price, which is typically
20 significantly higher than the price actually paid
21 by purchasers of the drug, is used by state
22 Medicaid agencies as a basis for determining

---

Page 394

1  their estimated acquisition cost (EAC) for
2  pharmacy reimbursement purposes."
3      Q.  Do you know what is -- when the
4  definition refers to published suggested
5  wholesale price --
6      A.  I would assume that this is talking
7  about the compendia.
8      Q.  Well, do you know of any other source
9  where average wholesale prices are published
10 other than the compendia?
11     A.  They may be someplace else.  But I know
12 of the compendia.
13     Q.  You're not aware of any other as you
14 sit here today?
15     A.  No.
16     Q.  Ms. Gaston, do you recall having
17 conversations with the Alabama Medicaid agency
18 relating to prescription drugs?
19     A.  Not specifically.
20     Q.  Do you recall having conversations with
21 them relating to issues on dispensing fees?
22     A.  Not specifically.

---

Page 395

1      Q.  Do you recall -- just to see if it
2  refreshes your recollection -- that at some point
3  Alabama wanted to have a dispensing fee that had
4  different amounts for different drugs?
5         MR. WINGET-HERNANDEZ:  Objection, form.
6      A.  Did you --
7      Q.  Yeah.  Do you recall that?
8      A.  No, I don't.
9      Q.  If I threw out the name Mary Hayes-
10 Finch, would that refresh your recollection at
11 all about this?
12     A.  No.
13     Q.  I'd like to ask you to look at Abbott
14 Exhibit 578.
15         MR. TORBORG:  Ani, that's one that I
16 gave you a copy of yesterday.  It's the 1990
17 publication of the Medicaid Pharmacy Bulletin.
18 BY MR. TORBORG:
19     Q.  Ms. Gaston, do you recall a publication
20 known as the Medicaid Pharmacy Bulletin?
21     A.  It looks familiar.
22     Q.  This particular document or this volume

---

28 (Pages 392 to 395)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 396

1  of the Medicaid Pharmacy Bulletin is titled
2  "Revisiting Medicaid reimbursement for home IV
3  drug therapy." Do you see that?
4      A.  Yes.
5      Q.  And the second paragraph on the first
6  page, the second sentence, indicates "Several
7  administrators indicate that the complex nature
8  of IV drug therapy, which involves the use of
9  multiple drugs, various supplies such as tubing
10 and needles and nursing services, has slowed the
11 development of a standardized payment system."
12 Do you see that?
13     A.  Yes.
14     Q.  Do you recall issues arising, Ms.
15 Gaston, with the fact that infusion and
16 injectable drugs had higher cost to dispense to
17 Medicaid beneficiaries?
18         MS. MARTINEZ:  Objection, form.
19     A.  I don't remember a conversation like
20 that.
21     Q.  Do you recall that -- apart from
22 conversations --

Page 397

1      A.  Okay.
2      Q.  -- just the issue arising ever?
3          MS. MARTINEZ:  Objection, form.
4      A.  It may have.  I can't remember.
5      Q.  It's been some time since these issues
6  have been raised?
7      A.  Yes.
8      Q.  Your memory has faded?
9      A.  Yes.
10     Q.  Ms. Gaston, I asked you briefly last
11 time about a project that the Department of
12 Justice in connection with the National
13 Association of Medicare Fraud Control Units had
14 worked on related to providing more accurate AWPs
15 for a set of drugs.  Do you recall that?
16     A.  Yes.
17     Q.  And you recall that effort, right?
18     A.  Yes.
19     Q.  Was that an effort that was spearheaded
20 by your office?
21         MS. MARTINEZ:  Objection, form.
22     A.  What do you mean by spearheaded?

Page 398

1      Q.  Whose idea was it?
2      A.  I thought it was a result of a
3  litigation suit.
4          (Exhibit Abbott 755 was marked for
5  identification.)
6  BY MR. TORBORG:
7      Q.  Ms. Gaston, when you said results from
8  a litigation suit, your understanding was it
9  resulted from a qui tam that had been filed by
10 Ven-A-Care; is that right?
11         MS. MARTINEZ:  Objection, form.
12     A.  I can't say that.  I don't have a
13 recollection.
14     Q.  For the record, what I've marked as
15 Abbott Exhibit 755 bears the Bates numbers KY-
16 DMS, dash, a whole bunch of zeros, 125918, 919
17 and 20.  I'd ask if you would go to Bates page
18 919.  There's an e-mail -- actually, why don't
19 you take a look at that and see if you recall the
20 e-mail.
21     A.  (Reading.)  I don't remember the e-
22 mail.

Page 399

1      Q.  But it appears you sent an e-mail to a
2  distribution on April 25th 2000, subject: First
3  Databank settlement?
4      A.  Correct.
5      Q.  And then on May 11th 2000 it appears as
6  though an individual named Joe Reeder, who
7  appears to be from HCFA, sent an e-mail to a
8  distribution.  Do you see that?
9      A.  Correct.  He's in the regional office.
10     Q.  And he said in his e-mail to the
11 distribution "Please see the attached which
12 provided background on the FDB agreement reached
13 between the Department of Justice and the states.
14 Before this agreement was finalized HCFA provided
15 the DOJ with information on how state
16 reimbursements are set, the state plan process
17 and how this proposal may affect states.  It
18 appears that the FDB agreement only provides
19 states with the 'true AWP' data provided by FDB
20 for the approximately 400 drugs, but does not
21 address the state reimbursement issue.
22         "HCFA was informed that states received

29 (Pages 396 to 399)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                         Washington, DC

Page 400

1  their FDB file the first week of May.  The file
2  contains an indicator which denotes the 'true AWP
3  prices' for those 400 drugs that were identified
4  on the price list states received from the
5  attorney general's office.  I will keep you
6  advised on this issue and share any additional
7  information received.  Please remember that any
8  changes in your reimbursement methodology must be
9  reflected in your state plan."
10       Do you see that?
11       A.  Yes.
12       Q.  And he was forwarding an e-mail that
13  you had written to individuals in the HCFA
14  regional offices, correct?
15       A.  This looks like it was to folks at the
16  state.  You're talking about the May 11th?
17       Q.  I'm talking about the e-mail that you
18  sent on April 25th, 2000.  Individuals in the
19  distribution line are individuals in the HCFA
20  regional offices, correct?
21       A.  Correct.  Oh, he copied.  Okay.
22  Correct.

Page 401

1       Q.  And you gave a brief summary in your e-
2  mail, correct?
3       A.  Yes.
4       Q.  Of the true AWP prices that were being
5  placed on 400 drugs, correct?
6       MS. MARTINEZ:  Objection, form.
7       A.  Correct.  The First Databank
8  settlement.
9       Q.  And you stated amongst other things,
10  "By way of background, there is a qui tam False
11  Claims Act lawsuit files against more than 20
12  drug manufacturers which is still partially under
13  seal."  Do you see that?
14       A.  Correct.
15       Q.  And that's consistent with your
16  recollection that the DOJ/NAMFCU AWP effort was
17  one that was coming out of litigation --
18       A.  Yes.
19       Q.  -- correct?
20       So that effort to provide more accurate
21  AWPs was something that was instigated by the
22  Department of Justice, correct?

Page 402

1       MS. MARTINEZ:  Objection, form.
2       A.  That's what it appears.
3       MR. TORBORG:  Ms. Gaston, that's all
4  the questions I have for you at this time.  I
5  reserve the right to ask some follow-up
6  questions.  But we're done.  I thank you for your
7  time.
8       THE WITNESS:  Okay.
9       THE VIDEOGRAPHER:  Off the record at
10  11:41.
11       (Recess.)
12       THE VIDEOGRAPHER:  On the record at
13  11:53.
14
15       EXAMINATION BY COUNSEL FOR WARRICK
16  PHARMACEUTICALS, SCHERING-PLOUGH CORPORATION AND
17  SCHERING CORPORATION
18  BY MR. BUEKER:
19       Q.  Good morning, Ms. Gaston.  My name is
20  John Bueker.  I'm here on behalf of Warrick
21  Pharmaceuticals, Schering-Plough Corporation and
22  Schering Corporation.  And we all are defendants

Page 403

1  in the New York counties case.  And I'm going to
2  focus my questioning on that case.  There have
3  been nine drugs for which FULs have been
4  established that have been singled out for kind
5  of focused discovery.
6       And a lot of what I want to do today is
7  use I think some of the printouts from the FUL
8  application that maybe you looked at to refresh
9  your recollection for the deposition and kind of
10  walk through the mechanics of how FULs are set to
11  kind of drill down and see if we can't better
12  understand that process, is a lot of what I want
13  to do today.
14       A.  Okay.
15       Q.  But I just want to before we delve into
16  that make sure that we have a common
17  understanding with regard to the chronology here
18  for a second.  As I understand it, from 1991 to
19  2003 you were one of the individuals at CMS who
20  was responsible for setting the FULs; is that
21  correct?
22       A.  Correct.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                      March 19, 2008
                    Washington, DC

Page 404

1    Q.  And originally it was Peter Rodler who
2  trained you?
3    A.  Correct.
4    Q.  So starting in about 1991 Mr. Rodler
5  would have trained you to set FULs?
6    A.  Yes.
7    Q.  And I think you said last time that
8  when Mr. Rodler left CMS in the mid-1990s you
9  became solely responsible for setting the FULs at
10 that point, subject obviously to approval kind of
11 up the chain?
12   A.  Correct.
13   Q.  But you were the person day-to-day that
14 would get the printouts from the FUL application
15 and do the manual review and actually set the
16 FUL, correct?
17   A.  Correct.
18     MS. MARTINEZ:  Objection, form.
19   A.  But also in that period of time there
20 were other individuals that I trained.
21   Q.  In a period '91 to 2003?
22   A.  Correct.

Page 405

1    Q.  Yeah.  Okay.  And let me -- let's see
2  if we can spell that out a little more clearly.
3  The other individual I know you trained was Cindy
4  Bergin?
5    A.  Correct.
6    Q.  And when did you begin training Ms.
7  Bergin on calculating or establishing FULs?
8    A.  When she started with the government in
9  '99.
10   Q.  So from 1999 until 2003 you and Ms.
11 Bergin would have worked on FULs setting FULs
12 together?
13   A.  Correct.
14   Q.  But you were involved in the process of
15 setting FULs through your departure from the
16 policy position in 2003, correct?
17   A.  Correct.
18   Q.  So as I understand it, there was a
19 period of time between, say, 1995 or the mid-
20 1990s when Mr. Rodler left and 1999 when Ms.
21 Bergin arrived where you were solely responsible
22 for setting the FULs?

Page 406

1      MS. MARTINEZ:  Objection, form.
2    A.  Correct.
3      MR. BUEKER:  I ask the court reporter
4  to mark this as New York Counties Exhibit 1.
5      (Exhibit NY Counties 001 was
6  marked for identification.)
7  BY MR. BUEKER:
8    Q.  It's a document that's an excerpt from
9  the Code of Federal Regulations.  I just want to
10 make sure we have a common understanding.  This
11 section 447.332 is the FUL regulation, correct?
12   A.  Correct.
13   Q.  And it's a regulation with which you're
14 familiar, right?
15   A.  Yes.
16   Q.  In fact you set the FULs under this
17 regulation for the better part of 12 years,
18 right?
19     MS. MARTINEZ:  Objection, form.
20   A.  Yes.
21   Q.  To your knowledge did the regulation
22 change at all during the period 1991 to 2003?

Page 407

1    A.  There was a period -- and I don't know
2  -- there was a period where we allowed the
3  federal upper limit drugs to be expanded to look
4  at at least three A-rated.
5    Q.  Let me see if I can help --
6    A.  As long -- and I can't remember the
7  dates.
8    Q.  Let me see if I can help you with the
9  dates, because I think we talked a little bit
10 about this the last time.  As I read this,
11 section (a)(1) talks about all formulations of
12 the drug needing to be therapeutically
13 equivalent, correct?
14   A.  Correct.
15   Q.  And at some point your recollection is
16 that CMS's approach to setting FULs expanded and
17 it wasn't that all drugs had to be A-rated, but
18 there had to be three A-rated equivalents,
19 correct?
20   A.  Correct.
21   Q.  And we looked at a document last time
22 that was a printout from the OBRA '90 statute.

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                  Washington, DC

Page 408

1  Do you recall that?
2      A.  I don't recall.
3      Q.  Would it be consistent with your memory
4  that when OBRA -- when Congress passed OBRA '90
5  that Congress dictated that CMS set FULs when
6  there were three A-rated --
7      A.  Yes.  Yes.
8      Q.  So in the early period of time prior to
9  OBRA '90 coming into effect CMS would only have
10 set a FUL if all drugs were A-rated or
11 therapeutically equivalent as the regulation
12 says, but post OBRA '90 the definition was
13 expanded?
14     A.  Correct.
15     Q.  But to your knowledge the regulation
16 wasn't changed?
17     A.  Correct.
18     Q.  And I keep using a term and I want to
19 make sure the jury understands, which is A-rated.
20 What is A-rated?  Would you explain that?
21     A.  Here again, I've been out of it for
22 years.  But it's my understanding that they have

Page 409

1  to be therapeutically and pharmaceutically
2  equivalent.
3      Q.  And what does that mean?
4      A.  That's all the farther I can get.  I
5  don't get into the details of it.
6      Q.  Those are terms, though, that the FDA,
7  the Food and Drug Administration, defines?
8      A.  Correct.
9      Q.  And an A rating is a Food and Drug
10 Administration rating, is it not?
11     A.  That's my understanding.
12     Q.  And an A rating is the rating that the
13 Food and Drug Administration attaches to a drug
14 when it's deemed to be therapeutically and
15 pharmaceutically equivalent, correct?
16     A.  Correct.
17     Q.  Looking at Exhibit 1, and specifically
18 the FUL regulation, as I understand it there were
19 basically two criteria that had to be satisfied
20 before CMS would begin to look at establishing a
21 FUL.  The first was, as we've talked about, there
22 had to be for a while all therapeutically

Page 410

1  equivalent drugs or then three therapeutically
2  equivalent drugs, and the second criteria, as I
3  understand it, was there had to be at least three
4  suppliers listed in Red Book, Blue Book or Medi-
5  Span; is that correct?
6      A.  Yes.  We said in a national compendia.
7      Q.  And the national compendia are what?
8      A.  We considered that Red Book, Blue Book
9  and Medi-Span.
10     Q.  Were actually any other pricing sources
11 that CMS looked at or considered national
12 compendia?
13     A.  No.
14     Q.  Just so we have I think a common
15 understanding about how the process worked, once
16 those criteria were deemed to be satisfied then
17 the process became picking a price and
18 multiplying that price by 150 percent to set the
19 FUL, correct?
20     A.  The system did that.
21     Q.  The FUL system?
22     A.  The FUL system.

Page 411

1      Q.  So just mechanically -- I think you
2  described this the last time, but tell me if my
3  understanding is incorrect.  There was a program
4  called FULs that did some data crunching and then
5  there was manual review that went on after that;
6  is that correct?
7      A.  Correct.
8      Q.  So essentially you as the individual
9  responsible for setting FULs at particular points
10 in time would have gotten a printout from the
11 FULs system and then you would have embarked on a
12 manual review after that?
13     A.  Correct.
14     Q.  But basically the process was that
15 either the system or you picked a price and that
16 price was multiplied by 150 percent to set the
17 FUL, correct?
18     A.  Correct.
19         MR. BUEKER:  I ask the court reporter
20 to mark a document that bears the Bates number
21 HHD 175-0849 on the bottom right-hand corner as
22 New York Counties Exhibit 2 for identification,

                              32 (Pages 408 to 411)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 412

1  please.
2           (Exhibit NY Counties 002 was
3  marked for identification.)
4  BY MR. BUEKER:
5      Q.  Ms. Gaston, do you have in front of you
6  what's been marked as New York Counties Exhibit 2
7  for identification?
8           MR. WINGET-HERNANDEZ:  Excuse me, John.
9  I apologize for not bringing this up with respect
10 to the first exhibit that you attached.  But
11 without at this point making an objection, I
12 would like to ask you if you would mind marking
13 these exhibits in some way that made it clear
14 that it was the defendant that was offering them
15 and attaching them to the deposition rather than
16 in a way that seems to suggest that they have
17 been attached by my clients.
18          MR. BUEKER:  I don't have an objection
19 to that.  In calling them New York county
20 exhibits I was simply trying to distinguish them
21 from the Abbott exhibits that are marked in this
22 deposition.

Page 413

1           MR. WINGET-HERNANDEZ:  Yeah.  I have no
2  truck with that.
3           MR. BUEKER:  How about we can mark them
4  New York Counties Defendants' Exhibit 1 for
5  identification, Defendants Exhibit 2 for
6  identification?  How is that?
7           MR. WINGET-HERNANDEZ:  That's perfectly
8  fine with me.
9           MR. BUEKER:  Great.
10 BY MR. BUEKER:
11     Q.  Do you have in front of you what's been
12 marked as New York Counties Defendants' Exhibit 2
13 for identification?
14     A.  Yes.
15     Q.  And this is a printout from the FUL
16 system of the kind you talked about refreshing
17 your recollection in connection with this case,
18 correct?
19     A.  Correct.
20     Q.  And this would have been -- this sheet
21 would have been the output that the FULs system
22 generated and would have been the basis for

Page 414

1  beginning kind of a manual review process, right?
2      A.  Correct.
3      Q.  And it's dated in the upper left-hand
4  corner, 8/21/2001, right?
5      A.  Correct.
6      Q.  And that's a period in time in which
7  you were responsible for setting the FULs?
8      A.  Yes.
9      Q.  And down in the lower right-hand corner
10 there's a -- I'll call it a calculation that
11 begins with what looks like a date at the top,
12 10/17/00.  Do you see that?
13     A.  Yes.
14     Q.  And down below it are a set of
15 initials.  SEG.  Dow see those?
16     A.  Yes.
17     Q.  Are those your initials?
18     A.  Yes.
19     Q.  And is that your handwriting at the
20 bottom of Exhibit 2?
21     A.  Yes.  On the right-hand side.
22     Q.  On the right-hand side.  I see.  What

Page 415

1  handwriting on Exhibit 2 is not yours?
2      A.  On the left-hand side dated 8/22 and
3  the handwriting that's been X'd out.
4      Q.  Okay.  And whose handwriting is that?
5      A.  That's Cindy Bergin's.
6      Q.  And then up above there's handwriting
7  that -- alongside the -- for example, Major
8  Pharmaceuticals.  Do you see that?
9      A.  At the top?
10     Q.  Yes.
11     A.  Yes.
12     Q.  Is that your handwriting?
13     A.  It looks like it.
14     Q.  And can you read into the record what
15 it says next to Major Pharmaceuticals?
16     A.  It says "not in stock."  Then it says
17 "soon."
18     Q.  And that you think is your handwriting?
19     A.  It appears to be.
20     Q.  And then next to Caraco Pharmaceuticals
21 Laboratory do you see that there's a written
22 "call" and then in parentheses "yes"?

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 416

1    A. Yes.
2    Q. Is that your handwriting?
3    A. I can't say.
4    Q. How about "discontinued (they no longer
5 manufacturer)," the printing?
6    A. That's not my handwriting.
7    Q. Okay. But Exhibit 2 is a document with
8 which you're familiar?
9    A. Correct.
10   Q. And I take from your initials at the
11 bottom right-hand corner that you had some
12 involvement in the manual review process that
13 went on before a FUL was set for 100-milligram
14 metoprolol?
15   A. Correct.
16   Q. I'd like you to hang on to that. I'm
17 going to flip back and forth between that and
18 another document that's labeled at the top
19 transmittal number 37, that I'd like to have
20 marked as New York Counties Defendants' Exhibit 3
21 for identification, please.
22       (Exhibit NY Counties 003 was

Page 417

1 marked for identification.)
2 BY MR. BUEKER:
3    Q. Ms. Gaston, do you have in front of you
4 Exhibit 3 for identification?
5    A. Yes.
6    Q. And would you describe for the record
7 what Exhibit 3 is?
8    A. This is transmittal number 37 of the
9 federal upper limit drug list dated November 20th
10 2001.
11   Q. And what is a -- I take it it's a CMS
12 transmittal?
13   A. Yes.
14   Q. What is a CMS transmittal? How is it
15 used in connection with the FUL program?
16   A. The -- I don't know about in 2001. But
17 previously the federal upper limit drug list was
18 published in the state Medicaid manual. And then
19 we started publishing it on our webpage. So we
20 would use the transmittal numbers because of the
21 state Medicaid manual issuance.
22   Q. I see. And if I take from that then

Page 418

1 the purpose of a CMS transmittal to the extent
2 these FULs were still being recorded in state
3 Medicaid manuals was to communicate to the states
4 that you were making changes to the FULs?
5    A. Correct.
6    Q. And you recognize transmittal 37 to be
7 one of those transmittals by which CMS was
8 transmitting to the state a new set of FULs?
9    A. Correct.
10   Q. And you can tell from the top that
11 transmittal number 37 was sent to the states on
12 November 20th 2001, right?
13   A. Correct.
14   Q. And there's a bold line about a third
15 of the way down Exhibit 3 which provides a date
16 when these FULs needed to be implemented by,
17 correct?
18   A. Correct.
19   Q. And what is that date?
20   A. November 20th 2001. And no later than
21 January 22nd -- I'm sorry. "The November 20th
22 2001 FUL list should be implemented no later than

Page 419

1 January 22nd 2002."
2    Q. So by January -- this transmittal was
3 essentially telling the states that by January
4 22nd 2002 these were the FULs that had to be in
5 place?
6    A. Correct.
7    Q. Would you turn with me to page 12,
8 please? And do you see the third entry down on
9 page 12 on Exhibit 3 is for metoprolol?
10   A. Yes.
11   Q. And you see the second line there is
12 for the 100-milligram strength, right?
13   A. Correct.
14   Q. And that's the FUL that -- Exhibit 2
15 relates to setting a FUL for the 100-milligram
16 strength of metoprolol?
17   A. Correct.
18   Q. And you see that the -- you would agree
19 with me that Exhibit 2 reflects the calculation
20 that resulted in the FUL that's published in
21 transmittal 37, correct?
22   A. Correct.

