# Exhibit C

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


In Re:                           )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 1 - 53




                      MOTION HEARING

             BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE




                       United States District Court
                       1 Courthouse Way, Courtroom 19
                       Boston, Massachusetts
                       July 26, 2007, 2:05 p.m.









                       LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 3205
                        Boston, MA  02210
                         (617)345-6787
```

Page 27

1  that context.  And I think that's actually driven home when
2  you start looking at what alternative measure one might
3  choose for, you know, what is fair.  It can't be AMP.  The
4  recent OIG reports --
5           THE COURT:  Well, because it wasn't published, so
6  AMP played no role in the FUL.
7           MR. BUEKER:  Right.  And it can't be an average as
8  the plaintiffs say.  I think, if you look at the average and
9  just take 150 percent of some average price to a wholesaler,
10 leave aside --
11          THE COURT:  But let me just pose a tough case,
12 though.  What if, like happened eventually with some of the
13 Bristol-Myers drugs, in the beginning it was roughly fair,
14 and then by the end, only 5 percent of the drugs were being
15 sold at WAC?  And so, you know, for huge periods it was a
16 fairer way, even though there was substantial discounting for
17 certain groups, but still something like, you know,
18 90 percent of the sales or 80 percent of the sales were at
19 the wholesale sale acquisition cost, but at some point it
20 drops to 5 percent.  So you're saying, even when it drops to
21 the 5 percent, it's fair for them to continue reporting it?
22          MR. BUEKER:  Yes.  I think the system was designed
23 to work on the basis of published prices, and I --
24          THE COURT:  I guess I'm not prepared to do that in
25 the context of a motion to dismiss.  On the other hand, I

Page 28

1  don't want you to come in -- I mean, if 80 -- let me put it
2  this way:  I found this to be a difficult issue in the last
3  case.  It's not just -- the fact that a substantial number of
4  discounts took place is not going to give you a cause of
5  action if there's a substantial number of sales also being
6  sold at wholesale acquisition cost, right?
7           MS. CICALA:  You're right, your Honor.  That's why
8  I think a weighted average approach really does make a
9  tremendous amount of sense.
10          THE COURT:  I don't know, and I'm not willing to
11 put my stake in the ground.  I think what really might be
12 called for is taking -- why don't we just take -- I mean,
13 there are so many of these.  Would it make some sense for
14 each side to take your best five and your best five, and try
15 and at least figure out the methodology, rather than do
16 discovery on these millions -- how many -- however many we
17 end up with to find out what makes sense?
18          MS. CICALA:  I mean, in terms of methodology, one
19 of the many benefits of the very high pleading standards that
20 we have on these issues is that a substantial amount of the
21 work we're going to need to do ultimately in this case for
22 liability and damages purposes is in large part done.  Now,
23 it's not entirely done because we don't have all the
24 defendants' data, nor do we have all of the data from the
25 wholesalers.  But what we do have is and what we've used is

d1ba5861-cb8e-43e4-a176-a44af5531b9c

1   sufficient data to demonstrate on a good-faith basis how the
2   failures to report accurate provider acquisition costs led to
3   these FULs, led to the issuance of these FULs.
4          THE COURT:  But doesn't it make sense to brief
5   summary judgment early on with respect to with some expert
6   guidance and a record with your case?  This was really
7   helpful in BMS.  We had drugs at both ends of the spectrum.
8          MR. BUEKER:  Trust me, your Honor, I don't disagree
9   at all with the idea of narrowing and doing discovery on a
10  smaller number of drugs here.  I think it would be
11  informative.  But I'm not sure we should even have to get
12  that far.  I think this is a --
13         THE COURT:  I'm not doing that for you on a motion
14  to dismiss.  But I am willing to because -- I've been looking
15  for, and I think I'm not really looking anymore to do this
16  because every time I give you the opportunity, you expand
17  it.  So I think what I would like to do is come up with a
18  schedule where each side takes -- how many defendants are
19  there again?
20         MS. CICALA:  There are 38 defendant groups, but
21  only a certain number of them manufacture drugs that were
22  ever subject to FULs, your Honor, so we could pick isolated
23  multi-source drugs, innovator or noninnovator, multi-sources
24  that were a subject --
25         THE COURT:  And maybe you pick five and you pick