Exhibit D

Devor, Harris L.                              December 9, 2008
                    New York, NY

Page 1

                UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS

------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE          )  Civil Action

LITIGATION                       )  01-12257-PBS

------------------------------X

THIS DOCUMENT RELATES TO:        )  Judge Patti B.

THE CONSOLIDATED NEW YORK        )  Saris

COUNTY ACTIONS                   )  (Case Pending

------------------------------X    in D. Mass.)


                    December 9, 2008

                       9:18 a.m.


         Videotaped deposition of HARRIS L.

DEVOR, taken by Defendants, at the offices of

Ropes & Gray LLP, 1251 Avenue of the Americas,

New York, New York,, before Brandon Rainoff, a

Federal Certified Realtime Reporter and Notary

Public of the State of New York.

Devor, Harris L.                          December 9, 2008
                        New York, NY

Page 56

1    that to me is an incredibly conservative way to

2    look at this given the fact that generic prices

3    usually fall as time goes on.  The company could

4    have taken a three-month average.  It could have

5    taken a six-month average which, of course, would

6    have yielded lower AWPs or WACs.

7           And I'm not suggesting that by virtue

8    of me using 12 months and one of the defendants

9    using six months that's the purpose of why we are

10   here today.  I'm just suggesting that based on

11   what I have read, that most of these things that

12   are available to the defendants in computing what

13   the cost to the wholesaler was and what the

14   average wholesale price were not used by those

15   people reporting prices.  And I took a stab

16   myself at doing it and I used the company's data.

17        Q.   After you computed AWPs and WACs to get

18   FULs from those AWPs and WACs that you

19   calculated, you multiplied by 150 percent,

20   correct?

21        A.   I believe so.  Again, that's sort of

22   set forth in the schedules attached to my report.

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                                December 9, 2008
                             New York, NY

---

Page 57

1        Q.   Is it your opinion that had the

2    manufacturers reported the lower AWPs and WACs

3    that you calculated, that CMS would have used

4    those lower AWPs and WACs to set FULs?

5             MS. CICALA:  Objection to form, beyond

6    the scope.

7        A.   That's not my opinion.  I have no

8    opinions on it.  It would seem to me to be a

9    factual thing that you don't need me to opine on.

10   CMS could opine on what they do with the AWPs and

11   WACs once they report it.  That's beyond the

12   scope of what I was asked to do and not really

13   relevant to what I was asked to do.

14       Q.   Well, embedded in the way you derive

15   FULs by multiplying the AWPs and WACs by 150

16   percent to get the FULs is the assumption that

17   those AWPs and WACs would have been used to set

18   the FUL, right?

19            MS. CICALA:  Objection to form.

20       A.   It is not necessarily -- I mean, what

21   my report sets forth by doing that, 150 percent

22   times the AWP and WACs is computing a FUL

---

Devor, Harris L.                          December 9, 2008
                         New York, NY

1    independent of CMS as -- using CMS's methodology

2    as I understood it based on WACs and AWPs.

3    That's all it is.  Not opining that CMS would

4    have used that or not.  I mean, I presume that

5    they wouldn't have ignored that data, you know,

6    the AWPs and WACs that were reported, but CMS can

7    speak to that.

8         Q.   You have no opinion on what CMS would

9    have done with AWPs or WACs that you calculate?

10        A.   My understanding is that CMS did in

11   fact review the reported pricing which included

12   AWPs and WACs in order to compute what a FUL was.

13   That's my understanding of the record.

14        Q.   Is it your understanding that CMS

15   always used the lowest published AWP or WAC?

16        A.   I know that's what the regulation

17   itself says but I am not a hundred percent sure

18   that they did that in all circumstances.

19        Q.   One of the other calculations you do in

20   your Rule 26 statement to multiply the AMPs, AMPs

21   that manufacturers report by 150 percent,

22   correct?

Devor, Harris L.                                December 9, 2008
                          New York, NY

Page 59

1        A.    Where I had the AMP data available I

2    believe I did do that as yet another -- an

3    alternative computation of a FUL based on AMP

4    reporting which my understanding was that was

5    required to be reported by manufacturers.

