# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
|  | Civil Action No. 01-12257-PBS |

THIS DOCUMENT RELATES TO:
*The City of New York v. Abbott Laboratories, Inc., et al.*
S.D.N.Y. Case No. 04-CV-06054
*County of Albany v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0425
*County of Allegany v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-0236
*County of Broome v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0456
*County of Cattaraugus v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-0256
*County of Cayuga v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0423
*County of Chautauqua v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-0214
*County of Chemung v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-6744
*County of Chenango v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0354
*County of Columbia v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0867
*County of Cortland v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0881
*County of Dutchess v. Abbott Laboratories,*

*Inc., et al.*                                      )
S.D.N.Y. Case No. 05-CV-6458                        )
*County of Essex v. Abbott Laboratories,*           )
*Inc., et al.*                                      )
N.D.N.Y. Case No. 05-CV-0878                        )
*County of Fulton v. Abbott Laboratories,*          )
*Inc., et al.*                                      )
N.D.N.Y. Case No. 05-CV-0519                        )
*County of Genesee v. Abbott Laboratories,*         )
*Inc., et al.*                                      )
W.D.N.Y. Case No. 05-CV-00267                       )
*County of Greene v. Abbott Laboratories,*          )
*Inc., et al.*                                      )
N.D.N.Y. Case No. 05-CV-0474                        )
*County of Herkimer v. Abbott*                      )
*Laboratories, Inc., et al.*                        )
N.D.N.Y. Case No. 05-CV-00415                       )
*County of Jefferson v. Abbott Laboratories,*       )
*Inc., et al.*                                      )
N.D.N.Y. Case No. 05-CV-0715                        )
*County of Lewis v. Abbott Laboratories,*           )
*Inc., et al.*                                      )
N.D.N.Y. Case No. 05-CV-0839                        )
*County of Madison v. Abbott Laboratories,*         )
*Inc., et al.*                                      )
N.D.N.Y. Case No. 05-CV-00714                       )
*County of Monroe v. Abbott Laboratories,*          )
*Inc., et al.*                                      )
W.D.N.Y. Case No. 05-CV-6148                        )
*County of Nassau v. Abbott Laboratories,*          )
*Inc., et al.*                                      )
E.D.N.Y. Case No. 04-CV-05126                       )
*County of Niagara v. Abbott Laboratories,*         )
*Inc., et al.*                                      )
W.D.N.Y. Case No. 05-CV-06296                       )
*County of Oneida v. Abbott Laboratories,*          )
*Inc., et al.*                                      )
N.D.N.Y. Case No. 05-CV-0489                        )
*County of Onondaga v. Abbott*                      )
*Laboratories, Inc., et al.*                        )
N.D.N.Y. Case No. 05-CV-0088                        )
*County of Ontario v. Abbott Laboratories,*         )
*Inc., et al.*                                      )
W.D.N.Y. Case No. 05-CV-6373                        )
*County of Orange v. Abbott Laboratories,*          )
*Inc., et al.*                                      )

S.D.N.Y. Case No. 07-CV-2777 )
*County of Orleans v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6371 )
*County of Putnam v. Abbott Laboratories,* )
*Inc., et al.* )
S.D.N.Y. Case No. 05-CV-04740 )
*County of Rensselaer v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-00422 )
*County of Rockland v. Abbott* )
*Laboratories, Inc., et al.* )
S.D.N.Y. Case No. 03-CV-7055 )
*County of Schuyler v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6387 )
*County of Seneca v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6370 )
*County of St. Lawrence v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0479 )
*County of Saratoga v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0478 )
*County of Steuben v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6223 )
*County of Suffolk v. Abbott Laboratories,* )
*Inc., et al.* )
E.D.N.Y. Case No. 03-CV-12257 )
*County of Tompkins v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0397 )
*County of Ulster v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 06-CV-0123 )
*County of Warren v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0468 )
*County of Washington v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0408 )
*County of Wayne v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-06138 )

| | |
|---|---|
| *County of Westchester v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| S.D.N.Y. Case No. 03-CV-6178 | ) |
| *County of Wyoming v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-6379 | ) |
| *County of Yates v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-06172 | ) |
| | ) |
| | ) |

# Affidavit of Dr. Sumanth Addanki

**May 15, 2009**

# I. Introduction

## A.    Qualifications and Assignment

1.  I am an economist and a Senior Vice President at NERA Economic Consulting (NERA). I hold a Ph.D. degree in economics from Harvard University and have specialized in the study of industrial organization.  My qualifications are summarized in Exhibit 1 and were set out more fully in the Report that I rendered in this matter in March of this year.[1]

2.  Counsel for the defendants in this matter asked me to:  (1) investigate how the Centers for Medicare and Medicaid Services ("CMS") and its predecessors appear to have set Federal Upper Limits ("FULs") and (2) comment on the economic implications of the plaintiffs' theory of manipulation of FULs.[2]

## B.    Information Relied Upon

3.  This Affidavit is based on my professional training and experience, including my experience working in other cases involving allegations of Average Wholesale Price ("AWP") and Wholesale Acquisition Cost ("WAC") manipulation.  My staff at NERA and I have reviewed various materials, including data from pricing compendia, public documents and court filings.  A list of the materials relied upon in preparing this Affidavit is attached as Exhibit 2.

4.  I reserve the right to supplement or revise my conclusions if additional information is provided to me or if additional research, reflection or the correction of inadvertent errors leads me to change my current opinions.

---

[1]   See Expert Report of Dr. Sumanth Addanki, In re:  Pharmaceutical Industry Average Wholesale Price Litigation relating to The City of New York et al. v. Abbott Laboratories, Inc., et al., March 18, 2009 ("Addanki Report").

[2]   Rule 26 Statement of Harris L. Devor, In re:  Pharmaceutical Industry Average Wholesale Price Litigation relating to The City of New York et al. v. Abbott Laboratories, Inc., et al., September 30, 2008, as amended ("Devor Statement").  New York Counties v. Abbott Laboratories, Inc., et al., Revised First Amended Consolidated Complaint, October 5, 2007, and Exhibit B.

## C.     Summary of Conclusions

5.    In essence, the plaintiffs' theory of FUL manipulation—and Mr. Devor's calculations of the impact of such alleged manipulation as set out in his report—can be summarized thus:  had the defendants published lower WACs and AWPs (at the levels calculated and prescribed by Mr. Devor), these would have resulted in lower FULs (equal to 150 percent of the lower prices) and would, ultimately, have resulted in lower amounts being reimbursed to New York pharmacies under the state's Medicaid program.

6.    The foregoing theory makes no economic sense for at least the following reasons:  the information available to the agency setting FULs—CMS and its predecessors—was not limited to published prices but included, among other things, Average Manufacturer Prices ("AMPs"); the agency did not mechanically choose the lowest published price as the basis for the FUL; rather, in exercising its discretion, the agency generally did ***not*** select the lowest published price, passing over several existing prices that were lower than the one that it actually selected as the basis for the FUL.  Indeed, many of these lower prices were for the very NDCs that are accused in this case and which Mr. Devor has included in the exhibits to his report. Thus, the hypothesis that the FULs would have been different in the manner suggested by Mr. Devor is pure speculation and is, in fact, contradicted by the available facts.

7.    Moreover, while Mr. Devor purports to calculate alternative measures of "WAC" and "AWP," his calculations are neither consistent nor transparent, nor reliable. I have commented on these calculations in more detail in my Report in this matter, so I will not cover them in this Affidavit.

## II.   The Plaintiffs' Theories of Causation and Harm Are Speculative and Inconsistent with Market Facts

### A.  Wide Discretion Was Used in Setting the Actual FULs

8.   According to the published regulation, the manner in which FULs are theoretically supposed to be set appears simple enough:  when three or more therapeutically equivalent alternatives are available, the FUL is supposed to be based on the lowest price published for a package size of 100 (or the most common package size) of any of those alternatives, being calculated as 150 percent of that price.[3]  In practice, however, that simple rule is not followed.  Rather, my analysis of the nine GCNs at issue clearly shows that CMS (and its predecessors) exercised considerable discretion in setting FULs (and, indeed, in deciding whether or not to issue a FUL at all).   In fact, for 25 out of the 31 FULs that were in effect for these GCNs during the period, the simple rule does not produce the FUL that was set.  Thus, the FULs are almost impossible to predict and certainly impossible for a manufacturer to manipulate in any meaningful way.

---

[3]  42 CFR § 447.332 ("§ 447.332 Upper limits for multiple source drugs. [note omitted] (a) Establishment and issuance of a listing.  (1) CMS will establish listings that identify and set upper limits for multiple source drugs that meet the following requirements:  (i) All of the formulations of the drug approved by the Food and Drug Administration (FDA) have been evaluated as therapeutically equivalent in the most current edition of their publication, Approved Drug Products with Therapeutic Equivalence Evaluations (including supplements or in successor publications).  (ii) At least three suppliers list the drug (which has been classified by the FDA as category "A" in its publication, Approved Drug Products with Therapeutic Equivalence Evaluations, including supplements or in successor publications) based on all listings contained in current editions (or updates) of published compendia of cost information for drugs available for sale nationally.  (2) CMS publishes the list of multiple source drugs for which upper limits have been established and any revisions to the list in Medicaid program instructions.  (3) CMS will identify the sources used in compiling these lists.  (b) Specific upper limits. The agency's payments for multiple source drugs identified and listed in accordance with paragraph (a) of this section must not exceed, in the aggregate, payment levels determined by applying for each drug entity a reasonable dispensing fee established by the agency plus an amount established by CMS that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size.").

9. I have examined the FULs and compendia prices for all of the NDCs in the nine GCNs at issue in this matter:  two albuterol GCNs, a cefadroxil, a clonazepam, an enalapril, an isosorbide mononitrate, a lorazepam, a metoprolol and a ranitidine.  The number of NDCs associated with each of these GCNs varied from 37 to 371.  I reviewed the FULs that were in effect at any point during the period from 1997 to 2005 for each of the GCNs.  The GCNs and their corresponding FULs are presented in Exhibit 3.

## B.  FULs Are not 150 Percent of the Lowest Published Price

10. In Exhibit 3, I first attempt to apply the simple rule described above, to evaluate the extent to which a knowledgeable observer, familiar with the rule and with the prices available in the compendia, could have predicted *ex ante* the FULs that would be issued. The exercise involved was as follows: identify all of the NDCs in each GCN that were A-rated equivalents for the package size specified by CMS in its transmittals; for each FUL, further limit this set to those NDCs that were available (i.e., not declared to be obsolete/inactive/discontinued/terminated in the compendia) during the month identified by CMS in its letters of transmittal;[4] for each NDC that survived this filter, identify from the major compendia—First DataBank ("FDB"), Red Book and Medispan—all of its published prices (AWPs, WACs, and Direct Prices ("DPs")) that were in effect at the time and multiply them by 150 percent; finally, evaluate whether the FUL that was actually set, in fact, matched the lowest of these calculated numbers across the NDCs in the GCN.

---

[4] There are 9 FULs for which the CMS transmittals do not provide the month during which the prices used to set the FUL were current.  For these FULs, we searched for matching prices that were in effect on any day up to 11 months prior to the effective date of the FUL.  (For the transmittals that did provide the "current month", the longest gap between the current month and the effective date was about 11 months.)  The search for lower prices, however, was limited to those that were continuously in effect for the 3-month period prior to the effective date of the FUL.

11. As Exhibit 3 makes abundantly clear, overwhelmingly, the FULs were **not set** based on any such simple rule:  the FUL does not equal 150 percent of the lowest valid published price among the A-rated alternatives of the right package size.  For 23 out of 31 of the FULs in effect for the nine GCNs, there were lower published prices upon which the FUL could have been set that were ignored.[5]

12. Moreover, for all but two of the FULs at issue here, during the period in which the FUL was in effect, at least one price was published that was lower than the price upon which the FUL was based but that did not result in a lower FUL.[6]  Thus, for all nine GCNs, FULs based on existing published prices could have been lower but were not.  See Exhibit 4.  In fact, for all but six of the 31 FULs, during the period in which the FUL was in effect, there was **always** a published price upon which a lower FUL could have been set.

---

[5]  Of the 8 FULs for which a lower price could not be found, six are those for which the simple rule appears to predict the FUL.  The other two are FULs which do not appear to have been set following the simple rule, but nonetheless result in FULs so low that no published price would have made them lower.  One is a cefadroxil FUL for January 1, 1997 to August 31, 1998, whose matching price is out of date.  The other is a clonazepam FUL for which we never find an apparent price basis (there are four such FULs in total).

[6]  One of these FULs, set for cefadroxil in 1997, used a price that was apparently out of date when it appears to have been relied upon.  The other FUL was set for the albuterol inhaler in 2005, long after there was widespread public knowledge about albuterol's pricing.  Studies focused on or including information about albuterol, include:  (1) Department of Health and Human Services, Office of Inspector General, *Suppliers' Acquisition Costs For Albuterol Sulfate* (June 1996), (OEI-03-94-00393); (2) Department of Health and Human Services, Office of Inspector General, *A Comparison of Albuterol Sulfate Prices* (June 1996), (OEI-03-94-00392); (3) Department of Health and Human Services, Office of Inspector General, *Excessive Medicare Payments for Prescription Drugs* (December 1997), (OEI-03-97-00290); (4) Department of Health and Human Services, Office of Inspector General, *Are Medicare Allowances for Albuterol Sulfate Reasonable?* (August 1998), (OEI-03-97-00292); (5) Department of Health and Human Services, Office of Inspector General, *Medicare Reimbursement of Albuterol* (June 2000), (OEI-03-00-00311); (6) Department of Health and Human Services, Office of Inspector General, *Medicare Reimbursement of Prescription Drugs* (January 2001), (OEI-03-00-00310); (7) General Accounting Office, *Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost* (Report to Congressional Committees, September 2001), (GAO-01-1118); (8) Department of Health and Human Services, Office of Inspector General, *Excessive Medicare Reimbursement for Albuterol* (March 2002), (OEI-03-01-00410); and (9) Department of Health and Human Services, Office of Inspector General, *Update: Excessive Medicare Reimbursement For Albuterol* (January 2004), (OEI-03-03-00510).

13. This leads to the next obvious question: what published price was, in fact, chosen as the basis for the FUL? Answering this question could help reveal whether the agency departed from the letter of the regulation in some predictable manner. Unfortunately, because the agency does not indicate, in its transmittals, which NDC's published price was the basis for the FUL being issued, we need to try to match the FUL by hand.

14. Exhibit 5 shows the result of this matching exercise.  As noted above, only six of the 31 FULs can be explained using the simple rule in the regulation.  Finding the basis for the FUL in the other cases can only be done by ignoring the published requirements for a match, such as permitting prices which were not the lowest, or considering products with incorrect therapeutic equivalence ratings, or using prices that were out of date at the time that the FUL appears to have been set.  Through this process, I was able to identify the price on which the FUL was set in all but four cases; however, there is no systematic pattern to the various departures from the published regulation, revealing that substantial discretion was being exercised in the process, on a case-by-case basis.

