UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL NO. 1456 Civil Action No. 01-12257-PBS |
|  | ) ) ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: | ) ) |  |
| *The City of New York v. Abbott Labs., et al.* (S.D.N.Y. No. 04-CV-06054) *County of Suffolk v. Abbott Labs., et al.* (E.D.N.Y. No. CV-03-229) *County of Westchester v. Abbott Labs., et al.* (S.D.N.Y. No. 03-CV-6178) *County of Rockland v. Abbott Labs., et al.* (S.D.N.Y. No. 03-CV-7055) *County of Dutchess v. Abbott Labs., et al.* (S.D.N.Y. No. 05-CV-06458) *County of Putnam v. Abbott Labs., et al.* (S.D.N.Y. No. 05-CV-04740) *County of Washington v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00408) *County of Rensselaer v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00422) *County of Albany v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00425) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |

[Caption Continues on Next Page]

## AFFIDAVIT OF CESAR A. PERALES

*County of Warren v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00468)     )
*County of Greene v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00474)     )
*County of Saratoga v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00478)     )
*County of Columbia v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00867)     )
*Essex County v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00878)     )
*County of Chenango v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00354)     )
*County of Broome v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00456)     )
*County of Onondaga v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00088)     )
*County of Tompkins v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00397)     )
*County of Cayuga v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00423)     )
*County of Madison v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00714)     )
*County of Cortland v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00881)     )
*County of Herkimer v. Abbott Labs. et al.*     )
(N.D.N.Y. No. 05-CV-00415)     )
*County of Oneida v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00489)     )
*County of Fulton v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00519)     )
*County of St. Lawrence v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00479)     )
*County of Jefferson v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00715)     )
*County of Lewis v. Abbott Labs., et al.*     )
(N.D.N.Y. No. 05-CV-00839)     )
*County of Chautauqua v. Abbott Labs., et al.*     )
(W.D.N.Y. No. 05-CV-06204)     )
*County of Allegany v. Abbott Labs., et al.*     )
(W.D.N.Y. No. 05-CV-06231)     )
*County of Cattaraugus v. Abbott Labs., et al.*     )
(W.D.N.Y. No. 05-CV-06242)     )

11032131_1.DOC

*County of Genesee v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06206)  )
*County of Wayne v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06138)  )
*County of Monroe v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06148)  )
*County of Yates v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06172)  )
*County of Niagara v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06296)  )
*County of Seneca v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06370)  )
*County of Orleans v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06371)  )
*County of Ontario v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06373)  )
*County of Schuyler v. Abbott Labs, et al.*  )
(W.D.N.Y. No. 05-CV-06387)  )
*County of Steuben v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06223)  )
*County of Chemung v. Abbott Labs., et al.*  )
(W.D.N.Y. No. 05-CV-06744)  )
                      AND  )
*County of Nassau v. Abbott Labs., et al.*  )
(E.D.N.Y. No. 04-CV-5126)  )

I, CESAR A. PERALES, being duly sworn, depose and say as follows:

1.       I served as the Commissioner of the New York Department of Social Services
from January 1983 until November 1991. During my tenure as the Commissioner, the New
York Department of Social Services was responsible for, among other things, administering New
York's Medicaid program.

2.       Attached to this Affidavit as Exhibit A is a true and accurate copy of a letter that I
signed and sent on or about October 3, 1986 to the United States Health Care Financing
Administration ("HCFA") (now known as Centers for Medicare & Medicaid Services ("CMS"))
in response to a notice of public rulemaking published by HCFA in the August 19, 1986 Federal
Register regarding upper limits for prescription drug reimbursement under Medicaid.

3.       The letter attached as Exhibit A reflects, among other things, the New York
Department of Social Services' understanding as of 1986 that a pharmacy's acquisition cost for a
drug is likely to be lower than the prices quote in third-party pricing compendia such as the Red
Book or First DataBank and, more generally, the New York Department of Social Services'
comments on HCFA's proposed regulation. During my tenure as the Commissioner, it was the
New York Department of Social Services' regular practice to comment on regulations proposed
by HCFA that would affect Medicaid reimbursement. Consistent with that practice, Exhibit A
was prepared at my direction, sent, and maintained in the ordinary course of the New York
Department of Social Services' regularly conducted business activities.

