UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL NO. 1456 Civil Action No. 01-12257-PBS Subcategory Case No. 03-10643-PBS |
| THIS DOCUMENT RELATES TO:  *The City of New York, et al.* v.  *Abbott Laboratories, et al.* | ) ) ) ) ) ) ) | Judge Patti B. Saris |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON ISSUES RELATING TO THE
FEDERAL UPPER LIMIT AND UNDER
NEW YORK SOCIAL SERVICES LAW § 145-B**

# TABLE OF CONTENTS

**Page No.**

**TABLE OF AUTHORITIES** ...........................................................................................iii

**INTRODUCTION**.......................................................................................................... 1

**BACKGROUND** ........................................................................................................... 4

    **A.**    **The Federal Upper Limit** .......................................................................... 4

    **B.**    **New York Medicaid** .................................................................................. 6

    **C.**    **The FUL Thirteen's Reported Prices**...................................................... 7

    **D.**    **Impact of the FUL Thirteen's False Prices on FUL**............................... 9

    **E.**    **The Rulings of this Court** ...................................................................... 10

**ARGUMENT** .............................................................................................................. 12

**I.**    **LEGAL STANDARD** ...................................................................................... 12

**II.**    **DEFENDANTS' FAILURE TO REPORT TRUE PRICES AND
THEIR REPORT OF FALSE PRICES "SHALL BE UNLAWFUL"**................... 13

**CONCLUSION** ........................................................................................................... 21

**APPENDIX A:**    **Drug by Drug Detail**

**APPENDIX B:**    **Issues Precluded**

**APPENDIX C:**    **Claims Precluded**

# TABLE OF AUTHORITIES

## Cases

*Barbour v. Dynamics Research Corp.*,
    63 F.3d 32 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c) ....................................... 12

*Clackamas Gastroenterology Associates, P. C. v. Wells*,
    538 U.S. 440 (U.S. 2003)................................................................................................ 18

*Commonwealth of Massachusetts v. Mylan*,
    2008 WL 5650859 (D. Mass. Dec. 23, 2008)................................................................ passim

*Hecht v. City of New York*,
    60 N.Y.2d 57, 454 N.E.2d 527 (N.Y. 1983) ............................................................... 20

*In re Pharm. Average Wholesale Price Litig.* ("*Track One Findings*")
    491 F. Supp. 2d 20, 95 (D. Mass. 2007)...................................................................... 7

*In re Pharm. Average Wholesale Price Litig.*,
    460 F. Supp. 2d 277 (D. Mass 2006)........................................................................... 7

*In re Pharm. Indus. Average Wholesale Litig.*,
    2004 WL 2387125 (D. Mass. Oct. 26, 2004)............................................................... 16

*In re Pharm. Indus. Average Wholesale Litig.*,
    2007 WL 1051642 (D. Mass. April 2, 2007)............................................................... 16

*In re Pharm. Indus. Average Wholesale Litig.*,
    339 F. Supp. 2d 165 (D. Mass. 2004) .......................................................................... 16

*In re Pharmaceutical Average Wholesale Price Litig.*,
    498 F. Supp. 2d. 402 (D. Mass. 2007) ("*NY Counties II*") ....................................... 1

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
    475 U.S. 574 (1986)....................................................................................................... 13

*Mesnick v. General Elec. Co.*,
    950 F.2d 816 (1st Cir. 1991)........................................................................................ 12

*United States v. Aerodex, Inc.*,
    469 F.2d 1003 (5th Cir. 1972) ..................................................................................... 17

*United States v. ATK Launch Systems, Inc.*,
   No. 1:06-CV-39 TS, 2008 WL 4642164 (D. Utah Oct. 16, 2008) .......................... 17

*United States v. Cushman & Wakefield, Inc.*,
   275 F. Supp. 2d (N.D. Tex. 2002) ....................................................... 17

*United States v. NHC Health Care Corp.*,
   No. 00-3128-CV-S-4-ECF, 2000 WL 33146582 (W.D. Mo. Nov.15, 2000) .......................... 17

**Statutes**

42 C.F.R. § 447.301 (2006). ................................................................ 6

42 C.F.R. § 447.333 (2001) ................................................................ 6

42 C.F.R. 447.332(a)(1)(ii). ................................................................ 5

42 U.S.C. §1396r-8(e)(4) ................................................................ 5, 18

52 Fed. Reg. 28648 (July 31, 1987) ........................................................ 4

Federal Rules of Civil Procedure, Rule 56 ................................................ 1, 6

Local Rule 56.1 ................................................................ 1, 2, 4, 5

Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5B .............................. 3

N.Y. General Business Law §349 ............................................................ 3

New York False Claims Act ................................................................ 3

New York Social Services Law §145-b ................................................ passim

Omnibus Budget Reconciliation Act of 1990 ................................................ 5

**Other Authorities**

2003 Compliance Program Guidance for Pharmaceutical Manufacturers ................... 13

Approved Drug Products with Therapeutical Equivalence Evaluations........................ 6

## INTRODUCTION

In July 2007, the Court directed plaintiffs to demonstrate that "defendants submitted false prices that, if truthful, would likely have affected the [Federal Upper Limit] FUL." *In re Pharmaceutical Average Wholesale Price Litig.*, 498 F. Supp. 2d. 402, 405 (D. Mass. 2007) ("*NY Counties II*").[1] The Court further instructed plaintiffs and defendants each to select five drugs subject to FUL reimbursement. CMO 33 at 5(a) [Dkt. No. 4745].   Pursuant to that directive, and following extensive analysis, the parties submit the following nine subject drugs[2] manufactured by thirteen defendants (hereinafter "the FUL Thirteen")[3] for the Court's consideration: Albuterol .90 MCG Inhaler; Albuterol .83 MG Solution; Cefadroxil 500 MG Capsule; Clonazepam .5 MG Tablet; Enalapril Maleate 20 MG Tablet; Isosorbide Mononitrate 60 MG Tablet; Lorazepam 1 MG Tablet; Metropolol 100 MG Tablet; and Ranitidine 150 MG Tablet (the "subject drugs").

Plaintiffs now move pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 for summary judgment that the FUL Thirteen's false price reports for the nine subject drugs

---

[1]    This Court is so profoundly aware of the history of these proceedings that plaintiffs will try to minimize repetitive explanations of terms of art, rulings of law, or industry mechanics.

[2]    The Court had asked that the parties choose five selections each, but, as matters turned out, one choice overlapped.

[3]    The "FUL Thirteen" are: (1) Barr Laboratories, Inc.; (2) Dey, L.P. and Dey, Inc.; (3) Ethex Corporation; (4) Ivax Corporation/Ivax Pharmaceuticals Inc.; (5) Mylan Laboratories, Inc./Mylan Pharmaceuticals, Inc., and UDL Laboratories, Inc.; (6) Par Pharmaceuticals Companies, Inc./Par Pharmaceutical, Inc.; (7) Purepac Pharmaceutical Co.; (8) Boehringer Ingelheim Roxane Inc. f/k/a Roxane Laboratories, Inc.; (9) Sandoz, Inc.; (10) Schering Corp/Schering-Plough Corp./Warrick Pharmaceuticals Corporation; (11) Teva Pharmaceutical

violated New York Social Services Law §145-b (hereinafter "Section 145-b") and caused inflated FULs to be set by CMS.

