**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) )  MDL NO. 1456 )  Civil Action No. 01-12257-PBS )   Subcategory Case No: 03-10643-PBS |
| THIS DOCUMENT RELATES TO:  *The City of New York, et al.*  *v.*  *Abbott Laboratories, et al.* | ) ) )  Judge Patti B. Saris ) ) ) ) ) ) |

**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL**
**FACTS AS TO IVAX CORPORATION AND IVAX PHARMACEUTICALS INC.**

Pursuant to Rule 56.1 of the Local Rules of this Court, plaintiffs hereby submit their

Statement of Undisputed Material Facts Applicable to Defendants Ivax Corporation and Ivax

Pharmaceuticals, Inc. (collectively "Ivax")[1] in support of their Motion for Partial Summary

Judgment.

**I.      IVAX SPECIFIC FACTS**

**1.**      The Ivax drugs and NDCs that have been examined on this motion are set forth in

Exhibit A hereto.  This exhibit also sets forth Ivax's Published AWPs and WACs for these Drugs

and NDCs, any operative Federal Upper Limit ("FUL") and Ivax's AMPs.  The exhibit notes

which NDCs are associated with package sizes that set the FUL.

**2.**      The specific Ivax drugs at issue are the Albuterol .83 mg/ml solution, Albuterol

90 MCG Inhaler, Cefadroxil 500 MG Capsule, Enalapril Maleate 20 MG Tablet, Isosorbide

---

[1]Ivax refers to both Ivax Corporation and Ivax Pharmaceuticals, Inc. (formerly known as Zenith Goldline Pharmaceuticals, Inc.).  Kim Bloom testified that there was no difference between Ivax and Zenith-Goldline with respect to the generic operations since the mid-1990s.  *See* Deposition of Kim Bloom dated 2/4/09 ("Bloom 2/4/09 Dep.") (Exhibit B) at 30:19-31:1.

Mononitrate 60 MG Tablet, Lorazepam 1MG Tablet, Metroprolol 100 MB Tablet and Ranitidine

150 MG Tablet.

3.      Ivax has entered into and executed the federal Medicaid rebate agreement

pursuant to 42 U.S.C. § 1396r-8.  *See* Ivax Corporation's and Ivax Pharmaceutical Corporation's

Answer and Affirmative Defenses to the Revised First Amended Complaint ("Ivax

Answer")[Dkt #4822]  at ¶132.

4.      Ivax participates in and is aware of State Medicaid reimbursement formulas,

including those of New York State Medicaid Program.  *See* Deposition of Thomas Stuart Blake

dated 1/24/08 ("Blake 1/24/08 Dep.")(Exhibit C) at 61:21-62:4; Deposition of Corrine Hogan

dated 2/6/08 ("Hogan 2/6/08 Dep.")(Exhibit D) at 68:17-70:9; Deposition of Ivax Corporation

30(b)(6)(Corrine Hogan) dated 6/17/08 ("Ivax 30(b)(6)(Hogan) 6/17/08 Dep.") (Exhibit E) at

36:22-37:19; Exhibit F (Deposition of Trisha Sarfas dated 3/19/09 ("Sarfas 3/19/09 Dep.")

Exhibit 3 (April 8, 1999 memo circulating information on each State's reimbursement and

substitution program)).

5.      Ivax knew that eligibility for reimbursement by Medicaid was an important issue

for its customers.  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 36:4-14; Bloom 2/4/09

Dep. (Exhibit B) at 24:5-16.

6.      Corrine Hogan testified, "I think that our customers would say that we were

required to participate in [Medicaid], yes."  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E)

at 36:8-10.

7.      Ivax knew that AWP and WAC were used for state Medicaid reimbursement

purposes.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 69:10-70:6.  Kim Bloom testified that it was

important to have Ivax products approved for Medicaid because "[a] pharmacy is not going to use your product if they're not going to be reimbursed." *Id.* at 71:1-8.

**Ivax Set and Reported Its AWPs and WACs**

8.      At all times, from 1997 to 2005, at the time of launch of a new product Ivax set an AWP and a WAC for each of its drugs as well as the pricing "buckets" for each of its customers. *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 56:17-57:21.

