# APPENDIX B

| WITNESS | TESTIMONY |
|---|---|
| Charles Booth, Director of CMS's Office of Payment Policy (1984-1994) | Q. And in October of 1992 when your office was advised that vancomycin could be purchased at $3.45 and the median AWP was $19.17, you still believed that AWP could be a reliable indicator of acquisition cost?<br>A. In certain cases, yes.<br>Q. In which cases is that?<br>A. Well, I'm not prepared to be specific. It's been too long since I've been involved with this.<br>Q. How did you determine at the time in which cases --<br>A. I have no idea. I do not remember. I'm sorry, I'm 70 years old. I have not dealt with these issues for at least 13 years, and when I dealt with these issues, they were very minor in the scheme of things. I spent extremely little time during my career in payment policy on drugs because we did not have a drug benefit.<br><br>Booth Dep. (4/23/07) at 157 |
| Kathy Buto, Director of CMS's Bureau of Policy Development (1985-1993); Associate Administrator for Policy (1993-1997); Deputy Director of Health Plans and Providers (1997-2000) | Q. I believe you just testified that you don't recall having any discussions within your bureau of policy development about the implications of the repeal of the separate benefit for home infusion, correct?<br>A. That's correct.<br>Q. Did you have a personal view on whether or not there should be a separate payment for home IV services?<br>A. Not really, not any more than whether there should be a drug benefit generally, which many of us felt was long overdue. But that would include small molecule as well as the IV drugs.<br>Q. Do you recall ever meeting with any advocacy groups, provider representative groups, in the home infusion industry?<br>A. I don't remember meeting with them, but it wouldn't surprise me if we had met with them because it was our custom to meet with almost anybody who requested a meeting and I would assume these folks would have requested a meeting.<br><br>Buto Dep. (9/12/07) at 191-92<br>----------------------<br><br>Q. For the record, what I've marked as Exhibit Abbott 294 bears the Bates numbers HHC 9060093 through 98. It is a document from the HCFA regional office in Dallas specifically signed by a M.J. Christenberry to yourself; is that correct?<br>A. That's correct.<br>Q. If you would, take a look at this document to the extent necessary to tell me whether you recall it as you sit here today.<br>A. I recall it in reading it. Let's put it that way. It's not unfamiliar. But again, it's not one that for the last 17 years I've remembered.<br>Q. But as you sit here and review it today you recall the document?<br>A. It looks familiar, yeah.<br>Q. And briefly stated can you tell me what this document is?<br>A. It's a piece of correspondence from the regional office in Dallas, which was the most -- I think I've already said -- one of the most proactive in the area of fraud and abuse, overpayments and so on, in looking for ways to reduce the reimbursement that the program was paying for various items and services. What they've done here is to lay out several issues where they think Medicare should revise its payment policy, and specifically around drug payment. And they've got seven different recommendations for addressing the issues. |

| WITNESS | TESTIMONY |
|---|---|
| | Buto Dep. (9/12/07) at 226-27<br>----------------------<br><br>Q. And does it appear to you based on the context of Mr. Sigmund's comments that HCFA had still not moved forward with the estimated acquisition cost proposal?<br>A. That is what -- it definitely appears that way.<br>Q. And do you know why HCFA had not immediately started implementing the estimated acquisition cost proposal?<br>A. I believe -- again, this is based on just the way I remember it -- that we had submitted a request for the survey that we would use to collect those data to the office of management and budget and that the request was either held up or denied or in process. I think that's what happened. But it may just be that it was bogged down somewhere in our own bureaucracy at the agency.