# APPENDIX C

| WITNESS | TESTIMONY |
|---|---|
| David Campana<br>(Alaska) (30(b)(6)) | Q.  Do you know why the decision was made not to implement the changes that you had discussed in those memoranda?<br>A.  I do not know.<br>Q.  Did you have any discussions with anyone after sending the memos to try and figure out what had happened or why the changes had not been acted on?<br>A.  Had a couple discussions along the way, but I don't remember what happened or what the outcome of those discussions were.<br>Q.  Was any part of the reason why those changes were not implemented concerns about potential impact on access to care if dispensing fees were reduced?<br>A.  I don't remember.<br>Q.  Was any part of the reason why those changes were not enacted concerns about potential political impact if changes were not -- changes were implemented reducing the dispensing fee?<br>MR. HENDERSON:  Objection, form.<br>THE WITNESS:  I don't recall.<br><br>Campana Dep. (8/20/08) at 436-37<br>----------------------<br><br>Q.  Are you familiar, sir, with an entity called Ven-A-Care or Ven-A-Care [pronunciation]?<br>A.  No, I'm not.<br>Q.  It's a pharmacy based in Florida that's been involved in some litigation surrounding drug pricing.  Does hearing that refresh your memory at all about this entity?<br>A.  I don't remember seeing anything on that.<br>Q.  Do you remember whether in the late 1990s Ven-A-Care or any other entity had meetings with the folks at Alaska Medicaid talking about drug pricing and potential litigation?<br>A.  I don't remember.<br>Q.  If such meetings were to be -- were to take place, would you typically be involved in a meeting of that kind relating to drug pricing?<br>A.  I might have been involved.<br>Q.  Who would be the best person to talk to to find out whether such meetings occurred and who would have been involved?<br>A.  I -- I don't know.<br><br>Campana Dep. (8/20/08) at 558-59 |
| Suzette Bridges<br>(Arkansas) (30(b)(6)) | Q.  In preparation for your deposition today, did you review any OIG reports?<br>A.  Not that I remember.<br>Q.  Did you talk to Mr. Hanley about any OIG reports?<br>A.  No.<br><br>Bridges Dep. (12/10/08) at 187<br>----------------------<br><br>Q.  Have you had any discussions with anyone at Arkansas' Medicaid Program why it didn't move to actual acquisition costs?<br>A.  I'm not even familiar with this document, so no.<br><br>Bridges Dep. (12/10/08) at 204-05 |

| WITNESS | TESTIMONY |
|---------|-----------|
|  | ---------------------<br><br>Q.  This next document is a rather heavy one.  We've marked it as Roxane Exhibit 10.  It's a document entitled "A Survey of Costs of Dispensing Prescription and Estimated Acquisition Costs in the State of Arkansas."  It was prepared for the Arkansas Department of Human Services, prepared by Myers and Stauffer in consultation -- consultation with Carol Morgan, RPH, and is dated June 1989.  My first question is, have you seen this document before today?<br>A.  No.  I don't even know who Carol Morgan is.<br>Q.  Did you know that Myers and Stauffer performed a survey of costs of dispensing prescriptions and estimated acquisition costs in the State of Arkansas in 1989?<br>A.  I knew we had files with past surveys.  I've never reviewed them.  I didn't know what the dates were.<br>Q.  So you didn't look at this report?<br>A.  No.<br>Q.  -- in preparation for today?<br>A.  I did not review this report.<br><br>Bridges Dep. (12/10/08) at 205-206<br>---------------------<br><br>Q.  Was there any discussion about incentivizing the use of generic drugs by paying providers more for generic drugs than they would for branded drugs?<br>A.  Paying providers more for generic drugs?<br>Q.  Yes.<br>A.  Prior to 2002?<br>Q.  Yes.<br>A.  Not that I'm aware of.<br>Q.  You agree that promoting generic drug use is a goal of Arkansas' Medicaid Program, because it saves it money?<br>A.  I don't think promoting generic use definitely is a way of saving money by --<br>Q.  I thought you --<br>A.  No, I just -- I stopped.  I didn't have anything to add.<br>Q.  So you've never been --<br>A.  I just thought I did.<br>Q.  -- involved in any discussions about using a single rate to reimburse both generic and -- and branded drugs?<br>A.  As far as the ingredient cost?<br>Q.  Yes.<br>A.  I want to make sure we're on the same page here.<br>Q.  I will let you know when I'm talking about dispensing fee.  So again --<br>A.  Actually, no.  I mean, I was not involved in setting any of these rates and why they were not different between brand and generic.<br>Q.  Did you talk to Mr. Hanley about why Arkansas Medicaid used a single rate prior to 2002 to reimburse both branded and generics?<br>A.  No, I did not.<br><br>Bridges Dep. (12/10/08) at 268-69<br>---------------------<br><br>Q.  Okay.  And to ask the question, did you have any conversations with Mr. Hanley about his interactions with a Florida pharmacy?<br>A.  Not specifically, that I recall.  Regarding this document, specifically?  I mean, or |

| WITNESS | TESTIMONY |
|---|---|
|  | in general? Not that I recall.<br>Q.   And so you didn't -- you don't have knowledge, one way or the other, whether Ven-A-Care had contacted Arkansas to discuss the acquisition cost of drugs for pharmacies?<br>A.   Not that I'm aware of.<br>Q.   Okay.  Let's turn to page -- back -- excuse me.  Bates Page VAC MDL 74712, and let me know when you get to that page.  This is a copy of a fax.<br>A.   Okay.<br>Q.   This is a copy of a fax from the State of Arkansas to the office -- of the Office of the Attorney General in Arkansas, somebody by the name of the Danny White.  Do you see that?<br>A.   No.  Where are you seeing Dan -- oh, at the bottom, from Danny White?<br>Q.   Yes.<br>A.   I don't know Danny White.<br>Q.   Okay.  That's not a name you'd recognize?<br>A.   No.<br>Q.   This is -- this, you will agree, is a cover letter of a fax that was sent to Zack Bentley in Key West, Florida?<br>A.   That's what it appears.<br>Q.   And Mr. White, in Arkansas' Medicaid Fraud Control Unit, is providing information to Mr. Bentley?<br>A.   It appears that way.<br><br>Bridges Dep. (12/11/08) at 449-51<br>----------------------<br><br>Q.   Okay.  Do you see in the last sentence in first paragraph, it says, "The Arkansas Pharmacists has requested additional reimbursement for the preparation of these products."  Going back in the other sentence, it says, "Home IV therapy -- for the preparation of these products, which it contends require a good deal more time and supply usage to prepare than most prescriptions."<br>A.   It's in the document.<br>Q.   And then the last paragraph on this first page of Exhibit 4, do you see that it says,  "We believe the most equitable policy would be the States to allow an additional amount above the dispensing fee for the preparation of home IV therapies, which they have determined require significant preparation time and supply usage."  Do you see that?<br>*****<br>A.   Yes, I've read it with you.<br>Q.   Okay.  And to your knowledge, did that happen, was there an additional amount above the dispensing fee that was provided for the preparation of home IV therapy?<br>A.   Not to my knowledge.  It doesn't reflect it in the reimbursement.<br>Q.   Do you know why that never came to pass?<br>A.   I do not.<br>*****<br>Q.   Could you turn to Page 17 of Roxane Exhibit 15?<br>A.   I'm there.<br>Q.   And just backing up a second, this is the June 2001 Myers and Stauffer report on the survey of dispensing costs, right?<br>A.   Yes, it is.<br>Q.   And I plumb forgot, is this one that you said you had read?<br>A.   Yes, it's one I'm familiar with.<br>Q.   Okay.  And then on Page 17, you see below Chart 3.2, it -- it has the write -- |

| WITNESS | TESTIMONY |
|---------|-----------|
|  | going back into the writing, "The most significant characteristic that affects pharmacy dispensing cost was the provision of intravenous IV solutions.  Our analysis revealed significantly higher costs of dispensing associated with the six pharmacies in the sample that provided significant levels of this service."<br>A.  I do see that.<br>Q.  Does that refresh your recollection that -- that home infusion or IV pharmacies have higher costs than normal retail dispensing pharmacies?<br>A.  According to the survey --<br>MS. MOSLEY-SIMS:  Objection.<br>A.  -- I -- I do recall having read that in the past, yes.<br>Q.  (By Mr. Berlin) And you'll see the document continues to say, "In every pharmacy dispensing study where information on IV solution dispensing activity has been collected by Myers and Stauffer, such activity has been found to be associated with higher dispensing costs."  And then it goes on to -- with some of the additional costs of dispensing that home IV pharmacies have.  Do you see that?<br>A.  Yes, sir.<br>Q.  And does that further refresh your recollection that home infusion pharmacies have been found to have higher costs of dispensing than retail pharmacies?<br>MS. MOSLEY-SIMS:  Objection.<br>A.  As reported by Myers and Stauffer in the survey findings, I -- that does refresh my memory.<br>Q.  (By Mr. Berlin) And do you have any reason to disagree with the findings, these findings in this Exhibit 15?<br>MS. MOSLEY-SIMS:  Objection.<br>A.  I don't have any reasons to dispute the findings.<br>Q.  (By Mr. Berlin) And then could you -- bear with me a moment.  Can you go down to the bottom of the page, and you'll see there's a Footnote 8 that reads, "Although typical dispensing fees reimburse less than the dispensing costs of the IV pharmacies, they are they are generally able to break even based on the margin allowed on ingredient cost reimbursement."  Do you have any basis to disagree with that statement?<br>MS. MOSLEY-SIMS:  Objection.<br>A.  I see it as a footnote.  I mean, I don't have any reason to object.  It's part of the report.<br>Q.  (By Mr. Berlin) And that's -- this report was presented to the Arkansas Department of Human Services in June 2001, right?<br>A.  That's correct.  Or --<br>Q.  Had you heard that prior to that time that pharmacies were using -- that IV pharmacies were using ingredient cost reimbursement to help make up for an inadequate dispensing fees?<br>A.  Not that I'm aware of.<br>Q.  And -- and we earlier saw Exhibit 4, which was from 1993.  At any time after 1993, all the way through the present, did Arkansas consider giving some additional dispensing fee or some additional payment to home IV pharmacies?<br>A.  Not that I'm aware of.  Not that I recall.<br>Q.  And do you have any reason to believe that anything contained -- or anything that we just read in the Myers and Stauffer study is any different today?<br>MS. MOSLEY-SIMS:  Objection.<br>A.  I wouldn't know.  I don't know what the current survey -- I don't recall if the current survey factored out the home IV pharmacies or not.<br><br>Bridges Dep. (12/11/08) at 516-22 |
| James Kevin Gorospe | Q.  Have you ever spoken to any of the principals who own or owned, at one time, |

