# EXHIBIT F

UNITED STATES DEPARTMENT OF JUSTICE

Civil Investigative Demand No. 95-125

TO: Abbott Laboratories
100 Abbott Park Road
Abbott Park, Illinois 60064

Serve on: Custodian of records or any person authorized to accept service of process for the Company.

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that the corporation knowingly presented or caused to be presented false and fraudulent pricing information regarding the Average Wholesale Price ("AWP") of injectable pharmaceutical drugs to the Medicare and Medicaid Programs, and, thus, caused to be submitted false and/or fraudulent claims to the Medicare and Medicaid Programs.

This Demand requires you to provide documents to the federal Government. No copies have been served on other parties.

### Document Request

You are required by this Demand to produce any and all of the following documents in your custody or control:

### DEFINITIONS

A. "Document(s)" means, without limitation, any written, printed, typed, photographed, recorded or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created which have any non-conforming notes or other markings and the backsides of any communication or representation which all contain any of the above.

By way of example, "document(s)" includes, but is not limited to: correspondence; memoranda; notes; drafts; records; letters; envelopes; telegrams; messages; electronic mail; analyses; agreements; accounts; working papers; reports and summaries of investigations; trade letters; press releases; comparisons; books; notices; drawings; diagrams; instructions; manuals; calendars; diaries; articles; magazines; newspapers; brochures; guidelines; notes or minutes of meetings or of other communications of any type, including inter- and intra-office or company communications; questionnaires; surveys; charts; graphs; photographs; films or videos; tapes; discs; data cells; bulletins; printouts of

- 2 -

information stored or maintained by electronic data processing or
word processing equipment; electronic claims filing, invoices, all
other data compilations from which information can be obtained
including electromagnetically sensitive stored media such as floppy
discs, hard discs, hard drives and magnetic tapes; and any
preliminary versions, drafts or revisions of any of the foregoing.

B.  "Listed Pharmaceuticals" include the following brand name
products and their respective generic products: Sodium Chloride
0.9%, Liposyn II 10%, Liposyn II 20%, Vancomycin HCL, Dextrose 5%,
Lactated Ringers, Dextrose 5% with Sodium Chloride 0.9%, Dextrose
in Water 50%, Dextose in Water 70%, Aminosyn II 8.5%, Aminosyn II
10% and Aminosyn II 15%.

C.  "Publications" means the following three publishers that
compile and distribute the Average Wholesale Price for various
pharmaceuticals:  The Red Book aka Drug Topics, The Blue Book aka
First Data Bank, and Medi-Span, Inc.

D.  "Average Wholesale Price" ("AWP") means the price that the
company reported to the publications as the AWP for the listed
pharmaceuticals.

E.  <u>Relevant Time Period</u>:  All documents requested herein
refer to January 1, 1986 to the present, unless otherwise
indicated, and shall include all documents that relate to such
period even though prepared or published before that period.

<u>INSTRUCTIONS</u>

A.  Where a claim of privilege is asserted in response to any
document requested, and such document, or any part thereof, is not
produced on the basis of such claim, for each document or part
thereof that is not produced, please provide a privilege log
wherein you identify the type of document being withheld (e.g.,
letter, memorandum, handwritten notes, marginalia, etc.), a
description of its contents, its author(s), all actual and intended
recipients of the document, its date, and the specific privilege
being asserted, all with sufficient particularity so as to allow
the Custodian, and potentially the Court, to assess the validity of
the claim of privilege.

B.  All documents provided in response to this CID are to
include all marginalia and post-its, as well as any attachments
referred to or incorporated by the documents.

C.  If information exists or can be retrieved from information
stored in computerized form, this request includes the information
on computer disk and the hard drive, if necessary, including an
identification of the software program necessary to access and use
the information.

- 3 -

D. Use of the word "and" or "or" should be read in the conjunctive and disjunctive (i.e., "and/or") to provide the broadest possible meaning of the request.

E. If the requested documents are no longer in the company's possession or control, the Government requests that the Company state what disposition was made of them, including identification and address of the person(s) who are or are believed to be in possession or control of such documents.

F. Scope of search required: This CID calls for all documents in the possession, custody or control of the Company, including, but not limited to, its officers, directors, employees, agents, consultants and contractors. The Company is required to search all files reasonably likely to contain responsive documents, including files left behind by former officers, directors, agents and employees.

G. Manner of production: All documents produced in response to this CID shall comply with the following instructions:

(a) The Company shall conduct its search for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

(b) All documents produced in response to this CID shall be segregated and labelled to show the document request to which the documents are responsive and the source and location where the document was found.

(c) To the extent that documents are found in file folders and other similar containers which have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

(d) To the extent that documents are found attached to other documents, by means of paper clips, staples or other means of attachment, such documents shall be produced together in their condition when found.

H. If there are no responsive documents to a particular request, please specify that the Company has no responsive documents.

*mike Heffy*

- 4 -

## DOCUMENTS REQUESTED

*AW CORRESPONDENCE TO PUBLISHERS. BOB?*

1. All documents that discuss, analyze or comment upon the setting of the direct price, wholesale acquisition cost, and/or AWP as reported to the publishers for the listed pharmaceuticals.

2. All documents that discuss, analyze or comment upon the setting of the price of the listed pharmaceuticals that you actually use when you sell the product to wholesalers or direct purchasers.

3. All documents that discuss, analyze or refer to the discrepancy between the direct price and/or AWP as reported by you to the publishers and the price that you and or the wholesaler actually charge for the listed pharmaceuticals.

*dissolved*

4. All documents that discuss, analyze or comment upon the decision to increase your AWP in 1995 while maintaining or reducing the price for which you actually sold the following products: sodium chloride .9%, Liposyn II 10%, Dextrose 5% in water, Liposyn II 20%, Dextrose in Water 70%, Aminosyn 10% and Aminosyn 15%.

5. All documents that discuss, analyze or comment upon the decision to increase your AWP in 1994 while maintaining or reducing the price for which you actually sold the following products: Liposyn II 10% for NDC numbers 00074979001 & 00074979003, Vancomycin HCL, Dextrose 5% in Water for NDC number 00074132203, Liposyn 20%, Lactated Ringers, Dextrose in Water 50%, Dextrose in Water 70%, Aminosyn II 8.5% and Aminosyn II 10%.

*ATM*

6. All communications between you and the publications regarding pricing of the listed pharmaceuticals.

7. All communications between you and wholesalers and/or providers referring to pricing and reimbursement by the Medicare or Medicaid programs for the listed pharmaceuticals.

*N/A*

8. All invoices to wholesalers, providers and/or suppliers where you sold the listed pharmaceuticals for the published AWP.

9. All licensing or distribution agreements between you and other manufacturers or distributors of the listed pharmaceuticals allowing them to market or distribute your product.
↳ *DISTRIBUTION AND WHOLESALER AGREEMENTS (ALSO AT SITE)*

10. All documents between you and any Medicare or Medicaid representative regarding pricing of the listed pharmaceuticals.

↳ *REVIEW GTE DOCUMENTS; ARE THERE ANY DOCUMENTS*

- 5 -

You must make this material available to Michael C. Theis, who has been designated as a False Claims Act custodian in this case.

These documents shall be produced on or before February 28, 1996, at the office of the Department of Justice, Room 364., 10th and Constitution Avenue, N.W., Washington, D.C. 20530, or at another location to be mutually agreed upon by yourself and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn cert ficate in the form printed in this Demand.

Issued at Washington, D.C., this _22_ day of _January_, 1996.

JANET RENO
Attorney General

6/6'd                                    1-30 NOTIHOTITI LIORBH WHJ0:0T  3E. SO A34
FEB 05. '96  10:47/ST.10:47/NO.  LIBERTY TITANIUM 1-30

# EXHIBIT G

FILED BY_____ D.C.

97 AUG 20  AM 11: 10

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,      )
ex rel. Ven-A-Care of the      )
Florida Keys, Inc.,            )      Case No. 95-1354-Civ-Marcus
                               )
                               )
                               )      **FILED UNDER SEAL**
                               )
                               )
              Plaintiffs,      )
                               )
                               )
                               )
                v.             )
                               )
                               )
                               )      **UNITED STATES'**
                               )      **STATUS REPORT**
Abbott Laboratories; ▓▓▓▓▓▓▓   )
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ et al.,       )
                               )
              Defendants.      )
_____)

        The United States presents to this Court, ex parte and under

seal, its status report in the above-referenced case and states:

        Substantial activity has occurred since the United States

last brought this matter before the Court.  For example, many

meetings and conferences have been held with the representatives

of the Medicaid programs of the states of Florida, Texas and New

Jersey.  Another meeting is scheduled for August 21, 1997 with

representatives of the Medicaid program for Alabama.  Preliminary

8/20/97

ABT008-0354

discussions have been held with representatives of the Medicaid programs of other states as well.  The meetings have been productive, particularly with regard to enlisting the aid of each state in searching for relevant information and data.

A first wave of documentary evidence was recently received from the State of Texas.  The documents relate to representations made by several of the defendants to the Texas Medicaid program with regard to their drug prices.  Those documents have been reviewed and follow-up discussions have been held to request additional materials from Texas which are maintained in archives which were not as easily accessible as the first group of documents.

The State of Florida has provided the United States with computer data regarding the billings which it has received for many of the drugs at issue.  Although the computer information was analyzed in part and was very helpful, the analysis could not be completed because the data needed to be revised.  The revised data has not yet been received and further analysis has been delayed.

