# EXHIBIT M

Lewis, Marianne (DHS-MCPD)

**From:** Hillblom, Doug (DHS-MCPD)
**Sent:** Monday, November 06, 2000 2:49 PM
**To:** Hinton, Phil (DHS-PSD-ONSITE); Lewis, Marianne (DHS-MCPD)
**Cc:** Juarez, Jenny (DHS-PSD-ONSITE)
**Subject:** RE: OIL 137-00 New Medicaid Only AWP Pricing

**Importance:** Low

The OIL is still in effect until directed otherwise. We will issue new directions when we have been able to address all of the surrounding issues which are still currently under review.

-----Original Message-----
**From:** Hinton, Phil (DHS-PSD-ONSITE)
**Sent:** Monday, November 06, 2000 11:51 AM
**To:** Lewis, Marianne (DHS-MCPD)
**Cc:** Hillblom, Doug (DHS-MCPD); Juarez, Jenny (DHS-PSD-ONSITE)
**Subject:** OIL 137-00 New Medicaid Only AWP Pricing

In May of this year, PSD issued an OIL directing EDS **not** to use a new "Medicaid only" AWP pricing provided by First Data Bank(FDB). The Medicaid only AWP was the result of reporting procedures worked out with FDB to correct problems found by a national investigation that found that drug manufacturers were misreprenting the AWP and wholesale acquisition price of certain products(about 400 NDC's). The OIL stated that Governor's office approval would be sought before implementing the new Medicaid oly AWP pricing provided by FDB.

To my knowledge the OIL is still in effect. Is it correct that we are to continue to use standard AWP's and not use the Medicaid only pricing? Is this issue still under review?



EXHIBIT 14

Garosp 7-19-08

CAAG/DHS0076371
CAAG/DHS0076371 [D]

State of California—Health and Human Services Agency                                                      Department of Health Services

*7/20*

## GOVERNOR'S ACTION REQUESTED

*Cyd –*
*pls find 76*
*MU*

**TO:**            File

**ATTENTION:**   Susan P. Kennedy
                 Cabinet Secretary

**FROM:**         Grantland Johnson
                 Secretary, Health and Human Services Agency

         Prepared by:   Doug Hillblom, Pharm.D.
                        Medi-Cal Benefits Branch
                        657-0539

**DATE:**

**SUBJECT:**      Change in Prices for Medi-Cal Drugs   *effective April 2000,*

---

☒ Request for Approval                    ☐ For Governor's Information
☐ Request for Cabinet Discussion          ☐ For Governor's Signature

**SUMMARY/PRO-CON ARGUMENTS:** As a result of litigation, Medi-Cal's primary drug price reference source has reduced the Average Wholesale Prices for approximately 400 drug products.  If implemented, access to these important drugs may be reduced (see attached discussion).

**EFFECT ON EXISTING LAW:** N/A   *↳ due to decreased reimbursement to providers.*

**ESTIMATED COST:** The aggregate savings from implementing the new prices has not been determined.

**TIME FACTOR:** A decision on whether to implement the new prices is needed as soon as possible.

**RECOMMENDATION:** The Department advises that the new prices for the identified drugs not be implemented.

---

**APPROVED:**

---

Diana M. Bontá, R.N., Dr.P.H.          Date          Susan P. Kennedy                        Date
Director                                             Cabinet Secretary

                                                     Michael J. Gotch                         Date
                                                     Legislative Secretary

Grantland Johnson                      Date          Gray Davis                               Date
Secretary.                                           Governor

DHS 1049 (4/00)

CAAG/DHS0076372
CAAG/DHS0076372

The Medi-Cal program has an immediate need for a decision on whether to implement a change in drug reimbursement to providers as a result of a recent settlement of a drug price reporting lawsuit.   If implemented, Medi-Cal fee-for-service (FFS) provider reimbursement levels will be reduced for certain drugs. The provider categories affected are physicians, clinics, home health agencies and pharmacies.

Background:

First Data Bank is the primary drug price reference source utilized by the Medi-Cal fee-for-service program and essentially all other state Medicaid programs. A recent national investigation by State and Federal agencies revealed a pattern of misrepresentations by some drug manufacturers of the average wholesale prices (AWP) and wholesale acquisition costs of certain products. The basis of the litigation was that the federal Medicaid fee-for-service program was paying excessive prices for drugs based on the manufacturer reported AWPs which were then published by First Data Bank.

