# EXHIBIT S

AO 88 (Rev. 1/94) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

### SUBPOENA IN A CIVIL CASE

In re LUPRON MARKETING AND SALES
PRACTICES LITIGATION

CASE NUMBER:   MDL DOCKET NO. 1430
                Master File No. 01-CV-10861
            Judge Richard G. Stearns (D. Mass.)

TO:   Office of the General Counsel

      United States Department of Health and Human Services
      Room 711-E
      200 Independence Avenue, S.W.
      Washington, D.C.  20201

☒    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place,
date, and time specified below (list documents or objects):

                    See EXHIBIT A (attached)

| PLACE | DATE AND TIME |
|---|---|
| Joshua T. Buchman, Esq.<br>McDermott, Will & Emery<br>227 West Monroe Street<br>Chicago, IL  60606-5096<br>(312) 372-2000 | January 5, 2004 |

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | 10-23-03 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael S. Nadel, D.C. Bar # 470144
(Attorney for Abbott Laboratories)
McDermott, Will & Emery
600 Thirteenth Street
Washington, D.C.  200005
(202) 756-8000

(See Rule 45, Federal Rules of civil Procedure, Parts C & D on Reverse)

AO 88 (Rev. 1/94) Subpoena in a Civil Case



EXHIBIT
Abbott 74
3-21-07

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
|  |  |  |

| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
|---|---|---|
|  |  |  |

| SERVED BY (PRINT NAME) | | TITLE |
|---|---|---|
|  |  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE                                                  SIGNATURE OF SERVER

_____

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A TO SUBPOENA TO HHS

### PRELIMINARY STATEMENT

Abbott Laboratories ("Abbott"), TAP Pharmaceutical Products Inc. and TAP Pharmaceuticals Inc. (collectively "TAP"), and Takeda Chemical Industries, Ltd. ("Takeda") are serving this Subpoena on the Office of the General Counsel of the United States Department of Health and Human Services ("HHS") pursuant to Rule 45 of the Federal Rules of Civil Procedure and 45 C.F.R. § 2.5.

### DEFINITIONS

1.      "Document" means the original and each non-identical copy of a document in any medium, including electronic form, whether or not it was communicated to any person other than the author, and shall include but not be limited to, writings, printings, photographs, photocopies, tapes, recordings, video recordings, electronic data, e-mails, and any other symbolic representations in the possession, custody or control of Plaintiffs or known or believed by Plaintiffs to exist.

2.      "Copy" or "Copies" when used in reference to a document means any color or black-and-white reproduction of a document, regardless of whether the reproduction is made by means of carbon paper pressure, sensitive paper, photostat, xerography or other means or process.

3.      "Correspondence" means all communications between two different persons or entities, including e-mail and other forms of electronic communications.

4.      "Home drug infusion therapy services" means the administration of drugs at the patient's home using an infusion pump.

5.      "Home nebulizer treatments" means the administration of drugs at the patient's home by means of a nebulizer.

6.      "AWP" shall refer to the published Average Wholesale Price as reported in pharmaceutical pricing compendia, such as the Red Book and First Data Bank.

7.      "HHS" means the United States Department of Health and Human Services and all constituent agencies.

8.      "CMS" means Centers for Medicare and Medicaid Services, formerly known as Health Care Financing Administration ("HCFA"), and encompasses the Social and Rehabilitation Service ("SRS"), HCFA's predecessor in the administration of the Medicaid program.

9.      "OIG" means the HHS Office of Inspector General.

10.      "Carrier" shall mean and refer to any and all insurance companies or other entities that have contracted with HCFA or CMS at any time from Jan. 1, 1985 to the present to process claims submitted under Part B of the Medicare program.

11.      "Relating to" means all information, facts and/or documents that directly, indirectly or in any other way support, negate, bear upon, touch upon, incorporate, affect, include, pertain to and/or are otherwise connected with the subject matter about which a request is being made.

12.      "Communication" means the transmission, sending and/or receipt of information of any kind by and/or through any means including but not limited to speech, writings, language, computer electronics of any kind, magnetic tape, video tape, photographs, graphs, symbols, signs, magnetic disks, sound, radio and/or video signal, telephone, teletype, telecommunication, telegram, microfilm, microfiche, photographic film of any type and/or other media of any kind.

13.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information that might otherwise be construed to be outside its scope.

14.     The singular form of a noun or pronoun shall include within its meaning the plural form of the noun or pronoun and vice versa; the masculine form of a pronoun shall include within its meaning the feminine form of the pronoun, and vice versa; and the use of any tense of any verb shall include within its meaning all other tenses of the verb.

## INSTRUCTIONS

1.     Abbott, TAP, and Takeda request that HHS certify that the records it produces are true and correct copies.

2.     Unless the request specifically relates to an earlier time period, the requests below refer to the period of January 1, 1991 to the present

3.     The headings provided in the document requests, below, are intended to assist HHS in locating responsive documents by setting forth general categories, and should not be relied upon to modify in any way the actual numbered requests.

4.     Please produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the request. The following constituents within HHS are believed by Abbott, TAP, and Takeda to be in possession of documents responsive to this subpoena: (a) HHS Main Office and Regional Offices; (b) HHS Office of General Counsel; (c) OIG; (d) CMS; and (e) Public Health Service.

5.     Provide the following information for each document withheld on the grounds of privilege:

      (a)     its date;

      (b)     its title;

3

(c)     its author;

(d)     its addressee;

(e)     the identity of each person who received and/or saw the original or any copy of such document;

(f)     the specific privilege under which it is withheld;

(g)     its general subject matter;

(h)     its present custodian(s); and

(i)     a description of the document adequate to support the contention of privilege.

## DOCUMENTS TO PRODUCE

<u>Regulatory Documents Regarding Medicare or Medicaid Drug Reimbursement</u>

1.      All documents relating to the promulgation of a regulation concerning Medicare reimbursement for prescription drugs, effective January 1, 1992, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation.  (The Notice of Proposed Rulemaking for the regulation was published at 56 Fed. Reg. 25,860 (June 5, 1991), and the Notice of Final Rule was published at 56 Fed. Reg. 59,424 (Nov. 25, 1991).)  This request seeks only documents relating to reimbursement by Medicare of prescription drugs, and not documents related to other matters covered by the regulation in question.

2.      All documents relating to the promulgation of a regulation concerning Medicare reimbursement for prescription drugs, effective January 1, 1999, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation.  (The Notice of Proposed Rulemaking

4

for the regulation was published at 63 Fed. Reg. 30,818 (June 5, 1998), and the Notice of Final Rule was published at 63 Fed. Reg. 58,814 (Nov. 2, 1998).) This request seeks only documents related to reimbursement by Medicare of prescription drugs, and not documents relating to other matters covered by the regulation in question.

3.      From 1985 to the present, all documents relating to the promulgation of a regulation concerning Medicaid reimbursement for prescription drugs published at 34 Fed. Reg. 1,244 (January 25, 1969), codified at 45 C.F.R. § 250.30(b)(2) (1970), including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation.  This request seeks only documents related to reimbursement by Medicaid of prescription drugs, and not documents related to other matters covered by the regulation in question.

4.      From 1974 to the present, all documents relating to the promulgation of a regulation concerning Medicaid reimbursement for prescription drugs, effective July 1976, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation.  (The Notice of Proposed Rulemaking for the regulation was published at 39 Fed. Reg. 41,480 (Nov. 27, 1974), and the Notice of Final Rule was published at 40 Fed. Reg. 34,516 (Aug. 15, 1975).) This request seeks only documents related to reimbursement by Medicaid of prescription drugs, and not documents relating to other matters covered by the regulation in question.

5.      From 1985 to the present, all documents relating to the promulgation of a regulation concerning Medicaid reimbursement for prescription drugs, effective in 1987, including all comments on the proposed and final regulation, all drafts of the regulation, and all memoranda, correspondence, analyses and other documents concerning the regulation.  (The

5

Notice of Proposed Rulemaking for the regulation was published at 52 Fed. Reg. 28,648 (July 31, 1987).)   This request seeks only documents related to reimbursement by Medicaid of prescription drugs, and not documents relating to other matters covered by the regulation in question.

6.      From 1985 to the present, all documents relating to the decision that Medicare covers prescription drugs provided incident to durable medical equipment, including all documents related to Section 2100.5 of the Medicare Carrier's Manual, and all revisions or modifications thereto.

7.      All documents relating to HCFA/CMS's actual or proposed use of its "inherent reasonableness" authority in connection with Medicare reimbursement of prescription drugs.

<u>Audits, Reviews, Analyses, Reports and Publications</u>

8.      From 1985 to the present, all documents relating to OIG audits and reports regarding reimbursement or payment for prescription drugs by Medicare, Medicaid, the Department of Veterans Affairs or any other federal agency or federal health benefits program, including drafts, work papers, surveys, survey responses, interview summaries, correspondence, notes, and all responses and drafts of responses to OIG audits and reports.

9.      From 1985 to the present, all documents relating to reviews of drug purchase prices by pharmacies in Arkansas, Louisiana, New Mexico, Oklahoma and Texas, performed by HCFA Region VI and referenced in <u>Louisiana v. Department of Health and Human Services</u>, 905 F.2d 877, 882 (5th Cir. 1990).

10.     From 1985 to the present, all documents relating to efforts by HCFA or CMS, Carriers or other Medicare contractors to determine acquisition costs of drugs, including efforts to determine "estimated acquisition cost" pursuant to 42 C.F.R. § 405.517 (1992).

6

11.     All documents relating to a report prepared for CMS by PricewaterhouseCoopers entitled "A Study of Pharmaceutical Benefit Management" (June 2001), and referenced at 67 Fed. Reg. 10,285 (March 6, 2002), including the report, drafts of the report, correspondence relating to the report, and all documents relating to the engagement of PricewaterhouseCoopers to prepare the report.

12.     From 1968 to the present, all documents relating to a report prepared by the Task Force on Prescription Drugs, the Office of the Secretary, United States Department of Health, Education and Welfare, entitled "The Drug Makers and the Drug Distributor" and dated December 1968.

13.     From 1985 to the present, all OIG correspondence with Congress, including Semi-Annual Reports, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

14.     From 1985 to the present, all OIG Red Books and Orange Books relating to Medicare's or Medicaid's method of reimbursement for prescription drugs.

15.     All documents relating to committees or task forces within HHS that review, consider, establish, or alter policies for Medicare reimbursement for prescription drugs, including agendas and minutes of meetings, correspondence, memoranda, lists of members, and notes.

16.     All documents relating to efforts by CMS, HCFA or Carriers to base Medicare reimbursement for prescription drugs on the "least costly alternative" or any standard other than AWP.

17.     All documents relating to efforts by the Department of Justice to consider, calculate, or apply average wholesale prices that differ from the AWPs for the prescription drugs

7

published in pharmaceutical industry pricing compendia, such as the <u>Red Book</u> and <u>First Data</u> <u>Bank</u>.

18.    All documents relating to efforts by CMS, HCFA or Carriers to consider, calculate or apply average wholesale prices that differ from the published AWPs for the prescription drugs.

19.    From 1985 to the present, all documents considering hypothetical, proposed or actual federal legislation concerning Medicare or Medicaid reimbursement for prescription drugs.

20.    To the extent not covered above, from 1985 to the present, all HHS reviews, studies, analyses, audits and reports relating to the fact that AWP commonly exceeds the actual sales price or acquisition cost of a drug.

21.    To the extent not covered above, from 1985 to the present, all HHS reviews, studies, analyses, audits and reports relating to the fact that AWP commonly exceeds the actual average wholesale price of a drug.

Communications with State Government Entities Regarding
AWP or Medicaid Drug Payments

22.    From 1985 to the present, all written communications with any State Medicaid agency regarding Medicaid reimbursement for prescription drugs.

23.    From 1985 to the present, all documents relating to non-written communications, such as meetings or phone conversations, with any State Medicaid agency regarding Medicaid reimbursement for prescription drugs.

24.    From 1985 to the present, all documents relating to CMS, HCFA, or SRS policies, regulations, rules or standards related to Medicaid reimbursement for prescription drugs.

8

25. From 1985 to the present, all written communications with any State Medicaid agency regarding the possibility that CMS or HCFA might disapprove a State Medicaid plan due to the manner in which a proposed or existing State Medicaid program reimburses for prescription drugs.

26. From 1985 to the present, all documents relating to non-written communications, such as meetings or phone conversations, with any State Medicaid agency regarding the possibility that CMS or HCFA might disapprove a State Medicaid plan due to the manner in which a proposed or existing State Medicaid program reimburses for prescription drugs.

<u>Communications with Federal Government Entities or Government Contractors</u>
<u>Regarding AWP or Medicare Drug Reimbursement</u>

27. All written communications with any Carrier, Carrier Advisory Committees, or other Medicare contractor, regarding the method(s) by which Medicare reimburses for prescription drugs.

28. All documents relating to non-written communications, such as meetings or phone conversations, with any Carrier, Carrier Advisory Committees or other Medicare contractor regarding Medicare's method of reimbursement for prescription drugs.

29. All written communications with the Office of Management and Budget regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including the performance of surveys or other actions to determine the estimated acquisition cost of prescription drugs under 42 C.F.R. § 405.517 (1992).

30. All documents relating to non-written communications with the Office of Management and Budget regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including the performance of surveys or other actions to determine the estimated acquisition cost for prescription drugs under 42 C.F.R. § 405.517 (1992).

9

31.    All written communications with Members of Congress, their staff, or any Congressional committees regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

32.    All documents relating to non-written communications, such as meetings or phone conversations, with Members of Congress, their staff, or any Congressional committees regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

33.    All written communications with the Office of Technology Assessment regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

34.    All documents relating to non-written communications, such as meetings or phone conversations, with the Office of Technology Assessment regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

35.    All written communications with the General Accounting Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

36.    All documents relating to non-written communications, such as meetings or phone conversations, with the General Accounting Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

37.    All written communications with the Congressional Budget Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

38.    All documents relating to non-written communications, such as meetings or phone conversations, with the Congressional Budget Office regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

39.    All written communications with the Department of Justice regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

40.    All documents relating to non-written communications, such as meetings or phone conversations, with the Department of Justice regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

41.    All written communications with the Department of Justice regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

42.    All written communications with the Office of the President of the United States regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including all documents related to the Medicare prescription drug provisions of any President's annual proposed budgets and President Clinton's December 13, 1997 radio address to the nation.

43.    All documents relating to non-written communications, such as meetings or phone conversations, with the Office of the President of the United States regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, including all documents related to the Medicare prescription drug provisions of any President's annual proposed budgets and President Clinton's December 13, 1997 radio address to the nation.

