# EXHIBIT AA

Kramer, Sandra                                    March 25, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL INDUSTRY        MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION     Civil Action:

                                       01-CV-12257-PBS

THIS DOCUMENT RELATES TO U.S.          Judge Patti B. Saris

Ex rel. Ven-A-Care of the Florida      Magistrate Judge

Keys, No. 06-CV-11337-PBS              Marianne B. Blower

                              /




        The Videotaped Deposition of SANDRA KRAMER,

        Taken at 2860 Eyde Parkway,

        East Lansing, Michigan,

        Commencing at 9:08 a.m.,

        Tuesday, March 25, 2008,

        Before Cynthia A. Chyla, CSR 0092.

Kramer, Sandra                                                March 25, 2008

---

Page 90

1    A.    At the time that this was written who was
2  he?
3    Q.    Yes.
4    A.    I'm uncertain.  He probably was a bureau
5  director at the time.
6    Q.    Was he --
7    A.    Management to me.
8    Q.    So someone you reported to?
9    A.    Probably not directly.
10   Q.    But he was higher on the Michigan Medicaid
11 hierarchy?
12   A.    Yes.
13   Q.    And in your memos to Mr. Smith or others
14 higher on the Michigan Medicaid hierarchy, did you
15 attempt to be as accurate as possible?
16   A.    I would try to.
17   Q.    You see the subject of this is elimination
18 of actual acquisition costs reimbursement.
19         Do you see that?
20   A.    Yes.
21   Q.    What does that refer to?
22   A.    I think it would refer to switching the

---

Page 91

1  reimbursement technique from AAC to EAC.
2    Q.    And that switch was actually made in 1995;
3  right?
4    A.    Yes.
5    Q.    So this is approximately three years before
6  the switch was made?
7    A.    Yes.
8    Q.    Do you know why this was being discussed in
9  1992?
10   A.    It explains here that the pharmacy
11 association's newsletter published that there was going
12 to be a change from AAC reimbursement for Michigan
13 Medicaid.
14   Q.    And it's dated -- it actually states that
15 Mr. Smith agreed to move way from actual acquisition
16 costs; is that right?
17   A.    Yeah.
18   Q.    Did you have a discussion with him regarding
19 whether he did, in fact, agree to move away from AAC?
20   A.    I don't recall.
21   Q.    Did you ever have any discussions with
22 Mr. Smith about moving away from AAC to EAC?

---

Page 92

1    A.    Yes.
2    Q.    Okay.  How many -- how many times did you
3  have discussions with him about that topic?
4    A.    I don't know how many times.
5    Q.    Do you recall ever discussing with him what
6  AWPs were meant to represent?
7    A.    Not really.  Not -- no.
8    Q.    You state, and I'd like to focus here on the
9  second paragraph, the last sentence of that paragraph,
10 it states:  "If such a proposal were adopted, there
11 could be tremendous cost implications for the program."
12         What did you mean by that?
13   A.    I meant that AWP minus 10 percent is --
14 would not have been what we were paying under AAC
15 reimbursement.
16   Q.    So fair to say that you thought there would
17 have to be a steeper discount off of AWP if you were
18 going to approximate AAC?
19   A.    Yes.
20   Q.    And when you say tremendous cost
21 implications, what did you mean by that phrase?
22         MR. HENDERSON:  Objection.

---

Page 93

1    A.    I guess I was trying to get his attention.
2  BY MR. GABEL:
3    Q.    Did you get his attention?
4    A.    I don't remember him responding.
5    Q.    Okay.  The next paragraph you say:  "As an
6  example, I have attached the direct (or acquisition
7  cost) and AWP for several new products from a major
8  generic company.  The price differentials are enormous
9  with AWP ranging from 13 percent to 500 percent above
10 acquisition cost!!!"
11         With the three exclamations, were
12 you also trying to get his attention?
13         MR. HENDERSON:  Objection.
14   A.    I think it speaks for itself.
15 BY MR. GABEL:
16   Q.    Okay.  Fair enough.
17         You state:  "The price differentials
18 are enormous --" well, actually, strike that.
19         It's fair to say that as early as
20 1992 you realized that in some instances AWPs were
21 upwards of 500 percent above acquisition costs?
22   A.    For the generic.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

---

Page 110

1    A.   Yes.
2    Q.   All right.  And, so, in that case there
3  would be a different discount below AWP that the small
4  volume provider would have in comparison to the large
5  volume provider?
6    A.   Some of that, though, would be dependent on
7  the actual purchase size that was associated with the
8  NDC.
9    Q.   Okay.  But there could be a variety of
10  percentages depending on what type of discounts
11  providers could take advantage of?
12    A.   I wasn't privy to how steep those discounts
13  were or what the range --
14    Q.   You didn't believe that all providers got
15  the same exact discount when they purchased drugs?
16  Providers purchased drugs for a variety of different
17  prices; right?
18        MR. HENDERSON:  Objection to the
19  form.
20    A.   I -- you know, no, I didn't believe that
21  they all purchased for the same price.
22  BY MR. GABEL:

---

Page 111

1    Q.   So, when you're attempting to establish an
2  estimated acquisition cost and you use a particular
3  percentage, whether it's 13.5 for independent
4  pharmacies or some other percentage for chain
5  pharmacies, you recognize that in certain instances
6  providers will receive drug payments that are higher
7  than their actual acquisition cost; right?
8        MR. HENDERSON:  Objection to the
9  form.
10    A.   It's difficult for me to respond to your
11  questions because the MSA set different price screens
12  depending on which type of drug you were referring to.
13  So, when you're --
14  BY MR. GABEL:
15    Q.   If the screen didn't come into play?
16    A.   When you're referring to EAC and -- you
17  know, so, it would be helpful if you could say for
18  brand name drugs and nonbrand drugs or generic drugs.
19    Q.   For generic drugs, assuming the screens did
20  not come into play, assuming it wasn't going to reach
21  the MAC, did you understand that certain providers
22  would be paid greater than their acquisition costs when

---

Page 112

1  Michigan used an EAC system?
2    A.   Yeah.
3    Q.   Did you believe that the providers receiving
4  those payments that were greater than their acquisition
5  costs were submitting false claims to Michigan
6  Medicaid?
7        MR. HENDERSON:  Objection.
8        MR. MATUS:  Objection.  Calls for a
9  legal conclusion.
10    A.   I -- I didn't monitor those kinds of issues.
11  BY MR. GABEL:
12    Q.   Did you believe they were committing fraud?
13        MR. HENDERSON:  Objection.
14        MR. MATUS:  Same objection; calls
15  for a legal conclusion.
16    A.   That was outside of my responsibilities.
17  BY MR. GABEL:
18    Q.   Did you personally believe, or considering
19  it now, did you believe that that was wrong for the
20  providers?
21        MR. MATUS:  Objection; vague.
22    A.   That wasn't my responsibility.

---

Page 113

1  BY MR. GABEL:
2    Q.   Did you ever have any discussions with
3  anyone on whether that would be wrong for providers to
4  receive payments above their actual acquisition costs?
5    A.   I don't recall that.
6    Q.   You've already mentioned that you understood
7  that the spread for generics would generally be greater
8  than the spread for brands; correct?
9    A.   Yes.
10    Q.   Were there any other classes of drugs that
11  you understood the spread would be greater than other
12  classes of drugs for?
13        MR. HENDERSON:  Objection to the
14  form.
15    A.   Not that I recall.
16  BY MR. GABEL:
17    Q.   Have any drug manufacturers communicated to
18  you that the AWPs published in the compendia reflected
19  actual acquisition costs to providers?
20    A.   I don't recall that.
21    Q.   When drug manufacturers would communicate to
22  you and send you the AWPs, did they ever tell you that

---

29  (Pages 110 to 113)

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 142

BY MR. GABEL:
1  BY MR. GABEL:
2     Q.   This AWP screen, whether it was AWP, AWP
3  minus 8 percent, AWP minus 10 percent, that would only
4  act as a cap if actual acquisition costs exceeded that
5  amount; right?
6     A.   Correct.
7     Q.   Okay.  So, AWP would only come into play to
8  lower Michigan Medicaid's payments in the event actual
9  acquisition costs or usual and customary costs exceeded
10 that AWP screen?
11    A.   Where I'm having the problem is the actual
12 acquisition costs.  It's really the provider's charge
13 representing the actual acquisition costs.  If that
14 exceeded the AWP, then they would be cut back on the
15 brand name drugs and drugs that didn't have a MAC on
16 it.
17    Q.   Okay.  For generic drugs that did have MACs,
18 AWP wouldn't come into play whatsoever with respect to
19 how the provider would be reimbursed for those drugs
20 prior to 1995?
21    A.   If the AWP discount was lower than the MAC,
22 it would come into play.

Page 143

1     Q.   Okay.  So the MAC wouldn't only act as a
2  screen, the AWP would be an additional screen
3  potentially?
4     A.   Yes.
5          MR. GABEL:  I think we're about to
6  run out of time on the tape.  Why don't we just break
7  now, get a quick lunch.  Can we do a quick lunch, is
8  that all right?
9          MR. MATUS:  Yeah, that's fine.
10         MR. GABEL:  Why don't we go off the
11 record and we'll discuss.
12         THE VIDEOGRAPHER:  Going off the
13 record at 11:51 and 51 seconds a.m.
14         (Lunch recess was taken from
15          11:51 a.m. to 12:35 p.m.)
16         THE VIDEOGRAPHER:  We're back on the
17 record at 12:35 and 15 seconds p.m.
18 BY MR. GABEL:
19    Q.   Ms. Kramer, how were MACs set when you
20 worked for Michigan Medicaid?
21         MR. HENDERSON:  Objection.
22    A.   Can you define a time period?

Page 144

1  BY MR. GABEL:
2     Q.   Were you responsible -- let me ask a
3  different question.
4               Were you responsible for setting
5  MACs?
6     A.   For a lot of the time that I was in the
7  policy area.
8     Q.   For what time period were you responsible?
9     A.   I don't remember the exact dates.
10    Q.   Were you responsible from 1990 through the
11 time you left for setting state MACs?
12    A.   Yes.
13    Q.   Okay.  How were those set during that time
14 period?
15    A.   During that time period, the best that I can
16 recall is that we had a pharmacist consultant with the
17 department.  I don't remember how frequently he came
18 in, but periodically he would come in and I would
19 provide him with utilization data on the generic drugs
20 and he would do research of maybe what other states or
21 another insurer would have priced MAC at, and then also
22 he would have availability of wholesaler information

Page 145

1  and would establish target MACs, and then I would take
2  those target MACs and publish them in drafts for
3  comment with the pharmacist and other people that were
4  interested in pharmacy issues.
5     Q.   And then after the comments came in?
6     A.   After the comments came in, those were
7  resolved and the prices were published with a 30-day
8  lead time.
9     Q.   When you published the target MACs for
10 comment, did you ever receive any comments from
11 manufacturers on the MACs?
12    A.   I don't recall whether there was or not.
13    Q.   Who was the pharmacist consultant that you
14 used to set MACs in the '90s?
15    A.   Robert Phetteplace, P-H-E-T-T-E-P-L-A-C-E.
16    Q.   And did this -- you stated this pharmacist
17 consultant had access to wholesale prices?
18    A.   He was a practicing pharmacist.
19    Q.   So he knew what his actual acquisition costs
20 would be for particular drugs?
21    A.   I assume so.  He never showed me the, you
22 know, his invoices or anything, but ....

37  (Pages 142 to 145)

# EXHIBIT BB

Scully, Thomas A.                           May 15, 2007
                    Washington, DC

                                              Page 1

                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL       :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   :  CIVIL ACTION

PRICE LITIGATION             :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO     :

U.S. ex rel. Ven-a-Care of   :  Judge Patti B. Saris

the Florida Keys, Inc.       :

      v.                     :

Abbott Laboratories, Inc.,   :  Chief Magistrate

No. 06-CV-11337-PBS          :  Judge Marianne B.

- - - - - - - - - - - - - -x    Bowler

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                May 15, 2007
                    Washington, DC

| Page 2 | Page 4 |
|---|---|

Page 2

1          IN THE CIRCUIT COURT OF
2          MONTGOMERY COUNTY, ALABAMA
3    - - - - - - - - - - - - - -x
4    STATE OF ALABAMA,          :
5        Plaintiff,         :
6        vs.              : Case No.: CV-05-219
7    ABBOTT LABORATORIES, INC., : Judge Charles Price
8    et al.                :
9        Defendants.        :
10   - - - - - - - - - - - - - -x
11
12   STATE OF WISCONSIN    CIRCUIT COURT    DANE COUNTY
13   ----------------------------X
14   STATE OF WISCONSIN,        : CASE NO.
15       Plaintiff,        : 04-CV-1709
16       v.              :
17   AMGEN INC., et al.,        :
18       Defendants.       :
19   ----------------------------X
20
21
22

Page 3

1          UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS
3    ----------------------------X
4    THE COMMONWEALTH OF MASSACHUSETTS : CIVIL ACTION NO.
5        Plaintiff,        : 03-CV-11865-PBS
6        v.              :
7    MYLAN LABORATORIES, INC., et al. :
8        Defendants.       :
9    ----------------------------X
10
11       SUPERIOR COURT OF NEW JERSEY
12          UNION COUNTY
13   ----------------------------X
14   CLIFFSIDE NURSING HOME, INC., on : LAW DIVISION
15   behalf of itself and all others   : DOCKET NO.
16   similarly situated, as defined    : UNN-L-2329-04
17   herein,
18       Plaintiffs,      :
19       v.              :
20   DEY, INC., et al.        :
21       Defendants.       :
22   ----------------------------X

Page 4

1          IN THE COURT OF COMMON PLEAS
2          FIFTH JUDICIAL CIRCUIT
3    ----------------------------X
4    STATE OF SOUTH CAROLINA, and    :    STATE OF
5    HENRY D. McMASTER, in his official : SOUTH CAROLINA
6    capacity as Attorney General for  : COUNTY OF
7    the State of South Carolina,      :    RICHLAND
8        Plaintiff,        :
9        v.              : CIVIL ACTION NO.
10   WARRICK PHARMACEUTICALS       : 2006-CP-40-4390
11   CORPORATION, et al.        : 2006-CP-40-4399
12       Defendants.       :
13   ----------------------------X
14   STATE OF SOUTH CAROLINA, and    :    STATE OF
15   HENRY D. McMASTER, in his official : SOUTH CAROLINA
16   capacity as Attorney General for  : COUNTY OF
17   the State of South Carolina,      :    RICHLAND
18       Plaintiff,        :
19       v.              : CASE NO.
20   ABBOTT LABORATORIES, INC.      : 2006-CP-40-4394
21       Defendant.        :
22   ----------------------------X

Page 5

1          IN THE COURT OF COMMON PLEAS
2          FIFTH JUDICIAL CIRCUIT
3    ----------------------------X
4    STATE OF SOUTH CAROLINA, and    :    STATE OF
5    HENRY D. McMASTER, in his official : SOUTH CAROLINA
6    capacity as Attorney General for  : COUNTY OF
7    the State of South Carolina,      :    RICHLAND
8        Plaintiff,        :
9        v.              : CIVIL ACTION NO.
10   PAR PHARMACEUTICALS COMPANIES,    : 2006-CP-40-7151
11   INC.,              : 2006-CP-40-7153
12       Defendant.        :
13   ----------------------------X
14   STATE OF SOUTH CAROLINA, and    :    STATE OF
15   HENRY D. McMASTER, in his official : SOUTH CAROLINA
16   capacity as Attorney General for  : COUNTY OF
17   the State of South Carolina,      :    RICHLAND
18       Plaintiff,        :
19       v.              : CIVIL ACTION NO.
20   MYLAN LABORATORIES INC.,        : 2007-CP-40-0282
21       Defendant.        : 2007-CP-40-0283
22   ----------------------------X

                                    2 (Pages 2 to 5)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

| Page 6 | Page 8 |
|---|---|

**Page 6**

1        IN THE COURT OF COMMON PLEAS
2             FIFTH JUDICIAL CIRCUIT
3    --------------------------------X
4    STATE OF SOUTH CAROLINA, and    :    STATE OF
5    HENRY D. McMASTER, in his official :  SOUTH CAROLINA
6    capacity as Attorney General for  :   COUNTY OF
7    the State of South Carolina,      :   RICHLAND
8         Plaintiff,          :
9         v.              : CIVIL ACTION NO.
10   BARR PHARMACEUTICALS, INC.    : 2007-CP-40-0280
11        Defendant.      : 2007-CP-40-0286
12   --------------------------------X
13
14      IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
15             STATE OF HAWAII
16   --------------------------------X
17   STATE OF HAWAII,        : CASE NO.
18        Plaintiff,     : 06-1-0720-04 EEH
19        v.           :
20   ABBOTT LABORATORIES, INC., et al. : JUDGE EDEN
21        Defendants.      : ELIZABETH HIFO
22   --------------------------------X

**Page 8**

1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2             STATE OF MISSOURI
3    - - - - - - - - - - - - - - - - x
4    STATE OF MISSOURI, ex rel,     :
5    JEREMIAH W. (JAY) NIXON,       :
6    Attorney General,        :
7    and           :
8    MISSOURI DEPARTMENT OF SOCIAL    :
9    SERVICES, DIVISION OF MEDICAL    : Case No.
10   SERVICES,              : 054-1216
11        Plaintiffs,       : Division No. 31
12        vs.            :
13   DEY INC., DEY, L.P., MERCK KGaA,  :
14   EMD, INC., WARRICK           :
15   PHARMACEUTICALS CORPORATION,    :
16   SCHERING-PLOUGH CORPORATION, and :
17   SCHERING CORPORATION,       :
18        Defendants.       :
19   - - - - - - - - - - - - - - - - x
20
21
22

| Page 7 | Page 9 |
|---|---|

**Page 7**

1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2        IN AND FOR LEON COUNTY, FLORIDA
3    THE STATE OF FLORIDA
4    ex rel.
5    - - - - - - - - - - - - - - - - x
6    VEN-A-CARE OF THE FLORIDA      :
7    KEYS, INC., a Florida       :
8    Corporation, by and through its  :
9    principal officers and directors, :
10   ZACHARY T. BENTLEY and        :
11   T. MARK JONES,           :
12        Plaintiffs,       :
13        vs.             : Civil Action
14   MYLAN LABORATORIES INC.; MYLAN   : No.: 98-3032G
15   PHARMACEUTICALS INC.; NOVOPHARM  : Judge: William
16   LTD., SCHEIN PHARMACEUTICAL, INC.,: L. Gary
17   TEVA PHARMACEUTICAL INDUSTRIES   :
18   LTD., TEVA PHARMACEUTICAL USA;   :
19   and WATSON PHARMACEUTICALS, INC., :
20        Defendants.      :
21   - - - - - - - - - - - - - - - - x
22

**Page 9**

1        COMMONWEALTH OF KENTUCKY
2      FRANKLIN CIRCUIT COURT - DIV. II
3    --------------------------------X
4    COMMONWEALTH OF KENTUCKY,     : CIVIL ACTION NO.
5        Plaintiff,      : 03-CI-1134
6        v.            :
7    ABBOTT LABORATORIES, INC., et al. :
8        Defendants.       :
9    --------------------------------X
10
11       COMMONWEALTH OF KENTUCKY
12     FRANKLIN CIRCUIT COURT - DIV. I
13   --------------------------------X
14   COMMONWEALTH OF KENTUCKY, ex rel. : CIVIL ACTION NO.
15   GREGORY D. STUMBO, Attorney General: 04-CI-1487
16        Plaintiff,       :
17        v.            :
18   ALPHAPHARMA, INC., et al.      :
19        Defendants.        :
20   --------------------------------X
21             Washington, D.C.
22             Tuesday, May 15, 2007

