# EXHIBIT FF

Bowen, Marianne                                    June 5, 2007
                        Baltimore, MD

              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL       : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION:

PRICE LITIGATION            : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO   :

U.S. ex rel. Ven-a-Care of : Judge Patti B. Saris

the Florida Keys, Inc. v.  :

Abbott Laboratories, Inc., : Chief Magistrate

No. 06-CV-11337-PBS         : Judge Marianne B.

- - - - - - - - - - - - -x Bowler

           IN THE CIRCUIT COURT OF

           MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - -x

STATE OF ALABAMA,           :

            Plaintiff, :

       vs.                  : Case No.: CV-05-219

ABBOTT LABORATORIES, INC., : Judge Charles Price

et al.,                     :

            Defendants.:

- - - - - - - - - - - - -x

762b1f4d-aaec-4471-a08f-4e61a3217d81

Bowen, Marianne                                           June 5, 2007
                        Baltimore, MD

| Page 2 |
|---|

1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2         IN AND FOR LEON COUNTY, FLORIDA
3
4    THE STATE OF FLORIDA
5    ex rel.
6    - - - - - - - - - - - - - - - - x
7    VEN-A-CARE OF THE FLORIDA       :
8    KEYS, INC., a Florida           :
9    Corporation, by and through its :
10   principal officers and directors, :
11   ZACHARY T. BENTLEY and          :
12   T. MARK JONES,                  :
13         Plaintiffs,       :
14        vs.               : Civil Action
15   MYLAN LABORATORIES INC.; MYLAN   : No.: 98-3032G
16   PHARMACEUTICALS INC.; NOVOPHARM  : Judge: William
17   LTD., SCHEIN PHARMACEUTICAL, INC.;:  L. Gary
18   TEVA PHARMACEUTICAL INDUSTRIES   :
19   LTD., TEVA PHARMACEUTICAL USA;   :
20   and WATSON PHARMACEUTICALS, INC., :
21         Defendants,       :
22   - - - - - - - - - - - - - - - - x

| Page 3 |
|---|

1      IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2           STATE OF MISSOURI
3    - - - - - - - - - - - - - - - - x
4    STATE OF MISSOURI, ex rel.,     :
5    JEREMIAH W. (JAY) NIXON,        :
6    Attorney General,               :
7    and                             :
8    MISSOURI DEPARTMENT OF SOCIAL    :
9    SERVICES, DIVISION OF MEDICAL    : Case No.:
10   SERVICES,                : 054-1216
11         Plaintiffs,        : Division No. 31
12        vs.                :
13   DEY INC., DEY, L.P., MERCK KGaA, :
14   EMD, INC., WARRICK              :
15   PHARMACEUTICALS CORPORATION,     :
16   SCHERING-PLOUGH CORPORATION, and :
17   SCHERING CORPORATION,           :
18         Defendants,       :
19   - - - - - - - - - - - - - - - - x
20
21
22

| Page 4 |
|---|

1        Videotaped Deposition of MARIANNE BOWEN,
2    a witness herein, called for examination by counsel
3    for Abbott Laboratories in the above-entitled
4    matter, pursuant to notice, the witness being duly
5    sworn by Robert M. Jakupciak, a Notary Public in and
6    for the District of Columbia, taken at the offices
7    of Hogan & Hartson, 111 S. Calvert Street,
8    Baltimore, Maryland, 21201, at 9:30 a.m., on June 5,
9    2007, and the proceedings being taken down by
10   Stenotype by Robert M. Jakupciak, RPR.
11
12
13
14
15
16
17
18
19
20
21
22

| Page 5 |
|---|

1    APPEARANCES:
2
3    On behalf of the United States of America:
4
5        ANA MARIA MARTINEZ, ESQUIRE
6        U.S. Department of Justice
7        99 N.E. 4th Street
8        Miami, Florida  33132
9        (305) 961-9431
10
11   On behalf of the Centers for Medicare and
12   Medicaid Services:
13
14       LESLIE M. STAFFORD, ESQUIRE
15       Centers for Medicare and
16       Medicaid Services
17       7500 Security Blvd.
18       Baltimore, Maryland  21244
19       (410) 786-9655
20
21
22   (CONTINUED)

                                      2 (Pages 2 to 5)

762b1f4d-aaec-4471-a08f-4e61a3217d81

Bowen, Marianne                                          June 5, 2007
                          Baltimore, MD

Page 98

1   days, can you put it in a safe place.  And I
2   would say, sure, bring it in my office, and I
3   lock my office at night.
4        Q.   What happened to these computers that
5   were pulled off from being re-imaged?
6        A.   After whoever was interested in
7   whatever was on them was done, they would just be
8   re-imaged and reissued.
9        Q.   To your knowledge, does HCFA have any
10  computers that have been pulled aside for re-
11  imaging now?
12       A.   Let me make sure I understand your
13  question.  You asked me if there are any
14  computers that I'm aware of right now that have
15  been pulled aside to be re-imaged?
16       Q.   No.  To not be re-imaged.
17       A.   I see.  I believe I understand, and I
18  do not know this as firsthand knowledge, I do
19  understand that Tom Gustafson's computer has
20  asked to be held aside.  But I was not the person
21  asked to take that action.
22       Q.   How did you come to that understanding?

Page 99

1        A.   I came to that understanding from
2   discussions with my attorney.
3        Q.   Did you -- strike that.
4             Are you aware of anyone else's computer
5   that has been pulled aside for hold off from re-
6   imaging?
7        A.   I honestly am not.  I'm not working in
8   that area any longer so I wouldn't be involved in
9   any of those types of actions.
10       Q.   When you discontinued responsibility
11  for this around 2003, at that point were there
12  any computers that had been held aside for re-
13  imaging that were still in your office; for
14  example?
15       A.   No.
16       Q.   Would they have been anywhere else?
17       A.   Not to my knowledge.
18       Q.   Do you know the names of anyone else
19  that has a computer that has been pulled to not
20  be re-imaged?
21       A.   In the past?
22       Q.   Yes.

Page 100

1        A.   I do.
2        Q.   Who would that be?
3        A.   Tom Scully.
4        Q.   What do you know about --
5        A.   And one more.  Ruben King Shaw.
6        Q.   Describe for me what you know about Mr.
7   Scully's computer being pulled from re-imaging?
8        A.   I was -- I received a phone call late
9   in the day one day asking if Mr. Scully's
10  computer had been re-imaged yet and it was
11  shortly after he left the agency, after some
12  investigation.  It was still in his office.  It
13  hadn't been touched yet.  And I was asked to
14  retrieve it.  And quite honestly, he had a
15  laptop, it was a Sony Vaio, and I kept that
16  laptop in my office for probably six months and,
17  to my knowledge, no one ever actually looked at
18  it.  I just held onto it until they told me it
19  was okay to re-image it.
20       Q.   Who did you receive the phone call
21  from?
22       A.   Oh, geez.  I honestly don't remember

Page 101

1   who called me.
2        Q.   Do you recall what office they were in?
3        A.   I believe it was someone from the
4   Office of Operations Management.
5        Q.   No guess who that may have been?
6        A.   I'm trying to remember.  CMS, in case
7   you haven't noticed, is an agency that people
8   come and go very frequently.  And I just can't
9   remember who was in that office at that time.
10            It may have been one of the attorneys,
11  but honestly I just can't remember which one or
12  who.
13       Q.   When did this phone call occur?
14       A.   I remember the office I was sitting in
15  at the time.  It was probably in 2003, if my
16  recollection is correct.  I'm picturing myself in
17  the office I was in at that time, if I recall,
18  that was around 2003.
19       Q.   Do you recall how long approximately it
20  had been since Mr. Scully had left?
21       A.   Geez, I honestly don't.  Honestly, I
22  just don't remember.  I don't remember when Mr.

Henderson Legal Services
202-220-4158

762b1f4d-aaec-4471-a08f-4e61a3217d81

Bowen, Marianne                                        June 5, 2007
                        Baltimore, MD

---

Page 102

1  Scully left the agency.
2      Q.  It was a short enough time period
3  though that his office --
4      A.  Correct.
5      Q.  -- his personal office was still set
6  up?
7      A.  Correct.  And honestly, the agency
8  doesn't use Sony Vaio computers as our typical
9  laptop.  That was -- he wanted that particular
10 computer and so that's why it hasn't been
11 touched, because no one else wanted it.
12     Q.  Do you know why the Office of
13 Operations Management, did I get that correct?
14     A.  That's correct.
15     Q.  Do you know why the Office of
16 Operations Management wanted Mr. Scully's
17 computer to be preserved?
18     A.  I believe the rationale was that
19 someone had asked to look at the contents of the
20 hard drive.
21     Q.  Were you told who was asked to --
22     A.  No, I wasn't.

---

Page 103

1      Q.  You indicated that you kept Mr.
2  Scully's computer for approximately six months?
3      A.  I just held onto it for approximately
4  six months.
5      Q.  Did you keep it in your office?
6      A.  I did.
7      Q.  Were any copies of his computer made?
8      A.  No.
9      Q.  So you physically took his laptop, kept
10 it in your office?
11     A.  Locked it in a cabinet for six months.
12     Q.  What happened after the six months?
13     A.  I believe I was moving to a new
14 location and spoke with the attorneys in the
15 agency and said I've been holding onto this for a
16 period of time and they said, oh, no, we don't
17 need to keep it any longer.  You can just have it
18 re-imaged.  And honestly we have a laptop loaner
19 pool at the agency. My assumption is it went back
20 into that and that loaner pool is if you needed
21 to borrow a laptop for travel you would borrow it
22 for the period of time you were going to be away

---

Page 104

1  and then return it.
2      Q.  So this would have been approximately
3  mid-2004?
4      A.  It was probably still in 2003.  I think
5  I was asked to hold onto it earlier in 2003.  So
6  I would think before the end of the year in 2003
7  it was turned back in.
8      Q.  If I represented to you that Mr. Scully
9  did not leave the agency until the end of 2003, I
10 believe his technical last day was early 2004,
11 does that fresh your recollection of when you may
12 have had the computer?
13     A.  It may have been early 2004 that I got
14 the phone call then.
15     Q.  Sure.  So you held onto it for six
16 months, you initiated a phone call with an
17 individual asking whether you needed to preserve
18 it, preserve the computer, and you were told
19 that, you were told what?
20     A.  Not any longer.  You know, we don't
21 need it any longer, you can just re-image it and
22 put it back into the loaner pool.

---

Page 105

1      Q.  What did you do with the computer then?
2      A.  I gave it to the technician that worked
3  for me who was responsible for the loaner pool at
4  that time and said could you, have the
5  contractor just re-image it and make it part of
6  our normal loaner laptop.
7      Q.  So you have no reason to believe that
8  Mr. Scully's laptop was not re-imaged?
9      A.  No.
10     Q.  Had your directions been followed?
11     A.  Had my directions been followed, I have
12 no reason to believe it wasn't.
13     MS. MARTINEZ:  Counsel, I just want to
14 ask you, try to refrain from asking her directly
15 about communications with counsel.  Because we do
16 object on privilege grounds.
17     MS. RAMSEY:  Sure.
18 BY MS. RAMSEY:
19     Q.  I believe the other individual that you
20 mentioned was Ruben King Shaw.
21     A.  Correct.
22     Q.  What can you tell me about the

---

Henderson Legal Services
202-220-4158

762b1f4d-aaec-4471-a08f-4e61a3217d81

Bowen, Marianne                                    June 5, 2007

Baltimore, MD

| | |
|---|---|
| Page 174 | Page 176 |

Page 174

1       Under Outlook there are no post
2   offices. It's all one giant plate of spaghetti
3   and we're just identified by our individual e-
4   mail addresses.
5       And so if I were given the challenge of
6   figuring out how to do that, I would first have
7   to understand the period of time in which we're
8   talking about, I would then have to have someone
9   provide for me the names of every person who
10  worked in an individual area during that period
11  of time, and if they still existed, if they were
12  still employees of CMS, would have to
13  individually go to each of their GroupWise PST
14  files and find them out.
15      And that would be a challenge.
16      Q.  So when the GroupWise e-mail was
17  transferred to Outlook as a PST file, you lost
18  the post office?
19      A.  Yes.  We retained -- we identified the
20  mail for Marianne Bowen with Marianne Bowen's ID,
21  and Marianne Bowen got her mail.  And that's it.
22  It's not connected anywhere else.

Page 175

1       Q.  So you would have to do it on a user-
2   by-user basis?
3       A.  Correct.  Assuming we could, making a
4   couple of assumptions.  One, that the users who
5   were under a given post office during the period
6   of time that we would be looking for, are still
7   at CMS.
8       Q.  Why does that have anything to do with
9   it?
10      A.  When someone leaves employment with CMS
11  and goes off for greener pastures, we have no
12  reason, on a day-to-day basis under normal
13  circumstances, to retain their mail.  When a
14  person leaves CMS, we -- I want to get this right
15  for you.  We actually -- the day they leave, their
16  last day, we make a change to their e-mail
17  address that hides it from the address book.
18  Which means no one can send anymore mail to them,
19  and it locks their account.
20      The office that person works in has the
21  opportunity to retrieve any mail they want from
22  that e-mail account, store it however they feel

Page 176

1   they need to, and after a period of about 30
2   days, the e-mail account itself is deleted.
3       Q.  Everything in that user's e-mail
4   account is deleted?  Their archives are deleted?
5   I'm sorry, Ms. Bowen, I was just going to remind
6   --
7       A.  You told me that and I'm surprised that
8   was the first time I shook my head and didn't say
9   yes all day, but yes.
10      Q.  Can we repeat the question?  I believe
11  that I asked, everything in that user's e-mail
12  account is deleted?
13      A.  That's correct.
14      Q.  Their archives are deleted?
15      A.  That's correct.
16      Q.  So unless special measures are taken,
17  an employee who leaves CMS, and every e-mail they
18  have is gone within 30 days?
19      MS. MARTINEZ:  Objection to form.
20      A.  Unless someone takes the initiative to
21  save any of the documents or e-mail that was in
22  that person's account before the 30 days are up

Page 177

1   or someone takes measures to assure that it's not
2   deleted for a given reason, the account is
3   deleted.
4       Q.  That's the same for the user's files
5   that are stored on the LAN drive and also for the
6   e-mails?
7       A.  The files that are stored on the LAN
8   drive, it works pretty much the same, with a
9   little variation to it.
10      Q.  For the e-mail files, are requests ever
11  made for a user's e-mail to be frozen once they
12  leave, or it not to be deleted?
13      MS. MARTINEZ:  To the extent that she
14  knows.
15      MS. RAMSEY:  Yes.  To the extent that
16  you know.
17      A.  To the extent I know, we would never
18  agree.  I have never agreed to retain someone's
19  e-mail forever.  As I mentioned, if someone
20  leaves and there's information or data in their
21  e-mail that needs to be retained, it is the
22  responsibility of the organization the person

45 (Pages 174 to 177)

762b1f4d-aaec-4471-a08f-4e61a3217d81

Bowen, Marianne                                          June 5, 2007
                              Baltimore, MD

Page 234

1    account?
2        A.   That's correct.  I'm sorry.
3        Q.   So the only way to determine any Tom
4    Scully e-mails that might still exist would be to
5    run a key word search on all the individual
6    employee's e-mails?
7        A.   Yes.  And that would assume that anyone
8    kept Tom's notes.  If they decided to delete his
9    notes, they do come out on a daily basis for a
10   while, and if they decided to delete his notes,
11   they're deleted.
12       Q.   Someone else may have decided to keep
13   his e-mails though?
14       A.   That's correct.
15       Q.   And someone in his department after his
16   departure may have adopted his e-mails as their
17   own; is that correct?
18       A.   That's certainly a possibility.
19       Q.   Is this, does this equally apply with
20   the electronic documents located in the LAN
21   folders?
22           MS. MARTINEZ:  Objection as to form.

Page 235

1    I'm not sure what you mean by this.
2        A.   I'm assuming you mean key word search.
3        Q.   Key word searches.
4        A.   I don't know the answer to that.  I
5    would have to find that out, do some research on
6    that.
7        Q.   When you testified that there were no
8    electronic documents for the 28 former employees
9    --
10           MS. MARTINEZ:  Objection to form.
11       Q.   -- this includes e-mails and electronic
12   documents that would be on the LAN system; is
13   that correct?
14           MS. MARTINEZ:  Objection as to form.
15       A.   I don't exactly remember the context in
16   which you asked me that question, but I'll try to
17   answer it.
18       Q.   I can rephrase it.
19       A.   Okay.
20       Q.   Are there any electronic documents on
21   the LAN folders, the group drives, the individual
22   drives, for these 28 former employees?

Page 236

1        A.   Again, you have to keep in mind, their
2    accounts are gone.
3        Q.   Their accounts have been deleted?
4        A.   Their accounts are gone.  Should
5    someone else have taken those electronic
6    documents and stored them on their LAN drive,
7    stored them on their hard drive, stored them on a
8    diskette, on a CD, paper format, they would still
9    be around if they haven't deleted those.
10       Q.   CMS has not taken any efforts to
11   preserve the electronic files for these 28 former
12   employees; is that correct?
13           MS. MARTINEZ:  Objection as to form.
14       A.   Actually, I don't agree with that.
15   Because when you talk about CMS, keep in mind
16   you're talking about the entire entity and not
17   just the IT environment.  I'm representing the IT
18   environment.  So from an IT perspective, I can
19   tell you that we did not take any steps to
20   preserve Tom Scully's or the other 27 former's
21   electronic documents.
22       Q.   Are you aware whether CMS took any

Page 237

1    steps to preserve these electronic documents?
2        A.   I am not aware.
3        Q.   Would you have become aware through the
4    course of your preparation for today's
5    deposition?
6        A.   No, I wouldn't have.
7        Q.   If these electronic documents had been
8    pulled or retained, would you have learned this
9    in your preparation for today's deposition?
10           MS. MARTINEZ:  Objection; asked and
11   answered.
12           THE WITNESS:  Does that mean I answer?
13           MS. MARTINEZ:  Yeah.  Unless I say that
14   it's a privilege, it's an objection privilege,
15   you can always answer.
16       A.   Okay.  No.  I don't think I would have.
17   Because I'm completely focused on our electronic
18   environment and how we came to where we are, how
19   we operate where we are.  I would not have been
20   part of discussions with the administrator's
21   office, for example, on what they were going to
22   preserve from Tom's LAN or e-mail accounts or

60 (Pages 234 to 237)

762b1f4d-aaec-4471-a08f-4e61a3217d81

# EXHIBIT GG

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

          UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

---------------------------------X


           IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

         Plaintiff,                :  CV-05-219

     v.                            :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

         Defendants.               :

---------------------------------X

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                    New York, NY

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
2  ----------------------------------X
3  STATE OF WISCONSIN,        : CASE NO.
4       Plaintiff,            : 04-CV-1709
5    v.                       :
6  AMGEN INC., et al.,        :
7       Defendants.           :
8  ----------------------------------X
9
10       IN THE COURT OF COMMON PLEAS
11         FIFTH JUDICIAL CIRCUIT
12  ----------------------------------X
13  STATE OF SOUTH CAROLINA, and   :   STATE OF
14  HENRY D. McMASTER, in his official : SOUTH CAROLINA
15  capacity as Attorney General for  :   COUNTY OF
16  the State of South Carolina,   :   RICHLAND
17       Plaintiff,            :
18    v.              : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.      : 07-CP-40-0283
20       Defendant.            :
21  ----------------------------------X
22

**Page 3**

1    IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2       IN AND FOR LEON COUNTY, FLORIDA
3  THE STATE OF FLORIDA
4  ex rel.
5  - - - - - - - - - - - - - - - - - x
6  VEN-A-CARE OF THE FLORIDA       :
7  KEYS, INC., a Florida           :
8  Corporation, by and through its  :
9  principal officers and directors, :
10  ZACHARY T. BENTLEY and           :
11  T. MARK JONES,                   :
12          Plaintiffs,          :
13     vs.           : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN    : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM    : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES    : Gary
18  LTD., TEVA PHARMACEUTICAL USA;     :
19  and WATSON PHARMACEUTICALS, INC.  :
20          Defendants.          :
21  - - - - - - - - - - - - - - - - - x
22

**Page 4**

1   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2         STATE OF MISSOURI
3  - - - - - - - - - - - - - - - - -x
4  STATE OF MISSOURI, ex rel.,     :
5  JEREMIAH W. (JAY) NIXON,        :
6  Attorney General,              :
7  and                            :
8  MISSOURI DEPARTMENT OF SOCIAL    :
9  SERVICES, DIVISION OF MEDICAL    : Case No.:
10  SERVICES,                      : 054-1216
11          Plaintiffs,      : Division
12                       : No. 31
13     vs.             :
14  DEY INC., DEY, L.P., MERCK KGaA,  :
15  EMD, INC., WARRICK             :
16  PHARMACEUTICALS CORPORATION,     :
17  SCHERING-PLOUGH CORPORATION, and  :
18  SCHERING CORPORATION,           :
19          Defendants.       :
20  - - - - - - - - - - - - - - - - -x
21
22

**Page 5**

1          New York, New York
2          Friday, May 4, 2007
3
4
5       Videotaped Deposition of BRUCE C.
6  VLADECK, Ph.D., a witness herein, called for
7  examination by counsel for Abbott Laboratories in
8  the above-entitled matter, pursuant to Subpoena,
9  the witness being duly sworn by JOMANNA DEROSA, a
10  Notary Public in and for New York, taken at the
11  offices of Jones Day, 222 East 41st Street, New
12  York, New York, at 8:38 a.m. on Friday, May 4,
13  2007, and the proceedings being taken down by
14  Stenotype by JOMANNA DEROSA, and transcribed under
15  her direction.
16
17
18
19
20
21
22

2 (Pages 2 to 5)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                        New York, NY

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  reassignments, things of that, that I would have
2  generated directly.
3      Q.  How about notes of meetings?
4      A.  I'm not much of a note taker.
5      Q.  E-mail?
6          MS. BROOKER:  Objection.  Form.
7      A.  I am an extensive e-mailer, so --
8      Q.  And did you use e-mail while you were
9  the administrator of HCFA?
10     A.  Yes.
11         MS. BROOKER:  Objection.  Form.
12         THE WITNESS:  Sorry.
13     Q.  What was your e-mail address?
14     A.  That's a good question.  I don't
15  recall.
16     Q.  But you personally were e-mailing.  It
17  wasn't an assistant who was e-mailing on your
18  behalf?
19         MS. BROOKER:  Objection.  Form.
20     A.  No.  I was personally reading and
21  writing lots of e-mails.
22     Q.  Do you know what efforts, if any, were

**Page 103**

1  made to either preserve or not preserve your e-
2  mail traffic while administrator of HCFA?
3          MS. BROOKER:  Objection.  Form.
4      A.  My understanding was, under the
5  relevant statutes, that all e-mails to and from
6  me, in my position as administrator, were
7  archived and preserved at two levels.  There was
8  a 30-day or 60-day active archive, and then there
9  was a permanent repository.
10     Q.  Do you know where the permanent
11  repository of your e-mail traffic could be found?
12     A.  No.
13     Q.  Do you know who would be responsible
14  for that?
15     A.  There is a records officer at what is
16  now the Centers for Medicare and Medicaid
17  Services, the renaming of HCFA, who, I believe,
18  would have the legal responsibility and authority
19  to superintend those records.
20     Q.  And any paper records that you
21  generated, memos, letters, whatever, do you know
22  what would have happened to those?

**Page 104**

1          MS. BROOKER:  Objection.  Form.
2      A.  Similarly, I believe all such documents
3  were archived, but the physical arrangements
4  under which they're archived, I have no idea.
5      Q.  Before getting into the substance of --
6  of your work with drug reimbursement policies,
7  Dr. Vladeck, I'd like to try to figure out who
8  you worked with while at HCFA on -- on those
9  issues.
10         Can you tell me, was there a particular
11  person with whom you had primary communications
12  within HCFA on drug reimbursement policy?
13         MS. BROOKER:  Objection.  Form.
14     A.  They were very separate.  It was always
15  the case at HCFA on Medicare and Medicaid
16  policies.  The principal Medicaid drug pricing
17  expert, drug reimbursement expert during most of
18  my tenure was an expert in the Medicaid Bureau by
19  the name of Randall Graydon.
20     Q.  How do you spell Graydon?
21     A.  G-R-A-Y-D-O-N.  His supervisor, with
22  whom I worked the most closely, although I don't

**Page 105**

1  recall specifically on these issues, would have
2  been Rozann Abato, who was deputy director of the
3  Medicaid Bureau.
4      Q.  How do you spell Abato?
5      A.  A-B-A-T-O.
6          On the Medicaid issues, the principal
7  person with whom I would have worked would have
8  been Tom Hoyer, H-O-Y-E-R, who was in charge of
9  the hodgepodge of -- Medicare reimbursement for a
10  hodgepodge of services other than the hospitals
11  and physicians.  And his supervisor, with whom I
12  also would have discussed these issues, was
13  Thomas Ault, A-U-L-T, who was deputy director and
14  then director of what was then the Policy Bureau.
15         Tom's supervisor was Kathy Buto, B-U-T-
16  O, who was head of the Policy Bureau, and then an
17  associate administrator.
18         And in '96 and '97, the issue of
19  Medicare reimbursement for prescription drugs
20  took on a legislative component.  And so, I would
21  also have been in conversation with folks on the
22  legislative staff.

