# EXHIBIT OO

Atlanta, GA

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

--------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

--------------------------------X

dd23118e-9e82-4fd1-afbb-155015bf3b99

Atlanta, GA

Page 118

1  representation and common interest arrangements
2  are also protected.  Anybody's conversation about
3  hiring an attorney, for example, is -- is
4  protected.  So that's not the test.
5        The same standard applies to protected
6  common interest privilege that we've objected on
7  the basis of.
8        I want to add an objection that I don't
9  see this -- any of this specified in the 30(b)(6)
10 areas of inquiry.  He's not here to be deposed as
11 an individual either.
12       MR. ROBBEN:  I'm just going to ask him
13 a couple more questions.  Then I'm going to move
14 on.
15   Q.  (By Mr. Robben)  Do you know when the
16 last meeting was between the State of Georgia and
17 the Finley & Buckley firm?
18   A.  I do not recall the date, no.
19       MR. ROBBEN:  Let's mark this as Exhibit
20 20.
21       (Whereupon a document was
22 identified as Exhibit Georgia 020.)

Page 119

1        MR. ROBBEN:  For the record, Exhibit 20
2  is a small chart or spreadsheet that lists some
3  states, a column that says "Litigation," a column
4  that says "Recoveries," a column that says
5  "Counsel," and a column that says
6  "Comments/Notes."
7        It was produced by the State of Georgia
8  in response to Dey and Roxane's subpoena.
9        MR. SULLIVAN:  Was this the inadvertent
10 production of the --
11       MR. ROBBEN:  No.  This was the second
12 one.
13       MR. SULLIVAN:  This was -- this was not
14 part of the materials inadvertently produced that
15 --
16       MR. ROBBEN:  No.
17       MR. SULLIVAN:  -- were turned back over
18 --
19       MR. ROBBEN:  No.
20       MR. SULLIVAN:  -- based on the
21 attorney-client privileged and the common
22 interest privileged documents?

Page 120

1        MR. ROBBEN:  No.
2    Q.  (By Mr. Robben)  Do you recognize this
3  chart?
4    A.  I do.
5    Q.  Do you know who prepared it?
6    A.  I do not recall the author of it.  But
7  I recall the origin of it.
8    Q.  What was the origin of it?
9    A.  The origin was the -- pharmacy
10 administrators across the country have an
11 organization, and there was a poll that we had
12 submitted through our online inquiries.  And this
13 was the compilation of responses as to which
14 states might have been involved or entertained
15 ideas of litigation regarding this -- this topic.
16   Q.  So, now, you -- let me back up a little
17 bit.
18       Did you say this was an online --
19   A.  Well, through e-mail.  I apologize.
20   Q.  So it's an e-mail -- is this like an e-
21 mail listserv?
22   A.  E-mail listserv, that's correct.

Page 121

1    Q.  And this e-mail listserv services
2  Medicaid agencies around the United States?
3    A.  That's correct.
4    Q.  So each state participates in this to
5  some extent?
6    A.  To some extent, yes.
7    Q.  And your office participates in this?
8    A.  We do.
9    Q.  And so there was a poll circulated
10 through this e-mail listserv?
11   A.  That is correct.
12   Q.  Do you remember what the poll was
13 seeking?
14   A.  I don't recall the specific questions.
15 But in looking at the document, it was -- it
16 appears to have been, Are you involved in AWP-
17 related litigation; have you had any recoveries;
18 and did you do the -- the litigation with in-
19 house counsel, or did you use outside counsel.
20   Q.  Okay.  And then people submitted
21 responses to the poll from the Medicaid agencies
22 across the country?

31 (Pages 118 to 121)

# EXHIBIT PP

                    UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           )

LITIGATION                        ) CIVIL ACTION:

                                  ) 01-CV-12257-PBS

                                  ) Judge Patti B. Saris

                                  ) Magistrate Judge

                                  ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____


                  VIDEOTAPED DEPOSITION OF

                        CODY WIBERG

                   Taken March 14, 2008

                  Commencing at 9:13 a.m.

Wiberg, Cody                                        March 14, 2008

Page 62

1    calculated by the Minnesota Medicaid Program,
2    correct?
3      A.  We established the MACs, yes.  For -- for
4    most drugs.  For some drugs, we followed what is
5    known as the Federal Upper Limit, which is
6    essentially the federal MAC.
7      Q.  And the 365 that you referred to in the
8    formula, that was known as the dispensing fee,
9    correct?
10     A.  Correct.
11     Q.  Can you tell me, the usual and customary
12   cost, the U and -- was that typically referred to
13   as the UN -- the U and C?
14     A.  U and C, uh-huh.
15     Q.  Were there any limits on what a pharmacy
16   could submit -- submit as its U and C?
17     A.  There are -- and, again, I haven't looked at
18   this -- this section of the state law for a while.
19   There are -- there is a definition or some
20   information in state law about usual and customary.
21       We thought of it in practical terms as what --
22   what the cash price -- what the price of pharmacy

Page 63

1    -- the prices a pharmacy would charge to a
2    cash-paying customer.  Providers were not supposed
3    to submit more -- a claim for more than they were
4    willing to charge a cash-paying customer,
5    basically.  There -- there's a provision in there
6    about if a -- I believe, if a pharmacy derives more
7    than 50 percent of its business from a particular
8    third-party payer, then they would use that rate.
9    But the -- the reality of that is pharmacies don't
10   -- there is no payer that generally pays over 50
11   percent of any particular pharmacy's  reimbursement
12   for pharmaceuticals dispensed.
13     Q.  And as I understand it, if the U and C
14   submitted by a pharmacy or other provider was lower
15   than the amount calculated as the AWP minus 9
16   percent plus $3.65, Minnesota Medicaid would pay at
17   the U and C, right?
18     A.  That's correct.
19     Q.  Do you know how often it was that drugs were
20   paid at the U and C, rather than at the calculated
21   rate?
22     A.  No, I don't.  My hunch would be, based on

Page 64

1    some claims data queries that I ran in doing fiscal
2    notes for various bits of legislation that were
3    being considered through the years, we -- our
4    claims warehouse -- or our claims data warehouse
5    has a field for submitted amount. And just my
6    recollection is, you know, comparing submitted
7    amounts to what we actually paid.  It was virtually
8    almost always higher, the submitted amount. We
9    almost always paid lower than that.
10       But there may have been some small percentage
11   where the U and C was actually less than what our
12   calculated amount was.
13     Q.  How was it that Minnesota Medicaid went about
14   calculating a MAC for a particular drug?
15     A.  Well, that's a difficult thing to do.
16   Because we had no right to -- to more or less force
17   providers, either pharmacies or physicians, to
18   reveal to us what they actually paid for the drugs
19   that they purchased. As I mentioned earlier, we did
20   not know how average manufacturers' price was
21   calculated, and we really had no idea of what the
22   relationship was between average manufacturers'

Page 65

1    price, average wholesale price that was published,
2    and the actual acquisition cost that pharmacies
3    paid for.
4       So what we were fortunate enough to have and
5    -- is a group of pharmacists around the state who
6    we could call, essentially.  And they would be our
7    reality check. They would provide us with
8    information about what actual acquisition cost was,
9    what they were actually paying for the drugs.  You
10   might find that odd, but there were pharmacists out
11   there who looked at this issue as they were
12   taxpayers, as well.  And they didn't want the
13   Medicaid program paying excessive amounts of money.
14     Q.  I assume they also trusted you to set an
15   appropriate amount.
16     A.  Yes.
17     Q.  To allow them to stay in business, right?
18     A.  Yes.
19     Q.  What sort of information would you get from
20   this network of pharmacists?
21     A.  Well, we would -- if we were considering
22   putting a drug on the MAC, we would call them up,

17 (Pages 62 to 65)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                          March 14, 2008

Page 66

1  and basically say -- we asked a variety of things.
2  We would ask, first of all, what their actual cost
3  was per NDC, National Drug Code. So we would
4  consider differences in costs between, say,
5  30-count bottles, 100-count bottles, 1,000-count
6  bottles, 5,000-count bottles, because there are
7  differences in the AWP between the various quantity
8  bottles.
9      We would ask them -- this would be more
10  particularly after a MAC was set -- if a pharmacy
11  would call and say that they weren't able to
12  purchase the drug, and make a profit, we might call
13  again and use it as a reality check. We would call
14  either those pharmacies or the major wholesalers if
15  pharmacies were basically saying that there was a
16  shortage of the generic product, so we had to
17  temporarily lift the MAC so that the brand name
18  could be dispensed. And that did happen on several
19  occasions while I was there.
20     Q. Do you remember what drugs that happened
21  with?
22     A. Well, one I remember for sure was albuterol

Page 67

1  inhalers.
2      Q. Did that ever happen with vancomycin.
3      A. Not that I'm aware of.
4      Q. All right. So you would check with them if
5  there was a claim that, for whatever reason, prices
6  have gone up; the MAC is too low for me to stay in
7  business.
8      A. Right.
9      Q. Essentially. Okay. When a drug was paid
10  based upon the MAC, did the provider also receive
11  the $3.65 dispensing fee?
12     A. Yes.
13     Q. So the MAC was simply a -- a ceiling on the
14  AWP, minus a percentage formula payment.
15     A. Essentially. Pharmaceutical reimbursement is
16  divided into two halves. At least when you're
17  talking about reimbursing pharmacies. One half is
18  the ingredient cost. The other half is the -- the
19  dispensing fee. And with the ingredient cost,
20  that's where you have typically some sort of a
21  discount off of AWP, or you have a Maximum
22  Allowable Cost. And then, independently, you have

Page 68

1  a dispensing fee.
2      In theory, in the best -- this is more of an
3  opinion. In the best of all possible worlds, there
4  would be pricing transparency, and payers would
5  know exactly what purchasers, end -- not end users,
6  but providers, pharmacies and doctors, paid for
7  drugs. You would reimburse at that amount. And
8  then you would set, on the -- in the case of a
9  pharmacy, your dispensing fee. Or in the case of a
10  physician, an administration fee. You would set
11  that at a rate that would allow them to cover the
12  cost of dispensing, which includes things like
13  paying for staff, paying for computers, paying for
14  electricity, paying for the rent on the building.
15  Paying for all of those sort of things. And then,
16  because they are for-profit businesses, and you
17  want them to remain Medicaid providers, you would
18  build in some -- what you hoped was some reasonable
19  profit into the calculations. That would -- that
20  would be the best of all possible worlds, if you
21  had that. We didn't have that. We don't have
22  pricing. Didn't have pricing transparency then, I

