# EXHIBIT FFF
# (PART 2)

### Standardizing the Components of Home I.V. Medication Packages May Be the Key to More Efficient and Cost Effective Reimbursement Systems.

In an effort to simplify the process of determining reimbursement for compounded home I.V. medications, a few states have initiated projects aimed at standardizing the ingredients in these solutions. Certain home I.V. treatments administered routinely do not differ radically from one compound to another. If some of these solutions can be standardized, corresponding reimbursement amounts can be attached to each one, enabling bill claims processing to be executed through a computer.

In the spring of 1986, Minnesota Medicaid launched two separate but related projects to standardize home I.V. solutions and their corresponding reimbursement amounts. One is an attempt to standardize reimbursement for the 50 most commonly requested parenteral medications and the other ventures to do the same for parenteral nutritional products.

Minnesota's experience indicates that many compounded home I.V. medications can be standardized by ingredients and that even in cases where acids and dextrose in varying quantities are added, the cost differential is insignificant. Minnesota has attached code numbers for billing purposes to each compounded mixture. Each digit in the code number represents the name, strength and volume of the products contained. The assigned code numbers and the prices that correspond to each coded compound are easily insertable into automated systems. When these systems are further refined, the tasks of calculating and monitoring reimbursement for home I.V. medications will be considerably simplified. It will also enable providers to obtain information in advance about the reimbursement amounts for these products. A secondary gain will be a reduction of time spent on negotiating payment between providers and the Medicaid program.

Other states implementing similar programs include Washington and South Carolina. It is anticipated that what will ultimately emerge from these efforts will be reasonable, adequate and consistent pricing levels for home I.V. substances, increased speed in reimbursing providers and reduced administrative burden for Medicaid pharmacy personnel.

### 4. THE ESTABLISHMENT OF SPECIFIC REQUIREMENTS TO BE MET BY PROVIDERS OF HOME I.V. PRODUCTS.

#### The Risks Associated With Intravenous Administration of Substances Raise Serious Concerns About Provider Compliance With Standard Preparation Procedures.

The intravenous administration of drugs carries a higher potential for complications than does the administration of drugs through other routes. However, one risk factor associated with intravenous therapy, i.e., the development of infection, may be reduced when treatment is provided in the home rather than in the hospital. The procedures used in the preparation and storage of home I.V. products have a direct bearing on the reduction of complications. It is, therefore, sound clinical as well as economic policy for Medicaid pharmacy programs to focus attention on home I.V. provider capabilities and protocols.

As a general rule, Medicaid programs mandate pharmacy providers to be licensed by the State Board of Pharmacy. Most State Boards of Pharmacy do not have specific requirements for providers of home I.V. products. The Maryland State Board of Pharmacy, however, is currently developing regulatory policies "that will affect Maryland pharmacists that dispense outpatient parenteral preparations...." The regulations will establish requirements for training and expertise, equipment and facilities, storage, recordkeeping and procedures used in preparing medications.

This initiative is intended to lower the risk potential associated with home I.V. therapy. It will also serve as a cost-savings measure by potentially reducing the expense of treating complications brought on by ill-equipped providers.

7

See *Medicaid*, page 8

### THE EXPANSION OF PHARMACY BUDGETS TO COVER HOME I.V. THERAPY PRODUCTS.

**Pharmacy Budgets Should Be Adjusted to Meet the Additional Expense of Providing Home I.V. Products.**

Findings such as those reported in the Colorado study effectively demonstrate the potential advantages of improved and increased Medicaid home I.V. coverage. It appears that substantial program savings can be a primary outcome of additional funding for such treatments. In order to maximize the benefits of Medicaid coverage for home I.V. therapy, what are also needed are refined reimbursement systems for the multitude of products involved.

