# EXHIBIT GGG

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456   Master File No. 01-CV-12257-PBS

-----------------------------------X

In re:  PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION   )

-----------------------------------X

United States of America ex rel      )

Ven-A-Care of the Florida Keys,      )

Inc., et al. v. Dey, Inc., et al.,   )

Civil Action No. 05-11084-PBS        )

-----------------------------------X

United States of America ex rel      )

Ven-A-Care of the Florida Keys, Inc.,)

et al. v. Boehringer Ingelheim Corp.,)

et al., Civil Action No. 07-10248-PBS)

-----------------------------------X

30(b)(6) DEPOSITION OF THE STATE OF ALASKA

DEPARTMENT OF HEALTH AND SOCIAL SERVICES

DESIGNEE:  DAVID CAMPANA

Thursday, August 21, 2008

Anchorage, Alaska

Henderson Legal Services, Inc.

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 182

1  recollection?
2      A.  It still doesn't remind me as to why
3  that was not included in the recommendations.
4      Q.  Now, you stated previously that these
5  drugs, these IV drugs, including Vancomycin were
6  priced manually by you, right?
7      A.  Correct.
8      Q.  They weren't priced by the regular MMIS
9  system that calculated drug payments, right?
10     MR. HENDERSON:  Objection.
11     A.  Correct.
12     Q.  So the fact that one might have to
13 change the computer system was not a reason
14 Alaska continued to use AWPs for these drugs; is
15 that right?
16     MR. HENDERSON:  Objection.
17     A.  Can you repeat that?  My brain didn't
18 catch all of that.
19     Q.  Okay.  Let me try it again.  The fact
20 that AWPs were loaded into an MMIS system and
21 were then processed via a computer for most drug
22 claims, that's not the reason why you would stick

Page 183

1  with AWP for these IV drugs; is that right?
2      MR. HENDERSON:  Objection.
3      A.  Well, the MMIS wasn't -- I don't think
4  was a reason that entered that much into this
5  issue.
6      Q.  Let me try to come at it a different
7  way.  We have had heard some contentions in this
8  case, Mr. Campana, that the state had relied upon
9  the AWPs published by the compendia, such as
10 FirstDataBank, because it was so integrated with
11 the state's computer reimbursement processing
12 system that there was in practice no other
13 choice.
14     Do you follow what I'm saying?
15     A.  Somewhat.  As far as there was -- well,
16 FirstDataBank information was put in the system,
17 but that information could have come from other
18 sources.
19     It was just that FirstDataBank was
20 listed in our regulation that we obtained that
21 through the Blue Book product, so as far as
22 changing to anything else, we would have to

Page 184

1  change the regulation that says that.
2      You know, as far as getting it from
3  somewhere else, if we did get it from somewhere
4  else, it would also have to come through on
5  FirstDataBank or we would have to switch out
6  FirstDataBank for another source.
7      Q.  And that's something you could have
8  done for all drugs, right?
9      A.  We could have.  However, that would not
10 have been something that we would order and then
11 implement two days later.
12     It would be something that would have
13 to go through the public process and a regulation
14 change before that could be implemented.
15     Q.  You need to do a regulation change
16 because the regulation required reimbursement be
17 based off of prices reported in FirstDataBank,
18 correct?
19     A.  Yes.
20     Q.  But in any event, for home IV drugs,
21 you didn't use the computer system to calculate
22 reimbursement for those products; you did that

Page 185

1  yourself, right?
2      A.  I did that based on the average
3  wholesale prices that were contained in the
4  computer system for those drugs used in infusion
5  therapy or other compounds.
6      Q.  But the computer itself did not
7  calculate the reimbursement amount?
8      A.  That is correct.
9      MR. TORBORG:  Mr. Katz, if you would
10 hand Mr. Campana Exhibit No. 577.
11     MR. KATZ:  Go ahead.
12     Q.  Mr. Campana, this is a document titled
13 "Medicaid Pharmacy Bulletin".
14     Let me ask you first -- you don't need
15 to read this.  Let me ask you first if you are
16 familiar with this newsletter.
17     A.  I have seen this newsletter.
18     Q.  And how did you come to see this
19 newsletter?
20     A.  This was sent out by, it appears, by
21 Lederle, and I think later submitted or sent out
22 by Pfizer.  It was sent out on a certain schedule

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

Page 186

1  throughout the year.
2      Q.  Did you review those publications when
3  they came in?
4      A.  Yes.
5      Q.  Were you ever contacted by the staff
6  who published the Medicaid pharmacy bulletin for
7  your thoughts?
8      A.  I don't remember or recall any specific
9  instance.  I may have been contacted.
10     Q.  It's my understanding that the Medicaid
11 Pharmacy Bulletin had a rotating advisory panel
12 that was made up of state pharmacy personnel like
13 yourself?
14     A.  Yes.
15     Q.  Were you ever a member of the advisory
16 panel?
17     A.  No, I was not.  Did you hear that?
18     Q.  No.
19     A.  No, I was not part of that advisory
20 panel for the Medicaid Pharmacy Bulletin.
21     Q.  Do you still have copies of these
22 bulletins in your files?

Page 187

1      A.  I have seen some.  I don't remember if
2  I have those now or not.
3      Q.  Did you look for them as something to
4  produce in response to the document requests
5  issued in the state litigation?
6      A.  I don't recall.
7      MR. TORBORG:  Counsel, we would ask
8  that a search be done of his files for any of
9  these newsletters that may still exist.
10     Q.  Do you know how long, Mr. Campana,
11 these Medicaid Pharmacy Bulletins were published?
12     A.  They were published up into the -- at
13 least the mid-nineties.
14     Q.  Do you recall if the focal point of
15 this publication was reimbursement pharmacy
16 issues at state Medicaid?
17     A.  Can you repeat that question?
18     Q.  Do you recall if the focus of these
19 newsletters was reimbursement issues that arose
20 in state pharmacy programs?
21     A.  That was often a title or a focus of
22 these bulletins.

Page 188

1      Q.  And do you recall if these bulletins
2  discussed the issue of average wholesale price
3  and its relationship to the cost to pharmacies?
4      A.  I don't recall that.
5      Q.  May have happened, you just don't
6  recall?
7      A.  That's correct.
8      Q.  Now, we discussed earlier Alaska's
9  reimbursement system for home IV, right?
10     A.  Yes.
11     Q.  In the 1990s, in addition to a
12 dispensing fee of $11.46, you were paying a
13 compounding fee of $10 every 15 minutes, right?
14     A.  Correct.
15     Q.  Do you have any insight as to how
16 Alaska's reimbursement of intravenous
17 prescriptions compared with that of other states?
18     A.  It was generally higher than other
19 states.
20     Q.  How did you become aware of that?
21     A.  Through different surveys or different
22 questionnaires that we completed.

Page 189

1      Q.  What questionnaires would you have
2  completed?
3      A.  I don't recall any specific one, but I
4  know over the years that I have completed
5  questionnaires on that type of question.
6      Q.  Do you retain -- did you retain copies
7  of those?
8      A.  Yes, I have a binder of some years of
9  copies of questionnaires that I completed.  I
10 don't know what the limits of that binder are,
11 but it's got some years of those questionnaires.
12     Q.  Have those been provided to counsel for
13 production, do you know?
14     A.  I don't believe so.
15     MR. TORBORG:  Counsel, we would ask
16 that those be -- documents be preserved and be
17 produced in the state litigation.
18     MR. BURNHAM:  Just so there is no
19 mistake, I'm not keeping track of these requests.
20 I'm expecting that anybody that wants some more
21 documents, that they will be sending us something
22 in writing to which we can respond, but I'm not

48 (Pages 186 to 189)

b402ad78-7827-456e-987c-3331b70c1138

# EXHIBIT HHH

Newark, DE

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

-------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 346

1  packaging, the staff is there.  So I'm not sure I
2  could agree there's a difference in cost, if you
3  go with my presumption that you have a baseline
4  staff.
5      Q.  What about the costs for a home IV
6  pharmacy to dispense a compounded prescription?
7  Would you agree that Delaware was aware that
8  those costs exceeded the standard costs to
9  dispense a bottle of pills from a traditional
10 pharmacy?
11     MS. HEALY SMITH:  Objection.
12     THE WITNESS:  So just to be clear,
13 you've changed the type of questions you're
14 asking and were asking, based on the Division's
15 policy, whether that there was a separate or a
16 different methodology for reimbursement on IV add
17 mixture.
18 BY MS. RAMSEY:
19     Q.  No, I wasn't asking about a separate
20 policy.  I was asking about knowledge of the
21 specific increased costs for a home IV company to
22 administer IV drugs?

Page 347

1      A.  I want to make sure that I'm answering
2  the question correctly, so I need it --
3      MS. SHUTTEE:  Do you need to have it
4  read back to you?
5      THE WITNESS:  -- read back to me.  I'm
6  sorry.
7      MS. RAMSEY:  Actually, I can go ahead
8  and have a document marked.
9  BY MS. RAMSEY:
10     Q.  Okay.  I am handing the witness what
11 has been previously marked as Abbott Exhibit 578.
12     A.  Do you want me to put this away now?
13     Q.  You can keep it handy.  We'll probably
14 be looking at it from time to time.
15     MS. HEALY SMITH:  You don't have one
16 more copy handy, do you?
17     MS. RAMSEY:  No.
18     THE COURT REPORTER:  Do you want this
19 marked again?
20     MS. RAMSEY:  No, it can stay marked as
21 Abbott 578.
22     THE COURT REPORTER:  Oh.  Okay.

Page 348

1      THE WITNESS:  Wow, something before my
2  time.
3      Sorry.  I couldn't help myself.  I know
4  we're on record still.
5      1988.
6      MS. SHUTTEE:  Yeah.
7  BY MS. RAMSEY:
8      Q.  Now, after you have a moment to review
9  this document, let me know, and I'll direct you -
10 - you don't have to read it page by page, but
11 just familiarize yourself.
12     And for the record this is a Medicaid
13 Pharmacy Bulletin that's dated January to
14 February, 1988, titled Developing an Effective
15 Reimbursement Methodology for Home IV Therapy.
16     First of all, are these Medicaid
17 Pharmacy Bulletins documents that you received in
18 your work with Delaware Medicaid?
19     A.  Not the ones that were sponsored by
20 Lederle, but the ones that came after Lederle.  I
21 think the first one I received were by Parke-
22 Davis.

Page 349

1      Q.  Do you know whether Delaware Medicaid
2  was provided with these pharmacy bulletins prior
3  to your arrival in 1993?
4      MS. HEALY SMITH:  Objection.
5      THE WITNESS:  My assumption is that the
6  manufacturers and labelers have a pretty good
7  national list and when they want to mail the
8  Medicaid Programs they have a contact for each
9  program.
10 BY MS. RAMSEY:
11     Q.  Is that a yes?
12     A.  What was the exact question again?
13     Q.  I believe that I asked whether you had
14 any knowledge as to whether Delaware Medicaid
15 received Medicaid Pharmacy Bulletins prior to
16 your arrival.
17     A.  Other than what I just stated, I would
18 say, no, I don't have specific knowledge.
19     Q.  Okay.  So they could have or they might
20 not have?
21     A.  Correct.
22     Q.  Okay.  But you indicated that you did

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 350

1  begin receiving these at some point?
2      A.  Yes.
3      Q.  Okay.  Do you recall when that was?
4          MS. SHUTTEE:  Strike that -- I'm sorry.
5  I said strike that.  That's not what I meant to
6  say.
7          Excuse me.  When you said receiving
8  these, did you --
9          MS. RAMSEY:  Medicaid Pharmacy
10 Bulletins.
11         MS. SHUTTEE:  -- mean these from
12 Lederle or these from Parke-Davis or these from
13 another provider?
14         MS. RAMSEY:  Any Medicaid pharmacy
15 provider.
16         MS. HEALY SMITH:  Any Medicaid.
17         Thank you very much.  Pardon for my
18 interruption.
19         THE WITNESS:  My recollection of
20 receiving Medicaid Pharmacy Bulletin goes fairly
21 back to when I first started.  They were valuable
22 publications, but exactly when I started to

Page 351

1  receive them, I don't know.
2  BY MS. RAMSEY:
3      Q.  Okay.
4      A.  It would have been in the early to mid-
5  '90s.
6      Q.  Now, the first column, the title is
7  home intravenous IV reimbursement is a complex
8  issue for Medicaid Pharmacy Programs.
9          And then the second paragraph it
10 states, because home IV therapy involves a host
11 of additional pharmacy services; storage,
12 preparation, delivery, patient instruction, et
13 cetera, it is generally agreed that it is more
14 expensive to dispense this type of medication
15 than to dispense other outpatient drugs.
16         Did I read that correctly?
17     A.  You read it correctly.
18     Q.  And do you agree with that sentence?
19     A.  No.
20     Q.  Why not?
21     A.  Because some of the functions that are
22 mentioned are not specific to the dispensing

Page 352

1  function and more subject to other facets of
2  delivering health care.
3      Q.  Such as what?
4      A.  Such as delivery.
5      Q.  And what about compounding?
6      A.  Preparation is what's listed here.  And
7  in some situations preparation may be longer,
8  yes.
9          I also would disagree with patient
10 instruction being part of the dispensing
11 application or function for these products.  In
12 most situations that I am aware of with IV-
13 administered drugs, you're going to have a home
14 health component, such as a visiting nurse, and,
15 therefore, I believe that the charges associated
16 with patient instructions would be done onsite at
17 the home or the facility where the person was
18 receiving the drug.
19     Q.  So you do agree that there are
20 additional costs and services that home IV
21 providers would incur versus a traditional retail
22 pharmacist dispensing a drug; is that correct?

Page 353

1          MS. HEALY SMITH:  Objection.
2          THE WITNESS:  Yes.  To some degree.
3  BY MS. RAMSEY:
4      Q.  How did Delaware reimburse provider of
5  home IV medications --
6          MS. HEALY SMITH:  Objection.
7  BY MS. RAMSEY:
8      Q.  -- during the relevant time period?
9      A.  Can you redefine the relevant time
10 period?
11     Q.  Beginning in 1991 and going through
12 approximately 2001.
13     A.  We reimbursed the pharmacy providers
14 for the ingredient costs plus a $3.65 dispensing
15 fee.
16     Q.  Were there any additional -- strike
17 that.
18         Did Delaware provide any additional
19 reimbursement or compensation other than the
20 ingredient costs and the $3.25 dispensing fee?
21     A.  We reimbursed a dispensing fee of
22 $3.65.

21 (Pages 350 to 353)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

# EXHIBIT III

# Indianapolis, IN

Page 362

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------X

IN RE: PHARMACEUTICAL        ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE   ) Master File No.

PRICE LITIGATION             ) 01-CV-12257-PBS

--------------------------) Subcategory Case

THIS DOCUMENT RELATES TO:    ) No. 06-11337

United States of America ex )

rel. Ven-A-Care of the       ) Hon. Patti B. Saris

Florida Keys, Inc., et al.   )

v. Dey, Inc., et al., Civil  )

Action No. 05-11084-PBS, and) VIDEOTAPED DEPOSITION

United States of America ex ) OF THE INDIANA FAMILY

rel. Ven-A-Care of the       )  AND SOCIAL SERVICES

Florida Keys, Inc., et al.   )   ADMINISTRATION by

v. Boehringer Ingelheim      )      CARL MARK

Corp., et al., Civil Action  )    SHIRLEY, R.Ph.

No. 07-10248-PBS             )      VOLUME II

--------------------------X

DECEMBER 3, 2008

INDIANAPOLIS, INDIANA

e7567ca2-f9c5-466f-9f26-8b590237613e

Indianapolis, IN

Page 575

1  previously marked Abbott Exhibits 292, 577 and
2  578.  If you could take a quick look at those.
3  As a general matter, Mr. Shirley, do you recall
4  receiving Medicaid pharmacy bulletins of which
5  these are three examples?
6      A.  I recall this was published, yes.  It
7  was in the mid-'80s, I believe, that's -- yeah.
8      Q.  These are dated 1987, 1988 and 1990.
9      A.  Yes, I remember when these were
10 published.
11     Q.  And were you on the mailing lists for
12 them?
13     A.  I believe I was.
14     Q.  Did you read them regularly?
15     A.  Again, given the amount of information
16 that came through my office, I would take a look
17 at it.  If it looked like it had anything of
18 interest in it, I would scan it.  I don't recall
19 reading any of these three in particular.
20     Q.  All three of these, Exhibits 292, 577
21 and 578 have cover stories relating specifically
22 to home IV therapy.  Do you have an understanding

Page 576

1  of what home IV therapy is?
2      A.  I think different people have perhaps
3  different interpretations or definitions of it.
4  My understanding is that it's intravenous,
5  probably drug therapy that a person receives
6  while residing in their own home.
7      Q.  Does Indiana Medicaid pay for home IV
8  therapy?
9      A.  Under the pharmacy program, we pay for
10 drugs.  So to the extent drugs are part of home
11 IV therapy, then Medicaid would pay for the
12 products.
13     Q.  If you look at Exhibit 292, at the top
14 of the second column it's talking there about a
15 study in Colorado that documents significant
16 financial savings that Medicaid programs can
17 achieve in comparison to inpatient IV therapy.
18 Do you see that?
19     A.  Yes.
20     Q.  Was it your understanding in the late
21 '80s that the advent of home IV therapy could
22 result in significant savings to Indiana Medicaid

Page 577

1  as opposed to patients going into the hospital to
2  receive IV treatments?
3          MS. ST. PETER-GRIFFITH:  Object to the
4  form.
5      A.  I can only say that it would make sense
6  if that was -- if someone stated that, I would
7  say, well, that makes sense.  It's cheaper to get
8  a service in their own home than it is in a
9  hospital.
10     Q.  But do you have any specific
11 recollection of those issues being discussed back
12 in the late 1980s?
13     A.  No, I don't.
14     Q.  All right.  And then if you look at
15 page 389 and flowing over into 390, it's the
16 second and third pages, it's the section
17 entitled, quote, "The Establishment of a Fair and
18 Reasonable Pricing Methodology for Home IV
19 Products is a Major Concern of Most State
20 Medicaid Programs," closed quote.  And then if
21 you look at the very first sentence of that
22 section, am I correct, indicates that according

Page 578

1  to this report at least, "A major obstacle to the
2  development of home IV pricing methodologies is
3  the fact that dispensing of home IV medications
4  is more complex than the dispensing of other
5  outpatient drugs."  Did I read that correctly?
6      A.  Yes.
7      Q.  In the late 1980s and through the '90s,
8  at any time did Indiana Medicaid look to
9  establish pricing methodologies specifically with
10 respect to home IV products?
11         MS. ST. PETER-GRIFFITH:  Object to the
12 form.
13     A.  I do not recall that.
14     Q.  If you look down at the next paragraph
15 on 390, the very first sentence there indicates
16 that, quote, "For lack of a better alternative,
17 some state Medicaid programs use the same
18 ingredient-based therapy they apply to other
19 legend drugs in calculating reimbursement for
20 home IV medications," closed quote.
21         Is that true, or was that true in the
22 1980s and through the 1990s for Indiana Medicaid?

55 (Pages 575 to 578)

e7567ca2-f9c5-466f-9f26-8b590237613e

# EXHIBIT JJJ

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

                MDL NO. 1456

                NO. 01-CV-12257-PBS

                JUDGE PATTI SARIS

                MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

        VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

Page 242

1  something like that?
2      A.  Yes.
3      Q.  When did you start on that e-mail
4  distribution?
5      A.  Oh, it's been several years.
6      Q.  Do you still have those e-mails on your
7  computer?
8      A.  I have some e-mails.
9      Q.  Now, this collection of documents was
10  produced in sequential order.  All appear to be
11  different e-mails concerning reimbursement for
12  compounding home IV-type issues of the type we were
13  just talking about.  I would like to ask you to go
14  to the Bates page ending 768.  Are you there?
15      A.  Yes.
16      Q.  The bottom of the page is an e-mail from
17  Rachel Broussard.  She was on your staff?
18      A.  Yes.
19      Q.  Is on your staff?
20      A.  (Witness nods head affirmatively.)
21      Q.  She e-mailed a distribution to the state
22  Medicaid administrators; is that right?

Page 243

1      A.  Yes.
2      Q.  Do you recognize those names?
3      A.  Yes.
4      Q.  And she asked, "We are interested in
5  information regarding policies in reimbursement of
6  compound prescriptions.  Are other states
7  reimbursing pharmacy providers for compound
8  prescriptions?  If so, what is your policy for
9  reimbursing compounds, what is your reimbursement
10  methodology and do you reimburse a compound fee?"
11      Do you see that?
12      A.  Yes.
13      Q.  Do you recall Ms. Broussard seeking
14  information from other states concerning
15  reimbursement of compound prescriptions?
16      A.  Yes.
17      Q.  What motivated that?  Was it the Myers
18  and Stauffer report?
19      A.  No.  Occasionally, we will get calls on
20  compounding scrips, and we don't have any policies
21  so we were looking at other states' policies.
22      Q.  Do you know what, if anything, Louisiana

Page 244

1  did with the information it received?
2      A.  We haven't done anything yet.
3      Q.  Why is that?
4      A.  Probably because we have lots of other
5  things to do, so it is still on our to-do list.
6      Q.  If reimbursement were cut on the
7  ingredient side, the actual acquisition cost, is
8  that something you think would go to the top of
9  your list and re-create a separate fee for
10  compounding?
11      MR. FAUCI:  Objection.
12      THE WITNESS:  I don't know, it's a kind of
13  whatever-is-on-top-of-the-list sort of day here.
14  BY MR. TORBORG
15      Q.  And what runs the agenda on what is at
16  the top of the list?
17      A.  The secretary of the department.
18      Q.  And the secretary of the department gets
19  calls from providers?
20      A.  Yes.  Mostly we get calls from providers.
21      Q.  Do you recall getting phone calls from
22  providers concerning the need for a compounding

Page 245

1  fee?
2      A.  We have gotten a few calls, yes.
3      Q.  Do you recall what you have told them
4  about why it is Louisiana is not paying one?
5      A.  Rachel answers those calls primarily.  We
6  try to work with the pharmacist to, under our
7  existing policy, to go ahead and provide those
8  drugs.
9      Q.  Well, how about the payment of a separate
10  higher dispensing fee for compound prescriptions?
11      A.  That has not been addressed.
12      Q.  Okay.  If I could ask you to get out
13  Abbott Exhibit 292, which is one of the -- should
14  be on the top right underneath the stack there.  I
15  think I put it in order.  This is a document titled
16  "Medicaid Pharmacy Bulletin," dated
17  January/February 1997, titled "Medicaid
18  Reimbursement for the Pharmacy Component of Home IV
19  Therapy."
20      Do you see that?
21      A.  Yes.
22      Q.  And you recall getting these bulletins.

Page 246

1  Is that right?
2      A.  Yes.
3      Q.  And you were at some point a member of
4  the editorial staff.  Is that right?
5      A.  Yes.  For a short tenure.
6      Q.  And did you retain copies of these
7  bulletins?
8      A.  I don't believe I have them anymore.
9      Q.  If I wanted to get my hands on these,
10 what is the best way to get them, other than the
11 ones I have?  If I wanted to get all of the copies
12 of these, what is your -- do you have any guidance
13 for me about how I might do that?
14     A.  I do not, other than you would get a
15 pharmacy director that retained them all.
16     Q.  Was it your understanding that this was a
17 publication that was widely recognized in the state
18 Medicaid pharmacy administrator universe?
19     A.  Yes.
20     Q.  And do you recall when you were on the
21 advisory panel of this publication, that there were
22 annual meetings that were associated with this

Page 247

1  publication?
2      A.  I do not recall.
3      Q.  I would like to ask you to go to the
4  second page of Abbott Exhibit 92, under the Section
5  1, "The Development of Pricing Mechanisms for Home
6  IV Medications," it states, "The establishment of a
7  fair and reasonable pricing methodology for home IV
8  products is a major concern of most state Medicaid
9  programs.  One of the major obstacles to the
10 development of adequate home IV pricing
11 methodologies is the fact that the dispensing of
12 home IV medications is more complex than the
13 dispensing of other outpatient drugs."
14     Do you see that?
15     A.  Yes.
16     Q.  And was that something that you were
17 aware of throughout the time 1991 through 2001?
18     A.  I do not recall.
19     Q.  Do you recall when you started receiving
20 these bulletins?
21     A.  I do not.
22     Q.  Do you have any basis to disagree with

Page 248

1  the notion that dispensing home IV medications is
2  more complex than dispensing of other outpatient
3  drugs?
4      A.  I agree it is more complex.
5      Q.  Let me ask you to go to the next page.  We
6  are on page 390.  It says, "Providers and
7  pharmacist consultants concur that it is not
8  appropriate to apply the same ingredient-based
9  pricing mechanisms to home IV medications as those
10 that apply to other outpatient drugs."
11     Do you see that?
12     A.  Yes.
13     Q.  Did you agree with that?
14     A.  I don't know that I agree with it.  I
15 would say you would have to survey to determine
16 what is the appropriate structure of the pricing
17 mechanism that you utilize for home IV, although it
18 should probably be different than normal retail
19 business.
20     Q.  And if we go to the second paragraph
21 under that section, it states, "Home IV treatments
22 are frequently a combination of multiple drug

Page 249

1  entities dispensed in varying doses and dispensed
2  several times daily.  Although it may be minimal to
3  moderate in quantity over an entire treatment,
4  large volumes of medications are generally
5  administered.  It is therefore difficult to
6  estimate based on a single daily or even weekly
7  administration the purchase price these providers
8  are paying with volume and trade discounts.  These
9  discounts are generally not revealed in drug
10 publications such as Red Book, Blue Book, and
11 DataBank.  Consequently, programs are reluctant to
12 increase reimbursement for home IV medications,
13 suspecting that reported costs for these substances
14 may already be exaggerated."
15     Do you see that?
16     A.  Yes.
17     Q.  Do you have an understanding of what that
18 last sentence is saying?
19     A.  What I think it is saying is that the
20 programs -- and that would be the Medicaid programs
21 -- are reluctant to increase the reimbursement for
22 home IV based upon the increase in cost of the

2d9d517a-cf38-41c8-9c65-0424823ff391

# EXHIBIT KKK



**U.S. Department of Justice**

Civil Division, Fraud Section

---

*601 D Street, NW*
*Ninth Floor*
*Washington, D.C. 20004*

*Telephone:  (202) 305-9300*
*Telecopier:  (202) 616-3085*

March 3, 2008

*Via Electronic Transmission*

David Torborg
Jones Day
51 Louisiana Ave., N.W.
Washington, DC 20001-2113

Re:   *U.S. ex rel. Ven-a-Care of the Florida Keys Inc v. Abbott Laboratories*
        MDL No. 1456/Civil Action No. 01-12257-PBS

Dear David:

         This letter responds to your inquiries about the status of the Government's production of documents relating to the OIG reports covered by Abbott's Requests for Production of Documents (RFPs) in the above-referenced matter.  Additionally I am writing to update you regarding the current status of the Government's entire production and will identify items that we expect to produce by March 31, 2008 in order to complete the Government's responses to Abbott's RFPs.

**Government Reports Relating to Drug Pricing and Related Issues**

         With respect to the material requested in Abbott's First RFP 20, to date the Government has produced 60 reports and related workpapers from OIG's Office of Evaluations and Inspections and Office of Audit Services.  Abbott asked that we give priority status to thirty-two of the reports listed on Schedule B to the RFPs; you later amended that request to add two additional reports.

         At this time, we have largely complied with Abbott's request.  You have asked about the status of the production of documents and information related to the reports on your priority list which have not yet been produced.  We have produced additional documentation for 25 of the 34 reports on your list.

         The outstanding reports for which we have not yet produced workpapers or other documentation are: HHS-OIG, "Title XIX of the Social Security Act, Limitation on Payment or Reimbursement for Drugs" (Sept. 1, 1984); HHS-OIG, "Changes to the Maximum Allowable Cost Medicaid Drug Limit Could Save Millions" (CAN 08-60203, Aug. 15, 1986); HHS-OIG, "Use of Average Wholesale Price in Reimbursing Pharmacies Participating in Medicaid and the

-2-

Medicare Prescription Drug Program" (A-06-89-0037, Oct. 1989); HHS-OIG, "Comparison of Reimbursement Prices for Multiple Source Prescription Drugs in the United States and Canada" (OEI-03-91-000470, Aug. 1, 1991); Task Force on Prescription Drugs, the Office of the Secretary, U.S. Dept. of Health, Education and Welfare – Final Report (Feb. 1969); HCFA (Region IX), "EAC Survey Report, Hawaii Medicaid Program, EAC Patrol Initiative" (1986); HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services" (Nov. 1996); HHS-OIG, "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products" (A-06-97-00011, Aug. 1997); and HHS-OIG, "OIG's Partnership Plan – Utah Division of Health Care Financing Reports on Medicaid Pharmacy Acquisition Costs of Brand Name and Generic Drugs" (May 1999).

At this time, we can advise you that the Government has not been able to locate workpaper files for the first eight items listed above. The Office of Counsel to OIG is still working on the ninth item, and I expect to update you about the work papers for that report within the next seven days.

**Production from DHHS-OIG**

We expect to fully complete production from the OIG by March 31, 2008. Material remaining to be produced includes materials from the files of Paul Chesser, Benjamin Jackson, Gordon Sato and a small number of additional documents from OEI Region V. Additionally, we expect to produce material relating to the OAS reports "Physician's Cost for Chemotherapy Drugs" (A-02-91-010490) and "Physicians Cost for Chemotherapy Drugs" (A-02-91-010490, as well as the OEI reports "State Strategies to Contain Medicaid Drug Costs" (OEI-05-02-00680) and "Omission of Drugs from the Federal Upper Limit List in 2001" (OEI-03-02-00670).

Please note, the Government's production on behalf of the OIG does not include material from the files of the Office of Counsel to the Inspector General.

**Material from CMS**

As for CMS, in the coming weeks we expect produce material from following sources at CMS: the files of Larry Reed, Elizabeth Richter, and the Medicaid pharmacy team; documents from CMS's central office regarding review of Medicaid State Plan Amendments. We also have a very limited amount of material left to be produced from the Office of Legislation. At this point, we have not completed our search for documents in the custody of CMS's Medicare Carrier Contract Group. We will update you regarding the status of that search in the coming weeks.

The Government has completed its production of Medicare claims data to Abbott for the subject drugs. We have also been providing you with Medicaid claims data obtained from the States. For these data sets, production has now been completed for Florida, Illinois, California, Kentucky, Missouri, New York, Ohio, Michigan, Louisiana, North Carolina, Wisconsin, and Texas. We expect to provide claims information relating to the Indiana, New Jersey and

-3-

Pennsylvania programs in the coming month.  We also expect to produce data from CMS's State Medicaid Error Rate Findings (SMERF) system by March 31, 2008.

      With respect to the material that the Government has obtained from the private contractors retained by CMS as Medicaid Carriers, the Government has substantially completed its production of the material to Abbott.  The Government certifies that Abbott's RFPs were transmitted to all Carriers likely to have responsive information and they were directed, pursuant to their contracts with CMS to provide material in response thereto.  In the coming weeks we expect to be producing some additional material from HealthNow, Cahaba, GBA, and First Coast Services Options, Inc.  Once that occurs, we will have produced to Abbott all responsive non-privileged material provided by the contractors to CMS.

      Once the United States has produced the material described above, the United States will have completed its document production on behalf of the Centers for Medicare and Medicaid Services and the Office of the Inspector General, DHHS, subject to the objections stated by the United States in response to Abbott's First RFPs numbered 1 through 126 and Abbott's Second RFPs numbered 1 through 16 and consistent with the parties' discussions and negotiations beginning in December 2006.

      Thank you for your attention.


Very Truly Yours,

/s/
Justin Draycott
Trial Attorney
Commercial Litigation Branch


cc:    James Breen

# EXHIBIT LLL

Molyneaux, Nancy                         January 11, 2007
                    Philadelphia, PA

                                                      Page 1

                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

------------------------x

IN RE:  PHARMACEUTICAL     :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE :  CIVIL ACTION

PRICE LITIGATION           :  01-CV-12257-PBS

           vs.             :

THIS DOCUMENT RELATES TO   :

U.S. ex rel. Ven-A-Care of :

The Florida Keys, Inc.     :

v. Abbott Laboratories,    :

Inc., No. 06-CV-11337-PBS  :

------------------------x


          Oral Deposition of NANCY MOLYNEAUX, was

taken pursuant to notice at the Law Offices of Morgan

Lewis, 1701 Market Street, Philadelphia,

Pennsylvania, on Thursday, January 11, 2007,

beginning at 10:00 a.m., before Jeanne Christian,

Court Reporter-Notary Public, there being present.


                Henderson Legal Services, Inc.
                      (202) 220-4158

f87d2b00-f300-4d94-8d68-cfac104cfa34

Molyneaux, Nancy                                    January 11, 2007
                          Philadelphia, PA

Page 22

1    A.  Yes.
2    Q.  Who else is working on this project with
3  you?
4    A.  At the moment, no one.
5    Q.  Do you expect others will be joining you
6  on the project?
7    A.  No.
8    Q.  Did you receive training when you joined
9  OIG?
10   A.  Any training?
11   Q.  Yes.
12   A.  Yes.
13   Q.  What type of training did you receive?
14   A.  I had like new employee orientation.
15   Q.  How long is that?
16   A.  That was like three days.  I think I had
17  training, you know, in computer programs, like I
18  mentioned before.
19   Q.  How did you learn about the various
20  issues of health care implicated in your projects?
21  Through just experience?
22   A.  Um-hum, yes.

Page 23

1    Q.  I'm going to follow up a little bit on
2  some of the language in your resume.
3    A.  Okay.
4    Q.  The section on the first page
5  responsibilities include, are you with me there?
6    A.  Yes.
7    Q.  The first bullet point discusses
8  "creating, developing and writing complex
9  inspection designs, outlining the purpose of the
10  inspection, background information, sampling and
11  data collection, methodology, budget and
12  schedule."
13       Do you see that?
14   A.  Yes.
15   Q.  And what are inspection designs?
16   A.  It is the document that lays out our
17  objectives, our background information, what we
18  call pre-inspection, contacts that we have made,
19  information that we have gathered, and then it
20  lays out the issues that we plan to address and
21  how we plan to address them in terms of our data
22  collection and methodology.

Page 24

1    Q.  The second bullet states, "Developing
2  data collection instruments, including record
3  review checklists, mail surveys and telephone
4  surveys."
5        Do you see that?
6    A.  Yes.
7    Q.  What are record review checklists?
8    A.  If we are going to be collecting
9  documents from a respondent, we might have a
10  checklist of things that we want to find in that
11  document.
12   Q.  Do you retain the record review
13  checklist after completing the report?
14   A.  For a specified period.
15   Q.  And what is the specified period?
16   A.  For a primary document, it would be ten
17  years.
18   Q.  What is a primary document?
19   A.  Information relating to what actually
20  went into the report or summarizing what went into
21  the report or summarizing data collection
22  analysis.

Page 25

1    Q.  Would most record review checklists be
2  retained for ten years?
3    A.  I'm not sure.
4    Q.  Who would know the answer to that
5  question?
6    A.  It is I think -- it would depend on the
7  checklist, how big it was.  It might be put into a
8  secondary file.
9    Q.  What is a secondary file?
10   A.  It is a file that's retained -- that
11  contains extraneous information or information
12  that's summarized elsewhere.
13   Q.  And how long are the secondary files
14  retained?
15   A.  About five years.
16   Q.  What happens to the primary file after
17  ten years and the secondary file after five years?
18       MR. NEAL:  I'm going to object to the
19  form.  You can answer.
20  BY MR. TORBORG:
21   Q.  You can answer separately, your answer
22  first as to the primary file, the second answer as

7 (Pages 22 to 25)

f87d2b00-f300-4d94-8d68-cfac104cfa34

# EXHIBIT MMM

Page 313

                    UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL INDUSTRY     :   MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION :   CIVIL ACTION

THIS DOCUMENT RELATES TO:          :   01-CV-12257-PBS

United States of America ex rel.   :

Ven-a-Care of the Florida Keys,    :

Inc., v. Boehringer Ingelheim      :

Corp., et al., Civil Action No.    :

07-10248-PBS and United States of  :

America, ex rel. Ven-A-Care of the :   Hon. Patti B.

Florida Keys, Inc., v. Abbott      :     Saris

Laboratories, Inc., Civil Action   :

Nos. 06-11337-PBS and              :

07-CV-11618-PBS                    :

- - - - - - - - - - - - - - - - -x

        (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

                        Washington, D.C.

                        Tuesday, October 28, 2008

                        VOLUME II

                        PAUL CHESSER

659f3143-f1ba-497f-be0c-b04914cf5712

Chesser, Paul - Vol. II                    October 28, 2008
                  Washington, DC

Page 598

1    not exist anymore. Do you have any memory of any
2    records that either might have been lost or destroyed
3    since the 1994 time period, and whether in the
4    regular course of OIG's business or otherwise?
5        A.    I guess I'm not following exactly what
6    type of record you're talking about.
7        Q.    Sure. I think you had indicated that
8    there might be a record of the meeting, whether it's
9    a memo of the meeting or some description of the
10   meeting?
11       A.    Which meeting?
12       Q.    The meetings that Mr. Shrigley or others
13   had with Mr. Reed prior to initiating --
14       A.    I don't know that I would have ever had
15   knowledge if there were records of that meeting
16   maintained, other than Bill Shrigley's personal notes
17   or --
18       Q.    Are there any records that relate to the
19   1994 study that don't exist anymore that you're aware
20   of?
21       A.    Well, unfortunately, we had maintained
22   those records. Well beyond the -- our self-imposed

Page 599

1    requirement for time limit.
2        Q.    Why is that?
3        A.    I don't know. I guess I bear some
4    responsibility. I regretted it at some point about a
5    year ago.
6        Q.    So it wasn't -- it wasn't that there was a
7    litigation hold on them, for example?
8        A.    No. Not that I was -- I was just, I
9    thought they belonged in the audit hall of fame, I
10   guess.
11       Q.    We received only scanned versions of paper
12   records as part of the production. Are there any
13   electronic records that still exist from this 1994
14   audit, for example, the Quattro spreadsheets or the
15   dBASE file?
16       A.    Yes.
17       Q.    Where would I find those?
18       A.    I think I turned those over as part of the
19   -- we did this in phases, we had the hard copy and
20   then we had an electronic work paper or documents
21   phase that that would have been part of that.
22            BY MR. COOK:

Page 600

1        Q.    And were those turned over on disks or on
2    a drive or on five and a quarter inch floppy disks?
3        A.    I don't remember.
4        Q.    Okay. But those would be something that
5    they exist, it's just a matter of the format they
6    exist in and where they are right now, right?
7        A.    Yes.
8        Q.    What would be contained within those
9    electronic records that you produced?
10       A.    A variety, from those spreadsheets that
11   you're talking about, the Quattro spreadsheets to
12   emails to spreadsheets and other analysis.
13       Q.    How did you keep emails from that long
14   ago?
15       A.    I don't know if the emails from that long
16   ago would actually be in this. I'm just talking
17   about emails that I have electronically that would
18   probably have to be more recent than that -- I don't
19   have emails from --
20       Q.    Justin, we would request copies of any
21   electronic documents that were produced by
22   Mr. Chesser that would be responsive to our request?

Page 601

1            MR. DRAYCOTT: We'll certainly look into
2    it, Chris, but again, my understanding is if it was
3    produced, if Mr. Chesser produced it to us, we would
4    have produced it by now, so -- but we'll check that.
5            BY MR. COOK:
6        Q.    Sure. I'm going to skip ahead just a
7    little bit on my outline and ask you -- I believe you
8    gave some testimony earlier about sort of the nature
9    of the work product that you generated from that 1994
10   report, and that is the report showing the discounts
11   from AWP. Could you give me just a physical
12   description of what those report runs would have
13   looked like? What the physical piece of paper would
14   have looked like that showed the discounts from AWP
15   for specific NDCs from that 1994 analysis?
16       A.    Are you talking about going through the
17   software, going through the software, the RAT STATS.
18       Q.    Yes. The final end, it spits out a report
19   that says NDC number 1234567 has a discount of X, Y,
20   Z?
21       A.    My recollection of the software was that
22   it didn't produce a report, it did it by pharmacy.

73 (Pages 598 to 601)

659f3143-f1ba-497f-be0c-b04914cf5712

Chesser, Paul - Vol. II                         October 28, 2008
                    Washington, DC

Page 602

1   So actually, when we ran the software, we had to do
2   it in two phases.  First phase, if I remember right,
3   I took all of the data for a state, ran it through
4   the RAT STATS, and all that data was grouped by each
5   pharmacy had its own ID number.  Every invoice price
6   that we included in the review was in there, as well
7   as the discount off AWP, if any, for that NDC.
8          After that went through the system, it
9   created a file that summarized by that state, and by
10  each strata, what the average -- I'm not sure exactly
11  what it did.  I'm not a statistician.
12     Q.   All right.  So the input into the RAT
13  STATS -- and RAT STATS is the statistical software,
14  right?
15     A.   Correct.
16     Q.   The input into the RAT STATS was line by
17  line, it would have a drug by NDC number, right?
18     A.   Yes.
19     Q.   It would indicate the --
20     A.   Well, actually, what I compiled from that
21  might not have had the -- I mean, at some point, we
22  would have had the NDC.

Page 603

1   Q.   That would be on the Quattro?
2   A.   I can't remember if what went into RAT
3   STATS didn't necessarily need the NDC, it just
4   needed.
5   Q.   Okay.  Let me take one step back then.
6   For each pharmacy, you created a Quattro spreadsheet
7   that showed the date of the invoice, whether it was
8   a -- the NDC for the particular drug, right?
9   A.   Yes.
10  Q.   The price -- the invoice price for that
11  drug, right?
12  A.   Yes.
13  Q.   And would you then include the AWP on that
14  spreadsheet, or would that be in another data set
15  somewhere?
16  A.   Eventually, after that spreadsheet was
17  uploaded into dBASE and pumped against the AWP file,
18  I can't remember if I -- I could have done it any
19  number of ways, but eventually you would have had a
20  spreadsheet that did all that.
21  Q.   Okay.  So whether it's after dBASE or
22  Quattro, there would be in a spreadsheet where I

Page 604

1   could lay it out and say, this drug with this NDC, so
2   manufacturer specific, was purchased on this date by
3   this pharmacy at this price.  The AWP is another
4   number and the discount that this pharmacy received
5   on this date for this drug was a percentage, right?
6      A.   Correct.
7      Q.   And it went down that way for the however
8   many tens of thousands of invoice prices that you
9   inputted into the -- into the databases, right?
10     A.   Yes.
11     Q.   And then it was that collection of data
12  that RAT STATS pulled up, did its thing and spit out
13  for this type of pharmacy in this state the average
14  discount is whatever percent, right?
15         MR. DRAYCOTT:  Objection.
16         THE WITNESS:  Yes.
17         BY MR. COOK:
18     Q.   Okay.  And so, for example, if one were to
19  look at the raw data in dBASE, one would be able to
20  determine that on a particular date, an infusion
21  pharmacy in a month in 1994 paid, say, a dollar for a
22  bag of saline, the AWP for which was $10 for a

Page 605

1   discount of 90 percent, realizing those numbers are
2   hypothetical, right?
3      A.   Yes.
4          MR. DRAYCOTT:  Objection.
5          BY MR. COOK:
6      Q.   You testified on your first day that you
7   provided the raw data to a couple of states, one of
8   which was Florida.  Do you recall that?
9      A.   Yes.  I do remember that.
10     Q.   Have you since remembered which the other
11  state was that got the raw data?
12     A.   No.
13     Q.   The raw data that you provided to Florida
14  and to one other state, was it that level of detail
15  of raw data, the invoice, NDC, discount level data?
16     A.   Yes.  I think so.
17     Q.   If any other states had asked you for that
18  level of data, would you have been willing to provide
19  it?
20         MR. DRAYCOTT:  Objection.
21         THE WITNESS:  Yes.  Because we believed --
22  I mean, they were managing the Medicaid program.

74 (Pages 602 to 605)

659f3143-f1ba-497f-be0c-b04914cf5712

# EXHIBIT NNN

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113

TELEPHONE: (202) 879-3939 • FACSIMILE: (202) 626-1700

Direct Number:  (202) 879-3734
ccook@jonesday.com

March 30, 2009

VIA EMAIL

M. Justin Draycott, Esq.
Patrick Henry Building
601 D Street, N.W.
Washington, D.C. 20004

Re:     *United States ex rel. Ven-A-Care of the Florida Keys v. Abbott Laboratories, Inc.*

Dear Justin:

I write to address a number of discovery topics.

### OGC Opinions

I refer to your March 13, 2009 letter in which you described a search for certain OGC opinions pertaining to CMS's ability to "require carriers to use the DOJ data because it is characterized by DOJ as more accurately reflecting average wholesale prices," as referenced in the recently produced June 2000 memorandum from Michael Hash to Kevin Thurm (HHD809-0008 *et seq.*).  You have advised us that any such opinions likely were "conveyed orally by OGC staff" to HCFA decision-makers.  Given this newfound evidence, Abbott wishes to take limited additional discovery.  This could include testimony and documents from Mr. Hash and the other individuals the United States has identified as receiving these opinions, as well as from the individuals who analyzed the potential impact described in the recently disclosed memorandum.  *See id.*  Please identify the witnesses who have relevant knowledge and advise whether the United States will agree to reopening document and deposition discovery for this limited purpose.  I am available to discuss with you the most efficient manner of obtaining the pertinent information.

In addition, please advise us whether the United States will supplement its responses to the written discovery propounded by Abbott, to the extent that this newly discovered evidence bears upon those requests.  *See, e.g.*, Interrogatories 14, 15.

### 30(b)(6) Witnesses

Pursuant to the Court's rulings at the December 4, 2008 hearing pertaining to the United States' Motion for a Protective Order Regarding Abbott's Rule 30(b)(6) Notices, please provide the names of the witnesses, and corresponding topics, that the United States is designating.  As

JONES DAY

M. Justin Draycott, Esq.
March 30, 2009
Page 2

the OGC opinions, surrounding discussions, impact analysis, and decisions are encompassed within several of the topics for which the United States must produce a witness (*see, e.g.*, Topics 2, 7-9 of November 21, 2007 Letter from Cook to Gobena), please identify which witness(es) will testify as to this information.  Finally, please provide suggested dates for each 30(b)(6) witness that the Government is designating.

### *The Government's Late Production of Documents from the Files of Paul Chesser*

At his deposition, Mr. Chesser testified regarding the existence of a number of types of electronic data, documents, and files pertaining to the 1994 OAS audit.  He stated that he still had in his possession spreadsheets that compared invoice prices to the published average wholesale prices for many, if not all, of the drugs involved in this litigation.  *See* Chesser Dep. at 598-604.  As you will recall, I immediately requested the United States conduct a search and produce this information.  *Id.* at 600-01.  On February 23, 2009 the Government produced some of the electronic data associated with this audit.

Having compared the recently produced data to Mr. Chesser's testimony, it appears that this latest production remains incomplete, as the spreadsheets produced do not appear to contain all of the information that Mr. Chesser described in his deposition.  Accordingly, we request that the United States undertake a further review for all electronic data, databases, documents, and analyses that relate to the 1994 OAS audit, as well as all other OIG, OEI, and OAS studies that analyzed Medicare Part B or Medicaid's payment for prescription drugs or dispensing fees, Provider's acquisition cost for drugs, drug pricing, and/or the difference between a Provider's acquisition cost for drugs and then published AWPs, WACs, Direct Prices, or List Prices.  Please advise Abbott whether additional material responsive to our discovery requests exists and provide a date by which additional productions will be made.

Once we are certain that the production of files and data relating to the 1994 OAS audit is complete, we can discuss the extent to which it is necessary to re-open Mr. Chesser's deposition.

Sincerely,

/s/ R. Christopher Cook

R. Christopher Cook

cc:    Counsel for Dey
       Counsel for Roxane
       Counsel for Ven-A-Care

# EXHIBIT OOO

Jackson, Milton B             December 12, 2008
Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL      ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  ) CIVIL ACTION

PRICE LITIGATION         ) 01-CV-12257-PBS

- - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:   )

U.S. ex rel. Ven-A-Care of  ) Judge Patti B. Saris

the Florida Keys, Inc. v.   )

Boehringer Ingelheim Corp., ) Chief Magistrate

et al., Civil Action No.    ) Judge Marianne B.

07-10248-PBS             ) Bowler

- - - - - - - - - - - - - - -

(Cross captions appear on following pages)


Videotaped deposition of MILTON B. "BEN" JACKSON


Washington, D.C.

Friday, December 12, 2008

9:00 a.m.

3b292ebc-0451-432b-a513-4690e63a2144

Jackson, Milton B                                December 12, 2008
                    Washington, DC

Page 182

1   final results.
2       Q.  And the exit, was that the second
3   Richmond meeting?
4       A.  No, no, no, no.  The Richmond meeting
5   dealt with just the players that were involved
6   with the audit itself.  When the report is
7   finally written and distributed it went to CMS
8   and goes in draft form.  We give them 30 days or
9   45 days -- I can't remember which -- to respond.
10  They give us a formal response back.  At that
11  point we will sit down and have an exit
12  conference with the CMS officials -- no state
13  officials were there -- and discuss the findings.
14  If they have anything that they want to add or
15  change or revise or reword that would be done
16  there.
17          And then based on the results of that
18  meeting their comments would be incorporated into
19  a final report and distributed.  And I think we
20  also attached their comments to the back of the
21  record.
22      Q.  Now, if I understand this exit

Page 183

1   conference, this was a procedure you followed
2   with regard to all audits you did for CMS; is
3   that right?
4       A.  We should have.  Yes.
5       Q.  Sometimes it didn't happen?
6       A.  I don't recall whether there were times
7   that it didn't happen, but we should have always
8   had an exit, either in person or sometimes over
9   the phone.
10      Q.  And how many people would usually
11  attend these types of exit meetings?
12      A.  It depends.  It would be the region
13  that was responsible, so there would be region 6
14  folks.  Gordon Sato most likely.  Bill Shrigley
15  could have been there.  I would have been there.
16  George Reeb would have been there.  And then the
17  CMS officials.  It could have been Dave McNally.
18  It could have been a number of folks.
19      Q.  I take it you don't recall the exit
20  conference for these audits?
21      A.  No, I don't.
22      Q.  And you would have had one exit

Page 184

1   conference for obviously both the branded and
2   generic reports combined, correct?
3       A.  We could have, yes.
4       Q.  You could have had separate ones as
5   well?
6       A.  No.  We would have had separate ones.
7   We wouldn't have had them together because the
8   reports came out at different times.
9       Q.  So you had a meeting with them with
10  regard to the findings of the generic report
11  alone; is that right?
12      A.  Yes.
13      Q.  And then also a meeting with regard to
14  the branded report as well, correct?
15      A.  We should have, yes.
16      Q.  And typically how many people from CMS
17  are represented at these --
18      A.  It varies.  It just varies.  It's hard
19  to give a number.  It would be the operating
20  component of the people in charge of the Medicaid
21  reimbursement section.
22      Q.  So it would have been the people

Page 185

1   responsible for setting Medicaid reimbursement
2   levels?
3       A.  Yes.  Well, they don't set
4   reimbursement.
5       Q.  Well, let me clarify that.  It would
6   have been the people at CMS with responsibility
7   for oversight of Medicaid drug reimbursement,
8   correct?
9       A.  Correct.
10      Q.  People like Dave McNally or Larry Reed,
11  correct?
12      A.  Correct.
13      Q.  Now, you indicated you didn't recall a
14  specific meeting.  At my meeting with CMS around
15  the time of this audit, did CMS ever express any
16  disagreement or concerns with the audit that you
17  did?
18      A.  I don't believe so, because they were a
19  partner in this from day one.
20      Q.  Now, let's flip to the back of the
21  generic report which is Roxane Exhibit Number 74.
22  The very last two pages.  This appears to be the

47 (Pages 182 to 185)

3b292ebc-0451-432b-a513-4690e63a2144

Jackson, Milton B                                    December 12, 2008
                    Washington, DC

Page 382

1    A.  Yes.
2    Q.  And manufacturers would have been aware
3  of that?
4        MR. DRAYCOTT:  Objection.
5    A.  They should have been, yes.
6    Q.  And manufacturers then would believe
7  that the states and HCFA would be informed about
8  your results, right?
9        MR. AZORSKY:  Objection to the form.
10   A.  Manufacturers believed that the states
11  and them would be informed?  I can't talk for
12  them.  I don't know.  I don't know of that for
13  sure.
14   Q.  But would you agree with me, Mr.
15  Jackson, that if you're discussing your work with
16  AWP at these meetings and manufacturers are
17  there, the manufacturers would assume that HCFA
18  and the states are being told about differences
19  between AWP and acquisition cost?
20   A.  I could see where they could draw that
21  assumption, yes.
22       MR. AZORSKY:  Objection.

Page 383

1    Q.  It seems a pretty reasonable
2  assumption?
3    A.  Yes.
4    Q.  You spoke of the fact that you would
5  have exit conferences with CMS, correct?
6    A.  Yes.
7    Q.  Do you believe you would have had an
8  exit conference for both the 1997 roll-up report
9  for generics and the 1997 roll-up report for
10  branded, correct?
11   A.  Yes.
12   Q.  And were minutes kept of those
13  meetings?
14   A.  They should have been.  Yes.
15   Q.  And where would those be?
16   A.  They should be in the work paper file
17  in the administrative folder.
18   Q.  Now, would it bother you in I got a
19  chance to look of the those minutes?
20   A.  Would it bother me?
21   Q.  Yes.
22   A.  No.

Page 384

1    Q.  Do you think I should have full access
2  to hear what all was being talked about at those
3  meetings?
4        MR. DRAYCOTT:  Objection.
5    A.  I'm not sure it's my place to say that
6  or not, to be honest with you.
7    Q.  It wouldn't bother for me to see?
8    A.  Yeah.  No.  It wouldn't bother me.
9    Q.  You indicated that your finding
10  regarding the fact that there were discount --
11  that products were being sold below WAC was a
12  surprise to you in your 1999 to 2001 work,
13  correct?
14   A.  Yes, correct.
15   Q.  And you had reported -- I think we saw
16  that in the report.  And you had reported your
17  findings in a report, correct?
18   A.  (Nods head).
19   Q.  And your understanding was that HCFA
20  was going to circulate that report to all 50
21  states, correct?
22   A.  That was our understanding, yes.

Page 385

1    Q.  And given that this was a surprise to
2  you is that something that you talked about at
3  the meetings that you attended with all state
4  pharmacy administrators?
5        MR. AZORSKY:  Objection to form.
6    A.  First off, the work that we did on the
7  WAC side of the house in those reports were not
8  originally part of the scope of the audit.  And
9  that's why if you look at the report it's in an
10  other matters section.  And in discussions we had
11  with states as the audit was progressing and we
12  were getting the WAC information and we had the
13  pricing information on what pharmacies were
14  purchasing these drugs at, we were asked to look
15  at the WAC.  And for those states we had the
16  information on I believe that's what we did.  And
17  that's why we put it under other matters.
18   Q.  Do you recall discussing your findings
19  regarding WAC at the meetings that you had such
20  as the Eastern Medicaid Pharmacy --
21   A.  Oh, I'm sure we did.  Absolutely.
22   Q.  You're familiar with an article that

97 (Pages 382 to 385)

3b292ebc-0451-432b-a513-4690e63a2144

# EXHIBIT PPP

# Charles Booth,
# Director of CMS's Office of
# Payment Policy (1984-1994)

Booth, Charles R.                                    April 23, 2007
                        Washington, DC

                                                          Page 1

                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL      :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  :  CIVIL ACTION:

PRICE LITIGATION            :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    :

U.S. ex rel. Ven-a-Care of  :  Judge Patti B. Saris

the Florida Keys, Inc. v.   :

Abbott Laboratories, Inc.,  :  Chief Magistrate

No. 06-CV-11337-PBS         :  Judge Marianne B.

- - - - - - - - - - - - - -x   Bowler

                 IN THE CIRCUIT COURT OF

              MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - -x

STATE OF ALABAMA,           :

          Plaintiff,        :

          vs.               :  Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,  :  Judge Charles Price

et al.,                     :

          Defendants.  :

- - - - - - - - - - - - - -x

                  Henderson Legal Services
                      202-220-4158

5570917b-ccec-4522-964a-1aa1ed72506d

Booth, Charles R.                                       April 23, 2007
                        Washington, DC

---

Page 154

1    Q.   And according to this chart prepared by
2  OIG, there were various price points in between
3  $3.45 and $26.61, correct?
4         MR. GOBENA:  Object to the form.
5    A.   There appear to be.
6    Q.   Is that consistent with your understanding
7  that it's impossible to determine a single
8  percentage discount from AWP that would give you
9  provider acquisition cost?
10        MR. GOBENA:  Object to the form.
11   A.   I would conclude that for an individual
12  dosage of an individual drug, it could be difficult
13  to set a uniform discounted price on AWP.
14   Q.   And is it fair to say that there was no
15  predictable relationship between AWP and acquisition
16  cost?
17        MR. GOBENA:  Object to the form.
18   A.   I have no idea.
19   Q.   Well, let me ask you this.  In November
20  1992, did you believe that there was a predictable
21  relationship between AWP and provider acquisition
22  cost?

---

Page 155

1         MR. GOBENA:  Object to the form, asked and
2  answered.
3    A.   I don't recall having such a belief.
4    Q.   Returning again to Exhibit Abbott 079
5  please, there's a conclusions page on page 11, and
6  the first conclusion is that for the physicians
7  surveyed, OIG found that the 13 high dollar volume
8  chemotherapy drugs can be purchased at amounts below
9  AWP.  Would you agree with me that as of November
10  1992, individuals within the Office for Payment
11  Policy were aware of OIG findings that these 13 high
12  dollar volume chemotherapy drugs could be purchased
13  at amounts below AWP?
14        MR. GOBENA:  Object to the form.
15   A.   No.
16   Q.   You would not agree that this conclusion
17  was communicated to someone within the Office of
18  Payment Policy?
19   A.   In the paragraph above, the second
20  sentence says, "The conclusions reached may not
21  apply in all cases."
22   Q.   That wasn't my question.

---

Page 156

1    A.   Well, it's my answer.
2    Q.   Fair enough.  Would you agree that for the
3  physicians surveyed, this report advised officials
4  within the Office of Payment Policy that for these
5  physicians, these chemotherapy drugs could be
6  purchased at amounts below AWP?
7         MR. BREEN:  Objection, form.
8    A.   My answer would be the same because I
9  don't -- I don't understand what the IG is really
10  trying to say here.
11   Q.   Well, can you understand what the IG is
12  trying to say in the next bullet point, AWP is not a
13  reliable indicator of the cost of a drug to
14  physicians?  Did you understand that?
15   A.   Yes.  That doesn't mean it's too high, it
16  doesn't mean it's too low, it doesn't mean it's just
17  right.  It just means it's not reliable.
18   Q.   Did you believe that AWP was a reliable
19  indicator of the cost of a drug to a physician in
20  November of 1992?
21        MR. GOBENA:  Object to the form.
22   A.   I actually I think in 1992 thought it was

---

Page 157

1  a relatively reliable indicator, though it was
2  certainly not a consistent indicator.
3    Q.   And in October of 1992 when your office
4  was advised that vancomycin could be purchased at
5  $3.45 and the median AWP was $19.17, you still
6  believed that AWP could be a reliable indicator of
7  acquisition cost?
8    A.   In certain cases, yes.
9    Q.   In which cases is that?
10   A.   Well, I'm not prepared to be specific.
11  It's been too long since I've been involved with
12  this.
13   Q.   How did you determine at the time in which
14  cases --
15   A.   I have no idea.  I do not remember.  I'm
16  sorry, I'm 70 years old.  I have not dealt with
17  these issues for at least 13 years, and when I dealt
18  with these issues, they were very minor in the
19  scheme of things.  I spent extremely little time
20  during my career in payment policy on drugs because
21  we did not have a drug benefit.
22   Q.   But you were the person responsible within

---

Henderson Legal Services
202-220-4158

5570917b-ccec-4522-964a-1aa1ed72506d

# Kathy Buto,

**Director of CMS's Bureau of Policy Development (1985-1993);**
**Associate Administrator for Policy (1993-1997);**
**Deputy Director of Health Plans and Providers (1997- 2000)**

Buto, Kathleen                              September 12, 2007
                    Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      ) CIVIL ACTION

PRICE LITIGATION                ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      ) Judge Patti B.

the Florida Keys, Inc.          ) Saris

        v.                      ) Chief Magistrate

Abbott Laboratories, Inc.,      ) Judge Marianne B.

No. 06-CV-11337-PBS             ) Bowler

- - - - - - - - - - - - - - - -

        (captions continue on following pages)



        Videotaped deposition of Kathleen Buto

                    Volume I


                    Washington, D.C.

            Wednesday, September 12, 2007

                    9:00 a.m.

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                                    September 12, 2007
                    Washington, DC

Page 190

1    Q.  Did you ever speak with ESRD providers
2  about the adequacy of the composite rate that was
3  being made?
4    A.  Yes.
5    Q.  Who did you speak with and what was
6  their reaction?
7    A.  Usually representatives of the
8  associations.  So the association representing
9  kidney physicians, renal physicians.  The
10  dialysis facility association.  And those are
11  staffed by physicians as well.  And then
12  physicians from some of the larger renal dialysis
13  facility chains.
14    Q.  What was their position on the adequacy
15  of the composite rate?
16    A.  They felt it ought to be updated and
17  increased.  What the rationale back then was I
18  can't remember.  But they felt it was unfair that
19  other rate fee schedules were updated and theirs
20  was not.  So --
21    Q.  Let's go back to the document, the
22  regulation.  The second rate, per diem rate, on

Page 191

1  the page is for pain management therapy.
2    A.  Mm-hmm.
3    Q.  And that was $31.63, correct?
4    A.  Yes.
5    Q.  Do you recall any discussions within
6  the bureau of policy development about the
7  implications on home IV providers from the repeal
8  of the separate benefit that was conferred by the
9  Medicare Catastrophic Coverage Act?
10    A.  No, I don't.
11       MR. TORBORG:  We have to go off the
12  record very quickly to do a tape change.
13       THE VIDEOGRAPHER:  This concludes tape
14  3 in the deposition of Kathleen Buto.  Off the
15  record at 2:20.
16       (Discussion off the record).
17       THE VIDEOGRAPHER:  This begins tape 4
18  in the deposition of Kathleen Buto.  On the
19  record at 2:22.
20  BY MR. TORBORG:
21    Q.  I believe you just testified that you
22  don't recall having any discussions within your

Page 192

1  bureau of policy development about the
2  implications of the repeal of the separate
3  benefit for home infusion, correct?
4    A.  That's correct.
5    Q.  Did you have a personal view on whether
6  or not there should be a separate payment for
7  home IV services?
8    A.  Not really, not any more than whether
9  there should be a drug benefit generally, which
10  many of us felt was long overdue.  But that would
11  include small molecule as well as the IV drugs.
12    Q.  Do you recall ever meeting with any
13  advocacy groups, provider representative groups,
14  in the home infusion industry?
15    A.  I don't remember meeting with them, but
16  it wouldn't surprise me if we had met with them
17  because it was our custom to meet with almost
18  anybody who requested a meeting and I would
19  assume these folks would have requested a
20  meeting.
21    Q.  Subsequent to the repeal or at the time
22  of the regulation?

Page 193

1    A.  No.  At the time the regulations were
2  being developed.  Sorry.
3    Q.  If I could ask you to turn to Exhibit
4  Abbott 018 of the orange binders -- for the
5  record, this is a document that we pulled off of
6  the House Committee On Weighs and Means health
7  subcommittee dated October 3rd 2002.  It's a
8  statement for the record that was provided to the
9  state by the National Alliance for Infusion
10  Therapy and the National Home Infusion
11  Association.
12    A.  Mm-hmm.
13    Q.  Do those names, those two organization
14  names, ring a bell?
15    A.  No.
16    Q.  If I could ask you to go to the section
17  under Medicare coverage and payment for home
18  infusion drug therapy?
19    A.  Mm-hmm.
20    Q.  It states "Providers and suppliers of
21  infusion drug therapies in the home setting are
22  not paid separately by Medicare for the critical

Henderson Legal Services
202-220-4158

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                                    September 12, 2007
                        Washington, DC

Page 226

1    A.  Yes, if they felt, number one, they
2  thought it was important to communicate something
3  to Congress or just to help frame an answer or a
4  position on something, they would consult with
5  the program staff.
6    Q.  I need to grab a document.  Excuse me.
7        (Exhibit Abbott 294 was marked for
8  identification.)
9  BY MR. TORBORG:
10    Q.  For the record, what I've marked as
11  Exhibit Abbott 294 bears the Bates numbers HHC
12  9060093 through 98.  It is a document from the
13  HCFA regional office in Dallas specifically
14  signed by a M.J. Christenberry to yourself; is
15  that correct?
16    A.  That's correct.
17    Q.  If you would, take a look at this
18  document to the extent necessary to tell me
19  whether you recall it as you sit here today.
20    A.  I recall it in reading it.  Let's put
21  it that way.  It's not unfamiliar.  But again,
22  it's not one that for the last 17 years I've

Page 227

1  remembered.
2    Q.  But as you sit here and review it today
3  you recall the document?
4    A.  It looks familiar, yeah.
5    Q.  And briefly stated can you tell me what
6  this document is?
7    A.  It's a piece of correspondence from the
8  regional office in Dallas, which was the most --
9  I think I've already said -- one of the most
10  proactive in the area of fraud and abuse,
11  overpayments and so on, in looking for ways to
12  reduce the reimbursement that the program was
13  paying for various items and services.
14      What they've done here is to lay out
15  several issues where they think Medicare should
16  revise its payment policy, and specifically
17  around drug payment.  And they've got seven
18  different recommendations for addressing the
19  issues.
20    Q.  And why would this memorandum be sent
21  to you?
22    A.  I can't say exactly why this one was,

Page 228

1  but this regional office was very active in
2  coming up with policy approaches to deal with
3  these issues.  They created a program called -- I
4  want to say PATROL.  It was an acronym for
5  something.
6    Q.  The PATROL Initiative?
7    A.  Yes.  P-A-T-R-O-L.  I can't remember
8  what the letters stood for.  But the idea was to
9  actually look for places where Medicare and
10  Medicaid were overpaying for a variety of
11  services and try to apply principles of inherent
12  reasonableness, which is are there better ways,
13  are there objective other sources that tell us
14  that we could be paying a more market-based
15  price.  So it wouldn't be unusual for the
16  regional office because it's very proactive to
17  have identified several areas where they actually
18  wanted to recommend that we change our policy.
19      Now, let's see.  The time frame of
20  this. 1990.  They may or may not have been aware
21  of the fact that we were looking at revising the
22  payment schedule for physician payment.  And they

Page 229

1  may have seen that.
2      I see on item 4 they refer to proposals
3  being considered to implement those reforms.  And
4  they may have seen that this was an opportunity
5  to incorporate a number of these ideas into the
6  reforms.  Because in the government one of the
7  kind of underlying principles is if you have a
8  vehicle that has to move -- so a piece of
9  legislation that must be implemented by a certain
10  date -- if there are other things that you want
11  to get done if you can figure out a way to attach
12  those your chances are greater that you'll
13  actually get them through the system.
14      So they may have been thinking along
15  those lines.  I'm just guessing.  But they
16  referred to the fact that we were considering
17  these proposals.  It makes me think they thought,
18  okay, here's an opportunity, we ought to point
19  out some things that should be looked at.
20      MR. MERKL:  Excuse me.  Objection.
21  Move to strike.  Could I have a reservation for
22  similar objections so I don't have to keep making

                              58  (Pages 226 to 229)

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen - Vol. II                    September 13, 2007
                    Washington, DC

Page 324

1    Q.  The second page indicates this was
2  prepared by Jimmy Sigmund.  Are you familiar with
3  that gentleman?
4    A.  The name is familiar, but I can't tell
5  you what his position was.
6    Q.  If I could direct you back to the first
7  page, to the paragraph that has the little 3 in
8  front of it?
9    A.  Yes.
10    Q.  Mr. Sigmund wrote "Page 59525 of the
11  November 25th 1992 regulations" -- I think that's
12  probably a typo.  I think he meant 1991
13  regulations.  That was the date of the
14  regulations we've been looking at, correct, 1991?
15    A.  Correct.
16    Q.  "States that for high volume or for
17  high cost" -- plus this document was dated
18  November 17th 1992, which is --
19    A.  Before November 25th 1992.  Yeah.
20    Q.  Would you agree with me that he
21  probably was referring to the 1991 regulations?
22    A.  I would agree.

Page 325

1    Q.  In any event, Mr. Sigmund wrote "Page
2  59525 of the November 25, 199" -- I think he
3  means 1 -- "regulations states that for high
4  volume or high cost drugs as determined on a
5  national basis we may designate certain carriers
6  which represent different geographic areas of the
7  country to survey physicians in their area to
8  determine the average cost of these drugs.
9      "HCFA would then distribute these
10  surveys to carriers.  We have determined that in
11  many instances such surveys would result from
12  lower allowances than the Red Book.  We suggest
13  that we move forward with designating carriers to
14  determine acquisition costs of these drugs rather
15  than continue to price them at many times
16  inflated Red Book prices."
17      This is a memo dated approximately one
18  year after the final rule went in place, correct?
19    A.  Correct.
20    Q.  And does it appear to you based on the,
21  context of Mr. Sigmund's comments that HCFA had
22  still not moved forward with the estimated

Page 326

1  acquisition cost proposal?
2    A.  That is what -- it definitely appears
3  that way.
4    Q.  And do you know why HCFA had not
5  immediately started implementing the estimated
6  acquisition cost proposal?
7    A.  I believe -- again, this is based on
8  just the way I remember it -- that we had
9  submitted a request for the survey that we would
10  use to collect those data to the office of
11  management and budget and that the request was
12  either held up or denied or in process.  I think
13  that's what happened.  But it may just be that it
14  was bogged down somewhere in our own bureaucracy
15  at the agency.
16    Q.  Do you recall if the -- the attempt to
17  do the survey, did HCFA originally seek OMB
18  approval or did it attempt to implement it and
19  then was stopped by OMB?  Do you remember the
20  sequence?
21    A.  I don't.  That was a period where we
22  attempted to implement things and OMB was

Page 327

1  attempting to make more systematic the way HCFA
2  did business.  So it could be we tried to do it
3  before we sought approval, but I don't remember.
4  I don't even really remember if we saw an
5  approval, but I think we did.  I think that's
6  what ended up bogging it down.
7      (Exhibit Abbott 304 was marked for
8  identification.)
9  BY MR. TORBORG:
10    Q.  Ms. Buto, you've been handed what's
11  been marked as Exhibit Abbott 304 which bears the
12  Bates numbers AWP 041-0823 through 27.  It
13  appears to be -- the first page is a March 22nd
14  1994 memo from Joe Mirabal to all region II HCFA
15  Medicare carriers and attaches a March 15th 1994
16  draft memo to all associate regional
17  administrators for Medicare from Charles Booth.
18      Ms. Buto, my first question will be if
19  you recall this document.
20    A.  I don't recall it.  And by then I think
21  I was in the position of associate administrator,
22  so I was no longer the director of BPD.  And I

                              14  (Pages 324 to 327)

7b157f28-df3f-40ae-bc12-b3227fef509e

# Gary Cheloha,

**Nebraska Medicaid Staff Pharmacist (1972-1987);**
**Nebraska Medicaid Pharmacy Consultant (1996-Present)**

NE Dept of Health and Human Services (Gary Cheloha)                    December 2, 2008
Lincoln, NE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

-----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Dey, Inc., et. al., Civil )

Action No. 05-11084-PBS; and United)

States of America, ex. rel.        ) December 2, 2008

Ven-a-Care of the Florida Keys,    ) 8:57 a.m.

Inc., v. Boehringer Ingleheim      )

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) VOLUME I

----------------------------------X

Deposition of THE NEBRASKA DEPT. OF HEALTH AND HUMAN

SERVICES by GARY CHELOHA, taken by Defendants, pursuant

to Notice, held at the Cornhusker Hotel, Lincoln, Nebraska,

before Shana W. Spencer, a Certified Shorthand Reporter

and Notary Public of the State of Nebraska.

d98d776d-741f-454c-8c46-8fdf11028000

Lincoln, NE

Page 302

1  has been doing to help control expenditures for
2  pharmaceuticals.
3       Q.  And just for clarification, who was it
4  written to?
5       A.  It looks like to myself.
6       Q.  Yeah.  I mean, I don't know.  It looks
7  like a memo to file.  Do you know?
8       A.  I believe --
9       Q.  I'm sorry.  What?
10           MR. DUNNING:  He's considering the
11  issue.
12           MS. CITERA:  Oh, sorry.
13           THE WITNESS:  It was developed by me or
14  written by me as a -- you know, to describe those
15  efforts and the things that we had done and been
16  doing.  And in -- I don't know if it was ever
17  distributed to any administration.
18       Q.  (BY MS. CITERA)  In item No. 4, it
19  talks about Nebraska's MAC program, and it says a
20  few sentences in:  One injectable that we MAC'd
21  was Vancomycin.  The difference in price between
22  published AWPs and actual purchase prices were

Page 303

1  $65 per dose versus $13 per dose.  Do you see
2  that?
3       A.  I do.
4       Q.  Where did you get the information for
5  the $13 per dose?  Do you recall?
6       A.  I think I referenced an Abbott pricing
7  document a few minutes ago.
8       Q.  Okay.  So you believe you may have
9  gotten the information directly from Abbott, the
10  $13?
11       A.  I may have, yes.
12       Q.  Okay.  And can you tell me if it was
13  difficult to set a MAC for Vancomycin?
14           MR. DUNNING:  Object to the form.
15           THE WITNESS:  It was not difficult in
16  that I had this pricing information available,
17  and the process was the same as any other MAC
18  drug.  It was not a drug that attracted a lot of
19  attention due to its place in the total payment
20  by the Department for drugs or classes of drugs.
21       Q.  (BY MS. CITERA)  What do you mean by
22  that?  Well, let me -- to speed it up, do you mean

Page 304

1  that it was not a heavily-used product by
2  Medicaid?
3       A.  That's -- that's what I --
4       Q.  Heavily-reimbursed product?
5       A.  That is my intention of that statement,
6  yes.
7       Q.  Okay.  Do you know if you got pharmacy
8  -- information from pharmacies about the price of
9  Vancomycin in order to set the MAC?
10       A.  I don't recall one way or the other.
11       Q.  Okay.  If you could just turn to 909,
12  Exhibit -- what I believe was Exhibit 909, the
13  MAC list.
14       A.  All right.  I have that.
15       Q.  Okay.  I've looked through this, and on
16  pages 55 and 56, it looks like there's some MAC
17  information for Vancomycin.  Do you see that?
18       A.  I do, yes.
19       Q.  And I think you testified to this
20  before.  But in some instances, it looks like the
21  begin date is after the end date.  Can I assume
22  that that's a mistake?  Do you see that?  Like,

Page 305

1  for example, 20611 says that it began in April
2  2006 and that it ended on 12/31/1999.
3       A.  That end date is actually all 9s, and
4  that's a default date.
5       Q.  Oh, I see.  Okay.
6       A.  And I believe I also testified earlier
7  that those begin dates were, to a certain extent,
8  defaults because of our move to ACS for claims
9  processing and --
10       Q.  So it's possible they may have been
11  earlier?
12       A.  Yes.
13       Q.  Okay.
14       A.  And I'm -- yes.  It's likely that they
15  were earlier.  It's earlier than the 2006 date
16  and 2005 date.
17       Q.  Do you have any idea as to when they
18  might have been MAC'd?  I mean, obviously we saw
19  in Exhibit 5 that at least one version of
20  Vancomycin was MAC'd in 1989.
21       A.  Yes.  That should have been consistent
22  across the whole -- all the forms of the

Henderson Legal Services, Inc.

d98d776d-741f-454c-8c46-8fdf11028000

# Cynthia Denemark,
## Delaware Medicaid Pharmacy Consultant (1993-Present))

Newark, DE

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

-------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 446

1    utilized this Most Favored Nation definition with
2    respect to U&C; is that correct?
3        A.  Yes.
4        Q.  I asked you earlier about whether
5    Delaware conducted any surveys or had any studies
6    conducted relating to the costs to dispense drugs
7    or the provider costs related to dispensing of
8    drugs between 1991 through 2001, correct?
9        A.  Correct.
10       Q.  Similarly for -- were any studies
11   conducted by Delaware or did Delaware order any
12   studies conducted relating to the costs of
13   dispensing for home IV pharmacies?
14       A.  Not that I'm aware of.
15       Q.  Did you order any of these studies?
16       A.  No.
17       Q.  Okay.  Do you think you would be aware?
18       A.  Yes.
19       Q.  Okay.  I'm going to have you quickly
20   look at Dey Exhibit 111.
21           MS. HEALY SMITH:  611?
22           MS. RAMSEY:  611.  I'm sorry.  Which

Page 447

1    was the meeting notes from the 1995 Richmond
2    meeting.
3           THE WITNESS:  Okay.
4    BY MS. RAMSEY:
5        Q.  Now, there are three officials from
6    HCFA that were present at this meeting, Mike --
7    do you know how to pronounce that last name?
8        A.  Keogh.
9        Q.  Estelle Chisholm and Sue Gaston,
10   correct?
11       A.  That's what the record -- notes say,
12   yes.
13       Q.  Do you recall those individuals being
14   at the 1995 meeting?
15       A.  No.
16       Q.  Okay.  Just because time has gone by?
17       A.  Yes.
18       Q.  Who are Mike Keogh and Estelle
19   Chisholm?
20       A.  You know, I really don't recall Estelle
21   at all.
22           Mike Keogh, I had follow-up

Page 448

1    interactions with him because he went on after
2    this time to work on drug rebate disputes between
3    the labelers and the states when they were at an
4    impasse.
5        Q.  And Sue Gaston, as we just saw, was
6    someone at HCFA that you would communicate with
7    from time to time regarding Medicaid
8    reimbursement issues?
9        A.  Yes.  And at the time, I believe that
10   she had some interaction on federal upper limits.
11       Q.  Okay.  Do you remember the reaction of
12   any of these individuals to the results that were
13   presented at the 1995 meeting relating to the
14   costs -- or the discounts off AWP for which
15   providers could acquire drugs?
16       A.  I don't remember.
17           MS. HEALY SMITH:  Objection.
18           THE WITNESS:  I don't remember at all.
19   BY MS. RAMSEY:
20       Q.  Do you recall whether they provided any
21   input or reactions one way or the other?
22       A.  No.

Page 449

1           MS. HEALY SMITH:  Objection.
2    BY MS. RAMSEY:
3        Q.  Do you recall whether the HCFA
4    officials indicated they would make
5    recommendations relating to Medicare
6    reimbursement based on the results that OIG had
7    found?
8           MS. HEALY SMITH:  Objection.
9           THE WITNESS:  I have limited
10   recollection of this meeting in general, and
11   nonspecific to your question.
12   BY MS. RAMSEY:
13       Q.  Okay.  Is there anything that you
14   recall from the 1995 meeting that I have not
15   asked you about?
16       A.  Only that I really enjoyed walking
17   around the streets at Richmond at night and
18   looking at the statutes.
19       Q.  It's a nice city.
20           But there's --
21       A.  Nothing specific to the topic, no.
22       Q.  Okay.  And similar, for the 1994, which

45  (Pages 446 to 449)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

# Nancy Min-DeParle,
## Former CMS Administrator (1997-2000)

DeParle, Nancy-Ann                                    May 18, 2007
                        Washington, DC

                                                            Page 1

                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x

IN RE:  PHARMACEUTICAL         : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     : CIVIL ACTION:

PRICE LITIGATION               : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-a-Care of     : Judge Patti B. Saris

the Florida Keys, Inc. v.      :

Abbott Laboratories, Inc.,     : Chief Magistrate

No. 06-CV-11337-PBS            : Judge Marianne B.

- - - - - - - - - - - - - x Bowler

              IN THE CIRCUIT COURT OF

            MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - x

STATE OF ALABAMA,              :

              Plaintiff,       :

        vs.                    : Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,     : Judge Charles Price

et al.,                        :

              Defendants.      :

- - - - - - - - - - - - - - x

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                    May 18, 2007
                    Washington, DC

Page 46

1    A.  No.
2    Q.  While you were at the Office of
3  Management and Budget, did you have any
4  involvement in either reviewing, approving or
5  disapproving surveys relating to the price of
6  prescription drugs?
7    A.  Yes.
8    Q.  Tell me about that.
9    A.  Well, it's been about 15 years ago, so
10  my memory of it is limited.  But I do recall that
11  HCFA wanted to do a survey of physicians to
12  determine their actual acquisition cost for
13  certain drugs that Medicare covered, and they
14  submitted that to the Office of Information and
15  Regulatory Analysis at OMB.
16    Q.  I'm sorry, what was the -- I'll just
17  read the transcript.  It was the Office of --
18    A.  Information and Regulatory Analysis.
19    Q.  Analysis at OMB.  Who was in charge of
20  that office at the time?
21    A.  I believe it was Sally Katson.
22    Q.  Do you know where Sally Katson is now?

Page 47

1    A.  No, I don't.
2    Q.  The Office of Information and
3  Regulatory Analysis; did you have any formal
4  relationship in your role as an associate
5  director for health and personnel with that
6  office?
7    A.  No.
8    MS. YAVELBERG:  Chris, if I could just
9  remind the witness that to the extent the
10  questions call for answers that would require the
11  disclosure of deliberative communications, just
12  to be mindful of that.  She is going to answer
13  the questions to the extent she recalls and that
14  she can, but to be mindful of the answers that
15  might be pre-conditional into the work at issue.
16  BY MR. COOK:
17    Q.  Do you remember who at -- was it HCFA
18  that sent over the survey?
19    A.  No, I don't.
20    Q.  Okay.  You don't remember who at HCFA
21  sent over the survey, but it was HCFA that sent
22  over the survey?

Page 48

1    A.  It was HCFA, but I don't remember that
2  the survey itself was sent over.  I just remember
3  there was an issue about HCFA wanting to do a
4  survey.  I don't know if it was the survey
5  instrument itself that was sent over to OIRA.
6    Q.  And what was your role in considering
7  the survey or discussing the survey?
8    A.  I attended a meeting.
9    Q.  Where did this meeting take place?
10    A.  In the old executive office building.
11    Q.  Who attended?
12    A.  I don't recall.
13    Q.  How long did the meeting last?
14    A.  I don't recall.
15    Q.  Do you recall anybody who was at the
16  meeting?
17    A.  I believe that Bruce Vladeck was at the
18  meeting, I believe that Allison Eydt was at the
19  meeting.
20    Q.  Who was the second person?
21    A.  Allison Eydt.
22    Q.  How do you tell that?

Page 49

1    A.  E-Y-D-T.
2    Q.  Who is Allison Eydt?
3    A.  She was an analyst at the Office of
4  Information and Regulatory Analysis at the Office
5  of Management and Budget.
6    Q.  And Bruce Vladeck at the time was the
7  Administrator of HCFA?
8    A.  Yes.
9    Q.  And for the court reporter, HCFA is all
10  caps, H-C-F-A, and that stands, am I correct, for
11  the Health Care Financing Administration?
12    A.  Yes.
13    Q.  I always wonder whether it's finance or
14  financing and I get it wrong half the time.
15    Do you recall anyone else who attended
16  this meeting?
17    A.  No.
18    Q.  What was discussed at the meeting?
19    A.  Just what I told you.
20    Q.  And that is that HCFA wanted to do a
21  survey to determine physician acquisition costs?
22    A.  That's what I recall.

13  (Pages 46 to 49)

a2e99778-7e61-4f3d-8317-e255e740d5a9

# Deirdre Duzor,

Director, CMS Office of Legislation (1990-1994);
Associate Director, CMS Medicaid Bureau (1994-1995);
Director, CMS Data and Systems Division for Medicaid (1995-1997);
Director, CMS Quality Systems Management Division (1997-2002);
Director, CMS Division of Pharmacy (2004-Present)

Duzor, Deirdre                                    October 30, 2007
                        Washington, DC

                  UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -

         (cross-captions on following pages)

                        Washington, D.C.

                        Tuesday, October 30, 2007

                        9:00 a.m.

     Videotaped deposition of DEIRDRE DUZOR

                  Volume I

f5f0cb67-5db5-4a19-acea-ff4afd75844b

Duzor, Deirdre                                        October 30, 2007
                        Washington, DC

---

Page 46

1    any of these meetings, the issue of average
2    wholesale price or WAC?
3        A.   Yeah.  I would think that when the
4    Deficit Reduction Act was under consideration and
5    then enacted in discussing the provisions of the
6    Deficit Reduction Act I would have talked about
7    average -- AWP and WAC.
8        Q.   What are the type of issues that --
9    obviously these relate to pharmacy issues, correct?
10       A.   Yes.
11       Q.   What type of issues are discussed at
12   these meetings?  I think you've mentioned one would
13   be the Deficit Reduction Act.  What other type of
14   issues are discussed?
15       A.   The states take time to share with each
16   other their best practices.
17       Q.   On what issues?
18       A.   Issues such as prior authorization and
19   the establishment of preferred drug lists.  That
20   type of issue.
21       Q.   I have also seen some reference to issues
22   like pharmacy plus.

---

Page 47

1        MR. WINGET-HERNANDEZ:  Objection to form.
2        Q.   Is that something that's been discussed
3    at the meetings?
4        A.   Yes.  I'm sure it was when it was active.
5        Q.   Are the methodologies used or the methods
6    used to calculate the amount that state Medicaid
7    programs will pay for drugs been something that's
8    been discussed at the meetings?
9        MS. MARTINEZ:  Objection to form.
10       A.   I don't recall.  Likely they were, but I
11   don't recall.
12       Q.   Okay.  Apart from the meetings that
13   you've discussed already, any other meetings or
14   seminars that you've attended where the issue of
15   state Medicaid programs' payment for drugs has been
16   discussed?
17       A.   I've attended or I've spoken at several
18   conferences put on by the International Research --
19   the acronym is IRR.  International Research -- I
20   can't remember what the other R is.
21       Q.   Can you tell me about those?
22       A.   Yes.  They are generally called Medicaid

---

Page 48

1    drug rebate, but I go to, again, provide an update
2    on what's going on at the federal level in terms of
3    Medicaid drug policy.
4        Q.   Are these annual face-to-face meetings or
5    periodic conference calls or something in between?
6        A.   There is an annual face-to-face meeting
7    that I attended in 2006 and 2007.
8        Q.   You mentioned earlier that this was
9    something -- at least you mentioned one of the
10   issues discussed at these meetings would be the
11   Medicaid drug rebate issue?
12       A.   They're generally termed Medicaid drug
13   rebate conference.  That's sort of the billing that
14   they've given them for years.
15       Q.   And is this something that you attended
16   last month?
17       A.   Yeah.  I attended one in September, yes.
18       Q.   In September?
19       A.   Yes.
20       Q.   Do you discuss other issues relating to
21   state Medicaid programs and the issue of
22   prescription drugs besides the Medicaid rebate

---

Page 49

1    program?
2        A.   No, I don't recall going to any others.
3        Q.   Are minutes of these meetings taken or
4    otherwise transcribed?
5        A.   It may be videotaped.  I'm not sure.
6        Q.   Any other type of meetings oar
7    conferences that you've attended related to state
8    Medicaid programs' payment for drugs?
9        A.   The only other thing that may fall within
10   that is that there is a Pharmacy Technical Advisory
11   Group.
12       Q.   PTAG for short?
13       A.   Yes, PTAG.
14       Q.   And you've been attending those meetings
15   since 2002; is that right?
16       A.   Yes.
17       Q.   And how often were those meetings or
18   conference calls?
19       A.   They have varied over the years based
20   upon the amount of activity.  I believe they were
21   quarterly for the first several years.  Most
22   recently we were doing them monthly.

13  (Pages 46 to 49)

Henderson Legal Services
202-220-4158

f5f0cb67-5db5-4a19-acea-ff4afd75844b

Duzor, Deidre - Vol. II                    February 27, 2008
                    Washington, DC

Page 387

1  pharmacy.
2      Q.  So services above and beyond the
3  dispensing of a pharmacy, say, at CVS, like a
4  bottle of materials including some written
5  material along with that, something above and
6  beyond that?
7      A.  And even beyond some brief
8  conversations with a patient.
9      Q.  And are these the kind of services that
10 are associated with particular types of drugs?
11     A.  I think they may be or it may be
12 particular types of patients, patients with
13 certain conditions or certain co-morbidities.
14     Q.  When you say co-morbidities, what did
15 you mean by that?
16     A.  Well, people that have multiple health
17 issues that can interact with each other, more
18 complex cases.
19     Q.  Do you know any kind of drugs -- any
20 types of drugs for which medication therapy
21 management is more common?
22     A.  I'm not that familiar with it to be

Page 388

1  able to say where it's most commonly used.
2      Q.  Are any -- to your knowledge, Ms.
3  Duzor, are any state Medicaid programs currently
4  paying a service fee component?
5      A.  They are not paying it as part of their
6  pharmacy payment.  In Medicaid that would be
7  considered a case management service and it would
8  be reimbursed as such.
9      Q.  And do you know if -- are all state
10 pharmacy programs reimbursing the same amount for
11 a case management service?
12     A.  They don't all provide those services.
13 It's a fairly new concept.
14     Q.  When you say they don't all provide
15 those services, do you mean not all state
16 Medicaid plans provide payment for medication
17 therapy management? Is that what you meant?
18     A.  Yes.  I mean that most states do not
19 pay the pharmacist a fee for medication therapy
20 management.  But we are beginning to see some
21 state interest in doing that.
22     Q.  What is prompting that interest?

Page 389

1      A.  I think it's a movement in -- a broader
2  movement beyond Medicaid in which I think both
3  managed care and some other health insurers see a
4  potential benefit to this kind of a service in
5  terms of getting adherence to drug regimens by
6  people and ultimately better health care and
7  reduced cost.
8      Q.  Is there any connection to the
9  potential decrease in ingredient cost
10 reimbursement and the movement towards possibly
11 providing service fees?
12     MS. MARTINEZ:  Objection, form.
13     A.  In the Medicaid world we would see the
14 two as quite distinct.  So, you know, whether
15 that may be part of a motivation of some people,
16 I don't know.  But in Medicaid, again, they're
17 distinct services.  Dispensing -- or what's paid
18 to a pharmacist for providing a drug consisting
19 of both the ingredient cost and the dispensing
20 fee is quite distinct from any additional payment
21 for medication therapy management.
22     Q.  But you would agree with me that the

Page 390

1  state pharmacy personnel would probably be the
2  best people to ask about what might be motivating
3  a service fee component for medication therapy
4  management?
5      MS. MARTINEZ:  Objection, form.
6      A.  Yes.  Better than -- I don't know.  So
7  for the states that are proposing that, yes, they
8  would be the better source.
9      Q.  I'd like to ask you to go to page 7,
10 the next page, the first full paragraph.  ABT
11 wrote in the report "Most experts agree that AWP
12 or even the typical discounts to AWP exceed
13 actual acquisition costs for both pharmacies and
14 physicians.  This is particularly true for
15 generic drugs."  Do you see that?
16     A.  Yes, I do.
17     Q.  Is that something that you became aware
18 of in your role as the pharmacy team leader?
19     A.  Yes.
20     Q.  And it goes on "At the same time, these
21 experts agree that Medicaid dispensing fees are
22 low relative to actual dispensing costs."  Do you

36  (Pages 387 to 390)

43d600b1-21ec-4511-a4d1-17012cd41147

Duzor, Deidre - Vol. II                February 27, 2008
                 Washington, DC

Page 391

1   see that.
2       A.   I do see that.
3       Q.   Okay.  And do you recall that subject
4   being discussed at the panel meeting?
5       A.   I remember the discussion about the
6   discounts on AWP.  I don't recall the discussion
7   -- a discussion about dispensing fees.
8       Q.   But it's something that may have been
9   discussed?  You just don't recall?
10      A.   It may have been discussed, yes.  I
11  just don't recall.
12      Q.   Would you agree that Medicaid
13  dispensing fees are low relative to actual
14  dispensing costs?
15          MS. MARTINEZ:  Objection, form.
16      A.   No.  I don't consider myself
17  knowledgeable enough to make that statement.
18      Q.   So you wouldn't have any basis to
19  disagree with ABT's statement that "Experts agree
20  that Medicaid dispensing fees are low relative to
21  actual dispensing costs"; is that fair to say?
22          MS. MARTINEZ:  Objection, form.

Page 392

1       A.   The only problem I have is Medicaid
2   dispensing fees being talked about as a unit I
3   think is a bit problematic, because they do vary
4   quite substantially across states.  So --
5       Q.   But this firm felt it appropriate to
6   refer to Medicaid dispensing fees in the
7   aggregate and make comments upon it.  Do you
8   think that's inappropriate for them to do that?
9           MS. MARTINEZ:  Objection to form.
10      A.   I don't think it was inappropriate for
11  them to do that.  But your question to me was do
12  I concur with this statement as written.  And I
13  think it's a bit overbroad to just talk about
14  them in general in the aggregate.  Because they
15  do vary quite a bit.
16      Q.   Do you have any basis to disagree with
17  the contention that most experts agree that
18  generally speaking Medicaid dispensing fees are
19  low relative to actual dispensing costs?
20          MS. MARTINEZ:  Objection, form.
21      A.   I just am not knowledgeable enough to
22  speak to what most experts think.  I just don't

Page 393

1   know.
2       Q.   Do you think that there are others who
3   know more about the actual cost to dispense drugs
4   than you?
5       A.   Oh, I'm sure there are many people who
6   know more than me.
7       Q.   And who know more than anyone else at
8   CMS?
9           MS. MARTINEZ:  Objection, form.
10      A.   I don't think we at CMS are very
11  knowledgeable on this subject.
12      Q.   If you go to the next line, it states
13  in the next sentence "One panel member commented
14  'If it weren't for the AWP spread, the pharmacies
15  would be out of business.'"
16      A.   I see that.
17      Q.   Do you recall that comment being made?
18      A.   No.  I don't recall it.
19      Q.   But you don't disagree that the comment
20  was made during the panel conference?
21          MR. KELLEY:  Objection to form.
22          MS. MARTINEZ:  Objection, form.

Page 394

1       A.   I assume since it's reported here that
2   -- I accept it on its face value that it was
3   probably said, yes.
4       Q.   So you don't recall who made the
5   statement?
6       A.   No, I don't.
7       Q.   Then it says "Payments based on the
8   cost structure experienced by pharmacies may
9   warrant payment of a reasonable and managed
10  spread (an amount paid above the actual
11  acquisition cost) in addition to a fixed
12  dispensing fee and an appropriate service fee for
13  medication therapy management."  Do you see that?
14      A.   Yes.
15      Q.   And is it your view that a reasonable
16  and managed spread should not be paid above
17  acquisition cost by Medicaid programs?
18          MS. MARTINEZ:  Objection, form.
19      A.   I believe our regulations call for an
20  actual acquisition cost, which is a cost very
21  close to, if not precisely -- but, you know,
22  certainly a cost close to what is paid by the

37 (Pages 391 to 394)

43d600b1-21ec-4511-a4d1-17012cd41147

Duzor, Deidre - Vol. II                    February 27, 2008
                    Washington, DC

Page 403

1  (physicians and pharmacies) for deficiencies
2  elsewhere in the payment system.  If and when the
3  method for estimating acquisition costs is
4  altered, it may be desirable to reconsider the
5  payment policy as a whole."  Do you see that?
6      A.  Yes, I do.
7      Q.  Do you recall discussion at the panel
8  meeting that margins or spreads may be
9  compensating providers for deficiencies elsewhere
10 in the system?
11         MS. MARTINEZ:  Objection, form.
12     A.  I don't recall the discussion, but it
13 could have been discussed.
14     Q.  Is that a topic that's been discussed
15 at other meetings that you've been at?
16         MS. MARTINEZ:  Objection, form.
17     A.  Well, after the Deficit Reduction Act
18 was passed we did acknowledge -- CMS did
19 acknowledge in a -- I believe a state Medicaid
20 director's letter -- that when the new federal
21 upper limits went into effect that states may
22 want to review their dispensing fees to assure

Page 404

1  that they are adequate to cover the cost of
2  dispensing.
3      Q.  And that's something that you issued in
4  connection with a decrease in -- a potential
5  decrease in ingredient cost reimbursement; is
6  that right?
7      A.  I believe it was a state Medicaid
8  director's letter discussing or describing the
9  pharmacy provisions of the DRA.
10     Q.  And one of those provisions was to
11 reduce the payment on the ingredient cost through
12 FUL legislation; is that right?
13     A.  Right.  It was a new method by which
14 the federal upper limits would be established.  A
15 new formula.
16     Q.  That CMS expected would decrease the
17 amount for ingredient cost, correct?
18         MR. WINGET-HERNANDEZ:  Objection, form.
19     A.  Yes, that it would on many drugs, that
20 the FULs would be decreased on many drugs.
21     Q.  As the co-lead of CMS's pharmacy team
22 you were not unaware of the dialogue in the

Page 405

1  industry about the fact that insufficient
2  dispensing fees were being cross subsidized by
3  margins and spreads on ingredient costs, were
4  you?
5          MS. POLLACK:  Objection to form.
6          MR. KELLEY:  Objection to form.
7          MS. MARTINEZ:  Objection, form.
8      A.  What I was aware of was that there was
9  a spread in the ingredient cost and in some
10 states that may have led to states not keeping
11 their dispensing fees up to date in terms of cost
12 to dispense because the overall reimbursement was
13 generous.
14     Q.  I'd like to ask you to go to 458.
15         MR. TORBORG:  It may be that you have
16 to get, Ani, the Manila folder behind you.  458?
17 Is it in there?
18         MS. MARTINEZ:  Yeah.  It should be.
19 BY MR. TORBORG:
20     Q.  Ms. Duzor, this is a GAO report dated
21 March of 1993.  It's titled "Medicaid, Outpatient
22 Drug Costs and Reimbursements for Selected

Page 406

1  Pharmacies in Illinois and Maryland."  Ms. Duzor,
2  if you would take a look at this to see if this
3  is something that you have ever reviewed in
4  connection with your role as the co-lead of the
5  CMS pharmacy team.
6      A.  No.  I don't recall ever seeing this
7  and note that it was nine years preceding my
8  involvement in Medicaid drug policy.
9      Q.  When you started at CMS on the pharmacy
10 issues in 2002 did you make any effort to go back
11 and review OIG, GAO or other reports pertinent to
12 Medicaid pharmacy?
13     A.  I don't recall whether I did or not.
14     Q.  I'd like to ask you to go to page 6 of
15 this document.  The first paragraph -- this is
16 the GAO report where they wrote "Although total
17 Medicaid reimbursements exceeded the pharmacies'
18 total drug purchase costs for the drugs we
19 reviewed, whether this represents unreasonable
20 benefits for the pharmacies is not clear.
21 Neither HCFA nor the states have determined what
22 would be an appropriate margin between

40  (Pages 403 to 406)

43d600b1-21ec-4511-a4d1-17012cd41147

# Joseph Fine,

**Director of Pharmacy Division for Maryland Medicaid and Associated Positions (1976-2005);**
**Technical Director for the CMS Pharmacy Division for Medicaid (2005-Present)**

# Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - -


        Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

        MENTAL HYGIENE BY JOSEPH L. FINE


                        Baltimore, Maryland

                        Tuesday, December 9, 2008

                        9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 174

1  invoices, which as I said earlier in discussion in
2  different questions, but that it's difficult to get
3  each pharmacy's costs down.  And here you had an
4  auditor being able to go in there and see what they're
5  paying for drugs.  We felt that, well, let's see what
6  it costs them to fill a prescription also and get a
7  balanced report.  And that's really what it was.
8      Q.   If we continue on with the minutes it
9  states "they stated" -- again, this was the state
10 officials.
11     A.   Yeah.
12     Q.   "They stated that we should include a fifth
13 category of pharmacies to include nontraditional
14 retail pharmacies such as hospitals, home IV, nursing
15 homes, physicians, et cetera.  The state officials
16 believed that these pharmacies purchased at
17 substantially bigger discounts than traditional
18 pharmacies," right?
19     A.   And that is the statement I made on your
20 previous documentation when you showed me individual
21 prices when there was an audit done to hospital
22 outpatient department pharmacy and nursing homes.

Page 175

1  This lends to the issue.
2      Q.   You're talking about the 1993 GAO report?
3      A.   Yes.  Absolutely yes.
4      Q.   And this one indicates that home IV
5  pharmacies are among those who are able to purchase at
6  substantially bigger discounts, correct?
7      A.   Correct.
8      Q.   So this is something the department was
9  aware of at least by August of 1994, correct?
10         MS. YAVELBERG:  Objection, form.
11     A.   The department was aware that there was
12 preferential pricing for certain selected providers.
13     Q.   Including home IV pharmacies, correct?
14     A.   Yes.
15     Q.   Hospital pharmacies and nursing homes,
16 correct?
17     A.   Correct.
18     Q.   As well as physicians, correct?
19     A.   Correct.
20     Q.   And those are the type of pharmacies that
21 purchase and seek reimbursement for the products on
22 schedule 1 to Abbott's cross notice, correct?

Page 176

1          MS. YAVELBERG:  Objection, form.
2      Q.   Saline solution, dextrose, vancomycin?
3      A.   Predominantly at that time, yes.
4          MR. TORBORG:  I'd like to mark this as
5  Abbott Maryland 11.
6          (Exhibit Abbott Maryland 011
7           was marked for
8           identification.)
9          BY MR. TORBORG:
10     Q.   For the record, what I've marked as Abbott
11 Maryland 11 bears the Bates numbers HHD 114-0264
12 through 67.  It appears to be an agenda of the meeting
13 in Richmond, August 30 and 31, 1994.  Do you see that?
14     A.   Mm-hmm.  Yes.
15     Q.   Do you see the opening comments here?  One
16 of the people listed is Benny Ridout?
17     A.   Yes.
18     Q.   Is he someone -- do you know why he was
19 giving the opening comments from the state
20 perspective?
21     A.   You know, I'm just looking here.  They
22 wanted a person from the OIG, a person from HCFA and a

Page 177

1  person from the states as a balanced opening set of
2  remarks.  Each one welcoming, you know -- that's how
3  this worked.  And if you see, George Reeb is an OIG
4  auditor, Dave McNally is from HCFA and Benny is
5  certainly from the states.
6      Q.   If you would go to the second page of this
7  exhibit ending with 265, this is the agenda for
8  Wednesday August 31st.
9      A.   And you notice also Rob Vito.  I mentioned
10 his name before.  I had contact with him.  He does
11 evaluation.
12     Q.   That was where I was going.
13     A.   Okay.
14     Q.   Do you recall Mr. Vito being at this
15 meeting?
16     A.   Yes.
17     Q.   And he is said to have spoken on the topic
18 of inhalation therapy drugs.  Do you see that?
19     A.   Yes.
20     Q.   And that would be drugs like albuterol?
21     A.   Correct.
22     Q.   Do you recall him giving a presentation

45 (Pages 174 to 177)

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 178

1  about albuterol?
2      A.   I remember him giving a presentation.  I
3  can't for the life of me tell you exactly what he said
4  right now.  I mean, it's just been too many years.
5      Q.   Just to see if it refreshes your
6  recollection, do you recall Mr. Vito advising the
7  states that they were doing a -- that they had begun
8  doing a study to compare provider acquisition cost
9  with AWPs for albuterol?
10         MS. YAVELBERG:  Objection, form.
11     A.   I don't recall that.  I know that he was
12 doing a study because that's what he does.  He does an
13 evaluation.  He's not an auditor.  He does
14 evaluations.  He's in the evaluation area, where
15 auditors are in Ben Jackson's area.
16     Q.   The meeting was to discuss the study OIG
17 was doing to compare AWP to invoice prices, correct?
18     A.   Correct.
19     Q.   And Mr. Vito gave a presentation about
20 inhalation therapy drugs, right?
21     A.   Yes.
22     Q.   Is it fair to infer that he was presenting

Page 179

1  you or talking about an evaluation he was doing to
2  study --
3      A.   I don't know if it was --
4          MS. YAVELBERG:  Objection, form.
5      Q.   Let me finish my question.
6          -- AWP and invoice prices for inhalation
7  drugs?
8          MS. YAVELBERG:  Objection, form.
9      A.   I don't recall.
10     Q.   It's been too long?
11     A.   Pardon me?
12     Q.   It's been too long?
13     A.   It's been too long.  I don't recall.
14     Q.   If I could have asked you about this
15 meeting ten years ago you would have had a much better
16 recollection, correct?
17         MS. YAVELBERG:  Objection, form.
18     A.   One could assume since there's a shorter
19 time frame between meetings that you would remember
20 more.
21     Q.   I would like to ask you to go to the Bates
22 page ending 270.

Page 180

1          MS. YAVELBERG:  Which document?
2          THE WITNESS:  We don't have 270.
3          MR. TORBORG:  We have to stop anyway.
4          THE VIDEOGRAPHER:  This is the end of tape
5  2.  Off the record at 2:04.
6          (Recess.)
7          THE VIDEOGRAPHER:  This is the beginning of
8  tape 3 in the 30(b)(6) deposition of DHMH by Joseph
9  Fine.  On the record at 2:17.
10         BY MR. TORBORG:
11     Q.   Welcome back, Mr. Fine.  I've handed you
12 what we've marked previously as Abbott Exhibit 1066.
13 It bears the Bates numbers VAC MDL 75205 through 219.
14 These were documents, Mr. Fine, that were produced by
15 Ven-A-Care of the Florida Keys in this litigation in a
16 file as you can see on the first page titled
17 "Maryland."  Prior to today have you seen any of these
18 documents?  Take all the time you need to look through
19 them.
20         MS. YAVELBERG:  Are you representing that
21 all of these documents were from that same file?  Is
22 that right?

Page 181

1          MR. TORBORG:  Do I have some other state in
2  here?  They're all in Bates order.
3          MS. YAVELBERG:  They all look like
4  different documents from different time periods and
5  dates and I just wasn't --
6          MR. TORBORG:  The document was produced by
7  Ven-A-Care in the order that they produced them.
8          MS. YAVELBERG:  Okay.
9          MR. TORBORG:  I think the next Bates in
10 sequence is a different state.  So I take it as being
11 someone took a file folder and made a copy of it.
12         MS. YAVELBERG:  Right.  But these were
13 found in not Maryland's files, but Ven-A-Care's files?
14         MR. TORBORG:  Right.
15         MS. YAVELBERG:  So if they had them in this
16 order, that was how they had them?
17         MR. TORBORG:  Yes.
18     A.   (Reading).  Okay.  Where did you get these?
19         BY MR. TORBORG:
20     Q.   These were documents that were produced by
21 the relator in this case, Ven-A-Care.
22     A.   Okay.  All right.  I just wanted to make

46  (Pages 178 to 181)

0bd2b054-a753-4e97-a066-e37ff7ee308f

# Sue Gaston,

**CMS Health Insurance Specialist (1991-2003);**
**Team Leader for Medicaid Drug Rebate Dispute Resolution**
**(2003-Present)**

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

PRICE LITIGATION            )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    )

U.S. ex rel. Ven-a-Care of  )  Judge Patti B. Saris

the Florida Keys, Inc.      )

     v.                     )  Chief Magistrate

Abbott Laboratories, Inc.,  )  Judge Marianne B.

No. 06-CV-11337-PBS         )  Bowler

- - - - - - - - - - - - - - -

     (cross captions appear on following pages)




          Videotaped deposition of SUE GASTON

                    Volume I



                    Washington, D.C.

                    Thursday, January 24, 2008

                    9:00 a.m.

Gaston, Sue                                January 24, 2008
                    Washington, DC

Page 62

1      A.   Some of the pharmacy associations have
2  meetings.  I attended one in Boston.  They're more
3  or less conferences.  I think one was in Raleigh,
4  North Carolina.
5      Q.   When you say pharmacy association, what
6  is that?  Is that a group of pharmacists or a group
7  of state people, state administrators, who work in
8  the pharmacy area?
9      A.   It's my recollection they were state
10 pharmacy folks and then some manufacturers would
11 also attend.
12     Q.   Was the topic of average wholesale price
13 discussed at those meetings?
14     A.   I can't recall.
15     Q.   Did you receive any materials at those
16 meetings?
17     A.   I may have.
18     Q.   Did you keep those?
19     A.   No.
20     Q.   Do you recall what type of topics were
21 discussed at the meetings of the state pharmacy
22 personnel?

Page 63

1          MS. MARTINEZ:  Objection, form.
2      A.   I do remember that some of the states
3  that are present, they would go around the table
4  just talking about what's happening in their states
5  relating to their Medicaid programs.  I presented at
6  those conferences discussing various issues
7  concerning the rebate program.
8      Q.   Did you keep any materials relating to
9  that, to your presentations?
10     A.   No.
11     Q.   Did you prepare any materials for these
12 presentations?
13     A.   Yes.
14     Q.   Do you recall any other meetings that
15 you've had apart from meetings with state pharmacy
16 personnel and the PTAG group at which the issue of
17 state pharmacy payment for drugs was discussed?
18         MS. MARTINEZ:  Objection, form.
19     A.   I can't specifically remember any
20 particular meetings.
21     Q.   But you believe that there may have been
22 others?

Page 64

1      A.   There may have been.
2      Q.   You just can't recall those given the
3  passage of time; is that fair to say?
4          MS. MARTINEZ:  Objection, form.
5      A.   Correct.
6      Q.   At the meetings that you recall, was the
7  issue of adequacy of dispensing fees ever discussed?
8          MS. MARTINEZ:  Objection, form.
9      A.   I can't recall.
10     Q.   And do you know what I'm asking you about
11 there with the adequacy of dispensing fee?
12     A.   Do I know --
13     Q.   Yeah.  You know what I'm talking about?
14     A.   Yes, I do.
15     Q.   The dispensing fee is what?
16     A.   That it's reasonable.
17     Q.   Is that a topic that you recall coming up
18 quite a bit during your time at CMS?
19         MR. WINGET-HERNANDEZ:  Objection, form.
20         MS. ALBEE:  Objection, form.
21         MS. MARTINEZ:  Objection, form.
22     A.   The issue comes up in the discussion of

Page 65

1  state plan amendments, but other than that I don't
2  recall it being a big issue.
3      Q.   And how does it come up in the context of
4  state plan amendments?
5      A.   Because in the state plan amendment
6  generally states will have something in there about
7  their dispensing fee.  And then they have to provide
8  sufficient documentation or justification for their
9  dispensing fee.
10     Q.   Do you recall there being discussion that
11 the dispensing fee as set by the states was not
12 adequate to cover a pharmacy's cost?
13         MS. MARTINEZ:  Objection, form.
14     A.   Can you repeat that?
15         MR. TORBORG:  Would you mind reading it
16 back, Jon?
17         (Whereupon, the requested portion was
18 read by the reporter.)
19     A.   I don't recall specific conversations.
20     Q.   And is that because of the passage of
21 time?
22         MR. WINGET-HERNANDEZ:  Objection, form.

17 (Pages 62 to 65)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

# Thomas Gustafson,

**Director of the Division of Medicaid & Long Term Care (1985-1988);
Acting Director of the Office of Policy and Analysis (1988-1991);
Deputy to the Director of the Office of Legislation and Policy (1991-1996);
Deputy to the Director of the Office of Research and Demonstrations (1996-
1998); Director of Hospital and Ambulatory Policy Group (1998-2003);
Deputy Director of CMS (2003-2007))**

Gustafson, Thomas A.                    September 28, 2007
                    Washington, DC

Page 1

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      )  Judge Patti B. Saris

the Florida Keys, Inc.          )

    v.                          )  Chief Magistrate

Abbott Laboratories, Inc.,      )  Judge Marianne B.

No. 06-CV-11337-PBS             )  Bowler

- - - - - - - - - - - - - - - -

        (captions continue on following pages)


    Videotaped deposition of THOMAS A. GUSTAFSON

                    Volume I



                    Washington, D.C.

                    Friday, September 28, 2007

                    9:00 a.m.

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Thomas A.                          September 28, 2007
                    Washington, DC

---

Page 58

1  were with the agency, when you were with CMS --
2      A.   This covers a 20-year period, you
3  understand.
4      Q.   You're absolutely correct.  When you
5  left CMS to this position you didn't suddenly
6  discover that manufacturers were conforming their
7  conduct to the system in order to maximize their
8  profits, correct?
9          MR. WINGET-HERNANDEZ:  Objection, form.
10     A.   The matter came as no surprise.
11     Q.   And in fact staying in 2007, you would
12  expect pharmaceutical manufacturers to conform
13  their conduct to the system as set up by the agency
14  and by the legislature, correct?
15         MR. MAO:  Objection, form.
16     A.   I'm an economist.  I understand the
17  incentives that face for-profit organizations, and
18  for that matter some that affect non-for-profit
19  organizations.  I have spent the last at least 20
20  years if not 30 years of my life worrying, dealing,
21  being concerned very directly with the effect of
22  various kinds of incentives on actors within

---

Page 59

1  complex social systems.
2          The sort of situation you're describing
3  falls within this.  I'm not naive.  I understand
4  that these things happen.
5      Q.   Were you aware as far back as 1991 while
6  you were with the agency that pharmaceutical
7  manufacturers were on the one hand conforming their
8  conduct to the drug reimbursement systems being set
9  up by CMS?
10         MR. MAO:  Objection to form.
11     A.   I don't recall what I may have thought
12  on that matter back in -- or what I was aware of
13  back in 1991.  I would fall back on my prior
14  answer.  It could hardly have surprised me.
15     Q.   At any time when you were with CMS and
16  before that HCFA did you become actually aware that
17  pharmaceutical manufacturers were advocating to the
18  agency and to the legislature to change the system
19  for their benefit?
20         MR. MAO:  Objection, form.
21     A.   Sure.  You know, among other things I
22  would witness representatives of the organization

---

Page 60

1  now called PHARMA -- it had a slightly different
2  name previously -- dropping in to see the
3  administrator.  They weren't there to have tea.
4  They're urging the point of view of their members.
5  I don't remember specific instances or issues.  But
6  as with any well-organized industry you would
7  expect the companies to be attempting to influence
8  government policy.
9      Q.   Did you ever witness the pharmaceutical
10  industry engage in any inappropriate attempts to
11  sway the agency or the legislature regarding drug
12  payment policy?
13         MR. MAO:  Objection, form.
14     A.   Can you be a little bit more precise
15  about what you might mean by inappropriate?
16     Q.   Actually, I can't.  Inappropriate in any
17  way, whether unethical, illegal, fraudulent or
18  otherwise inappropriate.
19         MR. WINGET-HERNANDEZ:  Objection to
20  form.
21     A.   I find this too vague a question to
22  answer.

---

Page 61

1      Q.   Did you ever witness the pharmaceutical
2  industry engaging in any fraudulent conduct to try
3  to sway the agency in its policy decisions?
4          MR. WINGET-HERNANDEZ:  Objection to
5  form.
6          MR. MAO:  Objection, form.
7      A.   It depends on what you mean by conduct.
8          I see you're puzzled by my response and
9  let me just explain that that the fee for service
10  program of Medicare -- leave aside Medicaid, leave
11  aside the HMO products that Medicare advantage and
12  its cousins -- processes a billion claims a year,
13  deals with literally a million providers.
14         I mean, I could go on.  You get the
15  point here.  Is there fraud in this environment?
16  Unquestionably there is.
17     Q.   Actually, you misunderstand my question.
18  I was asking about the pharmaceutical industry
19  advocating the changes in the system or advocating
20  for keeping the system, not individual claims.  Do
21  you understand?
22     A.   So you're talking about their lobbying

---

16  (Pages 58 to 61)

8d657762-8fb9-483b-bb85-12b9bc9eea17

# Kimberly Howell,

**Maryland Medicaid Operations Division (1991-2000);
CMS Senior Drug Policy Analyst (2000-2008)**

Howell, Kimberly M.                              April 22, 2008
                    Washington, DC

              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

PRICE LITIGATION              ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    ) Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       ) Chief Magistrate

Abbott Laboratories, Inc.,    ) Judge Marianne B.

No. 06-CV-11337-PBS           ) Bowler

- - - - - - - - - - - - - - -

        (captions continue on following pages)


     Videotaped deposition of KIMBERLY M. HOWELL

                    Volume I


                 Washington, D.C.

                 Tuesday, April 22, 2008

                 9:00 a.m.

Howell, Kimberly M.                                    April 22, 2008
                        Washington, DC

Page 118

1    A.  It's an electronic document, and you
2  would get a hard -- you could get a hard copy.
3  It would be millions of individual papers.  And
4  you're talking about over 10,000 drugs and it
5  would show a chain -- not necessarily a pricing
6  update.  If there was any other change to their
7  particular record itself it would generate in a
8  report.
9    Q.  Okay.  If I could ask you to go to
10 Abbott Exhibit 16.  It should be in one of those
11 in front of you.  Ms. Howell, this document
12 contains after a cover page an article titled
13 "Hooked On Drugs" that was published in Barron's
14 magazine.  If you would take a look at that to
15 the extent necessary to tell me whether you
16 recall this document.
17       MS. ALBEE:  I'm sorry.  What was that
18 exhibit number?
19       MR. TORBORG:  Abbott 16.
20    A.  No, I don't.
21    Q.  I'd like to ask you to go to page 155
22 of this document in the bottom right-hand corner.

Page 119

1  At the top of the second column there it starts
2  "but for generic drugs."  Do you see that?
3    A.  Yes, I see that.
4    Q.  It states "But for generic drugs nearly
5  every manufacturer's price was 60 to 85 percent
6  below the published average wholesale price.
7  Some of the generics account for significant
8  spending on Medicare, claiming half of the top 20
9  slots.  Two of them, albuterol and leucovorin,
10 are in the number two and number 5 slots
11 respectively."  Do you see that?
12    A.  Yes, I do.
13    Q.  Do you recall during your time at
14 Maryland Medicaid knowing that the average
15 wholesale prices for generic drugs were a
16 particularly unreliable source or an area where
17 the AWP was particularly unreliable as a source
18 of acquisition cost?
19       MS. OBEREMBT:  Objection, form.
20    A.  Could you restate that?
21    Q.  Let me try again, because it wasn't a
22 very good question.

Page 120

1        While you were at Maryland Medicaid did
2  you become aware of the fact that for generic
3  drugs the average wholesale prices in the
4  compendia were a particularly unreliable source
5  for acquisition costs?
6        MS. OBEREMBT:  Objection, form.
7    A.  No.
8    Q.  Did you have an idea of why it is that
9  the state had a maximum allowable cost program?
10    A.  Because it was in a state regulations
11 to maximize their prices.  The state had the
12 flexibility to do that.
13    Q.  Yeah, but do you know why it was in the
14 regulations, why have the program?
15    A.  You would have to go back and look in
16 the legislative history on it.
17    Q.  Then the next sentence says the -- the
18 next paragraph states "The pricing unreality is
19 even worse for intravenous nutritionals and
20 solutions, a category documented by Abbott
21 Laboratories and Baxter International.  Catalog
22 prices for these items are on average 80 to 93

Page 121

1  percent below those companies' AWPs."  Do you see
2  that?
3    A.  Yes.
4        MS. OBEREMBT:  It says "catalog
5  wholesale prices."
6        MR. TORBORG:  I'm sorry.  I'll rephrase
7  the question to incorporate that correct reading.
8  BY MR. TORBORG:
9    Q.  Do you recall during your time at
10 Maryland Medicaid becoming aware of the fact that
11 average wholesale prices for intravenous
12 nutritionals and solutions were a particularly --
13 that the AWPs were a particularly unreliable
14 source for acquisition cost for those products?
15       MS. OBEREMBT:  Objection, form.
16    A.  What are the solutions?
17    Q.  Intravenous solutions?  Do you have an
18 understanding of what those mean?
19    A.  No.  That's why I'm asking for
20 clarification.
21    Q.  Products like dextrose, sodium chloride
22 solutions.

                            31 (Pages 118 to 121)

dbdcd79d-0bbd-4654-b5a7-f97b5f69ffcc

Howell, Kimberly M.                                    April 22, 2008
                        Washington, DC

Page 122

1     A.  Oh, okay.  Those solutions.  My
2  response to that I don't recall that.
3     Q.  You may have, but you just don't recall
4  as you sit here today?
5     A.  I don't recall.  Yes.  I don't recall
6  for the time I was at Maryland Medicaid.
7          (Exhibit Abbott 1066 was marked
8  for identification.)
9  BY MR. TORBORG:
10    Q.  What I've marked as Abbott Exhibit 1066
11 bears the Bates numbers VAC MDL 75205 through
12 219.  Ms. Howell, this is a series of documents
13 that was produced by Ven-A-Care in this case.
14 I'm going to be asking you first about the
15 document Bates page ending 212.  This is an
16 October 24th 1994 letter from Zachary Bentley to
17 the specialist for pharmacy policy administration
18 in Baltimore, Maryland.
19         In the first sentence Mr. Bentley
20 refers to the fact that he's currently working on
21 a continuing education project concerning our
22 nation's Medicaid reimbursement of the above-

Page 123

1  referenced drugs, which are intravenous solutions
2  and injectable drugs.  Do you see that?
3     A.  Yes, I see that.
4     Q.  Do you recall becoming aware of a
5  continuing education project that was being
6  spearheaded by Ven-A-Care during this time?
7     A.  No, I don't.
8     Q.  You may have been, but you don't recall
9  as you sit here today?
10    A.  No, I don't.
11    Q.  So you're sure that you did not become
12 aware of it?
13    A.  I did not become aware of it.
14    Q.  If we go to the pages before that, 210
15 and then 211 is a response from Frank Tetkoski,
16 right?
17    A.  Yes.
18    Q.  It appears as though he at least became
19 aware of the project; is that fair to say?
20        MS. OBEREMBT:  Objection.
21    A.  Are you waiting for a response whether
22 I knew that Frank was aware of the project?

Page 124

1     Q.  Well, does it appear as you sit here
2  today that Frank was aware of the project?
3         MS. OBEREMBT:  Objection.
4     A.  Frank, based on -- he did a response,
5  so apparently he received an inquiry regarding
6  this issue.
7     Q.  And if you go to Bates page ending 214
8  and 215 and 216 there are some charts here that
9  were prepared.  Do you see those?
10    A.  Yes, I do.
11    Q.  Are you familiar with these charts at
12 all?
13    A.  No, I'm not.
14    Q.  If you would go to the chart on Bates
15 page ending 215 titled "Examples of excessive
16 reimbursements for pharmaceuticals by Maryland
17 Medicaid pharmacy program," do you see that?
18    A.  Yes, I see this.
19    Q.  The final column on the right says
20 "Maryland Medicaid reimbursement" and there's a
21 couple stars next to it.  It states "Maryland's
22 Medicaid reimbursements obtained from Maryland

Page 125

1  Medicaid policy, Medicaid pharmacy."  Do you see
2  that?
3     A.  Yes.
4     Q.  Do you know what that is, the Maryland
5  Medicaid policy, Medicaid pharmacy?
6     A.  That's the policy division where Frank
7  worked.
8     Q.  And if you see -- if you go to the
9  first drug, leucovorin --
10    A.  Yes.
11    Q.  -- on July '97 the reimbursement is
12 stated at $49.50 and then December '97 it goes
13 down to $21.53 and then on December 22nd '97 it
14 goes down to $7.20 do you see that?
15    A.  Yes, I do.
16    Q.  And then if we go to the next drug
17 down, Abbott, on October 1995 there is a price of
18 $29.12, do you see that?
19    A.  Yes, I do.
20    Q.  And then November '95 it goes down to
21 $6.55 roughly?
22    A.  Yes.

32  (Pages 122 to 125)

dbdcd79d-0bbd-4654-b5a7-f97b5f69ffcc

Howell, Kimberly M.                                    April 22, 2008
                    Washington, DC

| Page 374 | Page 376 |
|---|---|

Page 374

1  even if that rate may differ from the
2  documentation, such as a state survey."  What did
3  you mean by that?
4      A.  We could just accept what the state
5  gave us, just basically what the legislature made
6  this decision.  When you're doing these decision
7  memos you have to look at all available options.
8  Although they may not be the most appropriate
9  option, but you need to consider those options.
10     Q.  Why did you consider doing this
11 particular option?
12     A.  Again, because we had had a number of
13 state plan amendments where the state's
14 justification was that the legislature determined
15 the reimbursement level.
16     Q.  Now, it says in the next paragraph that
17 you continued to allow greater flexibility on
18 dispensing fees?  It says "Because the
19 requirements to set dispensing fees are less
20 specific, we would continue to allow states
21 greater flexibility here."  Do you see that?
22     A.  Yes, I see that.

Page 375

1      Q.  And why was that important?
2      A.  I can't recall the thought process for
3  this.
4      Q.  When you were preparing this memo did
5  you consider the interplay between dispensing fee
6  and ingredient cost?
7      A.  I don't think I did.  The issue was the
8  problem with the ingredient cost.
9      Q.  Were there any discussions about cross
10 subsidization issues as it related to ingredient
11 cost and dispensing fees in connection with the
12 preparation of the ideas in this memo?
13         MS. OBEREMBT:  Objection.
14     A.  I don't think so.
15     Q.  Did anyone on your team ever discuss
16 that with you at this time?
17         MS. OBEREMBT:  Objection.
18     A.  No.
19     Q.  If you turn to the next page, it says
20 under options -- did you write those options?
21     A.  Some of the options.
22     Q.  Okay.  Are there ones you did not

Page 376

1  write?
2      A.  Yes.
3      Q.  Which ones did you not write?
4      A.  For ingredient cost, the second one.
5      Q.  Okay.  So the other ones you wrote?
6      A.  Yes.  Pretty much.
7      Q.  Now, the first one, "Approve SPAs that
8  decrease the ingredient cost," that one there, is
9  that something that you yourself formulated or
10 had that been the existing policy and you were
11 just writing it down?
12     A.  No.  It's just looking at the available
13 options that you could have.
14     Q.  Was this an option that had been
15 followed?
16     A.  There may have been some state plans
17 that were approved based on the fact that the
18 states looked at what continuous states were
19 paying for their ingredient costs.
20     Q.  Okay.  Now, the next one, "Approve SPAs
21 that decrease the ingredient cost as long as it
22 is no lower than the levels of costs found by the

Page 377

1  OIG."  Who wrote that one?
2      A.  Deirdra.
3      Q.  And then the next one, "Approve SPAs to
4  increase payment for ingredient costs if they are
5  less than the median nationally."  Where did you
6  get that idea from?
7      A.  I think we did that.  Deirdra and I did
8  that together.
9      Q.  What is the median that you're talking
10 about there?
11     A.  It would have been based on a median
12 national average for the time period that we were
13 talking about.
14     Q.  But a median of what?
15     A.  Of pharmacy costs.
16     Q.  Is it like you would add up all the
17 formulas or --
18     A.  To get an average.
19     Q.  So this is like an average of AWP minus
20 10?
21     A.  Yes.  But again, this was just an
22 option.  And you have to remember that we were at

95 (Pages 374 to 377)

dbdcd79d-0bbd-4654-b5a7-f97b5f69ffcc

# Robert Niemann,

CMS Policy Analyst (1976-1993);
Drug Payment Policy and Ambulance Payment Policy (1993-2005)

Page 300

                   UNITED STATES DISTRICT COURT

                   DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x

In re:  PHARMACEUTICALS INDUSTRY :  MDL No. 1456

AVERAGE WHOLESALE PRICE          :  Civil Action

LITIGATION                       :  01-CV-12257-PBS

_____:

THIS DOCUMENT RELATES TO:        :  Judge Patti B.

United States of America, ex     :    Saris

rel. Ven-a-Care of the Florida   :

Keys, Inc.,                      :

            vs.                  :  Chief Magistrate

ABBOTT LABORATORIES, INC.,       :   Judge Marianne

No. 06-11337-PBS                 :   B. Bowler

- - - - - - - - - - - - - - - -x

                        Baltimore, Maryland

                        Thursday, October 11, 2007

   Continued Videotaped Deposition of ROBERT NIEMANN

                        Volume 2

7740c121-2ef5-42fa-b469-75f6ff96f4b6

Niemann, Robert - Vol. II                          October 11, 2007
                          Baltimore, MD

Page 377

1  time is 11:08:52.
2  BY MR. COOK:
3      Q.  Mr. Niemann, before going to another
4  subject, I neglected to ask you at the beginning,
5  did you discuss your testimony from your last day
6  of deposition with anybody prior to this day of
7  deposition?
8      A.  No.
9      Q.  Did you meet with counsel to prepare
10 for the second day of deposition?
11     A.  No.
12     Q.  And before I forget, a one-off
13 question.  Do you know who John Warren is?
14     A.  He works at CMS.
15     Q.  Do you know what he does at CMS?
16     A.  When I knew him, he was -- no.
17     Q.  Do you know what he did when you knew
18 him?
19     A.  I realized how irrelevant that was.
20 That was many years ago.  I thought he had
21 something to do with issuing instructions, but --
22     Q.  Between 1991 and 2001, do you have any

Page 378

1  idea whether Mr. Warren had any responsibilities
2  relating to payment for drugs?
3      A.  No, I don't know.
4      Q.  Is that something you would have known,
5  given your position during that time period?
6      A.  It depends on what connection he would
7  have had.  I don't know that I knew everybody
8  that had some connection to it.
9          MR. COOK:  I ask the court reporter to
10 mark this document as Exhibit Abbott 335, but
11 first for the record, it is a document bearing
12 Bates number HHD081-1154.  It is an October 2,
13 1996 letter from Ven-a-Care to Dr. Bruce Vladeck,
14 appears to have the word handwritten "Bob" at the
15 top.
16          (Exhibit Abbott 335 was marked for
17 identification.)
18          MS. OBEREMBT:  Do we have it?
19          MR. COOK:  No, this is newly marked.
20 This is another version of this document that has
21 already been marked, but this is a new document.
22          MR. WINGET-HERNANDEZ:  Exhibit Abbott

Page 379

1  335?
2  BY MR. COOK:
3      Q.  Yes.  Do you recognize this document,
4  Mr. Niemann?
5      A.  No, I don't.
6      Q.  It's been represented to us that this
7  came from your files.  Is this the type of
8  document you would have expected to come from
9  your files?
10         MR. WINGET-HERNANDEZ:  Objection, form.
11     A.  It doesn't surprise me, because it
12 relates to drug payment.
13     Q.  The handwriting at the top where it
14 says "Bob," do you recognize the handwriting on
15 page 1 at the top?
16     A.  No.
17     Q.  Can you read the handwriting?
18     A.  Not on this.
19     Q.  It looks like a series of numbers, and
20 then below that the word "Bob" slash, and then
21 some more letters.  Do those notations have any
22 meaning to you?

Page 380

1      A.  No.
2      Q.  This is the first of a large number of
3  documents that I've selected some to go through
4  with you that have been represented to us as
5  having come from your files that in one way or
6  another relate to Ven-a-Care.  Do you recall
7  maintaining a file relating to Ven-a-Care?
8      A.  No, I don't.
9      Q.  Do you recall receiving documents
10 relating to Ven-a-Care?
11     A.  Only when you brought that up did it
12 shake my memory about that name, Ven-a-Care.  I
13 don't have any specific recollection of any
14 specific documents coming to me, but it doesn't
15 surprise me if they did.
16     Q.  The very first sentence of this letter
17 to Dr. Vladeck indicates that Ven-a-Care had
18 attempted for more than seven years to insist
19 HCFA state Medicare programs in limiting infusion
20 and inhalation pharmaceutical reimbursements to
21 the reasonable levels contemplated by the
22 enabling legislation.  Do I summarize that

21  (Pages 377 to 380)

7740c121-2ef5-42fa-b469-75f6ff96f4b6

Niemann, Robert - Vol. II                    October 11, 2007
                        Baltimore, MD

Page 381

1  correctly?
2      A.  That's what the sentence says.
3      Q.  Do you recall any attempts by Ven-a-
4  Care for more than seven years to limit the
5  reimbursement for infusion and inhalation
6  pharmaceutical products?
7      A.  Well, to the extent that you reminded
8  me with the name, I don't really remember the
9  specifics of it.
10     Q.  What do you remember?
11     A.  Just -- just the name and the fact that
12  they were a relater.
13     Q.  Do you recall receiving letters such as
14  this and other material from Ven-a-Care relating
15  to the market price for pharmaceutical products?
16     A.  I certainly don't remember the
17  specifics.  Do I recall receiving anything?
18  Vaguely.
19     Q.  Do you recall anything other than the
20  fact that you may have received material from
21  Ven-a-Care?
22     A.  Just what I've said.

Page 382

1      Q.  Do you recall Ven-a-Care providing you
2  information relating to the price at which it was
3  able to purchase pharmaceutical products in the
4  marketplace?
5      A.  Not -- not directly.  When you say
6  providing you, meaning me, I don't remember being
7  the direct recipient of any information like
8  this.
9      Q.  You agree with me that Exhibit Abbott
10  335 is a letter that relates to reimbursement for
11  pharmaceuticals at least in part under the
12  Medicare Part B program, correct?
13     A.  Yes, yes, I agree.
14     Q.  And it at least appears to have been
15  sent to the administrator of HCFA in 1996,
16  correct?
17     A.  Yes.
18     Q.  Would you have expected a letter such
19  as this to have made its way to you, given your
20  position in HCFA in 1996?
21     A.  A copy of it.
22     Q.  Yes.

Page 383

1      A.  Yes.
2      Q.  If you could take a look at the
3  information that at least Ven-a-Care purports to
4  communicate to HCFA in Exhibit Abbott 335 and
5  tell me, is this information pertinent to
6  anything you were doing in 1996 in your position
7  at CMS?
8          MS. OBEREMBT:  Objection.
9      A.  It had the potential to be I guess.
10     Q.  How do you mean?
11     A.  I don't know that we would have based
12  any policy decisions on this, but I suppose since
13  it relates to payments for Medicare drugs in that
14  sense, it's in the right ball park.
15     Q.  To the extent that Ven-a-Care provided
16  information to HCFA regarding the price at which
17  Ven-a-Care was able to purchase pharmaceutical
18  products being lower than the current Medicare-
19  allowable amount of average wholesale price, did
20  that have any effect on the manner in which you
21  implemented the Medicare Part B payment
22  methodology?

Page 384

1      A.  I don't remember that.
2      Q.  I mean, it was your understanding as I
3  recall in 1996 that the Medicare-allowable amount
4  was established by published AWPs, correct?
5          MS. OBEREMBT:  Objection.  I think that
6  misstates his earlier testimony.
7      A.  I mean, it was what this -- oh, before
8  the program memorandum?
9      Q.  Yes.
10     A.  Yeah, it was -- as I said, it was the
11  lower of these different things.  AWP was one of
12  them.
13     Q.  And in fact, it's described in Exhibit
14  Abbott 202, the program memorandum from January
15  1998, that is, the second paragraph of Exhibit
16  Abbott 202 describes what the payment methodology
17  was prior to enactment of BBA 1997, correct?
18         MS. OBEREMBT:  I think that's --
19     A.  Yeah, it doesn't seem to mention
20  estimated acquisition cost.  I mean, you know,
21  the policy was what you already know.  It was
22  what -- what the regulation stipulated.

7740c121-2ef5-42fa-b469-75f6ff96f4b6

# Linda Ragone,

**OIG Program Analyst (1989-1998);**
**Deputy Regional Inspector General (1998-Present)**

Ragone, Linda - Vol. I                    April 17, 2007
                    Philadelphia, PA

Page 1

            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY   :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

----------------------------------X

THIS DOCUMENT RELATES TO:         :

U.S. ex rel. Ven-A-Care of the    :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott      :  06-CV-11337-PBS

Laboratories, Inc.                :

----------------------------------X


            IN THE CIRCUIT COURT OF

          MONTGOMERY COUNTY, ALABAMA

----------------------------------X

STATE OF ALABAMA,                 :  CASE NO.

          Plaintiff,              :  CV-05-219

      v.                          :

ABBOTT LABORATORIES, INC.,        :  JUDGE

et al.,                           :  CHARLES PRICE

          Defendants.             :

----------------------------------X

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                    April 17, 2007
                    Philadelphia, PA

Page 386

1    Q.  Okay.  So to wrap it up, could you
2  please give testimony to the jury about how you
3  knew $0.43 was inappropriate?
4       MR. NEAL:  Objection to the form. This
5  has been asked and answered a number of times.
6       MR. COOK:  Okay.  Your objection's on the
7  record.  I'll read it again.
8  BY MR. COOK:
9    Q.  Could you please testify and tell the
10  jury how you knew that $0.43 was an inappropriate
11  amount of reimbursement for Medicare to pay for
12  Albuterol Sulfate?
13    A.  We base those findings and our
14  recommendations on the work that we did, where we
15  found prices in the marketplace that were far below
16  the price that Medicare was paying.
17    Q.  What do you mean by far below?
18    A.  I'd have to go back to reports, but the
19  percentages that you were reading off.
20    Q.  So in 1996, you found that buying groups
21  were paying between 13 and $0.19, correct?
22    A.  I believe that's true.  I don't have the

Page 387

1  report in front of me, but yes.
2    Q.  And retail pharmacy customers were
3  paying $0.38 or above, correct?
4    A.  We found that 55 percent of them were
5  charging less than what Medicare reimbursed, 45
6  percent were more.
7    Q.  And 75 percent were paying $0.38 or
8  more, correct?
9    A.  I don't know if 75 is the correct
10  number.
11    Q.  And so can you tell me, how much is far
12  below?
13    A.  No.
14    Q.  And so it's your testimony that you can
15  opine on what is inappropriate without having an
16  opinion about what is appropriate?
17       MR. NEAL:  Objection; asked and answered.
18  This is argumentative.
19  BY MR. COOK:
20    Q.  Is that your testimony?
21    A.  My testimony is that I could produce
22  findings and recommendations based on what I found

Page 388

1  that suggest that something is not appropriate or
2  not reasonable and not provide what is appropriate
3  or reasonable.
4    Q.  Do you know whether it was the position
5  of the Office of Inspector General that the Office
6  of Inspector General had no opinion about what an
7  appropriate amount of Medicare Part B drug
8  reimbursement would be?
9       MR. NEAL:  Objection to the form.
10       THE WITNESS:  I do not know what the
11  Inspector General at that -- during this juncture
12  would have thought would be the appropriate price
13  for a drug.
14  BY MR. COOK:
15    Q.  Getting back to Exhibit Abbott 064,
16  Lisa Foley is listed as a program specialist. On an
17  earlier sign-in sheet, it appeared that Lisa Foley
18  was signed in as an attorney.  Is Lisa Foley an
19  attorney?
20    A.  I believe Lisa Foley is an attorney.
21    Q.  And a program specialist?
22    A.  She might -- might have been for a short

Page 389

1  period of time.  I don't remember her being a
2  program specialist.
3    Q.  Okay.  But at some point in time she
4  became an attorney?
5    A.  I know when I met her, she was an
6  attorney.
7    Q.  And when she worked with you on this
8  report, as a program specialist at headquarters,
9  was she acting as an attorney?
10    A.  I don't recall any conversations with
11  Lisa about this report.  I don't know.
12    Q.  Do you recall any conversations with
13  Cynthia Hansford relating to this report?
14    A.  I don't remember any of them, no.
15    Q.  Do you recall any conversations with
16  Robert Vito relating to this report?
17    A.  No, I don't remember any conversations
18  about this report.
19    Q.  Stuart Wright?
20    A.  No.
21    Q.  Back to Ms. Min DeParle's responses to
22  OIG's recommendations in her June 11, 1998 memo,

98  (Pages 386 to 389)

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                          April 17, 2007
                        Philadelphia, PA

Page 390

1  and I'm here at Page A-2 of Exhibit Abbott 064.  The
2  second sentence of Ms. Min DeParle's response, at
3  the bottom there of Page A-2, reads:  If given the
4  authority, HCFA would like to increase the discount
5  we now take on the published average wholesale
6  price and base our price on the acquisition cost.
7      Is that consistent with what employees of HCFA
8  advised you about what HCFA would like to do when
9  it comes to Medicare Part B reimbursement?
10         MR. NEAL:  Objection.
11         I'm going to instruct you not to answer
12  to the extent that would get into conversations
13  that took place at exit or entrance conferences.
14  BY MR. COOK:
15     Q.  Can you answer the question consistent
16  with the instruction?
17     A.  I don't recall -- I don't remember any
18  -- any of the conversations that we had with CMS
19  staff about their feelings about this
20  recommendation.
21     Q.  The sentence begins, at the bottom of
22  Page A-2:  If given the authority, HCFA would like

Page 391

1  to increase the discount we now take on the
2  published average wholesale price.
3      Was it your understanding that HCFA did not
4  have authority to increase the discount they took
5  on the published average wholesale price?
6         MR. NEAL:  Object to the form.
7         You can answer.
8         THE WITNESS:  I don't remember ten, you
9  know, years ago what I knew the authority to be or
10  not to be at that time.
11  BY MR. COOK:
12     Q.  This sentence refers to both the
13  published average wholesale price and as an
14  alternative basing the price on acquisition cost.
15  Was it your understanding that in June of 1998, the
16  Health Care Finance Administration did not believe
17  that average wholesale price was the same as
18  acquisition cost?
19         MR. NEAL:  Objection as to form.
20         THE WITNESS:  I don't know what they
21  believed in June of 1988 [sic].
22  BY MR. COOK:

Page 392

1     Q.  Well, you had discussions with HCFA,
2  correct?
3         MR. NEAL:  Objection to the form. I don't
4  know that she said that.
5  BY MR. COOK:
6     Q.  You had communications with individuals
7  at HCFA with respect to Medicare drug pricing
8  reimbursement -- and reimbursement, correct?
9     A.  We would have had entrance and exit
10  conferences, yes.
11     Q.  Were you able to draw any conclusions
12  from the conversations about whether individuals at
13  HCFA understood that published average wholesale
14  price was the same or different than acquisition
15  cost?
16         MR. NEAL:  Objection.
17         You can answer that yes, no, or I don't
18  remember.
19         THE WITNESS:  I don't -- I don't know
20  what they understood.  I don't remember.
21  BY MR. COOK:
22     Q.  Well, in the next sentence, Ms. Min

Page 393

1  DeParle states that:  The acquisition price and the
2  average wholesale price are two distinct pricing
3  methods.
4      First, given the work that you did in '96,
5  '97, and '98 on Medicare Part B drug reimbursement,
6  would you agree that acquisition price and average
7  wholesale price are two distinct pricing methods?
8         MR. WINGET-HERNANDEZ:  Objection to form.
9         MR. NEAL:  I join the objection.
10         THE WITNESS:  I believe that the
11  acquisition prices that we saw for some of the
12  drugs that we reviewed were not similar to average
13  wholesale price.
14  BY MR. COOK:
15     Q.  And so paying based upon acquisition
16  price would be a different pricing method than
17  paying based upon average wholesale price, correct?
18         MR. WINGET-HERNANDEZ:  Objection to form.
19         MR. NEAL:  The same objection.
20         THE WITNESS:  I think it would depend on
21  what the average wholesale price -- what the
22  average wholesale price represented for an

99 (Pages 390 to 393)

752f543d-a1b8-4aaf-8de4-a5ada851a581

# Larry Reed,

**Branch Chief, Medicaid Non-Institutional Payment Policy
Branch (1990-1995);
Technical Director, CMS Medicaid Program (1995-2002);
Technical Director, CMS Medicaid Division of Pharmacy
(2002-Present)**

Reed, Larry - Vol. III                    March 18, 2008
                  Washington, DC

Page 604

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION

PRICE LITIGATION               ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     ) Judge Patti B. Saris

the Florida Keys, Inc.         )

     v.                        ) Chief Magistrate

Abbott Laboratories, Inc.,     ) Judge Marianne B.

No. 06-CV-11337-PBS            ) Bowler

- - - - - - - - - - - - - - -

        (captions continue on following pages)

Videotaped deposition of LARRY REED

               Volume III

               Washington, D.C.

               Tuesday, March 18, 2008

               9:00 a.m.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

8615aca3-c44e-4f74-a36a-79d28ca5988e

Reed, Larry - Vol. III                        March 18, 2008
                       Washington, DC

Page 689

1    Would you be surprised if you made that statement
2    in that period of time?
3          MS. MARTINEZ: Objection, form.
4          A.   Again, I don't recall making that
5    statement.  It's possible that -- would the
6    statement be completely outside my realm of
7    experience? Probably not.
8          Q.   Mr. Reed, in this lawsuit do you
9    believe the government should be able to recover
10   those amounts that state Medicaid programs had to
11   use from the ingredient side for reimbursements
12   to cover insufficient dispensing fees?
13         MS. MARTINEZ: Objection, form.
14         A.   Give me that sentence again, please.
15         Q.   Mr. Reed, in this lawsuit do you
16   believe that the federal government should be
17   able to recover those amounts that state Medicaid
18   programs deliberately used from the ingredient
19   side for reimbursements to cover insufficient
20   dispensing fees?
21         MS. MARTINEZ: Objection, form.
22         A.   If the state had an approved state plan

Page 690

1    for that ingredient cost or that dispensing fee,
2    then those would be considered proper payments.
3          Q.   If a state deliberately paid a profit
4    on the ingredient side to subsidize insufficient
5    dispensing fees, do you believe the government
6    should be able to recover that amount?
7          MS. MARTINEZ: Objection, form.
8          A.   And I don't think I can answer that
9    question any further than I did.  If the state
10   were to present to us an overpayment of the
11   ingredient cost to make up for an underpayment of
12   a dispensing fee, we would probably disapprove
13   that plan.
14         Q.   If it was done in writing?
15         A.   If it was done as part of the state
16   plan amendment process or if the state were to
17   ask us can we overpay on the ingredient cost to
18   make up for a deficit in dispensing, we would
19   probably have responded no.
20         Q.   But you knew that they were doing that,
21   didn't you?
22         MS. MARTINEZ: Objection, form.

Page 691

1          A.   Again, I think that we've talked a
2    little bit about that.  I don't recall earlier
3    periods of time.  But most recently I was aware
4    that their dispensing fees may have been lower
5    than the cost of dispensing and there may have
6    been some profit in ingredient cost.
7          Q.   And that's not something that a state
8    is providing to you in writing, correct, so that
9    you could disapprove that, today?
10         A.   I don't remember a plan amendment that
11   came in that would have said that.
12         MR. TORBORG: Why don't we take our
13   first break.
14         THE VIDEOGRAPHER: This is the end of
15   tape 1.  Off the record at 10:36.
16           (Recess.)
17         THE VIDEOGRAPHER: This is the
18   beginning of tape 2 in the deposition of Mr.
19   Reed.  On the record at 10:51.
20   BY MR. TORBORG:
21         Q.   Mr. Reed, would it be fair to say that
22   you can't tell me one way or the other whether

Page 692

1    you knew in 1993 that state Medicaid programs
2    were using excess payments of ingredient costs to
3    subsidize insufficient dispensing fees?
4          A.   It would fair to say that.  I don't
5    recall that memory.
6          Q.   You don't recall one way or the other
7    whether or not you had that knowledge?
8          A.   I don't recall.  That's correct.  I
9    don't recall.
10         Q.   And it's been 15 years since 1993,
11   correct?
12         A.   Correct.
13         Q.   Your memory has faded over time, I take
14   it?
15         A.   Yeah.
16         Q.   Would you agree that someone within
17   HCFA was aware that state Medicaid programs were
18   using excess payments on the ingredient side to
19   subsidize insufficient dispensing fees?
20         MS. MARTINEZ: Objection, form.
21         A.   From the GAO report that you were
22   showing me, a HCFA official did make that

23 (Pages 689 to 692)

8615aca3-c44e-4f74-a36a-79d28ca5988e

# Robert Reid,

**Ohio Medicaid Consultant (1976-1991);**
**Ohio Medicaid Staff Pharmacist (1991-1995;**
**Administrator of the Ohio Medicaid Pharmacy Service Unit**
**(1995-2008)**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - ) MDL No. 1456

IN RE: PHARMACEUTICAL INDUSTRY     ) Master File No.

AVERAGE WHOLESALE PRICE LITIGATION) 01-12257-PBS

--------------------------------)

THIS DOCUMENT RELATES TO:          ) Hon. Patti B.

United States of America ex rel.  ) Saris

Ven-A-Care of the Florida Keys,   )

Inc, et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS     )

--------------------------------


VIDEOTAPED DEPOSITION OF ROBERT PAUL REID

Monday, December 15, 2008

9:59 o'clock a.m.

Jones Day

325 John H. McConnell Boulevard

Suite 600

Columbus, Ohio 43215

SHAYNA M. GRIFFIN

REGISTERED PROFESSIONAL REPORTER

Reid, Robert Paul                                    December 15, 2008
                          Columbus, OH

Page 102

1    A.  I don't think anybody paid average
2  wholesale price.  Most pharmacies had
3  arrangements with their wholesalers that they
4  would get a discount based on volume.
5    Q.  You used the term "AAC" to
6  distinguish from average wholesale price?
7    A.  Yes.
8    Q.  And was it your understanding during
9  the entirety of the time that you were either a
10 consultant, staff pharmacist or administrator at
11 the various Ohio departments that worked --
12   A.  Uh-huh.
13   Q.  -- on the pharmacy issues that AWP
14 did not represent an actual acquisition cost?
15       MS. GEOPPINGER:  I'm going to object to
16 the form of the question.
17       You can answer.
18   A.  That understanding would have been
19 based on my experience as a pharmacy owner.
20   Q.  Going back to 1969?
21   A.  Yes.
22   Q.  Based on your interactions with other

Page 103

1  state pharmacy administrators, is it your view,
2  Mr. Reid, that the state pharmacy community all
3  knew that average wholesale price did not equate
4  to actual acquisition cost?
5        MS. GEOPPINGER:  Object to the form of
6  the question.
7        You can answer.
8    A.  That would be speculative on my part.
9  I don't know for a fact that every state thought
10 about that term in the same way.
11   Q.  You recall conversations about AWP
12 with your colleagues; right?
13   A.  I'm sure I had plenty, many.  I can't
14 recall a specific one.
15   Q.  Did you believe that the -- that in
16 trying to determine what a pharmacy actually paid
17 for a drug --
18   A.  Uh-huh.
19   Q.  -- that you could just take the AWP
20 and shave 20, 30 percent off of it and get to a
21 reliable price?
22   A.  No.

Page 104

1        MS. GEOPPINGER:  Object to the form of
2  the question.
3    A.  No.
4    Q.  And how did you learn that --
5        MS. GEOPPINGER:  Object to form of the
6  question.
7  BY MR. TORBORG:
8    Q.  -- that that wasn't the case?
9        MS. GEOPPINGER:  Okay.
10   A.  How did I learn AAC?
11   Q.  How did you learn that you couldn't
12 just take 20, 30 percent off AWP and get to a
13 reliable actual acquisition cost?
14   A.  I don't know that I ever thought
15 about it in those terms.  I think the difference
16 between AWP and AAC were all over the board, and
17 was different for different products.
18   Q.  Do you remember any kinds of products
19 for which it was more variable?
20   A.  Not in particular, no.
21   Q.  Did you become aware of wide
22 disparities between AWPs and AACs for drugs?

Page 105

1        MS. GEOPPINGER:  Object to the form of
2  the question.
3    A.  Conjecture on my part.  I recall
4  getting information from the National Fraud
5  Control Unit out of New York that talked about
6  that topic.
7    Q.  What do you recall about that?
8    A.  Well, they sent us a -- they sent --
9  I think they sent every state a binder about the
10 size of that one, and it contained information
11 about average wholesale price and actual
12 acquisition cost -- cost.
13       MR. TORBORG:  Let the record reflect he
14 was pointing to my binder, which is a three-inch
15 three-ring binder.
16   A.  Yes.
17   Q.  Do you recall when that was?
18   A.  I remember the guy's name that was
19 instrumental -- Lupinetti, I think it was -- in
20 the development of that; and I remember that it
21 was intended to be informative, and I don't think
22 it -- there was any mandate involved.  In other

27 (Pages 102 to 105)

af69f64b-a1fb-4f21-a237-a09d2632bad5

# Benny Ridout,

**North Carolina Medicaid Pharmacy Director (1972- 2000)**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE          )  Master File No.

LITIGATION                       )  01-CV-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        )  Judge Patti B.

United States of America ex      )  Saris

rel. Ven-A-Care of the Florida   )

Keys, Inc., et al.  v.  Dey,     )

Inc., et al., Civil Action No.   )

05-11084-PBS                     )

-------------------------------X


        Video Deposition of C. BENNY RIDOUT,

taken by the Defendants, at the Hilton North

Raleigh, 3415 Wake Forest Road, Boardroom, Raleigh,

North Carolina, on the 5th day of December, 2008 at

9:10 a.m., before Marisa Munoz-Vourakis, Registered

Merit Reporter, Certified Realtime Reporter and

Notary Public.

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                    December 5, 2008
                        Raleigh, NC

Page 134

1   for drugs reimbursed under the Medicaid program?
2      A.  Yes.
3      Q.  Is it your memory that OIG conducted a
4   study in 1994 as well in which they pulled and
5   reviewed pharmacy invoices for drugs reimbursed
6   by the Medicaid program?
7         MS. YAVELBERG:  Objection to form.
8      A.  Well, this -- I'm getting a little
9   confused, I think, because I thought this was the
10  one that we did in '84 or '89, and I must be
11  getting my dates mixed up, because this looks
12  like the letter that I got when I met with him,
13  because, like I said, we met in Richmond,
14  Virginia.  I'm getting the years confused.  I
15  didn't realize there were two meetings or two
16  different times.
17        So having received this letter, I
18  definitely met in Richmond, Virginia with him.  I
19  guess, and like I said, I can't recall the exact
20  years that I had meetings with him.  So I'm
21  assuming it was in '94 and not earlier that I met
22  with him to discuss it.

Page 135

1      Q.  And as I was getting at before the
2   break, were you involved in one invoice study or
3   were you involved in two invoice studies with the
4   Office of Inspector General?
5      A.  I think one.
6         MS. YAVELBERG:  Objection to form.
7   Excuse me.
8      A.  I think one -- the first one that they
9   were trying to do is when I asked to get involved
10  with them, and it looks like this is when he was
11  doing, that was in '94 when we met in Richmond.
12  And then after the study was completed, I met
13  with him again to discuss how it should be used.
14     Q.  That meeting also was in Richmond,
15  right?
16     A.  Best I recall, I do remember going to
17  Richmond, Virginia, because there were Virginia
18  people there.
19     Q.  In the 1980s, Mr. Ridout, do you recall
20  did you receive, as a matter of course, reports
21  that were issued by Medicaid or by the Office of
22  Inspector General relating to Medicaid?

Page 136

1         MS. YAVELBERG:  Objection, form.
2         MS. HAYES:  Objection, form.
3      A.  I received information all the time
4   from all different state agencies, federal
5   agencies, OIG, CMS, old HCFA.  I always received
6   those from people.
7      Q.  As to the 1984 report that we were just
8   looking at, and that is Exhibit Ridout 1, do you
9   recall we looked at it, and that report
10  specifically referred to invoices that were
11  pulled and reviewed in North Carolina, right?
12        MS. YAVELBERG:  Objection, form.
13  BY MR. COOK:
14     Q.  That's on page 2213, was the chart with
15  North Carolina's range of discounts on it?
16     A.  Yeah, I'm wondering if this is the same
17  time period when I met with him, but this is
18  something they did independent of me.  You see
19  they came in and did audits with the state, or
20  they could have stayed in their home office and
21  reviewed some claims, you know.
22        So I can't say.  I'm a little confused

Page 137

1   right now.  I can't say that this is the time
2   that I met with him when they were going to use
3   that study or this is the time that I met with
4   him, because obviously he met with him here,
5   because I got a letter saying that I remember
6   meeting in Richmond, that we met in Richmond.
7      Q.  I can represent to you, and we will be
8   going over documents that show that you did meet
9   in Richmond, and we have substantial documents
10  relating to the '94 and '95 meetings in Richmond,
11  and we will go over that.
12        What I'd like to do is figure out
13  whether you had any involvement in the pulling of
14  invoices ten years earlier in 1984 in North
15  Carolina?
16        MS. YAVELBERG:  Objection, form.
17        MS. HAYES:  Objection to form.
18     A.  I don't remember.  In fact, I
19  didn't have anything to do with the pullings.
20     Q.  Whether you had any involvement in the
21  study in 1984, you just don't recall?
22        MS. YAVELBERG:  Objection to form.

35  (Pages 134 to 137)

Ridout, C. Benny                                      December 5, 2008
                          Raleigh, NC

|                                                      | Page 138 |
|---|---|

1       A.  I don't recall.  I can't remember.
2           MS. YAVELBERG:  Asked and answered.
3       A.   That could be something that they did
4    to lead them to the fact that they were going to
5    look at it independent of me, which led them to
6    this, I don't know.
7       Q.   If you could turn to page --
8       A.   Which document?
9       Q.   Sorry, in Abbott Ridout 1 in the 1984
10   you have right there.
11      A.   Okay.
12      Q.   Page 2226, that's a page with -- page
13   of conclusions.  Do you see that, or the title is
14   conclusions, I want to make sure we're on the
15   same page.
16      A.   Yeah, I see it.
17      Q.   And I'd like to turn your attention to
18   the second paragraph of that page and
19   specifically to the second sentence of that
20   second paragraph that begins with the word
21   however?
22      A.   The second sentence of the second

|                                                      | Page 139 |
|---|---|

1    paragraph?
2       Q.   Yes, sir, it begins with however.
3       A.   Okay, yeah.
4       Q.   And just so the folks reading the
5    record will know what we're looking at, it says:
6    "Pharmacies do not purchase drugs at the AWP
7    published in the Bluebook, Red Book or similar
8    publications."
9           And then the next sentence reads, the
10   next two sentences read: "Thus, AWP cannot be
11   the best or even an adequate estimate of the
12   prices providers generally are paying for drugs.
13   AWP represents a list price and does not reflect
14   several types of discounts, such as prompt
15   payment discounts, total order discounts, end-of-
16   year discounts and any other trade discounts,
17   prepaids or pregoods that do not appear on the
18   pharmacist's invoices."
19          MS. YAVELBERG:  Objection, form.  You
20   left off the first word of the first sentence.
21          MR. COOK:  The first word, as I
22   indicated, was however.

|                                                      | Page 140 |
|---|---|

1       Q.   Do you see those three sentences, Mr.
2    Ridout?
3       A.   Yes.
4       Q.   Is there anything about the statement
5    that OIG was making back in 1984 in this report
6    that was inconsistent with your understanding of
7    AWP, as you recall it back in the mid-1980s?
8           MS. YAVELBERG:  Objection, form.
9       A.   If they issued this report to me at
10   that time and I saw that, I would be aware that
11   there was some discrepancies back in '84, because
12   I would have read this report.  The problem with
13   us is that it doesn't just talk about AWP.  It
14   says, if you look at the last paragraph, it says:
15   AWP represents a list price and does not reflect
16   several types of discounts, such as prompt pay
17   discounts, total order discounts, end-of-year
18   discounts and all the other discounts that have
19   been paid.
20          So, therefore, they said that's not
21   what he was paid because of all these other
22   things added onto it too.

|                                                      | Page 141 |
|---|---|

1           So I would have been aware that after
2    reading this report, that AWP was not accurate.
3           MS. YAVELBERG:  Objection I'm sorry.
4       A.   At that point, I guess of what OIG is
5    saying if they had done a study of that.
6       Q.   And then if you would turn to page 2229
7    of the report, and this is a section of the
8    report if you look at the previous page, that is
9    the OIG commenting on HCFA's response to the
10   report and the paragraph I'd like to turn your
11   attention to is the second to the last.  Let me
12   know when you are done reading that paragraph.
13      A.   Paragraph three?
14      Q.   Yes, sir, it's the one beginning with
15   administrator concurred.
16          (Pause.)
17      A.   Okay.
18      Q.   Specifically in the fourth sentence, do
19   you see where the OIG cites a concern by the
20   administrator that: "Any reduction in EAC screens
21   by HCFA may well result in pressure by the
22   pharmaceutical industry to increase state

36  (Pages 138 to 141)

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                    December 5, 2008
                          Raleigh, NC

|  |
|---|

Page 154

1  pharmacies continued to provide services to North
2  Carolina Medicaid, even though the dispensing fee
3  for North Carolina Medicaid paid didn't cover all
4  of their expenses?
5       MS. YAVELBERG:  Objection, form.
6    A.  I didn't know what the expenses were.
7  I didn't have any idea what the average, we pay
8  an average sometimes, you know, if they fill just
9  a prescription or what, sometimes they may have
10  done something else that cost more.  So I didn't
11  have any idea what that was.  We never did a
12  study to prove what it was.
13    Q.  But you assumed that it was more than
14  $6, right?
15       MS. YAVELBERG:  Objection, form.
16    A.  I couldn't assume that without some
17  kind of documentation that showed on average that
18  all cases, I knew it would be more than that,
19  there are cases what they did it could be less.
20    Q.  I will hand you what I will mark as
21  Exhibit Abbott Ridout 5.  For the record, it's
22  been previously marked as Exhibit Roxane 86.

Page 155

1       (The document referred to was
2  marked as Defendant's Exhibit Abbott Ridout 005
3  for identification.)
4    Q.  And I'll give you a chance to read
5  through that document beginning to end and let me
6  know when you're done.
7       (Pause.)
8    A.  Okay.
9    Q.  And then the other document that I will
10  get you to look at before I ask you some
11  questions I will mark as Abbott Ridout 6.
12       (The document referred to was
13  marked as Defendant's Exhibit Abbott Ridout 006
14  for identification.)
15       MR. COOK:  While you are looking at
16  that document, for the record, Abbott Exhibit
17  Ridout 5 is a record of discussion that was
18  produced to us by the government from the files
19  of the Office of the Secretary General, dated
20  August 30 and 31, 1994, and it relates to a
21  discussion that took place in Richmond, Virginia
22  at the Radisson Hotel.

Page 156

1       Exhibit Ridout 6 is what appears to be
2  an agenda, also produced by the Office of
3  Inspector General for a state HCFA OIG conference
4  on Medicaid outpatient prescription drug programs
5  in Richmond, Virginia on the same dates in August
6  of 1994.
7    Q.  Have you ever seen before either Ridout
8  5 or Ridout 6, Mr. Ridout?
9    A.  I'm sure I did, because my name is on
10  it.
11    Q.  And you are referring there to Exhibit
12  Ridout 6, correct?
13    A.  It's on both of them.
14    Q.  Having read Exhibit Ridout 5, is that a
15  fair description of a meeting that you attended
16  in August of 1994?
17       MS. YAVELBERG:  Objection, form.
18       MS. HAYES:  Objection.  When you say
19  description, are you referring to the typed
20  statement or the additional handwritten notes?
21       MR. COOK:  I'm referring to the entire
22  document.

Page 157

1    Q.  Mr. Ridout, is that a fair description
2  of the meeting that you attended in August of
3  1994?
4       MS. YAVELBERG:  Objection, form.
5    A.  Yes.  I started telling you earlier
6  that I had told them that we wanted to meet with
7  them to make sure that we had some input as to
8  how this study was done and what came out of it.
9  This is a meeting that I requested.  This is a
10  meeting we put together, and this is what we
11  discussed.
12    Q.  And then the agenda that's marked as
13  Exhibit Ridout 6, do you recognize that as the
14  agenda that was prepared for the August 1994
15  meeting?
16    A.  I can't remember that now.  I remember
17  being there.  I can't remember who spoke, all
18  those people spoke.  I remember, you know, like I
19  said, attendees, but I can't remember what they
20  spoke on.  I remember that we wanted some ideas
21  and suggestions that we wanted to get across to
22  them, is why we wanted to meet with them.  What

                              40  (Pages 154 to 157)

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                          December 5, 2008
                              Raleigh, NC

| Page 158 | Page 160 |

**Page 158**

1  they wanted to get across with us I can't
2  remember.  I'm sure they told us what they wanted
3  to, but I just can't recall everything they said.
4        MR. COOK:  I only have a little bit of
5  time on this tape.  Why don't we go through a few
6  of the attendees and then break for lunch.
7     Q.   The attendees on Exhibit Ridout 6 are
8  broken up between Office of Inspector General,
9  the Health Care Financing Administration and
10  Medicaid pharmacy representatives, correct?
11    A.   Right.
12    Q.   Do you know each of the five
13  representatives of the Office of Inspector
14  General, who they are?
15    A.   I don't know Gordon.
16    Q.   That was Gordon Sato, correct?
17    A.   Yeah, I don't remember him.  I don't
18  believe I know him.  I don't remember him being
19  at the meeting.  But Bill Shrigley, Paul Chesser,
20  George Reeb and Ben Jackson I know.  I know Dave
21  McNally, Mike Keogh.
22    Q.   As to Mr. Reeb, Mr. Jackson, Mr.

**Page 159**

1  Shrigley Mr. Chesser, are they all
2  representatives from the Office of Inspector
3  General with whom you worked in setting invoice
4  pricing of drugs?
5        MS. YAVELBERG:  Objection, form.
6     A.   I think we dealt mostly with Bill
7  Shrigley and Paul Chesser, and they were doing
8  the study.
9     Q.   And then the two representatives from
10  HCFA, Dave McNally and Mike Keogh who were they?
11    A.   Dave McNally was in policy, Mike Keogh
12  was the gentleman that worked for HCFA that was
13  with the drug rebate program involved in, I
14  guess, having meetings and working with the
15  states on, I guess, communication back and forth
16  between the manufacturers of CMS and drug
17  rebates.
18    Q.   Had you worked with Mr. McNally and Mr.
19  Keogh before this 1994 meeting?
20    A.   Yeah, Mike Keogh would get these
21  together and invite states to it, to meet with
22  the drug manufacturers on disputes with rebates.

**Page 160**

1  We used to meet out in the Midwest, and he would
2  share those meetings, sort of ram rod them and
3  get them together and invite the manufacturers
4  in, invite the states, and we had a lot of times
5  where we would go talk to the states about
6  problems we had with them not paying their bill
7  for rebates, and they would have problems they
8  wanted to argue with us about some things.  So we
9  used these meetings to resolve those issues, get
10  our bills paid, and he was there to represent
11  HCFA on that.
12    Q.   How about Mr. McNally, had you worked
13  with him before?
14    A.   You know, very seldom.  I think Dave
15  McNally I met when I originally came with the
16  Medicaid program, but in the latter years, I
17  hardly ever saw him and had any contact with him.
18  There were some other people I knew real well.
19    Q.   Then there was a number of Medicaid
20  pharmacy representatives listed on the right.  Do
21  you know each of those individuals?
22    A.   I do.  I did.

**Page 161**

1     Q.   And for the record, they are Susan
2  McCann from Missouri, Susan McCleod from Florida,
3  Donna Bovell from DC, David Shepherd from
4  Virginia, Elizabeth Miller from Virginia, Joe
5  Fine from Maryland, Alan Fung from California, Ed
6  Vaccaro from New Jersey, Cindy Denemark from
7  Delaware, you from North Carolina and Terry
8  Krantz from Montana.  Of those Medicaid pharmacy
9  reps, can you identify any of them that were
10  particularly knowledgeable about the subject
11  matter of this meeting?
12        MS. YAVELBERG:  Objection to form.
13        MS. HAYES:  Objection to form.
14    A.   Yeah, that would be hard to answer.  I
15  have no idea of the knowledge of an individual
16  that's meeting with them or what, but I'm
17  assuming that they had to have some degree of
18  level of understanding of it.  But to what,
19  really I have no idea.  In fact, they could have
20  been for the first time just learning this, as
21  far as I know, at this meeting.
22    Q.   But what I'm trying to identify is were

41  (Pages 158 to 161)

77907573-2dff-47a3-bd8c-719356f2d9e8

# Thomas Scully,
## Former CMS Administrator (2001-2003)

Scully, Thomas A.                                    May 15, 2007
                    Washington, DC

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL        :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :  CIVIL ACTION

PRICE LITIGATION              :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-a-Care of    :  Judge Patti B. Saris

the Florida Keys, Inc.        :

     v.                       :

Abbott Laboratories, Inc.,    :  Chief Magistrate

No. 06-CV-11337-PBS           :  Judge Marianne B.

- - - - - - - - - - - - - -x    Bowler

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                        May 15, 2007
                        Washington, DC

Page 146

1  Do you see that in the first sentence?
2      A.   Uh-huh.
3      Q.   And then in the third sentence, you say,
4  "for example, in CMS/HCFA's June 1991 proposed
5  physician fee schedule, the agency proposed that
6  payment be based on 85 percent of AWP."  Do you see
7  that?
8      A.   Yes.
9      Q.   And that is the time period with -- during
10 which you were part of the Bush Administration, the
11 Bush I Administration, correct?
12     A.   Yes.
13     Q.   And this is the time period, based on your
14 earlier testimony, where you would have interfaced
15 with Ms. Wollenski?
16     A.   Yes.
17     Q.   And so you were involved at least somewhat
18 on behalf of the administration in this 1991 attempt
19 to reduce the payments based on AWP?
20     A.   Yes.
21          MR. GOBENA:  Object to the form.
22          BY MR. DALY:

Page 147

1      Q.   And that proposal was, according to this,
2  to reduce it from, what, 100 percent of AWP to 85
3  percent of AWP, is that correct?
4      A.   Yes.
5      Q.   I'll hand you what's been previously
6  marked as -- keep that other exhibit with you, but I'll
7  because we're going to be going back to it, but I'll
8  hand you what's been previously marked as Exhibit
9  Abbott 120.  And just ask you if this is the
10 proposed rule that's referenced in this first full
11 paragraph on page 5 of your written statement to
12 Congress.
13     A.   I assume so.
14     Q.   I think you mentioned earlier that this
15 attempt to reduce reimbursement levels like many of
16 the others ran into political difficulties during
17 this time period, right?
18          MR. GOBENA:  Object to the form.
19          THE WITNESS:  I can't remember exactly
20 that far back what the issues were, but yes, there
21 was significant concern about the rule at the time, I
22 believe.

Page 148

1          BY MR. DALY:
2      Q.   And do you remember what the result of the
3  proposal was?
4      A.   I don't, but I'm sure we didn't publish a
5  final rule in the Senate.  There was a physician fee
6  rule that year, and I believe it didn't include -- I
7  may be wrong, I don't think it included final AWP
8  reform.
9      Q.   Let me hand you what's been previously
10 marked as Exhibit number, Exhibit Abbott 038, which
11 is the final rule that was issued emanating from
12 these proceedings that are referenced in '91-'92.  Do
13 you recognize it as such?
14     A.   I'm sure you're correct.  I don't
15 recognize it, but I'm sure you're correct that's what
16 it is.
17     Q.   Take a look at the second page of the
18 exhibit.  I'm sorry.  The first page of the exhibit.
19 Under methodology.  Do you see that?
20     A.   Yes.
21     Q.   And I just want to understand your
22 understanding of this at the time.  Is it your

Page 149

1  understanding that the methodology that was put out
2  in the rule was to pay AWP or estimated acquisition
3  costs?
4          MR. GOBENA:  Object to the form.
5          THE WITNESS:  It's been 15 years.  I don't
6  remember.  I'm sure that's correct.
7          BY MR. DALY:
8      Q.   Do you remember the concept of estimated
9  acquisition costs?
10     A.   Vaguely.
11     Q.   What do you remember it to be?
12     A.   Unworkable.
13     Q.   Well, we'll get to that in a second.  What
14 was it supposed to be?
15     A.   I think it was supposed to be calculating
16 roughly what the cost that a physician or other
17 provider could actually acquire the drugs for.
18     Q.   And it was to be that or the published
19 AWP, whichever was lower, right?
20     A.   I believe so.
21     Q.   And you said that that estimated
22 acquisition cost was unworkable?

                                      38  (Pages 146 to 149)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                    Washington, DC

Page 150

1       MR. GOBENA:  Object to the form.
2       THE WITNESS:  I don't remember, to be
3  honest with you, I just know it would never actually
4  happen, that it was not a viable calculation.
5       BY MR. DALY:
6    Q.   Yes.  Well, I mean, you use the word
7  unworkable.  I think you use the word unworkable in
8  your testimony as well.
9    A.   No, I didn't.
10   Q.   Why didn't it, what was wrong with it?
11 Why didn't it work?
12   A.   I don't remember, to be honest with you.
13 It wasn't something that could be easily tracked or
14 calculated.  And it would seem to be, if I remember,
15 as least as gameable as AWP was.
16   Q.   Well, if you're -- do you recall how it
17 was that whoever was supposed to determine EAC was
18 supposed to determine it?
19       MR. GOBENA:  Objection.  Form.
20       THE WITNESS:  I hate to say, I just don't
21 remember precisely 15 years ago how it worked.
22       BY MR. DALY:

Page 151

1    Q.   Okay.
2    A.   I just know that functionally it never --
3  it ended up being functionally 95 percent of AWP in
4  that particular calculation.  In fact, I didn't
5  remember it was actually in the rule.  Never really
6  came into play, from what I remember.
7    Q.   And you don't remember why?
8    A.   I really don't.
9    Q.   Is it something that you feel couldn't be
10 determined?
11       MR. GOBENA:  Objection.  Form.
12       THE WITNESS:  I just don't recall why.  I
13 just know that it was not a viable pricing mechanism.
14       BY MR. DALY:
15   Q.   And do you know why?
16   A.   I just can't -- I can't remember why.
17   Q.   Okay.
18   A.   It wasn't measurable or wasn't -- who was
19 the acquiring party?  I just don't remember.  It
20 never, never actually in practice was anything that
21 functionally took hold.
22   Q.   Okay.  And so reimbursement was then fixed

Page 152

1  at the AWP as published by the compendia, correct?
2       MR. GOBENA:  Objection.  Form.
3       BY MR. DALY:
4    Q.   And that's how CMS --
5    A.   My recollection is that in practice, the
6  reality was it was 95 percent of the Red Book and
7  that's the way it was paid.
8    Q.   Okay.  All right.  Is it your recollection
9  that CMS couldn't figure out what the estimated
10 acquisition cost was?
11       MR. GOBENA:  Objection.  Form.
12       THE WITNESS:  I just don't remember
13 exactly what the reason was, but it was never
14 something that was used in a meaningful way.
15       BY MR. DALY:
16   Q.   From a theoretical point of view, I'm just
17 trying to get your sense of this, and is it possible
18 that the EAC could have been determined through
19 surveys of providers, for example?
20       MR. GOBENA:  Objection.  Form.
21       THE WITNESS:  I think at one point we
22 proposed doing that, and I think I talked about that

Page 153

1  later, 10 years later, in testimony, as one option to
2  do provider surveys to figure out what the actual
3  acquisition cost was.  But I don't think that was one
4  of the many options we looked at including ASP, ANP
5  and various other things.  And obviously, what we
6  settled on at the end ASP plus 6.
7       BY MR. DALY:
8    Q.   But as you mentioned, 10 years later, one
9  of your proposals was to have one of your carriers
10 for example conduct a survey, right?
11   A.   Yes.
12   Q.   And is there any reason why that couldn't
13 have been done in '91-'92?
14       MR. GOBENA:  Objection.  Form.
15       THE WITNESS:  In theory, it could have
16 been, I guess, but I don't remember exactly why.  It
17 was not workable at the time.
18       BY MR. DALY:
19   Q.   I hand you what's been previously marked
20 as Exhibit Abbott 082, which is an OIG report, the
21 cover memorandum of which is dated October 20, 1992.
22 First, I would ask whether you think you've ever seen

39 (Pages 150 to 153)

934268fd-66d9-4c40-b8d6-725605bc72fb

# Harry Leo Sullivan,
**Director of Pharmacy Services for TennCare (1989-2004)**

Sullivan, Harry Leo                           March 12, 2008
                    Nashville, TN

                  UNITED STATES DISTRICT

            FOR THE DISTRICT OF MASSACHUSETTS


     --------------------------X

     IN RE:  PHARMACEUTICAL       )  MDL NO. 1456

     INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

     PRICE LITIGATION             )  01-CV-12257-PBS

     THIS DOCUMENT RELATES TO     )

     U.S. ex rel. Ven-a-Care of   )

     of the Florida Keys, Inc.    )

         v.                       )  No.06-CV-11337-PBS

     ABBOTT LABORATORIES, INC.,   )

     --------------------------X


        (cross captions appear on following pages)


            Deposition of HARRY LEO SULLIVAN

                     Volume I

               Nashville, Tennessee

             Tuesday, March 12, 2008

                   9:05 a.m.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                         March 12, 2008
                          Nashville, TN

Page 134

1    A.  Sure.
2        MR. TORBORG:  Why don't we take a
3    break.
4        VIDEOGRAPHER:  Going off record.  End
5    of tape 2.  Time now is 11:31.
6        (Recess.)
7        (Exhibit Abbott 576 marked.)
8        VIDEOGRAPHER:  Back on record.
9    Beginning of Tape 3.  Time now is 11:49.
10   BY MR. TORBORG:
11   Q.  Welcome back, Mr. Sullivan.
12   A.  Yeah.
13   Q.  I have marked and handed you as Abbott
14   Exhibit 576 a document that bears the Bates Nos.
15   VAC-MDL 75533 through 66.
16       For the record, and so that you know,
17   this is a document that was produced by the
18   relator in this case, a company called Ven-A-Care
19   of the Florida Keys, Inc., and particularly these
20   were documents that were looks like contained in
21   a folder titled Tennessee.  And as you were the
22   director of pharmacy services at Tennessee, I

Page 135

1    thought I might ask you about some documents
2    contained therein.
3        A.  Okay.
4        Q.  In particular I would like to start
5    with the Bates page ending 539.  This is an
6    October 24th, 1994 letter from Zachary Bentley to
7    Leo Sullivan regarding state policy and
8    methodology for reimbursement of intravenous
9    solutions and injectable drugs.  Do you see that?
10       A.  Yes, sir.
11       Q.  If you would take a look at that
12   document.  Let me know if you recall it and then
13   I'll have some questions for you about it.
14       A.  Okay.
15           Okay.
16       Q.  Mr. Sullivan, do you recall this, this
17   particular page?
18       A.  I really don't.
19       Q.  Do you recall ever having any
20   correspondence or communications with Zachary
21   Bentley or anyone else that you understood to be
22   affiliated with Ven-A-Care of the Florida Keys?

Page 136

1    A.  I honestly do not remember.
2    Q.  Have you ever heard of the company Ven-
3    A-Care?
4    A.  No, I really -- the logo looks
5    familiar, but I don't know by what context I
6    would know them.
7    Q.  Do you recall that some company was
8    working on a project, a continuing education
9    project --
10   A.  No.
11   Q.  -- concerning these kind of drugs?
12   A.  No.
13       You, you have to know that during the
14   course of a week you'll get, in a position like
15   that, you'll get all kinds of requests for
16   surveys and stuff like this.
17   Q.  If we go to the page preceding this
18   page, page ending 538, there is a document titled
19   Response to National State Medicaid Reimbursement
20   Survey.  Contact person is -- that's you; right?
21   A.  Yes.
22   Q.  And then it appears as though you gave

Page 137

1    him some information relating to Tennessee's
2    reimbursement for IV drug reimbursement and TPN
3    reimbursement.  Do you see that?
4    A.  Yes.
5    Q.  And in particular IV reimbursement was
6    AWP minus 8 percent plus a $3.91 dispensing fee
7    per ingredient.
8        And was that the standard, from your
9    recollection, was that the standard reimbursement
10   rate that Tennessee used for drugs at that time?
11   A.  No.
12       Oh, this, this information is not
13   accurate at all.
14       Based on the date 11/29/94 we're almost
15   a year into TennCare.  I wasn't paying for any,
16   any of these products.  The MCOs, through their
17   PBMs, or however they set up reimbursement, for
18   paying for this.  So somebody, sounded like
19   somebody just got an old NPC book and wrote this
20   down.  I don't remember talking to them.  I may
21   have.  But this is not accurate information.
22       The state didn't have a policy for IV

                                    35  (Pages 134 to 137)

0c585b6a-88d2-47d8-bc26-289a064ea87e

# David Tawes,

**OIG Office of Evaluations and Inspections (1997-2005);
Director of OIG Medicare & Medicaid Drug Pricing
Unit (2005-Present)**

Tawes, David - Vol. I                    April 24, 2007
                    Philadelphia, PA

Page 1

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY     :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

----------------------------------X

THIS DOCUMENT RELATES TO:           :

U.S. ex rel. Ven-A-Care of the      :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott        :  06-CV-11337-PBS

Laboratories, Inc.                  :

----------------------------------X


                    IN THE CIRCUIT COURT OF

                MONTGOMERY COUNTY, ALABAMA

----------------------------------X

STATE OF ALABAMA,                   :  CASE NO.

            Plaintiff,              :  CV-05-219

        v.                          :

ABBOTT LABORATORIES, INC.,          :  JUDGE

et al.,                             :  CHARLES PRICE

            Defendants.             :

----------------------------------X

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                          April 24, 2007
                        Philadelphia, PA

Page 118

1  know, than this one would have been.
2      Q.  And who did you discuss these reports
3  with?
4      A.  Paul Chesser, Bill Shrigley (ph).
5      Q.  Anyone else?
6      A.  Gordon Sato.  That's all --
7      Q.  That's all?
8      A.  -- I can remember.
9      Q.  How many times had -- did you -- did you
10 discuss the -- this work with them in person or
11 over the phone?
12     A.  Probably a few times in person and a few
13 times in phone -- over the phone.
14     Q.  And what occasioned your in-person
15 meetings with these individuals relating to this
16 work?
17     A.  One time was a meeting between OEI staff
18 and OAS staff about drug reimbursement issues that
19 we had, like, a two- or three-day meeting about
20 that.  Actually, I think that -- that happened on
21 two separate occasions.
22     Q.  And they were two, two-to-three day

Page 119

1  meetings?
2      A.  Yes.
3      Q.  And do you recall roughly when those
4  took place?
5      A.  I believe one was in December of 2004
6  and the other one would have had to have been in
7  2001 or 2002.
8      Q.  What do you recall about those meetings?
9      A.  Not that much that -- I mean, we sort of
10 described the work that we were doing, the folks
11 from Audit described the work they were doing.  At
12 the first meeting, there was -- there were some
13 folks from CMS there that talked about their
14 perspectives.
15     Q.  And who was there from CMS?
16     A.  All I can remember being there was Sue
17 Gaston, but I know there were a couple others.  I
18 just don't remember their names.
19     Q.  And what thoughts did the CMS officials
20 share?
21     A.  I -- I don't remember.
22     Q.  Do you remember generally?

Page 120

1      A.  No.
2      Q.  If I could ask you to flip to the second
3  to last page of this document.  It's a letter dated
4  May 23rd, 1996 from Douglas Cook to June Gibbs
5  Brown.  And can go to the second page of that
6  document, the first paragraph, Mr. Cook wrote:
7  Injectable products and associated intravenous
8  fluids also continue to be problematic.
9  Manufacturers offer contracts to most vendors
10 providing very favorable pricing and terms, but
11 manufacturers continue to market small quantities
12 of these through conventional sources and report
13 single-unit pricing through the national data
14 sources.
15     Do you have an understanding of what Mr. Cook
16 is saying when he talks about the single-unit
17 pricing?
18         MR. NEAL:  Object to the form.
19         You can answer.
20         THE WITNESS:  I can take a guess at what
21 he means.
22 BY MR. TORBORG:

Page 121

1      Q.  What's your guess?
2          MR. NEAL:  The same objection.
3          You can answer.
4          THE WITNESS:  That when they actually
5  sell the products and when the manufacturers
6  actually sell the products through contracts in the
7  market, they provide much greater quantities and
8  offer very large discounts for those quantities.
9  However, when they're reporting prices to the -- to
10 the compendia, they're only using the pricing for a
11 single unit, which is typically not sold in most --
12 in most instances.
13 BY MR. TORBORG:
14     Q.  But there could be some sales of single
15 units, correct?
16         MR. NEAL:  Objection as to form.
17         THE WITNESS:  I -- I -- I don't know.
18 That's what he's saying.  I have no idea whether
19 that's the case or not.
20 BY MR. TORBORG:
21     Q.  Are you familiar with something called a
22 manufacturers list price?

31  (Pages 118 to 121)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                              April 24, 2007
                    Philadelphia, PA

Page 286

1        THE WITNESS:  I think that I may have
2   been surprised by some of the really, really large
3   spreads between the VA cost and the -- and the
4   Medicare reimbursement amount for some drugs.  I
5   don't think that I was shocked that the VA pays --
6   pays less. Sometimes it was just how much less
7   that, you know, was a little bit surprising.
8   BY MR. TORBORG:
9        Q.  Did you have discussions with CMS about
10  this report?
11       A.  At entrance and exit conferences.
12       Q.  Okay.  Do you recall what was said
13  during those conferences?
14       MR. NEAL:  You can answer that.
15       THE WITNESS:  Actually, I don't recall
16  what was said during those conferences.
17  BY MR. TORBORG:
18       Q.  Do you recall if they were surprised by
19  the findings in your report?
20       MR. NEAL:  I'm going to instruct you not
21  to answer that question.
22       Answering that question would reveal the

Page 287

1   substance of the communications between CMS and
2   OIG.
3        MR. TORBORG:  I'd like to mark as a new
4   exhibit...
5        THE COURT REPORTER:  Exhibit Abbott 132.
6        - - -
7        (Whereupon, Exhibit Abbott 132 was marked
8   for Identification.)
9        - - -
10  BY MR. TORBORG:
11       Q.  Mr. Tawes, I can tell you that this is
12  another document that we pulled from the work paper
13  files for this particular report.  And if you have
14  that document in front of you and then also open
15  the page up to Appendix B.  You can see the
16  document that I have marked as Exhibit Abbott 132,
17  it states what information?
18       A.  Whether a product is multi-brand,
19  multi-source, or single-source.
20       Q.  And if you compare the -- if you look at
21  the drugs that are listed as multi -- the HCPCs
22  codes that are listed as multi-source on Exhibit

Page 288

1   Abbott 132, if I could ask you to highlight the
2   following HCPCs codes in the Percentage Difference
3   column.
4        The first one is J0640, Leucovorin Calcium.
5   The second would be two down, J1245. The next would
6   be about ten down from there, J9000.  And then
7   another four down from that, J9181.  Then the next
8   one after that, J9182. And then starting with
9   K0503, down at the bottom, do you see that?
10       A.  Uh-huh.
11       Q.  The next six -- the next six codes.
12       A.  (Complies.)
13       Q.  Now, in looking at the percentages that
14  you've highlighted, does -- does anything jump out
15  at you?
16       MR. WINGET-HERNANDEZ:  Objection to form.
17       MR. NEAL:  Objection as to form.
18       THE WITNESS:  Many of the drugs with the
19  largest percent difference between the VA and
20  Medicare were multiple-source drugs.
21  BY MR. TORBORG:
22       Q.  Was that something you recalled

Page 289

1   observing as you were doing the report in 1998?
2        A.  It was something that was definitely
3   noticeable, yes.
4        Q.  And did you have discussions about the
5   fact that many of the drugs with the large
6   percentage differences were generic drugs with
7   officials at CMS?
8        MR. NEAL:  Objection.
9        You can answer that question so long as
10  you don't reveal the substance of communications
11  that you had at entrance or exit conferences with
12  CMS personnel.
13       THE WITNESS:  I don't remember.
14  BY MR. TORBORG:
15       Q.  If I had been able to ask you that
16  question five years ago, would you have a better
17  recollection of both their comments on that issue
18  as well as your reaction to their comments?
19       MR. NEAL:  Objection as to form.
20       THE WITNESS:  Most likely.
21  BY MR. TORBORG:
22       Q.  If we go to Page 9 of the report,

73 (Pages 286 to 289)

bcab4204-38f1-4b48-ab34-7037316b0f5a

# Edward Vaccaro,

**New Jersey Medicaid Staff Pharmacist (1979- 1982);
Regional Pharmaceutical Consultant for Medicaid (1982-
1991);
Chief of Pharmaceutical Service (1991-1994);
Assistant Director of the Office of Utilization Management
(1994-2007)**

Page 323

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------X

In re: PHARMACEUTICAL          ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE     ) Civil Action No.

PRICE LITIGATION               ) 01-12257-PBS

----------------------------X

THIS DOCUMENT RELATES TO:      ) Hon. Patti B. Saris

United States of America       )

ex rel. Vena-A-Care of the     )

Florida Keys, Inc.,            )

v. Dey, Inc., et al., Civil    )

Action No. 05-11084-PBS        )

----------------------------X


          Continued Videotaped Deposition Of

         THE STATE OF NEW JERSEY DEPARTMENT

      OF HUMAN SERVICES by EDWARD J. VACCARO


              DECEMBER 3, 2008

             TRENTON, NEW JERSEY

                 9:04 A.M.

b8f82058-8500-490d-b833-e6b27705e427

NJ Dept of Human Services (Edward J Vaccaro) - Vol. II                    December 3, 2008
Trenton, NJ

Page 476

1  Number HHD021-0121 through HHD021-0122, is marked
2  for identification.)
3      THE WITNESS: Okay. I'm fine. Go
4  ahead.
5  BY MR. KIM:
6      Q.  Okay.  Thank you.
7      Under Comments Part 3, it says:  Our
8  review -- I'd like to read this into the record.
9      "Our review was limited to ingredient
10 acquisition costs and did not address other areas
11 such as the effect of Medicaid business as a
12 contribution to other store sales, the cost to
13 provide professional services other than
14 dispensing a prescription, such as therapeutic
15 interventions, patient education, physician
16 consultation, and the cost of dispensing, which
17 includes costs for computers, multipart labels,
18 containers, technical -- technical staff,
19 transaction fees, Medicaid specific
20 administrative costs and general overhead."
21     My question for you, Mr. Vaccaro, is --
22 I'm sorry, to -- to as a representative of the State

Page 477

1  of New Jersey is:  The costs that are listed here
2  that are associated with dispensing costs that
3  you see in this paragraph, computers, multipart
4  labels, containers, technical staff, do you agree
5  that these are costs that are -- that are part of
6  the cost of dispensing a prescription?
7      A.  Yes.
8      Q.  Okay.  Including Medicaid specific
9  administrative costs and general overhead?
10     A.  Cost of doing business.
11     Q.  Okay.  The -- you'll see here that
12 right above the paragraph that I just read into
13 the record, it says, "We reviewed a draft copy of
14 a State report," and then it says, "The State
15 officials believed that the report should include
16 the following disclaimer," and the disclaimer is
17 what I partly just read into the record; is that
18 correct?
19     A.  Correct.
20     Q.  And then the next paragraph says, "The
21 State officials were concerned that without the
22 above disclaimer, that uninformed State officials

Page 478

1  might overreact to our report and adjust pharmacy
2  reimbursement without considering the other
3  aspects of reimbursement."
4      You see that; right.
5      A.  Yes.
6      Q.  Okay.  And then the next paragraph,
7  "The State officials also expressed a desire to
8  obtain a copy of the data reviewed for their
9  respective States so that they could analyze."
10     What are they referring to as "a copy
11 of the data."
12     A.  OIG's data.
13     Q.  What is OIG's data?
14     A.  The invoice, the result of the invoice
15 collection.
16     Q.  The result of the invoice collection or
17 the information collected to compile the OIG
18 audit report?
19     MS. YAVELBERG:  Objection, form.
20     THE WITNESS:  Likely one and the same.
21 BY MR. KIM:
22     Q.  Okay.  And was New Jersey amongst one

Page 479

1  of those states that requested or expressed a
2  desire to obtain a copy of this data?
3      A.  I don't recall.
4      Q.  New Jersey does not recall whether it
5  obtained or whether it requested?
6      A.  New Jersey participated in a conference
7  from 1995 which is now 13 years ago.  I do not
8  recall if we requested a copy of that report.  I
9  apologize.
10     MR. KIM:  How much time?
11     THE VIDEO TECHNICIAN:  Eight minutes.
12     MR. KIM:  We should break for lunch.
13     MS. YAVELBERG:  That's fine.
14     MR. KIM:  Because this is definitely
15 going to go over the eight minutes.
16     MS. YAVELBERG:  Okay.
17     THE VIDEO TECHNICIAN:  This concludes
18 Tape Number 3 of the video deposition of Edward
19 Vaccaro.  The time is 12:09.  We are going to
20 break for lunch.  We are off the record.
21     (A luncheon recess is held.)
22     THE VIDEO TECHNICIAN:  This is the

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

b8f82058-8500-490d-b833-e6b27705e427

# Robert Vito,

**Office of Audit Services (1978-1990);**
**Deputy Regional Inspector General (1990-1995);**
**Regional Inspector General (1995- Present)**

Vito, Robert                                    June 19, 2007
                    Philadelphia, PA

                UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

                         - - -

IN RE:  PHARMACEUTICAL      : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION:

PRICE LITIGATION            : 01-CV-12257-PBS

                            :

THIS DOCUMENT RELATES TO    :

U.S. ex rel. Ven-A-Care of  :

the Florida Keys, Inc. v.   :

Abbott Laboratories, Inc.   :

No. 06-CV-11337-PBS         :

                         - - -

          Videotaped deposition of ROBERT

VITO was taken, pursuant to notice, at MORGAN

LEWIS & BOCKIUS, LLP, 1701 Market Street,

Philadelphia, Pennsylvania, on Tuesday, June

19, 2007, beginning at 9:10 a.m., before M.

Kathleen Muino, Professional Shorthand

Reporter, Notary Public; Michael Hunterton,

Certified Legal Video Specialist, there being

present:

                Henderson Legal Services
                    202-220-4158

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Vito, Robert                                          June 19, 2007
                         Philadelphia, PA

Page 130

1    Q.  Do you recall that -- that the Senate
2  had set up a Special Committee on Aging led by
3  Senator David Pryor relating to prescription drug
4  issues?
5    A.  I'm not familiar with that.
6    Q.  You've never reviewed any of that
7  material?
8    A.  I just don't remember.
9    Q.  If I could ask you to go to the page
10  that has the number 209 at the top, it's about four
11  pages in.  There is a, toward the bottom, a
12  section, Statement of Louis B. Hays, Acting
13  Administrator of HCFA --
14    A.  Yes.
15    Q.  -- do you see that?
16    A.  Uh-huh.
17    Q.  Have you ever met Mr. Hays?
18    A.  Have I?
19    Q.  Yes.
20    A.  I don't think so.
21    Q.  If you go to the next page, Mr. Hays'
22  statement says, about halfway through the first

Page 131

1  paragraph, I'll read it into the record, if you
2  would follow along:  The payment limit for most
3  drugs will be average wholesale price of the drug.
4  While the term, quote, average wholesale price, end
5  quote, is suggestive of an amount that pharmacies
6  actually pay for drugs, it is, in fact,
7  significantly higher than actual costs.  The
8  average wholesale price is somewhat comparable to a
9  manufacturer's sticker price on a new car.
10    Mr. Vito, have you ever heard the term average
11  wholesale price to -- it being mentioned it was
12  comparable to a sticker price on a car?
13    A.  Yes.
14    Q.  And when did you hear that?
15    A.  I don't recall.  I know I heard it.
16    Q.  Was it within the last five years, last
17  ten years, last twenty years; any sense at all?
18    A.  Probably within the last ten years, but
19  I can't say with -- for certainty.
20    Q.  And do you recall how you came to learn
21  that?
22    A.  No.  I just remember hearing somebody

Page 132

1  saying it's like the car, the manufacturer's stick
2  price -- sticker price.
3    Q.  Okay.  That's all I have on that one.
4  I'd like to hand you what we've marked previously
5  as Exhibit Abbott 120, which is a section out of
6  The Federal Register, Wednesday, June 5th, 1991.
7    And, Mr. Vito, I assume you're familiar with
8  the -- The Federal Register?
9    A.  Yes.
10    Q.  And what is The Federal Register?
11    A.  I think this is when they put out
12  notices indicating certain things, like the fee
13  schedule or changes they would -- they -- they'd
14  like to implement.
15    Q.  If I could ask you to go to the page
16  that has the number on the top 25800, and
17  specifically, there's a section in the second
18  column, Drugs; do you see that about --
19    A.  Yes.
20    Q.  -- halfway down?  And then I'm going to
21  ask you, if you would, to follow along as I read
22  into the record some language at the very bottom of

Page 133

1  that column, where it says:  Thus, we have decided
2  to exclude the cost of drugs from the national fee
3  schedule and to continue to pay for them under the
4  current "reasonable charge" system.
5    Mr. Vito, do you have an understanding of what
6  the regional -- reasonable charge system is?
7    A.  It says here that:  Generally, carriers
8  base payment for drug -- for the drug on the
9  physician's estimated acquisition cost of the drug
10  using one of the -- it says, using one of the
11  wholesale pricing guides, such as Red Book.
12    Q.  Okay.  Let me ask you to move away from
13  prescription drugs specifically and more generally
14  to the Medicare program.  Do.
15    You have an understanding that there is
16  something called a reasonable charge basis
17  vis-a-vis a reasonable cost basis?
18    A.  For Part B services?
19    Q.  Yes.
20    A.  Yes.
21    Q.  What is the difference between the two?
22    MR. NEAL:  I'll object to the form.

34  (Pages 130 to 133)

0cfa4ef9-679b-48aa-88d6-df32d22db9f34

Vito, Robert                                    June 19, 2007
                    Philadelphia, PA

Page 222

1    A.  I do --
2    Q.  -- now that I've read it?
3    A.  Not -- well, you've read it and I
4  believe it's there, I saw it, but I -- I -- I don't
5  remember it.
6    Q.  And these were comments that were made
7  to a draft report, right?
8    A.  Yes.
9    Q.  And your final report doesn't have any
10 -- doesn't include any comments about the subject
11 matter that I just read, correct, total
12 reimbursement?
13   A.  We did not -- yes, we did not do -- we
14 did not get the total reimbursement amounts.
15   Q.  And did you have a meeting with members
16 of HCFA regarding this report?
17   A.  Oh, we always have meetings.  Both when
18 we start the review and when we have a working
19 draft report, we meet with them.
20   Q.  Do you recall any discussions relating
21 to the comment made regarding dispensing fees and
22 total reimbursement?

Page 223

1    A.  Yeah, I -- I think we addressed that on
2  C-1, where it says:  The HCFA also suggested that
3  we expand our review to include drug dispensing
4  fees.  We are aware that the total reimbursement
5  includes both the drug costs and the dispensing
6  fee, as stated in the methodology section.  Our
7  comparison was for the drug cost only.  We did not
8  review dispensing fees.
9    Q.  Have you ever reviewed the adequacy of
10 dispense -- of dispensing fees in any of your work?
11   A.  We have not.
12   Q.  Have you had discussions with HCFA about
13 the adequacy of dispensing fees at state Medicaid
14 programs?
15   A.  Oh, I believe that we had discussions
16 periodically on -- on the dispensing fee issue.
17   Q.  What do you recall; when were those
18 discussions and who were they with?
19   A.  Well, the ones I recall is, for example,
20 if they -- the Federal Upper Limits, the -- the
21 provisions under the DRA call for it to be 250 time
22 -- 250 percent times the lowest AMP.  And if they

Page 224

1  were to make the product come in at the cost and
2  there wouldn't be any excess amount in, then they
3  would have to consider the dispensing fee so that
4  people would be able to provide the product.
5    Q.  And who did you have those discussions
6  with?
7    A.  I believe we had those discussions with
8  Larry Reed and others.  I -- I -- I -- I think --
9  yeah, I -- I that's -- that's it, Larry Reed.
10   Q.  Have you ever had discussions with state
11 pharmaceutical representatives -- when I say
12 "state," I mean individuals that worked in state
13 Medicaid agencies, pharmacy side -- about issues
14 regarding the adequacy of dispensing fees?
15   A.  Yeah, I -- I think there has been
16 periodic discussions about that.  I believe certain
17 states have commissioned studies to see what would
18 be the appropriate dispensing fee.
19   Q.  Do you recall any -- any state officials
20 commenting to you that if they lower the
21 ingredient-cost payment, they would have to
22 increase the dispensing-fee component to ensure

Page 225

1  provider participation?
2    MR. AZORSKY:  Objection to form.
3    MR. NEAL:  I'll join the objection.
4    You can answer.
5    THE WITNESS:  I -- I'm not -- I don't
6  think that that was the -- the -- the gist of the
7  conversation.  I think there were discussions about
8  looking at the total cost and when -- to look at
9  the total cost, you have to look at both those, and
10 if you were to lower one to the point where they're
11 just getting the -- the cost of their product, then
12 there has to be something else that would enable
13 them to, you know, make enough money to survive and
14 to produce the -- and to provide the service.
15 BY MR. TORBORG:
16   Q.  And who did you have those discussions
17 with?
18   A.  I think they -- they were with Larry
19 Reed again.
20   Q.  Anyone else?
21   A.  Maybe Deirdre Duzor as well.
22   Q.  Deirdre Duzor is a -- an official at

57 (Pages 222 to 225)

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Vito, Robert                                     June 19, 2007
                    Philadelphia, PA

Page 226

1  CMS?
2      A.  Yes.  She works with Larry Reed.
3      Q.  Okay.  Do you recall having any
4  conversation along those lines with state
5  pharmaceutical representatives?
6      A.  I don't recall any.  That doesn't --
7  doesn't mean that there -- we -- I didn't, but I
8  just don't recall any.
9      Q.  Do you recall if, in your discussions
10 with Mr. Reed and Ms. Duzor, that they were
11 conveying what they had heard from state
12 representatives?
13     A.  I don't understand your question.
14     Q.  Let me try it again.  You indicated that
15 you recall discussions with Mr. Reed and Ms. Duzor
16 about potential need to, if you were going to lower
17 one aspect of reimbursement, you might have to
18 increase the other aspect of reimbursement in order
19 for --
20     A.  To pay fairly.
21     Q.  To pay fairly.  Do you recall if they,
22 Mr. Reed and Ms. Duzor, were expressing comments

Page 227

1  that they had heard from their state counterparts
2  or something that was their own personal view?
3          MR. AZORSKY:  Objection --
4          THE WITNESS:  I don't know --
5          MR. NEAL:  I'll object to the form.
6          THE WITNESS:  Yeah, I -- I don't know.
7  It would be better to ask them.  I -- I don't know.
8          MR. NEAL:  Dave, why don't we go ahead
9  and take a short break now.
10         MR. TORBORG:  Let me -- I'm almost done
11 with this section.  I think I'm done, but --
12         MR. NEAL:  Okay.
13         MR. TORBORG:  -- just give me one second.
14         MR. NEAL:  Sure.
15         MR. TORBORG:  Okay.  Yeah, we can take a
16 break.
17         MR. NEAL:  Thank you.
18         THE VIDEOGRAPHER:  The time is 2:54 p.m.
19 We're going off the record, concluding Tape No. 4
20 in the deposition of Robert Vito in the matter In
21 Re: Pharmaceutical Industry Average Wholesale Price
22 Litigation.

Page 228

1              ---
2          (Whereupon, a recess was taken.)
3              ---
4          (Whereupon, Exhibit Abbott 235 was marked
5  for Identification.)
6              ---
7          THE VIDEOGRAPHER:  The time is 3:12 p.m.
8  We're going back on the record, starting Tape No. 5
9  in the deposition of Robert Vito in the matter of
10 In RE: Pharmaceutical Industry Average Wholesale
11 Price Litigation.
12 BY MR. TORBORG:
13     Q.  Welcome back, Mr. Vito.
14     A.  Thank you.
15     Q.  I've handed you, as Exhibit Abbott 235,
16 it's a document titled, Declaration of Robert
17     A.  Vito, that attaches a HHS-OIG Privilege
18 Log, and if -- if we look at page -- the last page
19 of the actual Affidavit, is this something that you
20 signed on April 20th, 2007?
21     A.  Yes.
22     Q.  Mr. Vito, do you recall this Affidavit

Page 229

1  --
2      A.  Yes.
3      Q.  -- or this declaration, I should say?
4      A.  Yes.
5      Q.  And who drafted this declaration?
6      A.  I believe legal counsel.
7      Q.  Did you review the declaration?
8      A.  Yes.
9      Q.  Did you draft any of the language in the
10 declaration?
11     A.  I -- I don't know I drafted [sic], but I
12 -- if there were issues or concerns or anything
13 like that, I -- I would bring it to the counsels'
14 attention.
15     Q.  Did you provide line edits to the draft?
16         MR. AZORSKY:  Object to the form.
17         MR. NEAL:  I'll object to the form as
18 well.
19         THE WITNESS:  I did provided edits.
20 BY MR. TORBORG:
21     Q.  Do you recall what edits you provided?
22     A.  I do not recall what edits I provided.

                         58  (Pages 226 to 229)

0cfa4ef9-679b-48aa-88d6-df32d22db9f34

# Bruce Vladeck,
## Former CMS Administrator (1993-1997)

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

Page 1

                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY     :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION  :  01-CV-12257-PBS

-----------------------------------X

THIS DOCUMENT RELATES TO:           :

U.S. ex rel. Ven-A-Care of the      :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott        :  06-CV-11337-PBS

Laboratories, Inc.                  :

-----------------------------------X


                 IN THE CIRCUIT COURT OF

               MONTGOMERY COUNTY, ALABAMA

-----------------------------------X

STATE OF ALABAMA,                   :  CASE NO.

          Plaintiff,                :  CV-05-219

     v.                             :

ABBOTT LABORATORIES, INC.,          :  JUDGE

et al.,                             :  CHARLES PRICE

          Defendants.               :

-----------------------------------X

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                              May 4, 2007
                        New York, NY

Page 254

1   understanding of how Medicare Part B reimbursed
2   for laboratory tests performed outside of the
3   physician's office; that is, that the physician
4   was reimbursed for only his actual cost in having
5   the test done.
6          MS. LIANG.  Object to the form.
7       A.  I'm pretty certain that is consistent
8   with my understanding, yes.
9       Q.  And did you understand that to the
10  extent that Medicare Part B had gone to an actual
11  acquisition cost methodology for paying for
12  Medicare Part B drugs that it also would have
13  involved Medicare Part B paying for the actual
14  cost incurred by a physician in purchasing drugs?
15         MS. BROOKER: Objection.  Form.
16      A.  That was my understanding as to actual
17  acquisition costs, yes.
18      Q.  So, it wouldn't have involved
19  conducting a survey and determining an average
20  acquisition cost but requiring the provider to
21  report what his actual cost was for the drug.
22      Correct?

Page 255

1          MR. BREEN:  Objection to form.
2       A.  I don't recall the exact way in which
3   we defined it as to whether to require that sort
4   of passthrough information or to permit an
5   estimation of it.  I recall some discussion of
6   the mechanics, but I don't remember what our
7   conclusion was as to that.
8          MR. COOK:  I apologize to go off the
9   record so quickly, but let me get a couple of
10  things lined up with exhibits, and we'll get back
11  and move more swiftly.
12         THE VIDEOGRAPHER:  The time is 3:05
13  p.m.  We're going off the record, concluding Tape
14  No. 4 of the deposition Dr. Bruce Vladeck in the
15  matter of In Re Pharmaceutical Average Wholesale
16  Price Litigation.
17         (Recess taken.)
18         (Exhibit Abbott 151 marked for
19  identification.)
20         THE VIDEOGRAPHER:  The time is 3:22
21  p.m.  We're going back on the record, starting
22  Tape No. 5 in the deposition of Dr. Bruce Vladeck

Page 256

1   in the matter of In Re Pharmaceutical Average
2   Wholesale Price Litigation.
3          MR. COOK:  For the record, we've tried
4   to gather up all of the cross-notices of which we
5   personally are aware and marked them as a group
6   exhibit, Exhibit Abbott 151.  We'll make it
7   available to anybody who wants to review it, see
8   if there are others that we've missed.  I
9   personally have concerns that we gathered them
10  all just because there were so many, but it's a
11  good-faith attempt at gathering them up so we
12  have a record of at least the ones we know about.
13         MS. BROOKER: Okay.  Thank.  Appreciate
14  it.
15      Q.  You mentioned earlier, Dr. Vladeck,
16  Randall Graydon a couple of times.
17      A.  That's correct.
18      Q.  It's not a name that I've heard before.
19  Do you know if Mr. Graydon still works for HCFA?
20      A.  I don't know.  My impression was as of
21  a couple of years ago that he still did, but I
22  don't know if he still does.

Page 257

1       Q.  So he was a -- I don't know the
2   distinction -- a non-political?
3       A.  He was a career member of the staff of
4   the Medicaid bureau, and he was our resident.  If
5   I remember correctly, he was our resident expert
6   on drug reimbursement issues in the Medicaid
7   program.
8       Q.  Do you know what his background was?
9       A.  No, I don't.
10      Q.  Again going back to some stuff that we
11  talked about earlier this morning, you mentioned
12  that you met regularly with state Medicaid
13  directors and that you would often sit in on
14  those quarterly meetings?
15      A.  There was actually a formal
16  organization that is a state Medicaid directors
17  association.  They have an executive committee
18  which met formally quarterly, generally for a
19  couple of days in Washington or Baltimore, and I
20  would generally sit in for an hour or two.
21      Q.  Who from HCFA would attend those
22  meetings?

65  (Pages 254 to 257)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                         May 4, 2007
                        New York, NY

Page 262

1   principle liaison with OIG.  So, it probably
2   would have been that official plus people from
3   some of the other parts of the agency that had
4   particular concerns or particular agenda issues
5   or things of that sort.  Undoubtedly, someone
6   from our financial management office as well
7   would have participated.
8       Q.   And who was the director of the Office
9   for Program Integrity?
10      A.   The first director was Judith Berik.
11  She was director from '94 through mid-to late
12  '96.  I believe he was succeeded by Linda Ruiz.
13       MS. BROOKER:  How do you spell that
14  last name?
15       THE WITNESS:  Berik is B-E-R-I-K.  Ruiz
16  is R-U-I-Z.
17      A.   I think that was it during my tenure.
18      Q.   We have a number of letters that I
19  would like to show that were addressed to you
20  from Ven-A-Care.  Before pulling them out --
21  well, let me pull them out and put them in front
22  of you so you can recall them.

Page 263

1        The first is very lengthy, and I
2   apologize, but we're only going to be talking
3   about the first few pages of this very lengthy
4   document.  And so this will be Exhibit Abbott
5   160. I'll ask the court reporter to mark that and
6   hand it to you.
7        (Exhibit Abbott 160, Exhibit
8   Abbott 161, Exhibit Abbott 162, and Exhibit
9   Abbott 163 marked for identification.)
10       (Discussion off the record.)
11       MR. COOK:  For the record, we'll put
12  the following exhibits and then I'll hand them to
13  Dr. Vladeck.  First is an October 2nd, 1996,
14  letter from Ven-A-Care to Dr. Vladeck.  It's
15  Exhibit Abbott 160.  The second is a December 3,
16  1996, letter from Ven-A-Care to Thomas Hoyer.
17  It's numbered Exhibit Abbott 161.
18       August 13, 1997, letter from --
19  addressed to Dr. Vladeck from Ven-A-Care.  Its
20  Exhibit Abbott 162.
21       Next is a July 10, 1997, letter from
22  Ven-A-Care to Dr. Vladeck.  It's Exhibit Abbott

Page 264

1   163.
2       Q.   And I'll hand all of those to Dr.
3   Vladeck and ask you to take a quick look.
4       A.   Thank you.  This document is dated June
5   12th with a cover sheet to the Inspector General.
6   I don't have a number on it.
7        MS. BROOKER:  We don't have a June 12th
8   one.
9        MR. COOK:  I'm sorry.  It's at the top.
10  It's been previously marked as Exhibit Abbott
11  017, a June 12, 1997, letter from Bruce Vladeck
12  to Ven-A-Care, with a cover fax sheet from Zach
13  Bentley and Mark Jones to June Gibbs Brown.
14      Q.   Dr. Vladeck, I would like to turn first
15  to the October 2, 1996 letter.  It's with the
16  large exhibit, and it's marked Exhibit Abbott
17  160.  And I'm going to focus just on the first
18  few pages of that very large exhibit, which is
19  the actual letter from Zach Bentley and Mark
20  Jones at Ven-A-Care to you on October 2,1996.
21       First, have you ever seen this letter
22  before?

Page 265

1       A.   I have.
2       Q.   When do you recall first seeing this
3   letter?
4       A.   I -- I honestly don't recall whether I
5   saw it in -- in '96.  I may have.  I'm certain I
6   saw it when I was engaged by Mr. Azorsky in 2003.
7   I've seen it on a number of occasions since, but
8   during that time I tried to remember whether I
9   saw it in '96 and I -- I'm not certain one way or
10  another.
11      Q.   If you did not see it in October --
12  whether or not you saw it in October of 1996,
13  what would have been the typical process for
14  handling this sort of correspondence coming in to
15  you as administrator of HCFA?
16      A.   I'm not sure this would have received
17  the typical process because of the heading at the
18  top that it was sensitive and under court seal
19  and so forth.  It might, therefore, have been
20  routed in the first instance to counsel's office.
21  Had it not been, it would have probably been
22  routed to the Department of Integrity Office by

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

Page 310

1          MS. BROOKER: Objection. Form.
2     A.    It could very well have.  Again, as
3  I believe I testified at our last session, it was
4  not one of the major sort of issues on my
5  attention or on which I was focusing, but to the
6  extent that it came up it was as likely to come up
7  through an e-mail exchange as through an oral
8  conversation or a written document.
9     Q.    And at least for me personally, if
10 I wanted to go back and recreate what I was doing,
11 and the various issues were that were raised
12 during a particular time period, looking at my old
13 e-mails is -- is the most effective way for me to
14 do that nowadays.
15         Would that be true for you as well
16 during this time period?
17         MS. BROOKER: Objection. Form.
18    A.    I don't know that I ever had the
19 opportunity to do that or think about it.  It
20 would certainly be a very useful spur to the
21 memory.  I would probably get so bogged down in
22 being reminded of things I had totally forgotten

Page 311

1  that it might not be that efficient, but it would
2  -- I think it would be very helpful to try to
3  reconstruct.
4     Q.    You mentioned the name of Randall
5  Graydon as your preeminent drug reimbursement
6  expert when you were there.
7          Can you tell me a little bit --
8  what's Randall Graydon's background?
9     A.    I honestly don't know.  He was
10 already -- I'm trying to remember if he actually
11 had formal training in pharmacy.  I believe he
12 did.  He may have, but I do not recall.  He may
13 have actually had been licensed as a professional
14 pharmacist before, or at about the time he came to
15 work at the agency.
16         He certainly had been working on
17 drug issues for the organization for a number of
18 years before I got there.  I think it's been a
19 good part of his professional career at the
20 agency.
21    Q.    How old was he at the time you were
22 administrator?

Page 312

1     A.    Oh, I wouldn't be able to say.  I
2  would guess he was roughly a contemporary of mine,
3  and I would have been in my mid 40s.
4     Q.    Do you recall any conversations
5  with Randall Graydon relating specifically to
6  average wholesale price and -- and those drug
7  reimbursement issues?
8          MS. BROOKER: Objection. Form.
9     A.    The only conversation I recall with
10 -- specific conversation I recall with a member of
11 my staff about average wholesale price and drug
12 pricing issues, which I believe we discussed last
13 time, although I'm not certain, was with Tom
14 Hoyer, relative to the Medicare drug pricing
15 issues, and -- and the issue of average wholesale
16 price.
17         I also know that I had one or more
18 conversations with his supervisor, Mr. Ault, at
19 some point.  Whether it was the same conversation
20 or a separate conversation, I couldn't say.
21    Q.    Do you recall when those
22 conversations or conversation took place?

Page 313

1     A.    I couldn't tell you when -- it was
2  early -- I recall the conversation with Mr. Hoyer
3  particularly because it was really, I think, the
4  first time I ever got -- had any extensive
5  substantive conversation about the issue of
6  average wholesale price, and learned a little bit
7  about the history of the implementation of the
8  Medicare provisions for OBRA '90 relative to the
9  efforts to survey physicians about acquisition
10 cost that was aborted, and so forth.
11         And I just, for some reason,
12 remember his referring to the Red Book and
13 explaining to me that it was derived not from
14 independent investigation but from information
15 supplied to the publisher by the manufacturers.
16    Q.    Do you remember anything else that
17 Mr. Hoyer or Mr. Ault told you relating to average
18 wholesale price?
19         MS. BROOKER: Objection. Calls for
20 hearsay.  Also, I just want to be mindful just to
21 instruct the witness to be careful about
22 disclosing pre-decisional deliberative

8  (Pages 310 to 313)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

Page 314

1   conversations.
2        A.   I do believe there was some
3   discussion of the extent to which average
4   wholesale price was an artificial construct of
5   some sort, rather than a -- a true empirical
6   reflection of actual prices in market
7   transactions.
8        Q.   Do you recall if anybody else was
9   part of this conversation?
10       A.   I don't.  It could have been, but I
11  -- I don't recall.
12       Q.   Do you remember any other details
13  about the conversation?
14       MS. BROOKER: Objection.
15       MR. COOK: What's the objection?
16       MS. BROOKER: It calls for hearsay.
17  I'm entitled to put that objection on the record.
18       MR. COOK: You're objecting to
19  hearsay at a deposition?
20       MS. BROOKER: I have to make my
21  objections at the deposition.  Absolutely.
22       MR. COOK: I think we can -- I

Page 315

1   think we can all agree that hearsay objections are
2   preserved until trial.
3        MS. BROOKER: I'm going to make my
4   objections when appropriate.
5        MR. COOK: You're coaching the
6   witness.
7        MS. BROOKER: It's not coaching the
8   witness.
9        MR. COOK: Come on.
10       Q.   Do you remember anything else about
11  the conversation?
12       MS. BROOKER: Okay. Let me --
13  Chris --
14       MR. COOK: First of all, it's not
15  hearsay to ask him if he remembers any of the
16  details about the conversation.
17       MS. BROOKER: I have allowed you to
18  ask him many questions about who was present at
19  conversations and so forth.  And I haven't made
20  hearsay objections.  Only when I hear that it
21  calls for hearsay.
22       If you want to agree, on the

Page 316

1   record, that when I say "objection, form," that
2   also covers hearsay objections, then I can agree
3   to that.
4        MR. COOK: I'm not agreeing that
5   objections to form includes hearsay.  Fine. Make
6   whatever objections you want.
7        MS. BROOKER: Well, if you would
8   like that agreement, then I don't have to say
9   "hearsay."  I will just say "objection, form."
10       MR. COOK: Make whatever objections
11  you want.
12       MR. BREEN: See, the problem -- the
13  problem, Chris -- and I -- I realize you're
14  irritated by this.  Okay?
15       The problem is we've got this thing
16  cross-noticed so many doggone ways, and there's so
17  many rules, there's always one place where you
18  need to make your hearsay objections, and this is
19  arguable on the record.
20       So, if everybody could agree that
21  form objections includes hearsay, and they're all
22  our respected rules, it would certainly resolve

Page 317

1   your issue about potential -- about this -- this -
2   - this -- this coaching suspicion you've got.
3        MR. COOK: The deal, Jay, is
4   litigating only in federal court.
5        MR. BREEN: Well --
6        MR. COOK: And I don't think that
7   there's --
8        MR. BREEN: One objection -- do you
9   want to --
10       MR. COOK: Does anybody think that
11  hearsay objections have to be made at a -- at a
12  deposition --
13       MR. BREEN: Where's John McDonald?
14       MR. COOK: -- under the federal
15  rules?
16       MR. MCDONALD: I'm right here.
17       MR. BREEN: This isn't only under
18  the federal -- I don't know about -- I don't know
19  about that.  Is -- are we -- are we going to agree
20  that in any -- are we agreeing in any state case -
21  - there's some folks in state cases here -- that
22  the federal rules totally apply to this thing?

                              9  (Pages 314 to 317)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

Page 318

1          MR. MCDONALD:  It is fine with my
2   clients to say you're not waiving hearsay.
3          MS. BROOKER:  Okay.  So, we can --
4          MR. MCDONALD:  I can't speak for
5   everyone else.
6          MS. BROOKER:  Can we have an
7   agreement that -- that we don't waive any hearsay
8   objections?  I have a standing objection to any
9   hearsay questions.  We preserve them?
10         MR. ESCOBAR:  I don't think we have
11  any standing objections at all.  I think you
12  should only make proper objections.
13         MR. COOK:  You know, let's chat on
14  -- on the next break rather than taking up Dr.
15  Vladeck's time.
16         MS. BROOKER:  Sure.
17         MR. COOK:  Make whatever objections
18  you would like.
19         MS. BROOKER:  And I don't think we
20  wanted to argue about it.
21     Q.    Do you remember any other details
22  about the conversation, Dr. Vladeck?

Page 319

1      A.    No.
2      Q.    I don't think I pinned down exactly
3   when the conversation took place.
4      A.    I -- I couldn't tell you.  I would
5   -- sometime -- my guess would be in 1995 or 1996,
6   but I couldn't be any more exact than that. And
7   I'm not even certain it wouldn't have been -- it
8   could have been late 1994, too.
9      Q.    We'll come back to this a little
10  bit later, but you said that in 1996 and 1997
11  Medicare prescription drug reimbursement took on a
12  legislative component?
13     A.    We -- it was certainly in our
14  legislative recommendations.  I believe I said
15  last time that I didn't know, didn't recall
16  whether our recommendation that a change in Part B
17  drug reimbursement be included in the President's
18  budget survived into the budget or not.
19         I'm pretty certain it did in '97
20  and then got dropped during the legislative
21  process.
22     Q.    You had mentioned that Debbie Chang

Page 320

1   was the person you dealt with most at the Office
2   of Legislation and Policy.
3          Do I have that correct?
4      A.    That's correct.
5      Q.    In what ways would you interact
6   with Debbie Chang?
7      A.    Well, Debbie --
8          MS. BROOKER:  Objection.  Form.
9          THE WITNESS:  I'm sorry.
10     A.    Debbie was director of the Office
11  of Legislation and Policy from, I guess, late --
12  mid to late 1995 until shortly before I left the
13  agency.  We would talk essentially on a -- on a
14  daily basis about any issue that might have
15  legislative implications or be -- in which the
16  Congress might be involved, which was just about
17  everything in which we were involved.
18     Q.    And would you communicate by e-mail
19  by Debbie Chang or -- or in person?
20         MS. BROOKER:  Objection.  Form.
21     A.    Both.  Both.  We talked directly
22  frequently.  If there were occasions when one of

Page 321

1   us wasn't physically in the office, we might very
2   well send the other an e-mail.
3      Q.    How was it, generally speaking,
4   that proposed legislation would be created by or
5   proposed by the administration that related to
6   your agency?
7          MS. BROOKER:  Objection.  Form.
8      A.    That's interestingly put that way.
9   Most of the legislation that was proposed by the
10  administration originated with us.  We had a
11  relatively elaborate process tied to an annual
12  cycle, in which leadership in the sort of
13  operating line components of the agency would make
14  recommendations as to legislative changes.
15         Previous legislative changes that
16  had not been enacted were added to that mix, along
17  with things that the legislative people or the
18  policy people themselves thought up.  The -- the
19  Office of Legislation and Policy would put
20  together a big list.
21         Over the course of the year we'd go
22  through it and decide what the priorities would

10  (Pages 318 to 321)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

# Jude Walsh,
## Quality Director of Maine Medicaid (2000-2004)

Walsh, Jude E.                                March 26, 2008
                        Augusta, ME

Page 1

                 UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

     --------------------------

IN RE:  PHARMACEUTICAL      ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION

PRICE LITIGATION            ) 01-CV-12257-PBS

THIS DOCUMENT RELATES       )

U.S. ex rel. Ven-A-Care of ) Judge Patti B. Saris

the Florida Keys, Inc.      )

        vs.                 ) Chief Magistrate

Abbott Laboratories, Inc., ) Judge Marianne B.

No. 06-CV-11337-PBS         ) Bowler

     --------------------------


          VIDEOTAPED DEPOSITION OF JUDE E. WALSH,

taken pursuant to notice dated March 18, 2008, at

the offices of the Maine Attorney General, Burton M.

Cross Building, 6th Floor, 6 State House Station,

Augusta, Maine, on March 26, 2008, commencing at

9:06 A.M., before Tammy L. Martell, Registered

Professional Reporter, a Notary Public in and for

the State of Maine.

8e8c0070-c540-4f61-a0f2-1edca3a788ed

Walsh, Jude E.                                    March 26, 2008
                          Augusta, ME

| Page 118 | Page 120 |
|---|---|

Page 118

1  marked as Abbott Exhibit 148.  If you can take a
2  look at that and let me know when you have
3  finished.  For the record this is a May 25th,
4  2000, letter from a number of individuals.  From
5  the American College of Apothecaries, American
6  Society of Consultant Pharmacists, American
7  Pharmaceutical Association, National Community
8  Pharmacists Association, and -- and two others.
9  It is addressed Dear State Medicaid Director.  I
10 know you were not the state Medicaid director at
11 the time, Ms. Walsh.
12       Do you recognize, first of all, any of
13 the names or organizations listed at the -- at
14 the back of this letter?
15    A.  No names, but the organizations I have
16 heard of some of them.
17    Q.  And are these organizations that might
18 have contacted you -- you to register complaints
19 about pharmaceutical pricing?
20    A.  No.
21    Q.  Because these are -- are these national
22 organizations?

Page 119

1    A.  They seem to be.
2    Q.  What are some of the provider
3  organizations or pharmacist organizations that
4  would have contacted you about payment for
5  prescription drugs?
6       MS. ST. PETER-GRIFFITH:  Object to the
7  form.
8    A.  Pharmacy Group of New England, Maine
9  Pharmacy Association, and National Association of
10 Chain Drug Stores.
11    Q.  And I assume then that you did not --
12 you do not recall ever receiving this letter?
13    A.  No, I don't.
14    Q.  Having looked it over, however, do you
15 recall any of the sentiments in this letter being
16 expressed to you by -- you or the Maine Medicaid
17 -- state Medicaid agency during this time frame
18 of May 2000?
19    A.  No, I don't.
20    Q.  What do you recall about the Department
21 of Justice's effort in 2000 to implement these
22 revised average wholesale prices?

Page 120

1    A.  I don't --
2       MS. ST. PETER-GRIFFITH:  Object to the
3  form.  Sorry.
4    A.  I don't recall anything.
5    Q.  Anything?  Okay.
6    A.  No.
7    Q.  Let's take a look at one more study
8  before we break.  This is marked previously as
9  Abbott Exhibit 197.  For the record this is a
10 March 14th, 2002, document.  It is from Janet
11 Rehnquist, the Inspector General of the
12 Department of Health and Human Services, and the
13 subject of the memo -- cover memo is Medicaid
14 Pharmacy Actual Acquisition Costs Of Generic
15 Prescription Drug Products, and there is a three
16 page memo and then it attaches a report dated
17 March 2002, and you can just take your -- a
18 second to familiarize yourself with this
19 document.
20       Okay.  Do you recall ever seeing this
21 document before?
22    A.  I might have.

Page 121

1    Q.  In 2002 you were working at the
2  Medicaid program still?
3    A.  Yes, I was.
4    Q.  Would reports like this have been
5  transmitted to the head of the Maine state
6  Medicaid program?
7    A.  Yes.
8    Q.  And he or she would have reviewed this
9  and determined whether action was necessary?
10    A.  They probably would have given it to me
11 and we could have talked about it.  I don't
12 remember.
13    Q.  In the first paragraph of the cover
14 memo towards the bottom of the page it says most
15 states use -- I'm sorry, towards the bottom of
16 the paragraph, it says most states use Average
17 Wholesale Price, AWP, minus a percentage
18 discount, which varies by state, as a basis for
19 reimbursing pharmacies for drug prescriptions.
20 Although this discount averaged 10.31 percent
21 nationally in 1999 we believe that it is not a
22 sufficient discount to ensure that a reasonable

Henderson Legal Services, Inc.

8e8c0070-c540-4f61-a0f2-1edca3a788ed

# Jerry Wells,

**Florida Medicaid Pharmacist Consultant (1984-1990);
Department of Health Pharmacy Program Manager (1990-1992);
Florida Medicaid Bureau Chief (1992-2007)**

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
Tallahassee, FL

Page 1

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

--------------------------------X 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:         )

U.S. ex rel. Ven-A-Care of the    ) Judge Patti B.

Florida Keys, Inc., v. Abbott     ) Saris

Laboratories, Inc., No.           )

06-CV-11337-PBS; U.S. ex rel.     ) Magistrate Judge

Ven-A-Care of the Florida Keys,   ) Marianne Bowler

Inc. v. Abbott Laboratories, Inc.,)

No. 07-CV-11618-PBS; U.S. ex rel. )

Ven-A-Care of the Florida Keys,   )  DEPOSITION OF

Inc. v. Dey, Inc., et al., No.    )   JERRY WELLS

05-11084-PBS; U.S. ex rel.        )

Ven-A-Care of the Florida Keys,   ) DECMEBER 15, 2008

Inc., et al. v. Boehringer        )  TALLAHASSEE, FL

Ingelheim Corp., et al., No.      )

07-10248-PBS                      )

--------------------------------X

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                          Tallahassee, FL

Page 46

1    A.  No, that's not true.  Waterford
2  irrigation is not necessarily injectable, but the
3  others are.
4    Q.  Was it your understanding that the
5  federal upper limit program never had federal
6  upper limits for injectable drugs?
7    A.  At least, initially, it did not address
8  injectable drugs.
9    Q.  What's your basis for that
10  understanding?
11    A.  That was their policy.  They were
12  looking at controlling the cost the -- the
13  state's reimbursed for oral prescription drugs,
14  oral and topical.
15    MR. BREEN:  Chris, just so the record's
16  clear, when you -- when you or the witness use
17  the term "injectable," are you also using that to
18  include drugs that are infused by gravity or by
19  pump versus an injection, like a shot?
20    MR. COOK:  That would be my
21  understanding as well.
22    MR. BREEN:  I just want to make sure

Page 47

1  the witness is -- that you guys are talking about
2  the same thing.
3  BY MR. COOK:
4    Q.  How are you aware of what federal
5  policy was with respect to establishing federal
6  upper limits?
7    A.  They published it in the Code of
8  Federal Regulations, and I had a number of
9  conversations with staff at the Healthcare
10  Financing Administration.
11    Q.  Which staff at the federal -- when you
12  say the Healthcare Financing Administration,
13  that's HCFA, correct?
14    A.  That's HCFA, or what is now CMS.
15    Q.  Who at HCFA did you speak to regarding
16  the scope of the federal upper limit program?
17    A.  I remember some names.  I don't
18  remember the name of the individual who developed
19  the first administrative rule for federal upper
20  limit pricing, but he was an ex-Merck employee
21  that had gone to work for the Healthcare
22  Financing Administering, but I don't recall his

Page 48

1  name.  Larry Reid is still at the Healthcare
2  Financing, or CMS.  I talked with him at some
3  length about that and with some other people
4  whose names I don't recall.  That's many years
5  ago.
6    Q.  How many years ago -- that is my next
7  question.  Do you recall when it was that these
8  conversations took place?
9    A.  The late '80s, early '90s, ongoing,
10  until I left state employment.
11    Q.  Do you recall any specific
12  conversations that related to whether or not
13  injectable or infusion drugs, including those
14  listed on Pages 10 and 11 of Exhibit 1002, would
15  be included within the federal upper limit
16  program?
17    A.  No.  As I said, I think they excluded
18  them.  It was not their intent to put federal
19  upper limit prices on those drugs.
20    Q.  Do you know why it was that HCFA --
21  strike that.
22    Were you ever told by anyone at HCFA

Page 49

1  why it was that HCFA intended to exclude
2  injection and infusion drugs from the federal
3  upper limit program?
4    MS. ST. PETE-GRIFFITH:  Object to form.
5    THE WITNESS:  I don't recall.
6  BY MR. COOK:
7    Q.  From your conversations with Larry Reid
8  and others at HCFA, were you able to infer why it
9  was that the federal government excluded
10  injection and infusion drugs from the federal
11  upper limit program?
12    MS. WALLACE:  Objection.
13    MS. ST. PETE-GRIFFITH:  Objection.
14    THE WITNESS:  I don't think that I was
15  ever satisfied or got a satisfactory answer for
16  my purposes or that issue, but I just don't
17  recall.  That's many years ago.
18  BY MR. COOK:
19    Q.  Did you seek a satisfactory answer?
20    MS. ST. PETE-GRIFFITH:  Object to the
21  form.
22    THE WITNESS:  I think we had some

13  (Pages 46 to 49)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

# EXHIBIT QQQ

# David Campana (Alaska) (30(b)(6))

Page 405

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT OF ANCHORAGE

-----------------------------------X

STATE OF ALASKA,                        )

    Plaintiff,                          )

vs.                                     )

ALPHARMA BRANDED PRODUCTS DIVISION, )

INC., et al.,                           )

    Defendants.                         )

-----------------------------------X

Case No. 3AN-06-12026 Civil            )

-----------------------------------X

CAPTIONS CONTINUED ON FOLLOWING PAGE

VOLUME II

VIDEOTAPED DEPOSITION OF DAVID L. CAMPANA

and STATE OF ALASKA 30(b)(6)

Taken August 20, 2008

Taken by the Defendants at

Captain Cook Hotel, Whitby Room

939 West 5th Avenue

Anchorage, Alaska

Reported by:  Mary A. Vavrik, RMR

43ed45aa-87f9-43bb-8fed-670c39e33709

Page 434

1      A.  Pardon me?
2      Q.  Who prepared the memos to management?
3      A.  I would prepare the memos to
4  management.
5      Q.  Do you maintain copies of those memos
6  in your files?
7      A.  I have maintained some of those.
8      Q.  Do you know why those have not been
9  produced in this litigation?
10     A.  I don't know if those particular memos
11 were saved at the -- at the time.
12     Q.  Would they be saved in the files of the
13 people you sent them to?
14     A.  I don't know.
15     Q.  Have you looked in the files of the
16 people you sent them to or their successors that
17 inherited their files?
18     A.  I know that Teri Keklak's files when
19 she left our division were all shredded.
20     Q.  And when did she leave the division?
21     A.  2000 -- I believe 2003 or 2004.
22     Q.  And her files were shredded at that

Page 435

1  time?
2      A.  They were shredded or somehow destroyed
3  and -- and/or taken with her.  But it's my
4  recollection that most everything is shredded.
5      Q.  Who else did you send these memos to?
6      A.  Went to the director.
7      Q.  Was that Mr. Labbe at the time that you
8  did these dispensing fee evaluations you
9  mentioned?
10     A.  Yes.
11     Q.  And where are Mr. Labbe's files?
12     A.  I have no idea.
13     Q.  Who succeeded him as director?
14     A.  There were two different positions,
15 actually.  There was a Medicaid director, and
16 that's Jerry Fuller, and then there was a
17 director of medical assistance, which became
18 later health care services, and that was Dwayne
19 Peeples.
20     Q.  Did they inherit Mr. Labbe's files?
21     A.  I have no idea.
22     Q.  Have you carried out any investigation

Page 436

1  in connection with this litigation to ascertain
2  what happened to Mr. Labbe's files?
3      A.  No, I have not.
4          MR. MANGI:  For the record, we call for
5  the production of the referenced dispensing fee
6  evaluations.
7  BY MR. MANGI:
8      Q.  Do you know why the decision was made
9  not to implement the changes that you had
10 discussed in those memoranda?
11     A.  I do not know.
12     Q.  Did you have any discussions with
13 anyone after sending the memos to try and figure
14 out what had happened or why the changes had not
15 been acted on?
16     A.  Had a couple discussions along the way,
17 but I don't remember what happened or what the
18 outcome of those discussions were.
19     Q.  Was any part of the reason why those
20 changes were not implemented concerns about
21 potential impact on access to care if dispensing
22 fees were reduced?

Page 437

1      A.  I don't remember.
2      Q.  Was any part of the reason why those
3  changes were not enacted concerns about potential
4  political impact if changes were not -- changes
5  were implemented reducing the dispensing fee?
6          MR. HENDERSON:  Objection, form.
7          THE WITNESS:  I don't recall.
8  BY MR. MANGI:
9      Q.  I'd like you to turn to the second page
10 of the memo, please.  There is a section 4 there
11 entitled Review the Cost of Drugs.  Do you see
12 that, sir?
13     A.  Yes.
14     Q.  One of the things you mentioned there
15 is we need to look at -- I'm sorry.  The second
16 entry there is "look at the feasibility of
17 changing our reimbursement of generic drugs a
18 percentage over wholesale acquisition cost (WAC)
19 for generic drugs." Why is that an option that
20 you were considering?
21     A.  It was just an available option.
22     Q.  Well, this is a memorandum about

9 (Pages 434 to 437)

43ed45aa-87f9-43bb-8fed-670c39e33709

David L Campana and State of Alaska 30(b)(6) - Volume II                    August 20, 2008

Anchorage, AK

Page 558

1  Alaska should utilize for its Medicaid program?
2         MR. HENDERSON: Objection, form.
3         THE WITNESS: Not that I remember.
4  BY MR. MANGI:
5     Q.  Have manufacturers ever played a role
6  in that process, to your knowledge?
7         MR. BURNHAM: Objection, form.
8         THE WITNESS: Not that I remember.
9  BY MR. MANGI:
10    Q.  Are you familiar, sir, with an entity
11 called Ven-A-Care or Ven-A-Care [pronunciation]?
12    A.  No, I'm not.
13    Q.  It's a pharmacy based in Florida that's
14 been involved in some litigation surrounding drug
15 pricing. Does hearing that refresh your memory
16 at all about this entity?
17    A.  I don't remember seeing anything on
18 that.
19    Q.  Do you remember whether in the late
20 1990s Ven-A-Care or any other entity had meetings
21 with the folks at Alaska Medicaid talking about
22 drug pricing and potential litigation?

Page 559

1     A.  I don't remember.
2     Q.  If such meetings were to be -- were to
3  take place, would you typically be involved in a
4  meeting of that kind relating to drug pricing?
5     A.  I might have been involved.
6     Q.  Who would be the best person to talk to
7  to find out whether such meetings occurred and
8  who would have been involved?
9     A.  I -- I don't know.
10    Q.  Who was the commissioner in 1998?
11    A.  1990 --
12    Q.  '8.
13    A.  '8? I have to say I -- it probably was
14 Jay Livey.
15    Q.  Where is he now?
16    A.  I believe he's in Juneau.
17    Q.  Let me show you what we are marking as
18 exhibit 59 to your deposition which bears Bates
19 Nos. 1298 to 1316.
20        (Exhibit Campana 059 marked.)
21 BY MR. MANGI:
22    Q.  All right, sir. The cover page of this

Page 560

1  is an organizational chart from 2005. Do you see
2  that?
3     A.  Yes.
4     Q.  I take it organizational charts are
5  what you endeavor -- part of what you endeavored
6  to collect and produce for this litigation?
7     A.  Yes.
8     Q.  If you flip forward three or four
9  pages, you will see this chart becomes hard to
10 read. The pages seem to be either photocopied
11 badly or perhaps are hard to read from the
12 original. Take a look, for example, at the page
13 Bates No. 1305.
14    A.  Yeah.
15    Q.  Are these -- is this just poor
16 photocopying, or are these documents maintained
17 only in hard copy such that perhaps the originals
18 are hard to read?
19    A.  I don't remember.
20    Q.  Where do you go if you want to see org
21 charts, current or historic?
22    A.  I ask our administrative manager for

Page 561

1  the -- for copies.
2     Q.  And do you know whether they are stored
3  electronically or not?
4     A.  Some are stored electronically, and I
5  don't know where -- where the -- all of them are.
6     Q.  Are you able to ascertain, sir, whether
7  or not better copies of these org charts exist?
8     A.  I don't know what -- what the year-end
9  dates are on these.
10    Q.  It's on the top, January of '05?
11    A.  There is one I can read is September.
12 September 2003. I would -- I don't know, but
13 there is probably better copies. And I don't
14 know how these -- how you got these. In fact, I
15 don't know how you got any of your copies that
16 are really hard to read.
17    Q.  Well, you are certainly able to go back
18 and check to see if better copies exist, right?
19    A.  Yes.
20    Q.  Would you be willing to do that?
21    A.  If ordered.
22    Q.  I request that you do that and provide

40  (Pages 558 to 561)

43ed45aa-87f9-43bb-8fed-670c39e33709

# Suzette Bridges
# (Arkansas) (30(b)(6))

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE         )

LITIGATION                      )

-------------------------------)

United States of America ex rel.) MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    ) Civil Action

Inc., Civil Action No. 06-      ) No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of   ) Honorable

the Florida Keys, Inc., v. Dey, ) Patti B. Saris

Inc., et al., Civil Action No.  )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care   )

of the Florida Keys, Inc., v.   )

Boehringer Ingelheim Corp., et  )

al., Civil Action No. 07-10248- )

PBS                             )

-------------------------------x

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

Page 2

1                December 10, 2008
2                  Volume I
3        VIDEOTAPED DEPOSITION OF SUZETTE BRIDGES
4    Taken on behalf of the Plaintiff, produced, sworn,
5    and examined on the 10th day of December, 2008,
6    between the hours of nine o'clock in the forenoon
7    and six o'clock in the evening of that day, at the
8    offices of United States Attorneys' Office, 425 West
9    Capitol, Suite 500, Metropolitan Building, Little
10   Rock, Arkansas, before BRENDA ORSBORN, a Certified
11   Court Reporter within and for the State of Missouri,
12   in a certain cause now pending before the United
13   States District Court, District of Massachusetts,
14   In re: Pharmaceutical Industry Average Wholesale
15   Price litigation.
16
17
18
19
20
21
22

Page 4

1        EXHIBITS CONTINUED:            PAGE
2    Exhibit Roxane 002 Federal Register        129
3    Exhibit Roxane 003 Code of Federal Regulations  129
4    Exhibit Roxane 004 DHS Document          151
5    Exhibit Roxane 005 HHC0190087          160
6    Exhibit Roxane 006 HHC9020486          162
7    Exhibit Roxane 007 HHC)100997          165
8    Exhibit Roxane 008 HHD1860650 to 0663      168
9    Exhibit Roxane 009 HHD0210076 to 0114      191
10   Exhibit Roxane 010 ARK00007310 to 7436      205
11   Exhibit Roxane 011 ARK00007688 to 7806      233
12   Exhibit Roxane 012 (Memorandum)        235
13   Exhibit Roxane 013 AWP-IL-00010143        269
14   Exhibit Roxane 014 (Survey)          275
15   Exhibit Roxane 015 ARK00006870 to 6932      292
16   Exhibit Roxane 016 ARK00006933 to 6993      294
17
18
19
20
21
22

Page 3

1        I N D E X   O F   E X A M I N A T I O N
2                  Page
3    Questions by Ms. Oberembt ...................   9
4    Questions by Mr. Reale .......................  81
5
6        I N D E X   O F   E X H I B I T S
7    Exhibit Bridges 001 (Notice of Deposition)    12
8    Exhibit Bridges 002 (Federal Register)      29
9    Exhibit Bridges 003 (Draft)          31
10   Exhibit Bridges 004 ARK0004141        37
11   Exhibit Bridges 005 HHC092-0726        38
12   Exhibit Bridges 006 ARK00003540 to 5026      41
13   Exhibit Bridges 007 ARK00003068 to 3081      45
14   Exhibit Bridges 008 ARK00002640 to 2646      47
15   Exhibit Bridges 009 ARK00002783 to 3313      48
16   Exhibit Bridges 010 ARK00003057 to 3067      53
17   Exhibit Bridges 011 ARK00002742 to 2770      54
18   Exhibit Bridges 012 ARK00000087 to 0132      55
19   Exhibit Bridges 013 ARK00000117 to 0147      58
20   Exhibit Bridges 014 ARK00002151 to 2187      60
21   Exhibit Bridges 015 ARK00000788 to 0783      61
22   Exhibit Roxane 001 Amended Notice of Deposition 84

Page 5

1          A P P E A R A N C E S
2    For the United States:
3    Ms. Laurie A. Oberembt
4    U.S. Department of Justice
5    Commercial Litigation Fraud
6    P.O. Box 261
7    Ben Franklin Station
8    Washington, D.C. 20044
9    (202)514-3345
10   Laurie.oberembt@usdoj.gov
11
12   For the Witness and Arkansas Department
13   of Human Services:
14   Ms. Carmen Mosley-Sims
15   Arkansas Department of Human Services
16   700 Main Street, Slot S-260
17   Little Rock, Arkansas 72203
18   (501)602-1366
19   Carmen.mosley-sims@arkansas.gov
20
21
22

                              2  (Pages 2 to 5)

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
                          Little Rock, A

Page 186

1        MS. OBEREMBT:  Objection.
2        A.  Not intentionally.
3        Q.  (By Mr. Reale) And just -- I mean,
4   given the stakes at play for Arkansas' Medicaid
5   Program, if the Federal Government says something
6   or issues a communication, you're going to review
7   that communication?
8        MS. OBEREMBT:  Objection.
9        A.  Somebody within the department will
10  review that communication.
11       Q.  (By Mr. Reale) And if CMS or the
12  Federal Government were to issue reports or
13  studies or letters or anything of that kind that
14  was relevant and touched upon the business of
15  drug pricing, is it fair to say that Arkansas
16  Medicaid would take a look at that information?
17       MS. MOSLEY-SIMS:  Objection.
18       MS. OBEREMBT:  Objection.
19       A.  Again, we would have to review whatever
20  CMS said, if it was a recommendation, a mandate
21  or guideline.  But again, we would read it and
22  review and determine how it fit into what we do.

Page 187

1        Q.  (By Mr. Reale) Right.  And if the
2   Federal Government were to issue a report on drug
3   pricing that was relevant to Medicaid, that's the
4   report that you would presume Arkansas Medicaid
5   would consider?
6        MS. OBEREMBT:  Objection.
7        A.  It depends.  I mean, if it's just a
8   report on drug pricing, it may not be relevant to
9   what we do.
10       Q.  (By Mr. Reale) Then from time to time,
11  Arkansas Medicaid has received reports from the
12  Department of Health and Human Services, Office
13  of the Inspector General, correct?
14       A.  What type of reports?  I'm not familiar
15  of any just like reports from the OIG.  I'm not
16  following what you're asking me.
17       Q.  In preparation for your deposition
18  today, did you review any OIG reports?
19       A.  Not that I remember.
20       Q.  Did you talk to Mr. Hanley about any
21  OIG reports?
22       A.  No.

Page 188

1        Q.  Have you ever seen an OIG report that
2   refers to drug pricing?
3        A.  Yes, yes, yes, yes.  I'm sorry.  I have
4   seen an OIG report that refers to drug pricing.
5   Let me go back.  I did.  The OIG did do a report
6   several years ago, right after we had had a Myers
7   and Stauffer survey, but we had just completed a
8   survey, it really wasn't relevant to what we were
9   doing, because we had just conducted our own
10  survey on our own pharmacies, so -- but I do
11  recall an OIG report on drug pricing.
12       Q.  And you reviewed the report at the time
13  that it was issued?
14       A.  I may have looked over it.  I don't
15  even remember -- I'm sure I looked over it.  I
16  don't specifically remember.  I'd be lying if I
17  said I specifically sat there and reviewed that
18  report.  I remember the discussions around that
19  report.  I can't remember if I specifically
20  looked at that report.
21       Q.  But don't you think it would be prudent
22  for Arkansas Medicaid to review reports issued by

Page 189

1   OIG that touched upon drug pricing in the
2   Medicaid context?
3        A.  We had just conducted our own.
4        Q.  I'm not asking specifically about that
5   event.  I'm asking as a general matter.
6        A.  But as a general matter, we had just
7   conducted a survey of acquisition costs for our
8   state, and so we knew what our -- Myers and
9   Stauffer had conducted a survey of acquisition
10  costs of the pharmacies in our state, so it was
11  much more -- we knew we had a survey that was
12  very --
13       Q.  Oriented to Arkansas Medicaid --
14       A.  No.  It was oriented, but was very --
15  expansive is the word I'm looking for.  It was
16  going to be -- it was very expansive and had, you
17  know, covered a lot of NDCs, a lot of different
18  drugs, so it was --
19       Q.  Well, did you review any OIG reports in
20  1996 and '97 that discussed acquisition costs in
21  the Medicaid context?
22       A.  I honestly don't recall.

48  (Pages 186 to 189)

7ce5a780-185e-426a-a9ae-dc7b0f28408e

Page 202

1  survey showed that there were greater ranges on
2  the generics than there were on the brands.  I'm
3  not saying that consistently, the range was
4  excessively greater off of the AWP.  I'm not
5  saying it was consistently that much higher.
6      Q.  But the Myers and Stauffer reports and
7  the OIG reports, specifically the 2002 that you
8  said you looked at --
9      A.  Uh-huh.
10     Q.  -- they all report there being, on
11  average, a greater discount off of AWP for
12  generic drugs than branded drugs?
13         MS. MOSLEY-SIMS:  Objection.
14     A.  I'm not going to dispute that the
15  survey said that.  I just don't have it to be
16  specific to tell you that.  I mean, I'm not
17  disagreeing with you that generics can be
18  discounted much greater than a brand.  As far as
19  the numbers and the average as far as the number
20  of claims -- not the number of claims, the actual
21  number of drugs, I can't be specific to tell you.
22  We are agreeing.  It's just the number of drugs.

Page 203

1  I don't have any way to know.
2      Q.  Sure.  And when we visit those reports,
3  we'll look at what the average discounts off of
4  AWP for generic drugs is compared to branded
5  drugs, and we'll consider this testimony then.
6  Okay?
7      A.  Okay.
8      Q.  All right.  Now I just want to turn
9  quickly to Page 14, and at the very last sentence
10  on Page 14, we see a reference to an OIG report
11  on "Potential for Significant Cost Savings in
12  Medicaid Prescription Drug Program, Arkansas
13  Department of Human Services".  Have you ever
14  seen that report?
15     A.  No, unless this is it.
16         MR. BERLIN:  Sorry, John.  Can you say
17  the name of the report again?
18         MR. REALE:  Yes.  "OIG Report on
19  Potential for Significant Cost Savings in
20  Medicaid Prescription Drug Program.  Arkansas
21  Department of Human Services", Audit Control No.
22  06-40203, issued December 16, 1983.

Page 204

1      Q.  (By Mr. Reale) Now let's turn to Page
2  20, the second paragraph.  In the first sentence
3  in the second paragraph, it references the 1983
4  OIG report on Arkansas' Medicaid Program; in
5  particular, the Prescription Drug Program?
6      A.  Okay.
7      Q.  And about halfway down in this
8  paragraph, it states that the director of
9  Arkansas' Medicaid Agency has advised, quote,
10  "The State legislator, that his Agency will
11  change its current system and base drug
12  reimbursement on the actual cost paid by
13  pharmacies rather than the AWP."  Do you see that
14  language?
15     A.  I see it.
16     Q.  You're not aware of any instance in
17  which Arkansas Medicaid, since 1985, has used
18  actual acquisition costs for reimbursement of
19  prescription drugs?
20     A.  All I'm familiar with is that we've
21  ever reimbursed off of AWP.
22     Q.  Have you had any discussions with

Page 205

1  anyone at Arkansas' Medicaid Program why it
2  didn't move to actual acquisition costs?
3      A.  I'm not even familiar with this
4  document, so no.
5         [Marked Exhibit Roxane 010]
6      Q.  This next document is a rather heavy
7  one.  We've marked it as Roxane Exhibit 10.  It's
8  a document entitled "A Survey of Costs of
9  Dispensing Prescription and Estimated Acquisition
10  Costs in the State of Arkansas".  It was prepared
11  for the Arkansas Department of Human Services,
12  prepared by Myers and Stauffer in consultation --
13  consultation with Carol Morgan, RPH, and is dated
14  June 1989.  My first question is, have you seen
15  this document before today?
16     A.  No.  I don't even know who Carol Morgan
17  is.
18     Q.  Did you know that Myers and Stauffer
19  performed a survey of costs of dispensing
20  prescriptions and estimated acquisition costs in
21  the State of Arkansas in 1989?
22     A.  I knew we had files with past surveys.

52 (Pages 202 to 205)

7ce5a780-185e-426a-a9ae-dc7b0f28408e

| | |
|---|---|
| Page 206 | Page 208 |

Page 206

1  I've never reviewed them.  I didn't know what the
2  dates were.
3      Q.  So you didn't look at this report?
4      A.  No.
5      Q.  -- in preparation for today?
6      A.  I did not review this report.
7      Q.  Now, if we turn to the acknowledgment
8  section on Bates Page ARK 7312 -- when I say
9  "ARK", I'm using ARK.  One of the individuals
10  that is acknowledged is Ray Hanley.
11      A.  Uh-huh.
12      Q.  Do you see that?
13      A.  Uh-huh.
14      Q.  Is it fair to say that Mr. Hanley was
15  involved in the Arkansas Medicaid Program in the
16  1989 time frame?
17      A.  I have to assume he was.
18      Q.  As was Kenny Whitlock and Thelma
19  Underwood?
20      A.  Correct.
21      Q.  I should say "as were".  Now, I believe
22  you testified that Myers and Stauffer, from time

Page 207

1  to time, had conducted dispensing and acquisition
2  cost surveys for Arkansas; is that correct?
3      A.  That's correct.
4      Q.  And this is a copy of one of the
5  surveys produced from Arkansas' file that Myers
6  and Stauffer had performed?
7      A.  Yes, appears to be.
8      Q.  And Arkansas was assisted by Myers and
9  Stauffer in its understanding of the cost of
10  drugs for pharmacies within the state?
11      A.  I'm really not sure what -- other than
12  providing the audit in the report, what
13  assistance they provided after they gave them the
14  report.
15      Q.  Well, they provided data on the
16  acquisition cost of drugs for pharmacies within
17  the state?
18      A.  I would have to say yes.
19      Q.  And Arkansas relies on these surveys?
20      A.  Yes, or uses them to assist in the
21  determination, yes.
22      Q.  And similarly, Myers and Stauffer

Page 208

1  performed surveys on the cost for Arkansas
2  pharmacies to dispense drugs?
3      A.  Dispensing and Estimated Acquisition
4  Cost Survey, yes.
5      Q.  And I believe you testified that
6  Arkansas Medicaid Agency relies on these reports?
7      MS. OBEREMBT:  Objection.
8      A.  They're used in assisting in the
9  development of a change if one is warranted.
10      Q.  (By Mr. Reale) You spoke earlier of
11  something called "Program Integrity".  Do you
12  recall that testimony?
13      A.  I've mentioned it a few times, so I'm
14  not sure specific to what you're -- what you're
15  specifically referring to.  Excuse me.
16      Q.  Well, you said that the individuals
17  that were involved in Arkansas' Program Integrity
18  didn't have the staff to conduct audit of
19  pharmacies; is that true?
20      A.  No.  I think what I said is they don't
21  have the capability or staff to look at all of
22  the actual costs of all of the pharmacies.

Page 209

1      Q.  But Arkansas didn't need members of its
2  own Medicaid Agency to look at the acquisition
3  cost to providers or the dispensing cost, because
4  they hired Myers and Stauffer to perform that
5  work?
6      A.  Myers and Stauffer was contracted to
7  perform acquisition cost surveys.
8      Q.  And dispensing cost surveys?
9      A.  And dispensing cost surveys.
10      Q.  And Arkansas Medicaid had a contract
11  with Myers and Stauffer?
12      A.  It was a bid.  It was a -- yes, it was
13  a contract.
14      Q.  And they agreed with the methodology
15  that Myers and Stauffer used as part of its
16  survey?
17      MS. MOSLEY-SIMS:  Objection.
18      A.  I can only assume that that was agreed
19  upon.
20      Q.  (By Mr. Reale) It's a reasonable
21  assumption?
22      A.  A reasonable assumption.

53 (Pages 206 to 209)

7ce5a780-185e-426a-a9ae-dc7b0f28408e

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

Page 266

1  is everyone else on the phone.  Please
2  accommodate us.  That's what the rules require.
3         MS. OBEREMBT:  I -- I disagree.  And I
4  think you violate the rules when you get an
5  answer you don't like, and you keep going back
6  and hoping it's going to change.
7      A.   Okay.  Can you repeat again?  I'm
8  sorry. When I'm -- the acquisition --
9      Q.   (By Mr. Reale) Are you familiar with
10 340B pricing?
11     A.   Am I familiar with 340B pricing?
12     Q.   Yes.
13     A.   Yes, I am.
14     Q.   And what is 340B pricing?
15     A.   A high overview level, it's a special
16 price that certain covered entities are allowed
17 to purchase prescription drugs at.
18     Q.   Right.  And when they bill Medicaid for
19 those 340B claims, they submit actual acquisition
20 cost, correct?
21     A.   No.
22     Q.   They don't?

Page 267

1      A.   They bill us at actual acquisition cost
2  plus a dispensing fee.
3      Q.   Okay.  But one of the requirements that
4  a pharmacy must input for a 340B claim is actual
5  acquisition cost, correct?
6      A.   That's correct.
7      Q.   And that's submitted to the Medicaid
8  Program?
9      A.   That's correct.
10     Q.   And the Medicaid Program will make
11 payment according to either the actual
12 acquisition cost or something else that may be
13 input?
14     A.   And I don't disagree, and the ability
15 to audit that just on the few that we have is --
16 is a tremendous effort.  So asking 800 pharmacies
17 to do that is just not a feasible -- feasible.
18     Q.   Why, from 1990 to 2002, did Arkansas
19 use a single rate to reimburse both branded and
20 generic drugs?
21     A.   Honestly, I can't answer that.  I
22 really don't know.

Page 268

1      Q.   Was there any discussion about
2  incentivizing the use of generic drugs by paying
3  providers more for generic drugs than they would
4  for branded drugs?
5      A.   Paying providers more for generic
6  drugs?
7      Q.   Yes.
8      A.   Prior to 2002?
9      Q.   Yes.
10     A.   Not that I'm aware of.
11     Q.   You agree that promoting generic drug
12 use is a goal of Arkansas' Medicaid Program,
13 because it saves it money?
14     A.   I don't think promoting generic use
15 definitely is a way of saving money by --
16     Q.   I thought you --
17     A.   No, I just -- I stopped.  I didn't have
18 anything to add.
19     Q.   So you've never been --
20     A.   I just thought I did.
21     Q.   -- involved in any discussions about
22 using a single rate to reimburse both generic and

Page 269

1  -- and branded drugs?
2      A.   As far as the ingredient cost?
3      Q.   Yes.
4      A.   I want to make sure we're on the same
5  page here.
6      Q.   I will let you know when I'm talking
7  about dispensing fee.  So again --
8      A.   Actually, no.  I mean, I was not
9  involved in setting any of these rates and why
10 they were not different between brand and
11 generic.
12     Q.   Did you talk to Mr. Hanley about why
13 Arkansas Medicaid used a single rate prior to
14 2002 to reimburse both branded and generics?
15     A.   No, I did not.
16        [Marked Exhibit Roxane 013]
17     Q.   Ms. Bridges, you've just been handed a
18 document which we have marked as Roxane Exhibit
19 13. This document is Bates Page AWPIL-10143 to
20 10144.
21     A.   Okay.
22     Q.   This was a document produced to us by

68  (Pages 266 to 269)

30 (b)(6) Arkansas Dept of HS - Vol. II                    December 11, 2008
Little Rock, A

Page 449

1    Q.  And next to Arkansas, there's somebody
2  who has signed for receipt of the materials by
3  the name of William Gaddy.  Do you recognize that
4  name?
5    A.  I have no idea who that is.
6    Q.  So just to ask the question, you don't
7  know if he works for Arkansas' Medicaid Fraud and
8  Control Unit?
9    A.  I have no idea who that is.  I've never
10  heard that name before, that I recall.
11    Q.  Now let's take a look at Roxane
12  Exhibit 49, which the first page is entitled
13  "Examples of Excessive Reimbursements for
14  Pharmaceuticals by Arkansas Medicaid Pharmacy
15  Program".  My question is, I take it you haven't
16  seen this packet of materials before today; is
17  that true?
18    A.  Not that I recall, John.
19    Q.  Okay.  And to ask the question, did you
20  have any conversations with Mr. Hanley about his
21  interactions with a Florida pharmacy?
22    A.  Not specifically, that I recall.

Page 450

1  Regarding this document, specifically?  I mean,
2  or in general? Not that I recall.
3    Q.  And so you didn't -- you don't have
4  knowledge, one way or the other, whether
5  Ven-A-Care had contacted Arkansas to discuss the
6  acquisition cost of drugs for pharmacies?
7    A.  Not that I'm aware of.
8    Q.  Okay.  Let's turn to page -- back --
9  excuse me.  Bates Page VAC MDL 74712, and let me
10  know when you get to that page.  This is a copy
11  of a fax.
12    A.  Okay.
13    Q.  This is a copy of a fax from the State
14  of Arkansas to the office -- of the Office of the
15  Attorney General in Arkansas, somebody by the
16  name of the Danny White.  Do you see that?
17    A.  No.  Where are you seeing Dan -- oh, at
18  the bottom, from Danny White?
19    Q.  Yes.
20    A.  I don't know Danny White.
21    Q.  Okay.  That's not a name you'd
22  recognize?

Page 451

1    A.  No.
2    Q.  This is -- this, you will agree, is a
3  cover letter of a fax that was sent to Zack
4  Bentley in Key West, Florida?
5    A.  That's what it appears.
6    Q.  And Mr. White, in Arkansas' Medicaid
7  Fraud Control Unit, is providing information to
8  Mr. Bentley?
9    A.  It appears that way.
10      MS. MOSLEY-SIMS:  Objection.
11    Q.  (By Mr. Reale) We can put that aside
12  for now.  We have examined today a number of
13  acquisition, Drug Acquisition Cost Reports that
14  provided Arkansas with information on the cost of
15  drugs for pharmacies within the State.  Do you
16  agree?
17    A.  We've looked at documents with averages
18  of acquisition costs off of AWP, yes.
19    Q.  And you've testified that that is the
20  type of information that Arkansas would consider
21  when it sets its payment rate?
22    A.  I've said that that's information that

Page 452

1  Arkansas would use for reference or possibly for
2  review.
3    Q.  And at any point when I ask these
4  questions, if you need to refer to those reports,
5  just let me know, and I'll re-ask my question.
6    A.  Okay.
7    Q.  But one report that we looked at was an
8  OIG Report in 1984 that focused in part on the
9  acquisition cost of pharmacies -- for pharmacies
10  in Arkansas.  Do you recall, generally, that
11  report?
12    A.  Generally, I recall that report.  It
13  wasn't one that I was familiar with, because that
14  was long before my time here, but I recall us
15  looking at it.
16    Q.  And in that report, Arkansas was
17  provided with information that some pharmacies
18  were able to purchase drugs directly from
19  manufacturers at discounts of 20 percent off of
20  AWP?
21    A.  I don't recall those exact figures.  I
22  recall looking at the report yesterday.

30 (Pages 449 to 452)

06db8d46-1900-438e-b5fa-9bac07802652

Page 513

1  be prepared for -- for the defense, but I did not
2  see that document.  Or I'm -- don't recall seeing
3  that document.  As to which ones --
4         MR. BERLIN:  Carmen, do you know the
5  state of that document?
6         MS. MOSLEY-SIMS:  I believe that that
7  was the document that was provided to the
8  Department of Justice at their request.
9         MR. BERLIN:  Has that been produced to
10 Defendants?
11        MS. OBEREMBT:  I -- I forgot to use it
12 yesterday as an exhibit.  I've got it here,
13 though.  I can get it to you guys.
14        MR. BERLIN:  Okay.  Would you be so
15 kind as to pass it on to us?
16        MS. OBEREMBT:  Yes, I just said that.
17 Yes.
18     Q.  (By Mr. Berlin) And it's your
19 understanding, Ms. Bridges, that that document
20 will answer the question as to which of the NDCs
21 on Schedules 1 and 2 have had State MACs during
22 the relevant period?

Page 514

1     A.  Yes, sir, I agree.
2     Q.  Can you -- for -- for the record, can
3  you tell us what a home infusion pharmacy is?
4     A.  I'm not sure I know a definition of a
5  home infusion pharmacy.  What I consider to be a
6  home infusion pharmacy is a home health pharmacy
7  that would go to a person's home and provide
8  certain types of medications for them.
9     Q.  And do home infusion pharmacies
10 typically have higher dispensing costs than
11 traditional retail pharmacies?
12    A.  All of our pharmacies that bill through
13 the Pharmacy Program are reimbursed at the same
14 rates.  We don't have different fees for
15 different pharmacy types.
16    Q.  So the home infusion pharmacies are --
17 receive the same dispensing fee as the retail
18 pharmacies?
19    A.  All pharmacies are enrolled as retail
20 pharmacies regardless -- regardless -- excuse me
21 -- of their provider type.
22    Q.  And going back to that other question,

Page 515

1  do you agree that home infusion pharmacies
2  typically have higher dispensing costs?
3     A.  I really wouldn't know that.
4     Q.  Beg your pardon?
5     A.  I really don't know the answer to that.
6         MR. BERLIN:  John, could you mark as an
7  exhibit HHD0130556?  And actually while we're
8  doing that, if -- you might as well go ahead and
9  mark HHC0130554 at the same time.
10        MR. REALE:  Well, I have 5, 4.  That's
11 in -- marked as Abbott Exhibit Arkansas 4.
12        MS. MOSLEY-SIMS:  Can I get a copy?
13        MR. REALE:  Oh, sorry.
14        MS. MOSLEY-SIMS:  Thank you.
15        MR. BERLIN:  Okay.  Can --
16        MR. REALE:  It was in -- sorry, Eric.
17 The other one is not in the stack, but let me see
18 if I brought that separately.
19        MR. BERLIN:  No problem, John.  We can
20 just skip that other one.  The one that you have
21 marked as Exhibit 4 will suffice.  I'll make it
22 do.

Page 516

1         [Marked Exhibit Abbott-ARK 004]
2     Q.  (By Mr. Berlin) Could you take a look
3  at what's been marked as Exhibit 4?
4     A.  I have it.
5     Q.  Okay.  And is that a -- a memo dated
6  April 3, 1993?
7     A.  April 9th?
8     Q.  From the Associate Regional
9  Administrator for Region 6 to the Acting Director
10 of the Medicaid bureau?
11    A.  And just for clarification, it's April
12 9th, so that we don't get confused, but --
13    Q.  Oh, pardon me.
14    A.  I do have the memo.
15    Q.  Okay.  Do you see in the last sentence
16 in first paragraph, it says, "The Arkansas
17 Pharmacists has requested additional
18 reimbursement for the preparation of these
19 products."  Going back in the other sentence, it
20 says, "Home IV therapy -- for the preparation of
21 these products, which it contends require a good
22 deal more time and supply usage to prepare than

30 (b)(6) Arkansas Dept of HS - Vol. II                    December 11, 2008
Little Rock, A

Page 517

1    most prescriptions."
2        A.  It's in the document.
3        Q.  And then the last paragraph on this
4    first page of Exhibit 4, do you see that it says,
5    "We believe the most equitable policy would be
6    the States to allow an additional amount above
7    the dispensing fee for the preparation of home IV
8    therapies, which they have determined require
9    significant preparation time and supply usage."
10   Do you see that?
11       A.  I do.  The phone is cutting out.  So
12   I'm -- we keep losing you.
13       Q.  I apologize.  You -- you were able to
14   read the sentence along with me, right?
15       A.  Yes.
16       Q.  Ms. Bridges?
17       A.  Yes, I've read it with you.
18       Q.  Okay.  And to your knowledge, did that
19   happen, was there an additional amount above the
20   dispensing fee that was provided for the
21   preparation of home IV therapy?
22       A.  Not to my knowledge.  It doesn't

Page 518

1    reflect it in the reimbursement.
2        Q.  Do you know why that never came to
3    pass?
4        A.  I do not.
5        Q.  Could you please pull out Roxane
6    Exhibit 15?
7        A.  Oh, Roxane 15.  I'm sorry.  I was
8    waiting for John to hand me another exhibit.
9    I've got it.
10       Q.  Okay.  And this is a document that you
11   examined with Mr. Reale earlier in your
12   examination, right?
13       A.  It appears to be so, yes.
14       Q.  Could you turn to Page 17 of Roxane
15   Exhibit 15?
16       A.  I'm there.
17       Q.  And just backing up a second, this is
18   the June 2001 Myers and Stauffer report on the
19   survey of dispensing costs, right?
20       A.  Yes, it is.
21       Q.  And I plumb forgot, is this one that
22   you said you had read?

Page 519

1        A.  Yes, it's one I'm familiar with.
2        Q.  Okay.  And then on Page 17, you see
3    below Chart 3.2, it -- it has the write -- going
4    back into the writing, "The most significant
5    characteristic that affects pharmacy dispensing
6    cost was the provision of intravenous IV
7    solutions.  Our analysis revealed significantly
8    higher costs of dispensing associated with the
9    six pharmacies in the sample that provided
10   significant levels of this service."
11       A.  I do see that.
12       Q.  Does that refresh your recollection
13   that -- that home infusion or IV pharmacies have
14   higher costs than normal retail dispensing
15   pharmacies?
16       A.  According to the survey --
17       MS. MOSLEY-SIMS:  Objection.
18       A.  -- I -- I do recall having read that in
19   the past, yes.
20       Q.  (By Mr. Berlin) And you'll see the
21   document continues to say, "In every pharmacy
22   dispensing study where information on IV solution

Page 520

1    dispensing activity has been collected by Myers
2    and Stauffer, such activity has been found to be
3    associated with higher dispensing costs."  And
4    then it goes on to -- with some of the additional
5    costs of dispensing that home IV pharmacies have.
6    Do you see that?
7        A.  Yes, sir.
8        Q.  And does that further refresh your
9    recollection that home infusion pharmacies have
10   been found to have higher costs of dispensing
11   than retail pharmacies?
12       MS. MOSLEY-SIMS:  Objection.
13       A.  As reported by Myers and Stauffer in
14   the survey findings, I -- that does refresh my
15   memory.
16       Q.  (By Mr. Berlin) And do you have any
17   reason to disagree with the findings, these
18   findings in this Exhibit 15?
19       MS. MOSLEY-SIMS:  Objection.
20       A.  I don't have any reasons to dispute the
21   findings.
22       Q.  (By Mr. Berlin) And then could you --

47 (Pages 517 to 520)

06db8d46-1900-438e-b5fa-9bac07802652

Page 521

1   bear with me a moment.  Can you go down to the
2   bottom of the page, and you'll see there's a
3   Footnote 8 that reads, "Although typical
4   dispensing fees reimburse less than the
5   dispensing costs of the IV pharmacies, they are
6   -- they are generally able to break even based on
7   the margin allowed on ingredient cost
8   reimbursement."  Do you have any basis to
9   disagree with that statement?
10      MS. MOSLEY-SIMS:  Objection.
11      A.  I see it as a footnote.  I mean, I
12  don't have any reason to object.  It's part of
13  the report.
14      Q.  (By Mr. Berlin) And that's -- and this
15  report was presented to the Arkansas Department
16  of Human Services in June 2001, right?
17      A.  That's correct.  Or --
18      Q.  Had you heard that prior to that time
19  that pharmacies were using -- that IV pharmacies
20  were using ingredient cost reimbursement to help
21  make up for an inadequate dispensing fees?
22      A.  Not that I'm aware of.

Page 522

1       Q.  And -- and we earlier saw Exhibit 4,
2   which was from 1993.  At any time after 1993, all
3   the way through the present, did Arkansas
4   consider giving some additional dispensing fee or
5   some additional payment to home IV pharmacies?
6       A.  Not that I'm aware of.  Not that I
7   recall.
8       Q.  And do you have any reason to believe
9   that anything contained -- or anything that we
10  just read in the Myers and Stauffer study is any
11  different today?
12      MS. MOSLEY-SIMS:  Objection.
13      A.  I wouldn't know.  I don't know what the
14  current survey -- I don't recall if the current
15  survey factored out the home IV pharmacies or
16  not.
17      Q.  (By Mr. Berlin) Now, all the way at the
18  beginning of your examination, the lawyer from
19  the DOJ told you what the allegations in this
20  case were, right?
21      A.  From what I recall, yes.
22      Q.  Yeah.  And had you heard those

Page 523

1   allegations prior to that time?
2       A.  Prior to yesterday?
3       Q.  Yeah.
4       A.  I understood that that was the basis
5   for the law -- or for the suit, yes.
6       Q.  And you understand that those are
7   allegations.  They're not established facts,
8   right?
9       A.  Yes.
10      Q.  Do you -- do you believe the
11  allegations are true?
12      A.  I don't think that's for me to
13  determine.
14      Q.  So do you have an opinion one way or
15  another?
16      MS. MOSLEY-SIMS:  Objection.
17      A.  I have no way to know if any prices are
18  inflated or are not inflated.
19      Q.  (By Mr. Berlin) But you did --
20      A.  Or were -- or were purposely inflated.
21  I don't have any way to know that.
22      Q.  I apologize that I just interrupted

Page 524

1   you.  That was one time I thought you were done,
2   but you weren't.  We had -- you had said a few
3   times during your examination that along the
4   lines of that we wouldn't have this problem if
5   the manufacturers had reported accurately.  Am I
6   stating your testimony accurately?
7       MS. MOSLEY-SIMS:  Objection.
8       A.  That's -- what I was reporting is
9   reporting AWPs accurately, because we have
10  stated, and the surveys have stated, that AWPs
11  are not accurate, that there is a discount off of
12  AWP.  So that is what I have stated.
13      Q.  (By Mr. Berlin) Now, what's -- what's
14  your understanding of who sets the AWPs?
15      A.  It's my understanding that the
16  manufacturer reports the AWP to First DataBank
17  and that First DataBank might -- First DataBank
18  -- now we know that First DataBank applies some
19  sort of a percentage to that.  I don't know if
20  that's across the board.
21      Q.  Well, let me ask you a few questions
22  that may -- may challenge your understanding.

48  (Pages 521 to 524)

06db8d46-1900-438e-b5fa-9bac07802652

# James Kevin Gorospe
# (California) (30(b)(1))

Gorospe, James Kevin                        March 19, 2008
                    Sacramento, CA

                                                      Page 1

                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

        ----------------------------X

        IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

        INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION:

        PRICE LITIGATION              ) 01-CV-12257-PBS

        ----------------------------X

        THIS DOCUMENT RELATES TO:     ) Judge Patti B. Saris

        U.S. ex rel. Ven-A-Care of    )

        the Florida Keys, Inc. v.     ) Magistrate Judge

        Abbott Laboratories, Inc.,    ) Marianne B. Bowler

        et al.                        )

        Case No. 06-CV-11337-PBS      )

        ----------------------------X

                      --oOo--

               WEDNESDAY, MARCH 19, 2008

                      --oOo--

             VIDEOTAPED DEPOSITION OF

               JAMES KEVIN GOROSPE

        Reported By:  JOANIE MURAKAMI, CSR No. 5199

                  Registered Merit Reporter

                  Certified Realtime Reporter

Gorospe, James Kevin                      March 19, 2008
                    Sacramento, CA

Page 310

1   preparation of this deposition?
2      A.   Yes.
3      Q.   Did you ever -- have you ever spoken to
4   any other lawyers for Ven-A-Care?
5      A.   Not that I can recall.
6      Q.   Okay.  Have you ever spoken to someone
7   named -- with the last name Breen?
8      A.   Not that I can recall.
9      Q.   Have you ever spoken to any of the
10  principals who own or owned, at one time, Ven-A-
11  Care?
12     A.   Yes.
13     Q.   And which people have you -- which of
14  the principals have you spoken to?
15     A.   I don't recall their names.
16     Q.   Do you recall when you talked to them?
17     A.   Not specifically, no.
18     Q.   Was it recently or was it several years
19  ago?
20     A.   Several years ago.
21     Q.   Was it before or after?  Can you tell
22  me:  Do you recall whether it was before or after

Page 311

1   they filed the lawsuit in which the State of
2   California has now intervened?
3      A.   I don't know.
4      Q.   Okay.  Was it in the '90s?
5      A.   Yes.
6      Q.   Can you peg it in the late '90s, mid-
7   '90s, early '90s?
8      A.   Late '90s.
9      Q.   Was it an in-person meeting?
10     A.   Yes.
11     Q.   And were lawyers present?
12     A.   Yes.
13     Q.   Lawyers for whom?
14     A.   To my recollection, the Attorney
15  General's Office and the Department of Health
16  Care Services, or Health Services at that time.
17     Q.   Were any lawyers for Ven-A-Care
18  present?
19     A.   Not that I can recall.
20     Q.   And what was the purpose of the
21  meeting?
22     A.   I don't recall the content.  I just

Page 312

1   remember a meeting.  I don't recall the content.
2      Q.   Did it have anything to do with the
3   litigation?
4      A.   I believe so.
5      Q.   Were any other nonlawyers from DHS
6   present besides yourself?
7      A.   Yes.
8      Q.   And who were those people?
9      A.   To my recollection, it was Doug
10  Hillblom and Len Terra.
11     Q.   Were representatives of any other
12  states present?
13     A.   No.
14     Q.   Was the meeting here in Sacramento?
15     A.   Yes.
16     Q.   Do you recall any other meetings with
17  the principals of Ven-A-Care?
18     A.   No.
19     Q.   Are you familiar with the term "usual
20  and customary charge"?
21     A.   Yes.
22     Q.   Okay.  And what's your understanding of

Page 313

1   that term?
2      A.   That is the charge that pharmacies
3   typically charge a cash paying customer for a
4   particular product.
5      Q.   And back when you were working, I
6   guess, for Myers Apothecary, way back when --
7      A.   Yes.
8      Q.   -- do you recall including a usual and
9   customary charge on the claim forms that you
10  submitted?
11     A.   Yes.
12     Q.   And the usual and customary charge,
13  again, in your experience, is greater than what
14  the pharmacy paid to acquire the drug?
15     A.   Yes.
16     Q.   And is it also true that, in your
17  experience, the usual and customary charge
18  included, on a claim form, typically exceeds the
19  AWP of the product?
20     MR. PAUL:  Objection.  Form.
21     THE WITNESS:  I don't know that for a
22  fact.

79 (Pages 310 to 313)

7518707c-46aa-4bff-8eef-0c456891e081

# Allen Chapman
# (Colorado) (30(b)(1))

Chapman, Allen D.                    December 15, 2008
                    Denver, CO

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION)

--------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:         ) Master File No.

United States of America ex rel.  ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,   ) Subcategory Case

Inc., et al. v. Dey, Inc., et al.,) No. 06-11337

Civil Action No. 05-11084-PBS     ) Hon. Patti B.

--------------------------------X Saris


     VIDEOTAPED DEPOSITION OF:  ALLEN D. CHAPMAN

               December 15, 2008

     PURSUANT TO AMENDED NOTICE AND SUBPOENA,

the deposition of ALLEN D. CHAPMAN was taken on

behalf of Defendant Dey, Inc., at 1701 California

Street, Silverton Room, Denver, Colorado 80202, on

December 15, 2008, at 10:06 a.m., before Tammie E.

Singer, Professional Court Reporter and Notary

Public within Colorado.

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                    December 15, 2008
                          Denver, CO

|  | Page 198 |  | Page 200 |
|---|---|---|---|

**Page 198**

1  would -- you know, that we would not be the --
2  the provider.  The managed care entities would be
3  the provider.
4      Q.  Okay.
5      A.  So I had been working on that.  But
6  clearly, you know, Roger being in charge of the -
7  - his job was rates and analysis.  And so he and
8  Martha were working on that.
9          And if I had any conversations with
10  them, it was casual conversations.  But certainly
11  I was -- you know, they might have a question,
12  but I don't -- I don't remember -- I just
13  remember that they were working on something and
14  -- but it certainly wasn't part of what I was
15  doing.
16      Q.  If you -- turn to the second page of
17  this exhibit.
18      A.  Okay.
19      Q.  And previously you testified you recall
20  that there was a state MAC program implemented in
21  2002; is that -- is that accurate?
22      A.  No.  I said there was a -- they were

**Page 199**

1  talking about having the ability to do state
2  MACs.  But I don't have any recollection of the
3  fact whether they actually did put numbers in
4  there and add drugs to that.
5          That -- this was -- they would have to
6  have it in their state plan before they could
7  actually do this.  So this was essentially en --
8  enabling actions that could be done.  But I don't
9  know that they ever did -- whether they ever did
10  come up with state MACs.
11      Q.  Were you involved in the discussions
12  about the proposal to add a state MAC program to
13  the state plan?
14      A.  I remember discussions, but I don't
15  remember any formalized ways that -- you know, as
16  to what drugs would be there and how you would
17  determine the cost and that type of thing.  There
18  were always discussion with other states that had
19  them and how they did them.
20          MR. KATZ:  Why don't we go off the
21  record for a minute.  I'm going to move into a
22  new topic, and I've got to get my documents

**Page 200**

1  together.
2          THE VIDEOGRAPHER:  Off the record at
3  2:25.
4          (A break was taken from 2:25 p.m.
5  to 2:29 p.m.)
6          (Deposition Exhibit Dey 375 was
7  marked.)
8          THE VIDEOGRAPHER:  On the record at
9  2:29.
10      Q.  (BY MR. KATZ)  I have handed you a
11  document marked Dey Exhibit 375.  Is this your
12  handwriting --
13      A.  No.
14      Q.  -- on this document?
15      A.  No.  This must have been --
16      Q.  Oh.  I should -- I should know that,
17  actually.  Do you -- do you recall speaking to
18  someone about the information called for in this
19  survey?
20      A.  No.
21      Q.  Do you have any reason to think that
22  you didn't speak to someone with the fed -- with

**Page 201**

1  the federal government on January 9, 2001?
2      A.  No.
3      Q.  I would like you to actually read
4  through the whole survey.  And when you're done,
5  let me know if that refreshes your recollection
6  about what we referred to earlier as the DOJ AWPs
7  or the National Association of Medicaid Fraud
8  Control Units, or NAMFCU, AWPs.
9          (A pause occurred in the
10  proceedings while the deponent looked at the
11  document.)
12      A.  My only recollection is I think there
13  were some people -- some concerns about the
14  information on First Databank's tape being
15  accurate.
16          But I don't remember anything about the
17  -- I assume this has to do with the 400-and-some
18  drugs we talked about earlier, is that right, the
19  400-and-some DOJ drugs?  I don't have much
20  recollection -- or any about that.  I --
21      Q.  Do you recall that -- does this refresh
22  your recollection that the DOJ provided revised

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                        December 15, 2008
                          Denver, CO

|  | Page 202 |
|---|---|

1   AWPs?
2        MR. ANDERSON: Objection, form.
3     A.   No.  I just remember there being
4   concerns about the First DataBank and --
5     Q.   (BY MR. KATZ)  Who was expressing those
6   concerns about the First DataBank?
7     A.   I think there were other states,
8   possibly providers that were questioning why -- I
9   don't know.
10    Q.   Did Colorado Medicaid do anything in
11  response to those concerns?
12       MR. ANDERSON: Objection, form.
13    A.   Sounds like we didn't, from what this
14  says.  I don't remember doing anything.  If they
15  did, it would have been somebody other than me.
16    Q.   (BY MR. KATZ)  Do you recall that
17  Colorado Medicaid chose not to use these DOJ AWPs
18  because Medicare decided not to?  Does that
19  refresh your recollection at all?
20    A.   See, that's what supposedly I said.  I
21  don't remember that, but . . .
22    Q.   You can set that aside.

|  | Page 203 |
|---|---|

1     A.   That was a long time ago.
2     Q.   Well, the next document will be even
3   longer.
4     A.   Okay.
5        MR. KATZ: Well, before I show this to
6   you, I'll hand this to Mr. Anderson.
7        And I'll ask if you'll agree to
8   withdraw the "highly confidential" designation?
9        MR. ANDERSON: Well, doesn't the
10  protective order provide for provision of highly
11  confidential information to third parties?  He
12  just needs to sign --
13       MR. KATZ: Yeah, I'll have to get ahold
14  of that certificate.
15       MR. ANDERSON: Yeah.
16       MR. KATZ: If we need to take a break,
17  I can get it.  But I'm asking if you'll just
18  withdraw it.  I mean, we've agreed to withdraw a
19  number of designations on both sides, Mr. Berlin
20  has, and I know Dey has.  I'd just like you to
21  take a look at it and --
22       MR. ANDERSON: Let's do this.  I'm not

|  | Page 204 |
|---|---|

1   saying -- I'm not foreclosing the possibility
2   that Ven-A-Care would withdraw the designation,
3   but I would need to talk to Jim, and that's going
4   to slow things down.
5        But what I will agree to is that you
6   can use it with this witness in this deposition
7   so long as Mr. Chapman's agreeable to signing a
8   protective order compliance agreement.
9        THE DEPONENT: Fine with me.
10       MR. ANDERSON: It's a certificate that
11  says that you won't disclose --
12       THE DEPONENT: Okay.
13       MR. ANDERSON: -- any information that
14  you see in here.  Is that okay, Mr. Chapman?
15       THE DEPONENT: That's fine with me.
16  I'll forget it as soon as I walk out this door.
17       MR. ANDERSON: All right.  Let's all
18  proceed under that assumption for the time being.
19  And we'll follow up with Mr. Chapman and get --
20  does anybody have an objection to that being the
21  way we'll proceed, and Mr. Chapman will
22  subsequently sign a certificate?

|  | Page 205 |
|---|---|

1        MR. GOBENA: No objection from the
2   United States.
3        MR. BERLIN: No object (inaudible)
4   Abbott Laboratories.
5        MR. ANDERSON: All right.
6        MR. KATZ: Do you want me to get a
7   certificate today, or can you follow up -- are
8   you going to follow up later?
9        MR. ANDERSON: Well, I don't want to --
10  no, I -- no, I think we need to respect the
11  witness' time and complete this --
12       MR. KATZ: Okay.
13       MR. ANDERSON: -- expeditiously.
14       MR. KATZ: I can print it on a break if
15  you'd like.
16       MR. ANDERSON: Yeah, or even tomorrow
17  morning is fine by me.  I -- you know --
18       MR. KATZ: Okay.
19       MR. ANDERSON: -- when we get -- we can
20  fax it to him or just U.S. mail, whatever.
21       MR. KATZ: Okay.
22       MR. ANDERSON: Okay.

                                    52  (Pages 202 to 205)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                    December 15, 2008
                            Denver, CO

Page 210

1      A.  I guess I remember talking to the AL --
2   ALJ people over the phone.  I didn't -- I don't
3   remember having specific meetings.
4      Q.  The AOJ?  You mean the DOJ?
5      A.  The A -- attorney -- the attorney
6   general's office.
7      Q.  Oh, the attorney general?
8      A.  Yeah.
9      Q.  Do you see where it says, "real
10  disparity between acquisition costs and AWP"?
11     A.  Uh-huh, yeah.
12     Q.  Is that something you would have said?
13         MR. ANDERSON:  Let me interject
14  something because I feel --
15         THE DEPONENT:  Yeah.
16         MR. ANDERSON:  -- like the witness
17  needs to understand this.  Mr. Chapman, to the
18  extent you're referencing discussions you had
19  with attorneys --
20         THE DEPONENT:  Yeah.
21         MR. ANDERSON:  -- for the Colorado AG's
22  office, I can't -- I'm not providing you with any

Page 211

1   instruction on this, but I am giving you some
2   kind of information so you can understand.  You
3   may have a privilege --
4          THE DEPONENT:  Right.
5          MR. ANDERSON:  -- back when you were
6   with the Medicaid program --
7          THE DEPONENT:  Yeah.
8          MR. ANDERSON:  -- when you communicated
9   with --
10         THE DEPONENT:  Uh-huh.
11         MR. ANDERSON:  -- Colorado --
12         THE DEPONENT:  Yeah.
13         MR. ANDERSON:  -- AGs.
14         THE DEPONENT:  Right.
15         MR. ANDERSON:  Okay?  So you can answer
16  these questions, but if the answer is going to
17  cause you to --
18         THE DEPONENT:  Right.
19         MR. ANDERSON:  -- divulge something you
20  learned or discussed with attorneys for the
21  Colorado AG's office --
22         THE DEPONENT:  Yeah.

Page 212

1          MR. ANDERSON:  -- you have the right to
2   claim a privilege on that.
3          THE DEPONENT:  Yeah.
4          MR. ANDERSON:  I'm not telling you you
5   should.  I'm just saying you have that right.
6          THE DEPONENT:  Yeah.
7          MR. ANDERSON:  Okay?
8          MR. KATZ:  And I'll just point out for
9   the record that this is a record that was
10  produced in this litigation by Ven-A-Care too --
11         MR. ANDERSON:  I'm -- no, I'm not
12  talking about --
13         THE DEPONENT:  Yeah.
14         MR. ANDERSON:  -- the document per se.
15  I'm talking --
16         THE DEPONENT:  Yeah.
17         MR. ANDERSON:  -- bigger picture,
18  Cliff.  He --
19         MR. KATZ:  Okay.
20         MR. ANDERSON:  -- just said that he had
21  --
22         MR. KATZ:  No, I understand what he's

Page 213

1   saying.  I just wanted to make --
2          MR. ANDERSON:  Yeah.
3          MR. KATZ:  -- make the record clear.  I
4   understand --
5          MR. ANDERSON:  Yeah.
6          MR. KATZ:  -- what he's saying.
7          MR. ANDERSON:  I'm not trying to snap
8   back this particular page.  I'm assuming --
9          THE DEPONENT:  Yeah.
10         MR. ANDERSON:  -- that you can ask
11  questions about this particular --
12         THE DEPONENT:  Yeah.
13         MR. ANDERSON:  -- page, but I don't --
14  that doesn't mean it opens the door to his prior
15  communications with AGs or --
16         THE DEPONENT:  Yeah.
17         MR. ANDERSON:  -- what have you.
18     Q.  (BY MR. KATZ)  Mr. Chapman --
19     A.  Okay.
20     Q.  -- can you -- can you tell me whether
21  or not you had a discussion with people who may
22  or may not have included representatives of Ven-

54  (Pages 210 to 213)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

Chapman, Allen D.                                December 15, 2008
                        Denver, CO

|  | Page 214 |
|---|---|

1  A-Care regarding real disparity between
2  acquisition costs and AWP?
3      A.  I don't recall any -- any meetings with
4  Ven-A-Care people.  I don't recall -- I do recall
5  having some discussions about -- about this with
6  attorneys, and I don't recall what was said for
7  sure.
8          I guess I do know that -- that -- that
9  this was -- this was going on.  I didn't remember
10 it was in the 94 series.
11     Q.  Well, do you see --
12     A.  Yeah.
13     Q.  -- and I don't know --
14     A.  Yeah.
15     Q.  -- if this is accurate, but you see on
16 this page, it says --
17     A.  Yeah.
18     Q.  -- June 26, 1997?
19     A.  Yeah.
20     Q.  Could that be an accurate date of when
21 you might have had this conversation?
22         MR. ANDERSON:  Objection, form.

|  | Page 215 |
|---|---|

1      A.  I don't really remember when it was.
2      Q.  (BY MR. KATZ)  All right.  Let's take a
3  look at the document Bates stamped 74730.
4          MR. ANDERSON:  I'm sorry, Cliff.  30?
5          MR. KATZ:  Yes.
6          MR. ANDERSON:  Okay.
7      Q.  (BY MR. KATZ)  And it's titled
8  "Examples of excessive reimbursements for
9  pharmaceuticals by Colorado Medicaid" --
10     A.  Uh-huh.
11     Q.  -- "pharmacy programs."  Is this a
12 chart that you received from Ven-A-Care of the
13 Florida Keys?
14     A.  I don't remember that if I did.  When
15 was that?  Do you know when this was?  A chart?
16     Q.  Well, let's take a look at 74737 and
17 74738.  Now, 74737 appears to be a fax from Mr.
18 Bentley to you on December 30, 1997?
19     A.  Okay.
20     Q.  And Mr. Bentley is asking for some
21 information.  He's asking for "Colorado's
22 reimbursements for the following NDCs," and the

|  | Page 216 |
|---|---|

1  following page contains some NDCs.  Did I
2  describe that accurately?
3      A.  You're talking about 74738?
4      Q.  Yes.
5      A.  Okay.
6      Q.  Is that accurate?
7      A.  Yes.
8      Q.  Is that your handwriting on 74738?
9      A.  No.  That's Martha's handwriting.
10     Q.  Okay.  Did you discuss with Martha
11 providing information to Ven-A-Care of the
12 Florida Keys?
13     A.  I don't remember it if we did.
14     Q.  Going back to the charts, do you have
15 any recollection of seeing these charts or having
16 any discussions with anyone about them?
17         MR. ANDERSON:  Objection, form.
18     A.  No, I don't.
19     Q.  (BY MR. KATZ)  You can set that aside.
20 Have you ever had any communications with any
21 representatives of Dey?
22     A.  Not to my knowledge.

|  | Page 217 |
|---|---|

1      Q.  Do you have any knowledge as to how Dey
2  sets any of its prices?
3      A.  No.
4      Q.  Do you have any knowledge as to Dey's
5  sales and marketing practices?
6      A.  No.
7          MR. KATZ:  I'll pass the witness.
8          MR. ANDERSON:  Hey, Eric --
9          MR. KATZ:  Let's --
10         MR. ANDERSON:  -- why don't you --
11         MR. KATZ:  -- switch the tape.
12         MR. ANDERSON:  Yeah.  Why don't you
13 collect your notes, and then we're going to
14 switch tapes, and you can begin your examination.
15         MR. BERLIN:  Okay --
16         MR. KATZ:  I'll just --
17         MR. BERLIN:  -- fine.
18         MR. KATZ:  I'll just note for the
19 record that it's 2:45.
20         THE VIDEOGRAPHER:  Off the --
21         MR. BERLIN:  We need to switch a tape?
22         MR. KATZ:  Yeah, we're switching a tape

                                   55 (Pages 214 to 217)

3a52829d-7e0c-4034-a0c1-5d44bd720e64

# Cynthia Denemark (Delaware) (30(b)(6))

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

--------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

Newark, DE

Page 378

1    Q.   Were there other officials from CMS
2  that were present at the meeting?
3    A.   Not that I recall.
4    Q.   And what were the questions that you
5  posed to Ms. Duzor and Mr. Fine relating to
6  cross-subsidization?
7        MS. HEALY SMITH:  Objection.
8        THE WITNESS:  I don't recall the exact
9  questions.
10  BY MS. RAMSEY:
11   Q.   Do you recall the general nature of the
12  -- the Q and A?
13   A.   It would have been the general nature
14  of the -- the combination of how do we get to
15  ingredient cost and what could and could not be
16  included in a dispensing fee?
17   Q.   And do you recall the responses
18  provided by Ms. Duzor and Mr. Fine?
19   A.   The responses from Ms. Duzor would have
20  been a non-answer and no direction.  And I don't
21  remember specific answers from Mr. Fine, other
22  than it would have probably been something to the

Page 379

1  effect of you need to do the best that you can,
2  given the information that you have.
3    Q.   Was Delaware ever directed by CMS that
4  it was prohibited from paying a margin on
5  ingredient costs to compensate for an inadequate
6  dispensing fee?
7        MS. HEALY SMITH:  Objection.
8        THE WITNESS:  I've not seen any -- any
9  Medicaid director letters from CMS commenting on
10  that, no.
11  BY MS. RAMSEY:
12   Q.   So it was the understanding of Delaware
13  Medicaid that this was an appropriate way to
14  compensate providers under the Delaware Medicaid
15  Program?
16        MS. HEALY SMITH:  Objection.
17        THE WITNESS:  I wouldn't agree that the
18  Division thought it was appropriate --
19  BY MS. RAMSEY:
20   Q.   You didn't think there was anything
21  wrong with it?
22   A.   No, I didn't agree to that either.

Page 380

1    Q.   Oh, I'm sorry.
2    A.   I believe that the Division's response
3  to that would be that they were doing the best
4  they could with the data elements that were
5  available to them.
6    Q.   Is it fair to say that the Delaware
7  Medicaid Program would not utilize reimbursement
8  methodologies or policies that it felt violated
9  federal regulations?
10   A.   I would agree that the Division would
11  never knowingly violate federal regulations.
12   Q.   And you would agree that Delaware did
13  not believe its reimbursement policies did
14  violate federal violations; --
15        MS. HEALY SMITH:  Objection.
16  BY MS. RAMSEY:
17   Q.   -- is that correct?
18   A.   That is correct.
19   Q.   Now, we discussed yesterday your
20  participation in the '94 and '95 meetings with
21  OIG in -- in conjunction with the OIG's report on
22  Delaware's Medicaid reimbursement system?

Page 381

1    A.   Correct.
2    Q.   How did you come to be selected to
3  participate in the meetings with OIG for Delaware
4  Medicaid?
5        MS. HEALY SMITH:  Objection.
6        THE WITNESS:  To the best of my
7  understanding of how Delaware got selected and
8  why I personally was invited to Richmond is, I
9  attended a national meeting in Chicago during the
10  summer and I asked lots of questions.  And I
11  think they decided I would be a good candidate to
12  participate.
13  BY MS. RAMSEY:
14   Q.   I'm sorry.  Where did you indicate that
15  the national meeting in the summer occurred?
16   A.   I didn't indicate where it was, but it
17  was in Chicago, Illinois.
18   Q.   In Chicago.
19        And who participated in the Chicago
20  meeting?
21   A.   I don't know everybody that
22  participated.

28  (Pages 378 to 381)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Newark, DE

Page 398

1  BY MS. RAMSEY:
2     Q.  Do you recall conversations with Ms.
3  Nazario about the relationship between AWP to any
4  true cost?
5     A.  I do not recall a conversation with the
6  secretary, no.
7     Q.  In the -- on the first page in the
8  fourth paragraph, she states, It is well known
9  that these drugs usually have an AWP that is not
10  related to any true cost?
11       You understood that Ms. Nazario
12  believed that AWP is not related to any true
13  cost?
14       MS. HEALY SMITH:  Objection.
15       THE WITNESS:  I believe that Secretary
16  Nazario was comfortable taking a draft letter and
17  agreeing to sign it on behalf of the Division.
18  BY MS. RAMSEY:
19     Q.  Would you have been the one who
20  probably drafted this letter?
21     A.  Yes.
22     Q.  So do you recall placing this language

Page 399

1  into the letter?
2     A.  It sounds like verbiage I would use.
3     Q.  And fair to say that this was
4  Delaware's position regarding AWP during the
5  relevant time period?
6     A.  Yes.
7     Q.  If I could ask you to turn to the
8  Schedule 1, which is in the Abbott cross-notice
9  which is in front of you.  I believe you have
10  Schedule 2 open.
11       I'd like to talk about the DMACs that
12  were established in 1996.
13       Looking at the products listed in
14  Schedule 1, can you tell me whether these
15  products had a DMAC established?
16     A.  Yes.
17     Q.  Would you please do so?
18     A.  Most likely all of these have a DMAC
19  established.
20       The only ones I might question is
21  whether Vancomycin had DMACs, but if you tell me
22  that they were multisource, given all the

Page 400

1  different methods of unique product preparation,
2  that's the only thing that I would say might not.
3     Q.  Okay.  So for the rest of the products,
4  there were DMACs that were established, other
5  than, potentially, the Vancomycins that were the
6  Add-Vantage packaging; is that correct?
7     A.  Correct.
8     Q.  And the Vancos that had the Add-Vantage
9  may or may not have had DMACs?
10     A.  Correct.
11     Q.  How would we learn whether there were
12  DMACs for these Vanco products?
13     A.  Should be able to go in online on the
14  NDC and lookup function of the DMMA website and
15  put in the date of service that you'd be
16  interested in and it would tell you whether it
17  had state MAC or not.
18     Q.  So if I went to that website, could I
19  learn whether DMACs were established for these
20  products in 1997?
21       MS. HEALY SMITH:  Objection.
22       THE WITNESS:  I don't believe it would

Page 401

1  specifically tell you what date it was
2  established.  I think it would tell you what the
3  rate of reimbursement would be.
4  BY MS. RAMSEY:
5     Q.  Is there any way to learn the date on
6  which DMACs were established for the products
7  listed on Schedule 1?
8     A.  There would be a way to tell which date
9  we implemented that reimbursement rate.  What
10  date it was actually proposed or suggested is
11  different from what day we implemented it on.
12     Q.  Do you have any knowledge about the
13  date of implementation for the products listed on
14  Schedule 1?
15     A.  Not off the top of my head.
16     Q.  But the website that you referenced
17  earlier would have historical knowledge, to the
18  extent a -- as a website can have knowledge, it
19  would have information relating to the date of
20  implementation?
21     A.  Not the implementation.
22     Q.  Okay.

33 (Pages 398 to 401)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Newark, DE

Page 422

1  litigation relating to AWP or drug pricing.
2       MS. HEALY SMITH: I'm going to explain
3  my objection on the record to the form.
4       I think this witness could only testify
5  what request came to the EDS office where the
6  claims are processed and not what Delaware,
7  elsewhere, either the agency or other agencies
8  have received due to the different location.
9  BY MS. RAMSEY:
10      Q.  If you can provide an answer, please do
11 so.
12      A.  I have not received anything of the
13 nature that you suggested.
14      Q.  And in your personal capacity, you had
15 never received a directive to retain documents
16 relating to the subject matters that we've been
17 discussing over the last two days?
18      A.  Only so far as I was notified of the
19 delivery of the subpoena and asked to retain
20 records according to the Dey subpoena.
21      Q.  And that Dey subpoena was issued within
22 the last month or so?

Page 423

1       A.  No, that was in the summer sometime.
2       MR. CYR: It was in July, I believe.  I
3  don't have it with me, but I believe it was in
4  July.
5       THE WITNESS: I believe it was, yes.
6       MS. HEALY SMITH: July 22nd.
7  BY MS. RAMSEY:
8       Q.  Okay.  So prior to July 22nd or
9  thereabouts of 2008, you had not received any
10 directive to either collect or -- collect
11 documents that would be pertaining to the
12 subjects we've discussed today or to retain the
13 documents?
14      A.  No.
15      Q.  Have you ever -- strike that.
16      Has Delaware ever had any
17 communications with representatives from Abbott
18 relating to Delaware's reimbursement methodology?
19      MS. HEALY SMITH: Objection.
20      THE WITNESS: I've had conversations
21 with the -- with various Abbott representatives.
22 Whether we circled specifically around or talked

Page 424

1  about reimbursement, I couldn't recollect
2  specifically.
3  BY MS. RAMSEY:
4       Q.  What Abbott representatives have you
5  had contact with?
6       A.  Off the top of my head, the most recent
7  one would be Doug Crampel, but there's others,
8  too.
9       Q.  Who is Doug Crampel?
10      A.  I believe he's a government sales
11 representative or a government representative for
12 Abbott.
13      Q.  And what did your conversations pertain
14 to?
15      A.  Probably products, preferred drug list
16 levels, whether it was on or off, DUR board
17 activity.  I, actually, have been interacting
18 with Doug for several years, so we would have
19 chatted about families.
20      Q.  Is he someone you consider a friend?
21      A.  An acquaintance.
22      Q.  An acquaintance.

Page 425

1       And when did you first meet Mr.
2  Crampel?
3       A.  Somewhere around 1998.
4       Q.  And how did you come to meet him?
5       A.  At EMPAA.
6       Q.  Have all of your communications with
7  Mr. Crampel been in the EMPAA context?
8       A.  No.
9       Q.  What other context have you had
10 conversations with Mr. Crampel?
11      A.  About Abbott products, coverage, he
12 attends DUR board meetings as a public attendee.
13 He attends the P and T meetings as a public
14 attendee.
15      General, what I would consider,
16 Medicaid pharmaceutical representative liaison-
17 type contact.
18      Q.  And what types of conversations would
19 you have with Mr. Crampel relating to products?
20      A.  Whether a drug -- one drug was better
21 than another drug, whether it was cost-effective
22 for the program compared to other drugs in the

39 (Pages 422 to 425)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Newark, DE

Page 426

1  same therapeutic category, how it was
2  administered, whether it was self-administered or
3  administered in a physician's office, just --
4      Q.   Is he a drug rep, would you say?
5      A.   Not necessarily a drug rep, because I
6  believe that my understanding of manufacturer's
7  industry right now is that they have specialized
8  personnel who -- who interact either with managed
9  care organizations or with government entities.
10  And they are not what you would consider a sales
11  rep that would call on a physician's office or a
12  pharmacy.
13          That's my understanding of the
14  profession.
15      Q.   And do you recall the names of any
16  other Abbott employees that you have had
17  communications with?
18      A.   I can't recall the names.  I can see
19  the faces.  And I know I've had conversations at
20  the Western Medicaid Pharmacy Administrator's
21  Association, but I cannot remember the person's
22  name.

Page 427

1      Q.   Would they be conversations similar to
2  those or on the topics that you discussed with
3  Mr. Crampel?
4      A.   Yes, they would be similar.
5      Q.   Okay.  And did any of these
6  communications relate to the subject of how much
7  the State of Delaware would pay for Medicaid
8  reimbursement?
9      A.   I can't recall the specific discussion
10  that we had that conversation, no.
11          MS. RAMSEY:  Now, I believe that I
12  don't have any further questions; however, it's
13  12:30 and I know the witness wanted to take a
14  lunch break about now.
15          So since we have to resume, I don't
16  want to pass the witness until after lunch so I
17  can review my notes to ensure that I don't have
18  any additional witnesses.  But I believe I am by
19  and large done, say, five minutes for a follow-up
20  question that I may have to ask the witness.
21          MS. HEALY SMITH:  Okay.
22          THE VIDEOGRAPHER:  All right.  Off the

Page 428

1  record at 12:30.
2          (Lunch recess taken.)
3          THE VIDEOGRAPHER:  We are on the record
4  at 1:31.
5  BY MS. RAMSEY:
6      Q.   Ms. Denemark, if I could have you pull
7  out Dey Exhibit 607, which was marked yesterday.
8          And this was one of the documents that
9  you brought with you to the deposition and was
10  produced to us yesterday.
11      A.   Okay.
12      Q.   Just -- can you please read -- first of
13  all, is this your handwriting?
14      A.   Yes.
15      Q.   And you prepared this document?
16      A.   Yes.
17      Q.   And why did you prepare this document?
18      A.   Because I was asked questions related
19  to the survey that was done for the Division
20  related to ingredient cost.
21      Q.   What was the name of the company that
22  undertook that study?

Page 429

1      A.   Heritage.
2      Q.   Heritage.
3          So we've referred to this as the 2001
4  study or the Heritage study; is that correct?
5      A.   Correct.
6      Q.   Could you please read the handwriting
7  that starts with the symbol at?
8      A.   Yes.
9          This is not in reference to that study,
10  though.
11      Q.   Okay.  What is that handwriting in
12  reference to?
13      A.   I was reviewing the OIG study of 1996,
14  as well.
15      Q.   The one pertaining to Delaware's
16  reimbursement as of 1996?
17          MS. HEALY SMITH:  Objection.
18          THE WITNESS:  I'm sorry.  It is
19  regarding the Heritage study.  So it says, at
20  time of study, national average, 11.02, how
21  Michigan AWP minus 13.5.
22          It says, Rite would provide inform,

40  (Pages 426 to 429)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 446

1  utilized this Most Favored Nation definition with
2  respect to U&C; is that correct?
3      A.  Yes.
4      Q.  I asked you earlier about whether
5  Delaware conducted any surveys or had any studies
6  conducted relating to the costs to dispense drugs
7  or the provider costs related to dispensing of
8  drugs between 1991 through 2001, correct?
9      A.  Correct.
10     Q.  Similarly for -- were any studies
11 conducted by Delaware or did Delaware order any
12 studies conducted relating to the costs of
13 dispensing for home IV pharmacies?
14     A.  Not that I'm aware of.
15     Q.  Did you order any of these studies?
16     A.  No.
17     Q.  Okay.  Do you think you would be aware?
18     A.  Yes.
19     Q.  Okay.  I'm going to have you quickly
20 look at Dey Exhibit 111.
21         MS. HEALY SMITH:  611?
22         MS. RAMSEY: 611.  I'm sorry.  Which

Page 447

1  was the meeting notes from the 1995 Richmond
2  meeting.
3         THE WITNESS:  Okay.
4  BY MS. RAMSEY:
5      Q.  Now, there are three officials from
6  HCFA that were present at this meeting, Mike --
7  do you know how to pronounce that last name?
8      A.  Keogh.
9      Q.  Estelle Chisholm and Sue Gaston,
10 correct?
11     A.  That's what the record -- notes say,
12 yes.
13     Q.  Do you recall those individuals being
14 at the 1995 meeting?
15     A.  No.
16     Q.  Okay.  Just because time has gone by?
17     A.  Yes.
18     Q.  Who are Mike Keogh and Estelle
19 Chisholm?
20     A.  You know, I really don't recall Estelle
21 at all.
22         Mike Keogh, I had follow-up

Page 448

1  interactions with him because he went on after
2  this time to work on drug rebate disputes between
3  the labelers and the states when they were at an
4  impasse.
5      Q.  And Sue Gaston, as we just saw, was
6  someone at HCFA that you would communicate with
7  from time to time regarding Medicaid
8  reimbursement issues?
9      A.  Yes.  And at the time, I believe that
10 she had some interaction on federal upper limits.
11     Q.  Okay.  Do you remember the reaction of
12 any of these individuals to the results that were
13 presented at the 1995 meeting relating to the
14 costs -- or the discounts off AWP for which
15 providers could acquire drugs?
16     A.  I don't remember.
17         MS. HEALY SMITH:  Objection.
18         THE WITNESS:  I don't remember at all.
19 BY MS. RAMSEY:
20     Q.  Do you recall whether they provided any
21 input or reactions one way or the other?
22     A.  No.

Page 449

1         MS. HEALY SMITH:  Objection.
2  BY MS. RAMSEY:
3      Q.  Do you recall whether the HCFA
4  officials indicated they would make
5  recommendations relating to Medicare
6  reimbursement based on the results that OIG had
7  found?
8         MS. HEALY SMITH:  Objection.
9         THE WITNESS:  I have limited
10 recollection of this meeting in general, and
11 nonspecific to your question.
12 BY MS. RAMSEY:
13     Q.  Okay.  Is there anything that you
14 recall from the 1995 meeting that I have not
15 asked you about?
16     A.  Only that I really enjoyed walking
17 around the streets at Richmond at night and
18 looking at the statutes.
19     Q.  It's a nice city.
20         But there's --
21     A.  Nothing specific to the topic, no.
22     Q.  Okay.  And similar, for the 1994, which

45  (Pages 446 to 449)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

# Jerry Wells
# (Florida) (30(b)(1))

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

--------------------------------X 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:         )

U.S. ex rel. Ven-A-Care of the    ) Judge Patti B.

Florida Keys, Inc., v. Abbott     ) Saris

Laboratories, Inc., No.           )

06-CV-11337-PBS; U.S. ex rel.     ) Magistrate Judge

Ven-A-Care of the Florida Keys,   ) Marianne Bowler

Inc. v. Abbott Laboratories, Inc.,)

No. 07-CV-11618-PBS; U.S. ex rel. )

Ven-A-Care of the Florida Keys,   )  DEPOSITION OF

Inc. v. Dey, Inc., et al., No.    )   JERRY WELLS

05-11084-PBS; U.S. ex rel.        )

Ven-A-Care of the Florida Keys,   ) DECMEBER 15, 2008

Inc., et al. v. Boehringer        )  TALLAHASSEE, FL

Ingelheim Corp., et al., No.      )

07-10248-PBS                      )

--------------------------------X

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                        Tallahassee, FL

Page 46

1     A.  No, that's not true.  Waterford
2 irrigation is not necessarily injectable, but the
3 others are.
4     Q.  Was it your understanding that the
5 federal upper limit program never had federal
6 upper limits for injectable drugs?
7     A.  At least, initially, it did not address
8 injectable drugs.
9     Q.  What's your basis for that
10 understanding?
11    A.  That was their policy.  They were
12 looking at controlling the cost the -- the
13 state's reimbursed for oral prescription drugs,
14 oral and topical.
15        MR. BREEN:  Chris, just so the record's
16 clear, when you -- when you or the witness use
17 the term "injectable," are you also using that to
18 include drugs that are infused by gravity or by
19 pump versus an injection, like a shot?
20        MR. COOK:  That would be my
21 understanding as well.
22        MR. BREEN:  I just want to make sure

Page 47

1 the witness is -- that you guys are talking about
2 the same thing.
3 BY MR. COOK:
4     Q.  How are you aware of what federal
5 policy was with respect to establishing federal
6 upper limits?
7     A.  They published it in the Code of
8 Federal Regulations, and I had a number of
9 conversations with staff at the Healthcare
10 Financing Administration.
11    Q.  Which staff at the federal -- when you
12 say the Healthcare Financing Administration,
13 that's HCFA, correct?
14    A.  That's HCFA, or what is now CMS.
15    Q.  Who at HCFA did you speak to regarding
16 the scope of the federal upper limit program?
17    A.  I remember some names.  I don't
18 remember the name of the individual who developed
19 the first administrative rule for federal upper
20 limit pricing, but he was an ex-Merck employee
21 that had gone to work for the Healthcare
22 Financing Administering, but I don't recall his

Page 48

1 name.  Larry Reid is still at the Healthcare
2 Financing, or CMS.  I talked with him at some
3 length about that and with some other people
4 whose names I don't recall.  That's many years
5 ago.
6     Q.  How many years ago -- that is my next
7 question.  Do you recall when it was that these
8 conversations took place?
9     A.  The late '80s, early '90s, ongoing,
10 until I left state employment.
11    Q.  Do you recall any specific
12 conversations that related to whether or not
13 injectable or infusion drugs, including those
14 listed on Pages 10 and 11 of Exhibit 1002, would
15 be included within the federal upper limit
16 program?
17    A.  No.  As I said, I think they excluded
18 them.  It was not their intent to put federal
19 upper limit prices on those drugs.
20    Q.  Do you know why it was that HCFA --
21 strike that.
22        Were you ever told by anyone at HCFA

Page 49

1 why it was that HCFA intended to exclude
2 injection and infusion drugs from the federal
3 upper limit program?
4        MS. ST. PETE-GRIFFITH:  Object to form.
5        THE WITNESS:  I don't recall.
6 BY MR. COOK:
7     Q.  From your conversations with Larry Reid
8 and others at HCFA, were you able to infer why it
9 was that the federal government excluded
10 injection and infusion drugs from the federal
11 upper limit program?
12        MS. WALLACE:  Objection.
13        MS. ST. PETE-GRIFFITH:  Objection.
14        THE WITNESS:  I don't think that I was
15 ever satisfied or got a satisfactory answer for
16 my purposes or that issue, but I just don't
17 recall.  That's many years ago.
18 BY MR. COOK:
19    Q.  Did you seek a satisfactory answer?
20        MS. ST. PETE-GRIFFITH:  Object to the
21 form.
22        THE WITNESS:  I think we had some

13  (Pages 46 to 49)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                        Tallahassee, FL

Page 50

1  discussions about it because I felt like they
2  should, and they had some reasons that, as I
3  said, I don't think I was ever satisfied with,
4  but I don't even recall what their reasons were.
5  BY MR. COOK
6      Q.  Do you recall expressing to individuals
7  at HCFA your belief that injection and infusion
8  drugs should be included within the federal upper
9  limit program?
10         MS. ST. PETE-GRIFFITH:  Object to the
11  form.
12         THE WITNESS:  I don't think it was
13  specific to injectable drugs.  They -- they chose
14  not to put federal upper limit prices on a number
15  of drugs that I felt like they should have; over-
16  the-counter products that sometimes we
17  reimbursed, for instance.  I felt like it should
18  be a more expansive program, and I felt like they
19  should update it more frequently than they
20  planned to update it.
21  BY MR. COOK:
22      Q.  What was the context in which you

Page 51

1  expressed these beliefs to representatives of
2  HCFA?
3         MS. ST. PETE-GRIFFITH:  Object to the
4  form.
5         THE WITNESS:  I don't understand your
6  question.
7  BY MR. COOK:
8      Q.  Sure.  Were these one-on-one telephone
9  conversations or were they group meetings in
10  which you expressed these beliefs?
11      A.  I probably would say both.
12      Q.  Would it also have included in-person
13  meetings with individuals from HCFA?
14         MS. ST. PETE-GRIFFITH:  Object to the
15  form.
16         THE WITNESS:  That would have been
17  group meetings, and several of us met with HCFA
18  staff in Atlanta and Washington on a number of
19  these issues.
20  BY MR. COOK:
21      Q.  Although you can't put a specific date
22  on the conversations relating to the federal

Page 52

1  upper limit program, can you give me a time range
2  in which these conversations, specifically with
3  respect to what should and should not be in the
4  federal upper limit program, took place?
5         MS. ST. PETE-GRIFFITH:  Object to the
6  form.
7         THE WITNESS:  I would think that that
8  started about 1987 and continued until I left.
9  BY MR. COOK:
10      Q.  Why did you urge the federal government
11  to expand the federal upper limit program beyond
12  simply oral and topical prescriptions?
13         MS. ST. PETE-GRIFFITH:  Object to form.
14         MS. WALLACE:  Objection.
15         THE WITNESS:  Because we did not have
16  staff at Florida Medicaid, and I felt like most
17  other states did not have the staff and the
18  expertise to gather all the necessary data and
19  establish those pricing restrictions, and I felt
20  like it should be the federal government's
21  responsibility to do it centrally rather than
22  have fifty individual efforts out there trying to

Page 53

1  do it.
2  BY MR. COOK:
3      Q.  In your experience, did the federal
4  upper limit program work as an effective cost
5  containment measure for oral and topical
6  prescriptions?
7         MS. ST. PETE-GRIFFITH:  Object to the
8  form.
9         THE WITNESS:  I felt like there was
10  some deficiencies in the program related to the
11  inability to get it updated in a timely manner.
12  BY MR. COOK:
13      Q.  Other than your belief that the
14  updating may not have been as quick as it could
15  have been, were there any other deficiencies in
16  the federal upper limit program --
17      A.  I had some --
18      Q.  -- that is, relating to oral and
19  topical?
20      A.  I had some personal reservations about
21  the way it was designed, but it was effective in
22  controlling or setting a ceiling on the

14  (Pages 50 to 53)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry        PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                         Tallahassee, FL

Page 54

1    reimbursement for some of those drugs.
2        Q.  Other than the resource issue of HCFA
3    having more resources than the states, did you
4    have a belief as to why it would be good policy
5    for the federal upper limit program to be
6    extended to drugs such as those contained or
7    listed in Exhibit 1002?
8            MS. ST. PETE-GRIFFITH:  Object to the
9    form.
10           MS. WALLACE:  Objection.
11           THE WITNESS:  You're going to have to
12   restate that.
13   BY MR. COOK:
14       Q.  Sure.  What was the purpose of the
15   federal upper limit program as you understood it
16   back in the 1980s?
17           MS. ST. PETE-GRIFFITH:  Object to the
18   form.
19           THE WITNESS:  The purpose was to
20   contain costs that prescription drug -- various
21   state prescription drug programs spent buying
22   generic prescription drugs.

Page 55

1    BY MR. COOK:
2        Q.  And did you understand that there was a
3    need to contain costs relating to generic drugs
4    beyond simply oral and topical prescriptions in
5    the 1980s?
6        A.  I felt like if you're going to have a
7    cost control program, you ought to make it
8    applicable to everything you reimburse, not just
9    isolate the oral tablets and capsules and
10   topicals.
11       Q.  You indicated that you never got a
12   satisfactory answer from HCFA.  Did you ever get
13   any answer from someone at HCFA as to why the
14   federal upper limit program was not expanded to
15   include injection and infusion products?
16           MS. WALLACE:  Objection.
17           MS. ST. PETE-GRIFFITH:  Object to the
18   form.
19           THE WITNESS:  I may have.  These were
20   philosophical discussions, and we had lots of
21   differences of opinion about what ought to and
22   ought not to be done in managing the prescription

Page 56

1    drug program.  I don't recall the answer.
2    Obviously, it didn't stick in my mind or I'd tell
3    you what it was.
4    BY MR. COOK:
5        Q.  And to be clear, the -- your inability
6    to testify about why it was that HCFA told you is
7    a function of the passage of time, correct?
8            MS. ST. PETE-GRIFFITH:  Object to the
9    form.
10           MS. WALLACE:  Objection.
11           THE WITNESS:  Yeah, I think the
12   function of the passage of time, and it wasn't --
13   apparently, wasn't satisfactory enough to stick.
14   BY MR. COOK:
15       Q.  Was one purpose for Florida
16   establishing its own state MAC to make up for the
17   shortcomings of the federal upper limit program?
18           MS. ST. PETE-GRIFFITH:  Object to the
19   form.
20           MS. WALLACE:  Objection.
21           THE WITNESS:  Specifically, I wanted to
22   have the ability to do a more timely update to be

Page 57

1    able to track the commodities nature of the
2    prescription drug generic market and to allow us
3    more flexibility in applying those cost controls
4    to additional products than that very narrow list
5    that the feds were using.
6    BY MR. COOK:
7        Q.  How did you go about establishing state
8    MACs once the program was authorized by the
9    Florida legislature?
10       A.  Actually, it wasn't authorized by the
11   Florida legislature initially.  We put it in the
12   administrative rule as part of our reimbursement
13   logic.
14       Q.  About when was that?
15       A.  I think that was in the early '90s when
16   I first came back to Medicaid.
17           MS. WALLACE:  Mr. Cook, I just, again,
18   want to reiterate, this has been covered quite
19   extensively in his prior transcripts.
20           MR. COOK:  All right.
21   BY MR. COOK:
22       Q.  How did you go about setting state MACs

15  (Pages 54 to 57)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

# Jerry Dubberly
# (Georgia) (30(b)(6))

Atlanta, GA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

---------------------------------X

Atlanta, GA

Page 110

1     A.  I have not.
2     Q.  Did you bring any documents with you
3  today?
4     A.  I did.
5     Q.  Can I see them?
6     A.  Sure.
7        MR. SULLIVAN:  For the record, Ven-A-
8  Care objects to any inquiry into matters covered
9  by the common interest privilege or the attorney-
10  client privilege or the work product doctrine.
11        I don't know what documents the witness
12  has today, but Ven-A-Care insists on protecting
13  that -- all of those privileges and protections.
14        So we would strongly suggest that
15  counsel for the witness make sure that privilege
16  is -- remains intact.
17        MS. TOWNES:  Did you want this?
18        MR. ROBBEN:  Just a blank pad?
19        MS. TOWNES:  Yes.
20        MR. ROBBEN:  So just let the record
21  reflect that I've been handed a small Redweld
22  with some documents in it that Mr. Dubberly

Page 111

1  brought with him to the deposition today.  I
2  intend to look at them at a break.
3        I just asked counsel for the Relater
4  and for the United States and for the witness
5  whether or not any documents of what Mr. Dubberly
6  brought other than his blank notepad were removed
7  from here on the grounds of privilege.
8        MS. TOWNES:  No.
9        MR. ROBBEN:  Okay.  I'll take a look at
10  these at a break, just to --
11        MS. TOWNES:  You can sit them --
12     Q.  (By Mr. Robben)  Now, a little while
13  ago, Mr. Lavine asked you if you had any
14  understanding of the allegations in the lawsuit,
15  and I think you said that in general you do.
16     A.  Yes.
17     Q.  Is that a -- do I have that right?
18        What is your understanding?  Can you
19  explain it.
20     A.  My understanding is that there is an
21  allegation that manufacturers reported an AWP
22  price that was higher than some unknown

Page 112

1  definition of what AWP is.
2        And by way of doing that with state --
3  states using AWP as a reimbursement methodology,
4  states may have overpaid for drugs.
5        MR. LAVINE:  Let me just object to
6  form, please.
7     Q.  (By Mr. Robben)  When you say an
8  unknown definition of what AWP is, what do you
9  mean by that?
10        MR. LAVINE:  Object to form.
11     A.  There's no federal definition.  There's
12  nothing in statute that defines what AWP is and
13  how it's to be calculated.
14     Q.  (By Mr. Robben)  When did you first
15  learn about this particular lawsuit?
16        MR. LAVINE:  Object to form.
17        MS. TOWNES:  Can you clarify whether
18  you're asking him when Georgia first found out or
19  he personally.
20        MR. ROBBEN:  Sure.
21     Q.  (By Mr. Robben)  Well, when did Georgia
22  first find out about the lawsuit?

Page 113

1     A.  The first time that I heard about the
2  Ven-A-Care is the -- when I actually received the
3  subpoena.  I wasn't aware of the -- the case by
4  that name at that time.
5     Q.  Had you or anybody from your department
6  ever met with Ven-A-Care or a representative of
7  Ven-A-Care?
8     A.  No, I have not.
9     Q.  Do you know if anybody from the State
10  of Georgia has met with anybody from Ven-A-Care?
11     A.  I'm not aware of anyone who has.
12     Q.  Was Georgia aware of other lawsuits
13  that make that same AWP allegation?
14     A.  I'm aware of the conversations with
15  other attorneys who were suing manufacturers on
16  the same topic, but I'm not aware of the name of
17  a case.
18     Q.  When you say "other attorneys," who do
19  -- do you know who those attorneys were
20  representing?
21     A.  I do not know who they were
22  representing.  They were coming in to sue

Henderson Legal Services, Inc.

dd23118e-9e82-4fd1-afbb-155015bf3b99

Atlanta, GA

Page 262

1  you -- you have some numbered responses, and it
2  says in the italicized portion at the top, "The
3  change in the network reimbursement rate
4  effective July 11, 2004, was a decision from the
5  2004 legislative session as a result of H.B. 1181
6  in which the conference committee handed down a
7  pharmacy provider network reimbursement rate
8  change from AWP minus 10 percent to AWP minus 11
9  percent."
10       Do you see that?
11     A.  Yes.
12     Q.  I read that -- I read that correctly?
13     A.  You did.
14     Q.  What was H.B. 1181?
15     A.  It's the bill that established the
16  budget for the State.
17     Q.  Was this -- is this the -- or an
18  example of the process you described before where
19  the legislature would set a budget and then the
20  department would set its reimbursement according
21  to the budgeted funds?
22     A.  Some -- yes, essentially.

Page 263

1     Q.  Okay.  What do I have -- is there
2  something I'm missing?
3     A.  Well, the department proposes the
4  budget to the legislature.  The legislature then
5  reviews the -- reviews the budget and may change
6  the budget.  But it's -- the department submits a
7  proposed budget.
8     Q.  In this circumstance, do you remember
9  whether the department proposed to change
10  reimbursement from AWP minus 10 to AWP minus 11?
11     A.  They did.
12     Q.  So Georgia Medicaid proposed to the
13  legislature that change.
14     A.  Yes.
15     Q.  And did they propose exactly this
16  change, or did they propose some change that
17  worked its way down to this?
18     A.  I do not recall.
19     Q.  And then at the end of that paragraph
20  in italics, it says, "Attached you would find a
21  copy of the documentation from the conference
22  committee as well as the signature page of the

Page 264

1  conference committee members."
2       But the fax that I have only has three
3  pages.
4       Do you remember what that additional
5  documentation consisted of?
6     A.  I remember that it had the signature of
7  the individuals who were on the committee and the
8  notes from -- the notes from the committee.  But
9  I -- I can't speak any more specifically than
10  that.
11     Q.  When you say the "notes from the
12  committee," is that a type of legislative
13  history?
14     A.  It's -- yeah.  It's from the conference
15  committee that worked on House Bill 1181.
16     Q.  And does it -- what does that type of
17  document contain?  What does it -- what -- what
18  are its terms?  What does it say?
19     A.  I cannot recall.
20     Q.  If you can't recall specifically, have
21  you seen documents like that in other
22  circumstances that you do remember?

Page 265

1     A.  No.
2     Q.  Do you remember what the rationale was
3  for the change?
4     A.  The rationale for the change was to
5  attempt to get closer to the actual reimbursement
6  -- the actual acquisition cost.  But the decision
7  to pursue this was made prior to my employment at
8  the department.
9     Q.  I see.
10       I have some questions about an exhibit
11  you looked at earlier today.  It's Exhibit 3.  It
12  was the collection of the state plan pages.
13       If you look at that first page at the -
14  - the text opposite October 29, 1987, see under 1
15  it talks about the reimbursement for covered
16  multiple source drugs?
17     A.  Yes.
18     Q.  As I follow this down, I read
19  subparagraph a to be talking about the federal
20  upper limit; is that right?
21     A.  Yes.
22     Q.  And then I see subparagraph b is the

Henderson Legal Services, Inc.

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 282

1        I just want to confirm.
2        MR. LAVINE:  Object to form.
3        A.   That was the answer, but we're talking
4   about two different things.
5        Q.   (By Mr. Robben)  We are talking about
6   two different things?
7        A.   Uh-huh.
8        Q.   What -- what -- what was -- putting
9   aside my prior questions, has Georgia Medicaid
10  ever made a comparison between the URA or the AMP
11  of a product and its A -- AWP?
12       A.   Not to my recollection.
13       Q.   Has it -- has Georgia Medicaid ever
14  performed a comparison between URA or AMP for a
15  drug product and its WAC?
16       A.   No.
17       Q.   Has Georgia Medicaid ever performed a
18  comparison between URA and AMP and any component
19  of the Medicaid reimbursement formula?
20       MR. LAVINE:  Object to form.
21       A.   Not that I can recall right now.
22       Q.   (By Mr. Robben)  Can you locate Exhibit

Page 283

1   16.
2        Do you remember Mr. Lavine asking you
3   some questions about this document?
4        A.   I do.
5        Q.   At the -- toward the end of the
6   document, there's an Attachment A.
7        A.   Okay.
8        Q.   And it says "Covered Pharmaceuticals,"
9   and then it lists two NDCs with product
10  descriptions.
11       Do you see that?
12       A.   I do.
13       Q.   Is the -- is this contract and the
14  provisions of this contract limited to these
15  pharmaceuticals on this Attachment A?
16       A.   It is.
17       MR. ROBBEN:  Why don't we go off the
18  record for a second.
19       THE VIDEOGRAPHER:  Going off the record
20  at 4:06 p.m.
21       (Deposition in recess, 4:06 p.m.
22  to 4:07 p.m.)

Page 284

1        THE VIDEOGRAPHER:  This is the
2   continuation of tape No. 5.  Going on the record
3   at 4:07 p.m.
4        Q.   (By Mr. Robben)  A few minutes ago I
5   asked you about -- about --
6        MR. LAVINE:  Why don't we go back off
7   the record for a second.
8        THE VIDEOGRAPHER:  Going off the record
9   at 4:07 p.m.
10       (Deposition in recess, 4:07 p.m.
11  to 4:08 p.m.)
12       THE VIDEOGRAPHER:  This is a
13  continuation of tape No. 5.  Going on the record
14  at 4:08 p.m.
15       Q.   (By Mr. Robben)  Mr. Dubberly, have you
16  ever heard of AWP referred to as "ain't what's
17  paid"?
18       A.   Yes.
19       Q.   Is that a fairly common phrase?
20       A.   Yes, it is.
21       Q.   Common in the Medicaid director
22  circles?

Page 285

1        A.   In Medicaid as well as other pharmacy
2   circles.
3        Q.   Are you a pharmacist?
4        A.   I am.
5        Q.   Is that something that you've heard
6   throughout your pharmacy career?
7        A.   Yes.
8        Q.   Is that something that's been well
9   known to Georgia Medicaid?
10       A.   Yes.
11       MR. LAVINE:  Object to form.
12       Q.   (By Mr. Robben)  For how long has that
13  been well known to Georgia Medicaid?
14       MR. LAVINE:  Object to form.
15       MR. SULLIVAN:  Object to form.
16       A.   I don't know when the department first
17  had knowledge of that as an entity, but it has
18  been common knowledge in the industry for quite
19  some time.
20       Q.   (By Mr. Robben)  Has it been common
21  knowledge at least since the 1980s?
22       MR. LAVINE:  Object to form.

72  (Pages 282 to 285)

dd23118e-9e82-4fd1-afbb-155015bf3b99

Atlanta, GA

Page 302

1  the top.
2      A.  Yes.
3      Q.  Are you prepared, sir, to testify today
4  about all of those topics on behalf of the
5  Georgia Medicaid program?
6      A.  Yes.  Yes, I'm prepared to answer to
7  these within my knowledge.
8      Q.  If you would keep going in Exhibit 31,
9  sir, past the -- topics of inquiry, you'll
10  come across a couple of schedules, a Schedule I
11  and a Schedule II, those pages.  They list
12  various drug products along with their NDC.
13      A.  Yes, I see them.
14      Q.  Are you -- let -- let's start with
15  Schedule I.
16          Are you familiar with the products
17  listed in Schedule I of Exhibit 31?
18      A.  I am.
19      Q.  Do you recognize those products to be
20  products that are used in the home infusion
21  setting?
22      A.  They can be used in home infusion

Page 303

1  setting.
2      Q.  Are you familiar with the term "home
3  infusion"?
4      A.  I am.
5      Q.  And what's your understanding of the
6  term?
7      A.  An IV or admixture infusion that is
8  administered in -- in the home.
9      Q.  And would you agree that -- that most,
10  if not all, of the products that are listed on
11  Schedule I are products that can be administered
12  in the home infusion setting?
13      A.  They can.  There are some that cannot.
14      Q.  And which ones are those?
15      A.  Sodium chloride for irrigation and
16  sterile water for irrigation are not to be used
17  intravenously.
18          There are other sterile -- other
19  irrigation products listed here as well.
20      Q.  So setting aside the irrigation
21  products listed on Schedule I, would the
22  remainder of the products be products that can

Page 304

1  and are administered in home infusion setting?
2      A.  Yes.  That would be correct.
3      Q.  Are you aware -- let me start over.
4          In your experience, what type of
5  pharmacies dispense products such as those listed
6  in Schedule I to be used in a home infusion
7  setting?
8          MR. LAVINE:  Objection to form.
9      A.  The majority of pharmacies who
10  dispense these type medications would be home
11  health pharmacies.
12      Q.  (By Mr. Cole)  And when you say "home
13  health pharmacies," what do you mean by that?
14      A.  Those are pharmacies who -- who
15  dispense or prepare medications that are to be
16  administered in the home setting typically by a
17  home healthcare nurse.
18      Q.  Does the pharmacy benefit for the
19  Georgia Medicaid program cover products dispensed
20  by home health pharmacies?
21      A.  Yes.
22      Q.  If a home health pharmacy wanted to

Page 305

1  seek reimbursement from the Georgia Medicaid
2  program, would they follow the same procedure
3  that you described earlier today?
4      A.  Yes, they would.
5      Q.  Is there anything unique or different
6  about either the way a home health pharmacy would
7  submit a claim for a home infusion product or any
8  of the information that would be included with a
9  claim submitted by a home health pharmacy?
10      A.  No.  It would be identical to the
11  previous process.
12      Q.  As -- as far as you know, that has been
13  the case going back in time -- let me start over.
14          Has there ever been a time in the --
15  that you're aware of in the Georgia Medicaid
16  program where home infusion providers had a
17  different claim process than other pharmacies?
18      A.  Not to my knowledge.
19      Q.  Looking at the list of products in
20  Schedule I, do you have a sense of whether those
21  products -- the home infusion products listed in
22  Schedule I are included on the Georgia MAC list?

77 (Pages 302 to 305)

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 306

1        MR. LAVINE:  Object to form.
2        A.   I do not know without comparing to the
3    MAC list.
4        Q.   (By Mr. Cole)  Do you have a sense of
5    whether home infusion products in general are the
6    kinds of products that would appear on the
7    Georgia MAC list?
8        A.   They are not exempt from the MAC list.
9        Q.   What do you mean by that?
10       A.   We do not exclude home healthcare --
11   products used in home healthcare from MAC
12   determinations.
13       Q.   Earlier, sir, you testified that -- I
14   believe you said that the PBMs are responsible
15   for creating the MAC list, the Georgia MAC list;
16   is that right?
17       A.   That's correct.
18       Q.   And that they create those lists using,
19   I believe you said, proprietary algorithms?
20       A.   That's correct.
21       Q.   Does the Georgia Medicaid program have
22   any insight as to how that process works?

Page 307

1        MR. SULLIVAN:  Object to the form.
2        A.   We -- I have -- I have and the
3    department has no insight as to how our PBMs have
4    formulated their -- their MAC reimbursement --
5    the Georgia MAC reimbursement formula.
6        Q.   (By Mr. Cole)  So if I'm understanding
7    you correctly, the Georgia Medicaid program isn't
8    aware of any of -- any of the requirements or
9    elements that PBMs analyze or consider in coming
10   up with the Georgia MAC list.
11       MR. SULLIVAN:  Object to the form.
12       Q.   (By Mr. Cole)  Is that fair?
13       A.   Not to -- that is fair in determination
14   of the price.  The product does have to be
15   generally available on the market and other
16   things like that, which, you know, we -- we --
17   are stipulated.
18       But in terms of developing the price,
19   we are not aware of the -- any methodology or
20   formula used to develop the price.  We're not
21   privy to that.
22       Q.   Well, what about the products that go

Page 308

1    onto the list?
2        A.   The products that go on the list,
3    they're proposals to the department as to MAC
4    changes, and we review those changes and
5    authorize or decline their inclusion in the list.
6        Q.   And who proposes those to the
7    department?  Is that -- is that the PBM?
8        A.   Yes.
9        Q.   And what factors does the program
10   consider in deciding whether to approve or reject
11   those proposals?
12       A.   We look at the previous MAC rate for
13   that drug if it's a change in price.  We look at
14   the PBM's validation as to whether the drug is
15   readily available on the marketplace.
16       And those are really the two major
17   points that we review, is the drug available and
18   what is the magnitude of the change they're
19   proposing if it's a drug already on the list.
20       Q.   Earlier I asked you about how home
21   health pharmacies dispense products to be used in
22   the home setting.

Page 309

1        Could you, I guess, expand a little
2    bit, you know, sort of from A to Z how it is that
3    a home health pharmacy would dispense a product
4    to be used in the home setting.
5        MR. LAVINE:  Object to form.
6        Q.   (By Mr. Cole)  And to make it easier,
7    maybe we could use some of the products that are
8    listed on Schedule I, for instance, sterile water
9    or sodium chloride for injection.
10       Is your understanding, sir, that
11   those are diluents?
12       A.   Yes, they are.
13       Q.   So there would be a -- another product
14   such as, say for instance, Vancomycin that would
15   be diluted into the -- into the diluent?
16       A.   That's correct.
17       Q.   And if you could, just kind of take us
18   -- take me through that process of -- of how it
19   would work in practice for a home health pharmacy
20   that -- that needed to fill a prescription in the
21   home infusion setting.
22       A.   I'm not sure the department's in a

78  (Pages 306 to 309)

dd23118e-9e82-4fd1-afbb-155015bf3b99

# Michael Sharp
# (Indiana) (30(b)(1))

Sharp, R.Ph., Michael                                    March 28, 2008

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL         )

INDUSTRY AVERAGE WHOLESALE  )

PRICE LITIGATION              )

                             ) MDL NO. 1456

                             ) CIVIL ACTION:

                             ) 01-CV-12257-PBS

                             )

                             ) Judge Patti B. Saris

U.S. ex re. Ven-A-Care of   )

the Florida Keys, Inc., v.  )

Abbott Laboratories, Inc.,  )

et al. No. 06-CV-11337-PBS )


   VIDEOTAPED DEPOSITION OF MICHAEL SHARP, R.Ph.


   The videotaped deposition upon oral examination of

MICHAEL SHARP, R.Ph., a witness produced and sworn

before me, Aprille Lucas, RPR, Notary Public in and for

the County of Hamilton, State of Indiana, taken on

801ecc01-3fd8-4f6c-a3ac-f1645cffa8d3

Sharp, R.Ph., Michael                                March 28, 2008

Page 86

1   one of the compendia?
2       A.   Yes.
3       Q.   Do you know which compendia?
4       A.   Let's see, with Hook's that would have
5   been Medi-Span; with Meijer, that was also
6   Medi-Span; and with Partners Medical, I believe
7   that was First DataBank.
8       Q.   As a provider did you ever just simply
9   compare AWP price to the prices at which you could
10  actually acquire a drug?
11      A.   Yes.
12      Q.   And did you notice that AWPs were
13  oftentimes higher than the prices you would pay for
14  drugs?
15      A.   Yes.
16      Q.   Significantly higher?
17      A.   It depended on the -- it depended really
18  on the particular product you were looking at.
19      Q.   What about generics in comparison to
20  brand drugs, do you have an understanding of
21  whether -- and I'll refer to it as the spread;
22  that's the difference between what the provider

Page 87

1   would be paying for the product and the AWP figure.
2   Are you aware of how that spread compared for
3   generics versus brand?
4       A.   Yes.
5       Q.   What's your understanding of that?
6       MR. HENDERSON:  Objection, time frame.
7   BY MR. GABEL:
8       Q.   What was your understanding of that when
9   you were a provider?
10      MR. HENDERSON:  Objection, same objection.
11      A.   Can you supply me -- you said relative.
12  Can you supply me with some graduations --
13  BY MR. GABEL:
14      Q.   Did you understand that the spread on
15  generic drugs could vary depending on the
16  particular product at issue?
17      MR. HENDERSON:  Objection.
18  BY MR. GABEL:
19      Q.   There wasn't one consistent spread
20  between what a provider could acquire a drug at and
21  what the AWP would be?
22      MR. HENDERSON:  Objection.

Page 88

1       MR. LINNEWEBER:  Objection.
2       A.   For generic drugs I would agree with that
3   statement.
4   BY MR. GABEL:
5       Q.   For brand, there was a general --
6       A.   There was --
7       Q.   -- range that it would fall into?
8       A.   Excuse me, for brand name drugs there was
9   a -- there was in most instances a much better and
10  defined correlation between your acquisition cost
11  and the AWP that you were looking at.
12      Q.   For generics it could be all over the
13  map, is that fair to say?
14      MR. HENDERSON:  Objection.
15      A.   There was no consistent, you know, spread
16  between acquisition cost and AWP for the majority
17  of the generic drug products.
18  BY MR. GABEL:
19      Q.   Had you noticed spreads of the magnitude
20  of 100 percent?
21      A.   For?
22      Q.   For generics.

Page 89

1       A.   Yes, 100 percent and greater.
2       Q.   500 percent?
3       A.   Let's see here --
4       MR. HENDERSON:  Objection.
5       A.   I don't recall seeing anything that high,
6   but there's obviously lots of drugs, and my memory
7   is not that good.
8   BY MR. GABEL:
9       Q.   Was that something that was well known to
10  the provider community at the time?
11      MR. HENDERSON:  Objection, foundation.
12      MR. LINNEWEBER:  Objection.
13      A.   Can you state what that something is?
14  BY MR. GABEL:
15      Q.   That there were sometimes large spreads
16  between the acquisition cost for a drug and the
17  published AWP for a drug?
18      MR. HENDERSON:  Objection.
19      A.   Specifically what class of drugs?
20  BY MR. GABEL:
21      Q.   In generic drugs.
22      A.   Okay, I believe that it was well known in

23 (Pages 86 to 89)

Henderson Legal Services, Inc.

801ecc01-3fd8-4f6c-a3ac-f1645cffa8d3

Sharp, R.Ph., Michael                                    March 28, 2008

Page 162

1  realized, or attempting to return that margin to
2  Indiana Medicaid?
3      A.  I'm not aware of that, no.
4      Q.  Did you think that there was anything
5  improper about retaining that margin that was
6  realized on the ingredient cost component of the
7  Medicaid reimbursement?
8      A.  No.
9      Q.  Did you consider it to be illegal to do
10 so?
11     MR. HENDERSON:  Objection.
12     MS. FRICK:  Objection.
13     MR. LINNEWEBER:  Objection.
14     A.  I can't provide that level of
15 interpretation.
16 BY MR. GABEL:
17     Q.  Are you aware of something called DOJ
18 AWPs?
19     A.  Yes.
20     Q.  When did you first hear of something
21 called DOJ AWPs?
22     A.  I recall seeing something along those

Page 163

1  lines back around 2000 or 2001.  There may have
2  been a Medicaid bulletin that came out with that
3  rate information, but I don't recall, but obviously
4  in the course of business at Indiana Medicaid that
5  topic has come up from time to time, that rates
6  were released, I believe it was sometime around
7  2001.
8      Q.  When those rates were released, were you
9  involved to any extent in the decision of whether
10 Indiana Medicaid would adopt the DOJ AWPs?
11     A.  No, I was not.
12     Q.  Do you know who was?
13     A.  I do not know.  I don't have direct
14 knowledge of who would have been involved.
15     Q.  Have you been involved in any of Indiana
16 Medicaid's decision-making process with respect to
17 whether they would use DOJ AWPs?
18     A.  No, I haven't.
19     Q.  Do you know who has been involved in
20 that?
21     A.  It would have been Mark Shirley and
22 probably Pat Nolting.

Page 164

1      (Exhibit Abbott 955 marked for
2  identification.)
3  BY MR. GABEL:
4      Q.  I'll mark for you Abbott Exhibit 955.
5  This is a document that I printed off of the
6  Indiana Medicaid web site, Indiana Medicaid.com,
7  approximately two days ago. Have you seen this
8  document before?
9      A.  No, I haven't.
10     Q.  For the record, this is at the top
11 entitled Important Information, and it states, To
12 All Indiana Health Coverage Programs Pharmacy
13 Providers and All Providers Administering
14 Injections, and it's a two-page document.
15     So is this -- I take it this is not the
16 bulletin you were referencing that mentioned the
17 DOJ AWPs?
18     A.  It could have been, but I knew that there
19 was something that was sent out to providers
20 regarding the Department of Justice rates, but I
21 don't believe I've ever seen a specific document.
22     Q.  And ultimately that's something -- the

Page 165

1  issue of the DOJ AWPs and whether they would be
2  used by Indiana Medicaid just wasn't something
3  under your area of responsibility at any time?
4      A.  That's correct.
5      Q.  Do you know if an analysis was ever done
6  by Indiana Medicaid on how the DOJ AWPs compared to
7  the way Indiana was reimbursing for drugs before
8  the DOJ AWPs were implemented?
9      A.  I'm not aware of any.
10     Q.  Do you know if Indiana Medicaid did in
11 fact end up adopting the DOJ AWPs?
12     A.  I do not know if they did end up adopting
13 those.
14     Q.  Which AWPs -- let me step back.  What's
15 the source for AWP that Indiana Medicaid uses
16 today?
17     A.  First DataBank, NDDF Plus.
18     Q.  DDF Plus?
19     A.  It's the National Drug Data File Plus.
20 That's the label for the product.
21     Q.  And do you know where DDF Plus obtains
22 its AWP information?

42 (Pages 162 to 165)

801ecc01-3fd8-4f6c-a3ac-f1645cffa8d3

Sharp, R.Ph., Michael                           March 28, 2008

Page 178

1    Q.   Is that beginning at page JDIND 409?
2    A.   Yes.
3    Q.   Okay, so up to JDIND 00397, that is part
4  of the study, and the last pages beginning at 409
5  are a separate document?
6    A.   Yes.
7    MR. GABEL:  Why don't I correct the record,
8  and you can just rip those pages off the back, and
9  we will make Abbott Exhibit 957 as spanning JDIND
10  00270 through 408 [sic]. Everybody got that?
11    MR. HENDERSON:  Yes, fair enough.
12  BY MR. GABEL:
13    Q.   Studies like these were done every two
14  years, you say.  When did that first begin?
15    A.   I believe this was the first dispensing
16  fee study that was conducted for Indiana Medicaid.
17  The 2005 I believe was the first that was one done,
18  to the best of my knowledge.
19    Q.   Did you have any involvement in the
20  decision to have this study completed?
21    A.   No, this was actually required by
22  statute.

Page 179

1    Q.   By State statute?
2    A.   Yes, and there's a reference to the
3  statute here in the document.
4    Q.   Do you have any knowledge on why this was
5  a requirement?
6    MR. HENDERSON:  Objection.
7    MS. FRICK:  Objection.
8    A.   Yes.
9  BY MR. GABEL:
10    Q.   What's your knowledge on that?
11    A.   Lobbyists for the, either the Indiana
12  Retail Council or the Indiana Pharmacists Alliance,
13  were successful in passing legislation that
14  required the office to conduct the survey to assess
15  the appropriate levels of the fees.  So essentially
16  it was put into statute by interest groups that
17  support community pharmacies.
18    Q.   Is it your understanding that the
19  pharmacy groups were claiming that dispensing fees
20  were too low?
21    MR. HENDERSON:  Objection.
22    A.   That's not my understanding.  I don't

Page 180

1  know -- I don't think I have an understanding of
2  what their thoughts were at the time.
3  BY MR. GABEL:
4    Q.   Did you monitor the progress of the
5  proposed legislation as it came into being?
6    A.   No, I did not.
7    Q.   Do you have any understanding of why the
8  pharmacy groups requested such studies be
9  undertaken?
10    MR. HENDERSON:  Objection, asked and answered.
11    MR. LINNEWEBER:  Objection.
12    A.   I don't know that I have direct
13  knowledge, but I would assume that they want to try
14  to use this as a document to increase their
15  dispensing fee reimbursement.
16  BY MR. GABEL:
17    Q.   Do you know how Myers & Stauffer was
18  chosen to conduct this study?
19    A.   I don't know that -- I don't know the
20  details behind it, but I believe that it was put
21  into, after it was -- after it became part of the
22  statute, that it was included in a procurement as

Page 181

1  one of the tasks that they were to perform, and
2  having done this particular task in many other
3  states, they had experience to perform such an
4  analysis.
5    Q.   If you look at page three, the first page
6  of chapter one, it's JDIND 000272, it mentions that
7  Myers & Stauffer was engaged in similar studies for
8  18 other states.  Do you see that?
9    A.   Yes.
10    Q.   Have you ever reviewed any of the reports
11  or studies that Myers & Stauffer did for other
12  states?
13    A.   I briefly reviewed the report they had
14  done in the Commonwealth of Kentucky, looking at
15  dispensing fees and acquisition cost.
16    Q.   Any other states?
17    A.   I don't believe I've looked at any
18  particular reports that they have done outside of
19  Indiana besides the one in Kentucky.
20    Q.   Have you reviewed OIG reports in
21  connection with drug pricing issues?
22    A.   I have seen the reports and reviewed

46 (Pages 178 to 181)

Sharp, R.Ph., Michael                                          March 28, 2008

Page 182

1  reports that discussed differences in various
2  pricing benchmarks.  I can't recall the specific
3  titles.  I think there might have been two or three
4  different ones that compared WAC to AWP to
5  acquisition cost.  I can't recall the specific
6  titles.  It seems like there were two or three
7  different OIG reports out on that topic.
8      Q.  Do you know what the conclusion was with
9  respect to the comparison of AWPs to acquisition
10  cost?
11      A.  I do not recall.
12      MR. HENDERSON:  Objection.
13  BY MR. GABEL:
14      Q.  Do you recall when you reviewed those OIG
15  reports that you just referenced?
16      A.  It's probably been one and a half to
17  three years ago, or perhaps a little bit greater
18  than that.  There's nothing that's sticking in my
19  mind as to a specific report or date.
20      Q.  What was your purpose in reviewing those
21  reports?
22      A.  To review the findings of what they had

Page 183

1  discovered to see if it was anything different than
2  I had already known.
3      Q.  Was it anything different?
4      A.  No.
5      Q.  And the conclusions that they reached
6  with respect to the difference between AWP and
7  acquisition cost, how long had you known that there
8  was such a difference?
9      MR. HENDERSON:  Objection.
10      A.  I can't, in terms of specifics, I
11  couldn't tell you.  I mean I've always known that
12  there are differences in those amounts.  That may
13  have been one of the first analyses that I've seen
14  that tried to put a number on it, but.
15  BY MR. GABEL:
16      Q.  You state that you always knew that there
17  was a difference in the AWP amounts as opposed to
18  acquisition cost amounts.  Do you know of anyone in
19  your entire time as a provider or consultant or
20  State employee who actually held AWP out to be a
21  reflection of actual acquisition cost for
22  providers?

Page 184

1      MS. FRICK:  Objection.
2      MR. HENDERSON:  Objection.
3      A.  Well, the term reflection, there is a
4  reflection between acquisition cost and AWP for
5  certain drug products.
6  BY MR. GABEL:
7      Q.  What about for generics?
8      A.  There is no defined correlation that I'm
9  aware of between the two for generic drugs
10  products; however, I can't say that there isn't
11  somebody that may have thought that the two meant
12  the same.
13      Q.  Are you aware of anyone?  Could you give
14  me any names of anyone?
15      A.  No, I don't think we've, I've had a
16  particular conversation with anybody on that.
17      Q.  If I could have you turn to JDIND 00286,
18  and instead of going through each of these
19  potential components of dispensing fee
20  individually, if you could look at JDIND 00286
21  through JDIND 00292, and my question to you, with
22  respect to those pages, is whether the costs

Page 185

1  allocated by Myers & Stauffer on those pages and
2  what they indicate should be captured by the
3  dispensing fee is in fact what Indiana Medicaid
4  hopes to capture when it pays its dispensing fee to
5  providers?
6      MR. HENDERSON:  Objection.
7      MR. LINNEWEBER:  Objection.
8  BY MR. GABEL:
9      Q.  Does that make sense in the context of
10  those pages, what I'm asking?
11      A.  To the extent that I'm knowledgeable in
12  this area, this information appears to be accurate
13  in determining the things that go into the
14  assessment of dispensing fees, but I would have to
15  look at something from CMS to see, you know, the
16  definition that they have.  But typically the
17  office refers to, uh, the office of Medicaid Policy
18  and Planning would defer to Myers & Stauffer on a
19  topic such as this.
20      Q.  I'll place before you what I'm marking as
21  Abbott Exhibit 958.  For the record it spans Bates
22  number JDIND 00403 through 408.

47 (Pages 182 to 185)

801ecc01-3fd8-4f6c-a3ac-f1645cffa8d3

Sharp, R.Ph., Michael                          March 28, 2008

Page 230

1      MR. HENDERSON: Direct or indirect or both?
2  BY MR. GABEL:
3      Q. Direct representations.
4      A. There's always ongoing discussion about a
5  product's cost in comparison to products, you know,
6  in a similar class. There probably literally have
7  been hundreds and hundreds of presentations that
8  take pricing into account for any given product
9  that's being -- that is new to the market or is in
10 a class with other competitors.
11     Q. Has Abbott been involved in any of those
12 presentations to State Medicaid officials?
13     A. Not that I'm aware of, not that I can
14 recall.
15     Q. You stated that providers would submit
16 comments -- well, actually maybe you didn't. Let me
17 ask, though, when there would be a change to the
18 State's reimbursement methodology, in your
19 experience would providers submit comments in
20 response to the change?
21     MR. HENDERSON: Objection.
22     A. Yes. As required with the rule

Page 231

1  promulgation, there is a public hearing where the
2  public can come and offer comments. At the time we
3  changed to AWP minus 16 from AWP minus 13 and a
4  half, there were a number of public commenters.
5  BY MR. GABEL:
6      Q. Are you aware of any manufacturers
7  offering public comments to proposed changes to
8  Indiana's reimbursement methodology?
9      A. I'm not aware of any.
10     Q. You mentioned suggested AWPs that were
11 submitted by some manufacturers, including Abbott.
12 Do you have any personal knowledge of how Abbott
13 arrived at those suggested AWPs that were submitted
14 to Medi-Span?
15     A. No, I don't. Their suggested AWPs or
16 suggested wholesale prices would be the two terms I
17 would use for that, but I have no idea how a
18 company would have arrived at those figures.
19     Q. Any knowledge on how any drug
20 manufacturers would have arrived at WACs that were
21 reported?
22     A. No. I will comment that brand name

Page 232

1  companies that supply WACs and supply suggested
2  wholesale prices for those -- they're typically
3  branded products -- they typically use a markup
4  factor or a spread in between of 1.25.
5      Q. Is that just something you've noticed
6  from observation?
7      A. Yes. On our drug pricing file you can
8  see the correlation between WAC and AWP. There's
9  almost always a 1.25, and that could be the First
10 DataBank markup factor, or from time to time we get
11 submissions from manufacturers that will have their
12 WAC and suggested AWP on a document, and the
13 correlation is usually a 1.25 correlation.
14     Q. When you say we occasionally get
15 documentation that shows a WAC and a suggested AWP,
16 when you say we, does that mean Indiana Medicaid?
17     A. Indiana Medicaid, mainly myself. I will
18 get from time to time pricing notifications that I
19 don't do anything with, but they --
20     Q. You still get those to this day?
21     A. Occasionally.
22     Q. Have you received any such communications

Page 233

1  from Abbott?
2      A. It seems that there may have been
3  something in the past year, but I don't recall. I
4  don't keep those.
5      Q. You discard those?
6      A. Yes.
7      Q. You say there may have been. I'd like to
8  zero in on that.
9      A. I can't, I can't say for sure that it was
10 Abbott or Hospira, but there was, there was
11 something that came through for normal saline
12 several months back, but I don't remember who the
13 manufacturer was.
14     Q. So it may not have been Abbott?
15     A. Right.
16     MR. GABEL: I think I'm all finished with my
17 questions. I thank you for your time, and I'm
18 going to pass the witness.
19         EXAMINATION BY MS. GIULIANA:
20     Q. Good afternoon, Mr. Sharp. My name is
21 Toni Giuliana, and I represent Dey in this action.
22 Have you heard of Dey?

59 (Pages 230 to 233)

801ecc01-3fd8-4f6c-a3ac-f1645cffa8d3

# Carl Shirley
# (Indiana) (30(b)(6))

Page 362

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

---------------------------X

IN RE: PHARMACEUTICAL        ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE   ) Master File No.

PRICE LITIGATION             ) 01-CV-12257-PBS

---------------------------) Subcategory Case

THIS DOCUMENT RELATES TO:    ) No. 06-11337

United States of America ex )

rel. Ven-A-Care of the       ) Hon. Patti B. Saris

Florida Keys, Inc., et al.  )

v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS, and) VIDEOTAPED DEPOSITION

United States of America ex ) OF THE INDIANA FAMILY

rel. Ven-A-Care of the       ) AND SOCIAL SERVICES

Florida Keys, Inc., et al.  )   ADMINISTRATION by

v. Boehringer Ingelheim      )      CARL MARK

Corp., et al., Civil Action )     SHIRLEY, R.Ph.

No. 07-10248-PBS             )      VOLUME II

---------------------------X

                    DECEMBER 3, 2008

                 INDIANAPOLIS, INDIANA

Indianapolis, IN

Page 411

1      A.  That's my understanding.
2      Q.  Thank you.  Do you know if MAC rates
3  are set per drug or per manufacturer or how
4  they're set?
5      A.  They're set by pricing group, as I
6  recall.
7      Q.  And if several -- do you understand --
8  pardon me, strike that.
9          For a drug where there are several
10  manufacturers, would you understand that it would
11  be one MAC rate set for all manufactured versions
12  of that drug?
13      A.  That's my understanding of the process,
14  yes.
15      Q.  Thank you.  So it's not set on the
16  manufacturer -- by a manufacturer basis?
17      A.  No.
18      Q.  And the 1.2 multiplier is consistent
19  across the entire program, it's not set per drug
20  or per manufacturer?
21      A.  That's my understanding, yes.
22      Q.  Thank you.

Page 412

1          MR. JULIE:  In the interest of brevity,
2  I'm just going to skip some stuff.
3          Can I ask you to mark this as Dey 512.
4          (Deposition Exhibit Dey 512 marked
5  for identification.)
6      Q.  Sir, this is a series of several
7  letters.  Can I ask you to look at the second to
8  last page, the one that is addressed "Attention:
9  Medicaid Administrator."
10          Can I -- can you tell me a little bit
11  about the procedures that are followed at Indiana
12  Medicaid when the program receives letters from
13  drug manufacturers?
14      A.  There is no procedure that I'm aware
15  of.
16      Q.  So what would happen when -- pardon me,
17  strike that.
18          The mail would come in at some point,
19  and someone would open the letter; is that
20  correct?
21      A.  Yes.
22          MS. ST. PETER-GRIFFITH:  Object to the

Page 413

1  form.
2      Q.  And how would the person who opened the
3  mail know how to route the mail?
4      A.  I do not know that.  I'm not involved
5  in that process.
6      Q.  Okay.  If the letter related to a drug
7  manufacturer announcing a change to its published
8  prices, do you know where that letter would be
9  routed?
10      A.  Likely be routed to the pharmacy area.
11      Q.  Okay.  That's your area, sir?
12      A.  Mine and other pharmacy staff, that's
13  correct.
14      Q.  All right, thank you.  Do you know
15  whether Indiana Medicaid received a copy of this
16  letter?
17      A.  No, I do not know.
18      Q.  Okay.  Would Indiana keep a record of
19  letters that it received from drug manufacturers?
20      A.  That has never been the case that I'm
21  aware of.
22      Q.  Okay.  Well, I'll represent to you that

Page 414

1  this was a letter sent by Dey to many Medicaid
2  administrators.  And it is our belief that it was
3  sent to Indiana Medicaid.
4          I'm going to read part of this letter
5  just out loud.  This is below the chart.  It
6  states:  "As you know, WAC is referred to by data
7  reporting services and government agencies as an
8  'estimate,' and Dey believes that WAC generally
9  means the invoice price charged by a
10  pharmaceutical manufacturer to drug wholesalers.
11  As you know, WAC does not include the net effect
12  of discounts from invoice price (based on volume
13  of purchases, speed of payment and other
14  factors), rebates, chargebacks, administration
15  fees and other cost adjustments, which are well-
16  known and commonplace in the pharmaceutical
17  industry and can affect, to a greater or lesser
18  degree, the actual 'final' cost to [every]
19  purchaser.  These discounts may not be determined
20  until some months after the date of the invoice.
21  Therefore, we remind you that WAC may well not be
22  representative of actual market costs to those

14  (Pages 411 to 414)

e7567ca2-f9c5-466f-9f26-8b590237613e

## Indianapolis, IN

Page 447

1    Q.   You have no recollection either way?
2    A.   I have no recollection of that.
3    Q.   Thank you.  Have you ever heard of a
4  Florida pharmacy called Ven-A-Care of the Florida
5  Keys?
6    A.   Yes.
7    Q.   Can you tell me what you know about
8  that pharmacy?
9    A.   Only that sometime, again time frame on
10 this is quite a ways back, there was something to
11 do with a whistleblower law case involving Ven-A-
12 Care of the Florida Keys.
13   Q.   Can you recall when you first heard the
14 name of that pharmacy?
15   A.   No.
16   Q.   Can you recall any representatives --
17 meetings with representatives of Ven-A-Care?
18   A.   I had no meetings with representatives
19 of Ven-A-Care.
20   Q.   What about counsel, attorneys for Ven-
21 A-Care?
22   A.   None that I recall.

Page 448

1    Q.   Thank you.
2       MR. JULIE:  Can we go off the record
3  for one minute.
4       MS. ST. PETER-GRIFFITH:  Sure.
5       VIDEOGRAPHER:  Going off record.  It's
6  10:49.
7       (A discussion was held off the
8  record.)
9       VIDEOGRAPHER:  We're back on record at
10 10:51.
11 BY MR. JULIE:
12   Q.   Sir, I'm going to hand you the final
13 exhibit that I'll be showing you.  What a long,
14 strange trip it's been.
15      MS. ST. PETER-GRIFFITH:  Certainly a
16 cold one.  What number are we on?
17      (Deposition Exhibit Dey 513 marked
18 for identification.)
19   Q.   This is a document that I've asked the
20 court reporter to mark as Dey 513.  If I could
21 ask you, it's a one-page document, to take as
22 much time as you'd like in reviewing it.

Page 449

1       (Witness complied with request.)
2    Q.   Just let me know when you've finished
3  and you've seen it.
4    A.   Okay, I'm done.
5    Q.   Thank you.  As you can see this is --
6  or would you agree with me that this is an
7  invoice that appears to be from Cardinal
8  Distribution for a shipment to K-Mart pharmacy in
9  Jeffersonville, Indiana?
10   A.   Yes.
11      MS. ST. PETER-GRIFFITH:  Object to the
12 form.
13   Q.   Thank you.  Are you familiar with that
14 pharmacy in Jeffersonville, Indiana?
15   A.   No.
16   Q.   You would agree that this appears to be
17 an invoice for albuterol sulfate inhalation
18 solution 25 pack times 3 milliliters; is that
19 correct?
20   A.   Yes.
21   Q.   And I will represent to you that in the
22 NDC/UPC column, the NDC listed is an NDC for

Page 450

1  Dey's product by that description.
2       It is my understanding that this
3  document is from a batch of documents that is
4  maintained by Myers & Stauffer.
5       Do you have an understanding of why
6  Myers & Stauffer would have been collecting
7  invoices from -- for purchases by Indiana
8  pharmacies in 2002?
9    A.   Presumably associated with the state
10 MAC program.
11   Q.   And Myers & Stauffer was using invoices
12 at that time to -- as the agent of Indiana to aid
13 Indiana in determining actual average acquisition
14 costs of Indiana pharmacies?
15   A.   They were doing what they're required
16 to do under our contract with them to establish
17 state MAC rates.
18   Q.   And as part of that contract, they were
19 determining the prices at which Indiana
20 pharmacies were obtaining pharmaceutical
21 products; is that correct?
22   A.   Through invoice data, so obtaining

23 (Pages 447 to 450)

e7567ca2-f9c5-466f-9f26-8b590237613e

Indianapolis, IN

Page 539

1    Q.   And does this refresh your memory just
2  a few lines down that the OIG report there in
3  1984 showed that 99.6 percent of pharmacy
4  purchases were made below average wholesale
5  price, right?
6    A.   Yes.
7    Q.   And I think you said yesterday, but
8  just to confirm, this is the type of report that
9  you would have passed on to other people within
10 Indiana Medicaid?
11       MS. ST. PETER-GRIFFITH:  Object to the
12 form.
13   A.   I don't know if I said I would have
14 passed it on to others.  It would have been
15 passed on to me, and others would have seen it as
16 well.
17   Q.   Is this the type of information that
18 you would receive and share at least the
19 information with others when making or discussing
20 policy decisions within Indiana Medicaid?
21       MS. ST. PETER-GRIFFITH:  Object to the
22 form.

Page 540

1    A.   Yeah, I believe this, you know, this is
2  the kind of information that would have been
3  considered by state administrative staff in
4  making decisions.
5    Q.   And to be clear, you don't have a
6  specific memory about whether or not these
7  particular facts were considered back 20 years
8  ago, right?
9        MS. ST. PETER-GRIFFITH:  Object to the
10 form.
11       MR. BIPPUS:  I'm going to object.
12       MR. COOK:  I can ask it differently.
13       MR. BIPPUS:  Okay.
14 BY MR. COOK:
15   Q.   Do you have any specific memory of
16 what, if anything, you did with the facts that
17 you learned from this 1984 report 25 years ago?
18   A.   No, sir.
19   Q.   All right.  If you could turn to page
20 25 of that report.  It's Bates number '2229.  In
21 the second paragraph up from the bottom, you see
22 that that paragraph describes statements that the

Page 541

1  administrator of HCFA made to OIG regarding the
2  report and begins "the administrator concurred."
3  Do you see that paragraph?
4    A.   Yes, I see that.
5    Q.   I'd like to turn your attention to the
6  third sentence there.  And I'll just read it for
7  you.  Quote, "She," referring to the
8  administrator, also stated concern that any
9  reduction in EAC screenings by HCFA may well
10 result in pressure by the pharmaceutical industry
11 to increase state-dispensing fees accordingly,
12 and the net result may be zero," closed quote.
13       First of all, do you recall reading
14 that back in 1984?
15   A.   No, sir, I don't.
16   Q.   The issue of upward pressure on
17 dispensing fees if EAC is reduced, is that an
18 issue that you dealt with back in the 1980s?
19   A.   I can't remember in 1980s.  The issue
20 itself is very familiar, not only to me but other
21 pharmacy administrators as well.  So I certainly
22 heard that type of thing over time, yes.

Page 542

1    Q.   Can you explain to me why is that issue
2  prevalent among pharmacy administrators?
3    A.   I can only guess that when pharmacies
4  see their reimbursement affected, and it's a two-
5  piece reimbursement system, if one side goes
6  down, they want to see the other side go up so
7  that they don't incur any net decrease in
8  reimbursement.
9        So if that's the case of pharmacies
10 across the country, people in the states that are
11 similarly situated to me would probably hear the
12 same type of thing.
13   Q.   Okay.  How do you know that this was an
14 issue among pharmacy administrators beyond just
15 Indiana Medicaid?
16   A.   I don't remember anything specific, but
17 people at my level did attend annual conferences.
18 And, you know, occasionally someone would call
19 somebody else to talk about pharmacy matters.
20 And this is the type of thing that would have
21 been discussed.
22   Q.   And then the next sentence in Exhibit

46  (Pages 539 to 542)

e7567ca2-f9c5-466f-9f26-8b590237613e

Indianapolis, IN

Page 543

1  Shirley 2 is a response by OIG to the
2  administrator's description of that phenomenon,
3  and let me read that for the record for you.
4      Quote, "While we can understand the
5  basis for the administrator's concerns, our
6  report demonstrates that the Medicaid program is
7  currently reimbursing pharmacies amounts for
8  drugs' ingredient costs that are significantly in
9  excess of the pharmacies' actual costs of the
10 drug products which is contrary to the intent of
11 the existing federal regulations," closed quote.
12     First of all, do you remember reading
13 that 25 years ago?
14     MS. ST. PETER-GRIFFITH:  Object to the
15 form.
16     A.  No.
17     Q.  The fact that Medicaid programs were
18 currently reim -- or were reimbursing pharmacies
19 in excess of actual ingredient costs on the EAC
20 portion of the reimbursement, is that a sentiment
21 that was common among pharmacy administrators,
22 also?

Page 544

1      A.  Oh, restate that, please, what the
2  question is.
3      Q.  Sure.  OIG's statement that the
4  Medicaid program was reimbursing pharmacies
5  amounts in excess of pharmacies' actual costs for
6  the drug ingredients, was that also a sentiment
7  that you heard expressed among pharmacy
8  administrators?
9      A.  Make sure I understand this.  The
10 sentiment being that pharmacies were being
11 reimbursed above their acquisition costs?
12     Q.  Correct.
13     A.  You're saying was that a concern?
14     Q.  Was that a sentiment that you heard
15 expressed among pharmacy administrators?
16     MS. ST. PETER-GRIFFITH:  Object to the
17 form.
18     A.  Is that a sentiment?  I think it was
19 probably something that was discussed, is that
20 there was a difference between the published AWP
21 rates and what pharmacies purchased drugs.
22     Q.  But here, leaving AWP aside for a

Page 545

1  moment, although it's related, here in 1984 the
2  OIG was stating publicly and recognizing that
3  Medicaid was paying more than pharmacies' actual
4  costs for drug ingredients, right?
5      MS. ST. PETER-GRIFFITH:  Object to the
6  form.
7      Q.  Is that how you read that?
8      A.  It says, "While we can understand the
9  basis for the administrator's concerns, our
10 report demonstrates that the Medicaid program is
11 currently reimbursing pharmacies amounts for drug
12 ingredient costs that are significantly in excess
13 of the pharmacies' actual costs of the drug
14 ingredients," that's their statement.
15     Q.  First of all, you don't remember
16 reading that specifically --
17     A.  No, I do not.
18     Q.  -- 25 years ago?
19     A.  No.
20     Q.  Were you familiar with, 25 years ago,
21 with that being an observed fact?
22     MS. ST. PETER-GRIFFITH:  Object to the

Page 546

1  form.
2      A.  No.
3      Q.  Okay.  If you had read this report, you
4  would have certainly had this report telling you
5  that, right?
6      MS. ST. PETER-GRIFFITH:  Object to the
7  form.
8      A.  Again, you're stating the obvious.  If
9  I read the report, I had it.  I couldn't read it
10 without having it.
11     Q.  But you don't remember specifically --
12     A.  No --
13     Q.  -- whether or not you read that?
14     A.  -- I do not.
15     Q.  All right.  Do you recall in meetings
16 with pharmacy administrators, and we'll get to
17 that in just a minute, the fact being discussed
18 that ingredient reimbursement tended to be
19 greater than pharmacy acquisition cost?
20     A.  Pharmacy -- and, again, I'm going to
21 ask you to repeat it so --
22     Q.  Sure.

47 (Pages 543 to 546)

e7567ca2-f9c5-466f-9f26-8b590237613e

# M.J. Terrebonne (Louisiana) (30(b)(6) witness on 11/7/08); (30(b)(1) witness on 3/31/08)

# Baton Rouge, LA

Page 1

                    UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL       *  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  *  MASTER FILE NO.

PRICE LITIGATION            *  01-CV-12257-PBS

                            *

THIS DOCUMENT RELATES TO:   *  JUDGE PATTI B.

U.S. EX REL. VEN-A-CARE OF  *  SARIS

THE FLORIDA KEYS, INC. V.   *  MAGISTRATE

DEY INC., ET AL             *  MARIANNE BOWLER

NO. 05-11084-PBS, AND       *

U.S. EX REL VEN-A-CARE OF   *

THE FLORIDA KEYS, INC., ET  *

AL V. BOEHRINGER INGELHEIM  *  (Cross-noticed

CORP, ET AL                 *   captions on

NO.07-10248-PBS             *   following pages.)

* * * * * * * * * * * * * *

          November 7, 2008

          Transcript of the videotaped Rule

30(b)(6) deposition of the LOUISIANA

DEPARTMENT OF HEALTH AND HOSPITALS through

MARY JULIA TERREBONNE

4f51dae7-223c-46dc-90f5-5835e793cf26

Baton Rouge, LA

Page 90

1      A.   Right.
2      Q.   How was it that -- And that dispensing
3  fee is significantly lower than at least what
4  Myers and Stauffer is indicating it cost to
5  dispense the home I.V. drug; is that right?
6      A.   I'm sorry.  Could you state your
7  question again?
8          MR. TORBORG:  Could I ask the court
9  reporter to read that one back?
10         (Whereupon the previous question was
11  read back by the court reporter.)
12         THE WITNESS:  I still don't get it.
13         The -- the report shows that it cost
14  more to dispense I.V.s [sic] prescriptions than
15  non-I.V. prescriptions.
16 BY MR. TORBORG:
17     Q.   And it's showing an unweighted mean
18  cost for pharmacies dispensing home I.V.
19  prescriptions of $18.57; correct?
20     A.   Correct.
21     Q.   But Louisiana is only paying at this
22  time $5.77; right?

Page 91

1      A.   Right.
2      Q.   How is it that Louisiana is able to
3  compensate the providers of home I.V. therapy
4  their cost to dispense those drugs?
5          MR. FAUCI:  Objection to the form.
6          THE WITNESS:  How is it?
7  BY MR. TORBORG:
8      Q.   Yes.
9      A.   Well, we do.  We pay them in accordance
10  with our current reimbursement methodology.
11     Q.   If you look to the footnote 8 on page
12  21 of the Myers and Stauffer report --
13     A.   Right.
14     Q.   -- that states -- Would you read that
15  into the record?
16     A.   "Although typical dispensing fees
17  reimburse less than the dispensing cost of I.V.
18  pharmacies, they are generally able to break even
19  based on the margin allowed on ingredient cost
20  reimbursement."
21     Q.   And do you have an understanding of --
22  of what that's saying?

Page 92

1      A.   I believe what he's saying is that
2  there's a margin on the ingredient side, so
3  that's how they're generally able to dispense.
4      Q.   And this is something that -- that you
5  would have read back in 1999; correct?
6          MR. FAUCI:  Objection to form.
7          THE WITNESS:  Probably.
8  BY MR. TORBORG:
9      Q.   Okay.  And if you disagreed with that
10  footnote, would you have told Myers and Stauffer
11  that?
12     A.   Well, they were the surveyors, so they
13  had the information.  We were relying on --
14     Q.   Well, was it your understanding, Miss
15  Terrebonne, that because of the higher cost to
16  dispense home I.V. drugs and the fact that
17  Louisiana was only paying a $5.77 dispensing fee
18  for those drugs, that the margin being earned on
19  the ingredient cost was covering that cost to
20  dispense?
21         MR. FAUCI:  Objection to form.
22         THE WITNESS:  Based upon the survey

Page 93

1  results, yes.
2  BY MR. TORBORG:
3      Q.   Let's go to Abbott topic -- the Abbott
4  cross-notice, topic number 16.  This is titled
5  "DOJ AWPs," and the area of inquiry reads "Your
6  implementation of revised average wholesale price
7  information developed by the United States
8  Department of Justice and NAMFCU, the dates when
9  you did or did not implement the revised pricing
10  information, and the reasons why you did or did
11  not implement the revised pricing information."
12  Do you see that?
13     A.   Yes.
14     Q.   And do you have an understanding of
15  what we're getting at there?
16     A.   No.
17     Q.   Are you aware of the so-called DOJ AWP
18  effort?
19     A.   No.
20     Q.   Do you recall, just to see if it
21  refreshes your recollection at all, that around
22  1999 to 2000, there was an effort by the National

24  (Pages 90 to 93)

4f51dae7-223c-46dc-90f5-5835e793cf26

Baton Rouge, LA

Page 94

1   Association of Medicaid Fraud Control Units and
2   Department of Justice to send revised average
3   wholesale prices to state Medicaid programs and
4   First DataBank?
5       A.   Not that I recall.
6       Q.   And did you do anything to prepare
7   yourself to testify on this topic for today's
8   deposition?
9       A.   No.
10      Q.   If we go to -- If I could have the
11  document with the Bates numbers HHD006-0292
12  through 97 marked as Abbott Exhibit 1163.
13  Somebody let me know when we're ready.
14          (Whereupon the document was marked as
15  Exhibit Abbott 1163 by the court reporter.)
16      MR. KATZ:  Okay.  She has it in front
17  of her.
18  BY MR. TORBORG:
19      Q.   Okay.  Thank you.
20          Miss Terrebonne, there's been some
21  testimony about this document already, but this
22  -- these -- this is an interview sheet that the

Page 95

1   OIG put together in talking to you and others
2   about your experience with the so-called DOJ
3   AWPs, and I'd like to ask you to go to the Bates
4   page ending 295 --
5       A.   Okay.
6       Q.   -- in particular, question number 17.
7   It states, "Have providers or other groups lodged
8   complaints about the new prices?"  And then the
9   note there states, "Calls about whether they were
10  going to implement provided" -- I think that
11  means providers and pharmacies.
12          Just to see if it refreshes your
13  recollection at all, do you recall getting calls
14  from pharmacies or providers about the revised
15  average wholesale prices?
16      A.   No, I do not recall.
17      Q.   And 18 states, "How have complaints
18  been resolved?"  The comment there is, "Do not
19  implement."
20          Do you have any reason to believe, Miss
21  Terrebonne, that Louisiana did not implement the
22  DOJ AWPs?

Page 96

1       A.   I do not -- I don't know.
2       Q.   And do you have any reason to believe
3   that they did not implement those prices because
4   of provider and pharmacy concerns?
5       MR. FAUCI:  Objection to form.
6       THE WITNESS:  I don't know because I
7   really don't remember this.
8   BY MR. TORBORG:
9       Q.   Okay.  I'd like to go now to topic 6 in
10  the Abbott cross-notice.
11          Let me know, if you would --
12      A.   I'm there.
13      Q.   -- when you're -- when you have that in
14  front of you.
15      A.   I'm there.
16      Q.   Okay.  This is titled, "Methods used to
17  calculate ingredient cost."  It states, "The
18  method used to calculate ingredient cost payments
19  to providers associated with dispensing the
20  Abbott/DOJ Action NDCs" -- and there's a date
21  there -- "and the Abbott/Ven-A-Care Action NDCs"
22  -- another date there -- "including the use of

Page 97

1   MACs and/or FULs when any MACs/FULs were
2   utilized, how any MACs/FULs were calculated, and
3   any methods considered but not used by the
4   Medicaid program and the reasons why those
5   methods were rejected."  Do you see that?
6       A.   Yeah.
7       Q.   And then if we go to Schedule 1,
8   there's a listing of NDCs.  It's titled:  The
9   Abbott DOJ action NDCs.  Do you see those?
10      A.   Yes.  Yes.
11      Q.   Okay.  Do you know how the Louisiana
12  Medicaid program reimbursed -- or calculated
13  ingredient cost payment for these NDCs from 1991
14  through 2001?
15      A.   I know there were a variety of
16  different reimbursement methodologies.  I don't
17  know that I can recite them.
18      Q.   Do you know if -- Well, let me back up.
19          Since 1991 Louisiana has had a -- a
20  state MAC program; is that right?
21      A.   Yes.
22      Q.   And can you tell me how that state MAC

25  (Pages 94 to 97)

4f51dae7-223c-46dc-90f5-5835e793cf26

Baton Rouge, LA

Page 98

1   program worked, how the payment rate was
2   calculated?
3       A.   The payment rate is calculated based
4   upon the generic descriptions for those
5   multiple-source drugs, and then there's -- they
6   use the AWPs, and they get the -- the median cost
7   using the AWPs to determine the state MAC.
8       Q.   So Louisiana would take all the drugs
9   that fell within a particular generic class and
10  array them from the highest cost AWP to the
11  lowest cost AWP and then select the median; is
12  that right?
13      A.   Yes.
14      Q.   If there were two -- If there was an
15  even number, you would take the average of the
16  two, right, the two median numbers?
17      A.   Correct.
18      Q.   Louisiana has had since 1991 one of the
19  largest MAC lists in the country; is that right?
20      MR. FAUCI: Objection to form.
21      THE WITNESS:  I believe that's correct.
22  BY MR. TORBORG:

Page 99

1       Q.   And do you know if Louisiana calculated
2   MACs for the NDCs listed on schedule one, the
3   so-called Abbott DOJ action NDCs?
4       A.   I do not.  No, I don't off the top of
5   my head.
6       Q.   And as we sit here today, how would we
7   determine whether or not Louisiana had maximum
8   allowable costs for these products?
9       A.   Well, we maintain our drug file, and I
10  think back in the day that was via microfiche, so
11  I don't know if that's still stored somewhere.
12      Q.   Go to Schedule 2.  It lists the
13  so-called Abbott Ven-A-Care Action NDCs.  Do you
14  see that?
15      A.   Yes.
16      Q.   And this lists a number of products,
17  most -- most of which relate to the drug
18  Erythromycin.  Do you see that?
19      A.   Yes.
20      Q.   Do you know if starting in January 1,
21  1994 and through today whether or not Louisiana
22  had a state MAC on these NDCs on Schedule 2?

Page 100

1       A.   I would have to rely on using the drug
2   file information if it still exists.
3       Q.   And you don't know if it still exists?
4       A.   I do not.  I don't know how far back
5   that's archived.
6       Q.   Now, do you have copies of the arrays
7   that would have been used to calculate the median
8   AWPs for the products on Schedules 1 and 2 going
9   back to 1991 and 1994?
10      A.   I don't believe I'd have that that far
11  back.
12      Q.   Do you know how far back you have it?
13      A.   I do not.
14      Q.   Would you be able to testify about what
15  impact, if any, that the AWPs reported for the
16  products on Schedules 1 and 2 actually had on the
17  ingredient cost payment paid for the Abbott DOJ
18  action NDCs and the Abbott Ven-A-Care Action NDCs
19  during the time period stated in Abbott subject
20  number 6?
21      MR. FAUCI: Objection to form.
22      THE WITNESS:  Would I be able to

Page 101

1   testify?
2   BY MR. TORBORG:
3       Q.   Would you be able to tell us what
4   impact that the AWPs reported for those products
5   had on Louisiana's calculated payment for
6   ingredient cost?
7       A.   I don't know.  I don't know if that
8   information is still available.
9       Q.   But in any event, you're -- you're not
10  able to testify about that today; right?
11      A.   Correct.
12      Q.   Now, if we can go to Abbott Exhibit
13  1050, state plan --
14      A.   I got it.
15      Q.   Okay.  If we can go to the Bates page
16  ending -- I guess it's the second page of the
17  document, Bates page ending 523 -- Now, this --
18  this document we're looking at is the -- the
19  portion of the state plan in Louisiana that
20  govern payments for prescription drugs in 1992;
21  correct?
22      A.   Yes.

26  (Pages 98 to 101)

4f51dae7-223c-46dc-90f5-5835e793cf26

Page 174

1 injectable products tended to be large?
2     MR. FAUCI:  Objection, form.
3     THE WITNESS:  I do not recall.
4 BY MR. TORBORG
5     Q.   Something you may have been aware of, but
6 you just don't recall as you sit here today?
7     A.   It is not something that distinctly I
8 would recall, no.
9     Q.   And do you have an understanding of what
10 Mr. Cook is saying when he notes that
11 "manufacturers continued to market small quantities
12 of these" -- and he is referring to injectable
13 products and associated intravenous fluids --
14 "through conventional sources and report single
15 unit pricing for the national data sources."
16     A.   I do not.
17     Q.   Do you have an understanding of what
18 single unit pricing means?
19     A.   I do not.  I would assume that is
20 something that is broken down on a single unit
21 rather than a bulk.
22     Q.   If I could ask you to go next to Abbott

Page 175

1 Exhibit 575.  Ms. Terrebonne, this is a document
2 that was produced by Ven-A-Care from the Kansas
3 Medicaid program, I believe.
4         If you will go to the last paragraph on
5 the first page, under "Final Policy," do you see
6 that?
7     A.   Yes.
8     Q.   They wrote: "Effective dates of service
9 1-1-95, all sterile irrigation solutions and all
10 large volume parenteral and small volume parenteral
11 fluid replacement vehicles for intravenous drug
12 administration which are billed as pharmacy claims
13 will be reimbursed at AWP less 50 percent (inhalation
14 solutions are not included in this reimbursement
15 change)."
16         Do you see that?
17     A.   Yes.
18     Q.   Did you become aware that Kansas had at
19 some point changed or had a special reimbursement
20 methodology for large and small volume parenterals?
21     A.   No, I did not.
22     Q.   Go to the next page, "The rationale for

Page 176

1 change:  States discount from the referenced
2 pharmaceutical pricing schedule shown as average
3 wholesale price vary by product class."
4         Is that also something that you knew, Ms.
5 Terrebonne, that discounts from AWP could vary by
6 product class?
7     A.   I would think that, yeah, AWPs could vary
8 by product class.
9     Q.   Is that something you knew about from
10 1991 through 2001?
11     A.   In relation to this?
12     Q.   Just generally speaking.
13     A.   No.  No.  And I think our documents
14 supported that one of the items that they could not
15 purchase at the discount was immunosuppressant
16 drugs.  So there is variation there.
17     Q.   And in this document, the author also
18 noted, "Generally, intravenous vehicles and
19 irrigation solutions are available at much greater
20 discounts than are other pharmaceuticals."
21         Do you see that?
22     A.   Yes.

Page 177

1     Q.   Is that something you became aware of at
2 some point in time from 1991 through 2001?
3     A.   No.
4     Q.   Do you recall having discussions with
5 Ven-A-Care of the Florida Keys?
6     A.   I did not have any discussions with
7 Ven-A-Care.
8     Q.   Did you have any communications via a fax
9 or document with people from Ven-A-Care?
10     A.   I do not recall.
11     Q.   Does the name Zachary Bentley ring a
12 bell?
13     A.   No.
14     (Exhibit Abbott 1054 was marked.)
15     MR. TORBORG:  For the record, what I have
16 marked as Abbott Exhibit 1054 bears Bates No. VAC
17 MDL 77742 through 63.
18 BY MR. TORBORG
19     Q.   Ms. Terrebonne, for the record, these are
20 some more materials produced by Ven-A-Care of the
21 Florida Keys related to this case.  In particular,
22 this was a collection of documents produced in a

Page 178

1    file titled "Louisiana."
2        I would ask you to take a look at that if
3    you would.
4        Ms. Terrebonne, do any of these pages
5    look familiar to you?
6    A.  I see my name on it, but I don't recall.
7    Q.  Look at Bates page ending 77759.  Do you
8    see that?
9    A.  Yes.
10   Q.  This is a -- appears to be, at least, a
11   fax from M. J. Terrebonne to Zachary Bentley at
12   Ven-A-Care dated January 30 of 1998.  Do you see
13   that?
14   A.  Yes.
15   Q.  Is that your handwriting?
16   A.  Yes.
17   Q.  So it appears you had sent a fax to Mr.
18   Bentley.  Is that fair to say?
19   A.  Yes.
20   Q.  Does that refresh your recollection at
21   all regarding communications that you had with
22   Ven-A-Care?

Page 179

1    A.  No.
2    Q.  If you look at the next page there, it
3    appears to be next to the -- this appears to list
4    NDCs and then reimbursement.  Do you see that?
5    A.  Yes.
6    Q.  Do you recall providing Mr. Bentley with
7    information regarding how much the State of
8    Louisiana reimbursed for ingredients for a set of
9    drugs?
10   A.  I do not.
11   Q.  If we go to the next page there, it
12   appears to be part of the same fax.  Is that right?
13   A.  Yes.
14   Q.  Is that your handwriting?
15   A.  Yes.
16   Q.  And did you write, "Zachary, Louisiana
17   Medicaid reimburses the lower of 1, usual and
18   customary charge, or 2, AWP minus 10.5 percent,
19   plus a fee (the maximum fee is $5.77).  I have
20   listed the AWP for the drugs," which you listed.
21   Then you wrote -- is that what you wrote?
22   A.  Yes.

Page 180

1    Q.  And then you wrote, "I would appreciate,"
2    can you read that to me and into the record?
3    A.  "If you could send me the information on
4    the definition which exempts IV pharmacies from
5    retail class of trade.  Also, your findings of the
6    states' analyses compared to the average
7    acquisition price.  Thanks."
8    Q.  Do you recall why you were asking Mr.
9    Bentley to provide information both on the
10   definition of IV pharmacies and the findings of
11   states' analyses?
12   A.  I would only say we were probably looking
13   at ingredient cost at that time.
14   Q.  Does reading this refresh your
15   recollection at all about conversations you may
16   have had with Mr. Bentley or others at Ven-A-Care?
17   A.  No.
18   Q.  And it has been almost ten years since
19   you actually -- more than ten years since you faxed
20   this.  Is that right?
21   A.  Yes.
22   Q.  So, it's fair to say there are a lot of

Page 181

1    communications you may have had with Ven-A-Care
2    that you don't recall given the passage of time?
3        MR. FAUCI:  Objection.
4        THE WITNESS:  It is possible, yes.
5    BY MR. TORBORG:
6    Q.  And if we look at the charts that are on
7    Bates pages 756 and 57, does it appear as though --
8    you did not prepare this document, right, the
9    charts?
10   A.  I did not.
11   Q.  Does it appear as though --
12   A.  I don't think I did.
13   Q.  Do you recall receiving these charts?
14   A.  No, I don't.
15   Q.  Do you have any reason to believe that
16   you did not receive them?
17   A.  I don't recall.  I really don't.
18   Q.  But if you did receive these, does it
19   appear as though you are being advised of the
20   differences for certain drugs between the brand
21   name AWP and what Louisiana Medicaid was
22   purportedly reimbursing?

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

MDL NO. 1456

NO. 01-CV-12257-PBS

JUDGE PATTI SARIS

MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

Page 258

1  to an e-mail distribution that includes yourself
2  toward the end of the distribution there.  Is that
3  you, mterrybo, is that your e-mail address?
4      A.  Yes.
5      Q.  And then, it forwards an e-mail that
6  concerns the subject of Jim Martin at the National
7  Community Pharmacy Association calling for a
8  perfect pharmacy reimbursement formula.
9          Do you recall, Ms. Terrebonne, comments
10  from someone at the National Community Pharmacy
11  Association about a perfect pharmacy reimbursement
12  formula?
13      A.  I do not.
14      Q.  If we go to Mr. Wiberg's e-mail, the
15  first two pages of the exhibit, do you know Mr.
16  Wiberg?
17      A.  I have met him before, yes.
18      Q.  Where have you met him?
19      A.  At one of the pharmacy meetings.
20      Q.  Do you find him to be knowledgeable about
21  reimbursement rates and the like?
22      MR. FAUCI:  Objection.

Page 259

1      THE WITNESS:  I didn't get into much
2  discussion with him.  There were 49 other people
3  there.
4  BY MR. TORBORG:
5      Q.  Second paragraph, he states, "What is
6  needed is a better method of determining actual
7  acquisition cost (AAC).  In addition to AAC, a fee
8  should be added that takes into account the average
9  cost of dispensing a prescription at a reasonable
10  price.  Such a fee might have to be double what we
11  typically pay as a dispensing fee now (i.e., in the
12  range of 8 to $9 per prescription). the pharmacy I
13  still occasionally moonlight at is doing just fine
14  with a gross margin of about $8.25 per
15  prescription."
16          Do you see that?
17      A.  Yes.
18      Q.  Do you recall getting this e-mail?
19      A.  I do not.
20      Q.  Do you recall discussions of the possible
21  need to increase dispensing fees should the
22  ingredient cost reimbursement be decreased to AAC?

Page 260

1      A.  I do not.
2      Q.  In this time frame?
3      A.  I do not.
4      Q.  It has been something that has been
5  discussed more recently in connection with the AMP
6  proposal?
7      A.  Have dispensing fees been discussed more
8  recently?  Yes.  Do you recall conversations earlier than
9      Q.  Do you recall conversations earlier than
10  that about the potential need to reduce the
11  dispensing fee if there is a reduction in the
12  ingredient side?
13      A.  Not recently.
14      Q.  Something that could have been discussed,
15  you just don't recall?
16      A.  We haven't discussed it in quite some
17  time, since the implementation of the $5.77 and the
18  AWM minus 13 and a half and 15.
19      Q.  But here we have -- this is a
20  communication amongst state pharmacies that talks
21  directly about the potential need to increase the
22  dispensing fee if reimbursement is reduced to AAC.

Page 261

1  Is that fair to say?
2      A.  It appears to be, yes.
3      Q.  And you don't recall this e-mail?
4      A.  I do not.
5      Q.  Don't recall the subject matter or
6  anything about it?
7      A.  I do not.
8      Q.  Ms. Terrebonne, have you had any
9  communications with representatives of Abbott
10  Laboratories over the course of the last 15 years?
11      A.  I don't know if I did or not.
12      MR. TORBORG:  Ms. Terrebonne, that is all the
13  questions I have at this point.  I appreciate your
14  time.  I may have a few very brief follow-up
15  questions after Mr. Fauci questions, but thanks
16  again.
17      MR. FAUCI:  Marisa, do you want to go?
18      THE VIDEOGRAPHER:  We are off the record, it
19  is 5:21, the end of tape 3.
20      (Recess.)
21      THE VIDEOGRAPHER:  We're back on record, it's
22  5:26, beginning of tape 4.

# Jude Walsh
# (Maine) (30(b)(1))

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------

IN RE: PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION

PRICE LITIGATION             ) 01-CV-12257-PBS

THIS DOCUMENT RELATES        )

U.S. ex rel. Ven-A-Care of ) Judge Patti B. Saris

the Florida Keys, Inc.       )

     vs.                     ) Chief Magistrate

Abbott Laboratories, Inc., ) Judge Marianne B.

No. 06-CV-11337-PBS          ) Bowler

--------------------------


        VIDEOTAPED DEPOSITION OF JUDE E. WALSH,

taken pursuant to notice dated March 18, 2008, at

the offices of the Maine Attorney General, Burton M.

Cross Building, 6th Floor, 6 State House Station,

Augusta, Maine, on March 26, 2008, commencing at

9:06 A.M., before Tammy L. Martell, Registered

Professional Reporter, a Notary Public in and for

the State of Maine.

Walsh, Jude E.                                        March 26, 2008
                          Augusta, ME

| Page 70 | Page 72 |
|---|---|

Page 70

1      Have you ever seen these provisions
2  before, Ms. Walsh?
3      A.  I am sure I have, but I don't directly
4  recall.
5      Q.  Do you see the top of the right-hand
6  column under the heading 447.301, definitions,
7  there is a term estimated acquisition cost, do
8  you see that?
9      A.  Yes.
10     Q.  Are you familiar with that term?
11     A.  Yes.
12     Q.  And here it is defined as the agency's
13  best estimate of the price generally and
14  currently paid by providers for a drug marketed
15  or sold by a particular manufacturer or labor --
16  labeler and the package size of drug most
17  frequently purchased by providers?
18     MS. ST. PETER-GRIFFITH:  Object to the
19  form.
20     Q.  You said you had heard estimated
21  acquisition cost or EAC, in what context have --
22  have you heard that acronym?

Page 71

1      A.  They are drug pricing acronyms.
2      Q.  And is EAC the guideline set by the
3  federal government for states in drug payment
4  policy?
5      A.  No.
6      Q.  What would you say that EAC is?
7      A.  Arbitrary.
8      Q.  Arbitrary.  What do you mean by that?
9      A.  It is just a pricing mechanism.
10     Q.  Is -- do you know if EAC is defined at
11  all under Maine law?
12     A.  I am sure that -- I am pretty sure that
13  we have that in our Section 80 pharmacy policy as
14  a term, but it is not something that we use for
15  reimbursement means.
16     Q.  What did you use for reimbursement in
17  Maine?
18     A.  We use AWP.
19     Q.  And that stands for Average Wholesale
20  Price?
21     A.  That's correct.
22     Q.  And what is Average Wholesale Price?

Page 72

1      A.  Again it is a pricing mechanism that's
2  set on a drug file.
3      Q.  Where did -- during your time at the
4  Maine state Medicaid program where did Maine look
5  to find Average Wholesale Price data?
6      A.  We purchased --
7      MS. ST. PETER-GRIFFITH:  Form.
8      A.  Okay.  We purchase drug files from
9  First Databank.  Originally First Databank and
10  then Medi-Span as we implemented our PDL.
11     Q.  Your?
12     A.  Preferred drug list.
13     Q.  And First Databank and Medi-Span, are
14  those commonly referred to as compendia, drug
15  pricing compendia?
16     A.  I am not sure.  I don't refer to them
17  that way.
18     Q.  Do you know whether Maine state
19  Medicaid program ever had a written definition of
20  Average Wholesale Price?
21     A.  We define it in our rules.
22     Q.  When is the first time you remember

Page 73

1  ever hearing the term AWP?
2      MS. ST. PETER-GRIFFITH:  Object to the
3  form.
4      A.  In the spring of 2000.
5      Q.  How did you hear about AWP at that
6  time?
7      A.  I was given the Maine RX program to run
8  and you have to set reimbursement to run a drug
9  program.
10     Q.  Prior to 2000 you had never heard of
11  the term AWP?
12     A.  I don't recall.
13     MR. MALONE:  Let me introduce another
14  exhibit that's been previously marked Abbott
15  Exhibit 326.  For the record, this is a document
16  entitled Medicaid Drug Reimbursement Report and
17  in the upper left-hand corner it says NPC-1990,
18  and it appears to contain a number of years 1990
19  through 2006.
20     Q.  Have you ever seen this document before
21  --
22     A.  Yes.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

8e8c0070-c540-4f61-a0f2-1edca3a788ed

Walsh, Jude E.                                        March 26, 2008
                          Augusta, ME

Page 118

1  marked as Abbott Exhibit 148.  If you can take a
2  look at that and let me know when you have
3  finished.  For the record this is a May 25th,
4  2000, letter from a number of individuals.  From
5  the American College of Apothecaries, American
6  Society of Consultant Pharmacists, American
7  Pharmaceutical Association, National Community
8  Pharmacists Association, and -- and two others.
9  It is addressed Dear State Medicaid Director.  I
10  know you were not the state Medicaid director at
11  the time, Ms. Walsh.
12       Do you recognize, first of all, any of
13  the names or organizations listed at the -- at
14  the back of this letter?
15    A.  No names, but the organizations I have
16  heard of some of them.
17    Q.  And are these organizations that might
18  have contacted you -- you to register complaints
19  about pharmaceutical pricing?
20    A.  No.
21    Q.  Because these are -- are these national
22  organizations?

Page 119

1    A.  They seem to be.
2    Q.  What are some of the provider
3  organizations or pharmacist organizations that
4  would have contacted you about payment for
5  prescription drugs?
6       MS. ST. PETER-GRIFFITH:  Object to the
7  form.
8    A.  Pharmacy Group of New England, Maine
9  Pharmacy Association, and National Association of
10  Chain Drug Stores.
11    Q.  And I assume then that you did not --
12  you do not recall ever receiving this letter?
13    A.  No, I don't.
14    Q.  Having looked it over, however, do you
15  recall any of the sentiments in this letter being
16  expressed to you by -- you or the Maine Medicaid
17  -- state Medicaid agency during this time frame
18  of May 2000?
19    A.  No, I don't.
20    Q.  What do you recall about the Department
21  of Justice's effort in 2000 to implement these
22  revised average wholesale prices?

Page 120

1    A.  I don't --
2       MS. ST. PETER-GRIFFITH:  Object to the
3  form.  Sorry.
4    A.  I don't recall anything.
5    Q.  Anything?  Okay.
6    A.  No.
7    Q.  Let's take a look at one more study
8  before we break.  This is marked previously as
9  Abbott Exhibit 197.  For the record this is a
10  March 14th, 2002, document.  It is from Janet
11  Rehnquist, the Inspector General of the
12  Department of Health and Human Services, and the
13  subject of the memo -- cover memo is Medicaid
14  Pharmacy Actual Acquisition Costs Of Generic
15  Prescription Drug Products, and there is a three
16  page memo and then it attaches a report dated
17  March 2002, and you can just take your -- a
18  second to familiarize yourself with this
19  document.
20       Okay.  Do you recall ever seeing this
21  document before?
22    A.  I might have.

Page 121

1    Q.  In 2002 you were working at the
2  Medicaid program still?
3    A.  Yes, I was.
4    Q.  Would reports like this have been
5  transmitted to the head of the Maine state
6  Medicaid program?
7    A.  Yes.
8    Q.  And he or she would have reviewed this
9  and determined whether action was necessary?
10    A.  They probably would have given it to me
11  and we could have talked about it.  I don't
12  remember.
13    Q.  In the first paragraph of the cover
14  memo towards the bottom of the page it says most
15  states use -- I'm sorry, towards the bottom of
16  the paragraph, it says most states use Average
17  Wholesale Price, AWP, minus a percentage
18  discount, which varies by state, as a basis for
19  reimbursing pharmacies for drug prescriptions.
20  Although this discount averaged 10.31 percent
21  nationally in 1999 we believe that it is not a
22  sufficient discount to ensure that a reasonable

31  (Pages 118 to 121)

8e8c0070-c540-4f61-a0f2-1edca3a788ed

# Joseph Fine
# (Maryland) (30(b)(6))

Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -


     Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

     MENTAL HYGIENE BY JOSEPH L. FINE


                 Baltimore, Maryland

                 Tuesday, December 9, 2008

                 9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                          December 9, 2008

## Baltimore, MD

Page 90

1   just because the witness hasn't reviewed it in
2   preparation for the deposition doesn't mean that the
3   State of Maryland ever received it or reviewed it.
4   And I think -- I guess I'm not blaming the questioning
5   necessarily, but I think it would be easier if that
6   was clarified as to time going forward.
7       A.   I am not familiar with this document.
8           BY MR. TORBORG:
9       Q.   Either from your preparation sessions or
10  your time?
11      A.   Correct.
12      Q.   Okay.  And did you do anything to determine
13  whether or not the department received a copy of this
14  document on or around the time it was published?
15      A.   I have no knowledge.
16      Q.   So you did no investigation, correct?
17      A.   Correct.
18      Q.   If I could direct you to the page 5 of this
19  document.  Again, this is the 1989 OIG report?
20          MR. DAVIS:  Counsel, you're referring to
21  the page designations in the upper right-hand corner?
22          MR. TORBORG:  Yes, sir.

Page 91

1           BY MR. TORBORG:
2       Q.   The second paragraph from the bottom that
3   starts with "Rugby Laboratories," do you see that?
4       A.   Yes.
5       Q.   It says "Rugby Laboratories' director of
6   regulatory affairs was recently quoted in the
7   Lexington Harold-Leader as saying 'The average
8   wholesale price is a joke.  It has largely become a
9   farce because many companies have abused it and
10  continue to abuse it.'"  Do you see that?
11      A.   Yes.
12      Q.   Does this refresh your personal
13  recollection or whether or not you've ever reviewed
14  this document?
15      A.   I have never read this document nor have I
16  heard anyone talking about that paragraph.
17          MR. TORBORG:  This will be Abbott Maryland
18  2.
19          (Exhibit Abbott Maryland 002
20               was marked for
21               identification.)
22          BY MR. TORBORG:

Page 92

1       Q.   For the record, what I've marked as Abbott
2   Maryland 2 is a July 5th 1987 news article from the
3   Lexington Herald ledger titled "Drug industry
4   overcharging Medicaid prescriptions cost taxpayers
5   millions of extra dollars."  Do you see that?
6       A.   Yes.
7       Q.   And the author is listed as John Winn
8   Miller.  Do you see that?  Does that name ring a bell
9   at all?
10      A.   No.  And when you say Frankfort, we're
11  talking about Kentucky or what are we talking about?
12  Frankfort Lexington Herald?
13      Q.   I am assuming that it's Kentucky.
14           If you would take a look at that --
15      A.   The reason why I ask is because it's
16  Reuters and Reuters could be international.  Yes, it
17  is.  On page 3, "The trouble in Kentucky."  It was
18  Kentucky.
19      Q.   Take a look at this article, if you would,
20  Mr. Fine --
21      A.   Mm-hmm.
22      Q.   -- and tell me if you recall it.

Page 93

1       A.   I do not recall it.
2       Q.   You may have seen it; you just don't recall
3   it?
4       A.   No.  I have not seen it.
5       Q.   You're certain of it?
6       A.   I'm positive.
7       Q.   How are you so certain?
8           MR. DAVIS:  Objection.
9       A.   I don't recall this, so that's how certain
10  I am.
11      Q.   I'd like to hand you what's already been
12  marked as Abbott Exhibit 82.  Mr. Fine, if you would
13  take a look at that to the extent necessary to tell me
14  whether or not you personally recall reviewing this
15  document?
16      A.   I do not personally recall reviewing this
17  document.
18      Q.   Did Maryland Medicaid review documents from
19  OIG that related to Medicare drug reimbursement?
20          MS. YAVELBERG:  Objection, form.
21      A.   I have no knowledge.
22      Q.   What did you do to investigate whether or

24  (Pages 90 to 93)

0bd2b054-a753-a4e97-a066-e37ff7ee308f

Page 94

1   not Maryland Medicaid, anyone in the department,
2   reviewed this document?
3          MS. YAVELBERG:  Objection, form.
4      A.   Could you restate that question, please?
5      Q.   What did you do, if anything, to
6   investigate whether the department reviewed this
7   report?
8      A.   I didn't do anything because I had no
9   knowledge of this document.
10      Q.   But others in the department may have
11   reviewed the document, correct?
12      A.   It is possible.
13             (Exhibit Abbott Maryland 003
14               was marked for
15               identification.)
16      BY MR. TORBORG:
17      Q.   This will be Abbott Maryland 3.  I've
18   already marked this one at least twice but we'll give
19   it a new sticker.  And just to go back a second, the
20   document that I showed you that was Abbott exhibit --
21   the previous one.
22      A.   Mm-hmm.

Page 95

1      Q.   The report titled "An analysis of the cost
2   of dispensing third party prescription" -- I'm sorry.
3   Wrong one.  "The cost of dialysis-related drugs"?
4   That one?
5      A.   Yes.
6      Q.   That one is listed in the Abbott cross
7   notice as item number 6, correct?
8      A.   Correct.
9      Q.   And the document that I have now handed you
10   as Abbott Maryland 3 is the document that's listed as
11   item 7 of the Abbott cross notice, correct?
12      A.   Yes.
13      Q.   Do you recall this document, Mr. Fine,
14   personally?
15      A.   No, I do not.  I do not recall this
16   document.
17      Q.   Did you do anything to investigate whether
18   others in the department reviewed this report?
19      A.   I have not.
20          MR. DAVIS:  Let me just note a continuing
21   objection to that line of questioning with regard to
22   any investigation as to items in the cross notice

Page 96

1   inasmuch as we did not receive this until -- the
2   service date on this is November 25th, which is only
3   two weeks ago.
4          MR. TORBORG:  We have to take a tape change
5   break.
6          THE VIDEOGRAPHER:  This is the end of tape
7   1.  Off the record at 11:09.
8          (Recess.)
9             (Exhibit Abbott Maryland 004
10               was marked for
11               identification.)
12          THE VIDEOGRAPHER:  This is the beginning of
13   tape 2 in the 30(b)(6) deposition of DHMH by Joseph
14   fine.  On the record at 11:20.
15          BY MR. TORBORG:
16      Q.   Welcome back, Mr. Fine.  I've handed you as
17   Abbott Maryland 4 a September 5th 1986 letter from
18   Douglas Morgan to HCFA.  It's on State of Maryland
19   DHMH letterhead copied to a number of individuals
20   including yourself; is that right?
21      A.   Yes.
22          MS. YAVELBERG:  David, can I ask the Bates

Page 97

1   number on the bottom right corner?  What does that
2   indicate?
3          MR. TORBORG:  That indicates that these
4   documents were taken from public comments.  I believe
5   they were made available by HCFA to a group of
6   defendants some time ago.  Abbott put Bates numbers on
7   it so they could manage them in its database.  That's
8   what that is.
9          MS. YAVELBERG:  Okay.  Thank you.
10          BY MR. TORBORG:
11      Q.   Mr. Fine, this document is from a long time
12   ago, but let me ask you if you recall it.
13      A.   Vaguely.
14      Q.   It appears to be comments that the State of
15   Maryland had to proposed rules that HCFA had issued
16   relating to drug reimbursement policy; is that right?
17      A.   Yes.
18      Q.   Do you recall that on or around 1986 and
19   1987 that HCFA issued regulations relating to drug
20   reimbursement under Medicaid programs?
21      A.   We're talking 20-some years ago.  22 years
22   ago.  HCFA put out drug information on a MAC program.

25  (Pages 94 to 97)

0bd2b054-a753-a4e97-a066-e37ff7ee308f

Page 182

1  sure where they came from.
2      Q.   Do you recall before today having seen any
3  of the pages in this?
4      A.   No, I have not seen them before.
5      Q.   Do you see if we go to Bates page ending
6  with the page 212 that's a letter from Zachary Bentley
7  to specialist for pharmacy medical care policy?
8      A.   Policy, yeah.  All inquiries -- as I said
9  previously, all inquiries went to policy.
10     Q.   Okay.  And this was referring to a
11 continuing education project concerning our nation's
12 Medicaid reimbursement of the above-referenced drugs.
13 And those are intravenous solutions and injectable
14 drugs.  Do you see that?  If you look at the re: line
15 of this letter?
16     A.   The what?
17     Q.   The re: line.
18     A.   I see the re: --
19     Q.   "Re: state policy and methodology" --
20     A.   Yeah.  Right.  I see.  "For reimbursement
21 of intravenous solutions and injectable drugs."  Yes.
22     Q.   Do you recall, personally, Mr. Fine, any

Page 183

1  discussions with Ven-A-Care ever?
2      A.   No.  Ever.  Ever.  I'm not saying that the
3  State of Maryland didn't have discussions with them,
4  but I didn't.
5      Q.   Let's take a look at the Abbott cross
6  notice that I've handed you again right there.  Topic
7  19 titled "Ven-A-Care."
8      A.   Mm-hmm.
9      Q.   It's asking for "the sum and substance of
10 any communications between you" -- and "you" is
11 defined earlier as the department -- "and
12 representatives of Ven-A-Care including but not
13 limited to," blah, blah, blah.  It goes on.  Right?
14     A.   Mm-hmm.
15     Q.   I take it you have done nothing to prepare
16 to testify on communications the department may have
17 had with Ven-A-Care?
18     A.   That is correct.
19     Q.   And if we go to the Bates page 210 in the
20 Abbott 1066, that's a response to Mr. Bentley on State
21 of Maryland letterhead; is that right?
22     A.   Yes.

Page 184

1      Q.   From Frank Tetkoski?
2      A.   Correct.
3      Q.   He was in the policy section?
4      A.   He was in the policy section.
5      Q.   So if I was to ask about communications
6  that the department had with Ven-A-Care, Mr. Tetkowski
7  might be a good place to start?
8      A.   Yes.  Inquiries were not unusual to policy.
9  How do you pay for drugs.  And Ven-A-Care is not any
10 different than any other company, et cetera, asking
11 questions of how you pay.
12     Q.   Okay.  I wanted to ask you about something
13 that he said in this letter.  It has really nothing to
14 do with Ven-A-Care, just how Maryland reimbursed
15 claims.  In the fourth paragraph of his response,
16 Bates page 210 -- I think you're with me --
17     A.   Mm-hmm.
18     Q.   -- he wrote "Claims submitted with the
19 catch-all code require some compounding and payment is
20 based on the ingredients, the supplies used and the
21 dispensing fee.  The actual drug and the bulk fluid
22 are ingredients and priced as previously stated."  Do

Page 185

1  you see that?
2      A.   Yes.
3      Q.   And then if we go -- I'm sorry.  I should
4  have started with the first paragraph.  The second
5  sentence.
6      A.   Which paragraph?
7      Q.   Actually, the second paragraph.  Let's just
8  start there.  "Prescriptions for home intravenous
9  therapy are covered either as a compound prescription
10 with special catch-all NDC codes or as an individual
11 item billed with the manufacturer's NDC code.
12 Intravenous drugs billed with the actual NDC number
13 can pay online with the point of sale system as with
14 any ordinary prescription with the reimbursement
15 amount calculated as quantity times unit cost plus
16 professional fee.  An IV claim billed with a catch-all
17 code must be submitted hard copy for manual
18 processing."  Do you see that?
19     A.   Mm-hmm.
20     Q.   Was that accurate?
21     A.   Yes.
22     Q.   I'd like to ask you to go to the chart on

47 (Pages 182 to 185)

0bd2b054-a753-4e97-a066-e37ff7ee308f

# Sandra Kramer (Michigan) (30(b)(1))

Kramer, Sandra                                    March 25, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL INDUSTRY        MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION     Civil Action:

                                       01-CV-12257-PBS

THIS DOCUMENT RELATES TO U.S.          Judge Patti B. Saris

Ex rel. Ven-A-Care of the Florida      Magistrate Judge

Keys, No. 06-CV-11337-PBS              Marianne B. Blower

                          /




        The Videotaped Deposition of SANDRA KRAMER,

        Taken at 2860 Eyde Parkway,

        East Lansing, Michigan,

        Commencing at 9:08 a.m.,

        Tuesday, March 25, 2008,

        Before Cynthia A. Chyla, CSR 0092.

Kramer, Sandra                                            March 25, 2008

Page 146

1    Q.   When you published the target MACs for
2  comment, would providers provide comments on the MACs?
3    A.   You know, it's kind of escaping me but I
4  would assume there were some comments from the
5  providers.
6    Q.   Do you know if other states used a similar
7  process to establish their MACs?
8    A.   I don't know how they set their MACs.
9    Q.   If they had wanted to, could they have
10  obtained a pharmacist consultant to do
11  something similar --
12       MR. HENDERSON:  Objection to form.
13  BY MR. GABEL:
14    Q.   -- to what Michigan was doing?
15    A.   I don't know their -- their decision points.
16    Q.   Is it fair to say that MACs were not based
17  on any single manufacturer's prices?
18    A.   I'm really not clear how he set the prices,
19  because a generic entity could have anywhere, you know,
20  like a small number of NDCs or like, you know, hundreds
21  of NDCs that relate with it, and I'm not aware of how
22  he set the MACs or the process that he went through to

Page 147

1  do it.
2    Q.   Does he still work as a consultant for
3  Michigan Medicaid?
4    A.   Not that I'm aware of.
5    Q.   Do you know where he practices, or does he
6  still practice as a pharmacist?
7    A.   I've lost touch with him.
8    Q.   Okay.  Did Michigan Medicaid ever -- well,
9  strike that.
10       Do you know roughly how many generic
11  drugs were on the MAC lists in the '90s?
12       MR. HENDERSON:  Objection.
13    A.   That's -- no, I don't.  I believe one of the
14  -- I can't remember if one document referred to
15  something -- related to additional generic entities
16  were added, but it's not like I kept track of how many
17  were on the MAC list.
18  BY MR. GABEL:
19    Q.   Do you know if any of the subject drugs in
20  this case as identified in the complaint were on
21  Michigan's MAC list?
22    A.   I'd to have research that.  I do not know.

Page 148

1    Q.   The best way to find that out would be to
2  actually look at the list of the MAC prices for
3  Michigan Medicaid during the relevant time period?
4    A.   Because I no longer work for the department,
5  to retrieve that information now I'm unclear how you
6  would go about it.
7    Q.   Okay.  Do you know whether or not the MAC
8  list for -- MAC lists for 1991 through 2001 still
9  exist?
10    A.   I wouldn't know.
11    Q.   How often were the MACs updated?  And I'm
12  talking specifically about the period of 1991 through
13  the time you left Michigan Medicaid?
14    A.   The schedule was not regular.  Only to my --
15  I don't know what the exact --
16    Q.   Do you know:  Was it done roughly yearly?
17    A.   I would guess it's more frequently than
18  that, but I don't even know if it was quarterly.
19    Q.   And they were updated by the same process we
20  described, the pharmacist consultant would do the
21  updating?
22       MR. HENDERSON:  Objection to the

Page 149

1  form.
2    A.   In the '90s?
3  BY MR. GABEL:
4    Q.   In the '90s.
5    A.   I don't know exactly when he started in the
6  '90s.
7    Q.   And, so, for drugs on the MAC list, prior to
8  1995 when the switch was made to EAC, for those drugs
9  that were on the MAC list, the MAC would act as a cap
10  for any providers who submitted actual acquisition
11  costs that happened to be above those MAC levels; is
12  that right?
13    A.   Right.
14    Q.   And, then, on top of that cap, there could
15  be another cap which would have been the AWP screen?
16    A.   That's what I'm recalling.  I know we
17  already discussed this issue, but it's -- before I
18  believe sometime in '94, Michigan did not have NDCs
19  and, you know, kind of trying to grope with how it was
20  handled with the Michigan billing codes.
21    Q.   Michigan had its own billing codes?
22    A.   Um-hmm.

38 (Pages 146 to 149)

a2ec164a-d34e-4eff-9164-2373f4149e12

# Gary Cheloha
# (Nebraska) (30(b)(6))

Lincoln, NE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Dey, Inc., et. al., Civil )

Action No. 05-11084-PBS; and United)

States of America, ex. rel.        ) December 2, 2008

Ven-a-Care of the Florida Keys,    ) 8:57 a.m.

Inc., v. Boehringer Ingleheim      )

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) VOLUME I

----------------------------------X

Deposition of THE NEBRASKA DEPT. OF HEALTH AND HUMAN

SERVICES by GARY CHELOHA, taken by Defendants, pursuant

to Notice, held at the Cornhusker Hotel, Lincoln, Nebraska,

before Shana W. Spencer, a Certified Shorthand Reporter

and Notary Public of the State of Nebraska.

d98d776d-741f-454c-8c46-8fdf11028000

# Lincoln, NE

Page 130

1       A.   The same general process, looking at
2   the availability and the difference between the
3   price of the brand and the generic.  We would
4   receive recommendations or information from
5   providers, from Pace, mailings from the drug
6   companies about the availability of their generic
7   version of a brand name.  Really, from any
8   source, we would consider, and we'd look at the
9   product for determining its MAC.
10      Q.   And once you determined -- I guess,
11  let's start currently.  Once you determined that
12  there's a particular drug that you'd like to set
13  a maximum allowable cost for, how do you go about
14  setting that actual price?
15      A.   Ask for a recommendation from Pace
16  Alliance.  We'll also call pharmacies to
17  determine the range of costs or range of
18  recommended -- recommendations for SMAC pricing.
19      Q.   Okay.  So if you find out from Mr.
20  Woods at Pace that, for a particular prescription
21  drug, that he can purchase it for, say, 50 cents
22  for that particular dosage, I mean, do you use

Page 131

1   that figure?  Or is there a calculation involved
2   in taking that number and turning it into a MAC?
3       A.   Into an actual SMAC price?
4       Q.   Uh-huh.
5       A.   There is no set formula, and he doesn't
6   provide us -- I think he has -- I believe he has
7   confidentiality agreements for the actual price
8   that the Alliance members can purchase the drug
9   for.  So -- and we rely mostly on the Pace
10  recommendations.
11      Q.   So he'll give you kind of a range, and
12  you'll --
13      A.   He'll generally quote a specific price.
14  He'll say 8 cents, 10 cents.  I recommend this
15  for the SMAC price on it.
16      Q.   And do you know -- you said that
17  there's some confidentiality provisions as far as
18  what they're actually paying.  Do you know if he
19  bills in some percentage or a few cents here or
20  there to make sure that other people can get that
21  or to account for profit or anything like that?
22      A.   All I would know for sure is that it's

Page 132

1   more than the contract price, but I don't know
2   whether he uses a specific formula or how he
3   specifically determines that.  He -- from time to
4   time, on a very limited basis, he and I have
5   discussed -- how will I say it -- the price that
6   the pharmacies pay.  And then I would -- when I
7   was doing it, I made a determination of where to
8   set the MAC price, at something above that.
9       Q.   And did you have a formula, or you were
10  just -- it was a case-by-case basis for --
11      A.   Generally, a case -- it was a case-by-
12  case basis.  I did not have a set formula.
13      Q.   And I'm assuming that the -- you said
14  that Pace is a purchasing organization that has
15  pharmacies in Nebraska, and those pharmacies are
16  participants in the Medicaid program?
17      A.   Yes.
18      Q.   Do you have a sense of how many
19  pharmacies obtain their drugs from Pace?
20      A.   I don't anymore.
21      Q.   Okay.
22      A.   It's -- when I was with the pharmacists

Page 133

1   association, I don't know that I could tell you
2   the number even then.  It's not what it was 20
3   years ago, and I do -- I'm sorry.  I don't know
4   the number in Nebraska.
5       Q.   Okay.  Is it a large percentage, small?
6   I mean, do you remember?
7       A.   I would -- it's a small percentage.
8       Q.   Small.  Okay.  And so I think we had
9   kind of narrowed that -- our previous
10  conversation to the current time period.  Is that
11  the similar process that has always taken place
12  as far as the setting of the actual rates that
13  were paid?
14      A.   I'm sorry.  I missed the first part of
15  what you said.  Is that the --
16      Q.   Has that always been the practice in
17  setting the particular prices for state MACs, or
18  has that changed over time?
19      A.   Many years ago, we had access to the
20  McKesson catalog.  And also, there was a
21  wholesaler in Lincoln, Lincoln Drug Company, and
22  we had access to their catalog information.  And

Henderson Legal Services, Inc.

d98d776d-741f-454c-8c46-8fdf11028000

Lincoln, NE

Page 286

1   the extra cost of home IV.
2        And what my question is:  Is did Nevada
3   -- Nebraska Medicaid treat home infusion or home
4   IV therapy and drugs dispensed through home IV
5   different than it did other drugs?
6        MR. DUNNING:  I'm going to object to
7   form.  Is there a time frame you're talking
8   about?  1988 or a different time frame?
9        Q.  (BY MS. CITERA)  I'm really asking
10  ever, but if you want me to break it down -- if
11  the witness needs me to break it down, I
12  certainly can.
13       A.  When -- and I'll respond to the
14  question.  When the point-of-sale system was
15  implemented with First Health in 1995, I found
16  directions from the then Medicaid pharmacy
17  consultant, Max Ward, to First Health to -- for
18  IV therapy compounding, which was priced
19  manually, to use AWP or to allow a higher than
20  AWP minus pricing, I believe, up to AWP for the
21  ingredient costs.  So at that time, which was
22  April of '95 until sometime after I started in

Page 287

1   1996, in which I changed that, there was
2   different consideration given to the compounding
3   of the home IV therapy products.
4        Q.  And after you changed it?
5        A.  Subjected the ingredients to the same
6   EAC or MAC or -- well, I don't know if there were
7   any federal upper limits on injectables, but to
8   use that same pricing for the ingredients as in
9   any other prescription.
10       Q.  Was there ever a compounding fee paid
11  separate?
12       A.  Not that I recall, no.
13       Q.  Was there a dispensing fee paid that
14  was higher than the dispensing fee for, you know,
15  the pills or other drugs like that?
16       A.  At one time, I allowed payment of two
17  dispensing fees if there were at least two
18  ingredients.
19       Q.  So two dispensing fees might be paid if
20  there were two ingredients?
21       A.  That's correct.  For --
22       Q.  Do you know what time frame that was?

Page 288

1        A.  For prescriptions that the cost was 50
2   -- or the charge to the Department was $50 or
3   greater.  And then -- that was for an interim
4   period, and then it was changed to $30 or greater
5   until -- so that would have been -- I'm going to
6   estimate it was '98 until the implementation of
7   the ACS point of sale, at which time, they could
8   handle multi-line billings for compounded
9   prescriptions, so 2003.
10       Q.  So at that time in 2003, the Department
11  stopped paying a dispensing -- two dispensing
12  fees if there were two ingredients?
13       A.  That's right.  That's correct.
14       Q.  Do you know why, in the time period
15  prior to 1996, the Department chose to pay at AWP
16  or AWP less than 8.71 percent?
17       A.  I do not know why Mr. Ward made that
18  decision, no.  I mean, I can't say definitively
19  why he made that decision.
20       Q.  Can you say -- can you -- do you have
21  an idea as to why?
22       MR. DUNNING:  Object to form,

Page 289

1   foundation.  Calls for speculation.
2        THE WITNESS:  This bulletin addresses
3   the issue of a complicated -- more complicated
4   process which may result in additional time being
5   needed to compound and prepare those
6   preparations.  So --
7        Q.  (BY MS. CITERA)  So as I understand it,
8   in this instance, it's possible that the
9   ingredient cost was used to compensate for the
10  cost of dispensing a home IV?
11       MR. DUNNING:  Object to form,
12  foundation.
13       THE WITNESS:  Again, I'm not sure why
14  Max allowed -- or directed First Health
15  specifically to do that.
16       Q.  (BY MS. CITERA)  But it's possible?
17       MR. DUNNING:  Objection.  Same
18  objection, form, foundation.  It's been asked and
19  answered.
20       Q.  (BY MS. CITERA)  Can you answer?
21       MR. DUNNING:  He's already answered.
22       MS. CITERA:  I disagree.

d98d776d-741f-454c-8c46-8fdf11028000

Lincoln, NE

Page 290

1      MR. DUNNING:  He's answered --
2      MS. CITERA:  Are you instructing him
3  not to answer?
4      MR. DUNNING:  Well, I would say that
5  he's answered to the best of his ability.
6      MS. CITERA:  Well, are you -- but my
7  question is:  Are you instructing him not to
8  answer?
9      MR. DUNNING:  I'm not instructing him
10  not to answer.
11     Q.  (BY MS. CITERA)  Mr. Cheloha, is it
12  possible?
13     MR. DUNNING:  Same objection.
14     THE WITNESS:  At this time, yes, it was
15  possible.
16     Q.  (BY MS. CITERA)  Were any surveys done
17  to consider the cost of dispensing home infusion
18  drugs?
19     A.  No.
20     Q.  In the survey that you mentioned today
21  that was done, I believe, last year or in the
22  last two years, did you -- was special

Page 291

1  consideration given to home infusion pharmacies?
2      A.  I believe they were excluded, and I
3  don't know if that was by decision or whether
4  that was due to the lack of participation of
5  those pharmacies.  I don't recall.  But I believe
6  that they were not -- were not surveyed for their
7  cost of dispensing.
8      Q.  So the approximately -- I think you
9  said it was in the range of 8.50 to 11-dollar
10  estimation of the cost of dispensing would not
11  have included home infusion pharmacies?
12     A.  To the best of my knowledge, that's
13  correct.  That's accurate.
14     Q.  At some point today -- I know it's been
15  a long day -- you talked about lobbying.  And I'm
16  just wondering whether home infusion pharmacies
17  ever lobbied the Department for increases in
18  reimbursements?
19     A.  I can -- I recall that a pharmacist
20  provided information from what I believe was the
21  national -- a National Association of
22  Compounding, or home IV pharmacies.  And if you

Page 292

1  consider that lobbying, I was provided with
2  information.  The Department really doesn't allow
3  lobbying of staff.  Lobbying would occur at the
4  state legislature with the state senator.  But I
5  was provided information at one time, as it was -
6  - I believe a white paper was the term that I
7  would use to describe that information.
8      Q.  Do you know if you still have that
9  white paper?
10     A.  I did not see it when I went through
11  all of those documents.
12     Q.  Do you know around when that white
13  paper was submitted?
14     A.  My best guess would be around 2000, the
15  year 2000, but that's purely a guess.  I do not
16  remember any event or other occurrence that could
17  help me recall, you know, like, this is when I
18  got it because something happened.  So that's
19  just a guess.
20     Q.  Okay.  You know, we would just ask, if
21  you could, to -- if you come across it, to
22  produce it to us.

Page 293

1      A.  I --
2      Q.  Do you recall what the nature of the
3  white paper was?
4      A.  Justification or explanation for the
5  process used to prepare sterile products and the
6  costs and time associated with that and attempted
7  justification for a compounding fee or some
8  consideration from Medicaid for a different
9  reimbursement -- higher reimbursement.
10     Q.  Do you recall what, if any, response
11  the Department made to that white paper?
12     A.  Rejected that request.
13     Q.  Why was that?
14     A.  There was no established policy at the
15  time for exceptional reimbursement, and I think I
16  just -- I mean, there was no policy to allow us
17  to do that.
18     Q.  When you say there was no policy, do
19  you mean there was no -- well, why don't you tell
20  me what you mean by that, because I'm not sure I
21  understand.
22     A.  We had established reimbursement

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Lincoln, NE

Page 294

1    algorithms and used those to price and pay all
2    claims at that point in 2000.
3        Q.   And so the Department decided that it
4    would not -- it did not want to change those
5    algorithms to make an exception for this type of
6    therapy?
7        A.   As the --
8        Q.   I'm sorry.  What did you say?
9        A.   I didn't finish.
10       Q.   Oh, sorry.
11       A.   In my capacity as the pharmacy
12   consultant, at that time, I just rejected the
13   request.
14       Q.   Why?
15           MR. DUNNING:  I object.  I believe it's
16   been asked and answered.
17       Q.   (BY MS. CITERA)  Why not change the
18   policy?
19       A.   I don't recall my reasoning at that
20   time.  Nothing -- I can't recall anything
21   specific, but if I -- I mean --
22       Q.   Did you consider the fact that maybe

Page 295

1    drug reimbursement or drug ingredient cost was
2    being used to offset some of the cost that the
3    home infusion pharmacies were seeking a fee for?
4        A.   Not that I recall.
5        Q.   Do you know of any communications that
6    the Nebraska Medicaid program has had with
7    Abbott?
8        A.   I'm not sure I understand.  But are you
9    saying did we correspond with -- have we received
10   information from Abbott, or have we --
11       Q.   Yeah.  Has the Department had any
12   communications with Abbott over the course of
13   your employment with the agency, to your
14   knowledge?
15       A.   We may have had calls.  If Abbott had a
16   government representative, there may --
17       Q.   Do you -- I'm sorry.  I didn't mean to
18   cut you off.
19       A.   If Abbott had a government
20   representative, not a salesperson but a
21   government representative, it's certainly
22   possible.

Page 296

1        Q.   Do you know if there were any
2    communications or -- strike that.
3            Are you aware of any communications
4    between Nebraska Medicaid and Abbott regarding
5    Abbott's prices?
6        A.   I remember seeing an Abbott catalog or
7    something that contained prices for Abbott
8    products.
9        Q.   Do you recall where you received that
10   from?
11       A.   I believe it was the hospital
12   representative from Abbott.
13       Q.   Do you recall when this was?
14       A.   I do not, not specifically.  1997
15   maybe, or maybe it was a regular Abbott pricing
16   catalog.
17       Q.   What do you mean by regular Abbott
18   pricing catalog?
19       A.   I don't know.
20       Q.   Okay.  Other than that one instance, do
21   you recall any other communications between
22   Nebraska Medicaid and Abbott regarding Abbott's

Page 297

1    prices?
2        A.   Nothing specific, no.
3            MS. CITERA:  How are we doing on time?
4    I have two more topics I'd like to cover, but I
5    want to get a sense from the witness and from
6    Matt how we're doing.
7            MR. DUNNING:  We're past 5:00.  How
8    much longer do you think you're going to take?
9            MS. CITERA:  How about five, ten more
10   minutes?
11           MR. DUNNING:  I think we can do that.
12       Q.   (BY MS. CITERA)  Okay.  Can you,
13   Marissa, or someone, pull Exhibit 921 and 922?
14           MS. LORENZO:  Sure.  I think they're
15   doing that now.
16           THE WITNESS:  These previously
17   submitted ones?
18           MS. CITERA:  Yeah.  They're Dey 921 and
19   Dey 922.
20           THE WITNESS:  I have 921 and 922 in
21   front of me, and this is Gary.
22       Q.   (BY MS. CITERA)  I'm just going to be

75 (Pages 294 to 297)

NE Dept of Health and Human Services (Gary Cheloha)                    December 2, 2008

Lincoln, NE

Page 298

1  quick here. I wanted to direct your attention to
2  page 2 of the document. It's at least labelled
3  page 2 at the bottom.
4        MR. DUNNING: Of 921?
5     Q.  (BY MS. CITERA) Of 921. It's labelled
6  -- it's under scope.
7     A.  All right. I have that.
8     Q.  Okay. I just wanted to quickly direct
9  your attention to one item here. It says in the
10 third paragraph, last two sentences under scope:
11 We included the non-traditional category so as to
12 be able to exclude those pharmacies from our
13 estimates. We believe that such pharmacies are
14 able to purchase drugs at substantially greater
15 discounts than a retail pharmacy and would
16 inflate our estimate.
17       And in referring back, nontraditional
18 is defined as (nursing home pharmacies, hospital
19 pharmacies, home IV, et cetera). Do you see
20 that?
21    A.  I do.
22    Q.  Would you agree that those types of

Page 299

1  pharmacies are able to purchase drugs at
2  substantially greater discounts than retail
3  pharmacies?
4        MR. DUNNING: I'm going to object to
5  form and foundation on this exhibit. I don't
6  recall if this is an exhibit that Mr. Cheloha has
7  seen before or not.
8        MS. CITERA: Well, I'm just asking
9  generally, in his experience, does he agree that
10 they are able to purchase drugs at --
11       MR. DUNNING: I'm making my objection
12 for the record, and he'll testify to the extent
13 of his ability as a 30(b)(6) designee.
14       MS. CITERA: Sure.
15       THE WITNESS: I have no knowledge of
16 the specialty pharmacies' ability to buy at
17 discounts substantially greater than the --
18    Q.  (BY MS. CITERA) So you've never heard
19 that nontraditional pharmacies are able to
20 purchase drugs at substantially greater
21 discounts?
22    A.  I know about the concept of the closed-

Page 300

1  door pharmacy, if that's included as a specialty
2  or non, non-traditional.
3     Q.  And it goes with the nursing home
4  pharmacies.
5     A.  Yes. As far as home infusion, have I
6  ever heard that said? I -- at this point, I
7  can't say definitively yes or no. I don't have
8  an opinion, and I don't have recollection about
9  anything specifically related to that any more
10 than any other -- just were pharmacies buying at
11 discounts, or whatever. So I don't know that
12 they were singled out, and I don't know why they
13 were or weren't included in this, in this scope
14 of this one. I mean, other --
15    Q.  And you don't recall -- I'm sorry.
16    A.  Other than what it states here, I have
17 no other knowledge about this.
18    Q.  And when you -- when you received this
19 report, do you recall seeing that in the report?
20    A.  I do not.
21    Q.  I think we can skip 922. It shows the
22 same thing, so we'll move on.

Page 301

1        MR. DUNNING: All right.
2        MS. CITERA: Marissa, can you give the
3  witness exhibit -- or tab 37?
4        MS. LORENZO: Yep.
5        MS. CITERA: And, also, I'm going to
6  want to refer to Exhibit 909 that you marked. I
7  believe it's the MAC list, if you want to get
8  that out as well.
9        (Exhibit Abbott NE 005 was
10 marked for identification.)
11    Q.  (BY MS. CITERA) Just let me know when
12 you have it in front of you, Mr. Cheloha.
13    A.  I have it, NE 5, Nebraska page 1121.
14    Q.  Okay. Do you recognize -- I'm sorry.
15 It's been marked Exhibit 5?
16    A.  Abbott Nebraska 5.
17    Q.  Thank you. Do you recognize this
18 document?
19    A.  I do.
20    Q.  And can you tell me what it is?
21    A.  It's a document or a paper written by
22 me describing what the Medicaid pharmacy program

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

d98d776d-741f-454c-8c46-8fdf11028000

NE Dept of Health and Human Services (Gary Cheloha)                    December 2, 2008

Lincoln, NE

Page 302

1  has been doing to help control expenditures for
2  pharmaceuticals.
3      Q.  And just for clarification, who was it
4  written to?
5      A.  It looks like to myself.
6      Q.  Yeah.  I mean, I don't know.  It looks
7  like a memo to file.  Do you know?
8      A.  I believe --
9      Q.  I'm sorry.  What?
10         MR. DUNNING:  He's considering the
11  issue.
12         MS. CITERA:  Oh, sorry.
13         THE WITNESS:  It was developed by me or
14  written by me as a -- you know, to describe those
15  efforts and the things that we had done and been
16  doing.  And in -- I don't know if it was ever
17  distributed to any administration.
18      Q.  (BY MS. CITERA)  In item No. 4, it
19  talks about Nebraska's MAC program, and it says a
20  few sentences in:  One injectable that we MAC'd
21  was Vancomycin.  The difference in price between
22  published AWPs and actual purchase prices were

Page 303

1  $65 per dose versus $13 per dose.  Do you see
2  that?
3      A.  I do.
4      Q.  Where did you get the information for
5  the $13 per dose?  Do you recall?
6      A.  I think I referenced an Abbott pricing
7  document a few minutes ago.
8      Q.  Okay.  So you believe you may have
9  gotten the information directly from Abbott, the
10  $13?
11      A.  I may have, yes.
12      Q.  Okay.  And can you tell me if it was
13  difficult to set a MAC for Vancomycin?
14         MR. DUNNING:  Object to the form.
15         THE WITNESS:  It was not difficult in
16  that I had this pricing information available,
17  and the process was the same as any other MAC
18  drug.  It was not a drug that attracted a lot of
19  attention due to its place in the total payment
20  by the Department for drugs or classes of drugs.
21      Q.  (BY MS. CITERA)  What do you mean by
22  that?  Well, let me -- to speed it up, do you mean

Page 304

1  that it was not a heavily-used product by
2  Medicaid?
3      A.  That's -- that's what I --
4      Q.  Heavily-reimbursed product?
5      A.  That is my intention of that statement,
6  yes.
7      Q.  Okay.  Do you know if you got pharmacy
8  -- information from pharmacies about the price of
9  Vancomycin in order to set the MAC?
10      A.  I don't recall one way or the other.
11      Q.  Okay.  If you could just turn to 909,
12  Exhibit -- what I believe was Exhibit 909, the
13  MAC list.
14      A.  All right.  I have that.
15      Q.  Okay.  I've looked through this, and on
16  pages 55 and 56, it looks like there's some MAC
17  information for Vancomycin.  Do you see that?
18      A.  I do, yes.
19      Q.  And I think you testified to this
20  before.  But in some instances, it looks like the
21  begin date is after the end date.  Can I assume
22  that that's a mistake?  Do you see that?  Like,

Page 305

1  for example, 20611 says that it began in April
2  2006 and that it ended on 12/31/1999.
3      A.  That end date is actually all 9s, and
4  that's a default date.
5      Q.  Oh, I see.  Okay.
6      A.  And I believe I also testified earlier
7  that those begin dates were, to a certain extent,
8  defaults because of our move to ACS for claims
9  processing and --
10      Q.  So it's possible they may have been
11  earlier?
12      A.  Yes.
13      Q.  Okay.
14      A.  And I'm -- yes.  It's likely that they
15  were earlier.  It's earlier than the 2006 date
16  and 2005 date.
17      Q.  Do you have any idea as to when they
18  might have been MAC'd?  I mean, obviously we saw
19  in Exhibit 5 that at least one version of
20  Vancomycin was MAC'd in 1989.
21      A.  Yes.  That should have been consistent
22  across the whole -- all the forms of the

# Lise Farrand
# (New Hampshire) (30(b)(6))

Concord, NH

Page 1

                  UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

In Re: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Master File No.

-------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:          )

United States of America ex rel.   ) Hon. Patti B.

Ven-A-Care of the Florida Keys,    )    Saris

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,     ) VIDEOTAPED

and United States of America ex    ) DEPOSITION

rel. Ven-A-Care of the Florida     ) OF THE NEW

Keys, Inc., et al. v. Boehringer   ) HAMPSHIRE DEPT.

Ingelheim Corp., et al., Civil     ) OF HEALTH &

Action No. 07-10248-PBS and United ) HUMAN SERVICES

States, ex rel. Ven-A-Care of the  ) BY LISE C.

Florida Keys v. Abbott             ) FARRAND

Laboratories, Inc. Civil Action    )

Nos. 06-CV-11337 and 07-CV-11618   ) OCTOBER 28, 2008

-------------------------------X

ff2a09d4-6d96-4138-8ac8-bdac97d50764

Page 158

1    Q.   Those are sometimes reports called OIG
2  reports?
3    A.   Uh-hum, yes.
4    Q.   Have you ever seen OIG reports?
5    A.   Yes.
6    Q.   When those reports are received by New
7  Hampshire Medicaid, you're one of the people that
8  reviews those reports?
9    A.   They go to some clearinghouse here in
10 the state and they are put out on the web, and
11 they don't necessarily -- they don't actually
12 come to me.
13   Q.   Okay.
14   A.   They are not routed to me.
15   Q.   You've seen OIG reports related to
16 reimbursement for drugs, right?  Withdraw that.
17        You've seen OIG reports relating to
18 AWPs and acquisition costs for prescription
19 drugs, right?
20   A.   I don't know.
21   Q.   But that would be information that
22 might have been available to you?

Page 159

1    A.   Yes.
2    Q.   Do you know who else would have had
3  that information available at the New Hampshire
4  Medicaid?
5    A.   Whoever would look through the federal
6  mail.
7    Q.   As a general matter, did New Hampshire
8  Medicaid consider the information provided by the
9  Office of Inspector General reliable?
10        MR. HENDERSON:  Objection.
11        THE WITNESS:  I don't know.
12 BY MR. KATZ:
13   Q.   Do you know whether or not the OIG
14 reports were considered when New Hampshire
15 Medicaid was setting its reimbursement?
16   A.   I don't know.
17   Q.   Do you know who would know?
18   A.   Probably whatever commissioner was at
19 the --
20        MS. WEISSBARD:  Wait, wait, she didn't
21 finish.  Now you're talking on top of her.
22        THE WITNESS:  Whatever commissioner was

Page 160

1  at the helm at the time that was deciding or
2  legislation.  Some of those were legislators, and
3  they may have seen an OIG report.
4  BY MR. KATZ:
5    Q.   Could it also have been the pharmacy
6  program director starting in 2001?
7    A.   Could be.
8    Q.   Did Ms. Clifford ever speak to you
9  about any OIG reports?
10   A.   Not that I can remember.
11   Q.   Are you aware Rhode Island and
12 Massachusetts use a price called Wholesale
13 Acquisition Cost or WAC?
14   A.   Yes.
15   Q.   In its reimbursement methodology?
16   A.   I am aware some states use WAC.
17 Whether it was Massachusetts and Rhode Island in
18 specific, no.
19   Q.   You never had any discussions with
20 Medicaid officials at Rhode Island or
21 Massachusetts about their use of WAC?
22   A.   No.

Page 161

1    Q.   Do you know if New Hampshire Medicaid
2  considered using WAC in its reimbursement
3  methodology?
4    A.   I know we will have to change our
5  reimbursement methodology in the future because
6  First Data Bank is no longer going to be updating
7  AWP.
8    Q.   And do you know whether or not -- so
9  you don't know what the options are being
10 considered right now by New Hampshire Medicaid?
11   A.   No.
12        (Exhibit Dey 092 marked for
13 identification.)
14   Q.   Okay.  I've handed you a document
15 marked Dey Exhibit 92.  Now this is a document
16 produced by New Hampshire Bates stamped NH 03878
17 to 03771.  Do you recognize this document?
18   A.   Yes, this was in my file cabinet.
19   Q.   When did you first review this
20 document?
21   A.   When I took the job and I found that it
22 was in my file cabinet.

41 (Pages 158 to 161)

ff2a09d4-6d96-4138-8ac8-bdac97d50764

Concord, NH

Page 170

1    Q.  Okay.
2    A.  I think the costs may be made up in
3  other areas, not necessarily in that
4  reimbursement.
5    Q.  What other areas?
6    A.  By having these people come into the
7  stores.  That's how pharmacies make money, by
8  other sales.
9    Q.  But they are also making money on
10  dispensing drugs, right?
11    A.  Not necessarily.
12    Q.  Does New Hampshire Medicaid believe
13  that New Hampshire pharmacies are losing money on
14  every time they dispense a drug?
15    A.  That I don't know.
16    Q.  You don't have any reason to believe
17  that that's what the state believes, right?
18        MR. HENDERSON:  Objection.
19        THE WITNESS:  I don't know.
20  BY MR. KATZ:
21    Q.  Are you familiar with someone by the
22  name of Cody Weiberg?  He is a Minnesota

Page 171

1  Medicaid, a former Minnesota Medicaid pharmacy
2  administrator?
3    A.  No.
4    Q.  That name doesn't sound familiar to
5  you?
6    A.  There are pharmacy administrators for
7  50 states and they change frequently, so.
8    Q.  Are you on a list serve called NMPAA?
9    A.  N-M?
10    Q.  PAA, National Medicaid Pharmacy
11  Administrators?
12    A.  I am on an AMPA.
13    Q.  And that's a list serve where pharmacy
14  administrators of Medicaid programs exchange
15  information?
16    A.  Ask questions, yes.
17    Q.  Do you recall any Medicaid pharmacy
18  administrators discussing adjusting the
19  dispensing fee when the DOJ AWPs were
20  implemented?
21    A.  I was not part of the list serve then.
22    Q.  But in general, do you recall any

Page 172

1  discussion at the Medicaid agency regarding
2  adjusting the formula, adjusting the
3  reimbursement methodology in any way when the DOJ
4  AWPs were implemented?
5    A.  No.
6        MR. KATZ:  Want to break now and I'll
7  finish up my portion after lunch.
8        VIDEOGRAPHER:  Time is 12:24.  We are
9  off the record.
10        (Exhibit Dey 093 marked for
11  identification.)
12        VIDEOGRAPHER:  The time is 1:02.  We
13  are on the record.
14  BY MR. KATZ:
15    Q.  Going to hand you a document marked Dey
16  Exhibit 93.  It is Bates stamped NH 04227 through
17  4231.  This is a list of Medicaid releases 1 to
18  144, right?
19    A.  Yes.
20    Q.  Have you ever seen this document
21  before?
22    A.  Yes.

Page 173

1    Q.  When?
2    A.  It is a federal -- when you go on the
3  federal CMS website and you want to find a state
4  Medicaid release, go by topic and it will tell
5  you what release number to look for.
6    Q.  And all of these releases relate to the
7  Medicaid drug rebate program, right?
8    A.  Not necessarily the drug rebate
9  program.  Some of it are coverage of
10  reimbursement.
11    Q.  Who receives the releases when CMS puts
12  them out at New Hampshire Medicaid?
13    A.  They are sent through federal mail.  I
14  don't believe that a paper copy is sent.
15    Q.  Do you see those copies?  Do you review
16  the releases as they are issued by CMS?
17    A.  I may get sent them by someone else in
18  the state.  They decide that, oh, this looks like
19  it belongs to you.
20    Q.  Have you reviewed releases relating to
21  the Medicaid drug rebate program?
22    A.  I have, yes, some.

44  (Pages 170 to 173)

ff2a09d4-6d96-4138-8ac8-bdac97d50764

Page 186

1      MR. HENDERSON:  That is exhibit what?
2      MR. KATZ:  96.
3  BY MR. KATZ:
4      Q.   And this is the Supplemental Rebate
5  Agreement between First Health and Dey, right?
6      A.   Yes.
7      Q.   And then Exhibit 97 evidences New
8  Hampshire's participation in that rebate
9  agreement, right?
10     A.   Yes.
11     Q.   And New Hampshire then receives
12  supplemental rebates from Dey; or they, at least,
13  have an agreement with Dey to receive
14  supplemental rebates, right?
15     A.   At this point in time, in 2003, they
16  had an agreement.
17     Q.   Do you know how the supplemental
18  rebates are calculated with respect to Dey?
19     A.   No.
20     Q.   Can you turn to the final page of
21  Exhibit 96? Now this is titled "Schedule 3
22  Supplemental Rebate Calculation"?

Page 187

1      A.   Yes.
2      Q.   And do you see here that WAC is part of
3  the calculation?
4      A.   That is what this states, yes.
5      Q.   And also the CMS unit rebate amount is
6  part of the calculation?
7      A.   Yes.
8      Q.   And the CMS unit rebate amount is based
9  on AMP, right?
10     A.   Yes.
11     Q.   And AWP is not part of the calculation,
12  right?
13     A.   Not that I can see here.
14     Q.   And do you know why AWPs are not used
15  to calculate supplemental rebates?
16     A.   I don't know.
17     MR. HENDERSON:  Counsel, are you
18  suggesting that the state of New Hampshire
19  received this document that's been marked Exhibit
20  96 or had knowledge of the Schedule 3 that's
21  included at the back of this?
22     MR. KATZ:  Well, let me ask the

Page 188

1  witness.
2  BY MR. KATZ:
3      Q.   Does New Hampshire have a copy of the
4  Supplemental Drug Rebate Agreement between Dey
5  and First Health which would cover the agreement
6  with New Hampshire?
7      A.   I don't know.
8      Q.   This is something that New Hampshire
9  Medicaid could obtain from First Health if it
10  wanted to get, right?
11     MR. HENDERSON:  Objection.
12     THE WITNESS:  I would believe so.
13  BY MR. KATZ:
14     Q.   Has New Hampshire Medicaid ever met
15  with any representatives of Ven-a-Care?
16     A.   Of who?
17     Q.   Ven-a-Care of Florida Keys?
18     A.   No.  Let me put it this way:  I have
19  never met.  I don't know about other members of
20  Medicaid.
21     Q.   So they could have?
22     A.   The commissioner's office, I don't

Page 189

1  know.
2      Q.   Does it sound familiar to you that the
3  National Association of Medicaid Fraud Control
4  Units had a meeting with all the Medicaid
5  programs in 1998 in which representatives of Ven-
6  a-Care spoke?
7      A.   I don't know.
8      Q.   You can set those exhibits aside.  Do
9  you recall any specific communications that
10  you've had with any representatives of Dey?
11     A.   No.
12     Q.   To your knowledge, has New Hampshire
13  Medicaid ever explicitly instructed Dey how to
14  set, report or calculate its AWP?
15     A.   No.
16     Q.   To your knowledge, has New Hampshire
17  Medicaid ever explicitly instructed Dey to how to
18  set, report or calculate its WAC?
19     A.   No.
20     Q.   Does New Hampshire Medicaid have any
21  knowledge about how Dey markets or sells its
22  drugs?

48  (Pages 186 to 189)

ff2a09d4-6d96-4138-8ac8-bdac97d50764

# Edward Vaccaro
# (New Jersey) (30(b)(6))

Trenton, NJ

Page 323

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------X

In re: PHARMACEUTICAL          ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE     ) Civil Action No.

PRICE LITIGATION               ) 01-12257-PBS

----------------------------X

THIS DOCUMENT RELATES TO:      ) Hon. Patti B. Saris

United States of America       )

ex rel. Vena-A-Care of the     )

Florida Keys, Inc.,            )

v. Dey, Inc., et al., Civil    )

Action No. 05-11084-PBS        )

----------------------------X

Continued Videotaped Deposition Of

THE STATE OF NEW JERSEY DEPARTMENT

OF HUMAN SERVICES by EDWARD J. VACCARO

DECEMBER 3, 2008

TRENTON, NEW JERSEY

9:04 A.M.

b8f82058-8500-490d-b833-e6b27705e427

Trenton, NJ

Page 476

1  Number HHD021-0121 through HHD021-0122, is marked
2  for identification.)
3        THE WITNESS:  Okay.  I'm fine.  Go
4  ahead.
5  BY MR. KIM:
6     Q.   Okay.  Thank you.
7        Under Comments Part 3, it says:  Our
8  review -- I'd like to read this into the record.
9        "Our review was limited to ingredient
10 acquisition costs and did not address other areas
11 such as the effect of Medicaid business as a
12 contribution to other store sales, the cost to
13 provide professional services other than
14 dispensing a prescription, such as therapeutic
15 interventions, patient education, physician
16 consultation, and the cost of dispensing, which
17 includes costs for computers, multipart labels,
18 containers, technical -- technical staff,
19 transaction fees, Medicaid specific
20 administrative costs and general overhead."
21       My question for you, Mr. Vaccaro, is --
22 I'm sorry, to -- to as a representative of the State

Page 477

1  of New Jersey is:  The costs that are listed here
2  that are associated with dispensing costs that
3  you see in this paragraph, computers, multipart
4  labels, containers, technical staff, do you agree
5  that these are costs that are -- that are part of
6  the cost of dispensing a prescription?
7     A.   Yes.
8     Q.   Okay.  Including Medicaid specific
9  administrative costs and general overhead?
10    A.   Cost of doing business.
11    Q.   Okay.  The -- you'll see here that
12 right above the paragraph that I just read into
13 the record, it says, "We reviewed a draft copy of
14 a State report," and then it says, "The State
15 officials believed that the report should include
16 the following disclaimer," and the disclaimer is
17 what I partly just read into the record; is that
18 correct?
19    A.   Correct.
20    Q.   And then the next paragraph says, "The
21 State officials were concerned that without the
22 above disclaimer, that uninformed State officials

Page 478

1  might overreact to our report and adjust pharmacy
2  reimbursement without considering the other
3  aspects of reimbursement."
4        You see that; right.
5     A.   Yes.
6     Q.   Okay.  And then the next paragraph,
7  "The State officials also expressed a desire to
8  obtain a copy of the data reviewed for their
9  respective States so that they could analyze."
10       What are they referring to as "a copy
11 of the data."
12    A.   OIG's data.
13    Q.   What is OIG's data?
14    A.   The invoice, the result of the invoice
15 collection.
16    Q.   The result of the invoice collection or
17 the information collected to compile the OIG
18 audit report?
19       MS. YAVELBERG:  Objection, form.
20       THE WITNESS:  Likely one and the same.
21 BY MR. KIM:
22    Q.   Okay.  And was New Jersey amongst one

Page 479

1  of those states that requested or expressed a
2  desire to obtain a copy of this data?
3     A.   I don't recall.
4     Q.   New Jersey does not recall whether it
5  obtained or whether it requested?
6     A.   New Jersey participated in a conference
7  from 1995 which is now 13 years ago.  I do not
8  recall if we requested a copy of that report.  I
9  apologize.
10       MR. KIM:  How much time?
11       THE VIDEO TECHNICIAN:  Eight minutes.
12       MR. KIM:  We should break for lunch.
13       MS. YAVELBERG:  That's fine.
14       MR. KIM:  Because this is definitely
15 going to go over the eight minutes.
16       MS. YAVELBERG:  Okay.
17       THE VIDEO TECHNICIAN:  This concludes
18 Tape Number 3 of the video deposition of Edward
19 Vaccaro.  The time is 12:09.  We are going to
20 break for lunch.  We are off the record.
21       (A luncheon recess is held.)
22       THE VIDEO TECHNICIAN:  This is the

b8f82058-8500-490d-b833-e6b27705e427

Page 728

1  do you have?  It's -- it's 10 to 6:00.
2       MR. BERLIN:  Less than five minutes.
3       MS. YAVELBERG:  Okay.
4  BY MR. BERLIN:
5     Q.   Could you go -- I -- I believe you were
6  shown, and if you can't find it quickly, that's
7  fine, but it was a letter sent from Ven-A-Care to
8  you dated October 24, 1994.
9     A.   Yes.
10    Q.   And it says, "I'm currently working on
11 a continuing educational project."
12    A.   Yes.
13    Q.   Did you -- do you remember receiving
14 that letter?
15    A.   Honestly, Eric, I do not.
16    Q.   Okay.
17    A.   It may not even have reached me in that
18 there was a process in the organization for
19 things to pass through the Director's office on
20 down.  If something came directly to me, I may
21 either decided not to respond to it or didn't --
22 I don't recall.  You know, it's interesting how

Page 729

1  the letter's written.  Continuing --
2     Q.   Why -- what do you mean by that?
3     A.   Well, just continuing education, you
4  know, it looked like its intent was to get
5  information, that kind of thing.
6     Q.   It looked like the intent was to get
7  information for some sort of a continuing
8  education project; right?
9     A.   That's what it looked like, yes.
10    Q.   It -- it didn't, in fact, say that
11 we're collecting documents to -- for a lawsuit;
12 right?
13    A.   No, it did not.
14    Q.   I mean, in fact, it contained a lie;
15 right?
16       MS. YAVELBERG:  Objection, form.
17       THE WITNESS:  Yeah, and I'm not too
18 sure I can -- I can respond to that, but -- but
19 knowing what I know now and looking at the
20 letter, one has to conclude certain things.
21 BY MR. BERLIN:
22    Q.   Well, let me ask it a slightly

Page 730

1  different way.
2       If, in fact, Ven-A-Care was not
3  collecting this for a continuing educat -- what -
4  - what is your understanding or -- or what would
5  have been your understanding, as best you can
6  tell, in 1994 what was meant by continuing
7  education project.
8     A.   Well, I have to preface that by saying
9  I was not familiar with Ven-A-Care at that point,
10 number one.  Number two, we did get letters from
11 researchers, you know, graduate students looking
12 for information from Medicaid because we store a
13 lot of information in our system.  So we would
14 service those requests.  So back in '94, looking
15 at it then, we probably would have treated it
16 like any other request for information, again,
17 knowing what we know at the time, that's all.
18    Q.   All right.
19    A.   I don't think -- I don't think it would
20 have gotten any special attention.  That's my
21 point.
22    Q.   You would have just handed -- 'cause

Page 731

1  you get lots of requests --
2     A.   Yes.
3     Q.   -- for continuing education projects --
4     A.   Yes.
5     Q.   -- that sort of thing?
6     A.   Yes.  In fact, we get quite a few
7  because we have so much information, healthcare
8  information, that kind of thing in our system.
9  And if it's approved --
10    Q.   Would you have handled it differently
11 if it had said we're collecting a -- we're
12 collecting documents to build a case for a
13 national lawsuit?
14    A.   I probably would have brought that to
15 the attention of our Director in the agency and
16 had the Director's office make a decision how
17 best to handle that.  We do have a legal entity
18 within the agency that would look at it and
19 perhaps respond to it.
20    Q.   It would have -- it would have created
21 more problems for Mr. Bentley and Ven-A-Care to
22 get the documents; right?

b8f82058-8500-490d-b833-e6b27705e427

# Anne Haase
# (North Dakota) (30(b)(6))

Haase, Anne                                    December 10, 2008

Rapid City, SD

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS          )

--------------------------------X


          VIDEOTAPE DEPOSITION OF:  ANNE HAASE

             DATE:  December 10, 2008

               TIME:  9:02 a.m.

       PLACE:  Radisson Hotel, 445 Mount Rushmore

            Road, Rapid City, South Dakota

a751ed6f-1814-410a-9212-ada6f2207df0

Haase, Anne                                    December 10, 2008
                        Rapid City, SD

---

Page 22

1    there for a few years, and then she came back.
2    And she was above me. I'm not sure if she was
3    assistant or what. But she was above me.
4    Assistant director. I don't know what her title
5    was.
6        Q. Do you know -- well, approximately what
7    year did you leave your employment with the
8    state?
9        A. '97.
10       Q. '97?
11       A. I started here June 30th, in South
12   Dakota. I took inventory and started my store
13   July 1st. So I know those dates.
14       Q. So you -- after -- immediately after
15   leaving North Dakota, you started your employment
16   at your current pharmacy?
17       A. Yeah.
18       Q. In Spearfish, South Dakota?
19       A. I mean, I don't know if it was, you
20   know, within the month of June or May but, yeah.
21       Q. It was your next job?
22       A. Yes.

Page 23

1        Q. Do you know who took your position when
2    you left Medical Services?
3        A. No. I don't think they had it filled.
4    I don't remember it being filled when I left.
5    But I'm not sure.
6        Q. Can you give me a general description
7    of your responsibilities as pharmacy
8    administrator for Medical Services?
9        A. I don't remember the exact job
10   description. But basically I worked with
11   pharmacists, worked with the other units, claims.
12   Anything to do with pharmacy they pretty much
13   asked questions or we worked together on things.
14       Q. The pharmacist would ask questions?
15       A. If the pharmacist -- you -- in the
16   pharmacy had questions about whether something
17   was covered or not, then they could call me, or
18   they could call the customer service.
19           And if the customer service couldn't
20   answer the question, then they would forward them
21   in to me.
22       Q. Did your job involve reimbursement

Page 24

1    formulas for prescription drugs under North
2    Dakota's Medicaid program?
3        A. There was a formula. Don't ask me what
4    it was at this point.
5        Q. At the time were you aware what it was?
6        A. Yeah. There was a formula, yeah.
7        Q. Were you involved in any amendments or
8    changes to that formula during your time at North
9    Dakota Medicaid?
10       A. There might have been a change to the
11   dispensing fee. I don't remember. It was all
12   done computerized, electronic.
13       Q. Do you recall any proposed amendments
14   to the reimbursement formula during your time at
15   North Dakota Medicaid?
16       A. You mean during the sessions and stuff?
17       Q. Well, by sessions, what do you mean?
18       A. Like, when the legislature got -- met.
19   I don't -- I mean, there could have been in some
20   of those. We didn't really get called down
21   unless it was actually, you know, really going to
22   happen or something. And then we were sometimes

Page 25

1    told to give our opinions.
2            And I don't know that I went down
3    there. I think Pat probably did, if there was.
4    I don't remember.
5        Q. But your department would have been
6    involved?
7        A. May have. I mean, I guess it's the
8    director of the medical division, and they saw
9    all of the things that came down. And they
10   evaluated whether they were there, and then they
11   evaluated whether I went or not.
12           So I didn't really know. I was told
13   you will -- if we need you, we need you to be
14   there on this day or something.
15       Q. And as you mentioned, after working for
16   North Dakota Medical Services, you -- your next
17   job was the pharmacy that you currently work at?
18       A. Uh-huh.
19       Q. And that's Medicap Pharmacy in
20   Spearfish, South Dakota?
21       A. Uh-huh.
22       Q. Do you have an ownership interest in

7 (Pages 22 to 25)

a751ed6f-1814-410a-9212-ada6f2207df0

Haase, Anne                                    December 10, 2008
                        Rapid City, SD

Page 102

1    Q.  Do you know whether there were any home
2  infusion pharmacies in North Dakota?
3    A.  No, I don't.
4    Q.  You don't know or, no, there were none?
5    A.  I don't know.
6    Q.  During your time at North Dakota
7  Medicaid, did you ever compare what a provider
8  was submitting as a usual and customary charge to
9  the estimated acquisition cost formula of AWP
10 minus 10 percent?
11       MS. THOMAS:  Objection.  Form.
12    A.  Don't remember.
13    Q.  (BY MS. GEISLER)  During your time at
14 North Dakota Medicaid, did you do any analysis of
15 the cost -- I'm sorry, strike that.
16       During your time at North Dakota
17 Medicaid, did you ever do any analysis of the
18 reimbursement amounts that were paid to
19 providers?
20    A.  Not that I know of.
21    Q.  Are you familiar with the term -- or
22 while you were at North Dakota Medicaid, are you

Page 103

1  familiar with the term maximum allowable cost?
2    A.  I've heard of it.
3    Q.  During your time at North Dakota
4  Medicaid, did North Dakota Medicaid ever pay for
5  drugs based on a maximum allowable cost?
6    A.  I'm not sure.
7    Q.  During your time at North Dakota
8  Medicaid, did North Dakota Medicaid ever require
9  recipients to make a co-pay?
10       MS. THOMAS:  Objection.  Form.
11    A.  I don't know.  I guess I'm sure it's on
12 file there.  I don't remember.
13    Q.  (BY MS. GEISLER)  During your time at
14 North Dakota Medicaid, did North Dakota Medicaid
15 do anything to incentivize the dispensing of
16 generic drugs?
17       MS. THOMAS:  Objection.  Form.
18    A.  I don't know.
19    Q.  (BY MS. GEISLER)  During your time at
20 North Dakota Medicaid, did you have any
21 communications with Abbott Laboratories?
22    A.  Maybe in the rebate program, if I had a

Page 104

1  question on their rebates.
2    Q.  Do you recall any specific
3  conversations you had with anyone at Abbott
4  Laboratories during your time at North Dakota
5  Medicaid?
6    A.  No.
7    Q.  I'm sorry.  Was there an answer to the
8  question?  If so, I didn't hear it.
9    A.  I said no.
10    Q.  Do you recall during your time at North
11 Dakota Medicaid, if you had any communications
12 with pharmaceutical manufacturers regarding the
13 amount that North Dakota was reimbursing for
14 prescription drugs?
15    A.  Not that I know of.
16       MS. GEISLER:  I don't have any more
17 questions.
18       MR. MALONEY:  Did anyone else join us
19 on the phone?
20       Do you have any questions?
21       MS. THOMAS:  Yeah.  I think I just have
22 one or two.

Page 105

1
2            CROSS-EXAMINATION
3  BY MS. THOMAS:
4    Q.  Could you turn back, please, to the
5  exhibit marked Dey 705?  It's the one with the
6  dark cover.
7    A.  Okay.
8    Q.  And if you would look again at the
9  claim form that Mr. Maloney directed your
10 attention to before.  It's between pages 10 and
11 11.
12    A.  Okay.
13    Q.  Are you able to read the second
14 sentence that is in that block 22 into the
15 record, please, starting, "I understand."
16    A.  "I understand that payment and
17 satisfaction of this claim will be from federal
18 and state funds and accept as payment in full the
19 amount paid and that any false claims, statements
20 or documents or concealment of a material fact
21 may be prosecuted under the applicable federal
22 and state laws."

                        27 (Pages 102 to 105)

a751ed6f-1814-410a-9212-ada6f2207df0

# Brendan Joyce
# (North Dakota) (30(b)(6))

# Bismarck, ND

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION )

--------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:          ) Master File No.

United States of America ex rel.   ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,    )

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,     ) Hon. Patti B.

and United States of America ex    ) Saris

rel. Ven-A-Care of the Florida     )

Keys, Inc., et al. v. Boehringer   )

Ingelheim Corp., et al., Civil     )

Action No. 07-10248-PBS            )

--------------------------------X

VIDEOTAPED DEPOSITION OF THE NORTH DAKOTA DEPARTMENT

OF HUMAN SERVICES-MEDICAID DIVISION by BRENDAN JOYCE

     DATE:          Friday, December 12, 2008

     PLACE:         Bismarck, North Dakota

     REPORTED BY:   Deanna L. Sager, R.P.R.

e493af4d-8e46-4d73-8103-a911360fe13d

Bismarck, ND

Page 38

1   $2.
2       A.   Yes.
3       Q.   And have you heard about these types of
4   contracts since you started?
5       A.   Yes.
6            MR. BAHR:  Since you started you mean
7   at the department?
8            MR. MALONEY:  At the Department of
9   Human Services, yes.
10      Q.   (Mr. Maloney continuing)  And you said
11  -- I believe you said that you talked with other
12  state Medicaid pharmacists regarding their
13  reimbursement schedules.  Do you recall the names
14  of any of these state Medicaid pharmacists?
15      A.   Specific to discussions about
16  reimbursement policy?  Mark Petersen in South
17  Dakota would be the only one that I can guarantee
18  that I had discussed it with him.
19      Q.   But you do remember having discussions
20  with other state Medicaid pharmacists --
21      A.   Yes.  But I do not know which ones in
22  particular.

Page 39

1       Q.   Okay.  Do you have an idea of how many
2   states -- or state Medicaid pharmacists you may
3   have spoken to?  A general idea of the number?
4            MR. BAHR:  Regarding?
5       Q.   Regarding reimbursement.
6       A.   Specifically reimbursement, I'm not
7   sure.
8       Q.   Do you -- do you have any idea whether
9   it was more than two?
10      A.   I'm sure it was more than two.  When
11  you get up to the ten to 15 I'm not sure if it's
12  more than that.
13      Q.   Okay.  And generally what did you learn
14  about other states' reimbursement schedules or
15  formulas when you spoke with these other state
16  Medicaid pharmacists?
17      A.   You're asking what I learned as far as
18  what their reimbursement schedule is or....
19      Q.   Yes.
20      A.   Learned mostly AWP based.  Some WAC.
21      Q.   And have you held these types of
22  conversations with other state Medicaid

Page 40

1   pharmacists since you started at the department?
2       A.   Isn't that what we were discussing?
3       Q.   I'm just trying to get an idea of the
4   time frame.  Did you start this -- you know, did
5   these conversations arise after you started, or
6   did you start talking to other state Medicaid
7   pharmacists the same year you started with the
8   Department of Human Services?
9       A.   I'm not sure when the discussions would
10  have first happened.  It's just one of the many
11  topics that are discussed.
12      Q.   Okay.  Do you have a general idea of
13  whether they started -- may have started years
14  after you first began work at the department or
15  before then?
16      A.   I'm --
17           MS. THOMAS:  Objection.  Form.
18      A.   I would -- pretty sure that it's been
19  talked about throughout my time here.
20      Q.   Okay.  And you mentioned WAC.  What
21  does WAC stand for?
22      A.   Wholesale acquisition cost.

Page 41

1       Q.   Do you have an understanding of what
2   wholesale acquisition cost is?
3       A.   In relation to?
4       Q.   Just in general what the term means in
5   -- I guess in relation to reimbursement.
6       A.   My understanding is it's the basis for
7   how First DataBank sets their AWPs.
8       Q.   I'd like to talk a little bit more
9   about the Medicaid Program.  The Medicaid Program
10  is a joint federal and state program, correct?
11      A.   Yes.
12      Q.   And at the federal level the agency
13  responsible for operating the program is called
14  the Centers for Medicare and Medicaid Services,
15  correct?
16      A.   Yes.
17      Q.   And that agency used to be called the
18  Health Care Financing Administration?
19      A.   Yes.
20      Q.   Is it okay if I just refer to it as
21  CMS?
22      A.   Yes.

11  (Pages 38 to 41)

e493af4d-8e46-4d73-8103-a911360fe13d

ND Dept of Human Services - Medicaid Division (Brendan Joyce)                              December 12, 2008

## Bismarck, ND

Page 202

1    aware from at least as early as 1986 that AWP
2    exceeded a pharmacy's acquisition cost?
3         MS. THOMAS: Objection. Form.
4       A.  I can only speak to my time there.
5       Q.  Okay.  For the time period that you
6    have worked at North Dakota Medicaid, would you
7    agree that North Dakota Medicaid was aware that
8    AWP exceeded pharmacy's acquisition costs for
9    prescription drugs?
10        MS. THOMAS: Objection. Form.
11      A.  And that would explain why we
12   implemented a MAC pricing algorithm.  So yes.
13      Q.  Okay.  Have you ever heard of the term
14   DOJ AWPs?
15      A.  I have heard of DOJ, and I've heard of
16   DOJ, but not specifically DOJ AWPs.
17      Q.  Are you familiar with a revised list of
18   AWPs for approximately 400 NDCs that was created
19   by the National Association of Medicaid Fraud
20   Control Units and the Department of Justice in
21   the early 2000s?
22      A.  I'm aware of DOJ pricing.

Page 203

1       Q.  Okay.  And North Dakota Medicaid used
2    these DOJ prices for a short time in 2000,
3    correct?
4         MS. THOMAS: I'm sorry.  Could you
5    repeat that?
6         MR. MALONEY: Could you read it back?
7         THE COURT REPORTER: "And North Dakota
8    Medicaid used these DOJ prices for a short time
9    in 2000, correct?"
10        MS. THOMAS: Objection.
11      A.  My memory would be based on what was
12   told to me while I -- when I started my job.
13   Because if it was implemented in 2000 and then
14   disimplemented it would have never occurred while
15   I was there.
16      Q.  (Mr. Maloney continuing)  And what was
17   told to you when you started at North Dakota
18   Medicaid recording DOJ pricing?
19      A.  I know there was a mention of DOJ
20   pricing.  I cannot state 100 percent exactly what
21   it was.
22        MR. MALONEY: Okay.  I'd like to mark

Page 204

1    this as Dey Exhibit 723.
2         (Whereupon, Exhibit Dey 723 was
3    marked for identification by the court reporter.)
4       Q.  (Mr. Maloney continuing)  Take a minute
5    to review this document.  Let me know when you're
6    ready.
7       A.  I'm ready.
8       Q.  Do you recognize this document?
9       A.  No.
10      Q.  Just for the record, this is a document
11   entitled, "Medicaid Prescription Drug Pricing
12   Survey Interview Sheet."  It bears Bates Nos.
13   HHD006-0301 to HHD006-0304.  This appears to be a
14   survey completed by a respondent from North
15   Dakota Medicaid, correct?
16        MS. THOMAS: Objection. Form.
17      A.  I can only assume given the information
18   filled out on top of the first page.
19      Q.  The name of the respondent listed on
20   this document is Cindy Frohlich, correct?
21      A.  Correct.
22      Q.  Do you recognize that name?

Page 205

1       A.  Yes.  As discussed earlier.
2       Q.  And refresh my recollection.  Was she
3    your predecessor?
4       A.  No.  She was the boss who quit -- put
5    in the notice the day I started.
6       Q.  Okay.  Okay.  So at the date indicated
7    on this document, January 25th, 2001, she worked
8    for North Dakota Medicaid, correct?
9       A.  Yes.  That was about two weeks before I
10   started.
11      Q.  Could you turn to the second page,
12   please.
13      A.  Okay.
14      Q.  Actually, I'm sorry, could you please
15   go back to the first page, item 4.
16      A.  Yes.
17      Q.  Item -- or question 4 on this survey
18   states, "Are you aware that First DataBank has
19   recently reported more accurate AWPs for over 400
20   NDCs based on work done by the U.S. Department of
21   Justice and the National Association of Medicaid
22   Fraud Control Units?"  And the response

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

e493af4d-8e46-4d73-8103-a911360fe13d

# Robert Reid
# (Ohio) (30(b)(1))

Reid, Robert Paul                        December 15, 2008
                    Columbus, OH

                   UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - )  MDL No. 1456

IN RE: PHARMACEUTICAL INDUSTRY   )  Master File No.

AVERAGE WHOLESALE PRICE LITIGATION) 01-12257-PBS

--------------------------------)

THIS DOCUMENT RELATES TO:        )  Hon. Patti B.

United States of America ex rel. )  Saris

Ven-A-Care of the Florida Keys,  )

Inc, et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS    )

--------------------------------


        VIDEOTAPED DEPOSITION OF ROBERT PAUL REID

                   Monday, December 15, 2008

                   9:59 o'clock a.m.

                   Jones Day

                   325 John H. McConnell Boulevard

                   Suite 600

                   Columbus, Ohio 43215

              SHAYNA M. GRIFFIN

          REGISTERED PROFESSIONAL REPORTER

Reid, Robert Paul                            December 15, 2008
                    Columbus, OH

Page 102

1    A.  I don't think anybody paid average
2  wholesale price.  Most pharmacies had
3  arrangements with their wholesalers that they
4  would get a discount based on volume.
5    Q.  You used the term "AAC" to
6  distinguish from average wholesale price?
7    A.  Yes.
8    Q.  And was it your understanding during
9  the entirety of the time that you were either a
10  consultant, staff pharmacist or administrator at
11  the various Ohio departments that worked --
12    A.  Uh-huh.
13    Q.  -- on the pharmacy issues that AWP
14  did not represent an actual acquisition cost?
15        MS. GEOPPINGER:  I'm going to object to
16  the form of the question.
17        You can answer.
18    A.  That understanding would have been
19  based on my experience as a pharmacy owner.
20    Q.  Going back to 1969?
21    A.  Yes.
22    Q.  Based on your interactions with other

Page 103

1  state pharmacy administrators, is it your view,
2  Mr. Reid, that the state pharmacy community all
3  knew that average wholesale price did not equate
4  to actual acquisition cost?
5        MS. GEOPPINGER:  Object to the form of
6  the question.
7        You can answer.
8    A.  That would be speculative on my part.
9  I don't know for a fact that every state thought
10  about that term in the same way.
11    Q.  You recall conversations about AWP
12  with your colleagues; right?
13    A.  I'm sure I had plenty, many.  I can't
14  recall a specific one.
15    Q.  Did you believe that the -- that in
16  trying to determine what a pharmacy actually paid
17  for a drug --
18    A.  Uh-huh.
19    Q.  -- that you could just take the AWP
20  and shave 20, 30 percent off of it and get to a
21  reliable price?
22    A.  No.

Page 104

1        MS. GEOPPINGER:  Object to the form of
2  the question.
3    A.  No.
4    Q.  And how did you learn that --
5        MS. GEOPPINGER:  Object to form of the
6  question.
7  BY MR. TORBORG:
8    Q.  -- that that wasn't the case?
9        MS. GEOPPINGER:  Okay.
10    A.  How did I learn AAC?
11    Q.  How did you learn that you couldn't
12  just take 20, 30 percent off AWP and get to a
13  reliable actual acquisition cost?
14    A.  I don't know that I ever thought
15  about it in those terms.  I think the difference
16  between AWP and AAC were all over the board, and
17  was different for different products.
18    Q.  Do you remember any kinds of products
19  for which it was more variable?
20    A.  Not in particular, no.
21    Q.  Did you become aware of wide
22  disparities between AWPs and AACs for drugs?

Page 105

1        MS. GEOPPINGER:  Object to the form of
2  the question.
3    A.  Conjecture on my part.  I recall
4  getting information from the National Fraud
5  Control Unit out of New York that talked about
6  that topic.
7    Q.  What do you recall about that?
8    A.  Well, they sent us a -- they sent --
9  I think they sent every state a binder about the
10  size of that one, and it contained information
11  about average wholesale price and actual
12  acquisition cost -- cost.
13        MR. TORBORG:  Let the record reflect he
14  was pointing to my binder, which is a three-inch
15  three-ring binder.
16    A.  Yes.
17    Q.  Do you recall when that was?
18    A.  I remember the guy's name that was
19  instrumental -- Lupinetti, I think it was -- in
20  the development of that; and I remember that it
21  was intended to be informative, and I don't think
22  it -- there was any mandate involved.  In other

27 (Pages 102 to 105)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                    December 15, 2008
                          Columbus, OH

Page 126

1     Q.  You stated that the -- the
2  handwritten annotations in the bottom right
3  corner are yours?
4     A.  Yes.
5     Q.  And I may have asked you this
6  already, but I apologize if I have.  Does
7  reviewing this letter again refresh your
8  recollection about any conversations that you had
9  with Mr. Bentley apart from the one that you
10 already testified about?
11    A.  Well, I mean, in going through there,
12 apparently, I had a lot more interaction with
13 them than I remembered.
14    Q.  And do you recall wondering why he
15 was doing a project relating to intravenous
16 solutions and injectable drugs?
17       MS. GEOPPINGER:  Object to the form of
18 the question.
19       You can answer.
20    A.  I don't recall why he -- that I knew
21 why he was doing it.  I -- we would get queries
22 from a lot of people about a lot of items.  It

Page 127

1  was not unusual to get a request to complete a
2  survey.  Yeah.
3     Q.  Do you recall this project or any
4  other issue relating to the pricing of
5  intravenous solutions and injectable drugs being
6  raised at a PTAG meeting?
7        MS. GEOPPINGER:  Would you mind
8  repeating that.  I'm sorry.  I just lost the end
9  of the question.
10       MR. TORBORG:  A PTAG meeting.  I'm
11 asking --
12       MS. GEOPPINGER:  Could you repeat the
13 question.  I'm sorry.
14 BY MR. TORBORG:
15    Q.  Mr. Reid, do you recall any issue
16 relating to intravenous solutions and injectable
17 drugs being raised at any meeting of the PTAG?
18    A.  I don't recall.
19    Q.  It could have, you just don't recall?
20       MS. GEOPPINGER:  Object to the form of
21 the question.
22       You can answer.

Page 128

1     A.  I'm sorry, what was it again?
2     Q.  It could have been raised, you just
3  don't recall?
4     A.  Yes, yes, that's right.  It wouldn't
5  be unusual.
6     Q.  Do you recall anything relating to
7  Ven-A-Care ever being raised at a PTAG meeting?
8     A.  I don't recall.
9     Q.  It could have, you just don't recall?
10       MS. GEOPPINGER:  Same objection.
11       You can answer.
12    A.  Correct.
13    Q.  If we go back four pages in the
14 document -- I guess forward to 346.
15    A.  Okay.
16    Q.  These appear to be some handwritten
17 notes asking for payment information for certain
18 NDC codes; is that right?
19    A.  Yes.
20    Q.  And is the handwriting on the right
21 side, the one that actually has some prices there
22 --

Page 129

1     A.  Yes.
2     Q.  -- is that your handwriting?
3     A.  Yes.
4     Q.  So, for example, if we go to the
5  second one down, Vanco, 0074-6533-01 --
6     A.  Yes.
7     Q.  -- that's not your handwriting, that
8  part; right?
9     A.  No, that's not.
10    Q.  But then the price that says 14.9553
11 (MAC), that is your handwriting?
12    A.  Yes.
13    Q.  Right?
14    A.  He asked me what we were paying for
15 Vancomycin and I responded.
16    Q.  There are some names listed in some
17 of the earlier pages of this document, a guy by
18 -- a man by the name of Jim Dyer.
19    A.  Jim Dyer was the bureau chief of
20 Surveillance and Utilization Review.
21    Q.  Do you recall having any discussions
22 with him relating to drug pricing?

                                33 (Pages 126 to 129)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                    December 15, 2008
                          Columbus, OH

Page 130

1      A.   Probably, but I can't recall any
2  specifics.
3      Q.   How about a -- sorry.  I've lost the
4  name. John Guthrie?
5      A.   John Guthrie?  To my recollection, he
6  was affiliated with the AG's office.
7      Q.   Did you have -- do you recall having
8  conversations with him relating to drug pricing?
9      A.   Vaguely.
10     Q.   What do you recall about that?
11         MS. GEOPPINGER:  Let me do this first:
12  Do you know if Mr. Guthrie is an attorney?
13         THE WITNESS:  Do I know if he is?
14         MS. GEOPPINGER:  You mentioned he was
15  in the AG's office.
16         THE WITNESS:  I thought -- I think he
17  is, I think he is.
18         MS. GEOPPINGER:  Okay.  To the extent
19  that it might reveal any attorney/client
20  privilege communications, I'd just caution you
21  not to reveal those.
22         th we:  Okay.  Well, I don't remember

Page 131

1  them anyhow, so...
2         MS. GEOPPINGER:  I figured that was the
3  case.
4  BY MR. TORBORG:
5      Q.   Do you remember having any
6  conversations with either of those gentlemen, Mr.
7  Guthrie or Mr. Dyer, relating to drug pricing?
8  And I'm not asking for the substance, just a yes
9  or no.
10     A.   I'm sure I did, but I don't remember.
11     Q.   Do you recall -- well, forget it.  If
12  you don't remember that, you're not going to
13  recall when they are.  Fair to say?
14     A.   Fair to say.
15     Q.   I'd like to hand you what we've
16  marked previously as Abbott Exhibit 581.
17     A.   Okay.
18     Q.   Mr. Reid, there's been some testimony
19  about these notes.
20         MS. GEOPPINGER:  Could he have a minute
21  just to take a quick look?
22         MR. TORBORG:  Sure.

Page 132

1      A.   I don't appear to be on this Medicaid
2  pharmacy reps.
3      Q.   Yes, I know.
4      A.   Okay.  Okay.  Go ahead.
5      Q.   There's been some testimony about
6  these notes, Mr. Reid, that they were prepared by
7  OIG after a meeting in August of 1994 in
8  Richmond, Virginia, relating to an audit that the
9  OIG was performing around that time to assess the
10  difference between invoice price for drugs and
11  AWP.
12     A.   Uh-huh.  Uh-huh.
13     Q.   Do you recall the OIG doing that
14  audit?
15         MS. GEOPPINGER:  Let me just object for
16  the record.  The previous testimony will speak
17  for itself.
18         You can answer.
19     A.   Well, they would come to us and audit
20  us on a variety of issues, but I don't remember
21  anyone specifically.
22     Q.   At the very bottom of the second page

Page 133

1  of the document -- you're there -- the very
2  bottom?
3      A.   Here?
4      Q.   No, the page --
5      A.   Oh, here?
6      Q.   Yes.
7      A.   Okay.  Oh, yeah.
8      Q.   The second to last line there is a
9  sentence that starts with "They stated."
10     A.   Uh-huh.
11     Q.   Okay.  It says, "They stated that we
12  should include a fifth category of pharmacies to
13  include non-traditional retail pharmacies such as
14  hospitals, home IV, nursing homes, physicians, et
15  cetera.  The state officials believed that these
16  pharmacies purchased at substantially bigger
17  discounts than traditional retail pharmacies."
18         Do you see that?
19     A.   I see that.
20     Q.   Okay.  Is that something that you
21  believed on or around 1994, that hospitals, home
22  IV, pharmacies, nursing homes and physicians

                          34  (Pages 130 to 133)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                    December 15, 2008
                        Columbus, OH

Page 134

1  could purchase drugs at substantially bigger
2  discounts than retail pharmacies?
3          MR. HENDERSON:  In 1994?
4      A.  Only because their volume was higher.
5  I think that that would be a logical assumption.
6      Q.  Do you recall being aware of that on
7  or around 1994?
8          MS. GEOPPINGER:  I'm going to object to
9  the form of the question.
10         You can answer.
11     A.  I don't recall.
12         MR. TORBORG:  Why don't we mark as --
13             ---
14         (And, thereupon, Exhibit Abbott-Reid
15  006 was marked for purposes of identification.)
16             ---
17  BY MR. TORBORG:
18     Q.  -- Abbott/Reid 6 a new document.
19     A.  Okay.
20     Q.  For the record, this document bears
21  the Bates No. HHD059-0015 through, I believe, 29.
22         MR. TORBORG:  Is that what you have,

Page 135

1  counsel?  Does it end with 29?
2          MS. GEOPPINGER:  Just a minute.  Sorry.
3  Yes, mine, in fact, ends with 29.
4          MR. TORBORG:  Okay.
5          THE WITNESS:  Uh-huh.
6  BY MR. TORBORG:
7      Q.  Mr. Reid, the first page of this
8  appears to be a fax dated June 12th, 1996, to
9  yourself.  Do you see that?
10     A.  Yes, I do.
11     Q.  And that's from an individual by the
12  name of Robert Vito.
13     A.  I remember him.
14         MS. GEOPPINGER:  Hang on one second.
15  Can we go off the record for just a minute.  You
16  started with 15 or 14?
17         THE VIDEOGRAPHER:  One moment, please.
18         MS. GEOPPINGER:  I'm sorry, no.  Go
19  ahead and stay on the record.
20         THE VIDEOGRAPHER:  Okay.
21         MS. GEOPPINGER:  Your document starts
22  with 15 or 14?

Page 136

1          THE WITNESS:  15.
2          MS. GEOPPINGER:  Mr. Reed's starts with
3  15.
4          MR. TORBORG:  I noticed that.  I was
5  just going to mark a new exhibit.
6          MS. GEOPPINGER:  Okay.
7          MR. TORBORG:  But his seems to be
8  missing -- one copy seems to be missing the front
9  page.
10         MS. GEOPPINGER:  I can give him this
11  one, if you'd like.
12         MR. TORBORG:  That would be fine.
13         MS. GEOPPINGER:  Okay.  Let's go ahead
14  and do that.  So you were actually talking about
15  the second page; correct?
16         MR. TORBORG:  Yes.  And for the record,
17  Abbott/Reid 6 will bear the Bates number
18  HHD059-0014 through 29.
19         MS. GEOPPINGER:  Okay.
20         MR. TORBORG:  Okay.  And I'll be asking
21  you about the second page of the exhibit ending
22  in 015.

Page 137

1              ---
2          (And, thereupon, Exhibit Abbott-Reid
3  006 was re-marked for purposes of
4  identification.)
5              ---
6  BY MR. TORBORG:
7      Q.  You said you recall Mr. Vito?
8      A.  I do.
9      Q.  Okay.  Did you have contact with him?
10     A.  Yes.
11     Q.  Okay.  In what way?
12     A.  Well, he was with the OIG, and there
13  were frequent interactions between OIG and the
14  department, our department.  I don't remember a
15  lot of details, but they were always interested
16  in how we arrived at the methodology that we used
17  to pay pharmacies.
18     Q.  Now, are you talking about the WAC
19  plus methodology or the way in which you created
20  MACs or something else?
21     A.  The way in which we created MACs,
22  uh-huh.

35  (Pages 134 to 137)

Reid, Robert Paul                                     December 15, 2008
                          Columbus, OH

| Page 174 | Page 176 |
|---|---|

**Page 174**

1  made by Abbott Laboratories to the Ohio
2  Department relating to pricing of drugs?
3        MS. GEOPPINGER:  Object to the form of
4  the question.
5        You can answer.
6     A.  Abbott probably was one of the better
7  pharmaceutical companies in sending out price
8  changes, notification of price changes.
9     Q.  And when you say they were one of the
10 better, what do you mean by that?
11    A.  Well, we got them more frequently
12 from them than we did from most other companies.
13    Q.  I think you said earlier that your
14 discussions with Mr. Duty and Ms. Morgan while
15 she was at Abbott didn't have anything to do with
16 AWP.
17    A.  As far as I know, yeah.
18    Q.  Do you recall having any oral
19 conversations at all with Abbott about drug
20 pricing?
21    A.  No.  I don't recall.
22    Q.  And do you have any knowledge or

**Page 175**

1  understanding about how it is that the prices in
2  the compendia get there?
3     A.  Based on -- as far as I know, based
4  on what the company tells, in particular, First
5  DataBank.  They give First DataBank their average
6  wholesale price and they give them their WAC
7  price. And I don't think First DataBank is
8  judgmental at all.  They maintain the database
9  and then they supply it to Medicaid agencies; as
10 far as I know, almost every one, almost every
11 Medicaid agency.
12    Q.  And do you have any knowledge or
13 understanding about why Abbott reported any price
14 to the compendia?
15       MS. GEOPPINGER:  Object to the form of
16 the question.
17 BY MR. TORBORG:
18    Q.  Do you have any knowledge or
19 understanding about why it is that Abbott
20 reported the prices it reported to the compendia?
21       MS. GEOPPINGER:  Same objection.
22       You can answer.

**Page 176**

1     A.  I don't know what transpired between
2  Abbott and the compendia.
3     Q.  I take it then that you don't know --
4  you have no knowledge or understanding about why
5  Abbott sets the prices that it sets and why it
6  sets it those ways?
7     A.  I have no knowledge.
8        MS. GEOPPINGER:  Same -- same objection
9  for the record.
10 BY MR. TORBORG:
11    Q.  Are you aware of any fraudulent
12 conduct committed by Abbott related to drug
13 pricing?
14       MS. GEOPPINGER:  Is he personally, is
15 that what you're asking?
16       MR. TORBORG:  Yes, sir (sic).
17    A.  I have no knowledge.
18    Q.  I'd like to hand you what we've
19 marked previously as Abbott Exhibit 1055, Mr.
20 Reid.  For the record, Abbott Exhibit 1055 bears
21 the Bates numbers HHD031-0396 --
22    A.  Uh-huh.

**Page 177**

1     Q.  -- through 397.
2     A.  Uh-huh.
3     Q.  It appears to be a record of
4  discussion of a meeting held on March 20th, 1997,
5  at the Medicaid Pharmacy Administrator Symposium
6  in Asheville, North Carolina.
7     A.  Oh, I remember being there.
8     Q.  You recall being at that meeting?
9     A.  I do.
10    Q.  Okay.  If you'd take a moment, Mr.
11 Reid, just to read that document.  It's a short
12 one.
13    A.  Uh-huh.  Okay.
14       There was some talk about basing the
15 rebates on AWP, and I think what drove that was
16 the very issue of some companies having what you
17 might call inflated AWPs; and that obviously if
18 you based the rebates on AWP, they would stop
19 that practice, because they would want to have a
20 low AWP so they would have a low rebate
21 liability.
22    Q.  In that the rebate amount is

45 (Pages 174 to 177)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                December 15, 2008
                        Columbus, OH

Page 206

1  paid for generics?
2        MS. GEOPPINGER:  Object to the form of
3  the question.
4  BY MR. TORBORG:
5     Q.  Right?
6        MS. GEOPPINGER:  You can answer.
7     A.  Yeah.  I'm reasonably sure that that
8  happened.
9     Q.  Did you have any follow up with
10 Alabama about that?
11    A.  I don't recall.  I don't think so.
12    Q.  Do you know if they, in fact,
13 implemented the pricing that you had sent them
14 for generics?
15    A.  State -- my peers were generally
16 secretive about how they did things.  They would
17 ask for information.  I don't recall that any of
18 them ever said to me, "Well, I'm going to do
19 exactly what you did."  I don't think so.
20    Q.  Do you know how it was that Alabama
21 learned that Ohio had these lower prices for
22 generics?

Page 207

1        MS. GEOPPINGER:  Object to the form of
2  the question.
3     A.  Probably a feature of, you know,
4  public records.
5     Q.  Now, were you aware that there were
6  some states that don't have any state MAC
7  program?
8     A.  I'm not aware of a state that doesn't
9  have a state MAC program of some kind. Maybe it
10 wasn't as detailed as our program.  It may have
11 been just simply AWP minus something, done as a
12 matter of administrative simplicity.
13    Q.  Do you recall having discussions with
14 states about the possibility of having a
15 two-tiered discount off of AWP?
16    A.  No.
17    Q.  One for brand, one for generics?
18    A.  Oh, two-tiered discount --
19    Q.  Yes.
20    A.  -- off of AWP?
21    Q.  Like a higher discount off of AWP for
22 generic products.

Page 208

1     A.  Some states did that.  I don't recall
2  that I ever had a discussion with any of them.  I
3  wasn't critical of the way they were doing things
4  just because they were different than ours.
5     Q.  Everybody did things a little bit
6  different?
7     A.  I would say that is a fair statement.
8     Q.  Okay.  I'd like to ask you about just
9  one more document.
10        - - -
11        (And, thereupon, Exhibit Abbott-Reid
12 013 was marked for purposes of identification.)
13        - - -
14 BY MR. TORBORG:
15    Q.  This will be Abbott/Reid 13.
16    A.  Oh, that's the PTAG, yeah.
17    Q.  For the record, what I've marked as
18 Abbott/Reid 13 bears the Bates No. M0.28185
19 through 216.
20    A.  Okay.
21    Q.  Mr. Reid, I'll ask you a few
22 questions.  I think you've already indicated

Page 209

1  these look like they relate to a PTAG meeting; is
2  that right?
3     A.  It looks like it.
4     Q.  In particular, this one is dated June
5  8 through June 9, 1999; right?
6     A.  Right.
7     Q.  It appears to be at -- that it was
8  held at the LaFonda on the Plaza Hotel in Santa
9  Fe, New Mexico.
10    A.  Yes.  I remember that there was quite
11 a few CMS people there as well.
12    Q.  You -- was this a face-to-face
13 meeting?
14    A.  Yes.
15    Q.  And it shows -- you're listed as
16 being a part of a group doing an NASMD
17 presentation?
18    A.  National Association of State
19 Medicaid Directors.
20    Q.  Okay.  You were speaking --
21    A.  It was sort of a combined meeting.
22    Q.  Who is Anne Koci; do you know?

                              53  (Pages 206 to 209)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                December 15, 2008
                        Columbus, OH

Page 210

1    A.  I think she worked for CMS, but I'm
2  not sure.
3    Q.  And Mark Richard Butt, he had --
4    A.  New York.
5    Q.  He had your job in New York, roughly
6  speaking?
7    A.  New York, yeah.  And Shepherd was
8  Virginia.
9    Q.  He had your job in Virginia?
10    A.  Uh-huh.
11    Q.  Did you work with Mr. Butt and Mr.
12  Shepherd on a presentation?
13    A.  Yes, we did work together.
14    Q.  What do you recall about that?
15    A.  Nothing.
16    Q.  If we go to the second page of the
17  agenda, Bates page 186.
18    A.  Okay.
19    Q.  You're listed as -- under the heading
20  "Work Group Presentations."
21       Do you see that?
22    A.  Uh-huh.

Page 211

1    Q.  In particular, it looks like you were
2  giving a presentation on average wholesale price.
3    A.  Uh-huh, probably much like what we've
4  been talking about today.
5    Q.  Do you recall that at all?  Does this
6  refresh your recollection at all about this?
7    A.  Pretty vague.
8    Q.  Go to the page that starts with 187.
9       MS. GEOPPINGER:  Ends with 187?
10       MR. TORBORG:  Starts with 187 and goes
11  to 190.  This is a document titled "Prescription
12  Drug Cost."
13       MS. GEOPPINGER:  Forgive me.  I don't
14  know what you're referring to.
15       MR. TORBORG:  Ends with 187, the Bates
16  number.
17       MS. GEOPPINGER:  Okay.  You said
18  begins.  That's why I was confused.
19       MR. TORBORG:  I'm sorry.  The document
20  that begins with the Bates page ending 187.
21       MS. GEOPPINGER:  I understand.  Sorry
22  about that.

Page 212

1       MR. TORBORG:  That's fine.
2  BY MR. TORBORG:
3    Q.  And it's titled "Prescription Drug
4  Cost: Rising?  Why?  How can they be Controlled?"
5       Do you see that, Mr. Reid?
6    A.  Yeah.  That was -- that was -- I'm
7  sure it was a topic for discussion at that
8  meeting.
9    Q.  If you go down to the bottom of the
10  page before the little 1 there.
11    A.  Before the 1?  Okay.
12    Q.  Yeah.  There's a paragraph that
13  starts, "In an effort to understand."
14    A.  Uh-huh.
15    Q.  It states, "In an effort to
16  understand the dynamics of this situation, NASMD
17  requested the Pharmacy Technical Advisory Group,
18  TAG, to put together this short paper providing
19  their thoughts on why prescription drug costs are
20  rising.  A number of possible reasons have been
21  offered.  They are listed below."
22    A.  Okay.

Page 213

1    Q.  Do you see that?
2    A.  I see it.
3    Q.  Do you recall having any involvement
4  in putting together this paper?
5    A.  Yeah, I'm sure I did.
6    Q.  And does this provide a list of
7  possible reasons why prescription drug costs have
8  been rising?
9    A.  Yes.
10    Q.  And then if we go to the Bates page
11  ending 189.
12    A.  189.  Okay.
13    Q.  The middle of the page is a paragraph
14  that states, "To cope with this ever increasing
15  cost of care, insurers are raising premiums and
16  government payers are scrambling for answers.
17  Some potential solutions are as follows."
18    A.  Are as follows, right.
19    Q.  And No. 4 there states, "Lower
20  based-rate reimbursement to providers" -- I'm
21  sorry -- "lower-based rate reimbursement to
22  providers, great care has to be taken here to

Henderson Legal Services, Inc.

af69f64b-a1fb-4f21-a237-a09d2632bad5

# Nancy Nesser (Oklahoma) (30(b)(6))

OK Health Care Authority (Nancy Nesser)                December 12, 2008

## Oklahoma City, OK

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X

In Re:  PHARMACEUTICAL INDUSTRY       ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION  ) Master File No.

-----------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:            )

United States of America ex rel.    ) Hon. Patti B.

Ven-A-Care of the Florida Keys,      )   Saris

Inc., et al., v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS;       )

and United States of America ex      ) DEPOSITION OF

rel. Ven-A-Care of the Florida       )  THE OKLAHOMA

Keys, Inc., et al., v. Boehringer    )  HEALTH CARE

Ingelheim Corp., et al., Civil       )   AUTHORITY

Action No. 07-10248-PBS;             )   by NANCY

and United States ex rel. Ven-A-Care)    NESSER

of the Florida Keys v. Abbott        )

Laboratories, Inc., Civil Action     ) DECEMBER 12,

Nos. 06-CV-11337 and 07-CV-11618     )    2008

-----------------------------------X

OK Health Care Authority (Nancy Nesser)                    December 12, 2008
                        Oklahoma City, OK

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  Oklahoma Health Care Authority produced to the
2  defendants in this case pursuant to the subpoena
3  issued --
4      A.   Correct.
5      Q.   -- this summer?
6      A.   Correct.
7      Q.   Okay.  Were there any other documents
8  that you reviewed in order to prepare for the
9  deposition besides the ones that Oklahoma
10  produced to defendants in this case?
11      A.   No.
12      Q.   How much time did you spend reviewing
13  those documents?
14      A.   Maybe an hour.
15      Q.   Did any of the documents provide you
16  with information that you did not have
17  previously?
18      A.   No.
19      Q.   Did you review any deposition
20  transcripts?
21      A.   No.
22      Q.   Did you have any meetings or contact

**Page 28**

1      A.   From May of 2001 through the current
2  time period.
3      Q.   Are you aware that the topics -- that
4  many of the topics of inquiry and areas of
5  inquiry in the deposition notice regard time
6  periods earlier than May, 2001?
7      A.   Yes.
8      Q.   What did you do to prepare to testify
9  about those topics or time periods earlier than
10  May, 2001?
11      A.   There are no documents available for me
12  to reference those time periods.
13      Q.   Did you contact any previous pharmacy
14  directors or anyone who had been with the
15  Oklahoma Department of Human Services?
16      A.   No.  That previous pharmacy director is
17  deceased.
18      Q.   Who was the previous pharmacy director?
19      A.   What's his last name?  Hyatt?
20          MS. RAMBO-JONES:  Yeah.
21          THE WITNESS:  I think it was Ralph
22  Hyatt.

**Page 27**

1  any current or former employees of Oklahoma
2  Medicaid?
3      A.   No.
4      Q.   Did you contact or have any meetings
5  with any current or former employees of any
6  department of Oklahoma to prepare for this
7  deposition?
8      A.   No.
9      Q.   What is your position with Oklahoma?
10      A.   I'm the pharmacy director at the Health
11  Care Authority.  The Health Care Authority is the
12  designated Medicaid administrative agency.
13      Q.   When did you begin your employment in
14  this position as pharmacy director of the
15  Oklahoma Health Care Authority?
16      A.   In May of 2001.
17      Q.   Did you have any other position with
18  Oklahoma prior to the position as pharmacy
19  director?
20      A.   No, I did not.
21      Q.   For what time period are you prepared
22  to testify about the topics of inquiry?

**Page 29**

1      Q.   (BY MS. LIEBERMAN) And Ralph Hyatt was
2  the pharmacy director of the Oklahoma Health Care
3  Authority prior to --
4      A.   Right.
5      Q.   -- your tenure there?
6      A.   There was another man for a few years
7  in there -- I don't have the dates -- named John
8  Crumly.
9      Q.   Was John Crumly also the pharmacy
10  director of Oklahoma Health Care Authority at one
11  period in time?
12      A.   Yes.
13      Q.   Do you have a sense of what years he
14  was the pharmacy director of Oklahoma Health Care
15  Authority?
16      A.   I would say from around '99 until 2001.
17  I mean, he was gone -- when I got there, he had
18  been gone for a couple of months.
19      Q.   Okay.  And once he was gone, Mr. Hyatt
20  was the --
21      A.   No.  Mr. Hyatt was pre 1999.
22      Q.   Mr. Hyatt was pre 1999?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6c588002-4fee-44ed-96a2-898548fcdd31

OK Health Care Authority (Nancy Nesser)                    December 12, 2008

Oklahoma City, OK

| Page 242 | Page 244 |
|---|---|

Page 242

1  reported or calculated WAC; is that correct?
2      A.  That's correct.
3      Q.  You have no knowledge concerning how
4  Abbott, Dey or Roxane markets or sells their
5  drugs, do you?
6      A.  No.
7      Q.  Oklahoma Medicaid has no knowledge
8  concerning how Abbott, Dey or Roxane marketed or
9  sold their drugs?
10     A.  Correct.
11     Q.  You have no evidence that Abbott, Dey
12  or Roxane has defrauded Oklahoma Medicaid?
13     A.  No, I don't.
14         MS. LIEBERMAN:  Let me take a moment,
15  if you guys don't mind, for me to go off the
16  record to look over my notes.  Is that okay?
17         MR. MAO:  Sure.
18         MR. PACK:  We're now off the videotape
19  record.  Time is 2:41 p.m.
20         (A recess was taken from 2:41 PM
21  to 2:50 PM.)
22         MR. PACK:  We're back on the videotaped

Page 243

1  record.  Time is 2:50 p.m.
2      Q.  (BY MS. LIEBERMAN) You recall the
3  discussion that we had a little bit earlier about
4  Oklahoma Medicaid's use of the DOJ AWPs; correct?
5      A.  Yes.
6      Q.  Does Oklahoma Medicaid currently use
7  those DOJ AWPs?
8      A.  I don't believe we do.
9      Q.  Do you know when Oklahoma Medicaid
10  stopped using the DOJ AWPs?
11     A.  I think it -- I was looking at this
12  Medicaid prescription drug pricing survey, and on
13  -- which is Exhibit Number 22.  On the second
14  page, it talks about looking -- changing them
15  back with invoice or changing them.
16         And basically all -- that's how all of
17  them were changed.  To something besides the DOJ
18  price, was with an invoice from a provider.  So
19  that now they would -- they would be -- most
20  likely if those NDCs are still effective, they
21  would just be updated like regular from our First
22  Databank tape.

Page 244

1      Q.  Okay.  We also mentioned earlier the
2  subpoenas that Oklahoma Medicaid received for
3  documents by the Abbott, Dey or Roxane defendants
4  in the summer of 2008; correct?
5      A.  I don't remember getting them that long
6  ago.  But maybe we did.
7      Q.  Were you ever asked to collect
8  documents in response to the subpoenas for
9  documents by these defendants?
10     A.  Yeah.  About a month or five weeks ago.
11     Q.  And what were you asked to collect?
12     A.  Well, there was a big list.  And I went
13  through and just said, "These are the things I
14  know how to find."  And that's what -- that's
15  what we were able to produce, was the things that
16  I knew where they were.
17     Q.  Did you talk to anyone else or use any
18  other means of obtaining documents whose specific
19  locations you were not aware of?
20     A.  I talked to a couple of people in our
21  policy department because I needed to get those
22  rate briefs.  I just had the draft copies.  I

Page 245

1  didn't have the final versions.
2         And otherwise our state plan is
3  available on our web site so I could find that.
4  And the provider letters are available on the web
5  site so I could find that.  And then I had -- I
6  have a data analyst, and she got the State MAC
7  pricing histories that were available.
8      Q.  Are you aware that Oklahoma Medicaid
9  only produced about 10 documents in this case?
10     A.  Yes.
11     Q.  You would assume that there are
12  significantly more than 10 documents that relate
13  to the subjects requested in the subpoena about
14  prescription drug pricing?
15     A.  I would suspect there are more
16  somewhere.
17     Q.  Did you search for any of the surveys
18  about acquisition costs and dispensing costs that
19  Oklahoma Medicaid commissioned in response to the
20  subpoena?
21     A.  The only one that I knew of was the
22  2003 one.  I -- I didn't know that the others

62  (Pages 242 to 245)

6c588002-4fee-44ed-96a2-898548fcdd31

OK Health Care Authority (Nancy Nesser)                    December 12, 2008

Oklahoma City, OK

Page 246

1   existed.
2        Q.  I'll have to find the page, but I
3   believe you mentioned the Oklahoma College of
4   Pharmacy also conducted a survey in approximately
5   1995.
6        A.  Right.  Although I've never seen it.
7   I've only heard reference to it.  I've never seen
8   their -- there was something hinky about it, for
9   lack of a better term.  Nobody will really tell
10  me anything about it other than there was one.
11  But nobody has it.
12       Q.  Who did you contact about that survey?
13       A.  For -- for the subpoena, I didn't
14  contact anybody.  But just in the past I -- I had
15  heard them talk about it.
16       Q.  Did you search for the 2002-2003 survey
17  conducted by Oklahoma College of Pharmacy?
18       A.  Yes.  And I really actually intended to
19  put that in and -- and completely forgot about
20  it.
21       Q.  Okay.  Can you produce that to the
22  Roxane, Abbott and Dey Defendants in this case?

Page 247

1        MS. RAMBO-JONES:  If we have it, we'll
2   give it to you.
3        THE WITNESS:  Yeah.  I think -- I think
4   I have it.  I thought it was in the folder that I
5   sent electronically to legal, but apparently it
6   wasn't.  So, yeah, sorry.
7        Q.  (BY MS. LIEBERMAN) So could you send
8   that to --
9        A.  Yeah.
10       Q.  -- your attorney to send to us?
11       A.  To -- yeah.  I could do that.
12       Q.  Okay.
13       MR. MAO:  We would like a copy, also.
14       MS. RAMBO-JONES:  Sure.
15       Q.  (BY MS. LIEBERMAN) Did you contact any
16  of your predecessors, in particular John Crumly,
17  regarding any documents or information he might
18  have?
19       A.  No, I did not.
20       MR. MILLER:  Can we go off the record
21  for a second.
22       MR. PACK:  We're off the record.  Time

Page 248

1   is 2:57 p.m.
2        (Discussion off the record.)
3        MR. PACK:  We're now back on the
4   videotaped record.  Time is 3:00 p.m.
5        MS. LIEBERMAN:  I believe that I'm done
6   with my questions for right now, although I will
7   reserve time to ask questions after the United
8   States goes.  Thank you very much for your time,
9   Ms. Nesser.
10       And I'm going to turn it over to Abbott
11  and Dey.  And I have the exhibits here, if either
12  of you want.
13       MS. CITERA:  Okay.  I guess that I'm
14  going to go because, Antonia, you don't have any
15  questions; is that right?
16       MS. GIULIANA:  Right.
17
18       CROSS EXAMINATION
19  BY MS. CITERA:
20       Q.  Before we --
21       MR. MILLER:  Why don't you identify
22  yourself for the record.

Page 249

1        MS. CITERA:  Oh, okay.  I'm forgetting
2   that we're on the record now.  You know what, I'm
3   getting an echo.
4        MR. MILLER:  Maybe by --
5        MS. LIEBERMAN:  You know, just so you
6   know, we had to place the microphone close to the
7   phone so that the videographer could record it.
8   And that may be providing an echo.  But we're not
9   hearing any sort of echo, just so you know.
10       MS. CITERA:  Okay.  It's going to drive
11  me a little crazy, but -- Miriam, I just want to
12  see if Exhibit 2 is the Abbott cross notice.
13       MS. LIEBERMAN:  Yes.
14       Q.  (BY MS. CITERA) Okay.  Okay.  Ms.
15  Nesser, my name is Toni Citera and I'm from the
16  law firm of Jones Day and I represent Abbott
17  Laboratories.
18       A.  Okay.
19       Q.  And I'm just going to ask some
20  questions of you.  And we'll see how do I.  It's
21  a little difficult, as you might expect, doing
22  this by phone.  So if you could just indulge me.

63  (Pages 246 to 249)

6c588002-4fee-44ed-96a2-898548fcdd31

OK Health Care Authority (Nancy Nesser)                    December 12, 2008

Oklahoma City, OK

| Page 254 | Page 256 |
|---|---|

Page 254

1  that might be responsive to our subpoena, but
2  haven't been reviewed; is that correct?
3      A.  I don't -- I don't recall any of the
4  requests that would have led me to need to look
5  at E-mail.  But --
6      Q.  So, for example, you don't believe
7  there's any E-mails that talk about maybe
8  estimated acquisition costs or reimbursement
9  issues?
10     A.  I -- I don't know either way, whether
11 there is or there is not.
12     Q.  Just for the record -- and I know your
13 attorney's gone --
14         MS. RAMBO-JONES:  I'm here now.
15         MR. MAO:  She's here.
16         MS. CITERA:  Oh, I'm sorry.  I just
17 want to make a request that any responsive E-
18 mails be produced.
19         MS. RAMBO-JONES:  You know, we didn't
20 get this until the 8th.
21         MS. CITERA:  The Abbott one?
22         MS. RAMBO-JONES:  The Abbott one.

Page 255

1         THE WITNESS:  Yes.
2         MS. CITERA:  And what about the Roxane
3  one?
4         MS. RAMBO-JONES:  Oh, we've had that
5  longer.  If there's any responsive E-mails, they
6  would be on Nancy's E-mail server, if she kept
7  it.  I -- you know, I'm -- haven't made a search
8  of that, and I'll have to look as to whether I'm
9  willing to do so or not.
10        MS. CITERA:  Okay.  Well, I will send
11 you a follow -- one of us will send you a follow-
12 up letter, if that makes it easier.
13     Q.  (BY MS. CITERA) The other thing I think
14 you mentioned was that when you were pulling
15 documents, there was a MAC list that you pulled.
16 Did I hear you correctly?
17     A.  Yes.
18     Q.  I did not see that among the documents.
19 Do you know if that was produced to us?
20     A.  It was an Excel spreadsheet that I sent
21 to our legal department.  And I'm assuming it was
22 forwarded on.

Page 256

1      Q.  Okay.  And would that be a current MAC
2  list?
3      A.  No.  It's only -- it's the history of
4  the subject drugs probably just for the Roxane
5  and possibly the Dey.  It may be just the Roxane
6  drugs.
7      Q.  So in other words, the history, meaning,
8  like, when they were MACed and what their MACs
9  were?
10     A.  Right.
11        MS. CITERA:  Okay.  We would also
12 request, to the extent that there is a MAC list
13 pertaining to Abbott, that that be produced.
14        MR. MAO:  We would like that, as well.
15     Q.  (BY MS. CITERA) And actually apropos to
16 that subject, if you could turn in Exhibit 2 that
17 you're looking at to schedule 1.  Just let me
18 know when you have that in front of you.
19     A.  Schedule 1?
20     Q.  Yes.  It's a list of Abbott/DOJ action
21 NDCs.
22     A.  Okay.

Page 257

1      Q.  Do you see that?
2      A.  Yes.
3      Q.  Are you familiar at all with these
4  drugs?
5      A.  I know what they are.  Is that what you
6  mean?
7      Q.  Yes.  Do you know whether they are
8  generic drugs?
9      A.  They -- no, not -- not without doing
10 some further investigation.  They appear to be,
11 but I don't know that.
12     Q.  Okay.  One of the things I forgot to
13 warn you is that I may sometimes step over your
14 talking because I don't realize that you're not
15 done.  So I apologize in advance if I do that.
16 And you can just tell me I interrupted you.
17     A.  Okay.
18     Q.  So, I'm sorry, were you done with your
19 answer?
20     A.  Yes.
21     Q.  Do you have any idea whether these
22 drugs -- or do you have an understanding as to

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6c588002-4fee-44ed-96a2-898548fcdd31

OK Health Care Authority (Nancy Nesser)                    December 12, 2008

Oklahoma City, OK

Page 258

1  whether these drugs are frequently dispensed by
2  home infusion pharmacies?
3      A.  I don't -- I can't say that I've ever
4  investigated that.  It would make sense that they
5  are.
6      Q.  Okay.  And do you know whether these
7  drugs were MACed by the state?
8      A.  I don't know off the top of my head,
9  no.
10      Q.  Okay.  And the same question for
11  Schedule 2, which is a list of drugs.  Do you
12  know whether those were MACed by the state?
13      A.  I would be more likely to say that
14  those probably have all been MACed at some point.
15      Q.  And the reason why you wouldn't say
16  that necessarily as to Schedule 1 is because
17  those are injectables and --
18      A.  Right.
19      Q.  -- type of products?
20      A.  Right.
21      Q.  Okay.  And why is it that the state did
22  not MAC those type of products?

Page 259

1      A.  Well, I don't know that we didn't, for
2  certain.  But it definitely would have been in
3  sort of the phase 2 or phase 3 of the SMAC list
4  when we did.
5      Q.  Do you know why?
6      A.  Well, they're less dispensed.  So
7  they're not -- you know, the schedule 2, those
8  things are dispensed quite frequently.  So
9  they're going to have more claims and more
10  activity.  So they're going to get our attention
11  a little faster than the drugs on schedule 1.
12      Q.  Now, I mentioned a home infusion
13  pharmacy; and I was wondering if you are familiar
14  with what a home infusion pharmacy is.
15      A.  My understanding is that they have a
16  limited practice or maybe an additional practice
17  where they have the ability to make sterile
18  injectable products and deliver them for home use
19  so that the patient doesn't have to stay in a
20  hospital.
21      Q.  And you never worked for a home
22  infusion pharmacy, did you?

Page 260

1      A.  That's correct.  I did not.
2      Q.  Okay.  And do you have an understanding
3  of what -- what's involved to prepare an
4  infusion?
5      A.  I have kind of a general overall
6  understanding.
7      Q.  Can you tell me what that is?
8      A.  Well, you've got to have a hood, a
9  laminar flow hood.  And you need to follow the
10  sterile techniques.  You would need to have a
11  different set of supplies than you need for a
12  typical retail pharmacy.
13          You need to know kind of different
14  things about drug compatibility, in solution and
15  -- you know, you need to know what to mix the
16  powdered things.  You need to know how to -- what
17  you use to reconstitute those.  And -- and how to
18  do -- you know, make sure the percents work out
19  for your final concentrations.
20      Q.  So would you agree that dispensing a
21  home IV or home infusion medicine or drug is more
22  complicated than other outpatient drugs?

Page 261

1      A.  Sometimes, yes.
2          MS. CITERA:  I'm going to ask Ms.
3  Lieberman to pull out tab 9.  And I guess we'll
4  start marking this as Abbott Oklahoma Exhibit 1.
5          (Exhibit Abbott-OK 001 marked.)
6          MS. LIEBERMAN:  Okay.  We've
7  distributed these.
8          MS. CITERA:  Okay.
9      Q.  (BY MS. CITERA) If you could -- if you
10  could look at the document.  And I know this
11  precedes your time at Oklahoma Medicaid, but I
12  wanted to just ask if you are familiar with the
13  document.
14      A.  No.  I've never seen this document.
15      Q.  Have you ever seen anything like this
16  Medicaid Pharmacy Bulletin?
17      A.  It's been a long time, but I have seen
18  something like it.  Like when I first started
19  working.
20      Q.  Working as a pharmacist or working --
21      A.  No.  I'm sorry.  When I first started
22  working for the state.

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

6c588002-4fee-44ed-96a2-898548fcdd31

OK Health Care Authority (Nancy Nesser)                         December 12, 2008
Oklahoma City, OK

Page 282

1     Q.   (BY MS. CITERA) And while she's getting
2  those together for you, let me ask you:  Are you
3  -- have you ever heard of Ven-A-Care of the
4  Florida Keys.
5          MS. LIEBERMAN:  You know, Toni, I'm
6  sorry.  If I could just interrupt.  The court
7  reporter, I think, can't mark the exhibits and
8  type if one of us is talking.
9          MS. CITERA:  Oh, well, that's a good
10 point.
11         MS. LIEBERMAN:  So we could just maybe
12 -- and also just --
13         MS. CITERA:  It's the benefit of being
14 on the phone because you can't see these things.
15         MS. LIEBERMAN:  And just so you know,
16 too, if you ask me to pull something, I will pull
17 it.  I probably won't say anything about pulling
18 it just so she can mark it.  And now I'm going to
19 be quiet.
20         MS. CITERA:  Okay.  Okay.  So just let
21 me know when you have them in front of you.
22         THE WITNESS:  Okay.  I have them.

Page 283

1     Q.   (BY MS. CITERA) Okay.  So before even
2  looking at these documents, my question is:  Have
3  you ever heard of Ven-A-Care of the Florida Keys?
4     A.   No.  Not before I saw the documents in
5  this case.
6     Q.   Okay.  And when did you see the
7  documents in this case?
8     A.   A few weeks ago.
9     Q.   And what documents are you referring to
10 that relate to Ven-A-Care?
11    A.   The -- I guess it was the subpoena or
12 the notice where it has the name of the case.
13    Q.   And other than the name appearing in
14 the case caption, are you aware of Ven-A-Care
15 otherwise?
16    A.   No.
17    Q.   Okay.  And you know that Mr. Miller
18 represents Ven-A-Care in this case?
19    A.   Yes, I do.
20    Q.   Okay.  Looking at Exhibit 4, which I
21 believe should be a letter from Ven-A-Care, Mr.
22 Zack Bentley to Mr. Hyatt.

Page 284

1     A.   Yes.
2     Q.   Do you see that?
3     A.   Yes.
4     Q.   And -- or I know this is, again, before
5  your time; but are you familiar with this
6  document?
7     A.   No.  I've never seen this.
8     Q.   Okay.  And if you want to read the
9  letter to yourself, please, go ahead.
10    A.   Okay.  Okay.
11    Q.   Okay.  Were you aware that Ven-A-Care
12 had conversations with Oklahoma Medicaid as early
13 as 1998?
14    A.   No, I was not.
15    Q.   Okay.  And I assume you were not aware
16 that they had conversations about the AWP?
17    A.   No.
18    Q.   And it looks like from the letter --
19 strike that.
20         Just give me a second.  It looks like
21 from the letter, would you agree, that Mr. Hyatt
22 had asked Mr. Bentley to prepare Oklahoma

Page 285

1  specific reimbursement information on charts?
2     A.   That is what it seems to indicate, yes.
3     Q.   Who is Mr. Hyatt?
4     A.   He was the pharmacy director prior to
5  John Crumly.
6     Q.   And is he the one who's deceased?
7     A.   That is correct.
8     Q.   Okay.  And he was the one who was there
9  for the majority of the relevant time period?
10    A.   Correct.
11    Q.   Okay.  And then if you look at the
12 Exhibit 5.
13    A.   Okay.
14    Q.   And have you ever seen this document
15 before?
16    A.   No, I have not.
17    Q.   And it's -- it's probably double-sided,
18 but it's two charts.  Am I correct?
19    A.   That's correct.
20    Q.   And one of the drugs that's listed on
21 these charts is one of my clients' drugs,
22 Vancomycin.

72  (Pages 282 to 285)

6c588002-4fee-44ed-96a2-898548fcdd31

Oklahoma City, OK

Page 286

1    A.  Yes.
2    Q.  Do you see that?
3    A.  Yes.
4    Q.  And were you aware that in -- well,
5  actually we don't know when this is dated.  But
6  were you aware that Ven-A-Care was providing
7  pricing information to Oklahoma at some point?
8    A.  No, I was not aware of that.
9    Q.  And here it shows, if you look at the
10  page entitled, "Examples of Accepted
11  Reimbursement for Pharmaceutical by Oklahoma
12  Medicaid Pharmacy Program."  I think it's the
13  second page of your exhibit.
14    A.  Oh, yeah, uh-huh.
15    Q.  It shows for Abbott Vancomycin the
16  lowest price OIG report is 3.45.  Do you see
17  that?
18    A.  Okay.  Yes.
19    Q.  And the average Medicare allowed OIG
20  reports 9.44?
21    A.  Yes.
22    Q.  And then the Oklahoma Medicaid

Page 287

1  reimbursement is $31.02.
2    A.  Okay.
3    Q.  So were you aware that at some point
4  Ven-A-Care was providing information showing that
5  Oklahoma Medicaid was reimbursing Abbott's
6  Vancomycin at a rate greater than OIG reports had
7  shown for Vancomycin?
8    A.  No.
9    Q.  Do you know whether Oklahoma took any
10  action as a result of receiving this information
11  from Ven-A-Care?
12    A.  I do not know.
13    Q.  Okay.  I'm done with those exhibits.
14    A.  Okay.
15    Q.  And, well -- and just to -- just to
16  close this up, you have not had any discussions -
17  - other than with Mr. Miller preparing for your
18  deposition, you have not had any discussions with
19  Ven-A-Care?
20    A.  That's correct.
21    Q.  In determining reimbursement, did the
22  State of Oklahoma ever consider prices that the

Page 288

1  state -- that the state was able to purchase
2  drugs at?  For example, by it's state price list
3  or something like, you know, another agency?
4    A.  Not to my knowledge.
5    Q.  And do you know why not?
6    A.  No, I don't know why not.
7    Q.  Are you aware that other state entities
8  purchased prescription drugs from --
9    A.  I'm aware of that fact, yes.
10    Q.  Do you know the rates at which they
11  purchased such drugs, whether they get discounts,
12  et cetera?
13    A.  No, I don't.  I don't have any idea.
14    Q.  I think at one point you testified
15  earlier that Oklahoma Medicaid paid a better
16  reimbursement rate than other payors in the
17  state.
18    A.  Yes.  That's my understanding.
19    Q.  Did you -- have you ever seen any
20  studies indicating that dispensing drugs to
21  Medicaid -- Medicaid beneficiaries is more
22  expensive than dispensing drugs to the general

Page 289

1  population?
2    A.  I have not seen a study like that, I
3  don't believe.
4    Q.  Do you know whether it's more expensive
5  to dispense a drug to Medicaid pharmacies as
6  opposed to the general public -- I'm sorry.  I'm
7  getting really dry.
8        Do you know whether it's more expensive
9  to dispense a drug to a Medicaid patient as
10  opposed to the general population?
11    A.  No, I don't know.
12    Q.  And you don't have any understanding,
13  including during your time as a pharmacist?
14    A.  No.  During my time as a pharmacist, I
15  had extremely wealthy clients who were hard to
16  dispense to and I had very poor clients who were
17  very easy to dispense to.  So I couldn't make any
18  kind of a generalization about that.
19    Q.  What are dispensing fees intended to
20  cover?
21    A.  Dispensing fees originally were
22  intended to cover the cost of dispensing.

73  (Pages 286 to 289)

# Jesse Anderson (Oregon) (30(b)(6))

Salem, OR

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY  ) MDL No. 1456

AVERAGE WHOLESALE PRICE         ) Civil Action No.

LITIGATION                      ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:       ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

-------------------------------X

VIDEOTAPED DEPOSITION OF THE OREGON DEPARTMENT

OF HUMAN SERVICES by JESSE ANDERSON

PURSUANT TO FEDERAL RULE 30(B)(6)

TUESDAY, DECEMBER 16, 2008

b846576d-51e8-4822-8a5f-bd9328d500c0

OR Department of Human Services (Jesse Anderson)                      December 16, 2008

Salem, OR

Page 106

1  transmission from OMAP to CMS, telling them that
2  they are withdrawing their State Plan amendment
3  that would reduce Oregon's estimated acquisition
4  costs from 14 percent to 17 percent?
5      A.  Correct.  Yes.
6      Q.  So am I correct that, in other words,
7  this is Oregon Medicaid's notification to CMS
8  that it no longer intends to cut reimbursement
9  from AWP minus 14 percent to AWP minus 17
10 percent?
11     A.  Correct.
12     Q.  And I'd like you to pick out of the
13 stack of exhibits Exhibit 10.
14         And I'll note for the record that
15 Exhibit 10 was shown to yesterday's 30(b)(6)
16 designee, Ms. Ketchum, but the exhibit shown to
17 her did not have the second page.  Now we have
18 corrected Exhibit 10 to include the second page,
19 and that is the complete exhibit that Mr.
20 Anderson is now reviewing.
21         Mr. Anderson, after you've had a chance
22 to review the -- in general, the substance of

Page 107

1  Exhibit 10, I'd like you to let me know.
2      A.  Okay.
3      Q.  Mr. Anderson, is it correct that
4  Exhibit 22 -- or, excuse me -- Exhibit 10 is a
5  letter from Lynn Read to Mr. Reed at CMS?
6      A.  Correct.
7      Q.  What was Lynn Read's position with OMAP
8  at the time of this letter?
9      A.  She was the administrator of the
10 department.
11     Q.  And am I correct that Ms. Read is
12 writing to Mr. Reed in connection with a State
13 Plan amendment?
14     A.  Correct.
15     Q.  And is -- am I -- Strike that.
16         Am I correct that Ms. Read is writing
17 to Mr. Reed in connection with a request for
18 additional information that she received from Mr.
19 Reed?
20     A.  Correct.
21     Q.  And am I correct that CMS's request for
22 additional information is likely what has been

Page 108

1  transcribed as the questions numbered one, two,
2  three, and four?
3      A.  Yes.
4      Q.  And am I correct that OMAP's response
5  to CMS's request for additional information are
6  typed below those questions numbered one, two,
7  three, four?
8      A.  Correct.
9      Q.  Now, I'd like to direct your attention
10 to OMAP's answer to question number 2, where CMS
11 asks: "Please explain why AWP minus 15 percent is
12 the best estimate and the basis for this change
13 from the current estimate of AWP minus 14
14 percent."  Do you see that?
15     A.  Yes, I do.
16     Q.  And am I correct that, in the first
17 paragraph, Ms. Read from OMAP explains that the
18 state -- the state legislature originally
19 requested AWP minus 15 percent in September -- in
20 February of 2002 after reviewing previously
21 submitted information?  Am I correct?
22     A.  Correct.

Page 109

1      Q.  And that, instead of implementing AWP
2  minus 15 percent as proposed by OMAP, Governor
3  Kitzhaber made a decision to change the reduction
4  instead to only AWP minus 14 percent.  Do I see
5  that?
6          MS. SCHNEIDER THOMAS:  Objection, form.
7      Q.  BY MR. HEINZ:  Did I state that
8  correctly?
9      A.  Yes.
10     Q.  Do you have an understanding as to why
11 Governor Kitzhaber refused to implement OMAP's
12 proposal to decrease reimbursement to AWP minus
13 15 percent, and instead only implemented AWP
14 minus 14 percent?
15     A.  I do not recall.
16     Q.  And you'll see that Ms. Read also
17 explains that CMS approved the reduction in
18 reimbursement from AWP minus 13 percent to AWP
19 minus 14 percent, on July 22nd, 2002, and that
20 change was implemented September 1st, 2002.  Am I
21 correct?
22     A.  Correct.

28  (Pages 106 to 109)

b846576d-51e8-4822-8a5f-bd9328d500c0

Salem, OR

Page 122

1    A.  It doesn't refresh my recollection, but
2  it gives me more details of what's around the
3  fee.
4    Q.  And according to Exhibit 11, it shows
5  that a higher dispensing fee was paid to those
6  pharmacies with greater than 20 percent Medicaid
7  prescription volume annually.  Do you see that?
8    A.  Yes.
9    Q.  In your experience as a policy analyst
10  and as an employee of the Oregon Medicaid program
11  generally, why would Oregon Medicaid pay a higher
12  dispensing fee to pharmacies with more than 20
13  percent Medicaid prescription volume?
14    A.  Again, the only thing I can think of is
15  the -- because, traditionally, a Medicaid
16  population is a more difficult population than
17  the commercial population.  I -- I -- I -- I just
18  don't know.  I have no recollection of when they
19  developed it.  I just don't know.
20    Q.  Do you have an understanding as to
21  whether it costs a pharmacy more on average to
22  dispense a prescription to a Medicaid beneficiary

Page 123

1  versus beneficiary versus a non Medicaid
2  beneficiary?
3    A.  I --
4      MS. SCHNEIDER THOMAS:  Objection, form.
5      THE WITNESS:  I don't have any
6  knowledge that it would cost more than any other
7  individual.
8    Q.  BY MR. HEINZ:  Mr. Anderson, do you
9  have any knowledge from your own research --
10  surveys, reports, et cetera, that you've reviewed
11  -- that demonstrate what the average cost is for
12  a pharmacy to dispense a prescription in Oregon?
13      MS. SCHNEIDER THOMAS:  Objection, form.
14      THE WITNESS:  The -- The -- I have seen
15  states, you know, full -- all the state surveys
16  about what dispensing fee they used.  When I was
17  with the managed care, I have seen surveys of
18  what commercial insurance pays for dispensing.  I
19  haven't done any surveys myself.
20    Q.  BY MR. HEINZ:  As opposed to surveys of
21  what the dispensing fees are, have you looked at
22  any information that demonstrates what it costs a

Page 124

1  pharmacy on average to dispense a prescription?
2    A.  I -- I have seen a survey that was done
3  -- well, not a survey -- an audit that was done
4  by the Secretary of State on nursing facility
5  long-term care pharmacies and what their costs to
6  dispense are.
7    Q.  Have you ever heard of the organization
8  Grant Thornton in connection with surveys of
9  dispensing costs?
10    A.  No.
11    Q.  I'd like to show you what we've marked
12  as Exhibit 12 in your stack of exhibits.  Have
13  you seen Exhibit 12 before today?
14    A.  No.
15    Q.  And I'd like for you to turn to page 2
16  of the survey, or the third page of the exhibit,
17  the executive summary.  And you'll see that this
18  is titled "national cost of dispensing study."
19  Do you see that?
20    A.  Um-hum.  Yes.
21    Q.  And you'll see in the first paragraph
22  that "Grant Thornton was engaged to perform an

Page 125

1  independent study to identify and quantify the
2  costs incurred by pharmacies across the United
3  States in dispensing prescriptions."  Do you see
4  that?
5    A.  Yes.
6    Q.  And it goes on to say:  "The primary
7  purpose of the study was to provide a comparative
8  analysis of dispensing costs across all states
9  with types" -- "and types of payers, including
10  Medicaid."  Do you see that?
11    A.  Yes.
12    Q.  And the next paragraph explains that
13  "data was submitted" -- excuse me -- "data were
14  submitted for over 24,400 pharmacies, of which
15  23,152 provided complete and usable data and are
16  included in the computation shown in this report.
17  The survey requested data for the six months from
18  March through August of 2006."  Do you see that?
19    A.  Yes.
20    Q.  And if you'll flip to page 27 of the
21  report, you'll see that page 27 is a portion of a
22  table titled "table 18, overall COD per

Henderson Legal Services, Inc.

b846576d-51e8-4822-8a5f-bd9328d500c0

Page 126

1  prescription." Do you see that?
2      A.  Yes.
3      Q.  And you'll see at the top that COD is
4  defined as national cost of dispense -- or,
5  excuse me -- cost of dispensing. Do you see
6  that?
7      A.  Yes.
8      Q.  And so you'll see that down in the
9  Oregon entry it shows that the mean cost of
10  dispensing per prescription in Oregon is $11.61
11  per prescription. Do you see that?
12      A.  Yes.
13      Q.  And if you flip to page 31 of the same
14  exhibit, you'll see this is a different table
15  titled "table 20, Medicaid COD per prescription,"
16  which is Medicaid cost of dispensing per
17  prescription; correct?
18      A.  Yes.
19      Q.  And you'll see in the Oregon entry that
20  the mean cost of Medicaid -- of dispensing a
21  Medicaid prescription is $12.05. Do you see
22  that?

Page 127

1      A.  Yes.
2      Q.  So you'll agree with me that $12.05 for
3  a Medicaid prescription is higher than the $11.61
4  for the overall cost of dispensing a
5  prescription; correct?
6      A.  Yes. Correct.
7      Q.  And you'll agree with me that this is
8  consistent with your prior testimony that it may
9  cost a pharmacy more to dispense a prescription
10  to a Medicaid beneficiary as opposed to a non
11  Medicaid beneficiary?
12      MS. SCHNEIDER THOMAS:  Objection, form.
13      THE WITNESS:  I think I said that --
14  that the Medicaid client is -- well, I think I
15  talked about the cost of dispensing, that the
16  volume that we pay may be related to the hassle
17  factor, if you will, of a Medicaid client versus
18  a commercial client, but I don't think I talked
19  about the cost.
20      Q.  BY MR. HEINZ:  Do you have an
21  understanding as to whether the costs to dispense
22  a prescription to a Medicaid patient differ from

Page 128

1  the costs associated with dispensing a
2  prescription to a non Medicaid patient?
3      A.  No, I don't have a -- No.
4      Q.  Do you have an understanding as to
5  whether the current $3.50 dispensing fee that has
6  been in place since 2001 covers the dispensing
7  costs that a pharmacy incurs when it dispenses a
8  Medicaid prescription?
9      A.  I don't know if it covers costs or if
10  it's over costs. I don't -- I -- I personally
11  have not seen any analysis other than the
12  Secretary of State's audit about the costs.
13  Kathy would be more of an expert on that
14  discussion.
15      Q.  But you would agree with me that,
16  looking at this report that we've marked as
17  Exhibit 12, that if it does cost a pharmacy
18  $12.05 to dispense a Medicaid prescription to a
19  beneficiary in Oregon, that the $3.50 dispensing
20  fee for Medicaid is not adequate to cover those
21  costs?
22      A.  I would agree that this table reflects

Page 129

1  a very different amount than what we pay. I -- I
2  don't know if that -- without reading the whole
3  report, really, what the -- what's included in
4  the costs.
5      MR. HEINZ:  I think now would be a good
6  time to break for lunch.
7      THE VIDEOGRAPHER:  We're off the
8  record.
9      (Recess.)
10      THE VIDEOGRAPHER:  We are back on the
11  record.
12      Q.  BY MR. HEINZ:  Mr. Anderson, I'd like
13  to ask you a few questions about the State of
14  Oregon's mail order pharmacy program that the
15  Medicaid agency runs.
16      A.  Okay.
17      Q.  Do you have familiarity with the mail
18  order portion of the Medicaid program?
19      A.  I know that we have a mail order
20  program.
21      Q.  Do you have an understanding as to when
22  the mail order piece of the pharmacy program was

33  (Pages 126 to 129)

b846576d-51e8-4822-8a5f-bd9328d500c0

Salem, OR

Page 242

1  ours to think about as a payer.
2      Q.  BY MS. SCHNEIDER THOMAS:  Did you
3  consider it the role of the pharmaceutical
4  manufacturers to determine, by setting their
5  published prices, how much of a spread, if any,
6  the Oregon Medicaid program would provide to
7  pharmacies?
8          MR. MALONEY:  Object to form.
9          MR. HEINZ:  Object to form.
10         THE WITNESS:  No.
11     Q.  BY MS. SCHNEIDER THOMAS:  If you would
12 turn back, please, to the document you thought I
13 wanted a minute ago.  It was schedule A of Abbott
14 Oregon 1.
15     A.  Okay.
16     Q.  Do you see schedule 1 listing a number
17 of Abbott products?
18     A.  Yes.
19     Q.  Okay.  If Oregon Medicaid deemed it
20 appropriate to pay providers more for those types
21 of drugs than for other types of drugs, would the
22 Medicaid program have looked to Abbott to set its

Page 244

1          MR. DAVIS:  Object to form.
2          THE WITNESS:  I don't know what's
3  involved in the MAC or the FUL.  I don't know if
4  that's more generic or brand.  I -- I don't -- I
5  don't know that.
6      Q.  BY MR. MALONEY:  So would it be
7  accurate to say that you have no knowledge as to,
8  generally, which types of drugs are reimbursed
9  base on MAC, FUL, or AWP prices?
10     A.  I don't -- Correct.  I don't know what
11 percentage are paid at what levels.
12     Q.  And you also don't know which types of
13 drugs, referring to brand or generic drugs, are
14 paid based on those prices?
15     A.  Correct.  I don't know -- Yeah, I don't
16 know the -- the number of brand or generics that
17 we pay a particular FUL or AWP price.
18     Q.  And you also would have no knowledge
19 regarding what prices are used to pay claims for
20 the drugs listed in the complaints that you
21 looked at a few minutes ago?
22     A.  Correct.

Page 243

1  published prices in such a manner as to determine
2  -- as to set the amount that would be paid to
3  providers?
4      A.  No.
5          MS. CARON:  Object.
6          MS. SCHNEIDER THOMAS:  I'd like to take
7  a short break, and then I will wrap up quickly.
8          THE VIDEOGRAPHER:  We're off the
9  record.
10         (Recess.)
11         THE VIDEOGRAPHER:  We're back on the
12 record.
13         MS. SCHNEIDER THOMAS:  I have no
14 further questions.
15
16         FURTHER EXAMINATION
17 BY MR. MALONEY:
18     Q.  Mr. Anderson, I have just a few follow-
19 up questions here.
20         Are you aware that Oregon Medicaid
21 generally reimburses generic drugs based on the
22 MAC or FUL prices?

Page 245

1          MR. MALONEY:  Thank you.  That's all.
2          MR. HEINZ:  I believe we're ready to
3  conclude.
4          MS. SCHNEIDER THOMAS:  Thank you very
5  much.
6          MR. HEINZ:  Andrea, do you have any
7  questions?
8          MS. CARON:  No.
9          MR. HEINZ:  Thank you, Mr. Anderson.
10         THE VIDEOGRAPHER:  We're off the
11 record.
12         (DEPOSITION ADJOURNED AT 4:27 P.M.)
13
14         _____
15              JESSE ANDERSON
16
17 Subscribed and sworn to and before me
18 this _____ day of _____, 20____.
19
20 _____
21      Notary Public
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

b846576d-51e8-4822-8a5f-bd9328d500c0

# Kathy Ketchum
# (Oregon) (30(b)(6))

# Salem, OR

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

-------------------------------X

VIDEOTAPED DEPOSITION OF THE OREGON DEPARTMENT

OF HUMAN SERVICES by KATHY KETCHUM

PURSUANT TO FEDERAL RULE 30(B)(6)

MONDAY, DECEMBER 15, 2008

9bb28950-1369-4bf5-a707-517a5b4855c6

Page 158

1      MS. SCHNEIDER THOMAS: Objection, form.
2      Q.  BY MR. HEINZ: Now, Ms. Ketchum, this
3  wasn't always the dispensing fee structure that -
4  - that Oregon Medicaid has had; correct?
5      A.  Can you give me some time frame,
6  please.
7      Q.  Sure.  Subsequent to this 2001 document
8  that we're looking at in front of you as Exhibit
9  11, Oregon Medicaid subsequently changed their
10  dispensing fee; correct?
11      A.  Are you asking about prior to 2001?
12      Q.  After 2001, Oregon Medicaid changed
13  their dispensing fee structure; correct?
14      A.  Yes.
15      Q.  And do you recall what they changed the
16  structure to?
17      A.  I believe it was -- went from this
18  tiered structure to, hmm, I believe it was two --
19  or $3.50.
20      Q.  And do you have any understanding as to
21  the rationale behind the change in reimbursement?
22      A.  I don't.

Page 159

1      Q.  Do you have an understanding as to what
2  the costs are for a pharmacy, on average, to
3  dispense a prescription in Oregon?
4      A.  What time frame?
5      Q.  Good clarification question.  Do you
6  have an understanding presently as to what the
7  current dispensing costs are for a pharmacy in
8  Oregon?
9      A.  I know what it costs, or I have an idea
10  of what it costs a Safety Net clinic to dispense.
11  I -- I haven't seen -- I haven't seen anything in
12  Oregon for retail pharmacies.
13      Q.  I'd like you to grab the -- this
14  exhibit from your stack.  It's the -- And what
15  exhibit number is that, for the record?
16      A.  Exhibit 5.
17      Q.  Exhibit 5.  If you look to the second
18  to last page of Exhibit 5, you'll see that -- and
19  we've already discussed this at length in
20  response to another line of questioning -- that
21  the estimated pharmacy dispensing costs here are
22  between $4.00 and -- $4.51 and $5.08; correct?

Page 160

1      A.  Which?
2      Q.  Oh, sure.  It's the second to last
3  page.
4      A.  So at page 8 at the top?
5      Q.  Correct.  And I'll rephrase the
6  question.
7      Here in Exhibit 5, it notes that the
8  estimated pharmacy dispensing costs are $4.51 to
9  $5.08.  Do you see that?
10      A.  I do see that.
11      Q.  And this document, which was prepared
12  in 2002, is it fair to assume that, at this time,
13  Oregon Medicaid understood that pharmacy
14  dispensing costs for Oregon were in the $5 range?
15      A.  That was estimated --
16      MS. SCHNEIDER THOMAS: Objection, form.
17      THE WITNESS: -- estimated dispensing
18  costs based upon the footnoted literature review.
19      Q.  BY MR. HEINZ: And you would agree with
20  me that, in 2002, the -- Or strike that.
21      Do you recall when the change to the
22  $3.50 for retail pharmacies for the dispensing

Page 161

1  fee was -- was implemented?
2      A.  It was either 2001 or 2002.  I believe
3  it was 2001.
4      Q.  And so you would agree with me that, in
5  2001, the dispensing fee of $3.50 for retail
6  pharmacies is less than the $5 estimate in
7  Exhibit 5 that it costs a pharmacy to dispense a
8  prescription?
9      MS. SCHNEIDER THOMAS: Objection, form.
10      THE WITNESS:  It is less than what this
11  has reported as estimated dispensing costs, yes.
12      Q.  BY MR. HEINZ: Do you have any
13  understanding that Oregon Medicaid -- Strike
14  that.
15      Do you have any understanding -- Strike
16  that one too.
17      Ms. Ketchum, you have not seen any
18  other surveys estimating the dispensing costs for
19  Oregon pharmacies?
20      MS. SCHNEIDER THOMAS: Objection, form.
21      THE WITNESS:  Time period?
22      Q.  BY MR. HEINZ: At any point during your

41  (Pages 158 to 161)

9bb28950-1369-4bf5-a707-517a5b4855c6

Salem, OR

Page 230

1     Q.   And do you have any recollection as to
2  when the MAC program first started?
3     A.   I don't.
4     Q.   But it was before March of 2002?
5     A.   I -- I can testify that I've seen
6  reference to it in the State Plan documents that
7  we produced for this subpoena, and that's my only
8  knowledge of the fact that we had a MAC program
9  prior.
10     Q.   Okay.  Do you happen to recall the date
11  of those state plans that you reviewed?
12     A.   I know that there was a 2002 and a
13  2003; and there was one from the '90s, and I
14  don't recall the exact date.
15     Q.   Okay.  And I believe you testified
16  earlier -- again, please correct me if I'm wrong
17  -- that First Health Services MAC pricing --
18  Well, let me restate it.
19       I believe you testified earlier that
20  the method used by First Health Services in
21  setting MAC prices was proprietary?
22     A.   There -- Yes, it is proprietary.

Page 231

1  Although, I see in the State Plan that there is a
2  basement or a floor that it has to be available
3  to: It's the cost available by two wholesalers in
4  the state of Oregon; so it has to be at least
5  available by two wholesalers for that cost.
6     Q.   Okay.  So when Oregon contracted with
7  First Health Services to set MAC prices, it set a
8  floor of the price at which the drug would be
9  available from at least two wholesalers?
10     A.   Yes.
11     Q.   Okay.  And did Oregon use the same
12  floor for its contract with EDS regarding MAC
13  pricing?
14     A.   Yes.
15     Q.   And does EDS also use a proprietary
16  method of setting MAC prices?
17     A.   Yes.
18     Q.   And is it accurate to say that Oregon
19  does not have any knowledge whatsoever as to what
20  First Health Services used in setting MAC prices?
21     A.   No.  It's easy knowledge; I'm sure we
22  could get it if we had to.

Page 232

1     Q.   And do you mean to say that if Oregon
2  had requested in its contract that the method be
3  given or that through some other means it would
4  request --
5     A.   Well, as I understand how proprietary
6  information runs, we can see it but we can't make
7  it public.
8     Q.   Okay.  And do you know if the vendor
9  used before March of 2002 also used a proprietary
10  method of setting MAC prices?
11     A.   I can't speak to that.  I don't know.
12     Q.   Okay.  When Oregon Medicaid contracted
13  with First Health Services for MAC pricing, did
14  it instruct First Health Services to use any
15  specific type of information in its proprietary
16  method of setting MAC pricing?
17     A.   I -- I can't speak to that.  I -- Since
18  I'm a contractor, I don't -- I don't see the
19  contracts of vendors, and so I don't know -- have
20  personal knowledge of that.
21     Q.   Okay.  Do you know of anyone at Oregon
22  Medicaid who would have that knowledge?

Page 233

1     A.   Perhaps Jesse will tomorrow.
2     Q.   And is it accurate to say that you
3  haven't reviewed any documents or otherwise
4  educated yourself about the contract between
5  Oregon Medicaid and First Health Services
6  regarding MAC pricing, in preparation for this
7  deposition?
8     A.   I have not.
9       MS. SCHNEIDER THOMAS:  Objection, form.
10     Q.  BY MR. MALONEY:  And that would be the
11  same for EDS as well?
12     A.   I have more firsthand knowledge of EDS,
13  because I've been working with them more closely.
14     Q.   Okay.  Do you know -- Do you have any
15  information as to what type of information EDS
16  considers in setting its MAC prices?
17     A.   I have some general knowledge that they
18  -- they determine whether drugs are multiple
19  source, how many manufacturers make -- make the
20  drug available.  And then -- So those are the
21  drugs that are eligible for a MAC price.  I don't
22  -- I don't know how they actually set the actual

Henderson Legal Services, Inc.

9bb28950-1369-4bf5-a707-517a5b4855c6

Salem, OR

Page 234

1  price.
2      Q.  Okay.
3      A.  I don't know that part.
4      Q.  And do you know if Oregon Medicaid
5  instructed EDS to consider certain information in
6  setting its MAC prices when it contracted with
7  EDS?
8      A.  Well, it has the same State Plan floor.
9      Q.  Okay.
10     A.  And an added direction was that, for
11 this transition, it was to not be too different
12 than the one previous, in aggregate.
13     Q.  Okay.  Do you know if Oregon Medicaid
14 has copies or otherwise has access to the MAC
15 prices used by the Oregon Medicaid program since
16 the MAC program was first implemented?
17     MS. SCHNEIDER THOMAS:  I'm sorry.
18 Could you repeat that question.
19     MR. MALONEY:  Can you read it back.
20     (Record read.)
21     THE WITNESS:  I know we have data as
22 far as back the First Health system, because they

Page 235

1  -- they maintain that for us.  Prior to that, I
2  don't believe that we have that data; but I don't
3  know, I'd have to research it.
4      Q.  BY MR. MALONEY:  Okay.  I apologize.
5  Did you mention that you thought Jesse Anderson
6  might be more knowledgeable about Oregon
7  Medicaid's contract with First Health Services
8  for MAC pricing?
9      A.  Potentially, yeah.
10     Q.  Potentially?
11     MR. MALONEY:  Counsel, I noticed that
12 Kathy has been designated for topic 15, which
13 relates to the MAC program, but Jesse Anderson
14 has not.  Will we be allowed to ask Jesse
15 questions about the MAC program in a 30(b)(6)
16 capacity tomorrow, to the extent he has knowledge
17 regarding to the contract between Oregon and
18 First Health Services relating to the MAC
19 program?
20     MR. DAVIS:  I don't have an objection -
21 -
22     MR. MALONEY:  Okay.

Page 236

1      MR. DAVIS:  -- to that, to questions to
2  him about that topic.
3      MR. MALONEY:  Okay.  Thank you.
4      Q.  BY MR. MALONEY:  With regard to the
5  contract between EDS and Oregon Medicaid
6  regarding MAC prices, do you know how Oregon
7  instructed EDS to select drugs for MAC pricing?
8      A.  They were --
9      MS. SCHNEIDER THOMAS:  Objection, form.
10     THE WITNESS:  They came to us with a
11 proposal, and then we responded.
12     Q.  BY MR. MALONEY:  Do you know what the
13 proposal was?
14     A.  They established that it had to be a
15 multiple source drug and that it had to be
16 available for more than two manufacturers in the
17 state of Oregon in order to be eligible for a MAC
18 price.
19     Q.  And that is consistent with the floor
20 set in Oregon's State Plan for MAC pricing?
21     A.  Yes.
22     Q.  So is it accurate to say that the EDS

Page 237

1  proposal is, for the most part, consistent with
2  the method used by First Health Services to
3  select drugs for MAC pricing?
4      A.  I don't have firsthand knowledge of how
5  First Health selects drugs, but I -- I do know
6  that the lists themselves were very similar --
7      Q.  Okay.
8      A.  -- so the methods must be similar.
9      MR. MALONEY:  I think that's all I
10 have.  I'd like to reserve some additional time
11 for any additional questions I may have after Ms.
12 Thomas's questions.
13     THE WITNESS:  Can we take a break?
14     MS. SCHNEIDER THOMAS:  I was going to
15 ask you that.
16     THE VIDEOGRAPHER:  We're off the
17 record.
18     (Recess.)
19     THE VIDEOGRAPHER:  We're back on the
20 record.
21
22     EXAMINATION

Henderson Legal Services, Inc.

9bb28950-1369-4bf5-a707-517a5b4855c6

# John Young
# (Rhode Island) (30(b)(6))

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

In Re: PHARMACEUTICAL INDUSTRY       )

AVERAGE WHOLESALE PRICE LITIGATION )

----------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:            ) Master File No.

United States of America ex rel.   ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,      )

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,       ) Hon. Patti B.

and United States of America ex    ) Saris

rel. Ven-A-Care of the Florida       )

Keys, Inc., et al. v. Boehringer   )

Ingelheim Corp., et al., Civil       )

Action No. 07-10248-PBS              )

----------------------------------X

VIDEOTAPED DEPOSITION OF

THE RHODE ISLAND DEPARTMENT OF HUMAN SERVICES

by JOHN YOUNG

Providence, Rhode Island

Wednesday, December 3, 2008

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008

## Providence, RI

Page 74

1   more detailed information that explains the
2   state's reimbursement methodology and the amount
3   of dispensing fees. It says here that the
4   proposed reimbursement methodology defines the
5   estimated acquisition cost of the drug product as
6   wholesale acquisition cost plus a 10 percent
7   markup. The second paragraph says, "The previous
8   method is based on the Estimated Acquisition Cost
9   on the average wholesale price."
10      Does this help to refresh your
11  recollection about what the reimbursement
12  methodology was that was in place prior to Rhode
13  Island seeking a change in the reimbursement
14  methodology to wholesale acquisition cost plus a
15  10 percent markup?
16      A.  It does reflect that AWP was used as
17  the basis, yes.
18      Q.  Rhode Island response goes on to say,
19  "The AWP represents the manufacturer's suggested
20  price which generally is higher than the actual
21  cost of the drug paid by the pharmacy. Indeed,
22  pharmacies typically purchase drug products at

Page 75

1   prices much less than AWP. The largest savings
2   from the WAC plus 10 pricing methodology will
3   come from generic products. Our experience is
4   that the AWP for a generic product can be up to
5   10 times the WAC." Did I read that correctly?
6       A.  You did.
7       Q.  Do you recall any discussions about
8   Rhode Island's determination that the AWP is
9   higher than the actual cost of the drug paid by
10  the pharmacy?
11      A.  I don't recall specific discussions,
12  no.
13      Q.  Do you recall any discussions about why
14  Rhode Island determined that the largest savings
15  from the WAC plus 10 pricing methodology would
16  come from generic products?
17      A.  I don't recall specific discussions,
18  no.
19      Q.  Do you have any recollection of what
20  your understanding was at the time regarding this
21  move to a WAC plus 10 pricing methodology, the
22  rationale for it?

Page 76

1       A.  I was not involved in the discussion,
2   and so at this point in time we would be simply
3   trying to secure approval for the request made in
4   1995.
5       Q.  Who would you -- let's see. This
6   letter is submitted by Christine Ferguson; is
7   that correct?
8       A.  That's correct.
9       Q.  And it is copied to you and Paula
10  Avarista?
11      A.  Yes, I believe so.
12      Q.  And Ann Martino?
13      A.  Correct.
14      Q.  Who is Ann Martino?
15      A.  Ann Martino was the chief of the office
16  of policy.
17      Q.  She is the individual you identified
18  earlier as someone who may be a custodian for
19  State Plan Amendment information?
20      A.  Correct.
21      Q.  As Medicaid Director, would you have
22  wanted to understand why the pricing methodology

Page 77

1   for generic products was being adjusted?
2       A.  If it was an action I had proposed,
3   then yes, I would.
4       Q.  What if it was an action you hadn't
5   proposed? Would you care to understand the
6   reasoning for why the WAC plus 10 pricing
7   methodology?
8       A.  To the extent it was an outstanding
9   action, I would certainly have wanted to be
10  briefed for informational reasons.
11      Q.  But you have no recollection of
12  whatever briefing you may have received on why
13  this change was made?
14      A.  I do not.
15      Q.  The paragraph below the one that I just
16  read has a second sentence, and it says, "On a
17  claim specific basis the payment that results
18  from the state's formula frequently is less than
19  and never exceeds the amount that would be paid
20  under the federal upper limits."
21      Do you understand what federal upper
22  limits are?

20  (Pages 74 to 77)

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008

Providence, RI

Page 98

BY MS. RANKIN:
    Q.   And why is that significant?
    A.   It is possible that Exhibit 5 represents the Department's original proposal, and that Attachment 8 reflects the action of the General Assembly in passage of a final state budget.
    Q.   Would you have expected a Medicaid provider to react to that change in reimbursement from WAC plus 10 to WAC plus 5?
        MS. BAUM:  Objection.
        MS. SMITH:  Objection.
        THE WITNESS:  The legal notice is an opportunity for that reaction.  And in addition, the deliberations of the General Assembly are a matter of public record and open for public comment.
BY MS. RANKIN:
    Q.   I take it you don't recall any reaction from Medicaid providers to this change?
        MS. SMITH:  Objection.
        THE WITNESS:  I wouldn't.  This

Page 99

predates my tenure with the Department.
BY MS. RANKIN:
    Q.   And you never discussed it while you were Medicaid Director that you recall?
    A.   Not that I recall.
        MS. RANKIN:  If we can go off the record just for a second, please.
        VIDEOGRAPHER:  Time is 11:58.  We are going off the record.
        (Off-the-record discussion.)
        (Exhibit Roxane-RI 009 marked for identification.)
        VIDEOGRAPHER:  The time is 11:59.  We are back on the record.
BY MS. RANKIN:
    Q.   Asked the court reporter to mark as Roxane Rhode Island Exhibit 9 some documents that were produced to me last night.  So the fax scrawl at the top is not an original part of the document.  If you take a second to kind of page through this collection of documents.
        The first document is a letter dated

Page 100

May 31, 2001 from you to Ronald Preston at HCFA. And this is a response to HCFA's request for additional information for the State Plan Amendment that changed wholesale acquisition cost plus 10 percent to a wholesale acquisition cost plus a 5 percent markup; is that correct?
    A.   Correct.
    Q.   If you compare this letter dated March 31, 2001 with the letter from Roxane, Exhibit 6, which is the second page, a letter dated May 11, 2001, the May 11, 2001 letter we already established is Rhode Island's response to HCFA's request for additional information regarding the change from AWP to WAC plus 10 percent.  The letter from May 31, 2001 you've just testified is the response to HCFA's request for supplemental information relating to wholesale, the change to wholesale acquisition cost plus 5 percent.  And these letters are dated about 20 days apart.  Is that correct?
    A.   That's correct.
    Q.   As the director of Medicaid at the

Page 101

time, what was your understanding of whatever additional analysis was done from May 11, 2001 to May 31, 2001 to assess what the impact of the change from wholesale acquisition costs plus 10 percent to wholesale acquisition costs plus 5 percent would be?
    A.   I have no memory of additional analysis between those two dates.  The single additional representation would appear to be that the proposed WAC plus 5 percent would cause no further harm to providers and would still result in a profit for the pharmacies.
    Q.   But other than the fact that you have just put that conclusion in the letter, do you recall what the basis for that conclusion is?
    A.   I do not.
    Q.   Would you have had any concern about further harm to providers as a result of a reduction in reimbursement?
        MS. BAUM:  Objection.
        THE WITNESS:  I think our concern was always as to the adequacy of network, and so if

26 (Pages 98 to 101)

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008

Providence, RI

Page 138

1  implemented state maximum allowable costs for any
2  drugs?
3      A.  We did not maintain a state MAC during
4  my tenure.  I don't know whether they ever did
5  before that.
6      Q.  Had you ever considered during your
7  tenure implementing a state MAC?
8      A.  It had never been recommended to me,
9  no.
10      Q.  What is your understanding of what a
11  state MAC is?
12      A.  A state MAC is similar to the federal
13  upper limit, an upper limit that will be paid.  I
14  think it is probably much more germane in a state
15  that is larger and has more markets within it.
16      Q.  What were the reasons for not adopting
17  a state MAC during your tenure?
18          MS. BAUM:  Objection.
19          MS. SMITH:  Objection.
20          THE WITNESS:  It was never recommended
21  to me.
22  BY MS. RANKIN:

Page 139

1      Q.  Did you ever consider whether that
2  would be a good idea as state Medicaid Director?
3      A.  I did not.
4      Q.  Are you aware that a state MAC is a
5  method that some states use in their
6  reimbursement methodologies to contain costs?
7      A.  I am.
8      Q.  Were you ever curious about whether
9  that would be a good proposal for Rhode Island to
10  consider?
11          MS. BAUM:  Objection.
12          MS. SMITH:  Objection.
13          THE WITNESS:  No.
14  BY MS. RANKIN:
15      Q.  You say that you had some understanding
16  that there used to be a state MAC in place in
17  Rhode Island; is that correct?
18      A.  No.  I said there may have been but I
19  am not aware of them.
20      Q.  You're not aware whether Rhode Island
21  has ever implemented a state MAC?
22      A.  I am not.

Page 140

1      Q.  Do you know what information is used
2  for purposes of calculating some state MACs?
3      A.  I do not.
4      Q.  Are you aware that some states use
5  state MACs as cost containment purposes because
6  they can be the lowest method or the lowest
7  calculation of cost for reimbursement?
8      A.  I believe I probably read that.
9      Q.  But it never occurred to you as state
10  Medicaid Director to ask if that should be, if
11  that should be a consideration for implementation
12  in Rhode Island Medicaid?
13          MS. SMITH:  Objection.
14          THE WITNESS:  It did not.
15          (Exhibit Roxane-RI 012 marked for
16  identification.)
17  BY MS. RANKIN:
18      Q.  Ask the court reporter to mark as
19  Roxane 12 a document from the Department of
20  Health and Human Services Office of the Inspector
21  General dated March 14, 2002.  Subject is
22  Medicaid Pharmacy Actual Acquisition Cost of

Page 141

1  Generic Prescription Drug Products.  It is to
2  Thomas Scully at the Centers for Medicare and
3  Medicaid Services.  The document, as reflected in
4  the first paragraph, says that it is a report
5  providing the results of our review of pharmacy
6  acquisition costs for generic drugs reimbursed
7  under the Medicaid prescription drug program.
8          If you scroll down to the third
9  paragraph it describes the objective of this
10  review was to develop an estimate of the discount
11  below AWP at which pharmacies purchase generic
12  drugs.
13      A.  I'm sorry, what page are you on?
14      Q.  I'm on the very first page, third
15  paragraph?
16          MS. SMITH:  Second paragraph, counsel.
17  BY MS. RANKIN:
18      Q.  Second paragraph.
19      A.  Okay.
20      Q.  And the third paragraph states that the
21  conclusions of their report is that they have
22  estimated that, quote, nationally actual drug

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008
                        Providence, RI

| Page 142 |
| --- |

1   acquisition costs was an average of 65.93 percent
2   below AWP.
3         This OIG report from 2002 would have
4   been issued during your tenure as Rhode Island
5   Medicaid Director; is that right?
6       A.  Correct.
7       Q.  Do you recall receiving this report?
8       A.  Not specifically.
9       Q.  But it was generally the case that you
10  would receive and review OIG reports; is that
11  right?
12      A.  Correct.
13      Q.  Do you recall discussing around the
14  2002 time frame that there was federal
15  acknowledgment that the actual drug acquisition
16  cost was 65 percent or more below AWP?
17      A.  I don't remember specific discussions,
18  no.
19      Q.  But it was -- was it your understanding
20  during that time frame that AWP was -- that
21  actual acquisition costs were substantially below
22  AWP?

| Page 143 |
| --- |

1         MS. BAUM:  Objection.
2         THE WITNESS:  I think I've always
3   recognized that AWP as a list price would not
4   necessarily correlate to actual cost.
5   BY MS. RANKIN:
6       Q.  Were you aware of the fact that AWP was
7   higher than actual acquisition cost?
8       A.  As a list price it would logically be
9   higher than acquisition cost.  AWP is a retail
10  asking price, and cost is exactly that.
11      Q.  If you flip through this report on page
12  3 -- excuse me, page 7, under "other matters."
13  Are you with me?
14      A.  I am.
15      Q.  It says, "For the eight states that we
16  reviewed, in addition to our comparison of AWP to
17  acquisition cost, we also compared WAC to invoice
18  price.  This was done because some states use WAC
19  plus a percentage in determining their pharmacy
20  reimbursement methodology.  We estimated that the
21  invoice price for generic drugs was a national
22  average of 30.55 percent below WAC rather than it

| Page 144 |
| --- |

1   being higher, and therefore perhaps supporting
2   that a percentage would be added to WAC."
3         Then you scroll down and it says, "The
4   results of our review show that WAC was not a
5   true wholesale acquisition price and was
6   significantly higher than the actual acquisition
7   cost for generic drugs.  Therefore, we believe
8   the use of WAC plus a percentage as the basis for
9   reimbursing pharmacies could result in payments
10  which significantly exceed the actual acquisition
11  cost of generic drugs."
12        Do you recall learning anything from
13  this report about the relationship between WAC
14  and actual acquisition costs?
15      A.  I don't recall this report
16  specifically.
17      Q.  Did you already know at the time in
18  2002 that WAC was not a true wholesale
19  acquisition price?
20      A.  I think I always knew that as published
21  in a compendium, that it was some artifact of a
22  variety of inputs that were taken from the

| Page 145 |
| --- |

1   various manufacturers who purported their inputs
2   to be their wholesale acquisition cost.
3       Q.  And based on that understanding would
4   it have always been your expectation that the
5   reported WACs were significantly higher than the
6   actual acquisition costs for generic drugs?
7         MS. BAUM:  Objection.
8         THE WITNESS:  No, it would not have
9   been my expectation.
10  BY MS. RANKIN:
11      Q.  Would it have been your expectation
12  that the reported WAC would have been lower than
13  the acquisition cost?
14      A.  It would have been my expectation that
15  the reported WAC would have approximated the
16  actual acquisition cost as stated in the
17  definition.
18      Q.  Your understanding of what a wholesale
19  acquisition cost as it is reported in the pricing
20  compendia, though, was not a net price, right?
21      A.  That that was the price that
22  wholesalers could acquire a pharmaceutical for.

37 (Pages 142 to 145)

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008

Providence, RI

Page 158

1  BY MS. RANKIN:
2       Q.  -- but that your files and other
3  documents that would have been in your custody as
4  Medicaid Director are still there?
5       A.  That's correct.
6       Q.  What is Rhode Island state Medicaid
7  retention policy for e-mails?
8       A.  I don't know that we have a retention
9  policy for e-mail.  I erased and deleted mine
10  fairly routinely and probably kept no more than
11  60 days worth of history on mine.  If there was
12  something specific, pertinent and important, I
13  would have printed it down and placed it in a
14  paper file.
15       Q.  Are there any places you would suggest
16  one look for documents that could relate to this
17  litigation?
18            MS. BAUM:  Objection.
19            THE WITNESS:  I would have had some
20  collection of documents in my possession that
21  would be in my office either as reports or on
22  bookshelves or files in file cabinets.  If it was

Page 159

1  a State Plan Amendment matter, the original copy
2  would have been kept in the policy office.  Those
3  would be the main repositories of documents.
4  Provider records and payment records take a
5  different path and would either have been scanned
6  to electronic format and maintained or moved to
7  the state record center for the duration of their
8  retention period.
9  BY MS. RANKIN:
10       Q.  When you left the office in May 2008,
11  did you do anything with your electronic files?
12       A.  I asked that the hard drive be erased.
13       Q.  Do you have any copies of documents,
14  electronic, draft or otherwise, that are in your
15  possession?
16       A.  I probably have a backup disc somewhere
17  that would reflect electronic copies of what
18  would be in my paper files.
19       Q.  And that's in your personal possession?
20       A.  It is.
21       Q.  Anything else?
22       A.  Not that comes to mind, no.

Page 160

1       Q.  Have you ever heard of the Pharmacy
2  Technical Advisory Group or P-TAG?
3       A.  I have.
4       Q.  Did you participate in P-TAG?
5       A.  I did not.
6       Q.  During your tenure, was anyone -- to
7  your knowledge was anyone at Rhode Island
8  Medicaid a participant in P-TAG?
9       A.  I don't believe so.  I don't believe.
10  If it had been anyone, it might have been Paula;
11  but I don't think she qualified because TAG
12  membership was typically reserved for state
13  Medicaid directors.
14       Q.  Would you receive any information from
15  P-TAG?
16       A.  The P-TAG occasionally issued reports
17  or notifications.
18            (Exhibit Roxane-RI 015 marked for
19  identification.)
20       Q.  I've asked the court reporter to mark
21  as Roxane Exhibit 15 a document that is entitled
22  "Pharmacy Technical Advisory Group (P-TAG)

Page 161

1  Position Paper," September 11, 2000.  The first
2  paragraph reads:  The P-TAG should go on record
3  as endorsing the initiative for revised average
4  wholesale prices as developed by the National
5  Association of Medicaid Fraud Control Units and
6  the U.S. Department of Justice.
7            You were state Medicaid Director at
8  this time; is that correct?
9       A.  That's correct.
10       Q.  Were you aware of revised average
11  wholesale prices that were developed by NAMFCU
12  and DOJ?
13       A.  Not specifically, no.
14       Q.  Do you have no recollection of the
15  Department of Justice suggesting revised average
16  wholesale prices as basis for reimbursement?
17       A.  No, I don't.
18       Q.  As the designee for Rhode Island
19  Medicaid today, who would you suggest is most
20  knowledgeable about P-TAG correspondence?
21       A.  I would think that perhaps Paula
22  Avarista would have greater technical knowledge

41  (Pages 158 to 161)

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                December 3, 2008

Providence, RI

Page 162

1  than I would.
2      Q.   If the Department of Justice was
3  recommending that states used revised average
4  wholesale prices as basis for reimbursement,
5  would you have wanted to know that as state
6  Medicaid Director?
7      A.   Probably.
8      Q.   But you have no recollection of anyone
9  bringing this to your attention?
10     A.   I do not.
11         (Exhibit Roxane-RI 016 marked for
12  identification.)
13     Q.   Ask the court reporter to mark as
14  Roxane Exhibit 16 a letter from the Center for
15  Medicaid, Centers for Medicare and Medicaid
16  Services, dated September 18, 2002.  And it is
17  addressed to Dear State Medicaid Director.
18         The first paragraph reads:  This letter
19  is to clarify issues related to supplemental drug
20  rebate agreements and prior authorization of
21  Medicaid covered outpatient drugs.  A number of
22  states have sought CMS approval of supplemental

Page 163

1  drug rebate agreements between a state and drug
2  manufacturers with respect to Medicaid covered
3  outpatient prescription drugs.
4         September 18, 2002 you were still the
5  director of Rhode Island's Medicaid program; is
6  that correct?
7      A.   That's correct.
8      Q.   Do you recall receiving this letter
9  from CMS relating to clarifications about
10  supplemental drug rebate agreements?
11     A.   It is a state Medicaid Director letter,
12  so I would have received it and I would have read
13  it.
14     Q.   And does Rhode Island have a
15  supplemental drug rebate program?
16     A.   We do now.
17     Q.   When did that start?
18     A.   It probably did not start until 2007, I
19  think.
20     Q.   2007 while you were still director of
21  state Medicaid?
22     A.   Correct.

Page 164

1      Q.   Why did Rhode Island implement a
2  supplemental drug rebate program?
3      A.   At the point we proposed instituting a
4  supplemental drug rebate program, I believe we
5  were following the established lead of 35 plus
6  other states who had successfully implemented
7  such a measure and shown savings as a
8  consequence.
9      Q.   Savings in their overall Medicaid
10  reimbursement expenses?
11     A.   Yes.
12     Q.   If you look down to the third
13  paragraph, it says here, "We remind states that
14  supplemental drug rebates must be, quote,
15  considered a reduction in the amount expended
16  under the State Plan in the quarter for medical
17  assistance, unquote, as required by 1927(b)(1)(B)
18  of the Act."
19         Did you, as Rhode Island state Medicaid
20  Director, consider supplemental drug rebates to
21  be a reduction in the amount paid by Rhode Island
22  for Medicaid reimbursement?

Page 165

1      A.   Yes, we did.
2      Q.   We last discussed the ingredient cost
3  reimbursement component for Rhode Island being
4  WAC plus 5 percent in late 1995; is that correct?
5      A.   That's correct.
6      Q.   Did the basis for reimbursement of
7  ingredient cost change while you were still
8  Medicaid Director for the state of Rhode Island?
9      A.   Yes, it did.
10     Q.   When did that happen?
11     A.   That happened in 2000 -- it would have
12  been passed in the 2007 session, I believe.  I
13  could be off by a year on that.  It would have
14  taken effect the following July.
15     Q.   How did it change?
16     A.   The formula was changed from WAC plus 5
17  percent to WAC plus no percent, plus dispensing
18  fee.
19     Q.   Why was it changed?
20     A.   As a budget savings initiative.
21     Q.   What was the basis for choosing
22  straight WAC as opposed to some other number?

42  (Pages 162 to 165)

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008

Providence, RI

Page 174

1    Q.  What is your recollection of the
2  reaction Rhode Island Pharmacists' Associations
3  had to the change in WAC?
4    A.  Obviously they didn't welcome the
5  change.  It was a reduction in their
6  reimbursement.  No provider welcomes a change in
7  reimbursement to the negative.  They only welcome
8  changes to the positive.
9    Q.  How did making this presentation help
10  you determine whether there was going to be an
11  impact on pharmacy provider participation?
12    A.  It didn't help me determine if there
13  would be an impact, because clearly I knew there
14  would be.  Their reimbursement would be lowered
15  by whatever the discounted factor or 5 percent of
16  105 percent would be.  It clearly did not give me
17  a foundation to assess whether or not the network
18  would be impacted.
19    Q.  Did you undertake any effort to assess
20  whether the network would be impacted?
21    A.  I did not.
22    Q.  Why not?

Page 175

1    A.  At the time we were proposing that, we
2  were, as we are now, in a projected deficit
3  situation.  All provider groups were being
4  examined.  Many of them were being touched for
5  reductions in our payments to them, usually
6  through rate mechanisms, but through whatever
7  measure we could.
8        VIDEOGRAPHER:  Time is 2:33.  This is
9  the end of cassette number 2.  We are going off
10  the record.
11        VIDEOGRAPHER:  The time is 2:41.  This
12  is beginning cassette number 3.  We are back on
13  the record.
14  BY MS. RANKIN:
15    Q.  Mr. Young, during your tenure as the
16  director of Rhode Island Medicaid, did you ever
17  have direct communication with representatives
18  from Boehringer?
19    A.  Not to my recollection, no.
20    Q.  Have you heard of Boehringer?
21    A.  I have.
22    Q.  What about Roxane?

Page 176

1    A.  Not to my recollection.
2    Q.  What about Dey?
3    A.  Not to my recollection.
4    Q.  Warrick?
5    A.  I don't think so.
6    Q.  And Abbott Laboratories?
7    A.  I may have met somebody from Abbott.
8  That's a stronger possibility.
9    Q.  Do you have any specific recollection
10  of meeting somebody from Abbott?
11    A.  I don't.
12    Q.  Has anyone ever reported to you that
13  they had had specific conversations with any of
14  the defendants on the complaint that I showed you
15  earlier?
16    A.  Not to my recollection, no.
17    Q.  Do you have any knowledge as to how any
18  of the defendants set their AWPs?
19    A.  I have no knowledge.
20    Q.  Do you have any knowledge as to how any
21  of the defendants sets their wholesale
22  acquisition costs?

Page 177

1    A.  I have no knowledge.
2    Q.  Other than what your attorneys may have
3  told you, do you have any reason to believe that
4  any of the WAC prices submitted by the defendants
5  are false in any way?
6    A.  None.
7    Q.  Do you have any knowledge of fraudulent
8  conduct committed by any of the defendants
9  relating to the pricing of their pharmaceuticals?
10    A.  No.
11        MS. RANKIN:  I may be finished if
12  you'll just give me one second to look over my
13  notes.
14  BY MS. RANKIN:
15    Q.  Has Rhode Island Medicaid program
16  during your tenure ever considered setting a
17  different dispensing fee for generic drugs versus
18  brand drugs?
19    A.  I think we may have discussed that at
20  one time.  And I really don't recall why it was
21  not pursued if we did.
22    Q.  What was the rationale for that

45 (Pages 174 to 177)

e56b5548-1f6a-4f27-a21d-46b66f77af45

# Larry Iversen
# (South Dakota) (30(b)(6))

Pierre, SD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Abbott Laboratories, Inc.)

Civil Action No. 06-11337-PBS;   ) TRANSCRIPT OF

United States of America ex rel. ) PROCEEDINGS

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil ) DEPOSITION OF

Action No. 05-11084-PBS; and     ) THE SOUTH DAKOTA

United States of America ex rel. ) DEPARTMENT OF

Ven-A-Care of the Florida Keys,  ) SOCIAL SERVICES

Inc. v. Boehringer Ingelheim     ) by LARRY IVERSEN

Corp., et al., Civil Action No.  )

07-10248-PBS                     ) DECEMBER 15, 2008

--------------------------------X

SD Department of Social Services (Larry Iversen)                    December 15, 2008

# Pierre, SD

|  | Page 18 |
|---|---|

1      Q.   And when did you meet with him?
2      A.   Last week.
3      Q.   How many meetings did you have with
4   him?
5      A.   One or two.
6      Q.   Was there anyone else present at these
7   meetings besides yourself and Dan Todd?
8      A.   At one there was the federal attorney,
9   yes.
10      Q.   And who is the federal attorney who was
11   present?
12      A.   She is.
13      Q.   You are pointing to Ms. June Acton?
14      A.   Correct.
15      Q.   So for the first meeting with Dan Todd,
16   was June Acton present at that first meeting?
17      A.   No.
18      Q.   How long was that first meeting?
19      A.   Brief, probably less than a half hour.
20      Q.   Did you review any documents at this
21   first meeting?
22      A.   No.

|  | Page 19 |
|---|---|

1      Q.   Did you review any deposition
2   transcripts at the first meeting?
3      A.   No.
4      Q.   And for the second meeting, when was
5   the second meeting that you met with Dan Todd and
6   June Acton?
7      A.   Thursday.
8      Q.   That would be December 11th?
9      A.   Correct.
10      Q.   Was anyone else present at the meeting
11   besides June Acton, Dan Todd, and yourself?
12      A.   No.
13      Q.   And how long was that second meeting?
14      A.   Approximately an hour to an hour and a
15   half.
16      Q.   Did you review any documents at that
17   meeting?
18      A.   No.
19      Q.   Did you review any deposition
20   transcripts at that meeting?
21      A.   No.
22      Q.   When did you begin your employment with

|  | Page 20 |
|---|---|

1   South Dakota Medicaid?
2      A.   Approximately 13 years ago.
3      Q.   So roughly in 1995?
4      A.   Roughly.
5      Q.   For what time period are you prepared
6   to testify today?
7      A.   For the time frame that I've been
8   employed with Department of Social Services.
9      Q.   And did you do anything in preparation
10   for this deposition to inform yourself of the
11   time period prior to your employment at South
12   Dakota Medicaid?
13      A.   No.
14      Q.   Were you involved in the collection of
15   documents that were produced by South Dakota
16   Medicaid?
17      A.   No.
18      Q.   Were you at all asked to gather
19   documents to produce in connection to this
20   litigation on behalf of South Dakota Medicaid?
21      A.   No.
22      Q.   Although you are primarily testifying

|  | Page 21 |
|---|---|

1   on behalf of South Dakota Medicaid today, I'd
2   like to get to know a little bit more about your
3   background, so you stated that you began work
4   about 13 years ago at South Dakota Medicaid; is
5   that correct?
6      A.   Yes.
7      Q.   And in what position did you begin your
8   employment at South Dakota Medicaid?
9      A.   Payment control officer.
10      Q.   And how long were you in that position?
11      A.   Approximately a year and a half.
12      Q.   So to roughly 1997?
13      A.   Yes.
14      Q.   And what position did you move to after
15   being payment control officer?
16      A.   Program manager.
17      Q.   How long were you in that position?
18      A.   Approximately a year and a half.
19      Q.   And what was your next position?
20      A.   Deputy director.
21      Q.   How long were you in that position?
22      A.   Five years.

6 (Pages 18 to 21)

354e3b13-d775-406f-912c-c8856c7f542c

Page 122

1    Q.   Can you describe for me the documents
2  that she did show you?
3    A.   Boy, I just don't recall exactly what
4  they were.  There may have been some state plan
5  documents.
6    Q.   What else?
7    A.   That's all I recall.
8    Q.   Did she show you any legal documents
9  such as deposition transcripts?
10   A.   No.
11   Q.   Did she show you any other type of
12 legal documents?
13   A.   No.
14   Q.   Did the United States Attorney provide
15 an overview on the legal theories of the case?
16   A.   No.
17   Q.   Did the United States Attorney provide
18 any indication of the United States's claims in
19 this action?
20   A.   No.
21   Q.   Besides this meeting that you referred
22 to last Thursday, have you had any other

Page 123

1  discussions with attorneys from the United States
2  Department of Justice or CMS regarding drug
3  pricing litigation?
4    A.   No.
5    Q.   Is there anything else which you recall
6  the United States Attorney telling you that I
7  have not asked about?
8    A.   No.
9    Q.   Approximately how long did you meet?
10   A.   Oh, somewhere between an hour and hour
11 and a half.
12   Q.   Have you ever reviewed any complaints
13 related to the matter for which we are here
14 today?
15   A.   No.
16   Q.   Do you have an understanding about the
17 nature of the lawsuit?
18   A.   A very basic understanding.
19   Q.   And how did you come to that
20 understanding?
21   A.   Simply by reading the subpoena that we
22 had received.

Page 124

1    Q.   Any other way?
2    A.   No.
3    Q.   When did you first become aware of the
4  United States lawsuit against Abbott, Dey, and
5  Roxane?
6    A.   When we received the subpoena.
7    Q.   Did South Dakota ever receive
8  notification from CMS or the Department of
9  Justice indicating that it should retain
10 documents relating to AWP or drug pricing?
11   A.   To the best of my knowledge, no.
12   Q.   Have you ever personally been advised
13 to retain documents relating to South Dakota's
14 Medicaid reimbursement system or its knowledge
15 about published AWPs?
16   A.   No.
17   Q.   When South Dakota established its
18 definition of estimated acquisition cost as AWP
19 minus 10.5 percent, how was the figure of 10.5
20 percent determined?
21   A.   I don't know that, that was before my
22 time with the department.

Page 125

1    Q.   In preparation for your deposition
2  today, were you educated as to how this figure
3  was set?
4    A.   No.
5    Q.   Do you have any insight as to how that
6  figure was determined?
7    A.   I don't.
8    Q.   Do you know when the 10.5 percent
9  discount was first applied in the South Dakota
10 Medicaid reimbursement formula?
11   A.   I don't know specifically, but it's
12 been 10 and a half percent for as long as I can
13 recall.
14   Q.   And you began work with the department
15 around 1995; is that correct?
16   A.   Approximately 13 years.
17   Q.   I'm sorry, I didn't hear your answer,
18 sir.
19   A.   Yes, approximately 13 years.
20   Q.   And similarly, I believe you previously
21 testified that the dispensing fee has remained at
22 the $4.25 level since you began with the

32  (Pages 122 to 125)

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

Page 126

1  department around 1995.
2      A.  I think it's 4.75.
3      Q.  I'm sorry, I misspoke.  4.75 --
4      A.  Yes.
5      Q.  -- has remained the dispensing fee
6  level since at least as early as 1995; is that
7  correct?
8      A.  There may have been a change in there
9  at some point, I don't recall.  I can recall it's
10 been 4.75 for a number of years.
11     Q.  How was the $4.75 level selected for
12 the South Dakota dispensing fee?
13     A.  I don't know that.
14     Q.  As part of your preparation for today's
15 deposition, were you educated at all regarding
16 South Dakota's knowledge about the adequacy or
17 inadequacy of its dispensing fee rate?
18     A.  No.
19     Q.  Are you familiar with the term
20 nontraditional pharmacies?
21     A.  No.
22     Q.  Have you ever heard of home IV

Page 127

1  pharmacies?
2      A.  Could you repeat that?
3      Q.  Yes.  Have you ever heard of home IV
4  pharmacies?
5      A.  No.
6      Q.  We discussed earlier some references to
7  closed pharmacies; do you recall that?
8      A.  Yes.
9      Q.  What is your understanding of a closed
10 pharmacy?
11     A.  My understanding of a closed pharmacy
12 is it's a pharmacy that provides prescription
13 drugs to individuals in nursing facilities.  They
14 don't necessarily have a store front where they
15 dispense drugs to someone walking in through the
16 door.
17     Q.  Are you aware of any other types of
18 examples besides nursing home pharmacies for
19 closed pharmacies?
20     A.  No.
21     Q.  Is it fair to say that you have no
22 reason to disbelieve that these exist, you just

Page 128

1  may not be aware of them?
2      A.  Other examples other than nursing
3  facilities?
4      Q.  Yes.
5      A.  That's the limit of my experience and
6  knowledge with them.
7      Q.  If South Dakota -- if South Dakota's
8  Medicaid office was going to make a change to its
9  reimbursement methodology, does the agency have
10 authority to do so or must any change to the
11 reimbursement formula go through the legislature?
12     A.  Changes in administrative rule are
13 required to go through an interim rules committee
14 that is made up of legislative members.
15     Q.  I'll give an example and maybe you can
16 walk me through this.  If South Dakota wanted to
17 increase its dispensing fee, how would it go
18 about doing so?
19     A.  If we wanted to increase our dispensing
20 fee, first we would look to see if a state plan
21 amendment needed to be made and then we would go
22 through the process that I previously described.

Page 129

1  If a rules change were to be required, then I
2  would also then say we would have to go through
3  the process that I previously described, that
4  includes meeting in front of the legislative
5  interim rules committee.
6      Q.  From 1991 through 2003, did South
7  Dakota take any efforts to increase its
8  dispensing fee?
9      A.  I don't immediately recall any actions
10 to change the dispensing fee.
11         MS. RAMSEY:  Lisa, if I could please
12 ask you to hand the court reporter the cross-
13 notice.
14         MS. KHANDHAR:  Sure.
15         MS. RAMSEY:  I ask this please be
16 marked as Abbott South Dakota 1.
17         (Deposition Exhibit Abbott-SD 001
18 marked for identification.)
19     Q.  (BY MS. RAMSEY)  Mr. Iversen, do you
20 have that document in front of you?
21     A.  Yes, I do.
22     Q.  If you could please turn to Schedule A,

33  (Pages 126 to 129)

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008

Pierre, SD

Page 130

1  which is about five or six pages into the
2  document. On Schedule A you will see a list of
3  topics of inquiry for which you have been
4  designated to testify.
5      A.  Just a moment, please. Okay.
6      Q.  Do you understand that you have been
7  designated to testify as to these topics of
8  inquiry?
9      A.  Yes.
10     Q.  Now, if you could turn to Schedule 1,
11 which is a few pages back, it has a list of
12 national drug codes and it's titled Schedule 1,
13 Abbott slash DOJ action NDCs.
14     A.  Yes.
15     Q.  I can represent to you that these are
16 the products that are at issue in the Abbott/DOJ
17 action. Are you familiar with these drug
18 products?
19     A.  No.
20     Q.  Do you have an understanding that these
21 are all multisource products?
22     A.  I understand what multisource products

Page 131

1  are. I didn't know that they were all
2  multisource.
3      Q.  Do you have any knowledge as to how
4  these drug products are administered to patients?
5      A.  No.
6      Q.  For the record, I can represent to you
7  that these are all liquid drugs, infusion or
8  irrigation products, and they are generic
9  products. For which of these products did South
10 Dakota have a MAC?
11     A.  I don't know that.
12     Q.  In preparation for your deposition
13 today, were you educated at all about which of
14 these products listed on Schedule 1 South Dakota
15 had established a MAC for?
16     A.  No.
17     Q.  Is it fair to say that South Dakota
18 could have MACs for these products, you are just
19 not aware one way or the other?
20     A.  That's correct.
21     Q.  And is it fair to say that you don't
22 have any knowledge about when MACs would have

Page 132

1  been established by South Dakota for these
2  products; is that correct?
3      A.  I would say at the earliest they would
4  have been established would have been with the
5  implementation of our state MAC program around
6  2002, if they have a MAC on them.
7      Q.  And similarly, if you could flip to the
8  next page, which is Schedule 2, Abbott slash Ven-
9  A-Care action, and you will see a list of some
10 NDCs on the next two pages.
11     A.  Okay.
12     Q.  Can you provide testimony as to whether
13 South Dakota has established MACs for the
14 products listed on Schedule 2?
15     A.  I don't know whether these products on
16 Schedule 2 have a South Dakota MAC on them or
17 not.
18     Q.  And similarly, in preparation for your
19 deposition today, you were not provided any
20 education as to whether MACs were established for
21 these products?
22     A.  Correct.

Page 133

1      Q.  Similarly, you have no knowledge as to
2  the time period for which the MACs were
3  established, if they were in fact established?
4      A.  Same answer as I gave on the prior
5  schedule. If they had a MAC on them, they would
6  have been implemented sometime in 2002.
7      Q.  How does South Dakota determine the
8  products for which it would establish MACs?
9      A.  We leave that up to the contractor who
10 supplies us the MAC list.
11         MS. KHANDHAR: Hilary, it looks like we
12 need to change the tape. Is this a good time to
13 take a break?
14         MS. RAMSEY: Sure, let's go off the
15 record for a few minutes and let the court
16 reporter change the tape.
17         VIDEOGRAPHER: This is the end of tape
18 number three of the video deposition of Larry
19 Iversen. The time is approximately 11:26 a.m.
20         (Whereupon, the deposition was in
21 recess at 11:26 a.m., and subsequently reconvened
22 at 11:31 a.m., and the following proceedings were

34  (Pages 130 to 133)

354e3b13-d775-406f-912c-c8856c7f542c

Pierre, SD

Page 134

1  had and entered of record:)
2      VIDEOGRAPHER:  This is the beginning of
3  recording number four of the video deposition of
4  Larry Iversen.  The date is December 15th, 2008,
5  the time is approximately 11:31 a.m., and the
6  videographer is Torre Kavanaugh.
7      Q.  (BY MS. RAMSEY)  Mr. Iversen, at what
8  point did South Dakota first consider
9  implementing a state MAC program?
10     A.  I would have to say it was probably
11 sometime in 2001.  Again, I wasn't director at
12 the time, but given when the state MAC was
13 implemented, I'd have to say that it was sometime
14 in 2001.
15     Q.  On what do you base your belief that
16 2001 was the first point in time that South
17 Dakota first considered implementing a MAC
18 program?
19     A.  Based upon when the MAC was actually
20 implemented in 2002.
21     Q.  Do you have any reason to disbelieve
22 that South Dakota considered implementing a MAC

Page 135

1  program prior to that time?
2      A.  No, but I also don't have any reason to
3  believe that we did.
4      Q.  So is it fair to say that you don't
5  know one way or the other whether South Dakota
6  considered implementing a MAC program prior to
7  2001?
8      A.  That would be fair.
9      Q.  Mr. Iversen, I'd like to look quickly
10 back at the document regarding the South Dakota
11 survey, I'm not sure which exhibit that is.
12 Lisa, if you could remind me of the exhibit
13 number for the AWP Illinois document.
14     MS. KHANDHAR:  Dey 912.
15     Q.  (BY MS. RAMSEY)  Mr. Iversen, if you
16 could pull out Dey 912 again, please.
17     A.  Okay.
18     Q.  What prompted South Dakota to implement
19 this survey looking into the difference between
20 the published AWPs and the rate at which
21 providers could acquire drugs?
22     A.  I don't know that.

Page 136

1      Q.  Who would know?
2      A.  Bob Coolidge.
3      Q.  What is Mr. Coolidge's position today?
4      A.  All I know is he doesn't work for the
5  Department of Social Services.
6      Q.  Do you have any idea when he left
7  Department of Social Services?
8      A.  It's probably been close to 11 to 12
9  years ago.
10     Q.  Where are the files relating to this
11 survey stored in the South Dakota Medicaid
12 office?
13     A.  I don't know that there are any files
14 related to this survey even in existence.
15     Q.  If you had to speculate as to where
16 these files would be located, where would that
17 be?
18     A.  If I was to speculate, they would
19 probably be located in the current pharmacist's
20 office.
21     MS. RAMSEY:  Counsel, I would like to
22 request that the files in the current

Page 137

1  pharmacist's office be searched to insure that
2  any documents relating to this survey be produced
3  in response to defendant's subpoena.
4      MR. TODD:  I will visit with the
5  pharmacist and we'll see if we can locate them or
6  confirm we don't have them.
7      MS. RAMSEY:  Thank you.
8      Q.  (BY MS. RAMSEY)  Mr. Iversen, how did
9  South Dakota utilize the data that it received in
10 response to this survey?
11     A.  I don't believe that there was anything
12 done.
13     Q.  Why do you believe that?
14     A.  Because to the best of my recollection,
15 there weren't any significant changes to the
16 pharmacy program until we implemented the state
17 MAC in 2002.
18     Q.  That's not to say that the data was not
19 considered by individuals making policy decisions
20 within the South Dakota Medicaid department,
21 though, correct?
22     A.  They may have used that, I don't know.

35 (Pages 134 to 137)

354e3b13-d775-406f-912c-c8856c7f542c

SD Department of Social Services (Larry Iversen)                    December 15, 2008

## Pierre, SD

Page 142

1  have knowledge one way or the other?
2      A.  I don't have knowledge one way or the
3  other and it would appear that that is, again
4  without knowing reliable industry sources or who
5  those sources are, whether he even received
6  accurate information.
7      Q.  Do you have any knowledge that this
8  information is incorrect?
9      A.  No.
10     Q.  Mr. Iversen, are you familiar with a
11 set of prices for certain drug products that was
12 circulated by the Department of Justice on or
13 around 2000?
14     A.  I don't immediately recall a set of
15 prices that were circulated by the Department of
16 Justice.
17     Q.  I'll ask you whether you have ever
18 heard the term DOJ AWPs.
19     A.  It sounds kind of familiar, but I don't
20 know what they are.
21         MS. RAMSEY:  Lisa, if I could ask you
22 to hand Mr. Iversen the document with the Bates

Page 143

1  label HHD006-0335.
2          MS. KHANDHAR:  Okay.
3          (Deposition Exhibit Abbott-SD 002
4  marked for identification.)
5          MS. RAMSEY:  I'll ask the court
6  reporter to mark this, which I believe would be
7  Abbott South Dakota 2.
8      Q.  (BY MS. RAMSEY)  Mr. Iversen, could you
9  let me know when you have that document in front
10 of you.
11     A.  I have it.
12     Q.  First of all, have you ever seen this
13 document before?
14     A.  No.
15     Q.  Who is Mark Peterson?
16     A.  He was our pharmacist up until about a
17 little over a year ago.
18     Q.  And where is he now?
19     A.  He passed away in a car accident.
20     Q.  Sorry to hear that.  On the second page
21 of the document under number five, the question
22 is asking whether South Dakota implemented the

Page 144

1  revised prices, and the response for South Dakota
2  is, "No, we have never used the new prices for
3  any of the listed drugs."  Did I read that
4  correctly?
5      A.  Yes.
6      Q.  What is your understanding as to why
7  South Dakota did not implement the prices
8  referred to as the DOJ AWPs?
9      A.  Well, I guess like I said, I'm not
10 really familiar with DOJ AWPs and I would have to
11 say that our general rules methodology says that
12 we will pay using AWP less 10 and a half percent,
13 so I would have to assume that we were just going
14 to stick with that reimbursement.
15     Q.  Under number nine, the question asks
16 "If you are not currently using the new prices,
17 what reasons led to this decision?"  And Mr.
18 Peterson wrote, "Concerns that providers would
19 not be adequately reimbursed after discount.
20 Little input into decisions.  Where did prices
21 come from?  Also pressure from groups."  Do you
22 know any other reasons for which South Dakota did

Page 145

1  not implement the new prices?
2      A.  No.
3      Q.  Did South Dakota compensate certain
4  providers differently or were all providers
5  compensated the same dispensing fee of $4.75?
6      A.  I believe all providers are compensated
7  at 4.75, but then there is I think it was 80
8  cents that's added on a unit dosage packaging.
9          MS. RAMSEY:  I note that it is nearing
10 one o'clock, I'm sorry, twelve o'clock, and I
11 understand that the deposition cannot continue
12 too much longer because of unavailability of the
13 witness and the Attorney General; is that
14 correct?
15         MR. TODD:  That's correct.
16         MS. RAMSEY:  To insure that the
17 Department of Justice has a few minutes, I'm
18 willing to give the Department of Justice a few
19 minutes to question the witness.  However, I am
20 not waiving my right to continue my cross-
21 examination of this witness.  Is the United
22 States Attorney willing to accept this agreement?

37 (Pages 142 to 145)

# Harry Leo Sullivan (Tennessee) (30(b)(1)6))

Sullivan, Harry Leo                          March 12, 2008
                    Nashville, TN

Page 1

                UNITED STATES DISTRICT

          FOR THE DISTRICT OF MASSACHUSETTS


        ---------------------------X
        IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

        INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

        PRICE LITIGATION            )  01-CV-12257-PBS

        THIS DOCUMENT RELATES TO    )

        U.S. ex rel. Ven-a-Care of  )

        of the Florida Keys, Inc.   )

            v.                      )  No.06-CV-11337-PBS

        ABBOTT LABORATORIES, INC.,  )

        ---------------------------X


          (cross captions appear on following pages)


              Deposition of HARRY LEO SULLIVAN

                     Volume I

                Nashville, Tennessee

                Tuesday, March 12, 2008

                     9:05 a.m.

Sullivan, Harry Leo                                March 12, 2008
                    Nashville, TN

Page 134

1    A.  Sure.
2        MR. TORBORG:  Why don't we take a
3    break.
4        VIDEOGRAPHER:  Going off record.  End
5    of tape 2.  Time now is 11:31.
6        (Recess.)
7        (Exhibit Abbott 576 marked.)
8        VIDEOGRAPHER:  Back on record.
9    Beginning of Tape 3.  Time now is 11:49.
10   BY MR. TORBORG:
11   Q.  Welcome back, Mr. Sullivan.
12   A.  Yeah.
13   Q.  I have marked and handed you as Abbott
14   Exhibit 576 a document that bears the Bates Nos.
15   VAC-MDL 75533 through 66.
16       For the record, and so that you know,
17   this is a document that was produced by the
18   relator in this case, a company called Ven-A-Care
19   of the Florida Keys, Inc., and particularly these
20   were documents that were looks like contained in
21   a folder titled Tennessee.  And as you were the
22   director of pharmacy services at Tennessee, I

Page 135

1    thought I might ask you about some documents
2    contained therein.
3        A.  Okay.
4        Q.  In particular I would like to start
5    with the Bates page ending 539.  This is an
6    October 24th, 1994 letter from Zachary Bentley to
7    Leo Sullivan regarding state policy and
8    methodology for reimbursement of intravenous
9    solutions and injectable drugs.  Do you see that?
10       A.  Yes, sir.
11       Q.  If you would take a look at that
12   document, let me know if you recall it and then
13   I'll have some questions for you about it.
14       A.  Okay.
15       Okay.
16       Q.  Mr. Sullivan, do you recall this, this
17   particular page?
18       A.  I really don't.
19       Q.  Do you recall ever having any
20   correspondence or communications with Zachary
21   Bentley or anyone else that you understood to be
22   affiliated with Ven-A-Care of the Florida Keys?

Page 136

1    A.  I honestly do not remember.
2    Q.  Have you ever heard of the company Ven-
3    A-Care?
4    A.  No, I really -- the logo looks
5    familiar, but I don't know by what context I
6    would know them.
7    Q.  Do you recall that some company was
8    working on a project, a continuing education
9    project --
10   A.  No.
11   Q.  -- concerning these kind of drugs?
12   A.  No.
13       You, you have to know that during the
14   course of a week you'll get, in a position like
15   that, you'll get all kinds of requests for
16   surveys and stuff like this.
17   Q.  If we go to the page preceding this
18   page, page ending 538, there is a document titled
19   Response to National State Medicaid Reimbursement
20   Survey.  Contact person is -- that's you; right?
21   A.  Yes.
22   Q.  And then it appears as though you gave

Page 137

1    him some information relating to Tennessee's
2    reimbursement for IV drug reimbursement and TPN
3    reimbursement.  Do you see that?
4    A.  Yes.
5    Q.  And in particular IV reimbursement was
6    AWP minus 8 percent plus a $3.91 dispensing fee
7    per ingredient.
8        And was that the standard, from your
9    recollection, was that the standard reimbursement
10   rate that Tennessee used for drugs at that time?
11   A.  No.
12       Oh, this, this information is not
13   accurate at all.
14       Based on the date 11/29/94 we're almost
15   a year into TennCare.  I wasn't paying for any,
16   any of these products.  The MCOs, through their
17   PBMs, or however they set up reimbursement, for
18   paying for this.  So somebody, sounded like
19   somebody just got an old NPC book and wrote this
20   down.  I don't remember talking to them.  I may
21   have.  But this is not accurate information.
22       The state didn't have a policy for IV

35  (Pages 134 to 137)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 198

1    A.  Right.
2    Q.  If you would take a look at that, to
3  the extent necessary, to tell me if you are
4  familiar with this document.
5    A.  I, I don't remember seeing this
6  specifically, but I certainly could have.
7    Q.  And if you would go to Tab 82.
8       This is a document marked previously as
9  Abbott Exhibit 82, that includes a report dated
10 October 1992 titled Cost of Dialysis-Related
11 Drugs.
12      If you would take a look at that
13 document, Mr. Sullivan, I'll have the same
14 question for you.
15   A.  My answer would be the same.  I do not
16 specifically remember it.  I really doubt that I
17 looked at this one.  It's not -- doesn't seem to
18 be jogging my memory.
19   Q.  If I could ask you to go to page 6 of
20 the actual report.  Look at the top left of each
21 page, you'll see something there.  Will have page
22 numbers.

Page 199

1       There is a chart on that page --
2    A.  Right.
3    Q.  -- that appears to compare for three
4  drugs, EAC, an AWP, and then has a payment
5  difference.  Do you see that?
6    A.  Yes.
7    Q.  And the last of the drugs listed, last
8  row of drugs is Vancocin, Vancomycin, 500
9  milliliters.  Do you see that?
10   A.  Right.
11   Q.  Shows an EAC of five dollars, an AWP of
12 $19.17, payment different of $14.73.  Do you see
13 that?
14   A.  Yes.
15   Q.  When you were the director of
16 pharmaceutical services for Tennessee, did you
17 become aware of differences between the AWP and
18 acquisition costs for the drug Vancomycin?
19   A.  There were, there were certainly
20 periods of time, and I do not remember these,
21 where I believe Vancomycin was available,
22 something makes me want to think off and on

Page 200

1  periods of time when it was available from
2  multiple sources, and I'm sorry, when it was only
3  available from the, the brand name manufacturer.
4       So that seems to be a recollection, but
5  --
6       And therefore there were times when we
7  might, and the way it would come to my attention
8  was we may have MACed it and suddenly the generic
9  is no longer available, only the brand name, and
10 the provider might call and say, Can't get the
11 generic, I mean you need to lift this MAC, or you
12 need to adjust it somehow.
13      For some reason I seem to remember
14 some, a situation like that with Vancomycin.
15      I don't know from this, I haven't
16 looked at this, I don't know how they determined
17 EA catalog.  Do you know that off the top of your
18 head?  Or is that relevant?
19   Q.  (Nodding no.)
20   A.  Okay.  Okay.  It's a big spread, but I
21 don't know what went into that catalog.
22   Q.  What you recall, you have a vague

Page 201

1  recollection that for Vancomycin there were
2  issues about the availability of the drug?
3    A.  That's correct.  And I could be wrong,
4  but there is something that is sticking in my
5  mind about that.
6    Q.  And from your experience you know that
7  changes in the availability of a drug can affect
8  the pricing --
9    A.  Sure.
10   Q.  -- on the drug?
11   A.  Sure.
12   Q.  And why is that?
13   A.  Well, if it's only available from a
14 single source, either a brand name or even that
15 single generic manufacturer, you know, there may
16 be incentive on the part of the manufacturer to
17 increase the price to maximize profits during a,
18 you know, situation where they have the sole
19 product on the market in that therapeutic
20 catalog.
21   Q.  Nothing wrong with doing that from the
22 pharmaceutical manufacturer's perspective, would

                                    51 (Pages 198 to 201)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                          March 12, 2008
                              Nashville, TN

Page 254

1    whatever, different package sizes, the last two
2    digits of the NDC number identifies the package
3    size.
4             Well, each of those, based on economies
5    of scale, may have a different cost per unit, per
6    capsule, let's say.  Big ol' bottle should be
7    cheaper than a bottle of 20.
8             You truncate the last two digits and
9    take the sales or the, or the prices in sales
10   information, and including inflation, penalties
11   and do some calculations on what the average one
12   of those capsules costs on an average basis.
13   Two, you assume wholesaler levels of, of buyers.
14   But that's not, probably not all inclusive of
15   the, the formula for making that calculation.
16   It's very complex.  Designed to be very complex.
17   So it's very hard to understand.
18        Q.   If you had AMP information for each NDC
19   down to the 11-digit level, so we don't have  the
20   kind of concerns that you had.
21        A.   AWP?  Or AM?
22        Q.   AMP information.

Page 255

1        A.   Well, AMP is inclusive of all package
2    sizes.
3        Q.   If you had a specific AMP for each 11-
4    digit NDC, if you had -- if you actually did have
5    it.  I'm not saying you did, but if you did have
6    it for each NDC, and you were allowed to use it
7    for reimbursement, would you have?
8             MR. DRAYCOTT:  Objection.
9        A.   Well, it's, it's -- I don't -- I don't
10   -- I can't think of an analogy to explain, but
11   what you're saying is, what you're describing
12   can't happen is what, what I would like to say.
13   Because it is an average of multiple package
14   sizes.  You can't have an average of a group
15   apply -- you can't have an average of one package
16   size.  That, that would go back to AWP or some
17   other number, okay?
18   BY MR. TORBORG:
19        Q.   If you did have an AMP price, though,
20   for each NDC, so if you had the actual price
21   which a particular 11-digit NDC was sold to the
22   retail class of trade.

Page 256

1        A.   Okay.  An actual acquisition cost.
2        Q.   Yeah.
3        A.   Not an AMP.
4        Q.   Okay.
5        A.   All right.
6        Q.   If you had that down to the NDC level,
7    would you have used it as the benchmark --
8             MR. DRAYCOTT:  Objection.
9    BY MR. TORBORG:
10        Q.   -- for setting reimbursement rates?
11        A.   No.
12        Q.   Why not?
13        A.   Back to the previously what I have
14   said, I don't want the drug to be a commodity.  I
15   don't want to lose the flexibility I have with
16   provider incentives or adjustment to cost to
17   dispense or adjustments to whatever the
18   dispensing fee is.  I don't want to lose some
19   margin that I control of profitability on the
20   ingredient side of the drug.
21        Q.   During your time at Tennessee Medicaid
22   program, do you recall any communications with

Page 257

1    representatives of Abbott Labs?
2        A.   Oh, sure.
3             Every, every pharmaceutical
4    manufacturer -- well, the majority of them have
5    government affairs reps that will call on you.
6        Q.   Do you recall in particular who you
7    talked to or what they -- what you talked about?
8        A.   Oh, God.  Well, I could look in a, in a
9    cardholder and tell you, right out.  There were
10   two different gentlemen that I dealt with mainly
11   from Abbott.  Nice people.  Never was very
12   controversial, like it is with a lot of other
13   companies.  But I can't remember their names
14   right now.
15        Q.   Michael Hagee.  Does that --
16        A.   Who?
17        Q.   Michael Hagee.  Does that sound
18   familiar?
19        A.   No.
20             John -- oh, God.  I can see his face.
21   I can't think of his last name.
22             These were government affair type

65  (Pages 254 to 257)

0c585b6a-88d2-47d8-bc26-289a064ea87e

# Ann Rugg
# (Vermont) (30(b)(6))

VT Department of Health (Ann Rugg)                    December 15, 2008
                              Montpelier, VT

                                                                Page 1

                     UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MASSACHUSETTS

          -----------------------------------X

          In Re: PHARMACEUTICAL INDUSTRY          )

          AVERAGE WHOLESALE PRICE LITIGATION      )

          -----------------------------------X MDL No. 1456

          THIS DOCUMENT RELATES TO:              ) Master File No.

          United States of America ex rel.       ) 01-CV-12257-PBS

          Ven-A-Care of the Florida Keys, Inc.,)

          et al. v. Dey, Inc., et al.,           )

          Civil Action No. 05-11084-PBS,         ) Hon. Patti B.

          and United States of America ex rel. ) Saris

          Ven-A-Care of the Florida Keys, Inc.,)

          et al. v. Boehringer Ingelheim Corp.,)

          et al., Civil Action No. 07-10248-PBS)

          -----------------------------------X


                       VIDEOTAPED DEPOSITION OF

              THE VERMONT DEPARTMENT OF HEALTH by ANN RUGG

                         Montpelier, Vermont

                       Monday, December 15, 2008

                            9:00 a.m.

b9f61001-fb9e-4765-9357-3dda2a83fb72

VT Department of Health (Ann Rugg)                    December 15, 2008
Montpelier, VT

Page 102

1  then. I wasn't involved in the calculation of
2  the establishment of that amount.
3      Q.   You can't testify whether Vermont was
4  involved, I am sorry, the OVHA -- you have no
5  understanding of what OVHA's understanding was at
6  this time?
7          MR. DONOFRIO:  Objection.
8  BY MR. KIM:
9      Q.   Is that correct?
10         MR. FAUCI:  Objection.
11         THE WITNESS:  Hum?
12 BY MR. KIM:
13     Q.   Well, let me repeat that.
14     A.   These -- try that question again.
15     Q.   Are you testifying that you personally
16 don't -- have no recollection of what OVHA's
17 understanding of its dispensing fee change or
18 dispensing fee of $4.25 was?
19         MR. FAUCI:  Objection.
20         MR. DONOFRIO:  Objection.
21         THE WITNESS:  I got lost at the
22 personally.

Page 103

1  BY MR. KIM:
2      Q.   You said that you don't recollect?
3      A.   Uh-hum.
4      Q.   The reason for the $4.25 dispensing fee
5  at this time; is that correct?
6          MR. FAUCI:  Objection.
7          THE WITNESS:  Let me try this then.
8  BY MR. KIM:
9      Q.   Sure.
10     A.   I have no personal knowledge of the --
11 how they arrived, how the dispensing fee of $4.25
12 was established and what it was prior to four and
13 a quarter.
14     Q.   Does Vermont have any understanding of
15 the reason for that change, the reason for the
16 dispensing fee?
17         MR. DONOFRIO:  Objection.
18         THE WITNESS:  I don't know that there
19 would be any remaining -- there certainly is no
20 party that was party to it that is still in the
21 employ of the Vermont Medicaid program.
22 BY MR. KIM:

Page 104

1      Q.   So, your testimony right now is that
2  Vermont does not know what the policy was behind
3  the $4.25 dispensing fee was?
4          MR. FAUCI:  Objection to form.
5          THE WITNESS:  As the representative of
6  Vermont I don't know.  I don't know of anyone who
7  would know.
8  BY MR. KIM:
9      Q.   And would your testimony apply to the
10 policy behind the lack of discount off of AWP in
11 1996?  Is your testimony that you don't know the
12 policy behind that either?
13         MR. DONOFRIO:  Objection.
14         MR. FAUCI:  Objection to form.
15         THE WITNESS:  You'll have to do that
16 again, the sentence again.
17 BY MR. KIM:
18     Q.   You'll see on the State Plan Amendment
19 that there is no discount applied off of Average
20 Wholesale Price; is that correct?
21     A.   That's right.
22     Q.   That's what you see before you?

Page 105

1      A.   Uh-hum.
2      Q.   Do you know the reason for not having a
3  discount applied off of AWP?
4          MR. FAUCI:  Objection to form.
5          THE WITNESS:  I do not.
6  BY MR. KIM:
7      Q.   When you say I, do you mean Vermont
8  Medicaid?
9      A.   I as a representative of Vermont do not
10 know and I do not know anyone currently
11 affiliated with the Medicaid program that would
12 have the history of that in 1996 and before.
13     Q.   Ms. Rugg, can I just ask to go back to
14 my earlier question?  How long did you meet with
15 the attorneys at the state AG's office in
16 preparation for this deposition?
17     A.   I don't know.  An hour?  An hour with
18 the attorney from the United States.  Sorry, I'm
19 bad with names.  And perhaps a total of three
20 with Vermont attorneys as well as the attorney
21 for the United States.
22     Q.   And did you go over any of the topics

27 (Pages 102 to 105)

b9f61001-fb9e-4765-9357-3dda2a83fb72

VT Department of Health (Ann Rugg)                    December 15, 2008
Montpelier, VT

Page 302

1        MR. FAUCI:  Objection to form.
2        THE WITNESS:  It was issued by Fred
3   Schutzman, director of the Bureau of Quality
4   Control.
5   BY MR. KIM:
6        Q.   Correct.  And he works for the -- he's
7   a director at the Bureau of Quality Control?
8        A.   He is.  Well, was.  Seemingly.
9        Q.   And this is on a Health Care Financing
10  Administration memorandum?
11       A.   That's correct.
12       Q.   Letterhead?
13       A.   That's correct.
14       Q.   Do you know Cody Wiberg?
15       A.   He's a pharmacy administrator in, be
16  one of the Dakotas.
17       Q.   For Minnesota?
18       A.   One of those states.  One of those
19  places.
20       Q.   Like to designate this as next exhibit.
21           (Exhibit Rugg 026 marked for
22  identification.)

Page 303

1        Q.   I've handed the witness a June 22 --
2   sorry, June 23, 2000 e-mail chain.  Do you see
3   this appears to be an e-mail that was authored by
4   Cody Wiberg that's being forwarded by David
5   Shepherd; is that correct?  Just look at the
6   first page.
7        A.   From, to.  It does appear to be
8   something forwarded by David Shepherd of Virginia
9   to Martha McNeill of Texas.
10       Q.   And if you see below that, there is an
11  excerpt of an e-mail from Cody Wiberg.  Do you
12  see that?
13       A.   I do.
14       Q.   Can I turn your attention to page 2?
15  If I could refer you to the second full paragraph
16  where it starts with "there is no doubt."  Do you
17  see?
18       A.   Uh-hum, I do see.
19       Q.   Do you need a second to look over that?
20       A.   Yeah, I've not read it before.  I think
21  I'm at the end of a paragraph even though there
22  isn't a paragraph, right?

Page 304

1        Q.   Okay.  So Mr. Wiberg in the e-mail is
2   saying there is no doubt in my mind that NAMFCU
3   is correct when it points out that the spread
4   between AWP and AAC is too large for many, even
5   most of these drugs.  The question is what should
6   be done about it?  Almost everyone who's familiar
7   with pharmacy reimbursement knows that AWP ain't
8   what's paid.  That's why most states and private
9   pharmacy benefit managers reimburse pharmacies at
10  AWP minus a discount, anywhere from 5 to 15
11  percent or more."
12           When Mr. Wiberg is saying that the
13  spread between AWP and AAC is too large for many,
14  even most of these drugs, do you have any reason
15  to disagree with anything he's saying at this
16  point?
17           MR. FAUCI:  Objection to form.
18           MR. DONOFRIO:  Objection.
19           THE WITNESS:  I don't have the study
20  he's referring to.  I go back to he was looking
21  at 428 NDCs in the last.  I would guess the
22  number of NDCs that we have paid on in the last

Page 305

1   year would be something in the area of 15,000 so
2   it was a study of 428 NDCs.
3   BY MR. KIM:
4        Q.   Have you ever heard of NAMFCU revised
5   AWPs?
6        A.   Yup.  Hum?
7        Q.   Have you ever heard of DOJs AWPs or
8   NAMFCU AWPs around the time of 2000, 2001?
9        A.   I'm pausing because I have some vague -
10  - I remember somebody saying DOJ AWPs, but I
11  don't recall seeing what it was or what it looked
12  like or -- so I can only say I know of some talk
13  of, but I don't know what it is.
14       Q.   Have you ever heard the term "spread"
15  before?
16       A.   Yes.
17       Q.   And is your understanding of spread
18  consistent with what Mr. Wiberg is referring to
19  here?
20       A.   Where does he refer to spread here?
21       Q.   Where he says that the spread between
22  AWP and AAC -- so when you --

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

b9f61001-fb9e-4765-9357-3dda2a83fb72

# Keith Hayashi
# (Virginia) (30(b)(6))

VA Dept of Medical Assistance Services (Hayashi)                December 4, 2008

# Richmond, VA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY  ) MDL No. 1456

AVERAGE WHOLESALE PRICE         ) Civil Action No.

LITIGATION                      ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:       ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Abbott Laboratories, Inc.)

Civil Action No. 06-11337-PBS;  )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil ) DEPOSITION OF

Action No. 05-11084-PBS; and    ) VA DEPT. OF

United States of America ex rel. ) MEDICAL ASSISTANCE

Ven-A-Care of the Florida Keys,  ) SERVICES by KEITH

Inc. v. Boehringer Ingelheim    ) T. HAYASHI

Corp., et al., Civil Action No. )

07-10248-PBS                    ) DECEMBER 4, 2008

-------------------------------X

ec8cc3c5-ae87-48e4-b193-f0d2a3878560

VA Dept of Medical Assistance Services (Hayashi)                    December 4, 2008
Richmond, VA

Page 158

1     A.   When we talked to David Shepherd I was
2  questioning him on the reimbursement of the old
3  VMAC program and his knowledge of how that method
4  was to calculate those VMACs.
5     Q.   Did you review any other VMAC price
6  lists?
7     A.   No, I did not.
8     Q.   Did you ask if any VMAC price lists
9  were available?
10    A.   Yes, we did.
11    Q.   What were you told?
12    A.   That they were not available.
13    Q.   Were you told where they went?
14    A.   No one knew where they were or how we
15  would be able to obtain one.
16    Q.   Did you review any claims data?
17    A.   In the period of 1990 to 2004?
18    Q.   Yes.
19    A.   No, I did not.
20    Q.   Did you review any claims data after
21  2004?
22    A.   No, I did not.

Page 159

1     Q.   Do you have an understanding of what
2  claims data is available for the time period of
3  1991 through 2004?
4     A.   My understanding of what the system has
5  is from 2003 where the new system was implemented
6  that all that claim information is readily
7  available.  Before that time I have an
8  understanding that it is available but there
9  might be -- it might be more work to get to those
10  claims.
11    Q.   What type of work is required?
12    A.   Once again, that's in the systems side
13  -- I'm not a systems person -- how to retrieve
14  old claims and old data.
15    Q.   Do you know how far back the
16  potentially retrievable claims data goes?
17    A.   I do not know that.
18    Q.   I'd like to ask you to go to schedule 1
19  of the Abbott cross notice.  This is the so-
20  called Abbott DOJ action NDCs.
21    A.   Okay.
22    Q.   Okay.  For the products on this list

Page 160

1  can you testify as to how DMAS calculated the
2  ingredient cost payments for claims submitted by
3  providers seeking payment for dispensing these
4  NDCs?
5     A.   It would go through the four
6  methodologies that DMAS has used to reimburse
7  providers for medications, one being the federal
8  upper limit, one being the Virginia MAC, the old
9  Virginia MAC or the new current vendor MAC, the
10  estimated acquisition cost of AWP minus a
11  percentage, or the usual and customary of the
12  provider submitting a claim.
13    Q.   Do you know what percentage of the
14  claims for each of these NDCs was reimbursed on
15  the basis of a usual and customary price?
16    A.   No, I do not.
17    Q.   Do you have any sense of the percentage
18  or dollar amount of the claims for these NDCs
19  that were reimbursed on the basis of U&C price?
20    A.   No, I do not.
21    Q.   How would you go about determining the
22  answer to that question?

Page 161

1     A.   Once again, that would be a systems
2  question in terms of looking at the claim data.
3  I believe currently there is a field that
4  identifies which methodology the claim was paid
5  at.
6     Q.   Do you know if there was such a field
7  from 1991 through 2003?
8     A.   I do not know that for certain.
9     Q.   Does DMAS have the claims data
10  available to determine what percentage of the
11  claims for the drugs on schedule 1 were
12  reimbursed at a usual and customary price?
13    A.   I can't definitively say that they have
14  and can calculate or come up with that figure.
15    Q.   You don't know either way?
16    A.   I do not know whether they can or not.
17    Q.   Do you know if any of the NDCs on
18  schedule 1 were reimbursed on the basis of a
19  federal upper limit for the period of 1991
20  through 2001?
21    A.   I do not know that.
22    Q.   Did you know -- let me see if I can

41  (Pages 158 to 161)

ec8cc3c5-ae87-48e4-b193-f0d2a3878560

## Richmond, VA

Page 162

1  save some time while we're here.  I don't think
2  DOJ will object.  You've looked at the schedules
3  of the subject drugs in the Dey and Roxane cases
4  as well; is that right?
5      A.  Correct.
6      Q.  Would you be able to testify as to what
7  percentage of the claims for those NDCs were
8  reimbursed on the basis of the usual and
9  customary charge from 1991 through 2003?
10     A.  No, I would not be able to.
11     Q.  And would you be able to say which of
12 those NDCs in the Roxane and Dey schedules were
13 reimbursed on the basis of the FUL?
14     A.  I would not be able to give you a
15 percentage, no.
16     Q.  Back to the schedule 1 -- actually,
17 schedule 2.  This is the Abbott Ven-A-Care NDCs -
18 - would you be able to testify as to what
19 percentage of the NDCs on this schedule were
20 reimbursed on the basis of a U&C?
21     A.  I would not be able to do that.
22     Q.  Nor would you be able, I take it, to

Page 163

1  tell us what percentage of the claims were
2  reimbursed on the basis of a FUL?
3      A.  No.
4      Q.  Nor could you provide a dollar amount
5  for any of those subject drugs in any of the
6  cases?
7      A.  No.
8      Q.  Back to schedule 1, the Abbott DOJ
9  NDCs, for the period of 1991 through 2001 do you
10 know if Virginia applied a maximum allowable cost
11 to any of these products?
12     A.  It was in the pricing methodologies
13 that would have been applied if it met that
14 criteria.
15     Q.  And which criteria are you speaking of?
16     A.  The 60 percentile for prescription
17 drugs.
18     Q.  You're talking about the VMAC program
19 here?
20     A.  The VMAC program.
21     Q.  But you're not able to testify about
22 which of these products had a VMAC and which did

Page 164

1  not?
2      A.  Correct, since we do not have that
3  list.
4      Q.  Would your testimony be the same with
5  respect to the schedule 2 Abbott Ven-A-Care NDCs?
6      A.  That would be correct.
7      Q.  How about would your testimony be the
8  same as to the accepted drugs in the Dey and
9  Roxane accepted drug list?
10     A.  In the old VMAC program?
11     Q.  Yes.
12     A.  That would be correct also.
13     Q.  I want to ask you some questions on the
14 VMAC program.  Do you have an understanding of
15 when that program started?
16     A.  I do believe it predates the dates of
17 the subpoena.
18     Q.  Do you know what the purpose of the
19 program was?
20     A.  To reduce costs.
21     Q.  And do you know what the criteria were
22 for including drugs within the VMAC program?

Page 165

1      A.  First of all it was based on the
2  Virginia voluntary formulary.  And these drugs
3  had to be available in the commonwealth.  So
4  it made it problematic in terms of creating MACs
5  for these drugs because in terms of an example of
6  how a drug was calculated at the 60 percentile,
7  if you have ten drugs with different AWPs and you
8  put them from lowest to highest, on the sixth
9  drug would be the 60 percent.  But then not all
10 drugs that were available through the country was
11 available in the commonwealth.  So it made a
12 problem with the program.
13     Q.  And you don't know here today how that
14 problem may have affected any of the NDCs on
15 schedules 1 and 2 to Abbott's cross notice?
16     A.  No.
17     Q.  And would your testimony be the same as
18 to the Roxane and Dey drugs?
19     A.  That would be correct.
20         MR. TORBORG:  I'd like to mark this as
21 Abbott Hayashi 15.
22         (Exhibit Abbott Hayashi 015 was

42  (Pages 162 to 165)

ec8cc3c5-ae87-48e4-b193-f0d2a3878560

Richmond, VA

Page 242

1    Q.  You did not discuss this document with
2  Mr. Shepherd?
3    A.  No, I did not.
4    Q.  I take it you don't know which state
5  officials made the comment that they also thought
6  -- and I'm just paraphrasing here based on OIG's
7  report -- they also thought that "those drug
8  manufacturers that play games with AWP (overstate
9  AWP for marketing purposes)" -- I take it you
10  don't know which state officials may have made
11  that comment?
12    A.  I do not know.
13    Q.  Would you agree with me that DMAS's
14  David Shepherd either already knew or was
15  informed at this meeting of allegations that drug
16  manufacturers were playing games with AWP for
17  marketing purposes?
18        MS. OBEREMBT:  Objection.
19        MS. KODURU:  Objection.
20    A.  I wouldn't know that.
21    Q.  What else would you need to see?
22    A.  I wouldn't know that.  He would have

Page 243

1  known that ahead of time of this meeting.
2    Q.  You would agree with me this document
3  evidences a discussion where manufacturers
4  playing games with AWP for marketing purposes was
5  discussed at a meeting that Mr. Shepherd
6  attended?
7    A.  I would agree with that.
8        MS. OBEREMBT:  Objection.
9    Q.  I'd like to go now to topic 16.  This
10  is titled DOJ AWPs.  The title says "Your
11  implementation of revised average wholesale price
12  information developed by the United States
13  Department of Justice and NAMFCU, the dates when
14  you did or did not implement the revised pricing
15  information and the reasons why you did or did
16  not implement the revised pricing information."
17  Do you see that?
18    A.  Yes, I do.
19    Q.  This is a topic on which you've been
20  designated to testify?
21    A.  That is correct.
22    Q.  Can you tell me what you did to prepare

Page 244

1  for this topic?
2    A.  I reviewed the documentation, documents
3  that were provided by counsel.
4    Q.  Did you find any documents provided by
5  counsel that related to this topic?
6    A.  I do not recall any documents.
7    Q.  Did you discuss this topic -- so you
8  don't recall any documents being able to provide
9  you information about this topic --
10    A.  Correct.
11    Q.  -- correct?
12        But you are designated to testify on
13  this topic, correct?
14    A.  That is correct.
15    Q.  So you had to do something else to get
16  the information you needed to testify on this
17  topic, correct?
18    A.  Correct.
19    Q.  Because you weren't there at the time,
20  right?
21    A.  Correct.
22    Q.  What did you do to prepare yourself to

Page 245

1  testify on this topic?
2    A.  Once again, reviewed the documents that
3  counsel gave me.
4    Q.  Did you speak with anyone about this
5  topic?
6    A.  No, I did not.
7    Q.  Did you ask Mr. Shepherd about this
8  topic?
9    A.  No, I did not.
10    Q.  Do you have an understanding of what is
11  being asked here with regard to the revised
12  average wholesale price information developed by
13  the DOJ and NAMFCU?
14    A.  I have seen no documents to understand
15  what those are.  So I don't have any information
16  on it.
17    Q.  So you have no idea what that topic is
18  even talking about?
19    A.  I have an idea that it's the Department
20  of Justice AWPs.
21    Q.  So I take it you can't tell me if DMAS
22  implemented that revised pricing?

62  (Pages 242 to 245)

ec8cc3c5-ae87-48e4-b193-f0d2a3878560

VA Dept of Medical Assistance Services (Hayashi)                    December 4, 2008

# Richmond, VA

Page 246

1    A.  I am unaware that it did.
2    Q.  You've seen no documents indicating
3  that it did, correct?
4    A.  Correct.
5    Q.  And have you seen any documents -- have
6  you been provided any documents that would
7  provide any clues as to why Virginia may not have
8  adopted the DOJ AWPs?
9    A.  Not to my knowledge.
10    Q.  Do you have an understanding that the
11  specific products for which the DOJ and NAMFCU
12  provided revised average wholesale prices are
13  some of the same national drug codes listed on
14  schedule 1 of Abbott's cross notice?
15    A.  I do not have that knowledge.
16    MR. TORBORG:  Could you mark this as
17  our next exhibit.  This was marked as Abbott
18  Exhibit 1158 at Mr. Tomlinson's deposition.
19    (Exhibit Abbott Hayashi 025 was
20  marked for identification.)
21  BY MR. TORBORG:
22    Q.  Mr. Hayashi, I can represent to you

Page 247

1  that this one-page document bearing the Bates
2  numbers HHD 006-0105 was produced by the OIG and
3  there's been some testimony on these documents
4  that they were survey sheets that were done
5  relating to whether or not states such as
6  Virginia were adopting the revised pricing by the
7  Department of Justice.  This one, as you can see
8  at the top, appears to relate to Virginia.  And
9  have you looked at this document before to
10  testify on topic 16?
11    A.  No, I have not.
12    Q.  Under the section 27 it says "Please
13  add any comments you may have about the use of
14  more accurate AWPs for the Medicaid program."
15  The comment is "Before implementation wants to
16  make sure there are no access problems."  Do you
17  see that?
18    A.  Yes, I do.
19    Q.  Do you have any idea of what is being
20  discussed there?
21    MS. OBEREMBT:  Objection.
22    A.  I'm assuming that access problem means

Page 248

1  access of drugs for the recipients.
2    Q.  I can also represent to you that the
3  person at DMAS who was interviewed was Mr.
4  Shepherd.  Okay?
5    A.  Okay.
6    Q.  At least that's what the document is
7  telling me.  If you look down below toward the
8  bottom of the page there's some handwriting that
9  states "Can't look at this in a vacuum.  New
10  prices affect total system."  Do you see that?
11    A.  Yes, I do.
12    Q.  Do you know what that means?
13    MS. OBEREMBT:  Objection.
14    A.  No, I do not.
15    Q.  You did not ask him about that,
16  correct?
17    A.  No, I did not.  I do not see where this
18  was authored by him.
19    Q.  What I'm stating is that these are
20  handwritten notes by an individual by OIG from a
21  phone interview with Mr. Shepherd.  There has
22  been prior testimony to that effect.

Page 249

1    A.  Okay.
2    Q.  Does this document -- let me back up.
3  When you prepared to testify on these topics you
4  relied upon documents that you reviewed, correct?
5    A.  That is correct.
6    Q.  And you used those documents to inform
7  yourself about DMAS's knowledge and policies for
8  a time period that you were not there, correct?
9    A.  That's correct.
10    Q.  And does this document, Mr. Hayashi, a
11  document you did not review before today, provide
12  you any insight as to why it is or what
13  Virginia's concerns were on using the DOJ AWPs?
14    MS. OBEREMBT:  Objection.
15    MS. KODURU:  Objection.
16    A.  No, it does not.
17    Q.  I take it you don't know who in
18  Virginia decided whether to use the DOJ AWPs,
19  correct?
20    A.  No, I do not know.
21    Q.  Why don't we go to topic 17.  This is
22  titled "340(b) drug reimbursement."  Do you see

63  (Pages 246 to 249)

ec8cc3c5-ae87-48e4-b193-f0d2a3878560

# Ayuni Hautea-Wimpee (Washington) (30(b)(6))

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

# Olympia, WA

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE            ) Civil Action No.

LITIGATION                         ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:          ) Hon. Patti B.

United States of America ex rel.   ) Saris

Ven-A-Care of the Florida Keys,    )

Inc. v. Abbott Laboratories, Inc.,) Chief Magistrate

Civil Action No. 06-11337-PBS;     ) Judge Marianne

United States of America ex rel.   ) B. Bowler

Ven-A-Care of the Florida Keys,    )

Inc. v. Dey, Inc., et al., Civil   ) DEPOSITION OF

Action No. 05-11084-PBS; and       ) WA DEPT. OF

United States of America ex rel.   ) SOCIAL AND HEALTH

Ven-A-Care of the Florida Keys,    ) SERVICES by AYUNI

Inc. v. Boehringer Ingelheim       ) HAUTEA-WIMPEE

Corp., et al., Civil Action No.    )

07-10248-PBS                       ) NOVEMBER 24, 2008

--------------------------------X

9ee0c979-f127-403d-9cab-f60504868883

Olympia, WA

Page 182

1   we were -- we knew from just looking at the
2   listings, the microfiche prices for our MACs, for
3   example, that the products would not necessarily
4   -- are not necessarily the AWP prices, but what
5   we're trying to get to is the closest to the
6   acquisition cost.
7   BY MR. REALE:
8       Q.   Right.
9       A.   So we apply the discount.
10      Q.   And so during your work on the MAC
11  program in the 1980's I believe you testified you
12  were aware that AWP did not represent an actual
13  price to pharmacies, correct?
14          MS. FORD:  Objection to form.
15          THE WITNESS:  We were aware that --
16  that pharmacists were not paying the AWP, but
17  that they had paid a certain discount off of that
18  and that's what we were trying to get to.
19  BY MR. REALE:
20      Q.   Now, if a manufacturer told you that
21  AWP does not represent any actual price, what
22  would you in 2001 do with a letter like this?

Page 183

1   What would you do with that kind of information?
2       A.   Well, we did something in terms of
3   trying to change the discount off of AWP.  We did
4   it from 11% to 14%.
5       Q.   Now, I want to turn your attention back
6   to the dispensing fee.  You said the dispensing
7   fee had been set originally prior to your tenure
8   at Washington Medicaid?
9       A.   Yes, there was an existing tiered
10  system in 1979 when I started working for DSHS
11  and to my knowledge we have not done anything to
12  change that; we just, you know, added on the
13  vendor rate increases --
14      Q.   Do you know --
15      A.   -- periodically.
16      Q.   Sorry.  Do you know how or what factors
17  were considered by the folks who set that
18  original dispensing fee?
19      A.   I do not, no.
20      Q.   Do you know if they considered the
21  amount of ingredient cost reimbursement that
22  would be provided to a pharmacy?

Page 184

1           MS. FORD:  Objection to form.
2   BY MR. REALE:
3       Q.   When they set the dispensing fee?
4       A.   I do not know, but I doubt that.
5       Q.   Why?
6       A.   We have -- like I said, we have always
7   had separation between ingredient cost and
8   dispensing fee, so to my knowledge, we have
9   always -- that's the way it was always done, so
10  the -- the ingredient cost would not have
11  considered the -- the other factors aside from
12  the cost of the ingredients, the administrative
13  costs were the ones that we assumed were included
14  in the dispensing fee and that was what, labor,
15  well, you know, all of these other things that
16  would normally be considered part of their
17  administrative cost.
18      Q.   But you have no personal knowledge --
19      A.   No.
20      Q.   -- of what factors?
21      A.   No, only hearsay, only what I was told.
22      Q.   Okay.  We've got to make sure that we

Page 185

1   don't talk over each other because I know the
2   Court Reporter will get fed up with both of us
3   quickly.
4       A.   Sorry.
5       Q.   So you don't know what factors were
6   considered by Medicaid when it set its original
7   dispensing fee; is that correct?
8       A.   That is correct.  The program started
9   in '66 or '67 so, you know, whatever happened
10  between then and -- and when I started working
11  for the State, I have no idea.
12      Q.   Okay.  We're going to mark this as
13  Roxane-WA Exhibit No. 1.
14          (Exhibit Roxane-WA 001 marked for
15  identification)
16          Ayuni, have you seen this document
17  before?
18      A.   I believe I saw this in passing.  It
19  was one of the Notice of Deposition, at least the
20  front page I know I read.
21      Q.   And do you recognize this document as
22  the 30(b)(6) topics that were attached to

47  (Pages 182 to 185)

9ee0c979-f127-403d-9cab-f60504868883

Page 425

1 that would not necessarily come under the -- the
2 pharmacy drug program, you know.
3        (Exhibit Roxane-WA 020 marked
4        for identification)
5 BY MR. REALE:
6    Q.  Washington Roxane Exhibit No. 20 is
7 Bates page VAC MDL 75947 to 75951.  And the first
8 page is a fax cover sheet from Barbara Zelner at
9 the National Association of Medicaid Fraud
10 Control Units to Mark Levine.  And the fax line
11 date is April 2nd, 1998; is that correct?
12    A.  Yes.
13    Q.  Now, if we turn to Bates page VAC MDL
14 75951, the title of this page is Receipt for
15 Ven-a-Care of the Florida Keys, Inc.,
16 Presentation Material at the National Association
17 Medicaid Fraud Control Unit Conference on March
18 19, 1998. Do you see that?
19    A.  Yes.
20    Q.  And for Washington it indicates that
21 somebody by the name of David Waterbury received
22 the presentation materials from Ven-a-Care.

Page 426

1    A.  Yes.
2    Q.  Who is David Waterbury?
3    A.  Well, he was not a member of the -- a
4 staff -- an employee of D.S.H.S.  He was a part
5 of the Medicaid Control Unit, Fraud Control Unit.
6 And I don't remember which agency they reported
7 to at the time for Washington State.  I don't
8 know if they were part of the Attorney General's
9 Office at that time, but it was not part of
10 Medical Assistance.
11    Q.  Did Mr. Waterbury provide the
12 presentation materials that he had received from
13 Ven-a-Care to Washington's Medicaid?
14    A.  I do not know.
15    Q.  That's not something you've ever seen?
16    A.  I don't recall seeing that at all.
17    Q.  Would you expect that Washington
18 Medicaid would have received a copy of this
19 material?
20    A.  I would assume so.
21      MS. FORD:  Objection to form to the
22 last question.

Page 427

1 BY MR. REALE:
2    Q.  And why would you assume so?
3    A.  I would assume that if they thought
4 that there was something that we needed to know,
5 that they would let us know.
6    Q.  Have you had any discussions with any
7 individuals associated with Ven-a-Care of the
8 Florida Keys, Inc.?
9    A.  No.
10    Q.  Do you know if others in Washington's
11 Medicaid program have had conversations with
12 Ven-a-Care?
13    A.  I do not know.
14      (Exhibit Roxane-WA 021 marked
15      for identification)
16    Q.  This next document is Bates page
17 AWP-IL-00010039 to 10040, and this is a facsimile
18 transmission to Medicaid Pharmacy Program
19 Administrators, dated September 27th, 1995.  And
20 on the cover page, it indicates one of the names
21 as Garth Holmes, Washington?
22    A.  Yes.

Page 428

1    Q.  And Mr. Holmes we've learned is
2 associated with Washington's Medicaid program,
3 correct?
4    A.  Yes.
5    Q.  If we turn to the next page, we see
6 it's a letter from Bob Coolidge, someone who was
7 associated with South Dakota's Medicaid program,
8 dated September 27th, 1995, and the cover letter
9 again is addressed to all Medicaid Pharmacy
10 Administrators regarding Average Wholesale Price?
11    A.  Yes.
12    Q.  Do you recall receiving this request or
13 is this something you've reviewed before?
14    A.  I do not remember.
15    Q.  Did Washington Medicaid receive
16 communications from other Medicaid agencies from
17 time to time?
18    A.  Yes.
19    Q.  Did you have the occasion to review any
20 survey of acquisition costs done in other states?
21    A.  I probably had, I just don't remember
22 any of them, but over the course of several years

19  (Pages 425 to 428)

40ab6362-f888-49e7-a65d-8cd62d3b4ae1

WA Dept of Social and Health Services (Hautea-Wimpee, Ayuni)                                    December 2, 2008

Page 525

1   taking.  I was looking at acquisition cost.
2       Q.   You testified previously a little bit
3   about the AMAC program which began in 1996; is
4   that correct?
5       A.   Yes.
6       Q.   How did the AMAC program come about?
7       A.   I don't remember much about it, to be
8   honest.  I -- this is about the time period, like
9   I said, that most of the MAC or -- or the drug
10  pricing duties devolved to Diane Stevens who was
11  listed in one of these exhibits here as having a
12  meeting with providers or, you know, those
13  pharmacists and the Washington Retail Association
14  representative.  I think it was in the memo from
15  Tom Johnson or something that included the
16  Minutes of the meeting.  So around that time, I
17  don't recall a lot of the details, only that
18  there were some issues with some drugs and we
19  needed to get to a certain pricing algorithm for
20  that class of drugs or for those classes of
21  drugs.
22      Q.   What types of issues with drugs?

Page 526

1       A.   I don't remember the details, only that
2   there were some things about the pricing being
3   not reflective of -- of their -- of the Actual
4   Acquisition Costs.
5       Q.   Do you recall what classes of drug --
6       A.   No, I don't.
7       Q.   -- the issues were with?
8       A.   No, I don't.
9       Q.   Now, an AMAC would be created for drugs
10  for which there was no MAC and there were at
11  least three manufacturers that made this
12  multi-source product; is that correct?
13      A.   Yes.
14      Q.   Between the MAC and the AMAC program --
15  strike that.  Are there any generic drugs that
16  did not have a MAC and there were at least three
17  manufacturers of the product that did not have an
18  AMAC?
19          MS. FORD:  Objection to form.  Is there
20  a particular point in time that you're
21  referencing?
22  BY MS. RAMSEY:

Page 527

1       Q.   If the witness knows of any, let's
2   start there.
3       A.   I don't recall.
4       Q.   Between the MAC program and the AMAC
5   program, how many -- what percentage of the
6   generic products did not -- were not covered by
7   either the MAC or the AMAC program?
8           MS. FORD:  Objection to form.
9           THE WITNESS:  I don't know, but I would
10  assume that it was a small percentage.
11          MS. RAMSEY:  So between the MAC and the
12  AMAC programs you would say nearly all generic
13  products were covered?
14          MS. FORD:  Objection to form.
15          THE WITNESS:  Most of the multi-source
16  drugs would have been covered, yes.
17  BY MS. RAMSEY:
18      Q.   If you could look back at what was
19  marked as Abbott Washington 001, which is
20  Abbott's Cross Notice of the deposition.
21      A.   (Witness complies).
22      Q.   And looking specifically at Schedule 1

Page 528

1   and Schedule 2 which lists the drugs that are at
2   issue in the United States' cases against Abbott.
3   After looking at those schedules, please let me
4   know for which drug products Washington had an
5   AMAC.
6       A.   I don't recall.
7       Q.   At some point would there have been
8   lists of the products for which Washington had an
9   AMAC?
10      A.   I don't remember if we ever published
11  an AMAC list.
12      Q.   Going back to the MAC program for a
13  moment, what was the impact of the MAC program on
14  Washington's reimbursement?
15          MS. FORD:  Objection to form.
16          THE WITNESS:  I'm not sure I understand
17  the question.
18          MS. RAMSEY:  Did the MAC program lower
19  the amount that Washington was reimbursing under
20  Medicaid?
21          MS. FORD:  Objection to form.
22          THE WITNESS:  If you mean the total

44  (Pages 525 to 528)

40ab6362-f888-49e7-a65d-8cd62d3b4ae1

Page 533

1  recall here, but I think that if there were
2  multiple generic lines available, but the
3  majority of the lowest priced ones were -- did
4  not have a federal rebate agreement, then that
5  was a problem, and again, because we were
6  prohibited from paying for those drugs, we had to
7  go to the -- we had to go to the level where we
8  would be able to cover the drug at a contract
9  price at that -- at the price from a manufacturer
10 or labeler that had a signed federal rebate
11 agreement.
12     Q.   Ayuni, earlier you were discussing
13 Washington's receipt of the -- what you were
14 calling the Certified AWPs.  Do you recall that?
15     A.   Yes.
16     Q.   How long did Washington utilize the
17 Certified AWPs?
18     A.   I don't recall.  What I remember of the
19 discussion was that after a point in time when I
20 think updates to that -- to those prices were not
21 available readily, then I think we discarded that
22 system, but I am not absolutely sure how long --

Page 534

1  how long that took.
2     Q.   But the system was discarded because
3  the drug prices were not being updated?
4     A.   That is correct.  On the Certified
5  AWPs, like I said, I do not believe that that was
6  a percentage off of AWP.  It was not something
7  that -- that was a discount taken off of
8  something else.  I recall that they were specific
9  prices, they were specific rates associated with
10 a particular drug, and that was what was put into
11 the system.  And I believe that after a point in
12 time when we were looking for updates because, as
13 I mentioned, we do have periodic reviews of our
14 MAC program and our pricing data, once they were
15 -- they were determined to be, you know, outdated
16 and no longer -- and we were no longer able to
17 update them, then we discarded that system is my
18 recollection.
19     Q.   Do you have a sense for how long the
20 Certified AWPs were utilized?
21     A.   I'm not sure and I -- I would guess
22 probably a couple of years, but I could be wrong.

Page 535

1  Again, the best person to know about that would
2  have been my second-in-command, Tom Zuchlewski.
3     Q.   John, I'd like you to hand Ayuni the
4  document which is the OIG report pertaining to
5  Washington.  It does not have a Bates label on
6  it.
7         MR. REALE:  Yes, I think we marked that
8  -- the 2001, right?
9         MS. RAMSEY:  Yes.
10        MR. REALE:  I think we marked that this
11 morning. Let me -- do we have that readily
12 available?  I think I have an extra copy.  It
13 should be Roxane Exhibit 15.
14        MS. MANGIARDI:  That's right.
15        MS. RAMSEY:  Ayuni, could you let me
16 know when you have that document in front of you?
17        THE WITNESS:  I'm looking.
18        MR. REALE:  It looks like this, Ayuni.
19        THE WITNESS:  This is 18 on this one.
20        MR. REALE:  No, it wasn't that one.
21 What's the next one?
22        THE WITNESS:  Okay.  Yes, I have it.

Page 536

1  BY MS. RAMSEY:
2     Q.   And you recall looking at this document
3  earlier?
4     A.   Yes.
5     Q.   And you recall that OIG informed
6  Washington that based on their sampling, they
7  believe that there were discounts averaging
8  65.32% for generic drugs; is that correct?
9     A.   Yes.
10     Q.   Now, the last sentence of that
11 paragraph states:  The estimates excluded the
12 results obtained from non-traditional pharmacies
13 (nursing home pharmacies, hospital pharmacies,
14 home I.V., etc.) because we believe such
15 pharmacies are able to purchase drugs at
16 substantially greater discounts than retail
17 pharmacies and those discounts would inflate our
18 estimates.  Do you see that?
19     A.   Yes.
20     Q.   Now, you indicated earlier that, I
21 believe, that you had previously learned of
22 discounts in this range for generic drugs by your

46  (Pages 533 to 536)

40ab6362-f888-49e7-a65d-8cd62d3b4ae1