# EXHIBIT RRR
# (PART 1)

## DECLARATION OF DAVID B. SHEPHERD

I, David B. Shepherd, declare the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.        My name is David B. Shepherd.  From 1989 until approximately September, 2003, I actively worked for the Virginia Department of Medical Assistance Services, commonly referred to as "DMAS."  DMAS is the agency within the Commonwealth of Virginia which administers Virginia's Medicaid program.  During the entirety of my time at DMAS, I worked within a division of DMAS that administered the pharmacy benefits provided to those Virginia citizens eligible to receive Medicaid.

2.        I have been a registered pharmacist in the Commonwealth of Virginia since 1974. I am currently a licensed pharmacist, but my license status has been inactive for the past year.  I have not been a practicing pharmacist for the past 19 years.  I received my Bachelor of Science degree in Pharmacy from the Medical College of Virginia in 1974.  Prior to joining DMAS in 1989, I worked as a pharmacist at Standard Drug Company in Richmond, Virginia from June 1974 until June 1983.  From June 1983 until approximately September 1989, I worked as the Assistant Director of Professional Services at Standard Drug Company.

3.        From approximately September 1989 to September 2000, I was a Pharmacy Supervisor in the Division of Program Operations at DMAS.  From approximately September 2000 to March 2003, I was a Pharmacist II initially in the Division of Program Operations from 2000 to 2002 and then in the Health Care Services Division until 2003 at DMAS.  From approximately 1997 to 2002, my working title was Pharmacy Consultant at DMAS.  In these positions, I was actively involved in administering Virginia Medicaid's pharmacy benefits.  At times, I initiated recommendations for pharmacy policy changes given my position at DMAS; however, I was not the final decision maker in determining DMAS' adoption of a specific policy.

4.      I am currently suffering from a number of very serious health conditions which, in the opinion of at least one of my physicians, render me unavailable to provide live testimony at a deposition or trial.  My physician believes that the physical and mental functions needed for and the stress associated with providing testimony would endanger my health.  My health conditions began to worsen in February, 2003, and eventually required my leaving DMAS in September, 2003 to go on short-term disability.  In March, 2004, I transitioned to long-term disability.  I am currently on disability.

5.      My current medical complications, as well as the side effects of medications used to treat those complications, have severely impacted my memory.  This, plus the passage of time, has resulted in a severe loss of memory of many details of my work at DMAS helping to administer Virginia's Medicaid pharmacy benefits.

6.      I understand that counsel for defendants in litigation related to drug pricing have requested my deposition.  Counsel for DMAS has provided me copies of written materials found behind Tab 1 that generally summarize the topics defendants would question me about at a deposition.

7.      Due to the passage of time, and the aforementioned medical complications, I do not believe that I can provide reliable testimony on any of these areas of inquiry.

8.      I understand that defendants wish to question me about certain documents, attached hereto at Tabs 2 through 13.  If I were able to sit for a deposition, I would provide the following testimony about these documents.

(a)      Tab 2 (VAC MDL 75673 - VAC MDL 75714).  The documents behind Tab 2 include what appear to be communications between myself and representatives of a company called Ven-A-Care of the Florida Keys in 1994 and 1997 relating to the pricing

2

of certain drug products, including certain injectible and infusion products.  I understand from DMAS counsel that the documents were produced from the files of Ven-A-Care. Although one of the pages appears to be a facsimile cover sheet sent by me (VAC MDL 75686) and others appear to have been sent to me, I do not now recall either the documents or any communications with anyone from Ven-A-Care.  The handwriting on the page bates labeled VAC MDL 75687 appears to be my writing.  I do not recognize the handwriting on the page bates labeled VAC MDL 75683.  Due to the passage of time and my medical complications, I do not recall if I received or reviewed charts of the type found at VAC MDL 75675 and VAC MDL 75680.

(b)    Tab 3 (HHD022-0201 - HHD022-0203) and Tab 4 (HHD021-0121 - HHD021-0122).  The documents behind Tabs 3 and 4 appear to be minutes from two meetings held in Richmond, Virginia on August 30-31, 1994 and September 27-28, 1995 that were attended by individuals from HCFA, OIG and various state Medicaid pharmacy representatives, including myself.  I recall attending the meetings; however, apart from reading the documents, I do not recall any specific details about the substance of the discussion or any remarks I or others may have made.  I did not take the minutes at these meetings, and I do not recall who took the minutes.  I do not recall receiving or reviewing the minutes of these meetings.  The meetings appear to relate to an OIG project to review the difference between invoice price for drugs and AWP.  The minutes indicate that state officials expressed concern that OIG's project was limited to one aspect of pharmacy reimbursement (ingredient cost) and did not review other elements of Medicaid pharmacy reimbursement, such as dispensing fees and the cost to provide professional services. The minutes also indicate that state officials believed that specialty pharmacies such as

3

hospitals, home IV, nursing homes, and physicians could purchase drugs at substantially larger discounts than traditional retail pharmacies.

(c)     Tab 5 (HHD014-0408 - HHD014-0426).  The document behind Tab 5 appears to be a report dated November 1996 from OIG related to its project to review the difference between invoice price for drugs and AWP.  I do not recall this report.  The report appears to contain findings specific to Virginia.  The document at HHD014-0425-0426 appears to be a letter dated October 17, 1996 from Joseph M. Teefey to OIG's Ben Jackson responding to a draft of OIG's report.  Given my position at DMAS and some of the terminology used in the letter, it is likely that I prepared the first draft of this letter.  I no longer recall for certain.  The letter states that acquisition cost is just one factor involved in pharmacy reimbursement policy or methodology, and with any change, consideration should be given to other factors.  These factors include the impact on recipient access to care; the rebate allowance from pharmaceutical manufacturers; provider specialty care (such as home health providers); coordination of monitoring for recipients with compliance needs; and overhead costs for dispensing functions and record keeping.  The letter concludes by stating that if "one aspect of the equation is affected, all possible consequences should be considered."  Although I do not recall the letter, I have no reason to believe that it does not accurately represent the considerations DMAS had at the time regarding a possible decrease in ingredient cost reimbursement.

Although I do not recall OIG's report, it appears the 1996 study found that, on average, retail pharmacies were able to purchase generic drugs at a discount of 45.1 percent off of average wholesale price.  I do not recall whether Virginia considered

revising the reimbursement methodology for generic drugs in light of this finding, or what factors the state may have considered.

(d)     Tab 6 (HHD015-2534 - HHD015-2558).  The pages behind Tab 6 include a December 6, 1994 letter from me to a hospital pharmacy relating to OIG's project to determine the difference between invoice prices and AWP (HHD015-2552).  I recognize the signature on the letter as mine; however, I do not recall writing the letter.  Other pages (for example, HHD015-2538-2551) appear to be drug invoices from providers.  I recall assisting OIG to obtain invoices, but do not now recall whether I received, reviewed or maintained any of the invoices.

(e)     Tab 7 (HHD031-0396 - HHD031-0397).  The document behind Tab 7 appears to be minutes of a March 20, 1997 meeting between OIG's Paul Chesser and various state Medicaid pharmacy representatives, including myself.  The meeting appears to have been held at a Medicaid Pharmacy Administrators Symposium.  The document indicates that the purpose of the meeting was to get input from state Medicaid pharmacy representatives on basing Medicaid drug rebates on AWPs rather than AMP.  I did not take the minutes at this meeting, and I do not recall who took the minutes.  I do not recall receiving or reviewing the minutes of this meeting.  The minutes indicate that all of the state representatives supported "the idea of basing rebates on AWP but were unsure how easily it could be done."  The minutes also state this idea "would result in AWP becoming a meaningful number on which they could base reimbursement."  The minutes also allude to a discussion that drug manufacturers "play games with AWP (overstate AWP for marketing purposes)."  Throughout my tenure at DMAS, I attended various meetings and I do not recall this specific meeting.

