# EXHIBIT RRR
# (PART 4)

PAGE 3

| ID | DATE | TYPE INV. | NDC | B/G | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|---|---|---|---|
| VA-0-04 | 07/05/94 | W | 57317023210 | | ADENOCARD 6MG VL | 10X2 | 197.54 | |
| VA-0-04 | 07/05/94 | W | 00005321934 | | ATENOL TAB 50MG          LED 1000@ | 1000 | 70.25 | |
| VA-0-04 | 07/05/94 | W | 00058070505 | | ATROPISOL OPHT SOL 1%          5ML | 5 | 1.75 | |
| VA-0-04 | 07/05/94 | W | 00998110135 | | AVITENE N/WOV 70X35X1 UD | 12 | 951.21 | |
| VA-0-04 | 07/05/94 | W | 00003048251 | | CAPOTEN TAB 50MG U/D          100 | 100 | 97.86 | |
| VA-0-04 | 07/05/94 | W | 00615257213 | | CLONIDIN TAB 0.1MG UD VGD          100 | 100 | 2.37 | |
| VA-0-04 | 07/05/94 | W | 00007336003 | | COMPAZINE SUPP 2.5MG          12 | 12 | 19.25 | |
| VA-0-04 | 07/05/94 | W | 00065039602 | | CYCLOGYL 1% DT 2ML          CT/12 | 2X12 | 19.33 | |
| VA-0-04 | 07/05/94 | W | 00364073990 | | DISOPYRAM CP 100MG UD SCHE 100 | 100 | 8.56 | |
| VA-0-04 | 07/05/94 | W | 00056006470 | | ETHMOZINE TAB 300MG | 100 | 97.74 | |
| VA-0-04 | 07/05/94 | W | 00054830125 | | FUROSEM TAB 80MG UD ROX          100 | 100 | 3.21 | |
| VA-0-04 | 07/05/94 | W | 00641244045 | | HEPAR MDV 10MU 10ML E/S          25 | 25X10 | 12.11 | |
| VA-0-04 | 07/05/94 | W | 51079035730 | | DIPHENHYD ELIX 5ML UD UDL 100 | 100X5 | 12.92 | |
| VA-0-04 | 07/05/94 | W | 00074781124 | | METRONID PBV 500MG 1CML ABB 24 | 24X100 | 40.60 | $3,730.30 |
| VA-0-04 | 07/25/94 | M | 00074613903 | | WATER IRRIG 500ML 6139   ABB 12 | 500 | 8.76 | |
| VA-0-04 | 07/25/94 | M | 00074713909 | | WATER IRRIG 1000ML 7139  ABB 12 | 1000 | 9.32 | |
| VA-0-04 | 07/25/94 | M | 00074613803 | | SOD CHL SOL 0.9% 500ML ABB 12 | 500 | 9.00 | |
| VA-0-04 | 07/25/94 | M | 00074713809 | | SOD CHL SOL 0.9% 7138-9 ABB 12 | 1000 | 9.62 | |
| VA-0-04 | 07/25/94 | M | 00074797208 | | SOD CHL SOL 0.9% 7972-8 ABB 4 | 3000 | 18.91 | |
| VA-0-04 | 07/25/94 | M | 00074792203 | | DEXTR SOL 5%  7922-03 ABB   24 | 500 | 15.07 | |
| VA-0-04 | 07/25/94 | M | 00074792209 | | DEXTR SOL 5%  7922-09 ABB   12 | 1000 | 8.97 | |
| VA-0-04 | 07/25/94 | M | 00074798436 | | DEXTR SOL 5% 50ML, ABB 80 | 80 | 78.91 | |
| VA-0-04 | 07/25/94 | M | 00074798302 | | SOD CHL SOL 0.9%   ABB 7983-02&124T | 250 | 14.57 | |
| VA-0-04 | 07/25/94 | M | 00074798303 | | SOD CHL SOL 0.9%   500ML ABB 24 | 500 | 14.57 | |
| VA-0-04 | 07/25/94 | M | 00074798309 | | SOD CHL SOL .9%  7983-9 ABB 12 | 1000 | 8.24 | |
| VA-0-04 | 07/25/94 | M | 00074795309 | | LACT RING 7953-09  ABB 1000ML&12T | 1000 | 10.22 | |
| VA-0-04 | 07/25/94 | M | 00074792909 | | DEXTR SOL 5%  7929-09 ABB   12 | 1000 | 11.08 | |
| VA-0-04 | 07/25/94 | M | 00074794109 | | DEXTR SOL 5%  7941-09 ABB   12 | 1000 | 9.76 | |
| VA-0-04 | 07/25/94 | M | 00074798509 | | SOD CHL SOL .45% 7985-9 ABB 12 | 1000 | 9.09 | |
| VA-0-04 | 07/25/94 | M | 00074792609 | | DEXTR SOL 5%  7926-09 ABB   12 | 1000 | 9.76 | |
| VA-0-04 | 07/25/94 | M | 00074792403 | | DEXTR SOL 5%          ABB 7924-03&24T | 500 | 16.21 | |
| VA-0-04 | 07/25/94 | M | 00074797205 | | SOD CHL SOL 0.9% 7972-5 ABB 12 | 1000 | 22.72 | |
| VA-0-04 | 07/25/94 | M | 00074710102 | | SOD CHL SOL AV    ABB 7101-02&24T | 250 | 44.16 | |
| VA-0-04 | 07/25/94 | M | 00074710113 | | SOD CHL SOL AV    ABB 7101-13&48T | 50 | 66.87 | |
| VA-0-04 | 07/25/94 | M | 00074109003 | | AMINOSYN II SOL 10% 500ML   12 | 12 | 104.08 | |
| VA-0-04 | 07/25/94 | M | 00074978603 | | LIPOSYN II SOL 10% 5CML ABB 12 | 500 | 55.34 | |

HHD015-2557

PAGE 4

| ID | DATE | TYPE INV. | NDC | B/G | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|---|---|---|---|
| VA-O-04 | 07/25/94 | M | 00074188148 | | VENOSET 78 VENT 1881-48 ABB 48 | 48 | 38.10 | $593.33 |

1- Issued + verified changes P/C 4/28/95

HHD015-2558   L

CIN: A-06- 9 7 - 0 0 0 5 2

# RECORD OF DISCUSSION

EXHIBIT

ABBOTT
1055

**DATE:**     March 20, 1997

**PLACE:**    Medicaid Pharmacy Administrators Symposium
              Asheville, NC

**TIME:**     2:00 pm

**PARTICIPANTS:**

Elizabeth Geary, Connecticut Dept. of Social Services
Pat Gladden, Texas Dept. of Health
Marvin Hazelwood, Illinois Department of Public Health
Bob Reid, Ohio Dept. of Human Services
Benny Ridout, North Carolina Dept. of Human Resources
David Shepherd, Virginia Dept. of Medical Assistance
M. J. Terrebonne, Louisiana Dept. Of Health and Hospitals
Jerry Wells, Florida Medicaid Office of Pharmacy Services
Paul Chesser, HHS-OIG

**DISCUSSION:**

The purpose of this meeting was to get input from State Medicaid pharmacy representatives concerning rebates based on AWP rather than AMP. All State officials attending this meeting expressed support for the idea of basing rebates on AWP but were unsure how easily it could be done. They believed that basing rebates on AWP would result in AWP becoming a meaningful number on which they could base reimbursement. They also thought that those drug manufacturers that play games with AWP (overstate AWP for marketing purposes) would immediately lower their AWPs to a more realistic level. They pointed out some possible problems and concerns related to this issue:

- The percentage difference between AWP and AMP varies widely from manufacturer to manufacturer.

- Manufacturers may not always establish AWP. There may be instances where the wholesalers actually set the AWP.

- Any legislative change to the rebate legislation could result in the drug manufacturers pressuring Congress to lower or eliminate drug rebates.

Despite these problems and concerns, the State officials were in favor of pursing rebates based on AWP. They wondered if the definition of AMP could be changed by HCFA without any additional legislation. They suggested that HCFA could merely change to definition of AMP to

AWP less some percentage.  The percentage most talked about was 20 percent, as we informed them that a preliminary analysis of AMP versus AWP had shown that the difference between them was about 20 percent.  They thought by changing AMP to AWP minus 20 percent would allow States to keep their current reimbursement methodology.

State officials stated that if legislative changes were required to convert to rebates base on AWP that another issue to address would be entry level pricing.  The officials believe that new drug pricing (drug manufacturers setting new drug prices at unreasonable levels) is a problem and could become a bigger problem in the future.

Some officials also thought we should do away with rebates for generic drugs while other officials did not want to.

