# EXHIBIT SSS



Department of Medical Assistance Services
Division of **Program Operations, Pharmacy**
600 East Broad Street, Suite 1300
Richmond, Virginia 23219

# Facsimile Cover Sheet

To: *Frank Tetkowsk,*
Company: *Maryland Medicaid*
Phone: *410-767-1455*
Fax: *410-333-7044*

From: David Shepherd RPh.
Unit: Pharmacy
Phone: (804) 225-2773
Fax: (804) 786-0414

Date: *10/11/2000*
Pages including this
cover page:

*CONFIDENTIAL: The information contained in this facsimile transmission may contain
confidential information intended for the use of the individual or entity named above. If the
reader of this message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly prohibited. If you
have received this communication in error, please notify the above named sender
immediately and destroy original.*

Comments: *Frank – I do not agree with the proposal.*
*But other states so the TAG – voted to present before*
*medicaid Directors next week. I abstained. – David Shepherd*

*also, attached to part of my presentation –*

PHARMACY TECHNICAL ADVISORY GROUP (P-TAG)
POSITION PAPER
9/11/2000

The P-TAG should go on record as endorsing the initiative for revised average wholesale prices as developed by the National Association of Medicaid Fraud control Units (NAOMFCU) and the U.S. Department of Justice (DOJ).

The nationally recognized pharmacy average wholesale price (AWP) list has been used for decades by the pharmacy industry. Before the use of electronic claim processing, the nation's pharmacies relied on the AWP for setting accurate and just reimbursement for prescriptions. The AWP had two publishers that provided yearly publications called the Red Book and the Blue Book. The Red Book is still available as a hard copy from Medical Economics and the Blue Book is available on CD-ROM or the INTERNET from First DataBank.

For the past several years it has been in the pharmaceutical manufacturer's best interest to hold the AWP as high as possible to maximize profits. At the present time, the pharmaceutical manufacturers, not the wholesalers set the AWP. The nation's pharmaceutical wholesale houses have been more than willing to support artificially inflated prices as they too, are able to maximize profits. The greater the spread on the AWP and actual acquisition cost, the greater the maneuvering room when negotiating product price contracts with PBMs (Pharmacy Benefit Managers) and purchasing groups. Even some physicians have supported an artificially inflated AWP for products they give in their office because the difference in the list price (AWP) and their actual acquisition adds to the profit margin.

There has been a continual excessive creep in the AWP along with the advent of the Medicaid Rebate program and electronic claim processing. Only a very small minority of patients pay cash for pharmaceuticals, the rest being paid for by insurance groups. Since 1992, the consumer price index (CPI) for prescription drugs has exceeded the CPI for all items every year except 1995. Nobody has been minding the shop, until the DOJ and the NAOMFCU intervened.

The DOJ and NAOMFCU's initiative is long over due. AWP has become known as "ain't whats paid". The artificially inflated drug price has caused an excessive burden on the American public. However, correcting the AWP list will be a long painful process. Medicaid agencies when computing the amount paid to pharmacies will have to negotiate the discount taken from the AWP and also negotiate a new dispensing fee with pharmacy providers. Traditionally, the formula for setting the amount paid has been (AWP - discount + dispensing fee). A new "professional fee" may have to be considered to reimburse pharmacists for counseling and product oversight. This fee would be different from the brick and mortar "overhead" discussed in Accounting 101. Many states have the discount and the fee coded into law or state plan. States could save millions; large states could save tens or hundreds of millions. The entire pharmacy sector in the United States will be affected. The spread between prices paid for prescription drugs in other countries and the U.S. will decrease.

According to the Wall Street Journal, the initiative has resulted in more than 20 drug companies coming under investigation for inflated AWP. There is a clear mandate to take action. The P-TAG has a moral responsibility to not only support the initiative, but to encourage the DOJ and NAOMFCU to expand the project to include the entire AWP list. The P-TAG should notify HCFA and Congress of this decision.

