# EXHIBIT WWW
# (PART 1)

# United States, ex rel. Ven-A-Care of the Florida Keys, Inc.
# v.
# Abbott Laboratories Inc.

*Materials Filed in Support of Abbott Laboratories Inc.'s Memorandum in Support of its Motion for a Finding of Spoliation and for Sanctions* (filed June 4, 2009)

# Evidence of What Federal and State Understood About Average Wholesale Price

# CMS Testimony (Bruce Vladeck, Thomas Scully and Charles Booth)



# Testimony of Sandra Kramer (Michigan) and Jerry Dubberly (Georgia)



# Audiotape of March 24, 1994 Pharmacy Technical Advisory Group Meeting (State and Federal Officials)



Audio clip #1



Audio clip #2

# Testimony of Leo Sullivan (Tennessee)



# Testimony of Bruce Vladeck (CMS)



# The Government Has Known the Invoice Price and "Spread" for Abbott's Vancomycin Since at Least 1991





**Invoice Price =  $4.59**

**AWP =  $24.88**

Source: HHD200-1431; HHD200-0016

8

# OIG Informed CMS and the Public About the "Spread" on Vancomycin in 1992



Department of Health and Human Services

## OFFICE OF INSPECTOR GENERAL

COST OF DIALYSIS-RELATED [

| Drugs/Dosage | EAC | AWP | Payment Difference | Number of Facilities At or Below EAC[1] | Number of Facilities Above EAC |
|---|---|---|---|---|---|
| Calcijex 1 MCGM | $ 7.34 | $ 9.18 | $ 1.84 | 19 | 7 |
| Imferon 2 ML | $10.19 | $11.99 | $ 1.80 | 9 | 9 |
| Vancocin/ Vancomycin 500 ML[2] | $ 5.00 | $19.17 | $14.17 | 12 | 9 |

NOTES

[1]   Not all facilities administered or purchased the drug in the same dosage.  To ensure adequate comparison, we limited our analysis to only 1 month, May 1991, and the same dosage.

[2]   This drug is a multiple-source drug.  We used the median AWP for the generic drug.



OCTOBER 1992   A-01-91-00526

Source: Abbott Ex. 82

# Evidence of Cross-Subsidization Policies by Government Payors for Home Infusion

# *Medicaid Pharmacy Bulletin* (Jan.-Feb. 1988)



ME-31-1

## Medicaid Pharmacy Bulletin

Volume 2, No.1       JANUARY-FEBRUARY 1988

### Developing An Effective Reimbursement Methodology
### For Home I.V. Therapy

Home Intravenous (IV) Reimbursement Is A Complex Issue For Medicaid Pharmacy Programs.

One of the many problems facing Medicaid pharmacy administrators is the determination of an equitable and effective methodology for the reimbursement of home IV therapy. Because home IV therapy involves the extensive use of multiple pharmaceuticals, supplies, and equipment, the composition of which often differs from prescription to prescription, it is difficult to standardize and streamline the reimbursement process.

The process is further complicated by the fact that the dispensing of home IV medications is more complex than the dispensing of other outpatient drugs. Because home IV therapy involves a host of additional pharmacy services (storage, preparation, delivery, patient instruction, etc.), it is generally agreed that it is more expensive to dispense this type of medication than to dispense other outpatient drugs. Most Medicaid programs, however, do not recognize this in the form of additional compensation, other than the usual dispensing fee.

The cost of therapy is also made very high because home IV therapy involves large volumes and quantities of drugs and sup... This may limit coverage for certain home services and supplies. It is also difficult to estimate the purchase prices being paid to... providers, given volume and trade discou...

Medicaid Programs Are Becoming More ... Of The Importance Of Encouraging Provi... Participation In Home IV Therapy

As cost containment becomes increasingly important to Medicaid progra... home health services, including home IV therapy, are seen as a means of cost avoi... — a way of potentially reducing costs in ... areas of the Medicaid program, especiall... hospitalization costs. In order to take advantage of home health services, state... programs must encourage provider participation. A number of Medicaid pha... programs have begun to investigate and ... the reimbursement process for home IV t... in an attempt to adequately compensate ... pharmacy providers, thereby encouraging provision of this type of service.

Provided as a service to Medicaid by Lederle Laboratories, Wayne, N.J.

