# EXHIBIT WWW
# (PART 2)

# SLIDE 3

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

Page 1

            UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY      :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

-----------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :  06-CV-11337-PBS

Laboratories, Inc.                   :

-----------------------------------X


            IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

-----------------------------------X

STATE OF ALABAMA,                    :  CASE NO.

          Plaintiff,                 :  CV-05-219

     v.                              :

ABBOTT LABORATORIES, INC.,           :  JUDGE

et al.,                              :  CHARLES PRICE

          Defendants.                :

-----------------------------------X

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                    New York, NY

Page 278

1    make it through the House legislative process.
2    Whether at the committee level or at the full
3    House level I don't recall.
4        Q.   And that would be for the proposed 1998
5    budget?
6        A.   That would be in the Balanced Budget
7    Act which addressed the Fiscal 1998 budget.
8        Q.   And that would be the legislation that
9    legislated that Medicare Part B reimbursement
10   would be at 95 percent of AWP.  Correct?
11       A.   I don't recall what our original
12   proposal was, and I don't recall the details of
13   the legislative process.  I think it came out the
14   other end at 95 percent.
15       Q.   Right.  The ultimate legislation.
16       A.   The ultimate legislation called for 95
17   percent of AWP, yes.
18       Q.   And the AWP in that legislation, did
19   you understand that in the same way you
20   understood AWP in the regulation from 1992?
21       A.   Yes.
22           MS. BROOKER:  Objection.  Form.

Page 279

1        Q.   And so that would refer to a published
2    average wholesale price.  Correct?
3        A.   That was our understanding of it, yes.
4        Q.   And the next cc is Teruni, T-E-R-U-N-I,
5    Rosengren, R-O-S-E-N-G-R-E-N, with the GAO.  Do
6    you know who Mr. or Ms. Rosengren is?
7        A.   No, I do not.
8        Q.   There is Michael Hertz, United States
9    Department of Justice.  Do you know who Mr. Hertz
10   is?
11       A.   Mr. Hertz was a senior person in the
12   civil litigation side of the Department of
13   Justice, from my understanding.  I, in fact, had
14   met Mr. Hertz and worked with him on an other
15   number of occasions.
16       Q.   And the next are Mr. Breen and Mr.
17   Wampler from the Wampler, Buchanan and Breen
18   firm, Mr. Breen here in the flesh, and Mr.
19   Wampler.  Do you -- and at the time did you know
20   who Mr. Wampler and Mr. Breen were?
21       A.   No.  I had not had the pleasure.
22       Q.   Okay.  I'd like to show you one last

Page 280

1    exhibit, and then we'll let you go promptly at 4
2    to your call.
3            MR. COOK:  We will mark this, as soon
4    as we go off the record, as Exhibit Abbott 165.
5            For the record, it's a printout of a
6    Wall Street Journal article dated May 12th, 2000,
7    entitled "Medicare monitor, how a whistleblower-
8    spurred pricing case involved drug makers."  And
9    the second sub bullet, "Toilet seat as a talking
10   point."
11       Q.   I'll ask you to take a quick look that
12   and ask you, do you recall that?
13       A.   I recall the newspaper story.  I recall
14   being interviewed for it.
15       Q.   And tell me what you recall about the
16   interview for that newspaper story.
17       A.   Ms. McGinley, the reporter from the
18   Wall Street Journal, with whom I had worked with
19   quite a bit over the time, called me and told me
20   that she was asking about it.  She asked me if I
21   remembered the toilet seat, and I think she
22   probably pretty accurately reported in this

Page 281

1    newspaper story my response to her.
2        Q.   And that response on this Page 2 of
3    this particular printout is on the fourth
4    paragraph up from the bottom.  And I'll read it
5    for the record, attributed to you:
6            "I thought the toilet seat was clever,
7    but the tone of the letter was so hostile that it
8    took all the fun out of it.  We were not unaware
9    of the problem, we were just moving slowly."
10           Do I understand correctly that you were
11   accurately quoted as saying that HCFA was not
12   unaware of the problem when you received the
13   letter in June of 1997?
14           MS. BROOKER:  Objection.  Form.
15       A.   We were not unaware of certainly the
16   Medicare problem, which was the one we were -- I
17   was focused on.
18       Q.   And the one described in the letter.
19   Correct?
20       A.   That is correct.
21           MR. COOK:  It's 4:02.  I have blown two
22   minutes past your prompt 4:00 adjournment time.

a005168d-477f-4afb-97fe-d27a3af7b9a9

Page 443

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL       : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION

PRICE LITIGATION            : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO    : U.S. ex rel.

Ven-a-Care of The Florida   : Judge Patti B. Saris

Keys, Inc.                  :

     v.                     :

Abbott Laboratories, Inc.,  : Chief Magistrate

No. 06-CV-11337-PBS         : Judge Marianne B.

- - - - - - - - - - - - - -x  Bowler




          THOMAS A. SCULLY - VOLUME II

               JULY 13, 2007

               WASHINGTON, DC




   (CAPTION CONTINUED)

15199ddc-fb97-46a6-9907-a9804764b3c3

Scully, Thomas A. - Vol. II                    July 13, 2007
                    Washington, DC

Page 708

1  generally, that with generic products, as a
2  general proposition, WAC prices over time
3  declined to reflect competition?
4       MR. NEAL:  Object to the form.  You can
5  answer.
6       A.  I didn't know that.
7       Q.  Did you know that to the extent some
8  drugs end up having high spreads it's because --
9  some generic drugs -- end up with high spreads
10 it's because prices keep getting lower and lower
11 as there's more competition?
12      MR. NEAL:  Objection.
13      MR. RIKLIN:  Objection to form.
14      A.  I was aware of that.
15      Q.  So were you aware that -- that
16 increasing spreads were --
17      A.  But prices get lower and lower to the
18 providers, not to the government.
19      Q.  Well, to the providers, in the sense
20 that the, for example, the WAC keeps declining?
21      A.  Right.
22      Q.  And AMPs would keep declining, as well;

Page 709

1  right?
2       MR. NEAL:  Objection to form.  You can
3  answer.
4  BY MR. ESCOBAR:
5       Q.  Well, that would be -- that would
6  generally be true; right?
7       MR. RIKLIN:  Objection to form.
8  BY MR. ESCOBAR:
9       Q.  And so the government would be able to
10 see that the life of a drug like Albuterol that
11 the WACs and the AMPs decline over time; right?
12      MR. RIKLIN:  Objection to form.
13      MR. NEAL:  I'll join in the objection.
14 You can answer.
15      A.  Yes.
16      Q.  Now, if you turn to page 13 of the
17 complaint, Exhibit Dey 028, just read to yourself
18 paragraph 40?
19      A.  Yes.
20      Q.  Okay.  Now, this was a complaint that
21 was signed the 22nd day of August, 2006, and on
22 paragraph 40, in the first sentence, it says, AWP

Page 710

1  is used to refer to the price at which a
2  pharmaceutical firm or a wholesaler sells a drug
3  to a retail customer, who then administers it to
4  a patient; do you see that?
5       A.  Yes.
6       Q.  That's not what AWP was viewed as,
7  that's not the view of CMS as to what AWP was, is
8  it?
9       MR. NEAL:  Objection as to form.
10 BY MR. ESCOBAR:
11      Q.  Is it?
12      MR. NEAL:  This is not a 30 (b)(6),
13 this is not a 30 (b)(6) deposition.  You can
14 answer.
15      A.  No, I don't think that's what AWP is
16 commonly considered to be, I think that's an
17 inaccurate description.
18      Q.  In fact, that's a completely inaccurate
19 statement of AWP; right?
20      MR. NEAL:  Objection as to form.
21      A.  I think it's probably a poor
22 description, yes.

Page 711

1       Q.  Because it's not accurate?
2       A.  Yes.
3       MR. NEAL:  Objection as to form.
4  BY MR. ESCOBAR:
5       Q.  Now, you would think that -- well,
6  let's take the next one -- WAC is used to refer
7  to the price at which a pharmaceutical firm
8  typically sells a drug to wholesalers who will
9  then resell it to a retail customer; do you see
10 that?
11      A.  Yes.
12      Q.  And that's a description of what WAC
13 is, is also not accurate; is it?
14      MR. NEAL:  Objection as to form.
15      A.  Well, a little closer.
16      Q.  But it's not accurate, is it?
17      MR. NEAL:  Objection.
18      A.  Probably not totally accurate.
19      Q.  In fact, that sentence, where the
20 government describes in the complaint against Dey
21 what WAC is, this does not include the fact that
22 it's -- it lists price before discounts, which is

15199ddc-fb97-46a6-9907-a9804764b3c3

Charles R. Booth                                    October 29, 2007
                        Washington, DC

                                                              Page 265

                    UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS

        - - - - - - - - - - - - - - -

        IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

        INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

        PRICE LITIGATION              ) 01-CV-12257-PBS

        THIS DOCUMENT RELATES TO      )

        U.S. ex rel. Ven-a-Care of    ) Judge Patti B. Saris

        the Florida Keys, Inc.        )

             v.                       ) Chief Magistrate

        Abbott Laboratories, Inc.,    ) Judge Marianne B.

        No. 06-CV-11337-PBS           ) Bowler

        - - - - - - - - - - - - - - -

             (captions continue on following pages)


             Videotaped deposition of CHARLES R. BOOTH

                        Volume II



                        Washington, D.C.

                        Monday, October 29, 2007

                        10:00 a.m.

432ce50a-616b-406d-b9bd-d3b4c631b461

Charles R. Booth                                    October 29, 2007
                        Washington, DC

| Page 518 | Page 520 |
|---|---|

**Page 518**

1    MR. GOBENA:  Object to the form.
2    A.   It was my understanding that physicians
3  were paying less for many drugs than they were
4  receiving in payment.
5    Q.   You answered some questions from a number
6  of attorneys, including Mr. Merkl most recently,
7  about your understanding about what AWP referred to.
8  Do you recall those questions?
9    A.   Yes.
10   Q.   During this time period from 1991 to 1997
11 what was your understanding of what AWP referred to?
12   A.   AWP was what the manufacturers chose to
13 put in the compendia.
14   Q.   At any time in this time period did you
15 understand AWP to refer to a calculated average of
16 wholesale prices that were charged to physicians or
17 other purchasers of these products?
18   A.   No.
19       MR. GOBENA:  Object to the form.
20   Q.   At any time were you ever fooled into
21 believing that average wholesale price somehow was
22 the same thing as acquisition cost?

**Page 520**

5  _____
6      SIGNATURE OF THE WITNESS
7
8  Subscribed and sworn to and before me
9  this _____ day of _____, 20____.
10
11
12 _____
13     Notary Public

**Page 519**

1       MR. GOBENA:  Objection to the form.
2       MR. WINGET-HERNANDEZ:  Objection.
3    A.   Was that a leading question?
4    Q.   Yes, sir.
5    A.   Fine.
6        I did not believe that there was a
7  relationship to any great extent between acquisition
8  costs and AWP.
9        MR. MERKL:  I have no more questions.
10       MR. GOBENA:  Anyone else?  Or are we
11 done?
12       THE VIDEOGRAPHER:  This deposition
13 concludes at 4:12:15 and consists of five tapes.
14       (Whereupon, at 4:12 p.m. the deposition
15 was adjourned.)
16           * * * * *
17
18
19
20
21
22

65 (Pages 518 to 520)

432ce50a-616b-406d-b9bd-d3b4c631b461

# SLIDE 4

Kramer, Sandra                                    March 25, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL INDUSTRY          MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION    Civil Action:

01-CV-12257-PBS

THIS DOCUMENT RELATES TO U.S.         Judge Patti B. Saris

Ex rel. Ven-A-Care of the Florida     Magistrate Judge

Keys, No. 06-CV-11337-PBS             Marianne B. Blower

                                /



    The Videotaped Deposition of SANDRA KRAMER,

    Taken at 2860 Eyde Parkway,

    East Lansing, Michigan,

    Commencing at 9:08 a.m.,

    Tuesday, March 25, 2008,

    Before Cynthia A. Chyla, CSR 0092.

Kramer, Sandra                                    March 25, 2008

Page 102

1    Q.   Did you understand that WACs were reported
2  in other pricing compendia?
3    A.   Probably from Medi-Span, yes.
4    Q.   Now, you state: "It is for this reason that
5  pharmacists often refer to AWP as artificial wholesale
6  price."
7            What was the source of information
8  for that statement?
9    A.   I don't recall now.
10   Q.   Had you spoken with pharmacists who had used
11 the term AWP as artificial wholesale price?
12   A.   That's what's written here, so ....
13   Q.   Have you ever heard of AWP referred to as
14 Ain't what's paid?
15   A.   Yes.
16   Q.   When did you hear it referred to as Ain't
17 what's paid?
18   A.   I can't recall the exact date.
19   Q.   Was it while you worked for Michigan
20 Medicaid?
21   A.   My best recollection was not.
22   Q.   It was after?

Page 103

1    A.   Yes.
2    Q.   You don't recall the context, though?
3    A.   No.
4    Q.   Okay.
5    A.   Not the first time.
6    Q.   Would it be fair to say that when Michigan
7  used an AWP-based formula to estimate acquisition
8  costs, it did not hold AWP out to be a reflection of
9  market prices?
10           MR. HENDERSON:  Objection to form.
11 BY MR. GABEL:
12   Q.   You understood that in 1994 when you drafted
13 this; right?
14   A.   Right.  We knew that we had to discount it.
15   Q.   Placing before you a document that has
16 previously been marked as Abbott Exhibit 19, is this
17 the document that Mr. Henderson sent to you to review?
18   A.   It appears to be.  I'm uncertain.
19   Q.   Okay.  And you'll see it's entitled
20 Complaint?
21           MR. GABEL:  And, for the record,
22 this is the Complaint by the Government against Abbott

Page 104

1  Laboratories.
2  BY MR. GABEL:
3    Q.   If you could look at Paragraph 42, please,
4  and that's on page 14.
5            Are you there?
6    A.   Yes.
7    Q.   Okay.  You'll see at Paragraph 42, it says:
8  "AWP is used to refer to the price at which a
9  pharmaceutical firm or a wholesaler sells a drug to a
10 retailer customer who then administers it to a
11 patient."
12           That's not how you understood AWP in
13 1994; right?
14           MR. HENDERSON:  Objection.
15   A.   I understood it as the list price.
16 BY MR. GABEL:
17   Q.   This definition of AWP here, Paragraph 42 of
18 the Complaint, isn't consistent with the documents that
19 we just looked at --
20           MR. HENDERSON:  Objection.
21 BY MR. GABEL:
22   Q.   -- of defining AWP; right?

Page 105

1            MR. HENDERSON:  Objection to the
2  form.
3    A.   Not with my understanding.
4  BY MR. GABEL:
5    Q.   Switching gears just a little bit, could you
6  tell me what your definition of the state plan is?
7            MR. HENDERSON:  Objection.
8    A.   The best of my ability, it's the agreement
9  with the Medicaid agency with CMS.
10 BY MR. GABEL:
11   Q.   Agreement on how the Medicaid program would
12 be administered and run?
13   A.   That component, yes, and its coverages.
14   Q.   Do you know if AWP was defined in the state
15 plan at all?
16   A.   Not to my recollection.
17   Q.   What's your definition of the term actual
18 acquisition costs?
19           MR. HENDERSON:  Objection to the
20 form.
21   A.   I would have to refer you to the policies
22 that were in place in the Michigan Medicaid Manual.

27 (Pages 102 to 105)

a2ec164a-d34e-4eff-9164-2373f4149e12

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

----------------------------------X

GA Department of Community Health (Jerry Dubberly)                                    December 15, 2008

Atlanta, GA

Page 342

1   can answer to the extent that he can answer,
2   given the objections and his earlier testimony.
3       Q.  (By Mr. Cole)  Do you understand the
4   question, Mr. Dubberly?
5       A.  I do.  But I'm not sure I understand
6   what counsel just said.
7           MS. TOWNES:  Well, I just reminded him
8   that earlier you informed -- I don't -- I don't
9   know if he recalls, but when you were asked a
10  question by -- I don't know -- I guess it was Mr.
11  Lavine, you informed him that the State hasn't
12  taken a position, and I was just reminding him of
13  that.
14      Q.  (By Mr. Cole)  Let me clarify, Mr.
15  Dubberly.
16          I'm not asking you to -- to pick a side
17  or to say whether a claim is valid or -- or not
18  valid.
19          I'm -- I'm simply asking you to tell me
20  if you agree or disagree with the way the term
21  "AWP" has been defined in the United States'
22  complaint in this case.

