UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,*<br>Civil Action No. 05-11084-PBS | MDL No. 1456<br>Master File No. 01-CV-12257-PBS<br>Subcategory Case No. 06-11337<br>Hon. Patti B. Saris<br><br>Magistrate Judge<br>Marianne B. Bowler<br><br>**ORAL ARGUMENT REQUESTED** |

## DEY, INC., DEY, L.P., AND DEY L.P., INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A FINDING OF SPOLIATION AND FOR SANCTIONS

Defendants Dey, Inc., Dey L.P., and Dey L.P., Inc. (collectively, "Dey") hereby join in Abbott Laboratories, Inc.'s Motion for a Finding of Spoliation and for Sanctions which was filed on June 4, 2009 in *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, No. 06-CV-11337-PBS (Dkt. 6096) (the "Abbott Case"). Dey respectfully requests that the Court also enter an order (1) finding that the United States has spoliated evidence in this case and that sanctions are warranted and (2) issuing appropriate sanctions in *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS (the "Dey Case"). All of the arguments set forth by Abbott in its accompanying memorandum of law, Docket 6097 are adopted by Dey.[1]

---

[1] A copy of Abbott's Motion, Docket 6096, is attached to the Declaration of Sarah L. Reid ("Reid Decl.") as Exhibit A, and a copy of Abbott's Memorandum of Law, and supporting exhibits, Docket 6097, is attached to the Reid Decl. as Exhibit B.

## DEY'S FACTUAL BACKGROUND

Ven-A-Care filed its complaint against Dey under seal on August 13, 1997, and it was not until nine years later, on August 24, 2006, that the Government filed its complaint-in-intervention, finally unsealing the case on September 7, 2006.

Prior to the unsealing of the case, the DOJ met with Dey to discuss Ven-A-Care's allegations. In January of 1999, after Dey had met with the Government, Dey began sending letters to Medicaid agencies explicitly detailing what its reported AWP and WACs were. These letters were sent each time there was a product price change so that there could be no possibility of confusion, let alone fraud. A typical letter included the following language:

> ...As you know, WAC is referred to by data reporting services and government agencies as an "estimate," and Dey believes that WAC generally means the <u>invoice</u> price charged by a pharmaceutical manufacturer to drug wholesalers. As you also know, WAC does not include the net effect of discounts from invoice price (based on volume of purchases, speed of payment and other factors), rebates, chargebacks, administration fees, and other such cost adjustments which are well-known and commonplace in the pharmaceutical industry and can affect, to a greater or lesser degree, the actual "final" cost to each purchaser. These discounts may not be determined until some months after the date of invoice. Therefore, we remind you that <u>WAC may well not be representative of actual market costs to those entities which you are reimbursing under Medicaid</u>.

*See* Ex. C to Reid Decl. at Ex. DL-0050553. (emphasis in the original). The letters describe Dey's AWP as follows:

> Further, as you also know, the Average Wholesale Price (or "AWP") per unit listed above does not represent actual wholesale prices which will be charged or paid for this product. It is Dey's practice to set an AWP before a product is first sold and not subsequently to change that figure. We understand that this is consistent with industry practice and is understood by state and federal Medicaid regulators.

*Id.*

2

Along with Abbott, Dey was one of the manufactures that, in March 2000, submitted a white paper to the DOJ that highlighted evidence showing that Medicaid and Medicare were aware of large discounts from AWP and argued that the Government could not colorably claim to have been defrauded. Also during this time period while the Government was deciding whether to intervene, the DOJ and NAMFCU published their alternative AWPs, which included revised AWPs for six of the NDCs that have been identified by Plaintiff as Dey's Subject Drugs, effective September 8, 2000. (*See* Ex. D to Reid Decl., Abbott Ex. 138). Most states and Medicare rejected these prices.

