**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION

MDL NO. 1456
Civil Action No. 01-12257-PBS

Judge Patti B. Saris

THIS DOCUMENT RELATES TO:

*City of New York v. Abbott Labs., et al.* (S.D.N.Y. No. 04-CV-06054)
*County of Suffolk v. Abbott Labs., et al.* (E.D.N.Y. No. 03-CV-229)
*County of Westchester v. Abbott Labs., et al.* (S.D.N.Y. No. 03-CV-6178)
*County of Rockland v. Abbott Labs., et al.* (S.D.N.Y. No. 03-CV-7055)
*County of Dutchess v. Abbott Labs., et al.* (S.D.N.Y. No. 05-CV-06458)
*County of Putnam v. Abbott Labs., et al.* (S.D.N.Y. No. 05-CV-04740)
*County of Washington v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00408)
*County of Rensselaer v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00422)
*County of Albany v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00425)

[Caption Continues on Next Page]

**RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WATSON PHARMACEUTICALS, INC. AND WATSON PHARMA, INC.**

*County of Warren v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00468) )
*County of Greene v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00474) )
*County of Saratoga v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00478) )
*County of Columbia v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00867) )
*Essex County v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00878) )
*County of Chenango v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00354) )
*County of Broome v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00456) )
*County of Onondaga v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00088) )
*County of Tompkins v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00397) )
*County of Cayuga v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00423) )
*County of Madison v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00714) )
*County of Cortland v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00881) )
*County of Herkimer v. Abbott Labs. et al.* )
(N.D.N.Y. No. 05-CV-00415) )
*County of Oneida v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00489) )
*County of Fulton v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00519) )
*County of St. Lawrence v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00479) )
*County of Jefferson v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00715) )
*County of Lewis v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00839) )
*County of Chautauqua v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06204) )
*County of Allegany v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06231) )
*County of Cattaraugus v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06242) )

*County of Genesee v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06206) )
*County of Wayne v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06138) )
*County of Monroe v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06148) )
*County of Yates v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06172) )
*County of Niagara v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06296) )
*County of Seneca v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06370) )
*County of Orleans v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06371) )
*County of Ontario v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06373) )
*County of Schuyler v. Abbott Labs, et al.* )
(W.D.N.Y. No. 05-CV-06387) )
*County of Steuben v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06223) )
*County of Chemung v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06744) )
AND )
*County of Nassau v. Abbott Labs., et al.* )
(E.D.N.Y. No. 04-CV-5126) )
____________________________________)

**RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WATSON PHARMACEUTICALS, INC. AND WATSON PHARMA, INC.**

Pursuant to Local Rule 56.1, Defendants Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. (f/k/a Schein Pharmaceutical, Inc.) (collectively, "Watson" or the "Watson Defendants") submit this response to the Statement of Undisputed Material Facts Applicable to Watson that Plaintiffs filed in support of their Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-B.

Watson's responses correspond to the numbered paragraphs set forth in Plaintiffs' Statement and identify those issues that are undisputed and those issues for which there exists a genuine issue of material fact.

## I. WATSON'S SPECIFIC RESPONSES

1. The Watson Drugs and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto. This exhibits also set forth Watson's Published AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limits ("FUL") and Watson's AMPs. That exhibit notes which NDCs are associated with package sizes that set the FUL.

RESPONSE NO. 1: Watson states that the drugs sold by Watson that are at issue for purposes of this motion are accurately listed on Exhibit A. However, Watson states that because Plaintiffs fail to cite with specificity the sources for the prices and date ranges set forth on Exhibit A, despite the requirements of Local Rule 56.1, Watson cannot confirm whether the data set forth on Exhibit A accurately reflects prices it reported to First DataBank. See O'Brien v. Town of Agawam, 440 F. Supp. 2d 3, 5 n.1 (D. Mass 2006) (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings as required by Local Rule 56.1). Moreover, Watson disputes that it reported "AWPs" to First DataBank for all of the time period identified in Exhibit A, as Watson reported SWPs (suggested wholesale prices) beginning in 2000. See Plaintiffs' 56.1 Statement Applicable to Watson, ¶ 11 (hereinafter "SOF-W, ¶ _"). Accordingly, Watson disputes the allegations set forth in SOF-W, ¶ 1.

