# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS,<br>Plaintiff,<br><br>v.<br><br>MYLAN LABORATORIES, INC., IVAX CORPORATION, WARRICK PHARMACEUTICAL CORPORATION, WATSON PHARMACEUTICALS, INC., SCHEIN PHARMACEUTICAL, INC., TEVA PHARMACEUTICALS USA, INC., PAR PHARMACEUTICAL, INC., PUREPAC PHARMACEUTICAL CO., and ROXANE LABORATORIES, INC.,<br>Defendants | CIVIL ACTION<br>No. 03-11865-PBS |

**DECLARATION OF MEREDITH ROSENTHAL**
**Report on the Prescription Drug Market**

## I. EXECUTIVE SUMMARY

I have been asked to provide an overview of the prescription drug market, focusing on distribution and payment for drugs, both in general and specific to Massachusetts Medicaid. My report begins with a general summary of the regulatory and competitive environments for brand name and generic drugs. Next, I trace out the product and payment flows for prescription drugs from the manufacturer to the end

sometimes have "auto-substitution programs" through which they offer smaller buyers (retailers) the opportunity to share in some of the lower prices offered to large chains through group purchasing. In an auto-substitution program, a wholesaler will negotiate a low price for a particular generic by committing to buy a large quantity on behalf of its auto-substitution program members.

24. It should be noted that discounts are typically measured relative to a wholesale list price. This list price is called the Wholesale Acquisition Cost (WAC) or Wholesale List Price (WLP). The sources and uses of these prices are the subject of Section VII, below.

25. Direct customers get their discounts directly from the manufacturer-- they pay less for the drug up front. Customers, such as some retail pharmacies, who buy from wholesalers negotiate a discounted price with the manufacturer, which the wholesaler they buy from must honor (i.e., sell to the pharmacy or other provider at that price), despite the fact that the wholesaler may have paid more for the drug in question. The wholesaler must report those "contract sales" to the manufacturer to be made whole – they receive "chargebacks" for each unit sold equal to the difference between the list price (typically WAC) and the actual price negotiated with the retailer or other group.

26. It is worth emphasizing that while wholesalers may pay manufacturers something that is close to WAC when they take ownership of products, this does not mean that WAC is the ultimate price paid by retailers, particularly for generic drugs. Instead of an average or typical price, WAC has come to represent a maximum price with manufacturer chargebacks to wholesalers and rebates paid directly to retailers, or at times to wholesalers, reducing the effective price.

27. Finally, at the end of the supply chain, consumers and insurers ("end payers") pay pharmacies when prescriptions are filled. Consumers without insurance may be charged whatever a pharmacy chooses (that is, pharmacies set these prices based on the market). Typically, the uninsured pay the highest prices at the pharmacy, because they are the smallest volume buyers.

28. Today, the majority of prescription drug sales are covered by an insurer. Between 1990 and 2000, the share of prescription drug spending accounted for by cash-only (that is, not covered by public or private insurance) transactions fell from 63% to less than 20%, and this decline has continued through the present.[17] Consumers with insurance usually pay a copayment – either a fixed dollar amount or a percentage of the price of the drug. In either case, copayments for generic drugs are typically lower than for their brand-name equivalents, to encourage consumers to choose the generic alternative. Insurers (including Medicaid) set the total payment for pharmacies and pay them the difference between this total and the contributions of all other payers (such as other insurers if a consumer is covered by a second plan) including the consumer.

29. The total payment negotiated by insurers is usually in two parts: the ingredient cost and the dispensing fee. Ingredient cost for brand name drugs is based on list prices: frequently AWP less a percentage discount. Generic reimbursement may also be based on list prices, either the AWP or the WAC, but often rely on a somewhat more complicated formula. In particular, when there are multiple generics (usually at least three) payers often create their own list price, called a Maximum Allowable Cost (MAC).

---

[17] See Diane West, "Mail-Order Rx chips Away at Retail Sales – Pharmacy," *Drug Store News*, May 20, 2002, citing IMS Health: NPA+7, Method of Payment Report, 2001.

