## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Master File No.: 01-CV-12257-PBS<br>Subcategory Case No. 03-10643-PBS |
| THIS DOCUMENT RELATES TO:<br>*The City of New York, et al*<br>*v. Abbott Laboratories, et al.* | Judge Patti B. Saris |

### DEFENDANT PUREPAC PHARMACEUTICAL CO.'S RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS APPLICABLE TO PUREPAC

Pursuant to Rule 56.1 of the Local Rules of this Court, Purepac Pharmaceutical Co. ("Purepac") submits its Response to Plaintiffs' Statement of Undisputed Material Facts applicable to Purepac ("Statement").  In support thereof Purepac's Response addresses the material facts of record that are allegedly undisputed, demonstrating those "facts" as to which there exists a genuine issue to be tried, with page references to relevant declarations, depositions and other documentation.  Copies of all referenced documentation are attached as exhibits to this Response.  Purepac also incorporates herein, and refers the Court to, Defendants' Joint Statement of Material Facts in Dispute and Defendants' Joint Response in Opposition to the Plaintiffs' Statement of Undisputed Material Facts Related to Federal Upper Limits ("FULs") and Applicable to All Thirteen FUL Defendants (The "FUL Thirteen").

As an initial matter, Purepac generally objects to Plaintiffs' Statement on the grounds that it improperly includes purported headings in the form of unnumbered statements that contain argumentative and unsupported allegations that are improper in a

Statement of "Undisputed Facts."  Moreover, Purepac generally objects to Plaintiffs'

Statement as these improper headings misstate, misconstrue and/or mischaracterize the

underlying alleged "undisputed" facts they purport to introduce.  Accordingly, Purepac

omits these improper and argumentative headings in its Specific Responses and Objections

below.

Purepac disputes any statements that are not properly supported with citations to the

record.  *See O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n1 (D. Mass. 2006)

(disregarding "purported statement of 'fact' not properly supported by citations to the

record" in summary judgment pleading as required by Local Rule 56.1).

Except as specifically noted, each and every alleged undisputed fact contained in

Plaintiffs' Rule 56.1 Statement set forth below is disputed and controverted by Purepac.

1.       The Purepac Drugs and NDCs that have been examined in connection with this
motion are set forth in Exhibit A hereto.  This Exhibit also sets forth Purepac's Published
AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limit
("FUL") and Purepac's AMPs.  The exhibit also notes which NDCs are associated with
package sizes that set the FUL.

**RESPONSE:**  Purepac does not dispute that Plaintiffs' Exhibit A purports to

contain AWPs and WACs and any operative FUL for Purepac Drugs.  However, Purepac

disputes the data set forth in Exhibit A to the extent they are not properly supported by

cited evidence in the record.

2.       The specific Purepac Drugs at issue are the Clonazepam .5 MG Tablet, Enalapril
Maleate 20 MG Tablet, Isosorbide Mononitrate 60 MG Tablet and Lorazepam 1 MG
Tablet.

**RESPONSE:**  Purepac does not dispute that the four drugs identified are the

designated FUL fraud drugs pursuant to CMO 33, September 14, 2007.

3.       Purepac has executed the federal Medicaid rebate agreement.  *See* Answer and
Affirmative Defenses of Purepac Pharmaceutical Co. to Revised First Amended

Consolidated Complaint [Docket # 4818] ("Purepac Answer") at ¶132; *see also Commonwealth of Mass. v. Mylan Labs.*, 2008 WL 5650859 *25 (D. Mass. Dec. 23, 2008) ("*Mylan*").  Purepac signed the federal Medicaid rebate agreement because Purepac wanted its products to be reimbursed by Medicaid.  *See* Purepac 30(b)(6) (O'Malley, Patricia) dated 6/20/08 ("Purepac 30(b)(6)(O'Malley) 6/20/08 Dep.") (Exhibit B) at 125:5-18.

