# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br>Subcategory No: 03-10643 |
| THIS DOCUMENT RELATES TO: | |
| *City of New York v. Abbott Labs., et al.* (S.D.N.Y. No. 04-CV-06054)<br>*County of Suffolk v. Abbott Labs., et al.* (E.D.N.Y. No. 03-CV-229)<br>*County of Westchester v. Abbott Labs., et al.* (S.D.N.Y. No. 03-CV-6178)<br>*County of Rockland v. Abbott Labs., et al.* (S.D.N.Y. No. 03-CV-7055)<br>*County of Dutchess v. Abbott Labs., et al.* (S.D.N.Y. No. 05-CV-06458)<br>*County of Putnam v. Abbott Labs., et al.* (S.D.N.Y. No. 05-CV-04740)<br>*County of Washington v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00408)<br>*County of Rensselaer v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00422)<br>*County of Albany v. Abbott Labs., et al.* (N.D.N.Y. No. 05-CV-00425) | Judge Patti B. Saris |

[Caption Continues on Next Page]

**DEFENDANTS' RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF "UNDISPUTED" FACTS APPLICABLE TO ALL DEFENDANTS <u>AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS</u>**

| | |
|---|---|
| *County of Warren v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00468) | ) |
| *County of Greene v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00474) | ) |
| *County of Saratoga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00478) | ) |
| *County of Columbia v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00867) | ) |
| *Essex County v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00878) | ) |
| *County of Chenango v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00354) | ) |
| *County of Broome v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00456) | ) |
| *County of Onondaga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00088) | ) |
| *County of Tompkins v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00397) | ) |
| *County of Cayuga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00423) | ) |
| *County of Madison v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00714) | ) |
| *County of Cortland v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00881) | ) |
| *County of Herkimer v. Abbott Labs. et al.* | ) |
| (N.D.N.Y. No. 05-CV-00415) | ) |
| *County of Oneida v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00489) | ) |
| *County of Fulton v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00519) | ) |
| *County of St. Lawrence v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00479) | ) |
| *County of Jefferson v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00715) | ) |
| *County of Lewis v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00839) | ) |
| *County of Chautauqua v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06204) | ) |
| *County of Allegany v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06231) | ) |
| *County of Cattaraugus v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06242) | ) |

| | |
|---|---|
| *County of Genesee v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06206) | ) |
| *County of Wayne v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06138) | ) |
| *County of Monroe v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06148) | ) |
| *County of Yates v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06172) | ) |
| *County of Niagara v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06296) | ) |
| *County of Seneca v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06370) | ) |
| *County of Orleans v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06371) | ) |
| *County of Ontario v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06373) | ) |
| *County of Schuyler v. Abbott Labs, et al.* | ) |
| (W.D.N.Y. No. 05-CV-06387) | ) |
| *County of Steuben v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06223) | ) |
| *County of Chemung v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06744) | ) |
| AND | ) |
| *County of Nassau v. Abbott Labs., et al.* | ) |
| (E.D.N.Y. No. 04-CV-5126) | ) |
| _____ | ) |

Pursuant to Local Rule 56.1, Defendants submit this Response to Plaintiffs' Local Rule 56.1 Statement of "Undisputed" Material Facts Applicable To All Defendants and a Statement of Additional Undisputed Material Facts in opposition to Plaintiffs' Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit.

## **RESPONSE**

**1.    New York Medicaid, like all State Medicaid programs, is required to reimburse providers, at their "estimated acquisition cost" ("EAC") of the drug plus a reasonable dispensing fee. 42 C.F.R. 447.301 (2006).**

