Exhibit B

A-1747

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X

PHARMACEUTICAL SOCIETY OF THE STATE OF   :
NEW YORK, INC., STILL'S PHARMACY, INC.,
RIIS-WALD PHARMACY, INC., AND M.F.K.     :
DRUG CO., INC.,
                                         :    AFFIDAVIT IN REPLY
                  Plaintiffs,                 AND IN OPPOSITION TO
                                         :    PLAINTIFFS' CROSS-
          -against-                           MOTION TO MODIFY
                                         :
MARIO CUOMO, Governor of the State            Civil Action No.
of New York, and CESAR A. PERALES,       :    76-5080 (KTD)
Commissioner, New York State
Department of Social Services,           :

                  Defendants.            :

------------------------------------------X


STATE OF NEW YORK    )
                     :SS.:
COUNTY OF ALBANY     )


          MARY ALICE BRANKMAN, being duly sworn, deposes and

says:

          1.  I am the Director of the Bureau of Ambulatory

Services, Inpatient Care and Contracts, a bureau of the Division

of Medical Assistance of the New York State Department of Social

Services ("DSS").  I make this affidavit in: (a) reply to

plaintiffs' opposition to defendants' motion to dissolve the

existing injunction and to modify the underlying settlement

order; and (b) opposition to plaintiffs' cross-motion to modify

the stipulation.

          2.  On October 31, 1989, defendants, Mario Cuomo and

Cesar Perales, DSS Commissioner (collectively, the "State"),

moved this Court to dissolve an injunction entered by this Court on February 29, 1988 which restrained the State from implementing an aggregate upper limit ("AUL") methodology for Medicaid reimbursement of participating pharmacies (the "injunction"). The Court had entered the injunction after finding that the State had not observed the terms of a stipulation of settlement and order dated July 5, 1978 (the "settlement order"). (A copy of the settlement order is annexed as Exhibit B to my affidavit, sworn to on October 30, 1989 [the "Oct. 30 aff."]). The State's dissolution motion urges that the injunction should be dissolved because the State has fully cured its default of the settlement order when it met with the Pharmacy Advisory Committee (the "PAC") and there explained why, for multi-source drugs, it had to substitute the AUL methodology for the estimated acquisition cost (the "EAC") methodology referenced in paragraph 4 of the settlement order.

3. Simultaneously with its dissolution motion, the State moves for modification of the settlement order to permit adoption of the AUL methodology in the event that the Court rules that the AUL methodology can only be adopted by such modification. Additionally, the State's motion to modify seeks to add a sunset clause to the settlement order.

4. Plaintiffs, the Pharmaceutical Society of the State of New York, Inc., Still's Pharmacy, Inc., Riis-Wald Pharmacy, Inc. and M.F.K. Drug Co., Inc. (collectively, "PSSNY"), now have opposed the State's motion. They also have

- 2 -

cross-moved to add numerous provisions to the settlement order, including one, an increase in the dispensing fee, which would cause the State involuntarily to spend an additional 62.3 million dollars.

### The State Has Cured Its
#### Default Of The Settlement Order

5.   The State has moved to dissolve the injunction on the ground that it has complied with the settlement order by: (a) meeting with the PAC on March 23, 1988 as required by paragraph 6; and (b) demonstrating, as required by paragraph 11 of the settlement order, that the adoption of the AUL methodology provides the only reasonable alternative to insure receipt of federal financial participation ("FFP").

6.   PSSNY concedes that a meeting was held and that the PAC "did not object to AUL when notice was formally given on March 23, 1988... ." Affidavit of Elizabeth Lasky, sworn to on November 28, 1989 (the "Lasky aff."), at ¶ 11.  However, it says that DSS could not expect support from the PAC because of the ongoing litigation between PSSNY and the State.  Id. at ¶ 11. But, PSSNY and the PAC are not the same entity and, in any event, the PAC had an obligation to respond to the State pursuant to paragraph 6 of the settlement order and the principles of good faith and fair dealing which are implied in all agreements. PSSNY's position is untenable.  On the one hand, it obtained the injunction because it complained that the State did not meet

- 3 -

with the PAC and explain the predicate for its action.  On the other hand, it now says that the PAC, which it appears to regard as its *alter ego*, had no obligation to respond once the State was willing to make good on its stipulated promise.

