Exhibit D

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

    v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - -

    (cross captions appear on following pages)


Videotaped deposition of SUE GASTON

Volume I


Washington, D.C.

Thursday, January 24, 2008

9:00 a.m.

Gaston, Sue                                    January 24, 2008
                        Washington, DC

                                                    Page 233

1    application.  I'm going to talk about it in

2    reference to the application that's used that houses

3    this information.  But our systems folks when it's

4    time to set a FUL or put out a new list of FUL

5    drugs, the system folks will obtain the FDA Orange

6    Book data and they'll pull that into their system.

7    And there are some standards within that program

8    that look for the criteria that's sort of detailed

9    in this handout here.

10            Once that criteria is met then the system

11   will pull in the latest compendia data and then

12   they'll merge the two.  And the compendia data,

13   there's some criteria in there too.  But they try to

14   match the compendia data to the drugs pulled from

15   the FDA.  And they match them together and then the

16   application -- and I'm simplifying this -- but the

17   application will have in there FUL groups, which

18   include like all NDC numbers, and it will have the

19   FUL group, the drug names, the NDC number and then

20   the compendia and the compendia pricing in there.

21            So it will have the source, if it's Red

22   Book, Blue Book, Medi-Span, and then it will have

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                January 24, 2008
                    Washington, DC

                                              Page 234

1    the prices.  It will have an AWP price, a direct

2    price or WAC price.  If there's not a price it'll

3    just be blank in any of those categories.  And then

4    the system, the application itself -- from my

5    recollection -- it's been a while since I've used

6    it.  But it will determine a FUL price where it can.

7           Then we apply some manual review just to

8    assure we have -- there's some edits and I can't

9    remember all of those.  But we want to make sure

10   that it's using -- because it's supposed to use the

11   lowest price in published compendia, and we want to

12   make sure that that lowest price is a true price,

13   that it's using a true price to establish a FUL.

14          So there's a manual review that's applied

15   to some of the drugs where the pricing might not

16   look right in there or there's missing pricing.  But

17   basically there's a lot of manual review that's

18   included before the final FUL listing will come out.

19       Q.    Okay.  I appreciate that.  I'm going to

20   try to follow up on each of those steps as best I

21   can.  You indicated that there was a system

22   involved.

                Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 235

1        A.    It's an application.

2        Q.    I think I've seen some documents that

3    indicate the FUL process was computerized?

4        A.    Correct.

5        Q.    Right?  Is that what you're talking about

6    when you talk about the system?

7        A.    Yeah.  It's an application that they use.

8        Q.    And what kind of application is it?

9        A.    I'm not a techie person.  I don't know.

10   It's on the computer.  It's an application.  I don't

11   know what more -- how to describe it.

12       Q.    Was the application set up before you

13   started working on it or did you --

14       A.    No.

15       Q.    -- take part in setting it up?

16       A.    When I first started working on FULs it

17   was in our mainframe.  The activity would occur in

18   our mainframe.  They took it from the mainframe and

19   put it into an application that they can use on the

20   computer, if that helps.

21       Q.    And do you recall -- was there someone --

22   you mentioned systems folks.  Was there somebody at

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 287

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - -

     (cross captions appear on following pages)


          Videotaped deposition of SUE GASTON


                    Volume II


                    Washington, D.C.

                    Wednesday, March 19, 2008

                    9:00 a.m.

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 410

1    equivalent drugs or then three therapeutically

2    equivalent drugs, and the second criteria, as I

3    understand it, was there had to be at least three

4    suppliers listed in Red Book, Blue Book or Medi-

5    Span; is that correct?

6         A.   Yes.  We said in a national compendia.

7         Q.   And the national compendia are what?

8         A.   We considered that Red Book, Blue Book

9    and Medi-Span.

10        Q.   Were actually any other pricing sources

11   that CMS looked at or considered national

12   compendia?

13        A.   No.

14        Q.   Just so we have I think a common

15   understanding about how the process worked, once

16   those criteria were deemed to be satisfied then

17   the process became picking a price and

18   multiplying that price by 150 percent to set the

19   FUL, correct?

20        A.   The system did that.

21        Q.   The FUL system?

22        A.   The FUL system.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 411

1     Q.    So just mechanically -- I think you

2   described this the last time, but tell me if my

3   understanding is incorrect.   There was a program

4   called FULs that did some data crunching and then

5   there was manual review that went on after that;

6   is that correct?

7     A.    Correct.

8     Q.    So essentially you as the individual

9   responsible for setting FULs at particular points

10  in time would have gotten a printout from the

11  FULs system and then you would have embarked on a

12  manual review after that?

