# Exhibit E

Sexton, Gail                                                         May 20, 2008

Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| IN RE: PHARMACEUTICAL | ) MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) CIVIL ACTION NO. |
| PRICE LITIGATION | ) 01-CV-12257-PBS |

- - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:                        )
The City of New York v. Abbott Labs., et al.     )
(S.D.N.Y. No. 04-CV-06054)                       )
County of Suffolk v. Abbott Labs., et al.        )
(E.D.N.Y. No. 03-CV-229)                         )
County of Westchester v. Abbott Labs., et al.    )
(S.D.N.Y. No. 03-CV-6178)                        )
County of Rockland v. Abbott Labs., et al.       )
(S.D.N.Y. No. 03-CV-7055)                        )
[Caption continues on Next Page]                 )

Washington, D.C.

Monday, May 20, 2008

9:30 a.m.

VIDEOTAPED DEPOSITION OF GAIL SEXTON

Page 88

1    A.   As a cross-check we did have those
2    ratings in our software system.
3    Q.   Okay.  Other than the online Orange
4    Book and your software system, was there anywhere
5    else you would have gone to look to see if
6    something was therapeutically equivalent?
7    A.   Not no, not to my knowledge.  Just the
8    compendia or the FDA sources.
9         MR. BUEKER:  Can I ask the court
10   reporter to mark as Sexton Exhibit 9 for
11   identification a one-page document Bates labeled
12   HHD 175-1058?
13        (Exhibit Sexton 009 was marked for
14   identification.)
15   BY MR. BUEKER:
16   Q.   Ms. Sexton, let me know when you've had
17   a chance to look at Sexton Exhibit 9.
18   A.   Okay.  (Reading.)  Okay.
19   Q.   Exhibit 9, first of all, appears to me
20   to be a printout from the federal upper limited
21   system with your handwriting on it.  Is that
22   true?

Sexton, Gail                                                May 20, 2008
                           Washington, DC

Page 89

1      A.   Yes.
2      Q.   And Exhibit 9 pertains to the 0.09
3   microgram albuterol inhaler, the same drug we
4   were talking about in Exhibit 8, correct?
5      A.   Correct.
6      Q.   And just so we understand what's going
7   on at the top of Exhibit 8, it looks like the WAC
8   for IVAX's albuterol inhaler has been crossed
9   out; is that correct?
10     A.   Yes.
11     Q.   And written to the right of that it
12  says "new WAC" and then "0.2911."  Do you see
13  that?
14     A.   Yes.
15     Q.   What significance, if any, does that
16  notation have to you?
17     A.   Well, the new WAC would be used to set
18  the FUL.  It would change from the original WAC
19  to increase the FUL.  And from memory we had a
20  lot of concern raised from the pharmacy community
21  on the availability of this drug.  And so further
22  evaluation was done to determine the exact

Page 90

1   availability in the market, prices and
2   availability.
3        Q.   And it looks like from Exhibit 9 that
4   one of the things that you did to determine
5   availability in the marketplace was to call IVAX
6   and ask IVAX about its WAC; is that correct?
7             MR. FAUCI:  Objection, form.
8        A.   I cannot recall, but that would have
9   been -- either that or contacting First Databank,
10  Rojan or someone.  But more than likely I called
11  IVAX.  But it was determined that there was a
12  different WAC for that drug.
13       Q.   Down in the bottom of the page there's
14  a column labeled "contact."  Do you see that?
15       A.   Okay.  Yes.  Then I did contact them.
16  Mm-hmm.
17       Q.   So you contacted IVAX and learned that
18  their --
19       A.   Correct.
20       Q.   -- WAC price had been increased; is
21  that correct?
22       A.   Correct.

Page 92

1   limit, was set on the IVAX NDC.  And we had three
2   WACs of the available suppliers there that --
3   three WACs that were less than the calculated
4   FUL.  And the calculated FUL was less than the
5   AWP.
6       Q.   And again, why did you make those
7   comparisons?
8       A.   Well, that was just the notation that
9   we -- a documentation that was done as far as the
10  WACs being -- how many WACs less than the FUL.
11  FUL less than AWP because it would not have been
12  -- it would not have rendered savings for the
13  Medicaid program to set a FUL that was higher
14  than the AWP, according -- per our prior
15  conversation on that.
16      Q.   And the notation about WACs, why was
17  that?
18      A.   To note that there were at least three
19  NDCs that were available less than the calculated
20  FUL.
21      Q.   Okay.  There's a -- under the chart in
22  bold there's a typed notation which I haven't

Page 93

1    seen before which starts with three stars and
2    then says "FULs price not greater than another
3    supplier."  Do you see that?
4         A.   Yes.
5         Q.   Is that generated by the FULs system?
6         A.   Yes.
7         Q.   In what circumstances is that notation
8    generated?
9         A.   I'm interpreting that to mean that the
10   calculated FULs price was not higher than the
11   NDCs listed, the WAC prices.
12        Q.   So in other words, there's not another
13   WAC price -- other than the WAC price that's used
14   to set the federal upper limit as calculated by
15   the system, there's not another WAC price that's
16   lower than that FUL calculated by the system; is
17   that correct?
18             MR. FAUCI:  Objection, form.
19        A.   Right.  In the system, but as you can
20   see there was further manual interventions done
21   on this drug from other suppliers that the FULs
22   system would not take into account when they

