Exhibit F

Devor, Harris L.                                December 9, 2008
                        New York, NY

Page 1

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

        -------------------------------X

        In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

        AVERAGE WHOLESALE PRICE         )  Civil Action

        LITIGATION                      )  01-12257-PBS

        -------------------------------X

        THIS DOCUMENT RELATES TO:       )  Judge Patti B.

        THE CONSOLIDATED NEW YORK       )  Saris

        COUNTY ACTIONS                  )  (Case Pending

        -------------------------------X   in D. Mass.)


                    December 9, 2008

                        9:18 a.m.


             Videotaped deposition of HARRIS L.

        DEVOR, taken by Defendants, at the offices of

        Ropes & Gray LLP, 1251 Avenue of the Americas,

        New York, New York,, before Brandon Rainoff, a

        Federal Certified Realtime Reporter and Notary

        Public of the State of New York.

Devor, Harris L.                          December 9, 2008
                        New York, NY

Page 138

1    as to the drugs that are shown on the exhibits to
2    your Rule 26 statement and that's it?
3         A.   I am not aware of -- well, when you say
4    "and that's it," I mean, obviously --
5         Q.   No other drugs?
6         A.   No other drugs.  To the best of my
7    knowledge, the nine drugs that I have been asked
8    to analyze are the ones that I will opine on.
9         Q.   As reflected in the exhibits to your
10   Rule 26 statement?
11        A.   I believe so.  I mean, as I recall
12   there was an exhibit for every one of the nine
13   drugs, so --
14        Q.   You used a proxy WAC in certain cases,
15   right?
16             MS. CICALA:  Object to form.
17        A.   Did I use that term, proxy WAC?  Maybe
18   I did, I don't remember.
19        Q.   Look at Exhibit 14.01 if you would.
20        A.   The exhibits only go to 10 or 11.
21        Q.   No, I'm sorry, in your -- in Exhibit 3,
22   your Exhibit 14.01.

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                              December 9, 2008
                        New York, NY

                                                    Page 139

 1          A.    Okay.  14 -- give me it one more time?
 2     Sorry.
 3          Q.    14.01.
 4          A.    I'm with you.
 5          Q.    You see down there you use the word
 6     "proxy"?
 7          A.    Not yet.
 8          Q.    In the footnote A you say --
 9          A.    Yes, at least in this context it is
10     meant to say a substitute, it's meant -- that's
11     what the word is meant to be.  I don't know if
12     that was your question, but --
13          Q.    When did you decide to use a proxy for
14     a WAC?
15          A.    I think it is described in this
16     footnote A, it says exactly when it was used.  I
17     mean, I would have to read it but I think that's
18     exactly what the purpose of the footnote was, to
19     say when we used it.
20          Q.    So when a WAC was negative you used a
21     proxy?
22          A.    Yes, I mean, it doesn't make sense to

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                                    December 9, 2008
                          New York, NY

Page 140

1    have a negative WAC if you think about it,

2    although there is an explanation as to why in the

3    computation you would end up with a negative

4    number, I mean, that makes sense.

5         Q.   Why would you end up with a negative

6    WAC?

7         A.   Well, just as a hypothetical example,

8    assume a product had run its course and it was,

9    you know, not being sold or whatever, that

10   product's life was over, because generally

11   rebates, credits, charge-backs, that sort of

12   thing sort of comes after the original sale, it's

13   not -- obviously if the sales have stopped but

14   the credits, rebates and/or charge-backs are

15   continuing for another couple months or quarters,

16   you would only end up with a negative number as

17   opposed to -- so that's why you logically might

18   end up with a negative number.

19        But it doesn't make sense that the WAC

20   would be negative, I mean, it actually would be

21   if you computed it that way, but obviously that's

22   nonsensical to include a WAC that's negative for

Devor, Harris L.                                    December 9, 2008
                          New York, NY

                                                              Page 141

1    those reasons.

2         Q.    Let me just make sure I understand.

3    Your hypothetical which you are positing is a

4    quarter in which the company has stopped largely

5    selling the drug and what's rolling back are just

6    charge-backs and other rebates and stuff so the

7    calculated number turns out negative?

8         A.    That would be an example.  Or, say

9    there is a significant reduction in sales over

10   time of a product for whatever reason, maybe not

11   stopped, but it's significant, yet -- yet there

12   might be significant charge-backs relating to

13   periods or rebates or credits that relate to

14   periods prior to that which just may be in excess

15   of the amount of sales for that period.  So,

16   again, that would yield a negative WAC.

