Exhibit H

# The Pharmaceutical Industry

*A Discussion of Competitive and Antitrust
Issues in an Environment of Change*

Roy Levy

BUREAU OF ECONOMICS STAFF REPORT
FEDERAL TRADE COMMISSION
March 1999

management programs for a number of illnesses, including asthma, diabetes, high cholesterol, and ulcers.[119]  In addition, according to 1996 information, Caremark's PBM then offered disease management programs for several disorders, including cystic fibrosis, hemophilia, and multiple sclerosis.[120]  In part, these programs attempt to control long term costs by facilitating substitution of prescription drugs for other health care treatments when outcomes research indicates that such substitution is appropriate.[121]  PBMs also undertake more direct initiatives to control drug costs, including the negotiation of drug price rebates as discussed below.

### b.   Key Characteristics of PBM and Other Contracts

The computerization of drug delivery depends critically on underlying contracts between cost-containment institutions like PBMs and HMOs and pharmaceutical companies.  Since PBM and HMO contracts with drug companies have a direct impact on competition in drug markets, it is useful to focus on key provisions of these contracts.  The discussion also distinguishes non-capitated from capitated contracts for prescription drugs.[122]

### i.   Non-capitated Contracts

Table III.1 lists some provisions commonly found in PBM/HMO contracts with drug companies.  These contracts typically cover multiple brand-name prescription drugs and dosage

---

[119]  See, Merck & Co., *1995 Annual Report - Achieving the Full Potential of Managed Pharmaceutical Care* (1996).

[120]  See, "Caremark at a Glance - Disease Management" (1996).  At that time, Caremark's PBM also offered disease management programs for genetic emphysema, growth disorders, and ulcers.

[121]  See, Muirhead (August 1995).

[122]  The glossary at the end of this report describes these different types of contracts. Since the use of capitated contracts is a relatively new phenomenon, there does not appear to be any systematic information on the extent to which they are used as an alternative to non-capitated contracts.

### Table III.1
### Key Features of PBM/HMO
### Contracts with Drug Companies

| Item | Description |
|------|-------------|
| Product Coverage | Contracts often cover a number of specified prescription drugs and dosage forms. |
| Base Prices | Pricing metric that does not necessarily account for any discounts and rebates. |
| Formulary Rebates | Manufacturer rebates provided to PBMs for formulary management services undertaken by PBMs. |
| Cost Effectiveness Rebate | Manufacturer rebates provided to PBMs should PBMs meet some minimum volume requirements. |
| Retail Conversion Rebates | Manufacturer rebates provided to PBMs in support of some therapeutic substitution program. |
| Growth Rebates | Manufacturer rebates provided to PBMs who meet specified volume growth targets. |
| Maximum Rebates | Maximum total manufacturer's rebate. |
| MFN Provision | Contractual provision under which companies agree to grant most-favored-nation status to PBMs. |
| Usage Reports | Provisions requiring PBMs to maintain data on drug prices and usage for reporting purposes. |

Notes: The items listed are for illustrative purposes.  Terminology for the concepts underlying these items may vary across contracts.

forms, and many of their provisions are specific to particular drug products.[123]   The price and

rebate provisions often use "wholesale acquisition cost" (WAC) as a metric for determining the

transaction prices for the prescription drugs subject to the contract.[124]   A 1996 study found that

---

[123]  For instance, some of the rebates discussed below could vary by drug product, depending on the nature and extent of therapeutic and generic competition, and by customer class (e.g., HMO v. non-HMO member).

[124]  WAC refers to the wholesale list price of the prescription drugs, and often differs from actual transaction prices.  Transaction prices would equal WAC if no rebates, discounts or any other credits or allowances apply to transactions involving a particular prescription drug.

52

rebates typically range from $1.00 to $1.50 per claim, averaging about 6 percent of sales.[125] Although many rebates are expressed as a percentage of dollar sales for particular drug products, some manufacturer rebates might take a per unit form.[126] A formulary rebate is an example of a rebate expressed as a percentage of dollar sales in which companies pay PBMs to place their drugs in preferred positions on the various PBM formularies. The rebate could amount to 5 percent or more of dollar sales of the subject drug.[127] Similarly, cost effectiveness and growth rebates, which are rebates to PBMs that achieve particular volume targets, are often some percentage of dollar sales above some base volume or market share. These volume-based rebates may effectively amount to exclusive dealing agreements that could raise competitive concerns.[128]

---

[125] Gondek (1996) also reports findings from comparative studies of Medicaid rebates, indicating that state Medicaid programs receive larger rebates from manufacturers than PBM organizations.

[126] For example, conversion rebates are sometimes expressed on a per unit basis. A drug manufacturer might agree to rebate a PBM $X for each prescription the PBM undertakes to switch from another brand-name drug to the brand-name of the subject manufacturer. PBMs share these various rebates with plan sponsors or other clients to encourage them to comply with the formulary and other requirements in the PBM/drug manufacturer contracts (See, Jones (February, 1996)).

[127] The contracts also contain provisions that require PBMs to undertake efforts to encourage their clients to place a subject manufacturer's drug(s) on their formularies.

[128] The competitive implications of volume-based rebates are discussed further in Chapter V.