Exhibit J

Report to the General Court
Reimbursement for Prescribed Drugs

October 3, 2002

Commonwealth of Massachusetts
Executive Office of Health and Human Services

Division of Health Care Finance and Policy
Linda L. Ruthardt, Commissioner



Jeffrey

Exhibit No. 3

LISA A. MOREIRA
6/14/07

MA012663

## I.    Introduction

This report is submitted pursuant to Line Item 4100-0060 of Chapter 184 of the Acts of 2002 (the FY 2003 Budget) which required the Division of Health Care Finance and Policy (the Division) to conduct a public hearing on MassHealth payment rates for prescription drugs. The Division was directed, among other things, to revise the definition of Estimated Acquisition Cost to equal Wholesale Acquisition Cost (WAC) minus two percent and to determine whether this payment level is adequate to ensure that enough pharmacies will continue to participate in the MassHealth program to maintain sufficient access for MassHealth members. The Division is also authorized to modify, if necessary, the revised definition of EAC in the best interests of MassHealth members.

The Division held a public hearing on September 5 and 6, 2002. Based on the testimony at the hearing, and its review of other relevant data, the Division will establish an Estimated Acquisition Cost to equal WAC plus 6.0 percent effective August 3, 2002. In addition, the Division will increase the dispensing fee for generic drugs from $3.00 to $5.00, and for brand drugs from $3.00 to $3.50, effective November 1, 2002. The Division will adopt these changes to provide adequate payment rates that ensure sufficient access to pharmacy services for MassHealth members. The basis for the Division's findings are set forth below.

## II.    MASSHEALTH PHARMACY REIMBURSEMENT

The Division of Medical Assistance (DMA) currently spends approximately $900 million annually on prescribed drugs, or an estimated 17.3 percent of total MassHealth fee-for-service spending. This figure represents aggregate Medicaid spending. The net state cost is reduced by federal matching funds and pharmaceutical manufacturer rebates.

There are two components to MassHealth payments for prescription drugs: the acquisition cost and a dispensing fee. For the acquisition cost component, there are different federal Medicaid payment requirements for brand-name drugs and generic drugs. For brand-name drugs, or generic drugs with fewer than three generic equivalents, reimbursement must be the lower of (a) the pharmacy's usual and customary charge to the general public and (b) the drug's Estimated Acquisition Cost, or EAC. The EAC is each state's estimate of the price paid by providers for a particular drug.

For certain generic drugs, there is a federal upper limit (FUL), on the amount the federal government will reimburse for drugs with three or more generic equivalents. This upper limit is 150 percent of the published price for the least costly therapeutic equivalent that can be purchased by pharmacies in quantities of 100 tablets. States may also set their own payment limits for these drugs, which cannot exceed the federal upper limit. In Massachusetts, this is called the Massachusetts upper limit (MUL).

Most states determine the EAC by using what is known as "Average Wholesale Price" (AWP). The AWP is a list price reported by drug manufacturers to commercial publishers of drug pricing

3

data such as the Red Book®, Medi-Span Inc., and First DataBank.  The AWP is used as a starting point by many governmental and private payers for determining their payments for prescription drugs.  The AWP could be considered the prescription drug equivalent of the "sticker price" for automobiles.  It is not the price the retail pharmacy actually pays for the drug.

Due to a specific statutory prohibition against discounting from a standard when determining reimbursement for prescribed drugs, Massachusetts does not base its EAC for brand-name drugs on the AWP. It uses another figure, the Wholesale Acquisition Cost, or WAC.  The Division's prescription drug regulation, 114.3 CMR 31.00, by which the DMA payments are determined, has defined EAC as WAC + 10 percent since 1991.  The WAC is theoretically the manufacturer's charge to the wholesaler to purchase the drug, but it does not reflect any rebates, discounts, promotional bonuses, or credits for prompt payment.  The WAC is not, therefore, the actual cost of purchasing the drug - it is the prescription drug equivalent of a "catalogue" price.   The WAC equals 80 to 83.3 percent per cent of the AWP.

States' formulas generally provide for payment at a percentage less than AWP or a percentage greater than the WAC.

