# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____ )

IN RE PHARMACEUTICAL INDUSTRY     )
AVERAGE WHOLESALE PRICE          )    MDL No. 1456
LITIGATION                                )    Civil Action No. 01-12257-PBS
_____)    Subcategory No: 03-10643
                                       )

THIS DOCUMENT RELATES TO:        )    Judge Patti B. Saris

                                     )

*City of New York* v. *Abbott Labs., et al.*     )
(S.D.N.Y. No. 04-CV-06054)            )
*County of Suffolk* v. *Abbott Labs., et al.*    )
(E.D.N.Y. No. 03-CV-229)             )
*County of Westchester* v. *Abbott Labs., et al.* )
(S.D.N.Y. No. 03-CV-6178)           )
*County of Rockland* v. *Abbott Labs., et al.*   )
(S.D.N.Y. No. 03-CV-7055)           )
*County of Dutchess* v. *Abbott Labs., et al.*  )
(S.D.N.Y. No. 05-CV-06458)          )
*County of Putnam* v. *Abbott Labs., et al.*    )
(S.D.N.Y. No. 05-CV-04740)          )
*County of Washington* v. *Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00408)          )
*County of Rensselaer* v. *Abbott Labs., et al.*  )
(N.D.N.Y. No. 05-CV-00422)          )
*County of Albany* v. *Abbott Labs., et al.*    )
(N.D.N.Y. No. 05-CV-00425)          )

[Caption Continues on Next Page]

## SCHERING CORPORATION'S, SCHERING-PLOUGH CORPORATION'S, AND WARRICK PHARMACEUTICALS CORPORATION'S RESPONSE TO THE PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF "UNDISPUTED" MATERIAL FACTS AS TO SCHERING CORPORATION, SCHERING-PLOUGH CORPORATION, AND WARRICK PHARMACEUTICALS CORPORATION AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

*County of Warren* v. *Abbott Labs., et al.*          )
(N.D.N.Y. No. 05-CV-00468)                            )
*County of Greene* v. *Abbott Labs., et al.*          )
(N.D.N.Y. No. 05-CV-00474)                            )
*County of Saratoga* v. *Abbott Labs., et al.*        )
(N.D.N.Y. No. 05-CV-00478)                            )
*County of Columbia* v. *Abbott Labs., et al.*        )
(N.D.N.Y. No. 05-CV-00867)                            )
*Essex County* v. *Abbott Labs., et al.*              )
(N.D.N.Y. No. 05-CV-00878)                            )
*County of Chenango* v. *Abbott Labs., et al.*        )
(N.D.N.Y. No. 05-CV-00354)                            )
*County of Broome* v. *Abbott Labs., et al.*          )
(N.D.N.Y. No. 05-CV-00456)                            )
*County of Onondaga* v. *Abbott Labs., et al.*        )
(N.D.N.Y. No. 05-CV-00088)                            )
*County of Tompkins* v. *Abbott Labs., et al.*        )
(N.D.N.Y. No. 05-CV-00397)                            )
*County of Cayuga* v. *Abbott Labs., et al.*          )
(N.D.N.Y. No. 05-CV-00423)                            )
*County of Madison* v. *Abbott Labs., et al.*         )
(N.D.N.Y. No. 05-CV-00714)                            )
*County of Cortland* v. *Abbott Labs., et al.*        )
(N.D.N.Y. No. 05-CV-00881)                            )
*County of Herkimer* v. *Abbott Labs. et al.*         )
(N.D.N.Y. No. 05-CV-00415)                            )
*County of Oneida* v. *Abbott Labs., et al.*          )
(N.D.N.Y. No. 05-CV-00489)                            )
*County of Fulton* v. *Abbott Labs., et al.*          )
(N.D.N.Y. No. 05-CV-00519)                            )
*County of St. Lawrence* v. *Abbott Labs., et al.*    )
(N.D.N.Y. No. 05-CV-00479)                            )
*County of Jefferson* v. *Abbott Labs., et al.*       )
(N.D.N.Y. No. 05-CV-00715)                            )
*County of Lewis* v. *Abbott Labs., et al.*           )
(N.D.N.Y. No. 05-CV-00839)                            )
*County of Chautauqua* v. *Abbott Labs., et al.*      )
(W.D.N.Y. No. 05-CV-06204)                            )
*County of Allegany* v. *Abbott Labs., et al.*        )
(W.D.N.Y. No. 05-CV-06231)                            )
*County of Cattaraugus* v. *Abbott Labs., et al.*     )
(W.D.N.Y. No. 05-CV-06242)                            )

*County of Genesee* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06206)    )
*County of Wayne* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06138)    )
*County of Monroe* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06148)    )
*County of Yates* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06172)    )
*County of Niagara* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06296)    )
*County of Seneca* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06370)    )
*County of Orleans* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06371)    )
*County of Ontario* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06373)    )
*County of Schuyler* v. *Abbott Labs, et al.*    )
(W.D.N.Y. No. 05-CV-06387)    )
*County of Steuben* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06223)    )
*County of Chemung* v. *Abbott Labs., et al.*    )
(W.D.N.Y. No. 05-CV-06744)    )
AND    )
*County of Nassau* v. *Abbott Labs., et al.*    )
(E.D.N.Y. No. 04-CV-5126)    )
_____)

Pursuant to Local Rule 56.1, Schering Corporation ("Schering"), Schering-Plough Corporation ("Schering-Plough"), and Warrick Pharmaceuticals Corporation ("Warrick") (collectively the "Warrick Defendants") submit this Response to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Schering Corporation, Schering Plough Corporation, and Warrick Pharmaceuticals Corporation ("Plaintiffs' 56.1 Statement as to the Warrick Defendants") and Statement of Additional Undisputed Material Facts.  On the basis of these facts, and the facts set forth in defendants' summary judgment papers, Plaintiffs' Motion for Partial Summary Judgment should be denied and summary judgment entered in defendants' favor on all claims that New York Medicaid paid or should have paid on the basis of a FUL.

## **INTRODUCTION**

The Plaintiffs' 56.1 Statement as to the Warrick Defendants should be rejected for its failure to comply with Local Rule 56.1.  The requirements of this rule are simple: "a concise statement of the *material facts of record* as to which the moving party contends there is *no genuine issue to be tried, with page references to affidavits, depositions and other documentation*."  Local Rule 56.1 (emphasis added).

Many of the assertions in the Plaintiffs' 56.1 Statement as to the Warrick Defendants lack citations to factual support in the record.  Even where plaintiffs provide citations to factual support in the record, in several instances, the cited material does not support the "fact" for which it is cited.  Often, the record shows exactly the opposite of what the plaintiffs claim. Plaintiffs' 56.1 Statement as to the Warrick Defendants also offers "facts" that plainly are not material to the plaintiffs' partial summary judgment motion on issues related to the Federal Upper Limit ("FUL").  Finally, many of the purported "facts" are not "facts" at all:  as they are written, they are argumentative, conclusory, or irrelevant assertions.

Statements full of "[b]ombast and bluster, wholly detached from verified facts of record," are insufficient to support a motion for summary judgment. *Corrada Betances* v. *Sea-Land Serv., Inc.*, 248 F.3d 40, 44 (1st Cir. 2001) (refusing to credit statement of facts that lacked citations and appeared in the memorandum).  Because of the plaintiffs' failure to comply with Local Rule 56.1, their 56.1 Statement as to the Warrick Defendants should be rejected, and their motion for partial summary judgment should be denied. *See, e.g., Dale* v. *H.B. Smith Co., Inc.*, 910 F. Supp. 14, 20 (D. Mass. 1995) (denying summary judgment motion when party made 56.1 statements that were argumentative, conclusory, and unsupported by record evidence).

## GENERAL RESPONSES

1.      The Warrick Defendants dispute plaintiffs' alleged material facts to the extent they purport to relate to Schering-Plough or Schering.  Only generic, Warrick products are the subject of plaintiffs' motion.  *See* Plaintiffs' 56.1 Statement as to the Warrick Defendants at ¶ 2 (specifying Albuterol .83 mg/ml solution, Albuterol 90 MCG Inhaler, and Isosorbide Mononitrate 60 MG tablet as the only drugs at issue for the Warrick Defendants, hereinafter "the Subject Drugs"); *id.* at Ex. A (listing the NDCs of the drugs at issue all of which contain the Warrick labeler code 59930).

2.      Plaintiffs' alleged undisputed material facts based on Average Wholesale Price ("AWP") are immaterial and irrelevant to this motion, limited as it is to issues relating to the FUL.  As defendants point out in their own motion for summary judgment, CMS officials could not recall ever having used an AWP as the basis for a FUL.  *See* Local Rule 56.1 Stmt. of Undisputed Material Facts Supporting Defs.' Joint Mot. for Summary Judgment on Pls.' "FUL Fraud" Claims ("Defs.' 56.1 Stmt.") at ¶ 34, filed May 15, 2009 [Docket No. 6054].

