Exhibit B

```
                    IN THE CIRCUIT COURT OF
                   MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,          )
          Plaintiff,       )
                           )
VS.                        )      NO. CV-2005-0219-PR
                           )
ABBOTT LABORATORIES,       )
INC., et al,               )
          Defendants.      )



     *******************************************************


      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
          IN AND FOR THE COUNTY OF MARICOPA


ROBERT J. SWANSTON,        )      NO. CV 2022-004988
individually and on behalf )
of himself and all others  )
similarly situated,        )
          Plaintiff,       )      (Assigned to the
                           )      Honorable Janet
VS.                        )      Barton)
                           )
TAP PHARMACEUTICAL PRODUCTS, )
INC.; et al.,              )
          Defendants.      )



     *******************************************************


           ORAL AND VIDEOTAPED DEPOSITION OF

                 HARVEY J. WEINTRAUB

                 September 18, 2006

                     Volume 1


     *******************************************************
```

1    A.    Most certainly.

2    Q.    Okay.  How did you go about doing that?

3    A.    I went around the country and talked to

4  friends of mine in the wholesale trade and in the

5  chain business and just had them tell me what they

6  knew about generics and how one had to operate on that

7  plane, a business that I had never been in before.

8    Q.    What did you learn to be the most significant

9  differences between selling brands and generics?

10   A.    In terms of selling them?

11   Q.    Yes, sir.  Well, let's -- let's back up.

12  Let's -- let's leave selling out for just a minute.

13  What did you -- let's make it more general.

14         What did you understand, based on your

15  investigation, to be the most significant difference

16  between brand drug products and generic drug products?

17   A.    Well, you say most significant, not

18  necessarily in order, but brand drugs tend to have

19  prices that are stable and go up over time.  They can

20  only be dispensed upon the prescription of a physician

21  and unless there's a generic equivalent to it, it must

22  be dispensed as written by the prescription.

23         Brand drugs are prescribed by

24  physicians, they're promoted by the pharmaceutical

25  companies to hundreds of thousands of physicians and

1    the prescriptions are filled in the drug stores that

2    receive those prescriptions.

3              Generic drugs are different in that

4    prices deteriorate very -- very rapidly, depending

5    upon the amount of competition for the drug.  They are

6    not promoted to the physician because the physician

7    has no choice in the generic drug as dispensed.  The

8    pharmacist has a choice.  And basically in this

9    country, there are probably 60 or 70 points of

10   purchase for the generics that account for probably 90

11   percent or more of the generic business.

12             Did I indicate that prices go down very

13   rapidly?

14        Q.   Yes, sir.

15        A.   That -- I guess one of the most important

16   differences is that a generic drug is stocked as only

17   one entity from any given manufacturer for that

18   particular chemical entity.  In other words, if

19   generic drug A is on the market and generic drug B and

20   C and D all the same, only one person in one

21   organization makes the choice as to which one will be

22   stocked.  The others are not stocked at all.

23        Q.   To try to further --

24        A.   Am I clear on that?

25        Q.   Yes, sir.  Let me -- let me ask you a few

1    follow-up questions and ask you to give us some

2    examples that will make this a little clearer,

3    hopefully.  Let's just say today, hypothetically,

4    someone goes to their doctor and they get a

5    prescription for an albuterol inhaler.  Are you with

6    me?

7        A.   Yes.

8        Q.   All right.  They then -- the patient then

9    takes that prescription to the -- let's say takes it

10   to the Walgreens pharmacy.  Okay?

11       A.   Correct.

12       Q.   And presents it to the pharmacist, correct?

13       A.   Correct.

14       Q.   What -- what -- whose albuterol inhaler gets

15   handed to the patient, is it Warrick's, is it Company

16   A or Company B?

17       A.   It will be only Warrick's because --

18       Q.   Why?

19       A.   Because the choice was made by the purchasing

20   agent for Walgreens to stock the Warrick product.

21   None of the 5,000 stores that Walgreens had could

22   stock any other product unless they were in emergency

23   supply and out.  All of the distribution centers for

24   Walgreens would have the Warrick product in it and

25   service their stores in their particular area that

1      Q.   All right.  And hold that box up first and

2   tell us what it is, Mr. Weintraub.

3      A.   That's a box of albuterol inhalers.

4      Q.   All right.  And what --

5      A.   Oh, you want the box up.

6      Q.   That's okay.  That's okay.

7      A.   Okay.

8      Q.   What are -- what are you holding in your hand

9   there, sir?

10      A.   I'm holding an inhaler.

11      Q.   All right.  And how does an inhaler work?

12      A.   It works by -- well, I haven't worked one of

13   these things in quite a while, but it's a spray.

14      Q.   Okay.

15      A.   And you inhale the spray and that is absorbed

16   very quickly into the body and exhibits its effect

17   that way.

18      Q.   And that's -- what you've just held up there

19   and in the box is a -- is a Warrick --

20      A.   Warrick inhaler.

21      Q.   -- Warrick generic albuterol inhaler?

22      A.   That's correct.

23      Q.   When did the -- when did the Warrick -- the

24   one you are just holding, and hold it up there, when

25   did that go on the market, as you recall?

Page 104

1      A.   At the very end of 1995.

2      Q.   Okay.  Why -- why did it go on the market

3  later than the solutions that we just looked at?

4      A.    Well, that was a combination of the patent

5  expiration date and the ability of someone else to

6  make a product that would be approved by the FDA as

7  equivalent to this product.

8      Q.   Now, Mr. Weintraub, when you went out and

9  sold, you were the --

10     A.   I meant to say --

11     Q.   I'm sorry.

12     A.   -- equivalent to Proventil.  I'm sorry.

13     Q.   I'm sorry I spoke over you.

14          Mr. Weintraub, when you and your sales

15  force of three individuals went out and sold these

16  products to the customers, what were the key points

17  that Warrick communicated to its customers in order to

18  sell Warrick product?

19          MR. HEUCK:  Objection, form.

20     A.   They were manufactured by Schering

21  Corporation for Warrick.  They were manufact -- they

22  were the identical product.  It was the company that

23  these accounts had dealt with for a number of years,

24  that we would guarantee the continuity of supply, that

25  they could do one-stop shopping as we got all these

Page 105

1    forms in place, the inhaler, the tablets, the syrup,

2    the solution, et cetera.

3              And then there was the fact that they

4    were dealing not only with a company they knew well,

5    they were dealing with the people that they knew well.

6    I had been around 40 years.  I knew many of these

7    people well.  Walter Gough had been around.  Al Graf

8    had been around.  So that their word was good, their

9    word was known, their reputation was good, the

10   company's reputation was good.  They had one-stop

11   shopping.  It was an easy sell.

12             MR. MOORE:  All right.  Let's --

13   let's -- if we can, let's take a five-minute break.

14             THE VIDEOGRAPHER:  Stand by.  The time

15   its 10:24.  We are off the record.  This concludes

16   Tape 1.

17             (Recess from 10:24 to 10:39)

18             THE VIDEOGRAPHER:  Stand by.  The time

19   is 10:39 a.m.  We are back on the record.  This is the

20   beginning of Tape 2.

21        Q.   (BY MR. MOORE)  Mr. Weintraub, we were

22   talking about Warrick's communicating to its customers

23   in connection with the sale of Warrick products.  Did

24   you perceive that it was an advantage to Warrick in

25   selling a generic Warrick albuterol inhaler that it --

cfd33e8b-c256-4aa7-8394-70433ad63a54

1   that there had been a previous Proventil albuterol

2   inhaler?

3                    MR. HEUCK:  Objection, form.

4                    MR. HEIDLAGE:  Objection.

5        Q.  (BY MR. MOORE)  Let me -- let me strike it

6   and try to do better than that.

7                    Mr. Weintraub, what did you perceive to

8   be the advantages, if any, of selling a Warrick

9   albuterol inhaler that was being produced on the

10  Schering production lines that made Proventil

11  inhalers?

12       A.   Well, it's -- it was the identical product,

13  number one.  And since the accounts that would be

14  buying had purchased Proventil and never had a problem

15  with supply, and continuity of supply is a key issue,

16  then they knew they would have the product made by

17  Schering and they would be assured of continuity of

18  supplying.

19       Q.   You mentioned in your previous testimony that

20  Warrick offered a full line of albuterol products; is

21  that true?

22       A.   Over time it offered the tablets, the

23  solution, the syrup, the Repetabs, the inhaler.

24       Q.   Was that or was it not an advantage as

25  respect to other generic competitors who did not offer

1    a full line?

2              MR. HEIDLAGE:  Objection, Heidlage.

3         Q.   (BY MR. MOORE)  Go ahead.

4         A.   Absolutely.  It was a one-stop shopping

5    situation.

6         Q.   Were there other generic competitors of

7    Warrick that did not offer a full line of albuterol

8    products?

9              MR. HEIDLAGE:  Objection.

10        A.   I think most of them did not have a line as

11   full of ours -- as full as ours.

12        Q.   (BY MR. MOORE)  Okay.  I want to talk to you

13   for a moment, Mr. Weintraub, about the different

14   categories of Warrick's -- the major categories of

15   Warrick's customers.  Are these sometimes referred to

16   as classes of trade?

17        A.   That's the way we refer to them.

18        Q.   All right.  What is a class of trade as

19   Warrick referred to it?

20        A.   We -- it's a defined audience.  We would call

21   all chains one class of trade, wholesalers another

22   class of trade, generic distributors another class of

23   trade.

24        Q.   Let's start with the chain class of trade.

25   Can you describe generally how Warrick -- what Warrick

cfd33e8b-c256-4aa7-8394-70433ad63a54

1       Q.    What is a stocking allowance?

2       A.    When a chain, or even a wholesaler, puts in a

3  product for the first time, it has to assign all sorts

4  of internal data to it, space in the warehouse, and so

5  on.  They charge you -- not charge you, but they

6  demand that you give them a stocking allowance to

7  recoup the cost of doing that.  And generally at

8  Warrick when we had a new product launch and the

9  product was purchased for the first time, we provided

10  a five percent stocking allowance.

11      Q.    Was there a type of a discount or rebate that

12  was sometimes given by Warrick to -- to its chain

13  pharmacy class of trade called a full-line rebate?

14               MR. HEIDLAGE:  Objection.

15      Q.    (BY MR. MOORE)  Go ahead.

16      A.    Yes.

17      Q.    What is a full-line rebate?

18      A.    If they bought all the products in our line

19  or a certain percentage of the products in the line or

20  in a given therapeutic category, they were given a

21  rebate.

22      Q.    Was there a type of rebate or discount given

23  by Warrick to its chain pharmacy class of trade

24  customers from time to time called a market share

25  rebate?

cfd33e8b-c256-4aa7-8394-70433ad63a54

1       A.    Yes.

2       Q.    Would you describe for the jury what a market

3  share rebate is?

4       A.    If they used our product to the exclusion or

5  in -- predominantly more of our product than a

6  competitor product and it achieved a certain share, 90

7  percent share or that sort of thing, we provided an

8  extra rebate.

9       Q.    Now, why did Warrick offer these types of

10 discounts and rebates to its chain pharmacy customers?

11      A.    The competition had them and we had to meet

12 the competition.

13      Q.    Who was the competition?

14      A.    For any given product?

15      Q.    Just generally, not -- I'm not asking for

16 names of companies.

17      A.    Any generic manufacturer.

18      Q.    Did all chains get the same discounts and

19 rebates from Warrick all the time?

20      A.    No.  The generic industry is different from

21 the brand industry in that you have different prices

22 to different customers.  That's a marked distinction

23 and you just met the competition customer by customer.

24      Q.    You anticipated my next question.  Did all

25 the chain pharmacies get the same price for the

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 114

1   Warrick products?

2       A.   By no means.

3            MR. HEIDLAGE:  Objection, foundation.

4       Q.   (BY MR. MOORE)  Okay.  Were these types of --

5   the types of rebates and discounts that you generally

6   described to us, were they unique to Warrick as a

7   generic company?

8            MR. HEUCK:  Objection, lack of

9   foundation.

10      A.   No.  We just merely met the competition

11  and -- and doing what the competition did.

12      Q.   (BY MR. MOORE)  At the time you make a -- you

13  made a -- Warrick made a sale to a particular customer

14  like Walgreens or CVS, would Warrick know at that time

15  of sale whether or not the customer would earn all of

16  the rebates that had been offered to it?

17      A.   No.

18           MR. HEIDLAGE:  Objection.

19           MR. HEUCK:  Object.

20      Q.   (BY MR. MOORE)  Would you explain that to the

21  jury, please?

22      A.   Well, if it was a market share rebate that

23  you had to get the data and that would be sometime

24  after the sale was made.

25      Q.   Mr. Weintraub, was Warrick ever involved in

1    the chain pharmacies' resale of the Warrick products

2    to their customers?

3                    MR. HEIDLAGE:  Objection.

4        A.   In no way.

5        Q.   (BY MR. MOORE)  Okay.  Did Warrick ever tell

6    chain pharmacies what to charge their customers when

7    they resold the Warrick product to their customers?

8                    MR. HEUCK:  Objection --

9        A.   In no way.

10                   MR. HEUCK:  -- calls for speculation.

11       Q.   (BY MR. MOORE)  Okay.

12                   MR. HEUCK:  Heuck.

13       Q.   (BY MR. MOORE)  I'm asking you about Warrick.

14   Was there ever a communication from -- that you're

15   aware of, either by you or from anyone else at

16   Warrick, getting involved in what a chain pharmacy

17   sold its product to its customer for?

18                   MR. HEIDLAGE:  Objection.

19       A.   Never.

20       Q.   (BY MR. MOORE)  Did you know the prices at

21   which chains resold the Warrick products to their

22   customers?

23                   MR. HEIDLAGE:  Objection.

24       A.   No.

25       Q.   (BY MR. MOORE)  Did you know who all their

Page 120

1        A.   Yes, they are.

2        Q.   In dealing with full-line national

3    wholesalers like McKesson and Cardinal, do -- does

4    Warrick also respond to bid -- bid solicitations from

5    those wholesalers?

6        A.   Yes.

7        Q.   Would you explain to the jury just generally

8    how the bidding process works for one of these

9    national full-line wholesalers?

10       A.   Well, as a generalization these wholesalers

11   have programs which they call either preferred

12   programs or Source programs or may have their own

13   category name for it, but they will act much like a

14   chain.  They'll tell their pharmacies that they serve,

15   "If you will allow us to send any brand -- any

16   manufacturer's brand" -- I shouldn't use "brand" for

17   "generic," "any manufacturer's make of a generic, we

18   will pick the make, we'll pick the manufacturer, we

19   will give you the best price possible."  That's what's

20   called the Source programs and they make the selection

21   of that product on a bid basis for a one-year period

22   or a two-year period.  And the drug store, when it

23   orders generic A will get only the manufacturer's

24   product as specified by that wholesaler.  The drug

25   store has no choice in the matter.  But in return for

Page 121

1    that he gets a very good price.

2        Q.   And -- and has Warrick participated from time

3    to time in those bidding processes with these

4    full-line wholesalers?

