Exhibit L

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 03-CV-11865-PBS |
| MYLAN LABORATORIES, INC. et al., | ) ) | Judge Patti B. Saris |
| Defendants. | ) ) | |

## WARRICK PHARMACEUTICALS CORPORATION'S RESPONSE TO THE COMMONWEALTH OF MASSACHUSETTS'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS APPLICABLE TO WARRICK AND COUNTERSTATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Warrick Pharmaceuticals Corporation ("Warrick") submits this Response to the Commonwealth of Massachusetts's Local Rule 56.1 Statement of Undisputed Material Facts Applicable to Warrick ("the Commonwealth's 56.1 Statement Applicable to Warrick") and Counterstatement of Additional Undisputed Material Facts, entitling Warrick to summary judgment or at least requiring that the Commonwealth's Motion for Partial Summary Judgment be denied.  Warrick responds as follows.

### INTRODUCTION

The Commonwealth's 56.1 Statement Applicable to Warrick should be rejected for its failure to comply with Local Rule 56.1.  The requirements of this rule are simple: "a concise statement of the *material facts of record* as to which the moving party contends there is *no*

*genuine issue to be tried, with page references to affidavits, depositions and other documentation.*"  Local Rule 56.1 (emphasis added).

Many of the assertions in the Commonwealth's 56.1 Statement Applicable to Warrick lack citations to factual support in the record.  Often, the record shows exactly the opposite of what the Commonwealth claims—something the Commonwealth seeks to obscure by failing to include any record citations—let alone with page references to affidavits, depositions and other documentation.  The 56.1 Statement Applicable to Warrick also offers "facts" that plainly are not material to the Commonwealth's lawsuit against Warrick.  Finally, many of the purported "facts" are not "facts" at all: as they are written, they are argumentative, conclusory, or irrelevant assertions.

Statements full of "[b]ombast and bluster, wholly detached from verified facts of record," are insufficient to support a motion for summary judgment.  *Corrada Betances v. Sea-Land Serv., Inc.*, 248 F.3d 40, 44 (1st Cir. 2001) (refusing to credit non-movant's statement of facts that lacked citations and appeared in the memorandum).  Because of the Commonwealth's failure to comply with Local Rule 56.1, their Statement Applicable to Warrick should be rejected, and their motion for partial summary judgment should be denied.  *See, e.g., Dale v. H.B. Smith Co., Inv.*, 910 F. Supp. 14, 20 (D. Mass. 1995) (denying summary judgment motion when party made 56.1 statements that were argumentative, conclusory, and unsupported by record evidence).

## **GENERAL RESPONSES**

1.  The Commonwealth's alleged undisputed material facts based on Average Wholesale Price (AWP) are immaterial and irrelevant to this action.  By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for

Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP.

2.  Warrick disputes the Commonwealth's alleged undisputed material facts based on Wholesale Acquisition Cost (WAC) on the grounds that: (i) Warrick did not have or use WACs for its drugs; (ii) Warrick did not report WACs for the Subject Drugs to any pricing compendia; (iii) none of the pricing compendia ever published a WAC for Warrick's drugs in their hard-copy publications; (iv) when, in 1993, Warrick discovered that First DataBank was publishing the Direct Price Warrick reported at launch for its drugs, Warrick instructed First DataBank not to publish a Direct Price for its drugs; and (v)  thereafter, First DataBank ceased to publish Direct Price (and never published WACs) for Warrick drugs in its hard-copy publication.  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Price that Warrick reported for its drugs at launch as a WAC, because Warrick did not subscribe to that service.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.

3.  Warrick further disputes the Commonwealth's alleged undisputed material facts to the extent they create an implication that the Commonwealth did not have access to actual prices for the Warrick Subject Drugs.  First, since 1991 the Commonwealth has had access to Average Manufacturers Prices (AMPs) through the Unit Rebate Amounts (URAs) provided to it on a quarterly basis through the federal Medicaid Rebate Program.  In addition, since 1995, the Commonwealth has had access to actual acquisition cost information in its claims data in the form of 340B prices, which are generally defined as AMP minus URA.  Moreover, beginning in January 2002 and continuing every month thereafter, Warrick voluntarily provided the Commonwealth with a report of its high-low range of prices for the drugs at issue – specifically,

Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.

    4.  Warrick further disputes the Commonwealth's recitation of the purportedly undisputed facts to the extent that it implies that the Commonwealth set reimbursement rates in the belief that they were based on the actual selling prices for the Warrick Subject Drugs.  There is no evidence that the Commonwealth used the actual prices provided by Warrick in setting reimbursement rates on Warrick drugs.  As noted above, since January 2002, the Commonwealth has had access to reports on the high-low range of prices for the Warrick drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.  There is no evidence in the record that even suggests that the Commonwealth used this information in setting reimbursement rates.  Indeed, the Commonwealth's own expert, Raymond Hartman, conceded in the AWP MDL proceedings before this Court that because price competition in the multi-source drug marketplace generally leads to declining prices, reimbursers generally impose maximum allowable costs (MACs), or other limits to curtail costs, on multi-source drugs.  The Commonwealth sought to benefit from these MAC prices by revising its definition of usual and customary charge (U&C) in 1995 to require pharmacists to submit the lowest price charged or accepted by the pharmacy for the product dispensed from any PBM, HMO, or other private third-party payor (*i.e.*, MAC prices).  Finally, it is undisputed that throughout the relevant time period, other Commonwealth programs purchased and reimbursed for the Subject Drugs at rates well below the prices at which the Medicaid program reimbursed for the Subject Drugs.

## SPECIFIC RESPONSES

As described in detail below, there are material facts that preclude entry of summary judgment for the Commonwealth.  The below numbered paragraphs correspond to the assertions in the Commonwealth's 56.1 Statement Applicable to Warrick.

**1.     Defendant Warrick Pharmaceuticals Corporation ("Warrick") is a Delaware corporation with its principal place of business in Union, New Jersey.  Defendant Warrick Pharmaceuticals Corporations' Answer the First Amended Complaint ("Warrick's Answer") at ¶ 10.**

> **Response:  Undisputed.**

Warrick acknowledges that it is a Delaware corporation with its principal place of business in Union, New Jersey.

**2.     Warrick is a second-tier subsidiary of Schering-Plough Corporation ("Schering"), which is a New Jersey Corporation with its principle [sic] place of business in Kenilworth, New Jersey.  *Id.***

> **Response:  Undisputed.**

Warrick acknowledges that it is a second-tier subsidiary of Schering-Plough Corporation, which is a New Jersey Corporation with its principal place of business in Kenilworth, New Jersey.

**3.     Warrick is in the business of manufacturing, marketing, and selling prescription pharmaceuticals, some of which are covered by Medicaid.  *Id.* at ¶ 11.  Warrick markets generic pharmaceutical products manufactured by Schering or entities controlled by Schering.  September, 2006 Deposition of Harvey J. Weintraub ("9/06 Weintraub Dep. Tr.") (Exhibit 5) at 104: 13-22.**

**RESPONSE:  Disputed as written.**

Warrick acknowledges that it is in the business of manufacturing, marketing, and selling prescription pharmaceuticals, some of which are covered by Medicaid.  *See* Declaration of Carisa A. Klemeyer Transmitting Documents Relied Upon in Warrick Pharmaceuticals Corporation's Response to the Commonwealth of Massachusetts's Local Rule 56.1 Statement of Undisputed Material Facts Applicable to Warrick and Counterstatement of Additional Undisputed Material Facts, dated Mar. 31, 2008, Tab 1 Deposition of Harvey J. Weintraub, Sept. 18, 2006 ("Weintraub Dep. Vol. I") at 104 (hereinafter citations directly to exhibits by tab).

**4.      Warrick entered into a rebate agreement pursuant to 42 U.S.C. § 1396r-8 (the "Rebate Statute").  Warrick's Answer at ¶ 93.  Under the Rebate Statute, entering into a rebate agreement is required as a condition of a manufacturer's products being eligible for reimbursement by Medicaid programs.  *Id.* at ¶ 79; 9/06 Weintraub Dep. Tr. (Exhibit 5) at 172-73: 24-25, 1-12 (Weintraub involved in listing Warrick's drugs in State Medicaid programs).  Warrick's products were therefore required to be reimbursed by the Commonwealth's Medicaid program at all times relevant to this litigation.  Massachusetts Medicaid has paid for Warrick's drugs dispensed by providers.  Warrick's Answer at ¶ 79.**

**RESPONSE:  Disputed as written.**

Warrick acknowledges only that it entered into a rebate agreement pursuant to 42 U.S.C. § 1396r-8.  Warrick denies that "Warrick's products were therefore required to be reimbursed by the Commonwealth's Medicaid program at all times relevant to this litigation" to the extent that this statement constitutes a legal conclusion and is unsupported by any factual citation to either the record or affidavits as required by Local Rule 56.1.  Warrick acknowledges that Warrick sells drugs for which Massachusetts Medicaid makes reimbursements to providers.

