Exhibit N

Sexton, Gail                                                  May 20, 2008

Washington, DC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL           ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      ) CIVIL ACTION NO.

PRICE LITIGATION                ) 01-CV-12257-PBS

- - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:                          )

The City of New York v. Abbott Labs., et al.       )

(S.D.N.Y. No. 04-CV-06054)                         )

County of Suffolk v. Abbott Labs., et al.          )

(E.D.N.Y. No. 03-CV-229)                           )

County of Westchester v. Abbott Labs., et al.      )

(S.D.N.Y. No. 03-CV-6178)                          )

County of Rockland v. Abbott Labs., et al.         )

(S.D.N.Y. No. 03-CV-7055)                          )

[Caption continues on Next Page]                   )


                    Washington, D.C.

                    Monday, May 20, 2008

                    9:30 a.m.

          VIDEOTAPED DEPOSITION OF GAIL SEXTON

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                    May 20, 2008
                    Washington, DC

Page 57

1  where we would obtain our pricing information

2  from.  We have a software system that -- as this

3  system (indicating) -- where the compendia

4  information is downloaded into.  We also receive

5  a monthly paper supplement from the compendia

6  from Red Book and from Medi-Span.

7      Q.   You just made reference to a system and

8  a piece of paper.  I take it that the first step

9  in the process of setting FULs is that the FULs

10  program that we talked about a little bit ago

11  downloads pricing data from the compendia?

12          MR. FAUCI:   Objection, form.

13      A.   Did you say that would be our first?

14  Well, the first criteria actually that we would

15  look at after we determined that a drug is

16  available as a multiple source would be the

17  Orange Book, the FDA Orange Book, for the A

18  rating to make sure that regulation was met.

19      Q.   And do you do that or is that done by

20  the FULs program?

21      A.   I did that.  I do that.

22      Q.   When is a printout from the FULs system

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                              May 20, 2008
                         Washington, DC

Page 58

1    like Exhibit 4 generated?

2         A.    It can be generated at any point.

3    Generally I would print out a pricing sheet when

4    I was evaluating a drug and I would keep a hard

5    copy as this for any drugs that there were

6    changes made in the federal upper limit system.

7         Q.    How about drugs for which you evaluated

8    and decided not to make a change?  Would you keep

9    copies of those?

10        A.    My process was that if I did not make a

11   change to the federal upper limit list, if I did

12   not increase or decrease or add or delete a drug,

13   I would make a notation onto the system which we

14   had the capability to do.

15             And I also had a follow-up book that I

16   compiled where if a drug did not meet the

17   criteria, if it was -- we did not have the A-

18   rated drugs, if we did not have a sufficient

19   amount of A ratings, if we did not have a

20   sufficient amount of suppliers, or in the case

21   where if the federal upper limit, once it was

22   calculated, was higher than the AWP price or the

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                        Washington, DC

Page 59

1    majority of the AWP prices, then we would

2    generally not set a FUL on those drug

3    ingredients, because the AWP -- well, a couple

4    years ago the average AWP on a national basis was

5    I think AWP minus 12 percent for drug

6    reimbursement, estimated acquisition costs for

7    drug reimbursement for a drug that did not have a

8    federal upper limit.

9          And if a drug did not -- if the FUL was

10   calculated to be higher than an AWP price then

11   generally we did not put a federal upper limit on

12   it because we would be setting a higher limit

13   than what was already established in regulation

14   because EAC reimbursement or estimated

15   acquisition costs were AWP minus a percentage.

16        Q.   In other words, if the FUL that would

17   have been set would have been higher than AWP it

18   wouldn't have resulted in a cost savings for the

19   Medicaid program and so you didn't set a FUL?

20        MR. FAUCI:  Objection, form.

21        A.   Correct.  That was generally the

22   thinking, why a FUL would not be set.

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                May 20, 2008
                     Washington, DC

Page 60

1      Q.    Mechanically, once you got a printout

2  from the FULs system like Exhibit 4, what if

3  anything would you do before CMS established a

4  federal upper limit for a particular drug?

5      A.    What would I do with this sheet?

6      Q.    What additional steps if any would you

7  take?

8      A.    Well, generally I would make a notation

9  on the sheet what drug the federal upper limit

10  was set on and show the calculation of the 150

11  percent times the lowest priced drug, the lowest

12  priced available drug, because there could be

13  situations where the lowest priced drug was not

14  available.  So I may put that calculation on the

15  sheet and perhaps that the FUL was not higher

16  than AWP.  Just general notations for my own

17  knowledge.

