# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) |
|  | ) MDL NO. 1456 |
|  | ) Civ. Action No. 01-12257-PBS |

THIS DOCUMENT RELATES TO:                     )  Judge Patti B. Saris

*The City of New York v. Abbott Labs., Inc., et al.,*
S.D.N.Y. Case No. 04-CV-06054

*County of Albany v. Abbott Labs., Inc., et al.,*
N.D.N.Y. Case No. 05-CV-0425

*County of Allegany v. Abbott Labs., Inc., et al.,*
W.D.N.Y. Case No. 05-CV-0236

*County of Broome v. Abbott Labs., Inc., et al.,*
N.D.N.Y. Case No. 05-CV-0456

*County of Cattaraugus v. Abbott Labs., Inc., et al.,*
W.D.N.Y. Case No. 05-CV-0256

*County of Cayuga v. Abbott Labs., Inc., et al.,*
N.D.N.Y. Case No. 05-CV-0423

*County of Chautauqua v. Abbott Labs., Inc., et al.,*
W.D.N.Y. Case No. 05-CV-0214

*County of Chemung v. Abbott Labs., Inc., et al.,*
W.D.N.Y. Case No. 05-CV-6744

*County of Chenango v. Abbott Labs., Inc., et al.,*
N.D.N.Y. Case No. 05-CV-0354

*County of Columbia v. Abbott Labs., Inc., et al.,*
N.D.N.Y. Case No. 05-CV-0867

[Caption continues on Next Page]

# DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR JOINT MOTION TO EXCLUDE THE PROFFERED EXPERT REPORT AND TESTIMONY OF HARRIS DEVOR, C.P.A.

*County of Cortland v. Abbott Labs., Inc., et al.,*    )
N.D.N.Y. Case No. 05-CV-0881                                     )
                                                                              )
*County of Dutchess v. A Abbott Labs., Inc., et al.,*   )
S.D.N.Y. Case No. 05-CV-6458                                     )
                                                                              )
*County of Essex v. Abbott Labs., Inc., et al.,*          )
N.D.N.Y. Case No. 05-CV-0878                                     )
                                                                              )
*County of Fulton v. Abbott Labs., Inc., et al.,*         )
N.D.N.Y. Case No. 05-CV-0519                                     )
                                                                              )
*County of Genesee v. Abbott Labs., Inc., et al.,*       )
W.D.N.Y. Case No. 05-CV-00267                                   )
                                                                              )
*County of Greene v. Abbott Labs., Inc., et al.,*        )
N.D.N.Y. Case No. 05-CV-0474                                     )
                                                                              )
*County of Herkimer v. Abbott Labs., Inc., et al.,*     )
N.D.N.Y. Case No. 05-CV-00415                                   )
                                                                              )
*County of Jefferson v. Abbott Labs., Inc., et al.,*     )
N.D.N.Y. Case No. 05-CV-0715                                     )
                                                                              )
*County of Lewis v. Abbott Labs., Inc., et al.,*          )
N.D.N.Y. Case No. 05-CV-0839                                     )
                                                                              )
*County of Madison v. Abbott Labs., Inc., et al.,*       )
N.D.N.Y. Case No. 05-CV-00714                                   )
                                                                              )
*County of Monroe v. Abbott Labs., Inc., et al.,*        )
W.D.N.Y. Case No. 05-CV-6148                                     )
                                                                              )
*County of Nassau v. Abbott Labs., Inc., et al.,*        )
E.D.N.Y. Case No. 04-CV-05126                                   )
                                                                              )
*County of Niagara v. Abbott Labs., Inc., et al.,*       )
W.D.N.Y. Case No. 05-CV-06296                                   )
                                                                              )
*County of Oneida v. Abbott Labs., Inc., et al.,*        )
N.D.N.Y. Case No. 05-CV-0489                                     )
                                                                              )
*County of Onondaga v. Abbott Labs., Inc., et al.,*     )
N.D.N.Y. Case No. 05-CV-0088                                     )
                                                                              )

[Caption continues on Next Page]

*County of Ontario v. Abbott Labs., Inc., et al.,*    )
W.D.N.Y. Case No. 05-CV-6373    )
    )
*County of Orange v. Abbott Labs., Inc., et al.,*    )
S.D.N.Y. Case No. 07-CV-2777    )
    )
*County of Orleans v. Abbott Labs., Inc., et al.,*    )
W.D.N.Y. Case No. 05-CV-6371    )
    )
*County of Putnam v. Abbott Labs., Inc., et al.,*    )
S.D.N.Y. Case No. 05-CV-04740    )
    )
*County of Rensselaer v. Abbott Labs., Inc., et al.,*    )
N.D.N.Y. Case No. 05-CV-00422    )
    )
*County of Rockland v. Abbott Labs., Inc., et al.,*    )
S.D.N.Y. Case No. 03-CV-7055    )
    )
*County of Schuyler v. Abbott Labs., Inc., et al.,*    )
W.D.N.Y. Case No. 05-CV-6387    )
    )
*County of Seneca v. Abbott Labs., Inc., et al.,*    )
W.D.N.Y. Case No. 05-CV-6370    )
    )
*County of St. Lawrence v. Abbott Labs., Inc., et al.,*    )
N.D.N.Y. Case No. 05-CV-0479    )
    )
*County of Saratoga v. Abbott Labs., Inc., et al.,*    )
N.D.N.Y. Case No. 05-CV-0478    )
    )
*County of Steuben v. Abbott Labs., Inc., et al.,*    )
W.D.N.Y. Case No. 05-CV-6223    )
    )
*County of Suffolk v. Abbott Labs., Inc., et al.,*    )
E.D.N.Y. Case No. 03-CV-12257    )
    )
*County of Tompkins v. Abbott Labs., Inc., et al.,*    )
N.D.N.Y. Case No. 05-CV-0397    )
    )
*County of Ulster v. Abbott Labs., Inc., et al.,*    )
N.D.N.Y. Case No. 06-CV-0123    )
    )
*County of Warren v. Abbott Labs., Inc., et al.,*    )
N.D.N.Y. Case No. 05-CV-0468    )
    )

