# EXHIBIT 1

Page 1

 1                   IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

      In Re:                            )
 4    PHARMACEUTICAL INDUSTRY           ) CA No. 01-12257-PBS
      AVERAGE WHOLESALE PRICE           ) MDL No. 1456
 5    LITIGATION                        ) Pages 1 - 53

 6

 7

 8                          MOTION HEARING
 9              BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE

10

11

12

13

                             United States District Court
14                           1 Courthouse Way, Courtroom 19
                             Boston, Massachusetts
15                           July 26, 2007, 2:05 p.m.

16

17

18

19

20

21

22

                          LEE A. MARZILLI
23                     OFFICIAL COURT REPORTER
                    United States District Court
24                  1 Courthouse Way, Room 3205
                       Boston, MA  02210
25                        (617)345-6787

 1   sufficient data to demonstrate on a good-faith basis how the

 2   failures to report accurate provider acquisition costs led to

 3   these FULs, led to the issuance of these FULs.

 4           THE COURT:  But doesn't it make sense to brief

 5   summary judgment early on with respect to with some expert

 6   guidance and a record with your case?  This was really

 7   helpful in BMS.  We had drugs at both ends of the spectrum.

 8           MR. BUEKER:  Trust me, your Honor, I don't disagree

 9   at all with the idea of narrowing and doing discovery on a

10   smaller number of drugs here.  I think it would be

11   informative.  But I'm not sure we should even have to get

12   that far.  I think this is a --

13           THE COURT:  I'm not doing that for you on a motion

14   to dismiss.  But I am willing to because -- I've been looking

15   for, and I think I'm not really looking anymore to do this

16   because every time I give you the opportunity, you expand

17   it.  So I think what I would like to do is come up with a

18   schedule where each side takes -- how many defendants are

19   there again?

20           MS. CICALA:  There are 38 defendant groups, but

21   only a certain number of them manufacture drugs that were

22   ever subject to FULs, your Honor, so we could pick isolated

23   multi-source drugs, innovator or noninnovator, multi-sources

24   that were a subject --

25           THE COURT:  And maybe you pick five and you pick

Page 30

1    five, and we brief it before we do discovery on any other

2    FULs, and just get to what I think might be some fair way of

3    thinking about this issue for purposes of discovery, because

4    normally I would say, "Go ahead, do discovery."  Like, I have

5    a Neurontin case; just Neurontin, do Neurontin.  Or just some

6    other drug, do that drug.  You can't possibly expect to do

7    discovery on these 1,400 drugs on both sides, and then have

8    me then say, "Oops, I actually don't agree with the

9    methodology."  It would be a waste of money.

10            MS. CICALA:  Yes.  No, I agree, I agree.  And we

11   have no problem with this approach at all, your Honor.  The

12   methodology is -- because I think it will do a number of

13   things.  First of all, essential -- let me make one point

14   first -- essential to our ability to meaningfully present

15   this to your Honor is to obtain the transaction data that

16   would be necessary to calculate an ASP on these drugs from

17   the defendants.  That's not something that we have now.  But

18   assuming we can -- let's say we come up with a list of

19   innovator and noninnovator multi-sources that were ever

20   subject to a FUL, we come up with a list of 10, or whatever

21   number your Honor wants to propose, we need the transaction

22   data for those so that we can calculate a true ASP based on

23   defendants' own data.  Or we can use the wholesaler data.  We

24   don't have any problem using the wholesaler data, given that

25   the overwhelming majority of the wholesaler prices were

 1   prices that defendants negotiated with the providers.  But

 2   we'd need the ASP data --

 3            THE COURT:  So let's say ten of them.  You're doing

 4   ongoing discovery now anyway, right?

 5            MS. CICALA:  Yes.

 6            THE COURT:  So on the FULs, let's fast track that

 7   because that's really a big issue for you, right?

 8            MR. BUEKER:  It is, it is a big issue.  I think

 9   it's a question of plausibility of any kind of a theory, and

10   I'm not --

11            THE COURT:  It's plausible.  It may not win,

12   though.  You know, it's plausible.  You're in the AWP mode,

13   and you're right that there's no -- I don't think you're

14   competing with each other based on the FUL.  That was an

15   issue as well with the median price.  But if they're not

16   truthful prices, they're not truthful prices, so --

17            MR. TRETTER:  It does lead to an issue of motive in

18   a fraud case.  But may I make one point that's a legal point

19   on the FULs?

20            THE COURT:  I'm not saying it's irrelevant, but it

21   isn't dispositive.

22            MR. TRETTER:  The FUL, the Federal Upper Limit, is

23   not a reimbursement rate.  That's the most important thing

24   you get out of the government's brief.  All it is is a

25   ceiling under which, if the states pay more than that, the