# EXHIBIT 4

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE          )  Civil Action

LITIGATION                       )  01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:        )  Judge Patti B.

THE CONSOLIDATED NEW YORK        )  Saris

COUNTY ACTIONS                   )  (Case Pending

--------------------------------X   in D. Mass.)


December 9, 2008

9:18 a.m.


Videotaped deposition of HARRIS L.

DEVOR, taken by Defendants, at the offices of

Ropes & Gray LLP, 1251 Avenue of the Americas,

New York, New York,, before Brandon Rainoff, a

Federal Certified Realtime Reporter and Notary

Public of the State of New York.

55

1          The purpose of this analysis was to

2 take the manufacturer's own data and, in a

3 relatively easy manner, take that data and

4 compute an estimated AWP and WAC.  I did that.

5 Nowhere in my report do I say that's the number

6 that should have been reported by the defendants,

7 and that's the only number that should have been

8 reported by the defendants.

9          It's just one way -- I mean, the

10 defendants, unlike me, would have at their hands

11 a lot more information to perhaps compute it in a

12 different manner or even an easier manner.  So

13 I'm not suggesting that my way was the required

14 way that anybody had to do it.  I'm just

15 suggesting that that's the way I used to estimate

16 it using the defendants' own data.

17     Q.   And there are other ways that could

18 have been used to estimate AWP or WACs in your

19 opinion that would have been equally acceptable?

20          MS. CICALA:  Object to form.

21     A.   There could have been, I mean, for

22 instance, we took a 12-month average.  You know,

57

1      Q.    Is it your opinion that had the

2  manufacturers reported the lower AWPs and WACs

3  that you calculated, that CMS would have used

4  those lower AWPs and WACs to set FULs?

5           MS. CICALA:  Objection to form, beyond

6  the scope.

7      **A.    That's not my opinion.  I have no**

8  **opinions on it.  It would seem to me to be a**

9  **factual thing that you don't need me to opine on.**

10 **CMS could opine on what they do with the AWPs and**

11 **WACs once they report it.  That's beyond the**

12 **scope of what I was asked to do and not really**

13 **relevant to what I was asked to do.**

14     Q.    Well, embedded in the way you derive

15 FULs by multiplying the AWPs and WACs by 150

16 percent to get the FULs is the assumption that

17 those AWPs and WACs would have been used to set

18 the FUL, right?

19           MS. CICALA:  Objection to form.

20     **A.    It is not necessarily -- I mean, what**

21 **my report sets forth by doing that, 150 percent**

22 **times the AWP and WACs is computing a FUL**

1 **independent of CMS as -- using CMS's methodology**

2 **as I understood it based on WACs and AWPs.**

3 **That's all it is.  Not opining that CMS would**

4 **have used that or not.  I mean, I presume that**

5 **they wouldn't have ignored that data, you know,**

6 **the AWPs and WACs that were reported, but CMS can**

7 **speak to that.**

8      Q.   You have no opinion on what CMS would

9 have done with AWPs or WACs that you calculate?

10      **A.   My understanding is that CMS did in**

11 **fact review the reported pricing which included**

12 **AWPs and WACs in order to compute what a FUL was.**

13 **That's my understanding of the record.**

14      Q.   Is it your understanding that CMS

15 always used the lowest published AWP or WAC?

16      **A.   I know that's what the regulation**

17 **itself says but I am not a hundred percent sure**

18 **that they did that in all circumstances.**

19      Q.   One of the other calculations you do in

20 your Rule 26 statement to multiply the AMPs, AMPs

21 that manufacturers report by 150 percent,

22 correct?

62

1 court from doing that, from setting a FUL on the

2 basis of 250 percent of the lowest reported AMP

3 in a lawsuit brought by the National Pharmacists

4 Association?

5     **A.   I am not aware of it nor, again, do I**

6 **see any relevance to the analysis that I**

7 **performed in this matter.**

8     Q.   You would agree with me, wouldn't you,

9 that based on the discovery record in this

10 litigation, discovery that you have reviewed,

11 that CMS doesn't always set the FUL on the basis

12 of the lowest published available price, right?

13     **A.   As I believe I said before, that I**

14 **thought there were instances where they did not,**

15 **I think I was aware of that.**

16     Q.   Do you know of the approximately thirty

17 changes that CMS made to the FUL for the nine

18 drugs that are the subject of your Rule 26

19 report, what percentage of the time CMS chose not

20 to use the lowest published price available?

