# EXHIBIT 6

**CONFIDENTIAL**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ) | |
| ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | |
| AVERAGE WHOLESALE PRICE ) | MDL NO. 1456 |
| LITIGATION ) | |
| ) | |
| ) | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ) | |
| *The City of New York v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| S.D.N.Y. Case No. 04-CV-06054 ) | |
| *County of Albany v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0425 ) | |
| *County of Allegany v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-0236 ) | |
| *County of Broome v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0456 ) | |
| *County of Cattaraugus v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-0256 ) | |
| *County of Cayuga v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0423 ) | |
| *County of Chautauqua v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-0214 ) | |
| *County of Chemung v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-6744 ) | |
| *County of Chenango v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0354 ) | |
| *County of Columbia v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0867 ) | |
| *County of Cortland v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0881 ) | |
| *County of Dutchess v. Abbott Laboratories,* ) | |

1

| | |
|---|---|
| *Inc., et al.* | ) |
| S.D.N.Y. Case No. 05-CV-6458 | ) |
| *County of Essex v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0878 | ) |
| *County of Fulton v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0519 | ) |
| *County of Genesee v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-00267 | ) |
| *County of Greene v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0474 | ) |
| *County of Herkimer v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-00415 | ) |
| *County of Jefferson v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0715 | ) |
| *County of Lewis v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0839 | ) |
| *County of Madison v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-00714 | ) |
| *County of Monroe v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-6148 | ) |
| *County of Nassau v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| E.D.N.Y. Case No. 04-CV-05126 | ) |
| *County of Niagara v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-06296 | ) |
| *County of Oneida v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0489 | ) |
| *County of Onondaga v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0088 | ) |
| *County of Ontario v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-6373 | ) |
| *County of Orange v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |

S.D.N.Y. Case No. 07-CV-2777 )
*County of Orleans v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6371 )
*County of Putnam v. Abbott Laboratories,* )
*Inc., et al.* )
S.D.N.Y. Case No. 05-CV-04740 )
*County of Rensselaer v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-00422 )
*County of Rockland v. Abbott* )
*Laboratories, Inc., et al.* )
S.D.N.Y. Case No. 03-CV-7055 )
*County of Schuyler v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6387 )
*County of Seneca v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6370 )
*County of St. Lawrence v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0479 )
*County of Saratoga v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0478 )
*County of Steuben v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6223 )
*County of Suffolk v. Abbott Laboratories,* )
*Inc., et al.* )
E.D.N.Y. Case No. 03-CV-12257 )
*County of Tompkins v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0397 )
*County of Ulster v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 06-CV-0123 )
*County of Warren v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0468 )
*County of Washington v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0408 )
*County of Wayne v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-06138 )

| | |
|---|---|
| *County of Westchester v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| S.D.N.Y. Case No. 03-CV-6178 | ) |
| *County of Wyoming v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-6379 | ) |
| *County of Yates v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-06172 | ) |
| | ) |
| | ) |

# Report of Dr. Sumanth Addanki

## March 18, 2009

# I.    Introduction
## A.    Qualifications

1.  I am an economist and a Senior Vice President at NERA Economic Consulting (NERA). I hold a Ph.D. degree in economics from Harvard University and have specialized in the study of industrial organization.  I have published articles on industrial organization economics and have written articles on antitrust issues for the American Bar Association (ABA) and other like institutions.  These institutions have also invited me to lecture and comment on the market impact of various marketing, pricing and intellectual property strategies employed by firms in general as well as specifically in the pharmaceutical industry.  I have testified by invitation before the Federal Trade Commission (FTC) on the analysis of competition in high technology industries.

2.  I have consulted on many antitrust, intellectual property and commercial damages cases involving different industries, including agriculture, airlines, computer hardware and software, electronic components, health care, newspaper, office products, oil and gas, tobacco, and tools and hardware among many others.  In addition, I have consulted extensively in the pharmaceutical industry, analyzing the market impact of various pricing, marketing and intellectual property strategies; assessing the impact of mergers and acquisitions; studying the effect of suppressed or delayed generic competition; and assessing economic damages, among other assignments.  I have previously worked on matters involving allegations of AWP manipulation.

3.  Some of my consulting assignments have led to my being qualified as an expert economist in Federal courts and testifying in those courts as an expert in the economics

of industrial organization.  I have also testified on the appropriate analysis of

pharmaceutical markets in proceedings before the FTC.

4.  My curriculum vitae, which is appended to this report as Exhibit 1, includes a list of all

my publications within the preceding ten years and my testimony as an expert at trial or

in deposition within the preceding four years.

5.  NERA is being compensated at my customary hourly rate of $695 for my services in this

matter.

## B.    Scope of the Engagement

6.  Counsel for the defendants in this matter asked me to:  (1) comment on the economic

implications of the plaintiffs' theory of manipulation of the Federal Upper Limits (FULs)

and (2) review and respond to the report submitted by Mr. Devor in relation to the

allegations in the complaint as they related to reimbursement based on FULs.[1]

## C.    Information Relied Upon

7.  This report is based on my professional training and experience, including my

experience working in other cases involving allegations of Average Wholesale Price

("AWP") and Wholesale Acquisition Cost ("WAC") manipulation.  My staff at NERA

and I have reviewed various materials, including data from pricing compendia, public

documents and court filings.  A list of the materials relied upon in preparing this report is

attached as Exhibit 2.

8.  I reserve the right to supplement or revise my conclusions if additional information is

provided to me or if additional research, reflection or the correction of inadvertent errors

leads me to change my current opinions.

---

[1] Rule 26 Statement of Harris L. Devor, In re:  Pharmaceutical Industry Average Wholesale Price Litigation relating
to The City of New York et al. v. Abbott Laboratories, Inc., et al., September 30, 2008, as amended ("Devor
Statement").  New York Counties v. Abbott Laboratories, Inc., et al., Revised First Amended Consolidated
Complaint, October 5, 2007, and Exhibit B.

### D.    Summary of Conclusions

9.  In essence, the plaintiffs' theory of FUL manipulation—and Mr. Devor's calculations of the impact of such alleged manipulation—can be summarized thus:  had the defendants published lower WACs and AWPs (at the levels calculated and prescribed by Mr. Devor), these would have resulted in lower FULs (equal to 150 percent of the lower prices) and would, ultimately, have resulted in lower amounts being reimbursed to New York pharmacies under the state's Medicaid program.

10. The foregoing theory makes no economic sense for at least the following reasons:  the information available to the agency setting FULs—the Centers for Medicare and Medicaid Services ("CMS") and its predecessors—was not limited to published prices but included, among other things, Average Manufacturer Prices ("AMPs"); the agency did not mechanically choose the lowest published price as the basis for the FUL; rather, in exercising its discretion, the agency generally did *not* select the lowest published price, passing over several existing prices that were lower than the one that it actually selected as the basis for the FUL.  Thus, the hypothesis that the FULs would have been different in the manner suggested by Mr. Devor is pure speculation and is, in fact, contradicted by the available facts.

11. Moreover, while Mr. Devor purports to calculate alternative measures of "WAC" and "AWP," his calculations are neither consistent nor transparent, nor reliable. At their core, being based solely on manufacturers' sales transaction data, his calculations simply reflect alternative (and *ad hoc*) measures of AMP—a quantity that manufacturers have calculated according to CMS's specifications and provided to CMS since 1991.  Thus, his *ad hoc* measure adds no reliable or meaningful information to the data already

readily available to CMS.  Worse, his "methodology" results in calculated "WACs" and "AWPs" that frequently violate relationships generally understood to hold in the industry:  for instance, AWP is generally understood to be greater than WAC, but Mr. Devor's calculated "WAC" is often greater than his calculated "AWP."  In addition to this and several other errors, he modifies his calculated measures in various *ad hoc* ways based on subjective judgment.  For all of these reasons, and quite apart from the deficiencies in the plaintiffs' theory of causation and harm, Mr. Devor's calculations are unhelpful, unreliable and should be set aside.

## II.   The "But For" FULs Calculated by Mr. Devor Are Speculative and Inconsistent with Market Facts

### A. Wide Discretion Was Used in Setting the Actual FULs

12. According to the published regulation, the manner in which FULs are theoretically supposed to be set appears simple enough:  when three or more therapeutically equivalent alternatives are available, the FUL is supposed to be based on the lowest price published for a package size of 100 (or the most common package size) of any of those alternatives, being calculated as 150 percent of that price.[2]  In practice, however, that

---

[2] 42 CFR § 447.332 ("§ 447.332 Upper limits for multiple source drugs. [note omitted] (a) Establishment and issuance of a listing. (1) CMS will establish listings that identify and set upper limits for multiple source drugs that meet the following requirements:  (i) All of the formulations of the drug approved by the Food and Drug Administration (FDA) have been evaluated as therapeutically equivalent in the most current edition of their publication, Approved Drug Products with Therapeutic Equivalence Evaluations (including supplements or in successor publications).  (ii) At least three suppliers list the drug (which has been classified by the FDA as category "A" in its publication, Approved Drug Products with Therapeutic Equivalence Evaluations, including supplements or in successor publications) based on all listings contained in current editions (or updates) of published compendia of cost information for drugs available for sale nationally.  (2) CMS publishes the list of multiple source drugs for which upper limits have been established and any revisions to the list in Medicaid program instructions.  (3) CMS will identify the sources used in compiling these lists.  (b) Specific upper limits. The agency's payments for multiple source drugs identified and listed in accordance with paragraph (a) of this section must not exceed, in the aggregate, payment levels determined by applying for each drug entity a reasonable dispensing fee established by the agency plus an amount established by CMS that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly

simple rule is not followed.  Rather, my analysis of the nine GCNs at issue clearly shows that CMS (and its predecessors) exercised considerable discretion in setting FULs (and, indeed, in deciding whether or not to issue a FUL at all).   In fact, for 25 out of the 31 FULs that were in effect for these GCNs during the period, the simple rule does not produce the FUL that was set.  Thus, the FULs are almost impossible to predict and certainly impossible for a manufacturer to manipulate in any meaningful way.

13. I have examined the FULs and compendia prices for all of the NDCs in the nine GCNs at issue in this matter:  two albuterol GCNs, a cefadroxil, a clonazepam, an enalapril, an isosorbide mononitrate, a lorazepam, a metoprolol and a ranitidine.  The number of NDCs associated with each of these GCNs varied from 37 to 371.  I reviewed the FULs that were in effect at any point during the period from 1997 to 2005 for each of the GCNs.  The GCNs and their corresponding FULs are presented in Exhibit 3.

## B. FULs Are not 150 Percent of the Lowest Published Price

14. In Exhibit 3, I first attempt to apply the simple rule described above, to evaluate the extent to which a knowledgeable observer, familiar with the rule and with the prices available in the compendia, could have predicted *ex ante* the FULs that would be issued. The exercise involved was as follows: identify all of the NDCs in each GCN that were A-rated equivalents for the package size specified by CMS in its transmittals; for each FUL, further limit this set to those NDCs that were available (i.e., not declared to be obsolete/inactive/discontinued/terminated in the compendia) during the month identified

---

available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size.”).

by CMS in its letters of transmittal;[3] for each NDC that survived this filter, identify from the major compendia—First DataBank ("FDB"), Red Book and Medispan—all of its published prices (AWPs, WACs, and Direct Prices ("DPs")) that were in effect at the time and multiply them by 150 percent; finally, evaluate whether the FUL that was actually set, in fact, matched the lowest of these calculated numbers across the NDCs in the GCN.

15. As Exhibit 3 makes abundantly clear, overwhelmingly, the FULs were **not set** based on any such simple rule:  the FUL does not equal 150 percent of the lowest valid published price among the A-rated alternatives of the right package size.  For 23 out of 31 of the FULs in effect for the nine GCNs, there were lower published prices upon which the FUL could have been set that were ignored.[4]

16. Moreover, for all but two of the FULs at issue here, during the period in which the FUL was in effect, at least one price was published that was lower than the price upon which the FUL was based but that did not result in a lower FUL.[5]  Thus, for all nine GCNs,

---

[3] There are 9 FULs for which the CMS transmittals do not provide the month during which the prices used to set the FUL were current.  For these FULs, we searched for matching prices that were in effect on any day up to 11 months prior to the effective date of the FUL.  (For the transmittals that did provide the "current month", the longest gap between the current month and the effective date was about 11 months.)  The search for lower prices, however, was limited to those that were continuously in effect for the 3-month period prior to the effective date of the FUL.

[4] Of the 8 FULs for which a lower price could not be found, six are those for which the simple rule appears to predict the FUL.  The other two are FULs which do not appear to have been set following the simple rule, but nonetheless result in FULs so low that no published price would have made them lower.  One is a cefadroxil FUL for January 1, 1997 to August 31, 1998, whose matching price is out of date.  The other is a clonazepam FUL for which we never find an apparent price basis (there are four such FULs in total).

[5] One of these FULs, set for cefadroxil in 1997, used a price that was apparently out of date when it appears to have been relied upon.  The other FUL was set for the albuterol inhaler in 2005, long after there was widespread public knowledge about albuterol's pricing.  Studies focused on or including information about albuterol, include:  (1) Department of Health and Human Services, Office of Inspector General, *Suppliers' Acquisition Costs For Albuterol Sulfate* (June 1996), (OEI-03-94-00393); (2) Department of Health and Human Services, Office of Inspector General, *A Comparison of Albuterol Sulfate Prices* (June 1996), (OEI-03-94-00392); (3) Department of Health and Human Services, Office of Inspector General, *Excessive Medicare Payments for Prescription Drugs* (December 1997), (OEI-03-97-00290); (4) Department of Health and Human Services, Office of Inspector General, *Are Medicare Allowances for Albuterol Sulfate Reasonable?* (August 1998), (OEI-03-97-00292); (5)

FULs based on existing published prices could have been lower but were not.  See Exhibit 4.   In fact, for all but six of the 31 FULs, during the period in which the FUL was in effect, there was *always* a published price upon which a lower FUL could have been set.

17. This leads to the next obvious question: what published price was, in fact, chosen as the basis for the FUL? Answering this question could help reveal whether the agency departed from the letter of the regulation in some predictable manner. Unfortunately, because the agency does not indicate, in its transmittals, which NDC's published price was the basis for the FUL being issued, we need to try to match the FUL by hand.

18. Exhibit 5 shows the result of this matching exercise.  As noted above, only six of the 31 FULs can be explained using the simple rule in the regulation.  Finding the basis for the FUL in the other cases can only be done by ignoring the published requirements for a match, such as permitting prices which were not the lowest, or considering products with incorrect therapeutic equivalence ratings, or using prices that were out of date at the time that the FUL appears to have been set.  Through this process, I was able to identify the price on which the FUL was set in all but four cases; however, there is no systematic pattern to the various departures from the published regulation, revealing that substantial discretion was being exercised in the process, on a case-by-case basis.

---

Department of Health and Human Services, Office of Inspector General, *Medicare Reimbursement of Albuterol* (June 2000), (OEI-03-00-00311); (6) Department of Health and Human Services, Office of Inspector General, *Medicare Reimbursement of Prescription Drugs* (January 2001), (OEI-03-00-00310); (7) General Accounting Office, *Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost* (Report to Congressional Committees, September 2001), (GAO-01-1118); (8) Department of Health and Human Services, Office of Inspector General, *Excessive Medicare Reimbursement for Albuterol* (March 2002), (OEI-03-01-00410); and (9) Department of Health and Human Services, Office of Inspector General, *Update: Excessive Medicare Reimbursement For Albuterol* (January 2004), (OEI-03-03-00510).

19. The fact that CMS did not follow any simple rule, or, indeed, any discernible pattern, in setting FULs but, rather, exercised its discretion on a case-by-case basis, almost always ignoring lower published prices, flatly contradicts the hypothesis that lower published prices would have led to lower FULs.

## C. CMS Testimony Confirms the Substantial Exercise of Discretion

20. These empirical results are consistent with testimony from CMS employees, who affirm that there was a significant discretionary element to the CMS process of setting the FULs.[6] Indeed, Ms. Gaston, who was in charge of setting the FUL from April 1991 to

---

[6] See, e.g., Deposition of Sue Gaston, March 19, 2008 ("Gaston Deposition, Vol. 2"), p. 320 ("Q. … In the period from 1991 to, say, 1997, did you have discretion on whether or not to set a federal upper limit on drugs? MS. MARTINEZ: Objection, form. A. Yes."), pp. 428-429 ("Q. So you have a manufacturer, anyway, who's got available product at a lower published price, but it wasn't used for the FUL, correct? A. Correct. Sometimes discretion was used with this too. You might look at that price and if that price still appears to be too low that it would make the product available out there, then you would check to see if there's another manufacturer that might be a step up that's closer, but that could still allow you to set a reasonable FUL price. Q. I see. So sometimes discretion was used to ensure that the FUL was reasonable? A. And available. Q. And available? A. Yeah. Q. And the reason you used that discretion was to make sure that providers -- you didn't set a FUL that was so low that providers couldn't acquire the product on the marketplace, correct? A. Correct. Q. And so you don't know for certain, but it's possible that one of the reasons that the Caraco price wasn't used here was discretion was exercised and it was deemed maybe that this was too low? A. It could be too low or Caraco only distribute to maybe limited amount of states and not all states. That's something else to keep in consideration. Q. Okay. But there was in any event a manual review process and discretion exercised and a choice that CMS made not to use that price, correct? A. Correct."), p. 451 ("Q. So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct? A. Correct."), pp. 464-465 ("Q. I see. So there wasn't a commonly established -- there wasn't a practice or a policy on how to determine the most commonly available package size; that was something that was left to your discretion? A. Correct. Q. Okay. And just so I get the bounds of the discretion, the overall objective obviously was to find the most commonly available package size and utilization tended to be a pretty good measure of that, right? A. Correct. Q. So whether it was looking at some subset of the states or all the states, utilization was generally what CMS looked at? A. In these types of situations, yes. Q. Is that written down anywhere to your knowledge? A. Not that I'm aware of. Q. So it's not in the regulation or a manual or something that, you know, outsiders would know? A. No. We always reference the most commonly used package size. Q. Right. But how that most commonly used package size is determined is something that's less to CMS's discretion? A. Correct. Q. And there aren't to your knowledge written guidelines about how to exercise that discretion? A. Correct."), and p. 499 ("Q. And the manual intervention resulted in CMS making a choice in its discretion, correct? A. Correct."). See also, e.g., Deposition of Gail Sexton, May 20, 2008 ("Sexton Deposition"), pp. 60-61 ("Q. Anything else that you would do before -- any other steps or additional information you would seek before CMS established a FUL? MR. FAUCI: Objection, form. A. There were times when we would call or I would call the manufacturers or the suppliers to determine if a drug was available. If – and some of these drugs were looked at, most of them, on a case-by-case basis because there were times when we would have three or more suppliers but perhaps we were missing a wholesale acquisition cost, for instance."), pp. 66-67 ("Q. Let me just ask generally, what criteria did you use in trying to determine the most commonly available package size? MR. FAUCI:

February 2003,[7] testified about using published prices that did not conform to the letter

of the regulation in the following ways:  not using the lowest published price if the

resulting FUL would be too low to ensure access,[8] not using an NDC if it was not

---

Objection, form. A.  If it was not determined that a drug was available in a package size of 100 or it did not appear that the package size of 100 had ample suppliers, which could have meant it was not the most commonly prescribed package size, I would ask a pharmacist, at that time Christie Cahee was a pharmacist who had previously worked in the division of pharmacy. I believe in the FULs program she had previously worked. Or we would check the Medicaid drug rebate system for utilization amounts of the NDC. They were two pretty reliable ways to determine that we were fairly setting a FUL. Q.  And how did you decide between those two ways which you'd use in a particular case? A.  I think there was really no specific guidelines as far as which one I would use."), and p. 109 ("Q.  So in other words, the criteria were met to establish a FUL, but CMS made a decision not to establish a FUL based on feedback it was receiving from providers and others in the marketplace about whether or not it was available? MR. FAUCI:  Objection, form. A.  Well, I wouldn't -- it was kind of a gray area whether it met the criteria.  I think that was the point, that if a manufacturer or a drug supplier had it in limited supply or it was not available at all, they still marketed the drug but there was not going to be any available for maybe a number of weeks or months.  I think a decision had to be made on whether they could be considered suppliers."). See also the CMS response to an OIG report that attempted to model FULs for drugs without one (Department of Health and Human Services, Office of Inspector General, *Addition of Qualified Drugs to the Medicaid Federal Upper Limit List* (December 2004), (OEI-03-04-00320)).

[7] See, e.g., Deposition of Sue Gaston, January 24, 2008 ("Gaston Deposition, Vol. 1"), p. 40 ("Q.  But your duties and responsibility in this job were the same from April of 1991 through February of '03; is that right?  A.  Correct."), p. 45 ("Q.  I wanted to ask one other thing.  From 1991 to 2003, the previous job, did you work on federal upper limits?  A.  Yes. … Q.  What was the nature of your involvement with the federal upper limit program?  A.  I took care of setting the upper limit reimbursement amount on the drugs."), and Gaston Deposition, Vol. 2, p. 403 ("Q.  But I just want to before we delve into that make sure that we have a common understanding with regard to the chronology here for a second.  As I understand it, from 1991 to 2003 you were one of the individuals at CMS who was responsible for setting the FULs; is that correct?  A.  Correct.").

[8] See, e.g., Gaston Deposition, Vol. 2, pp. 428-429 ("Q.  So you have a manufacturer, anyway, who's got available product at a lower published price, but it wasn't used for the FUL, correct? A.  Correct.  Sometimes discretion was used with this too.  You might look at that price and if that price still appears to be too low that it would make the product available out there, then you would check to see if there's another manufacturer that might be a step up that's closer, but that could still allow you to set a reasonable FUL price. Q.  I see.  So sometimes discretion was used to ensure that the FUL was reasonable? A.  And available. Q.  And available? A.  Yeah. Q.  And the reason you used that discretion was to make sure that providers -- you didn't set a FUL that was so low that providers couldn't acquire the product on the marketplace, correct? A.  Correct. Q.  And so you don't know for certain, but it's possible that one of the reasons that the Caraco price wasn't used here was discretion was exercised and it was deemed maybe that this was too low? A.  It could be too low or Caraco only distribute to maybe limited amount of states and not all states.  That's something else to keep in consideration."), pp. 444-445 ("Q.  Do you know why CMS chose not to set a FUL on the basis of that lower published price? A.  I could give you my opinion. Q.  Sure. A.  That here again what I think they were trying to do was since there's such a difference between the .07 and then the next price of .16370, that we wanted to make sure that the FUL price that's set is a reasonable price and that we'll be assured the availability of the drug. So we went up to the next lowest price. Q.  And when you say reasonable, what do you mean in that context? A.  That we feel that the pharmacies will be able to purchase this drug at the FUL price. Q.  So in other words, you thought it was reasonable to ignore a published price that was maybe too low in CMS's view so that you established a reasonable FUL, correct? A.  Correct."), and pp. 451-453 ("Q.  So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct? A.  Correct. … Q.  Just for the record, why is it that CMS chose not to use the lowest published price in setting the FUL for

available in all the states,[9] using NDCs that were not A-rated or were not listed in the

Orange Book,[10] not using an NDC if the resulting FUL was above the AWP postings,[11]

not setting FULs on injectable, infusion and unit-dose drugs,[12] not using an NDC if a call

---

lorazepam in 2001? A.  Because we wanted to assure that the FUL price was a reasonable price.  So we chose to ignore Major's lowest price.").

