# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------X

STATE OF WISCONSIN,              )

       Plaintiff,              )

   vs.                           )    No. 04 C V 1709

AMGEN, INCORPORATED, et al.,     )

       Defendants.             )

------------------------------X

       The deposition of BRIAN S. ROMAN, called by

the Plaintiff for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before CATHERINE ARMBRUST RAJCAN,

a Notary Public within and for the County of DuPage,

State of Illinois, and a Certified Shorthand Reporter

of said state, taken at 40 West Erie Street, Chicago,

Illinois, on the 16th day of November, A.D. 2006, at

9:45 a.m.

Roman, Brian S.        HIGHLY CONFIDENTIAL    November 16, 2006
Chicago, IL

---

**2**

1  PRESENT:

2

3    MINER, BARNHILL & GALLAND, P.C.

4    44 East Mifflin Street, Suite 803

5    Madison, Wisconsin 53703

6    by: MR. CHARLES J. BARNHILL, JR., ESQ.

7    and MR. ROBERT S. LIBMAN, ESQ.

8    608.255.5200

9        Appeared on behalf of the Plaintiff;

10

11   KELLEY DRYE & WARREN LLP

12   101 Park Avenue

13   New York, New York 10178

14   by: MR. WILLIAM A. ESCOBAR, ESQ.

15   212.808.7771

16       Appeared on behalf of Defendant Mylan

17       Pharmaceuticals, Incorporated.

18

19  ALSO PRESENT:

20     MR. ANTHONY MICALLETO, Videographer.

21  REPORTED BY:

22     MS. CATHERINE ARMBRUST RAJCAN, CSR, RDR, CRR, CCP

---

**4**

1          E X H I B I T S  (CONTINUED)

2  NUMBER        DESCRIPTION        PAGE

3  Exhibit Roman 158 - WI-JJ00013650................ 314

4  Exhibit Roman 159 - Corrected Copy of Johnson &

5              Johnson Defendants' Reply

6              Memorandum in Support of

7              Their Motion for a

8              Protective Order............. 317

9  Exhibit Roman 160 - WiMylan013194............... 325

10 Exhibit Roman 161 - Plaintiff's Second Amended

11             Complaint, Exhibit D,

12             dated June 28, 2006.......... 331

13 Exhibit Roman 162 - Group of documents starting

14             with WiMylan010911 and ending

15             with WiMylan012685........... 361

16

17

18

19

20

21

22

---

**3**

1            I N D E X

2

3  WITNESS: BRIAN S. ROMAN            PAGE

4    Examination by Mr. Barnhill.................. 007

5

6          E X H I B I T S

7  NUMBER        DESCRIPTION        PAGE

8  Exhibit Roman 145 - Notice of Deposition.......... 060

9  Exhibit Roman 146 - Printout of 42 CFR 447.331... 069

10 Exhibit Roman 147 - Mylan001157 - 001192......... 083

11 Exhibit Roman 148 - Mylan006853 - 006866......... 088

12 Exhibit Roman 149 - Mylan007275.................. 135

13 Exhibit Roman 150 - Mylan001947 - 001948......... 135

14 Exhibit Roman 151 - WiMylan012635 - 012641....... 141

15 Exhibit Roman 152 - WiMylan010557 - 010559....... 194

16 Exhibit Roman 153 - WiMylan010543 - 010548....... 217

17 Exhibit Roman 154 - WiMylan010549 - 010556....... 228

18 Exhibit Roman 155 - Definition of "Cost" from

19             Webster's Ninth New

20             Collegiate Dictionary........ 241

21 Exhibit Roman 156 - R1-019293.................... 243

22 Exhibit Roman 157 - SANDOZWISC0014382............ 313

---

**5**

1          P R O C E E D I N G S

2

3      THE VIDEOGRAPHER:  This is Anthony

4  Micheletto of Henderson Legal Services; I am the

5  operator of this camera.