34 (Pages 416 to 419)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                      Washington, DC

Page 420

1    Q.  And just so it's clear for the record,
2  what is the B written next to the 0.0914 in
3  Exhibit 3?
4    A.  That's the compendia source that the
5  price was driven on, which is Blue Book.
6    Q.  So in other words the price that was
7  used to set that FUL was a price that was
8  published in Blue Book?
9    A.  Correct.
10    Q.  And if there was an R next to -- as
11  there is a now lines down -- what would an R
12  mean?
13    A.  Red Book.
14    Q.  And what if the price that was being
15  used had been published by Medi-Span?  What would
16  be there?  Would you assume an M?
17    A.  I would assume an M.  I think there was
18  a period of time where First Databank and Medi-
19  Span were considered one.  And I can't remember
20  if we still picked up the M from Medi-Span.  I'm
21  not sure.  It's shown in the compendia source,
22  though.

Page 421

1    Q.  So during that period of time where
2  they were treated as one there would only have
3  been two sources that CMS looked at for pricing
4  information, right?
5    A.  No.  We still had a separate tape for
6  Medi-Span, even though they were both considered
7  -- I think however they worked.  Yeah.  But we
8  still had two separate compendias' tapes for each
9  one of those, and we used those in the pick.
10    Q.  I see.  So during that period of time
11  we just might not see an M --
12    A.  As much.
13    Q.  -- in the transmittal?
14    A.  Yeah.
15    Q.  And then just stick with the metaprolol
16  example for a minute.  Entry number 3 reads
17  across 100 mg, which is 100 milligrams, right?
18    A.  Correct.
19    Q.  And then tablet.  Tablet is the form of
20  the drug?
21    A.  It's the dosage.  That's what it's
22  considered on -- if you look at Exhibit 2.

Page 422

1    Q.  Okay.  And then what's oral?
2    A.  Is the route of administration.
3    Q.  And what's the 100?
4    A.  It's the strength.
5    Q.  Well --
6    A.  A bottle of 100.  So --
7    Q.  When you say a bottle of 100, in other
8  words, this FUL was set for a package size of a
9  bottle of 100 pills, correct?
10    A.  Correct.
11    Q.  If you look a little bit further down
12  the page to minocycline hydrochloride, do you see
13  that there's a 50?  Do you see that?
14    A.  Correct.
15    Q.  And that indicates that that FUL was
16  set on a basis of a package size of 50, correct?
17    A.  Correct.
18    Q.  Not to bounce around too much -- I
19  probably should have done this earlier, but if
20  you would just flip back to Exhibit 1 for a
21  second, package size plays a role in setting the
22  FUL, correct?

Page 423

1    A.  The most commonly used package size.
2    Q.  Right.  And in the regulation there's a
3  -- you select either the package size or 100 or
4  if there's another more commonly used package
5  size, you'd select that?
6    A.  Correct.
7    Q.  So in the case of metoprolol, as we see
8  in Exhibit 3, it's the 100 -- bottle of 100 is
9  the package size that's most commonly used,
10  whereas for minocycline it's 50 that CMS has
11  deemed to be the most commonly available package
12  size?
13    A.  Right.
14      MR. WINGET-HERNANDEZ:  Objection, form.
15      MS. MARTINEZ:  Objection, form.
16    A.  For the 100-milligram base.
17    Q.  Let me ask the question, for the 100-
18  milligram base for minocycline, CMS deemed 50 to
19  be the most commonly available package size,
20  correct?
21    A.  Correct.
22    Q.  Let's jump back now to Exhibit 2.  And

35 (Pages 420 to 423)

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

| Page 424 |
|---|

1  before I go any further, let me -- I may have
2  misspoke and I want to make sure the record is
3  clear.  Looking down at the bottom I think I said
4  -- we identified some text that began with 10/17.
5  And I think I said 2000.  But that actually may
6  be 2001.  Do you see that?
7      A.  Yes.  It's not very clear.
8      Q.  It's not very clear.  But whether it's
9  -- given the date up in the top left-hand corner
10  of 8/21/2001, it's more likely that you made your
11  note on October 17th of 2001, correct?
12      A.  Correct.
13      Q.  And that -- what follows the 10/17/2001
14  is in fact your note?
15      A.  Correct.
16      Q.  Now, to -- let's just understand a
17  little bit about what you wrote in the bottom
18  right-hand corner.  The .0609 is the price on
19  which this FUL is being set, correct?
20      A.  Correct.
21      Q.  And you're multiplying that by 150
22  percent to get the .0914 that we see appears in

| Page 425 |
|---|

1  Exhibit 3, transmittal 37?
2      A.  Correct.
3      Q.  And so if I wanted to find out what
4  manufacturer's price set the FUL in this
5  instance, what I'd do is go up to the list of
6  prices above and I'd look for the .0609, right?
7      A.  Yes.
8      Q.  And so if I do that I go up and I see
9  that it actually was Mutual Pharmaceuticals' WAC
10  that set the FUL in this instance; is that
11  correct?
12      A.  It appears that way.
13      Q.  Well, the --
14      A.  Yes.  Yes.
15      Q.  Okay.  And what -- just so we're clear,
16  what Exhibit 2 is a list of published prices from
17  three national pricing compendia that CMS had in
18  front of it when it was establishing this FUL,
19  correct?
20      A.  Correct.
21      Q.  And there are lower published prices on
22  this list than the .0609 that was used to set the

| Page 426 |
|---|

1  FUL, correct?
2      A.  Correct.
3      Q.  For example, if you look down almost to
4  the bottom, Geneva Pharmaceuticals, Inc., there's
5  a published pharmaceutical price of Geneva
6  Pharmaceuticals, Inc. of .0544 which was less
7  that was used to set the FUL?
8      A.  That one has a line through it and it
9  says "discontinued."
10      Q.  Right.  So that wasn't used to set the
11  FUL.  But that's something you would have had to
12  make a telephone call to find out?
13      A.  Probably.
14      Q.  What does the T over in the left-hand
15  column mean?  Do you recall?
16      A.  I think it means it's temporarily
17  unavailable.  It's a code that can be put into
18  the FULs application.
19      Q.  So if you or a colleague of yours calls
20  one of these manufacturers and learns that Geneva
21  Pharmaceuticals is temporarily out of stock of
22  metoprolol, you would put a T in the FULs system?

| Page 427 |
|---|

1      A.  Correct.
2      Q.  And that would be to ensure that the
3  Geneva price didn't get used as the basis for the
4  FUL?
5      A.  Correct.
6      Q.  And why would you do that?
7      A.  Because if the product is in the
8  available you don't want to said a FUL price on a
9  product that is not available.
10      Q.  Why not?
11      A.  Because it might not be a realistic
12  price.  That product could be unavailable for
13  three years but they're still reporting it to the
14  compendia.  So if it's not a realistic price then
15  there's no sense in setting the FUL price based
16  on that.
17      Q.  And by realistic price you mean a price
18  that's high enough that providers could acquire
19  the product in the market place?
20      A.  Correct.
21      Q.  Caraco Pharmaceuticals also has a lower
22  reported price, right, of .0569?

36 (Pages 424 to 427)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 428

1    A.  Correct.
2    Q.  Do you know why that wasn't used to set
3  the FUL in this case?
4    A.  No.  I'm not real sure.
5    Q.  I mean, it does look to me from the
6  notation over on the right that somebody called
7  and that was a product that was deemed to be
8  available, right?
9    A.  Correct.
10    Q.  So you have a manufacturer, anyway,
11  who's got available product at a lower published
12  price, but it wasn't used for the FUL, correct?
13    A.  Correct.  Sometimes discretion was used
14  with this too.  You might look at that price and
15  if that price still appears to be too low that it
16  would make the product available out there, then
17  you would check to see if there's another
18  manufacturer that might be a step up that's
19  closer, but that could still allow you to set a
20  reasonable FUL price.
21    Q.  I see.  So sometimes discretion was
22  used to ensure that the FUL was reasonable?

Page 429

1    A.  And available.
2    Q.  And available?
3    A.  Yeah.
4    Q.  And the reason you used that discretion
5  was to make sure that providers -- you didn't set
6  a FUL that was so low that providers couldn't
7  acquire the product on the marketplace, correct?
8    A.  Correct.
9    Q.  And so you don't know for certain, but
10  it's possible that one of the reasons that the
11  Caraco price wasn't used here was discretion was
12  exercised and it was deemed maybe that this was
13  too low?
14    A.  It could be too low or Caraco only
15  distribute to maybe limited amount of states and
16  not all states.  That's something else to keep in
17  consideration.
18    Q.  Okay.  But there was in any event a
19  manual review process and discretion exercised
20  and a choice that CMS made not to use that price,
21  correct?
22    A.  Correct.

Page 430

1    MR. BUEKER:  Okay.  I have I think run
2  out of tape.  So perhaps we could set this to the
3  side, have some lunch and we'll come back this
4  afternoon.
5    THE WITNESS:  Okay.
6    THE VIDEOGRAPHER:  This is the end of
7  tape 2.  Off the record at 12:25.
8    (Whereupon, at 12:25 p.m. a lunch
9  recess was taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 431

1    A F T E R N O O N   S E S S I O N
2    (1:16 p.m.)
3
4  Whereupon,
5    SUE GASTON,
6  the witness testifying at the time of recess,
7  having been previously duly sworn, was further
8  examined and testified as follows.
9
10    EXAMINATION RESUMED BY COUNSEL FOR
11  THE WARRICK PHARMACEUTICALS, SCHERING-PLOUGH
12  CORPORATION AND SCHERING CORPORATION
13    THE VIDEOGRAPHER:  This is the
14  beginning of tape 3 in the deposition of Ms.
15  Gaston.  On the record at 1:16.
16    MR. BUEKER:  Can I ask the court
17  reporter to mark as three page exhibit that has
18  the Bates number HHD 175-0850 through 0852 as New
19  York Counties Defendants' Exhibit 4 for
20  identification, please.
21    (Exhibit NY Counties 004 was
22  marked for identification.)

37 (Pages 428 to 431)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 432

1  BY MR. BUEKER:
2      Q.  Ms. Gaston, do you have in front of you
3  what's been marked as Exhibit 4 for
4  identification?
5      A.  Yes.
6      Q.  And would you agree with me that
7  Exhibit 4 is a three page exhibit consisting of
8  three separate e-mails?
9      A.  Correct.
10     Q.  And are you familiar with e-mails like
11 those reflected in Exhibit 4?
12     A.  It looks familiar.
13     Q.  What is it?
14     A.  From my recollection, there was a
15 period of time where we were soliciting comments
16 from states or I think some of the pharmacy
17 associations on a FUL list that was placed out
18 there without manual review.  And we established
19 a federal upper limit e-mail box where they could
20 send in their comments to give us some feedback
21 on this draft FUL list.
22     Q.  And that FUL list that you're referring

Page 433

1  to that was sent out without manual review, that
2  took place in 2000, right?
3      A.  I'm not sure.  It appears so because of
4  the date on the e-mail.
5      Q.  But in or about 2000?
6      A.  Correct.
7      Q.  And you said you set up an e-mail
8  mailbox to get complaints?
9      A.  Feedback.
10     Q.  Feedback?  Sorry.
11         And did you get a lot of feedback?  Did
12 CMS get a lot of feedback?
13     A.  I can't remember.
14     Q.  Okay.  Just looking at the e-mails that
15 are contained in Exhibit 4, it looks like you got
16 feedback here from Albertson's, Omni Care and it
17 looks like Eckerd or Brooks Pharmacy.  I take it
18 one source of feedback was the pharmacy
19 community, pharmacists?
20     A.  Correct.
21     Q.  And you also said associations and --
22     A.  Yeah.  State Medicaid agencies.

Page 434

1      Q.  Okay.  Do you recall the nature of the
2  feedback at all?
3      A.  Basically they were giving us feedback
4  whether they felt that the FUL prices or the
5  drugs were correctly on the FUL list or needed
6  adjust or shouldn't -- or weren't available.  I
7  think it was feedback about the whole list that
8  was put out at that time.
9      Q.  Okay.  Do you recall what if anything
10 CMS did in response to receiving feedback?
11     A.  I can't remember.  I don't know if we
12 just reverted back to the list that was still in
13 place.  I don't have a recollection of that.
14     Q.  Do you know whether CMS withdrew the
15 list that had been sent out without manual
16 review?
17     A.  I would assume that that's what
18 occurred.
19     Q.  Other than in this time period, the
20 2000 to 2001 time period, were there other ways
21 in which CMS received feedback on its FULs?
22     A.  Yes.

Page 435

1      Q.  How?
2      A.  We would get phone calls, e-mails,
3  sometimes letters or faxes.
4      Q.  And who would receive that feedback?
5      A.  I would.  Or Larry Reed.
6      Q.  And what kind of feedback would CMS
7  typically receive?
8      A.  It would be comments maybe from the
9  pharmacy saying that the product is not available
10 or that the pricing appears to be either too low
11 or too high.  Mostly availability issues.
12     Q.  And when you got feedback from some
13 source that a drug wasn't available, what if any
14 steps would CMS take?
15     A.  What we would do is call the
16 manufacturer or wholesaler and verify if that was
17 a fact.  Sometimes it might be just one state
18 that's having an availability problem.  But we
19 have to make sure that it's an availability
20 problem that would affect the FUL list for all
21 the states.
22     Q.  And what if you learn that, for

38 (Pages 432 to 435)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 436

1  example, a manufacturer had discontinued a
2  particular drug that had been used to set the
3  FUL?  What would you do then?
4      A.  Then we would reevaluate whether the
5  FUL should be removed or if the FUL price should
6  be adjusted.
7      Q.  And in the case of a low price that had
8  been removed, the adjustment would have been one
9  that was upward?
10     A.  Well, we would look at the most recent
11 FUL application page for that particular drug and
12 look at the most current pricing that we have and
13 see if a new price should be established.
14     Q.  And if you say FUL application page you
15 mean something like Exhibit 2?
16     A.  Correct.
17     Q.  Let's parse the time periods a little
18 bit here.  Prior to 2000/2001 where you were
19 receiving feedback on your FULs, on CMS's FULs?
20     A.  We always receive feedback on the FULs.
21     Q.  So throughout the entire time period
22 '91 to 2003 you can recall receiving feedback on

Page 437

1  the FULs?
2      A.  Correct.  Just not by the FUL e-mail
3  address.  We established that for that one
4  particular situation.
5      Q.  Did CMS leave in place the mailbox, the
6  mail means of receiving feedback, post 2000/2001?
7      A.  I don't know.
8      Q.  So in terms of -- I'll refer to the e-
9  mail as a systematic way of receiving feedback.
10 Other than the e-mail systematic way of receiving
11 feedback, were there other systematic ways in
12 which CMS received feedback on its FULs?
13     A.  We would still receive faxes.  I think
14 in this particular situation we wanted the
15 feedback in writing.  So if we received phone
16 calls we would ask them to follow up in writing.
17     Q.  I see.  Do you recall receiving written
18 complaints in the 2000 period from the National
19 Association of Chain Drug Stores?
20     A.  Yes.
21     Q.  Tell me about that.  What do you
22 recall?

Page 438

1      A.  Just that they had complaints about the
2  -- some of the FUL prices or -- I can't remember
3  if availability was an issue for them.  And they
4  also wanted to receive a file with all the NDC
5  numbers of the FUL drugs.
6      Q.  Did they tell you why they wanted to
7  receive that?
8      A.  I can't recall.
9      Q.  When you say they had complaints about
10 the FUL prices what do you mean?  What kind of --
11 what was the nature of the complaint?
12     A.  I can only guess because it's been so
13 long.  But generally I would assume that they're
14 complaining that the FUL prices are probably set
15 too low.  They could have been complaining --
16 maybe the availability of the drugs too.
17     Q.  And when you say too low, in other
18 words, that the FUL was -- I'm sorry.  Go ahead.
19 What do you mean by too low?
20     A.  Okay.  In their -- I think because they
21 have a lot of pharmacies that they're
22 representing and if they feel that the prices are

Page 439

1  too low they feel the pharmacies can't purchase
2  them at the FUL prices.
3      Q.  And do you recall CMS doing anything in
4  response to the complaint from the National
5  Association of Chain Drug Stores?
6          MS. MARTINEZ:  Objection, form.
7      A.  I do want to clarify, that what I'm
8  talking about with the National Association of
9  Chain Drug Store complaints is during the period
10 of time when we sent out -- the one that I'm
11 addressing anyhow, is during this period of time.
12     Q.  I didn't mean to imply otherwise.
13     A.  I just wanted to make sure I'm clear.
14     Q.  And your counsel objected, to let me
15 see -- in the 2000/2001 time period you recall
16 CMS receiving a complaint from the National
17 Association of Chain Drug Stores.  What if any
18 action do you recall CMS taking in response to
19 that particular complaint?
20     A.  CMS took their complaints or
21 suggestions or issues, whatever they had, along
22 with all the other ones, and then whatever

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                 Washington, DC

Page 440

1  happened with that draft that was put out at that
2  time I can't recall.
3      Q.  Other than the 2000/2001 draft list, do
4  you recall another instance in which CMS
5  circulated a FUL list without manual review and
6  got a series of complaints?
7      A.  I don't recall that.
8      Q.  So in your mind at least 2000/2001,
9  that instance is unique?
10     A.  Yes.
11         MR. BUEKER:  I ask the court reporter
12  to mark a one-page document with the Bates number
13  HHD 175-1492 as New York Counties Defendants'
14  Exhibit 5 for identification, please.
15         (Exhibit NY Counties 005 was
16  marked for identification.)
17  BY MR. BUEKER:
18     Q.  Ms. Gaston, the court reporter his
19  placed in front of you what has been marked as
20  New York Counties Defendants' Exhibit 5 for
21  identification.  And this I apologize is where
22  this might begin to get repetitive.  But Exhibit

Page 441

1  5 you would agree is a printout from the FULs
2  system from August of 2001, correct?
3      A.  Correct.
4      Q.  And it's a printout from the FUL's
5  system that relates to the 0.5-milligram strength
6  of clonazepam?
7      A.  Can I just back up?  You said August
8  2001.  I don't have a date on mine.
9      Q.  Okay.  Fair point.  The copy wasn't
10  well done.
11         MS. REID:  John, do you want to give me
12  her mine?
13         MR. BUEKER:  Sure.
14         MS. MARTINEZ:  Could I just look at it?
15         MR. BUEKER:  Sure.  Perhaps we could
16  substitute that as the one for the record,
17  please?
18         (Whereupon, Exhibit NY Counties
19  005 was replaced with a better photocopy of the
20  same document.)
21  BY MR. BUEKER:
22     Q.  Ms. Gaston, I apologize for you.  You

Page 442

1  now have in front of you what's been marked as
2  Exhibit 5 for identification.  And you would
3  agree with me that it's an August 2001 printout
4  from the FULs system?
5      A.  Yes.
6      Q.  And it relates to the 0.5-milligram
7  strength of clonazepam?
8      A.  Correct.
9      Q.  Which I'll represent to you is one of
10  the nine drugs that are at issue in the focused
11  discovery in the New York Counties.  Is that your
12  handwriting down at the bottom of the page?
13     A.  No.
14     Q.  That's Ms. Bergin's handwriting?
15     A.  Correct.
16     Q.  But nonetheless you recognize Exhibit 5
17  to be the printout from the FULs system that's
18  kind of the basis for the manual review that CMS
19  would have done in terms of setting this FUL?
20     A.  Correct.
21     Q.  And if you'd turn back with me to page
22  5 of Exhibit 3, can we agree that the 0.2455

Page 443

1  that's written at the bottom of page 5 is
2  actually what becomes the FUL in November of 2001
3  for the 5-milligram strength for clonazepam?
4      A.  Correct.
5      Q.  And looking at Exhibit 3, what you see
6  is that that's set on the basis of a Blue Book
7  price? That's the B?
8      A.  Correct.
9      Q.  And on the package size of 100?
10     A.  Correct.
11     Q.  Turning back to Exhibit 5, and there's
12  Ms. Bergin's writing down at the bottom.  This
13  FUL appears to have been set on the basis of
14  Purepac's WAC?
15     A.  Correct.
16     Q.  And if you go up and look, Purepac's
17  WAC at this time as reported by Blue Book was
18  0.16370, correct?
19     A.  Correct.
20     Q.  And you see in this FULs printout from
21  CMS again that there were lower published prices
22  that CMS was considering when setting this FUL,

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 444

1  correct?
2      A.  Correct.
3      Q.  For example, Teva Pharmaceuticals,
4  Inc., a few up from the bottom, has a lower
5  published price?
6      A.  Correct.
7      Q.  But there's a T over in the left-hand
8  column which we established earlier I think meant
9  that one was maybe temporarily unavailable?
10     A.  Correct.
11     Q.  But if you look up at Major
12  Pharmaceuticals, as an example, up at the top,
13  Major has a lower published price in both Red
14  Book and Blue Book, correct?
15     A.  Correct.
16     Q.  Do you know why CMS chose not to set a
17  FUL on the basis of that lower published price?
18     A.  I could give you my opinion.
19     Q.  Sure.
20     A.  That here again what I think they were
21  trying to do was since there's such a difference
22  between the .07 and then the next price of

Page 445

1  .16370, that we wanted to make sure that the FUL
2  price that's set is a reasonable price and that
3  we'll be assured the availability of the drug.
4  So we went up to the next lowest price.
5      Q.  And when you say reasonable, what do
6  you mean in that context?
7      A.  That we feel that the pharmacies will
8  be able to purchase this drug at the FUL price.
9      Q.  So in other words, you thought it was
10  reasonable to ignore a published price that was
11  maybe too low in CMS's view so that you
12  established a reasonable FUL, correct?
13     A.  Correct.
14     Q.  I think we can set Exhibit 5 to the
15  side.  We'll do another one that looks exactly
16  like it.  If the court reporter could mark as
17  Exhibit 6 for identification New York Counties
18  Defendants' Exhibit 6 for identification HHD 175-
19  2110.  And I do confirm that this one has a date.
20          (Exhibit NY Counties 006 was
21  marked for identification.)
22  BY MR. BUEKER:

Page 446

1      Q.  Ms. Gaston, you recognize Exhibit 6 to
2  be again a printout from the FULs system?
3      A.  Correct.
4      Q.  And Exhibit 6 is dated August of 2001,
5  correct?
6      A.  Correct.
7      Q.  And this is the printout that relates
8  to establishing a FUL in this case for the 1
9  milligram strength of lorazepam?
10     A.  Correct.
11     Q.  Which I'll represent to you is another
12  one of the nine drugs that are the subject of
13  focused discovery in the New York Counties case.
14  I take it that's not your handwriting down at the
15  bottom of Exhibit 6?
16     A.  Correct.
17     Q.  That's again, Ms. Bergin's handwriting?
18     A.  Yes.
19     Q.  But you are familiar with Exhibit 6 and
20  recognize it to be a printout from the FULs
21  system that would have been the basis on which
22  CMS began its manual review of this FUL?