6        Q.    Right.  You are aware that CMS has

7    required manufacturers, each of the defendants in

8    this case, in fact, to report AMPs on a quarterly

9    basis since at least 1991, right?

10       A.    I know it is by federal statute and I'm

11   not a hundred percent sure I know the year 1991,

12   but nonetheless I am aware that it's required to

13   be reported.

14       Q.    It was required to be reported for the

15   entire relevant time here in 1997 to 2005, right?

16       A.    I believe so.

17       Q.    To your knowledge has CMS ever

18   suggested setting a FUL on the basis of 150

19   percent of AMP?

20       A.    I believe their goal is to set the FUL

21   at 150 percent of the lowest price reported.

22   That's what I think their goal is.

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                                December 9, 2008
                          New York, NY

                                                        Page 61

1        Q.   To your knowledge has CMS ever set a

2   FUL on the basis of an AMP?

3        A.   Well, if I understand the definition of

4   what an AMP is, CMS in looking at either AWP or

5   WAC is trying to get -- I mean, I don't know that

6   an AMP is much different, for instance, than --

7   have to go back, but I think it was -- can't

8   remember whether it was a WAC or an AWP.

9             So in theory, so if CMS is setting FULs

10  based on the reporting of AWPs and WACs, then in

11  essence one of those as I recall approximates

12  what an AMP is.

13       Q.   Were you aware that as a part of a 2005

14  deficit reduction act CMS sought to establish

15  FULs on the basis of 250 percent for the lowest

16  reported AMP?

17       A.   I don't believe I'm aware of it, nor

18  would it have been relevant to what I was asked

19  to do.  I don't see how that's relevant to my

20  analysis.

21       Q.   Were you aware -- I guess, then, you

22  weren't aware that CMS was enjoined by a federal

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                          December 9, 2008
                       New York, NY

Page 62

1    court from doing that, from setting a FUL on the

2    basis of 250 percent of the lowest reported AMP

3    in a lawsuit brought by the National Pharmacists

4    Association?

5         A.    I am not aware of it nor, again, do I

6    see any relevance to the analysis that I

7    performed in this matter.

8         Q.    You would agree with me, wouldn't you,

9    that based on the discovery record in this

10   litigation, discovery that you have reviewed,

11   that CMS doesn't always set the FUL on the basis

12   of the lowest published available price, right?

13        A.    As I believe I said before, that I

14   thought there were instances where they did not,

15   I think I was aware of that.

16        Q.    Do you know of the approximately thirty

17   changes that CMS made to the FUL for the nine

18   drugs that are the subject of your Rule 26

19   report, what percentage of the time CMS chose not

20   to use the lowest published price available?

21        A.    No.

22        Q.    That's not something that you have

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                              December 9, 2008
                       New York, NY

                                                    Page 63

1    examined in connection with your work in this

2    case?

3         A.   No.   No.   I mean, I don't believe that

4    I computed FULs based on the lowest price either.

5    I computed FULs based on my estimate of what WAC

6    might have been, what WAC was.   I computed FULs

7    based on my estimate of what the AWP was without

8    regard to which one was lower.   Just I did them

9    both, as well as AMPs.   I wasn't searching for

10   the lowest one, I computed FULs for various of

11   them, for different reported prices.

12        MR. BUEKER:   We have five minutes left

13   on the tape.   Let me change the tape now.   I am

14   going to hand out a copy of the report and the

15   exhibits but they are thick, it may take a minute

16   or two to do that.   Let's go off the record,

17   we'll mark those exhibits and let the court

18   reporter change the tape.

19        THE VIDEOGRAPHER:   This ends tape

20   number one, 10:18.

21        (Recess)

22        (Exhibit Devor 002, Rule 26

Devor, Harris L. - Vol. II                December 10, 2008
                  New York, NY

Page 343

                UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE          )  Civil Action

LITIGATION                       )  01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        )  Judge Patti B.