15. The fact that CMS did not follow any simple rule, or, indeed, any discernible pattern, in setting FULs but, rather, exercised its discretion on a case-by-case basis, almost always ignoring lower published prices, flatly contradicts the hypothesis that lower published prices would have led to lower FULs.

## C.   Mr. Devor's Own Exhibits Demonstrate CMS's Exercise of Discretion

16. As I noted in my Report, for the nine GCNs at issue in this case, for which the 31 FULs were set over the relevant period, there were over 1,400 NDCs with valid published

prices for at least some portion of the period. According to Mr. Devor, he has only

analyzed 187 of them, and he has only provided Exhibits for 164 in his report.[7]

17. Examination of even just these 164 NDCs is enough to demonstrate that CMS frequently

passed over lower published prices in setting FULs.  Indeed, for about 46 percent of the

NDC-quarter combinations for which *Mr. Devor's own exhibits* report a published

WAC and FUL, the *published* WAC was already low enough to have produced a lower

FUL, had CMS used it.  Approximately two-thirds of the NDCs reported on by Mr.

Devor, where such a comparison is possible, exhibit this for at least one quarter.[8]   See

Exhibit 6.

### D.  CMS Testimony Confirms the Substantial Exercise of Discretion

18. These empirical results are consistent with testimony from CMS employees, who affirm

that there was a significant discretionary element to the CMS process of setting the

FULs.[9]   Indeed, Ms. Gaston, who was in charge of setting the FUL from April 1991 to

---

[7]   Addanki Report, footnote 38, p. 23.

[8]   There are even some instances where the published AWP in Mr. Devor's exhibits is low enough to have produced a lower FUL.  See Exhibit 6, notes.

[9]   See, e.g., Deposition of Sue Gaston, March 19, 2008 ("Gaston Deposition, Vol. 2"), p. 320 ("Q.  … In the period from 1991 to, say, 1997, did you have discretion on whether or not to set a federal upper limit on drugs? MS. MARTINEZ:  Objection, form. A.   Yes."), pp. 428-429 ("Q.  So you have a manufacturer, anyway, who's got available product at a lower published price, but it wasn't used for the FUL, correct? A.   Correct.  Sometimes discretion was used with this too.  You might look at that price and if that price still appears to be too low that it would make the product available out there, then you would check to see if there's another manufacturer that might be a step up that's closer, but that could still allow you to set a reasonable FUL price.  Q.  I see.  So sometimes discretion was used to ensure that the FUL was reasonable? A.   And available. Q.   And available? A.   Yeah. Q.  And the reason you used that discretion was to make sure that providers -- you didn't set a FUL that was so low that providers couldn't acquire the product on the marketplace, correct? A.   Correct. Q.   And so you don't know for certain, but it's possible that one of the reasons that the Caraco price wasn't used here was discretion was exercised and it was deemed maybe that this was too low? A.   It could be too low or Caraco only distribute to maybe limited amount of states and not all states.  That's something else to keep in consideration. Q.   Okay.  But there was in any event a manual review process and discretion exercised and a choice that CMS made not to use that price, correct? A.   Correct."), p. 451 ("Q.  So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct? A.   Correct."), pp. 464-465 ("Q.  I see.  So there wasn't a commonly established -- there wasn't a practice or a policy on how to determine the most commonly available package size; that was something that was left to your

February 2003,[10] testified about using published prices that did not conform to the letter

of the regulation in the following ways:  not using the lowest published price if the

resulting FUL would be too low to ensure access,[11] not using an NDC if it was not

---

discretion? A.   Correct.   Okay.   And just so I get the bounds of the discretion, the overall objective obviously was to find the most commonly available package size and utilization tended to be a pretty good measure of that, right? A.   Correct. Q.   So whether it was looking at some subset of the states or all the states, utilization was generally what CMS looked at? A.   In these types of situations, yes. Q.   Is that written down anywhere to your knowledge? A.   Not that I'm aware of. Q.   So it's not in the regulation or a manual or something that, you know, outsiders would know? A.   No.   We always reference the most commonly used package size. Q.   Right.   But how that most commonly used package size is determined is something that's less to CMS's discretion? A.   Correct. Q.   And there aren't to your knowledge written guidelines about how to exercise that discretion? A.   Correct."), and p. 499 ("Q.   And the manual intervention resulted in CMS making a choice in its discretion, correct? A.   Correct.").  See also, e.g., Deposition of Gail Sexton, May 20, 2008 ("Sexton Deposition"), pp. 60-61 ("Q.   Anything else that you would do before -- any other steps or additional information you would seek before CMS established a FUL? MR. FAUCI:  Objection, form. A.   There were times when we would call or I would call the manufacturers or the suppliers to determine if a drug was available.  If – and some of these drugs were looked at, most of them, on a case-by-case basis because there were times when we would have three or more suppliers but perhaps we were missing a wholesale acquisition cost, for instance."), pp. 66-67 ("Q.   Let me just ask generally, what criteria did you use in trying to determine the most commonly available package size? MR. FAUCI:  Objection, form. A.   If it was not determined that a drug was available in a package size of 100 or it did not appear that the package size of 100 had ample suppliers, which could have meant it was not the most commonly prescribed package size, I would ask a pharmacist, at that time Christie Cahee was a pharmacist who had previously worked in the division of pharmacy.  I believe in the FULs program she had previously worked.  Or we would check the Medicaid drug rebate system for utilization amounts of the NDC.  They were two pretty reliable ways to determine that we were fairly setting a FUL.  Q.   And how did you decide between those two ways which you'd use in a particular case? A.   I think there was really no specific guidelines as far as which one I would use."), and p. 109 ("Q.   So in other words, the criteria were met to establish a FUL, but CMS made a decision not to establish a FUL based on feedback it was receiving from providers and others in the marketplace about whether or not it was available? MR. FAUCI:  Objection, form. A.   Well, I wouldn't -- it was kind of a gray area whether it met the criteria.  I think that was the point, that if a manufacturer or a drug supplier had it in limited supply or it was not available at all, they still marketed the drug but there was no way to be any available for maybe a number of weeks or months.  I think a decision had to be made on whether they could be considered suppliers."). See also the CMS response to an OIG report that attempted to model FULs for drugs without one (Department of Health and Human Services, Office of Inspector General, *Addition of Qualified Drugs to the Medicaid Federal Upper Limit List* (December 2004), (OEI-03-04-00320)).

[10] See, e.g., Deposition of Sue Gaston, January 24, 2008 ("Gaston Deposition, Vol. 1"), p. 40 ("Q.   But your duties and responsibility in this job were the same from April of 1991 through February of '03; is that right?  A.   Correct."), p. 45 ("Q.   I wanted to ask one other thing.  From 1991 to 2003, the previous job, did you work on federal upper limits?  A.   Yes. … Q.   What was the nature of your involvement with the federal upper limit program?  A.   I took care of setting the upper limit reimbursement amount on the drugs."), and Gaston Deposition, Vol. 2, p. 403 ("Q.   But I just want to before we delve into that make sure that we have a common understanding with regard to the chronology here for a second.  As I understand it, from 1991 to 2003 you were one of the individuals at CMS who was responsible for setting the FULs; is that correct?  A.   Correct.").

[11] See, e.g., Gaston Deposition, Vol. 2, pp. 428-429 ("Q.   So you have a manufacturer, anyway, who's got available product at a lower published price, but it wasn't used for the FUL, correct? A.   Correct.   Sometimes discretion was used with this too.   You might look at that price and if that price still appears to be too low that it would make the product available out there, then you would check to see if there's another manufacturer that might be a step up that's closer, but that could still allow you to set a reasonable FUL price. Q.   I see.   So sometimes discretion was used to ensure that the FUL was reasonable? A.   And available. Q.   And available? A.   Yeah. Q.   And the

available in all the states,[12] using NDCs that were not A-rated or were not listed in the

Orange Book,[13] not using an NDC if the resulting FUL was above the AWP postings,[14]

---

reason you used that discretion was to make sure that providers -- you didn't set a FUL that was so low that providers couldn't acquire the product on the marketplace, correct? A.   Correct. Q.   And so you don't know for certain, but it's possible that one of the reasons that the Caraco price wasn't used here was discretion was exercised and it was deemed maybe that this was too low? A.   It could be too low or Caraco only distribute to maybe limited amount of states and not all states.   That's something else to keep in consideration."), pp. 444-445 ("Q. Do you know why CMS chose not to set a FUL on the basis of that lower published price? A.   I could give you my opinion. Q.   Sure. A.   That here again what I think they were trying to do was since there's such a difference between the .07 and then the next price of .16370, that we wanted to make sure that the FUL price that's set is a reasonable price and that we'll be assured the availability of the drug. So we went up to the next lowest price. Q. And when you say reasonable, what do you mean in that context? A.   That we feel that the pharmacies will be able to purchase this drug at the FUL price. Q.   So in other words, you thought it was reasonable to ignore a published price that was maybe too low in CMS's view so that you established a reasonable FUL, correct? A. Correct."), and pp. 451-453 ("Q.   So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct? A.   Correct. … Q. Just for the record, why is it that CMS chose not to use the lowest published price in setting the FUL for lorazepam in 2001? A.   Because we wanted to assure that the FUL price was a reasonable price.  So we chose to ignore Major's lowest price.").

[12] See, e.g., Gaston Deposition, Vol. 2, p. 429 ("Q.   And the reason you used that discretion was to make sure that providers -- you didn't set a FUL that was so low that providers couldn't acquire the product on the marketplace, correct? A.   Correct. Q.   And so you don't know for certain, but it's possible that one of the reasons that the Caraco price wasn't used here was discretion was exercised and it was deemed maybe that this was too low? A.   It could be too low or Caraco only distribute to maybe limited amount of states and not all states.   That's something else to keep in consideration.").

[13] See, e.g., Gaston Deposition, Vol. 2, pp. 517-518 ("Q.   I see.  So even though something might not be A-rated in the Orange Book, if that manufacturer or you said repackager or wholesaler is listed in the compendia, that price can be used to set the FUL? A.   Yes. Q.   Ah. A.   Also, these companies may purchase and very likely they purchase these A-rated drugs. … Q.   Okay.  In any event, it's your testimony that the price in which the FUL was based isn't necessarily the price for one of the manufacturers who's actually listed in the Orange Book? A. Correct.") and p. 525 ("Q.   In your experience, setting a FUL from 1991 to 2003, it's your testimony that the published price for a drug that was B-rated, that published price could still be the basis for the FUL that CMS set? A.   From what I remember, yes.").

[14] See, e.g., Gaston Deposition, Vol. 2, pp. 456-457 ("Q.   And Ms. Bergin's note indicates that in this instance CMS did not set a FUL because the FUL price would have been equal to Major's AWP; is that correct? A.   Correct. Q. Are you familiar with making that kind of a decision not to set a FUL when it was equal to an AWP? A.   Yes. Q. Why would CMS decline to set a FUL when the FUL was equal to an AWP? A.   Because states have other methodologies they can use for reimbursement.   And their regular reimbursement methodology would be a percentage off of AWP.   That would be a reasonable reimbursement rate for other drugs. So the purpose of setting the FUL price is to try to set reasonable reimbursement.   And that would kind of counter what the states were doing with their other reimbursement methodology. … Q.   And so in this case, if I understand what's going on here with cefadroxil in 2001, basing a FUL on the lowest published price seemed to result in a FUL that was too low, right? A.   It appeared that way because of the compendia information that we have. Q.   And setting a FUL - - not using that lowest published price but moving up to the next seemed to result in a FUL that was too high? A. Correct. Q.   And so CMS declined to set a FUL given the published prices that were out there? A.   Correct."), pp. 494-495 ("Q.   And I think you said 'Remove FUL greater than most AWPs.'   And I think that's "SEG" under that; is that right? A.   That's me, right. Q.   And those are your initials? A.   Yes. Q.   In other words, you were concluding that the FUL ought to be removed here, right? A.   That's what it appears."), and pp. 497-498 ("Q.   In other words, there were three manufacturers who were reported published prices for the 90-microgram inhaler? A.

not setting FULs on injectable, infusion and unit-dose drugs,[15] not using an NDC if a call to the manufacturer indicated the product was temporarily unavailable,[16] not using the most common package size,[17] reviewing state MACs to ensure the FUL was "realistic",[18]

---

Correct. Q.   And so in other words the conditions necessary for CMS to establish a FUL were met at this time? MS. MARTINEZ:  Objection, form. A.   The conditions were met, but the pricing condition wasn't met. Q.   What pricing condition was that? A.   It was that if you would take the prices that are remaining and multiply by 150 percent you're going to have a price that's, it looks like, over what the AWPs are.  So you're sort of defeating the purpose of the FUL program.").

[15] See, e.g., Gaston Deposition, Vol. 1, pp. 245-246 ("Q.  … Why are not injectable products included on the FUL? MR. WINGET-HERNANDEZ:  Objection, form. A.   When I started to work on the FULs injectable products were not included.  And it's my understanding that the purpose of the FUL program is to set reimbursement rates on drugs that are generally used by the Medicaid population in an outpatient-type, like a pharmacy-type setting, most commonly used products.  And it's my understanding that injectables and other products many times are provided in a physician's office and other type of settings where they might not be claimed separately. They might be included in a payment, like a physician payment. Also, injectables, many times when they're billed on the claim form they're not -- they're billed with codes rather than NDC numbers, which means that the states may not be paying for them through their pharmacy benefit but through another means, such as a physician's visit or a hospital or something like that. So many times what we're trying to do with the FULs is use most commonly used drugs and covered outpatient drug type, so like tablets and capsules."), p. 250 ("Q.   Are you aware of any other criteria that HCFA has used to eliminate drugs that might otherwise satisfy the regulatory or statutory criteria? A. I think unit dose. … Q.  And why are those -- do you understand why those are excluded? A.   Here again, what I think they're trying to focus on is what's the drugs that are commonly used and dispensed by the pharmacies."), and Gaston Deposition, Vol. 2, pp. 326-327 ("Q.   Ms. Gaston, is it your testimony that even though you became aware of the large differences between acquisition costs and AWPs for certain injectable and infusion products, you did not believe you had the authority or discretion to place FULs on those drugs? MS. MARTINEZ: Objection, form. Q.  Is that a fair summary of your testimony? MS. MARTINEZ:  Objection, form. A.   We did not set FUL prices on those types of drugs.  Is it would be a matter of changing the criteria.  And that wouldn't be strictly my place to do that.").

[16] See, e.g., Gaston Deposition, Vol. 2, pp. 426-427 ("Q.   What does the T over in the left-hand column mean?  Do you recall? A.   I think it means it's temporarily unavailable.  It's a code that can be put into the FULs application. Q.   So if you or a colleague of yours calls one of these manufacturers and learns that Geneva Pharmaceuticals is temporarily out of stock of metoprolol, you would put a T in the FULs system? A.   Correct. Q.   And that would be to ensure that the Geneva price didn't get used as the basis for the FUL? A.   Correct. Q.   And why would you do that? A.   Because if the product is in the available you don't want to said a FUL price on a product that is not available. Q.   Why not? A.   Because it might not be a realistic price.  That product could be unavailable for three years but they're still reporting it to the compendia.  So if it's not a realistic price then there's no sense in setting the FUL price based on that. Q.   And by realistic price you mean a price that's high enough that providers could acquire the product in the market place? A.   Correct.").