4.       During my tenure as the Commissioner, the New York Department of Social
Services sought to implement the federal regulation establishing Federal Upper Limits on
Medicaid's reimbursement for "multiple source" prescription drugs or FULs. In connection with
that effort, the Pharmacy Society of the State of New York sought to have enforced in federal

court a Stipulation of Settlement, dated June 23, 1978, previously entered into between, among other parties, the New York Department of Social Services and the Pharmacy Society.

5.     Attached to this Affidavit as Exhibit B is a true and accurate copy of a letter that I received on or about December 4, 1987 from Henry L. Goldberg, an attorney representing the Pharmacy Society in connection with its efforts to have the 1978 Stipulation of Settlement enforced. As was the Department's regular practice when it received correspondence in connection with litigation, the Department would maintain the correspondence (such as Exhibit B) in the ordinary course of its regularly conducted business activities.

6.     As a part of its responsibilities in connection with administering New York's Medicaid program, during my tenure as the Commission, the New York Department of Social Services was responsible for seeking and maintain HCFA's approval of New York Medicaid's State Plan. When compliance issues arose from time to time, they were brought to my attention as the Commissioner of the New York Department of Social Services.

7.     Attached to this Affidavit as Exhibit C is a true and accurate copy of a letter that the New York Department of Social Services received on or about January 25, 1991, from Arthur J. O'Leary, then the Associate Regional Administrator, Division of Medicaid, Health Care Financing Administration. As was the Department's regular practice when it received correspondence from HCFA regarding approval for New York Medicaid's State Plan, the

Department would maintain the correspondence (such as <u>Exhibit C</u>) in the ordinary course of its

regularly conducted business activities.

Dated: ~~May~~ June ___, 2008

Cesar A. Perales

Sworn to before me this

___ day of ~~May~~ June, 2008

ALAN LEVINE
Notary Public, State of New York
No. 02LE2832715
Qualified in New York County
Commission Expires November 7, 20__

EXHIBIT A

NEW YORK STATE

DEPARTMENT OF SOCIAL SERVICES

40 NORTH PEARL STREET, ALBANY, NEW YORK 12243

CESAR A. PERALES
*Commissioner*



October 3, 1986

RE: Medicare & MA – Limits on Drug
Payments (Federal Register Publica-
tion – Ref. No. 447)

Dear Sir/Madam:

The purpose of this correspondence is to provide you with the New York State
Department of Social Services' comments on the above-captioned proposed rule
published in the August 19, 1986 <u>Federal Register</u>.

The Department has reviewed the three (3) alternative approaches to the current
Medicaid rules (42 CFR 447.331 through 447.334) regarding upper limits for drug
reimbursement and offers the following comments:

A. <u>Pharmacists' Incentive Program Alternative</u>

The New York State Department of Social Services is not in favor of the
Pharmacists' Incentive Program.  In order for New York to realize a
significant cost benefit from this pharmacists' incentive plan,
pharmacists must be allowed to make unlimited substitution of drugs.
This would not be possible under current state law.

The plan proposes to set the upper limit at 150% of the least costly
multiple source drug advertised in a specific quantity or volume.
However, the advertised price found in the Red Book or the Blue Book
may not reflect the actual purchase price (APC) and there is no rational
basis for using the quantity base of 100 for tablets or capsules and pints
for liquids.  Generic or multiple source drug prices are competitively low
for larger quantities enabling all pharmacies large or small to purchase
at lower cost.  There are very few pharmacies which could not purchase
drugs in quantities larger than 100 tablets/capsules or pints.  In fact, the
pharmacist's acquisition cost is likely to be lower than the price quoted
in the Red or Blue Books.

Although this plan will encourage pharmacists to become more prudent
purchasers, the Medicaid program may not realize savings in an appreci-
able amount since the markup of the acquisition costs will be significant.
Furthermore, the publication of new price limits as prices in the
marketplace may not be timely and therefore, the Medicaid program will
not realize the full advantage of economies available in the marketplace.