Each of the nine subject drugs had FULs in place during some or all of 1997-2005[4].  For each drug, the FUL Thirteen reported WACs (or WAC equivalents) and/or AWPs[5] that were false, inflated and had no connection to the FUL Thirteen's actual prices.  The FUL Thirteen submitted these false WACs and AWPs knowing that the Centers for Medicare and Medicaid Services ("CMS") would consider them and use them when setting FULs on which New York Medicaid reimbursements are based.

The FUL Thirteen's submission of fictitious and grossly inflated WACs and AWPs carried at least the potential to inflate FULs[6].  Given that liability under Section §145-b attaches upon the "attempt to obtain" payment from the public fisc (see discussion *infra* at II.B), the FUL Thirteen's issuance of the false WACs and AWPs on which FULs were predictably to be based is *by itself* sufficient for granting plaintiffs the

---

USA, Inc.; (12) Watson Pharmaceuticals, Inc./Watson Pharma, Inc. and (13) Wyeth Pharmaceuticals, Inc.

[4]     The accompanying Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts (One (1) Common and thirteen (13) defendant-specific) and the Declaration of Harris L. Devor, dated May 15, 2009, and Exhibits thereto ("Devor Decl.") set out in detail the evidence gathered with respect to the scrutinized drugs and their thirteen defendant manufacturers.  That evidence establishes defendants' false and inflated WACs and AWPs.  We expect defendants to deny this evidence, but to date they have offered no support whatsoever of the truthfulness of their reported AWPs or WACs.

[5]     Barr 56.1 at ¶¶ 5-16; Dey 56.1 at ¶¶ 13-14; Ethex 56.1 at ¶¶ 6-12; Ivax 56.1 at 8-17; Mylan 56.1 at 9-13; Par 56.1 at ¶¶ 7-16; Purepac 56.1 at ¶¶ 7-14; Roxane 56.1 at ¶¶ 5-8; Sandoz 56.1 at ¶¶ 11-20; Teva 56.1 at ¶¶ 8-20; Schering-Warrick 56.1 at ¶¶ 7-16; Watson 56.1 at ¶¶ 9-12; and Wyeth 56.1 at ¶¶ 6-12.

relief sought.   Prior decisions of this Court have significantly simplified the issues presented by this motion.

In the December, 2008 *Mylan* decision, to name an example, the Court resolved, *inter alia*: (i) whether defendants to that motion had knowingly made material, false statements about WACs (*see id*. at *16), (ii) that the cause for false reporting comes into being upon the claim for payment (*see id*. at *18), and (iii) that the defense of government knowledge becomes available only upon showing either that the government had knowledge of the actual, true facts of the claim, or had been a witting participant to the fraud through government agents (*see id*. at *19).   In the same decision, the Court resolved claims respecting a number of particular drugs.   Defendants there are among the defendants here, and some of the drugs there are those as to which claims are made here.[7]

The issue of imputation of damages to particular defendants is not addressed here, as we do not understand that to be part of the Court's 2007 assignment.   We note however that the Court has upheld plaintiffs' right to proceed under four separate theories:   Section 145-b, common law fraud, N.Y. General Business Law § 349 and unjust enrichment.   Measures of damage may differ with respect to each.   By this motion,

---

[6]      *See Commonwealth of Massachusetts v. Mylan*, 2008 WL 5650859, at *15, 23-24. (D. Mass. Dec. 23, 2008) ("*Mylan*").

[7]      Appendices B and C hereto identify the issues and claims respecting particular drugs that defendants previously contested and lost that are again on display in this motion.   We note that Section 145-b is at least as broad as the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5B, addressed in *Mylan*.   On its face, the New York False Claims Act imposes liability and damages for the mere "attempt" to swindle.   *See* Argument, Point II.B, *infra*.

plaintiffs seek summary judgment solely with respect to claims predicated on Section 145-b and concerning the impact of the FUL Thirteen's false prices on the FUL.

In sum, plaintiffs are entitled to partial summary judgment that the record evidence, and the reasoning undergirding prior decisions of this Court, determine defendants' violations of law. Plaintiffs do not now seek a determination of damages, and, in light of New York's law respecting contributory damages (*See* Argument, Point II.C, *infra*), plaintiffs need not apportion liability among the wrongdoers.

## BACKGROUND

### A.    The Federal Upper Limit

The Secretary of Health and Human Services ("Secretary") established the FUL in 1987 to allow "the Federal and State governments to take advantage of saving that are currently available in the marketplace for multiple source drugs… [while] maintain[ing] State flexibility in the administration of the Medicaid program." 52 Fed. Reg. at 28648 (July 31, 1987).[8]  The two primary goals of the FUL program are to ensure access to prescription drugs while taking advantage of the lower prices that are offered in a competitive generic marketplace.  Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts applicable to all Defendants ("Common 56.1") at ¶ 4.

The particulars regarding how FULs are set are detailed at plaintiffs' Common 56.1 at ¶¶ 7-11.   In *breve*, at all times relevant hereto, in order for a FUL to be set for a

multiple source drug, the drug had to have at least three therapeutic and pharmaceutical equivalents in the "Orange Book"[9].  *See* 42 U.S.C. § 1396r-8(e)(4).  Second, there had to be at least three national suppliers for the drug, as reflected in "all listings contained in current editions (or updates) of published compendia of cost information for drugs available for sale nationally."  42 C.F.R. § 447.332(a)(1)(ii).

Once these two criteria were met, the regulations provided that CMS may establish the FUL by taking "150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or if the drug is not commonly available in quantities of 100, the package size commonly listed)…"  42 C.F.R. § 447.332(b).  The computer system that did this work (the FUL system or "FULs") is described at ¶ 9 of the Common 56.1.

Given the policy objectives of the FUL program, FULs are not automatically set once the threshold criteria are satisfied. Where appropriate, CMS engages in a manual review to ensure availability nationwide of the drug and accuracy of pricing information. Common 56.1 at ¶ 11.   In all events, FULs were set based on defendants' false prices. To the extent the FUL Thirteen reported false and inflated WACs, the reports had potential to or actually did cause inflated FULs to issue and, predictably, overcharges to

---

[8]     Congress statutorily required the establishment of FULs as part of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 4401 (a)(3), 1927(f)(2), 104 Stat. 1388, 1388-143 (codified at 42 U.S.C. 1396r-8(e)(4)).

the New York Medicaid system.  As presented more fully throughout, that is all Section 145-b requires for a finding of liability.  *See* Argument, Point II.B, *infra*.

**B.    New York Medicaid**

New York Medicaid, like all State Medicaid programs, is required to reimburse providers at their "estimated acquisition cost" ("EAC") of the drug plus a reasonable dispensing fee.  *Mylan,* 2008 WL 5650859, at *2.  EAC is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers."  *Id.*; 42 C.F.R. § 447.301 (2006).

The New York Medicaid reimbursement formula is set by the Legislature.  During 1997-2005, if a FUL was in place for a drug, it was to be reimbursed based on the FUL. *See* N.Y. Soc. Serv. L. § 367-a(9)(b)(i).  The Federal Government approved of the New York State Medicaid Plan throughout the 1997-2005 period.  *See* 42 C.F.R. § 447.333 (2001), *e.g.*.

Each of the FUL Thirteen entered into Medicaid rebate agreements[10], and, accordingly, all were required as a matter of law to familiarize themselves with the legal requirements, standards and procedures of the New York Medicaid program, including

---

[9]     The Orange Book is the FDA's publication, Approved Drug Products with Therapeutical Equivalence Evaluations.