9.      Ivax's standard practice was to set the AWP for its drugs at 89.5% of the brand AWP as published by First Databank to obtain the generic drug indicator and be deemed a generic.    Deposition of Ivax Corporation 30(b)(6)(Trisha Sarfas) dated 8/22/07 ("Ivax 30(b)(6)(Sarfas) 8/22/07 Dep.") (Exhibit G) at 154:11-155:11.  Ivax admits that it would have been deemed a generic if its AWP had been at 75% of the brand AWP the drug would still have been deemed a generic.  *Id*. at 155:13-20.

10.     While Ivax wanted to be deemed a generic, it also wanted to be in line with the competition. *See* Sarfas 3/19/09 Dep. (Exhibit H) at 65:5-13.  If the competition was at 50% below the brand AWP, then Ivax would set its AWP to be comparable.  *Id*. at 66:7-11.

11.     Ivax sets its WAC when it is the first generic manufacturer to enter the market as a function of the published brand WAC, typically around 30-35% below the published brand WAC.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 91:3-13; Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 68:7-19.

12.     Ivax would often set its Premier Retail Price to chain pharmacies at 50% of the published brand WAC, then establish its customer "pricing buckets" upward and finally setting its WAC above all the customer "pricing buckets".  *See* Bloom 2/4/09 Dep. (Exhibit B) at 43:19-46:7.  If Ivax was not the first to enter the market and competition existed then it was Ivax

practice to set its WAC as low as competitively possible but in line with the published WACs of the competition.  *See* Hogan 2/6/08 Dep (Exhibit D) at 91:14-18; Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 68:14-19.

13.    In addition to the AWP and WAC "pricing buckets", Ivax maintained "pricing buckets" for each of its customer types: Distributor, Premier Retail (chains), Retail (independent pharmacies), Compliant Buying Group (retail GPOs), Non-Compliant Buying Group (retail pharmacies), Managed Health Care (institutional/hospital), and Government (Prisons, Federal Supply Schedule).  *See* Bloom 2/4/09 Dep. (Exhibit B) at 36:15-42:3.  All customer "pricing buckets" were below the WAC with Premier Retail (chains) being the best price offered by Ivax, and the WAC was below the AWP.  *Id.* at 42:8-43:14.  The Premier Retail (chains) and the Distributor "pricing buckets" are net prices, while the others are contract prices.  *Id*. at 49:23-51:8.

14.    At all times, from 1997 to 2005, Ivax reported both AWP and WAC for its drugs to all three of the national compendia – First DataBank, RedBook and Medi-Span.  *Id.* at 74:22-76:2; 156:9-20; Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 127:1-9, 322:1-323:16, 327:22-328:2-6; *see also Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) ("*Mylan*") at *6.

15.    Ivax knew and controlled the AWPs and WACs for its drugs that were published by the national drug pricing compendia knowing that its WACs and AWPs would then be used by state Medicaid agencies.  *See* Sarfas 3/19/09 Dep. (Exhibit H)  at 31:22-32:4, 35:20-25; 37:18-38:1, 193:18-24; 195:12-196:9; Bloom 2/4/09 Dep. (Exhibit B) at 74:22-76:2; 156:9-20.

16.    Both Redbook and First Databank would send requests to Ivax to verify the accuracy of the AWPs and WACs for its drugs and Ivax would respond with corrections if errors

were found.  *See* Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 254:12-256:7; Sarfas 3/19/09

Dep. (Exhibit H) at 193:18-194:3; 195:12-196:9; Exhibit I (Sarfas 3/19/09 Dep. Exhibit 21

(Excerpt of a Redbook Product Listing Verification for Ivax drugs signed 10/16/03)).

17.     Ivax subscribed to First Databank services to monitor both its published prices

and that of its competitors.  *See* Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 256:9-20.

**Ivax's Published AWPs and WACs had No Relationship to Actual Prices**

18.     Ivax admits that its reported AWPs were not tethered to the actual prices that

anyone pays or to the WAC.  *See* Sarfas 3/19/09 Dep. (Exhibit H) at 33:6-34:8, 61:22-24; Ivax

30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 87:22-88:4; *see also Mylan*, 2008 WL 5650859 at

*6.

19.     Ivax's reported WACs and AWPs that had no relationship to contract prices, nor

could they be used to determine the actual cost of a drug to anyone.  *See* Bloom 2/4/09 Dep.

(Exhibit B) at 156:21-157:2; *Mylan* at *6.

20.      Ivax never calculated an average of the wholesale prices that it believed was

being paid by pharmacists.  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 203:9-204:16.