<br>Q. Do you recall if the -- the attempt to do the survey, did HCFA originally seek OMB approval or did it attempt to implement it and then was stopped by OMB? Do you remember the sequence?<br>A. I don't. That was a period where we attempted to implement things and OMB was attempting to make more systematic the way HCFA did business. So it could be we tried to do it before we sought approval, but I don't remember. I don't even really remember if we saw an approval, but I think we did. I think that's what ended up bogging it down.<br><br>Buto Dep. (9/13/07) at 325-27 |
| Gary Cheloha, Nebraska Medicaid Staff Pharmacist (1972-1987); Nebraska Medicaid Pharmacy Consultant (1996-Present) | Q. Okay. Do you know if you got pharmacy information from pharmacies about the price of Vancomycin in order to set the MAC?<br>A. I don't recall one way or the other.<br><br>Cheloha Dep. (12/2/08) at 304 |
| Cynthia Denemark, Delaware Medicaid Pharmacy Consultant (1993-Present) | Q. Now, there are three officials from HCFA that were present at this meeting, Mike -- do you know how to pronounce that last name?<br>A. Keogh.<br>Q. Estelle Chisholm and Sue Gaston, correct?<br>A. That's what the record -- notes say, yes.<br>Q. Do you recall those individuals being at the 1995 meeting?<br>A. No.<br>Q. Okay. Just because time has gone by?<br>A. Yes.<br>*****<br>Q. Okay. Do you remember the reaction of any of these individuals to the results that were presented at the 1995 meeting relating to the costs -- or the discounts off AWP for which providers could acquire drugs?<br>A. I don't remember.<br>MS. HEALY SMITH: Objection.<br>THE WITNESS: I don't remember at all.<br>BY MS. RAMSEY:<br>Q. Do you recall whether they provided any input or reactions one way or the other?<br>A. No.<br>MS. HEALY SMITH: Objection.<br>BY MS. RAMSEY:<br>Q. Do you recall whether the HCFA officials indicated they would make recommendations relating to Medicare reimbursement based on the results that OIG had found? |

| WITNESS | TESTIMONY |
|---|---|
|  | MS. HEALY SMITH: Objection.<br>THE WITNESS: I have limited recollection of this meeting in general, and nonspecific to your question.<br><br>Denmark Dep. (12/10/08) at 447-49 |
| Nancy Min-DeParle, Former CMS Administrator (1997-2000) | Q. While you were at the Office of Management and Budget, did you have any involvement in either reviewing, approving or disapproving surveys relating to the price of prescription drugs?<br>A. Yes.<br>Q. Tell me about that.<br>A. Well, it's been about 15 years ago, so my memory of it is limited. But I do recall that HCFA wanted to do a survey of physicians to determine their actual acquisition cost for certain drugs that Medicare covered, and they submitted that to the Office of Information and Regulatory Analysis at OMB.<br><br>DeParle Dep. (5/18/07) at 46 |
| Deirdre Duzor, Director, CMS Office of Legislation (1990-1994); Associate Director, CMS Medicaid Bureau (1994-1995); Director, CMS Data and Systems Division for Medicaid (1995-1997); Director, CMS Quality Systems Management Division (1997-2002); Director, CMS Division of Pharmacy (2004-Present) | Q. Are the methodologies used or the methods used to calculate the amount that state Medicaid programs will pay for drugs been something that's been discussed at the meetings?<br>MS. MARTINEZ: Objection to form.<br>A. I don't recall. Likely they were, but I don't recall.<br><br>Duzor Dep. (10/30/07) at 47<br>----------------------<br><br>Q. And it goes on "At the same time, these experts agree that Medicaid dispensing fees are low relative to actual dispensing costs." Do you see that.<br>A. I do see that.<br>Q. Okay. And do you recall that subject being discussed at the panel meeting?<br>A. I remember the discussion about the discounts on AWP. I don't recall the discussion -- a discussion about dispensing fees.<br>Q. But it's something that may have been discussed? You just don't recall?<br>A. It may have been discussed, yes. I just don't recall.<br><br>Duzor Dep. (02/27/08) at 390-91<br>----------------------<br><br>Q. Do you recall discussion at the panel meeting that margins or spreads may be compensating providers for deficiencies elsewhere in the system?<br>MS. MARTINEZ: Objection, form.<br>A. I don't recall the discussion, but it could have been discussed.<br><br>Duzor Dep. (02/27/08) at 403 |