| WITNESS | TESTIMONY |
|---|---|
| (California) (30(b)(1)) | Ven-A-Care?<br>A.  Yes.<br>Q.  And which people have you -- which of the principals have you spoken to?<br>A.  I don't recall their names.<br>Q.  Do you recall when you talked to them?<br>A.  Not specifically, no.<br>Q.  Was it recently or was it several years ago?<br>A.  Several years ago.<br>Q.  Was it before or after?  Can you tell me: Do you recall whether it was before or after they filed the lawsuit in which the State of California has now intervened?<br>A.  I don't know.<br>Q.  Okay.  Was it in the '90s?<br>A.  Yes.<br>Q.  Can you peg it in the late '90s, mid-'90s, early '90s?<br>A.  Late '90s.<br>Q.  Was it an in-person meeting?<br>A.  Yes.<br>Q.  And were lawyers present?<br>A.  Yes.<br>Q.  Lawyers for whom?<br>A.  To my recollection, the Attorney General's Office and the Department of Health Care Services, or Health Services at that time.<br>Q.  Were any lawyers for Ven-A-Care present?<br>A.  Not that I can recall.<br>Q.  And what was the purpose of the meeting?<br>A.  I don't recall the content.  I just remember a meeting.  I don't recall the content.<br>Q.  Did it have anything to do with the litigation?<br>A.  I believe so.<br><br>Gorospe Dep. (3/19/08) at 310-12 |
| Allen Chapman<br>(Colorado) (30(b)(1)) | Q.  I would like you to actually read through the whole survey.  And when you're done, let me know if that refreshes your recollection about what we referred to earlier as the DOJ AWPs or the National Association of Medicaid Fraud Control Units, or NAMFCU, AWPs.<br>A.  My only recollection is I think there were some people -- some concerns about the information on First Databank's tape being accurate.  But I don't remember anything about the -- I assume this has to do with the 400-and-some drugs we talked about earlier, is that right, the 400-and-some DOJ drugs?  I don't have much recollection -- or any about that.  I --<br>Q.  Do you recall that -- does this refresh your recollection that the DOJ provided revised AWPs?<br>MR. ANDERSON:  Objection, form.<br>A.  No.  I just remember there being concerns about the First DataBank and --<br>Q.  (BY MR. KATZ)  Who was expressing those concerns about the First DataBank?<br>A.  I think there were other states, possibly providers that were questioning why -- I don't know.<br>Q.  Did Colorado Medicaid do anything in response to those concerns?<br>MR. ANDERSON:  Objection, form.<br>A.  Sounds like we didn't, from what this says.  I don't remember doing anything.  If they did, it would have been somebody other than me.<br>Q.  (BY MR. KATZ)  Do you recall that Colorado Medicaid chose not to use these DOJ AWPs because Medicare decided not to?  Does that refresh your recollection at |

| WITNESS | TESTIMONY |
|---|---|
| | all?<br>A.  See, that's what supposedly I said.  I don't remember that, but . . .<br>Q.  You can set that aside.<br>A.  That was a long time ago.<br><br>Chapman Dep. (12/15/08) at 201-03<br>----------------------<br><br>Q.  (BY MR. KATZ)  Mr. Chapman --<br>A.  Okay.<br>Q.  -- can you -- can you tell me whether or not you had a discussion with people who may or may not have included representatives of Ven-A-Care regarding real disparity between acquisition costs and AWP?<br>A.  I don't recall any -- any meetings with Ven-A-Care people.  I don't recall -- I do recall having some discussions about -- about this with attorneys, and I don't recall what was said for sure.  I guess I do know that -- that -- that this was -- this was going on.  I didn't remember it was in the 94 series.<br>*****<br>Q.  -- June 26, 1997?<br>A.  Yeah.<br>Q.  Could that be an accurate date of when you might have had this conversation?<br>MR. ANDERSON:  Objection, form.<br>A.  I don't really remember when it was.<br>Q.  (BY MR. KATZ)  All right.  Let's take a look at the document Bates stamped 74730.<br>MR. ANDERSON:  I'm sorry, Cliff.  30?<br>MR. KATZ:  Yes.<br>MR. ANDERSON:  Okay.<br>Q.  (BY MR. KATZ)  And it's titled "Examples of excessive reimbursements for pharmaceuticals by Colorado Medicaid" --<br>A.  Uh-huh.<br>Q.  -- "pharmacy programs."  Is this a chart that you received from Ven-A-Care of the Florida Keys?<br>A.  I don't remember that if I did.  When was that?  Do you know when this was?  A chart?<br>Q.  Well, let's take a look at 74737 and 74738.  Now, 74737 appears to be a fax from Mr. Bentley to you on December 30, 1997?<br>A.  Okay.<br>Q.  And Mr. Bentley is asking for some information.  He's asking for "Colorado's reimbursements for the following NDCs," and the following page contains some NDCs.  Did I describe that accurately?<br>A.  You're talking about 74738?<br>Q.  Yes.<br>A.  Okay.<br>Q.  Is that accurate?<br>A.  Yes.<br>Q.  Is that your handwriting on 74738?<br>A.  No.  That's Martha's handwriting.<br>Q.  Okay.  Did you discuss with Martha providing information to Ven-A-Care of the Florida Keys?<br>A.  I don't remember it if we did.<br><br>Chapman Dep. (12/15/08) at 213-16 |

| WITNESS | TESTIMONY |
|---|---|
| Cynthia Denemark (Delaware) (30(b)(6)) | Q.   And what were the questions that you posed to Ms. Duzor and Mr. Fine relating to cross-subsidization?<br>MS. HEALY SMITH:  Objection.<br>THE WITNESS:  I don't recall the exact questions.<br>BY MS. RAMSEY:<br>Q.   Do you recall the general nature of the -- the Q and A?<br>A.   It would have been the general nature of the -- the combination of how do we get to ingredient cost and what could and could not be included in a dispensing fee.<br>Q.   And do you recall the responses provided by Ms. Duzor and Mr. Fine?<br>A.   The responses from Ms. Duzor would have been a non-answer and no direction. And I don't remember specific answers from Mr. Fine, other than it would have probably been something to the effect of you need to do the best that you can, given the information that you have.<br><br>Denemark Dep. (12/10/08) at 378-79<br>----------------------<br><br>Q.   Is there any way to learn the date on which DMACs were established for the products listed on Schedule 1?<br>A.   There would be a way to tell which date we implemented that reimbursement rate.  What date it was actually proposed or suggested is different from what day we implemented it on.<br>Q.   Do you have any knowledge about the date of implementation for the products listed on Schedule 1?<br>A.   Not off the top of my head.<br><br>Denemark Dep. (12/10/08) at 401<br>----------------------<br><br>Q.    Has Delaware ever had any communications with representatives from Abbott relating to Delaware's reimbursement methodology?<br>MS. HEALY SMITH:  Objection.<br>THE WITNESS:  I've had conversations with the -- with various Abbott representatives.  Whether we circled specifically around or talked about reimbursement, I couldn't recollect specifically.<br>*****<br>Q.   And do you recall the names of any other Abbott employees that you have had communications with?<br>A.   I can't recall the names.  I can see the faces.  And I know I've had conversations at the Western Medicaid Pharmacy Administrator's Association, but I cannot remember the person's name.<br>Q.   Would they be conversations similar to those or on the topics that you discussed with Mr. Crampel?<br>A.   Yes, they would be similar.<br>Q.   Okay.  And did any of these communications relate to the subject of how much the State of Delaware would pay for Medicaid reimbursement?<br>A.   I can't recall the specific discussion that we had that conversation, no.<br><br>Denemark Dep. (12/10/08) at 423-27<br>----------------------<br><br>Q.   Now, there are three officials from HCFA that were present at this meeting, Mike -- do you know how to pronounce that last name? |

| WITNESS | TESTIMONY |
|---|---|
| | A.  Keogh. |
| | Q.  Estelle Chisholm and Sue Gaston, correct? |
| | A.  That's what the record -- notes say, yes. |
| | Q.  Do you recall those individuals being at the 1995 meeting? |
| | A.  No. |
| | Q.  Okay.  Just because time has gone by? |
| | A.  Yes. |
| | ***** |
| | Q.  Okay.  Do you remember the reaction of any of these individuals to the results that were presented at the 1995 meeting relating to the costs -- or the discounts off AWP for which providers could acquire drugs? |
| | A.  I don't remember. |
| | MS. HEALY SMITH:  Objection. |
| | THE WITNESS:  I don't remember at all. |
| | BY MS. RAMSEY: |
| | Q.  Do you recall whether they provided any input or reactions one way or the other? |
| | A.  No. |
| | MS. HEALY SMITH:  Objection. |
| | BY MS. RAMSEY: |
| | Q.  Do you recall whether the HCFA officials indicated they would make recommendations relating to Medicare reimbursement based on the results that OIG had found? |
| | MS. HEALY SMITH:  Objection. |
| | THE WITNESS:  I have limited recollection of this meeting in general, and nonspecific to your question. |
| | |
| | Denemark Dep. at (12/10/08) 447-49 |
| Jerry Wells (Florida) (30(b)(1)) | Q.  From your conversations with Larry Reid and others at HCFA, were you able to infer why it was that the federal government excluded injection and infusion drugs from the federal upper limit program? |
| | MS. WALLACE:  Objection. |
| | MS. ST. PETE-GRIFFITH:  Objection. |
| | THE WITNESS:  I don't think that I was ever satisfied or got a satisfactory answer for my purposes or that issue, but I just don't recall.  That's many years ago. |
| | BY MR. COOK |
| | Q.  Did you seek a satisfactory answer? |
| | MS. ST. PETE-GRIFFITH:  Object to the form. |
| | THE WITNESS:  I think we had some discussions about it because I felt like they should, and they had some reasons that, as I said, I don't think I was ever satisfied with, but I don't even recall what their reasons were. |
| | |
| | Wells Dep. (12/15/08) at 49-50 |
| | ---------------------- |
| | |
| | Q.  You indicated that you never got a satisfactory answer from HCFA.  Did you ever get any answer from someone at HCFA as to why the federal upper limit program was not expanded to include injection and infusion products? |
| | MS. WALLACE:  Objection. |
| | MS. ST. PETE-GRIFFITH:  Object to the form. |
| | THE WITNESS:  I may have.  These were philosophical discussions, and we had lots of differences of opinion about what ought to and ought not to be done in managing the prescription drug program.  I don't recall the answer.  Obviously, it didn't stick in my mind or I'd tell you what it was. |

| WITNESS | TESTIMONY |
|---|---|
| | BY MR. COOK:   And to be clear, the -- your inability to testify about why it was that HCFA told you is a function of the passage of time, correct?<br>MS. ST. PETE-GRIFFITH:  Object to the form.<br>MS. WALLACE:  Objection.<br>THE WITNESS:  Yeah, I think the function of the passage of time, and it wasn't -- apparently, wasn't satisfactory enough to stick.<br><br>Wells Dep. (12/15/08) at 55-56 |
| Jerry Dubberly<br>(Georgia) (30(b)(6)) | Q.  Had you or anybody from your department ever met with Ven-A-Care or a representative of Ven-A-Care?<br>A.  No, I have not.<br>Q.  Do you know if anybody from the State of Georgia has met with anybody from Ven-A-Care?<br>A.  I'm not aware of anyone who has.<br><br>Dubberly Dep. (12/15/08) at 113<br>----------------------<br><br>Q.  In this circumstance, do you remember whether the department proposed to change reimbursement from AWP minus 10 to AWP minus 11?<br>A.  They did.<br>Q.  So Georgia Medicaid proposed to the legislature that change.<br>A.  Yes.<br>Q.  And did they propose exactly this change, or did they propose some change that worked its way down to this?<br>A.  I do not recall.<br><br>Dubberly Dep. (12/15/08) at 263<br>----------------------<br><br>Q.  Has Georgia Medicaid ever performed a comparison between URA and AMP and any component of the Medicaid reimbursement formula?<br>MR. LAVINE:  Object to form.<br>A.  Not that I can recall right now.<br><br>Dubberly Dep. (12/15/08) at 282<br>----------------------<br><br>Q.  Looking at the list of products in Schedule I, do you have a sense of whether those products -- the home infusion products listed in Schedule I are included on the Georgia MAC list?<br>MR. LAVINE:  Object to form.<br>A.  I do not know without comparing to the MAC list.<br><br>Dubberly Dep. (12/15/08) at 305-06 |
| Michael Sharp<br>(Indiana) (30(b)(1)) | Q.  Had you noticed spreads of the magnitude of 100 percent?<br>A.  For?<br>Q.  For generics.<br>A.  Yes, 100 percent and greater.<br>Q.  500 percent?<br>A.  Let's see here --<br>MR. HENDERSON:  Objection.<br>A.  I don't recall seeing anything that high, but there's obviously lots of drugs, and |