Most importantly, the Health and Human Services Office of Inspector General is in the process of preparing "Inspector General" subpoenas for service upon each of the named defendants. The subpoenas are currently being reviewed for approval by the appropriate officials in Washington, D.C.  Once the subpoenas have been approved, it is anticipated that they will be quickly

2

ABT008-0355

issued and served upon each of the 24 defendants.  The subpoenas
will seek, among other things, documents which reflect the prices
at which the drugs were actually sold as well as all
communications with any Medicaid program regarding price
representations.  Also, the subpoenas are not going to be
"broadsides" seeking hundreds of thousands of pages of documents,
but instead, targeted requests that relate directly to the
evidence provided by Florida and Texas Medicaid.  Receipt of
corroborating evidence, pursuant to the subpoenas, will greatly
advance the investigation and will enable the United States to
narrowly tailor the issues relevant to the intervention
decision..

Most recently, the Plaintiff in this action has now filed a
Second Amended Complaint.  The Second Amended Complaint has
expanded the allegations from 105 to 222 pages and names a total
of 24 pharmaceutical companies as defendants.  The Court
previously extended the seal in this matter through August 19,
1997 based upon the government's need for additional time to
investigate this complicated and difficult case.  As set forth in
the Relator's motion accompanying the Second Amended Complaint,
the filing of the second amended complaint has thereby triggered
a new 60-day evaluatory period for the government.  The United
States will endeavor to comply with the new deadline set thereby.

3

ABT008-0356

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

By:

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 536-5472 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

MICHAEL F. HERTZ
JOYCE R. BRANDA
T. REED STEPHENS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-1437

4

ABT008-0357

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this ___20ᵗʰ___ day of March, 1997 to:

Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131

ASSISTANT UNITED STATES ATTORNEY

5

ABT008-0358      L

# EXHIBIT H

04/02/98 12:10 FAX



**NATIONAL ASSOCIATION OF MEDICAID**
**FRAUD CONTROL UNITS**
**750 FIRST STREET, N.E., SUITE 1100**
**WASHINGTON, DC 20002**
**FAX (202) 289-0671**

Date: 4/2/98

**To:**  Mark Levine

**From:**  Barbara Zelner

**Fax Number:**  305-536-4101

**Number of Pages (including this page):** 5

*If there are any problems with this transmittal, please call Tracye Payne Wilson on 202-326-6012.*

medfraud\memos\faxcove2.mf

1401556



VAC MDL 75947

Case 1:01-cv-12257-PBS   Document 6097-6   Filed 06/04/08   Page 16 of 55
NAIL.ATT.GEN.CNCL.
Highly Confidential

RECEIPT FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.
PRESENTATION MATERIAL AT THE
NATIONAL ASSOCIATION MEDICAID FRAUD CONTROL UNIT
CONFERENCE ON MARCH 19, 1998

PAGE 1

| STATE NAME | SIGNATURE | PRINT NAME |
|---|---|---|
| ALABAMA | | |
| ALASKA | | |
| ARIZONA | *Pam Svoboda* | Pam Svoboda |
| ARKANSAS | *Wm D. Gaddy* | WM. D. GADDY |
| CALIFORNIA | *Thomas A. Temmerman* | Thomas A. Temmerman |
| COLORADO | *Milton K. Blakey* | Milton K. Blakey |
| CONNECTICUT | *Catherine McWhirter* | CATHREN McWHIRTER |
| DELAWARE | *David L Corman* | David L Corman |
| DISTRICT OF COLUMBIA | *Nan M. Keiner* | Nan M. Keiner |
| FLORIDA | *Steven E. Kogan* | STEVEN E. KOGAN |
| GEORGIA | *Charles M. Richards* | Charles M. Richards |
| HAWAII | *Dewey H. Kim Jr* | Dewey H. Kim Jr |
| IDAHO | NO MFC | |

1401557

VAC MDL 75948

Case 1:01-cv-12257-PBS   Document 6097-6   Filed 06/04/09   Page 16 of 55
NATL.ATT.GEN.CNCL.
Highly Confidential

RECEIPT FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.
PRESENTATION MATERIAL AT THE
NATIONAL ASSOCIATION MEDICAID FRAUD CONTROL UNIT
CONFERENCE ON MARCH 19, 1998

PAGE 2

| STATE NAME | SIGNATURE | PRINT NAME |
|---|---|---|
| ILLINOIS | | Thomas Bierman |
| INDIANA | | PATTY HEBENSTREIT |
| KANSAS | Martha J. Hodgesmith | Martha J. Hodgesmith |
| KENTUCKY | | Barbara Maines Whaley |
| LOUISIANA | | |
| MAINE | Kerry O'Brien | KERRY O'BRIEN |
| MARYLAND | | CAROLYN McSHERRY |
| MASSACHUSETTS | Anne P. Powers | ANNE P. POWERS |
| MICHIGAN | | WALLACE T. HART |
| MINNESOTA | Louise T. Dobbe | Louise T. Dobbe |
| MISSISSIPPI | Kerry O'Neal | Kenny O'Neal |
| MISSOURI | Charles R. Lucas | Charles R. Lucas |
| MONTANA | | Jimmy Weg |

1401558

VAC MDL 75949

Highly Confidential

04/02/98  12:11 FAX                    NATL.ATT.GEN.CNCL.

RECEIPT FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.
PRESENTATION MATERIAL AT THE
NATIONAL ASSOCIATION MEDICAID FRAUD CONTROL UNIT
CONFERENCE ON MARCH 19, 1998

PAGE 3

| STATE NAME | SIGNATURE | PRINT NAME |
|---|---|---|
| NEVADA | | L. TIMOTHY TERRY |
| NEW HAMPSHIRE | | MARY P. CASTELLI |
| NEW JERSEY | | John Krayniak |
| NEW MEXICO | | SANDRA K. WATTS |
| NEW YORK | | STEPHEN M. SPAHR |
| NORTH CAROLINA | | Christoper Brewer |
| OHIO | | JOHN GUTHRIE |
| OKLAHOMA | | Tully McCoy |
| OREGON | | Ellyn Sternfield |
| PENNSYLVANIA | | Jeffrey L Craig |
| RHODE ISLAND | | JOHN EDWARD FAULEY |
| SOUTH CAROLINA | | C. WILLIAM GAMBRELL JR |
| SOUTH DAKOTA | | Jay Miller |

1401559

VAC MDL 75950

Case 1:01-cv-12257-PBS Document 6097-6 Filed 06/04/09 Page 18 of 55
NATL.ATT.GEN.CNCL.

Highly Confidential

RECEIPT FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.
PRESENTATION MATERIAL AT THE
NATIONAL ASSOCIATION MEDICAID FRAUD CONTROL UNIT
CONFERENCE ON MARCH 19, 1998

PAGE 4

| STATE NAME | SIGNATURE | PRINT NAME |
|---|---|---|
| TENNESSEE | | William Benson |
| TEXAS | | BETH TAYLOR |
| UTAH | | Mitch Ingersoll |
| VERMONT | | Linda Purdy |
| VIRGINIA | | Robert Beasley Jr. |
| WASHINGTON | | DAVID Waterbury |
| WEST VIRGINIA | | JAMES E Riley |
| WISCONSIN | | Gregory L. Kipfer |
| WYOMING | | CLARK CORBRIDGE |
| Main Justice | | Reed Stephani |
| " " | | Rina C Tucker |
| So. Dist of FL | | Mark A. Lavine |
| HHS-OIG | | KEVIN ABERLE |
| NAmFCU | | Barbara Zelner |

F:CLIENT\30279\MFCU-REC

1401560

VAC MDL 75951

# EXHIBIT I

SUBCOMMITTEE ON HEALTH

NANCY L. JOHNSON, CONNECTICUT
JIM McCRERY, LOUISIANA
PHILIP M. CRANE, ILLINOIS
SAM JOHNSON, TEXAS
DAVE CAMP, MICHIGAN
JIM RAMSTAD, MINNESOTA
PHILIP S. ENGLISH, PENNSYLVANIA

FORTNEY PETE STARK, CALIFORNIA
GERALD D. KLECZKA, WISCONSIN
JOHN LEWIS, GEORGIA
JIM McDERMOTT, WASHINGTON
KAREN L. THURMAN, FLORIDA

Ex Officio:
BILL ARCHER, TEXAS
CHARLES B. RANGEL, NEW YORK

BILL ARCHER, TEXAS, CHAIRMAN
COMMITTEE ON WAYS AND MEANS

A.L. SINGLETON, CHIEF OF STAFF
ANN-MARIE LYNCH, SUBCOMMITTEE STAFF DIRECTOR

JANICE MAYE, MINORITY CHIEF COUNSEL
BILL VAUGHAN, SUBCOMMITTEE MINORITY

## COMMITTEE ON WAYS AND MEANS

U.S. HOUSE OF REPRESENTATIVES
WASHINGTON, DC 20515

SUBCOMMITTEE ON HEALTH

April 21, 1999

The Honorable Nancy-Ann Min DeParle
Administrator, Health Care Financing Administration
200 Independence Avenue SW
Washington DC   20201

Dear Administrator DeParle:

I urge you to take a simple and easy step to counteract an ongoing fraudulent practice by some pharmaceutical manufacturers that is costing Medicare and Medicaid hundreds of millions of dollars in excessive reimbursement payments. It is my understanding that HCFA and various anti-fraud units of the government have been working with a company known as First Data Bank to make available more accurate drug pricing information. If my understanding is correct, I request that you immediately issue written guidance to the States' Medicaid Programs approving their use of First Data Bank's agreed reporting of more accurate prices in calculating reimbursement amounts for certain injection, infusion and inhalation drugs and biologicals. I also request that you take similar action to insure that the Medicare carriers have access to and use the more accurate First Data Bank prices for the drugs and biologicals in question.

We have been working together for a long time to make sure that the amounts paid for prescription drugs by the Medicare, Medicaid and other Federally funded programs, are not excessive, particularly in light of the applicable laws and regulations which require that reimbursements be reasonable and based upon the acquisition cost of the drug. Although I do not know the specifics, I am aware of the existence of a joint enforcement team comprised of representatives of the Department of Justice, the HHS Office of Inspector General, HCFA, and the National Association of Medical Fraud Control Units that is dedicated to resolving a severe problem resulting from inflated and misleading price information about the above referenced drugs and biologicals.