It is our understanding that the intent of the lawsuit was to mitigate the potential for excessive profit margin that would encourage physicians to administer drugs as part of patients' routine office visits.  This incentive for profit is based on the difference between the manufacturers' inflated AWPs which is the basis for Medicaid reimbursement and the actual cost of the product to physicians or other providers of these drugs.

As a result, the National Association of Medicaid Fraud Control Units (NAMFCU), which conducted the investigation, entered into a settlement agreement with First Data Bank, which affects the manner in which the AWPs are calculated and reported to state Medicaid fee-for-service agencies. The California Attorney General, Medicaid Fraud Control Unit, has been a participant in this legal class action.

First Data Bank's new AWP reporting system, in accordance with the settlement, is based on their survey of drug wholesalers and manufacturer sales to members of group purchasing organizations (GPO) and other purchasers. These GPO's currently appear to include all wholesale prime vendor networks such as California's State contracts and the United States Public Health Services Office of Drug Pricing.  The inclusion of these deeply discounted programs in the survey impact the reported AWPs for the drugs by lowering them substantially.  Additionally, these AWPs are only reported to state Medicaid agencies and not to other third party payers. These AWPs will also be reported to Medicare carriers in determining Medicare drug allowances. There is no requirement in either the settlement or by the Federal Government that state Medicaid programs implement the new AWPs as the basis for drug reimbursement to providers.

Impact:

CAAG/DHS0076373
CAAG/DHS0076373

The Medi-Cal program has an immediate need for a decision on whether to implement a change in drug reimbursement to providers as a result of a recent settlement of a drug price reporting lawsuit.   If implemented, Medi-Cal fee-for-service (FFS) provider reimbursement levels will be reduced for certain drugs. The provider categories affected are physicians, clinics, home health agencies and pharmacies.

Background:

First Data Bank is the primary drug price reference source utilized by the Medi-Cal fee-for-service program and essentially all other state Medicaid programs. A recent national investigation by State and Federal agencies revealed a pattern of misrepresentations by some drug manufacturers of the average wholesale prices (AWP) and wholesale acquisition costs of certain products. The basis of the litigation was that the federal Medicaid fee-for-service program was paying excessive prices for drugs based on the manufacturer reported AWPs which were then published by First Data Bank.

It is our understanding that the intent of the lawsuit was to mitigate the potential for excessive profit margin that would encourage physicians to administer drugs as part of patients' routine office visits.  This incentive for profit is based on the difference between the manufacturers' inflated AWPs which is the basis for Medicaid reimbursement and the actual cost of the product to  physicians or other providers of these drugs.

As a result, the National Association of Medicaid Fraud Control Units (NAMFCU), which conducted the investigation, entered into a settlement agreement with First Data Bank, which affects the manner in which the AWPs are calculated and reported to state Medicaid fee-for-service agencies. The California Attorney General, Medicaid Fraud Control Unit, has been a participant in this legal class action.

First Data Bank's new AWP reporting system, in accordance with the settlement, is based on their survey of drug wholesalers and manufacturer sales to members of group purchasing organizations (GPO) and other purchasers. These GPO's currently appear to include all wholesale prime vendor networks such as California's State contracts and the United States Public Health Services Office of Drug Pricing.  The inclusion of these deeply discounted programs in the survey impact the reported AWPs for the drugs by lowering them substantially.  Additionally, these AWPs are only reported to state Medicaid agencies and not to other third party payers. These AWPs will also be reported to Medicare carriers in determining Medicare drug allowances. There is no requirement in either the settlement or by the Federal Government that state Medicaid programs implement the new AWPs as the basis for drug reimbursement to providers.

Impact:

Accepting these new AWP's as the basis for provider reimbursement in Medi-Cal is a serious policy consideration.  This change would result in dramatic decreases in the reported AWP for approximately 400 drugs - decreases of as much as 80% in some cases. The new AWP reductions apply to drugs which are usually administered in physicians' offices or clinics. However, the same drugs are often administered at patients' homes via pharmacy dispensing and home health care administration. Cancer drugs are included among these 400 drugs as well as a number of blood factors used by those with hemophilia and drugs for inhalation therapy.  The aggregate savings to the Medi-Cal fee-for-service program from the new AWPs for these 400 drugs has not been determined.

Following are just two examples of the price differentials between the traditional AWP pricing mechanism and the new mechanism.