44.    To the extent not covered by the above requests, all written communications between HHS or any HHS constituent agency and any state or federal governmental entity outside HHS regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

45.    To the extent not covered by the above requests, all documents relating to non-written communications, such as meetings and phone conversations, between HHS or any HHS constituent agency and any state or federal governmental entity outside HHS regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

<u>Communications with Non-Governmental Entities Regarding</u>
<u>AWP or Medicare or Medicaid Reimbursement of Drugs</u>

11

46.   All written communications with pharmaceutical manufacturers or associations representing or consisting of pharmaceutical manufacturers regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

47.   All documents relating to non-written communications, such as meetings or phone conversations, with pharmaceutical manufacturers or associations representing or consisting of pharmaceutical manufacturers regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

48.   All written communications with publishers of pharmaceutical pricing compendia regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

49.   All documents relating to non-written communications, such as meetings and phone conversations, with publishers of pharmaceutical pricing compendia regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

50.   All written communications with pharmacists, pharmacies, or associations representing or consisting of pharmacies or pharmacists, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

51.   All documents relating to non-written communications such as meetings and phone conversations, with pharmacists, pharmacies, or associations representing or consisting of pharmacies or pharmacists, regarding Medicare's or Medicaid's method of reimbursement for prescription drugs.

52.   All written communications with health care providers, or associations representing or consisting of health care providers, including the American Society of Clinical Oncology and the American Urology Association, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

12

53.    All documents relating to non-written communications, such as meetings or phone conversations, with health care providers, or associations representing or consisting of health care providers, including the American Society of Clinical Oncology, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

54.    All written communications with health care providers regarding agreements between insurers and providers pursuant to which health care providers waive coinsurance or copayment amounts required under Medicare, including agreements between insurers and physicians that require physicians to waive Medicare copayment obligations as a condition of participation in insurance company networks.

55.    All documents relating to non-written communications, such as meetings or phone conversations, with health care providers regarding agreements between insurers and providers pursuant to which health care providers waive coinsurance or copayment amounts required under Medicare, including agreements between insurers and physicians that require physicians to waive Medicare copayment obligations as a condition of participation in insurance company networks.

56.    All written communications with cancer survivors or cancer patients, or associations representing or consisting of such individuals, the National Coalition for Cancer Survivorship, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

57.    All documents relating to non-written communications, such as meetings or phone conversations, with cancer survivors or cancer patients, or associations representing or consisting of such individuals, including the National Coalition for Cancer Survivorship, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

58.     All written communications with private insurers, Carriers, ERISA plan administrators, health maintenance organizations, Blue Cross organizations or other non-governmental third-party payors regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

59.     All documents relating to non-written communications, such as meetings or phone conversations, with private insurers, Carriers, ERISA plan administrators, health maintenance organizations, Blue Cross organizations or other non-governmental third-party payors regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

60.     To the extent not covered above, all written communications with non-governmental entities, including the press, healthcare providers, associations and members of the general public, regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs.

61.     From 1985 to the present, copies of all Freedom of Information Act requests submitted to HHS or any HHS constituent agency seeking documents regarding the method(s) by which Medicare and/or Medicaid reimburse for prescription drugs, all responses thereto, and all documents produced in response to such requests.

<u>HHS Administrative and Judicial Litigation Concerning AWP</u>

62.     From 1985 to the present, all documents relating to Amendment 87-33 to the Louisiana State Medicaid plan. (To facilitate the search for responsive documents, note that HCFA published a Notice of hearing on this matter at 53 Fed. Reg. 29,381 (Aug. 4, 1988).)

63.     From 1985 to the present, all documents relating to <u>In re Disapproval of Louisiana State Plan Amendment No. 87-33</u>, No. 88-11 (HCFA Administrator June 9, 1989), including

14

briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions.

64.     From 1985 to the present, all documents relating to State of Louisiana v. United States Department of Health and Human Services, No. 89-4566, opinion reported at 905 F.2d 877 (5th Cir. 1990), including briefs, exhibits, appendixes, the Administrative Record, all other filings, correspondence, and transcripts of oral argument.

65.     From 1985 to the present, all documents relating to Amendment 88-05 to the Arkansas State Medicaid plan, including all documents relating to administrative proceedings regarding HCFA's decision to disapprove Amendment 88-05 to the Arkansas State Medicaid plan, such as briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions.  (To facilitate the search for responsive documents, note that HCFA published a Notice of hearing on this matter at 53 Fed. Reg. 45,587 (Nov. 10, 1988).)

66.     From 1985 to the present, all documents relating to administrative proceedings regarding HCFA's refusal to pay the federal portion for certain Arkansas Medicaid reimbursement for prescription drugs in 1989, including briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions. (To facilitate the search for responsive documents, note that the HHS Department Appeals Board issued decisions regarding this matter on Aug. 22, 1991 (Decision No. 1273) and Apr. 29, 1992 (Decision No. 1329).)

67.     From 1985 to the present, all documents relating to an amendment to the Oklahoma State Medicaid plan submitted in October 1987, and revised in March 1988, concerning Oklahoma Medicaid reimbursement for prescription drugs.

68.     From 1985 to the present, all documents relating to administrative proceedings regarding HCFA's decision to disapprove Amendment 87-18 to the Oklahoma State Medicaid

15

plan including but not limited to briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions. (To facilitate the search for responsive documents, note that HCFA published a Notice of hearing on this matter at 53 Fed. Reg. 38,979 (Oct. 4, 1988).)

69.     From 1985 to the present, all documents relating to an amendment to the Oklahoma State Medicaid plan submitted in April 1989 concerning Oklahoma Medicaid reimbursement for prescription drugs, including all documents relating to administrative proceedings regarding HCFA's refusal to pay the federal portion for certain Oklahoma Medicaid reimbursement for prescription drugs in 1989, such as briefs and other filings, exhibits, correspondence, hearing and other transcripts, rulings and opinions. (To facilitate the search for responsive documents, note that the HHS Department Appeals Board issued a decision regarding this matter on Aug. 13, 1991 (Decision No. 1271).)

70.     To the extent not requested above, from 1985 to the present, all documents relating to any administrative or judicial proceedings involving actual or threatened action by CMS/HCFA/SRS to disapprove a State Medicaid plan or plan amendment, or to disallow federal financial participation, due to alleged excessive Medicaid reimbursement for prescription drugs.

71.     To the extent not requested above, from 1985 to the present, all documents relating to any administrative or judicial proceedings concerning the appropriateness of AWP as a measure for reimbursement for prescription drugs.

<u>Medicare Reimbursement for Professional Services of Oncologists</u>

72.     Copies of the federal supply schedule for drugs for each year.

73.     All documents relating to setting the Medicare fee schedule payments for professional services for the administration of chemotherapy or other drugs used in connection with treatment of cancer.

16

74.    All documents relating to whether Medicare adequately reimburses oncologists or other doctors for professional services for the administration of chemotherapy or other drugs used in connection with treatment of cancer.

75.    All documents relating to the computation of the practice expense component used or considered for use to derive the Medicare physician fee schedule for the administration of chemotherapy or other drugs used in connection with anticancer chemotherapy treatment.

<u>Home Drug Infusion Therapy and Nebulizer Treatments</u>

76.    All documents relating to whether Medicare adequately reimburses providers for the provision of home drug infusion therapy services, including all documents evidencing that Medicare reimbursement for drugs is the means by which providers of professional services associated with home drug infusion therapy are reimbursed for such services.

77.    All documents relating to whether Medicare adequately reimburses providers for the provision of home nebulizer treatments, including all documents noting that Medicare reimbursement for drugs constitutes the means of reimbursing providers for professional services associated with home nebulizer treatments.

<u>HHS Organizational Documents</u>

78.    All organizational charts for HHS, HHS Central and Regional Offices, HCFA/CMS, OIG and the Public Health Service.

79.    All document retention or destruction policies for HHS, HHS Central and Regional Offices, HCFA/CMS, OIG and the Public Health Service.

80.    Documents sufficient to describe the manner by which electronic documents, including e-mails, are preserved or deleted, for HHS, HHS Central and Regional Offices, HCFA/CMS and OIG.

17

81.    Documents sufficient to identify the name and address of all Medicare Carriers and fiscal intermediaries.

82.    Copies of contracts with Medicare Carriers and fiscal intermediaries.

83.    All documents relating to policies, procedures or practices of HHS, HHS Central and Regional Offices, HCFA/CMS or OIG, regarding the preservation or destruction of documents relating to Medicare's or Medicaid's method of reimbursement for prescription drugs.

84.    Documents sufficient to identify all efforts made by HHS, HHS Central and Regional Offices, HCFA/CMS or OIG to preserve documents relating to Medicare's or Medicaid's method of reimbursement for drugs.

85.    Documents sufficient to identify any document responsive to this subpoena that has been deleted, discarded or destroyed.

86.    Documents sufficient to describe the manner in which HHS electronic documents, including e-mails, are preserved or deleted, discarded or destroyed.

CHI99 4191096-1.023560.0042

18

# EXHIBIT T

Robey 30(b)(6), Victoria HIGHLY CONFIDENTIAL          March 20, 2007
                         Baltimore, MD

Page 1

                    UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS


        -------------------------X

        IN RE: PHARMACEUTICAL      : MDL NO. 1456

        INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION:

        PRICE LITIGATION           : 01-CV-12257-PBS

        THIS DOCUMENT RELATES TO   :

        U.S. ex rel. Ven-A-Care of : Judge Patti B. Saris

        the Florida Keys, Inc. v.  :

        Abbott Laboratories, Inc., : Chief Magistrate

        No. 06-CV-11337-PBS        : Judge Marianne B.

                                   : Bowler

        -------------------------X

                      HIGHLY CONFIDENTIAL

                    Tuesday, March 20, 2007

        The video 30(b)(6) deposition of VICTORIA ROBEY,

        called for oral examination by Counsel for the

        Defendant Abbott Laboratories, Inc., pursuant to

        notice, held in the law offices of Hogan &

        Hartson, 111 South Calvert Street, Baltimore,

        Maryland 21202, beginning at 9:20 a.m., before

126bfa54-4e4e-49ff-85e7-999d676a1331

Robey 30(b)(6), Victoria HIGHLY CONFIDENTIAL                March 20, 2007
Baltimore, MD

Page 74

1   on behalf of all of CMS with respect to this.
2          MR. COOK: Oh, sure.
3          BY MR. COOK:
4      Q   Oh, sure. We're not asking you what
5   you've done to gather documents. I'm not asking
6   for CMS to testify about what you, Vicky Robey,
7   did to preserve the documents.
8          MS. MARTINEZ: No, no. What I mean
9   is that you were not asking -- since this is a
10  30(b)(6) depo, I just want to be clear on the
11  record that that was not the answer on behalf of
12  CMS.
13         BY MR. COOK:
14     Q   Correct. That question and answer,
15  you were testifying as Vicky Robey, not as the
16  designee of the 30(b)(6). I should have made
17  that clear.
18         Back into character, though -- do we
19  have a copy of the complaint?
20         MR. GABEL: The original?
21         MR. COOK: Yes.
22         BY MR. COOK:

Page 75

1      Q   I'd like to show you real quickly --
2   we'll set those aside and come back it -- a copy,
3   I'll mark it as Exhibit Abbott 070.
4              (Exhibit Abbott 070,
5              document entitled Original
6              Complaint, was marked for
7              identification.)
8          MS. MARTINEZ: Could I see it before
9   you --
10         MR. COOK: Oh, absolutely. It is a
11  copy of -- that one is thicker because it is two
12  of them. It is a copy of the original complaint
13  filed by Ven-a-Care. It indicates on the cover
14  sheet that Ven-a-Care put on the document
15  Original Complaint filed on about June 23, 1996.
16  I believe that's incorrect for the record, that
17  it is 1995, inasmuch as the civil case number is
18  a '95 case number.
19         MS. MARTINEZ: Do you have an extra
20  copy that counsel for Ven-a-Care could use?
21         MR. COOK: Absolutely. Absolutely.
22         MS. THOMAS: Thank you.

Page 76

1          MR. COOK: Does anybody else need a
2   copy? I would love to get rid of them so I don't
3   have to carry them back.
4          BY MR. COOK:
5      Q   If you could just take a quick
6   moment, I realize that's a lengthy document but
7   take a look at it and tell me whether you've ever
8   seen that document before?
9          MS. THOMAS: You might want to
10  clarify whether you mean, whether she's ever seen
11  this document that may or may not have had these
12  redactions.
13         MR. COOK: Okay.
14         THE WITNESS: No. I've never seen
15  this before.
16         BY MR. COOK:
17     Q   Either with or without the
18  redactions?
19     A   No.
20     Q   And just for the record, on page 69,
21  it indicates that it was served on June 23 of
22  1995.

Page 77

1          To the best of your knowledge,
2   Ms. Robey, did CMS institute any document
3   preservation instruction in connection with this
4   complaint that was filed on June 23, 1995?
5      A   Not that I'm aware of.
6      Q   Going back to the February 19, 2004
7   memorandum included within Exhibit Abbott 069, are
8   you aware of any subsequent memoranda that were
9   issued relating to the litigation described in
10  this February 19, 2004 memorandum regarding
11  preservation of documents?
12     A   There was one after this in January
13  of 2007, I believe.
14     Q   And what did that one -- again, is
15  that a privileged communication?
16         MS. MARTINEZ: Objection to the
17  extent it calls for privileged communication.
18  You may be able to ask her if she has information
19  from anybody who is a nonlawyer regarding that.
20         BY MR. COOK:
21     Q   Just sticking with the memorandum and
22  then moving on to information from a nonlawyer,

20  (Pages 74 to 77)

126bfa54-4e4e-49ff-85e7-999d676a1331

Robey 30(b)(6), Victoria HIGHLY CONFIDENTIAL          March 20, 2007
                    Baltimore, MD

Page 78

1  do you remember from whom the January 2007
2  memorandum was from?
3      A    It was from our program area -- I'm
4  trying to remember the lady's name, Mary Beth --
5  Mary Beth Jason, I think.  I'm not sure about the
6  last name.
7      Q    Is she an attorney?
8      A    No.
9      Q    Without describing the contents of
10 the memorandum, can you describe generally what
11 the nature of the document was?
12         MS. THOMAS:  Objection.
13         MS. MARTINEZ:  If you would focus
14 your question with respect, if she has any
15 information from a nonlawyer regarding whether or
16 not that document instructed anyone to preserve,
17 you might be able to get an answer that is
18 helpful.
19         BY MR. COOK:
20     Q    Do you have any information from a
21 nonlawyer that would indicate whether that
22 document was intended to preserve documents

Page 79

1  relating to litigation?
2      A    Yes, I do.
3      Q    From whom do you have that
4  information?
5      A    It is from Mary Beth, I think the
6  last name is Jason.
7      Q    She was the author of the memorandum?
8      A    I believe so, yes.
9      Q    Is this a conversation you had with
10 Ms. Jason?
11     A    A conversation as well as a copy of
12 the correspondence.
13     Q    Do you remember when and where this
14 conversation took place, approximately?
15     A    I talked with her yesterday as well
16 as in the past where she contacted me regarding
17 the agency's policy on retention.
18     Q    As best you can recall, what did you
19 say to Ms. Jason, what did she say to you in the
20 earlier conversations?
21     A    I can't remember.
22     Q    Do you remember the nature of the

Page 80

1  conversation?
2      A    It was with regard to preservation --
3  not preservation but what the agency's policy was
4  on retention and the appropriate way to word
5  records management language in notice about
6  preservation.
7      Q    So, she called with a question?
8      A    Yes.
9      Q    And you answered her question?
10     A    Yes.
11     Q    A long conversation?  Short
12 conversation?
13     A    I can't remember.  It was before the
14 holidays.
15     Q    But she called to ask you about how
16 one would go about drafting a document
17 preservation or a hold memorandum?
18     A    She wanted records management
19 language to use.  She didn't -- I did not -- I --
20 I didn't give her content.  I just talked with
21 her and gave her instructions.
22     Q    And what was your understanding about

Page 81

1  why she was asking this question of you?
2      A    Because she was going to be preparing
3  correspondence that was being released about
4  preservation.
5      Q    Do you know why she was going to send
6  out correspondence relating to preservation at
7  that time?
8      A    She did not go into that with me.
9      Q    You say just before the holidays.
10 This would have been December of '96?
11         MS. THOMAS:  Objection.
12         THE WITNESS:  Oh. I'm talking -- no.
13         BY MR. COOK:
14     Q    You said January of 2007.  That's why
15 I had my dates off.  About when was this
16 conversation, I should ask you?
17     A    It was before the holidays in 2006.
18     Q    Okay.  So, before the Christmas
19 holidays of 2006?
20     A    I believe, yes.
21     Q    So, it would have been November,
22 December of 2006?