3 (Pages 6 to 9)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

| | Page 10 | | Page 12 |
|---|---|---|---|

Page 10

1        Videotaped Deposition of THOMAS A.
2   SCULLY, a witness herein, called for examination by
3   counsel for Abbott Laboratories in the above-entitled
4   matter, pursuant to subpoena, the witness being duly
5   sworn by SUSAN L. CIMINELLI, a Notary Public in and
6   for the District of Columbia, taken at the offices of
7   Jones Day, 51 Louisiana Avenue, Northwest,
8   Washington, D.C., at 8:49 a.m. on Tuesday, May 15,
9   2007, and the proceedings being taken down by
10  Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and
11  transcribed under her direction.
12
13
14
15
16
17
18
19
20
21
22

Page 12

1   APPEARANCES (continued):
2
3        On behalf of the U.S. Department of
4   Health and Human Services:
5          TROY A. BARSKY, ESQ.
6          U.S. Department of Health and Human Services
7          CMS Division
8          C2-05-23
9          7500 Security Boulevard
10         Baltimore, MD  21244-1850
11         (410) 786-8873
12         troy.barsky@hhs.gov
13
14       On behalf of the State of California:
15         NICHOLAS N. PAUL, ESQ.
16         Supervising Deputy Attorney General
17         Civil Prosecutions Unit
18         P.O. Box 85266
19         110 West A Street, #1100
20         San Diego, CA  82186
21         (619) 688-6099
22         nicholas.paul@doj.ca.gov

Page 11

1   APPEARANCES:
2
3        On behalf of the United States of America:
4          GEJAA T. GOBENA, ESQ.
5          JOHN K. NEAL, ESQ.
6          ANDREW MAO, ESQ.
7          U.S. Department of Justice
8          Civil Division
9          601 D Street, Northwest
10         PHB - 9028/P.O. Box 261
11         Washington, D.C. 20044
12         Gejaa.Gobena@usdoj.gov
13         (202) 307-1088
14
15
16
17
18
19
20
21
22

Page 13

1   APPEARANCES (continued):
2
3        On behalf of the State of Alabama:
4          ROGER BATES, ESQ.
5          Hand Arendall, L.L.C.
6          1200 Park Place Tower
7          2001 Park Place North
8          Birmingham, AL  35203
9          (205) 502-0105
10         Rbates@handarendall.com
11
12       On behalf of the State of Florida:
13         MARY S. MILLER, ESQ.
14         Office of the Attorney General of Florida
15         PL-01, The Capitol
16         Tallahassee, FL 32399-1050
17         (850) 414-3600
18         Mary_Miller@oag.state.fl.us
19
20
21
22

4 (Pages 10 to 13)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                    Washington, DC

| Page 70 | Page 72 |
|---|---|
| 1  recall who your direct reports were?  In other words,<br>2  who reported directly to you?<br>3      A.    A long list of people, but the direct<br>4  reports were my deputy, and then three center<br>5  directors, the person who ran Medicare, the person<br>6  that ran Medicaid, and the person that ran the<br>7  essentially managed side of Medicare, which had a<br>8  separate division, the general counsel and various<br>9  other -- probably 15 people who reported essentially<br>10 directly to me, but those were the primary ones.<br>11     Q.    And who was your deputy?<br>12     A.    Leslie Norwalk, who is acting<br>13 administrator now.  And prior to that, Ruben<br>14 King-Shaw, who was the deputy for probably the first<br>15 two years I was there.<br>16     Q.    And who was the -- you mentioned Medicaid<br>17 and Medicare, were those divisions?<br>18     A.    Dennis Smith has been -- the whole time<br>19 has been the head of Medicaid.  Yes.<br>20     Q.    Dennis Smith?<br>21     A.    Dennis Smith.<br>22     Q.    And what is that called within CMS, is | 1  time, to be honest with you.  It was largely career<br>2  people, Michael McMullen, career person, most of the<br>3  time.<br>4      Q.    And who was the --<br>5      A.    She was a woman, by the way.  Michael was<br>6  a female.<br>7      Q.    Spelled like in the normal way?<br>8      A.    Spelled just like the male Michael<br>9  McMullen.<br>10     Q.    And who was the general counsel during<br>11 your tenure?<br>12     A.    Technically, there is -- it's the deputy<br>13 general counsel of HHS serves effectively as the<br>14 chief counsel at CMS.  The lawyers at HHS have an<br>15 assignment at the CMS.  So Peter Urbanowicz, who is<br>16 the deputy general counsel of HHS most of that period<br>17 was effectively chief counsel at CMS.<br>18     Q.    What was Peter's last name as well?<br>19     A.    Urbanowicz.<br>20     Q.    And in terms of who you reported to, you<br>21 reported to the Secretary of HHS?<br>22     A.    Yes. |

| Page 71 | Page 73 |
|---|---|
| 1  that a division or department?<br>2      A.    It's a center.  Center for Medicaid<br>3  services.<br>4      Q.    And who was the person with, on the<br>5  Medicare center?<br>6      A.    Center for Medicare management was Tom<br>7  Grissam most of the time.<br>8      Q.    And was someone else also in that role<br>9  during your tenure?<br>10     A.    Tom may have probably -- I don't think<br>11 anybody was -- Tom Gustafson may have been acting for<br>12 a while as a career person, but I think Tom Grissam<br>13 left roughly when I did.  They would have been the<br>14 two primary -- those two would have been primarily<br>15 responsible for Medicare and Medicaid in this<br>16 context.<br>17     Q.    And I could look it up, but what was<br>18 Dennis's last name on the Medicaid?<br>19     A.    Smith.  He is still there.<br>20     Q.    I should be able to remember that.  Okay.<br>21 And who headed up the managed care center?<br>22     A.    I'm not sure anybody did for most of the | 1      Q.    And you did not report to the President<br>2  directly, correct?<br>3      A.    No.<br>4      Q.    I mean, that's correct?<br>5      A.    Yes.<br>6      Q.    And during your tenure at CMS, CMS had an<br>7  email system, is that correct?<br>8      A.    Yes.<br>9      Q.    And did you use email to communicate with<br>10 folks?<br>11     A.    Yes.<br>12     Q.    And was that during the entire time you<br>13 were at CMS?<br>14     A.    Yes.<br>15     Q.    When you came on board, did you receive<br>16 any emails from your predecessor?<br>17     A.    Well, my immediate predecessor was Michael<br>18 McMullen for 10 months.  Nancy-Ann Mindeparo left, I<br>19 believe, in sometime late in the Clinton<br>20 Administration, and Michael McMullen who was the top<br>21 career person was the acting administrator for<br>22 probably 8 to 10 months, roughly. |

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                          May 15, 2007
                        Washington, DC

| Page 78 | Page 80 |
|---|---|

Page 78

1  done it phonetically, but do you know how to spell
2  Mr. Urbanowicz's name?
3      A.   U-R-B-A-N-O-W-I-C-Z, I think.  Are you at
4  a convenient stop for a 30-second bio break?  Just
5  very quick.  Sorry about that.
6          THE VIDEOGRAPHER:  The time is 9:47 a.m.
7  We are going off the record.  This ends tape number 1
8  in the deposition of Thomas Scully in the matter of
9  In Re Pharmaceutical Industry Average Wholesale Price
10 Litigation.
11         (Recess.)
12         THE VIDEOGRAPHER:  The time is 10:01 a.m.
13 We are going back on the record, starting tape number
14 2 in the deposition of Thomas Scully, in the matter
15 of In Re Pharmaceutical Industry Average Wholesale
16 Price Litigation.
17         BY MR. DALY:
18     Q.   Mr. Scully, I wanted to go back to what
19 you said about shortly after you left CMS, having
20 checked with CMS about some emails.  What were the
21 circumstances under which you were looking for those
22 emails at that point in time?

Page 79

1      A.   Oh, I think there was a discussion of --
2  there were a variety of investigations going on
3  surrounding the drug bill.  There was another one
4  surrounding a personal issue with me and my, my
5  leaving.  And during the course of the investigation,
6  both GAO people and Inspector General people and
7  people from CMS, at least my recollection, all told
8  me that my emails from those days did not exist.
9          For example, I sent out almost daily an
10 email to all 4,000 employees saying what I was doing
11 that day.  And I think all of those were deleted from
12 the system from what I was told.  I've certainly
13 never seen any of them, and I've asked to see them.
14     Q.   And I think we touched on this, but who is
15 it that you think told you that?
16     A.   I'm pretty certain that I talked to the
17 systems people at CMS.  I know that I talked to --
18 I'm pretty sure I talked to Peter Urbanowicz and Tom
19 Barker.
20     Q.   And this was within three months
21 approximately after you left in January of '04?
22     A.   Three or four months after I left, there

Page 80

1  was a rather large public debate around the cost of
2  the Medicare bill, and various issues about, you
3  know, the negotiation of the Medicare bill during
4  that period.
5      Q.   And you mentioned one type of email which
6  was -- was that a weekly or daily email that you
7  sent?
8      A.   First year and a half, I sent a daily
9  email to all employees.  And then I probably started
10 sending it twice a week after that.
11     Q.   And when you -- you may have not done this
12 personally, but maybe your assistant may have done
13 it, but did you have any kind of process where you
14 would save emails and put them into a folder or
15 archive them or anything like that?
16     A.   My assistant now at my law firm was my
17 assistant, one of my primary assistants back then, so
18 she would know.  But I'm not aware if there was one,
19 if she did it.  Shanetta Allen, she worked for me at
20 CMS and came to my law firm with me.
21     Q.   And what's her name?
22     A.   Shanetta Allen.

Page 81

1      Q.   And if she had a system for maintaining
2  your emails, it's something that she would know
3  about, but you don't?
4      A.   Yes.  But I believe she would also tell
5  you that she has also been told that the emails don't
6  exist.
7      Q.   Did CMS, while you were there, have any
8  policy concerning the retention of emails?
9      A.   Not that I'm aware of.
10     Q.   Who would -- who within CMS would, would
11 know that, if there was such a policy?
12     A.   I'm not sure who's left that would know
13 that.  Let me -- I'm not sure, to be honest with you.
14     Q.   In terms of -- they don't have to still be
15 there.  I mean, if you know somebody that while you
16 were there you think is the person --
17     A.   Well, at the time, most of the time I was
18 there, before she became the deputy, Leslie Norwalk,
19 who is now the acting administrator was the chief
20 counsel.  I mean, she was my personal staff counsel,
21 not the HHS deputy general counsel.  And she probably
22 would have made calls like that.  And she was very

                                    21  (Pages 78 to 81)

                    Henderson Legal Services
                        202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                   May 15, 2007
                        Washington, DC

Page 122

1        THE WITNESS:  In my opinion, I think a lot
2   of oncologists weren't comfortable with it, and I
3   think -- were they doing something wrong?  I think it
4   was outrageous behavior, much like hospital outliers
5   were by Tenet.  You can debate, it's not my place to
6   say whether it was -- whether the physician behavior
7   was appropriate or not.
8        I think most physicians knew what was
9   going on, and much like coming into debate with
10  foreign programs are occasionally oversubsidized, I
11  mean, the behavior was outrageous and I knew many
12  oncologists and other physicians were uncomfortable
13  with it.
14       And as we were going through these
15  reforms, I had many of them tell me that.  But on the
16  other hand, that's the way the system was operating
17  at the time.  So you can debate the physician
18  behavior or not, but clearly the results and the
19  policy were as insane as anything I've run across in
20  many years of government service.
21       BY MR. DALY:
22       Q.   But that was the system that was in place,

Page 123

1   correct?
2        A.   That was the system that was in place.
3        Q.   And you mentioned the RUC or the RUC, I
4   believe it's R-U-C?
5        A.   It's misspelled in here.
6        Q.   And just for the record, explain what that
7   is and give the right initials?
8        A.   It's the R-U-C, and I think it's the -- I
9   should know this -- Resource Utilization Committee, I
10  think it is.  It's basically run through the AMA, and
11  it's theoretically an advisory group to CMS on
12  physician payments.  But in practice, over the years,
13  unless they come up with something really foolish,
14  CMS lock stock and barrel generally -- it's sort of
15  the UN of physician groups.  They all come in and
16  argue over the relative pot of allocation of money
17  going to physicians.
18       They make a recommendation to CMS every
19  year in the annual CMS payment rule, but if the
20  gastroenterologists are underpaid or internists, or
21  surgeons, and they try to balance the relative
22  weighting.  And in most cases, CMS takes the vast

Page 124

1   bulk of the recommendations and puts it in the
2   physician fee schedule.
3        Q.   You said it's kind of like the UN of
4   providers, is that what you said?
5        A.   Of physicians.
6        Q.   Physicians.  Okay.  Now, you mentioned --
7   well, you mentioned that in the, in the first year at
8   least, you had -- you being CMS -- and strike that.
9        In the year of the MMA, CMS, you had
10  estimated that the additional money that would be
11  needed to put into the oncology and other provider
12  pot to increase service fees was 48 to 52 million,
13  right?
14       MR. GOBENA:  Object to the form.  This
15  witness is not here as a 30(b)(6) to testify on
16  behalf of CMS's position on anything.
17       THE WITNESS:  I believe that was in
18  testimony, the initial recommendation both, roughly,
19  of CMS and of GAO.
20       BY MR. DALY:
21       Q.   And then you said that, you know, politics
22  got involved and it ended up being 500 to 600

Page 125

1   million, is that correct?
2        A.   You could have a very rational policy
3   debate about what the appropriate level was, but I
4   would say the 5 to 600 million clearly represented --
5   a large chunk of that was politics.
6        Q.   And so that we are clear, what we are
7   talking about is that under the MMA, when it went
8   into effect, drug reimbursement was reduced by a
9   certain amount, and at the same time, service fees to
10  providers were increased, correct?
11       A.   Yes.
12       Q.   And the increase on the service fees to
13  providers was in the range of 500 to $600 million?
14       MR. GOBENA:  Object to the form.
15       BY MR. DALY:
16       Q.   Is that right?
17       MR. GOBENA:  Mischaracterizes the
18  witness's testimony.
19       THE WITNESS:  Yes.  In the RUC, or in the
20  normal process of roughly $70 million of Part B
21  payments, if you're going to raise oncologists, you
22  have to cut somebody else.  It's a budget neutral

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                    Washington, DC

| Page 202 | Page 204 |
|---|---|

**Page 202**

1  of how states reimbursed Medicaid drug purchases?
2       MR. GOBENA:  Object to the form.
3       THE WITNESS:  Every state was vastly
4  different.
5       BY MR. DALY:
6   Q.   And did most states use some sort of
7  variation on AWP minus?
8       MR. GOBENA:  Object to the form.
9       THE WITNESS:  I'm not -- you know, I can't
10 tell you what the survey is.  I would say they
11 probably did to some degree.  I'm not sure.  I'm not
12 sure there is a consistent pattern.
13      BY MR. DALY:
14  Q.   And you saw, while you were administrator,
15 you saw reports from OIG indicating that state
16 Medicaid programs were overpaying for drugs under
17 their respective Medicaid programs, did you not?
18      MR. GOBENA:  Object to the form.
19      THE WITNESS:  I don't remember the focus
20 was much, much more on Medicare.  And in Medicaid was
21 much, in my recollection, much more on the
22 calculation of rebates and how that worked than it

**Page 203**

1  was on what the AWP pricing was.
2       BY MR. DALY:
3   Q.   Were you aware that during your tenure the
4  OIG did a series of reports on Medicaid where they
5  indicated that on average, the payments made by state
6  Medicaid agencies for branded drugs were in the
7  neighborhood of 18 percent, or more, less than AWP
8  and for generic drugs, it could be 42, 48 percent
9  lower than AWP or even higher than that?  Do you
10 recall reports in that area?
11      MR. BREEN:  Objection.
12      MR. GOBENA:  Object to the form.
13      BY MR. DALY:
14  Q.   Go ahead.
15  A.   I don't, but I can tell you, in my
16 opinion, AWP was always a completely meaningless
17 number, so it could have been AWP minus 99 percent.
18 It usually would have been wrong.
19  Q.   Okay.  And you knew that the states were
20 reimbursing based on AWP, right?
21      MR. GOBENA:  Object to the form.
22      THE WITNESS:  50 different state programs

**Page 204**

1  plus territorial programs.  And generally -- well,
2  CMS had a hard time figuring out how the process the
3  work.  States were usually less staffed and less
4  aware, and that was a problem.
5       BY MR. DALY:
6   Q.   But you knew that states were generally
7  reimbursing on a formula that was ASP minus a
8  percent?
9   A.   AWP?
10  Q.   What did I say?
11  A.   You said ASP.
12      MR. GOBENA:  Object to the form.
13      BY MR. DALY:
14  Q.   AWP?
15  A.   Again, generally.  But I think my
16 recollection is almost every state was different.
17 There wasn't a whole lot of consistency.
18  Q.   Well, you said that if a state was acting
19 unreasonably, then the federal government could step
20 in and make them change their program?  Is that your
21 understanding of how the dynamics between the states
22 and the federal government worked?

**Page 205**

1       MR. GOBENA:  Object to the form.
2       THE WITNESS:  My view was that Medicaid
3  was chronically understaffed.  I significantly
4  increased the Medicaid staff while I was there.  But
5  when I got there, out of 5,000, 4200 staff and
6  probably 50,000 contract staff, almost all the
7  contract staff were carriers and fiscal
8  intermediaries, a thousand people maybe fewer that
9  worked on Medicaid nationwide.  And there just was
10 not -- states with 50 different programs plus the
11 territories, the understanding that was going on
12 Medicaid day-to-day was pitifully weak.
13      And I did my best to enhance that but
14 it's, you know, Medicare was the CMS's program,
15 Medicaid was the states' program that we matched for.
16 And generally our policy and guidance and
17 understanding the mechanics was not very good.  To
18 this day isn't very good in my opinion.
19  Q.   But back to my question about the
20 programs, the federal government and CMS to your
21 understanding had the right to approve or disapprove
22 a state reimbursement program, right?