27 (Pages 102 to 105)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                          New York, NY

                                                          Page 285

            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

--------------------------------X


            IN THE CIRCUIT COURT OF

           MONTGOMERY COUNTY, ALABAMA

--------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

          Plaintiff,               :  CV-05-219

     v.                            :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

          Defendants.              :

--------------------------------X

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

Page 286

1  STATE OF WISCONSIN    CIRCUIT COURT   DANE COUNTY
2  ---------------------------------X
3  STATE OF WISCONSIN,          : CASE NO.
4      Plaintiff,        : 04-CV-1709
5      v.          :
6  AMGEN INC., et al.,          :
7      Defendants.      :
8  ---------------------------------X
9
10       IN THE COURT OF COMMON PLEAS
11          FIFTH JUDICIAL CIRCUIT
12  ---------------------------------X
13  STATE OF SOUTH CAROLINA, and    :   STATE OF
14  HENRY D. McMASTER, in his official : SOUTH CAROLINA
15  capacity as Attorney General for   :   COUNTY OF
16  the State of South Carolina,     :     RICHLAND
17      Plaintiff,          :
18      v.          : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.        : 07-CP-40-0283
20      Defendant.        :
21  ---------------------------------X
22

Page 287

1       IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2          IN AND FOR LEON COUNTY, FLORIDA
3  THE STATE OF FLORIDA
4  ex rel.
5  ------------------x
6  VEN-A-CARE OF THE FLORIDA       :
7  KEYS, INC., a Florida       :
8  Corporation, by and through its   :
9  principal officers and directors, :
10  ZACHARY T. BENTLEY and          :
11  T. MARK JONES,          :
12          Plaintiffs,      :
13      vs.          : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN   : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM   : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES    : Gary
18  LTD., TEVA PHARMACEUTICAL USA;   :
19  and WATSON PHARMACEUTICALS, INC.  :
20          Defendants.      :
21  ------------------x
22

Page 288

1  IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2           STATE OF MISSOURI
3  ------------------x
4  STATE OF MISSOURI, ex rel.,      :
5  JEREMIAH W. (JAY) NIXON,          :
6  Attorney General,          :
7  and          :
8  MISSOURI DEPARTMENT OF SOCIAL   :
9  SERVICES, DIVISION OF MEDICAL   : Case No.:
10  SERVICES,          : 054-1216
11      Plaintiffs,   : Division
12          : No. 31
13      vs.          :
14  DEY INC., DEY, L.P., MERCK KGaA,  :
15  EMD, INC., WARRICK          :
16  PHARMACEUTICALS CORPORATION,      :
17  SCHERING-PLOUGH CORPORATION, and  :
18  SCHERING CORPORATION,          :
19      Defendants.      :
20  ------------------x
21
22

Page 289

1          New York, New York
2          Thursday, June 21, 2007
3
4       CONTINUED Videotaped Deposition of
5  BRUCE C. VLADECK, Ph.D., a witness herein, called
6  for examination by counsel for Abbott Laboratories
7  in the above-entitled matter, pursuant to
8  Subpoena, the witness being duly sworn by JOMANNA
9  DEROSA, a Notary Public in and for New York, taken
10  at the offices of Jones Day, 222 East 41st Street,
11  New York, New York, at 8:54 a.m. on Thursday, June
12  21, 2007, and the proceedings being taken down by
13  Stenotype by JOMANNA DEROSA, and transcribed under
14  her direction.

                    2 (Pages 286 to 289)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                              June 21, 2007
                              New York, NY

Page 306

1   anybody cover duplicative areas.  I think Mr. Cook
2   has been pretty thorough.
3           And I just wanted to make that
4   statement for the record.
5           MR. COOK:  Sure.  Just so we're
6   clear, the documents that we've requested that
7   we're waiting for in particular are documents
8   related to the Office of Legislative Affairs at
9   CMS, for which I don't believe we've received any
10  documents at all.
11          Dr. Vladeck, obviously, didn't work
12  in the Office of Legislative Affairs, and it's my
13  strong hope that -- that we're able to finish the
14  -- the deposition today.
15          And I have no interest in bringing
16  Dr. Vladeck back, and, obviously, I don't know,
17  until I've seen the documents, but I'm going to do
18  my best to -- to question the witness in a way
19  that -- that doesn't require us to -- to try to
20  bring him back.
21          MS. BROOKER:  I appreciate it.
22

Page 307

1       EXAMINATION BY COUNSEL FOR
2          ABBOTT LABORATORIES:
3   BY MR. COOK:
4       Q.    It's good to see you again, Dr.
5   Vladeck.
6       A.    Thank you.
7       Q.    The feeling, I'm sure -- I'm sure
8   is not mutual.
9       A.    No.  I would distinguish the
10  personal and the professional.
11      Q.    Fair enough.  I'd like to start by
12  just going over a couple of things from your last
13  deposition that I didn't get to come back to and
14  fill out when we ended.
15          The first was you indicated in your
16  last deposition that you personally read and wrote
17  a lot of e-mails while you were the administrator
18  of, at that time, HCFA.
19          Do you recall that?
20      A.    Yes, I do.
21      Q.    The e-mails that you read and
22  wrote, what would be the -- the purposes for which

Page 308

1   you would receive and send e-mails as the
2   administrator of HCFA?
3           MS. BROOKER:  Objection.  Form.
4       A.    I would range the gamut.  I would -
5   - particularly in light of the fact that I spend
6   most of the time in our Washington offices, but a
7   large portion of the staff was in Baltimore.  A lot
8   of it would be the communications, asking
9   questions about issues, expressing direction,
10  giving direction about certain items, reviewing
11  drafts of material that might be sent to me
12  electronically because it would be quicker or more
13  efficient to do that.
14          And then because I made it a point
15  of making sure that every employee of the agency
16  had my e-mail address, there would be a broad
17  range of other kinds of issues.
18          I remember particularly one
19  employee who was especially concerned about the
20  issue of bicycle lockers at our new facility in
21  Baltimore.  And after five or six exchanges with
22  him, I just sort of turned him over to one of my

Page 309

1   colleagues, but -- so, it really ran the whole --
2   the gamut of sort of things.
3       Q.    And was it your experience that
4   when you were administrator of HCFA that there
5   was, for lack of a better word, an e-mail culture,
6   that people used e-mail extensively?
7           MS. BROOKER:  Objection.  Form.
8       A.    I -- I think -- I think it was
9   stylistic and partially generational.  I think
10  there were folks in the organization that were
11  very paper-dependent.  There were folks in the
12  organization, although a small minority, I would
13  say, who were allergic to writing anything down,
14  or if they did you couldn't understand what it was
15  anyway.
16          And then there was -- I think over
17  time, as people became more familiar with it, more
18  accustomed to it, a growing reliance on e-mail as
19  a means of internal communications certainly.
20      Q.    Would some of your e-mail
21  communications have related to drug reimbursement
22  issues?

                           7 (Pages 306 to 309)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

Page 310

1           MS. BROOKER: Objection. Form.
2      A.    It could very well have.  Again, as
3  I believe I testified at our last session, it was
4  not one of the major sort of issues on my
5  attention or on which I was focusing, but to the
6  extent that it came up it was as likely to come up
7  through an e-mail exchange as through an oral
8  conversation or a written document.
9      Q.    And at least for me personally, if
10 I wanted to go back and recreate what I was doing,
11 and the various issues were that were raised
12 during a particular time period, looking at my old
13 e-mails is -- is the most effective way for me to
14 do that nowadays.
15          Would that be true for you as well
16 during this time period?
17          MS. BROOKER: Objection. Form.
18     A.    I don't know that I ever had the
19 opportunity to do that or think about it.  It
20 would certainly be a very useful spur to the
21 memory.  I would probably get so bogged down in
22 being reminded of things I had totally forgotten

Page 311

1  that it might not be that efficient, but it would
2  -- I think it would be very helpful to try to
3  reconstruct.
4      Q.    You mentioned the name of Randall
5  Graydon as your preeminent drug reimbursement
6  expert when you were there.
7          Can you tell me a little bit --
8  what's Randall Graydon's background?
9      A.    I honestly don't know.  He was
10 already -- I'm trying to remember if he actually
11 had formal training in pharmacy.  I believe he
12 did.  He may have, but I do not recall.  He may
13 have actually had been licensed as a professional
14 pharmacist before, or at about the time he came to
15 work at the agency.
16          He certainly had been working on
17 drug issues for the organization for a number of
18 years before I got there.  I think it's been a
19 good part of his professional career at the
20 agency.
21     Q.    How old was he at the time you were
22 administrator?

Page 312

1      A.    Oh, I wouldn't be able to say.  I
2  would guess he was roughly a contemporary of mine,
3  and I would have been in my mid 40s.
4      Q.    Do you recall any conversations
5  with Randall Graydon relating specifically to
6  average wholesale price and -- and those drug
7  reimbursement issues?
8          MS. BROOKER: Objection. Form.
9      A.    The only conversation I recall with
10 -- specific conversation I recall with a member of
11 my staff about average wholesale price and drug
12 pricing issues, which I believe we discussed last
13 time, although I'm not certain, was with Tom
14 Hoyer, relative to the Medicare drug pricing
15 issues, and -- and the issue of average wholesale
16 price.
17          I also know that I had one or more
18 conversations with his supervisor, Mr. Ault, at
19 some point.  Whether it was the same conversation
20 or a separate conversation, I couldn't say.
21     Q.    Do you recall when those
22 conversations or conversation took place?

Page 313

1      A.    I couldn't tell you when -- it was
2  early -- I recall the conversation with Mr. Hoyer
3  particularly because it was really, I think, the
4  first time I ever got -- had any extensive
5  substantive conversation about the issue of
6  average wholesale price, and learned a little bit
7  about the history of the implementation of the
8  Medicare provisions for OBRA '90 relative to the
9  efforts to survey physicians about acquisition
10 cost that was aborted, and so forth.
11          And I just, for some reason,
12 remember his referring to the Red Book and
13 explaining to me that it was derived not from
14 independent investigation but from information
15 supplied to the publisher by the manufacturers.
16     Q.    Do you remember anything else that
17 Mr. Hoyer or Mr. Ault told you relating to average
18 wholesale price?
19          MS. BROOKER: Objection. Calls for
20 hearsay.  Also, I just want to be mindful just to
21 instruct the witness to be careful about
22 disclosing pre-decisional deliberative

8 (Pages 310 to 313)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

# EXHIBIT HH



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Health Care Financing Administration

Associate Administrator
for Policy
Washington, D.C. 20201

DEC 1 7 1996

T. Mark Jones
Ven-A-Care of the Florida Keys, Inc.
933 Fleming Street
Key West, Florida 33040

Dear Mr. Jones:

I am responding to your letter to Bruce Vladeck, the
Administrator of the Health Care Financing Administration,
concerning the Medicare and Medicaid program payment allowances
for infusion and inhalation drugs. The Administrator referred
your letter to me as drug payment policy is one of my areas of
responsibility.

We appreciate the information that you forwarded to us concerning
the prices of certain of these drugs. We are very concerned
about this area of the program and we are evaluating various ways
to assure that the Medicare and Medicaid programs pay for drugs
at a fair price. We will consider your information in our
evaluations.

Thank you again for sending this information to us. We are
sending a similar response to Zachary T. Bentley.

Sincerely,

Kathleen a. Buto

Kathleen A. Buto
Associate Administrator
for Policy

Exhibit No. Abbott-164
Date 5/4/07
Jomanna DeRosa, CSR

HHC003-0477    F

# EXHIBIT II





EXHIBIT

*Abbott #17*

*1-11-07*

913 FLEMING ST.
KEY WEST, FLA. 33040
(305) 292-1635
FAX: (305) 292-1739

## FAX TRANSMITTAL SHEET

### "PERSONAL AND CONFIDENTIAL"

TO: *Ms. June Gibbs Brown*
*Inspector General*

AT: *Office of the Inspector General*

FAX NO: *202-619-0521*

FROM: *Zachary Bentley and S. Mark Jones*

FAX NO: 305-292-1739

DATE: *6/12/97*      TIME: *12pm*

RE:

*Copy of letter to HCFA Administrator,*
*Dr. Bruce Vladeck*

PAGES TO FOLLOW INCLUDING COVER SHEET: *4*

NOTE: FORWARD THIS FAX IMMEDIATELY TO THE ADDRESSEE, AS THE DOCUMENTS CONTAINED IN THIS FAX ARE PERSONAL AND CONFIDENTIAL!! IF YOU DO NOT RECEIVE THIS FAX IN ITS ENTIRETY, PLEASE CALL SALLY SMITH AT 305-292-1635.

2302673

HIGHLY CONFIDENTIAL                                                    R2-040813

# VEN-A-CARE
## OF THE FLORIDA KEYS, INC.
### A Home I.V. and Nutritional Service

933 FLEMING ST.
KEY WEST, FLA 33040
(305) 292-1635
FAX: (305) 292-1739

June 12, 1997

Dr. Bruce Vladeck
Administrator
Health Care Financing Administration
Department of Health and Human Services
200 Independence Blvd. S.W.
Hubert Humphrey Building Room 314G
Washington, D. C. 20201

RE: <u>THE HEALTH CARE FINANCING ADMINISTRATION'S KNOWING</u>
   <u>SQUANDERING OF MORE THAN ONE BILLION DOLLARS OF MEDICARE</u>
   <u>FUNDS FOR PARENTERAL NUTRITION.</u>

Dear Dr. Vladeck,

Ven-A-Care of the Florida Keys, Inc., "VAC", has for the past six years attempted to assist the Health Care Financing Administration, "HCFA", in limiting infusion and inhalation pharmaceutical reimbursements to the reasonable levels contemplated by United States laws and regulations.

One of the specific pharmaceutical products is Total Parenteral Nutrition, "TPN". TPN is covered under the Prosthetic Device Benefit of Part B of the Medicare Program. During the past six years, VAC's officers, directors and legal counsel have made countless telephone calls, written numerous letters, created numerous reports and made detailed presentations to HCFA and other responsible governmental officials detailing the grossly excessive, price gouging reimbursements that the Medicare Program is making for TPN. For years, VAC characterized these payments as being unwittingly made by HCFA. However, after six years of knowledge by HCFA and no discernable action concerning these grossly excessive reimbursements, these payments can no longer be characterized as unwitting.

Enclosed herewith you will find a toilet seat, together with a bag of TPN, HCPCS code B4199, that has been admixed with parenteral nutrition lipids 20%, HCPCS code B4186. The toilet seat is symbolic of the grossly excessive payments made a number of years ago by the Pentagon. To this day, Americans still remember the Pentagon's $400.00 toilet seats. Fortunately, for American taxpayers, the Pentagon only purchased a limited number of the infamous $400.00 toilet seats. Conversely, HCFA ,after six years of knowledge about the true costs for TPN and ancillary supplies continues to allow grossly excessive payments to be made. The bag of TPN enclosed herewith and the ancillary supplies and pump costs VAC a total of **$48.90 per day** , yet our Nation's Medicare Program which you administer continues to allow **$427.67 per day** for TPN (HCPCS codes B4199, B4186, B4224, B4220, B9006RR, and E0776RRXA).

**2302674**

24 Hour Beeper Service • 745-0289

HIGHLY CONFIDENTIAL

R2-040814

Dr. Bruce Vladeck
HCFA
June 12, 1997
Page 2

Financial data obtained from the Part B Extract and Summary System "BESS" reports indicates that the Medicare Program has allowed approximately **$1.4 billion dollars** during the last six years for parenteral nutrition and ancillary supplies and pumps. Your agency's inability to act responsibly and take corrective action has cost our Nation's Medicare Program approximately **$1.176 billion dollars in excessive payments** during the past six years ( computation equals VAC's cost plus a reasonable 40% profit margin). You should be ashamed of your agency's course of conduct particularly in light of the fact that the Medicare Program is now raising beneficiaries' Part B premiums and the Medicare Part A Program's financial solvency is in jeopardy.

We have elaborated in previous communications the fact that during the past six years Medicare's allowable for TPN has risen despite the fact that the cost in the private sector has fallen dramatically. The Medicare Program now pays two to three times the amounts that private insurers pay for TPN.

If you fail to heed our last cry for you and your agency to take responsible action, your legacy as the Administrator of HCFA may well be remembered as the Administrator responsible for purchasing Medicare's version of the infamous $400.00 toilet seats. We are aware that this letter is less than cordial. However, we hope that you will find our frankness and candor sobering and will finally take some immediate corrective action. Be advised that we are willing to wait no more than thirty days (30) from the date of this letter for you or your agency to send to us a copy of your plan outlining the corrective measures and timetable for implementation before VAC seeks to implement its own corrective plan.

Sincerely,

Zachary T. Bentley

T. Mark Jones

cc: minus toilet seat and TPN
    HHS Secretary, Donna Shalala
    Inspector General, June Gibbs Brown
    Congressman Fortney "Pete" Stark
    Teruni Rosengren, GAO
    Michael Hertz, Esquire, United States Department of Justice
    James Breen, Esquire, Wampler, Buchanan and Breen
    Atlee Wampler III, Esquire, Wampler, Buchanan and Breen

2302675

933 Fleming Street                VEN-A-CARE of the Florida Keys, Inc.          Key West, Florida 33040
                                          (305) 292-1635

HIGHLY CONFIDENTIAL                                                      R2-040815



2302676

HIGHLY CONFIDENTIAL

R2-040816

# EXHIBIT JJ

Smith, Dennis G.                    February 26, 2008
                    Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) CIVIL ACTION |
| PRICE LITIGATION | ) 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) |
| U.S. ex rel. Ven-a-Care of | ) Judge Patti B. Saris |
| the Florida Keys, Inc. | ) |
|     v. | ) Chief Magistrate |
| Abbott Laboratories, Inc., | ) Judge Marianne B. |
| No. 06-CV-11337-PBS | ) Bowler |

- - - - - - - - - - - - - -

(caption continues on following pages)

Videotaped deposition of DENNIS G. SMITH

Volume I

Washington, D.C.

Tuesday, February 26, 2008

9:00 a.m.

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                          Washington, DC

Page 26

1   your memory or to otherwise prepare for today's
2   deposition?
3       A.   The -- when I first learned that I was
4   going to be deposed and heard the name of the
5   case, I was curious as to what that was since I
6   wasn't already familiar with it.  So I used
7   Google and typed it in and learned what the case
8   was about.  In terms of -- I think that was the
9   only specific thing that I did.
10      Q.   Did you discuss the matter with anybody
11  other than counsel?
12      A.   Other than counsel?  No.
13      Q.   What sort of hits did you get back from
14  your Google search relating to the case?
15      A.   I only looked at one and that was to
16  the -- I don't know the precise terminology.  But
17  the -- I don't know what the legal term of it is.
18      Q.   Perhaps the complaint?
19      A.   It was some kind of brief.  I don't
20  know.  Maybe it was.
21      Q.   So it was something written by lawyers
22  submitted to the court of some sort?

Page 27

1       A.   It appeared to be a legal document that
2   described the case.
3       Q.   You didn't keep a copy of that or print
4   it off --
5       A.   No.
6       Q.   -- just read it online, correct?
7            You indicated that you produced
8   documents in connection with this case.  Could
9   you describe that in some more detail for me,
10  please?
11      A.   Through the -- there's a central
12  clearing office within CMS that had -- I don't
13  recall who all they sent notices to, but I was
14  one of the recipients to produce -- to search
15  documents and produce any material.  So there was
16  a computer search done.  I did not do that myself
17  because they have computer people who do those
18  types of things that I don't.
19           The material that is produced and
20  released to the public generally I do not keep
21  copies of.  So there was very little information
22  that I had in my control because I generally

Page 28

1   don't keep those things in my control.
2       Q.   When was it that this notice to search
3   for documents came out?  Do you recall?
4       A.   I don't remember the time frame.
5       Q.   Can you estimate about when it might
6   have occurred in the last seven years?
7       A.   There I believe were two different
8   requests, the one more than a year ago -- and I
9   really don't recall the year -- and one within
10  the last year.
11      Q.   The one that you received more than one
12  year ago, is it fair to say that it was less than
13  some period of time, whether it's three years,
14  five years, four years?
15      A.   I think it was less than -- I'm trying
16  to put different dates when -- sort of matching
17  up periods of time.  I don't think it was more
18  than five years ago.
19      Q.   When you arrived at CMS in 2001 were
20  you at that time the director of the Center for
21  Medicaid and State Operations?
22      A.   I came into -- during a transition

Page 29

1   period for the administration I was a senior
2   advisor to the secretary and my duties generally,
3   although there were other duties, but sort of
4   learning the issues in the transition for HCFA at
5   the time.  I took -- the present position was the
6   end of July of 2001.
7       Q.   At the time that you arrived during the
8   transition and in July 2001 to become the
9   director of the Center for Medicaid and State
10  Operations, were you advised of any requirement
11  to preserve documents in connection with any
12  ongoing litigation?
13      A.   I don't recall.
14      Q.   Are you aware of whether any efforts
15  were made within CMS to your knowledge to
16  preserve documents before you received the notice
17  -- the first of the two notices that you
18  described a moment ago?
19      A.   My recollection was that was the first
20  time.
21      Q.   Do you use e-mail, Mr. Smith?
22      A.   Yes.

                                    8 (Pages 26 to 29)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

| Page 30 |
| --- |

1     Q.  Can you quantify in any way how much
2  you use e-mail?  I can ask that better.  Do you
3  use e-mail heavily?
4     A.  I am more the recipient than the
5  sender, much to my dismay.
6     Q.  As a side-bar, I maintain that all
7  professionals seek to become net exporters of
8  paper.  I think that's become net exporters of e-
9  mail as well.  About how many e-mails a day do
10  you think you get?
11     A.  Probably a hundred.
12     Q.  Have you made any special efforts to
13  set aside e-mails that you might have sent or
14  received that would relate to the issues in this
15  case?
16     A.  No.
17     Q.  Your usage of e-mail, has that varied
18  up or down over the years that you've been at
19  CMS?
20     A.  I'd say it's probably pretty steady.
21     Q.  At a very high level of generality,
22  what are the types of topics that the e-mails

| Page 31 |
| --- |

1  that you send and receive would deal with today?
2     A.  There's wide variation.  We deal with
3  50 states, the District of Columbia, the
4  territories.  We have Medicaid, State Children's
5  Health Insurance Program survey and
6  certification.  Responses to Members of Congress.
7  There's wide variation.
8     Q.  Is it fair to say that between 2001 and
9  today some percentage of those e-mails would have
10  related to prescription drug issues, correct?
11     A.  Yes.
12     Q.  For example, some of them may have
13  related to state plan amendments specific to the
14  methodology by which a state pays for its
15  prescription drugs, correct?
16     A.  Generally not specific methodology.
17  Generally policy.  Review of state plan
18  amendments.
19     Q.  What are some of the -- again, at a
20  very high level of generality, what are some of
21  the policy issues that would be discussed in the
22  e-mails that you've sent and received over the

| Page 32 |
| --- |

1  years relating to prescription drug payments?
2     A.  Since 2001 we dealt with state requests
3  to find savings in their Medicaid programs, how
4  to find such savings.  We have the establishment
5  of purchasing pools among the states.  When the
6  Deficit Reduction Act of 2005 was passed to
7  implement those provisions we -- those are sort
8  of big categories of work that fits into those.
9     Q.  You indicated that you kept relatively
10  few paper files earlier.  Could you characterize
11  what those paper files would consist of?
12     A.  I think you asked me in regards to
13  things that I produced in response to --
14     Q.  Oh, yes, sir.
15     A.  -- the deposition.  I indicated that I
16  thought I had produced very little because the
17  agency -- I deal with sort of higher policy.  We
18  haven't released a great deal.  We have released
19  some, obviously, when we dealt with the issues of
20  the Deficit Reduction Act, that sort of thing.
21  But in general the correspondence -- there's a
22  body that deals with correspondence.  So I would

| Page 33 |
| --- |

1  not personally keep a copy of things that have
2  been sent out.
3     Q.  Right.  And my question is actually the
4  flip side of that.  It's what types of documents
5  do you maintain, if any?
6     A.  I maintain things that I would use on a
7  regular basis to make certain that I could
8  retrieve it easily.  For example, in the 2009
9  President's budget, maintaining files that I can
10  go back quickly to answer a question on S-CHIP
11  reauthorization last year I kept things handy for
12  myself because I would rely on them frequently.
13  So I would want them -- to be able to retrieve
14  them quickly.
15     Q.  Do you keep notes or any personal
16  documentation of meetings that you attend?
17     A.  No.
18     Q.  Are there any other types of paper
19  documents that you maintained other those that
20  you're currently at the time using to refer to in
21  your job?
22     A.  Well, again, articles that I find of

                                    9 (Pages 30 to 33)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

# EXHIBIT KK

Gaston, Sue                                January 24, 2008
                    Washington, DC

                                                      Page 1

                UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - -

       (cross captions appear on following pages)




          Videotaped deposition of SUE GASTON

                    Volume I



                Washington, D.C.

                Thursday, January 24, 2008

                9:00 a.m.