Page 69

1  don't think we have it now. And so what you end up
2  doing -- in our case, because we didn't have the
3  authority to go in and actually find out what a
4  wide range of pharmacies or physicians were paying
5  for drugs, in our case, we did our best using the
6  contacts that we had. Also, mentioning -- should
7  have mentioned this before, is we did take a look
8  at what other payers had for Maximum Allowable
9  Costs, other state Medicaid programs. And also
10  remember, we had managed care organizations under
11  contract for us. And they would provide us with
12  what their Maximum Allowable Costs were. So that's
13  kind of a crucial thing I forgot to mention. The
14  pharmacies, as I mentioned, were more of a reality
15  check to make sure that the information we were
16  collecting from these other sources sort of fit
17  what was happening in Minnesota.
18     Q. And so you said that you didn't have the --
19  the ideal world, where the dispensing fee would
20  cover costs, plus a profit.
21     A. Right.
22     Q. And the ingredient cost would cover the

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 146

1    Q.  Do you know who Doctor Bruce Waddick (ph) is?
2    A.  No.
3    Q.  It was the Director of -- Administrator of
4  HCFA in the mid 1990s?
5    A.  If it was mid 1990s, that was --
6    Q.  Before your time?
7    A.  -- five years before I started there.  I may
8  have seen the name, but even the name doesn't sound
9  familiar.
10   Q.  If he had testified that he expected for
11 these particular products for GPOs to offer
12 discounts of as much as 99 percent off of listed
13 prices or AWPs, is that something that would be
14 inconsistent with your expectations?
15       MR. BLACK:  Objection.
16       MR. FAUCI:  Objection.
17   A.  I -- I can't -- I don't know.  I really don't
18 know.  You know, it's just -- these sort of
19 products, as I mentioned earlier, first of all,
20 they wouldn't have been the focus to the extent
21 that they were available generically, like any
22 other drug available generically, we probably would

Page 147

1  have tended to manage this more with MACs.
2        And we -- our primary concern was not
3  differential prices that different pharmacies might
4  be paid.  We didn't establish differential MACs for
5  different types of pharmacies.  We established one
6  MAC that all pharmacies would -- would need to --
7  to abide by.
8  BY MR. COOK:
9    Q.  And given what you knew about the OIG
10 reports, regarding generic drugs, it would be
11 consistent with your understanding that if the
12 acquisition cost for one of these generic products
13 was $2, the AWP could be in the range of $10.
14       MR. FAUCI:  Objection.
15   A.  It could be in a wide range.  Because -- and,
16 again, I don't have the OIG report with me.  But I
17 haven't looked at it for over two-and-a-half years.
18 But my understanding, if I remember correctly, is
19 they differentiated between different types of
20 generics.  And so there were different -- it was up
21 to 70 percent, but some of them were not that much
22 off.

Page 148

1  BY MR. COOK:
2    Q.  There were some classes that would have
3  lesser discounts, some would have more discounts --
4    A.  Right.
5    Q.  -- right?  You mentioned earlier a LISTSERV
6  that you were on as the Manager of Minnesota
7  Pharmacy Program.
8    A.  Correct.
9    Q.  Could you describe that for me?
10   A.  Well, I'm not quite sure who actually ran the
11 LISTSERV.  But the -- or if anyone actually ran the
12 LISTSERV.
13   Q.  Well, what is a LISTSERV?
14   A.  Well, a LISTSERV is -- is, my understanding
15 -- I'm not a computer expert, but a LISTSERV is a
16 -- if people have something in common, the email
17 addresses are on this LISTSERV.  And, in my case, I
18 had all of the names of the folks that were -- my
19 counterparts around the country set up so that I
20 could, you know, click on one entity, and if I
21 wanted to, send an email to all of them.  And --
22 and we did commonly communicate that way on a

Page 149

1  variety of different issues, from pricing to DUR to
2  whatever.
3    Q.  And so you would both receive emails from
4  various people similarly situated to you, and send
5  emails to people who were similarly situated to
6  you.
7    A.  That's correct.
8    Q.  You also sat on a Pharmacy Technical Advisory
9  Group, PTAG?
10   A.  That's correct.
11   Q.  Could you describe for me, what is the PTAG?
12   A.  Okay.  Every state, Medicaid agency, has a --
13 what's called a Medicaid Director.  And this is the
14 person in that state that is supposed to be more or
15 less overall in charge of making sure the Medicaid
16 Program runs.  My understanding is that, you know
17 -- while they're not the only person that interacts
18 with the Federal Government, DHS had a whole
19 federal liaison unit.  But, in essence, they
20 communicate with CMS.  They have overall
21 responsibility for how the Medicaid Program runs in
22 each state.  They have something called a National

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 358

1   the Minnesota Department of Human Services, there
2   was one pharmacist working. We used the pharmacy
3   program manager, he was working there by himself.
4   He had three rebate analysts. There had been more
5   pharmacists working for the Department earlier, but
6   they worked in different divisions. In fact, there
7   wasn't a pharmacy program a year-and-a-half before
8   I started. There was no coherent Pharmacy
9   Management Policy. And as a result of that, we
10  made -- after I took over, we ended up making
11  massive changes. It went from, in my opinion,
12  being a program that was not very effectively
13  managed, to being one that is very aggressively
14  managed now.
15      So -- and the other issue that we had -- I
16  mentioned earlier that my predecessor, because
17  he introduced this language that ended up getting
18  amended, took away our authority to do a lot of
19  things with -- with MACs.
20      So part of what we were trying to do, although
21  we had to accelerate when we got to 2002 and 2003,
22  we had no choice. Part of it was to not shock the

Page 359

1   system, which had essentially been unmanaged. So
2   we're trying to introduce these changes in a -- I
3   wouldn't say gradual, but we're trying to not hit
4   people with so many things at once that we cause
5   disruptions to service, or that, quite frankly,
6   because it's a political environment, that it
7   backfires on us, and we do have people going to the
8   legislators, saying, basically, these people over
9   at DHS are out of control, and have our authority
10  to make the changes we thought were necessary taken
11  away from us. So we didn't always do things
12  initially as aggressively as we might have in the
13  time frame we're talking about here, 2000, 2001.
14      2002, 2003, when we're starting facing budget
15  deficits, even before then, we had started ramping
16  up and doing preferred -- you know, our own
17  internal preferred drug list for some categories.
18  But we got very, very aggressive at that point.
19  And so these days, as I mentioned earlier, we
20  increased the use of generics because of the MAC
21  program from about 50 percent when I started to 60
22  percent. It's now up to 69 percent. So -- you know

Page 360

1   -- anyway.
2      Q. But in these generics MACs that you're
3   setting are shooting for a dollar amount spread --
4      A. Right.
5      Q. -- not necessarily for a correct percentage
6   spread, right?
7      A. That's correct.
8      Q. And the correct percentage could be a
9   thousand, could be 2,000, could be 1 percent,
10  depending upon the starting cost of the product,
11  right?
12     A. Yes, we are searching for a dollar spread,
13  not a percent spread.
14     Q. And if you go to Abbott Exhibit 19, and the
15  item that Mr. Black asked you about --
16     A. Four up from the bottom?
17     Q. Yeah, the $900 spread on a bag of saline?
18     A. Uh-huh.
19     Q. It would offend you if Minnesota Medicaid was
20  paying a $900 spread on a bag of saline, correct?
21     A. Yes.
22     Q. If that were a case of 100, and the spread

Page 361

1   were $9 on the bag of saline, would your answer be
2   different?
3      A. If -- if the actual acquisition cost --
4   you're talking about the actual --
5      Q. If the actual acquisition cost were about a
6   dollar.
7      A. About a dollar.
8      Q. The AWP was about $9, and the AWP minus 9
9   percent came out to about $8, such that the spread
10  was about $7. That would be consistent with the
11  goals of the Medicaid program, correct?
12     A. Yes.
13     Q. And so when Mr. Black asked you these
14  questions about $900 spreads, you were answering
15  those questions based upon your belief that that
16  was $900 for one bag of saline, right?
17     A. Correct.
18     Q. Not for a case of 100 bags of saline, right?
19     A. Correct.
20     Q. Mr. Black asked you whether there had been
21  any closures of pharmacies -- oh and, by the way,
22  do you know who drafted this chart that Mr. Black

91 (Pages 358 to 361)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

# EXHIBIT QQ

**From:**  Littlejohn, Kelli <Kelli.Littlejohn@medicaid.alabama.gov>
**Sent:**  Friday, October 20, 2006 8:56 AM
**To:**  Caroline Sojourner <Sojourne@scdhhs.gov>; wellsj@ahca.myflorida.com; annr@ahs.state.vt.us; suzette.bridges@arkansas.gov; Del.Swan@azahcccs.gov; carolyn.rachel@dc.gov; jdubberly@dch.ga.gov; coleenl@dhcfp.state.nv.us; graycl@dhfs.state.wi.us; MTerrebo@dhh.la.gov; LFarrand@dhhs.state.nh.us; cogannp@dhmh.state.md.us; kgorospe@dhs.ca.gov; pavarista@dhs.ri.gov; sparker2@dhs.state.ia.us; Rachel.Cain@dmas.virginia.gov; childsa@dshs.wa.gov; George.L.Oestreich@dss.mo.gov; Denmark, Cynthia <cynthia.denmark@eds.com>; Marc.Shirley@fssa.in.gov; David_Campana@health.state.ak.us; mrb01@health.state.ny.us; barbara.dean@hhsc.state.tx.us; barbara.mart@hhss.ne.gov; EideT@idhw.state.id.us; Lisa.Voils@illinois.gov; mary.lesperance@khpa.ks.gov; Nici.Gaines@ky.gov; bruce.mcclenahan@maine.gov; Ldonovan@medicaid.dhs.state.hi.us; phjpc@medicaid.state.ms.us; PERRIG@michigan.gov; rcitron@mt.gov; tom.dandrea@ncmail.net; sojoyb@nd.gov; REIDR@odjfs.state.oh.us; nancy.nesser@okhca.org; james.zakszewski@po.state.ct.us; James Assey <Asseyj@scdhhs.gov>; Catherine.traugott@state.co.us; Paul.Jeffrey@state.ma.us; kristin.c.young@state.mn.us; neal.solomon@state.nm.us; Sherry.Montoya@state.nm.us; Brian.Olson@state.or.us; c-tcathers@state.pa.us; Mark.Petersen@state.sd.us; jeff.stockard@state.tn.us; ABROWN@state.wy.us; rashley@utah.gov; pking@wvdhhr.org; bennyridout@yahoo.com
**Subject:**  $4 generics

Well, we all knew this was coming...Wal-mart announced earlier this week they were expanding their $4 generic program throughout several additional states (Alabama was not one of them for this particular rollout), and I am sure other retailers will follow suit (if they have not already done so).
What plan does your state have to address this issue to ensure that these retailers charge your program their U&C (which should be $4)?
Kelli D. Littlejohn, R.Ph.
Director, Pharmacy Services
Alabama Medicaid Agency
Office 334 353 4525

# EXHIBIT RR

JCAHO Accredited
**COTTAGE HOME** *options*                                    **option**care *

## SPECIALISTS IN HOME HEALTH SERVICES AND PRODUCTS

| 427 East Fremont Street | 952 East Eldorado | 4239 War Memorial Drive | 320 North Third Street |
|---|---|---|---|
| Galesburg, IL 61401 | Suite 200 | Suite 203 | Suite 416 |
| (309) 343-9031 | Decatur, IL 62521 | Peoria, IL 61614 | Burlington, IA 52601 |
| (309) 343-8057 Fax | (217) 423-6006 | (309) 688-1780 | (319) 752-0483 |
| | (217) 423-9882 Fax | (309) 688-1824 Fax | (319) 752-0854 Fax |

6-12-00

Congressman Lane Evans
√ Senator Carl Hawkinson
Representative David Hultgren

Gentlemen:

Please allow me to thank you all in advance for what I assume will be your usual sympathetic attention to the item which I am bringing before you today.