In general, Medicaid pharmacy budgets have not been expanded to meet the additional expenses of home I.V. therapy. More studies are needed to illustrate to policymakers the benefits that could be achieved through further development and expansion of these programs. Until more funds are available, it may be necessary to transfer portions of Medicaid hospitalization budgets to pharmacy budgets in order to obtain the overall savings made possible by the home I.V. therapy alternative. ∎

# Third Party Liability

**Federal Regulations Require Medicaid Programs to Use the Cost Avoidance Method of Reimbursement.**

New Health Care Financing Administration (HCFA) regulations, effective May 12, 1986, require that state Medicaid programs determine whether third party liability (TPL) exists, thereby ensuring that other insurance carriers assume the financial responsibility for Medicaid services before Medicaid funds are expended. This necessitates the establishment of a cost avoidance system of reimbursement by each state Medicaid program, in which providers bill other liable third party insurers first, leaving Medicaid as the payor of last resort.

**State Medicaid Programs Can Request a Waiver of the Use of Cost Avoidance.**

An alternative to cost avoidance is pay and chase (P&C), a system in which the provider bills the Medicaid program for all claims, leaving the Medicaid agency to pursue TPL. However, states cannot use P&C unless (1) an application for a waiver, including documentation of the cost effectiveness of using P&C, is submitted to the regional HCFA office, and (2) the state was using P&C before November 12, 1985 (publication date of the regulations). Regulations specified January 12, 1986, as the deadline for submitting waiver applications, but some regional offices will still consider applications. These include Regions VI, VII and VIII. The goal of the regional offices is to work closely with the various state Medicaid programs to ensure compliance with federal regulations and a cost effective TPL program, according to a HCFA spokesperson.

**Many States Opt to Use Pay and Chase in the Medicaid Pharmacy Program.**

A number of states have submitted applications to waive cost avoidance in the pharmacy program, having determined that pay and chase is more suitable for this program. Many of these Medicaid programs reported that the Medicaid pharmacists in their states were outraged at the prospect of having to utilize cost avoidance, which they believed would substantially increase administrative costs.

HHC002-0395

## The Medicaid Pharmacy Program is Not Well Suited to Cost Avoidance.

Cost avoidance is difficult in Medicaid pharmacy since pharmacies are not adequately equipped to pursue and file large numbers of relatively inexpensive duplicate third party claims. In most cases they do not have adequate staffing or equipment to perform additional third party billing as do other providers, nor are they easily able to incorporate the added administrative burden in a cost effective manner. The pharmacy coverage offered by other third party insurers varies widely from plan to plan; while it is relatively easy to devise a system in which other insurance coverage is indicated on a Medicaid card, it is difficult to specify which drugs are included in the coverage, whether the coverage is still in effect, and whether there is a deductible to be met (in which case the Medicaid program would be liable).

In addition, "most insurance companies reimburse pharmacy services at only 70%-80% of the provider's billed charges. This would require pharmacies to bill Medicaid for the balance, resulting in the pharmacy absorbing the cost of multiple billings."[1] The administrative costs can end up exceeding the cost of the claim, since the average cost per pharmacy claim is quite small.

Many Medicaid pharmacy directors feel that cost avoiding pharmacy claims may jeopardize provider participation in the various Medicaid programs, "if a pharmacist judges the inconvenience of billing requirements to be greater than the value of Medicaid's business."[2]

## Insufficient Data Result in Rejected Waivers.

Some of the waiver applications were rejected on the basis of inadequate or insufficient cost effectiveness data. No guidelines were published by HCFA for performing such an analysis, other than the requirement that administrative costs must be included when determining the cost effectiveness of P&C and that the P&C method of reimbursement must be as cost effective as the cost avoidance method. A few states circumvented this problem by consulting data and information already collected and compiled by other states in their region. The regional HCFA offices aided the situation by granting extensions to many states to allow more time to collect data or implement the new TPL programs.