5

(f)     Tab 8 (NAMFCU 000018 - NAMFCU 000020).  The document at Tab 8 appears to be a March 6, 2000 letter from myself to Patrick E. Lupenetti of the New York MFCU office, responding to a letter dated February 15, 2000 from Mr. Lupenetti.  I recognize the signature on page NAMFCU 000020 as mine, but I do not recall writing this letter  The letter addresses an initiative by the National Association of Medicaid Fraud Control Units ("NAMFCU") to have First Databank publish alternative pricing for approximately 400 national drug codes.  The letter contains my reaction to the initiative and, among other things, includes the following observation:  "The present initial changes may be enough to solve an immediate need but for long term solutions a consistent policy must be adopted with clear understandings from state, federal, industry and provider.  If adverse actions occur the primary entity to suffer will be the recipient (patient).  And to my knowledge a majority of the patients involved with this pharmaceutical treatment are seriously medically compromised.  Unfortunately, the determination to focus on monitory [sic] issues does not consider the reason services are available."

Due to the passage of time and my medical complications, I do not recall this letter and cannot provide further elaboration on what I meant by the comments in the letter.  I have no reason, however, to believe that the letter does not accurately represent my views on this matter at the time.

(g)     Tab 9 (HHD006-0074), Tab 10 (HHD006-0105), and Tab 11 HHD006-0383 - HHD006-0391).  The documents at Tabs 9, 10 and 11 appear to relate to communications with OIG related to whether Virginia had implemented, or intended to implement, the alternative pricing developed by the NAMFCU for approximately 400 NDCs.

(h)     The document at Tab 9 (HHD006-0074) appears to be a list of states and dates.  DMAS counsel represented to me that this document appears to be a list of states that participated in telephone interviews with OIG, and my name is included on the list.  I do not recall any oral or written communications with OIG about this topic.

(i)     The document at Tab 10 (HHD006-0105) contains handwritten notes, including the notation "state: VA" in the top left hand corner.   DMAS counsel represented to me that these notes appear to have been taken during a telephone interview with OIG.  I do not recognize the handwriting, nor do I recall participating in a telephone interview.   The document indicates that the following comments, among others, were made in the telephone interview with OIG:  "Before implementation, wants to make sure there are no access problems."  The handwritten notes state, "can't just take prices from Vena-care or other pharmacy [and] make this a national price.  small/rural issue," "can't look at this in a vacuum," and "new prices affect total system."

(j)     There is language in the document at Tab 11 that is identical to language used in the document at Tab 8, a letter which contains my signature.  *Compare* HHD006-0389-0390 *with* NAMFCU 000018-20).  Page HHD006-0386 of the document at Tab 11 indicates that Virginia Medicaid did not use the revised pricing information, and refers to attachment #1 for concerns and reasons.   Attachment 1, at HHD006-0389-0390, indicates, among other things:  "In calculating savings from such a program ask[ed] for by your questions, all potential areas impacted should be considered.  One is the rebate for each of the affected NDCs.  Another being any potential negative outcome that might result from access problems."  I do not recall writing the document at Tab 11.  I believe that I may have taken portions of the language in the letter found at Tab 8 to contribute to

7

portions of the document at Tab 11.  I do not recall the letter (NAMFCU 000018 – 20) and cannot provide further elaboration on what I meant by the comments in the letter.  I have no reason, however, to believe that the identical language found in the documents at Tab 8 and Tab 11 does not accurately represent my views at the time.

I do not recall any discussions within DMAS about whether Virginia would use the revised pricing information developed by the NAMFCU.  Due to the passage of time and my medical complications, I do not recall any communications with OIG relating to the NAMFCU project and cannot provide further elaboration on my contemporaneous thoughts on that matter.  Nor can I provide any further elaboration on why Virginia did not implement the revised pricing provided by NAMFCU.

(k)     Tab 12 (MO 000598).  The document at Tab 12 appears to be a June 9, 2000 e-mail that I sent to Carl Tepper of New Jersey Medicaid relating to the NAMFCU project.  Among other things, my e-mail stated:  "Unfortunately the individuals that have decided upon this tact are our own state MFCU and DOJ.  As well as some state pharmacy administrators.  There is no mandatory statutory or regulatory language that requires this.  Also there is no court order mandate to do this.  The states are encouraged to do this.  I plan to follow rule procedures in order to use these prices if appropriate and only after an impact has been assessed."  Due to the passage of time and my medical complications, I do not recall this e-mail or any other communications that I may have had with other states concerning the subject matter of this e-mail.  Nor can I provide any further elaboration on the statements made in the e-mail.  I have no reason to believe, however, that the document does not accurately represent my views on this matter at the time.

8

(l)  Tab 13 (MO.028120 - MO.028137).  The document at Tab 13 appears to

be the minutes of a face-to-face meeting held on September 28-29, 2000 of the PTAG.

At the page MO.028133, under the section "Brainstorming," "Devising a Plan to Address

AWP Issues/Steps Toward Resolution," there is a reference to a presentation that I made

to the PTAG on "a broad overview of potential impacts as a result of a major change in

the reimbursement methodology."   The document indicates that a handout for this

presentation was included as Appendix N to the materials distributed at the September

28-29, 2000 meeting.  I do not recall making a presentation at this meeting.  Based on my

review of the document at Tab 13, I have no reason to believe that I did not make a

presentation on this topic, but I no longer recall anything about that presentation.  I no

longer have a copy of the referenced handout.

The September 28-29, 2000 PTAG meeting minutes attached at Tab 13 also

include (at MO.028127) reference to a presentation done by Mary Riordan and Tim Terry

concerning a House Commerce Committee investigation of alleged Medicare drug

pricing manipulation.  I do not recall anything about this presentation.

9.  During my time at DMAS, I do not recall having any discussions with

pharmaceutical manufacturers relating to drug pricing or Virginia Medicaid's reimbursement to

providers for dispensing drugs to Medicaid beneficiaries.

10.  I do not recall at any time being interviewed by the United States Department of

Justice or other federal investigators relating to my understanding of average wholesale price or

Virginia Medicaid's drug reimbursement policy.  During my employment at DMAS, I do not

recall at any time being requested to retain documents relating to my understanding of average

wholesale price or Virginia Medicaid's drug reimbursement policy.  Nor do I recall actively

taking any such measures. When counsel for DMAS contacted me to discuss ongoing discovery taking place in drug pricing litigation, they requested that I retain any documents that I may have in my personal possession that relate to my understanding of average wholesale price or Virginia Medicaid's drug reimbursement policy.

11.    During my employment at DMAS, I attended various meetings with other state Medicaid pharmacy contacts, such as PTAG meetings and meetings of the Southern Association of Medicaid Pharmacy Administrators. In many instances, I used a microcassette recorder to record the meetings to assist with my note taking. I was familiar with operating the microcassette recorder on each occasion that I recorded a meeting. It was my practice to place the microcassette recorder on the table at the meetings. The microcassette recorder was in plain view during the meetings.

In at least one instance, I participated in a PTAG telephone conference call that I recorded. Other members of the PTAG and a representative from HCFA and OIG also participated in this call. I did not inform anyone that I was recording the call nor was I directed by DMAS to record the call. I cannot recall whether I recorded any other telephone conference calls.

I have provided DMAS counsel with approximately 95 microcassette tapes of various pharmacy-related meetings I attended and at least one telephone conference call in which I participated. I was not directed by DMAS to record any meetings or telephone calls. There are two microcassette tapes of a hearing before United States Representative Henry Waxman held on September 14, 1990 in Washington, DC. DMAS did not direct me to attend this hearing and DMAS did not pay for me to attend.

The 95 microcassettes have been in my personal possession since the dates of recording until they were provided to DMAS counsel. I have not altered, edited, or changed the microcassettes in any way since I left DMAS. While I was at DMAS, there may have been instances when I may have recorded over a microcassette, but in these cases it was my practice to strike through the old description on the microcassette label and include a description of the new recording. I labeled most of the tapes when I made them; however, some of the tapes are not labeled. I did not review these tapes after I left DMAS.

Dated: 3/11/2009

David B. Shepherd, R.Ph.

# TAB

# 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL NO. 1456 |
| | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.,* No. 06-CV-11337-PBS and *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.,* No. 07-CV-11618-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

## CROSS-NOTICE OF DEPOSITION OF THE STATE OF VIRGINIA DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

PLEASE TAKE NOTICE that, pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure and court order, Defendant Abbott Laboratories, Inc. ("Abbott"), by its undersigned counsel, hereby cross-notices the Rule 30(b)(6) deposition of the representative(s) of the Virginia Department of Medical Assistance Services in the cases of *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.,* No. 06-CV-11337-PBS (hereafter, the "Abbott/DOJ Action") and *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.,* No. 07-CV-11618-PBS (hereafter, the "Abbott/Ven-A-Care Action").