# TAB

7

CIN: A-06  97-00052

# RECORD OF DISCUSSION

EXHIBIT

ABBOTT
1055

**DATE:**          March 20, 1997

**PLACE:**         Medicaid Pharmacy Administrators Symposium
                   Asheville, NC

**TIME:**          2:00 pm

**PARTICIPANTS:**

Elizabeth Geary, Connecticut Dept. of Social Services
Pat Gladden, Texas Dept. of Health
Marvin Hazelwood, Illinois Department of Public Health
Bob Reid, Ohio Dept. of Human Services
Benny Ridout, North Carolina Dept. of Human Resources
David Shepherd, Virginia Dept. of Medical Assistance
M. J. Terrebonne, Louisiana Dept. Of Health and Hospitals
Jerry Wells, Florida Medicaid Office of Pharmacy Services
Paul Chesser, HHS-OIG

**DISCUSSION:**

The purpose of this meeting was to get input from State Medicaid pharmacy representatives concerning rebates based on AWP rather than AMP. All State officials attending this meeting expressed support for the idea of basing rebates on AWP but were unsure how easily it could be done. They believed that basing rebates on AWP would result in AWP becoming a meaningful number on which they could base reimbursement. They also thought that those drug manufacturers that play games with AWP (overstate AWP for marketing purposes) would immediately lower their AWPs to a more realistic level. They pointed out some possible problems and concerns related to this issue:

- The percentage difference between AWP and AMP varies widely from manufacturer to manufacturer.

- Manufacturers may not always establish AWP. There may be instances where the wholesalers actually set the AWP.

- Any legislative change to the rebate legislation could result in the drug manufacturers pressuring Congress to lower or eliminate drug rebates.

Despite these problems and concerns, the State officials were in favor of pursing rebates based on AWP. They wondered if the definition of AMP could be changed by HCFA without any additional legislation. They suggested that HCFA could merely change to definition of AMP to

AWP less some percentage. The percentage most talked about was 20 percent, as we informed them that a preliminary analysis of AMP versus AWP had shown that the difference between them was about 20 percent. They thought by changing AMP to AWP minus 20 percent would allow States to keep their current reimbursement methodology.

State officials stated that if legislative changes were required to convert to rebates base on AWP that another issue to address would be entry level pricing. The officials believe that new drug pricing (drug manufacturers setting new drug prices at unreasonable levels) is a problem and could become a bigger problem in the future.

Some officials also thought we should do away with rebates for generic drugs while other officials did not want to.

2

HHD031-0397

# TAB

# 8

MAR -06' 00(MON) 16:05   DMAS PROG-OPERATIONS         TEL:8047860414            P 002



# COMMONWEALTH of VIRGINIA

*Department of Medical Assistance Services*

DENNIS G. SMITH
DIRECTOR

SUITE 1300
600 EAST BROAD STREET
RICHMOND, VA 23219
804/786-7933
804/725-4512 (Fax)
800-343-0634 (TDD)

March 6, 2000

Patrick E. Lupinetti
Director, Special Projects Division
New York OAG, MFCU
One Blue Hill Plaza
P.O. Box 1747, Suite 1037
Pearl River, NY 10965-8747

MAR 27 2008

Ex. 904d  ___ EV
CARL 'N GIRAPF

Re: Selected Drug NDC Investigation for "AWP" & "WAC" Corrections

Dear Mr. Lupinetti:

First, I wish to thank you for recent information concerning the current
national investigation of average wholesale prices (AWP) and wholesale
acquisition costs (WAC) of selected products. The primary reason for this
letter is to take advantage of the request for comments or suggestions.

Having been unable to attend the national conference of Pharmacy
Directors in July of 1999, my issues may be a duplication of already
addressed topics. I apologize for that, but believe that certain issues need
to be emphasized in repetition for clarity and different perspectives. I also
apologize for any possible reference to more questions than answers. I
have always believed that solutions must be addressed with statement of
the problem.

My thought process will be presented in response to your letter as of
February 15, 2000 and the enclosed draft letter from Joseph Palermo
addressed to Drug Pricing Team – National Association of Medicaid Fraud
Control Units (NAMFCU).

Although First Data Bank (FDB) represents the data source for probably
all or close to all state Medicaid programs, dependence on this sole
source should only be allowed with exception. FDB does make mistakes
and their info has to be double-checked through Redbook or directly with
manufacturer. As with any other successful process, there must be a
redundant backup system. Consideration should be given to the fact that

NAMFCU 000018

Red Book is still considered a reliable back up or alternative compendia to FDB. Redbook is named along with MediSpan and FDB as the three official pricing compendia (Addendum A, 42 CFR 447.332 and section 1927 (e) of the Social Security Act). To my knowledge this CFR or SSA site has not been amended or repealed. Also, the possibility exists that FDB may no longer be available for one reason or another.

The present initial changes may be enough to solve an immediate need but for long term solutions a consistent policy must be adopted with clear understandings from state, federal, industry and provider. If adverse actions occur the primary entity to suffer will be the recipient (patient). And to my knowledge a majority of the patients involved with this pharmaceutical treatment are seriously medically compromised. Unfortunately, the determination to focus on monitory issues does not consider the reason services are available.

In answer to the draft letter from FDB, I wish to make the following points.

A.  The approximately 400 NDC's may be fairly accurate initially, but unfortunately the NDC drug file which might at any one point contain 40,000 to 50,000 active, claim paying, NDC's with prices are subject to daily updates both on the drug info data and price data. With the exception of potential adverse patient outcomes understood, the provider of services could monetarily adversely be effected with these daily change possibilities. A 10 % increase in actual acquisition cost of a $1000 item results in $100 increase of purchase price. This price increase can not be controlled by the patient, provider or prescriber. A 6-month delay as proposed by FDB does not effect the price increase either, irrespective of discount purchase structures.

B.  FDB does not address how the 400 chosen NDC's will be uploaded or updated to Medicaid payment files and maintained as part of the FDB update requirements.

C.  From all indications, FDB is the only designated responsible entity for oversight of this initiative. The states look to be independently given the option of following these guidelines with information available for such responsibility. I never have quite understood why HCFA really never has been more of a partner in such a process.

D.  This initiative is no different than what FDB does as normal course of business other then to set up the 400 NDC's as a table that will except out and require data entry that is no more than 24-36 hours and that is being liberal.

The only reason that I might understand why this direction is being taken is that if monetary pressure is placed on the provider (pharmacy), the pharmacy might be able to control what the wholesaler offers as

NAMFCU 000019

discount or price. This is not going to happen. The manufacturer and wholesaler are not affected by process and they are the main reasons for the price structure.

The major issue of physician and other service billing on the HCFA 1500 to my knowledge was not addressed. There is a distinction between actual acquisition cost and estimated acquisition cost (EAC).

True, there are large discrepancies in actual acquisition cost and average wholesale price. These large discrepancies should be addressed. In my opinion there is a better way that will allow for a long term solution. What is being created is another maintenance file that eventually will erode due to other priority issues. If this is the intent, then I really have nothing else that would be of any value to offer. My compliments to you and your team's excellent work.