AP-TAG.2000

# Direct Relationships

- A. Manufacturer to Patient
- B. Manufacturer to Third Party
- C. Manufacturer with Wholesaler
- D. Pharmacy with Manufacturer
- E. Third Party to Manufacturer
- F. Wholesaler to Pharmacy
- G. Pharmacy/Physician/Patient

# Relationships Continued

- **H. Third Party to Pharmacy**
- **I. Patient/Physician**
- **J. Wholesaler/Manufacturer to Physician**
- **K. Third Party to Physicians**
- **L. Third Party to Employer**
- **M. Employer to Patient**

# Parameters for Discussion

- Should resolutions have impact on recipients?
- Should resolutions have impact on providers?
- Should resolution have impact on wholesalers?
- Should resolution have impact on manufacturers?
- Should resolution have impact on physicians?
- Should resolution have impact on state/federal Medicaid?

# PRICING METHODOLOGY

- AWP(AVERAGE WHOLESALE PRICE)
- Billed Charge
- CMAC (Client MAC)
- AWP Discount Cost
- EAC (ESTIMATED ACQUISITION COST)
- FMAC Federal MAC), HCFA MAC, Pharmacy Gold MAC
- FGUL ( Federal Guidelines Upper Limits)
- ANAC (ALTA Negotiated Acquisition Cost)
- ANAC MAC
- Usual & Customary

# EXHIBIT TTT

## Richmond, VA

Page 307

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

In Re: PHARMACEUTICAL INDUSTRY   : MDL No. 1456

AVERAGE WHOLESALE PRICE          : Civil Action No.

LITIGATION                       : 01-12257-PBS

- - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:        : VIDEOTAPED

United States of America, ex rel.: DEPOSITION OF

Ven-A-Care of the Florida Keys,  : THE VIRGINIA

Inc. v. Abbott Laboratories, Inc.: DEPARTMENT OF

Civil Action No. 06-11337-PBS;   : MEDICAL

and United States of America ex  : ASSISTANCE

rel. Ven-A-Care of the Florida   : SERVICES by

Keys, Inc., v. Dey, Inc., et al.,: HOWARD BRYAN

Civil Action No. 05-11084-PBS;   : TOMLINSON, II

and United States of America ex  :

rel. Ven-A-Care of the Florida   : VOLUME II

Keys, Inc., v. Boehringer        : NOVEMBER 4, 2008

Ingelheim Corp., et al., Civil   : RICHMOND,

Action No. 07-10248-PBS          : VIRGINIA

- - - - - - - - - - - - - - - -x

Richmond, VA

Page 468

1  formally administered under his division.  And
2  when I arrived at DMAS to head up this new
3  division of Health Care Services, one of the
4  programs that was transferred to this new
5  division, of which I headed up, was pharmacy.  So
6  he was responsible as the Division Director for
7  Pharmacy for a good part of the time that --
8  covered by these documents.
9      Q.  What was Mr. Cohen's -- what were his
10  employment dates?
11      A.  I don't have his exact employment
12  dates.  But he was there, certainly, when I
13  arrived.  He left probably within the year or so
14  after I arrived.  And then -- but he had been
15  there for a number of years prior to 2003.
16      Q.  Okay.  Do you know how many number of
17  years?
18      A.  I couldn't tell you the precise number
19  of years.
20      Q.  Can you give me -- are we talking about
21  two years?  10 years?  20 years?
22      A.  My -- my best estimate would be five to

Page 469

1  10 years.
2      Q.  What's the basis for your -- for that?
3      A.  Just the general information in the
4  agency about people having served for the agency,
5  their tenure.
6      Q.  When were Ms. Rollins employment dates?
7      A.  I don't have her specific employment
8  dates.  But I believe she was there at least five
9  years or so in the -- she was there when I
10  arrived at DMAS in 2003.  She left shortly
11  thereafter.  But she had been there for a number
12  of years prior to that.
13      Q.  Do you have a guess -- what's your best
14  guess for the number of years that she was there
15  prior to your arrival?  In May of 2003?
16      A.  I believe her tenure was somewhat
17  shorter than David Sheppard, but she had been
18  there a number of years.  Maybe as many as five.
19      Q.  How long did you speak with Mr. Cohen?
20      A.  Mr. Cohen was involved in a -- there
21  was a tell -- a conference call placed to Marry
22  Ann Rollins and Dave Sheppard.  Dave Sheppard