The process is further complicated by the fact that the dispensing of home IV medications is more complex than the dispensing of other outpatient drugs. Because home IV therapy involves a host of additional pharmacy services (storage, preparation, delivery, patient instruction, etc.), **it is generally agreed that it is more expensive to dispense this type of medication than to dispense other outpatient drugs. Most Medicaid programs, however, do not recognize this in the form of additional compensation, other than the usual dispensing fee.**

# Florida's Attempt To Implement a Reasonable Reimbursement Mechanism for Home Infusion Drugs

## 1998 Florida Legislative Proposal



**Executive Summary:**

Intravenous/Intramuscular administration of drugs such as antibiotics, cancer chemotherapy, immune suppression agents and many others, during the past 6 years, has moved dramatically from the inpatient hospital environment to the patients home. As a result, parenteral/enteral (PE) pharmacy, a distinct permit entity by the board of pharmacy, is increasingly the provider of services for Medicaid patients. The Medicaid prescribed drug program, developed to reimburse community pharmacies for self administered oral and topical medications, does not respond to the requirements of this new therapeutic modality. Cost savings resulting from reduced inpatient days are dramatic but result in increased costs for prescribed drugs. The current dispensing fee ($4.23) does not approach the cost of providing these services and no current reimbursement exists for ancillary supplies (syringes/needles, tubing, admixture bags, IV pumps etc). This bill will authorize establishing a distinct provider type for parenteral or infusion pharmacy services. It is anticipated that reimbursement will be based on product cost plus a patient management fee or per diem rate as is routine policy in commercial managed health care plans. Artificially inflated drug pricing by manufacturers for parenterally administered drugs can be adjusted to reflect true costs while improving access to these services in a lower cost setting.

Source: Abbott Wells Ex. 6

# Myers & Stauffer Report Prepared for the Louisiana Department of Health and Hospitals (Sept. 1999)

A Survey of
Acquisition
Pharmaceu
Louisiana

Prepared for the
~~Louisiana~~ Department of Health and Hospitals
Baton Rouge, Louisiana

September 1999


Myers and Stauffer LC
Certified Public Accountants

In every pharmacy dispensing study where information on I.V. solution dispensing activity has been collected by Myers and Stauffer, such activity has been found to be associated with higher dispensing costs. Discussions with pharmacists providing I.V. solutions indicate that the activities and costs involved in filling I.V. prescriptions are significantly different from the costs incurred by the typical retail (or long term care) pharmacy. The reasons for this difference include:

Table 3.3  Cost Per Prescription  - I.V. Versus non I.V. Pharmacies

| Type of Pharmacy | Number of Pharmacies | Unweighted Mean Total Cost | Standard Deviation | Mean Total Cost Weighted by Total Volume |
|---|---|---|---|---|
| Pharmacies Dispensing I.V. Prescriptions | 28 | $18.57 | $32.86 | $8.97 |
| Pharmacies Not Dispensing I.V. Prescriptions | 377 | $5.55 | $1.76 | $5.14 |

*(Dispensing Costs have been inflated to the common point of June 30, 1999)*

• Although typical dispensing fees reimburse less than the dispensing costs of I.V. pharmacies, they are generally able to break even based on the margin allowed on ingredient cost reimbursement.

Source: Abbott Ex. 1051

13

# Myers & Stauffer Report Prepared for the California Department of Health Services (June 2002)



Study of Medi-Cal Pharmacy Reimbursement

Prepared for the
California Department of Health Services

June 2002

Myers and Stauffer
Certified Public Accountants

or home infusion prescriptions. In every dispensing cost survey performed by Myers and Stauffer in which data on the provision of intravenous services was collected, the provision of this service has been associated with higher dispensing costs.

Although the analysis should not be considered comprehensive, the data suggests that dispensing costs ranging from $20 to $40 per intravenous prescription would be considered typical. In addition to variable states of

approximately $350.[24] Based on the results of the acquisition cost study performed simultaneously with the dispensing cost survey and the assumption of the Department's current ingredient reimbursement formula of AWP minus 5%, it is estimated that such an average prescription would yield a margin on ingredients of approximately $42. **This margin typically allows for adequate reimbursement of the pharmacy's dispensing cost. So long as the ingredient reimbursement rate remains at AWP minus 5% or any other relatively "high" level, the need for the Department to set a separate dispensing fee for intravenous drugs is somewhat mitigated by the margins realized on ingredient reimbursement.**