Page 343

1           MR. LAVINE:  Object to form.
2           MR. SULLIVAN:  And let me make a
3   further objection.  Since it's a 30(b)(6)
4   deposition, you're actually asking him to state
5   the State of Georgia's position, not his own.
6           MR. COLE:  That's true.
7           MR. SULLIVAN:  And I think you -- and
8   his counsel has already explained what his
9   testimony has already been.
10          MR. COLE:  You guys can state your
11  objections for the record.  I believe Mr.
12  Dubberly answers -- understands the question.
13          And I would ask the court reporter to
14  read it back it him one more time so that he can
15  answer.
16              (The record was read by the
17  reporter.)
18          MR. LAVINE:  Same objections.
19          MR. SULLIVAN:  Same objections.
20      A.  I would disagree with that -- with that
21  definition.
22      Q.  (By Mr. Cole)  Mr. Dubberly, earlier

Page 344

1   you were shown a document -- I think it was
2   Exhibit 20 -- and it was a chart.  It was a one-
3   page -- it looks like a spreadsheet, and it had
4   various columns.
5           It said, State, Litigation, Recoveries,
6   Counsel.
7           Do you remember that exhibit, sir?
8       A.  I do.
9       Q.  Do you have it in front of you?
10      A.  I do.
11      Q.  I'm not asking you about any
12  conversations that you may have had with counsel
13  -- either counsel for the State, any counsel
14  representing the State, any counsel potentially
15  representing the State.
16          My question to you is simply:  Did you
17  have any conversations with other nonlawyers
18  within the Georgia Medicaid program about whether
19  the State of Georgia should pursue any -- any
20  claims related to AWP?
21          MR. SULLIVAN:  I'm sorry.  I -- would
22  you mind repeating your question.  I just missed

Page 345

1   part of it, and I might have an objection; I
2   might not.  Or I can ask the court reporter to
3   read it back.  That will probably be easier.
4              (The record was read by the
5   reporter.)
6           MR. SULLIVAN:  Before you answer, I'm
7   going to object just to the extent that calls for
8   information that is within the common interest
9   privilege, the attorney-client privilege, and the
10  work product protection, given that there were
11  conversations with outside counsel with the --
12  with the State representatives within that
13  privilege.
14      A.  I do not recall any conversations that
15  were had without DCH legal present as well
16  regarding this topic.  That's to the best of my
17  recollection.
18      Q.  (By Mr. Cole)  Thank you, Mr. Dubberly.
19          MR. COLE:  I believe that's all, but
20  let me just go over my notes quickly before --
21  before I pass the witness.
22      Q.  (By Mr. Cole)  Mr. Dubberly, have you

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

dd23118e-9e82-4fd1-afbb-155015bf3b99

# SLIDE 6

Sullivan, Harry Leo                          March 12, 2008
                    Nashville, TN

                   UNITED STATES DISTRICT

            FOR THE DISTRICT OF MASSACHUSETTS


         --------------------------X

         IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

         INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

         PRICE LITIGATION            )  01-CV-12257-PBS

         THIS DOCUMENT RELATES TO    )

         U.S. ex rel. Ven-a-Care of  )

         of the Florida Keys, Inc.   )

              v.                     )  No.06-CV-11337-PBS

         ABBOTT LABORATORIES, INC.,  )

         --------------------------X


            (cross captions appear on following pages)


              Deposition of HARRY LEO SULLIVAN

                      Volume I

                 Nashville, Tennessee

               Tuesday, March 12, 2008

                    9:05 a.m.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 98

1    -- if, if actual acquisition costs is being used
2    as a reimbursement methodology, it still does not
3    get to net cost.
4       Q.   During the entirety of the time that
5    you were the director of pharmacy services for
6    Tennessee Medicaid, did you believe that the AWPs
7    in the compendia were a reliable source of
8    information regarding what pharmacies or
9    physicians actually paid for drugs?
10      A.   No.
11      Q.   And from your interactions with other
12   state pharmacy administrators, in your view did
13   other state pharmacy administrators believe that
14   AWPs were a reliable source for what pharmacies
15   and physicians actually paid for drugs?
16         MR. DRAYCOTT:  Objection.
17      A.   Again, I don't ever remember such a
18   specific discussion with, with those peers,
19   because it just wouldn't come up.  I -- everybody
20   knows the sky's blue.  I mean it is that basic to
21   me.  I couldn't imagine some -- one of your peers
22   in that situation sitting down and saying, Hey,

Page 99

1    Did you know pharmacists really aren't paying
2    AWP?
3    BY MR. TORBORG:
4       Q.   So just as the sky, just as everyone
5    knows the sky is blue, you think your peers knew
6    that average wholesale prices did not represent a
7    reliable source of the prices at which physicians
8    and pharmacies actually paid for drugs.
9       A.   That's correct.
10      Q.   During the entirety of the time that
11   you were the director of pharmacy services for
12   Tennessee, did you believe that the AWPs and the
13   compendia approximated what pharmacies or
14   physicians actually paid for drugs?
15         MR. DRAYCOTT:  Objection.
16      A.   No.
17         No.
18         And "approximate" is kind of a hard
19   term.  Well, I mean I guess you could say AWP
20   minus 22 approximates what their AWP, but I don't
21   know how you would define approximate.  But --
22   BY MR. TORBORG:

Page 100

1       Q.   Would that be --
2       A.   -- the way I would look at it, I would
3    answer no.
4       Q.   During the entirety of the time that
5    you were the director of pharmacy services for
6    Tennessee Medicaid, did you believe that there
7    was some consistent percentage by which average
8    wholesale prices exceeded actual acquisition
9    costs?
10      A.   Um --
11      Q.   Did you -- let me ask it a different
12   way.
13         Did you believe that you could shave
14   20, 30 percent off of it and get to a reliable
15   number of what pharmacies and physicians actually
16   paid for drugs?
17      A.   Well, it would, it would depend on -- I
18   mean, are we talking brand or generic?
19      Q.   Both right now.  Would you draw a
20   distinction?
21      A.   Oh, yeah.  Yeah.
22      Q.   All right.

Page 101

1       A.   The generic drugs, you know, you could
2    pay AWP minus 80 percent and still the pharmacist
3    make money for some, I assume.
4         But AWP minus 25 might be below cost
5    for a brand name drug for a rural pharmacy that
6    has a very small volume.  Okay?  So there is,
7    there is a difference between brand and generic.
8         In Tennessee, it wasn't as pronounced
9    because, you know, what I did as part of my job,
10   as soon as a drug became multi-source, and after
11   OBRA '90, as soon as that drug, the multi-source
12   version of a drug was cheaper than the brand name
13   net-net of Medicaid rebates, we MACed it.  So AWP
14   wasn't an issue on the generic side.
15      Q.   And why did you --
16      A.   But to say 20-30 percent, use that
17   number, you would have to distinguish between
18   brand and generic.
19      Q.   Would it be fair to say, Mr. Sullivan,
20   that during the entirety of the time that you
21   were the director of pharmacy services for the
22   State of Tennessee that you knew that the AWPs

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

# SLIDE 7

Vladeck, Ph.D., Bruce C.                        May 4, 2007
                    New York, NY

Page 1

                    UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

    -----------------------------------X  MDL NO. 1456

    IN RE:  PHARMACEUTICAL INDUSTRY     :  CIVIL ACTION:

    AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

    -----------------------------------X

    THIS DOCUMENT RELATES TO:           :

    U.S. ex rel. Ven-A-Care of the      :  CIVIL ACTION:

    Florida Keys, Inc. v. Abbott        :  06-CV-11337-PBS

    Laboratories, Inc.                  :

    -----------------------------------X


                    IN THE CIRCUIT COURT OF

                  MONTGOMERY COUNTY, ALABAMA

    -----------------------------------X

    STATE OF ALABAMA,                   :  CASE NO.

             Plaintiff,                 :  CV-05-219

        v.                              :

    ABBOTT LABORATORIES, INC.,          :  JUDGE

    et al.,                             :  CHARLES PRICE

             Defendants.                :

    -----------------------------------X

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                    New York, NY

Page 142

1    Q.   And for a brand name drug, would you --
2  at the time, did you expect that there would be
3  much variation between various purchasers based
4  upon volume purchases of the brand name drug?
5    A.   I believe we had a perception that the
6  bigger the purchaser, the larger the discount
7  they were likely to be able to achieve; that the
8  very largest pharmacy chains, for instance, or
9  hospital group purchasing operations, probably
10 received the most favorable prices, but that that
11 would be -- and that some small independent
12 pharmacies might actually pay average wholesale
13 price as described in the compendia; that there
14 would be a range below that in which most of the
15 prices would actually occur.
16   Q.   Turning to generic drugs for a minute,
17 what do you understand to be the differences
18 between the market for brand name drugs and the
19 market for generic drugs?
20        MS. BROOKER:  Objection.  Form.
21   A.   If we're going back to 1997 --
22   Q.   Correct.

Page 143

1    A.   -- I think it's fair to say that I had
2  really only a very limited understanding of the
3  marketplace for generic drugs and an even more
4  limited understanding of the difference between
5  the market for generic drugs and for brand drugs.
6        And, again, my perception at the time
7  was that that was likely more like a commodity
8  market in which there was probably more
9  purchasing power on the part of the large
10 purchasers, but not the same ability to raise
11 prices on the up-side to small purchasers that
12 prevailed on the brand name side.
13   Q.   I'd like to focus you just for a
14 minute, before we turn to a specific document,
15 about a particular generic drug.  I think you
16 mentioned commodities.  Are you familiar with
17 sodium saline solution?
18   A.   Yes.
19   Q.   It's a bag of salt water, essentially.
20 Correct?
21   A.   That's correct.
22   Q.   Would you agree with me that you can't

Page 144

1  get much more commoditized in a bag of salt water
2  in the drug market?
3    A.   The only quibble I would provide to
4  that question is I never really thought of it as
5  classically being part of the pharmaceutical
6  market.  It was such a -- it was really a
7  hospital supply kind of market.  It was such a
8  standard product that even though it was FDA
9  regulated and -- and sterility issues were so
10 forth, it tended to be -- hospitals tend to stock
11 it, for example, in sterile supplies, put it on
12 their cost report as part of sterile supplies
13 rather than through their pharmacies.
14   Q.   But a home infusion provider reimbursed
15 under Part B, for example, might be reimbursed
16 for sodium saline solution.
17        Was that your understanding in '97?
18        MS. BROOKER:  Objection.  Form.
19   A.   Yes, but whether that was as a supply
20 or a drug, I honestly couldn't tell you.  I would
21 have thought of it as a supply.
22   Q.   Turning to the market of it, whether we

Page 145

1  call it a drug or -- or a supply, did you have an
2  understanding, in 1997, of what the market would
3  look like for a product such as sodium saline
4  solution?
5        MS. BROOKER:  Objection.  Form.
6        MR. BREEN:  Objection.  Form.
7    A.   Yes, I did.
8    Q.   And what was your understanding?
9    A.   Well, I actually -- in the 1980s, I
10 believe, when I was first becoming involved in
11 some of these issues in health care economics was
12 the first development of hospital group
13 purchasing operations, and I recall -- and the
14 first widespread circulation of the -- of "Modern
15 Healthcare," the magazine, and I recall monthly
16 headlines in "Modern Healthcare" about group
17 purchasing operations being -- achieving
18 discounts of 98 and 99 percent in their purchase
19 of basic infusion products and sterile supplies.
20        So, my perception was that on the
21 supply market, which, again, I understood and
22 still would contend is actually a separate market

                          37  (Pages 142 to 145)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                        New York, NY

Page 146

1   from the pharmaceutical market that list prices,
2   are essentially entirely meaningless and that
3   only the weakest and smallest scale buyers pay
4   anything close to it.
5       Q.   And so, as of 1993, for example, would
6   you be surprised if a single bag of sodium saline
7   solution sold to a provider who bought maybe five
8   would pay $10 per bag, and a large purchaser who
9   bought a very large volume would pay less than a
10  dollar?
11      MS. BROOKER:  Objection.  Form.
12      A.   I would not have been surprised.
13      Q.   Okay.  So, to that extent that --
14  President Clinton referring to a 10-to-1 ratio is
15  something that would be consistent with your
16  understanding of that particular market.
17  Correct?
18      MS. BROOKER:  Objection.  Form.
19      Q.   I'm sorry.  You have to verbalize.
20      A.   Again, I would have thought that market
21  was a subset of the supplies market rather than
22  the drug market.

Page 147

1       Q.   That was my question.  But you would
2   have distinguished between the drug market, where
3   10-to-1 would not -- you would not expect to see.
4   Correct?
5       A.   That's correct.
6       Q.   And the supply market, where sodium
7   saline solution would be found, where there could
8   be a huge variation between a small purchaser
9   purchasing at list price and a very large
10  purchaser purchasing at 99 percent off of list
11  price?
12      MS. BROOKER:  Objection.  Form.
13      A.   I would have made such a distinction,
14  and I would not have been surprised to see those
15  sorts of differentials of the supply market.
16      Q.   And in between the commodities supply
17  market of sodium saline and the patent-protected
18  market of a brand name drug, would you expect
19  generic drugs to be somewhere between those two
20  extremes?
21      MS. BROOKER:  Objection.  Form.
22      MR. BREEN:  Objection.  Form.

Page 148

1       A.   That would be a question I never
2   thought about before today.  But today I would
3   say that we always made the distinction between -
4   - between drugs and -- and supplies.  And, again,
5   I would fall back on the Medicare green eyeshade
6   distinction between what's sterile supplies and
7   what's pharmacy.
8       MR. COOK:  Let's take a break.
9       THE VIDEOGRAPHER:  The time is 11:28
10  a.m.  We're going off the record, concluding Tape
11  No. 2 in the deposition of Dr. Bruce Vladeck in
12  the matter of In re Pharmaceutical Average
13  Wholesale Price Litigation.
14      (Recess taken.)
15      THE VIDEOGRAPHER:  The time is 11:46
16  a.m.  We're going back on the record, starting
17  Tape No. 3 of the deposition of Dr. Bruce Vladeck
18  in the matter of In re Pharmaceutical Average
19  Wholesale Price Litigation.
20      Q.   Doctor, based upon what we were talking
21  about just before the break, would it be fair to
22  say that while you were administrator of HCFA,

Page 149

1   you did not understand published average
2   wholesale price to be the average of prices at
3   which wholesalers were selling their drugs to
4   their customers?
5       A.   It would -- it would be fair to say
6   that I did not believe it was, in fact, an
7   empirical estimate, that rather it was a -- an
8   amount reported by the manufacturer to -- of the
9   compendium compilers or whatever, yes.
10      Q.   And, again, akin to a sticker price?
11      A.   That's correct.
12      Q.   Where did you get that understanding?
13      A.   I believe that was probably what my
14  staff explained to me when I first encountered
15  the concept sometime after I took office.
16      Q.   Do you recall anybody within HCFA who
17  was under the belief that average wholesale price
18  was an average of prices at which wholesalers
19  sold drugs to customers?
20      MS. BROOKER:  Object to form.  And I
21  would just instruct the witness, just, you know,
22  be mindful of not disclosing deliberations,