## ARGUMENT

This Court itself has expressed its reservations relating to the history of delay in unsealing the Dey case, calling the number of extensions "worrisome" and stating that that "in some circumstances egregious delay may be sufficiently prejudicial to trigger due process concerns." *United States ex rel. Ven- A-Care of the Fla. Keys, Inc. v. Dey, Inc.*, 498 F. Supp. 2d 389, 399 (D. Mass. 2007) (the July 17th Decision"). The Court went on to state:

> These long delays are quite troubling. Evidence spoils, memories fade, and prejudice may result. In my experience, the government routinely files for multiple extensions of time, frequently citing as the reason the size of the case and the lack of resources to investigate adequately. At some point, though, the government must fish or cut bait.

July 17th Decision at 399, fn6 (internal citation omitted). In the July 17th Decision, this Court declined to make a ruling based on the number of extensions, stating that, despite the Court's reservations, that "Dey has not produced any evidence that these extensions were improper, in bad faith, or prejudicial." July 17th Decision at 399. Dey filed its motion to dismiss without the benefit of having conducted discovery. Now, however, after conducting numerous depositions and gathering extensive discovery from Plaintiffs, Dey can point to the evidence which

3

demonstrates the extent of the prejudice suffered from the nine year period during which the complaint was under seal.

Dey has been prejudiced because during those nine years that the Government was gathering evidence to bolster its case, the Government was doing nothing to preserve the full record of evidence that could be used by Dey in support of its defenses. The Court's concern over the spoliation of evidence and the fading of memories was not misplaced, and as demonstrated in Abbott Laboratories, Inc.'s Memorandum in Support of its Motion for a Finding of Spoliation and for Sanctions, Docket 6097, the discovery record in the cases brought by the Government demonstrates the extent of the prejudice that has in fact resulted.

As set forth by Abbott in its Memorandum of Law, the Government's inaction has resulted in the widespread destruction of relevant documents and e-mails. Because the Government did not issue a litigation hold, numerous documents from CMS, OIG, and the states have been destroyed pursuant to document retention policies.[2] As detailed by Abbott, e-mails from key CMS personnel Bruce Vladeck and Thomas Scully were destroyed when those officials left CMS in as late as 2004, and the e-mails and files of 25 other CMS officials identified by the Government as having relevant information were destroyed as well. (*See, e.g.*, Exhibit B, Dkt. 6097, Abbott Ex. FF at 175-77, 235-36.) These documents are equally important and relevant to the issues raised in the Dey Case and therefore their absence is equally problematic.

---

2   When litigation is reasonably anticipated, a party "must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) A party must preserve all evidence that is "reasonably calculated to lead to discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." James S. Gorelick, *et al.*, *Destruction of Evidence* § 3.11, at 93 (1989 & Supp. 2008).

Furthermore, the absence of the specific, identifiable documents and data described by Abbott are equally prejudicial here. In addition to the documents relating to Ven-A-Care's "Continuing Education Project," the 1995 "Relationship Between AWP and Pharmacy Cost" State Survey, the Medicaid Pharmacy Bulletins, and the workpapers and related material for key OIG Reports which are equally applicable to the Abbott and Dey cases, in the Dey case, Additionally, the Government has not been able to produce Medicare arrays for certain time periods because those arrays, which are in the possession of the Government's contractors the Durable Medical Equipment Regional Carriers ("DMERCs"), have been lost or destroyed as a result of the Government's failure to issue a litigation hold notice. Furthermore, claims data and Maximum Allowable Cost Information for some time periods and states have also not been preserved, and therefore is not available for use in the Dey Case.