2. The specific Watson drugs at issue are the Albuterol 90 MCG Inhaler, Clonazepam .5 MG Tablet, Enalapril Maleate 20 MG Tablet, Lorazepam 1 MG Tablet, Metropolol 100 MG Tablet and Ranitidine 150 Tablet.

RESPONSE NO. 2: Watson does not dispute that the list of drugs set forth in SOF-W, ¶ 2 are the targets of discovery for this portion of the case (see Case Management Order 33), and that Watson sold these drugs at least for part of the time frame under consideration.

3. Watson Pharma, Inc. was formerly known as Schein and has been a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. since 2000. [citation omitted]

RESPONSE NO. 3: Undisputed.

4. Watson has entered into and executed the federal Medicaid rebate agreement pursuant to 42 U.S.C. § 1396r-8. [citation omitted]

RESPONSE NO. 4: Watson admits that Schein entered into a federal rebate agreement with the Secretary of HHS, and that certain of Watson Pharmaceuticals' subsidiaries have entered into rebate agreements with the Secretary of HHS. Because Watson Pharmaceuticals is a holding company, it has not entered into a Rebate Agreement. See Watson's March 31, 2008 Rule 56.1 Response, Dkt 493, ¶ 3, Case 1:03-cv-11865-PBS (hereinafter, "Watson's 3-31-08 Rule 56.1 Response").

5. Watson was required as a matter of law to familiarize itself with the legal requirements, standards and procedures of the Medicaid program. [citation omitted]

RESPONSE NO. 5: Watson states that the allegations set forth in SOF-W, ¶ 5 consist merely of conclusions of law, and not of allegations of fact, and therefore, no response is required. To the extent that the allegations set forth in SOF-W, ¶ 5 seek to characterize the federal rebate agreements that Schein or Watson Pharmaceuticals' subsidiaries entered into with HHS, Watson states that the agreements speak for themselves and otherwise Watson denies the allegations set forth in SOF-W, ¶ 5. Indeed, the Medicaid Rebate Agreement[1] imposes *no* general obligation for pharmaceutical companies to familiarize themselves with the legal requirements of the Medicaid program with respect to reimbursement of pharmacies.

6. Watson is aware of State Medicaid reimbursement formulas. [citations omitted]

RESPONSE NO. 6: Watson states that the testimony and documents cited in SOF-W, ¶ 6 demonstrate only that Ms. Recchia used a single reimbursement formula of "AWP minus 13%" at an unspecified period of time to conduct an internal analysis. See, e.g., SOF-W, Ex. B, at 156-57 ("Q: How did you make the determination that reimbursement formula would be AWP minus

[1] A sample agreement is available at: http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf.

13? A: I would have expected probably to get that information somewhere. Q: Do you recall now where you got it? A: No.”). The cited materials do not support the broader statement that “Watson is aware of State Medicaid reimbursement formulas,” and therefore, the allegations set forth in SOF-W, ¶ 6 are denied.

7. Watson knew and understood that most drugs purchases are paid for by third-party payors, including Medicaid, and not by cash paying customers. [citations omitted]

RESPONSE NO. 7: Watson states that the document cited in SOF-W, ¶ 7 is a Schein memorandum dated February 17, 1998, and it sets forth a unsupported hearsay conclusion that “[r]ecent surveys show that most pharmacists average from 70-100% third party prescriptions with very few exceptions.” Therefore, this memorandum is inadmissible and is neither evidence of the underlying facts alleged nor of Schein or Watson Pharmaceutical’s knowledge of such alleged facts in February 1998 or at any other time. Accordingly, the allegations set forth in SOF-W, ¶ 7 are denied.