The MAC is set by payers based on looking at all the published generic prices – for example, the MAC price might be the minimum of the wholesale list prices for all the generics (MAC lists are proprietary so it is difficult to gather data on exactly how they are set). The Federal government also has a MAC price, called the Federal Upper Limit (FUL), which pertains to Medicaid and is discussed in greater detail below. Finally, pharmacies have a usual and customary (U&C) price that they set internally. With multiple possible price rules, generic reimbursement is defined by Medicaid and some commercial payers in terms of the lowest of an amount based on a list price, the MAC if it exists, and U&C.

30.    The dispensing fee is fixed per prescription, and is usually higher for generic products to encourage pharmacies to use them if possible. There may also be some additional incentive payments that payers provide to encourage generic substitution. For example, some payers may reward pharmacies for high generic fill rates (the percentage of prescriptions filled with a generic product).

## VIII.   Publishers and List Pricing

31.    As noted above, both commercial payers and Medicaid have relied on published list prices for reimbursing prescription drugs. These prices have historically been supplied in the Blue Book (published by First DataBank), the Red Book (published by Thomson), and Medi-span.[18]

---

[18] M. Kolassa, "Guidance for Clinicians in Discerning and Comparing the Price of Pharmaceutical Agents, Journal of Pain and Symptom Management, Vol. 9, No. 4, May 1994:

> "The AWP, the most common figure used for drug price comparisons, is a vestige of a drug distribution system that disappeared in the early 1980s. Prior to that time, there

REPORT OF M. ROSENTHAL: PRESCRIPTION DRUG MARKET					PAGE 16

# EXHIBIT 2

Page 95

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-CV-11865-PBS

-------------------------------X

| THE COMMONWEALTH OF | ) | |
|---|---|---|
| MASSACHUSETTS, | ) | VIDEOTAPED |
| Plaintiff, | ) | DEPOSITION UPON |
| v. | ) | ORAL EXAMINATION |
| MYLAN LABORATORIES INC., et | ) | OF |
| al., | ) | NAPOLEON D. CLARK |
| Defendants. | ) | V O L U M E   2 |

-------------------------------X

========================
C O N F I D E N T I A L
========================

T R A N S C R I P T of the stenographic notes of JANE LORFING COLWELL, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, taken at the Madison Hotel, One Convent Road, Morristown, New Jersey, on Thursday, June 28, 2007, commencing at 8:20 a.m.

Page 102

1  questions, there was one matter that I wanted to
2  clarify from Mr. Clark's testimony yesterday, and
3  Mr. Heidlage has kindly given me permission to
4  proceed with that question now as opposed to
5  waiting until the end of his questioning.
6         Mr. Clark, yesterday you were asked a
7  question about whether customers of
8  pharmaceutical products from Watson Pharma, Inc.,
9  are reimbursed based on AWP, and you answered
10 that question yes. First of all, do you have
11 personal knowledge of how customers of Watson
12 Pharmaceuticals are reimbursed for their drug
13 products?
14        THE WITNESS: Personal in the sense of
15 what process they go through to get reimbursed?
16        MR. FARQUHAR: Right.
17        THE WITNESS: No.
18        MR. FARQUHAR: And are all -- to your
19 understanding, are all of your customers
20 reimbursed based on AWP?
21        THE WITNESS: To my understanding, some
22 are. AWP is one basis of reimbursement. There

Clark, Napoleon D. - Vol. II CONFIDENTIAL                June 28, 2007
                        Morristown, NJ

Page 103

1    are also other categories that are used to
2    reimburse customers, to my understanding.
3           MR. FARQUHAR:  What kind of other
4    standards are there?
5           THE WITNESS:  We have customers --
6    customers could be reimbursed through MAC
7    pricing.  I believe federal upper limit pricing
8    and other pricing categories that may be set by
9    their third-party payors.
10          MR. FARQUHAR:  Thank you.
11          Thank you, Mr. Heidlage.
12          MR. HEIDLAGE:  Thank you.
13
14          N A P O L E O N   D.   C L A R K,
15   360 Mount Kemble Avenue, Morristown, New Jersey
16   07960, having been previously sworn, testifies as
17   follows:
18
19                CONTINUED DIRECT EXAMINATION
20   BY MR. HEIDLAGE:
21      Q.   Good morning, Mr. Clark.
22      A.   Good morning.