 **RESPONSE:**  Purepac does not dispute paragraph 3, except that Purepac signed

the Agreement because federal law mandates that Purepac sign the agreement in order for

its customers to seek and obtain reimbursement from Medicaid for their sales of Purepac

products.

4. Purepac was required as a matter of law to familiarize itself with the legal requirements, standards and procedures of the Medicaid reimbursement formulas, including those of the New York State Medicaid program. *Mylan*, 2008 WL 5650859 at *25.

 **RESPONSE:**  Purepac disputes the statement of paragraph 4 because it not a

proper statement of fact for a Rule 56.1 statement, but is instead a question of law.  In

fact, Purepac's obligations under the Rebate Agreement are limited to compliance "with

the conditions of 42 U.S.C. section 1396s, changes thereto and implementing regulations

as the Secretary deems necessary and specifies by actual prior notice to the

manufacturer."  *See* sample agreement available at

http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf.

Purepac further disputes that *Mylan* has any legal effect in this case, as it involved

different issues and is a nonfinal decision denying the parties' motions for summary

judgment. *See Gonzalez v. Rodriguez*, 407 F.3d 425 (1st Cir. 2005) (collateral estoppel

requires, among other conditions, identity of issues, and finality of the judgment).

5. Purepac knew that its published prices were used for Medicaid reimbursement. *Mylan*, 2008 WL 5650859 at *16.

**RESPONSE:**  Purepac disputes the statement that it knew that its suggested

published prices were used for Medicaid reimbursement because the term "published

prices" is unduly vague and ambiguous.  Moreover, the citation does not set forth the

facts that it purports to support.  In fact, Purepac's (30)(b)(6) deponent Patricia O'Malley

testified that she did not know that WAC was used for Medicaid reimbursement.  Purepac

30(b)(6)(O'Malley) 9/19/07 Dep. at 91:13-15.

6.      Purepac knows that third party payor reimbursement can be based on AWPs.  *See*
Deposition of Roberto Miranda dated 10/19/2007 ("Miranda Dep. 10/19/07") (Exhibit C)
79:20- 80:1.  It was important that the information printed in the pricing compendium be
accurate because third party payors used the information as the basis for reimbursement.
*See* Deposition of Bradford Cunningham dated 10/23/2007 ("Cunningham Dep.
10/23/07") (Exhibit D) at 107:15-22.

**RESPONSE:**  Purepac disputes the statements in paragraph 6 to the extent that

they are purportedly based on what Purepac now knows when neither of the cited

deponents testified to what Purepac now knows and there is not allegation as to what

Purepac knew at any point during the relevant time period.  Purepac further disputes the

use of the term "accurate" because it is unduly vague and ambiguous.  Purepac further

disputes this statement because Plaintiffs noticed and took the deposition of Purepac's

30(b)(6) designee in this case and did not ask any questions regarding this issue.  Purepac

does not dispute that in his deposition Mr. Cunningham stated that Purepac wanted "to

make sure  that First DataBank got notice [of changes in AWP and WAC] . . . because

the information was used by so many third-party payors for reimbursement" but disputes

the remainder of paragraph 6.

7.      At all times, from 1997 to 2005, Purepac reported or caused to be reported the
AWPs (as suggested AWPs) for its drugs to the publishing compendia.  *See* Purepac
30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 36:19-38:16; 60:3-61:10; 62:19-63:1;
Purepac 30(b)(6)(O'Malley, Patricia) dated 9/19/07 ("Purepac 30(b)(6)(O'Malley)
9/19/07 Dep.") (Exhibit E) at 81:7-17; The Alpharma Defendants' Supplemental

Responses and Objections to Plaintiff's First Set of Interrogatories and Request for Production to Defendants, *State of Alabama v. Abbott Laboratories, Inc., et al.,* CV 2005-21, Cir. Court of Montgomery County, Alabama, June 20, 2006, p. 12, response to Interrogatory No. 11 ("Alpharma Supp. Resp. to Alabama's First Set of Interrogatories") (Exhibit F); *Mylan*, 2008 WL 5650859 at *10.