**Response to Alleged Fact No. 1:  Disputed.**

Defendants dispute that reimbursement for the drugs at issue in Plaintiffs' Motion for Partial Summary Judgment was governed by 42 C.F.R. § 447.301.  Although brand and other non-multiple source drugs are to be reimbursed at the lesser of EAC and a pharmacist's usual and customary charge to the general public, ingredient cost reimbursement for multiple source drugs subject to a Federal Upper Limit ("FUL") is subject only to the aggregate limitation imposed by § 447.332.  *See* 42 C.F.R. § 447.331.  Furthermore, as the regulatory history makes clear, § 447.332 was promulgated with the knowledge and intent that pharmacists could acquire multiple source drugs below the mandated aggregate cap.  *See*, *e.g.*, Medicare and Medicaid Programs; Limits on Payments for Drugs, 51 Fed. Reg. 29,560, 29,562 (Aug. 19, 1986) ("[P]harmacists would be encouraged to purchase as prudently as possible because . . . they would retain the difference between what they pay for the drug product and the upper limit of payment established by HCFA for the particular drug."); Medicare and Medicaid Programs; Limits on Payments for Drugs, 52 Fed. Reg. 28,648, 28,648-56 (July 31, 1987) (stating that by basing the FUL on published prices, HCFA (CMS's predecessor) was "building into [] rates for ingredients, a *profit margin* for pharmacists") (emphasis added).

**2.     EAC is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of the drug most frequently purchased by providers."**  *Id.*

**Response to Alleged Fact No. 2:  Disputed in part.**

While defendants do not dispute that plaintiffs have accurately quoted the definition of EAC set forth in § 447.301, the definition is irrelevant to the reimbursement of multiple source drugs subject to a FUL.  *See* 42 C.F.R. § 447.331, § 447.332.

3.     The New York Medicaid reimbursement formula has always been set by the legislature.  During the relevant period of 1997-2005 it provided that New York Medicaid would reimburse providers based on the FUL if a FUL was in place.  Specifically:

> (b) for drugs dispensed by pharmacies:
>
> > (i) if the drug dispensed is a multiple source prescription drug for which an upper limit has been set by the federal health care financing administration, [reimbursement will be] an amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug,
>
> N.Y. Soc. Serv. L. sec 367-a(9)(b)(i).

**Response to Alleged Fact No. 3**:  Disputed in part.

Defendants dispute plaintiffs' assertion that New York Medicaid's reimbursement formula has always been set by the legislature.  In fact, from 1976 until 1994, the reimbursement methodology was dictated by a consent decree negotiated by and entered into between the New York Department of Health ("NYDOH") and the Pharmaceutical Society of the State of New York ("PSSNY").  *See* 7/7/78 Stipulation at ¶ 4, *PSSNY* v. *Cuomo*, Civ. No. 76-5080 (KTD) (S.D.N.Y.), attached as Exhibit A to the Declaration of Kim B. Nemirow in support of Defendants' Response To Plaintiffs' Local Rule 56.1 Statement Of "Undisputed" Facts Applicable To All Defendants And Statement Of Additional Undisputed Material Facts, filed June 15, 2009 ("Nemirow Decl.").

In 1987, NYDOH attempted to modify the reimbursement rate, by regulation, to comply with the then newly-promulgated FUL regulation.  It was prevented from doing so when PSSNY successfully moved the court for an injunction on the grounds that such a modification violated the consent decree.  *See* 12/19/89 Affidavit of Mary Alice Brankman at ¶¶ 8-11, *PSSNY* v. *Cuomo*, Nemirow Decl. at Ex. B; 2/29/88 Order, *PSSNY* v. *Carey*, Nemirow Decl. at Ex. C.  It

was not until 1994 that the New York *legislature* set the reimbursement rate and, then, the rate that was adopted by the legislature was the product of a negotiation between NYDOH and the pharmacists to settle and finally resolve their long-running legal battle over the adequacy of pharmaceutical reimbursement rates.  Defendants do not dispute that plaintiffs accurately quote N.Y. Soc. Serv. L. § 367-a(9).  N.Y. Soc. Serv. L. § 367-a(9) (1994) (amended 2003).

**4.     The purposes of the Federal Upper Limit ("FUL") program are to ensure access to prescription drugs while achieving cost savings.  Gaston, Sue (March 19, 2008) Vol. II 498:16-22 (Exhibit A hereto).**

**Response to Alleged Fact No. 4:  Undisputed.**

**5.     To achieve cost savings for states and Medicaid, CMS seeks to set a reasonable reimbursement rate on drugs that are commonly used by the Medicaid population in an outpatient setting.  Gaston, Sue (January 24, 2008) 216:14-19; 245:12-246:16 (Exhibit B hereto); Gaston, Sue (March 19, 2008) Vol. II, 329:10-331:3; 456:10-457:6 (Exh. A hereto);** *see also* **Brief of the United States on the Federal Upper Limit, p. 2-3,** *citing* **51 Fed. Reg. at 29563 (Docket No. 4413) (Exh. C hereto); Sexton, Gail (May 20, 2008) 72:21-76:11, 91:18-93:19 (Exh. D hereto).**