7.  PSSNY also seeks to excuse the PAC's failure to respond upon the ground that DSS did not provide the PAC with any "statistical" data to support its decision.  *See* Lasky aff. at ¶ 12.  The excuse is flimsy for two reasons.  *First*, paragraph 6 of the settlement order does not require DSS to submit any data, let alone "statistical" data, to the PAC as PSSNY suggests.  However, DSS did report the results of its analysis to the PAC as PSSNY, itself, concedes.  *See id*.  This analysis used the first six months of 1987, which then provided the most current data base, and compared the actual expenditures obtained under EAC with what DSS' expenditures would have been for the same drugs if the upper limits provided by the AUL methodology had applied.  It showed that the AUL methodology, as the Second Circuit observed, set a *de facto* limit on individual drug prices because the expenditures for each of these EAC-priced drugs, when added together, would exceed the cap of AUL.  *Second*, the PAC never requested any additional data but, in any event, the State provided the backup data supporting its analysis to PSSNY during settlement discussions conducted in the winter months of 1989.  The PAC's total silence on this subject belies PSSNY's claim.  In fact, all who were involved and knowledgeable under- stood that a prospective reimbursement scheme, such as the one

- 4 -

at issue, depended upon future behavior which made prediction with certainty impossible and which required, therefore, the adoption of a prudent approach to insure receipt of FFP.

8.   PSSNY further argues that our 1987 analysis is now faulty because certain cost containment measures, such as the brand override regulation, have been implemented.  See Lasky aff. at ¶ 9.  However, these efforts do not impact upon the aggregate limit.  Rather, they simply remove a category of drugs from the calculation of the aggregate.  I offer the following hypothetical as illustrative:

> Assume that there are 10 units of a multi-source drug subject to the AUL methodology at an upper limit price of $10 per unit.  The aggregate would be $100.  Further assume that 5 of the units are a brand name product and 5 are generic equivalents of that product.  Under the brand override regulation, the 5 units of the brand name product are exempt from the calculation of the aggregate which now becomes $50 (i.e., 5 units x $10.00) rather than $100.  Thus, the value of the aggregate remains the result of the multiplication of units by price.

Similarly, the requirement of triplicate forms for benzodiazepines will produce an identical result:  i.e., the value of the aggregate will be lowered by a reduction of drug units.  Contrast Lasky aff. at ¶ 9(d).

9.   While PSSNY never offers any alternative, it continues to incant that the State has failed to demonstrate that "implementation of specific upper limits is as close as practicable to the EAC methodology contained under the Stipulation."  Lasky aff. at ¶ 15.  Contrary to PSSNY, we have made the

- 5 -

requisite showing.  Thus, the EAC price for a drug is calculated
on the basis of its average wholesale price ("AWP").  If the AWP
for a drug was greater than the upper limit promulgated by the
federal government for that drug, basic mathematic principles
taught that the State would have exceeded the AUL unless the
price for this drug was reduced to the upper limit.  For these
drugs, we had no choice if the State were to receive FFP.
However, we continued to use the EAC methodology when a drug's
AWP was at or below the upper limit.  Thus, the methodology is
as close to the EAC as possible.