13    A.    Correct.

14    Q.    But basically the process was that

15  either the system or you picked a price and that

16  price was multiplied by 150 percent to set the

17  FUL, correct?

18    A.    Correct.

19    MR. BUEKER:   I ask the court reporter

20  to mark a document that bears the Bates number

21  HHD 175-0849 on the bottom right-hand corner as

22  New York Counties Exhibit 2 for identification,

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 412

1    please.

2                    (Exhibit NY Counties 002 was

3    marked for identification.)

4    BY MR. BUEKER:

5         Q.   Ms. Gaston, do you have in front of you

6    what's been marked as New York Counties Exhibit 2

7    for identification?

8                    MR. WINGET-HERNANDEZ:  Excuse me, John.

9    I apologize for not bringing this up with respect

10   to the first exhibit that you attached.  But

11   without at this point making an objection, I

12   would like to ask you if you would mind marking

13   these exhibits in some way that made it clear

14   that it was the defendant that was offering them

15   and attaching them to the deposition rather than

16   in a way that seems to suggest that they have

17   been attached by my clients.

18                    MR. BUEKER:  I don't have an objection

19   to that.  In calling them New York county

20   exhibits I was simply trying to distinguish them

21   from the Abbott exhibits that are marked in this

22   deposition.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                        Washington, DC

Page 415

1    handwriting on Exhibit 2 is not yours?

2         A.   On the left-hand side dated 8/22 and

3    the handwriting that's been X'd out.

4         Q.   Okay.  And whose handwriting is that?

5         A.   That's Cindy Bergin's.

6         Q.   And then up above there's handwriting

7    that -- alongside the -- for example, Major

8    Pharmaceuticals.  Do you see that?

9         A.   At the top?

10        Q.   Yes.

11        A.   Yes.

12        Q.   Is that your handwriting?

13        A.   It looks like it.

14        Q.   And can you read into the record what

15   it says next to Major Pharmaceuticals?

16        A.   It says "not in stock."  Then it says

17   "soon."

18        Q.   And that you think is your handwriting?

19        A.   It appears to be.

20        Q.   And then next to Caraco Pharmaceuticals

21   Laboratory do you see that there's a written

22   "call" and then in parentheses "yes"?

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 416

1        A.    Yes.

2        Q.    Is that your handwriting?

3        A.    I can't say.

4        Q.    How about "discontinued (they no longer

5    manufacturer)," the printing?

6        A.    That's not my handwriting.

7        Q.    Okay.  But Exhibit 2 is a document with

8    which you're familiar?

9        A.    Correct.

10       Q.    And I take from your initials at the

11   bottom right-hand corner that you had some

12   involvement in the manual review process that

13   went on before a FUL was set for 100-milligram

14   metoprolol?

15       A.    Correct.

16       Q.    I'd like you to hang on to that.  I'm

17   going to flip back and forth between that and

18   another document that's labeled at the top

19   transmittal number 37, that I'd like to have

20   marked as New York Counties Defendants' Exhibit 3

21   for identification, please.

22                  (Exhibit NY Counties 003 was

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 417

1    marked for identification.)

2    BY MR. BUEKER:

3         Q.   Ms. Gaston, do you have in front of you

4    Exhibit 3 for identification?

5         A.   Yes.

6         Q.   And would you describe for the record

7    what Exhibit 3 is?

8         A.   This is transmittal number 37 of the

9    federal upper limit drug list dated November 20th

10   2001.

11        Q.   And what is a -- I take it it's a CMS

12   transmittal?

13        A.   Yes.

14        Q.   What is a CMS transmittal?  How is it

15   used in connection with the FUL program?

16        A.   The -- I don't know about in 2001.  But

17   previously the federal upper limit drug list was

18   published in the state Medicaid manual.  And then

19   we started publishing it on our webpage.  So we

20   would use the transmittal numbers because of the

21   state Medicaid manual issuance.

22        Q.   I see.  And if I take from that then

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 427

1        A.    Correct.

2        Q.    And that would be to ensure that the

3  Geneva price didn't get used as the basis for the

4  FUL?

5        A.    Correct.

6        Q.    And why would you do that?

7        A.    Because if the product is in the

8  available you don't want to said a FUL price on a

9  product that is not available.

10       Q.    Why not?

11       A.    Because it might not be a realistic

12  price.  That product could be unavailable for

13  three years but they're still reporting it to the

14  compendia.  So if it's not a realistic price then

15  there's no sense in setting the FUL price based

16  on that.

17       Q.    And by realistic price you mean a price

18  that's high enough that providers could acquire

19  the product in the market place?