Page 94

1    would -- when the FULs system would show that
2    message.
3        Q.   Okay.  And why do that further manual
4    intervention?
5        A.   Well, I learned -- and it could have
6    been from the paper compendia that I did the
7    second checks on I learned of other suppliers
8    that were marketing this drug.  So I tried to
9    determine if they were still marketing and at
10   what price to see exactly what the availability
11   was in the market, because there was a lot of
12   concern raised by the pharmacy community about
13   this drug and that it was not available.
14       Q.   At the federal upper limit price?
15       A.   Or that it was even not available,
16   adequate supply.
17       Q.   Is the notation "FULs price not greater
18   than another supplier" something that in your
19   experience is automatically generated by the
20   system?
21       A.   I really don't think I ever noticed
22   those messages or the messages that would come

Page 95

1  out.  They come out kind of in a different color
2  or small at the bottom of the system when you're
3  looking at the screen.  And that's not something
4  I would generally look at or look for.
5       Q.   Okay.  So it wasn't a flag that caused
6  you to do anything differently than would have
7  been done with other drugs for which you were
8  establishing a federal upper limit?
9       A.   No, it would not have.
10      Q.   But is it fair to say then that there's
11 a manual review process that you undertake with
12 regard to each federal upper limit that you
13 established?
14           MR. FAUCI:  Objection, form.
15      A.   I wouldn't say each.  I would say in
16 cases where I saw that manual intervention could
17 have changed the price, changed the federal upper
18 limit, or where it appeared that perhaps the
19 criteria was not met and that further
20 intervention should have been taken.
21      Q.   How would you identify those situations
22 in which manual intervention might change the FUL

Page 96

1  price?
2      A.   Could you repeat that?
3      Q.   Sure.  How would you identify -- what
4  criteria would you use to identify situations in
5  which your manual intervention might change the
6  FUL price that was set?
7      A.   Well, for instance, if I saw a price
8  that was -- that looked to be an outlier price,
9  maybe far lower than the other prices, I may call
10 that supplier to determine was the NDC available
11 at that price, so as not to set an unfairly low
12 price on an outlier that was not available.  If I
13 saw -- comparing to the paper compendia, if I saw
14 that there were other suppliers other than what
15 was noted in the system then I would call those
16 suppliers.
17          Is that what you mean?
18     Q.   Yeah.  I'm just trying to understand
19 the criteria that you used to decide when you'd
20 want to manually intervene in the process.
21     A.   Right.  If the paper compendia maybe
22 showed a different amount of suppliers and there

Sexton, Gail                                                May 20, 2008
                            Washington, DC

Page 137

1   would be important to make sure they are
2   available, if possible.  If we could possibly
3   determine that.
4        Q.   And if you could possibly determine
5   it's important to make sure they're available at
6   the federal upper limit price, correct?
7             MR. FAUCI:  Objection, form.
8        A.   Not at the federal upper limit price,
9   but at the published price.  That would be -- the
10  price that we would verify if we called a
11  supplier would be their published price, not the
12  federal upper limit price, or that drugs were
13  available at the federal upper limit price.
14       Q.   Would you agree with Mr. McClellan in
15  the next sentence that "New drugs may be in
16  limited supply or unavailable nationwide"?
17       A.   Would I agree with that statement?
18       Q.   Yes.  In your experience.
19       A.   I couldn't answer that in my
20  experience.
21       Q.   Would you agree with Mr. McClellan in
22  the next sentence that "CMS manually verifies

Sexton, Gail                                           May 20, 2008
                        Washington, DC

```
                                                      Page 138
 1    that the FUL drugs continue to be available for
 2    manufacturers and suppliers to assure current
 3    market availability"?
 4              MR. WINGET-HERNANDEZ:  Objection, form.
 5    You need to read that again.
 6         A.   When possible we would manually verify
 7    that drugs were available.
 8         Q.   That was one of the reasons you
 9    undertook the manual verification process that
10    we've been talking about this morning?
11         A.   Yes, correct.
12         Q.   One of the other things that you've
13    tried to do through the manual verification
14    process is, as Mr. McClellan states in the second
15    sentence, to make sure that they're actually
16    available in the marketplace before establishing
17    a federal upper limit, correct?
18              MR. FAUCI:  Objection to form.
19         A.   It says before a drug is placed on the
20    FUL list, right, it is important to make certain
21    that the products are actually available in the
22    marketplace, yes.  And that would be the reason
```

Page 139

1   that we would attempt manual verifications on the
2   drugs.
3        Q.   Okay.  You mentioned earlier
4   maintaining a FUL follow-up book?
5        A.   Mm-hmm.
6        Q.   In what form?  Hard copy, electronic?
7        A.   It's a hard copy separated into the
8   reason that the FUL could not be applied at the
9   time:  We didn't have the proper amount of A-
10  rated drugs, if we did not have three suppliers
11  or if the FUL was higher than AWP.
12       Q.   Are any of the documents we've looked
13  at today from that book?
14       A.   No.  This was a handwritten book that I
15  compiled just so that each month when -- or each
16  quarter when I would go WAC to publish a new
17  federal upper limit update I could re-check
18  multiple-source drugs that didn't previously
19  qualify for a FUL but may qualify for a FUL at a
20  future date.
21       Q.   Were you asked to provide a copy of
22  that book to the lawyers from CMS or DOJ in