17        Q.    You also, if you look at Exhibit 14.02,

18   use proxies for AWP when you have a negative AWP,

19   when you calculate a negative AWP, correct?

20        A.    Right, and I see the last line item on

21   the page is actually a negative AWP, correct.

22        Q.    Is there any other case other than when

Devor, Harris L.                          December 9, 2008
                        New York, NY

Page 142

1    you calculate a negative WAC or AWP that you use

2    a proxy?

3         A.   Other than when it is negative?

4         Q.   Yes.

5         A.   Yes, well, the description, at least, I

6    mean, there is a lot of exhibits here, so I would

7    have to go through it, but the description

8    indicates also if there was an outlier.

9              So, for instance, let's assume the AWP

10   was -- or the WAC was two dollars, $1.98, $1.80

11   whatever, and then all of a sudden it was $453.

12   Well, obviously with respect to that data there

13   is something wrong with that and that would

14   distort the whole analysis.

15             So in that case, and I can't recall

16   whether we actually had those cases, we may have,

17   given how much, you know, how many drugs and how

18   many periods we analyzed, there could have been

19   one or two.  With respect to those we would have

20   also used a proxy which I believe in both cases

21   would have been the calculated AWP or WAC just

22   prior to that, I believe.

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                                    December 9, 2008
                        New York, NY

Page 143

1       Q.   What was your standard for determining

2  when something was an outlier and that you would

3  use a proxy?

4       A.   I think that was only if it was -- the

5  answer -- I don't even remember having any so it

6  is hard for me to say my standard, but if you

7  point me to one I would be glad to comment on it

8  as to why it got taken out.

9       Q.   Do you know if you have applied a

10 consistent standard across manufacturers when

11 deciding whether to use a proxy?

12      A.   I would think I did, assuming I even

13 did use a proxy for the second part.  Certainly

14 with respect to the negative AWPs and WACs that

15 we computed we would have been consistent, yes.

16      Q.   We can put Exhibit 3 to the side for a

17 minute.

18           I want to return to paragraph 15 of

19 your Rule 26 statement.  You state in the first

20 sentence of paragraph 15 your understanding of

21 the term AWP, correct?

22           MS. CICALA:  Object to form.

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                                    December 9, 2008
                          New York, NY

                                                          Page 144

1          A.   Well, I say it in the entire paragraph,

2    I wouldn't -- it's not just the first sentence,

3    but --

4          Q.   You state in the first sentence:  "AWP

5    is defined as the average price which a

6    wholesaler or distributor would charge a pharmacy

7    or other provider for a particular product."

8               Correct?

9          A.   Right, it does say that and it is

10   referenced to a First DataBank document.

11         Q.   You cite the First DataBank document in

12   Judge Saris' so-called plain meaning decision

13   interpreting the Medicare statute as support for

14   your interpretation of the term AWP, correct?

15              MS. CICALA:  Objection to the

16   characterization and form.

17         A.   I need the question back, please.

18              (Question read)

19         A.   I mean, I also have a basic

20   understanding of what the words "average

21   wholesale price" means.  I am an accountant and

22   accountants would use all three of those terms,

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                          December 9, 2008
                        New York, NY

Page 162

1      Q.    Okay.   So is it your opinion consistent

2   with what's stated in your Rule 26 statement in

3   paragraph 17 that normally you would expect to

4   see AWPs that would be higher than or I guess

5   equal to WAC?

6      A.    I mean, in general I still -- I stand

7   by that, yes.   I mean, that is that if you

8   understand the chain correctly, a manufacturer

9   sells to a wholesaler, presumably the wholesaler

10  would mark it up at least somewhat to make a

11  profit, so therefore the price being paid by the

12  provider would be somewhat more than the

13  wholesaler paid the manufacturer.   I mean, that

14  is for the most part the way I would think it

15  would work.   There might be exceptions, but I

16  think overall I would expect that.

17     Q.    That's -- you characterize that as your

18  presumed understanding in the last sentence of

19  paragraph 17 of your Rule 26 statement, right?

20     A.    I need to read the sentence.

21           Right, that's there to say if in fact

22  AWP turns out to be less than WAC, it's just

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                                    December 9, 2008
                          New York, NY

Page 163

1    pointing out the fact that I could only use the

2    data that the defendants gave us, and if there

3    are issues with the data, I can't -- I mean, I

4    can't know that or I don't have enough

5    information to adjust for it.