Under the regulation, MassHealth pays retail pharmacies for prescribed drugs at the lower of the following:

|  MULTIPLE SOURCE Lower of: | SINGLE SOURCE Lower of: |
|---|---|
| 1. the Federal Upper Limit (FUL) | 1. the usual and customary charge |
| 2. the Massachusetts Upper Limit (MUL) | 2. the EAC |
| 3. the usual and customary charge | |
| 4. the EAC | |

The "EAC" formula is only one of the four federally permissible ways to pay for prescription drugs. DMA claims for the month of July 2002 were paid as follows:

7% FUL
1% MUL
34% usual and customary
58% EAC (WAC plus 10%)

The approximately 25 percent of MassHealth members who are enrolled in managed care organizations are not included above.  In addition, as in the past, the reimbursement rate also will not affect prescriptions paid at the usual and customary charge when it is lower than WAC plus 6.0 per cent.

Despite the fact that brand and generic drugs each represent approximately 50 percent of MassHealth pharmacy claims, DMA spends a much greater percentage on brand-name drugs than on generics since brands are generally priced so much higher. In July, 2002, the average

MA012665

4

brand-name prescription drug payment for MassHealth was $100.71 while the average generic payment was $19.34. At the same time, 82.2 percent of MassHealth pharmaceutical expenditures were for brand-name drugs, while they represented only 49.2 percent of the claims. Conversely, only 15.6 percent of MassHealth expenditures on pharmaceuticals were for generics, while they represented 48.5 percent of the claims.[1]

In July 2002, approximately 39 percent of brand-name drug claims were paid at EAC while 61 percent were paid at the usual and customary rate. Generic drug claims were paid at EAC about 74 percent of the time, while 16 percent of the time they were paid at the usual and customary rate, with the remainder paid at the FUL or MUL.

In addition to the acquisition cost component, MassHealth payments also include a dispensing fee. The current dispensing fee of $3.00 for all drugs has been in effect since 1995.

As evidenced by the following chart, Medicaid drug expenditures in Massachusetts have more than doubled in the past five years growing from $398 million in 1997 to $931 million in 2002. During the 1990s Massachusetts Medicaid drug expenditures grew more than five-fold.



**Massachusetts Medicaid Rx Expenditures: 1982 to 2002 (Current $)**

SOURCE: Compiled by Stephen W. Schondelmeyer, PRIME Institute, University of Minnesota from data found in Pharmaceutical Benefits Under State Medical Assistance Programs, National Pharmaceutical Council, 1984 to 2001. Data for 2002 are estimates from various sources including HCFA Form 64 and and HCFA Medicaid Drug Rebate public use files.

**MA012666**

5

Drug expenditures have grown to represent 17.3% of Massachusetts Medicaid expenditures in FY2002.  Drug product payments ($818 million) represent 15.2% of total Medicaid expenditures, while pharmacy dispensing payments ($113 million) account for 2.1% of total expenditures.



**Massachusetts Drug Expenditures as a % of Total Medicaid Expenditures: 1982 to 2002**

SOURCE: Compiled by Stephen W. Schondelmeyer, PRIME Institute, University of Minnesota from data found in Pharmaceutical Benefits Under State Medical Assistance Programs, National Pharmaceutical Council, 1984 to 2001. Data for 2002 are estimates from various sources including HCFA Form 64 and and HCFA Medicaid Drug Rebate public use files.

MA012667

6

Effective steps to manage the increase in drug expenditures requires examination of the various factors that have contributed to such growth. These factors include the number of drug recipients, the number of prescriptions per drug recipient per year, the drug product payment, the dispensing fee, and general inflation.



**Massachusetts Medicaid Drug Expenditures**
**Percent Change in Major Components:**
**1995 to 2000 in Current Year $**

SOURCE: Compiled by Stephen W. Schondelmeyer, PRIME Institute, University of Minnesota from data found in Pharmaceutical Benefits Under State Medical Assistance Programs, National Pharmaceutical Council, 1984 to 2001. Data for 2002 are estimates from various sources including HCFA Form 64 and HCFA Medicaid Drug Rebate public use files.

MA012668

7

The number of Massachusetts Medicaid recipients has increased substantially over the past 5 years from 695,000 in 1995 to nearly 1 million recipients in 2002. Drug utilization by Massachusetts Medicaid recipients has also increased dramatically over the past decade from 14.8 prescriptions per person per year in 1990 to 18.8 per year in 1995 and 21.6 per year in 2002. Increased utilization has contributed substantially to the increased drug expenditures.