3.      The Warrick Defendants dispute the plaintiffs' alleged undisputed material facts based on Wholesale Acquisition Cost ("WAC") on the grounds that: (i) Warrick did not have or use WACs for its drugs; (ii) Warrick did not report WACs for the Subject Drugs to any pricing compendia; (iii) none of the pricing compendia ever published a WAC for Warrick's drugs in their hard-copy publications; (iv) when, in 1993, Warrick discovered that First DataBank was publishing the Direct Price Warrick reported at launch for its drugs, Warrick instructed First DataBank not to publish a Direct Price for its drugs; and (v) thereafter, First DataBank ceased to publish Direct Prices (and never published WACs) for Warrick drugs in its hard-copy publication.  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Price that Warrick reported for its drugs at launch as a WAC, because Warrick did not subscribe to that service.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.

4.      Warrick further disputes the plaintiffs' alleged undisputed material facts to the extent they create an implication that the State of New York ("New York") or the New York Department of Health ("NYDOH"), the entity responsible for reimbursing Medicaid providers in New York, did not have access to actual prices for the Warrick Subject Drugs.  First, since as early as 1991, NYDOH received AMP data directly from the Warrick Defendants as part of its Elderly Pharmaceutical Insurance Coverage Program ("EPIC"), which helps seniors in the State of New York pay for prescription drugs.  *See*, *e.g.*, Tab A, Legislative Changes 2002 (February 6, 2002), NYCO AWP NYDOH 04887.[1]  In addition, since 1991, New York has had access to

---

[1]     All Exhibits are attached as Tabs to the Declaration of Kim B. Nemirow in Support of Schering Corporation's, Schering-Plough Corporation's, And Warrick Pharmaceuticals Corporation's Response To The Plaintiffs' Local
(Continued…)

3

Average Manufacturers Prices ("AMPs") through the Unit Rebate Amounts ("URAs") provided to it on a quarterly basis through the federal Medicaid Rebate Program.  Moreover, since 1995, New York has had access to actual acquisition cost information in its claims data in the form of 340B prices, which are generally defined as AMP minus URA.  Finally, beginning in January 2002 and continuing every month thereafter, Warrick voluntarily provided New York with a report of its high-low range of prices for the drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.

5.      Warrick further disputes the plaintiffs' recitation of the purportedly undisputed facts to the extent that it implies that New York set reimbursement rates in the belief that they were based on the actual selling prices for the Warrick Subject Drugs.  As set forth in defendants' summary judgment papers, NYDOH has long understood that "a pharmacy's acquisition cost for a drug is likely to be lower than the prices quote[d] in third-party pricing compendia such as the Red Book or First DataBank." *See* Defs.' 56.1 Stmt. at ¶¶ 60-63 (Aff. of Cesar A. Perales, at ¶ 2 & Ex. A).  Indeed, during the notice-and-comment period for the FUL in 1986, the New York Department of Social Services (the predecessor to NYDOH) commented on three proposed alternatives for establishing the FUL and specifically urged the Health Care Financing Administration ("HCFA") not to base the FUL on published prices because "the advertised price found in the Red Book or the Blue Book may not reflect the actual purchase prices."  *Id.* at ¶¶ 60-61.  In fact, since as early as 1991, NYDOH received AMP data directly

---

Rule 56.1 Statement Of Undisputed Material Facts As To Schering Corporation, Schering-Plough Corporation, And Warrick Pharmaceuticals Corporation And Statement Of Additional Undisputed Material Facts, filed June 15, 2009.

4

from the Warrick Defendants as part of EPIC.  *See, e.g.*, Tab A, Legislative Changes 2002 (February 6, 2002), NYCO AWP NYDOH 04887.  Moreover, as noted above, since January 2002, New York has had access to reports on the high-low range of prices for the Warrick drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.

## SPECIFIC RESPONSES

As described in detail below, there are disputes of material fact that preclude the entry of summary judgment for the plaintiffs.  The below numbered paragraphs correspond to the assertions in Plaintiffs' 56.1 Statement as to the Warrick Defendants.

**1.      The Schering/Warrick Drugs and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto.  This exhibit also sets forth Schering/Warrick's Published AWPs and DPs/WACs for these Drugs and NDCs.  The exhibit specifically notes which NDCs are associated with package sizes that set the FUL.**

**Response:  Disputed in part.**

The Warrick Defendants acknowledge that Exhibit A sets forth the Warrick drugs at issue in this motion.  The Warrick Defendants also acknowledge that Exhibit A lists AWPs and FULs and purports to provide Direct Prices and WACs for such drugs.  The Warrick Defendants dispute that the listed values constitute *Warrick's* "AWPs" or "Published DPs/WACs" for such drugs.  With respect to WACs, as set forth in General Response No. 3 above, Warrick did not have WAC prices and did not report a WAC for the Subject Drugs to any pricing compendia.  *See* Tab B, Deposition of Harvey Weintraub, Sept. 18-22, 2006 ("Weintraub Dep.") at 154-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically

5

invoice prices "were different for each customer." *Id.*; *see also id.* at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  None of the pricing compendia, First DataBank, Medispan or Red Book, ever reported a WAC for Warrick's drugs in their hard-copy publications.  Because Warrick did not subscribe to First DataBank's electronic pricing service, Warrick was never aware, during the relevant time, that First DataBank was reporting Warrick's Direct Price at launch as a WAC.  *See id.* at 154 & 387.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See id.* at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product); *id.* at 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab C, A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.  With respect to Direct Prices or DPs, at the launch of a product, Warrick generally set a direct price.  *See* Weintraub Dep. at 153-54 & 353 (direct price was the "going-out price" that Warrick intended to get if it could); *id.* at 566 (direct price was the initial "going-out price" expected for the wholesale class of trade).  Warrick typically sent letters at the launch of a product to customers, pricing compendia, and state Medicaid agencies, including New York, providing notice of the product's AWP and NDC number, and occasionally its direct price at launch.  *See*, *e.g.*, *id.* at 639 (testifying that Warrick's procedure when launching a new product was to notify First DataBank of the AWP and NDC numbers); Tab D, Letter from Harvey Weintraub to Beth Rader and Ed Edlestein dated Sept. 3, 1993 (announcing availability of 25 x 3 ml albuterol sulfate inhalation solution 0.083%, 59930-1500-08 and reporting AWP and direct price at launch); Tab E, Letter from Harvey J. Weintraub to Beth Rader dated Dec. 29, 1995 (announcing availability of

6

albuterol USP inhalation aerosol (59930-1560-1) and refill (59930-1560-2) and reporting AWP);

Tab F, Letter from Phyllis T. Sinoradzki, M.A.E. to Arnold Shapiro dated Dec. 30, 1995

(announcing availability of albuterol USP inhalation aerosol (59930-1560-1) and refill (59930-

1560-2) and reporting AWP and direct price at launch for same).  After launch, Warrick did not

maintain a uniform direct price that was the same for each customer.  *See* Weintraub Dep. at 153.

For that reason, in a letter dated October 12, 1993, Harvey Weintraub asked First DataBank to

"[p]lease delete direct price listings from your publication or database."  *Id.*; *see also* Tab G,

Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  Mr.

Weintraub confirmed that First DataBank complied with his request by reviewing the First

DataBank publication to ensure no Warrick Direct Prices were included.  *See* Weintraub Dep. at

153-54.  As noted below, Warrick also did not have ultimate control over the AWPs published

for its products by the national pricing compendia.  *See infra* Responses to ¶ 9.

**2.      The specific Schering/Warrick drugs at issue are the Albuterol .83 mg/ml solution,
the Albuterol 90 MCG Inhaler and Isosorbide Mononitrate 60 MG Tablet.**

>        **Response:  Disputed in part.**

        The Warrick Defendants acknowledge that the Warrick drugs at issue are the Albuterol

.83 mg/ml solution, the Albuterol 90 MCG Inhaler and Isosorbide Mononitrate 60 MG Tablet.

As set forth in General Response No. 1, the drugs identified in this paragraph are all generic,

Warrick products.  Accordingly, the Warrick Defendants dispute this alleged material fact to the

extent it purports to relate to Schering.

**3.      Schering/Warrick has entered into and executed the federal Medicaid rebate
agreement pursuant to 42 U.S.C. § 1396r-8.  *See* Defendants Schering-Plough
Corporation's, Schering Corporation's, and Warrick Pharmaceuticals Corporation's**

**Answer to Plaintiffs' Revised First Amended Consolidated Complaint ("Schering/Warrick Answer") [Docket #4835] at ¶ 132;** *see also Commonwealth of Mass. v. Mylan***, 2008 WL 5650859 \*25 (D. Mass. Dec. 23, 2008).**

>       **RESPONSE:  Disputed in part.**

The Warrick Defendants acknowledge that Warrick has entered into and executed the federal Medicaid rebate agreement pursuant to 42 U.S.C. § 1396r-8.  As set forth in General Response No. 1, the drugs identified in this paragraph are all generic, Warrick products. Accordingly, the Warrick Defendants dispute this allegedly material fact to the extent it purports to relate to Schering.