5        A.   Yes, we have.

6        Q.   And who would you be bidding against for,

7    say -- let's just say albuterol inhalers.  Who -- who

8    would you be bidding against --

9        A.   I would be bidding against anybody else who

10   submitted a bid for the product.  Any manufacturer or

11   all manufacturers who had the identical product.

12       Q.   And -- and what would the -- in the final

13   analysis, what would the competition be based upon?

14       A.   Price.

15       Q.   Price to the wholesaler?

16       A.   Price to the wholesaler.

17       Q.   If you bid, say, for a generic inhaler to

18   McKesson and there were two or three other bidders for

19   generic inhalers and you lost the competition, what

20   happened to you with respect to McKesson?

21       A.   I was out entirely.

22       Q.   There's a term called an "autosubstitution

23   program."  Are you familiar with that term?

24       A.   Yes.  I think that's what I've just

25   described.

1      Q.   As a Source program?

2      A.   Yes.

3      Q.   Is that another -- in your mind is that

4  another --

5      A.   Yes.

6      Q.   -- term for a Source program?

7      A.   Yes.

8      Q.   Now, there is something that is used in the

9  wholesale business called a "chargeback"; is that

10  correct?

11            MR. HEUCK:  Objection, leading.

12      Q.   (BY MR. MOORE)  What is a chargeback?

13      A.   Chargebacks are monies given back to the

14  wholesaler for the differential price between what the

15  wholesaler bought it for and what it sold it for on

16  contract to certain accounts.

17            For example, hospitals might have a

18  price of $3.  The wholesale -- that was contracted for

19  by the manufacturer or some other third party.  The

20  normal price of that wholesaler may have been $5.  So

21  the wholesaler would sell your product to the hospital

22  at the contracted price of $3.  It would charge you

23  back for the $2 differential between the three and the

24  five so it wouldn't lose money.

25      Q.   Okay.  As Warrick did you -- or as the --

cfd33e8b-c256-4aa7-8394-70433ad63a54

1  inventories low and at the same time be assured they

2  would get product in time for their needs.  It allowed

3  for sale of the product to the hospital at that price.

4  But the wholesaler never really got that price.  The

5  wholesaler in terms of selling its product to its

6  other customers noncontracted by the manufacturer sold

7  it at the price off -- whatever price they got off

8  their invoice.

9      Q.   Is the chargeback system as we've been

10  discussing it an industry-wide system?

11      A.   Oh, yes.

12      Q.   To your understanding virtually all drug

13  manufacturers or most drug manufacturers and

14  wholesalers utilize the system?

15              MR. WINGET-HERNANDEZ:  Objection.

16              MR. HEUCK:  Objection.

17      Q.   (BY MR. MOORE)  Is that your understanding?

18      A.   Almost every manufacturer has to utilize that

19  system, otherwise they're out of business in that area

20  of trade.

21      Q.   I mean, is it just Warrick that is involved

22  in the chargeback system?

23      A.   No.

24              MR. WINGET-HERNANDEZ:  Objection.

25      A.   We only got involved in the chargeback system

Page 125

1    because the competition was already there.  It was

2    existent in the trade.

3         Q.   (BY MR. MOORE)  All right.  Now --

4         A.   It's an industry-wide practice.

5         Q.   All right.

6              MR. HEUCK:  Objection, move to strike.

7         Q.   (BY MR. MOORE)  Mr. Weintraub, Warrick -- did

8    Warrick offer discounts and rebates to its wholesale

9    class of trade customers?

10        A.   We had discounts.  We had rebates.

11        Q.   Why did Warrick offer discounts and rebates

12   to its wholesale customers?

13        A.   To meet the competition.

14        Q.   What competition are you referring to?

15        A.   Any company that had a generic product that

16   was identical to ours.

17        Q.   Okay.  Do all wholesalers or did -- while you

18   were at Warrick, did all wholesalers receive the same

19   price from Warrick on a particular product at a

20   particular time?

21        A.   No.

22        Q.   While you were at Warrick did all wholesalers

23   receive the same rebates and discounts on a particular

24   product at a -- at a particular time?

25        A.   No.

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 126

1    Q.   Mr. Weintraub, did Warrick have information
2  about precisely what a wholesaler is charging its
3  customer when the wholesaler resells the Warrick
4  product to its customers?
5    A.   No.
6              MR. HEIDLAGE:   Objection.
7    Q.   (BY MR. MOORE)  When Warrick sells a product
8  to a wholesaler, does it know or -- or have any idea
9  as to who or what type of wholesale customer will
10  ultimately receive that product from the wholesaler?
11             MR. HEIDLAGE:   Objection.
12   A.   No.
13   Q.   (BY MR. MOORE)  For example, if a Warrick
14  inhaler goes into a McKesson warehouse and you sold it
15  to them and you've shipped it to their warehouse.  Are
16  you with me?
17   A.   Yes.
18   Q.   Do you know where that inhaler is going as
19  far as the customer that is going to ultimately buy
20  and take possession of that inhaler?
21             MR. HEIDLAGE:   Objection.
22   A.   No.
23   Q.   (BY MR. MOORE)  Okay.  Let's turn to another
24  class of trade.  You mentioned this earlier, generic
25  distributors.

Page 134

1    and the amounts that we designated in there, that

2    would be the amount that the check would be cut for.

3         Q.   Was it an amount per unit sold?

4         A.   Per unit.

5         Q.   Did it change from time to time?

6         A.   Yes.

7         Q.   Can you give us some idea on an inhaler what

8    would sort of be the range of the -- of the amount

9    that someone might get because they placed the order

10   through the telemarketer and it was on promotion, what

11   are we talking about here?

12        A.   50 cents, 25 cents.

13        Q.   Okay.  Mr. Weintraub, are you familiar with a

14   term known as "AWP"?

15        A.   Yes, I am.

16        Q.   What do those letters stand for?  Just the --

17   just the letters AWP.

18        A.   Average wholesale price.

19        Q.   What is your understanding of the meaning of

20   AWP or average wholesale price?

21        A.   To me it's a reference point or a sticker

22   price.

23        Q.   Has it ever been your understanding that AWP

24   is an actual average of prices in the marketplace

25   between wholesalers and their customers?

Page 135

1      A.   No.

2             MR. WINGET-HERNANDEZ:  Objection.

3      Q.   (BY MR. MOORE)  No.  How did you understand

4  AWP was used in the pharmaceutical industry?

5             MR. HEUCK:  Objection

6      A.   As a sticker price, a point of reference from

7  which negotiations were -- were started.

8      Q.   (BY MR. MOORE)  Whose negotiations?

9      A.   That of the third-party payer and the account

10  that it was servicing.

11      Q.   What is a third-party payer?

12      A.   A payer other than the patient.  In other

13  words, an HMO, perhaps, a pharmacy benefit manager, an

14  insurance plan.

15      Q.   You mentioned the word "reimbursement."

16  What -- what do you mean by "reimbursement"?

17      A.   Did I mention reimbursement?

18      Q.   I thought you did.

19      A.   I don't think I did.

20      Q.   You didn't.  Maybe it was just something I

21  had written on a sheet of paper here.  What is

22  reimbursement in this context?

23      A.   In this context reimbursement is the monies

24  received by the account or the patient for supplying

25  the medication.

cfd33e8b-c256-4aa7-8394-70433ad63a54

1      Q.   Can you give the jury, say, in the HMO or

2   insurance context, could you just give a brief example

3   of -- of a -- of a third-party reimbursement and how

4   it would generally work?

5      A.   A patient would bring a prescription into a

6   drug store.  If that person was on an insurance plan

7   of some type, that person might pay a small amount of

8   money or some form of money as a co-payment or maybe

9   nothing for the prescription.  But there would have

10  been a negotiation between the insurance company and

11  the provider, the pharmacy, to obtain a certain price

12  for that product.  And that provider would bill the

13  insurance company for that amount of money and receive

14  it from that insurance company.

15     Q.   The provider would -- would deliver the --

16  the product to the patient, correct?

17     A.   And in this case I mentioned the pharmacy,

18  correct.

19     Q.   The pharmacy would deliver the product to the

20  patient, right?

21     A.   Correct.

22     Q.   But then someone else, an insurance company,

23  a third party would pay the pharmacy for the

24  medication, correct?

25     A.   That is correct.  At an agreed-upon price.

Page 137

1    Q.   Okay.  Based on your general knowledge of the

2    business how many -- when you were at Warrick how many

3    third-party payers are there in the United States,

4    roughly?

5    A.   There are thousands.

6    Q.   Thousands?

7    A.   Thousands.

8    Q.   HMOs, insurance companies.  What else?

9    A.   Third-party payers, there were government

10   agencies that reimbursed, there are all sorts of

11   private plans.  You know, anywhere from ARP to CIGNA

12   to Aetna to Kaiser, all sorts of them.

13   Q.   Did you or anyone else at Warrick attempt to

14   keep track of the specific reimbursement methods of

15   these thousands of reimbursement plans and formulas?

16   A.   Never.

17   Q.   Okay.  Why not?

18   A.   It was not our focus.  Reimbursement was not

19   our issue.

20   Q.   What was your issue?

21   A.   Price, service, continuity of supply, meeting

22   the competition.

23   Q.   Mr. Weintraub, was the different formulas and

24   different uses of reimbursement formulas ever part of

25   any Warrick sales presentation that you're aware of?

Page 138

1       A.   Not to my knowledge.

2       Q.   Were third-party reimbursement amounts or

3   differences part of -- any part of a Warrick sales

4   presentation that you were ever aware of?

5       A.   Not to my knowledge.

6            MR. HEIDLAGE:  Objection.

7       Q.   (BY MR. MOORE)  Mr. Weintraub, did you ever

8   sell or attempt to sell a Warrick drug by discussing

9   AWPs or third-party reimbursement amounts with a

10  Warrick customer?

11           MR. HEIDLAGE:  Objection.

12      A.   Not to my knowledge.

13      Q.   (BY MR. MOORE)  Pause a moment so the

14  gentleman here can get his objections in, if you don't

15  mind.

16           Mr. Weintraub, did anyone else at

17  Warrick ever sell or attempt to sell a Warrick drug by

18  discussing AWPs or third-party reimbursement amounts

19  with a Warrick customer?

20           MR. HEIDLAGE:  Objection.

21      A.   Not to my knowledge.

22      Q.   (BY MR. MOORE)  All right.  Mr. Weintraub,

23  did you ever sell or attempt to sell a Warrick drug by

24  discussing either Medicaid or Medicare reimbursement

25  amounts with a Warrick customer?

1    anyone above you to do that?

2                MR. HEIDLAGE:  Objection.

3        A.    Never.

4        Q.    (BY MR. MOORE)  Was that even discussed with

5    you?

6        A.    No.

7        Q.    Mr. Weintraub, did you or anyone else at

8    Warrick, to your knowledge, attempt to sell Warrick

9    products by comparing AWPs of the generic competitors

10   for the product?

11               MR. HEIDLAGE:  Objection.

12       A.    No.

13       Q.    (BY MR. MOORE)  Did you or anyone else, to

14   your knowledge, at Warrick prepare documents

15   discussing that as a possible method to sell Warrick

16   drugs?

17               MR. HEIDLAGE:  Objection.

18       A.    Not to my knowledge, not at Warrick.

19       Q.    (BY MR. MOORE)  What was discussed with

20   Warrick customers when either you or the sales

21   directors went in to try to sell Warrick products to

22   them?

23               MR. HEUCK:  Objection.

24       A.    Here's my products.

25               MR. HEUCK:  Excuse me, sir.

cfd33e8b-c256-4aa7-8394-70433ad63a54

1      A.   You know who you're dealing --

2                MR. MOORE:  Wait.  He's making an

3      objection.

4                MR. HEUCK:  Mr. Weintraub, let me finish

5      my objection.

6                THE WITNESS:  I'm sorry, sir.  I didn't

7      hear you.

8                MR. HEUCK:  Yes.

9                THE WITNESS:  You're kind of soto voice

10     down there.

11               MR. HEUCK:  I'm down at this end, so

12     it's a little hard to hear, probably.

13               Bob Heuck.  Objection, calls for

14     speculation.

15     Q.   (BY MR. MOORE)  Okay.  Go ahead.

16               MR. HEUCK:  Thank you.

17     A.   I'm sorry, will you rephrase the question or

18     repeat the question?

19               MR. MOORE:  Can you read it back?

20               (Requested portion was read)

21     A.   We discussed the fact that we were a company

22     that they had dealt with in terms of the parent

23     company.  They had a good reputation.  The people they

24     were dealing with were people that they knew for many

25     years.  The products were the identical products.  We

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 142

1    had a full line of products.  We were competitive.  We

2    could supply it without interruption of supply.  It

3    was a quality product sold by quality people in a

4    quality company and they could do one-stop shopping in

5    the process.

6         Q.   (BY MR. MOORE)  Did --

7         A.   And we would meet the competition.

8         Q.   Meet the competition as to what?

9         A.   Price.

10        Q.   Did Bi-Coastal -- to your knowledge,

11   Bi-Coastal was the broker for the generic

12   distributors, correct?

13        A.   Yes.

14        Q.   Did Bi-Coastal, to your knowledge, ever

15   discuss AWPs or third-party reimbursement with generic

16   distributors as part of their sales presentation for

17   Warrick products?

18        A.   Not to --

19             MR. ANDERSON:  Anderson.  Objection,

20   form.

21             MR. HEIDLAGE:  Objection.

22        A.   Not to my knowledge.

23        Q.   (BY MR. MOORE)  Did you ever instruct

24   Bi-Coastal or anyone at Bi-Coastal to market Warrick

25   products in that manner?

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 143

1          MR. HEIDLAGE:  Objection.

2      A.   I did not.

3      Q.   (BY MR. MOORE)  To your knowledge, did any of

4  the telemarketers who worked for Warrick, to your

5  knowledge, ever market reimbursement spreads or AWP

6  through the telemarketing operation?

7      A.   Not to my knowledge.

8          MR. HEIDLAGE:  Objection.

9      Q.   (BY MR. MOORE)  Did it ever come to your

10  attention from any source that the TMS telemarketers

11  were discussing third-party reimbursement as part of

12  their telemarketing operation?

13          MR. HEIDLAGE:  Objection.

14      A.   No.

15      Q.   (BY MR. MOORE)  There were times and from

16  time to time you listened in on conversations of the

17  telemarketers; is that correct, sir?

18          MR. HEUCK:  Objection, leading.

19      A.   That's correct.  Unknown to them.

20          MR. HEUCK:  Excuse me.  Bob Heuck.

21  Leading.

22      Q.   (BY MR. MOORE)  Let me cure that, if I can.

23  Maybe I can.

24          Were there occasion -- did you ever

25  listen in on the telemarketers' presentations in the

Page 149

1    Q.   Did you call him on the phone?

2    A.   Yes, I did.

3    Q.   Would you tell the jury as best you can

4  recall what you and Mr. Edelstein discussed in that

5  telephone call?