5.      The Warrick drugs at issue in this case are Albuterol Sulfate, 0.083%, NDC No.
59930-1500-08 ("Unit Dose"), Albuterol Sulfate, 0.5%, NDC No. 59930-1515-04
("Concentrate"), and Albuterol, 90 mcg, NDC No. 59930-1560-01 ("Inhaler") (hereinafter
collectively referred to as "Warrick's Subject Drugs").  Warrick's Subject Drugs are
generic pharmaceuticals manufactured and sold by Warrick under the Warrick names and
drug code and covered by Medicaid.  Warrick's Answer, ¶¶ 11, 59; 9/06 Weintraub Dep.
Tr. (Exhibit 5) at 99:14-101:1; 106:19-23; 390-391: 20-25, 1-21.

        **Response:  Undisputed.**

        Warrick acknowledges that the Warrick drugs at issue in this case are Albuterol Sulfate,
0.083%, NDC No. 59930-1500-08 ("Unit Dose"), Albuterol Sulfate, 0.5%, NDC No. 59930-
1515-04 ("Concentrate"), and Albuterol, 90 mcg, NDC No. 59930-1560-01 ("Inhaler").  Warrick
further acknowledges that Warrick's Subject Drugs are generic pharmaceuticals manufactured
and sold by Warrick under the Warrick names and drug code, and covered by Medicaid.

6.      Albuterol is the generic name for Proventil and is used to treat the symptoms of
asthma, chronic bronchitis, emphysema, and other lung diseases.  9/06 Weintraub Dep. Tr.
(Exhibit 5) at 79: 17-22; 83: 3-7.  In its solution form, the only form at issue in this case,
albuterol is almost exclusively dispensed by pharmacies for patients to self-administer at
home with a nebulizer or with an inhaler.  *In re Pharmaceutical Industry Average Wholesale
Price Litigation*, 491 F. Supp. 2d 20, 74 (D. Mass. 2007); Schering's and Warrick's Post-
Trial Proposed Findings of Fact, Trial of Class 2 and 3 Claims, *In re Pharmaceutical
Industry Average Wholesale Price Litigation*, MDL No. 1456, CA No. 01-12257-PBS
("Warrick's MDL Proposed Findings") (Exhibit 6) at ¶¶ 3, 57.

        **Response:  Disputed as written.**

7

Warrick acknowledges that albuterol is the generic name for Proventil and is used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases. Warrick further acknowledges that in its solution form, albuterol is almost exclusively dispensed by pharmacies for patients to self-administer at home with a nebulizer. Warrick denies that the albuterol solution is the only form at issue in this case; as stated above in Warrick's response to Paragraph 5, the albuterol inhaler is also at issue in this case.

**7.    Both Warrick's 0.5% albuterol solution and its 0.083% albuterol solution were launched in 1993 at a time when several other branded and generic versions of albuterol sulfate had already been introduced to the market. *Id.* at ¶ 58. Albuterol sulfate was a multi-source drug for the entire period from 1993 forward, facing competition from over 29 different manufacturers. *Id.*; *see also In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 74 (D. Mass. 2007).**

> **Response:  Undisputed.**

Warrick acknowledges that both Warrick's 0.5% albuterol solution and its 0.083% albuterol solution were launched in 1993 at a time when several other branded and generic versions of albuterol sulfate had already been introduced to the market. Warrick further acknowledges that albuterol sulfate was a multi-source drug for the entire period from 1993 forward, facing competition from over 29 different manufacturers.

**8.    Warrick sells its products almost entirely to wholesalers, large chain pharmacies, and generic distributors and, in so doing, competes based on price, quality, and reliability of supply. Warrick's MDL Proposed Findings (Exhibit 6) at ¶ 62. Because of the price-competitive nature of the generic industry, Warrick's principal competitive tool was to**

"match the price of its generic competitors in order to obtain and maintain business." *Id.*;
9/06 Weintraub Dep. Tr. (Exhibit 5) at 113: 9-17; 114: 4-11.

  **Response: Undisputed.**

Warrick acknowledges that Warrick sells its products almost entirely to wholesalers,
large chain pharmacies, and generic distributors and, in so doing, competes based on price,
quality, and reliability of supply. Warrick further acknowledges that because of the price-
competitive nature of the generic industry, Warrick's principal competitive tool was to "match
the price of its generic competitors in order to obtain and maintain business."

**9. Generic manufacturers compete vigorously to get their version of a drug stocked by
a particular pharmacy or pharmacy chain. As a result of that competition, Warrick's
prices for albuterol sulfate declined substantially over time. Warrick's MDL Proposed
Findings (Exhibit 6) at ¶ 63; 9/06 Weintraub Dep. Tr. (Exhibit 5) at 89: 15, 91:7.**

  **Response: Undisputed.**

Warrick acknowledges that generic manufacturers compete vigorously to get their
version of a drug stocked by a particular pharmacy or pharmacy chain. Warrick further
acknowledges that as a result of that competition, Warrick's prices for albuterol sulfate generally
declined substantially over time. *See* Tab 2 Deposition of Harvey Weintraub, Sept. 21, 2006
("Weintraub Dep. Vol. IV") at 753-57 (testifying that prices for Warrick's products generally
declined over time).

**10. At all times relevant to this action, Warrick was aware that its actual sales prices
would drop significantly and rapidly after launch due to price competition. *See* Warrick's
MDL Proposed Findings (Exhibit 6) at ¶ 64, 65; 9/06 Weintraub Dep. Tr. (Exhibit 5) at 89:
3-14.**

**Response:  Disputed in part.**

Warrick acknowledges only that Harvey Weintraub testified that actual sales prices for generic drugs generally dropped significantly and rapidly after launch due to price competition. *See* Tab 1 Weintraub Dep. Vol. I at 89 ("Generic drugs are different in that prices deteriorate very – very rapidly, depending upon the amount of competition for the drug."); Tab 2 Weintraub Dep. Vol. IV at 658-59 (testifying that Warrick expected that prices for the inhaler would drop very quickly after launch, but that "[o]ne never knows what the future holds"); Tab 2, 753-57 (testifying that "[a]s a general rule prices for generics fall over time"); Tab 3 Deposition of Harvey Weintraub, Sept. 22, 2006 ("Weintraub Dep. Vol. V") at 864-65 (testifying that, for the most part, generic products would have falling prices from the time they were launched).  The alleged fact is, however, contradicted by Paragraph 16 of the Commonwealth's 56.1 Statement Applicable to Warrick, which acknowledges that in for a period 1995, direct sales prices to consumers for the 20 mL albuterol solution increased.  Moreover, as the reported AMPs for Warrick's Subject Drugs show, while there was a general downward trend over time, the AMPs themselves both increased and decreased at various times over the relevant time period in response to market forces.  On October 26, 2007, Warrick  produced AMP data to the Commonwealth electronically on a CD Bates labeled WAR-MA000001.  In addition, beginning in January 2002 and continuing every month thereafter, Warrick voluntarily provided the Commonwealth with a report of its high-low range of prices for the drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.  These letters showed that prices for Warrick's products varied over time. *See, e.g.*, Tab 4 Deposition of Paul Jeffrey, June 14, 2007 ("Jeffrey Dep.") at 206-207; Tab 5

Deposition of Gary Gilmore, July 26, 2007 ("Gilmore Dep.") at 341-42; Tab 6 Letter from B.

Michael Kennedy to Gary Gilmore dated Jan. 9, 2002.

**11.     Warrick typically reported an AWP at launch and, in almost all instances, left it**
**untouched for the life of the product.  Warrick has not changed the AWP for any subject**
**drug since 1995.  Warrick's MDL Proposed Findings (Exhibit 6) at ¶ 61; 9/06 Weintraub**
**Dep. Tr. (Exhibit 5) at 165: 5-10; 166: 3-5.**

> **Response:  Undisputed.**

As set forth in General Objection No. 1 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this litigation.  By the Commonwealth's own

concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for

Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim

against Warrick based on AWP.  Warrick acknowledges that it typically suggested an AWP at

launch and, in almost all instances, left it untouched for the life of the product.  Warrick further

acknowledges that Warrick has not changed the AWP for any subject drug since 1995.

**12.     Warrick also reported to the price reporting compendia a Direct Price at launch.**
***See* Exhibit 7 and 8.  Warrick's Direct Price was "the price at which [Warrick] invoice[d]**
**an account."  9/06 Weintraub Dep. Tr. (Exhibit 5) at 153-154: 24-25, 1.  For example, on or**
**about September 3, 1993, Warrick's Harvey Weintraub notified First Databank of the**
**availability of Albuterol sulfate, USP Inhalation Solution, 0.083%, 2.5 mg/3ml, NDC 59930-**
**1500-08.  Exhibit 7.  The notice included an AWP of $32.25 and a Direct Price of $24.75 for**
**the 25 x 3 ml unit dose bottles (75 mL/package).  *Id*.**

> **Response:  Disputed in part.**

Warrick acknowledges only that Warrick reported to First DataBank on or about September 3, 1993, the availability of 25 x 3ml albuterol sulfate inhalation solution 0.083% and that direct price is the price at which it invoices an account at launch. *See* Tab 7 Letter from Harvey Weintraub to Beth Rader and Ed Edlestein dated Sept. 3, 1993. The notice included an AWP of $32.25 and a Direct Price at launch of $24.75. *See id.* Warrick did not maintain a uniform direct price that was the same for each customer. *See* Tab 1 Weintraub Dep. Vol. I at 153. For that reason, in a letter dated October 12, 1993, Harvey Weintraub asked First DataBank to "please delete direct price listings from your publication or database." *Id.*; *see also* Tab 8 Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.