18      Q.    Anything else that you would do before

19  -- any other steps or additional information you

20  would seek before CMS established a FUL?

21      MR. FAUCI:  Objection, form.

22      A.    There were times when we would call or

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                    May 20, 2008
                    Washington, DC

Page 75

1        Q.   Let me make sure I got it.  So the

2    reason you'd look to see whether there were WACs

3    less than the federal upper limit is to determine

4    whether there was drugs available on the

5    marketplace at that federal upper limit price?

6             MR. FAUCI:  Objection, form.

7        A.   That's why I documented, because that

8    was just how I learned -- that's how I was

9    taught.  That's one thing that was looked at.

10   However, I did not set a FUL based on that

11   criteria.  It was just something that I guess at

12   some point was looked at.

13       Q.   But it was a check that you continued

14   to do during the period of time October 2004 to

15   December 2006, correct?

16            MR. FAUCI:  Objection, form.

17       A.   Yes.

18       Q.   And the second part of that statement

19   says "FUL less than AWP minus"; is that correct?

20       A.   That's not a minus.  That's just a

21   marking.  It's just "FUL less than AWP."

22       Q.   Okay.  I think you explained it,

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                    May 20, 2008
                    Washington, DC

Page 76

1    certainly.  But why would you look at that?  Why

2    would you make that comparison?

3         A.   Because EAC or estimated acquisition

4    cost for drugs that did not have a federal upper

5    limit or even for drugs that had a federal upper

6    limit were AWP minus a percent and that varied by

7    state.  And if a FUL was calculated to be higher

8    than the majority of the AWPs, then it did not --

9    it would not yield cost savings to set a federal

10   upper limit that was higher than an EAC already

11   established by a state.

12        Q.   Do you recall in your time where you

13   were the program lead on FULs ever establishing a

14   FUL based on a published AWP?

15             MR. FAUCI:  Objection, form.

16        A.   I don't recall there -- I remember rare

17   occasions when an AWP would be calculated in the

18   system to be the lowest price.  Very rare

19   occasions.

20        Q.   On those occasions do you ever recall

21   establishing a FUL or was that a situation where

22   the drug wasn't -- a FUL wasn't established for

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                         May 20, 2008
                        Washington, DC

                                                        Page 77
1    the drug because it wouldn't have resulted in a

2    cost savings?

3              MR. FAUCI:  Objection, form.

4         A.   I would not have not set a FUL based on

5    that if that was the lowest published price.  But

6    I don't recall if that was ever the case where a

7    federal upper limit was set on a drug with the

8    AWP.

9         Q.   Just so I'm clear, you don't ever

10   recall setting a FUL based on an AWP?

11             MR. FAUCI:  Objection, form.

12        A.   I'm not saying that I haven't.  I just

13   don't -- I don't recollect ever doing that.

14        Q.   But if you ever did, it would be a rare

15   occasion?

16             MR. FAUCI:  Objection, form.

17        A.   I would say that it was rare that the

18   AWP price was ever the lowest price.

19             MR. BUEKER:  We've been going for about

20   an hour.  Do you want to take a break here and

21   we'll come back in five or ten minutes?  What's

22   good for you?

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                        Washington, DC

                                                        Page 78

1            THE WITNESS:  Sure.  That's fine.

2            THE VIDEOGRAPHER:  This is the end of

3    tape 1.  Off the record at 10:44.

4                 (Recess.)

5            THE VIDEOGRAPHER:  This is the

6    beginning of tape 2 in the deposition of Ms.

7    Sexton.  On the record at 10:58.

8            MR. BUEKER:  I'll ask the court

9    reporter to mark as Sexton Exhibit 8 for

10   identification a five page document, the first

11   page of which bears the Bates number HHD 175-

12   1059.

13                 (Exhibit Sexton 008 was marked for

14   identification.)

15   BY MR. BUEKER:

16       Q.   Ms. Sexton, the court reporter has

17   handed you Exhibit 8.  Once you've had a chance

18   to take a look, let me know.

19       A.   Okay.  (Reading.)  Okay.

20       Q.   Okay?  And for the record, would you

21   explain what the first page of Exhibit 8 is?

22       A.   The first page is a pricing sheet

97df9962-63cb-4bf4-b0e6-7ddde994d826