[Caption continues on Next Page]

| | |
|---|---|
| *County of Washington v. Abbott Labs., Inc., et al.,*<br>N.D.N.Y. Case No. 05-CV-0408 | )<br>)<br>) |
| *County of Wayne v. Abbott Labs., Inc., et al.,*<br>W.D.N.Y. Case No. 05-CV-06138 | )<br>)<br>) |
| *County of Westchester v. Abbott Labs., Inc., et al.*<br>S.D.N.Y. Case No. 03-CV-6178 | )<br>)<br>) |
| *County of Wyoming v. Abbott Labs., Inc., et al.,*<br>W.D.N.Y. Case No. 05-CV-6379 | )<br>)<br>) |
| *County of Yates v. Abbott Labs., Inc., et al.,*<br>W.D.N.Y. Case No. 05-CV-06172 | )<br>) |

## INTRODUCTION

Plaintiffs have identified Mr. Harris Devor as a purported "expert" in support of their FUL-fraud claims.  Plaintiffs cite to Mr. Devor as capable of articulating how Defendants' reported prices caused CMS to set "inflated" Federal Upper Limits ("FULs"), and how New York Medicaid supposedly over-reimbursed for Defendants' drugs.  Unfortunately for Plaintiffs, neither Mr. Devor's Report, nor his calculations, accomplish that task.

The whole of Mr. Devor's supposed expert opinion in this case is based on a comparison of his so-called "estimated" FULs (computed via rote multiplication by 150% of his newly-minted "estimated" WACs and AWPs) with the actual FULs issued by CMS.  Tellingly, Mr. Devor never opines -- indeed, he expressly disavows -- that his calculations would have had any effect whatsoever with respect to CMS, or that Defendants should have used his "estimated" pricing metrics instead of their own.  Rather, according to Mr. Devor, the sole function of his analysis is to provide additional (*post hoc*) numbers that *might* have been included in the array of published and unpublished prices otherwise available to CMS.  As such, Mr. Devor's analysis cannot and does not establish a viable causation theory with respect to drugs reimbursed on the basis of a FUL, and is thus irrelevant.

In addition to its irrelevance, Mr. Devor's analysis -- which is neither consistent nor transparent -- fails to satisfy the minimum standards of reliability under Fed. R. Evid. 702.  Many of the calculations resulted in "estimated" WACs and AWPs that violate well-established relationships between the various pricing metrics and are simply nonsensical.  For example, where Mr. Devor calculated an "estimated" WAC and/or AWP:

- nearly 90% of his "estimated" AWPs were *less than* AMPs for the same NDC for at least one quarter;

- over a third of Mr. Devor's "estimated" AWPs were *less than* the AMPs for the same NDC;

- 60% of his "estimated" WACs were *greater* than his "estimated" AWPs;

- 90% of his "estimated" WACs were *greater* than his "estimated" AWPs for at least one quarter;

- over 10% of his "estimated" AWPs or WACs were *negative*; and,

- in over 40% of the NDCs for which either an "estimated" AWP or WAC was computed, at least one of the two was negative for at least one quarter.

And even when faced with these and other inconsistent and nonsensical results, Mr. Devor has chosen not to alter (or even cogently to explain) his methodology.

In sum, Mr. Devor's calculations do nothing to advance any theory of causation with respect to FUL drugs and suffer from numerous errors in application and execution.  For these reasons, Defendants ask this Court to exclude Mr. Devor's testimony and conclusions in their entirety, just as other courts have done.[1]

---

[1]    This would not be the first time Mr. Devor's "expert" opinions have been excluded by a federal court under *Daubert*.  *See, e.g.*, *In re Acceptance Ins. Cos., Inc., Sec. Litig.*, 352 F. Supp. 2d 940, 948 (D. Neb. 2004) (striking Mr. Devor's opinions as irrelevant for failing to assist the Court in its determinations); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 701 (E.D. Pa. 2001) (rejecting Mr. Devor's supposed expert opinions on the grounds that his testimony did not support Plaintiff's theory of liability).

## BACKGROUND

Plaintiffs' Revised First Amended Consolidated Complaint asserts claims for thousands of NDCs reimbursed on the basis of a FUL. The FUL for any particular multi-source or generic drug is set by CMS, not drug manufacturers. Plaintiffs' apparent theory of causation is that Defendants' reported prices somehow resulted in CMS setting "inflated" FULs, causing New York Medicaid to over-reimburse for those same drugs. (*See* 10/05/07 Revised First Amended Complaint (Dkt. No. 4780) at ¶¶ 14-15.) Of course, this theory presupposes a showing that but for Defendants' reporting practices, CMS would have acted differently with respect to FUL drugs.

In light of this unique reimbursement context, the Court ordered targeted discovery regarding Plaintiffs' FUL claims. (*See* 7/26/07 Motion Hearing at 29-31 (excerpt attached as Exhibit 1); *see also* 9/14/07 Case Management Order No. 33 (Dkt. No. 4745) ("CMO 33") (attached as Exhibit 2).) Specifically, the Court ordered Plaintiffs and Defendants to each select five generic code numbers ("GCNs") for expedited fact and expert discovery. (CMO 33 ¶ 5.) The parties engaged in targeted discovery on the selected nine GCNs (having one in common).

Upon the completion of this FUL-related discovery, Plaintiffs were directed to come forward with expert testimony that would allow them to articulate, based on those nine GCNs, a plausible theory of causation with respect to FUL drugs. (*Id.* ¶ 5(d).) On September 30, 2008, in an attempt to establish their theory of causation, Plaintiffs tendered the report of Mr. Devor, a certified public accountant with no apparent experience in the pharmaceutical industry.