21     **A.   No.**

22     Q.   That's not something that you have

138

1 as to the drugs that are shown on the exhibits to

2 your Rule 26 statement and that's it?

3      **A.   I am not aware of -- well, when you say**

4 **"and that's it," I mean, obviously --**

5      Q.   No other drugs?

6      **A.   No other drugs.   To the best of my**

7 **knowledge, the nine drugs that I have been asked**

8 **to analyze are the ones that I will opine on.**

9      Q.   As reflected in the exhibits to your

10 Rule 26 statement?

11     **A.   I believe so.   I mean, as I recall**

12 **there was an exhibit for every one of the nine**

13 **drugs, so --**

14     Q.   You used a proxy WAC in certain cases,

15 right?

16          MS. CICALA:   Object to form.

17     **A.   Did I use that term, proxy WAC?   Maybe**

18 **I did, I don't remember.**

19     Q.   Look at Exhibit 14.01 if you would.

20     **A.   The exhibits only go to 10 or 11.**

21     Q.   No, I'm sorry, in your -- in Exhibit 3,

22 your Exhibit 14.01.

1     A.   Okay.  14 -- give me it one more time?

2  Sorry.

3     Q.   14.01.

4     A.   I'm with you.

5     Q.   You see down there you use the word

6  "proxy"?

7     A.   Not yet.

8     Q.   In the footnote A you say --

9     A.   Yes, at least in this context it is

10  meant to say a substitute, it's meant -- that's

11  what the word is meant to be.  I don't know if

12  that was your question, but --

13     Q.   When did you decide to use a proxy for

14  a WAC?

15     A.   I think it is described in this

16  footnote A, it says exactly when it was used.  I

17  mean, I would have to read it but I think that's

18  exactly what the purpose of the footnote was, to

19  say when we used it.

20     Q.   So when a WAC was negative you used a

21  proxy?

22     A.   Yes, I mean, it doesn't make sense to

140

1 have a negative WAC if you think about it,

2 although there is an explanation as to why in the

3 computation you would end up with a negative

4 number, I mean, that makes sense.

5      Q.   Why would you end up with a negative

6 WAC?

7      A.   Well, just as a hypothetical example,

8 assume a product had run its course and it was,

9 you know, not being sold or whatever, that

10 product's life was over, because generally

11 rebates, credits, charge-backs, that sort of

12 thing sort of comes after the original sale, it's

13 not -- obviously if the sales have stopped but

14 the credits, rebates and/or charge-backs are

15 continuing for another couple months or quarters,

16 you would only end up with a negative number as

17 opposed to -- so that's why you logically might

18 end up with a negative number.

19           But it doesn't make sense that the WAC

20 would be negative, I mean, it actually would be

21 if you computed it that way, but obviously that's

22 nonsensical to include a WAC that's negative for

141

1 **those reasons.**

2      Q.   Let me just make sure I understand.

3 Your hypothetical which you are positing is a

4 quarter in which the company has stopped largely

5 selling the drug and what's rolling back are just

6 charge-backs and other rebates and stuff so the

7 calculated number turns out negative?

8      **A.   That would be an example.  Or, say**

9 **there is a significant reduction in sales over**

10 **time of a product for whatever reason, maybe not**

11 **stopped, but it's significant, yet -- yet there**

12 **might be significant charge-backs relating to**

13 **periods or rebates or credits that relate to**

14 **periods prior to that which just may be in excess**

15 **of the amount of sales for that period.  So,**

16 **again, that would yield a negative WAC.**

17      Q.   You also, if you look at Exhibit 14.02,

18 use proxies for AWP when you have a negative AWP,

19 when you calculate a negative AWP, correct?

20      **A.   Right, and I see the last line item on**

21 **the page is actually a negative AWP, correct.**

22      Q.   Is there any other case other than when

142

1 you calculate a negative WAC or AWP that you use

2 a proxy?

3        A.   Other than when it is negative?

4        Q.   Yes.

5        A.   Yes, well, the description, at least, I

6 mean, there is a lot of exhibits here, so I would

7 have to go through it, but the description

8 indicates also if there was an outlier.