[9] See, e.g., Gaston Deposition, Vol. 2, p. 429 ("Q.  And the reason you used that discretion was to make sure that providers -- you didn't set a FUL that was so low that providers couldn't acquire the product on the marketplace, correct? A.  Correct. Q.  And so you don't know for certain, but it's possible that one of the reasons that the Caraco price wasn't used here was discretion was exercised and it was deemed maybe that this was too low? A.  It could be too low or Caraco only distribute to maybe limited amount of states and not all states.  That's something else to keep in consideration.").

[10] See, e.g., Gaston Deposition, Vol. 2, pp. 517-518 ("Q.  I see.  So even though something might not be A-rated in the Orange Book, if that manufacturer or you said repackager or wholesaler is listed in the compendia, that price can be used to set the FUL? A.  Yes. Q.  Ah. A.  Also, these companies may purchase and very likely they purchase these A-rated drugs. … Q.  Okay.  In any event, it's your testimony that the price in which the FUL was based isn't necessarily the price for one of the manufacturers who's actually listed in the Orange Book? A.  Correct.") and p. 525 ("Q.  In your experience, setting a FUL from 1991 to 2003, it's your testimony that the published price for a drug that was B-rated, that published price could still be the basis for the FUL that CMS set? A.  From what I remember, yes.").

[11] See, e.g., Gaston Deposition, Vol. 2, pp. 456-457 ("Q.  And Ms. Bergin's note indicates that in this instance CMS did not set a FUL because the FUL price would have been equal to Major's AWP; is that correct? A.  Correct. Q. Are you familiar with making that kind of a decision not to set a FUL when it was equal to an AWP? A.  Yes. Q. Why would CMS decline to set a FUL when the FUL was equal to an AWP? A.  Because states have other methodologies they can use for reimbursement.  And their regular reimbursement methodology would be a percentage off of AWP.  That would be a reasonable reimbursement rate for other drugs. So the purpose of setting the FUL price is to try to set reasonable reimbursement.  And that would kind of counter what the states were doing with their other reimbursement methodology. … Q.  And so in this case, if I understand what's going on here with cefadroxil in 2001, basing a FUL on the lowest published price seemed to result in a FUL that was too low, right? A.  It appeared that way because of the compendia information that we have. Q.  And setting a FUL -- not using that lowest published price but moving up to the next seemed to result in a FUL that was too high? A.  Correct. Q.  And so CMS declined to set a FUL given the published prices that were out there? A.  Correct."), pp. 494-495 ("Q.  And I think you said 'Remove FUL greater than most AWPs.'  And I think that's "SEG" under that; is that right? A.  That's me, right. Q.  And those are your initials? A.  Yes.  Q.  In other words, you were concluding that the FUL ought to be removed here, right? A.  That's what it appears."), and pp. 497-498 ("Q.  In other words, there were three manufacturers who were reported published prices for the 90-microgram inhaler? A. Correct. Q.  And so in other words the conditions necessary for CMS to establish a FUL were met at this time? MS. MARTINEZ:  Objection, form. A.  The conditions were met, but the pricing condition wasn't met. Q.  What pricing condition was that? A.  It was that if you would take the prices that are remaining and multiply by 150 percent you're going to have a price that's, it looks like, over what the AWPs are.  So you're sort of defeating the purpose of the FUL program.").

[12] See, e.g., Gaston Deposition, Vol. 1, pp. 245-246 ("Q.  … Why are not injectable products included on the FUL? MR. WINGET-HERNANDEZ:  Objection, form. A.  When I started to work on the FULs injectable products were not included.  And it's my understanding that the purpose of the FUL program is to set reimbursement rates on drugs that are generally used by the Medicaid population in an outpatient-type, like a pharmacy-type setting, most commonly used products.  And it's my understanding that injectables and other products many times are provided in a physician's office and other type of settings where they might not be claimed separately. They might be included in a payment, like a physician payment. Also, injectables, many times when they're billed on the claim form they're not -- they're billed with codes rather than NDC numbers, which means that the states may not

14

to the manufacturer indicated the product was temporarily unavailable,[13] not using the most common package size,[14] reviewing state MACs to ensure the FUL was "realistic",[15]

---

be paying for them through their pharmacy benefit but through another means, such as a physician's visit or a hospital or something like that. So many times what we're trying to do with the FULs is use most commonly used drugs and covered outpatient drug type, so like tablets and capsules."), p. 250 ("Q.   Are you aware of any other criteria that HCFA has used to eliminate drugs that might otherwise satisfy the regulatory or statutory criteria? A.   I think unit dose. … Q.   And why are those -- do you understand why those are excluded? A.   Here again, what I think they're trying to focus on is what's the drugs that are commonly used and dispensed by the pharmacies."), and Gaston Deposition, Vol. 2, pp. 326-327 ("Q.   Ms. Gaston, is it your testimony that even though you became aware of the large differences between acquisition costs and AWPs for certain injectable and infusion products, you did not believe you had the authority or discretion to place FULs on those drugs? MS. MARTINEZ: Objection, form. Q.   Is that a fair summary of your testimony? MS. MARTINEZ:  Objection, form. A.   We did not set FUL prices on those types of drugs.  Is it would be a matter of changing the criteria.  And that wouldn't be strictly my place to do that.").

[13] See, e.g., Gaston Deposition, Vol. 2, pp. 426-427 ("Q.   What does the T over in the left-hand column mean?  Do you recall? A.   I think it means it's temporarily unavailable.  It's a code that can be put into the FULs application. Q.   So if you or a colleague of yours calls one of these manufacturers and learns that Geneva Pharmaceuticals is temporarily out of stock of metoprolol, you would put a T in the FULs system? A.   Correct. Q.   And that would be to ensure that the Geneva price didn't get used as the basis for the FUL? A.   Correct. Q.   And why would you do that? A.   Because if the product is in the available you don't want to said a FUL price on a product that is not available. Q.   Why not? A.   Because it might not be a realistic price.  That product could be unavailable for three years but they're still reporting it to the compendia.  So if it's not a realistic price then there's no sense in setting the FUL price based on that. Q.   And by realistic price you mean a price that's high enough that providers could acquire the product in the market place? A.   Correct.").

[14] See, e.g., Gaston Deposition, Vol. 2, pp. 468-469 ("Q.   If you turn to page 4 of Exhibit 3, the third entry up from the bottom, that's the same cefadroxil we've been talking about? A.   Correct. Q.   And that FUL is set on the basis of a package size of 50? A.   Correct. Q.   And so if you lay the two transmittals, the 2004 transmittal and the January 2002 transmittal, next to one another as kind of book- ends -- I'll represent to you I'm not aware of another transmittal between -- throughout this time period the cefadroxil FUL was set on the basis of the 50 package size, correct? A.   Yes. Q.   And turning back to Exhibit 8 it says -- Ms. Bergin wrote '100 looks like the most commonly used package size,' right? A.   Correct. Q.   Presumably as a result of her analysis here? A.   Correct. Q.   You don't know why she reached that conclusion that the FUL was set on the 50 package size? A. Right.  I don't know.").

[15] See, e.g., Gaston Deposition, Vol. 2, pp. 479-481 ("Q.   … How would the state MACs have been used in the analysis? … A.   The FUL prices are set on what we have in the compendia source. … Sometimes the compendia source isn't real easily to be read.  There's sometimes availability problems.  So we set a price and we still want to make sure that we're being realistic with the price, that it's going to be a price that states will be able to use in the FUL program.  So sometimes we would check.  I know Texas had it on their webpage.  I don't know if other states did.  Once in a while we would check to see that we were being reasonable in our analysis using the compendia source. Q.   And how would the state MAC list tell you if you were being reasonable? A.   Because generally, especially Texas, they were pretty up to date with setting their MACs, which helped us because sometimes a compendia source isn't as current.  Because the manufacturers don't submit the pricing it isn't current, the updated pricing.  So it helps us to validate that we are using current prices and that they aren't outdated.  So it was just something that we could do a comparison and see that our prices were a realistic price. Q.   Okay.  And what comparison would you have had to observe between, say, the Texas MAC list and the FUL to conclude that the FUL that CMS was setting was reasonable? A.   You mean -- Q.   How would the two had to have compared for you to -- A.   Well, if Texas was -- even if they were a little lower than us, then we know that they were -- if they were extremely lower than us then we might have to do more research and check the compendia sources to dig a little built deeper to  make sure that we had real prices from them.  Or if they were extremely high we would

adjusting or removing FULs based on feedback from pharmacies,[16] and removing a FUL

if there was a shortage of the drug's raw material.[17]  Similarly, Ms. Sexton, who was in

charge of setting the FUL starting in October 2004,[18] testified about using published

prices that did not conform to the regulation in the following ways:  not using the lowest

published price,[19] setting the FUL based on prices not published in the compendia,[20]

---

do the same thing and say, well, let's check and make sure that we're using realistic prices for establishing the FUL.").

[16] See, e.g., Gaston Deposition, Vol. 2, pp. 435-436 ("Q.  And what kind of feedback would CMS typically receive? A.  It would be comments maybe from the pharmacy saying that the product is not available or that the pricing appears to be either too low or too high.  Mostly availability issues.  Q.  And when you got feedback from some source that a drug wasn't available, what if any steps would CMS take? A.  What we would do is call the manufacturer or wholesaler and verify if that was a fact.  Sometimes it might be just one state that's having an availability problem.  But we have to make sure that it's an availability problem that would affect the FUL list for all the states.  Q.  And what if you learn that, for example, a manufacturer had discontinued a particular drug that had been used to set the FUL?  What would you do then? A.  Then we would reevaluate whether the FUL should be removed or if the FUL price should be adjusted.  Q.  And in the case of a low price that had been removed, the adjustment would have been one that was upward? A.  Well, we would look at the most recent FUL application page for that particular drug and look at the most current pricing that we have and see if a new price should be established.").

[17] See, e.g., Gaston Deposition, Vol. 2, p. 472 ("Q.  So in or about October of 2000 you were removing the FUL -- CMS removed the FUL for the albuterol inhaler? A.  Correct.  Q.  And the reason -- why did CMS remove the FUL from the inhaler at this point? A.  Because it looks like from the note here that we found out that it was temporarily deleted because we found out there was a raw material shortage.  Q.  And why would that cause CMS to want to remove the FUL for the albuterol inhaler? A.  Because if the product is not available then it wouldn't make sense to put a FUL price on it.").

[18] See, e.g., Sexton Deposition, pp. 33-35 ("Q.  Ms. Sexton, how long have you worked for CMS? A.  Since -- the date that I started working at CMS was October 31st, 2004. … Q.  What positions have you held at CMS since October 31, 2004? A.  The same position I'm in now, the health insurance specialist.  I've been in the same position in the same division since I started with CMS.  Q.  Would you describe generally your job responsibilities as they relate to -- as a health insurance specialist at CMS? A.  Well, I've been the lead since I started at CMS or shortly thereafter I became the lead on federal upper limit program for CMS where I would look at drugs that have been classified at multiple-source drugs for whether they met the criteria per the federal statute and regulation for a federal upper limit.  And then increasing, decreasing, adding or taking off the drugs from the federal upper limit list.  I also have had other responsibilities as adjudicating state plan amendments for the states for changes in policy or regulation for the states' Medicaid programs, responding to Office of Inspector General reports.  Basically just developing policy and regulation for Medicaid pharmacy for the Medicaid drug rebate program.  Q.  When you say adjudicating state plans do you mean approving state plan amendments? A.  Reviewing them for approval or disapproval.  Q.  What states have you been primarily responsible for reviewing state plan amendments? A.  Vermont, Texas, Wyoming, New Mexico and Oregon.").

[19] See, e.g., Sexton Deposition, p.128 ("Q.  But at least on Exhibit 13, one pricing sheet CMS -- you in particular -- had before you a lower published price that was not used to set the federal upper limit? … A.  Yes.").

[20] See, e.g., Sexton Deposition, p. 72 ("Q.  And in addition to publications what if any other sources of information did you use in establishing federal upper limits? A.  Any other pricing, sources of pricing? Q.  Yes. A.  Well, if we would call a supplier and obtain pricing information directly from a supplier, if we were trying to verify or obtain pricing, that would be another source, I guess. But as far as the publications, the compendia, these were the

using NDCs that were not rated by Orange Book,[21] not using an NDC if the resulting

FUL was above the AWP postings,[22] not setting FULs on injectable drugs,[23] not using an

NDC if a call to the manufacturer indicated the product was discontinued or temporarily

---

three that I knew of that were used.  I was not aware of any other pricing compendia."), p. 90 ("Q.  And it looks like from Exhibit 9 that one of the things that you did to determine availability in the marketplace was to call IVAX and ask IVAX about its WAC; is that correct?  MR. FAUCI:  Objection, form. A.  I cannot recall, but that would have been -- either that or contacting First Databank, Rojan or someone.  But more than likely I called IVAX.  But it was determined that there was a different WAC for that drug. Q.  Down in the bottom of the page there's a column labeled "contact."  Do you see that? A.  Okay.  Yes.  Then I did contact them. Mm-hmm. Q.  So you contacted IVAX and learned that their -- A.  Correct. Q.  -- WAC price had been increased; is that correct? A.  Correct."), pp. 96-97 ("Q.  Sure.  How would you identify – what criteria would you use to identify situations in which your manual intervention might change the FUL price that was set? A.  Well, for instance, if I saw a price that was -- that looked to be an outlier price, maybe far lower than the other prices, I may call that supplier to determine was the NDC available at that price, so as not to set an unfairly low price on an outlier that was not available.  If I saw -- comparing to the paper compendia, if I saw that there were other suppliers other than what was noted in the system then I would call those suppliers. … A.  Right.  If the paper compendia maybe showed a different amount of suppliers and there was a possibility that you did have three suppliers, just that the system was not showing three suppliers, or in the case of an outlier drug, or in the case where a drug supplier was shown, an NDC was shown, but there was no price at all, you would try to determine the price."), and pp. 117-118 ("Q.  And it looks like you settled on Ethex as the lowest published price? A.  Yes. Q.  But that you got that price not from the pricing compendia; it was not one that was published in the pricing compendia; you got it from some other source? A.  Yes.  By calling the supplier.").

[21] See, e.g., Sexton Deposition, p. 104 ("Q.  Okay.  So let me just make sure – I know I've spent a lot of time on this. Let me make sure I get the point.  So using the Andrx example, because Andrx isn't in the Orange Book that A rating wouldn't have been considered in terms of whether or not the inhaler was eligible for a FUL, correct? A. Correct. MR. FAUCI:  Objection, form.  Q.  But then in terms of whether or not Andrx's published price could set the FUL, because it was A-rated in someplace other than Orange Book, that is a price that you would have used? A.  Correct.").

[22] See, e.g., Sexton Deposition, pp. 58-59 ("A.  …in the case where if the federal upper limit, once it was calculated, was higher than the AWP price or the majority of the AWP prices, then we would generally not set a FUL on those drug ingredients, because the AWP -- well, a couple years ago the average AWP on a national basis was I think AWP minus 12 percent for drug reimbursement, estimated acquisition costs for drug reimbursement for a drug that did not have a federal upper limit. And if a drug did not -- if the FUL was calculated to be higher than an AWP price then generally we did not put a federal upper limit on it because we would be setting a higher limit than what was already established in regulation because EAC reimbursement or estimated acquisition costs were AWP minus a percentage.") and pp. 76-77 ("Q.  Do you recall in your time where you were the program lead on FULs ever establishing a FUL based on a published AWP? MR. FAUCI:  Objection, form.  A.  I don't recall there -- I remember rare occasions when an AWP would be calculated in the system to be the lowest price.  Very rare occasions.  Q.  On those occasions do you ever recall establishing a FUL or was that a situation where the drug wasn't -- a FUL wasn't established for the drug because it wouldn't have resulted in a cost savings? MR. FAUCI: Objection, form.  A.  I would not have not set a FUL based on that if that was the lowest published price.  But I don't recall if that was ever the case where a federal upper limit was set on a drug with the AWP.").

[23] See, e.g., Sexton Deposition, p. 32 ("A.  Generally we do have some inhalation solutions on the federal upper limit list as opposed to injectable solutions which we generally do not look at for a federal upper limit.").

17

unavailable,[24] not using a consistent methodology to determine the most common

package size,[25] and adjusting or removing FULs based on feedback from pharmacies.[26]

### D. Suppliers Had Neither the Ability nor Incentive to Manipulate FULs

21. Given the substantial discretion that was exercised by the agency in setting FULs—so

much so that even *ex post* it is difficult to determine how a particular FUL was set—

there is obviously no systematic relationship between the prices published in the

compendia and the FUL ultimately set.  Therefore, it is impossible for any supplier to

determine the FUL through the prices that it published.

22. Moreover, the FUL is a ceiling price for the reimbursement under Medicaid of *all* of the

drugs in a GCN. As I explained in my testimony in the MDL, when all products are

---

[24] See, e.g., Sexton Deposition, pp. 60-61 ("Q.  Anything else that you would do before -- any other steps or additional information you would seek before CMS established a FUL? MR. FAUCI:  Objection, form. A.  There were times when we would call or I would call the manufacturers or the suppliers to determine if a drug was available."), p. 109 ("Q.  So in other words, the criteria were met to establish a FUL, but CMS made a decision not to establish a FUL based on feedback it was receiving from providers and others in the marketplace about whether or not it was available? MR. FAUCI:  Objection, form. A.  Well, I wouldn't -- it was kind of a gray area whether it met the criteria.  I think that was the point, that if a manufacturer or a drug supplier had it in limited supply or it was not available at all, they still marketed the drug but there was not going to be any available for maybe a number of weeks or months.  I think a decision had to be made on whether they could be considered suppliers."), and p. 117 ("Q.  To make sure I understand this, you would have called Purepac and I guess learned that it had been -- their NDC for this drug had been discontinued? MR. FAUCI:  Objection, form. A.  Correct. That's what it appears.").

[25] See, e.g., Sexton Deposition, pp. 66-67 ("Q.  Let me just ask generally, what criteria did you use in trying to determine the most commonly available package size? MR. FAUCI:  Objection, form. A.  If it was not determined that a drug was available in a package size of 100 or it did not appear that the package size of 100 had ample suppliers, which could have meant it was not the most commonly prescribed package size, I would ask a pharmacist, at that time Christie Cahee was a pharmacist who had previously worked in the  division of pharmacy. I believe in the FULs program she had previously worked.  Or we would check the Medicaid drug rebate system for utilization amounts of the NDC.  They were two pretty reliable ways to determine that we were fairly setting a FUL. Q.  And how did you decide between those two ways which you'd use in a particular case? A.  I think there was really no specific guidelines as far as which one I would use.").

[26] See, e.g., Sexton Deposition, pp. 111-112 ("Q.  And what if anything did you do in reaction to the feedback you were receiving about a market availability? A.  I would look at the availability in the compendia or I may call suppliers or check – you know, verify price availability per the criteria. Q.  And can you think of instances in which you made a decision to change the federal upper limit based on the feedback you were receiving? MR. FAUCI:  Objection, form. A.  I can't remember individual drugs or ingredient, route, strength, dose, product groups.  But yes, changes were made to the federal upper limit based on a pharmacy provider giving us feedback. Not because they gave us feedback, but it would be the impetus for me to further evaluate the drug.").

reimbursed at the same rate, no supplier obtains any competitive advantage from that level of reimbursement being raised. Therefore, whether the FUL is high or low makes no difference to any individual supplier; it gets no competitive advantage vis-à-vis its competitors from the FUL being higher (and no disadvantage, correspondingly, from a lower FUL). Thus, suppliers have no economic incentive to attempt to manipulate the FUL, quite apart from their inability, as a practical matter, to effect such manipulation.

## III.   CMS Possessed Extensive Knowledge Beyond Published Prices
### A. Public Knowledge and CMS Market Intelligence

23. As I have discussed in other settings, including my testimony during the MDL, there has been widespread public knowledge regarding the divergence, in general, between the published prices of generic drugs and their actual transaction prices in the marketplace.[27] In addition, CMS personnel gathered market intelligence in carrying out their duties, including making calls to manufacturers and others.[28]

---

[27] See Exhibit 2 for a partial listing of public documents discussing AWP and WAC and the difference between these and actual transaction prices.

[28] See, e.g., Gaston Deposition, Vol. 2, p. 435, ("Q.   And when you got feedback from some source that a drug wasn't available, what if any steps would CMS take? A.   What we would do is call the manufacturer or wholesaler and verify if that was a fact."), p. 476 ("Q.   Did CMS ever check prices other than prices that are listed in the compendia? A.   … to verify, we would call wholesalers or the manufacturers."), and p. 494 ("Q. Okay.  When you say call, who were you going to call? MR. WINGET-HERNANDEZ:  Objection, form. A.   We call the manufacturer, Warrick, as indicated here, Martec, Glaxo, Schering. Q.   And what was the purpose of calling the manufacturer? A.   To check on availability and to try to verify, if we can, a WAC price.").  Sexton Deposition, p. 62 ("Q.   And who would you call to get WACs typically? A.   The suppliers we would call. Sometimes I would try to contact Rojan from First Databank. Or we would call the suppliers to see if a drug -- an NDC was available, and if it was … at what price or the currently listed price. Q.   And when you say suppliers, do you mean wholesalers? A.   No.  The suppliers that would be listed on the pricing sheets or in the software system.  In Exhibit 4, Dr. Reddy's, Sandoz, IVAX. Q.   So companies selling pharmaceutical products? MR. WINGET-HERNANDEZ:  Objection, form. A.   Correct.  The companies listed under a specific drug."), p. 72 ("Q.   And in addition to publications what if any other sources of information did you use in establishing federal upper limits? A.   Any other pricing, sources of pricing? Q.   Yes. A.   Well, if we would call a supplier and obtain pricing information directly from a supplier, if we were trying to verify or obtain pricing, that would be another source, I guess."), and p. 111 ("Q.   And what if anything did you do in reaction to the feedback you were receiving about a market availability? A.   I would look at the availability in the compendia or I may call suppliers or check – you know, verify price availability per the criteria.").