6      This is the videotape deposition of

7  Brian S. Roman, and it's being taken pursuant to

8  Wisconsin State Rules of Civil Procedure on behalf

9  of the plaintiff. We are on the record on November

10 16th, 2006; the time is 9:41 a.m. as indicated on

11 the video screen.

12     We are at 14 West Erie, Chicago,

13 Illinois.  The case is captioned State of

14 Wisconsin versus Amgen, Incorporated, et al., Case

15 No. 04 CV 1709.

16     Will the attorneys please identify

17 themselves for the video record.

18     MR. BARNHILL:  Charles Barnhill

19 representing the plaintiff.

20     MR. LIBMAN:  Robert Libman representing

21 the plaintiff.

22     MR. ESCOBAR:  William Escobar, Kelley,

---

Henderson Legal Services, Inc.
(202) 220-4158

Roman, Brian S.        HIGHLY CONFIDENTIAL   November 16, 2006
Chicago, IL

---

**10**

1  -- it exists and is run and is managed as a stand-
2  alone corporation.
3  BY MR. BARNHILL:
4     Q.  Does it have its own board of directors?
5     A.  Yes.
6     Q.  And who is -- who are on the board of
7  directors?
8     A.  I'm not sure.
9     Q.  Okay.  What is Mylan Laboratories?
10    A.  Mylan Laboratories is a Pennsylvania
11 corporation; it is a -- a holding company, that's
12 probably the best way to think about it.  It's a
13 publicly traded company in the New York Stock
14 Exchange, S & P 500 listed, and is the corporate
15 parent of UDL Labs, also Mylan Pharmaceuticals,
16 which is the company I work for, and Mylan
17 Technologies, and several other subsidiaries.
18    Q.  And what is Mylan Pharmaceuticals, Inc.?
19    A.  Mylan Pharmaceuticals, Inc., is the
20 generic manufacturing and distribution company
21 within the Mylan group of companies.  Mylan
22 Pharmaceuticals is located in Morgantown, West

---

**11**

1  Virginia; we have big production facility there,
2  research and development labs; a distribution
3  center in Greensboro, North Carolina.  And we make
4  and sell generic drugs in the United States.
5     Q.  And what are generic drugs?
6     A.  Generic drugs are low-cost versions of
7  branded drugs, the branded prescription drugs that
8  people often think about and see the TV ads for
9  and things like that.  The generic versions are
10 always priced lower, they contain the same active
11 ingredients in the same amounts.
12       We have to prove to the Food and Drug
13 Administration that generic drugs are
14 bioequivalent to the brand name counterpart, in
15 other words, that the drug works the same in the
16 body, technically it's absorbed the same rate and
17 extent into the bloodstream of -- of a -- of a
18 person.
19       But they're a high quality, safe,
20 effective, low-cost version of a brand name
21 pharmaceutical.
22    Q.  Now, what is Burtech?

---

**12**

1     A.  Burtech -- Burtech is no longer in
2  business.  I think it still exists as a
3  corporation.  It's name actually was changed to
4  Mylan-Bertek, Incorporated a couple of years ago.
5       Bertek was a -- a separate -- well, it's
6  still a separate subsidiary of Mylan Labs.  Its
7  business was more on the branded side; and they
8  sold what are called branded generics also.  But
9  they had a sales force, and they sold prescription
10 drugs that were basically a different line of
11 drugs than Mylan Pharmaceuticals.
12    Q.  You keep referring to Bertek in the past
13 tense.
14       Is it still operating?
15    A.  It's not.  We -- we closed the Mylan-
16 Bertek business I think in 2004, maybe 2005.
17    Q.  Are the drugs which Bertek marketed
18 still being marketed by Mylan Laboratories, or
19 UDL, or any other corporation owned by Mylan?
20    A.  Mylan Laboratories doesn't make or sell
21 anything.  But some of the drugs that were in the
22 Mylan-Bertek line are now being sold by Mylan