Page 447

1      A.  Yes.
2      Q.  I want to ask you about some text
3  that's written in the middle of the page in bold
4  and it's preceded by a couple of stars.  It says
5  "FULs price not greater than another supplier."
6  Do you see that?
7      A.  Yes.
8      Q.  Is that text that the FULs system in
9  your experience would have put on a page like
10  this?
11     A.  Correct.
12     Q.  Explain to me what that means.
13     A.  I think it was checking on the
14  supplier.  It has to make sure there's at least
15  three suppliers.  And here again, I haven't dealt
16  with this for a while, so I need to refresh my
17  memory.
18     Q.  Well, let me see if we can get at it
19  this way.  Just above that text do you see a low
20  price?
21     A.  Correct.
22     Q.  And you see that it's .1999?

                        41 (Pages 444 to 447)

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 448

1      A.  Correct.
2           MR. WINGET-HERNANDEZ:  Objection, form.
3  I apologize.  I withdraw that objection.  I just
4  was confused about what number you were looking
5  at.
6  BY MR. BUEKER:
7      Q.  Okay.  And you see there's a number
8  that's crossed out that's .2999 over in the left-
9  hand side just before the bolded text we were
10  talking about?
11      A.  Correct.
12      Q.  And that -- because it's cut off,
13  perhaps it would help to refer to Exhibit 5.  But
14  that's the FUL price that the FULs system
15  calculated, correct --
16      A.  Correct.
17      Q.  -- the crossed out number .2999?
18      A.  Correct.
19      Q.  And that FUL number that's calculated
20  by the system would have been based on this low
21  price of .1999, correct?
22      A.  Correct.

Page 449

1      Q.  And if you go up and look at the list
2  of published prices above, you would agree with
3  me that there's no published price that's below
4  that .2999 number, right?
5      A.  Correct.
6      Q.  Except the one price in which the FUL
7  was based?
8      A.  Yes.
9      Q.  Or I shouldn't say based.  Was
10  calculated by the system.
11           So does that help to refresh your
12  recollection that indeed this warning, "FULs
13  price not greater than another supplier," was
14  essentially an occasion that the FULs system had
15  detected that by basing a FUL on the lowest
16  published price the FUL was being set at below
17  the next published price?
18      A.  Correct.
19      Q.  Is that a warning -- you talked the
20  last time in your last deposition about certain
21  flags that the system had to tell you and your
22  colleagues that you needed to conduct a manual

Page 450

1  review.  Is this one of those flags?
2      A.  Yes.
3      Q.  And why was it important that the FULs
4  system cautioned you to look at or manually
5  review a FUL that was set in this manner?
6      A.  Because if we allowed the FUL to be set
7  at this price then it would be an availability
8  issue.
9      Q.  In other words, that if you allowed a
10  FUL to be set at this price based on this lowest
11  published price, then you'd have an availability
12  issue and that's a problem, it's not a reasonable
13  FUL?
14      A.  Correct.
15      Q.  And so that number is crossed out and a
16  different number is written in that's .5718,
17  right?
18      A.  For the FUL price.
19      Q.  For the FUL price.
20      A.  Correct.
21      Q.  And that appears to be based on from
22  the note on the bottom a United Research Labs or

Page 451

1  URL's WAC?
2      A.  Correct.
3      Q.  And URL's WAC was not the lowest
4  published price in this instance, right?  Because
5  we've seen for example Major Pharmaceuticals had
6  a lower published price?
7      A.  Well, I thought you meant excluding
8  that published price.
9      Q.  No.  I didn't mean that.
10      A.  Yeah.  Major's was the next lowest.
11  The next lowest was URL.
12      Q.  So what we see in Exhibit 6 is another
13  situation in which, exercising its discretion,
14  CMS chose to set a FUL not based on the lowest
15  published price but based on the next lowest
16  published price because that's what was
17  reasonable to do in terms of ensuring access,
18  correct?
19      A.  Correct.
20      Q.  And for the record, why is it that CMS
21  would have chosen to ignore the lowest published
22  price?

42 (Pages 448 to 451)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 452

1       MS. MARTINEZ: Objection, form.
2       A.  Because setting the FUL on the lowest
3   published price here might not allow us to have a
4   reasonable FUL price for this drug.
5       Q.  Okay.  Let me see if I can cure Ani's
6   objection.  Why would CMS have chosen to have
7   ignored the lowest published price in setting a
8   FUL for the 1 milligram lorazepam in 2001?
9       MS. MARTINEZ: Objection, form.  Just
10  to let you know, one of my objections is to you
11  were stating that CMS is ignoring the price, the
12  characterization of ignoring.
13      MR. BUEKER: Okay.  Didn't use?  Is
14  that better?
15      MS. MARTINEZ: Did not use.  Yeah.
16      MR. BUEKER: Okay.
17  BY MR. BUEKER:
18      Q.  Just for the record, why is it that CMS
19  chose not to use the lowest published price in
20  setting the FUL for lorazepam in 2001?
21      A.  Because we wanted to assure that the
22  FUL price was a reasonable price.  So we chose to

Page 453

1   ignore Major's lowest price.
2       Q.  I think we can set Exhibit 6 to the
3   side.  I warned you this was going to get
4   repetitive.  May I ask the court reporter to mark
5   as New York Counties Defendants' Exhibit 7 for
6   identification a one-page document that's labeled
7   HHD 175-0009 in the bottom right-hand corner.  I
8   was looking for one that's got the best date.
9       (Exhibit NY Counties 007 was
10  marked for identification.)
11  BY MR. BUEKER:
12      Q.  Ms. Gaston, do you have in front of you
13  what's been marked as Exhibit 7 for
14  identification?
15      A.  Yes.
16      Q.  And this is, again, a printout from the
17  CMS's FUL system and it's dated in the upper
18  left-hand corner 7/24/2001?
19      A.  Correct.
20      Q.  And this is the same kind of printout
21  we've been looking at in other examples; it's
22  just that this one is now for the 500 milligrams

Page 454

1   strength of cefadroxil?
2       A.  Correct.
3       Q.  And I'll represent cefadroxil is
4   another one of the drugs at issue in the New York
5   Counties case.
6       Is that your handwriting at the bottom
7   of Exhibit 7?
8       A.  No.
9       Q.  Whose handwriting is that is that?
10      A.  It's Cindy Bergin's.
11      Q.  But nevertheless, you're familiar with
12  the form of Exhibit 7; it's a printout from the
13  FULs system?
14      A.  Correct.
15      Q.  Can you read into the record what Ms.
16  Bergin wrote in her handwriting at the bottom of
17  the page?
18      A.  She said on 7/25 "The FUL was too low
19  at 1.2749, but when I raised it it became equal
20  to Major's AWP.  That means delete for now."
21      Q.  Can you help me understand what she was
22  doing here?

Page 455

1       A.  It appears that the FUL price the
2   system generated needed to be evaluated --
3       Q.  We've got another one of those notes,
4   right?  The FUL price not greater than another
5   supplier?
6       A.  Correct.  And so we needed to do some
7   manual review.  It looks like the low price that
8   it was based on --
9       Q.  It looks like Major?
10      A.  -- was Major.  And it seemed extremely
11  low.  Not extremely.  But it seemed much lower
12  than all the other published prices.
13      Q.  And so the next, as I understand it,
14  the next highest published price after Major's
15  was Zenith Labs?
16      A.  Correct.
17      Q.  And when you used a Zenith Labs price
18  as I understand it you got something -- you
19  multiplied that by 150 percent to calculate what
20  a FUL might be, you get a number that was
21  equivalent to Major's AWP?
22      A.  That's what it appears.

43 (Pages 452 to 455)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 456

1    Q.  And Ms. Bergin's note indicates that in
2  this instance CMS did not set a FUL because the
3  FUL price would have been equal to Major's AWP;
4  is that correct?
5    A.  Correct.
6    Q.  Are you familiar with making that kind
7  of a decision not to set a FUL when it was equal
8  to an AWP?
9    A.  Yes.
10   Q.  Why would CMS decline to set a FUL when
11 the FUL was equal to an AWP?
12   A.  Because states have other methodologies
13 they can use for reimbursement.  And their
14 regular reimbursement methodology would be a
15 percentage off of AWP.  That would be a
16 reasonable reimbursement rate for other drugs.
17 So the purpose of setting the FUL price is to try
18 to set reasonable reimbursement.  And that would
19 kind of counter what the states were doing with
20 their other reimbursement methodology.
21   Q.  I see.  So just like we talked about
22 there morning, one of the objectives of the FUL

Page 457

1  program is cost savings?
2    A.  Correct.
3    Q.  And so if you set a FUL that was equal
4  to an AWP it wouldn't really result in any cost
5  savings to the state?
6    A.  Correct.
7    Q.  And so in this case, if I understand
8  what's going on here with cefadroxil in 2001,
9  basing a FUL on the lowest published price seemed
10 to result in a FUL that was too low, right?
11   A.  It appeared that way because of the
12 compendia information that we have.
13   Q.  And setting a FUL -- not using that
14 lowest published price but moving up to the next
15 seemed to result in a FUL that was too high?
16   A.  Correct.
17   Q.  And so CMS declined to set a FUL given
18 the published prices that were out there?
19   A.  Correct.
20   Q.  Let me just digress here for a second.
21 What role if any did AWP play in setting FULs?
22   A.  Generally, it did not.

Page 458

1    Q.  Can you think of any instance in which
2  CMS based a FUL on the published AWP price?
3    A.  I can't think of a situation where they
4  did.
5    Q.  In other words, other than being used
6  to check whether there was going to be cost
7  savings that resulted, FUL was basically -- or --
8  I'm sorry -- AWP was basically irrelevant for the
9  FUL calculation?
10      MS. MARTINEZ:  Objection, form.
11      MR. WINGET-HERNANDEZ:  Objection, form.
12   A.  It was used in the methodology just for
13 consideration, but I don't know of any times when
14 it would have been used to set a FUL price.
15   Q.  So in terms of a basis of calculation,
16 the price on which the FUL was based, AWP was
17 irrelevant?
18      MR. WINGET-HERNANDEZ:  Objection, form.
19      MS. MARTINEZ:  Objection, form.
20   A.  We wouldn't have used AWP.
21   Q.  Why would CMS not have used AWP?
22   A.  Because we know that states will be

Page 459

1  reimbursing for drugs at a percentage off of AWP.
2  That's one of the methodologies they could use.
3  And we will let states reimburse according to
4  that methodology.  Setting a FUL using the AWP
5  wouldn't achieve the cost savings where if they
6  did it with their own methodology, a percentage
7  off of AWP, they would be achieving savings.
8    Q.  You can set that aside.  But don't
9  worry, I have others that look like it.
10   A.  I'm sure.
11   Q.  Can I ask the court reporter to mark as
12 Exhibit 8 -- New York Counties Defendants'
13 Exhibit 8 for identification a one-page document
14 labeled HHD 175-0276.
15      (Exhibit NY Counties 008 was
16 marked for identification.)
17 BY MR. BUEKER:
18   Q.  Ms. Gaston, you have in front of you
19 Exhibit 8?
20   A.  Yes.
21   Q.  And Exhibit 8, again, looks to be to
22 you a printout from the FULs system for 500-

44 (Pages 456 to 459)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 460

1  milligram strength of cefadroxil?
2      A.   Correct.
3      Q.   And Exhibit 8 is dated in the top left-
4  hand corner 3/27/02?
5      A.   Correct.
6      Q.   What I want to do is focus on the
7  writing at the bottom of Exhibit 8.  Is that your
8  handwriting?
9      A.   No.
10     Q.   Again, it's Ms. Bergin's handwriting?
11     A.   Correct.
12     Q.   Let me ask specifically, the
13 handwriting kind of above the chart that looks
14 like pound sign or number sign "100 looks like
15 the most commonly used size," is that your
16 handwriting?
17     A.   No.  That's Cindy's.
18     Q.   You would agree with me that it looks
19 like what Ms. Bergin was trying to do here was
20 determine what the most commonly available
21 package size was, right?
22     A.   Correct.

Page 461

1      Q.   And down the left-hand column it looks
2  like a list of six states, correct?
3      A.   Correct.
4      Q.   And those are Florida, California, New
5  York, North Carolina, Idaho and Missouri?
6      A.   Correct.
7      Q.   How did -- is Exhibit 8 representative
8  of how CMS determined the most commonly available
9  package size?
10     A.   We didn't have to do this a lot.
11 Generally it was easily identifiable.
12     Q.   Okay.
13     A.   There were some situations where if the
14 100 was the most commonly used package size at
15 one time and it appears that something has
16 changed and it looks like the 50 might now be the
17 most commonly used package size, we would have to
18 do some research because we would want to use the
19 most commonly used package size.  And that's what
20 this research involved.  It didn't occur a lot.
21     Q.   How did CMS know to do this kind of
22 research to determine whether something was no

Page 462

1  longer the most commonly used package size?
2      A.   I can't remember.  But I do know that
3  there was something with the feedback that we had
4  from the FULs program, whether it was maybe there
5  wasn't a lot of compendia information.  I'm
6  really not sure.  But something alerted us to
7  that.
8      Q.   So -- I don't see anything on this
9  particular page that might alert it.  But you
10 think there was something along the lines of the
11 bolded FULs not lower than the published price
12 kind of thing that the FULs system spit out to
13 alert you to go look at the package size?
14     A.   I don't know if it was an alert
15 statement or it was just -- if there was FUL data
16 also printed out that helped us to be alerted to
17 that.
18     Q.   But this is a fairly short list
19 relative to the others in terms of the number of
20 manufacturers?
21     A.   Correct.
22     Q.   Is that the kind of thing that would

Page 463

1  have alerted you it go look at the package size?
2      A.   I really can't remember.
3      Q.   When CMS determined that it needed to
4  look at the package size, what did it do to
5  determine what the most commonly used package
6  size was?
7      A.   Are you saying what did we do?
8      Q.   Yeah.  What did you do.
9      A.   Okay.  It appears from the work in the
10 bottom of this page that we probably looked at
11 the utilization of each of these NDC numbers in
12 the state utilization data that CMS has.
13     Q.   Mm-hmm.  Do you yourself recall ever
14 searching for a most commonly available package
15 size?
16     A.   I recall doing it.
17     Q.   And did you do the analysis as is shown
18 here, meaning by going out and looking at the
19 state utilization?
20     A.   Yes.
21     Q.   And it looks like here that not all of
22 the states were used.  It looks like six states,

45 (Pages 460 to 463)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                              March 19, 2008
                        Washington, DC

Page 464

1  right?
2     A.  Correct.
3     Q.  Was that CMS's practice, to use a
4  subset of the states?
5     A.  It wasn't a practice.  It was just
6  using our judgment.
7     Q.  I see.  So there wasn't a commonly
8  established -- there wasn't a practice or a
9  policy on how to determine the most commonly
10 available package size; that was something that
11 was left to your discretion?
12    A.  Correct.
13    Q.  Okay.  And just so I get the bounds of
14 the discretion, the overall objective obviously
15 was to find the most commonly available package
16 size and utilization tended to be a pretty good
17 measure of that, right?
18    A.  Correct.
19    Q.  So whether it was looking at some
20 subset of the states or all the states,
21 utilization was generally what CMS looked at?
22    A.  In these types of situations, yes.

Page 465

1     Q.  Is that written down anywhere to your
2  knowledge?
3     A.  Not that I'm aware of.
4     Q.  So it's not in the regulation or a
5  manual or something that, you know, outsiders
6  would know?
7     A.  No.  We always reference the most
8  commonly used package size.
9     Q.  Right.  But how that most commonly used
10 package size is determined is something that's
11 less to CMS's discretion?
12    A.  Correct.
13    Q.  And there aren't to your knowledge
14 written guidelines about how to exercise that
15 discretion?
16    A.  Correct.
17       MR. WINGET-HERNANDEZ:  John, I know
18 it's quick.  It's right after lunch.  So as soon
19 as you can find a chance for a break, that would
20 be great.
21       MR. BUEKER:  Okay.  Give me a couple
22 more minutes to do this and we'll take a break.

Page 466

1        MR. WINGET-HERNANDEZ:  Sure.
2  BY MR. BUEKER:
3     Q.  Would it surprise you to learn that the
4  package sizing in which CMS actually wound up
5  basing the FUL in this time period was actually
6  the 100?  I'm sorry.  Was actually the 50.
7        MS. MARTINEZ:  Objection, form.
8     A.  I can't explain that.
9     Q.  Okay?
10       MR. BUEKER:  We'll take a break here.
11       THE VIDEOGRAPHER:  Off the record at
12 1:57.
13       (Recess.)
14       THE VIDEOGRAPHER:  On the record at
15 2:11.
16       (Exhibit NY Counties 009 was
17 marked for identification.)
18 BY MR. BUEKER:
19    Q.  Back on the record.  Let me place in
20 front of you, Ms. Gaston, what's been marked as
21 New York Counties Defendants' Exhibit 9 for
22 identification.  And before the break we were

Page 467

1  talking about cefadroxil and I asked you whether
2  or not it surprised you that in this time period
3  actually the FUL was set on the 50 package size
4  of cefadroxil?
5     A.  Mm-hmm.
6     Q.  I just wanted to show you that in fact
7  the cefadroxil was based on 50.  If you look with
8  me at Exhibit 9 for a minute.  Exhibit 9 for the
9  record again is a transmittal from CMS?
10    A.  Yes.
11    Q.  Okay.  And it's a transmittal in the
12 June 7th 2004 time period, correct?
13    A.  Correct.
14    Q.  And if you just turn to page do you see
15 the second entry down is for cefadroxil?
16    A.  Correct.
17    Q.  And the 50 over at the end of that
18 line, the 500-milligram base, is the package size
19 in which the FUL was set?
20    A.  Correct.
21    Q.  Right?  And of course that doesn't line
22 up with Exhibit 8 because Exhibit 8 is calculated

46 (Pages 464 to 467)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                    Washington, DC

Page 468

1  on package sizes of 100?
2        MS. MARTINEZ:  Objection, form.
3     A.   Actually, Exhibit 8 is calculated on
4  the package size of 50, the FUL that's
5  established here on the printout.  But the work
6  that was done on the bottom was evaluating the
7  different package sizes.
8     Q.   We'll try it this way.  Exhibit 3 -- do
9  you have Exhibit 3?
10    A.   Mm-hmm.
11    Q.   If you turn to page 4 of Exhibit 3, the
12 third entry up from the bottom, that's the same
13 cefadroxil we've been talking about?
14    A.   Correct.
15    Q.   And that FUL is set on the basis of a
16 package size of 50?
17    A.   Correct.
18    Q.   And so if you lay the two transmittals,
19 the 2004 transmittal and the January 2002
20 transmittal, next to one another as kind of book-
21 ends -- I'll represent to you I'm not aware of
22 another transmittal between -- throughout this

Page 469

1  time period the cefadroxil FUL was set on the
2  basis of the 50 package size, correct?
3     A.   Yes.
4     Q.   And turning back to Exhibit 8 it says -
5  - Ms. Bergin wrote "100 looks like the most
6  commonly used package size," right?
7     A.   Correct.
8     Q.   Presumably as a result of her analysis
9  here?
10    A.   Correct.
11    Q.   You don't know why she reached that
12 conclusion that the FUL was set on the 50 package
13 size?
14    A.   Right.  I don't know.
15    Q.   Okay.  We're done with cefadroxil.
16       MR. BUEKER:  Let's mark as Exhibit 10
17 for identification a four-page document that's
18 Bates labeled HHD 170-1050 through 1053.
19       (Exhibit NY Counties 010 was
20 marked for identification.)
21 BY MR. BUEKER:
22    Q.   Do you have Exhibit 10 in front of you?