THE CONSOLIDATED NEW YORK        )  Saris

COUNTY ACTIONS                   )  (Case Pending

-------------------------------X   in D. Mass.)


                    December 10, 2008

                       9:10 a.m.


           Continued videotaped deposition of

HARRIS L. DEVOR, Vol. II, taken by Defendants,

at the offices of Ropes & Gray LLP, 1251 Avenue

of the Americas, New York, New York, before

Brandon Rainoff, a Federal Certified Realtime

Reporter and Notary Public of the State of New

York.

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                    December 10, 2008
                          New York, NY

Page 456

1    yield a number in excess of $150, right?

2          A.    In your hypothetical, yes, that's

3    correct.

4          Q.    Well, it's not a hypothetical, that's

5    just applying the FUL formula?

6          A.    You started with "if" so it was

7    hypothetical.

8          Q.    Calculating the FUL on the basis of the

9    Mylan $102.60 would yield a number that is higher

10   than the FUL that existed in that quarter?

11         A.    That's a correct statement.

12         Q.    And does your data that's reflected on

13   this chart also indicate to you that for whatever

14   reason, CMS decided not to change the FUL at all

15   for this Mylan drug?

16              MS. CICALA:   Objection to form.

17         A.    I need that question back.

18              (Question read)

19         A.    I think I would need further

20   explanation before I could answer that.

21         Q.    Well, the published FUL is $91.50 and

22   that remains the published FUL in your analysis

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 457

1    for the entire period all the way through October

2    1 -- all the way to December 31, 2005, right?

3         A.   That's correct.

4         Q.   Since there is no change in that

5    number.  Does that indicate to you, particularly

6    given that Mylan's published WAC went down to

7    $57.15, does that indicate to you that somehow

8    CMS decided not to publish an FUL for this Mylan

9    drug lower than the $91.50?

10             MS. CICALA:  Object to form.

11        A.   Well, that, of course, is given the

12   fact that what was reported was $57.15.  However,

13   if what was reported for -- by Mylan was $3.91,

14   there would be an entirely different array of

15   numbers to be used by CMS in setting the FUL.

16             So I can't speculate on what CMS would

17   have done had the real numbers or a good faith

18   estimate of WAC been given, but they would have

19   had a whole different array of numbers to look

20   at.

21        Q.   Well, you can't -- based just on what

22   you have on your chart, there came a point in

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 458

1    time where the Mylan WAC for this particular

2    drug, enalapril maleate, was $57.15, right?

3          A.    There came a time where Mylan reported

4    57.15, is that the question?

5          Q.    Yes.

6          A.    Yes.

7          Q.    And that's listed on your exhibit as

8    the published WAC, right?

9          A.    That is correct.

10         Q.    For the Mylan drug, right?

11         A.    That's correct.

12         Q.    So there was a Mylan published price of

13   $57.15, a published WAC of $57.15, right?

14         A.    That's correct.

15         Q.    Now, if you apply the FUL formula to

16   $57.15, what is the number that that would yield?

17         A.    Roughly --

18         Q.    Why don't you calculate it?

19         A.    I don't need that.

20         Q.    Just give us the exact number.

21         A.    It would be somewhere --

22         Q.    I want the exact number.

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 459

1          A.    Do you really?

2          Q.    Yes.

3          A.    Okay.  I am fairly slow.  Can we stay

4     on the record?

5          Q.    Sure.

6          A.    Thanks.

7          Q.    If we have a calculator I'll give you

8     one, that will make it easier.  Here.

9          A.    $85.72 and a half cents.

10          Q.    I'm sorry, give me that again?

11          A.    $85.72 and a half cents.

12          Q.    Okay.  So, now, at a time when the

13    Mylan published WAC of $57.15 existed and the

14    published FUL remained at $91.50, even though it

15    could have been $85.725 if the Mylan WAC was used

16    to calculate the FUL, right?

17          MS. CICALA:  Objection to form, beyond

18    the scope.