[17] See, e.g., Gaston Deposition, Vol. 2, pp. 468-469 ("Q.   If you turn to page 4 of Exhibit 3, the third entry up from the bottom, that's the same cefadroxil we've been talking about? A.   Correct. Q.   And that FUL is set on the basis of a package size of 50? A.   Correct. Q.   And so if you lay the two transmittals, the 2004 transmittal and the January 2002 transmittal, next to one another as kind of book- ends -- I'll represent to you I'm not aware of another transmittal between -- throughout this time period the cefadroxil FUL was set on the basis of the 50 package size, correct? A.   Yes. Q.   And turning back to Exhibit 8 it says -- Ms. Bergin wrote '100 looks like the most commonly used package size,' right? A.   Correct. Q.   Presumably as a result of her analysis here? A. Correct. Q.   You don't know why she reached that conclusion that the FUL was set on the 50 package size? A. Right.  I don't know.").

adjusting or removing FULs based on feedback from pharmacies,[19] and removing a FUL

if there was a shortage of the drug's raw material.[20] Similarly, Ms. Sexton, who was in

charge of setting the FUL starting in October 2004,[21] testified about using published

---

[18] See, e.g., Gaston Deposition, Vol. 2, pp. 479-481 ("Q.  … How would the state MACs have been used in the analysis? … A.  The FUL prices are set on what we have in the compendia source. …  Sometimes the compendia source isn't real easily to be read.  There's sometimes availability problems.  So we set a price and we still want to make sure that we're being realistic with the price, that it's going to be a price that states will be able to use in the FUL program.  So sometimes we would check.  I know Texas had it on their webpage.  I don't know if other states did.  Once in a while we would check to see that we were being reasonable in our analysis using the compendia source.  Q.  And how would the state MAC list tell you if you were being reasonable?  A.  Because generally, especially Texas, they were pretty up to date with setting their MACs, which helped us because sometimes a compendia source isn't as current.  Because the manufacturers don't submit the pricing it isn't current, the updated pricing.  So it helps us to validate that we are using current prices and that they aren't outdated.  So it was just something that we could do a comparison and see that our prices were a realistic price.  Q.  Okay.  And what comparison would you have had to observe between, say, the Texas MAC list and the FUL to conclude that the FUL that CMS was setting was reasonable?  A.  You mean -- Q.  How would the two had to have compared for you to -- A.  Well, if Texas was -- even if they were a little lower than us, then we know that they were -- if they were extremely lower than us then we might have to do more research and check the compendia sources to dig a little built deeper to  make sure that we had real prices from them.  Or if they were extremely high we would do the same thing and say, well, let's check and make sure that we're using realistic prices for establishing the FUL.").

[19] See, e.g., Gaston Deposition, Vol. 2, pp. 435-436 ("Q.  And what kind of feedback would CMS typically receive?  A.  It would be comments maybe from the pharmacy saying that the product is not available or that the pricing appears to be either too low or too high.  Mostly availability issues.  Q.  And when you got feedback from some source that a drug wasn't available, what if any steps would CMS take?  A.  What we would do is call the manufacturer or wholesaler and verify if that was a fact.  Sometimes it might be just one state that's having an availability problem.  But we have to make sure that it's an availability problem that would affect the FUL list for all the states.  Q.  And what if you learn that, for example, a manufacturer had discontinued a particular drug that had been used to set the FUL?  What would you do then?  A.  Then we would reevaluate whether the FUL should be removed or if the FUL price should be adjusted.  Q.  And in the case of a low price that had been removed, the adjustment would have been one that was upward?  A.  Well, we would look at the most recent FUL application page for that particular drug and look at the most current pricing that we have and see if a new price should be established.").

[20] See, e.g., Gaston Deposition, Vol. 2, p. 472 ("Q.  So in or about October of 2000 you were removing the FUL -- CMS removed the FUL for the albuterol inhaler?  A.  Correct.  Q.  And the reason -- why did CMS remove the FUL from the inhaler at this point?  A.  Because it looks like from the note here that we found out that it was temporarily deleted because we found out there was a raw material shortage.  Q.  And why would that cause CMS to want to remove the FUL for the albuterol inhaler?  A.  Because if the product is not available then it wouldn't make sense to put a FUL price on it.").

[21] See, e.g., Sexton Deposition, pp. 33-35 ("Q.  Ms. Sexton, how long have you worked for CMS?  A.  Since -- the date that I started working at CMS was October 31st, 2004. …  Q.  What positions have you held at CMS since October 31, 2004?  A.  The same position I'm in now, the health insurance specialist.  I've been in the same position in the same division since I started with CMS.  Q.  Would you describe generally your job responsibilities as they relate to -- as a health insurance specialist at CMS?  A.  Well, I've been the lead since I started at CMS or shortly thereafter I became the lead on federal upper limit program for CMS where I would look at drugs that have been classified at multiple-source drugs for whether they met the criteria per the federal statute and regulation for a federal upper limit.  And then increasing, decreasing, adding or taking off the drugs from the federal upper limit list.  I also have had other responsibilities as adjudicating state plan amendments for the states

prices that did not conform to the regulation in the following ways:  not using the lowest

published price,[22] setting the FUL based on prices not published in the compendia,[23]

using NDCs that were not rated by Orange Book,[24] not using an NDC if the resulting

FUL was above the AWP postings,[25] not setting FULs on injectable drugs,[26] not using an

---

for changes in policy or regulation for the states' Medicaid programs, responding to Office of Inspector General reports.  Basically just developing policy and regulation for Medicaid pharmacy for the Medicaid drug rebate program.  Q.  When you say adjudicating state plans do you mean approving state plan amendments?  A.  Reviewing them for approval or disapproval.  Q.  What states have you been primarily responsible for reviewing state plan amendments?  A.   Vermont, Texas, Wyoming, New Mexico and Oregon.").

[22] See, e.g., Sexton Deposition, p.128 ("Q.  But at least on Exhibit 13, one pricing sheet CMS -- you in particular -- had before you a lower published price that was not used to set the federal upper limit? … A.  Yes.").

[23] See, e.g., Sexton Deposition, p. 72 ("Q.  And in addition to publications what if any other sources of information did you use in establishing federal upper limits?  A.  Any other pricing, sources of pricing?  Q.  Yes.  A.  Well, if we would call a supplier and obtain pricing information directly from a supplier, if we were trying to verify or obtain pricing, that would be another source, I guess.  But as far as the publications, the compendia, these were the three that I knew of that were used.  I was not aware of any other pricing compendia."), p. 90 ("Q.  And it looks like from Exhibit 9 that one of the things that you did to determine availability in the marketplace was to call IVAX and ask IVAX about its WAC; is that correct?  MR. FAUCI:  Objection, form.  A.  I cannot recall, but that would have been -- either that or contacting First Databank, Rojan or someone.  But more than likely I called IVAX.  But it was determined that there was a different WAC for that drug.  Q.  Down in the bottom of the page there's a column labeled "contact."  Do you see that?  A.  Okay.  Yes.  Then I did contact them.  Mm-hmm.  Q.  So you contacted IVAX and learned that their -- A.  Correct.  Q.  -- WAC price had been increased; is that correct?  A.  Correct."), pp. 96-97 ("Q.  Sure.  How would you identify – what criteria would you use to identify situations in which your manual intervention might change the FUL price that was set?  A.  Well, for instance, if I saw a price that was -- that looked to be an outlier price, maybe far lower than the other prices, I may call that supplier to determine was the NDC available at that price, so as not to set an unfairly low price on an outlier that was not available.  If I saw -- comparing to the paper compendia, if I saw that there were other suppliers other than what was noted in the system then I would call those suppliers. …  A.  Right.  If the paper compendia maybe showed a different amount of suppliers and there was a possibility that you did have three suppliers, just that the system was not showing three suppliers, or in the case of an outlier drug, or in the case where a drug supplier was shown, an NDC was shown, but there was no price at all, you would try to determine the price."), and pp. 117-118 ("Q.  And it looks like you settled on Ethex as the lowest published price?  A.  Yes.  Q.  But that you got that price not from the pricing compendia; it was not one that was published in the pricing compendia; you got it from some other source?  A.  Yes.  By calling the supplier.").

[24] See, e.g., Sexton Deposition, p. 104 ("Q.  Okay.  So let me just make sure – I know I've spent a lot of time on this.  Let me make sure I get the point.  So using the Andrx example, because Andrx isn't in the Orange Book that A rating wouldn't have been considered in terms of whether or not the inhaler was eligible for a FUL, correct?  A.  Correct.  MR. FAUCI:  Objection, form.  Q.  But then in terms of whether or not Andrx's published price could set the FUL, because it was A-rated in someplace other than Orange Book, that is a price that you would have used?  A.  Correct.").

[25] See, e.g., Sexton Deposition, pp. 58-59 ("A.  …in the case where if the federal upper limit, once it was calculated, was higher than the AWP price or the majority of the AWP prices, then we would generally not set a FUL on those drug ingredients, because the AWP -- well, a couple years ago the average AWP on a national basis was I think AWP minus 12 percent for drug reimbursement, estimated acquisition costs for drug reimbursement for a drug that did not have a federal upper limit.  And if a drug did not -- if the FUL was calculated to be higher than an AWP price then generally we did not put a federal upper limit on it because we would be setting a higher limit than what was already established in regulation because EAC reimbursement or estimated acquisition costs were

NDC if a call to the manufacturer indicated the product was discontinued or temporarily

unavailable,[27] not using a consistent methodology to determine the most common

package size,[28] and adjusting or removing FULs based on feedback from pharmacies.[29]

## E.  Suppliers Had Neither the Ability nor Incentive to Manipulate FULs

19. Given the substantial discretion that was exercised by the agency in setting FULs—so

much so that even *ex post* it is difficult to determine how a particular FUL was set—

---

AWP minus a percentage.") and pp. 76-77 ("Q.  Do you recall in your time where you were the program lead on FULs ever establishing a FUL based on a published AWP? MR. FAUCI:  Objection, form.  A.  I don't recall there -- I remember rare occasions when an AWP would be calculated in the system to be the lowest price.  Very rare occasions. Q.  On those occasions do you ever recall establishing a FUL or was that a situation where the drug wasn't -- a FUL wasn't established for the drug because it wouldn't have resulted in a cost savings? MR. FAUCI:  Objection, form.  A.  I would not have not set a FUL based on that if that was the lowest published price.  But I don't recall if that was ever the case where a federal upper limit was set on a drug with the AWP.").

[26] See, e.g., Sexton Deposition, p. 32 ("A.  Generally we do have some inhalation solutions on the federal upper limit list as opposed to injectable solutions which we generally do not look at for a federal upper limit.").

[27] See, e.g., Sexton Deposition, pp. 60-61 ("Q.  Anything else that you would do before -- any other steps or additional information you would seek before CMS established a FUL? MR. FAUCI:  Objection, form.  A.  There were times when we would call or I would call the manufacturers or the suppliers to determine if a drug was available."), p. 109 ("Q.  So in other words, the criteria were met to establish a FUL, but CMS made a decision not to establish a FUL based on feedback it was receiving from providers and others in the marketplace about whether or not it was available? MR. FAUCI:  Objection, form.  A.  Well, I wouldn't -- it was kind of a gray area whether it met the criteria.  I think that was the point, that if a manufacturer or a drug supplier had it in limited supply or it was not available at all, they still marketed the drug but there was not going to be any available for maybe a number of weeks or months.  I think a decision had to be made on whether they could be considered suppliers."), and p. 117 ("Q.  To make sure I understand this, you would have called Purepac and I guess learned that it had been -- their NDC for this drug had been discontinued? MR. FAUCI:  Objection, form.  A.  Correct. That's what it appears.").

[28] See, e.g., Sexton Deposition, pp. 66-67 ("Q.  Let me just ask generally, what criteria did you use in trying to determine the most commonly available package size? MR. FAUCI:  Objection, form.  A.  If it was not determined that a drug was available in a package size of 100 or it did not appear that the package size of 100 had ample suppliers, which could have meant it was not the most commonly prescribed package size, I would ask a pharmacist, at that time Christie Cahee was a pharmacist who had previously worked in the  division of pharmacy. I believe in the FULs program she had previously worked.  Or we would check the Medicaid drug rebate system for utilization amounts of the NDC.  They were two pretty reliable ways to determine that we were fairly setting a FUL. Q.  And how did you decide between those two ways which you'd use in a particular case? A.  I think there was really no specific guidelines as far as which one I would use.").

[29] See, e.g., Sexton Deposition, pp. 111-112 ("Q.  And what if anything did you do in reaction to the feedback you were receiving about a market availability? A.  I would look at the availability in the compendia or I may call suppliers or check – you know, verify price availability per the criteria. Q.  And can you think of instances in which you made a decision to change the federal upper limit based on the feedback you were receiving? MR. FAUCI:  Objection, form.  A.  I can't remember individual drugs or ingredient, route, strength, dose, product groups.  But yes, changes were made to the federal upper limit based on a pharmacy provider giving us feedback. Not because they gave us feedback, but it would be the impetus for me to further evaluate the drug.").

there is obviously no systematic relationship between the prices published in the compendia and the FUL ultimately set.  Therefore, it is impossible for any supplier to determine the FUL through the prices that it published.

20. Moreover, the FUL is a ceiling price for the reimbursement under Medicaid of *all* of the drugs in a GCN. As I explained in my testimony in the MDL, when all products are reimbursed at the same rate, no supplier obtains any competitive advantage from that level of reimbursement being raised. Therefore, whether the FUL is high or low makes no difference to any individual supplier; it gets no competitive advantage vis-à-vis its competitors from the FUL being higher (and no disadvantage, correspondingly, from a lower FUL).  Thus, suppliers have no economic incentive to attempt to manipulate the FUL, quite apart from their inability, as a practical matter, to effect such manipulation.

## III.  CMS Possessed Extensive Knowledge Beyond Published Prices
### A. Public Knowledge and CMS Market Intelligence

21. As I have discussed in other settings, including my testimony during the MDL, there has been widespread public knowledge regarding the divergence, in general, between the published prices of generic drugs and their actual transaction prices in the marketplace.[30] In addition, CMS personnel gathered market intelligence in carrying out their duties, including making calls to manufacturers and others.[31]

---

[30] See Exhibit 2 for a partial listing of public documents discussing AWP and WAC and the difference between these and actual transaction prices.

[31] See, e.g., Gaston Deposition, Vol. 2, p. 435, ("Q.  And when you got feedback from some source that a drug wasn't available, what if any steps would CMS take? A.  What we would do is call the manufacturer or wholesaler and verify if that was a fact."), p. 476 ("Q.  Did CMS ever check prices other than prices that are listed in the compendia? A.  … to verify, we would call wholesalers or the manufacturers."), and p. 494 ("Q. Okay.  When you say call, who were you going to call? MR. WINGET-HERNANDEZ: Objection, form. A.  We call the manufacturer, Warrick, as indicated here, Martec, Glaxo, Schering. Q.  And what was the purpose of calling the manufacturer? A.  To check on availability and to try to verify, if we can, a WAC price."). Sexton Deposition, p. 62 ("Q.  And who would you call to get WACs typically? A.  The suppliers we would call.