- 2 -

B. Revision of the MAC Program Alternative

The New York State Department of Social Services supports direct operation of the Maximum Allowable Cost (MAC) program by HCFA. The Pharmaceutical Reimbursement Board, a special board for establishing MAC limits, should be eliminated to overcome unnecessary delays in finalization of a MAC designated item and price.

The Department agrees that the $50,000 annual reduction in expenditures that HCFA expects is a reasonable figure.

New York strongly supports the proposed survey of drug wholesalers for assurances that the drugs proposed for MAC limits are widely and consistently available at the MAC prices. However, New York State would like the survey process extended to cover generic manufacturers and distributors whereby the purchasing practices of pharmacists could be identified since the majority of generic drug purchases seem to occur in this manner.

New York also supports the waiver of specific MAC limits for a state upon the state medicaid agency's request and satisfactory demonstration that a particular volume of the drug is too low to justify administering the limit. It is believed that such a waiver would be an improvement over the current MAC program procedures and would be more acceptable to the pharmacy community.

New York supports instituting a contact point for complaints when a MAC limit is established since this will again enhance provider and state program relations with HCFA.

New York State is strongly supportive of this alternative because it presents no administrative problems and continues what program administrators feel has been a rational approach to savings.

C. Competitive Incentive Program Alternative

The New York State Department of Social Services does not support the Competitive Incentive Program since a careful review of this alternative indicates that the concept would be administratively difficult to implement and control.

The proposal indicates that the starting point for establishing an upper limit for reimbursement for all drugs would be the price the pharmacy charges a majority of its private retail customers for that drug, at that time and in that quantity. This initial step for setting limits on drug reimbursement can present the State program with both administrative and technical systems problems that could dilute any potential cost benefits.

Pharmacy operations service a multitude of third party programs in addition to the Medicaid program. Therefore, it would be difficult to determine the price paid by the majority of private retail customers since cash payment for prescriptions is presently a very small percentage of these operations.

- 3 -

The Department believes that this alternative is another approach to adopting the "marketplace price" concept which the chain pharmacy organizations have been actively lobbying for. If this proposal is adopted, a good possibility exists that the large competitive pharmacies would control the program and federal/state governments would become highly dependent upon a competitive marketplace that could be manipulated by the pharmacies.

New York State strongly rejects this concept which assumes that the retail marketplace is reasonably efficient in setting drug prices that would reflect a balance between demand and supply of drugs. Medicaid patients will not shift their business from one retail drug store to another as prices change. Medicaid patients do not contribute any monies to the cost of their prescriptions. Therefore, a Medicaid patient has no incentive to shop for prices and to go to the pharmacies with lower prices.

In conclusion, New York State supports proposal "B. Revision of the MAC Program." The proposed revisions, which would streamline and improve the process for establishing MAC limits, can expedite the entire process of setting price limits in a manner that would be acceptable to the individual states and to pharmacies.

It should be further noted that the Maximum Allowable Cost (MAC) methodology can produce savings when enforced. The current program was implemented by the federal government on August 26, 1976 and has been an effective cost control. However, delays in adding new drug items to the list and intensive lobbying against the program by pharmacists have reduced the percentage of savings that could have been realized under the program.

Sincerely yours,

*Cesar A. Perales*

Cesar A. Perales
Commissioner

Health Care Financing Administration
Department of Health and Human Services
BERC-356-P.
P.O. Box 26676
Baltimore Maryland, 21207