[10]     Barr 56.1 at ¶ 4; Dey 56.1 at ¶ 3; Ethex 56.1 at ¶ 4; Ivax 56.1 at ¶ 3; Mylan 56.1 at ¶ 3; Par 56.1 at ¶ 3; Purepac 56.1 at ¶ 3; Roxane 56.1 at ¶ 3; Sandoz 56.1 at ¶ 7; Schering-Warrick 56.1 at ¶ 3; Teva 56.1 at ¶ 3; Watson 56.1 at ¶ 4; and Wyeth 56.1 at ¶ 4.

the rules governing reimbursement.  *See Mylan*, 2008 WL 5650859, at *25.  This means that each of the FUL Thirteen was legally obligated to know that its submission of false WACs on which FULs were or could have been based would lead to overcharges to the New York Medicaid system and liability under Section 145-b.

**C.     The FUL Thirteen's Reported Prices**

This Court has defined AWP according to its plain meaning and to include discounts and rebates.  *See In re Pharm. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 288 (D. Mass 2006).  The Court also has ruled that a company's reported AWP must be tethered to its actual prices and that published AWPs that are more than 30% above the actual price charged are false and misleading[11]. *In re Pharm. Average Wholesale Price Litig.,* 491 F. Supp. 2d 20, 95 (D. Mass. 2007) ("*Track One Findings*").  The Court has also held that "WAC must mean the actual cost at which wholesalers acquired a drug".  *Mylan*, 2008 WL 5650859, at *15 (internal quotations omitted).[12]

---

[11]     The 30% "speed bump" was adopted by the Court in the context of the Track One trial which involved private third-party payors - not Medicaid.  *Track One Findings*, 491 F.Supp. 2d. at 95.  It has yet to be determined whether a 30% speed bump is appropriate for Medicaid and plaintiffs are not adopting the 30% speed bump here.  Plaintiffs reference the Court's Findings as to 30% speed bump as they are clearly instructive on the question of AWP falsity.  With only a few isolated exceptions, none of the FUL Thirteen's published AWPs could satisfy a 30% test.

[12]     Extensive discussion of the meaning of "WAC" appears at *Mylan*, 2008 WL 5650859, at *11-12, 14.  Some of this discussion concerns how the term is used in Massachusetts, but the Court's findings that "WAC did not have an established and settled meaning in the industry as a term of art meaning 'an undiscounted list price'" and that WAC "does not mean a list price; it means the amount that goods actually cost" (*id.* at * 14) are not confined to Massachusetts particulars.   The Court found that **"**[t]he evidenced produced by the Commonwealth and defendants demonstrates that WAC either did not have an established and settled meaning, and thus was not a term of art, or it was a term of art, but a term of art that meant 'the actual cost at

The FUL Thirteen's published AWPs and WACs for the subject drugs do not satisfy these conditions[13] and were, in short, "far, far higher than the prices.... actually paid." *Mylan*, 2008 WL 5650859, at *15; *See* also Devor Decl. Exh. C.  And, the FUL Thirteen's witnesses have testified uniformly under oath that their WACs and AWPs were not prices that any customer ever paid to acquire the drugs at issue. *See* note 13, *supra*.

The following materials make plain the falsity of the FUL Thirteen's reported prices:

1. Attached as Exhibit A to each defendant's Local Rule 56.1 Statement of Undisputed Facts is a spreadsheet setting forth the reported WAC, reported AWP, AMP and operative FUL, if any, for every Drug and NDC examined on this motion.  None of the pricing data reflected in these charts is in dispute.

---

which wholesalers acquired a given drug'." *Id.* at *12.  That evidence, set forth at *12-14 of the decision, consisted of: an article published by the U.S. Department of Health and Human Services, FDB definitions from 1994 and 1998, Medi-Span definitions from 1996, an August, 2004 report for CMS that included statements on the meaning of WAC, a 2001 document provided by Schering Laboratories defining WAC, , the February, 2005 report of Independent Expert Professor Ernst R. Berndt, a 1994 GAO report, a 1997 book by Stuart Schweitzer, the 1997 book "Elements of Pharmaceutical Pricing", and the deposition testimony of FDB witness Kay Morgan.  NONE of this evidence is Massachusetts specific.

[13]     Barr 56.1 at ¶¶ 18-30; Dey 56.1 at ¶¶ 17-23; Ethex 56.1 at ¶¶ 16-31; Ivax 56.1 at ¶¶ 18-27; Mylan 56.1 at ¶¶ 18-25; Par 56.1 at ¶¶ 18-22; Purepac 56.1 at ¶¶ 15-34; Roxane 56.1 at ¶¶ 9-17; Sandoz 56.1 at ¶¶ 24-44; Schering-Warrick 56.1 at ¶¶ 17-23; Teva 56.1 at ¶¶ 21-26; Watson 56.1 at ¶¶ 18-21; and Wyeth 56.1 at ¶¶ 15-27.

8

2. Attached as Exhibit C to the Devor Declaration is a spreadsheet setting forth spreads between defendants' (a) reported AWPs and AMPs[14]; (b) reported WACs and AMPs, and (c) reported WACs and true WACs (a/k/a "Devor WACs").

3. Appendix C hereto identifies the defendants and drugs or NDCs that this Court already found FULly inflated in the *Mylan* decision.

**D.     Impact of the FUL Thirteen's False Prices on FUL**

Attached as Exhibit A to the Devor Declaration is the Rule 26 Statement of Harris L. Devor, dated September 30, 2008 and Exhibits 5-17 thereto ("Devor Rule 26 Statement"). For each defendant, drug and NDC examined, Mr. Devor calculated a "true WAC" (also known as the "Devor WAC") that was net of all rebates, chargebacks, etc. consistent with the Court definition. *See* Devor Rule 26 Statement at ¶¶ 177-185**.** Mr. Devor further calculated what the FUL would have been had it been set on this true WAC. *See, e.g.* Devor Rule 26 Statement Exhibits 5-17. Mr. Devor also prepared exhibits setting forth the FUL Thirteen's AMPs for the subject drugs (*id.*), and calculated what the FUL would have been had it been set on a price equal to those AMPs. *Id*. Mr. Devor's methodology for these calculations is fully set forth in the Devor Rule 26 Statement at ¶¶ 177-193.

---

[14]     AMP is defined as "the average price paid to the manufacturer for drugs distributed to the retail pharmacy class of trade." 42. U.S.C. §1396r-8(k)(1)(A). AMPs are neither WACs nor AWPs but nevertheless have been accepted by this Court as one means of evaluating the veracity of both. *See, e.g., Mylan*, 2008 WL 5650859 at *5-10 (discussion of individual defendant spreads based on AMP); at FN4 (noting impact on FUL if Par reported a truthful AWP more

Attached as Exhibit B to the Devor Declaration are graphs for every Drug and NDC associated with the package size that set the FUL for each subject drug.  Each chart presents:

1.    The FUL Thirteen's Reported AWP
2.    The FUL Thirteen's Reported WAC
3.    Any Operative FUL
4.    The FUL Thirteen's AMP
5.    Calculation of a FUL based on AMP
6.    Plaintiffs' Expert's Calculation of the True WAC ("Devor WAC")
7.    Calculation of FUL based on Devor WAC.

Attached as Exhibit C to the Devor Declaration is a spreadsheet showing the spreads between the FUL Thirteen's (a) reported WACs and AMPs; (b) reported AWPs and AMPs and (c) reported WACs and Devor WACs.