Ivax knew that none of its customers in the competitive market pay AWP for generic drugs.  *See*

Bloom 2/4/09 Dep. (Exhibit B) at 24:3-4; Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at

323:18-22.]

21.     Ivax knew that the real wholesale cost accounts for chargebacks, rebates,

discounts and other pricing incentives and allowances that got the wholesaler to its net price.  *See*

Sarfas 3/19/09 Dep. (Exhibit H) at 78:23-79:3.

22.     Approximately 90% of Ivax sales to wholesalers are subject to chargebacks.  *See*

Hogan 2/6/08 Dep. (Exhibit D) at 66:17-67:10; .

23.     Ivax knew that less than five (5) percent of its sales are at WAC or WAC plus. *See* Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 324:1-3.

24.     Ivax does not set its WAC at the net price that the wholesalers pay for Ivax drugs. *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 32:5-12.  All of Ivax's contract prices to its customers were below the WAC and generated chargebacks to the wholesalers.  *Id*. at 62:14-63:4.  The net price that customers pay for Ivax drugs through a wholesaler can range from 90% to 10% of the published WAC, and on average the net prices actually paid for Ivax drugs was at a 50% discount of the published WAC.  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 69:13-70:6.

25.     Ivax also sells its drugs to distributors, who differ from wholesalers in that the distributor buys at a net price and typically services retail independent pharmacies.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 34:11-20.  Ivax does not invoice generic distributors at WAC like it does wholesalers, but instead invoices distributors at a net price, which is below WAC, and is determined based on what was being paid in the marketplace.  *See id*. at 35:6-36:6.

26.     The WAC and AWP for Ivax drugs typically did not change even though the pricing to Ivax's customers would typically decrease over time.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 132:16-133:1; 167:3-11.  Corinne Hogan testified that this occurred so customers could make more money on the reimbursement.  *Id*. at 167:12-168:2.

27.     Ivax admitted to the United States Congress that "all or substantially all" of its net revenue sales occur at more than 5% below the WAC for its drugs.  *See* Exhibit J (August 15, 2003 letter from Ivax CEO Rafick Henein to Anthony Cooke Esq., Counsel for the Subcommittee on Oversight and Investigations, Committee on Energy & Commerce in response to Committee Chairmen Tauzin's and Greenwood's June 26, 2003 letter) at p. 3.

**Ivax Marketed the Spread**

28.     Ivax defined "spread" in a PowerPoint presentation as "the difference between reimbursement and net cost on scripts paid by Medicaid or PBM – interchangeable with profit." *See* Hogan 2/6/08 Dep. (Exhibit D) at 73:7-75:5; Blake 1/24/08 Dep. (Exhibit C) at 130:22-132:6; *see also Mylan*, 2008 WL 5650859 at *6.  The definition of reimbursement spread was commonly known in the pharmaceutical industry and by any competent sales person.  *See id.*

29.     Ivax knew that spread between contract price and reimbursement was a factor in a customer's buying decision.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 113:2-115:24 (customer Gerimed telling Ivax it is considering spread and increased revenues); 121:18-122:21 (acknowledging that customer informed Ivax of it was interested in AWP spread).  Kim Bloom, who worked with pharmaceutical pricing since 1988, testified that this was not a secret in the industry.  *Id.* at 80:19-81:17.

30.     Ivax would be at a competitive disadvantage if other manufacturers had higher AWPs than Ivax.  *Id.* at 210:8-210:23.  Ivax knew that raising an AWP did not have any ramifications on anything other than reimbursement.  *Id.* at 211:9-12.

31.     Ivax notified customers such as RX Solutions, a mail order pharmacy, of the percentage spread between Ivax's Reported AWP and the RX solutions contract pricing.  *See id.* at 87:20-90:21; Exhibit K (Bloom 2/4/09 Dep. Exhibit 4 (May 21, 2003 Price Decrease & Increase Notification to RX Solutions)).

32.     Ivax knew that the reimbursement spread basically marketed itself as it was self-evident to Ivax's pharmacy customers for all of its drugs given that the customers knew how they would be reimbursed by Medicaid.  *See* Blake 1/24/08 Dep. (Exhibit C) at 67:1-19.

**33.**     If spread on Ivax drugs ever came up in discussions with pharmacists, it would be discussed.  *Id*. at 82:16-83:17.