| Joseph Fine, Director of Pharmacy Division for Maryland Medicaid and Associated Positions (1976-2005); Technical Director for the CMS Pharmacy Division for Medicaid (2005-Present) | Q. Do you recall Mr. Vito being at this meeting?<br>A. Yes.<br>Q. And he is said to have spoken on the topic of inhalation therapy drugs. Do you see that?<br>A. Yes.<br>Q. And that would be drugs like albuterol?<br>A. Correct.<br>Q. Do you recall him giving a presentation about albuterol?<br>A. I remember him giving a presentation. I can't for the life of me tell you exactly what he said right now. I mean, it's just been too many years. |

- 3 -

| WITNESS | TESTIMONY |
|---|---|
| | Fine Dep. (12/9/08) at 177-78 |
| Sue Gaston, CMS Health Insurance Specialist (1991-2003); Team Leader for Medicaid Drug Rebate Dispute Resolution (2003-Present) | Q.  When you say pharmacy association, what is that?  Is that a group of pharmacists or a group of state people, state administrators, who work in the pharmacy area?<br>A.  It's my recollection they were state pharmacy folks and then some manufacturers would also attend.<br>Q.  Was the topic of average wholesale price discussed at those meetings?<br>A.  I can't recall.<br>Q.  Did you receive any materials at those meetings?<br>A.  I may have.<br>Q.  Did you keep those?<br>A.  No.<br>Q.  Do you recall what type of topics were discussed at the meetings of the state pharmacy personnel?<br>MS. MARTINEZ:  Objection, form.<br>A.  I do remember that some of the states that are present, they would go around the table just talking about what's happening in their states relating to their Medicaid programs.  I presented at those conferences discussing various issues concerning the rebate program.<br>Q.  Did you keep any materials relating to that, to your presentations?<br>A.  No.<br>Q.  Did you prepare any materials for these presentations?<br>A.  Yes.<br>Q.  Do you recall any other meetings that you've had apart from meetings with state pharmacy personnel and the PTAG group at which the issue of state pharmacy payment for drugs was discussed?<br>MS. MARTINEZ:  Objection, form.<br>A.  I can't specifically remember any particular meetings.<br>Q.  But you believe that there may have been others?<br>A.  There may have been.<br>Q.  You just can't recall those given the passage of time; is that fair to say?<br>MS. MARTINEZ:  Objection, form.<br>A.  Correct.<br>Q.  At the meetings that you recall, was the issue of adequacy of dispensing fees ever discussed?<br>MS. MARTINEZ:  Objection, form.<br>A.  I can't recall.<br><br>Gaston Dep. (1/24/08) at 62-64 |
| Thomas Gustafson, Director of the Division of Medicaid & Long Term Care (1985-1988); Acting Director of the Office of Policy and Analysis (1988-1991); Deputy to the Director of the Office of Legislation and Policy (1991-1996); Deputy to the Director of the Office of Research and Demonstrations (1996-1998); Director of | Q.  Were you aware as far back as 1991 while you were with the agency that pharmaceutical manufacturers were on the one hand conforming their conduct to the drug reimbursement systems being set up by CMS?<br>MR. MAO:  Objection to form.<br>A.  I don't recall what I may have thought on that matter back in -- or what I was aware of back in 1991.  I would fall back on my prior answer.  It could hardly have surprised me.<br><br>Gustafson Dep. (9/28/07) at 59 |

- 4 -

| WITNESS | TESTIMONY |
|---|---|
| Hospital and Ambulatory Policy Group (1998-2003); Deputy Director of CMS (2003-2007) | |