| WITNESS | TESTIMONY |
|---|---|
| | my memory is not that good. |
| | Sharp Dep. (3/28/08) at 88-89 |
| | ---------------------- |
| | Q.  Do you know if an analysis was ever done by Indiana Medicaid on how the DOJ AWPs compared to the way Indiana was reimbursing for drugs before the DOJ AWPs were implemented? |
| | A.  I'm not aware of any. |
| | Q.  Do you know if Indiana Medicaid did in fact end up adopting the DOJ AWPs? |
| | A.  I do not know if they did end up adopting those. |
| | Sharp Dep. (3/28/08) at 165 |
| | ---------------------- |
| | Q.  Have you reviewed OIG reports in connection with drug pricing issues? |
| | A.  I have seen the reports and reviewed reports that discussed differences in various pricing benchmarks.  I can't recall the specific titles.  I think there might have been two or three different ones that compared WAC to AWP to acquisition cost.  I can't recall the specific titles.  It seems like there were two or three different OIG reports out on that topic. |
| | Q.  Do you know what the conclusion was with respect to the comparison of AWPs to acquisition cost? |
| | A.  I do not recall. |
| | Sharp Dep. (3/28/08) at 181-82 |
| | ---------------------- |
| | Q.  Have you received any such communications from Abbott? |
| | A.  It seems that there may have been something in the past year, but I don't recall.  I don't keep those. |
| | Q.  You discard those? |
| | A.  Yes. |
| | Sharp Dep. (3/28/08) at 232-33 |
| Carl Shirley (Indiana) (30(b)(6)) | Q.  Okay.  If the letter related to a drug manufacturer announcing a change to its published prices, do you know where that letter would be routed? |
| | A.  Likely be routed to the pharmacy area. |
| | Q.  Okay.  That's your area, sir? |
| | A.  Mine and other pharmacy staff, that's correct. |
| | Q.  All right, thank you.  Do you know whether Indiana Medicaid received a copy of this letter? |
| | A.  No, I do not know. |
| | Q.  Okay.  Would Indiana keep a record of letters that it received from drug manufacturers? |
| | A.  That has never been the case that I'm aware of. |
| | Shirley Dep. (12/3/08) at 413 |
| | ---------------------- |
| | Q.  Thank you.  Have you ever heard of a Florida pharmacy called Ven-A-Care of the Florida Keys? |
| | A.  Yes. |

| WITNESS | TESTIMONY |
|---|---|
| | Q.  Can you tell me what you know about that pharmacy? |
| | A.  Only that sometime, again time frame on this is quite a ways back, there was something to do with a whistleblower law case involving Ven-A-Care of the Florida Keys. |
| | Q.  Can you recall when you first heard the name of that pharmacy? |
| | A.  No. |
| | Q.  Can you recall any representatives -- meetings with representatives of Ven-A-Care? |
| | A.  I had no meetings with representatives of Ven-A-Care. |
| | Q.  What about counsel, attorneys for Ven- A-Care? |
| | A.  None that I recall. |
| | |
| | Shirley Dep. (12/3/08) at 447 |
| | ---------------------- |
| | |
| | Q.  All right.  If you could turn to page 25 of that report.  It's Bates number 2229.  In the second paragraph up from the bottom, you see that that paragraph describes statements that the administrator of HCFA made to OIG regarding the report and begins "the administrator concurred."  Do you see that paragraph? |
| | A.  Yes, I see that. |
| | Q.  I'd like to turn your attention to the third sentence there.  And I'll just read it for you.  Quote, "She," referring to the administrator, also stated concern that any reduction in EAC screenings by HCFA may well result in pressure by the pharmaceutical industry to increase state-dispensing fees accordingly, and the net result may be zero," closed quote.  First of all, do you recall reading that back in 1984? |
| | A.  No, sir, I don't. |
| | Q.  The issue of upward pressure on dispensing fees if EAC is reduced, is that an issue that you dealt with back in the 1980s? |
| | A.  I can't remember in 1980s.  The issue itself is very familiar, not only to me but other pharmacy administrators as well.  So I certainly heard that type of thing over time, yes. |
| | Q.  Can you explain to me why is that issue prevalent among pharmacy administrators? |
| | A.  I can only guess that when pharmacies see their reimbursement affected, and it's a two-piece reimbursement system, if one side goes down, they want to see the other side go up so that they don't incur any net decrease in reimbursement.  So if that's the case of pharmacies across the country, people in the states that are similarly situated to me would probably hear the same type of thing. |
| | Q.  Okay.  How do you know that this was an issue among pharmacy administrators beyond just Indiana Medicaid? |
| | A.  I don't remember anything specific, but people at my level did attend annual conferences.  And, you know, occasionally someone would call somebody else to talk about pharmacy matters.  And this is the type of thing that would have been discussed. |
| | Q.  And then the next sentence in Exhibit Shirley 2 is a response by OIG to the administrator's description of that phenomenon, and let me read that for the record for you.  Quote, "While we can understand the basis for the administrator's concerns, our report demonstrates that the Medicaid program is currently reimbursing pharmacies amounts for drugs' ingredient costs that are significantly in excess of the pharmacies' actual costs of the drug products which is contrary to the intent of the existing federal regulations," closed quote. First of all, do you remember reading that 25 years ago? |

| WITNESS | TESTIMONY |
|---|---|
| | MS. ST. PETER-GRIFFITH:  Object to the form. <br> A.  No. <br><br> Shirley Dep. (12/3/08) at 540-43 |
| M.J. Terrebonne (Louisiana) (30(b)(6) witness on 11/7/08); (30(b)(1) witness on 3/31/08) | Q.  Let's go to Abbott topic -- the Abbott cross-notice, topic number 16.  This is titled "DOJ AWPs," and the area of inquiry reads "Your implementation of revised average wholesale price information developed by the United States Department of Justice and NAMFCU, the dates when you did or did not implement the revised pricing information, and the reasons why you did or did not implement the revised pricing information." <br> Do you see that? <br> A.  Yes. <br> Q.  And do you have an understanding of what we're getting at there? <br> A.  No. <br> Q.  Are you aware of the so-called DOJ AWP effort? <br> A.  No. <br> Q.  Do you recall, just to see if it refreshes your recollection at all, that around 1999 to 2000, there was an effort by the National Association of Medicaid Fraud Control Units and Department of Justice to send revised average wholesale prices to state Medicaid programs and First DataBank? <br> A.  Not that I recall. <br> Q.  And did you do anything to prepare yourself to testify on this topic for today's deposition? <br> A.  No. <br><br> Terrebonne Dep. (11/7/08) at 93-94 <br> ---------------------- <br><br> Q.  Louisiana has had since 1991 one of the largest MAC lists in the country; is that right? <br> MR. FAUCI:  Objection to form. <br> THE WITNESS:  I believe that's correct. <br> BY MR. TORBORG <br> Q.  And do you know if Louisiana calculated MACs for the NDCs listed on schedule one, the so-called Abbott DOJ action NDCs? <br> A.  I do not.  No, I don't off the top of my head. <br> Q.  And as we sit here today, how would we determine whether or not Louisiana had maximum allowable costs for these products? <br> A.  Well, we maintain our drug file, and I think back in the day that was via microfiche, so I don't know if that's still stored somewhere. <br><br> Terrebonne Dep. (11/7/08) at 98-99 <br> ---------------------- <br><br> Q.  Do you recall having discussions with Ven-A-Care of the Florida Keys? <br> A.  I did not have any discussions with Ven-A-Care. <br> Q.  Did you have any communications via a fax or document with people from Ven-A-Care? <br> A.  I do not recall. <br> Q.  Does the name Zachary Bentley ring a bell? <br> A.  No. <br> (Exhibit Abbott 1054 was marked.) <br> MR. TORBORG:  For the record, what I have marked as Abbott Exhibit 1054 bears |

| WITNESS | TESTIMONY |
|---|---|
| | Bates No. VAC MDL 77742 through 63.<br>BY MR. TORBORG<br>Q.   Ms. Terrebonne, for the record, these are some more materials produced by Ven-A-Care of the Florida Keys related to this case.  In particular, this was a collection of documents produced in a file titled "Louisiana." I would ask you to take a look at that if you would.  Ms. Terrebonne, do any of these pages look familiar to you?<br>A.   I see my name on it, but I don't recall.<br>Q.   Look at Bates page ending 77759.  Do you see that?<br>A.   Yes.<br>Q.   This is a -- appears to be, at least, a fax from M. J. Terrebonne to Zachary Bentley at Ven-A-Care dated January 30 of 1998.  Do you see that?<br>A.   Yes.<br>Q.   Is that your handwriting?<br>A.   Yes.<br>Q.   So it appears you had sent a fax to Mr. Bentley.  Is that fair to say?<br>A.   Yes.<br>Q.   Does that refresh your recollection at all regarding communications that you had with Ven-A-Care?<br>A.   No.<br>Q.   If you look at the next page there, it appears to be next to the -- this appears to list NDCs and then reimbursement.  Do you see that?<br>A.   Yes.<br>Q.   Do you recall providing Mr. Bentley with information regarding how much the State of Louisiana reimbursed for ingredients for a set of drugs?<br>A.   I do not.<br>Q.   If we go to the next page there, it appears to be part of the same fax.  Is that right?<br>A.   Yes.<br>Q.   Is that your handwriting?<br>A.   Yes.<br>Q.   And did you write, "Zachary, Louisiana Medicaid reimburses the lower of 1, usual and customary charge, or 2, AWP minus 10.5 percent, plus a fee (the maximum fee is $5.77).  I have listed the AWP for the drugs," which you listed.  Then you wrote -- is that what you wrote?<br>A.   Yes.<br>Q.   And then you wrote, "I would appreciate," can you read that to me and into the record?<br>A.   "If you could send me the information on the definition which exempts IV pharmacies from retail class of trade.  Also, your findings of the states' analyses compared to the average acquisition price.  Thanks."<br>Q.   Do you recall why you were asking Mr. Bentley to provide information both on the definition of IV pharmacies and the findings of states' analyses?<br>A.   I would only say we were probably looking at ingredient cost at that time.<br>Q.   Does reading this refresh your recollection at all about conversations you may have had with Mr. Bentley or others at Ven-A-Care?<br>A.   No.<br>Q.   And it has been almost ten years since you actually -- more than ten years since you faxed this.  Is that right?<br>A.   Yes.<br>Q.   So, it's fair to say there are a lot of communications you may have had with Ven-A-Care that you don't recall given the passage of time?<br>MR. FAUCI:  Objection.<br>THE WITNESS:  It is possible, yes. |