I now understand that a positive result of these combined efforts has been an agreement whereby First Data Bank, the private entity that gathers and reports drug prices to all of the States' Medicaid programs, will take appropriate steps to insure that the reported prices for the prescription drugs in question more closely reflect truthful and actual prices rather than prices that have been

The Honorable Nancy-Ann Min DeParle
April 20, 1999
Page 2

falsely inflated in order to cause the Medicare and Medicaid programs to pay
exorbitant reimbursement in excess of that provided by law.  I have also been
advised that the State Medicaid Agencies look to HCFA for approval of their
prescription drug reimbursement plans and, accordingly, have sought HCFA's
approval of their proposed use of the more accurate prices as part of their
prescription drug reimbursement plans.

I am disappointed to learn that HCFA has not yet provided the States'
Medicaid programs with written guidance that will facilitate the receipt and
use of more accurate and truthful prices, rather than the falsely inflated
prices, in estimating acquisition costs for reimbursement purposes.  **This long
overdue correction should save Medicaid and Medicare hundreds of millions of
dollars and go a long way toward insuring that scarce health care dollars are
efficiently used to provide the programs' beneficiaries with the care that they
need.  As I understand it, every day we delay wastes more money.  It will also
be of great help to the Joint Enforcement Team's efforts to put an end to the
unreasonably high reimbursement for the drugs that have been the subject of
this gross price manipulation and gouging of the federal programs that you
supervise.**

I strongly urge you to provide the written direction to the State Medicaid
Programs to facilitate the rapid implementation of the Joint Enforcement
Team's recommendation to use the First Data Bank prices.  I also urge you to
provide similar guidance to the Medicare carriers.

In the event that you believe that a more formal inquiry by Congress **will**
facilitate a resolution to this very serious problem, please let me know.  Your
attention and action is vital in stopping this hemorrhage of Medicare and
Medicaid program dollars.

Thank you for your help.

Sincerely,

Pete Stark
Ranking Democrat

FPS/vj

HHC001-0734    L

# EXHIBIT J

EXHIBIT

Abbott 492

PENGAD 800-631-6989

From: David Shepherd [DShepher@dmas.state.va.us]
Sent: Friday, June 23, 2000 3:57 PM
To: Martha.McNeill@tdhex.tdh.state.tx.us
Subject: Re: [NMPAA-talk] NAMFCU Drug Pricing Issue

National Medicaid Pharmacy Administrators

Thank You - David Shepherd - Virginia

>>> Cody.C.Wiberg@state.mn.us 06/22/00 07:09PM >>>
National Medicaid Pharmacy Administrators

Greetings from Minnesota,

Thought I would share with you the text of e-mail that I sent to First DataBank
last week:

        "I am the Pharmacy Program Manager for the Minnesota Department of Human
        Services(DHS). As you are aware, First DataBank (FDB) has been working
with
        representatives of state Medicaid Fraud Control Units on drug pricing
        issues. Since early May, FDB has been reporting to state Medicaid agencies
        "AWPs" for approximately 428 NDCs that are different than the real AWP
that
        is being reported to your commercial customers. In Minnesota, pharmacy
        providers are usually reimbursed at AWP - 9% plus a dispensing fee.
After
        checking local wholesale prices, I have discovered that the new "AWP" you
        are reporting to us is often at or below the actual acquistion cost
(AAC)
        for which pharmacies can purchase the drugs. After subtracting an
additional
        9%, pharmacies will actually be reimbursed less than their cost for those
        products - even after adding back a dispensing fee. I have received a
number
        of complaints from pharmacies about reimbursement. Those pharmacies have
        stated that they will stop supplying the products in question to our
        recipients if the new "AWPs" remain in effect.
        In Minnesota, the reimbursement rate for drugs was established in statute
by
        our legislature. While the legislators did not define AWP, we believe that
        their intent was to use "AWP" to mean a single estimate of wholesale price
        as published in a compendia such as Redbook or by First DataBank. My
        understanding is that FDB is now publishing two sets of "AWPs" for the 428
        drugs in question - one for Medicaid agencies and one for everyone else.
        The fact that the legislators chose to estimate actual acquistion cost at
        AWP - 9% indicates that they were aware that the single, published AWP was
        actually higher than the price for which most pharmacies could buy drug
        products. Had they known that AWP would be reduced to AAC, they would not
        have established a 9% discount off of AWP.
        Consequently, the Minnesota Department of Human Services has determined
that
        we must use the AWPs that FDB is reporting to its commercial customers and
        NOT the "AWPs" that you are currently reporting to us for the 428 drugs in
        question. DHS staff intends to bring this issue to the attention of our
        legislature during the next scheduled session. But for now, I am formally
        requesting that First DataBank supplies the Minnesota Department of Human



Rodriquez
EXHIBIT NO. 207
10/11/06
G. Barker

Services with the AWPs it supplies to other commercial, non-Medicaid customers as soon as possible. Please feel free to contact me with any questions or concerns."

First DataBank contacted me today and confirmed that they will honor this request. Like many of you, I have spent a considerable amount of time on this issue. (I even spent half of one Sunday in a pharmacy verifying their actual acquisition cost for over one hundred of the drugs in question. For almost all of those drugs AAC was at or above the new "AWP"). A number of pharmacy providers, ranging from independents to chains to specialty infusion pharmacies have written or called to complain. Many of them called about specific drugs after realizing that they were being reimbursed at less than cost.

There is no doubt in my mind that NAMFCU is correct when it points out that the spread between AWP and AAC is too large for many, even most, of these drugs. The question is – what should be done about it? Almost everyone who is familiar with pharmacy reimbursement knows that AWP "Ain't What's Paid". That's why most states and private pharmacy benefit managers reimburse pharmacies at AWP minus a discount (anywhere from 5-15% or more).
It is also one reason why there is a federal upper limit list and why many states and private PBMs have maximum allowable cost programs. The spread between AAC and AWP is taken into account when determining what to pay for a dispensing fee. For drugs not on the FUL, 42CFR447.331(b) states:

"b) Other drugs. The agency payments for brand name drugs certified in accordance with paragraph (c) of this section   and drugs other than multiple source drugs for which a specific limit has been established under Sec. 447.332 must   not exceed in the aggregate, payment levels that the agency has determined by applying the lower of the-- (1)   Estimated acquisition costs plus reasonable dispensing fees established by the agency; or (2) Providers' usual   and customary charges to the general public".

Some public and private third party payers have purposely kept the dispensing fee low precisely because there is a spread between AWP and AAC. In fact, when pharmacy organizations have sought an increase in dispensing fees, the AWP spread has been pointed out to legislators. It is true that ingredient reimbursement is supposed to be based on estimated acquistion cost. The ancillary costs of dispensing the drug are supposed to be accounted for by the dispensing fee. If the AWP spread disappears, the dispensing fee may have to be increased, especially for many of the 428 drugs currently in question. Many of these drugs require some type of compounding or other preparation.

The point, I guess, is that NAMFCU's solution is really a substantial change that may very well have a negative impact on pharmacy providers and, even more importantly, patients.  In Minnesota, we believe that something should be done about the AWP spread. However, the problem should be approached in one of two ways:

1. State Medicaid agencies should be allowed to work out their own solutions (by increasing the discount off of AWP, adjusting the dispensing fee, establishing MACs, etc); or
2. A national solution should be pursued that accounts for all aspects of the problem and that is developed by and with input from all interested parties (NAMFCU, HCFA, state Medicaid agencies, private third party payers, First DataBank, pharmacy organizations, etc).

Cody Wiberg, Pharm.D., R.Ph.
Pharmacy Program Manager
Minnesota Department of Human Services

(651) 296-8515
(651) 282-6744 (FAX)

To unsubscribe, write to NMPAAtalk-unsubscribe@listbot.com

To unsubscribe, write to NMPAAtalk-unsubscribe@listbot.com

# EXHIBIT K

```
From:        "David Shepherd" <DShepher@dmas.state.va.us>
To:          Domain4.Internet("NMPAAtalk@listbot.com","DShepher...
Date:        6/9/00 12:46pm
Subject:     Re: [NMPAA-talk] May 1, 2000 AWP Adjustments
```

National Medicaid Pharmacy Administrators

Carl - You are exactly correct. My intent is to do just that, starting with
Hemophilia specialty pharmacies. To my knowledge HCFA still has not officially
addressed this issue. This is not a mandate. Donna Shalala has stated that
there is going to have to be rule changes. She indicates that the medicare
rates will not take place til 10-1-2000.  Unfortunately the individuals that
have decided upon this tact are our own state MFCU and DOJ. As well as some
state pharmacy administrators. There is no mandatory statutory or regulatory
language that requires this. Also there is no court order mandate to do this.
The states are encouraged to do this. I plan to follow rule procedures in
order to use these prices if appropriate and only after an impact has been
assessed.

>>> cdtepper@dhs.state.nj.us 06/09/00 02:27PM >>>
National Medicaid Pharmacy Administrators

I just had a phone call from a retail pharmacist stating that the new AWPs
were based on the infusion company AWP pricing that are extremely different
from the retail pharmacy AWPs. The retail pharmacist stated that he would lose
$300 to dispense a  Zofran prescription.  If this is true why doesn't HCFA set
up AWPs based on the pharmacy setting since we know that the manufacturer's
give different prices to LTC, infusion, hospice, hospitals and retail
pharmacies?