Albuterol Sulfate 0.83% 3ml        (Bronchodilator for Asthma and Chronic Obstructive Pulmonary Disease)

NDC (National Drug Code)                        Current AWP               New

CAAG/DHS0076374
CAAG/DHS0076374

49502-0697-03          $30.25                    $12.20


Cisplatin 1mg/ml  (Chemotherapy for cancer)

NDC                           Current AWP         New
50mg/50ml vial
63323-0103-51          $210.90         $162.64

100mg/100ml vial
63323-0103-65          $421.80         $321.00

The above examples were chosen at random from the documents provided to the Department from the New York State Attorney General Office.

Concerns:

The Department is concerned that providers affected by the new AWPs may discontinue serving FFS Medi-Cal patients if the new prices are implemented. If this occurs, patients would either not have access to these important drugs or patients would be directed to a hospital to obtain them.  The Department has already received correspondence from various advocacy groups such as hemophilia organizations and pharmacist organizations (see Attachment A) expressing their serious concerns over the new AWPs. We have not yet received similar contact from physicians and clinic provider groups.

Department staff recently participated in a national teleconference on this subject involving other state Medicaid pharmacy programs.  Most pharmacy program administrators indicated that they were not implementing the new AWPs at this time because of concerns over provider discontinuation and resultant patient access problems.   On the other side of this issue, NAMFCU representatives in a letter dated May 18, 2000  challenge the states' assertions that provider access will be negatively impacted by the adoption of the new AWP's. (Attachment B)

For Medi-Cal, a further consideration is that the new AWP's apply only to FFS, not managed care.  This could create a discrepancy between FFS patients and those enrolled in Medi-Cal managed care from the standpoint of access to physician-administered medications.  An additional impact would be on the Medi-Cal Drug Rebate Program since there would be two different AWPs used as cost bases for reimbursement, compounding drug rebate disputes from drug manufacturers and affecting rebate collections. As a result of the implications of applying the new AWP's which became available in April 2000, DHS has advised EDS to continue to update the formulary file with the standard  AWP's until further notice.


Options:

A) The Department could implement these price changes.
Pro:
The Medi-Cal program would save an undetermined amount of drug cost.

Con:
Providers,  may choose not to provide these services to Medi-Cal beneficiaries.
Providers may hospitalize patients to obtain the medically necessary services, resulting in increased program costs.

B)The Department could delay implementation of these price changes until a mechanism has been established to  transfer the drug cost savings to increased provider professional fee reimbursement.

CAAG/DHS0076375
CAAG/DHS0076375

Pro:
The Department would lower the risk of decreasing provider participation, by addressing provider reimbursement concerns.

Con:
The Department could set a precedent of transferring savings from one area of provider reimbursement to fund other areas of provider reimbursement.
The Department would not experience the maximum amount of potential cost savings available.

C)The Department could not implement the new price reporting mechanism.

Pro:
This would have the least impact on provider participation and patient access to health services.
No changes would be necessary in the claims processing system.

Con:
The Department would not receive any savings from the decrease in reported AWPs.

Recommendation:

We recommend that Medi-Cal not implement the new price reporting mechanism due to the serious impact on both the providers and beneficiaries.

CAAG/DHS0076376
CAAG/DHS0076376

# EXHIBIT N

0032603ABCT

# Program Memorandum
# Intermediaries/Carriers

**Department of Health and Human Services (DHHS)**
**HEALTH CARE FINANCING ADMINISTRATION (HCFA)**

Transmittal  AB-00-115

Date: NOVEMBER 17, 2000

### CHANGE REQUEST 1447

This Program Memorandum (PM) supercedes PM AB-00-86, Change Request 1232, dated September 8, 2000.

SUBJECT:   Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program

This PM suspends, until further notice, PM AB-00-86, dated September 8, 2000.

This is to notify you that you should **NOT** use the Department of Justice (DOJ) data attached to PM AB-00-86 in your next update of Medicare payment allowances for drugs and biologicals. Instead, until further notice, you should delay use of this new source of average wholesale price (AWP) and use the AWP data from your usual source.

While we continue to believe that the AWPs reported in the usual commercially available sources are inaccurate and inflated above the true wholesale prices charged in the marketplace, congressional action may preclude the use of this alternative source. To avoid the disruption that would result from a decrease in payment allowances followed by an immediate increase due to final congressional action, we are deferring the use of the DOJ AWP data until further notice.

The *effective date* for this PM is upon receipt.

The *implementation date* for this PM is November 17, 2000.