Henderson Legal Services
(202) 220-4158

126bfa54-4e4e-49ff-85e7-999d676a1331

Robey 30(b)(6), Victoria HIGHLY CONFIDENTIAL          March 20, 2007
                    Baltimore, MD

Page 82

1      A    I can't remember.
2      Q    But within the last five months, six
3   months?
4      A    Maybe.
5      Q    Okay.  I just wanted to make sure I
6   had the right year, that I wasn't off by 12
7   months.
8      A    You just said '96 before that.
9      Q    Right.  So, before the holidays,
10  December of --
11     A    But you said 1996.
12     Q    I'm so old that '96 and 2006 seem
13  like the same year.  I apologize.  I didn't even
14  understand it when you told me I had it wrong.
15  So, 2006.
16     A    Okay.
17     Q    Within the last half a year?
18     A    (Witness nods head.)
19     Q    Is there any way you would figure out
20  when that conversation took place?
21     A    No.
22     Q    As the records management officer for

Page 83

1   the CMS home office had -- let me strike that and
2   step one step back.  Do you know what litigation
3   she was asking in connection with?
4      A    I can't remember.  I get hundreds of
5   calls.
6      Q    The case about which Ms. Jason --
7      A    Mary Beth, I think the last name is
8   Jason.  The first name is Mary Beth.
9      Q    The case about which Mary Beth
10  contacted you before the holidays in 2006, was
11  that a case about which anybody, to your memory,
12  had contacted you before?
13         MS. THOMAS:  Objection.
14         THE WITNESS:  I can't remember.
15         BY MR. COOK:
16     Q    And without revealing any of the
17  substance of it, did a memorandum subsequently
18  come out from Mary Beth?
19     A    Yes.
20     Q    To whom was it addressed?
21     A    I can't remember.
22     Q    Did it describe -- did it relate

Page 84

1   specifically to a particular litigation?
2      A    Yes.
3      Q    Prior to that memorandum being
4   distributed, without revealing the contents of
5   that of that memorandum, had there ever been any
6   prior communications within CMS relating to
7   document preservations in connection to that
8   case?
9         MS. MARTINEZ:  Objection to the
10  extent that she knows.
11         MR. COOK:  Sure.
12         BY MR. COOK:
13     Q    To the extent that you are aware of
14  as the records officer for CMS, had there ever
15  been any prior records preservation directions
16  issued relating to that case that was the subject
17  of Mary Beth's memorandum?
18     A    Yes.
19     Q    When was that?
20     A    Early 2003, late 2004.
21     Q    So, it is your understanding that
22  those two cases were somehow connected?

Page 85

1      A    Yes.
2      Q    The same case or connected?
3      A    I just associated it because of
4   information that was provided in the subject
5   line.
6      Q    Okay.
7      A    I'm not an expert on that.
8      Q    And I understand completely.  Other
9   than the 2003-2004 prior preservation memo, and
10  that's the one we have here at pages 5 through 7,
11  correct -- yes, 5 through 7.
12     A    Yes.
13     Q    Other than that February 19, 2004
14  communication, had there ever, before that, been
15  any preservation instructions issued in
16  connection with that case?
17     A    Not that I'm --
18         MS. THOMAS:  Objection.
19         THE WITNESS:  Not that I'm aware of.
20         THE REPORTER:  Counsel, is this a
21  good time to take a recess?
22         MR. COOK:  I'd be happy to.  Thank

22  (Pages 82 to 85)

126bfa54-4e4e-49ff-85e7-999d676a1331

Robey 30(b)(6), Victoria HIGHLY CONFIDENTIAL          March 20, 2007
                          Baltimore, MD

Page 130

1   destroyed.  So, many years after.
2       Q    So, there's some time limit and the
3   question is whether that time goes back to before
4   1998?
5       A    Yes.
6       Q    When a particular box is subject to a
7   litigation hold, how do you apply that litigation
8   hold to the warehouse?
9           MS. MARTINEZ:  Objection to form.
10  You are assuming that a box from a litigation
11  hold would be in that location.
12          BY MR. COOK:
13      Q    Good point.  Is it possible that a
14  box in your warehouse or a document in your
15  warehouse could be subject to a litigation hold?
16      A    Yes.
17      Q    Has that happened?
18      A    Yes.
19      Q    When it happens, what do you do?
20          MS. MARTINEZ:  Objection to form.
21  When what happens, she does what?
22          BY MR. COOK:

Page 131

1       Q    How do you determine whether a
2   particular box or document in your house is
3   subject to a litigation hold?
4       A    The record owner --
5           MS. THOMAS:  Objection.
6           THE WITNESS:  The record owner
7   notifies me.
8           BY MR. COOK:
9       Q    Do you do -- in the absence of an
10  affirmative communication from the records owner,
11  do you do anything to preserve the document?
12          MS. THOMAS:  Objection.
13          THE WITNESS:  I mean if -- if --
14          BY MR. COOK:
15      Q    Is there any way for you to know, you
16  as the records officer to know that this box is
17  subject to a litigation hold unless the record
18  owner sends you a communication?
19      A    Correct, because I'm not a program --
20  I am not a program area person.  They are the
21  experts.  I'm not.
22      Q    How are those communications made to

Page 132

1   you?
2       A    Verbally, e-mail.
3       Q    Do you keep a record of those
4   communications?
5       A    The e-mails, I would.  Verbal
6   communications, I don't.
7       Q    Once you receive a verbal, e-mail or
8   written communication of this sort, what do you
9   then do?
10      A    I go into my database and I mark that
11  the records are frozen.  Because the way my
12  database is set up, I have to assign a disposal
13  date.  So, I mark it out like ten years from the
14  date that the disposal date originally was.  That
15  way, in ten years, if that -- if it happens to
16  come up and the case is still active or the
17  records are still frozen, then a notice would be
18  generated again to the record owner, telling them
19  it's come time or because of the freeze, can we
20  lift the freeze or do we -- can we dispose of
21  them.
22      Q    In connection with the -- can you

Page 133

1   hand me Exhibit Abbott 069?  I don't remember the
2   date.  In connection with the February 19,
3   2004 record hold memorandum that we looked at
4   before as part of Exhibit Abbott 069, this was the
5   memorandum from Jacquelyn White, if you'll recall
6   --
7       A    Okay.
8       Q    Did you place a hold on any documents
9   in the CMS warehouse?
10      A    No, I did not.
11      Q    In connection with the January 2007
12  memorandum that was issued following your
13  discussion with Mary Beth Jason, did you place a
14  hold on any documents in the CMS warehouse?
15      A    No.
16          MS. MARTINEZ:  I just want to
17  clarify, if you are trying to ask whether she
18  recalls whether any owner sent her any kind of
19  notice like that, is that what you are asking or
20  whether she personally did?
21          MR. COOK:  I am asking whether the
22  records officer placed a hold on any documents.

                              34 (Pages 130 to 133)

126bfa54-4e4e-49ff-85e7-999d676a1331

Robey 30(b)(6), Victoria HIGHLY CONFIDENTIAL                March 20, 2007
Baltimore, MD

Page 134

1        MS. MARTINEZ:  That she recalls.
2        THE WITNESS:  And it would be hard
3   for me to do that because a lot of times in the
4   subject line they give me, there may not be the
5   description that I need to be able to apply
6   something.
7        Q    I may not have been clear.  Following
8   the September 2004 memorandum in Exhibit Abbott
9   069, that's the Jacquelyn White memorandum on
10  February 19, 2004, did you receive any
11  instructions from CMS employees to place holds on
12  documents in the CMS warehouse?
13       A    No.
14       Q    And so is there anybody else that
15  would have input of records holds into the CMS
16  database that you described other than you?
17       A    I have a person who is my backup but
18  that's only -- she only goes into the system to
19  generate accession numbers or to do the disposal
20  process.
21       Q    And so to the best of your knowledge,
22  were any documents in the CMS warehouse held and

Page 135

1   preserved from destruction as a result of the
2   February 19, 2004 memorandum from Jacquelyn
3   White?
4        MS. MARTINEZ:  Objection to form.
5        MS. THOMAS:  Objection.
6        THE WITNESS:  Not that I'm aware of.
7        BY MR. COOK:
8        Q    Would you know whether documents were
9   collected from the CMS warehouse following the
10  February 19, 2004 memorandum from Jacquelyn
11  White?
12       MS. MARTINEZ:  Objection to form.
13       MS. THOMAS:  Objection.
14       THE WITNESS:  When boxes are
15  requested from the warehouse, they don't give me
16  the reason.  They're the record owners.  They
17  need the boxes back to be able to access their
18  information and files.  They don't give me a
19  reason why.
20       BY MR. COOK:
21       Q    So, it could be that boxes were
22  requested from the warehouse as a result of this

Page 136

1   memorandum, sent back to the record owner and you
2   simply facilitated the delivery of the box?
3        A    Correct.
4        Q    Without knowing the reason?
5        A    Yes.
6        Q    Was there an increase in the number
7   of requests following the September 2004 memo, if
8   you recall?
9        A    I don't know.
10       Q    Do you know of any specific requests
11  that actually did relate to the September 2004
12  memorandum and collection effort that followed
13  it?
14       A    No.
15       Q    When someone requests a box back from
16  the warehouse and removes documents from it,
17  sends it back to the warehouse, is any notation
18  made of the fact the documents were removed from
19  the box?
20       MS. MARTINEZ:  Objection to form.
21       THE WITNESS:  If they tell me that
22  they're taking something out, I will then go back

Page 137

1   to my copy of the transmittal sheet or inventory
2   and make a notation.
3        Q    It's always a big if.  So, if policy
4   is followed, there would be a notation on the
5   index that some files were removed before the box
6   was returned to the warehouse?
7        MS. THOMAS:  Objection.
8        THE WITNESS:  Yes.
9        BY MR. COOK:
10       Q    But obviously, people don't always
11  follow policy so there is no way to tell.
12       A    I have no --
13       MS. MARTINEZ:  Objection to form.
14       BY MR. COOK:
15       Q    You didn't independently verify it
16  because you don't go through the box --
17       A    Absolutely --
18       Q    -- to make sure that it matches up to
19  the index?
20       A    No.
21       Q    With respect to the January 2007,
22  just so we're clear, are you aware of any

35 (Pages 134 to 137)

126bfa54-4e4e-49ff-85e7-999d676a1331

Robey 30(b)(6), Victoria HIGHLY CONFIDENTIAL          March 20, 2007
Baltimore, MD

Page 138

1  litigation hold being placed on any boxes in the
2  warehouse as a result of the January 2007 memo
3  from Mary Beth Jason?
4      A    No.
5      Q    Are any boxes in the warehouse
6  currently subject to a litigation hold?
7          MS. THOMAS:  Objection.
8          THE WITNESS:  Yes, MSP.
9          BY MR. COOK:
10     Q    Other than MSP, are there any
11 litigation holds currently in place in the
12 warehouse?
13         MS. THOMAS:  Objection.
14         THE WITNESS:  There may be.  I won't
15 -- don't know without looking at my records.
16         BY MR. COOK:
17     Q    But not that you remember right now?
18     A    No.
19     Q    I'd like to turn to the Federal
20 Records Center.
21     A    Okay.
22     Q    What is the manual process of sending

Page 139

1  records to the Federal Records Center?
2      A    The record owner has eligible records
3  in accordance with the record schedule that they
4  want to send to storage that are no longer active
5  files.  They request the storage boxes from me.
6  I provide them the boxes.  They box up their
7  files.  They do an inventory of what is in each
8  box.  They prepare a record transmittal receipt
9  for that to me electronically.  I send that to
10 the Records Center for approval.
11         Once they send back an approved copy
12 of the transmittal sheet, I put that in box
13 number one and then the records are sent to the
14 Federal Records Center.
15     Q    What information is sent to the
16 Federal Records Center along with the physical
17 box of documents?
18     A    The records transmittal receipt which
19 provides contact information, who the record
20 owner is, our agency information, the accession
21 number, the number of boxes that are being sent,
22 a description, the disposition authority, as well

Page 140

1  as the disposal date and then attached to that is
2  the box inventory.
3      Q    If that box -- if you or someone at
4  CMS want to retrieve that box, how would you go
5  about doing it?
6      A    Electronically, I am hooked into a
7  server where I can order the boxes.  They process
8  it within 24 hours, and the Records Center
9  receives the request, pulls the box, and then
10 ships it to me.
11     Q    Are you -- do you have access to a
12 record of all boxes sent to the Federal Records
13 Center by CMS and all boxes retrieved from the
14 Federal Records Center at CMS?
15     A    I have -- not retrieved.  I have a
16 record of everything that is at the Federal
17 Records Center.  I'm sorry.  I'm wrong.  I have
18 my -- I keep an internal log of records that have
19 been requested from the Records Center and then
20 returned.
21     Q    Okay.  So, you have your own traffic
22 log of what went out, what came back, what went

Page 141

1  back?
2      A    Yes.
3      Q    And similar to -- step back a
4  minute -- the warehouse, do you keep a similar
5  log of retrieval requests and returns for the CMS
6  warehouse?
7      A    It's maintained in the database.
8      Q    It is?  Okay.  So, if I have a line
9  with accession box number one from Louie Gabel,
10 disposition date, given to me on stuff and such a
11 date, retrieved on another date and returned back
12 to me on the following date?
13     A    That information is available but
14 it's not in one report.  You would have to go
15 into several different screens to get it.
16     Q    Okay.  At the Federal Records Center,
17 do you know if the Federal Records Center keeps
18 also a log of comings and goings of the boxes for
19 which it maintains custody?
20     A    I don't know.
21     Q    Do you have any way of knowing what
22 happens to a box at the Federal Records Center

36 (Pages 138 to 141)

126bfa54-4e4e-49ff-85e7-999d676a1331

# EXHIBIT U

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF CHAIN DRUG STORES *et al.* | ) ) ) |
|           Plaintiffs, | ) |
| | )    Civil Action No. 1:07cv02017 (RCL) |
|     v. | ) |
| | ) |
| MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES *et al.*, | ) ) |
| | ) |
|           Defendants. | ) |

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY**
**INJUNCTION AND REQUEST FOR EXPEDITED HEARING**

---

their AMP data pursuant to that former system, by requiring CMS to publish AMPs calculated in an

inconsistent manner, and by requiring CMS to calculate and apply federal payment limits using these

unreliable data.  These harms substantially outweigh the harms Plaintiffs have asserted, which are

undermined in any event by their own unreasonable delay.