52 (Pages 202 to 205)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                         May 15, 2007
Washington, DC

Page 226

1        And it was just a flat-out political
2  calculation that I had already discussed with all the
3  staff and all the members about how do we get from
4  here to there, without -- because the general
5  community screaming about this generally far
6  outweighed the substance of understanding of members.
7        So I think I congratulated the members of
8  this hearing for having it, and raising the
9  awareness.  I also realized the only way to get this
10 thing done, because it was a fairly obscure technical
11 issue, was to send a message early on that we were
12 sensitive to all parties and that we were not just
13 going to cut drugs, that we would try to find some
14 way to put some money back in.
15       But I also said from the beginning that we
16 were looking at 50 million out of a billion and
17 certainly it wasn't a one for one cross-subsidy.  We
18 were also trying to say that, you know -- I said from
19 the very first day, if I have to do this myself,
20 there is no money back in it for practice expenses.
21 I'm just going to cut the drugs.  If we work with
22 Congress, we can cut the drugs and put some money

Page 227

1  back in for practice expenses.
2        So you know, that was the issue.  And from
3  the very beginning, I was trying with the very
4  tightly coordinated discussion with the members of
5  Congress, at least the chairman and the ranking
6  member, to send a signal we were going to reform
7  this, but we talked to all parties and tried to do it
8  correctly.
9     Q.   And while people might be able to debate
10 how much -- how many dollars it would take to provide
11 appropriate services reimbursement, your testimony
12 under oath to Congress was that it was a legitimate
13 concern for the providers, correct?
14       MR. GOBENA:  Object to the form.
15       THE WITNESS:  Certainly it's a legitimate
16 concern to the providers because they were going to
17 lose reimbursement.  Was their existing level of
18 reimbursement correct?  I would argue not.  Was it
19 their fault, on the physician side?  They were
20 following what I consider to be stupid policy that
21 was in place.  But it was clearly very little
22 argument and zero argument in my opinion to take the

Page 228

1  money out of the drugs and put it all back in the
2  practice expenses.
3        BY MR. DALY:
4     Q.   That's why I said you could debate how
5  much money was involved, but what you're telling
6  Congress is that there is a legitimate concern on
7  behalf of the providers here when it comes to
8  cross-subsidization?
9     A.   Overwhelmed by the legitimate concern on
10 behalf of the taxpayers and the program that we are
11 paying way too much.
12    Q.   Well, what I'm trying to get to is when
13 you told Congress here under oath in this hearing, it
14 is a legitimate concern for the providers, I just
15 want -- you were telling the truth there, right?
16    A.   It is a legitimate concern for providers
17 that the reimbursement was going to go down on the
18 drug side.  Yes.  As I discussed earlier with the
19 RUC, there was a general awareness that because
20 oncologists in particular and rheumatologists and
21 others had done so well compensation-wise, I mean the
22 average oncologist salary was probably going up --

Page 229

1  income, 25 to 30 percent all during the '90s because
2  of this drug churn, there had probably been
3  subconsciously in the RUC and other mechanism in
4  Medicare an effort to kind of say, they are making so
5  much money on drugs, why do we keep paying them money
6  on practice expenses.  So if you're going to take the
7  money away from drugs, at least they would look at
8  other side as a matter of equity, which we tried to
9  say we were willing to do here.
10    Q.   If we come down a couple of paragraphs,
11 the one that begins "I'm not saying."  But at the
12 last sentence of that paragraph states that "I do
13 think it's appropriate to make sure that to the
14 extent we can set prices right for drugs, then for
15 practice expenses then for practice patterns, we
16 should set them right.  And I think there is very
17 little doubt they are not right now."  Do you see
18 that language?
19    A.   Yes.
20    Q.   And by that, you mean it's very -- there
21 is very little doubt that the practice expenses were
22 not set at the appropriate level, correct?

58 (Pages 226 to 229)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                          May 15, 2007
                        Washington, DC

Page 294

1  say, this is you, you say, "everybody has
2  acknowledged for years that oncologists have a
3  significant cross-subsidy through AWP, so I think
4  there was a subconscious effort within the RUC to not
5  fully and completely consider all of the practice
6  expenses for oncologists because of the acknowledged
7  cross-subsidy from AWP's overpricing." Do you see
8  that?
9     A.  Yes.
10    Q.   And everyone includes CMS, correct?
11       MR. GOBENA:  Object to the form.
12       THE WITNESS:  I think the staff that
13  oversaw the RUC, when they sat down with the RUC
14  every year to figure out which physicians needed more
15  and which physicians didn't, they probably -- I'm
16  fairly certain, which is the argument I made all
17  along, consciously were trying to put more money into
18  the other places because the oncologists had this
19  other stream of income from very high drug margins.
20       So do I think people were excited about
21  that policy or supportive of it?  No.  It's just a
22  fact of life.  So when you're sitting there trying to

Page 295

1  equitably treat all physician groups, from a 70
2  billion pot, and you know the oncologists have this
3  side stream of income, I think there was a
4  subconscious movement for a couple of years to
5  probably not be as concerned about giving them more
6  money in the practice expense pocket.
7       BY MR. DALY:
8     Q.   Because CMS knew that they were making so
9  much money on the drugs, correct?
10       MR. GOBENA:  Objection to the form.  The
11  witness is not here as a 30(b)(6) for CMS.
12       THE WITNESS:  As I said repeatedly, it was
13  nowhere near one to one, it was more like a 1 to
14  20 -- you can debate whether it was 1 to 5 or 1 to
15  20, but the amount of money that perceived to be
16  coming as income from drug margins was significantly
17  higher than I think anybody would credibly argue was
18  any perceived or real shortfall on the practice
19  extension side.
20       Then again, a lot of this was politics.
21  I'm testifying, trying to get this passed, trying to
22  send the signal to the oncology world that we feel

Page 296

1  your pain, we are sensitive.  As we reform this,
2  we're going to take concerns into the mind, because I
3  had watched all previous efforts crash on the rocks.
4       BY MR. DALY:
5     Q.   I'm not sure the court reporter got your
6  response, but because it was interfered with by the
7  objection, but for just in terms of her being able to
8  type it.  But my question was, well, go back to my
9  other question, would you, go back to my last
10  question.
11       MR. GOBENA:  Maybe it would be help, Tom,
12  if you would wait a beat before I object and then we
13  won't talk over each other.
14       THE WITNESS:  Sorry.
15       MR. GOBENA:  That's okay.  Certainly
16  wasn't an interference, though.
17       BY MR. DALY:
18    Q.   You had in your -- one of your prior
19  answers talked about how there had been maybe a
20  subconscious effort not to put more money into the
21  service side for oncology because everybody knew that
22  they were making profits on the drugs, is that

Page 297

1  correct?
2       MR. GOBENA:  Object to the form.
3       MR. BREEN:  Objection.  Form.
4       MR. GOBENA:  You can answer.
5       THE WITNESS:  Yes.  I would say on
6  rheumatology probably to a lesser degree as well
7  because there was a general knowledge in some
8  practice areas these physicians had a second income
9  stream from margins on drugs that other providers did
10  not.  And so you're sitting around trying to figure
11  out whether surgeons need more on a relative basis.
12       Well, that's what the whole RUC process is
13  about.  Internists, surgeons, cardiac surgeons making
14  an adjustment to find that pot of money when you know
15  the oncologists have a second pot of money, you're
16  generally not as concerned in making sure their
17  practice expense goes up in a budget neutral pot as
18  somebody else's.
19       On the other hand, if you knew that some
20  of that drug revenue was going to go away, you might
21  make a certain calculation but it certainly wasn't in
22  my estimation a one to one swap, whereas on the

                              75 (Pages 294 to 297)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

Page 366

1   subject to this carveout in the home infusion
2   setting, Congress has kept the reimbursement of those
3   drugs at 95 percent of AWP as of --
4       A.   As of October 2003.
5       Q.   That's correct, isn't it?
6       A.   I guess it is.  That's what the statute
7   says.  Another piece of sausage.  I have just
8   forgotten that we did that, to be honest with you,
9   which I assume is why they don't have a dispensing
10  fee for anything but respiratory drugs, because they
11  didn't do that for respiratory drugs.
12      Q.   So it would appear that Congress, at least
13  for these drugs and in that setting of home infusion,
14  has determined to subsidize the provision
15  of the services by overpaying for the drugs, correct?
16      MR. GOBENA:  Object to the form.  The
17  legislation speaks for itself.
18      MR. BREEN:  Objection to the form.
19      BY MR. DALY:
20      Q.   You can go ahead.
21      A.   Yes.  I was surprised to see this.  I
22  forgot we did it.  It was certainly never discussed

Page 367

1   by members.  I'm sure the staff -- staff person who
2   wrote it works with me at Alston & Bird, so I'll go
3   back and ask him, but I'm sure that it's probably,
4   they froze it to freeze it, and some level of
5   cross-subsidy apparently.  I'm not sure what the
6   congressional intent there was, but I think it was
7   Senator Grassley's staff that did that provision.  So
8   I had totally forgotten we did it.  That it was in
9   the bill.  It wasn't something that was widely
10  discussed at all.
11      Q.   And are you aware of whether the drugs
12  that DOJ is suing Abbott for, many of those drugs are
13  used in the home infusion context and using DME?
14      MR. GOBENA:  Objection to form.
15      THE WITNESS:  As of today, I'm aware of
16  it.  I wasn't aware of it before.
17      BY MR. DALY:
18      Q.   But as of today, you are?
19      A.   Yes.  Obviously looking at the drug list.
20      Q.   Page 27 of Exhibit Abbott 191, which is
21  your 10-3 -- yes, your October 3 -- excuse me,
22  October 3, 2002 testimony.  I just want to direct you

Page 368

1   to page 27.
2       A.   27?
3       Q.   Yes.
4       A.   Okay.
5       Q.   And in your testimony in response to
6   Mr. English, you indicate that you think -- well, you
7   state, "I think there are a lot of different provider
8   areas that may have small impacts from AWP, and we
9   are certainly willing to work with the committee to
10  identify those."  And then you mentioned oncology
11  as -- oncology and dialysis and hematology being sort
12  of the big three, right?
13      A.   Yes.
14      Q.   And then you say, "I think almost every
15  physician to some degree that administers drugs
16  probably has some beneficial cost shifting benefit
17  from AWP, I think those are the three big areas," you
18  see that language?
19      A.   Yes.
20      Q.   And that was a true statement, correct?
21      A.   Yes.
22      Q.   On page 31, I just want to get a fix for

Page 369

1   -- and we may have covered this in some part in the
2   sort of background section that we did at the
3   beginning, but you state at the bottom of the page,
4   "I had been working on Medicare for over 20 years and
5   there has never been any law passed more complicated
6   than this one."  How far back does your work on
7   Medicare go?
8       A.   In a minor way, probably 1982.  But in a
9   full time way, 1989.
10      Q.   And what were you doing with respect to
11  Medicare in 1982?
12      A.   Not much.  Occasional staff work for
13  Senator Gorton, but very, you know, minor.
14      Q.   And '89 would have started your work with
15  the Bush Administration?
16      A.   And OMB.  Yes.
17      Q.   And if you would turn to page 34.  If you
18  -- actually, if you look at 33, the page before, it
19  looks like you finished up your testimony, and then
20  George Reeb, R-E-E-B, got in the hot seat.  And began
21  to talk a little bit about Medicare and Medicaid.
22  And on page 34 of Mr. Reeb's testimony, he states

                                93 (Pages 366 to 369)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                          May 15, 2007
                        Washington, DC

Page 374

1    Q.   And to do so -- well, I mean, I take it
2  that fixing 50 state Medicaid programs would be, you
3  know, versions of trying to fix Medicare times 50.
4  Is that fair?
5    A.   Yes.
6    Q.   Because each state would have its own
7  political issues, for example, correct?
8       MR. GOBENA: Object to the form.
9       THE WITNESS: Yes. Medicaid is 54
10 territories, 55 different programs that are all
11 complex and all different payment rates and different
12 politics and makes Medicare reform look simple.
13      BY MR. DALY:
14   Q.   And for example, you would have, you know,
15 providers within each state, this time including
16 pharmacies, for example, that would be complaining to
17 state governments if reimbursement levels attempted
18 to be reduced, be reduced, is that true?
19      MR. GOBENA: Objection. Form.
20      THE WITNESS: Yes. Every state had
21 different pharmacy politics with the providers and
22 what the dispensing fees were and what the

Page 375

1  acquisition costs were. Yes.
2       BY MR. DALY:
3    Q.   But it was your view, it was CMS's view
4  that if a state wanted to pay to reimburse pharmacies
5  at AWP minus, say, 10 percent, for example, even
6  though the actual acquisition cost of the drug might
7  be AWP minus 72 percent, you did not find that to be
8  unreasonable?
9       MR. GOBENA: Objection to the form. This
10 witness is not here as a 30(b)(6) testifying about
11 CMS's views.
12      BY MR. DALY:
13   Q.   Go ahead.
14      MR. GOBENA: You can answer.
15      THE WITNESS: My personal view was that it
16 was -- was it unreasonable? Yes. I mean, I spent a
17 lot of time complaining to states about trying to
18 make sure that they paid the lower cost for drugs,
19 and some did. And I pushed on a lot of states to
20 hire third party PBMs which a lot of them did, to buy
21 their drugs and lower their acquisition costs and
22 come up with a market-based pricing, which

Page 376

1  increasingly some did.
2       And I authorized the number multi-state
3  purchasing groups which were controversial for states
4  to go ahead and use private PBMs to lower their cost.
5  So it was a concern. For me it was more direct and
6  immediate concern for the Medicare program, which I
7  was directly responsible for. But when states asked
8  me what to do on Medicaid drug pricing, my general
9  advice, which a lot of them did, was to hire a PBM to
10 go out, put them at risk, and drive prices down,
11 which a number of them did.
12      BY MR. DALY:
13   Q.   In your testimony in 2003, you testified
14 that Medicaid has actually become a larger program
15 than Medicare. Do you recall that testimony?
16   A.   Yes.
17   Q.   And so why do you say that you didn't have
18 direct responsibility for trying to reduce the
19 federal government's Medicaid payments?
20      MR. GOBENA: Object to the form.
21 Mischaracterizes the witness's testimony. You can
22 answer.

Page 377

1       THE WITNESS: I did have responsibility
2  for Medicaid. The federal government runs and
3  manages Medicare day-to-day. And when you had a
4  situation like you did for Medicare, I felt it was
5  probably next to prescription drug reform, which was
6  my number one priority going back in the government.
7  And number two was probably fixing AWP, because it
8  was a big fiscal and management and policy problem
9  for the agency.
10      So I spent a lot of time trying to fix it.
11 On Medicaid, I had equal interest but the single
12 biggest Medicaid policy fiscal issue that we had was
13 if -- was the states scamming reimbursement matches
14 which I mentioned earlier, which was a multibillion
15 dollar problem, state by state, with the states
16 because they had a fiscal partnership between the
17 federal and state governments. The single biggest
18 policy problem there that I spent most of my time on
19 was to trying to prevent the states from putting up
20 air to match federal, and drawdown federal dollars
21 without putting out state dollars.
22      Once we got to the point where we're

95 (Pages 374 to 377)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                          May 15, 2007
                        Washington, DC

Page 378

1  actually running the state Medicaid programs as
2  partnership with equal partners putting up their
3  matches, it was a lot easier to talk to them about
4  trying to -- they didn't care as much about what they
5  paid for drugs when they were spending federal
6  dollars.
7         So my biggest policy priority on Medicaid
8  was to trying to get the states to actually live with
9  a match. Once they did that, they were magically
10 much more interested in trying to figure out how to
11 pay the right amount for drugs. They weren't quite
12 as interested in what they paid for drugs or for
13 physicians or nursing homes or anything else when
14 they were paying with 100 percent federal dollars or
15 90 percent federal dollars.
16        So my number one priority was to make sure
17 they were putting in their share and then magically
18 they became much more interested in trying to figure
19 out what the right amount to pay for drugs was, which
20 many states did. And the states that I worked with,
21 including governors, Michigan and a lot of other
22 states that formed multistate cooperatives were very

Page 379

1  interested in lowering their drug costs.
2         And my view was because they did not have
3  the statutory construct that we had in Medicare, the
4  smartest states hired private PBMs, I think seven or
5  eight of them in the multistate cooperative, and a
6  lot of the third party negotiators to lower the drug
7  cost, which many of them did. And that was the
8  growing trend while I was at CMS.
9         BY MR. DALY:
10    Q.   When you said that the states didn't have
11 statutory constructs, what do you mean by that?
12    A.   I don't believe the states had -- they
13 were able to file state Medicaid plans to pay for
14 drugs under a variety of mechanisms. Their average
15 might have been ASP minus 10, but they consensually
16 -- as long as they covered the basic categories of
17 drugs and beneficiaries mandated by Medicaid law,
18 they could pay -- they could do it under a wide
19 variety of payment schemes, and they did. And
20 probably as many different ways to pay for drugs as
21 there were states.
22    Q.   But the OIG is telling you that the

Page 380

1  discounts below AWP run all the way up to 72 percent,
2  correct?
3         MR. GOBENA:  Object to the form.
4         THE WITNESS:  That states were paying?
5         BY MR. DALY:
6    Q.   Yes.
7    A.   I'm sure that's right. The discount is
8  below that if you measure it versus AWP, but AWP is a
9  meaningless number for me. So were some states
10 negotiating prices much lower than that? I'm sure
11 they probably were.
12    Q.   Well, but OIG is telling you that it's the
13 average reimbursement by state Medicare agencies is
14 AWP minus 10.3 percent?
15        MR. GOBENA:  Object to the form.
16        THE WITNESS:  Yes.
17        BY MR. DALY:
18    Q.   So that's the average?
19    A.   Yes.
20        MR. GOBENA:  Object to the form.
21        BY MR. DALY:
22    Q.   And if for certain drugs, the actual sales

Page 381

1  price is 75 percent lower than AWP, then those states
2  are overpaying by 65 percent, right?
3         MR. GOBENA:  Object to the form.
4         THE WITNESS:  In theory, some states may
5  have, but I believe over the time that I was there,
6  that probably -- that may be the average, but my
7  guess is that the weighting, weighted average may
8  have been lower, because more and more states hired
9  third party PBMs to do negotiating for them. And I
10 don't believe they -- maybe I'm wrong, but I don't
11 think that number counts rebates either.
12        BY MR. DALY:
13    Q.   When you said that you wanted to -- when
14 you came on with CMS, you wanted to work on the
15 prescription drug benefit and fix AWP, right?
16    A.   Right. Many other things, but that was --
17    Q.   Among other things?
18    A.   Those were certainly number one and three
19 or four of my top 10 probably.
20    Q.   And AWP is also an issue on the Medicaid
21 side of the equation within CMS, right?
22    A.   Yes. But it was not as high a priority as

96 (Pages 378 to 381)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

# EXHIBIT CC

Niemann, Robert                          September 14, 2007
                       Baltimore, MD

Page 1

                 UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

     - - - - - - - - - - - - - -x

     IN RE:  PHARMACEUTICAL       :  MDL NO. 1456

     INDUSTRY AVERAGE WHOLESALE   :  CIVIL ACTION

     PRICE LITIGATION             :  01-CV-12257-PBS

     THIS DOCUMENT RELATES TO     :

     U.S. ex rel. Ven-a-Care of   :  Judge Patti B. Saris

     the Florida Keys, Inc.       :

          v.                      :

     Abbott Laboratories, Inc.,   :  Chief Magistrate

     No. 06-CV-11337-PBS          :  Judge Marianne B.

     - - - - - - - - - - - - - -x    Bowler

                     Baltimore, Maryland

                     Friday, September 14, 2007

        Videotaped Telephone Deposition of ROBERT NIEMANN

                   Henderson Legal Services
                       202-220-4158

27a18706-d632-4df8-8162-703fc9f893ed

Niemann, Robert                              September 14, 2007
                        Baltimore, MD

---

Page 58

1    Q.   When you left in 2005, what did you do
2  with your files in the file cabinet?
3    A.   Nothing.  I mean, I just left.
4    Q.   And they were there?
5    A.   They were there.
6    Q.   Were you responsible for any documents
7  that were kept in CMS or Federal Record Center
8  archives?
9    A.   Was I responsible for them?
10   Q.   Yes, sir.
11   A.   I guess I'm not sure what you're asking.
12   Q.   Were you ever the person that was assigned
13 to be responsible for determining the retention of
14 documents on a subject in the federal archives or the
15 CMS archives?
16   A.   I just -- I don't remember that.
17   Q.   You wouldn't get a notice from the Federal
18 Records Center asking whether a particular file could
19 be kept or discarded, for example?
20   A.   I don't remember ever having that.
21   Q.   Over the course of your career, is it fair
22 to say that documents and communication moved from

---

Page 59

1  paper to electronic form?
2    A.   Well --
3    Q.   Not completely.
4    A.   Well, we certainly used a computer, but I
5  seem to remember that there was a paper copy of
6  things.  I mean, anything formal would have been
7  paper, as I remember it, because we would have sent
8  it -- physically sent it to the other party.
9    Q.   You used email, correct?
10   A.   Yes.
11   Q.   How did you use -- well, first of all,
12 when did you begin using email?
13   A.   When?  Well, it would have been in the
14 '90s, somewhere in the '90s, whenever computers were
15 distributed to everybody.
16   Q.   From that time until 2005 when you left
17 CMS, how was it that you used email?
18   A.   How did I use email?
19   Q.   Yes, sir.
20   A.   I used it to communicate with other
21 individuals mostly within CMS.
22   Q.   Sometimes with carriers, for example?