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 90

1  archives or something like that?
2      A.   No.
3      Q.   Or just leave them behind in your office
4  and move on?
5      A.   I left them behind.
6      Q.   You don't know who they went to?
7      A.   No.
8      Q.   Can you give me a sense for the volume of
9  documents you had relating to approval of state plan
10 amendments?
11     A.   I really wouldn't have any idea.
12     Q.   Would it be a file cabinet?
13     A.   If -- probably less than that.
14     Q.   Compared to the volume of the federal
15 upper limit documents, more or less?
16     A.   That's really hard to say.
17     Q.   Did you have any documents -- when you
18 switched jobs, did you keep the same computer or did
19 you switch? Files that were on your hard drive
20 originally, did they stay there?
21     A.   Correct.
22     Q.   So you still had access to all the same

Page 91

1  documents when you moved jobs; is that right?
2          MS. MARTINEZ: Objection, form.
3      A.   I didn't keep all of those documents. I
4  got rid of a lot of those documents when I moved.
5      Q.   And when you say you got rid of, what do
6  you mean by that?
7      A.   I mean, just deleted them off my hard
8  drive because I didn't need the information, didn't
9  need the information any longer.
10     Q.   Are you familiar with something called a
11 document hold notice?
12         MS. MARTINEZ: Objection to form.
13     A.   Can you explain that?
14     Q.   A notice for you to retain any files you
15 may have related to a specific subject.
16     A.   Yes.
17     Q.   Have you ever received a document hold
18 notice during your work at CMS?
19     A.   Yes.
20     Q.   Tell me about that. When did you get it
21 and what did it cover?
22     A.   I can't remember the date on it, but it

Page 92

1  was probably -- I can't remember the date on the
2  document. But we received it and it was asking us
3  to not destroy any documents.
4      Q.   Related to what subject?
5      A.   I can't remember.
6      Q.   Did you get this notice while you were
7  working in the new position?
8      A.   Yes.
9      Q.   Was it a notice you received within the
10 last year or prior to that?
11     A.   Prior to that.
12     Q.   Prior to getting that document hold
13 notice did you make any efforts to keep documents
14 that might relate to Medicaid payment for drugs?
15     A.   Can you I guess explain -- can you
16 restate that?
17     Q.   I don't think I can.
18     A.   Can you repeat that? Yeah. Prior to
19 getting the notice to not destroy documents, did you
20 take any evidence to consciously maintain documents
21 that related to Medicaid payment for drugs.
22         MS. MARTINEZ: Objection, form.

Page 93

1      A.   Medicaid payment for drugs is kind of
2  broad. So are you saying state plan amendments? I
3  mean --
4      Q.   In your view what all would fall in the
5  category of Medicaid payment for drugs, other than
6  state plan amendments obviously that you indicated.
7      A.   You're asking me that?
8      Q.   Yes.
9      A.   Okay. I don't know. We have -- any kind
10 of correspondence that maybe I replied to. So --
11     Q.   Did you make any efforts to retain any
12 documents relating to state plan amendments prior to
13 getting the hold notice?
14     A.   Well, the notice that -- I was in my new
15 area so I didn't have the state plan amendment
16 information with me.
17     Q.   Okay. Prior to getting the litigation
18 hold notice and back during the time you were
19 working on state plan amendment stuff --
20     A.   Okay.
21     Q.   -- did you make any conscious efforts to
22 retain any of those documents?

Henderson Legal Services, Inc.

202-220-4158               www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 94

1          MS. MARTINEZ:  Objection, form.
2     A.   I retained the documents.
3     Q.   All of them?
4     A.   I can't say all of them.  What was
5  pertinent to what I was working on at that time.
6     Q.   But if it didn't relate to what you were
7  working on at the time, you didn't make an effort to
8  keep them; is that right?
9          MS. MARTINEZ:  Objection, form.
10    A.   I can't answer that.
11    Q.   Did you use e-mail?
12    A.   Yes.
13    Q.   When did you start using e-mail?
14    A.   I can't remember.
15    Q.   Was it during the time that you were
16  working on state plan amendments and federal upper
17  limits?
18    A.   Yes.
19    Q.   Did you have e-mail correspondence on
20  those subjects with anyone?
21    A.   Yes.
22    Q.   Was that something that you did

Page 95

1  regularly?
2     A.   Yes.
3     Q.   And where are those e-mails today?
4          MS. MARTINEZ:  Objection, form.
5     A.   I don't know.
6     Q.   Did you take any efforts to keep any
7  e-mails?
8          MS. MARTINEZ:  Objection, form.
9     A.   From that period?
10    Q.   Yes.
11    A.   I really -- I'm not sure.
12    Q.   Do you have a sense on your computer --
13  what is the approximate date of the oldest e-mail
14  that you have access to on your computer?
15    A.   I have no idea.
16    Q.   Did you correspond by e-mail with people
17  who administered the state Medicaid programs?
18    A.   Yes.
19    Q.   Relating to the way in which they paid
20  for drugs?  Is that a topic you e-mailed them about?
21    A.   Are you saying relating to state plan
22  amendments?

Page 96

1     Q.   That and anything else dealing with
2  payment of drugs.
3          MS. MARTINEZ:  Objection, form.
4     A.   Yes.
5     Q.   Is that something that you did regularly?
6     A.   When it was necessary.
7     Q.   Do you recall being asked to search for
8  documents relating to drug pricing litigation on or
9  around 2003?
10    A.   I wouldn't -- I can't remember
11  specifically that time frame.
12    Q.   But you recall an effort being made to
13  search for documents relating to drug pricing
14  litigation; is that fair to say?
15    A.   Correct.
16    Q.   And what involvement did you have in that
17  search?
18    A.   I just searched my folders to see if I
19  had any information that was relevant to the
20  request.  And generally the request would come
21  through Larry's division, through policy, and they
22  would copy me to see if we had any documents.  And

Page 97

1  if I did I would share them back with the policy
2  folks and they would submit the document request.
3     Q.   Did you have any documents?
4     A.   I may have.
5     Q.   You don't recall?
6     A.   I don't recall.
7     Q.   Did you search your hard drive in your
8  computer for documents that may have been responsive
9  to the document requests?
10    A.   I may have.
11         MR. TORBORG:  Okay.  We'll mark this as
12  our next exhibit.  I think I have ten copies of
13  these, of the newly marked exhibits.  I'll let you
14  all fight about who gets the copies and who has to
15  share.
16              (Exhibit Abbott 453 was
17              marked for
18              identification.)
19         MS. MARTINEZ:  There's only four on the
20  plaintiff's side.  Could we have one more on the
21  plaintiff's side?  Thanks.
22         MR. TORBORG:  Now, when you say

                              25  (Pages 94 to 97)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

# EXHIBIT LL

Page 1

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

     v.                        )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - - -

        (captions continue on following pages)


    Videotaped deposition of THOMAS A. GUSTAFSON

                    Volume I



                    Washington, D.C.

                    Friday, September 28, 2007

                    9:00 a.m.

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Thomas A.                    September 28, 2007
                Washington, DC

Page 94

1  the early 90s.  It was called Pegasus.  And we
2  started to use it.  The agency had an e-mail system
3  that was hideous and slow at the time.  I remember
4  one of my bosses sending a subordinate on the other
5  side of the office, so from one end of this
6  building to the other, sending them a message by
7  the e-mail system and then writing it out in hand
8  and walking over and giving it to them.  He got
9  there before it did.  It was that sort of world.
10  So this evolved gradually over time.
11        But let me ask you why we're spending so
12  much time dealing with this question?
13    Q.   And I can answer.  I'm sure counsel will
14  be able to give a more deep answer.  Part of the
15  process we're engaged in in the discovery process
16  is our attempt to obtain information from the party
17  that sued us.  As you might imagine an important
18  part of that is electronic documents.  And there
19  are some issues about document retention and our
20  ability to get documents.  And I'm trying to figure
21  out what may have been lost as a result of the
22  destruction of electronic documents by the agency.

Page 95

1    A.   I can't speak to that, you see.
2    Q.   You might be able to speak to it more
3  than you think.
4        When was it that the agency made the
5  transition from being primarily a paper-based
6  communication system to primarily an electronic-
7  based communication system?
8        MR. MAO:  Objection, form.
9    A.   I find that question entirely vague.  I
10  have no idea how to judge either end of that
11  question.
12    Q.   You would agree with me that in 1985
13  there was no electronic communication, correct?
14    A.   Right.
15    Q.   So that would define certainly one pole
16  of the spectrum, correct?
17    A.   Mm-hmm.
18    Q.   By 2007 would you agree with me that the
19  majority of communications were conducted
20  electronically rather than by paper within the
21  agency?
22        MR. MAO:  Objection to form.

Page 96

1    A.   I'm not sure I could say that.  I would
2  say that in 2007 we sure did a lot of e-mail with
3  each other.  Whether that was the primary form of
4  communication would be a different matter.
5    Q.   When did you begin using a lot of e-mail
6  with each other within the agency?
7    A.   The middle '90s, I would guess.  At the
8  time I joined the agency, people did not have
9  personal computers on their desks.  You had to
10  fight to get space on the PCs.  In the Office of
11  Legislation and Policy there were two PCs for a
12  staff of 50 people.  So it was only -- I can't
13  remember just when, maybe 1990 or so that they were
14  routinely on people's desk.  And that was not with
15  connectivity.
16        So by the time we entered the new
17  building in 1997, consolidated the Baltimore staff
18  into a single site, we were thoroughly wired,
19  everybody had it.  That was probably a point at
20  which it really took off.
21    Q.   By 2000, just to pick a round number --
22    A.   Mm-hmm.

Page 97

1    Q.   By 2000 if you wanted to send a document
2  to a colleague would you be as likely to have sent
3  it as an attachment to an e-mail as a paper
4  document?
5        MR. MAO:  Objection to form.
6    A.   It would have been routinely accepted to
7  do it that way.
8    Q.   And you routinely would receive
9  documents as attachments to electronic messages by
10  2000, correct?
11    A.   Mm-hmm.  There was some emphasis on
12  reducing the amount of paper that we were
13  consuming.  There were actually sort of counter
14  messages along the lines of people are sending too
15  big documents through the e-mail system.  You know,
16  stop clogging it up.  Not everybody has to have a
17  copy of the entire text of the inpatient
18  perspective payment system update regulation in
19  their in box.  You can put it on the web and -- or
20  the internal web and have them have access to it
21  and so forth.
22    Q.   During the course of your tenure at the

25  (Pages 94 to 97)

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Thomas A.                                    September 28, 2007
                        Washington, DC

Page 98

1  agency were you ever asked not to destroy either
2  paper or electronic documents because of pending
3  litigation?
4      A.   Yes.
5      Q.   When was that?
6      A.   There may have been a number of
7  instances over the years.  I mean, we were not
8  infrequently subject to discovery requests of one
9  sort or another.  The most recent instance was in
10 connection with this litigation.  The most recent
11 instance that I can recall was in connection with
12 this litigation, but that was hardly a stranger.
13 It happened before.
14     Q.   When was the first time you were asked
15 to retain documents in connection with this
16 litigation?
17     A.   I don't know.  A year and a half, two
18 years ago.  Something like that.
19     Q.   What did you understand the breadth of
20 the request to be with respect to the retention
21 request in connection with this litigation?
22     A.   Anything, paper, electronic, paper

Page 99

1  napkins, you know, packs of envelopes that had
2  anything to do with prescription drugs, or at least
3  anything to do with average wholesale price on
4  prescription drugs.  In other words, it was a very
5  broad instruction we had.
6      Q.   You received that in writing or orally?
7      A.   I believe it was in an e-mail actually.
8  I believe it was reinforced orally.  And I
9  personally had several conversations with Leslie
10 Stafford with the office of general counsel about
11 my need to retain documents that were in my
12 possession.
13     Q.   And did you do so?
14     A.   I did so.  I told her that I didn't have
15 much but I'd keep everything that there was that
16 I -- you know, that was in -- you know, that I
17 believe was in any way even the most tangentially
18 relevant to this subject.  And I believe in
19 leaving, I did that.  It certainly was my intent to
20 do that.
21     Q.   How did you go about retaining e-mails
22 that were subject to this request?

Page 100

1      A.   Well, at the time I was leaving I was
2  concerned about exactly what had happened to my
3  e-mail files.  They don't necessarily do any
4  archiving of everything every departing staffer has
5  hanging around.  And in fact I had some difficulty
6  in connection with my e-mail address book that took
7  six weeks or so to resolve.  I stuck them
8  somewhere.
9           I mean, I don't recall in detail, but I
10 believe I identified a specific file -- as I was
11 cleaning up files identified a specific folder on
12 prescription drugs and put anything in that file
13 that seem in any way relevant to this question and
14 left instruction with my special assistant to make
15 sure that these were made available to Leslie
16 Stafford and that they were not wiped out as a
17 result of my departure.
18     Q.   Do you recall about how many e-mails
19 would have been in that folder?
20     A.   No.
21     Q.   Hundreds, dozens?
22     A.   Maybe a hundred, 200, something -- not

Page 101

1  gobs and gobs.
2           MR. COOK:  Counsel, it would be very
3  helpful as part of your production if you could
4  give us a screen shot of that folder, recognizing
5  you might redact some of the re: lines if they're
6  privileged.
7           MR. MAO:  We'll look into it.
8           MR. COOK:  Thank you.
9      Q.   You mentioned an internal website.
10     A.   Mm-hmm.
11     Q.   Could you describe that to me?
12     A.   As most organizations have these days,
13 there was a provision for -- actually, I may have
14 misspoken.  There is an internal website at CMS.
15 Access to it is limited to CMS employees.  And it
16 is where information that might be of interest to
17 CMS employees but that has not been made available
18 to the public might be put.  This includes things
19 like The Water Cooler where you can advertise --
20 you know, you've got a set of snow tires for sale
21 and things of that sort.
22           And what is referred to as the intranet,

26 (Pages 98 to 101)

Henderson Legal Services
202-220-4158

8d657762-8fb9-483b-bb85-12b9bc9eea17

# EXHIBIT MM

Vito, Robert                                    June 19, 2007
                        Philadelphia, PA

Page 1

             UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

                      - - -

IN RE:  PHARMACEUTICAL      : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION:

PRICE LITIGATION            : 01-CV-12257-PBS

                            :

THIS DOCUMENT RELATES TO    :

U.S. ex rel. Ven-A-Care of  :

the Florida Keys, Inc. v.   :

Abbott Laboratories, Inc.   :

No. 06-CV-11337-PBS         :

                      - - -

           Videotaped deposition of ROBERT

VITO was taken, pursuant to notice, at MORGAN

LEWIS & BOCKIUS, LLP, 1701 Market Street,

Philadelphia, Pennsylvania, on Tuesday, June

19, 2007, beginning at 9:10 a.m., before M.

Kathleen Muino, Professional Shorthand

Reporter, Notary Public; Michael Hunterton,

Certified Legal Video Specialist, there being

present:

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Vito, Robert                                          June 19, 2007
                        Philadelphia, PA

Page 98

1    Q.  Okay.  Did you have any hard copy
2  folders with documents?
3    A.  Yes.
4    Q.  How many?
5    A.  Numerous.
6    Q.  And did those folders have names?
7    A.  No.
8    Q.  They were just in redwells or...
9    A.  In folders, just in general -- these are
10  hard copies you're talking about?  They were --
11    Q.  Yes.
12    A.  -- just in manila folders.
13    Q.  And did the manila folders have titles?
14    A.  They weren't placed in that way.  They
15  just were put into folders.
16    Q.  How would you know where to find a
17  document if you wanted to find it again?
18    A.  Very good question.
19    Q.  So you wouldn't; is that your...
20    A.  That's correct.
21    Q.  Did you search your manila folders for
22  documents relating to prescription drugs?

Page 99

1    A.  Yes.
2    Q.  And did you produce those to counsel in
3  hard copy?
4    A.  Yes.
5    Q.  Were there any documents that you had
6  either electronically or in hard copy that related
7  to prescription drugs that you did not provide to
8  counsel?
9    A.  Not that I knew of.  I gave everything
10  that I had.
11    Q.  Are you familiar with something called a
12  document hold or a direction to maintain documents
13  that might be relevant to litigation?
14    A.  I'm not as familiar with that term.
15    Q.  Have you ever been given a direction or
16  given a direction to retain documents relating to
17  prescription drugs?
18    A.  Yes.
19    Q.  When did you receive that or give that?
20    A.  We were given that by our counsel, and
21  we -- we did not destroy any of the files or
22  anything.  Even though the dates would allow us to

Page 100

1  do that, we do not destroy any records once we
2  received that date -- once we receive that.
3    Q.  When did you receive that?
4    A.  I don't know.
5    Q.  Do you have a general understanding; was
6  it within the last -- was it five years ago, was it
7  a year ago, was it ten years ago?
8    A.  I -- I think it was probably within the
9  last year.
10    Q.  Prior to that period of time, did you
11  take any efforts to retain documents relating to
12  prescription drugs?
13        MS. LIANG:  Object to the form.
14        MR. NEAL:  I'll join the objection.
15        You can answer.
16        THE WITNESS:  I -- I saved information
17  involving prescription drugs.
18  BY MR. TORBORG:
19    Q.  And did you save it for any particular
20  purpose?
21    A.  Save it with the hope that I would learn
22  more about prescription drug pricing.

Page 101

1    Q.  But you didn't have -- you weren't
2  thinking, I need to retain these documents for
3  purposes of potential litigation; is that --
4    A.  No.
5    Q.  -- fair to say?  No?
6    A.  (No verbal response.)
7    Q.  What type of e-mail do you use today;
8  what is your e-mail system?
9    A.  I think it's Outlook.
10    Q.  And do you draft e-mails relating to
11  prescription drug issues?
12    A.  We have e-mail that transmits all of our
13  reports back and forth, all of that information,
14  yes.
15    Q.  Have you taken any efforts to look at
16  your e-mail files for documents that might be
17  responsive to the discovery in this case?
18    A.  I looked.
19    Q.  Did you find any?
20    A.  Whatever I found, I put on the -- in the
21  -- in the folders that you have.
22    Q.  How far back do the e-mails that you

26 (Pages 98 to 101)

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

# EXHIBIT NN

# David Campana
# (Alaska) (30(b)(6))

Anchorage, AK

Page 405

        IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

           THIRD JUDICIAL DISTRICT OF ANCHORAGE

-----------------------------------X

STATE OF ALASKA,                    )

      Plaintiff,                    )

vs.                                 )

ALPHARMA BRANDED PRODUCTS DIVISION, )

INC., et al.,                       )

      Defendants.                   )

-----------------------------------X

Case No. 3AN-06-12026 Civil         )

-----------------------------------X

        CAPTIONS CONTINUED ON FOLLOWING PAGE

                  VOLUME II

      VIDEOTAPED DEPOSITION OF DAVID L. CAMPANA

         and STATE OF ALASKA 30(b)(6)

              Taken August 20, 2008

           Taken by the Defendants at

         Captain Cook Hotel, Whitby Room

             939 West 5th Avenue

               Anchorage, Alaska

        Reported by:  Mary A. Vavrik, RMR

Anchorage, AK

Page 430

1    Q.   And is it fair to say, sir, that you do
2  your best to run the best possible pharmacy
3  program that you can?
4    A.   Yes.
5    Q.   Is it fair to say that you do your best
6  to provide the maximum amount of access to care
7  for Medicaid beneficiaries as you can?
8       MR. BURNHAM:  Objection, form.
9       THE WITNESS:  Yes.
10 BY MR. MANGI:
11   Q.   And is it fair to say, sir, that you
12 endeavor to do all of that while spending money,
13 which is State's money and federal government's
14 money, as judiciously and carefully as possible?
15   A.   Yes.
16   Q.   So to the extent there are ways to save
17 money, can we agree that you would regularly
18 examine those carefully and then make strategic
19 judgments as to whether or not they were
20 desirable and practical options generally?
21   A.   Yes.
22   Q.   Does this memorandum reflect your

Page 431

1  examination and analysis of some potential ways
2  of saving on the cost side of the pharmacy
3  program?
4    A.   Yes, this had recommendations on the
5  cost side of -- on the pharmacy Medicaid program.
6    Q.   The first entry in this memo is
7  dispensing fees on the first page.  Do you have
8  that in front of you, sir?
9    A.   Yes.
10   Q.   You will see at the end of that first
11 paragraph talking about potential changes, and
12 you describe any change in dispensing fee "as the
13 number one cost avoidance idea."  You say, "As
14 with any changes proposed to pharmacies it may be
15 controversial, although we cannot let controversy
16 get in our way of implementing cost-saving
17 measures."  What is the controversy that you are
18 referring to?
19   A.   This is a controversy that is mentioned
20 in the early days of the pharmacy program and the
21 controversy with the pharmacies reacting to
22 changes in the reimbursement formula for

Page 432

1  Medicaid.
2    Q.   So were you anticipating here, sir,
3  potential political opposition and lobbying
4  efforts by pharmacists similar to some of the
5  past efforts that we looked at yesterday?
6    A.   Yes.
7    Q.   You then say, "I am concerned because
8  the dispensing fee review should take place on an
9  annual basis; however, my last attempt to do this
10 review was not approved."  What are you referring
11 to there?
12   A.   Well, I don't know what I was referring
13 to, other than reading this.
14   Q.   Do you have any recollection of whether
15 or not a dispensing fee review is supposed to
16 take place on an annual basis?
17   A.   I don't remember that it is.
18   Q.   How many dispensing fee reviews have
19 taken place during your tenure at the agency?
20   A.   The current one.
21   Q.   So the record is clear, there was one
22 analysis that was done by Myers & Stauffer in the

Page 433

1  late '80s, correct?
2    A.   Correct.
3    Q.   And after that the first review that
4  you are aware of is the one that's currently
5  under way.
6    A.   The current or the first study that's
7  actually being -- taken place is the current one.
8    Q.   Now, leaving aside studies for a
9  moment, was there other consideration given to
10 changing dispensing fees or the dispensing fee
11 methodology at any time from 1990 to the present?
12   A.   There were a couple at different times.
13   Q.   When were those evaluations?
14   A.   I don't remember.
15   Q.   Do you recall what the outcome was of
16 those evaluations?
17   A.   The evaluations were done as a -- some
18 type of memo and provided to management, and
19 management never cared to take it any further.
20   Q.   Why was that?
21   A.   I don't know.
22   Q.   Who prepared the memos?

8  (Pages 430 to 433)

43ed45aa-87f9-43bb-8fed-670c39e33709

David L Campana and State of Alaska 30(b)(6) - Volume II                    August 20, 2008

Anchorage, AK

Page 434

1     A.  Pardon me?
2     Q.  Who prepared the memos to management?
3     A.  I would prepare the memos to
4  management.
5     Q.  Do you maintain copies of those memos
6  in your files?
7     A.  I have maintained some of those.
8     Q.  Do you know why those have not been
9  produced in this litigation?
10    A.  I don't know if those particular memos
11  were saved at the -- at the time.
12    Q.  Would they be saved in the files of the
13  people you sent them to?
14    A.  I don't know.
15    Q.  Have you looked in the files of the
16  people you sent them to or their successors that
17  inherited their files?
18    A.  I know that Teri Keklak's files when
19  she left our division were all shredded.
20    Q.  And when did she leave the division?
21    A.  2000 -- I believe 2003 or 2004.
22    Q.  And her files were shredded at that

Page 435

1  time?
2     A.  They were shredded or somehow destroyed
3  and -- and/or taken with her.  But it's my
4  recollection that most everything was shredded.
5     Q.  Who else did you send these memos to?
6     A.  Went to the director.
7     Q.  Was that Mr. Labbe at the time that you
8  did these dispensing fee evaluations you
9  mentioned?
10    A.  Yes.
11    Q.  And where are Mr. Labbe's files?
12    A.  I have no idea.
13    Q.  Who succeeded him as director?
14    A.  There were two different positions,
15  actually.  There was a Medicaid director, and
16  that's Jerry Fuller, and then there was a
17  director of medical assistance, which became
18  later health care services, and that was Dwayne
19  Peeples.
20    Q.  Did they inherit Mr. Labbe's files?
21    A.  I have no idea.
22    Q.  Have you carried out any investigation

Page 436

1  in connection with this litigation to ascertain
2  what happened to Mr. Labbe's files?
3     A.  No, I have not.
4        MR. MANGI:  For the record, we call for
5  the production of the referenced dispensing fee
6  evaluations.
7  BY MR. MANGI:
8     Q.  Do you know why the decision was made
9  not to implement the changes that you had
10  discussed in those memoranda?
11    A.  I do not know.
12    Q.  Did you have any discussions with
13  anyone after sending the memos to try and figure
14  out what had happened or why the changes had not
15  been acted on?
16    A.  Had a couple discussions along the way,
17  but I don't remember what happened or what the
18  outcome of those discussions were.
19    Q.  Was any part of the reason why those
20  changes were not implemented concerns about
21  potential impact on access to care if dispensing
22  fees were reduced?