Our company provides home health services through a broad area of central Illinois and eastern Iowa; these services include home health nursing and therapy, medical equipment and perhaps, most importantly, home infusion or home intravenous services. This last area is somewhat unique in that far fewer companies provide these services than do the aforementioned others and do to our lack of significant numbers of providers many times our voice is lost in the bureaucratic jungle of lobbyists and power brokers. A significant issue regarding governmental reimbursement for our services has suddenly occurred and it is one which I believe deserves your attention in order that access to care for our disadvantaged citizens does not occur.

On May 1st of this year the Illinois Department of Public Aid drastically reduced reimbursement for the "drug component" of IV medication services based upon an investigation which was promulgated by the Federal department of Justice. A copy of a memorandum from the State of New York Attorney General is enclosed along with news clippings from USA Today which offer an explanation of why the department has taken the step of drastically reducing reimbursement. For your edification, approximately 10 other states have also reduced reimbursement and Medicare has indicated its intention to follow later this year.

This issue resolves around the concept of AWP or average wholesale price of drugs, a concept which quite frankly has outlived its usefulness in today's marketplace. Prescription drugs are routinely priced via some multiple of AWP, sometimes with a fee for dispensing the medication. In the case of Medicaid, drugs are costed at AWP less either 10 or 12% and in the case of Medicare, a discount of 5% is attached. A minimal dispensing fee is added for Medicaid prescriptions and no dispensing fee for Medicare prescriptions.

Some years ago when the State of Illinois developed its current reimbursement mechanism, I had many discussions with the then pharmacy coordinator, Ron Gottrich concerning the mechanism for reimbursing IV medications. It is and was understood that the dispensing fee in NO WAY is able to compensate the pharmacy organization for the costs of preparing and delivering compounded IV

*"We have the solution for you"*

CONFIDENTIAL                                    AWP-IL-00016908

solutions, HOWEVER, it was further understood that IV pharmacies were and are able to purchase pharmaceuticals at well below AWP pricing thus partially compensating them for their costs from the drug component. For your edification there are significant costs associated with the preparation and delivery of sterile intravenous products for patient home use that are NOT seen in the standard pharmacy "pour and count" practice, i.e. traditional pharmacy practice. Such costs include accreditation by JCAHO (Joint Commission on Accreditation of Homecare Organizations), which as an aside for our last accreditation was $27,000; significantly more pharmacist time which must be spent on professional activities, delivery costs and certainly far greater time spent in compounding activities - illustratively it takes less than a minute to count pills and label a vial while it may take hours to compound complex sterile IV products.

What I find incredibly interesting is that ONLY IV medications have been targeted for the reduction in AWP prices that is indicated in the attached memorandum. Oral medications, which surely account for the lion's share of pharmacy costs are NOT targeted. I can assure you that pharmacies receive every bit as deep of a discount on oral drugs as we IV providers do on IV products, yet general pharmacy products have been left untouched. I might also indicate to you that my pharmacy, which is one of the larger in the area is unable to purchase anything at the new revised pricing which has been issued. If we therefore assume that I am to cover my costs under the dispensing fee, which both sides agree is inadequate to do so, it should leave me with no rational business alternative than to reduce my services to Medicaid and Medicare patients. At this point we intend to allow our private business to subsidize the losses we will occur under Medicaid and Medicare, however, I am not certain that other providers will do the same, nor that we can do this forever.

Many states have NOT put into place the absurd price rollbacks that have created this crisis and I urge you learned gentlemen to persuade the Illinois department of Public Aid to either reverse the rollback on costs or greatly increase the dispensing fees. The alternative, I fear, is that many disadvantaged recipients of home intravenous services will be left without an alternative to institutionalization. The department should also remember their tacit agreement of years ago that allowed providers such as myself to service their clients and cover our costs. Perhaps the time has come to adequately reimburse pharmacy providers for the services associated with product dispensation, rather than to invent systems that rely on "devious" reimbursement methods which make great headlines but little or no sense.

I would be glad to discuss this serious issue with any of you at any time.

Thank you,

John Carmody BS, MS, RPh
President

AWP-IL-00016909

# EXHIBIT SS

## DECLARATION OF JOHN CARMODY

I, John Carmody, declare under penalty of perjury:

1.      My name is John Carmody.  My current address is 2 Nicholas Ct., White Health, Illinois 61884.  I have worked in the home health services industry since 1988.  From 1988 to 2004, I was the President of OptionCare of Western Illinois and, later, Cottage Home Options (a franchisee of OptionCare of Western Illinois).  During this time, OptionCare of Western Illinois/Cottage Home Options provided home health services to patients in central Illinois and eastern Iowa.  Those services included home health nursing and therapy, medical equipment and supplies, and home drug infusion therapy.

2.      OptionCare of Western Illinois and Cottage Home Options provided services to citizens of Illinois eligible to receive healthcare benefits under the Illinois Medicaid program. As President of OptionCare of Western Illinois and Cottage Home Options, I became very familiar with how the Illinois Medicaid program reimbursed healthcare companies for providing home infusion drug therapies to Illinois Medicaid beneficiaries.  I had several conversations with individuals who worked for the State of Illinois concerning the reimbursement paid to providers of home infusion drug therapies under Illinois's Medicaid program.  The reimbursement paid by Illinois Medicaid for home infusion drug therapies was an important consideration in deciding whether providing services to Medicaid patients was financially feasible.

3.      I recall having specific conversations with an individual named Ron Gottrich, who I understood worked in a policy position for the State of Illinois and had involvement with Illinois Medicaid's pharmacy benefit program.  I do not recall the exact dates or years of those conversations, but believe that they occurred sometime in the mid-1990s.

4.      During those conversations, I recall explaining to Mr. Gottrich that there were considerably higher costs associated with preparing and delivering compounded prescriptions in

1

the homecare setting. Such prescriptions would include the antibiotic drug Vancomycin, as well as the diluents used in compounding Vancomycin and many other drugs that are commonly infused into patients over a course of treatment. As a pharmacist, Mr. Gottrich understood this. He acknowledged that there were considerably higher costs associated with providing injectable and infusion drugs in the homecare setting, and that the dispensing fee paid by Illinois Medicaid (which he acknowledged was designed for retail pill prescriptions) did not come close to covering the costs to dispense home infusion drug therapies.

5.      I advised Mr. Gottrich that home infusion providers such as OptionCare of Western Illinois and Cottage Home Options believed that the considerably higher costs associated with dispensing home infusion drug therapies warranted additional reimbursement, such as a per diem payment, from Illinois Medicaid. Mr. Gottrich and I discussed the well-known fact that home infusion pharmacies were able to purchase pharmaceuticals at well below the published AWP pricing often used to set Illinois Medicaid's payment amount for the drugs. I recall Mr. Gottrich indicating that the "split" between AWP and providers' acquisition cost on the drugs served to partially compensate home infusion providers for the extra costs associated with dispensing home infusion drug therapies. I also recall Mr. Gottrich indicating that Illinois was reluctant to pay higher fees for home infusion drug therapies (which represented a small percentage of drug claims paid by Illinois Medicaid) because doing so might set a precedent of increased reimbursement for other drug therapies that required additional services. It was well-understood and agreed that the split between AWP and actual acquisition cost was providing the payment necessary to cover the extra costs of home infusion drug therapy.

6.      This was how Illinois Medicaid paid home infusion providers for dispensing home infusion drug therapies to Illinois Medicaid beneficiaries until early 2000. At that time, in

response to an investigation by the United States Department of Justice and the state of New York Attorney General's office, the Illinois Department of Public Aid drastically reduced reimbursement for the "drug component" of several intraveneous therapies.  To the best of my knowledge, this change was done before providers could provide feedback on the impact of the drastic reimbursement cuts.  In response to the drastic reimbursement cuts, I drafted a letter to three Illinois legislators to express my concern over the change in policy.  A copy of that letter is attached as Exhibit A to this Declaration.  As stated in the letter, the drastic cuts in reimbursement occasioned by the Department of Justice and the New York Attorney General investigation represented a substantial and fundamental change in Illinois Medicaid's policy of reimbursing cost-intensive home infusion drug therapies, and were inconsistent with the understanding between Illinois Medicaid and home infusion providers on paying a fair reimbursement that would allow home infusion providers to both service their clients and cover their costs.

7.     Subsequent to this change in policy, I observed that Illinois Medicaid beneficiaries faced challenges obtaining access to home infusion drug therapies.  I am aware of several home infusion companies that quit providing services to Medicaid patients because doing so was no longer fiscally feasible.  This access difficulty has been somewhat mitigated by the creation of Medicare Part D.

FURTHER AFFIANT SAYETH NAUGHT.

_____
JOHN CARMODY

# EXHIBIT A

JCAHO Accredited

**COTTAGE HOME** *options*

**option**care°

### SPECIALISTS IN HOME HEALTH SERVICES AND PRODUCTS

| ☒ 427 East Fremont Street | ☐ 952 East Eldorado | ☐ 4239 War Memorial Drive | ☐ 320 North Third Street |
| Galesburg, IL 61401 | Suite 200 | Suite 203 | Suite 416 |
| (309) 343-9031 | Decatur, IL 62521 | Peoria, IL 61614 | Burlington, IA 52601 |
| (309) 343-8057 Fax | (217) 423-6006 | (309) 688-1780 | (319) 752-0483 |
| | (217) 423-9882 Fax | (309) 688-1824 Fax | (319) 752-0854 Fax |

6-12-00

Congressman Lane Evans
✓ Senator Carl Hawkinson
Representative David Hultgren

Gentlemen:

Please allow me to thank you all in advance for what I assume will be your usual sympathetic attention to the item which I am bringing before you today.