## HCFA Can Rescind or Amend Waivers.

Although regional HCFA offices have the authority to rescind waivers if the cost effectiveness of the TPL program changes, more often than not they will amend the waiver, thus enabling a state to change or modify its existing reimbursement method. Regulations state that individual Medicaid programs must monitor the cost effectiveness of their TPL programs and report any changes to the regional office. The main goal, however, according to spokespersons from both the Region V and Region VII HCFA offices, is overall cost savings in the Medicaid program. ∎

---

[1] "Documentation in Support of Colorado's Request to Waive Federal Requirements to Cost Avoid Nursing Home, Pharmacy, EPSDT, and HCBS Claims." Third Party Resource Section, Colorado Dept. of Social Services, March 11, 1986.
[2] Ibid.

HHC002-0396

# 10

# State Medicaid Agencies React to Proposed PHIP, CIP and Revised MAC Program

The Health Care Financing Administration's (HCFA) proposed regulations to establish limits on payments for drugs in the Medicaid Program have met with considerable criticism from a majority of the state Medicaid programs.

Forty-two state Medicaid programs submitted comments to HCFA about these alternatives by the October 19th deadline for submission. Although numerous and diverse points are raised by the various state programs, their comments reflect a consensus on several key issues.

As a group, state programs appear to be particularly concerned about:
1) the extent to which the regulation alternatives will increase administrative burden and costs,
2) the potential impact of the regulations on provider participation in the Medicaid Program,
3) the validity of HCFA's projections about program cost savings to result from implementation of the regulations, and
4) the elimination of existing and successful cost containment strategies.

### Administrative Time and Costs of CIP Could Outweigh the Benefits.

State Medicaid programs indicate that of all the alternatives outlined in the proposal, CIP is the most complex and expensive to implement. Several states point out that the amount of time and the costs involved in developing statewide screens of usual and customary charges in each state would be tremendous. Furthermore, existing auditing and billing systems would have to be revamped to accommodate the pricing system under the CIP alternative. Since the PhIP and Revised MAC pricing systems are similar to those that are currently implemented under the Federal MAC Program, it is believed that either of these would be less costly to implement than CIP. Generally, state programs feel that if any of these alternatives are adopted it should be the Revised MAC because it would have the least impact on their already limited administrative budgets.

### If Provider Participation is Reduced, Serious Access Problems Could Arise.

According to Medicaid law, HCFA is charged with the responsibility for ensuring adequate compensation for pharmacist participation in th Medicaid Program.[1] A number of comments from state Medicaid programs express concern that this statutory provision will not be upheld if the proposed regulations go into effect. It is anticipated that those pharmacies able to utilize economies of scale to purchase and sell drugs at lower prices are most likely to benefit, especially from the PhIP and CIP options. Small, independent pharmacies, unable to compete successfully under the PhIP or CIP options or to absorb the potential losses brought about by an expanded number of products subject to MAC limits, may be forced to drop out of Medicaid programs. As the Michigan Medicaid Program points out, often one or two pharmacists serve most of the Medicaid recipients

---

[1] "A Memorandum of Law Applicable to Review b' dicaid Drug Reimbursement Rules," Paul Bator, P of Law, University of Chicago.

HHC002-0397

in a certain area. If primary Medicaid pharmacy providers are forced to withdraw from programs, in some areas recipients may be left without an alternative provider within reasonably close proximity.

### State Programs Doubt That Either PhIP or CIP Will Produce HCFAs Cost Saving Projections.

Given the wide range of usual and customary prices charged by the various types of providers, many state programs have concluded that CIP would require not just one screen of charges per state but rather multiple screens. Designing and monitoring such a multitiered system would constitute a significant administrative burden to which many state programs object.

In the interest of minimizing administrative burden and costs to state Medicaid programs, the CIP proposal suggests that price updates be conducted no more than once a year. While programs generally favor steps to reduce excessive administrative activities, in this case they feel that annual updates would not adequately keep up with ongoing market price fluctuations.

HCFA maintains that PhIP would necessarily generate program savings by alleviating administrative delays and costs inherent in the current MAC program. However, cost comparison data submitted to HCFA refute this assertion. For example, Michigan Medicaid calculates that it would be more costly in Michigan to administer a PhIP limit on acetaminophen with codeine 30 mg. (projected as $77,000 annually) than to maintain its entire existing state MAC system which includes almost 100 drug entities.[2]

### States With Their Own Programs Are Satisfied With Their Results.

Currently, about 28 states implement their own generic substitution programs in addition to the Federal MAC. In general, state program officials are pleased with the results of their individual programs and find the prospect of installing a new system unnecessary and in some cases counterproductive.