In response to this cross-notice, the Virginia Department of Medical Assistance Services shall designate a person or persons to testify under oath about the Topics of Inquiry set forth in Schedule A of the attached Subpoena served by Defendant Abbott.  Abbott's Subpoena is attached hereto as Exhibit 1.

The deposition is noticed to commence for November 3, 2008 and is scheduled for two days.  It will continue from day to day until completed.  The deposition will take place at United States Attorney's Office, Main Street Centre, 600 E. Main Street, Suite 1800, Richmond, VA

23219.  The deposition will be conducted under oath by an officer authorized to take such

testimony, and will be recorded by stenographic and/or sound and visual means.  The deposition

will be taken upon cross examination.  Arrangements will be made so that counsel may

participate by telephone if they wish.  The deposition is being taken for the purposes of

discovery, for use at trial, and for other such purposes as permitted under the Federal Rules of

Civil Procedure.

Dated:  October 17, 2008

/s/ David S. Torborg
James R. Daly
Eric P. Berlin
Tara Fumerton
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, David S. Torborg, an attorney, hereby certify that I caused a true and correct copy of the foregoing to be served upon all counsel of record electronically by causing same to be posted via LexisNexis, this 17th day of October, 2008.

/s/ David S. Torborg
David S. Torborg

# EXHIBIT 1

AO 88 (Rev. 1/94) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

| | Pending in: |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO<br>*U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.,*<br>No. 06-CV-11337-PBS and *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.,* No. 07-CV-11618-PBS | **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**<br><br>MDL NO. 1456<br><br>Civil Action Nos. 06-CV-11337-PBS and 07-CV-11618-PBS<br><br>Lead Case No. 01-CV-12257<br><br>Judge Patti B. Saris<br><br>Magistrate Judge Marianne B. Bowler |

# SUBPOENA

TO:   Virginia Department of Medical Assistance Services
        c/o Nancy Malczweski
        600 East Broad Street
        Richmond, VA 23219

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. **See attached Schedule A for Topics of Inquiry & Definitions**

| PLACE OF DEPOSITION<br>United States Attorney's Office<br>Main Street Centre<br>600 E. Main Street, Suite 1800<br>Richmond, VA 23219 | DATE AND TIME<br>November 3-4, 2008 9:00 AM |
|---|---|

☐  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>/s/ David S. Torborg<br>Attorney for Defendant Abbott Laboratories, Inc. | DATE<br>October 17, 2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER: David S. Torborg, Esq., Jones Day, 51 Louisiana Ave., N.W., Washington, DC 20001 (202) 879-3939

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| SERVED | DATE | PLACE |
|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(C)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party service the subpoena shall not be entitled to inspect and copy materials or inspect the premises expect pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
    (i)    fails to allow reasonable time for compliance;
    (ii)   requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
    (iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or
    (iv)   subjects a person to undue burden.

(B) If a subpoena

    (i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or
    (ii)   requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
    (iii)  requires a person who is not a party of an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

Pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, Defendant Abbott in the above-captioned matters requests that You designate in writing to counsel for Abbott one or more officers, officials, employees, or other representatives to testify on Your behalf who are most knowledgeable about and will testify about matters known or reasonably available to You in regard to the Topics of Inquiry set forth below.

In addition to the Additional Definitions provided below, Abbott incorporates herein for purposes of this Cross Notice the Definitions set forth in Schedule A to the Subpoena issued by the Dey and Roxane defendants on July 17, 2008.  The Dey and Roxane Subpoena is attached as Exhibit 2.

## Additional Definitions

1.     "Abbott/DOJ Action NDCs" means and refers to those products listed on attached Schedule 1.

2.     "Abbott/Ven-A-Care Action NDCs" means and refers to those products listed on attached Schedule 2.

3.     "Home Intravenous Drug Therapy" means the intravenous administration of fluids, drugs, or chemical agents to recipients in the home setting, including but not limited to antibiotic drug therapy, hydration therapy, chemotherapy, and pain management therapy.

## TOPICS OF INQUIRY

1.     Abbott incorporates herein by reference the Areas of Inquiry set forth in the July 17, 2008 Cross-Notice of Videotaped Deposition of the State of Virginia Department of Medical Assistance Services by Defendants Dey and Roxane.  *See* attached Ex. 2.  Where those Areas of Inquiry refer to the "Subject Drugs," Abbott incorporates those topics but hereby modifies them

to substitute the term "Subject Drugs" with the language "Abbott/DOJ Action NDCs and Abbott/Ven-A-Care Action NDCs." *See* Definitions; Schedules 1 and 2. In addition, Abbott clarifies that it seeks testimony about Your knowledge, throughout the Relevant Period, of each topic, unless otherwise stated.

2.    *Individuals Involved.* From January 1, 1989 to the present, the identity of all individuals who have been involved with or consulted about any issue affecting the Reimbursement methodology or Reimbursement amounts for drugs under Your Medicaid program, including those individuals' educational and work backgrounds, job titles, employment dates, and job responsibilities.

3.    *Understanding of Terms.* From January 1, 1989 to the present, how You have understood and interpreted the terms "Average Wholesale Price" ("AWP"), "Wholesale Acquisition Cost" ("WAC"), "Direct Price" ("DP"), and "List Price" ("LP"), including as any of those terms are used in Your state Medicaid plans.

4.    *Published Prices vs. Acquisition Cost.* Your knowledge concerning the difference between Providers' acquisition costs and AWPs, WAC, and DPs reported by Publishers for multiple-source drugs (January 1, 1989 to the present), the Abbott/DOJ Action NDCs (January 1, 1989 to December 31, 2001), and the Abbott/Ven-A-Care Action NDCs (January 1, 1989 to the present), and whether You believed that the AWPs, WACs, and DPs reported by Publishers approximated and/or were reliable indicators of Providers' acquisition costs for multiple-source drugs, the Abbott/DOJ Action NDCs, and the Abbott/Ven-A-Care Action NDCs during the indicated time periods.

5.    *Process to Establish Payment Rates/Margins.* From January 1, 1989 to the present, the process used and the factors considered by You, the state legislature, and any other relevant decision-maker in developing and determining payment rates for drug ingredient costs, dispensing fees, and any other payments related to the dispensing of drugs to Medicaid

beneficiaries, and whether You expected and/or intended that Your payment for ingredient cost would provide a margin to Providers relative to the price at which drug products were generally and currently available in the marketplace.

6.  ***Methods Used to Calculate Ingredient Cost.***  The methods used to calculate ingredient cost payments to Providers associated with dispensing the Abbott/DOJ Action NDCs (January 1, 1991 to December 31, 2001) and the Abbott/Ven-A-Care Action NDCs (January 1, 1994 to the present), including the use of MACs and/or FULs, when any MACs/FULs were utilized, how any MACs/FULs were calculated, and any methods considered but not used by the Medicaid program and the reasons why those methods were rejected.

7.  ***Methods Used to Calculate Dispensing and Any Other Fees.***  Apart from ingredient cost, the methods used to calculate payments to Providers associated with dispensing the Abbott/DOJ Action NDCs (January 1, 1991 to December 31, 2001) and the Abbott/Ven-A-Care Action NDCs (January 1, 1994 through the present), including dispensing fees, professional or compounding fees, home infusion fees, and any per diem payments.

8.  ***Costs of Dispensing Analysis (Retail).***  From January 1, 1989 to the present, any evaluation, consideration, or analysis initiated, prepared, or reviewed by You relating to Providers' costs to dispense retail prescriptions to Medicaid beneficiaries.

9.  ***Compensation for Costs of Dispensing, etc. (Retail).***  From January 1, 1989 to the present, how You compensated Providers' total costs to dispense drugs, provide a profit, and assure beneficiary access.