Respectfully,

David B. Shepherd, R.Ph.
Pharmacy Consultant
Virginia Medicaid

NAMFCU 000020

# TAB

**9**

B19

**States who completed phone interviews**

| | Name | State | IntDate | IntComp |
|---|---|---|---|---|
| 1 | Dave Campana | AK | 10-Jan-01 | TRUE |
| 2 | Louise Jones | AL | 05-Jan-01 | TRUE |
| 3 | Suzette Bridges | AR | 10-Jan-01 | TRUE |
| 4 | Kevin Gurosby | CA | 11-Jan-01 | TRUE |
| 5 | Alien Chapman | CO | 09-Jan-01 | TRUE |
| 6 | Elizabeth Geary | CT | 10-Jan-01 | TRUE |
| 7 | Donna Bovell | DC | 16-Jan-01 | TRUE |
| 8 | Cynthia Denemark | DE | 02-Jan-01 | TRUE |
| 9 | Jerry Wells | FL | 02-Jan-01 | TRUE |
| 10 | Mark Trail | GA | 16-Jan-01 | TRUE |
| 11 | Lynn Donovan | HI | 23-Jan-01 | TRUE |
| 12 | Ronald Mahrenholz | IA | 10-Jan-01 | TRUE |
| 13 | Gary Duerr | ID | 08-Jan-01 | TRUE |
| 14 | Marvin Hazelwood | IL | 05-Jan-01 | TRUE |
| 15 | Marc Shirley | IN | 25-Jan-01 | TRUE |
| 16 | Karen Braman | KS | 04-Jan-01 | TRUE |
| 17 | Debra Bahr | KY | 05-Jan-01 | TRUE |
| 18 | M.J. Terrebonne | LA | 10-Jan-01 | TRUE |
| 19 | Gary Gilmore | MA | 24-Jan-01 | TRUE |
| 20 | Frank Tetkoski | MD | 11-Jan-01 | TRUE |
| 21 | James Kenyon | MI | 29-Jan-01 | TRUE |
| 22 | Cody Wiberg | MN | 04-Jan-01 | TRUE |
| 23 | Susan McCann | MO | 11-Jan-01 | TRUE |
| 24 | Jack Lee | MS | 03-Jan-01 | TRUE |
| 25 | Dorothy Poulsen | MT | 16-Jan-01 | TRUE |
| 26 | C. Benny Ridout | NC | 24-Jan-01 | TRUE |
| 27 | Cindy Frohlich | ND | 25-Jan-01 | TRUE |
| 28 | Gary Cheloha | NE | 03-Jan-01 | TRUE |
| 29 | Lise Farrand | NH | 03-Jan-01 | TRUE |
| 30 | Carl Tepper | NJ | 03-Jan-01 | TRUE |
| 31 | Neil Solomon | NM | 08-Jan-01 | TRUE |
| 32 | Laurie Squartsoff | NV | 16-Jan-01 | TRUE |
| 33 | Mark-Richard Butt | NY | 24-Jan-01 | TRUE |
| 34 | Robert Reid | OH | 03-Jan-01 | TRUE |
| 35 | John Crumley | OK | 11-Jan-01 | TRUE |
| 36 | Jesse Anderson | OR | 09-Jan-01 | TRUE |
| 37 | Joseph Concino | PA | 11-Jan-01 | TRUE |
| 38 | Paula Avarista | RI | 23-Jan-01 | TRUE |
| 39 | James Assey | SC | 12-Jan-01 | TRUE |
| 40 | Mark Peterson | SD | 09-Jan-01 | TRUE |
| 41 | H. Leo Sullivan | TN | 22-Jan-01 | TRUE |
| 42 | Patsy Napier | TX | 24-Jan-01 | TRUE |
| 43 | RaeDell Ashley | UT | 09-Jan-01 | TRUE |
| 44 | David Shepherd | VA | 26-Jan-01 | TRUE |
| 45 | Gloria Jacobs | VT | 16-Jan-01 | TRUE |
| 46 | Siri Childs | WA | 10-Jan-01 | TRUE |
| 47 | Roma Rowlands | WI | 08-Jan-01 | TRUE |
| 48 | Peggy King | WV | 12-Jan-01 | TRUE |
| 49 | Roxanne Holmar | WY | 30-Jan-01 | TRUE |
| 50 | | AZ | | FALSE |
| 51 | Christine Gi | ME | | FALSE |

# TAB

# 10

State - VA

F13

27. Please add any other comments you may have about the use of more accurate AWPs for the Medicaid program.

Before implementation, wants to make sure there are no access problems.

1) access problems

many of the prices (esp hemophilia) may be too low if discount is taken off.

2) Short term solution

a) how will prices be updated
b) can't just take prices from Venacare or other pharmacy + make this a national price. Small/rural issue.

3) FDB is not taking responsibility

How is DOJ + NAMFCU pricing pharma products? To effectively make a difference, focus should be on manufacturers. Can't look at this in a vacuum.

New prices effect total system

AWP is basis for HMO, other reimbursers too.

# TAB

# 11

**Thursday, January 11, 2001**
*DRAFT*

**A. General Background**

#1.What is your State's reimbursement methodology for drugs covered under the prescription drug benefit?

*The following is present State of Virginia reimbursement methodology language according to the State Plan under Title XIX of the Federal Social Security Act.*

*Payment for pharmacy services shall be the lowest of items 1 through 5 (except that items 1 and 2 will not apply when prescriptions are certified as brand necessary by the prescribing physician in accordance with the procedures set forth in 42 CFR 447.331 (c) if the brand cost is greater than the HCFA upper limit of VMAC cost) subject to the conditions, where applicable, set forth in subdivisions 6 and 7 of this section:*
*1. The upper limit established by the Health Care Financing Administration (HCFA) for multiple source drugs pursuant to 42 CFR 447.331 and 447.332, as determined by the HCFA Upper Limit List plus a dispensing fee. If the agency provides payment for any drugs on the HCFA Upper Limit List, the payment shall be subject to the aggregate upper limit payment test.*
*2. The Virginia Maximum Allowable Cost (VMAC) established by the agency plus a dispensing fee for multiple source drugs listed on the VVF.*
*3. The Estimated Acquisition Cost (EAC) which shall be based on the published Average Wholesale Price (AWP) minus a percentage discount established by the methodology set out in a through c below.*
*a. Percentage discount shall be determined by a statewide survey of providers' acquisition cost.*
*b. The survey shall reflect statistical analysis of actual provider purchase invoices.*
*c. The agency will conduct surveys at intervals deemed necessary by DMAS.*
*4. (Reserved.)*
*5. The provider's usual and customary charge to the public, as identified by the claim charge.*
*6. Payment for pharmacy services will be as described above; however, payment for legend drugs will include the allowed cost of the drug plus only one dispensing fee per month for each specific drug. Exceptions to the monthly dispensing fees shall be allowed for drugs determined by the department to have unique dispensing requirements.*
*7. The Program pays additional reimbursement for the 24-hour unit dose delivery system of dispensing drugs. This service is paid only for patients residing in nursing facilities. Reimbursements are based on the allowed*

1

payments described above plus the unit dose add-on fee and an allowance for the cost of unit dose packaging established by the state agency. The maximum allowed drug cost for specific multiple source drugs will be the lesser of: either the VMAC based on the 60th percentile cost level identified by the state agency or HCFA's upper limits. All other drugs will be reimbursed at drug costs not to exceed the estimated acquisition cost determined by the state agency.

8. Determination of EAC was the result of an analysis of FY89 paid claims data of ingredient cost used to develop a matrix of cost using 0 to 10% reductions from AWP as well as discussions with pharmacy providers. As a result of this analysis, AWP minus 9.0% was determined to represent prices currently paid by providers effective October 1, 1990.

The same methodology used to determine AWP minus 9.0% was utilized to determine a dispensing fee of $4.40 per prescription as of October 1, 1990. A periodic review of dispensing fee using Employment Cost Index--wages and salaries, professional and technical workers will be done with changes made in dispensing fee when appropriate. As of July 1, 1995, the Estimated Acquisition Cost will be AWP minus 9.0% and dispensing fee will be $4.25.

9. Home infusion therapy.

a. The following therapy categories shall have a pharmacy service day rate payment allowable: hydration therapy, chemotherapy, pain management therapy, drug therapy, total parenteral nutrition (TPN). The service day rate payment for the pharmacy component shall apply to the basic components and services intrinsic to the therapy category. Submission of claims for the per diem rate shall be accomplished by use of the HCFA 1500 claim form.

b. The cost of the active ingredient or ingredients for chemotherapy, pain management and drug therapies shall be submitted as a separate claim through the pharmacy program, using standard pharmacy format. Payment for this component shall be consistent with the current reimbursement for pharmacy services. Multiple applications of the same therapy shall be reimbursed one service day rate for the pharmacy services. Multiple applications of different therapies shall be reimbursed at 100% of standard pharmacy reimbursement for each active ingredient.

Statutory Authority

§ 32.1-325 of the Code of Virginia.

Historical Notes

Derived from VR460-02-4.1920 § 4; eff. July 1, 1993.

Amended, Virginia Register Volume 11, Issue 17, eff. July 1, 1995; Volume 11, Issue 18, eff. July 1, 1995; Volume 12, Issue 5, eff. December 27, 1995; Volume 13, Issue 7, eff. February 1, 1997; Volume 16, Issue 2, eff. November 10, 1999.

Effect of Amendment

The February 1, 1997 substantially revised this section.

2

*The November 10, 1999 amendment made technical changes in the introductory paragraph, and added subsection 9, providing for home infusion therapy.*

#2 What does your state use as its source of pricing information for drugs covered under the prescription drug benefit?

*A. First and most comprehensively- DMAS contracts through First Health Services for updates and adds from First Data Bank Drug Pricing Compendia on a monthly basis.*
*B. Secondarily- Bindley Western Wholesale Pricing Catalog or Medical Economics Red Book are used for confirmation of published prices.*
*C. Thirdly – Manufacturer notifications of prices are referenced for additional confirmation when appropriate.*

*Note:B and C are not required for pricing information.These sources are used solely for additional information and checks of First Data Bank information.*

#3. Who calculates your State's reimbursement amounts for drugs covered under the prescription drug benefit.

*The reimbursement amounts are determined by authority of approved Virgnina Medicaid State Plan lanuage for the prescription drug benefit. Calculations are a result of HCFA approved First Health Services MMIS programs for reimbursement formulated by claims adjudication process.*

#4 Are you aware that First Databank has recently reported to State Medicaid agencies more accurate AWPs for over 400 NDCs based on work done by the U.S. Department of Justice (DOJ) and the National Association of Medicaid Fraud Control Units (NAMFCU)?