Page 470

1  lives outside of the Richmond area.  And is
2  retired from DMAS.  I'm not sure of the exact
3  location.  Mary Ann Rollins lives in Richmond,
4  but she has recently had a fairly significant
5  automobile accident and has been -- only just
6  recently returned to work at First Health
7  Services, but she's been out for, I think, close
8  to a year.  So we did that by phone.  Jim Cohen
9  was the third individual.  He joined -- joined
10  the conference call in person because he works in
11  the same building for another agency.  Another
12  organization.  So he was there in person along
13  with the assistant Attorney Generals.
14      Q.  Do you know what city Mr. Sheppard
15  lives in?
16      A.  I don't know the city.
17      Q.  Do you know generally?
18      A.  I believe he's somewhere in the western
19  part of the state.
20      Q.  How long was the conference call that
21  you had with these three individuals?
22      A.  The conference call was somewhat less

Page 471

1  than an hour.  It may have been anywhere from 45
2  minutes to an hour.
3      Q.  Did you show them -- did you send any
4  documents to Mr. Sheppard or Ms. Rollins for them
5  to review in anticipation of the call?
6      A.  The actual arrangements for the call
7  were placed, I believe the -- the assistant
8  Attorney Generals made those arrangements for the
9  -- for the call.  So I personally did not provide
10  them with any documents.
11      Q.  So you don't know if Mr. Sheppard or
12  Ms. Rollins were provided any documents, correct?
13      A.  I'm not aware of any documents that
14  were provided to them.
15      Q.  Were any documents shown to Mr. Cohen
16  during the conference call?
17      A.  I don't recall any documents actually
18  shown to him.
19      Q.  What, generally, was discussed during
20  this approximately 45 minute conference call?
21      A.  The -- there was -- there was a -- some
22  questions related to what their role had been at

42 (Pages 468 to 471)

6d272837-35cb-42a4-a76b-41a6939d706d

Page 472

1  DMAS during the period of the subpoena.  How the
2  organization was organized at the time.  What
3  their specific roles were.  The extent to which
4  they were involved in decision-making.  The
5  reporting structure.  What the nature of the --
6  of the pharmacy program was at the time, in terms
7  of its sophistication, and automation and so
8  forth.  The extent to which they were aware of --
9  of particular reports, for example, the OIG
10  reports, and to what extent that influenced the
11  policy development.  Some discussion as to who
12  was responsible over that period for policy
13  development as it relates to pharmacy.
14      Q.  Do you recall which particular reports
15  you inquired about with Mr. Sheppard, Mr. Cohen
16  and Ms. Rollins?
17      A.  There was questions related to the OIG
18  reports in general.  And there was also some
19  query, as far as the MCV study is.
20      Q.  Was it the 1996 OIG report for
21  Virginia?  Was that one discussed in particular?
22      A.  Cite that report.

Page 473

1      Q.  I believe it's Roxane -- Roxane Exhibit
2  5. I'm not sure about that.  Yeah, Roxane 5.
3      A.  I believe the report that was -- we
4  focused on was not this report, but was the
5  report that entailed the -- the MCV study, which
6  was the '98.  So --
7      Q.  That's Roxane Exhibit 7?
8      A.  Exhibit 7.
9      Q.  That's the one you recall asking --
10  asking them about?
11      A.  Specific, as it relates to the -- the
12  MCV study, since I was not as aware of how that
13  study came about and was conducted.
14      Q.  Fair to say then that you didn't ask
15  any questions of Mr. Sheppard, Mr. Cohen Ms.
16  Rollins about the Commonwealth of Virginia's
17  response of October 17, 1996 to the 1996 OIG
18  report, correct?
19      A.  Would you restate the question?
20      Q.  Would it be fair to say then that you
21  didn't ask any particular questions of Mr.
22  Sheppard, Mr. Cohen and Ms. Rollins about the

Page 474

1  October 17, 1996 response by Virginia to the 1996
2  OIG report?
3          MS. GOBBLE:  Objection.
4      Q.  Contained in Roxane Exhibit 5, at the
5  end of the document?
6          MS. GOBBLE:  Objection.
7      A.  We asked about a number of reports.
8  Given the time frame that's elapsed and their
9  particular place in the organization and their
10  role of -- in decision-making, they were aware of
11  OIG reports, but were not aware of -- been able
12  to relate anything about the contents or to what
13  extent they may have influenced policy.
14      Q.  Did -- now, Mr. Reale asked you some
15  pretty specific questions about that October 17,
16  1996 response; isn't that right?
17      A.  He asked a number of specific
18  questions, right, about that document.
19      Q.  You didn't ask those questions of Mr.
20  Sheppard, Mr. Cohen and Ms. Rollins; fair to say?
21      A.  I don't recall all the questions that
22  Mr. Reale asked me.  But the -- we did ask him