# States Rejected the DOJ AWPs Because Drug Margins Were Necessary for Providers

## Missouri





Missouri officials initially implemented the more accurate prices for provider reimbursement using the normal $4.09 dispensing fee, which was not designed to cover these drugs. Division officials reversed this decision after home infusion providers threatened to cease services due to insufficient dispensing fees. Provider personnel admitted the former reimbursement rates exceeded their product acquisition costs, but they used the excess reimbursement to offset the higher dispensing costs of home infusion drugs. Division officials indicated they plan to use these lower prices again after determining adequate compensation for home infusion services. While no implementation date has been set, the Division Director stated the necessary changes to implement these prices would be part of the division's fiscal year 2004 budget proposal.

Report No. 2002-48
June 28, 2002
www.auditor.state.mo.us

# Benny Ridout (North Carolina) and Leo Sullivan (Tennessee)



# Testimony of Thomas Scully (CMS)



# Evidence of How Government Payors Measured Drug Margins

# Congressional Budget Office Report



**Measuring Markups**

In addition to dollar terms, the difference between the ... quiring the drug from the manufacturer, divided by Medicaid's payment.

The two measures—the markup and the margin—yield very different pictures. For example, the percentage margin retained by pharmacies and wholesalers has been ...

... unrelated to the cost of acquiring its ingredients or the size of the prescription, the dollar markup is a better indicator of the size or adequacy of Medicaid's reimbursements to pharmacies than is the percentage margin. The time a pharmacist spends filling a prescription is generally unrelated to the drug's cost and is only marginally greater for larger prescriptions than for smaller ones. Moreover, the shelf space required to store a $5 pill is no different from that required for a $1 pill. If ingredient costs increase, pharmacies' cost of invested capital tied up in inventories will increase, as drugs are held on the shelves and pharmacies are waiting for payment from Medicaid. By CBO's estimates, however, on a per-prescription basis, those costs account for only a small share of the increase in markups over the period.[5]

Highlighted callout text:

> The two measures—the markup and the margin—yield very different pictures. For example, the percentage mar-

> size of the prescription, the dollar markup is a better indicator of the size or adequacy of Medicaid's reimbursements to pharmacies than is the percentage margin. The

Source: Abbott Ex. 475

19

# Testimony of Cody Wiberg (Minnesota), Leo Sullivan (Tennessee), and M.J. Terrebonne (Louisiana)



# Evidence That Drug Payment Rates are, In Fact, Established Through Negotiation with Providers, Not Through Estimates of Actual Acquisition Cost

# Payment Rates Are Negotiated With Providers to Maintain Access to Care

## Illinois

## Idaho



Our drug cost methodology was derived via a two step approach which included 1) a thorough review of what other State's were doing and selecting the percentage off of AWP that was reasonable and 2) conducting negotiations with the Pharmacy Industry.

· Representatives from the state pharmacy association, hospital association, and retailer's association met with the Department numerous times to negotiate reimbursement rates for pharmacies. It should be noted that the pharmacy representatives were concerned that lowering the dispensing fee may create additional access problems for Medicaid participants, especially those serviced by rural independent pharmacies.

Source: Abbott Ex. 769

Source: Abbott Ex. 491

# CMS Recognizes This

**REVIEW OF MEDICAID DRUG STATE PLAN AMENDMENTS**

Although there are no statutory provisions for payment rates for Medicaid drugs, states are required to set rates in accordance with regulations at 42 CFR 447.301-333.

BACKGROUND

*Estimated Acquisition Cost (EAC) and Dispensing Fee*

There are two c...
separately. The...
the drug. The s...
cost of dispensi...
overhead costs ...
separately. The...
best estimate of...
or sold by a par...
purchased by pr...
regulations req...
described "com...

In practice we h...
provide a factua...
support a chang...
current acquisiti...
reviewing state ...
rates as well as...
drug cost studie...
fee by: (1) audit...
professional sal...
overhead costs,...
they could, amo...
e.g. the Consum...

*Office of Inspec...*

Recently issued...
prescription drug products nationally is an average of AWP less 21.84 percent. Recent discussions with the OIG indicate that they will further refine this number to differentiate it between those single source (brand name drugs) without generic competition and those with innovator multiple source (brand name drugs) with generic competition. The OIG indicates that the single source drugs will likely show an average discount of around 17% and the innovator multiple source drugs of around 24%. The OIG also studied generic

---
[1] States usually base the EAC on Average Wholesale Price (AWP) levels with a significant discount e.g. AWP less 10%.