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

# SLIDE 8



INVOICE
REMITTANCE COPY

# METRO
MEDICAL·SUPPLY·INC

1911 CHURCH STREET
NASHVILLE, TENNESSEE 37203
Phone: (615) 329-4647

| DATE | NUMBER |
|---|---|
| 04/03/91 | 8493 |

PAGE 1

| B I L L T O | DIALYSIS CLINIC,DICKSON<br>100 ACADEMY STREET<br><br>DICKSON, TN   37055 | S H I P T O | DIALYSIS CLINIC, DICKSON<br>100 ACADEMY STREET<br><br>DICKSON, TN 37055 |
|---|---|---|---|

| ORDER NO. | ORDER DATE | CUSTOMER NO. | SALES MAN NO. | PURCHASE ORDER NO. | SHIP VIA | SHIP DATE | TERMS |
|---|---|---|---|---|---|---|---|
| 5943 | 04/03/91 | 19057 | IP | 1069DK | | 04/03/91 | |

| QTY. ORDERED | QTY. SHIP | QTY. B.O. | ITEM NO. | DESCRIPTION | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|---|
| 2 | 2 | | 45-1444975 | BETADINE OINT. U/D PAKS 144/BX | 4.90 @ BX | 9.80 |
| 1 | 1 | | 45-1663335 | CALCIUM GLUCONATE 10% 10ML - VIAL | 0.79 @ EA | 0.79 |
| 25 | 25 | | 45-1668516 | HEPARIN 10,000U/ML 4ML | 1.79 @ EA | 44.75 |
| 3 | 3 | | 45-2185528 | HEPARIN BEEF LUNG 1000U/ML 30ML | 3.26 @ EA | 9.78 |
| 125 | 125 | | 45-2450450 | HEPARIN PORK 1000U/ML 30ML | 0.79 @ EA | 99.75 |
| 3 | | 3 | 45-1318930 | IMFERON 50MG/ML 2ML  (10/BX) | | |
| 1 | 1 | | 45-1444546 | INSULIN REGULAR 10ML (LILLY) | 103.93 @ BX | 0.00 |
| 3 | 3 | | 45-1138783 | KEFZOL 1GM INJ. | 10.99 @ EA | 32.99 |
| 25 | 25 | | 45-1744739 | LIDOCAINE 1% 50ML - PLAIN | 2.19 @ EA | 6.57 |
| 1 | 1 | | 45-1942598 | DARVON 65MG (EQUIV) #100 | 0.56 @ EA | 14.00 |
| 10 | 10 | | 45-2256717 | SODIUM CHLORIDE 23.4% 30ML | 4.85 @ BT | 4.85 |
| 20 | 20 | | 45-2505683 | VANCOMYCIN 500MG INJ.- ABBOTT | 0.79 @ EA<br>4.59 @ EA | 7.90<br>91.80 |

NO CREDIT WILL BE ALLOWED FOR MERCHANDISE RETURNED WITHOUT PRIOR AUTHORIZATION

4-1. 91

| | |
|---|---|
| SALE AMOUNT | 299.98 |
| MISC. CHARGES | |
| SALES TAX | 0.00 |
| FREIGHT | 0.00<br>5.71 |
| PLEASE PAY | 305.69 |

THANK YOU FOR YOUR BUSINESS

HHD200-1431

OFFICE OF INSPECTOR GENERAL
OFFICE OF AUDIT SERVICES

CIN: A-01-91-00526

Cost of Dialysis Related Drugs

Purpose: To record HCFA's response to the draft

report

Source: William Toby, Jr
Acting Administrator
Health Care Financing Administration

Conclusion: Response follows on pgs 2→5.

HCFA indicates agreement with recommendations

1 & 2 and has deferred comment on number 3

pending further information

_Parker_ 8/17/25
PREPARED BY          DATE

_Gene Conway_ 8/19/92
REVIEWED BY          DATE

CODE_____ W/P R-8   PAGE / OF 5

F

# SLIDE 9

Department of Health and Human Services

# OFFICE OF
# INSPECTOR GENERAL

## COST OF DIALYSIS-RELATED DRUGS



OCTOBER 1992     A-01-91-00526

Page 6 - William Toby, Jr.

Under the new drug regulations, separately billable drugs will be reimbursed based on the lower of EAC or AWP. The EAC is determined based on surveys of the actual invoice prices paid for the drug by facilities. To comply with the new regulations, we developed an EAC for the more frequently administered separately billable drugs using the median invoice price obtained from the 30 dialysis facilities. The following chart illustrates the impact of the new regulations on the reimbursement rate to the sampled facilities:

| Drugs/Dosage | EAC | AWP | Payment Difference | Number of Facilities At or Below EAC[1] | Number of Facilities Above EAC |
|---|---|---|---|---|---|
| Calcijex 1 MCGM | $ 7.34 | $ 9.18 | $ 1.84 | 19 | 7 |
| Imferon 2 ML | $10.19 | $11.99 | $ 1.80 | 9 | 9 |
| Vancocin/ Vancomycin 500 ML[2] | $ 5.00 | $19.17 | $14.17 | 12 | 9 |

NOTES

[1]   *Not all facilities administered or purchased the drug in the same dosage. To ensure adequate comparison, we limited our analysis to only 1 month, May 1991, and the same dosage.*

[2]   *This drug is a multiple-source drug. We used the median AWP for the generic drug.*

As shown above, Medicare program expenditures for separately billable drugs should be reduced if the EAC is properly implemented.

Even though the reimbursement rate will be reduced, our analysis disclosed that the majority of facilities included in our review will recover its costs under the EAC provision. On the other hand, the new regulations would adversely affect some facilities whose costs were above the EAC. However, the implementation of the EAC should encourage those providers to follow the prudent buyer concept in order to obtain lower prices. In any event, the EAC provision should not significantly affect

# SLIDE 11

ME-31-1

# Medicaid Pharmacy Bulletin



Volume 2, No.1                                      JANUARY-FEBRUARY 1988

# Developing An Effective Reimbursement Methodology For Home I.V. Therapy

<u>Home Intravenous (IV) Reimbursement Is A Complex Issue For Medicaid Pharmacy Programs.</u>

One of the many problems facing Medicaid pharmacy administrators is the determination of an equitable and effective methodology for the reimbursement of home IV therapy. Because home IV therapy involves the extensive use of multiple pharmaceuticals, supplies, and equipment, the composition of which often differs from prescription to prescription, it is difficult to standardize and streamline the reimbursement process.

The process is further complicated by the fact that the dispensing of home IV medications is more complex than the dispensing of other outpatient drugs. Because home IV therapy involves a host of additional pharmacy services (storage, preparation, delivery, patient instruction, etc.), it is generally agreed that it is more expensive to dispense this type of medication than to dispense other outpatient drugs. Most Medicaid programs, however, do not recognize this in the form of additional compensation, other than the usual dispensing fee.

The cost of therapy is also made very high because home IV therapy involves large volumes and quantities of drugs and supplies. This may limit coverage for certain home IV services and supplies. It is also difficult to estimate the purchase prices being paid by providers, given volume and trade discounts.

<u>Medicaid Programs Are Becoming More Aware Of The Importance Of Encouraging Provider Participation In Home IV Therapy</u>

As cost containment becomes increasingly important to Medicaid programs, home health services, including home IV therapy, are seen as a means of cost avoidance — a way of potentially reducing costs in other areas of the Medicaid program, especially hospitalization costs. In order to take advantage of home health services, state programs must encourage provider participation. A number of Medicaid pharmacy programs have begun to investigate and update the reimbursement process for home IV therapy in an attempt to adequately compensate their pharmacy providers, thereby encouraging the provision of this type of service.

Exhibit: Abbott 578
Wit: Sullivan
Date: 3/12/08
Rptr: FS

Provided as a service to Medicaid by Lederle Laboratories, Wayne, N.J.

*Lederle*

# SLIDE 12

# LEGISLATIVE PROPOSAL ANALYSIS

| | |
|---|---|
| An act related to: | Medicaid Prescribed Drug Services |
| Florida Statutes Affected: | 409.912 |
| Department: | AHCA Medicaid |
| Effective Date: | October 1, 1998 |
| Contact Name: Title: | Jerry Wells      Phone Number: 922-0681<br>Pharmacy Program Manager |

**Executive Summary:**
Intravenous/Intramuscular administration of drugs such as antibiotics, cancer chemotherapy, immune suppression agents and many others, during the past 6 years, has moved dramatically from the inpatient hospital environment to the patients home. As a result, parenteral/enteral (PE) pharmacy, a distinct permit entity by the board of pharmacy, is increasingly the provider of services for Medicaid patients. The Medicaid prescribed drug program, developed to reimburse community pharmacies for self administered oral and topical medications, does not respond to the requirements of this new therapeutic modality. Cost savings resulting from reduced inpatient days are dramatic but result in increased costs for prescribed drugs. The current dispensing fee ($4.23) does not approach the cost of providing these services and no current reimbursement exists for ancillary supplies (syringes/needles, tubing, admixture bags, IV pumps etc). This bill will authorize establishing a distinct provider type for parenteral or infusion pharmacy services. It is anticipated that reimbursement will be based on product cost plus a patient management fee or per diem rate as is routine policy in commercial managed health care plans. Artificially inflated drug pricing by manufacturers for parenterally administered drugs can be adjusted to reflect true costs while improving access to these services in a lower cost setting.

**Effect of Proposed Changes:**
Prescription drug costs for IV/IM medications will be reduced, parenteral/enteral (PE) pharmacies will no longer be reimbursed a dispensing fee for each service (currently as high as 90 per month), to be replaced with a per diem rate or patient management fee, and procuct reimbursement will be adjusted downward to reflect actual product costs.

**Policy Analysis (Subjective Analysis):**
Medicaid will no longer force reimbursement for IV/IM therapies through an inappropriate program. Access to services by the most seriously ill patients will be improved and increased numbers of services can be moved from the inpatient hospital arena to a lower cost outpatient service area, the recipients residence.

**Fiscal Impact:**

| | | |
|---|---|---|
| Describe and quantify any revenue impacts: | First Year | Annualized |
| Assuming October 1, 1998 effective date | $1,050,000 | $1,400,000 |
| (assumes 15% increase in access, offsetting 2000 inpatient days at $700/day) | | |
| Describe and quantify any spending impacts on state agencies | First Year | Annualized |
| | $4,374,000 | $5,817,000 |



△π EXHIBIT 1006
Deponent Abbott Wells
Date 12/15/06 Rptr BM
WWW.DEPOBOOK.COM

AHCA PR5 3467

# SLIDE 13

# A Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the State of Louisiana

Prepared for the
~~Louisiana~~ Department of Health and Hospitals
Baton Rouge, Louisiana

September 1999



Myers and Stauffer LC

Certified Public Accountants



EXHIBIT

*abbott*

*105*



Chart 3.3 Dispensing Cost by Pharmacy
All Pharmacies in Sample

The most significant characteristic which affected pharmacy dispensing cost was the provision of intravenous (I.V.) solutions. Our analysis revealed significantly higher costs of dispensing is associated with the 28 pharmacies in the sample that provided this service.

In every pharmacy dispensing study where information on I.V. solution dispensing activity has been collected by Myers and Stauffer, such activity has been found to be associated with higher dispensing costs. Discussions with pharmacists providing I.V. solutions indicate that the activities and costs involved in filling I.V. prescriptions are significantly different from the costs incurred by the typical retail (or long term care) pharmacy. The reasons for this difference include:

- costs of special equipment for mixing and storage of I.V. solutions;

- higher direct labor costs because most I.V. prescriptions must be mixed in the pharmacy, whereas the manual activities to fill a non-I.V. prescription are mainly limited to counting pills (or vials, etc.) and printing and affixing the label; and

- a pharmacy may mix and deliver many "dispensings" of a daily I.V. solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions.

This latter factor, in particular, can have a dramatic impact on increasing a pharmacy's apparent cost per prescription.



KY_AWP_KRF_03183

The differences in dispensing costs which were observed for providers of I.V. services compared to those pharmacies which did not offer I.V. services are summarized in Table 3.3.

**Table 3.3  Cost Per Prescription  - I.V. Versus non I.V. Pharmacies**

| Type of Pharmacy | Number of Pharmacies | Unweighted Mean Total Cost | Standard Deviation | Mean Total Cost Weighted by Total Volume |
|---|---|---|---|---|
| Pharmacies Dispensing I.V. Prescriptions | 28 | $18.57 | $32.86 | $8.97 |
| Pharmacies Not Dispensing I.V. Prescriptions | 377 | $5.55 | $1.76 | $5.14 |

*(Dispensing Costs have been inflated to the common point of June 30, 1999)*

Based on our cost findings, it must be concluded that the costs incurred to dispense I.V. prescriptions are not representative of the costs incurred by a general pharmacy. If the costs of I.V. services were to be included in the computation of an average or median dispensing cost that was then used to establish a reimbursement rate, the effect would be to pay approximately 93% of pharmacies an additional allowance for a service they never provided. And, for those pharmacies providing I.V. services, the marginal increase in the fee would be immaterial in relation to the cost of actually dispensing an I.V. prescription.[8] Consequently, many of the analyses which follow, exclude these providers which had dispensed I.V. prescriptions. Table 3.4 restates some of the measurements noted in Table 3.2 excluding pharmacies that dispensed I.V. prescriptions.

**Table 3.4  Cost Per Prescription -- Excluding I.V. Pharmacies**

| | Dispensing Cost |
|---|---|
| Median Weighted by Medicaid Volume | $5.07 |
| Median Weighted by Total Volume | $5.03 |
| Median | $5.23 |
| Raw Mean | $5.55 |
| Mean Weighted by Medicaid Volume | $5.19 |
| Mean Weighted by Total Volume | $5.14 |

*(Dispensing Costs have been inflated to the common point of June 30, 1999)*

---

[8] Although typical dispensing fees reimburse less than the dispensing costs of I.V. pharmacies, they are generally able to break even based on the margin allowed on ingredient cost reimbursement.

Myers and Stauffer

KY_AWP_KRF_03184

# SLIDE 14

# Study of Medi-Cal Pharmacy Reimbursement

Prepared for the

California Department of Health Services

June 2002



Myers and Stauffer LC

Certified Public Accountants



EXHIBIT
Abbott
Schondelmeyer 4
2/25/09

Remuneration to the pharmacies for these services is subject to the provisions of those contractual relationships. Consequently, any cost for these pharmaceutical consulting services would be reported to Medi-Cal via the *nursing facility cost report*. It would therefore be inappropriate to include these consulting services in a survey of the cost of *dispensing* prescription medications. To the extent that such costs could be explicitly identified, the costs associated with consultant pharmacists were not included in the analysis of dispensing cost.

**Intravenous and Home Infusion Pharmacies**

A small number of pharmacies that responded to the dispensing cost survey indicated that a significant portion of their business consisted of filling intravenous or home infusion prescriptions. In every dispensing cost survey performed by Myers and Stauffer in which data on the provision of intravenous services was collected, the provision of this service has been associated with higher dispensing costs.

There is some difficulty, however, in determining an average dispensing cost for this type of activity with any degree of stability. Reasons for this include the following:

- There is a significant inconsistency in the way in which pharmacies count the number of intravenous prescriptions dispensing. A pharmacy may mix and deliver many "dispensings" of a daily intravenous solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions. Alternatively, some pharmacies count each daily dispensing individually.

- Many pharmacies that dispense intravenous prescriptions also dispense traditional prescriptions. The task of segregating intravenous and traditional dispensing costs is made difficult by the combined approach to financial and prescription record keeping which make it difficult to isolate costs associated with the dispensing of intravenous prescriptions.

- Based on a review of the literature, there is also considerable variability in the labor and equipment cost inputs into various types of intravenous prescriptions.

Because of these factors, Myers and Stauffer has typically seen extreme variation in the dispensing cost calculated for pharmacies that provide intravenous prescription services. In the current survey, the dispensing cost in the 34 responding pharmacies that dispensed a significant amount of intravenous prescriptions ranged from $8.04 to $71.37. The average (mean) dispensing cost was $32.97, but it should be noted that this average is highly unstable (i.e. there was a very high standard deviation).

One of the reasons it is difficult to determine a stable average dispensing cost for pharmacies that provide intravenous prescriptions is the low number of pharmacies for which data is collected in each survey. To better understand dispensing cost in these pharmacies, Myers and Stauffer performed an analysis



of the dispensing cost from data collected on over 100 surveys in recent years (inflation adjusted to calendar year 2002). Data for this analysis includes pharmacies in California, but was also supplemented by data from other states. Although each of these pharmacies had indicated on the survey forms that they dispensed intravenous prescriptions, most of these pharmacies also dispensed traditional prescriptions as well. After calculating a cost of dispensing for each pharmacy, statistical regression techniques were used in an attempt to isolate the costs associated strictly with the dispensing of intravenous prescriptions.