Finally, in the Dey Case, as in the Abbott Case, the Government's spoliation has also contributed significantly to faded memories and a deficient factual record, as demonstrated in the numerous officials and witnesses who have testified to a lack of memory because of the passage of time, and those witnesses who developed illnesses which have impacted their memories and ability to testify. In addition to the examples of individuals with decreased memory cited by Abbott, Dey has been unable to depose a key witness from Palmetto and a key witness from the Office of the Inspector General ("OIG"). Dey attempted to depose Dr. Metzger, the former Medical Director of Palmetto, the DMERC with the largest number of Medicare claims for Dey' drugs. Dr. Metzger was Medical Director of Palmetto from 1994 to 2000. He was involved in an OIG investigation relating to fraudulent claims submitted by providers in the Miami area entitled "Review of Payments for Inhalation Drugs Made by Region C Durable Medical Equipment Regional Carriers" (A-06-00-00053). After requesting Dr.

Metzger's deposition, Dey received two confidential notes from Dr. Metzger's physician stating that Mr. Metzger would not able to testify for medical reasons which arose after the Complaint in this case was first filed under seal. *See* Ex. E to Reid Decl., July 29, 2008 Letter.

Dey has also been unable to depose Robert Katz. Mr Katz worked at the OIG's Philadelphia Regional Office and served either as a project leader or program analyst for four of the OIG reports that specifically deal with the Dey Subject Drugs:

- HHS-OIG "Medicare Payments for Nebulizer Drugs" OEI-03-94-00390 (February 1996) (Program Analyst);
- HHS-OIG, "A Comparison of Albuterol Sulfate Prices" OEI 03-94-00392 (June 1996) (Program Analyst);
- HHS-OIG, "Suppliers' Acquisition Costs for Albuterol Sulfate" OEI-03-94-00393 (June 1996) (Project Leader); and
- HHS-OIG "Questionable Practices Involving Nebulizer Drug Therapy" OEI-03-94-00391 (March 1997) (Project Leader).

These reports directly address the acquisition cost for albuterol sulfate, one of the Dey Subject Drugs, and the working files for these reports include invoices for Dey's own albuterol sulfate. For instance, a memo dated November 8, 1995 from "Karen" to "Rob," (presumably Mr. Katz) "Bob," and "Amy," discusses invoices the government received from Medicare suppliers for Dey's albuterol sulfate 0.083%. *See* Ex. F to Reid Decl., HHD011-0915-16. The memo notes that the lowest price suppliers pay to Dey for albuterol sulfate is $0.1167 per milliliter, and the highest price paid by suppliers for Dey's albuterol sulfate was $0.1667 per milliliter. *Id.*

After several attempts to depose Mr. Katz on these reports and the invoices contained in the working files for these reports, Mr. Katz's physician set forth his opinion that as a result of several medical conditions and deteriorated memory, Mr. Katz is not able to give competent testimony in any legal proceeding. *See* Ex. E to Reid Decl., July 29, 2008 Letter.

For these reasons and those set forth in Abbott's Memorandum of Law, Dkt. 6097, Dey therefore respectfully requests that the Court hold that spoliation has occurred and

sanctions are warranted as a remedy. The Court should also preclude recovery of any damages on alleged "false claims" for those categories and/or periods which the key underlying arrays or claims data payment data has been lost or destroyed as a result of the Government's failure to issue a litigation hold. The Court also has the power to award fees and costs as a response to spoliation, including against the Government, as well as any other sanctions or relief it sees fit.

Dated: June 12, 2009

                                      Respectfully Submitted,

                                      KELLEY DRYE & WARREN LLP

                                      By: __/s/ Sarah L. Reid_____
                                          Paul F. Doyle (BBO # 133460)
                                          Sarah L. Reid *(pro hac vice)*
                                          William A. Escobar *(pro hac vice)*
                                          Neil Merkl *(pro hac vice)*
                                      101 Park Avenue
                                      New York, NY 10178
                                      Telephone: (212) 808-7800
                                      Facsimile: (212) 808-7897

                                      *Attorneys for Defendants Dey, Inc.*
                                      *Dey, L.P., and Dey, L.P., Inc.*

## CERTIFICATE OF SERVICE

       I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on June 12, 2009, a copy to LexisNexis File and Serve for posting and notification to all parties.

                                                                By:   /s/ Sarah L. Reid
                                                                          Sarah L. Reid