8. Watson knew that third-party payors, including state Medicaid programs, used SWP, AWP and WAC to set reimbursement rates for drugs. [citations omitted]

RESPONSE NO. 8: Watson disputes the allegations set forth in SOF-W, ¶ 8 to the extent that they go beyond or are inconsistent with the testimony cited therein. Moreover, Watson knew that most of its drugs were subject to maximum allowable costs (“MACS”) or FULs. See Declaration of Sara Jane Shanahan (“Shanahan Decl.”), Ex. 2 (Deposition of Napoleon Clark, June 28, 2007 (“Clark Dep.”), at 102-03); see also id., Ex. 1 (Declaration of Meredith Rosenthal, Feb. 28, 2008 (“Rosenthal Decl.”), ¶ 29) (“In particular, when there are multiple generics (usually at least three) payers often create their own list price, called a Maximum Allowable Cost (MAC).”). Furthermore, Mr. Boyer testified that Medicaid reimbursements were such a small

percentage of Watson's sales that "it doesn't come into play when I look to make any decisions." Shanahan Decl., Ex. 3 (Deposition of Andrew Boyer, July 14, 2004 ("2004 Boyer Dep."), at 83).

9. For each of its generic drugs, Watson generally set the AWP at about 10% to 11% below the corresponding brand AWP. [citations omitted] If there was other generic competition for the product, then Watson set AWP at or near the AWPs set by the competing generic manufacturers selling the same generic drug. [citations omitted]

RESPONSE NO. 9: Watson disputes the allegations set forth in SOF-W, ¶ 9 to the extent that they are unsupported by or go beyond the materials cited. For example, the testimony cited in support of the first sentence of SOF-W, ¶ 9 (Exs. E, F, and H) relates only to products that were "new to market." The testimony cited in support of the second sentence of SOF-W, ¶ 9 (Exs. B, E, and F) demonstrates that suggested prices were based upon "what's happening in the marketplace." See, e.g., SOF-W, Ex. E, at 92:15-16. In addition, the materials cited relate solely to generalized practices. Accordingly, the materials cited do not constitute specific allegations regarding the prices reported for the drugs that are the subject of this motion. Finally, Watson disputes that it "set" AWP or any other reported price. Instead, Watson reported AWP, and later SWP, as a suggestion of a wholesale price, as defined by First Databank. See Shanahan Decl. Ex. 4 (Declaration of Non-Party First DataBank's Custodian of Business Records ("First Databank Decl."), Exs., A-E); see id., Ex. 6 (Declaration of Jesse Childs ("Childs Decl."), Attachment 2).

10. Watson set its WAC for new products at 20 to 25 percent off of AWP. [citations omitted] For products in competitive markets, Watson sets the WAC by comparing its price to that of its competitors' WACs. [citation omitted]

RESPONSE NO. 10: Watson disputes the allegations set forth in SOF-W, ¶ 10 to the extent that they are unsupported by or go beyond the materials cited. For example, the testimony cited in support of the first sentence of SOF-W, ¶ 10 (Exs. E and H) relates only to products that were "new to market." The testimony cited in support of the second sentence of SOF-W, ¶ 10

does not relate to WAC, although Mr. Clark did testify that for products that have been on the market for some time, "we review our WAC prices as compared to our competitors." SOF-W, Ex. H, at 40:15-19. In addition, the materials cited relate solely to generalized practices. Accordingly, the materials cited do not constitute specific allegations regarding the prices reported for the drugs that are the subject of this motion. Finally, Watson disputes that it "set" WAC or any other reported price. Instead, Watson reported WAC as an undiscounted price to wholesalers. See Shanahan Decl., Ex. 4 (First Database Decl., Ex. F) ("As you are aware, rebates or other adjustments which, if granted, may result in an effective net price to some purchasers of less than the listed WAC."); id., Ex. 3 (2004 Boyer Dep. at 94) ("[WAC is] just the price [a] wholesaler pays for the product. It's our list price to the wholesaler."); id., Ex. 1 (Rosenthal Decl. ¶ 26); id., Ex. 5 (Deposition of Dr. Paul Jeffrey, Pharmacy Director for Massachusetts Medicaid, Oct. 19, 2007 ("Jeffrey 30(b)(6) Dep.") at 169-70).