1   action to increase its AWPs or WACs?
2       A.   No.   I don't recall any specific
3   instance.
4       Q.   And by the way, just to take this
5   forward, once you moved from Schein -- or once
6   Schein was acquired and you became part of
7   Watson, did you continue to prepare the kind of
8   report and do the review that you have just
9   testified about with regard to your competitors'
10  AWPs and WACs?
11      A.   To the best of my knowledge, I don't
12  think it then was a quarterly report.  It may
13  have been just as needed.
14      Q.   Okay.
15           MR. HEIDLAGE:  Doug, if you'd like to
16  follow up on those questions, now is a good time
17  to do it.
18
19                CROSS-EXAMINATION
20  BY MR. FARQUHAR:
21      Q.   Mr. Clark, isn't it true there are
22  instances where the wholesaler buys generic

Clark, Napoleon D. - Vol. II CONFIDENTIAL                June 28, 2007
                      Morristown, NJ

Page 125

1   product from Schein or from Watson that is not
2   the subject of a contract price to a customer of
3   the wholesaler?
4        A.   Yes.
5        Q.   And in those instances isn't it true
6   that the wholesaler pays the WAC cost for the
7   drug?
8        A.   Yes.
9        MR. FARQUHAR:  No further questions.
10
11                CONTINUED DIRECT EXAMINATION
12   BY MR. HEIDLAGE:
13        Q.   Because for -- strike that.
14             Because of the chargeback process, both
15   Schein and Watson could determine the percentage
16   of their products that were sold pursuant to
17   indirect contracts and those that were paid for
18   at WAC by the wholesalers; isn't that correct?
19        A.   Yes.
20        Q.   And over the time that you have been
21   there, do you know the approximate percentage of
22   the product that was sold subject to a chargeback

# EXHIBIT 3

Transcript for Boyer, Andrew  7/14/2004

### Page 1

```
 1           UNITED STATES DISTRICT COURT
 2             DISTRICT OF MASSACHUSETTS
   ------------------------------
 3                              )
   IN RE PHARMACEUTICAL INDUSTRY )  MDL No. 1456
 4 AVERAGE WHOLESALE PRICE       )
   LITIGATION                    )
 5                              )
   ------------------------------
 6                              )
   This Document Relates To:     )  01-CV-12257-PBS
 7      ALL ACTIONS-----------  )
                                 )
 8 ------------------------------
              HIGHLY CONFIDENTIAL
 9
10             Wednesday, July 14, 2004
11             New York, New York
12             9:43 a.m.
13        Deposition of ANDREW BOYER, held at
14 the offices of Cohen, Tauber, Spievack &
15 Wagner, LLP, 420 Lexington Avenue, New York,
16 New York, pursuant to 30(b)(6) Notice, before
17 Josephine H. Fassett, a Certified Shorthand
18 Reporter and Notary Public of the State of New
19 York.
```

### Page 2

```
 1 A P P E A R A N C E S :
 2
 3 SPECTOR, ROSEMAN & KODROFF, P.C,
 4 Attorneys for Plaintiffs
 5      1818 Market Street
 6      Suite 2500
 7      Philadelphia, Pennsylvania  19103
   BY:  JOHN A. MACORETTA, ESQ.
 8      RACHEL E. KOPP, ESQ.
 9 HYMAN, PHELPS & McNAMARA, P.C.
10 Attorneys for Watson
        700 Thirteenth Street, N.W.
11      Suite 1200
        Washington, D.C.  20005
12 BY:  DOUGLAS B. FARQUHAR, ESQ.
13 SHOOK HARDY & BACON, LLP
14 Attorneys for Aventis
        2555 Grand Boulevard
15      Kansas City, Missouri  64108-2613
   BY:  JAMES P. MUEHLBERGER, ESQ.
16
17 SONNENSCHEIN NATH & ROSENTHAL, LLP
   Attorneys for Secor
18      1221 Avenue of the Americas
        New York, New York  10016
19 BY TELEPHONE:  JACKIE FINNEGAN, ESQ.
20 ALSO PRESENT:
21 JOHN MARKOW, ESQ.
22 Watson Senior Corporate Counsel
```