**RESPONSE:**  Purepac does not dispute the statements set forth in paragraph 7.

8.      Purepac reported or caused to be reported the same AWPs to all three of the national compendia.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 122:10-21.

**RESPONSE:**  Purepac does not dispute the statement set forth in paragraph 8.

9.      Purepac had only one AWP in place at any given time.  *See* Purepac 30(b)(6) (O'Malley) 6/20/08 Dep. (Exhibit B) at 122:10-21.

**RESPONSE:**  Purepac does not dispute the statement set forth in this paragraph,

to the extent that it refers to a specific NDC code.

10.      At all times, from 1997 to 2005, Purepac reported or caused to be reported WACs for its drugs to the publishing compendia.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 61:17-66:15; *Mylan*, 2008 WL 5650859 at *10.

**RESPONSE:**  Purepac does not dispute the statement set forth in this paragraph

to the extent that it refers to Purepac's periodic reporting to the publishing compendia.

11.      Purepac reported or caused to be reported the same WACs to all three of the national compendia.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 122:22-123:4; Alpharma Supp. Resp. to Alabama's First Set of Interrogatories, response to Interr. No. 11 (Exhibit F).

**RESPONSE:**  The citation to the 30(b)(6) deposition does not support the

statement in paragraph 11.  Nevertheless, Purepac does not dispute the statement set forth

in paragraph 11.

12.      Purepac knew and controlled the WACs for its drugs that were being published by the national drug pricing compendia.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 65:14-66:15 (Purepac supplied the WACs that appeared in the compendia). Purepac had only one WAC at any given time.  *See* O'Malley (6/20/08) 30(b)(6) Dep. (Exhibit B) at 122:22- 123:4.

> **RESPONSE:**  Disputed to the extent that this "fact" is unduly vague in terms of the time period to which it allegedly pertains.  Although Purepac does not dispute that it supplied WACs for its drugs to all three national pricing compendia, it denies the remainder of this paragraph; the cited parts of the record do not support that Purepac "controlled" the WACs.

13.     Purepac knew and controlled the published prices for its drugs that appeared in the national drug pricing compendia.  Purepac received price verifications from Red Book.  *See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. (Exhibit E) at 214:9-215:4; Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 39:11-43:14.  Purepac would confirm the prices  were Purepac's published AWPs and WACs.  *See Id*.  If the prices were not correct, Purepac would make a correction.  *See Id*.

> **RESPONSE:**  Disputed to the extent that this "fact" is unduly vague in terms of the time period to which it allegedly pertains.  However, Purepac did at certain times supply suggested AWPs and WACs to the national drug pricing compendia.  In addition, the cited parts of the record do not support Plaintiffs' assertion that Purepac did "control[] the published prices for its drug."

14.     When Purepac sent WACs and AWPs to the drug pricing compendia, it was Purepac's understanding that the pricing compendia were going to publish them as Purepac's WACs and AWPs.  *See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. (Exhibit E) at 132:20-133:5; Purepac 30(b)(6) (O'Malley) 6/20/08 Dep. (Exhibit B) at 65:14-66:15.

> **RESPONSE:**  Disputed to the extent that this "fact" is unduly vague in terms of the time period to which it allegedly pertains.  However, Purepac does not dispute that, at certain times, "it was Purepac's understanding that the pricing compendia [would] publish [the WACs and suggested AWPs that Purepac submitted] as Purepac's WACs and AWPs."

15.     At launch, for each of its generic drugs, Purepac generally set the AWP around 10% below the corresponding brand AWP.  *See* O'Malley, Patricia (6/20/08) 58:13-17; O'Malley (9/19/2007) 30(b)(6) Dep. (Exhibit E) at 83:20-84:7.

**RESPONSE:**  To the extent that Plaintiffs state that Purepac suggested an AWP at around 10.1% below the corresponding brand AWP, Purepac does not dispute this paragraph.