**Response to Alleged Fact No. 5:  Undisputed.**

**6.     A reasonable FUL was considered to be somewhere between WAC and AWP.  Gaston, Sue, Vol. II (March 19, 2008) 446:1-453:1; 488:2-19. (Exh. A hereto).**

**Response to Alleged Fact No. 6:  Disputed.**

The testimony cited by plaintiffs in support of this contention makes no reference to AWP at all, or to the reasonableness of a FUL in relation to AWP.  Instead, the cited testimony

provides an example of CMS's decision not to use the lowest published price in the setting of the FUL for lorazepam, one of the drugs that was the subject of the targeted discovery in this matter. *See* Gaston Tr. 446:1 – 453:1, Nemirow Decl. at Ex. D.  Ms. Gaston's testimony further highlights why the decision was made to disregard the lowest reported WAC price – to ensure that all providers were able to purchase the drug within the limits set by CMS.  *See* Gaston Tr. at 428:21 – 429:1 (agreeing that "sometimes discretion was used to ensure that the FUL was reasonable"), Nemirow Decl. at Ex. D; Gaston Tr. at 429:2 – 429:8 (further acknowledging that discretion was used to set the FUL at a level that allowed the drug to be acquired in the marketplace), Nemirow Decl. at Ex. D.

> 7. **Federal regulations provide that CMS may set a FUL when two criteria are met:  (1) there must be at least three therapeutic equivalents (A-rated) listed for the generic drug in the FDA Orange Book publication, Approved Drug Products with Therapeutic Equivalence Evaluations; and (2) there must be at least three suppliers of the generic drug listed in the pricing compendia. 42 CFR § 447.332(a)(i) and (ii).**

**Response to Alleged Fact No. 7:  Disputed.**

Plaintiffs mischaracterize the applicable federal regulation.  Title 42, Code of Federal Regulations, Section 447.332 provides that "CMS *will* establish" a FUL when the specified criteria are met.  42 C.F.R. § 447.332(a)(1) (emphasis added).  The regulation cited does not merely permit CMS to set a FUL in those circumstances, it *requires* CMS to do so.  *Id*.  However, responding further, the undisputed record evidence shows that CMS often chose not to establish a FUL even if those criteria were met.  *See*, *e.g.*, Defendants' Local 56.1 Statement of Undisputed Material Facts Supporting Defendants' Joint Motion for Summary Judgment on

Plaintiffs' "FUL Fraud" Claims, dated May 15, 2009 [Docket No. 55] ("Defs.' 56.1 Stmt.") at ¶ 31.

**8.     Once these two criteria were met, the regulations provided that CMS may establish the FUL by taking "150 percent of the lowest published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or if the drug is not commonly available in quantities of 100, the package size commonly listed)…" 42 CFR § 447.332(b).**

**Response to Alleged Fact No. 8:  Disputed.**

Defendants dispute plaintiffs' assertions insofar as plaintiffs mischaracterize the regulation. The cited regulation requires that CMS set a FUL at 150% of the lowest published price even though the undisputed record evidence shows that CMS very often chose to disregard the regulatory requirements when setting FULs. *See*, *generally*, Affidavit of Sumanth Addanki, dated May 15, 2009 [Docket No. 57]; *see also* 42 C.F.R. § 447.332.

**9.     At all times relevant hereto, CMS had a computer application ("FUL system" or "FULS") that analyzed the FDA Orange Book ratings and the publishing compendia (First Data Bank, Red Book and Medispan) price information to automatically find the therapeutic equivalent with the lowest published price (AWP, WAC, and DP) and multiply it by 150 percent.  Gaston, Sue (January 24, 2008) 232:22-237:9 (Exh. B hereto).**

**Response to Alleged Fact No. 9:  Undisputed.**

**10.     CMS's FULs program pulled published prices from First Data Bank, Red Book and Medispan to establish the FUL. Gaston, Sue (January 24, 2008) 145:5-146:16 (Exh. B hereto).**

**Response to Alleged Fact No. 10:  Undisputed as written.**

Defendants dispute plaintiffs' assertions to the extent the word "establish" is intended to imply that CMS set the FULs mechanically, and did not perform a subsequent manual review and/or exercise substantial discretion. *See infra* at Response to Alleged Fact No. 11; *see also* Defs.' 56.1 Stmt.,¶¶ 7, 15-36.