The Injunction Should Be Dissolved
Effective April 23, 1988

10.  PSSNY challenges the State's request that the
Court dissolve the injunction as of April 23, 1988 when DSS
cured its violation of the settlement order by meeting with the
PAC and showing why it had adopted the AUL methodology.  See
Lasky aff. at ¶¶ 23-25.  It says that "failure to give notice to
the PAC was not the only violation of the Stipulation upon which
the injunction was issued."  Id. at ¶ 25.  Rather, PSSNY con-
tends that there were other violations.  Id.  However, it names
only one which the Court supposedly found as a further predicate
for the injunction -- the purported obligation of the State to
seek modification of the settlement order prior to adoption of
the AUL methodology.  Id.  The Court did not so find.  (A copy
of the transcript of the February 29, 1988 proceeding ["Tr."] is

annexed as Exhibit E to the Oct. 30 aff.) In colloquy with counsel, it stated (Tr. at 23, lines 17-24):

> You have now admitted that you are in a bind.  The problem is you have permitted the way out of your bind, (a), to be dissolved by your activities, not by anybody else's; and (b), having done that, you decided you would also ignore the possibility of coming back to the court and having a change made in this thing.  You could have done either one or both, which is what I would have recommended if I were your lawyer.  (Emphasis added.)

The reference to "the way out of your bind" is clearly to the PAC.  As appears, the Court was suggesting that DSS could extricate itself from its "bind" if it had met with the PAC and advised it of the need to change the EAC methodology. Since the PAC then did not exist, the Court had presented an alternative -- seeking modificaiton.  Thus, the State cured its default by complying with one of the alternatives presented by the Court.

11.  Having remedied the wrong of which PSSNY properly complained, the State satisfied its obligation under the settlement order.  Thus, we continue to urge that the injunction be dissolved as of April 23, 1988.  Contrary to PSSNY's position (Lasky aff. at ¶ 28), we believe that PSSNY received the benefit of its bargain as of this date.  As promised by the State's counsel during argument on the State's stay application before the Second Circuit, they have been made whole for the found wrong.  Contrast Lasky aff. at ¶ 26.

12.  Finally, I note that PSSNY substitutes inflammatory language for reasoned discussion of where lies the public

- 7 -

interest on this question.  We do not minimize that the Court
was disserved when the State failed to return promptly for
dissolution of the injunction.  Certainly, we have learned a
valuable lesson.  However, this experience should not be at the
expense of New York's taxpayers.  For this reason, I submit that
the public interest warrants the injunction's dissolution
effective April 23, 1988.

>           The Settlement Order Should Be
>           Modified To Permit The Adoption
>           Of The AUL Methodology

13.  As discussed above, the State cannot use the EAC
methodology for multi-source drugs if it is to be assured of
continued receipt of FFP.  Yet, another, and actually larger,
problem looms.  After the injunction's entry and the affirmance
by the appellate court, the federal government announced that it
would disapprove reimbursement for all drugs, including
multi-source drugs, which rely upon the EAC methodology estab-
lished in paragraph 4 of the settlement order.  I describe below
these events, but I first provide the Court with some
background.

The prior proceeding

14.  In 1976 when PSSNY commenced this litigation,
states participating in the Medicaid program were permitted to
reimburse for prescription drugs at no more than the lower of
ingredient cost plus a reasonable dispensing fee, or the

provider's usual and customary charge to the general public. See 42 CFR 447.331-447.334 (1976).  The ingredient cost of a prescription drug was defined as the lower of: (a) the maximum allowable cost as established by the federal government for certain multi-source drugs; or (b) the EAC.

15.  As stated in my earlier affidavit, PSSNY challenged how the State determined the EAC.  According to PSSNY, the State had adopted an EAC "which did not accurately reflect current market conditions in New York."  Lasky aff. at ¶ 11. When the parties settled this litigation, they revised how the State would calculate EAC.  Thus, it was agreed that the State would survey twelve New York wholesalers to determine the price, i.e., the AWP, which they had charged to pharmaceutical providers.  Settlement order at ¶ 4.  They further agreed that the State would reimburse pharmacists for prescription drug claims at the manufacturer's price "[i]f it determines from ascertainable evidence that the prevailing sound business practice of pharmaceutical providers with regard to the purchase of a particular drug product is a direct purchase from the manufacturer... ."  Id. at ¶ 5.