20       A.    Correct.

21       Q.    Caraco Pharmaceuticals also has a lower

22  reported price, right, of .0569?

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                     Washington, DC

Page 428

1        A.    Correct.

2        Q.    Do you know why that wasn't used to set

3   the FUL in this case?

4        A.    No.  I'm not real sure.

5        Q.    I mean, it does look to me from the

6   notation over on the right that somebody called

7   and that was a product that was deemed to be

8   available, right?

9        A.    Correct.

10       Q.    So you have a manufacturer, anyway,

11  who's got available product at a lower published

12  price, but it wasn't used for the FUL, correct?

13       A.    Correct.  Sometimes discretion was used

14  with this too.  You might look at that price and

15  if that price still appears to be too low that it

16  would make the product available out there, then

17  you would check to see if there's another

18  manufacturer that might be a step up that's

19  closer, but that could still allow you to set a

20  reasonable FUL price.

21       Q.    I see.  So sometimes discretion was

22  used to ensure that the FUL was reasonable?

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                      March 19, 2008
                    Washington, DC

                                                    Page 429

1          A.    And available.

2          Q.    And available?

3          A.    Yeah.

4          Q.    And the reason you used that discretion

5     was to make sure that providers -- you didn't set

6     a FUL that was so low that providers couldn't

7     acquire the product on the marketplace, correct?

8          A.    Correct.

9          Q.    And so you don't know for certain, but

10    it's possible that one of the reasons that the

11    Caraco price wasn't used here was discretion was

12    exercised and it was deemed maybe that this was

13    too low?

14         A.    It could be too low or Caraco only

15    distribute to maybe limited amount of states and

16    not all states.  That's something else to keep in

17    consideration.

18         Q.    Okay.  But there was in any event a

19    manual review process and discretion exercised

20    and a choice that CMS made not to use that price,

21    correct?

22         A.    Correct.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 430

1           MR. BUEKER:  Okay.  I have I think run

2    out of tape.  So perhaps we could set this to the

3    side, have some lunch and we'll come back this

4    afternoon.

5           THE WITNESS:  Okay.

6           THE VIDEOGRAPHER:  This is the end of

7    tape 2.  Off the record at 12:25.

8              (Whereupon, at 12:25 p.m. a lunch

9    recess was taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 445

1    .16370, that we wanted to make sure that the FUL

2    price that's set is a reasonable price and that

3    we'll be assured the availability of the drug.

4    So we went up to the next lowest price.

5         Q.   And when you say reasonable, what do

6    you mean in that context?

7         A.   That we feel that the pharmacies will

8    be able to purchase this drug at the FUL price.

9         Q.   So in other words, you thought it was

10   reasonable to ignore a published price that was

11   maybe too low in CMS's view so that you

12   established a reasonable FUL, correct?

13        A.   Correct.

14        Q.   I think we can set Exhibit 5 to the

15   side.  We'll do another one that looks exactly

16   like it.  If the court reporter could mark as

17   Exhibit 6 for identification New York Counties

18   Defendants' Exhibit 6 for identification HHD 175-

19   2110.  And I do confirm that this one has a date.

20              (Exhibit NY Counties 006 was

21   marked for identification.)

22   BY MR. BUEKER:

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 446

1        Q.    Ms. Gaston, you recognize Exhibit 6 to
2    be again a printout from the FULs system?
3        A.    Correct.
4        Q.    And Exhibit 6 is dated August of 2001,
5    correct?
6        A.    Correct.
7        Q.    And this is the printout that relates
8    to establishing a FUL in this case for the 1
9    milligram strength of lorazepam?
10       A.    Correct.
11       Q.    Which I'll represent to you is another
12   one of the nine drugs that are the subject of
13   focused discovery in the New York Counties case.
14   I take it that's not your handwriting down at the
15   bottom of Exhibit 6?
16       A.    Correct.
17       Q.    That's again, Ms. Bergin's handwriting?
18       A.    Yes.
19       Q.    But you are familiar with Exhibit 6 and
20   recognize it to be a printout from the FULs
21   system that would have been the basis on which
22   CMS began its manual review of this FUL?

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 447

1        A.   Yes.

2        Q.   I want to ask you about some text

3   that's written in the middle of the page in bold

4   and it's preceded by a couple of stars.  It says

5   "FULs price not greater than another supplier."

6   Do you see that?

7        A.   Yes.

8        Q.   Is that text that the FULs system in

9   your experience would have put on a page like

10   this?