6              So, therefore, the purpose of that is

7    to say, hey, look, you would normally expect AWP

8    to be greater than WAC, but keep in mind I can

9    only use the data that I had been provided with,

10   so that's what I --

11        Q.   So your expectation when you set out to

12   do the AWP and WAC calculations that you did was

13   that you turn up by and large calculations where

14   the AWP was higher than the WAC, correct?

15             MS. CICALA:  Object to form.

16        A.   You are asking if when I began the

17   project I had that expectation in mind, is that

18   really the question?

19        Q.   Yes.

20        A.   I don't know that it was consciously in

21   my mind because I don't know that it is relevant

22   to what I did.  It is just an understanding of

Devor, Harris L.                         December 9, 2008
                        New York, NY

Page 164

1  the way the chain works, and that generally in

2  any chain the provider is paying more than the

3  wholesaler paid the manufacturer because usually

4  the wholesaler is in business to make a profit.

5       Q.   So if you had stopped to think about it

6  at the outset of the project, what would your

7  expectation have been?

8            MS. CICALA:  Object to form.

9       A.   Overall that the AWP probably would

10 have been higher than the WAC in most cases.

11 That's what my expectation would have been.

12      Q.   Do you know in what percentage of the

13 cases where you have calculated a WAC and an AWP

14 for a product it turns out that your calculated

15 WAC is higher than your calculated AWP?

16      A.   No, nor would it be relevant to what I

17 was asked to do.  Why would I go through this

18 computation?

19      Q.   You didn't make a comparison as a

20 sanity check, for example, on your calculations?

21           MS. CICALA:  Object to form.

22      A.   We looked at the items overall but, you

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L.                    December 9, 2008
                        New York, NY

                                              Page 165

1   know, there is an awful lot of data here that we

2   sort of crunched to come up with this and the end

3   result is pretty big.  So, I mean, if you want to

4   point me to something I would be glad to look at

5   it.  If for some reason you think it is out of

6   whack, I mean, I'd be glad to -- no pun intended

7   -- I would be glad to look at it.

8       Q.   I'm just trying to ascertain what you

9   did to kind of quality check the data.  Did you

10  do --

11      A.   Sure.

12      Q.   -- that kind of a comparison where you

13  said:  Are there instances in which my WAC is

14  higher than my AWP and does that make sense?

15      A.   We did a sanity check, I believe, as

16  you described it, and that would have been one

17  thing which we would have probably noted, in

18  addition to other items, any other items that

19  might have looked unusual for other circumstance

20  -- for other reasons.  Yes, we definitely looked

21  at this stuff before it went out.

22      Q.   But you don't know in what percentage

6ce6649f-9ebc-40bd-97cc-2f4f880ddb84

Devor, Harris L. - Vol. II                December 10, 2008
New York, NY

Page 343

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE         )  Civil Action

LITIGATION                      )  01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:       )  Judge Patti B.

THE CONSOLIDATED NEW YORK       )  Saris

COUNTY ACTIONS                  )  (Case Pending

-------------------------------X   in D. Mass.)


               December 10, 2008

                  9:10 a.m.


          Continued videotaped deposition of

HARRIS L. DEVOR, Vol. II, taken by Defendants,

at the offices of Ropes & Gray LLP, 1251 Avenue

of the Americas, New York, New York, before

Brandon Rainoff, a Federal Certified Realtime

Reporter and Notary Public of the State of New

York.

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 436

1        A.   I would gain an understanding as to why

2   it's a negative number because I would presume

3   that we are not paying wholesalers to buy our

4   product, okay, and that therefore the wholesalers

5   are in fact paying us to buy our product and that

6   we are in business to be charging someone as

7   opposed to paying them, and therefore I would try

8   to understand how that can be a negative number.

9        As I testified yesterday, I believe,

10  it's perfectly reasonable and logical to have a

11  negative number sometimes if in fact towards the

12  end of the course of the product, that it's run

13  its course and it is not any longer used or

14  whatever, that because of the way credits and

15  charge-backs and rebates work, especially charge-

16  backs, those amounts are often paid after the

17  original transaction.

18        So that if the drug ceases to be sold

19  or is decreasing greatly over some period of time

20  such that in some months -- some months while you

21  are issuing charge-backs you either have very

22  little or no sales, that number could be

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II          December 10, 2008
                   New York, NY

Page 437

1    negative.

2           So having said all that in your

3    hypothetical, once I came to that, assuming that

4    was the reason, I would try to find a proxy for

5    what the product was really selling for.  And in

6    this analysis, which is no longer your

7    hypothetical but my analysis, we took as a proxy

8    the most recent month that wasn't negative.