### Massachusetts Medicaid
### Rx's/Drug Recipient/Year &
### Rx's/Total Recipient/Year: 1982 to 2002

SOURCE: Compiled by Stephen W. Schondelmeyer, PRIME Institute, University of Minnesota from data found in Pharmaceutical Benefits Under State Medical Assistance Programs, National Pharmaceutical Council, 1984 to 2001. Data for 2002 are estimates from various sources including HCFA Form 64 and HCFA Medicaid Drug Rebate public use files.

MA012669

8

The average prescription price for Massachusetts Medicaid has grown from $29.43 in 1995 to $56.92 in 2002.  The drug product cost grew from $25.37 in 1995 to $53.92 in 2002.  During this same period the pharmacy dispensing fee decreased from $4.06 to $3.00 in 1995.



**Massachusetts Medicaid Rx Payments**
**Dispensing Fee & Drug Product Payment: 1982**
**to 2002 (Current $)**

SOURCE: Compiled by Stephen W. Schondelmeyer, PRIME Institute, University of Minnesota from data found in Pharmaceutical Benefits Under State Medical Assistance Programs, National Pharmaceutical Council, 1984 to 2001.
Data for 2002 are estimates from various sources including HCFA Form 64 and and HCFA Medicaid Drug Rebate public use files.

MA012670

## III.   FINDINGS

### A. FEDERAL OFFICE OF INSPECTOR GENERAL REPORTS

In August 2001, the federal Department of Health and Human Service's Office of the Inspector General (OIG) published a report entitled "Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drugs". The OIG reviewed pharmacies' actual acquisition cost of brand name prescription drugs in 8 states (Colorado, Florida, Indiana, Montana, Texas, Washington, West Virginia, and Wisconsin). It requested that pharmacies submit data for specified months in 1999. The review found that the actual acquisition cost for brand name prescription drugs in 1999 was a national average of 21.84 percent below AWP and 1.81 percent below WAC (excluding non-traditional pharmacies such as hospital and nursing facility pharmacies). It is important to note that the OIG reviewed invoice prices only, and its average discount figures do not include the effect of any further price concessions, such as prompt pay discounts, additional volume discounts, rebates, chargebacks or any other off-invoice discounts.

In March 2002, the OIG published a follow-up report entitled "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products". Pharmacies in the same states were asked to submit acquisition cost data for generic drugs during specified months in 1999. The OIG found that the actual acquisition cost for generic drugs was a national average of 65.93 percent below AWP and 30.55 below WAC (excluding non-traditional pharmacies).

Based on these findings, the OIG concluded that states were overpaying for prescription drugs, and recommended that states reevaluate their current payment levels. Pharmacies, however, argued that the OIG study methodology was flawed.

In September 2002, the OIG released another report on the Medicaid pharmacy payments which provides more detailed cost estimates by breaking out the analysis for different categories of drugs. The report indicated that pharmacies paid:

|  | Revised OIG Report AWP Discount |
|---|---|
| Single source innovator drugs | -17.20% |
| All drugs without FUL | -27.20% |
| -- multiple source without FUL | -44.20% |
| -- innovator multiple source without FUL | -24.40% |
| -- non-innovator multiple source w/out FUL | -54.20% |
| Multiple source with FUL | -72.10% |

MA012671

Due to the variation of acquisition cost among the above categories, the OIG recommended that states use a four-tiered reimbursement methodology consisting of "(1) tier one – a percentage discount off AWP for single source brand name drugs; (2) tier two – a percentage discount off AWP for innovator multiple source drugs without FULs; (3) tier three – a percentage discount off AWP for non-innovator multiple source drugs without FULs; (4) tier four – the FUL price for those FUL multiple source drugs." [2]

At least four states tier their ingredient reimbursement rate by brand versus generic, while at least two states reimburse at a higher discount for chains versus independent pharmacies. Most of the reimbursement methodologies that use tiering took effect very recently, and some states based their decision to tier reimbursement on the OIG reports.