**4.       Schering/Warrick was required as matter of law to familiarize itself with the legal requirements, standards and procedures of Medicaid reimbursement formulas.**  *Mylan***, 2008 WL 5650859 at \*25.**

>       **RESPONSE:  Disputed in part.**

The Warrick Defendants acknowledge only that, in *Commonwealth of Mass.* v. *Mylan*, 608 F. Supp. 2d 127, 154 (D. Mass. 2008), this Court wrote "having entered into the rebate agreements, the defendants were required, as a matter of law, to familiarize themselves with the legal requirements, standards and procedures of the Medicaid program."  The Warrick Defendants deny this statement to the extent that it constitutes a legal conclusion and is unsupported by any factual citation to either the record or affidavits as required by Local Rule 56.1.  In addition, the Warrick Defendants object to plaintiffs' use of the *Mylan* decision, a ruling on summary judgment motions involving different bases of reimbursement, a different state Medicaid program, and entirely different causes of action, that is not yet final, as evidentiary support for its allegedly undisputed facts.  Moreover, the Court concluded, after viewing the

8

proffered evidence in the light most favorable to the moving party, that sufficient disputed material facts existed to preclude summary judgment either for defendants or for plaintiffs.  *E.g. Mylan*, 608 F. Supp. 2d at 154-55.  As set forth in General Response No. 1, the drugs identified in this paragraph are all generic, Warrick products.  Accordingly, the Warrick Defendants dispute plaintiffs' alleged material fact to the extent it purports to relate to Schering.

**5.     Warrick knew that eligibility for reimbursement by Medicaid was an important issue for its customers.  *See* Warrick Pharmaceuticals Corp. 30(b)6) (Harvey Weintraub) 9/18/06 Deposition Transcript (Exhibit B) at 173:5-9 (hereinafter "Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B)") ("In order to have our drugs purchased by the national accounts we certainly had to have our products reimbursed by – under the Medicaid programs.").**

          **Response:  Undisputed.**

The Warrick Defendants acknowledge that Harvey Weintraub testified that "[i]n order to have our drugs purchased by the national accounts we certainly had to have our products reimbursed by - under the Medicaid programs."  *See* Weintraub Dep. at 173.  Mr. Weintraub's complete testimony continued "and so all we wanted to do was to be listed as a product for which they would reimburse.  So we sent them out a letter saying, 'This is what our product is.  Here's the NDC code.  Please list it,' in essence."  *Id.*

**6.     Schering/Warrick was well aware of the importance of the Medicaid market and that many states use third-party pricing services for the pricing data used to establish reimbursement levels.  *Id.* at 369: 7 – 371-23.  In the Schering/Warrick "Action Plan" for the Albuterol Inhaler launch, the authors state at page 10 under the heading "MEDICAID, DUR AND PRICING SERVICES:" 1) One of the critical factors in the success of a generic**

9

**product is to get reimbursement as quickly as possible.  Third party reimbursers represent as much as 2/3 of an accounts utilization of a given product.  It will be critical to achieve 100% reimbursement as quickly as possible.  2) Many states utilize third party pricing services to update their files for new additions as products become available for reimbursement on Medicaid.  Letters should be prepared immediately for mailing the day of launch to all pricing services.  *See*, Exhibit K (excerpts of Action Plan).**

        **Response:  Disputed in part.**

The Warrick Defendants acknowledge only that Mr. Weintraub testified that it was important to Warrick's success that Warrick be listed and eligible for reimbursement by third-party payers including Medicaid.  *See* Weintraub Dep. at 369.  The Warrick Defendants deny that Warrick knew "that many states use third-party pricing services for the pricing data used to establish reimbursement levels."  The deposition testimony cited by plaintiffs does not support this statement.  *See id.* at 370 ("We wanted to be listed on the program.  How the reimbursing agents determine their reimbursement, whether it was on one price or another, I don't know.")  In addition, Exhibit K is inadmissible because the document is not authenticated, and Mr. Weintraub testified that he is not familiar with it, and it appeared to be a Schering (and not a Warrick) document.  *See id.* at 366-67 & 372.  Warrick acknowledges that Harvey Weintraub testified he was aware that AWP was used in the pharmaceutical industry as a sticker price, a point of reference from which negotiations between a third-party payor and the account it was servicing were started.  *See id.* at 135.  Mr. Weintraub further testified that there were thousands of such third-party payors, including HMOs, insurance companies, and government agencies.  *See id.* at 137.  Mr. Weintraub also testified that no one at Warrick attempted to keep track of the specific reimbursement methods of these thousands of reimbursement plans and formulas, and

that reimbursement "was not [their] focus" but, rather, their focus was "[p]rice, service, continuity of supply, [and] meeting the competition." *See id.* at 137 & 173-75 (Mr. Weintraub testified that Warrick did not know the specifics of each state's Medicaid reimbursement formula, did not know whether they all reimbursed in the same manner with the same formula at the same time, did not keep track of what the formulas were or how they changed from time to time, and did not consider that relevant to the business of selling Warrick generic drugs.).  As set forth in General Response No. 1, the drugs identified in this paragraph are all generic, Warrick products.  Accordingly, the Warrick Defendants dispute this allegedly material fact to the extent it purports to relate to Schering.

**7.     Warrick reported an AWP for its drugs to the pricing compendia.  *See* Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B) at 151:9-11; Warrick Pharmaceuticals Corp. 30(b)6) (Harvey Weintraub) 9/19/06 Deposition Transcript (Exhibit C) at 376:6-9 (hereinafter "Warrick 30(b)(6) (Weintraub) 9/19/06 Dep. (Exhibit C)").  *Mylan*, 2008 WL 5650859 at \*7.  Warrick 30(b)(6) (Weintraub) 9/22/06 Dep. (Exhibit D) at 893:24-894:4.**

**Response:  Disputed as written.**

As set forth in General Response No. 2 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to the FUL.  The Warrick Defendants acknowledge that Warrick typically suggested an AWP at launch.  To the extent that plaintiffs intend to imply Warrick continued to report AWPs periodically after launch, Warrick denies the implication.  Tab H, First DataBank Price History for Albuterol 90 MCG Inhaler (59930-1560-01) dated July 27, 2004, First DataBank Price History for Albuterol 90 MCG Inhaler Refill (59930-1560-02) dated July 27, 2004.

**8.     At all times, from 1997 to 2005, at the time of launch of a new product Warrick set**

11

an AWP for each of its drugs.  *See* **Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B)**
**at 166:17-24.** *Mylan***, 2008 WL 5650859 at \*7.  Warrick has only one AWP for any Warrick**
**product at any time.**  *See* **Warrick Pharmaceuticals Corp. 30(b)6) (Harvey Weintraub)**
**9/22/06 Deposition Transcript (Exhibit D) at 852:21-23 (hereinafter "Warrick 30(b)(6)**
**(Weintraub) 9/22/06 Dep. (Exhibit D)").**

> **Response:  Disputed in part.**

As set forth in General Response No. 2 above, the alleged undisputed material facts
relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to
the FUL.  The Warrick Defendants acknowledge that Warrick typically suggested an AWP at
launch and that Warrick has only one AWP for any Warrick product at any time.

**9.**      **Warrick knew and controlled the AWPs for its drugs that were published by the**
**national drug pricing compendia.**  *See* **Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit**
**B) at 154:9-16.  First Databank would send requests to Warrick to verify the accuracy of**
**the AWPs for its drugs.**  *See* **Warrick 30(b)(6) (Weintraub) 9/22/06 Dep. (Exhibit D) at**
**843:7 – 844:3; 849:8-17.**

> **Response:  Disputed.**

The Warrick Defendants deny that Warrick knew and controlled the AWPs for its drugs
that were published by the national drug pricing compendia.  The Warrick Defendants
acknowledge only that, generally, the pricing compendia published the AWPs that Warrick had
suggested at launch.  The cited deposition testimony relates to a single episode in 1993 where
Harvey Weintraub wrote to a pricing publication to request that the AWP of one package size of
albuterol 0.083 % solution be lowered so as to make the per unit AWP consistent with another
package size, and where Mr. Weintraub later reviewed the publication to confirm that the change

had been made.  *See* Weintraub Dep. at 151-54.  The Warrick Defendants deny that the lowering

of AWP on one package size of the 0.083% solution in 1993 is a material fact for purposes of

this litigation, as it is outside the relevant time period, and deny that this single episode

demonstrates that Warrick "knew and controlled the AWPs for its drugs that were published by

the national drug pricing compendia."  The Warrick Defendants also deny that First DataBank

would send requests to Warrick to verify the accuracy of the AWPs for its drugs.  The Warrick

Defendants acknowledge only that Harvey Weintraub testified that Warrick received requests to

update AWPs.  *See id*. at 843-44.   Additional evidence suggests that First DataBank did not

regularly send such requests.  *See* Tab I, Deposition of Patricia Kay Morgan, Jan. 28, 2002

("Morgan Dep.") at 19-22 (First DataBank had no policy to routinely request updated

information from manufacturers); *see also* Weintraub Dep. at 639 (testifying that he did not

recall any routine requests from First DataBank for information).

  More generally, as this Court knows from its having presided over the *McKesson* case, no

manufacturer "controlled" its AWPs.  AWPs were published by the national pricing compendia,

including specifically First DataBank, that unilaterally and over some manufacturers' objections,

and to their detriment, raised AWPs for their products as a result of an agreement with

McKesson and other wholesalers.  The *McKesson* case makes plain that First DataBank did not

function as the manufacturers' agent and the manufacturers did not "control" their AWPs or

other published prices for that matter.  *See*, *e.g.*, *New England Carpenters Health Benefits Fund*

v. *First DataBank, Inc.*, 244 F.R.D. 79 (D. Mass. 2007).