6    A.   I identified --

7         MR. ANDERSON:  Objection, form.

8    A.   I identified myself and I recall asking him

9  how a product was listed as a generic and he said it

10 had to be 10 to 15 percent away from the brand AWP and

11 that was his criteria for listing it in the book.

12   Q.   (BY MR. MOORE)  Okay.  Did he tell you

13 anything else as far as criteria for listing it in the

14 book?

15   A.   Not that I recall.

16   Q.   Did Mr. Edelstein in that telephone call tell

17 you that the AWP was or should be an average of actual

18 marketplace transactions charged by a wholesaler to

19 their customers?

20   A.   No.

21   Q.   Just for background with the jury,

22 Mr. Weintraub, what is First DataBank and what does it

23 generally do?

24   A.   It publishes prices of prescription products,

25 publishes their AWP and tells what brands the generics

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 150

1    are equivalent to.

2        Q.    Does First DataBank, as you understand it,

3    have customers that it sells information to?

4        A.    Oh, yes.

5        Q.    In selling Warrick products did you or anyone

6    else, to your knowledge, discuss First DataBank or

7    their data in connection with the sale of Warrick

8    products?

9               MR. HEIDLAGE:   Objection.

10       A.    No.

11       Q.    (BY MR. MOORE)  Did Warrick subscribe to and

12   receive electronic price information from First

13   DataBank?

14       A.    No, we did not.

15       Q.    Did First DataBank ever seek input from

16   Warrick on how to conduct its business or to deal with

17   its customers?

18               MR. HEIDLAGE:   Objection.

19       A.    No.

20       Q.    (BY MR. MOORE)  Did Warrick, to your

21   knowledge, have any involvement in the transactions

22   between First DataBank and its customers?

23               MR. HEIDLAGE:   Objection.

24       A.    No.

25       Q.    (BY MR. MOORE)   Does Warrick or did Warrick

Page 151

1    receive any money from the transactions between First

2    DataBank and its customers?

3              MR. HEIDLAGE:   Objection.

4        A.   No.

5              (Exhibit 3 marked)

6        Q.   (BY MR. MOORE)  Mr. Weintraub, I've handed

7    you what has been marked as Exhibit 3.  Would you --

8    would you identify this for us, please?

9        A.   This is a letter sent by me to First DataBank

10   asking for a change in the AWP of one of our products,

11   albuterol solution.

12       Q.   Does this appear to be a true and correct

13   copy of a letter that you sent to First DataBank on or

14   about October 12th, 1993?

15       A.   Yes, it is.

16       Q.   And is that your signature, Harvey Weintraub?

17       A.   Yes, it is.

18       Q.   And who did you send the letter to

19   specifically at First DataBank?

20       A.   To a Beth Rader and Ed Edelstein.  Did I say

21   Lee Edelstein before?  I should correct that to Ed.

22       Q.   It's Ed Edelstein?

23       A.   Yes.

24       Q.   All right.  And what was your purpose in

25   sending this letter?

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 152

1        A.   As I recall, we had a package of 60's of the

2    3 mL and a package of 25's of the 3 mL, and as I

3    recall, the price for one when divided through by the

4    number of units in the package was higher than the

5    price for the other.  If memory serves me rightly, one

6    was $1.21 for each 3 mL in one package and $1.24 for

7    another, as I remember it.  And I wanted to get them

8    consistent with each other because what we were really

9    talking about was the 3 mL unit and consequently asked

10   to lower the price to $1.21.

11       Q.   So is that what you were communicating in

12   this letter marked as Exhibit 3 to First DataBank?

13       A.   Yes.

14       Q.   You were lowering the AWP on one of the 3 mL

15   products; is that true?

16       A.   To be consistent with the price with another

17   package.

18       Q.   But you lowered it -- you lowered one instead

19   of raising the other; is that true?

20       A.   That is true.  I lowered one.

21       Q.   Why did you lower one as opposed to just

22   raising the other?

23       A.   I have no real feeling one way or the other.

24   I just wanted them to be consistent.

25       Q.   The change you made here, lowering the AWP on

Page 153

1    one of the 3 mL products, did you do that with any

2    thought in mind that you were going to utilize that in

3    any way to market Warrick drugs based on third-party

4    reimbursements?

5         A.   No.

6              MR. WINGET-HERNANDEZ:  Objection.

7              MR. HEUCK:  Objection, form.

8         A.   Reimbursement was not my issue.

9         Q.   (BY MR. MOORE)  Okay.  Mr. Weintraub, at the

10   bottom of the letter marked as Exhibit 3 there's a

11   statement -- well, quote, please delete direct price

12   listings from your publication or database.  Is

13   that -- did I read that correctly?

14        A.   Yes, you read that correctly.

15        Q.   And is that what you wrote to First DataBank

16   back in October of '93?

17        A.   It's in this memo, so I must have written it.

18        Q.   What were you trying to accomplish by making

19   that communication to First DataBank?

20        A.   I was trying to -- since we really didn't

21   have a direct price that was the same for everyone

22   else, it would be different for everyone else, there

23   was no point in listing a direct price.

24        Q.   What is direct price?  What does that mean?

25        A.   That's the price at which we invoice an

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 154

1    account.

2         Q.   Did -- to your recollection, did anyone from

3    First DataBank ever respond to this request?

4         A.   I don't recall any response.

5         Q.   To your recollection, were you under the

6    impression that they had complied with this request?

7         A.   Yes.

8         Q.   Why?

9         A.   Because I would get the publication, the

10   written publication, periodically every two weeks or

11   every month, I can't remember how often they came out,

12   and I remember looking to see if they had complied.

13        Q.   Okay.  And what do you remember seeing when

14   you did look?

15        A.   Prices that came out to $1.21 per unit for

16   both package sizes.

17        Q.   All right.  What about direct price?

18        A.   I don't recall even looking for it, but I

19   don't think it was in there.

20        Q.   All right.  In the -- in the -- you received

21   the paper form of First DataBank, the booklets?

22        A.   That's the only form we got.

23        Q.   Did you ever receive the electronic

24   information?

25        A.   Not to my knowledge.

Page 155

1    Q.   Did you have to pay more for the electronic

2  information?

3    A.   Yes.

4    Q.   Chose not to purchase it?

5    A.   That's correct.

6              (Exhibit 4 marked)

7    Q.   (BY MR. MOORE)   Mr. Weintraub, I've put in

8  front of you a document that's marked as Exhibit

9  Number 4.  Would you identify this for us, please,

10  sir, if you can?

11    A.   It's a letter that I wrote to a Kay Morgan at

12  First DataBank.

13    Q.   What's the date of the letter, sir?

14    A.   The date of the letter was July 16, 2002.

15    Q.   All right.  And is this a true and correct

16  copy of a letter that you sent Kay Morgan of First

17  DataBank on or about July 16th, 2002?

18    A.   Yes, it is.

19    Q.   And is it your signature at the bottom?

20    A.   Yes, it is.

21    Q.   Describe the circumstances, Mr. Weintraub,

22  surrounding sending this letter to First DataBank in

23  2002.

24    A.   I don't recall the exact circumstances.  The

25  most I can recall was that there was a request that

Page 156

1   came in from First DataBank for purposes that they

2   wanted to furnish WAC prices.  And I indicated that we

3   did not have WAC prices.  We had no published list.

4   At that point -- I can't remember if it was in the

5   same conversation or in a subsequent conversation they

6   said, "Well, send us your highest WAC prices for the

7   products involved."  So we sent them the highest WAC

8   prices, I believe.

9        Q.   What were your highest WAC -- what did you go

10  to to get your highest WAC prices?

11       A.   We had a price listing in Schering -- in

12  Warrick, rather, and that -- that became the source of

13  my information.

14       Q.   Now, there is a term here, I want to back up

15  just a minute, a term called "WAC," W-A-C.

16       A.   Yes.

17       Q.   What is your understanding of what -- what

18  those letters stand for, W-A-C?

19       A.   Wholesaler acquisition cost.

20       Q.   All right.  And what is your understanding of

21  what -- what price is being referred to when --

22  when -- when a WAC price is mentioned?

23       A.   An undiscounted invoice price.

24       Q.   To who?

25       A.   To the recipient, the wholesaler.

cfd33e8b-c256-4aa7-8394-70433ad63a54

1    Q.   All right.  Now, you said that Warrick didn't

2  publish a list of WAC prices; is that true?

3    A.   That's correct.

4    Q.   All right.

5    A.   We didn't have WAC prices as such.

6    Q.   Did Warrick periodically publish sort of like

7  a quarterly listing or an annual listing of published

8  list WAC prices, did you do that?

9    A.   No, we did not.

10            MR. HEIDLAGE:  Objection.

11    Q.   (BY MR. MOORE)  Why not?

12    A.   We didn't have WAC prices.

13    Q.   Okay.

14    A.   And whatever prices we invoiced at were

15  different for each customer.

16    Q.   Did Warrick usually use the term "WAC" in its

17  business on a routine basis?

18    A.   Not usually.

19    Q.   Were there times that you would use the term

20  "WAC" in your business?

21    A.   Yes.

22    Q.   Explain to the jury why you might -- we might

23  find you using the acronym "WAC" in your business.

24    A.   Some wholesalers utilize the term "WAC" and

25  wanted their communications on the basis of WAC so

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 158

1    they -- we would make sure there was no

2    miscommunication.  And Cardinal, I believe, was one of

3    those.  They wanted -- they wanted everything as WAC

4    for their purposes to make sure we were on the same

5    page.

6         Q.    Looking at Exhibits -- look at Exhibit

7    2 and -- excuse me.  Look at Exhibit 3 and 4 together,

8    Mr. Weintraub.  Exhibit 3 is your letter to First

9    DataBank dated October 12th, 1993 when you lowered the

10   AWP on one of the 3 mL's, correct?

11        A.    That's correct.

12        Q.    And Exhibit 4 is a letter some nine years

13   later, July 16th, 2002, when you sent some pricing

14   information to First DataBank at their request; is

15   that true?

16        A.    That's correct.

17        Q.    All right.  In the interim, in that nine-year

18   interim, did First DataBank ask you for any pricing

19   information, direct prices or WACs or anything else?

20        A.    I can't recall any time.

21        Q.    Okay.

22        A.    They may have, but I can't recall.

23        Q.    Can you recall any time that First DataBank

24   asked you for some WAC pricing other than this event

25   that occurred in July of 2002?  Do you have a

Page 159

1    recollection of any other time that First DataBank

2    asked you for that kind of information?

3         A.   I have no recollection of any of that.

4         Q.   Do you have a recollection of providing

5    direct prices to First DataBank from October of '93

6    until July of 2002?  Do you have a recollection of

7    that?

8         A.   I don't have a specific recollection.

9         Q.   Okay.

10                   (Exhibit 5 marked)

11        Q.   (BY MR. MOORE)  Mr. Weintraub, I've handed

12   you a document which the court reporter has marked as

13   Exhibit 5.  Would you identify that, please?

14        A.    It is a communication from me to the State of

15   Texas indicating that the AWP for albuterol

16   solution .5 percent 20 mL would increase.  This letter

17   went out to all states, state Medicaid offices.

18        Q.   That was going to be my next question.

19   Let's -- let's take it one step at a time, please.

20                   Exhibit 5 is a letter that you wrote to

21   the State of Texas announcing that an increase in your

22   AWP on the -- on this 20 mL bottle of solution that we

23   looked at, the bigger bottle, correct?

24                   MR. HEUCK:  Objection, leading.

25        A.    Correct.

Page 160

1    Q.    (BY MR. MOORE)   Okay.   What's the date of the
2    letter?
3    A.    The letter is dated February 23rd, 1995.
4    Q.    Would it be fair to say based on your
5    procedures that a letter like this would have gone out
6    to all the states at about that time?
7    A.    Yes.
8    Q.    Okay.   Why were you raising the AWP on the 20
9    mL bottle of solution in February of 1995?
10   A.    Because I raised the price uniformly for this
11   product across the country and I came out of the brand
12   industry and it was the practice in the brand industry
13   to raise the AWPs when you raised a price for a
14   product uniformly and consequently I raised the price,
15   the AWP.
16   Q.    Why were you taking a price increase on the
17   20 milliliter bottle of albuterol solution in 1995?
18   A.    The major competitor that we had for that
19   product had its product removed from the market by the
20   FDA.  We were virtually the only 20 mL manufacturer
21   and supplier in the country at that time.  This gave
22   us a chance to recoup the monies lost because the
23   price had deteriorated from the time we came out with
24   the product to this level and we thought this would
25   help recoup some of the monies on this product and we

Page 172

1     A.   I can recall no such instance.

2     Q.   (BY MR. MOORE)  Well, didn't you consider

3   that Zenith Goldline in 2001 had a big advantage over

4   you by having a $28.75 AWP and yours is $7 lower,

5   didn't you -- didn't that worry you?

6              MR. HEUCK:  Objection, leading.

7              MR. HEIDLAGE:  Objection.

8     Q.   (BY MR. MOORE) Go ahead.

9     A.   No.

10    Q.   Why?

11    A.   We sold our product on price.  No one was

12  coming to me and saying that I had to do anything

13  other than sell them on price.

14    Q.   And what do you mean when you say "sell them

15  on price"?  Let's be clear about that.  What does it

16  mean to sell them on price?

17    A.   They wanted to know what their price was for

18  the inhaler.

19    Q.   They didn't want to know about the Zenith AWP

20  versus the Warrick AWP?

21             MR. HEIDLAGE:  Objection.

22    A.   That never came to my discussions with the

23  account.

24    Q.   (BY MR. MOORE)  Were you involved while you

25  were at Warrick in getting Warrick generic drugs

cfd33e8b-c256-4aa7-8394-70433ad63a54

1    listed on state Medicaid programs?

2         A.   Yes, I was.

3         Q.   What involvement did you have in that,

4    Mr. Weintraub?

5         A.   In order to have our drug purchased by the

6    national accounts we certainly had to have our

7    products reimbursed by -- under the Medicaid programs,

8    and so all we wanted to do was to be listed as a

9    product for which they would reimburse.  So we sent

10   them out a letter saying, "This is what our product

11   is.  Here's the NDC code.  Please list it," in

12   essence.

13        Q.   Okay.  Did you know the specifics of each

14   state's Medicaid reimbursement formula?

15        A.   No.

16        Q.   Did you know whether they all reimbursed in

17   the same manner with the same formulas at the same

18   time?

19                  MR. HEIDLAGE:  Objection.

20        A.   No.

21        Q.   (BY MR. MOORE)  Did you keep track of what

22   those were or how they changed from time to time?

23                  MR. HEIDLAGE:  Objection.

24        A.   No.

25        Q.   (BY MR. MOORE)  Would you even necessarily

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 174

1    know when they changed their formulas?

2        A.   No.

3        Q.   Did you consider that relevant to your

4    business of selling Warrick generic drugs?