As set forth in General Objection No. 1 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this litigation. By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP.

**13.     Warrick also reported Direct Prices to Medicaid programs directly at launch with the intent that these prices be used for Medicaid's reimbursements for Warrick's Subject Drugs.** *See* **Exhibit 8. On or about December 20, 1995, Warrick sent Arnold Shapiro, the Commonwealth's Pharmacy Program Manager and other Medicaid pharmacy program managers a letter announcing the availability of generic Albuterol, USP Inhalation Aerosol.** *Id.* **The letter represented that the AWP package price for the 17 g. Canister (inhaler), NDC No. 59930-1560-01 was $21.41 and that the Direct Wholesale Price was $16.06.** *Id.* **The letter states that "[t]his information is being provided in the event it is required for reimbursement purposes."** *Id.*

**Response:  Disputed.**

Warrick denies that it "reported Direct Prices to Medicaid programs directly at launch with the intent that these prices be used for Medicaid's reimbursements for Warrick's Subject Drugs."  Warrick acknowledges only that on or about December 20, 1995, Warrick sent Arnold Shapiro, the Commonwealth's Pharmacy Program Manager and other Medicaid pharmacy program managers a letter announcing the availability of generic Albuterol, USP Inhalation Aerosol.  *See* Tab 9 Letter from Phyllis T. Sinoradzki to Arnold Shapiro dated Dec. 30, 1995. That letter included a Direct Price at launch of $16.06 for the 17 g canister and $14.80 for the 17 g refill.  *See id.*  Warrick acknowledges that the letter states that "[t]his information is being provided in the event it is required for reimbursement purposes."  *Id.*  The letter also states, "[p]lease be advised that Warrick does not sell direct to retail pharmacies."  *Id.*  The Commonwealth has no evidence that Warrick's intent was that these prices would be used for Medicaid's reimbursements for Warrick's Subject Drugs.  Mr. Weintraub testified that his "intent was to inform [Medicaid programs] of what our direct wholesale price would be going out.  How they utilized it, I really don't know."  Tab 10 Deposition of Harvey Weintraub, Sept. 20, 2006 ("Weintraub Dep. Vol. III") at 566.  Moreover, as discussed in Warrick's response to Paragraph 12 above, when Warrick learned that First DataBank was reporting a Direct Price for its drugs, in a letter dated October 12, 1993, Harvey Weintraub asked First DataBank to "please delete direct price listings from your publication or database."  Tab 1 Weintraub Dep. Vol. I at 153; Tab 8 Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993. Warrick asked for the Direct Price to be deleted because Warrick did not maintain a standard direct price that was the same for each customer.  *See* Tab 1 Weintraub Dep. Vol. I at 153.

In addition, as set forth in General Objection No. 1 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this litigation. By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP.

**14.     None of Warrick's Subject Drugs reported AWPs and Direct Prices were ever changed after 1995. 9/06 Weintraub Dep. Tr. (Exhibit 5) at 167:3-8. For NDCs 59930-1500-08 and 59930-1560-01, the AWPs and Direct Prices were never changed after launch. *Id*. at 164: 2-9, 19-24. For 59930-1515-04, it was lowered on February 25, 1995 when the AWP was raised and then raised again on September 22, 1995 when the AWP was raised again. *Id*. at 159: 11-17; 160: 1-7; 162-163: 24-25; 1-17. None of the reported prices were ever changed by Warrick again although its actual prices continued to drop throughout the period at issue in this action. *Id*. at 163-164: 23-25, 1.**

    **Response: Disputed in part.**

Warrick acknowledges only that it generally reported AWPs and Direct Prices for the Subject Drugs at launch, and that it reported AWPs on occasions subsequent to launch only as specifically acknowledged below. Warrick states that for NDCs 59930-1500-08 and 59930-1560-01, it never reported a new AWP or Direct Price to the pricing compendia after launch. Warrick further acknowledges only that for 59930-1515-04, it reported a higher AWP to the pricing compendia on February 23, 1995, and then again on September 22, 1995. Warrick further acknowledges that it never changed its AWP for the Subject Drugs again after September 22, 1995. With respect to the Direct Prices Warrick reported at launch, when Warrick discovered in 1993 that First DataBank was publishing those Direct Prices subsequent to launch,

14

it instructed them to stop.  *See* Tab 1 Weintraub Dep. Vol. I at 153; *see also* Tab 8 Weintraub

Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993.  First

DataBank complied and no longer published Direct Prices (and never published WACs) in its

hard-copy publication.  *See* Tab 1 Weintraub Dep. Vol. 1 at 153-55; Tab 11 Deposition of Kathy

Chadwick, Oct. 24, 2007 ("Chadwick Dep.") at 171-72 (First DataBank did not publish Warrick

WAC in its hard-copy publication).

     As set forth in General Objection No. 1 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this litigation.  By the Commonwealth's own

concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for

Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim

against Warrick based on AWP.

**15.**    **None of the prices reported by Warrick either to First DataBank or to the Medicaid**

**Directors had any correlation to the prices Warrick charged to its customers in the**

**marketplace.  *Id*. at 134-135: 13-25, 1 (AWP is a sticker price).  Rather, Warrick set its**

**AWPs 10% to 20% below the AWPs of the branded versions of the drugs in order to be**

**identified as a generic in the price compendia.  Warrick's MDL Proposed Findings (Exhibit**

**6) at ¶ 59; 9/06 Weintraub Dep. Tr. (Exhibit 5) at 166-167: 17-25, 1-2.  When competitor**

**generic products are already on the market, Warrick set AWP for its product "somewhere**

**in the pack" of the competitor AWP values.  9/06 Weintraub Dep. Tr. (Exhibit 5) at 527-**

**528: 6-22, 1-8.  According to Mr. Weintraub, a former Warrick sales and marketing**

**consultant who was responsible for setting the AWP, this was done simply to save the "time**

**and trouble" of calculating its own price.  *Id*. at 527: 15-23.**

    **Response:  Disputed in part.**

Warrick denies that it reported "prices" to First DataBank to the extent that this alleged

fact creates an implication that Warrick reported anything other than AWP and Direct Price for

the Subject Drugs at launch and with two specific exceptions noted above after launch.  While

Warrick generally reported Direct Prices at launch, when Warrick discovered in 1993 that First

DataBank was publishing those Direct Prices after launch it instructed them to stop.  *See* Tab 1

Weintraub Dep. Vol. I at 153; *see also* Tab 8 Letter from Harvey J. Weintraub to Beth Rader and

Ed Edlestein dated Oct. 12, 1993.  First DataBank complied and no longer published Direct

Prices (and never published WACs) in its hard-copy publication.  *See* Tab 1 Weintraub Dep. Vol.

1 at 153-55; Tab 11 Chadwick Dep. at 171-72 (First DataBank did not publish Warrick WAC in

its hard-copy publication).

As set forth in General Objection No. 2 above, Warrick did not have WACs and did not

report WACs for the Subject Drugs to any pricing compendia.  *See* Tab 1 Weintraub Dep. Vol. I

at 155-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and

typically invoice prices "were different for each customer."  *Id*; *see also* Tab 10 Weintraub Dep.

Vol. III at 528-29 (Warrick would have a whole range of different prices, and the prices would

be different for different customers and according to the position of the competition).

As set forth in General Objection No. 1 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this litigation.  By the Commonwealth's own

concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for

Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim

against Warrick based on AWP.  Moreover, the Commonwealth has presented no evidence that it

expected the AWPs reported by Warrick at launch to have any correlation to the prices Warrick

charged to its customers in the marketplace.  It cites no evidence regarding the Commonwealth's

16

understanding of Direct Price or AWP as correlated with actual prices in marketplace. This is
not surprising, as the Commonwealth's witnesses acknowledged their understanding that AWP is
a sticker price with no correlation to actual prices in the marketplace, particularly for generic
drugs. *See* Defendants' Joint Statement of Undisputed Material Facts In Support of Defendants'
Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 42, 76.

**16.    Warrick, however, did change the AWP on three occasions.  First, in 1993 Warrick
lowered the AWP on one size of the 0.083% solution in order to make the AWPs the same
for all forms of the product on a per unit basis.  *Id*. at 151-152: 6-25, 1-24.  Then, in 1995,
Warrick raised the AWP for its 20 mL albuterol solution twice, from $12.50 to $13.95, and
later to $14.99.  Id. at 160: 3-15; 163: 3-22.  At that time, Warrick was the only producer of
the solution because a competitor was having manufacturing problems.  *Id*. at 160-61: 16-
25.  The increases in AWP were matched by an identical percentage increase in the direct
sales price to customers, such that the average sales price for the 20 mL solution also
increased in 1995.  *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F.
Supp. 2d 20, 74-75 (D. Mass. 2007).**

    **Response:  Disputed in part.**

    As set forth in General Objection No. 1 above, the alleged undisputed material facts
relating to AWP are irrelevant and immaterial to this litigation.  By the Commonwealth's own
concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for
Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim
against Warrick based on AWP.  Moreover, Warrick denies that the lowering of AWP on one
size of the 0.083% solution in 1993 is a material fact for purposes of this litigation, as it is
outside the relevant time period.  Warrick acknowledges that in 1995, Warrick raised the AWP

for its 20 mL albuterol solution twice, from $12.50 to $13.95, and later to $14.99.  Warrick

acknowledges that at that time, Warrick was the only producer of the solution because a

competitor was having manufacturing problems.  Warrick acknowledges that the increases in

AWP matched by an identical percentage increase in the direct sales price to customers, such that

the average prices to customers for the 20 mL solution also increased in 1995.