### A.    Mr. Devor's Rule 26 Report.

In his Rule 26 Report, Mr. Devor describes his assignment as follows:   to "compute, as of the end of each quarterly period beginning January 1, 1997 and ending

December 31, 2005 . . . an estimated measure of WAC and AWP that could have been computed and reported" by Defendants for each of the nine GCNs.  (*See* 9/30/08 Rule 26 Statement of Harris L. Devor ("Devor Rep.") at ¶ 5 (attached as Exhibit 3).)  In other words, using Defendants' transactional data, Mr. Devor set out to calculate a series of alternative prices that he termed "estimated WACs" and "estimated AWPs."  Mr. Devor's "estimated" WACs purport to represent the  "net" prices at which wholesalers acquire drugs.   (*See id.* at ¶¶ 180-81.)  Mr. Devor's "estimated" AWPs purport to represent the actual prices at which retailers acquire drugs.  (*Id*. at ¶ 188.)

From those "estimated" WACs and AWPs, Mr. Devor "compute[d] an estimate of FUL," *id.* at ¶¶ 6-7, by multiplying each of his "estimated" WACs and AWPs (or a "proxy," as described below) by 150%, *id.* at ¶190.  Mr. Devor also performed the same calculation using manufacturers' average manufacturer prices ("AMPs") -- *i.e.*, he multiplied each manufacturer's quarterly AMPs by 150% to "estimate" the FUL.  (*Id*. at ¶ 193.)  Mr. Devor then compared his "estimated" FULs to those established by CMS, and because his "estimated" FULs were (sometimes) lower than CMS's FULs, concluded that CMS "would have been *influenced*, during the relevant timeframe, by *what appear to have been* exaggerated prices," thereby increasing New York Medicaid's reimbursement expenditures.  (*Id*. at ¶ 8 (emphases added).)

Despite this conclusion, Mr. Devor testified in his sworn deposition that he in fact has *no opinion* on whether his "estimated" WACs and AWPs would have any effect whatsoever on FULs set by CMS, or whether CMS would have used his calculations had they been available to the agency.  (*See, e.g.*, Deposition of Harris Devor, Dec. 9-11, 2008 ("Dec. Devor Dep.") at 57:1-57:13 ("Q:   Is it your opinion that had the manufacturers reported the lower AWPs and WACs that you calculated, that CMS would have used those lower AWPs and WACs to set FULs?  . . .  A:  That's not my

opinion.  *I have no opinions on it*. . . . That's beyond the scope of what I was asked to do and not really relevant to what I was asked to do.") (emphasis added) (excerpts attached as Exhibit 4).)  Mr. Devor also unequivocally testified that he has *no opinion* as to how CMS actually determined FULs.  (*See, e.g., id.* at 731:11-14 ("Q:  So you are offering no opinions as to how HCFA or CMS actually set any FUL for any of the identified drugs?  A:  That is correct.  That is correct."); *id.* at 354:10-357:2.)  In fact, Mr. Devor studiously avoided any analysis of CMS's methodology or policy decisions related to setting the FUL for the nine GCNs at issue.  Had Mr. Devor examined CMS's methodology, he would have learned that CMS often disregarded the lowest published price to set the FUL.  Indeed, as set forth in Defendants' motion for summary judgment, 25 of the 31 FULs for the nine GCNs at issue here were established using a figure other than the lowest published price.

Mr. Devor's decision to disregard CMS's actual methodology in establishing FULs is further demonstrated by his decision to calculate "estimated" FULs based on 150% of AMPs.  This entire analysis is completely irrelevant to any theory of causation, because CMS has never based FULs on AMPs.  In fact, as explained in defendants' summary judgment papers, in 2006, Congress directed CMS to stop basing FULs on "published prices" and begin basing them on AMPs.  However, before CMS could implement this new methodology for establishing FULs, the United States District Court for the District of Columbia enjoined its implementation because it was expected to cause such significant access problems for Medicaid beneficiaries.  *See* National Association of Chain Drug Stores, "Judge Grants AMP Rule Injunction," (available at: http://www.nacds.org/wmspage.cfm?parm1=5557) (last visited June 13, 2009).  Mr. Devor overlooks these facts entirely in purporting to calculate FULs based on AMPs.  More fundamentally, Plaintiffs' theory of causation is that

defendants should have supplied lower published prices to the national pricing compendia; AMP simply cannot be not relevant to that theory causation, as AMPs were never "published prices," particularly in light of the 2006 injunction.

Furthermore, Mr. Devor testified that he did not believe that Defendants should have used his methodology. (*See, e.g.,* Dec. Devor Dep. at 55:5-8, 12-16 ("Nowhere in my report do I say that's the number that should have been reported by the defendants, and that's the only number that should have been reported by the defendants. . . . I'm not suggesting that my way was the required way that anybody had to do it.").) He also testified that any discussion of "how New York used the FUL" in his report was simply "[b]ackground information." (*Id.* at 355:8-11.) Mr. Devor similarly disavowed any opinions regarding how the pharmaceutical industry functions in general. *Id.* at 591:14-592:1 ("I have no intention to offer any opinions regarding the way the industry works other than what I know about the industry and other than if asked."). Last, Mr. Devor testified that how manufacturers set prices, and how those prices are used in the industry (roughly 72% of his Report), were both outside the scope of his expertise and opinions in this case.[2]

Moreover, the fact of the matter is that Mr. Devor's calculations are irrelevant because they are not even estimates of FULs in the first place. The FUL set by CMS applies to *all* drugs in the *entire* GCN. For whatever reason, in his calculations, Mr. Devor sets out up to three separate and distinct "estimated" FULs (one based on an "estimated" WAC, one on an "estimated" AWP, and (often) one based on an AMP) for

---

[2]     Plaintiffs' counsel also disclaimed this portion of his Report. *See id.* at 729:16-20 ("MS. CICALA: Absolutely, as Mr. Devor has repeatedly stated. These are not his opinions, these are background statements of facts. Mr. Devor's opinions are confined to the calculations set forth in the exhibits.").

*each* NDC, resulting if tens, if not hundreds of NDC-specific "estimated" FULs in the same GCN.[3]   This analysis is by definition irrelevant to any theory of causation with respect to FUL drugs because it completely different from how CMS actually issues FULs in the real world.