9             So, for instance, let's assume the AWP

10 was -- or the WAC was two dollars, $1.98, $1.80

11 whatever, and then all of a sudden it was $453.

12 Well, obviously with respect to that data there

13 is something wrong with that and that would

14 distort the whole analysis.

15             So in that case, and I can't recall

16 whether we actually had those cases, we may have,

17 given how much, you know, how many drugs and how

18 many periods we analyzed, there could have been

19 one or two.  With respect to those we would have

20 also used a proxy which I believe in both cases

21 would have been the calculated AWP or WAC just

22 prior to that, I believe.

143

1    Q.    What was your standard for determining

2 when something was an outlier and that you would

3 use a proxy?

4    **A.    I think that was only if it was -- the**

5 **answer -- I don't even remember having any so it**

6 **is hard for me to say my standard, but if you**

7 **point me to one I would be glad to comment on it**

8 **as to why it got taken out.**

9    Q.    Do you know if you have applied a

10 consistent standard across manufacturers when

11 deciding whether to use a proxy?

12   **A.    I would think I did, assuming I even**

13 **did use a proxy for the second part.   Certainly**

14 **with respect to the negative AWPs and WACs that**

15 **we computed we would have been consistent, yes.**

16   Q.    We can put Exhibit 3 to the side for a

17 minute.

18        I want to return to paragraph 15 of

19 your Rule 26 statement.   You state in the first

20 sentence of paragraph 15 your understanding of

21 the term AWP, correct?

22        MS. CICALA:   Object to form.

161

1 between AWP and WAC, any understanding that

2 whereas WAC represents the price paid by

3 wholesalers and distributors to the manufacturer

4 for a particular product, AWP represents the

5 price paid to the wholesaler or distributor by a

6 provider of that product.  Normally AWP would be

7 higher than WAC."

8         Did I read that correctly?

9     **A.   Or equal to.  Yes, you did, but I guess**

10 **or it might be equal to.**

11    Q.   So you would normally expect that AWP

12 would be higher than or equal to WAC?

13    **A.   Normally I would.**

14    Q.   That's your considered opinion?

15         MS. CICALA:  Object to form.

16    Q.   It's more than a knee-jerk reaction,

17 I'll ask the question that way?

18         MS. CICALA:  Object to form.

19    **A.   Right, I said that because you posited**

20 **the question without the report in front of me**

21 **and without thinking it through, so I could only**

22 **give you a knee-jerk reaction.**

167

1  that question other than that.

2      Q.   So would you characterize that as an

3  unexpected result?

4      A.   I wouldn't characterize it as an

5  unexpected result.  Saying it is going to happen

6  more often than not doesn't necessarily mean when

7  it doesn't happen that it is unexpected, it just

8  means that it's not within the majority of the

9  cases.

10     Q.   Did you have an expectation as to how

11 often WAC would be higher than AWP or --

12          MS. CICALA:  Object to form.

13     A.   I had no -- I'm sorry, you may not have

14 been finished with the question.

15     Q.   No, go ahead.

16     A.   I did not, no.

17     Q.   Have you ever looked at wholesaler

18 catalogs, pricing catalogs for drugs?

19     A.   I don't believe I did on this case, but

20 over the last five years or so I may have looked

21 at some in other cases.

22     Q.   Are you aware of any instance in

170

1      Q.    In doing your analysis in this case,

2  did you observe any instance in which the

3  published AWP was less than the published WAC?

4      **A.    I don't recall whether I did or I**

5  **didn't.**

6      Q.    If you had that wouldn't have been

7  consistent with your expectation?

8          MS. CICALA:   Object to form.

9      **A.    Again, it would have been consistent**

10 **with my expectation if my expectation was that**

11 **most of the items you would think the AWPs were**

12 **going to be in excess of the WAC.  But inherent**

13 **in that expectation is that some items may not be**

14 **that way.  So, therefore, it's totally consistent**

15 **with my expectation.**

16     Q.    How would you have expected the AWPs

17 and WACs you calculated to compare with the AMPs

18 that the manufacturers actually reported to CMS?

19          (Question read)

20     **A.    I would, based on my understanding of**

21 **the definition of AMPs, I would have expected the**

22 **AMPs and the WACs to be somewhat close or**

171

1 **similar.**

2    Q.   And relative -- you would have expected

3 then that AWP would have been higher than,

4 generally speaking, AMPs?