## B. The AMP

24. In addition to the general knowledge and market intelligence discussed above, CMS and its predecessors—the agencies charged with setting FULs—had, at their disposal, the average prices actually charged by manufacturers for each of the drugs reimbursed under Medicaid: the AMPs.  AMPs have been reported since the inception of the program in 1991, and they are calculated by manufacturers according to CMS's instructions.  CMS reserves the right to audit such calculations, and CMS and the manufacturers engage in periodic discussions regarding the calculation methodology.[29]

25. There is no question, therefore, of the agency being under any misapprehension that published prices like AWP and WAC represent actual transaction prices.  And certainly, it would make little economic sense for the agency to request specific calculations of AMPs if it were under the mistaken impression that the same information could be found in the readily-available published WAC.

## C. The Rejection of AMP as Too Low a Basis for Reimbursement

26. Recent history makes it clear that CMS was aware of the differences between AMP and WAC, i.e., that AMPs, being net of discounts, were substantially lower than WACs, DPs and other published prices.  A rule was considered that would have replaced the current rule, under which the FUL is to be "150 percent of the lowest published price", with one under which the FUL would be set at "250 percent of the lowest AMP."

---

[29] See, e.g., Centers for Medicare and Medicaid Services, "[Sample] REBATE AGREEMENT Between The Secretary of Health and Human Services (hereinafter referred to as 'the Secretary') and The Manufacturer Identified in Section XI of this Agreement (hereinafter referred to as 'the Labeler')" (http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf), p. 7 ("(c) The Secretary may audit Manufacturer calculations of AMP and Best Price.").

27. What is striking, of course, is that 250 percent of the AMP was thought to represent an improvement—a FUL lower than 150 percent of the lowest published price—indicating that there was full understanding that AMPs were much lower than the published prices.[30] For example, if the lowest published price were a WAC of $2, the new rule and old rule would yield the same theoretical FUL if the AMP were $1.20; the new rule would yield a lower FUL only if the AMP were even less than $1.20. Thus, CMS was aware that AMPs were substantially lower than published prices.

28. What is perhaps even more striking in light of the calculations proffered by Mr. Devor is that the proposed rule was rejected because the resulting FULs would be too low. Government studies found that reimbursement of 250 percent of the AMP would be less than the acquisition price paid by pharmacies.[31] The National Association of Chain

---

[30] Even with the price multiplier being raised from 150 percent to 250 percent, the expectation was that Medicaid expenditures would still fall as a result of the change. See, e.g., Department of Health and Human Services, Office of Inspector General, *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program* (June 2007), (OEI-03-06-00400), p. i ("Previous Office of Inspector General (OIG) work consistently found that the published prices that were used to set Medicaid Federal upper limit amounts often greatly exceeded prices available in the marketplace. Based in part on this work, the Deficit Reduction Act of 2005 (DRA) required that, beginning January 1, 2007, Medicaid Federal upper limits be based on 250 percent of the lowest AMP rather than on 150 percent of the lowest price published in the national compendia. The Congressional Budget Office estimates that this will reduce Medicaid expenditures for Federal upper limit drugs by $3.6 billion over 5 years. In response to these changes, industry groups have expressed concerns that pharmacies will not be able to acquire drugs for prices at or below the new Federal upper limit amounts. In an effort to ensure that Medicaid providers are reimbursed appropriately and, in turn, that Medicaid beneficiaries continue to have access to needed drugs, this study provides a preliminary assessment of the expected impact of the DRA reductions.").

[31] Government Accountability Office, *Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs* (December 22, 2006), (GAO-07-239R), p. 4 ("The AMP-based FULs we estimated using AMP data from first quarter 2006 were lower than average retail pharmacy acquisition costs from the same period for 59 of the 77 drugs in our sample. For our entire sample of 77 multiple-source outpatient prescription drugs, we found that these estimated AMP-based FULs were, on average, 36 percent lower than average retail pharmacy acquisition costs for the first quarter of 2006."). Department of Health and Human Services, Office of Inspector General, *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program* (June 2007), (OEI-03-06-00400), p. iii ("Six of twenty-five selected high-expenditure drugs had estimated average pharmacy acquisition costs that would be below the new Federal upper limit amounts. Based on pricing and sales data provided by distributors, we determined that, on average, pharmacies would have been able to purchase only 6 of 25 selected high-expenditure drugs for less than the new Federal upper limit amounts during the second quarter of 2006. For the remaining 19 drugs, the average pharmacy acquisition costs would have been higher than the new Federal upper limit amounts that quarter. We estimate that 12 of these 19 drugs had average pharmacy acquisition costs that would have been more than double

Drug Stores and National Community Pharmacists Association sued the Department of

Health and Human Services ("DHHS") and CMS to block implementation of the "250

percent of AMP" rule.[32]   The pharmacists were concerned over the contemplated

reductions to reimbursement.[33]   An injunction was granted that prevented the

implementation of the new rule.[34]   The pharmacists also wanted Congress to intervene.[35]

Congress passed legislation that blocks CMS from implementing the "250 percent of

AMP" rule.[36]

---

the new reimbursement limit. For 13 of the 25 selected high-expenditure drugs, at least one individual drug
product was available for a price at or below the new Federal upper limit amount.").

[32] See, e.g., National Association of Chain Drug Stores & National Community Pharmacists Association,
"Frequently Asked Questions (FAQs), Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP
Rule, November 7, 2007", November 6, 2007 (http://www.ncpanet.org/pdf/amp_ncpanacds-lawsuitfaq.pdf).

[33] See, e.g., National Association of Chain Drug Stores, "Judge Grants AMP Rule Injunction"
(http://www.nacds.org/wmspage.cfm?parm1=5557) ("The lawsuit challenges CMS-imposed Medicaid pharmacy
reimbursement reductions scheduled to be implemented via rulemaking in January 2008 that would reduce
reimbursement rates below what is permitted by law.") and "Frequently Asked Questions (FAQs), Lawsuit Filed
by NACDS and NCPA Against CMS Challenging AMP Rule, November 7, 2007" ("Why has the lawsuit been
filed? The lawsuit was filed to block implementation of a new federal rule known as the AMP rule. As discussed
below, the AMP rule violates the plain language of the Social Security Act. The AMP rule will drastically cut
reimbursement payments to community pharmacies that serve disadvantaged Americans in the Medicaid program.
The defendants estimated that the AMP rule will reduce Medicaid reimbursement to community pharmacies by
more than $8 billion over five years. Studies by the HHS Office of Inspector General and the Government
Accountability Office found that Medicaid reimbursement rates will be cut well below the prices that retail
pharmacies pay for drugs. [citations omitted] Medicaid reimbursement rates for retail pharmacies were expected
to decline as a result of the Deficit Reduction Act of 2005. However, in their zeal to cut retail pharmacy
reimbursement rates even further, the Defendants have slashed reimbursement well below the rates called for by
Congress. Retail pharmacies will suffer even greater losses then [sic] they would if the defendants had faithfully
implemented the plain meaning of the statute.  Many community pharmacies, particularly independent pharmacies
that that [sic] serve a large number of Medicaid patients, are expected to be forced to reduce hours and services,
forced out of Medicaid, or forced to close their doors altogether. When that happens, many Medicaid patients will
lose access to the community pharmacies they depend on for critical pharmacy care.").

[34] See, e.g., National Association of Chain Drug Stores, "Judge Grants AMP Rule Injunction"
(http://www.nacds.org/wmspage.cfm?parm1=5557)

[35] See, e.g., National Association of Chain Drug Stores & National Community Pharmacists Association,
"Frequently Asked Questions (FAQs), Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP
Rule, November 7, 2007" , November 6, 2007 (http://www.ncpanet.org/pdf/amp_ncpanacds-lawsuitfaq.pdf) ("Is
there still a need for the U.S. Congress to act to address the Medicaid pharmacy reimbursement cuts, and is there
still a need for the states to increase dispensing fees? Absolutely. Our lawsuit argues that the defendants must
comply with existing law. However, the existing law itself is fundamentally flawed and must be replaced.").

[36] Congressional Research Service (CRS), "P.L. 110-275:  The Medicare Improvements for Patients and Providers
Act of 2008" (CRS Report for Congress), July 23, 2008
(http://www.ohanet.org/finance/medicare/HR6331CMSSummary.pdf), p. 29 ("The rule has been contested, and

## IV.   Mr. Devor's Analysis is not Reliable
### A. Overview

29. I have already mentioned the problem inherent in Mr. Devor's approach in that it seeks to substitute various alternative calculations of AMP as replacements for AWP and WAC.  I have also noted that AMP—even at 250 percent—has been rejected as a basis for the FUL.  Unfortunately, the problems with Mr. Devor's calculations go far beyond these conceptual difficulties.  Mr. Devor's approach to determining 'new' FULs ignores many important pieces of information and relevant facts.

30. For example, he apparently makes no use of the available wholesaler data in calculating his AWPs, or even in vetting those calculations.[37]  Moreover, he has analyzed only about 13 percent of the NDCs in the relevant GCNs with published prices during the period at issue.[38]  Second, although he apparently understands that the prices in a distribution

---

CMS is prohibited from implementing its provisions until the court hears the case and makes a final determination of its legality. In the interim, FUL formulas remain calculated by CMS as equal to 150% of the published price for the least costly therapeutic equivalent. The provision will retain, through September 30, 2009, the FUL formulas for federal reimbursement of multiple source drugs as described in federal regulations in effect as of December 21, 2006 (42 CFR 447).").

[37] See, e.g., Deposition of Harris Devor, December 9, 2008 ("Devor Deposition, Vol. 1"), pp. 157-158 ("Q.  Are you aware that plaintiffs' counsel in this case has in the discovery record in this case accumulated the transaction data showing the prices at which the three national wholesalers sold to various provider types, were you aware of that? A.  Am I aware of that information being provided by the wholesalers?  Q.  To plaintiffs' counsel in this case? A.  I'm not aware of it, I'm not sure it's relevant to me but --  Q.  Did you use any of that information in the calculations you did of AWP?  A.  I just said I wasn't even aware that they had it, so --  Q.  So you didn't?  A.  It was not relevant -- I mean, I had enough information from my understanding of the way this works and my experience as well as from the data that was provided us to be able to calculate the AWP.  I did not need to look at wholesaler invoices.").

[38] Mr. Devor analyzed, based on his work files, 187 NDCs, although he has exhibits for only 164.  Based on my analysis of these nine products there were over 1,400 NDCs with active published AWPs, WACs, or DPs between 1997 and 2005.  In addition, the drugs Mr. Devor appears to have analyzed, apparently at the direction of counsel for the plaintiff, include drugs that do not appear on Exhibit B to the complaint, or were included there without a FUL listing.  The NDCs like these for which Mr. Devor provides exhibits include:  00005317223, 00005317231, 00005317234, 00054485325, 00054806321, 00093002901, 00093002910, 00172419810, 00172419860, 00172419864, 00172419870, 00172419880, 00172439018, 00172640544, 00172640549, 00182180701, 00182180705, 00182180710, 00182180789, 00182196710, 00182198801, 00182198810, 00182268789, 00182801024, 00182801026, 00228266111, 00228271111, 00364079401, 00364263298, 00364263301, 00364263305, 00364263306, 00364273401, 00364273402, 00378004701, 00378004710, 00378045701, 00378045705, 00378045710, 00378105401, 00378105405, 00378325201, 00378325205, 00378325291,

chain will necessarily have a certain hierarchical relationship, the "AWPs" and "WACs" that he calculates, upon which he bases his "but for" FULs, frequently violate this relationship. Third, and perhaps most important, Mr. Devor's analysis does not account for, and he apparently cannot explain, the large number of instances in which CMS had published prices available to it from which it could have produced a lower FUL—from these very defendants and for these very NDCs—but which it elected not to use.

## B. Mr. Devor's calculations violate expected relationships

31. Mr. Devor writes in his Rule 26 Statement that "AWP is defined as an average price which a wholesaler (or distributor) would charge a pharmacy (or other provider) for a particular product."[39] Mr. Devor also states that "WAC is defined as the price paid by a wholesaler (or distributor) to a manufacturer for the purchase of a particular product."[40] In calculating his proposed measure of AWP, Mr. Devor says that he will include sales data "relating to both direct (i.e., directly between the manufacturers and the retail classes of trade) and indirect (i.e., between wholesalers or distributors and the retail

---

51079038620, 51079038619, 51079038621, 51079038624, 51079038656, 51079038699, 51079080219, 51079080220, 51079087920, 51079088120, 51079088121, 51079088156, 51079095320, 00536451305, 00555058210, 00591067101, 00641400186, 00641400189, 00781122813, 00781123310, 00781137213, 00781140401, 00781140413, 00781188301, 00781188305, 00781188310, 00781188313, 00781188360, 00781293801, 00781293850, 00781915093, 49502030317, 49502033317, 49502069703, 49502069730, 49502069733, 49502069760, 49884041301, 49884041310, 49884049505, 49884054401, 49884054402, 49884054405, 49884054410, 49884059401, 49884059410, 52544076005, 52544076060, 58177023804, 58177023808, 58177023811, 58177023812, 59930150006, 59930150008, 59930154901, and 59930156001. Devor Deposition, Vol. 1, p. 137 ("Q. There are generic drugs, Warrick drugs for which you have prepared exhibits but for which there is no FUL shown in Exhibit B to plaintiffs' complaint. Do you know why you would have prepared exhibits for those drugs? A. Again, the -- I believe the list of drugs that we were asked to do the analysis on was provided by counsel and I made no effort to reconcile that list to the drugs that might have been included in the complaint, nor did I deem that necessary based on what I was asked to do.").

[39] Devor Statement, ¶ 15. It is well-documented that AWP was not defined in this manner but was widely described as an undiscounted benchmark. See Exhibit 2 for a partial list of public documents touching on the meaning of AWP and demonstrating the difference between AWP and transaction prices.

[40] Devor Statement, ¶ 16.

classes of trade) transactions from the manufacturers' transactional data."[41]   AMP is an average of a manufacturer's sales prices, to be calculated in a manner prescribed by CMS, for submission to, and use by, the Medicaid system.

32. The ordinal relationships between and among these measures are relatively straightforward:  the AWP is expected to be greater than the WAC, and the WAC is expected to be no less than the AMP.  Mr. Devor confirmed his understanding of these relationships, stating in his deposition that he would expect AWP to be greater than WAC in the majority of instances.[42]  Mr. Devor also testified that he would expect AWP to be greater than AMP, and WAC to be similar to AMP.[43]

33. In fact, however, Mr. Devor's calculated "AWPs" and "WACs" frequently violate these expected relationships. In as much as 60 percent of the instances (by NDC-quarter) in which Mr. Devor calculated both an "AWP" and a "WAC," his calculated "WAC" exceeded his "AWP"!  For nearly *all* (about 92 percent) of the NDCs for which he

---

[41] Devor Statement, ¶ 185.  The inclusion of direct sales to pharmacies appears to be in direct conflict with his definition of AWP as a price between distributors and pharmacies—as those sales are priced by the manufacturer and are, hence, "direct" sales.

[42] Devor Deposition, Vol. 1, pp. 165-167 ("Q.  But you don't know in what percentage of the case the calculated WACs turned out to be higher than the calculated AWPs? MS. CICALA: Objection, asked and answered.  A.  I see no benefit that I would have gotten from calculating the percentage of times that that occurred.  Q.  So the answer is no?  A.  The answer is no.  Q.  Are those instances in which the calculated WAC turns out to be higher than the AWP, would you characterize those as unexpected results? MS. CICALA:  Object to form.  A.  I would -- you can characterize them any way you want.  I mean, if you go with the presumption that entering into the exercise you believe that the provider is going to pay more for the good than the wholesaler, then you would expect AWP to be greater.  So when it doesn't happen, it may not -- it's not impossible, but it may in fact occur.  I don't know how to answer that question other than that.  Q.  So would you characterize that as an unexpected result?  A.  I wouldn't characterize it as an unexpected result.  Saying it is going to happen more often than not doesn't necessarily mean when it doesn't happen that it is unexpected, it just means that it's not within the majority of the cases.").

[43] Devor Deposition, Vol. 1, pp. 170-171 ("Q.  How would you have expected the AWPs and WACs you calculated to compare with the AMPs that the manufacturers actually reported to CMS?  (Question read)  A.  I would, based on my understanding of the definition of AMPs, I would have expected the AMPs and the WACs to be somewhat close or similar.  Q.  And relative -- you would have expected then that AWP would have been higher than, generally speaking, AMPs?  MS. CICALA:  Objection, mischaracterizes the witness's testimony.  A.  I would have if you carry that forward and apply it to the AWPs as opposed to the WACs.  Since I would believe that the AWPs would be greater than the WACs and I would expect the WACs and the AMPs to be similar, then I would think the AWP would, most cases, be greater than the AMPs.").

produces exhibits and reports both an "AWP" and a "WAC", he calculates a "WAC" greater than the "AWP" for at least one quarter.  See Exhibit 6.

34. Equally at odds with reality, his calculated "WACs" and "AWPs" are frequently less than his AMPs.  In about a third (about 34 percent) of the instances (by NDC-quarter) in which Mr. Devor reported both his calculated "AWP" and the AMP, the calculated amount for his "AWP" was less than the AMP—which makes no economic sense. Moreover, for about 88 percent of the NDCs in Mr. Devor's exhibits, where the relationship between his calculated "AWP" and the AMP can be observed, his "AWP" is less than the AMP for at least one quarter.  See Exhibit 7.   The results for his calculated "WACs" yield similar results.  See Exhibit 8.

35. Even more troubling, perhaps, Mr. Devor calculates and reports several negative "AWPs" and "WACs".  In about 11 percent of the instances (by NDC-quarter) in which Mr. Devor calculated either an "AWP" or a "WAC", at least one of his calculated amounts was negative.  About 43 percent of the NDCs for which he calculated a "WAC" or "AWP" had at least one quarter in which one of these values was negative.  It is absurd, of course, to suppose that AWPs or WACs could be negative. See Exhibit 9.

36. Mr. Devor then arbitrarily replaces these negative values with what he terms a "proxy" value, which appears to be the last positive figure he calculated.  Even more egregious, Mr. Devor replaces his calculated values with "proxies" when he finds what he calls an "outlier".[44]  In each of the latter cases, where Mr. Devor used a proxy in place of a

---

[44] Devor Deposition, Vol. 1, pp. 141-142 ("Q:  Is there any other case other than when you calculate a negative WAC or AWP that you use a proxy?  A:  Other than when it is negative?  Q:  Yes.  A:  Yes, well, the description, at least, I mean, there is a lot of exhibits here, so I would have to go through it, but the description indicates also if there was an outlier.  So, for instance, let's assume the AWP was -- or the WAC was two dollars, $1.98, $1.80 whatever, and then all of a sudden it was $453.  Well, obviously with respect to that data there is something wrong with that and that would distort the whole analysis.  So in that case, and I can't recall whether we actually

positive number he had calculated, that calculated positive number was large enough to imply a FUL greater than the published FUL.  See Exhibit 10.  Moreover, Mr. Devor did not provide any explanation or rule regarding the method used to determine what constituted an "outlier" and, when questioned about it, was unable to enunciate his standard for deciding what was, and what was not, an "outlier".[45]

## C. Mr. Devor's Analysis is Inconsistent with the Observed Published Prices and FULs

37. Mr. Devor states that the published AWPs and WACs of the defendants "appear to have been exaggerated".[46]  He concludes that FULs would have been lower if the defendants had published the AWPs and WACs he calculates.  This conclusion completely ignores the fact that many of the actual published prices, which he reports on his own exhibits, would have produced a lower FUL had CMS simply used them.  Indeed, in some instances, his calculated "AWP" or "WAC" is higher than the one actually published.  See Exhibit 11.

38. For about 46 percent of the NDC-quarter combinations for which Mr. Devor reports a published WAC and FUL, the published WAC was already low enough to have produced a lower FUL, had CMS used it.  Approximately two-thirds of the NDCs reported on by Mr. Devor, where such a comparison is possible, exhibit this for at least

---

had those cases, we may have, given how much, you know, how many drugs and how many periods we analyzed, there could have been one or two.  With respect to those we would have also used a proxy which I believe in both cases would have been the calculated AWP or WAC just prior to that, I believe.").

[45] Devor Deposition, Vol. 1, p. 143 ("Q: What was your standard for determining when something was an outlier and that you would use a proxy?  A:  I think that was only if it was – the answer -- I don't even remember having any so it is hard for me to say my standard, but if you point me to one I would be glad to comment on it as to why it got taken out.").

[46] Devor Statement, ¶ 8 ("Accordingly, the determination of a FUL by CMS would have been influenced, during the relevant timeframe, by what appear to have been exaggerated prices, thereby having increased the cost of reimbursement incurred by the State of New York.").

one quarter.[47]   See Exhibit 12.  Oddly, there are even instances in which Mr. Devor

ignores the fact that the published price is already low enough to have produced a lower

FUL and goes on to calculate a *higher* one on which to set the FUL.  See Exhibit 11.

39. Mr. Devor's statement offers no explanation for why CMS proceeded in the manner that

it did. When questioned, he indicated that understanding and attempting to apply CMS's

actual practices in setting FULs was beyond the scope of his assignment.[48]

## D. Inconsistencies with a "non-discretionary FUL"

40. It is clear that CMS exercised discretion in setting the FUL and, in so doing, did not

adhere to a simple and strict application of the regulations.  In addition to having given

no attention to CMS's interpretation of the FUL regulations and how CMS actually went

---

[47] There are even some instances where the published AWP in Mr. Devor's exhibits is low enough to have produced a lower FUL.  See Exhibit 12, notes.