---

**13**

1  Pharmaceuticals.  Some may be being sold by UDL.
2  I'm not sure; and I think at least one product
3  that Mylan-Bertek had launched has been sold to
4  another company.
5     Q.  Do you know the labeler codes of Bertek?
6     A.  Burtech's labeling codes?
7     Q.  Uh-huh.
8     A.  I don't.
9     Q.  Okay.  You realize that Mylan
10 Pharmaceuticals is a defendant in this litigation;
11 is that correct?
12    A.  Yes.
13    Q.  And it's a defendant in other litigation
14 alleging that Mylan caused to be published false
15 prices for its drugs; is that correct?
16    A.  We have been sued in a number of these
17 AWP-type cases; however you want to characterize
18 the allegations.  We are a defendant in several of
19 these suits.
20    Q.  Are you being currently investigated by
21 Congress in connection with -- with the pricing of
22 Mylan's drugs?

---

4 (Pages 10 to 13)

Roman, Brian S.        HIGHLY CONFIDENTIAL    November 16, 2006
Chicago, IL

58

1        MR. ESCOBAR: Objection to the form of
2   the question and beyond the scope.
3   BY MR. BARNHILL:
4        Q.  Is that what it empowers Mylan to do?
5        MR. ESCOBAR: This is beyond the scope,
6   and objection to the form. I don't understand --
7        MR. BARNHILL: It isn't beyond the
8   scope.
9   BY MR. BARNHILL:
10       Q.  Take a look at --
11       MR. ESCOBAR: Is there a -- is there a -
12   - a request that says the rebate agreement with
13   the federal government?
14       I didn't see one there.
15       MR. BARNHILL: It stays knowledge of
16   Medicaid programs. Take a look at Paragraphs 2, 3
17   and 4 of the -- of the notice.
18       MR. ESCOBAR: Right. And --
19       MR. BARNHILL: He's supposed to have
20   knowledge of this, otherwise he's not the witness
21   he's supposed to be.
22       MR. ESCOBAR: And we've objected to the

59

1   generality of that. He's able to answer questions
2   on a general basis. He has told you about the
3   rebate agreement.
4        At some point -- if you wanted to know
5   more about the rebate agreement, I suppose you
6   could put that as a subject in your deposition.
7        MR. BARNHILL: I don't have to be any
8   more specific than I am. If this witness is going
9   to take the position he doesn't know anything in
10   connection with these topics --
11       MR. ESCOBAR: Well, he's been answering
12   all the questions.
13       MR. BARNHILL: -- only answered one
14   question in connection with it, then we're going
15   to terminate this deposition and get somebody who
16   can testify.
17       MR. ESCOBAR: Chuck, he has answered
18   your questions, he's answering your questions. I
19   am telling you that there's nothing in there that
20   says have a witness ready to discuss the federal
21   government's rebate agreement. He's -- having
22   said that, he has answered your questions with

60

1   respect to the rebates.
2        So what's your question?
3        Let's --
4        MR. BARNHILL: I'm going to mark as
5   Exhibit Roman 145 the deposition notice so that we
6   can deal with Mr. Escobar's objections in that
7   connection and other connections.
8        MR. ESCOBAR: I'm sorry, you're marking
9   this as what?
10       MR. BARNHILL: Exhibit Roman 145.
11       (WHEREUPON, said document was
12   marked Deposition Exhibit Roman 145, for
13   identification, as of 11/16/06, CAR.)
14       MR. BARNHILL: Now, Mr. Escobar, if you
15   look at No. 2, it says Mylan's knowledge of the
16   federal Medicaid programs, laws, regulations and
17   rules.
18       MR. ESCOBAR: Okay.
19       MR. BARNHILL: And that's what we're
20   talking about.
21       MR. ESCOBAR: What's your question?
22       What's your question?