Page 470

1     A.   Yes, I do.
2     Q.   Do you recognize Exhibit 10?
3     A.   Yes.
4     Q.   What do you recognize it to be?
5     A.   It's a screen shot of the FUL
6  application.
7     Q.   And it's for the drug albuterol 90-
8  microgram inhaler, correct?
9     A.   Correct.
10    Q.   And is that your handwriting down at
11 the bottom of page 1 of Exhibit 10?
12    A.   Yes.
13    Q.   And would you read into the record the
14 first bit of handwriting that begins "temp"?
15    A.   "Temp delete due to raw material
16 shortage."
17    Q.   So "MTL" is material?
18    A.   Correct.
19    Q.   And what does that mean?
20    A.   Apparently we must have done some
21 research on this and we were told that there is a
22 raw material shortage, so we would temporarily

Page 471

1  delete it from the FULs and look at it the next
2  time we would reevaluate.
3     Q.   Okay.  And then there are three lines
4  that say -- that begin "delete" and a check mark
5  over to the right down in the right-hand corner.
6  That's also your handwriting?
7     A.   Yes.
8     Q.   And what does that mean?  What do those
9  lines tell you?
10    A.   I'm assuming that it was -- here again,
11 it's been a while -- but that we delete this drug
12 product from the FUL list, delete it from --
13 there's a memo that goes out with updates.  So
14 apparently this must have been on there.  So
15 delete it from the memo.  And delete the NDC
16 probably from the application at this point.
17    Q.   Okay.  And those checkmarks indicate
18 that that was done, right?
19    A.   That's my understanding, yes.
20    Q.   So the FUL was removed in or about
21 October of 2000, correct?  If it helps you,
22 there's a date at the bottom of the screen print

                              47 (Pages 468 to 471)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 472

1  on each of the pages that says -- I guess you can
2  confirm -- October 24th 2000.
3      A.  I know when this was done.  But I don't
4  know the date to see when it was removed from the
5  FULs.  But this was put into the application at
6  that time.
7      Q.  So in or about October of 2000 you were
8  removing the FUL -- CMS removed the FUL for the
9  albuterol inhaler?
10     A.  Correct.
11     Q.  And the reason -- why did CMS remove
12  the FUL from the inhaler at this point?
13     A.  Because it looks like from the note
14  here that we found out that it was temporarily
15  deleted because we found out there was a raw
16  material shortage.
17     Q.  And why would that cause CMS to want to
18  remove the FUL for the albuterol inhaler?
19     A.  Because if the product is not available
20  then it wouldn't make sense to put a FUL price on
21  it.
22     Q.  And in removing the FUL CMS understood

Page 473

1  that, I assume, that states would start
2  reimbursing for the inhaler at a higher price?
3          MS. MARTINEZ:  Objection, form.
4      A.  Well, they would reimburse it at their
5  state methodology.  They also can MAC it if they
6  want to, put it subject to their state MAC.  So
7  whatever that price is, they determine that.
8      Q.  But because of an access issue CMS
9  thought it was appropriate to remove the FUL at
10  this time?
11     A.  Correct.
12         MR. BUEKER:  Can I ask the court
13  reporter to mark a seven page document that's
14  Bates labeled at the bottom HHD 175-1065 through
15  1071 as Exhibit 11, New York Counties Defendants'
16  Exhibit 11 for identification, please?
17         (Exhibit NY Counties 011 was
18  marked for identification.)
19  BY MR. BUEKER:
20     Q.  Let me know when you're ready.
21     A.  (Reading.)  Okay.  I'm ready.
22     Q.  Okay.  You would agree with me,

Page 474

1  wouldn't you, that the first page of Exhibit 11
2  is a printout from the FULs system like we've
3  been looking at before -- like we've been looking
4  at in several of the other exhibits that have
5  been marked today?
6      A.  Correct.
7      Q.  And it's a printout from the FULs
8  system for the 90-microgram albuterol inhaler and
9  it's dated 8/17/2001?
10     A.  Correct.
11     Q.  And this again is the printout from the
12  FULs system that would have been the basis for
13  the manual review that would have followed with
14  regard to setting a FUL for the 90-microgram
15  inhaler, correct?
16     A.  Correct.
17     Q.  And is that your handwriting down at
18  the bottom of Exhibit 11?
19     A.  On the right-hand side.
20     Q.  Just so we're clear about what you mean
21  by the right-hand side, would you read into the
22  record that which you wrote?

Page 475

1      A.  "Work up new FUL based on" -- it looks
2  like "$7."
3      Q.  Okay.  And whose handwriting is on the
4  left-hand side of the page, if you know?
5      A.  Cindy Bergin's.
6      Q.  Okay.  And there's -- down at the
7  bottom there's -- it looks to me written "FDB
8  prices? OIB prices?"  Do you see that?
9      A.  I see that.
10     Q.  And is that your handwriting?
11     A.  That's my handwriting.
12     Q.  And there's an X crossing that
13  handwriting out, correct?
14     A.  Correct.
15     Q.  Do you know what that means, "FDB
16  prices? OIB prices?"?
17     A.  No, I don't.
18     Q.  Do you know why you wrote that?
19     A.  No.  Unless we were just trying to
20  check current prices.
21     Q.  Is that something that CMS did in
22  setting FULs, check current prices?

                              48 (Pages 472 to 475)

Gaston, Sue - Vol. II                           March 19, 2008
                    Washington, DC

Page 476

1     A.  In the compendia.
2     Q.  Did CMS ever check prices other than
3  prices that are listed in the compendia?
4     A.  Other than calling.  We would call the
5  wholesale -- you know, to verify, we would call
6  wholesalers or the manufacturers.
7     Q.  Can you turn with me to the fifth page
8  of Exhibit 11?  It's a page that has a Moore
9  Medical up in the top left-hand column and a
10  Bates number HHD 175-0169 in the lower right-hand
11  corner.
12     A.  I see it.
13     Q.  Do you know what Moore Medical Supply
14  is?
15     A.  No.  Just -- I mean, I've heard of
16  them, but I don't know specifically what they
17  are.  They purchase, I guess, drugs and supplies.
18     Q.  You say they purchase drugs and
19  supplies.
20     A.  I'm assuming.  I don't know.
21     Q.  Purchase drugs and supplies from whom?
22     A.  I don't know.

Page 477

1     Q.  Are they a wholesaler or a place that a
2  provider could purchase drugs?
3     A.  I don't know.
4     Q.  Do you know what you meant when you
5  wrote "Work up new FUL based on $7"?
6     A.  No.
7     Q.  Was it your practice to -- I mean, do
8  you ever recall trying to establish a FUL based
9  on a target that you would come up with like
10  this?
11     A.  No.
12        MS. MARTINEZ:  Objection, form.
13     Q.  Do you recall trying to work up with
14  FUL in the $7 range for the albuterol inhaler?
15     A.  No.
16     Q.  Turn with me to the last page.  Do you
17  recognize the last page of Exhibit 11?
18     A.  No, I don't.  Except for the writing at
19  the top.
20     Q.  And what's the writing at the top?
21     A.  It says Texas Medicaid.  So this might
22  be their -- a copy of their MAC listing.

Page 478

1     Q.  Well, the next line down, right, where
2  there are a bunch of circles are MAC -- some of
3  the column headings are MAC?
4     A.  Right.
5     Q.  Does that help you identify this as the
6  Texas MAC list?
7     A.  Because it says Texas at the top, it
8  could be.
9     Q.  And that's your handwriting, right?
10     A.  It could be.
11     Q.  Do you ever remember in establishing
12  FULs going out and looking at various states' MAC
13  lists?
14     A.  Sometimes we would for -- not for
15  establishing, but just for analysis and
16  verification.
17     Q.  What kind of analysis and verification
18  would you do using a state MAC list?
19     A.  Make sure to verify that the FUL price
20  that we establish is in the ballpark, that it
21  looks realistic.  Sometimes we don't have a lot
22  of feedback from the compendia.

Page 479

1     Q.  Mm-hmm.
2     A.  So we want to make sure that if we're
3  setting it it's something that looks realistic
4  for states.
5     Q.  And to look realistic for states to use
6  the term kind of in the ballpark, what do you
7  mean?
8     A.  So that it's available; that a price
9  isn't something that the state couldn't reach.
10     Q.  So if I kind of follow the analysis you
11  might have done, you would have been looking to
12  see that the FUL price that you were setting was
13  either right at or slightly above where the state
14  MAC prices were; is that correct?
15     A.  Not necessarily.
16     Q.  Okay.
17     A.  It would just be used in the analysis.
18     Q.  I'm just trying -- let me ask the
19  question again.  How would the state MACs have
20  been used in the analysis?  Maybe I'm missing
21  something.
22     A.  The FUL prices are set on what we have

                      49 (Pages 476 to 479)

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 480

1  in the compendia source.
2      Q.   Mm-hmm.
3      A.   Sometimes the compendia source isn't
4  real easily to be read.  There's sometimes
5  availability problems.  So we set a price and we
6  still want to make sure that we're being
7  realistic with the price, that it's going to be a
8  price that states will be able to use in the FUL
9  program.  So sometimes we would check.  I know
10 Texas had it on their webpage.  I don't know if
11 other states did.  Once in a while we would check
12 to see that we were being reasonable in our
13 analysis using the compendia source.
14     Q.   And how would the state MAC list tell
15 you if you were being reasonable?
16     A.   Because generally, especially Texas,
17 they were pretty up to date with setting their
18 MACs, which helped us because sometimes a
19 compendia source isn't as current.  Because the
20 manufacturers don't submit the pricing it isn't
21 current, the updated pricing.  So it helps us to
22 validate that we are using current prices and

Page 481

1  that they aren't outdated.  So it was just
2  something that we could do a comparison and see
3  that our prices were a realistic price.
4      Q.   Okay.  And what comparison would you
5  have had to observe between, say, the Texas MAC
6  list and the FUL to conclude that the FUL that
7  CMS was setting was reasonable?
8      A.   You mean --
9      Q.   How would the two had to have compared
10 for you to --
11     A.   Well, if Texas was -- even if they were
12 a little lower than us, then we know that they
13 were -- if they were extremely lower than us then
14 we might have to do more research and check the
15 compendia sources to dig a little built deeper to
16 make sure that we had real prices from them.  Or
17 if they were extremely high we would do the same
18 thing and say, well, let's check and make sure
19 that we're using realistic prices for
20 establishing the FUL.
21     Q.   What if Texas was only a little bit
22 higher?  Would that have been a signal of any kind

Page 482

1  to you?
2      A.   No.  Then I think we would feel like
3  we're in the ballpark.
4      Q.   It would have been okay to you --
5  strike that.
6          It would have been okay to CMS for the
7  FUL to be slightly lower than a state MAC?
8      A.   It depends on the supporting data that
9  we have from the compendia sources too.  It's not
10 just using that MAC.  But we can't just depend on
11 one state either.  If we feel that we can support
12 the FUL price that we set by the compendia source
13 and that we've checked the compendia sources,
14 then that would be fine.
15     Q.   What were some of the other state MAC
16 programs besides Texas that you recall looking
17 at?
18     A.   Maybe New York.  I can't remember any
19 other states.
20     Q.   Wisconsin?
21     A.   I can't remember.
22     Q.   Turning back with me to the first page

Page 483

1  of Exhibit 11, do you see a P in the far left
2  hand column?  It seems to correspond with the
3  cross-outs?
4      A.   Correct.
5      Q.   Do you know what P meant?
6      A.   I think it was permanently removed.
7      Q.   Okay.  That's consistent with my
8  recollection.  I just wanted to confirm that we
9  were on the same page there.
10         Just so we understand kind of what's
11 going on in Exhibit 11, the low price down there
12 at the bottom, that's a .26470.  Do you see that?
13     A.   Yes.
14     Q.   And that would have been the price that
15 the FULs system used to calculate a FUL, right?
16     A.   Correct.
17     Q.   And that would have been a price that
18 you were manually reviewing to see if it was
19 reasonable?
20     A.   Correct.
21     Q.   And it looks like that was based on
22 Martec Pharmaceuticals, Inc.'s Red Book or -- I'm

50 (Pages 480 to 483)

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 484

1  sorry -- Blue Book price, right?
2         MR. WINGET-HERNANDEZ:  Objection, form.
3    A.  Oh, yes.  It does.
4    Q.  And you know that because you're
5  looking at the bottom line on the list of prices
6  below and there's the B and then .26470, right?
7    A.  Correct.
8    Q.  If you go up kind of to the middle of
9  the page there's a circle with handwriting in it
10 that looks like .7935.  Do you see that?
11   A.  Correct.
12   Q.  Is that your handwriting?
13   A.  No.
14   Q.  Do you know whose handwriting that is?
15   A.  That's Cindy Bergin's.
16   Q.  Looking at the writing down at the
17 bottom there are four companies' names written
18 there in the lower left-hand side.  Do you see
19 that?
20   A.  Yes.
21   Q.  And then there's what looks to me to be
22 a price, multiplication sign, and then a number,

Page 485

1  17, right?
2    A.  Correct.
3    Q.  And 17, if you look at the top of
4  Exhibit 11, is the package size.
5    A.  Correct.
6    Q.  And it appears that what Ms. Bergin was
7  doing here was calculating the cost of a package
8  of this good based on the WAC price from above,
9  right?
10   A.  Correct.
11   Q.  Just take the first line as an example.
12 She calculates for the Schering Warrick product
13 that the cost of the package based on the WAC
14 would be $16.06, correct?
15   A.  Yes.
16   Q.  And would you turn with me back to the
17 fifth page of Exhibit 11?  This is the Moore
18 Medical page.
19   A.  Mm-hmm.
20   Q.  And would you state for the record what
21 it appears Moore Medical's selling price was for
22 the Warrick albuterol inhaler?

Page 486

1    A.  For the 17 gram?
2    Q.  17 gram, right.
3    A.  52940?
4    Q.  Yes.
5    A.  It says 8.65.
6    Q.  You understood in or about this time
7  period that WAC was a list price, right?
8         MS. MARTINEZ:  Objection, form.
9    Q.  You understood in or about the August
10 2001 time period that WAC was a list price that
11 didn't reflected all the discounts available in
12 the market, correct?
13        MS. MARTINEZ:  Objection, form.
14   A.  I just -- I understood that it was a
15 published price that we used for this purpose.
16   Q.  And did you have an understanding of
17 how that published price related to the prices
18 actually available in the marketplace for a
19 particular drug?
20   A.  I mean -- I don't understand.  Like --
21 what do you mean?
22   Q.  It looks to me here that Ms. Bergin was

Page 487

1  comparing a price based on the WAC to, you know,
2  this Moore Medical price and it looks like from
3  that one might have concluded that the actual
4  price at which you could buy the albuterol
5  inhaler was less than the price derived using the
6  WAC.  Would you agree with that?
7         MS. MARTINEZ:  Objection, form.
8    A.  It looks like it was used to -- I mean,
9  this was used as a comparison, yes.
10   Q.  And it looks like the comparison showed
11 that the prices available in the market were less
12 than the price derived using the WAC?
13        MS. ALBEE:  Objection.
14   A.  At least with this catalog, or whatever
15 Moore Medical is.
16   Q.  And from the Moore Medical price do you
17 draw any connection with the $7 target that you
18 seem to indicate ought to be the target for this
19 FUL?
20        MS. MARTINEZ:  Objection, form.
21   A.  No.  I mean, just what's worded here.
22 Maybe that's why that was written there.  I don't

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 488

1  remember.
2      Q.  Okay.  I guess to get back to the
3  questions about WAC, I guess I'm trying to
4  understand whether you had any understanding of
5  the relationship between the published WAC price
6  and the actual price that one might buy in the
7  marketplace in this 2001 time period.
8      A.  Well, I guess the WAC, we used the WAC
9  for consideration for establishing the FUL.  But
10 we know that we need to increase it by 150
11 percent so that the product is out there and
12 available.  So it's an assumption that the WAC is
13 a lower price.  It's not -- this is -- my
14 understanding from the compendia source, it's a
15 lower price that needs to be raised in order for
16 the product to be available for states.
17     Q.  And that's why -- CMS adds the 150
18 percent to ensure availability, right?
19     A.  Correct.
20     Q.  And so in establishing the FUL CMS
21 recognized that the product would be available in
22 the marketplace at a price less than the FUL it

Page 489

1  was establishing, correct?
2      A.  Say that again.
3          MR. BUEKER:  Can you actually read that
4  back?
5          (Whereupon, the requested portion
6  was read by the reporter.)
7          MR. WINGET-HERNANDEZ:  Objection, form.
8      A.  I wouldn't have known that unless it
9  was brought to my attention.
10 BY MR. BUEKER:
11     Q.  And was it ever brought to your
12 attention?
13     A.  When we get feedback from pharmacies
14 after the FUL price is set, we may have.
15     Q.  Would you recall one way or the another
16 ever receiving that feedback?
17     A.  I can't, because we received feedback
18 every time we published a FUL price or even
19 during the year you would get feedback.
20     Q.  What's your understanding of the term
21 WAC?
22     A.  It's wholesale acquisition cost.  It's

Page 490

1  a price that a manufacturer uses just like AWP or
2  direct price and they submit these prices to the
3  compendia.
4      Q.  Were you aware that there are certain
5  manufacturers that don't submit WAC prices, like
6  my client Warrick?
7          MR. WINGET-HERNANDEZ:  Objection, form.
8      A.  I would notice it on the printout.
9      Q.  But other than noticing it on the
10 printout, you have no independent knowledge --
11     A.  No.
12     Q.  -- of whether or not a particular
13 manufacturer submits a WAC price?
14     A.  No.
15         Can I ask you a question?  There is a
16 WAC price on here from Warrick.
17     Q.  Yeah.  That's because FDB created a WAC
18 despite our telling them not to publish a WAC.
19 If you look actually at Medi-Span or Red Book,
20 you'll see that there's no WAC for Warrick.
21 That's the zero.  That's what -- that's what it
22 should have been.

Page 491

1          MR. WINGET-HERNANDEZ:  Objection, form.
2          MS. MARTINEZ:  Objection, form.
3          MS. ALBEE:  And I ask that be stricken
4  from the record as now being evidence.
5          MR. BUEKER:  I ask the court reporter
6  to mark a three page document that's Bates
7  labeled HHD 175-0557 to 0559 as Exhibit 12 for
8  identification, please.
9          (Exhibit NY Counties 012 was
10 marked for identification.)
11         MR. BUEKER:  And let's -- if you don't
12 mind, before I get started with this exhibit, the
13 videographer has told me we need to change the
14 tape.  So let's do that.  So off the record.
15         THE VIDEOGRAPHER:  This is the end of
16 tape 3.  Off the record at 2:43.
17         (Discussion off the record.)
18         THE VIDEOGRAPHER:  This is the
19 beginning of tape 4 in the deposition of Ms.
20 Gaston.  On the record at 2:45.
21 BY MR. BUEKER:
22     Q.  You have now in front of you what's

52 (Pages 488 to 491)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 492

1  been marked, Ms. Gaston, as New York Counties
2  Defendants' Exhibit 12 for identification?
3      A.  Yes.
4      Q.  And Exhibit 12, at least the first page
5  of Exhibit 12, looks to be a printout from the
6  FULs system, correct?
7      A.  Correct.
8      Q.  And again, this is the printout from
9  the FULs system that would have been the
10 beginning for the manual review process that CMS
11 engaged in before establishing a FUL?
12     A.  Correct.
13     Q.  And the next two pages of Exhibit 12
14 for identification are e-mails like we looked at
15 earlier that were sent to the e-mail mailbox that
16 CMS established to get feedback on the 2000/2001
17 FUL list, correct?
18     A.  Correct.
19     Q.  And these are feedback as it relates to
20 the albuterol 90-microgram inhaler, correct?
21     A.  Correct.
22     Q.  And the first page of Exhibit 1, that's

Page 493

1  a FUL printout that also relates to the 90-
2  microgram inhaler?
3      A.  Correct.
4      Q.  And --
5          MS. MARTINEZ:  Mr. Bueker, are you
6  saying 90 or 9?
7          MR. BUEKER:  90 microgram.  It's .09
8  milligram.  90 microgram.
9          MS. MARTINEZ:  Okay.  Got it.
10 BY MR. BUEKER:
11     Q.  Can you identify the handwriting on the
12 first page of Exhibit 12?  Is any of that your
13 handwriting?
14     A.  Yes.
15     Q.  What's your handwriting?  What portions
16 of the handwriting on Exhibit 12 are yours?
17     A.  At the top it says "Note: NDC number
18 includes inhaler and refills."
19     Q.  Mm-hmm.
20     A.  Some of the little notes on the right
21 that say "call."
22     Q.  Mm-hmm.

Page 494

1      A.  It looks like it says "10/30, remove
2  FUL, greater than most AWPs."  And I think that's
3  it.
4      Q.  Okay.  When you say call, who were you
5  going to call?
6          MR. WINGET-HERNANDEZ:  Objection, form.
7      A.  We call the manufacturer, Warrick, as
8  indicated here, Martec, Glaxo, Schering.
9      Q.  And what was the purpose of calling the
10 manufacturer?
11     A.  To check on availability and to try to
12 verify, if we can, a WAC price.
13     Q.  Do you recall Schering or Warrick ever
14 confirming a WAC price for you?
15     A.  I would only know if there were
16 notations.  I can't remember.
17     Q.  And I think you said "Remove FUL
18 greater than most AWPs."  And I think that's
19 "SEG" under that; is that right?
20     A.  That's me, right.
21     Q.  And those are your initials?
22     A.  Yes.