19          A.    Given the fact that Mylan reported a

20    $57.15 WAC as opposed to $3.91, yes.  If they

21    have reported $57.15, I presume CMS could have

22    adjusted its WAC using -- I'm sorry, adjusted its

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 460

1    FUL based on that number.  And if $3.91 was

2    reported, CMS might have made an entirely

3    different decision.

4         Q.   Right.  But what we do know from the

5    data that's included in your report is that even

6    though it could have had a lower FUL, for

7    whatever reason CMS decided to keep the FUL for

8    this Mylan drug at $91.50, right?

9              MS. CICALA:  Object to form.

10        A.   Given the reporting of 57.15, not the

11   reporting of $3.91.

12        Q.   Right.

13        A.   $3.91, I can't speculate what CMS would

14   do.  I would presume, though, they wouldn't keep

15   -- they would not keep a FUL at 91.50 if the drug

16   was being sold for three dollars.

17        Q.   And what would be the FUL on the $3.91?

18   That's the one that appears in the column around

19   2004.  That would be $5.86, right?

20        A.   Right, I have already done it.  That's

21   correct.

22        Q.   The tape has come to an end so we'll

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II          December 10, 2008
                    New York, NY

Page 461

1   need to take a break.

2           THE VIDEOGRAPHER:  11:22, we are off

3   the record.

4               (Recess)

5           THE VIDEOGRAPHER:  11:40.  Back on the

6   record.

7   BY MR. ESCOBAR:

8       Q.   Mr. Devor, if you could to the same

9   Exhibit 3 we are looking at and find page Exhibit

10  No. 6.05?

11      A.   Okay.

12      Q.   This is a section of your report that

13  deals with the Dey drug No. 49502069703 albuterol

14  .83 mg/ml solution, correct?

15      A.   Yes.

16      Q.   Again, on this sheet in your analysis

17  there comes a point in time when in your analysis

18  towards the bottom in the quarter beginning

19  January 1, 2005 there is a negative number

20  yielded by your calculation, right?

21      A.   That's correct.

22      Q.   And the estimated WAC that you

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                    December 10, 2008
                        New York, NY

Page 467

1    alternative method which could have also been

2    reasonable.

3         Q.   So one possible method was the method

4    you used in this case in your opinion, right?

5         A.   One method would have been the one I

6    used.

7         Q.   And using your method, it's your belief

8    that Barr could have calculated the estimated

9    WACs and estimated AWPs that you calculated,

10   right?

11        MS. CICALA:  Objection, asked and

12   answered.

13        A.   Using -- yes, the assumption is that

14   Barr had within its house the ability to compute

15   an estimated WAC or AWP and furthermore it could

16   have been computed the way I did or some

17   alternative that would have also given an

18   estimated WAC and AWP in good faith.

19        Q.   Now, based on the Devor-estimated WACs

20   and Devor-estimated AWPs that you calculated for

21   Barr's NDCs, you also computed what you believed

22   the new federal upper limit price would have been

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 468

1    based on those estimates, right?

2         A.   It's not exactly what I did but -- what

3    I did was compute an FUL assuming that it was

4    used -- assuming that the Barr -- the Devor-

5    estimated WAC or estimated AWP was used to

6    compute the FUL, that's what I did.

7         Q.   So you computed what you believed the

8    new FUL would have been if the Devor-estimated

9    WACs and Devor-estimated AWPs were used to

10   compute the FUL?

11        MS. CICALA:  Object to form and

12   characterization of testimony.

13        A.   Again, I'm just struggling a little bit

14   with the "would have been."  What I did was

15   compute it assuming that those prices, the

16   estimated WACs and AWPs that I computed, were

17   used to compute the FUL at 150 percent of those

18   prices.

19        Q.   What's the struggle with "would have

20   been"?

21        A.   I may be incorrect, but I thought there

22   was something in the way you asked the question

Devor, Harris L. - Vol. II                December 10, 2008
                       New York, NY

Page 469

1    that insinuated that the FUL would have been

2    that, period.  And I don't want to go to where --

3    what CMS would have done with it.  They may have

4    chosen not to use it.