## B.  The AMP

22. In addition to the general knowledge and market intelligence discussed above, CMS and

    its predecessors—the agencies charged with setting FULs—had, at their disposal, the

    average prices actually charged by manufacturers for each of the drugs reimbursed under

    Medicaid: the AMPs.  AMPs have been reported since the inception of the program in

    1991, and they are calculated by manufacturers according to CMS's instructions.  CMS

    reserves the right to audit such calculations, and CMS and the manufacturers engage in

    periodic discussions regarding the calculation methodology.[32]

23. There is no question, therefore, of the agency being under any misapprehension that

    published prices like AWP and WAC represent actual transaction prices.  And certainly,

    it would make little economic sense for the agency to request specific calculations of

    AMPs if it were under the mistaken impression that the same information could be found

    in the readily-available published WAC.

## C.  The Rejection of AMP as Too Low a Basis for Reimbursement

24. Recent history makes it clear that CMS was aware of the differences between AMP and

    WAC, i.e., that AMPs, being net of discounts, were substantially lower than WACs, DPs

---

Sometimes I would try to contact Rojan from First Databank. Or we would call the suppliers to see if a drug -- an NDC was available, and if it was … at what price or the currently listed price. Q.  And when you say suppliers, do you mean wholesalers? A.  No.  The suppliers that would be listed on the pricing sheets or in the software system.  In Exhibit 4, Dr. Reddy's, Sandoz, IVAX. Q.  So companies selling pharmaceutical products? MR. WINGET-HERNANDEZ:  Objection, form. A.  Correct.  The companies listed under a specific drug."), p. 72 ("Q.  And in addition to publications what if any other sources of information did you use in establishing federal upper limits? A.  Any other pricing, sources of pricing? Q.  Yes. A.  Well, if we would call a supplier and obtain pricing information directly from a supplier, if we were trying to verify or obtain pricing, that would be another source, I guess."), and p. 111 ("Q.  And what if anything did you do in reaction to the feedback you were receiving about a market availability? A.  I would look at the availability in the compendia or I may call suppliers or check – you know, verify price availability per the criteria.").

[32] See, e.g., Centers for Medicare and Medicaid Services, "[Sample] REBATE AGREEMENT Between The Secretary of Health and Human Services (hereinafter referred to as 'the Secretary') and The Manufacturer Identified in Section XI of this Agreement (hereinafter referred to as 'the Labeler')" (http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf), p. 7 ("(c) The Secretary may audit Manufacturer calculations of AMP and Best Price.").

and other published prices.  A rule was considered that would have replaced the current rule, under which the FUL is to be "150 percent of the lowest published price", with one under which the FUL would be set at "250 percent of the lowest AMP."

25. What is striking, of course, is that 250 percent of the AMP was thought to represent an improvement—a FUL lower than 150 percent of the lowest published price—indicating that there was full understanding that AMPs were much lower than the published prices.[33]  For example, if the lowest published price were a WAC of $2, the new rule and old rule would yield the same theoretical FUL if the AMP were $1.20; the new rule would yield a lower FUL only if the AMP were even less than $1.20.  Thus, CMS was aware that AMPs were substantially lower than published prices.

26. What is perhaps even more striking in light of the calculations proffered by Mr. Devor is that the proposed rule was rejected because the resulting FULs would be too low. Government studies found that reimbursement of 250 percent of the AMP would be less than the acquisition price paid by pharmacies.[34]  The National Association of Chain

---

[33] Even with the price multiplier being raised from 150 percent to 250 percent, the expectation was that Medicaid expenditures would still fall as a result of the change.  See, e.g., Department of Health and Human Services, Office of Inspector General, *Deficit Reduction Act of 2005:  Impact on the Medicaid Federal Upper Limit Program* (June 2007), (OEI-03-06-00400), p. i ("Previous Office of Inspector General (OIG) work consistently found that the published prices that were used to set Medicaid Federal upper limit amounts often greatly exceeded prices available in the marketplace. Based in part on this work, the Deficit Reduction Act of 2005 (DRA) required that, beginning January 1, 2007, Medicaid Federal upper limits be based on 250 percent of the lowest AMP rather than on 150 percent of the lowest price published in the national compendia. The Congressional Budget Office estimates that this will reduce Medicaid expenditures for Federal upper limit drugs by $3.6 billion over 5 years. In response to these changes, industry groups have expressed concerns that pharmacies will not be able to acquire drugs for prices at or below the new Federal upper limit amounts. In an effort to ensure that Medicaid providers are reimbursed appropriately and, in turn, that Medicaid beneficiaries continue to have access to needed drugs, this study provides a preliminary assessment of the expected impact of the DRA reductions.").

[34] Government Accountability Office, *Medicaid Outpatient Prescription Drugs:  Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs* (December 22, 2006), (GAO-07-239R), p. 4 ("The AMP-based FULs we estimated using AMP data from first quarter 2006 were lower than average retail pharmacy acquisition costs from the same period for 59 of the 77 drugs in our sample. For our entire sample of 77 multiple-source outpatient prescription drugs, we found that these estimated AMP-based FULs were, on average, 36 percent lower than average retail pharmacy acquisition costs for the first quarter of 2006."). Department of Health and Human Services, Office of Inspector General, *Deficit Reduction Act of 2005:*

Drug Stores and National Community Pharmacists Association sued the Department of

Health and Human Services ("DHHS") and CMS to block implementation of the "250

percent of AMP" rule.[35]   The pharmacists were concerned over the contemplated

reductions to reimbursement.[36]   An injunction was granted that prevented the

implementation of the new rule.[37]   The pharmacists also wanted Congress to intervene.[38]

---

*Impact on the Medicaid Federal Upper Limit Program* (June 2007), (OEI-03-06-00400), p. iii ("Six of twenty-five selected high-expenditure drugs had estimated average pharmacy acquisition costs that would be below the new Federal upper limit amounts. Based on pricing and sales data provided by distributors, we determined that, on average, pharmacies would have been able to purchase only 6 of 25 selected high-expenditure drugs for less than the new Federal upper limit amounts during the second quarter of 2006. For the remaining 19 drugs, the average pharmacy acquisition costs would have been higher than the new Federal upper limit amounts that quarter. We estimate that 12 of these 19 drugs had average pharmacy acquisition costs that would have been more than double the new reimbursement limit. For 13 of the 25 selected high-expenditure drugs, at least one individual drug product was available for a price at or below the new Federal upper limit amount.").

[35] See, e.g., National Association of Chain Drug Stores & National Community Pharmacists Association, "Frequently Asked Questions (FAQs), Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP Rule, November 7, 2007", November 6, 2007 (http://www.ncpanet.org/pdf/amp_ncpanacds-lawsuitfaq.pdf).

[36] See, e.g., National Association of Chain Drug Stores, "Judge Grants AMP Rule Injunction" (http://www.nacds.org/wmpage.cfm?parm1=5557) ("The lawsuit challenges CMS-imposed Medicaid pharmacy reimbursement reductions scheduled to be implemented via rulemaking in January 2008 that would reduce reimbursement rates below what is permitted by law.") and "Frequently Asked Questions (FAQs), Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP Rule, November 7, 2007" ("Why has the lawsuit been filed? The lawsuit was filed to block implementation of a new federal rule known as the AMP rule. As discussed below, the AMP rule violates the plain language of the Social Security Act. The AMP rule will drastically cut reimbursement payments to community pharmacies that serve disadvantaged Americans in the Medicaid program. The defendants estimated that the AMP rule will reduce Medicaid reimbursement to community pharmacies by more than $8 billion over five years. Studies by the HHS Office of Inspector General and the Government Accountability Office found that Medicaid reimbursement rates will be cut well below the prices that retail pharmacies pay for drugs. [citations omitted] Medicaid reimbursement rates for retail pharmacies were expected to decline as a result of the Deficit Reduction Act of 2005. However, in their zeal to cut retail pharmacy reimbursement rates even further, the Defendants have slashed reimbursement well below the rates called for by Congress. Retail pharmacies will suffer even greater losses then [sic] they would if the defendants had faithfully implemented the plain meaning of the statute.  Many community pharmacies, particularly independent pharmacies that that [sic] serve a large number of Medicaid patients, are expected to be forced to reduce hours and services, forced out of Medicaid, or forced to close their doors altogether. When that happens, many Medicaid patients will lose access to the community pharmacies they depend on for critical pharmacy care.").

[37] See, e.g., National Association of Chain Drug Stores, "Judge Grants AMP Rule Injunction" (http://www.nacds.org/wmpage.cfm?parm1=5557).

[38] See, e.g., National Association of Chain Drug Stores & National Community Pharmacists Association, "Frequently Asked Questions (FAQs), Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP Rule, November 7, 2007" , November 6, 2007 (http://www.ncpanet.org/pdf/amp_ncpanacds-lawsuitfaq.pdf) ("Is there still a need for the U.S. Congress to act to address the Medicaid pharmacy reimbursement cuts, and is there still a need for the states to increase dispensing fees? Absolutely. Our lawsuit argues that the defendants must comply with existing law. However, the existing law itself is fundamentally flawed and must be replaced.").

Congress passed legislation that blocks CMS from implementing the "250 percent of AMP" rule.[39]

_(signature)_
_____

Sumanth Addanki

_5-14-09_
_____

Date

---

[39] Congressional Research Service (CRS), "P.L. 110-275:  The Medicare Improvements for Patients and Providers Act of 2008" (CRS Report for Congress), July 23, 2008 (http://www.ohanet.org/finance/medicare/HR6331CMSSummarry.pdf), p. 29 ("The rule has been contested, and CMS is prohibited from implementing its provisions until the court hears the case and makes a final determination of its legality. In the interim, FUL formulas remain calculated by CMS as equal to 150% of the published price for the least costly therapeutic equivalent. The provision will retain, through September 30, 2009, the FUL formulas for federal reimbursement of multiple source drugs as described in federal regulations in effect as of December 21, 2006 (42 CFR 447).").

EXHIBIT 1

**NERA**
Economic Consulting

**Sumanth Addanki**
Senior Vice President

National Economic Research Associates, Inc.
50 Main Street
White Plains, New York 10606
+1 914 448 4000 Fax +1 914 448 4040
Direct dial: +1 914 448 4060
sumanth.addanki@nera.com
www.nera.com

# SUMANTH ADDANKI
## SENIOR VICE PRESIDENT

## Education

**Harvard University**
Ph.D., Economics, 1986

**Birla Institute of Technology and Science, India**
M.A. (Hons.), Economics, 1980

## Professional Experience

| | |
|---|---|
| | **NERA Economic Consulting** |
| 1986- | Senior Vice President (current position) |
| | **New York University, Robert F. Wagner Graduate School of Public Service** |
| 1997 | Adjunct Assistant Professor of Public and Health Administration |
| | **National Bureau of Economic Research Inc.** |
| 1981-1986 | Research Associate and Computer Manager |
| | **Harvard University** |
| 1981-1985 | Instructor in Economics, Teaching Fellow, and Assistant Head Tutor |
| | **National Council of Applied Economic Research, India** |
| 1980 | Research Associate |

## Honors and Professional Activities

Associate Editor, *Antitrust Magazine*, 2001 - 2002

Vice Chair, Economics Committee at Antitrust Section of ABA, 1999 - 2000

Danforth Center Award for Excellence in Teaching, Harvard University, 1983

**MMC** Marsh & McLennan Companies

## Testimony (2004 – 2008)

*In re Pharmaceutical Industry Average Wholesale Price Litigation: The City of New York v. Abbott Laboratories, Inc., et al.,* United States District Court for the District of Massachusetts, MDL No. 1456, CA No. 01-12257-PBS (Deposition Testimony) November 2008 and April 2009

*State of Missouri, ex rel. Jeremiah W. (Jay) Nixon, Attorney General and Missouri Department of Social Services, Division of Medical Services v. Dey, Inc., et al and Warrick Pharmaceuticals Corporation, Schering-Plough Corporation, Schering Corporation,* In the Circuit Court of the City of St. Louis State of Missouri, Case No. 054-1216 Division: 2.  October 2008

*State of Wisconsin v. Amgen, Inc., Abbott Laboratories, AstraZeneca Pharmaceuticals, LP, AstraZeneca, LP, Aventis Pharmaceuticals, Inc. Baxter Healthcare Corporation, Ben Venue Laboratories, Inc. et al.,* The Circuit Court for Dane County in the State of Wisconsin, Case No. 04-CV-1709 (Deposition Testimony) May 2008

*The Commonwealth of Massachusetts v. Mylan Laboratories, Inc. IVAX Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc. Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., PAR Pharmaceutical, Inc., Purepac Pharmaceutical Co, and Roxane Laboratories, Inc.,* U.S. District for the District of Massachusetts, Civil Action No. 03-11865-PBS (Deposition Testimony).  April 2008

*Discover Financial Services,* et al. v. *Visa U.S.A. Inc.,* et al., U.S. District Court for the Southern District of New York, Civil Action No 04-CF-7844 (BSJ) (Deposition Testimony). December 2007.

*State of Alabama v. Abbott Laboratories, Inc., et al.*, In the Circuit Court of Montgomery County, Alabama, CV-05-219 (Deposition Testimony).  November 2007.

*Dynax Corporation v. Chemguard, Inc.*, U.S. District Court for the Southern District of New York, Index:  06-CIV-5143 (CM)(ECF CASE) (Deposition Testimony).  June 2007

*State of Colorado,* et al. *v. Warner Chilcott Holdings Company III, Ltd,* et al., U.S. District Court for the District of Columbia, Civil Action No 1:05CV02182 (CKK) (Deposition Testimony).  August 2007

*Novartis Corporation, Novartis Pharmaceuticals Corporation, and Novartis International AG v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of New Jersey, Civil Action Nos. 04-4473 and 06-1130 (HAA)(MF) (Deposition Testimony).  February 2007

*In re Pharmaceutical Industry Average Wholesale Price Litigation (MDL 1456)*, U.S. District Court for the District of Massachusetts, Civil Action No. 01-12257-PBS.  December 2006

*Briant Chun-Hoon and Carlo Guglielmino v. McKee Foods Corporation, a Tennessee Corporation; and Does 1 through 100, inclusive,* U.S. District Court for the Northern District of California, Case No. C05-00620 VRW (Deposition Testimony).  March 2006

*XIOtech Corporation v. Compellent Technologies, Inc., Michael Markovich, Russell B. Taddiken, Scott A. Winslow, Kristofer M. Zuber,* District Court for the State of Minnesota, Fourth Judicial District, Court File No.: 04-5065 (Deposition Testimony).  March 2006

*Medtronic Minimed, Inc., v. Smiths Medical MD, Inc.,* U. S. District Court for the District of Delaware, Civil Action No. 03-776-KAJ (Deposition Testimony).  February 2006

## Papers and Publications (1998 – 2008)

"Patent Settlement Agreements" with Alan J. Daskin, Chapter 85, Volume 3, in *Issues in Competition Law and Policy*, published by American Bar Association, Section of Antitrust Law, August, 2008.