**EXHIBIT B**

*Goldberg & Goldberg*

ATTORNEYS AND COUNSELLORS AT LAW

I & I Building
66 North Village Avenue
Rockville Centre, New York 11570

516 764-2800
718 343-6340

David Goldberg
Henry L. Goldberg *

Janet M. Connolly
Michael D. Sanker
Kenneth R. Shaw
Gregory V. Bitterman ²

George Weinbaum *
Robert Katz
Milton Sandberg
Counsel

CABLE ADDRESS:
"GOLDANGOLD" NEW YORK
NO. 516-764-2827

December 4, 1987

*MEMBER OF N.Y. AND FLA. BAR
²MEMBER OF N.Y., FLA. AND CONN. BAR
²MEMBER OF N.Y. AND N.J. BAR

VIA FEDERAL EXPRESS

Hon. Cesar A. Perales
Commissioner
Department of Social Services
40 Pearl Street
Albany, NY 12243

       re: - Departmental Letter of October 2, 1987
           to Health Care Professionals (# 872711);
        - HCFA Regulations Affecting Multiple Source
          Drug Pricing;
        - Stipulation of Settlement in PSSNY v. Carey

Dear Commissioner Perales:

        This firm represents the Pharmaceutical Society of
the State of New York, Inc. (hereafter, "PSSNY").

        On behalf of our client, we would like to call
your immediate attention to the above-captioned letter from
the Department of Social Services (hereafter, the
"Department") to Health Care Professionals (Exhibit A), the
Federal Regulations published on July 31. 1987 at 52 Fed.
Reg. 28648-28658, affecting "multiple source" prescription
drug pricing, the State's response to those regulations, and
the effect of the the Stipulation of Settlement, dated June
23, 1978, in the case of PSSNY v. Carey, 76 Civ. 5080 (LWP)
(U.S.D.C., S.D.N.Y.) (Exhibit B).

        The new regulations provide that their effect is
to set limits on spending for Medicaid prescription
reimbursement. 42 CFR sections 447.331(a) and 447.331(b).
However, the regulatory commentary provided by the Health
Care Financing Administration (hereafter, "HCFA") makes it
clear that a state is not required to use a fixed formula in
deciding reimbursement levels, but is rather given the
broadest possible flexibility:

A-228

Hon. Cesar A.   rales, p. 2

We want to emphasize that as a result of our adopting aggregate limits as the upper limit standards, State agencies are encouraged to exercise maximum State flexibility in establishing their own payment methodologies. We do not intend that our adoption of the formula approach to set limits for multiple source drugs be construed as an indicator of the Federally preferred payment system. [52 Fed. Reg. 28653, emphasis added]

The aggregate payment limit on drugs listed by the Health Care Financing Administration as well as the general limit on sole-source and non-listed multiple source drugs, afford State agencies wide latitude in developing their own payment schemes to suit local conditions and unusual circumstances that may arise from time to time. [52 Fed. Reg. 28655, emphasis added]

COMPLIANCE WITH FEDERAL REGULATIONS

We believe that the Department's October 2 letter does not reflect compliance with the Federal Regulations. In particular, 42 CFR section 447.333 requires that the State plan must describe comprehensively the agency's payment methodology for prescription drugs, including separate and distinct findings that Medicaid expenditures for multiple source drugs and for all other drugs do not exceed the aggregate limits set by HCFA. The October 2 letter neither states that this has been done, nor explains the rationale, nor even indicates that an attempt has been made to do so.

Even more important, the October 2 letter gives no hint as to which drugs will be determined to be "multiple source drugs" and "other" drugs, or what the permitted "estimated acquisition costs" for these drugs will be. A Medicaid pharmaceutical provider cannot know which category a particular prescription falls into, or the reimbursement level. The letter contains none of this required material nor reflects a sufficient basis for any change in reimbursement levels.

The second paragraph of the Department's October 2 letter appears to state an intention to limit reimbursement for "multiple source drugs" if such drugs meet the definition contained in 42 CFR section 447.301 (published at 52 Fed. Reg. 28567) (i.e., that the drug is marketed by two or more manufacturers or by a single manufacturer under two or more names). However, under 42 CFR section 447.332(a)(1)(ii), the drug must be listed by at least three separate suppliers before it gets such treatment.