These exhibits collectively show that the FUL Thirteen's reported WACs and AWPs were "much much higher" than their true prices and that FULs based on their true prices would have been lower than what they were.  Drug-by-drug detail is set forth in Appendix A hereto.

E.    **The Rulings of this Court**

Prior decisions of this Court coupled to the causes alleged and applied to the accumulated record evidence make clear beyond genuine controversy that plaintiffs will prevail on liability under Section 145-b.  This Court's December, 2008 decision in *Mylan* has, as a functional matter, effectively precluded defendants from contesting plaintiffs

---

along lines of Par's AMP); Order on Schering's Motion for a Protective Order, dated September 22, 2008 [Dkt. No. 5605].

with respect to the issues and drugs participant to this motion.  *See* Appendix B hereto

(issues previously resolved); Appendix C hereto (claims previously resolved).

In *Mylan*, this Court ruled:

1.      The state need not prove that it has been damaged by false claims.  Citing false claims and qui tam principles, liability attaches "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.  *11 (internal quotations omitted).

2.      WAC is not a term of art, and WAC "meant the actual cost at which wholesalers acquired a given drug".  *12 (internal quotations omitted).

3.      The apposite statute must be interpreted with the whole of it and "the statute's purpose." *14.

4.      A "knowing submission" of a false claim may be reasonably inferred from knowledge of publication of inflated WAC's or even because publisher may have had apparent authority to do so. *16.

5.      Even if certain links of the chain that resulted in Medicaid overpayments had been inflated by persons other than a particular defendant, "that would not stop the defendants from being chargeable with causing false claims to be submitted."  Presentment of a false claim rather than actual payment controls. *17-18.

6.      Materiality in the context of false claims means "the type of statement capable of influencing the government's decision (that is, the falsehood must be potentially relevant to the decision)."  This standard "focuses on the potential effect of the false statement when it is made, not on the actual effect of the statement when it is discovered." *23-24 (internal citations omitted).

7.      Government knowledge is not a defense against presentment of a false claim unless government had "knowledge of the actual true facts of the claim, not simply knowledge that the claim is generally false;" or "the government was defrauded by the very activities its agents ordered" *19-20 (internal quotations omitted).  Moreover, knowledge of one agency of government not imputed to another. *20.

11

8.     Defendants' knowledge may be inferred because they "were required, as a matter of law, to familiarize themselves with the legal requirements, standards and procedures of the Medicaid program." *25. Also considered are submission of "reported WAC's that were grossly out of whack with the prices that were actually paid," and that actual payments were "susceptible to actual knowledge." *27.

9.     The Court found that the nine defendants participant to plaintiff's motion in *Mylan* had "reported [WAC] numbers that were far, far higher than the prices that most (if not all) wholesalers actually paid." *15. Appendices B and B hereto correspond to the Court's *Mylan* findings in this regard with the defendants and drugs subject to this motion.

## ARGUMENT

### I.     LEGAL STANDARD

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Mylan*, 2008 WL 5650859, at *10, citing *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).

"Not every discrepancy in the proof is enough to forestall a properly supported motion for summary judgment; the disagreement must relate to some genuine issue of material fact."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991).  Where a rational trier of fact could not find for the non-moving party based on the record as a

whole, there is no "genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio*

475 U.S. 574, 587(1986).

Here, summary judgment is appropriate because each defendant has admitted, and

the record establishes beyond genuine controversy, that it knowingly made false

statements or representations, or deliberately concealed material facts, to attempt to

obtain or to obtain payments pursuant to Chapter 55 of the Consolidated Laws of the

State of New York.

## II.   DEFENDANTS' FAILURE TO REPORT TRUE PRICES AND THEIR REPORT OF FALSE PRICES "SHALL BE UNLAWFUL"

**A.**   Defendants had a legal obligation to report true prices to the government.

These obligations appear at the 2003 Compliance Program Guidance for pharmaceutical

manufacturers issued by the Office of the Inspector General of the U.S. Department of

Health and Human Services and sent to the FUL Thirteen. *See* Exhibit E to the Common

56.1.

> Pharmaceutical manufacturers have a legal duty to avoid submitting false or inaccurate pricing or rebate information to any federal health care program.  68 Fed. Reg. at 23732.

> The government sets reimbursement with the expectation that the data provided are complete and accurate.  The knowing submission of false, fraudulent or misleading information is actionable.  68 Fed. Reg. 23733

> In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.  68 Fed. Reg. 23734.

13

This Court has acknowledged that defendants are charged with as a matter of law knowledge of the Medicaid laws, rules and regulations including those relating to the federal government's use of published prices to set FUL and state Medicaid agencies use of defendants' reported prices to estimate acquisition cost.   *See Mylan*, 2008 WL 5650859, at *25.

**B.**   New York Social Services Law 145-b provides:

> 1(a) ***It shall be unlawful*** for any person, firm or corporation knowingly by means of a false statement or representation or by deliberate concealment of any material fact or other fraudulent scheme or device on behalf of himself or others ***to attempt to obtain or to obtain*** payment from public funds for services or supplies furnished or purportedly furnished pursuant to this Chapter.
>
> *      *      *
>
> 2.   For ***any violation of subdivision one***, the local social services district or the state ***shall have a right to recover civil damages equal to three times the amount by which any figure is falsely overstated*** ...." (emphasis supplied.)

Thus, to establish liability under Section 145-b, plaintiffs must prove that a defendant: (a) (i) knowingly (ii) made a false statement or representation, *or* (i) deliberately (ii) concealed a material fact, *or* (iii) other scheme, (b) on behalf of himself or others, (c) to attempt to obtain, or to obtain (d) payment from public funds .

The record evidence is that each of the FUL Thirteen knowingly made a false statement or representation, or deliberately concealed a material fact on behalf of itself or others to attempt to obtain, or to obtain payments from public funds for services or

supplies (here prescription drugs).  *See* note 12, *supra*. Specifically, each of the FUL Thirteen

1.      Knowingly reported WACs and AWPs (*See* note *5*), *supra.*

2.      Knew the WACs and AWPs did not reflect actual prices to customers (*See* note *13*), *supra.*

3.      Knew that CMS would consider these published prices to set the FUL[15]

4.      Knew that New York Medicaid would reimburse on the FUL.  (*See* note *10, supra.*)

5.      Made these reports so that defendants or "others" (providers) could obtain payment (reimbursement)[16].

Prior rulings of this Court have confirmed, at minimum, the absence of any genuine issue respecting: knowledge, falsity of statement or representation, attempt to obtain or payments.  *See* Background Section "D", *supra*.

This Court has repeatedly upheld plaintiffs' Section 145-b claims.  In *Suffolk I*, the Court found that the AWP scheme alleged there by plaintiff – "that a company make a fraudulent statement regarding AWP in order to get higher a reimbursement rate for providers who purchase its  drugs" – met the requirements of the provision.  *In re Pharm.*

---

[15]      Barr 56.1 at ¶¶ 4-17; Dey 56.1 at ¶ 16; Ethex 56.1 at ¶ 4; Ivax 56.1 at ¶¶ 3, 38; Mylan 56.1 at ¶¶ 3, 4, 6, 14; Par 56.1 at ¶¶ 3, 6, 17; Purepac 56.1 at ¶¶ 3-6; Roxane 56.1 at ¶ 3; Sandoz 56.1 at ¶ 7, 23; Schering/Warrick 56.1 at ¶¶ 3, 6; Teva 56.1 at ¶¶ 3, 6, 7; Watson 56.1 at ¶¶ 4-6, 8, 13, 23; and Wyeth 56.1 at ¶¶ 4, 14.