**34.**     Ivax analyzed and prepared bid pricing based upon spread calculations between AWP and the customer's price to win the business of customers like the Pharmacy Benefits Manager ("PBM") Caremark.  *See* Exhibits L (Deposition of Susan Randall dated 4/16/09 ("Randall 4/16/09 Dep.") Exhibit 14 (spreadsheet, note and email string in December 2002 concerning a bid price to Caremark and the fact that it must have a spread of at least 60% between AWP and contract price to win Caremark's business)); Exhibit M (Randall 4/16/09 Dep. Exhibit 15 (email dated 7/22/03 from Susan Randall (Ivax) to James Matas (Ivax) discussing the preparation of a bid price to Caremark at 65% off of AWP)).

**35.**     Ivax knew that if it increased its AWP in response to the competitive marketplace, which it did on occasion, that the reimbursement spread for a drug reimbursed on AWP would also increase.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 98:9-99:12.

**36.**     Ivax knew that if it kept its AWP constant and reduced the contract price for a drug that the effect would be to increase reimbursement profit for that drug to the pharmacy when reimbursed on an AWP calculation.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 182:14-183:9.

**37.**     Ivax believed there was no competitive reason to be lower than the threshold AWP for generic designation (10% off brand AWP) because at a lower AWP its customers would make less profit on Ivax's drugs than its competitors who were at or near the threshold AWP.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 147:22-148:12.

**38.**     Ivax knew of the Federal Upper Limit (FUL) and that it is a limitation on reimbursement below AWP that is set on published prices.  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 260:15-261:15; *see also* Bloom 2/4/09 Dep. (Exhibit B) at 144:10-145:2.

39.     Ivax notified customers when a drug it sold was no longer subject to the Federal

Upper Limit knowing that the reimbursement would increase once the FUL restriction was

removed.  *See* Exhibit N (Deposition of Jon Holden dated 4/28/09 Exhibit 8 (Letters dated and

February 15, 2000 and March 17, 2000 from Jon Holden (Ivax) to Lynn King (Eckerd)

discussing a price increase and informing Eckerd that the Federal Upper Limit had been removed

thus "eliminating any reimbursement restrictions")).

**Ivax's AMPs**

40.     At all times, from 1997 to 2005, Ivax calculated and reported the average

manufacturer's price ("AMP") for all its products on a quarterly basis as required by the federal

rebate statute.  *See* Sarfas 3/19/09 Dep. (Exhibit H) at 31:13-18; Bloom 2/4/09 Dep. (Exhibit B)

at 142:10-18; Hogan 2/6/08 Dep. (Exhibit D) at 93:8-94:12; see also *Mylan*, 2008 WL 5650859

at *30.

Dated: May 15, 2009                         Respectfully submitted,

                                            **KIRBY McINERNEY, LLP**
                                            825 Third Avenue
                                            New York, New York 10022
                                            (212) 371-6600

                                            /s/ Joanne M. Cicala
                                   By:      Joanne M. Cicala
                                            James P. Carroll Jr.
                                            Jocelyn R. Normand
                                            Kathryn Allen

                                            *Counsel for the City of New York and New York
                                            Counties in MDL 1456 except Nassau and Orange*

                                            Ross B. Brooks, Esq.
                                            **MILBERG LLP**
                                            One Pennsylvania Plaza
                                            New York, NY 10119
                                            (212) 594-5300

                                            *Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
**LEVY PHILLIPS &
KONIGSBERG, LLP**
800 Third Ave.
New York, NY 10022
(212) 605-6205

Co*unsel for the County of Orange*

## <u>CERTIFICATE OF SERVICE</u>

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO IVAX CORPORATION AND IVAX PHARMACEUTICALS INC., to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.  The confidential exhibits to the foregoing have been served electronically directly to counsel for Ivax Corporation and Ivax Pharmaceuticals, Inc.

Dated:  May 15, 2009

_____/s/_____

James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 371-6600

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) )<br>) MDL NO. 1456<br>) Civil Action No. 01-12257-PBS<br>) Subcategory Case No: 03-10643-PBS |
| THIS DOCUMENT RELATES TO:<br><br>    *The City of New York, et al.*<br>*v.*<br>    *Abbott Laboratories, et al.* | )<br>) Judge Patti B. Saris<br>)<br>)<br>)<br>)<br>) |

**CONFIDENTIAL EXHIBITS**

**TO**
**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO IVAX CORPORATION AND IVAX PHARMACEUTICALS INC.**

**MAY 15, 2009**

**SUBJECT TO MOTION FOR LEAVE TO FILE UNDER SEAL**