| Kimberly Howell, Maryland Medicaid Operations Division (1991-2000); CMS Senior Drug Policy Analyst (2000-2008) | Q.  Do you recall during your time at Maryland Medicaid becoming aware of the fact that average wholesale prices for intravenous nutritionals and solutions were a particularly -- that the AWPs were a particularly unreliable source for acquisition cost for those products?<br>MS. OBEREMBT:  Objection, form.<br>A.  What are the solutions?<br>Q.  Intravenous solutions?  Do you have an understanding of what those mean?<br>A.  No.  That's why I'm asking for clarification.<br>Q.  Products like dextrose, sodium chloride solutions.<br>A.  Oh, okay.  Those solutions.  My response to that I don't recall that.<br>Q.  You may have, but you just don't recall as you sit here today?<br>A.  I don't recall.  Yes.  I don't recall for the time I was at Maryland Medicaid.<br><br>Howell Dep. (4/22/08) at 121-22<br>----------------------<br><br>Q.  Why did you consider doing this particular option?<br>A.  Again, because we had had a number of state plan amendments where the state's justification was that the legislature determined the reimbursement level.<br>Q.  Now, it says in the next paragraph that you continued to allow greater flexibility on dispensing fees?  It says "Because the requirements to set dispensing fees are less specific, we would continue to allow states greater flexibility here."  Do you see that?<br>A.  Yes, I see that.<br>Q.  And why was that important?<br>A.  I can't recall the thought process for this.<br><br>Howell Dep. (4/22/08) at 374-75 |
| Robert Niemann, CMS Policy Analyst (1976-1993); Drug Payment Policy and Ambulance Payment Policy (1993-2005) | Q.  The very first sentence of this letter to Dr. Vladeck indicates that Ven-a-Care had attempted for more than seven years to insist HCFA state Medicare programs in limiting infusion and inhalation pharmaceutical reimbursements to the reasonable levels contemplated by the enabling legislation.  Do I summarize that correctly?<br>A.  That's what the sentence says.<br>Q.  Do you recall any attempts by Ven-a-Care for more than seven years to limit the reimbursement for infusion and inhalation pharmaceutical products?<br>A.  Well, to the extent that you reminded me with the name, I don't really remember the specifics of it.<br>Q.  What do you remember?<br>A.  Just -- just the name and the fact that they were a relater.<br>Q.  Do you recall receiving letters such as this and other material from Ven-a-Care relating to the market price for pharmaceutical products?<br>A.  I certainly don't remember the specifics.  Do I recall receiving anything?  Vaguely.<br>Q.  Do you recall anything other than the fact that you may have received material from Ven-a-Care?<br>A.  Just what I've said.<br><br>Niemann Dep. (10/11/07) at 380-81 |
| Linda Ragone, | Q.  Back to Ms. Min DeParle's responses to OIG's recommendations in her June 11, |

- 5 -

| WITNESS | TESTIMONY |
|---|---|
| OIG Program Analyst (1989-1998); Deputy Regional Inspector General (1998-Present) | 1998 memo, and I'm here at Page A-2 of Exhibit Abbott 064.  The second sentence of Ms. Min DeParle's response, at the bottom there of Page A-2, reads:  If given the authority, HCFA would like to increase the discount we now take on the published average wholesale price and base our price on the acquisition cost.  Is that consistent with what employees of HCFA advised you about what HCFA would like to do when it comes to Medicare Part B reimbursement? <br> MR. NEAL:  Objection.  I'm going to instruct you not to answer to the extent that would get into conversations that took place at exit or entrance conferences. <br> BY MR. COOK: <br> Q.  Can you answer the question consistent with the instruction? <br> A.  I don't recall -- I don't remember any -- any of the conversations that we had with CMS staff about their feelings about this recommendation. <br> Q.  The sentence begins, at the bottom of Page A-2: If given the authority, HCFA would like to increase the discount we now take on the published average wholesale price.  