| WITNESS | TESTIMONY |
|---|---|
|  | Terrebonne Dep. (3/31/08) at 177-81<br>---------------------<br><br>Q.  Ms. Terrebonne, have you had any communications with representatives of Abbott Laboratories over the course of the last 15 years?<br>A.  I don't know if I did or not.<br><br>Terrebonne Dep. (3/31/08) at 261 |
| Jude Walsh<br>(Maine) (30(b)(1)) | Q.  Prior to 2000 you had never heard of the term AWP?<br>A.  I don't recall.<br><br>Walsh Dep. (3/26/08) at 73<br>---------------------<br><br>Q.  What do you recall about the Department of Justice's effort in 2000 to implement these revised average wholesale prices?<br>A.  I don't --<br>MS. ST. PETER-GRIFFITH:  Object to the form.  Sorry.<br>A.  I don't recall anything.<br>Q.  Anything?  Okay.<br>A.  No.<br><br>Walsh Dep. (3/26/08) at 119-20 |
| Joseph Fine<br>(Maryland) (30(b)(6)) | Q.  Did Maryland Medicaid review documents from OIG that related to Medicare drug reimbursement?<br>MS. YAVELBERG:  Objection, form.<br>A.  I have no knowledge.<br>Q.  What did you do to investigate whether or not Maryland Medicaid, anyone in the department, reviewed this document?<br>MS. YAVELBERG:  Objection, form.<br>A.  Could you restate that question, please?<br>Q.  What did you do, if anything, to investigate whether the department reviewed this report?<br>A.  I didn't do anything because I had no knowledge of this document.<br>Q.  But others in the department may have reviewed the document, correct?<br>A.  It is possible.<br><br>Fine Dep. (12/9/08) at 93-94<br>---------------------<br><br>Q.  Do you recall, personally, Mr. Fine, any discussions with Ven-A-Care ever?<br>A.  No.  Ever.  Ever.  I'm not saying that the State of Maryland didn't have discussions with them, but I didn't.<br>Q.  Let's take a look at the Abbott cross notice that I've handed you again right there.  Topic 19 titled "Ven-A-Care."<br>A.  Mm-hmm.<br>Q.  It's asking for "the sum and substance of any communications between you" -- and "you" is defined earlier as the department -- "and representatives of Ven-A-Care including but not limited to," blah, blah, blah.  It goes on.  Right?<br>A.  Mm-hmm.<br>Q.  I take it you have done nothing to prepare to testify on communications the department may have had with Ven-A-Care? |

| WITNESS | TESTIMONY |
|---|---|
| | A.   That is correct.<br><br>Fine Dep. (12/9/08) at 182-83 |
| Sandra Kramer<br>(Michigan) (30(b)(1)) | Q.   Do you know roughly how many generic drugs were on the MAC lists in the '90s?<br>MR. HENDERSON:  Objection.<br>A.   That's -- no, I don't.  I believe one of the I can't remember if one document referred to something -- related to additional generic entities were added, but it's not like I kept track of how many were on the MAC list.<br>BY MR. GABEL:<br>Q.   Do you know if any of the subject drugs in this case as identified in the complaint were on Michigan's MAC list?<br>A.   I'd to have research that.  I do not know.<br><br>Kramer Dep. (3/25/08) at 147 |
| Gary Cheloha<br>(Nebraska) (30(b)(6)) | Q.   And once you determined -- I guess, let's start currently.  Once you determined that there's a particular drug that you'd like to set a maximum allowable cost for, how do you go about setting that actual price?<br>A.   Ask for a recommendation from Pace Alliance.  We'll also call pharmacies to determine the range of costs or range of recommended -- recommendations for SMAC pricing.<br>Q.   Okay.  So if you find out from Mr. Woods at Pace that, for a particular prescription drug, that he can purchase it for, say, 50 cents for that particular dosage, I mean, do you use that figure?  Or is there a calculation involved in taking that number and turning it into a MAC?<br>A.   Into an actual SMAC price?<br>Q.   Uh-huh.<br>A.   There is no set formula, and he doesn't provide us -- I think he has -- I believe he has confidentiality agreements for the actual price that the Alliance members can purchase the drug for.  So -- and we rely mostly on the Pace recommendations.<br>Q.   So he'll give you kind of a range, and you'll --<br>A.   He'll generally quote a specific price. He'll say 8 cents, 10 cents.  I recommend this for the SMAC price on it.<br>Q.   And do you know -- you said that there's some confidentiality provisions as far as what they're actually paying.  Do you know if he bills in some percentage or a few cents here or there to make sure that other people can get that or to account for profit or anything like that?<br>A.   All I would know for sure is that it's more than the contract price, but I don't know whether he uses a specific formula or how he specifically determines that.  He -- from time to time, on a very limited basis, he and I have discussed -- how will I say it -- the price that the pharmacies pay.  And then I would -- when I was doing it, I made a determination of where to set the MAC price, at something above that.<br>Q.   And did you have a formula, or you were just -- it was a case-by-case basis for --<br>A.   Generally, a case -- it was a case-by-case basis.  I did not have a set formula.<br>Q.   And I'm assuming that the -- you said that Pace is a purchasing organization that has pharmacies in Nebraska, and those pharmacies are participants in the Medicaid program?<br>A.   Yes.<br>Q.   Do you have a sense of how many pharmacies obtain their drugs from Pace?<br>A.   I don't anymore.<br><br>Cheloha Dep. (12/2/08) at 130-32<br>---------------------- |

| WITNESS | TESTIMONY |
|---------|-----------|
|  | Q.   So at that time in 2003, the Department stopped paying a dispensing -- two dispensing fees if there were two ingredients? |
|  | A.   That's right.  That's correct. |
|  | Q.   Do you know why, in the time period prior to 1996, the Department chose to pay at AWP or AWP less than 8.71 percent? |
|  | A.   I do not know why Mr. Ward made that decision, no.  I mean, I can't say definitively why he made that decision. |
|  | Q.   Can you say -- can you -- do you have an idea as to why? |
|  | MR. DUNNING:  Object to form, foundation.  Calls for speculation. |
|  | THE WITNESS:  This bulletin addresses the issue of a complicated -- more complicated process which may result in additional time being needed to compound and prepare those preparations.  So -- |
|  | Q.   (BY MS. CITERA)  So as I understand it, in this instance, it's possible that the ingredient cost was used to compensate for the cost of dispensing a home IV? |
|  | MR. DUNNING:  Object to form, foundation. |
|  | THE WITNESS:  Again, I'm not sure why Max allowed -- or directed First Health specifically to do that. |
|  | ***** |
|  | Q.   Mr. Cheloha, is it possible? |
|  | MR. DUNNING:  Same objection. |
|  | THE WITNESS:  At this time, yes, it was possible. |
|  |  |
|  | Cheloha Dep. (12/2/08) at 288-90 |
|  | --------------------- |
|  |  |
|  | Q.   Do you know of any communications that the Nebraska Medicaid program has had with Abbott? |
|  | A.   I'm not sure I understand.  But are you saying did we correspond with -- have we received information from Abbott, or have we -- |
|  | Q.   Yeah.  Has the Department had any communications with Abbott over the course of your employment with the agency, to your knowledge? |
|  | A.   We may have had calls.  If Abbott had a government representative, there may -- |
|  | Q.   Do you -- I'm sorry.  I didn't mean to cut you off. |
|  | A.   If Abbott had a government representative, not a salesperson but a government representative, it's certainly possible. |
|  | Q.   Do you know if there were any communications or -- strike that.  Are you aware of any communications between Nebraska Medicaid and Abbott regarding Abbott's prices? |
|  | A.   I remember seeing an Abbott catalog or something that contained prices for Abbott products. |
|  | Q.   Do you recall where you received that from? |
|  | A.   I believe it was the hospital representative from Abbott. |
|  | Q.   Do you recall when this was? |
|  | A.   I do not, not specifically.  1997 maybe, or maybe it was a regular Abbott pricing catalog. |
|  | Q.   What do you mean by regular Abbott pricing catalog? |
|  | A.   I don't know. |
|  | Q.   Okay.  Other than that one instance, do you recall any other communications between Nebraska Medicaid and Abbott regarding Abbott's prices? |
|  | A.   Nothing specific, no. |
|  |  |
|  | Cheloha Dep. (12/2/08) at 295-97 |

| WITNESS | TESTIMONY |
|---------|-----------|
| | ---------------------<br><br>Q.  Would you agree that those types of pharmacies are able to purchase drugs at substantially greater discounts than retail pharmacies?<br>MR. DUNNING:  I'm going to object to form and foundation on this exhibit.  I don't recall if this is an exhibit that Mr. Cheloha has seen before or not.<br>MS. CITERA:  Well, I'm just asking generally, in his experience, does he agree that they are able to purchase drugs at --<br>MR. DUNNING:  I'm making my objection for the record, and he'll testify to the extent of his ability as a 30(b)(6) designee.<br>MS. CITERA:  Sure.<br>THE WITNESS:  I have no knowledge of the specialty pharmacies' ability to buy at discounts substantially greater than the --<br>Q.  (BY MS. CITERA)  So you've never heard that nontraditional pharmacies are able to purchase drugs at substantially greater discounts?<br>A.  I know about the concept of the closed -- door pharmacy, if that's included as a specialty or non, non-traditional.<br>Q.  And it goes with the nursing home pharmacies.<br>A.  Yes.  As far as home infusion, have I ever heard that said?  I -- at this point, I can't say definitively yes or no.  I don't have an opinion, and I don't have recollection about anything specifically related to that any more than any other -- just were pharmacies buying at discounts, or whatever.  So I don't know that they were singled out, and I don't know why they were or weren't included in this, in this scope of this one.  I mean, other --<br>Q.  And you don't recall -- I'm sorry.<br>A.  Other than what it states here, I have no other knowledge about this.<br>Q.  And when you -- when you received this report, do you recall seeing that in the report?<br>A.  I do not.<br><br>Cheloha Dep. (12/2/08) at 298-300<br><br>---------------------<br><br>Q.  Okay.  Do you know if you got pharmacy information from pharmacies about the price of Vancomycin in order to set the MAC?<br>A.  I don't recall one way or the other.<br><br>Cheloha Dep. (12/2/08) at 304 |
| Lise Farrand<br>(New Hampshire)<br>(30(b)(6)) | Q.  You've seen OIG reports relating to AWPs and acquisition costs for prescription drugs, right?<br>A.  I don't know.<br>Q.  But that would be information that might have been available to you?<br>A.  Yes.<br>Q.  Do you know who else would have had that information available at the New Hampshire Medicaid?<br>A.  Whoever would look through the federal mail.<br>Q.  As a general matter, did New Hampshire Medicaid consider the information provided by the Office of Inspector General reliable?<br>MR. HENDERSON:  Objection.<br>THE WITNESS:  I don't know.<br>BY MR. KATZ:<br>Q.  Do you know whether or not the OIG reports were considered when New Hampshire Medicaid was setting its reimbursement? |