Carl D. Tepper, Chief Pharmaceutical Consultant
NJ DMAHS Office of Utilization Management
Quakerbridge Plaza, Building 11A, PO Box 712
Trenton, NJ 08625-0712

---

To unsubscribe, write to NMPAAtalk-unsubscribe@listbot.com

---

To unsubscribe, write to NMPAAtalk-unsubscribe@listbot.com

MO 000598

# EXHIBIT L



**COST CONTAINMENT FOR STATE PRESCRIPTION
DRUG EXPENDITURES**

# From The Office Of State Auditor
# Claire McCaskill

> *Medicaid officials have been slow implementing new cost containment initiatives, updating current measures and recommending legislative or rule changes that are more favorable to the state.*

**Report No. 2002-48**
**June 28, 2002**
**www.auditor.state.mo.us**

PERFORMANCE AUDIT

Office of                                    **June 2002**
Missouri State Auditor
Claire McCaskill

## State Medicaid program may pay too much for prescription drugs and reimburse pharmacies more than necessary

Missouri's Medicaid outpatient prescription drug costs have more than doubled in the last 5 years and totaled $770 million in fiscal year 2001. This audit focuses on the Division of Medical Services' efforts to reduce prescription drugs costs. Auditors found Missouri has not been as proactive as other states with certain containment programs, such as preferred drug lists or prior authorization. The following highlights our findings:

### Preferred drug lists help other states save money

Many states are now following practices of most employee health insurance plans in using preferred drug lists to reduce costs. Physicians who want to prescribe drugs not on the list have to seek prior approval from the Medicaid program. Michigan and Florida officials estimate these lists will save annually $80 million and $150 million, respectively. Legislation just passed in Missouri's 2002 session allows the division to establish a preferred drug list by January 2003, but division officials predict, in the end, the state rule making process will block its implementation. (See page 5)

### State prior authorization rules more complicated then federal

Division officials have not placed many drugs in prior authorization status in the last 5 years, partly due to restrictive state rules which exceed federal requirements. Drugs in this status require a physician seek Medicaid program approval before dispensing them, which often saves costs by resulting in fewer unnecessary prescriptions. State rules require Missouri-specific clinical and therapeutic analysis before placing a drug in prior authorization. Federal law only requires a state plan to respond within 24 hours of a request and dispense a 72-hour emergency prescription. In January 2002, division officials tried to place more drugs in this status, but were blocked from doing so. (See page 6)

### Outdated pharmacy reimbursement rates raise costs

Each state Medicaid agency determines how pharmacies are reimbursed for acquiring and dispensing drugs for Medicaid recipients. One way Missouri reaches this price is to use the average wholesale price for a drug less 10.43 percent. But Missouri has not changed this percentage decrease since 1991 and 19 states use a higher percentage decrease than Missouri. For example, a Missouri pharmacy would receive a $119.66 reimbursement from Medicaid for a month's supply for the 20 milligram version of Prilosec®, whereas

**YELLOW SHEET**

pharmacies in a state with a 14 percent decrease would receive $115.05 for dispensing the same supply.  Overall, if Missouri changed its percentage decrease from 10.43 percent to 14 percent, division records estimated annual savings of $16.4 million.  (See page 7)

**Lower reimbursement rate on some drugs could save $1.5 million**

Missouri pays more than necessary on 437 drugs dispensed intravenously to at-home or non-hospitalized chronically ill patients.  The overpayment occurs because division officials have not timely implemented new dispensing fees for these drugs which would allow providers to be reimbursed using more accurate drug prices.  In May 2000, the federal government provided more accurate average wholesale prices for these drugs, with some prices being 80 percent less than previous prices.  Our calculations indicate the state could have saved an estimated $1.5 million ($2 million in drugs costs less $500,000 increase in dispensing fees) on the $8.4 million spent on these drugs in fiscal year 2001 if the more accurate prices had been used.  Division officials believe any costs savings from the more accurate drug prices would be completely offset by the higher dispensing fees.  (See page 9)

**State to pay pharmacies the nation's highest dispensing fee to offset new tax**

Legislation  passed in the 2002 session nearly doubled the dispensing fee paid by the state Medicaid program to pharmacies.  The fee increase to $8.04 per prescription from $4.09 would rank as the nation's highest.  On average, state Medicaid programs paid a $4.27 fee in 2001.  This increase offsets a new 2 percent pharmacy provider tax, also passed in the 2002 session, which would help the state obtain additional federal Medicaid matching funds.  Pharmacies would pay about $55.4 million with the new tax, but then receive about $60.4 million from the state in higher dispensing fees.  It is uncertain if the federal government will agree to match the tax revenues and the state legislation is not yet signed into law.  (See page 10)

**New program director appears to have conflict of interest**

The Department of Social Services hired a pharmacy program director in October 2001 who previously worked as a lobbyist for the Missouri Pharmacy Association and continues to own at least one pharmacy.  Department legal staff determined hiring this person did not violate state conflict of interest laws.  However, an appearance of a conflict still exists because of the director's continued financial interests in the pharmacy industry and his new position's influence over policy or legislative changes effecting the industry.  (See page 15)

**Reports are available on our web site: www.auditor.state.mo.us**

**COST CONTAINMENT FOR
STATE PRESCRIPTION DRUG EXPENDITURES**

## TABLE OF CONTENTS

<u>Page</u>

**STATE AUDITOR'S REPORT** ..................................................................................1

**RESULTS AND RECOMMENDATIONS**................................................................3

1.    Missouri Can Better Contain Medicaid Prescription Drug Costs........................3

        Conclusion........................................................................................12

        Recommendations ..........................................................................12

2.    Pharmacy Program Director Appears to Have a Conflict of Interest ...............15

        Conclusion........................................................................................15

        Recommendation..............................................................................15

**APPENDIXES**

I.    OBJECTIVES, SCOPE AND METHODOLOGY ...........................................17

II.    BACKGROUND.................................................................................................20

III.    TOP 25 MEDICAID OUTPATIENT PRESCRIPTION
    DRUGS  -  FISCAL YEAR 2001 ......................................................................23



# CLAIRE C. McCASKILL
**Missouri State Auditor**

Honorable Bob Holden, Governor
    and
Members of the General Assembly
    and
Kathy Martin, Director
Department of Social Services
Jefferson City, MO 65102

The state's Medicaid prescription drug costs have more than doubled since 1997 and account for $660 million of the $770 million spent by the state in fiscal year 2001 on prescription drugs. The objectives of this audit were to (1) determine total direct and indirect cost of prescription drugs for the state, (2) evaluate the effectiveness of some of the state's efforts to reduce Medicaid drug costs, and (3) evaluate the factors leading to increased drug costs in the Medicaid program.

Missouri's current budget problems and legislative mandates have led to cost control initiatives during the last year. Medicaid officials are implementing a pharmacy enhancement program consisting of various cost containment initiatives. While this program focuses on some pharmacy reimbursement issues, other reimbursement issues are not being addressed or do not include the therapeutic benefit and cost effectiveness of prescribed drugs. We recommend changes to help improve the effectiveness of this program. In addition, the Pharmacy Program Director has an appearance of a conflict of interest that should be resolved.

-1-

The audit was conducted in accordance with applicable standards contained in *Government Auditing Standards,* issued by the Comptroller General of the United States, and included such tests of the procedures and records as were considered appropriate under the circumstances.


Claire McCaskill
State Auditor


February 19, 2002 (fieldwork completion date)

The following auditors contributed to this report:

| | |
|---|---|
| Director of Audits: | Kirk Boyer |
| Audit Manager: | Jon Halwes, CPA, CGFM |
| In-Charge Auditor: | Christina Davis |
| Audit Staff: | Shad Becker |
| | Cindy Elliott |
| | Andrea Paul |
| | Lori Melton |

## RESULTS AND RECOMMENDATIONS

### 1.  Missouri Can Better Contain Medicaid Prescription Drug Costs

Division of Medical Services officials, who run the state's Medicaid program, have not proactively contained drug costs or evaluated pharmacy reimbursements.  In the last 5 years, the state's Medicaid outpatient prescription drugs costs have more than doubled.  While officials are implementing a pharmacy enhancement program, the program currently does not include establishing a preferred drug list which other states use to lower drug costs.  The enhancement initiatives lack emphasis on pharmacy compensation issues.  The following concerns were noted:

- Outdated estimated acquisition prices,
- Higher maximum reimbursement rate for insulin drugs,
- More accurate pricing data on home infusion drugs not being used,
- Pharmacies keeping shared dispensing fees, and
- Inadequate monitoring of transactions related to a federal discount program.

In addition, the implemented or planned initiatives to limit prescriptions to a 31-day supply and not pay for over-the-counter products may not be cost effective.  As a result, Missouri's Medicaid program may be paying too much for some drugs and reimbursing pharmacies more than necessary.

**State prescription drug costs**

The state spent approximately $770 million on prescription drugs during fiscal year 2001.  Medicaid drug costs[1] made up approximately 85 percent of this total, with the majority for outpatient prescriptions.  Table 1.1 shows the prescription drug costs for the state.

---

[1] Medicaid program expenditures are approximately 60 percent paid for from federal funding.  In addition, 60 percent of any Drug Rebates received go to the federal government.

**Table 1.1:  State Prescription Drug Costs Fiscal Year 2001**

| Agency or Program Area | Amount Spent |
|---|---|
| Direct Expenditures: | |
| Medicaid - Outpatient Services[1] | $ 681,377,799 |
| less Medicaid Drug Rebate[2] | (128,352,149) |
| Department of Mental Health | 7,791,114 |
| Department of Health | 2,789,904 |
| Other State Agencies | 1,812,943 |
| Total Direct Costs | 565,419,611 |
| Indirect[3] Expenditures: | |
| Employee Health Insurance | 91,662,982 |
| Medicaid - Managed Care | 62,364,747 |
| Medicaid - Hospital Inpatient[4] | 45,000,000 |
| Inmates | 5,160,557 |
| Total Indirect Costs | 204,188,286 |
| Total Costs | $ 769,607,897 |

[1]  Medicaid program activity is highlighted in yellow.

[2]  Federal law requires drug manufacturers to rebate a portion of the drug costs when purchased through state Medicaid programs.  The rebate is generally between 15 and 20 percent of the drug's cost.

[3]  Costs are built into contract prices.