These instructions should be implemented within your current operating budget.

This PM may be discarded after December 31, 2001.

If you have any questions, contact Robert Niemann at (410) 786-4569.

HCFA-Pub. 60AB



EXHIBIT

22 1

PENGAD 800-631-6989

AWP029-0029      F

# EXHIBIT O

DeParle, Nancy-Ann                                    May 18, 2007
                        Washington, DC

Page 1

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x

IN RE:  PHARMACEUTICAL        : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    : CIVIL ACTION:

PRICE LITIGATION              : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-a-Care of    : Judge Patti B. Saris

the Florida Keys, Inc. v.     :

Abbott Laboratories, Inc.,    : Chief Magistrate

No. 06-CV-11337-PBS           : Judge Marianne B.

- - - - - - - - - - - - - - x Bowler

            IN THE CIRCUIT COURT OF

            MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - x

STATE OF ALABAMA,            :

            Plaintiff,       :

        vs.                  : Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,   : Judge Charles Price

et al.,                      :

            Defendants.      :

- - - - - - - - - - - - - - x

                Henderson Legal Services
                    202-220-4158

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                          May 18, 2007
                        Washington, DC

| | Page 2 |
|---|---|
| 1 | IN THE COURT OF THE SECOND JUDICIAL CIRCUIT |
| 2 | IN AND FOR LEON COUNTY, FLORIDA |
| 3 | |
| 4 | THE STATE OF FLORIDA |
| 5 | ex rel. |
| 6 | - - - - - - - - - - - - - - - - x |
| 7 | VEN-A-CARE OF THE FLORIDA       : |
| 8 | KEYS, INC., a Florida           : |
| 9 | Corporation, by and through its : |
| 10 | principal officers and directors, : |
| 11 | ZACHARY T. BENTLEY and          : |
| 12 | T. MARK JONES,                  : |
| 13 |         Plaintiffs,     : |
| 14 |      vs.         : Civil Action |
| 15 | MYLAN LABORATORIES INC.; MYLAN    : No.: 98-3032G |
| 16 | PHARMACEUTICALS INC.; NOVOPHARM  : Judge: William |
| 17 | LTD., SCHEIN PHARMACEUTICAL, INC.;:  L. Gary |
| 18 | TEVA PHARMACEUTICAL INDUSTRIES    : |
| 19 | LTD., TEVA PHARMACEUTICAL USA;   : |
| 20 | and WATSON PHARMACEUTICALS, INC., : |
| 21 |         Defendants,     : |
| 22 | - - - - - - - - - - - - - - - - x |

| | Page 3 |
|---|---|
| 1 | IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS |
| 2 | STATE OF MISSOURI |
| 3 | - - - - - - - - - - - - - - - - x |
| 4 | STATE OF MISSOURI, ex rel.,     : |
| 5 | JEREMIAH W. (JAY) NIXON,        : |
| 6 | Attorney General,              : |
| 7 | and                    : |
| 8 | MISSOURI DEPARTMENT OF SOCIAL     : |
| 9 | SERVICES, DIVISION OF MEDICAL     : Case No.: |
| 10 | SERVICES,            : 054-1216 |
| 11 |         Plaintiffs,     : Division No. 31 |
| 12 |      vs.         : |
| 13 | DEY INC., DEY, L.P., MERCK KGaA, : |
| 14 | EMD, INC., WARRICK              : |
| 15 | PHARMACEUTICALS CORPORATION,    : |
| 16 | SCHERING-PLOUGH CORPORATION, and : |
| 17 | SCHERING CORPORATION,           : |
| 18 |         Defendants,     : |
| 19 | - - - - - - - - - - - - - - - - x |
| 20 | |
| 21 | |
| 22 | |