 For these reasons, this Court should deny Plaintiffs' request for a preliminary injunction.

**<u>BACKGROUND</u>**

**I. THE MEDICAID PAYMENT FRAMEWORK PRIOR TO THE DEFICIT
REDUCTION ACT OF 2005**

 Established by the Social Security Act of 1965, Medicaid is a federal/state cooperative program

designed to furnish medical assistance to persons "whose income and resources are insufficient to meet

the costs of necessary medical services."  42 U.S.C. § 1396.  The program is administered by the states

but jointly financed by the federal and state governments.  *See id.*  Each state is required to establish a

medical assistance plan (known as the "State Plan") that is approved by CMS and which describes,

*inter alia*, eligibility standards, the scope of benefits, and payment methodologies of that state's

Medicaid program.  *Id.* § 1396a(a).  CMS reviews the various State Plans and subsequent plan

amendments to ensure compliance with federal requirements.  *See id.* §§ 1396a(b), 1396c.  For

example, the states' payment levels must be "sufficient to enlist enough providers so that care and

services are available under the plan at least to the extent that such care and services are available to the

general population in the geographic area."  *Id.* § 1396a(a)(30)(A).  States – not the federal government

– set the rate at which they pay pharmacies and other healthcare providers for Medicaid-covered

products and services, and the federal government provides federal financial participation (FFP) to

states to cover a portion of those costs.  *Id.* § 1396b.

 Most states currently pay pharmacies for prescription drugs at the lower of estimated

acquisition cost (EAC) plus a dispensing fee or the pharmacy's usual and customary charge to the

will do so with full knowledge of the criteria that, at CMS's direction, manufacturers now use to compute those AMPs.

Finally, and perhaps most importantly, Plaintiffs argue that they will be harmed monetarily by the implementation of the AMP rule. *See* Pls.' PI Memo. at 38-40. If Plaintiffs are correct, however, the additional money afforded them with this preliminary injunction will come at the expense of the Medicaid program itself. The injunction would simply reallocate money from the Medicaid program to Plaintiffs, and the Medicaid program will be equally unable to recover its costs. States have long been confronting budget crises leading them to consider cutbacks in their Medicaid programs. *See, e.g.*, *Pharm. Research & Mfrs. Ass'n of Am. v. Thompson*, 259 F. Supp. 2d 39, 84 (D.D.C. 2003) ("Michigan . . . is facing a budget crisis and possible cut-backs in its budget for Medicaid and other health care services."); *see also* H.R. Rep. No. 109-276 (Nov. 7, 2005) ("Unreformed, analysts predict Medicaid will bankrupt every state in as little as 20 years absorbing 80 [to] 100% of all state dollars."). If this injunction saves Plaintiffs substantial sums of money, as they claim, it would do so at the expense of an already-struggling Medicaid system and, ultimately, its beneficiaries.

Because Plaintiffs assert only monetary harm, because the taxpaying public would suffer at least the same harm, and because Medicaid beneficiaries could suffer an even greater harm, the balance of harms tips decidedly against Plaintiffs.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

SHEILA M. LIEBER

45

Deputy Director
Federal Programs Branch

s/ Wendy M. Ertmer
WENDY M. ERTMER
DC Bar No. 490228
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.ertmer@usdoj.gov

*Counsel for Defendants*

Dated:  December 6, 2007

# EXHIBIT V

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY   )

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

-------------------------------)

United States of America ex rel.) MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    ) Civil Action

Inc., Civil Action No. 06-      ) No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of   ) Honorable

the Florida Keys, Inc., v. Dey, ) Patti B. Saris

Inc., et al., Civil Action No.  )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care   )

of the Florida Keys, Inc., v.   )

Boehringer Ingelheim Corp., et  )

al., Civil Action No. 07-10248- )

PBS                             )

-------------------------------x

7ce5a780-185e-426a-a9ae-dc7b0f28408e

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

---

Page 2

```
1                 December 10, 2008
2                   Volume I
3          VIDEOTAPED DEPOSITION OF SUZETTE BRIDGES
4    Taken on behalf of the Plaintiff, produced, sworn,
5    and examined on the 10th day of December, 2008,
6    between the hours of nine o'clock in the forenoon
7    and six o'clock in the evening of that day, at the
8    offices of United States Attorneys' Office, 425 West
9    Capitol, Suite 500, Metropolitan Building, Little
10   Rock, Arkansas, before BRENDA ORSBORN, a Certified
11   Court Reporter within and for the State of Missouri,
12   in a certain cause now pending before the United
13   States District Court, District of Massachusetts,
14   In re: Pharmaceutical Industry Average Wholesale
15   Price litigation.
16
17
18
19
20
21
22
```

Page 3

```
1           I N D E X   O F   E X A M I N A T I O N
2                          Page
3    Questions by Ms. Oberembt ....................  9
4    Questions by Mr. Reale .......................  81
5
6              I N D E X   O F   E X H I B I T S
7    Exhibit Bridges 001 (Notice of Deposition)     12
8    Exhibit Bridges 002 (Federal Register)       29
9    Exhibit Bridges 003 (Draft)          31
10   Exhibit Bridges 004 ARK0004141           37
11   Exhibit Bridges 005 HHC092-0726          38
12   Exhibit Bridges 006 ARK00003540 to 5026      41
13   Exhibit Bridges 007 ARK00003068 to 3081      45
14   Exhibit Bridges 008 ARK00002640 to 2646      47
15   Exhibit Bridges 009 ARK00002783 to 3313      48
16   Exhibit Bridges 010 ARK00003057 to 3067      53
17   Exhibit Bridges 011 ARK00002742 to 2770      54
18   Exhibit Bridges 012 ARK00000087 to 0132      55
19   Exhibit Bridges 013 ARK00000117 to 0147      58
20   Exhibit Bridges 014 ARK00002151 to 2187      60
21   Exhibit Bridges 015 ARK00000788 to 0783      61
22   Exhibit Roxane 001 Amended Notice of Deposition 84
```

Page 4

```
1         EXHIBITS CONTINUED:              PAGE
2    Exhibit Roxane 002 Federal Register          129
3    Exhibit Roxane 003 Code of Federal Regulations 129
4    Exhibit Roxane 004 DHS Document              151
5    Exhibit Roxane 005 HHC0190087                160
6    Exhibit Roxane 006 HHC9020486                162
7    Exhibit Roxane 007 HHC)100997                165
8    Exhibit Roxane 008 HHD1860650 to 0663        168
9    Exhibit Roxane 009 HHD0210076 to 0114        191
10   Exhibit Roxane 010 ARK00007310 to 7436       205
11   Exhibit Roxane 011 ARK00007688 to 7806       233
12   Exhibit Roxane 012 (Memorandum)              235
13   Exhibit Roxane 013 AWP-IL-00010143           269
14   Exhibit Roxane 014 (Survey)                  275
15   Exhibit Roxane 015 ARK00006870 to 6932       292
16   Exhibit Roxane 016 ARK00006933 to 6993       294
17
18
19
20
21
22
```

Page 5

```
1             A P P E A R A N C E S
2    For the United States:
3    Ms. Laurie A. Oberembt
4    U.S. Department of Justice
5    Commercial Litigation Fraud
6    P.O. Box 261
7    Ben Franklin Station
8    Washington, D.C. 20044
9    (202)514-3345
10   Laurie.oberembt@usdoj.gov
11
12   For the Witness and Arkansas Department
13   of Human Services:
14   Ms. Carmen Mosley-Sims
15   Arkansas Department of Human Services
16   700 Main Street, Slot S-260
17   Little Rock, Arkansas 72203
18   (501)602-1366
19   Carmen.mosley-sims@arkansas.gov
20
21
22
```

2 (Pages 2 to 5)

7ce5a780-185e-426a-a9ae-dc7b0f28408e

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

| Page 286 |
|---|
| 1  referring -- what I'm trying to understand from |
| 2  this, if they're referring strictly to brand, |
| 3  generic or both.  Can we tell?  I mean ,it's what |
| 4  the -- the statement says. |
| 5      Q.  Well, for some drugs that were subject |
| 6  to a MAC Myers and Stauffer found that they were |
| 7  acquired at rates of AWP minus 90 percent? |
| 8          MS. OBEREMBT:  Objection. |
| 9      A.  I'm not following you.  I'm sorry. |
| 10     Q.  (By Mr. Reale)  Okay. |
| 11     A.  I'm just not following you at all. |
| 12     Q.  Let me break up my question a little |
| 13  bit. The last -- second to last sentence in this |
| 14  paragraph states, "The acquisition cost of drugs |
| 15  purchased direct as a percent of AWP ranged from |
| 16  80 to 84.6 percent for non-MAC drugs and 9.5 |
| 17  percent to 80 percent for MAC drugs."  Do you see |
| 18  that language? |
| 19     A.  I see that language. |
| 20     Q.  Now, Myers and Stauffer is reporting |
| 21  that for some MAC drugs, pharmacies would acquire |
| 22  them at rates of AWP minus 90 percent; isn't that |

| Page 287 |
|---|
| 1  correct? |
| 2      A.  Based on the 9.5 percent? |
| 3      Q.  Yes. |
| 4      A.  How do I answer this? |
| 5      Q.  Yes or no. |
| 6      A.  They -- well, 9.5 to 80 percent, but |
| 7  what my -- what you're not -- what's not being |
| 8  stated, they're not saying where our MAC fit in |
| 9  there, because you had asked me earlier what |
| 10  percent was our MAC off of AWP, and I have no |
| 11  idea. So they're just -- that's just a statement |
| 12  saying that that can occur. It's not -- |
| 13     Q.  Right.  And the statement that it can |
| 14  occur is that some drugs can be purchased by |
| 15  pharmacies at rates of AWP minus 90 percent; |
| 16  that's correct? |
| 17     A.  That's a true statement. |
| 18     Q.  And that was information that was |
| 19  provided by Myers and Stauffer to Arkansas |
| 20  Medicaid?  Yes? |
| 21     A.  Anywhere from 9.5 to off -- 80 percent |
| 22  off of AWP. |

| Page 288 |
|---|
| 1      Q.  If you would, could you turn to Exhibit |
| 2  22, which is entitled "Drugs Included in the |
| 3  Estimated Acquisition Cost Study"? |
| 4      A.  Sure. |
| 5      Q.  And it looks like this. |
| 6      A.  Okay.  Got it. |
| 7      Q.  Now, I want you please to turn to the |
| 8  third page within Exhibit 22.  And it begins with |
| 9  Effexor, if I'm saying that right, at the top? |
| 10     A.  Close. |
| 11     Q.  How do you pronounce that? |
| 12     A.  Effexor. |
| 13     Q.  Effexor.  Do you see about a quarter of |
| 14  the way down there's a reference to the |
| 15  Furosemide 40-milligram tablet? |
| 16     A.  I see it listed, yes. |
| 17     Q.  And the NDC number for this drug is |
| 18  00054429931.  Do you see that? |
| 19     A.  I do. |
| 20     Q.  Do you know if Furosemide 40-milligram |
| 21  tablet is subject to a State MAC or FUL? |
| 22     A.  I assume it is.  I don't really know |

| Page 289 |
|---|
| 1  for a fact.  I'd have to have the list in front |
| 2  of me to answer it completely accurately. |
| 3      Q.  But the Furosemide 40-milligram tablet |
| 4  with the NDC number I just referenced was one of |
| 5  the drugs included in the estimated acquisition |
| 6  cost study, correct? |
| 7      A.  According to what Myers and Stauffer |
| 8  put here, yes. |
| 9      Q.  Now, turn, if you would for me, to |
| 10  Exhibit 26, Page 1.  This is entitled "Arkansas |
| 11  Pharmacies' Totals and Means for Non-MAC Drugs |
| 12  Acquisition Cost As a Percent of AWP".  Do you |
| 13  understand what that means, acquisition cost as a |
| 14  percent of AWP? |
| 15     A.  I understand acquisition cost is a |
| 16  percent of AWP.  But not being a statistical or |
| 17  an analytical person, the mean and the medians |
| 18  are not things that are real clear to me, so I |
| 19  understand what acquisition cost as a percent of |
| 20  AWP means. |
| 21     Q.  So if we look at provider vendor number |
| 22  in the left column -- |

73 (Pages 286 to 289)

7ce5a780-185e-426a-a9ae-dc7b0f28408e

30 (b)(6) Arkansas Dept of HS - Vol. II                    December 11, 2008

# Little Rock, A

Page 336

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE         )

LITIGATION                      )

-------------------------------)

United States of America ex rel.) MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    ) Civil Action

Inc., Civil Action No. 06-      ) No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of   ) Honorable

the Florida Keys, Inc., v. Dey, ) Patti B. Saris

Inc., et al., Civil Action No.  )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care   )

of the Florida Keys, Inc., v.   )

Boehringer Ingelheim Corp., et  )

al., Civil Action No. 07-10248- )

PBS                             )

-------------------------------x

06db8d46-1900-438e-b5fa-9bac07802652

30 (b)(6) Arkansas Dept of HS - Vol. II                    December 11, 2008
Little Rock, A

Page 337

1        December 11, 2008
2            Volume II
3     VIDEOTAPED DEPOSITION OF SUZETTE BRIDGES,
4  produced, sworn, and examined on the 11th day of
5  December, 2008, between the hours of nine o'clock
6  in the forenoon and six o'clock in the evening of
7  that day, at the offices of United States Attorneys'
8  Office, 425 West Capitol, Suite 500, Metropolitan
9  Building, Little Rock, Arkansas, before BRENDA
10 ORSBORN, a Certified Court Reporter within and for
11 the State of Missouri, in a certain cause now
12 pending before the United States District Court,
13 District of Massachusetts, In re: Pharmaceutical
14 Industry Average Wholesale Price litigation.
15
16
17
18
19
20
21
22

Page 338

1     I N D E X   O F   E X A M I N A T I O N
2
3                           Page
4  Continued Questions by Mr. Reale .............. 345
5  Questions by Mr. Berlin ...................... 465
6  Questions by Ms. Mangiardi ................... 531
7
8       I N D E X   O F   E X H I B I T S
9  Exhibit Roxane 017, HHD014-0764 to 0782        345
10 Exhibit Roxane 018  (Cover Letter)             345
11 Exhibit Roxane 019  HHC902-1091          353
12 Exhibit Roxane 020  HHC011-2260 to 2268    359
13 Exhibit Roxane 021  HHD006-0231 to 0235    367
14 Exhibit Roxane 022  HHD127-0119 to 0123    371
15 Exhibit Roxane 023  HHC011-2189 to 2190    378
16 Exhibit Roxane 024  HHC010-1007 to 1008    380
17 Exhibit Roxane 025  HHD084-0411 to 1006    383
18 Exhibit Roxane 026  HHC010-0969 to 0970    387
19 Exhibit Roxane 027  HHC010-0956          390
20 Exhibit Roxane 028  HHC010-0775 to 0776    391
21 Exhibit Roxane 029  HHC902-0711 to 0713    396
22 Exhibit Roxane 030  HHC010-0868          402