---

Page 60

1    A.   Well, that has undoubtedly happened
2  occasionally, to the extent I actually had that kind
3  of communication with an individual carrier.  Because
4  as I remember it, most of our communication was
5  formal to all carriers.  It wasn't -- but it seems to
6  me I probably would have been as likely to speak over
7  the phone with the carrier person as to email that
8  carrier person.
9    Q.   Did you maintain folders or other
10 organization of emails within the email system you
11 used?
12   A.   I don't remember organizing the emails
13 particularly.
14   Q.   So if there was an email you wanted to
15 save, would you always print that email or would you
16 put it in some sort of a place to save it for future
17 reference within the system?
18   A.   I don't remember going out of my way to
19 save an email in the way that you're saying.  I just
20 would have left it in the email in box.
21   Q.   And attachments to emails, if you received
22 an electronic message with an attachment attached to

---

Page 61

1  it, would you always print that or would you
2  sometimes leave it in your email in box for future
3  reference?
4    A.   I'm sure I would have left it in the email
5  in box.  I don't think to this day I know how to
6  delete an attachment without deleting the email, so I
7  would have left it in the email.
8    Q.   Would you tend to delete emails after you
9  read them or just leave them there in case you needed
10 them in the future?
11   A.   As I recall, I did not immediately delete
12 emails.  I don't remember doing that.
13   Q.   Do you know what was the volume of your
14 email communications while you were with CMS?
15   A.   That I don't -- I don't know how I would
16 quantify that.
17   Q.   It grew over time, no doubt.
18   A.   Yes.  I guess it grew over time as more
19 and more people used computers.
20   Q.   What would you do with drafts, whether
21 electronic or paper copy?
22   A.   Well, that was -- I guess that was a mixed

---

16 (Pages 58 to 61)

27a18706-d632-4df8-8162-703fc9f893ed

Niemann, Robert                                    September 14, 2007
                        Baltimore, MD

Page 62

1  bag.  I mean, there again, my recollection on this is
2  pretty vague, but I think sometimes I threw them out
3  and sometimes I might save them for a while, and then
4  throw them out.  To the extent that drafts were
5  saved -- I mean, I don't know how useful a draft is.
6  After the policy decision is made, I probably would
7  have been more likely to throw them away, but I can't
8  be sure I threw them all away.
9      Q.   Did you do your own typing?
10     A.   Once we got the computers, yes.
11     Q.   Did you have a section on a shared drive
12  where you would store electronic documents?
13     A.   There was such a section.
14     Q.   And was that called a P drive or an H
15  drive?
16     A.   F.
17     Q.   F?
18     A.   Well, it could have changed.  It probably
19  changed over time.
20     Q.   Whatever drive it was?
21     A.   At one time, I remember it was F.  It
22  could have become H.

Page 63

1      Q.   Was it your understanding that this was on
2  a server?
3      A.   Yes.
4      Q.   Or that it was on your hard drive?
5      A.   No.  That shared drive was definitely not
6  on my hard drive.
7      Q.   Did you maintain documents on your portion
8  of the shared drive?
9      A.   As I remember, a few.  I mean, some of the
10  documents would have been on there.
11     Q.   Is there anyplace else that you would have
12  kept electronic documents?
13     A.   No.  It would have either been on my hard
14  drive or on that shared drive.
15     Q.   Was there any organization to these
16  documents that would be on the shared drive or on
17  your hard drive?
18     A.   I think generally, you know, drug stuff
19  would have been kept separate from ambulance stuff,
20  for example.  I don't know how meticulous the
21  subdirectories got.
22     Q.   So there might be a subdirectory called

Page 64

1  drugs or drug payment or some such thing, and you'd
2  put things -- put documents in there?
3      A.   Right.  I don't remember doing a whole lot
4  on the shared drive.
5      Q.   Most of your --
6      A.   But I do -- I do think there were some
7  documents on there.
8      Q.   Would most of your documents have been on
9  the hard drive, then?
10     A.   I believe that's true.
11     Q.   Do you know what happened to your hard
12  drive or your shared drive when you left CMS?
13     A.   No.  I sure don't.
14     Q.   Do you remember what any of the folder
15  names or directory names were that you used?
16     A.   No.
17     Q.   How about in your personal files?  Do you
18  remember what any of the file folder names were in
19  your organization of files?
20     A.   Not really.  I mean, other than the word
21  ambulance and the word drugs, how else I would have
22  refined it, I don't really remember.

Page 65

1      Q.   Were you ever asked to preserve documents
2  in connection with your job, not to delete or destroy
3  electronic or paper documents?
4      A.   I don't remember that.  I don't remember
5  ever being asked to do that.
6      Q.   Stepping back just a little bit, you
7  described the list of subject matters for which you
8  were policy analyst relating to Medicare drug payment
9  policy.  Did your responsibilities ever apply to
10  Medicaid drug payment policy?
11     A.   No.
12     Q.   Is it a good time for a break?
13     A.   I can keep going a little bit if you want
14  to.
15     Q.   No.  It's up to you.  If you want to take
16  a break, give me a holler, if you want to keep going,
17  we'll keep going.
18     A.   Okay.
19     Q.   Did you ever have any communications with
20  Congress on the question of drug payment policy?
21     A.   Yes.
22     Q.   When did you have communications with

Henderson Legal Services
202-220-4158

27a18706-d632-4df8-8162-703fc9f893ed

Niemann, Robert                                    September 14, 2007
                        Baltimore, MD

---

Page 70

1    Q.   With the in person meetings or the
2  face-to-face meetings, my question is, would you work
3  with the legislative office ahead of time to prepare
4  for these communications?
5    A.   I mean, that's such a general question,
6  I'm sure we had discussions.
7    Q.   Right.
8    A.   And they are not always -- they weren't
9  always specific, you know, we didn't know what the
10 staffer was going to ask.  But there would -- yes, we
11 would have, we would have discussions.
12   Q.   And you indicated to me that you can't
13 remember any specifics of any of these conversations?
14   A.   No.  Not really.
15   Q.   And why is that?
16   A.   Well, it's -- it's because I've moved on.
17   Q.   And it's been a long time?
18   A.   Yes.  It's been a long time.  I don't, I
19 don't think about this stuff.
20   Q.   So if I had asked you, say, in 1997 about
21 a conversation that took place in 1996, there is a
22 much better chance that you would remember what you

---

Page 71

1  said in 1996?
2        MS. OBEREMBT:  Objection.
3        THE WITNESS:  I would hope so.
4        BY MR. COOK:
5    Q.   It's fair to say?
6    A.   I guess that's right.  I hope that's true.
7    Q.   Does anything stick out in your mind about
8  any of the conversations with Congress on drug
9  payment policy issues?  I mean, is there one that
10 really stands out at all with Congressman so and so
11 and he said something or --
12   A.   No.
13   Q.   Do you know if any of these conversations
14 had to do with the concept of average wholesale
15 price?
16   A.   Yes.
17   Q.   Was that a frequent topic of conversation
18 in your -- to the extent that frequent can be used
19 for these conversations with the legislative branch?
20   A.   Yes.  Well, that was the basis for what
21 our payment policy was, so yes.  It would have been.
22   Q.   If I wanted to find out what those

---

Page 72

1  communications were between the agency and Congress
2  regarding average wholesale price, standing here in
3  2007, is there any way that I could reconstruct those
4  communications?
5    A.   I guess your best hope of doing that, if
6  that's possible, would be to contact the legislative
7  people, the staff over there.
8    Q.   Do you remember by name any of the other
9  individuals who were on any of these meetings or
10 telephone calls?
11   A.   Well, one name I certainly remember is Ira
12 Bernie, who may still be working there.  Another
13 name, and I'm sure she is not working there now, is
14 Kathleen.  I seem to have a pattern here.  I can
15 remember first names and not last names.  I can't
16 remember Kathleen's last name, but I'm sure she left
17 the government.
18   Q.   Where did they work, Kathleen and Ira
19 Bernie?
20   A.   It was called OLP, at least then.  Office
21 of -- well, the L is Legislation.  I'm not sure what
22 the P stands for.  It was Office of Legislation.

---

Page 73

1    Q.   Anybody else that you can remember that
2  were involved in these conversations?
3    A.   Peter Hickman, he was the division
4  director over there.
5    Q.   How about on the other side of the
6  telephone on the legislative side.  Do you recall any
7  specifics of the individuals with whom you spoke?
8    A.   I don't.
9    Q.   Do you remember any of the issues that
10 were raised in these conversations at any level of
11 generality, other than the general topic of average
12 wholesale price?
13   A.   Other than that?
14   Q.   Yes, sir.
15   A.   No.
16   Q.   And now in these conversations related to
17 average wholesale price, we've used the term average
18 wholesale price.  What do you understand average
19 wholesale price to be?
20       MS. OBEREMBT:  Objection.
21       THE WITNESS:  Well, I guess, some mix of
22 what the words mean and what the IG reported.  What

19 (Pages 70 to 73)

27a18706-d632-4df8-8162-703fc9f893ed

# EXHIBIT DD

Reed, Larry                                    September 26, 2007
                         Baltimore, MD

                                                        Page 1

              UNITED STATES DISTRICT COURT

          OF THE DISTRICT OF MASSACHUSETTS

---------------------------x

IN RE:  PHARMACEUTICAL      :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   :   CIVIL ACTION

PRICE LITIGATION            :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO    :

U.S. ex rel. Ven-A-Care of  :   Judge Patti B.

The Florida Keys, Inc.,     :        Saris

            Plaintiff,      :

        vs.                 :

ABBOTT LABORATORIES, INC.,  :   Chief Magistrate

No. 06-CV-11337-PBS         :   Judge Marianne B.

            Defendants.     :        Bowler

---------------------------x

                       VOLUME I

              Baltimore, Maryland

              Wednesday, September 26, 2007

Videotape Deposition of:

              LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

6beda74d-d4ef-4589-b133-19d88d943a5d

Reed, Larry                                          September 26, 2007
                        Baltimore, MD

Page 98

1    A.  The minutes would have to be the
2  material I'd make reference to.
3    Q.  And without those minutes, you can't
4  recall whether or not the issue of reliance and
5  average wholesale prices was discussed at the
6  PTAG meetings?
7    A.  There are a number of issues
8  discussed, and to make a definitive statement
9  other than I can't recall, I would have to look
10  at those minutes.
11    Q.  Now, the issue of reliance on average
12  wholesale prices by state Medicaid programs to
13  determine reimbursement has been a hot topic for
14  a number of years; is that fair to say?
15        MS. MARTINEZ:  Objection to form.
16        THE WITNESS:  The issue of payment
17  based on average wholesale price?  And by
18  "average wholesale price," you mean the published
19  average wholesale -- what do you mean by "average
20  wholesale price"?
21  BY MR. TORBORG:
22    Q.  What do you understand the term

Page 99

1  "average wholesale price" to mean?
2    A.  There's a lot of different definitions
3  of it.  Average wholesale price typically would
4  simply be the average that a wholesaler sold its
5  product at.  There are other definitions that are
6  used within the pharmacy program.
7    Q.  When you use the term average wholesale
8  price, or AWP, what did you mean it to refer to?
9        MS. MARTINEZ:  Objection to form.
10        MR. HERNANDEZ:  Objection to form.
11        THE WITNESS:  Well, that was pretty
12  unanimous.
13        MS. MARTINEZ:  You can answer.  We're
14  just objecting to the form of the question.
15        THE WITNESS:  Okay.  When we use
16  average wholesale price, generally we will be
17  using average wholesale price as reported by one
18  of the pricing compendia.
19  BY MR. TORBORG:
20    Q.  Would you agree with me that the issue
21  of reliance on average wholesale prices as
22  reported in the pricing compendia has been a hot

Page 100

1  topic for a number of years?
2        MS. MARTINEZ:  Objection to form.
3        THE WITNESS:  There has been a lot of
4  discussion of average wholesale price as reported
5  by the pricing compendia.
6  BY MR. TORBORG:
7    Q.  And was this something that you believe
8  was discussed at these Pharmacy Technical
9  Advisory Group meetings?
10    A.  Again, it's possible, but I don't
11  recall.
12    Q.  Well, when we talk about -- when I
13  asked you what was discussed at the meetings,
14  your general recollection was, number one,
15  dispute resolution, number two, payment for
16  drugs.
17    A.  That's correct.
18    Q.  And three, I think you did sort of a
19  catch-all category, right?
20    A.  I don't remember what three was.
21    Q.  Okay.  Do you recall anything else that
22  was discussed at the meetings, other than dispute

Page 101

1  resolution or payment for drugs?
2    A.  I do recall that there may be a
3  discussion of new drugs that were coming onto the
4  market, what those -- what those indications
5  might be, some general medical discussion.
6    Q.  And so when you said that the topic of
7  payment for drugs was discussed, what did you
8  mean by that?
9    A.  In general, it might be the -- again, a
10  payment system would be a pretty integral part of
11  the pharmacy program, so some discussion of what
12  a state might be doing, what caution a state may
13  have, but unfortunately I just don't remember if
14  it was a discussion of AWP.
15    Q.  What did you mean when you just
16  referred to there a payment system?
17    A.  States maintain a payment system for
18  pharmacy services that is based on, by federal
19  regulations, estimated acquisition cost.
20    Q.  And in your experience, you know that
21  most states, for the last 10, 15 years and more,
22  have relied on average wholesale prices as

                    Henderson Legal Services
                         202-220-4158

6beda74d-d4ef-4589-b133-19d88d943a5d

Page 604

                    UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   ) CIVIL ACTION

PRICE LITIGATION             ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO     )

U.S. ex rel. Ven-a-Care of   ) Judge Patti B. Saris

the Florida Keys, Inc.       )

     v.                      ) Chief Magistrate

Abbott Laboratories, Inc.,   ) Judge Marianne B.

No. 06-CV-11337-PBS          ) Bowler

- - - - - - - - - - - - - - -

          (captions continue on following pages)




          Videotaped deposition of LARRY REED

                    Volume III



                    Washington, D.C.

                    Tuesday, March 18, 2008

                    9:00 a.m.

8615aca3-c44e-4f74-a36a-79d28ca5988e

Reed, Larry - Vol. III                                    March 18, 2008
                        Washington, DC

Page 689

1  Would you be surprised if you made that statement
2  in that period of time?
3         MS. MARTINEZ:  Objection, form.
4      A.  Again, I don't recall making that
5  statement.  It's possible that -- would the
6  statement be completely outside my realm of
7  experience?  Probably not.
8      Q.  Mr. Reed, in this lawsuit do you
9  believe the government should be able to recover
10 those amounts that state Medicaid programs had to
11 use from the ingredient side for reimbursements
12 to cover insufficient dispensing fees?
13        MS. MARTINEZ:  Objection, form.
14     A.  Give me that sentence again, please.
15     Q.  Mr. Reed, in this lawsuit do you
16 believe that the federal government should be
17 able to recover those amounts that state Medicaid
18 programs deliberately used from the ingredient
19 side for reimbursements to cover insufficient
20 dispensing fees?
21        MS. MARTINEZ:  Objection, form.
22     A.  If the state had an approved state plan

Page 690

1  for that ingredient cost or that dispensing fee,
2  then those would be considered proper payments.
3      Q.  If a state deliberately paid a profit
4  on the ingredient side to subsidize insufficient
5  dispensing fees, do you believe the government
6  should be able to recover that amount?
7         MS. MARTINEZ:  Objection, form.
8      A.  And I don't think I can answer that
9  question any further than I did.  If the state
10 were to present to us an overpayment of the
11 ingredient cost to make up for an underpayment of
12 a dispensing fee, we would probably disapprove
13 that plan.
14     Q.  If it was done in writing?
15     A.  If it was done as part of the state
16 plan amendment process or if the state were to
17 ask us can we overpay on the ingredient cost to
18 make up for a deficit in dispensing, we would
19 probably have responded no.
20     Q.  But you knew that they were doing that,
21 didn't you?
22        MS. MARTINEZ:  Objection, form.

Page 691

1      A.  Again, I think that we've talked a
2  little bit about that.  I don't recall earlier
3  periods of time.  But most recently I was aware
4  that their dispensing fees may have been lower
5  than the cost of dispensing and there may have
6  been some profit in ingredient cost.
7      Q.  And that's not something that a state
8  is providing to you in writing, correct, so that
9  you could disapprove that, today?
10     A.  I don't remember a plan amendment that
11 came in that would have said that.
12        MR. TORBORG:  Why don't we take our
13 first break.
14        THE VIDEOGRAPHER:  This is the end of
15 tape 1.  Off the record at 10:36.
16        (Recess.)
17        THE VIDEOGRAPHER:  This is the
18 beginning of tape 2 in the deposition of Mr.
19 Reed.  On the record at 10:51.
20 BY MR. TORBORG:
21     Q.  Mr. Reed, would it be fair to say that
22 you can't tell me one way or the other whether

Page 692

1  you knew in 1993 that state Medicaid programs
2  were using excess payments of ingredient costs to
3  subsidize insufficient dispensing fees?
4      A.  It would fair to say that.  I don't
5  recall that memory.
6      Q.  You don't recall one way or the other
7  whether or not you had that knowledge?
8      A.  I don't recall.  That's correct.  I
9  don't recall.
10     Q.  And it's been 15 years since 1993,
11 correct?
12     A.  Correct.
13     Q.  Your memory has faded over time, I take
14 it?
15     A.  Yeah.
16     Q.  Would you agree that someone within
17 HCFA was aware that state Medicaid programs were
18 using excess payments on the ingredient side to
19 subsidize insufficient dispensing fees?
20        MS. MARTINEZ:  Objection, form.
21     A.  From the GAO report that you were
22 showing me, a HCFA official did make that

23 (Pages 689 to 692)

8615aca3-c44e-4f74-a36a-79d28ca5988e

# EXHIBIT EE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY | ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| **THIS DOCUMENT RELATES TO:** | ) | |
| *United States of America ex rel.* | ) | Chief Magistrate Judge Marianne B. Bowler |
| *Ven-a-Care of the Florida Keys, Inc., v.* | ) | |
| *Abbott Laboratories, Inc.* | ) | |
| CIVIL ACTION NO. 06-11337-PBS | ) | |
| | ) | |

## UNITED STATES' OBJECTIONS AND RESPONSES
## TO DEFENDANT ABBOTT'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the United States

provides these objections and responses to Defendant Abbott Laboratories, Inc.'s ("Abbott")

First Set of Interrogatories ("Interrogatories") Directed To Plaintiff United States of America

And Relator Ven-A-Care Of The Florida Keys, Inc. ("Relator").