Page 437

1     A.  I don't remember.
2     Q.  Was any part of the reason why those
3  changes were not enacted concerns about potential
4  political impact if changes were not -- changes
5  were implemented reducing the dispensing fee?
6        MR. HENDERSON:  Objection, form.
7        THE WITNESS:  I don't recall.
8  BY MR. MANGI:
9     Q.  I'd like you to turn to the second page
10  of the memo, please.  There is a section 4 there
11  entitled Review the Cost of Drugs.  Do you see
12  that, sir?
13    A.  Yes.
14    Q.  One of the things you mentioned there
15  is we need to look at -- I'm sorry.  The second
16  entry there is "look at the feasibility of
17  changing our reimbursement of generic drugs a
18  percentage over wholesale acquisition cost (WAC)
19  for generic drugs."  Why is that an option that
20  you were considering?
21    A.  It was just an available option.
22    Q.  Well, this is a memorandum about

9  (Pages 434 to 437)

43ed45aa-87f9-43bb-8fed-670c39e33709

# James Kevin Gorospe (California) (30(b)(1))

Gorospe, James Kevin                                    March 19, 2008
                        Sacramento, CA

Page 1

                  UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION:

PRICE LITIGATION              ) 01-CV-12257-PBS

----------------------------X

THIS DOCUMENT RELATES TO:     ) Judge Patti B. Saris

U.S. ex rel. Ven-A-Care of    )

the Florida Keys, Inc. v.     ) Magistrate Judge

Abbott Laboratories, Inc.,    ) Marianne B. Bowler

et al.                        )

Case No. 06-CV-11337-PBS      )

----------------------------X

                    --oOo--

            WEDNESDAY, MARCH 19, 2008

                    --oOo--

            VIDEOTAPED DEPOSITION OF

              JAMES KEVIN GOROSPE

Reported By:  JOANIE MURAKAMI, CSR No. 5199

              Registered Merit Reporter

              Certified Realtime Reporter

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                                    March 19, 2008
                        Sacramento, CA

Page 330

1    A.  Not directly.
2    Q.  Indirectly?
3    A.  Possibly.
4    Q.  Okay.  And when you say "possibly,"
5  what are you referring to?
6    A.  The direction to preserve documents
7  came from our internal legal counsel.
8    Q.  Okay.  But do you have any reason to
9  believe that that directive came from the United
10  States through your legal counsel?
11       MR. GOBENA:  Object to the form.  Lacks
12  foundation.
13       THE WITNESS:  I don't know who,
14  specifically.
15  BY MR. COLE:
16    Q.  You just know that counsel for the
17  State of California at some point asked you to
18  preserve or gather documents?
19    A.  That is correct.
20    Q.  You didn't receive any directive from
21  the United States to gather or preserve
22  documents.

Page 331

1       MR. GOBENA:  Object to the form.  Asked
2  and answered.
3       THE WITNESS:  Not that I can recall.
4  BY MR. COLE:
5    Q.  When was the first time you were asked
6  to preserve or gather documents by counsel for
7  the State of California?
8    A.  I don't recall.
9    Q.  Okay.  I'm not asking for a specific
10  date but can you -- can you date it in any way:
11  A month, a year, a decade?
12    A.  Longer than a year ago --
13    Q.  Okay.
14    A.  -- is the best I can do.
15    Q.  So sometime two or three years ago?
16    A.  I don't recall.
17    Q.  Is that fair?
18    A.  I don't recall.
19    Q.  Okay.  Do you remember ever being asked
20  to preserve documents in the '90s in connection
21  with these lawsuits?
22    A.  Not that I can recall.

Page 332

1    Q.  And again, I'm just trying to see if
2  there's any way you can put a time period on when
3  you were asked -- first asked to gather or
4  preserve documents and you've said it was more
5  than a year ago.
6       Was it somewhere two to three years
7  ago?  Was it five years ago?  Can you be any more
8  precise than that?
9    A.  I don't believe it's greater than five
10  years.
11    Q.  Okay.  Do you believe it's greater than
12  three years?
13    A.  I don't recall.
14    Q.  Okay.  In the positions that you've
15  held at DHS as a staff pharmacy consultant and
16  then as the chief, I'm trying to get a sense of
17  how you maintained documents; in other words,
18  hard copy files and e-mail files in those
19  positions.
20       What sort of hard copy files did you
21  maintain?
22    A.  Generally hard copy files of documents

Page 333

1  produced by staff were returned to staff for
2  maintenance.  Hard copies of documents for which
3  there was not an electronic format were placed in
4  the file folder and put in file cabinet.
5  Everything else was electronically stored.
6    Q.  Okay.  And did you periodically update
7  files to, you know, get rid of any information
8  that was at least in your mind no longer
9  applicable to your current duties?  Did you have
10  like an annual pruning process or a monthly
11  pruning process?
12    A.  No.
13    Q.  Do you recall, from time to time,
14  however, discarding documents that you no longer
15  had a use for?
16    A.  Yes.
17    Q.  And I take it the same would apply to
18  electronic files that you had on your computer?
19    A.  Yes.
20    Q.  And would some of those documents
21  include discussion or analyses of some of the
22  topics we talked about today, such as proposed

7518707c-46aa-4bff-8eef-0c456891e081

# Cynthia Denemark (Delaware) (30(b)(6))

Newark, DE

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

-------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

DE Div of Medicaid and Medical Assistance (Denmark) - Vol. II                    December 10, 2008

Newark, DE

Page 418

1    single-source proprietary products, not generic.
2        Q.  I see.
3            So did you consider having a -- I know
4    that you, in 2003, had AWPs for traditional and
5    nontraditional pharmacies, is that correct,
6    discounts off of AWP for different pharmacy
7    types?
8        A.  Yes.
9        Q.  In 1997, did you consider implementing
10   a program that had a greater reimbursement rate
11   for brands versus generics?
12       A.  For pharmacies in general?
13       Q.  In general.
14       A.  No.  In 1997 what we said was that we
15   made the assumption that if there was a generic
16   product, then that product, in general, was
17   multisource, hence it would fall under FUL or
18   MAC.
19       Q.  So it wasn't really a concern related
20   to the acquisition costs of generics because they
21   would have a MAC or a FUL?
22           MS. HEALY SMITH:  Objection.

Page 419

1            THE WITNESS:  I have no idea what that
2    question was.
3    BY MS. RAMSEY:
4        Q.  When you -- when you agreed with the
5    providers that you would set the AWP discount at
6    12 -- 12.9?
7        A.  12.9, so we're back to 1997?
8        Q.  Yes.
9        A.  Okay.
10       Q.  So when you made that sort of deal with
11   the providers that that was the level that the
12   Delaware Medicaid program would implement, you
13   did so knowing that that was not going to really
14   apply to generic drugs, because generic drugs
15   would have a MAC or a FUL; is that correct?
16       A.  We did not deal with the providers, so
17   to speak, or negotiate in 1997.  We presented
18   what the reimbursement changes were going to be.
19           To my knowledge, there was no
20   opposition to the proposed changes.
21       Q.  When was the opposition that you
22   discussed yesterday?

Page 420

1        A.  In 2002.
2        Q.  In 2002.
3            And do you recall pharmacies actually
4    dropping out of the Delaware Medicaid Program as
5    a result of those changes?
6        A.  They didn't actually drop out.  They
7    suggested that they would.
8        Q.  Do you recall a pharmacy named Happy
9    Harrys?
10       A.  I -- I am familiar with the chain of
11   Happy Harrys, and, yes, they were one of the ones
12   that suggested they would no longer be providers
13   if we proceeded with the rate of reimbursement
14   that we had published.
15       Q.  Okay.  Now, going back to my earlier
16   point relating to the AWP minus 12.9 percent,
17   when Delaware established that level of discount
18   off of AWP, it did so knowing that it would be
19   applied to brand name drugs, by and large; --
20       A.  Yes.
21       Q.  -- is that correct?  Okay.
22       A.  Brand name single-source.

Page 421

1        Q.  Brand name single-source drugs.
2            It would not have applied to the drugs
3    that we looked at as Schedule 1 and Schedule 2;
4    is that correct?
5        A.  There would have been an additional
6    rate established that would have defined the
7    DMAC, which should have been the lower-of would
8    have been the DMAC.
9        Q.  Okay.  Did Delaware ever receive a
10   notice from either DOJ or CMS to retain documents
11   relating to its reimbursement scheme or AWP?
12           MS. HEALY SMITH:  Objection.
13           THE WITNESS:  Not that I'm specifically
14   aware of, no.
15   BY MS. RAMSEY:
16       Q.  Still to this day Delaware has never
17   received a memo or document or other
18   communication from DOJ or CMS to retain documents
19   due to litigation?
20           MS. HEALY SMITH:  Objection.
21   BY MS. RAMSEY:
22       Q.  Well, wait.  I should clarify,

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Newark, DE

Page 422

1  litigation relating to AWP or drug pricing.
2         MS. HEALY SMITH:  I'm going to explain
3  my objection on the record to the form.
4         I think this witness could only testify
5  what request came to the EDS office where the
6  claims are processed and not what Delaware,
7  elsewhere, either the agency or other agencies
8  have received due to the different location.
9  BY MS. RAMSEY:
10        Q.  If you can provide an answer, please do
11 so.
12        A.  I have not received anything of the
13 nature that you suggested.
14        Q.  And in your personal capacity, you had
15 never received a directive to retain documents
16 relating to the subject matters that we've been
17 discussing over the last two days?
18        A.  Only so far as I was notified of the
19 delivery of the subpoena and asked to retain
20 records according to the Dey subpoena.
21        Q.  And that Dey subpoena was issued within
22 the last month or so?

Page 423

1        A.  No, that was in the summer sometime.
2         MR. CYR:  It was in July, I believe.  I
3  don't have it with me, but I believe it was in
4  July.
5         THE WITNESS:  I believe it was, yes.
6         MS. HEALY SMITH:  July 22nd.
7  BY MS. RAMSEY:
8        Q.  Okay.  So prior to July 22nd or
9  thereabouts of 2008, you had not received any
10 directive to either collect or -- collect
11 documents that would be pertaining to the
12 subjects we've discussed today or to retain the
13 documents?
14        A.  No.
15        Q.  Have you ever -- strike that.
16        Has Delaware ever had any
17 communications with representatives from Abbott
18 relating to Delaware's reimbursement methodology?
19        MS. HEALY SMITH:  Objection.
20        THE WITNESS:  I've had conversations
21 with the -- with various Abbott representatives.
22 Whether we circled specifically around or talked

Page 424

1  about reimbursement, I couldn't recollect
2  specifically.
3  BY MS. RAMSEY:
4        Q.  What Abbott representatives have you
5  had contact with?
6        A.  Off the top of my head, the most recent
7  one would be Doug Crampel, but there's others,
8  too.
9        Q.  Who is Doug Crampel?
10        A.  I believe he's a government sales
11 representative or a government representative for
12 Abbott.
13        Q.  And what did your conversations pertain
14 to?
15        A.  Probably products, preferred drug list
16 levels, whether it was on or off, DUR board
17 activity.  I, actually, have been interacting
18 with Doug for several years, so we would have
19 chatted about families.
20        Q.  Is he someone you consider a friend?
21        A.  An acquaintance.
22        Q.  An acquaintance.

Page 425

1        And when did you first meet Mr.
2  Crampel?
3        A.  Somewhere around 1998.
4        Q.  And how did you come to meet him?
5        A.  At EMPAA.
6        Q.  Have all of your communications with
7  Mr. Crampel been in the EMPAA context?
8        A.  No.
9        Q.  What other context have you had
10 conversations with Mr. Crampel?
11        A.  About Abbott products, coverage, he
12 attends DUR board meetings as a public attendee.
13 He attends the P and T meetings as a public
14 attendee.
15        General, what I would consider,
16 Medicaid pharmaceutical representative liaison-
17 type contact.
18        Q.  And what types of conversations would
19 you have with Mr. Crampel relating to products?
20        A.  Whether a drug -- one drug was better
21 than another drug, whether it was cost-effective
22 for the program compared to other drugs in the

Henderson Legal Services, Inc.

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

# Michael Sharp
# (Indiana) (30(b)(1))

Sharp, R.Ph., Michael                    March 28, 2008

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL         )

INDUSTRY AVERAGE WHOLESALE  )

PRICE LITIGATION               )

                               ) MDL NO. 1456

                               ) CIVIL ACTION:

                               ) 01-CV-12257-PBS

                               )

                               ) Judge Patti B. Saris

U.S. ex re. Ven-A-Care of   )

the Florida Keys, Inc., v.  )

Abbott Laboratories, Inc.,   )

et al. No. 06-CV-11337-PBS  )


    VIDEOTAPED DEPOSITION OF MICHAEL SHARP, R.Ph.


    The videotaped deposition upon oral examination of

MICHAEL SHARP, R.Ph., a witness produced and sworn

before me, Aprille Lucas, RPR, Notary Public in and for

the County of Hamilton, State of Indiana, taken on

Sharp, R.Ph., Michael                                        March 28, 2008

Page 42

1   in response to the subpoena, which would be this
2   stack of information.
3       Q.   And that stack of information, did you
4   see any of the files that came from Mr. Shirley's
5   office?
6       A.   I believe there was a couple of items
7   that he had put into that request.
8       Q.   Do you know if there were any items that
9   he decided not to include?
10      A.   I'm not aware of any.
11      Q.   And am I right that you produced
12  everything that you had in your possession --
13      A.   Yes.
14      Q.   -- in response to the subpoena?
15      A.   Yes.
16      Q.   Have you ever received direction from
17  anyone to withhold from destroying documents that
18  could be relevant to this case?
19      A.   No.
20      Q.   No lit hold memos?
21      A.   I'm not sure what that is.
22      Q.   No written or verbal instructions telling

Page 43

1   you to refrain from destroying documents?
2       A.   No.
3       Q.   If you had been given such instructions,
4   would you have followed them?
5       A.   No.
6       Q.   You would not have followed them?
7       A.   No.
8       Q.   Why not?
9       A.   I -- you don't destroy documents that are
10  --
11      Q.   Oh, no, no, no, no, I'm sorry; I think we
12  have a misunderstanding.
13      A.   Okay.
14      Q.   That's why I was surprised by your
15  answer. If you had been given instructions not to
16  destroy documents, I'm correct that you would have
17  followed the instructions not to destroy documents,
18  had you been given that instruction?
19      A.   Yes.
20      Q.   What's your understanding of what the
21  government alleges Abbott did wrong in this case?
22      A.   Well, in looking at the complaint, it has

Page 44

1   to deal with the submission of pricing information
2   to the compendia that is not, does not correlate to
3   the acquisition cost information that providers
4   would ultimately purchase products for.  And
5   obviously with, with those particular components of
6   pricing information being utilized by payers, it
7   creates a certain amount of profit in use of
8   products that may not have existed, had the more
9   relevant pricing information been transmitted to
10  the compendia.
11      Q.   And when you worked for Medi-Span, were
12  you aware of what information was reported from the
13  manufacturers to the pricing compendia?
14      A.   Yes.
15      Q.   And what's your understanding of the
16  pricing information that was reported from the
17  manufacturers to the compendia?
18      A.   Manufacturers would submit initial
19  pricing information for new products and then
20  pricing updates as pricing changed, and they would
21  typically supply a number of figures to the
22  compendia.  And it varied upon, based upon which

Page 45

1   manufacturer was submitting direct pricing
2   information, wholesale acquisition cost, suggested
3   AWP, and AWP information would be submitted along
4   with the information regarding the products, such
5   as the National Drug Code.
6       Q.   You mentioned suggested AWPs or AWP
7   information.  Are you aware of whether Abbott ever
8   submitted suggested AWPs or AWP information?
9       A.   I'm not aware.
10      Q.   Do you know of any manufacturer
11  specifically who submitted that type of
12  information?
13      A.   Not based on -- no, no, I don't.
14      Q.   Have you ever seen any documentation from
15  Abbott specifically where they were submitting
16  either an AWP or suggested AWP?
17      A.   Yes.
18      Q.   When did you see that documentation?
19      A.   During my time at Medi-Span.  I can't
20  recall the specifics.
21      Q.   And that was from Abbott specifically?
22      A.   Yes.

12  (Pages 42 to 45)

# M.J. Terrebonne (Louisiana) (30(b)(6) witness on 11/7/08); (30(b)(1) witness on 3/31/08)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

MDL NO. 1456

NO. 01-CV-12257-PBS

JUDGE PATTI SARIS

MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 26

1     A.   2002, 2003.
2     Q.   How long have you had your -- what kind
3  of e-mail system do you use today?
4     A.   GroupWise.
5     Q.   How long have you had that system?
6     MR. FAUCI:  Same objection.
7     THE WITNESS:  I don't know.
8  BY MR. TORBORG
9     Q.   In your job, I take it you have had a
10  number of communications with a number of different
11  people relating to the subject of how much the
12  State Medicaid program will pay for drugs and the
13  dispensing of drugs. Is that fair to say?
14     A.   Yes.
15     Q.   Who would be included, not names, but
16  generally speaking, who would be included in that
17  set of people you would have communications with on
18  that subject?
19     A.   On the subject of reimbursement?
20     Q.   Yes. How much Louisiana is going to pay,
21  basically.
22     A.   Probably my own staff, my boss, probably

Page 27

1  the undersecretary, providers.
2     Q.   Did you ever have communications with
3  manufacturers about the subject of how much the
4  State of Louisiana would pay for Medicaid and the
5  dispensing of drugs through providers?
6     A.   On occasion, drug manufacturers will
7  contact our office.
8     Q.   Do you recall any communications with
9  representatives from Abbott?
10     A.   I do not.
11     Q.   Did you have communications with the
12  Louisiana legislature or their staff people on the
13  subject of reimbursement for drugs or dispensing
14  fees?
15     A.   I'm sure I have over the years.
16     Q.   And the communications that you have had
17  on the subject of reimbursement of drugs,
18  dispensing fees, with the group of people that we
19  have talked about already, would those be orally
20  and in writing?
21     A.   Yes.
22     Q.   And do you have a place in the files

Page 28

1  where those communications are kept, or are they
2  kept?
3     MR. FAUCI:  Object to the extent she is being
4  asked to testify on behalf of the State.
5     MR. TORBORG:  You wanted a general objection
6  at the beginning on this, you have got it, so you
7  don't have to do it every time.
8     THE WITNESS:  Can you repeat the question?
9  BY MR. TORBORG
10     Q.   Sure. The communications that you have
11  had with providers, your staff, your boss,
12  undersecretary, occasionally manufacturers and
13  state legislators and their staff concerning
14  reimbursement of drugs and dispensing fees, would
15  those be kept anywhere in a central file, or are
16  they kept at all?
17     A.   Some of them are probably kept, some of
18  them are probably not kept.
19     Q.   Have you ever been asked to retain
20  documents that concern the subject of how much
21  Louisiana paid for drugs and dispensing fees?
22     A.   Have I ever been asked to retain

Page 29

1  documents?
2     Q.   Yes. Such as the communications that we
3  were discussing a second ago.
4     A.   I retain documents if we send in
5  information to CMS for state plans and that kind of
6  thing.
7     Q.   Those would be the formal state plan
8  amendment documents of the type that you produced
9  to us in this case, correct?
10     MR. FAUCI:  Objection, form.
11     THE WITNESS:  The formal documents, yes. I
12  keep those.
13  BY MR. TORBORG
14     Q.   Apart from that, have you ever been asked
15  to retain documents concerning the subject of how
16  much Louisiana Medicaid paid for drugs and
17  dispensing fees?
18     A.   That is a pretty broad question, because
19  we keep documents, we have reports of our
20  expenditures and that kind of thing, which we do
21  have.
22     Q.   And there, you are talking about the

Page 30

1  claims data, that kind of thing?
2      A.  Right.
3      Q.  How about if you had an e-mail from a
4  provider or a provider had a question concerning
5  payment rates in, say, the mid-1990s.  Is that the
6  kind of thing that you would keep?
7      A.  I would probably keep it if it were
8  related to some type of state plan that we may be
9  submitting, but just to keep it, if it doesn't
10  pertain to anything, I wouldn't keep it.
11      Q.  Do you know if the department has a
12  formal document retention policy?
13      A.  I do not.
14      Q.  Do you have a general understanding of
15  what it is that the United States government, as
16  the plaintiff in this action, alleges that Abbott
17  did wrong?
18      A.  I do not.
19      Q.  Is it your understanding that the case
20  relates to the subject of average wholesale price?
21      MR. FAUCI:  Object to the form.
22      THE WITNESS:  It is my understanding.

Page 31

1  BY MR. TORBORG
2      Q.  How did you obtain that understanding?
3      A.  I think I saw it on the document that you
4  sent.
5      Q.  Okay.  Do you have an understanding of
6  the nature of the damages that the United States is
7  seeking against Abbott?
8      A.  I do not.
9      Q.  And do you have an understanding of the
10  types of drug products that are at issue in the
11  case?
12      A.  I do not.
13      Q.  To your left, Ms. Terrebonne, are a
14  couple of boxes that have documents.  I'm not going
15  to ask you about all of those.  Those are copies of
16  exhibits that we have used with people who came
17  before you.  From time to time, I would ask you to
18  take out Exhibit X.  There are tabs in those orange
19  binders that indicate where you would find such
20  exhibits.
21      The first one I would like to go to, it
22  should be in the first volume at tab 19.  If you

Page 32

1  would be so kind as to take that out.  I have
2  copies for you and counsel.
3      Okay.  It looks like you have
4  successfully managed to get Abbott Exhibit 19. That
5  puts you ahead of others we have done before.
6      Abbott Exhibit 19 is a copy of the United
7  States' complaint against Abbott Labs in this case.
8  I take it, given your responses so far, you have
9  never seen this document.  Would that be fair to
10  say?
11      A.  Yes.  That's correct.
12      Q.  If I could ask you to go to page 10 of
13  the complaint, in particular, paragraph 31, there
14  is a listing of drugs and their corresponding NDC
15  numbers that are at issue in the case, that is at
16  the bottom of page 10, carrying over to page 11. Do
17  you see that?
18      A.  Yes.
19      Q.  And you are familiar with what a National
20  Drug Code is, correct?
21      A.  Yes.
22      Q.  If we look through the listing of the

Page 33

1  drugs, I think you will see that the drug products
2  fall into a few categories, including sodium
3  chloride injection, sodium chloride irrigation,
4  sterile water injection, sterile water irrigation,
5  vancomycin, then a number of dextrose solutions. Do
6  you see that?
7      A.  Yes.
8      Q.  Are you familiar with these drug
9  products?
10      A.  Yes.
11      Q.  Are you familiar with the term "large
12  volume parenterals"?  Am I pronouncing that right?
13      A.  Yes.
14      Large volume parenterals, no.
15      Q.  How about parenterals?
16      A.  I'm familiar with that.
17      Q.  What are those?
18      A.  Those are used IV.
19      Q.  Have you come across, in your work, these
20  drugs?
21      A.  Yes.
22      Q.  And do you know how they are dispensed to

2d9d517a-cf38-41c8-9c65-0424823ff391

# Brenda McCormick (Maine) (30(b)(1))

McCormick, Brenda A.                          March 28, 2008
                    Augusta, ME

Page 1

                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

        --------------------------

IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE )  CIVIL ACTION

PRICE LITIGATION           )  01-CV-12257-PBS

THIS DOCUMENT RELATES      )

U.S. ex rel. Ven-A-Care of )  Judge Patti B. Saris

the Florida Keys, Inc.     )

      vs.                  )  Chief Magistrate

Abbott Laboratories, Inc., )  Judge Marianne B.

No. 06-CV-11337-PBS        )  Bowler

        --------------------------


    VIDEOTAPED DEPOSITION OF BRENDA A. MCCORMICK,

taken pursuant to notice dated March 18, 2008, at

the offices of the Maine Attorney General, Burton

M. Cross Building, 6th Floor, 6 State House Station,

Augusta, Maine, on March 28, 2008, commencing at

9:12 A.M., before Tammy L. Martell, Registered

Professional Reporter, a Notary Public in and for

the State of Maine.

McCormick, Brenda A.                              March 28, 2008
                        Augusta, ME

---

Page 14

1   for this.  Pass those around.  For the record
2   this is a notice of deposition of Ms. McCormick,
3   it is dated March 18th, 2007, and a subpoena
4   addressed to Ms. McCormick is attached.
5            (Exhibit Abbott 860, Notice of
6   Deposition and Subpoena, marked for
7   identification.)
8       Q.   Have you ever seen this document
9   before?
10      A.   Parts of it.
11      Q.   Which parts have you seen?
12      A.   Starting with Exhibit A.
13      Q.   And you are referring to the subpoena
14  that's attached with a list of requests for the
15  production of documents?
16      A.   Yes.  It says page one.
17      Q.   Did you search for documents in
18  response to this subpoena?
19      A.   Yes, I did.
20      Q.   Do you recall approximately when?
21      A.   A month ago.
22      Q.   Did you have anyone else assisting you?

---

Page 15

1       A.   Yes.
2       Q.   Who assisted you?
3       A.   Janet Ober.  She is the secretary to
4   the director's office.
5       Q.   Anyone else?
6       A.   No.
7       Q.   Approximately how long did you or how
8   long -- how many hours, approximately, did you
9   spend searching for documents in response to this
10  subpoena?
11      A.   I spent two hours, and I am not sure
12  how long Janet spent.
13      Q.   Where did you look to find documents
14  responsive to this request?
15      A.   I looked in the files of my predecessor
16  to this position.
17      Q.   And would that be Ms. Jude Walsh?
18      A.   Yes.
19      Q.   And when you say the files, these
20  aren't her personal files?
21      A.   No.  These would be files that were
22  prepared during her tenure at the department.