Our company provides home health services through a broad area of central Illinois and eastern Iowa; these services include home health nursing and therapy, medical equipment and perhaps, most importantly, home infusion or home intravenous services. This last area is somewhat unique in that far fewer companies provide these services than do the aforementioned others and do to our lack of significant numbers of providers many times our voice is lost in the bureaucratic jungle of lobbyists and power brokers. A significant issue regarding governmental reimbursement for our services has suddenly occurred and it is one which I believe deserves your attention in order that access to care for our disadvantaged citizens does not occur.

On May 1st of this year the Illinois Department of Public Aid drastically reduced reimbursement for the "drug component" of IV medication services based upon an investigation which was promulgated by the Federal department of Justice. A copy of a memorandum from the State of New York Attorney General is enclosed along with news clippings from USA Today which offer an explanation of why the department has taken the step of drastically reducing reimbursement. For your edification, approximately 10 other states have also reduced reimbursement and Medicare has indicated its intention to follow later this year.

This issue resolves around the concept of AWP or average wholesale price of drugs, a concept which quite frankly has outlived its usefulness in today's marketplace. Prescription drugs are routinely priced via some multiple of AWP, sometimes with a fee for dispensing the medication. In the case of Medicaid, drugs are costed at AWP less either 10 or 12% and in the case of Medicare, a discount of 5% is attached. A minimal dispensing fee is added for Medicaid prescriptions and no dispensing fee for Medicare prescriptions.

Some years ago when the State of Illinois developed its current reimbursement mechanism, I had many discussions with the then pharmacy coordinator, Ron Gottlich concerning the mechanism for reimbursing IV medications. It is and was understood that the dispensing fee in NO WAY is able to compensate the pharmacy organization for the costs of preparing and delivering compounded IV

*"We have the solution for you"*

CONFIDENTIAL

AWP-IL-00016908

solutions, HOWEVER, it was further understood that IV pharmacies were and are able to purchase pharmaceuticals at well below AWP pricing thus partially compensating them for their costs from the drug component. For your edification there are significant costs associated with the preparation and delivery of sterile intravenous products for patient home use that are NOT seen in the standard pharmacy "pour and count" practice, i.e. traditional pharmacy practice. Such costs include accreditation by JCAHO (Joint Commission on Accreditation of Homecare Organizations), which as an aside for our last accreditation was $27,000; significantly more pharmacist time which must be spent on professional activities, delivery costs and certainly far greater time spent in compounding activities - illustratively it takes less than a minute to count pills and label a vial while it may take hours to compound complex sterile IV products.

What I find incredibly interesting is that ONLY IV medications have been targeted for the reduction in AWP prices that is indicated in the attached memorandum. Oral medications, which surely account for the lion's share of pharmacy costs are NOT targeted. I can assure you that pharmacies receive every bit as deep of a discount on oral drugs as we IV providers do on IV products, yet general pharmacy products have been left untouched. I might also indicate to you that my pharmacy, which is one of the larger in the area is unable to purchase anything at the new revised pricing which has been issued. If we therefore assume that I am to cover my costs under the dispensing fee, which both sides agree is inadequate to do so, it should leave me with no rational business alternative than to reduce my services to Medicaid and Medicare patients. At this point we intend to allow our private business to subsidize the losses we will occur under Medicaid and Medicare, however, I am not certain that other providers will do the same, nor that we can do this forever.

Many states have NOT put into place the absurd price rollbacks that have created this crisis and I urge you learned gentlemen to persuade the Illinois department of Public Aid to either reverse the rollback on costs or greatly increase the dispensing fees. The alternative, I fear, is that many disadvantaged recipients of home intravenous services will be left without an alternative to institutionalization. The department should also remember their tacit agreement of years ago that allowed providers such as myself to service their clients and cover our costs. Perhaps the time has come to adequately reimburse pharmacy providers for the services associated with product dispensation, rather than to invent systems that rely on "devious" reimbursement methods which make great headlines but little or no sense.

I would be glad to discuss this serious issue with any of you at any time.

Thank you,

John Carmody BS, MS, RPh
President

CONFIDENTIAL

AWP-IL-00016909

# EXHIBIT TT

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 1

                    UNITED STATES DISTRICT

             FOR THE DISTRICT OF MASSACHUSETTS


       --------------------------X

       IN RE:  PHARMACEUTICAL       )  MDL NO. 1456

       INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

       PRICE LITIGATION             )  01-CV-12257-PBS

       THIS DOCUMENT RELATES TO     )

       U.S. ex rel. Ven-a-Care of   )

       of the Florida Keys, Inc.    )

           v.                       )  No.06-CV-11337-PBS

       ABBOTT LABORATORIES, INC.,   )

       --------------------------X


          (cross captions appear on following pages)


             Deposition of HARRY LEO SULLIVAN

                      Volume I

               Nashville, Tennessee

               Tuesday, March 12, 2008

                    9:05 a.m.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                          March 12, 2008
                              Nashville, TN

Page 62

1  might be some, some discussion on, you know,
2  brand versus generic, or to use a MAC or not to
3  use a MAC.
4        You also have issues in different
5  states of do they allow dispenses written?  Do
6  they have a two-line prescription form?  Or what
7  are their particular guidelines for physicians
8  and pharmacists when it comes to being able to
9  substitute a generic?  So, but I don't remember
10 saying, you know, I'm paying 2 cents apiece for
11 generic penicillin, what do you pay?  What -- I
12 don't, I don't think anybody ever did that.
13    Q.  From your experience, do you think it
14 was well accepted amongst the Medicaid pharmacy
15 administrative community that you would want to
16 pay some profit on multiple-source drugs to
17 incentivize their use?
18    MS. DAMOULAKIS:  Objection.
19    A.  It's just so fundamental, I don't
20 remember discussing that with anybody.  I think
21 it's just -- it's something you -- you know, I
22 mean it's just -- makes good sense.  I don't, I

Page 63

1  don't remember any specific discussions with
2  anybody on, you really need to make it profitable
3  so that they will have an incentive to use it.
4  BY MR. TORBORG:
5    Q.  In your view it's just one of those
6  fundamental tenets of how you operate a state
7  Medicaid pharmacy program.
8    A.  One of my bosses long ago told me that
9  the color of health care is green, and that's
10 true.
11    Q.  In your time as the director of
12 pharmacy services, did you have communications
13 with the federal government concerning drug
14 payments?
15    A.  I don't know in what context you would
16 -- I mean can you -- is there another way you can
17 ask that question?
18    Q.  I'll try.
19        In determining how much the state
20 should be paying for drugs, both as an ingredient
21 cost component and as a dispensing cost
22 component, did you have discussions with the --

Page 64

1  any representatives from CMS then known as HFCA.
2    A.  I couldn't name any individual in HFCA
3  or CMS, and I don't remember -- and I couldn't
4  tell you the exact time.  I would say in the, in
5  the early Nineties HFCA putting directives out to
6  the state, and it was, it was as if they're
7  suggesting that, you know, we're going to be
8  looking -- kind of giving you a heads-up, the way
9  they would do with, with policy.  That, you know,
10 we're aware that a lot of states are, are paying
11 AWP minus 5 or whatever.  And we really think
12 that y'all need to get to maybe 10 percent.  I
13 don't know where -- you know, if OIG or somebody
14 gave them some number.  They wanted everybody to
15 get to 10.  Or some convoluted calculation of WAC
16 or acquisition costs or however you could get
17 there that would demonstrate to HFCA that you're
18 doing about AWP minus 10.
19        Tennessee was -- and this may -- there
20 may be various constraints on other states.  For
21 example, some state may -- reimbursement may be
22 subject to legislation within the state.  May

Page 65

1  have to be legislated.  It may be up to the
2  Medicaid director or the pharmacy director, it
3  may be tied to a cost-to-dispense study from a
4  state university, college of pharmacy, or
5  something like that.  So it -- I'm sure it varied
6  wide, widely from state to state on their
7  flexibility to comply with, with such a -- and it
8  wasn't a mandate at that time.  But it was -- you
9  could clearly tell that HFCA was wanting
10 something done with reimbursement for pharmacy
11 services that, that I guess saved money or more
12 closely approximated what people were really
13 paying for drugs.
14    Q.  You made a comment or some comments
15 about some of the -- tell me if I'm paraphrasing
16 you wrong here -- but there might be some
17 roadblocks that would come between a state
18 pharmacy director and wanted to comply with what
19 HFCA wanted to do.  Is that fair to say?
20    A.  Well, no, ultimately, in Tennessee, for
21 example, at that time, and really pretty much
22 still today, two-thirds of the bill's paid by the

17 (Pages 62 to 65)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  compendia were matching the actual market prices
2  as they lowered on generic drugs?
3      A.  For multi-source drugs?
4      Q.  Yes.
5      A.  I had no knowledge, and I didn't care
6  because if it was up to me, I think, as my job,
7  to find out what the net cost was to the
8  pharmacist.
9          Two things, availability, statewide, in
10  Tennessee, of the generic, and, secondly, what
11  are they paying?  I have to know that in order to
12  get back to what we were talking about earlier,
13  providing the proper incentive to dispense
14  generic for the pharmacist to do whatever
15  intervention was necessary with either the
16  patient or the physician, or both, to get the
17  generic substitution accomplished.
18      Q.  Now where would you get the information
19  that you would use in the MAC program regarding
20  what pharmacists were -- pharmacies were actually
21  paying for drugs?
22      A.  My, my system was, was not very

**Page 107**

1  sophisticated or very scientific, but nonetheless
2  believe it to have been very effective.
3          What I did was, I knew I had a contact
4  within the largest generic distributor in our
5  area, and one of the most -- one of the more
6  popular.  Again during this time that I, that I
7  was setting MAC prices, rather than MCOs or PBMs,
8  the, the best deal on generic weren't coming
9  from, from big wholesalers.  They were coming
10  from generic distributors.
11          So I had contacts within this one
12  particular company who would tell me, who would
13  first of all keep me apprized any time they, they
14  were able to distribute new generic drugs, also
15  give me information if, if there was some problem
16  with an existing generic drug's availability, and
17  also tell me and give -- send me catalogs that
18  they sent to the pharmacists and then tell me
19  additionally what am I looking at for this drug
20  X, Y, Z, what does a hundred of them cost a
21  pharmacy?  I didn't look at Red Book or Blue Book
22  or First Data; I called the people that sell it.