**11**

Several states have generic substitution laws that would dilute the effect of PhIP or CIP. For example, according to Indiana law, generic substitution cannot occur unless the prescribing physician gives his consent, the patient agrees to substitute and the dispensing pharmacist believes that dispensing the generic version will not harm the patient.[3] If the PhIP or CIP proposals are enacted, pharmacists in Indiana will still be bound by these mandates listed above, preventing them from dispensing generics unless these conditions are met.

Because drug needs, availability and prices vary significantly from state to state, state programs tend to be in favor of state and local discretion over federal determination of pricing policies. Should the proposed regulations go into effect, states that wish to maintain their own programs will have to obtain a state waiver to do so. Waiver application requires a state to provide substantial evidence to prove that its own program will obtain at least the cost savings available through the federal program. This could, and most likely would, act as a deterrent to the development of creative cost containment initiatives at the state level. ■

---

[2] Michigan Medicaid, Comments submitted to HCFA.
[3] Indiana Code 16-6-8. 1-2.



# Legislative and Regulatory Update

## FEDERAL

The Health Care Financing Administration (HCFA) has received strong recommendations from The American Pharmaceutical Association (APhA), the National Association of Chain Drug Stores (NACDS) and the National Association of Retail Druggists (NARD) to fund demonstration projects that would examine options for reimbursement mechanisms in the Medicaid Prescription Drug Program. "HCFA data show more than 50% of all Medicaid paperwork is triggered by drug claims" but that these claims "constitute 6%-8% of the total program expenditures." (From Medicaid Prescription Reimbursement Reform, APhA, June 1986.)

Two alternatives were offered by APhA, NACDS and NARD: The first was a voucher system in which recipients receive numbered certificates similar to a checking account. Each voucher could represent a certain dollar amount or a specific prescription. Similar programs have been successful in Alabama and with Delaware Blue Cross/Blue Shield.

The second alternative involves the use of "smart cards," similar to electronic banking cards, which would be coded with a recipient's medical history and eligibility information. This system would enable pharmacists to receive instantaneous prescription information and verification of eligibility. More importantly, though, this system would reduce paperwork, expedite payment, and potentially decrease waste, fraud and abuse. To date no action has been taken on this issue.

## STATE

### Michigan
The Michigan House of Representatives is considering a bill which would permit, under the Medicaid program, medical services to be provided in the home, if charges are not greater than they would be in institutions. This bill would also require that an initial medical evaluation and medical orders be given for any services provided over a long period of time. (From IHPP "Major changes in Medicaid policy...")

### New York
Under a proposed state Medicaid regulation designed to eliminate reimbursement for fraudulent sales of certain medical supplies, New York would require authorization by the state Social Services Department for specific medical supplies before payment for these items would be issued. These supplies include such things as heating pads, elastic stockings and vaporizers.

### North Carolina
In an attempt to reduce Medicaid pharmacy costs, North Carolina Medicaid amended its rules and regulations to define "Usual and Customary Charge." North Carolina Medicaid currently reimburses the lower of MAC, EAC or AWP plus a $3.36 dispensing fee for each different drug dispensed during a month, or the pharmacist's usual and customary charge (U&C). U&C is now defined as the lowest price a pharmacist is willing to accept from any third party payor. For example, a pharmacist who is dispensing prescriptions at cost through a contract with an HMO must now dispense at that lower level for Medicaid recipients.

### South Carolina
Beginning October 1, 1986, South Carolina Medicaid has increased its monthly prescription limit from three to four, on insulin syringes (S.C. Medicaid's number one prescription item), and antibiotics for home I.V. therapy. South Carolina Medicaid ensured funding for this increase by re-budgeting. ■