10.  ***Costs of Dispensing Analysis (Home IV).***  From January 1, 1989 to the present, any evaluation, consideration, or analysis initiated, prepared, or reviewed by You relating to Providers' costs to dispense or provide Home Intravenous Drug Therapy to Medicaid beneficiaries.

11.     ***Compensation for Costs of Dispensing, etc. (Home IV).*** From January 1, 1989 to the present, how You compensated Providers' total costs to dispense or provide Home Intravenous Drug Therapy to Your Medicaid beneficiaries, provide a profit, and assure beneficiary access.

12.     ***Access to Care.*** From January 1, 1989 to the present, how You interpreted and satisfied the federal requirement that payment rates for drugs be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area" (*see* 42 U.S.C. § 1396a(a)(30)(A)), and Your knowledge, and response to any concerns expressed (within the Medicaid program or by third parties), on whether the dispensing fees paid by You during this time period were themselves adequate to compensate Providers' total cost to dispense drugs to Medicaid beneficiaries, provide a profit, and assure beneficiary access.

13.     ***Estimated Acquisition Cost.*** From January 1, 1989 to the present, how You have interpreted and complied with 42 C.F.R. §§ 447.311, 447.332 and 447.333, including the requirement that Your payments not exceed, "in the aggregate," the lower of (i) estimated acquisition cost ("EAC") (defined in 42 C.F.R. §§ 447.301 as a state Medicaid agency's "best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers") plus reasonable dispensing fees and (ii) Providers' usual and customary charges to the general public.

14.     ***Findings and Assurances.*** From January 1, 1989 to the present, what You did to comply with 42 C.F.R. §§ 447.333(b)&(c), including what "Findings" You made under § 447.333(b)(1), what "Assurances" You made to HCFA under § 447.333(b)(2), and what "data, mathematical or statistical computations, comparisons, and any other pertinent records to support [the] findings and assurances" You developed and maintained under § 447.333(c).

15.   *Manufacturer Marketing and Pricing.*  Your knowledge of any information or allegations that any manufacturer used or considered the difference between Providers' acquisition costs and AWPs, WAC, or DPs reported by Publishers to market or price any of its products, as well as Your source and response to any such knowledge.

16.   *DOJ AWPs.*  Your implementation of revised average wholesale price information developed by the United States Department of Justice and NAMFCU, the dates when You did or did not implement the revised pricing information, and the reasons why You did or did not implement the revised pricing information.

17.   *340B Drug Reimbursement.*  From January 1, 1989 to the present, the methodology You used to calculate Reimbursement paid for drugs dispensed by 340B Providers, and the reason for that methodology.

18.   *State Medicaid Pharmacy Meetings.*  From January 1, 1989 to the present, Your attendance at national or regional meetings held among Medicaid pharmacy administrators and/or meetings of the Pharmacy Technical Advisory Group, any notes or other materials in Your possession relating to those meetings, and Your recollection of what was discussed at those meetings concerning Medicaid drug Reimbursement.

19.   *OIG Report Meetings.*  Your participation in HHS-OIG's work relating to AWP, including but not limited to your attendance at meetings held with OIG, HCFA, and/or other state Medicaid pharmacy personnel on August 30-31, 1994, September 27-28, 1995, and March 20, 1997, and Your reaction to HHS-OIG's findings.

20.   *Ven-A-Care.*  The sum and substance of any Communications between You and representatives of Ven-A-Care, including but not limited to the date and duration of those Communications, any materials presented or shared at those Communications, and the specific products discussed during those Communications, as well as what You did with any information

provided by Ven-A-Care during those Communications.

21.   **_Specific Reports/Documents._**  Your awareness, review, consideration, participation in, and/or actions taken in response to the following.  For those reports/documents prepared by or with the assistance of Your current or past employees, You are requested to provide a witness(s) able to testify about the contents and subject matters of those reports/documents.[1]

(01)   1990 Report of the Joint Subcommittee Studying Pharmaceutical Costs in the Virginia Medical Assistance Program Pursuant to HJR 403 ("1990 Joint Subcommittee Report");

(02)   1988 Department of Medical Assistance Services, "Legislative Report/Plan to Reduce Pharmacy Expenditures for FY 1990" (_see_ 1990 Joint Subcommittee Report, footnote 26);

(03)   Department of Medical Assistance Services, Regulation Review Summaries of April 18, 1989 and June 15, 1989 (_see_ 1990 Joint Subcommittee Report, footnote 62);

(04)   1989 Majority Staff Report of the Special Committee Aging (U.S. Senate) titled "Prescription Drug Prices:  Are We Getting Our Money's Worth?";

(05)   Staff Memorandum, October 2, 1989, summarizing the United States Senate Special Committee on Aging, Staff Briefing Paper, "Prescription Drug Prices:  Are We Getting Our Money's Worth?" (July 18, 1989) (_see_ 1990 Joint Subcommittee Report, footnote 70);

(06)   Staff Memorandum, December 12, 1989, regarding the United States Senate Special Committee on Aging, Staff Information Paper, "Skyrocketing Prescription Drug Prices: Turning a Bad Deal into a Fair Deal" (November 16, 1989) and the Pryor Committee's November 16, 1989 hearing (_see_ 1990 Joint Subcommittee Report, footnote 72);

(07)   Minutes of August 8, 1989, October 3, 1989, December 13, 1989, and January 8, 1990 meetings (_see_ 1990 Joint Subcommittee Report, footnote 68, 73, 90, and 94);

(08)   Lederle Laboratories, "The Dilemma of Pharmacy Provider

---

[1] For your convenience, where counsel has them, copies of these reports and materials are contained on a compact disk that will be sent to DMAS.

Compensation," *Medicaid Pharmacy Bulletin* (March-April 1988) (*see* 1990 Joint Subcommittee Report, footnote 32);

(09)   1989 HHS-OIG report "Use of Average Wholesale Price in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program" (A-06-89-00037);

(10)   1990 article titled "An Assessment of Chain Pharmacies' Cost of Dispensing a Third Party Prescription";

(11)   1991 HHS-OIG report "Comparison of Reimbursement Prices for Multiple-Source Prescription Drugs in the United States and Canada" (OEI-03-91-004700);

(12)   1992 article titled "An Analysis of the Cost of Dispensing Third-Party Prescriptions in Chain Pharmacies";

(13)   1992 HHS-OIG report "Cost of Dialysis-Related Drugs" (A-01-91-00526);

(14)   1992 HHS-OIG report "Physician's Cost for Chemotherapy Drugs" (A-02-91-01049);

(15)   1992 GAO report "Prescription Drugs - Changes in Prices for Selected Drugs" (GAO/HRD-92-128);

(16)   1993 GAO report "Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland" (GAO/HRD-93-55FS);

(17)   October 24, 1994, December 1994, and December 1997 communications between Ven-A-Care of the Florida Keys, Inc. and David B. Shepherd regarding State policy and methodology for reimbursement of intravenous solutions and injectable drugs;

(18)   1996 HHS-OIG report "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services" (A-06-95-00072), in particular Your October 16, 1996 response to OIG's draft report;

(19)   1996 Barron's article "Hooked on Drugs: Why Do Insurers Pay Such Outrageous Prices for Pharmaceuticals";

(20)   1997 HHS-OIG report "Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products" (A-06-97-00011);

(21)   1997 HHS-OIG report "Excessive Medicare Payments for Prescription Drugs" (OEI-03-97-00290);

(22)   1997 Remarks by President Clinton in radio address to the nation;

(23)   1998 Evaluation of Departments of Medical Assistance Services and Personnel and Training Prescription Drug Programs (HJR 623);

(24)   1998 HHS-OIG report "The Impact of High-Priced Generic Drugs on Medicare and Medicaid" (OEI-03-97-00510);

(25)   1998 HHS-OIG report "Need To Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs" (A-06-97-00057);

(26)   1998 HHS-OIG report "Comparing Drug Reimbursement:  Medicare and Department of Veterans Affairs" (OEI-03-97-00293);

(27)   2000 Report of the Department of Medical Assistance Services, "Evaluation of the Department of Medical Assistance Services Prescription Drug Reimbursement";

(28)   March 6, 2000 letter from David B. Shepherd to Patrick Lupinetti;

(29)   June 23, 2000 email from Cody Wiberg to David Shepherd regarding "NAMFCU Drug Pricing Issue";

(30)   November 26, 2001 email from Cody Wiberg to David Shepherd regarding "Martin Calls for Development of 'Perfect' Pharmacy Reimbursement Formula";

(31)   2002 HHS-OIG report "Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products" (A-06-01-00053);

(32)   2004 CBO report "Medicaid's Reimbursements to Pharmacies for Prescription Drugs"; and

(33)   2005 Report of the Virginia Department of Medical Assistance Services, "History of Medicaid Reimbursement Rates for Dialysis Services in Virginia";

22.   ***Medicaid Pharmacy Bulletins.***  Your review, consideration, or participation in a bi-monthly newsletter titled "Medicaid Pharmacy Bulletin," and any copies of such newsletters

in Your possession.[2]

23.    ***Communications with Abbott.***  Communications between You and Abbott Laboratories or any of its past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on its behalf or under its control concerning drug pricing, drug price reporting, or Reimbursement policy.