*I am aware that prices have been reported to First Data Bank (FDB) regarding a list of NDCs complied by NAMFCU and DOJ. This list of prices was also sent to state Medicaid Administrators by NAMFCU and DOJ.*

## B. Implementation of New First Databank Prices

5. Is your agency currently using the more accurate AWPs calculated by the DOJ and the NAMFCU and reported by First Databank.

*No, Virginia Medicaid is not presently using the reported prices submitted by NAMFCU and DOJ.*

3

#6. If you have ever used the new prices, when did you begin?

*Virginia Medicaid has not used the reported new prices submitted by NAMFCU and DOJ.*

#7. If your agency is currently using the new prices, do you plan to continue doing so for the foreseeable future?

*Virginia Medicaid does not presently use the submitted NAMFCU and DOJ prices.*

#8. If you implemented the new prices but are no longer using them, when did you stop?

*This question is not applicable to the Virginia Medicaid pharmacy benefit program.*

#9. If you are not currently using the new prices, what reasons led to this decision?

*No, Virginia Medicaid is not currently using the new prices. Please see attachment #1 regarding concerns and reasons.*

#10. When the new prices were implemented, did your State change its reimbursement methodology for the affected drugs in any manner?

*New prices were not implemented, thus, the reimbursement methodology did not change.*

#11. Does your agency have the legal authority to change its reimbursement methodology for the new AWPs reported by DOJ/First Databank, e.g., pay AWP instead of a discounted AWP? If not, have you or do you plan to seek the authority to change the methodology?

*Authority to change reimbursement methodology is under consideration and review.*

#12. If a drug on the DOJ/First Databank list is subject to a Federal Upper Limit or State MAC, which price is being used?

*This question is not applicable to Virginia Medicaid.*

#13. Are you aware that some of the NDC's included in the DOJ/First Data Bank list are no longer valid?

4

HHD006-0386

*No, I have not been aware that some of the NDC's included in the DOJ/First Data Bank list are no longer valid.*

14. For NDC's on the DOJ/First Data Bank list which are no longer valid, has your state or First Data Bank crosswalked the drugs to their new NDCs ( where applicable) so that the more accurate AWPs are in effect?

*This crosswalk would not be applicable to Virginia Medicaid.*

15. Do you feel that your State has the authority to crosswalk to new NDCs?

*At this point, question 15 can not be answered due to present review of authority for implementation of DOJ/First Data Bank list of prices.*

16. Have you found that providers are substituting NDCs which have not undergone price reductions for NDC's included in the DOJ/First Databank list? Could you provide us with data to support this?

*Due to the fact that the DOJ/First Data Bank prices are not presently being utilized, this question is not applicable to Virginia Medicaid.*

17. Have providers or other groups lodged complaints about the new prices?

*Yes*

18. How have provider complaints been resolved?

*Due to the fact that these DOJ/First Data Bank prices are not presently being utilized, this question is not applicable.*

## D. Reimbursement of Physician-Administered Drugs

#19. Other than any applicable dispensing fees, does your state pay for physician-administered drugs in the same manner as drugs purchased from a pharmacy?

*No- Reimbursement is based on Medicare prices and invoices.*

#20. How do physicians bill for drugs they administer?

*HCFA-1500 claim*

HHD006-0387

#21. How is the reimbursement amount for a physician-administered drug determined?

*Reimbursement is based on Medicare's reimbursement rates*

#22. If reimbursement amounts are based soley on a HCPCS code, are the new First Databank prices somehow taken into account?

*Answer to #22 is no. First Data Bank is used as a guide if Medicare has no pricing information*

## E. Impact of New Prices

23. Do you believe that these new prices are having a long-term cost-saving impact? Could you provide us with data to support this?

*This question is not applicable to Virginia Medicaid.*

24. Do you believe that these new prices will have a long-term cost saving impact? Could you provide us with data to support this?

*This question is not applicable to Virginia Medicaid.*

25. If you are currently using the DOJ/First Databank prices, approximately how much money do you think these new prices will save your State this? Could you provide us with date to support this?

*This question is not applicable to Virginia Medicaid.*

## E. Summary

26. Overall, has First Databank been responsive to any comments or questions your agency may have had?

*Yes*

27. Please add any other comments you may have about the use of more accurate AWPs for the Medicaid program.

*Please refer to Attachment #1 for comments regarding these NAMFCU/DOJ prices.*

HHD006-0388

Attachment 1

Although First Data Bank (FDB) represents the data source for probably all or close to all state Medicaid programs, dependence on this sole source should only be allowed with exception. FDB does make some mistakes and their info has to be periodically double-checked through Redbook, wholesaler, provider or directly with manufacturer. As with any other successful process, there must be a redundant backup system. Consideration should be given to the fact that Red Book is still considered a reliable back up or alternative compendia to FDB. Redbook is named along with MediSpan and FDB as the three official pricing compendia (Addendum A, 42 CFR 447.332 and section 1927 (e) of the Social Security Act). To my knowledge this CFR site has not been amended or repealed. Also, the possibility exists that FDB may no longer be available for one reason or another.

The present initial changes may be enough to solve an immediate need but for long term solutions a consistent policy must be adopted with clear understandings from state, federal, industry,provider and patient. If adverse actions occur the primary entity to suffer will be the recipient (patient). And to my knowledge a majority of the patients involved with the pharmaceutical treatment addressed by these drugs are seriously medically compromised. Unfortunately, the determination to focus on monitory issues does not consider the reason services are available.

The approximately 400 NDC's may be fairly accurate initially, but unfortunately the NDC drug file which might at any one point contain 40,000 to 50,000 active, claim paying NDC's with prices are subject to daily updates both on the drug info data and price data. With the exception of potential adverse patient outcomes understood, the provider of services could monetarily adversely be effected with these daily change possibilities.  A 10 % increase in actual acquisition cost of a $1000 item results in $100 increase of purchase price. This price increase can not be controlled by the patient, provider or prescriber. A 6-month delay as proposed by FDB does not effect the price increase either, irrespective of discount purchase structures.

The requirement that First Data Bank be responsible for file maintenance is a mistake. First Data Bank is not bound by regulation or code and has already indicated that they will have no responsibility for information on their data file.

A.  FDB does not address how the 400 chosen NDC's will be uploaded or updated to Medicaid payment files and maintained as part of the FDB update requirements.

7

B. From all indications, FDB is the only designated responsible entity for oversight of this initiative. The states look to be independently given the option of following these guidelines with information available for such responsibility. I never have quite understood why HCFA really never has been more of a partner in such a process.

C. This initiative is no different than what FDB does as normal course of business other than to set up the 400 NDC's as a table that will except out and require data entry that is no more than 24-36 hours and that is being liberal.

The only reason that I might understand why this direction is being taken is that if monetary pressure is placed on the provider (pharmacy), the pharmacy might be able to control what the wholesaler offers as discount or price. This is not going to happen. The manufacturer and wholesaler are not affected by process and they are the main reasons for the price structure.

The major issue of physician and other service billing on the HCFA 1500 to my knowledge was not addressed.  There is a distinction between actual acquisition cost and estimated acquisition cost (EAC).

True, there are large discrepancies in actual acquisition cost and average wholesale price. These large discrepancies should be addressed. In my opinion there is a better way that will allow for a long-term solution. What is being created is another maintenance file that eventually will erode due to other priority issues.

In calculating the savings from such a program ask for by your questions, all potential areas impacted should be considered. One is the rebate for each of the affected NDCs. Another being any potential negative outcome that might result from access problems. For example, one of Virginia's hemophilia Medicaid patients on one admission to a hospital in Winston Salem N.C. accumulated charges of approximately $980,000 for an 8 day inpatient stay. This unfortunately was due to the patient being in a rural area difficult to receive needed care. If the reduction in price structure negatively impacts access to the 50 plus hemophilia patients in Virginia without alternative means of care available, the hospital expenditures could increase exponentially as a result. In essence what might be initiated as a cost savings measure could result in a cost increase for the overall state Medicaid program.

Virginia Medicaid as a result of regulation ( state plan language ) must conduct a statewide survey in addressing or initiating any major changes in reimbursement methodology. This normally requires legislative initiatives and Administrative Processes Act (APA) compliance. Thus,

HHD006-0390

authority is presently not available for reimbursement methodology changes.

Please also reference Attachment 2 that addresses position of Medicare on adopting the prices in question. This communication is from Ted Gallagher, Chief , HCFA Region III. In essence the memorandum indicates that Medicare Contractors are **not** to use the new DOJ AWPs for pricing.