Page 475

1  about his general knowledge of that report.
2      Q.  Did you show him the copy of the report
3  to see if it might refresh his recollection?
4          MS. OBEREMBT:  Objection.
5          MS. GOBBLE:  Objection.
6      A.  It was a conference call.  He was not
7  there physically.  And I'm not aware that that
8  was shared with him before the conference call.
9          MR. TORBORG:  I have only three copies
10  of documents so could we have that marked as
11  Abbott Exhibit Number 50.  1150.  1150.
12          (The Defendants' Opposition to
13  Plaintiffs' Motion for Preliminary Injunction was
14  marked and received for identification as Exhibit
15  Abbott 1150.)
16  BY MR. TORBORG:
17      Q.  Mr. Tomlinson, I've handed you a copy
18  of what's been marked as Abbott Exhibit 1150,
19  which is a brief that was filed by the United
20  States Department of Justice, on December 6, 2007
21  in a litigation relating to the AMP based FUL
22  issue.

43 (Pages 472 to 475)

6d272837-35cb-42a4-a76b-41a6939d706d

VA Dept of Medical Assistance Services (Howard Tomlinson)-Vol II                    November 4, 2008

## Richmond, VA

Page 540

1    Q.  And have you reviewed those; any or all
2  of the e-mails that have come up in the searches?
3    A.  No.  My -- my involvement -- the answer
4  is, no, I have not.  The -- was involved in the
5  coordination between the Attorney General's
6  Office and a -- Division of Information
7  Technology.  Information Management.  To identify
8  what e-mail -- what electronic mail might have
9  been -- or documents might be retained within the
10  system.  And to identify the resources to extract
11  that information from the system in responding to
12  the subpoena and the key terms, the subject drug
13  information key terms and discovery items we
14  used.  So I was involved in sort of designing and
15  -- or at least identifying the resources and
16  getting a commitment by the agency to -- to
17  respond to the subpoenas.
18        The -- that was a fairly extensive
19  electronic search.  It involved the production of
20  multiple CDs, which were made available to the
21  Attorney General's Office, and I understanding
22  they were to review those.

Page 541

1    Q.  Do you have an understanding of whether
2  these e-mails are the most current e-mails or are
3  older e-mails?
4    A.  There are thousands and tens of
5  thousands of documents.  I don't know that I can
6  recall the final count, but there -- it's
7  voluminous; in the tens of thousands, if not even
8  more.  And they -- they -- they include the
9  electronic mail, plus any other files that are
10  retained in the -- in the -- in our system.  And
11  they go back -- depends on the nature of the
12  document, but they go back to the time when the -
13  - there was a enterprise vault -- or there is --
14  there is a proprietary software that retains
15  documents as they are generated and -- and that -
16  - all that electronic messaging goes into that.
17  And that stretches back, I believe, based on
18  information we provided the Attorney General's
19  Office back a number of years.
20    Q.  Roughly, 2003?
21    A.  2003 was the year that we made a --
22  there was -- there was a major change in our

Page 542

1  information system.  And most information in the
2  agency does not go back beyond that, because the
3  system change was so major that it's very
4  difficult to capture information prior to 2003,
5  because it was an entirely different programming.
6    Q.  If you go to the Abbott cross-notice,
7  which we marked as Abbott Exhibit 1154.  Should
8  be close to you.  Item 26?
9    A.  1154?
10    Q.  Forget it.  I'll -- I'll deal without a
11  document.  Mr. Tomlinson, has DMAS ever received
12  or implemented a document hold for documents that
13  might be relevant to drug pricing litigation?
14    A.  Have we ever pulled data related to
15  drug pricing information?
16    Q.  Have you ever received or issued a
17  directive to retain documents that might be
18  relevant to drug pricing litigation?
19    A.  Yes.
20    Q.  When?
21    A.  When we received the subpoenas, we
22  tried to identify how both the -- the nature of