ANALYSIS

In recent months there has been an increase in SPAs proposing to change the reimbursement methodology (a listing of these SPAs is attached). Where there are surveys of costs, the findings generally show that these State's reimbursement could have been reduced by a percentage greater than the proposed AWP discount levels. The lesser level of discount is generally the result of negotiations that occur between the state and pharmacy representatives after the survey results are known. In other cases, the states legislature have responded to the escalating costs of Medicaid drugs by enacting legislation that increases the discount in the ingredient cost or the dispensing fee of these drugs. Legislation usually does not address why these rates are the best estimates or are reasonable.

Source: Abbott Ex. 328

# Testimony of Cody Wiberg (Minnesota) and Jerry Dubberly (Georgia)



# The Government's Expert Recognizes the Complexity of the Issues Involved

Impact of the 10 Percent Fe

on Medi-Cal Bene

Prepared by:

Stephen W. Schondelmeyer, Pharm.D., M.A. Pub.Adm., Ph.D., FAPhA
Professor of Pharmaceutical Management & Economics
Director, PRIME Institute
College of Pharmacy
University of Minnesota
Minneapolis, Minnesota  55455

Phone: (612) 624-9931;  FAX:  (612) 625-9931

June 3, 2008

## D.  Impact on Medi-Cal Program Overall

The 10 percent fee reductions for Medi-Cal prescriptions will not simply result in the Medi-Cal patients getting the same prescriptions at the same pharmacies for 10 percent less cost.  Virtually all pharmacies will refuse a few high cost Medi-Cal prescriptions. Some pharmacies will refuse some Medi-Cal prescriptions and some patients.  Other pharmacies will refuse all Medi-Cal prescriptions and all patients.  The point is, there will be patients who do not receive the care that they need and will end up seeking alternative sources of care that may be less effective, more costly, or both.  The continuity and coordination of care for Medi-Cal patients will decrease.  For example, epilepsy and mental health patients will use the emergency room in an attempt to get medications that the community pharmacies choose not to provide due to the loss that will be incurred every time these prescriptions are dispensed.  Hospitalizations and other forms of institutionalization for certain types of patients are likely to increase substantially and the cost of care will also escalate.



Spoliation Timeline

# Duty to Preserve Evidence Began in 1995



**June 23, 1995**
Ven-A-Care files *qui tam* complaint under seal.

**Sep. 14, 1995**
HCFA, OIG, DOJ and Ven-A-Care meet in Baltimore to discuss allegations in the *qui tam* complaint. Ven-A-Care informs HCFA of the alleged "fraud scheme" and the prices for the Subject Drugs.

**Mar. 19, 1998**
Ven-A-Care and DOJ presentation to head of HCFA (Nancy Ann Min DeParle) and to NAMFCU

**Aug. 4, 2000**
Defendants demand in writing that DOJ and HHS retain government knowledge evidence.

**Mar. 17, 2000**
Defendants submit white paper describing defenses based on government policy and knowledge

**Oct. 27, 1999**
DOJ makes presentation to Abbott seeking settlement.

| 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
| --- | --- | --- | --- | --- | --- |

**Feb. 1996 to July 2000**
DOJ issues three document demands on Abbott.

27

# Government's Preservation Efforts Were Late and Inadequate



**Nov. 18, 2003**
CMS begins
to collect documents
for MDL subpoena.

**Sep. 4, 2004**
CMS changes
to Outlook;
destroys emails.

**Jan. 2007**
CMS issues first document hold
memo in *qui tam* action. Details
redacted on claim of privilege.

**Jan. 19, 2007**
Boughn testifies
that no steps have
been taken to
make forensic
copies of emails
or servers at CMS.

**Nov. 30, 2006**
DOJ allegedly instructs
MFCUs to preserve evidence.
No documentary evidence
provided.

**Nov. 22, 2006**
Abbott serves deposition
notice for CMS document
preservation witness.

**Mar. 20, 2007**
Robey testifies
that she has no
hold on archived
CMS documents.

| 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|

**Mar. 17, 2006**
DOJ intervenes against Abbott.