Although the analysis should not be considered comprehensive, the data suggests that dispensing costs ranging from $20 to $40 per intravenous prescription would be considered typical. In addition to variable states of efficiency in these pharmacies, it should be noted that there are various levels of complexity associated with dispensing intravenous prescriptions. A pharmacy's utilization mix of dispensing various types of intravenous prescriptions can have a significant effect on dispensing cost. It is therefore possible that some pharmacies could very well have dispensing costs in excess of $40 per prescription.

Under current policies, the California Department of Health Services reimburses for intravenous prescriptions in a dispensing fee plus ingredient reimbursement formula similar to traditional retail prescriptions (plus some additional compounding, container, and sterility fees). Although dispensing costs at intravenous pharmacies appears to be in excess of the current dispensing fee, this reimbursement methodology has been accepted by these pharmacies because the margin on ingredient reimbursement has allowed pharmacies to offset any shortfall from the dispensing fee. In the case of intravenous prescriptions, the typical ingredient reimbursement per prescription is much higher than for traditional retail prescriptions. The average Medi-Cal reimbursement per single source drug prescription on intravenous drugs is approximately $350.[24] Based on the results of the acquisition cost study performed simultaneously with the dispensing cost survey and the assumption of the Department's current ingredient reimbursement formula of AWP minus 5%, it is estimated that such an average prescription would yield a margin on ingredients of approximately $42. **This margin typically allows for adequate reimbursement of the pharmacy's dispensing cost. So long as the ingredient reimbursement rate remains at AWP minus 5% or any other relatively "high" level, the need for the Department to set a separate dispensing fee for intravenous drugs is somewhat mitigated by the margins realized on ingredient reimbursement.**

In recent years, some states have dealt with the issue of intravenous prescription reimbursement rates *in light of reduced ingredient reimbursement*. For example, the state of Utah recently adopted "revised AWPs" for certain products based on the recommendations of the United States Department of Justice and the

---

[24] Based on an analysis of California Medi-Cal drug utilization for calendar year 2000.


Myers and Stauffer LC
Certified Public Accountants

National Association of Medicaid Fraud Control Units (NAMFCU).[25]   Products with these "revised AWPs" were primarily injectable, infusion, and inhalation drugs.  Subsequent to the adoption of these prices, intravenous and home infusion pharmacies alleged that the margins on ingredient reimbursement were no longer sufficient such that they could accept the typical Medicaid dispensing fee.  As a result of these allegations, the state of Utah created alternate dispensing fees primarily for home infusion pharmacies.  The rates were set through a negotiated process and varied based on the perceived level of input costs required to fill the prescription.  Table D.1 shows the various dispensing fee categories created by Utah Medicaid.

**Table D.1 Utah Medicaid Home Infusion Drug Categories[26]**

| Dispensing Fee Category | Level of Service | Current Dispensing Fee |
|---|---|---|
| Category 'B' or 'C' | Traditional: technician input point-of-sale; pharmacist input; fixed overhead costs | $3.90 or $4.40 |
| Category 'J' | Dispensing fee B or C plus:<br><br>Labor II factor; clinical monitoring; prefilled syringes/PB; horizontal hood; technician input | $8.90 |
| Category 'K' | Dispensing fee J plus:<br><br>Clinical monitoring; quality assurance; labor factor | $18.90 |
| Category 'L' | Dispensing fee K plus:<br><br>Replacement into individual doses such as syringe; recalculations from vial to syringe to bag; large bulk inventory costs; peer review | $22.90 |
| Category 'M' | Dispensing fee L plus:<br><br>Double gloves; gown; vertical hood; labor factor V; OSHA documentation; special handling; special storage; clean room; hazardous waste | $33.90 |

The Utah Medicaid home infusion dispensing fee methodology has the advantage that dispensing fee reimbursement is more closely tied to actual

---

[25] "Medicaid's Use of Revised Average Wholesale Price." Department of Health and Human Services, Office of the Inspector General, OEI-03-01-00010, September 2001.
[26] Derived from Utah Medicaid State Plan Amendment documents and discussions with Utah Medicaid officials.



Myers and Stauffer lc
Certified Public Accountants

dispensing costs. It has the disadvantage that it necessitates increased complexity for the claims adjudication process. It is noteworthy to emphasize that the Utah rates were established based on a negotiated process rather than being based on a survey of actual costs and that the rates were created only because of significant cuts in ingredient reimbursement such that the margin on ingredients was reduced.

## Compounding Pharmacies

A small number of pharmacies that responded to the dispensing cost survey indicated that a significant portion of their business consisted of filling compounded prescriptions. Survey data indicated that this practice was associated with statistically significant higher dispensing costs.

The observation that the practice of compounding prescriptions resulted in higher dispensing cost is not surprising given the special labor and equipment needs that are required in this type of pharmacy practice. Preparation time for individual compounded prescriptions, though highly variable depending upon the specific task, tend to be higher than the time associated with filling "traditional" prescriptions in pre-manufactured tablet, capsule, or liquid (etc.) forms. Additionally, the practice of pharmacy compounding does require some additional expensive equipment such as clean rooms for sterile preparation, sensitive scales, and other equipment for making special pharmaceutical dosage forms.

The practice of pharmaceutical compounding has proven to be somewhat controversial given the perception of a fine line between "compounding" and "manufacturing". The U.S. Food and Drug Administration has imposed some limits relating to the practice and advertising of compounding services.

Despite these restrictions, the practice of compounding is appealing to many pharmacists, not only because the practice is perceived to be a return to a historical form of pharmacy practice, but also because compounding is a niche business, which, if successful, can yield high margins. In part, these high margins are due to the promotion of compounding services primarily to cash customers, often in more affluent areas. In some aspects, pharmacy compounding appeals to those seeking "alternative" forms of medical treatments and provides traditional medications in non-traditional forms or in a form free of dyes or other perceived allergens.

Compounding pharmacies have made only minimal attempts to promote wide acceptance of third-party coverage for compounded pharmaceuticals. Primarily, this appears to be related to a desire to avoid reimbursement limitations that could be imposed by a broad acceptance of third party reimbursement plans and fee schedules based primarily on ingredient cost. Compounding pharmacists seem to prefer to maintain the relatively high margins and billing simplicity associated with cash-paying customers. Additionally, because of the potential for billing complexities associated with compounded prescriptions (which sometimes



Myers and Stauffer LC
Certified Public Accountants

62

# SLIDE 15



**COST CONTAINMENT FOR STATE PRESCRIPTION
DRUG EXPENDITURES**

# From The Office Of State Auditor
# Claire McCaskill

> *Medicaid officials have been slow implementing new
> cost containment initiatives, updating current
> measures and recommending legislative or rule
> changes that are more favorable to the state.*

**Report No. 2002-48**
**June 28, 2002**
**www.auditor.state.mo.us**

PERFORMANCE AUDIT

## Lower reimbursement rates for certain home infusion drugs not used

Missouri continues to pay more than it should on home infusion drugs[11] because division officials have not implemented more accurate drug prices. In May 2000, the federal Department of Justice provided all states with more accurate average wholesale prices for 437 primarily home infusion dispensed drugs. Some prices were more than 80 percent less than the average wholesale prices previously reported by pharmaceutical companies. The state could have saved an estimated $1.5 million on the $8.4 million spent on these 437 drugs in fiscal year 2001 if officials used the more accurate average wholesale prices and a dispensing fee structure similar to one implemented in another state.

Within 2 months of Department of Justice notice of the more accurate average wholesale prices, Utah officials began using the lower drug prices with new dispensing fees. With the help of infusion specialty providers, Utah officials categorized the 437 drugs into 5 groups appropriate to the preparation and overhead costs for the product. The new dispensing fees set up for drugs in 4 of the 5 categories ranged from $8.90 to $33.90 per prescription.

> The state could save $1.5 million annually

Missouri officials initially implemented the more accurate prices for provider reimbursement using the normal $4.09 dispensing fee, which was not designed to cover these drugs. Division officials reversed this decision after home infusion providers threatened to cease services due to insufficient dispensing fees. Provider personnel admitted the former reimbursement rates exceeded their product acquisition costs, but they used the excess reimbursement to offset the higher dispensing costs of home infusion drugs. Division officials indicated they plan to use these lower prices again after determining adequate compensation for home infusion services. While no implementation date has been set, the Division Director stated the necessary changes to implement these prices would be part of the division's fiscal year 2004 budget proposal.

## State is not collecting some pharmacy fees while proposing to increase other fees

For years, division officials have allowed pharmacies to keep some recipient co-payments, known as shared dispensing fees, in lieu of increasing the $4.09 prescription dispensing fee. Pharmacies kept an estimated $3 million to $6 million in shared dispensing fees in fiscal year 2001. Certain Medicaid recipients pay an optional shared dispensing fee for pharmacy transactions ranging from 50 cents to $2 based on the cost of the prescription.[12] However, this compensation is not being considered as part of legislation to establish a pharmacy provider tax and nearly double the dispensing fee to $8.04 per prescription.

Division officials do not maintain any data on the shared dispensing fee amounts kept by pharmacies. They estimate this fee applies to half of all pharmacy transactions, and

---

[11] Drugs generally dispensed intravenously by health care professionals to patients with chronic illnesses who can live at home or in a non-hospital arrangement.
[12] Children, pregnant women and institutionalized recipients are exempt from paying the shared dispensing fee. However, no Medicaid recipient can be denied a prescription if he/she cannot pay the shared fee amount.

# SLIDE 16

Ridout, C. Benny                          December 5, 2008
                    Raleigh, NC

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE          )  Master File No.

LITIGATION                       )  01-CV-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        )  Judge Patti B.

United States of America ex      )  Saris

rel. Ven-A-Care of the Florida   )

Keys, Inc., et al.  v.  Dey,     )

Inc., et al., Civil Action No.   )

05-11084-PBS                     )

-------------------------------X


         Video Deposition of C. BENNY RIDOUT,

taken by the Defendants, at the Hilton North

Raleigh, 3415 Wake Forest Road, Boardroom, Raleigh,

North Carolina, on the 5th day of December, 2008 at

9:10 a.m., before Marisa Munoz-Vourakis, Registered

Merit Reporter, Certified Realtime Reporter and

Notary Public.

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                    December 5, 2008
                         Raleigh, NC

Page 62

1 the gap on those.  Well, they went to ASP for
2 Medicare drugs in physician's office to get rid
3 of that type thing, average selling prices, they
4 changed the methodology of pricing because of
5 that.
6     Q.  You mentioned that it was common
7 knowledge that Vancomycin had a spread, do I have
8 that correct?
9         MS. HAYES:  Objection to form.
10    A.  Yes.
11    Q.  When was it common knowledge that
12 Vancomycin had a spread?
13    A.  I don't remember the year, just like it
14 was this, but I just remember that drug was one
15 of the antibiotics.
16    Q.  Do you recall whether it was similarly
17 common knowledge that infusion products had
18 spreads?
19        MS. YAVELBERG:  Objection, form.
20        MS. HAYES:  Objection, form.
21    A.  We had no idea what the specialty
22 pharmacists were paying for that drug, what kind

Page 63

1 of deals they struck with the manufacturers, but
2 it was of their opinion of us that there was some
3 kind of spread in there because of what they were
4 able to do that a regular pharmacist couldn't do
5 at AWP.  You see, we still paid at AWP.
6     Q.  What do you mean what they could do
7 that other pharmacists couldn't?
8     A.  Infusion drugs is a whole lot more than
9 just putting a pill in a bottle.  You got to
10 prepare.  In fact, the pharmacists wanted a
11 special fee to do this under-the-hood
12 preparation, you know, also injection takes
13 longer, you got to have syringe and all the stuff
14 to do that.  Of course they were shipping that on
15 top of the cost to ship the product.
16        So if you add up all that extra cost in
17 a regular pharmacy or regular pills, you know,
18 you think well, how in the world can they afford
19 to do this and accept that same price?
20    Q.  What was your conclusion?
21    A.  That somehow they were getting some
22 kind of special deal back or discount from the

Page 64

1 manufacturers to be able to do it or something.
2 That was just my own personal feeling.  How did
3 they do it?
4     Q.  And the significance of their ability
5 to get special deals would be that they could
6 make profit on the drug ingredient cost, right?
7         MS. YAVELBERG:  Objection to form.
8         MS. HAYES:  Objection to form.
9     A.  I have no idea what profit they made or
10 what they were doing.  I just know that nobody
11 does anything for a loss.  You wouldn't stay in
12 business.
13    Q.  Let's take a couple of steps back.
14        Could you describe for the jury when
15 you talk about specialty pharmacies, what are you
16 referring to?
17    A.  Well, there's pharmaceutical companies,
18 pharmaceutical providers, excuse me, they will
19 take drugs that will require a lot of attention
20 and effort that have to be mixed and have to be
21 stored and have to be administered by a highly-
22 trained person, such as the chemotherapy drugs,

Page 65

1 some of the asthmatic drugs, some of the
2 specialty diseases.  And they will go in and say,
3 you know, here's a niche, we will carve this out
4 and we will provide this to Medicaid as a service
5 because the local pharmacists can't do that.  He
6 doesn't go into a person's home.  He doesn't send
7 a nurse out.  They have a nurse on the team that
8 will go in and administer that drug for that
9 patient.
10        So it's more involved than just
11 dispensing a drug like a regular pharmacist does.
12 So they are called specialty pharmacists.
13    Q.  So the jury understands, when you refer
14 to these specialty drugs, are they in pill form?
15    A.  No, most of the time they are.
16    Q.  What form are they taken?
17    A.  They would either be injections or
18 infusions, inhalation drugs.
19    Q.  Could you explain to the jury what
20 infusion and inhalation are?
21    A.  Inhalation would be a drug that is
22 administered through breathing apparatus, like an

Ridout, C. Benny                                    December 5, 2008
                        Raleigh, NC

Page 70

1   years, but we did a dispensing fee survey to
2   determine what it cost for the prescription.  And
3   we did something in North Carolina that everybody
4   needs to know and understand, that our fee was a
5   little higher than some state fees, dispensing
6   fees, but I started this in North Carolina, I
7   started quite a few things in Medicaid.  It was
8   adopted in other states.  But we did not pay for
9   refills of the same drug within the same month
10  that all other states did.  I found out that was
11  abuse being done by them, especially nursing
12  homes.  They would send over prescription every
13  week and get another fee, and some of the
14  pharmacists on maintenance medication, they would
15  be taking a whole month, give them maybe a two-
16  week supply, get them to come back and they would
17  get two fees.
18        So I went in and said okay, you all,
19  I'm going to give you one fee per drug per month,
20  and that's all you are going to get.  And in
21  doing that, I went into my system and found out
22  how many refills I was paying for at that time

Page 71

1   and how much I would be taking back from the
2   pharmacists.
3         And so I tried to split part of that
4   with them, to be fair with them, and I raised the
5   fee, I think at that time 25 cents.
6         So that was based on some of the fee
7   while ours was up, and we didn't pay for those
8   refills and we never did.  Where other states
9   were paying a lot more for them in paying for
10  those.  And then, of course, a lot of those
11  states adopted it after they found out.
12     Q.   But the dispensing fee throughout the
13  '90s was something less than $6?
14     A.   Yes.
15     Q.   Did -- in home IV pharmacies, infusion
16  pharmacies, did they receive that same dispensing
17  fee as retail pharmacies did?
18     A.   Yes, anybody that participated in an
19  outpatient drug program got the same
20  reimbursement.  We took AWP minus ten off of
21  them.  They got the same fee.
22     Q.   Did these home IV pharmacies receive

Page 72

1   any sort of additional payment for the additional
2   services that you described?
3         MS. YAVELBERG:  Objection, form.
4     A.   I'm not aware what they received, but
5   some of them were eligible for some reimbursement
6   through the home health program, the third-party
7   program we had, durable medical equipment, some
8   of the pumps they had to supply and some of the
9   equipment they had to supply, they could bill
10  that through the durable medical equipment
11  program, but it didn't come through the
12  outpatient drug program.  We paid for drugs.
13     Q.   You mentioned earlier your belief that
14  given the amount of services that some of these
15  specialty pharmacies were providing, that you
16  were led to believe that they were buying drugs
17  at deeper discounts.  Do you recall that
18  testimony?
19         MS. YAVELBERG:  Objection, form.
20         MS. HAYES:  Objection, form.
21         MS. YAVELBERG:  I don't believe that
22  was his testimony.