11. Before 2000, Watson reported only AWPs to FDB. In 2000, Watson switched from reporting AWP to reporting a "Suggested Wholesale Price" or "SWP." [citation omitted] However, Watson knew that SWP represented the same price as AWP. [citation omitted]

RESPONSE NO. 11: The allegations set forth in the first and second sentences of SOF-W, ¶ 11 are undisputed. However, the allegations set forth in the third sentence of SOF-W, ¶ 11 are disputed, as the cited testimony does not support the allegations. The cited testimony demonstrates only that Watson intended to clarify that it was reporting a suggested wholesale price. SOF-W, Ex. E, at 60:22-61:6.

12. In addition to AWP and SWP, Watson at times reported WAC or WHNET to FDB. [citations omitted]

RESPONSE NO. 12: Undisputed that Watson at times reported a WAC to First DataBank, although Watson did not report a WHNET or a WHLNET to First DataBank. The cited testimony shows that the data cited in the "WHLNET" column was WAC, which Watson

understood to be an undiscounted list price. See SOF-W, Exs. B and G; Shanahan Decl., Ex. 4 (First Database Decl., Ex. F) ("As you are aware, rebates or other adjustments which, if granted, may result in an effective net price to some purchasers of less than the listed WAC."); id., Ex. 3 (2004 Boyer Dep. at 94) ("[WAC is] just the price [a] wholesaler pays for the product. It's our list price to the wholesaler."); id., Ex. 1 (Rosenthal Decl., ¶ 26); id., Ex. 5 (Jeffrey 30(b)(6) Dep. at 169-70); see also Watson's 3-31-08 Rule 56.1 Response, ¶ 23.

13. Watson knew that the Federal Upper Limit (FUL) limited the reimbursement paid by third-party payors. [citations omitted]

RESPONSE NO. 13: Watson disputes the allegations set forth in SOF-W, ¶ 13 to the extent that they are unsupported by or go beyond the materials cited and to the extent that they seeks to characterize the role and purpose of the FUL, which is prescribed by legislation and has been described by CMS. See, e.g., L.R. 56.1 Stmt. of Undisputed Material Facts Supporting Defs.' Jt. Mot. for Summary Judgment on Pls.' "FUL Fraud" Claims, ¶¶ 7-9; 37-38 (Dkt. 6054) (D. Mass., 01-cv-12257-PBS) (hereinafter "Defs.' 56.1 Stmt.").

14. At all times from 1997 to 2005, Watson sold drugs to the three national wholesalers and/or one of their predecessors companies. [citations omitted]

RESPONSE NO. 14: Undisputed.

15. Watson pays the wholesalers chargebacks and rebates that reduce the wholesalers net costs. [citations omitted] Watson knew that non-warehousing chains purchased Watson's products from wholesalers below WAC, and the wholesalers received chargebacks from Schein, resulting in a net cost to the wholesaler of WAC less the chargeback. [citation omitted]

RESPONSE NO. 15: Watson disputes the allegations set forth in the first sentence of SOF-W, ¶ 15 to the extent that they are unsupported by or go beyond the materials cited. For example, the testimony cited references chargebacks and rebates to wholesalers, but does not provide details of times or dates, customer names, products, amounts, or terms or circumstances upon which rebates or chargebacks are provided. However, Watson does not dispute that it paid

wholesalers chargebacks and rebates that reduced the wholesalers' net costs on purchases of drugs that were then resold to customers that had contracts with Watson. Shanahan Decl., Ex. 2, at 124-25. Watson disputes the allegations set forth in the second sentence of SOF-W, ¶ 15 to the extent that they are unsupported by or go beyond the material cited. For example, the testimony cited relates to chargebacks provided by Schein for three specific products at a specific point in time (SOF-W, Ex. R).