### Page 3

```
                   I N D E X
   WITNESS          EXAMINATION BY         PAGE
   ANDREW BOYER     MR. MACORETTA          7
                    AFTERNOON SESSION - 170

                   EXHIBITS
   EXHIBIT          DESCRIPTION            PAGE

   Exhibit Boyer 001  Amended Notice of Rule 30(b)(6)
                      Deposition           7

   Exhibit Boyer 002  Generic Description Document   43

   Exhibit Boyer 003  INFOLERT Product Introduction
                      Notification         90

   Exhibit Boyer 004  Drug Report Document on Buspirone  145

   Exhibit Boyer 005  Request for Quotation (RFQ)
                      Document             152
```

### Page 4

```
   ------------------ EXHIBITS --------------------
   EXHIBIT          DESCRIPTION            PAGE

   Exhibit Boyer 006  Request to Meet the Competition
                      Document             165

   Exhibit Boyer 007  June 24, 1994 Miles Internal
                      Memorandum with attached Medco
                      Proposal             171

   Exhibit Boyer 008  July 24, 1997 Schein Wholesaler
                      Letter with attached July
                      Product Status Report  188

   Exhibit Boyer 009  AWP Check - Schein Labeled
                      Injectables Red Book and Medispan
                      Document             258

   Exhibit Boyer 010  Red Book Product Listing
                      Verification Document  259
```

Transcript for Boyer, Andrew  7/14/2004

Page 81

1  the Lotus Notes?
2       A       I would think Lotus Notes would
3  be, there's got to be some kind of a
4  communication if I had to guess.
5       Q       And that's your e-mail system?
6       A       Yes.
7       Q       Is there somewhere in a file with
8  a paper memo that says "We've decided to stop
9  producing gemfibrozil now and here's why" and an
10 analysis of that?
11      A       If you're looking for something
12 like that, I would say it would have to be on
13 Lotus Notes because anything that you are making
14 a decision on is usually sent back to somebody,
15 "No, I want something to verify it. No, we do
16 not want to continue to manufacture and market
17 gemfibrozil," they're going to be looking for a
18 commitment. It would either be from myself or
19 it would have been from my predecessor.
20      Q       So any analysis of the market for
21 gemfibrozil we would find on your notes?
22      A       It would have to be attached to

Page 82

1  that.
2       Q       And it would probably be in the
3  notes of whoever got those e-mails --
4       A       Yeah.
5       Q       -- but there isn't a centralized
6  gemfibrozil place where all those would relate
7  to?
8       A       No.
9       Q       Okay. Let me jump back for a
10 second to something you mentioned a few minutes
11 ago.
12              ASP calculation for the Medicare
13 Reform Act, do you know if any of the drugs, any
14 of the generic drugs on this list are subject to
15 that calculation?
16              MR. FARQUHAR:  I'm going to object
17      on the grounds that there's a protective
18      order pending, a motion for protective
19      order pending as to this particular
20      subject, but I'll permit the witness to
21      answer the question.
22      Q       Let me show these. I'm going to