16.   Purepac's AWPs were not true prices.  *Mylan*, 2008 WL 5650859 at *18.

**RESPONSE:**  Disputed to the extent that this statement is unduly vague in terms of the time period to which it allegedly pertains.  Moreover, paragraph 16 purports to state a legal conclusion not a fact.  In addition, Purepac also disputes that *Mylan* has any legal effect in this case, as it involved different issues and is a nonfinal decision denying the parties' motions for summary judgment. *See Gonzalez v. Rodriguez*, 407 F.3d 425 (1st Cir. 2005) (collateral estoppel requires, among other conditions, identity of issues, and finality of the judgment).  Purepac further disputes this statement because the phrase "true prices" is unduly vague and ambiguous.

17.   Purepac does not sell any of its generic drugs at AWP.  *See* Purepac 30(b)(6) (O'Malley) 9/19/07 Dep. (Exhibit E) at 88:1-6.

**RESPONSE:**  Disputed as written.  What Purepac currently does is not relevant.  Moreover, the testimony does not relate to the present.  Purepac does not dispute the statement in paragraph 17 to the extent it concerns the four generic drugs at issue at some undefined time.  To the extent the statement concerns any of Purepac's other products, the statement is not relevant to this motion.

18.   Purepac's definition of AWP is different than FDB's definition of AWP.  Purepac did not have an understanding that AWP represents the average wholesale price a wholesaler would charge for a particular product.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 214:5-216:14.

**RESPONSE:**  Disputed to the extent that the second "fact" is unduly vague in

terms of  the time period to which it allegedly pertains.  Otherwise, Purepac does not

dispute the statements in paragraph 18.

19.    Typically, the published Purepac AWP is higher than the published WAC.  *See*
Cunningham Dep. 10/23/07 (Exhibit D) at 195:21-196:9. And typically, the published
WAC is higher than contract prices.  *See Id.* Purepac established WACs at a discount off
AWPs. *See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. (Exhibit E) at 100:12-19.

**RESPONSE:**  Disputed.  Mr. Cunningham's statements are not admissions of the

company.  Plaintiffs had the opportunity to depose Purepac's 30(b)(6) witness, Patricia

O'Malley and did not ask any questions that could have established these facts as

undisputed facts attributable to Purepac.  Purepac also disputes these "facts" to the extent

they relate to the present and therefore are not relevant and not supported by the record.

Purepac disputes the last sentence of paragraph 19 to the extent that it is controverted by

Purepac's statement that AWP, WAC and contract price moved independently.  *See*

Plaintiffs' Exhibit E at 128:19-129:7; 145:18-147:11; *see also* paragraph 21, *infra*.

20    Purepac reduced the WACs in order to minimize accruals for chargebacks and to
minimize prompt pay discounts.  *See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. (Exhibit
E) at 104:7-107:5.

**RESPONSE:**  Disputed to the extent that it is unduly vague in terms of the time

period to which it allegedly pertains.  However, Purepac does not dispute that it, at

undefined times, might have reduced WAC "when the difference between the contract

price and the WAC price became Greater . . . and the accruals greater."

21.    Purepac had three general categories of prices: AWP, WAC, and Contract prices.
*See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. (Exhibit E) at 128:9-14.  These prices
changed independently of each other.  *See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep.
(Exhibit E) at 128:19-129:7; 145:18-147:11.

**RESPONSE:**  Disputed to the extent the statement suggests that Purepac had only three prices.

22.     Purepac invoiced wholesalers at WAC, but its WACs and AWPs were independent of its contract prices. *Mylan*, 2008 WL 5650859 at *10.

**RESPONSE:**  Disputed.  Purepac admits that at certain times WAC and AWP moved independent of its contract prices.  However, 8 percent of Purepac's sales to wholesalers was at WAC.  See paragraph 29, *infra*.