**11.     In addition to the two criteria mandated by the federal regulation governing the FUL, CMS on occasion engaged in a manual review to ensure availability of the drug and accuracy of pricing information. Gaston, (January 24, 2008) 257:3-12 (Exh. B hereto).**

**Response to Alleged Fact No. 11:  Disputed in part.**

CMS testimony makes clear that the manual review of the computer-set FUL pricing was done in nearly every case, rather than "on occasion," and often resulted in a modification to the FUL. *See, e.g.*, Gaston Tr. at 234:7 – 234:18 ("but basically there's a lot of manual review that's included before the final FUL listing will come out"), 411:8 - 411:13, 416:10 – 416:15, 429:18 – 429:22, 533:5 – 533:10), Nemirow Decl. at Ex. D; Sexton Tr. at 89:2 – 89:10, 93:19 – 94:13, Nemirow Decl. at Ex. E (stating that Ms. Sexton conducted "further manual interventions" into the FUL for albuterol because she had "learned of other suppliers that were marketing this drug"); *id.* at 95:15 – 95:20, Nemirow Decl. at Ex. E (stating that she would conduct a manual review "in cases where I saw that manual intervention could have changed the price, changed the federal upper limit, or where it appeared that perhaps the criteria was not met and that further

intervention should have been taken"); *id.* at 138:6 – 138:7, Nemirow Decl. at Ex. E ("When possible we would manually verify that drugs were available.").  In fact, considering the FULs set for the drugs that were the subject of the targeted discovery in this matter, the FUL was manually reviewed and set on a price other than the lowest published price available at the time in nearly 75% of all cases (23 out of 31 cases).  *See* Defs.' 56.1 Stmt., ¶ 7.

**12.     The 2003 Compliance Program Guidance for Pharmaceutical Manufacturers issued by the Office of the Inspector General of the U.S. Department of Health and Human Services, Federal Register, Vol. 68, No. 86, Monday May 5, 2003 ("2003 OIG Guidance"), provides:**

> **[Pharmaceutical manufacturers have a] legal duty to avoid submitting false or inaccurate pricing or rebate information to any federal health care program.  68 Fed. Reg. at 23732.**
>
> **The government sets reimbursement with the expectation that the data provided are complete and accurate.  The knowing submission of false, fraudulent or misleading**
>
> **information is actionable.  68 Fed. Reg. 23733**
>
> **In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.  68 Fed. Reg. 23734.**

**A copy of the 2003 OIG Guidance is attached as Exhibit E hereto.**

**Response to Alleged Fact No. 12:  Disputed.**

Defendants dispute plaintiffs' assertion that the OIG Guidance cited above has any relevance to this motion.  To the contrary, it is irrelevant and inappropriately relied upon.  The OIG guidance bulletin clearly states that it is "intended to present voluntary guidance to the industry and not to represent binding standards for pharmaceutical manufacturers."  2003 Compliance Program Guidance for Pharmaceutical Manufacturers issued by the Office of the Inspector General of the U.S. Department of Health and Human Services, Federal Register, Vol.

68, No. 86, Monday May 5, 2003 at 23731 ("Guidance Memo")  (attached as Exhibit "E" to Plaintiff's Statement of Undisputed Material Facts).  Moreover, the Guidance relates to specific governmentally-defined pricing measures such as AMP and is intended is to offer suggestions for pharmaceutical manufacturers' development of compliance programs, and does not speak directly to reporting requirements and standards.  It is therefore irrelevant to the motion before the Court.  *Id*.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

1.    The various pricing measures used in the pharmaceutical industry are widely understood to have the following ordinal relationship:  AWPs are expected to be higher than WACs, and WACs are often higher than the AMPs reported by manufacturers to CMS for particular products.  *See* Affidavit of Sumanth Addanki, dated June 15, 2009 ("6/15/09 Addanki Aff."), at ¶ 8.