16.  For a number of reasons, including lack of cooperation from New York wholesalers, it was impossible, as contemplated in paragraph 4 of the settlement order, to conduct a survey to determine the AWP paid in New York.  Instead, the State simply relied on pharmaceutical trade publications which list AWP.  The pharmacists never objected because AWP,

- 9 -

established by reference to the journals, insured their receipt of a premium price. Thus, DSS reimbursed the pharmacists as if they shopped in a prestigious department store. In reality, many of them purchased their drugs at a considerable discount.

17. In the following decade, the federal government became more and more cognizant that calculating EAC on the basis of the AWP produced an artificially high reimbursement rate. By letter dated September 17, 1985, Theodore Shulman, Associate Regional Administrator of the Department of Health & Human Services ("HHS"), wrote to DSS Commissioner Perales concerning the issue. (A copy of Mr. Shulman's letter is annexed hereto as Exhibit A). He informed the State (Exhibit A at 1):

> In June 1984, the DHHS Office of the Inspector General (IG) issued a report to HCFA recommending action to reduce inflated payments for drugs paid under Medicaid. The IG's recommendations were based on a national review of State practices through intensive sample surveys in six States. The reviews consistently showed that Medicaid EACs were primarily based on published AWPs which were inflated, on the average about 16 percent. Other data has confirmed the IG's findings. While HCFA is not mandating that States adopt any particular methodology for the reimbursement of prescription drugs, it is clear that certain changes in State reimbursement systems are in order. States that rely solely on AWPs as an indicator of what providers are actually paying for prescription drugs can no longer do so and still claim that they are applying their best estimate to determining prescription drug costs as required by 42 CFR Section 447.332(c) unless they can provide other evidence that supports a contrary conclusion.

(Emphasis added.)   HHS demanded that the "State...analyze drug
pricing and, where necessary, implement Medicaid drug pricing
levels which reflect more accurately than AWPs the prices that
pharmacists are generally paying for drugs.  Id. at 2.

HHS' present position on the State's methodology

18.   Because paragraph 4 of the settlement order
establishes a methodology which calculates the EAC based on the
AWP, New York has been unable to comply with HHS' demand.  The
federal government, by letter dated June 20, 1989, has pursued
the matter.  (A copy of this June 20, 1989 letter from Arthur J.
O'Leary, HHS Associate Regional Commissioner to Jo-Ann
Costantino, DSS Deputy Commissioner, is annexed hereto as
Exhibit B.)  It informed the State that the EAC methodology is
"not acceptable."  Exhibit B at 2.  We were told "to conduct an
assessment of the purchasing patterns of pharmacists in New York
State in order to arrive at appropriate EAC levels."  Id.

19.   My staff recently surveyed drug wholesalers to
determine the prices which they charged to retailers for their
commonly dispensed drugs.  (I annexed hereto as Exhibit C a copy
of a memorandum, dated November 11, 1989, which reflects the
results of our survey.)  The wholesalers submitted their catalog
prices which reflected, in turn, manufacturer-listed AWP.  We
also asked for their discount policies.  Their responses con-
firmed the federal government's position that prices set by an
EAC methodology predicated on the AWP were unrealistically high.

- 11 -

Thus, we learned that an entire network of discounts, rebates and special sales by the manufacturers exists behind the wholesalers' prices.  Tellingly, pharmacists actually pay anywhere between eight and fourteen percent below the listed AWP.  In fact, they know that they have been receiving a bonanza.  One of their own, Harold Cohen, writing for the May 1, 1989 edition of the Drug Store News, conceded that "AWP is a joke... it actually stands for the highest price at which manufacturers sell their product."  (A copy of Mr. Cohen's article is annexed hereto as Exhibit D.)