11       A.   Correct.

12       Q.   Explain to me what that means.

13       A.   I think it was checking on the

14   supplier.  It has to make sure there's at least

15   three suppliers.  And here again, I haven't dealt

16   with this for a while, so I need to refresh my

17   memory.

18       Q.   Well, let me see if we can get at it

19   this way.  Just above that text do you see a low

20   price?

21       A.   Correct.

22       Q.   And you see that it's .1999?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

```
                                              Page 448

 1        A.   Correct.

 2             MR. WINGET-HERNANDEZ:   Objection, form.

 3   I apologize.   I withdraw that objection.   I just

 4   was confused about what number you were looking

 5   at.

 6   BY MR. BUEKER:

 7        Q.   Okay.   And you see there's a number

 8   that's crossed out that's .2999 over in the left-

 9   hand side just before the bolded text we were

10   talking about?

11        A.   Correct.

12        Q.   And that -- because it's cut off,

13   perhaps it would help to refer to Exhibit 5.   But

14   that's the FUL price that the FULs system

15   calculated, correct --

16        A.   Correct.

17        Q.   -- the crossed out number .2999?

18        A.   Correct.

19        Q.   And that FUL number that's calculated

20   by the system would have been based on this low

21   price of .1999, correct?

22        A.   Correct.
```

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                    Washington, DC

Page 449

1      Q.   And if you go up and look at the list

2  of published prices above, you would agree with

3  me that there's no published price that's below

4  that .2999 number, right?

5      A.   Correct.

6      Q.   Except the one price in which the FUL

7  was based?

8      A.   Yes.

9      Q.   Or I shouldn't say based.  Was

10  calculated by the system.

11          So does that help to refresh your

12  recollection that indeed this warning, "FULs

13  price not greater than another supplier," was

14  essentially an occasion that the FULs system had

15  detected that by basing a FUL on the lowest

16  published price the FUL was being set at below

17  the next published price?

18      A.   Correct.

19      Q.   Is that a warning -- you talked the

20  last time in your last deposition about certain

21  flags that the system had to tell you and your

22  colleagues that you needed to conduct a manual

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 450

1    review.  Is this one of those flags?

2         A.   Yes.

3         Q.   And why was it important that the FULs

4    system cautioned you to look at or manually

5    review a FUL that was set in this manner?

6         A.   Because if we allowed the FUL to be set

7    at this price then it would be an availability

8    issue.

9         Q.   In other words, that if you allowed a

10   FUL to be set at this price based on this lowest

11   published price, then you'd have an availability

12   issue and that's a problem, it's not a reasonable

13   FUL?

14        A.   Correct.

15        Q.   And so that number is crossed out and a

16   different number is written in that's .5718,

17   right?

18        A.   For the FUL price.

19        Q.   For the FUL price.

20        A.   Correct.

21        Q.   And that appears to be based on from

22   the note on the bottom a United Research Labs or

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                        Washington, DC

Page 451

1    URL's WAC?

2         A.   Correct.

3         Q.   And URL's WAC was not the lowest

4    published price in this instance, right?  Because

5    we've seen for example Major Pharmaceuticals had

6    a lower published price?

7         A.   Well, I thought you meant excluding

8    that published price.

9         Q.   No.  I didn't mean that.

10         A.   Yeah.  Major's was the next lowest.

11   The next lowest was URL.

12         Q.   So what we see in Exhibit 6 is another

13   situation in which, exercising its discretion,

14   CMS chose to set a FUL not based on the lowest

15   published price but based on the next lowest

16   published price because that's what was

17   reasonable to do in terms of ensuring access,

18   correct?

19         A.   Correct.

20         Q.   And for the record, why is it that CMS

21   would have chosen to ignore the lowest published

22   price?

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

                                              Page 452

1          MS. MARTINEZ:  Objection, form.

2      A.   Because setting the FUL on the lowest

3  published price here might not allow us to have a

4  reasonable FUL price for this drug.

5      Q.   Okay.  Let me see if I can cure Ani's

6  objection.  Why would CMS have chosen to have

7  ignored the lowest published price in setting a

8  FUL for the 1 milligram lorazepam in 2001?

9          MS. MARTINEZ:  Objection, form.  Just

10  to let you know, one of my objections is to you

11  were stating that CMS is ignoring the price, the

12  characterization of ignoring.

13          MR. BUEKER:  Okay.  Didn't use?  Is

14  that better?

15          MS. MARTINEZ:  Did not use.  Yeah.

16          MR. BUEKER:  Okay.

17  BY MR. BUEKER:

18      Q.   Just for the record, why is it that CMS

19  chose not to use the lowest published price in

20  setting the FUL for lorazepam in 2001?