9           Q.   So when you would reach the point where

10   the analysis yielded a negative number and you

11   were running this at Mylan as we described in the

12   hypothetical using your methodology and coming up

13   with the same numbers that are in your report,

14   when you get to the -- when you get the report

15   that says the WAC for this quarter is a negative

16   $6.98 --

17          A.   Based on the computations that I would

18   have done.

19          Q.   Right.  You would not send to First

20   DataBank the negative $6.98, would you?

21          A.   No, I mean, the number --

22          Q.   Okay.

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                 December 10, 2008
                        New York, NY

Page 438

1        A.    No, let me explain.  I said no but --

2        Q.    That's all I need, that's all I need.

3        A.    Well, but I would like to explain my

4   number.

5        Q.    There is no need to explain any more,

6   you said no.

7        A.    I thought I was in the control of the

8   answers.

9        Q.    You were wrong, see?

10            MS. CICALA:  Mr. Escobar --

11            THE WITNESS:  You lied to me, you told

12   me they are my answers and not his.  You said

13   it's his questions.

14   BY MR. ESCOBAR:

15        Q.    You answered the question no, that's

16   all I need from that answer.  If your lawyer

17   wants to ask you questions based on this they can

18   ask you all kinds of stuff and let you explain to

19   your heart's content.  Right now you said no.

20            MS. CICALA:  Mr. Escobar, the court and

21   jury who watch this tape will want the witness's

22   answer and a complete record and will see your

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                           New York, NY

Page 471

1    NDCs, right?

2          A.   Assuming Barr gave us AMP data, I'm not

3    looking at the particular sheets, but assuming

4    they did, we did.  Because not everybody did.

5          Q.   Okay.  We'll look at your sheets in

6    just a minute.  And the sheets you are referring

7    to for Barr are Exhibit 5 to your Rule 26

8    statement.

9               Are you aware of that or should we pull

10   out your --

11         A.   Exhibit 5 through 17, and I do believe

12   Barr was the first one so it might be Exhibit 5.

13         Q.   Okay.

14         A.   Actually it is the first page, right?

15   So it is Exhibit 5.

16         Q.   Okay.  Normally AWP would be higher

17   than WAC, right?

18              MS. CICALA:  Objection, asked and

19   answered.  Objection to form.

20         A.   I did already answer that, but I will

21   be glad to answer it again if that's what you are

22   asking me to do.  I mean, I'm not going to change

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II              December 10, 2008
                        New York, NY

Page 472

1    my answer.  Would you like me to repeat the

2    answer?

3         Q.   Mr. Devor, normally AWP would be higher

4    than WAC, right?

5              MS. CICALA:  Same objection.

6         A.   Same answer.

7         Q.   Let's turn to paragraph 17 of your Rule

8    26 statement.  It's on page seven.  Let me know

9    when you have it.

10        A.   I have it.

11        Q.   Do you see right in the middle of

12   paragraph 17 it says:  "Normally AWP would be

13   higher than WAC."

14             Do you see that?

15        A.   I do see it.

16        Q.   That would be your expectation, right?

17             MS. CICALA:  Objection, asked and

18   answered.

19        A.   The answer is the same.  As I said

20   before, generally that would be the case, but it

21   wouldn't surprise me if it was the other way

22   around and I gave several examples that might

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

1    yield to that.  That is, the provider was paying

2    -- I hate to be repeating all this -- but the

3    provider bought directly from the manufacturer at

4    a price that was equal to or less than the

5    wholesaler would buy that from, and I'm sure

6    there are certain large providers that in fact do

7    that.

8            So, therefore, I shouldn't say I'm

9    sure, I would think that -- it would surprise me

10   if there were.  So, therefore, that's not an

11   absolute, but I think overall I would expect AWPs

12   to be greater than WAC.  That's why it says

13   normally.

14       Q.   And the reason you would expect that is

15   so that wholesalers and distributors would profit

16   from selling the products they obtained from the

17   manufacturer, right?

18       A.   Which is -- I guess that's the same

19   thing as saying that the wholesalers are in

20   business to make money and they buy it at one

21   price and presumably mark it up and sell it down

22   the chain to -- at a higher price or else why are

Devor, Harris L. - Vol. II                December 10, 2008
                         New York, NY

                                                    Page 474

1    they in business?

2         Q.    Because or else they would be losing

3    money, right?

4              MS. CICALA:  Objection to the form.

5         A.    If they -- is the question if they sold

6    the product at a price that was less than the

7    price they paid for it would they lose money?