### B.   DHCFP PUBLIC HEARING AND SUMMARY

As noted above, the FY2003 budget required the Division to conduct a hearing on the legislative directive to change the Commonwealth's EAC from WAC plus 10 percent to WAC minus 2 percent. The legislative language, requiring the rates to be lowered took effect when the budget was signed. The three major pharmacies that fill 61 percent of the MassHealth prescriptions, CVS Corporation (CVS), Brooks Pharmacy (Brooks) and Walgreen Co. (Walgreens), all threatened to terminate participation in the Medicaid program if the proposed rates were to go into effect. As a result, the Governor ordered that the current rates remain in effect pending the Division's hearing and findings.

The Division's notice of public hearing requested, among other things, information and data from pharmacy providers, suppliers, warehouses, and parent corporations on the following:

- Invoice cost from suppliers, warehouses and parent corporations, documented by invoice copies;
- Direct or indirect off-invoice discounts, including but not limited to, all volume discounts and rebates, credits or offset amounts, whether in cash or in kind, documented by copies of rebate and volume discount agreements; and
- Actual cost of dispensing prescribed drugs.

The Division requested this information concerning the twenty-five drugs most often prescribed for MassHealth members. These included fifteen brand name and ten generic drugs.

The Division held the public hearing on September 5 and 6, 2002. Over 200 people attended the hearing and 40 people testified in person or in writing, including the Commissioner of DMA, independent pharmacists, chain pharmacies including Brooks and CVS, pharmacy associations, and MassHealth members. Written testimony was received from many interested parties as well before, during and after the public comment hearing days and is included in the public hearing record. At the hearing, the Commissioner announced that the record would be kept open until the close of business September 18 to receive documentation and additional testimony. This was later extended to September 24, 2002 and then again to September 26, 2002.

MA012672

Six state legislators gave testimony about the importance of this issue to their constituents and pharmacies in Massachusetts. They recommended that the Division wait longer to determine a rate based on actual costs and asked pharmacies to submit cost data.

DMA Commissioner Wendy Warring, and DMA's Director of Pharmacy Paul Jeffrey also testified. They discussed current MassHealth expenditures for prescription drugs and described in detail the fiscal impact of the current and proposed pharmacy reimbursement rates. Citing claims data from July 2002, they explained that while approximately 50 percent of claims are for brand name drugs, approximately 82 percent of expenditures were for brand name drugs. Commissioner Warring also requested that more pharmacies come forward with cost data and invoices.

Seven of those who testified represented long-term care pharmacies including the Long Term Care Pharmacy Alliance. This group argued that their costs are higher than those of retail pharmacies and the new rate would negatively impact their business even more extensively.

Seventeen of those who testified in the hearing were either pharmacists or represented pharmacies in some capacity, including national or state-wide associations. They testified that a new reimbursement rate of WAC minus 2 with a $3 dispensing fee would be inadequate and force them to lose money on every Medicaid prescription filled. In particular, CVS representative Mr. James Smith stated that with the new rate they would lose approximately $3.89 per prescription, and if the newly legislated copayment of $2.00 were not paid, they would lose $5.89 per prescription. Pharmacists generally contended that the current level of WAC + 10 was the lowest reimbursement they could accept. They also testified that Medicaid claims were more time-consuming and costly to fill than third-party payer claims. They stated that the manufacturers were the entities making the largest profits in the delivery of pharmaceuticals to the patients and that retail pharmacies generally operate at a 1-2 percent profit margin. They suggested that the state should try to save money by working to get better discounts from the drug manufacturers.

MA012673

12

The net profit after taxes for all Fortune 500 firms in the U.S. was 3.3 percent in 2001.  Drug manufacturers had a median net profit of 18.5 percent and community pharmacies averaged 2.2 percent net profit.  It was also noted that margins for this industry are slim, and should not be confused with the margins of pharmaceutical manufacturers.  This fact is depicted in the figure below.



Pharmacy representatives, including those from Brooks Pharmacy and CVS, testified that all retail pharmacies, to their knowledge, purchase brand prescription drugs at or near WAC, and in addition pharmacies usually receive a discount of 2 percent for prompt payment.  The chain pharmacies testified that they receive no discount on brand name drugs for bulk purchases.  The representatives state that only one manufacturer sells each single source brand name drug, therefore there is no incentive for the manufacturer to provide a discount to some pharmacies and not others.