  As set forth in General Response No. 2 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to

the FUL.

13

**10.     All published AWPs reflected what Warrick submitted to them.  Warrick received written publications from First DataBank on either a bi-weekly or monthly basis and would review them to confirm that First DataBank published the prices Warrick had submitted.  *See* Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B) at 154:9-16.**

**Response:  Disputed in part.**

The Warrick Defendants acknowledge that generally, the pricing compendia published the AWPs that Warrick had suggested at launch.  Plaintiffs cite no record evidence, however, to show that "*[a]ll* published AWPs reflected what Warrick submitted to them."  The Warrick Defendants acknowledge that Warrick periodically received written publications from First Databank but deny that Warrick would review each of those publications to confirm that First DataBank published the prices Warrick had submitted.  The deposition cited refers to a single instance, in 1993, where Mr. Weintraub recalled reviewing a First DataBank publication to confirm that the published AWP was the one Warrick had suggested.  *See* Weintraub Dep. at 153-54.  The Warrick Defendants deny that this instance in 1993 in which Mr. Weintraub reviewed a First DataBank publication is a material fact for purposes of this litigation, as it is outside the relevant time period, and deny that this single episode demonstrates that Warrick generally "would review" First DataBank publications to confirm that the published AWPs were consistent with the AWPs Warrick had suggested.  The *McKesson* litigation demonstrates, moreover, that published AWPs did not always reflect the prices manufacturers submitted to them.  *See*, *e.g.*, *New England Carpenters Health Benefits Fund* v. *First DataBank, Inc.*, 244 F.R.D. 79 (D. Mass. 2007).

14

As set forth in General Response No. 2 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to

the FUL.

**11.    Warrick's Direct Price was synonymous with "Invoice Price" which was**

**synonymous with WAC.  Deposition of Harvey J. Weintraub dated 2/12/03 (Exhibit E) at**

**489:20-490:7; 592:7-17. 635:23-636:3; 708:15-20 (hereinafter "Weintraub 2/12/03 Dep.**

**(Exhibit E)").**

Response:  Disputed in part.

The Warrick Defendants acknowledge only that Warrick, at the launch of a product, set a

direct price, which Harvey Weintraub testified was "the price at which [Warrick] invoiced an

account."  *See* Weintraub Dep. at 153-54, 353 (direct price was the "going-out price" that

Warrick intended to get if it could), 566 (direct price was the initial "going-out price" expected

for the wholesale class of trade).  The Warrick Defendants dispute that Warrick's Direct Price is

synonymous with WAC.  As set forth in General Response No. 3 above, Warrick did not have

WACs and did not report WACs for the Subject Drugs to any pricing compendia.  *See id*. at 155-

59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and

typically invoice prices "were different for each customer."  *Id.* at 155-59 & 528-29 (Warrick

would have a whole range of different prices, and the prices would be different for different

customers and according to the position of the competition).  The Warrick Defendants

understand WAC to be a list or invoice price used for all customers.  None of the pricing

compendia, First DataBank, Medispan or Red Book, ever reported a WAC for Warrick's drugs

in their hard-copy publications.  When Warrick realized that First DataBank was publishing

Direct Prices for its drugs in 1993, it instructed First DataBank not to do so, and First DataBank

15

ceased to publish Direct Prices (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication. *See* Weintraub Dep. at 153-55;  Tab G, Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  Because Warrick did not subscribe to First DataBank's electronic pricing service, Warrick was never aware, during the relevant time, that First DataBank was reporting Warrick's Direct Price at launch as a WAC.  *See* Weintraub Dep. at 154 & 387.  Rather, Warrick only ever reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See* Weintraub Dep. at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product) & 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab C, A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.

**12.      Warrick did not report WACs for its drugs but reported DPs which Warrick knew FDB would publish as WACs.  *See* Warrick Pharmaceuticals Corporation's Response to the Commonwealth of Massachusetts's Local Rule 56.1 Statement of Undisputed Material Facts Applicable to Warrick and Counterstatement of Additional Undisputed Material Facts, ("Response to Mass. 56.1") [Mass. Docket #475] (Exhibit F) at ¶11 (hereinafter "Warrick Resp. to Mass. SOF (Exhibit F)"), *Mylan*, 2008 WL 5650859 at \*6.  Warrick admits that it knew that Warrick's DPs were published as WACs, and on at least one occasion, provided its Direct Price to First Databank specifically and expressly to be published as its WAC, as a condition of having its products listed.  *See* Warrick Resp. to Mass. SOF (Exhibit F) at footnote 1 on page 38 (describing a transaction between Harvey Weintraub on behalf of Warrick and Kay Morgan on behalf of First Databank in which**

16

Weintraub was informed that Warrick's Direct Price was considered by First Databank to
be an appropriate proxy for WAC); *Mylan*, 2008 WL 5650859 at * 17.

Response:  Disputed in part.

The Warrick Defendants acknowledge only that they "did not report WACs for their
drugs."  With respect to the Direct Prices Warrick reported at launch, when Warrick discovered
in 1993 that First DataBank was publishing those Direct Prices subsequent to launch, it
instructed First DataBank to stop.  *See* Weintraub Dep. at 153; *see also* Tab G, Letter from
Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  Warrick separately
negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were
different for each customer."  *Id.*; *see also* Weintraub Dep. at 528-29 (Warrick would have a
whole range of different prices, and the prices would be different for different customers and
according to the position of the competition).  First DataBank complied and no longer published
Direct Prices (and never published WACs) in its hard-copy publication.  *See* Weintraub Dep. at
153-55.  Accordingly, the Warrick Defendants deny that Warrick knew that First DataBank
would publish the DPs submitted at launch as WACs.  As set forth in General Response No. 3
above, Warrick did not have WACs and did not report WACs for the Subject Drugs to any
pricing compendia.  *See* Tab B, Weintraub Dep. at 155-59.

The Warrick Defendants deny that Warrick has ever admitted "that it knew that
Warrick's DPs were published as WACs, and on at least one occasion, provided its Direct Price
to First Databank specifically and expressly to be published as its WAC, as a condition of having
its product listed."  Warrick acknowledges that, in one isolated incident in July 2002, Warrick
reported a WAC to pricing compendia when Kay Morgan of First DataBank directly asked
Harvey Weintraub to provide WACs for its new sterile solutions as a condition of listing those

17

new sterile solutions in its publication.  *See* Tab J, Letter from Harvey Weintraub to Kay Morgan

dated July 16, 2002.  On that occasion, Mr. Weintraub informed First DataBank that Warrick

"did not have WAC prices," but rather "that Warrick has a range of prices at which it sells its

products at any given time."  *See* Weintraub Dep. at 156.  First DataBank informed Mr.

Weintraub that "disclosing [Warrick's] highest WAC would be sufficient for [their] purposes"

and in response, Warrick reported the highest prices for the albuterol sulfate inhalation solution.

*Id.*  Contrary to plaintiffs' statement, the letter in question makes no reference at all to Direct

Price.

        Further, notes taken by Kay Morgan, a First DataBank employee, of a subsequent

conversation with Warrick confirm that First DataBank "used [its] own judgment" in setting

Warrick's WAC.  The notes state as follows:

> Called Harvey Winetraub [sic] and asked for WACs.  Harvey
> stated that they do not have one priced [sic] for wholesalers.  I
> asked which of prices attached should be used.  After discussion
> Harvey will get back to me.  Kay Morgan 4/15/2004
>                    * * *
> *Received message from Harvey Winetraub [sic] on 4/16 indicating
> they do not have WACs and I should use my own judgment.*
> Contracted wholesalers per attached.  WAC equals system price.
> Kay Morgan 4/21/04

*See* Tab K, Contested Privilege Dep. of James Breen, at 24–25 (emphasis added).

        In addition, the Warrick Defendants object to plaintiffs' use of the *Mylan* decision, a

ruling on summary judgment motions involving different bases of reimbursement, a different

state Medicaid program, and entirely different causes of action, that is not yet final, as

evidentiary support for its alleged undisputed facts.  Moreover, the Court concluded, after

viewing the proffered evidence in the light most favorable to the moving party, that sufficient

disputed material facts existed to preclude summary judgment either for defendants or for plaintiffs.  *E.g. Mylan*, 608 F. Supp. 2d at 154-55.