5                MR. HEIDLAGE:   Objection.

6        A.   Their changes?

7        Q.   (BY MR. MOORE)   Yes, sir.   Their various

8    formulas.   Did you consider --

9        A.   Oh, no, not their -- no.   The only change

10   that would be relevant to me would be whether we were

11   on the program or off the program.

12       Q.   Was Warrick ever involved in the decisions as

13   to the reimbursement procedures and how much a

14   particular state Medicaid program will reimburse a

15   pharmacist for dispensing drugs to Medicaid

16   recipients?

17               MR. HEIDLAGE:   Objection.

18       A.   No.

19       Q.   (BY MR. MOORE)   Did you have any

20   communications with any of the state Medicaid agencies

21   over what their reimbursements were going to be?

22               MR. HEIDLAGE:   Objection.

23       A.   No.

24       Q.   (BY MR. MOORE)   Same question with respect to

25   private payers.   Did CIGNA or Aetna or Blue Cross ever

cfd33e8b-c256-4aa7-8394-70433ad63a54

Page 175

1    call you up and say, "We're considering changing our

2    reimbursements and we want to get your input"?

3                    MR. WINGET-HERNANDEZ:  Objection, form.

4                    MR. HEIDLAGE:  Objection.

5        Q.   (BY MR. MOORE)  Did that ever happen?

6        A.   No.

7        Q.   Same questions with Medicare.  You told me

8    earlier you weren't even sure -- well, strike that.

9                    Did you know the ins and outs of how

10   Medicare did its reimbursements?

11                   MR. HEIDLAGE:  Objection.

12       A.   No.

13       Q.   (BY MR. MOORE)  Did anyone from the federal

14   government, Medicare, call you up, or anyone else at

15   Warrick, and get your input on how much they should

16   reimburse and when?

17                   MR. HEIDLAGE:  Objection.

18       A.   Not to my knowledge.

19       Q.   (BY MR. MOORE)  How was Medicare calculating

20   its reimbursement, do you know?

21       A.   I do not know.

22       Q.   Did Warrick ever consider Medicaid or

23   Medicare reimbursements in determining who Warrick's

24   customers would be?

25                   MR. HEUCK:  Objection, calls for

Page 176

1    speculation.

2              MR. HEIDLAGE:  Objection.

3       A.   Not to my knowledge.

4       Q.   (BY MR. MOORE)  Did you or Warrick ever

5    consider Medicaid or Medicare reimbursements in

6    determining what price you would establish for a

7    particular project?

8              MR. HEUCK:  Objection, calls for

9    speculation.

10      A.   No.

11      Q.   (BY MR. MOORE)  Did you or Warrick ever

12   consider Medicaid or Medicare reimbursement in

13   establishing an AWP?

14             MR. HEIDLAGE:  Objection.

15             MR. HEUCK:  Same objection.

16      A.   No.

17      Q.   (BY MR. MOORE)  How about in negotiating

18   discounts or rebates?

19             MR. HEUCK:  Same objection.

20      A.   No.  We met the competition.

21      Q.   (BY MR. MOORE)  How about in determining how

22   to market Warrick drugs?

23             MR. HEUCK:  Same objection.

24             MR. HEIDLAGE:  Objection.

25      A.   No.

                     IN THE CIRCUIT COURT OF
                   MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,          )
         Plaintiff,        )
                           )
VS.                        )     NO. CV-2005-0219-PR
                           )
ABBOTT LABORATORIES,       )
INC., et al,               )
         Defendants.       )



*******************************************************


      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
          IN AND FOR THE COUNTY OF MARICOPA


ROBERT J. SWANSTON,        )     NO. CV 2022-004988
individually and on behalf )
of himself and all others  )
similarly situated,        )
         Plaintiff,        )     (Assigned to the
                           )     Honorable Janet
VS.                        )     Barton)
                           )
TAP PHARMACEUTICAL PRODUCTS, )
INC.; et al.,              )
         Defendants.       )



*******************************************************

           ORAL AND VIDEOTAPED DEPOSITION OF

                HARVEY J. WEINTRAUB

               September 19, 2006

                    Volume 2

*******************************************************

a95e5d1d-1b91-464c-9d3e-0e3b03fb4127

Page 351

1   immediate availability of a new package size, 25 x 3mL

2   albuterol sulfate inhalation solution .083%, to the

3   Warrick Pharmaceuticals line.  I request that you list

4   this new package size in your pricing guide or file.

5   Information on this new package including pack size,

6   NDC number and price is included on the attached

7   sheet."

8            Did I read that correctly?

9       A.   Yes, you did.

10      Q.   Mr. Weintraub, why were you sending pricing

11  information to First DataBank?

12      A.   All of our accounts require that you be

13  listed in the pricing services.

14      Q.   When you say "all of our accounts," who are

15  you referring to?

16      A.   Any account that we had.

17      Q.   You mean your customers, right?

18      A.   Yes.

19      Q.   And is that so that pharmacies -- well, why

20  is that, sir?  Do you know why it is that the pharmacy

21  customers of Warrick wanted your products listed in

22  First DataBank?

23      A.   Not only in First DataBank.  Depending upon

24  what pricing service they used, all the pricing

25  services so that they could be listed as a product

Page 352

1    that would be -- or the product would be listed as

2    long as we would be reimbursed.

3         Q.   Okay.  So you understood that the reason you

4    needed to report prices to First DataBank is so that

5    your products would be eligible for reimbursement,

6    correct?

7         A.   That's correct.  We had to be listed there.

8    We didn't have to report prices as such.

9         Q.   Well, what if you listed an NDC number on a

10   Warrick product but gave a price of zero, do you think

11   that your product would be reimbursed?

12        A.   No.  You only had to list an AWP.

13        Q.   But you had to list a price, correct?

14        A.   An AWP price.

15        Q.   And you also listed other prices with the

16   pricing services, didn't you?

17        A.   We may have listed that at the very outset,

18   but we certainly didn't do that at the time.

19        Q.   Do you recall when you launched the albuterol

20   inhaler in December of '95 that you listed other

21   prices with the pricing service?

22        A.   I would have to look at the document.

23        Q.   Okay.  We'll get to that.

24             Look at the second page of Exhibit 28.

25   You see in the -- kind of upper middle of the page the

Page 353

1   line item "Direct Price"?

2       A.   Correct.

3       Q.   And then next to that is an amount $24.75,

4   correct?

5       A.   Correct.

6       Q.   And then under that is "AWP," correct?

7       A.   Correct.

8       Q.   And then that amount is $32.25, correct?

9       A.   Correct.

10      Q.   And this is for the package of 25 3 mL

11  bottles, right?

12      A.   Correct.

13      Q.   Is it your testimony, Mr. Weintraub, that any

14  customer of Warrick ever paid $24.75 for the three by

15  25 albuterol solution?

16      A.   I cannot recall.  I would have to look at the

17  price file.

18      Q.   In reporting that direct price to First

19  DataBank, what did you intend for that to represent?

20      A.   I intend -- that was certainly our price that

21  we intended to get, if we could.  That was our

22  going-out price.  But, again, this is prior to even

23  making a first sale.

24      Q.   Do you recall, Mr. Weintraub, testifying that

25  there were sales of albuterol solution going on in

Page 354

1    early 1993?

2        A.    Prior to my getting there, yes.

3        Q.    So there were, in fact, transaction prices in

4    Schering and Warrick's records prior to September of

5    '93, correct?

6        A.    I believe they were in Schering's records.  I

7    don't believe that Warrick had been set up with its

8    own recordkeeping system at that point.

9        Q.    Did you attempt to access the records of the

10   prices at which the three by 25 was being sold in

11   representing your prices to First DataBank?

12       A.    No.

13       Q.    Why not?

14       A.    I wasn't selling at that time.  I was just

15   going out to get a price on the market --

16       Q.    When you say you weren't --

17       A.    -- and get listed.

18       Q.    I'm sorry.  I didn't mean to cut you off.

19       A.    I mean, I wasn't selling the product.

20       Q.    When you say, "I wasn't selling," do you

21   mean --

22       A.    I personally.

23       Q.    -- you personally?

24       A.    That's correct.  That's correct.

25       Q.    Harvey Weintraub?

Page 365

1    drugs.  I may have been notified by a managed care

2    person, but I'm not quite sure.

3        Q.   When you say "managed care," you mean a

4    Schering managed care employee?

5        A.   That's correct.

6        Q.   And also from time to time wouldn't you field

7    inquiries or complaints from Schering government

8    affairs representatives regarding the reimbursement of

9    Warrick drugs?

10       A.   I don't recall ever receiving a complaint or

11   a call regarding the reimbursement as such.  The calls

12   would come about whether we were listed on the

13   formulary or how to get them on the formulary,

14   something of that sort.

15       Q.   Right.  And so to the extent that a Warrick

16   drug is not listed on a formulary, then that's not

17   going to allow the Warrick drug to be reimbursed,

18   correct?

19       A.   That is correct.

20       Q.   Okay.

21       A.   Incidentally, I thought you were going to

22   spend more time on this document.  This is not a --

23   well, let's pass it by.

24            (Exhibit 31 marked)

25       Q.   (BY MR. ANDERSON)  Mr. Weintraub, please

Page 366

1    review what's been marked as Exhibit Number 31.

2              MR. ANDERSON:  For the record, it's

3    Bates labeled WPX0001508 through 1522.  Also labeled

4    as Florida Exhibit 202.

5         A.   (Witness reviewing document).

6         Q.   You're welcome to review the entire document,

7    Mr. Weintraub, but just so you know, I'm going to ask

8    you questions regarding Page 10.

9         A.   Can you tell me what date this was issued?

10        Q.   It appears to have been issued before

11   December of '94, but I'll ask you some questions about

12   that, Mr. Weintraub.

13             MR. MOORE:  But, Jarrett, it doesn't --

14   I guess what you're saying is, as far as you know it

15   just doesn't have a date on it?

16             MR. ANDERSON:  Well, it does have some

17   dates.  I'm going to ask him some questions about it.

18        A.   Yes.

19        Q.   (BY MR. ANDERSON)  Specifically,

20   Mr. Weintraub, I have questions for you regarding the

21   section on Page 10 titled "Medicaid, DUR and Pricing

22   Services."  Do you see that page?

23        A.   Yes.

24        Q.   Let me just back up one moment and ask you:

25   Are you familiar with this document at all?

a95e5d1d-1b91-464c-9d3e-0e3b03fb4127

Page 367

1        A.   I do not recall seeing it.

2        Q.   Do you remember Schering and Warrick issuing

3   what's known as an albuterol inhaler action plan?

4        A.   I don't recall it.

5        Q.   Will you agree with me that the first page of

6   Exhibit 31 --

7        A.   Was I copied on it?

8        Q.   I don't know, sir.  Do you remember getting

9   copied on it?

10       A.   I do not.

11       Q.   Will you agree with me that the first page of

12   Exhibit 31 reads "Schering/Warrick Albuterol Inhaler

13   Action Plan"?

14       A.   That is correct.

15       Q.   And it was prepared by Steve Cooper and Mark

16   Calabrese, apparently.

17            MR. MOORE:  I object to the form of the

18   question as speculation.

19       Q.   (BY MR. ANDERSON)  Mr. Weintraub, does the

20   first page state, "Prepared by:  Steve Cooper, Mark

21   Calabrese"?

22       A.   Yes.

23       Q.   And Steve Cooper was one of these individuals

24   that you were working with early on in the launch of

25   the Warrick name, correct?

1          MR. MOORE:  Object to the form of the

2    question.

3          A.   No.

4          Q.   (BY MR. ANDERSON)  Let me rephrase.  Was

5    Steve Cooper an individual that you worked with in '93

6    and '94 concerning the sale and marketing of Warrick

7    labeled products?

8          A.   Steve Cooper came to work for Warrick, and I

9    can't recall the exact date, but this was done while

10   he was not working for Warrick.  He was not working

11   for Warrick in 1993 that I recall.

12         Q.   When do you recall that Steve Cooper came to

13   work for Warrick?

14         A.   I can't recall the exact date.

15         Q.   But you do recall that Steve Cooper was

16   assigned to Warrick at some point?

17         A.   At some point.

18         Q.   Looking there on Page 10, Mr. Weintraub,

19   under the "Medicaid, DUR and Pricing Services"

20   section.  I'll read for the benefit of the record at

21   Paragraph 1.  "One of the critical factors in the

22   success of a generic product is to get reimbursement

23   as quickly as possible.  Third party reimbursers

24   represent as much as 2/3 of an accounts utilization of

25   a given product.  It will be critical to achieve 100%

Page 369

1  reimbursement as quickly as possible.  Several states

2  (i.e. New Jersey, Virginia, etc.) establish their own

3  formulary which determines an account's ability to

4  substitute a generic for a branded product."

5           Did I read that correctly?

6      A.   Yes, you did.

7      Q.   Do you agree, Mr. Weintraub, that it was

8  critical to the success of the Warrick labeled

9  products that they be listed and eligible for

10 reimbursement by third-party payers?

11          MR. MOORE:  I object to the form of the

12 question.

13     A.   Yes.

14     Q.   (BY MR. ANDERSON)  And that applies equally

15 to Medicaid programs for the various states, correct?

16          MR. MOORE:  Objection, form as it

17 relates to this document.

18     A.   That is correct.

19     Q.   (BY MR. ANDERSON)  So when you and others

20 were reporting prices to First DataBank and Medicaid

21 programs for Warrick labeled products, you were aware

22 that that was going to be the pricing that would allow

23 the Warrick products to be reimbursable, correct?

24          MR. MOORE:  Objection as to form to the

25 extent you're trying to relate it to this document.

a95e5d1d-1b91-464c-9d3e-0e3b03fb4127

Page 370

1      A.   We wanted to be listed on the program.   How

2  the reimbursing agents determine their reimbursement,

3  whether it was on one price or another, I don't know.

4  We just wanted to be listed.

5      Q.   (BY MR. ANDERSON)  Right.  And in wanting to

6  be listed Warrick voluntarily reported prices to

7  Medicaid programs and the pricing services such as

8  First DataBank, correct?

9      A.   We reported --

10          MR. MOORE:  Excuse me, Mr. Weintraub.

11  You've got to give me a chance to --

12          THE WITNESS:  Yeah.  Sure.

13          MR. MOORE:  -- just for the record to

14  make my objection.

15          I object to the form of the question to

16  the extent the question is intending to relate to

17  Exhibit Number 31.

18      A.   Okay.  Will you rephrase the question again,

19  please?

20      Q.   (BY MR. ANDERSON)  Yes, sir.  I'm not

21  focusing this question --

22      A.   Okay.

23      Q.   -- on Exhibit 31.

24          Mr. Weintraub, you'll agree with me,

25  won't you, that you and others reporting prices on

1   behalf of Warrick to Medicaid programs and to pricing

2   services such as First DataBank knew that in reporting

3   those prices you were allowing your product to be

4   reimbursable?

5            MR. MOORE:  Objection to form.

6       A.   Yes, by being listed on the program.

7       Q.   (BY MR. ANDERSON)  And you couldn't be listed

8   on those various programs without reporting pricing,

9   correct?