**17.     Schering and Warrick never lowered their reported AWPs despite offering**

**significant discounts that reduced the actual selling prices.  *In re Pharmaceutical Industry***

***Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 70-71 (D. Mass. 2007); 9/06**

**Weintraub Dep. Tr. (Exhibit 5) at 125: 7-16 (Warrick offered customers price reductions**

**via discounts and rebates to meet competition.)**

        **Response:  Disputed in part.**

        As set forth in General Objection No. 1 above, the alleged undisputed material facts

relating to AWP are irrelevant and immaterial to this litigation.  By the Commonwealth's own

concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for

Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim

against Warrick based on AWP.  Warrick acknowledges only that Warrick offered customers

price reductions via discounts and rebates to meet competition.  *See* Tab 1 Weintraub Dep. Vol. I

at 125.  Schering is not a defendant in this action and there is no record evidence regarding its

pricing policies (nor is there any relevance to them here; certainly, they cannot be considered

material facts for purposes of the Commonwealth's 56.1 Statement applicable to Warrick).

Moreover, there is no evidence that Warrick's AWPs should have been reduced to reflect actual

selling prices.  The Commonwealth's own witnesses understood AWP to be merely a reference

or sticker price with no correlation to actual selling prices.  *See e.g.,* Tab 12 Deposition of

Arnold Shapiro, Oct. 3, 2007 ("Shapiro Dep.") at 41-42 (acknowledging that he was aware as early as 1988 of "dramatic" discounts off AWP); *see also* Defendants' Joint Statement of Undisputed Material Facts In Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 42, 76. Furthermore, there is no record evidence that the Commonwealth ever relied on or used AWPs published for Warrick's drugs in reimbursing Medicaid providers for dispensing them.

**18.     After 1995, no changes were made to AWP. 9/06 Weintraub Dep. Tr. (Exhibit 5) at 167: 3-8. However, Warrick's selling prices for all NDCs of albuterol sulfate declined substantially over time as Warrick sought to match the price of its generic competitors. *Id*. at 380: 1-13. The spreads for every NDC in every year were all over 100%, reaching over 800% in 2003. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 75 (D. Mass. 2007).**

   **Response:  Disputed as written.**

As set forth in General Objection No. 1 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this litigation. By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP. Thus, while Warrick acknowledges that the Court found, in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 75 (D. Mass. 2007), that "spreads" for every NDC in every year were all over 100%, reaching over 800% in 2003 (as those values were arithmetically calculated in that opinion), such AWP spread are irrelevant and immaterial to the Commonwealth's claims in this case. Warrick further acknowledges that, after 1995, no changes were made to AWPs for Warrick's subject drugs and

19

that Warrick's selling prices for all NDCs of albuterol sulfate generally declined over time as

Warrick sought to match the price of its generic competitors.  *See* Tab 2 Weintraub Dep. Vol. IV

at 753-757.  This is in keeping with expectations in the generics marketplace, including the

expectations of the Commonwealth's witnesses.  *See* Tab 12 Shapiro Dep. at 43; Tab 13

Deposition of Paul Jeffrey, Oct. 19, 2007 ("Jeffrey 30(b)(6) Dep.") at 102.

**19.     Attached hereto as Exhibit 4 are copies of the charts prepared by the**

**Commonwealth's experts tracking the reported AWPs and WACs for Warrick's Subject**

**Drugs against their reported Average Manufacturers' Price reported each quarter to CMS.**

**These charts show in graphic form that the Warrick reported prices during the relevant**

**time period had no correlation whatsoever to its real prices in the marketplace.  Exhibit 4,**

**Hartman Decl. at Attachment F.**

> **Response:  Disputed.**

Warrick denies that it reported "prices" for the Subject Drugs to the extent that the

statement implies that Warrick reported anything other than AWP and Direct Price at launch and

with two specific exceptions noted above after launch.  As set forth in General Objection No. 2

above, Warrick did not have WAC prices and did not report a WAC for the Subject Drugs to any

pricing compendia.  *See* Tab 1 Weintraub Dep. Vol. I at 154-59.  Warrick separately negotiated

with its wholesaler and chain pharmacy customers and typically invoice prices "were different

for each customer."  *Id*; *see also* Tab 10 Weintraub Dep. Vol. III at 528-29 (Warrick would have

a whole range of different prices, and the prices would be different for different customers and

according to the position of the competition).  None of the pricing compendia, First DataBank,

Medispan and Red Book, ever reported a WAC for Warrick's drugs in their hard-copy

publications.  When Warrick realized that First DataBank was publishing Direct Price for its

drugs in 1993, it instructed First DataBank not to do so and First DataBank ceased to publish Direct Price (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication. *See* Tab 1 Weintraub Dep. Vol. I at 153-55; Tab 8 Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993; Tab 11 Chadwick Dep. at 171-72 (First DataBank did not publish Warrick WAC in its hard-copy publication). Because Warrick did not subscribe to First DataBank's electronic pricing service, Warrick was never aware, during the relevant time, that First DataBank was reporting the Direct Price that Warrick reported for its drugs at launch as a WAC. *See* Tab 1 Weintraub Dep. Vol. I at 154; Tab 14 Deposition of Harvey Weintraub, Sept. 19, 2006 ("Weintraub Dep. Vol. II") at 387. Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides. *See* Tab 10 Weintraub Dep. Vol. III at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product); Tab 1 Weintraub Dep. Vol. I at 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab 15 A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.

Moreover, as set forth in General Objection No. 1 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this litigation. By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP. In any event, the Commonwealth has presented no evidence that it expected AWPs and WACs to have a correlation with real prices in the marketplace. Indeed, this is not surprising in light of the Commonwealth's own witnesses' testimony about the meaning of AWP and WAC and the correlation between AWP and WAC to

prices in the marketplace.  *See* Defendants' Joint Statement of Undisputed Material Facts In

Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 42, 55, 76, 78.

**20.     At all times, Warrick affirmatively concealed its true prices from third party payor**

**such as the Commonwealth.  9/06 Weintraub Dep. Tr. (Exhibit 5) at 343: 6-25 (Generally,**

**generic drug prices in the marketplace are not transparent to outside parties).  Customer**

**contracts included confidentiality provisions which precluded the customer from revealing**

**to any third party the prices charged in the contract.  *Id*. at 344: 1-15 (Warrick had**

**confidentiality clauses and would like its prices confidential).  Indeed, customer contracts**

**produced by Warrick in this case are marked "Highly Confidential" pursuant to the**

**Court's Protective Order.  *See In re Pharmaceutical Industry Average Wholesale Price***

***Litigation*, 491 F. Supp. 2d 20, 36 N. 15 (D. Mass. 2007) (Noting that the terms of the**

**customer contracts at issue in the MDL trial were kept confidential and that "[i]ndeed,**

**throughout this litigation these contracts were marked "highly confidential" pursuant to a**

**protective order.")**

   **Response: Disputed.**

  Warrick denies that it affirmatively concealed its true prices from third party payors such

as the Commonwealth.  This statement is unsupported by any factual citation to either the record

or an affidavit as required by Local Rule 56.1, and in fact is contradicted by the record evidence.

*See, e.g.*, Tab 10 Weintraub Dep. Vol. III at 581 (testifying that Warrick did not have a practice

of concealing its WACs from Medicaid programs and pricing services).  Mr. Weintraub

explained that while Warrick "would not like the competition to see our price, . . . [i]n actuality

competition knows pretty well where you're selling at.  I just said that we met competition. . . .

[T]he customers tell us generally where the competitor's price is.  So there—it may not be

transparent in that someone doesn't shout them from the rooftop, so to speak, but they're available."  Tab 14 Weintraub Dep. Vol. II at 344.  Although Warrick acknowledges that customer contracts produced by Warrick in this case are marked "Highly Confidential" pursuant to the Court's Protective Order, Warrick states that they were so marked to avoid disclosing confidential pricing data to its competitors, some of whom are co-defendants in this case.