In sum, notwithstanding the (equivocal) conclusion in his Report, Mr. Devor has not and cannot offer any opinion that Defendants' reported prices had any impact on the CMS-set FULs, or that Defendants caused Plaintiffs to overpay for FUL drugs.  In fact, a large number of Mr. Devor's "estimated" FULs are actually greater than those determined by CMS, and thus are by definition irrelevant (and contradictory) to Plaintiff's theory of causation with respect to FUL drugs.[4]

### B.      Mr. Devor's Calculations Are Neither Consistent Nor Reliable.

Not only do Mr. Devor's calculations fail to demonstrate that Defendants' published prices impacted the way CMS set FULs, they are also inherently unreliable. In particular, Mr. Devor's calculations are internally inconsistent, they conflict with well-established relationships between various pricing metrics, they produce absurd resultant figures, and they are obscured by his subjective, unexplained "corrections."

---

[3]      *See, e.g.*, Devor Rep. Exs. 6.05-06A, 6.07-.08A, 6.09-.10A, 6.11-.12A, 6.13-.14A, 6.15-.16A, 6.17-.18A; Exs. 8.34-.36, 8.37-.39, 8.64-.66; Exs. 12.01-.02, 12.03-.04, 12.05-.06; 14.01-.02A, 14.03-.04A, 14.05-.06A, 14.07-.08A (compiling forty-eight separate "estimated" FULs per quarter for the seventeen NDCs in the same GCN, even though CMS had only *one* FUL for all seventeen NDCs).

[4]      *See, e.g.*, Devor Rep. Ex. 9.67 (each estimated FUL from 1997-2005 greater than published FUL); *id.* Ex. 9.70 (each estimated FUL from 1997-2005, except for those calculated for 10/1/00-12/31/00, greater than the published FUL); *id.* Ex. 16.04 (4/1/98-6/30/98) (estimated FUL of $9.50, published FUL of $7.47); *id.* Ex. 16.50 (10/1/05-12/31/05) (estimated FUL of $66.80, published FUL of $54.40); *id.* Ex. 16.56 corrected (4/1/04-6/30/04) (estimated FUL of $112.13, published FUL of $57.18); *id.* Ex. 9.37 (7/1/98-9/30/98) (estimated FUL of $88.83, published FUL of $41.46); *id.* Ex. 9.40 revised (10/1/98-12/31/98) (estimated FUL of $83.72, published FUL of $41.46); *id.* Ex. 9.40 revised (7/1/98-9/30/98) (estimated FUL of $90.00, published FUL of $41.46); *id.* Ex. 9.45 revised (7/1/98-9/30/98) (estimated FUL of $226.02, published FUL of $124.38); *id.* Ex. 10.05 corrected (1/1/04-3/31/04) (estimated FUL of $383.85, published FUL of $24.55); *id.* Ex. 8.01 (10/1/03-12/31/03) (estimated FUL of $68.51, published FUL of $59.61).

      1.     **Mr. Devor's "Estimated" WACs And AWPs Are Less Than Manufacturers' AMPs.**

There is a serious logical disconnect between Mr. Devor's calculations and the real-world relationships between various pricing metrics. For example, as part of his analysis, Mr. Devor compared his "estimated" FULs (derived from his "estimated" AWPs and WACs) to what the FULs "would have been had defendants reported AMP" instead of WAC or AWP. (*See* Devor Rep. at ¶ 193.) AMPs are congressionally-defined metrics for calculating average manufacturers' net prices to the "retail pharmacy class of trade," less chargebacks, rebates and discounts. 42 U.S.C. § 1396r-8(k)(1)(A)-(B).[5]

While Mr. Devor admits that in his view AWP should be greater than AMP, and that WAC would be similar to AMP, *see* Dec. Devor Dep. at 170:16-171:13,[6] roughly a third of the time that he actually computed an "estimated" AWP, Mr. Devor's "estimated" AWP is less than the AMP. For almost 90% of the NDCs in his calculations, where the relationship between AMP and the "estimated" AWP can be observed, the AWP is less than the corresponding AMP for at least one quarter. (*See* 6/15/09 Affidavit of Dr. Sumanth Addanki at ¶ 10 ("Addanki Aff.") (attached as Exhibit 5); 3/18/09 Report of Dr. Sumanth Addanki ("Addanki Rep.") Ex. 7 (attached as Exhibit 6).)[7] And Mr. Devor's "estimated" WACs suffer from the same methodological error.

---

[5]     The Deficit Reduction Act of 2005 ("DRA") amended the federal rebate statute, 42 U.S.C. § 1396r-8, and its definition of AMP. Pub. L. 109-71, § 6001(c)(1). In his Report, Mr. Devor refers to the pre-DRA definition of AMP, which was in effect from 1997-2005. Devor Rep. ¶ 192.

[6]     Unlike Mr. Devor, Congress defines WAC as an *undiscounted* price, *see* 42 U.S.C. § 1395w-3a, 42 U.S.C. §1396r-8(b)(3)(A)(iii)(II) (incorporating the Medicare definition of WAC into the Medicaid Rebate Statute), and AMP as a *discounted* one, *see* 42 U.S.C. §1396r-8(k)(1)(A)-(B).

[7]     *See, e.g.*, Devor Rep. Exs. 10.04, 10.04a (10/1/99-12/31/99) (estimated AWP of $13.00, AMP of $52.06); *id.* Exs. 8.23 revised, 8.24 revised (10/1/00-12/31/00) (estimated AWP of $111.76, AMP of $188.66); *id.* Exs. 13.04, 13.04a (4/1/02-6/30/02) (estimated AWP of $24.68, AMP of $2,030.38); *id.* Exs. 13.22, 13.22a (4/1/02-6/30/02) (estimated AWP of $39.87, AMP of $417.66); *id.* Exs. 15.05, 15.06 (7/1/00-9/30/00) (estimated AWP of $56.23, AMP of $656.43); *id.* Exs. 9.11, 9.12 (4/1/98-6/30/98) (estimated AWP of $54.06, AMP of $136.30); *id.* Exs. 9.14, 9.15 (1/1/98-3/31/98) (estimated AWP of $70.03, AMP of $179.47); *id.* Ex. 10.04, corrected 10.04A (7/1/98-9/30/98) (estimated AWP of $45.18, (Continued…)