5        MS. CICALA:   Objection,

6 mischaracterizes the witness's testimony.

7    **A.   I would have if you carry that forward**

8 **and apply it to the AWPs as opposed to the WACs.**

9 **Since I would believe that the AWPs would be**

10 **greater than the WACs and I would expect the WACs**

11 **and the AMPs to be similar, then I would think**

12 **the AWP would, most cases, be greater than the**

13 **AMPs.**

14    Q.   Did you compare the AWPs you calculated

15 and the AMPs that manufacturers reported as a

16 means of checking your calculated AWPs?

17    **A.   Could you repeat that?**

18        **(Question read)**

19    **A.   Well, overall, I mean, I'm looking at**

20 **the schedules, I mean, there may be exceptions to**

21 **this, but for the most part the AMPs were well,**

22 **well under both the reported WACs and the AWPs.**

343

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE          )  Civil Action

LITIGATION                       )  01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        )  Judge Patti B.

THE CONSOLIDATED NEW YORK        )  Saris

COUNTY ACTIONS                   )  (Case Pending

-------------------------------X   in D. Mass.)


December 10, 2008

9:10 a.m.


Continued videotaped deposition of

HARRIS L. DEVOR, Vol. II, taken by Defendants,

at the offices of Ropes & Gray LLP, 1251 Avenue

of the Americas, New York, New York, before

Brandon Rainoff, a Federal Certified Realtime

Reporter and Notary Public of the State of New

York.

354

1 you just described, it's your understanding that

2 the New York Medicaid reimbursement program,

3 whenever CMS had put out a FUL for a drug, it

4 would use that FUL as the basis for reimbursing

5 pharmacists who had dispensed that drug to

6 Medicaid recipients, correct?

7       A.   The City and the Counties would use

8 this when dispersing, is that part of your

9 question, is that really your question?

10      Q.   Yes, that the -- if there was -- if CMS

11 had put out a FUL and that FUL was in place, when

12 reimbursing providers in New York for dispensing

13 that drug, the FUL would be used to calculate

14 their reimbursement?

15           MS. CICALA:  Object to form.

16      Q.   Is that your understanding?

17           MS. CICALA:  Object to form.

18      A.   Beyond the scope of what I was asked to

19 do.  I merely calculated, based on the

20 manufacturer's data, information that -- an

21 estimate of a WAC that could have been computed

22 from the manufacturer's own data as well as an

355

1 AWP, and computed a new FUL based on those as

2 well as an AMP.

3          I was not engaged, nor part of my

4 analysis -- my analysis did not contain steps to

5 ascertain whether the Counties paid based on the

6 FUL, that was not my -- that was beyond the scope

7 of what I was asked to do.

8     Q.   Well, if it is beyond the scope, why

9 are you discussing how New York used the FUL in

10 your report?

11     A.   Background information, probably.

12     Q.   Okay.  So as background it's your

13 understanding that if there was a FUL in place

14 when the drug -- that drug was dispensed by a

15 provider to a Medicaid recipient, New York would

16 use the published FUL to reimburse, that's your

17 understanding, right?

18     A.   What actually happened -- again, it was

19 beyond the scope.  My understanding was that's

20 what was supposed to happen but it is not -- it

21 did not impact at all what I was asked to do.

22     Q.   So, then, let's take it in your own

356

1 phraseology.

2         What you understood was supposed to

3 happen in New York was that if there was a FUL in

4 place when that drug for which there was a FUL

5 was dispensed to a Medicaid recipient in New

6 York, the reimbursement as you understood it

7 would have -- should have been based on the FUL,

8 right?

9     A.   Again, not part of my analysis to

10 ascertain whether that happened, whatever, but my

11 understanding from reading various things,

12 perhaps the complaint a year and a half ago, as

13 well as whatever I have read about the New York

14 Medicaid system, led me to believe that that was

15 the way the system operated as opposed -- but

16 that, again, did not impact at all what I was

17 asked to do.

18         I mean, it's nice background

19 information to sort of get an understanding of

20 what's going on, but it doesn't impact the fact

21 that I take the data and I calculate a new AWP

22 and I -- and a new WAC.  That has no impact on

357

1 that at all.  Whether it happens, doesn't happen,

2 the calculations are the same.

3     Q.   Okay.  So once you have done your

4 calculations, however the system actually worked

5 in practice doesn't impact anything you did?