[48] See, e.g., Devor Deposition, Vol. 1, pp. 99-100 ("Q.   What did you do in your analysis to determine whether a particular manufacturer's drugs that are the subject of your analysis in the Rule 26 statement were a therapeutic equivalent?  MS. CICALA:  Objection to form.  A.   Let's be clear about what I did, maybe, again, because I'm not sure you are -- maybe we are passing each other here.  You keep coming back and asking me about things that CMS did or didn't do, and alls I did was take their number and compare it to what I computed based on the reported numbers of the manufacturers.  So I computed a FUL based on the reporting of the 13 manufacturers for the nine drugs.  Your question seems to go to what did I do to look at therapeutic equivalent.  I'm telling you what I did.  I mean, I just looked at their -- I estimated what their WAC was, I estimated what their AWP was, to the extent it was provided I looked at their AMP numbers, and I computed a Harris Devor FUL based on 150 percent of that number in the event that the court finds that relevant for its analysis.  That's what I did."), p. 130 ("Q:  … Why did you calculate AWPs and WACs when there was no FUL in effect?  A.   The scope of our assignment was to compute an average AWP and WAC, sort of a 12-month rolling average, AWP and WAC for all the drugs at issue in this case.  The list of drugs at issue in this case was given to me and I did it for that.  That's solely what I was asked to do."), pp. 91-92 ("Q.   You don't know in practice how CMS interpreted the package size requirement in the regulation, do you?  A.   I don't, I don't know that it was relevant to what I was doing."), pp. 102-103 ("Q.   Do you know whether Warrick's albuterol inhaler was A rated?  A.   Was A rated?  Q.   Yes.  A.   No.  Q.   Do you know what A rated means?  A.   No.  Q.   Do you know how CMS determined what was considered to be therapeutic equivalent, a therapeutic equivalent?  A.   Again, I mean, I hate to drag this deposition out, but once again, my work was based on computing estimated WACs -- estimated average WACs and AWPs for the subject defendants for these drugs, not what CMS did to compute its FULs.  I have said that now six or seven times.  Q.   Maybe you'll say it again now, but do you know whether CMS had a practice of setting FULs on the basis of other than therapeutically equivalent drugs?  A.   It was beyond -- I do not know and it was beyond the scope of what I was asked to do."), and p. 782 ("Q.   And your methodology for calculating estimated federal upper limits doesn't incorporate regulatory criteria with respect to package sizes, available therapeutic equivalent and other manufacturers' published prices, correct?  MS. CICALA:  Object to form.  A.   That is correct, and it is not intended to convey that it does, it is merely intended to take 150 percent of the estimated WAC and the estimated AWP as well as the AMP information.").

about setting the FULs in practice, Mr. Devor appears to have given no serious consideration to any of the elements of the FUL regulations apart from multiplying by 150 percent.[49]

41. The FUL regulations say that the FUL should be set on NDCs with a package size of 100 or, alternatively, the most common package size for the product.  And, in fact, CMS's transmittals indicate the package size used in setting the FUL.  Many of the defendant NDCs on which Mr. Devor reports are not the appropriate package size for setting the FUL.  About half of the NDCs, and about half of the quarters permitting comparisons, reported on by Mr. Devor were of a package size inconsistent with that reported on the CMS transmittal as having been used to set the FUL.  See Exhibits 13A and 13B.

42. In addition, many of the calculations he makes appear to be for NDCs which were obsolete according to the compendia, as presumably were their price postings, for at least part of the relevant period.  Mr. Devor testified that he did not utilize the compendia's obsolete dates in his analysis.[50]  Thus, as he did not end published prices

---

[49] Mr. Devor did testify in his deposition that he had seen and read the regulations before and that he knew that CMS did not always use the lowest published price. See, e.g., Devor Deposition, Vol. 1, pp. 28-29 ("Q.  …  Were you familiar with how CMS established federal upper limits before you began your work in connection with this case?  A.  I had some idea by virtue of having worked in similar litigation in other states, so I was somewhat aware of what a FUL was and in essence how it was computed.  Q.  Did you do anything in connection with this case to familiarize yourself with how CMS established federal upper limits?  A.  Well, I understood and I believe I have in my report the -- how a FUL is presumably determined.  Q.  And that's according to a federal regulation, right?  A.  I believe so.  Q.  Did you read 42 CFR Section 447.332, the FUL, the federal FUL regulation?  A.  Yes, it's referenced in paragraph 12 in my report.  Q.  Is that something you rely on in connection with the opinions that are set forth in your Rule 26 statement?  A.  It is -- it forms -- it forms a piece of the knowledge that I use to compute FULs.") and p. 62 ("Q.  You would agree with me, wouldn't you, that based on the discovery record in this litigation, discovery that you have reviewed, that CMS doesn't always set the FUL on the basis of the lowest published available price, right?  A.  As I believe I said before, that I thought there were instances where they did not, I think I was aware of that.").

[50] Deposition of Harris Devor, December 11, 2008 ("Devor Deposition, Vol. 3"), pp. 767-768 ("Q.  Did you in your analysis -- or were obsolete dates for subject drugs, or the other drugs you were looking at if they weren't subject drugs, were obsolete dates relevant to your analysis?  A.  Only to the extent that because they were obsolete dates, the data -- wouldn't have had any data for those periods of time.  So if the data that your client provided me had data that related to that period of time, it entered into the computation.  That's what was relevant.  AWPs and WACs were based -- that I computed were based on the data that your client gave us.  Q.  You also may have had

upon the indication of obsolescence, he includes analyses for quarters where an NDC is, according to the compendia, obsolete (or inactive or discontinued or terminated).  For example, had Mr. Devor simply consulted the most recently posted obsolete dates in the FDB data, he would have found that for about 35 percent of the NDCs for which he calculates alternative FULs, his calculations continue beyond the NDC's obsolete date. See Exhibit 14.  Mr. Devor has apparently ignored the issue of obsolescence.

_____

Sumanth Addanki

3-18-09
_____

Date

_____

data from First DataBank, however, correct? MS. CICALA: Objection, asked and answered.  A.  But I didn't compute those.  I thought we were talking about my computations and the exercise I did.  Q.  So if the first First DataBank data that you got from whatever means indicated an obsolete date for a product, you did not take that into account in your computations, correct?  A.  My computations, my computations merely took into account the data that was supplied by your client which enabled me to compute using the same data an estimated WAC and AWP.  Those are the only computations I did.").

**NERA**
Economic Consulting

**Sumanth Addanki**
Senior Vice President

National Economic Research Associates, Inc.
50 Main Street
White Plains, New York 10606
+1 914 448 4000 Fax +1 914 448 4040
Direct dial: +1 914 448 4060
sumanth.addanki@nera.com
www.nera.com

# SUMANTH ADDANKI
## SENIOR VICE PRESIDENT

## Education

**Harvard University**
Ph.D., Economics, 1986

**Birla Institute of Technology and Science, India**
M.A. (Hons.), Economics, 1980

## Professional Experience

**NERA Economic Consulting**
1986-        Senior Vice President (current position)

**New York University, Robert F. Wagner Graduate School of Public Service**
1997         Adjunct Assistant Professor of Public and Health Administration

**National Bureau of Economic Research Inc.**
1981-1986    Research Associate and Computer Manager

**Harvard University**
1981-1985    Instructor in Economics, Teaching Fellow, and Assistant Head Tutor

**National Council of Applied Economic Research, India**
1980         Research Associate

## Honors and Professional Activities

Associate Editor, *Antitrust Magazine*, 2001 - 2002

Vice Chair, Economics Committee at Antitrust Section of ABA, 1999 - 2000

Danforth Center Award for Excellence in Teaching, Harvard University, 1983

**MMC** Marsh & McLennan Companies

Sumanth Addanki

## Testimony (2004 – 2008)

*In re Pharmaceutical Industry Average Wholesale Price Litigation:  The City of New York v. Abbott Laboratories, Inc., et al.,* United States District Court for the District of Massachusetts, MDL No. 1456, CA No. 01-12257-PBS.  November 2008.


*State of Missouri, ex rel. Jeremiah W. (Jay) Nixon, Attorney General and Missouri Department of Social Services, Division of Medical Services v. Dey, Inc., et al and Warrick Pharmaceuticals Corporation, Schering-Plough Corporation, Schering Corporation,* In the Circuit Court of the City of St. Louis State of Missouri, Case No. 054-1216 Division: 2.  October 2008.
*State of Wisconsin v. Amgen, Inc., Abbott Laboratories, AstraZeneca Pharmaceuticals, LP, AstraZeneca, LP, Aventis Pharmaceuticals, Inc. Baxter Healthcare Corporation, Ben Venue Laboratories, Inc.  et al.,* The Circuit Court for Dane County in the State of Wisconsin, Case No. 04-CV-1709 (Deposition Testimony) May 2008

*The Commonwealth of Massachusetts v. Mylan Laboratories, Inc. IVAX Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc. Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., PAR Pharmaceutical, Inc., Purepac Pharmaceutical Co, and Roxane Laboratories, Inc.,*  U.S. District for the District of Massachusetts, Civil Action No. 03-11865-PBS (Deposition Testimony).  April 2008

*Discover Financial Services,* et al. v. *Visa U.S.A. Inc.,* et al., U.S. District Court for the Southern District of New York, Civil Action No 04-CF-7844 (BSJ) (Deposition Testimony). December 2007.

*State of Alabama v. Abbott Laboratories, Inc., et al.*, In the Circuit Court of Montgomery County, Alabama, CV-05-219 (Deposition Testimony).  November 2007.

*Dynax Corporation v. Chemguard, Inc.*, U.S. District Court for the Southern District of New York, Index:  06-CIV-5143 (CM)(ECF CASE) (Deposition Testimony).  June 2007

*State of Colorado,* et al. *v. Warner Chilcott Holdings Company III, Ltd,* et al., U.S. District Court for the District of Columbia, Civil Action No 1:05CV02182 (CKK) (Deposition Testimony).  August 2007

*Novartis Corporation, Novartis Pharmaceuticals Corporation, and Novartis International AG v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of New Jersey, Civil Action Nos. 04-4473 and 06-1130 (HAA)(MF) (Deposition Testimony).  February 2007

*In re Pharmaceutical Industry Average Wholesale Price Litigation (MDL 1456)*, U.S. District Court for the District of Massachusetts, Civil Action No. 01-12257-PBS.  December 2006

*Briant Chun-Hoon and Carlo Guglielmino v. McKee Foods Corporation, a Tennessee Corporation; and Does 1 through 100, inclusive,* U.S. District Court for the Northern District of California, Case No. C05-00620 VRW (Deposition Testimony).  March 2006

*XIOtech Corporation v. Compellent Technologies, Inc., Michael Markovich, Russell B. Taddiken, Scott A. Winslow, Kristofer M. Zuber,* District Court for the State of Minnesota, Fourth Judicial District, Court File No.: 04-5065 (Deposition Testimony).  March 2006

*Medtronic Minimed, Inc., v. Smiths Medical MD, Inc.,* U. S. District Court for the District of Delaware, Civil Action No. 03-776-KAJ (Deposition Testimony).  February 2006


## Papers and Publications (1998 – 2008)

"Patent Settlement Agreements" with Alan J. Daskin, Chapter 85, Volume 3, in *Issues in Competition Law and Policy*, published by American Bar Association, Section of Antitrust Law, August, 2008.

"Who Defines the Relevant Market—The Core Customer or Marginal One?" with Alan Daskin, *Antitrust Insights*, National Economic Research Associates, Inc., Summer 2008.

"*Schering-Plough* and the Antitrust Analysis of Patent Settlement Agreements in Pharmaceutical Markets," *Antitrust Insights*, National Economic Research Associates, Inc., 2005 and published in Economics of Antitrust: Complex Issues in a Dynamic Economy, Chapter 4, May 2007.

"Economists Lend Insight Into Antitrust Risk,"*IFLR (International Financial Law Review), Mergers and Acquisitions* 2004, 2004.

"Market Definitions Using Econometrics: An Apparent Paradox Explained," *Antitrust Insights*, National Economic Research Associates, Inc., 2001.

"Presenting Complex Technical and Economic Evidence: Lessons From The Trenches," *Antitrust and Intellectual Property:  The Crossroads,* American Bar Association, 2000.

"The Relevant Market in Intellectual Property Antitrust: An Economist's Overview," Practising Law Institute, Intellectual Property Antitrust, June 1998.

November 2008

# Exhibit 2

## Case Materials

New York Counties v. Abbott Laboratories, Inc., et al.  Revised First Amended Consolidated Complaint. October 5, 2007 (including Exhibit B).

Rule 26 Statement of Harris L. Devor, In re:  Pharmaceutical Industry Average Wholesale Price Litigation relating to The City of New York, et al. v. Abbott Laboratories, Inc., et al.  September 30, 2008.

Depositions of Harris Devor and exhibits.

Depositions of Sue Gaston and exhibits.

Deposition of Gail Sexton and exhibits.

## Data

"Comprehensive Price History File."  2007 Wolters Kluwer Health (Medispan).

First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual* (Rev. April 2000).

Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.

Medispan Inactive Dates.  2007 Wolters Kluwer Health (Medispan).

Mr. Devor's Electronic Work Files and Exhibits.

Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced* (January 2008).

## Public Knowledge Documents

Alpert, Bill.  "Hooked on Drugs:  Why Do Insurers Pay Such Outrageous Prices For Pharmaceuticals?" *Barron's*, June 10, 1996.

American Society of Clinical Oncology.  *Reform of the Medicare Payment Methods for Cancer Chemotherapy.*  May 2001. http://www.asco.org/asco/downloads/MedicarePaymentReformASCOWhitePaper.pdf.

Congressional Budget Office.  *How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry*.  July 1998.  http://www.cbo.gov/ftpdoc.cfm?index=655&type=0&sequence=1.

Congressional Budget Office.  *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry*.  January 1996.  http://www.cbo.gov/ftpdoc.cfm?index=4750.

Congressional Budget Office.  *Medicaid's Reimbursements to Pharmacies for Prescription Drugs*.  December 2004.  http://www.cbo.gov/showdoc.cfm?index=6038&sequence=1.

Congressional Budget Office.  *Prices for Brand-Name Drugs Under Selected Federal Programs*.  June 2005.  http://www.cbo.gov/ftpdocs/64xx/doc6481/06-16-PrescriptDrug.pdf.

Congressional Budget Office.  *The Rebate Medicaid Receives on Brand-Name Prescription Drugs*.  June 21, 2005.  http://www.cbo.gov/ftpdocs/64xx/doc6493/06-21-MedicaidRebate.pdf.

Department of Health and Human Services, Office of Inspector General.  *Addition of Qualified Drugs to the Medicaid Federal Upper Limit List*.  December 2004.  (OEI-03-04-00320).

Department of Health and Human Services, Office of Inspector General.  *Are Medicare Allowances for Albuterol Sulfate Reasonable?*  August 1998.  (OEI-03-97-00292).

Department of Health and Human Services, Office of Inspector General.  *Comparing Drug Reimbursement:  Medicare and Department of Veterans Affairs*.  November 1998.  (OEI-03-97-00293).

Department of Health and Human Services, Office of Inspector General.  *A Comparison of Albuterol Sulfate Prices*.  June 1996.  (OEI-03-94-00392).

Department of Health and Human Services, Office of Inspector General.  *Cost of Dialysis-Related Drugs*.  October 1992.  (A-01-91-00526).

Department of Health and Human Services, Office of Inspector General.  *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program*.  June 2007.  (OEI-03-06-00400).

Department of Health and Human Services, Office of Inspector General.  *Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005*.  May 2006.  (A-06-06-00063).

Department of Health and Human Services, Office of Inspector General.  *Excessive Medicare Payments for Prescription Drugs*.  December 1997.  (OEI-03-97-00290).

Department of Health and Human Services, Office of Inspector General.  *Excessive Medicare Reimbursement for Albuterol*.  March 2002.  (OEI-03-01-00410).

Department of Health and Human Services, Office of Inspector General. *The Impact of High-Priced Generic Drugs on Medicare and Medicaid.* July 1998. (OEI-03-97-00510).

Department of Health and Human Services, Office of Inspector General.  *Infusion Therapy Services Provided in Skilled Nursing Facilities*.  December 1999.  (A-06-99-00058).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products*. August 2001. (A-06-00-00023).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products*. August 1997. (A-06-97-00011).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products*. March 2002. (A-06-01-00053).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs*. April 1997. (A-06-96-00030).

Department of Health and Human Services, Office of Inspector General. *Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products*. September 2002. (A-06-02-00041).

Department of Health and Human Services, Office of Inspector General. *Medicare Payments for Nebulizer Drugs*. February 1996. (OEI-03-94-00390).

Department of Health and Human Services, Office of Inspector General. *Medicare Reimbursement of Albuterol*. June 2000. (OEI-03-00-00311).

Department of Health and Human Services, Office of Inspector General. *Medicare Reimbursement of Prescription Drugs*. January 2001. (OEI-03-00-00310).

Department of Health and Human Services, Office of Inspector General. *Physicians' Costs for Chemotherapy Drugs*. November 1992. (A-02-91-01049).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the California Department of Health Services*. May 1996. (A-06-95-00062).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration*. February 2002. (A-06-01-00002).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Missouri Department of Social Services*. January 1997. (A-06-95-00067).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Health and Human Services*. July 1996. (A-06-95-00068).

Department of Health and Human Services, Office of Inspector General. *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Health and Human Services*. February 2002. (A-06-01-00005).

Department of Health and Human Services, Office of Inspector General.  *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Texas Health and Human Services Commission*.  November 2001.  (A-06-01-00001).

Department of Health and Human Services, Office of Inspector General.  *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services*.  November 1996.  (A-06-95-00072).

Department of Health and Human Services, Office of Inspector General.  *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the West Virginia Department of Health and Human Resources*.  December 2001.  (A-06-01-00007).

Department of Health and Human Services, Office of Inspector General.  *Semiannual Report, April 1, 1997 – September 30, 1997*.

Department of Health and Human Services, Office of Inspector General.  *Suppliers' Acquisition Costs for Albuterol Sulfate*.  June 1996.  (OEI-03-94-00393).

Department of Health and Human Services, Office of Inspector General.  *Update:  Excessive Medicare Reimbursement For Albuterol*.  January 2004.  (OEI-03-03-00510).

Department of Health and Human Services, Office of Inspector General.  *Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program*.  October 1989.  (A-06-89-00037).

Department of Health and Human Services, Office of Audit.  *Changes to the Medicaid Prescription Drug Program Could Save Millions*.  1984.

Department of Health, Education, and Welfare, Office of the Secretary.  *U.S. Task Force on Prescription Drugs:  The Drug Makers and The Drug Distributors*.  December 1968.

Federal Register.  November 15, 1974.  Vol. 39, No. 222, 45 CFR Part 19.  p. 40303.

Federal Register.  July 31, 1975.  Vol. 40, No. 148, 45 CFR Part 19.  p. 32293.

Federal Register.  August 20, 2003.  Vol. 68, No. 161, 42 CFR Part 405.  pp. 50428-50452.

Federal Register.  January 7, 2004.  Vol. 69, No. 4, 42 CFR Parts 405 and 414.  pp. 1084-1132.

Gencarelli, Dawn M.  "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism," *National Health Policy Forum Issue Brief No. 775*.  George Washington University, June 7, 2002.

General Accounting Office.  *Medicaid Changes in Drug Prices Paid by HMOs and Hospitals Since Enactment of Rebate Provisions*.  January 1993.  (GAO/HRD-93-43)

General Accounting Office.  *Medicare:  Payments for Covered Outpatient Drugs Exceed Providers' Cost* (Report to Congressional Committees).  September 2001.  (GAO-01-1118).

4

General Accounting Office.  *Prescription Drugs:  Changes in Prices for Selected Drugs* (Report to Congressional Requesters).  August 1992.  (GAO/HRD-92-128).

Government Accountability Office.  *Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs*.  December 22, 2006.  (GAO-07-239R).

Government Accountability Office.  *Medicare Chemotherapy Payments: New Drug and Administration Fees Are Closer to Providers' Costs*.  December 1, 2004.  (GAO-05-142R).

Government Accountability Office.  *Prescription Drugs:  An Overview of Approaches to Negotiate Drug Prices Used by Other Countries and U.S. Private Payers and Federal Programs*.  January 11, 2007.  (GAO-07-358T).

Gray, Tom.  "Construction Ahead."  *Homecare*, October 1, 2002.  http://homecaremag.com/mag/medical_construction_ahead/.

Gumbhir, Ashok and Johnny Anderson.  *Reimbursement for Pharmaceutical Services in Missouri*.  Final Report submitted to Missouri Department of Social Services, Division of Medical Care, March 1991.

MASSPIRG.  "*Consumer Groups Charge Industry-Wide Price Manipulation - Over $800 Million in Illegal Profits from Medicare & Medicare Patients.*"  http://masspirg.org/MA.asp?id2=5310&id3=MA&.

Letter from Nancy-Ann Min DeParle, Department of Health and Human Services, Health Care Financing Administration, to Members of Congress.  September 8, 2000.

Pear, Robert. "Administration Plans Cuts in Some Drug Payments."  *The New York Times*, August 6, 2000.

Medicare Payment Advisory Commission (MedPAC).  *Report to the Congress: Variation and Innovation in Medicare*.  June 2003.

Rozek, Richard P. and Ruth Berkowitz.  "The Costs to the U.S. Health Care System of Extending Marketing Exclusivity for Taxol."  *Journal of Research in Pharmaceutical Economics*, Vol. 9(4) (1999): pp. 21-41.

Schondelmeyer, Stephen W. and Marian V. Wrobel.  *Medicaid and Medicare Drug Pricing:  Strategy to Determine Market Prices*.  Final Report submitted by Abt Associates Inc. to the Centers for Medicare and Medicaid Services, August 30, 2004.

Spears, James M. and Jeff Pearlman.  "Using Litigation to Regulate Drug Prices: The Assault on 'AWP'."  Washington Legal Foundation, Critical Legal Issues, Working Paper Series No. 107.  February 2002.

State of Utah, Department of Health, Division of Health Care Financing.  *Medicaid Pharmacy— Acquisition Cost of Generic Prescription Drug Products*.  February 1999.

U.S. Congress.  House.  Committee on Energy and Commerce.  *Hearing: Medicaid and AWP Hearing: Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much*.  December 7, 2004.  http://globalag.igc.org/health/us/2004/toomuch.pdf.

U.S. Congress.  House.  Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  *Testimony of George Reeb, Assistant Inspector General, Centers for Medicare and Medicaid Audits, Office of Inspector General, U.S. Department of Health and Human Services*. December 7, 2004.

U.S. Congress.  House.  Committee on Ways and Means, Subcommittee on Health.  *Testimony of George Reeb, Assistant Inspector General, Centers for Medicare and Medicaid Audits, Department of Health and Human Services*.  October 3, 2002.

U.S. Congress.  Senate.  Special Committee on Aging.  *CBO Testimony of Douglas Holtz-Eakin (Payments for Prescription Drugs Under Medicaid)*.  July 20, 2005.


**<u>Miscellaneous</u>**

42 CFR § 447.332.

American Medical Association.  "AMA Downloadable Resource Table:  Asthma."  ASTHMA Version 3.0 July 2007. www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls.

Centers for Medicare and Medicaid Services.  "[Sample] REBATE AGREEMENT Between The Secretary of Health and Human Services (hereinafter referred to as 'the Secretary') and The Manufacturer Identified in Section XI of this Agreement (hereinafter referred to as 'the Labeler')." http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf.

Congressional Research Service (CRS).  "P.L. 110-275: The Medicare Improvements for Patients and Providers Act of 2008" (CRS Report for Congress).  July 23, 2008. http://www.ohanet.org/finance/medicare/HR6331CMSSummarry.pdf.

Department of Health and Human Services, Health Care Financing Administration.  "Federal Upper Limit (FUL) Changes to  Transmittal No. 37."  Current as of August 20, 2008.

Department of Health and Human Services, Health Care Financing Administration.  "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".

Department of Health and Human Services, Health Care Financing Administration.  "State Medicaid Manual:  Part 6 - Payment for Services."  Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).

FloridaInfusion, Nations Drug Pharmaceutical Distributor.  Product Search, Accessed February 6, 2009. http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword.

National Association of Chain Drug Stores.  "Judge Grants AMP Rule Injunction." http://www.nacds.org/wmspage.cfm?parm1=5557.