61

1        MR. BARNHILL: And my question is -- I
2   don't even know what my question is anymore
3   because you objected. We'll get to my question,
4   though. But that is one general subject, and
5   we're going to talk about his knowledge in that
6   connection.
7        MR. ESCOBAR: And he's been answering
8   questions about that.
9        MR. BARNHILL: But not without your
10   objection.
11   BY MR. BARNHILL:
12       Q.  Your company is responsible for knowing
13   the rules and regulations of the Medicaid program;
14   is that correct?
15       MR. ESCOBAR: Objection to the form of
16   the question.
17   BY THE WITNESS:
18       A.  I -- I'd agree that we're responsible
19   for knowing the rules and regulations that govern
20   the way that we interact with the Medicaid
21   program. There are a lot of aspects of the
22   Medicaid program that we don't participate in, for

16 (Pages 58 to 61)

Henderson Legal Services, Inc.
(202) 220-4158

Roman, Brian S.        HIGHLY CONFIDENTIAL    November 16, 2006
Chicago, IL

---

62

1  example, when the Medicaid program pays doctors
2  and things like that.
3       There's -- there are things that we are
4  involved in and many things that we're not. And
5  we are -- we are certainly responsible for and
6  take seriously our obligation to understand, know
7  and comply with the rules that apply to us.
8  BY MR. BARNHILL:
9       Q.  And does your company assume the
10  responsibility of behaving completely honestly and
11  above board in connection with the states'
12  Medicaid programs?
13      A.  Absolutely.
14      Q.  And your company is responsible for
15  knowing the laws that govern the states' Medicaid
16  programs; is that correct?
17      MR. ESCOBAR:  Objection to the form.
18  BY THE WITNESS:
19      A.  Again, the rules that apply to the way
20  that we interact with the Medicaid programs, I'd
21  agree with that.
22  BY MR. BARNHILL:

---

63

1       Q.  And are you aware that no state
2  employee, even a well-meaning state employee,
3  could permit you or Mylan to do something that is
4  contrary to state's laws; is that correct?
5       A.  Sure.  I'd agree with that.  And we
6  wouldn't.
7       Q.  Now, let me turn to how the state
8  Medicaid program operates.
9       Not every citizen in the state can
10  participate in the Medicaid program; is that
11  correct?
12      A.  I think that's right.  I think there are
13  eligibility criteria that need to be met.  It's a
14  needs-based program.  People who can't afford or
15  don't have other types of insurance are the ones
16  who are -- are eligible for it.
17      Q.  So it's a fact that the person has to be
18  unable to pay for adequate healthcare to be
19  eligible for the Medicaid program; is that
20  correct?
21      A.  I -- that's generally my understanding.
22      Q.  And the way the system operates is that

---

64

1  a medical recipient goes to a physician, who
2  writes a prescription, which the recipient then
3  takes to the pharmacy of his or her choice to have
4  filled; is that correct?
5       A.  Yes.
6       Q.  And that essentially sounds like a
7  relatively simple system.
8       But it's not that simple, is it?
9       MR. ESCOBAR:  Objection to the form.
10  BY MR. BARNHILL:
11      Q.  You may answer.
12      A.  What do you mean?
13      Q.  Well, because -- almost all the
14  manufacturer -- drug manufacturers participate in
15  this program, don't they?
16      MR. ESCOBAR:  Objection to the form.
17  BY THE WITNESS:
18      A.  Well, I'm here talking about what Mylan
19  does.  I do think it's common for drug
20  manufacturers to have signed these drug rebate
21  agreements and to be paying the rebates to the
22  states; yes.

---

65

1  BY MR. BARNHILL:
2       Q.  And because all the drugs companies
3  participate in the Medicaid program, a
4  prescription could come from any of thousands of
5  drugs; correct?
6       MR. ESCOBAR:  Objection to the form.
7  BY THE WITNESS:
8       A.  I assume the doctor's going to prescribe
9  the drug that the doctor in his or her medical
10  judgment thinks is the drug the patient needs to
11  help them get better.  The doctor might have 2
12  choices, might have 20 choices depending what the
13  person's medical problem is.
14  BY MR. BARNHILL:
15      Q.  You misunderstand my question.
16      My question is that because of the
17  variety of the -- of the people involved in the
18  program and the variety of drugs, at any given
19  moment a person may walk into a pharmacy who is a
20  Medicaid participant and ask for any one of
21  thousands of drugs; is that correct?
22      A.  Yeah, I think there probably are more