Page 495

1      Q.  In other words, you were concluding
2  that the FUL ought to be removed here, right?
3      A.  That's what it appears.
4      Q.  Well, if we go look at a transmittal
5  37, Exhibit 3, which was the transmittal that
6  came out --
7          MS. MARTINEZ:  Transmittal 37 is
8  Exhibit 9.
9          MR. BUEKER:  No.  That's an updated
10 version.
11         MS. MARTINEZ:  Oh, I see.
12         MR. BUEKER:  That's June 2004.  Exhibit
13 3 is the original transmittal 37.  It's the one
14 that came out kind of right after this time
15 period.  Let me see if I can establish a timeline
16 here, Ani.
17 BY MR. BUEKER:
18     Q.  Exhibit 12, Ms. Gaston, up in the top
19 left- hand corner bears a date October 12th 2001,
20 correct?
21     A.  Correct.
22     Q.  And this is the evaluation -- Exhibit

                                53 (Pages 492 to 495)

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 496

1    12 reflects the manual evaluation that was being
2    done in the October 2001 time period as to
3    whether or not to establish or reestablish a FUL
4    for -- or revise the FUL for the 90-microgram
5    albuterol inhaler?
6        A.  Correct.
7        Q.  And Exhibit 3 is the CMS transmittal
8    that comes out November 20th 2001, so shortly
9    after the analysis we see in Exhibit 12?
10       A.  Correct.
11       Q.  And if you flip to the second page,
12   page 2, of Exhibit 3 you'll see that there's no
13   FUL established for the 90-microgram albuterol
14   inhaler? There's other albuterol FULs but not for
15   the inhaler, correct?
16       A.  Correct.
17       Q.  Which is consistent with the note you
18   wrote in Exhibit 12, remove FUL greater than most
19   AWPs, correct?
20       A.  Correct.
21       Q.  So in other words, CMS didn't establish
22   or reestablish a FUL -- or revise the FUL for the

Page 497

1    90-microgram inhaler in this 2001 time period; it
2    actually removed the FUL?
3        A.  Correct.
4        Q.  And it did so despite the fact there
5    are shown on this sheet a series of
6    manufacturers' reported published prices, right?
7        A.  Correct.
8        Q.  There's a published price for Warrick,
9    there's a published price for Schering, Martec,
10   Zenith and Glaxo-Wellcome, among others?
11       A.  I think Schering is discontinued.
12       Q.  Oh, I'm sorry.  You're right.  But the
13   note at the bottom -- Ms. Bergin's note at the
14   bottom would indicate that there were at least
15   reported published prices for Warrick, Martec and
16   Zenith?
17       A.  Correct.
18       Q.  In other words, there were three
19   manufacturers who were reported published prices
20   for the 90-microgram inhaler?
21       A.  Correct.
22       Q.  And so in other words the conditions

Page 498

1    necessary for CMS to establish a FUL were met at
2    this time?
3            MS. MARTINEZ:  Objection, form.
4        A.  The conditions were met, but the
5    pricing condition wasn't met.
6        Q.  What pricing condition was that?
7        A.  It was that if you would take the
8    prices that are remaining and multiply by 150
9    percent you're going to have a price that's, it
10   looks like, over what the AWPs are.  So you're
11   sort of defeating the purpose of the FUL program.
12       Q.  Which was, again, soft savings?
13       A.  Soft savings to the states.  The states
14   can set their own reimbursement level at that
15   point.
16       Q.  So as we've kind of seen throughout,
17   CMS is trying to establish a FUL that's not too
18   low and not too high to achieve a cost savings,
19   but also not set it too low to create an access
20   issue; that's the balance CMS is trying to
21   strike?
22       A.  Correct.

Page 499

1        Q.  And you did that -- the balance was
2    struck, sometimes the computer program worked as
3    it was supposed to and that balance was struck by
4    the computer program, but other times it was the
5    result of manual intervention?
6        A.  Correct.
7        Q.  And the manual intervention resulted in
8    CMS making a choice in its discretion, correct?
9        A.  Correct.
10           MR. BUEKER:  Anyone keeping track of
11   how many drugs we've covered?
12           MS. MARTINEZ:  No.
13           MR. BUEKER:  Well, we're going to do
14   another one.  Can I ask the court reporter to
15   mark as Exhibit 13 for identification a five page
16   document that's Bates labeled HHD 175-1073 to
17   1077.
18           (Exhibit NY Counties 013 was
19   marked for identification.)
20   BY MR. BUEKER:
21       Q.  Not a rush, but just let me know when
22   you're ready.

54 (Pages 496 to 499)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 500

1    A.  I'm ready.
2    Q.  Ms. Gaston, you can identify page --
3  the first page of Exhibit 13 as a printout from
4  the FULs system, correct?
5    A.  Correct.
6    Q.  And is any of the handwriting on the
7  first page of the Exhibit 13 yours?
8    A.  Yes.
9    Q.  What handwriting is yours?
10   A.  It says "call - yes; inactive; call -
11  yes." And there's a little notation here.  I
12  think it says "available, Alpharma."
13   Q.  Okay.
14   A.  And the rest is Cindy Bergin's.
15   Q.  And the calls again were calls made to
16  the manufacturers to determine availability?
17   A.  Correct.
18   Q.  And as I understand the handwriting
19  down at the bottom of the page, both next to the
20  FUL price and in the very lower left-hand corner,
21  a new FUL of .1450 was established for in this
22  case the .083 albuterol solution, right?

Page 501

1    A.  Correct.
2    Q.  And if we go look at, if you still have
3  it in front of you, page 2 of Exhibit 3, the
4  transmittal 37, you'll see there you have the FUL
5  -- the .1450 FUL for that .083 solution?
6    A.  Correct.
7    Q.  And it has a B -- in transmittal 37 you
8  see there's a B next to the FUL for that .083
9  solution, correct?
10   A.  Correct.
11   Q.  And means it's based on a Blue Book
12  price?
13   A.  Correct.
14   Q.  And looking back at Exhibit 13 you see
15  that it's actually Alpharma's Blue Book WAC that
16  sets the FUL?
17   A.  Correct.
18   Q.  Just so we identify the rest of the
19  pages of Exhibit 13, the second and third and
20  fourth pages are, again, e-mails to CMS's e-mail
21  mailbox that was created for purposes of
22  receiving feedback on the 2001/2001 FUL list,

Page 502

1  correct?
2    A.  Correct.
3    Q.  And then the last page is a printout --
4  it looks like from a website ipcrx.com.  Do you
5  know what that is?
6    A.  No, I don't.
7    Q.  Just so I understand how the FUL was
8  mechanically set here, it looks like initially
9  the computer program picked up the Major
10  Pharmaceuticals price, the .12520 price, and
11  calculated a FUL on that basis, right?
12   A.  Correct.
13   Q.  And originally -- the Alpharma price is
14  actually lower than that price.  But originally
15  the computer program hadn't picked that up
16  because there was an indication in the computer
17  program that the Alpharma product was temporarily
18  unavailable?
19   A.  Correct.
20   Q.  But your handwritten note, "available,
21  Alpharma," indicates to you that indeed you
22  called Alpharma and learned that the product was

Page 503

1  in fact available?
2    A.  It appears that way, yes.
3    Q.  And -- well, you wouldn't have set a
4  FUL on the basis of an unavailable product,
5  right?
6    A.  Correct.
7    Q.  And this FUL is set on the basis of
8  Alpharma's published price?
9    A.  Correct.
10   Q.  So we can assume that you learned that
11  Alpharma's product was available and that became
12  the basis for setting the FUL?
13   A.  Yes.
14   Q.  Now, I want to ask you if you can read,
15  because I'm not sure I can read it entirely, Ms.
16  Bergin's handwritten note in the lower right-hand
17  corner that begins 11/8.  Can you read her
18  writing?
19   A.  I'll try.  "We only show one WAC less
20  than the new FUL price.  But IPREP" -- whatever
21  that says.
22   Q.  IPCRX.

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                         Washington, DC

Page 504

1     A.  "But ipcrx.com" --
2     Q.  Is that "shows"?
3     A.  I can't read it.  "Two prices."
4  Something.
5     Q.  Less than?
6     A.  I can't read.  "Two prices."  Maybe
7  it's "less than."  You're doing better than me.
8  What's the next one?
9     Q.  That's why I'm asking.  I don't know.
10    A.  Yeah.  And then it sounds like
11 "McKesson."
12    Q.  And what's McKesson?
13    A.  I think McKesson is another company,
14 like a catalog company.  "Shows three."
15    Q.  Is McKesson one of the national drug
16 wholesalers?
17    A.  Yeah.  I think so.  I can't remember,
18 but I think they are.
19    Q.  It's one of the big three national drug
20 wholesalers.
21    A.  Okay.
22       "Shows three.  We're going to leave it

Page 505

1  as is for now.  See attached."
2     Q.  And the last word is "documentation"?
3     A.  Yeah.
4     Q.  So now that we've struggled through
5  that, as I understand it, this is a situation
6  where we see that warning that the system put on,
7  right, "FUL prices not greater than another
8  supplier"?
9     A.  Correct.
10    Q.  And that warning was on there when it
11 was being calculated on the basis of Major's
12 price, right?
13    A.  Correct.
14    Q.  And in the end CMS sets the FUL based
15 on an even lower price, correct?
16    A.  Correct.
17    Q.  And so this is a situation in which the
18 FUL is being set at a price lower than the next
19 greatest supplier, which I think we talked about
20 earlier was a flag or a concern in terms of
21 availability, right?
22    A.  Correct.

Page 506

1     Q.  And so as I understand Ms. Bergin's
2  note, what she's done is gone out to a national
3  wholesaler in this IPCRX and found out that they
4  at least are reporting price availability at a
5  price less than the FUL, correct?
6     A.  That's what it appears, yes.
7     Q.  Do you recall yourself doing that kind
8  of an analysis when you had a situation where the
9  FUL was being set at a price lower than the next
10 greatest published price?
11    A.  Not many times, but I think once in a
12 while.  And mostly just to help us with your
13 analysis and to validate the fact that -- here
14 again, in this situation the prices that were
15 actually going to be used, the system thought
16 they should be temporarily excluded.  So in this
17 situation we call, but we also want to validate
18 the fact that the prices are actually out there
19 and the product is actually out there.
20       So there have been situations, not that
21 often, because usually we don't have to go that
22 far --

Page 507

1     Q.  Mm-hmm.
2     A.  -- for that type of research.
3     Q.  But in those instances where you did
4  have to go that far and validate it, how did you
5  do that?  You went to like wholesalers or places
6  where you could actually acquire the drug?
7     A.  Just someplace where we could validate
8  a WAC price.
9     Q.  Sometimes it might be a state MAC list;
10 sometimes it might be McKesson, but --
11    A.  Correct.  Just to help with the
12 analysis.
13    Q.  Right.  And I don't mean to suggest
14 that you then -- that CMS turns around and bases
15 a FUL on what it learns from McKesson or
16 whatever.  But you don't recall instances in
17 which to confirm the FUL price you were setting
18 was reasonable you did go and look at kind of
19 other prices that were available in the
20 marketplace?
21    A.  Right.  But for me it was rare.  Cindy
22 might have done it a few more times than me, but

56 (Pages 504 to 507)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                            March 19, 2008
                      Washington, DC

Page 508

1   -- she was learning.  I was teaching.  So --
2      Q.  And when you say rare, was it five or
3   ten times?
4      A.  I couldn't put a number on it.  Just on
5   an as-needed basis.  Generally I wouldn't need to
6   do that.
7      Q.  Because you were confident based on
8   what you were seeing in the published prices?
9      A.  Or calling.
10     Q.  Or calling?
11     A.  Yeah.
12        MR. BUEKER:  Ani, would you mind if we
13  took a short break here?
14        MS. MARTINEZ:  No.  That would be good.
15  Let's go off the record.
16        THE VIDEOGRAPHER:  Off the record at
17  3:05.
18        (Recess.)
19        (Exhibit NY Counties 014 was
20  marked for identification.)
21        THE VIDEOGRAPHER:  On the record at
22  3:23.

Page 509

1   BY MR. BUEKER:
2      Q.  Now I want to shift gears a little bit
3   and place before you, Ms. Gaston, what's been
4   marked as New York Counties Defendants' Exhibit
5   14 for identification.  Do you recognize this to
6   be an addendum to the state plan manual, a
7   transmittal from CMS?
8      A.  Correct.
9      Q.  And you see midway down the first page
10  that there's an effective date of this CMS
11  transmittal of October 1, 1997?
12     A.  Correct.
13     Q.  And I just want to ask you to turn to
14  what is actually the third page of Exhibit 14,
15  and it's got a page number 6 down at the bottom,
16  and just state for the record, if you would, what
17  the FUL was effective October 1, 1997 for the
18  .083 percent base inhalation solution in the
19  albuterol sulfate?
20     A.  .083?
21     Q.  Yup.
22     A.  .1990.

Page 510

1      Q.  Okay.  And that's based on a Blue Book
2   price, right?
3      A.  Correct.
4      Q.  Now, I don't have one of your helpful
5   FUL system printouts from this time period, so
6   I've got to kind of back into this.  But if you
7   wanted to know the price on which the FUL was
8   based you'd essentially divide the number .1990
9   by 1.5, correct?
10     A.  Yes.
11     Q.  I'm going to hand you a calculator.
12  Would you do that for me?
13     A.  (Witness uses calculator.)  Okay.
14     Q.  And what number did you get?
15     A.  .006666.  Or did I do it wrong?
16     Q.  Maybe we could try that again.  .1990
17  divided by 1.5.
18     A.  (Witness uses calculator.)  .132666.
19     Q.  So rounded off to the further decimal
20  point -- in other words, the price that the FUL
21  would have been based on was a price of .1327,
22  correct?

Page 511

1      A.  It appears that way, yes.
2      Q.  That's more than -- it's a matter of
3   mathematics, right?
4      A.  Yes.  Right.
5      Q.  Okay.  Now, I don't have, as I say,
6   helpful FULs printouts.  So let me ask the court
7   reporter to mark this as Exhibit 15.
8        (Exhibit NY Counties 015 was
9   marked for identification.)
10  BY MR. BUEKER:
11     Q.  I'm placing before you what's been
12  marked by the -- or the court reporter has placed
13  before you what's been marked as Exhibit 15 for
14  identification, which I'll represent to you is
15  the second page of the list of all of the
16  available prices as of June 1997 and the first
17  page kind of collects those in a way that's
18  readable.
19        So taking my representation as true, if
20  it is accurate that this is all the published
21  prices, can you identify the manufacturer whose
22  published price was .1327?

57 (Pages 508 to 511)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 512

1          MR. WINGET-HERNANDEZ: Excuse me.
2    Before you answer, are you representing, Counsel,
3    that this is a document that you yourself created
4    for this purpose?
5          MR. BUEKER: Yes.
6          MR. WINGET-HERNANDEZ: Thank you.
7       A.  The pricing is from the compendias?
8    Because you show the compendia sources.  So you
9    obtained these from the --
10      Q.  From the compendia.
11      A.  Okay.  And this is --
12      Q.  I'm sorry?
13      A.  This is this information blown up?
14      Q.  Condensed.  If you start with the
15   second page you see each of the three compendia,
16   FDB, Red Book and Medi-Span.  And those are all
17   of the published prices.  What I did to put
18   together the first page so we could all read it
19   is extract the lowest published price from each
20   of the compendia.
21      A.  Okay.
22          Okay.  It appears that the .1327 is

Page 513

1    Qualitest.  It's the first one.
2       Q.  Okay.  To assure that you're awash in
3    paper, I'll ask the court reporter to mark a
4    document that bears at the top the title
5    "Approved drug products with therapeutic
6    equivalence evaluations," 17th edition, and down
7    at the bottom U.S. Department of Health and Human
8    Services, as Exhibit 16 for identification,
9    please.
10          (Exhibit NY Counties 016 was
11   marked for identification.)
12   BY MR. BUEKER:
13      Q.  Do you recognize Exhibit 16, Ms.
14   Gaston, to be an excerpt from the FDA's Orange
15   Book?
16      A.  Yes.
17      Q.  And just for the record, what is the
18   Orange Book?
19      A.  The Orange Book is the FDA data that we
20   use for establishing the FULs.
21      Q.  In other words, that's how you
22   determine which drugs are therapeutically

Page 514

1    equivalent?
2       A.  Correct.
3       Q.  And we talked earlier today about the
4    fact or this morning about the fact that it's an
5    A rating in the Orange Book that deems something
6    to be therapeutically equivalent, correct?
7       A.  Correct.
8       Q.  And so if you turn with me to the third
9    page of Exhibit 16 you'll see the ratings for the
10   .083 albuterol solution on the left-hand side.
11   Do you see those?
12      A.  Yes.
13      Q.  And do you see listed there anywhere an
14   A-rated product for Qualitest?
15      A.  No.
16      Q.  If you would keep that in front of you,
17   I would, though, like to ask the court reporter
18   to mark a document that's entitled "Approved drug
19   products with therapeutic equivalence
20   evaluations," 18th edition, down at the bottom
21   U.S. Department of Health and Human Services, as
22   Exhibit 17 for identification, please.

Page 515

1          (Exhibit NY Counties 017 was
2    marked for identification.)
3    BY MR. BUEKER:
4       Q.  Ms. Gaston, you recognize Exhibit 17 to
5    be the 1998 version of the FDA's Orange Book, or
6    an extract from the 1998 version of the FDA's
7    Orange Book, correct?
8       A.  Correct.
9       Q.  And Exhibit 17 -- I'm sorry.  So the
10   record is clear, I've misspoken.
11          Exhibit 17 is the 1998 Orange Book and
12   Exhibit 16 is the 1997 Orange Book, correct?
13      A.  Correct.
14      Q.  And if you look in Exhibit 17, the 1998
15   version, the A-rated .083 solution products
16   appear on the second page; is that right?
17      A.  Correct.
18      Q.  And do you see Qualitest listed there?
19      A.  No.
20      Q.  The manufacturers you do see listed in
21   Exhibit 17 are Alpharma, Copley Pharma, Dey,
22   Nephron, Schering and Glaxo-Wellcome that all

                              58 (Pages 512 to 515)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 516

1    have A-rated versions of the .083 solution,
2    correct?
3        A.   Correct.
4        Q.   And in the '97 version, Exhibit 16, you
5    see that the A-rated versions in FDA's assessment
6    of the .083 solution are Alpharma, Copley Pharma,
7    Dey, Schering and Glaxo-Wellcome, so the same
8    list of manufacturers, correct?
9        A.   Correct.
10       Q.   And taking as true my representation
11   that Exhibit 15 contains all of the published
12   prices, it can't be that Alpharma, Copley or Dey
13   or Schering or Glaxo set the FUL in June of 1997,
14   because their published prices were higher than
15   the price that was used to set the FUL, correct?
16           MR. WINGET-HERNANDEZ:  Objection, form.
17       A.   I'd have to look at each one of their
18   prices.
19       Q.   Okay.  We could do that.
20       A.   I mean, but we pointed out that
21   Qualitest is the lowest.
22       Q.   Right.

Page 517

1        A.   Go ahead.
2        Q.   Maybe I can short circuit it.  Does it
3    surprise you that you don't see the Qualitest in
4    the Orange Book?
5        A.   No.
6            MR. WINGET-HERNANDEZ:  Objection, form.
7        Q.   Why not?
8        A.   Because the compendia gives us their
9    manufacturers.  They could be wholesalers,
10   repackagers.  So --
11       Q.   Go ahead.  I'm sorry.
12       A.   So the compendia source is giving us
13   ones that sell the drugs.
14       Q.   I see.  So even though something might
15   not be A-rated in the Orange Book, if that
16   manufacturer or you said repackager or wholesaler
17   is listed in the compendia, that price can be
18   used to set the FUL?
19       A.   Yes.
20       Q.   Ah.
21       A.   Also, these companies may purchase and
22   very likely they purchase these A-rated drugs.

Page 518

1        Q.   I see.  So -- and that would be the
2    idea of repackaging, right?
3        A.   Correct.  Or a wholesaler.
4        Q.   A wholesaler.  So somebody who's listed
5    in one of the pricing compendia, manufacturers
6    listed in one of the pricing compendia, might not
7    have an A-rated version of the drug in the Orange
8    Book, but that manufacturer, that repackager's
9    price, still could be the basis for the FUL?
10       A.   Correct.
11       Q.   Okay.  Are you familiar with the FDB
12   rating ZA?  A ZA rating?
13       A.   First Databank's?
14       Q.   Yeah.
15       A.   No.
16       Q.   Okay.  In any event, it's your
17   testimony that the price in which the FUL was
18   based isn't necessarily the price for one of the
19   manufacturers who's actually listed in the Orange
20   Book?
21       A.   Correct.
22       Q.   We can set that bit of paper to the

Page 519

1    side.  And just so I'm clear, because this really
2    is helpful to me, the FUL can be based on any of
3    the published prices listed in any of the pricing
4    compendia regardless of the rating of the drug in
5    Orange Book?
6        A.   Correct.
7        Q.   I'm just trying to make sure --
8        A.   I'm just trying to think it out.
9        Q.   Yeah.  I'm just trying to make sure we
10   get it right.  So in other words, if a
11   manufacturer publishes a price for the .083
12   solution, that price is eligible to be considered
13   the basis for the FUL?
14       A.   Yes.
15       Q.   We'll do one more printout.  Can we
16   mark this as Exhibit 18, please?
17           (Exhibit NY Counties 018 was
18   marked for identification.)
19   BY MR. BUEKER:
20       Q.   Exhibit 18, Ms. Gaston, at least the
21   first page -- let's say the first page of Exhibit
22   18 -- is one of the federal upper limit system

                              59 (Pages 516 to 519)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 520

1  printouts that we've been looking at kind of
2  throughout the day, right?
3      A.  Correct.
4      Q.  And this one is dated up in the top
5  left-hand corner 2/15/2005, which is actually
6  after you had left your position in the policy
7  area at CMS?
8      A.  Correct.
9      Q.  Okay.  So you haven't seen Exhibit 18
10 before?
11     A.  No.
12     Q.  But you are familiar with the form of
13 Exhibit 18; it's a printout from the FUL system?
14     A.  Correct.
15     Q.  And can you identify the handwriting on
16 Exhibit 18?
17     A.  No, I can't.
18     Q.  That's not Ms. Bergin's handwriting?
19     A.  No.  I'm not a hundred percent sure.  I
20 don't think it is.
21     Q.  Can you read into the record what's
22 written on the right-hand side that begins "three

Page 521

1  can"?
2      A.  It says "Three can have three suppliers
3  as long as the A drives the FUL.  The other two B
4  can still serve as suppliers."
5      Q.  Okay.  And it looks like up above on
6  the right-hand side next to each of the three,
7  there are three manufacturers shown in Exhibit
8  18?
9      A.  Correct.
10     Q.  And it looks like there's a BN or an AB
11 rating -- those are Orange Book ratings?
12     A.  Correct.
13     Q.  -- written next to each of the
14 manufacturers?
15     A.  Correct.
16     Q.  And it looks like in this case the
17 Warrick and Schering albuterol inhalers are B-
18 rated and the Ivax inhaler is B-rated, correct?
19     A.  Correct.
20     Q.  And this is an instance in which CMS
21 set a FUL despite the fact that there was only
22 one A-rated product, correct?