5         Q.   Because you just simply don't know what

6    they would have done with it, right?

7              MS. CICALA:  Object to form.

8         A.   I didn't study what CMS would have done

9    with it or not.  I mean, I understand what -- the

10   way FULs are calculated, what CMS would have done

11   in a hypothetical sense, given the fact that Barr

12   in this case would have reported the Devor WACs

13   or the Devor AWPs, I would only be speculating

14   what CMS would do with it.

15        Q.   You would just be speculating, right?

16        A.   Anybody would be speculating what CMS

17   would do with it other than CMS.

18        Q.   So we should turn to CMS to know what

19   they would have done with those numbers?

20             MS. CICALA:  Objection to form and

21   characterization.

22        A.   You know, are you asking me

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 470

1    strategically how the litigation should go?

2    That's not my call.  I just compute numbers.

3         Q.   I'm just following up on your answer,

4    actually.

5         A.   Yes.

6         Q.   Not asking you strategically how the

7    litigation should go, okay?

8         A.   Is that okay?  Yes.  Is that the

9    question?  That's fine.  That's fine with me.

10        Q.   So to determine what CMS would have

11   calculated as the FUL, we should turn to CMS,

12   right?

13             MS. CICALA:  Objection, beyond the

14   scope.

15        A.   In my humble opinion that would

16   probably be the most appropriate place to go.

17   There may be other people who are more

18   appropriate to go to, but what CMS absolutely

19   would have done is not -- I'm not the person to

20   go to to figure that out.

21        Q.   Now, you also calculated an estimated

22   FUL based on Barr's AMPs for each of the two Barr

Devor, Harris L. - Vol. II          December 10, 2008
                         New York, NY

Page 515

1        Q.   And your analysis didn't consider that
2    issue, right?
3        A.   My analysis considered the data that
4    was given to us.  That's all it considered.  And
5    it computed the numbers based on a formula.
6        Q.   Are you aware that Barr stopped selling
7    the product with NDC 58210 in the third quarter
8    of 2003?
9            MS. CICALA:  Objection, beyond the
10   scope.
11       A.   Again, I have no direct knowledge of
12   that.
13       Q.   Your analysis does not consider how
14   Barr could have impacted the FUL after Barr
15   discontinued those products, correct?
16           MS. CICALA:  Object to form.
17       A.   I don't understand that question.
18       Q.   What do you not understand?
19       A.   I don't understand the question.
20       Q.   What part of the question do you not
21   understand?
22       A.   From the beginning to the end of the

Henderson Legal Services, Inc.

202-220-4158          www.hendersonlegalservices.com

Devor, Harris L. - Vol. II            December 10, 2008
                    New York, NY

Page 516

1    question.

2         Q.    Your analysis -- strike that.

3              Your calculations do not consider how

4    Barr could have impacted the FUL set by CMS after

5    Barr discontinued these products?

6              MS. CICALA:  Object to form.

7         A.    I still don't understand the question.

8         Q.    Does your analysis consider how Barr's

9    products, 58202 and 58210, could have impacted

10   the FUL set by CMS after Barr discontinued those

11   products?

12             MS. CICALA:  Objection, beyond the

13   scope.

14        A.    My analysis was to determine based on

15   the data given an average WAC and an -- an

16   estimated average WAC and an estimated average

17   AWP for a 12-month period prior to that date

18   which then could have been reported.  It does not

19   at all assume that that -- that that would have

20   impacted the ultimate FUL used or not, that's

21   beyond the scope of what I was asked.

22             What it does indicate to me, not only

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                           New York, NY

Page 517

1    with respect to Barr but all the defendants, that

2    had those numbers been reported, the array of

3    numbers before CMS in -- that it would have had

4    before them in determining what the FUL was would

5    have been a much different array of numbers than

6    it actually had, at least with respect to these

7    defendants.

8        Q.   And your answer didn't consider what

9    that array of numbers would have looked like

10   after Barr discontinued these NDCs, correct?