"Who Defines the Relevant Market—The Core Customer or Marginal One?" with Alan Daskin, *Antitrust Insights*, National Economic Research Associates, Inc., Summer 2008.

"*Schering-Plough* and the Antitrust Analysis of Patent Settlement Agreements in Pharmaceutical Markets," *Antitrust Insights*, National Economic Research Associates, Inc., 2005 and published in Economics of Antitrust: Complex Issues in a Dynamic Economy, Chapter 4, May 2007.

"Economists Lend Insight Into Antitrust Risk,"*IFLR (International Financial Law Review), Mergers and Acquisitions* 2004, 2004.

"Market Definitions Using Econometrics: An Apparent Paradox Explained," *Antitrust Insights*, National Economic Research Associates, Inc., 2001.

"Presenting Complex Technical and Economic Evidence: Lessons From The Trenches," *Antitrust and Intellectual Property:  The Crossroads,* American Bar Association, 2000.

"The Relevant Market in Intellectual Property Antitrust: An Economist's Overview," Practising Law Institute, Intellectual Property Antitrust, June 1998.

May 2009

# Exhibit 2

## Case Materials

New York Counties v. Abbott Laboratories, Inc., et al.  Revised First Amended Consolidated Complaint. October 5, 2007 (including Exhibit B).

Rule 26 Statement of Harris L. Devor, In re:  Pharmaceutical Industry Average Wholesale Price Litigation relating to The City of New York, et al. v. Abbott Laboratories, Inc., et al.  September 30, 2008.

Depositions of Harris Devor and exhibits.

Depositions of Sue Gaston and exhibits.

Deposition of Gail Sexton and exhibits.

## Data

"Comprehensive Price History File."  2007 Wolters Kluwer Health (Medispan).

First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual* (Rev. April 2000).

Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.

Medispan Inactive Dates.  2007 Wolters Kluwer Health (Medispan).

Mr. Devor's Electronic Work Files and Exhibits.

Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced* (January 2008).

## Public Knowledge Documents

Alpert, Bill.  "Hooked on Drugs:  Why Do Insurers Pay Such Outrageous Prices For Pharmaceuticals?" *Barron's*, June 10, 1996.

American Society of Clinical Oncology.  *Reform of the Medicare Payment Methods for Cancer Chemotherapy.*  May 2001.
http://www.asco.org/asco/downloads/MedicarePaymentReformASCOWhitePaper.pdf.

Congressional Budget Office.  *How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry*.  July 1998. http://www.cbo.gov/ftpdoc.cfm?index=655&type=0&sequence=1.

Congressional Budget Office.  *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry*.  January 1996.  http://www.cbo.gov/ftpdoc.cfm?index=4750.

Congressional Budget Office.  *Medicaid's Reimbursements to Pharmacies for Prescription Drugs*. December 2004.  http://www.cbo.gov/showdoc.cfm?index=6038&sequence=1.

Congressional Budget Office.  *Prices for Brand-Name Drugs Under Selected Federal Programs*.  June 2005.  http://www.cbo.gov/ftpdocs/64xx/doc6481/06-16-PrescriptDrug.pdf.

Congressional Budget Office.  *The Rebate Medicaid Receives on Brand-Name Prescription Drugs*.  June 21, 2005.  http://www.cbo.gov/ftpdocs/64xx/doc6493/06-21-MedicaidRebate.pdf.

Department of Health and Human Services, Office of Inspector General.  *Addition of Qualified Drugs to the Medicaid Federal Upper Limit List*.  December 2004.  (OEI-03-04-00320).

Department of Health and Human Services, Office of Inspector General.  *Are Medicare Allowances for Albuterol Sulfate Reasonable?*  August 1998.  (OEI-03-97-00292).

Department of Health and Human Services, Office of Inspector General.  *Comparing Drug Reimbursement:  Medicare and Department of Veterans Affairs*.  November 1998.  (OEI-03-97-00293).

Department of Health and Human Services, Office of Inspector General.  *A Comparison of Albuterol Sulfate Prices*.  June 1996.  (OEI-03-94-00392).

Department of Health and Human Services, Office of Inspector General.  *Cost of Dialysis-Related Drugs*. October 1992.  (A-01-91-00526).

Department of Health and Human Services, Office of Inspector General.  *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program*.  June 2007.  (OEI-03-06-00400).

Department of Health and Human Services, Office of Inspector General.  *Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005*.  May 2006.  (A-06-06-00063).

Department of Health and Human Services, Office of Inspector General.  *Excessive Medicare Payments for Prescription Drugs*.  December 1997.  (OEI-03-97-00290).

Department of Health and Human Services, Office of Inspector General.  *Excessive Medicare Reimbursement for Albuterol*.  March 2002.  (OEI-03-01-00410).

Department of Health and Human Services, Office of Inspector General. *The Impact of High-Priced Generic Drugs on Medicare and Medicaid.* July 1998. (OEI-03-97-00510).

Department of Health and Human Services, Office of Inspector General.  *Infusion Therapy Services Provided in Skilled Nursing Facilities*.  December 1999.  (A-06-99-00058).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products*. August 2001. (A-06-00-00023).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products*. August 1997. (A-06-97-00011).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products*. March 2002. (A-06-01-00053).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs*. April 1997. (A-06-96-00030).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products*. September 2002. (A-06-02-00041).

Department of Health and Human Services, Office of Inspector General. *Medicare Payments for Nebulizer Drugs*. February 1996. (OEI-03-94-00390).

Department of Health and Human Services, Office of Inspector General. *Medicare Reimbursement of Albuterol*. June 2000. (OEI-03-00-00311).

Department of Health and Human Services, Office of Inspector General. *Medicare Reimbursement of Prescription Drugs*. January 2001. (OEI-03-00-00310).

Department of Health and Human Services, Office of Inspector General. *Physicians' Costs for Chemotherapy Drugs*. November 1992. (A-02-91-01049).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the California Department of Health Services*. May 1996. (A-06-95-00062).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration*. February 2002. (A-06-01-00002).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Missouri Department of Social Services*. January 1997. (A-06-95-00067).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Health and Human Services*. July 1996. (A-06-95-00068).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Health and Human Services*. February 2002. (A-06-01-00005).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Texas Health and Human Services Commission*. November 2001. (A-06-01-00001).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services*. November 1996. (A-06-95-00072).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the West Virginia Department of Health and Human Resources*. December 2001. (A-06-01-00007).

Department of Health and Human Services, Office of Inspector General. *Semiannual Report, April 1, 1997 – September 30, 1997*.

Department of Health and Human Services, Office of Inspector General. *Suppliers' Acquisition Costs for Albuterol Sulfate*. June 1996. (OEI-03-94-00393).

Department of Health and Human Services, Office of Inspector General. *Update: Excessive Medicare Reimbursement For Albuterol*. January 2004. (OEI-03-03-00510).

Department of Health and Human Services, Office of Inspector General. *Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program*. October 1989. (A-06-89-00037).

Department of Health and Human Services, Office of Audit. *Changes to the Medicaid Prescription Drug Program Could Save Millions*. 1984.

Department of Health, Education, and Welfare, Office of the Secretary. *U.S. Task Force on Prescription Drugs: The Drug Makers and The Drug Distributors*. December 1968.

Federal Register. November 15, 1974. Vol. 39, No. 222, 45 CFR Part 19. p. 40303.

Federal Register. July 31, 1975. Vol. 40, No. 148, 45 CFR Part 19. p. 32293.

Federal Register. August 20, 2003. Vol. 68, No. 161, 42 CFR Part 405. pp. 50428-50452.

Federal Register. January 7, 2004. Vol. 69, No. 4, 42 CFR Parts 405 and 414. pp. 1084-1132.

Gencarelli, Dawn M. "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism," *National Health Policy Forum Issue Brief No. 775*. George Washington University, June 7, 2002.

General Accounting Office. *Medicaid Changes in Drug Prices Paid by HMOs and Hospitals Since Enactment of Rebate Provisions*. January 1993. (GAO/HRD-93-43)

General Accounting Office. *Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost* (Report to Congressional Committees). September 2001. (GAO-01-1118).

General Accounting Office. *Prescription Drugs: Changes in Prices for Selected Drugs* (Report to Congressional Requesters). August 1992. (GAO/HRD-92-128).

Government Accountability Office. *Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs.* December 22, 2006. (GAO-07-239R).

Government Accountability Office. *Medicare Chemotherapy Payments: New Drug and Administration Fees Are Closer to Providers' Costs.* December 1, 2004. (GAO-05-142R).

Government Accountability Office. *Prescription Drugs: An Overview of Approaches to Negotiate Drug Prices Used by Other Countries and U.S. Private Payers and Federal Programs.* January 11, 2007. (GAO-07-358T).

Gray, Tom. "Construction Ahead." *Homecare*, October 1, 2002. http://homecaremag.com/mag/medical_construction_ahead/.

Gumbhir, Ashok and Johnny Anderson. *Reimbursement for Pharmaceutical Services in Missouri.* Final Report submitted to Missouri Department of Social Services, Division of Medical Care, March 1991.

MASSPIRG. "*Consumer Groups Charge Industry-Wide Price Manipulation - Over $800 Million in Illegal Profits from Medicare & Medicare Patients.*" http://masspirg.org/MA.asp?id2=5310&id3=MA&.

Letter from Nancy-Ann Min DeParle, Department of Health and Human Services, Health Care Financing Administration, to Members of Congress. September 8, 2000.

Pear, Robert. "Administration Plans Cuts in Some Drug Payments." *The New York Times*, August 6, 2000.

Medicare Payment Advisory Commission (MedPAC). *Report to the Congress: Variation and Innovation in Medicare.* June 2003.

Rozek, Richard P. and Ruth Berkowitz. "The Costs to the U.S. Health Care System of Extending Marketing Exclusivity for Taxol." *Journal of Research in Pharmaceutical Economics*, Vol. 9(4) (1999): pp. 21-41.

Schondelmeyer, Stephen W. and Marian V. Wrobel. *Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices.* Final Report submitted by Abt Associates Inc. to the Centers for Medicare and Medicaid Services, August 30, 2004.

Spears, James M. and Jeff Pearlman. "Using Litigation to Regulate Drug Prices: The Assault on 'AWP'." Washington Legal Foundation, Critical Legal Issues, Working Paper Series No. 107. February 2002.

State of Utah, Department of Health, Division of Health Care Financing. *Medicaid Pharmacy— Acquisition Cost of Generic Prescription Drug Products.* February 1999.

U.S. Congress. House. Committee on Energy and Commerce. *Hearing: Medicaid and AWP Hearing: Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much.* December 7, 2004. http://globalag.igc.org/health/us/2004/toomuch.pdf.

U.S. Congress.  House.  Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  *Testimony of George Reeb, Assistant Inspector General, Centers for Medicare and Medicaid Audits, Office of Inspector General, U.S. Department of Health and Human Services*. December 7, 2004.

U.S. Congress.  House.  Committee on Ways and Means, Subcommittee on Health.  *Testimony of George Reeb, Assistant Inspector General, Centers for Medicare and Medicaid Audits, Department of Health and Human Services*.  October 3, 2002.

U.S. Congress.  Senate.  Special Committee on Aging.  *CBO Testimony of Douglas Holtz-Eakin (Payments for Prescription Drugs Under Medicaid)*.  July 20, 2005.


**Miscellaneous**

42 CFR § 447.332.

American Medical Association.  "AMA Downloadable Resource Table:  Asthma."  ASTHMA Version 3.0 July 2007.  www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls.

Centers for Medicare and Medicaid Services.  "[Sample] REBATE AGREEMENT Between The Secretary of Health and Human Services (hereinafter referred to as 'the Secretary') and The Manufacturer Identified in Section XI of this Agreement (hereinafter referred to as 'the Labeler')."  http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf.

Congressional Research Service (CRS).  "P.L. 110-275: The Medicare Improvements for Patients and Providers Act of 2008" (CRS Report for Congress).  July 23, 2008.  http://www.ohanet.org/finance/medicare/HR6331CMSSummarry.pdf.

Department of Health and Human Services, Health Care Financing Administration.  "Federal Upper Limit (FUL) Changes to  Transmittal No. 37."  Current as of August 20, 2008.

Department of Health and Human Services, Health Care Financing Administration.  "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".

Department of Health and Human Services, Health Care Financing Administration.  "State Medicaid Manual:  Part 6 - Payment for Services."  Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).

FloridaInfusion, Nations Drug Pharmaceutical Distributor.  Product Search, Accessed February 6, 2009.  http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword.

National Association of Chain Drug Stores.  "Judge Grants AMP Rule Injunction."  http://www.nacds.org/wmspage.cfm?parm1=5557.

National Association of Chain Drug Stores & National Community Pharmacists Association.  "Frequently Asked Questions (FAQs) Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP Rule November 7, 2007."  November 6, 2007.  http://www.ncpanet.org/pdf/amp_ncpanacds-lawsuitfaq.pdf.

Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74.  December 1998.  http://www.dhs.state.ri.us/dhs/heacre/provsvcs/prvupdts/pu74.htm.

U.S. Food and Drug Administration, Center for Drug Evaluation and Research.  *Approved Drug Products with Therapeutic Equivalence Evaluations*.  11th Edition (1991) through 27th Edition (2007).

U.S. Food and Drug Administration, Center for Drug Evaluation and Research.  "National Drug Code Directory."  Current through December 3, 2008.  http://www.fda.gov/cder/ndc/database.