Hon. Cesar A   erales, p. 3

The third paragraph of the October 2 letter states
that an "other drug" will be reimbursed at the lower of the
"[e]stimated acquisition cost, plus a $2.60 dispensing fee,"
or the retail price to the general public.  However, 42
U.S.C. section 447.331(b)((1) requires that the level be set
at "[e]stimated acquisition costs plus reasonable dispensing
fees established by the agency."  The commentary makes it
clear that in order to be reasonable, the dispensing fee
must be based on direct and indirect costs actually incurred
by dispensing pharmacists, as established by investigation
and documentation.  Such investigation and documentation
could include:

"(1) Audits and surveys of pharmacy operational
costs;

"(2) [C]ompilation of data regarding professional
salaries and fees; and

"(3) [A]nalysis of compiled data regarding
pharmacy overhead costs, profits, etc." [42 Fed.
Reg. 28562]

The $2.60 dispensing fee has not been raised since
1978 and is obviously inadequate to pay more than a small
fraction of the reasonable cost of dispensing a prescription
today.  Any attempt to set new reimbursement levels without
establishing a dispensing fee that reasonably reflects
actual direct and indirect costs will be contrary to the
Federal Regulations.

The Department's October 2 letter further states
that the State "will continue its policy of not recognizing
an override certification that would allow for dispensing
and claiming reimbursement that exceeds the upper limit for
a specific multiple source drug [emphasis in original]."  We
believe that this policy is contrary to the explicit
provision of the regulations.  42 CFR section 447.331(c)(1)
provides:

The upper limit for payments [for] multiple
source drugs for which a specific limit has been
established . . . does not apply if a physician
certifies in his or her own handwriting that a
specific brand is medically necessary for a par-
ticular patient. [emphasis added]

HCFA's regulatory commentary makes the same point
and notes that the state will not lose federal money since
such prescriptions will not be subject to the limitations
for federal funding of multiple source drug prescriptions:

We are retaining the physician override
requirement. . . .  This provision is a safeguard

Hon. Cesar A. Perales, p. 4

that assures that the physician can select the
drug that is medically necessary and best suited
for his or her patient.  This means that the upper
limits established for specific [listed] multiple
source drugs <u>will not apply if the prescribing
physician certifies that a brand name drug is
medically necessary</u>.  These payments <u>will not be
included</u> in the calculation for compliance with
the upper limit for multiple source drugs.  [52
Fed. Reg. 28652, emphasis added]

Indeed, any contrary policy would put pharmacists
in an impossible position and provide an unfair windfall to
the state at pharmacists' expense.  Under section 6810(6) of
the New York Education Law, a pharmacist is legally required
to dispense a prescription for a brand-name drug "as
written" if the prescriber writes "D.A.W." ("Dispense As
Written") in the designated box on the prescription form.
(See also Education Law section 6816-a, requiring generic
substitution if the prescriber does not write "D.A.W." in
the designated box.)  Enforcement of the state policy to
make Medicaid reimbursements for such prescriptions only at
the "multiple source" price will force pharmacists to
dispense the brand-name drug at the multiple-source price.
Thus pharmacists would be forced to fill such prescriptions
at a loss.  In addition, the state would receive an
undeserved and unfair windfall, since such prescriptions
would not be counted in determining whether the state has
met federal "multiple source" expenditure limits.  Rather,
such prescriptions would be counted in the "other drug"
category, for which the state would appear to receive
federal funds at the brand-name rate, while reimbursing
pharmacists only at the generic rate.

COMPLIANCE WITH THE STIPULATION

We also believe that the actions proposed in the
Department's October 2 letter are improperly promulgated
because they are inconsistent with the Stipulation of
Settlement in <u>PSSNY v. Carey</u>.

Section 2 of the Stipulation, like the Federal
regulations, requires the Department to make reasonable
determinations of the prices "generally and currently paid"
by providers of drugs and to use such figures in preparing
lists of Estimated Acquisition Costs.  Sections 3-5 of the
Stipulation set forth specific procedures that must be
followed.  No such list has been promulgated in connection
with the October 2 letter, and there is no indication that
any such effort is under way.