[16]      Barr 56.1 at ¶ 31; Dey 56.1 at ¶¶ 4-5, 11; Ethex 56.1 at ¶ 14; Ivax 56.1 at ¶¶ 4-7; Mylan 56.1 at ¶¶ 5-8; Par 56.1 at ¶¶ 5-6; Purepac 56.1 at ¶¶ 5-6; Roxane 56.1 at ¶ 4; Sandoz 56.1 at ¶¶ 8-10, 21-23; Schering/Warrick 56.1 at ¶¶ 5-6; Teva 56.1 at ¶¶ 5-7; Watson 56.1 at ¶¶ 7-8; and Wyeth 56.1 at ¶¶ 13-14, 28.

*Indus. Average Wholesale Litig.*, 339 F. Supp. 2d 165, 179 (D. Mass. 2004) ("*Suffolk I*").

The Court ruled that:

> The scheme fits into 1(a) and (b), because Defendants attempted to obtain, "on behalf of" providers, payment from public funds through means of reporting of false data (the AWP's) that served as the basis for the claims of the providers. Alternatively, under 1(c), Defendants arguably obtained public funds when public funds were used to reimburse providers, from whom Defendants obtained payment.

*Id. See also In re Pharm. Indus. Average Wholesale Litig.*, 2004 WL 2387125, at *2 (D. Mass. Oct. 26, 2004) ("*Suffolk II*") (upholding Section 145-b claims against certain defendants); *In re Pharm. Indus. Average Wholesale Litig.*, 2007 WL 1051642, at *11 (D. Mass. April 2, 2007) ("*NY Counties I*") (agreeing that "defendants received public funds within the meaning of the statute when they fraudulently manipulated wholesale prices in order to increase Medicaid reimbursements to providers.").

And, with respect to the drugs that appear at Appendix C hereto, in *Mylan*, the Court satisfied itself of the falsity and illegality of defendants' reports. *Mylan, supra* at *5-10, 16-17. The reports made to CMS by the FUL Thirteen to this motion respecting the drugs subject to this motion were in all substantive ways identical to what occurred in Massachusetts. *See* note 15, *supra*.

Whether the FUL Thirteen achieved their purposes or actually deceived does not diminish their liability. New York is even more clear than Massachusetts on this score. FUL's have nationwide application and it is the "attempt" to bilk and its "potential" to deceive (*Mylan*, 2008 WL 5650859, at *23-24) that establish misconduct.

16

That liability is established regardless of whether money was actually obtained demonstrates that Section 145-b is focusing on, and trying to prevent, *defendant's* false behavior.  Intent to deceive is not a necessary element (*see Mylan*, 2008 WL 5650859, at * 24), merely that a knowingly false statement was made that led to, or *could have led to*, the payment of a false claim is enough.  This is further established because a party is liable under Section 145-b for making a knowingly false statement *regardless of* the behavior of the government.   *See United States v. Aerodex, Inc.*, 469 F.2d 1003, 1009 (5th Cir.1972) [17] (government failure to conduct final inspection where obligated to do so does not absolve the contractor of liability under the federal False Claims Act).

Accordingly, the FUL Thirteen's statutory liability for the filing of false prices

---

[17]     Addressing a tangential matter, the Court in *Mylan* partitioned liability from damages.

> Defendants argue that for those instances in which Massachusetts reimbursed above the FUL, Massachusetts cannot prove that the WACs affected the reimbursement.  Massachusetts argues that these instances are isolated administrative errors.  If the error consisted solely of a failure to take into account FULs, the correct FUL would limit damages but would not absolve defendants of liability.

*Mylan*, 2008 WL 5650859, at *29.  Governing bodies generally are not contributorily negligent in instances involving false claims.  *See, e.g., United States v. ATK Launch Systems, Inc*., No. 1:06-CV-39 TS, 2008 WL 4642164, at *3-4 (D. Utah Oct. 16, 2008) ("Courts have held that the doctrines of contributory or comparative negligence do not apply to . . . the False Claims Act"); *United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d at 773  (N.D. Tex. 2002) (the defense of comparative fault "is unavailable for an action brought under the FCA"); *United States v. NHC Health Care Corp*., No. 00-3128-CV-S-4-ECF, 2000 WL 33146582, at *1 (W.D. Mo. Nov.15, 2000) (striking "contributory and/or comparative fault" defenses in federal False Claims Act suit); *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1009 (5th Cir. 1972) (finding failure of government to conduct final inspection, even where the government was obligated to do so, does not absolve the contractor of liability under the federal False Claims Act).

that the FUL Thirteen knew would be considered by CMS in establishing FULs imposes Section 145-b liability and exposes each defendant to payment of the entirety of civil damages associated with each violative report.  *See* N.Y. Soc. Serv. L. §145-b(2).

**C.**   Although we are not charged at this time with the establishment of actual damages against each defendant, we touch on the subject both to forestall any attempt by the FUL Thirteen to displace liability for damages elsewhere and to show the strict intentions implicit in Section 145-b, and to show the irrelevancy of the need in New York to allocate damages among defendants.

Title 42 U.S.C. § 1396-8(e)(4) and implementing regulations[18] require CMS to consider WACs submitted by multiple vendors capable of distributing a product nationwide.  It was a commonplace for more than one defendant to file an inflated WAC for each drug, and for the amount of inflation to vary within those multiple submissions. *See* Exhibit A to each Individual Defendant 56.1, Devor Decl. Exhibit C.  Section 145-b does not address how damages are to be assessed among multiple wrongdoers. Where a statute does not provide a principle ancillary to its implementation, it is conventional to look to and employ forum principles.  *Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440, 447, (U.S. 2003) ("[legislative] silence often reflects an expectation that courts will look to the common law to fill gaps in statutory text");        Section  145-b(1) makes pellucid that a knowingly false reporter need not have succeeded in his plan

---

Regardless, New York contributory cause protocol renders irrelevant the issue of whether plaintiffs must show who contributed what.

to be liable ("shall be unlawful ... to attempt"), and Section 145-b(2) makes equally clear that the entity that a defendant attempts to cheat may recover three-fold, based not on the actual injuries incurred, but measured by "the amount by which any figure is falsely stated." *Id*.

This rigor is entirely consonant and in service of the principal, essentially tautological, purpose of every false reporting act – to prevent false reporting.  That is why, as this Court recognizes, the illegal act vests at point of the false presentment, not upon success of the scheme.  *See Mylan*, 2008 WL 5650859, at *24.  It is in keeping with the underlying purpose of the False Claims Act to evaluate the claim "based on the potential effect rather than actual result is more consistent with the underlying purpose of the FCA.  The United States Supreme Court has broadly interpreted the statute to cover 'all fraudulent attempts to cause the Government to pay out sums of money.'"  *Id*. (internal quotations omitted).

To hold otherwise would predictably enlarge the incidence of false statements by creating a substantially lessened risk environment for a would be perp.  If found out before the attempt succeeds, there would be no civil consequence.  If not caught, one pockets the payment with the hope of perpetual concealment.