Was it your understanding that HCFA did not have authority to increase the discount they took on the published average wholesale price? <br> MR. NEAL:  Object to the form.  You can answer. <br> THE WITNESS:  I don't remember ten, you know, years ago what I knew the authority to be or not to be at that time. <br> BY MR. COOK: <br> Q.  This sentence refers to both the published average wholesale price and as an alternative basing the price on acquisition cost.  Was it your understanding that in June of 1998, the Health Care Finance Administration did not believe that average wholesale price was the same as acquisition cost? <br> MR. NEAL:  Objection as to form. <br> THE WITNESS:  I don't know what they believed in June of 1988 [sic]. <br> BY MR. COOK: <br> Q.  Well, you had discussions with HCFA, correct? <br> MR. NEAL:  Objection to the form.  I don't know that she said that. <br> BY MR. COOK: <br> Q.  You had communications with individuals at HCFA with respect to Medicare drug pricing reimbursement -- and reimbursement, correct? <br> A.  We would have had entrance and exit conferences, yes. <br> Q.  Were you able to draw any conclusions from the conversations about whether individuals at HCFA understood that published average wholesale price was the same or different than acquisition cost? <br> MR. NEAL:  Objection.  You can answer that yes, no, or I don't remember. <br> THE WITNESS:  I don't -- I don't know what they understood.  I don't remember. <br><br> Ragone Dep. (4/17/07) at 389-92 |
| Larry Reed, Branch Chief, Medicaid Non-Institutional Payment Policy Branch (1990-1995); Technical Director, CMS Medicaid Program (1995-2002); Technical Director, CMS Medicaid Division of Pharmacy (2002-Present) | Q.  Mr. Reed, would it be fair to say that you can't tell me one way or the other whether you knew in 1993 that state Medicaid programs were using excess payments of ingredient costs to subsidize insufficient dispensing fees? <br> A.  It would [be] fair to say that.  I don't recall that memory. <br> Q.  You don't recall one way or the other whether or not you had that knowledge? <br> A.  I don't recall.  That's correct.  I don't recall. <br> Q.  And it's been 15 years since 1993, correct? <br> A.  Correct. <br> Q.  Your memory has faded over time, I take it? <br> A.  Yeah. <br><br> Reed Dep. (3/18/08) at 691-92 |

| WITNESS | TESTIMONY |
|---|---|
| Robert Reid, Ohio Medicaid Consultant (1976-1991); Ohio Medicaid Staff Pharmacist (1991-1995; Administrator of the Ohio Medicaid Pharmacy Service Unit (1995-2008) | Q.  You recall conversations about AWP with your colleagues; right?<br>A.  I'm sure I had plenty, many.  I can't recall a specific one.<br><br>Reid Dep. (12/15/08) at 103 |
| Benny Ridout, North Carolina Medicaid Pharmacy Director (1972- 2000) | Q.  I can represent to you, and we will be going over documents that show that you did meet in Richmond, and we have substantial documents relating to the '94 and '95 meetings in Richmond, and we will go over that.  What I'd like to do is figure out whether you had any involvement in the pulling of invoices ten years earlier in 1984 in North Carolina?<br>MS. YAVELBERG:  Objection, form.<br>MS. HAYES:  Objection to form.<br>A.  I don't remember that.  In fact, I didn't have anything to do with the pullings.<br>Q.  Whether you had any involvement in the study in 1984, you just don't recall?<br>MS. YAVELBERG:  Objection to form.<br>A.  I don't recall.  I can't remember.<br><br>Ridout Dep. (12/5/08) at 137-38<br>----------------------<br><br>Q.  And then the agenda that's marked as Exhibit Ridout 6, do you recognize that as the agenda that was prepared for the August 1994 meeting?<br>A.  I can't remember that now.  I remember being there.  I can't remember who spoke, all those people spoke.  I remember, you know, like I said, attendees, but I can't remember what they spoke on.  I remember that we wanted some ideas and suggestions that we wanted to get across to them, is why we wanted to meet with them.  What they wanted to get across with us I can't remember.  I'm sure they told us what they wanted to, but I just can't recall everything they said.<br><br>Ridout Dep. (12/5/08) at 157-58 |