| WITNESS | TESTIMONY |
|---|---|
| | A.  I don't know.<br><br>Farrand Dep. (10/28/08) at 158-59<br>----------------------<br><br>Q.  Do you recall any Medicaid pharmacy administrators discussing adjusting the dispensing fee when the DOJ AWPs were implemented?<br>A.  I was not part of the list serve then.<br>Q.  But in general, do you recall any discussion at the Medicaid agency regarding adjusting the formula, adjusting the reimbursement methodology in any way when the DOJ AWPs were implemented?<br>A.  No.<br><br>Farrand Dep. (10/28/08) at 171-72<br>----------------------<br><br>Q.  Has New Hampshire Medicaid ever met with any representatives of Ven-a-Care?<br>A.  Of who?<br>Q.  Ven-a-Care of Florida Keys?<br>A.  No.  Let me put it this way:  I have never met.  I don't know about other members of Medicaid.<br>Q.  So they could have?<br>A.  The commissioner's office, I don't know.<br>Q.  Does it sound familiar to you that the National Association of Medicaid Fraud Control Units had a meeting with all the Medicaid programs in 1998 in which representatives of Ven-a-Care spoke?<br>A.  I don't know.<br><br>Farrand Dep. (10/28/08) at 188-89 |
| Edward Vaccaro<br>(New Jersey) (30(b)(6)) | Q.  Okay.  And then the next paragraph, "The State officials also expressed a desire to obtain a copy of the data reviewed for their respective States so that they could analyze."  What are they referring to as "a copy of the data."<br>A.  OIG's data.<br>Q.  What is OIG's data?<br>A.  The invoice, the result of the invoice collection.<br>Q.  The result of the invoice collection or the information collected to compile the OIG audit report?<br>MS. YAVELBERG:  Objection, form.<br>THE WITNESS:  Likely one and the same.<br>BY MR. KIM:<br>Q.  Okay.  And was New Jersey amongst one of those states that requested or expressed a desire to obtain a copy of this data?<br>A.  I don't recall.<br>Q.  New Jersey does not recall whether it obtained or whether it requested?<br>A.  New Jersey participated in a conference from 1995 which is now 13 years ago.  I do not recall if we requested a copy of that report.  I apologize.<br><br>Vaccaro Dep. (12/3/08) at 478-79<br>----------------------<br><br>Q.  Could you go -- I -- I believe you were shown, and if you can't find it quickly, that's fine, but it was a letter sent from Ven-A-Care to you dated October 24, 1994.<br>A.  Yes. |

| WITNESS | TESTIMONY |
|---|---|
| | Q.  And it says, "I'm currently working on a continuing educational project."<br>A.  Yes.<br>Q.  Did you -- do you remember receiving that letter?<br>A.  Honestly, Eric, I do not.<br>Q.  Okay.<br>A.  It may not even have reached me in that there was a process in the organization for things to pass through the Director's office on down.  If something came directly to me, I may either decided not to respond to it or didn't -- I don't recall.  You know, it's interesting how the letter's written.  Continuing --<br>Q.  Why -- what do you mean by that?<br>A.  Well, just continuing education, you know, it looked like its intent was to get information, that kind of thing.<br>Q.  It looked like the intent was to get information for some sort of a continuing education project; right?<br>A.  That's what it looked like, yes.<br>Q.  It -- it didn't, in fact, say that we're collecting documents to -- for a lawsuit; right?<br>A.  No, it did not.<br>Q.  I mean, in fact, it contained a lie; right?<br>MS. YAVELBERG:  Objection, form.<br>THE WITNESS:  Yeah, and I'm not too sure I can -- I can respond to that, but -- but knowing what I know now and looking at the letter, one has to conclude certain things.<br><br>Vaccaro Dep. (12/3/08) at 728-29 |
| Anne Haase<br>(North Dakota) (30(b)(6)) | Q.  Did your job involve reimbursement formulas for prescription drugs under North Dakota's Medicaid program?<br>A.  There was a formula.  Don't ask me what it was at this point.<br>Q.  At the time were you aware what it was?<br>A.  Yeah.  There was a formula, yeah.<br>Q.  Were you involved in any amendments or changes to that formula during your time at North Dakota Medicaid?<br>A.  There might have been a change to the dispensing fee.  I don't remember.  It was all done computerized, electronic.<br>Q.  Do you recall any proposed amendments to the reimbursement formula during your time at North Dakota Medicaid?<br>A.  You mean during the sessions and stuff?<br>Q.  Well, by sessions, what do you mean?<br>A.  Like, when the legislature got -- met.  I don't -- I mean, there could have been in some of those.  We didn't really get called down unless it was actually, you know, really going to happen or something.  And then we were sometimes told to give our opinions.  And I don't know that I went down there.  I think Pat probably did, if there was. I don't remember.<br>Q.  But your department would have been involved?<br>A.  May have.  I mean, I guess it's the director of the medical division, and they saw all of the things that came down.  And they evaluated whether they were there, and then they evaluated whether I went or not. So I didn't really know.  I was told you will -- if we need you, we need you to be there on this day or something.<br><br>Haase Dep. (12/10/08) at 23-25<br>---------------------- |

| WITNESS | TESTIMONY |
|---|---|
| | Q.  During your time at North Dakota Medicaid, did North Dakota Medicaid ever pay for drugs based on a maximum allowable cost?<br>A.  I'm not sure.<br><br>Haase Dep. (12/10/08) at 103<br>----------------------<br><br>Q.  During your time at North Dakota Medicaid, did you have any communications with Abbott Laboratories?<br>A.  Maybe in the rebate program, if I had a question on their rebates.<br>Q.  Do you recall any specific conversations you had with anyone at Abbott Laboratories during your time at North Dakota Medicaid?<br>A.  No.<br>Q.  I'm sorry.  Was there an answer to the question?  If so, I didn't hear it.<br>A.  I said no.<br>Q.  Do you recall during your time at North Dakota Medicaid, if you had any communications with pharmaceutical manufacturers regarding the amount that North Dakota was reimbursing for prescription drugs?<br>A.  Not that I know of.<br><br>Haase Dep. at (12/10/08) 103-04 |
| Brendan Joyce<br>(North Dakota) (30(b)(6)) | Q.  And you said -- I believe you said that you talked with other state Medicaid pharmacists regarding their reimbursement schedules.  Do you recall the names of any of these state Medicaid pharmacists?<br>A.  Specific to discussions about reimbursement policy?  Mark Petersen in South Dakota would be the only one that I can guarantee that I had discussed it with him.<br>Q.  But you do remember having discussions with other state Medicaid pharmacists ?<br>A.  Yes.  But I do not know which ones in particular.<br>Q.  Okay.  Do you have an idea of how many states -- or state Medicaid pharmacists you may have spoken to?  A general idea of the number?<br>MR. BAHR:  Regarding?<br>Q.  Regarding reimbursement.<br>A.  Specifically reimbursement, I'm not sure.<br>Q.  Do you -- do you have any idea whether it was more than two?<br>A.  I'm sure it was more than two.  When you get up to the ten to 15 I'm not sure if it's more than that.<br><br>Joyce Dep. (12/12/08) at 38-39<br>----------------------<br><br>Q.  Okay.  Have you ever heard of the term DOJ AWPs?<br>A.  I have heard of DOJ, and I've heard of DOJ, but not specifically DOJ AWPs.<br>Q.  Are you familiar with a revised list of AWPs for approximately 400 NDCs that was created by the National Association of Medicaid Fraud Control Units and the Department of Justice in the early 2000s?<br>A.  I'm aware of DOJ pricing.<br>Q.  Okay.  And North Dakota Medicaid used these DOJ prices for a short time in 2000, correct?<br>MS. THOMAS:  I'm sorry.  Could you repeat that?<br>MR. MALONEY:  Could you read it back?<br>THE COURT REPORTER:  "And North Dakota Medicaid used these DOJ prices for a short time in 2000, correct?" |

| WITNESS | TESTIMONY |
|---|---|
|  | MS. THOMAS:  Objection.<br>A.   My memory would be based on what was told to me while I -- when I started my job.  Because if it was implemented in 2000 and then disimplemented it would have never occurred while I was there.<br>Q.   (Mr. Maloney continuing)  And what was told to you when you started at North Dakota Medicaid recording DOJ pricing?<br>A.   I know there was a mention of DOJ pricing.  I cannot state 100 percent exactly what it was.<br><br>Joyce Dep. (12/12/08) at 202-03 |
| Robert Reid<br>(Ohio) (30(b)(1)) | Q.   You recall conversations about AWP with your colleagues; right?<br>A.   I'm sure I had plenty, many.  I can't recall a specific one.<br><br>Reid Dep. (12/15/08) at 103<br>----------------------<br><br>Q.   Do you recall this project or any other issue relating to the pricing of intravenous solutions and injectable drugs being raised at a PTAG meeting?<br>MS. GEOPPINGER:  Would you mind repeating that.  I'm sorry.  I just lost the end of the question.<br>MR. TORBORG:  A PTAG meeting.  I'm asking --<br>MS. GEOPPINGER:  Could you repeat the question.  I'm sorry.<br>BY MR. TORBORG:<br>Q.   Mr. Reid, do you recall any issue relating to intravenous solutions and injectable drugs being raised at any meeting of the PTAG?<br>A.   I don't recall.<br>Q.   It could have, you just don't recall?<br>MS. GEOPPINGER:  Object to the form of the question.  You can answer.<br>A.   I'm sorry, what was it again?<br>Q.   It could have been raised, you just don't recall?<br>A.   Yes, yes, that's right.  It wouldn't be unusual.<br>Q.   Do you recall anything relating to Ven-A-Care ever being raised at a PTAG meeting?<br>A.   I don't recall.<br>Q.   It could have, you just don't recall?<br>MS. GEOPPINGER:  Same objection.  You can answer.<br>A.   Correct.<br><br>Reid Dep. at (12/15/08) 127-28<br>----------------------<br><br>Q.   There's been some testimony about these notes, Mr. Reid, that they were prepared by OIG after a meeting in August of 1994 in Richmond, Virginia, relating to an audit that the OIG was performing around that time to assess the difference between invoice price for drugs and AWP.<br>A.   Uh-huh.  Uh-huh.<br>Q.   Do you recall the OIG doing that audit?<br>MS. GEOPPINGER:  Let me just object for the record.  The previous testimony will speak for itself.  You can answer.<br>A.   Well, they would come to us and audit us on a variety of issues, but I don't remember anyone specifically.<br>Q.   At the very bottom of the second page of the document -- you're there -- the very bottom? |