[4]  Estimated based on fiscal year 1999 data.

Source: statewide accounting system, state agency survey and Medicaid records

Between 1997 and 2001, the cost for Medicaid outpatient prescription drugs in the Medicaid program more than doubled, increasing to $553 million from $268 million.  This increase has been driven by new drugs, more Medicaid recipients, increased use of maintenance drugs,[2] and higher drug prices.  Blind, disabled and elderly Medicaid recipients account for approximately 86 percent of all outpatient prescription drug costs.  In fiscal year 2001, the Medicaid program paid $131 million for antipsychotic and antidepressant drugs, before rebates.  Twenty-five brand name prescription drugs accounted for nearly 38 percent of all Medicaid outpatient drug expenditures, which are summarized in Appendix III, page 23.

> Medicaid drug costs doubled over 5 years

To help control increasing drug costs, the General Assembly mandated various cost containment initiatives.  One mandate, in December 2000, targeted the rising costs of antiulcer drugs ($48 million spent in fiscal year 2001) by requiring doctors to receive prior authorization before prescribing these drugs.  A second mandate, in fiscal year 2002, required the division to cut pharmacy program expenditures through various division determined initiatives.  The division hired a director in October 2001 to manage the Medicaid pharmacy program and oversee the cost

---

[2]  Maintenance drugs are taken daily by patients to treat conditions such as high blood pressure, high cholesterol and anxiety.

cutting initiatives. (See Appendix I, page 19 for a summary of the initiatives and their implementation status as of early 2002.)

**Missouri is behind other states in comprehensive cost-containment initiatives**

Missouri has not been as proactive as other states in developing preferred drug lists or requiring prior authorization. Both a preferred drug list and prior authorization can help control drug costs while not placing program recipients at risk. These measures would also help program officials better manage use of certain drugs and monitor prescribing practices.

### Preferred drug lists could help contain costs

Recently some Medicaid programs in other states have implemented preferred drug lists, which most employee health insurance plans have used for years. Drugs which are not on these lists may only be prescribed after physicians obtain prior approval from the Medicaid program. Preferred drug lists often take into account the cost and

> Millions in potential saving available

therapeutic value of a drug. Missouri's pharmacy enhancement program does not include plans to implement a preferred drug list. Part of a May 2002 house bill to establish the Department of Social Services budget for fiscal year 2003 would give the Division of Medical Services authorization to establish a preferred drug list prior to January 15, 2003. The Division Director stated that it would be difficult to get such a list approved through the states rule making process and there would be opposition from parties affected by this change.

Since early 2001, Florida and Michigan have joined California[3] in establishing preferred drugs lists. Michigan and Florida officials estimate the lists will save annually $80 million and $150 million, respectively in total state and federal funding. Other states, including Colorado, Louisiana, and Indiana, are also working on similar programs. The Missouri Pharmacy Program Director reported to the legislature an estimated annual savings of $32 million in state funding if a preferred drug list is implemented.

Florida's plan requires drug manufacturers to rebate the state an extra 10 percent of a drug's cost, in addition to the regular federal Medicaid rebate, to place products on the preferred drug list. Drugs from manufacturers unwilling to provide the additional state rebate are only made available to Medicaid recipients on a prior authorization basis. Florida officials allowed two drug manufacturers to guarantee certain costs savings from disease management programs in lieu of paying the rebate.

Michigan, with similar Medicaid prescription drug costs to Missouri, established a state medical panel to analyze cost and therapeutic data and select at least the two best drugs in each of 40 highest cost categories. Other drugs in these categories are placed on prior

---

[3] California's Medicaid program began using a preferred drug list in 1990. Drug manufacturers provide the state a rebate of 10 to 60 percent of the average manufacturer's price in addition to the federal drug rebate. In fiscal year 2001, California's Medicaid program had $3.2 billion in expenditures for outpatient prescription drugs. The estimated annual saving from using the preferred drug list was $235 million.

authorization status.  Drugs already less expensive than the preferred medicines are also placed on the preferred drug list.  Manufacturers can also have other products moved to the preferred drug list if they cut prices to match the best-in-class drugs.  The program is used for Medicaid and other state funded healthcare programs.

## Missouri's prior authorization rules are too complicated

Division officials have not placed many drugs or classes of drugs in prior authorization[4] status in the last five years.  The pharmacy enhancement program proposes expanding the number of drugs on the state's prior authorization list, but restrictive state rules hinder this process.  A prior authorization process is an integral part of any preferred drug list because drugs not on the list may not be prescribed without prior authorization.

Missouri's rules[5] for placing drugs on prior authorization are more complicated and restrictive than federal government requirements.  A division official stated part of the reason the rules are more complicated than necessary is because pharmaceutical industry representatives assisted state officials in drafting the rules 10 years ago.  State rules require Missouri-specific data based on medical and clinical criteria, a public hearing, and an annual review of approved drugs.  Federal law does not require these procedures.  Federal law only requires a state's prior authorization plan respond within 24 hours of a request and allow for dispensing of a 72-hour emergency prescription.  As a result, clinical and therapeutic analysis is not required to place drugs on prior authorization under federal law.  Missouri has used prior authorization as more of a clinical tool to prevent adverse drug interaction for recipients, while other states such as South Carolina, also used it to contain drug costs.

In January 2002, the division attempted to add some antihistamine and antifungal drugs to the state's prior authorization list.   The General Assembly's Joint Committee on Administrative Rules denied this request citing noncompliance with some of the prior authorization requirements.  Division officials believe all requirements were met, but withdrew the request with an intent to submit it again.  As a result, the state lost potential savings by not placing these drugs into prior authorization status.

Our survey of 20 states indicated that certain drugs or drug classes are frequently placed in a prior authorization program.   Product cost was at least one component in the decision to implement prior authorization for the drugs or drug classes in those states.  Table 1.2 lists these drugs or drug classes and the amount the Missouri Medicaid program spent on these drugs or drugs classes in fiscal year 2001.  As of February 2002, only the antiulcer drug class required prior authorization in Missouri.

Vioxx®, Celebrex®, Claritin®, and OxyContin® are among Missouri's top 25 Medicaid drug costs as noted in Appendix III, page 23.  While prior authorization of a drug or drug class

---

[4] A prior authorized drug will be approved for dispensing if the division's detailed algorithm based on clinical data specific to the drug indicates a patient's therapeutic need for it.

[5] Generally established through state agency developed proposals contingent upon the General Assembly's review of the proposed order of rulemaking through the Joint Committee on Administrative Rules.

may result in some increased costs to manage prior authorization requests, these additional costs are more than offset by fewer unnecessary prescriptions for these drugs.

### Table 1.2:  Drug or Drug Classes Other States Require Prior Authorization and Missouri's Cost for These Drugs

| Drug or Drug Class | Number of States | Missouri's Fiscal Year 2001 Cost |
|---|---|---|
| Antiulcer (Prilosec®, Prevacid®, etc.) | 8 | $ 48,052,775 |
| Cox II Inhibitors (Vioxx® and Celebrex®) | 8 | 22,347,736 |
| Antihistamines (Claritin®, Allegra®, Zyrtec®) | 6 | 13,029,558 |
| OxyContin® | 2 | 9,344,838 |

Source: State survey results and Medicaid data

**Cost containment initiatives lack emphasis on adjusting pharmacy compensation**

Most of the pharmacy enhancement program initiatives do not consider pharmacy reimbursement rates or evaluate appropriateness of pharmacy billings to the program.  One initiative is to expand the number of drugs on the state upper payment list as generic drugs become available for brand-name drugs.[6]  Updating state upper payment limit rates more frequently will help contain the state's drug costs.  These updates will have increasing importance as popular brand-name drugs lose patent protection over the next 5 years and more generic alternatives become available.  Currently, drugs added to the list and the upper limit reimbursement prices are updated on an irregular basis with a planned goal of updating them at least quarterly.  The most recent updates were done in September 2001; and January and May 2002.  Some states surveyed revise drugs and rates on upper payment limit lists more than quarterly.  For example, Nebraska officials do updates every other month and Illinois officials make changes weekly.

However, approximately 80 percent of the expenditures for outpatient prescription drugs received by Medicaid recipients in fiscal year 2001 were for brand-name and generic drugs not eligible for the state upper payment limit list.  Medicaid program officials have not evaluated the pharmacy compensation for these drugs, making it possible the state is paying too much for them.

**Pharmacy reimbursement rates are outdated**

Each state Medicaid agency determines how much pharmacies are reimbursed for the estimated cost involved in acquiring (estimated acquisition price) and dispensing drugs.[7]  This price is based on manufacturers' costs and is generally calculated using two different rates; one rate uses the average wholesale price for a drug less a percentage and the other rate is based on the wholesale acquisition cost plus a percentage.  While most states use one or

---

[6] This is a list of brand-name drugs with expired patents and associated generic drugs for which the division has established a lower reimbursement limit generally close to the lowest cost generic drug.

[7] See Appendix II, page 20, for a more detailed description of pharmacy reimbursement options.

the other rate, Missouri has used both since July 2001.  Further, the same rates are used for both brand-name and generic drugs.  According to division estimates, each percentage change in these price adjustments impacts expenditures by an estimated $5 million annually.

In addition to using the same price for brand and generic drugs, the average wholesale price percentage decrease used by Missouri may be outdated based on federal reports and discounts used by other states.  Missouri's average wholesale price decrease of 10.43 percent is based on a 10-year old (1991) state-sponsored study of pharmacy wholesale prices.  Further, the wholesale acquisition cost increase of 10 percent is based on percentages used in other states and not a state study.