| | Page 4 |
|---|---|
| 1 | Videotaped Deposition of NANCY-ANN |
| 2 | DePARLE, a witness herein, called for examination by |
| 3 | counsel for Abbott Laboratories in the |
| 4 | above-entitled matter, pursuant to notice, the |
| 5 | witness being duly sworn by Robert M. Jakupciak, a |
| 6 | Notary Public in and for the District of Columbia, |
| 7 | taken at the offices of Jones Day, 51 Louisiana |
| 8 | Avenue, N.W., Washington, D.C. , 20001, at 9:00 |
| 9 | a.m., on May 18, 2007, and the proceedings being |
| 10 | taken down by Stenotype by Robert M. Jakupciak, RPR. |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| | Page 5 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | On behalf of the United States of America: |
| 4 |     JAMIE ANN YAVELBERG, ESQUIRE |
| 5 |     U.S. Department of Justice |
| 6 |     Civil Division |
| 7 |     P.O. Box 261 |
| 8 |     Ben Franklin Station |
| 9 |     Washington, D.C.  20044 |
| 10 |     (202) 514-6514 |
| 11 | |
| 12 | and |
| 13 | |
| 14 |     REBECCA A. FORD, ESQUIRE |
| 15 |     U.S. Department of Justice |
| 16 |     601 D Street, N.W. |
| 17 |     Patrick Henry Building - 9133 |
| 18 |     Washington, D.C.  20044 |
| 19 |     (202) 514-1511 |
| 20 | |
| 21 | |
| 22 | |

2 (Pages 2 to 5)

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                          May 18, 2007
Washington, DC

Page 314

1       MS. YAVELBERG:  Objection; form.
2       A.   That these members of Congress were
3  concerned about the plan that had been announced
4  in the letter to Chairman Bliley and in the
5  letter that I sent to other members of Congress
6  to provide the additional source of data to the
7  carriers on AWP.
8       Q.   If you look at the bottom of the first
9  page, the Congressman writes, quote:  The
10 Congress in 1997 instructed the department to
11 base reimbursement for drugs on 95 percent of
12 AWP; a term widely understood and indeed defined
13 by department manuals to reference amounts
14 reflect in specified publications.
15      First of all, is that a correct
16 statement of what Congress did in 1997?
17      MS. YAVELBERG:  Objection to form.
18      A.   Yes.
19      Q.   And the very first letter -- sentence
20 of the letter is that the primary responsibility
21 of the Medicare program must be to ensure
22 continuity of care to beneficiaries.  That's a

Page 315

1  true statement; correct?
2       A.   I believe it's a very important
3  responsibility to the Medicare program, to ensure
4  care to beneficiaries.
5       Q.   The Congressman complained that the
6  data that -- this is the third paragraph -- the
7  data, referring to the data collected by the
8  Department of Justice, do not take into account
9  the fact that oncologists are chronically
10 underpaid for their drug administration services
11 in treating cancer patients. In fact, it is
12 widely recognized, including in your letter
13 announcing the plan to reduce reimbursement. Did
14 you understand that to be a concern, one of the
15 concerns of these 91 members of Congress?
16      A.   I understood -- I understand that
17 that's what this letter says.  I did not agree
18 that it was widely recognized.  Because I
19 remember being surprised when my staff told me
20 that they thought it was something we needed to
21 look at.
22      Q.   And after receiving this letter, did

Page 316

1  the department change its approach to
2  disseminating the DOJ data to exclude
3  chemotherapy drugs?
4       A.   Well, I changed --
5       Q.   You changed it?
6       A.   -- my approach, yes.
7       Q.   I hand you what I'll mark as Exhibit
8  Abbott 221.
9          (Exhibit Abbott 221 was marked for
10 identification.)
11 BY MR. COOK:
12      Q.   For the record, this is a November 17,
13 2000 program memorandum entitled Source of
14 Average Wholesale Price Data for Pricing Drugs
15 and Biologicals Covered by the Medicare Program.
16 Do you recognize what this is?
17      A.   No.
18      Q.   Do you know that in November of 2000
19 HCFA instructed its carriers not to use the
20 Department of Justice data that were distributed
21 in the September 8, 2000 program memorandum?
22      A.   I know it now, but I didn't know it

Page 317

1  then.
2       Q.   In the second paragraph it says that
3  Congressional action may preclude the use of this
4  alternative source of data.
5          Did Congressional action preclude the
6  use of the DOJ data?
7       A.   I believe it did.
8       Q.   And do you recall having any
9  conversations with Congress about why Congress
10 took that action?
11      MS. YAVELBERG:  Objection; form.
12      A.   No.
13      Q.   Do you know why Congress took that
14 action?
15      A.   No.
16      Q.   Do you know if there was any lobbying
17 or concern by other providers who would have been
18 impacted by the program memorandum of September
19 8, 2000?
20      A.   No.
21      Q.   Ms. DeParle, when you were
22 Administrator of HCFA did you ever have any

80 (Pages 314 to 317)

Henderson Legal Services
202-220-4158

a2e99778-7e61-4f3d-8317-e255e740d5a9