Page 339

1  INDEX CONTINUED:                    PAGE
2  Exhibit Roxane 031  HHC010-0857 to 0860      405
3  Exhibit Roxane 032  HHC010-0849 to 0852      410
4  Exhibit Roxane 033  HHC010-0842 to 0843      415
5  Exhibit Roxane 034  HHC010-0802 to 0807      417
6  Exhibit Roxane 035  HHC010-0798 to 0807      418
7  Exhibit Roxane 036  ARK00003068 to 3071      419
8  Exhibit Roxane 037  ARK00003245 to 3247      421
9  Exhibit Roxane 038  ARK00003267 to 3272      423
10 Exhibit Roxane 039  ARK00002256 to 2264      424
11 Exhibit Roxane 040  HHC014-0232 to 0235      428
12 Exhibit Roxane 041  ARK00000054 to 0055      430
13 Exhibit Roxane 042  ARK00000140 to 0146      431
14 Exhibit Roxane 043  ARK00000133          432
15 Exhibit Roxane 044  ARK00006568 to 6585      435
16 Exhibit Roxane 045  ARK00006586 to 6632      437
17 Exhibit Roxane 046  ARK00006495 to 6502      440
18 Exhibit Roxane 047  ARK00006504 to 6519      440
19 Exhibit Roxane 048  VACMDL75947 to 75951      446
20 Exhibit Roxane 049  VACMDL74706 to 74720      446
21 Exhibit Abbott-ARK 001 (Subpoena)          465
22 Exhibit Abbott-ARK 002 HHC024-0672 to 0674      503

Page 340

1  INDEX CONTINUED:                    PAGE
2  Exhibit Abbott-ARK 003 ARK00000115 to 0118      511
3  Exhibit Abbott-ARK 004 HHC013-0554 to 0555      516
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

06db8d46-1900-438e-b5fa-9bac07802652

30 (b)(6) Arkansas Dept of HS - Vol. II                    December 11, 2008
Little Rock, A

Page 357

1    OIG's 1984 report that discussed the acquisition
2    cost of pharmacies in Arkansas.  Do you recall
3    that?
4        A.  I recall looking at a lot of documents
5    yesterday.  I can't say that I specifically
6    remember that particular one, but I know we
7    looked at a lot of documents referring to
8    acquisition costs yesterday.
9        Q.  Well, just so that you don't have to
10   take my word for it, let's pull that out so you
11   can see what I'm referring to.  This was -- I
12   believe was Roxane Exhibit 9.  Is that the
13   number you have?
14       A.  Yes.
15       Q.  Right.  And we examined Roxane Exhibit
16   9 yesterday --
17       A.  Okay.  We did.
18       Q.  -- which was the report that talked
19   about the acquisition costs of pharmacies in
20   Arkansas, among other states, do you recall that?
21       A.  I do.
22       Q.  And we looked at the various ranges of

Page 358

1    acquisition costs for pharmacies in Arkansas on
2    Page 9.
3        A.  Uh-huh.  Correct.
4        Q.  So now back to Roxane Exhibit 19.
5    This letter in March of 1988, the -- HCFA's
6    regional office states that the average
7    difference between AWP and what pharmacists
8    generally paid in Arkansas and Texas was 12.53
9    percent below AWP.  Do you agree that this
10   document reflects that?
11       A.  Generally, it was 12.53, not on all
12   drugs. I will agree that the document says that.
13       Q.  And, in fact, that the document says
14   that the survey performed by Dallas regional
15   office excluded antibiotic drugs, generic drugs
16   and drugs that were purchased directly from the
17   manufacturer?
18       A.  So this would be strictly for brand
19   name drugs.  This would not include any generics.
20       Q.  And based on what we've seen, you would
21   expect that the discounts available for
22   pharmacies, when purchasing generic drugs, are

Page 359

1    typically greater than the discounts when
2    purchasing branded drug?
3            MS. OBEREMBT:  Objection.
4        A.  I can only make that assumption based
5    on the survey findings.  The survey findings
6    generally show that -- and I'd have to look at
7    the survey again, that the variance on brand is
8    not as great on the variance on generics.  I
9    mean, that's common knowledge.  I'd guess you'd
10   say.
11           MR. REALE:  Let me mark the next one.
12       A.  A common assumption.  Excuse me.  Let
13   me rephrase that.
14           [Marked Exhibit Roxane 020]
15       Q.  (By Mr. Reale) Roxane Exhibit 20 has
16   just been passed out.  This is Bates Page
17   HHC011-2260 to 2268.  And this is a letter from
18   the Arkansas Department of Human Services, and it
19   appears to be dated June 22nd, 1988, and it's
20   from Kenny Whitlock, Director at DHS, to Don
21   Hearn at HCFA in the regional office at Dallas,
22   Texas.  This was another document, Ms. Bridges,

Page 360

1    that was produced to us by the Federal Government
2    in this lawsuit.  And if you look at the first
3    paragraph of this letter, it's a response from
4    Arkansas to concerns raised by HCFA.  Do you
5    agree with that?
6        A.  It's a clarification or a modification,
7    according to this.
8        Q.  And it has been your experience, hasn't
9    it, that when Arkansas has submitted Plan
10   Amendments to CMS, from time to time they may ask
11   for additional information from the State, either
12   to support certain aspects of the Plan Amendment
13   or for other aspects.
14       A.  For a State Plan Amendment, they can
15   request additional information.  Is this in
16   reference to a State Plan Amendment?  I don't
17   know the -- I mean, I don't know if this is in
18   reference to a State Plan Amendment.  Let me
19   rephrase that.
20       Q.  Now, if you would turn to the second
21   page of the cover letter, or excuse me, of the
22   letter.  And at the top, there's something that

7 (Pages 357 to 360)

# EXHIBIT W

Gorospe, James Kevin                           March 19, 2008
                    Sacramento, CA

Page 1

                  UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

IN RE:  PHARMACEUTICAL          ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      ) CIVIL ACTION:

PRICE LITIGATION                ) 01-CV-12257-PBS

----------------------------X

THIS DOCUMENT RELATES TO:       ) Judge Patti B. Saris

U.S. ex rel. Ven-A-Care of      )

the Florida Keys, Inc. v.       ) Magistrate Judge

Abbott Laboratories, Inc.,      ) Marianne B. Bowler

et al.                          )

Case No. 06-CV-11337-PBS        )

----------------------------X

                       --oOo--

             WEDNESDAY, MARCH 19, 2008

                       --oOo--

             VIDEOTAPED DEPOSITION OF

                JAMES KEVIN GOROSPE

Reported By:  JOANIE MURAKAMI, CSR No. 5199

              Registered Merit Reporter

              Certified Realtime Reporter

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                    March 19, 2008
Sacramento, CA

Page 210

1  issues; is that fair?
2      A.  That's fair.
3      Q.  Did you -- so I take it you recall
4  reading this report when you took your first
5  position in DHS?
6      A.  That's correct.
7      Q.  And this report, it's titled Report by
8  the Auditor General of California.  How Medi-Cal
9  and Other Healthcare Providers Manage Their
10 Pharmaceutical Expenditures, and it's dated
11 August 1991 in the lower right-hand corner of the
12 first page.
13     A.  Uh-huh.
14     Q.  This document, obviously, if you read
15 it at DHS, it was sent to DHS at some point,
16 correct?
17     A.  That is correct.
18     Q.  And if you go to the last two pages of
19 the document, 71223 and 24, there's a letter from
20 a woman named Molly Joel Coye, who's the director
21 of DHS, to a gentleman named Kurt R. Sjoberg, S-
22 J-O-B-E-R-G, dated August 22, 1991.

Page 211

1      Do you see that letter?
2      A.  Yes.
3      Q.  And reading this letter, Ms. Coye
4  indicates that secretary Gould asked her to
5  respond to the August 1991 draft report that
6  appears earlier in the exhibit, correct?
7      A.  That is correct.
8      Q.  Okay.  If you could look at page seven
9  for me.  It's Bate Stamped 71171.  There's a
10 section there called Utilization and Price
11 Controls.
12     A.  I see it.
13     Q.  And that paragraph, it refers to two
14 United States Senate reports.
15     Do you see that?  One is titled
16 Skyrocketing Prescription Drug Prices:  Turning a
17 Bad Deal into a Fair Deal dated January of '90,
18 and then about halfway down the paragraph, it
19 refers to an August 1989 report, which we've
20 already looked at today, titled Prescription Drug
21 Prices:  Are We Getting Our Money's Worth.
22     Do you see that?

Page 212

1      A.  Yes, I do.
2      Q.  In reference to the first report, the
3  January 1990 report, the California Auditor
4  General is noting that the United States Senate
5  report in January of 1990 concluded that federal
6  and state governments pay higher prescription
7  drug prices through their Medicaid programs than
8  any other major purchasers of prescription drugs,
9  correct?
10     A.  That's the statement made.
11     Q.  And then in reference to the August
12 1989 report, which we've already looked at today,
13 the California Auditor General, again, is noting,
14 in 1991, that the earlier Senate report -- let me
15 start over.
16     This document refers to the August 1989
17 report from the US Senate which reported that
18 organizations, such as the Department of Veterans
19 Affairs, hospitals and HMOs, are negotiating
20 prices directly with manufacturers at discounts
21 of 41 to 99 percent off the published average
22 wholesale price, correct?

Page 213

1      A.  That's what it says, yes.
2      Q.  So DHS knew, no later than August of
3  1991, that certain pharmaceutical purchasers
4  received discounts of up to -- from anywhere from
5  41 to 99 percent off of the published AWP,
6  correct?
7      MR. PAUL:  Objection.  Form.  No
8  foundation to DHS.
9      MR. GOBENA:  Same objection.
10     THE WITNESS:  I would assume anybody
11 that read the report would have read this
12 passage.
13 BY MR. COLE:
14     Q.  Anyone who would read the report
15 would have learned this information at that time,
16 correct?
17     A.  That is correct.
18     Q.  And is it your understanding, based on
19 your experience at Medi-Cal, that if a draft
20 report by the Auditor General was sent to a
21 particular department, such as DHS, that people
22 in DHS would read it and learn the information

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                          March 19, 2008
                    Sacramento, CA

Page 214

1  contained in it?
2        MR. PAUL: Objection. Form. No
3  foundation.
4        MR. GOBENA:  Same objections.
5        THE WITNESS:  That is correct.
6  BY MR. COLE:
7    Q.  Okay.  In your time at Medi-Cal, if a
8  report was sent to the pharmacy policy unit, you
9  would have read it and considered the information
10 contained in it, correct?
11   A.  That is correct.
12   Q.  Dr. Gorospe, if you could turn to Page
13 31 in this document.  It's Bate Stamped 71195.
14 And just so you have a little bit of a frame of
15 reference, you might want to look back at the
16 prior two pages.
17       Table four, that appears on Page 31, is
18 part of a section called Variation in Amounts
19 Pharmacies Bill and are Reimbursed, and that
20 section starts on Page 29.
21       And if you look at the second
22 paragraph, it says:  We surveyed six pharmacists

Page 215

1  who obtained the amount their pharmacy would
2  charge Medi-Cal for a sample of six multiple
3  source prescription drugs, and multiple source is
4  another word for generic drugs; is that fair?
5    A.  That is correct.
6    Q.  Goes on to say:  We then compared the
7  amounts that these pharmacies would charge to
8  Medi-Cal with the amounts for Medi-Cal
9  reimbursement limits to determine whether a
10 significant difference existed between the amount
11 that the pharmacies would have billed and the
12 amount that Medi-Cal would have reimbursed.
13 Table 3 shows the variation in pharmacy charges
14 to Medi-Cal, by drug and manufacturer, for each
15 of the six pharmacies in our sample.  In
16 addition, the table reflects the difference in
17 Medi-Cal reimbursement limits.
18       So looking at Table 3 -- and I'm going
19 to focus on the tail end of Table 3, which is on
20 Page 31, and it appears to me -- and you can
21 correct me if you disagree -- that this table is
22 showing different estimated acquisition costs for

Page 216

1  one generic product that six different pharmacies
2  bought from various manufacturers; is that right?
3        Take your time if you want to study it
4  for a while.  It certainly took me a long time.
5    A.  Under the heading of estimated
6  acquisition costs, yes, it shows --
7    Q.  It has different columns?
8    A.  Different columns and different prices.
9    Q.  And the columns are -- well, at least
10 the last four columns are components, or at one
11 time, components of the reimbursement formula in
12 California, right?
13   A.  That's correct.
14       MR. PAUL: Objection. Form. No
15 foundation, if I can get that in before he
16 answered.
17       MR. COLE:  Sure.
18   Q.  You see this first column after the
19 manufacturer column, it says "amount pharmacy
20 would have charged Medi-Cal"?
21   A.  Yes, I see that.
22   Q.  Do you know what that means?

Page 217

1    A.  No, I do not.
2    Q.  Looking at this document, and based on
3  your experience as a pharmacist, would you agree
4  with me that the acquisition cost for these
5  pharmacies likely would have been something less
6  than the amount listed in that column?
7        When I say "that column," I mean
8  "amount pharmacy would have charged Medi-Cal."
9        MR. PAUL: Objection. Form.
10       MR. GOBENA:  Same objection.
11 Speculation.
12       THE WITNESS:  Based on my knowledge as
13 a pharmacist and based on the sub-note listed in
14 the chart that says that column includes a
15 dispensing fee, one could conclude that the price
16 for the drug was less than that price listed
17 there.
18 BY MR. COLE:
19   Q.  The acquisition cost was less than that
20 price listed?
21   A.  You could conclude that, yes.
22   Q.  Okay.  And again, I know that you

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                                    March 19, 2008
                          Sacramento, CA

| | |
|---|---|
| Page 218 | Page 220 |

Page 218

1  didn't prepare this report and you weren't even
2  working for Medi-Cal --
3      A.  Right.
4      Q.  -- at the time it was written.
5          In your experience, a pharmacy would
6  charge Medi-Cal -- start over.
7          In your experience, a pharmacy would
8  not charge Medi-Cal less than what the pharmacy
9  paid to acquire the drug; is that fair?
10         MR. ZLOTNICK:  Object to the form.
11         MR. GOBENA:  I'll join in the
12  objection.
13         THE WITNESS:  Yes, that's accurate.
14  BY MR. COLE:
15     Q.  And looking at this column, Amount
16  Pharmacy Would Have Charged Medi-Cal, as you
17  noted, there's a footnote or a sub-note --
18  whatever you want to call it -- that says it
19  includes a dispensing fee.
20         And if you were to back the dispensing
21  fee out of this column -- and again, the
22  dispensing fee around this time was approximately

Page 219

1  $4, or Footnote B says $4.05; do you see that?
2      A.  I see that.
3      Q.  If you back that $4.05 out of -- let's
4  look at Pharmacy B in this section.
5          If you back the $4 -- if you subtract
6  the $4.05 from the $5.70 that's listed there, you
7  get approximately 1.65.  $1.65, if my math is
8  right; is that fair?
9      A.  That makes the assumption that the
10  dispensing fee being charged -- that the pharmacy
11  is charging under that price was $4.05.
12     Q.  Correct.  Assuming that --
13     A.  I can't make that assumption based on
14  the information provided here.
15     Q.  I agree with you.  It doesn't say $4.05
16  in Footnote A, but if you -- let's assume that
17  the dispensing fee is the same.  That would put
18  the ingredient cost component of the product --
19  again, looking at Pharmacy B -- at a dollar --
20  $1.65.
21         MR. PAUL:  Objection.  Form.  No
22  foundation.