### Introductory Statement and General Objections

1.       These Interrogatories are unclear, vague, and ambiguous to the extent they are

directed jointly at the United States and the Relator.  The United States further objects to the

extent that it is unclear as to whether Abbott seeks responses to particular Interrogatories from

either the United States or the Relator, or both.  The United States objects to each Interrogatory

that is directed, in whole or part, to Relator.  The United States is not obligated to respond to all

or part of any Interrogatory that is, or should be, directed at the Relator.  Thus, the United States

1

responds only to those Interrogatories, in whole or part, that appear to be directed at the United
States.

2.      Subject to and without waiving its specific and general objections, and objections
to Abbott's definitions and instructions, the responses set forth herein are based on information
currently known to the United States, and their attorneys, and are made without prejudice to the
right of the United States to assert additional objections should grounds for objection be
discovered at a later time.  Discovery in this case has only just commenced, and Abbott has not
yet responded to any of the United States' discovery requests.  Thus, the United States has not
completed its discovery of the facts pertaining to this action or its preparation of this case for
trial.  The United States reserves the right to rely on any facts, documents, or other evidence that
may be developed by the parties, or come to the United States' attention, and to supplement these
Interrogatories when and if appropriate at a later time.

3.      The fact that the United States may answer or object to part or all of any particular
Interrogatory, should not be construed as an admission or acknowledgment of any fact set forth
in, assumed by, or inferred from any such Interrogatory.

4.      The United States reserves the right to object to the introduction into evidence in
this or any other action, any of the responses or objections set forth in response to these
Interrogatories.  The fact that the United States has responded to any part or all of any particular
Interrogatory is not intended, and shall not be construed, to be a waiver of any objection to the
competence, relevance, materiality, privilege or admissibility of any evidence in this or any other
action.

2

5.      The United States' responses or objections to these Interrogatories shall not be construed to be a waiver of the right to object on any ground to other discovery requests involving or relating to the subject matter of these Interrogatories.

6.      The United States objects to these Interrogatories to the extent that they seek information protected from disclosure by privilege or doctrine, including the attorney-client privilege, the work product doctrine, the joint prosecution/common interest doctrine, the deliberative process privilege, the law enforcement investigative files privilege or any other applicable basis for invoking privilege. The United States will screen materials and information to be released to Abbott to remove privileged materials. To the extent there is any inadvertent disclosure of privileged information, the United States reserves its right to argue that such inadvertent disclosure shall not constitute any waiver of the privileges. The United States reserves the right to object to the introduction into evidence before the Court at any time before or at trial of information that is privileged or otherwise protected under law and that has been revealed or produced inadvertently. The United States does not, by responding to these Interrogatories, waive any claim of privilege or the protection of any doctrine.

7.      The United States objects to these Interrogatories to the extent that responding would require it to violate any seal imposed by a Court, by statute in the context of a False Claims Act *qui tam* matter, or the Federal Rules of Criminal Procedure, a grand jury proceeding, a criminal sentencing or other disposition, or any other matter. The United States will not separately object to any specific Interrogatory to assert this ground where doing so would itself identify a case currently under seal.

3

8.     The United States objects to these Interrogatories to the extent that they seek material which is not subject to release in the absence of a protective order under Fed. R. Civ. Proc. 26(c)(7). To the extent that these Interrogatories call for material subject to any applicable protective order in this case, it will be produced subject to the terms of that order.

9.     The United States objects to these Interrogatories to the extent they require the United States to draw legal conclusions or otherwise seek to impose upon the United States any requirements beyond those established by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Massachusetts, or applicable Court Orders.

10.     The United States objects to these Interrogatories to the extent they exceed 25 in number in violation of Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts, in the absence an agreement between the parties, or a court order.

11.     The United States objects to the scope of these Interrogatories to the extent they call for information that are not within the possession, custody or control of the United States Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS).

12.     The United States objects to these Interrogatories as overly broad, vague, unduly burdensome, not relevant, and not reasonably calculated to lead to the discovery of admissible evidence to the extent they seek information spanning 40 years when the conduct alleged in the Complaint covers the time period from January 1, 1991 to January 31, 2001.

13.     Subject to and without waiving its specific and general objections, and objections to Abbott's definitions and instructions, where appropriate, the United States will produce information available to CMS through its contracts with Medicare carriers. The United States

4

does not waive any objections to any assertions made by Abbott that those contractors are part of CMS or parties to this action. The United States does not agree to be bound by the decisions or actions of those contractors.

14.     The United States objects to these Interrogatories as overly broad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, to the extent they seek information about drugs, manufacturers, other entities or providers not named or referenced in the United States' Complaint.

15.     The United States objects to these Interrogatories to the extent that they are cumulative and duplicative of Abbott's other discovery requests, including but not limited to, third-party subpoenas issued to the United States and its contractors by defendants in the Pharmaceutical Industry Average Wholesale Price Litigation ("AWP MDL") No. 1456, 01-12257-PBS (D. Mass.), and the Lupron Marketing & Sales Practices Litigation ("Lupron MDL"), MDL. No. 1430, 01-CV-10861-RGS (D. Mass.).

16.     The United States objects to the Interrogatories to the extent that: (a) the discovery sought by any Interrogatory is unreasonably cumulative or duplicative, or is obtainable from some other source (including but not limited to, a public source) that is more convenient, less burdensome, or less expensive; (b) the discovery sought is in Abbott's possession; (c) the discovery sought is equally available to Abbott; and (d) compliance with any Interrogatory would be unduly burdensome, unduly expensive, harassing, annoying, or oppressive.

17.     These general objections apply to each Interrogatory and thus, for convenience, are not repeated after each Interrogatory, but rather are set forth herein and hereby incorporated into each response. The assertion of the same, similar, or additional objections or the provision

5

of partial responses to individual Interrogatories does not and should not be construed to waive or modify any of the United States' general objections.

18.     When the United States states that it will produce documents in accordance with the Rule 33(d) of the Federal Rules of Civil Procedure, it will produce such documents to the extent that they exist and can be reasonably obtained, and are within its possession, custody and control.  By stating that it will produce documents, the United States does not represent that any such documents or things exist or are within its possession, custody, or control.

19.     Any information or documents supplied in response to these Interrogatories are for use in this litigation and for no other purpose.

### Objections to Definitions and Instructions

1.     The United States objects to the Interrogatories' definitions and instructions because they are unclear, vague, and ambiguous to the extent that the Interrogatories intend to incorporate the definitions and instructions of two sets of Requests for Production, one served on the United States, and one served on the Relator.

2.     The United States objects to the additional definition of "You" and "Your" included in the Interrogatories because it is vague and ambiguous to the extent it refers to the United States and the Relator "collectively."

3.     The United States objects to the additional definition of "time frame" included in the Interrogatories as vague, ambiguous, overly broad and unduly burdensome in that the definition does not clearly specify a time period, but refers to whatever time period may "correspond to the events, reports, laws, determinations, or documents referred to in particular Interrogatories."

6

4.      The United States objects to the inclusion of definitions and instructions in the Interrogatories that are neither invoked by nor referenced in any individual Interrogatory.  Failure of the United States to object to any particular definition or instruction in this document, particularly definitions and instructions not applicable to these Interrogatories in any way, should not be construed as a waiver of any objection the United States may raise to an identical definition or instruction in responding to discovery requests in this or any other action.

5.      The United States objects to Abbott's definition of "Communication" in that the terms "any oral or written exchange" of "thoughts or ideas" by "any process" are overly broad and vague.  Further, the United States objects to Abbott's definition of "Communication" to the extent that it purports to impose discovery obligations broader than the scope of permissible discovery under the Federal Rules of Civil Procedure.  Subject to and without waiving its specific and general objections, and objections to Abbott's definitions and instructions, the United States will look to the descriptive terms included in the Interrogatories themselves to determine the "circumstances" that render a communication responsive to any Interrogatory.

6.      The United States objects to Abbott's definition of the terms "Concern," "Concerning," "Relating to" and "Relate to" as vague and ambiguous in that the proposed definition, which includes the terms and phrases "embody," "mention," "support," "contradict," "whether directly or indirectly," and "as required by the context to bring within the scope of the requests," is not subject to objective application.

7.      The United States objects to Abbott's definition of "Documents" as overly broad and vague in that the term is defined to include "communications" which Abbott defines by reference to terms that are overly broad and vague.  The United States objects to the inclusion

7

within the term "Documents" materials "which are in the possession of the Carrier" and to any
implication in the definitions that Carriers or other payment processing contractors are to be
included within the definition of the United States or any particular agency. Those contractors
are not parties to this action. Although the United States contracts with Carriers to perform
services, and to the extent the United States incorporates information from the Carriers, the
United States does not thereby admit to or agree to be bound by the decisions or actions of those
Carriers. Further, the United States objects to the extent that Abbott's definition purports to
impose obligations beyond the requirements of the Federal Rules of Civil Procedure.

       8.     The United States objects to Abbott's definition of "Identify." The definition is
overly broad, in that with respect to persons, it seeks current contact information (including
personal residences). Any employees of the United States or its contractors should be contacted
through counsel for the United States. The United States objects to the extent that disclosure of
personal information, including home addresses, of any current or former government employee
is prohibited under the Privacy Act, 5 U.S.C.A. § 552a.

       9.     The United States objects to Abbott's definitions of the terms "You", "Your" and
"U.S. Government" as overly broad and vague. The United States objects to the use of the terms
"agents," "representatives," "attorneys" in these definitions as vague and ambiguous. The United
States objects to these definitions to the extent that they encompass any agency, office, employee,
agent, representative, officer or contractor of either the Legislative Branch or the Judicial Branch
of the United States government and, moreover, to the extent that they are directed at Executive
Branch agencies and offices that do not have materials or information relevant to this case or
reasonably calculated to lead to the discovery of admissible evidence. Further, the United States

8

objects to the inclusion of the Department of Justice in these definitions to the extent that these

Interrogatories call for the production of documents protected from disclosure by privilege or

doctrine, including the attorney-client privilege, the work product doctrine, the law enforcement

investigative files privilege, the informant's privilege, the consulting expert privilege, the

deliberative process privilege, or any other applicable basis for invoking privilege.  Subject to

and without waiving these objections, the United States will interpret these terms to mean offices

within the Centers for Medicare and Medicaid Services that are reasonably likely to possess

responsive information or documents, and the employees of those offices.

      10.     The United States objects to Abbott's definition of the term "Medicaid Drug

Rebate Program," to the extent that the definition asserts that the Public Health Service 340B

Drug Pricing Program is part of the Medicaid Drug Rebate Program.

      11.     The United States objects to Abbott's Instruction Number 1, incorporated by

reference to its First Set of Requests for Production of Documents, that the "requests are not

limited to documents in possession of the United States Department of Health and Human

Services," but include "documents in the possession of the United States Government's

executive, administrative, and legislative offices," as well as "all Medicare Carriers and Medicaid

Fiscal Intermediaries."  With respect to "Medicaid Fiscal Intermediaries," to the extent that any

state used a contractor to administer or assist in the administration of its Medicaid program, it

was pursuant to a contract or agreement between such contractor and a state agency and not the

U.S. Government.  To the extent that these Interrogatories call for the identification of documents

in the possession, custody or control of "Medicaid Fiscal Intermediaries," other state contractors,

or from state Medicaid agencies, which are not in the possession, custody or control of the U.S.

Government, the United States is not obligated to identify such documents. The United States incorporates by reference its objections to Abbott's definitions of "Documents" and "U.S. Government" in response to Instruction Number 1.

    12.     The United States objects to Abbott's definitions and instructions to the extent they are inconsistent with or in excess of that which is required by the Federal Rules of Civil Procedure, Local Rules of the District of Massachusetts or Case Management Orders applicable to the above-captioned action.

<u>**Responses and Objections to Interrogatories**</u>

<u>Interrogatory No. 1</u>: Identify each and every allegedly false or fraudulent statement or action made or taken by Abbott that relates in any way to Your claims in the Complaint, including:

(a) false or fraudulent statements made or caused to be made by Abbott and its agents;

(b) false or fraudulent claims filed by Abbott and its agents;

(c) actions or statements that caused a false or fraudulent claim to be filed; and

(d) false or fraudulent price representations.

    As to each statement or action You identify, state why the statement or action was false or fraudulent and state with particularity the circumstances of the alleged fraud, including the date, time, location, subject matter, and participants in any allegedly false or fraudulent action. Identify all Documents relating to information provided in response to this Interrogatory.

    <u>Response</u>:  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.   The United States objects to this interrogatory on the following additional grounds.  Objection, as used in this interrogatory the terms "agents" and "why" are vague, ambiguous, and not subject to objective

10

application in identifying responsive information.  Objection, this contention interrogatory is

overly broad and unduly burdensome, premature and unreasonable at this early stage of

discovery, before Abbott has responded to all the United States' factual discovery requests, before

all depositions have been taken, and before third-party discovery has commenced.  Objection,

serving such a contention interrogatory at the outset of discovery in an attempt to mandate

supplementation as "additional information becomes available," or as otherwise required by the

Federal Rules of Civil Procedure, imposes an undue burden on the United States by (a) requiring

the United States to respond multiple times over the course of this complex case, (b) disrupting

the effective administration of the United States' case, and (c) improperly infringing on attorney

work product by requiring what would amount to frequent or periodic reports on counsels'

ongoing review and analysis of the evidence.  Objection, by seeking an inventory of each and

every "statement or action" "that relates in any way to Your claims in the Complaint," and "all

Documents" "relating to" the United States' contentions, regardless of the level of significance of

such facts and documents, the interrogatory is overly broad and unduly burdensome.   Objection,

by seeking identification of "all Documents," the interrogatory calls for the production of

documents and information protected from disclosure by privilege and doctrine, including but not

limited to, the attorney-client privilege, the work product doctrine, the common interest privilege,

the deliberative process privilege, and the law enforcement investigative files privilege.

Objection, the interrogatory is overly broad and unduly burdensome to the extent that it calls on

the United States to organize and inventory for Abbott documents and information produced by

Abbott to the United States, and Abbott can easily identify from their own files all documents

11

produced to the United States that "relate to" the United States' contentions. Objection, to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response.

As stated in the United States' Complaint ("Complaint"), from approximately January 1991 through January 2001, Abbott engaged in fraudulent acts that harmed the Medicare and Medicaid Programs. The false or fraudulent statements or actions include Abbott reporting inflated pharmaceutical prices to price publications, such as the "Red Book," the "Blue Book," and the Medi-Span Hospital Formulary Guide ("Price Publications"), when Abbott knew or should have known that Medicare and Medicaid relied upon those reported prices to set reimbursement rates for Abbott's pharmaceutical products. Abbott's actual sales prices for the pharmaceutical products named in the Complaint were far less than the prices reported by Abbott. By reporting inflated prices – often 1000% higher than Abbott's actual prices – Abbott ensured its customers received inflated reimbursement from Medicare and Medicaid. Thus Abbott's acts ensured that providers would profit from choosing Abbott's products. Abbott then actively promoted "spreads" between (1) its fraudulently inflated prices and (2) its actual sales prices as an inducement to its customers.

(a) The false or fraudulent statements include the false prices reported by Abbott for the pharmaceuticals identified in the Complaint. Abbott submitted those prices and is fully knowledgeable of when it reported false prices for the pharmaceuticals at issue. Abbott is well aware of all aspects of its price reporting to the Price Publications.

12

(b) The United States alleges that Abbott's fraudulent acts caused the submission of false claims. The United States will also explore in discovery whether Abbott submitted false claims on behalf of certain of its customers.

(c) Abbott reported false, fraudulent and inflated drug prices for certain drugs (listed in ¶¶ 31 and 35 of the Complaint) to the Price Publications, which were relied upon by the Medicare and Medicaid programs when setting reimbursement rates for Abbott's customers.

(d) During the time frame that Abbott engaged in the fraudulent scheme, all the price representations to the Price Publications for the pharmaceuticals at issue in the Complaint were inflated and therefore false.

The specific date, time, place, and individuals involved for all of Abbott's false price representations are in Abbott's possession and have not yet been fully produced to the United States. The United States has propounded discovery to Abbott for all documents and information regarding Abbott's price reporting for the pharmaceuticals at issue. The United States has propounded an interrogatory seeking the exact same information from the entity that possesses that knowledge – Abbott. Upon Abbott's complete production to the United States of those discovery responses, both parties will possess all information responsive to this interrogatory.

Abbott's production of documents pursuant to a False Claims Act Civil Investigative Demand and agency investigative subpoenas that would be responsive to this request was incomplete. Any documents responsive to this request currently in the United States' possession have been produced as part of the United States' initial disclosures under Fed. R. Civ. P. 26. The United States expects a further, more complete production from Abbott of documents responsive to this interrogatory and to the United States' interrogatories and requests for production.

13

Interrogatory No. 2: From January 1, 1965 to the end of the Relevant Claim Period, Identify all Persons currently or formerly employed by or serving the U.S. Government, currently or formerly serving as a contractor to the U.S. Government, or currently or formerly acting on behalf of the U.S. Government, as an agent or otherwise, with any responsibility for, involvement in, or influence over:

(a) the methodologies, policies, and procedures used in determining the amount that Providers would be paid for drugs under Medicare or Medicaid;

(b) the implementation of those methodologies, policies, and procedures by CMS, HCFA, HHS, State Medicaid Programs, Medicare Carriers or Medicaid Intermediaries;

(c) the price at which any agency or department of the U.S. Government purchased drugs from Manufacturers, wholesalers, or distributors; or

(d) the amount of rebates paid under the Medicaid Drug Rebate Program. For each such Person, Identify the Person's position, the time period and geographic scope of the Person's role, and the subjects of information the Person is likely to have.

Response: The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory. The United States objects to this interrogatory on the following additional grounds. Objection, the interrogatory is vague and ambiguous in its use of the following terms and phrases: "contractor," "acting on behalf of," "agent," "responsibility for," "involvement in," "influence over," "methodologies," "procedures," "determining the amount," "implementation," and "geographic scope." Objection, the interrogatory is overly broad and burdensome, and seeks information that is not relevant to any claim or defense and is not reasonably calculated to lead to the discovery of

14

admissible evidence, because it seeks information spanning 40 years, seeks "all" former and

current employees, contractors, agents of the entire United States legislative and executive

branches (according to Abbott's definition of "U.S. Government"), seeks the identity of persons

who have no information about any claim or defense in this case, including but not limited to

persons from "any agency or department of the U.S. Government [which] purchased drugs."

Objection, to the extent that subpart (c) of this interrogatory relates to a different subject area and

is not logically related to the basic interrogatory. Objection, the process of developing policies,

rules and regulations is an inherently pre-decisional and policy-based process that includes

requests for legal advice frequently made in anticipation of litigation; the identities of all

individuals who were involved or consulted in that process is therefore protected from disclosure

by the deliberative process privilege and, in some cases the attorney-client privilege and/or the

work product doctrine. Objection, the interrogatory is not limited by reference to either

particular policies or particular dates. Objection, the defined term "Identify" renders the

interrogatory vague and ambiguous because the interrogatory purports to require the United

States to provide information different from that called for by Abbott's definition of identify.

Objection, the interrogatory is overly broad to the extent that it seeks current contact information

(including residence) for former or current employees of Plaintiff who should be contacted

through counsel for the United States. Objection, to the extent that disclosure of personal

information, including home addresses, of any current or former government employee is

prohibited under the Privacy Act, 5 U.S.C.A. § 552a.

15

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response.