---

Page 16

1       Q.   Did you look anywhere else?
2       A.   No.
3       Q.   Can you describe the way that Maine
4   archives its records of this -- of the sort that
5   are called for in this subpoena?
6            MS. ST. PETER-GRIFFITH:  Object to the
7   form.  The subpoena calls for personal records,
8   it does not call for records from the State of
9   Maine.  She is not here as a 30(b)(6) witness,
10  she is here as a 30(b)(1) witness.
11      Q.   Can you describe the way that the
12  documents you searched for are stored in response
13  to this subpoena?
14      A.   I --
15           MS. ST. PETER-GRIFFITH:  Object to the
16  form.  Same objection.
17      Q.   You may answer unless instructed
18  otherwise.
19      A.   I looked in paper files.
20      Q.   Can you give me an estimate of the size
21  of the paper files?
22      A.   The lateral file cabinets?  There are

---

Page 17

1   two file cabinets that have historical documents
2   going back I would say four years.
3       Q.   And for documents before that time
4   frame, where are those -- where are those stored?
5            MS. ST. PETER-GRIFFITH:  Object to the
6   form.
7            MR. FORTIN:  Go ahead.
8       A.   We have a somewhat unique situation at
9   -- at our office and that is that we were evicted
10  from a building that we were in originally
11  because of mold and harmful substances to
12  people's respiratory system so there were a lot
13  of documents destroyed at that time when we moved
14  from that building, and then we moved into a
15  temporary space for about three years, and when
16  we moved into the building that we're in right
17  now, which we have been in for -- I am not sure,
18  three or four years, we had to -- we destroyed
19  some documents because we didn't have as much
20  storage in this new building.
21      Q.   Do you recall approximately when you
22  were evicted from the old building?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

4ccb88eb-f368-4871-97f1-91d5922c8893

McCormick, Brenda A.                                      March 28, 2008
                          Augusta, ME

|  | |
|---|---|
| Page 18 | Page 20 |

**Page 18**

1    A.   Oh, gosh, you are testing my memory.
2    Q.   Is it more than five years ago?
3    A.   Yes.  I would expect it was -- I am
4  thinking six years ago.  Perhaps longer.
5    Q.   Have you ever heard of something called
6  a litigation hold?
7    A.   No.
8        MS. ST. PETER-GRIFFITH:  Object to the
9  form.
10    Q.   Do you recall ever being instructed by
11  anyone to preserve documents that may be related
12  to this case?
13        MS. ST. PETER-GRIFFITH:  Object to the
14  form.
15    A.   No.
16    Q.   Okay.  I would like to show you the
17  complaint in this case.  I believe we have marked
18  it -- used it yesterday, this is Abbott Exhibit
19  19.  You can take a minute to just flip through
20  this and when you have let me know if you have
21  ever seen this document before.
22    A.   Yes.

**Page 19**

1    Q.   Did you see this in preparation for
2  this deposition?
3    A.   Yes.
4    Q.   Did you look at any other documents in
5  preparing for your deposition today aside from
6  searching for e-mail records?
7    A.   No.
8    Q.   Strike that, not e-mail records.
9  Looking for records stored by the State of Maine.
10        MS. ST. PETER-GRIFFITH:  Object to the
11  form.
12    Q.   Do you have a general understanding of
13  the -- of the allegations in this particular
14  lawsuit?
15    A.   Yes.
16    Q.   Can you describe for me in your own
17  words what you understand the allegations to be?
18    A.   My understanding from the reading of
19  this is that the drug -- excuse me, the drug
20  company asked providers to mark up the -- the
21  charges that they were sending to the Medicaid
22  program.

**Page 20**

1    Q.   Okay.  Can you flip to page 10, please,
2  and you will see extending from pages 10 to 12 a
3  number of drugs listed first with NDC numbers and
4  on page 12 with HCPCS numbers.  Do you recognize
5  any of these drugs, Ms. McCormick?
6    A.   I am not sure what you mean by
7  recognition of the drugs.
8    Q.   Do you know what these are used for or
9  what type of drugs they are?
10    A.   No, I don't.
11    Q.   Are you familiar with the coding system
12  NDC numbers?
13    A.   Yes.
14    Q.   And what are -- what are NDC numbers?
15    A.   NDC numbers are the -- are the number
16  that tell you what the drug is, what the strength
17  is, what the dose is, so that we can use it for
18  payment purposes.
19    Q.   How, if at all, are NDC codes different
20  than HCPCS codes?
21    A.   The HCPCS codes have less specificity
22  than the NDC codes.

**Page 21**

1    Q.   Does the State of Maine use HCPCS codes
2  for different purposes than it uses NDC codes?
3    A.   I am not sure what you understand by
4  the question -- I mean what you mean by the
5  question.
6    Q.   You said you have some familiarity with
7  these coding systems, right?
8    A.   Yes.
9    Q.   How did you gain that familiarity?
10    A.   Through my experience with the Medicaid
11  program over time.
12    Q.   And how does the Maine Medicaid program
13  use these two different types of codes?
14    A.   The HCPCS codes are used by a different
15  type of provider than the NDC numbers.  NDC
16  numbers are the way that pharmacies send us their
17  claims and HCPCS codes are the ways that
18  physicians send us codes that are administered in
19  the physician's offices for payment purposes.
20    Q.   Do you know whether the drugs on the
21  pages 10 through 12 are generics or brand name
22  drugs?

6 (Pages 18 to 21)

4ccb88eb-f368-4871-97f1-91d5922c8893

# Joseph Fine (Maryland) (30(b)(6))

# Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

    v.                        )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -


     Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

     MENTAL HYGIENE BY JOSEPH L. FINE


                Baltimore, Maryland

                Tuesday, December 9, 2008

                9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 250

1    Q.   The latter.
2    A.   Okay.  The pharmacy payment system in the
3  State of Maryland addressed the issue by knowing which
4  pharmacy was a 340(b) pharmacy.  And the expectation
5  was that provider identification number which billed
6  would bill at cost.
7    Q.   Do they use the same port of sale system --
8    A.   Yes.
9    Q.   -- as the other providers who bill Medicaid
10  in the point of sale system?
11    A.   Yes.
12    Q.   They use the same form?
13    A.   Right.  But on the back end when rebates
14  are to be given, those entities that have drug product
15  that were billed through that provider are not to be
16  billed to the manufacturer for rebate.
17    Q.   And why is that?
18    A.   Because the pharmacy on the front end
19  billed at cost, at their acquisition cost plus the
20  allowed dispensing fee for Maryland.
21    Q.   What dispensing fee has the department paid
22  for those providers?

Page 251

1    A.   In Maryland it's no different.  Other
2  states -- I can only speak from my knowledge of that.
3  Some have a differential price.
4        MR. TORBORG:  We'll mark the next exhibit.
5  It will be my last.
6             (Exhibit Abbott Maryland 023
7                  was marked for
8                  identification.)
9        BY MR. TORBORG:
10    Q.   This is a document bearing the Bates number
11  MD 0013041 through 50, a document produced by
12  Maryland.  It appears to be a folder titled "PHS
13  prices - Abbott."
14    A.   Mm-hmm.
15    Q.   Then it contains a letter from Abbott dated
16  October 3rd 2000 and then some pricing information; is
17  that right?
18    A.   Yes.
19    Q.   Do you recall this document?
20    A.   No, I do not.
21    Q.   Do you know who within the department would
22  have been receiving these prices?

Page 252

1    A.   I believe that all letters that go into the
2  Medicaid program go through the policy administration.
3  And I just -- I don't recall this letter.  And from my
4  experience with the 340(b) program, the prices are
5  protected and not necessarily shared publicly because
6  Abbott's 340(b) price to one hospital may be different
7  than to another hospital.  And I say that because each
8  price is negotiated.
9        A 340(b) price is the ceiling price.  And
10  if you would go to Johns Hopkins they may want a
11  better price from Abbott.  And this is the way the
12  business is run.
13    Q.   But it appears as though someone in the
14  department had the prices?
15        MS. YAVELBERG:  Objection, form.
16    Q.   Correct?
17    A.   I don't know what the appearance is.  The
18  letter was written to "dear Abbott customer," you
19  know.  I see up on top --
20    Q.   Yeah.  What's that?
21    A.   -- director of outpatient pharmacy.  And
22  that's a misnomer.  There is no director of outpatient

Page 253

1  pharmacy per se.  That's a hospital verbiage.
2    Q.   Well, I can only tell you based on my
3  understanding -- and Mr. Davis can correct me -- that
4  these were produced from the files of DHMH.
5        MR. TORBORG:  Am I right, Mr. Davis?
6        MR. DAVIS:  That's what it appears.
7    A.   Okay.  So be it.
8    Q.   Mr. Fine, during your time at the
9  department were you ever -- did you ever become aware
10  of -- and I'm asking personally now -- of any
11  instruction to retain documents that might be related
12  to drug pricing litigation?
13    A.   Was I personally --
14    Q.   That's my first question.
15    A.   No.  Not that I was instructed, personally
16  instructed.
17    Q.   Do you know if the -- can you testify -- or
18  did you do anything to prepare to testify about
19  whether or not the department as a whole received any
20  instruction to retain documents that might be relevant
21  to drug pricing litigation?
22        MS. YAVELBERG:  Objection, form.

64  (Pages 250 to 253)

0bd2b054-a753-a4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008

## Baltimore, MD

Page 254

1      MR. DAVIS:  Objection.  I think it's beyond
2   the scope of the designation.
3      MR. TORBORG:  Topic 25.
4      MR. DAVIS:  Oh, okay.
5    A.   I have no knowledge of that.  I have no
6   knowledge.
7      BY MR. TORBORG:
8    Q.   You did nothing to investigate that?
9    A.   No.
10   Q.   You're just not aware of it personally?
11   A.   Personally.
12   Q.   Do you think if there had been such a
13  instruction you would have become aware of it --
14     MS. YAVELBERG:  Objection, form.
15   Q.   -- given your position?
16     MS. YAVELBERG:  The witness no longer works
17  for Maryland.
18     MR. TORBORG:  Back in 2005 he did.
19     MS. YAVELBERG:  But he didn't prepare for
20  this deposition in 2005 or your notice of inquiry in
21  2005.
22     MR. TORBORG:  That's not the point.  The

Page 255

1   point is I'm asking if during the time he was there --
2      MS. YAVELBERG:  Okay.
3      MR. TORBORG:  -- did he become aware.
4    A.   I was not aware.
5      BY MR. TORBORG:
6    Q.   And had there been an instruction to retain
7   documents prior to your departure do you think you
8   would have become aware of it?
9    A.   You're supposing what?  I'm not following
10  you.
11   Q.   Let me go back.  You left the department in
12  May of 2005 --
13   A.   Mm-hmm.
14   Q.   -- correct?
15   A.   Yes.
16   Q.   If there had been an instruction to
17  individuals within the department to retain documents
18  that might be relevant to drug pricing litigation, do
19  you think in your position you would have become aware
20  of it?
21   A.   Being the director of pharmacy for all
22  pharmacy services at that time, I believe I would have

Page 256

1   been made aware of it.
2      MR. TORBORG:  That's all the questions I
3   have for you right now, Mr. Fine.  Thank you for your
4   patience.
5      THE VIDEOGRAPHER:  Do you have questions?
6      MS. YAVELBERG:  I think the person on the
7   telephone -- Anne?
8      MS. MANGIARDI:  Yeah.
9      MS. YAVELBERG:  Are you ready?
10     MS. MANGIARDI:  I am.  What's your timing
11  situation?  Do you need to be out of there by a
12  certain time?
13     MR. DAVIS:  Sure.
14     MS. YAVELBERG:  Yes.
15     MS. MANGIARDI:  No.  I mean does the
16  building close at 5:00 or anything?
17     MS. STAFFORD:  No.  No.  It doesn't close.
18     MS. MANGIARDI:  Okay.  I'll do my best to
19  be brief, but that's good to know.
20     EXAMINATION BY COUNSEL FOR DEY, INC., DEY,
21        L.P. AND MYLAN
22     BY MS. MANGIARDI:

Page 257

1    Q.   Good afternoon, Mr. Fine.  It's been a
2   while, so let me just reintroduce myself.  My name is
3   Anne Mangiardi and I'm here to represent the Dey
4   entities today.  Can you hear me okay?
5    A.   Yes.
6    Q.   Okay.  Great.  The Dey entities are
7   pharmaceutical manufacturers that have been sued by
8   the Department of Justice in this litigation.  Are you
9   familiar with the Dey entities?
10   A.   Only as a drug manufacturer.
11   Q.   Okay.  I'd like for you to turn just
12  briefly to Abbott Maryland Exhibit 1.
13   A.   Yes.  Okay.
14   Q.   Okay.  If you flip through a little bit
15  you'll see that attached to that there's a big page
16  that says exhibit 2 on it.  Do you see that?
17   A.   I'm going through it.  Yes.  I see exhibit
18  2.
19   Q.   And the document that's behind that, do you
20  recognize that document?
21   A.   Yes.
22   Q.   Have you seen that document before?

65  (Pages 254 to 257)

0bd2b054-a753-4e97-a066-e37ff7ee308f

# Arnold Shapiro
# (Massachusetts) (30(b)(6))

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-CV-11865-PBS

-----------------------------------------X

THE COMMONWEALTH OF MASSACHUSETTS,          )

              Plaintiff,                     )

          -against-                          )

MYLAN LABORATORIES INC.; BARR                )

LABORATORIES, INC.; DURAMED                  )

PHARMACEUTICALS, INC.; IVAX                  )

CORPORATION; WARRICK PHARMACEUTICALS         )

CORPORATION; WATSON PHARMACEUTICALS,         )

INC.; SCHEIN PHARMACEUTICAL, INC.; TEVA      )

PHARMACEUTICALS USA, INC.; PAR               )

PHARMACEUTICAL, INC.; DEY, INC.; ETHEX       )

CORPORATION; PUREPAC PHARMACEUTICAL          )

CO.; and ROXANE LABORATORIES, INC.,          )

              Defendants.                    )

-----------------------------------------X

                         Boston, Massachusetts

                         Wednesday, October 3, 2007

          Videotaped Deposition of ARNOLD H. SHAPIRO,

Shapiro, Arnold H.                                    October 3, 2007
                          Boston, MA

                                                        Page 16

     1      A.  Many times.

     2      Q.  And did you have a practice of retaining

     3   your notes?

     4      A.  I did.

     5      Q.  And what year did you leave the employ of

     6   the Commonwealth?

     7      A.  In 1999.

     8      Q.  And when you left in 1999, do you know

     9   whether the correspondence and memoranda and notes

    10   that you had retained were still intact?

    11      A.  They were all shredded.

    12      Q.  And they were shredded when?

    13      A.  When I left the Commonwealth, all of my

    14   records were sent to shredding.

    15      Q.  And were they sent to shredding -- well, how

    16   did it come about that they were shredded?

    17      A.  When I left -- when I was leaving state

    18   service, I was told to just clean out the office and

    19   get rid of all the collections.

    20      Q.  And who told you that?

    21      A.  Oh, it could have been some supervisor,

    22   manager of some sort.

Shapiro, Arnold H.                                    October 3, 2007
                          Boston, MA

                                                        Page 17

1        Q.   Can you identify that person by name?

2        A.   Probably would have been -- it would have

3    probably been Priscilla Portis, who was the

4    administrative supervisor.

5        Q.   And during the time that you were with the

6    Commonwealth, was it a regular practice to shred the

7    files of departing employees or was this --

8        A.   Well, as far as I know, it was get rid of

9    all the documents that you have in your possession.

10   If there were memos that I had sent up the chain of

11   command, those would be someplace --

12       Q.   Sure.

13       A.   -- or may be someplace; but the stuff that I

14   kept was mostly copies of what I had done.

15       Q.   Do you recall any instructions to other

16   employees to destroy or shred their documents?

17       A.   It was pretty much common practice.

18       Q.   Okay, and did you gather the materials

19   together yourself or did someone do it for you?

20       A.   I did.

21       Q.   And do you recall the volume of material?

22       A.   It was a fairly large --

Shapiro, Arnold H.                           October 3, 2007
                    Boston, MA

Page 18

1        Q.   I'll bet.

2        A.   -- dumpster.  It was an accumulation of

3   probably close to 11 years --

4        Q.   Right.

5        A.   -- of documents.

6        Q.   Right.  So if -- I mean, was this six feet

7   of material or --

8        A.   It was a dumpster probably maybe slightly

9   larger than this end of the table standing about

10  this high.

11       Q.   Which is about 4 by 4?

12       A.   Yeah.

13       Q.   And 4 feet high?

14       A.   Yeah.

15       Q.   So a lot of material?

16       A.   A lot of stuff, right.

17       Q.   And then once you put this material in the

18  dumpster, do you know where it went?

19       A.   They -- those dumpsters would go -- they'd

20  be picked up by the shredding company.

21       Q.   And was there any material in your files of

22  correspondence and memoranda and notes that you

Shapiro, Arnold H.                                    October 3, 2007
                        Boston, MA

1    retained and that did not go into the dumpster for

2    the shredding?

3         A.   There were no notes.  There were some

4    materials, some personal things that I retained, but

5    nothing --

6         Q.   But no business-related things?

7         A.   No business-related.

8         Q.   Mr. Shapiro, Exhibit Shapiro 001, which is

9    the first volume of your 1989 deposition, contains a

10   lengthy review of your background, which I would like

11   not to repeat.

12        A.   Thank you.

13        Q.   But if you'll permit me, I'm going to try to

14   summarize it and see --

15        A.   Okay.

16        Q.   And you can tell me whether I've got it

17   correctly, and I'm going to focus on your education

18   and your -- then your employment after high school,

19   but am I correct that you graduated from the Mass.

20   College of Pharmacy in 1954?

21        A.   That's correct.

22        Q.   That you were a pharmacist in Jamaica Plain

# James Kenyon (Michigan) (30(b)(1))

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL INDUSTRY        MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION    Civil Action:

                                      01-CV-12257-PBS

THIS DOCUMENT RELATES TO U.S.         Judge Patti B. Saris

Ex rel. Ven-A-Care of the Florida     Magistrate Judge

Keys, No. 06-CV-11337-PBS             Marianne B. Blower

                         /



        The Videotaped Deposition of JAMES KENYON,

        Taken at 2860 Eyde Parkway,

        East Lansing, Michigan,

        Commencing at 4:13 p.m.,

        Tuesday, March 25, 2008,

        Before Cynthia A. Chyla, CSR 0092.

312c386c-07e0-486c-9ceb-bcc3c9f5dc87

Kenyon, James                                        March 25, 2008

Page 14

1    Q.   Did you compile documents in response to the
2    subpoena?
3    A.   No.
4    Q.   Did someone --
5    A.   Well, I take that back.  I did have some
6    documents which I supplied.
7    Q.   Prior to seeing that subpoena, had anyone
8    told you to withhold from destroying documents that
9    might be related to AWP matters or drug pricing issues?
10   A.   No.
11   Q.   Since being issued that subpoena, has anyone
12   instructed you to withhold from destroying documents
13   relating to drug pricing issues?
14   A.   No.
15   Q.   In your role in the pharmacy audit -- is it
16   a department or section?
17   A.   Program investigation section is the audit
18   section I currently am in.
19   Q.   Okay.  I'll refer to that as the audit
20   section just to --
21   A.   That's fine.
22   Q.   -- dumb it down for my sake.

Page 15

1         Did you also audit dispensing fees?
2    A.   We looked at the whole claim that was billed
3    to the pharmacy.
4    Q.   Did you ever compare dispensing fees to what
5    it would cost the provider to actually dispense a drug?
6    A.   No.
7    Q.   Are you -- I'm sorry.
8         What's the current dispensing fee
9    for pharmacists in Michigan?
10   A.   The current dispensing fee depends whether
11   there's long-term care or whether they're a regular
12   pharmacy.  It's $2.50 for standard retail pharmacy;
13   2.75 for the long-term care.
14   Q.   At one time the dispensing fees were greater
15   than that; is that right?
16   A.   Correct.
17   Q.   About a dollar greater than that?
18   A.   Roughly.
19   Q.   Do you know why they were decreased?
20   A.   No.
21   Q.   Do you believe that a $2.50 dispensing fee
22   is adequate to cover all the pharmacist's cost in

Page 16

1    dispensing drugs?
2         MR. HENDERSON:  Objection.
3    A.   I have not done any analysis.  I couldn't
4    say.
5    BY MR. GABEL:
6    Q.   In your experience as a pharmacist, and
7    although this was a number of years ago, do you believe
8    that $2.50 would be adequate to cover the cost you
9    would incur on dispensing a drug?
10        MR. HENDERSON:  Objection to form.
11   A.   I had nothing to do with billing.  I really
12   couldn't evaluate that on an analysis.
13   BY MR. GABEL:
14   Q.   Okay.  With respect to the dispensing fee
15   for Michigan, do you know if it is intended to cover
16   overhead for drugs?
17   A.   Not having done the analysis, I do not know.
18   Q.   If I were to ask you whether any particular
19   elements were to be covered by the dispensing fee, is
20   it right that you couldn't tell me just because that's
21   not something you've analyzed?
22   A.   Correct.

Page 17

1    Q.   Who determines what the dispensing fee is to
2    be for Michigan Medicaid participants?
3    A.   The dispensing fees I've seen have been
4    mandated by the legislature.
5    Q.   Do you know how they arrived at those
6    dispensing fee numbers?
7    A.   I do not know the entire process, no.
8    Q.   I'd like to show to you -- do you have the
9    stack of documents we used in the previous deposition.
10        MR. MATUS:  I don't have the actual.
11   I have my stack.
12        MR. GABEL:  Do you?
13        THE COURT REPORTER:  No.  I hope the
14   witness didn't take them.
15        MR. GABEL:  I hope so as well.
16        MR. MATUS:  She may have.  You can
17   use my set.
18        MR. GABEL:  We should track her
19   down.  You want to give her a -- let's go off the
20   record for just a second.
21        (Discussion had off the record.)
22        MR. GABEL:  We can go back.

5 (Pages 14 to 17)

312c386c-07e0-486c-9ceb-bcc3c9f5dc87

# Sandra Kramer (Michigan) (30(b)(1))

Kramer, Sandra                                    March 25, 2008

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL INDUSTRY        MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION     Civil Action:

                                       01-CV-12257-PBS

THIS DOCUMENT RELATES TO U.S.          Judge Patti B. Saris

Ex rel. Ven-A-Care of the Florida      Magistrate Judge

Keys, No. 06-CV-11337-PBS              Marianne B. Blower

                              /




        The Videotaped Deposition of SANDRA KRAMER,

        Taken at 2860 Eyde Parkway,

        East Lansing, Michigan,

        Commencing at 9:08 a.m.,

        Tuesday, March 25, 2008,

        Before Cynthia A. Chyla, CSR 0092.






Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 22

1    Q.   Okay.  Could you give me a sketch of your
2  clientele at HMA?
3    A.   My clientele or the HMA clientele?
4    Q.   How about your clientele.
5    A.   I work for state Medicaid programs.  I've
6  worked with the National Association of State Medicaid
7  Directors.  I've done research for manufacturers
8  explaining technical applications of regulations and
9  Medicaid programs.  I've worked for various county
10  programs.
11    Q.   You say --
12    A.   There could be others that I'm not recalling
13  right now.
14    Q.   Okay.  Fair enough.
15         You mentioned state Medicaid
16  programs.  Which states in particular?
17    A.   For Michigan.
18    Q.   Okay.  Any others?
19    A.   I do pro bono work for other --
20    Q.   Other states?
21    A.   Yes.
22    Q.   Which states?

Page 23

1    A.   I've done quite a bit for Missouri --
2    Q.   Okay.
3    A.   -- and some for New York through a
4  subcontractor arrangement.
5    Q.   Okay.  And you've worked with drug
6  manufacturers as well.  Which manufacturers?
7    A.   I've -- Pfizer, Roche are the ones that I
8  recall.
9    Q.   And am I right you stated that you worked
10  with them on how to interpret or how certain
11  regulations or statutes are implemented and
12  interpreted; is that right?
13    A.   Are you asking me the scope of the work that
14  I do?
15    Q.   Yeah.
16    A.   I -- a lot of Internet searching to define
17  various policies that state Medicaid programs have
18  implemented, their reimbursement techniques, whether
19  they have preferred drug lists, and other applications
20  of how they would implement federal and state
21  regulations.
22    Q.   Did any of that involve work into the

Page 24

1  meaning of or implementation of AWP-based payment
2  methodologies?
3    A.   No.
4    Q.   Have you seen the subpoena that Abbott
5  issued to you in this case?
6    A.   Yes.
7    Q.   Okay.  And did you see that it requested a
8  number of documents?
9    A.   Yes.
10    Q.   Did you search for documents yourself?
11    A.   Yes.
12    Q.   And did you produce everything that you
13  could locate in response to Abbott's subpoena?
14    A.   To the best of my ability, yes.
15    Q.   Prior to receiving the subpoena from Abbott,
16  had you received direction from anyone to specifically
17  retain documents that might be relevant to this
18  litigation?
19    A.   No.
20    Q.   Never received a litigation hold memo or
21  something telling you --
22    A.   I'm not familiar with that term.

Page 25

1    Q.   -- instructions either written or verbal
2  that said not to destroy or throw away certain
3  documents that might be related to the allegations that
4  the Government has brought against the drug
5  manufacturers?
6    A.   There was no specific memo that I recall.
7    Q.   If you had been asked to do, would you have
8  done so?
9    A.   I would have complied with directions.
10    Q.   Getting back to the allegations in this
11  litigation, do you have a general understanding of what
12  the Government believes Abbott did wrong in this case?
13    A.   Yes.
14    Q.   And what is that?
15    A.   The -- their AWP price was not in synch with
16  what the pharmacies were actually procuring the drugs
17  at, and also Abbott used that differential in those two
18  prices to market their products as profitable to their
19  purchasers.
20    Q.   And where did you gain that understanding of
21  what the Government's allegations are?
22    A.   From the document that was forwarded to me

Henderson Legal Services, Inc.