**Page 108**

1          Then I took that information, and never
2  going to take at one source completely at face
3  value, then I would call three or four -- I used
4  independent pharmacists in different parts of the
5  state, and I called.  And I said, I understand,
6  and I wouldn't mention that particular
7  distributor.  They never knew where I got my
8  numbers.  The pharmacists never knew where I got
9  my numbers.  But I would say, I'm thinking, I
10  believe that you can get this new generic, or
11  whatever it is, for five dollars a hundred, and
12  I'm going to set the MAC at 7.50 a hundred.  Does
13  that give you any heartburn?  And that's the way
14  I did business.
15          These, I trusted these people,
16  obviously.  But there are three different sources
17  there who are on the front lines in a pharmacy
18  who are running a business, who they have a
19  personal stake in.  That's why I went to
20  independents.  And then the distributor, who is
21  selling.  And who over the course of that
22  interaction I never found them to be anything but

**Page 109**

1  honest.
2          So -- and you can, you can quickly tell
3  if you have got something set too low, the phone
4  will ring.
5          So that -- and then I just -- I built
6  in a little, 30 percent or whatever, profit to a
7  generic MAC.  But I would immediately MAC -- AWP
8  was irrelevant.  For generic drugs.
9      Q.  And did you have a practice for doing,
10  for doing this process for all generic drugs?
11      A.  Yes.
12      Q.  And you did this all by yourself.
13      A.  Yes.
14      Q.  One person?
15      A.  Yes.
16      Q.  And you had other duties as well, --
17      A.  Yes.
18      Q.  -- correct?
19      A.  Yes.
20      Q.  And tell me a little bit about --
21      A.  Of course, you know, I, when I went to
22  work there in '89 we already had a MAC program.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                      March 12, 2008
                        Nashville, TN

---

Page 150

1  concerns on whether or not the payment for these
2  kind of therapies was, was adequate?
3      A.  Well, my opinion, particularly in the,
4  in the home health arena, was -- and during this
5  specific time period, the growth in Tennessee was
6  such of those type of providers that it wouldn't
7  -- that wouldn't -- not lead you to believe that
8  the reimbursement for Medicaid was inadequate.
9          When people are hollering and screaming
10  or you have trouble getting providers to take
11  care of your patients is when that was more
12  likely a concern.
13      Q.  Well, do you know when the home
14  infusion business really started taking off?
15      A.  Well, it certainly took off in the
16  early Nineties.  And I can't remember -- and
17  Tennessee was a little bit different because we
18  very purposely avoided expansion of home
19  community based services under the Medicaid
20  program because the vast majority of the patients
21  who would receive those services were dual
22  eligibles, which meant they had Medicaid and

Page 151

1  Medicare.  And Medicare home health was, was
2  truly exploding.  We had hundreds of providers in
3  Tennessee of home health services.  I dare say
4  there's, you know, maybe 20 now.  Because there
5  was, there was indeed a bonanza on the Medicare
6  side in Tennessee.  Other states didn't face it
7  quite as -- if they had chosen to expand or had
8  very aggressive home community-based services
9  through Medicaid, might have had a little bit
10  different policy issues.  We purely shifted to
11  Medicare, cost shifted to Medicare, with the
12  duals.  And so it wasn't maybe not as, as intense
13  on a Medicaid issue in Tennessee as it might be
14  elsewhere is what I'm saying.
15      Q.  The page starting with -- at 425 and
16  then going over to 426, there is a discussion of
17  what some states are doing in the home IV
18  reimbursement area, Minnesota indicates
19  compounding or a dispensing fee of $8 for IV
20  drugs, and then Washington indicates that they're
21  paying a compounding amount, Ohio as well.
22          Do you have an understanding of what

Page 152

1  they're talking about when they talk about a
2  compounding fee?
3      A.  Yes.
4      Q.  And what, what is that?
5      A.  Well, certain, be it -- I mean you can
6  compound IV drugs if you have the right equipment
7  and filters and hoods to keep it, make it a
8  sterile product.
9          And you can compound drugs for
10  inhalation.  If you have, again, the right
11  equipment, similar to what would be in a
12  hospital, to, to handle sterile products.
13          And you take the raw ingredient and
14  mimic whatever, generally, the brand name or the
15  innovator product was.
16      Q.  And do you know in Tennessee, either
17  before TennCare or after TennCare was paying a
18  compounding fee for IV?  Do you know if that was
19  something that was being paid?
20      A.  Ah, no.  But there's, there's ways to
21  pay it without, without having a separate -- you
22  know, I noticed on here that one form is for

Page 153

1  payment, one form is for reimbursement of
2  supplies, one form is for -- you know, they're,
3  they're making a variety to submit multiple
4  forms.  And I wouldn't -- I can't tell you a
5  specific product or specific time period, but one
6  of my strategies was in issues like this, where
7  compounding was involved, I didn't want to go
8  down the road, at least in the early Nineties, of
9  getting into paying for compounded prescriptions,
10  because that can -- that could range from a
11  sterile product all the way down to an ointment,
12  okay?
13          And, and our claims reimbursement
14  system hadn't evolved to the current NCPDP
15  sophistication of today.  So it was very hard to
16  put in a, a set compounding fee for what, what
17  products?
18          One may take a minute to make, one may
19  take an hour and a half.
20          So getting back to, to the MAC issue,
21  some, sometimes for certain products in this
22  arena, you would take that into account for the

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                          March 12, 2008
                          Nashville, TN

Page 154

1  MAC.
2        For example, I might say, I'm not
3  paying for the tape that you use to hold the IV
4  needle into place. I'm not paying for the IV
5  needle or the tube set. I'm not going to -- I
6  don't want bills for that. I know you've got to
7  do it to administer this drug. So we're going to
8  add on the cost of this drug X, because I know
9  this, this and this always goes with it, and I
10 know there is a fixed cost for that, but I don't
11 want five bills. I want 10 different places.
12 Bill me for the drug. And I'll make sure that
13 the -- whatever the MAC is incorporates all your
14 other costs. And you have to talk with providers
15 and know what that is. I mean, you know.
16    Q.  So, in short, you would use the payment
17 for the drug itself to cross-subsidize other
18 things that might need to be paid to fairly --
19    A.  And that would include compounding.
20    Q.  And it may include nursing services
21 that were not included, things of that nature?
22    A.  (Nodding yes.)

Page 155

1     Q.  Did anyone in the federal government
2  ever tell you that you were not allowed to do
3  that?
4     A.  No.
5     Q.  And if they had told you that, what
6  would you have said?
7     A.  That I wasn't allowed to pay for
8  compounding or --
9     Q.  That you weren't allowed to use the
10 payment for the drug to cross-subsidize those
11 other services or supplies?
12    A.  If they had told me I couldn't do it,
13 what would I do?
14    Q.  Yes.
15    A.  I would have had to have found another
16 way to, to handle the billing.
17    Q.  But they never told you that.
18    A.  No.
19    Q.  Do you know if other states were doing
20 -- were adopting similar type strategies to run
21 the programs?
22    A.  No, I don't -- I mean it may be

Page 156

1  addressed in this letter. I don't know. It
2  seems to talk about different states, but I'm
3  sure there were varying levels of complexity in
4  the billing process, and what was and wasn't
5  billable and what was and wasn't included, but I
6  don't know it and I didn't discuss it with folks.
7     Q.  Have you heard the term cross-subsidy
8  or cross-subsidization in the context of pharmacy
9  reimbursement?
10    A.  No, not -- no, I haven't.
11    Q.  I'm going to show you another, another
12 -- going to mark that as another exhibit.
13       MR. TORBORG:  I think this is 578.
14       (Exhibit Abbott 578 marked.)
15 BY MR. TORBORG:
16    Q.  For the record, what we have marked as
17 Exhibit 578 bears the Bates numbers HHC 002-0400
18 through 407. It's another Medicaid pharmacy
19 bulletin. This one dated January-February of
20 1988.
21       Mr. Sullivan, if I could ask you to go
22 to Bates page ending in 402. In particular the

Page 157

1  discussion on the first full paragraph about
2  Montana Medicaid. Do you see that?
3     A.  Yes.
4     Q.  Where it says, Similarly, Montana
5  Medicaid compensates for the additional time and
6  expense of dispensing compounded drugs by
7  allowing the provider's usual and customary
8  charge up to 2.5 times the cost of ingredients,
9  paren, reimbursement for other outpatient drugs
10 is a lower of AWP minus 10 percent, or the cost
11 of the drug, end paren. Do you see that?
12    A.  Yes.
13    Q.  Is that the, the type of thing that
14 Tennessee was doing?
15    A.  It's a different approach to -- yeah.
16 Make -- paying the provider for the, for the
17 compounding without -- and setting a limit on
18 what I will pay up to two and a half percent.
19 It's just a different, different twist.
20    Q.  Does it -- does this refresh your
21 recollection about any other types of approaches
22 like this that other states were using?

40 (Pages 154 to 157)

0c585b6a-88d2-47d8-bc26-289a064ea87e

# EXHIBIT UU

Reid, Robert Paul                           December 15, 2008
                    Columbus, OH

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - ) MDL No. 1456

IN RE: PHARMACEUTICAL INDUSTRY    ) Master File No.

AVERAGE WHOLESALE PRICE LITIGATION) 01-12257-PBS

---------------------------------)

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel.  ) Saris

Ven-A-Care of the Florida Keys,   )

Inc, et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS     )

---------------------------------


          VIDEOTAPED DEPOSITION OF ROBERT PAUL REID

                    Monday, December 15, 2008

                    9:59 o'clock a.m.