24.    ***Fraud Claims.***  From January 1, 1991 to the present, the steps required of Your employees when becoming aware of any fraud perpetrated on Your Medicaid program, any steps taken with respect to any purported or identified fraud by Providers, manufacturers, or others relating to drug pricing or Reimbursement, and whether, and how, Your claims data has been adjusted to reflect any funds recouped from Providers due to fraud or other overpayments concerning drug payments.

25.    ***Preparation.***  The identity of individuals contacted to prepare a witness or witnesses to testify on Your behalf regarding the areas of inquiry identified in the notices for this 30(b)(6) deposition, the subject matters discussed with those individuals, and the materials reviewed by those individuals in preparing for this 30(b)(6) deposition.

26.    ***Document Retention/Collection.***  The location of documents responsive to the subpoena for documents issued to You by counsel for Roxane/Dey, Your efforts to search for, collect, and produce Documents that would be responsive to the subpoena, Your efforts since August 1995 to preserve documents responsive to the subpoena, and any communications with the United States relating to the preservation of documents that might be pertinent to AWP litigation.

---

[2] For your convenience, a sample Medicaid Pharmacy Bulletin is contained on the compact disk that will be sent to DMAS.

## SCHEDULE 1:  ABBOTT/DOJ ACTION NDCS

| National Drug Code | Drug Description |
|---|---|
| 00074-1966-07 | BACTERIOSTATIC NACL INJECTION |
| 00074-3977-03 | BACTERIOSTATIC WATER FOR INJ. |
| 00074-4332-01 | STERILE VANCOMYCIN HYDROCHLORIDE INJECTION |
| 00074-4887-10 | STERILE WATER FOR INJECTION |
| 00074-4887-20 | STERILE WATER FOR INJECTION |
| 00074-4887-50 | STERILE WATER FOR INJECTION |
| 00074-4888-10 | SODIUM CHLORIDE INJECTION |
| 00074-4888-20 | SODIUM CHLORIDE INJECTION |
| 00074-6138-02 | SODIUM CHLORIDE IRRIGATION |
| 00074-6138-03 | SODIUM CHLORIDE IRRIGATION |
| 00074-6138-22 | SODIUM CHLORIDE IRRIGATION |
| 00074-6139-02 | STERILE WATER FOR IRRIGATION |
| 00074-6139-03 | STERILE WATER FOR IRRIGATION |
| 00074-6139-22 | STERILE WATER FOR IRRIGATION |
| 00074-6509-01 | STERILE VANCOMYCIN HYDROCHLORIDE |
| 00074-6533-01 | STERILE VANCOMYCIN HYDROCHLORIDE |
| 00074-6534-01 | STERILE VANCOMYCIN HYDROCHLORIDE ADD-VANTAGE VIALS |
| 00074-6535-01 | STERILE VANCOMYCIN HYDROCHLORIDE ADD-VANTAGE VIALS |
| 00074-7100-13 | DEXTROSE INJECTION |
| 00074-7100-23 | DEXTROSE INJECTION |
| 00074-7101-02 | SODIUM CHLORIDE INJECTION |
| 00074-7101-13 | SODIUM CHLORIDE INJECTION |
| 00074-7101-23 | SODIUM CHLORIDE INJECTION |
| 00074-7120-07 | DEXTROSE INJECTION |
| 00074-7138-09 | SODIUM CHLORIDE IRRIGATION |
| 00074-7139-09 | STERILE WATER FOR IRRIGATION |
| 00074-7902-09 | 5% DEXTROSE AND 0.45% NACL WITH 0.15% KCL INJECTION |
| 00074-7922-02 | DEXTROSE INJECTION |
| 00074-7922-03 | DEXTROSE INJECTION |
| 00074-7922-09 | DEXTROSE INJECTION |
| 00074-7923-23 | DEXTROSE INJECTION |
| 00074-7923-36 | DEXTROSE INJECTION |
| 00074-7923-37 | DEXTROSE INJECTION |
| 00074-7924-09 | 5% DEXTROSE AND 0.225% NACL INJECTION |
| 00074-7926-09 | 5% DEXTROSE AND 0.45% NACL INJECTION |
| 00074-7941-09 | 5% DEXTROSE AND 0.9% NACL INJECTION |
| 00074-7972-05 | SODIUM CHLORIDE IRRIGATION |
| 00074-7973-05 | STERILE WATER FOR IRRIGATION |
| 00074-7983-02 | SODIUM CHLORIDE INJECTION |
| 00074-7983-03 | SODIUM CHLORIDE INJECTION |
| 00074-7983-09 | SODIUM CHLORIDE INJECTION |
| 00074-7984-23 | SODIUM CHLORIDE INJECTION |
| 00074-7984-36 | SODIUM CHLORIDE INJECTION |
| 00074-7984-37 | SODIUM CHLORIDE INJECTION |
| 00074-7985-09 | SODIUM CHLORIDE INJECTION |
| 00074-7990-09 | STERILE WATER FOR INJECTION |

**SCHEDULE 2:  ABBOTT/VEN-A-CARE ACTION NDCS**

| NDC | DRUG NAME |
|---|---|
| 00074-2589-13 | Erythromycin Ethylsuccinate Tab 400 mg |
| 00074-2589-53 | Erythromycin Ethylsuccinate Tab 400 mg |
| 00074-3747-16 | ERYTHR ETH LIQ 200mg/5ml |
| 00074-3748-16 | ERYTHR ETH LIQ 400mg/5ml |
| 00074-5729-11 | E.E.S. 400 FILM |
| 00074-5729-13 | E.E.S. 400 FILM |
| 00074-5729-19 | E.E.S. 400 FILM |
| 00074-5729-53 | E.E.S. 400 FILM |
| 00074-6227-13 | ERYTHR BSE TAB 500mg |
| 00074-6301-13 | ERYTHROMYC DR 250mg CAP |
| 00074-6301-53 | ERYTHROMYC DR 250mg CAP |
| 00074-6304-11 | Ery-tab E/c Ud 250 Mg 100's |
| 00074-6304-13 | Ery-tab E/c 250 Mg 100's |
| 00074-6304-30 | Ery-tab E/c 250 Mg 30's |
| 00074-6304-40 | ERY-TAB 250MG E |
| 00074-6304-53 | ERY-TAB 250MG E |
| 00074-6306-13 | EES 200 Susp. 100ml |
| 00074-6306-16 | EES 200 Liq 200 Mg/5 ml |
| 00074-6316-13 | Erythromycin Stearate 500 Mg Tab 100's |
| 00074-6320-11 | Ery-tab 333 mg |
| 00074-6320-13 | Ery-tab 333 mg |
| 00074-6320-30 | Ery-tab 333 mg |

| NDC | DRUG NAME |
| --- | --- |
| 00074-6320-53 | Ery-tab 333 mg |
| 00074-6321-11 | Ery-tab 500 Mg u |
| 00074-6321-13 | Ery-tab 500 Mg e |
| 00074-6326-11 | ERYTHYR BSE TB 250mg |
| 00074-6326-13 | Erythromycin Base 250 Mg Tab 100's |
| 00074-6326-53 | Erythromycin Base 250 Mg Tab 500's |
| 00074-6346-19 | ERYTHR STE 250mg TAB |
| 00074-6346-20 | Erythromycin Stearate 250 Mg Tab 100's |
| 00074-6346-38 | Erythromycin Stearate Ud 250 Mg Tab 100's |
| 00074-6346-41 | ERYTHR STE 250mg TAB |
| 00074-6346-53 | Erythromycin Stearate 250 Mg Tab 500's |
| 00074-6369-02 | E.E.S. GRAN 200 |
| 00074-6369-10 | E.E.S. GRAN 200 |
| 00074-6373-13 | E.E.S. 400 LIQ |
| 00074-6373-16 | EES 400 Liq 400 Mg/5ml |
| 00074-7156-13 | EES/sulfisoxazole 200 Mg 100 ml |
| 00074-7156-43 | EES/sulfisoxazole 200 Mg 150 ml |
| 00074-7156-53 | EES/sulfisoxazole 200 Mg 200 ml |
| 00074-8030-13 | Pediazole Susp |
| 00074-8030-43 | Pediazole Susp |
| 00074-8030-53 | Pediazole Susp |