9

# TAB

# 12

```
From:        "David Shepherd" <DShepher@dmas.state.va.us>
To:          Domain4.Internet("NMPAAtalk@listbot.com","DShepher...
Date:        6/9/00 12:46pm
Subject:     Re: [NMPAA-talk] May 1, 2000 AWP Adjustments
```

National Medicaid Pharmacy Administrators

Carl - You are exactly correct. My intent is to do just that, starting with
Hemophilia specialty pharmacies. To my knowledge HCFA still has not officially
addressed this issue. This is not a mandate. Donna Shalala has stated that
there is going to have to be rule changes. She indicates that the medicare
rates will not take place til 10-1-2000.  Unfortunately the individuals that
have decided upon this tact are our own state MFCU and DOJ. As well as some
state pharmacy administrators. There is no mandatory statutory or regulatory
language that requires this. Also there is no court order mandate to do this.
The states are encouraged to do this. I plan to follow rule procedures in
order to use these prices if appropriate and only after an impact has been
assessed.

>>> cdtepper@dhs.state.nj.us 06/09/00 02:27PM >>>
National Medicaid Pharmacy Administrators

I just had a phone call from a retail pharmacist stating that the new AWPs
were based on the infusion company AWP pricing that are extremely different
from the retail pharmacy AWPs. The retail pharmacist stated that he would lose
$300 to dispense a  Zofran prescription.  If this is true why doesn't HCFA set
up AWPs based on the pharmacy setting since we know that the manufacturer's
give different prices to LTC, infusion, hospice, hospitals and retail
pharmacies?

Carl D. Tepper, Chief Pharmaceutical Consultant
NJ DMAHS Office of Utilization Management
Quakerbridge Plaza, Building 11A, PO Box 712
Trenton, NJ 08625-0712

---

To unsubscribe, write to NMPAAtalk-unsubscribe@listbot.com

---

To unsubscribe, write to NMPAAtalk-unsubscribe@listbot.com

MO 000598

# TAB

# 13

02-16-01   05:40pm   From-CONSUMER & PROGRAM SUPPORT          +6147289201          T-266   P.02/18   F-503

ROBERT REID - Minutes 928829.doc                                                      Page 1

# Pharmacy
## Technical Advisory Group

*Face-to-Face Meeting*

American Public Human Services Association
Washington, DC 20002
Thursday, September 28, 2000 & Friday, September 29, 2000

<u>Minutes</u>

### Participants

*Pharmacy TAG*
Ray Hanley, Arkansas, Chair
Bob Reid, Ohio, Region I (Midwest)
Duane Parke, Utah, Region II (West)
Gary Duerr, Idaho, Region II (West)
Jerry Wells, Florida, Region III (South)
Curtis Burch, Texas, Region III (South)
Mark-Richard Butt, Region IV (Northeast)
David Shepherd, Region IV (Northeast)
Lynn Mitchell, NASMD Executive Committee Liaison

*Additional State Attendees*
Suzette Bridges, Arkansas

*APHSA*
Kim Johnson
Lee Partridge

*HCFA- Center for Medicaid and State Operations (CMSO)*
Altamease Arnold
Cheryl Austein
Sue Gaston
B.J. Harris
Mike Keogh
Marge Lee
Christine Lyon
Cindy Pelter
Kim Powell
Larry Reed
Tim Westmoreland

1

MO.028120

*HCFA- Office of Legislation*
Susan Hammersten

*HCFA – Office of the Secretary*
Mary Riordan

*Presenters*
John Coster, National Association of Chain Drug Stores
Tom Fleming, Medical Economics *(conferenced in by phone)*
Pat Muller, First Data Bank *(conferenced in by phone)*
Don Muse, Muse & Associates (representing Pharmaceutical Research and
        Manufacturers of America)
Steve Schondelmeyer, PRIME Institute
Tim Terry, Nevada Medicaid, Fraud Control Unit

**Appendices**
A:      Agenda
B:      Texas Vendor Drug Program
C:      Copy of Petition in State of Texas v. Dey, Roxane and Warrick
D:      "Inquiry: The Journal of Health Care Organization, Provision and Financing"
E:      Low-Income Prescription Drug Plans: An Unworkable Prescription for
        American's Seniors.
F:      Disability, Medicare, and Prescription Drugs
G:      Press Release: President Unveils Improved Medicare Prescription Drug Benefit
H:      Press Release: Roth Introduce Medicare Bills With Immediate Prescription Drug
        Coverage for Nation's Neediest Seniors
I:      Summary of the Medicare Temporary Drug Assistance Act
J:      A Side-by-Side Comparison of Selected Medicare Prescription Drug Coverage
        Proposals.
K:      Letter to Alan Holmer, President, Pharmaceutical Research and Manufacturers of
        America
L:      Letter to Nancy Ann Min DeParle, Administrator, Health Care Financing
        Administration
M:      RedBook: Product Listing Verification Kit
N:      Handout from David Shepherds Presentation
O:      Position Paper
P:      Texas Pharmacy Rules
Q:      Federal DUR Newsletter

2

MO.028121

*Thursday, September 28, 2000*

## REMARKS: CMSO DIRECTOR
Tim Westmoreland

Tim identified 2 issues that he wanted to discuss with the TAG, the Federal Upper Limit (FUL) and items that he would like to jointly work with the TAG on.
1. Federal Upper Limit
   □   Short Term:
   There have been a lot of changes to the FUL list since it was last published two years ago. HCFA has had two iterations of this list, both of which had flaws in them. One Hundred and forty new products have been added to the list, which accounts for some of the inaccuracies. HCFA decided to work with chain drugs stores, and pharmacists to scrub the list and clean up any incorrect pricing. NASMD's P-TAG also played a part in this effort.

   HCFA will be drafting a letter that asserts that the Medicaid Directors urged them to go ahead with the FUL list as it stands currently. APHSA was asked to update the list of states that have moved forward with implementing the FUL list. It would also be interesting to know of any positive or negative experiences with implementation of the list. TAG representatives from TX, FL, UT and OH said that they have implemented the list. The TAG members who have implemented the FUL as a state MAC, will send Tim a letter about their experiences with doing so. Florida will look at their data to see what savings they've accrued as result of implementing the list. It was agreed that it would be helpful to have examples of the inflated mark up prices of some of the products on the FUL list. States voiced that they will need considerable lead-time to implement the list. This is one reason why many states move forward with the list. Errors to the list can be corrected at a later date. HCFA hopes to issue the revised list in the next few weeks, with a 30-day implementation date.

   □   Long Term:
   A better process for developing the FUL lists, other than relying on the Compendia, needs to be constructed. Tim would like to work with the TAG to figure out some ways, which could be presented to Congress, that illustrate why states should be allowed to use AMP.

2. Prescription Limits:
   Tim is concerned about the cap that some states have on prescriptions, for instance 3 prescriptions per month. He would like to work with the TAG on getting rid of arbitrary caps without exposing the states to an open ended system. Prior Authorization is not an issue for Tim. His interests lie in working on a "medically appropriate" process of filling prescriptions.

3

MO.028122

02-16-01   05:41pm   From-CONSUMER & PROGRAM SUPPORT        +6147289201        T-265   P.05/19   F-603

ROBERT REID - Minutes 926&29.doc                                                    Page 4

*Comments and/or Questions and Answers*

*Is HCFA going to play a role in determining what exactly is AWP?*

HCFA would like to, however they are not sure what role they will play or if Congress will allow it. It was suggested that states inform their own congressional delegation, allies, etc. of their issues on this matter.

*There were comments on Medicare and Medicaid collaboration.*
There doesn't seem to be a very good connection between Medicaid and Medicare. It was suggested that someone from the Medicare bureau should join in on the next P-TAG conference call to discuss appropriate billing of crossover claims.

## STATE ROUND TABLE

Each TAG member reported on their state's activities regarding their prescription drug benefit program. Highlights of their presentations are below.

### Ohio - Bob Reid
Ohio reported on a TPL issue. They use to employ the "pay and chase" method of dealing with third party liability. If the state paid a pharmacy claim and knew that the client had other insurance they would try to collect the money from them. Because of the magnitude of this task Ohio only pursued claims valued at $50.00 or more. When Ohio implemented the Point-of-Sale system they saw an opportunity to utilize "cost avoidance" as a way of capturing other resources, since Medicaid is legally the payor of last resort. Now the claim rejects back to the pharmacy in real time if the recipients master file indicates that the client has other insurance. Medicaid allows the pharmacy to call the TPL unit if the client has no insurance. Medicaid will take it out of their recipient record and audit later for appropriateness. The pharmacist can override denials if the client has other insurance that does not cover drugs or other insurance that covers drugs but not the drug being requested that day. Medicare covered drugs are treated in the same manner. This transition went very smoothly and without many complaints from the pharmacists.

### Florida - Jerry Wells
Florida has moved away from a prescription capitation to a limit on the number of brand prescriptions, 4 per month. Generic prescriptions are unlimited, as well as, unlimited exempted categories for mental health, contraception and HIV drugs. After the 4th brand named drug limit is reached, they will have the option of getting a generic drug. Florida reported that they have not experienced much resistance to this change. It has been in operation for 2 months and is projected to save about 118 million dollars. They will have a voluntary preferred drug list within the next week, which is exempted from the brand drug capitation. The PT Committee worked on determining what gets on the list.