Page 543

1  the information that was being stored within the
2  agency.  In other words, that information that
3  was electronically stored versus that information
4  that was -- that -- that contained paper
5  documents.  For the most part, the agency
6  operates electronically now.  Has for a number of
7  years, so we placed a hold on the -- there is a
8  cycle by which the electronic messaging,
9  electronic mail, the file sharing and so forth is
10  -- is retained.  We put a hold on the -- on the
11  removal of any information from the electronic
12  system.
13        And then we also placed a hold on the
14  destruction of documents that -- through the
15  state library, which is the official archive for
16  paper documents.  So that no additional -- so
17  documents would not -- the documents are
18  destroyed on a cycle or a scheduled basis, based
19  on their aging of the documents -- the age of the
20  documents.  So we put a hold on the destruction
21  of those documents, as well as a hold on the
22  removal of any electronic information from the

60  (Pages 540 to 543)

6d272837-35cb-42a4-a76b-41a6939d706d

Richmond, VA

Page 568

1  Care?
2      A.  Well, there's no one else at DMAS
3  currently that would have had communications with
4  Ven-A-Care.  To my knowledge.
5      Q.  And --
6      A.  In this time frame, this '97.
7      Q.  Why is that?
8      A.  Why is that?
9      Q.  Yeah.
10     A.  Either because people have retired or
11 left the agency for one reason or another.
12     Q.  Did you contact any former employees,
13 other than Mr. Sheppard, to see if they had
14 conversations with Ven-A-Care?
15     A.  The question was asked regarding Ven-A-
16 Care on the conference call, which included Mary
17 Ann Rollins, who -- who was formally with the
18 pharmacy program as a pharmacist.  And Jim Cohen,
19 who was the agency -- which was the division
20 director responsible for pharmacy at the time,
21 and they made no -- indicated no knowledge of
22 this communication.

Page 569

1      Q.  Did you ask -- do you know what
2  happened to Mr. Sheppard's files when he left
3  DMAS?
4      A.  The -- those files were supposed to
5  have subsequent -- subsequent to his departure.
6  Of course, any electronic files would have been
7  retained according to the schedule of the agency.
8  And -- but we were not able to locate any of his
9  files -- paper files.
10     Q.  When did he leave?
11     A.  He left soon after I joined the agency
12 in the May of '03.  But he went through an
13 extended period of -- he had been on disability
14 leave or sick leave.  Due to some fairly
15 significant health issues.  And he subsequently
16 went on disability.  And -- and then short-term
17 disability.  And then long-term disability.  And
18 then subsequently retired, because he was close
19 to retirement.  Being vested in the retirement
20 system.  So -- or reaching retirement age.  So he
21 never really returned to the agency.  I met him
22 maybe for an hour upon my arrival at the agency,

Page 570

1  and really had no -- don't recall any contact
2  with him since then -- since that time.  And --
3      Q.  Was Mr. Sheppard lucid when you spoke
4  with him on the conference call?
5      A.  Lucid?
6      Q.  Yes.
7      A.  How would you define lucid?
8      Q.  Did he appear to understand the
9  questions that you were asking and be able to
10 provide answers?
11     A.  He did -- he was responsive to the
12 questions that were asked him.  But he was also -
13 - pointed out that it had been a long time since
14 he had been with the agency, over five or six
15 years.  And then it was -- the -- the time period
16 that you're referencing, the documents were even
17 a longer period of time.  And he just didn't have
18 much recollection of -- of many things that were
19 asked of him.
20     Q.  Did DMAS have a personal -- personnel
21 issue with Mr. Sheppard prior to his departure?
22         MS. GOBBLE:  Objection.

Page 571

1      A.  Personnel issue?
2      Q.  Yeah.  Personnel issue.
3      A.  I'm not aware of a personal issue, in
4  my tenure.  As I said, he was having health
5  conditions.  He was out on leave.  And then he
6  went on short-term disability, long-term
7  disability.  So that was a function of his health
8  condition and not anything else.
9      Q.  Let me just go through here for a
10 second.  Go back to the Abbott cross-notice,
11 topic five.
12         (At this time, the document was
13 proffered.)
14     Q.  This is the topic titled, in my short
15 form, "Process to Establish Pay Rates/Margins."
16 States:
17         "From January 1, 1989 to present, the
18 process used and the factors considered by you,
19 the state legislature, and any relevant decision-
20 maker in developing and determining payment rates
21 for drug ingredient costs, and any other payments
22 related to the dispensing of drugs to Medicaid

6d272837-35cb-42a4-a76b-41a6939d706d

# EXHIBIT UUU

VA Dept of Medical Assistance Services (Hayashi)                December 4, 2008
# Richmond, VA

Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY  ) MDL No. 1456

AVERAGE WHOLESALE PRICE         ) Civil Action No.