Page 73

1     A.   I just said that I don't see how they
2   could do it for that.  I have no idea what they
3   were buying it for, what was going on.
4     Q.   Leaving aside the specifics of what
5   they were paying for it, you had an
6   understanding, am I correct, that they were
7   making profit on the drug side?
8         MS. YAVELBERG:  Objection, form.
9     A.   I had to assume that if I was taking
10  ten percent off of that price, and they were
11  providing all this service, that somehow they had
12  to be getting some kind of help from somewhere.
13  I mean, I couldn't see how they can do it with me
14  taking ten percent off of the drug cost and then
15  them providing those extra services and billed
16  for that.  That was my opinion.
17     Q.   Did you ever have any conversations
18  with anybody from IV pharmacies about that issue?
19     A.   I used to just try to discuss it with
20  them, but they didn't want to talk to me about
21  drug pricing.  In fact, I went to meetings and
22  talked to my providers and told them you know

19  (Pages 70 to 73)

77907573-2dff-47a3-bd8c-719356f2d9e8

Sullivan, Harry Leo                          March 12, 2008
                    Nashville, TN

Page 1

                 UNITED STATES DISTRICT

           FOR THE DISTRICT OF MASSACHUSETTS


     --------------------------X

     IN RE:  PHARMACEUTICAL       )  MDL NO. 1456

     INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

     PRICE LITIGATION            )  01-CV-12257-PBS

     THIS DOCUMENT RELATES TO    )

     U.S. ex rel. Ven-a-Care of  )

     of the Florida Keys, Inc.   )

          v.                     )  No.06-CV-11337-PBS

     ABBOTT LABORATORIES, INC.,  )

     --------------------------X


        (cross captions appear on following pages)


             Deposition of HARRY LEO SULLIVAN

                      Volume I

                Nashville, Tennessee

               Tuesday, March 12, 2008

                    9:05 a.m.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                      March 12, 2008
Nashville, TN

Page 150

1    concerns on whether or not the payment for these
2    kind of therapies was, was adequate?
3        A.  Well, my opinion, particularly in the,
4    in the home health arena, was -- and during this
5    specific time period, the growth in Tennessee was
6    such of those type of providers that it wouldn't
7    -- that wouldn't -- not lead you to believe that
8    the reimbursement for Medicaid was inadequate.
9            When people are hollering and screaming
10   or you have trouble getting providers to take
11   care of your patients is when that was more
12   likely a concern.
13       Q.  Well, do you know when the home
14   infusion business really started taking off?
15       A.  Well, it certainly took off in the
16   early Nineties.  And I can't remember -- and
17   Tennessee was a little bit different because we
18   very purposely avoided expansion of home
19   community based services under the Medicaid
20   program because the vast majority of the patients
21   who would receive those services were dual
22   eligibles, which meant they had Medicaid and

Page 151

1    Medicare.  And Medicare home health was, was
2    truly exploding.  We had hundreds of providers in
3    Tennessee of home health services.  I dare say
4    there's, you know, maybe 20 now.  Because there
5    was, there was indeed a bonanza on the Medicare
6    side in Tennessee.  Other states didn't face it
7    quite as -- if they had chosen to expand or had
8    very aggressive home community-based services
9    through Medicaid, might have had a little bit
10   different policy issues.  We purely shifted to
11   Medicare, cost shifted to Medicare, with the
12   duals.  And so it wasn't maybe not as, as intense
13   on a Medicaid issue in Tennessee as it might be
14   elsewhere is what I'm saying.
15       Q.  The page starting with -- at 425 and
16   then going over to 426, there is a discussion of
17   what some states are doing in the home IV
18   reimbursement area, Minnesota indicates
19   compounding or a dispensing fee of $8 for IV
20   drugs, and then Washington indicates that they're
21   paying a compounding amount, Ohio as well.
22           Do you have an understanding of what

Page 152

1    they're talking about when they talk about a
2    compounding fee?
3        A.  Yes.
4        Q.  And what, what is that?
5        A.  Well, certain, be it -- I mean you can
6    compound IV drugs if you have the right equipment
7    and filters and hoods to keep it, make it a
8    sterile product.
9            And you can compound drugs for
10   inhalation.  If you have, again, the right
11   equipment, similar to what would be in a
12   hospital, to, to handle sterile products.
13           And you take the raw ingredient and
14   mimic whatever, generally, the brand name or the
15   innovator product was.
16       Q.  And do you know in Tennessee, either
17   before TennCare or after TennCare was paying a
18   compounding fee for IV?  Do you know if that was
19   something that was being paid?
20       A.  Ah, no.  But there's, there's ways to
21   pay it without, without having a separate -- you
22   know, I noticed on here that one form is for

Page 153

1    payment, one form is for reimbursement of
2    supplies, one form is for -- you know, they're,
3    they're making a variety to submit multiple
4    forms.  And I wouldn't -- I can't tell you a
5    specific product or specific time period, but one
6    of my strategies was in issues like this, where
7    compounding was involved, I didn't want to go
8    down the road, at least in the early Nineties, of
9    getting into paying for compounded prescriptions,
10   because that can -- that could range from a
11   sterile product all the way down to an ointment,
12   okay?
13           And, and our claims reimbursement
14   system hadn't evolved to the current NCPDP
15   sophistication of today.  So it was very hard to
16   put in a, a set compounding fee for what, what
17   products?
18           One may take a minute to make, one may
19   take an hour and a half.
20           So getting back to, to the MAC issue,
21   some, sometimes for certain products in this
22   arena, you would take that into account for the

39  (Pages 150 to 153)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

|  |  |
|---|---|
| Page 154 | Page 156 |

**Page 154**

1  MAC.
2      For example, I might say, I'm not
3  paying for the tape that you use to hold the IV
4  needle into place. I'm not paying for the IV
5  needle or the tube set. I'm not going to -- I
6  don't want bills for that. I know you've got to
7  do it to administer this drug. So we're going to
8  add on the cost of this drug X, because I know
9  this, this and this always goes with it, and I
10  know there is a fixed cost for that, but I don't
11  want five bills. I want 10 different places.
12  Bill me for the drug. And I'll make sure that
13  the -- whatever the MAC is incorporates all your
14  other costs. And you have to talk with providers
15  and know what that is. I mean, you know.
16    Q.  So, in short, you would use the payment
17  for the drug itself to cross-subsidize other
18  things that might need to be paid to fairly --
19    A.  And that would include compounding.
20    Q.  And it may include nursing services
21  that were not included, things of that nature?
22    A.  (Nodding yes.)

**Page 155**

1    Q.  Did anyone in the federal government
2  ever tell you that you were not allowed to do
3  that?
4    A.  No.
5    Q.  And if they had told you that, what
6  would you have said?
7    A.  That I wasn't allowed to pay for
8  compounding or --
9    Q.  That you weren't allowed to use the
10  payment for the drug to cross-subsidize those
11  other services or supplies.
12    A.  If they had told me I couldn't do it,
13  what would I do?
14    Q.  Yes.
15    A.  I would have had to have found another
16  way to, to handle the billing.
17    Q.  But they never told you that.
18    A.  No.
19    Q.  Do you know if other states were doing
20  -- were adopting similar type strategies to run
21  the programs?
22    A.  No, I don't -- I mean it may be

**Page 156**

1  addressed in this letter. I don't know. It
2  seems to talk about different states, but I'm
3  sure there were varying levels of complexity in
4  the billing process, and what was and wasn't
5  billable and what was and wasn't included, but I
6  don't know it and I didn't discuss it with folks.
7    Q.  Have you heard the term cross-subsidy
8  or cross-subsidization in the context of pharmacy
9  reimbursement?
10    A.  No, not -- no, I haven't.
11    Q.  I'm going to show you another, another
12  -- going to mark that as another exhibit.
13      MR. TORBORG:  I think this is 578.
14      (Exhibit Abbott 578 marked.)
15  BY MR. TORBORG:
16    Q.  For the record, what we have marked as
17  Exhibit 578 bears the Bates numbers HHC 002-0400
18  through 407. It's another Medicaid pharmacy
19  bulletin. This one dated January-February of
20  1988.
21      Mr. Sullivan, if I could ask you to go
22  to Bates page ending in 402. In particular the

**Page 157**

1  discussion on the first full paragraph about
2  Montana Medicaid. Do you see that?
3    A.  Yes.
4    Q.  Where it says, Similarly, Montana
5  Medicaid compensates for the additional time and
6  expense of dispensing compounded drugs by
7  allowing the provider's usual and customary
8  charge up to 2.5 times the cost of ingredients,
9  paren, reimbursement for other outpatient drugs
10  is a lower of AWP minus 10 percent, or the cost
11  of the drug, end paren. Do you see that?
12    A.  Yes.
13    Q.  Is that the, the type of thing that
14  Tennessee was doing?
15    A.  It's a different approach to -- yeah.
16  Make -- paying the provider for the, for the
17  compounding without -- and setting a limit on
18  what I will pay up to two and a half percent.
19  It's just a different, different twist.
20    Q.  Does it -- does this refresh your
21  recollection about any other types of approaches
22  like this that other states were using?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

# SLIDE 17

Scully, Thomas A.                              May 15, 2007
                    Washington, DC

                                                        Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL        :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :  CIVIL ACTION

PRICE LITIGATION              :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-a-Care of    :  Judge Patti B. Saris

the Florida Keys, Inc.        :

      v.                      :

Abbott Laboratories, Inc.,    :  Chief Magistrate

No. 06-CV-11337-PBS           :  Judge Marianne B.

- - - - - - - - - - - - - -x    Bowler

Henderson Legal Services
                    202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                        May 15, 2007
                        Washington, DC

Page 362

1    be a level that was much higher than the ASP for
2    Vancomycin, correct?
3            MR. GOBENA: Objection. Form. Also going
4    to object to the previous question. I didn't get a
5    chance to get in there. Object to the form on that.
6    You can answer the question.
7            THE WITNESS: Yes. My guess would be
8    obviously it was a transition for one year to 85
9    percent of AWP for all drugs, 95 percent for clotting
10   factor and some other drugs. And I'm sure they
11   didn't go through drug by drug and look at the
12   margins. I assume there were other home health
13   infusion drugs, for which they felt the margins for
14   that one year may have been sensitively narrow, and
15   so they kept it at 95 percent.
16           I'm just guessing -- just remember, my
17   testimony for Vancomycin, the spread was pretty big
18   and there probably wasn't a whole lot of worry about
19   85 percent not being big enough to cover it, so it's
20   probably not the reason that drove the policy.
21           (Exhibit Abbott 194 was
22               marked for identification.)

Page 363

1            BY MR. DALY:
2        Q.   And Mr. Scully, I've handed you what the
3    court reporter has marked as Exhibit Abbott 194,
4    which is a copy of at least portions of the MMA
5    itself. And I would ask you to turn to page 23 of
6    that document. And you had asked whether this was a
7    carveout in the legislation itself, and I just want
8    to direct you to page 23 at the bottom, subparagraphs
9    D-1 and 2.
10       A.   Okay.
11       Q.   And does that appear to be the legislative
12   carveout for the rule that we were just looking at?
13       A.   Refreshing my memory, I had forgotten we
14   did that.
15           MR. GOBENA: While Mr. Daly is getting his
16   exhibit out, I'll note the first page, it says that
17   this piece of legislation was effective December 8,
18   2003 to December 31, 2004.
19           MR. DALY: Anything else you want to point
20   out?
21           THE WITNESS: Yes. This was a one-year
22   transition. It went to ASP plus 6 in 2004, is that

Page 364

1    right?
2            BY MR. DALY:
3        Q.   I believe that's right.
4            (Exhibit Abbott 195 was
5               marked for identification.)
6            THE WITNESS: Good heavy one. I can take
7    care of the rest of those if you like.
8            BY MR. DALY:
9        Q.   And you mentioned that, you know, this
10   might have been a one-year carveout. And Mr. Gobena
11   seems anxious to point that out. Taking a look at
12   Exhibit Abbott 195, which I've handed you, this is
13   certain amendments that went into effect with respect
14   to the MMA effective December 20, 2006. Do you see,
15   do you see that?
16       A.   Yes.
17       Q.   And if you would turn to page 21 of this
18   document, and subparagraphs D-1 and D-2. Do you see
19   that the carveout that we identified that was in
20   effect for 2004 remains in effect today?
21           MR. GOBENA: Object to the form. Excuse
22   me.

Page 365

1            THE WITNESS: Yes. I wasn't aware of
2    that, so there is still -- they're still 95 percent
3    of AWP today?
4            BY MR. DALY:
5        Q.   That's what the statute says, isn't it?
6        A.   Yes. I wasn't aware of that. That's what
7    the statute says.
8            MR. BREEN: Just for clarification,
9    Mr. Daly, are you referring to subparagraph D little
10   I, which ends with 95 percent of the average
11   wholesale price for such drug in effect on October 1,
12   2003?
13           MR. DALY: And D-2.
14           MR. BREEN: Say again?
15           MR. DALY: And the next paragraph, D
16   Romanette i and D Romanette ii.
17           THE WITNESS: Until they froze it at the
18   date of passage, October -- they picked the -- 95
19   percent of the AWP in place in October 2003, and
20   froze it. I had forgotten that.
21           BY MR. DALY:
22       Q.   And so at least for the drugs that are

92  (Pages 362 to 365)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                        May 15, 2007
                        Washington, DC

Page 366

1  subject to this carveout in the home infusion
2  setting, Congress has kept the reimbursement of those
3  drugs at 95 percent of AWP as of --
4       A.   As of October 2003.
5       Q.   That's correct, isn't it?
6       A.   I guess it is.  That's what the statute
7  says.  Another piece of sausage.  I have just
8  forgotten that we did that, to be honest with you,
9  which I assume is why they don't have a dispensing
10 fee for anything but respiratory drugs, because they
11 didn't do that for respiratory drugs.
12      Q.   So it would appear that Congress, at least
13 for these drugs and in that setting of home infusion,
14 has determined to continue to subsidize the provision
15 of the services by overpaying for the drugs, correct?
16      MR. GOBENA:  Object to the form.  The
17 legislation speaks for itself.
18      MR. BREEN:  Objection to the form.
19      BY MR. DALY:
20      Q.   You can go ahead.
21      A.   Yes.  I was surprised to see this.  I
22 forgot we did it.  It was certainly never discussed

Page 367

1  by members.  I'm sure the staff -- staff person who
2  wrote it works with me at Alston & Bird, so I'll go
3  back and ask him, but I'm sure that it's probably,
4  they froze it to freeze it, and some level of
5  cross-subsidy apparently.  I'm not sure what the
6  congressional intent there was, but I think it was
7  Senator Grassley's staff that did that provision.  So
8  I had totally forgotten we did it.  That it was in
9  the bill.  It wasn't something that was widely
10 discussed at all.
11      Q.   And are you aware of whether the drugs
12 that DOJ is suing Abbott for, many of those drugs are
13 used in the home infusion context and using DME?
14      MR. GOBENA:  Objection to form.
15      THE WITNESS:  As of today, I'm aware of
16 it.  I wasn't aware of it before.
17      BY MR. DALY:
18      Q.   But as of today, you are?
19      A.   Yes.  Obviously looking at the drug list.
20      Q.   Page 27 of Exhibit Abbott 191, which is
21 your 10-3 -- yes, your October 3 -- excuse me,
22 October 3, 2002 testimony.  I just want to direct you

Page 368

1  to page 27.
2       A.   27?
3       Q.   Yes.
4       A.   Okay.
5       Q.   And in your testimony in response to
6  Mr. English, you indicate that you think -- well, you
7  state, "I think there are a lot of different provider
8  areas that may have small impacts from AWP, and we
9  are certainly willing to work with the committee to
10 identify those."  And then you mentioned oncology
11 as -- oncology and dialysis and hematology being sort
12 of the big three, right?
13      A.   Yes.
14      Q.   And then you say, "I think almost every
15 physician to some degree that administers drugs
16 probably has some beneficial cost shifting benefit
17 from AWP, I think those are the three big areas," you
18 see that language?
19      A.   Yes.
20      Q.   And that was a true statement, correct?
21      A.   Yes.
22      Q.   On page 31, I just want to get a fix for

Page 369

1  -- and we may have covered this in some part in the
2  sort of background section that we did at the
3  beginning, but you state at the bottom of the page,
4  "I had been working on Medicare for over 20 years and
5  there has never been any law passed more complicated
6  than this one."  How far back does your work on
7  Medicare go?
8       A.   In a minor way, probably 1982.  But in a
9  full time way, 1989.
10      Q.   And what were you doing with respect to
11 Medicare in 1982?
12      A.   Not much.  Occasional staff work for
13 Senator Gorton, but very, you know, minor.
14      Q.   And '89 would have started your work with
15 the Bush Administration?
16      A.   And OMB.  Yes.
17      Q.   And if you would turn to page 34.  If you
18 -- actually, if you look at 33, the page before, it
19 looks like you finished up your testimony, and then
20 George Reeb, R-E-E-B, got in the hot seat.  And began
21 to talk a little bit about Medicare and Medicaid.
22 And on page 34 of Mr. Reeb's testimony, he states

                              93  (Pages 366 to 369)

934268fd-66d9-4c40-b8d6-725605bc72fb

# SLIDE 19



CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE

A

# CBO

P A P E R



EXHIBIT
ABBGITT
Pi Fo 475
2/5/08 gc



DECEMBER 2004

**Medicaid's Reimbursements to Pharmacies for Prescription Drugs**

macies. Those actions have included setting state-specific upper limits on the reimbursement for drugs available in both generic and brand-name versions (limits that are frequently lower than the federal upper limits) and lowering the estimated acquisition costs used as a basis for the reimbursement for brand-name drugs. Perhaps partly as a result of those state actions, the average annual growth rate in markups slowed from 11 percent over the 1997-2000 period to 8 percent over the 2000-2002 period.