16. Watson knew that customers such as Kerr Drug, Publix, and Winn Dixie, who purchase Watson drugs through wholesalers, received pass-through rebates from wholesalers in the form of credit. [citation omitted]

RESPONSE NO. 16: Watson disputes the allegations set forth in SOF-W, ¶ 16 to the extent that they are unsupported by or go beyond the materials cited. For example, the testimony cited makes clear that, to the witness' knowledge, only Kerr Drug, Publix, and Winn Dixie received pass-through rebates. Furthermore, the testimony does not state the amount of the rebate, under what circumstances it applied, or to which products it applied.

17. For the period between 1997 and 2005, Watson offered rebates of 2% to 19% off of net sales to various classes of trade. [citations omitted]

RESPONSE NO. 17: Watson disputes the allegation set forth in SOF-W, ¶ 17 to the extent that it is unsupported by or goes beyond the materials cited and to the extent that the phrase "net sales" is vague and undefined. Specifically, the cited materials describe rebates generally given to various classes of trade over time off of contract prices or invoice prices, whereas the allegation in SOF-W, ¶ 17 is misleading as it fails to distinguish between classes of trade or to define the phrase "net sales."

18. Watson knows that none of its customers pay AWP for generic drugs. [citations omitted]

RESPONSE NO. 18: Watson disputes the allegation set forth in SOF-W, ¶ 18 to the extent that it is unsupported by or goes beyond the materials cited, and is inherently misleading. Specifically, the cited testimony relates to prices paid by Watson's contracted customers. Moreover, the allegation ignores that AWP (or SWP in Watson's case, after 2000) is a suggestion of a wholesale price to be paid by the wholesaler's customer to the wholesaler (not to Watson), see Shanahan Decl., Ex. 7 (Deposition of Andrew Boyer, May 4, 2009 ("2009 Boyer Dep."), at 268) ("We are selling to direct customers, being chains, wholesalers, mail order. What they chose after that to sell the product for, a wholesale distributor marketplace, I don't have any control over. I don't know what the price would be . . . [t]here is a markup, I just don't know what it is."), and therefore, the allegation ignores the ordinal relationships widely understood to apply to pricing measures used in the pharmaceutical industry. See June 15, 2009 Defs' Jt. Response to Plaintiffs' Rule 56.1 Statement Applicable to All Defendants, Additional Undisputed Material Facts, ¶ 1 ("AWPs are expected to be greater than WACs").

19. With increasing competition, the price Watson charged its customers would decline as Watson's AWPs and WACs normally increased. [citation omitted]

RESPONSE NO. 19: Disputed. The cited testimony does not support this allegation. The full quote reads:

> Q: Suppose that nothing else was happening in the marketplace. What would you do with regard to your reported AWP or SWP?
> A: Probably discontinue the product.
> Q: And why is that?
> A: Because we have not been -- we have not been the ones that have really tried to change WACs or AWPs in the marketplace other than on exclusive products, which means most times they are going up. I think in most cases we have been meeting the competition in the marketplace as it relates to contract pricing and WAC and SWP in a multiplayer market. Normally, when the product gets that low anyway, there isn't a whole lot of profitability in it on our side of the equation, so what's the point of being in it?" (SOF-W, Ex. E, at 121:13 – 122:7.)

20. Watson maintained tiered product pricing for various classes of trade, which are the presumptive prices that would be charged to each particular customer. [citations omitted]

RESPONSE NO. 20: Watson disputes the allegations set forth in SOF-W, ¶ 20 to the extent that they are unsupported by or go beyond the materials cited. Specifically, the cited testimony demonstrates nothing more than that Watson provided various levels of discounts to various classes of trade. See, e.g., SOF-W, Ex. F at 71: 15-19 ("Q: So it would be prices that as a general matter would apply to different classes of trade that are your customers that you are selling to? A: Correct, contract pricing."); id. at 73:13 – 74:5 ("Q: Okay. Can you just work through just an example of how the level B price would be charged to a wholesaler in a transaction? A: Wholesaler purchases at the WAC price directly. Q: So that would be at WAC. A: At WAC. Q: Okay. A: They would sell the product out to customer or through their source program. When we get the chargeback, the units would be applied to the difference between the WAC price and the wholesaler price. The wholesale level B price. Then there would be applicable rebates on it to get to the rollover net price.").