Page 83

1  show you this list of drugs, this is the page
2  from the Complaint, these are my handwritten
3  notes. For whatever reason, it didn't occur to
4  me to make some extra copies of it.
5               Any of the drugs on this list, do
6  you know if a Medicare Reform Act ASP is being
7  calculated for them?
8       A       No, I do not. I would go, just so
9  you know, I mean, Medicare is such a small or
10 Medicaid is such a small piece of our business,
11 it doesn't come into play when I look to make
12 any decisions, so any of that type of
13 information I would go back to Bids and
14 Contracts and ask them, you know, which products
15 do you have to, you know, calculate this for,
16 can you show me the calculation, that's where I
17 would go with that.
18      Q       So it could be calculated, you
19 just wouldn't know?
20      A       I could be, yeah.
21      Q       Okay.
22      A       But I don't know if any of those

Page 84

1  are even a part of it. I mean, it's less than 2
2  percent of our business.
3       Q       On the generic side?
4       A       I think company-wide. I asked
5  Bids and Contracts, "Hey, just out of curiosity,
6  how big is this business that we're talking
7  about," she told me 1.8 percent of our total
8  business, I would assume she was talking about
9  the total Watson if I had to guess.
10      Q       Looking back at Exhibit Boyer 002
11 again, one thing on this report is a list of key
12 competitors by drug, do you have any documents
13 at Watson today that would tell you who the key
14 competitors are for each drug?
15      A       Yes. On a quarterly basis we do
16 get a listing of our products from market
17 research, from IMS data that's given to us by
18 market research that show us all of our key
19 competitors and the market shares. And she does
20 some -- there is usually a flavor to say, "Did
21 you increase during the quarter or decrease
22 during the quarter," if there's any substantial

Transcript for Boyer, Andrew  7/14/2004

Page 93

1  in this case that it would charge to people?
2      A      That they would charge to people?
3      Q      Yes, what price I guess.
4      A      It's WAC or it would be some other
5  contract price.
6      Q      WAC or a contract price?
7      A      Or a contract price for direct
8  customers and an indirect contract price for
9  indirect customers.
10     Q      What is an indirect contract
11 price?
12     A      It's a price that's loaded into
13 the wholesaler so that the wholesaler can manage
14 the sales of that customer for you because
15 they're not big enough to buy direct.
16     Q      So you tell the wholesaler "I have
17 a special deal with Customer X" and the
18 wholesaler inputs that into his system?
19     A      They put that contract price in
20 their system and they always charge that
21 customer that price.  That's where the
22 chargeback is created that you were referring to

Page 94

1  before.
2      Q      Okay.  Does Watson sell any of --
3  and from now on, let's just assume that I'm only
4  talking about the products at issue in this
5  case --
6      A      Okay.
7      Q      -- as opposed to the rest of the
8  Watson empire.
9      A      Okay.
10     Q      Does Watson sell any of these
11 products to anyone at WAC?
12     A      Yes.
13     Q      Who does it sell, what customers
14 does it sell to at WAC?
15     A      All of our wholesalers would buy
16 at WAC.  I don't think of any smaller customers,
17 but most of the wholesalers would buy at WAC.
18     Q      When Watson changes -- and WAC,
19 what do you understand WAC to mean?
20     A      It's just the price the wholesaler
21 pays for the product.  It's our list price to
22 the wholesaler.

Page 95

1      Q      Do you know what the acronym
2  means.
3      A      Wholesale Acquisition Cost.
4      Q      When Watson changes the WAC for
5  any of its products, how does it advise the
6  wholesalers of that information?
7      A      Well, WAC is a change to
8  everybody, it would be through, most likely, an
9  INFOLERT of this type.
10     Q      So if INFOLERT at Watson is used
11 not just to announce a new product, it could be
12 used to announce a change of a price to an
13 existing product?
14     A      Yes.
15     Q      Okay.  And if I wanted to see all
16 of the price change INFOLERTs for any of the
17 products at issue, are they collected somewhere
18 at Watson?
19     A      Again, I'd go to the same, as I
20 answered before, the Bids and Contracts is most
21 likely where they would have a copy of all of
22 them because they input it into our system.