23.     Purepac knew that its published WACs were false.  *Mylan*, 2008 WL 5650859 at *26.

**RESPONSE:**  Disputed.  The citation does not support the proposition for which it stands.  In fact, the Court did not decide knowledge or falsity of Purepac's WACs but acknowledged that defendants, including Purepac, used WAC as invoice price.  *Mylan*, 2008 WL 5650589 at 25;  *see* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. at 61:20-62:7; Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. at 259:15-260:5.  Purepac also disputes that *Mylan* has any legal effect in this case, as it involved different issues and is a nonfinal decision denying the parties' motions for summary judgment. *See Gonzalez v. Rodriguez*, 407 F.3d 425 (1st Cir. 2005) (collateral estoppel requires, among other conditions, identity of issues, and finality of the judgment).

24.     Purepac's WAC was grossly out of whack with the prices that were actually paid. *Mylan*, 2008 WL 5650859 at *26.

**RESPONSE:**  Disputed.  Purepac disputes paragraph 24 because the citation refers to a general discussion in a court opinion not a finding of fact as to Purepac.  Purepac further disputes that *Mylan* has any legal effect in this case, as it involved different issues and is a nonfinal decision denying the parties' motions for summary judgment. *See Gonzalez v. Rodriguez*, 407 F.3d 425 (1st Cir. 2005) (collateral estoppel

requires, among other conditions, identity of issues, and finality of the judgment).

Moreover, Purepac notes that approximately 8% of its sales to wholesalers were at WAC.

*See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. at 197:1-199:22; *see also* paragraphs 28,

29, *infra.*

25.    Purepac had a contract with Cardinal that provided Purepac pay Cardinal rebates
that included baseline rebates.  *See* O'Malley (6/20/08) 30(b)(6) Dep. (Exhibit B) at
175:11- 181:15.  Purepac had a profit share agreement with Cardinal for clonazepam.
*See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 201:14-203:2.

    **RESPONSE:**  Purepac disputes that the existence of the cited contracts with

Cardinal are material to the Plaintiffs' motion for partial summary judgment.  *See* Local

Rule 56.1 (requiring movant to "include a concise statement of the material facts of

record as to which the moving party contends there is no genuine issue to be tried"); *St.*

*Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d

183, 186 n.1 (D. Mass. 2005) (refusing to consider a summary judgment movant's

immaterial facts).  Purepac does not otherwise dispute the facts set forth in paragraph 25.

26.    Amerisource Bergen (f/k/a Bergen Brunswig) would receive a chargeback for
sales made to Purepac's indirect customers who received a lower price than the WAC
paid by Amerisource Bergen.  *See* O'Malley (6/20/08) 30(b)(6) Dep. (Exhibit B) at
187:17-189:8.

    **RESPONSE:**  Purepac objects to the statement in paragraph 26 to the extent it is

unduly vague because it does not define a time period to which the statement refers.

Purepac disputes that Amerisource Bergen's receipt of chargebacks for sales to Purepac's

indirect customers is material to the Plaintiffs' motion for partial summary judgment.  *See*

Local Rule 56.1 (requiring movant to "include a concise statement of the material facts of

record as to which the moving party contends there is no genuine issue to be tried"); *St.*

*Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d

183, 186 n.1 (D. Mass. 2005) (refusing to consider a summary judgment movant's

immaterial facts).  Purepac does not otherwise dispute the statements in paragraph 26.

27.     The WAC reported or caused to be reported by Purepac does not account for these
chargebacks, rebates and discounts.  *See* Miranda Dep. 10/19/07(Exhibit C) at 138:21-
140:18.

      **RESPONSE:**  Purepac objects to the statement of paragraph 27 to the extent it is

unduly vague as to the time period to which it pertains.  Purepac does not dispute that its

reported WACs did not account for chargebacks, rebates and discounts; Purepac

considered WAC a list price.  Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. at 61:20-62:7;

Purepac 30(b)(6) (O'Malley) 9/19/07 Dep. at 259:15-260:5.

28.     Purepac paid the wholesaler a chargeback to make up for the difference between
the contract price paid by the indirect customer and the WAC price invoiced to the
wholesaler.  *See* O'Malley (6/20/08) 30(b)(6) Dep. (Exhibit B) at 187:17-189:8.