2.    Plaintiffs' expert, Harris Devor, testified, consistent with this widely-held understanding, that he understood that AWPs are typically higher than WACs.  *See*, *e.g.*, Deposition of Harris Devor ("Devor Tr.") at 163:22-164:4, Nemirow Decl. at Ex. F (stating that he had "an understanding of the way the chain works, and that generally in any chain, the provider is paying more than the wholesaler paid the manufacturer because usually the wholesaler is in the business to make a profit");  Devor Tr. at 164:9-11 (stating specifically that his expectation was that "[o]verall that the AWP probably would have been higher than the WAC in most cases.  That's what my expectation would have been"), Nemirow Decl. at Ex. F; Devor Tr. at 472:11-20 (reviewing his own Rule 26 Statement, and agreeing that "normally AWP would be higher than WAC"), Nemirow Decl. at Ex. F; Devor Tr. at 473:11 - 473:13

11930156_4.DOC                                                         11

(testifying that he "think[s] overall [he] would expect AWPs to be greater than WAC"), Nemirow Decl. at Ex. F.

3. In as many as sixty percent (60%) of Mr. Devor's AWP and WAC calculations, his "but for" AWP was less than his "but for" WAC for a given drug. *See* 6/15/09 Addanki Aff. at ¶ 9; *see also*, *e.g.*, Devor Tr. at 480:3 – 480:8 ("Q: Comparing your estimated WACs on 5.01 with your estimated AWPs on 5.02, you will agree with me that for many of the quarters your estimated AWP is below your estimated WAC, right?  A:  I do see that ..."), Nemirow Decl. at Ex. F; Devor Tr. at 480:12-20 (confirming his calculation for a given drug in a given quarter that resulted in a WAC of $207.22 and an AWP of $24.09), Nemirow Decl. at Ex. F; Devor Tr. at 751:19 – 752:8 (acknowledging in deposition testimony that his "but for" AWPs in exhibits 10.01 and 10.02 to his Rule 26 Statement were "very significantly lower in most instances than the estimated WACs"), Nemirow Decl. at Ex. F.

4. Thirty-four percent (34%) of Mr. Devor's calculated AWPs were less than the AMP reported by the manufacturer during that quarter. 6/15/09 Addanki Aff. at ¶ 10; Ex. 4; *see also*, *e.g.*, Devor Tr. at 874:15 - 874:18 (acknowledging that in a given quarter, the AMP for enalapril maleate was ***three times greater*** than Mr. Devor's calculated AWP), Nemirow Decl. at Ex. F; Devor Tr. at 885:6 - 885:15 (acknowledging that the reported AMP for a given drug was a "far in excess of [his] estimated AWPs by a factor of several"), Nemirow Decl. at Ex. F.

5. In eleven percent (11%) of the instances in which Mr. Devor calculated either an AWP or a WAC, at least one of those calculated figures was a ***negative*** number.  6/15/09 Addanki Aff. at ¶ 10.

6. When the "but for" prices he calculated were negative, Mr. Devor created "proxies" which he used instead of the negative number.  Typically, his proxy was the last

positive figure he calculated. S*ee*, *e.g*., Devor Tr. at 139:20 – 140:1 ("Q:  So when a WAC was negative you used a proxy?  A: Yes, I mean, it doesn't make sense to have a negative WAC, if you think about it ..."), Nemirow Decl. at Ex. F; Devor Tr. at 141:17 – 141:21 ("You also, if you look at Exhibit 14.02, use proxies for AWP when you have a negative AWP, when you calculate a negative AWP, correct?  A: Right, and I see the last line item on the page is actually a negative AWP, correct."), Nemirow Decl. at Ex. F; Devor Tr. at 437:2 – 437:8 ("And in this analysis . . . we took as a proxy the most recent month that wasn't negative."), Nemirow Decl. at Ex. F; *but see, e.g.,* Devor Tr. at 792:15 – 793:4 ("Q:  You calculated a negative estimated WAC for three quarters here, correct?  A:  That's correct.  Q:  But unlike Exhibit 10.17, you do not substitute a proxy for the negative WAC, correct?  A:  That's correct.  Q:  Why the difference in your methodology? ...  A:  I can't – the answer is I don't know.  I don't know.  Could have been an oversight.  I don't know."), Nemirow Decl. at Ex. F.