20.  By letter dated October 2, 1989, we advised the federal government that the State was unable to revise how it calculates EAC due to this litigation.  While the federal government, as of this date, has not taken any action against the State, it is certain that it will disallow any state plan which computes EAC on the basis of the AWP.  Indeed, it already has disallowed Louisiana's state plan which predicated its EAC methodology, like New York, on an unmodified AWP.  Of course, the disallowance of New York's plan would mean that it would not be eligible for the receipt of any FFP.

21.  As the above accounting demonstrates, the federal government now has mandated a change in EAC methodology which requires the State to revise the AWP pricing contemplated in paragraph 4 of the settlement order.  Given the mandatory nature of the federal government's direction, this is exactly the type of regulatory change which the State is permitted to make under

- 12 -

paragraph 10 of the settlement order.  However, I have explained this methodological matter to the Court because it does interrelate with the State's motion that it be allowed to adopt the AUL methodology for multi-source drugs.  The federal government's position highlights the need for modification.  If the State must continue to use the EAC methodology of the settlement order rather than the AUL methodology for reimbursement of multi-source drugs, the existing problem with the federal government will be exacerbated.

PSSNY'S Cross-Motion
Should Be Denied

22.  PSSNY has cross-moved for modification of the settlement order.  It seeks: (a) an immediate and "reasonable" increase in the $2.60 dispensing fee set in paragraph 9 of the settlement order; (b) the conduct of an annual survey of dispensing costs of community pharmacies in lieu of the annual public hearing conducted on this issue as required by paragraph 6 of the settlement order; (c) monthly updating of prices, now permitted on a quarterly basis pursuant to paragraph 8 of the settlement order; and (d) the imposition of rigid deadlines for the conduct of PAC meetings and the submission of its agendas and minutes.  The cross-motion should be denied in its entirety. I explain why below.

The immediate and "reasonable"
increase in the dispensing fee

23.  I am advised by the State's attorneys that PSSNY
may not use the vehicle of its cross-motion as a shortcut
procedure for seeking an increase in the dispensing fee.  The
Court is respectfully referred to the accompanying memorandum
for the State's demonstration of law.  However, the facts are
against PSSNY even if it could raise this issue in this context.

24.  PSSNY has not challenged the State's dispensing
fee for over a decade because, contrary to the impression which
PSSNY now seeks to create, New York's pharmacists receive more
than a fair profit.  If they were not satisfied with their
position, they certainly had the option of withdrawing from the
Medicaid program which is voluntary.  Virtually none have left.

25.  Of course, pharmacists are entitled to operate
their business with a profit.  However, PSSNY engages in faulty
analysis when it focuses exclusively upon the dispensing fee to
determine profitability.  Rather, one must also look at the
factor of ingredient cost.  As described above, New York,
pursuant to the settlement order, uses the AWP to calculate
ingredient cost.  It is an exceptionally enriched measure of
cost.  In fact, the average reimbursement cost per prescription
is $17.35 in New York which places it third in the nation.  (A
copy of a chart from the November 6, 1989 edition of Drug Topic,
an industry journal, reflecting this data is annexed hereto as
Exhibit E.)  Virtually every other state which reimburses

- 14 -

ingredient cost on the basis of AWP discounts this measure of
cost anywhere between three and twelve percent.  See Exhibit E.
Thus, New York pharmacists, who pay less than the AWP as we now
know, actually receive a profit greater than the profit compo-
nent of the dispensing fee.  This profit amounts to: (a) the
difference between their actual cost and AWP; and (b) the
dispensing fee.  I offer a hypothetical illustration using a
conservative discount of the AWP:

> Assume that a pharmacist actually purchases a
> drug for $36.00 and that the AWP is 10 percent
> higher.  Under New York's scheme, the reim-
> bursement cost is $39.60 (i.e. $36.00 +
> $3.60).  Additionally, the pharmacist receives
> a dispensing fee of $2.60.  Thus, the pharma-
> cist will receive $42.20 in reimbursement for
> this prescription.
>
> In consequence, the pharmacist's profit here
> is the difference between $42.20 and $36.00,
> the real cost of the prescription.  His actual
> dispensing fee is $6.20 -- not $2.60.