21      A.   Because we wanted to assure that the

22  FUL price was a reasonable price.  So we chose to

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 453

1    ignore Major's lowest price.

2         Q.   I think we can set Exhibit 6 to the

3    side.  I warned you this was going to get

4    repetitive.  May I ask the court reporter to mark

5    as New York Counties Defendants' Exhibit 7 for

6    identification a one-page document that's labeled

7    HHD 175-0009 in the bottom right-hand corner.  I

8    was looking for one that's got the best date.

9              (Exhibit NY Counties 007 was

10   marked for identification.)

11   BY MR. BUEKER:

12        Q.   Ms. Gaston, do you have in front of you

13   what's been marked as Exhibit 7 for

14   identification?

15        A.   Yes.

16        Q.   And this is, again, a printout from the

17   CMS's FUL system and it's dated in the upper

18   left-hand corner 7/24/2001?

19        A.   Correct.

20        Q.   And this is the same kind of printout

21   we've been looking at in other examples; it's

22   just that this one is now for the 500 milligrams

Gaston, Sue - Vol. II                    March 19, 2008
                   Washington, DC

Page 454

1    strength of cefadroxil?

2         A.   Correct.

3         Q.   And I'll represent cefadroxil is

4    another one of the drugs at issue in the New York

5    Counties case.

6              Is that your handwriting at the bottom

7    of Exhibit 7?

8         A.   No.

9         Q.   Whose handwriting is that is that?

10        A.   It's Cindy Bergin's.

11        Q.   But nevertheless, you're familiar with

12   the form of Exhibit 7; it's a printout from the

13   FULs system?

14        A.   Correct.

15        Q.   Can you read into the record what Ms.

16   Bergin wrote in her handwriting at the bottom of

17   the page?

18        A.   She said on 7/25 "The FUL was too low

19   at 1.2749, but when I raised it it became equal

20   to Major's AWP.  That means delete for now."

21        Q.   Can you help me understand what she was

22   doing here?

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                      Washington, DC

                                                      Page 532

1    thought was appropriate to incorporate into the

2    process of setting FULs you incorporated that

3    information?

4           A.    For the updates, yes.

5           Q.    And then annually or some other period

6    of time, at least you began annually at the

7    beginning, there were these systematic updates of

8    the entire list?

9           A.    Correct.

10          Q.    Separate and apart from that, what

11   triggered the decision to actually add a new drug

12   to the list?

13          A.    Most of the time it came out on a new

14   run that we would do.  So if we're looking at

15   updating the whole entire FUL list, that's when

16   the new drugs would show up.

17          Q.    Let me see if I understand.  So the FUL

18   system -- when you do the update of the entire

19   list, the FUL system would go back to Orange Book

20   and identify all the drugs that were eligible and

21   also pull in the published prices.  So at that

22   time if a drug had gone generic and was now --

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

                                                    Page 533

 1    met the minimum criteria, it would get pulled in

 2    and you would at least get one of the printouts

 3    we've been looking at like Exhibit 18?

 4         A.   Correct.

 5         Q.   And then you begin a manual review

 6    process at that point to decide whether or not to

 7    set a FUL?

 8         A.   If it was necessary.  It might have

 9    enough information we wouldn't have to do a

10    manual review.

11         Q.   Okay.  And there may also have been

12    other instances in which you got the information

13    and decided even though the drug met the minimum

14    criteria in the regulation, for some other reason

15    it wouldn't result in a cost savings or the FUL

16    that would be derived on the basis of the

17    published prices would be too low, you might

18    decide not to set a FUL at that point even though

19    it was eligible?

20         A.   Yes, if there was a reason not to set

21    it.

22         Q.   Okay.  It sounds like in terms of

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 534

1    setting brand-new FULs at the very least they

2    would have been picked up as a part of the

3    complete or the entire update process?

4         A.   Correct.

5         Q.   And at that point, just like with any

6    of the other FULs, CMS would have made a

7    determination as to whether it made sense to add

8    a FUL, whether it was reasonable to add a FUL at

9    that time?

10        A.   Correct.

11        Q.   Can you remember instances in which a

12   drug was new, came on -- a new drug was

13   identified as a result of the annual update

14   process and CMS decided not to set a FUL?

15        A.   I can't remember that.

16        Q.   You can't remember specific examples?

17        A.   Correct.

18        Q.   But don't doubt that it happened?

19        A.   It could have happened.

20             MS. MARTINEZ:  Objection, form.

21        Q.   Is there anything else other than

22   having the annual update or receiving information

96c95944-eee1-42b5-b77a-388fc0daf3d5