8    The answer is that's the way it works, yes.

9         Q.    If the AWP were lower than the WAC, the

10   wholesaler could lose money on the transaction,

11   right?

12             MS. CICALA:  Objection to form, assumes

13   facts not in evidence.

14        A.    Well, but in my example it would be

15   perfectly understandable if the AWP was less than

16   WAC and everybody made money and that is -- let's

17   assume for a moment that in the -- the

18   transaction is that the generic -- that a --

19   sorry, that a provider purchased directly from a

20   manufacturer at a price equal to or less than

21   what the wholesaler might buy that and resell it

22   at.

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II          December 10, 2008
                    New York, NY

```
                                           Page 479
 1    BY MR. BROWN:
 2         Q.   Mr. Devor, the court reporter has
 3    handed you Exhibit 17.  I'll represent to you
 4    that Exhibit 17 is pages 5.04, 5.05 and 5.06 from
 5    your Rule 26 statement.
 6              Do you have any reason to disagree with
 7    that?
 8         A.   I do not.
 9         Q.   Exhibit 17 shows your calculations for
10    Barr NDC 58210, right?
11         A.   It does.
12         Q.   And the layout in Exhibit 17 is similar
13    to the layout in Exhibit 16, right?
14         A.   That's correct.
15         Q.   Let's start with Exhibit 16 for now.
16              I want you to compare the pages marked
17    5.01 and 5.02, okay?
18         A.   Okay.
19         Q.   Those -- the 5.01 is the page that
20    shows your estimated WAC, right?
21         A.   That's correct.
22         Q.   And 5.02 shows your estimated AWP,
```

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                    New York, NY

                                                      Page 480

1    right?

2         A.    That's correct.

3         Q.    Comparing your estimated WACs on 5.01

4    with your estimated AWPs on 5.02, you will agree

5    with me that for many of the quarters your

6    estimated AWP is below your estimated WAC, right?

7         A.    I do see that.  Let me just make sure

8    the line items -- yes.

9         Q.    So, for example, let's look at the

10   fourth quarter of 1999.  Do you see that?

11        A.    I do.

12        Q.    Your estimated WAC for that quarter is

13   $207.22, right?

14        A.    Correct.

15        Q.    Your estimated AWP for the same quarter

16   is $24.09, right?

17        A.    That's correct.

18        Q.    That's a difference of over $180,

19   right?

20        A.    It is.

21        Q.    In that quarter your estimated AWP --

22   strike that.

                Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. II                December 10, 2008
                        New York, NY

Page 481

1           Based on your calculations, in that
2      quarter the wholesaler was paying $207.22 to
3      purchase this particular NDC from Barr, right?
4           MS. CICALA:  Object to form.
5      A.    The cost to the wholesaler would --
6      this indicates that based on Barr's data, that
7      was the cost to the wholesaler for the -- average
8      cost to the wholesaler net for the last -- for 12
9      months prior to that.  That's what it says.
10          Q.    So that cost to the wholesaler for the
11     fourth quarter of 1999 for Barr NDC 58202 based
12     on your calculations was $207.22, right?
13          MS. CICALA:  Object to form.
14     A.    Again, using the data that was
15     supplied, the answer is yes.  The data that was
16     supplied is what I meant to say.
17          Q.    And the cost to the provider during the
18     fourth quarter of 1999 for Barr NDC 58202 based
19     on your calculations was 24.09, right?
20          MS. CICALA:  Object to form.
21     A.    That's what it says, yes.
22          Q.    Your estimated AWPs for NDC 58202 are

621ea04f-04a6-4633-9643-876153f7b957

Devor, Harris L. - Vol. III                December 11, 2008
                          New York, NY

Page 643

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re: PHARMACEUTICAL INDUSTRY ) MDL No. 1456

AVERAGE WHOLESALE PRICE        ) Civil Action

LITIGATION                     ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:      ) Judge Patti B.

THE CONSOLIDATED NEW YORK      ) Saris

COUNTY ACTIONS                 ) (Case Pending

-------------------------------X   in D. Mass.)


          December 11, 2008

             9:05 a.m.


     Continued videotaped deposition of

HARRIS L. DEVOR, Vol. III, taken by Defendants,

at the offices of Ropes & Gray LLP, 1251 Avenue

of the Americas, New York, New York, before

Brandon Rainoff, a Federal Certified Realtime

Reporter and Notary Public of the State of New

York.