MA012674

The pharmacy representatives testified that the acquisition costs for generic drugs is proprietary information and that disclosure would violate contracts they have with wholesalers and/or manufacturers. While they acknowledged that they receive bigger discounts for generic drugs, they pointed out that MassHealth has already captured some of those savings when it pays at the lower of the usual and customary charge, MUL, or FUL. They also pointed out that while there is a bigger percentage discount for generics, that percentage is applied to a much lower cost.

The Commissioner inquired whether the representatives of CVS and Brooks would consider submitting invoices to a third party that could aggregate and redact identifying information. They stated that they would consider this option if confidentiality could be guaranteed. Although there was a submission from a third party law firm on September 26, 2002, the data were not complete. The data submitted listed only a single cost for certain brand name drugs and did not include any data related to generic drugs. This data was much less specific and informative than the invoices submitted by the independent pharmacies, and was therefore not useable in our analyses.

Many pharmacists, representing both independent and chain pharmacies, testified that the invoice price is only one component of a pharmacy's total cost to supply and dispense the drug. Other costs include transportation and storage of the drug, coordination of benefits for the Medicaid recipient, overhead, and inventory carrying costs. Pharmacies also argue that the costs associated with filling prescriptions for MassHealth members are even higher than those for other payers due to the complexity of the MassHealth system.

Mr. James Smith of CVS testified that the dispensing fee paid by Medicaid is essentially in-line with private payers. The accounting firm of Myers and Stauffer L.C. has conducted recent surveys of dispensing fee costs for the states of Arkansas and Kentucky, which revealed weighted median costs of $5.08 and $5.02 respectively. It must be noted, however, that when rates are agreed upon with private payers, the totality of the rate is more important than one component of it, so the "dispensing fee" may vary depending upon the other pieces of reimbursement. CVS and Brooks pharmacy executives also cited in their testimony a 1993 Health Care Finance Administration, now Center for Medicaid and Medicare Services (CMS) study which, adjusted to 2001 dollars, found that the average cost to dispense in Massachusetts is $7.76. There are still discrepancies in the data concerning the actual dispensing cost to pharmacies. Other studies submitted concluded that actual dispensing costs were actually significantly lower than found by the CMS study.

*Access to Prescribed Drugs*

The Division heard and received written testimony regarding the critical need to maintain access for MassHealth members to pharmacy services. Five of those who testified in person were MassHealth or CommonHealth members, and two represented advocacy organizations. They expressed their concern about access to prescription drugs should pharmacies pull out of the Medicaid program and they expressed concern over the recently-enacted increase in the co-payment from 50 cents to $2.00. Current access to prescribed drugs is displayed in the two following graphs.

MA012675

14

Geographic distribution of fee-for-service MassHealth members:



Geographic distribution of average number of MassHealth prescriptions per pharmacy (for the period January through June 2002):



Massachusetts Division of Health Care Finance and Policy

MA012676

While MassHealth members are highly concentrated in our urban cities, they live in nearly every community across Massachusetts. It is important therefore to have adequate access for members living in areas without public transportation, the elderly who may not be able to travel far, and those with special needs. The Commonwealth clearly needs to evaluate alternative pharmacy purchasing and delivery systems, such as mail order or state bulk purchasing to address some of these issues. This evaluation would also require a study of the actual acquisition costs of bulk purchasing. Until such time as alternatives can be implemented, however, the Commonwealth must be concerned about setting adequate rates such that pharmacies will not decline to participate in the Medicaid program.

In addition, the Division received testimony and acknowledges that there are pharmacies that provide special packaging and/or delivery services to certain segments of the MassHealth population which affords them the opportunity to maintain independence. The MassHealth reimbursement level should not provide a disincentive for those "special" pharmacies to exist in Massachusetts.

*Summary*

Through information provided by testimony at the public hearing, documents submitted to the record of the public hearing, review of other studies, and data analysis referenced in this report, the Division learned that:

a) pharmacies acquire name brand drugs at or around WAC.

b) as reported by the OIG and other states' analyses, pharmacies acquire generic drugs at much deeper discounts from manufacturers. No verifiable data was submitted by Massachusetts pharmacies in sufficient quantity for a reliable statistical analysis concerning the amount of these discounts.

c) as reported by other states' analyses, pharmacies incur costs in addition to the acquisition cost. No verifiable data was submitted by Massachusetts pharmacies in sufficient quantity for a reliable statistical analysis.