      **13.**     **Warrick set AWP at launch and generally did not change it.  *See* Warrick Resp. to Mass. SOF (Exhibit F) at 11. Warrick knew that FDB published its DPs in the hard copy version of FDB's pricing service. *Mylan*, 2008 WL 5650859 at *7.  Warrick knew that FDB published its Direct Prices as WACs in the electronic form.  *See* Warrick Resp. to Mass. SOF (Exhibit F) at 26.**

      **Response:  Disputed in part.**

      The Warrick Defendants acknowledge that Warrick typically suggested an AWP at launch and generally did not change it.  As set forth in General Response No. 2 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to the FUL.  With respect to the Direct Prices Warrick reported at launch, when Warrick discovered in 1993 that First DataBank was publishing those Direct Prices subsequent to launch, it instructed them to stop.  *See* Weintraub Dep. at 153; *see also* Tab G, Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  First DataBank complied and no longer published Direct Prices (and never published WACs) in its hard-copy publication.  *See* Weintraub Dep. at 153-55.  The Warrick Defendants deny that Warrick knew that First DataBank published its Direct Prices as WACs in the electronic form.  Warrick Pharmaceuticals Corporation's Response to the Commonwealth of Massachusetts's Local Rule 56.1 Statement of Undisputed Material Facts Applicable to Warrick and Counterstatement of Additional Undisputed Material Facts ("Warrick's Response to Mass. 56.1"), cited by plaintiffs as evidence to support such knowledge on the part Warrick, expressly denies such knowledge.  *See* Tab L, Warrick's Response to Mass. 56.1, at Responses to ¶¶ 19,

21, 23-26, Counterstatement ¶ 10.   As indicated in Warrick's Response to Mass. 56.1, none of the pricing compendia, First DataBank, Medispan or Red Book, ever reported a WAC for Warrick's drugs in their hard-copy publications.  *Id.* at Responses to ¶¶ 19, 21, 23-24.  When Warrick realized that First DataBank was publishing Direct Prices for its drugs in 1993, it instructed First DataBank not to do so and First DataBank ceased to publish Direct Prices (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication.  *See* Weintraub Dep. at 153-55; Tab G, Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Price that Warrick reported for its drugs at launch as a WAC, because Warrick did not subscribe to that service.  *See* Weintraub Dep. at 154 & 387.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See id.* at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product) & 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab C, A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.

In addition, the Warrick Defendants object to plaintiffs' use of the *Mylan* decision, a ruling on summary judgment motions involving different bases of reimbursement, a different state Medicaid program, and entirely different causes of action, that is not yet final, as evidentiary support for its alleged undisputed facts.  Moreover, the Court concluded, after viewing the proffered evidence in the light most favorable to the moving party, that sufficient disputed material facts existed to preclude summary judgment either for defendants or for plaintiffs.  *E.g. Mylan*, 608 F. Supp. 2d at 154-55.

20

**14.     Warrick produced at least one fax from First Databank to Warrick of FDB's 1999 National Drug Data File Product Update, listing Warrick's drugs and their WACs, demonstrating that Warrick was aware of the fact that FDB was publishing its Direct Prices as WAC.  FDB Fax dated 3/2/99 (Exhibit G), Bates RGX 0190075-6; *Mylan,* 2008 WL 5650859 at \*7**.

      **Response:  Disputed in part.**

      The Warrick Defendants acknowledge that Exhibit G to Plaintiffs' Local Rule 56.1 Statement as to the Warrick Defendants is a fax from First Databank to Warrick of FDB's 1999 National Drug File Data Product Update that was produced by Warrick.  Warrick notes, however, that Exhibit G is inadmissible evidence.  It is not addressed to anyone in particular, no one has authenticated it, and plaintiffs cannot show that anyone at Warrick ever saw it or reviewed it.  Moreover, there is no evidence whether Warrick replied to the fax one way or the other.  Indeed, Warrick's 30(b)(6) witness, Harvey Weintraub, testified that he never saw this document or any document like it.  *See* Weintraub Dep. at 592-599.  Furthermore, the document refers to WHLNET and not WAC.  The term WAC appears nowhere on the document and, for that reason alone, plaintiffs' statement is inaccurate and unsupported by the record evidence.  The Warrick Defendants dispute that the document demonstrates that Warrick was aware that First DataBank was publishing its Direct Prices as WACs.  As set forth in General Response No. 3 above, Warrick did not have a WAC price and did not report WACs for the Subject Drugs to any pricing compendia.  *See id.* at 155-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id.*; *see also id.* at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).

None of the pricing compendia, First DataBank, Medispan or Red Book, ever reported a WAC for Warrick's drugs in their hard-copy publications.  When Warrick realized that First DataBank was publishing Direct Prices for its drugs in 1993, it instructed First DataBank not to do so and First DataBank ceased to publish Direct Prices (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication.  *See* Weintraub Dep. at 153-55;  Tab G, Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Price that Warrick reported for its drugs at launch as a WAC, because Warrick did not subscribe to that service.  *See* Weintraub Dep. at 154 & 387.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See id.* at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product) & 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab C, A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.  Samples of Price Alerts showing no WAC or Direct Price reported for the Warrick Subject Drugs appear in Tab M, to this Response.

In addition, the Warrick Defendants object to plaintiffs' use of the *Mylan* decision, a ruling on summary judgment motions involving different bases of reimbursement, a different state Medicaid program, and entirely different causes of action, that is not yet final, as evidentiary support for its alleged undisputed facts.  Moreover, the Court concluded, after viewing the proffered evidence in the light most favorable to the moving party, that sufficient disputed material facts existed to preclude summary judgment either for defendants or for plaintiffs.  *E.g. Mylan*, 608 F. Supp. 2d at 154-55.

15.     Kay Morgan also testified that from time-to-time, FDB would send manufacturers the information FDB was publishing, including WACs, and request that the manufacturer approve and update its information.  Deposition of Patricia Kay Morgan dated 1/28/02 (Exhibit H) at 38:5-25, Mylan, 2008 WL 5650859 at *17.

        Response:  Disputed in part.

        The Warrick Defendants acknowledge that Kay Morgan testified in 2002 that First DataBank had recently contacted manufacturers to request that they provide price updates.  The Warrick Defendants deny that, in the deposition excerpt cited by plaintiffs, Kay Morgan testified that FDB sought updates from manufacturers "from time to time" or earlier than 2002, or that she suggested that FDB requested that the manufacturer "approve" its information.  *See* Tab I, Morgan Dep. at 16.  Indeed, there is evidence that First DataBank had no such policy of periodically requesting that manufacturers update and/or approve their information.  *Id.* at 19-21 (First DataBank had no policy to routinely request updated information from manufacturers); *see also* Weintraub Dep. at 639 (testifying that he did not recall any routine requests from First DataBank for information).  Further, notes taken by Kay Morgan, a First DataBank employee, confirm that First DataBank "used [its] own judgment" in setting Warrick's WAC.  *See* Tab K, Contested Privilege Dep. of James Breen, at 24–25 (emphasis added).

        In addition, the Warrick Defendants object to plaintiffs' use of the *Mylan* decision, a ruling on summary judgment motions involving different bases of reimbursement, a different state Medicaid program, and entirely different causes of action, that is not yet final, as evidentiary support for its alleged undisputed facts.  Moreover, the Court concluded, after viewing the proffered evidence in the light most favorable to the moving party, that sufficient

disputed material facts existed to preclude summary judgment either for defendants or for plaintiffs.  *E.g. Mylan*, 608 F. Supp. 2d at 154-55.

**16.    Warrick refers to its DPs as "Direct Wholesale" indicating that Warrick presents its DPs as its wholesale prices.  Warrick Launch Letters dated 12/29/95 and 12/30/95 (Exhibit I), Mylan, 2008 WL 5650859 at \*17.  Warrick knew that its published prices were used for Medicaid reimbursement purposes.  *See* Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B) at 135:3-25; 137:1-12; Warrick 30(b)(6) (Weintraub) 9/19/06 Dep. (Exhibit C) at 369:7 – 371:23.  *Mylan*, 2008 WL 5650859 at \*16.**

> **Response:  Disputed in part.**

The Warrick Defendants acknowledge only that a 12/29/95 letter from Warrick to the <u>Massachusetts</u> Medicaid program referred to Warrick's direct price as "Direct Wholesale."  The Warrick Defendants deny the characterization that, in doing so, Warrick "presents its DPs as its wholesale prices."  The Warrick Defendants deny that Warrick knew "its published prices were used for Medicaid reimbursement purposes" to the extent that the statement does not specify to which  "published prices" it refers and to the extent the statement implies that Warrick generally reported to the publishers anything other than AWP and Direct Price at launch.

In addition, as set forth in General Response No. 3 above, Warrick did not have a WAC price and did not report a WAC for the Subject Drugs to any pricing compendia.  *See* Weintraub Dep. at 155-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id.*; *see also id.* at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  None of the pricing compendia, First DataBank, Medispan or Red Book, ever reported a WAC for Warrick's drugs

in their hard-copy publications.  When Warrick realized that First DataBank was publishing

Direct Prices for its drugs in 1993, it instructed First DataBank not to do so and First DataBank

ceased to publish Direct Prices (and never reported WACs) for Warrick's Subject Drugs in its

hard-copy publication.  *See id.* at 153-55;  Tab G, Letter from Harvey J. Weintraub to Beth

Rader and Ed Edlestein dated Oct. 12, 1993.  Warrick was never aware, during the relevant time,

that First DataBank was reporting in its electronic pricing file the Direct Prices that Warrick

reported for its drugs at launch as WACs, because Warrick did not subscribe to that service.  *See*

Weintraub Dep. at 154 & 387.  Rather, Warrick only reviewed First DataBank's monthly Price

Alerts, which First DataBank specified were its "official" pricing guides.  *See id.* at 444-45 (Mr.

Weintraub testified that he is familiar only with the booklet Price Alert and not with First

DataBank's electronic product) & 150 (Warrick did not have access to the electronic version of

First DataBank's publication used by states and their fiscal agents); Tab C, A Proposal for the

Exclusive Sponsorship of Price Alert, June 1991, at 2.