10           MR. MOORE:  Objection to form.

11      A.   I don't know about the individual programs,

12  each one.  In some company you may have been.  All we

13  wanted to be -- have our NDC number listed and we, as

14  a matter of course, like everyone else did, we

15  furnished an AWP for the product.

16      Q.   (BY MR. ANDERSON)  Yes, sir.  And in doing

17  so, when you reported those AWPs, you knew that you

18  were doing that so that your products would be

19  reimbursable, correct?

20           MR. MOORE:  Object to form.

21      A.   If we were listed we were reimbursable.  If

22  they required an AWP, that -- by furnishing one we

23  were listed.

24      Q.   (BY MR. ANDERSON)  And Warrick and the

25  persons acting on behalf of Warrick did that

a95e5d1d-1b91-464c-9d3e-0e3b03fb4127

Page 372

1    voluntarily, correct?

2            MR. MOORE:  Objection to form.

3       A.   Voluntarily?  In order to get our product

4    listed we would do that, of course.

5       Q.   (BY MR. ANDERSON)  And that was a decision

6    that Warrick made, correct?

7            MR. MOORE:  Same objection.

8       A.   Absolutely we made that decision.

9       Q.   (BY MR. ANDERSON)  Thank you.

10      A.   Incidentally, going back to your previous

11   comments about Steve Cooper working for Warrick.  This

12   document, as I look at it, had to be done prior to his

13   coming to work for Warrick.  This had to be done when

14   he was working in the marketing planning area for

15   Proventil.

16      Q.   Why is that?

17      A.   Because in looking at it Steve Cooper, Mark

18   Calabrese, I'm looking at the fact that Steve Cooper

19   is supervising the MCAMs.  He was in the managed care

20   area or relating to them at that time.  This was not a

21   document that was a Warrick document.

22      Q.   You believe this was a Schering document?

23      A.   Yes.

24      Q.   Hence the reason --

25      A.   I think.

1          Q.    -- it's titled Schering/Medi -- I mean,

2     pardon, "Schering/Warrick Albuterol Inhaler Action

3     Plan"?

4          A.    Because the Warrick name had already been

5     established and it had been established that the

6     Warrick would be the vehicle by which the generic

7     inhaler would be marketed.  I'm not copied on this at

8     all.  If this was done in 1993, I think I would have

9     been.

10         Q.    Do you recall, Mr. Weintraub, that the

11    managed care area managers, what you just referred to

12    as a MCAM, were, in fact, involved in the listing of

13    Warrick products on State Medicaid formularies?

14         A.    That was part of their function.

15         Q.    And, for instance, reading from that

16    Paragraph 1 on Page 10 of Exhibit 31, Mr. Weintraub,

17    "Since it can take several months lead time to get on

18    an agenda at these states, we should begin to complete

19    the paperwork and submit it immediately in order to be

20    available for reimbursement at launch.  Additionally,

21    the managed care person responsible for the states

22    that require a separate submission in addition to

23    HCFA, should monitor those states for competitive

24    activity by either Glaxo or IVAX."

25                     Did I read that correctly?

a95e5d1d-1b91-464c-9d3e-0e3b03fb4127

Page 386

1    asking him a legal -- for a legal conclusion.

2         A.   I don't believe that statement says that.  It

3    merely says if you require any additional information,

4    we're welcome to give it.

5         Q.   (BY MR. ANDERSON)  And did you?  When

6    Medicaid officials contacted you and asked for

7    additional information, did you provide it?

8         A.   If they called us we would, obviously.

9         Q.   Okay.  Oh, Mr. Weintraub, if you could,

10   compare side by side Exhibit 32 and Exhibit 33.

11        A.   (Witness complies).  Yes.

12        Q.   Do you agree with me that the price of 16.06

13   and the price of $14.80 under the "Direct Wholesale"

14   column on Exhibit 33 are the exact numbers that are

15   reflected on Exhibit 32 in handwriting?

16        A.   Yes, they are.

17        Q.   Do you have any understanding how that

18   happened?

19        A.   No, I don't.

20        Q.   Was there a reason why the letter under your

21   signature, Exhibit 32, did not have a column titled

22   "Direct Wholesale"?

23             MR. MOORE:  Objection, form.  Asked and

24   answered.

25        A.   It wasn't -- this was -- that was not the

a95e5d1d-1b91-464c-9d3e-0e3b03fb4127

Page 387

1    template.  We usually did not put on the Data -- First

2    DataBank's information a price other than the AWP.

3         Q.   (BY MR. ANDERSON)  Are you aware that over

4    the years, 10-plus years, that First DataBank has

5    published what's known as "wholesale net prices" for

6    Warrick products?

7              MR. MOORE:  Objection, form.

8         A.   I'm not sure about that.  I would have to see

9    a First DataBank.  And did they publish it in a

10   written document or on the electronic document?

11        Q.   (BY MR. ANDERSON)  Well, let's break it down.

12   Are you aware that over 10-plus years First DataBank

13   has published in the electronic publication wholesale

14   net prices on Warrick products?

15        A.   I have never seen it in electronic

16   publication from First DataBank.  We never subscribed

17   to it.

18        Q.   Have -- to your knowledge, has anyone at

19   Schering or Warrick received notification that

20   wholesale net prices were being published by First

21   DataBank on Warrick products?

22        A.   Not to my knowledge.

23        Q.   Mr. Weintraub, you know a gentleman named Dan

24   Valero, don't you?

25        A.   Yes, I do.

a95e5d1d-1b91-464c-9d3e-0e3b03fb4127

Page 388

1      Q.   And -- and you know, also, that Dan Valero

2   was involved from the very beginning in approving

3   pricing on Warrick products, correct?

4      A.   Dan Valero never approved a price.  Dan

5   Valero may have issued a price upon approval.  I don't

6   think he ever approved a price, to my knowledge.

7      Q.   And when you say "issued a price," you're

8   going back to that green, correct --

9      A.   Yes.

10      Q.   -- that Mr. Valero signed?

11      A.   Which I indicated was rather improperly made

12   out.

13      Q.   Okay.

14      A.   Never -- it could never have been a green.  A

15   green is a final notification.  Although it's stamped

16   "final," I said I didn't know if this was a draft or

17   not because there was no pricing on it.  It could

18   never be a final and have prices go into the system as

19   zero.  This was merely a notification to send out the

20   fact that we are coming out with a product and that

21   these were the NDC numbers for it.  He never approved

22   prices.

23      Q.   To your knowledge, as recently as 2005 has

24   Dan Valero been involved in reviewing and approving

25   pricing published by First DataBank on Warrick

```
                   IN THE CIRCUIT COURT OF
                  MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,          )
        Plaintiff,         )
                           )
VS.                        )    NO. CV-2005-0219-PR
                           )
ABBOTT LABORATORIES,       )
INC., et al,               )
        Defendants.        )



*******************************************************


      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
        IN AND FOR THE COUNTY OF MARICOPA


ROBERT J. SWANSTON,        )    NO. CV 2022-004988
individually and on behalf )
of himself and all others  )
similarly situated,        )
        Plaintiff,         )    (Assigned to the
                           )    Honorable Janet
VS.                        )    Barton)
                           )
TAP PHARMACEUTICAL PRODUCTS, )
INC.; et al.,              )
        Defendants.        )



*******************************************************

           ORAL AND VIDEOTAPED DEPOSITION OF

                 HARVEY J. WEINTRAUB

                September 20, 2006

                    Volume 3

*******************************************************
```

1    middle of the page an asterisk and then some words?

2        A.   Yes.

3        Q.   And he's written, "Is 8.8% off BR too close?"

4             Did I read that correctly?

5        A.   Yes, you did.

6        Q.   Do you understand what Mr. Lapila is

7    conveying to you there?

8             MR. MOORE:  Objection, form.

9        Q.   (BY MR. ANDERSON)  Let me rephrase to address

10   the objection.

11            What do you understand that wording to

12   mean, Mr. Weintraub?

13       A.   My recollection after all these years would

14   be that he was wondering if 8.8 percent off the brand

15   was too close to be listed as a generic product.

16       Q.   And does --

17       A.   That would be my recollection.

18       Q.   Yes, sir.  And does that go back to what you

19   had learned from First DataBank, that if a generic AWP

20   was within 10 percent of the corresponding brand AWP,

21   that that product would be also listed as a brand by

22   First DataBank?

23            MR. MOORE:  Objection, form.

24       A.   I don't know if it would be listed as a brand

25   or not listed at all.  I don't know.

Page 444

1     Q.   (BY MR. ANDERSON)  But it was your

2  understanding that if you had a generic labeled drug

3  within 10 percent -- with an AWP that was in -- within

4  10 percent of the brand AWP, that then that generic

5  labeled drug would no longer be eligible for generic

6  reimbursement, correct?

7            MR. MOORE:  Object to the form of the

8  question.

9     A.   I don't know if it would not be eligible for

10  reimbursement.  I know that PriceAlert probably would

11  not list it, according to what they had told me

12  previously.

13     Q.   (BY MR. ANDERSON)  And when you say

14  PriceAlert would not list it, you mean First

15  DataBank --

16     A.   Yes.

17     Q.   -- would not list it?

18     A.   I use the terms interchangeably.

19     Q.   Yes, sir.  And is it your understanding that

20  in that context PriceAlert is this electronic product

21  that First DataBank provided to subscribers of First

22  DataBank's services?

23     A.   I'm not familiar at all with the electronic

24  product.  I'm only familiar with the booklet

25  PriceAlert.

Page 445

1    Q.   Oh, you're only familiar with the -- with the

2    printed booklet styled PriceAlert?

3    A.   That is correct.

4    Q.   All right.  Now, if you could, flip to the

5    fourth page of your notes in Exhibit 39.  Do you agree

6    that that page is titled albuterol solution 20

7    milliliter?

8    A.   Correct.

9    Q.   And then underneath that, what -- what is

10   that phrase?  It starts with the word "Current."

11   A.   "Current," the second word is "Status."

12   Q.   "Current Status."  Okay.  And then under that

13   you've written "Pricing Service AWP," correct?

14   A.   Correct.

15   Q.   And then you've listed the AWPs of various

16   albuterol solution labelers, correct?

17   A.   That is correct.

18   Q.   Schein, Moore, Warrick, Proventil, Major,

19   Qualitest and Rugby, correct?

20   A.   Correct.

21   Q.   And in looking at those pricing service AWPs,

22   will you agree with me that Moore has the highest

23   listed at $15.86?

24   A.   Yes.

25   Q.   And then Proventil has the second highest

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 446

1   with $15.53?

2       A.   Correct.

3       Q.   Where did you look to obtain these AWPs,

4   Mr. Weintraub?

5       A.   Where it says "Pricing Service," I probably

6   would have looked in the PriceAlert.  I can't be sure

7   of that, but if those were the pricing services, that

8   would have been the one I used primarily.  I could

9   possibly have used Redbook, but I don't know.

10      Q.   Do you agree with me that the next highest

11  AWP listed here is $14.65?

12      A.   It appears to be.

13      Q.   And do you recall that, in fact, in 1995 you

14  raised the AWP on Warrick's albuterol solution 20

15  milliliter to $14.99?

16      A.   I'd have to take a look and see -- I don't

17  recall the exact AWPs I raised, but I'd have to take a

18  look and see.  I can't remember the exact numbers.

19      Q.   Why was it that you were looking at the AWPs

20  of the other labelers of the albuterol 20 milliliter

21  product?

22      A.   I was looking at everything that might relate

23  to the price increase.  I had not taken a price

24  increase before.  I was looking at pricing, AWP,

25  everything that would go into a notification of a

Page 527

1          MR. MOORE:  Objection, form.

2     A.   Pricing of what, their product?

3     Q.   (BY MR. ANDERSON)  The pricing of competitor

4  products.

5     A.   No.

6     Q.   Why would -- why are you so certain that

7  you've never considered the pricing of competitive

8  products in setting a Warrick generic AWP?

9          MR. MOORE:  Objection to form.  It's

10  argumentative.

11     A.   Are you talking about AWP pricing or are you

12  talking about the direct pricing?

13     Q.   (BY MR. ANDERSON)  AWPs.

14          MR. MOORE:  Same objection.

15     A.   I wouldn't consider it.  I would use it,

16  perhaps, as a mechanism if I was entering the market

17  and there were already AWPs for the competitive

18  products, I would just utilize theirs somewhere in the

19  pack, so to speak, and save me a lot of time and

20  trouble.

21     Q.   Why would you just join the pack, so to

22  speak?

23     A.   Save a lot of calculation.

24     Q.   How would you go about making the

25  calculations if you didn't join the pack?

Page 528

1          MR. MOORE:  Object --

2     A.    I really don't know.

3          MR. MOORE:  Object -- object to form.

4     A.    That's why I would just take a look at the --

5 on a product that was already in the marketplace by

6 the time we got there in any significance, I would

7 just take a look at the PriceAlert, see where the

8 competitors were and just slot mine somewhere.

9     Q.    (BY MR. ANDERSON)  Couldn't you, also,

10 Mr. Weintraub, have looked at the price that you were

11 going to be selling the product and then added 20

12 percent to it like you did for all those years at

13 Schering?

14     A.    Remember that this is a generic product.  The

15 price I would sell it at was going to be different for

16 different customers and according to where the

17 competition was.  I might desire to launch the product

18 today, but when I got into the market to sell it next

19 month, there would be a whole range of different

20 prices.  There is no way I would know the pricing for

21 each customer or for different customers.

22     Q.    But once you launch the product you know the

23 pricing, don't you?

24     A.    Not for each customer.  It would be different

25 for Walgreens and different for Wal-Mart and different

Page 529

1    for Rite Aid and different for CVS.  We would have a

2    desire to go in at a certain price, but thereafter it

3    was going to be negotiation.

4         Q.   And those negotiations were based upon

5    Warrick's standard policy to achieve uniform pricing

6    in classes of trade, correct?

7              MR. MOORE:  Object to the form of the

8    question.  No foundation.

9         A.   I think I said yesterday that that was the

10   ideal.  The pricing was going to be pragmatic.  To get

11   the business you had to meet the competition.

12             (Exhibit 54 marked)

13        Q.   (BY MR. ANDERSON)  Mr. Weintraub, if you

14   could, please review what's been marked as Exhibit 54.

15   It's a two-page document.  You may want to let your

16   counsel look at it.

17             MR. MOORE:  Do you have another copy?

18             MR. ANDERSON:  No, I don't.

19             MR. MOORE:  Can I see it, Harvey?

20             THE WITNESS:  (Tenders document).

21             MR. MOORE:  Thank you.

22        A.   (Witness reviewing document).  Yes.

23        Q.   (BY MR. ANDERSON)  Do you recognize the first

24   page of Exhibit 54 as a memo that you drafted and

25   signed?

Page 530

1    A.   Yes, I do.

2    Q.   And in that memo are you basically setting

3  the AWP on the Warrick isosorbide?

4    A.   I was making a recommendation for it.

5    Q.   Making the recommendation to whom?

6    A.   To Mr. Kapur.

7    Q.   And were you basing that recommendation upon

8  where other generic companies had set AWP on generic

9  isosorbide?