Moreover, as set forth in General Responses Nos. 3 and 4 above, there is undisputed evidence in this case that the Commonwealth and other third party payors were aware of actual market prices for the subject drugs throughout the relevant time period, a fact of which Warrick was well aware.  *See, e.g.,* Defendants' Joint Statement of Undisputed Material Facts In Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 42, 46, 47, 55, 61, 62, 76, 78, 100-107.  First, the Commonwealth had access to AMP prices since 1991 in the form of URAs provided to them on a quarterly basis as part of the federal Medicaid Rebate Program.  *See* Defendants' Joint Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 17-35.  Second, since 2005, the Commonwealth has had access to actual acquisition costs for the Warrick Subject Drugs in its claims data in the form of 340B prices, which are generally defined as AMP minus URA. Third, beginning in January 2002 and continuing every month thereafter, Warrick voluntarily provided the Commonwealth with a report of its high-low range of prices for the drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.  *See, e.g.*, Tab 4 Jeffrey Dep. at 206-207; Tab 5 Gilmore Dep. at 341-42; Tab 6 Letter from B. Michael Kennedy to Gary Gilmore dated Jan. 9, 2002.  Fourth, as the Commonwealth's own expert, Raymond Hartman, conceded in the AWP MDL proceedings

before this Court, because price competition in the multi-source drug marketplace generally leads to declining prices, reimbursers generally impose maximum allowable costs (MACs), or other limits to curtail costs, on multi-source drugs.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d at 39, n.17&18, (D. Mass. 2007) (noting that Dr. Hartman, assuming that MACs are not based on AWP, did not calculate damages for multi-source drugs in Class 3).  The Commonwealth took advantage of discounting available to pharmacy benefit managers (PBMs) and other third-party payors in 1995 by requiring pharmacists to submit to the Commonwealth as their usual and customary charge (U&C) the lowest price charged or accepted by the pharmacy for the product dispensed from any PBM, HMO, or other private third-party payor.  *See* Defendants' Joint Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment, Docket Entry No. 452, ¶¶ 60-62, 65, 66.  Finally, it is undisputed that throughout the relevant time period, other Commonwealth programs purchased and reimbursed for the Subject Drugs at rates well below the prices at which it reimbursed Medicaid providers.  *See id.* at ¶¶ 100-107.

**21.     Warrick reported prices to First DataBank for Warrick's Subject Drugs with the full expectation and intent that they would be published and later relied upon by third-party payors for reimbursement purposes.  9/06 Weintraub Dep. Tr. (Exhibit 5) at 135: 3-25 (AWP was used as a reference point for negotiations for Third Party Payors' reimbursement); 137: 1-12 (Government agencies were Third Party Payors).  Weintraub testified concerning the September 3, 1993 notice to FIRST DATABANK (Exhibit 7) referred to above.  He stated that it was sent out under his signature with his approval.  *Id.* at 350: 4-23.  He testified that he sent it because Warrick's pharmacy customers require**

that the product be listed in the pricing services and that the reason that they required the listing was so that the product would be reimbursed.  *Id*. at 351-352: 10-25, 1-8.

       **Response: Disputed in part.**

Warrick denies that it reported "prices" for the Subject Drugs to the extent that the statement implies that Warrick generally reported anything other than AWP and Direct Price at launch with two specific exceptions noted above after launch.  Warrick also denies that it reported "prices" with "the full expectation and intent that they would be published and later relied upon by third-party payors for reimbursement purposes."  Indeed, the Commonwealth's own expert, Raymond Hartman, conceded in the AWP MDL proceedings before this Court that because price competition in the multi-source drug marketplace generally leads to declining prices, reimbursers generally impose maximum allowable costs (MACs), or other limits to curtail costs, on multi-source drugs.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d at 39, n.17&18, (D. Mass. 2007) (noting that Dr. Hartman, assuming that MACs are not based on AWP, did not calculate damages for multi-source drugs in Class 3).

In addition, as set forth in General Objection No. 2 above, Warrick did not have a WAC price and did not report a WAC for the Subject Drugs to any pricing compendia.  *See* Tab 1 Weintraub Dep. Vol. I at 155-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id*; *see also* Tab 10 Weintraub Dep. Vol. III at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  None of the pricing compendia, First DataBank, Medispan and Red Book, never reported a WAC for Warrick's drugs in their hard-copy publications.  When Warrick realized that First DataBank was publishing Direct Price for its drugs in 1993, it instructed First

DataBank not to do so and First DataBank ceased to publish Direct Price (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication.  *See* Tab 1 Weintraub Dep. Vol. I at 153-55;  Tab 8 Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993;  Tab 11 Chadwick Dep. at 171-72 (First DataBank did not publish Warrick WAC in its hard-copy publication).  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Price that Warrick reported for its drugs at launch as a WAC, because Warrick did not subscribe to that service.  *See* Tab 1 Weintraub Dep. Vol. I at 154; Tab 14 Weintraub Dep. Vol. II at 387.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See* Tab 10 Weintraub Dep. Vol. III at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product); Tab 1 Weintraub Dep. Vol. I at 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab 15 A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.

As set forth in General Objection No. 1 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this litigation.  By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP.  In any event, Harvey Weintraub merely testified he was aware that AWP was used in the pharmaceutical industry as a sticker price, a point of reference from which negotiations between a third-party payor and the account it was servicing were started.  *See* Tab 1 Weintraub Dep. Vol. I at 135.  Mr. Weintraub testified that he sent the September 3, 1993, letter because Warrick's pharmacy customers require that the product be listed in First

DataBank, and that Warrick's products needed to be listed in order to be eligible for reimbursement, but that "[w]e had to be listed there.  We didn't have to report prices as such." Tab 14 Weintraub Dep. Vol. II at 352.  Mr. Weintraub further testified that he didn't know how the information would be utilized, and he did not specifically intend for it to be used for reimbursement.  *See* Tab 10 Weintraub Dep. Vol. III at 566 (testifying that his "intent was to inform [Medicaid programs] of what our direct wholesale price would be going out.  How they utilized it, I really don't know.").

**22.      Warrick and its corporate parent were well aware of the importance of the Medicaid market and that many states use third-party pricing services for the pricing data used to establish reimbursement levels.  *Id*. at 369: 7 – 371-23.  In the Schering/Warrick "Action Plan" for the Alberterol Inhaler launch, Exhibit 9 (excerpts of Action Plan), the authors state at page 10 under the heading "MEDICAID, DUR AND PRICING SERVICES:"**

1)  **One of the critical factors in the success of a generic product is to get reimbursement as quickly as possible.  Third party reimbursers represent as much as 2/3 of an accounts utilization of a given product.  It will be critical to achieve 100% reimbursement as quickly as possible.**
2)  **Many states utilize third party pricing services to update their files for new additions as products become available for reimbursement on Medicaid.  Letters should be prepared immediately for mailing the day of launch to all pricing services.**

    **Response:  Disputed in part.**

    Warrick denies that any awareness on the part of Warrick's corporate parent, Schering, is a relevant or material fact for purposes of the Commonwealth's 56.1 Statement Applicable to Warrick.  In addition, Exhibit 9 is inadmissible because the document is not authenticated, and Mr. Weintraub testified that he is not familiar with it, and that it appeared to be a Schering (and not a Warrick) document.  *See* Tab 14 Weintraub Dep. Vol. II at 366-67, 372.  Warrick

acknowledges only that Harvey Weintraub testified he was aware that AWP was used in the pharmaceutical industry as a sticker price, a point of reference from which negotiations between a third-party payor and the account it was servicing were started.  *See* Tab 1 Weintraub Dep. Vol. I at 135.  Mr. Weintraub further testified that there were thousands of such third-party payors, including HMOs, insurance companies, and government agencies.  *See id.* at 137.  Mr. Weintraub also testified that no one at Warrick attempted to keep track of the specific reimbursement methods of these thousands of reimbursement plans and formulas, and that reimbursement "was not [their] focus" but, rather, their focus was "[p]rice, service, continuity of supply, [and] meeting the competition."  *See id.* at 137, 173-75 (Mr. Weintraub testified that Warrick did not know the specifics of each state's Medicaid reimbursement formula, did not know whether they all reimbursed in the same manner with the same formula at the same time, did not keep track of what those were or how they changed from time to time, and did not consider that relevant to the business of selling Warrick generic drugs.).  Indeed, in its Rule 56.1 Statement, the Commonwealth concedes that Warrick "competes based on price, quality, and reliability of supply."  *See* Commonwealth's 56.1 Statement Applicable to Warrick, at ¶ 8. Furthermore, Warrick did not consider Medicaid reimbursements in determining what price would be established for a particular product, what AWP would be established, what discounts or rebates would be offered, or how to market Warrick drugs.  *See id.*

**23.    First DataBank periodically sent each manufacturer a National Drug Data File Update Report and asked the manufacturer to verify the information on the manufacturer's product line as listed in the First DataBank National Drug Data File. Exhibit 10 (Excerpts, produced by Warrick, from First DataBank's 1999 National Drug Data File Product Update Report relating to Warrick's Subject Drugs).  The documents**

28

shows a fax date from First DataBank for March 2, 1999. *Id*. Warrick's Subject Drugs at issue in this action are listed on pages bates nos. 0190075 and 76. *Id*. For NDC No. 59930-1500-08, the report lists a WHLNET (WAC) price of $24.75, the Direct Price amount reported to First DataBank by Warrick in 1993. *Id*. For NDC No. 59930-1515-04, the report lists a WHLNET (WAC) of $9.00 per package or $0.45/unit. *Id*. For NDC No. 59930-1560-01, the report lists a WHLNET (WAC) of $16.06 per package ($0.94470/unit), the Direct Price reported to the Medicaid Directors at product launch in 1995. *Id*. For convenience, the WAC prices reported on the First DataBank National Drug Data File Update Report and their conversion to unit prices are shown in the following chart:

| DRUG NAME | NDC | FIRST DATABANK WAC | WAC/UNIT |
|---|---|---|---|
| Albuterol Sulfate, 0.83 mg | 59930-1500-08 | $24.75 | $0.33/unit |
| Albuterol Sulfate, 5 mg/ml | 59930-1515-04 | $9.00 | $0.45/unit |
| Albuterol, 90 mcg | 59930-1560-01 | $16.06 | $0.94470/unit |