Although he intended his "estimated" WACs to reflect "average net prices," Devor Rep. at ¶ 178, *i.e.*, to essentially reflect AMPs, Mr. Devor's "estimated" WACs were often significantly less than manufacturers' AMPs.  (Addanki Aff. Ex. 5; Addanki Rep. Ex. 8.)[8]  In essence then, Mr. Devor's methodology suggests that Defendants should have submitted reference or list prices to First DataBank that were *lower than average net prices* (*i.e.*, net of rebates, chargebacks, and discounts).   Of course, Mr. Devor later testified that his calculations do not represent what Defendants ought to have reported. (Dec. Devor Dep. at 55:5-8, 12-16.)[9]

### 2. Mr. Devor's "Estimated" AWPs Are Less Than His "Estimated" WACs.

Mr. Devor's calculations also violate logical and well-understood relationships between WACs and AWPs.  It is well known that AWPs are expected to be greater than WACs, and that WACs should exceed AMPs.  Notably, Mr. Devor agrees:  "Q:  So you would normally expect that AWP would be higher than or equal to WAC?  A:  Normally I would."  (Dec. Devor Dep. at 161:11-13.)  Indeed, Mr. Devor testified that he would expect AWPs to be greater than WACs in "the majority of the cases."  (*Id*. at 167:2-9.)

---

AMP of $52.06); *id.* Exs. 10.10, corrected 10.10A (1/1/99-3/31/99) (estimated AWP of $4.49, AMP of $9.31).

[8]     *See* Devor Rep. Exs. 9.10, 9.12 (4/1/98-6/30/98) (estimated WAC of $82.53, AMP of $136.30); *id.* Exs. 9.13, 9.15 (1/1/98-3/31/98) (estimated WAC of $109.90, AMP of $179.47); *id.* Exs. 9.52 revised, 9.54 revised (4/1/98-6/30/98) (estimated WAC of $17.51, AMP of $41.51); *id.* Exs. 10.03 corrected, 10.04a corrected (10/1/98-12/31/98) (estimated WAC of negative $834.13, AMP of $52.06); *id.* Exs. 9.10, 9.12 (4/1/98-6/30/98) (estimated WAC of $82.53, AMP of $136.30); *id.* Exs. 9.13, 9.15 (1/1/98-3/31/98) (estimated WAC of $109.90, AMP of $179.47); *id.* Exs. 9.52 revised, 9.54 revised (4/1/98-6/30/98) (estimated WAC of $17.51, AMP of $41.51); *id.* Exs. 9.55 revised, 9.57 revised (4/1/98-6/30/98) (estimated WAC of $18.97, AMP of $41.51); *id.* Exs. 10.03 corrected, 10.04A (1/1/99-3/31/99) (estimated WAC of negative $622.48, AMP of $52.06).

[9]     Interestingly, roughly 46% of the time that he calculates an "estimated" WAC, the national pricing compendia contained a published WAC that was lower than the WAC used by CMS in setting the FUL.  (*See* Addanki Aff. at ¶ 14.)

Yet Mr. Devor's calculations are inconsistent with his own expectations and understanding of the relationship between AWP and WAC. Specifically, **60%** of the time that Mr. Devor calculated both an "estimated" AWP and an "estimated" WAC, his WAC was greater than his AWP. And for over 90% of NDCs for which he compiled calculations of both an "estimated" WAC and AWP, his WAC is greater than his AWP for at least one quarter. (Addanki Aff. ¶ 9 & Ex.3; Addanki Rep. Ex. 6.) Thus, despite acknowledging that AWP is expected to be greater than WAC as an industry standard, his "estimated" AWPs are *lower than* his "estimated" WACs a majority of the time.[10]

During his deposition, Mr. Devor declined to explain these results, and refused to acknowledge that they raise serious concerns about the reliability of his methodology. (*See, e.g.*, Dec. Devor Dep. at 480:3-20; *id.* at 485:15-486:5.) In fact, Mr. Devor testified that he chose not to investigate the percentage of his calculations that resulted in WACs larger than AWPs, because -- in his words -- he could not conceive of a reason "why [he] would do that." (*Id.* at 633:2-16; *id.* at 485:15-486:5). Eventually Mr. Devor conceded that if a sufficient percentage of his calculated WACs were greater than his calculated AWPs, it would cause him some "concern[]" about his calculations. (*Id.* at 633:10-16.)[11]

---

[10]      *See, e.g.*, Devor Rep. Exs. 16.79, 16.80 (4/1/03-6/30/03) (estimated WAC of $141,215.12, estimated AWP of negative $1,080.17); *id.* Exs. 10.05 corrected, 10.06 corrected (7/1/03-9/30/03) (estimated WAC of $185.38, estimated AWP of $3.26); *id.* Exs. 8.22, 8.23 (7/1/00-9/30/00) (estimated WAC of $914.63, estimated AWP of $119.24); *id.* Exs. 15.04, 15.05 (7/1/00-9/30/00) (estimated WAC of $828.10, estimated AWP of $56.23); *id.* Exs. 8.13, 8.14 (7/1/00-9/30/00) (estimated WAC of $78.44, estimated AWP of $9.06); *id.* Exs. 5.01, 5.02 (7/1/99-9/30/99) (estimated WAC of $207.27, estimated AWP of $83.33).

[11]      The "estimated" AWP calculations are also irrelevant because CMS never calculated FULs based on AWPs. (*See* Gaston Dep. at 457:20-459:7 ("What role if any did AWP play in setting FULs? A: Generally, it did not. Q: Can you think of any instance in which CMS based a FUL on the published AWP price? A: I can't think of situation where they did.") (attached as Exhibit 7.) Interestingly, Plaintiffs put forth no argument that Defendants' reported AWPs had any effect on CMS-established FULs.