6         MS. CICALA:  Object to form.

7     A.   Well, that's pretty broad.

8     Q.   That is very broad.  I'm just trying to

9 figure out the outer boundary of what you are

10 saying?

11     A.   Well, okay.  Let me try to explain it

12 again because I thought I did.  I was asked to

13 take the manufacturer's data, okay, which is not

14 impacted at all, whether the FUL was used, not

15 used, whatever.  I mean, I don't -- unless you

16 can explain to me how that would impact my

17 calculations, I fail to see it.

18         But I was asked to take that and

19 compute based on that data, that real, presumably

20 real data that we received from the

21 manufacturers, an AWP and a WAC, I was also given

22 AMP information.  Based on that I computed a FUL

469

1 that insinuated that the FUL would have been

2 that, period.  And I don't want to go to where --

3 what CMS would have done with it.  They may have

4 chosen not to use it.

5    Q.   Because you just simply don't know what

6 they would have done with it, right?

7         MS. CICALA:  Object to form.

8    A.   I didn't study what CMS would have done

9 with it or not.  I mean, I understand what -- the

10 way FULs are calculated, what CMS would have done

11 in a hypothetical sense, given the fact that Barr

12 in this case would have reported the Devor WACs

13 or the Devor AWPs, I would only be speculating

14 what CMS would do with it.

15    Q.   You would just be speculating, right?

16    A.   Anybody would be speculating what CMS

17 would do with it other than CMS.

18    Q.   So we should turn to CMS to know what

19 they would have done with those numbers?

20         MS. CICALA:  Objection to form and

21 characterization.

22    A.   You know, are you asking me

470

1 strategically how the litigation should go?

2 That's not my call.  I just compute numbers.

3     Q.   I'm just following up on your answer,

4 actually.

5     A.   Yes.

6     Q.   Not asking you strategically how the

7 litigation should go, okay?

8     A.   Is that okay?  Yes.  Is that the

9 question?  That's fine.  That's fine with me.

10     Q.   So to determine what CMS would have

11 calculated as the FUL, we should turn to CMS,

12 right?

13          MS. CICALA:  Objection, beyond the

14 scope.

15     A.   In my humble opinion that would

16 probably be the most appropriate place to go.

17 There may be other people who are more

18 appropriate to go to, but what CMS absolutely

19 would have done is not -- I'm not the person to

20 go to to figure that out.

21     Q.   Now, you also calculated an estimated

22 FUL based on Barr's AMPs for each of the two Barr

480

1 right?

2      A.   That's correct.

3      Q.   Comparing your estimated WACs on 5.01

4 with your estimated AWPs on 5.02, you will agree

5 with me that for many of the quarters your

6 estimated AWP is below your estimated WAC, right?

7      A.   I do see that.  Let me just make sure

8 the line items -- yes.

9      Q.   So, for example, let's look at the

10 fourth quarter of 1999.  Do you see that?

11     A.   I do.

12     Q.   Your estimated WAC for that quarter is

13 $207.22, right?

14     A.   Correct.

15     Q.   Your estimated AWP for the same quarter

16 is $24.09, right?

17     A.   That's correct.

18     Q.   That's a difference of over $180,

19 right?

20     A.   It is.

21     Q.   In that quarter your estimated AWP --

22 strike that.

485

1 to be less than the WACs.

2      Q.   If you had noted it --

3      A.   By the way, we've not only reviewed

4 them but we tested them.

5      Q.   So in doing that review and testing,

6 you don't recall any concern with the results of

7 your calculations, right?

8           MS. CICALA:   Asked and answered

9 multiple times.

10      A.   In reviewing these I cannot recall as I

11 sit here today whether or not I noted or made a

12 mental note or caused me concern a month and a

13 half ago as to whether Barr's AWPs were often

14 less than the estimated WACs.

15      Q.   Sitting here today, does it cause you

16 any concern to note that your estimated AWPs are

17 often less than your estimated WACs for Barr's

18 NDCs?

19      A.   I don't -- it doesn't cause me concern,

20 that wouldn't be the appropriate characterization

21 of how I feel.  I do -- in fact, I feel very

22 satisfied with the amount of testing we did.  We

486

1 actually took Barr's NDCs and went back to the

2 data after we had done this and made sure that

3 our computer tool had picked up the right items

4 to do that and it appeared from our tests that

5 they did.  So I'm not concerned at all.