**Confidential**

National Association of Chain Drug Stores & National Community Pharmacists Association.  "Frequently Asked Questions (FAQs) Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP Rule November 7, 2007."  November 6, 2007.  http://www.ncpanet.org/pdf/amp_ncpanacds-lawsuitfaq.pdf.

Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74.  December 1998. http://www.dhs.state.ri.us/dhs/heacre/provsvcs/prvupdts/pu74.htm.

U.S. Food and Drug Administration, Center for Drug Evaluation and Research.  *Approved Drug Products with Therapeutic Equivalence Evaluations*.  11th Edition (1991) through 27th Edition (2007).

U.S. Food and Drug Administration, Center for Drug Evaluation and Research.  "National Drug Code Directory."  Current through December 3, 2008.  http://www.fda.gov/cder/ndc/database.

Confidential

**Exhibit 3**

**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | AWP, WAC, and Direct Price Postings (TE = Therapeutic Equivalence; PS = Package Size) | | | | Narrowest |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | Restrictions for a Match[9] |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |
| 005037 | Albuterol 0.09 mg/inh, Aerosol, Metered, Inhalation, 17 gm | $ 0.4394 | Jun 1997 [10] | 10/01/97 | 12/06/00 | 1 | 2 | 1 | 2 | PS Only |
| | | 0.3490 | Jan 2000 | 12/07/00 | 12/07/00 | 1 | 2 | 1 | 2 | None |
| | | No FUL | n/a | 12/08/00 | 03/10/03 | n/a | n/a | n/a | n/a | n/a |
| | | 0.8823 | | 03/11/03 | 05/07/05 | 1 | 1 | 1 | 1 | TE & PS |
| | | 0.3088 | | 05/08/05 | 04/09/06 | - | - | - | - | TE & PS |
| 005039 | Albuterol Sulfate EQ 0.083% Base, Solution, Inhalation, 3 ml | 0.1990 | Jun 1997 | 10/01/97 | 12/06/00 | - | - | - | - | TE & PS |
| | | No FUL | n/a | 12/07/00 | 01/21/02 | n/a | n/a | n/a | n/a | n/a |
| | | 0.1450 | Apr 2001 | 01/22/02 | 05/07/05 | 10 | 10 | 10 | 10 | TE & PS |
| | | 0.1150 | | 05/08/05 | | 9 | 9 | 9 | 9 | TE & PS |
| 048262 | Cefadroxil 500 mg, Capsule, Oral, 50 | 2.7672 | Oct 1996 | 01/01/97 | 08/31/98 | - | 1 | 6 | 11 | All Active & Inactive Prices |
| | | No FUL | n/a | 09/01/98 | 01/21/02 | n/a | n/a | n/a | n/a | n/a |
| | | 3.0789 | Apr 2001 | 01/22/02 | 03/10/03 | - | - | 4 | 9 | TE & PS |
| | | 2.4837 | | 03/11/03 | | - | - | - | 5 | TE & PS |
| 004560 | Clonazepam 0.5 mg, Tablet, Oral, 100 | 0.8702 | Jun 1997 | 10/01/97 | 08/31/98 | 3 | 3 | 3 | 4 | TE & PS |
| | | 0.4146 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | None |
| | | 0.2760 | Jan 2000 | 12/07/00 | 01/21/02 | 6 | 6 | 15 | 15 | TE & PS |
| | | 0.2455 | Apr 2001 | 01/22/02 | | 6 | 7 | 13 | 14 | TE & PS |
| 000386 | Enalapril Maleate 20 mg, Tablet, Oral, 100 | 0.9150 | | 08/24/03 | | 4 | 4 | 4 | 4 | TE & PS |
| 017297 | Isosorbide MN 60 mg, Tablet, Extended Release, Oral, 100 | 0.7492 | Apr 2001 | 01/22/02 | 07/20/05 | - | - | 2 | 2 | TE & PS |
| | | 0.2025 | | 07/21/05 | | 2 | 2 | 2 | 3 | None |
| 003758 | Lorazepam 1 mg, Tablet, Oral, 100 | 0.0207 | Jan 1994 | 07/01/94 | 09/30/97 | 3 | 3 | 23 | 23 | TE & PS |
| | | 0.0203 | Jun 1997 | 10/01/97 | 02/11/98 | 2 | 2 | 29 | 29 | TE & PS |
| | | No FUL | n/a | 02/12/98 | 08/31/98 | n/a | n/a | n/a | n/a | n/a |
| | | 0.6684 | Apr 1998 | 09/01/98 | 12/06/00 | 17 | 19 | 79 | 106 | None |
| | | 0.5718 | Jan 2000 | 12/07/00 | | 7 | 9 | 40 | 63 | TE & PS |
| 005131 | Metoprolol 100 mg, Tablet, Oral, 100 | 0.1185 | Oct 1996 | 01/01/97 | 09/30/97 | 2 | 2 | 6 | 6 | TE & PS |
| | | 0.1161 | Jun 1997 | 10/01/97 | 08/31/98 | 4 | 4 | 13 | 13 | TE & PS |
| | | 0.0878 | Apr 1998 | 09/01/98 | 12/06/00 | 2 | 2 | 10 | 10 | All Active & Inactive Prices |

Confidential

**Exhibit 3**

**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | Narrowest |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | Restrictions for a Match[9] |
|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |
| | | 0.1290 | Jan 2000 | 12/07/00 | 01/21/02 | 6 | 6 | 13 | 13 | TE & PS |
| | | 0.0914 | Apr 2001 | 01/22/02 | 10/27/04 | 4 | 4 | 12 | 12 | TE & PS |
| | | 0.0690 | | 10/28/04 | | - | - | 1 | 1 | TE & PS |
| 011673 | Ranitidine EQ 150 mg Base, Tablet, Oral, 100 | 0.5914 [11] | | 09/24/98 | 09/21/99 | 4 | 6 | 17 | 23 | TE & PS |
| | | No FUL | n/a | 09/22/99 | 12/06/00 | n/a | n/a | n/a | n/a | n/a |
| | | 0.3410 | Jan 2000 | 12/07/00 | 01/21/02 | 4 | 5 | 16 | 23 | TE & PS |
| | | 0.3411 | Apr 2001 | 01/22/02 | 05/07/05 | 5 | 6 | 32 | 38 | TE & PS |
| | | 0.1088 | | 05/08/05 | | 2 | 2 | 21 | 21 | TE & PS |

Notes: - Analysis of each GCN includes: (1) products explicitly identified by the First DataBank (FDB) variable "GCN Sequence Number" as belonging to the GCN; (2) any similarly described products (based on name, strength, and dosage form) not listed in FDB that appear in Medispan or Red Book and not exclusively in another GCN in FDB at the NDC-9 level. Finally, following a review of online sources for NDCs that do not appear in FDB at the NDC-11 or NDC-9 level (355 NDCs in total), seven NDCs were dropped from the analysis (52493084701, 52493084717, 54977069501, 54977070601, 57362011601, 63874074917, and 51655027924), as either they were described as albuterol inhaler refills and not as albuterol inhalers or discrepancies in their descriptions were resolved such that they were confirmed to be outside the GCN.

- Some NDCs are reported under different GCNs in the FDB annual product description files at the NDC-11 level (15 NDCs) and, if the NDC does not appear in FDB at the 11-digit level, at the NDC-9 level (9 NDCs). In addition, some NDCs appear under different Package IDs in Red Book (6 NDCs). These differences, generally, are time dependent. With respect to FDB, any descriptive values (e.g., therapeutical equivalency rating or obsolete date) reported for an NDC while it is listed under a GCN other than those at issue are excluded from the analysis, as are any price postings that correspond to the time period when the NDC appears to correspond to another product and was listed under a different GCN. With respect to Red Book, the Package ID represents a unique identifier by which an NDC's product description, package size, therapeutical equivalence rating, deactivation/reactivation dates, and prices are reported. Package IDs, and all associated data, that correspond to a drug name other than those at issue are excluded.

- For all compendia, postings of zero invalidate the previously posted price. For Red Book, postings are treated as active through the price deactivation date or until the next posting. Deactivation dates that fall before the date of the posting are replaced with the date of the posting (4 instances in total). Finally, deactivation dates that occur on or after the date of a subsequent posting are replaced with the date immediately preceding the date of the next posting (10 instances in total).

- No postings are available from Medispan after August 3, 2007 and from FDB after February 1, 2007. Although postings are available in Red Book as late as April 2009, they are not used after June 9, 2008, the date the data were acquired. FULs analyzed are those for which any portion of their effective life falls within the period 1997 to 2005; however, the analysis extends over the full effective life of these FULs.

[1] The count of postings is based on AWPs, WACs, and Direct Prices in Medispan, FDB, and Red Book. Comparisons with the FUL are made by multiplying these posted prices by 1.5 and rounding to four decimals. The count does not include duplicate postings, such as two WACs for the same NDC for which the difference between the two prices is equal to zero when rounded to four decimals. Nor does this count include duplicate postings for the same product, as occurs when the NDC for a product changes.

[2] To count as a lower price, the posting must be active (i.e., the price has not been deactivated by obsolescence, a subsequent price posting, or otherwise) for the entire month specified in the CMS transmittal as the month during which prices analyzed to set the FUL were current (also see Note 5). Obsolescence, generally, is determined with reference to the FDB "Obsolete Date", the FDB "HCFA Termination Date", the Medispan "Inactive Date", and the Red Book "NDC Discontinuation Date" (collectively, the "end dates"). Postings are only applied prior to the earliest of the four end dates. However, any postings on or after the earliest end date are treated as a reactivation of the NDC and such postings are analyzed until the next end date. Postings after the second, third, or fourth end date are treated in the same manner. Similarly, the Red Book "Reactivation Date" can reactivate the most recent set of active prices for an NDC, assuming the date falls on or after the discontinuation date and the NDC is not already currently active. Finally, 33 NDCs among the nine GCNs, for which the FDB Obsolete Date exhibited stark inconsistencies across annual files, were examined separately, using price posting activity and CMS reimbursement.

Confidential

**Exhibit 3**

**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | Narrowest |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | Restrictions for a Match[9] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |

[3] Product descriptions are taken from the most recent CMS transmittal in which the GCN appears.  The package size used to set the FUL for each GCN is indicated by the value at the end of each description and remains constant for all 9 GCNs except for cefadroxil, which changed from 100 to 50 as of the January 22, 2002 FUL.

[4] Values of "No FUL" correspond to periods during which there was no FUL in place (i.e., FDB postings of zero).

[5] CMS transmittals typically indicate the month as of which prices analyzed to set the FUL were current, i.e., the "current month".  Where the current month was not available, the period considered was the three-month period preceding the relevant FUL's effective date.

[6] Missing end dates indicate FULs that were still in effect as of June 9, 2008, according to Red Book and CMS transmittals.

[7] The count only includes prices for NDCs that are determined to be therapeutically equivalent and that are of the same package size as that used to set the FUL.  An NDC is considered therapeutically equivalent if it was found to have an "A" rating in the available copies of the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (i.e., the Orange Book) or, if such information was not available, was "A" rated by either the FDB variable "Expanded Orange Book Code" or the Red Book variable "Orange Book Code".  Since the ratings in the Orange Book are reported by drug application number, the FDA's National Drug Code Directory was used to link each application number to an NDC.  An NDC is considered to be of the same package size as that used to set the FUL if the package size indicated in the CMS transmittal matches either the FDB variable "Package Size", the Red Book variables "Total Quantity - Actual" or "Standard Quantity - Actual", or the Medispan implied package size (the mean ratio between the package and unit prices, rounded to one decimal).  Data from each of the three pricing compendia are considered publicly available as of the date of the first AWP, WAC, or Direct Price posting reported by each compendium for the relevant NDC.  For FDB descriptive data, compendium data are used from the appropriate annual file and any changes across these files are recognized as of the beginning of the year of the file in which the change appears.  Changes across editions of the Orange Book are recognized as of the publication date of the edition in which the change appears, or April 30th (based on a survey of the different publication dates that were observable (1991 - 05/23/91; 1993 - 04/22/93;  1994 - 06/16/94; 1996 - 05/29/96; 2001 - 04/02/01; 2002 - 04/16/02; 2003 - 03/18/03; 2007 - 05/21/07)) if the publication date was unavailable.  The package size and therapeutical equivalence requirements must both be met as of the beginning of the FUL current month.

[8] Includes all active prices, regardless of whether the prices correspond to an NDC that is therapeutically equivalent and/or of the same package size as that used to set the FUL.

[9] Value represents the narrowest set of restrictions, among those identified in Exhibit 5 (e.g., TE & PS, PS Only, TE Only, All Active Prices, All Active and Inactive Prices), for which a match was found.

[10] While the FUL was reported in a later transmittal, this date is based on an earlier transmittal that reported the FUL for the albuterol inhaler refill, as the FULs for the refill and the inhaler have the same value and appear to have been posted in FDB simultaneously at a time consistent with the earlier transmittal.

[11] This is the only FUL in the table that does not appear in one of the CMS transmittals cited below.  However, the FUL is published by all three pricing compendia.  In addition, a provider update, published by the Rhode Island Medical Assistance Program in December 1998, notified pharmacy providers that, effective immediately, "Ranitidine HCL, 150mg, tablet, $0.5914/each" had been added to the FUL list.

Sources:   - American Medical Association, *AMA Downloadable Resource Table:  Asthma* , ASTHMA Version 3.0 July 2007, <www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls>.
- "Comprehensive Price History File," 2007 Wolters Kluwer Health (Medispan).
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37," Current as of August 20, 2008.
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".
- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services," Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).
- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual*  (Rev. April 2000).
- FloridaInfusion, Nations Drug, Accessed February 6, 2009 <http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword>.
- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.
- Medispan Inactive Dates, 2007 Wolters Kluwer Health (Medispan).
- Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced*  (January 2008).
- Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74, December 1998, <http://www.dhs.state.ri.us/dhs/heacre/provsvcs/prvupdts/pu74.htm>.

Confidential

**Exhibit 3**

**Counts of Published Compendia Prices[1] that Could Have Produced a Lower FUL at the Time the FUL was Set[2]**

**Federal Upper Limits: 1997 - 2005**

| | | | | | | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | Narrowest |
| | | | | | | | | | | Restrictions |
| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Limited to TE & PS[7] | Limited to PS Only | Limited to TE Only | All NDCs[8] | for a Match[9] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) |

- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *Approved Drug Products with Therapeutic Equivalence Evaluations* , 11th Edition - 27th Edition.

- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *National Drug Code Directory* , <http://www.fda.gov/cder/ndc/database/>.

Confidential

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDCs[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| 005037 | Albuterol 0.09 mg/inh, Aerosol, Metered, Inhalation, 17 gm | $  0.4394 | Jun 1997 [11] | 10/01/97 | 12/06/00 | 100.0 % | $  0.3221 | 5 | 15 | 5 | 15 |
| | | 0.3490 | Jan 2000 | 12/07/00 | 12/07/00 | 100.0 | 0.3221 | 2 | 3 | 2 | 3 |
| | | No FUL | n/a | 12/08/00 | 03/10/03 | n/a | 0.3221 | n/a | n/a | n/a | n/a |
| | | 0.8823 | | 03/11/03 | 05/07/05 | 100.0 | 0.3088 | 6 | 6 | 6 | 6 |
| | | 0.3088 | | 05/08/05 | 04/09/06 | - | 0.3088 | - | - | - | - |
| 005039 | Albuterol Sulfate EQ 0.083% Base, Solution, Inhalation, 3 ml | 0.1990 | Jun 1997 | 10/01/97 | 12/06/00 | 100.0 | 0.1150 | 23 | 23 | 23 | 23 |
| | | No FUL | n/a | 12/07/00 | 01/21/02 | n/a | 0.1000 | n/a | n/a | n/a | n/a |
| | | 0.1450 | Apr 2001 | 01/22/02 | 05/07/05 | 100.0 | 0.0627 | 42 | 42 | 42 | 42 |
| | | 0.1150 | | 05/08/05 | | 100.0 | 0.0627 | 17 | 17 | 17 | 17 |
| 048262 | Cefadroxil 500 mg, Capsule, Oral, 50 | 2.7672 | Oct 1996 | 01/01/97 | 08/31/98 | - | 2.9325 | - | 1 | 6 | 11 |
| | | No FUL | n/a | 09/01/98 | 01/21/02 | n/a | 1.2749 | n/a | n/a | n/a | n/a |
| | | 3.0789 | Apr 2001 | 01/22/02 | 03/10/03 | 57.9 | 1.8636 | 4 | 4 | 20 | 25 |
| | | 2.4837 | | 03/11/03 | | 36.9 | 0.7830 | 4 | 4 | 15 | 20 |
| 004560 | Clonazepam 0.5 mg, Tablet, Oral, 100 | 0.8702 | Jun 1997 | 10/01/97 | 08/31/98 | 100.0 | 0.3069 | 17 | 17 | 30 | 31 |
| | | 0.4146 | Apr 1998 | 09/01/98 | 12/06/00 | 100.0 | 0.1199 | 23 | 25 | 54 | 56 |
| | | 0.2760 | Jan 2000 | 12/07/00 | 01/21/02 | 100.0 | 0.0450 | 15 | 16 | 44 | 45 |
| | | 0.2455 | Apr 2001 | 01/22/02 | | 100.0 | 0.0422 | 20 | 21 | 110 | 117 |
| 000386 | Enalapril Maleate 20 mg, Tablet, Oral, 100 | 0.9150 | | 08/24/03 | | 100.0 | 0.0855 | 29 | 30 | 61 | 63 |
| 017297 | Isosorbide MN 60 mg, Tablet, Extended Release, Oral, 100 | 0.7492 | Apr 2001 | 01/22/02 | 07/20/05 | 74.5 | 0.0788 | 4 | 4 | 14 | 15 |
| | | 0.2025 | | 07/21/05 | | 100.0 | 0.0788 | 2 | 2 | 2 | 5 |
| 003758 | Lorazepam 1 mg, Tablet, Oral, 100 | 0.0207 | Jan 1994 | 07/01/94 | 09/30/97 | 100.0 | 0.0182 | 6 | 6 | 74 | 74 |
| | | 0.0203 | Jun 1997 | 10/01/97 | 02/11/98 | 100.0 | 0.0182 | 2 | 2 | 31 | 31 |
| | | No FUL | n/a | 02/12/98 | 08/31/98 | n/a | 0.0182 | n/a | n/a | n/a | n/a |
| | | 0.6684 | Apr 1998 | 09/01/98 | 12/06/00 | 100.0 | 0.0182 | 27 | 29 | 110 | 139 |
| | | 0.5718 | Jan 2000 | 12/07/00 | | 100.0 | 0.0182 | 33 | 36 | 177 | 227 |
| 005131 | Metoprolol 100 mg, Tablet, Oral, 100 | 0.1185 | Oct 1996 | 01/01/97 | 09/30/97 | 100.0 | 0.0878 | 10 | 10 | 24 | 24 |

Confidential

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDCs[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| | | 0.1161 | Jun 1997 | 10/01/97 | 08/31/98 | 100.0 | 0.0675 | 13 | 13 | 32 | 32 |
| | | 0.0878 | Apr 1998 | 09/01/98 | 12/06/00 | 100.0 | 0.0675 | 6 | 6 | 20 | 20 |
| | | 0.1290 | Jan 2000 | 12/07/00 | 01/21/02 | 100.0 | 0.0690 | 14 | 14 | 29 | 33 |
| | | 0.0914 | Apr 2001 | 01/22/02 | 10/27/04 | 100.0 | 0.0690 | 4 | 4 | 12 | 13 |
| | | 0.0690 | | | 10/28/04 | 5.7 | 0.0665 | 1 | 1 | 11 | 15 |
| 011673 | Ranitidine EQ 150 mg Base, Tablet, Oral, 100 | 0.5914 [12] | | 09/24/98 | 09/21/99 | 100.0 | 0.0782 | 11 | 15 | 45 | 61 |
| | | No FUL | n/a | 09/22/99 | 12/06/00 | 100.0 | 0.0782 | n/a | n/a | n/a | n/a |
| | | 0.3410 | Jan 2000 | 12/07/00 | 01/21/02 | 100.0 | 0.0782 | 7 | 8 | 51 | 58 |
| | | 0.3411 | Apr 2001 | 01/22/02 | 05/07/05 | 100.0 | 0.0413 | 22 | 23 | 123 | 141 |
| | | 0.1088 | | | 05/08/05 | 100.0 | 0.0413 | 6 | 6 | 64 | 73 |

Notes:  - Analysis of each GCN includes:  (1) products explicitly identified by the First DataBank (FDB) variable "GCN Sequence Number" as belonging to the GCN; (2) any similarly described products (based on name, strength, and dosage form) not listed in FDB that appear in Medispan or Red Book and not exclusively another GCN in FDB at the NDC-9 level.  Finally, following a review of online sources for NDCs that do not appear in FDB at the NDC-11 or NDC-9 level (355 NDCs in total), seven NDCs were dropped from the analysis (52493084701, 52493084717, 54977069501, 54977070601, 57362011601, 63874074917, and 51655027924), as either they were described as albuterol inhaler refills and not as albuterol inhalers or discrepancies in their descriptions were resolved such that they were confirmed to be outside the GCN.

- Some NDCs are reported under different GCNs in the FDB annual product description files at the NDC-11 level (15 NDCs) and, if the NDC does not appear in FDB at the 11-digit level, at the NDC-9 level (9 NDCs).  In addition, some NDCs appear under different Package IDs in Red Book (6 NDCs).  These differences, generally, are time dependent.  With respect to FDB, any descriptive values (e.g., therapeutical equivalency rating or obsolete date) reported for an NDC while it is listed under a GCN other than those at issue are excluded from the analysis, as are any price postings that correspond to the time period when the NDC appears to correspond to another product and was listed under a different GCN.  With respect to Red Book, the Package ID represents a unique identifier by which an NDC's product description, package size, therapeutical equivalence rating, deactivation/reactivation dates, and prices are reported. Package IDs, and all associated data, that correspond to a drug name other than those at issue are excluded.

- For all compendia, postings of zero invalidate the previously posted price.  For Red Book, postings are treated as active through the price deactivation date or until the next posting.  Deactivation dates that fall before the date of the posting are replaced with the date of the posting (4 instances in total).  Finally, deactivation dates that occur on or after the date of a subsequent posting are replaced with the date immediately preceding the date of the next posting (10 instances in total).

- No postings are available from Medispan after August 3, 2007 and from FDB after February 1, 2007.  Although postings are available in Red Book as late as April 2009, they are not used after June 9, 2008, the date the data were acquired. FULs analyzed are those for which any portion of their effective life falls within the period 1997 to 2005; however, the analysis extends over the full effective life of these FULs.