---

17 (Pages 62 to 65)

Roman, Brian S.        HIGHLY CONFIDENTIAL    November 16, 2006
Chicago, IL

74

1    about things that happen always, never, whatever.
2          But I think you could have a situation -
3    - I could imagine a situation where a customer
4    might call and say, you know, you're offering me
5    this drug at such and such a price, but that's
6    above the federal upper limit for it, and so I
7    can't pay you that, and I won't.
8          And then if we agreed to cut the price
9    for that customer, hypothetically, I guess you
10   could say that then the federal upper limit had
11   something to do with the pricing.  But really only
12   as it fits into this process of negotiation with
13   the customer about what we're going to charge and
14   what they're going to pay.
15   BY MR. BARNHILL:
16       Q.  Do you -- do you price your drugs higher
17   for those drugs that are not covered by the
18   federal upper limit than those that are?
19          MR. ESCOBAR:  Objection to the form.
20   BY THE WITNESS:
21       A.  We don't -- we don't price our drugs
22   based on what the federal upper limits are, we

75

1    price our products through our negotiations with
2    our customers in the competitive markets that
3    exist for these generic drugs.
4          So there really -- the concepts are
5    independent of one another.
6    BY MR. BARNHILL:
7        Q.  So the federal upper limit -- what the
8    federal upper limit is or is not has nothing do
9    with the pricing decisions; is that your
10   testimony?
11       A.  I'd say in a general sense that the
12   pricing policy or the pricing decisions is we
13   negotiate with our customers to sell them -- to
14   find a price at which they will buy our drugs.
15          I could see -- and I said this already -
16   - I mean, if you had a situation where there was a
17   federal upper limit, and we were asking for more
18   than that, I -- I could imagine that we would have
19   retail pharmacies who would tell us; we're not
20   interested in buying the drug for you because
21   that's just not going to work for us, we will lose
22   money on it; and then that would end up resulting

76

1    in a lower price, or we'd walk away from the
2    business.
3          So it could come into play, but it's not
4    like our pricing policy in some broad sense is
5    driven by federal upper limits.
6        Q.  So let me ask you this question just as
7    an example.  Let's assume that -- that Mylan has a
8    drug whose price is at $10 and it's covered by the
9    federal upper limit, and the federal upper limit
10   is taken off that drug.
11          Would that be a -- a reason for Mylan to
12   increase its prices in that drug?
13          MR. ESCOBAR:  Objection to the form, it
14   calls for a hypothetical.
15   BY THE WITNESS:
16       A.  Mylan wouldn't increase its price on the
17   drugs because of the federal upper limits; but the
18   fact that the federal upper limits came off in
19   your hypothetical suggests to me that maybe
20   something changed in the marketplace, and maybe
21   there aren't three companies selling the drug
22   anymore, maybe it's only one.  And if you had a

77

1    change in just supply-and-demand economics like
2    that, where Mylan was the only company selling a
3    drug, you may well see the price go up.
4          But it wouldn't be because the federal
5    upper limits went away.  I think you're sort of
6    cause and effect are backwards there.
7    BY MR. BARNHILL:
8        Q.  All right.  We'll talk about that
9    further.
10          You can put those regulations up.
11          What is a dispensing fee?
12       A.  A dispensing fee is an amount of money
13   that the state decides -- I assume you're asking
14   the Medicaid program.
15       Q.  Yeah.
16       A.  Okay.  Dispensing fees in state Medicaid
17   is the amount of money that the state Medicaid
18   program decides is appropriate to pay to
19   pharmacists as part of the overall compensation to
20   that pharmacist for dispensing a drug to a
21   Medicaid beneficiary.  For example, might be 4 or
22   5 dollars -- there's -- there's two aspects of