Page 522

1      A.  I can't say that, because I don't know
2  what the Orange Book reflects.
3      Q.  I'm sorry.  I don't know -- what do you
4  mean?
5      A.  I mean, I don't know if the Orange Book
6  -- when the system pulls down the information
7  from the Orange Book, did it show more than the
8  information here?
9      Q.  Well, I think, if we turn -- maybe we
10 can answer your question.  If we turn to the next
11 several pages of Exhibit 18.
12     A.  Okay.
13     Q.  Do you recognize that to be the online
14 version of the FDA's Orange Book?  Right?
15     A.  I've never seen it like this.
16     Q.  Oh, okay.
17     A.  If this is the Orange Book, it looks
18 like there's more than -- this is the .09?
19     Q.  Yup.
20     A.  You're showing one, two, three, four A-
21 rated.  Five A-rated.
22     Q.  Oh, okay.

Page 523

1      A.  And one B-rated.
2      Q.  Even though the CMS system is only
3  picking up --
4      A.  Yeah.  And I don't understand -- unless
5  -- here again, these are the manufacturers.  They
6  might not -- I don't know.  Maybe they're not
7  selling it or giving the pricing to the
8  compendia.  Because they're not showing up.  So
9  maybe these guys are selling it for them.  I
10 don't know.
11     Q.  Okay.  But this is after your time, so
12 --
13     A.  Correct.  And I'm just addressing the
14 basic criteria.
15     Q.  All right.  We'll set Exhibit 18 to the
16 side.  Well, before I do, could a B-rated drug --
17 let's assume the ratings here are accurate.
18 Could Warrick or Schering, which are B-rated
19 drugs, actually have been the basis for the FUL -
20 - published prices be the basis for the FUL?
21     A.  I can speak to when I was doing the
22 FUL.

60 (Pages 520 to 523)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 524

1    Q.  Yeah.
2        MR. WINGET-HERNANDEZ:  Objection, form.
3    A.  And as long as there were -- I can't
4  remember exactly.  I think it was as long as
5  there were three A-rated you could include the B-
6  rated drugs.
7    Q.  And if you included the B-rated drugs
8  then the B-rated drugs could be the basis for the
9  FUL?
10       MR. WINGET-HERNANDEZ:  Objection, form.
11   A.  From what I remember, yes.
12       MR. WINGET-HERNANDEZ:  In the interests
13  of time, John, are you interested -- I mean, I'd
14  like to offer you the basis of my objection so
15  that you can cure it.
16       MR. BUEKER:  Sure.
17       MR. WINGET-HERNANDEZ:  I think when you
18  use the term basis in that context that it's not
19  clear, that it's vague and that it would be much
20  clearer and preferable if you would use a term
21  like formed the price that the FUL was calculated
22  on or something like that.  Because it's clear --

Page 525

1  it seems based on the testimony that basis -- I
2  mean, they're basing the --
3        MR. BUEKER:  Okay.  I get your
4  objection.  Let me see if I can cure it.  I can't
5  promise to be able to do that.
6        MR. WINGET-HERNANDEZ:  Sure.
7  BY MR. BUEKER:
8    Q.  In your experience, setting a FUL from
9  1991 to 2003, it's your testimony that the
10  published price for a drug that was B-rated, that
11  published price could still be the basis for the
12  FUL that CMS set?
13   A.  From what I remember, yes.
14   Q.  I understand from your testimony back
15  in January that in addition to your job
16  responsibilities in terms of setting FULs you
17  also had some responsibilities for the Medicaid
18  rebate program?
19   A.  Correct.
20   Q.  For the record, what is the Medicaid
21  rebate program?
22   A.  The Medicaid rebate program was enacted

Page 526

1  in '90.  It began in '91.  It's a program that if
2  drug manufacturers wish to participate they sign
3  a rebate agreement with CMS.  And what will occur
4  is that the states will provide the
5  manufacturers' drugs to their Medicaid population
6  and in return the drug manufacturers pay rebate
7  dollars to the states and the federal government
8  gets their share.  That's kind of the short
9  version.
10   Q.  No.  It's a good version.  As I
11  understand it, for a manufacturer's drugs to be
12  reimbursable by Medicaid they had to sign a
13  rebate agreement, right?
14   A.  Correct.
15   Q.  And agree to pay rebates to the states?
16   A.  Correct.
17   Q.  And what were your responsibilities
18  when it came to the Medicaid rebate program?
19   A.  Any policy-related issues that would
20  come up pertaining to the rebate program.
21   Q.  Can you give me an example?
22   A.  Answering questions to explain the

Page 527

1  program.  Interpreting -- we didn't have a
2  regulation.  So trying to interpret parts of the
3  program, interpret the statute for states or for
4  drug manufacturers.
5    Q.  Did you have any administrative
6  responsibilities when it came to the Medicare
7  rebate program?
8    A.  What type of administrative
9  responsibilities?
10   Q.  Well, for example, I understand that
11  under the Medicaid rebate program manufacturers
12  had to submit AMPs and best price?  That's how
13  the rebate got calculated, right.
14   A.  Correct.
15   Q.  Did you have any responsibility for
16  collecting the AMP and best price information?
17   A.  No.  That's another staff that takes
18  care of that.
19   Q.  What staff takes care of that?
20   A.  They're called the operations staff.
21  Actually, they're in a separate group, in a
22  separate division within CMSO.

61 (Pages 524 to 527)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

| Page 528 |
|---|

1     Q.  Would you have had access to that AMP
2  information?
3     A.  Yes.
4     Q.  Did you ever use that AMP information
5  in setting FULs?
6     A.  No.
7     Q.  Did you ever use that AMP information
8  in terms of evaluating and the approval of state
9  Medicaid plans?
10    A.  State Medicaid plans are for the
11  states.  So we really wouldn't use AMPs.
12    Q.  Well, as I understand it, one of your
13  responsibilities -- one of your other
14  responsibilities was approving state Medicaid
15  plans, right?
16    A.  Correct.
17    Q.  And to get approval, one of the things
18  a state had to demonstrate was the reasonableness
19  of its reimbursement rates?
20    A.  Correct.  Their methodology.
21    Q.  Their methodology.
22    A.  Correct.

| Page 529 |
|---|

1     Q.  And I guess what I'm wondering is in
2  examining the reasonableness of the methodology,
3  the reasonableness of the reimbursement rates the
4  state was proposing to pay, if you ever looked at
5  AMP information.
6     A.  No.
7     Q.  Switching back to putting your FUL hat
8  back on, what if anything did CMS do to monitor
9  when drugs were coming off patents and therefore
10  going generic?
11    A.  Well, when I was doing the FUL program
12  basically I just waited to get notification if
13  somebody would let me know.  I really didn't do
14  anything proactively, because I just didn't have
15  the capability of doing it or the time.
16    Q.  Is it different today?  Do you know?
17    A.  I don't know.
18    Q.  And who typically will let you know
19  that something came off patent and therefore went
20  generic?
21    A.  Industry folks.  I can't say
22  specifically.  But sometimes pharmacies might

| Page 530 |
|---|

1  have an idea.  So they would call and let us know
2  if something was occurring.
3     Q.  So how was it that you determined when
4  it was time to update or set a new FUL?
5     A.  It's been a while.  But from what I
6  remember, we were on a schedule.  I can't
7  remember if it was once a year.  And then
8  periodically we would update the FULs list with
9  memos.  And then we would come out and produce a
10  whole new FUL list.  I think we tried to do it
11  once a year.  I can't remember the schedule after
12  that.  I think we got to a point where it was on
13  an as-needed basis.
14    Q.  Okay.  So let me try and unpack that a
15  little bit, because it seems like there were a
16  couple of things going on.  It sounds like on
17  some periodic basis, and you think maybe
18  annually, CMS tried to update the entire FUL
19  list?
20    A.  Correct.  And that was probably earlier
21  in the program, like earlier when I was there.
22    Q.  So not towards the 2003 end of time,

| Page 531 |
|---|

1  but rather towards the 1991 time period?
2     A.  Correct.  From what I remember.
3     Q.  Okay.  And from what you remember in
4  the interim between those kind of full -- excuse
5  the pun -- updates to the FUL list, there were
6  memos or smaller updates?
7     A.  Correct.
8     Q.  And those smaller updates obviously
9  didn't update the entire list; just particular
10  FULs?
11    A.  Correct.
12    Q.  As to those smaller interim -- can I
13  call them interim updates?
14    A.  Yes.
15    Q.  As to those smaller interim updates,
16  how would you decide which FULs got updated then?
17    A.  We would get current compendia
18  information.  Sometimes we would just do further
19  research when we received e-mails or calls about
20  certain drugs.
21    Q.  So there was no systematic way of doing
22  it; it was as you learned information that you

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 532

1  thought was appropriate to incorporate into the
2  process of setting FULs you incorporated that
3  information?
4      A.  For the updates, yes.
5      Q.  And then annually or some other period
6  of time, at least you began annually at the
7  beginning, there were these systematic updates of
8  the entire list?
9      A.  Correct.
10     Q.  Separate and apart from that, what
11 triggered the decision to actually add a new drug
12 to the list?
13     A.  Most of the time it came out on a new
14 run that we would do.  So if we're looking at
15 updating the whole entire FUL list, that's when
16 the new drugs would show up.
17     Q.  Let me see if I understand.  So the FUL
18 system -- when you do the update of the entire
19 list, the FUL system would go back to Orange Book
20 and identify all the drugs that were eligible and
21 also pull in the published prices.  So at that
22 time if a drug had gone generic and was now --

Page 533

1  met the minimum criteria, it would get pulled in
2  and you would at least get one of the printouts
3  we've been looking at like Exhibit 18?
4      A.  Correct.
5      Q.  And then you begin a manual review
6  process at that point to decide whether or not to
7  set a FUL?
8      A.  If it was necessary.  It might have
9  enough information we wouldn't have to do a
10 manual review.
11     Q.  Okay.  And there may also have been
12 other instances in which you got the information
13 and decided even though the drug met the minimum
14 criteria in the regulation, for some other reason
15 it wouldn't result in a cost savings or the FUL
16 that would be derived on the basis of the
17 published prices would be too low, you might
18 decide not to set a FUL at that point even though
19 it was eligible?
20     A.  Yes, if there was a reason not to set
21 it.
22     Q.  Okay.  It sounds like in terms of

Page 534

1  setting brand-new FULs at the very least they
2  would have been picked up as a part of the
3  complete or the entire update process?
4      A.  Correct.
5      Q.  And at that point, just like with any
6  of the other FULs, CMS would have made a
7  determination as to whether it made sense to add
8  a FUL, whether it was reasonable to add a FUL at
9  that time?
10     A.  Correct.
11     Q.  Can you remember instances in which a
12 drug was new, came on -- a new drug was
13 identified as a result of the annual update
14 process and CMS decided not to set a FUL?
15     A.  I can't remember that.
16     Q.  You can't remember specific examples?
17     A.  Correct.
18     Q.  But don't doubt that it happened?
19     A.  It could have happened.
20        MS. MARTINEZ:  Objection, form.
21     Q.  Is there anything else other than
22 having the annual update or receiving information

Page 535

1  from industry sources that would have caused CMS
2  in your time period, '91 and 2003, to update the
3  FUL list?
4      A.  That's all I can think of.
5        MR. BUEKER:  Okay.  Well, that's all I
6  have.
7        THE WITNESS:  Okay.
8        MR. BUEKER:  I appreciate your time.
9        THE WITNESS:  You're welcome.
10       MR. BUEKER:  I think some of the others
11 here may still have questions.
12       THE VIDEOGRAPHER:  This is the end of
13 tape 4.  Off the record at 355.
14        (Recess.)
15       THE VIDEOGRAPHER:  This is the
16 beginning of tape 5 in the deposition of Ms.
17 Gaston.  On the record at 3:57.
18
19        EXAMINATION BY COUNSEL FOR DEY,
20 INC., DEY, L.P. AND MYLAN
21 BY MS. REID:
22     Q.  Good afternoon.  My name again is Sarah

63 (Pages 532 to 535)

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

| Page 536 | Page 538 |
|---|---|

**Page 536**

1  Reid and I am with Kelley Drye representing the
2  Dey, Inc., Dey L.P. and Dey L.P., Inc. defendants
3  in the case that the United States has brought
4  against my clients.  And if I refer to them here
5  as Dey, can we have an understanding that that's
6  the entities that I'm referring to?
7      A.  Yes.
8      Q.  I don't have very many questions.  My
9  first question is have you ever seen the
10 complaint that the government has brought against
11 the Dey defendants?
12     A.  I saw the information that Leslie sent
13 me by e-mail.  Is it different than the Abbott --
14     Q.  Yes.
15     A.  Okay.  I don't remember seeing that.
16     Q.  Okay.  And have you ever had any
17 discussions with anybody from the Dey companies
18 concerning any of the allegations in -- you know,
19 about the litigation or contained in the
20 complaint?
21     A.  No.
22     Q.  Do you recall having had any

**Page 537**

1  conversations with people from Dey in the period
2  from 1991 to 2003 which we've been talking about
3  today?
4      A.  I can't recall.  The possibility is
5  there because we called manufacturers at times to
6  verify pricing or availability.
7      Q.  Right.  But you have no specific
8  recollection of talking to anyone from Dey at
9  this point in time?
10     A.  No.
11     Q.  And are you aware where Dey is located?
12     A.  No.
13     Q.  Let me just turn to marking Dey Exhibit
14 136.
15         (Exhibit Dey 136 was marked for
16 identification.)
17         MS. REID:  And if we can I'd like to
18 mark this one with the yellow stickers.
19 BY MS. REID:
20     Q.  Ms. Gaston, do you recognize Dey
21 Exhibit 136 as an excerpt from the 2000 Orange
22 Book?

**Page 538**

1      A.  Yes.
2      Q.  And I'd like to direct your attention
3  to two entries.  The first sticky, which is I
4  believe the page which has Chromelin sodium
5  inhalation solution on it, do you see that?
6      A.  Yes.
7      Q.  And for the record, the bottom of that
8  particular page has what looks to be the number
9  NO -- oh, no.  Ignore that.  It's 3-94.
10         MR. WINGET-HERNANDEZ:  I'm sorry.  What
11 page, Sarah?
12         MS. REID:  3-94.
13         MR. WINGET-HERNANDEZ:  Thank you.
14 BY MS. REID:
15     Q.  And directing your attention to that,
16 do you see that there are five manufacturers
17 listed under the Chromelin sodium solution
18 inhalation drug?
19     A.  And this is under the 10-milligram --
20     Q.  Yes.
21     A.  -- slash ML?
22     Q.  Yes.

**Page 539**

1      A.  Correct.  There's five.
2      Q.  And are there five A codes next to
3  those five manufacturers?
4      A.  Correct.
5      Q.  Would it be correct to say that the
6  coding means that these five drug products were
7  considered therapeutic equivalents according to
8  the FDA?
9      A.  Yes.
10     Q.  And from this listing does it appear
11 that Chromelin sodium qualified to be considered
12 for inclusion on the FUL list as of 2000?
13         MR. WINGET-HERNANDEZ:  Objection, form.
14     A.  Based on the FDA data.
15     Q.  To your knowledge, do you know whether
16 a FUL was ever established for this Chromelin
17 sodium product?
18     A.  I don't know.
19     Q.  And then if we could turn to the next
20 yellow sticky and look at ipratropium bromide on
21 the right side under the solution inhalation.
22     A.  Yes.

64 (Pages 536 to 539)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
Washington, DC

---

Page 540

1    Q.  And do you see there that there are
2  three manufacturer names listed under the
3  inhalation solution?
4    A.  Yes.
5    Q.  And that there are three A codes next
6  to those three manufacturers' names?
7    A.  Yes.
8    Q.  Is it therefore correct to say that
9  this coding also means that these three drug
10 products were considered therapeutic equivalents?
11   A.  Yes.
12   Q.  And is it correct to say that there are
13 three suppliers which have been listed for this
14 particular drug?
15   A.  I don't know about the suppliers.
16   Q.  Manufacturers.  Excuse me.
17   A.  Okay.  That's okay.  Yes, three
18 manufacturers.
19   Q.  And therefore does it appear that
20 ipratropium bromide inhalation solution was
21 qualified to be on the FUL list or to be
22 considered for inclusion on the FUL list as of

---

Page 541

1  2000?
2        MR. WINGET-HERNANDEZ:  Objection, form.
3    A.  Just based on the FDA data, yes.
4    Q.  Do you have any recollection of
5  actually working on looking at whether to create
6  a FUL for either ipratropium bromide or Chromelin
7  sodium during the time that you were working in
8  your position as FUL supervisor?
9    A.  No.  I don't remember that.
10   Q.  Let me mark as --
11   A.  Can I just correct?  I wasn't a
12 supervisor.  So I was just an analyst.  Make a
13 correction.  Yes.  Just an analyst.
14   Q.  Okay.
15   A.  Health insurance specialist.
16   Q.  Health insurance specialist and
17 analyst.
18       Let me mark as Dey Exhibit 137 a
19 document which bears Bates numbers HHC 0160123
20 through 0125.
21       (Exhibit Dey 137 was marked for
22 identification.)

---

Page 542

1  BY MS. REID:
2    Q.  Ms. Gaston, can you identify what has
3  been marked as Dey Exhibit 137?  What is it?
4    A.  That appears to be a memo to the state
5  Medicaid agencies.  And it has some FUL changes
6  through transmittal number 37.
7    Q.  And can I direct your attention to the
8  final page of the document and the last entry?
9  And can you explain what is being added to the
10 FUL list in the final entry?
11   A.  Ipratropium bromide, .02 percent
12 solution for inhalation, 2.500 ml, 25s.
13   Q.  And the price that is listed there is
14 based on the Blue Book; is that correct?
15   A.  Yes.
16   Q.  And to your knowledge is this the first
17 time that this particular -- excuse me.  We'll
18 withdraw the.
19       To your knowledge, is this the first
20 time that ipratropium bromide .02 percent
21 solution for inhalation was added to the FUL
22 list?

---

Page 543

1        MR. WINGET-HERNANDEZ:  Objection, form.
2    A.  I don't know.
3    Q.  If we could just quickly look at a
4  document --
5    A.  I'd like to clarify this memo, too.
6    Q.  Yes.
7    A.  This is -- this looks like it's from
8  the San Francisco regional office.  So this is
9  something that the regional office sends out to
10 the -- some of the states notifying them of these
11 changes.  So this wasn't initially from CMS
12 headquarters, central office.
13   Q.  But is there any reason to believe that
14 the San Francisco regional office is sending out
15 incorrect information?
16   A.  Oh, no.  They obtained this information
17 from CMS central office.
18   Q.  Oh, I see.  And then in turn generated
19 their own memo and sent it out?
20   A.  Correct.
21   Q.  If we could just quickly look at an
22 exhibit that you've already seen, which is Abbott

65 (Pages 540 to 543)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 544

1  108, which is the omission of drugs from the
2  federal upper limit list.  Do you have it?
3      A.  Yes.
4      Q.  First of all, are you familiar having
5  seen that particular report from the Office of
6  Inspector General which is titled "Omission of
7  drugs from the federal upper limit list in 2001"?
8      A.  I was aware of this report.  I don't
9  know if I read it, because this was published
10 after I worked on the FULs.
11     Q.  Did you have any input into drafting
12 the comments from CMS which are attached at the
13 end of the report?
14     A.  I do not remember having any feedback
15 to the comments.
16     Q.  I only have a very limited question.
17 Let me direct your attention to page 7 of the
18 report.  And I'm directing your attention both to
19 footnote 2 and also to the paragraph under the
20 chart.  If you could just read those.
21     A.  Footnote 2?
22     Q.  Yeah.  To yourself.