11           MS. CICALA:  Object to form.

12       A.   It considered exactly what, based on

13   the data, could have been reported given the way

14   I performed those calculations.  That is what I

15   considered.

16       Q.   Mark this as Exhibit 19.

17           (Exhibit Devor 019, Letter dated

18   September 11, 2008 to Jocelyn Normand from

19   Jennifer Atkins, marked for identification)

20   BY MR. BROWN:

21       Q.   Mr. Devor, the court reporter has

22   handed you what's been marked as Exhibit 19.

Devor, Harris L. - Vol. III                December 11, 2008
New York, NY

Page 643

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Judge Patti B.

THE CONSOLIDATED NEW YORK        ) Saris

COUNTY ACTIONS                   ) (Case Pending

-------------------------------X   in D. Mass.)


            December 11, 2008

                9:05 a.m.


        Continued videotaped deposition of

HARRIS L. DEVOR, Vol. III, taken by Defendants,

at the offices of Ropes & Gray LLP, 1251 Avenue

of the Americas, New York, New York, before

Brandon Rainoff, a Federal Certified Realtime

Reporter and Notary Public of the State of New

York.

Devor, Harris L. - Vol. III            December 11, 2008
                    New York, NY

Page 740

1      that we were provided and performing a

2      computation estimating WAC and AWP.  It is not at

3      all -- does not at all impact that computation.

4           Q.   Looking at Exhibit -- with that

5      understanding -- 10.01, can you put away Devor 27

6      and go back to your Exhibit 10.01 to your report.

7                This chart shows no published WAC for

8      any period, is that correct?

9           A.   That is correct.

10          Q.   Is that consistent or inconsistent with

11     your assertion in paragraph 76 of your report

12     that "Par did not report WAC to the pricing

13     compendia because Par knew that its WACs would

14     nevertheless appear in the pricing compendia"?

15               MS. CICALA:  Objection to form.

16          A.   It is not necessarily inconsistent in

17     that that first sentence that you just read is

18     not necessarily relative to all the NDCs that are

19     discussed in this.

20          Q.   Well, for this product, Par's WAC could

21     not possibly have influenced, in fact, the

22     federal upper limit no matter what those WACs

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III                December 11, 2008
                        New York, NY

Page 741

1    were, isn't that right?

2            MS. CICALA:  Objection, beyond the

3    scope.

4        A.    Assuming if -- I need that question

5    back again.

6        Q.    Well, for this product, Par's WAC could

7    not possibly have influenced the federal upper

8    limit no matter what those WACs were, isn't that

9    right?

10       A.    Well, but, again, I have testified

11   before, it is not within my knowledge range as to

12   whether or not you know how CMS computed and how

13   they should have computed a FUL.  To the extent -

14   - so, I mean, that's my answer.

15           It's beyond the scope of what I was

16   asked to do.  It does not impact -- none of what

17   you have asked me impacts my computation which is

18   really the scope of my assignment.

19       Q.    With respect to your computation, your

20   chart shows an estimated WAC, correct?

21       A.    It does.

22       Q.    Even though your chart also shows no

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III            December 11, 2008
                        New York, NY

---

                                                    Page 742

1    published WAC ever for this product, right?

2         A.    That's what the chart shows, that's

3    correct.

4         Q.    Now, in doing your computations, that

5    is inconsistent with how you handled similar

6    situations for Ethex, correct?

7              MS. CICALA:  Objection to form.

8         A.    On the surface it would appear to be,

9    but I don't see how it impacts anything.  The

10   fact that we have computed a WAC or didn't

11   compute an estimated WAC is how -- I fail to see

12   the relevance of that.  How is that important? I

13   mean --

14        Q.    Are you saying that your estimated WACs

15   are irrelevant?