**Exhibit 3**
**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**
**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | Narrowest Restrictions for a Match[9] |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |
| 005037 | Albuterol 0.09 mg/inh, Aerosol, Metered, Inhalation, 17 gm | $   0.4394 | Jun 1997 [10] | 10/01/97 | 12/06/00 | 1 | 2 | 1 | 2 | PS Only |
| | | 0.3490 | Jan 2000 | 12/07/00 | 12/07/00 | 1 | 2 | 1 | 2 | None |
| | | No FUL | n/a | 12/08/00 | 03/10/03 | n/a | n/a | n/a | n/a | n/a |
| | | 0.8823 | 03/11/03 | 03/11/03 | 05/07/05 | 1 | 1 | 1 | 1 | TE & PS |
| | | 0.3088 | | 05/08/05 | 04/09/06 | - | - | - | - | TE & PS |
| 005039 | Albuterol Sulfate EQ 0.083% Base, Solution, Inhalation, 3 ml | 0.1990 | Jun 1997 | 10/01/97 | 12/06/00 | - | - | - | - | TE & PS |
| | | No FUL | n/a | 12/07/00 | 01/21/02 | n/a | n/a | n/a | n/a | n/a |
| | | 0.1450 | Apr 2001 | 01/22/02 | 05/07/05 | 10 | 10 | 10 | 10 | TE & PS |
| | | 0.1150 | | 05/08/05 | | 9 | 9 | 9 | 9 | TE & PS |
| 048262 | Cefadroxil 500 mg, Capsule, Oral, 50 | 2.7672 | Oct 1996 | 01/01/97 | 08/31/98 | - | 1 | 6 | 11 | All Active & Inactive Prices |
| | | No FUL | n/a | 09/01/98 | 01/21/02 | n/a | n/a | n/a | n/a | n/a |
| | | 3.0789 | Apr 2001 | 01/22/02 | 03/10/03 | - | - | 4 | 9 | TE & PS |
| | | 2.4837 | | 03/11/03 | | - | - | - | 5 | TE & PS |
| 004560 | Clonazepam 0.5 mg, Tablet, Oral, 100 | 0.8702 | Jun 1997 | 10/01/97 | 08/31/98 | 3 | 3 | 3 | 4 | TE & PS |
| | | 0.4146 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | None |
| | | 0.2760 | Jan 2000 | 12/07/00 | 01/21/02 | 6 | 6 | 15 | 15 | TE & PS |
| | | 0.2455 | Apr 2001 | 01/22/02 | | 6 | 7 | 13 | 14 | TE & PS |
| 000386 | Enalapril Maleate 20 mg, Tablet, Oral, 100 | 0.9150 | | 08/24/03 | | 4 | 4 | 4 | 4 | TE & PS |
| 017297 | Isosorbide MN 60 mg, Tablet, Extended Release, Oral, 100 | 0.7492 | Apr 2001 | 01/22/02 | 07/20/05 | - | - | 2 | 2 | TE & PS |
| | | 0.2025 | | 07/21/05 | | 2 | 2 | 2 | 3 | None |
| 003758 | Lorazepam 1 mg, Tablet, Oral, 100 | 0.0207 | Jan 1994 | 07/01/94 | 09/30/97 | 3 | 3 | 23 | 23 | TE & PS |
| | | 0.0203 | Jun 1997 | 10/01/97 | 02/11/98 | 2 | 2 | 29 | 29 | TE & PS |
| | | No FUL | n/a | 02/12/98 | 08/31/98 | n/a | n/a | n/a | n/a | n/a |
| | | 0.6684 | Apr 1998 | 09/01/98 | 12/06/00 | 17 | 19 | 79 | 106 | None |
| | | 0.5718 | Jan 2000 | 12/07/00 | | 7 | 9 | 40 | 63 | TE & PS |
| 005131 | Metoprolol 100 mg, Tablet, Oral, 100 | 0.1185 | Oct 1996 | 01/01/97 | 09/30/97 | 2 | 2 | 6 | 6 | TE & PS |
| | | 0.1161 | Jun 1997 | 10/01/97 | 08/31/98 | 4 | 4 | 13 | 13 | TE & PS |
| | | 0.0878 | Apr 1998 | 09/01/98 | 12/06/00 | 2 | 2 | 10 | 10 | All Active & Inactive Prices |

**Exhibit 3**

**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | Narrowest |
| | | | | | | Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | Restrictions for a Match[9] |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |
| | | 0.1290 | Jan 2000 | 12/07/00 | 01/21/02 | 6 | 6 | 13 | 13 | TE & PS |
| | | 0.0914 | Apr 2001 | 01/22/02 | 10/27/04 | 4 | 4 | 12 | 12 | TE & PS |
| | | 0.0690 | | 10/28/04 | | - | - | 1 | 1 | TE & PS |
| 011673 | Ranitidine EQ 150 mg Base, Tablet, Oral, 100 | 0.5914 [11] | | 09/24/98 | 09/21/99 | 4 | 6 | 17 | 23 | TE & PS |
| | | No FUL | n/a | 09/22/99 | 12/06/00 | n/a | n/a | n/a | n/a | n/a |
| | | 0.3410 | Jan 2000 | 12/07/00 | 01/21/02 | 4 | 5 | 16 | 23 | TE & PS |
| | | 0.3411 | Apr 2001 | 01/22/02 | 05/07/05 | 5 | 6 | 32 | 38 | TE & PS |
| | | 0.1088 | | 05/08/05 | | 2 | 2 | 21 | 21 | TE & PS |

Notes:  - Analysis of each GCN includes:  (1) products explicitly identified by the First DataBank (FDB) variable "GCN Sequence Number" as belonging to the GCN; (2) any similarly described products (based on name, strength, and dosage form) not listed in FDB that appear in Medispan or Red Book and not exclusively in another GCN in FDB at the NDC-9 level.  Finally, following a review of online sources for NDCs that do not appear in FDB at the NDC-11 or NDC-9 level (355 NDCs in total), seven NDCs were dropped from the analysis (52493084701, 52493084717, 54977069501, 54977070601, 57362011601, 63874074917, and 51655027924), as either they were described as albuterol inhaler refills and not as albuterol inhalers or discrepancies in their descriptions were resolved such that they were confirmed to be outside the GCN.

- Some NDCs are reported under different GCNs in the FDB annual product description files at the NDC-11 level (15 NDCs) and, if the NDC does not appear in FDB at the 11-digit level, at the NDC-9 level (9 NDCs).  In addition, some NDCs appear under different Package IDs in Red Book (6 NDCs).  These differences, generally, are time dependent.  With respect to FDB, any descriptive values (e.g., therapeutical equivalency rating or obsolete date) reported for an NDC while it is listed under a GCN other than those at issue are excluded from the analysis, as are any price postings that correspond to the time period when the NDC appears to correspond to another product and was listed under a different GCN.  With respect to Red Book, the Package ID represents a unique identifier by which an NDC's product description, package size, therapeutical equivalence rating, deactivation/reactivation dates, and prices are reported.  Package IDs, and all associated data, that correspond to a drug name other than those at issue are excluded.

- For all compendia, postings of zero invalidate the previously posted price.  For Red Book, postings are treated as active through the price deactivation date or until the next posting.  Deactivation dates that fall before the date of the posting are replaced with the date of the posting (4 instances in total).  Finally, deactivation dates that occur on or after the date of a subsequent posting are replaced with the date immediately preceding the date of the next posting (10 instances in total).

- No postings are available from Medispan after August 3, 2007 and from FDB after February 1, 2007.  Although postings are available in Red Book as late as April 2009, they are not used after June 9, 2008, the date the data were acquired.  FULs analyzed are those for which any portion of their effective life falls within the period 1997 to 2005; however, the analysis extends over the full effective life of these FULs.

[1] The count of postings is based on AWPs, WACs, and Direct Prices in Medispan, FDB, and Red Book.  Comparisons with the FUL are made by multiplying these posted prices by 1.5 and rounding to four decimals.  The count does not include duplicate postings, such as two WACs for the same NDC for which the difference between the two prices is equal to zero when rounded to four decimals.  Nor does this count include duplicate postings for the same product, as occurs when the NDC for a product changes.

[2] To count as a lower price, the posting must be active (i.e., the price has not been deactivated by obsolescence, a subsequent price posting, or otherwise) for the entire month specified in the CMS transmittal as the month during which prices analyzed to set the FUL were current (also see Note 5).  Obsolescence, generally, is determined with reference to the FDB "Obsolete Date", the FDB "HCFA Termination Date", the Medispan "Inactive Date", and the Red Book "NDC Discontinuation Date" (collectively, the "end dates").  Postings are only active through the period prior to the earliest of the four end dates.  However, any postings on or after the earliest end date are treated as a reactivation of the NDC and such postings are analyzed until the next end date.  Postings after the second, third, or fourth end date are treated in the same manner.  Similarly, the Red Book "Reactivation Date" can reactivate the most recent set of active prices for an NDC, assuming the date falls on or after the discontinuation date and the NDC is not already currently active.  Finally, 33 NDCs among the nine GCNs, for which the FDB Obsolete Date exhibited stark inconsistencies across annual files, were examined separately, using price posting activity and CMS reimbursement.

**Exhibit 3**

**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | Narrowest |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | Restrictions for a Match[9] |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |

[3] Product descriptions are taken from the most recent CMS transmittal in which the GCN appears. The package size used to set the FUL for each GCN is indicated by the value at the end of each description and remains constant for all 9 GCNs except for cefadroxil, which changed from 100 to 50 as of the January 22, 2002 FUL.

[4] Values of "No FUL" correspond to periods during which there was no FUL in place (i.e., FDB postings of zero).

[5] CMS transmittals typically indicate the month as of which prices analyzed to set the FUL were current, i.e., the "current month". Where the current month was not available, the period considered was the three-month period preceding the relevant FUL's effective date.

[6] Missing end dates indicate FULs that were still in effect as of June 9, 2008, according to Red Book and CMS transmittals.

[7] The count only includes prices for NDCs that are determined to be therapeutically equivalent and that are of the same package size as that used to set the FUL. An NDC is considered therapeutically equivalent if it was found to have an "A" rating in the available copies of the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (i.e., the Orange Book) or, if such information was not available, was "A" rated by either the FDB variable "Expanded Orange Book Code" or the Red Book variable "Orange Book Code". Since the ratings in the Orange Book are reported by drug application number, the FDA's National Drug Code Directory was used to link each application number to an NDC. An NDC is considered to be of the same package size as that used to set the FUL if the package size indicated in the CMS transmittal matches either the FDB variable "Package Size", the Red Book variables "Total Quantity - Actual" or "Standard Quantity - Actual", or the Medispan implied package size (the mean ratio between the package and unit prices, rounded to one decimal). Data from each of the three pricing compendia are considered publicly available as of the date of the first AWP, WAC, or Direct Price posting reported by each compendium for the relevant NDC. For FDB descriptive data, contemporaneous data are used from the appropriate annual file and any changes across these files are recognized as of the beginning of the year of the file in which the change appears. Changes across editions of the Orange Book are recognized as of the publication date of the edition in which the change appears, or April 30th (based on a survey of the different publication dates that were observable (1991 - 05/23/91; 1993 - 04/22/93; 1994 - 06/16/94; 1996 - 05/29/96; 2001 - 04/02/01; 2002 - 04/16/02; 2003 - 03/18/03; 2005 - 05/21/07)) if the publication date was unavailable. The package size and therapeutical equivalence requirements must both be met as of the beginning of the FUL current month.

[8] Includes all active prices, regardless of whether the prices correspond to an NDC that is therapeutically equivalent and/or of the same package size as that used to set the FUL.

[9] Value represents the narrowest set of restrictions, among those identified in Exhibit 5 (e.g., TE & PS, PS Only, TE Only, All Active Prices, All Active and Inactive Prices), for which a match was found.

[10] While the FUL was reported in a later transmittal, this date is based on an earlier transmittal that reported the FUL for the albuterol inhaler refill, as the FULs for the refill and the inhaler have the same value and appear to have been posted in FDB simultaneously at a time consistent with the earlier transmittal.

[11] This is the only FUL in the table that does not appear in one of the CMS transmittals cited below. However, the FUL is published by all three pricing compendia. In addition, a provider update, published by the Rhode Island Medical Assistance Program in December 1998, notified pharmacy providers that, effective immediately, "Ranitidine HCL, 150mg, tablet, $0.5914/each" had been added to the FUL list.

Sources:   - American Medical Association, *AMA Downloadable Resource Table: Asthma*, ASTHMA Version 3.0 July 2007, <www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls>.

- "Comprehensive Price History File," 2007 Wolters Kluwer Health (Medispan).

- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37," Current as of August 20, 2008.

- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".

- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services," Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).

- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual* (Rev. April 2000).

- FloridaInfusion, Nations Drug, Accessed February 6, 2009 <http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword>.

- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.

- Medispan Inactive Dates, 2007 Wolters Kluwer Health (Medispan).

- Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced* (January 2008).

- Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74, December 1998, <http://www.dhs.state.ri.us/dhs/heacre/provsvcs/prvupdts/pu74.htm>.

**Exhibit 3**

**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | Narrowest |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | Restrictions for a Match[9] |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |

- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *Approved Drug Products with Therapeutic Equivalence Evaluations*, 11th Edition - 27th Edition.

- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *National Drug Code Directory*, <http://www.fda.gov/cder/ndc/database/>.

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutic Equivalence; PS = Package Size) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDCs[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| 005037 | Albuterol 0.09 mg/inh, Aerosol, Metered, Inhalation, 17 gm | $  0.4394 | Jun 1997 [11] | 10/01/97 | 12/06/00 | 100.0 % | $  0.3221 | 5 | 15 | 5 | 15 |
| | | 0.3490 | Jan 2000 | 12/07/00 | 12/07/00 | 100.0 | 0.3221 | 2 | 3 | 2 | 3 |
| | | No FUL | n/a | 12/08/00 | 03/10/03 | n/a | 0.3221 | n/a | n/a | n/a | n/a |
| | | 0.8823 | | 03/11/03 | 05/07/05 | 100.0 | 0.3088 | 6 | 6 | 6 | 6 |
| | | 0.3088 | | 05/08/05 | 04/09/06 | - | 0.3088 | - | - | - | - |
| 005039 | Albuterol Sulfate EQ 0.083% Base, Solution, Inhalation, 3 ml | 0.1990 | Jun 1997 | 10/01/97 | 12/06/00 | 100.0 | 0.1150 | 23 | 23 | 23 | 23 |
| | | No FUL | n/a | 12/07/00 | 01/21/02 | n/a | 0.1000 | n/a | n/a | n/a | n/a |
| | | 0.1450 | Apr 2001 | 01/22/02 | 05/07/05 | 100.0 | 0.0627 | 42 | 42 | 42 | 42 |
| | | 0.1150 | | 05/08/05 | | 100.0 | 0.0627 | 17 | 17 | 17 | 17 |
| 048262 | Cefadroxil 500 mg, Capsule, Oral, 50 | 2.7672 | Oct 1996 | 01/01/97 | 08/31/98 | - | 2.9325 | - | 1 | 6 | 11 |
| | | No FUL | n/a | 09/01/98 | 01/21/02 | n/a | 1.2749 | n/a | n/a | n/a | n/a |
| | | 3.0789 | Apr 2001 | 01/22/02 | 03/10/03 | 57.9 | 1.8636 | 4 | 4 | 20 | 25 |
| | | 2.4837 | | 03/11/03 | | 36.9 | 0.7830 | 4 | 4 | 15 | 20 |
| 004560 | Clonazepam 0.5 mg, Tablet, Oral, 100 | 0.8702 | Jun 1997 | 10/01/97 | 08/31/98 | 100.0 | 0.3069 | 17 | 17 | 30 | 31 |
| | | 0.4146 | Apr 1998 | 09/01/98 | 12/06/00 | 100.0 | 0.1199 | 23 | 25 | 54 | 56 |
| | | 0.2760 | Jan 2000 | 12/07/00 | 01/21/02 | 100.0 | 0.0450 | 15 | 16 | 44 | 45 |
| | | 0.2455 | Apr 2001 | 01/22/02 | | 100.0 | 0.0422 | 20 | 21 | 110 | 117 |
| 000386 | Enalapril Maleate 20 mg, Tablet, Oral, 100 | 0.9150 | | 08/24/03 | | 100.0 | 0.0855 | 29 | 30 | 61 | 63 |
| 017297 | Isosorbide MN 60 mg, Tablet, Extended Release, Oral, 100 | 0.7492 | Apr 2001 | 01/22/02 | 07/20/05 | 74.5 | 0.0788 | 4 | 4 | 14 | 15 |
| | | 0.2025 | | 07/21/05 | | 100.0 | 0.0788 | 2 | 2 | 2 | 5 |
| 003758 | Lorazepam 1 mg, Tablet, Oral, 100 | 0.0207 | Jan 1994 | 07/01/94 | 09/30/97 | 100.0 | 0.0182 | 6 | 6 | 74 | 74 |
| | | 0.0203 | Jun 1997 | 10/01/97 | 02/11/98 | 100.0 | 0.0182 | 2 | 2 | 31 | 31 |
| | | No FUL | n/a | 02/12/98 | 08/31/98 | n/a | 0.0182 | n/a | n/a | n/a | n/a |
| | | 0.6684 | Apr 1998 | 09/01/98 | 12/06/00 | 100.0 | 0.0182 | 27 | 29 | 110 | 139 |
| | | 0.5718 | Jan 2000 | 12/07/00 | | 100.0 | 0.0182 | 33 | 36 | 177 | 227 |
| 005131 | Metoprolol 100 mg, Tablet, Oral, 100 | 0.1185 | Oct 1996 | 01/01/97 | 09/30/97 | 100.0 | 0.0878 | 10 | 10 | 24 | 24 |