Section 6 of the Stipulation requires that the
Department inform the Pharmaceutical Advisory Committee at
least thirty days prior to the proposed effective date of

A-231

Hon. Cesar A. Perales, p. 5

any changes in pricing or pricing methodology.  The
Committee then has twenty-one days to consider the
appropriateness of such changes and present its views to the
Department, which must consider the Committee's views and
respond within nine days.  The section further requires a
public hearing on the subject of Medicaid pharmaceutical
dispensing fees and the Estimated Acquisition Costs of
prescription drugs.  None of the changes proposed in the
October 2 letter has been submitted to the Pharmaceutical
Advisory Committee.  Neither has the Department contacted
the Technical Advisory Committee or any representative
leaders of the retail pharmacy industry.

As noted above, the new HCFA Regulations give the
State and the Department great flexibility in planning
compliance with general spending limits.  We think that it
is clear that the Regulations do not mandate use of any
particular methodology.  Therefore, the State and the
Department have no basis to invoke Section 10 of the
Stipulation, which excuses compliance by the State and the
Department to the extent that another methodology is
"mandated by Federal law or Regulation. . . ."

In any event, even if the new Regulations are
sufficient to invoke Section 10, the State and the
Department are still bound by Section 11 of the Stipulation,
which provides that if the methodology agreed to in the
Stipulation becomes illegal due to enactment of inconsistent
Federal regulations, the State and the Department are still
required to formulate a legal methodology that creates
results as close as possible to those produced under the
Stipulation methodology.

MEETING REQUEST

In view of the above, we urgently request a
meeting with you and the members of your staff responsible
for Medicaid prescription reimbursement and related matters.
Since the new Federal rules went into effect on October 29,
and we are informed that the State has only until the end of
the year to comply, we request that the meeting be held as
soon as possible.  We also request a complete list of those
drugs the Department has declared or intends to declare to
be "multiple source drugs," and also "other drugs" as well
as the listing of Estimated Acquisition Costs for such
drugs.  If possible, we would like to have this material in
advance of the meeting, so that we can hold meaningful
discussions at that time.

PSSNY is cognizant of the short time constraints
imposed upon the states by HCFA.  This may require a delay
in implementation to avoid serious dislocations in the
Medicaid program.  We and our client stand ready to meet
with you and your staff members immediately to discuss the

A-232

Hon. Cesar A. Jrales, p. 6

complex and far-reaching issues raised by the Federal
regulations. We trust that by working together
cooperatively, this difficult matter can be handled
effectively and expeditiously. We look forward to a reply
at your earliest convenience.

Very truly yours,

GOLDBERG & GOLDBERG

by: Henry L. Goldberg
    Henry L. Goldberg

cc: Ben Mastrototero
    PSSNY

EXHIBIT C



DEPARTMENT OF HEALTH & HUMAN SERVICES

Refer to

Health Care
Financing Administration

Region II
Federal Building
26 Federal Plaza
New York NY 10278

DMD:SOB:B

JAN 2 2 1991

Cesar A. Perales, Commissioner
New York State Department of
   Social Services
40 North Pearl Street
Albany, New York  12243

RECEIVED

JAN 2 5 1991

OFFICE OF COUNSEL
N.Y. STATE DEPT. OF
SOCIAL SERVICES

Dear Commissioner Perales:

Each calendar quarter, we make a complete review of all unresolved compliance issues. As part of the review for the quarter ending December 31, 1990, we have identified the following items appearing below and on the enclosed HCFA-898F report forms.  Item 11 on the forms reflect current activities that have occurred on the issues.

The first issue below is a new compliance issue.

o   New York State does not adhere to the HCFA upper limits for multiple source drugs.  The State reimburses all other prescription drugs based on average wholesale price (AWP) which does not truly represent estimated acquisition cost (EAC).

o   Spenddown Policy - The State's provisions regarding the application of budgetary periods is not in compliance with Federal requirements.

It is our hope that the regional staff can assist your agency in resolving these issues as soon as possible.

Sincerely,

Arthur J. O'Leary
Associate Regional Administrator
Division of Medicaid

Enclosure
cc:  Jo-Ann Costantino

CONFIDENTIAL

E-18

LASKY 00112