New York's - and the general - view of how to treat false reporters is complemented by how New York law deals with multiple tortfeasors.  It does not require plaintiff to establish degrees of culpability among them, or permit a "but for" out.  *See*

---

[18]     *See* Background Section "A", *supra*.   19

note 17, *supra*. Rather, the New York principle is that tortfeasors are liable for the entirety of damages by operation of a contributory cause standard rather than "but for". *Hecht v. City of New York*, 60 N.Y.2d 57, 62, 454 N.E.2d 527 (N.Y. 1983) (citing Restatement, Torts 2d, § 875, and Comment [b] for proposition that multiple tortfeasors "are individually liable to plaintiff for the whole of the damage").   And surely, if appropriate to apply the contributory cause standard to accidental wrongdoers who commit no intentional injury and no harm to the public at large, the knowing deceiver bent on misappropriating the public's funds deserves no less forceful treatment. Shifting the burden of allocations to defendants also squares with a statute (145-b) that shares with all false claims acts the essential objective of assurance that payments are made on a fully informed basis.   In this instance, any false submission, much less an array of them, creates an artificial and inflated pricing environment in which CMS believes it must operate.[19]   The focus of the FUL Thirteen's false report therefore properly draws bead "on the potential effect of the false statement when it is made, not on the actual effect of the statement when it is discovered."  *Mylan*, 2008 WL 5650859, at *24.

---

[19]     There is no record evidence whatsoever that, in selecting manufacturers that submitted inflated WAC's, any government official had "knowledge of the actual true facts" underlying the reported price, or that any government employee knowingly participated in the implementation of the fraud complained of.  *See Mylan*, 2008 WL 5650859, at *20.

## CONCLUSION

For all the foregoing reasons, plaintiffs respectfully request that their motion for partial summary judgment be granted.

Dated: May 15, 2009

Respectfully submitted,

**City of New York and New York Counties in MDL 1456 except Nassau and Orange by**

**KIRBY McINERNEY, LLP**
825 Third Avenue
New York, New York 10022
(212) 371-6600

/s/ Joanne M. Cicala_____

By:   Joanne M. Cicala
James P. Carroll Jr.
Jocelyn R. Normand
Kathryn B. Allen

Ross B. Brooks, Esq.
MILBERG LLP
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300
*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
LEVY PHILLIPS &
KONIGSBERG, LLP
800 Third Avenue
New York, NY  10022
(212) 605-6205
*Counsel for the County of Orange*

## <u>CERTIFICATE OF SERVICE</u>

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON ISSUES RELATING TO THE FEDERAL UPPER LIMIT AND UNDER NEW YORK SOCIAL SERVICES LAW § 145-B, and Appendices A and B thereto to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.  The HIGHLY CONFIDENTIAL Appendix C has been served directly on counsel for the defendants joined in this motion

Dated:  May 15, 2009

_____/s/_____
James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue,16th Floor
New York, NY 10022
(212) 371-6600

22

Appendix A

# APPENDIX   A

**(1)      Albuterol .83 MG/ML Solution (GCN 05039)**

Albuterol .83 MG/ML Solution was manufactured by defendants Dey, Ivax, Roxane, Sandoz, and Schering-Warrick.  Exhibit A to each Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Dey, Ivax, Roxane, Sandoz and Schering-Warrick sets forth, for each defendant, the Albuterol .83 MG/ML Solution NDCs that have been examined in connection with this motion and which NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always higher than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for Albuterol .83 MG/ML Solution can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

During the 1997-2005 period, a FUL was in place for Albuterol .83 MG/ML Solution from October 1, 1997 through December 6, 2000; January 22, 2002 through May 7, 2005; and, May 8, 2005 through December 31, 2005.  *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 1-17 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit A to Plaintiffs' Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for the Albuterol .83 MG/ML Solution would have been lower, with the most

limited exceptions,[1] if it had been set on any of these defendants' true prices.  *See* Devor Declaration at Exhibits B-1 to B-17.

New York Medicaid reimbursed for the Albuterol .83 MG/ML Solution based on AWP whenever a FUL was not in place.  New York Soc. Serv. L. §367-a(9).

**(2)    Albuterol 90 MCG Inhaler (GCN 05037)**

The Albuterol 90 MCG Inhaler was manufactured by defendants Dey, Ivax, Sandoz, Schering-Warrick, and Watson.   Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts as to Dey, Ivax, Sandoz, Schering-Warrick and Watson sets forth, for each defendant, the Albuterol 90 MCG Inhaler NDCs that have been examined in connection with this motion and which NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always higher than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for Albuterol 90 MCG Inhaler can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

During the 1997-2005 period, a FUL was in place for this drug from October 1, 1997 through December 7, 2002 and again from March 11, 2003 through December 31, 2005.  *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 18-22 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs'

---

[1]      Ivax's AMP for one of its three Albuterol .83 NDCs  (00182801024) would not have set a lower FUL for certain quarters.  Plaintiffs note that: (i) the Devor WACs for this Ivax NDC are more in the range of prices in the market as indicated by the other defendants' AMPs for Albuterol .83 MG/ML Solution; and, (ii) after 1999, the Ivax AMP for this NDC is the same for each quarter.

Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for the Albuterol 90 MCG Inhaler would have been lower, with the most limited exceptions,[2] if it had been set on any of defendants' true prices.  *See* Devor Declaration at Exhibits B-18 to B-22.

New York Medicaid reimbursed for Albuterol 90 MCH Inhaler based on AWP whenever a FUL was not in place. New York Soc. Serv. L. 367-a(9).

### (3)    Cefadroxil 500 MG Capsule (GCN 09089/48262)

The Cefadroxil 500 MG Capsule was manufactured by Barr, Ivax and Sandoz.  Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts as to Barr, Ivax and Sandoz sets forth, for each defendant, the Cefadroxil 500 MG Capsule NDCs that have been examined in connection with this motion and which NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always greater than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for Cefadroxil 500 MG Capsule can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

During the 1997-2005 period, a FUL was in place for this drug from January 1, 1997 through August 31, 1997; January 22, 2002 through March 10, 2003 and March 11, 2003 through December 31, 2005.  *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor

---

[2]        Ivax true prices for NDC 00172439018 would not have set a lower FUL for one (1) quarter in 2005.  The

Declaration at Exhibits B 23-29 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs' Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for the Cefadroxil 500 MG Capsule would have been lower, with the most limited exceptions,[3] if it had been set on any of defendants' true prices.  *See* Devor Declaration at Exhibits B-23 to B-29.

New York Medicaid reimbursed for Cefadroxil 500 MG Capsule based on AWP whenever a FUL was not in place.  New York Soc. Serv. L. §367-a(9).

**(4) Clonazepam .5 MG Tablet (GCN 04560)**

The Clonazepam .5 MG Tablet was manufactured by Mylan, Par, Purepac, Sandoz, Teva and Watson.   Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts as to Mylan, Par, Purepac, Sandoz, Teva and Watson sets forth, for each defendant, the Clonazepam .5 MG Tablet NDCs that have been examined in connection with this motion and which NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always higher than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for the Clonazepam .5 MG Tablet can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

---

Devor WAC for Watson NDC 00364263298 would not have set a lower FUL for the periods that it was calculated.
[3]        The Devor WAC for Ivax NDC 00172405848 would not have set a lower FUL for the first quarter of 1997.

During the 1997-2005 period, a FUL was in place for this drug from October 1, 1997 through August 31, 1998;  September 1, 1998 through December 6, 2000;  December 7, 2000 through January 21, 2002 and January 22, 2002 through December 21, 2005.  *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 30-38 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs' Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for the Clonazepam .5MG Tablet would have been lower, with the most limited exceptions,[4] if it had been set on any of defendants' true prices.  *See* Devor Declaration at Exhibits B-30 to B-38.