| Thomas Scully, Former CMS Administrator (2001-2003) | Q.   And you said that that estimated acquisition cost was unworkable?<br>MR. GOBENA:  Object to the form.<br>THE WITNESS:  I don't remember, to be honest with you, I just know it would never actually happen, that it was not a viable calculation.<br>BY MR. DALY:<br>Q.   Yes.  Well, I mean, you use the word unworkable.  I think you use the word unworkable in your testimony as well.<br>A.  No, I didn't.<br>Q.  Why didn't it, what was wrong with it?  Why didn't it work?<br>A.  I don't remember, to be honest with you.  It wasn't something that could be easily tracked or calculated.  And it would seem to be, if I remember, as least as gameable as AWP was.<br>Q.   Well, if you're -- do you recall how it was that whoever was supposed to determine EAC was supposed to determine it?<br>MR. GOBENA:  Objection.  Form.<br>THE WITNESS:  I hate to say, I just don't remember precisely 15 years ago how it worked. |

| WITNESS | TESTIMONY |
|---|---|
|  | Scully Dep. (5/15/07) at 149-50 |
| Harry Leo Sullivan, Director of Pharmacy Services for TennCare (1989-2004) | Q.  Do you recall ever having any correspondence or communications with Zachary Bentley or anyone else that you understood to be affiliated with Ven-A-Care of the Florida Keys?<br>A.  I honestly do not remember.<br>Q.  Have you ever heard of the company Ven-A-Care?<br>A.  No, I really -- the logo looks familiar, but I don't know by what context I would know them.<br><br>Sullivan Dep. (3/12/08) at 135-36 |
| David Tawes, OIG Office of Evaluations and Inspections (1997-2005); Director of OIG Medicare & Medicaid Drug Pricing Unit (2005-Present) | Q.  What do you recall about those meetings?<br>A.  Not that much that -- I mean, we sort of described the work that we were doing, the folks from Audit described the work they were doing.  At the first meeting, there was -- there were some folks from CMS there that talked about their perspectives.<br>Q.  And who was there from CMS?<br>A.  All I can remember being there was Sue Gaston, but I know there were a couple others.  I just don't remember their names.<br>Q.  And what thoughts did the CMS officials share?<br>A.  I -- I don't remember.<br>Q.  Do you remember generally?<br>A.  No.<br><br>Tawes Dep. (4/24/07) at 119-20<br>----------------------<br><br>Q.  And did you have discussions about the fact that many of the drugs with the large percentage differences were generic drugs with officials at CMS?<br>MR. NEAL:  Objection. You can answer that question so long as you don't reveal the substance of communications that you had at entrance or exit conferences with CMS personnel.<br>THE WITNESS:  I don't remember.<br><br>Tawes Dep. (4/24/07) at 289 |
| Edward Vaccaro, New Jersey Medicaid Staff Pharmacist (1979-1982); Regional Pharmaceutical Consultant for Medicaid (1982-1991); Chief of Pharmaceutical Service (1991-1994); Assistant Director of the Office of Utilization Management (1994-2007) | Q.  Okay.  And then the next paragraph, "The State officials also expressed a desire to obtain a copy of the data reviewed for their respective States so that they could analyze."  What are they referring to as "a copy of the data."<br>A.  OIG's data.<br>Q.  What is OIG's data?<br>A.  The invoice, the result of the invoice collection.<br>Q.  The result of the invoice collection or the information collected to compile the OIG audit report?<br>MS. YAVELBERG:  Objection, form.<br>THE WITNESS:  Likely one and the same.<br>BY MR. KIM:<br>Q.  Okay.  And was New Jersey amongst one of those states that requested or expressed a desire to obtain a copy of this data?<br>A.  I don't recall.<br>Q.  New Jersey does not recall whether it obtained or whether it requested?<br>A.  New Jersey participated in a conference from 1995 which is now 13 years ago.  I do not recall if we requested a copy of that report.  I apologize. |

| WITNESS | TESTIMONY |