| WITNESS | TESTIMONY |
|---|---|
| | A.  Here?<br>Q.  No, the page --<br>A.  Oh, here?<br>Q.  Yes.<br>A.  Okay.  Oh, yeah.<br>Q.  The second to last line there is a sentence that starts with "They stated."<br>A.  Uh-huh.<br>Q.  Okay.  It says, "They stated that we should include a fifth category of pharmacies to include non-traditional retail pharmacies such as hospitals, home IV, nursing homes, physicians, et cetera.  The state officials believed that these pharmacies purchased at substantially bigger discounts than traditional retail pharmacies."  Do you see that?<br>A.  I see that.<br>Q.  Okay.  Is that something that you believed on or around 1994, that hospitals, home IV, pharmacies, nursing homes and physicians could purchase drugs at substantially bigger discounts than retail pharmacies?<br>MR. HENDERSON:  In 1994?<br>A.  Only because their volume was higher.  I think that that would be a logical assumption.<br>Q.  Do you recall being aware of that on or around 1994?<br>MS. GEOPPINGER:  I'm going to object to the form of the question.  You can answer.<br>A.  I don't recall.<br><br>Reid Dep. (12/15/08) at 132-34<br>----------------------<br><br>Q.  Do you recall having any oral conversations at all with Abbott about drug pricing?<br>A.  No.  I don't recall.<br><br>Reid Dep. (12/15/08) at 174<br>----------------------<br><br>Q.  Mr. Reid, I'll ask you a few questions.  I think you've already indicated these look like they relate to a PTAG meeting; is that right?<br>A.  It looks like it.<br>Q.  In particular, this one is dated June 8 through June 9, 1999; right?<br>A.  Right.<br>Q.  It appears to be at -- that it was held at the LaFonda on the Plaza Hotel in Santa Fe, New Mexico.<br>A.  Yes.  I remember that there was quite a few CMS people there as well.<br>Q.  You -- was this a face-to-face meeting?<br>A.  Yes.<br>Q.  And it shows -- you're listed as being a part of a group doing an NASMD presentation?<br>A.  National Association of State Medicaid Directors.<br>Q.  Okay.  You were speaking --<br>A.  It was sort of a combined meeting.<br>Q.  Who is Anne Koci; do you know?<br>A.  I think she worked for CMS, but I'm not sure.<br>Q.  And Mark Richard Butt, he had --<br>A.  New York. |

| WITNESS | TESTIMONY |
|---|---|
| | Q.  He had your job in New York, roughly speaking?<br>A.  New York, yeah.  And Shepherd was Virginia.<br>Q.  He had your job in Virginia?<br>A.  Uh-huh.<br>Q.  Did you work with Mr. Butt and Mr. Shepherd on a presentation?<br>A.  Yes, we did work together.<br>Q.  What do you recall about that?<br>A.  Nothing.<br>Q.  If we go to the second page of the agenda, Bates page 186.<br>A.  Okay.<br>Q.  You're listed as -- under the heading "Work Group Presentations."  Do you see that?<br>A.  Uh-huh.<br>Q.  In particular, it looks like you were giving a presentation on average wholesale price.<br>A.  Uh-huh, probably much like what we've been talking about today.<br>Q.  Do you recall that at all?  Does this refresh your recollection at all about this?<br>A.  Pretty vague.<br><br>Reid Dep. (12/15/08) at 208-11 |
| Nancy Nesser (Oklahoma) (30(b)(6)) | Q.  For what time period are you prepared to testify about the topics of inquiry?<br>A.  From May of 2001 through the current time period.<br>Q.  Are you aware that the topics -- that many of the topics of inquiry and areas of inquiry in the deposition notice regard time periods earlier than May, 2001?<br>A.  Yes.<br>Q.  What did you do to prepare to testify about those topics or time periods earlier than May, 2001?<br>A.  There are no documents available for me to reference those time periods.<br><br>Nesser Dep. (12/12/08) at 27- 28<br>---------------------<br><br>Q.  Okay.  We also mentioned earlier the subpoenas that Oklahoma Medicaid received for documents by the Abbott, Dey or Roxane defendants in the summer of 2008; correct?<br>A.  I don't remember getting them that long ago.  But maybe we did.<br>Q.  Were you ever asked to collect documents in response to the subpoenas for documents by these defendants?<br>A.  Yeah.  About a month or five weeks ago.<br>Q.  And what were you asked to collect?<br>A.  Well, there was a big list.  And I went through and just said, "These are the things I know how to find."  And that's what -- that's what we were able to produce, was the things that I knew where they were.<br>*****<br>Q.  Are you aware that Oklahoma Medicaid only produced about 10 documents in this case?<br>A.  Yes.<br>Q.  You would assume that there are significantly more than 10 documents that relate to the subjects requested in the subpoena about prescription drug pricing?<br>A.  I would suspect there are more somewhere.<br><br>Nesser Dep. (12/12/08) at 244-45<br>--------------------- |

| WITNESS | TESTIMONY |
|---|---|
| | Q.  Did you search for any of the surveys about acquisition costs and dispensing costs that Oklahoma Medicaid commissioned in response to the subpoena?<br>A.  The only one that I knew of was the 2003 one.  I -- I didn't know that the others existed.<br>Q.  I'll have to find the page, but I believe you mentioned the Oklahoma College of Pharmacy also conducted a survey in approximately 1995.<br>A.  Right.  Although I've never seen it.  I've only heard reference to it.  I've never seen their -- there was something hinky about it, for lack of a better term.  Nobody will really tell me anything about it other than there was one.  But nobody has it.<br><br>Nesser Dep. (12/12/08) at 245-46<br>----------------------<br><br>Q.  Do you have any idea whether these drugs -- or do you have an understanding as to whether these drugs are frequently dispensed by home infusion pharmacies?<br>A.  I don't -- I can't say that I've ever investigated that.  It would make sense that they are.<br>Q.  Okay.  And do you know whether these drugs were MACed by the state?<br>A.  I don't know off the top of my head, no.<br><br>Nesser Dep. (12/12/08) at 257-58<br>----------------------<br><br>Q.  Okay.  Were you aware that Ven-A-Care had conversations with Oklahoma Medicaid as early as 1998?<br>A.  No, I was not.<br>Q.  Okay.  And I assume you were not aware that they had conversations about the AWP?<br>A.  No.<br><br>Nesser Dep. (12/12/08) at 284<br>----------------------<br><br>Q.  So were you aware that at some point Ven-A-Care was providing information showing that Oklahoma Medicaid was reimbursing Abbott's Vancomycin at a rate greater than OIG reports had shown for Vancomycin?<br>A.  No.<br>Q.  Do you know whether Oklahoma took any action as a result of receiving this information from Ven-A-Care?<br>A.  I do not know.<br><br>Nesser Dep. (12/12/08) at 287 |
| Jesse Anderson<br>  (Oregon) (30(b)(6)) | Q.  Do you have an understanding as to why Governor Kitzhaber refused to implement OMAP's proposal to decrease reimbursement to AWP minus 15 percent, and instead only implemented AWP minus 14 percent?<br>A.  I do not recall.<br><br>Anderson Dep. (12/16/08) at 109<br>----------------------<br><br>Q.  In your experience as a policy analyst and as an employee of the Oregon Medicaid program generally, why would Oregon Medicaid pay a higher dispensing fee to pharmacies with more than 20 percent Medicaid prescription volume? |

| WITNESS | TESTIMONY |
|---|---|
| | A.   Again, the only thing I can think of is the -- because, traditionally, a Medicaid population is a more difficult population than the commercial population.  I -- I -- I -- I just don't know.  I have no recollection of when they developed it.  I just don't know. |
| | Anderson Dep. (12/16/08) at 122 |
| | ---------------------- |
| | Q.   BY MR. HEINZ:  Do you have an understanding as to whether the costs to dispense a prescription to a Medicaid patient differ from the costs associated with dispensing a prescription to a non Medicaid patient? |
| | A.   No, I don't have a -- No. |
| | Q.   Do you have an understanding as to whether the current $3.50 dispensing fee that has been in place since 2001 covers the dispensing costs that a pharmacy incurs when it dispenses a Medicaid prescription? |
| | A.   I don't know if it covers costs or if it's over costs.  I don't -- I -- I personally have not seen any analysis other than the Secretary of State's audit about the costs.  Kathy would be more of an expert on that discussion. |
| | Q.   But you would agree with me that, looking at this report that we've marked as Exhibit 12, that if it does cost a pharmacy $12.05 to dispense a Medicaid prescription to a beneficiary in Oregon, that the $3.50 dispensing fee for Medicaid is not adequate to cover those costs? |
| | A.   I would agree that this table reflects a very different amount than what we pay.  I -- I don't know if that -- without reading the whole report, really, what the -- what's included in the costs. |
| | Anderson Dep. At (12/16/08) 127-29 |
| | ---------------------- |
| | Q.   Are you aware that Oregon Medicaid reimburses generic drugs based on the MAC or FUL prices? |
| | MR. DAVIS:  Object to form. |
| | THE WITNESS:  I don't know what's involved in the MAC or the FUL.  I don't know if that's more generic or brand.  I -- I don't -- I don't know that. |
| | Q.   BY MR. MALONEY:  So would it be accurate to say that you have no knowledge as to, generally, which types of drugs are reimbursed base on MAC, FUL, or AWP prices? |
| | A.   I don't -- Correct.  I don't know what percentage are paid at what levels. |
| | Q.   And you also don't know which types of drugs, referring to brand or generic drugs, are paid based on those prices? |
| | A.   Correct.  I don't know -- Yeah, I don't know the -- the number of brand or generics that we pay a particular FUL or AWP price. |
| | Q.   And you also would have no knowledge regarding what prices are used to pay claims for the drugs listed in the complaints that you looked at a few minutes ago? |
| | A.   Correct. |
| | Anderson Dep. (12/16/08) at 244 |
| Kathy Ketchum (Oregon) (30(b)(6)) | Q.   After 2001, Oregon Medicaid changed their dispensing fee structure; correct? |
| | A.   Yes. |
| | Q.   And do you recall what they changed the structure to? |
| | A.   I believe it was -- went from this tiered structure to, hmm, I believe it was two -- |

| WITNESS | TESTIMONY |
|---|---|
| | or $3.50.<br>Q.  And do you have any understanding as to the rationale behind the change in reimbursement?<br>A.  I don't.<br><br>Ketchum Dep. (12/15/08) at 158<br>----------------------<br><br>Q.  Okay.  And do you know if the vendor used before March of 2002 also used a proprietary method of setting MAC prices?<br>A.  I can't speak to that.  I don't know.<br>Q.  Okay.  When Oregon Medicaid contracted with First Health Services for MAC pricing, did it instruct First Health Services to use any specific type of information in its proprietary method of setting MAC pricing?<br>A.  I -- I can't speak to that.  I -- Since I'm a contractor, I don't -- I don't see the contracts of vendors, and so I don't know -- have personal knowledge of that.<br>Q.  Okay.  Do you know of anyone at Oregon Medicaid who would have that knowledge?<br>A.  Perhaps Jesse will tomorrow.<br>Q.  And is it accurate to say that you haven't reviewed any documents or otherwise educated yourself about the contract between Oregon Medicaid and First Health Services regarding MAC pricing, in preparation for this deposition?<br>A.  I have not.<br>MS. SCHNEIDER THOMAS:  Objection, form.<br>Q.  BY MR. MALONEY:  And that would be the same for EDS as well?<br>A.  I have more firsthand knowledge of EDS, because I've been working with them more closely.<br>Q.  Okay.  Do you know -- Do you have any information as to what type of information EDS considers in setting its MAC prices?<br>A.  I have some general knowledge that they -- they determine whether drugs are multiple source, how many manufacturers make -- make the drug available.  And then -- So those are the drugs that are eligible for a MAC price.  I don't -- I don't know how they actually set the actual price.<br>Q.  Okay.<br>A.  I don't know that part.<br><br>Ketchum Dep. (12/15/08) at 232-34 |
| John Young<br>(Rhode Island) (30(b)(6)) | Q.  Rhode Island response goes on to say, "The AWP represents the manufacturer's suggested price which generally is higher than the actual cost of the drug paid by the pharmacy.  Indeed, pharmacies typically purchase drug products at prices much less than AWP.  The largest savings from the WAC plus 10 pricing methodology will come from generic products.  Our experience is that the AWP for a generic product can be up to 10 times the WAC."  Did I read that correctly?<br>A.  You did.<br>Q.  Do you recall any discussions about Rhode Island's determination that the AWP is higher than the actual cost of the drug paid by the pharmacy?<br>A.  I don't recall specific discussions, no.<br>Q.  Do you recall any discussions about why Rhode Island determined that the largest savings from the WAC plus 10 pricing methodology would come from generic products?<br>A.  I don't recall specific discussions, no. |