A 1997 federal report[8] based on Missouri pharmacy wholesale prices concluded pharmacy discounts from average wholesale prices were 18.5 percent for brand name drugs and 46.4 percent for generic drugs.  National figures for other states reviewed at that time indicated similar percentage reductions.  A 2001 federal report[9] indicated national pharmacy discounts had increased substantially to 21 percent for brand-name drugs and to 65 percent for generic drugs.  While state officials must include other factors beside wholesaler price discounts when setting estimated acquisition prices, 19 states use a higher average wholesale price percentage decrease than Missouri's 10.43 percent.  One state uses a 15 percent decrease.  If Missouri's percentage decrease was changed from 10.43 percent to 14 percent, division records showed annual savings of $16.4 million.

## Reimbursement rates for insulin drugs are also outdated

The state reimbursed pharmacies $320,000 more than necessary in state fiscal year 2001 as the result of using a higher maximum reimbursement rate for insulin drugs.[10]  The estimated acquisition price used for pharmacy reimbursements for these products is average wholesale price minus 10.43 percent plus 25 percent which is higher than the estimated price used for most drugs (average wholesale price minus 10.43 percent plus a $4.09 dispensing fee per prescription).  Division officials seemed to be unaware of this higher reimbursement rate when we questioned them on the issue.  Officials from three states surveyed indicated they used the same reimbursement rate for insulin drugs as other prescription drug products.  If the same estimated acquisition price had been used for insulin drugs as other prescription drugs in the Medicaid program, the state would have saved $320,000 on the $7.1 million spent on these drugs in fiscal year 2001.

---

[8]  Department of Health and Human Services Office of Inspector General  - *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Missouri Department of Social Services*  issued January 1997.

[9]  Department of Health and Human Services Office of Inspector General  - *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Washington Department of Social and Health Services*  issued November 2001.

[10] Insulin products are considered over-the-counter products for which pharmacies do not receive a dispensing fee.

**Lower reimbursement rates for certain home infusion drugs not used**

Missouri continues to pay more than it should on home infusion drugs[11] because division officials have not implemented more accurate drug prices.  In May 2000, the federal Department of Justice provided all states with more accurate average wholesale prices for 437 primarily home infusion dispensed drugs.  Some prices were more than 80 percent less than the average wholesale prices previously reported by pharmaceutical companies.  The state could have saved an estimated $1.5 million on the $8.4 million spent on these 437 drugs in fiscal year 2001 if officials used the more accurate average wholesale prices and a dispensing fee structure similar to one implemented in another state.

Within 2 months of Department of Justice notice of the more accurate average wholesale prices, Utah officials began using the lower drug prices with new dispensing fees.  With the help of infusion specialty providers, Utah officials categorized the 437 drugs into 5 groups appropriate to the preparation and overhead costs for the product.  The new dispensing fees set up for drugs in 4 of the 5 categories ranged from $8.90 to $33.90 per prescription.

> The state could save $1.5 million annually

Missouri officials initially implemented the more accurate prices for provider reimbursement using the normal $4.09 dispensing fee, which was not designed to cover these drugs.  Division officials reversed this decision after home infusion providers threatened to cease services due to insufficient dispensing fees.  Provider personnel admitted the former reimbursement rates exceeded their product acquisition costs, but they used the excess reimbursement to offset the higher dispensing costs of home infusion drugs.  Division officials indicated they plan to use these lower prices again after determining adequate compensation for home infusion services.  While no implementation date has been set, the Division Director stated the necessary changes to implement these prices would be part of the division's fiscal year 2004 budget proposal.

**State is not collecting some pharmacy fees while proposing to increase other fees**

For years, division officials have allowed pharmacies to keep some recipient co-payments, known as shared dispensing fees, in lieu of increasing the $4.09 prescription dispensing fee.  Pharmacies kept an estimated $3 million to $6 million in shared dispensing fees in fiscal year 2001.  Certain Medicaid recipients pay an optional shared dispensing fee for pharmacy transactions ranging from 50 cents to $2 based on the cost of the prescription.[12]  However, this compensation is not being considered as part of legislation to establish a pharmacy provider tax and nearly double the dispensing fee to $8.04 per prescription.

Division officials do not maintain any data on the shared dispensing fee amounts kept by pharmacies.   They estimate this fee applies to half of all pharmacy transactions, and

---

[11] Drugs generally dispensed intravenously by health care professionals to patients with chronic illnesses who can live at home or in a non-hospital arrangement.

[12] Children, pregnant women and  institutionalized recipients are exempt from paying the shared dispensing fee. However, no Medicaid recipient can be denied a prescription if he/she cannot pay the shared fee amount.

recipients pay the fee about half of the time.  During fiscal year 2001, the Medicaid program had more than 13 million pharmacy transactions.  We estimate that pharmacies received between $3 million and $6 million based on (1) an average prescription price greater than $10, (2) a shared dispensing fee between $1 and $2 per prescription, and (3) the fee applied to 25 percent of the more than 13 million pharmacy transactions in fiscal year 2001.

The fiscal year 2003 state budget includes a pharmacy provider tax to obtain additional federal Medicaid matching funds although it is uncertain the federal government will match these tax revenues.[13] The budget estimates pharmacies will pay about $55.4 million under a 2 percent tax on their prescription drug business.  However, the

> $8.04 fee would be nation's highest

budget also shows the state will pay pharmacies $60.4 million in additional dispensing fee compensation.  The dispensing fee would nearly double from $4.09 to $8.04.  If the pharmacy tax is implemented, the state's $8.04 dispensing fee will far exceed fees paid by any other state.  During fiscal year 2001, the average dispensing fee for all state Medicaid programs was $4.27, with the highest being $5.77 in Louisiana.  The $8.04 fee does not include the shared dispensing fees currently retained by pharmacies.  Some states that require recipient co-payments or shared dispensing fees will reduce a pharmacy's transaction reimbursement for the amount the pharmacy receives from a recipient.  However, this situation was not considered by the state under this pharmacy tax/increased dispensing fee legislation.

**Controls over transactions for a pharmacy discount program need improvement**

The state may have lost more than $500,000 in fiscal year 2001 by overpaying some pharmacies or incorrectly billing manufacturers for rebates related to a federal discount drug program.  Section 340B of the Public Health Service Act requires drug manufacturers discount the cost of drugs supplied to certain federally covered entities, and that the entities pass on the discounts by billing Medicaid at the discounted prices.  We focused on approximately 20 pharmacies that received more than 95 percent of the outpatient pharmacy expenditures paid to program participating providers.  The errors occurred because division staff did not determine if program providers billed the state appropriately and did not effectively evaluate the continued participation status of program providers.  As a result, the state (1) did not claim some rebates from pharmaceutical manufacturers, (2) claimed some rebates for ineligible transactions, and (3) failed to receive the required discount from at least three program participating providers.  Table 1.3 summarizes these results.

According to federal officials, discounted prices through this program generally average about 40 percent less than the manufacturers' average wholesale price.  For entities participating in the Section 340B program, the state is not allowed to bill the manufacturer for drug rebates for transactions billed at the discounted rate.  The state has established a computer edit to remove transactions for participating providers from the rebate billing process.

---

[13]  The federal matching funds are estimated at $86.5 million.  The federal government will have to approve a waiver to the state's Medicaid Plan for this tax revenue to qualify for additional matching funds.

**Table 1.3:  Fiscal Year 2001 340B Program Provider Errors**

| Error Type | Number of Providers | Pharmacy Expenditures to Provider | Estimated Value of Errors |
|---|---|---|---|
| Provider failed to bill at discounted rate | 3 | $ 1,275,651 | $ 389,549 |
| Rebate not claimed | 7[1] | 1,279,297 | 177,502[2] |
| Rebates inappropriately claimed[3] | 1 | 1,157,761 | (40,169)[2] |
| Total | | $ 3,712,709 | $ 526,882 |

[1] Four of the 7 providers receive only family planning drugs through the 340B program, but all facility transactions are excluded from the rebate process.  These providers billed little or no family planning drugs to the Medicaid program.

[2] These errors may be corrected through billing corrections for any rebates not claimed and the manufacturer billing dispute process.

[3] Provider began participating in the 340B program April 1, 2001.

Source: Medicaid data and discussions with providers

### Two initiatives may be counter-productive and increase costs

In fiscal year 2001, Medicaid program rule changes limited most prescription drugs to a maximum 31-day supply.  Department budget documents also proposed, beginning in fiscal year 2003, not paying for over-the-counter products, except insulin.  These changes could cost the program more, particularly with the proposed increase in dispensing fees to $8 or more per prescription.

The 31-day supply limit prevents many recipients from receiving 90-day prescriptions for maintenance drugs which triples the program's dispensing costs for these recipients.  According to division officials, the theory behind such a policy change is the increased dispensing costs will be offset by less money spent on unused portions of 90-day prescriptions.  Unused drugs may occur if recipients are given 90-day prescriptions for drugs prior to their doctor determining the drug was effective to treat them.  The Pharmacy Program Director stated it was inconclusive whether the Medicaid program saved money with the 31-day supply limit during fiscal year 2001.  At least three of the states surveyed have monthly supply limits, but make an exception for maintenance drugs.  In December 2000, Missouri made this same exception on maintenance drugs for 25,000 Medicaid spenddown[14] recipients.

Missouri and 12 states responding to our survey questions on over-the-counter products currently use payment for these products as a cost containment measure.  A Medicaid program would rather have a physician prescribe a less expensive over-the-counter product than a more expensive prescription product if that product could effectively treat the patient.  During fiscal year 2001, the Medicaid program paid $6.4 million for non-insulin over-the-counter drugs.  Most of these products were for the treatment of lice, indigestion, pain, or iron deficiency.  State officials estimate the Medicaid program will save more than $6 million by not paying for over-the-counter products.  However, if doctors begin prescribing

---

[14] Spenddown is a status given to a recipient whose income is too high to qualify for normal Medicaid benefits but can qualify after incurring a determined amount of medical costs during a three-month period.

prescription drugs for Medicaid recipients when an over-the-counter product would suffice, this potential saving is lost by paying higher prices for prescription drugs.  This scenario could occur since Medicaid recipients pay little or no cost for prescription drugs and may tell doctors they cannot afford the prescribed over-the-counter product.  In addition, recent news that the popular prescription product Claritin® will be converted to over-the-counter status in late 2002 may require this decision to be modified.