Page 220

1          THE WITNESS:  Given the conditions you
2  just stated, the math would indicate that, yes.
3  BY MR. COLE:
4      Q.  And then if you move over to the AWP
5  minus five percent column for that same product,
6  for Pharmacy B, you've got $20.64 listed.
7          Do you see that?
8      A.  Yes.
9      Q.  And again, the footnote there indicates
10  that that figure, built into it is a $4.05
11  dispensing fee; is that correct?
12     A.  That's what the footnote says.
13     Q.  So if you subtract $4.05 from that
14  figure, you get down to $16.59, if my math is
15  correct.  Do you agree?
16     A.  Yes, your math is correct.
17     Q.  Okay.  So -- and again, this is AWP
18  minus five percent.
19         So if you were to determine the AW --
20  the straight AWP of this particular product, you
21  would have to add five percent, correct?
22     A.  Actually, that isn't how the math would

Page 221

1  work but I understand what you're describing.
2          You would not add five percent to a
3  lower amount because that would not get you to
4  the AWP.
5      Q.  I agree with you.  But the number would
6  be slightly higher than $16.59, right?
7      A.  That is correct.
8      Q.  Okay.  So if you compared, for Pharmacy
9  B, what we have described as the acquisition
10  costs, what we earlier talked about as the
11  ingredient cost of the product being $1.65, the
12  AWP of that product would be at or around $17,
13  somewhere in that neighborhood?
14     A.  Approximately, that's correct.
15     Q.  Okay.  So anyone reading this report,
16  again, at DHS back in 1991, looking at this
17  particular table, could see that there was -- I
18  don't know what the percentage would be, but we
19  could certainly calculate it, but you have
20  Pharmacy B acquiring a generic drug product for
21  somewhere around $1.65 and the AWP of that
22  product being somewhere in the neighborhood of

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                          March 19, 2008
                    Sacramento, CA

Page 222

1   $17.
2       A.   Based on the information we've just
3   discussed, yes.
4       Q.   Are you familiar with the term
5   "spread"?
6       A.   Yes.
7       Q.   And what do you understand that to
8   mean?
9       A.   My understanding of spread, as it
10  relates to pharmaceuticals or prescription drugs,
11  is the difference between what a provider
12  purchases a product for and what they are
13  reimbursed for that same product.
14      Q.   Looking solely at this column, average
15  wholesale price minus five percent, would you
16  agree with me that there are wide variations in
17  the AWPs for this particular generic product?
18      A.   Yes.
19      Q.   And again, the numbers listed here
20  aren't the AWPs.  They're AWPs minus five
21  percent, but if you gave each one of them a boost
22  to compensate for that, you would have some of

Page 223

1   the products having an AWP of somewhere around,
2   in the $21 range, and some products having an AWP
3   of half of that, correct?
4       A.   As you previously discussed, the AWP
5   would be somewhere in the $17 range for the
6   upper, the higher priced products, and the other
7   products would be below, because these numbers
8   include the dispensing fee, as you previously
9   noted.
10      Q.   Good point.  The AWP, at least to that
11  second product, would be somewhere in the $17
12  range, and if we looked at this first product
13  listed, the one from Goldline, if you back out
14  the dispensing fee, that figure drops to $5.37?
15      A.   That's correct.
16      Q.   So the AWP would be somewhere between -
17  - somewhere around $6 roughly, maybe a little
18  less?
19      A.   Yes, that's correct.
20      Q.   I wasn't a math major.  So you would
21  have one product with an AWP of around $17, one
22  generic product, and a therapeutically equivalent

Page 224

1   product with an AWP of roughly one-third of that.
2       A.   That is accurate.
3       Q.   And again, anyone in DHS who you know
4   was pouring through or reading this report, would
5   be able to -- would have learned that there were
6   these wide variations in AWPs for generic
7   products --
8           MR. GOBENA:  Object to --
9   BY MR. COLE:
10      Q.   -- correct?
11          MR. GOBENA:  Sorry.  Objection.
12          THE WITNESS:  That is correct.
13          (Exhibit Gorospe 017 was marked
14  for identification.)
15  BY MR. COLE:
16      Q.   I marked Exhibit 17.
17          Dr. Gorospe, this is a Proposed Rule
18  excerpt from the Code of Federal Regulations,
19  Federal Register, Volume 39, Number 230, dated
20  November 27, 1974, and I'm reading from the
21  bottom of the document.
22          Have you ever referred to or seen this

Page 225

1   regulation, proposed regulation before?
2       A.   Not that I can recall.
3       Q.   Okay.  You were probably in junior high
4   or high school at the time.
5       A.   High school.
6       Q.   Okay.  But since the time that you've
7   joined Medi-Cal, did you ever have occasion to
8   review this proposed rule?
9       A.   Not that I can recall, no.
10      Q.   If you look towards the top of the
11  middle column, it says -- there's a section
12  called "acquisition costs."
13      A.   I'm sorry.  Where?  Oh, I see it.
14      Q.   It says:  In referring to drug cost,
15  current regulations specify cost as determined by
16  the state.  Most states use average wholesale
17  price.  Red Book data, Blue Book data, survey
18  results or similar standard costs.  Such standard
19  prices are frequently in excess of actual
20  acquisition costs to the retail pharmacist.
21  Thus, to achieve maximum savings to the Medicaid
22  program, the proposal requires the use of actual

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

7518707c-46aa-4bff-8eef-0c456891e081

Sacramento, CA

Page 394

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------x

IN RE PHARMACEUTICAL INDUSTRY)

AVERAGE WHOLESALE PRICE        )

LITIGATION                     )

_____)

THIS DOCUMENT RELATES TO       ) MDL No. 1456

State of California, ex rel. ) Civil Action:

Ven-A-Care v. Abbott           ) 01-12258-PBS

Laboratories, Inc., et al.   )

----------------------------x

VOL. II

--oOo--

MONDAY, SEPTEMBER 22, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

J. KEVIN GOROSPE, Pharm.D.

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
Sacramento, CA

| Page 591 | Page 593 |
|---|---|
| 1    A.  Yes.<br>2    Q.  Second to the last paragraph on that<br>3  page the first sentence reads "It is clear and well<br>4  documented that pharmacy reimbursement<br>5  methodologies that rely on AWP and a low dispensing<br>6  fee overpay pharmacies for drug ingredient costs<br>7  and underpay them for the cost of dispensing the<br>8  drug."<br>9        Did I read that correctly?<br>10   A.  Yes.<br>11   Q.  Is that consistent with your<br>12  understanding of pharmacy reimbursement methodology<br>13  that rely on AWP?<br>14   A.  Yes.<br>15   Q.  And how long have you had that<br>16  understanding?<br>17   A.  Again, as I previously stated, the late<br>18  nineties.<br>19   Q.  If you turn to page 2, you'll see that<br>20  under the heading "Drug Ingredient Costs" the first<br>21  paragraph goes through some of the findings of the<br>22  Myers and Stauffer study that we talked about | 1  implemented minus 10 percent occurred before or<br>2  after June of 2002?<br>3    A.  That is correct.<br>4    Q.  You would agree with me, though, that<br>5  the rate study was referenced in the state's<br>6  attempts to -- in the state's communications with<br>7  CMS to seek approval of the AWP minus 10 percent?<br>8    A.  Yes.<br>9    Q.  The last paragraph on that page --<br>10       Scratch that.<br>11       The second to the last -- the second to<br>12  last paragraph in the page, last sentence, states<br>13  "Therefore, the Department proposed using a single<br>14  and differentiated rate equal to AWP minus 20<br>15  percent."<br>16       Do you understand that to mean that the<br>17  -- that they were not proposing to reimburse<br>18  generics differently?<br>19   A.  That is correct.<br>20   Q.  And then the first sentence of the<br>21  following paragraph states "A rate of AWP minus 20<br>22  percent is still significantly higher than the |

| Page 592 | Page 594 |
|---|---|
| 1  earlier; correct?<br>2    A.  Yes.<br>3    Q.  And in the last sentence it reads "It's<br>4  clear from the information that the Department's<br>5  current rate of AWP minus 10 percent does not<br>6  accurately reflect the drug acquisition costs in<br>7  the marketplace;" correct?<br>8    A.  Yes.<br>9    Q.  Do you agree with that statement or is<br>10  that consistent with your understanding at the<br>11  time?<br>12   A.  Yes.<br>13   Q.  The rate referenced there, AWP minus 10<br>14  percent, was adopted after the study was performed;<br>15  correct?<br>16   A.  I don't recall.<br>17   Q.  The rate of AWP minus 10 percent was --<br>18  didn't become effective until after the Myers and<br>19  Stauffer study was released; correct?<br>20   A.  That's correct.<br>21   Q.  I take it you don't recall whether the<br>22  specific legislation or budget proposal that | 1  pharmacy acquisition cost of generic drugs."<br>2        Did I read that correctly?<br>3    A.  Yes.<br>4    Q.  Is that consistent with your<br>5  understanding at the time?<br>6    A.  Yes.<br>7    Q.  Did you have that understanding also<br>8  going back to the late nineties, that AWP minus 20<br>9  percent is significantly higher than pharmacy<br>10  acquisition costs for generic drugs?<br>11   A.  Yes.<br>12   Q.  Last sentence of that paragraph or that<br>13  page, I guess, going over to the next page, "The<br>14  reimbursement of generic drugs will still be<br>15  significantly above pharmacy's acquisition costs."<br>16       And then it goes on.<br>17       Did I read that correctly?<br>18   A.  Yes.<br>19   Q.  Do you understand that to --<br>20       Withdrawn.<br>21       So was it your understanding to the<br>22  extent you recall this proposal that the |

Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

a39105de-514e-4ced-a538-3196ba1a2531

# EXHIBIT X

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                         Tallahassee, FL

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

-------------------------------X 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:         )

U.S. ex rel. Ven-A-Care of the    ) Judge Patti B.

Florida Keys, Inc., v. Abbott     ) Saris

Laboratories, Inc., No.           )

06-CV-11337-PBS; U.S. ex rel.     ) Magistrate Judge

Ven-A-Care of the Florida Keys,   ) Marianne Bowler

Inc. v. Abbott Laboratories, Inc.,)

No. 07-CV-11618-PBS; U.S. ex rel. )

Ven-A-Care of the Florida Keys,   ) DEPOSITION OF

Inc. v. Dey, Inc., et al., No.    )   JERRY WELLS

05-11084-PBS; U.S. ex rel.        )

Ven-A-Care of the Florida Keys,   ) DECMEBER 15, 2008

Inc., et al. v. Boehringer        )   TALLAHASSEE, FL

Ingelheim Corp., et al., No.      )

07-10248-PBS                      )

-------------------------------X

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                    Tallahassee, FL

Page 70

1  in the 1987 time period?
2        MS. ST. PETE-GRIFFITH:  Object to the
3  form.
4        MS. WALLACE:  Objection.
5        THE WITNESS:  I would have used that to
6  explain the fact that pharmacy vendors were
7  getting a discount off of the published price,
8  the published AWP or suggested price that
9  pharmacists should pay.
10  BY MR. COOK:
11     Q.  If you look on Page 1 of this article,
12  the second to last paragraph begins with the
13  words "in Florida."
14        Do you see that paragraph?
15     A.  Yes.
16     Q.  That paragraph indicates -- am I
17  reading it correctly -- that Florida Medicaid
18  officials had found that Florida Medicaid was
19  paying an average of $1.08 too much for each
20  prescription drug because the published prices
21  were inflated?  Did I summarize that correctly?
22        MS. ST. PETE-GRIFFITH:  Object to the

Page 71

1  form.
2        MS. WALLACE:  Objection.
3        THE WITNESS:  That's what that
4  statement says.
5  BY MR. COOK:
6     Q.  Okay.  Do you recall whether Florida
7  Medicaid determined that they were paying $1.08
8  too much for each prescription drug because
9  published prices were inflated back in 1987?
10        MS. ST. PETE-GRIFFITH:  Object to the
11  form.
12        MS. WALLACE:  Objection.
13        THE WITNESS:  I don't recall the
14  specifics on this, but I can certainly understand
15  how we would have gotten there, to that number.
16  BY MR. COOK:
17     Q.  Do you recall doing any sort of
18  empirical analysis back in 1987?
19        MS. ST. PETE-GRIFFITH:  Object to the
20  form.
21        THE WITNESS:  I recall doing a number
22  of analyses in 1987.  The average prescription

Page 72

1  price at that time was probably 21 or $22.  And
2  if the reimbursement was based on AWP, the
3  ingredient cost would have been about $18.  And
4  if pharmacies were getting a 14 or 15 percent
5  discount, you would get to the $1.08 pretty
6  easily.
7  BY MR. COOK:
8     Q.  The next sentence reads, quote, "Other
9  states cite examples of published prices being
10  triple what pharmacists really paid," closed
11  quote.
12        Do you recall examples of published
13  prices being triple what pharmacists really paid
14  back in 1987?
15        MS. ST. PETE-GRIFFITH:  Object to the
16  form.
17        MS. WALLACE:  Objection.
18        THE WITNESS:  I think that this
19  paragraph includes the reference to the $1.08,
20  which would have been referencing the brand name
21  prescription drug.  And the other sentence is
22  like a lot of things in newspaper articles, and

Page 73

1  the press is talking about a different subject,
2  was talking about some of the generic drugs where
3  manufacturers were grossly overstating their
4  AWPs.
5  BY MR. COOK:
6     Q.  When you say that manufacturers were
7  grossly overstating their AWPs, back in 1987, you
8  knew that the AWPs for generic drugs could be
9  three times the actual acquisition cost, correct?
10        MS. ST. PETE-GRIFFITH:  Object to the
11  form.
12        MS. WALLACE:  Objection.
13        THE WITNESS:  We could find examples of
14  that.  That was in the early days of pricing
15  databases, and we did not have good data on all
16  drugs, but you could find instances of almost
17  anything you wanted to find by doing invoice
18  audits.  But that's very tedious, so we didn't do
19  that on every drug and every claim.  Obviously,
20  somebody had found an instance of that.
21  BY MR. COOK:
22     Q.  You had referred earlier in your

19 (Pages 70 to 73)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry         PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                      Tallahassee, FL