All Federal Register notices of proposed or final policies, rules, regulations, or guidance concerning Medicare or Medicaid programs, identify individuals and offices within the U.S. Department of Health and Human Services that serve as points of contact. In addition, the United States has also already provided responsive information and documents in its initial disclosures pursuant to Fed. R. Civ. P. 26.

The following are persons currently or formerly employed by or serving within the Centers for Medicare and Medicare Services with material responsibility for the methodologies, policies, and procedures concerning drug reimbursement under Medicare or Medicaid and the implementation of those methodologies, policies, and procedures:

| | |
|---|---|
| Thomas Gustafson, Ph.D. | Deputy Director, Center for Medicare Management, CMS |
| Robert Nieman | Retired, former Health Insurance Specialist, Center for Medicare Management, Hospital & Ambulatory Policy Group |
| Bernie Patashnik | Retired, Director, Division of Medical Services Payment, Office of Payment Policy, Bureau of Policy Development |
| Bernadette Schumaker | Retired, Deputy Director, Division of Integrated Delivery Systems, Center for Health Plans & Providers |
| Thomas Ault | Former Director of Bureau of Policy Development |
| Barbara Wynn | Former Director of Bureau of Policy Development |
| Nancy-Ann Deparle | Former Administrator, CMS |
| Bruce Vladek | Former Administrator, CMS |

16

| | |
|---|---|
| Thomas Scully | Former Administrator, CMS |
| Kathleen Buto | Former Associate Administrator for Policy, CMS |
| Robert Berenson | Former Director, Center for Health Plans & Providers |
| Mark Miller | Former Deputy Director, Center for Health Plans & Providers |
| Michael Hash | Former Deputy Administrator, HCFA |
| Elizabeth Cusick | Retired, Deputy Director, Center for Medicare Management |
| Stanley Weintraub | Retired, Branch Chief, Division of Medical Services Payment, Office of Payment Policy, Bureau of Policy Development |
| Rosanne Abato | Former Acting Director, Medicaid Bureau |
| Christine Nye | Former Director, Medicaid Bureau |
| Sally Richardson | Former Director, Medicaid Bureau and Director, Center for Medicaid and State Operations |
| Dennis G. Smith | Director, Center for Medicaid & State Operations |
| Timothy Westmoreland | Former Director, Center for Medicaid & State Operations |
| Rick Fenton | Deputy Director, Family & Children's Health Program Group, Center for Medicaid & State Operations |
| William Hickman | Supervisory Social Science Research Analyst, Office of Research, Development & Information, Planning & Policy Analysis Group |
| Jerome Jackson | Former Director, Division of Benefits, Coverage, and Payment |
| Linda Sizelove | Former Office Director, Medical Services, Medicaid Bureau |
| Robert Wardwell | Former Office Director, Division of Coverage Policy, Medicaid Bureau |

| | |
|---|---|
| Cheryl Austein-Casnoff | Former Division Director, Division of Benefits, Coverage and Payment, Medicaid Bureau |
| Debbie Chang | Former Division Director, Division of Benefits, Coverage and Payment, Medicaid Bureau |
| Larry Reed | Health Insurance Specialist, Centers for Medicaid & State Operations, Disabled & Elderly Health Programs Group, Division of Pharmacy |
| Rhonda Rhoades | Former Division Director, Division of Benefits, Coverage and Payment, Medicaid Bureau |
| Deirdre Duzor | Director, Centers for Medicaid & State Operations, Disabled & Elderly Health Programs Group, Division of Pharmacy |
| Peter Rodler | Pharmacist, Chairman, Pharmaceutical Reimbursement Board |

The following are persons currently or formerly employed by or serving within the

Centers for Medicare and Medicare Services with material responsibilities concerning the

Medicaid Drug Rebate Program:

| | |
|---|---|
| Rosanne Abato | Former Acting Director, Medicaid Bureau |
| Christine Nye | Former Director, Medicaid Bureau |
| Sally Richardson | Former Director, Medicaid Bureau and Director, Center for Medicaid and State Operations |
| Dennis G. Smith | Director, Center for Medicaid & State Operations |
| Timothy Westmoreland | Former Director, Center for Medicaid & State Operations |
| Rick Fenton | Deputy Director, Family & Children's Health Program Group, Center for Medicaid & State Operations |

18

| | |
|---|---|
| William Hickman | Supervisory Social Science Research Analyst, Office of Research, Development & Information, Planning & Policy Analysis Group |
| Jerome Jackson | Former Director, Division of Benefits, Coverage, and Payment |
| Linda Sizelove | Former Office Director, Medical Services, Medicaid Bureau |
| Robert Wardwell | Former Office Director, Division of Coverage Policy, Medicaid Bureau |
| Cheryl Austein-Casnoff | Former Division Director, Division of Benefits, Coverage and Payment, Medicaid Bureau |
| Debbie Chang | Former Division Director, Division of Benefits, Coverage and Payment, Medicaid Bureau |
| Larry Reed | Health Insurance Specialist, Center for Medicaid & State Operations, Disabled & Elderly Health Programs Group, Division of Pharmacy |
| Rhonda Rhoades | Former Division Director, Division of Benefits, Coverage and Payment, Medicaid Bureau |
| Deirdre Duzor | Director, Center for Medicaid & State Operations, Disabled & Elderly Health Programs Group, Division of Pharmacy |
| Peter Rodler | Pharmacist, Chairman, Pharmaceutical Reimbursement Board |
| Vincent Powell | Former Health Insurance Specialist, Center for Medicaid & State Operations, Finance, Systems & Budget Group, Division of State Systems |
| David McNally | Former Deputy Director of the Finance, Systems and Budget Group, Center for Medicaid and State Operations |

19

Interrogatory No. 3: From January 1, 1965 to the end of the Relevant Claim Period, Identify all studies, analyses, or reviews performed on behalf of or received by the U.S. Government concerning (I) Medicare Part B or Medicaid's payment for prescription drugs or dispensing fees, (ii) the acquisition costs of Providers for drugs, (iii) drug pricing, and/or (iv) a difference between Providers' actual or average drug acquisition costs and then-published AWPs, WACS, Direct Prices, or List Prices for drugs. For each study, Identify:

(a) the entity, agency, department, organization, consultant, commission, accountant, or task force that performed the study;

(b) all individual Persons who were involved in the study;

(c) the time period of the study;

(d) the particular subject matter or drug involved in the study;

(e) any report or other Documents prepared as a result of the study;

(f) what, if anything, was done with the results of the study;

(g) each Person who received a report of the study or who otherwise learned of the study's conclusions; and

(h) Documents, data, information and witness statements collected in connection with the study.

Response:  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.  The United States objects to this interrogatory on the following additional grounds.  Objection, the interrogatory is vague and ambiguous in its use of the following terms and phrases: "studies," "analyses," "reviews," "performed on behalf of," "drug pricing," "persons who were involved," "as a result

20

of the study," and "the results of the study." Objection, the interrogatory is overly broad and unduly burdensome, and seeks information that is not relevant to any claim or defense and is not reasonably calculated to lead to the discovery of admissible evidence, because: it seeks information spanning 40 years; it seeks "all" "studies, analyses, or reviews" performed "on behalf of" or even just "received by" the entire United States legislative and executive branches (according to Abbott's definition of "U.S. Government") and relating to overly broad categories such as "drug pricing"; it is not limited to defendant Abbott and the drugs at issue in the United States' Complaint; it seeks the identity of persons and details about studies that have no relevance to any claim or defense in this case; and it seeks irrelevant and overly broad details such as the identification of "each person who received a report of the study or who otherwise learned of the study's conclusions." Objection, the interrogatory is overly broad and unduly burdensome to the extent that it calls on the United States to organize and inventory for Abbott documents and information that is equally accessible to Abbott, because it is publicly available and a large number of reports of the type requested by Abbott are already in Abbott's possession; these publicly available reports contains the non-privileged information that Abbott asks the United States to identify and inventory. Objection, the interrogatory seeks information protected from disclosure by privilege, including but not limited to, the attorney-client privilege, the work product privilege, the deliberative process privilege, and the law enforcement investigative files privilege.

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response. Pursuant to Rule 33(d)

21

the United States will produce, for inspection and copying, reports issued between January 1,

1991 and January 31, 2001, by the Office of Inspector General of the U.S. Department of Human

Services relating to reimbursement of drugs under the Medicare and Medicaid programs.

Interrogatory No. 4: For any time period, Identify all Persons, including all current or former

employees or agents of the U.S. Government, of any State Medicaid Program, of any Medicare

Carrier, or of any Medicaid Intermediary, who received or were made aware of the Ven-A-Care

Qui Tam Complaint, the disclosure statement filed by Ven-A-Care pursuant to 31 U.S.C. §

3730(b)(2), or any of the allegations contained in the Ven-A-Care Qui Tam Complaint or

disclosure statement prior to May 16, 2006. For each Person identified, state when and under

what circumstances that Person became aware of Ven-A-Care's allegations and what information

was provided to them.  Identify all Documents relating to the information provided in response to

this Interrogatory.

   Response:  The United States incorporates by reference its general objections and its

objections to definitions and instructions implicated by this interrogatory.   The United States

objects to this interrogatory on the following additional grounds.  Objection, part or all of this

interrogatory seems directed at the Relator which is a separate party in this case.  Objection, the

interrogatory is vague and ambiguous and overly broad in its use of the terms and phrases "were

made aware of" and "any of the allegations."  Objection, the interrogatory is overly broad and

unduly burdensome, and seeks information that is not relevant to any claim or defense and is not

reasonably calculated to lead to the discovery of admissible evidence, because it seeks

information for "any time period," seeks "all" former and current employees and agents of the

entire United States legislative and executive branches (according to Abbott's definition of "U.S.

22

Government"), any State Medicaid Program, any Medicare Carrier and any Medicaid Intermediary, and seeks the identity of persons who have no information about any claim or defense in this case.   Objection, this interrogatory is an improperly promulgated request for information, communications, and the identification of documents protected from disclosure by privilege, including but not limited to the attorney-client privilege, the work product doctrine, the common interest privilege, the consulting expert privilege, the law enforcement investigative files privilege, and the deliberative process privilege.   Objection,  this interrogatory is an improperly promulgated request for information which is sealed by Court Order.  Objection, the defined term "Identify" renders the interrogatory vague and ambiguous because the interrogatory purports to require the United States to provide information different from that called for by Abbott's definition of identify.  Objection, the interrogatory is overly broad to the extent that it seeks current contact information (including residence) for former or current employees of Plaintiff, who should be contacted through counsel for the United States.  Objection, to the extent that disclosure of personal information, including home addresses, of any current or former government employee is prohibited under the Privacy Act, 5 U.S.C.A. § 552a.

Interrogatory No. 5: Identify and provide all facts in your possession relating to each and every instance in which Abbott marketed the "spread" to any Provider as alleged in paragraph 3 of the Complaint, and for each such instance, Identify:

(a) the employee of Abbott who allegedly marketed the spread;

(b) the Provider to whom the spread was marketed (and the individual employees of the Provider involved in the interaction);

(c) the drug that was marketed;

23

(d) the place and time of the alleged marketing;

(e) the content of the alleged marketing (including the precise facts on which You base your assertion that the employee "marketed the spread");

(f) whether the Provider purchased or did not purchase the product; and

(g) if applicable, all evidence that supports or refutes Your contention that the Provider purchased the product because of the spread between acquisition cost and reimbursement, as opposed to some other reason.

Identify all Documents relating to the information provided in response to this Interrogatory.

Response: The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory. The United States objects to this interrogatory on the following additional grounds. Objection, this interrogatory is vague and ambiguous to the extent that it seeks evidence that "supports" or "refutes" "Your contention." Objection, the United States objects to this interrogatory to the extent that it changes and characterizes the allegations in the United States' Complaint. Objection, this contention interrogatory is overly broad and unduly burdensome, premature and unreasonable at this early stage of discovery, before Abbott has responded to all the United States' factual discovery requests, before all depositions have been taken, and before third-party discovery has commenced. Objection, serving such a contention interrogatory at the outset of discovery in an attempt to mandate supplementation as "additional information becomes available," or as otherwise required by the Federal Rules of Civil Procedure, imposes an undue burden on the United States by (a) requiring the United states to respond multiple times over the course of this complex case, (b) disrupting the effective administration of Plaintiffs' case, and (c) improperly

24

infringing on attorney work product by requiring what would amount to frequent or periodic reports on counsels' ongoing review and analysis of the evidence. Objection, by seeking an inventory of "each and every instance" and "all Documents" "relating to" the United States' contentions, regardless of the level of significance of such facts and documents, the interrogatory is overly broad and unduly burdensome. Objection, by seeking identification of "all Documents," the interrogatory calls for the production of documents and information protected from disclosure by privilege and doctrine, including but not limited to, the attorney-client privilege, the work product doctrine, the common interest privilege, the deliberative process privilege, the law enforcement investigative files privilege. Objection, the interrogatory is overly broad and unduly burdensome to the extent that it calls on the United States to organize and inventory for Abbott documents and information produced by Abbott to the United States, and Abbott can easily identify all documents produced to the United States that "relate to" the United States' contentions from Abbott's own files.

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response.

As stated in the Complaint, from at least January 1991 through January 2001, Abbott engaged in a fraudulent scheme that harmed the Medicare and Medicaid Programs. The details of Abbott's marketing are known by Abbott's employees and are contained in Abbott's own documents.

The United States is unable at this early stage of the litigation to document every single time, place or Abbott individuals involved in marketing the spread on Abbott's pharmaceuticals.

25

First, it is not feasible to list all specific acts of a scheme that spanned ten years and fifty states. Second, the vast majority of that information still remains in Abbott's possession. Abbott provided incomplete responses to the United States' investigatory subpoenas and document requests on this issue. The United States issued two subpoenas requesting this material in 1997 and 2000. Abbott failed to provide materials regarding its spread marketing activities in response to the 1997 subpoena. Abbott failed to respond to the 2000 subpoena. The United States believes that Abbott's initial disclosures and production to date on this issue have been deficient.

Now that discovery has begun in this action, United States is seeking additional evidence of Abbott's marketing the spread on its products. In addition, the United States is aware that depositions are on-going in state cases where current and former Abbott employees are testifying about marketing the spread on Abbott drugs. The United States expects to obtain those transcripts as part of discovery in this case.

Abbott's failure to produce evidence notwithstanding, the United States has identified instances where Abbott marketed the spread to its customers. For example:

> • In an April 26, 1995 memorandum, Abbott's Manager for Reimbursement, Michael Heggie, discusses why having an inflated AWP for Abbott's Vancomycin is important. In discussing changes in the reported AWP for Vancomycin, Mr. Heggie states "These changes will effect (sic) reimbursement and so customers may question us... Medicaid ... pays for the most part from NDC numbers. Having a published price which is high allows a provider to bill at that list price. Some customers who were buying our Vanco at a deep discount off list may ask about the price

26

change." This admission that Abbott kept the reported prices for its Pharmaceuticals "high" to boost its customers' reimbursement indicates that Abbott was marketing the spread.

- An Abbott employee (Jerrie Cicerale) and a Medi-Span employee (Michelle Christopher) had a discussion on May 8, 1995 regarding Vancomycin's inflated AWPs. In contemporaneously-taken notes, Ms. Christopher wrote, "Jerrie said Abbotts (sic) prices were always a little bit high and they want to be more competitive."

- Abbott actively marketed its spreads to numerous group purchasing organizations ("GPOs"), including one named Gerimed, Inc. ("Gerimed"). In a December 20, 1995 report on sales efforts to Gerimed, National Account Manager Dennis Walker wrote, "One of Gerimed's goals of obtaining maximum profitability for its members presents an opportunity for our injectables. They think there is about an 18 month window of opportunity to promote our injectables as more profitable for their members to use because of the bigger spread between AWP and cost. Legislative changes in reimbursement are expected to do away with this spread advantage by mid 1997 . . . **PLAN OF ACTION** . . . (3) Develop a plan for our field reps to complement Gerimed's efforts to promote our injectables that offer their members maximum profitability."

- In August 7, 1996 memorandum from Mr. Walker to his infusion system specialists and district managers, he noted, "GeriMed usually recommends

27

that our products be included on a members (sic) formulary because of the higher spread between contract price and our average wholesale price (AWP). This means your customers will be eager to know they now have additional Abbott products available to them on their GeriMed contract, because in most cases, they will make more money using our products." In this document, an Abbott national sales manager is directing his staff to market Abbott's inflated spreads.

- Abbott's customers expected the spreads Abbott marketed. When Abbott lowered its WAC prices in early 2001, it led to a lowering of its AWPs. Customers complained about the lowered reimbursement, having expected Abbott's spreads based on Abbott's marketing of its products. On May 11, 2001, one customer, Omnicare, went so far as to write a letter demanding approximately $10 million in restitution for lost profits from the decreased Abbott spreads.

- In addition, the United States is aware that Abbott marketed the spreads on certain of its drugs to the Relator in this case, Ven-A-Care of the Florida Keys, Inc.

Interrogatory No. 6: For each of the Subject Drugs and for each quarter during the Relevant Claim period, Identify:

(a) the false price You allege Abbott reported or represented;

(b) all circumstances of the Communication, including to whom and when;

(c) the specific prices You contend Abbott should have reported to Publishers or others;

28

(d) the basis for Your contention that Abbott should have reported each of those prices; and

(e) for those claims You allege to have been false and for which You are seeking damages, the

basis for any contention that the price reported or represented by Abbott was used in determining

reimbursement under Medicare Part B or Medicaid.

    Response:  The United States incorporates by reference its general objections and its

objections to definitions and instructions implicated by this interrogatory.   The United States

objects to this interrogatory on the following additional grounds.  Objection, to the extent this

interrogatory contains multiple subparts that are not logically part of the basic interrogatory.

Objection, the term "Your contention" is vague and ambiguous as used in this interrogatory.

Objection, to the extent that this interrogatory changes and characterizes the allegations in the

United States' Complaint.  Objection, this contention interrogatory is overly broad and unduly

burdensome, premature and unreasonable at this early stage of discovery, before Abbott has

responded to all the United States' factual discovery requests, before all depositions have been

taken, and before third-party discovery has commenced.  Objection, serving such a contention

interrogatory at the outset of discovery in an attempt to mandate supplementation as "additional

information becomes available," or as otherwise required by the Federal Rules of Civil

Procedure, imposes an undue burden on the United States by (a) requiring the United States to

respond multiple times over the course of this complex case, (b) disrupting the effective

administration of the United States' case, and (c) improperly infringing on attorney work product

by requiring what would amount to frequent or periodic reports on counsels' ongoing review and

analysis of the evidence.  Objection, the interrogatory is overly broad and unduly burdensome in

that it seeks prices reported by Abbott and communications made by Abbott, which are in the

possession of Abbott and are more easily inventoried by Abbott.  Objection, the United States objects to the extent that the interrogatory seeks privileged information, including but not limited to, the attorney-client privilege, the work product privilege, the common interest privilege, the consulting expert privilege, and the law enforcement investigative files privilege.  Objection, to the extent that this interrogatory is a premature request for information that may be contained in the United States' testifying experts' reports that will be disclosed in accordance with Fed. R. Civ. P. 26 and any applicable scheduling orders.  Objection, to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following.  The United States reserves its right to supplement or amend this response.