# Cody Wiberg
# (Minnesota) (30(b)(1))

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           )

LITIGATION                        ) CIVIL ACTION:

                                  ) 01-CV-12257-PBS

                                  ) Judge Patti B. Saris

                                  ) Magistrate Judge

                                  ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Wiberg, Cody                                           March 14, 2008

Page 54

1    products.  And they used the inflated average
2    wholesale prices essentially as a marketing tool,
3    And that, in turn, resulted in essentially false
4    claims being submitted to federal health care
5    programs.  Most notedly, Medicaid and Medicare.
6    BY MR. COOK:
7      Q.  And just so we understand the -- the
8    parameters of your testimony today, do you have any
9    personal knowledge of what Abbott specifically did
10   or didn't do with respect to the reporting of
11   prices for Abbott products?
12     A.  No.
13     Q.  Okay.  Before getting to some more
14   substantive questions, Mr. Wiberg, are you aware of
15   any efforts by the Minnesota Medicaid Program to
16   preserve -- first of all, let me step back.  Are
17   you familiar with a litigation hold or a document
18   preservation effort, what that would involve?
19     A.  I -- well, I'm not 100 percent sure what you
20   may be referring to, but --
21     Q.  I can ask it a little bit differently.
22     A.  Well, I think I -- I think I know what you

Page 55

1    may be getting at.  I'm assuming you're -- you're
2    referring to whether or not the Department has
3    received requests for documents that might be
4    pertinent to some sort of a lawsuit.
5      Q.  And has it ever been your experience when you
6    were with Minnesota Medicaid that the agency would
7    make efforts to prevent documents from being lost,
8    because there is relevant litigation pending
9    somewhere.
10     A.  Yes.  We had a -- at least for part of the
11   time I was there, we had a retention schedule.  And
12   we did keep documents -- you know, when I was
13   there, I had documents from my predecessors going
14   back to the early 1980s.  And I started in 1999.
15   Now, right before I moved from the Medicaid Program
16   to the pharmacy, the Department of Human Services
17   was in the process of move -- or consolidating from
18   eight separate locations into three.  And the state
19   built a new office building that housed the
20   majority of the Department of Human Services,
21   including the Health Care Administration that I
22   worked for.

Page 56

1        As a run up to that process, we all had to
2    revamp the retention schedules.  We had to go
3    through all of our documents, decide what needed to
4    be kept, what could be discarded.  Anything that
5    was kept -- and then that was -- we were going to
6    keep for any length of time was -- was scanned, and
7    saved into a document management system.  Most of
8    that happened after I left the department, but it
9    was on the run up there, we were doing that.  So,
10   yeah, we were actively, for the last
11   year-and-a-half I was there, involved in trying to
12   decide what documents needed to be kept, which
13   could be thrown, which actually had to be sent to
14   the state historical society for archiving
15   purposes, yeah.
16     Q.  Now, at that time, and today, it's your
17   understanding that the State of Minnesota is not
18   involved in any litigation with Abbott, correct?
19     A.  That's my understanding.
20     Q.  At the time, were you aware that the Federal
21   Government had this case under seal as to Abbott?
22        MR. FAUCI:  Objection.  What time period?

Page 57

1        MR. COOK:  2005.
2      A.  I don't think so.  I don't recall.
3    BY MR. COOK:
4      Q.  And this may be a self-answering question,
5    but when you were going through the process of
6    deciding what to keep, what to archive, what to
7    throw away at the department of health and human
8    services, did this case, and were there documents
9    needed to be retained for this case, it all entered
10   into that equation.
11     A.  No.  This case?  No.
12     Q.  And had anybody from the Department of
13   Justice or the CMS contacted the State of Minnesota
14   to ask that documents that might relate to this
15   case be preserved?
16        MR. FAUCI:  Objection, form.
17     A.  Not to my knowledge.
18        MR. COOK:  I'm changing subjects.  Would
19   this be a good time to take a short break?
20        THE WITNESS:  It would.  I need some
21   coffee.
22        VIDEOGRAPHER:  We are going off the video

15  (Pages 54 to 57)

# Gary Cheloha
# (Nebraska) (30(b)(6))

Lincoln, NE

Page 1

                IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Dey, Inc., et. al., Civil )

Action No. 05-11084-PBS; and United)

States of America, ex. rel.        ) December 2, 2008

Ven-a-Care of the Florida Keys,    ) 8:57 a.m.

Inc., v. Boehringer Ingleheim      )

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) VOLUME I

---------------------------------X

Deposition of THE NEBRASKA DEPT. OF HEALTH AND HUMAN

SERVICES by GARY CHELOHA, taken by Defendants, pursuant

to Notice, held at the Cornhusker Hotel, Lincoln, Nebraska,

before Shana W. Spencer, a Certified Shorthand Reporter

and Notary Public of the State of Nebraska.

d98d776d-741f-454c-8c46-8fdf11028000

Page 274

1  It's in front of the witness.
2      Q.  (BY MS. CITERA)  Okay.  Have you seen a
3  copy, Mr. Cheloha, of that document before?
4      A.  I believe I have not, but I'm not
5  absolutely sure.  If I have, it was -- I read
6  through it very quickly without noting whether
7  this was an amended or not.  It's possible, but I
8  don't remember absolutely for sure yes or no.
9  I'm sorry.
10     Q.  Okay.  Are you generally familiar with
11 the allegations that the United States has made
12 against my client, Abbott Laboratories?
13     A.  Yes.
14     Q.  And when did you become familiar with
15 those allegations?
16     A.  Specifically for Abbott, I just read it
17 now on the first page of the amended complaint.
18 Generally, during the preparation for this
19 deposition.
20     Q.  Let me ask you this:  Did the State at
21 any time receive a request from the United States
22 to preserve documents related to their welfare

Page 275

1  lawsuit against Abbott or Roxane or Dey?
2      A.  I don't recall such a -- I don't recall
3  that.
4      Q.  If such a request had come in, would
5  you be made aware of that?
6      A.  Since I was preparing for this
7  deposition, I would think that, yes, I would be.
8      Q.  But prior to preparing, would you be
9  the person who would be -- would you be someone
10 who would be made aware of that type of request
11 if it had come in?
12     A.  It could be that Barbara Mart --
13        MR. DUNNING:  I'm going to object to
14 form, foundation.  I mean, we're not sure if any
15 request was made, who it was directed to.  Mr.
16 Cheloha is not necessarily here to testify about
17 this type of a process.  If this directs to the
18 department generally and not to the Medicaid
19 division or the pharmaceutical division of the
20 Medicaid department, then who knows where that
21 would have went?
22     Q.  (BY MS. CITERA)  Okay.  I believe it

Page 276

1  was one of the topics referred to, at least in
2  our notice, but I will move on.
3        Okay.  Do you know why Nebraska chose
4  to use direct price in certain instances?
5      A.  Yes, I do know.
6      Q.  And why -- what is that?
7      A.  That was based on the Jac -- Jacobs
8  survey indicating that was actual practice of
9  pharmacies purchasing medications at that time.
10     Q.  And do you know why Abbott was selected
11 as a manufacturer whose products were reimbursed
12 based on direct price?
13     A.  Again, I believe that was based on the
14 survey that was done by Dr. Jacobs and his
15 findings representing actual purchasing practices
16 of pharmacies in Nebraska.
17     Q.  So just so I understand, you believe
18 that Mr. Jacobs concluded that pharmacies were
19 purchasing the products directly from Abbott and
20 then that's why direct price was used as a basis
21 for reimbursement?
22     A.  Yes.

Page 277

1      Q.  What is your understanding of direct
2  price?
3      A.  My understanding of direct price is
4  when a labeler or manufacturer sold drugs
5  directly to the pharmacy without the use of a
6  wholesaler.
7      Q.  Has your understanding of direct price
8  evolved over time?
9      A.  No.  That's always been my
10 understanding.
11     Q.  Would you agree that direct price is --
12 has also been described as a list price?
13     A.  No.  I've not heard that term or that
14 description or understood that.
15     Q.  Okay.  So you have not heard them used
16 synonymously?
17     A.  I have not.
18     Q.  Okay.  What is your basis for your
19 understanding of the definition of direct price?
20     A.  The -- again, the Dr. Jacobs' survey
21 and somewhat from my practice as a pharmacist at
22 the hospital.

70 (Pages 274 to 277)

d98d776d-741f-454c-8c46-8fdf11028000

# Margaret Clifford
# (New Hampshire) (30(b)(1))

Clifford, Margaret                    October 29, 2008
                    Concord, NH

Page 1

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

In Re: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Master File No.

---------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:          )

United States of America ex rel.   ) Hon. Patti B.

Ven-A-Care of the Florida Keys,    )    Saris

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,     ) VIDEOTAPED

and United States of America ex    ) DEPOSITION

rel. Ven-A-Care of the Florida     ) OF MARGARET

Keys, Inc., et al. v. Boehringer   ) CLIFFORD

Ingelheim Corp., et al., Civil     )

Action No. 07-10248-PBS and United ) OCTOBER 29, 2008

States, ex rel. Ven-A-Care of the  )

Florida Keys v. Abbott             )

Laboratories, Inc. Civil Action    )

Nos. 06-CV-11337 and 07-CV-11618   )

---------------------------------X

Clifford, Margaret                                    October 29, 2008
                        Concord, NH

Page 190

1    Q.  What are some of the requirements that
2  you're referring to?
3    A.  If I knew what they were, I could tell
4  you what they were.  I just know --
5    Q.  I see.
6    A.  -- that there are certain requirements
7  that you have to follow before you change your
8  reimbursement methodology.  I already told you I
9  wasn't part of that department.  I don't know
10 what they are.
11   Q.  That's what I was trying.  You know the
12 requirements exist, you just don't know what any
13 of them are?
14   A.  Correct.  It wasn't part of my job
15 duties.
16   Q.  Bear with me for one moment.  We don't
17 need to go off the record but we need to wait
18 about 30 seconds.
19        Can you remind me?  I apologize to ask
20 you again, but that OIG report that showed AWP
21 minus 42.5 percent, was it your testimony that
22 you had seen it prior to this deposition, or were

Page 191

1  you seeing that figure for the first time today?
2    A.  No.  I believe I saw it prior to this,
3  prior to today.
4    Q.  So, and do you know, is it your belief
5  that you would have seen that back in 1997 when
6  it was issued?
7    A.  I don't know exactly when I saw it.  It
8  could have been in 1997 when it was issued.  It
9  could have been later on.
10   Q.  So between the time that you saw it and
11 the time that you left the program in 2005, did
12 you ever wonder why New Hampshire Medicaid was
13 making payments at AWP minus 12 percent or 16
14 percent when there was a study showing for
15 generic multisource AWP minus 42.5 percent?
16   A.  Well, I believe in most cases we
17 weren't paying the AWP minus on multisource
18 drugs.  We were paying either the state MAC or
19 the federal upper limit.
20   Q.  And I guess I was going to ask you
21 about the state MAC.  But you have no idea how
22 the state MAC was calculated, right?

Page 192

1    A.  Right.  That was a proprietary formula
2  owned by First Health.
3    Q.  Did anyone in the program look at those
4  numbers, the MAC numbers, and determine what
5  discount off of AWP they were equivalent to?
6    A.  No.  We were given a list every month
7  of the NDCs with the price attached to it, but I
8  didn't have time in my day to calculate what they
9  were.
10   Q.  Did you ever even just for one drug on
11 the MAC go back and see whether it was closer to
12 AWP minus 42.5 percent as opposed to closer to
13 AWP minus 12 percent?
14   A.  No.
15   Q.  Did you ever think to do it but it was
16 just a situation that you didn't have time or
17 just never occurred to you to do that?
18   A.  It wasn't part of my duties.  I didn't
19 have time to do that.  I had enough other stuff
20 to do.
21   Q.  Do you know whether anyone else in the
22 program did that?

Page 193

1    A.  No, I don't.
2    Q.  While you were within the Medicaid
3  program, was there any sort of a document
4  retention policy?
5    A.  No policy that I ever saw written.
6    Q.  Was there a verbal or any sort of
7  unwritten document retention policy?
8    A.  We pretty much kept everything that
9  came in the door.
10   Q.  Forever or was there a point where it
11 would be thrown out?
12   A.  I don't recall throwing stuff out.  So
13 I think you can go back in the file cabinet that
14 near where my desk used to be, probably still has
15 everything back from the day I started.
16   Q.  Did you at any time receive what we
17 refer to as a litigation hold which is a
18 notification or a memo saying there's a
19 litigation in place, you should hold on to
20 documents relating to this litigation?
21   A.  Not that I recall.
22   Q.  And you mentioned earlier this week you

49  (Pages 190 to 193)

3eda5f7f-7115-47a9-9291-d4198c3ab619

# Robert Stevens
# (New Mexico) (30(b)(6))

Santa Fe, NM

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X

In Re:  PHARMACEUTICAL INDUSTRY       )  MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION   )  Master File No.

-----------------------------------)  01-CV-12257-PBS

THIS DOCUMENT RELATES TO:             )

United States of America ex rel.     )  Hon. Patti B.

Ven-A-Care of the Florida Keys,      )    Saris

Inc., et al., v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS;       )

and United States of America ex      )  DEPOSITION OF

rel. Ven-A-Care of the Florida       )  THE NEW MEXICO

Keys, Inc., et al., v. Boehringer    )  DEPARTMENT OF

Ingelheim Corp., et al., Civil       )  HUMAN SERVICES

Action No. 07-10248-PBS;             )  by ROBERT J.

and United States ex rel. Ven-A-Care)  STEVENS

of the Florida Keys v. Abbott        )

Laboratories, Inc., Civil Action     )  DECEMBER 15,

Nos. 06-CV-11337 and 07-CV-11618     )    2008

-----------------------------------X

Santa Fe, NM

Page 26

1    A.  Since August 9 of 1976.
2    Q.  And has there been any interruption in
3  your work for the Medical Assistance Division of
4  HSD during that time?
5    A.  There was a short time period under
6  which I worked as a contractor rather than as a
7  state employee.
8    Q.  You worked as a contractor.  With whom
9  was the contract?
10   A.  For most of the time period, it was
11 actually with the State of New Mexico, the Human
12 Services Department.  For a few months, it was
13 actually through a contractor to the State of New
14 Mexico for the Human Services Department.
15   Q.  And when -- do you recall the dates
16 when you were working for that outside
17 contractor?
18   A.  Yes.  I retired working from -- for the
19 state on July 31st, 2001.  And then I began the
20 next day working as a contractor.
21   Q.  And when did you cease working -- that
22 was -- I'm sorry.

Page 27

1        You began working as a contractor at
2  that point for HSD or for the outside entity?
3    A.  It was actually a contract that HSD
4  used that they already had in place, that they
5  asked that contractor to pick up myself under
6  their contract so that I could keep working
7  specifically on the projects that I was working
8  for for the Medical Assistance Division.
9    Q.  Okay.  And when did you cease working
10 for that contractor?
11   A.  I don't remember specifically when I
12 ceased working for that contractor.  But when
13 their contract expired, I began working for a
14 similar contractor under the same arrangement.
15 But I still worked within the office of the
16 Medical Assistance Division.
17   Q.  What was the name of that second
18 contractor?
19   A.  I believe their name was POD
20 Associates, just the capital letters P-O-D.
21   Q.  And do you recall when you ceased
22 working for POD Associates?

Page 28

1    A.  I don't remember the specific date.
2  But I was only for a certain number of months
3  that I worked for them.  I know that it wasn't
4  for a whole year.
5    Q.  Do you recall a month or a year where
6  you then went back to work for HSD?
7    A.  I believe that I started working for
8  the state again directly.  I believe it was in
9  December of 2003.
10   Q.  You stated that you've been -- with the
11 exception of a brief break, you've been working
12 for -- directly for HSD since 1976.  How far back
13 in time are you prepared to testify to today?
14       MR. RIKLIN:  Well, I'm going to object,
15 because the notice sets out the time period.
16 BY MR. JULIE:
17   Q.  Well, are you prepared to testify as
18 far back as the notice calls for which --
19       MS. ERDMAN:  Can we clarify what time
20 the notice calls for.
21       MR. RIKLIN:  I thought you put a time
22 period in there if I'm not mistaken.

Page 29

1        MR. JULIE:  Yeah.  It is before the,
2  quote, unquote, relevant period in the case.
3        MR. RIKLIN:  The relevant period is '91
4  forward.
5        MR. JULIE:  For damages, yes.  I think
6  this -- the subpoena goes back to the eighties.
7        MR. RIKLIN:  I think it goes back to
8  '84.
9        MR. JULIE:  I think that's right.
10       MR. RIKLIN:  I saw it somewhere in
11 here.  Oh, instruction one, "Unless otherwise
12 specifically stated, the areas of inquiry refer
13 to the time period from January 1, '84, to the
14 present."
15       MR. JULIE:  Thank you, sir.
16 BY MR. JULIE:
17   Q.  Sir, are you prepared to testify from
18 the time period of January -- regarding the time
19 period of January 1, 1984, to the present?
20   A.  Yes, I am.
21   Q.  Do you know whether New Mexico HSD or
22 New Mexico -- the New Mexico Medicaid program

8  (Pages 26 to 29)

cf7b6218-b5ad-4888-bff2-2a015fc3b396

Santa Fe, NM

Page 30

1  ever received a request or instruction from the
2  department of -- the federal Department of Health
3  & Human Services or the United States Department
4  of Justice to preserve documents in connection
5  with this lawsuit?
6      A.  I'm not aware of any order to do so.
7      Q.  Thank you.  Can I ask you to describe
8  your educational background since high school,
9  since after high school?
10     A.  I attended the University of New Mexico
11 for six years.  And I have a degree of -- a
12 Bachelor of Science in pharmacy.
13     Q.  What year did you graduate?
14     A.  In 1972.
15     Q.  Do you have any postgraduate degrees?
16     A.  No, I do not.
17     Q.  Are you a registered pharmacist?
18     A.  Yes, I am.
19     Q.  And for how long have you been a
20 registered pharmacist?
21     A.  I believe that I became a registered
22 pharmacist in January of 1973.

Page 31

1      Q.  Did you have any -- did you work at all
2  in the pharmaceutical industry prior to working
3  for New Mexico Medicaid?
4      A.  Yes, I did.  I worked for the
5  University of New Mexico Hospital.
6      Q.  And do you recall the dates that you
7  worked for that hospital?
8      A.  Yes.  I began my internship actually at
9  the University of New Mexico Hospital.  And I
10 believe that was in 1971.  And I worked for that
11 hospital until 19 -- 1976.
12     Q.  And after working for the -- that
13 hospital, did you then go -- was your next job
14 with the state Medicaid program?
15     A.  Yes, it was.
16     Q.  What is your current title at New
17 Mexico Medicaid?
18     A.  The chief of the Benefits Bureau for
19 the Medical Assistance Division.
20     Q.  And how long have you had that title?
21     A.  I believe since about January of 2004.
22     Q.  And what was your title before that?

Page 32

1  Was that your time when you were with the
2  contractor for that?
3      A.  No.  There still is a certain period of
4  time there that I had come back to work for the
5  state.  I worked under the direction of the
6  director's office on essentially the same work
7  that I did as the bureau chief.
8      Q.  You mean in your job as chief of
9  benefits or in a prior -- or are you saying it
10 was the same work you were doing -- as you were
11 doing in a prior position?
12     A.  Essentially the same as the chief of
13 the benefits bureau with some responsibilities
14 that I was doing both as a contractor and also as
15 a prior state employee.
16     Q.  Did you have a title in that position?
17     A.  No, I didn't.
18     Q.  All right.  And prior to holding that
19 position, you worked at several contractors?
20     A.  I think that there were two
21 contractors.  And then also directly contracting
22 with the state.

Page 33

1      Q.  Okay.  Prior to contracting -- and the
2  contracting with the state you had said was the
3  earliest of the three contracting positions; is
4  that correct?
5      A.  I believe that's true, yes.
6      Q.  Okay.  Prior to contracting with the
7  state, did you have a title, did your job with
8  the state have a title?
9      A.  Yes, it did.  I was working as the
10 chief of the Management Information System
11 Bureau.
12     Q.  And do you recall the dates that you
13 were chief of Management Information Systems
14 Bureau?
15     A.  I believe that it was from
16 approximately the year 1999 until I retired as a
17 state employee in July of 2001.
18     Q.  And what was your title before you were
19 chief management -- before you were chief of
20 Management Information Systems Bureau?
21     A.  I was called the chief information
22 officer for the Medical Assistance Division.

9  (Pages 30 to 33)

cf7b6218-b5ad-4888-bff2-2a015fc3b396

# Lisa Weeks
# (North Carolina) (30(b)(6))

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------x

In Re:  PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Civil Action

---------------------------------x 01-12257-PBS

THIS DOCUMENT RELATES TO:          )

United States of America, ex rel. ) Hon. Patti B.

Ven-A-Care of the Florida Keys,    )    Saris

Inc., v. Abbott Laboratories, Inc.,)

Civil Action Nos. 06-11337-PBS and )

07-CV-11618-PBS and United States  )

of America ex rel. Ven-a-Care of  ) Video 30(b)(6)

the Florida Keys, Inc., v. Dey,    ) Deposition of

Inc., et al., Civil Action No.     ) State of North

05-11084-PBS and United States of  ) Carolina Dept.

America ex rel. Ven-a-Care of the  ) of Health &

Florida Keys, Inc., v. Boehringer  ) Human Services

Ingelheim Corp., et al., Civil     ) by Lisa Weeks

Action No. 07-10248-PBS            ) Raleigh, NC

---------------------------------x October 21, 2008

Reporter: Marisa Munoz-Vourakis-RMR, CRR, Notary Public

b568fa66-5d69-4f65-b5c3-21751e4b978e

NC Department of Health and Human Services (Lisa Weeks)                    October 21, 2008

Raleigh, NC

|  | Page 378 |
|---|---|

1  believe it was the secretary to follow up that
2  OIG report, they decided, the division, the
3  department decided not to because of there was an
4  example in that report where the, I think rural
5  independent pharmacies could purchase at AWP
6  minus 13.3.  So I think there was concern not to
7  lower it to AWP minus 17.  That's my
8  understanding of why it stayed at AWP minus 10.
9      Q.   Because if you were to lower, you would
10  not necessarily be covering the cost of those
11  rural pharmacies to which that report referred?
12      A.   Yeah, for that specific report, that's
13  correct, yes.
14      Q.   And you wanted to make sure that you
15  were covering the cost of that rural pharmacy?
16      A.   That's what it appears to me, and from
17  the follow-up letter from the secretary at that
18  time, I believe it was the secretary, let me make
19  sure I'm stating that correctly, because it was
20  either the secretary or the director.  That was
21  the secretary, yeah, okay.
22      Q.   Is Tom D'Andrea still with the Medicaid

|  | Page 379 |
|---|---|

1  program in North Carolina?
2      A.   Yes.
3      Q.   And if you would just bear with me for
4  a minute.  I'm trying to make sure we chop out
5  some things so we can get done in time.
6      A.   Okay.
7      Q.   Based on your understanding of the
8  allegations in these cases, is it now your
9  understanding that in fact the North Carolina
10  Medicaid program has overpaid providers?
11          MS. YAVELBERG:  Objection, form.
12      A.   It appears there's a possibility based
13  on the information provided in the complaint,
14  those attachments particularly.
15      Q.   What do you mean when you say it
16  appears that it's a possibility?
17      A.   Well, if Medicaid covers the drugs on
18  the attached list, then if those were the prices,
19  the attachment reflects the accurate cost and
20  AWPs and all of that, then we would more than
21  likely have paid more.
22      Q.   So you are not convinced that that has

|  | Page 380 |
|---|---|

1  occurred, but you are saying it's at least
2  possible that that maybe happened?
3      A.   I believe that's definitely a
4  possibility, but, again, I don't have any claims
5  data with me to show that at this moment.
6      Q.   And if you go and find and determine
7  that in fact that occurred, will the North
8  Carolina Medicaid program or anyone on their
9  behalf seek recoupment from the providers to
10  which it overpaid?
11          MS. YAVELBERG:  Objection, form.
12      A.   I have no idea.  I have no idea.
13      Q.   Has the North Carolina DMA staff ever
14  been told not to destroy documents relevant to
15  these lawsuits?
16      A.   Yes, I believe at the initial subpoena,
17  I believe there was some communication about
18  that.
19      Q.   The communication from whom?
20      A.   My recollection is from the Attorney
21  General's Office, North Carolina Attorney
22  General's Office.

|  | Page 381 |
|---|---|

1      Q.   And when did the program staff receive
2  that communication?
3      A.   At the time that we received the Abbott
4  subpoena.
5      Q.   So in 2007?
6      A.   Yes.
7      Q.   Up until that time, had, to your
8  knowledge, anyone ever told the North Carolina
9  DMA staff not to destroy documents relevant to
10  these lawsuits?
11      A.   Not that I'm aware of.
12      Q.   And in fact, between 1996 and 2007, did
13  the North Carolina DMA destroy documents during
14  the normal course of business?
15          MS. YAVELBERG:  Objection, form.
16      A.   I'm not aware of that.  I don't know.
17      Q.   Do you have normal document destruction
18  policies, or do you all keep your documents
19  indefinitely?
20      A.   We have a retention policy, I believe
21  it's, in most cases, it's around five years and
22  sometimes longer, depending on the documents.  I

96 (Pages 378 to 381)

b568fa66-5d69-4f65-b5c3-21751e4b978e

# Brendan Joyce
# (North Dakota) (30(b)(6))

# Bismarck, ND

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION )

--------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:          ) Master File No.