                    Jones Day

                    325 John H. McConnell Boulevard

                    Suite 600

                    Columbus, Ohio 43215

              SHAYNA M. GRIFFIN

          REGISTERED PROFESSIONAL REPORTER

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                    December 15, 2008
                        Columbus, OH

| Page 86 | Page 88 |

**Page 86**

1   matters.  We had a 50-state e-mail connection,
2   not related to the PTAG.
3       Q.   That was next on my list here to ask
4   you about, so let me ask you about that.
5       A.   Oh, okay.
6       Q.   Tell me about the e-mail connection
7   that you had with the other states.
8       A.   Yeah.  Carolyn Sojourner, who was the
9   pharmacy administrator for South Carolina, took
10  it upon herself to create a National Association
11  of Medicaid Pharmacy Administrators.  That was
12  that -- yeah, that was it.  And every time
13  anybody on the 50 states asked a question, all 50
14  states got to see the question.  And any time
15  that the states -- any of the states would reply
16  to the question, if they had replied to all, then
17  every state would be privy to the answers.  Very
18  informative.  All 50 Medicaid agencies are
19  different, of course.  If you've seen one, you've
20  seen one.  But people are interested in what
21  their peers are doing.
22      Q.   Do you have a sense for when that

**Page 87**

1   e-mail group started?
2       A.   I would say around 2000.
3       Q.   Now, prior to that, was there a
4   mechanism where your peers at other states could
5   communicate?
6       A.   Phone.
7       Q.   Pull out a document, see if it
8   refreshes your recollection on anything.
9           MR. TORBORG:  Mark this as Abbott/Reid
10  2.
11          - - -
12          (And, thereupon, Exhibit Abbott-Reid
13  002 was marked for purposes of identification.)
14          - - -
15          THE WITNESS:  Thank you.
16  BY MR. TORBORG:
17      Q.   For the record, what I've marked as
18  Abbott/Reid 2 bears the Bates numbers
19  AWP-IL-00010038 through 42.
20          Mr. Reid, your -- you can look at this
21  document if you want to.  I'm going to have some
22  questions about it for you later.  I want to ask

**Page 88**

1   you first to go to the second page in the
2   document --
3       A.   Yes.
4       Q.   -- bearing the Bates number ending
5   039. And I'm pointing to --
6           MS. GEOPPINGER:  Bear with me just a
7   second.
8           MR. TORBORG:  I'll explain it.
9           MS. GEOPPINGER:  Okay.  Go ahead.
10  BY MR. TORBORG:
11      Q.   When I refer to Bates numbers, I'll
12  refer to --
13      A.   Uh-huh.
14      Q.   -- that little number in the lower
15  right corner of the document.
16      A.   Uh-huh, okay.
17      Q.   And I usually will read off the last
18  three digits.
19      A.   Okay.
20      Q.   And so here, for example, I'm asking
21  you to go to 039 --
22      A.   Okay.

**Page 89**

1       Q.   -- which will be on the page that
2   you're at.
3       A.   Okay.
4       Q.   Now, this appears to be a fax cover
5           Now, this appears to be a fax cover
6   page titled "Facsimile Transmission Medicaid
7   Pharmacy Program Administrators."  This one is
8   dated September 25th, 1995.
9       A.   Okay.
10      Q.   And in looking at that list, does
11  that appear to contain both yourself at the top
12  of the third column --
13      A.   Yes.
14      Q.   -- as well as a number of your other
15  -- of your peers at other state Medicaid
16  programs?
17      A.   Yes.  Looks like all of them.
18      Q.   Do you recall getting faxes like this
19  in this kind of form?
20      A.   Vaguely.  That's 1995.
21      Q.   Was this a way that your peers in
22  other states communicated on issues?

23  (Pages 86 to 89)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                    December 15, 2008
                          Columbus, OH

Page 90

1    A.  Well, it appears as though someone on
2  their own created the list and sent the e-mail to
3  everybody.  I don't think this had anything to do
4  with PTAG.
5    Q.  And I'm not suggesting that it does.
6    A.  Oh, okay.
7    Q.  I'm just trying to get an idea if you
8  recall fax cover sheets like this and
9  communications among Medicaid pharmacy program
10  administrators in this form prior to the e-mail
11  being sent out?
12    A.  Yes.
13    Q.  You do recall that?
14    A.  Yes, I recall that.  After seeing
15  that, I recall that.
16    Q.  Apart from the meetings of the
17  Association of State Medicaid Administrators, the
18  PTAG, do you recall attending other -- any other
19  meetings that were attended by your peers at
20  other states?
21    A.  There was one meeting I went to with
22  my -- not my boss, Robyn Colby, but her boss,

Page 91

1  Barbara Edwards.  And I think it was the National
2  Association of State Medicaid Directors.  And I
3  think it was in San Jose, New Mexico.  And I
4  don't remember the agenda.
5    Q.  Do you recall when that was?
6    A.  No, I don't.
7    Q.  Was it before 2000 --
8    A.  It would have been probably -- I
9  don't know.
10    Q.  Was the issue -- was any issue of
11  Medicaid pharmacy discussed at that meeting?
12    A.  I'm sure it was.
13    Q.  Otherwise, why would you be there?
14    A.  Well, it was the National Association
15  of State Medicaid Directors, so they had -- their
16  topics were not necessarily solely about
17  pharmacy.
18    Q.  Sure.
19    A.  Yeah.
20    Q.  I'm just trying -- what I'm saying
21  is, the fact that you were invited to this one --
22    A.  I presume I was invited because there

Page 92

1  were some pharmacies issues to be discussed.
2    Q.  -- would suggest -- and do you recall
3  what pharmacy issues were discussed at all?
4    A.  No, I don't.
5    Q.  Generally speaking?
6    A.  No, I don't.  It probably had
7  something -- it might have had something to do
8  with the rebate program, because that was new to
9  all of us at the time.  And many states were
10  struggling with the rebate program, principally
11  because many pharmaceutical companies disputed
12  some of the invoices that they got.  So I'm just
13  speculating now. That might have been the reason
14  why they invited me to the meeting.
15    Q.  I understand from some prior
16  testimony that from time to time there would be
17  rebate conferences that were sponsored by various
18  organizations.  Do you recall attending any of
19  those?
20        MS. GEOPPINGER:  Object to the form of
21  the question.
22        You can answer.

Page 93

1    A.  This information that I received
2  refreshed my memory about the International
3  Institute for Research, and they sponsored
4  meetings frequently.  And almost always the
5  meetings had to do with the Medicaid rebate
6  program.
7    Q.  Who was in attendance at those
8  meetings?
9    A.  My peers, and even my boss, Robyn
10  Colby, attended one of the meetings with me.
11    Q.  Do you remember attending any
12  meetings like this that were also attended by
13  pharmaceutical companies?
14        MS. GEOPPINGER:  I'm going to object to
15  the form of the question.  Are you referring to
16  the rebate conversations or what he described?
17        MR. TORBORG:  Any.
18    A.  There were meetings, mostly in
19  Denver, that were sponsored by CMS, and they had
20  to do with the way to resolve impasses between
21  the manufacturer and the state on the rebate
22  issues.  And I don't think I ever attended one of

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                    December 15, 2008
                           Columbus, OH

| Page 158 | Page 160 |
|---|---|

**Page 158**

1    A.  Well, I think we took into
2  consideration -- let's take the example of
3  Phenergan 12 and a half milligram that we used
4  earlier.  We would try to determine how much
5  pharmacies were paying for each version of that
6  from the various generic companies, and we put
7  them on a grid and picked the one price that was
8  available 65 percent of the time.
9    Q.  Let me back up a little bit.
10       Where did you get the -- those prices
11 from?
12   A.  First DataBank, mostly.
13   Q.  For the generic drugs?
14   A.  Well, they would give us -- they
15 would give us a starting point -- when they sent
16 their monthly reports to us, they would give us a
17 starting point of WAC plus seven for the -- I
18 think it was whatever -- whatever the going rate
19 was at the time. We wouldn't necessarily use
20 those prices, but they would be ones that we
21 would put in that grid to determine which one was
22 the 65th percentile.  Very complicated.

**Page 159**

1    Q.  Which other prices would you use?
2    A.  Oh, we would call pharmacies and ask
3  them. Pharmacies would call us and volunteer
4  information. And we, in more recent times, were
5  using the MAC prices that were set by other
6  states, all of which were public record.
7    Q.  Which pharmacies would you call?
8    A.  I would call my own, which was
9  Northland Pharmacy, in Columbus.  I would call
10 Cline's Pharmacy in Akron.  And there was a rural
11 store that I called, which has since gone out of
12 business, just to get a feel for what was going
13 on in the market, the dynamics of the
14 marketplace.
15   Q.  And they would provide you with a
16 price at which they actually purchased the drug?
17   A.  Yes.
18   Q.  And those are the prices that you
19 would then put in your grid?
20   A.  Yes.  Sometimes a pharmacy would
21 object to the price that we had set and they
22 would send an invoice as documentation of what

**Page 160**

1  they were really paying for a product.  And they
2  would encourage us to raise our allowable.  A lot
3  of times there was a lot of other information on
4  that invoice that we would use.
5    Q.  What other information?
6    A.  Well, prices of other drugs.
7    Q.  Okay.
8    A.  Sometimes, you know, stores would
9  black out everything except they would only
10 answer the question.  But other times they would
11 send an invoice -- a copy of an invoice that gave
12 us a lot of information.
13   Q.  And some pharmacies actually called
14 to volunteer this information to you?
15   A.  Once in a while I would get a call --
16 understandably, not very often -- you're paying
17 too much.  And they would be representing
18 themselves as a taxpayer.
19   Q.  So the prices that you used to set
20 the MAC amount, those were based on actual prices
21 that you got from pharmacies; correct?
22   A.  Right.

**Page 161**

1    Q.  They are not based on --
2    A.  Well, partly, yeah.
3    Q.  What else were they based on?
4    A.  Well, we would take the First
5  DataBank price into consideration, although
6  rarely use it on the grid, unless it was
7  reasonable, comparable.
8    Q.  So if the First DataBank price was
9  not comparable to the other prices, you wouldn't
10 use it?
11   A.  No.  I would consider it to be an
12 outlier.
13   Q.  If it was an outlier, it wouldn't
14 even go into the 65th percentile calculation?
15       MS. GEOPPINGER:  Object to the form of
16 the question.
17       You can answer.
18   A.  Yes.
19   Q.  And you did all this by yourself?
20   A.  I did it all by myself up until 2001.
21   Q.  Now, it says here that --
22       MS. GEOPPINGER:  What are we looking

Henderson Legal Services, Inc.

af69f64b-a1fb-4f21-a237-a09d2632bad5

# EXHIBIT VV

Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL        )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

PRICE LITIGATION             )   01-CV-12257-PBS

THIS DOCUMENT RELATES TO     )

U.S. ex rel. Ven-a-Care of   )   Judge Patti B. Saris

the Florida Keys, Inc.       )

    v.                       )   Chief Magistrate

Abbott Laboratories, Inc.,   )   Judge Marianne B.