AO88  (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA |

In Re: Pharmaceutical Industry Average Wholesale Price Litigation

THIS DOCUMENT RELATES TO
*U.S. ex rel Ven-A-Care v. Boehringer, et al., 07-10248-PBS*
*U.S. ex rel Ven-A-Care v. Dey, Inc., et al., 05-11084-PBS*

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  MDL No. 1456
Lead Case No. 01-CV-12257-PBS

TO:  Virginia Dept. of Medical Assistance Servs.
c/o Nancy Malczewski
600 East Broad Street
Richmond, VA  23219

PENDING IN:  UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   U.S. Attorney's Office, Main Street Centre, 600 E. Main St., Ste. 1800 Richmond, VA 23219 [See attached Schedule A for Topics of Inquiry] | DATE AND TIME 10/10/2008 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)  Attorney for Defendant Boehringer Ingelheim Roxane, Inc. | DATE 7/17/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

John W. Reale, Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601   (312) 861-3452

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | | PLACE |
|---|---|---|---|
| SERVED | | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Nancy Malczewski | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
            DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises— or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## SCHEDULE A

Defendants in the above-captioned matters request, pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, that You designate in writing to counsel for Boehringer Ingelheim Roxane, Inc. one or more officers, officials, employees, or other representative to testify on Your behalf who are most knowledgeable about and will testify about matters known or reasonably available to You in regard to the Topics of Inquiry set forth below. You are further requested to set forth the matter or matters on which each such designated person will testify at least two days prior to each deposition.

### TOPICS OF INQUIRY

1.      Your knowledge of the terms "Average Wholesale Price" (also referred to as "AWP"), and "Wholesale Acquisition Cost" (also referred to as "WAC").

2.      Any efforts by the state to define, calculate, determine, investigate, understand or interpret AWP or WAC.

3.      Your knowledge, consideration, understanding or use of AMP, MAC, FUL, EAC, Direct Price, Best Price, Federal Supply Schedule prices, or any other price, cost, or reimbursement amount or benchmark, metric, or methodology for Subject Drugs.

4.      Your knowledge of actual acquisition costs for the Subject Drugs by any Provider, including but not limited to, pharmacies, physicians, wholesalers, PBMs, drug purchasing pools, or the state itself.

5.      All attempts by the state to ascertain Providers' actual acquisition costs for any prescription drugs reimbursed by the state Medicaid program.

1

6.    Communications between You and Providers regarding reimbursement for acquiring, dispensing, or administering Subject Drugs from January 1984 to the present.

7.    Information, including but not limited to the existence, nature, and location of Documents, relating to the following:

(a)    Your compliance with 42 U.S.C. § 1396a(a)(30), 42 U.S.C. § 1396a(a)(54), 42 C.F.R. §§ 447.201 et seq., or 42 C.F.R. § 447.512-518;

(b)    Any evaluations, audits, analyses, or reviews of any aspect of the state Medicaid program from January 1984 to the present;

(c)    Your procedures for the calculation, monitoring, processing, or payment of claims for Subject Drugs from January 1991 to the present;

(d)    Internal or external assessments, studies, analyses, reviews, or audits conducted by or on Your behalf regarding pricing or reimbursement amount or rates for prescription drugs from January 1984 to the present, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(e)    Documents created by or received from any state entity concerning a change in the methodology for reimbursement of pharmacy-dispensed and physician-administered drugs;

(f)    Documents created by, received from, or sent to, or Communications with other state governments, including other state Medicaid programs, relating to prices, costs, or reimbursements for prescription drugs from 1984 to the present, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(g)    Documents created by, received from, or sent to, or Communications with, the federal government or federal agencies, including the DOJ, National Association of Medicaid Fraud Control Units, National Association of Attorneys General, HHS-OIG, CMS, and the Department of Health and Human Services, relating to prices, costs, or reimbursements for prescription drugs from January 1984 to the present;

(h)    Documents created by, received from, or sent to, or Communications with other state governments, including other state Medicaid programs, relating to the cost of Providers to dispense or administer prescription drugs, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(i)    Documents created by, received from, or sent to, or Communications with, the federal government or federal agencies, including the DOJ, National Association relating to the cost of Providers to dispense or administer prescription drugs, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(j)    Communications between the state and either Dey or the Roxane Defendants concerning the pricing of prescription drugs;

(k)    Your potential or actual contractual relationships with PBMs, Third Party Administrators, Benefit Consultants, Auditors, Wholesalers, Manufacturers, Group Purchasing Organizations, Insurers, Independent Practice Associations, Retailers, Mail Order Pharmacies, Providers, Trade Associations, or Lobbyists, insofar as they cover reimbursement, purchasing, rebates, or expenditures concerning Subject Drugs;

(l)    Documents or data received from or published by a Publisher and the state's reliance on such data or Documents;

(m)    Your efforts to reduce or limit expenditures for Subject Drugs;

8.    The state's administration or oversight of the state Medicaid Program, including but not limited to the existence, nature, and location of data relating to the following:

(a)    The utilization of Subject Drugs by patients covered by the state Medicaid Program;

(b)    Your efforts to reduce or limit expenditures for Subject Drugs;

(c)    The expense to providers of acquiring and dispensing or administering Subject Drugs;

(d)    Manufacturer rebates received relating to Subject Drugs;

(e)    Information provided to or received from the federal government in connection with the state Medicaid Program relating to prescription drug pricing or dispensing fees;

(f)    Payments made by state or other entities, such as local agencies, to providers in connection with the state Medicaid Program;

(g)    Payments from the state to other entities, such as local agencies, in connection with the state Medicaid Program; and

(h)    The state budgetary source of the money used by the state to make payments in connection with the state Medicaid Program.

9.    The administration of reimbursement to providers for any Subject Drug in connection with the state Medicaid Program, including but not limited to the existence, nature, and location of Documents, relating to the following:

(a)    The manner in which claims for reimbursement of Subject Drugs are submitted and verified;

(b)     Calculation, monitoring, processing, and payment of claims for reimbursement to providers for Subject Drugs under the state Medicaid Program from January 1991 to present;

(c)     Your negotiation, authoring, or execution of any contract or memorandum of understanding or agreement, or contribution to any contract or memorandum of understanding or agreement, between the state and any Provider relating to AWP or WAC or the reimbursement of prescription drugs;

(d)     Your establishment, consideration, determination, calculation, or setting of the dispensing fees or fees for other professional services payable in connection with the supply or administration of pharmacy-dispensed and physician-administered drugs;

(e)     Subject HCPCS Codes;

(f)     All reports, meetings and other information relating to any analysis by the state of any change to the reimbursement formula (including dispensing fee) under Medicaid for the Subject Drugs from January 1984 to the present, and your adoption, rejection, or consideration of such proposal;

(g)     The circumstances surrounding each change or discussion of a potential change in the state Medicaid program reimbursement rates from January 1984 to the present;

(h)     Your reliance on Pricing Elements, including AWP, WAC and Direct Price, published for the Subject Drugs;

(i)     Your use or consideration of published price information, AMPs, URAs or other pricing information related to Subject Drugs, including how or if such information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under the state Medicaid Program; and

(j)     Your use or consideration of any pricing information provided to the state directly by any drug manufacturer, including how or if such information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under the state Medicaid Program.