4

MO.028123

HCFA was asked to provide the states with a letter documenting that there is a process for doing supplemental rebates without effecting best price.

### New York - Mark Richard Butt

New York has been very active in the area of disease management. Medicaid works with several nurses who have taken a very forceful role in working in areas of asthma and diabetes. They have also been focusing on antibiotics for a number of reasons, primarily due to the resistance factor. They started with Otitis Media and will work towards other upper respiratory infections. New York has been meeting with doctors to get them to agree amongst themselves in determining under what circumstances a drug should be administered. They have seen substantial cuts as a result of the work being done in this area.

Starting in October New York will implement a prior authorization system that is completely telephone interactive. It will be an all automated voice activated PA system. The doctors will call in, a number of questions will be asked - which will take under three minutes, and at the end a doctor will receive a prior authorization number. When the pharmacist gets the prescription he will call in to verify the prior authorization number. A pharmacist will need a verified prior authorization number to receive payment. Claims with a non-verified prior authorization number will go to a fiscal agent. A prior authorization number is given regardless of how the doctor answers the questions, however there will be a record of what was said during the call which will be reviewed by DUR staff. Interventions will be done with doctors who are answering the questions incorrectly. This system requires 1-2 people to staff the system.

### Idaho - Gary Duerr

Idaho reported that they experienced a heated legislative budget battle this year. Out of nineteen legislative proposals, only 1 involved pharmacy. Two issues were raised in the legislation; (1) increase the use of generics and (2) investigate formularies. In response to the legislation, Medicaid will be eliminating the DAW override on prescriptions and will force the physicians to write a letter requesting prior authorization. They will start off with the new FUL list and a few select state MAC products. Medicaid is currently devising a plan to address the formulary directive.

### Oklahoma - Lynn Mitchell

Oklahoma reported that they spent a good deal of time last year in court over their preferred quality initiative that is an aggressive prior authorization program. They started with an anti-ulcer drug. Astra Zeneca sued the state for placing Prilosec into a third tier. Everything else resulted in an initial first tier, which needed no prior authorization. Tier two products needed prior authorization. Astra Zeneca placed a restraining order on the program, not based on the program itself, but on the rulemaking process. As a result Oklahoma re-promulgated and then re-implemented the program as of January 2000. Astra Zeneca tried very hard to make sure that the rule was overturned in the federal legislative session, however they were not successful.

5

MO.028124

Oklahoma is conducting an internal quality assurance initiative. The state called about 150 individuals who have requested drugs, on monthly bases, to look at any adverse events. The following questions are some examples of what was asked. Have you had to return to your physician? Have you had any kind of adverse physical event? Have you been in the emergency room? Oklahoma has also contracted a separate external entity to look at the medical economics of the program. They hope to have a report before the end of the year.

So far Oklahoma has seen a few financial benefits since implementing the program. Preliminary reports show internally an increase in physician visits on drugs that they would not be able to obtain through the PA process because it didn't meet the guidelines. The state has not experienced statistically significant adverse admissions in terms of ER visits or regular admissions.

*Utah - Duane Parke*
Utah is in the second year of their hemophilia case management program. The first year showed a dramatic decrease in factor use of the product. They are noticing behavior modification with infusions, mostly in children. The beneficiaries are keeping logs and doing other things needed from a clinical standpoint. There are some savings. Select clients have reduced total factor utilization by thousands of units, one client reducing total usage by over 200,000 units.

*Texas - Curtis Burch*
Texas requires manufacturers and distributors to provide directly to them certain cost information. Texas decided to conduct a number of audits on some of their pharmacies (5 chain pharmacies, 52 independent pharmacies and 10 special pharmacies) to see if drug manufacturers were submitting inflated price information. Sixty-two drugs were audited and over 3,000 invoices were reviewed. The audit began in April and was completed in August. Results showed that on average Medicaid reimbursement rates for the 62 targeted drugs were 286% of actual invoice costs, which is almost three times as high. Medicaid reimbursement rates among independent pharmacies was 263% of actual invoice costs, 291% for chain pharmacies and 314% for special pharmacies. The state continues to conduct additional invoice audits.

The Texas Attorney General's Office has filed suit against Dey, Inc., Roxane Laboratories, Inc. and Warrick Pharmaceuticals Corporation on the basis that since these companies are required to provide pricing information under the provisions of the Texas Medicaid Fraud Prevention Act, they knowingly and intentionally misrepresented their prices. Additional suits may occur in the future.

*Please refer to Appendix B and C for more information about the Texas Department of Health (TDH) Audit.*

*Virginia – David Shepard*

6

An update was given on the following initiatives:

- They are in the latter stages of rebuilding their Medicaid Management Information System (MMIS). They hope to be done with this process by July 2001.
- Virginia plans to change their co-payment to a differential co-pay on brand & generic drugs.
- The state is moving forward with a special needs program for hemophilia. They presently have disease management programs initiated for diabetes, cardiovascular disease, asthma, anti-ulcer and depression. Virginia had an article published on their asthma program, which they worked on with the Virginia Health Outcomes Partnership. *(Please refer to Appendix D for a copy of the article).*
- Virginia has completed a report on Pharmacy Benefit Managers (PBM) practices and therapeutic interchange.

*Arkansas – Ray Hanley & Suzette Bridges*
Arkansas reported on the following initiatives:

- In July of 1999, the dispensing fee was changed to $5.51.
- A two-tier reimbursement was proposed and was approved by HCFA. It was implemented for a brief time until it was reversed by court order. A new RDUR contractor began in August.
- The Department of Psychiatry at UAMS is working with the state to provide psychiatric evaluations for Medicaid recipients in LTC facilities in an attempt to provide appropriate mental health care for these patients while at the same time containing costs on these drugs.
- Due to the waste of drugs in LTC, Arkansas is working with their LTC unit in writing policy to require the nursing homes to become more responsible in what can be cycle filled and become accountable for notifying pharmacy providers of the residents medication changes.
- In September Arkansas held a meeting with PhRMA to look for ways to contain costs and see if they would provide funding for education and disease management.
- Arkansas has had voice response for their prior authorization system for a many years. There is a very specific criterion that the physician has to fill out on a form. When filling out a PA prescription, the pharmacist must go through the voice response and reconcile it with the written physician criteria. Arkansas has been receiving a lot of complaints from the pharmacist about having the responsibility of reviewing the physician's form. They feel that they should not be the gatekeepers.


## LEGISLATIVE UPDATE
Susan Hammersten

A brief overview was given on two Medicare prescription drug benefit proposals that have received a lot of congressional attention, the Administration's proposal and the proposals introduced by Senate Finance Committee Chairman William Roth (R-DE).

*Please refer to Appendices E, F, G, H, I and J for additional information regarding these*

7

MO.028126

*proposals.*

## AVERAGE WHOLESALE PRICE ISSUES
Mary Riordan & Tim Terry

- ❏ A report was given on the House Commerce Committee's investigation of Medicare drug pricing manipulation. The Committee's examination produced evidence indicating certain drug companies may be deliberately inflating the reported average wholesale price (AWP) of their Medicare-covered drugs. Discrepancies were identified between the price Medicare pays for certain drugs and the prices charged to many private sector purchasers of the same drugs. The Committee also learned that certain manufacturers may be inflating Medicare drug reimbursement rates as set by the AWP in order to help them better market their drugs by creating a spread between the prices they charge to providers and the Medicare reimbursement price (95% of AWP). These spreads were used to create incentives for providers to use a particular manufacturer's drug.

  Copies of correspondence written from the Commerce Committee to PhARMA and HCFA were distributed to the TAG. (*Please refer to Appendices K and L.*)

- ❏ An update was given on a tentative settlement with Bayer. Highlights of the report are as follows:
  - • Bayer will pay $14 billion
  - • Bayer will undertake certain drug price reporting activities, including certifications
  - • Bayer will report specified drug pricing information on a quarterly basis to: First Data Bank and HCFA (for Medicaid purposes only), and the State Medicaid programs.
  - • Bayer will report average sales price information to the above-referenced parties. The *average sales price* is defined as the average price paid to Bayer in the U.S. for its products by all non-government purchasers (except for direct sales to hospitals). This is a weighted average price.
  - • For the drugs at issue in the lawsuit, Bayer will cease reporting an AWP to First Data Bank for purposes of the Medicaid programs.
  - • When it submits the quarterly pricing information, Bayer will also provide a detailed methodology as to how it calculated the average sales price. In addition, a highly placed Bayer representative will certify as to the truth and accuracy of the pricing information and the calculation methodology used.
  - • Under the terms of the Corporate Integrity Agreement, an independent review

8

MO.028127

organization will verify the pricing information provided by Bayer.