LITIGATION                      ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:       ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Abbott Laboratories, Inc.)

Civil Action No. 06-11337-PBS;  )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil ) DEPOSITION OF

Action No. 05-11084-PBS; and    ) VA DEPT. OF

United States of America ex rel. ) MEDICAL ASSISTANCE

Ven-A-Care of the Florida Keys,  ) SERVICES by KEITH

Inc. v. Boehringer Ingelheim    ) T. HAYASHI

Corp., et al., Civil Action No.  )

07-10248-PBS                    ) DECEMBER 4, 2008

-------------------------------X

ec8cc3c5-ae87-48e4-b193-f0d2a3878560

Richmond, VA

Page 74

1  reviewed all of the hard copy documents that DMAS
2  has produced in the case?
3      A.  I reviewed all of them.
4      Q.  All of the ones they had Bates numbers,
5  whatever the prefix was through roughly 1700?
6      A.  Exactly.
7      Q.  What else did you do to prepare to
8  testify on behalf of DMAS?
9      A.  Other than reading the documents, we
10  met with DMAS's counsel.
11      Q.  Did you have meetings with DMAS's
12  counsel apart from the meetings with the
13  Department of Justice?
14      A.  Yes.
15      Q.  How many meetings did you have with
16  DMAS's counsel?
17      A.  Maybe three, four.
18      Q.  And can you give me an idea of for how
19  long those meetings were?
20      A.  Between one and two hours.
21      Q.  Was anyone else present at the meetings
22  apart from DMAS's counsel?

Page 75

1      A.  There was one where another attorney
2  was present.
3      Q.  Who was that?
4      A.  I know his first name.  I can't
5  remember his last name.  Michael was his first
6  name.
7      Q.  Do you know who this person
8  represented, who was their client?
9      A.  I do not remember.
10      Q.  Winget-Hernandez?  Does the name
11  Michael Winget-Hernandez sound like it might be
12  that person?
13      A.  I can't say for certain.
14      Q.  Did he have glasses?  Like the Sarah
15  Palin glasses, if you know what I'm talking
16  about.
17      A.  I believe he had glasses.
18      Q.  Was anyone else present during any of
19  your conversations?
20      A.  No.
21      Q.  Did you meet with any current or former
22  employees of DMAS to prepare for today's

Page 76

1  deposition?
2      A.  We had a conference call with former
3  employees, a couple former employees.
4      Q.  Who were those employees?
5      A.  One was David Shepherd.  Another was
6  Marianne Rollins and a third was Jim Cohen.
7      Q.  Did you look at any documents during
8  that meeting with those individuals?
9      A.  Not that I can remember, no.
10      Q.  How long was the meeting?
11      A.  Approximately about an hour.
12      Q.  What did you discuss with -- or in that
13  conference call what did you discuss?
14      A.  We discussed their knowledge on in
15  previous years of the different programs within
16  the Medicaid program.
17      Q.  What do you mean by that?  When you say
18  different programs --
19      A.  Well, one of these topics of discussion
20  was basically the old VMAC program.  In terms of
21  preparing for that we discussed the pricing
22  methodology.

Page 77

1      Q.  Do you recall any other topics that you
2  discussed at this conference call?
3      A.  Not off the top of my head, no.
4      Q.  So you discussed the pricing
5  methodology?
6      A.  Mm-hmm.
7      Q.  At any time during your calls did DMAS
8  or any other counsel provide you with any factual
9  information regarding any of the topics?
10      A.  Not that I can remember.
11      Q.  Now, many of the topics -- most of the
12  topics, if not all of the topics that I'm going
13  to ask you about today go back to 1989.  Okay?
14      A.  Okay.
15      Q.  You started at DMAS in 2004, correct?
16      A.  Correct.
17      Q.  So you wouldn't have personal knowledge
18  of many of the topics, correct?
19      A.  That is correct.
20      Q.  So in order to form the basis of your
21  testimony you reviewed some documents, correct?
22      A.  Correct.