## Measuring Markups

In addition to dollar terms, the difference between the amount that Medicaid pays pharmacies for prescription drugs and the amount that manufacturers charge pharmacies for the drugs can be expressed in percentage terms as a margin (or gross margin)—that is, the difference between what Medicaid pays a pharmacy and the cost of acquiring the drug from the manufacturer, divided by Medicaid's payment.

The two measures—the markup and the margin—yield very different pictures. For example, the percentage margin retained by pharmacies and wholesalers has been about the same in recent years for both newer and older generic drugs, but because Medicaid's reimbursements for newer generic drugs have been higher, the dollar markup on them has been more than three times that on older generic drugs.

Because pharmacies' cost of filling a prescription is largely unrelated to the cost of acquiring its ingredients or the size of the prescription, the dollar markup is a better indicator of the size or adequacy of Medicaid's reimbursements to pharmacies than is the percentage margin. The time a pharmacist spends filling a prescription is generally unrelated to the drug's cost and is only marginally greater for larger prescriptions than for smaller ones. Moreover, the shelf space required to store a $5 pill is no different from that required for a $1 pill. If ingredient costs increase, pharmacies' cost of invested capital tied up in inventories will increase, as drugs are held on the shelves and pharmacies are waiting for payment from Medicaid. By CBO's estimates, however, on a per-prescription basis, those costs account for only a small share of the increase in markups over the period.[5]

## Figure 1.

### Markups per Prescription and Margins Under Medicaid, 1995 to 2002



Source:   Congressional Budget Office based on data from the Centers for Medicare and Medicaid Services.

Note:   The real (inflation-adjusted) markup is calculated using the chain-weighted gross national product price index.

## Factors Contributing to Rising Markups

After rising slowly between 1995 and 1997, the average dollar markup for all Medicaid prescriptions increased between 1997 and 2002, as described, by 59 percent, rising from $8.70 to $13.80, or about 9.7 percent annually (see Figure 1). In comparison, pharmacists' wages—a key component of dispensing costs—increased by 5.3 percent

---

5.   Over the 1997-2002 period, the average acquisition cost per prescription increased by 66 percent, from $28.30 to $47.10. Assuming a cost of capital for pharmacies of 8 percent per year and an average shelf life of two months would put the associated rise in capital costs at about 25 cents per prescription. Adding in the cost of waiting for a final payment from Medicaid would probably no more than double that amount. Sales taxes (another type of cost that could increase with the price of a prescription) currently are imposed by only one state (Illinois, at 1 percent). See an analysis by the Federation of Tax Administrators at www.taxadmin.org/fta/rate/sales.html.

# SLIDE 20

Wiberg, Cody                                          March 14, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           )

LITIGATION                        ) CIVIL ACTION:

                                  ) 01-CV-12257-PBS

                                  ) Judge Patti B. Saris

                                  ) Magistrate Judge

                                  ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 354

1  know, especially on generics.  You're going to see
2  a wide range of prices, depending on how the
3  individual pharmacy wants to price their products.
4     Q.  Okay.  But as far as the Medicaid rate --
5  Medicaid recipient, they have no incentive to shop
6  around, because they're not paying.  Right?
7     A.  That's correct.
8     Q.  They just go the most convenient place and
9  get it.  It's the government that is not allowed to
10 shop around, because of the way the manufacturers
11 set up the AWPs, is that right?
12        MR. COOK:  Objection.
13    A.  Well, at the time frame we're looking at,
14 there wasn't even a co-pay, so Medicaid recipients
15 at that point were not paying out-of-pocket
16 expenses.
17 BY MR. BLACK:
18    Q.  Okay.  So there is no shopping-around
19 incentive.
20    A.  Not that I would be aware of.
21    Q.  Okay.  Is it correct that, based on your
22 knowledge, '99 -- late '99 through -- when you were

Page 355

1  through this program, Minnesota never paid a
2  thousand percent more than the actual cost?
3     A.  I don't think that we ever would have.  We
4  would have had -- if these were generically
5  available products, we would have had them on -- on
6  MAC in terms of the pharmacy program.  In terms of
7  the reimbursement to physicians, again, when I
8  started there, we were paying AWP -- flat AWP.  And
9  then we were paying AWP minus 5 percent, and then
10 we brought it in line with Medicare.  So now,
11 presumably, we are paying ASP plus 6 percent.
12    Q.  Okay.  But you would be stunned if even
13 Minnesota had paid a spread such as that.
14        MR. COOK:  Objection.
15    A.  As a pharmacy program manager, I would have
16 been quite concerned.
17 BY MR. BLACK:
18    Q.  Even if it was more than 5 -- even if it was
19 500 percent, correct?
20    A.  Yes, I would have been concerned.
21    Q.  Even if it was 200 percent.
22    A.  If we were -- if we were paying that, for

Page 356

1  products that were available generically, I would
2  be concerned if we had not aggressively MACed them,
3  yes.
4     Q.  Okay.  Knowing that I'm a dunder head, people
5  keep sending me emails, saying "ask him this."
6     I apologize.
7        MR. COOK:  I have no objection to the
8  dunder head characterization.
9        MR. BLACK:  I said it myself.
10 BY MR. BLACK:
11    Q.  Looking at one other thing, and then I may be
12 done.  I told you I'd get you out of here by 5:30,
13 so I'll give someone else some time.
14        MR. BLACK:  That's all of the questions I
15 have, thank you, sir.
16        THE WITNESS:  Great.
17        RE-EXAMINATION
18 BY MR. COOK:
19    Q.  Mr. Wiberg, I'd like to -- or Doctor Wiberg.
20 I apologize for that.  I've been calling you "Mr."
21 all day.  I would like to take you back to the
22 Zantac example you gave earlier.

Page 357

1     A.  Yes.
2     Q.  I think you said the AWP was 90 cents.
3     A.  Around there, yeah.
4     Q.  The MAC was about 25 cents, and the AAC was
5  about 6 cents, right?
6     A.  Well, the -- the actual acquisition costs for
7  the store I worked as was -- was -- was around 6
8  cents, as I recall.
9     Q.  So 25 cents is what the State Medicaid
10 Program chose to pay for that 6 cent pill, right?
11    A.  That's correct.
12    Q.  Isn't that about a 400 percent spread,
13 between 6 and 25?
14    A.  Well, again, you can't -- people don't spend
15 percentages.  They spend dollars.  And what the
16 goal was -- and I don't have a calculator handy,
17 but if you do the math, typically we're talking
18 about 60 tablets.  In a typical prescription.  So,
19 you know, the actual math is -- is they're not
20 getting huge amounts of actual dollars.  And at
21 some point, I think we reduced the MAC.  Part of --
22 well, let me just say that when I came on board at

90  (Pages 354 to 357)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 358

1  the Minnesota Department of Human Services, there
2  was one pharmacist working.  We used the pharmacy
3  program manager, he was working there by himself.
4  He had three rebate analysts.  There had been more
5  pharmacists working for the Department earlier, but
6  they worked in different divisions.  In fact, there
7  wasn't a pharmacy program a year-and-a-half before
8  I started.  There was no coherent Pharmacy
9  Management Policy.  And as a result of that, we
10 made -- after I took over, we ended up making
11 massive changes.  It went from, in my opinion,
12 being a program that was not very effectively
13 managed, to being one that is very aggressively
14 managed now.
15     So -- and the other issue that we had -- I
16 mentioned earlier that my predecessor, because
17 he introduced this language that ended up getting
18 amended, took away our authority to do a lot of
19 things with -- with MACs.
20     So part of what we were trying to do, although
21 we had to accelerate when we got to 2002 and 2003,
22 we had no choice.  Part of it was to not shock the

Page 359

1  system, which had essentially been unmanaged.  So
2  we're trying to introduce these changes in a -- I
3  wouldn't say gradual, but we're trying to not hit
4  people with so many things at once that we cause
5  disruptions to service, or that, quite frankly,
6  because it's a political environment, that it
7  backfires on us, and we do have people going to the
8  legislators, saying, basically, these people over
9  at DHS are out of control, and have our authority
10 to make the changes we thought were necessary taken
11 away from us.  So we didn't always do things
12 initially as aggressively as we might have in the
13 time frame we're talking about here, 2000, 2001.
14     2002, 2003, when we're starting facing budget
15 deficits, even before then, we had started ramping
16 up and doing preferred -- you know, our own
17 internal preferred drug list for some categories.
18 But we got very, very aggressive at that point.
19 And so these days, as I mentioned earlier, we
20 increased the use of generics because of the MAC
21 program from about 50 percent when I started to 60
22 percent.  It's now up to 69 percent.  So -- you know

Page 360

1  -- anyway.
2     Q.  But in these generics MACs that you're
3  setting are shooting for a dollar amount spread --
4     A.  Right.
5     Q.  -- not necessarily for a correct percentage
6  spread, right?
7     A.  That's correct.
8     Q.  And the correct percentage could be a
9  thousand, could be 2,000, could be 1 percent,
10 depending upon the starting cost of the product,
11 right?
12    A.  Yes, we are searching for a dollar spread,
13 not a percent spread.
14    Q.  And if you go to Abbott Exhibit 19, and the
15 item that Mr. Black asked you about --
16    A.  Four up from the bottom?
17    Q.  Yeah, the $900 spread on a bag of saline?
18    A.  Uh-huh.
19    Q.  It would offend you if Minnesota Medicaid was
20 paying a $900 spread on a bag of saline, correct?
21    A.  Yes.
22    Q.  If that were a case of 100, and the spread

Page 361

1  were $9 on the bag of saline, would your answer be
2  different?
3     A.  If -- if the actual acquisition cost --
4  you're talking about the actual --
5     Q.  If the actual acquisition cost were about a
6  dollar.
7     A.  About a dollar.
8     Q.  The AWP was about $9, and the AWP minus 9
9  percent came out to about $8, such that the spread
10 was about $7.  That would be consistent with the
11 goals of the Medicaid program, correct?
12    A.  Yes.
13    Q.  And so when Mr. Black asked you these
14 questions about $900 spreads, you were answering
15 those questions based upon your belief that that
16 was $900 for one bag of saline, right?
17    A.  Correct.
18    Q.  Not for a case of 100 bags of saline, right?
19    A.  Correct.
20    Q.  Mr. Black asked you whether there had been
21 any closures of pharmacies -- oh and, by the way,
22 do you know who drafted this chart that Mr. Black

91 (Pages 358 to 361)

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

Page 1

                    UNITED STATES DISTRICT

           FOR THE DISTRICT OF MASSACHUSETTS


    --------------------------X

    IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

    PRICE LITIGATION            )  01-CV-12257-PBS

    THIS DOCUMENT RELATES TO    )

    U.S. ex rel. Ven-a-Care of  )

    of the Florida Keys, Inc.   )

        v.                      )  No.06-CV-11337-PBS

    ABBOTT LABORATORIES, INC.,  )

    --------------------------X


        (cross captions appear on following pages)


           Deposition of HARRY LEO SULLIVAN

                    Volume I

              Nashville, Tennessee

             Tuesday, March 12, 2008

                 9:05 a.m.

Sullivan, Harry Leo                                        March 12, 2008
                        Nashville, TN

Page 326

1    A.  No.
2         MR. KATZ:  Objection to form.
3    A.  Nor federal matching share either.
4         MR. DRAYCOTT:  That was my last
5    question.
6         THE WITNESS:  Outstanding.
7         MR. TORBORG:  I have a couple follow-up
8    questions.  If anyone -- see if anyone else on
9    the phone has any.  Anyone?
10        MS. LIEBERMAN:  Roxane would like to
11   reserve the right to ask questions at a later
12   date.
13        MR. DRAYCOTT:  I'm not representing
14   this witness, but I think the witness's
15   preference, and he can state it for himself,
16   would be to get this deposition finished today.
17        THE WITNESS:  That's correct.
18        MR. TORBORG:  Is there anybody else who
19   has questions today for Mr. Sullivan?  I have a
20   couple follow-ups, but I'll wait until everyone
21   else has had a chance to question.
22        MR. LYNN:  This is Paul Lynn.  I do not

Page 327

1    have any questions.
2         MR. JONES:  This is Scott Jones.  Go
3    ahead.
4         MR. TORBORG:  Okay.
5
6         REDIRECT EXAMINATION
7    BY MR. TORBORG:
8    Q.  Mr. Sullivan, I have just a couple
9    followup questions from the questions Mr.
10   Draycott had asked you.
11        First, Mr. Draycott asked you some
12   questions about a thousand percent spreads on
13   drugs; correct?
14   A.  Yes,sir.
15   Q.  And asked you if your testimony should
16   be seen by the jury in this case as endorsing or
17   not endorsing such spreads and whether or not
18   payment of a thousand percent spreads would be
19   appropriate.  Do you recall that?
20   A.  Yes.
21   Q.  Do you believe the better way to look
22   at the appropriateness of a Medicaid program

Page 328

1    paying a margin or spread on a drug is the dollar
2    value of the spread rather than the percentage?
3    A.  You know, at certain ends of the scale,
4    both need to be looked at, but I would agree that
5    the dollar difference is something that needs to
6    be looked at first, because, you know, a thousand
7    percent makes headlines but doesn't mean anything
8    if you don't have a dollar amount affixed to it.
9    Q.  And do you think expressing spreads in
10   terms of a percentage, like Mr. Draycott did, can
11   oftentimes --
12        MR. DRAYCOTT:  Objection.
13   BY MR. TORBORG:
14   Q.  -- misconvey the real spread that's
15   being paid by a Medicaid program?
16   A.  That's possible.
17   Q.  It may be that a spread of a thousand
18   percent might be an appropriate amount to pay,
19   depending on the facts and circumstances of both
20   the drug involved and the services involved in
21   paying those, dispensing those drugs?
22   A.  It gets back to partially this thought

Page 329

1    process of not wanting the drug to merely be a
2    commodity.  So if, for example, your dispensing
3    fee is limited to 2.50 and the drug -- and it is
4    a very inexpensive drug, and it does cost 6 bucks
5    to dispense that drug to a Medicaid patient,
6    ratcheting down reimbursement based on a
7    percentage of profit on the ingredients side may
8    make it prohibitive for that provider to dispense
9    the product.  If that makes sense.
10   Q.  It does.
11        If I could ask you to take out the
12   United States complaint once again, Tab 19.  It's
13   paragraph 42.  This is the point in the complaint
14   that states AWP is used to refer to the price at
15   which a pharmaceutical firm or a wholesaler sells
16   a drug to a retail customer who then administers
17   it to a patient; correct?
18   A.  Yes.
19   Q.  Mr. Draycott had asked you some
20   questions whether or not you were aware of the
21   legal definition of AWP; is that right?  Do you
22   recall that?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

MDL NO. 1456

NO. 01-CV-12257-PBS

JUDGE PATTI SARIS

MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

Page 214

1  State of Louisiana?
2      A.  Yes.
3      Q.  Go to Bates page 1419 of this report. Are
4  you there?
5      A.  Yes.
6      Q.  Under "Conclusions," second paragraph
7  states, "An overall evaluation of the adequacy of
8  current pharmacy reimbursement rates should
9  consider findings related to dispensing costs in
10  tandem with an analysis of ingredient reimbursement
11  rates and the costs pharmacy incur to acquire
12  prescription medications."
13      Do you see that?
14      A.  Yes.
15      Q.  Did you agree with that?
16      A.  Yes.
17      Q.  "The Department's current maximum
18  pharmacy dispensing fee is lower than the average
19  cost of dispensing prescriptions. However, on
20  average, Myers and Stauffer estimates that
21  pharmacies realize positive net margins on Medicaid
22  prescriptions due to margins on ingredient cost."