21. Because Mylan [sic], contract sales which comprised the majority of its business, were always priced below WAC [citation omitted], Mylan [sic] knew that its published WACs were false.

RESPONSE NO. 21: Disputed. For purposes of this response, Watson assumes that the references to Mylan were intended to be references to Watson. Watson denies that its reported WAC was ever intended to be a price that was net of all discounts and rebates and denies that its reported WACs were "false." See Shanahan Decl., Ex. 4 (First Database Decl., Ex. F) ("As you are aware, rebates or other adjustments which, if granted, may result in an effective net price to some purchasers of less than the listed WAC."); id., Ex. 3 (2004 Boyer Dep. at 94) ("[WAC is] just the price [a] wholesaler pays for the product. It's our list price to the wholesaler."); id., Ex. 1 (Rosenthal Decl., ¶ 26); id., Ex. 5 (Jeffrey 30(b)(6) Dep., at 169-70); see also id., Ex. 2

(Clark Dep., at 124-25) and Ex. 3 (2004 Boyer Dep. at 241); SOF-W, Ex. F at 73:16-19 ("A: Wholesaler purchases at the WAC price directly. Q: So that would be WAC. A. At WAC."). Watson further states that the cited testimony demonstrates only that Mr. Canny estimated that contract sales accounted for approximately 90% of Watson's sales for two brand drugs (Ferrlecit and InFeD).

22. Watson knew that the reimbursement spread basically marketed itself, as it was self-evident to Watson's pharmacy customers for all of its drugs as they were aware of how they would be reimbursed by Medicaid. [citations omitted]

RESPONSE NO. 22: Disputed. It is improper for Plaintiffs to contend that an argument about what was "self-evident" or known to a third party is an allegation of fact as to Watson or Watson's knowledge. Moreover, the cited document does not support the allegation set forth in SOF-W, ¶ 22.

23. As opportunities to increase prices became limited, Watson lowered its AWP, knowing that it would affect an increase in the FUL resulting in increased reimbursement for Watson's drugs. [citations omitted]

RESPONSE NO. 23: Disputed. The allegations set forth in SOF-W, ¶ 23 are not supported by the materials cited. Moreover, there is no evidence showing that Watson's changing of AWP affected the FUL at all, as FULs were not based on AWPs. See Defs' 56.1 Stmt., ¶ 34. Finally, a change in the FUL would provide no competitive advantage for Watson, as all therapeutically equivalent drugs were reimbursed at the FUL price. See Addanki Affidavit of May 15, 2009, ¶ 20 (Dkt. 6056) (D. Mass., 01-cv-12257-PBS).

24. Watson knew about the OIG Guidelines. [citations omitted]

RESPONSE NO. 24: Undisputed, to the extent that the phrase "OIG Guidelines" references the 2003 Office of Inspector General Compliance Program Guidance for

Pharmaceutical Manufacturers, 68 Fed. Reg. 23731. Watson further notes that the cited testimony appears to relate only to reimbursement for the dialysis market in 2005.

25. Watson reports its average manufacturer's price ("AMP") to HHS. [citation omitted]

RESPONSE NO. 25: Undisputed, to the extent that the Plaintiffs' reference to AMP coincides with the statutory definition of the information that Watson reported.

Respectfully submitted,

/s/ Sara Jane Shanahan
James W. Matthews, BBO#: 560560
Sara Jane Shanahan BBO#: 567837
Katy E. Koski, BBO#: 650613
Courtney A. Clark, BBO#: 651381
Sherin and Lodgen LLP
101 Federal Street
Boston, MA 02110
(617) 646-2000

*On Behalf of the Watson Defendants*

Dated: June 15, 2009

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2009, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

/s/ Sara Jane Shanahan
Sara Jane Shanahan