Page 96

1      Q      Okay.  And looking at Exhibit Boyer
2  003, I mean for a price change for a product, is
3  it the same type of heading at the top?
4      A      It says INFOLERT and, if I had to
5  guess, it probably says Price Change
6  Notification.
7      Q      Okay.  Do you have to approve
8  those price change, those INFOLERTs before they
9  go out?
10     A      We should have a system but they
11 usually -- when you say "approve," you're
12 talking about the verbiage in it?  I mean, the
13 pricing usually is approved by myself, the
14 verbiage I don't always read it before it goes
15 out, look at it that way.
16     Q      Whose job is it to generate the
17 verbiage and content of the INFOLERT?
18     A      Pretty much this one's a --
19 because it's a product introduction --
20     Q      I don't want to talk about the
21 product introductions because we said with one
22 exception none of the products at issue in this

Transcript for Boyer, Andrew  7/14/2004

Page 241

```
 1              We talked before that some
 2   customers pay WAC, right?
 3       A      Yeah.
 4       Q      Are there any customers who pay
 5   WAC and don't get any rebates?
 6       A      There may be some that do not get
 7   rebates other than the cash terms and buy at
 8   WAC. If it's an exclusive type product or if
 9   they don't have an overall rebate program, in
10   other words, like if it's a sales out based upon
11   the contract sales, they sell product at WAC or
12   WAC plus.
13       Q      Okay.
14       A      So there may not be a rebate
15   associated with those.
16       Q      Okay. Is it fair to say that the
17   majority of the Watson customers get some form
18   of rebate?
19       A      I would say 95 percent.
20       Q      Okay. Is there some document that
21   would tell me who does or doesn't get a rebate?
22       A      I would say that everybody gets a
```

Page 242

```
 1   rebate, it's whether the units came through on a
 2   chargeback or not. There's a certain amount of
 3   product that the wholesaler does not send the
 4   chargeback through for because they sold it at
 5   WAC.
 6       Q      Okay. Is there some document that
 7   would tell me the range of rebates you're
 8   offering on any product? In other words, you
 9   know, what's the biggest rebate we give anybody
10   on diazepam, could you?
11       A      No.
12       Q      How would you determine that?
13       A      I don't look at that. The rebate
14   to me is immaterial, it's not important to us,
15   what's important to us is the net average
16   selling price because you've got some customers
17   that want a very large rebate so they can show
18   it as a profit center and you've got others that
19   want a very small rebate because they don't want
20   the cash, you know, they want the cash flow. So
21   the rebate to me is unimportant, it's what's the
22   net price, how does their net price compare to
```

Page 243

```
 1   somebody else's net price.
 2       Q      And that's a discussion with the
 3   customers as to how you get to that net price?
 4       A      Once the program is in place, it
 5   doesn't usually change all that often.
 6       Q      And what documents exist that
 7   would tell me what that discussion was with the
 8   customer?
 9       A      When it was originally created?
10       Q      Yeah.
11       A      Unless it's been negotiated
12   recently, it may be in place for five, six,
13   seven years already.
14       Q      So --
15       A      It could be --
16       Q      -- if we go back --
17       A      -- there could be an original
18   original rebate program, I'd go back to Bids and
19   Contracts and ask them what do they have in
20   place for all the different customers if you
21   wanted that.
22       Q      So there's not some contract form
```

Page 244

```
 1   that says a customer would prefer to get this
 2   kind of rebate setup or --
 3       A      No, that's during the negotiation.
 4       Q      So back to --
 5              MR. MACORETTA: You know what, why
 6       don't we take a break for a second?
 7              MR. FARQUHAR: Are we taking a
 8       break?
 9              MR. MACORETTA: Well, I'm
10       uncomfortable asking any questions
11       without you here.
12              (Whereupon, off the record.)
13              (Whereupon, resumed.)
14   BY MR. MACORETTA:
15       Q      So what documents exist comparing
16   your prices or rebates to any competitors'
17   prices? We talked about the request forms
18   internally, do you have any promotional pieces
19   that you show to customers?
20       A      No. No. The only thing you would
21   have is an e-mail that says "Hey, Walgreens says
22   that their net price on this from your
```