      **RESPONSE:**  Purepac objects to the statement of paragraph 28 to the extent it is

unduly vague as to the time period to which it pertains.  Purepac further disputes the

statement of paragraph 28 to the extent it suggests that Purepac paid all wholesalers

chargebacks for all their sales.  *See* paragraph 29, *infra.*

29.     Only 8 percent of sales to wholesalers were not subject to chargebacks; meaning
only 8 percent of sales to wholesalers were at WAC.  *See* Purepac 30(b)(6)(O'Malley)
9/19/07 Dep. (Exhibit E) at 197:1-199:22.

      **RESPONSE:**  Purepac objects to the statement of paragraph 29 to the extent it is

unduly vague as to the time period to which it pertains.  Purepac does not dispute that at

some time, 8 percent of its sales to wholesalers was not subject to chargebacks.

30.     Ninety-two percent of Purepac's sales to wholesalers were subject to chargeback.
*See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 90:14-94:13, 95:20-96:15.

**RESPONSE:**  Purepac objects to the statement of paragraph 30 to the extent it is

unduly vague as to the time period it pertains.  Purepac does not dispute that at some

time, ninety-two percent of its sales to wholesalers was subject to chargeback.

31.     Purepac offered contract prices to its pharmacy customers.  *See* O'Malley,
(6/20/08) 30(b)(6) Dep. (Exhibit B) at 85:21-86:1; 145:13-21 (Peyton); 88:9-18
(Walgreens); 146:20-147:11 (Caremark and Express Scripts).  Some retail contracts
provided product-specific pricing.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep.
(Exhibit B) at 146:9-19.  From 1997 to 2005, Purepac offered contract pricing for
Clonazepam and Isosorbide Mononitrate to retail customers.  *See* Purepac
30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 199:7-14; 206:2-11.  In particular,
Purepac entered into a profit share agreement with CVS for Isosorbide Mononitrate.  *See*
Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 210:15-19.  Purepac negotiates
contract prices with its pharmacy customers that are typically below the published prices
for each of its drugs.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 90:1-
13; 112:22- 113:11, *see* Exhibit O'Malley 009 to Purepac 30(b)(6)(O'Malley) 6/20/08
Dep. (Exhibit G).

**RESPONSE:**  Purepac objects to the statements in paragraph 31 to the extent

they are unduly vague as to the time period to which they pertain.  Purepac further

disputes the statements in paragraph 31 as immaterial to the extent that the cited

testimony does not establish the purported facts for the relevant drugs.  *See* Local Rule

56.1 (requiring movant to "include a concise statement of the material facts of record as

to which the moving party contends there is no genuine issue to be tried"); *St. Paul Fire*

*and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d 183, 186

n.1 (D. Mass. 2005) (refusing to consider a summary judgment movant's immaterial

facts).  Purepac disputes the phrases "pharmacy customers," "retail contracts," and "retail

customers" because they are unduly vague and ambiguous.  Purepac does not dispute that

at a certain time it had a profit sharing agreement with CVS but disputes that this

agreement is material to the Plaintiffs' motion for partial summary judgment.  Plaintiffs'

Exhibit G does not support the proposition for which it is cited.

32.     Purepac paid its pharmacy customers, such as Costco, rebates to encourage the purchase of Purepac products.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit G) at 192:18-197:6; *see also* Exhibit O'Malley 018 to Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit H).  Such rebates were based on invoice purchases.  *See Id.* Purepac paid rebates to the retail pharmacies, such as Target. Purepac 30(b)(6) (O'Malley) 6/20/08 Dep. (Exhibit B) at 210:22-213:20.  The rebate reduced pharmacies' contract prices even further below the WAC.  *See Id.*

        **RESPONSE:**  Purepac objects to the statements in paragraph 32 to the extent

they are unduly vague as to the time period to which they pertain.  Purepac disputes the

use of the terms "pharmacy customers" and "retail pharmacies."  Moreover, Purepac

disputes the use of the phrase "even further" as vague and argumentative.  Purepac does

not dispute that rebates were part of the contract prices offered to some customers.