      7.      Mr. Devor also used proxies when he detected an "outlier" figure in the data, claiming that to do otherwise would "distort the whole analysis." S*ee*, *e.g.*, Devor Tr. at 141:22 – 142:22 (testifying that a "proxy" was used when he detected an "outlier" or when a change in AWP or WAC would "distort the whole analysis," while admitting he could not "recall whether we actually had those cases, we may have, given how much, you know, how many drugs and how many periods we analyzed, there could have been one or two.  With respect to those we would have also used a proxy which I believe in both cases would have been the calculated AWP or WAC just prior to that, I believe"), Nemirow Decl. at Ex. F; Devor Tr. at 143:1 – 143:6 ("Q:  What was your standard for determining when something was an outlier and that you would use a proxy?  A:  I think that was only if it was – the answer – I don't remember having any so it is hard for me to say my standard ..."), Nemirow Decl. at Ex. F.

8. WAC is (and was during the relevant time) often described as, and commonly understood and used to mean in the pharmaceutical industry, an undiscounted invoice or list price for sales to wholesalers. For example:

(a) As early as 1993, Dr. Kreling, widely cited in the AWP litigation, authored an article defining WAC as an undiscounted list price. Kathleen Adams, Norma Gavin and David Kreling, *Assessment of Adequacy of Reimbursement Rates to Pharmacies and Its Impact on the Access to Medication and Pharmacy Services by Medicaid Recipients*, Systemetrics, Inc., (Nat. Tech. Info. Service, PB94-187689), August 1993, p. 4), Nemirow Decl. at Ex. G.

(b) Similarly, in 1996, Medi-Span defined WAC as an "estimated value," dependent upon whether wholesalers experience discounts through volume purchases or special deals. *See*, *e.g.*, *Massachusetts* v. *Mylan Labs*, 608 F. Supp. 2d 127, 141-142 (D. Mass. 2008).

(c) In 1998, the U.S. District Court for District of Columbia found WAC to be a "wholesale list price" and, as with many products, found that drugs can be acquired at a lower price in the marketplace. *Federal Trade Comm'n* v. *Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 40-42 (D.D.C. 1998) ("Valued customers can often buy drugs from wholesalers for the WAC *minus* a certain negotiated percent").

(d) In 1999, the Federal Trade Commission issued a report on the pharmaceutical industry, in which it defined WAC as the "wholesale list price of ... prescription drugs" while noting that WAC "often differs" from transaction prices as a result of industry-standard discounts such as the prompt pay discount, volume discounts, rebates and other credits and allowances. Roy Levy, Federal Trade Comm'n, *The Pharmaceutical Industry: A*

*Discussion of Competitive and Antitrust Issues in an Environment of Change* at 52 n. 124 (1999), Nemirow Decl. at Ex. H.

(e)  On several occasions, the Department of Health and Human Services Office of Inspector General categorized the WAC [and the AWP] as "suggested list prices" that typically are not the price paid for drugs.  *See*, *e.g.*, HHS-OIG, Cost Containment of Medicaid HIV/AIDs Drug Expenditures, OEI-05-00-00611 (July 2001), available at http://oig.hhs.gov/oei/reports/oei-05-99-00611.pdf; *see also* HHS-OIG, Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices, OEI-05-05-00240 (June 2005), available at http://oig.hhs.gov/oei/reports/oei-05-05-00240.pdf (defining WAC as "manufacturer's list price for the drug ... to wholesalers or direct purchasers in the United States, not including [any] prompt pay or other discounts, rebates or reductions in price ..."); HHS-OIG, Unit of Measure Inconsistencies in the Medicaid Prescription Drug Program, OEI-05-07-00050 (November 2007), available at http://oig.hhs.gov/oei/reports/oei-05-07-00050.pdf (stating that in the context of Medicaid, both AWP and WAC are "suggested list prices" that are not necessarily based on sales).