    26.  PSSNY says that "[d]efendants themselves have
even acknowledged that the dispensing fee is inadequate in a
survey conducted in 1982."  Lasky aff. at ¶ 37.  (A copy of the
survey is annexed as Exhibit C to the Lasky aff.)  The conten-
tion does not withstand scrutiny.  A reading of the survey
report demonstrates that its authors did not regard the survey
as statistically accurate.  Only 152 usable responses were
received from the 840 pharmacies in the survey's sample, and
serious doubt existed as to the issue of self-selection because

it appeared that chain pharmacies, who would have lower costs, were under-represented.

27.   The above discussion demonstrates that pharmacists are not entitled to an increase in the dispensing fee. Unlike other Medicaid providers, such as radiologists and surgeons, who have not received an increase in reimbursement since 1975, pharmacists have obtained automatic cost of living increases since their reimbursement is partially determined by AWP which does fluctuate according to market conditions.   While hearings on the dispensing fee are held every year as required by the settlement order, pharmacists have never made a case for a fee increase.   Nor, even after intensive lobbying, have they been able to convince the New York Legislature that they have any additional entitlement.

28.   PSSNY's request that the settlement order be modified to increase the dispensing fee must be denied.   PSSNY says "the pharmacists did not consider that DSS would require the pharmacists to operate eleven to twelve years after the Stipulation at the 1978 dispensing fee level."   Lasky aff. at ¶ 34.   The statement defies belief.   More accurately, PSSNY knew when it negotiated the settlement that the State would never agree to the relief it now requests.   Public officials cannot place the State in a financial straightjacket as PSSNY would now do.

The dispensing fee hearing

29.   PSSNY argues that an annual dispensing fee survey
should be substituted for the annual hearing on the dispensing
fee, presently required by paragraph 6 of the settlement order.
See Lasky aff. at ¶ 46.   PSSNY says this change is required
because "the Defendants do not consider the information obtained
at the hearings which establishes the inadequacy of the dispens-
ing fee... ."   Id. at ¶ 43.   If that truly were the case, PSSNY
has always had an adequate remedy to challenge the alleged
inaction through Article 78 of New York's Civil Practice Law and
Rules.   It has not.   Rather, the transcript of the annual
hearing, which last year was attended by only five individuals,
is always sent for consideration to DSS' Commissioner as well as
the Commissioner for the Department of Health which also shares
responsibility for this matter.

30.   PSSNY seeks to impose an obligation upon the
State which the federal government once required but has subse-
quently abolished.   See 52 F.R. 28851 (July 31, 1987).   Survey-
ing is an expensive exercise which is fraught with difficulty as
the statistical problems with the 1982 survey demonstrate.   The
State should be permitted to exercise its regulatory discretion
as to whether or not it chooses this route for decisionmaking.
In any event, a survey limited to the dispensing fee would be
inadequate.   It would have to be broader to permit an analysis

of true ingredient cost and would have to include not only community pharmacies but large chains as well.

Modifications to the operation
of the PAC

31.  The parties' intent that the PAC serve in an advisory capacity is evident from the use of the word "Advisory" in PAC's name.  PSSNY now wants to convert this advisory body into a governmental entity which shares the sovereign's decisionmaking power.  Lasky aff. at ¶ 64.  Such a change would place self-interested individuals in the role of public officials.  In short, decisionmaking would be controlled by "the fox in the chicken coop."