Devor, Harris L. - Vol. III          December 11, 2008
                    New York, NY

Page 750

1        Q.    Do you know of any marketing data that

2   Par has in-house that you don't have at this

3   point?

4             MS. CICALA:   Objection to form.   The

5   question is vague.

6        A.    Do I specifically know that Par has

7   certain marketing data that it did not give me,

8   is that in essence the question?

9        Q.    Correct.

10       A.    I have no specific understanding of

11  that, no.

12       Q.    Do you have -- as you sit here today,

13  can you tell me why there is an AWP listed for

14  this product under your column entitled estimated

15  AWP, only lists four quarters and not all the

16  others?  Can you tell me for a fact what

17  happened?

18       A.    Not without going back to the sheets

19  themselves, the aggregation tables to determine

20  the basis for why that occurred, the reasons for

21  why that occurred.  I mean, this is not a memory

22  test.

Devor, Harris L. - Vol. III          December 11, 2008
                    New York, NY

Page 751

1        Q.   Can you do that for me right now, then?

2        A.   I don't know if I have the Par sheets

3   with me or whether you brought them, the

4   aggregation tables.

5        Q.   Please take a look in your own

6   materials and let me know.

7        A.   If I have Par with me.

8             (Pause)

9        A.   I don't have it with me.  But I would

10  think if you go back to the aggregation tables

11  you can determine, there could have been data

12  there that was not understood, whether there

13  wasn't enough information to determine class of

14  trade, there could have been a whole lot of

15  reasons why.

16       Q.   You don't know as you sit here?

17       A.   Not without looking at the aggregation

18  table itself.

19       Q.   If you compare now the four quarters of

20  AWPs in Exhibit 10.02 that we just identified,

21  your estimated AWPs versus the estimated WACs

22  presented in the -- for the same quarters in the

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III                December 11, 2008
                         New York, NY

                                                    Page 752
 1    prior exhibit, Exhibit 10.01 -- are you with me?

 2         A.    Yes.

 3         Q.    The AWPs are here again significantly,

 4    very significantly lower in most instances than

 5    the estimated WACs, will you agree with me on

 6    that?

 7              MS. CICALA:  Object to form.

 8         A.    That's correct.

 9         Q.    I think we looked at other examples,

10    but the fact that your estimated AWPs are

11    significantly lower than your estimated WACs for

12    this product, does this set off any alarms in

13    your head as to the appropriateness or viability

14    commercially of the use of the estimated WACs and

15    AWPs that you present in these exhibits?

16              MS. CICALA:  Objection to form.

17         A.    I need that back.

18                   (Question read)

19         A.    I don't understand the question with

20    respect to the commercial viability of -- I don't

21    understand what you mean by that in terms of WAC

22    or an AWP.  I don't understand.

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III          December 11, 2008
                          New York, NY

Page 753

1          Q.   Well, what is your understanding of
2    Par's use in the commercial world of wholesale
3    acquisition cost?
4               MS. CICALA:   Object to form, beyond the
5    scope.
6          A.   It is beyond the scope.  I do know --
7    and it is not relevant to my computations, but I
8    do know that WACs and AWPs are generally amongst
9    other -- perhaps for other uses, but they are
10   generally used by -- in the reimbursement process
11   by Medicare and Medicaid.
12         Q.   Do you have any understanding as to
13   whether Par makes use of wholesale acquisition
14   costs in the way it bills its customers?
15              MS. CICALA:   Objection, beyond the
16   scope.
17         A.   I haven't studied that, no.  I don't
18   have knowledge of that.
19         Q.   Do you have any understanding as to
20   whether standard industry 2 percent prompt pay
21   discounts are typically tied to WAC in Par's
22   dealings with its own customers?

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III                December 11, 2008
                              New York, NY

Page 791

1    the same NDC for which we have Exhibit 10.18 in

2    your report?

3         A.   I do.

4         Q.   The eighth column over under the word

5    "FUL" in Exhibit B27 of the complaint has the

6    word "none"?

7         A.   Yes.

8         Q.   Do you have any understanding as to the

9    significance of that column?

10        A.   No, I didn't prepare it, nor I think I

11   testified before, I am not sure I have ever seen

12   it.

13        Q.   Have you ever heard the term FUL fraud

14   drug in this litigation?

15        A.   Give it to me one more time?

16        Q.   FUL fraud drug, have you heard that

17   term used at all?