## IV.   CURRENT SAVINGS INITIATIVES

The Division notes that DMA has been implementing current savings initiatives, including:

- Implementing a preferred MassHealth Drug List.
- Further exploring a mail order policy for selected members.
- Examining 340B providers that purchase and dispense drugs to members under certain conditions.
- Increasing the number and scope of audits.
- Increasing pharmacy co-payments for many MassHealth members from $.50 to $2.00.

MA012677

## V.     RECOMMENDATIONS

### A.     REIMBURSEMENT

*Estimated Acquisition Costs*

The Division has concluded that the EAC should be established at WAC plus 6.0 percent. This figures reflects not only the acquisition cost of the drugs, but also some other costs associated with prescribing drugs and the need to ensure that MassHealth members will have sufficient access to prescribed drugs.

*Dispensing Fees*

The Division has concluded that to achieve Medicaid savings in the long run, the payment system must encourage the dispensing of a generic drug rather than a brand name drug whenever possible. To meet this goal, the Division recommends that the dispensing fee for generics be increased to $5.00, and for brand drugs to $3.50, effective November 1, 2002.

### B.     OTHER RECOMMENDATIONS

<u>Legislative Changes</u>

*Pharmaceutical Ingredient and Dispensing Cost Information*

Massachusetts has been forced to set Medicaid payment rates largely without crucial state-level pharmacy data on actual acquisition costs. Legislation appears to be necessary to require pharmacies to submit invoice data for review. The Commonwealth's public records law, M.G.L. c. 4, provides an exemption to the public records law for "trade secrets or commercial or financial information voluntarily provided to an agency for use in developing governmental policy and upon a promise of confidentiality." The Division's statute, however, provides that

> (t)he division may specify, by regulation, categories of information which may be
> furnished under an assurance of confidentiality to the provider. Such assurance
> may only be extended by the division if the data furnished is not to be used for
> setting rates. <u>M.G.L. c. 118G §6</u>.

Despite the pharmacies' general contention that the proposed rate is too low, they provided little usable invoice data relating to the acquisition cost of either brand or generic drugs.

A few independent pharmacies submitted invoices, which confirmed the OIG's findings. Some pharmacies submitted data through an independent source that did not include acquisition costs for generic drugs, and the brand data was insufficient to inform our analysis. Until pharmacies share more of their cost data with state governments, states will be forced to continue to adjust

MA012678

17

and set reimbursement rates based on the data available to them including OIG data and any other states' surveys.

The Division suggests legislation allowing the Division or another state agency to accept data with the promise of confidentiality, even when used for ratemaking. An intermediary step would be to give the Division the authority to collect, analyze and otherwise use invoice and dispensing cost data supplied by the pharmacies to an independent agent for redaction, certification, and submission to the Division.

The Division also notes that the state of Texas has enacted legislation that requires drug manufacturers to report Average Manufacturers Price data directly to the state. We recommend this option be explored as it offers a more efficient and direct method of obtaining actual prices charged by manufacturers to pharmacies in Massachusetts. Any such legislation should contain penalties for the filing of false, misleading, or incomplete information.

The Division recommends it be given explicit statutory authority to audit not only the invoice costs of pharmacies, but also the reasonable and necessary costs to dispense prescription drugs.

*Reimbursement Flexibility*

M.G.L. c. 118G, §7 provides that "notwithstanding the provisions of any general or special law or any rule or regulation to the contrary, the division, in determining the rate of payment for prescribed drugs dispensed to publicly-aided or industrial accident patients by pharmacy providers, shall not apply or use, either directly or indirectly, a discount from the primary standard used by the division in establishing the rate." The Division recommends that this language be eliminated in order to give the Commonwealth the flexibility to discount from AWP or some other standard as may be appropriate.