    As set forth in General Response No. 2 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to

the FUL.  In any event, Harvey Weintraub merely testified he was aware that AWP was used in

the pharmaceutical industry as a sticker price, a point of reference from which negotiations

between a third-party payor and the account it was servicing were started.  *See* Weintraub Dep. at

135.  Mr. Weintraub testified that he sent First DataBank launch letters because Warrick's

pharmacy customers required that the product be listed in First DataBank, and that Warrick's

products needed to be listed in order to be eligible for reimbursement.  *See id.* at 352.  Mr.

Weintraub further testified that he didn't know how the information would be utilized, and he did

not specifically intend for it to be used for reimbursement.  *See id.* at 566 (testifying that his

25

"intent was to inform [Medicaid programs] of what our direct wholesale price would be going out.  How they utilized it, I really don't know.").

In addition, the Warrick Defendants object to plaintiffs' use of the *Mylan* decision, a ruling on summary judgment motions involving different bases of reimbursement, a different state Medicaid program, and entirely different causes of action, that is not yet final, as evidentiary support for its alleged undisputed facts.  Moreover, the Court concluded, after viewing the proffered evidence in the light most favorable to the moving party, that sufficient disputed material facts existed to preclude summary judgment either for defendants or for plaintiffs.  *E.g. Mylan*, 608 F. Supp. 2d at 154-55.

**17.     Warrick knows and admits that its reported AWPs were not tethered to the actual prices that anyone pays or to the WAC.  *See* Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B) at 134:13 – 135:1 (AWP is "a reference point or a sticker price").**

**Response:  Disputed.**

The Warrick Defendants acknowledge that Warrick generally reported an AWP at launch that was 10-15% below the AWP for the equivalent brand drug and that, when Warrick entered the market with competitive products, it would set an AWP consistent with the AWPs of competing products.  Warrick believes further discovery will show that these practices were consistent with general industry practice.  To the extent that plaintiffs intend to imply Warrick continued to report AWPs periodically after launch, Warrick denies the implication.  Warrick's AWP at launch would have born some relationship to its Direct Price or DP at launch, which was invoice price for some transactions at or near the time of launch.

In addition, as set forth in General Response No. 3 above, Warrick did not have a WAC price and did not report a WAC for the Subject Drugs to any pricing compendia.  *See* Weintraub

Dep. at 155-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id.*; *see also id.* at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  None of the pricing compendia, First DataBank, Medispan or Red Book, ever reported a WAC for Warrick's drugs in their hard-copy publications.  When Warrick realized that First DataBank was publishing Direct Prices for its drugs in 1993, it instructed First DataBank not to do so and First DataBank ceased to publish Direct Prices (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication.  *See id.* at 153-55;  Tab G, Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Prices that Warrick reported for its drugs at launch as WACs, because Warrick did not subscribe to that service.  *See* Weintraub Dep. at 154 & 387.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See id.* at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product) & 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab C, A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.  The Warrick Defendants object to plaintiffs' assertion that its "reported AWPs were not tethered to . . . . the WAC."  Warrick could not have tethered anything to a price it did not have.

Moreover, NYDOH knew that generic prices decline over time because it received AMP data directly from the Warrick Defendants on a quarterly basis as part of its EPIC program.  *See*, *e.g.*, Tab A, Legislative Changes 2002 (February 6, 2002), NYCO AWP NYDOH 04887.   In

27

any event, it is a common industry understanding that price competition for generic drugs is robust and that prices for generic drugs drop over time. *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 94 (D. Mass 2005). Indeed, in the MDL class action, the plaintiffs asserted, and the Court adopted, the principle that competition is so pervasive in the generic market that a Maximum Allowable Cost ("MAC") can be presumed to apply to all generic drugs beginning six months after the first generic launch. *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 87 (D. Mass 2007).

As set forth in General Response No. 2 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to the FUL.

**18.     At all times relevant to this action, Warrick knew that its generic product line was subject to vigorous competition and that as a result, the actual prices for Warrick's products would generally decline substantially over time. *See* Warrick Pharmaceuticals Corp. 30(b)(6) (Harvey Weintraub) 9/21/06 Deposition Transcript (Exhibit J) at 753-57 (hereinafter Warrick 30(b)(6) (Weintraub) 9/21/06 Dep. (Exhibit J)"); Warrick Resp. to Mass. SOF (Exhibit F) at page 9.**

**Response:  Disputed in Part.**

The Warrick Defendants acknowledge that Harvey Weintraub testified that the prices for generic drugs generally dropped significantly and rapidly after launch due to price competition. *See* Weintraub Dep. at 89 ("Generic drugs are different in that prices deteriorate very – very rapidly, depending upon the amount of competition for the drug."); 658-59 (testifying that Warrick expected that prices for the inhaler would drop very quickly after launch, but that "[o]ne never knows what the future holds"); 753-57 (testifying that "[a]s a general rule prices for

28

generics fall over time"); 864-65 (testifying that, for the most part, generic products would have falling prices from the time they were launched).  However, NYDOH received AMP data directly from the Warrick Defendants on a quarterly basis as part of its EPIC program and, as the reported AMPs for Warrick's Subject Drugs show, while there was a general downward trend over time, the AMPs themselves both increased and decreased at various times over the relevant time period in response to market forces.  *See*, *e.g.*, Tab A, Legislative Changes 2002 (February 6, 2002), NYCO AWP NYDOH 04887; *see also* CD Bates labeled SP-MNYCC0030981, produced by Warrick Defendants on Oct. 27, 2008 (includes Warrick's AMP data).  In addition, beginning in January 2002 and continuing every month thereafter, Warrick voluntarily provided New York with a report of its high-low range of prices for the drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.  These letters showed that prices for Warrick's products varied over time. *See*, *e.g.*, Tab M, Examples of Monthly Letters from Warrick to NYDOH reporting Warrick's high-low prices.

**19.     Warrick sets its AWPs 10-15% below the AWPs of the branded versions of the drugs.  *See* Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B) at 166:17 – 167:2. When Warrick entered the market and there were already competitive products with AWPs, Warrick would set the AWP for its product "somewhere in the pack" of the competitor AWP values.  Warrick Pharmaceuticals Corp. 30(b)6) (Harvey Weintraub) 9/20/06 Deposition Transcript (Exhibit K) at 527:6 – 528:8.**

          **Response:  Undisputed.**

As set forth in General Response No. 2 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to the FUL.  CMS officials testified that they could not recall ever having used an AWP as the basis for a FUL.  *See* Tab N, Deposition of Gail Sexton, May 20, 2008 ("Sexton Dep.") at 76-77; s*ee also* Tab O, Deposition of Sue Gaston, March 19, 2008 ("Gaston Dep.") at 456 (discussing the FUL for cefadroxil).  The Warrick Defendants acknowledge that Warrick typically set an AWP at launch that was 10-15% below the AWPs of the branded form of the drug and that, when Warrick entered the market with competitive products, it would set an AWP consistent with the AWPs of competing products.

**20.     Warrick knows that it does not sell any of its generic drugs at AWP.  *See* Warrick 30(b)(6) (Weintraub) 9/21/06 Dep. (Exhibit J) at 760:16 – 761:15 ("I do not remember any such occasion" when Warrick sold a product to a customer at the AWP price); 762:24 – 763:6 ("Q. Warrick knows when it sets its AWP that the price that it charges to the chain is always going to be significantly lower than that price; isn't that true? ... A. Generally, yes.")**

**Response: Disputed in part.**

AWP has always been understood to be a reference or benchmark price, not an actual market price, for sales between *wholesalers* and *retailers*.  It is disingenuous, thus, to assert that AWP would ever have been a price paid to Warrick, a manufacturer.  The Warrick Defendants further deny plaintiffs' assertions to the extent that they differ from the testimony cited.  Furthermore, as set forth in General Response No. 2 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to the FUL.

30

11924652_8.DOC

21.      **After 1995, Warrick made no changes to its AWP.** *See* **Warrick 30(b)(6)**
**(Weintraub) 9/18/06 Dep. (Exhibit B) at 167:3-8.  Over time chain pharmacies would pay**
**less and less for Warrick products while the AWP stayed the same so that the difference**
**between the pharmacies' market price and Warrick's AWP would grow over time.** *See*
**Warrick 30(b)(6) (Weintraub) 9/18/06 Dep. (Exhibit B) at 163:23 – 164:1; Warrick 30(b)(6)**
**(Weintraub) 9/21/06 Dep. (Exhibit J) at 765:11 – 766:10.**

      **Response: Disputed in part.**

      As set forth in General Response No. 2 above, the alleged undisputed material
facts relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues
relating to the FUL.  The Warrick Defendants acknowledge that Warrick generally reported
AWPs at launch and that it made no changes to the AWPs for its Subject Drugs after 1995.
Warrick acknowledges that selling prices for its generic products generally declined over time as
Warrick sought to match the price of its generic competitors.  *See* Weintraub Dep. at 753-57.
Moreover, NYDOH knew that generic prices decline over time because it received AMP data
directly from the Warrick Defendants on a quarterly basis as part of its EPIC program.  *See*, *e.g.*,
Tab A, Legislative Changes 2002 (February 6, 2002), NYCO AWP NYDOH 04887.   In any
event, it is a common industry understanding that price competition for generic drugs is robust
and that prices for generic drugs drop over time.  *In re Pharm. Indus. Average Wholesale Price*
*Litig.*, 230 F.R.D. 61, 94 (D. Mass 2005).  Indeed, in the MDL class action, the plaintiffs
asserted, and the Court adopted, the principle that competition is so pervasive in the generic
market that a Maximum Allowable Cost ("MAC") can be presumed to apply to all generic drugs
beginning six months after the first generic launch.  *In re Pharm. Indus. Average Wholesale*

31

*Price Litig.*, 491 F. Supp. 2d 20, 87 (D. Mass 2007).  The Warrick Defendants expect that

ongoing discovery will show their practices are within expectations in the generics marketplace.