10   A.   That would appear to be the case.

11   Q.   And, again, you were just doing that so that

12  you were part of the generic pack?

13   A.   Yes.

14   Q.   Did you consider any Medicaid laws, rules,

15  regulations or other information in setting that AWP?

16        MR. MOORE:  Object to form.  Asked and

17  answered.

18   A.   No.

19   Q.   (BY MR. ANDERSON)  Did you subsequently

20  ask -- submit -- well, let me rephrase.

21        To your knowledge, was that AWP

22  subsequently approved by Schering's law department?

23   A.   I don't -- I don't remember.

24   Q.   Would it have been standard procedure for a

25  new AWP on a Warrick product to be approved by

Page 565

1   an exhibit and it's going to be in the record,

2   shouldn't we refer to the exhibit number?

3        Q.   (BY MR. ANDERSON)  Mr. Weintraub, do you

4   recognize that as an example of the form letters you

5   sent out to the Medicare program?

6              MR. MOORE:  Objection, form.

7              Can we show him the exhibit?

8        Q.   (BY MR. ANDERSON)  It was marked as Exhibit

9   33 yesterday, Mr. Weintraub.

10       A.   That would be in the pile.  I'll let you work

11  through it.

12             MR. MOORE:  Thank you.

13       Q.   (BY MR. ANDERSON)  Do you recognize that as

14  the form letter that was sent out under your

15  authorization to all the Medicaid programs when you

16  launched the inhaler and refill?

17       A.   Yes.

18       Q.   And do you see there prices of 16.06 and

19  14.80 --

20       A.   Yes.

21       Q.   -- listed as direct wholesale?

22       A.   Yes.

23       Q.   And did you intend those prices to be

24  utilized by the Medicaid programs in setting the

25  reimbursement on your Warrick products?

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 566

1          MR. MOORE:  Objection, asked and

2     answered.  Repetitive from yesterday or the day

3     before.

4          A.   My intent was to inform them of what our

5     direct wholesale price would be going out.  How they

6     utilized it, I really don't know.

7          Q.   (BY MR. ANDERSON)  Did you intend for those

8     direct wholesale prices to be utilized as WAC prices?

9          MR. MOORE:  Objection, asked and

10    answered, repetitive.  I object to the form.

11         A.   How they utilized it, I don't know.  All I

12    know is this was our direct price to the wholesaler.

13    It was our invoice price.

14         Q.   (BY MR. ANDERSON)  I'm asking about your

15    intent, sir.

16         A.   Our intent was that this -- we were providing

17    them information as to what our going-out price was

18    expected to be.  That's all that was intended for.

19         Q.   Your going-out price to what class of trade?

20         MR. MOORE:  Objection.  Excuse me.

21    Objection, asked and answered.  Repetitive.

22         A.   It says -- it says wholesale.

23         Q.   (BY MR. ANDERSON)  So your national

24    wholesalers you expected to pay $16.06 at launch?

25         MR. MOORE:  Objection --

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 567

1    A.   That is --

2         MR. MOORE:  Excuse me.  Objection, asked

3    and answered and repetitive.

4    A.   That is correct.

5    Q.   (BY MR. ANDERSON)  And if the -- your own

6    records reflect that no wholesaler was ever charged

7    $16.06, in your opinion would that be misleading?

8         MR. MOORE:  Object to the form.  And

9    you're also asking the witness for a legal conclusion.

10   It's asked and answered and it's repetitive and a

11   waste of time.

12        MR. ANDERSON:  I object to the sidebar

13   comments and the filibustering.  Move to strike.

14   Q.   (BY MR. ANDERSON)  Mr. Weintraub, do you

15   consider that to be misleading?

16        MR. MOORE:  Same objections.

17   A.   No.  It was our expectation.  Our expectation

18   was not misleading.  What transpired as a result of

19   competition, I couldn't tell in advance.

20   Q.   (BY MR. ANDERSON)  And did you take any steps

21   whatsoever to notify the Medicaids or disclose to the

22   Medicaids that the prices had dropped?

23        MR. MOORE:  Objection, asked and

24   answered, repetitive.

25   A.   No.

Page 580

1    a WAC list of our products.

2        Q.   Isn't that exactly what Ms. Underwood was

3    asking for at Arkansas Medicaid?

4                MR. MOORE:   Object to form.

5        A.   No.  Martha McNeill, as I believe from this

6    document, was asking for several specific products, I

7    think.

8                (Exhibit 67 marked)

9        Q.   (BY MR. ANDERSON)  Mr. Weintraub, please

10   review what's been marked as Exhibit 67.  Do you agree

11   this appears to be another copy of the letter to Texas

12   Medicaid in March of '97 with the attached prices in

13   unredacted form that contains WACs and AWPs for every

14   Warrick product?

15       A.   That is correct.

16       Q.   Does this indicate to you that in March of

17   '97 at a minimum Warrick had a, quote, WAC list?

18                MR. MOORE:   Objection, asked and

19   answered and repetitive.

20       A.   No, it does not.  This, I'm sure, was

21   developed specifically for this request.  We did not

22   publish a WAC list.  We did not have a WAC list.

23       Q.   (BY MR. ANDERSON)  Mr. Weintraub, do you

24   believe that the request by Arkansas Medicaid in July

25   of '98 constituted a special request for pricing?

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 581

1        A.    Which one are you referring to now?

2        Q.    The last page of Exhibit 65.

3        A.    Exhibit 65 is --

4        Q.    That's the page right there, Mr. Weintraub.

5   It's Bates labeled WPX0007724.

6        A.    Correct.

7        Q.    It's your testimony that that does constitute

8   a special price request, correct?

9        A.    It does.

10       Q.    So why in July of '98 did Warrick not submit

11  the WAC list that it had in March of '97?

12             MR. MOORE:   Objection, asked and

13  answered and repetitive.

14       A.    Judging from my comment on the first page

15  that I spoke to Underwood and said that we don't have

16  a WAC list.   I can't recall if I said that we could

17  prepare one or not, but she said that she would get

18  the information from other sources.

19       Q.    (BY MR. ANDERSON)  Did Warrick have a

20  practice of concealing its true WACs from Medicaid

21  programs and pricing services?

22             MR. MOORE:   Object to the form of the

23  question.   It's argumentative.

24       A.    No.

25       Q.    (BY MR. ANDERSON)   Mr. Weintraub, have you

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 582

1    known over the years or any personnel working on

2    behalf of Warrick known over the years that First

3    DataBank has been publishing prices known as wholesale

4    net or WAC prices on the Warrick products?

5            MR. MOORE:  Objection, asked and

6    answered, repetitive.

7        A.   I believe I testified that I only saw the

8    PriceAlert and First DataBank published books that we

9    received every two weeks or so.  The only thing I saw

10   in those on our products was AWPs.

11       Q.   (BY MR. ANDERSON)  Do you know if any other

12   personnel representing Warrick or Schering were

13   receiving notification that First DataBank was

14   publishing wholesale net or WAC prices for Warrick's

15   products?

16           MR. MOORE:  Objection, form.

17       A.   I don't know.

18           (Exhibit 68 marked)

19       Q.   (BY MR. ANDERSON)  Mr. Weintraub, please

20   review what's been marked as Exhibit 68.

21           MR. ANDERSON:  For the record, it's

22   Bates labeled RGX 0190051 through 069.

23       A.   (Witness reviewing document).  Yes.

24       Q.   Do you recognize this document,

25   Mr. Weintraub?

Page 583

1        A.   No, I do not.

2        Q.   Do you recognize the handwriting on the first

3    page of the document?

4        A.   No, I do not.

5        Q.   Do you recognize the name Janice Brennan?

6        A.   Yes, I do.

7        Q.   Does Janice Brennan perform work on behalf of

8    Warrick?

9        A.   She performs certain types of data

10   submissions to various agencies on behalf of all of

11   the units of Schering Corporation.

12       Q.   Including Warrick?

13       A.   Including Warrick.

14            MR. MOORE:   Jarrett, is there a date on

15   this or is it just a bad copy or --

16       Q.   (BY MR. ANDERSON)  Mr. Weintraub, could you

17   flip to the second page of Exhibit 68?  Does that

18   appear to be a letter from First DataBank to

19   Ms. Janice Brennan?

20       A.   It would appear to be.

21       Q.   Then flipping to the next page.  Do you see

22   there in the footer a copyright, quote, 1998

23   Medi-Span?

24       A.   Yes.

25       Q.   Do you know, Mr. Weintraub, whether or not

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 591

1    holding herself out as a Warrick representative in her

2    communications with Medicaid programs?

3                    MR. MOORE:  Objection, form, asked and

4    answered.

5        A.   I really don't know how she held herself out

6    in most cases.

7        Q.   (BY MR. ANDERSON)  Now that you've seen

8    Exhibit 70, does this refresh your recollection that

9    it's likely Ms. Brennan was, in fact, receiving

10   reports from the pricing services listing all the

11   pricing that was being published on the Warrick

12   products?

13                   MR. MOORE:  Objection, form.

14       A.   Which document are you referring to, 69?

15       Q.   (BY MR. ANDERSON)  No, sir.  Exhibit 70.

16       A.   Oh, 70?

17                   MR. MOORE:  Same objection.

18       A.   70 is a government document, not a pricing

19   services document.

20       Q.   (BY MR. ANDERSON)  Do you agree, sir, that in

21   the second paragraph of Exhibit 70 Ms. Brennan

22   discusses First DataBank as a, quote, source used by a

23   majority of the pharmacies and State Medicaid

24   agencies?

25                   MR. MOORE:  Objection, form, no

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 592

1    foundation.

2        A.    Will you rephrase the question, please?

3        Q.    (BY MR. ANDERSON)   I'll direct you more

4    specifically.   I apologize for that.   Take a look at

5    the last sentence of the second paragraph of Exhibit

6    70.   I'm reading with the word, quote, unfortunately.

7    "Unfortunately, this situation causes a problem since

8    First Data Bank is the source used by a majority of

9    the pharmacies and State Medicaid agencies."

10            Did I read that correctly?

11       A.    Yes, you did.

12       Q.    Does that indicate to you that Ms. Brennan

13   was authorized to interface with the First DataBank

14   and MediSpan and other pricing services on behalf of

15   Warrick?

16            MR. MOORE:   Same objections.

17       A.    In certain situations I'm sure that's true.

18            (Exhibit 71 marked)

19       Q.    (BY MR. ANDERSON)   Mr. Weintraub, please

20   review what's been marked as Exhibit 71.

21            MR. ANDERSON:   And for the record, it's

22   labeled RGX 0190075 through 084.

23       A.    (Witness reviewing document).   Yes.

24       Q.    (BY MR. ANDERSON)   Have you -- are you

25   familiar with reports such as Exhibit 71?

Page 593

1     A.   I am not.

2     Q.   Have you ever seen any reports similar to

3  Exhibit 71?

4     A.   Not to my knowledge or memory.

5     Q.   Are you familiar with any documents or other

6  information known as the National Drug Data File?

7     A.   I am not.

8     Q.   Will you agree with me that the fax header on

9  this document is dated March 2nd, 1999?

10         MR. MOORE:  Objection, form.  No

11  foundation.

12     A.   Yes.

13     Q.   (BY MR. ANDERSON)  And will you agree with me

14  that when you turn the document laterally that you see

15  a labeler code and then the name "Warrick Pharm"?

16         MR. MOORE:  Objection, form.  Same

17  objection.

18     A.   I see that.

19     Q.   (BY MR. ANDERSON)  And that labeler code is

20  Warrick's labeler code, correct?

21         MR. MOORE:  Same objections.

22     A.   That is correct.

23     Q.   (BY MR. ANDERSON)  And does this,

24  Mr. Weintraub, appear to be a report of all the

25  Warrick products?

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 594

1          MR. MOORE:  Is that the end of the

2   question?

3          MR. ANDERSON:  Yeah.

4          MR. MOORE:  I wasn't sure.

5          Objection, form.  There's no foundation

6   for the question.

7      A.   It would appear to be.  It's not a document

8   that was prepared by us.

9      Q.   (BY MR. ANDERSON)  Who do you believe this

10  document was prepared by?

11     A.   Well, it says --

12          MR. MOORE:  Excuse me, Mr. Weintraub.

13          I object to the form.  There's no

14  foundation.  He said he's not familiar with it.

15          MR. ANDERSON:  Quit coaching him, Mike.

16  He just said --

17          MR. MOORE:  I'm not coaching him,

18  Jarrett.  Good Lord.

19     Q.   (BY MR. ANDERSON)  Mr. Weintraub, who does --

20          MR. HEUCK:  Excuse me.

21     Q.   (BY MR. ANDERSON)  -- the document appear to

22  be prepared by?

23     A.   It says --

24          MR. MOORE:  Excuse me.  Excuse me.

25          MR. HEUCK:  Excuse me.  I have an

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 595

1    objection.  Because this is a discovery deposition

2    can -- can we just limit the objections to form?  I

3    mean, if there's no foundation -- if he doesn't

4    understand or know, he can say that.

5                    MR. MOORE:  We have a --

6                    MR. HEUCK:  We are trying to establish a

7    foundation here.

8                    MR. MOORE:  We have a difference of

9    opinion on -- perhaps on how this deposition -- what

10   it is and how it may be used and, therefore, I feel

11   the need -- and the fact that this deposition is also

12   a preservation deposition, to make these objections.

13   I'm making them as succinctly as I possibly can and

14   stating the basis for the -- for the objection.  So I

15   feel like I need to do that.  So I'm trying to be as

16   brief as possible.

17                    MR. HEUCK:  All right.  I understand.  I

18   appreciate --

19                    MR. MOORE:  Okay.

20                    MR. HEUCK:  I appreciate that.

21                    MR. MOORE:  That's -- that's the --

22                    MR. HEUCK:  I've sat here very quietly

23   today, as you know --

24                    MR. MOORE:  Well, there's difference of

25   opinion on how this deposition is going to be used.

1            MR. HEUCK:  When I feel that it's gone

2   far enough to where it's actually disrupting the

3   deposition, then I have a problem with that.

4            MR. MOORE:  Well, I don't think --

5            MR. HEIDLAGE:  I just put my objection

6   on the record.  Thank you.

7            MR. MOORE:  -- I'm disrupting.  Counsel,

8   I just respectfully disagree with you that making an

9   objection to preserve the record in the future is

10  disruptive.  I think I have a duty to do that.

11           So I object to the form of the question

12  because there's no foundation.

13      A.   If I remember your question correctly,

14  it's --

15      Q.   (BY MR. ANDERSON)  Let me rephrase it.

16      A.   It says that it was prepared by the First

17  DataBank Corporation.  First DataBank, part of The

18  Hearst Corporation.

19      Q.   And, obviously, First DataBank is one of the

20  pricing services that provides information to the

21  Medicaid programs, correct?

22           MR. MOORE:  Objection, asked and

23  answered and repetitive.