**Response: Disputed.**

Warrick denies that First DataBank periodically sent each manufacturer a National Drug Data File Update Report, or that First DataBank asked the manufacturer to verify the information on the manufacturer's product line as listed in the First DataBank National Drug Data File. The Commonwealth has cited to no evidence that First DataBank *periodically* sent *each manufacturer* a NDDF Update Report. Indeed, there is evidence that First DataBank had no such policy. *See* Tab 16 Deposition of Patricia Kay Morgan, Jan. 28, 2002 ("Morgan Dep.") at 42-44 (First DataBank had no policy to routinely request updated information from manufacturers); *see also* Tab 2 Weintraub Dep. Vol. IV at 639 (testifying that he did not recall any routine requests from First DataBank for information). The support cited by the

29

Commonwealth, Exhibit 10, is inadmissible evidence.  It is not addressed to anyone in particular, no one has authenticated it, and the Commonwealth cannot show that anyone at Warrick ever saw it.  Moreover, there is no evidence whether Warrick replied to the fax one way or the other.  Indeed, Warrick's 30(b)(6) witness, Harvey Weintraub, testified that he never saw this document or any document like it.  Tab 10 Weintraub Dep. Vol. III at 592-599.

Furthermore, the document refers to WHLNET and not WAC.  The term WAC appears nowhere on the document and, for that reason alone, the chart is misleading, inaccurate, and unsupported by the record evidence.  Moreover, as set forth in General Objection No. 2 above, Warrick did not have a WAC price and did not report WACs for the Subject Drugs to any pricing compendia.  *See* Tab 1 Weintraub Dep. Vol. I at 155-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id*; *see also* Tab 10 Weintraub Dep. Vol. III at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  None of the pricing compendia, First DataBank, Medispan and Red Book, ever reported a WAC for Warrick's drugs in their hard-copy publications.  When Warrick realized that First DataBank was publishing Direct Price for its drugs in 1993, it instructed First DataBank not to do so and First DataBank ceased to publish Direct Price (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication.  *See* Tab 1 Weintraub Dep. Vol. I at 153-55;  Tab 8 Weintraub Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993;  Tab 11 Chadwick Dep. at 171-72 (First DataBank did not publish Warrick WAC in its hard-copy publication).  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Price that Warrick reported for its drugs at launch as a WAC, because Warrick did not subscribe to that

30

service.  *See* Tab 1 Weintraub Dep. Vol. I at 154; Tab 14 Weintraub Dep. Vol. II at 387.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See* Tab 10 Weintraub Dep. Vol. III at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product); Tab 1 Weintraub Dep. Vol. I at 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab 15 A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.  Samples of extracts from Price Alert showing no WAC or Direct Price reported for the Warrick Subject Drugs appear in Tab 20 to this Response.

**24.      Exhibit 1 contains copies of the User Interface Screens for Warrick's Subject Drugs at issue in this litigation in the Commonwealth's Pharmacy Outline Payment System ("POPS") database as currently maintained by ACS with the Pricing tab activated. Declaration of Anthony Megathlin, Exhibit A.  Exhibit 2 contains a listing of the prices reported by First DataBank to ACS for the Warrick Subject Drugs for all time periods relevant to this litigation.  Declaration of David Sibor, Attachment 1.  The WNUs (Wholesaler Net Unit Price) are the WACs as reported to ACS by First DataBank.  The AWP is the Average Wholesale Price reported to ACS by First DataBank.  Sibor Declaration ¶ 5.  The WNUs and AWPs received from Warrick and listed in the First DataBank NDDF are the WNUs and AWPs First DataBank reported to the Massachusetts Medicaid program.  The following are the WACs and AWPs reported to the Massachusetts Medicaid program for Warrick's drugs:**

| DRUG NAME | NDC | BEGINNING DATE | WAC | AWP |
|---|---|---|---|---|
| **Albuterol Sulfate, 0.83 mg** | **59930-1500-08** | **September 3, 1993** | **$0.33000** | **$0.43000** |

| Albuterol Sulfate, 0.83 mg | 59930-1500-08 | October 12, 1993 | $0.33000 | $0.40333 |
| Albuterol Sulfate, 5 mg/ml | 59930-1515-04 | August 1, 1993 | $0.48000 | $0.62500 |
| Albuterol Sulfate, 5 mg/ml | 59930-1515-04 | February 25, 1995 | $0.39750 | $0.69750 |
| Albuterol Sulfate, 5 mg/ml | 59930-1515-04 | September 22, 1995 | $0.45000 | $0.74950 |
| Albuterol, 90 mcg | 59930-1560-01 | January 2, 1996 | $0.94470 | $1.25941 |

**Response:  Disputed.**

The Commonwealth conveniently uses the terms WNU and WAC interchangeably, asserting that "[t]he WNUs (Wholesale Net Unit Price) are the WACs as reported to ACS by First DataBank," without any factual citation to either the record or an affidavit, as required by Local Rule 56.1 for the alleged "fact" that the two are equivalent.  Warrick did not report WACs for the Subject Drugs, and the Commonwealth attempts to gloss over this fact by changing terminology as it suits the Commonwealth without support for the proposition.

As set forth in General Objection No. 2 above, Warrick did not have WAC prices and did not report WACs for the Subject Drugs to any pricing compendia.  *See* Tab 1 Weintraub Dep. Vol. I at 155-59.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id*; *see also* Tab 10 Weintraub Dep. Vol. III at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  None of the pricing compendia, First DataBank, Medispan and Red Book, ever reported a WAC for Warrick's drugs in their hard-copy publications.  When Warrick realized that First DataBank was publishing Direct Price for its drugs in 1993, it instructed First DataBank not to do so and First DataBank ceased to publish Direct Price (and never reported WACs) for Warrick's Subject Drugs in its hard-copy publication.  *See* Tab 1 Weintraub Dep.

Vol. I at 153-55;  Tab 8 Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993;  Tab 11 Chadwick Dep. at 171-72 (First DataBank did not publish Warrick WAC in its hard-copy publication).  Warrick was never aware, during the relevant time, that First DataBank was reporting in its electronic pricing file the Direct Price that Warrick reported for its drugs at launch as a WAC, because Warrick did not subscribe to that service.  *See* Tab 1 Weintraub Dep. Vol. I at 154; Tab 14 Weintraub Dep. Vol. II at 387.  Rather, Warrick only reviewed First DataBank's monthly Price Alerts, which First DataBank specified were its "official" pricing guides.  *See* Tab 10 Weintraub Dep. Vol. III at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not with First DataBank's electronic product); Tab 1 Weintraub Dep. Vol. I at 150 (Warrick did not have access to the electronic version of First DataBank's publication used by states and their fiscal agents); Tab 15 A Proposal for the Exclusive Sponsorship of Price Alert, June 1991, at 2.

With regard to the AWPs set forth in the chart above, as set forth in General Objection No. 1 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this litigation.  By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP.

**25.    Attached hereto as Exhibit 3 are copies of the MMIS Drug Information screens applicable to Warrick's Subject Drugs at issue in this case.  In the "Price" and "Begin Date" fields, the system records the Estimated Acquisition Cost in effect for the drug for the last five changes.  For example, the record for NDC 59930-1500-08 shows that the EAC was originally determined to be $0.363 as of September 3, 1993 and never changed after that.  Exhibit 3.  The record for NDC 59930-1560-01 shows that the EAC was originally**

determined to be $1.0392 as of January 2, 1996 and never changed after that.  *Id*.  The
record for NDC 59930-1515-04 shows that the EAC was originally determined to be
$0.5280 as of August 1, 1993; changed to $0.4373 as of February 25, 1995; and changed to
$0.4950 as of September 22, 1995.  It was then never changed again after that.  *Id*.  For
convenience, the following chart lists the EACs for each drug for each period as shown in
the MMIS records:

| DRUG NAME | NDC | BEGINNING DATE | EAC |
|---|---|---|---|
| Albuterol Sulfate, 0.83% mg | 59930-1500-08 | September 3, 1993 | $0.3630 |
| Albuterol Sulfate, 5 mg/ml | 59930-1515-04 | August 1, 1993 | $0.5280 |
| Albuterol Sulfate, 5 mg/ml | 59930-1515-04 | February 25, 1995 | $0.4373 |
| Albuterol Sulfate, 5 mg/ml | 59930-1515-04 | September 22, 1995 | $0.4950 |
| Albuterol, 90 mcg | 59930-1560-01 | January 2, 1996 | $1.0392 |

**Response: Disputed.**

Warrick denies that "Price" is equivalent to "Estimated Acquisition Cost" to the extent
that this statement is unsupported by any factual citation to either the record or an affidavit as
required by Local Rule 56.1.  EAC is a reimbursement amount set by the state.  Furthermore,
EAC is just one option of several that the Commonwealth utilizes in its reimbursement formula,
which also includes the Federal Upper Limit ("FUL"), State Maximum Allowable Cost
("SMAC") (also known as Massachusetts Upper Limit ("MULP")), and the pharmacist's Usual
and Customary Charge ("U&C").  *See* Am. Compl. ¶ 28.  As far back as the 1980s, the
Commonwealth expected that the WAC-based EAC would be used rarely if at all for generics,
which would be subject to a SMAC or FUL.  *See* Defendants' Joint Statement of Undisputed
Material Facts, Docket No. 452, at ¶ 51.  Moreover, since 1995 pharmacists submit to the

Commonwealth as their U&C the lowest price charged or accepted by the pharmacy for the product dispensed from any PBM, HMO, or other private third-party payor. *See id.* at ¶¶ 65, 66.