### 3.   Mr. Devor Consistently Calculated *Negative* "Estimated" WACs And AWPs.

Although Mr. Devor admits that "it doesn't make sense to have a negative WAC," *id.* at 139:22-140:1, let alone a negative AWP, that is precisely what he calculated for many NDCs.  For example, Mr. Devor's "estimated" WAC for Ivax's Enalapril Maleate was *negative* $24,014.73.  (*See* Devor Rep. Ex. 8.19 revised (1/1/03-3/31/03).)  Similarly, Mr. Devor's "estimated" WAC for Watson's Lorazepam was as low as *negative* $474,672.23.  (*See id.* Ex. 16.58 corrected (7/1/03-9/30/03).)  And these are not isolated incidents.[12]  For some NDCs, Mr. Devor's "estimated" WACs were consistently negative; in other words, Mr. Devor calculated negative "estimated" WACs for several consecutive quarters.  (*See, e.g.*, Devor Rep. Ex. corrected 10.01 (10/1/97-9/30/00) (negative WAC for twelve straight quarters); *id.* Ex. corrected 15.01 (7/1/01-6/30/04) (negative WAC for nine out of twelve consecutive quarters, including one stretch of five straight and another of three straight); *id.* Ex. 9.16 (7/1/03-6/30/04) (negative WAC for four straight quarters).)  In fact, in over 10% of the instances in which Mr. Devor calculated an "estimated" AWP or WAC, at least one of the two was negative.  (*See* Addanki Aff. at ¶ 11 & Ex. 6; Addanki Rep. Ex. 9.)  And for over 40% of the NDCs for which he computed either an "estimated" AWP or WAC, at least one of those "estimated" figures was negative for at least one quarter.  (Addanki Aff. at ¶ 11 & Ex. 6)

Mr. Devor was undeterred by these (surely unexpected) results.  (*See* Dec. Devor Dep. at 876:16-877:10; *id.* at 876:11-16 ("Q:  Deriving negative WACs of a thousand

---

[12]     *See, e.g.*, Devor Rep. Ex. 16.16 (7/1/03-9/30/03) (estimated WAC of negative $117,885.71); *id.* Ex. 16.17 (7/1/02-9/30/02) (estimated AWP of negative $4,082.99); *id.* Ex. 8.19 (10/1/02-12/31/02) (estimated WAC of negative $1,020.97); *id.* Ex. 5.05 (4/1/05-6/30/05) (estimated AWP of negative $2,504.74); *id.* Ex. 5.04 (7/1/04-9/30/04) (estimated WAC of negative $1,541.21); *id.* Ex. 13.07 (1/1/03-3/31/03) (estimated WAC of negative $12,020.28); *id.* Ex. 15.29 (1/1/01-3/31/01) (estimated AWP of negative $2,628.83); *id.* Ex. 16.13 corrected (10/1/99-12/31/99) (estimated WAC of negative $1,879.69); *id.* Ex. 16.16 (10/1/03-12/31/03) (estimated WAC of negative $88,099.96); *id.* Ex. 16.58 (10/1/03-12/31/03) (estimated WAC of negative $263,515.05).

dollars, $24,000, and as you see your next estimated WAC is almost $3500 negative, those numbers don't generate any question in your mind about the reliability of your methodology? A: Not at all."); *see also* Deposition of Harris Devor, Mar. 11, 2009 ("Mar. Devor Dep.") at 1064:6-21, 1069:3-12 (attached as Exhibit 8).)   Rather, Mr. Devor speculated that his "estimated" WACs could be negative if a manufacturer ceased selling a product (*i.e.*, no longer gaining revenue), but was still issuing chargebacks, credits or rebates (*i.e.*, still making payments).  (*See* Dec. Devor Dep. at 139:20-141:16; *id.* at 877:11-16, 877:22-878:12.)   But he never investigated whether his hypothesis was true nor did he explain why, if it were true, it would not undermine the reliability of his methodology, particularly given that it affected approximately 40% of the NDCs for which he calculated an "estimated" AWP or WAC.  (Addanki Aff. Ex. 6.)

### 4.    Mr. Devor Used "Proxies" For Certain WACs And AWPs Rather Than His Calculated Figures.

Rather than re-assess the data or re-evaluate his methodology when faced with consistently negative "estimated" WACs and AWPs,  Mr. Devor instead plucked those negative numbers out of his analysis and inserted a self-described "proxy" as the "appropriate" WAC or AWP.  According to Mr. Devor, this "proxy" was the most recent positive number calculated for that particular NDC, or a "zero" if no positive price had been computed in the two preceding quarters, *see* Dec. Devor Dep. at 139:20-140:4, or when his methodology produced an "outlier."  (Devor Rep. Ex. 14.01 n.(a) corrected; Dec. Devor Dep. at 138:14-142:22.)  Surprisingly, Mr. Devor could not articulate his standard for what qualified as an "outlier": "Q: What was your standard for determining when something was an outlier and that you would use a proxy?  A: ... I don't even remember having any so it is hard for me to say my standard, but if you point me to one I would be glad to comment on it as to why it got taken out."  (*Id.* at 143:1-8.)

# ARGUMENT

The Supreme Court and Rule 702 of the Federal Rules of Evidence dictate that district courts are to perform a "gatekeeping" role concerning the admission of expert or scientific testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); Fed. R. Evid. 702; *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). As "gatekeeper," the Court's "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999); *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir. 2002) (Rule 702 "assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical or other specialized knowledge both rests on a reliable foundation and is relevant to the task at hand.") (citations omitted).

Mr. Devor's report, calculations and testimony do not satisfy Rule 702. In order to establish FUL-based causation, Plaintiffs must demonstrate that *something that Defendants did* caused CMS to set inflated FULs. Mr. Devor's calculations do no such thing. Indeed, he expressly disavows any opinion on whether CMS would have even considered his "estimated WACs and AWPs" in setting FULs. The irrelevance of Mr. Devor's analysis is further amplified by his explicit testimony that he is not even suggesting that Defendants should have used it. (Dec. Devor Dep. at 55:5-8, 12-16.) And his analysis is also rife with inconsistencies and nonsensical leaps in logic, rendering it wholly unreliable. For these reasons, Defendants respectfully submit that Mr. Devor's report, calculations and all "expert" opinions related to causation that are based on his "estimated" WACs," "estimated AWPs" and "estimated FULs" should be excluded in their entirety.