6      Q.   Having seen that your estimated AWPs

7 are often lower than your estimated WACs for

8 Barr's NDCs, what would be an appropriate way to

9 characterize your feelings sitting here now?

10           MS. CICALA:  Object to form.

11      A.   Hungry.  You know, I don't -- I don't

12 feel any emotion over this, okay?  I'm not an

13 emotional kind of guy so I'm not --

14      Q.   Well, I'm hungry, too --

15      A.   I am an emotional guy but I don't wear

16 it on my sleeve, so -- I mean, I don't know what

17 to say.  I don't feel --

18      Q.   If you don't feel anything you don't

19 feel anything.

20      A.   That's probably true.  I don't.  I

21 mean, I am very satisfied with the testing we

22 did.  I mean, whenever you test something doesn't

591

1 reports or that is reported by third party

2 agencies' publishing, do you know whether that --

3 Watson uses that WAC in its business in any

4 respect?

5        MS. CICALA:  Objection, beyond the

6 scope.  Object to form.

7    A.    The question is, do I know if Watson

8 uses its reported WAC in any way in its business,

9 is that really the question?

10    Q.    Yes.

11    A.    I don't know as I sit here now, I don't

12 know that it is relevant to any of the

13 computations I performed.

14    Q.    Do you intend to offer any opinions

15 about the industry and how it functions, the

16 pharmaceutical industry and how it functions at

17 trial?

18        MS. CICALA:  Objection, the question is

19 vague.

20    A.    I have no intention to offer any

21 opinions regarding the way the industry works

22 other than what I know about the industry and

592

1 other than if asked.

2     Q.   Are those opinions that aren't set

3 forth in your report?

4          MS. CICALA:  Objection, form.

5     A.   The only opinions set forth in my

6 report right now are what the computation -- what

7 an estimated computation of WAC and AWP could be

8 using the defendants' own data in this case.

9 That's the only opinion I have in my report and

10 what the FUL would be if you multiplied it by 150

11 percent, as well as 150 percent of the reported

12 AMPs.

13     Q.   Separate and apart from your opinions

14 as to the estimated WACs and AWPs you calculated

15 for Watson, okay, do you intend to offer any

16 opinions about how Watson operates its business

17 at trial?

18     A.    I would think the testimony that has

19 been given within the discovery process would

20 indicate how Watson performs its calculations and

21 runs its business.  My opinion of how Watson runs

22 its business would not be relevant to anybody.

633

1 wholesaler would pay to the manufacturer.

2     Q.   Have you tried to make a determination

3 of what percentage of your transactions -- your

4 calculations result in AWPs lower than WACs?

5     A.   No, again, I don't know why I would do

6 that.  Again, the purpose of my engagement was

7 merely just to compute what the AWP and WAC could

8 have been estimated to be based on the data made

9 available to us.

10     Q.   Presumably, however, I think even

11 according to your own testimony, at some point if

12 it occurred on a sufficient percentage of

13 computations, it would cause you to be concerned

14 that that wasn't what you expected to see, right?

15     A.   I mean, that's -- hypothetically that's

16 correct.

17     Q.   So what we know as we sit here today is

18 without doubt it has happened on some occasions,

19 but that hasn't led you to go back and review the

20 data to make a determination as to what

21 percentage of occasions these kinds of events

22 have occurred?

643

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )   MDL No. 1456

AVERAGE WHOLESALE PRICE          )   Civil Action

LITIGATION                       )   01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        )   Judge Patti B.

THE CONSOLIDATED NEW YORK        )   Saris

COUNTY ACTIONS                   )   (Case Pending

-------------------------------X    in D. Mass.)


December 11, 2008

9:05 a.m.


Continued videotaped deposition of

HARRIS L. DEVOR, Vol. III, taken by Defendants,

at the offices of Ropes & Gray LLP, 1251 Avenue

of the Americas, New York, New York, before

Brandon Rainoff, a Federal Certified Realtime

Reporter and Notary Public of the State of New

York.

729

1  How is it beyond the scope?

2              MS. CICALA:  Mr. Devor has repeatedly

3  testified this week that he is not opining on

4  Par's practices with respect to publishing WACs

5  and that this is a background section of the

6  report.