[1] The count of postings is based on AWPs, WACs, and Direct Prices in Medispan, FDB, and Red Book.  Comparisons with the FUL are made by multiplying these posted prices by 1.5 and rounding to four decimals.  The count does not include duplicate postings, such as two WACs for the same NDC for which the difference between the two prices is equal to zero when rounded to four decimals.  Nor does this count include duplicate postings for the same product, as occurs when the NDC for a product changes.

[2] To count as a lower price, the posting must be active  (i.e., the price has not been deactivated by obsolescence, a subsequent price posting, or otherwise) for at least part of the period that begins with the end of the current month (i.e., the month specified in the CMS transmittal as the month during which prices analyzed to set the FUL were current (also see Note 5)) and that ends with the FUL end date.  Obsolescence, generally, is determined with reference to the

Confidential

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutic Equivalence; PS = Package Size) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDCs[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |

FDB "Obsolete Date", the FDB "HCFA Termination Date", the Medispan "Inactive Date", and the Red Book "NDC Discontinuation Date" (collectively, the "end dates"). Postings are only analyzed during the period prior to the earliest of the four end dates. However, any postings on or after the earliest end date are treated as a reactivation of the NDC and such postings are analyzed until the next end date. Postings after the second, third, or fourth end date are treated in the same manner. Similarly, the Red Book "Reactivation Date" can reactivate the most recent set of active prices for an NDC, assuming the date falls on or after the discontinuation date and the NDC is not already currently active. Finally, 33 NDCs among the nine GCNs, for which the FDB Obsolete Date exhibited stark inconsistencies across annual files, were examined separately, using price posting activity and CMS reimbursement.

[3] Product descriptions are taken from the most recent CMS transmittal in which the GCN appears. The package size used to set the FUL for each GCN is indicated by the value at the end of each description and remains constant for all 9 GCNs except for cefadroxil, which changed from 100 to 50 as of the January 22, 2002 FUL.

[4] Values of "No FUL" correspond to periods during which there was no FUL in place (i.e., FDB postings of zero).

[5] CMS transmittals typically indicate the month as of which prices analyzed to set the FUL were current, i.e., the "current month". Where the current month was not available, the period considered was the three-month period preceding the relevant FUL's effective date.

[6] Missing end dates indicate FULs that were still in effect as of June 9, 2008, according to Red Book and CMS transmittals.

[7] Calculation is based on the number of days during the relevant FUL posting period for which there was a posted AWP, WAC, or Direct Price, which, when multiplied by 1.5 and rounded to four decimals, was lower than the FUL. Posted prices only include prices analyzed in the above table that correspond to therapeutically equivalent NDCs of the same package size as that used to set the FUL (see Note 9). In addition, adjusted prices are only compared to the FUL during periods for which the NDC is considered active (see Note 2). Shares are calculated relative to the total number of days in the posting period, including parts of the period that fall before 1997 and after 2005. Shares are displayed rounded to one decimal.

[8] Price is based on the lowest AWP, WAC, or Direct Price, multiplied by 1.5 and rounded to four decimals, that was prevailing during at least part of the FUL period and corresponded to an NDC that was considered active (see Note 2), was therapeutically equivalent, and was of the same package size as that used to set the FUL (see Note 9).

[9] The count only includes prices for NDCs that are determined to be therapeutically equivalent and that are of the same package size as that used to set the FUL. An NDC is considered therapeutically equivalent if it was found to have an "A" rating in the available copies of the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (i.e., the Orange Book) or, if such information was not available, was "A" rated by either the FDB variable "Expanded Orange Book Code" or the Red Book variable "Orange Book Code". Since the ratings in the Orange Book are reported by drug application number, the FDA's National Drug Code Directory was used to link each application number to an NDC. An NDC is considered to be of the same package size as that used to set the FUL if the package size indicated in the CMS transmittal matches either the FDB variable "Package Size", the Red Book variables "Total Quantity - Actual" or "Standard Quantity - Actual", or the Medispan implied package size (the mean ratio between the package and unit prices, rounded to one decimal). Data from each of the three pricing compendia are considered publicly available as of the date of the first AWP, WAC, or Direct Price posting reported by each compendium for the relevant NDC. For FDB descriptive data, contemporaneous data are used from the appropriate annual file and any changes across these files are recognized as of the beginning of the year of the file in which the change appears. Changes across editions of the Orange Book are recognized as of the publication date of the edition in which the change appears, or April 30th (based on a survey of the different publication dates that were observable (1991 - 05/23/91; 1993 - 04/22/93; 1994 - 06/16/94; 1996 - 05/29/96; 2001 - 04/02/01; 2002 - 04/16/02; 2003 - 03/18/03; 2007 - 05/21/07)) if the publication date was unavailable. The package size and therapeutical equivalence requirements must both be met at some point in time between the end of the current month and the end of the FUL period, while the relevant price is in effect.

[10] Includes all active prices, regardless of whether the prices correspond to an NDC that is therapeutically equivalent and/or of the same package size as that used to set the FUL.

[11] While the FUL was reported in a later transmittal, this date is based on an earlier transmittal that reported the FUL for the albuterol inhaler refill, as the FULs for the refill and the inhaler have the same value and appear to have been posted in FDB simultaneously at a time consistent with the earlier transmittal.

[12] This is the only FUL in the table that does not appear in one of the CMS transmittals cited below. However, the FUL is published by all three pricing compendia. In addition, a provider update, published by the Rhode Island Medical Assistance Program in December 1998, notified pharmacy providers that, effective immediately, "Ranitidine HCL, 150mg, tablet, $0.5914/each" had been added to the FUL list.

Sources:  - American Medical Association, *AMA Downloadable Resource Table: Asthma*, ASTHMA Version 3.0 July 2007, <www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls>.

Confidential

**Exhibit 4**

**Counts of Published Compendia Prices[1] That Could Have Produced a Lower FUL at the Time the FUL was Set or During its Effective Period[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Share of Days During Period for Which There was a Lower, Alternative FUL[7] | Lowest Alternative FUL During Period[8] | AWP, WAC, and Direct Price Postings (TE = Therapeutic Equivalence; PS = Package Size) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All NDCs[10] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |

- "Comprehensive Price History File," 2007 Wolters Kluwer Health (Medispan).
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37," Current as of August 20, 2008.
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".
- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services," Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).
- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual* (Rev. April 2000).
- FloridaInfusion, Nations Drug, Accessed February 6, 2009 <http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword>.
- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.
- Medispan Inactive Dates, 2007 Wolters Kluwer Health (Medispan).
- Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced*  (January 2008).
- Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74, December 1998, <http://www.dhs.state.ri.us/dhs/heacre/provsvcs/prvupdts/pu74.htm>.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *Approved Drug Products with Therapeutic Equivalence Evaluations* , 11th Edition - 27th Edition.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *National Drug Code Directory* , <http://www.fda.gov/cder/ndc/database/>.

Confidential

**Exhibit 5**

**Counts of Published Compendia Prices[1] that Could Have Been the Basis for the Published FUL[2]**

**Federal Upper Limits:  1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |
| 005037 | Albuterol 0.09 mg/inh, Aerosol, Metered, Inhalation, 17 gm | $ 0.4394 | Jun 1997 [12] | 10/01/97 | 12/06/00 | - | - | - | 2 | - | 2 | 2 |
| | | 0.3490 | Jan 2000 | 12/07/00 | 12/07/00 | - | - | - | - | - | - | - |
| | | No FUL | n/a | 12/08/00 | 03/10/03 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.8823 | | 03/11/03 | 05/07/05 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.3088 | | 05/08/05 | 04/09/06 | 1 | 1 | 1 | 1 | 1 | 1 | 3 |
| 005039 | Albuterol Sulfate EQ 0.083% Base, Solution, Inhalation, 3 ml | 0.1990 | Jun 1997 | 10/01/97 | 12/06/00 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | | No FUL | n/a | 12/07/00 | 01/21/02 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.1450 | Apr 2001 | 01/22/02 | 05/07/05 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.1150 | | 05/08/05 | | - | - | 2 | 2 | 2 | 2 | 4 |
| 048262 | Cefadroxil 500 mg, Capsule, Oral, 50 | 2.7672 | Oct 1996 | 01/01/97 | 08/31/98 | - | - | - | - | - | - | 1 [13] |
| | | No FUL | n/a | 09/01/98 | 01/21/02 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 3.0789 | Apr 2001 | 01/22/02 | 03/10/03 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | | 2.4837 | | 03/11/03 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 004560 | Clonazepam 0.5 mg, Tablet, Oral, 100 | 0.8702 | Jun 1997 | 10/01/97 | 08/31/98 | - | - | 1 | 1 | 1 | 1 | 3 |
| | | 0.4146 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | - | - | - |
| | | 0.2760 | Jan 2000 | 12/07/00 | 01/21/02 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.2455 | Apr 2001 | 01/22/02 | | - | - | 2 | 2 | 3 | 3 | 3 |
| 000386 | Enalapril Maleate 20 mg, Tablet, Oral, 100 | 0.9150 | | 08/24/03 | | - | - | 2 | 2 | 2 | 2 | 2 |
| 017297 | Isosorbide MN 60 mg, Tablet, Extended Release, Oral, 100 | 0.7492 | Apr 2001 | 01/22/02 | 07/20/05 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | | 0.2025 | | 07/21/05 | | - | - | - [14] | - | - | - | - |
| 003758 | Lorazepam 1 mg, Tablet, Oral, 100 | 0.0207 | Jan 1994 | 07/01/94 | 09/30/97 | - | - | 3 | 3 | 5 | 5 | 6 |
| | | 0.0203 | Jun 1997 | 10/01/97 | 02/11/98 | - | - | 5 | 5 | 7 | 7 | 17 |
| | | No FUL | n/a | 02/12/98 | 08/31/98 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.6684 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | - | - | - |
| | | 0.5718 | Jan 2000 | 12/07/00 | | - | - | 2 | 2 | 2 | 2 | 2 |
| 005131 | Metoprolol 100 mg, Tablet, Oral, 100 | 0.1185 | Oct 1996 | 01/01/97 | 09/30/97 | - | - | 2 | 2 | 3 | 3 | 5 |
| | | 0.1161 | Jun 1997 | 10/01/97 | 08/31/98 | - | - | 1 | 1 | 1 | 1 | 4 |
| | | 0.0878 | Apr 1998 | 09/01/98 | 12/06/00 | - | - | - | - | - | - | 2 [15] |

Confidential

**Exhibit 5**

**Counts of Published Compendia Prices[1] that Could Have Been the Basis for the Published FUL[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Number of Matches that were the Lowest Price Among NDCs that Met Therapeutical Equivalence and Package Size Requirements | | Number of Matches Among All AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |
| | | 0.1290 | Jan 2000 | 12/07/00 | 01/21/02 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.0914 | Apr 2001 | 01/22/02 | 10/27/04 | - | - | 2 | 2 | 2 | 2 | 5 |
| | | 0.0690 | | 10/28/04 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 011673 | Ranitidine EQ 150 mg Base, Tablet, Oral, 100 | 0.5914 [16] | | 09/24/98 | 09/21/99 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | No FUL | n/a | 09/22/99 | 12/06/00 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | 0.3410 | Jan 2000 | 12/07/00 | 01/21/02 | - | - | 1 | 1 | 1 | 1 | 1 |
| | | 0.3411 | Apr 2001 | 01/22/02 | 05/07/05 | - | - | 5 | 5 | 5 | 5 | 5 |
| | | 0.1088 | | 05/08/05 | | - | - | 1 | 1 | 1 | 1 | 2 |

Notes:  - Analysis of each GCN includes:  (1) products explicitly identified by the First DataBank (FDB) variable "GCN Sequence Number" as belonging to the GCN; (2) any similarly described products (based on name, strength, and dosage form) not listed in FDB that appear in Medispan or Red Book and not exclusively in another GCN in FDB at the NDC-9 level.  Finally, following a review of online sources for NDCs that do not appear in FDB at the NDC-11 or NDC-9 level (355 NDCs in total), seven NDCs were dropped from the analysis (52493084701, 52493084717, 54977069501, 54977070601, 57362011601, 63874074917, and 51655027924), as either they were described as albuterol inhaler refills and not as albuterol inhalers or discrepancies in their descriptions were resolved such that they were confirmed to be outside the GCN.

- Some NDCs are reported under different GCNs in the FDB annual product description files at the NDC-11 level (15 NDCs), and, if the NDC does not appear in FDB at the 11-digit level, at the NDC-9 level (9 NDCs).  In addition, some NDCs appear under different Package IDs in Red Book (6 NDCs).  These differences, generally, are time dependent.  With respect to FDB, any descriptive values (e.g., therapeutical equivalency rating or obsolete date) reported for an NDC while it is listed under a GCN other than those at issue are excluded from the analysis, as are any price postings that correspond to the time period when the NDC appears to correspond to another product and was listed under a different GCN.  With respect to Red Book, the Package ID represents a unique identifier by which an NDC's product description, package size, therapeutical equivalence rating, deactivation/reactivation dates, and prices are reported.  Package IDs, and all associated data, that correspond to a drug name other than those at issue are excluded.

- For all compendia, postings of zero invalidate the previously posted price.  For Red Book, postings are treated as active through the price deactivation date or until the next posting.  Deactivation dates that fall before the date of the posting are replaced with the date of the posting (4 instances in total).  Finally, deactivation dates that occur on or after the date of a subsequent posting are replaced with the date immediately preceding the date of the next posting (10 instances in total).

- No postings are available from Medispan after August 3, 2007 and from FDB after February 1, 2007.  Although postings are available in Red Book as late as April 2009, they are not used after June 9, 2008, the date the data were acquired.  FULs analyzed are those for which any portion of their effective life falls within the period 1997 to 2005; however, the analysis extends over the full effective life of these FULs.

[1] The count of postings is based on AWPs, WACs, and Direct Prices in Medispan, FDB, and Red Book.  The count only includes postings, which, when multiplied by 1.5 and rounded to four decimals, fall within a tenth of a cent of the FUL.  The count does not include duplicate postings, such as two WACs for the same NDC for which the difference between the two prices is equal to zero when rounded to four decimals.  Nor does this count include duplicate postings for the same product, as occurs when the NDC for a product changes.

[2] To count as a match, the posting must be active  (i.e., the price has not been deactivated by obsolescence, a subsequent price posting, or otherwise) for at least part of the month specified in the CMS transmittal as the month during which prices analyzed to set the FUL were current (also see Note 5).  Obsolescence, generally, is determined with reference to the FDB "Obsolete Date", the FDB "HCFA Termination Date", the Medispan "Inactive Date", and the Red Book "NDC Discontinuation Date" (collectively, the "end dates").  Postings are only analyzed during the period prior to the earliest of the four end dates.  However, any postings on or after the earliest end date are treated as a reactivation of the NDC and such postings are analyzed until the next end date.  Postings after the second, third, or fourth end date are treated in the same manner.  Similarly, the Red Book "Reactivation Date" can reactivate the most recent set of active prices for an NDC, assuming the date falls on or after the discontinuation date and the NDC is not already currently active.  For some NDCs, the FDB end date only appear in an annual file corresponding to a year later than the date itself.  In such cases, for matching purposes, we replace the FDB end date with the first day of the year in which it first appeared.  Finally, 33 NDCs among the nine GCNs, for which the FDB Obsolete Date exhibited stark inconsistencies

Confidential

**Exhibit 5**

**Counts of Published Compendia Prices[1] that Could Have Been the Basis for the Published FUL[2]**

**Federal Upper Limits: 1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Number of Matches that were the Lowest Price Among NDCs that Met Therapeutical Equivalence and Package Size Requirements | | Number of Matches Among All AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) | | | |
| | | | | | | Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Limited to TE & PS[9] | Limited to PS Only | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |

[3] across annual files, were examined separately, using price posting activity and CMS reimbursement.

[3] Product descriptions are taken from the most recent CMS transmittal in which the GCN appears.  The package size used to set the FUL for each GCN is indicated by the value at the end of each description and remains constant for all 9 GCNs except for cefadroxil, which changed from 100 to 50 as of the January 22, 2002 FUL.

[4] Values of "No FUL" correspond to periods during which there was no FUL in place (i.e., FDB postings of zero).

[5] CMS transmittals typically indicate the month as of which prices analyzed to set the FUL were current, i.e., the "current month".  Where the current month was not available, the period considered was expanded to include the entire period from the day prior to the FUL effective date back to the first day of the month of the date that is 326 days before the FUL effective date, which is the longest period observed in the CMS transmittals between the middle of the current month and the FUL effective date.

[6] Missing end dates indicate FULs that were still in effect as of June 9, 2008, according to Red Book and CMS transmittals.

[7] Count includes all postings in column (h) that appear in the compendium used by CMS.

[8] Count includes all postings in column (i) that, at some point during the current month while the price was in effect, represented the lowest price available to CMS, as compared to similarly qualified prices.

[9] The count only includes prices for NDCs that are determined to be therapeutically equivalent and that are of the same package size as that used to set the FUL.  An NDC is considered therapeutically equivalent if it was found to have an "A" rating in the available copies of the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (i.e., the Orange Book) or, if such information was not available, was "A" rated by either the FDB variable "Expanded Orange Book Code" or the Red Book variable "Orange Book Code".  Since the ratings in the Orange Book are reported by drug application number, the FDA's National Drug Code Directory was used to link each application number to an NDC.  An NDC is considered to be of the same package size as that used to set the FUL if the package size indicated in the CMS transmittal matches either the FDB variable "Package Size", the Red Book variables "Total Quantity - Actual" or "Standard Quantity - Actual", or the Medispan implied package size (the mean ratio between the package and unit prices, rounded to one decimal).  Data from each of the three pricing compendia are considered publicly available as of the date of the first AWP, WAC, or Direct Price posting reported by each compendium for the relevant NDC.  For FDB descriptive data, contemporaneous data are used from the appropriate annual file and any changes across these files are recognized as of the beginning of the year of the file in which the change appears.  Changes across editions of the Orange Book are recognized as of the publication date of the edition in which the change appears, or April 30th (based on a survey of the different publication dates that were observable (1991 - 05/23/91; 1993 - 04/22/93;  1994 - 06/16/94; 1996 - 05/29/96; 2001 - 04/02/01; 2002 - 04/16/02; 2003 - 03/18/03; 2007 - 05/21/07)) if the publication date was unavailable.  The package size and therapeutical equivalence requirements must both be met at some point in time during the FUL current month, while the relevant price is in effect.

[10] Includes all active prices, regardless of whether the prices correspond to an NDC that is therapeutically equivalent and/or of the same package size as that used to set the FUL.

[11] Includes all prices cited in Note 10, as well as any published prices that were active at any point in time during the seven years preceding the beginning of the current month.

[12] While the FUL was reported in a later transmittal, this date is based on an earlier transmittal that reported the FUL for the albuterol inhaler refill, as the FULs for the refill and the inhaler have the same value and appear to have been posted in FDB simultaneously at a time consistent with the earlier transmittal.

[13] The posting corresponds to an AWP of $1.8448, posted in 1989, for NDC 00172405860, which, at the time the FUL was being set, had already been identified as being therapeutically equivalent and of the same package size as that used to set the FUL.  Nevertheless, the AWP was replaced with postings of $2.8465 in Medispan on March 11, 1996 and in FDB on March 14, 1996.

[14] According to deposition testimony by Gail Sexton, the FUL for isosorbide mononitrate was based on a non-published WAC for Ethex NDC 58177023804, which CMS obtained by calling the supplier ("Q.  And it looks like you settled on Ethex as the lowest published price?  A.  Yes.  Q.  But that you got that price not from the pricing compendia; it was not one that was published in the pricing compendia; you got it from some other source?  A.  Yes.  By calling the supplier."  (Deposition of Gail Sexton, pp. 117-118, and Sexton Exhibit 12)).

[15] The two postings correspond to a WAC and Direct Price of $0.0585, posted in April 1997, for NDC 00603462821, which, at the time the FUL was being set, had already been identified as being therapeutically equivalent and of the same package size as that used to set the FUL.  Nevertheless, both published prices were replaced with postings of $0.0450 on March 21, 1998.

[16] This is the only FUL in the table that does not appear in one of the CMS transmittals cited below.  However, the FUL is published by all three pricing compendia.  In addition, a provider update, published by the Rhode Island Medical Assistance Program in December 1998, notified pharmacy providers that, effective immediately, "Ranitidine HCL, 150mg, tablet, $0.5914/each" had been added to the FUL list.

Sources:  -  American Medical Association, *AMA Downloadable Resource Table:  Asthma* , ASTHMA Version 3.0 July 2007, <http://www.ama-assn.org/ama1/pub/upload/mm/370/astcodingspecs307_7.xls>.
          -  "Comprehensive Price History File," 2007 Wolters Kluwer Health (Medispan).

Confidential

**Exhibit  5**

**Counts  of  Published  Compendia  Prices[1]  that  Could  Have  Been  the  Basis  for  the  Published  FUL[2]**

**Federal  Upper  Limits:  1997 - 2005**

| GCN | Description[3] | FDB FUL[4] | Current Month[5] | Start Date | End Date[6] | Number of Matches that were the Lowest Price Among NDCs that Met Therapeutical Equivalence and Package Size Requirements Postings from the Same Source as Used by CMS[7] | Total Postings[8] | Number of Matches Among All AWP, WAC, and Direct Price Postings (TE = Therapeutical Equivalence; PS = Package Size) Limited to TE & PS[9] | Limited to PS Only[10] | Limited to TE Only | All Active Prices[10] | All Active and Inactive Prices[11] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |

- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37," Current as of August 20, 2008.
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".
- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services," Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).
- Deposition of Gail Sexton and exhibits.
- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual* (Rev. April 2000).
- FloridaInfusion, Nations Drug, Accessed February 6, 2009 <http://www.floridainfusion.com/awps.asp?keyword=capoten&searchfield=keyword>.
- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.
- Medispan Inactive Dates, 2007 Wolters Kluwer Health (Medispan).
- Red Book Advanced Data and *Red Book™ Drug Products and Pricing Developer's Guide Advanced* (January 2008).
- Rhode Island Medical Assistance Program, Provider Update Newsletter, Vol. 74, December 1998, <http://www.dhs.state.ri.us/dhs/heacre/prosvcs/prvupdts/pu74.htm>.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *Approved Products with Therapeutic Equivalence Evaluations* , 11th Edition - 27th Edition.
- U.S. Food and Drug Administration, Center for Drug Evaluation and Research, *National Drug Code Directory* , <http://www.fda.gov/cder/ndc/database/>.