20 (Pages 74 to 77)

Henderson Legal Services, Inc.
(202) 220-4158

Roman, Brian S.        HIGHLY CONFIDENTIAL   November 16, 2006
Chicago, IL

230

1   the question.
2   BY THE WITNESS:
3       A.  Well, we would include it in the
4   document going to First Data Bank so that First
5   Data Bank would know what our WAC is.  And I've
6   told you before I don't know why letter to -- to
7   Red Book doesn't include WAC.
8   BY MR. BARNHILL:
9       Q.  Does there -- is there any required
10  relationship that you know of between the AWP and
11  the WAC?
12      MR. ESCOBAR:  Objection to the form.
13  BY THE WITNESS:
14      A.  I'm not entirely sure I know what you
15  mean by "required relationship."  But if you're
16  asking me is there like a defined percentage
17  difference between though numbers, or do they
18  always move in some mathematical ratio, no.
19  BY MR. BARNHILL:
20      Q.  So the -- the WAC doesn't have to be 20
21  or 30 percent less than the AWP for any reason.
22      A.  I'm not aware of any requirement that

231

1   end; and the WAC is the price that we invoice to
2   the wholesaler.  And it's not -- we don't sell at
3   AWP.
4       Q.  And -- and you actually don't sell at
5   WAC, either, do you?
6       MR. ESCOBAR:  Objection to the form.
7   BY THE WITNESS:
8       A.  Actually, we do sell at WAC.
9   BY MR. BARNHILL:
10      Q.  All right.  Do you sell the majority of
11  your drugs at WAC?
12      A.  We invoice all of our wholesaler -- all
13  of our transactions with wholesalers, and that's a
14  great deal of our -- of our sales, at WAC.
15      Q.  No, I'm not talking about invoice.  I'm
16  talking what the price is that you actually sold
17  it at.
18      MR. ESCOBAR:  Objection to the form.
19  BY THE WITNESS:
20      A.  Well, we sell it at WAC; that's the
21  invoice price.
22  BY MR. BARNHILL:

232

1       Q.  Is that the price that they actually
2   pay?
3       MR. ESCOBAR:  Objection to the form of
4   the question.
5   BY THE WITNESS:
6       A.  Well, that depends on -- that depends on
7   the relationship with the wholesaler and whether
8   they meet different targets and so on.
9       We do have customers -- we do -- there
10  are a good deal of transactions that are done at
11  WAC.  We always invoice a wholesaler at WAC.
12      Now, if we have an agreement with a
13  wholesaler that says, for example, they get a 2
14  percent discount if they pay us within 60 days,
15  well, if they do pay us within 60 days, they can
16  get a 2 percent discount.  If they don't pay us
17  within 60 days, then you're still at WAC.
18      We might have an agreement with them
19  that says if they sell a certain -- or if they buy
20  a certain amount from us and then sell a certain
21  target level of our drugs, that they can earn a
22  rebate.  Well, if they earn the rebate, that will

233

1   come down off of WAC.  If they don't, then you're
2   still at WAC.
3       So there's a lot of things that have to
4   play out before you would know, for example, what
5   -- I mean, what a net fully discounted price would
6   be to the wholesaler.  But we actually do sell the
7   wholesaler at WAC.  And invoice them at WAC.
8   BY MR. BARNHILL:
9       Q.  WAC and -- that is W-A-C and A-W-P,
10  average wholesale price have two different
11  meanings; is that correct?
12      MR. ESCOBAR:  Objection to the form.
13  BY THE WITNESS:
14      A.  WAC is wholesale acquisition cost.  And
15  AWP is average wholesale price.  They're different
16  concepts.
17  BY MR. BARNHILL:
18      Q.  Yeah.  WAC is the -- defined as
19  wholesale acquisition cost; is that right?
20      MR. ESCOBAR:  Objection to the form.
21  BY THE WITNESS:
22      A.  That's what I understand the acronym to

59 (Pages 230 to 233)