Page 545

1      A.  Okay.  (Reading.)  Okay.
2      Q.  Does that refresh your recollection
3  that the first time ipratropium bromide solution
4  was added to the federal upper limit list was
5  indeed on August 24th 2003?
6      A.  I can't remember.  I can only take what
7  the report says.
8      Q.  And do you have any reason to believe
9  that the report is incorrect in this regard?
10     A.  I can't speak for the report.
11         MS. REID:  I have no further questions.
12         THE VIDEOGRAPHER:  Off the record at
13 4:11.
14         (Recess.)
15         THE VIDEOGRAPHER:  On the record at
16 4:12.
17
18         EXAMINATION BY COUNSEL FOR ROXANE
19 LABORATORIES AND BOEHRINGER INGELHEIM
20 BY MR. HECK:
21     Q.  Good afternoon, Ms. Gaston.  My name is
22 Jared Heck and I'm with a firm called Kirkland &

Page 546

1  Ellis and I represent a series of companies, one
2  of which is called Roxane Laboratories
3  Incorporated and the other companies are
4  affiliated with a company called Boehringer
5  Ingelheim Corporation.  And one of them is named
6  Boehringer Ingelheim Pharmaceuticals, Inc.  For
7  the purpose of my question I'm going to refer to
8  them as the Roxane defendants.  Is that okay?
9      A.  That's fine.
10     Q.  Have you ever had any communications
11 with any of these companies that I just
12 mentioned?
13     A.  I may have.
14     Q.  But sitting here today you don't recall
15 any specific communications with any of these
16 companies?
17     A.  Correct.
18     Q.  So if I understand correctly, you don't
19 have any personal knowledge about how the Roxane
20 defendants priced their drugs; is that correct?
21     A.  Correct.
22     Q.  And you don't have any personal

Page 547

1  knowledge about how the Roxane defendants
2  marketed their drugs; is that right?
3      A.  Correct.
4      Q.  And you don't have any personal
5  knowledge about how the Roxane defendants may or
6  may not have reported AWPs or WACs to third party
7  compendia like First Databank; is that right?
8      A.  Correct.
9      Q.  Are you aware that the federal
10 government has filed a federal qui tam action
11 against Roxane Laboratories?
12         MS. MARTINEZ:  Objection, form.
13     A.  I know that they're included in with
14 the Abbott, but that's all that I know.
15     Q.  Have you ever seen a complaint by the
16 government specifically against the Roxane
17 defendants?
18     A.  No.
19     Q.  And if I understand correctly, you were
20 never consulted for the facts contained in that
21 complaint; is that correct?
22     A.  No.

66 (Pages 544 to 547)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 548

1        MS. MARTINEZ:  Objection, form.
2        THE REPORTER:  You asked "never" and
3   she said "no."  You might want to --
4        Q.  If I understand correctly, you were not
5   consulted for the complaint, for the facts that
6   were contained in that complaint; is that
7   correct?
8        A.  Correct.
9        MR. HECK:  I think that's all for
10  questions, but we would just generally reserve
11  our right to redepose Ms. Gaston in conjunction
12  with the Roxane case.  That's all I have.
13  Thanks.
14       THE VIDEOGRAPHER:  Off the record at
15  4:14.
16       (Recess.)
17       THE VIDEOGRAPHER:  On the record at
18  4:32.
19
20       EXAMINATION BY COUNSEL FOR AVENTIS
21  PHARMACEUTICALS
22  BY MR. KOON:

Page 549

1        Q.  Ms. Gaston, my name is Michael Koon.
2   I'm probably the 415th lawyer that's talked with
3   you today.  I represent Aventis Pharmaceuticals.
4   I'd like to focus on a period of time in your
5   career at CMS that John spoke a little bit about,
6   particularly that's the point from 1991 to about
7   2001.  And I want to focus on some of the
8   questions that he began asking you about your
9   responsibilities with regard to the Medicaid
10  rebate statute.  Are you with me so far?
11       A.  Yes.
12       Q.  Okay.  The Medicaid rebate statute I
13  think you would agree with me marked a fairly
14  significant change in CMS's responsibilities with
15  the pharmaceutical industry?
16       A.  Correct.
17       Q.  A lot more reporting by the
18  pharmaceutical companies by the states,
19  interaction with the agency in different parts of
20  pharmaceutical company operations?
21       A.  Correct.
22       Q.  Did you during 1991 to 2001 time

Page 550

1   period, did you ever have final regulations with
2   regard to the calculation of payment of rebates?
3        A.  No.
4        Q.  Those were all tentative or proposed
5   regulations?
6        A.  I guess you could call them proposed,
7   but they never actually were made formal.
8        Q.  How did you all get trained in how to
9   advise the industry with regard to their Medicaid
10  rebate reporting obligations?
11       A.  Just on-the-job training.  Larry Reed,
12  he was the branch chief or division director, as
13  the time changed.  And just learned among staff.
14  Just educated ourselves or went to meetings, you
15  know, learned that way.
16       Q.  Let me focus on interactions that you
17  might have had with either pharmaceutical
18  companies or the people representing
19  pharmaceutical companies.  Would they call you
20  with questions about obligations that the
21  companies had on Medicaid rebate reporting
22  obligations?

Page 551

1        A.  Yes.
2        Q.  Was that a daily occurrence in the '91
3   to, say, '95 time period?
4        A.  I can't say daily.  I can't put a time
5   limit on it.
6        Q.  Okay.  What responsibilities did you
7   have with regard to advising industry about
8   Medicaid rebate obligations during that time
9   period?
10       MS. MARTINEZ:  Objection, form.
11       A.  When I started with the program I was
12  training.  So generally when I would get phone
13  calls most of the time I would be given phone
14  calls by Larry Reed and then I would return the
15  phone calls and then go back to him to find out
16  what the person said to me and then try to
17  interpret his answer to go back to them.  It was
18  a trial by error.  But it was a lot of that type
19  of exchange until I became more familiar and
20  could return phone calls on my own, still
21  conferring whenever I needed to with Larry or
22  other staff.

67 (Pages 548 to 551)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 552

1    Q.  Okay.  Was there a time when there was
2  a hotline set up at CMS where either people
3  representing the industry or the industry
4  themselves could call in and leave messages and
5  somebody would get back to them?
6    A.  The operations staff, the ones that ran
7  the data side of the program, they had a hotline.
8    Q.  Okay.  But this was not something that
9  policy did?
10    A.  No.
11    Q.  Would there be times when operations
12  would refer questions to policy that they
13  couldn't answer?
14    A.  Yes.
15    Q.  And when I say that, again, I'm
16  confining it to the Medicaid rebate obligations.
17  Would you get questions from operations about
18  questions that they had gotten from industry
19  about rebate obligations?
20    A.  Policy related rebate obligations.
21    Q.  And if you can do so, what sort of
22  questions would operations refer to policy with

Page 553

1  regard to rebate obligations?
2    A.  If they were policy related, if they
3  needed to understand the statute.  I guess
4  generally speaking if they were not data related,
5  that they would go to policy.
6    Q.  So questions about, you know, is this
7  class of trade to be included in AMP, that would
8  be a policy question, not a data question
9  probably, right?
10    A.  Correct.
11    Q.  And so if they couldn't answer that in
12  operations they'd refer it to your group?
13    A.  Correct.
14    Q.  Do you recall a time when the
15  operations hotline was discontinued?
16    A.  I don't know it happened, but I
17  know that it was discontinued.
18    Q.  And do you recall the -- at least --
19  let me rephrase that.
20       At the time they discontinued the
21  hotline did they then release information about
22  how to reach policy directly if they had

Page 554

1  questions about rebate obligations?
2    A.  I don't know.
3       (Exhibit Aventis 001 was marked
4  for identification.)
5  BY MR. KOON:
6    Q.  Let me show you what we've previously
7  marked for identification purposes as Aventis
8  Exhibit Number 1.  Take a look at that, if you
9  would.  And you're welcome to read the whole
10  thing if you want.  I'm most interested in the
11  first page.
12    A.  Thank you.  (Reading).
13    Q.  Have you taken a look at that?
14    A.  Yes.  You're just interested in the
15  first --
16    Q.  I'm interested in really the first
17  paragraph of the first page.
18    A.  Okay.
19    Q.  The document carries a date of August
20  16th 1995 and announces effective immediately the
21  drug rebate hotline is no longer operational.  Do
22  you see that?

Page 555

1    A.  Yes, I do.
2    Q.  Does that refresh your recollection
3  about when that hotline might have been shut down
4  by CMS?
5    A.  I don't remember what it was, but
6  because of the release that refreshes the memory.
7  I would assume that that's when it was shut down.
8    Q.  That first paragraph refers to
9  attachment A.  And it says "Attachment A lists
10  the members of the Medicaid rebate staff, their
11  general areas of responsibilities and their new
12  telephone numbers.  Please feel free to contact a
13  staff member with any questions you may have."
14       (Exhibit Aventis 002 was marked
15  for identification.)
16  BY MR. KOON:
17    Q.  And let me show you now what we've
18  marked previously as Aventis Exhibit Number 2 for
19  identification.  And I'll represent to you that I
20  think that's the attachment A that is referred to
21  in what we've marked previous as Exhibit number
22  1.

68  (Pages 552 to 555)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                    Washington, DC

Page 556

1    A.  Yes.
2    Q.  Does your name appear on that?
3    A.  Yes.
4    Q.  And what areas of responsibilities are
5  identified as being within your area of
6  expertise?
7    A.  "Coverage/policy issues, dispute
8  resolution, VHCA/formulary regulations, federal
9  upper limits."
10   Q.  And that first heading, coverage and --
11  what was it, policy?
12   A.  Policy issues.
13   Q.  Could you describe generally what that
14  would be with regard to rebate obligations that
15  manufacturers might have?
16   A.  Questions on Medicaid coverage, if a
17  drug is covered or not under the Medicaid
18  program, policy issues such as what we discussed,
19  helping to interpret the statute or the rebate
20  agreement.
21   Q.  And the next heading under your name?
22   A.  Dispute resolution.

Page 557

1    Q.  Is that as between manufacturers and
2  states for utilization issues?
3    A.  Correct.  Yes.
4    Q.  Was that your direct telephone line
5  that's listed there?
6    A.  Yes.
7    Q.  Did you have an increase in calls
8  directly from industry after release 18 came out?
9    A.  I can't remember.
10   Q.  But as I understand it, because Exhibit
11  1 says it went to all plating drug manufacturers,
12  essentially every drug manufacturer in America
13  had your phone number?
14   A.  The technical contacts for all the drug
15  manufacturers participating in the program.
16   Q.  Okay.  Do you recall a fellow by the
17  name of Mike Keough?
18   A.  Yes.
19   Q.  How were his responsibilities as they
20  related to manufacturer obligations under the
21  Medicaid rebate statute different than yours, if
22  they were?

Page 558

1    A.  I came on with the rebate program more
2  in a trainee position.  I was a lower grade.
3  Mike came on at a higher grade.  I think he had a
4  little more responsibilities.  And he worked in
5  different areas of the rebate program.
6    Q.  Can you be any more specific?
7    A.  He worked more on maybe pricing issues.
8  The example you gave earlier about something
9  being included in the pricing.
10   Q.  Included in AMP or BP?
11   A.  Best price rate.  Dispute resolutions,
12  he was the lead for dispute resolution.
13   Q.  So he -- at least in the early years he
14  have would have been more senior than you but
15  would have had some of the same responsibilities?
16   A.  Correct.
17   Q.  Do you recall when he left CMS?
18   A.  He retired about four years ago.
19   Q.  Have you spoken with him since he left
20  the government?
21   A.  Yes.
22   Q.  Have you had good relations with him?

Page 559

1    A.  Yes.
2    Q.  There's been some discussion about
3  repackagers earlier in your testimony.  Can you
4  just for the benefit of the jury describe what a
5  repackager is for purposes of classification
6  under the Medicaid rebate statutes?
7    A.  Repackagers are companies that will
8  repackage and relabel a drug product under their
9  own NDC.  And for that purpose we consider them a
10  manufacturer for drug rebate purposes.
11   Q.  The NDC is national drug code?
12   A.  Correct.
13   Q.  And a manufacturer who is a repackager
14  or relabeller, they would have to have their own
15  NDC for their product, correct?
16   A.  Correct.
17   Q.  Because they're responsible for
18  reporting to CMS any sales of that product for
19  rebate purposes, right?
20   A.  Correct.
21   Q.  And that's an eleven digit NDC number,
22  right?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 560

1    A.  Correct.
2    Q.  And so whether you're buying someone
3  else's product and repackaging it or buying
4  someone else's package and relabeling it, if
5  you're using your NDC number you are responsible
6  for recording those sales to CMS?
7    A.  Correct.
8    Q.  Do you recall ever responding to
9  questions from manufacturers about the inclusion
10  or the exclusion of repackagers or relabellers
11  from rebate reporting requirements?
12    A.  I don't remember specifically, but I
13  know I have.
14    Q.  Do you recall testifying in your -- I
15  think the first day of your deposition, having
16  gone up to Boston and appearing in front of the
17  grand jury?
18    A.  Yes.
19    Q.  I think you appeared twice?
20    A.  Yes.
21    Q.  And both times, as I understand it,
22  related to the U.S. Attorney's Office there and

Page 561

1  their investigation into repackagers or
2  relabellers, right?
3    A.  Yes.
4    Q.  Did you ever meet with any
5  representative of industry in connection with the
6  repackager or relabeller investigation out of
7  Boston?
8    A.  No.
9    Q.  Did you ever -- were you ever
10  interviewed by anyone in connection with that
11  investigation?  I'm not talking about your grand
12  jury testimony now.
13    A.  Like the AG's office in Boston.  But
14  you're not talking about that, right?
15    Q.  I'm not talking about your grand jury
16  testimony.
17    A.  Oh, okay.
18    Q.  Did you go for an interview before
19  then?
20    A.  When you say interview -- I'm confused.
21  You're confusing me.
22    Q.  All right.  A meeting other than your

Page 562

1  grand jury testimony.
2    A.  A meeting in general?
3    Q.  Right.
4    A.  Concerning repackaging?
5    Q.  Repackaging or relabelling and the
6  investigation of repackagers or relabellers by
7  the Boston U.S. Attorney's Office.
8    A.  Pertaining to that?
9    Q.  Yes, ma'am.
10    A.  Not that I know of.  Not that I
11  remember.
12    Q.  Were you subpoenaed to go to the grand
13  jury?  Do you know?
14    A.  Yes.
15    Q.  And you don't recall being interviewed
16  by Susan Winkler prior to going to the grand
17  jury?
18    A.  Yes.  She was the AG's office.  When
19  you asked me that question -- okay.
20    Q.  That's the confusion we had?
21    A.  Yes.
22    Q.  Was anyone else in the room when Susan

Page 563

1  interviewed you?
2    A.  Yes.
3    Q.  Do you recall who else was there?
4    A.  Mary Salhus.  That's S-a-l-h-u-s.
5    Q.  And she would have been general counsel
6  for CMS?
7    A.  Yes, CMS.
8    Q.  Anyone else?
9    A.  There was another individual, but I
10  don't know who that person was.  I can't
11  remember.
12    Q.  And I assume this took place before
13  your grand jury testimony?
14    A.  Correct.
15    Q.  Do you recall how long before your
16  grand jury testimony?
17    A.  The one meeting I remember was the day
18  before.
19    Q.  Do you think there was more than one
20  meeting?
21    A.  I don't know if we had any conference
22  calls.

70 (Pages 560 to 563)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 564

1     Q.  And I think you testified previously
2  that you did not recall the name of any of the
3  companies that were involved in that
4  investigation.  Is that right?
5     A.  The only name that I remember is
6  Kaiser.
7     Q.  And in what capacity was Kaiser
8  involved in that investigation, if you know?
9     A.  I don't know the specifics.  I just
10  know that that was one of the companies that was
11  involved in the investigation.
12     Q.  Did you at any time understand Kaiser
13  to be a manufacturer under CMS rules?
14     A.  I can't remember the details of Kaiser.
15  I know they had other roles other than -- if they
16  were a manufacturer they had other roles that
17  they played too.  Here again, it's sketchy
18  because it's been so long.
19     Q.  Sure.  And if the answer is you don't
20  know or you don't remember, that's fine.  Did you
21  understand Kaiser was buying from other
22  manufacturers?

Page 565

1     A.  I can't remember that.
2     Q.  Did you understand whether Kaiser had
3  its own NDCs for any of the products that it was
4  selling?
5     A.  I can't remember that.
6     Q.  Was there a time when you became aware
7  that some manufacturers were not including sales
8  to repackagers or relabellers in their AMP or
9  best price calculations?
10     A.  Yes.
11     Q.  Can you recall generally when that was?
12     A.  No.
13     Q.  In the general -- let's take a very
14  general concept.  A manufacturer sells to someone
15  that relabels or repackages and sells under their
16  own NDC.  Generally that's a transaction that
17  does not require recording by the original
18  selling manufacturer, right?
19        MR. WINGET-HERNANDEZ:  Objection, form.
20     A.  I can't answer that because I haven't
21  worked with that for years.  So just answer off
22  the top of my head, I can't do that.

Page 566

1     Q.  Okay.  That's fair.
2        Do you recall ever making a
3  presentation, either at a conference or in a
4  meeting, where you spoke on behalf of CMS about
5  the appropriateness of including or excluding
6  private label materials from a manufacturer's
7  rebate reporting?
8     A.  No.
9     Q.  Do you recall an Arnold & Porter
10  conference in 1997 here in Washington where you
11  appeared?
12     A.  Yes.
13     Q.  What do you recall about that
14  conference?
15     A.  I remember that Larry Reed and I were
16  present.  And it was more of a prepared questions
17  and we would answer.
18     Q.  And when you say prepared questions,
19  what does that mean?
20     A.  We met with someone from the company.
21  Larry decided what questions he felt were
22  appropriate for the discussion.  And then we sat

Page 567

1  there, they asked us questions and we answered
2  them.
3     Q.  Okay.  Do you recall whether any of
4  those questions dealt with repackaging or
5  relabeling?
6     A.  I can't remember.
7        (Exhibit Aventis 003 was marked
8  for identification.)
9  BY MR. KOON:
10     Q.  Let me show you what we've marked for
11  identification purposes as Aventis Exhibit Number
12  3.  And again, you're welcome to look through as
13  much of that as you want, but I'd like to make
14  sure that you've read the segment that begins on
15  page 2, additional guidance on average
16  manufacturer price.  And that continues onto page
17  3.
18     A.  (Reading.)  Okay.
19     Q.  Okay.  I understand this to be Medicaid
20  drug rebate program release number 29.  Have you
21  ever seen this document before?
22     A.  Yes.

                                71 (Pages 564 to 567)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 568

1    Q.  Did you by any chance write any part of
2  this?
3    A.  Not that I remember.
4    Q.  When these releases would come out and
5  they would deal with policy type or coverage type
6  questions, would you draft them or review them or
7  be in any way involved in getting them completed
8  before they went out to the industry?
9    A.  Yes, depending on what the subject
10 matter was.
11   Q.  Okay.  And the subject matter of the
12 part of this release that I pointed out beginning
13 on page 2 and continuing on to page 3 is headed
14 "Additional guidance on average manufacturer
15 price calculations." Do you see that?
16   A.  Yes.
17   Q.  Is that something that you would have
18 had some expertise on in the summer of 1997?
19   A.  I would have knowledge, but I don't
20 think I had the expertise to do this or put the
21 chart together.
22   Q.  Do you have any idea who would have

Page 569

1  been responsible for that?
2    A.  It might have been Mike Keough.
3    Q.  Okay.  Taking a look at page 2, the
4  segment there includes the following sentence,
5  and I'm reading about halfway down.  It begins
6  with the sentence "this additional information."
7    A.  Yes.
8    Q.  "This additional information does not
9  impose any new requirements on manufacturers and
10 no action is necessary by manufacturers that are
11 not revising or recalculating pricing data."
12 When would a manufacturer revise or recalculate
13 their pricing data?
14   A.  We had situations where manufacturers
15 might look back and reevaluate their methodology
16 and realize that they may not be including
17 something that they should have or maybe one of
18 the releases might remind them that they should
19 have been doing something.  So they would come to
20 CMS and sit down or submit their methodology to
21 make sure that they're submitting the correct
22 pricing.

Page 570

1    Q.  And the releases prompting them to do
2  that, that really was the concept here, right,
3  was guidance for the industry in a prospective
4  way so they could make sure they were reporting
5  what they needed to report?
6    A.  Correct.
7    Q.  That sentence or that paragraphs goes
8  on "Essentially the information on the chart is a
9  compilation of instructions previously provided
10 in earlier releases."  Do you see that?
11   A.  Yes.
12   Q.  So is it your understanding that this
13 is essentially trying to draw together materials
14 from prior releases for the benefit of the
15 industry?
16   A.  I can't say that.  I just think that
17 it's -- the releases are used for purposes of
18 providing the guidance to the industry and to the
19 states.
20       (Exhibit Aventis 004 was marked
21 for identification.)
22 BY MR. KOON:

Page 571

1    Q.  Let me show you what we've previously
2  marked as Exhibit 4, Aventis 4.  And I'll
3  represent to you that this appears or at least
4  was advised to us to be the chart that was
5  attached to release number 29, which we've
6  previously marked.  Does this chart look familiar
7  to you?
8    A.  Yes.
9    Q.  Do you think I got it right, that that
10 was in fact the chart attached to release 29?
11   A.  Yes.
12   Q.  It's headed -- let me back up.
13       I think you indicated before you didn't
14 think that you had the expertise to write the
15 segment of the release or to create the chart;
16 you thought that Mike Keough might have done
17 that?
18   A.  Correct.
19   Q.  Would Mike Keough have been able to
20 send it out without approval by Larry Reed or
21 someone else in his group?
22   A.  No.

72 (Pages 568 to 571)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                    Washington, DC

Page 572

1    Q.  So if it goes out it's supposed to be
2  the voice of CMS, right?
3    A.  Correct.
4    Q.  Now, this chart has categories of sales
5  along the left-hand side, does it not?
6    A.  Correct.
7    Q.  And then there's headings, whether
8  those sales should be first of all included in
9  AMP, included in best price and whether rebates
10 are due on those sales; is that right?
11   A.  Yes.
12   Q.  If you'll work down with me about --
13 let's see -- it's third from the bottom.  The
14 type of sales is described as sales to other
15 manufacturers who repackage or relabel under the
16 purchaser's NDC.  Do you see that?
17   A.  Yes.
18   Q.  And according to this chart, are those
19 sales to be included in AMP?
20   A.  No.
21   Q.  Are they to be included in best price?
22   A.  No.