16        A.    No.

17             MS. CICALA:  Objection to form.

18        A.    That's not what I said.  What I said

19   was we did compute an estimated -- no, it's

20   really not relevant to me, is whether or not a

21   WAC was published.

22        Q.    And in this product there was no

---

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III                December 11, 2008
                          New York, NY

Page 879

1        A.    It is.

2        Q.    If you look to the far right-hand

3   column, your difference between published FUL and

4   FUL based on estimated AWP, there is a series of

5   negative numbers, do you see that?

6        A.    I do.

7        Q.    Would you agree with me based on your

8   negative calculations in that column that Ivax's

9   AWP for this product could not affect the FUL

10  calculation?

11            MS. CICALA:   Objection, form, beyond

12  the scope.

13       A.    Well, first of all, by the way, one of

14  them is positive, so I don't know if you said all

15  of them but --

16       Q.    Positive 16 cents, is that right?

17       A.    One of them is.

18       Q.    Other than the 16 cent positive number

19  that is in the column on Exhibit 8.56, the right-

20  hand column in 8.56, is it correct or would you

21  agree with me that Ivax's estimated AWP could not

22  have affected the FUL for those periods listed?

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III                December 11, 2008
                          New York, NY

Page 880

1          MS. CICALA:  Same objection.

2      A.    Again, the --

3      Q.    Let me ask you this.  Let me strike

4   that that question and ask you a different

5   question.

6          Based on your estimated AWP, you would

7   estimate an FUL that was higher than the actual

8   FUL set by CMS, is that correct?

9      A.    By computing a FUL at 150 percent of my

10  computed AWP, it appears as though it results in

11  a FUL that is less -- that is greater than, with

12  the exception of the one item, than the FUL that

13  was published.  That was your question.

14     Q.    And on that basis, because your

15  calculation was greater than the actual FUL,

16  would you agree with me that for the periods in

17  which you calculated a negative difference

18  between the actual FUL and your estimated FUL,

19  that Ivax's estimated AWP could not have impacted

20  the FUL?

21     A.    And as I have said before, that was

22  beyond the scope of what I was asked to do.  And

Devor, Harris L. - Vol. III                December 11, 2008
                         New York, NY

```
                                                Page 881
 1    I am not opining on how CMS actually computed its
 2    FUL or used the array of information.
 3         Q.   Let's turn to Exhibit 15 to Deposition
 4    Exhibit 3.  We are still in your tables, I'm just
 5    asking you to move to exhibits beginning with
 6    15.01.
 7         A.   Okay.
 8         Q.   Let's turn to Exhibit 15.04.
 9         A.   You don't want to talk about 15.01?
10         Q.   Sure.  Let's talk about 15.01.  That's
11    your WAC calculation for Teva's enalapril maleate
12    ending in 2901, is that correct?
13         A.   That is correct.
14         Q.   If you look at your estimated WAC
15    calculation from July 1st, 2000, through
16    6/30/2001, see that?
17         A.   I'm sorry, I need the dates back again.
18         Q.   July 2000 through June 30, 2001.
19         A.   Okay, I'm there.
20         Q.   You see that through that period your
21    estimated WAC range is from $31.95 to a high of
22    $88.75, correct?
```

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III                December 11, 2008
                        New York, NY

Page 882

1          A.    That's correct.

2          Q.    You turn to the next page, 15.02,

3     that's your estimated AWP, correct, for the same

4     product?

5          A.    That's correct.

6          Q.    If you look at that same time period,

7     your estimated AWP range is from $5.30 to $10.70?

8          A.    That's correct.

9          Q.    And sitting here today you are

10    satisfied with your conclusions and calculations,

11    and you don't have any changes with respect to

12    your estimated AWP and your estimated WAC, is

13    that fair?

14         A.    Well, again, I mean, if anything -- if

15    the WACs are as high as they are in comparison to

16    AWPs, it might cause me to think that perhaps

17    some data in the form of a credit rebate or

18    charge-back is somehow not reflected in the data

19    and the computation, which again, would make the

20    estimated WAC even lower than that presented here

21    and would cause a larger difference.

22         Q.    A charge-back or credit was not

ff169131-a0d0-442d-a72d-fc0418fc0c74