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDC's[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| | | 0.1161 | Jun 1997 | 10/01/97 | 08/31/98 | 100.0 | 0.0675 | 13 | 13 | 32 | 32 |
| | | 0.0878 | Apr 1998 | 09/01/98 | 12/06/00 | 100.0 | 0.0675 | 6 | 6 | 20 | 20 |
| | | 0.1290 | Jan 2000 | 12/07/00 | 01/21/02 | 100.0 | 0.0690 | 14 | 14 | 29 | 33 |
| | | 0.0914 | Apr 2001 | 01/22/02 | 10/27/04 | 100.0 | 0.0690 | 4 | 4 | 12 | 13 |
| | | 0.0690 | | | 10/28/04 | 5.7 | 0.0665 | 1 | 1 | 11 | 15 |
| 011673 | Ranitidine EQ 150 mg Base, Tablet, Oral, 100 | 0.5914 [12] | | 09/24/98 | 09/21/99 | 100.0 | 0.0782 | 11 | 15 | 45 | 61 |
| | | No FUL | n/a | 09/22/99 | 12/06/00 | n/a | 0.0782 | n/a | n/a | n/a | n/a |
| | | 0.3410 | Jan 2000 | 12/07/00 | 01/21/02 | 100.0 | 0.0782 | 7 | 8 | 51 | 58 |
| | | 0.3411 | Apr 2001 | 01/22/02 | 05/07/05 | 100.0 | 0.0413 | 22 | 23 | 123 | 141 |
| | | 0.1088 | | | 05/08/05 | 100.0 | 0.0413 | 6 | 6 | 64 | 73 |

Notes: - Analysis of each GCN includes: (1) products explicitly identified by the First DataBank (FDB) variable "GCN Sequence Number" as belonging to the GCN; (2) any similarly described products (based on name, strength, and dosage form) not listed in FDB that appear in Medispan or Red Book and not exclusively in another GCN in FDB at the NDC-9 level. Finally, following a review of online sources for NDCs that do not appear in FDB at the NDC-11 or NDC-9 level (355 NDCs in total), seven NDCs were dropped from the analysis (52493084701, 52493084717, 54977069501, 54977070601, 57362011601, 63874074917, and 51655027924), as either they were described as albuterol inhaler refills and not as albuterol inhalers or discrepancies in their descriptions were resolved such that they were confirmed to be outside the GCN.

- Some NDCs are reported under different GCNs in the FDB annual product description files at the NDC-11 level (15 NDCs) and, if the NDC does not appear in FDB at the 11-digit level, at the NDC-9 level (9 NDCs). In addition, some NDCs appear under different Package IDs in Red Book (6 NDCs). These differences, generally, are time dependent. With respect to FDB, any descriptive values (e.g., therapeutical equivalency rating or obsolete date) reported for an NDC while it is listed under a GCN other than those at issue are excluded from the analysis, as are any price postings that correspond to the time period when the NDC appears to correspond to another product and was listed under a different GCN. With respect to Red Book, the Package ID represents a unique identifier by which an NDC's product description, package size, therapeutical equivalence rating, deactivation/reactivation dates, and prices are reported. Package IDs, and all associated data, that correspond to a drug name other than those at issue are excluded.

- For all compendia, postings of zero invalidate the previously posted price. For Red Book, postings are treated as active through the price deactivation date or until the next posting. Deactivation dates that fall before the date of the posting are replaced with the date of the posting (4 instances in total). Finally, deactivation dates that occur on or after the date of a subsequent posting are replaced with the date immediately preceding the date of the next posting (10 instances in total).

- No postings are available from Medispan after August 3, 2007 and from FDB after February 1, 2007. Although postings are available in Red Book as late as April 2009, they are not used after June 9, 2008, the date the data were acquired. FULs analyzed are those for which any portion of their effective life falls within the period 1997 to 2005; however, the analysis extends over the full effective life of these FULs.

[1] The count of postings is based on AWPs, WACs, and Direct Prices in Medispan, FDB, and Red Book. Comparisons with the FUL are made by multiplying these posted prices by 1.5 and rounding to four decimals. The count does not include duplicate postings, such as two WACs for the same NDC for which the difference between the two prices is equal to zero when rounded to four decimals. Nor does this count include duplicate postings for the same product, as occurs when the NDC for a product changes.

[2] To count as a lower price, the posting must be active (i.e., the price has not been deactivated by obsolescence, a subsequent price posting, or otherwise) for at least part of the period that begins with the end of the current month (i.e., the month specified in the CMS transmittal as the month during which prices analyzed to set the FUL were current (also see Note 5)) and that ends with the FUL end date. Obsolescence, generally, is determined with reference to the

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDC's[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |

FDB "Obsolete Date", the FDB "HCFA Termination Date", the Medispan "Inactive Date", and the Red Book "NDC Discontinuation Date" (collectively, the "end dates"). Postings are only analyzed during the period prior to the earliest of the four end dates. However, any postings on or after the earliest end date are treated as a reactivation of the NDC and such postings are analyzed until the next end date. Postings after the second, third, or fourth end date are treated in the same manner. Similarly, the Red Book "Reactivation Date" can reactivate the most recent set of active prices for an NDC, assuming the date falls on or after the discontinuation date and the NDC is not already currently active. Finally, 33 NDCs among the nine GCNs, for which the FDB Obsolete Date exhibited stark inconsistencies across annual files, were examined separately, using price posting activity and CMS reimbursement.

[3] Product descriptions are taken from the most recent CMS transmittal in which the GCN appears. The package size used to set the FUL for each GCN is indicated by the value at the end of each description and remains constant for all 9 GCNs except for cefadroxil, which changed from 100 to 50 as of the January 22, 2002 FUL.

[4] Values of "No FUL" correspond to periods during which there was no FUL in place (i.e., FDB postings of zero).

[5] CMS transmittals typically indicate the month as of which prices analyzed to set the FUL were current, i.e., the "current month". Where the current month was not available, the period considered was the three-month period preceding the relevant FUL's effective date.

[6] Missing end dates indicate FULs that were still in effect as of June 9, 2008, according to Red Book and CMS transmittals.

[7] Calculation is based on the number of days during the relevant FUL posting period for which there was a posted AWP, WAC, or Direct Price, which, when multiplied by 1.5 and rounded to four decimals, was lower than the FUL. Posted prices only include prices analyzed in the above table that correspond to therapeutically equivalent NDCs of the same package size as that used to set the FUL (see Note 9). In addition, adjusted prices are only compared to the FUL during periods for which the NDC is considered active (see Note 2). Shares are calculated relative to the total number of days in the posting period, including parts of the period that fall before 1997 and after 2005. Shares are displayed rounded to one decimal.

[8] Price is based on the lowest AWP, WAC, or Direct Price, multiplied by 1.5 and rounded to four decimals, that was prevailing during at least part of the FUL period and corresponded to an NDC that was considered active (see Note 2), was therapeutically equivalent, and was of the same package size as that used to set the FUL (see Note 9).

[9] The count only includes prices for NDCs that are determined to be therapeutically equivalent and that are of the same package size as that used to set the FUL. An NDC is considered therapeutically equivalent if it was found to have an "A" rating in the available copies of the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (i.e., the Orange Book) or, if such information was not available, was "A" rated by either the FDB variable "Expanded Orange Book Code" or the Red Book variable "Orange Book Code". Since the ratings in the Orange Book are reported by drug application number, the FDA's National Drug Code Directory was used to link each application number to an NDC. An NDC is considered to be of the same package size as that used to set the FUL if the package size indicated in the CMS transmittal matches either the FDB variable "Package Size", the Red Book variables "Total Quantity - Actual" or "Standard Quantity - Actual", or the Medispan implied package size (the mean ratio between the package and unit prices, rounded to one decimal). Data from each of the three pricing compendia are considered publicly available as of the date of the first AWP, WAC, or Direct Price posting reported by each compendium for the relevant NDC. For FDB descriptive data, contemporaneous data are used from the appropriate annual file and any changes across these files are recognized as of the beginning of the year of the file in which the change appears. Changes across editions of the Orange Book are recognized as of the publication date of the edition in which the change appears, or April 30th (based on a survey of the different publication dates that were observable (1991 - 05/23/91; 1993 - 04/22/93; 1994 - 06/16/94; 1996 - 05/29/96; 2001 - 04/02/01; 2002 - 04/16/02; 2003 - 03/18/03; 2007 - 05/21/07)) if the publication date was unavailable. The package size and therapeutical equivalence requirements must both be met at some point in time between the end of the current month and the end of the FUL period, while the relevant price is in effect.

[10] Includes all active prices, regardless of whether the prices correspond to an NDC that is therapeutically equivalent and/or of the same package size as that used to set the FUL.

[11] While the FUL was reported in a later transmittal, this date is based on an earlier transmittal that reported the FUL for the albuterol inhaler refill, as the FULs for the refill and the inhaler have the same value and appear to have been posted in FDB simultaneously at a time consistent with the earlier transmittal.

[12] This is the only FUL in the table that does not appear in one of the CMS transmittals cited below. However, the FUL is published by all three pricing compendia. In addition, a provider update, published by the Rhode Island Medical Assistance Program in December 1998, notified pharmacy providers that, effective immediately, "Ranitidine HCL, 150mg, tablet, $0.5914/each" had been added to the FUL list.

Sources:  - American Medical Association, *AMA Downloadable Resource Table: Asthma*, ASTHMA Version 3.0 July 2007, <www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls>.

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutic Equivalence; PS = Package Size) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDCs[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |

- "Comprehensive Price History File," 2007 Wolters Kluwer Health (Medispan).
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37," Current as of August 20, 2008.
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".
- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services," Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).
- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual*  (Rev. April 2000).
- FloridaInfusion, Nations Drug, Accessed February 6, 2009 <http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword>.
- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.
- Medispan Inactive Dates, 2007 Wolters Kluwer Health (Medispan).
- Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced*  (January 2008).
- Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74, December 1998, <http://www.dhs.state.ri.us/dhs/heacre/provsvcs/prvupdts/pu74.htm>.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *Approved Drug Products with Therapeutic Equivalence Evaluations* , 11th Edition - 27th Edition.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *National Drug Code Directory* , <http://www.fda.gov/cder/ndc/database/>.

**Exhibit 5**

**Counts of Published Compendia Prices[1] that Could Have Been the Basis for the Published FUL[2]**

**Federal Upper Limits:  1997 - 2005**

| | | | | | | Number of Matches that were the Lowest Price Among NDCs that Met Therapeutical Equivalence and Package Size Requirements | | Number of Matches Among All AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |
| 005037 | Albuterol 0.09 mg/inh, Aerosol, Metered, Inhalation, 17 gm | $  0.4394 | Jun 1997 [12] | 10/01/97 | 12/06/00 | - | - | - | 2 | - | 2 | 2 |
| | | 0.3490 | Jan 2000 | 12/07/00 | 12/07/00 | - | - | - | - | - | - | - |
| | | No FUL | n/a | 12/08/00 | 03/10/03 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.8823 | | 03/11/03 | 05/07/05 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.3088 | | 05/08/05 | 04/09/06 | 1 | 1 | 1 | 1 | 1 | 1 | 3 |
| 005039 | Albuterol Sulfate EQ 0.083% Base, Solution, Inhalation, 3 ml | 0.1990 | Jun 1997 | 10/01/97 | 12/06/00 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | | No FUL | n/a | 12/07/00 | 01/21/02 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.1450 | Apr 2001 | 01/22/02 | 05/07/05 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.1150 | | 05/08/05 | | - | - | 2 | 2 | 2 | 2 | 4 |
| 048262 | Cefadroxil 500 mg, Capsule, Oral, 50 | 2.7672 | Oct 1996 | 01/01/97 | 08/31/98 | - | - | - | - | - | - | 1 [13] |
| | | No FUL | n/a | 09/01/98 | 01/21/02 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 3.0789 | Apr 2001 | 01/22/02 | 03/10/03 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | | 2.4837 | | 03/11/03 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 004560 | Clonazepam 0.5 mg, Tablet, Oral, 100 | 0.8702 | Jun 1997 | 10/01/97 | 08/31/98 | - | - | 1 | 1 | 1 | 1 | 3 |
| | | 0.4146 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | - | - | - |
| | | 0.2760 | Jan 2000 | 12/07/00 | 01/21/02 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.2455 | Apr 2001 | 01/22/02 | | - | - | 2 | 2 | 3 | 3 | 3 |
| 000386 | Enalapril Maleate 20 mg, Tablet, Oral, 100 | 0.9150 | | 08/24/03 | | - | - | 2 | 2 | 2 | 2 | 2 |
| 017297 | Isosorbide MN 60 mg, Tablet, Extended Release, Oral, 100 | 0.7492 | Apr 2001 | 01/22/02 | 07/20/05 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | | 0.2025 | | 07/21/05 | | - | - | - [14] | - | - | - | - |
| 003758 | Lorazepam 1 mg, Tablet, Oral, 100 | 0.0207 | Jan 1994 | 07/01/94 | 09/30/97 | - | - | 3 | 3 | 5 | 5 | 6 |
| | | 0.0203 | Jun 1997 | 10/01/97 | 02/11/98 | - | - | 5 | 5 | 7 | 7 | 17 |
| | | No FUL | n/a | 02/12/98 | 08/31/98 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.6684 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | - | - | - |
| | | 0.5718 | Jan 2000 | 12/07/00 | | - | - | 2 | 2 | 2 | 2 | 2 |
| 005131 | Metoprolol 100 mg, Tablet, Oral, 100 | 0.1185 | Oct 1996 | 01/01/97 | 09/30/97 | - | - | 2 | 2 | 3 | 3 | 5 |
| | | 0.1161 | Jun 1997 | 10/01/97 | 08/31/98 | - | - | 1 | 1 | 1 | 1 | 4 |
| | | 0.0878 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | - | - | 2 [15] |

**Exhibit 5**

**Counts of Published Compendia Prices[1] that Could Have Been the Basis for the Published FUL[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Number of Matches that were the Lowest Price Among NDCs that Met Therapeutical Equivalence and Package Size Requirements — Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Number of Matches Among All AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) — Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |
| | | 0.1290 | Jan 2000 | 12/07/00 | 01/21/02 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.0914 | Apr 2001 | 01/22/02 | 10/27/04 | - | - | 2 | 2 | 2 | 2 | 5 |
| | | 0.0690 | | | 10/28/04 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 011673 | Ranitidine EQ 150 mg Base, Tablet, Oral, 100 | 0.5914 [16] | | 09/24/98 | 09/21/99 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | No FUL | n/a | 09/22/99 | 12/06/00 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.3410 | Jan 2000 | 12/07/00 | 01/21/02 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.3411 | Apr 2001 | 01/22/02 | 05/07/05 | - | - | 5 | 5 | 5 | 5 | 5 |
| | | 0.1088 | | | 05/08/05 | - | - | 1 | 1 | 1 | 1 | 2 |

Notes: - Analysis of each GCN includes: (1) products explicitly identified by the First DataBank (FDB) variable "GCN Sequence Number" as belonging to the GCN; (2) any similarly described products (based on name, strength, and dosage form) not listed in FDB that appear in Medispan or Red Book and not exclusively in another GCN in FDB at the NDC-9 level. Finally, following a review of online sources for NDCs that do not appear in FDB at the NDC-11 or NDC-9 level (355 NDCs in total), seven NDCs were dropped from the analysis (52493084701, 52493084717, 54977069501, 54977070601, 57362011601, 63874074917, and 51655027924), as either they were described as albuterol inhaler refills and not as albuterol inhalers or discrepancies in their descriptions were resolved such that they were confirmed to be outside the GCN.