New York Medicaid reimbursed for the Clonazepam .5MG Tablet based on AWP whenever a FUL was not in place. New York Soc. Serv. L. §367-a(9).

**(5)    Enalapril Maleate 20 MG Tablet (GCN 00386)**

The Enalapril Maleate 20 MG Tablet was manufactured by defendants Ivax, Mylan, Par, Purepac, Sandoz, Teva and Watson.  The Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts as to Ivax, Par, Purepac, Sandoz, Teva and Watson sets forth, for each defendant, the Enalapril Maleate 20 MG Tablet NDCs that have been examined in connection with this motion and which NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always higher than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for the Enalapril Maleate 20 MG Tablet can be

---

[4]    For assorted quarters from 1997 to 1999 the true prices for two the three Mylan NDCs  (51079088120, 51079088121) would not have set a lower FUL.  The Devor WAC would not have set a lower FUL for five (5) quarters in 2003 to 2004 for PAR NDC 49884049501, but a price at or about Par's AMPs would have.  For Watson NDC 52544074601 the Devor WAC would not have set a lower FUL for fifteen (15) quarters from 1997 to mid-2002; and for the same time period of the three (3) AMPs produced by Watson only one (1) would not have set a lower FUL

demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

During the 1997-2005 period, a FUL was in place for this drug from August 24, 2003 through December 31, 2005.  *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 39-49 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs' Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for this drug would have been lower if it had been set on any of defendants' true prices.  *See* Devor Declaration at Exhibits B-39 to B-49.

New York Medicaid reimbursed for the Enalapril Maleate 20 MG Tablet based on AWP whenever a FUL was not in place. New York Soc. Serv. L. §367-a(9).

**(6) Isosorbide Mononitrate 60 MG Tablet  (GCN 17297)**

Isosorbide Mononitrate 60 MG Tablet was manufactured by defendants Ethex, Ivax, Purepac, and Schering-Warrick.  Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts as to Ethex, Ivax, Purepac, and Schering-Warrick sets forth, for each defendant, the Isosorbide Mononitrate 60 MG Tablet NDCs that have been examined in connection with this motion and which NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always higher than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for the Isosorbide Mononitrate 60 MG Tablet can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor

7

Declaration which shows, defendant by defendant and at the NDC level, the spreads between each

defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and

Devor WAC.

During the 1997-2005 period, a FUL was in place for this drug from place January 22, 2002

through July 20, 2005 and July 21, 2005-December 31, 2005.  *See* Devor Declaration at Exhibit A

(Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 50-54 (graphs setting forth

time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs' Individual Rule 56.1

Statements of Undisputed Material Facts as to each defendant.

The FUL for the Isosorbide Mononitrate 60 MG Tablet would have been lower, with the

most limited exceptions,[5] if it had been set on any of defendants' true prices.  *See* Devor Declaration

at Exhibits B-50 to B-54**.**

New York Medicaid reimbursed for the Isosorbide Mononitrate 60 MG Tablet based on

AWP whenever a FUL was not in place. New York Soc. Serv. L. §367-a(9).

**(7)     Lorazepam 1 MG Tablet (GCN 03758)**

The Lorazepam 1 MG Tablet was manufactured by Ivax, Mylan, Purepac, Sandoz, Watson

and Wyeth.   The Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material

Facts as to Ivax, Mylan, Purepac, Sandoz, Watson and Wyeth sets forth, for each defendant, the

Lorazepam 1 MG Tablet NDCs that have been examined in connection with this motion and which

NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each

defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The

Exhibits show that each defendant's reported AWPs and WACs were always higher than their

reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

---

[5]        A price at or about the Ivax AMP for NDC 00182268789 would not have set a lower FUL for two (2)
quarters in 2005.  The Devor WAC for Purepac NDC 00228271111 would not have set a lower FUL for one (1)
quarter in 2005 and no AMPS were produced for this quarter.

The falsity of the defendants' reported prices for the Lorazepam 1 MG Tablet can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

During the 1997-2005 period, a FUL was in place for the Lorazepam 1 MG Tablet from January 1, 1997 through September 30, 1997; October 1, 1997 through February 11, 1998; September 1, 1998 through December 6, 2000; and, December 7, 2000 through December 31, 2005. *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 55-66 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs' Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for the Lorazepam 1 MG Tablet would have been lower, with the most limited exceptions,[6] if it had been set on any of defendants' true prices. *See* Devor Declaration at Exhibits B-55 to B-66.

New York Medicaid reimbursed for the Lorazepam 1 MG Tablet based on AWP whenever a FUL was not in place. New York Soc. Serv. L. §367-a(9).

**(8)     Metoprolol 100 MG Tablet (GCN 05131)**

The Metoprolol 100 MG Tablet was manufactured by Ivax, Mylan, Par, Sandoz, Teva and Watson.  The Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts as to Ivax, Mylan, Par, Sandoz, Teva and Watson sets forth, for each defendant, the Metoprolol 100 MG Tablet NDCs that have been examined in connection with this motion and which NDCs are

---

[6]     Mylan's true prices for NDC 51079038620 would not have set a lower FUL in 1997.  The Devor WAC would not have set a lower FUL for one (1) quarter in 1998 to 1999, but a price at or about the Mylan AMP would have.  In one (1) quarter in 2005 the Mylan AMP would not have set a lower FUL.  The Devor WAC for Purepac NDC 00228205910 would not have set a lower FUL in 1997.  No Purepac AMPs were produced for this time period.  For Sandoz, a price at or about its AMP for NDC 00781140401 would not have set a lower FUL for one (1) quarter in 2002.  The Devor WACs for Watson NDC 52544033301 would not have set a lower FUL for three (3) quarters in

associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always higher than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for the Metoprolol 100 MG Tablet can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

During the 1997-2005 period, a FUL was in place for the Metoprolol 100 MG Tablet from January 1, 1997-September 30, 1997; October 1, 1997-August 31, 1998; September 1, 1998-December 6, 2000; December 7, 2000-January 21, 2002; January 22, 2002-October 27, 2004; and, October 28, 2004-December 31, 2005.  *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 67 -76 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs' Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for the Metoprolol 100 MG Tablet would have been lower, with the most limited exceptions,[7] if it had been set on any of defendants' true prices.  *See* Devor Declaration at Exhibits B-67 to B-76.

New York Medicaid reimbursed for the Metoprolol 100 MG Tablet based on AWP whenever

---

1997.  No Watson AMPs were produced for these quarters.

[7]      The Devor WACs for Mylan NDC 0038004701 would not have set a lower FUL for eight (8) quarters from mid-1998 to early 2000, but prices at or about Mylan's AMPs would have.   Mylan's true prices for NDC 51079080220 would have only set a lower FUL five (5) quarters from late 1999 to early 2002.  Sandoz's true prices for NDC 00781122801 would not have set a lower FUL in three (3) quarters in late 2004 to early 2005.  The Devor WAC for Sandoz NDC 00781122813 would not have set a lower FUL in five (5) quarters from late 1999 to early 2001, but a price at or about Sandoz's AMP would have.   The Devor WAC for Watson NDC 52544046301 the Devor WAC would not have set a lower FUL in three (3) quarters from late 2002 to early 2003, but prices at or

10

a FUL was not in place. New York Soc. Serv. L. §367-a(9).