|---|---|
| | Vaccaro Dep.(12/3/08) at 478-79 |
| Robert Vito, Office of Audit Services (1978-1990); Deputy Regional Inspector General (1990-1995); Regional Inspector General (1995- Present) | Q.  If you go to the next page, Mr. Hays' statement says, about halfway through the first paragraph, I'll read it into the record, if you would follow along: The payment limit for most drugs will be average wholesale price of the drug.  While the term, quote, average wholesale price, end quote, is suggestive of an amount that pharmacies actually pay for drugs, it is, in fact, significantly higher than actual costs.  The average wholesale price is somewhat comparable to a manufacturer's sticker price on a new car.  Mr. Vito, have you ever heard the term average wholesale price to -- it being mentioned it was comparable to a sticker price on a car?<br>A.  Yes.<br>Q.  And when did you hear that?<br>A.  I don't recall.  I know I heard it.<br>Q.  Was it within the last five years, last ten years, last twenty years; any sense at all?<br>A.  Probably within the last ten years, but I can't say with -- for certainty.<br>Q.  And do you recall how you came to learn that?<br>A.  No.  I just remember hearing somebody saying it's like the car, the manufacturer's stick price -- sticker price.<br><br>Vito Dep. (6/19/07) at 130-32<br>----------------------<br><br>Q.  Do you recall any -- any state officials commenting to you that if they lower the ingredient-cost payment, they would have to increase the dispensing-fee component to ensure provider participation?<br>MR. AZORSKY:  Objection to form.<br>MR. NEAL:  I'll join the objection. You can answer.<br>THE WITNESS:  I -- I'm not -- I don't think that that was the -- the -- the gist of the conversation.  I think there were discussions about looking at the total cost and when -- to look at the total cost, you have to look at both those, and if you were to lower one to the point where they're just getting the -- the cost of their product, then there has to be something else that would enable them to, you know, make enough money to survive and to produce the -- and to provide the service.<br>BY MR. TORBORG:<br>Q.  And who did you have those discussions with?<br>A.  I think they -- they were with Larry Reed again.<br>Q.  Anyone else?<br>A.  Maybe Deirdre Duzor as well.<br>Q.  Deirdre Duzor is a -- an official at CMS?<br>A.  Yes.  She works with Larry Reed.<br>Q.  Okay.  Do you recall having any conversation along those lines with state pharmaceutical representatives?<br>A.  I don't recall any.  That doesn't -- doesn't mean that there -- we -- I didn't, but I just don't recall any.<br><br>Vito Dep. (6/19/07) at 224-26 |
| Bruce Vladeck, Former CMS Administrator (1993-1997) | Q.  And did you understand that to the extent that Medicare Part B had gone to an actual acquisition cost methodology for paying for Medicare Part B drugs that it also would have involved Medicare Part B paying for the actual cost incurred by a physician in purchasing drugs?<br>MS. BROOKER:  Objection.  Form.<br>A.  That was my understanding as to actual acquisition costs, yes.<br>Q.  So, it wouldn't have involved conducting a survey and determining an average |

| WITNESS | TESTIMONY |
|---|---|
| | acquisition cost but requiring the provider to report what his actual cost was for the drug.  Correct?<br>MR. BREEN:  Objection to form.<br>A.  I don't recall the exact way in which we defined it as to whether to require that sort of pass through information or to permit an estimation of it.  I recall some discussion of the mechanics, but I don't remember what our conclusion was as to that.<br><br>Vladeck Dep. (5/04/07) at 254-55<br>----------------------<br><br>Q.  Dr. Vladeck, I would like to turn first to the October 2, 1996 letter.  It's with the large exhibit, and it's marked Exhibit Abbott 160.  And I'm going to focus just on the first few pages of that very large exhibit, which is the actual letter from Zach Bentley and Mark Jones at Ven-A-Care to you on October 2,1996.  