| WITNESS | TESTIMONY |
|---------|-----------|
|         | Q.   Do you have any recollection of what your understanding was at the time regarding this move to a WAC plus 10 pricing methodology, the rationale for it?<br>A.   I was not involved in the discussion, and so at this point in time we would be simply trying to secure approval for the request made in 1995.<br>Q.   Who would you -- let's see.  This letter is submitted by Christine Ferguson; is that correct?<br>A.   That's correct.<br>Q.   And it is copied to you and Paula Avarista?<br>A.   Yes, I believe so.<br>Q.   And Ann Martino?<br>A.   Correct.<br>Q.   Who is Ann Martino?<br>A.   Ann Martino was the chief of the office of policy.<br>Q.   She is the individual you identified earlier as someone who may be a custodian for State Plan Amendment information?<br>A.   Correct.<br>Q.   As Medicaid Director, would you have wanted to understand why the pricing methodology for generic products was being adjusted?<br>A.   If it was an action I had proposed, then yes, I would.<br>Q.   What if it was an action you hadn't proposed?  Would you care to understand the reasoning for why the WAC plus 10 pricing methodology?<br>A.   To the extent it was an outstanding action, I would certainly have wanted to be briefed for informational reasons.<br>Q.   But you have no recollection of whatever briefing you may have received on why this change was made?<br>A.   I do not.<br><br>Young Dep. (12/3/08) at 74-77<br>----------------------<br><br>Q.   As the director of Medicaid at the time, what was your understanding of whatever additional analysis was done from May 11, 2001 to May 31, 2001 to assess what the impact of the change from wholesale acquisition costs plus 10 percent to wholesale acquisition costs plus 5 percent would be?<br>A.   I have no memory of additional analysis between those two dates.  The single additional representation would appear to be that the proposed WAC plus 5 percent would cause no further harm to providers and would still result in a profit for the pharmacies.<br>Q.   But other than the fact that you have just put that conclusion in the letter, do you recall what the basis for that conclusion is?<br>A.   I do not.<br><br>Young Dep. (12/3/08) at 100-01<br>----------------------<br><br>Q.   And the third paragraph states that the conclusions of their report is that they have estimated that, quote, nationally actual drug acquisition costs was an average of 65.93 percent below AWP.  This OIG report from 2002 would have been issued during your tenure as Rhode Island Medicaid Director; is that right?<br>A.   Correct.<br>Q.   Do you recall receiving this report? |

| WITNESS | TESTIMONY |
|---|---|
| | A.  Not specifically.<br>Q.  But it was generally the case that you would receive and review OIG reports; is that right?<br>A.  Correct.<br>Q.  Do you recall discussing around the 2002 time frame that there was federal acknowledgment that the actual drug acquisition cost was 65 percent or more below AWP?<br>A.  I don't remember specific discussions, no.<br><br>Young Dep. (12/3/08) at 141-42<br>----------------------<br><br>Q.  I've asked the court reporter to mark as Roxane Exhibit 15 a document that is entitled "Pharmacy Technical Advisory Group (P-TAG) Position Paper," September 11, 2000.  The first paragraph reads: The P-TAG should go on record as endorsing the initiative for revised average wholesale prices as developed by the National Association of Medicaid Fraud Control Units and the U.S. Department of Justice.  You were state Medicaid Director at this time; is that correct?<br>A.  That's correct.<br>Q.  Were you aware of revised average wholesale prices that were developed by NAMFCU and DOJ?<br>A.  Not specifically, no.<br>Q.  Do you have no recollection of the Department of Justice suggesting revised average wholesale prices as basis for reimbursement?<br>A.  No, I don't.<br>*****<br>Q.  If the Department of Justice was recommending that states used revised average wholesale prices as basis for reimbursement, would you have wanted to know that as state Medicaid Director?<br>A.  Probably.<br>Q.  But you have no recollection of anyone bringing this to your attention?<br>A.  I do not.<br><br>Young Dep. at (12/3/08) 160-62<br>----------------------<br><br>Q.  Mr. Young, during your tenure as the director of Rhode Island Medicaid, did you ever have direct communication with representatives from Boehringer?<br>A.  Not to my recollection, no.<br>*****<br>Q.  And Abbott Laboratories?<br>A.  I may have met somebody from Abbott.  That's a stronger possibility.<br>Q.  Do you have any specific recollection of meeting somebody from Abbott?<br>A.  I don't.<br><br>Young Dep. (12/3/08) at 175-76 |
| Larry Iversen<br>(South Dakota) (30(b)(6)) | Q.  When did you begin your employment with South Dakota Medicaid?<br>A.  Approximately 13 years ago.<br>Q.  So roughly in 1995?<br>A.  Roughly.<br>Q.  For what time period are you prepared to testify today? |

| WITNESS | TESTIMONY |
|---|---|
| | A.  For the time frame that I've been employed with Department of Social Services.<br>Q.  And did you do anything in preparation for this deposition to inform yourself of the time period prior to your employment at South Dakota Medicaid?<br>A.  No.<br>Q.  Were you involved in the collection of documents that were produced by South Dakota Medicaid?<br>A.  No.<br>Q.  Were you at all asked to gather documents to produce in connection to this litigation on behalf of South Dakota Medicaid?<br>A.  No.<br><br>Iversen Dep. (12/15/08) at 19-20<br>----------------------<br><br>Q.  When South Dakota established its definition of estimated acquisition cost as AWP minus 10.5 percent, how was the figure of 10.5 percent determined?<br>A.  I don't know that, that was before my time with the department.<br>Q.  In preparation for your deposition today, were you educated as to how this figure was set?<br>A.  No.<br>Q.  Do you have any insight as to how that figure was determined?<br>A.  I don't.<br>Q.  Do you know when the 10.5 percent discount was first applied in the South Dakota Medicaid reimbursement formula?<br>A.  I don't know specifically, but it's been 10 and a half percent for as long as I can recall.<br>Q.  And you began work with the department around 1995; is that correct?<br>A.  Approximately 13 years.<br>Q.  I'm sorry, I didn't hear your answer, sir.<br>A.  Yes, approximately 13 years.<br>Q.  And similarly, I believe you previously testified that the dispensing fee has remained at the $4.25 level since you began with the department around 1995.<br>A.  I think it's $4.75.<br>Q.  I'm sorry, I misspoke.  $4.75 --<br>A.  Yes.<br>Q.  -- has remained the dispensing fee level since at least as early as 1995; is that correct?<br>A.  There may have been a change in there at some point, I don't recall.  I can recall it's been $4.75 for a number of years.<br>Q.  How was the $4.75 level selected for the South Dakota dispensing fee?<br>A.  I don't know that.<br>Q.  As part of your preparation for today's deposition, were you educated at all regarding South Dakota's knowledge about the adequacy or inadequacy of its dispensing fee rate?<br>A.  No.<br><br>Iversen Dep. (12/15/08) at 124-26<br>----------------------<br><br>Q.  Now, if you could turn to Schedule 1, which is a few pages back, it has a list of national drug codes and it's titled Schedule 1, Abbott slash DOJ action NDCs.<br>A.  Yes.<br>Q.  I can represent to you that these are the products that are at issue in the |

| WITNESS | TESTIMONY |
|---------|-----------|
|  | Abbott/DOJ action.  Are you familiar with these drug products?<br>A.   No.<br>Q.   Do you have an understanding that these are all multisource products?<br>A.   I understand what multisource products are.  I didn't know that they were all multisource.<br>Q.   Do you have any knowledge as to how these drug products are administered to patients?<br>A.   No.<br>Q.   For the record, I can represent to you that these are all liquid drugs, infusion or irrigation products, and they are generic products.  For which of these products did South Dakota have a MAC?<br>A.   I don't know that.<br>Q.   In preparation for your deposition today, were you educated at all about which of these products listed on Schedule 1 South Dakota had established a MAC for?<br>A.   No.<br>Q.   Is it fair to say that South Dakota could have MACs for these products, you are just not aware one way or the other?<br>A.   That's correct.<br><br>Iverson Dep. (12/15/08) at 130-31<br>----------------------<br><br>Q.   What prompted South Dakota to implement this survey looking into the difference between the published AWPs and the rate at which providers could acquire drugs?<br>A.   I don't know that.<br>Q.   Who would know?<br>A.   Bob Coolidge.<br>Q.   What is Mr. Coolidge's position today?<br>A.   All I know is he doesn't work for the Department of Social Services.<br>Q.   Do you have any idea when he left Department of Social Services?<br>A.   It's probably been close to 11 to 12 years ago.<br>Q.   Where are the files relating to this survey stored in the South Dakota Medicaid office?<br>A.   I don't know that there are any files related to this survey even in existence.<br><br>Iverson Dep. (12/15/08) at 135-36<br>----------------------<br><br>Q.   Who is Mark Peterson?<br>A.   He was our pharmacist up until about a little over a year ago.<br>Q.   And where is he now?<br>A.   He passed away in a car accident.<br>Q.   Sorry to hear that.  On the second page of the document under number five, the question is asking whether South Dakota implemented the revised prices, and the response for South Dakota is, "No, we have never used the new prices for any of the listed drugs."  Did I read that correctly?<br>A.   Yes.<br>Q.   What is your understanding as to why South Dakota did not implement the prices referred to as the DOJ AWPs?<br>A.   Well, I guess like I said, I'm not really familiar with DOJ AWPs and I would have to say that our general rules methodology says that we will pay using AWP less 10 and a half percent, so I would have to assume that we were just going to stick with |