**Conclusion**

Cost containment for Medicaid prescription drug costs must be evaluated on an ongoing basis as changes take place in the pharmaceutical industry and in other state Medicaid programs. The Division of Medical Services has not done all it can to contain Medicaid drug costs.  While division officials have faced challenges in restrictive state laws, they have been slow in implementing new cost containment initiatives, updating current initiatives and recommending legislative or rule changes that enhance program effectiveness.  Some state Medicaid programs are implementing preferred drug lists which consider therapeutic value and/or cost of drugs being prescribed.  Several cost containment measures are currently being implemented with unknown savings.  Various pharmacy compensation issues need to be evaluated as part of the pharmacy enhancement program to better contain drug costs.

**Recommendations**

We recommend the Director, Department of Social Services:

1.1   Develop plans to implement a preferred drug list that considers the therapeutic value and cost of drugs.

1.2   Amend the state's Medicaid prior authorization rules to limit unnecessary issues that delay moving drugs or drug classes to a prior authorization basis.

1.3   Update drugs and reimbursement rates on the state upper payment limit list more frequently.

1.4   Update the current estimated acquisition prices and pharmacy dispensing fees.  Separate estimated acquisition price computations for generic and brand name drugs should be established as well as eliminating the current higher maximum reimbursement rate for insulin products.

1.5   Implement the lower average wholesale prices for home infusion products with equitable dispensing fees for home infusion services.

1.6   Improve procedures to ensure (1) 340B program providers pass on appropriate discounts to the state and (2) drug rebates are received for all appropriate pharmacy transactions including eligible transactions for providers only receiving some discounted drugs through the program.

1.7    Adjust pharmacy reimbursements for shared dispensing fees retained by pharmacies if the planned pharmacy tax/increased dispensing fee is implemented.

1.8    Closely monitor the cost effectiveness of (1) eliminating 90-day prescription authorization for maintenance drugs and (2) not paying for over-the counter drugs.

**Department of Social Services Responses**

*1.1    Consistent with the mandates of the General Assembly, the Division of Medical Services plans to begin work on a preferred drug list in FY 03.*

*1.2    The Division concurs with the SAO recommendation.  Consistent with the opportunities and constraints of the rulemaking process, the Division is amending the prior authorization rules to make the process more streamlined.*

*1.3    The Division is presently updating the upper payment information globally on a quarterly basis and as needed on an individual product basis.  This is more frequently than other third party payers.  The Division feels it would be impractical to update these limits more frequently.*

*1.4    The Division pointed out to the SAO the pharmacy reimbursement regarding the acquisition prices and the dispensing fees are set through the appropriation process by the General Assembly.  The Division continues to collect information regarding these reimbursement issues for use by the General Assembly in their deliberations.*

*With regard to the insulin products, they are presently subject to the "lower of" test with the AWP plus 25% reimbursement being the maximum allowable reimbursement.  The Division has found few pharmacies billing at this ceiling rate.  However, the Division will change the insulin reimbursement to the standard pharmacy reimbursement methodology approved by the General Assembly.*

*1.5    The Division agrees a change in the reimbursement methodology should occur with respect to the home infusion services.  The Division continues to work on this process and will develop a decision item for consideration in the SFY04 budget.  When implemented, the resulting changes are expected to be revenue neutral for the state and the providers.*

*1.6    The Division has accepted the recommendation of the SAO and is developing guidelines for 340B program providers.*

*The Division policy is to place providers that purchase products through 340B in a system edit (Parm) so claims will not enter the Medicaid rebate system.  When a provider is added to the Parm, all their products are exempt from reporting to Drug Rebate.  The Division will research a system modification to resolve the issue of providers purchasing specific products only through 340B.*

*Any uncollected rebates noted in the review are recoverable and overpayments of rebates will be resolved with the manufacturers during the dispute resolution process.*

1.7 *The shared dispensing fee collection is not required of the recipient to receive services. Federal law will not allow the assessment of the fee as a prerequisite for receiving services. Pharmacy providers in various areas of the state collect the fee at a different rate. The Division will consider the impact and the collection rate when providing information to the General Assembly for future changes in the pharmacy dispensing fee.*

1.8 *The 30-day prescription limit and limited payment for over-the-counter drugs were mandated by the General Assembly during the appropriation process. The Division will monitor both for fiscal impact to the state.*

### 2.   Pharmacy Program Director Appears to Have a Conflict of Interest

Prior to being hired by the Department of Social Services in October 2001, the Pharmacy Program Director served as a registered lobbyist for the Missouri Pharmacy Association and continues to own at least one pharmacy.  Division of Medical Services officials did not consult the Missouri Ethics Commission concerning potential conflicts, although they were aware of his business relationships.  The Division Director stated the department's legal staff evaluated the hiring and determined there would be no conflict of interest problem if the hiring took place.  Nevertheless, the pharmacy program is managed by someone with a financial interest in the same industry on which he can influence policy decisions made by his department and the legislature.  Department officials have no assurance that such influence is unbiased or in the state's best interest.

The Pharmacy Program Director said his business interests do not create a conflict of interest because he lacks rule-making authority and does not qualify as a "decision-making public servant" under state law.  However, this Director is in a position to influence program decisions and legislative changes that may impact the profitability of pharmacies, such as proposing changes to pharmacy reimbursement rates.  He needs to be free of unintentional or intentional bias towards the industry.  The Division Director stated the Pharmacy Program Director is providing the state needed expertise to get the pharmacy program in the right direction.

### Conclusion

Department officials should ensure conflicts of interest do not occur.  Issues regarding potential conflicts of interest should be resolved before employees are hired.

### Recommendation

The Director, Department of Social Services:

2.1   Resolve the appearance of a conflict of interest for the Pharmacy Program Director.

### Department of Social Services Responses

2.1   *The Division consulted with the Department's Division of Legal Services regarding the issue of conflict of interest of the Pharmacy Program Director.  The Pharmacy Program Director has filed a full disclosure with the Ethics Commission and has made his holdings clear to all interested parties.  Additionally, the Pharmacy Program Director obtained a legal opinion from his legal counsel and has shared that opinion with the Department and Division.  The opinion indicates no conflict of interest exists.*

*The results of the pharmacy program operations, the decline in industry reimbursement, and the program management statistics all support the fact the Pharmacy Program Director is fulfilling his job requirements without bias or regard to pharmacy or pharmaceutical industry outcomes.  The Pharmacy Program Director has been forthcoming in all recommendations and has delivered on all Division requests with*

*balanced recommendations, which allowed appropriate decisions to be made by the Division and Department administration.*

APPENDIX I

## OBJECTIVES, SCOPE AND METHODOLOGY

**Objectives**

The objectives of this audit were to (1) determine total direct and indirect cost of prescription drugs for the state, (2) evaluate the effectiveness of some of the state's efforts to reduce Medicaid drug costs, and (3) evaluate the factors leading to increased drug costs in the Medicaid program.

**Scope and Methodology**

To accomplish the objectives, we:

- Reviewed applicable state and federal laws related to outpatient prescription drug benefits in the state's Medicaid program.

- Reviewed the state's Medicaid pharmacy enhancement program current and planned initiatives. These initiatives and the implementation or planned implementation dates are summarized in Table I.1. Due to delays in implementation of some initiatives, and the timing of our audit, our review focused on the items discussed in the report.

- Interviewed the Pharmacy Program Director and other responsible officials to determine the status of the pharmacy enhancement program initiatives and pharmacy reimbursement processes, and obtained necessary documentation.

- Interviewed officials responsible for various state employee health plans (Missouri Consolidated Health Plan, Department of Conservation, Department of Transportation and the University of Missouri) to determine the total cost of prescription drugs to the state, and to compare the pharmacy benefits of the employee plans.

- Contacted Medicaid program officials of 20 states to determine how Missouri compares to other states in implementing cost containment initiatives.

- Analyzed Missouri Medicaid pharmacy claims for fiscal years 2000 and 2001 to determine the most prescribed and most expensive drugs to the program, and the reasons for the increase in prescription drug costs.

- Reviewed average wholesale prices, wholesale acquisition costs, and federal and state upper payment limits for selected drugs to understand the pharmacy reimbursement process and how Missouri's reimbursements compare to other states.

- Analyzed pharmacy claims for selected Medicaid providers participating in a federal prescription drug discount program. We identified approximately 20 pharmacies that handled the majority of the program's transactions. For each pharmacy we selected 5 brand-

-17-

**APPENDIX I**

name drugs and compared the reimbursed rate to a computation of the average wholesale price less 10.43 percent plus the $4.09 pharmacy fee.  If the reimbursed rate was 25 to 40 percent less than the estimated normal reimbursement we concluded the pharmacy billed the state at an appropriate discounted rate.  For any other results, we contacted representatives of the pharmacy to determine program participation status.   To evaluate if rebates were correctly billed, we obtained a listing of all providers in Missouri participating in the program.  This listing was compared to a listing of providers in the program maintained by the division whose transactions are not included in drug rebate billings.  The estimates for potential overpayments or rebate over or under billings were adjusted for dispensing fee compensation received by pharmacies.

- To determine the amount potentially overpaid for 51 insulin drugs, we obtained all transactions for these products for fiscal year 2001.  We compared the amount paid for each transaction to a computation of the average wholesale price less 10.43 percent plus the $4.09 pharmacy fee.

- To determine the potential saving for the 437 home infusion products, we obtained the spring 2000 wholesale prices submitted to states by the Department of Justice.  For these 437 drugs in fiscal year 2001, we compared the pharmacy reimbursement for each transaction using the wholesale prices submitted by the Department of Justice to the prices currently being used by the state.   To determine the potential increase in dispensing fee costs, we obtained the dispensing fee structure for these drugs used by Utah, and multiplied that rate less $4.09 times the number of transactions for each drug.  The estimated drug cost savings was $2 million with additional dispensing costs estimated at no more than $500,000.