Page 206

1  for single source brands.
2      Q.   And for innovator multisource products,
3  what was the discount they were able to receive?
4      A.   It was 43.41 percent.
5      Q.   What are innovator multisource
6  products?
7      A.   That is a product whose patent has
8  expired but is still marketed by the original NDA
9  applicant.
10      Q.   Do you have an expectation for what the
11  discounts from AWP would be for noninnovator
12  multisource products?
13      A.   Because those manufacturers and
14  suppliers tend to overstate their AWPs, you can
15  see 80 or 90 percent in some cases.
16      Q.   And you've known that since at least
17  1995, right?
18          MS. ST. PETER-GRIFFITH:  Object to the
19  form.
20          MS. WALLACE:  Objection to form.
21          MR. BREEN:  Objection, form.
22          THE WITNESS:  I don't know that I know

Page 207

1  that to that extent in 1995.  Certainly in 2001 I
2  knew that.
3  BY MR. COOK:
4      Q.   The sentence after you discussed the
5  discounts from single source brands and innovator
6  multisource products reads, quote, "These are
7  predictable, confirm the ability of closed shop
8  pharmacies to negotiate pricing concessions from
9  pharmaceutical manufacturers that may not be
10  available to community-based pharmacies," closed
11  quote.
12          Do you see that?
13      A.   Yes.
14      Q.   That was true in 2001, correct?
15          MS. ST. PETER-GRIFFITH:  Object to
16  form.
17          MS. WALLACE:  Objection, form.
18          THE WITNESS:  I believed it to be true.
19  That's why I put it in the letter.
20  BY MR. COOK:
21      Q.   And that was the same phenomenon that
22  you had observed in 1998 with the Legislative

Page 208

1  Proposal Analysis we looked at, right?
2          MS. ST. PETER-GRIFFITH:  Object to the
3  form.
4          THE WITNESS:  That was a little
5  different issue, but it would still apply.
6  BY MR. COOK:
7      Q.   And that was the same issues that you
8  saw discussed in response to the 1996 Florida-
9  specific report about pricing for IV drugs and IV
10  fluids, correct?
11          MS. ST. PETER-GRIFFITH:  Object to the
12  form.
13          THE WITNESS:  That was a presumption
14  that we had made in the 1996 period.
15  BY MR. COOK:
16      Q.   Other than the meeting in Richmond in
17  September of 1995, have you had discussions with
18  anybody from HCFA about the deeper level of
19  discounts that are available to purchasers of IV
20  fluids and IV drugs via the pharmacy market?
21      A.   Very likely I have.
22      Q.   Is it fair to say you don't recall the

Page 209

1  specifics of those conversations from years ago,
2  correct?
3          MS. ST. PETER-GRIFFITH:  Object to the
4  form.
5          THE WITNESS:  Right.  I have
6  conversations with lots of people, or I did when
7  I was working.
8  BY MR. COOK:
9      Q.   Do you recall what the reaction of
10  anybody from HCFA was to you describing these
11  deeper discounts for home IV pharmacies?
12      A.   I don't recall reactions.
13      Q.   Do you recall how far back those
14  conversations with individuals at HCFA go?
15      A.   No.
16      Q.   Have you discussed that issue with
17  anyone from other state Medicaid programs?
18      A.   Yes.
19      Q.   Do you recall who in other state
20  Medicaid programs you have had specific levels of
21  conversation with?
22      A.   I don't recall specific instances, but

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                         Tallahassee, FL

Page 210

1   that's an issue that comes up at the annual
2   meetings at the southern and national groups that
3   I attended and the western and eastern groups
4   when I attended them.  There were almost always
5   some discussion of those kinds of discounts.
6       Q.  Do you recall how far back those
7   discussions go at these meetings?
8       A.  I do not.
9       Q.  I have an attendee list from 1996 that
10  shows you attended a National Symposium of
11  Pharmacy Administrators.  Do you recall attending
12  these meetings as far back as 1996?
13      A.  And earlier.
14      Q.  Do you recall the issue of the
15  additional discounts available to purchasers of
16  home IV products and IV drugs and IV fluids being
17  a topic of conversation during the time period in
18  which the OIG study was going on in the '94, '95
19  time period?
20      A.  I don't recall specifically whether or
21  not they were discussed at that time period.
22  That's too far back for me to remember the

Page 211

1   sequence of events.
2       Q.  Do you recall Ben Jackson or Paul
3   Chesser or Bill Shrigley from the OIG speaking at
4   any of these conferences?
5       A.  It seems to me that I recall two or
6   three different times that one or more of them
7   would attend and make a presentation.
8       Q.  Do you recall what the subject matters
9   generally were of the presentations that those
10  gentlemen would make at these meetings?
11      A.  Their subject matter was always the
12  same.  It was always drug pricing.
13      Q.  At each of these, would these gentlemen
14  refer to the deeper discounting that was
15  available in the home IV and infusion market?
16      MR. BREEN:  Objection to form.
17      THE WITNESS:  I don't recall that.  In
18  one of their presentations -- I misspoke a minute
19  ago.  At one time they did a presentation that
20  was devoted to a study they had done on
21  dispensing costs.
22  BY MR. COOK:

Page 212

1       Q.  Have you ever discussed this issue
2   relating to the discounts for generic drugs
3   generally, but home IV and infusion drugs more
4   specifically, have you ever had that discussion
5   with anyone from the state of Alabama?
6       A.  Probably have.
7       Q.  Who --
8       A.  I don't recall the specifics, but I
9   probably have because we've discussed it at the
10  southern meetings which they attend and the
11  national meetings which they attend.
12      Q.  Are there any individuals that you
13  would have been most likely to have that
14  conversation with from the state of Alabama?
15      A.  There was only a couple of people that
16  I recall that have been active in Alabama for the
17  last few years, so it would be one or both of
18  them.
19      Q.  And what are their names?
20      A.  I don't recall their names.
21      Q.  And these are people that were most
22  recently active at the Alabama state Medicaid

Page 213

1   program or back in the '90s and '80s?
2       A.  I think that the people that were there
3   last year, one of the ladies is now departed and
4   gone to some other effort, and one, I think, is
5   still with the Alabama Medicaid program, but I
6   think they were there for eight or ten years.
7       Q.  And when you're referring to the people
8   that you are mostly to have had these
9   conversations with, you are referring to those
10  two ladies, correct?
11      A.  I am.
12          (Exhibit Abbott-Wells 1011 was
13  marked for identification.)
14  BY MR. COOK:
15      Q.  I will mark this as Exhibit 1011,
16  previously marked as Exhibit Roxane 154.  This a
17  September 16, 2002 report entitled Additional
18  Analyses of the Actual Acquisition Cost of
19  Prescription Drug Products.  And it is the
20  additional report issued by the OIG following
21  this 1999 invoice study that we were looking at
22  earlier.

54 (Pages 210 to 213)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                         Tallahassee, FL

Page 222

1  rebate statute, but I know that they do discount
2  those drugs more heavily after the patent has
3  expired.
4      Q.   And that would be consistent with what
5  you understand from competition in the free
6  market, correct?
7          MS. ST. PETER-GRIFFITH:  Object to the
8  form.
9          MS. WALLACE:  Objection, form.
10         THE WITNESS:  I think I can answer yes
11 to that.
12 BY MR. COOK:
13     Q.   Right.  The histogram that appears on
14 Page 9, the distribution of some very steeply
15 discounted products, and then a mode there at the
16 15 to 20 percent range but a smaller one at the
17 far left, is that consistent with your
18 understanding of the distribution of transaction
19 prices as compared to AWP for generic products?
20         MR. BREEN:  Objection to form.
21         THE WITNESS:  No.  That specific bar of
22 the graph at the 20 percent level is a little

Page 223

1  strange looking to me.  I would want to look
2  closer at the data.
3  BY MR. COOK:
4      Q.   And when this chart refers to multiple
5  source drugs with the federal upper limit, those
6  are drugs that have, is it your understanding, at
7  least three generic competitors in the
8  marketplace?
9          MS. ST. PETER-GRIFFITH:  Object to
10 form.
11         THE WITNESS:  At least three marketers.
12 It could be the innovator plus two generic.
13 BY MR. COOK:
14     Q.   Leaving aside the far left side of the
15 graph that is 10 to 20 percent discount.
16     A.   Uh-huh.
17     Q.   The right side of the graph with the
18 increasing number of discounts all the way up to
19 more than 90 percent off, is that consistent with
20 your understanding of how deeply discounted
21 generic products tend to be in the marketplace?
22     A.   That looks like a more normal

Page 224

1  distribution curve for discounts.
2      Q.   And when you talk about manufacturers
3  inflating the average wholesale price, would you
4  agree with me that this indicates that virtually
5  all of the average wholesale prices for the
6  generic drugs that are represented in this graph
7  are at least four times greater than the average
8  acquisition cost for those products?
9          MS. ST. PETER-GRIFFITH:  Object to the
10 form.
11         MS. WALLACE:  Objection, form.
12         THE WITNESS:  I can't do the math that
13 quickly, but I would agree that they are higher.
14 BY MR. COOK:
15     Q.   The outlier would the generic drug that
16 is sold somewhere close to AWP, not the generic
17 drug that's sold for five cents on the dollar,
18 right?
19         MS. ST. PETER-GRIFFITH:  Object to the
20 form.
21         MS. WALLACE:  Objection to form.
22         THE WITNESS:  I would agree.

Page 225

1  BY MR. COOK:
2      Q.   And is that consistent with your
3  understanding of the way generic drugs are priced
4  in the marketplace?
5      A.   I think --
6          MS. ST. PETER-GRIFFITH:  Object to the
7  form.
8          MS. WALLACE:  Objection to form.
9          THE WITNESS:  -- so.
10         MS. ST. PETER-GRIFFITH:  Counsel, can
11 we get a time period you're talking about?
12 BY MR. COOK:
13     Q.   That's been your understanding of the
14 way generic drugs have been priced in the
15 marketplace since at least the mid-1990's,
16 correct?
17         MR. BREEN:  Objection to form.
18         MS. WALLACE:  Objection to form.
19         MS. ST. PETER-GRIFFITH:  Object to the
20 form.
21         MR. BREEN:  Can we read the whole
22 question back?

57 (Pages 222 to 225)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
Tallahassee, FL

Page 230

1  you trying to set the MAC at exactly the
2  acquisition cost of providers or at some point
3  above or below the acquisition cost for
4  providers?
5      A.  We would not have tried to set
6  acquisition or the reimbursement level below
7  acquisition cost.  We would try to set the
8  reimbursement level at a point where 95 percent
9  of the providers could purchase the drug at or
10 below that price.
11     Q.  Now, the dispensing fee in Florida has
12 remained the same in Florida, of course, from
13 1986 until 2007, correct?
14     A.  That's correct.
15         MS. ST. PETER-GRIFFITH:  Object to the
16 form.
17 BY MR. COOK:
18     Q.  And that's primarily relevant to the
19 retail pharmacy, correct?
20         MS. WALLACE:  Objection to form.
21         MS. ST. PETER-GRIFFITH:  Object to the
22 form.

Page 231

1      THE WITNESS:  No.
2  BY MR. COOK:
3      Q.  I can ask that in a better way.  That
4  same -- while that same -- forget it.
5          Costs have gone up at the retail
6  pharmacy from 1986 to 2007, correct?
7      A.  I'm sure they have.
8      Q.  In setting state MACs, do you make an
9  effort to set the ingredient costs at a point
10 where the total reimbursement, the ingredient
11 cost plus the dispensing fee, covers pharmacies'
12 costs for dispensing that product?
13         MS. ST. PETER-GRIFFITH:  Object to the
14 form.
15         MS. WALLACE:  Objection to form.
16         THE WITNESS:  No.
17 BY MR. COOK:
18     Q.  What is your goal in setting the MAC?
19     A.  I just stated that, I think, but I'll
20 restate it.  The goal of setting a MAC price is
21 to set the price as low as you can set it where
22 somewhere in the neighborhood of 95 percent of

Page 232

1  providers can purchase the product at or below
2  that price.
3      Q.  I'm not a statistician, so I don't know
4  that I can frame this right.  Do you know what
5  sort of --
6      A.  And I wouldn't know whether you did or
7  not, so that's okay.
8      Q.  Do you know what sort of variance there
9  tends to be in the amount that providers pay for
10 these products?  That is, when you're hitting the
11 95 percent level where 95 percent of providers
12 can purchase it, do you have a feel for how wide
13 the variation can be below that 95th percentage
14 point?
15     A.  Well, yes, because we would look
16 something like your histogram for AWP discounts
17 almost.  We looked at invoices and catalogs and
18 set state MAC prices when we were doing that
19 internally.  And I would usually email that
20 information to Walgreens or Wal-Mart or CVS and
21 to a half of dozen independents or to the Florida
22 Pharmacy Association and say, I'm looking at

Page 233

1  these pricing levels on these drugs, give me some
2  feedback, can you buy them at that level, this is
3  what we think it ought to be.
4      Q.  Uh-huh.
5      A.  And if I set it too low, they'd scream
6  a lot.  If I set it too high, they'd say, well,
7  that looks fine, we can just barely make it.
8      Q.  Have you gone through that process for
9  the infusion and IV drugs listed in the complaint
10 in this case?
11     A.  No.
12     Q.  So those are still being paid based
13 upon --
14     A.  They are being paid based upon the
15 provisions of the Deficit Reduction Act of 2005
16 at this point, which mandated the State of
17 Florida adopting those -- that pricing logic
18 based on manufacturer rebate levels to calculate
19 the average manufacturer price.
20     Q.  And that's at 250 percent of the
21 average manufacturer's price, correct?
22     A.  That's correct.