(a) The false prices are the Direct Prices, WACs and AWPs Abbott reported to the Price Publications during the relevant time period of the Complaint for the following NDCs:

| DRUG | NDC# |
|---|---|
| Sodium Chloride Injection | 74196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |

30

| | |
|---|---|
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |
| 5% Dextrose in Water 100 ml | 74710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 74798309 |
| Sodium Chloride Injection | 74798436 |
| Sodium Chloride Injection | 74798437 |
| Sodium Chloride Injection | 74798509 |
| Water for Injection1000 ml | 00074799009 |

(b)     The prices for these pharmaceuticals were communicated to Price Publications by Abbott personnel – including, but not limited to, Ms. Jerrie Cicerale – throughout the time period covered by the United States' Complaint.  The dates of all communications will be determined when the United States completes review of Abbott's initial disclosures and Abbott makes full production of all documents related to its price reporting for the pharmaceuticals at issue.  Abbott already possess the information to answer this question.

(c)     Abbott should have reported the average or estimated acquisition cost for the pharmaceuticals at issue.

(d)     Abbott should have reported the average or estimated acquisition cost for its products because that was the amount at which Abbott was actually selling its pharmaceuticals. Abbott was not authorized by the government, any law or any regulation to submit false or fraudulent pricing information to inflate reimbursement to its customers to help sell or market its pharmaceuticals.

(e)     The basis for which the United States claims Abbott's false prices were part of the claims process for reimbursing providers for Abbott's pharmaceuticals is set forth in ¶¶ 31-50 of the United States' Complaint.

Interrogatory No. 7: During the Relevant Claim Period, state the basis for Your contention in paragraph 42 of the Complaint that "AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient." Separately identify:

(a) which Providers or class of Providers are included in Your use of the term "retail Customer" in paragraph 42 of the Complaint;

(b) which Providers or class of Providers included in Your use of the term "retail Customer" submitted claims to Medicare Part B or Medicaid that You allege were false;

(c) all Persons who at any time believed the term AWP or "Average Wholesale Price" was used to refer a price at which a pharmaceutical firm or wholesaler sells a drug to a retail Customer, and how such Persons came to that understanding;

32

(d) all Persons who at any time used the term AWP or "Average Wholesale Price" to refer to a price at which a pharmaceutical firm or wholesaler sells a drug to a retail Customer;

(e) the specific basis of any Person's belief that AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient;

(f) any statement, representation, or action by Abbott that You contend caused anyone to believe that AWP was used to refer a price at which Abbott sold drugs to a retail Customer who then administers it to a patient; and

(g) any statement, representation, or action by Abbott that You contend caused anyone to believe that AWP was used to refer a price at which Abbott sold drugs to any Provider or class of Providers who submitted claims to Medicare Part B or Medicaid that You allege were false. Identify all Documents relating to the information provided in response to this Interrogatory.

     <u>Response</u>:  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.   The United States objects to this interrogatory on the following additional grounds.  Objection, to the extent this interrogatory contains multiple subparts that are not logically part of the basic interrogatory. Objection, the terms "belief," "believe," and "action," are vague and ambiguous as used in this interrogatory.   Objection, to the extent that this interrogatory seeks information about the "beliefs" and actions of an indefinite and undefined category of persons, this interrogatory seeks information that is not relevant to a claim or defense of any party to this action and the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Objection, to the extent that this interrogatory changes and characterizes the allegations in the

33

United States' Complaint. Objection, this contention interrogatory is overly broad and unduly burdensome, premature and unreasonable at this early stage of discovery, before Abbott has responded to all the United States' factual discovery requests, before all depositions have been taken, and before third-party discovery has commenced. Objection, serving such a contention interrogatory at the outset of discovery in an attempt to mandate supplementation as "additional information becomes available," or as otherwise required by the Federal Rules of Civil Procedure, imposes an undue burden on the United States by (a) requiring the United States to respond multiple times over the course of this complex case, (b) disrupting the effective administration of the United States' case, and (c) improperly infringing on attorney work product by requiring what would amount to frequent or periodic reports on counsels' ongoing review and analysis of the evidence. Objection, to the extent that the interrogatory seeks privileged information, including but not limited to, the attorney-client privilege, the work product privilege, the common interest privilege, the consulting expert privilege, the law enforcement investigative files privilege, and the deliberative process privilege. Objection, to the extent that this interrogatory is a premature request for information that may be contained in the plaintiffs' testifying experts' reports that will be disclosed in accordance with Fed. R. Civ. P. 26 and any applicable scheduling orders. Objection, this interrogatory is overly broad to the extent that it requests the identification of "all" Documents "relating to" the information sought by the interrogatory. Objection, to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

34

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response.

The general concept that the AWP refers to the price at which a pharmaceutical firm or a wholesaler sells a drug to its customers is commonly understood in the industry.

(a)    Retail customers are all customers that purchased Abbot drugs, whether through a wholesaler or directly from Abbott.

(b)    To the extent those providers were reimbursed by Medicaid or Medicare, they were among the retail customers referred to in the Complaint. Abbott has or should have access to the names, addresses and other contact information of its purchasing customers. As claims data is produced in this matter, additional information regarding the retail customers who billed Medicaid and Medicare will be provided to Abbott.

(c) - (e)   The Court has ruled in this MDL proceeding that the term "average wholesale price" should be interpreted according to its plain meaning. The United States objects to these interrogatories as being unduly burdensome, vague and not relevant. The United States need not identify all "Persons'" understanding of AWP whether it be the same or otherwise.

(f) - (g)   Abbott reported prices it called "direct price," "list price," "wholesale acquisition cost," and "average wholesale price" to the Price Publications. To the United States' knowledge, Abbott never submitted any statement or qualifier that the prices it reported using these terms were false and not in keeping with the plain meaning of the pricing terms Abbott was reporting. Abbott gave no warning or indicator that it was reporting false prices when using these pricing terms to refer to the prices it reported to the Price Publications.

35

<u>Interrogatory No. 8</u>: Describe the damages You seek from Abbott. Your response to this Interrogatory should provide all information necessary for Abbott to quantify the damages You seek and should, at a minimum:

(a) Identify by name each state as to which you seek damages in this action relating to claims for reimbursement from the Medicaid program.

(b) Identify by name any programs beyond Medicare and Medicaid for which You seek damages.

(c) Identify, by NDC, calendar quarter, state (for Medicaid claims), program *(e.g.,* Medicare, Medicaid), and on a claim-by-claim basis, the amount of damages (excluding any punitive damages and civil penalties) Plaintiff seeks in this action.

(d) Describe the methodology, including any assumptions, used to calculate those amounts.

(e) For Medicare Part B claims, Medicaid claims relating to physician-administered drugs, and other classes of claims reimbursed by use of J-Codes, explain how You determined that reimbursement was paid using AWPs or WACS for Abbott drugs and how You calculated damages for such claims.

(f) Identify the number of "false or fraudulent claims that Abbott caused to be made" (Complaint, ¶ 104), the number of "false records or false statements made by Abbott" *(Id.,* ¶ 106), and the amount of civil penalties Plaintiff seeks in this action.

(g) Identify any lawsuits, judicial proceedings, settlements, or allegations concerning allegedly false claims filed by any Provider related to reimbursement of drugs by Medicare Part B or Medicaid, and explain how You intend to account for such lawsuits, judicial proceedings,

36

settlements, or allegations in determining Defendant's liability and the appropriate measure of damages in this case.

(h) Identify all Documents relating to the information provided in response to this Interrogatory.

Response:  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.  The United States objects to this interrogatory on the following additional grounds.  Objection, to the extent this interrogatory contains multiple subparts that are not logically part of the basic interrogatory. Objection, as used in this interrogatory the following terms and phrases are vague, ambiguous, and not subject to objective application in identifying responsive information:  "programs," "methodology," "assumptions," "other classes of claims," "lawsuits, judicial proceedings, settlements, or allegations concerning allegedly false claims filed by any Provider related to reimbursement of drugs," and "account for."  Objection, the interrogatory is overly broad and seeks information that is not relevant to any claim or defense and is not reasonably calculated to lead to admissible evidence to the extent that it asks "identify any lawsuits, judicial proceedings, settlements, or allegations concerning allegedly false claims filed by any Provider related to reimbursement of drugs by Medicare Part B or Medicaid, and explain how You intend to account for such lawsuits, judicial proceedings, settlements, or allegations in determining Defendant's liability and the appropriate measure of damages . . ."  Objection, this contention interrogatory is overly broad and unduly burdensome, premature and unreasonable at this early stage of discovery, before Abbott has responded to all the United States' factual discovery requests (including but not limited to requests for complete pricing and transactional data), before all depositions have been taken, and before third-party discovery has commenced.

37

Objection, serving such a contention interrogatory at the outset of discovery in an attempt to mandate supplementation as "additional information becomes available," or as otherwise required by the Federal Rules of Civil Procedure, imposes an undue burden on the United States by (a) requiring the United States to respond multiple times over the course of this complex case, (b) disrupting the effective administration of the United States' case, and (c) improperly infringing on attorney work product by requiring what would amount to frequent or periodic reports on counsels' ongoing review and analysis of the evidence.  Objection, this interrogatory is unduly burdensome to the extent that it seeks an identification of damages by NDC, calendar quarter, state, program, and on a "claim-by-claim basis."  Objection, this interrogatory is unreasonably broad and burdensome to the extent that it seeks the number of "false records or false statements" made by Abbott.  Objection, by seeking identification of "all Documents," the interrogatory calls for the production of documents and information protected from disclosure by privilege and doctrine, including but not limited to, the attorney-client privilege, the work product doctrine, the common interest privilege, the consulting expert privilege, the deliberative process privilege, and the law enforcement investigative files privilege.  Objection, to the extent that this interrogatory is a premature request for information that may be contained in the plaintiffs' testifying experts' reports that will be disclosed in accordance with Fed. R. Civ. P. 26 and any applicable scheduling orders.  Objection, to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response.

38

The United States has already provided responsive information and documents contained in the United States' initial disclosures which were previously provided to Abbott pursuant to Fed. R. Civ. P. 26. In addition, the United States provides the following.

The United States seeks damages for the Medicaid Programs of all 50 states. The United States is not seeking damages for any programs beyond Medicare and Medicaid at this time.

The United States has not received complete pricing and transaction data from Abbott. That information is needed for detailed damage calculations. Damage methodologies may include, but are not limited to:

- calculating all amounts paid by Medicare and Medicaid for the drugs in the United States' Complaint from January 1991 to January 2001, as all the claims were tainted by kickbacks;

- calculating the difference between what Medicare and Medicaid actually paid for the drugs in the Complaint from January 1991 to January 2001, and what would have been paid had Abbott not engaged in its scheme;

- calculating the amount by which Abbott was enriched by its scheme as measured by the profits received by Abbott for its sales of the drugs at issue in the Complaint from January 1991 to January 2001; the United States will also be conducting discovery as to Abbott's direct participation in the process of submitting claims to Medicaid and/or Medicare; Abbott may have been additionally enriched by directly receiving part of the spread that Abbott created for its customers through its fraudulent scheme;

- calculating the value of the kickbacks received by Abbott's customers; and

39

- penalties of $5,000 to $10,000 per Medicare and Medicaid claim for the Abbott drugs in the Complaint from January 1991 to September 28, 1999; and penalties of $5,500 to $11,000 per Medicare and Medicaid claim for the Abbott drugs in the Complaint from September 29, 1999 to January 31, 2001.

The United States will rely on testifying experts to provide damage calculations. The expert reports will be provided pursuant to Fed. R. Civ. P. 26 and the Court's scheduling order in this case.

Interrogatory No. 9: Paragraph 109 of the Complaint states that "Abbott has been unjustly enriched, including profits earned by Abbott because of illegal inducements Abbott arranged to be paid to its Customers." Identify with particularity all evidence that supports your contention, all illegal inducements that Abbott allegedly arranged to be paid to its Customers, and all payments by which Abbott allegedly was unjustly enriched. Identify all Documents relating to the information provided in response to this Interrogatory.

Response: The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory. The United States objects to this interrogatory on the following additional grounds. Objection, as used in this interrogatory the term "payments" is vague, ambiguous, and not subject to objective application in identifying responsive information. Objection, this contention interrogatory is overly broad and unduly burdensome, premature and unreasonable at this early stage of discovery, before Abbott has responded to all the United States' factual discovery requests, before all depositions have been taken, and before third-party discovery has commenced. Objection, serving such a contention interrogatory at the outset of discovery in an attempt to mandate supplementation as

40

"additional information becomes available," or as otherwise required by the Federal Rules of Civil Procedure, imposes an undue burden on the United States by (a) requiring the United States to respond multiple times over the course of this complex case, (b) disrupting the effective administration of the United States' case, and (c) improperly infringing on attorney work product by requiring what would amount to frequent or periodic reports on counsels' ongoing review and analysis of the evidence. Objection, by seeking an inventory of "all evidence" that supports "your contention," "all illegal inducements," "all payments," and "all Documents" "relating to" the United States' contentions, regardless of the level of significance or volume of such facts and documents, the interrogatory is overly broad and unduly burdensome. Objection, the interrogatory is overly broad and unduly burdensome to the extent that it calls on the United States to organize and inventory for Abbott documents and information produced by Abbott to the United States, and Abbott can easily identify all documents produced to the United States that "relate to" United States' contentions from Abbott's own files. Objection, by seeking identification of "all Documents," the interrogatory calls for the production of documents and information protected from disclosure by privilege and doctrine, including but not limited to, the attorney-client privilege, the work product doctrine, the common interest privilege, the consulting expert privilege, the deliberative process privilege, and the law enforcement investigative files privilege. Objection, to the extent that this interrogatory is a premature request for information that may be contained in the United States' testifying experts' reports that will be disclosed in accordance with Fed. R. Civ. P. 26 and any applicable scheduling orders. Objection, to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response.

The doctrine of unjust enrichment allows for restitution when it would be unconscionable to permit another to retain the benefit received. Abbott benefitted from reporting false prices by maintaining or increasing its market position as a result of its scheme. For example, in 1991, publically-available State Drug Utilization Data ("SDUD") showed that less than 10% of Abbott's Vancomycin sales were reimbursed by Medicaid; SDUD data shows that Abbott's market share eventually increased to approximately 80%. The relation between this increased market share and Abbott's fraudulent reporting of prices is evidenced by Abbott documents, which show consideration by Abbott employees of the additional profits that could be obtained by artificially inflating prices. While Abbott profited from this fraudulent price reporting from at least 1991 through 2001, Medicare and Medicaid paid in excess of $69 million for Vancomycin alone and approximately $145 million for large volume parenterals referred to in the United States' Complaint. The payments from the government flowed to Abbott's customers, who in turn paid Abbott for the drugs both directly and through wholesalers and group purchasing organizations, thereby maintaining and increasing Abbott's market share.

The market share maintained and increased as a result of Abbott's fraudulent scheme increased Abbott's profits. In addition, the United States will be conducting discovery as to Abbott's direct participation in the process of submitting claims to Medicaid and/or Medicare. Abbott may have caused additional damages and have been additionally enriched by directly receiving part of the spread that Abbott created for its customers through its fraudulent scheme.

42

The United States provided information responsive to this interrogatory in its initial disclosures under Fed. R. Civ. P. 26. The United States will rely on testifying experts to provide further damage calculations. The expert reports will be provided pursuant to Fed. R. Civ. P. 26 and the Court's scheduling order in this case.

Interrogatory No. 10: During the over ten years between the filing of the Ven- A-Care Qui Tam Complaint and the U.S. Government's decision to intervene in the action, Identify:

(a) all Persons or organizations the U.S. Government or Ven-A-Care contacted in connection with its investigation of the allegations in the Ven-A-Care Qui Tam Complaint;

(b) all Persons the U.S. Government interviewed or spoke with in connection with its investigation of the allegations in the Ven-A-Care Qui Tam Complaint;

(c) all Persons the U.S. Government deposed or questioned in connection with its investigation of the allegations in the Ven-A-Care Qui Tam Complaint;

(d) every subpoena or document request the U.S. Government issued in connection with its investigation of the allegations in the Ven-A-Care Qui Tam Complaint;

(e) every response to any subpoena or document request the U.S. Government issued in connection with its investigation of the allegations in the Ven-A-Care Qui Tam Complaint;

(f) all documents, transcripts, recordings (video or audio), or other materials that the U.S. Government received or that were generated in connection with its investigation of the allegations in the Ven-A-Care Qui Tam Complaint.

Response: The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory. The United States objects to this interrogatory on the following additional grounds. Objection, part or all of this

43

interrogatory seems directed at the Relator which is a separate party in this case. Objection, this interrogatory is an improperly promulgated request for information protected from disclosure by privilege, including but not limited to the attorney-client privilege, the work product doctrine, the common interest privilege, the consulting expert privilege, the law enforcement investigative files privilege, and the deliberative process privilege. Objection, to the extent that this interrogatory seeks information designated as confidential by third parties. Objection, this interrogatory is an improperly promulgated request for information which is sealed by Court Order. Objection, this interrogatory is unreasonably over broad and unduly burdensome to the extent that it seeks "all" contacts, interviews, depositions, subpoenas, responses, documents, transcripts, recordings or "other materials" related to "all persons or organizations," regardless of significance. Objection, this interrogatory is not limited to Abbott and the drugs in the United States' complaint. Objection, this interrogatory is cumulative to the extent that the United States has already provided their initial disclosures under Fed. R. Civ. P. 26 and will be responding to appropriate discovery during the discovery period. Objection, this interrogatory seeks information not relevant to any claim or defense and is not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory No. 11: From any time period, Identify all Communications regarding Medicare Part B or Medicaid's payment of or methodology for reimbursing drugs or dispensing fees; the acquisition costs of Providers for drugs; and/or drug pricing between Ven-A-Care and any other Person, including but not limited to: (I) the U.S. Government, (ii) any state or State Medicaid Program, (iii) NAMFCU or any MCFU, (iv) any Medicare Carrier or Medicaid Intermediary, (v) any Publisher, or (vi) any Provider. For each such Communication, Identify:

44

(a) the Persons involved in the Communication;

(b) the date and place of the Communication;

(c) all materials, including exchanges of data, associated with the Communication; and

(d) the subject matter of the Communication, including but not limited to the drugs at issue, the Manufacturer(s) of those drugs, and the prices at issue.

Identify all Documents relating to the information provided in response to this Interrogatory.

Response: The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory. The United States objects to this interrogatory on the following additional grounds. Objection, part or all of this interrogatory seems directed at the Relator which is a separate party in this case. Objection, to the extent this interrogatory contains multiple subparts that are not logically part of the basic interrogatory. Objection, as used in the interrogatory the terms "communications," "drug pricing," and "exchanges of data" are vague, ambiguous and overly broad. Objection, the interrogatory is overly broad, unduly burdensome, and seeks information that is not relevant to any claim or defense and not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information about communications from "any time period," communications with "any other Person," "all" communications regarding "acquisition costs," "and/or drug pricing." Objection, to the extent that this interrogatory seeks information and documents protected by privilege including but not limited to the attorney-client privilege, the work product doctrine, the common interest privilege, the consulting expert privilege, the law enforcement investigative files privilege, and the deliberative process privilege.

45

Interrogatory No. 12: Identify all instances where Ven-A-Care was over reimbursed for drugs by Medicare Part B or Medicaid and state what Ven-A-Care did with each such reimbursement. Identify the steps that other Providers should have taken when they were over-reimbursed for drugs by Medicare Part B and Medicaid.