United States of America ex rel.   ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,    )

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,     ) Hon. Patti B.

and United States of America ex    ) Saris

rel. Ven-A-Care of the Florida     )

Keys, Inc., et al. v. Boehringer   )

Ingelheim Corp., et al., Civil     )

Action No. 07-10248-PBS            )

--------------------------------X

VIDEOTAPED DEPOSITION OF THE NORTH DAKOTA DEPARTMENT

OF HUMAN SERVICES-MEDICAID DIVISION by BRENDAN JOYCE

        DATE:          Friday, December 12, 2008

        PLACE:         Bismarck, North Dakota

        REPORTED BY:   Deanna L. Sager, R.P.R.

e493af4d-8e46-4d73-8103-a911360fe13d

Bismarck, ND

Page 226

1  separately, is there any additional fee that's
2  paid to a home infusion pharmacy by North Dakota
3  Medicaid?
4      A.  Yes.
5      Q.  What fee is that?
6      A.  They get service fees through S Codes.
7      Q.  And can you explain to me what you mean
8  by a service fee through an S Code?
9      A.  It's the medical HCPCS code, H-C-P-C-S,
10 that allows them to bill for the other medical
11 and professional services.
12     Q.  So if a home infusion pharmacy is
13 billing a claim under the retail pharmacy -- or
14 under the pharmacy claim provision that North
15 Dakota Medicaid has, they also bill under an S
16 Code?
17     A.  Yes.
18     Q.  So that pharmacy that was billing --
19 submitting a pharmacy claim would receive a
20 dispensing fee as well as a payment for an S
21 Code?
22     A.  Yes.

Page 227

1      Q.  When a home infusion pharmacy dispenses
2  drugs does North Dakota Medicaid pay for all of
3  the supplies that are needed to administer the
4  drug?
5      A.  Yes.
6         MS. THOMAS:  Objection.  Form.
7      A.  Yes.
8      Q.  Would that include things like tubing
9  and needles and connections between the patient
10 and the intravenous drug?
11        MS. THOMAS:  Objection.  Form.
12     A.  That's all part of the S Code.
13     Q.  So North Dakota Medicaid doesn't
14 reimburse separately for those supplies, correct?
15     A.  Each individual supply, no.  But the
16 supplies as a whole, yes.
17     Q.  The supplies that are reimbursed as
18 part of the administrative service fee paid under
19 the S Code, correct?
20     A.  Yes.  I would have to review all the S
21 Codes to know the exact description of all
22 services that are covered under those.

Page 228

1      Q.  Can you tell me whether during your
2  time at North Dakota Medicaid you had any direct
3  communications with Abbott Laboratories?
4      A.  I'm sure I have.
5      Q.  Do you recall specific communications
6  you've had with Abbott Laboratories?
7      A.  Regarding a variety of products
8  including -- Synthroid is one of Abbott Lab's,
9  right?
10     Q.  Abbott does market and sell Synthroid,
11 yes.
12     A.  So I recall specific conversations
13 about Synthroid and specific conversations about
14 how they didn't want me to have a MAC pricing
15 list in North Dakota.  And a variety of other
16 things.
17     Q.  Do you recall who you spoke with?
18     A.  It's the governmental rep that was in
19 place at that time for this region.  I'll know
20 the name if I ever saw it.
21     Q.  Have you ever had a discussion with
22 anyone at Abbott Laboratories about reimbursement

Page 229

1  for sodium chloride, water, dextrose, or
2  vancomycin?
3      A.  No.  Beyond rebates, no.
4      Q.  Have you, during your time at North
5  Dakota Medicaid, ever received a notice or a
6  request for -- from the Department of Justice
7  asking you to retain documents in this litigation
8  or in the Dey litigation?
9         MS. THOMAS:  Objection.  Form.
10        MR. BAHR:  You can answer.
11        THE WITNESS:  I can?
12     A.  Yes.
13     Q.  (Ms. Geisler continuing)  You've
14 received a notice from the Department of Justice?
15 Can you tell me when you received that notice?
16     A.  When I personally received it?
17     Q.  Yes.
18     A.  A couple weeks ago.
19        MR. BAHR:  From the Department of
20 Justice?
21        THE WITNESS:  It's that one that --
22 second one.  The one that Galen Hanson got to

Henderson Legal Services, Inc.

# Nancy Nesser
# (Oklahoma) (30(b)(6))

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

In Re:  PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION  ) Master File No.

----------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:           )

United States of America ex rel.    ) Hon. Patti B.

Ven-A-Care of the Florida Keys,     )   Saris

Inc., et al., v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS;      )

and United States of America ex     ) DEPOSITION OF

rel. Ven-A-Care of the Florida      )  THE OKLAHOMA

Keys, Inc., et al., v. Boehringer   )  HEALTH CARE

Ingelheim Corp., et al., Civil      )   AUTHORITY

Action No. 07-10248-PBS;            )  by NANCY

and United States ex rel. Ven-A-Care)   NESSER

of the Florida Keys v. Abbott       )

Laboratories, Inc., Civil Action    ) DECEMBER 12,

Nos. 06-CV-11337 and 07-CV-11618    )   2008

----------------------------------X

OK Health Care Authority (Nancy Nesser)                    December 12, 2008

Oklahoma City, OK

Page 26

1  Oklahoma Health Care Authority produced to the
2  defendants in this case pursuant to the subpoena
3  issued --
4     A.  Correct.
5     Q.  -- this summer?
6     A.  Correct.
7     Q.  Okay.  Were there any other documents
8  that you reviewed in order to prepare for the
9  deposition besides the ones that Oklahoma
10 produced to defendants in this case?
11    A.  No.
12    Q.  How much time did you spend reviewing
13 those documents?
14    A.  Maybe an hour.
15    Q.  Did any of the documents provide you
16 with information that you did not have
17 previously?
18    A.  No.
19    Q.  Did you review any deposition
20 transcripts?
21    A.  No.
22    Q.  Did you have any meetings or contact

Page 27

1  any current or former employees of Oklahoma
2  Medicaid?
3     A.  No.
4     Q.  Did you contact or have any meetings
5  with any current or former employees of any
6  department of Oklahoma to prepare for this
7  deposition?
8     A.  No.
9     Q.  What is your position with Oklahoma?
10    A.  I'm the pharmacy director at the Health
11 Care Authority.  The Health Care Authority is the
12 designated Medicaid administrative agency.
13    Q.  When did you begin your employment in
14 this position as pharmacy director of the
15 Oklahoma Health Care Authority?
16    A.  In May of 2001.
17    Q.  Did you have any other position with
18 Oklahoma prior to the position as pharmacy
19 director?
20    A.  No, I did not.
21    Q.  For what time period are you prepared
22 to testify about the topics of inquiry?

Page 28

1     A.  From May of 2001 through the current
2  time period.
3     Q.  Are you aware that the topics -- that
4  many of the topics of inquiry and areas of
5  inquiry in the deposition notice regard time
6  periods earlier than May, 2001?
7     A.  Yes.
8     Q.  What did you do to prepare to testify
9  about those topics or time periods earlier than
10 May, 2001?
11    A.  There are no documents available for me
12 to reference those time periods.
13    Q.  Did you contact any previous pharmacy
14 directors or anyone who had been with the
15 Oklahoma Department of Human Services?
16    A.  No.  That previous pharmacy director is
17 deceased.
18    Q.  Who was the previous pharmacy director?
19    A.  What's his last name?  Hyatt?
20       MS. RAMBO-JONES:  Yeah.
21       THE WITNESS:  I think it was Ralph
22 Hyatt.

Page 29

1     Q.  (BY MS. LIEBERMAN) And Ralph Hyatt was
2  the pharmacy director of the Oklahoma Health Care
3  Authority prior to --
4     A.  Right.
5     Q.  -- your tenure there?
6     A.  There was another man for a few years
7  in there -- I don't have the dates -- named John
8  Crumly.
9     Q.  Was John Crumly also the pharmacy
10 director of Oklahoma Health Care Authority at one
11 period in time?
12    A.  Yes.
13    Q.  Do you have a sense of what years he
14 was the pharmacy director of Oklahoma Health Care
15 Authority?
16    A.  I would say from around '99 until 2001.
17 I mean, he was gone -- when I got there, he had
18 been gone for a couple of months.
19    Q.  Okay.  And once he was gone, Mr. Hyatt
20 was the --
21    A.  No.  Mr. Hyatt was pre 1999.
22    Q.  Mr. Hyatt was pre 1999?

8  (Pages 26 to 29)

OK Health Care Authority (Nancy Nesser)                    December 12, 2008

Oklahoma City, OK

Page 234

1     A.   Okay.
2     Q.   You indicated that you had reviewed
3  this document; correct?
4     A.   Yes.
5     Q.   The federal government never told
6  Oklahoma Medicaid that it should not pay more
7  than -- strike that.
8          To your knowledge, the federal
9  government never told Oklahoma Medicaid that it
10 should not pay more than the prices in Exhibit B
11 to its complaint against Roxane for the drugs in
12 that exhibit; correct?
13         MR. MAO:  Objection, form.
14         THE WITNESS:  I don't know what Exhibit
15 B is.
16     Q.   (BY MS. LIEBERMAN) Exhibit to the
17 federal government's complaint against Roxane.
18     A.   I don't -- I don't think I have enough
19 information to answer that question.
20     Q.   As you stated, the federal government
21 had set the DOJ AWPs; correct?
22     A.   Yes.

Page 235

1     Q.   The federal government could set a
2  maximum payment limit for drugs; correct?
3     A.   I think they could.
4     Q.   You would agree that if the federal
5  government thought in early 2000 that Roxane's
6  AWPs were false for particular drugs, it should
7  have told Oklahoma Medicaid?
8         MR. MAO:  Objection, form.
9         THE WITNESS:  That seems reasonable.  I
10 don't -- I mean, I don't know if any branch of
11 the federal government could set it or if it just
12 had to be CMS or -- not clear on that.
13     Q.   (BY MS. LIEBERMAN) You would agree that
14 some branch in the -- in the federal government
15 should have told Oklahoma Medicaid if it thought
16 in early 2000 that Roxane's AWPs were false for
17 particular drugs; correct?
18         MR. MAO:  Objection to form.
19         THE WITNESS:  Correct.
20     Q.   (BY MS. LIEBERMAN) Now, when Oklahoma
21 sought approval to change its drug payment
22 methodologies in 2003, did anyone at CMS or

Page 236

1  another agency of the federal government explain
2  that the federal government believed that certain
3  drugs sold by Roxane, Abbott or Dey were falsely
4  inflated in terms of their AWPs?
5         MR. MAO:  Objection, form.
6         THE WITNESS:  Not to my knowledge.
7     Q.   (BY MS. LIEBERMAN) When did Oklahoma
8  Medicaid first become aware of the federal
9  government's lawsuits with Abbott, Dey and
10 Roxane?
11     A.   I'm kind of unclear on when -- I mean,
12 we definitely heard about things, but I don't
13 know -- I mean, I still don't really know the
14 specifics so --
15     Q.   Are you aware that -- whether Oklahoma
16 Medicaid had knowledge of the federal
17 government's lawsuits, particularly against
18 Abbott, Dey or Roxane prior to the time that
19 Oklahoma Medicaid received the subpoena for
20 documents in the summer of 2008?
21     A.   I don't know whether we knew or not.
22     Q.   Has Oklahoma Medicaid ever received a

Page 237

1  document preservation notice or litigation hold
2  from the federal government?
3     A.   Not that I know of.
4     Q.   What steps has Oklahoma taken since it
5  first learned of the federal government's
6  lawsuits against Abbott, Dey and Roxane to make
7  sure the potential responsive documents were not
8  destroyed?
9     A.   What steps have we taken?
10     Q.   Yes.
11     A.   I don't -- I don't know that we've
12 taken any specific steps.
13     Q.   If Oklahoma Medicaid Fraud Control Unit
14 received a communication from the federal
15 government informing it that there was a lawsuit
16 and that claims in the lawsuit related to
17 Medicaid, is that the type of information
18 Oklahoma Medicaid would expect to receive?
19     A.   If it -- you say it went to Oklahoma
20 Medicaid Fraud Control?
21     Q.   I'm not saying anything went.  I'm
22 saying --

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6c588002-4fee-44ed-96a2-898548fcdd31

OK Health Care Authority (Nancy Nesser)                                    December 12, 2008

## Oklahoma City, OK

| Page 242 | Page 244 |
|---|---|

**Page 242**

1  reported or calculated WAC; is that correct?
2      A.  That's correct.
3      Q.  You have no knowledge concerning how
4  Abbott, Dey or Roxane markets or sells their
5  drugs, do you?
6      A.  No.
7      Q.  Oklahoma Medicaid has no knowledge
8  concerning how Abbott, Dey or Roxane marketed or
9  sold their drugs?
10      A.  Correct.
11      Q.  You have no evidence that Abbott, Dey
12  or Roxane has defrauded Oklahoma Medicaid?
13      A.  No, I don't.
14          MS. LIEBERMAN:  Let me take a moment,
15  if you guys don't mind, for me to go off the
16  record to look over my notes.  Is that okay?
17          MR. MAO:  Sure.
18          MR. PACK:  We're now off the videotape
19  record.  Time is 2:41 p.m.
20          (A recess was taken from 2:41 PM
21  to 2:50 PM.)
22          MR. PACK:  We're back on the videotaped

**Page 243**

1  record.  Time is 2:50 p.m.
2      Q.  (BY MS. LIEBERMAN) You recall the
3  discussion we had a little bit earlier about
4  Oklahoma Medicaid's use of the DOJ AWPs; correct?
5      A.  Yes.
6      Q.  Does Oklahoma Medicaid currently use
7  those DOJ AWPs?
8      A.  I don't believe we do.
9      Q.  Do you know when Oklahoma Medicaid
10  stopped using the DOJ AWPs?
11      A.  I think it -- I was looking at this
12  Medicaid prescription drug pricing survey, and on
13  -- which is Exhibit Number 22.  On the second
14  page, it talks about looking -- changing them
15  back with invoice or changing them.
16          And basically all -- that's how all of
17  them were changed.  To something besides the DOJ
18  price, was with an invoice from a provider.  So
19  that now they would -- they would be -- most
20  likely if those NDCs are still effective, they
21  would just be updated like regular from our First
22  Databank tape.

**Page 244**

1      Q.  Okay.  We also mentioned earlier the
2  subpoenas that Oklahoma Medicaid received for
3  documents by the Abbott, Dey or Roxane defendants
4  in the summer of 2008; correct?
5      A.  I don't remember getting them that long
6  ago.  But maybe we did.
7      Q.  Were you ever asked to collect
8  documents in response to the subpoenas for
9  documents by these defendants?
10      A.  Yeah.  About a month or five weeks ago.
11      Q.  And what were you asked to collect?
12      A.  Well, there was a big list.  And I went
13  through and just said, "These are the things I
14  know how to find."  And that's what -- that's
15  what we were able to produce, was the things that
16  I knew where they were.
17      Q.  Did you talk to anyone else or use any
18  other means of obtaining documents whose specific
19  locations you were not aware of?
20      A.  I talked to a couple of people in our
21  policy department because I needed to get those
22  rate briefs.  I just had the draft copies.  I

**Page 245**

1  didn't have the final versions.
2          And otherwise our state plan is
3  available on our web site so I could find that.
4  And the provider letters are available on the web
5  site so I could find that.  And then I had -- I
6  have a data analyst, and she got the State MAC
7  pricing histories that were available.
8      Q.  Are you aware that Oklahoma Medicaid
9  only produced about 10 documents in this case?
10      A.  Yes.
11      Q.  You would assume that there are
12  significantly more than 10 documents that relate
13  to the subjects requested in the subpoena about
14  prescription drug pricing?
15      A.  I would suspect there are more
16  somewhere.
17      Q.  Did you search for any of the surveys
18  about acquisition costs and dispensing costs that
19  Oklahoma Medicaid commissioned in response to the
20  subpoena?
21      A.  The only one that I knew of was the
22  2003 one.  I -- I didn't know that the others

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

6c588002-4fee-44ed-96a2-898548fcdd31

# John Young
# (Rhode Island) (30(b)(6))

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

In Re: PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE LITIGATION )

---------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:          ) Master File No.

United States of America ex rel.   ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,    )

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,     ) Hon. Patti B.

and United States of America ex    ) Saris

rel. Ven-A-Care of the Florida     )

Keys, Inc., et al. v. Boehringer   )

Ingelheim Corp., et al., Civil     )

Action No. 07-10248-PBS            )

---------------------------------X

VIDEOTAPED DEPOSITION OF

THE RHODE ISLAND DEPARTMENT OF HUMAN SERVICES

by JOHN YOUNG

Providence, Rhode Island

Wednesday, December 3, 2008

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                     December 3, 2008

Providence, RI

Page 154

1  Deposition so I'm not sure that I've seen this.
2  Anything that I would have received, I would have
3  received from counsel.
4  BY MS. RANKIN:
5    Q.  Do you know whether you have reviewed a
6  copy of the underlying complaint in this action?
7    A.  I am not sure.
8      MS. BAUM:  I can represent I've never
9  provided a copy nor do I have, have I seen one
10  other than today.  You just handed it.
11      MS. RANKIN:  He is a 30(b)(6) witness,
12  right?
13      MS. BAUM:  Yes, he is.
14  BY MS. RANKIN:
15    Q.  When is the first time you became aware
16  of litigation regarding allegations that
17  manufacturers were artificially inflating prices
18  that were submitted to pricing compendia for
19  Medicaid reimbursement?
20    A.  When I was contacted by counsel in
21  relation to this deposition I believe.
22    Q.  August of this year?

Page 155

1    A.  I believe so, yes.
2    Q.  Prior to August of this year, had
3  anyone ever asked you to retain documents that
4  could relate to WAC or AWP pricing?
5    A.  I don't recall any, no.
6    Q.  You don't recall anyone ever asking you
7  that?
8    A.  I don't recall it.
9    Q.  When did you leave the state Medicaid
10  office?
11    A.  May 2008.
12    Q.  May 2008?  Do you know whether anyone
13  made an effort to locate the documents that were
14  in your possession in May 2008 that could relate
15  to this litigation?
16      MS. BAUM:  Objection.
17      THE WITNESS:  I have no knowledge.
18  BY MS. RANKIN:
19    Q.  Is it possible that documents that
20  relate to Rhode Island Medicaid's decisions
21  relating to Medicaid reimbursement during your
22  tenure could have been destroyed?

Page 156

1      MS. BAUM:  Objection.
2      THE WITNESS:  Certainly not to my
3  knowledge, no.
4  BY MS. RANKIN:
5    Q.  It is not possible?
6    A.  I didn't say that.  I said not to my
7  knowledge.
8    Q.  You don't know whether any documents
9  have been destroyed?
10    A.  I do not.
11    Q.  Did you take -- make any effort at all
12  to retain any documents that could relate to this
13  litigation when you left in May 2008?
14      MS. BAUM:  Objection, foundation.
15  BY MS. RANKIN:
16    Q.  You can answer.
17    A.  I personally did not, no.
18    Q.  What would have happened to your files
19  and electronic files and hard copy files?
20    A.  My personal files are sitting in my old
21  office to the best of my belief and knowledge.
22  It would be my practice to copy down any

Page 157

1  electronic files and to put them into the paper
2  files.  My drives were all erased.
3    Q.  When were your drives erased?
4    A.  In May 2008.
5    Q.  So all of your drives were erased in
6  May 2008.  Would that be all of the drives
7  containing all of the documents that would have
8  been in your possession as Medicaid Director?
9    A.  Any electronic versions of the paper
10  file would have been, yes.
11    Q.  You indicated that hard copies of your
12  documents would be -- you think they would still
13  be in your old office?
14    A.  Correct.
15    Q.  Can you just explain, is your old
16  office not being occupied right now or --
17    A.  It isn't being occupied right now as a
18  matter of fact.
19    Q.  So there's your old office.  It is your
20  understanding that your old office is empty, but
21  that --
22      MS. SMITH:  It is a shrine.

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

e56b5548-1f6a-4f27-a21d-46b66f77af45

# Larry Iversen
# (South Dakota) (30(b)(6))

SD Department of Social Services (Larry Iversen)                    December 15, 2008

# Pierre, SD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Abbott Laboratories, Inc.)

Civil Action No. 06-11337-PBS;   ) TRANSCRIPT OF

United States of America ex rel. ) PROCEEDINGS

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil ) DEPOSITION OF

Action No. 05-11084-PBS; and     ) THE SOUTH DAKOTA

United States of America ex rel. ) DEPARTMENT OF

Ven-A-Care of the Florida Keys,  ) SOCIAL SERVICES

Inc. v. Boehringer Ingelheim     ) by LARRY IVERSEN

Corp., et al., Civil Action No.  )

07-10248-PBS                     ) DECEMBER 15, 2008

--------------------------------X

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

| Page 122 | Page 124 |
|---|---|
| 1    Q.  Can you describe for me the documents | 1    Q.  Any other way? |

<table>
<tr><td colspan="2" align="right">Page 122</td></tr>
</table>

Page 122

1    Q.  Can you describe for me the documents
2  that she did show you?
3    A.  Boy, I just don't recall exactly what
4  they were.  There may have been some state plan
5  documents.
6    Q.  What else?
7    A.  That's all I recall.
8    Q.  Did she show you any legal documents
9  such as deposition transcripts?
10    A.  No.
11    Q.  Did she show you any other type of
12  legal documents?
13    A.  No.
14    Q.  Did the United States Attorney provide
15  an overview on the legal theories of the case?
16    A.  No.
17    Q.  Did the United States Attorney provide
18  any indication of the United States's claims in
19  this action?
20    A.  No.
21    Q.  Besides this meeting that you referred
22  to last Thursday, have you had any other

Page 123

1  discussions with attorneys from the United States
2  Department of Justice or CMS regarding drug
3  pricing litigation?
4    A.  No.
5    Q.  Is there anything else which you recall
6  the United States Attorney telling you that I
7  have not asked about?
8    A.  No.
9    Q.  Approximately how long did you meet?
10    A.  Oh, somewhere between an hour and hour
11  and a half.
12    Q.  Have you ever reviewed any complaints
13  related to the matter for which we are here
14  today?
15    A.  No.
16    Q.  Do you have an understanding about the
17  nature of the lawsuit?
18    A.  A very basic understanding.
19    Q.  And how did you come to that
20  understanding?
21    A.  Simply by reading the subpoena that we
22  had received.

Page 124

1    Q.  Any other way?
2    A.  No.
3    Q.  When did you first become aware of the
4  United States lawsuit against Abbott, Dey, and
5  Roxane?
6    A.  When we received the subpoena.
7    Q.  Did South Dakota ever receive
8  notification from CMS or the Department of
9  Justice indicating that it should retain
10  documents relating to AWP or drug pricing?
11    A.  To the best of my knowledge, no.
12    Q.  Have you ever personally been advised
13  to retain documents relating to South Dakota's
14  Medicaid reimbursement system or its knowledge
15  about published AWPs?
16    A.  No.
17    Q.  When South Dakota established its
18  definition of estimated acquisition cost as AWP
19  minus 10.5 percent, how was the figure of 10.5
20  percent determined?
21    A.  I don't know that, that was before my
22  time with the department.

Page 125

1    Q.  In preparation for your deposition
2  today, were you educated as to how this figure
3  was set?
4    A.  No.
5    Q.  Do you have any insight as to how that
6  figure was determined?
7    A.  I don't.
8    Q.  Do you know when the 10.5 percent
9  discount was first applied in the South Dakota
10  Medicaid reimbursement formula?
11    A.  I don't know specifically, but it's
12  been 10 and a half percent for as long as I can
13  recall.
14    Q.  And you began work with the department
15  around 1995; is that correct?
16    A.  Approximately 13 years.
17    Q.  I'm sorry, I didn't hear your answer,
18  sir.
19    A.  Yes, approximately 13 years.
20    Q.  And similarly, I believe you previously
21  testified that the dispensing fee has remained at
22  the $4.25 level since you began with the

Henderson Legal Services, Inc.