No. 06-CV-11337-PBS          )   Bowler

- - - - - - - - - - - - - - -


Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE


Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                                    December 9, 2008

## Baltimore, MD

Page 78

1    A.   Around 1985 there was a federal requirement
2    that states enter into cost of dispensing studies.
3    And Maryland contracted with Myers & Stauffer to
4    implement a dispensing fee study in approximately
5    1985. I was involved in that. But as far as AWP
6    studies, there were none.
7        Q.   Apart from the OIG's work?
8        A.   Apart from the OIG work. Yeah. But
9    independently, Maryland did not get into them.
10       Q.   Did Maryland -- did the department ever
11   receive copies of AWP studies from Myers & Stauffer or
12   elsewhere for other states?
13           MS. YAVELBERG: Objection, form.
14       A.   Not that I'm aware of.
15       Q.   Maryland may have; you just don't know?
16       A.   I do not know.
17       Q.   Did the department have subscriptions to
18   any periodicals that it would review relating to drug
19   payment such as Drug Topics, Pink Sheets, things of
20   that nature?
21       A.   Maryland subscribed to the Green Sheet,
22   which in those days was the pharmacy information

Page 79

1    sheet.
2        Q.   Who publishes the Green Sheet?
3        A.   I do not know.
4        Q.   It's not Maryland-specific?
5        A.   No. It's a national newsletter that comes
6    out periodically.
7        Q.   How long has that been?
8        A.   I don't know if it's still in place now.
9    It may be the Pink Sheet has taken over for them. But
10   it was the Green Sheet.
11       Q.   Do you know who published that?
12       A.   No.
13       Q.   Do you know if other Medicaid programs
14   reviewed that Green Sheet?
15       A.   Yes. It was used by everyone. It gave
16   notice of what was happening in the pharmacy industry.
17       Q.   Do you recall -- do you have a sense for
18   when that publication started? Has it always been --
19       A.   From as long as I can recall there was
20   always that publication.
21       Q.   Do you recall something called the Pink
22   Sheets?

Page 80

1        A.   Vaguely. I was not involved in the Pink
2    Sheets.
3        Q.   Were you involved with the Green Sheets?
4        A.   In the fact that I read them.
5        Q.   Were you interviewed by the Green Sheets
6    for any purpose?
7        A.   No.
8        Q.   When you said the word involved I didn't
9    know what you meant.
10       A.   I'm sorry. The idea is I have read the
11   Green Sheets. I read them when they came out. The
12   department shared it. It came in through the policy
13   administration and it was dispersed among the other
14   administration so that we could see what was happening
15   in pharmacy.
16       Q.   How about Drug Topics? Are you familiar
17   with that one?
18       A.   Mm-hmm. Drug Topics is a retail pharmacy
19   publication.
20       Q.   Did the department have a subscription to
21   that?
22       A.   I do not recall. The only time I would see

Page 81

1    Drug Topics' information would be from pharmacy
2    providers when they may have sent it to us as copies.
3        Q.   But you recall reviewing some --
4        A.   Yes.
5        Q.   -- Drug Topics publications?
6            How About Modern Healthcare?
7        A.   No.
8        Q.   How about a publication called the Medicaid
9    Pharmacy Bulletin?
10       A.   Yes.
11       Q.   What can you tell me about that?
12       A.   I was part of the first panel that
13   developed it. A company called Rescon which was
14   bought out by Parexel again developed the Medicaid
15   Pharmacy Bulletin. What they did is they had a panel
16   of five state pharmacy administrators to review topics
17   and come together to write up information for Medicaid
18   pharmacy administrators that could be sent out. It
19   was subsidized initially by Lederle Laboratories.
20       Q.   Who is a drug manufacturer?
21       A.   Yes.
22       Q.   And you were --

21   (Pages 78 to 81)

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 82

1      A.   Initially.  And then Lederley was bought
2  out by Pfizer and -- that's how that works, you know.
3      Q.   And you were on the advisory board of the
4  Medicaid Pharmacy Bulletin for a time?
5      A.   Yes, I was.
6      Q.   As best I understand, the first publication
7  was in 1987.  Does that sound right?
8      A.   That sounds about right.
9      Q.   And you were on the advisory panel for how
10 long?
11     A.   I believe three years.
12     Q.   Were you on it after the three years were
13 up at any time?
14     A.   Yes.  Another two years.  They did it in
15 rotation.  I don't recall the second time.
16     Q.   Now, where did the publishers of the
17 Medicaid Pharmacy Bulletin get their information?
18     A.   From the Medicaid pharmacy administrators.
19     Q.   So --
20     A.   The panel got together and they discussed
21 what topics would be important to the other pharmacy
22 Medicaid administrators and then the company that

Page 83

1  published it would do their editorial work and write
2  up an article on this, do the investigation on it.
3  And then it would be submitted back to the panel for
4  review, editing and whatever before it would be
5  released.
6      Q.   Did you find that those bulletins were a
7  useful source of information?
8      A.   Yes, they were.
9      Q.   They had very reliable information in them?
10     A.   Absolutely.
11     Q.   Do you know -- did you maintain copies of
12 those?
13     A.   I did.  Before I left I had a whole book on
14 it.  I don't know -- I think I threw them out.
15     Q.   When you left the department -- let me back
16 up.
17     A.   I don't think I left it with the
18 department.  I didn't.
19     Q.   Did you take it with you?
20     A.   I think I did and I think I then discarded
21 it.
22     Q.   When did you throw them away?

Page 84

1      A.   2005.
2      Q.   Why did you throw them away?
3      A.   I was just cleaning.  I just had a lot of
4  papers.
5      Q.   Do you know how someone can get copies of
6  past issues of this publication?
7      A.   You'd have to probably inquire with
8  Parexel.  That was the last one -- it's no longer in
9  publication, by the way.
10     Q.   Did anything take its place?
11     A.   No.
12     Q.   When you left the department what did you
13 do with your files that you had?
14     A.   I left the files there.
15     Q.   You didn't take anything with you?
16     A.   No.  Other than my own personal
17 information, personal articles.
18     Q.   So you got to clean out your office and
19 start over.  That sounds like a good idea to me.  Any
20 other publications you can recall?
21     A.   I don't know what you're asking.
22     Q.   Relating to Medicaid pharmacy issues apart

Page 85

1  from the Green Sheets, Medicaid Pharmacy Bulletins and
2  the other ones we discussed.
3      A.   No.  Not that I can think of.  Oh.  There
4  is a compendia that comes out from the National
5  Pharmaceutical Council that does a survey of all
6  Medicaid programs.  You may have --
7      Q.   I know what you're talking about.
8      A.   Right.  Every state gets that and we used
9  it for review.
10     Q.   I'd like to hand you what we've marked
11 previously as Abbott Exhibit 81.  Mr. Fine, Abbott
12 Exhibit 81 is a document titled "Prescription drug
13 prices:  Are we getting our money's worth?  A majority
14 staff report of the Special Committee On Aging, United
15 States Senate."  Do you see that?
16     A.   I guess it's right before me.
17     Q.   Okay.  And have you seen this document
18 yourself before?
19     A.   No.
20     Q.   Do you know if the department followed the
21 work of the Special Committee On Aging, United States
22 Senate?  To see if it helps your recollection at all

Henderson Legal Services, Inc.

0bd2b054-a753-a4e97-a066-e37ff7ee308f

Baltimore, MD

Page 202

1  that a pharmacist who deals with one of the two major
2  local wholesalers -- and generally pharmacies purchase
3  drugs from one predominant wholesaler and had the
4  second as a backup when they couldn't get the drug.
5      So each local wholesaler carried at least
6  one or two lines of generic drugs.  And the
7  methodology was to take the lowest price of each one
8  of the two wholesalers and then pick the highest price
9  of the two so that any pharmacy using their own source
10 of supply could get the drug for that price and
11 wouldn't have to switch wholesalers just to get that
12 drug to meet the price.  Okay?
13     So we were able to get it with the
14 compliance of the two local wholesalers that they
15 worked with us on this.  It evolved that after several
16 years one local wholesaler went out of business and a
17 national company, McKesson, bought out the other local
18 wholesaler, Lowie.  Bought it out.  So therefore now
19 we were seeing pharmacists getting drug products from
20 a Virginia firm, Bergen Brunswick, and from McKesson,
21 predominantly.  And now we're dealing with national
22 wholesalers who didn't wish to work with us directly

Page 203

1  in setting up our state MAC or the IDC.
2      So we had to find some way to get drug
3  pricing, their files.  And what we did is we went to
4  pharmacies who had business with them, pharmacists
5  that belonged to Maryland pharmacist association who
6  knew it was for the common good anyway and we were
7  able to borrow their files.
8      Q.   So you got pricing information from either
9  wholesalers or a pharmacist who cooperated with the
10 department in giving --
11     A.   But it was from wholesalers.  It was always
12 wholesale prices.  It was the wholesaler file.  But
13 since they wouldn't let us use it directly we had to
14 go through them to get the files.
15     Q.   When you say wholesale file --
16     A.   Meaning the price list.  The drug price
17 list.
18     Q.   We're not talking about the compendia here?
19     A.   No.  Maryland did not use compendia,
20 meaning we did not use First Databank and/or Medi-Span
21 to set our IDC.  We were determined to set our state
22 MAC or IDC based on what local -- what our pharmacists

Page 204

1  could get the drug for if they were working and buying
2  the product from a wholesaler that was selling in
3  Maryland.
4      Q.   And this process of going to get wholesale
5  price lists from either a wholesaler or a pharmacist,
6  some of that was just part of your job, right?
7      A.   Correct.
8      Q.   Something you felt you needed to do to get
9  fair pricing for drugs?
10         MS. YAVELBERG:  Objection, form.
11     A.   Well, the feel -- it's not my feeling.
12 It's what Maryland decided to do to get fair pricing
13 to their pharmacists who fill prescriptions for
14 Maryland medical assistance recipients.
15     Q.   And you received cooperation from the
16 pharmacy providers in this effort?
17         MS. YAVELBERG:  Objection, form.
18     A.   Yes.  Yes.  The pharmacy providers worked
19 with us.
20     Q.   Now, you used two different prices for each
21 drug on the IDC list; is that right?
22     A.   We used two different sources of prices.

Page 205

1  In other words, a source price from one wholesaler and
2  a source price from another wholesaler.  We used two
3  wholesalers' prices that were doing business in
4  Maryland.
5      Q.   And then you paid at the higher of those
6  two prices, correct?
7      A.   We selected the line of generic drugs that
8  had the lowest price for each wholesaler and picked
9  the highest price of those two.  Highest of the
10 lowest, if you can understand that.  So therefore any
11 pharmacy could get it and stay with their same
12 wholesaler they normally did business with.
13         MR. TORBORG:  Why don't I mark this as our
14 next exhibit.  This will be Abbott Maryland 16.
15         (Exhibit Abbott Maryland 016
16          was marked for
17          identification.)
18 BY MR. TORBORG:
19     Q.   For the record, this bears the Bates
20 numbers MD 0019258 through 63.  And I'd like to ask
21 you just about the first page for now.  Do you
22 recognize this document, Mr. Fine?