10.     The manner in which Manufacturer rebates and Federal matching funds are applied for, calculated, received, processed, and allocated or distributed by the state, including, but not limited to:

(a)     Federal matching funds received relating to prescription drugs;

(b)     Your net costs, including but not limited to analyses or calculation of its net costs, for Subject Drugs under the state Medicaid Program after Manufacturer rebates and Federal matching funds;

(c)     The manner in which the state submits claims for manufacturer rebates and Federal matching funds in connection with the state Medicaid Program;

(d)     The manner in which the money received from manufacturer rebates and Federal matching funds is directed, allocated, or distributed upon its receipt by the state;

(e)     Your adoption, rejection, amendment to, consideration, or negotiation of any state supplemental rebate program; and

(f)     Any attempt by the state to calculate AMP for any Subject Drugs.

11.     Your adoption, rejection, or consideration of recommendations and information related to AWP, WAC, or other Pricing Element, received from any other state or the federal government including, but not limited to:

(a)     1968 Task Force on Prescription Drugs Background Papers, *The Drug Makers and the Drug Distributors* (December, 1968, Office of the Secretary, U.S. Department on Health, Education, and Welfare);

(b)     1974 Federal Register stating that "Most states use average wholesale price, Red Book data, Blue Book data, survey copies or similar standard costs. Such standard prices are frequently in excess of actual acquisition costs to the retail pharmacist. Thus. to achieve maximum savings to the Medicaid program, the proposal requires the use of actual acquisition cost." *See* 39 Fed. Reg. 41480, *Reimbursement of Drug Cost-Medical Assistant Program* (November 27, 1974);

(c)     HCFA's 1988 decision to disapprove state Medicaid plans that based reimbursement for prescription drugs on an undiscounted AWP;

(d)     1984 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP − 15.9%. *See* Department of Health & Human Services, Office of the Inspector General, *Changes to the Medicaid Prescription Drug Program Could Save Millions* (A-06-40216) (Sept. 1984);

(e)     1989 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP − 15.5%. *See* Department of Health & Human Services, Office of the Inspector General, *Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program* (A-06-89-00037) (Oct. 1989);

(f)     1989 HCFA Medicaid Manual indicating that pharmacies buy prescription drugs at AWP − 10-20%;

(g)     1990 Pharmacy Reform Tag Meeting minutes;

(h)     1994 GAO Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, *Prescription Drugs: Companies Typically Charge More in the United States than in the United Kingdom* (January, 1994);

(i)     1996 CBO Papers, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry* (January 1996, Congressional Budget Office);

(j)     1996 OIG Report *Medicare Payments for Nebulizer Drugs* (OEI-03-94-00390) (Feb. 1996);

(k)     1996 HHS-OIG report indicating potential for significant Medicare savings. *See* Department of Health & Human Services, Office of the Inspector General, *Appropriateness of Medicare Prescription Drug Allowances* (03-95-00420) (May 1996);

(l)     1996 OIG Report *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393) (June 1996);

(m)    1996 OIG Report *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392) (June 1996);

(n)     1997 OIG Report *Questionable Practices Involving Nebulizer Drug Therapy* (OEI-03-94-00391) (March 1997);

(o)     1997 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP – 18.3%. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs* (A-06-96-00030) (Apr. 1997);

(p)     1997 HHS-OIG report indicating that on average, pharmacists buy generic drugs at AWP – 42.5%. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products* (A-06-97-00011) (Aug. 1997);

(q)     1997 OIG Report *Excessive Medicare Payments for Prescription Drugs* (OEI-03-97-00290) (Dec. 1997);

(r)     1998 OIG Report *Are Medicare Allowances for Albuterol Sulfate Reasonable* (OEI-03-97-00292) (Aug. 1998);

(s)     The revised AWP prices provided by the United States Department of Justice and National Association of Medicaid Fraud Control Unit in 2000;

(t)     2000 OIG Report *Medicare Reimbursement of Albuterol* (OEI-03-00-00311) (June 2000);

(u)     2001 HHS-OIG report indicating that AWP bears little to no resemblance to actual wholesale prices. *See* Department of Health & Human Services, Office of the Inspector General, *Medicare Reimbursement of Prescription Drugs* (03-01-00310) (Jan. 2001);

(v)     2001 HHS-OIG report indicating that continued reliance on average wholesale prices as a reimbursement metric is flawed. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid's Use of Revised Average Wholesale Prices* (03-01-00010) (Sept. 2001);

(w)    2001 HHS-OIG report indicating that pharmacy actual acquisition cost was an average 21.84% below AWP. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products* (A-06-00-00023) (Aug. 2001);

(x)    2002 HHS-OIG report, Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products (A-06-02-00041) (Sept. 2002); and

(y)    2005 GAO Report, Medicare: Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs (October 2004, GAO-05-72).

12.    The preparation of survey responses to, participation in, and interviews with the OIG or other originating entity regarding the reports referenced in paragraph 11 above.

13.    From January 1, 1991 to present, the organizational structure of the state Medicaid program, including but not limited to identifying which individuals held what positions, how long the individuals held those positions, and what were the job duties of those position.

14.    State Medicaid plan provisions and state Medicaid plan amendments relating to prescription drugs and the process by which such plan amendments are approved, amended, and implemented.

15.    The nature and purpose of the state's MAC program, if applicable, including but not limited to the procedure for setting and changing MACs, the criteria and information used to establish and change MACs, and the changes to the MAC program that were considered and/or implemented over time. If the state does not have a MAC program, the reason(s) no MAC program has been implemented.

16.   Communications concerning the budget and reimbursement processes between the state and CMS relating to reimbursement rates for prescription drugs for the period 1988 to the present.

17.   Communications between the state Medicaid program and any member of the state legislature concerning reimbursement rates for prescription drugs.

18.   Any pending or threatened litigation, claims, allegations, or charges that the state Medicaid Program is not in compliance with Federal or state law or otherwise violates Federal or state law.

19.   The sum and substance of Communications between the state and CMS concerning (i) the Average Manufacturer's Price or "AMP"; (ii) the Unit Rebate Amount or "URA"; (iii) the supplemental rebate program; (iv) Rebate Agreements; and (v) how the Rebate Program was implemented and run.

20.   Any audits and/or compliance efforts the state made to ensure that Providers were in compliance with their obligations to report Usual and Customary Charges pursuant to 42 C.F.R. § 512(b)(2), or any applicable state regulation.

21.   Communications between the state and other states or Federal Agencies concerning the reimbursement of prescription drugs, including but not limited to, Documents received from, or sent by the state to, the National Association of Medicaid Fraud Control Units ("NAMFCU") and the National Association of Attorneys General concerning prices, costs, or reimbursements for prescription drugs from January 1984 to the present.

22.     Communications between the state and either Dey or the Roxane Defendants, Ven-a-Care of the Florida Keys, or any other person concerning prices, costs, or reimbursements for prescription drugs from January 1984 to the present.

23.     Communications between NAMFCU and the state concerning: (i) prescription drug prices; (ii) AWP, WAC, or AMP; and (iii) price of the Subject Drugs.

24.     Communications, arrangements, contracts or other Documents reflecting a relationship between the state and any Publisher regarding the purchase of or access to information regarding prescription drug pricing.

25.     Your retention, destruction and public disclosure policies regarding Documents and Your compliance with those policies.

26.     Your computer systems, networks, or databases that might store or contain Documents, data, and Communications, including but not limited to e-mail, responsive to the subpoena *duces tecum* served upon the state in connection with this action.

## Definitions

1.     "Actual Acquisition Cost" shall mean the net price (after discounts, rebates, or chargebacks) that a Provider pays to purchase a prescription drug intended for resale.

2.     "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

3.     "AWP" or "Average Wholesale Price" shall mean the pricing element as periodically published by any Publisher or pharmaceuticals industry compendia, including the

9

Drug Topics Red Book (the "Red Book"), American Druggist First Databank Annual Directory of Pharmaceuticals ("First DataBank"), Essential Directory of Pharmaceuticals (the "Blue Book"), and Medi-Span's Master Drug Database ("Medi-Span").