## COMPENDIA
Pat Muller and Tom Fleming

First Data Bank and Medical Economics (publisher of RedBook) were contacted by the TAG to address a number of compendia issues. During a 15-minute presentation they were asked to cover the following:

*First Data Bank – Pat Muller*

1)      Where does the data come from?
The pricing data is manufacturer supplied to First Data Bank and then is verified by a wholesaler's survey.

2)      How do you update your data?
First Data Bank makes calls to manufacturers inquiring about new changes in pricing and products that might become obsolete. This process is on going. The database is updated constantly. Some of their customers do receive the information daily.

3)      How do you find out about terminated/discontinued drugs?
First Data Bank puts out a turn around document whereby they contact the manufacturer, show them what products and prices they have in the database and then asks them to update the information. First Data Bank also checks with manufacturers they have not heard from in a while to see if their products are still active. By active, First Data Bank means are they still actively marketing the product, not just that it is sitting on the shelves.

4)      What changes have you planned to accommodate the new DOJ AWP's?
The Department of Justice's AWP's are different from their normal blue book prices. They can not incorporate them into their normal blue book because of the pricing situation. They are updated on a different cycle.

The current database has about a hundred thousand active ingredients on it and about two hundred and forty thousand total products, which makes to be 50/50 OTC's and legends. They have a number of different types of prices, 45% have a WAC price, 38% have direct pricing from the manufacturer to the pharmacy and 100% have AWP.

AWP is determined by factors from either WAC, direct price or the suggested wholesale

9

MO.028128

price.  The suggested wholesale price is the price that the manufacturer suggests the wholesaler sell to the pharmacy. First Data Bank reports this separately.

### Medical Economics (RedBook) – Tom Fleming

RedBook has been around for about 105 years.  It's an annual publication.  Monthly updates are also published providing AWP and direct price information for top 2000+ drugs.  They also have electronic products that provide pricing information; RedBook for Windows and Ready Price on CD ROM.

1)      Where does the data come from?
Prices are collected from the manufacturers.  They do not do any survey's of wholesalers.

2)      How do you update your data?
Pricing information of changes and new products is received from the manufacturers daily.  Some customers receive updates daily while other services range from weekly, monthly, quarterly and yearly.  Annual and update books supply AWP, direct pricing, HCFA pricing and the suggested retail pricing for OTC products.  The electronic products include direct pricing, HCFA pricing, AWP, suggested retail price and WAC.  RedBook also supplies the first and second previous price information and the effective dates for those pricing fields.   There are nine full time employees who are responsible solely for collecting and maintaining the data.  These employees have a group of manufacturers that they are each responsible for. There are about five pharmacists who are responsible for the initial clinical coding for their products and there is a staffer who is responsible for researching literature for new products and price changes.

3)      How do you find out about terminated/discontinued drugs?
Their database is verified by having the manufacturer fill out a Product Verification form.  (Please refer to Appendix M for an example of this form.)   They have about a 75% response rate. Phone calls are then placed to the manufacturer to verify the information. In 1998 RedBook had about 8,000 products that were deactivated.  In 1999 7,800 were deactivated.

4)      What changes have you planned to accommodate the new DOJ AWPs?
At this time they are not providing that information to any of their customers.

### Comments and/or Question and Answers
The following is a synopsis of the discussion between the TAG, First Data Bank and Medical Economics.

*Do you ever do an audit to verify these prices?*
First Data Bank uses the wholesaler surveys to verify the prices for AWP.

10

MO.028129

ROBERT REID - Minutes 928&29.doc                                    Page 11

*If you have correct information why is there a variance between what DOJ has found and what's provided for Medicaid?*
First Data Bank reported that they are still working with the lawyers and are unable to comment on it.

*Is the Blue Book AWP available to all of your customers including companies such as Express Scripts and BCS Patd?*
Both First Data Bank and RedBook reported yes.

*Isn't it odd to have two different prices for the same product, which supposedly represents AWP?*
First Data Bank reported that this is an issue that they're working with the lawyers on and therefore can't comment.

*Can you explain what the difference between Blue Book AWP verses the plain AWP and how it is reported in your data files?*
First Data Bank reported that in their data files they have what they call a Blue Book AWP, which is a survey on average wholesale price.  They also report a suggested wholesale price, which is the price that the manufacturers would like wholesalers to use.  Either price is available to their customers.  They have been working with lawyers on DOJ's Medicaid AWP.

The Blue Book AWP is derived by surveying national wholesalers and then doing a weighted average depending on the percent of the market.

*Are the DOJ AWP prices reported as Blue Book AWP?*
First Data Bank reported no.

*Will DOJ AWP be updated on a regular bases?*
First Data Bank reported that it was done on a six-month period with an effective date of May 1st.

*Could First Data Bank give a global variance between the suggested price and AWP?*
The variance would depend on the manufacturer.  First Data Bank doesn't offer this as a data element at this time.  The information is provided whereby Medicaid could calculate that variance themselves.

*Does RedBook intend to do surveys at the level where it might be acceptable to providers, such as Medicaid, so that they could use their pricing?*
The response was not at this time.

First Data Bank reported that they would be happy to check on a price that Medicaid feels is an inappropriate price.  They will do a market survey to see if the price is correct.  The TAG was directed to call their customer service department who will do a price check.

11

MO.028130

*First Data Bank gave the analogy of their prices being similar to the sticker price of a car.*

## DISCUSSION WITH PHARMA AND NACDS
Don Muse & John Coster

In preparation for this discussion, PhARMA and NACDS representatives were asked to address a number of subject areas, such as, cost containment assistance, federal upper limit list, assistance with keeping the list current and accurate, DUR/prescriber education assistance, prior approval, assistance with best price calculation on re-packaging labels and availability of products and at what price (AWP, WAC, contract price issues and accuracy).

Below are highlights of the dialogue between PhARMA, NACDS and the TAG.

*Don Muse – representing PhARMA*
Don stated that he would identify subject areas that PhARMA is open to having discussions with Medicaid, however, he will not try to defend PhARMA's pricing practices.

- With regard to issues of re-packaging, best price, etc. PhARMA claims that they are not cheating the system. Their position is that they would like HCFA to audit the industry and penalize those who were found to be reporting inaccurate prices.
- PhARMA believes that there are ways to save money in the Medicaid program and they refuse to deal with the silo approach of solely looking at the prescription drug industry.
- Disease Management is one area that PhARMA's believes to be a winning scenario for all parties involved.
- There is an interest in working in Drug Utilization Review (DUR) and fraud and abuse
- PhARMA is devoting resources to understanding why prescription drug spending is going up in the states. They have funded Don Muse, universities and several other consulting firms to conduct research aimed at determining why drug spending is increasing. Don has looked into four states and has compiled data from these states from the last two years. The data is being used to identify potential areas for savings. Some of the finding shows that in four states 44-52% of people have one of the following diseases: asthma, diabetes and congestive heart failure. The top 10% of the standards in those categories is about 15% of the budget for the total Medicaid program. The data shows these diseases as opportunities for cost reduction.
- PhARMA is willing to fund cooperative research with any state that is interested. Don's advice is that states should take advantage of this opportunity.

*John Coster – representing NACDS*
John's responsibility includes policy and strategy on the federal and legislative side,

12

MO.028131

ROBERT REID - Minutes 828&29.doc                                                    Page 13

including Medicaid.

- □ NACDS represents about 33 thousand retail pharmacy outlets. About 60% of outpatient prescriptions are being filled by these pharmacies.
- □ John gave an outline of what is happening in the market place for community pharmacies. (1) The "cost of goods" is increasing resulting in expensive new drugs. Accordingly, the cost of purchasing these drugs is escalating.    (2) There is an increase in prescriptions from public and private programs. Inventories have also increased to meet the demand without much increase in the rate of return. They are operating in about a 2% net profit margin. (3) Disproportionate focus on cost containment. The industry is consolidating with fewer drugs in therapeutic classes. (4) There are more prescriptions being filled. By the end of the year NACDS will have collectively filled 3.15 billion prescriptions. About 4 billion is projected by 2004. (5) They feel that pharmacist are spending too much time on administrative tasks and not enough time on patient care. (6) They are experiencing a severe shortage of pharmacists in every part of the country. This situation is driving up operational costs. NACDS requested that Congress ask HRSA to do a study to document the shortage and provide federal funding to increase scholarships to pharmacy schools or provide other forms of resources to assist with this problem. (7) A new Medicare benefit may lead to an increase in mail order prescriptions.
- □ NACDS is trying to establish a process to assure that pricing problems with the FUL lists are avoided. John would like to continue working with the states on the next FUL list.

*Comments and/or Questions and Answers*
The TAG was interested in hearing if PhARMA and NACDS would be able to assist in some of the challenges facing Medicaid's prescription drug program. The following was requested:

- □ States would like to see (on paper) some proposals/grants that would help them with cost containment.
- □ The TAG would like PhARMA and NACDS to come to the table and work collaboratively on pharmaceutical issues. It would be helpful if they could come back to the TAG with some constructive solutions.
- □ The TAG requested PhARMA and NACDS to list things that they are willing to work with the states on as well as a listing of who the players would be.