Henderson Legal Services, Inc.

ec8cc3c5-ae87-48e4-b193-f0d2a3878560

# EXHIBIT VVV

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____+_____ | |
| In re. PHARMACEUTICAL INDUSTRY ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE ) | Civil Action No. 01-12257-PBS |
| LITIGATION ) | |
| _____ ) | Hon. Patti Saris |
| THIS DOCUMENT RELATES TO ) | |
| UNITED STATES OF AMERICA, EX ) | |
| REL. VEN-A-CARE OF THE FLORIDA ) | |
| KEYS, INC. v. ABBOTT LABORATORIES, ) | |
| INC., AND HOSPIRA, INC. ) | |
| _____ ) | |

**PLAINTIFFS' RULE 26(a)(1) DISCLOSURES**

The United States ("Government") and Ven-A-Care of the Florida Keys, Inc. ("Relator") (collectively "Plaintiffs"), hereby provide their Rule 26(a)(1) Disclosures:

**A.  Witness Disclosures**

The individuals identified on the attached **Exhibit A** may have discoverable information that the Plaintiffs may use to support the claims in this case.[1]  Exhibit "A" also identifies generally the subject matter upon which the identified individuals may be knowledgeable.  If an identified individual is an employee of a corporate entity or a state, the information that each may provide may be subject to the approval of their employer and/or counsel representing that employer.

All contact and/or deposition scheduling of employees of the Government and the Relator identified herein should be coordinated through an Assistant United States Attorney or a

_____

[1] To the extent that any document covered by Section B of these disclosures identifies additional persons not named herein who the Plaintiffs later determine may have information supporting their claims, the names of those persons are incorporated in this initial disclosure.

1

Department of Justice Trial Attorney who has entered an appearance in this case or, where appropriate, through Relator's counsel.

Because Medicaid is a joint federal and state program, the Defendants may seek to obtain discoverable information – whether on liability or damages – from employees or representatives from various states throughout the country.  At this stage, Plaintiffs do not anticipate calling any such individuals at trial.  If that position changes, Plaintiffs will supplement these disclosures. To the extent Defendants nonetheless pursue such evidence, Defendants are referred to each individual state's Attorney General, Medicaid Agency legal representative, or other state legal representatives, who will be responsible for designating individual state witnesses authorized to provide information or testimony on each state's behalf.

**B.**     **Document Disclosures**

The United States is producing the documents identified in **Exhibit B** that may be used to support the Plaintiffs' claims in this case.  The Relator has identified in **Exhibit C** documents in the possession, custody or control of Ven-A-Care of the Florida Keys, Inc. and/or its attorneys that may be used to support the Plaintiffs' claims in this case.

The Plaintiffs reserve all rights to object to any documents produced in this case, including but not limited to objections based on relevancy and materiality.  The Plaintiffs also reserve the right to supplement the foregoing identified documents and witnesses.

**C.  Damages**

The United States seeks the recovery of damages to the Medicaid and Medicare programs arising from the Defendants' unlawful conduct.  Defendants have not yet fully produced

complete pricing and transaction data that is essential to identifying and understanding the amount of the United State's damages.  Until then, Plaintiffs will be unable to complete their damages analyses.  Hence, the amounts identified herein are estimates based on Plaintiffs' preliminary information and are subject to revision.  Plaintiffs will refine their damage calculations as they obtain and analyze relevant information from Defendants through discovery and reserve their rights to fully amend and supplement this disclosure as necessary.

### 1.   FCA and Common Law Fraud Damages

**Medicaid**:      Information regarding damages suffered by the Medicaid Programs of each state in connection with NDC-based reimbursement is provided in the accompanying disc labeled "Damages 1" in the file named NDC.Damages.xls.  There are a variety of different damages theories that may apply to the Defendants' false price reporting conduct and the resulting harm to the Medicaid Programs.  The Medicaid Programs paid approximately $125 million for the Defendants' products identified in the Complaint.  The payments were all tainted by the illegal kickbacks alleged in the United States' Complaint.  Under a damages theory based on the claims being paid as a result of the Defendants' unlawful conduct, the single damages suffered by the Medicaid Programs would be the entire $125 million paid for the Defendants' products listed in the Complaint. Under an alternative damages theory, single damages would equal the difference between the reimbursements inflated by the Defendants' false price reporting and the prices at which the products in the Complaint were generally and currently available in the marketplace. Plaintiffs have engaged experts to explore alternative damages theories arising from NDC-based Medicaid reimbursement for the Defendants' drugs identified in the Complaint and will supplement this part of its initial disclosures as necessary.