Page 215

1      You see that?
2      A.  Yes.
3      Q.  That wasn't news to you.  Is that fair to
4  say?
5      A.  Right.
6      Q.  And then they note later in there, "Based
7  on Myers and Stauffer's experience with drug
8  acquisition costs and Louisiana's current
9  reimbursement for drug ingredients, single source
10  drugs and multiple source drugs without a full
11  price or Louisiana Maximum Allowable Cost price,
12  may have average margins on drug ingredient costs
13  approximately in the range of 8 to $12 per
14  prescription."
15      Do you see that?
16      A.  Yes.
17      Q.  And was that something that was news to
18  you when you received this report?
19      A.  Well, they documented it.
20      Q.  Were you aware that Louisiana has been
21  paying margins in that range on ingredient cost
22  throughout the 1990s?

Page 216

1      MR. FAUCI:  Object to the form.
2      THE WITNESS:  I would have relied on the
3  survey reports.
4  BY MR. TORBORG
5      Q.  Does a payment of a margin of 8 to $12
6  per prescription, Ms. Terrebonne, concern you at
7  all?
8      MR. FAUCI:  Object to the form.
9      THE WITNESS:  I would say no, not based on the
10  current reimbursement methodology.
11  BY MR. TORBORG
12      Q.  And why is that?
13      A.  Because that's perhaps the pharmacists
14  are making a profit on the ingredient cost rather
15  than the dispensing fee, because the dispensing fee
16  may be lower than their ingredient cost.
17      Q.  Was that something that was also the case
18  throughout the 1990s?
19      MR. FAUCI:  Object to the form.
20      THE WITNESS:  I don't know.  I don't recall
21  what was in the reports back then.
22  BY MR. TORBORG

Page 217

1      Q.  You agree that pharmacies should be able
2  to make a profit from dispensing a drug to a
3  Medicaid beneficiary, correct?
4      A.  They should make a reasonable profit.
5      Q.  And do you have -- what do you believe is
6  a reasonable profit?
7      A.  I think you would have to rely on survey
8  results, depending on how you structure the
9  reimbursement.
10      Q.  How would the survey results tell you
11  what a reasonable profit would be?
12      A.  Well, I would rely on an expert like
13  Myers and Stauffer to tell us that, what they
14  thought a reasonable profit would be.
15      Q.  And would that be something that is based
16  upon comparisons with what providers were making
17  from other third party payors?
18      A.  No.  I think that their plan has also
19  been to survey invoices and document those and
20  recommend different options.
21      Q.  Would you agree that a profit of 8 to $12
22  a prescription paid on the drugs at issue in this

# SLIDE 22

Dawn Claborn - SPA 01-15 Drugs                                                Page 1

**From:**     Dawn Claborn
**To:**       Lreed@hcfa.gov;  Sgaston@hcfa.gov;  VDrivalas@hcfa.gov
**Date:**     08/01/2001 9:36:58 AM
**Subject:**  SPA 01-15 Drugs

I provided information to Vera yesterday via fax which included a new page 33 as well as a copy of other State Medicaid agency's drug cost methodologies.

Our drug cost methodology was derived via a two step approach which included 1) a thorough review of what other State's were doing and selecting the percentage off of AWP that was reasonable and 2) conducting negotiations with the Pharmacy Industry.

If you need additional information, please let me know.

Dawn Claborn

HHC009-1324      F

HHC009-1324



| | |
|---|---|
| **From:** | "Duerr, Gary - Medicaid" <DuerrG@idhw.state.id.us> |
| **To:** | "garza maria (E-mail)" <mgarza@cms.hhs.gov> |
| **Date:** | 12/10/01 1:38PM |
| **Subject:** | FW: ID 01-012 |



As requested the following is a summary of the points discussed during the conference call 12/10/01 at 9:30 AM MST. Those in attendance via phone conference included Maria Garza, Kim Howell, Gary Duerr and Shawna Kittridge.

· The State of Idaho conducted no further study or cost analysis as a determination for the reimbursement rate change beyond the previously submitted Myers and Stauffer Dispensing Cost Study of Kentucky and Arkansas. However, we are aware of CMS's concern that any possible future reimbursement changes to the AWP calculation or dispensing fee may necessitate another pharmacy cost survey.

· Representatives from the state pharmacy association, hospital association, and retailer's association met with the Department numerous times to negotiate reimbursement rates for pharmacies. It should be noted that the pharmacy representatives were concerned that lowering the dispensing fee may create additional access problems for Medicaid participants, especially those serviced by rural independent pharmacies.

· The OIG report was mentioned as it "added fuel" to the already burning fire to cutback spending by the state. The OIG report is currently under attack for methodology and extrapolation of national cost savings estimates. In addition it does not take into consideration FUL pricing, SMAC pricing, previous OIG reductions for injectable medications or recently discounted manufacturer AWP's (eg. Abbott). However, the OIG report does reiterate the general knowledge that AWP is significantly higher than pharmacy acquisition cost.

· CMS expressed concern that this reduction was just a "testing of the waters" for possible future pharmacy reductions.


----–Original Message-----
From: Duerr, Gary - Medicaid
Sent: Monday, December 10, 2001 1:55 PM
To: 'Maria Garza'
Cc: Swatsenbarg, Paul - Medicaid; Kittleson, Kathleen - Westgate
Subject: RE: ID 01-012


As requested from the telephone conference this AM including Maria Garza, Kim Howell, Gary Duerr, and Shawna Kittridge the following is a summary of the points discussed:


-----Original Message-----
From: Maria Garza [mailto:MGarza@cms.hhs.gov]
Sent: Friday, December 07, 2001 4:15 PM
To: Duerr, Gary - Medicaid
Cc: Kimberly Howell
Subject: RE: ID 01-012

# SLIDE 23

## REVIEW OF MEDICAID DRUG STATE PLAN AMENDMENTS

Although there are no statutory provisions for payment rates for Medicaid drugs, states are required to set rates in accordance with regulations at 42 CFR 447.301-333.

### BACKGROUND

*Estimated Acquisition Cost (EAC) and Dispensing Fee*

There are two components of this payment rate and each is required to be determined separately. The first is EAC, which simply means the cost to the pharmacy of obtaining the drug. The second is the dispensing fee, which is the pharmacy's direct and indirect cost of dispensing a drug. This includes everything from packaging to pharmacy overhead costs such as the electricity and salaries. Each component is measured separately. The ingredient cost is defined in 42 CFR 447.301 as the state "...agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size most frequently purchased by providers." Dispensing fees are simply required to be "reasonable". The regulations require that the agency's payment methodology for prescription drugs be described "comprehensively" in the state plan.

In practice we have told states that wish to modify their EAC levels that they must provide a factual basis to support a change in the EAC or dispensing fee. One method to support a change in EAC is to audit an appropriate number of pharmacies to determine current acquisition costs.[1] We have told the CMS Regional Offices (RO) that in reviewing state plan amendments (SPAs), they should compare rates for contiguous states rates as well as other states in the region. We have also said that they should consider drug cost studies. For the dispensing fee, we have said states could establish a reasonable fee by: (1) audits and surveys of operational costs; (2) compilation of data regarding professional salaries and fees; and (3) analysis of compiled data regarding pharmacy overhead costs, profits, etc. For dispensing fees, we have told the regional offices that they could, among other things, compare the proposed change to the related price indices, e.g. the Consumer Price Index (CPI).

*Office of Inspector General (OIG) Reports and State Submitted Audits*

Recently issued OIG reports indicated that the actual acquisition cost of brand name prescription drug products nationally is an average of AWP less 21.84 percent. Recent discussions with the OIG indicate that they will further refine this number to differentiate it between those single source (brand name drugs) without generic competition and those with innovator multiple source (brand name drugs) with generic competition. The OIG indicates that the single source drugs will likely show an average discount of around 17% and the innovator multiple source drugs of around 24%. The OIG also studied generic

---

[1] States usually base the EAC on Average Wholesale Price (AWP) levels with a significant discount e.g. AWP less 10%.

DEPOSITION
EXHIBIT
Abbott
328

HHC004-0188        F

HHC004-0188

drug discounts and found that the actual acquisition cost of generic prescription drug products nationally is an average of AWP less 65.93 percent.

State studies vary on the level of discount and while an exact level of discount cannot be determined, they appear to average in the range of 20% to 35% off of AWP.

## ANALYSIS

In recent months there has been an increase in SPAs proposing to change the reimbursement methodology (a listing of these SPAs is attached). Where there are surveys of costs, the findings generally show that these State's reimbursement could have been reduced by a percentage greater than the proposed AWP discount levels. The lesser level of discount is generally the result of negotiations that occur between the state and pharmacy representatives after the survey results are known. In other cases, the states legislature have responded to the escalating costs of Medicaid drugs by enacting legislation that increases the discount in the ingredient cost or the dispensing fee of these drugs. Legislation usually does not address why these rates are the best estimates or are reasonable.

It is proving increasingly difficult to require the states to establish payment rates in adherence to regulatory requirements. Accordingly, we believe an analysis and an acceptance of other factors states are now using to establish payment rates should be considered in looking at the EAC and the dispensing fee.

We think that the first part of our review should be continuing to rely on the existing review criteria (i.e. survey and rates in other states). For EAC, we would continue to look to surrounding states or because we now think that payment rates vary little nationwide, to a nationwide average. We think it is also helpful to strongly consider approval where the direction of the state's proposed level of reimbursement represents a program savings that does not appear to affect pharmacy participation. Finally, we think EAC needs to include a broader measure of factors that would result in a state agency's best estimate. We could consider the actions of the legislature or negotiations that result in a lower payment rate, even if that rate may differ from other documentation, such as a state survey.

Because the requirements to set dispensing fees are less specific, we would continue to allow states greater flexibility here. For instance, we would permit states to reduce these fees not only to reflect lower costs; but also to permit states to increase them to encourage other program savings measure, such as allowing a higher dispensing fee for the use of generic drugs.

Apart from that, we think a longer-range look at the OIG and state studies as well as a reevaluation of current regulations are in order. If, in fact, there needs to be another basis, such as nationwide surveys that can establish these rates, we need to look at the feasibility and impact of doing so.

HHC004-0189

HHC004-0189

## OPTIONS

(The following options are for approvals of SPAs, denials would be determined on a case-by-case basis)

*For ingredient costs –*

Approve SPAs that **decrease** the ingredient cost as long as it is no lower than that of another state, which has not experienced a significant decline in pharmacies (proxy measure for access).

Approve SPAs that **decrease** the ingredient cost as long as it is no lower than the levels of costs found by the OIG (i.e., approximately 17 % for single source, 24% for innovator multiple source, and 65.93 % for generics).

Approve SPAs to **increase** payment for ingredient costs if they are less than the median nationally.

Approve any rates set in state statute.

*For dispensing fees –*

Approve SPAs with higher dispensing fees for generics.

Approve SPAs with dispensing fees **increases** when the proposed fee is less than the national median.

Approve SPAs with dispensing fee **decreases** when the proposed fee is no less than what is paid by any other state (proxy measure for access).

## RECOMMENDATIONS

We recommend that we implement all of the above options. On SPAs that did not meet the above criteria, we would not automatically disapprove that SPA. We would look at the individual circumstances in the state as well as its supporting documentation and rational to decided whether to approve the SPA.

## DECISION

Approve _____   _____   Disapprove _____   _____
          Signature        Date                   Signature       Date

HHC004-0190     L

HHC004-0190

# SLIDE 24

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           )

LITIGATION                        ) CIVIL ACTION:

                                  ) 01-CV-12257-PBS

                                  ) Judge Patti B. Saris

                                  ) Magistrate Judge

                                  ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Wiberg, Cody                                    March 14, 2008

Page 170

1  considerations at the time.
2     So if you wanted to make it -- and you would
3  have three choices, basically.  You could either
4  make it -- try to make it as close as you could to
5  revenue-neutral. You could try to recoup savings.
6  And therefore, you -- you're going to set the
7  dispensing fee maybe not as high as you would if
8  you were going make it revenue-neutral. Or you
9  could try to actually pay providers more money
10  then, and you would set it a little bit higher.
11  But I basically -- when this came out, and at that
12  conference I mentioned, where -- where Mr. Lup --
13  Mr. Lupinetti and I both were presenters at a
14  conference.  We were talking about different
15  issues, and I was not talking about this particular
16  issue, per se.  But he was talking about this
17  issue.  And I did basically bring up that, you
18  know, you really have to understand how the
19  pharmacy reimbursement system works.  You can't --
20  you have to understand that there's two sides of
21  the equation, that the dispensing fees are kept
22  artificially low.  That if you just reduce the

Page 171

1  ingredient reimbursement to actual acquisition
2  cost, and don't do anything with the dispensing
3  fee, there's at least the possibility that you're
4  going to have access problems for patients, because
5  pharmacies at that point might drop out of the
6  system.
7     Now, there's an argument that it really
8  wouldn't make much difference, because the very
9  large national pharmacy chains don't necessarily
10  make their money on the prescriptions.  They make
11  the money on what you buy in the front end of the
12  store.  And if they use pharmacy sales or
13  prescription sales as a loss leader, they'll still
14  sign up for Medicaid.
15     Q.  There will be a retail pharmacy, correct?
16     A.  Yeah.
17     Q.  Not a closed pharmacy like an infusion
18  pharmacy.
19     A.  No, no.  So there's that argument.  But
20  anyway, the argument I made is that you can't --
21  you can't look at one side of the equation.  You
22  have to look at both sides of the equation.  You

Page 172

1  have to understand that we know, and this is a
2  serious aspect of ain't what paid -- "ain't what's
3  paid."  We know AWP, "ain't what's paid." But if we
4  move towards more transparency and we get closer to
5  reimbursing on the ingredient side at what
6  providers actually pay, then we have to look at the
7  dispensing fee side in the case of pharmacies,
8  because we've always kept that below what we think
9  the true cost of dispensing is to make up for the
10  fact that there is some money being made on the
11  ingredient side.  So to the extent, again, that you
12  start paying people a dispensing fee or a total
13  reimbursement that does not even get back the cost
14  of the drugs, plus the cost of labor and the
15  computer systems and the lights and all that, you
16  could have providers stop -- you know, start
17  dropping out of Medicaid.  And then this creates an
18  access issue for very poor people.  So -- yeah.
19     MR. BLACK:  Objection, form.
20  Nonresponsive.
21  BY MR. COOK:
22     Q.  And so would it be your understanding that if

Page 173

1  we were -- if one were to go to this ideal world in
2  which AWP actually represented acquisition costs,
3  the Medicaid programs would no longer use an AWP
4  minus a percentage.
5     A.  To the extent that -- that whatever was used,
6  revamped AWP or an ASP or an AMP, whatever you use
7  as a basis of a cost reimbursement, or -- or excuse
8  me, ingredient reimbursement to the extent that
9  that closely reflected the average actual price the
10  providers paid, then you would -- right.  You would
11  no longer be taking percentages off.
12     Q.  And, in fact, are you familiar with the
13  manner in which the federal legislation has changed
14  the calculation of federal upper limits to be
15  two-and-a-half times the Average Manufacturer's
16  Price?
17     A.  If that's a recent change within the last
18  two-and-a-half years, I wouldn't know.
19     Q.  And we've already talked about Medicare
20  paying ASP plus some percentage, correct?
21     A.  6 percent, I believe it is, yep.
22     Q.  Once you learned what the actual amounts were

44  (Pages 170 to 173)

Atlanta, GA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

---------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

--------------------------------X

Atlanta, GA

Page 310

1  position to testify as to the practices of an
2  individual practitioner. I -- I couldn't speak
3  to their internal process.
4     Q.  Based on your own experience in the
5  pharmacy field, do you have any -- any
6  understanding as to how that process works?
7     A.  Sure.
8        MS. TOWNES:  Are -- are you asking him
9  in a 30(b)(6) capacity?
10       MR. COLE:  I understand the witness is
11 here in a 30(b)(6) capacity. I'm just asking for
12 his -- his personal information on this
13 particular subject.
14       MR. LAVINE:  Okay. It's just -- it's
15 just helpful if the question makes that clear.
16       THE WITNESS:  Okay.
17       MR. SULLIVAN:  I object to the form for
18 that very reason.
19       But go ahead.
20    A.  Okay. The question is -- is very, very
21 broad in nature. But typically dispensing would
22 be subject to an order issued by a prescriber.