33.     Some retail pharmacies were direct customers of Purepac.  *See* O'Malley, Patricia (6/20/08) Dep. (Exhibit B) at 100:7-14.  Direct customer contract prices tend to be lower than indirect customer contract prices.  *See* Purepac 30(b)(6)(O'Malley) 6/20/08 Dep. (Exhibit B) at 100:15-101:10.

        **RESPONSE:**  Purepac objects to the statement of paragraph 33 to the extent it is

unduly vague as to the time period to which it pertains.  Purepac disputes the use of the

terms "retail pharmacies" because it is unduly vague.  Purepac does not dispute that some

retail chain warehouses were direct customers of Purepac.  As stated, Purepac disputes

the statement that "[d]irect customer contract prices tend to be lower than indirect

customer contract prices" because it is overly broad and concerns the present.  Purepac

does not dispute that the prices for direct warehousing chains typically were lower than

indirect contract prices.

34.     Purepac considered its contract prices to be confidential business information. *See* Purepac 30(b)(6)(O'Malley) 9/19/07 Dep. (Exhibit E) at 216:3-217:8.

        **RESPONSE:**  Purepac disputes the statement in paragraph 34 to the extent that it

implies that the confidentiality applied to reimbursement.  Purepac does not dispute that

its contract prices were confidential business information for purposes of its interactions

with its customers, and as  concerns its competitors.

35.    Purepac customers were interested in evaluating, and made purchasing decisions
based on the reimbursement spread between its cost and the reimbursement price of an
AWP.  *See* Miranda Dep. 10/19/07 (Exhibit C) at 77:15-79:14 (Miranda would request
authority for invoice pricing with a particular spread between the net price and the AWP
based on a customer's request).  *See* Exhibit Grauso 002 to the Deposition of James
Grauso dated 10/19/07, ("Grauso Dep. Exhibit 002) (Exhibit I)(e-mail from James
Grauso to Bob Jones recommending suggested AWPs that will maximize the customer's
reimbursement spread); *see also* Exhibit Grauso Dep. Exhibit 003 (Exhibit K) (e-mail
string between Bob Miranda and Bob Jones approving of AWP change in response to
customer request to increase AWP to match competitors' AWP spread).

       **RESPONSE:**  Purepac disputes the statements to the extent that it is overly broad

and unduly vague.  Moreover, whether Purepac customers were interested in evaluating,

and made purchasing decisions based on the "reimbursement spread" is not material for

Plaintiffs' motion for partial summary judgment.  *See* Local Rule 56.1 (requiring movant

to "include a concise statement of the material facts of record as to which the moving

party contends there is no genuine issue to be tried"); *St. Paul Fire and Marine Ins. Co. v.

Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005)

(refusing to consider a summary judgment movant's immaterial facts).  Purepac further

disputes that the parenthetical statement by Mr. Miranda supports Plaintiffs' statement.

To the extent that Plaintiffs cite Mr. Grauso exhibits, testimony discussing these exhibits

does not establish that Purepac knew that "customers were interested in evaluating and

made purchasing decisions based on the reimbursement spread . . . ."  *See* Deposition of

James Grauso dated 10/19/07 at 102:6-110:20 (Exhibit PUR-1).

36.    Purepac admits that drug manufacturers report AMPs to HHS. *See* Purepac
Answer at ¶126.  Purepac reports AMPs to CMS for each of its drugs.  *Mylan*, 2008 WL
5650859 at *30.

**RESPONSE:**  Purepac disputes that the statements in paragraph 36 are material to Plaintiffs' motion for partial summary judgment, but does not dispute the statements set forth therein.

## <u>CERTIFICATE OF SERVICE</u>

I, J.P. Ellison, hereby certify that on June 15, 2009, I filed this document through the ECF system, which sent it electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

  /s/  J.P. Ellison
J.P. Ellison