(f)  In 2001, the Kaiser Family Foundation issued a publication describing recent trends in the prescription drug coverage and defined WAC in its glossary as "the price paid by the wholesaler for drugs purchased from the wholesaler's suppliers (manufacturers).  On financial statements, the total of these amounts equals the wholesaler's cost of goods sold.  *Publicly disclosed or listed WAC amounts may not reflect all available discounts*."  Kaiser Family Foundation, *Prescription Drug Trends, A Chartbook Update* (November 2001), available at http://www.kff.org/rxdrugs/3112-index.cfm; *see also* Dawn Gencarelli, National Health Policy Forum Issue Brief, *Average Wholesale Price for Prescription Drugs:  Is There a More*

*Appropriate Pricing Mechanism* (June 2002) (defining WAC as "[t]he manufacturer's charge to the wholesaler to purchase the drug. The WAC is a published price and does not generally reflect any rebates or discounts. It is often referred to as the 'catalogue price'"), Nemirow Decl. at Ex. I.

        (g)       First Data Bank, the publisher of a pricing compendia, defines WAC as:

> the manufacturer's ... published catalogue or list price for a drug product to wholesalers ... not includ[ing] prompt pay or other discounts, rebates or reductions in price ...

*See* http://www.firstdatabank.com/downloads/pricing/BBAWP_Letter_To_Customers.pdf and http://www.firstdatabank.com/support/rcs/policies/pricing.

        (h)       The various state Medicaid programs also have indicated their knowledge of WAC as a list price. *See*, *e.g.*, Report to the General Court Reimbursement for Prescribed Drugs, Commonwealth of Massachusetts, Executive Office of Health and Human Services, Report to the General Court – Reimbursement for Prescribed Drugs, at 3 (Oct. 3, 2002) (report setting forth the basis for a change in the reimbursement rate defines WAC as "theoretically the manufacturer's charge to the wholesaler to purchase the drug, but it does not reflect any rebates, discounts, promotional bonuses, or credits for prompt payment"), attached as Ex. J to the Nemirow Decl.; Connecticut General Assembly, Legislative Program Review & Investigations Committee, Pharmacy Benefits and Regulation (December 2003), available at http://www.cga.ct.gov/2003/pridata/Studies/Pharmacy_Final_Report.htm (defining WAC in a glossary as "[t]he price paid by a wholesaler for drugs purchased from the manufacturer of the drug ... publicly disclosed WAC amounts may not reflect all available discounts"); Pennsylvania Bulletin, Vol. 35, Number 32 at 4317 (August 6, 2005), available at http:///www.pabulletin.com/secure/data/vol35/35-32/35-32.pdf (revisions to a Pennsylvania

statute defining WAC as a "manufacturer's list price for a drug to wholesalers or direct purchasers ...."); National Association of State Medicaid Directors (NASMD), 2007 State Perspectives Medicaid Pharmacy Policies and Practices (November 2007), available at http://www.nescsontrak.com/HomePage/files/NASMDPharmacyRpt1107.pdf (defining WAC in a glossary as a "*manufacturer's list price to wholesalers* or direct purchasers" (emphasis in original)).

   (i) By statute, the Medicare program has defined WAC as an "undiscounted" price.  42 U.S.C. § 1395w-3a.  *See also* 42 U.S.C. § 1396r-8(b)(3)(A)(iii)(II) (incorporating the Medicare definition of WAC into the Medicaid Rebate Statute).

 9. Similarly, to the extent that AWP is relevant to plaintiffs' motion, and defendants contend that AWP is not relevant as FULs were never based on AWPs, *see* Defs.' 56.1 Stmt., ¶ 34, the term "AWP" as used in the generic market is (and during the relevant time was) a pricing benchmark that, by standard convention, had to be set at least 10% below the AWP for the equivalent brand drug so that the pricing compendia would identify the particular drug as a generic.  *See, e.g.*, Pls.' L.R. 56.1 Stmt. of Undisputed Material Facts as to Schering Corp., Schering-Plough Corp. and Warrick Pharm. Corp., ¶ 19.

         Respectfully submitted,

          /s/ John P. Bueker
         John T. Montgomery (BBO#352220)
         John P. Bueker (BBO#636435)
         Kim B. Nemirow (BBO# 663258)

         ROPES & GRAY LLP
         One International Place
         Boston, Massachusetts 02110-2624
         (617) 951-7000

         *On behalf of All Defendants*

Dated: June 15, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2009, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

                                                        /s/ Kim B. Nemirow
                                                       Kim B. Nemirow