32.  As the State already has represented, it would continue the PAC even without the requirement to do so.  PSSNY has failed to show that the PAC has not operated as contemplated since it was re-constituted in 1988.  Monthly meetings initially were held and, when they have not been, it has been because the PAC members thought them to be unnecessary.  Matter to be included on the agenda are discussed well in advance with the PAC's chairman, and minutes are distributed before the next meeting to permit review for their accuracy.  Thus, there is no need to add greater specificity to paragraph 6 than already exists.  Contrast Lasky aff. at ¶ 65.  PSSNY's effort to do so simply highlights that PSSNY seeks to turn this advisory body into a governmental entity which it is not.

- 18 -

### The State's Request For The Addition
### Of A Sunset Clause Should Be Granted

33.  PSSNY has not demonstrated that it will suffer any prejudice by the addition of a sunset clause providing for the termination of the settlement order within a reasonable period of time.  See Lasky aff. at ¶¶ 20-22.  Nor has it refuted that state law provides it with ample protection.  See Oct. 30 aff. at ¶ 26.  Instead, it says that the settlement order "offer[s] sufficient flexibility to DSS while at the same time creating important safeguards to imprudent bureaucratic action and mechanisms for pharmacy industry input into the program." Lasky aff. at ¶ 20.  (Emphasis added.)

34.  PSSNY seeks to use the settlement order as a vehicle to involve this Court, for perpetuity, in the daily dialogue between the regulator and the regulated.  However, the Court entered the settlement order to correct a discrete wrong. At some time later, the matter should terminate.

35.  A recent issue concerning price updating illus-trates my concern.  Paragraph 8 of the settlement order provides that the State must update prices "no...less than quarterly." Given the State's obligation to make retroactive payments to PSSNY, I made the decision to use some of my staff for this priority matter.  Thus, these individuals, who ordinarily update drug prices on a monthly basis, were unavailable to perform this task.  By letter dated October 25, 1989, I advised the PAC members that the State wanted to update prices on a quarterly

- 19 -

basis under these circumstances. (A copy of my letter is annexed hereto as Exhibit F.) I solicited their views. Exhibit F. However, PSSNY moved to modify the settlement order to impose such a monthly duty even before the State could consider the PAC's comments. In fact, the State has decided not to implement quarterly updating as I advised the PAC members by letter dated December 6, 1989. (A copy of my December 6 letter is annexed hereto as Exhibit G.) PSSNY should not have applied to the Court. I fear that it seeks to make the Court the reviewer of first, rather than last, resort for, as it says, the "foreseeable" future. Lasky aff. at ¶ 20. Accordingly, the Court should add a sunset clause to the settlement order.

>              The State's Response To The
>              "Outstanding Issues" Presented
>              By PSSNY

36. The State has represented to the Court that it returned to the EAC methodology as of September 20, 1989. See Oct. 30 aff. at ¶ 2. As expected, some claims did "slip through the crack." PSSNY now complains that the State has imposed an unfair burden upon pharmacists because it has asked them to re-submit these claims. Lasky aff. at ¶ 69. However, PSSNY knows better. I wrote to its chairman by letter dated November 27, 1989 and advised that a pharmacy could choose to avoid any burden by awaiting the automated adjustment which we expect to make shortly. (A copy of my November 27 letter is annexed hereto as Exhibit H.)

37.   Last, PSSNY complains that the State has not provided the PAC with an explanation of "how EAC is presently being calculated.   In fact, my November 27 letter to its chairman offered to make this information available (Exhibit H at 1-2):

> The process of returning the upper limited drugs to EAC prices was completed in a very short time with the most current prices available to us.  We are continuing to research the price[s] of the nearly 8,000 drug entities to maintain current prices. <u>If you have information on specific drugs, we will be happy to provide the historical price change information on those drugs and to make corrections as needed.</u>

(Emphasis added.)   We have not heard further from PSSNY.

_____
MARY ALICE BRANKMAN

Sworn to before me this
_19_ day of December, 1989

_____
NOTARY PUBLIC

ROBERT T....
NOTARY Public, State of New York
No. ....
Qualified in Albany County
Commission Expires  2-28-90

- 21 -