18        A.   No.

19        Q.   Do you have any understanding one way

20   or another as to whether this NDC is an alleged

21   FUL fraud drug?

22        A.   I don't even know what the term means.

Devor, Harris L. - Vol. III            December 11, 2008
                        New York, NY

Page 792

1        Q.   It is not relevant to your analysis,
2    right?
3        A.   I mean, if you were to ask me to assume
4    that FUL fraud drug means a drug on which a FUL
5    was computed based on fraudulent information, I
6    would make that assumption, but I don't know that
7    independent of you telling me that.
8        Q.   Turn to Exhibit 10.19.  Is this another
9    NDC for enalapril maleate?
10       A.   Yes.
11       Q.   Do you have any reason to challenge my
12   assertion that this represents a package size of
13   1,000?
14       A.   No.
15       Q.   You calculated a negative estimated WAC
16   for three quarters here, correct?
17       A.   That's correct.
18       Q.   But here, unlike Exhibit 10.17, you do
19   not substitute a proxy for the negative WAC,
20   correct?
21       A.   That's correct.
22       Q.   Why the difference in your methodology?

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III                 December 11, 2008
                         New York, NY

                                                         Page 793

1            MS. CICALA:  Object to form.

2        A.   I can't -- the answer is I don't know.

3    I don't know.  Could have been an oversight.  I

4    don't know.

5        Q.   Turn back now to Exhibit 10.09.  What

6    drug is this?

7        A.   I'm not there yet.  Ranitidine.  Not

8    sure I am pronouncing it correctly.

9        Q.   This, again, is an NDC for which there

10   is no published WAC until the summer of 2002,

11   correct?

12       A.   On the chart, that's correct.

13       Q.   Now, in the quarters for which there is

14   a published WAC according to your chart of $7.25,

15   the federal upper limit of 34.11, looking at the

16   ones that are 34.11 is higher by quite a bit than

17   what the FUL would have been had CMS relied on

18   the published WAC for Par's drug, correct?

19       A.   Well, not necessarily relied on, but if

20   they had computed it based on 150 percent of

21   that.

22       Q.   What's the difference?

               Henderson Legal Services, Inc.

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III            December 11, 2008
                        New York, NY

---

Page 794

1       A.   Well, I think I have testified a couple

2   times that I am not speaking to exactly the

3   process that CMS used to compute these.  You said

4   it was higher -- I mean, I forget exactly the way

5   you phrased it, but it sort of went to my

6   specific knowledge of how CMS would have computed

7   this.  And I just want to make the record clear

8   that I am not opining on that process other than

9   these items would have been considered.

10      Q.   You are not opining on the issue of how

11  CMS relies on any numbers in arriving at its

12  federal upper limits, right?

13      A.   I'm just saying that assuming that CMS

14  relies on an array of prices to determine what

15  the FUL is, that that array of prices would have

16  been different had they reflected the data that

17  the defendants gave me.

18      Q.   As a general matter, can you point to

19  any generic pharmaceutical company that has ever

20  used your methodology for setting an AWP for any

21  drug?

22           MS. CICALA:  Objection, beyond the

---

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III          December 11, 2008
                    New York, NY

Page 873

1    calculation of an estimated FUL based on Ivax's

2    reported AMP data, is that right?

3        A.   Right, and I just -- go ahead, I'm

4    sorry.

5        Q.   It is for the same enalapril maleate

6    product that we looked at in 8.14 and 8.13, is

7    that correct?

8        A.   Yes.

9        Q.   It appears that if you compare 8.15,

10   the AMPs listed from 7/1/2000 to 12/31/2002, they

11   appear to be greater than your estimated AWP

12   calculation, is that correct?

13       A.   Certainly in the earlier periods, maybe

14   some of the later periods that's not the case,

15   but overall they seem to -- they seem to line up

16   much closer with the AWPs that we computed than

17   the WACs, which indicates to me that perhaps some

18   of the data used -- the data used to compute the

19   estimated WACs being as high as they are compared

20   to the AMPs and the AWPs might be missing certain

21   reductions like charge-backs or credits which, of

22   course, would have the impact of lowering the WAC

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III            December 11, 2008
                        New York, NY

```
                                                    Page 874
 1    that we estimated.
 2         Q.   You said they are closer to your AWP
 3    calculation, but let's look at the AMP for March
 4    31, 2001.  It is 19.88 for enalapril maleate, do
 5    see that?
 6         A.   I do.
 7         Q.   That's on Exhibit 815?
 8         A.   That's on Exhibit 815.
 9         Q.   Let's look at on Exhibit 814 your AWP
10    calculation for that same period, March 31, 2001.
11         A.   Okay.
12         Q.   You list an estimated AWP of $6.39, is
13    that right?
14         A.   I do see that.
15         Q.   So the AMP that was reported by Ivax
16    during that quarter was three times your
17    estimated AWP, is that right?
18         A.   Right, but by the -- well, roughly,
19    right, but -- well, wait a minute, I'm sorry.  I
20    wanted to finish my answer.
21              But as I said before, it seems to more
22    closely align to the AWPs than the WACs because
```

Devor, Harris L. - Vol. III                December 11, 2008
                        New York, NY

Page 875

1    the difference between the AMP and the AWP is

2    about 12, 13 bucks, but the difference between

3    the AMP and the WAC would appear to be somewhere

4    around 30 bucks.