*MassHealth Member Co-payments*

The Division recommends including the consumer in the construct of incentives to encourage the use of generics and recommends increasing the co-payment amount to $2 for name brand prescriptions only and restoring the co-payment to 50 cents for generics. Further, for those members with heavy prescription drug utilization, the Division proposes implementing a yearly cap on the out-of-pocket costs for which a MassHealth member would be responsible. This could encourage the consistent use of one pharmacy, as well, which should help prevent counterindicated medicines being dispensed, thereby encouraging patient safety.


**C.    OTHER RECOMMENDATION**

*MULs*

The Division recommends that the Division of Medical Assistance work with its prescription drug contractor to ensure that MULs are updated quickly so the DMA can access this "lowest" price whenever possible.

MA012679

**D.     AREAS FOR FURTHER STUDY**

*Movement of MassHealth Recipients to Generics and Over-the-Counter Pharmaceuticals*

The Division recommends study of additional methods to encourage pharmacies that convert a regularly used name brand prescription for a chronic condition to a therapeutically equivalent generic.  In addition to generic substitution, other options exist to transition MassHealth members from brand name drugs to less expensive alternatives.  Movement to over-the-counter brand and generic drugs also would reduce MassHealth's expenditures for pharmaceuticals.  Further, some private and state Medicaid plans pay pharmacists an incentive to encourage dispensing of generic prescriptions in order to benefit from the savings.

Other states have adjusted their Medicaid dispensing fees based on
- the volume of prescriptions filled at pharmacies (Washington);
- whether the pharmacist took the time to call the prescribing physician to change a patented brand name prescription to one for an off-patent drug, also known as "therapeutic substitution", (Wisconsin.  N.B.  This practice is different from simple generic substitution, which is already required.);
- whether the pharmacy is located in a rural area that would face significant access problems if the pharmacy closed or stopped filling Medicaid prescriptions (Nebraska); and,
- whether the drug dispensed is brand or generic (at least 3 states).

*Tiered Payment System*

The Division has concluded that at the present time, Massachusetts should not change to a tiered payment system.  Although it is clear that pharmacies receive larger discounts on generic drugs, one way to encourage the use of generic drugs is to maintain one payment rate for both brand name and generic drugs.  Although this may result in a greater percentage profit margin for dispensing a generic drug, the dollar amount will be smaller.  We cannot determine at this time whether use of a two-tiered, or even four-tiered system as suggested by the OIG, would have unintended consequences.  If the margin for generic drugs is reduced, it may create an incentive to dispense brand name drugs.  For every generic prescription dispensed in lieu of a single source brand name drug, MassHealth saves an average of $80.  Pharmacists have been a critical part of the increased generic dispensing rate seen over the last decade in Massachusetts.  The payment method, to the extent possible, should encourage the dispensing of generics whenever possible.  Further study and data collection are needed to assess whether tiered reimbursement is appropriate to differentiate payment rates for generic and brand name drugs.

MA012680

19

As the following chart indicates, a significant number of widely prescribed pharmaceuticals are scheduled to go off-patent within the next few years. This may provide the Commonwealth with potential savings as generic alternatives become available. This underscores the importance of creating the proper payment system incentives to dispense generic alternatives as soon as they become available.



**Drugs Losing Patents 2002-2005:
% of Total Drug Expenditures in 2001**

SOURCE: Estimates by Stephen W. Schondelmeyer, PRIME Institute, University of Minnesota from data found in Drug Topics, June 2002.

MA012681

20

*Manufacturer Rebates*

Massachusetts participates in the federal Medicaid drug rebate program, which was implemented as part of the Omnibus Budget Reconciliation Act of 1990. In addition to participating in this program, some states pursue additional manufacturer rebates. These initiatives are currently the subject of litigation between Michigan, Maine and Florida and certain drug manufacturers. The Division recommends monitoring this litigation and evaluating whether a similar initiative would be beneficial to Massachusetts.

The Division will continue to closely monitor the issues identified in this report. Should the Division acquire adequate information from pharmacies, we would like to assess other issues mentioned at the public hearing including the cost of dispensing prescriptions to MassHealth members vs. others, including but not limited to dispensing and packaging costs for special populations compared to others, the methods used for collecting co-pays and the experience collecting higher co-pays from MassHealth members.

---

[1] Source: the Division of Medical Assistance
[2] Department of Health and Human Services, Office of the Inspector General, September 2002, "Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products."

MA012682