**22.**      **Warrick's AWPs were not true prices.  *Mylan*, 2008 WL 5650859 at \*18.  Warrick's**

**corporate parents, Schering and Schering-Plough Corporation, understood, condoned and**

**concealed the disparity between Warrick's reported AWPs and the prices generally and**

**currently available in the market.  *See*, Exhibit M, Excerpt from Letter to the Honorable**

**Thomas Bliley, dated August 12, 1999, in which Schering and Schering-Plough**

**Corporation define AWP, while under investigation by Congress, as "the composite**

**wholesale price charged..." (emphasis added.)**

       **Response:  Disputed.**

As set forth in General Response No. 2 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this motion, limited as it is to issues relating to

the FUL.  The Warrick Defendants acknowledge that it understood AWP to be a reference or

benchmark, not an actual market price.

In addition, the Warrick Defendants object to plaintiffs' use of the *Mylan* decision, a

ruling on summary judgment motions involving different bases of reimbursement, a different

state Medicaid program, and entirely different causes of action, that is not yet final, as

evidentiary support for its alleged undisputed facts.  Moreover, in *Mylan*, the Court concluded,

after viewing the proffered evidence in the light most favorable to the moving party, that

sufficient disputed material facts existed to preclude summary judgment either for defendants or

for plaintiffs.  *E.g. Mylan*, 608 F. Supp. 2d at 154-55.

Finally, the Warrick Defendants object to plaintiffs' assertion that Schering and Schering-

Plough "understood, condoned and concealed the disparity between Warrick's reported AWPs

and the prices generally and currently available in the market" to the extent it implies something is wrong with Warrick's AWPs. Furthermore, the Warrick Defendants object to plaintiffs' reliance on a letter sent by Schering and Schering-Plough, containing no reference to Warrick. As set forth in General Response No. 1, the drugs identified in this paragraph are all generic, Warrick products. The Warrick Defendants acknowledge that Warrick generally reported an AWP at launch that was 10-15% below the AWP of the equivalent brand drug and that, when Warrick entered the market with competitive products, it would set an AWP consistent with the AWPs of competing products. This practice was widely followed in the marketplace, accepted, and certainly not concealed from anyone, including the United States Congress. *See* Tab P, Letter from Raman Kapur to the Honorable Thomas Bliley, dated August 24, 1999 (a similar letter to plaintiffs' Exhibit M *importantly* written on behalf of Warrick, not Schering).

Moreover, NYDOH knew that generic prices decline over time because it received AMP data directly from the Warrick Defendants on a quarterly basis as part of its EPIC program. *See*, *e.g.*, Tab A, Legislative Changes 2002 (February 6, 2002), NYCO AWP NYDOH 04887.   In any event, it is a common industry understanding that price competition for generic drugs is robust and that prices for generic drugs drop over time. *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 94 (D. Mass 2005). Indeed, in the MDL class action, the plaintiffs asserted, and the Court adopted, the principle that competition is so pervasive in the generic market that a Maximum Allowable Cost ("MAC") can be presumed to apply to all generic drugs beginning six months after the first generic launch. *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 87 (D. Mass 2007).

The Warrick Defendants object to the use of the term "true prices" on the grounds that the truth – or falsity – of a price can only be determined based on a framework of expectations.

Plaintiffs do not define the term "true prices," nor do they define the framework within which the alleged truthfulness of Warrick's AWPs is being judged. On these grounds, plaintiffs' assertion that "Warrick's AWPs were not true prices" can be neither admitted or denied.

**23.** **Warrick admits that it reported a Direct Price to the pricing compendia at product launch.** *See* **Warrick Resp. to Mass. SOF (Exhibit F) at page 11-12.**

      **Response: Undisputed.**

      The Warrick Defendants acknowledge that at the launch of a product, Warrick generally set a direct price. *See* Weintraub Dep. at 153-54; *see also id.* at 353 (direct price was the "going-out price" that Warrick intended to get if it could) & 566 (direct price was the initial "going-out price" expected for the wholesale class of trade). After launch, Warrick did not maintain a uniform direct price that was the same for each customer. *See id.* at 153. For that reason, in a letter dated October 12, 1993, Harvey Weintraub asked First DataBank to "[p]lease delete direct price listings from your publication or database." *Id.*; *see also* Tab G, Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.

**24.** **Schering/Warrick calculated and reported the average manufacturer's price ("AMP") for all its products on a quarterly basis as required by the federal rebate statute.** *Mylan***, 2008 WL 5650859 at \*30.**

      **Response: Undisputed.**

      The Warrick Defendants acknowledge that Warrick calculated and reported AMPs for all of its products on a quarterly basis as required by the federal rebate statute and to NYDOH as part of its EPIC program. As set forth in General Response No. 1, the drugs identified in this paragraph are all generic, Warrick products. Accordingly, the Warrick Defendants dispute plaintiffs' alleged material fact to the extent it purports to relate to Schering.

## <u>Statement of Additional Relevant Material Facts</u>

In further support of the Warrick Defendants' Opposition to the Plaintiffs' Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-b, the Warrick Defendants hereby incorporate by reference Defendants' Joint Response to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts Related to Federal Upper Limits and Applicable to All Thirteen FUL Defendants.  The Warrick Defendants also state as follows:

**A.      Warrick's AWPs Are Immaterial And Irrelevant To This Motion, Which Focuses on FUL Based Reimbursement.**

1.      CMS officials would decline to set a FUL when the FUL was equal to an AWP because States' "regular reimbursement methodology would be a percentage off of AWP," such that setting a FUL that was equal to AWP "would kind of counter what the states were doing with their other reimbursement methodology."  Tab O, Gaston Dep. at 456 (discussing the FUL for cefadroxil); *see also* Tab N, Sexton Dep. at 76-77 (stating that she could not recall ever having set a FUL based on an AWP).

2.      Ms. Gaston testified that CMS "wouldn't have used AWP" when establishing FULs because "[s]etting a FUL using the AWP wouldn't achieve the cost savings."  Tab O, Gaston Dep. at 458-59; *see also* Tab N, Sexton Dep. at 58–59 ("[I]f the federal upper limit, once it was calculated, was higher than the AWP price for the majority of the AWP prices, then we would generally not set a FUL on those drug ingredients, because the AWP—well, a couple years ago the average AWP on a national basis was I think AWP minus 12 percent for drug reimbursement, estimated acquisition costs for drug reimbursement for a drug that did not have a federal upper limit.").

**B.      Warrick Did Not Have WACs And Did Not Report WACs For The Subject Drugs.**

3.      Warrick understood Wholesale Acquisition Cost, or WAC, to be "[a]n undiscounted invoice price . . . [to] the wholesaler."  Weintraub Dep. at 156.

4.      Warrick did not have a WAC.  *See* Weintraub Dep. at 156-57.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id.; see also id.* at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  Warrick did not use the term WAC in its business on a routine basis.  *See id.* at 156-57.

5.      Warrick did not regularly publish a list of prices.  *See* Weintraub Dep. at 157.  Warrick did not report a WAC to pricing compendia for the Subject Drugs.  *Id.* at 155-59.[2]

---

[2]      In fact, Warrick did not report WACs to pricing compendia for any of its drugs except for one isolated incident in July 2002, when Kay Morgan of First DataBank directly asked Harvey Weintraub to provide WACs for its new sterile solutions, none of which are at issue in this case, as a condition of listing those new sterile solutions in its publication.  *See* Tab J, Letter from Harvey Weintraub to Kay Morgan dated July 16, 2002.  Mr. Weintraub informed First DataBank that Warrick "did not have WAC prices," but rather "that Warrick has a range of prices at which it sells its products at any given time.  *Id.*  First DataBank informed Mr. Weintraub that "disclosing [Warrick's] highest WAC would be sufficient for [their] purposes" and in response, Warrick reported the highest prices for the albuterol sulfate inhalation solution.  *Id.*; Weintraub Dep. at 156. Subsequently, Warrick expressly refused to provide WACs to First DataBank despite a personal request from Kay Morgan.  *See* Tab K, Contested Privilege Dep. of James Breen, at 24–25 (emphasis added).  In addition to being a one-time event involving drugs not at issue in this case, by this time Warrick already was reporting to New York on a quarterly or monthly basis a report of its high-low range of prices for the drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.  *See* Tab M, Examples of Monthly Letters from Warrick to NYDOH reporting Warrick's high-low prices.