24      A.   I believe so.

25      Q.   (BY MR. ANDERSON)  And over the years you and

1    others on behalf of Warrick have been involved in

2    reporting pricing to First DataBank, correct?

3              MR. MOORE:  Objection, asked and

4    answered and repetitive.

5        A.   I think I've said that we have reported the

6    AWP pricing.

7        Q.   (BY MR. ANDERSON)  Do you see, sir, on this

8    report that there's a column in the middle of the page

9    titled "WHLNET"?

10             MR. MOORE:  Object to form, no

11   foundation.

12       A.   I see that.

13       Q.   (BY MR. ANDERSON)  And do you understand what

14   that means?

15             MR. MOORE:  I object to the form, no

16   foundation.

17       A.   Not with certainty.  I can make a guess as to

18   what it might mean, but I don't know that I would be

19   correct.

20       Q.   (BY MR. ANDERSON)  I would like your best

21   testimony as to your understanding of the acronym

22   "WHLNET."

23             MR. MOORE:  Object to the form, no

24   foundation.

25       A.   Again, without being certain, I would assume,

e9cad788-f42b-465a-a9cd-73fdba73aa0f

1    and I don't know that an assumption is the proper

2    thing to do here, but it would be wholesale net.

3         Q.   (BY MR. ANDERSON)  And is it your

4    understanding over your many years of experience in

5    the industry that wholesale net is known at First

6    DataBank as synonymous with WAC?

7              MR. MOORE:  Objection --

8         A.   I can --

9              MR. MOORE:  Excuse me, Mr. Weintraub.

10             I object to the form, no foundation as

11   you are attempting to relate it to this document.

12        A.   I cannot comment on what First DataBank would

13   refer to as wholesale net.

14        Q.   (BY MR. ANDERSON)  Let me rephrase to address

15   that.

16             Is it your understanding over the years,

17   Mr. Weintraub, that in the pharmaceutical industry

18   "wholesale net" and "WAC" are used interchangeably?

19             MR. MOORE:  Objection, form.  Same

20   objection.

21        A.   I don't know that for sure.  I never used the

22   terms in my dealings.

23        Q.   (BY MR. ANDERSON)  Have you -- have you heard

24   the terms "wholesale net" and "WAC" used

25   interchangeably?

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 599

1      A.   Not myself that I recall.

2      Q.   What do you mean by that?

3      A.   I just don't know that WAC and wholesale net

4  are interchangeable.  WAC could be an invoice price as

5  I've defined.  A wholesale net might be a price that's

6  discounted.  I'm not sure.  This can be very

7  confusing.

8      Q.   You will agree, sir, that to the extent a

9  Medicaid program received wholesale net prices, they

10 would think that those are net of discounts, correct?

11           MR. MOORE:  I object to the form of the

12 question.

13     A.   I cannot --

14           MR. MOORE:  You're asking him to

15 speculate.

16     A.   I cannot comment on what Medicaid expected to

17 interpret these prices at.  I just don't know.

18     Q.   (BY MR. ANDERSON)  Mr. Weintraub, do you know

19 that other pricing services, such as Redbook, also

20 notified personnel representing themselves to be with

21 Warrick of Warrick published prices?

22           MR. MOORE:  I object to the form of the

23 question.

24     A.   I don't know that as such.  I don't recall

25 any information to that effect.

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 600

1          (Exhibit 72 marked)

2      Q.   (BY MR. ANDERSON)  Mr. Weintraub, please

3  review what's been marked as Exhibit 72, which is a

4  two-page exhibit.

5          MR. ANDERSON:  And for the record, it's

6  labeled RGX 0189706 and 707.

7      A.   Yes.

8      Q.   (BY MR. ANDERSON)  Are you familiar with the

9  type of document that's the second page of Exhibit 72?

10         MR. MOORE:  Objection, form.

11     A.   I am not.

12     Q.   (BY MR. ANDERSON)  Have you ever seen letters

13  similar to the second page of Exhibit 72?

14     A.   I don't recall doing so.

15     Q.   Do you agree that it appears to be a letter

16  dated July 16th, '99 from Redbook?

17         MR. MOORE:  Objection, form, no

18  foundation.

19     A.   It's a letter to "Dear Pharmaceutical

20  Manufacturer."

21     Q.   (BY MR. ANDERSON)  And is it from Redbook,

22  Mr. Weintraub?

23         MR. MOORE:  Objection, form, no

24  foundation.

25     A.   It is on their letterhead.

e9cad788-f42b-465a-a9cd-73fdba73aa0f

Page 619

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,            )
        Plaintiff,           )
                             )
VS.                          )      NO. CV-2005-0219-PR
                             )
ABBOTT LABORATORIES,         )
INC., et al,                 )
        Defendants.          )


*******************************************************


IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA


ROBERT J. SWANSTON,          )      NO. CV 2022-004988
individually and on behalf   )
of himself and all others    )
similarly situated,          )
        Plaintiff,           )      (Assigned to the
                             )      Honorable Janet
VS.                          )      Barton)
                             )
TAP PHARMACEUTICAL PRODUCTS, )
INC.; et al.,                )
        Defendants.          )


*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

HARVEY J. WEINTRAUB

September 21, 2006

Volume 4

*******************************************************

Page 638

1          MS. WILLIS:  Good morning.  Marguerite

2    Willis, Nexsen Pruet, Columbia, South Carolina for

3    Schering and Warrick.

4          MR. MOORE:  Thank you.

5             HARVEY J. WEINTRAUB,

6    having been previously duly sworn, testified further

7    as follows:

8             EXAMINATION (CONTINUED)

9    BY MR. ANDERSON:

10       Q.   Good morning, Mr. Weintraub.

11       A.   Good morning.

12       Q.   After 1:00 p.m. yesterday did you do anything

13   to prepare to testify here this morning?

14       A.   I did not.

15       Q.   If you could, Mr. Weintraub, look at what's

16   been previously marked as Exhibit 69 and I've turned

17   it laterally there in the stack.  Do you recall this

18   exhibit from yesterday, Mr. Weintraub?

19       A.   Somewhat.

20       Q.   Do you believe, Mr. Weintraub, that if

21   Schering and Warrick were receiving notification from

22   First DataBank that up-to-date and accurate prices

23   were being requested that it was incumbent upon

24   Schering and Warrick to provide those prices?

25            MR. MOORE:  Objection, form.  No

e6b75410-38c4-44e0-b5ba-7cb251ff5dbc

Page 639

1   foundation for the question as it relates to this

2   document and asking the witness for a legal

3   conclusion.

4        A.   I don't know that we got -- you're talking

5   about a hypothetical.  I don't know that except on

6   certain occasions we got requests for information from

7   First DataBank.  I know our procedure was to launch a

8   product and in the process notify First DataBank of

9   the AWP and the NDC numbers.  If they wanted any other

10  information as far as Warrick was concerned, that we

11  would provide it to them, if possible.  But other than

12  that, I don't recall any -- any routine requests for

13  information.

14       Q.   Mr. Weintraub --

15       A.   Have I answered your question?  I'm not -- it

16  was kind of --

17       Q.   Well, I'm going to ask a follow-up question.

18  I don't believe that you did exactly answer the

19  question.

20            Do you, Mr. Weintraub, believe that if

21  Schering or Warrick personnel had received a request

22  from First DataBank for accurate, up-to-date pricing,

23  that it was incumbent upon Schering or Warrick to

24  provide the requested pricing?

25            MR. MOORE:  Objection, asked and

Page 640

1    answered and assert all previous objections to that

2    question.

3        A.   Depending upon the nature of the request I

4    would say that we would -- we would do it.  I don't

5    know if it was incumbent.  I don't know if there was

6    any legal precedent for us -- legal requirement for us

7    to do so.

8        Q.   (BY MR. ANDERSON)  Do you agree with me, sir,

9    that the date of Exhibit 69 is December 1998?

10       A.   That's the date.  I don't recall ever seeing

11   this document.

12       Q.   Do you agree, Mr. Weintraub, that at least

13   after March of 1997 Warrick had, in fact, created and

14   reported a WAC list for all of its prices?

15            MR. MOORE:  Objection, asked and

16   answered.  This was all covered yesterday.

17       Q.   (BY MR. ANDERSON)  Let me rephrase because I

18   misspoke at the end of that question.

19            Do you agree, Mr. Weintraub, that after

20   March of '97 at a minimum that Warrick had a WAC list

21   for all of its products that it had reported?

22            MR. MOORE:  Objection, asked and

23   answered yesterday, repetitive.

24       A.   We may have had a WAC list for a specific

25   request.  It wasn't a routine of ours to have a WAC

e6b75410-38c4-44e0-b5ba-7cb251ff5dbc

Page 657

1    Analy$ource services that First DataBank offered?

2                    MR. MOORE:  Objection, form.

3        A.   By refresh my recollection, I'm not familiar

4    with Analy$ource.  I never dealt with it.  I never

5    heard of it.

6        Q.   (BY MR. ANDERSON)  Does -- in looking at this

7    document, do you have any refreshed recollection about

8    First DataBank having a service or data product known

9    as the National Drug Data File?

10                   MR. MOORE:  Objection, form.

11       A.   No.

12                   (Exhibit 79 marked)

13       Q.   (BY MR. ANDERSON)  Mr. Weintraub, I'm now

14   changing topics a little bit.  If you could, please,

15   review what's been marked as Exhibit 78 (sic).  It's a

16   one-page document Bates labeled WPX0007678.

17       A.   (Witness reviewing document).  Yes.

18       Q.   Are you familiar with this document,

19   Mr. Weintraub?

20       A.   I was copied on the document.  I don't recall

21   it specifically.

22       Q.   Given that you're copied on it, do you

23   believe you received this document in the ordinary

24   course of business?

25       A.   Yes, I probably did.

e6b75410-38c4-44e0-b5ba-7cb251ff5dbc

Page 658

1    Q.   Do you agree it appears to be a memo from

2   Dave Reich to Bob Bucko dated December 11th, 1995?

3    A.   Yes.

4    Q.   Is it true, Mr. Weintraub, that back in

5   December of '95 Bob Bucko was the chief financial

6   officer of Warrick -- I mean, pardon me, of Schering

7   Corporation?

8    A.   I don't know if that was his function.  He

9   was a vice-president of financial services of Schering

10  Corporation.  I don't know -- I wouldn't call him

11  chief financial officer, I don't think.

12   Q.   I'm sorry if I phrased that improperly.

13        Mr. Weintraub, back in December of '95

14  do you recall that Bob Bucko was the vice-president of

15  finance for Schering Corporation?

16   A.   He was a vice-president of finance for

17  Schering Corporation.

18   Q.   Thank you, sir.  Does this memo basically

19  reflect what you previously testified to in this

20  deposition, and that is that before Warrick launched

21  the inhaler, Warrick knew that the prices were going

22  to drop very quickly right after launch?

23        MR. MOORE:  Objection, form.

24   A.   We expected that they would drop very

25  quickly.  One never knows what the future holds.

e6b75410-38c4-44e0-b5ba-7cb251ff5dbc

Page 659

1      Q.   But it was Warrick's best understanding that

2  the prices of the albuterol inhaler, which was its

3  major product, were going to drop significantly very

4  quickly, correct?

5           MR. MOORE:  Objection, form.  Asked and

6  answered.

7      A.   It was our expectation that that would

8  happen.  Again, you never really know.

9           (Exhibit 80 marked)

10     Q.   (BY MR. ANDERSON)  Mr. Weintraub, please

11 review what's been marked as Exhibit Number 79.  It's

12 a three-page -- oh, pardon me.

13     A.   Mine is marked 80.  What you handed me is 80.

14     Q.   That was my -- my mistake, Mr. Weintraub.  If

15 you could, please review what's been marked as Exhibit

16 Number 80.  It's a one-page (sic) exhibit.  Bates

17 labeled RGX 0035092.

18     A.   (Witness reviewing document).  Yes.

19     Q.   Do you recognize this exhibit, Mr. Weintraub?

20     A.   I'm not -- I have to recollect that, yes,

21 it's my fax to Mr. Zahn.  I don't recall it because I

22 haven't seen it since 2000.

23     Q.   In reviewing the -- well, strike that.

24          Does this appear to be a fax that you

25 sent to Richard Zahn back in May of 2000?

Page 660

1      A.   Yes, it is.

2      Q.   And does that appear to be your initials

3  above your name there in the middle of the page?

4      A.   Yes, it is.

5      Q.   And in looking at this and reading

6  particularly the first page of Exhibit 80, is your

7  recollection refreshed that you were communicating

8  with Mr. Zahn back in May of 2000 about Mylan's AWPs?

9      A.   That is correct.

10     Q.   In May of 2000 is it true that Mr. Zahn was

11 the president of Schering?

12     A.   That is correct.

13     Q.   Did Mr. Zahn ask you to analyze the AWP

14 increases of Mylan?

15     A.   I don't know what he asked me to do.  I

16 noticed that I indicated that Mylan had had a number

17 of increases in AWP.  Very certainly this was in

18 direct response to a request of his, because I would

19 never have corresponded voluntarily with Mr. Zahn.  I

20 didn't report to him.  I really had very little

21 contact with him.  So this must have been a response

22 to a request that he made of me.

23     Q.   In conducting an analysis of the AWP

24 increases by Mylan, what did you determine?

25                   MR. MOORE:  Object to the form of the

Page 752

1       Q.   We'll assume, just for purposes of my

2   questions, that you're correct --

3       A.   Right.

4       Q.   -- that the AWP is $30.25.  As far as

5   you're -- as far as you know, did that AWP ever

6   change?

7       A.   I believe I testified that I brought the

8   price of one of -- a box of 60's and 25's to be in

9   synchronization with each other and I changed the AWP

10  for one and lowered it, as I recall.

11      Q.   Do you remember what you lowered it to?

12      A.   I remember I lowered it to the point where it

13  came to $1.21 per 3 mL unit.

14      Q.   And do you remember whether you ever changed

15  the AWP price for that product subsequently?

16      A.   I don't believe I did.

17      Q.   Do you know, as you sit here today, whether

18  the AWP for that product has ever changed since then?

19      A.   I don't believe it changed in all the time

20  that I was at Warrick.  I don't know what's happened

21  subsequently.

22      Q.   And when did you leave Warrick?

23      A.   At the end of 2004.

24      Q.   So do you have any knowledge about the AWP of

25  any Warrick product subsequent to the end of 2004?

Page 753

1      A.   No.

2      Q.   With respect to the product that we were just

3  discussing, are you aware that during the life of that

4  product the actual prices in the marketplace were

5  falling?

6      A.   Yes, I was aware.

7      Q.   And you knew at the time that you established

8  the AWP for that product that the prices would

9  precipitously fall at first and then would fall

10 gradually after that --

11             MR. MOORE:  Object to the form of the --

12     Q.   (BY MR. WINGET-HERNANDEZ)  -- isn't that

13 true?

14             MR. MOORE:  Excuse me.  Object to the

15 form of the question.