Furthermore, it is impossible for the Commonwealth's EAC for the Warrick Subject Drugs to have remained constant from 1995 forward, as this chart suggests, when it is undisputed that the Commonwealth's formula for estimated acquisition cost (EAC) changed once in late 2002 and once again in early 2003. *See* Defendants' Joint Statement of Undisputed Material Facts In Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 87, 97). The Commonwealth admits and it is not in dispute that AWPs for the Subject Drugs remained constant after 1995 (*see* Paragraphs 14 and 25 above) and that Direct Prices for the Subject Drugs (not reported by Warrick) remained constant after 1995 (*see* Paragraph 14 above). Warrick did not report a WAC to First DataBank. Even assuming that the Commonwealth used the Direct Price that First DataBank erroneously reported as a WAC in its electronic pricing file (unbeknownst to Warrick), it is still impossible that the "EAC" remained unchanged in light of the change in the Commonwealth's formula for estimated acquisition cost.

26.     **The Commonwealth based the determination of the EAC for Warrick's drugs on the WACs First DataBank reported for them. The following chart lists the subject drugs, their NDCs, the EAC listed in the MMIS Drug Data Files, the WACs and AWPs reported by First DataBank to Massachusetts Medicaid, and the calculation of WAC + 10%/6% and .9 x AWP for each NDC and time period. This chart demonstrates that the EACs shown in the Commonwealth's POPS system were derived from the Direct Prices that Warrick reported to First Databank and First DataBank reported in turn to Massachusetts Medicaid as the WACs:**

| DRUG NAME | NDC | BEG. DATE | WAC | 10% OF WAC | EAC = WAC + 10% |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **Albuterol Sulfate, 0.83 mg** | 59930-1500-08 | 9/3/1993 | $0.33 | $0.033 | $0.363 |
| **Albuterol Sulfate, 5 mg/ml** | 59930-1515-04 | 8/1/1993 | $0.48 | $0.048 | $0.5280 |
| **Albuterol Sulfate, 5 mg/ml** | 59930-1515-04 | 2/25/1995 | $0.3975 | $0.03975 | $0.4373 |
| **Albuterol Sulfate, 5 mg/ml** | 59930-1515-04 | 9/22/1995 | $0.45 | $0.045 | $0.4950 |
| **Albuterol, 90 mcg** | 59930-1560-01 | 1/2/1996 | $0.9447 | $0.09447 | $1.0392 |

**Response:  Disputed.**

As set forth in General Objection No. 2 above, Warrick did not have WAC prices for the

Subject Drugs or report WACs for the Subject Drugs to the pricing compendia.  *See* Tab 1

Weintraub Dep. Vol. I at 155-59.  Warrick separately negotiated with its wholesaler and chain

pharmacy customers and typically invoice prices "were different for each customer."  *Id*; *see*

*also* Tab 10 Weintraub Dep. Vol. III at 528-29 (Warrick would have a whole range of different

prices, and the prices would be different for different customers and according to the position of

the competition).

Furthermore, EAC is just one option of several that the Commonwealth utilizes in its

reimbursement formula, which also includes the FUL, SMAC, and U&C.  *See* Am. Compl. ¶ 28.

As far back as the 1980s, the Commonwealth expected that the WAC-based EAC would be used

rarely if at all for generics, which would be subject to a SMAC or FUL.  *See* Defendants' Joint

Statement of Undisputed Material Facts, Docket No. 452, at ¶ 51.  Moreover, since 1995

pharmacists submit to the Commonwealth as their U&C the lowest price charged or accepted by

the pharmacy for the product dispensed from any PBM, HMO, or other private third-party payor.

*See id.* at ¶¶ 65, 66.

Furthermore, it is impossible for the Commonwealth's EAC for the Warrick Subject

Drugs to have remained constant from 1995 forward, as this chart suggests, when it is undisputed

that the Commonwealth's formula for estimated acquisition cost (EAC) changed once in late 2002 and once again in early 2003. *See* Defendants' Joint Statement of Undisputed Material Facts In Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 87, 97). The Commonwealth admits and it is not in dispute that AWPs for the Subject Drugs remained constant after 1995 (*see* Paragraphs 14 and 25 above) and that Direct Prices for the Subject Drugs (not reported by Warrick) remained constant after 1995 (*see* Paragraph 14 above). Warrick did not report a WAC to First DataBank. Even assuming that the Commonwealth used the Direct Price that First DataBank erroneously reported as a WAC in its electronic pricing file (unbeknownst to Warrick), it is still impossible that the "EAC" remained unchanged in light of the change in the Commonwealth's formula for estimated acquisition cost.

Beyond that, the chart above makes no reference to "AWPs" or ".9 x AWP for each NDC" as purportedly undisputed Fact No. 26 states. In any event, as set forth in General Objection No. 1 above, the alleged undisputed material facts relating to AWP are irrelevant and immaterial to this litigation. By the Commonwealth's own concession in Paragraph 26 of its 56.1 Statement Applicable to Warrick, it did not reimburse for Warrick's Subject Drugs based on AWP; nor does the Commonwealth make any damages claim against Warrick based on AWP.

## Statement of Additional Relevant Facts

In further support of Warrick's Opposition to the Commonwealth's Partial Motion for Summary Judgment, Warrick hereby incorporates by reference Defendants' Joint Response To The Commonwealth of Massachusetts's Local Rule 56.1 Statement of Undisputed Material Facts Applicable To All Defendants. Warrick also states as follows:

**A.     Warrick Did Not Have WACs And Did Not Report WACs For The Subject Drugs.**

1.     Warrick understood Wholesale Acquisition Cost, or WAC, to be "an undiscounted invoice price . . . [to] the wholesaler."  Tab 1 Weintraub Dep. Vol. I at 156.

2.     Warrick did not have a single invoice or WAC price.  *See* Tab 1 Weintraub Dep. Vol. I at 156-57.  Warrick separately negotiated with its wholesaler and chain pharmacy customers and typically invoice prices "were different for each customer."  *Id; see also* Tab 10 Weintraub Dep. Vol. III at 528-29 (Warrick would have a whole range of different prices, and the prices would be different for different customers and according to the position of the competition).  Warrick did not use the term WAC in its business on a routine basis.  *See* Tab 1 Weintraub Dep. Vol. I at 156-57.

3.     Warrick did not regularly publish a list of WAC prices.  *See* Tab 1 Weintraub Dep. Vol. I at 157.  Warrick did not report a WAC to pricing compendia for the Subject Drugs.  *See* Weintraub Dep. Vol. I at 155-59.[1]

---

[1]   In fact, Warrick did not report WACs to pricing compendia for any of its drugs except for one isolated incident in July 2002, when Kay Morgan of First DataBank directly asked Harvey Weintraub to provide WACs for its new sterile solutions, none of which are at issue in this case, as a condition of listing those new sterile solutions in its publication.  *See id.*  Mr. Weintraub informed First DataBank that Warrick "did not have WAC prices," but rather "that Warrick has a range of prices at which it sells its products at any given time.  Tab 17 Letter from Harvey Weintraub to Kay Morgan dated July 16, 2002.  First DataBank informed Mr. Weintraub that "disclosing [Warrick's] highest WAC would be sufficient for [their] purposes" and in response, Warrick reported the highest prices for the albuterol sulfate inhalation solution.  *Id*; Tab 1 Weintraub Dep. Vol. I at 156.  In addition to being a one-time event involving drugs not at issue in this case, by this time Warrick already was reporting to the Commonwealth on a quarterly or monthly basis a report of its high-low range of prices for the drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.  *See, e.g.*, Tab 4 Jeffrey Dep. at 206-207; Tab 5 Gilmore Dep. at 341-42; Tab 6 Letter from B. Michael Kennedy to Gary Gilmore dated Jan. 9, 2002.

**B.    Warrick Set A Direct Price At Launch.  As The Commonwealth Was Well Aware, Generic Competition Quickly Caused Prices To Fall, Making That Direct Price Obsolete.**

4.    At the launch of a product, Warrick generally set a direct price, *i.e.,* the price at which Warrick invoiced an account.  *See* Tab 1 Weintraub Dep. Vol. I at 153-54; *see also* Tab 14 Weintraub Dep. Vol. II  at 353 (direct price was the "going-out price" that Warrick intended to get if it could); Tab 10 Weintraub Dep. Vol. III  at 566 (direct price was the initial "going-out price" expected for the wholesale class of trade).