I.    **MR. DEVOR'S CALCULATED "WACs," "AWPs" AND "FULs" ARE IRRELEVANT BECAUSE THEY DO NOT ESTABLISH A THEORY OF CAUSATION WITH RESPECT TO FUL DRUGS, OR THAT DEFENDANTS' PUBLISHED PRICES WERE "FALSE."**

Mr. Devor's expert testimony, report and calculations must be excluded because they are not "sufficiently tied to the facts of the case." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985); *see also Daubert*, 509 U.S. at 591 (requirement that testimony "assist the trier of fact to understand the evidence or to determine a fact in issue . . . goes primarily to relevance") (citation and quotations omitted).   Expert evidence must have a "valid . . . connection to the disputed facts in the case" and "logically advance [] a material aspect of the proposing party's case." *Allison*, 184 F.3d at 1312 (quotations omitted); *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).   By contrast, a "disconnect between [an expert's] work and [a Plaintiff's] theory of liability weighs heavily against the admission of [an expert's] testimony under *Daubert* because it undermines the existence of a legal nexus between the injury and *the defendants' wrongful conduct* and thus does not properly fit [a Plaintiff's] case." *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 (8th Cir. 2003) (emphasis in original) (quotations and citations omitted).   In such circumstances, courts should exclude expert evidence where the "only connection between the [expert's] conclusion[s] and the existing data [was] the expert's own assertions." *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) (citation omitted); *see also In re Acceptance Ins. Cos., Inc., Sec. Litig.*, 352 F. Supp. 2d at 948 ("Devor does not explain how he reached his ultimate opinions nor does he describe the analytical processes he went through to reach his opinions.").

The whole premise underlying Plaintiffs' causation theory regarding FUL drugs, and the whole reason this Court ordered expedited fact and expert discovery and briefing on the issue, is to ascertain how Defendants' conduct *caused Plaintiffs' injury*; that is, how the AWPs and/or WACs reported by Defendants resulted in inflated FULs.

14

Part and parcel of this analysis, of course, is some showing that but for what Defendants did, CMS would have acted differently.  But, as catalogued above, the numbers generated by Mr. Devor's analysis do no such thing.  Instead they are internally inconsistent and contravene standard industry norms and practice (*viz.*, producing negative WACs and AWPs, WACs and AWPs lower than AMPs) such that it is literally nonsensical to suppose that CMS would have ever relied upon his methodology or its results.

And Mr. Devor essentially admits as much.  He has acknowledged repeatedly that he has no opinion on the question of whether or not his "estimated" WACs and AWPs would have had any effect whatsoever on what the actual FULs would have been, or whether CMS would have even used his calculations had they been available to the agency.  (*See* Dec. Devor Dep. at 57:1-58:7; *id*. at 469:5-470:20.)  Mr. Devor has also unequivocally testified that he has no opinion as to how CMS actually determined FULs, *see id*. at 731:11-14; *id*. at 354:10-357:2, or as to how the pharmaceutical industry functions, *see id*. at 591:14-592-1.  Similarly, Mr. Devor's calculations -- according to his own testimony -- do not represent what he thinks Defendants ought to have reported.  (*See id*. at 55:5-8, 12-16.)  In light of these admissions, it is clear that nothing Mr. Devor purports to opine on has any effect on the central question here: Whether plaintiffs can prove that "defendants submitted false or inflated *published* prices which, if truthful, would likely have affected the FUL"?  *In re Pharm. Indus. Avg. Wholesale Price Litig*., 498 F. Supp. 2d 402, 405 (D. Mass. 2007) (emphasis in original).  By failing to study how CMS set FULs, and in closing his eyes to evidence demonstrating that CMS deliberately chose to disregard lower published prices in setting FULs, Mr. Devor's analysis brings nothing to the table and is wholly irrelevant to any theory of causation.

Even assuming *arguendo* that Mr. Devor were attempting to opine on something affecting causation (which he is not), the fact of the matter is that nothing about Mr. Devor's calculations supports any such theory with respect to FUL drugs. For starters, Mr. Devor's calculations are irrelevant because they are not even really "estimates" of anything at all. By calculating up to three separate "estimated" FULs (based on Mr. Devor's "estimated" WACs and AWPs and manufacturers' AMPs) for *each NDC* per quarter, Mr. Devor's figures are anything but estimated FULs, *i.e.*, an "upper limit" for reimbursement for an entire GCN. Relatedly, many of Mr. Devor's "estimated" FULs are actually greater than those set by CMS, and by definition cannot support Plaintiffs' theory of causation (that CMS would have set FULs lower if Defendants had reported different numbers); indeed, they directly repudiate it. Further, he offers no opinion that Defendants' published prices were "false." Nor could he. CMS -- the federal agency that set FULs -- as well as the persons directly responsible for setting FULs had access to AMPs yet CMS deliberately chose to use "published prices" in setting the FULs. Finally, Mr. Devor's method for calculating "estimated" FULs is contrary to CMS's own methodology, in that (unlike Mr. Devor) CMS often does not use the 150%-of-the-lowest-published-price-formula in calculating FULs.[13] In fact, CMS did not use this formula *80% of the time* for these nine GCNs. (*See* Addanki Rep. at 12-16.)[14] Mr. Devor ignores all of that.

---

[13]   Plaintiffs concede this very fact. *See* 5/15/09 Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment [Dkt. No. 6059] at 5 ("Given the policy objectives of the FUL program, FULs are not automatically set once the threshold criteria [150% of the lowest published price where there are at least three suppliers of the drug] are satisfied.").

[14]   *See, e.g.*, Gaston Dep. at 452:18-453:1 ("Q:  Just for the record, why is it that CMS chose not to use the lowest published price in setting the FUL for lorazepam in 2001? A:  Because we wanted to assure that the FUL price was a reasonable price. So we chose to ignore [the] lowest price."); *id.* at 428:10-429:22; *id.* at 451:12-452:4.