7              He has repeatedly testified that his

8  opinions concern the calculations set forth in

9  the exhibits estimating AWP and estimating WAC.

10  His opinions do not concern the statements in the

11  background section.  He will not be offering

12  opinions regarding whether Par reported WAC or

13  not.

14              MR. DUEFFERT:  The same will be true of

15  any other defendant?

16              MS. CICALA:  Absolutely, as Mr. Devor

17  has repeatedly stated.  These are not his

18  opinions, these are background statements of

19  facts.  Mr. Devor's opinions are confined to the

20  calculations set forth in the exhibits.

21  BY MR. DEUFFERT:

22      Q.   If Par didn't provide WACs to the

731

1 conclusions in this case.

2         You know, do I have any opinions about

3 them?  Maybe.  But none of it was relevant to the

4 opinions -- the opinions I have rendered in this

5 case.

6     Q.   So you are --

7     A.   Furthermore, the testimony we just read

8 seems to indicate that Par did set a WAC,

9 presuming that First DataBank picked that up in

10 some manner.

11    Q.   So you are offering no opinions as to

12 how HCFA or CMS actually set any FUL for any of

13 the identified drugs?

14    A.   That is correct.  That is correct.

15    Q.   And you are not offering an opinion

16 that publication or reporting by defendants of

17 the Harris Devor-estimated AWPs or estimated

18 Harris Devor WACs would in fact have caused HCFA

19 or CMS to change the FULs that were published?

20        MS. CICALA:  Objection to form.

21    A.   My understanding is that the WACs and

22 AWPs that were carried by First DataBank were

876

1          MS. CICALA:  Object to form.

2      A.    Can I hear that question back, please?

3            (Question read)

4      A.    Well, my understanding and ability to

5  analyze the data of course would have an impact

6  on my conclusions on the data.  How could it not?

7      Q.    Let's turn to Exhibit 8.19.  Exhibit

8  8.19 is your analysis for another Ivax NDC ending

9  in 9870, see that?

10     A.    Yes.

11     Q.    Looking down in your estimated WAC

12 column, you'll see that you calculate a negative

13 WAC of $1,000 for the period ending 12/31/2002,

14 do you see that?

15     A.    I do see that.

16     Q.    What is the next estimated Harris Devor

17 WAC, the next quarter?

18          MS. CICALA:  Object to form.

19     A.    I'm sorry, the next -- after the 1020,

20 is that what your question was?

21     Q.    Yes.

22     A.    24,014.73.

877

1       Q.    A negative, correct?

2       A.    Negative, that's correct.

3       Q.    So your estimated WAC for that period

4  was negative $24,000 for a single product?

5             MS. CICALA:   Object to form.

6       A.    The WAC computed by virtue of taking

7  the manufacturing data that we were given

8  computes to be for that quarter negative 24,000,

9  which in itself is exactly why we didn't use it

10 and used a proxy.

11      Q.    Deriving negative WACs of a thousand

12 dollars, $24,000, and as you see your next

13 estimated WAC is almost $3,500 negative, those

14 numbers didn't generate any question in your mind

15 about the reliability of your methodology?

16      A.    Not at all.  I mean, they are easily

17 explained in periods where there could be very

18 few transactions where there are not very many

19 sales but charge-backs and/or rebates or credits.

20 I mean, it is very explainable, there could be a

21 reason for that.

22      Q.    Based on your methodology, you would

878

1 conclude, or your definition of estimated WAC is

2 indeed -- is an average 12-month rolling average

3 net average cost to the wholesaler for this

4 particular product?

5     A.   It is the cost to the wholesaler after

6 considering what he paid for the drug and what he

7 got back for the drug from the manufacturer.

8     Q.   And for that quarter the wholesaler got

9 quite a lot back, is that correct?

10          MS. CICALA:   Object to form.

11    A.   It would appear that way, but, again, I

12 don't have the data in front of me.

13    Q.   Let's turn to Exhibit 8.56.  8.56 is

14 your calculation for another Ivax product NDC

15 ending 8801 metoprolol?

16    A.   I'm not there, sorry.

17          (Pause)

18    A.   Okay.  If I can have the question

19 again.

20    Q.   I just asked is it correct that 8.56 is

21 your calculation of an estimated AWP for Ivax's

22 metoprolol with an NDC ending 98801?