Confidential

## Exhibit 6
## Counts of NDC-Quarters and NDCs for which Mr. Devor's AWP is Lower than His WAC

| | Number of NDC-Qtrs for which: | | | Number of NDCs for which: | | | |
| | Estimated AWP is Less than Estimated WAC | Estimated AWP & WAC are Both Reported | Share of NDC-Quarters | Estimated AWP is Ever Less than Estimated WAC | Estimated AWP & WAC are Ever Reported for the Same Qtr | Share of NDCs | Total Number of NDCs with Exhibits |
| | ------(Number of NDC-Quarters)------ | | ---(Percent)--- [(a) / (b)] | -----------(Number of NDCs)----------- | | ----(Percent)---- [(d) / (e)] | |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| Barr | 46 | 52 | 88.5 % | 2 | 2 | 100.0 % | 2 |
| Dey | 75 | 150 | 50.0 | 8 | 8 | 100.0 | 9 |
| Ethex | - | - | | - | - | | 4 |
| Ivax | 213 | 304 | 70.1 | 13 | 13 | 100.0 | 23 |
| Mylan | 351 | 444 | 79.1 | 23 | 24 | 95.8 | 25 |
| Par | 127 | 180 | 70.6 | 7 | 9 | 77.8 | 10 |
| Purepac | 181 | 202 | 89.6 | 7 | 7 | 100.0 | 7 |
| Roxane | 19 | 34 | 55.9 | 3 | 3 | 100.0 | 4 |
| Sandoz | 150 | 295 | 50.8 | 17 | 18 | 94.4 | 25 |
| Schering | 46 | 114 | 40.4 | 6 | 6 | 100.0 | 6 |
| Teva | 176 | 286 | 61.5 | 11 | 11 | 100.0 | 11 |
| Watson | 142 | 467 | 30.4 | 23 | 29 | 79.3 | 31 |
| Wyeth | - | - | | - | - | | 7 |
| **Total:** | **1,526** | **2,528** | **60.4 %** | **120** | **130** | **92.3 %** | **164** |

Notes:   - Shares are displayed rounded to the nearest tenth of a percent.
　　　　- Summary is based on a comparison of the variables "Estimated WAC", as reported in exhibits with the subheader
　　　　　"Computation of FUL Based on WAC", and "Estimated AWP", as reported in exhibits with the subheader "Computation
　　　　　of FUL Based on AWP".
　　　　- The Estimated AWP and the Estimated WAC were only compared for combinations of NDC and quarter for which Mr.
　　　　　Devor provided a non-zero, non-missing value for both variables.

Source(s):   - Mr. Devor's Electronic Exhibits.

Confidential

# Exhibit 7
## Counts of NDC-Quarters and NDCs for which Mr. Devor's AWP is Less than AMP

| | Number of NDC-Qtrs for which: | | | Number of NDCs for which: | | | Total |
| | Estimated AWP is Less than AMP | Estimated AWP & AMP are Both Reported | Share of NDC-Quarters | Estimated AWP is Ever Less than AMP | Estimated AWP & AMP are Ever Reported for the Same Qtr | Share of NDCs | Number of NDCs with Exhibits |
| | ------(Number of NDC-Quarters)------ | | ----(Percent)---- [(a) / (b)] | ----------(Number of NDCs)---------- | | -----(Percent)----- [(d) / (e)] | |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
|---|---|---|---|---|---|---|---|
| Barr | 15 | 46 | 32.6 % | 2 | 2 | 100.0 % | 2 |
| Dey | 31 | 83 | 37.3 | 5 | 5 | 100.0 | 9 |
| Ethex | 17 | 49 | 34.7 | 2 | 4 | 50.0 | 4 |
| Ivax | 119 | 342 | 34.8 | 17 | 18 | 94.4 | 23 |
| Mylan | 136 | 442 | 30.8 | 22 | 24 | 91.7 | 25 |
| Par | 53 | 183 | 29.0 | 8 | 9 | 88.9 | 10 |
| Purepac | 21 | 109 | 19.3 | 4 | 7 | 57.1 | 7 |
| Roxane | - | - | | - | - | | 4 |
| Sandoz | 171 | 374 | 45.7 | 18 | 19 | 94.7 | 25 |
| Schering | 43 | 87 | 49.4 | 5 | 6 | 83.3 | 6 |
| Teva | 86 | 286 | 30.1 | 11 | 11 | 100.0 | 11 |
| Watson | 127 | 348 | 36.5 | 25 | 28 | 89.3 | 31 |
| Wyeth | - | 36 | - | - | 2 | - | 7 |
| **Total:** | **819** | **2,385** | **34.3 %** | **119** | **135** | **88.1 %** | **164** |

Confidential

**Exhibit 7**

**Counts of NDC-Quarters and NDCs for which Mr. Devor's AWP is Less than AMP**

Notes:   - Shares are displayed rounded to the nearest tenth of a percent.
       - Of the 2,670 total instances where, for a given NDC and quarter, Mr. Devor provides a non-zero, non-missing value for both the
         AMP and the Estimated AWP or WAC, 1,133 (42.4%) include an Estimated AWP or WAC that is lower than the AMP.
       - Of the 136 NDCs for which Mr. Devor ever provides, in the same quarter, a non-zero, non-missing value for both the AMP and
         the Estimated AWP or WAC, 125 (91.9%) include an Estimated AWP or WAC that is lower than the AMP for at least one quarter.
       - Summary is based on a comparison of the variables "Estimated WAC", "Estimated AWP", and "AMP", which were respectively
         obtained from exhibits with the subheaders "Computation of FUL Based on WAC", "Computation of FUL Based on AWP", and
         "Computation of FUL Based on AMP".
       - The Estimated AWP and Estimated WAC were only compared with the AMP for combinations of NDC and quarter for which Mr.
         Devor provided a non-zero, non-missing value for both the AMP and the AWP or WAC.

Source(s):   - Mr. Devor's Electronic Exhibits.

Confidential

## Exhibit 8
## Counts of NDC-Quarters and NDCs for which Mr. Devor's WAC is Less than AMP

| | Number of NDC-Qtrs for which: | | | Number of NDCs for which: | | | |
| | Estimated WAC is Less than AMP | Estimated WAC & AMP are Both Reported | Share of NDC-Quarters | Estimated WAC is Ever Less than AMP | Estimated WAC & AMP are Ever Reported for the Same Qtr | Share of NDCs | Total Number of NDCs with Exhibits |
| | -----(Number of NDC-Quarters)----- | | ---(Percent)--- [(a) / (b)] | ---------(Number of NDCs)--------- | | ----(Percent)---- [(d) / (e)] | |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| Barr | 10 | 48 | 20.8 % | 2 | 2 | 100.0 % | 2 |
| Dey | 21 | 83 | 25.3 | 5 | 5 | 100.0 | 9 |
| Ethex | - | - | | - | - | | 4 |
| Ivax | 75 | 310 | 24.2 | 11 | 13 | 84.6 | 23 |
| Mylan | 102 | 680 | 15.0 | 20 | 25 | 80.0 | 25 |
| Par | 50 | 197 | 25.4 | 9 | 9 | 100.0 | 10 |
| Purepac | - | 109 | - | - | 7 | - | 7 |
| Roxane | - | - | | - | - | | 4 |
| Sandoz | 147 | 295 | 49.8 | 17 | 18 | 94.4 | 25 |
| Schering | 55 | 87 | 63.2 | 4 | 6 | 66.7 | 6 |
| Teva | 68 | 286 | 23.8 | 11 | 11 | 100.0 | 11 |
| Watson | 192 | 317 | 60.6 | 26 | 27 | 96.3 | 31 |
| Wyeth | - | - | | - | - | | 7 |
| **Total:** | **720** | **2,412** | **29.9 %** | **105** | **123** | **85.4 %** | **164** |

Confidential

# Exhibit 8

# Counts of NDC-Quarters and NDCs for which Mr. Devor's WAC is Less than AMP

Notes:    - Shares are displayed rounded to the nearest tenth of a percent.
- Of the 2,670 total instances where, for a given NDC and quarter, Mr. Devor provides a non-zero, non-missing value for both the AMP and the Estimated AWP or WAC, 1,133 (42.4%) include an Estimated AWP or WAC that is lower than the AMP.
- Of the 136 NDCs for which Mr. Devor ever provides, in the same quarter, a non-zero, non-missing value for both the AMP and the Estimated AWP or WAC, 125 (91.9%) include an Estimated AWP or WAC that is lower than the AMP for at least one quarter.
- Summary is based on a comparison of the variables "Estimated WAC", "Estimated AWP", and "AMP", which were respectively obtained from exhibits with the subheaders "Computation of FUL Based on WAC", "Computation of FUL Based on AWP", and "Computation of FUL Based on AMP".
- The Estimated AWP and Estimated WAC were only compared with the AMP for combinations of NDC and quarter for which Mr. Devor provided a non-zero, non-missing value for both the AMP and the AWP or WAC.

Source(s):    - Mr. Devor's Electronic Exhibits.

Confidential

**Exhibit 9**
**Counts of NDC-Quarters and NDCs for which Mr. Devor's AWP or WAC is Negative**

| | Number of NDC-Quarters for which: | | | | | | Number of NDCs for which: | | | | | | Total |
| | Estimated AWP is Negative | Estimated AWP is Reported | Share of NDC-Quarters | Estimated WAC is Negative | Estimated WAC is Reported | Share of NDC-Quarters | Estimated AWP is Ever Negative | Estimated AWP is Ever Reported | Share of NDCs | Estimated WAC is Ever Negative | Estimated WAC is Ever Reported | Share of NDCs | Number of NDCs with Exhibits |
| | -----(Number of NDC-Qtrs)----- | | ---(Percent)--- [(a) / (b)] | ----(Number of NDC-Qtrs)----- | | ----(Percent)---- [(d) / (e)] | -----(Number of NDCs)----- | | ---(Percent)--- [(g) / (h)] | -----(Number of NDCs)----- | | ----(Percent)---- [(j) / (k)] | |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |
| Barr | 11 | 52 | 21.2  % | 13 | 54 | 24.1  % | 2 | 2 | 100.0  % | 2 | 2 | 100.0  % | 2 |
| Dey | - | 151 | - | 3 | 159 | 1.9 | - | 8 | - | 3 | 9 | 33.3 | 9 |
| Ethex | - | 49 | - | - | - | | - | 4 | - | - | - | | 4 |
| Ivax | 4 | 372 | 1.1 | 22 | 312 | 7.1 | 2 | 23 | 8.7 | 5 | 13 | 38.5 | 23 |
| Mylan | 4 | 453 | 0.9 | 22 | 691 | 3.2 | 3 | 24 | 12.5 | 6 | 25 | 24.0 | 25 |
| Par | - | 183 | - | 25 | 222 | 11.3 | - | 9 | - | 4 | 10 | 40.0 | 10 |
| Purepac | 1 | 203 | 0.5 | 1 | 203 | 0.5 | 1 | 7 | 14.3 | 1 | 7 | 14.3 | 7 |
| Roxane | - | 36 | - | 1 | 44 | 2.3 | - | 3 | - | 1 | 4 | 25.0 | 4 |
| Sandoz | 19 | 379 | 5.0 | 45 | 295 | 15.3 | 6 | 19 | 31.6 | 14 | 18 | 77.8 | 25 |
| Schering | 1 | 122 | 0.8 | 2 | 114 | 1.8 | 1 | 6 | 16.7 | 2 | 6 | 33.3 | 6 |
| Teva | 3 | 295 | 1.0 | 25 | 286 | 8.7 | 3 | 11 | 27.3 | 5 | 11 | 45.5 | 11 |
| Watson | 27 | 533 | 5.1 | 135 | 491 | 27.5 | 11 | 30 | 36.7 | 22 | 29 | 75.9 | 31 |
| Wyeth | - | 39 | - | - | - | | - | 3 | - | - | - | | 7 |
| **Total:** | **70** | **2,867** | **2.4  %** | **294** | **2,871** | **10.2  %** | **29** | **149** | **19.5  %** | **65** | **134** | **48.5  %** | **164** |

Notes:   - Shares are displayed rounded to the nearest tenth of a percent.
   - Of the 3,210 total instances where, for a given NDC and quarter, Mr. Devor provides a non-zero, non-missing value for the Estimated AWP or WAC, 339 (10.6%) include a negative Estimated AWP or WAC.
   - Of the 153 NDCs for which Mr. Devor ever provides a non-zero, non-missing value for the Estimated AWP or WAC, 66 (43.1%) include an Estimated AWP or WAC that is negative for at least one quarter.
   - Summary is based on the variables "Estimated WAC", as reported in exhibits with the subheader "Computation of FUL Based on WAC", and "Estimated AWP", as reported in exhibits with the subheader "Computation of FUL Based on AWP".
   - The Estimated AWP and the Estimated WAC were only summarized for combinations of NDC and quarter for which Mr. Devor provided a non-zero, non-missing value for each variable.

Source(s):   - Mr. Devor's Electronic Exhibits.

Confidential

**Exhibit 10**
**Instances in which Mr. Devor Proxies for a Non-Negative Calculated Value of AWP or WAC**

| Exhibit Number | NDC | Drug Information | Company | Start Date | End Date | 'Price' Type | Published 'Price' | Estimated 'Price' | Proxy 'Price' | Published FUL | FUL Based on Proxy 'Price' | FUL Based on Estimated 'Price' | Difference Between Published FUL & FUL Based on Estimated 'Price' |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | [(i) * 1.5] | [(k) - (m)] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| Exhibit #16.68 - CORRECTED | 52544033305 | LORAZEPAM 1 MG TABLET | Watson | 07/01/01 | 09/30/01 | AWP | $ 405.24 | $ 14,861.44 | $ 94.47 | $ 285.90 | $ 141.71 | $ 22,292.16 | $ (22,006.26) |
| Exhibit #16.74 - CORRECTED | 52544046301 | METOPROLOL 100 MG TABLET | Watson | 07/01/03 | 09/30/03 | AWP | 80.10 | 107.23 | 0.54 | 9.14 | 0.81 | 160.85 | (151.71) |
| Exhibit #16.10 - CORRECTED | 00364263305 | RANITIDINE 150 MG TABLET | Watson | 10/01/01 | 12/31/01 | WAC | 44.44 | 7,371.23 | 38.70 | 170.50 | 58.05 | 11,056.84 | (10,886.34) |
| Exhibit #16.16 - CORRECTED | 00364273401 | ENALAPRIL MALEATE 20 MG TAB | Watson | 04/01/02 | 06/30/02 | WAC | 104.30 | 3,123.11 | 44.31 | - | 66.47 | 4,684.67 | (4,684.67) |
| Exhibit #16.19 - CORRECTED | 00364273402 | ENALAPRIL MALEATE 20 MG TAB | Watson | 07/01/02 | 09/30/02 | WAC | 990.89 | 13,768.28 | 258.46 | - | 387.69 | 20,652.42 | (20,652.42) |
| Exhibit #16.64 - CORRECTED | 52544033301 | LORAZEPAM 1 MG TABLET | Watson | 04/01/00 | 06/30/00 | WAC | - | 1,450.71 | 11.66 | 66.84 | 17.49 | 2,176.06 | (2,109.22) |
| Exhibit #16.64 - CORRECTED | 52544033301 | LORAZEPAM 1 MG TABLET | Watson | 07/01/00 | 09/30/00 | WAC | - | 1,613.47 | 11.66 | 66.84 | 17.49 | 2,420.21 | (2,353.37) |
| Exhibit #16.70 - CORRECTED | 52544033310 | LORAZEPAM 1 MG TABLET | Watson | 10/01/00 | 12/31/00 | WAC | - | 15,040.70 | 67.93 | 571.80 | 101.90 | 22,561.04 | (21,989.24) |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 01/01/03 | 03/31/03 | WAC | 20.18 | 136,839.23 | 10.54 | 24.55 | 15.81 | 205,258.85 | (205,234.30) |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 04/01/03 | 06/30/03 | WAC | 20.18 | 141,215.12 | 10.54 | 24.55 | 15.81 | 211,822.68 | (211,798.13) |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 07/01/03 | 09/30/03 | WAC | 20.18 | 3,032.33 | 10.54 | 24.55 | 15.81 | 4,548.50 | (4,523.95) |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 10/01/03 | 12/31/03 | WAC | 20.18 | 3,244.25 | 10.54 | 24.55 | 15.81 | 4,866.38 | (4,841.83) |
| Exhibit #16.91 - CORRECTED | 52544076060 | RANITIDINE 150 MG TABLET | Watson | 01/01/04 | 03/31/04 | WAC | 8.53 | 537.64 | 0.34 | 20.47 | 0.51 | 806.46 | (785.99) |

Notes:  - Dollars are displayed rounded to the nearest penny.
 - Summary is based on a comparison of the variables "Estimated WAC", "Estimated AWP", and "Proxy", which were obtained from exhibits with the subheaders "Computation of FUL based on WAC" and "Computation of FUL based on AWP".
 - The analysis is restricted to instances where there is a positive value for the "Proxy" and there is a positive value for the "Estimated AWP" or "Estimated WAC".
 - Drug information is obtained from the second subheader of Mr. Devor's respective exhibit.

Source(s):  - Mr. Devor's Electronic Exhibits.