Page 573

1    Q.  And are rebates due on those sales
2  according to this chart?
3    A.  No.
4    Q.  Now, below that the next industry is
5  "sales to manufacturers who act as wholesalers
6  and do not repackage or relabel under the
7  purchaser's NDC."  Am I correct in understanding
8  those are people that buy but don't necessarily
9  sell under their own NDC?  Is that right?
10   A.  Correct.
11   Q.  And there those sales, first of all,
12 are to be included in AMP, right?
13   A.  Yes.
14   Q.  And are to be included in best price?
15   A.  Correct.
16   Q.  And there are rebates owed on those
17 sales, right?
18   A.  Correct.
19   Q.  And so that were clear, I think this
20 was Exhibit 4?
21   A.  Correct.
22   Q.  And that's dated June of 1997; is that

Page 574

1  right?
2    A.  This is Exhibit 4.
3    Q.  Exhibit 3.  That is dated --
4    A.  Exhibit 3 is dated June 5th of 1997.
5    Q.  Now, would you have used a chart like
6  this to advise callers about whether sales to
7  repackagers or relabellers should be treated in a
8  given way, or would that have been something that
9  Mike Keough would have been responsible for
10 dealing with?
11   A.  No.  I would have replied to questions
12 pertaining to this chart.  Yes.
13   Q.  And because this was guidance that had
14 gone out to the industry by CMS, you would have
15 used this essentially to provide that advice,
16 right?
17   A.  Correct.
18   Q.  So if someone said should sales to
19 repackagers or relabellers that sell under their
20 own NDC be included in AMP, you would have said
21 no, right?
22   A.  Correct.  But also many times when

Page 575

1  questions like that would come up, because no
2  question is that clear-cut, what we would
3  generally do is ask them to submit their question
4  in writing and provide a scenario so that we
5  truly understand what their question is.
6    Q.  Right.  Let me ask about that a little
7  bit.  There's a fairly robust health care law
8  practice here in Washington, isn't there?  A lot
9  of lawyers do health care law, advise people what
10 to do to comply with CMS regs?
11       MS. MARTINEZ:  Objection.
12   A.  You're asking me a question?
13   Q.  Do you know that to be true?
14   A.  I don't know that to be true.
15   Q.  Are there any lawyers that you've dealt
16 with during your time at CMS that call a lot
17 about questions to make sure that they're
18 providing advice that's consistent and
19 appropriate to their clients?
20   A.  We have lawyers, consultants.  They
21 call.
22   Q.  Are there any folks that you've talked

73 (Pages 572 to 575)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 576

1  to a lot, more than once, people whose names you
2  recall?
3      A.  Not that I -- no.  Not that I recall.
4      Q.  There's nobody that you can think of
5  that that called frequently enough that you got
6  to be on a first name or even a last name basis
7  with them?
8      A.  Do you want to give me an example?
9      Q.  Sure.  Donna Boswell with Hogan &
10 Hartson.
11     A.  Sure.  I've dealt with Donna.
12     Q.  Did she strike you as a serious health
13 care lawyer?
14     A.  I don't have a lot of recollection.  I
15 remember the name.  I remember dealing with her.
16 I can't remember issues, so I can't answer that.
17     Q.  Your impression of her positive,
18 negative or nondescript?
19     A.  I can't really say because I don't have
20 a lot of memory.
21     Q.  But you can recall her calling more
22 than once to the CMS policy group?

Page 577

1      A.  I would say yes.
2      Q.  Did there come a time when the agency
3  was criticized for its handling of the relabeling
4  or repackaging exclusion from best price and AMP?
5      A.  Criticized by whom?
6      Q.  Well, let's start with Congressman
7  Waxman.
8      A.  May have.  I don't recall.
9      Q.  Do you recall any investigation at CMS
10 in late 1999 or early 2000 about concerns by
11 Congressman Waxman or others on Capitol Hill
12 about whether the agency was doing the right
13 thing in excluding sales to repackagers or
14 relabellers from best price or AMP calculations?
15     A.  I may recall a letter from Waxman.  But
16 -- just because you brought it up.  But my
17 recollection is not good.
18     Q.  Okay.  My recollection from your
19 testimony was that you went to Boston in late
20 1999 or 2000.  Is that right?
21     A.  Correct.
22     Q.  Do you recall any connection between

Page 578

1  going to Boston to talk about repackaging or
2  relabeling there with any inquiry that was going
3  on at CMS at the time about repackaging other
4  relabeling exclusion from is best price or AMP?
5      A.  I didn't relate the two.
6      Q.  Do you recall ever telling someone
7  inquiring of you in your capacity as a coverage
8  or policy expert that the agency didn't like the
9  situation but that that's what the regs required
10 and a statutory fix was needed?
11         MS. MARTINEZ:  Objection, form.
12     A.  I don't remember saying that.
13     Q.  Do you remember ever talking with Mike
14 Keough about repackaging or relabeling issues?
15     A.  As a staff member, we may have.
16     Q.  But you don't have any recollection as
17 you sit here today of any specific conversation?
18     A.  No.
19     Q.  Do you have any recollection of any
20 general conversation about the topic with Mike
21 Keough?
22     A.  I don't have any recollection, no.

Page 579

1      Q.  Let me ask the same question with
2  regard to Larry Reed.  Do you have any general
3  recollection about talking with Mr. Reed about
4  repackaging or relabeling?
5      A.  I'm sure that I spoke to Larry about
6  repackaging and relabeling.  But I don't remember
7  specifically the conversion.
8      Q.  Do you remember generally those
9  conversations?
10     A.  No.  But I know that they occurred.
11     Q.  So you wouldn't be able to tell me
12 whether there was a difference of opinion between
13 the two of you about what the regulations did or
14 didn't say?
15     A.  No.
16     Q.  You wouldn't be able to tell me
17 anything of substance about those conversations?
18     A.  No.  I don't remember.
19     Q.  Your testimony would be you know they
20 happened but you simply don't have a substantive
21 recollection of what was passed between you?
22     A.  Correct.

                              74 (Pages 576 to 579)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 580

1          (Exhibit Aventis 005 was marked
2   for identification.)
3   BY MR. KOON:
4      Q.  Let me show you what we've previously
5   marked as Aventis Exhibit 5 for identification.
6   And again, this is something we pulled off the
7   website.  It purports to be a copy of a release
8   from CMS dated July 13th 2000, carrier release
9   number 47?
10     A.  Correct.
11     Q.  Have you ever seen this document
12  before?
13     A.  Yes.
14     Q.  Did you write any part of it?
15     A.  I may have been involved in it.
16     Q.  It indicates in the first sentence
17  there "We were recently alerted to a situation
18  where drug sales to an HMO are being omitted from
19  a manufacturer's best price calculation on the
20  basis that the purchaser is a drug repackager."
21  Do you see that?
22     A.  Yes.

Page 581

1      Q.  Do you have any information about when
2   the agency was recently alerted to that issue?
3      A.  No, I don't.
4      Q.  Before these releases go out, are there
5   typically meetings or are there drafts that are
6   circulated?
7      A.  Generally whatever is prepared for
8   here, there is a draft and then Larry Reed
9   reviews it as the final, or it goes through our
10  general counsel.
11     Q.  So is it fair to say that either Mr.
12  Reed on his own or Mr. Reed with the assistance
13  of the general counsel would be the final say-so
14  on these releases?
15     A.  Correct.
16     Q.  Now, there's no reference to any
17  attachment to release 47 that I've been able to
18  see.  Do you see any?
19     A.  No I don't.
20     Q.  I'm going to show you now what was
21  marked earlier today as Abbott Exhibit 753.  I
22  apologize.  I don't have an extra copy of that.

Page 582

1   The first three questions on there all relate to
2   this repackaging and relabeling issue, correct?
3      A.  Yes.
4      Q.  I think you indicated that was not your
5   handwriting; that was -- tell me again whose
6   handwriting that was.
7      A.  Cindy Bergin's.
8      Q.  Was there a conference call or a
9   meeting with OIG about these issues or was that
10  just a draft that was handed back and forth?
11     A.  I don't know.  It says called on
12  4/13/01.  But I don't remember this.
13         (Exhibit Aventis 006 was marked
14  for identification.)
15  BY MR. KOON:
16     Q.  Let me show you now what we've
17  previously marked as Aventis Exhibit Number 6.
18  And this should look a little familiar, right?
19     A.  Yes.
20     Q.  Now, this document is headed
21  "exclusions from rebate program," correct?
22     A.  Correct.

Page 583

1      Q.  But it is largely the same as the chart
2   that was appended to release number 29; is it
3   not?
4      A.  Correct.
5      Q.  In fact there's only one change, isn't
6   there?
7         MS. MARTINEZ:  Objection, form.
8      Q.  Well, let me speed this along a little
9   bit.  Take a look at the line third from the
10  bottom, the same one we talked about before, the
11  sales category, the third from the bottom, "sales
12  to other manufacturers who repackage/relabel
13  under the purchaser's NDC."
14     A.  Okay.
15     Q.  And on what we previously marked as
16  Exhibit 4 it indicates it's not to be included in
17  AMP, right?
18     A.  Correct.
19     Q.  And it's not to be included in best
20  price, correct?  I'm talking about Exhibit 4 now.
21     A.  Correct.
22     Q.  And it's not to be something on which

75 (Pages 580 to 583)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

| Page 584 |
| --- |

1  rebates are due, right?
2      A.   Correct.
3      Q.   And on Exhibit 6 -- is it 6?
4      A.   6.
5      Q.   It now says -- when you say is it
6  included in AMP, it still says no, right?
7      A.   Correct.
8      Q.   But now included in BP it doesn't say
9  no anymore, does it?
10     A.   Correct.
11     Q.   It says "Note 3," right?
12     A.   Correct.
13     Q.   And if you go to the right-hand side,
14 note 3 says "No, unless the manufacturer acts as
15 an HMO or other non-excluded entity."  Do you see
16 that?
17     A.   Yes, I do.
18     Q.   Are you aware of whether this was ever
19 broadcast to the industry, this chart?
20     A.   I'm not aware.
21     Q.   Are you aware of any releases that
22 carried this chart as an attachment to the

| Page 585 |
| --- |

1  industry?
2      A.   I don't recall.
3      Q.   Do you recall when this revised chart
4  was prepared?
5      A.   No.
6      Q.   Were you involved in preparing it?
7      A.   I don't remember.
8      Q.   Do you recall ever presenting the first
9  chart to any conference or meeting?
10     A.   Exhibit 4?
11     Q.   Yes.
12     A.   I may have.
13     Q.   Do you recall ever presenting Exhibit 6
14 to a conference or a meeting?
15     A.   I don't recall.
16     Q.   But you agree with me that Exhibit 6
17 represents a change from Exhibit 4 with regard to
18 the classification of those sales to repackagers
19 or relabellers being included in best price?
20     MS. ALBEE:  Objection to form.
21     A.   Yes.
22     MR. KOON:  That's all I have.  Thank

| Page 586 |
| --- |

1  you.
2      THE VIDEOGRAPHER:  Shall we go off the
3  record.
4      MS. MARTINEZ:  Yes.  Let's go off the
5  record for one second.
6      THE VIDEOGRAPHER:  Off the record at
7  5:08.
8      (Discussion off the record.)
9      THE VIDEOGRAPHER:  On the record at
10 5:09.
11     MS. MARTINEZ:  Mr. Winget-Hernandez and
12 Ms. Albee, right now I think it's a good time to
13 conclude because it's after 5:00.  It's about
14 5:10.  I understand that you may have additional
15 questions, especially Mr. Winget-Hernandez.  If
16 you want to make a statement --
17     MR. WINGET-HERNANDEZ:  Well, first I'd
18 like to find out whether all defense counsel have
19 had questions have asked their questions, because
20 I don't have the right to go at this point unless
21 the defense counsel have finished.
22     MR. BUEKER:  Is there anyone in the

| Page 587 |
| --- |

1  room who has questions for this witness on the
2  defendants' side?  Any defense counsel on the
3  telephone have questions for this witness?
4      MS. SALZMAN:  Not at this time.
5      MR. WINGET-HERNANDEZ:  Well, in that
6  case, first of all I'd like to restate my
7  previous objection to being invited as my clients
8  have been by Abbott, Johnson & Johnson, America,
9  Roxane, Schering and Warrick to the deposition
10 without being afforded an opportunity to ask
11 questions.  I'd also like to object to being
12 required to attend without the production of
13 salient materials that would have been responsive
14 to our outstanding discovery that have been
15 produced here and marked by defense counsel as
16 exhibits to this deposition.
17     I'd like to reserve my right to ask
18 questions of this witness at some point
19 subsequent to the production of responsive
20 materials, particularly materials responsive to
21 our second request for production in the New York
22 Counties case, which was served in November of

76 (Pages 584 to 587)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 588

1  last year, and which pertains particularly to
2  materials that are -- that touch upon the issue
3  of the establishment or the use of FULs.  And I
4  would defer to the language of the request rather
5  than to try to reproduce it here on the record.
6        I think that that is essentially all
7  the objection that I have at this point.
8        MR. BUEKER:  On behalf of at least my
9  clients, the defendants in the New York Counties
10 case, I don't mean to have a debate or an
11 argument here.  As to your first objection, being
12 invited without the opportunity to question, I
13 don't understand the objection because I don't
14 understand you not to have or at least not to
15 have the right to reserve your opportunity to
16 question this witness.  So I don't understand the
17 objection there.
18       And with regard to the production of
19 documents, you know, all of the documents that
20 anyway I marked today were produced by the
21 Federal Government.
22       MR. WINGET-HERNANDEZ:  Are you taking

Page 589

1  the position that because documents were produced
2  to you by the federal government that you have no
3  obligation to produce them to us in response to
4  our discovery?
5        MR. BUEKER:  I'm not taking a position
6  on that right now.
7        MR. WINGET-HERNANDEZ:  Okay.  I think
8  I'm done.
9        MS. MARTINEZ:  Okay.  Ms. Albee?
10       MS. ALBEE:  If this deposition is going
11 to be held open we'll reserve -- we have no
12 questions at this time on Ven-A-Care's behalf, no
13 questions at this time but reserve the right to
14 ask questions at a later date.
15       MR. WINGET-HERNANDEZ:  I think it
16 occurs to me in response to Mr. Bueker's
17 statement that my objection perhaps is not clear.
18 Assuming that we have the opportunity to come
19 back and question this witness, of course, I
20 don't object to that.  I would like to ask this
21 witness questions.  My objection is to the use of
22 this deposition in any case in which my clients

Page 590

1  have been cross noticed in the event that I'm not
2  provided the opportunity to ask those questions.
3  Thank you.
4        MS. MARTINEZ:  On behalf of the United
5  States, the United States just reserves its right
6  in the United States versus Abbott, the United
7  States versus Dey and the United States versus
8  Roxane to ask questions of Ms. Gaston.
9        THE VIDEOGRAPHER:  This deposition
10 adjourns at 5:14 and consists of five tapes.
11       (Whereupon, at 5:14 p.m. the
12 deposition was adjourned.)
13
14
15       _____
16              SUE GASTON
17
18 Subscribed and sworn to and before me
19 this _____ day of _____, 20____.
20
21 _____
22       Notary Public

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

EXHIBIT
*NY Counties
Defendants 2*
*3/19/08*

# Federal Upper Limit System

Product Group : 1067
Strengths : 100MG
Routes : ORAL
Ingredients : METOPROLOL TARTRATE

Package Size : 100
Dosage : TABLET
Exclusion Code :

*Notes: 8rh — soon*

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7773/60 | MAJOR PHARMACEUTICALS | *due* |
| | 0.00000 | 0.65400 | 0.06180 | B | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.06180 | R | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.18450 | R | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.21110 | B | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.67410 | 0.00000 | R | 55370/0821/07 | MOVA LABORATORIES INC. | |
| | 0.00000 | 0.67860 | 0.00000 | B | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | M | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | R | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | M | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | R | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | B | 64376/0503/01 | BOCA PHARMACAL, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | R | 57664/0167/08 | CARACO PHARMACAL, INC. | |
| T | 0.00000 | 0.73850 | 0.05690 | M | 64376/0503/01 | BOCA PHARMACAL, INC. | *called (yes)* |
| T | 0.00000 | 0.73850 | 0.05690 | R | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.73650 | 0.73990 | 0.00000 | B | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.00000 | 0.73990 | 0.00000 | M | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | *discontinued* |
| | 0.00000 | 0.73990 | 0.08440 | R | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | *(they no longer manufacture)* |
| T | 0.00000 | 0.76300 | 0.00000 | M | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| T | 0.00000 | 0.71830 | 0.06090 | M | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| T | 0.00000 | 0.71830 | 0.00090 | B | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.71830 | 0.06090 | R | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.76300 | 0.08600 | B | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.80100 | 0.00000 | M | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | M | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.80100 | 0.00000 | R | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| T | 0.00000 | 0.80100 | 0.00000 | R | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.80100 | 0.07250 | B | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.94280 | 0.00000 | M | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.94280 | 0.78570 | B | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 0.94284 | 0.78570 | R | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 1.15260 | 0.00000 | M | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.00000 | 1.15260 | 0.90050 | B | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| T | 0.00320 | 1.15260 | 0.05440 | R | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.10500 | 0.73990 | 0.05440 | B | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.55070 | 0.69750 | 0.09880 | M | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.55070 | 0.65400 | 0.00000 | B | 59772/3693/02 | APOTHECON INC | |
| | 0.55070 | 0.65400 | 0.52320 | M | 59772/3693/02 | APOTHECON INC | |
| | | | 0.52320 | R | 59772/3693/02 | APOTHECON INC | |

FULs Price : .0816
Percent Difference : -36.74
High Price : 1.15260

Prior FULs Price : .1290
Source Code : R
Low Price : .05440

*8/22 - FUL looks ok - 4 WACs are less than avr price*

*.05140  Geneva NDC#8*

*X 150*

*.0816    New FUL*

*#8    10/17/0*
*.0609*
*X150 70*
*.0914*
*New FUL*
*Seg*

# Federal Upper Limit System

EXHIBIT
NY Counties
DeFendals 5
3/19/08
DN

Product Group : 349
Strengths : 0.5MG
Routes : ORAL
ients : CLONAZEPAM

Package Size : . 100
Dosage : TABLET
Exclusion Code :

| Exc. CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.69230 | 0.00000 | M | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | B | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | R | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.71370 | 0.00000 | B | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | B | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | B | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | B | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | M | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | M | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | M | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | R | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | R | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74910 | 0.00000 | R | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74910 | 0.00000 | B | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74910 | 0.16370 | M | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74950 | 0.00000 | R | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74950 | 0.00000 | M | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74950 | 0.18400 | B | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.84768 | 0.70640 | B | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.84770 | 0.00000 | B | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.00000 | 0.84770 | 0.70640 | M | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| T | 0.09890 | 0.74900 | 0.09310 | R | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.59990 | 0.68390 | 0.56090 | M | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.59990 | 0.71237 | 0.56990 | B | 62269/0353/24 | INVAMED, INC. | |
| | 0.59990 | 0.71240 | 0.00000 | R | 62269/0353/24 | INVAMED, INC. | |
| | | | | M | 62269/0353/24 | INVAMED, INC. | |

FULs Price : .1199 .2455
Percent Difference : -56.56
High Price : .84770

Prior FULs Price : .2760
Source Code : R
Low Price : .07990

8/15 - 4 WACs are less than nr FUL - 100/b ok

.1637 (Purepac NDC) R
X 150

.2455 ) New FUL

NYCo Def 5

08/01/2001

# Federal Upper Limit System

**EXHIBIT**
NY Counties
Defendants 6
3/19/08

Product Group : 959
Strengths : 1MG
Routes : ORAL
Ingredients : LORAZEPAM

Package Size : 100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---------|-------------|-----|-----|---------|------------|-------------|-----------|
| | 0.00000 | 0.82950 | 0.00000 | M | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.82950 | 0.19990 | B | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.82950 | 0.19990 | R | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.83770 | 0.00000 | B | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.00000 | B | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | M | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 59911/5812/01 | ESI LEDERLE INC. | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | M | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| P | 0.00000 | 0.83770 | 0.00000 | R | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | R | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.38120 | B | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.38120 | R | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.38100 | R | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.00000 | 0.88000 | 0.00000 | B | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | M | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | R | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88250 | 0.00000 | M | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88250 | 0.00000 | M | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | B | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | R | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.40200 | B | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88750 | 0.00000 | R | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.45770 | 0.83770 | 0.38190 | B | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.86770 | 1.08460 | 0.00000 | B | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08460 | 0.00000 | R | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08462 | 0.86770 | B | 00008/0064/02 | WYETH LABORATORIES | |

Price : .2999  .5718
Current Difference : -47.55
High Price : 1.08462

Prior FULs Price : .5718
Source Code : B
Low Price : .19990

**\*\*\*FULs Price not greater than another supplier\*\*\***

8/1 → FUL 100b ok - five suppliers are less than our price

.38120 (URL NDC)R
x   150
─────────
   .5718  → New FUL



Product Group : 250
Strengths : 500MG
Routes : ORAL
Ingredients : CEFADROXIL/CEFADROXIL HEMIHYDRATE

Package Size :  100
Dosage : CAPSULE
Exclusion Code :

EXHIBIT
PENGAD 800-631-6989
NY Counties
Defendants 7
DW        3/19/08

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 2.84650 | 0.84990 | B | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.84990 | B | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 2.29950 | R | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 3.19950 | 0.00000 | M | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 0.00080 | R | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 2.12330 | B | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.27950 | 0.00000 | M | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 0.00000 | M | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 1.93390 | B | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 1.95500 | R | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 2.12900 | B | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 2.12900 | R | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 2.56840 | 3.05000 | 0.00000 | M | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | B | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | R | 59772/7271/04 | APOTHECON INC | |

FULs Price : 1.2749  2.9000
Percent Difference : 0.00
High Price : 3.27950

Prior FULs Price : .0000
Source Code : B
Low Price : .84990

***FULs Price not greater than another supplier***

7/25- FUL was too low at 1.2749, but when I raised it, it
became = to Major's AWP - delete for now