- Some NDCs are reported under different GCNs in the FDB annual product description files at the NDC-11 level (15 NDCs) and, if the NDC does not appear in FDB at the 11-digit level, at the NDC-9 level (9 NDCs). In addition, some NDCs appear under different Package IDs in Red Book (6 NDCs). These differences, generally, are time dependent. With respect to FDB, any descriptive values (e.g., therapeutical equivalency rating or obsolete date) reported for an NDC while it is listed under a GCN other than those at issue are excluded from the analysis, as are any price postings that correspond to the time period when the NDC appears to correspond to another product and was listed under a different GCN. With respect to Red Book, the Package ID represents a unique identifier by which an NDC's product description, package size, therapeutical equivalence rating, deactivation/reactivation dates, and prices are reported. Package IDs, and all associated data, that correspond to a drug name other than those at issue are excluded.

- For all compendia, postings of zero invalidate the previously posted price. For Red Book, postings are treated as active through the price deactivation date or until the next posting. Deactivation dates that fall before the date of the posting are replaced with the date of the posting (4 instances in total). Finally, deactivation dates that occur on or after the date of a subsequent posting are replaced with the date immediately preceding the date of the next posting (10 instances in total).

- No postings are available from Medispan after August 3, 2007 and from FDB after February 1, 2007. Although postings are available in Red Book as late as April 2009, they are not used after June 9, 2008, the date the data were acquired. FULs analyzed are those for which any portion of their effective life falls within the period 1997 to 2005; however, the analysis extends over the full effective life of these FULs.

[1] The count of postings is based on AWPs, WACs, and Direct Prices in Medispan, FDB, and Red Book. The count only includes postings, which, when multiplied by 1.5 and rounded to four decimals, fall within a tenth of a cent of the FUL. The count does not include duplicate postings, such as two WACs for the same NDC for which the difference between the two prices is equal to zero when rounded to four decimals. Nor does this count include duplicate postings for the same product, as occurs when the NDC for a product changes.

[2] To count as a match, the posting must be active (i.e., the price has not been deactivated by obsolescence, a subsequent price posting, or otherwise) for at least part of the month specified in the CMS transmittal as the month during which prices analyzed to set the FUL were current (also see Note 5). Obsolescence, generally, is determined with reference to the FDB "Obsolete Date", the FDB "HCFA Termination Date", the Medispan "Inactive Date", and the Red Book "NDC Discontinuation Date" (collectively, the "end dates"). Postings are only analyzed during the period prior to the earliest of the four end dates. However, any postings on or after the earliest end date are treated as a reactivation of the NDC and such postings are analyzed until the next end date. Postings after the second, third, or fourth end date are treated in the same manner. Similarly, the Red Book "Reactivation Date" can reactivate the most recent set of active prices for an NDC, assuming the date falls on or after the discontinuation date and the NDC is not already currently active. For some NDCs, the FDB end dates only appear in an annual file corresponding to a year later than the date itself. In such cases, for matching purposes, we replace the FDB end date with the first day of the year in which it first appeared. Finally, 33 NDCs among the nine GCNs, for which the FDB Obsolete Date exhibited stark inconsistencies

**Exhibit 5**

**Counts of Published Compendia Prices[1] that Could Have Been the Basis for the Published FUL[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | Number of Matches that were the Lowest Price Among NDCs that Met Therapeutical Equivalence and Package Size Requirements | | Number of Matches Among All AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |

across annual files, were examined separately, using price posting activity and CMS reimbursement.

[3] Product descriptions are taken from the most recent CMS transmittal in which the GCN appears. The package size used to set the FUL for each GCN is indicated by the value at the end of each description and remains constant for all 9 GCNs except for cefadroxil, which changed from 100 to 50 as of the January 22, 2002 FUL.

[4] Values of "No FUL" correspond to periods during which there was no FUL in place (i.e., FDB postings of zero).

[5] CMS transmittals typically indicate the month as of which prices analyzed to set the FUL were current, i.e., the "current month". Where the current month was not available, the period considered was expanded to include the entire period from the day prior to the FUL effective date back to the first day of the month of the date that is 326 days before the FUL effective date, which is the longest period observed in the CMS transmittals between the middle of the current month and the FUL effective date.

[6] Missing end dates indicate FULs that were still in effect as of June 9, 2008, according to Red Book and CMS transmittals.

[7] Count includes all postings in column (h) that appear in the compendium used by CMS.

[8] Count includes all postings in column (i) that, at some point during the current month while the price was in effect, represented the lowest price available to CMS, as compared to similarly qualified prices.

[9] The count only includes prices for NDCs that are determined to be therapeutically equivalent and that are of the same package size as that used to set the FUL. An NDC is considered therapeutically equivalent if it was found to have an "A" rating in the available copies of the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (i.e., the Orange Book) or, if such information was not available, was "A" rated by either the FDB variable "Expanded Orange Book Code" or the Red Book variable "Orange Book Code". Since the ratings in the Orange Book are reported by drug application number, the FDA's National Drug Code Directory was used to link each application number to an NDC. An NDC is considered to be of the same package size as that used to set the FUL if the package size indicated in the CMS transmittal matches either the FDB variable "Package Size", the Red Book variables "Total Quantity - Actual" or "Standard Quantity - Actual", or the Medispan implied package size (the mean ratio between the package and unit prices, rounded to one decimal). Data from each of the three pricing compendia are considered publicly available as of the date of the first AWP, WAC, or Direct Price posting reported by each compendium for the relevant NDC. For FDB descriptive data, contemporaneous data are used from the appropriate annual file and any changes across these files are recognized as of the beginning of the year of the file in which the change appears. Changes across editions of the Orange Book are recognized as of the publication date of the edition in which the change appears, or April 30th (based on a survey of the different publication dates that were observable (1991 - 05/23/91; 1993 - 04/22/93; 1994 - 06/16/94; 1996 - 05/29/96; 2001 - 04/02/01; 2002 - 04/16/02; 2003 - 03/18/03; 2007 - 05/21/07)) if the publication date was unavailable. The package size and therapeutical equivalence requirements must both be met at some point in time during the FUL current month, while the relevant price is in effect.

[10] Includes all active prices, regardless of whether the prices correspond to an NDC that is therapeutically equivalent and/or of the same package size as that used to set the FUL.

[11] Includes all prices cited in Note 10, as well as any published prices that were active at any point in time during the seven years preceding the beginning of the current month.

[12] While the FUL was reported in a later transmittal, this date is based on an earlier transmittal that reported the FUL for the albuterol inhaler refill, as the FULs for the refill and the inhaler have the same value and appear to have been posted in FDB simultaneously at a time consistent with the earlier transmittal.

[13] The posting corresponds to an AWP of $1.8448, posted in 1989, for NDC 00172405860, which, at the time the FUL was being set, had already been identified as being therapeutically equivalent and of the same package size as that used to set the FUL. Nevertheless, the AWP was replaced with postings of $2.8465 in Medispan on March 11, 1996 and in FDB on March 14, 1996.

[14] According to deposition testimony by Gail Sexton, the FUL for isosorbide mononitrate was based on a non-published WAC for Ethex NDC 58177023804, which CMS obtained by calling the supplier ("Q. And it looks like you settled on Ethex as the lowest published price? A. Yes. Q. But that you got that price not from the pricing compendia; it was not one that was published in the pricing compendia; you got it from some other source? A. Yes. By calling the supplier." (Deposition of Gail Sexton, pp. 117-118, and Sexton Exhibit 12)).

[15] The two postings correspond to a WAC and Direct Price of $0.0585, posted in April 1997, for NDC 00603462821, which, at the time the FUL was being set, had already been identified as being therapeutically equivalent and of the same package size as that used to set the FUL. Nevertheless, both published prices were replaced with postings of $0.0450 on March 21, 1998.

[16] This is the only FUL in the table that does not appear in one of the CMS transmittals cited below. However, the FUL is published by all three pricing compendia. In addition, a provider update, published by the Rhode Island Medical Assistance Program in December 1998, notified pharmacy providers that, effective immediately, "Ranitidine HCL, 150mg, tablet, $0.5914/each" had been added to the FUL list.

Sources:  -  American Medical Association, *AMA Downloadable Resource Table: Asthma*, ASTHMA Version 3.0 July 2007, <http://www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls>.
 -  "Comprehensive Price History File," 2007 Wolters Kluwer Health (Medispan).

**Exhibit 5**

**Counts of Published Compendia Prices[1] that Could Have Been the Basis for the Published FUL[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Number of Matches that were the Lowest Price Among NDCs that Met Therapeutical Equivalence and Package Size Requirements — Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Number of Matches Among All AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) — Limited to TE & PS[9] | Limited to PS Only[10] | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |

- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37," Current as of August 20, 2008.
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".
- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services," Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).
- Deposition of Gail Sexton and exhibits.
- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual* (Rev. April 2000).
- FloridaInfusion, Nations Drug, Accessed February 6, 2009 <http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword>.
- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.
- Medispan Inactive Dates, 2007 Wolters Kluwer Health (Medispan).
- Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced* (January 2008).
- Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74, December 1998, <http://www.dhs.state.ri.us/dhs/heacre/provsvcs/prvupdts/pu74.htm>.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *Approved Drug Products with Therapeutic Equivalence Evaluations* , 11th Edition - 27th Edition.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *National Drug Code Directory* , <http://www.fda.gov/cder/ndc/database/>.

**Exhibit 6**

**Counts of NDC-Quarters and NDCs for which the Published**

**WAC on Mr. Devor's Exhibit Would Have Produced a Lower FUL**

| | Number of NDC-Qtrs for which: | | | Number of NDCs for which: | | | |
|---|---|---|---|---|---|---|---|
| | Published WAC * 1.5 is Less than the Published FUL | Published WAC & FUL are Both Reported | Share of NDC-Quarters | Published WAC * 1.5 is Ever Less than the Published FUL | Published WAC & FUL are Ever Reported for the Same Quarter | Share of NDCs | Total Number of NDCs with Exhibits |
| | ------(Number of NDC-Quarters)------ | | ---(Percent)--- [(a) / (b)] | --------------(Number of NDCs)---------------- | | ----(Percent)---- [(d) / (e)] | |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| Barr | - | 32 | -    % | - | 2 | -    % | 2 |
| Dey | 141 | 161 | 87.6 | 9 | 9 | 100.0 | 9 |
| Ethex | - | - | | - | - | | 4 |
| Ivax | 263 | 535 | 49.2 | 14 | 23 | 60.9 | 23 |
| Mylan | 179 | 650 | 27.5 | 18 | 25 | 72.0 | 25 |
| Par | 53 | 90 | 58.9 | 4 | 7 | 57.1 | 10 |
| Purepac | 91 | 168 | 54.2 | 5 | 7 | 71.4 | 7 |
| Roxane | 38 | 44 | 86.4 | 3 | 3 | 100.0 | 4 |
| Sandoz | 234 | 514 | 45.5 | 16 | 25 | 64.0 | 25 |
| Schering | - | 116 | - | - | 5 | - | 6 |
| Teva | 99 | 197 | 50.3 | 5 | 11 | 45.5 | 11 |
| Watson | 255 | 450 | 56.7 | 19 | 27 | 70.4 | 31 |
| Wyeth | 15 | 16 | 93.8 | 4 | 5 | 80.0 | 7 |
| **Total:** | **1,368** | **2,973** | **46.0  %** | **97** | **149** | **65.1  %** | **164** |

**Exhibit 6**

**Counts of NDC-Quarters and NDCs for which the Published
WAC on Mr. Devor's Exhibit Would Have Produced a Lower FUL**

Notes: - Shares are displayed rounded to the nearest tenth of a percent.
- Of the 3,529 total instances where, for a given NDC and quarter, Mr. Devor provides a non-zero, non-missing value for both the Published FUL and the Published AWP, 53 (1.5%) include a Published AWP that, when multiplied by 1.5, is lower than the Published FUL.
- Of the 164 NDCs for which Mr. Devor ever provides, in the same quarter, a non-zero, non-missing value for both the Published FUL and the Published AWP, 7 NDCs (4.3%) include a Published AWP that, when multiplied by 1.5, is lower than the Published FUL for at least one quarter.
- Summary is based on a comparison of the variables "Published WAC", "Published AWP", and "Published FUL", in Mr. Devor's exhibits. The first two variables were obtained from exhibits with the subheaders "Computation of FUL Based on WAC" and "Computation of FUL Based on AWP", respectively. The third variable was taken from exhibits with the aforementioned subheaders, as well as from exhibits with the subheader "Computation of FUL Based on AMP". Given that there are instances where Mr. Devor provides a different FUL in different exhibits for the same NDC and quarter, the WAC was first compared with the FUL reported in the same exhibit as the WAC was. If a non-zero FUL was not reported in the WAC exhibit for the relevant NDC-quarter combination, the WAC was compared with the FULs reported in the AWP and AMP exhibits, with priority given to the former. The same methodology was used when comparing the AWP with the FUL.
- The Published AWP and Published WAC were only compared with the Published FUL for combinations of NDC and quarter for which Mr. Devor provided a non-zero, non-missing value for both the FUL and the AWP or WAC.

Source(s): - Mr. Devor's Electronic Exhibits.