**(9)      Ranitidine 150 MG Tablet  (GCN 11673)**

The Ranitidine 150 MG Tablet was manufactured by Ivax, Mylan, Par, Roxane, Sandoz, Teva and Watson.  The Exhibit A to each Plaintiffs' Local Rule 56.1 Statements of Undisputed Material Facts as to Ivax, Mylan, Par, Roxane, Sandoz, Teva and Watson sets forth, for each defendant, the Ranitidine 150 MG Tablet NDCs that have been examined in connection with this motion and which NDCs are associated with package sizes that set the FUL.  Each Exhibit A also sets forth each defendant's published AWPs and WACs for this drug, any operative FUL and the AMP.  The Exhibits show that each defendant's reported AWPs and WACs were always higher than their reported AMPs, and usually "far far higher".  *Mylan*, 2008 WL 5650859 at *15.

The falsity of the defendants' reported prices for the Ranitidine 150 MG Tablet can be demonstrated in a number of ways. On this motion, plaintiffs' present Exhibit C to the Devor Declaration which shows, defendant by defendant and at the NDC level, the spreads between each defendant's (a) reported WAC and AMP; (b) reported AWP and AMP; and (c) reported WAC and Devor WAC.

During the 1997-2005 period, a FUL was in place for the Ranitidine 150 MG Tablet from September 24, 1998- September 21, 1999; December 7, 2000-January 21, 2002; January 22, 2002-May 7, 2005; May 8, 2005-December 31, 2005.  *See* Devor Declaration at Exhibit A (Exhibits to Devor Rule 26 Statement); Devor Declaration at Exhibits B 77-84 (graphs setting forth time periods when FULs were in effect, *inter alia*); Exhibit As to Plaintiffs' Individual Rule 56.1 Statements of Undisputed Material Facts as to each defendant.

The FUL for the Ranitidine 150 MG Tablet would have been lower, with the most limited

---

about Watson's AMPs would have.

exceptions,[8] if it had been set on any of defendants' true prices.  *See* Devor Declaration at Exhibits B-77 to B-84.

New York Medicaid reimbursed for the Ranitidine 150 MG Tablet based on AWP whenever a FUL was not in place. New York Soc. Serv. L. §367-a(9).

---

[8]     The Devor WAC for Mylan NDC 51079087920 would not have set a lower FUL for one (1) quarter in 1998, but a price at or about Mylan's AMP would have.  Mylan's true prices for three (3) quarters in 2005 also would not have set a lower FUL.  The Devor WAC for Sandoz NDC 00781188313 would not have set a lower FUL in seven (7) quarters from 2001 to 2005, but a price at or about the Sandoz's AMPs would have.

**APPENDIX B**

**ISSUES PRECLUDED**

A.   <u>AS TO ALL *MYLAN* DEFENDANTS</u>

    1.     Defendants Ivax, Mylan, Purepac, Roxane, Teva, Warrick and Watson knowingly reported false prices to the compendia.  *Mylan* at *16, 17.

    2.     WAC means the actual cost at which wholesalers acquired a given drug. *Mylan* at *12.

    3.     Some defendants did not report WAC to FDB, and only reported AWP. These AWPs were not true prices.  *Mylan* at *18.

    4.     There is no genuine issue as to the materiality of defendants' false statements when they reported WAC.  *Mylan* at *24.

    5.     The practice of FDB was to report its WACs under the heading "WHLNES" or "WHN" or "WN" where the "WHL" or "WH" or "W" stood for "Wholesale" and the "Net" or "N" or "NU" stood for "Net Unit." *Mylan at *24.*

    6.     Having entered into rebate agreements, defendants were required as matter of law to familiarize themselves with the legal requirements, standards and procedures of the Medicaid program.  *Mylan* at *26.  These include the procedures and legal requirements applicable to reimbursements.  *Id*.

    7.     Manufacturers knew the published WACs were false.  *Mylan* at *26.

    8.     Manufacturers knowingly and willfully made false statements or representations when they reported their WACs.  *Mylan* at *26.

    9.     Defendants reported WACs that were grossly out of whack with the prices that were actually paid.  *Mylan* at *26.

    10.    By reporting false WACs, or by reporting false WACs without divulging the true nature of the prices they were reporting, the defendants made false representations sufficient to constitute fraud.  *Mylan* at *26.

    11.    Almost all publicly available information appearing through the end of the Damage Period suggested that participants and informed analysts of these markets believed that WAC + x%, where x% was reasonably small, provided a good approximation of the actual drug acquisition cost for retail pharmacies.  *Mylan* at *28.

**B.**     **Defendant-Specific Issues Precluded**

**IVAX**

    1.     Ivax provided both WAC and AWP to FDB.  *Mylan* at *6.

    2.     Ivax's AWPs were unrelated to its actual sales prices; its WACs, while listed on wholesalers' invoices, were actually paid on fewer than 10% of sales.  *Mylan* at *6.

**MYLAN**

    1.     Mylan reported AWP and WAC to FDB throughout the relevant time period.  *Mylan* at *8.

    2.     Mylan never charged its customers AWP.  *Mylan* at *8.

**PAR**

    1.     At drug launch, Par would set an AWP and report it to FDB.  *Mylan* at *5.

    2.     Par's AWPs had no correlation to the actual prices charged; instead, they were set 10% below the AWP of the bioequivalent brand, in order to get the drug identified as a generic in the price compendia.  *Mylan* at *5.

    3.     Approximately 90% of Par's sales were made for less than WAC.  *Mylan* at *5.

    4.     Par typically set a drug's WAC at 20% below the WAC for bioequivalent brand.  *Mylan* at *5.

    5.     FDB reported WACs for Par's drugs.  *Mylan* at *16.

    6.     Par knew FDB was reporting Par's WACs.   *Mylan* at *16.

**PUREPAC**

    1.     Purepac reported AWPs and WACs at all relevant times.  *Mylan* at *10.

    2.     Purepac invoiced wholesalers at WAC but its WACs and AWPs were independent of its contract prices.  *Mylan* at *10.

**TEVA**

    1.      Teva reported WACs and AWPs to FDB at all relevant times.  *Mylan* at *7.

    2.      At some point, Teva began adding a disclaimer to its price reports that AWP did not represent the price actually paid by pharmacies; they did not issue a similar disclaimer with respect to WAC given their claim that WAC was their actual invoice price.  *Mylan* at *7.

    3.      Fewer than 10% of Teva's sales were actually made at WAC.  *Mylan* at *7.

**WARRICK**

    1.      Warrick did not have WACs for its drugs; instead, FDB published Warrick's DPs as WACs.  *Mylan* at *6.

    2.      Warrick refers to its DPs as "Direct Wholesale," indicating that Warrick presented its DPs as its wholesale prices.  *Mylan* at *17.

    3.      Warrick knew FDB was reporting WACs for its drugs.  *Mylan* at *17.

**WATSON**

    1.      Before 2000, Watson reported only AWPs to FDB.  *Mylan* at *9.  In 2000, Watson switched from reporting AWP to reporting a "Suggested Wholesale Price" or "SWP."  *Id*.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )  MDL NO. 1456<br>) Civil Action No. 01-12257-PBS<br>) Subcategory Case<br>) No. 03-10643-PBS |
| THIS DOCUMENT RELATES TO:<br><br>        *The City of New York, et al.,*<br>*v.*<br>        *Abbott Laboratories, et al.* | )<br>)<br>) Judge Patti B. Saris<br>)<br>)<br>)<br>) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT
ON ISSUES RELATING TO THE FEDERAL UPPER LIMIT AND
UNDER NEW YORK SOCIAL SERVICES LAW § 145-B**

# APPENDIX  C

## HIGHLY CONFIDENTIAL

# FILED UNDER SEAL