First, have you ever seen this letter before?<br>A.  I have.<br>Q.  When do you recall first seeing this letter?<br>A.  I -- I honestly don't recall whether I saw it in -- in '96.  I may have.  I'm certain I saw it when I was engaged by Mr. Azorsky in 2003.  I've seen it on a number of occasions since, but during that time I tried to remember whether I saw it in '96 and I -- I'm not certain one way or another.<br><br>Vladeck Dep. (5/04/07) at 264-65<br>----------------------<br><br>Q.     Do you remember anything else that Mr. Hoyer or Mr. Ault told you relating to average wholesale price?<br>MS. BROOKER:  Objection.  Calls for hearsay.  Also, I just want to be mindful just to instruct the witness to be careful about disclosing pre-decisional deliberative conversations.<br>A.     I do believe there was some discussion of the extent to which average wholesale price was an artificial construct of some sort, rather than a -- a true empirical reflection of actual prices in market transactions.<br>Q.     Do you recall if anybody else was part of this conversation?<br>A.     I don't.  It could have been, but I -- I don't recall.<br>*****<br>Q.     Do you remember any other details about the conversation, Dr. Vladeck?<br>A.     No.<br>Q.     I don't think I pinned down exactly when the conversation took place.<br>A.     I -- I couldn't tell you.  I would -- sometime -- my guess would be in 1995 or but I couldn't be any more exact than that.  And I'm not even certain it wouldn't have been -- it could have been late 1994, too.<br><br>Vladeck Dep. (06/21/07) at 313-19 |

| WITNESS | TESTIMONY |
|---|---|
| Jude Walsh, Quality Director of Maine Medicaid (2000-2004) | Q.  What do you recall about the Department of Justice's effort in 2000 to implement these revised average wholesale prices?<br>A.  I don't --<br>MS. ST. PETER-GRIFFITH:  Object to the form.  Sorry.<br>A.  I don't recall anything.<br>Q.  Anything?  Okay.<br>A.  No.<br><br>Walsh Dep. (3/26/08) at 119-20 |
| Jerry Wells, Florida Medicaid Pharmacist Consultant (1984-1990); Department of Health Pharmacy Program Manager (1990-1992); Florida Medicaid Bureau Chief (1992-2007) | Q.  Who at HCFA did you speak to regarding the scope of the federal upper limit program?<br>A.  I remember some names.  I don't remember the name of the individual who developed the first administrative rule for federal upper limit pricing, but he was an ex-Merck employee that had gone to work for the Healthcare Financing Administering, but I don't recall his name.  Larry Reid is still at the Healthcare Financing, or CMS.  I talked with him at some length about that and with some other people whose names I don't recall.  That's many years ago.<br>Q.  How many years ago -- that is my next question.  Do you recall when it was that these conversations took place?<br>A.  The late '80s, early '90s, ongoing, until I left state employment.<br>Q.  Do you recall any specific conversations that related to whether or not injectable or infusion drugs, including those listed on Pages 10 and 11 of Exhibit 1002, would be included within the federal upper limit program?<br>A.  No.  As I said, I think they excluded them.  It was not their intent to put federal upper limit prices on those drugs.<br>Q.  Do you know why it was that HCFA -- strike that.  Were you ever told by anyone at HCFA why it was that HCFA intended to exclude injection and infusion drugs from the federal upper limit program?<br>MS. ST. PETE-GRIFFITH:  Object to form.<br>THE WITNESS:  I don't recall.<br>BY MR. COOK:<br>Q.  From your conversations with Larry Reid and others at HCFA, were you able to infer why it was that the federal government excluded injection and infusion drugs from the federal upper limit program?<br>MS. WALLACE:  Objection.<br>MS. ST. PETE-GRIFFITH:  Objection.<br>THE WITNESS:  I don't think that I was ever satisfied or got a satisfactory answer for my purposes or that issue, but I just don't recall.  That's many years ago.<br><br>Wells Dep. (12/15/08) at 47-49 |