| WITNESS | TESTIMONY |
|---|---|
| | that reimbursement.<br><br>Iversen Dep. (12/15/08) at 143-44 |
| Harry Leo Sullivan<br>(Tennessee) (30(b)(1)) | Q.   Do you recall ever having any correspondence or communications with Zachary Bentley or anyone else that you understood to be affiliated with Ven-A-Care of the Florida Keys?<br>A.   I honestly do not remember.<br>Q.   Have you ever heard of the company Ven-A-Care?<br>A.   No, I really -- the logo looks familiar, but I don't know by what context I would know them.<br><br>Sullivan Dep. (3/12/08) at 135-36<br>----------------------<br><br>Q.   When you were the director of pharmaceutical services for Tennessee, did you become aware of differences between the AWP and acquisition costs for the drug Vancomycin?<br>A.   There were, there were certainly periods of time, and I do not remember these, where I believe Vancomycin was available, something makes me want to think off and on periods of time when it was available from multiple sources, and I'm sorry, when it was only available from the, the brand name manufacturer.  So that seems to be a recollection, but -- And therefore there were times when we might, and the way it would come to my attention was we may have MACed it and suddenly the generic is no longer available, only the brand name, and the provider might call and say, Can't get the generic; I mean you need to lift this MAC, or you need to adjust it somehow.  For some reason I seem to remember some, a situation like that with Vancomycin.  I don't know from this, I haven't looked at this, I don't know how they determined [EAC].  Do you know that off the top of your head?  Or is that relevant?<br>Q.   (Nodding no.)<br>A.   Okay.  Okay.  It's a big spread, but I don't know what went into that catalog.<br>Q.   What you recall, you have a vague recollection that for Vancomycin there were issues about the availability of the drug?<br>A.   That's correct.  And I could be wrong, but there is something that is sticking in my mind about that.<br><br>Sullivan Dep. (3/12/08) at 199-201<br>----------------------<br><br>Q.   During your time at Tennessee Medicaid program, do you recall any communications with representatives of Abbott Labs?<br>A.   Oh, sure.  Every, every pharmaceutical manufacturer -- well, the majority of them have government affairs reps that will call on you.<br>Q.   Do you recall in particular who you talked to or what they -- what you talked about?<br>A.   Oh, God.  Well, I could look in a, in a cardholder and tell you, right out.  There were two different gentlemen that I dealt with mainly from Abbott.  Nice people.  Never was very controversial, like it is with a lot of other companies.  But I can't remember their names right now.<br><br>Sullivan Dep. (3/12/08) at 256-57 |
| Ann Rugg<br>(Vermont) (30(b)(6)) | Q.   So, your testimony right now is that Vermont does not know what the policy was behind the $4.25 dispensing fee was?<br>MR. FAUCI:  Objection to form. |

| WITNESS | TESTIMONY |
|---|---|
| | THE WITNESS:  As the representative of Vermont I don't know.  I don't know of anyone who would know.<br><br>Rugg Dep. (12/15/08) at 104<br>----------------------<br><br>Q.   You'll see on the State Plan Amendment that there is no discount applied off of Average Wholesale Price; is that correct?<br>A.   That's right.<br>Q.   That's what you see before you?<br>A.   Uh-hum.<br>Q.   Do you know the reason for not having a discount applied off of AWP?<br>MR. FAUCI:  Objection to form.<br>THE WITNESS:  I do not.<br>BY MR. KIM:<br>Q.   When you say I, do you mean Vermont Medicaid?<br>A.   I as a representative of Vermont do not know and I do not know anyone currently affiliated with the Medicaid program that would have the history of that in 1996 and before.<br><br>Rugg Dep. (12/15/08) at 104-05<br>----------------------<br><br>Q.   Have you ever heard of DOJs AWPs or NAMFCU AWPs around the time of 2000, 2001?<br>A.   I'm pausing because I have some vague -- I remember somebody saying DOJ AWPs, but I don't recall seeing what it was or what it looked like or -- so I can only say I know of some talk of, but I don't know what it is.<br><br>Rugg Dep. (12/15/08) at 305 |
| Keith Hayashi<br>(Virginia) (30(b)(6)) | Q.   Does DMAS have the claims data available to determine what percentage of the claims for the drugs on schedule 1 were reimbursed at a usual and customary price?<br>A.   I can't definitively say that they have and can calculate or come up with that figure.<br>Q.   You don't know either way?<br>A.   I do not know whether they can or not.<br>Q.   Do you know if any of the NDCs on schedule 1 were reimbursed on the basis of a federal upper limit for the period of 1991 through 2001?<br>A.   I do not know that.<br>Q.   Did you know -- let me see if I can save some time while we're here.  I don't think DOJ will object.  You've looked at the schedules of the subject drugs in the Dey and Roxane cases as well; is that right?<br>A.   Correct.<br>Q.   Would you be able to testify as to what percentage of the claims for those NDCs were reimbursed on the basis of the usual and customary charge from 1991 through 2003?<br>A.   No, I would not be able to.<br>Q.   And would you be able to say which of those NDCs in the Roxane and Dey schedules were reimbursed on the basis of the FUL?<br>A.   I would not be able to give you a percentage, no.<br><br>Hayashi Dep. (12/4/08) at 161-162 |

| WITNESS | TESTIMONY |
|---|---|
| | ----------------------

Q.  Back to schedule 1, the Abbott DOJ NDCs, for the period of 1991 through 2001 do you know if Virginia applied a maximum allowable cost to any of these products?
A.  It was in the pricing methodologies that would have been applied if it met that criteria.
Q.  And which criteria are you speaking of?
A.  The 60 percentile for prescription drugs.
Q.  You're talking about the VMAC program here?
A.  The VMAC program.
Q.  But you're not able to testify about which of these products had a VMAC and which did not?
A.  Correct, since we do not have that list.

Hayashi Dep. (12/4/08) at 163-64
----------------------

Q.  I'd like to go now to topic 16.  This is titled DOJ AWPs.  The title says "Your implementation of revised average wholesale price information developed by the United States Department of Justice and NAMFCU, the dates when you did or did not implement the revised pricing information and the reasons why you did or did not implement the revised pricing information."  Do you see that?
A.  Yes, I do.
Q.  This is a topic on which you've been designated to testify?
A.  That is correct.
Q.  Can you tell me what you did to prepare for this topic?
A.  I reviewed the documentation, documents that were provided by counsel.
Q.  Did you find any documents provided by counsel that related to this topic?
A.  I do not recall any documents.
Q.  Did you discuss this topic -- so you don't recall any documents being able to provide you information about this topic --
A.  Correct?
Q.  -- correct?  But you are designated to testify on this topic, correct?
A.  That is correct.
Q.  So you had to do something else to get the information you needed to testify on this topic, correct?
A.  Correct.
Q.  Because you weren't there at the time, right?
A.  Correct.
Q.  What did you do to prepare yourself to testify on this topic?
A.  Once again, reviewed the documents that counsel gave me.
Q.  Did you speak with anyone about this topic?
A.  No, I did not.
Q.  Did you ask Mr. Shepherd about this topic?
A.  No, I did not.
Q.  Do you have an understanding of what is being asked about here with regard to the revised average wholesale price information developed by the DOJ and NAMFCU?
A.  I have seen no documents to understand what those are.  So I don't have any information on it.
Q.  So you have no idea what that topic is even talking about?
A.  I have an idea that it's the Department of Justice AWPs.
Q.  So I take it you can't tell me if DMAS implemented that revised pricing? |

| WITNESS | TESTIMONY |
|---------|-----------|
| | A.  I am unaware that it did.<br>Q.  You've seen no documents indicating that it did, correct?<br>A.  Correct.<br>Q.  And have you seen any documents -- have you been provided any documents that would provide any clues as to why Virginia may not have adopted the DOJ AWPs?<br>A.  Not to my knowledge.<br>Q.  Do you have an understanding that the specific products for which the DOJ and NAMFCU provided revised average wholesale prices are some of the same national drug codes listed on schedule 1 of Abbott's cross notice?<br>A.  I do not have that knowledge.<br><br>Hayashi Dep. (12/4/08) at 243-46 |
| Ayuni Hautea-Wimpee (Washington) (30(b)(6)) | Q.  So you don't know what factors were considered by Medicaid when it set its original dispensing fee; is that correct?<br>A.  That is correct.  The program started in '66 or '67 so, you know, whatever happened between then and -- and when I started working for the State, I have no idea.<br><br>Hautea-Wimpee Dep. (11/24/08) at 185<br>----------------------<br><br>Q.  Now, if we turn to Bates page VAC MDL 75951, the title of this page is Receipt for Ven-a-Care of the Florida Keys, Inc., Presentation Material at the National Association Medicaid Fraud Control Unit Conference on March 19, 1998.  Do you see that?<br>A.  Yes.<br>Q.  And for Washington it indicates that somebody by the name of David Waterbury received the presentation materials from Ven-a-Care.<br>A.  Yes.<br>Q.  Who is David Waterbury?<br>A.  Well, he was not a member of the -- a staff -- an employee of D.S.H.S.  He was a part of the Medicaid Control Unit, Fraud Control Unit.  And I don't remember which agency they reported to at the time for Washington State.  I don't know if they were part of the Attorney General's Office at that time, but it was not part of Medical Assistance.<br>Q.  Did Mr. Waterbury provide the presentation materials that he had received from Ven-a-Care to Washington's Medicaid?<br>A.  I do not know.<br>Q.  That's not something you've ever seen?<br>A.  I don't recall seeing that at all.<br>Q.  Would you expect that Washington Medicaid would have received a copy of this material?<br>A.  I would assume so.<br>MS. FORD:  Objection to form to the last question.<br>BY MR. REALE:<br>Q.  And why would you assume so?<br>A.  I would assume that if they thought that there was something that we needed to know, that they would let us know.<br>Q.  Have you had any discussions with any individuals associated with Ven-a-Care of the Florida Keys, Inc.?<br>A.  No.<br>Q.  Do you know if others in Washington's Medicaid program have had |

| WITNESS | TESTIMONY |
|---------|-----------|
| | conversations with Ven-a-Care?<br>A.  I do not know.<br><br>Hautea-Wimpee Dep. (12/2/08) at 425-27<br>---------------------<br><br>Q.   How did the AMAC program come about?<br>A.   I don't remember much about it, to be honest.  I -- this is about the time period, like I said, that most of the MAC or -- or the drug pricing duties devolved to Diane Stevens who was listed in one of these exhibits here as having a meeting with providers or, you know, those pharmacists and the Washington Retail Association representative.  I think it was in the memo from Tom Johnson or something that included the Minutes of the meeting.  So around that time, I don't recall a lot of the details, only that there were some issues with some drugs and we needed to get to a certain pricing algorithm for that class of drugs or for those classes of drugs.<br>Q.   What types of issues with drugs?<br>A.   I don't remember the details, only that there were some things about the pricing being not reflective of -- of their -- of the Actual Acquisition Costs.<br>Q.   Do you recall what classes of drug --<br>A.   No, I don't.<br>Q.   -- the issues were with?<br>A.   No, I don't.<br>Q.   Now, an AMAC would be created for drugs for which there was no MAC and there were at least three manufacturers that made this multi-source product; is that correct?<br>A.   Yes.<br>Q.   Between the MAC and the AMAC program -- strike that.  Are there any generic drugs that did not have a MAC and there were at least three manufacturers of the product that did not have an AMAC?<br>MS. FORD:  Objection to form.  Is there a particular point in time that you're referencing?<br>BY MS. RAMSEY:<br>Q.   If the witness knows of any, let's start there.<br>A.   I don't recall.<br>Q.   Between the MAC program and the AMAC program, how many -- what percentage of the generic products did not -- were not covered by either the MAC or the AMAC program?<br>MS. FORD:  Objection to form.<br>THE WITNESS:  I don't know, but I would assume that it was a small percentage.<br><br>Hautea-Wimpee Dep. (12/2/08) 525-27<br>---------------------<br><br>Q.   How long did Washington utilize the Certified AWPs?<br>A.   I don't recall.  What I remember of the discussion was that after a point in time when I think updates to that -- to those prices were not available readily, then I think we discarded that system, but I am not absolutely sure how long -- how long that took.<br><br>Hautea-Wimpee Dep. (12/2/08) at 533-34 |