We conducted our fieldwork between August 2001 and February 2002.

APPENDIX I

### Table I.1:  Medicaid Prescription Drug Cost Containment Initiatives

| Initiative | Implementation or Planned Implementation Date |
|---|---|
| 31-day maximum supply | December  2000 |
| Expansion of state upper payment limit list | December 2000; September 2001; and January and May 2002[1] |
| Eliminate pay and chase | March 2001 - Halted due to litigation |
| Nursing home credits for returned drugs | July 2001[2] |
| Unique prescriber number | January 2002 |
| Prior authorization expansion | January 2002 - Withdrawn due to rule compliance issues |
| Dose optimization | April 2002 |
| Edits-max quantity/hard edits | June 2002[3] |
| Physician education components | June 2002[3] |
| Disease management | June 2002[3] |
| Patient profiling | June 2002[3] |
| Enhanced retrospective drug utilization | June 2002[3] |
| Additional justification on overrides | March 2002 |
| Provider audits | Fiscal Year 2003 |
| Prior authorization of all new drugs | Fiscal Year 2003 |
| Eliminate over-the- counter, except insulin | Fiscal Year 2003 |
| Pharmacy provider tax | Fiscal Year 2003 |
| Pill splitting | unknown - Reassessing based on fewer products being eligible for splitting than originally planned |

[1] Division officials estimate  this initiative saved the program $4.28 million through December 31, 2001.

[2] Division officials estimate  this initiative saved the program $100,000 through December 31, 2001.

[3] The initiative is pending installation of Medicaid computer system enhancements which are expected in the fourth quarter of fiscal year 2002.

Source:  Department of Social Services budget documents, discussions with Division of Medical Services officials

APPENDIX II

## BACKGROUND

The Department of Social Services - Division of Medical Services is responsible for administering the state's Medicaid program.  The program is authorized under Title XIX of the federal Social Security Act,[15] and is jointly funded by state and federal funds.  Services provided by the program include those required by federal regulations such as hospital, physician, and skilled nursing home care.  The state's Medicaid program also provides optional services such as dental, prescription drugs, and personal care as authorized by the General Assembly.

The state's Medicaid program provides eligible Missouri residents prescription drug services at nominal or no cost.  The cost for Medicaid outpatient prescription drugs increased $285 million between fiscal year 1997 and 2001 as shown in Table II.1.  These costs are estimated to be $744 million during fiscal year 2002.

### Table II.1:  Medicaid Outpatient Prescription Drug Costs
### Fiscal Years 1997 to 2001 (in millions)

| | | Fiscal Year | | | | |
|---|---|---|---|---|---|---|
| | | 1997 | 1998 | 1999 | 2000 | 2001 |
| Expenditures | $ | 321 | 374 | 469 | 581 | 681 |
| Less rebates | | (53) | (64) | (84) | (110) | (128) |
| Net expenditures | $ | 268 | 310 | 385 | 471 | 553 |
| Change from prior year | | | 16% | 24% | 22% | 17% |

Source:  Medicaid  records

**Pharmacy reimbursement options**

Medicaid regulations provide for the pharmacy reimbursement of outpatient drugs using two methods (multiple source and single source).

If a drug is a multiple source drug (brand-name drug and 3 or more generic versions of the drug), then reimbursement is based on the lower of the pharmacist's usual and customary charge to the general public or a federal upper limit amount plus a dispensing fee. The federal upper limit amounts are established by the Department of Health and Human Services - Centers for Medicare and Medicaid Services.  The reimbursed amount for the brand-name and associated generic drugs will be the federal upper payment limit amount no matter what the billed cost of the drug.  The rate is set based on the prices for each product and normally set near the lowest price for any of the products.  Missouri also has established another option (state upper payment limit) which is similar to the federal upper payment limit, but may be set once a brand-name drug

---

[15] Laws governing the Medicaid prescription drug programs are 42 United States Code (USC) Section 1396r-8
  (Payment for covered outpatient drugs) and 13 Code of State Regulation (CSR) 70-20  (Pharmacy Program).

APPENDIX II

has at least 1 but generally 2 or more generic versions verses the federal criteria of 3 or more versions. Pharmacy reimbursement is based on the lower of the pharmacist's usual and customary charge to the general public, the state upper payment limit plus a dispensing fee or the federal upper limit amount plus a dispensing fee (if applicable).

If a drug is a single source drug (brand-name drug), or a generic drug for which a state or federal upper limit amount has not been established, then the reimbursement is the lower of the pharmacist's usual and customary charge to the general public or the estimated acquisition cost plus a dispensing fee. Effective July 1, 2001, Missouri uses two potential estimated acquisition prices:

- Average wholesale price (AWP) minus 10.43 percent

- Wholesale acquisition cost (WAC) plus 10 percent

Tables II.2 and II.3 illustrate the reimbursement options and decision process for a one month prescription for two drugs.

**Table II.2:  Pharmacy Reimbursement Options**

| Drug Type | Drug Name | Estimated Acquisition Price | | Upper Payment Limit | |
|---|---|---|---|---|---|
| | | AWP-10.43% | WAC+10% | State | Federal |
| Brand | Prilosec | $ 115.57 | 118.27 | N/A | N/A |
| Generic | Amoxapine | $ 70.05 | 68.82 | 23.40 | 31.72 |

**Table II.3:  Pharmacy Reimbursement Decision**

| Drug Name | Lowest Option + Dispensing Fee[1] | Billed Amount | Reimbursement[2] |
|---|---|---|---|
| Prilosec | $ 119.66 | 115.00 | 115.00 |
| Amoxapine | $ 27.49 | 35.85 | 27.49 |

[1] The lowest cost of the 4 options is chosen and the $4.09 dispensing fee is added to determine the maximum reimbursement amount.

[2] The lower of the amount billed or the maximum reimbursement amount.

Source:  Medicaid drug price data

Figure II.1 describes the reimbursement process to pharmacies for drugs received by Medicaid recipients and the rebate provided by manufacturers to state Medicaid agencies.

APPENDIX II

**Figure II.1:  Description of the Medicaid Reimbursement Process**



**Manufacturers**
Manufacturers primarily distribute their products through drug wholesalers, but also sell directly to pharmacies, hospitals and other bulk purchasers.

Manufacturers establish **wholesale acquisition cost** and **average wholesale price**.

manufacturer to wholesaler transactions

List Price:  **Wholesale Acquisition Cost (WAC)**

Actual Selling Price: **Average Manufacturer's Price  (AMP)**

**Wholesalers**
Wholesalers act as the middlemen that distribute pharmaceuticals from manufacturers to pharmacies

wholesaler to pharmacy transactions
List Price:  **Average Wholesale Price (AWP)**

Actual Selling Price: **Actual Acquisition Cost (AAC)**

**Retail Pharmacies**
Pharmacies dispense prescriptions to Medicaid recipients

Manufacturers Rebate to Medicaid Agency
**15.1 percent of AMP [1] or AMP - Best Price**

[1] applies to brand-name drugs.  Rebate is 11 percent of AMP for generic drugs.

Reimbursement from Medicaid Agency to Pharmacy: **Estimated Acquisition Cost** *(WAC plus a percentage or AWP minus a percentage)* **plus dispensing fee** ($4.09 in Missouri)

**Medicaid Agency**
Cover the pharmaceutical costs of eligible recipients (children, aged, disabled, etc.)

Source:  Department of Health and Human Services - Office of Inspector General; SAO compiled data

**APPENDIX III**

## TOP 25 MEDICAID OUTPATIENT PRESCRIPTION DRUGS  -  FISCAL YEAR 2001

Table III.1 lists the 25 outpatient prescription drugs the Missouri Medicaid program spent the most for in fiscal year 2001.  These drugs represent nearly 38 percent of the $681,377,799 spent on outpatient prescription drugs that year.

**Table III.1:  Top 25 Medicaid Prescription Drugs - Fiscal Year 2001**

| Brand Name | Amount Spent | Use |
|---|---|---|
| Zyprexa® | $ 35,910,411 | Antipsychotic |
| Risperdal® | 22,991,612 | Antipsychotic |
| Prilosec® | 18,806,905 | Stomach Acid Blocker |
| Prevacid® | 14,432,770 | Stomach Acid Blocker |
| Celebrex® | 13,197,253 | Arthritis Treatment |
| Prozac® | 11,847,723 | Antidepressant |
| Zoloft® | 10,886,247 | Antidepressant |
| Depakote® | 10,767,140 | Anticonvulsant |
| Paxil® | 10,420,245 | Antidepressant |
| Lipitor® | 10,022,348 | Cholesterol Lowering Agent |
| Neurontin® | 9,895,260 | Anticonvulsant |
| Oxycontin® | 9,344,838 | Narcotic Pain Reliever |
| Vioxx® | 9,150,483 | Arthritis Treatment |
| Seroquel® | 9,100,210 | Antipsychotic |
| Norvasc® | 6,852,602 | Blood Pressure Reducer |
| Buspar® | 6,436,251 | Antianxiety |
| Claritin® | 6,160,792 | Antihistamine |
| Glucophage® | 6,136,640 | Lowers Blood Sugar |
| Zocor® | 5,294,398 | Cholesterol Lowering Agent |
| Celexa® | 5,200,362 | Antidepressant |
| Ultram® | 5,092,688 | Analgesic Pain Reliever |
| Remeron® | 5,077,321 | Antidepressant |
| Pepcid® | 5,007,771 | Stomach Acid Reducer |
| Zithromax® | 4,926,713 | Antibiotic |
| Effexor® | 4,899,261 | Antidepressant |
| Total | $ 257,858,244 | |

Source: Medicaid program expenditure data