59 (Pages 230 to 233)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                    Tallahassee, FL

Page 338

1    H I G H L Y   C O N F I D E N T I A L
2    customary charge.  That remains in the Federal
3    Code of Federal Regulations today.
4    BY MR. COOK:
5       Q.  The 1987 article that Mr. Breen
6    referred you to where you referred to AWP as a
7    sticker price, you said that the sticker price
8    analogy doesn't apply to generics, right?
9           MS. ST. PETER-GRIFFITH:  Objection to
10   form.
11          MR. BREEN:  Objection to form.
12          THE WITNESS:  At this point that would
13   not be an appropriate analogy to use for generic
14   products.
15   BY MR. COOK:
16      Q.  And you said that it didn't apply to
17   generics because the pricing of generics is all
18   over the place, right?
19      A.  It is now, and probably was even, to
20   some extent, at that point.
21      Q.  And just so I can nail down the
22   distinction you're drawing here, are you drawing

Page 339

1    H I G H L Y   C O N F I D E N T I A L
2    a distinction between brands and generics in the
3    sense that the relationship between published
4    prices and acquisition prices for generics are
5    not -- do not bear a predictable relationship?
6           MR. BREEN:  Object to the form.
7           MS. WALLACE:  Objection, form.
8           THE WITNESS:  The analogy for the
9    automobile window sticker that I used was
10   specifically related to brand name drugs in the
11   mid to late 1980s.
12   BY MR. COOK:
13      Q.  In the article, there are quotes
14   referring to AWP as, quote, "meaningless" and,
15   quote, "a joke."
16          MS. ST. PETER-GRIFFITH:  Object to
17   form.
18          MR. BREEN:  Objection to form.
19   BY MR. COOK:
20      Q.  Would that be a better characterization
21   for AWP with respect to generics?
22          MS. ST. PETER-GRIFFITH:  Object to

Page 340

1    H I G H L Y   C O N F I D E N T I A L
2    form.
3           MS. WALLACE:  Object to form.
4           THE WITNESS:  I don't know that that
5    article said that.  There was a letter from Ven-
6    a-Care that mentioned that AWP was a joke.
7           AWP was a pricing reference point that
8    is a reasonable indicator of approximate cost for
9    brand name drugs.  It is no longer a reasonable
10   indicator for generic drugs and I don't know when
11   that diversion occurred.  At one point it
12   probably was a reasonable indicator for generic
13   drugs.
14   BY MR. COOK:
15      Q.  Certainly by 1990 it was no longer a
16   reasonable indicator of price for generic drugs,
17   correct?
18          MS. WALLACE:  Object to form.
19          MS. ST. PETER-GRIFFITH:  Object to the
20   form.
21          MR. BREEN:  Object to form.
22          THE WITNESS:  I think that by 1990 that

Page 341

1    H I G H L Y   C O N F I D E N T I A L
2    would be a valid statement.
3           MR. COOK:  I don't have any more
4    questions.
5           MS. ST. PETER-GRIFFITH:  I have nothing
6    further.
7           MR. COOK:  I think we're done.  Thank
8    you very much.
9           MR. YOUNG:  Mr. Wells, just one or two
10   question to follow up.
11
12          EXAMINATION
13   BY MR. YOUNG:
14      Q.  Mr. Wells, just to follow up on some of
15   the questions Mr. Cook was just asking you, when
16   you were talking about average prices in response
17   to questions by Mr. Breen, were you responding
18   with respect to branded drugs as well?
19          MS. ST. PETER-GRIFFITH:  Object to the
20   form.
21          THE WITNESS:  I don't recall the
22   context of the question.

86 (Pages 338 to 341)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

# EXHIBIT Y

IL Department of Healthcare and Family Services (James Parker)                    November 18, 2008
## Springfield, IL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

---------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    ) Magistrate Judge

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE ILLINOIS

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) HEALTHCARE AND

Ven-a-Care of the Florida Keys,    ) FAMILY SERVICES

Inc., v. Boehringer Ingleheim      ) by  JAMES PARKER

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) NOVEMBER 18, 2008

--------------------------------X

IL Department of Healthcare and Family Services (James Parker)                                      November 18, 2008

## Springfield, IL

Page 182

1    Q.  And the reason that this budget
2  initiative was proposed was because AWP had
3  become virtually meaningless as a real number,
4  particularly for multi source drugs, correct?
5    A.  That is correct.
6    Q.  And it states, "The AWP is set by each
7  drug manufacturer and reported to the various
8  drug information services, but in actuality it is
9  no longer used by wholesalers selling to
10  pharmacies," correct?
11    A.  That is what it says.
12    Q.  And it states that, "Factors such as
13  volume discounts and rebates by wholesalers or
14  manufacturers are examples of changes that have
15  made AWP meaningless," correct?
16    A.  Correct.
17    Q.  And, in 1996, IDPA used AWP as part of
18  its reimbursement methodology, correct?
19    A.  That's correct.
20    Q.  And it continues to use AWP today?
21    A.  That is correct.
22    Q.  And in 1996 through December of 2000,

Page 183

1  it didn't use Wholesale Acquisition Cost-plus
2  method, correct?
3    A.  That is correct.
4    Q.  Now, if Illinois Medicaid understood
5  that AWP had become virtually meaningless as a
6  real number, particularly for multi source drugs,
7  why did it continue to use that benchmark as part
8  of its payment methodology?
9    A.  Because there was no viable
10  alternative.  So the best approach to Estimated
11  Acquisition Cost was to continue to try to figure
12  out the best discount off of AWP to estimate
13  acquisition cost.
14    Q.  But they understood it was virtually
15  meaningless in so doing?
16    MS. OBEREMBT:  Objection.
17    MR. LIBMAN:  Objection.  Objection to
18  form.
19  BY MR. REALE:
20    Q.  That AWP was virtually meaningless?
21    A.  Well, I --
22    MS. OBEREMBT:  Same objection.

Page 184

1    THE WITNESS:  Some people may have had
2  that opinion.  It depends on what they meant by
3  "virtually meaningless."  We certainly knew it
4  did not mean what the common understanding of the
5  words would mean.
6  BY MR. REALE:
7    Q.  Well, it -- a document from the
8  Director of the IDPA dated September 10th, 1994
9  refers to AWP as being meaningless, particularly
10  so for multi source drugs, correct?
11    A.  That is correct.
12    Q.  And at one time, Illinois Medicaid used
13  Actual Acquisition Cost to reimburse pharmacies,
14  correct?
15    A.  That is correct.
16    Q.  And there's nothing stopping Illinois
17  from continuing to use actual acquisition cost to
18  reimburse pharmacies today?
19    MR. LIBMAN:  Objection to form.
20    THE REPORTER:  You know what, I lost
21  your question.  I'm so sorry.  "There's nothing
22  stopping Illinois from using the actual..."

Page 185

1    MR. REALE:  Acquisition cost to
2  reimburse pharmacies today.
3    THE WITNESS:  There's nothing that
4  legally prohibits us from doing that.
5  BY MR. REALE:
6    Q.  And they did at one time?
7    A.  And we did at one time.
8    Q.  Did you talk to Mr. Hazelwood about
9  Roxane Illinois Exhibit 5 and in particular the
10  proposal in September of 1994?
11    A.  Not about this document, no.
12    (Exhibit Roxane IL 006 was marked
13  for ID)
14  BY MR. REALE:
15    Q.  Mr. Parker, you've just been handed
16  another exhibit which we've marked as Roxane
17  Illinois Exhibit 6, Bates No. AWP-IL-16734 to
18  16755.  The title of this document is
19  "Budget/System Impact Fiscal Year 1995."  Do you
20  recognize this type of document?
21    MR. LIBMAN:  Take your time to review
22  it if you need to, Mr. Parker.

47 (Pages 182 to 185)

# EXHIBIT Z

30(b)(6) LA Dept of Health and Hospitals (Terrebonne, Mary Julia)                    November 7, 2008

## Baton Rouge, LA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL      *  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE *  MASTER FILE NO.

PRICE LITIGATION           *  01-CV-12257-PBS

                           *

THIS DOCUMENT RELATES TO:  *  JUDGE PATTI B.

U.S. EX REL. VEN-A-CARE OF *  SARIS

THE FLORIDA KEYS, INC. V.  *  MAGISTRATE

DEY INC., ET AL            *  MARIANNE BOWLER

NO. 05-11084-PBS, AND      *

U.S. EX REL VEN-A-CARE OF  *

THE FLORIDA KEYS, INC., ET *

AL V. BOEHRINGER INGELHEIM *  (Cross-noticed

CORP, ET AL                *   captions on

NO.07-10248-PBS            *   following pages.)

* * * * * * * * * * * * * *

          November 7, 2008

          Transcript of the videotaped Rule

30(b)(6) deposition of the LOUISIANA

DEPARTMENT OF HEALTH AND HOSPITALS through

MARY JULIA TERREBONNE

## Henderson Legal Services, Inc.

4f51dae7-223c-46dc-90f5-5835e793cf26

30(b)(6) LA Dept of Health and Hospitals (Terrebonne, Mary Julia)                    November 7, 2008

## Baton Rouge, LA

Page 42

1 generic drugs to encourage the use of generic
2 drugs?"  And your response is, "I think you could
3 do that a multiple of ways, not necessarily on
4 the ingredient side but on the dispensing fees."
5       And the follow-up question is "But one
6 of the ways is through the ingredient size;
7 correct?"  And your answer is "One of the ways,
8 yes."
9       Sitting here today as a representative
10 for the State of Louisiana, do you adopt your
11 prior testimony on this point?
12     A.  Yes.
13     Q.  On page 163 of your deposition
14 transcript there is a discussion about a
15 proposal, a state plan amendment seeking an
16 increase of the dispensing fee for generic drugs
17 to $15 and an increase of the dispensing fee for
18 brand names to $10.  Do you recall that
19 discussion?
20     A.  As I see it, yes.
21     Q.  You're aware that there was this effort
22 --

Page 43

1     A.  Yeah.
2     Q.  -- submitted in a state plan amendment?
3       The discussion continues to page 164 of
4 your deposition transcript, and if you scroll to
5 line 13, the questioner notes that there's a
6 larger spread between AWP and actual acquisition
7 cost for generic drugs as a percentage.
8       Sitting here today as the State of
9 Louisiana's -- as a representative of the State
10 of Louisiana, do you agree that there is a larger
11 spread between AWP and actual acquisition cost
12 for generic drugs as a percentage when compared
13 to brand drugs?
14     MR. FAUCI:  Object to the form.
15     THE WITNESS:  I'm aware of it, yes.
16 BY MS. RANKIN:
17     Q.  On line 17 the questioner notes that
18 the state plan amendment that was seeking an
19 increase to $15 dispensing fee for generic drugs
20 and $10 dispensing fee for brand names, he notes
21 that, quote, "The legislature wanted to -- to
22 make up for taking" -- I apologize. I will

Page 44

1 paraphrase.  He's asking you whether -- what the
2 intention of the -- what the intention of the
3 legislation was in increasing the dispensing
4 fees.  And he asks whether -- whether the
5 intention was for, quote, "the legislature" --
6 Excuse me -- "The legislature wanted to make up
7 for taking that away by increasing the dispensing
8 fees for generics; correct?"  And you answer,
9 "That is my understanding of the legislation."
10       Do you -- Sitting here today as the
11 representative for the State of Louisiana, is it
12 your understanding that the -- that the intention
13 of the state plan amendment to seek a dispensing
14 -- an increase in the dispensing fee was to try
15 to make up for taking away the spread between AWP
16 and actual acquisition cost or reducing the
17 spread between AWP and actual acquisition cost
18 for generic drugs?
19     A.  I believe the intent of the legislation
20 was due in part from the federal upper limits
21 being implemented as a result of the DRA.
22     Q.  Right.  And -- and that's the part of

Page 45

1 the discussion here.  Let's just -- let's just
2 look at page 164 of your transcript because
3 that's the -- that's the proposal that's being
4 discussed here.
5       The question says, "And the proposal to
6 increase dispensing fees was due in large part to
7 the potential reduction and the ingredient cost
8 reimbursement due to the use of the AMP?"  And
9 you respond "Yes."
10       And the question -- questioner
11 continues on line 9, "And if that were
12 implemented, that would cut back on reimbursement
13 for generic drugs considerably; correct?"  And
14 you respond "Yes."
15       Then the questioner continues "Because
16 there is larger spread on AWP and actual
17 acquisition cost for generic drugs as a
18 percentage?"  And your response is "Yes."
19       And the questioner continues, "And so
20 the legislature wanted to make up for taking that
21 away by increasing the dispensing fees for
22 generics; correct?"  And your response is "That

12  (Pages 42 to 45)

## Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

4f51dae7-223c-46dc-90f5-5835e793cf26

30(b)(6) LA Dept of Health and Hospitals (Terrebonne, Mary Julia)                                    November 7, 2008

## Baton Rouge, LA

Page 46

1  is my understanding of the legislation."
2          Sitting here today as the
3  representative for the State of Louisiana, do you
4  agree with your prior testimony on this point?
5      A.  Yeah.
6      Q.  Turn to page 44 of this document,
7  please.  On page 171 of your deposition
8  transcript, you and Mr. Torborg are discussing
9  the Myers and Stauffer survey of dispensing
10  costs.  Do you recall the Myers and Stauffer
11  survey of dispensing costs that's being discussed
12  here?
13      A.  I'm assuming that's the one that goes
14  back to 1999.
15      Q.  I can pull it out for you if you'd like
16  me to.
17      A.  Yeah.
18      Q.  This is Abbott Exhibit 1051, "A Survey
19  of Dispensing and Acquisition Costs of
20  Pharmaceuticals in the State of Louisiana." It's
21  been previously marked.
22          MR. FAUCI:  Are we introducing this

Page 47

1  today?
2          MS. RANKIN:  Excuse me?
3          MR. FAUCI:  Are we introducing this
4  today?
5          MS. RANKIN:  I'm just using it to
6  refresh her recollection.  It's been previously
7  marked, so --
8          MR. FAUCI:  Oh.  Okay.
9  BY MS. RANKIN:
10      Q.  This is the exhibit that was being
11  discussed on page 171 of your deposition there.
12      A.  (Witness examines documents.)
13      Q.  And there is a discussion that starts
14  on line 15 of page 171 about an excerpt in this
15  report on page 6 which notes the -- Myers and
16  Stauffer's conclusion that, quote, "The discounts
17  from AWP for multiple-source drugs exhibited much
18  greater variation but averaged 32.6 percent for
19  drugs without FUL pricing and 69.6 percent for
20  drugs with FUL pricing."
21          MS. RANKIN:  For your benefit, that's
22  F-U-L, big caps, F-U-L, not f-u-l-l.

Page 48

1  BY MS. RANKIN:
2      Q.  And on page 172 Mr. Torborg asked you
3  if you knew that there was a wider variation for
4  discounts from AWP for generic drugs, and on line
5  14 of page 172 you say "Yes."
6          Sitting here today as a representative
7  for the State of Louisiana, do you agree with and
8  adopt this -- your prior testimony on this point?
9      A.  Yes, based on the survey.
10      Q.  The survey from 1999?
11      A.  Correct.
12      Q.  Please turn to page 47 of this
13  document, page 185 of your testimony.  Let me
14  know when you get there.
15      A.  (Witness examines documents.) I'm
16  there.
17      Q.  On line 9 of page 185, Mr. Torborg asks
18  you:  As far as you can recall, you've always
19  been aware of the joke, quote, "AWP equals ain't
20  what's paid," unquote, and your response on line
21  13 is "Pretty much, yes.  It's a running joke,"
22  unquote.

Page 49

1          Sitting here today as the
2  representative for the State of Louisiana, is it
3  fair to say that the joke "AWP equals ain't
4  what's paid" is a running joke that's been known
5  for some time for the State of Louisiana?
6          MR. FAUCI:  Object to the form.
7          THE WITNESS:  I wouldn't say just for
8  the State of Louisiana.  It's just a common
9  statement.
10  BY MS. RANKIN:
11      Q.  But you're a representative for the
12  state -- you're a representative for the State of
13  Louisiana, and here you're acknowledging that
14  you've been aware of the AWP ain't what's paid
15  joke for as long as you can remember?
16      A.  Yes.
17      Q.  Is that right?
18      A.  Yes.
19      Q.  Sitting here today, would you like to
20  correct your testimony here?  Is there anything
21  erroneous in your testimony on this point?
22      A.  No.

13  (Pages 46 to 49)

4f51dae7-223c-46dc-90f5-5835e793cf26