Response: The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory. The United States objects to this interrogatory on the following additional grounds. Objection, part or all of this interrogatory seems directed at the Relator which is a separate party in this case. Objection, to the extent this interrogatory contains multiple subparts that are not logically part of the basic interrogatory. Objection, as used in this interrogatory the following terms and phrases are vague, ambiguous, and not subject to objective application in identifying responsive information: "over-reimbursed," "what Ven-A-Care did," "the steps," "other Providers," and "should have taken." Objection, the interrogatory is also vague and overly broad in that it does not specify a time period, and is not limited to the Abbott drugs at issue in the Complaint. Objection, the interrogatory also seeks information that is not relevant to any claim or defense in this case, and is not reasonably calculated to lead to the discovery of admissible evidence. Objection, the United States objects to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

Interrogatory No. 13: For the Relevant Claim Period, Identify all laws, regulations, and Communications to Abbott that Plaintiff contends required Abbott to report prices to Publishers that reflected the "the prices at which Abbott actually sold its drugs" and/or refrain from marketing the "spread" to its Customers. *See* Complaint, ¶ 3. Identify (a) every Manufacturer

46

that did comply with these duties and (b) every Manufacturer that did not comply with these duties. Identify all Documents relating to the information provided in response to this Interrogatory.

     <u>Response</u>:  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.   The United States objects to this interrogatory on the following additional grounds.  Objection, to the extent this interrogatory contains multiple subparts that are not logically part of the basic interrogatory. Objection, as used in this interrogatory the term "communications" is vague, ambiguous, and not subject to objective application in identifying responsive information.  Objection, to the extent that this interrogatory seeks information about "every manufacturer," this interrogatory seeks information that is not relevant to a claim or defense of any party to this action and the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Objection, this contention interrogatory is overly broad and unduly burdensome, premature and unreasonable at this early stage of discovery, before Abbott has responded to all the United States' factual discovery requests, before all depositions have been taken, and before third-party discovery has commenced.  Objection, serving such a contention interrogatory at the outset of discovery in an attempt to mandate supplementation as "additional information becomes available," or as otherwise required by the Federal Rules of Civil Procedure, imposes an undue burden on the United States by (a) requiring the United States to respond multiple times over the course of this complex case, (b) disrupting the effective administration of the United States' case, and (c) improperly infringing on attorney work product by requiring what would amount to frequent or periodic reports on counsels' ongoing review and analysis of the evidence.

Objection, by seeking identification of "all Documents," the interrogatory calls for the

production of documents and information protected from disclosure by privilege and doctrine,

including but not limited to, the attorney-client privilege, the work product doctrine, the

common interest privilege, the deliberative process privilege, and the law enforcement

investigative files privilege.   Objection, to the extent the interrogatory purports to require the

United States to draw pure conclusions of law.

Subject to and without waiving the United States' general and specific objections, and its

objections to Abbott's definitions and instructions, the United States provides the following.

The United States reserves its right to supplement or amend this response.   The United States

refers Abbott to its Complaint, its Opposition to Abbott's Motion to Dismiss and its September

15, 2006 Amicus Brief on the meaning of AWP, all of which set forth statutes, regulations and

rules relevant to this case.

Abbott was prohibited by the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. ("FCA"),

from causing the submission of false or fraudulent inflated reimbursement claims.   By reporting

false prices, Abbott injected itself into the claims process and manipulated government

reimbursements.   Abbott's liability for manipulating government reimbursement does not

require an affirmative legal duty to disclose true and correct prices as a condition precedent.

Abbott's decision to manipulate government reimbursement claims for its drugs was voluntary;

engaging in a fraudulent scheme to induce the government to pay false claims can give rise to

FCA liability.   *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003)

("Congress wrote [the FCA] expansively, meaning 'to reach all types of fraud, without

qualification, that might result in financial loss to the Government.'")(citation omitted).   "'[T]he

48

[FCA] is violated not only by a person who makes a false statement or a false record, . . . but also by one who engages in a *fraudulent course of conduct* that causes the government' to lose money by honoring a false claim." *United States v Raymond & Whitecomb Co.*, 53 F. Supp. 2d 436, 445 (S.D.N.Y. 1999); *see also Franklin v. Parke-Davis*, 2003 WL 22048255, *1 (D. Mass. 2003) (sustaining FCA claims emanating from defendant's fraudulent statements about Medicaid policies although no false information appeared on the face of the claims submitted by providers).

In addition, the United States has alleged that Abbott offered illegal remuneration – in the form of the spread – to its customers in violation of the Anti-Kickback Statute ("AKS"). In pertinent part, the AKS, codified at 42 U.S.C. § 1320a-7b(b) (as amended), reads:

> (b) Illegal remuneration
>
> \*   \*   \*
>
> > (2) whoever knowingly and willfully offers or pays *any remuneration* (including any kickback, bribe, or rebate) *directly or indirectly, overtly or covertly, in cash or in kind* to any person to induce such person –
> >
> > > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> > >
> > > (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
> >
> > shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b) (emphasis added). The statute makes clear that offering indirect

remuneration that induces a provider to purchase Abbott drugs for which payment may be made

under Medicare and Medicaid – which is what Abbott did here by causing inflated government

reimbursement for its drugs as alleged in the Complaint – is illegal. *Id*. at § 1320a-7b(b)(2).

When a person violates the AKS and obtains referrals or other business as a result, the

claims relating to such referred items or services are not eligible for reimbursement because

compliance with the AKS is a condition of payment. *United States ex rel. McNutt v. Haleyville*

*Medical Supplies, Inc. et al.*, 423 F.3d 1256, 159-160 (11th Cir. 2005); *see generally Schmitt*,

386 F.3d at 245 (violation of AKS can give rise to FCA liability); *Thompson*, 125 F.3d at 902

(same); *Pogue*, 238 F. Supp. 2d at 266 (same). When an entity knowingly submits or causes the

submission of claims resulting from an illegal remunerative arrangement, it has presented or

caused the submission of a false or fraudulent claim in violation of the FCA. *Id.*

Interrogatory No. 14: From January 1, 1965 to the end of the Relevant Claim Period, Identify

all efforts by the U.S. Government to (I) establish a drug reimbursement methodology for

Medicare Part B, Medicaid, or any co-payment under Medicare Part B or Medicaid that did not

rely on or use AWP figures reported by Publishers and (ii) change the way in which Publishers

reported AWP figures, including but not limited to any proposed or enacted rule or regulation,

any proposed Congressional legislation, any survey of actual acquisition costs, any

determination by CMS or HCFA to disapprove of state Medicaid plans, any development of

alternative sources of AWP or average wholesale prices, any attempt by CMS or HCFA to use

its "inherent reasonableness" authority to change the amounts paid to Providers, and any

Communications with Publishers, Providers, or Manufacturers. Identify the date, individual

Persons involved, and the outcome of all such efforts.  Identify all Documents relating to the information provided in response to this Interrogatory.

Response:  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.  The United States objects to this interrogatory on the following additional grounds.   Objection, to the extent this interrogatory contains multiple subparts that are not logically part of the basic interrogatory.  Objection, as used in this interrogatory the following terms and phrases are vague, ambiguous, and not subject to objective application in identifying responsive information: "efforts," "establish,." "drug reimbursement methodology," "any copayment," "did not rely on or use AWP figures reported by Publishers," "change the way," "survey," "actual acquisition costs," "determination," "development," "alternative sources," "communications," "involved," and "outcome."  Objection, the defined term "Identify" renders the interrogatory vague and ambiguous because the interrogatory purports to require the United States to provide information different from that called for by Abbott's definition of identify.  Objection, the interrogatory seeks information that is not relevant to any claim or defense in this case, and is not reasonably calculated to lead to the discovery of admissible evidence.  Objection, to the extent that information responsive to this interrogatory is in Abbott's possession or is equally accessible to Abbott, including but not limited to items published in the Federal Register or otherwise publicly released by the U.S. Department of Health and Human Services.  Objection, the interrogatory is overly broad and unduly burdensome because it seeks information spanning 40 years, seeks information concerning the entire legislative and executive branches of the U.S. government (as defined by Abbott), and is not limited to Abbott and the drugs at issue in the

51

Complaint. Objection, this interrogatory is overly broad to the extent that it requests the identification of "all" Documents "relating to" the information sought by the interrogatory. Objection, the interrogatory improperly asks for information protected from disclosure by privilege, including but not limited to the attorney-client privilege, the work product privilege, the common interest privilege, the consulting expert privilege, and the law enforcement investigative files privilege. Objection, the process of developing policies, regulations, rules and policies is an inherently pre-decisional and policy-based process that includes requests for legal advice frequently made in anticipation of litigation; the identities of all individuals who were involved or consulted in that process is therefore protected from disclosure by the deliberative process privilege and, in some cases the attorney-client privilege and/or the work product doctrine. Objection, to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

Interrogatory No. 15: Regarding HCFA Program Memoranda AB-00-86 (Sept. 8, 2000):

(a) explain why HCFA issued AB-00-86 to Medicare Carriers;

(b) explain why HCFA believed AB-00-86 contained "more accurate wholesale prices" for certain drugs;

(c) explain why HCFA did not mandate use of the alternative AWP data contained in AB-00-86;

(d) explain why HCFA later directed Medicare Carriers to cease using the alternative AWP data;

(e) Identify all Persons who drafted, prepared, made decisions relating to or other played a role in the creation and promulgation of AB-00-86;

(f) Identify all data and information used to calculate the wholesale prices contained in AB-00-86;

52

(g) Identify all Communications with Medicaid Intermediaries or State Medicaid Programs

regarding AB-00-86, including the alternate AWP data contained therein; and

(h) Identify all Documents relating to AB-00-86.

Response:  The United States incorporates by reference its general objections and its

objections to definitions and instructions implicated by this interrogatory.   The United States

objects to this interrogatory on the following additional grounds.    Objection, to the extent this

interrogatory contains multiple subparts that are not logically part of the basic interrogatory.

Objection, the interrogatory misquotes and mischaracterizes the contents of the Program

Memorandum about which it inquires.  Accordingly, questions which proceed from such

misquotations and mischaracterizations are unduly confusing and vague.  Objection, as used in

this interrogatory the following terms and phrases are vague, ambiguous, and not subject to

objective application in identifying responsive information: "explain why," "mandate the use

of," "prepared," "made decisions," "other (sic) played a role," "creation," "promulgation," and

"communications."  Objection, the defined term "Identify" renders the interrogatory vague and

ambiguous because the interrogatory purports to require the United States to provide

information different from that called for by Abbott's definition of identify.   Objection, the

interrogatory seeks information that is not relevant to any claim or defense in this case, and is

not reasonably calculated to lead to the discovery of admissible evidence.   Objection, the

interrogatory is overly broad and unduly burdensome because it is not limited to Abbott and the

drugs at issue in the Complaint.  Objection, the United States objects to the request for

identification of "all" Documents "relating to" AB-00-86 as overly broad.  Objection, the

interrogatory improperly asks for information protected from disclosure by privilege, including

53

but not limited to the attorney-client privilege, the work product privilege, the common interest privilege, the consulting expert privilege, and the law enforcement investigative files privilege. Objection, the process of developing policies, regulations, rules, policies, and program memoranda is an inherently pre-decisional and policy-based process that includes requests for legal advice frequently made in anticipation of litigation; the identities of all individuals who were involved or consulted in that process is therefore protected from disclosure by the deliberative process privilege and, in some cases the attorney-client privilege and/or the work product doctrine. Objection, to the extent the interrogatory purports to require the United States to draw pure conclusions of law.

Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response. Pursuant to Fed. R. Civ. P. 33(d), the United States will produce HCFA Program Memoranda AB-00-86 dated September 8, 2000, and AB-00-115 dated November 17, 2000. These documents contain information responsive to this interrogatory.

Persons who had a role in the creation of HCFA Program Memorandum AB-00-86 were: Robert Neimann, CMS; Ira Burney, Office of Legislation, CMS; Michael Hash, former Deputy Administrator, CMS; Mark Miller, former Deputy Director, Center for Health Plans and Providers, CMS; Robert Berenson, former Director, Center for Health Plans and Providers, CMS; and counsel from the U.S. Department of Health and Human Services and the Department of Justice.

Interrogatory No. 16: Identify all actions taken by the U.S. Government and Ven-A-Care to insure the preservation of evidence, witness testimony, data, or other information relevant to or discoverable in this litigation, including, without limitation:

(a) the date on which the action was taken;

(b) the Persons who took the action;

(c) the specific direction to preserve evidence that was communicated, including the Persons to whom the direction were directed; and

(d) the parties to any Communication relating to the preservation of evidence.

 Identify all Documents relating to the information provided in response to this Interrogatory.

Response: The United States incorporates by reference its specific and general objections, and objections to Abbott's definitions and instructions. The United States objects to this interrogatory on the following, additional grounds. Objection, part or all of this interrogatory seems directed at the Relator which is a separate party in this case. Objection, as used in this interrogatory, the following terms and phrases are overly broad, vague, ambiguous, and not subject to objective application in identifying responsive information: "actions," "preservation," "evidence," "witness testimony," "data," "other information relevant to or discoverable in this litigation," and "communication." Objection, the defined term "Identify" renders the interrogatory vague and ambiguous because it purports to require the United States to provide information different from that called for by Abbott's definition of "Identify". Objection, the interrogatory is overly broad and unduly burdensome because it seeks "all" "actions," with respect to the entire legislative and executive branches of the U.S. Government (according to Abbott's definition of U.S. Government), the contents of all communications, and

55

the identification of "all" Documents "relating to" the information sought by the interrogatory. Objection, the interrogatory seeks information that is not relevant to any claim or defense in this case, and is not reasonably calculated to lead to the discovery of admissible evidence. Objection, the interrogatory improperly asks for information protected from disclosure by privilege, including but not limited to the attorney-client privilege, the work product privilege, the common interest privilege, the consulting expert privilege, the law enforcement investigative files privilege, and the deliberative process privilege.  Subject to and without waiving specific and general objections, and objections to Abbott's definitions and instructions, the United States responds that CMS has preserved relevant evidence relating to this litigation.

Interrogatory No. 17: Identify each Person consulted or relied upon, or who provided documents or who otherwise constituted a source of factual information, in connection with the preparation of the Complaint or Your responses to these Interrogatories or Defendant Abbott's First Set of Requests for Admission to Plaintiffs United States of America and Ven-A-Care of the Florida Keys, Inc. For each such person, Identify the subject matter and/or the particular interrogatories and/or requests for admission that such person was consulted upon or otherwise constituted a source of factual information.

        Response:  The United States incorporates by reference its general objections and its objections to definitions and instructions implicated by this interrogatory.  The United States objects to this interrogatory on the following additional grounds.    Objection, to the extent this interrogatory contains multiple subparts that are not logically part of the basic interrogatory. Objection, part or all of this interrogatory seems directed at the Relator which is a separate party in this case.  Objection, the interrogatory is vague and ambiguous in its use of the following

56

terms and phrases "consulted or relied upon" and "otherwise constituted a source." Objection, the defined term "Identify" renders the interrogatory vague and ambiguous because the interrogatory purports to require the United States to provide information different from that called for by Abbott's definition of identify. Objection, the interrogatory is overly broad and burdensome, and seeks information that is not relevant to any claim or defense and is not reasonably calculated to lead to the discovery of admissible evidence. Objection, the United States objects to the extent that the interrogatory seeks privileged information, including but not limited to, the attorney-client privilege, the work product privilege, the common interest privilege, the consulting expert privilege, the law enforcement investigative files privilege, and the deliberative process privilege. Subject to and without waiving the United States' general and specific objections, and its objections to Abbott's definitions and instructions, the United States provides the following. The United States reserves its right to supplement or amend this response. The United States states that it has already identified individuals and provided documents which support the United States' claims in its initial disclosures pursuant to Fed. R. Civ. P. 26.

57

| For the United States of America, | |
|---|---|
| MICHAEL J. SULLIVAN<br>UNITED STATES ATTORNEY | PETER D. KEISLER<br>ASSISTANT ATTORNEY GENERAL |
| George B. Henderson, II<br>Assistant U.S. Attorney<br>John Joseph Moakley U.S. Courthouse<br>Suite 9200, 1 Courthouse Way<br>Boston, MA 02210<br>Phone: (617) 748-3398<br>Fax: (617) 748-3272<br><br>R. ALEXANDER ACOSTA<br>UNITED STATES ATTORNEY<br>SOUTHERN DISTRICT OF FLORIDA<br><br>/s/ Ana Maria Martinez<br>Mark A. Lavine<br>Ana Maria Martinez<br>Ann St.Peter-Griffith<br>Special Attorneys for<br> the Attorney General<br>99 N.E. 4th Street, 3rd Floor<br>Miami, FL 33132<br>Phone: (305) 961-9003<br>Fax: (305) 536-4101<br><br>Dated: December 4, 2006 | /s/ Justin Draycott<br>Michael F. Hertz<br>Joyce R. Branda<br>Renée Brooker<br>Justin Draycott<br>Gejaa T. Gobena<br>Civil Division<br>Commercial Litigation Branch<br>P. O. Box 261<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Phone: (202) 307-1088<br>Fax: (202) 307-3852 |

## **VERIFICATION**

I declare under penalty of perjury that the facts provided in the answers of the,

Department of Health and Human Services' Centers for Medicare and Medicaid Services in the

foregoing Responses of the United States to Interrogatories number 2, 15, and 16 from

Defendant Abbott's First Set of Interrogatories are true and correct to the best of my knowledge,

information and belief.

Dated: 12/04/06

Thomas Gustafson
Deputy Director, Center for Medicare Management
Centers for Medicare and Medicaid Services
U.S. Dept. of Health and Human Services

## **VERIFICATION**

I declare under penalty of perjury that the facts provided in the answers of the,

Department of Health and Human Services' Centers for Medicare and Medicaid Services in the

foregoing Responses of the United States to Interrogatory number 2 from  Defendant Abbott's

First Set of Interrogatories are true and correct to the best of my knowledge, information and

belief.

Dated: 12-04-06

William Lasowski
Deputy Director, Center for Medicaid & State
Operations
Centers for Medicare and Medicaid Services
U.S. Dept. of Health and Human Services

## VERIFICATION

I declare under penalty of perjury that the facts provided in the answers of the

Department of Health and Human Services' Centers for Medicare & Medicaid Services in the

foregoing Responses of the United States to Interrogatory number 16 from Defendant Abbott's

First Set of Interrogatories are true and correct to the best of my knowledge, information and

belief.

Dated: 12/04/2006

Jacqueline White
Director, Office of Strategic Operations &
Regulatory Affairs
Centers for Medicare & Medicaid Services
U.S. Dept. of Health and Human Services

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above United States'

Objections And Responses To Defendant Abbott's First Set Of Interrogatories to be served on

the following counsel by electronic mail:

Daniel Reidy
James Daly
Tina M. Tabacchi
Brian J. Murray
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692
Tel: (312) 782-3939
Fax: (312) 782-8585
Email: jrdaly@jonesday.com

Martin F. Murphy
Foley Hoag LLP
155 Seaport Blvd
Boston, MA 02210-2600
Tel: (617)832.1213
Fax: (617)832.7000
Email: mmurphy@foleyhoag.com

R. Christopher Cook
David S. Torborg
Jones, Day, Reavis & Pogue
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: christophercook@jonesday.com

Neil Merkl
Paul F. Doyle,
William A. Escobar
Kelley Drye & Warren, LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 808-7811
Fax: (212) 808-7897
Email: nmerkl@kelleydrye.com

Date: December 4, 2006

   /s/ Ana Maria Martinez
   Ana Maria Martinez