202-220-4158                                www.hendersonlegalservices.com

354e3b13-d775-406f-912c-c8856c7f542c

Pierre, SD

Page 134

1    had and entered of record:)
2         VIDEOGRAPHER:  This is the beginning of
3    recording number four of the video deposition of
4    Larry Iversen.  The date is December 15th, 2008,
5    the time is approximately 11:31 a.m., and the
6    videographer is Torre Kavanaugh.
7         Q.  (BY MS. RAMSEY)  Mr. Iversen, at what
8    point did South Dakota first consider
9    implementing a state MAC program?
10        A.  I would have to say it was probably
11   sometime in 2001.  Again, I wasn't director at
12   the time, but given when the state MAC was
13   implemented, I'd have to say that it was sometime
14   in 2001.
15        Q.  On what do you base your belief that
16   2001 was the first point in time that South
17   Dakota first considered implementing a MAC
18   program?
19        A.  Based upon when the MAC was actually
20   implemented in 2002.
21        Q.  Do you have any reason to disbelieve
22   that South Dakota considered implementing a MAC

Page 135

1    program prior to that time?
2         A.  No, but I also don't have any reason to
3    believe that we did.
4         Q.  So is it fair to say that you don't
5    know one way or the other whether South Dakota
6    considered implementing a MAC program prior to
7    2001?
8         A.  That would be fair.
9         Q.  Mr. Iversen, I'd like to look quickly
10   back at the document regarding the South Dakota
11   survey, I'm not sure which exhibit that is.
12   Lisa, if you could remind me of the exhibit
13   number for the AWP Illinois document.
14        MS. KHANDHAR:  Dey 912.
15        Q.  (BY MS. RAMSEY)  Mr. Iversen, if you
16   could pull out Dey 912 again, please.
17        A.  Okay.
18        Q.  What prompted South Dakota to implement
19   this survey looking into the difference between
20   the published AWPs and the rate at which
21   providers could acquire drugs?
22        A.  I don't know that.

Page 136

1         Q.  Who would know?
2         A.  Bob Coolidge.
3         Q.  What is Mr. Coolidge's position today?
4         A.  All I know is he doesn't work for the
5    Department of Social Services.
6         Q.  Do you have any idea when he left
7    Department of Social Services?
8         A.  It's probably been close to 11 to 12
9    years ago.
10        Q.  Where are the files relating to this
11   survey stored in the South Dakota Medicaid
12   office?
13        A.  I don't know that there are any files
14   related to this survey even in existence.
15        Q.  If you had to speculate as to where
16   these files would be located, where would that
17   be?
18        A.  If I was to speculate, they would
19   probably be located in the current pharmacist's
20   office.
21        MS. RAMSEY:  Counsel, I would like to
22   request that the files in the current

Page 137

1    pharmacist's office be searched to insure that
2    any documents relating to this survey be produced
3    in response to defendant's subpoena.
4         MR. TODD:  I will visit with the
5    pharmacist and we'll see if we can locate them or
6    confirm we don't have them.
7         MS. RAMSEY:  Thank you.
8         Q.  (BY MS. RAMSEY)  Mr. Iversen, how did
9    South Dakota utilize the data that it received in
10   response to this survey?
11        A.  I don't believe that there was anything
12   done.
13        Q.  Why do you believe that?
14        A.  Because to the best of my recollection,
15   there weren't any significant changes to the
16   pharmacy program until we implemented the state
17   MAC in 2002.
18        Q.  That's not to say that the data was not
19   considered by individuals making policy decisions
20   within the South Dakota Medicaid department,
21   though, correct?
22        A.  They may have used that, I don't know.

35  (Pages 134 to 137)

354e3b13-d775-406f-912c-c8856c7f542c

# Bryan Tomlinson| (Virginia) (30(b)(6))

VA Dept of Medical Assistance Services (Howard Tomlinson)-Vol II                    November 4, 2008

# Richmond, VA

Page 307

                    UNITED STATES DISTRICT COURT

                     DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x

In Re: PHARMACEUTICAL INDUSTRY   : MDL No. 1456

AVERAGE WHOLESALE PRICE          : Civil Action No.

LITIGATION                       : 01-12257-PBS

- - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:        : VIDEOTAPED

United States of America, ex rel.: DEPOSITION OF

Ven-A-Care of the Florida Keys,  : THE VIRGINIA

Inc. v. Abbott Laboratories, Inc.: DEPARTMENT OF

Civil Action No. 06-11337-PBS;   : MEDICAL

and United States of America ex  : ASSISTANCE

rel. Ven-A-Care of the Florida   : SERVICES by

Keys, Inc., v. Dey, Inc., et al.,: HOWARD BRYAN

Civil Action No. 05-11084-PBS;   : TOMLINSON, II

and United States of America ex  :

rel. Ven-A-Care of the Florida   : VOLUME II

Keys, Inc., v. Boehringer        : NOVEMBER 4, 2008

Ingelheim Corp., et al., Civil   : RICHMOND,

Action No. 07-10248-PBS          : VIRGINIA

- - - - - - - - - - - - - - - -x

6d272837-35cb-42a4-a76b-41a6939d706d

VA Dept of Medical Assistance Services (Howard Tomlinson)-Vol II                    November 4, 2008

## Richmond, VA

Page 540

1    Q.  And have you reviewed those; any or all
2  of the e-mails that have come up in the searches?
3    A.  No.  My -- my involvement -- the answer
4  is, no, I have not.  The -- was involved in the
5  coordination between the Attorney General's
6  Office and a -- Division of Information
7  Technology.  Information Management.  To identify
8  what e-mail -- what electronic mail might have
9  been -- or documents might be retained within the
10  system.  And to identify the resources to extract
11  that information from the system in responding to
12  the subpoena and the key terms, the subject drug
13  information key terms and discovery items we
14  used.  So I was involved in sort of designing and
15  -- or at least identifying the resources and
16  getting a commitment by the agency to -- to
17  respond to the subpoenas.
18        The -- that was a fairly extensive
19  electronic search.  It involved the production of
20  multiple CDs, which were made available to the
21  Attorney General's Office, and I understanding
22  they were to review those.

Page 541

1    Q.  Do you have an understanding of whether
2  these e-mails are the most current e-mails or are
3  older e-mails?
4    A.  There are thousands and tens of
5  thousands of documents.  I don't know that I can
6  recall the final count, but there -- it's
7  voluminous; in the tens of thousands, if not even
8  more.  And they -- they -- they include the
9  electronic mail, plus any other files that are
10  retained in the -- in the -- in our system.  And
11  they go back -- depends on the nature of the
12  document, but they go back to the time when the -
13  - there was a enterprise vault -- or there is --
14  there is a proprietary software that retains
15  documents as they are generated and -- and that -
16  - all that electronic messaging goes into that.
17  And that stretches back, I believe, based on
18  information we provided the Attorney General's
19  Office back a number of years.
20    Q.  Roughly, 2003?
21    A.  2003 was the year that we made a --
22  there was -- there was a major change in our

Page 542

1  information system.  And most information in the
2  agency does not go back beyond that, because the
3  system change was so major that it's very
4  difficult to capture information prior to 2003,
5  because it was an entirely different programming.
6    Q.  If you go to the Abbott cross-notice,
7  which we marked as Abbott Exhibit 1154.  Should
8  be close to you.  Item 26?
9    A.  1154?
10    Q.  Forget it.  I'll -- I'll deal without a
11  document.  Mr. Tomlinson, has DMAS ever received
12  or implemented a document hold for documents that
13  might be relevant to drug pricing litigation?
14    A.  Have we ever pulled data related to
15  drug pricing information?
16    Q.  Have you ever received or issued a
17  directive to retain documents that might be
18  relevant to drug pricing litigation?
19    A.  Yes.
20    Q.  When?
21    A.  When we received the subpoenas, we
22  tried to identify how both the -- the nature of

Page 543

1  the information that was being stored within the
2  agency.  In other words, that information that
3  was electronically stored versus that information
4  that was -- that -- that contained paper
5  documents.  For the most part, the agency
6  operates electronically now.  Has for a number of
7  years, so we placed a hold on the -- there is a
8  cycle by which the electronic messaging,
9  electronic mail, the file sharing and so forth is
10  -- is retained.  We put a hold on the -- on the
11  removal of any information from the electronic
12  system.
13        And then we also placed a hold on the
14  destruction of documents that -- through the
15  state library, which is the official archive for
16  paper documents.  So that no additional -- so
17  documents would not -- the documents are
18  destroyed on a cycle or a scheduled basis, based
19  on their aging of the documents -- the age of the
20  documents.  So we put a hold on the destruction
21  of those documents, as well as a hold on the
22  removal of any electronic information from the

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

6d272837-35cb-42a4-a76b-41a6939d706d

# Ayuni Hautea-Wimpee (Washington) (30(b)(6))

Page 356

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY      )   MDL No. 1456

AVERAGE WHOLESALE PRICE             )   Civil Action

LITIGATION                          )   No. 01-12257-PBS

--------------------------------)

THIS DOCUMENT RELATES TO:           )      VIDEOTAPED

United States of America ex rel.  )    DEPOSITION OF

Ven-a-Care of the Florida Keys,   )    THE STATE OF

Inc. v. Abbott Laboratories, Inc.,)    WASHINGTON

Civil Action No. 06-11337-PBS;    )    DEPARTMENT

United States of America ex rel.  )    OF SOCIAL AND

Ven-a-Care of the Florida Keys,   )    HEALTH SERVICES

Inc. v. Dey, Inc., et al., Civil  )   BY AYUNI HAUTEA-

Action No. 05-11084-PBS; and      )      WIMPEE

United States of America ex rel.  )      VOL.  II

Ven-a-Care of the Florida Keys,   )

Inc. v. Boehringer Ingelheim      )   DECEMBER 2, 2008

Corp., et al., Civil Action No.   )      9:00 A.M.

07-10248-PBS                       )

WA Dept of Social and Health Services (Hautea-Wimpee, Ayuni)                    December 2, 2008

Page 429

1    I certainly had responded to several requests.
2         Q.   Requests relating to acquisition costs?
3         A.   Information in general, not just
4    acquisition costs, but that's certainly one of
5    them.
6         Q.   And what type of information would you
7    provide regarding acquisition costs to other
8    states?
9         A.   Depending on the question.  It's
10   basically what is your EAC, what is your MAC,
11   what else are you doing with regards to specific
12   drugs, if anything.
13        Q.   Did you have any communications with
14   other Medicaid agencies about the discounts you
15   saw present in AWP for -- through your survey
16   work?
17        A.   I'm sure we've provided that
18   information to many states.
19        Q.   With respect to this request from Mr.
20   Coolidge, is it fair to say you don't know
21   whether Washington Medicaid ever responded to
22   this?

Page 430

1         A.   I do not know.
2         Q.   Last week you talked about Texas' use
3    of Wholesale Acquisition Costs.  How did you come
4    to learn that Washington -- excuse me, Texas
5    Medicaid used Wholesale Acquisition Costs?
6         A.   I remember I had a conversation with
7    Tom Zuchlewski at one time and he -- and he had
8    mentioned that Texas had that system.  So, you
9    know, it was -- it was a little discussion and he
10   explained what -- what Texas was doing.  I don't
11   recall the rest of the conversation, only except
12   for the fact that I basically ended up saying
13   well, you know, it wasn't really applicable to us
14   because if we can't confirm the prices, and it
15   had something to do with how they got those
16   pricing information, if we couldn't do that, then
17   there was no sense in our going to that system
18   because we would never be able to update them
19   and, you know, it -- it would not be relevant to
20   our situation.
21        Q.   When did Washington Medicaid first
22   become aware of the federal government's lawsuits

Page 431

1    with Abbott, Dey and Roxane?
2         A.   Oh, a year ago, two years ago?  I --
3    peripherally.  I'm sorry, but I wasn't paying a
4    lot of attention to that.  I do know -- I knew
5    when I was notified that we received a Subpoena
6    and that I could possibly be deposed for that,
7    that was it, but realistically I haven't paid a
8    lot of attention to it.
9         Q.   Have you -- let me start again.  Was
10   the first time that you became aware of this
11   lawsuit when Abbott and Dey served a Subpoena on
12   Washington's Medicaid agency in January of 2008
13   or sometime thereabouts?
14        A.   Yes.
15        Q.   Have you ever been asked to preserve
16   documents?
17        A.   It is a matter of course that we were
18   told to preserve whatever.  But what do I
19   preserve if I didn't have anything?  You know, I
20   mentioned that I gave away my files when I left
21   the program in 2003, so I really didn't have
22   anything to preserve that I would know would be

Page 432

1    relevant to what you were asking or were going to
2    ask.
3         Q.   Did Washington Medicaid ever receive
4    any communications from the federal government
5    regarding this lawsuit since or before 2008?
6         A.   I'm not aware of it.  I -- I don't
7    know.
8         Q.   And would you expect that if
9    Washington's Medicaid Control and Fraud Unit
10   received a communication from the federal
11   government informing it that there was this
12   federal lawsuit and that the claims related to
13   Medicaid, that is the type of information that
14   Washington Medicaid would receive?
15        A.   Yes.
16        Q.   And you haven't received any of those
17   communications from Washington's Medicaid Control
18   and Fraud Unit, correct?
19             MS. FORD:  Objection to form.
20             THE WITNESS:  Not that I'm aware of.
21   BY MR. REALE:
22        Q.   Who would be the point of contact in

20  (Pages 429 to 432)

40ab6362-f888-49e7-a65d-8cd62d3b4ae1

# Myra Davis
# (Washington) (30(b)(6))

Olympia, WA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE           ) Civil Action No.

LITIGATION                        ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,   )

Inc. v. Abbott Laboratories, Inc.,) Chief Magistrate

Civil Action No. 06-11337-PBS;    ) Judge Marianne

United States of America ex rel. ) B. Bowler

Ven-A-Care of the Florida Keys,   )

Inc. v. Dey, Inc., et al., Civil ) DEPOSITION OF

Action No. 05-11084-PBS; and      ) WA DEPT. OF

United States of America ex rel. ) SOCIAL AND HEALTH

Ven-A-Care of the Florida Keys,   ) SERVICES by

Inc. v. Boehringer Ingelheim      ) MYRA DAVIS

Corp., et al., Civil Action No.   )

07-10248-PBS                      ) DECEMBER 3, 2008

--------------------------------X

Olympia, WA

Page 98

1    A.  I can't think of any others right now.
2    Q.  Has anyone from the federal government
3  told Washington Medicaid to preserve documents
4  that may be related to the allegations in these
5  lawsuits?
6       MS. FORD:  Objection to form.
7       THE WITNESS:  Has anyone from the
8  federal government told us to preserve documents?
9  Um, well, I couldn't speak to as anyone.  Did I
10  speak to anyone from the federal government?  No.
11  BY MR. REALE:
12    Q.  And would you expect that if somebody
13  from the federal government wanted documents
14  related to Washington's Medicaid program to be
15  preserved, that you would receive that kind of
16  information?
17    A.  I would receive it through our A.G.s.
18  I would receive the instruction through our in-
19  house legal department rather than directly from
20  the feds.
21    Q.  And have you received that information?
22    A.  Yes.

Page 99

1    Q.  When did you receive that information?
2    A.  I can't remember the date exactly, but
3  it's been over a year, I believe.
4    Q.  Was it when Washington Medicaid first
5  received the Subpoenas from Abbott in this past
6  winter?
7    A.  Probably.
8    Q.  So it -- the discussion surrounding
9  Washington's preservation of potentially relevant
10  materials occurred --
11    A.  Again --
12    Q.  -- as a result of Abbott's Subpoena; is
13  that correct?
14       MS. FORD:  Objection to form.
15       THE WITNESS:  I can't speak to that.  I
16  know that the instruction is if there is -- we
17  would certainly preserve records.  We have record
18  retention requirements anyway, so there's not --
19  there wouldn't be an issue where we would be
20  destroying relevant records, but I, um, I cannot
21  remember the exact dates in which I received
22  something from Bill or from Angela or from

Page 100

1  someone else in HRSA that said please assemble
2  and preserve those records.  We wouldn't be
3  destroying them regardless.
4  BY MR. REALE:
5    Q.  Well, how -- if -- if there was an
6  instruction to preserve documents, that would
7  have come from either Mr. Stephens or your
8  attorney present today?
9    A.  Yes.  Yes.
10    Q.  Now, you said that you wouldn't have
11  destroyed documents regardless?
12    A.  Yes.
13    Q.  Can you explain what you mean by that?
14    A.  That in terms of an instruction around
15  this lawsuit it would -- the only pertinent part
16  to us would be to assemble what we had.  The
17  instruction to -- to preserve would be not
18  meaningful because I wouldn't be just getting rid
19  of anything anyway.  So it's just the -- there is
20  the -- we have a data warehouse, we have a data
21  archive, we have some documents in file, old
22  publications in file, so all of our retention

Page 101

1  schedule would be in place regardless.
2    Q.  What is the retention schedule in
3  Washington?
4    A.  What is it, like --
5       MS. FORD:  Objection to form.
6       THE WITNESS:  Um...
7  BY MR. REALE:
8    Q.  Do you know what the retention schedule
9  is?
10    A.  I know it's like seven years and then
11  it goes into archives.  And if it's at issue, if
12  there's been an issue around it, it's even
13  longer, I don't know exactly, but we have -- I
14  believe it's ten years for some of them, but I --
15  I apologize, I'm not a records retention expert.
16    Q.  No, that's fine.  What is the mission
17  of Washington's Medicaid program since 2003?
18    A.  The mission for the entire Medicaid
19  program?
20    Q.  Yes, the mission policy.
21    A.  It is to provide high quality medical
22  services to Washington's most vulnerable citizens

26 (Pages 98 to 101)

67335dab-4d50-494e-824d-13a3d04fad2c

# Roxanne Homar (Wyoming) (30(b)(6))

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY ) MDL No. 1456

AVERAGE WHOLESALE PRICE         ) Master File No.

LITIGATION                      ) 01-CV-12257-PBS

-------------------------------X

United States of America ex rel.) Hon. Patti B. Saris

Ven-A-Care of the Florida Keys, )

Inc., et al. v. Dey, Inc., et   ) 30(b)(6) VIDEO

al., Civil Action No.           ) DEPOSITION OF

05-11084-PBS, and United States ) NONPARTY STATE OF

of America ex rel. Ven-A-Care of) WYOMING DEPARTMENT

the Florida Keys, Inc., et al.  ) OF HEALTH by and

v. Boehringer Ingelheim Corp.,  ) through ROXANNE

et  al., Civil Action No.       ) HOMAR

07-10248-PBS, and U.S. ex rel.  )

Ven-A-Care of the Florida Keys, )

Inc., v. Abbott Laboratories,   ) DECEMBER 2, 2008

Inc., Nos. 06-CV-11337-PBS and  ) CHEYENNE, WYOMING

07-CV-11618-PBS                 )

-------------------------------X

17f2424e-f10c-4fbd-b051-3856666b1910

WY Department of Health (Roxanne Homar)                          December 2, 2008

Cheyenne, WY

Page 270

1    Q.   Are you aware of any other definition
2  that Wyoming Medicaid has defined in a rule or
3  regulation for AWP?
4    A.   We may have.  I'm not specifically
5  aware of a different one, but I -- I don't know
6  that there's not.
7    Q.   This definition of AWP defines it as
8  the amount calculated by First Data Bank,
9  correct?
10   A.   By First Data Bank, its agent,
11 designee, or successor, yes.
12   Q.   Wyoming could have defined AWP as
13 actual acquisition cost if it had wanted to,
14 correct?
15      MS. THOMAS:  Objection to form.
16   A.   Yes, we could have defined this in a --
17 probably in a different way, and may have later
18 on.  I don't recall specifically.
19   Q.   (BY MS. LIEBERMAN)  In particular,
20 Wyoming Medicaid could have defined AWP as actual
21 acquisition cost if it had wanted to, correct?
22      MS. THOMAS:  Objection to form.

Page 271

1    A.   I don't know of a relation between AWP
2  and actual acquisition cost.  I don't think we
3  could define AWP as actual acquisition cost, if
4  that's what you said.
5    Q.   (BY MS. LIEBERMAN)  Why is that?
6    A.   I'm not aware of AWP representing
7  actual acquisition cost.
8    Q.   Okay.  Your understanding is that there
9  is a difference between AWP and actual
10 acquisition cost?
11   A.   Yes.
12      MS. THOMAS:  Objection to form.
13   A.   I think we've discussed that.
14      (Exhibit Roxane-WY 019 was
15 marked.)
16   Q.   (BY MS. LIEBERMAN)  I'm handing you
17 what has been marked Roxane-Wyoming Exhibit 19,
18 Bates labeled WY00001091 through 1109, titled
19 "Records Retention Requirements for State
20 Records."
21      If you'll look to the second page,
22 you'll see that this document is dated 2005.

Page 272

1  Correct?
2    A.   August 29th, 2005.
3    Q.   Are you familiar with this document?
4    A.   Not specifically.
5    Q.   Are you aware of Wyoming's document
6  retention policy?
7    A.   Generally we go with Medicaid Federal
8  requirements for maintaining documents, which is
9  generally seven -- or six years, I'm sorry, as I
10 understand it.  And that's generally what we go
11 with.
12   Q.   Roxane-Wyoming Exhibit 19 reflects
13 Wyoming's record retention requirements for state
14 records, correct?
15   A.   That's what it's titled, "Records
16 Retention Requirements for State Records."  And -
17 - yeah, it's a Wyoming document.
18   Q.   So Roxane-Wyoming Exhibit 19 reflects
19 Wyoming's document retention policy?
20      MS. THOMAS:  Objection.
21   A.   For the State of Wyoming, yes.
22   Q.   (BY MS. LIEBERMAN)  If you turn to Page

Page 273

1  8, Bates labeled WY00001098, it states that
2  legislative files, including bill drafts and
3  correspondence, may be destroyed at the
4  discretion of the agency director after three
5  years, correct?
6    A.   I'm sorry.  Did you say under
7  legislative files?
8    Q.   Yes.
9    A.   Retain three years, then evaluate for
10 legal, administrative.  Destroy remaining records
11 at discretion of agency director.  Yes.
12   Q.   Page 9, Bates labeled WY00001099,
13 states that rules and regulations must be
14 retained until superseded or obsolete, correct?
15   A.   That's what it says, yes.
16   Q.   Once a rule or regulation has been
17 superseded, under the document retention policy
18 Wyoming may destroy such documents, correct?
19   A.   It appears to state that, yes.
20   Q.   Did Wyoming Medicaid ever receive a
21 document preservation notice or litigation hold
22 from the Federal Government?

69  (Pages 270 to 273)

WY Department of Health (Roxanne Homar)                    December 2, 2008
Cheyenne, WY

Page 274

1     MS. THOMAS: Objection to form.
2     A.  Not that I specifically recall.
3     Q.  (BY MS. LIEBERMAN) You're not aware
4  that -- you're not aware of Wyoming Medicaid ever
5  having received a document preservation notice or
6  litigation hold from the Federal Government?
7     MS. THOMAS: Objection to form.
8     A.  Again, not that I specifically recall.
9  I know through our -- specifically through
10 program integrity we've had a lot of discussion
11 about maintaining records for a six-year Federal
12 requirement.
13    Q.  (BY MS. LIEBERMAN) When did those
14 discussions occur regarding maintaining documents
15 for six years?
16    A.  Well, Colleen Jones, our program
17 integrity pharmacist, as I stated earlier, was
18 hired at the -- towards the end of 2001.  And so
19 it would have been any time from then coming
20 forward to now.  I don't have specific
21 recollection of -- of any specific times for
22 conversations.

Page 275

1     Q.  So some time after 2001 there were
2  discussions in Wyoming Medicaid about retaining
3  documents for six years?
4     A.  Within our pharmacy office.
5     Q.  Was there a decision made to retain all
6  files for six years in Wyoming Medicaid some time
7  after 2001?
8     MS. THOMAS: Objection to form.
9     A.  No, not necessarily.  That -- that's
10 pretty broad.  My understanding, in terms of
11 claims and being able to go back and look at
12 claims, for example -- that's what program
13 integrity would be concerned with.
14    Q.  (BY MS. LIEBERMAN) So for documents
15 other than claims, the documents would be
16 governed by Wyoming's document retention policy,
17 I'm assuming.
18    A.  Probably.
19    Q.  Under Wyoming's document retention
20 policy then, documents such as legislative files
21 from more than three years ago could have been
22 destroyed?

Page 276

1     MS. THOMAS: Objection to form.
2     A.  Well, if I recall this, it talks about
3  legislative bills.  Legislative files includes
4  drafts of bills and correspondence.
5     Q.  (BY MS. LIEBERMAN) Under Wyoming's
6  document retention policy, documents such as
7  legislative files could have been destroyed after
8  three years, correct?
9     MS. THOMAS: Objection to form.
10    A.  It appears that that is allowed per
11 this policy.
12    Q.  (BY MS. LIEBERMAN) Documents
13 containing rules and regulations that have been
14 superseded may have been destroyed, correct?
15    A.  You said specific to rules and
16 regulations?
17    Q.  Correct.
18    A.  I just don't remember where that --
19    Q.  Page 9.
20    A.  Thanks.  Yeah.  Again, it does say that
21 once they're superseded or obsolete that they can
22 then be destroyed for rules and regulations.

Page 277

1     Q.  So under the Wyoming document retention
2  policy, rules and regulations that have been
3  superseded could be destroyed and could have been
4  destroyed.
5     MS. THOMAS: Objection to form.
6     A.  That -- that's what it says on this
7  policy.
8     Q.  (BY MS. LIEBERMAN) And this is the
9  policy that Wyoming Medicaid followed, other than
10 perhaps for claims that had been determined to be
11 retained for six years?
12    A.  Well -- and I think -- I just want to
13 clarify.  I think you said -- when you say
14 Medicaid, you're speaking of our pharmacy office.
15 But, yeah, I would be speaking specifically for
16 our pharmacy office with that -- with that
17 statement, yes.
18    Q.  Okay.
19    A.  It doesn't necessarily mean they were
20 destroyed, but it looks like we would -- could --
21 could if we so chose to.
22    MS. LIEBERMAN: Okay.  I have no

70  (Pages 274 to 277)