52  (Pages 202 to 205)

0bd2b054-a753-4e97-a066-e37ff7ee308f

# EXHIBIT WW

**2000 Pricing**   **J7050**

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | INFO DATE | LISTED DOSAGE PER REDBOOK | ML | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE @ 95% |
|---|---|---|---|---|---|---|---|---|---|
| J7050 | Infusion, Normal Saline Solution | 250 cc | Sodium Chloride (Abbott Hosp) | 2000 ann | Lifecare plastic .9% 250 ml 24's | 24 | $ 278.73 | $ 11.61 | $ 11.03 |
| | | | B. Braun McGaw | 2000 ann | (excel) .9% 250 ml | 1 | $ 10.69 | $ 10.69 | $ 10.16 |
| | | | Baxter | 2000 ann | Single-pack 250 m! 36's | 36 | $ 327.89 | $ 9.11 | $ 8.65 |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Brand RX: | | | | | | | #DIV/0! | #DIV/0! |
| | Brand RX: | | | | | | | #DIV/0! | #DIV/0! |
| | Brand RX: | | | | | | | #DIV/0! | #DIV/0! |
| | Brand RX: | | | | | | | #DIV/0! | #DIV/0! |
| | Brand RX: | | | | | | | #DIV/0! | #DIV/0! |
| | Brand RX: | | | | | | | #DIV/0! | #DIV/0! |
| | Brand RX: | | | | | | | #DIV/0! | #DIV/0! |

Q:\PartB\Part B Claims\Drug File\1999-2002 Pricing Workbooks\2000 Pricing Sheets\(J7050.xls)3rd Qtr

| | | | |
|---|---|---|---|
| Generic Median | $ 10.69 | Lowest Brand | #DIV/0! |
| 95% = Par | $ 10.16 | 95% = Par | #DIV/0! |
| Non-Par | $ 9.65 | Non-Par | #DIV/0! |
| Limiting Charge | $ 11.09 | Limiting Charge | #DIV/0! |

Last Update    January 31, 2007

AWQ005-0631

FL

# EXHIBIT XX

DRAFT

ORIGINAL ARRAY (Per Carrier Array Documents)

## Med B Drug Pricing Form

| DATE: | 5/11/2000 | GENERIC NAME | Infusion, Normal Saline Solution | | |
|---|---|---|---|---|---|
| ANALYST: | Debroah | BRAND NAME | | | |
| SOURCE: | 4/00 Redbook CD | GEN. or BRAND? | Generic | MEDIAN: | $4.48 |
| UPDATE: | Jul-00 | STRENGTH | 250 cc | PREVIOUS MEDIAN: | $4.48 |

| COMPANY | PAGE | STRENGTH | QUANTITY | NDC# | AWP | 1 cc | 250 cc |
|---|---|---|---|---|---|---|---|
| Abbott Hosp | | 0.9% | 250 ml, 12s | 00074-1583-02 | 148.20 | 0.04940 | 12.35 |
| Abbott Hosp | | 0.9% | 250 ml, 24s | 00074-7983-02 | 278.73 | 0.04646 | 11.61 |
| Abbott Hosp | | 0.9% | 500 ml, 24s | 00074-7983-03 | 278.73 | 0.02323 | 5.81 |
| Abbott Hosp | | 0.9% | 1000 ml, 12s | 00074-7983-09 | 151.19 | 0.01260 | 3.15 |
| Phys Total Care | | 0.9% | 500 ml | 54868-0710-01 | 2.30 | 0.00460 | 1.15 |
| Phys Total Care | | 0.9% | 1000 ml | 54868-0710-00 | 2.30 | 0.00230 | 0.58 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | Medicare Allowance: | $4.26 |

- Calculating an allowance based on the nomenclature of the code (250 cc) produces a fee that is higher than 1000 cc.
Vials were excluded from the calculation because of the availability of only very small vial sizes.  Several of the smaller
vials would have to be purchased to administer 250 cc or 1000 cc to the patient.  Plastic and glass containers were cheaper
and also large enough to prevent several purchases.  Therefore, we limited our sources to containers consisting of 250 cc,
500 cc, and 1000 cc.
- To insure price reasonability and consistency for drugs J7030, J7040 and J7050, The pricing unit used the same sources for
all three codes and calculated the price for 1cc in each code.  Then, we multiplied that 1cc price by total dosage in each code.
- Redbook names this drug as SODIUM CHLORIDE.

| Sources not listed on 4/00 Redbook CD: | | | | | | | |
|---|---|---|---|---|---|---|---|
| McGaw | | 0.9% | 500 ml | 00264-4001-55 | 11.95 | 0.02390 | 5.98 |
| McGaw | | 0.9% | 1000 ml | 00264-4000-55 | 11.34 | 0.01134 | 2.84 |

REVISED ARRAY

## Med B Drug Pricing Form

| DATE: | 5/11/2000 | GENERIC NAME | Infusion, Normal Saline Solution | | |
|---|---|---|---|---|---|
| ANALYST: | Debroah | BRAND NAME | | | |
| SOURCE: | 4/00 Redbook CD | GEN. or BRAND? | Generic | MEDIAN: | $4.48 |
| UPDATE: | Jul-00 | STRENGTH | 250 cc | PREVIOUS MEDIAN: | $4.48 |

| COMPANY | PAGE | STRENGTH | QUANTITY | NDC# | AWP | 1 cc | 250 cc |
|---|---|---|---|---|---|---|---|
| Abbott Hosp | | 0.9% | 250 ml, 12s | 00074-1583-02 | 148.20 | 0.04940 | 12.35 |
| Abbott Hosp | | 0.9% | 250 ml, 24s | 00074-7983-02 | 278.73 | 0.04646 | 11.61 |
| Abbott Hosp | | 0.9% | 500 ml, 24s | 00074-7983-03 | 278.73 | 0.02323 | 5.81 |
| Abbott Hosp | | 0.9% | 1000 ml, 12s | 00074-7983-09 | 151.19 | 0.01260 | 3.15 |
| Phys Total Care | | 0.9% | 500 ml | 54868-0710-01 | 2.30 | 0.00460 | 1.15 |
| Phys Total Care | | 0.9% | 1000 ml | 54868-0710-00 | 2.30 | 0.00230 | 0.58 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | Medicare Allowance: | $4.26 |

- Calculating an allowance based on the nomenclature of the code (250 cc) produces a fee that is higher than 1000 cc.
Vials were excluded from the calculation because of the availability of only very small vial sizes.  Several of the smaller
vials would have to be purchased to administer 250 cc or 1000 cc to the patient.  Plastic and glass containers were cheaper
and also large enough to prevent several purchases.  Therefore, we limited our sources to containers consisting of 250 cc,
500 cc, and 1000 cc.
- To insure price reasonability and consistency for drugs J7030, J7040 and J7050, The pricing unit used the same sources for
all three codes and calculated the price for 1cc in each code.  Then, we multiplied that 1cc price by total dosage in each code.
- Redbook names this drug as SODIUM CHLORIDE.

| Sources not listed on 4/00 Redbook CD: | | | | | | | |
|---|---|---|---|---|---|---|---|
| McGaw | | 0.9% | 500 ml | 00264-4001-55 | 11.95 | 0.02390 | 5.98 |
| McGaw | | 0.3% | 1000 ml | 00264-4000-55 | 11.34 | 0.01134 | 2.84 |

NOTES:

1. Source: Electronic array, AWQ028\nonPrivDATA\Item 1 Drug Files (Pricing information)\2000 PTB Drugs\QTR3\J7000s_7_1_2000.zip\
J7000s_7_1_2000.xls
2. According to the carrier array document, the Medicare allowance ("Medicare Allowance") is cialcuated in cell H22 of the original array and cell H57
of the revised array and is 95% of the median of the "250 cc" values.

# EXHIBIT YY

WPS00322
WPS00558

Page 1

| ode | Drug Name | Dose | MFctr | Qty | Price | Each | |
|---|---|---|---|---|---|---|---|
| J7030 | Sodium Chloride (Normal)-(0.9%) | 1000cc | Abbott | 12's | 151.19 | $12.60 | |
| | 00074-7983-03 | 1000cc | Braun McGaw | 0.9% 1000ml | 14.16 | $14.16 | |
| | nlc 1-8-2008 | 1000cc | Braun McGaw | 0.9% 1000ml | 11.34 | $11.34 | �X |
| | | 1000cc | Baxter | 12's | 118.37 | $9.86 | |
| | | 1000cc | Phys Total Care | 0.9% 1000ml | 2.30 | $2.30 | |
| J7050 | Sodium Chloride (Normal)-(0.9%) | 250cc | Abbott | 12's | 148.20 | 12.35 | |
| | 00074-1583-02 | 250cc | Abbott | 24's | 406.70 | 16.95 | |
| | 00074-7983-01 | 250cc | Abbott | 24's | 278.73 | 11.61 | X |
| | 00074-7101-02 | 250cc | Braun McGaw | 0.9% 250ml | 10.69 | 10.69 | X |
| nlc | 00074-7983-02 | 250 cc | Baxter | 12's | 116.06 | 9.67 | |
| 1-8-2008 | | 250cc | Baxter | 36's | 327.89 | 9.11 | |

AWQ036-0322

# EXHIBIT ZZ

Highly Confidential

# VEN-A-CARE
## OF THE FLORIDA KEYS, INC.
### A Home I.V. and Nutritional Service

933 FLEMING ST
KEY WEST, FLA 33040
(305) 292-1635
FAX: (305) 292-1739

October 24, 1994

Mr. Robert P. Reid, R.Ph.
Bureau of Medicaid Policy
Department of Human Services
30 E. Broad Street 31st Floor
Columbus, OH 43266

Re: State policy and methodology for reimbursement of
intravenous solutions and injectable drugs.

Dear Mr. Reid:

I am currently working on a continuing educational project
concerning our nation's Medicaid reimbursement of the above
referenced drugs.

My company, Ven-A-Care of the Florida Keys, Inc., is a
Florida Medicaid provider specializing primarily in the
providing of infusion drugs. I would be most appreciative if
you could provide me with your state's policy and
methodology and any special policies or provisions for the
determination of the monetary reimbursment of these drugs.

Naturally, the more responses I receive the more accurate
and better understanding I will have in analyzing my data.

Your cooperation is therefore extremely important and
appreciated.

Please feel free to contact me at (305)292-1635 should you
have any questions.

Sincerely

Zachary T. Bentley
cc: Mr. Jerry Wells, R.Ph.
    Florida Medicaid Pharmacy Services

*[Handwritten note:]*
PRIOR AUTHORIZATION REQUIRED
REIMBURSEMENT BASED ON
  INGREDIENTS @ AWP - 7%
  DISPENSING FEE  4.00
  COMPOUNDING FEE 20.00/hr
  (length at discretion of
   reviewer)

Bob R

Further Questions
Call Phil Rogers
614 466 6065

1400933

VAC MDL 75352