4.      "CMS/HCFA" shall mean "Centers for Medicare and Medicaid Services," its predecessor agencies, including the Health Care Financing Administration ("HCFA"), and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

5.      "Communication" shall mean any oral or written exchange of words, thoughts or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by telex or by any other process, electric, electronic or otherwise.  All such Communications in writing shall include, without limitation, printed, typed, handwritten, or other readable Documents, whether in hardcopy, electronic mail or stored electronically on a computer disk or otherwise, contracts, correspondence, diaries, drafts (initial and all subsequent), forecasts, invoices, logbooks, memoranda, minutes, notes, reports, statements, studies, surveys and any and all non-identical copies thereof.

6.      "Concern," "concerning," "relating to," or "relate to" shall mean refer to, regard, concern, describe, explain, state, evidence, record, constitute, pertain to, reflect, comprise, contain, embody, mention, show, support, contradict, and discuss, whether directly or indirectly, as required by the context to bring within the scope of the requests in this request for production of Documents any Documents that might be deemed outside their scope by another construction.

7.      "Dey" shall mean Dey, Inc., Dey, L.P, and Dey, L.P., Inc. and any of their past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions,

departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on their behalf or under their control.

8.    "Documents" shall mean all original written, recorded, or graphic matters whatsoever, and any and all non-identical copies thereof, including but not limited to advertisements, affidavits, agreements, analyses, applications, appointment books, bills, binders, books, books of account, brochures, calendars, charts, checks or other records of payment, Communications, computer printouts, computer stores data, conferences, or other meetings, contracts, correspondence, diaries, electronic mail, evaluations, facsimiles, files, filings, folders, forms, interviews, invoices, jottings, letters, lists, manuals, memoranda, microfilm or other data compilations from which information can be derived, minutes, notations, notebooks, notes, opinions, pamphlets, papers, photocopies, photographs or other visual images, policies, recordings of telephone or other conversations, records, reports, resumes, schedules, scraps of paper, statements, studies, summaries, tangible things, tapes, telegraphs, telephone logs, telex messages, transcripts, website postings, and work papers.  A draft or non-identical copy is a separate Document within the meaning of this term.

9.    "EAC" or "Estimated Acquisition Cost" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.502.

10.    "Each," "any," and "all" shall mean "each and every."

11.    "Federal government" shall mean all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, attorneys, or representatives of any of the foregoing.  The United States Government includes, but is not limited to, CMS/HCFA, Congress,

Department of Commerce, Department of Defense, Department of Justice, Department of Health and Human Services, Department of Health and Human Services-Office of Inspector General, Department of Veterans Affairs General Accounting Office, Medicare Payment Advisory Commission (MedPac), Office of Management and Budget, Office of Pharmacy Affairs/Pharmacy Affairs Branch, Pharmacy Support Services Center, and the National Association of Medicaid Fraud Control Units, and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of the foregoing.

12.    "FUL" or "Federal Upper Limit" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.332 prior to January 2, 2008, and 42 C.F.R. § 447.514 as of January 2, 2008.

13.    "J-Code reimbursement basis" shall mean the reimbursement of drugs through use of a subset of the HCPCS code set with a high-order value of "J" (compare to "NDC reimbursement basis").

14.    "MAC" shall mean "Maximum Allowable Cost" and includes the meaning ascribed to that term in any state Medicaid plan, or as defined by any state Medicaid department or agency.

15.    "Manufacturer" shall mean a company that manufactures pharmaceutical products.

16.   "Medicaid" shall mean the jointly funded federal-state health insurance program enacted in 1965 under Title XIX of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

17.   "Medicaid Crossover Claim" shall mean claims for which Medicare is the primary payor and the state Medicaid agency is the secondary payor.

18.   "Medicaid Drug Rebate Program" shall mean and refers to the program established by the Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1396r-8, as amended by the Veterans Health Act of 1992, whereby drug manufacturers have national drug rebate agreements with HHS and a pricing agreement with HHS for the Public Health Service Section 340B Drug Pricing Program.

19.   "Medicare" shall mean the federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

20.   "Meeting" shall mean any discussion between two or more persons either in person, telephonically, or through other electronic means.

21.   "MFCU" shall mean individual state Medicaid Fraud Control Units, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

22.   "Medicare" shall mean the federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

13

23.    "Myers & Stauffer" shall mean Myers & Stauffer, L.C. and any of its representatives, agents, employees, or other person or entity acting or purporting to act on its behalf or under its control.

24.    "NAMFCU" shall mean National Association of Medicaid Fraud Control Units and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

25.    "NDC reimbursement basis" shall mean the reimbursement of drugs based on a Provider's submission of a National Drug Code ("NDC") (compare to "J-code reimbursement basis").

26.    "Person" shall mean any natural person or any firm, business, legal, or governmental agency or association, or any other organization or entity.

27.    "Point of Sale System" shall mean a computer-transmitted claims processing system used by Providers to submit claims to the state Medicaid agency.

28.    "Pricing Element" shall mean any of the following:

(a)    Average Wholesale Price or "AWP";
(b)    Blue Book Average Wholesale Unit Price;
(c)    Blue Book Average Wholesale Package Price;
(d)    Calculated Average Wholesale Package Price;
(e)    Wholesale Unit Price;
(f)    Wholesale Acquisition Cost or "WAC";
(g)    Maximum Allowable Cost or "MAC";
(h)    Suggested Wholesale Price "SWP";
(i)    Wholesale Net Price;
(j)    Direct Price;

14

(k)     List Price;

(l)     Actual Sale Price;

(m)     BaseLine Price;

(n)     BaseLine AWP Unit Price;

(o)     BaseLine Direct Price Unit Price;

(p)     BaseLine Net Wholesale Price Unit Price;

(q)     Estimated Acquisition Cost or "EAC";

(r)     Federal Maximum Allowable Cost (a/k/a Federal Upper Limit or "FUL");

(s)     Department of Justice Medicaid Average Wholesale Price;

(t)     Generic Price Indicator;

(u)     Generic Price Spread Indicator;

(v)     State Maximum Allowable Cost or "SMAC";

(w)     Usual and customary charge; or

(x)     Any pricing element created by the federal government or state Medicaid agencies.

29.     "Provider" or "Providers" shall mean any and all persons or entities that render health care services or products, including but not limited to pharmacists, institutional pharmacies, home health agencies, physicians, nurses, nurse practitioners, physicians' assistants, specialty pharmacy, nursing home personnel, laboratory technicians, x-ray and other medical equipment technicians, and other hospital or physician-office personnel.

30.     "Publisher" or "Publishers" shall mean Red Book, First DataBank, Blue Book, and Medi-Span, their predecessors and successors, and all employees, agents, consultants, accountants, or attorneys of any of the foregoing.

31.     "Reimbursement" shall mean the amount of, or formula for calculating, the payment under Medicare, Medicaid, or a medical assistance program at which healthcare providers are reimbursed for administering or dispensing prescription drugs to a beneficiary.

32.    "Roxane Defendants" shall mean Boehringer Ingelheim Corp., Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Roxane, Inc., and Roxane Laboratories, Inc., and any of their past or present officials, officers, representatives, agents, assigns, attorneys, or employeesand all other persons or entities acting or purporting to act on their behalf or under their control.

33.    "Subject Drugs" shall mean those drugs listed on attached Schedule 1.

34.    "Subject HCPCS Codes" shall mean those J-Codes and K-Codes associated with the Subject Drugs, including but not limited to those J-Codes and K-Codes identified in attached Schedule 2.

35.    "U.S. Government" shall mean all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.    U.S. Government includes but is not limited to CMS/HCFA, Congress, Department of Commerce, Department of Defense, Department of Justice, Department of Health and Human Services, Department of Health and Human Services-Office of Inspector General, Department of Veterans Affairs General Accounting Office, Medicare Payment Advisory Commission (MedPac), Office of Management and Budget, Office of Pharmacy Affairs/Pharmacy Affairs Branch, and Pharmacy Support Services Center.

36.    "Ven-A-Care" shall mean Ven-A-Care of the Florida Keys, Inc., a corporation organized under the laws of Florida, and all predecessor or successor corporations, and any of its past or present officials, officers, representatives, agents, assigns, attorneys, employees,