Both Don Muse and John Coster stated that they would go back to their organizations and communicate to them the TAG's requests.

**PRIME INSTITUE**
Steve Schondelmeyer

The PRIME Institute is an independent and global research, education and consulting

13

MO.028132

organization whose mission is the study of the economic and policy issues to help improve the access of the population to pharmaceuticals and pharmaceutical services. The Institute was established in 1991 in The College of Pharmacy, University of Minnesota. The main area of research of the Institute is the application of health economics and public policy theory to analyze the trends and relationships in the pharmaceutical market.

Steve's data is derived from drug rebate files that were complied each quarter from each state during the time period of 1991 to 1999. He has researched the patterns and trends on pharmaceutical spending in each of the states. Steve gave a summary of the data he has collected regarding trends in Medicaid pharmaceutical expenditures and utilization.

Handouts were not provided to the TAG, however, Steve can be contacted directly for a copy at schonool@tc.umn.edu. If requested Steve is also willing to provide state specific data.

---

*Friday, September 29, 2000*

## BRAIN STORMING

There were a number of issues that the TAG wanted to brainstorm on during the face-to-face meeting. Below are highlights of the discussion involving three subject areas: development of a best practice guide on Medicaid pharmacy, devising a plan to address AWP issues/steps toward resolutions and cost containment initiatives.

### *Development of a Best Practice Guide on Medicaid Pharmacy*
- The TAG decided that a best practice guide on Medicaid pharmacy programs would be valuable for states and HCFA. The purpose of the guide is to provide an overview of the Medicaid pharmacy programs in each state. It is hoped that access to the best practice guide will serve as a tool to share information and knowledge of successful innovations.
- Ray Hanley will put together a draft that will be shared with the TAG for comments/edits/suggestions.
- Eventually the guide would be available on the NASMD website.

### *Devising a Plan to Address AWP Issues/Steps Toward Resolutions*
- David Shepherd presented a broad overview of potential impacts as a result of a major change in the reimbursement methodology. Please refer Appendix N for a copy of his handout.
- Duane Park from Utah presented a position paper that he drafted for the TAG's endorsement. His position is that AWP should be the cost of the drug. Efforts to

14

MO.028133

ROBERT REID - Minutes 928&29.doc

clean up the outrageous prices by the National Association of Medicaid Fraud Control Units (NAOMFCU) and the U.S. Department of Justice (DOJ) should continue and should be supported. The work being done by NAOMFCU and DOJ should not be limited to AWP's for 400 products but should be expanded to include all drugs. *(Please refer to Appendix O for a copy of the position paper).*

❑  It was decided that the position paper would be amended slightly (specifically focusing on the last paragraph) and then moved forward to NASMD's Executive Committee for review.

### Cost Containment Initiatives

❑  Mark attends meetings every week with his Governor's office discussing pharmacy cost. Part of these meetings has to do with what other states are doing. There are at least 10 states that are engaged in various cost containment projects.   Some of which include New England consortium states, Massachusetts, Connecticut, Virginia, Mississippi, California, Texas and Florida.

❑  All information regarding cost containment initiatives and other pharmacy related issues should be widely shared. TAG members should be in constant contact with the states in their regions whereby information can be shared. It was suggested that HCFA's regional office should also be in the communication loop as well.

❑  New York talked about their efforts to restrict the number of pharmacy providers. NYC was divided into zip codes. A determination of the number of providers for Medicaid recipients in each area was done. Only a certain number of pharmacies are allowed in a particular zip code area based on need, population and other factors. If a pharmacy wants to join a particular area and there is no unmet need, they can be denied unless they show some service that would make them unique from the other providers in that region. They were unable to do this in New York State because there wasn't enough available pharmacy providers. There is a court case pending on this initiative. Mark will forward the determination criteria to Kim for further distribution to the TAG.

### OBRA'90: RE-OPENING AND RE-BASING OF REBATES
Mike Keogh

❑  Under section 1927 of the Social Security Act, states are able to enter into separate Medicaid rebate agreements with manufacturers as long as they have HCFA approval. There are several instances of those.  HCFA reviews these agreements based on the answers to the following questions: Are the additional rebates at least as great as those that are available under the National agreement?  Is access compromised? Does a state agree to report those additional rebates to HCFA?   The incentive for manufacturers to enter into these agreements are that they don't want to be under prior approval and that prices offered under those separate rebate agreements are exempted from best price. A new best price is not established. There is a release that describes this procedure, release #38 which addresses the approval process, the

15

MO.028134

ROBERT REID - Minutes 928&29.doc

submission process and the exemption to best price.

This is different from state funded only programs. HCFA has no review or approval over those. The result from manufacturers is the same. Prices offered under state funded only pharmaceutical assistance programs are exempted from best price and AMP as well. Manufactures can be referred to release # 11 for a description of this policy.

HCFA plans to reiterate these facts in an up coming release.

☐ Under current law, manufacturers can go back to day one, January 1991, and say that they incorrectly calculated their drug prices. There is no question that manufacturers are allowed to re-calculate their prices. There is no limitation on how far back they can go.

HCFA has instituted a process when this situation occurs. They put together a chart for AMP and best price calculations. It describes the types of sales (ex. Pharmacy or mail order), it asks if AMP and best price were included and if there were rebates on those sales. When HCFA gets a request from manufacturers to re-calculate drug prices HCFA asks for the methodology during the time the price was originally calculated and what they are now proposing to use. An analysis is done based on what should and shouldn't be in AMP and best price. HCFA then makes an approval determination. If it meets a certain threshold where the state would significantly be impacted, HCFA asks OIG to review it. To minimize the effect on the states, HCFA asks the manufacturer to spread their recoupment over a period of time.

When the final regulation is published there will be a 3-year time limit for manufacturers.

A release regarding this issue will be coming out in the future.

☐ States are urged to send their rebate staff to the national dispute resolution meeting in Denver. States that come to the meeting will get priority in solving their dispute. More information about this meeting can be obtained by contacting Mike Keogh at (410) 786-5910 or by email Mkeogh1@hcfa.gov.

HCFA asked APHSA to send a letter encouraging HCFA to consider changing the administrative match to 100% for states to attend these meeting. Data to support this request will be forwarded to Kim at APHSA.

There are three meetings each fiscal year. Future meetings will be announced in the next few months.

## ELECTRONIC PRESCRIBING AND RECORD KEEPING

16

MO.028135

Curtis Burch

The TAG was provided with Texas' pharmacy rules regarding electronic prescribing.
(*Please refer to Appendix P: Texas Pharmacy Rules*)

One of the concerns is that the current regulation relating to the override procedure for
brand name drugs state that the prescriber must hand write on the face of the prescription
the term "brand medically necessary" for the drug to be paid for. Telephone prescriptions
and fax prescriptions are considered to be electronic prescriptions. Under the current
process, if a physician phones a prescription in requesting a brand name drug, the states
gives them 30 days to follow up with a written prescription of "brand name necessary".
As we move toward electronic signature capability there will be a need to amend the
regulation to accommodate this technology.

The other issue involves audit procedures and retention of records at the pharmacy level.
Hard copy prescriptions are going to the pharmacies. Texas is now requiring pharmacies
to generate something on the day of service, like a log, so that when the auditors come in
years later they can regenerate that information. Texas would like to have something that
assures them that the information can not be changed at a later date.

## ASTHMA DRUGS
Larry Reed

Asthma cases have increased significantly during the past two decades. A guidance
document is being developed by HCFA to encourage full coverage of asthma related
services. During a meeting with the Maternal and Child Health (MCH) TAG, the TAG
indicated that supplies associated with the delivery of asthma-related medications should
be covered as home health services, rather than prescribed drugs. These supplies include
nebulizers (used to convert medications to steam), peak flow meters (used to monitor
degree of airflow obstruction) and spacers (used to assist in proper delivery of inhaled
medication to the lungs in young children). Requiring coverage of these supplies as
home health services might pose a hardship for small pharmacies that do not already sell
home health supplies and equipment and would therefore need to enter into a separate
provider agreement with Medicaid as a home health supplier.

HCFA asked the TAG to get back to them with feedback.

## ANNOUNCEMENTS

❑ HCFA has awarded a contract to USP to do a DUR study. Tom Fulda, project officer,
will be HCFA's lead on this effort. HCFA would like to involve the P-TAG in this
study.
❑ A copy of the Federal DUR Newsletter was distributed to the TAG. (*Appendix Q*).

17

MO.028136

ROBERT REID - Minutes 928&29.doc

Christina Lyon and Altanease Arnold would like the TAG to provide comments and suggestions on the newsletter.

Meeting was adjourned.

18

MO.028137