Information regarding damages suffered by each state's Medicaid Program in connection with J-Code based reimbursement is not available at this time.  Plaintiffs do estimate that the total amount of Medicaid J-Code reimbursement could exceed the amount of Medicaid NDC-based reimbursement.  Plaintiffs have engaged experts to explore various Medicaid J-Code damages theories, including the damages theory based upon the claims having been paid as a result of the Defendants' wrongful conduct.

**Medicare**:      Information regarding damages suffered by the Medicare Program in connection with J-Code based reimbursement is provided in the accompanying disc labeled "Damages 1" in the file named Abbott Medicare Damages 1.xls.  The Medicare program paid approximately $210 million in total reimbursement for the specified J-Codes between 1993 and 2000.  Additional damages may also have been caused in connection with additional reimbursement paid in all or a portion of 2001.  The spreadsheet tab labeled Vancomycin calculates the portion of the total Vancomycin reimbursement paid for the Defendants' products based upon its estimated minimum market share for each year at issue.  The spreadsheet tab labeled Solutions calculates the portion of the total solutions reimbursement paid for the Defendants' products based upon its estimated minimum market share for each year at issue. The payments were all tainted by the illegal kickbacks alleged in the United States' Complaint. Under the damages theory that bases damages upon the claims paid as a result of the Defendants' unlawful conduct set forth above, the entire amount of reimbursement for the Defendants' products was improper, which for the Defendants is estimated to be approximately $89 million in single damages.  In addition to that theory, the Plaintiffs have engaged experts to explore

4

alternative Medicare damages theories and will supplement this part of its initial disclosures as necessary.

***

Additionally, Plaintiffs seek treble the amount of its actual damages under the False Claims Act, plus penalties of between $5,000/$5,500 and $10,000/$11,000 for each false claim submitted or caused to be submitted by the Defendants to Medicaid and Medicare during the time period identified in the Complaint.  For the common law fraud claims, the Plaintiffs seek compensatory and punitive damages in an amount to be determined, together with costs and interest.

### 2.    Unjust Enrichment

As set forth in the Complaint, the recovery sought for the Plaintiffs' unjust enrichment claim is the amounts by which the Defendants were unjustly enriched, including an accounting of all revenues unlawfully obtained by the Defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by the Defendants, plus interest, costs, and expenses.  The information required to quantify these amounts is solely in the Defendants' possession and will be sought in discovery.

DATED this _____ day of August, 2006.

5

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

_____

MARK A. LAVINE
ANA MARIA MARTINEZ
ANN ST. PETER-GRIFFITH
Assistant U.S. Attorneys
99 N.E. 4th Street
Miami, FL   33132
Phone:  (305) 961-9003
Fax: (305) 536-4101
Mark.Lavine@usdoj.gov

_____

MICHAEL F. HERTZ
JOYCE R. BRANDA
RENÉE BROOKER
JUSTIN DRAYCOTT
GEJAA T. GOBENA
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088

ATTORNEYS FOR THE UNITED STATES

6

JAMES J. BREEN
ALISON W. SIMON
THE BREEN LAW FIRM, P.A.
P. O. Box 297470
Pembroke Pines, FL 33029
Telephone: 954-874-1635
Facsimile: 954-874-1705


SHERRIE R. SAVETT
GARY L. AZORSKY
SUSAN S. THOMAS
JEANNE A. MARKEY
JOY CLAIRMONT
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000
Facsimile: 215-875-4636


ATTORNEYS FOR VEN-A-CARE
OF THE FLORIDA KEYS, INC.

7

<u>CERTIFICATE OF SERVICE</u>

I, Mark Lavine, hereby certify that this document served by electronic mail and express mail to counsel listed below, on this date.

August 9, 2006

_____
Mark Lavine

**<u>SERVICE LIST</u>**

James J. Breen
The Breen Law Firm, P.A.
3350 S.W. 148th Avenue
Suite 110
Miramar, FL 33027
Tel:  (954) 874-1635
Fax: (954) 874-1705
Email: jbreen@breenlaw.com
*Counsel for Relator*

R. Christopher Cook
Daniel Reidy, Esq.
James Daly, Esq.
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692
Tel: (312) 782-3939
Fax: (312) 782-8585
Email: jrdaly@jonesday.com

*Counsel for Defendants*