Page 311

1        The order would -- in the event that it
2  was, say, Vancomycin with -- in 250 mils of
3  normal saline, as one of the examples here would
4  provide, the order would come in. The pharmacist
5  would verify the order, enter into a -- typically
6  a computer system.
7        There would be an admixture of the --
8  the drug would be diluted and then withdrawn from
9  the vial and placed into a bag, an -- a bag
10 containing IV fluids.
11       It would be labeled with instructions
12 for the nurse. There would be -- a nurse or a
13 courier would deliver the medication to the home
14 for administration in the home.
15       I'm not -- I'm not real sure about -- I
16 mean, there are -- there are other parts of the
17 process, but I'm not sure if I'm answering your
18 question or not. It's very broad.
19    Q.  (By Mr. Cole) As the state Medicaid
20 director of Georgia Medicaid and as the 30(b)(6)
21 witness testifying on behalf of Georgia Medicaid,
22 was the program aware -- was the department aware

Page 312

1  that the dispensing costs associated with home
2  infusion products such as those listed in
3  Schedule I were higher than the dispensing costs
4  of drugs dispensed, say, by retail pharmacies?
5        MR. LAVINE:  Object to form.
6     A.  Yes.
7     Q.  (By Mr. Cole) That was a long
8  question. Let me see if I can -- I can tighten
9  it up a little bit.
10       So the -- the department -- the Georgia
11 Medicaid program was aware that, for instance,
12 home health pharmacies who dispense products into
13 the home infusion setting -- that its dispensing
14 costs were significantly higher than the
15 dispensing costs of, say, a retail pharmacy.
16       MR. LAVINE:  Object to form.
17    A.  Yes.
18    Q.  (By Mr. Cole) Are you aware of any
19 discussions or studies involving the Medicaid
20 program that sort of analyzed that issue, that
21 issue being that it -- it costs more to dispense
22 products in the home infusion setting than in the

Page 313

1  retail pharmacy setting?
2     A.  I recall there have been internal
3  discussions. I'm referring back to Exhibit 18
4  because I can't recall if that was actually
5  included in the other.
6     Q.  I don't have Exhibit 18 in front of me.
7        But if you could, please summarize
8  whatever -- whatever discussions you recall about
9  that issue.
10    A.  Those discussions just included the
11 fact that some providers, such as home health
12 providers as well as long-term care providers,
13 have additional costs that are not accounted for
14 in our dispensing fee.
15    Q.  That was my next question.
16       So there's not a separate schedule to
17 compensate pharmacies who submit claims related
18 to the home infusion setting.
19    A.  That's correct.
20    Q.  And they would be compensated at least
21 for their dispensing costs in the same way that
22 any other pharmacy would be compensated when it

79 (Pages 310 to 313)

dd23118e-9e82-4fd1-afbb-155015bf3b99

Atlanta, GA

Page 314

1  submits a claim.
2      A.   That is correct.
3      Q.   Mr. Robben asked you some questions
4  about the interplay between the -- the
5  reimbursement of ingredient costs and the
6  reimbursement for dispensing costs.
7          Do you remember those questions, sir?
8      A.   Yes.
9      Q.   And I believe you said that -- that the
10  Georgia Medicaid program understood that -- that
11  they were providing a -- a profit margin to
12  providers in reimbursing them for the ingredient
13  costs; is that right?
14          MR. LAVINE:  Object to form.
15      A.   Yes.  I acknowledged that there was
16  profit margin in the current ingredient cost
17  formula.
18      Q.   (By Mr. Cole)  And that if -- if that
19  margin were to be eliminated, then Georgia would
20  have to pay a higher dispensing fee to providers
21  to make up for the lost margin on the ingredient
22  cost side; is that fair?

Page 315

1          MR. LAVINE:  Object to form.
2      A.   That's fair.
3      Q.   (By Mr. Cole)  And would that approach
4  apply even more in the home infusion setting
5  where you have pharmacies incurring even greater
6  dispensing costs?
7          MR. SULLIVAN:  Object to form.
8      A.   No.  That equation that we spoke about
9  was only looking at the acquisition cost of the
10  drug, not the -- the overhead.
11      Q.   (By Mr. Cole)  What do you mean by
12  that?
13      A.   When we were talking about the fact
14  that there was margin in the ingredient cost of
15  the drug, the cost by which the pharmacy
16  purchased the drug -- when you're talking --
17  you're talking to an additional cost to
18  dispense.
19          So changing the ingredient cost and
20  getting that more in line with the actual
21  acquisition cost would not necessarily mean that
22  we would adjust and make a differential for home

Page 316

1  health or for long-term care or any other
2  provider.
3          We may review that, but it -- it would
4  actually be an additional exercise.
5      Q.   Going back to the let's say mid to late
6  '90s time period when the dispensing fee paid by
7  Georgia Medicaid was roughly in the $4 to $4.63
8  range, do you believe that the dispensing fee
9  paid by Georgia Medicaid during that time frame
10  was adequate to cover pharmacies' dispensing
11  costs?
12      A.   No.
13      Q.   And in the home infusion setting -- if
14  at that level -- if -- if the $4.63 was not
15  adequate to cover a retail pharmacy's dispensing
16  costs, then I assume you would agree with me that
17  it certainly did not cover the dispensing costs
18  of a home health pharmacy or some other pharmacy
19  that administered prescriptions in the home
20  infusion setting.
21          MR. SULLIVAN:  Object to the form.
22      A.   Agreed.

Page 317

1      Q.   (By Mr. Cole)  Is it fair to say, Mr.
2  Dubberly, that in assessing whether to increase
3  the dispensing fee, it has been the policy of the
4  Georgia Medicaid program to consider the margin
5  on ingredient cost?
6          MR. LAVINE:  Object to form.
7      A.   It's been the practice.
8      Q.   (By Mr. Cole)  And there's nothing
9  wrong with that practice as -- as far as you are
10  aware; is that fair?
11          MR. LAVINE:  Object to form.
12      Q.   (By Mr. Cole)  Did you answer that
13  question?  I'm sorry.  If you did --
14      A.   No.
15      Q.   -- I couldn't hear it on the
16  speakerphone.
17      A.   No.  I was trying to -- to reassess the
18  -- the language of your question.
19          Is it possible to restate it?
20      Q.   Well, earlier you testified that -- you
21  know, that the Georgia Medicaid program obviously
22  complies with -- in the day-to-day operation of

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

Atlanta, GA

Page 330

1   that the, quote, underpayment on the dispensing
2   fee is a result of overpayment on the ingredient
3   cost.
4          THE COURT REPORTER:  Mr. Cole?
5          MR. COLE:  Yes?
6          THE COURT REPORTER:  We're about to run
7   out of videotape.  We need to --
8          MR. COLE:  Yes?
9          THE COURT REPORTER:  -- take a quick
10  break.
11         MR. COLE:  That's fine.
12         THE VIDEOGRAPHER:  This is the end of
13  tape No. 5.  Going off the record at 5:10 p.m.
14         (Deposition in recess, 5:10 p.m.
15  to 5:21 p.m.)
16         THE VIDEOGRAPHER:  This is the
17  beginning of tape No. 6 in the deposition of
18  Jerry Dubberly.  Going on the record at 5:21 p.m.
19     Q.  (By Mr. Cole)  Mr. Dubberly, when we
20  left off, we were talking about the -- the margin
21  on ingredient costs and how that fit in with an
22  underpayment to providers for dispensing costs.

Page 331

1          And I believe you said -- you took
2   issue with my last question and said that it
3   worked the other way around or something like
4   that.
5          Do you remember that question?
6      A.  I do.
7      Q.  Can you explain a little more -- when
8   you say it was the "other way around," what do
9   you mean by that?
10     A.  You were stating that we overpaid on
11  the ingredient portion because we underpaid on
12  the dispensing fee, and it's actually the
13  opposite.
14         We underpay on the dispensing fee
15  because we overpay on the ingredient.  It's a
16  subtle difference, but I think it's important.
17     Q.  That practice, as you just stated it --
18  and that is, if I have it correctly, underpaying
19  on dispensing costs because you overpay on
20  ingredient costs, has that practice been in place
21  at Georgia Medicaid as far back as you can
22  recall?

Page 332

1          MR. LAVINE:  Object to form.
2      A.  Yes.
3      Q.  (By Mr. Cole)  Do you have any reason
4   to believe that practice -- let me start over.
5          When you joined the Georgia Medicaid
6   program, is it your understanding that that
7   practice existed prior to your joining Georgia
8   Medicaid?
9      A.  Yes.
10         MR. LAVINE:  Let me object to form.
11     Q.  (By Mr. Cole)  Is it your understanding
12  that that practice, like some of the other topics
13  we've talked about today, was a practice employed
14  by other state Medicaid programs?
15         MR. LAVINE:  Object to form.
16     A.  Yes.
17     Q.  (By Mr. Cole)  In other words, Georgia
18  wasn't the only state that was overcompensating
19  providers on ingredient costs at the same time
20  that they were undercompensating providers for
21  their dispensing costs; correct?
22         MR. LAVINE:  Object to form.

Page 333

1          MR. SULLIVAN:  Object to form.
2      A.  Correct.
3      Q.  (By Mr. Cole)  Would you say that --
4   that most of the states, if not all of the states
5   that you communicated with or have communicated
6   with, given your position as the Georgia State
7   Medicaid director -- that the majority of those
8   states have employed a similar practice?
9          MR. LAVINE:  Object to form.
10         And I'd request you clarify whether
11  this is a question you're asking as an official
12  opinion of the Georgia department or his personal
13  opinion you're seeking now.
14         MR. COLE:  It's not a personal opinion.
15  I'm asking -- I'm asking him as the
16  representative of the Georgia Medicaid program if
17  it's his understanding, based on the
18  communications that he has had with other states,
19  that those other states had a similar practice of
20  overcompensating providers on the ingredient cost
21  while they undercompensated providers for their
22  dispensing costs.

84  (Pages 330 to 333)

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008

Atlanta, GA

Page 334

1        MR. SULLIVAN:  Object to the form.
2     A.  Yes, that is my understanding.
3     Q.  (By Mr. Cole)  Can you think of any
4  state that did not have that practice?
5        MR. LAVINE:  Object to form.
6     A.  No.
7     Q.  (By Mr. Cole)  Mr. Lavine asked you
8  some questions about whether Georgia has received
9  pricing information directly from manufacturers.
10        And I believe you testified, Mr.
11  Dubberly, that in certain instances, the Georgia
12  Medicaid program has received ASP information
13  from certain manufacturers in connection with
14  settlement agreements.
15        Do you remember that testimony?
16     A.  That's correct.  And then I was
17  refreshed with another document that reminded me
18  that we also have received other documentation as
19  well.
20     Q.  Referring to the -- the ASP information
21  that was supplied by certain manufacturers, I
22  believe you said that the program does not retain

Page 335

1  the ASP information because it's not part of the
2  state plan and that it's typically shredded; is
3  that right?
4     A.  That's correct.
5     Q.  If -- if Abbott or any of the other
6  defendants in these cases had submitted ASP
7  information to the State, would you have any
8  reason to believe that that information would
9  have been treated any differently?
10        MR. LAVINE:  Object to form.
11     A.  No.
12     Q.  (By Mr. Cole)  Do you believe it would
13  be treated in the same manner as the other ASP
14  information supplied by other manufacturers?
15        MR. LAVINE:  Object to form.
16     A.  Yes, it would be treated the same.
17     Q.  (By Mr. Cole)  Mr. Lavine asked you
18  some questions about how Georgia reimbursed for
19  compounded drugs versus admixture drugs.
20        Do you remember those questions?
21     A.  I do.
22     Q.  Could you explain that for me one more

Page 336

1  time.
2        And I apologize.  I was a little
3  confused when you gave your earlier answer, and I
4  don't believe I -- I understood what you were
5  trying to say regarding the reimbursement of
6  compounded drugs versus admixture drugs.
7     A.  Admixtures are not considered to be
8  compounded drugs, and compounded are reimbursed
9  using the sum of the average wholesale price of
10  each individual component.
11     Q.  Is that a -- a discounted average
12  wholesale price or an undiscounted average
13  wholesale price?
14     A.  It's an undiscounted.
15     Q.  And why is it that compounded drugs are
16  reimbursed in that manner?
17     A.  Compounded -- well, compounded drugs
18  are reimbursed in that manner because compounding
19  takes a pharmacist to actually mix the
20  medications, calculate the -- calculate the
21  individual components, weigh the components out,
22  often doing a process called "geometric dilution"

Page 337

1  with topical products.
2        It's much more involved than -- than
3  any of the other dispensing actions, including
4  simple admixtures.
5     Q.  Is there a dispensing fee that goes
6  along with compounded drugs?
7     A.  It's the same dispensing fee as the
8  normal reimbursement methodology we mentioned
9  before.
10     Q.  So let me see if I understand.
11        The Georgia Medicaid program for
12  compounded drugs reimburses providers at an
13  undiscounted AWP level --
14     A.  Correct.
15     Q.  -- correct?
16     A.  Correct.
17     Q.  And that would be higher than the
18  reimbursement level for noncompounded drugs;
19  correct?
20     A.  Correct.
21     Q.  And that -- that higher reimbursement
22  is actually given to the providers on the

85 (Pages 334 to 337)

dd23118e-9e82-4fd1-afbb-155015bf3b99

# SLIDE 25

# Impact of the 10 Percent Fee-for-Service Payment Reductions

## on Medi-Cal Beneficiaries and Pharmacies

Prepared by:

Stephen W. Schondelmeyer, Pharm.D., M.A. Pub.Adm., Ph.D., FAPhA
Professor of Pharmaceutical Management & Economics
Director, PRIME Institute
College of Pharmacy
University of Minnesota
Minneapolis, Minnesota 55455

Phone: (612) 624-9931; FAX: (612) 625-9931

June 3, 2008



EXHIBIT
Abbott
Schondelmeyer 5
2/23/09

1452

**Impact on Medi-Cal Program Overall**

The 10 percent fee reductions for Medi-Cal prescriptions will not simply result in the Medi-Cal patients getting the same prescriptions at the same pharmacies for 10 percent less cost. Virtually all pharmacies will refuse a few high cost Medi-Cal prescriptions. Some pharmacies will refuse some Medi-Cal prescriptions and some patients. Other pharmacies will refuse all Medi-Cal prescriptions and all patients.

The point is, there will be patients who do not receive the care that they need and will end up seeking alternative sources of care that may be less effective, more costly, or both. The continuity and coordination of care for Medi-Cal patients will decrease. For example, epilepsy and mental health patients will use the emergency room in an attempt to get medications that the community pharmacies choose not to provide due to the loss that will be incurred every time these prescriptions are dispensed. Hospitalizations and other forms of institutionalization for certain types of patients are likely to increase substantially and the cost of care will also escalate.

Executive Summary

ix

1464