5        Q.   It doesn't give you any pause that your

6    estimated AWP is below, in some cases, multiples

7    below the actual AMP during the same period?

8            MS. CICALA:  Object to form.

9        A.   The only -- what it does, I mean, not

10   so much with respect to the AMPs does it cause me

11   any pause, as you put it, but it causes me to

12   think that perhaps the WAC information is missing

13   some reductions like credits or charge-backs or

14   whatever reductions that might be or that our

15   understanding of the data somehow may have

16   omitted some of the reductions which, again,

17   would cause the WACs to be even lower than we

18   have presented.

19       Q.   So is it true or would you agree with

20   me that your understanding of the data may impact

21   the reliability of your conclusions with respect

22   to your calculations in this case?

Devor, Harris L. - Vol. III          December 11, 2008
                    New York, NY

Page 884

1    your estimated AWP for that same period.

2         A.    Okay.

3         Q.    You see your estimated AWP for the same

4    product in the same period ranges from $56.23 to

5    a high of $95.10, is that right?

6         A.    That's correct.

7         Q.    So your estimated WAC is several,

8    several times your estimated AWP for the same

9    period, is that right?

10        A.    That's a fair observation.

11        Q.    Let's look at your -- the AMPs on the

12   following page.  On 15.06 deposition Exhibit 3

13   you list the AMPs for the same enalapril maleate

14   product ending in 2910, is that right?

15        A.    Yes.

16        Q.    And you see that the AMPs reported for

17   the same period that we have been discussing are

18   a low of $656.43 to a high of $750.68, do you see

19   that?

20        A.    Yes.

21        Q.    So your AWP calculation, your estimated

22   AWP is but a very small fraction of the AMP

Henderson Legal Services, Inc.

ff169131-a0d0-442d-a72d-fc0418fc0c74

Devor, Harris L. - Vol. III            December 11, 2008
                    New York, NY

```
                                                      Page 885
 1     reported during the same period, do you agree

 2     with that same statement?

 3             MS. CICALA:  Object to form.

 4        A.   I need -- I want to make sure I heard

 5     that question right.  Can I hear that back?

 6        Q.   Well, I'll just reask it.

 7             Would you agree with me that the AMPs

 8     reported for enalapril maleate during this period

 9     --

10        A.   The AMPs.

11        Q.   The AMPs?

12        A.   Okay.

13        Q.   Are far in excess of your estimated

14     AWPs by a factor of several?

15        A.   Yes.

16        Q.   In fact, comparing the same period

17     ending in 9/30/2000, your estimated AWP is $56.23

18     whereas the AMP is $656.43, is that right?

19        A.   That's correct.

20        Q.   And sitting here today, those numbers

21     you don't intend to change or they don't give you

22     any concern about your calculations with respect
```

Devor, Harris L. - Vol. III                December 11, 2008
                          New York, NY

Page 886

1   to that product?

2        A.   They -- again, I'm satisfied with the

3   methodology that was employed.  I cannot speak to

4   the accuracy of the data that was supplied to us.

5   I am certain that this -- these computations used

6   the data that was supplied to us in a formula

7   that was appropriate.

8        Q.   When you saw the results of your

9   formula, your methodology, and you presumably

10  noticed comparisons such as we just went through,

11  that doesn't cause you to reexamine your

12  methodology in this case, is that correct?

13       MS. CICALA:  Object to form.

14       A.   I don't think it would cause me to -- I

15  mean, I reviewed and tested the methodology, I

16  believe the methodology is very sound.  So the

17  answer is no, it did not cause me to change my

18  methodology at all.

19       Q.   Now, let's turn to Exhibit 15.22.

20       A.   .22?

21       Q.   Yes.  And 15.22 is your calculation of

22  an estimated WAC for ranitidine NDC ending 4401,

ff169131-a0d0-442d-a72d-fc0418fc0c74