C.   **Warrick Set A Direct Price At Launch, And Generic Competition Quickly Caused Prices To Fall, Making That Direct Price Obsolete.**

6.       At the launch of a product, Warrick generally set a direct price.  *See* Weintraub Dep. at 153-54, 353 (direct price was the "going-out price" that Warrick intended to get if it could), 566 (direct price was the initial "going-out price" expected for the wholesale class of trade).

7.       Warrick typically sent letters at the launch of a product to customers, pricing compendia, and state Medicaid agencies, including New York, providing notice of the product's AWP and NDC number, and occasionally its direct price at launch.  *See, e.g.*, Weintraub Dep. at 639 (testifying that Warrick's procedure when launching a new product was to notify First DataBank of the AWP and NDC numbers); Tab D, Weintraub Letter from Harvey Weintraub to Beth Rader and Ed Edlestein dated Sept. 3, 1993 (announcing availability of 25 x 3 ml albuterol sulfate inhalation solution 0.083%, 59930-1500-08 and reporting AWP and direct price at launch); Tab E, Letter from Harvey J. Weintraub to Beth Rader dated Dec. 29, 1995 (announcing availability of albuterol USP inhalation aerosol (59930-1560-1) and refill (59930-1560-2) and reporting AWP);  Tab F, Letter from Phyllis T. Sinoradzki, M.A.E. to Arnold Shapiro dated Dec. 30, 1995 (announcing availability of albuterol USP inhalation aerosol (59930-1560-1) and refill (59930-1560-2) and reporting AWP and direct price at launch for same).

8.       Warrick sells its products almost entirely to wholesalers, large chain pharmacies, and generic distributors and, in so doing, competes based on price, quality, and reliability of supply.  *See* Weintraub Dep. at 104-06, 113-14, 121, 125, 141-142.  Because of the price-competitive nature of the generic industry, Warrick's principal competitive tool was to match the price of its generic competitors in order to obtain and maintain business.  *See id.*

9.       Generic manufacturers compete vigorously to provide the generic version of a drug stocked by a particular pharmacy or pharmacy chain.  *See* Weintraub Dep. at 89 (generic drug

37

prices deteriorate very rapidly depending on the amount of competition for a drug).  As a result of that competition, Warrick's prices generally declined substantially over time, as do the prices for most generic drugs.  *See, e.g.*, Weintraub Dep. at 753-57; *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 94 (D. Mass 2005).  Indeed, in the MDL class action, the plaintiffs asserted, and the Court adopted, the principle that competition is so pervasive in the generic market that a Maximum Allowable Cost ("MAC") can be presumed to apply to all generic drugs beginning six months after the first generic launch.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 87 (D. Mass 2007).

**D.    In 1993, Warrick Instructed First DataBank To Stop Publishing Direct Prices For Its Products, And First DataBank Complied.**

10.    In October 1993, Warrick directed First DataBank not to publish a Direct Price for its products.  Warrick knew that it did not have a direct price that was the same for every customer, so there was no point in listing a direct price.  *See* Weintraub Dep. at 153; *see also* Tab G, Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  As far as Warrick was aware, FDB stopped reporting a direct price in its hard-copy publication after Mr. Weintraub asked them to remove it.  *See* Weintraub Dep. at 153-55.

11.    First DataBank did not publish a WAC for Warrick's products in its hard-copy publication, the monthly Price Alerts, which First DataBank specified were its "official" pricing guides, and Warrick was not aware that First DataBank was publishing the Direct Prices Warrick reported to First DataBank at launch for its products in its electronic databases as WACs.  *See* Weintraub Dep. at 154, 387, 581-82; Tab C, A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.  While Warrick subscribed to First DataBank's monthly Price Alert, no WAC appeared in this hard-copy publication for any Warrick product.  Tab Q, First DataBank Price Alert dated Dec. 15, 1997, First DataBank Price Alert dated Nov. 15, 1999, First DataBank

Price Alert dated Nov. 15, 2001, and First DataBank Price Alert dated Nov. 15, 2003; Tab B,

Weintraub Dep. at 153-155, 444-45 (Mr. Weintraub testified that he is familiar only with the

booklet Price Alert and not with First DataBank's electronic product).  Warrick did not have

access to the electronic version of First DataBank's publication used by states and their fiscal

agents.  *See id.* at 150.  None of the other written pricing compendia published WACs for

Warrick's products.

**E.      New York Had Access To The Actual Prices Of The Warrick Subject Drugs And Could Not Have Believed That Published Prices Were Correlated To Actual Sales Prices To Customers.**

12.      Since as early as 1991, NYDOH received AMP data directly from the Warrick

Defendants as part of its EPIC program, which helps seniors in the State of New York pay for

prescription drugs.  *See*, *e.g.*, Tab A, Legislative Changes 2002 (February 6, 2002), NYCO AWP

NYDOH 04887.

13.      New York also had access to AMPs since 1991 through the URAs it received on a

quarterly basis as part of the federal Medicaid Rebate Program.  *See* 42 U.S.C. §§ 1396r-8(a)(1),

(b)(1).  URAs are derived from AMPs by formulae that are set forth in the federal statute, *see* 42

U.S.C. § 1396r-8(c)(1), and (3), and in the Rebate Agreement with every State.  *See* Medicaid

Program: Drug Rebate Agreement, 56 Fed. Reg. 7049; *see also* Tab R, 1991 Rebate Agreement.

For most generic drugs, URA is 11% of AMP; for innovator generic drugs and brand drugs,

URA is no less than 15 % of AMP.  *Id.*  In every quarter since 1991, CMS has reported to each

State the Unit Rebate Amount or "URA" for each product covered by Medicaid.  *See* 42 U.S.C.

§§ 1396r-8(a), (b).  In addition, since 1995, New York has had access to actual acquisition cost

information in its claims data in the form of 340B prices, which are generally defined as AMP

minus URA.  Moreover, since 2006, New York has received AMPs directly from CMS under the

Deficit Reduction Act of 2005.  *See* Medicaid Program, Prescription Drugs, 71 Fed. Reg. 77174,

*77174-77176 (Dec. 22, 2006).

14.     Beginning in January 2002 and continuing every month thereafter, Warrick voluntarily

provided New York with a report of its high-low range of prices for the drugs at issue –

specifically, Warrick's high and low contract prices for the previous month for each of these

drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy

chains and generic distributors.  *See, e.g.*, Tab M, Examples of Monthly Letters from Warrick to

NYDOH Reporting Warrick's High-Low Prices.

**F.      Plaintiffs' Expert, Harris Devor, Makes Numerous Errors With Respect To The
         Warrick Defendants In His Analysis.**

15.     In addition to the errors cited in Defendants' Joint Response to Plaintiffs' Local Rule

56.1 Statement of Undisputed Material Facts Related to Federal Upper Limits and Applicable to

All Thirteen FUL Defendants, plaintiffs' expert Harris Devor testified that he included "free

goods" to charities in his calculations of "true" AWPs and WACs for Warrick drugs.  *See* Tab S,

Deposition of Harris Devor, Dec. 9, 2008 & March 11, 2009 ("Devor Dep."), at 124-25

(testifying that he subtracted nearly $3 million of free goods for charitable purposes from his

calculation of a "Devor WAC" for Warrick).

16.     When asked why he included "free goods to customers" in his calculations, Mr. Devor

testified:

> [T]here is [sic] a whole lot of classes of trade.  I don't have them
> memorized, no.  I have no idea.  Alls I can go by is what it says
> here.  It says free goods customers.  If it turns -- I mean, it could
> very well be charitable but I have no -- I have no knowledge of
> that, I guess is what I am saying.

*See* Devor Dep. at 126.

17.     When asked whether he tried to contact anyone at Warrick to determine the meaning of the "free goods" class of trade, Mr. Devor testified: "I did not.  I mean – no, I did not – did I attempt to speak with Warrick?  The answer is no."  *See* Devor Dep. at 128-29.

18.     In addition, Mr. Devor testified that, when deducting chargebacks from his calculations, he treated negative numbers as positive numbers in calculating chargeback amounts.  *See* Devor Dep. at 943-44.

19.     Mr. Devor "assumed" that the "predominant" type of chargebacks in a manufacturer's data – positive or negative – was representative of all chargebacks in that manufacturer's data and then altered the non-predominant numbers accordingly.  *See* Devor Dep. at 951-52.

20.     Thus, for example, Mr. Devor confirmed that he changed negative charge-back information from Warrick to positive charge-back information without considering whether the negative charge-back numbers for Warrick might represent an overpayment by Warrick that was credited back by the wholesaler.  *See* Devor Dep. at 953-55.

21.     Mr. Devor testified that he did not check with Warrick, or any other manufacturer, to see why certain chargebacks might be positive and others might be negative.  *See* Devor Dep. at 910, 913-14, 917 ("no, nobody talked to Warrick").

                    Respectfully submitted,


                     /s/ John P. Bueker
                    John T. Montgomery (BBO#352220)
                    John P. Bueker (BBO#636435)
                    Kim B. Nemirow (BBO# 663258)

                    ROPES & GRAY LLP
                    One International Place
                    Boston, Massachusetts 02110-2624
                    (617) 951-7000

                    *Counsel for Schering-Plough Corporation,*

41

*Schering Corporation, and Warrick*
*Pharmaceuticals Corporation*

Dated:  June 15, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2009, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

 /s/ Kim B. Nemirow
Kim B. Nemirow