16     A.   The 3 mL product, I believe, was already on

17 the market.  I don't know that it would precipitously

18 fall, but over time the price of almost any generic

19 product falls, the repetity of which depends upon the

20 amount of competition there is in the marketplace.

21     Q.   (BY MR. WINGET-HERNANDEZ)  Is it fair to say,

22 Mr. Weintraub, that you knew when you established the

23 AWP price for any of the products, for all of the

24 products at Warrick Pharmaceuticals, that the prices

25 for those products would fall over time?

Page 754

1            MR. MOORE:  I object to the form of the

2     question.  There's no foundation.

3        A.   As a general rule prices for generics fall

4     over time.

5        Q.   (BY MR. WINGET-HERNANDEZ)  Were there -- did

6     the -- did the products at Warrick follow the general

7     rule?

8        A.   There were a couple of products we talked

9     about within this -- the context of this deposition

10    that did not follow that rule.

11       Q.   And which products were they?

12       A.   They were the 20 mL.

13       Q.   And so the 20 mL rose in price in the

14    marketplace over time?

15       A.   It rose for a period of time.

16       Q.   For what period of time?

17       A.   From 1995 I don't recall how long it was

18    before competition came back into the marketplace.

19       Q.   Was it a matter of months?

20       A.   I can't recall exactly.

21       Q.   So you know that it rose at some point, but

22    you -- and you know that it began to fall again

23    thereafter, but you don't know how long it stayed up?

24       A.   I don't know.

25       Q.   All right.  And you don't know at what price

1    it stayed at?

2        A.   I can't recall the prices specifically.  I

3    would have to look.

4        Q.   Let me ask you the question a little bit

5    better.  You don't know what price the product began

6    at, correct?

7        A.   Began --

8        Q.   Launched.

9        A.   -- when?

10       Q.   When it launched.

11       A.   The 20 mL?

12       Q.   Yeah.

13       A.   Not that I would recall.  I would have to

14   look to find out.

15       Q.   And did you bring materials with you today to

16   look to see what the price of the 20 mL was?

17       A.   I did not.

18       Q.   Did you bring any materials with you today to

19   talk about the price of any of Warrick's products?

20       A.   I brought no materials with me.

21       Q.   When -- when the 20 mL increased in price, do

22   you recall what the price increased to?  That is, the

23   AWP price?

24       A.   I think, as I recall from the testimony here

25   today and looking at some of the documents, that it

Page 756

1    went to 13.95 at one point.

2        Q.   But you don't know from what?

3        A.   I can't recall.

4        Q.   And subsequent to that you know that it fell,

5    but you don't know to what price, correct?

6        A.   Subsequent to that the price was taken up

7    again because there was no competition and then after

8    the second time competition came in, I can't recall

9    how long it was before that competition came in.

10       Q.   And each time that competition came in on

11   that product, the price in the marketplace fell,

12   correct?

13       A.   The actual --

14            MR. MOORE:  Objection, form.

15       Q.   (BY MR. WINGET-HERNANDEZ)  The actual price

16   in the marketplace.

17            MR. MOORE:  Objection, form.

18       A.   I don't know that it fell each time a

19   competitor came in, but it fell.

20       Q.   (BY MR. WINGET-HERNANDEZ)  As a general

21   proposition you knew that as competition increased

22   that the price in the marketplace was going to fall,

23   correct?

24       A.   Correct.

25            MR. MOORE:  Objection, asked and

Page 757

1    answered and repetitive.

2       Q.   (BY MR. WINGET-HERNANDEZ)  And after you

3    raised the AWP twice on that product, did you ever

4    lower the AWP?

5               MR. MOORE:  Objection -- objection,

6    asked and answered and repetitive.

7       A.   I think I have testified that we did not.

8       Q.   (BY MR. WINGET-HERNANDEZ)  Other than that

9    product did Warrick's products generally follow the

10   rule that we -- that you expressed earlier, that they

11   fall in price in the marketplace over time?

12              MR. MOORE:  Objection, asked and

13   answered and repetitive.

14      A.   Generally so.

15      Q.   (BY MR. WINGET-HERNANDEZ)  Can you recall at

16   this point any other product in -- in Warrick's

17   product line that -- where prices in the marketplace

18   actually rose?

19      A.   Not specifically.  There probably were cases

20   that -- where individual accounts had a rise in price

21   for one reason or another.

22      Q.   In any case, other than the 20 mL that you

23   were talking about a moment ago, there was never any

24   occasion on which you set an AWP price for a Warrick

25   product and the AWP price was, while you were there,

e6b75410-38c4-44e0-b5ba-7cb251ff5dbc

Page 758

1    subsequently lowered, correct?

2              MR. MOORE:  Object to --

3        A.   To my --

4              MR. MOORE:  Object to form.

5        A.   To my recollection after 1995 I don't believe

6    that we lowered any AWP price.

7        Q.   (BY MR. WINGET-HERNANDEZ)  So as a rule,

8    other than the exceptions that you've stated, it was

9    Warrick's practice to set an AWP price at launch and

10   not change it, correct?

11       A.   That was the industry practice and it was our

12   practice.

13       Q.   In fact, the only reason that you have cited

14   during the course of your testimony for engaging in

15   that practice is because you had learned that the

16   industry did it, correct?

17             MR. MOORE:  Object to the form of the

18   question.

19       A.   The industry did what?

20       Q.   (BY MR. WINGET-HERNANDEZ)  That it was the

21   industry practice.

22       A.   To?

23       Q.   To set an AWP at launch and not change it for

24   generic products.

25       A.   That is correct.

Page 811

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,          )
        Plaintiff,         )
                           )
VS.                        )      NO. CV-2005-0219-PR
                           )
ABBOTT LABORATORIES,       )
INC., et al,               )
        Defendants.        )


*******************************************************


IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA


ROBERT J. SWANSTON,          )    NO. CV 2022-004988
individually and on behalf   )
of himself and all others    )
similarly situated,          )
        Plaintiff,           )    (Assigned to the
                             )    Honorable Janet
VS.                          )    Barton)
                             )
TAP PHARMACEUTICAL PRODUCTS, )
INC.; et al.,                )
        Defendants.          )


*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

HARVEY J. WEINTRAUB

September 22, 2006

Volume 5

*******************************************************

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911  -  HOUSTON (713) 572-8897  -  SAN ANTONIO (210) 222-9161

Page 842

1   in your previous testimony, Mr. Weintraub?

2       A.   Yes, I do.

3       Q.   Do you recall that that document is a letter

4   from First DataBank requesting price corrections and

5   updates on the prices that were submitted to First

6   DataBank for publication in the Bluebook --

7            MR. MOORE:  I object to --

8       Q.   (BY MR. WINGET-HERNANDEZ)  -- or PriceAlert?

9            MR. MOORE:  I object to the form of the

10  question.  There is no foundation with respect to this

11  document.

12      A.   That's what it's requesting.  I don't know if

13  that went to Schering or to Warrick or -- it just says

14  "Dear Valued Customer."  I don't recall seeing it.

15      Q.   (BY MR. WINGET-HERNANDEZ)  Assuming for a

16  moment that the document was produced by Schering

17  specifically in connection with your deposition,

18  Mr. Weintraub, can you agree with me that it's -- that

19  that document, if it were in the Schering-Plough

20  files, is probably a document that was addressed to

21  Schering?

22           MR. MOORE:  Objection, calls for

23  speculation.

24      A.   If it was in the Schering files, I would

25  assume it would have been addressed to Schering.

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 843

1      Q.   (BY MR. WINGET-HERNANDEZ)   And if it were in

2   the Warrick files, would you assume that it had been

3   addressed to Warrick?

4           MR. MOORE:   Objection, calling for

5   speculation.

6      A.   I could make that assumption.

7      Q.   (BY MR. WINGET-HERNANDEZ)   Isn't it true,

8   Mr. Weintraub, without respect to the document that

9   you're aware that First DataBank, as a regular matter,

10   requested in writing that Warrick correct or update

11   its prices which were published in the First DataBank

12   pricing compendia?

13           MR. MOORE:   Objection, asked and

14   answered and repetitious.

15      A.   I believe --

16      Q.   (BY MR. WINGET-HERNANDEZ)   This question,

17   Mr. Weintraub, just so that I can attempt to cure

18   counsel's objection, is directed to you in your

19   capacity as the designated -- as the designee for

20   Warrick.  I'm asking you for Warrick's official

21   position on the question.

22           MR. MOORE:   It's still -- I still have

23   the same objection.  He's already -- he's already

24   given his testimony on this.  This is repetitious.

25      A.   We receive requests or we were asked to

Page 844

1    update, I can't recall how often that happened, but

2    the only prices that we listed for the most part were

3    the AWPs, the so-called reference price.

4         Q.   (BY MR. WINGET-HERNANDEZ)  Please look at

5    Exhibit Number 71.  It's right here (indicating).

6    Now, that Exhibit 71 is a listing that's provided on a

7    regular basis by First DataBank to Warrick for

8    purposes of updating or correcting the price

9    representations that Warrick has made through First

10   DataBank to the people who receive and utilize the

11   First DataBank price compendia; isn't that right?

12             MR. MOORE:  Objection, form, no

13   foundation, asked and answered and it's repetitive.

14   He's already been asked about this document.

15        A.   I don't recall seeing this particular

16   document.

17        Q.   (BY MR. WINGET-HERNANDEZ)  Yes.  But you do

18   recognize that document as being one of a type of

19   documents which was received by Warrick on a regular

20   basis, don't you?

21             MR. MOORE:  Same objections, asked --

22        A.   I --

23             MR. MOORE:  Excuse me, sir.

24             Same objections, asked and answered,

25   repetitious of prior testimony.

Page 845

1          MR. ANDERSON:  Mike, are you taking the

2    position that all of Mr. Weintraub's prior testimony

3    was in his corporate designee capacity?

4          MR. MOORE:  No.  What I'm saying is that

5    this is just wholly repetitious testimony --

6          MR. ANDERSON:  But now he's --

7          MR. MOORE:  -- and -- well, let me --

8          MR. ANDERSON:  Okay.  Sorry.

9          MR. MOORE:  You asked -- you asked me --

10         MR. ANDERSON:  I thought you were done.

11         MR. MOORE:  -- and I'm telling you.  No,

12   I wasn't done.

13         I think this is wholly repetitious

14   testimony going over documents that he has already

15   been shown and said that he has never seen them and

16   doesn't know what they are.  Whether he's in his

17   personal capacity or his corporate capacity, the facts

18   are the facts vis-a-vis what he knows.  And where we

19   have limited time and -- and the time has been taken

20   up by two counsel in this week of depositions, I, for

21   the life of me, cannot understand why we are going

22   over the same -- exact same ground twice.

23         Because as I've said all along in this

24   deposition, come Friday, today, at -- whenever we

25   stop, and we're talking about that, we are not going

Page 863

1    Q.   When the price was lowered -- when the AWP

2  price was lowered, it was lowered because the market

3  price for that commodity was falling; isn't that true?

4    A.   Because the manufacturer's selling price were

5  lowered.

6    Q.   These brand side practices were something

7  that you were aware of for 40 years in the brand

8  industry; isn't it true?

9    A.   That is correct.

10   Q.   That is, you were personally aware of them.

11   A.   I was.

12   Q.   Did you have -- did you have any part in

13  creating those brand -- those practices in the brand

14  industry?

15   A.   Creating the practices?

16   Q.   Yes, sir.

17   A.   They existed.

18   Q.   Well, AWP actually came about during your

19  tenure as executive at Schering, isn't that true?

20   A.   They may have been in existence prior to my

21  becoming an executive.  I became an executive in 19 --

22  an executive of the corporation somewhere in the 19 --

23  late 1970s or '80s.  AWPs, to my knowledge, existed

24  long before that.

25   Q.   So as long as you were -- as long -- from --

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 864

1    from the -- from the '70s you had experience that when

2    brand prices -- when manufacturers' brand prices go up

3    that they raise the AWPs, right?

4        A.   Yes.

5        Q.   And, likewise, that when manufacturers'

6    prices for their commodities -- their branded drugs

7    fell, they also lowered the AWPs proportionately?

8        A.   Yes.

9        Q.   All right.  With respect to the market prices

10   or even the manufacturers' prices for Warrick's

11   generic products, you were aware because of market

12   research that all of those products would have falling

13   prices from the time that they were launched; isn't

14   that true?

15              MR. MOORE:  I object to the form of the

16   question.  This is repetitive.  This has been asked

17   and answered over and over in this deposition.

18       A.   For the most part that is true.

19       Q.   (BY MR. WINGET-HERNANDEZ)  And generally

20   speaking, the rate of that fall was predicted by

21   Warrick based on its market research; isn't that also

22   true?

23              MR. MOORE:  Object to the form.

24       A.   It wasn't predicted for any particular or

25   specific product.  We would estimate it as part of the

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 865

1    forecasting and getting into the market.  A lot

2    depended on how many competitors there were in the

3    market and when they came in.

4         Q.   (BY MR. WINGET-HERNANDEZ)  But regardless of

5    how many competitors there were in the market and when

6    they came in, you knew as a practical matter that

7    all -- at the time of launch that all of Warrick's

8    generic products would eventually begin to fall in

9    price, some more precipitously than others; isn't that

10   true?

11             MR. MOORE:  Objection to the form,

12   repetitious, asked and answered.

13        A.   That's true for Warrick and for every generic

14   manufacturer.

15        Q.   (BY MR. WINGET-HERNANDEZ)  And when Warrick

16   raised its AWP prices, it did so based on its

17   experience of the industry practice in the brand

18   market; isn't that right?

19        A.   Yes.

20        Q.   And when Warrick's prices fell, Warrick chose

21   not to proportionately lower the AWP; isn't that

22   right?

23             MR. MOORE:  Object to the form,

24   repetitive, asked and answered.  It's already been

25   covered in this deposition and many others.

64c199fc-9a95-4388-931e-7e8055cdd80e

1          MR. HEUCK:  I'm going to object to the

2   speaking objection.

3          MR. MOORE:  Thank you.

4      A.    I think I've indicated that I raised the AWP

5   for the two products in question, the albuterol

6   solutions -- or the albuterol solution 3 mL -- or 20

7   mL, I'm sorry, 20 mL because we were the only ones in

8   the marketplace and there was a uniform price in the

9   market.  When prices went down for products, they went

10  down not uniformly, they went down account by account,

11  different days, different times calculating a

12  so-called market price.  A direct price would have

13  been virtually an impossibility on our part.

14      Q.    (BY MR. WINGET-HERNANDEZ)  So the answer is

15  "yes," correct?

16          MR. MOORE:  Objection, repetitive, asked

17  and answered.

18      A.    The answer is yes -- again, rephrase your

19  question.  I've lost --

20          MR. WINGET-HERNANDEZ:  Objection,

21  nonresponsive to the last -- to the last two

22  questions.

23      Q.    (BY MR. WINGET-HERNANDEZ)  And when -- when

24  Warrick's prices fell, Warrick chose not to

25  proportionately lower the AWP; isn't that right?

64c199fc-9a95-4388-931e-7e8055cdd80e