5.    Warrick typically sent letters at the launch of a product to customers, pricing compendia, and state Medicaid agencies, including Massachusetts, providing notice of the product's AWP and NDC number, and occasionally its direct price at launch.  *See, e.g.*, Tab 2 Weintraub Dep. Vol. IV at 639 (testifying that Warrick's procedure when launching a new product was to notify First DataBank of the AWP and NDC numbers); Tab 7 Weintraub Letter from Harvey Weintraub to Beth Rader and Ed Edlestein dated Sept. 3, 1993 (announcing availability of 25 x 3 ml albuterol sulfate inhalation solution 0.083%, 59930-1500-08 and reporting AWP and direct price at launch); Tab 18 Letter from Harvey J. Weintraub to Beth Rader dated Dec. 29, 1995 (announcing availability of albuterol USP inhalation aerosol (59930-1560-1) and refill (59930-1560-2) and reporting AWP);  Tab 9 Letter from Phyllis T. Sinoradzki, M.A.E. to Arnold Shapiro dated Dec. 30, 1995 (announcing availability of albuterol USP inhalation aerosol (59930-1560-1) and refill (59930-1560-2) and reporting AWP and direct price at launch for same).

6.    Warrick sells its products almost entirely to wholesalers, large chain pharmacies, and generic distributors and, in so doing, competes based on price, quality, and reliability of supply.  *See* Tab 1 Weintraub Dep. Vol. I at 127.  Because of the price-competitive nature of the generic

industry, Warrick's principal competitive tool was to match the price of its generic competitors in order to obtain and maintain business. *See id.* at 104-06, 113-14, 121, 125, 141-142.

7.      Generic manufacturers compete vigorously to provide the generic version of a drug stocked by a particular pharmacy or pharmacy chain. *See* Tab 1 Weintraub Vol. I at 89 (generic drug prices deteriorate very rapidly depending on the amount of competition for a drug). As a result of that competition, Warrick's prices generally declined substantially over time, as do the prices for most generic drugs. *See, e.g.*, Tab 2 Weintraub Dep. Vol. IV at 753-57.

8.      Since at least 1989, public and private payors in Massachusetts, including the Commonwealth itself, have been aware of large spreads for generic drugs. *See* Defendants' Joint Statement of Undisputed Material Facts In Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 42, 46, 47, 55, 61, 62, 76, 78, 100-107.

**C.      In 1993, Warrick Instructed First DataBank To Stop Publishing Direct Prices For Its Products, And First DataBank Complied.**

9.      In October 1993, Warrick directed First DataBank not to publish a Direct Price for its products. Warrick knew that it did not have a direct price that was the same for every customer, so there was no point in listing a direct price. *See* Tab 1 Weintraub Dep. Vol. I at 153; *see also* Tab 8 Letter from Harvey J. Weintraub to Beth Rader and Ed Edlestein dated Oct. 12, 1993. As far as Warrick was aware, FDB stopped reporting a direct price in its hard-copy publication after Mr. Weintraub asked them to remove it. *See* Tab 1 Weintraub Dep. Vol. I at 153-55.

10.     First DataBank did not publish a WAC for Warrick's products in its hard-copy publication, the monthly Price Alerts, which First DataBank specified were its "official" pricing guides, and Warrick was not aware that First DataBank was publishing the Direct Prices Warrick reported to First DataBank at launch for its products in its electronic databases as WACs. *See* Tab 1 Weintraub Dep. Vol. I at 154; Tab 14 Weintraub Dep. Vol. II at 387; Tab 10 Weintraub

40

Dep. Vol. III at 581-82; Tab 15 A Proposal for the Exclusive Sponsorship of Price Alert, June

1991, at 2.  This data, in the format the Commonwealth received it, showed that the WACs

published for Warrick's Subject Drugs (not reported by Warrick) did not change from 1995

forward.  *See* Tab 19 Deposition of Anthony Megathlin, Oct. 17, 2007 ("Megathlin Dep.") at

404-05.  While Warrick subscribed to First DataBank's monthly Price Alert, no WAC appeared

in this hard-copy publication for any Warrick product.  *See* Tab 11 Chadwick Dep. at 171-72;

Tab 20 First DataBank Price Alert dated Dec. 15, 1997, First DataBank Price Alert dated Nov.

15, 1999, First DataBank Price Alert dated Nov. 15, 2001, and First DataBank Price Alert dated

Nov. 15, 2003; Tab 1 Weintraub Dep. Vol. I at 153-155; *see also* Tab 10 Weintraub Dep. Vol. III

at 444-45 (Mr. Weintraub testified that he is familiar only with the booklet Price Alert and not

with First DataBank's electronic product).  Warrick did not have access to the electronic version

of First DataBank's publication used by states and their fiscal agents.  *See* Tab 1 Weintraub Dep.

Vol. I at 150.  None of the other written pricing compendia published WACs for Warrick's

products.

**D.   The Undisputed Record Is Directly Contrary To The Commonwealth's Repeated
Implications That It Did Not Have Access To The Actual Prices Of The Warrick
Subject Drugs, And That It Believed That Published Prices Were Correlated To
Actual Sales Prices To Customers.**

11.     Since 1991, the Commonwealth had access to AMPs through the URAs it received on a

quarterly basis as part of the federal Medicaid Rebate Program.  *See* Defendants' Joint Statement

of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment,

Docket No. 452, ¶¶ 17-35.  In addition, since 1995, the Commonwealth has had access to actual

acquisition cost information in its claims data in the form of 340B prices, which are generally

defined as AMP minus URA.  Moreover, since 2006, the Commonwealth has received AMPs

directly from CMS under the Deficit Reduction Act of 2005.  *See* Tab 21 Medicaid Program, Prescription Drugs, 71 Fed. Reg. 77174, *77174-77176 (Dec. 22, 2006).

12.     Beginning in January 2002 and continuing every month thereafter, Warrick voluntarily provided the Commonwealth with a report of its high-low range of prices for the drugs at issue – specifically, Warrick's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.  *See, e.g.*, Tab 4 Jeffrey Dep. at 206-207; Tab 5 Gilmore Dep. at 341-42; Tab 6 Letter from B. Michael Kennedy to Gary Gilmore dated Jan. 9, 2002.  There is no evidence that the Commonwealth used the actual prices provided by Warrick in setting reimbursement rates on Warrick drugs.  Indeed, the Commonwealth's reimbursement methodology has remained unchanged from 2003 through the present.  *See* Tab 4 Jeffrey Dep. at 192; Tab 22 Deposition of Lucinda Brandt, June 12, 2007 ("Brandt Dep.") at 177-78.

13.     The Commonwealth's own expert, Raymond Hartman, conceded in the AWP MDL proceedings before this Court that because price competition in the multi-source drug marketplace generally leads to declining prices, reimbursers generally impose maximum allowable costs (MACs), or other limits to curtail costs, on multi-source drugs.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d at 39, n.17&18, (D. Mass. 2007) (noting that Dr. Hartman, assuming that MACs are not based on AWP, did not calculate damages for multi-source drugs in Class 3).  The Commonwealth took advantage of discounting available to pharmacy benefit managers (PBMs) and other third-party payors in 1995 by requiring pharmacists to submit to the Commonwealth as their usual and customary charge (U&C) the lowest price charged or accepted by the pharmacy for the product dispensed from any PBM, HMO, or other private third-party payor.  *See* Defendants' Joint Statement of Undisputed

Material Facts in Support of Defendants' Joint Motion for Summary Judgment, Docket Entry No. 452, ¶¶ 60-62, 65, 66.

14.     Throughout the relevant time period, other Commonwealth programs purchased and reimbursed for the Warrick Subject Drugs at prices well below WAC.  *See* Defendants' Joint Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment, Docket No. 452, ¶¶ 100-107.

15.     As for albuterol more generally, when confronted with publicly available OIG reports in the context of the AWP MDL, including a 1996 report specific to albuterol, the Commonwealth's expert, Dr. Raymond Hartman, conceded that the "large spreads [between AWP and the actual selling price for albuterol] . . . began to reach public awareness in 1996." Tab 23 Direct Testimony of Raymond S. Hartman, Nov. 1, 2006, at ¶ 77, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, Civil Action 01-CV-12257 (Docket No. 3296).

**E.     The Commonwealth Reimbursed Claims For Warrick Subject Drugs At Rates Higher Than The Lowest Available Bases For Payment.**

16.     Of 1,367,374 claims at issue in this lawsuit based on Warrick drugs, 98,744, or 7.22% of the total claims, were reimbursed at a level higher than the lowest available basis for payment. *See* Tab 24 Affidavit of Sumanth Addanki, Ph.D. dated Mar. 31, 2008, ¶ 10 and Exhibit 3.

17.     For the .085% albuterol solution in particular, 84,630 of 180,037 claims, or 47.01% % of the total claims, were reimbursed at a level higher than the lowest available basis for payment. *See id.*

Respectfully submitted,

By attorneys,

/s/ Carisa A. Klemeyer
John T. Montgomery (BBO#352220)
John P. Bueker (BBO # 636435)
Carisa A. Klemeyer (BBO# 655045)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Warrick Pharmaceuticals Corporation*

Dated:  March 31, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I, Carisa A. Klemeyer, hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on March 31, 2008.

/s/ Carisa A. Klemeyer
Carisa A. Klemeyer