In sum, Mr. Devor's analysis flunks *Daubert*'s "special" relevancy test by failing to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (citations and quotations omitted).  Mr. Devor's calculations are not "estimated" FULs at all.  Further, he offers *no opinion* on *any* conduct of *any* Defendant that establishes FUL-drug causation, and thus fails to demonstrate *any* "valid . . . connection to the pertinent inquiry."  *Ruiz-Troche*, 161 F.3d at 81; *Sutera v. Perrier Gr. of Am., Inc.*, 986 F. Supp. 655, 661 (D. Mass. 1997).  Mr. Devor's report, testimony and calculations are irrelevant and should be excluded in their entirety.

## II.  MR. DEVOR'S "ESTIMATED" FULS ARE INHERENTLY UNRELIABLE.

Even assuming *arguendo* that Mr. Devor's calculations were somehow relevant (which they are not), they must still be excluded for failing to meet the minimum standards for reliability under Rule 702.  *See Sutera*, 986 F. Supp. at 667 (excluding expert evidence where Plaintiff "produced no reliable [expert] evidence that plaintiff's [injury] was more likely than not caused by [Defendants' conduct.]"); *Ruiz-Troche*, 161 F.3d at 81.  District courts must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152; *SMS Systems Maintenance Servs., Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 25 (1st Cir. 1999).  For the reasons that follow, Mr. Devor's calculations undeniably fail to meet this standard.

*First*, Mr. Devor's analysis frequently results in "estimated" AWPs and WACs that violate expected relationships between these pricing metrics, and he provides no rationale for why this occurs.  For instance, Mr. Devor fails to explain how or why his "estimated" AWPs or WACs are often *less than* the corresponding AMP for the same NDC in the same quarter.  This seems to insinuate that had Defendants reported the

17

WACs and AWPs he "estimated," CMS would have set FULs at levels *lower than AMPs*. Mr. Devor fails to provide any justification for this absurd proposition. Similarly, and even though he acknowledges the disconnect between many of his "estimated" AWPs and WACs and their real-world relationship, *see* Dec. Devor Dep. at 161:11-13, Mr. Devor does nothing to explain this phenomenon other than posit a *post hoc* hypothetical situation that he can neither affirm nor deny occurred with respect to any of his calculations for any of the nine GCNs (which, in any event, would further undermine the reliability of his methodology). Nor does he articulate what CMS would have done with AWPs that are (often many times) lower than the WAC for the same NDC. This is not the stuff of reliable expert opinion. *See SMS Systems*, 188 F.3d at 25 ("[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession.").

*Second*, Mr. Devor's calculations produce a number of *negative* "estimated" AWPs and WACs. These results are, as Mr. Devor concedes, nonsensical. But yet again, he does not (and cannot) explain how his methodology could produce such results and still be reliable. And these sorts of results were not rare; to the contrary, in over 10% of the instances in which Mr. Devor calculated an "estimated" AWP or WAC, at least one of the two was negative, and over 40% of the NDCs for which he compiled calculations either an "estimated" AWP or WAC was negative for at least one quarter. (Addanki Aff. at ¶ 11; Addanki Rep. Ex. 9.) These data are even more worthy of exclusion when coupled with Mr. Devor's "remedy" for his (concededly) illogical results. When faced with a negative "estimated" WAC or AWP, or a self-described "outlier," he created a "proxy" out of whole cloth and used that instead, even though he could neither identify nor explain his standard for doing so, rendering his calculations, and any

18

opinions related thereto, inherently unreliable.  *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2003).

And *third*, Mr. Devor's calculations do not even purport to replicate CMS's actual methodology for calculating FULs.  In fact, in calculating his "estimated" FULs based on 150% of his "estimated" AWPs and WACs, Mr. Devor completely ignored that out of the thirty-one FULs that were set by CMS for these nine GCNs from 1997 through 2005, CMS set the FUL at prices that did not equal 150% of the lowest published price *over 80% of the time*.  While he admits that he knew that CMS did not always use the lowest published price, *see* Dec. Devor Dep. at 62:8-15, Mr. Devor did nothing to adjust his calculations to achieve consistency with CMS's real-world FUL-setting methodology. In fact, he paid no attention to CMS's interpretation of the FUL regulations at all, or to how CMS actually established FULs.  This alone and by definition renders his opinions and analysis unreliable.  *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) ("[A] district court may properly consider whether the expert's methodology has been contrived to reach a particular result."); *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 309-10 (D. Me. 2005) (rejecting similar "*ipse dixit* expert testimony [that] the *Daubert* trilogy intended to eliminate").

## CONCLUSION

At bottom, Mr. Devor should not be allowed to present to this Court a methodology (created out of whole cloth) that is unsound in form and function, that produces absurd results with an alarming frequency, and that is completely inconsistent with the way the agency he is allegedly trying to simulate undertakes to formulate its methodologies.  This is especially so when he neither can nor will explain all of his the problems evident in analysis, or how or what CMS would have done with the same "estimated" numbers (if anything at all).  For these reasons, all of the so-

called expert opinions and testimony of Mr. Devor regarding Plaintiffs' causation theory with respect to FUL drugs should be excluded in their entirety and not relied upon for any purpose.

DATED: June 15, 2009

/s/ *Jennifer G. Levy*
Jennifer G. Levy
Patrick M. Bryan
John K. Crisham
**KIRKLAND & ELLIS LLP**
655 Fifteenth Street, NW
Washington, D.C. 20005
(Tel) 202-879-5000
(Fax) 202-879-5200

Robert J. Muldoon, Jr., BBO# 359480
Courtney A. Clark, BBO# 651381
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA 02110
(Tel) 617-646-2000
(Fax) 617-646-2222

Attorneys for Defendants
Teva Pharmaceuticals USA, Inc.,
Ivax Corporation and
Ivax Pharmaceuticals, Inc.

*On behalf of all Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2009, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Court in MDL 1456.


/s/ *John K. Crisham*
John K. Crisham