Confidential

**Exhibit 11**
**Instances in which Mr. Devor Calculates an Estimated WAC Greater than the Published WAC**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Taken from Mr. Devor's Exhibit | | |
| **Exhibit Number** | **NDC** | **Drug Information** | **Company** | **Start Date** | **End Date** | **Estimated WAC** | **Proxy WAC** | **Published WAC** | **Difference Between Published WAC and Estimated WAC[1]** | **FUL Based on Estimated WAC** | **Published FUL** | **FUL Based on Published WAC** |
| | | | | | | ---------------------------------------------------------------(Dollars)--------------------------------------------------------------- | | | | | | |
| | | | | | | | | | | | | **[(i) * 1.5]** |
| **(a)** | **(b)** | **(c)** | **(d)** | **(e)** | **(f)** | **(g)** | **(h)** | **(i)** | **(j)** | **(k)** | **(l)** | **(m)** |
| Exhibit #8.31 - CORRECTED | 00172439018 | ALBUTEROL 90 MCG INHALER | Ivax | 07/01/04 | 09/30/04 | $    7.14 | $ | $    3.50 | $    (3.64) | $   10.71 | $  15.00 | $   5.25 * |
| Exhibit #8.31 - CORRECTED | 00172439018 | ALBUTEROL 90 MCG INHALER | Ivax | 10/01/04 | 12/31/04 | 5.53 | | 3.50 | (2.03) | 8.30 | 15.00 | 5.25 * |
| Exhibit #8.31 - CORRECTED | 00172439018 | ALBUTEROL 90 MCG INHALER | Ivax | 01/01/05 | 03/31/05 | 4.84 | | 3.50 | (1.34) | 7.26 | 15.00 | 5.25 * |
| Exhibit #8.31 - CORRECTED | 00172439018 | ALBUTEROL 90 MCG INHALER | Ivax | 04/01/05 | 06/30/05 | 3.81 | | 3.50 | (0.31) | 5.72 | 5.25 | 5.25 |
| Exhibit #9.37 - REVISED | 51079088120 | CLONAZEPAM 0.5 MG TABLET | Mylan | 07/01/99 | 09/30/99 | 41.07 | | 17.38 | (23.69) | 61.61 | 41.46 | 26.07 * |
| Exhibit #9.37 - REVISED | 51079088120 | CLONAZEPAM 0.5 MG TABLET | Mylan | 10/01/99 | 12/31/99 | 31.33 | | 17.38 | (13.95) | 47.00 | 41.46 | 26.07 * |
| Exhibit #9.37 - REVISED | 51079088120 | CLONAZEPAM 0.5 MG TABLET | Mylan | 01/01/00 | 03/31/00 | 26.33 | | 17.38 | (8.95) | 39.49 | 41.46 | 26.07 * |
| Exhibit #9.40 - REVISED | 51079088121 | CLONAZEPAM 0.5 MG TABLET | Mylan | 07/01/99 | 09/30/99 | 40.63 | | 17.74 | (22.89) | 60.94 | 41.46 | 26.61 * |
| Exhibit #9.40 - REVISED | 51079088121 | CLONAZEPAM 0.5 MG TABLET | Mylan | 10/01/99 | 12/31/99 | 31.59 | | 17.74 | (13.85) | 47.39 | 41.46 | 26.61 * |
| Exhibit #9.40 - REVISED | 51079088121 | CLONAZEPAM 0.5 MG TABLET | Mylan | 01/01/00 | 03/31/00 | 28.84 | | 17.74 | (11.10) | 43.27 | 41.46 | 26.61 * |
| Exhibit #9.40 - REVISED | 51079088121 | CLONAZEPAM 0.5 MG TABLET | Mylan | 04/01/00 | 06/30/00 | 19.28 | | 17.74 | (1.54) | 28.92 | 41.46 | 26.61 * |
| Exhibit #9.73 - REVISED | 51079087920 | RANITIDINE 150 MG TABLET | Mylan | 01/98/98 | 03/31/98 | 64.91 | | 48.80 | (16.11) | 97.36 | - | 73.20 |
| Exhibit #9.73 - REVISED | 51079087920 | RANITIDINE 150 MG TABLET | Mylan | 04/01/98 | 06/30/98 | 57.32 | | 48.80 | (8.52) | 85.98 | - | 73.20 |
| Exhibit #9.73 - REVISED | 51079087920 | RANITIDINE 150 MG TABLET | Mylan | 10/01/98 | 12/31/98 | 33.72 | | 28.80 | (4.92) | 50.59 | 59.14 | 43.20 * |
| Exhibit #10.05 - CORRECTED | 49884049501 | CLONAZEPAM 0.5 MG TABLET | Par | 07/01/03 | 09/30/03 | 185.38 | | 18.41 | (166.97) | 278.08 | 24.55 | 27.62 |
| Exhibit #10.05 - CORRECTED | 49884049501 | CLONAZEPAM 0.5 MG TABLET | Par | 10/01/03 | 12/31/03 | 255.90 | | 18.41 | (237.49) | 383.85 | 24.55 | 27.62 |
| Exhibit #10.05 - CORRECTED | 49884049501 | CLONAZEPAM 0.5 MG TABLET | Par | 01/01/04 | 03/31/04 | 255.90 | | 18.41 | (237.49) | 383.85 | 24.55 | 27.62 |
| Exhibit #10.05 - CORRECTED | 49884049501 | CLONAZEPAM 0.5 MG TABLET | Par | 04/01/04 | 06/30/04 | 29.46 | | 18.41 | (11.05) | 44.19 | 24.55 | 27.62 |
| Exhibit #10.05 - CORRECTED | 49884049501 | CLONAZEPAM 0.5 MG TABLET | Par | 07/01/04 | 09/30/04 | 33.86 | | 18.41 | (15.45) | 50.79 | 24.55 | 27.62 |
| Exhibit #11.16 | 00228300311 | CLONAZEPAM 0.5MG TABLET | Purepac | 07/01/97 | 09/30/97 | 48.02 | | 46.31 | (1.71) | 72.02 | - | 69.47 |
| Exhibit #11.16 | 00228300311 | CLONAZEPAM 0.5MG TABLET | Purepac | 10/01/97 | 12/31/97 | 45.47 | | 40.44 | (5.03) | 68.21 | 87.02 | 60.66 * |
| Exhibit #11.16 | 00228300311 | CLONAZEPAM 0.5MG TABLET | Purepac | 01/98/98 | 03/31/98 | 41.96 | | 40.44 | (1.52) | 62.94 | 87.02 | 60.66 * |
| Exhibit #11.16 | 00228300311 | CLONAZEPAM 0.5MG TABLET | Purepac | 04/01/98 | 06/30/98 | 30.56 | | 20.46 | (10.10) | 45.84 | 87.02 | 30.69 * |
| Exhibit #11.16 | 00228300311 | CLONAZEPAM 0.5MG TABLET | Purepac | 07/01/98 | 09/30/98 | 22.98 | | 20.46 | (2.52) | 34.47 | 41.46 | 30.69 * |
| Exhibit #11.16 | 00228300311 | CLONAZEPAM 0.5MG TABLET | Purepac | 10/01/98 | 12/31/98 | 20.47 | | 20.46 | (0.01) | 30.71 | 41.46 | 30.69 * |
| Exhibit #11.19 | 00228300350 | CLONAZEPAM 0.5MG TABLET | Purepac | 01/01/00 | 03/31/00 | 17.33 | | 16.37 | (0.96) | 25.99 | 41.46 | 24.56 * |
| Exhibit #11.19 | 00228300350 | CLONAZEPAM 0.5MG TABLET | Purepac | 04/01/98 | 06/30/98 | 138.34 | | 90.26 | (48.08) | 207.51 | 435.10 | 135.39 * |
| Exhibit #11.19 | 00228300350 | CLONAZEPAM 0.5MG TABLET | Purepac | 07/01/98 | 09/30/98 | 93.24 | | 90.26 | (2.98) | 139.86 | 207.30 | 135.39 * |
| Exhibit #15.13 | 00093083201 | CLONAZEPAM 0.5 MG TABLET | Teva | 04/01/98 | 06/30/98 | 27.70 | | 23.69 | (4.01) | 41.55 | 87.02 | 35.54 * |
| Exhibit #16.04 - CORRECTED | 00364263298 | ALBUTEROL 90 MCG INHALER | Watson | 07/01/97 | 09/30/97 | 6.67 | | 5.59 | (1.08) | 10.01 | - | 8.39 |
| Exhibit #16.04 - CORRECTED | 00364263298 | ALBUTEROL 90 MCG INHALER | Watson | 10/01/97 | 12/31/97 | 6.33 | | 5.59 | (0.74) | 9.50 | 7.47 | 8.39 |
| Exhibit #16.04 - CORRECTED | 00364263298 | ALBUTEROL 90 MCG INHALER | Watson | 01/98/98 | 03/31/98 | 5.79 | | 5.59 | (0.20) | 8.68 | 7.47 | 8.39 |
| Exhibit #16.10 - CORRECTED | 00364263305 | RANITIDINE 150 MG TABLET | Watson | 10/01/01 | 12/31/01 | 7,371.23 | 38.70 | 44.44 | 5.74 | 58.05 | 170.50 | 66.66 * |
| Exhibit #16.13 - CORRECTED | 00364263306 | RANITIDINE 150 MG TABLET | Watson | 01/01/00 | 03/31/00 | 7.74 | | 5.98 | (1.76) | 11.61 | - | 8.97 |
| Exhibit #16.13 - CORRECTED | 00364263306 | RANITIDINE 150 MG TABLET | Watson | 04/01/00 | 06/30/00 | 6.55 | | 5.98 | (0.57) | 9.82 | - | 8.97 |
| Exhibit #16.13 - CORRECTED | 00364263306 | RANITIDINE 150 MG TABLET | Watson | 07/01/00 | 09/30/00 | 6.41 | | 5.98 | (0.43) | 9.61 | - | 8.97 |
| Exhibit #16.16 - CORRECTED | 00364273401 | ENALAPRIL MALEATE 20 MG TAB | Watson | 04/01/02 | 06/30/02 | 3,123.11 | 44.31 | 104.30 | 59.99 | 66.47 | - | 156.45 |
| Exhibit #16.16 - CORRECTED | 00364273401 | ENALAPRIL MALEATE 20 MG TAB | Watson | 01/01/04 | 03/31/04 | 2,021.46 | - | 61.00 | - | - | 91.50 | 91.50 |
| Exhibit #16.19 - CORRECTED | 00364273402 | ENALAPRIL MALEATE 20 MG TAB | Watson | 07/01/00 | 09/30/00 | 1,129.90 | | 990.89 | (139.01) | 1,694.86 | - | 1,486.34 |
| Exhibit #16.19 - CORRECTED | 00364273402 | ENALAPRIL MALEATE 20 MG TAB | Watson | 10/01/00 | 12/31/00 | 1,056.54 | | 990.89 | (65.65) | 1,584.80 | - | 1,486.34 |
| Exhibit #16.19 - CORRECTED | 00364273402 | ENALAPRIL MALEATE 20 MG TAB | Watson | 07/01/02 | 09/30/02 | 13,768.28 | 258.46 | 990.89 | 732.43 | 387.69 | - | 1,486.34 |
| Exhibit #16.61 - CORRECTED | 52544024110 | LORAZEPAM 1 MG TABLET | Watson | 01/01/05 | 03/31/05 | 920.93 | | 359.43 | (561.50) | 1,381.40 | 571.80 | 539.15 * |
| Exhibit #16.73 - CORRECTED | 52544046301 | METOPROLOL 100 MG TABLET | Watson | 07/01/03 | 09/30/03 | 8.07 | | 4.60 | (3.47) | 12.11 | 9.14 | 6.90 * |
| Exhibit #16.73 - CORRECTED | 52544046301 | METOPROLOL 100 MG TABLET | Watson | 10/01/03 | 12/31/03 | 16.72 | | 4.60 | (12.12) | 25.08 | 9.14 | 6.90 * |
| Exhibit #16.73 - CORRECTED | 52544046301 | METOPROLOL 100 MG TABLET | Watson | 01/01/04 | 03/31/04 | 26.46 | | 4.60 | (21.86) | 39.69 | 9.14 | 6.90 * |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 01/01/03 | 03/31/03 | 136,839.23 | 10.54 | 20.18 | 9.64 | 15.81 | 24.55 | 30.27 |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 04/01/03 | 06/30/03 | 141,215.12 | 10.54 | 20.18 | 9.64 | 15.81 | 24.55 | 30.27 |

Confidential

**Exhibit 11**

**Instances in which Mr. Devor Calculates an Estimated WAC Greater than the Published WAC**

| | | | | | | Taken from Mr. Devor's Exhibit | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Exhibit Number | NDC | Drug Information | Company | Start Date | End Date | Estimated WAC | Proxy WAC | Published WAC | Difference Between Published WAC and Estimated WAC[1] | FUL Based on Estimated WAC | Published FUL | FUL Based on Published WAC |
| | | | | | | | | | ----(Dollars)---- | | | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | [(i) * 1.5] (m) |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 07/01/03 | 09/30/03 | 3,032.33 | 10.54 | 20.18 | 9.64 | 15.81 | 24.55 | 30.27 |
| Exhibit #16.79 - CORRECTED | 52544074601 | CLONAZEPAM 0.5 MG TABLET | Watson | 10/01/03 | 12/31/03 | 3,244.25 | 10.54 | 20.18 | 9.64 | 15.81 | 24.55 | 30.27 |
| Exhibit #16.85 - CORRECTED | 52544076005 | RANITIDINE 150 MG TABLET | Watson | 10/01/04 | 12/31/04 | 1,193.64 | - | 64.27 | - | - | 170.55 | 96.41 * |
| Exhibit #16.85 - CORRECTED | 52544076005 | RANITIDINE 150 MG TABLET | Watson | 01/01/05 | 03/31/05 | 1,193.64 | - | 64.27 | - | - | 170.55 | 96.41 * |
| Exhibit #16.91 - CORRECTED | 52544076060 | RANITIDINE 150 MG TABLET | Watson | 01/01/04 | 03/31/04 | 537.64 | 0.34 | 8.53 | 8.19 | 0.51 | 20.47 | 12.80 * |

Notes: - Dollars are displayed rounded to the nearest penny.

- Values with an asterisk (*) represent instances where the FUL on the Published WAC is lower than the Published FUL.

- Summary is based on a comparison of the variables "Estimated WAC" and "Published WAC", both of which were obtained from exhibits with the subheader "Computation of FUL based on WAC".

- The analysis is restricted to instances where the actual difference between the "Estimated WAC" and "Published WAC", i.e., column (g) minus column (i), is greater than $0.01.

[1] Note that this column in Mr. Devor's exhibits is not necessarily the difference between the Published WAC and his Estimated WAC because Mr. Devor sometimes calculates the difference using his Proxy WAC instead of his Estimated WAC.

Source(s): - Mr. Devor's Electronic Exhibits.

Confidential

## Exhibit 12
### Counts of NDC-Quarters and NDCs for which the Published
### WAC on Mr. Devor's Exhibit Would Have Produced a Lower FUL

| | Number of NDC-Qtrs for which: | | | Number of NDCs for which: | | | |
| | Published WAC * 1.5 is Less than the Published FUL | Published WAC & FUL are Both Reported | Share of NDC-Quarters | Published WAC * 1.5 is Ever Less than the Published FUL | Published WAC & FUL are Ever Reported for the Same Quarter | Share of NDCs | Total Number of NDCs with Exhibits |
| | ------(Number of NDC-Quarters)------ | | ---(Percent)--- [(a) / (b)] | --------------(Number of NDCs)--------------- | | ----(Percent)---- [(d) / (e)] | |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| Barr | - | 32 | -    % | - | 2 | -    % | 2 |
| Dey | 141 | 161 | 87.6 | 9 | 9 | 100.0 | 9 |
| Ethex | - | - | | - | - | | 4 |
| Ivax | 263 | 535 | 49.2 | 14 | 23 | 60.9 | 23 |
| Mylan | 179 | 650 | 27.5 | 18 | 25 | 72.0 | 25 |
| Par | 53 | 90 | 58.9 | 4 | 7 | 57.1 | 10 |
| Purepac | 91 | 168 | 54.2 | 5 | 7 | 71.4 | 7 |
| Roxane | 38 | 44 | 86.4 | 3 | 3 | 100.0 | 4 |
| Sandoz | 234 | 514 | 45.5 | 16 | 25 | 64.0 | 25 |
| Schering | - | 116 | - | - | 5 | - | 6 |
| Teva | 99 | 197 | 50.3 | 5 | 11 | 45.5 | 11 |
| Watson | 255 | 450 | 56.7 | 19 | 27 | 70.4 | 31 |
| Wyeth | 15 | 16 | 93.8 | 4 | 5 | 80.0 | 7 |
| **Total:** | **1,368** | **2,973** | **46.0  %** | **97** | **149** | **65.1  %** | **164** |

Confidential

## Exhibit 12
## Counts of NDC-Quarters and NDCs for which the Published
## WAC on Mr. Devor's Exhibit Would Have Produced a Lower FUL

Notes:  - Shares are displayed rounded to the nearest tenth of a percent.
- Of the 3,529 total instances where, for a given NDC and quarter, Mr. Devor provides a non-zero, non-missing value for both the Published FUL and the Published AWP, 53 (1.5%) include a Published AWP that, when multiplied by 1.5, is lower than the Published FUL.
- Of the 164 NDCs for which Mr. Devor ever provides, in the same quarter, a non-zero, non-missing value for both the Published FUL and the Published AWP, 7 NDCs (4.3%) include a Published AWP that, when multiplied by 1.5, is lower than the Published FUL for at least one quarter.
- Summary is based on a comparison of the variables "Published WAC", "Published AWP", and "Published FUL", in Mr. Devor's exhibits.  The first two variables were obtained from exhibits with the subheaders "Computation of FUL Based on WAC" and "Computation of FUL Based on AWP", respectively.  The third variable was taken from exhibits with the aforementioned subheaders, as well as from exhibits with the subheader "Computation of FUL Based on AMP".  Given that there are instances where Mr. Devor provides a different FUL in different exhibits for the same NDC and quarter, the WAC was first compared with the FUL reported in the same exhibit as the WAC was.  If a non-zero FUL was not reported in the WAC exhibit for the relevant NDC-quarter combination, the WAC was compared with the FULs reported in the AWP and AMP exhibits, with priority given to the former.  The same methodology was used when comparing the AWP with the FUL.
- The Published AWP and Published WAC were only compared with the Published FUL for combinations of NDC and quarter for which Mr. Devor provided a non-zero, non-missing value for both the FUL and the AWP or WAC.

Source(s):  - Mr. Devor's Electronic Exhibits.

Confidential

# Exhibit 13A

## Counts of NDC-Quarters for which Mr. Devor Calculates a FUL Using an NDC of the Wrong Package Size

**Number of NDC-Quarters for which Mr. Devor Provides a Non-Zero Difference Between the Published FUL and his Estimated FUL Based on:**

| | AWP | | | WAC | | | AMP | | |
|---|---|---|---|---|---|---|---|---|---|
| | NDC-Quarters with Wrong PS | Total NDC-Quarters | Share | NDC-Quarters with Wrong PS | Total NDC-Quarters | Share | NDC-Quarters with Wrong PS | Total NDC-Quarters | Share |
| | ----(Number of NDC-Quarters)--- | | ---(Percent)--- [(a) / (b)] | -----(Number of NDC-Quarters)----- | | ---(Percent)--- [(d) / (e)] | ---(Number of NDC-Quarters)--- | | ---(Percent)--- [(g) / (h)] |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
| Barr | 16 | 32 | 50.0 % | 16 | 32 | 50.0 % | 12 | 26 | 46.2 % |
| Dey | - | 113 | - | - | 118 | - | - | 107 | - |
| Ethex | 1 | 33 | 3.0 | - | - | - | 32 | 64 | 50.0 |
| Ivax | 102 | 239 | 42.7 | 88 | 196 | 44.9 | 135 | 299 | 45.2 |
| Mylan | 197 | 390 | 50.5 | 282 | 608 | 46.4 | 378 | 705 | 53.6 |
| Par | 83 | 139 | 59.7 | 99 | 160 | 61.9 | 93 | 167 | 55.7 |
| Purepac | 82 | 165 | 49.7 | 82 | 164 | 50.0 | 39 | 78 | 50.0 |
| Roxane | - | 29 | - | - | 32 | - | - | - | |
| Sandoz | 171 | 321 | 53.3 | 132 | 249 | 53.0 | 245 | 503 | 48.7 |
| Schering | - | 81 | - | - | 73 | - | - | 55 | - |
| Teva | 164 | 260 | 63.1 | 161 | 257 | 62.6 | 162 | 259 | 62.5 |
| Watson | 278 | 452 | 61.5 | 232 | 380 | 61.1 | 268 | 427 | 62.8 |
| Wyeth | 17 | 37 | 45.9 | - | - | | 24 | 48 | 50.0 |
| **Total:** | **1,111** | **2,291** | **48.5 %** | **1,092** | **2,269** | **48.1 %** | **1,388** | **2,738** | **50.7 %** |

Notes: - Shares are displayed rounded to the nearest tenth of a percent.
- Package sizes from First DataBank (using the variable "Package Size") were compared to those used by CMS in setting the FUL, as provided in CMS Transmittals.  With the exception of cefadroxil (GCN 048262), package sizes remain constant within a GCN.  The FUL package size for cefadroxil changes from 100 to 50 with the posting of a FUL on January 22, 2002.  The transition is applied in the quarter corresponding to the "current month", as of which the FUL was set, which in this case was April 2001.

Confidential

# Exhibit  13A

# Counts  of  NDC-Quarters  for  which  Mr.  Devor  Calculates  a  FUL  Using  an  NDC  of  the  Wrong  Package  Size

Sources:   - Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37," Current as of August 20, 2008.

- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated April 2000 - Effective December 7, 2000".

- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services," Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July 1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994), 27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July 1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).

- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual*  (Rev. April 2000).

- Mr. Devor's Electronic Exhibits.

Confidential

# Exhibit 13B
# Counts of NDCs for which Mr. Devor Calculates a FUL Using an NDC of the Wrong Package Size

**Number of NDCs for which Mr. Devor Ever Provides a Non-Zero Difference Between the Published FUL and his Estimated FUL Based on:**

| | AWP | | | WAC | | | AMP | | |
|---|---|---|---|---|---|---|---|---|---|
| | NDCs with Wrong PS | Total NDCs | Share | NDCs with Wrong PS | Total NDCs | Share | NDCs with Wrong PS | Total NDCs | Share |
| | --------(Number of NDCs)-------- | | ----(Percent)---- [(a) / (b)] | ------(Number of NDCs)------ | | ----(Percent)---- [(d) / (e)] | --------(Number of NDCs)-------- | | ----(Percent)---- [(g) / (h)] |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
| Barr | 1 | 2 | 50.0 % | 1 | 2 | 50.0 % | 1 | 2 | 50.0 % |
| Dey | - | 8 | - | - | 9 | - | - | 9 | - |
| Ethex | 1 | 3 | 33.3 | - | - | | 2 | 4 | 50.0 |
| Ivax | 11 | 21 | 52.4 | 7 | 12 | 58.3 | 9 | 18 | 50.0 |
| Mylan | 12 | 24 | 50.0 | 13 | 25 | 52.0 | 13 | 25 | 52.0 |
| Par | 5 | 9 | 55.6 | 6 | 10 | 60.0 | 5 | 9 | 55.6 |
| Purepac | 3 | 6 | 50.0 | 3 | 6 | 50.0 | 3 | 6 | 50.0 |
| Roxane | - | 3 | - | - | 4 | - | - | - | |
| Sandoz | 9 | 20 | 45.0 | 8 | 17 | 47.1 | 11 | 25 | 44.0 |
| Schering | - | 6 | - | - | 6 | - | - | 6 | - |
| Teva | 7 | 11 | 63.6 | 7 | 11 | 63.6 | 7 | 11 | 63.6 |
| Watson | 18 | 29 | 62.1 | 17 | 27 | 63.0 | 18 | 29 | 62.1 |
| Wyeth | 1 | 3 | 33.3 | - | - | | 1 | 2 | 50.0 |
| **Total:** | **68** | **145** | **46.9 %** | **62** | **129** | **48.1 %** | **70** | **146** | **47.9 %** |

Notes:   - Shares are displayed rounded to the nearest tenth of a percent.
   - Package sizes from First DataBank (using the variable "Package Size") were compared to those used by CMS in setting the FUL, as provided in CMS
   Transmittals.  With the exception of cefadroxil (GCN 048262), package sizes remain constant within a GCN.  The FUL package size for cefadroxil changes from
   100 to 50 with the posting of a FUL on January 22, 2002.  The transition is applied in the quarter corresponding to the "current month", as of which the FUL
   was set, which in this case was April 2001.

Confidential

**Exhibit 13B**

**Counts of NDCs for which Mr. Devor Calculates a FUL Using an NDC of the Wrong Package Size**

Sources:   - Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit (FUL) Changes to Transmittal No. 37,"
Current as of August 20, 2008.
- Department of Health and Human Services, Health Care Financing Administration, "Federal Upper Limit Drug Changes to Transmittal No. 36 Dated
April 2000 - Effective December 7, 2000".
- Department of Health and Human Services, Health Care Financing Administration, "State Medicaid Manual:  Part 6 - Payment for Services,"
Transmittal Nos. 45-6 Thru Rev. 13 (Reprint Date August 1989), 14 (August 1989), 15 (September 1989), 16 (March 1990), 17 (April 1990), 18 (July
1990), 19 (August 1991), 20 (March 1992), 21 (October 1992), 22 (April 1993), 23 (August 1993), 24 (October 1993), 25 (May 1994), 26 (October 1994),
27 (January 1995), 28 (May 1995), 29 (October 1995), 30 (June 1996), 31 (July 1996), 32 (November 1996), 33 (March 1997), 34 (July 1997), 35 (July
1998), 36 (April 2000), 36 (November 2000), and 37 (November 2001).
- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual*  (Rev. April 2000).
- Mr. Devor's Electronic Exhibits.

Confidential

## Exhibit 14
## Counts of NDCs for which Mr. Devor Extends His Analysis Beyond an NDC's FDB Obsolete Date

Number of NDCs for which Mr. Devor Ever Provides a Non-Zero Difference Between the Published FUL and his Estimated FUL Based on:

| | AWP | | | WAC | | | AMP | | |
|---|---|---|---|---|---|---|---|---|---|
| | NDCs Obsolete During Period[1] | Total NDCs | Share | NDCs Obsolete During Period[1] | Total NDCs | Share | NDCs Obsolete During Period[1] | Total NDCs | Share |
| | --------(Number of NDCs)-------- | | ----(Percent)---- [(a) / (b)] | --------(Number of NDCs)-------- | | ----(Percent)---- [(d) / (e)] | ---------(Number of NDCs)--------- | | ----(Percent)---- [(g) / (h)] |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
| Barr | 2 | 2 | 100.0 % | 2 | 2 | 100.0 % | 2 | 2 | 100.0 % |
| Dey | 4 | 8 | 50.0 | 5 | 9 | 55.6 | 1 | 9 | 11.1 |
| Ethex | - | 3 | - | - | - | | - | 4 | - |
| Ivax | 4 | 21 | 19.0 | 1 | 12 | 8.3 | 6 | 18 | 33.3 |
| Mylan | 3 | 24 | 12.5 | 4 | 25 | 16.0 | 5 | 25 | 20.0 |
| Par | 2 | 9 | 22.2 | 3 | 10 | 30.0 | 3 | 9 | 33.3 |
| Purepac | 2 | 6 | 33.3 | 2 | 6 | 33.3 | - | 6 | - |
| Roxane | 2 | 3 | 66.7 | 3 | 4 | 75.0 | - | - | |
| Sandoz | 12 | 20 | 60.0 | 9 | 17 | 52.9 | 17 | 25 | 68.0 |
| Schering | 2 | 6 | 33.3 | 1 | 6 | 16.7 | 1 | 6 | 16.7 |
| Teva | - | 11 | - | - | 11 | - | - | 11 | - |
| Watson | 15 | 29 | 51.7 | 14 | 27 | 51.9 | 19 | 29 | 65.5 |
| Wyeth | 1 | 3 | 33.3 | - | - | | 2 | 2 | 100.0 |
| **Total:** | **49** | **145** | **33.8 %** | **44** | **129** | **34.1 %** | **56** | **146** | **38.4 %** |

Notes:   - Shares are displayed rounded to the nearest tenth of a percent.

[1] Identified as NDCs for which Mr. Devor analyzes at least one obsolete quarter.  NDC-Quarters are defined as obsolete when they begin on or after a given NDC's obsolete date, which is based on the most recently reported date in the FDB annual product description files.

Sources:   - Mr. Devor's Electronic Exhibits.
- First DataBank (Alabama Production) Data and *NDDF (National Drug Data File)™ Documentation Manual* (Rev. April 2000).