# EXHIBIT I

Cunard, Robert G.                                    October 26, 2007
                          Atlanta, GA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


THE COMMONWEALTH OF MASSACHUSETTS,          )

    Plaintiff,                              )   C.A. NO.

v.                                          )   03-11865-PBS

MYLAN LABORATORIES, INC., BARR              )

LABORATORIES, INC., DURAMED                 )

PHARMACEUTICALS, INC., IVAX CORPORATION,)

WARRICK PHARMACEUTICALS CORPORATION,        )

WATSON PRAMACEUTICALS, INC., SCHEIN         )

PHARMACEUTICAL, INC., TEVA                  )

PHARMACEUTICALS USA, INC., PAR              )

PHARMACEUTICAL, INC.,                       )

PUREPAC PHARMACEUTICAL CO.,                 )

AND ROXANE LABORATORIES, INC.               )

    Defendants.                             )

--------------------------------------

VIDEOTAPED DEPOSITION OF

ROBERT G. CUNARD

October 26, 2007

9:21 a.m.

Cunard, Robert G.                                    October 26, 2007
                          Atlanta, GA

|  | Page 2 |
|---|---|
| 1 | 1180 West Peachtree Street |
| 2 | Atlanta, Georgia |
| 3 | Kendra B. James, B-2194 |
| 4 | |
| 5 | |
| 6 | APPEARANCES OF COUNSEL: |
| 7 | |
| 8 | For Plaintiff: |
| 9 | PETER A. MULLIN, ESQ. |
| 10 | ROBERT C. MOLVAR, ESQ. |
| 11 | The Commonwealth of Massachusetts |
| 12 | Office of the Attorney General |
| 13 | 1 Ashburton Place |
| 14 | Boston, Massachusetts 02108 |
| 15 | 617-727-2200 |
| 16 | 617-727-2008 |
| 17 | robert.molvar@ago.state.ma.us |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES OF COUNSEL: |
| 2 | |
| 3 | For Defendant: |
| 4 | WILLIAM A. ESCOBAR, ESQ. |
| 5 | Kelley Drye & Warren LLP |
| 6 | 101 Park Avenue |
| 7 | New York, New York 10178 |
| 8 | 212-808-7771 |
| 9 | 212-808-7897 |
| 10 | wescobar@kelleydrye.com |
| 11 | |
| 12 | Also Present: |
| 13 | Mr. Brian Cuthbertson, Associate Litigation Counsel |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

Page 4

CONTENTS

| | EXAMINATION BY | PAGE |
|---|---|---|
| 3 | MR. MULLIN | 8, 300 |
| 4 | MR. ESCOBAR | 271, 323 |

INDEX TO EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Cunard 001 Section 4C Attachment | | 97 |
| Exhibit Cunard 002 11/8/01 E-mail from Dan King | | |
| to Bob Potter Regarding Weekly | | |
| Update, Ending 11/2/01 | | 103 |
| Exhibit Cunard 003 New Product Plan Summary | | 112 |
| Exhibit Cunard 004 6/28/00 E-mail from Jodi | | |
| Eichelberger to Robert Cunard | | |
| Regarding Drug 7 Spread | | 130 |
| Exhibit Cunard 005 4/5/01 E-mail to Bob Potter | | |
| From Jack Walsh Regarding | | |
| Drug 2 | | 138 |
| Exhibit Cunard 006 3/15/01 E-mail from Dan King | | |
| to Bob Potter and Robert | | |
| Cunard Regarding PCS | | 146 |

Page 5

INDEX TO EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Cunard 007 3/10/00 E-mail from Bob Potter | | |
| Regarding Drug VII | | 153 |
| Exhibit Cunard 008 AWP Price Changes | | 173 |
| Exhibit Cunard 009 11/13/00 Letter to Generic | | |
| Contract Vendor Regarding | | |
| Market Competitive Prices | | 185 |
| Exhibit Cunard 010 4/15/03 E-mail from Tony | | |
| Mauro to Anthony Thomassey | | |
| Regarding Cyclobenzaprine | | 195 |
| Exhibit Cunard 011 4/27/00 E-mail from Jason | | |
| Harper to Steve Krinke | | |
| Regarding Reimbursements | | 202 |
| Exhibit Cunard 012 4/24/00 E-mail from Robert | | |
| Cunard to Mr. Moldin | | |
| Regarding Drug 7 Info | | 212 |
| Exhibit Cunard 013 Medicaid Reimbursement | | |
| Comparison Worksheet | | 219 |
| Exhibit Cunard 014 Product Planning Backup | | |
| Information 7/24/00 -- | | |
| Enalapril | | 231 |

                                            2  (Pages 2 to 5)

Cunard, Robert G.                                    October 26, 2007
                              Atlanta, GA

---

**Page 6**

1              INDEX TO EXHIBITS
2    NUMBER          DESCRIPTION          PAGE
3    Exhibit Cunard 015 8/28/01 E-mail from Dennis
4              Bonnstetter to Robert
5              Cunard Regarding Competitor's
6              Catalogs              236
7    Exhibit Cunard 016 10/10/00 Letter to Laura
8              Schneider from Bob Cunard    237
9    Exhibit Cunard 017 11/6/00 Letter to Steve
10             LaFrance from Bob Cunard     243
11   Exhibit Cunard 018 7/31/00 E-mail from Dan King
12             to bbsprad@wal-mart.com
13             Regarding New AWPS           246
14   Exhibit Cunard 019 8/31/01 E-mail From Mike Hatch
15             to Robert Cunard Regarding
16             Anthem Pricing - Drug 2 30 mg 253
17   Exhibit Cunard 020 4/8/01 E-mail from Robert
18             Cunard to Joe Duda Regarding
19             Request for AWP/WAC Info     259
20   Exhibit Cunard 021 Table of Contents    266
21
22

---

**Page 7**

1    THE VIDEOGRAPHER: Good morning, ladies and
2    gentlemen. It's Friday, October 26th, 2007. It's
3    9:21 a.m. We're in Atlanta, Georgia. This will be
4    the deposition of Robert G. Cunard.
5        The case is the Commonwealth of Massachusetts
6    plaintiffs versus Mylan Laboratories, Inc., Barr
7    Laboratories, Inc., Duramed Pharmaceuticals, Inc.,
8    IVAX Corporation, Warrick Pharmaceuticals
9    Corporation, Watson Pharmaceuticals, Inc., Schein
10   Pharmaceuticals, Inc., TEVA Pharmaceuticals USA,
11   Inc., Par Pharmaceutical, Inc., Purepac
12   Pharmaceutical Company, and Roxane Laboratories,
13   Inc. defendants, United States District Court,
14   District of Massachusetts, Civil Action Number
15   03-11865-PBS.
16       Would the attorneys please introduce
17   themselves.
18       MR. MULLIN: Good morning. Peter Mullin and
19   Robert Molvar, assistant attorney generals (sic)
20   for the Commonwealth of Massachusetts.
21       MR. ESCOBAR: William Escobar, Kelley, Dry &
22   Warren on behalf of Mylan and the witness.

---

**Page 8**

1        MR. CUTHBERTSON: Brian Cuthbertson, Mylan.
2        THE VIDEOGRAPHER: Would the court reporter
3    please swear the witness.
4            ROBERT G. CUNARD,
5            having been first duly sworn,
6    was examined and testified as follows:
7            EXAMINATION
8    BY MR. MULLIN:
9        Q. Good morning, sir.
10       A. Good morning.
11       Q. Could you tell us your full name, please.
12       A. Robert George Cunard.
13       Q. And, Mr. Cunard, what's your residence
14   address.
15       A. 3560 Berkshire Eve Court, Duluth, Georgia.
16       Q. And the ZIP Code?
17       A. 30097.
18       Q. Mr. Cunard, I think as you know, my name
19   is Peter Mullin. This is Robert Molvar. We're
20   assistant attorney generals with the Commonwealth
21   of Massachusetts.
22       Are you aware that the Commonwealth of

---

**Page 9**

1    Massachusetts has sued Mylan Laboratories and some
2    other generic drug manufacturers in connection with
3    price reporting?
4        A. Yes.
5        Q. And are you aware that this deposition is
6    being taken in that case?
7        A. Yes.
8        Q. As you can see, we have a videographer and
9    we're making a videotape of the testimony today and
10   we have a court reporter and the reporter will
11   prepare a transcript of the testimony that's given.
12   And some or all of this deposition may be played to
13   a jury in Boston in connection with the trial of
14   the case.
15       You've sworn an oath to tell the whole truth
16   today. Do you understand that you're required to
17   testify to the full extent of your recollection
18   relating to any of the events that we ask you about
19   today?
20       MR. ESCOBAR: Objection to the form.
21       You can answer.
22       Q. (By Mr. Mullin) Do you understand --

---

                                    3 (Pages 6 to 9)

Cunard, Robert G.                                    October 26, 2007
                        Atlanta, GA

---

Page 62

1   the prices that Mylan reported to the price
2   reporting services was AWP?
3        A.  Yes.  As I recall, that was one of the
4   elements in the data file.
5        Q.  And did Mylan also report WAC prices,
6   W-A-C?
7        A.  Yes, I believe so.
8        Q.  And is that true for the period when you
9   joined the company at least through September of
10  2003?
11       A.  Yes.
12       Q.  Were there any other prices that Mylan
13  customarily or usually reported to price reporting
14  services during the period from when you joined the
15  company up through September of 2003?
16       MR. ESCOBAR:  Objection to the form.
17       THE WITNESS:  Would you please read that back?
18       (Whereupon, the record was read by the
19       reporter.)
20       THE WITNESS:  Not that I recall, no.
21       Q.  (By Mr. Mullin)  Would you describe your
22  role with regard to the establishment of Mylan's

---

Page 63

1   AWP prices during the time period from August '89
2   through September of 2003.
3        MR. ESCOBAR:  You mean August '99?
4        MR. MULLIN:  I'm sorry.  August of '99, yes.
5        Q.  (By Mr. Mullin)  When -- when you joined
6   the company up through September of 2003.
7        MR. ESCOBAR:  Objection to the form.
8        THE WITNESS:  Could you be more specific what
9   you're looking for.
10       Q.  (By Mr. Mullin)  What role, if any, you
11  played in deciding what the company's AWP was going
12  to be on its products.
13       A.  During the time period outlined, it -- my
14  role varied product to product, but I had oversight
15  and -- and -- and visibility into the price
16  setting.
17       Q.  Are you the primary person to recommend,
18  are you a decision-maker?  Describe your role for
19  us.
20       MR. ESCOBAR:  Objection to the form.
21       THE WITNESS:  As stated, it varied product to
22  product.  In some cases, I would be actively

---

Page 64

1   involved in the creation.  In other cases, I would
2   have just approved what others had put together.
3        Q.  (By Mr. Mullin)  And did you have at least
4   in some instances final approval authority during
5   that time period?
6        MR. ESCOBAR:  Objection to the form.
7        THE WITNESS:  Yes.
8        Q.  (By Mr. Mullin)  What was the practice at
9   Mylan with regard to the establishment of its AWP
10  during the time period from when you joined up
11  through September of 2003?
12       MR. ESCOBAR:  Objection to the form.
13       THE WITNESS:  As indicated around pricing, it
14  all varies product to product.  But at the time of
15  introduction, an -- a proposed AWP would be
16  established based on the reference listed drug AWP.
17       Q.  (By Mr. Mullin)  I'm sorry.  I didn't hear
18  the last part of your answer.
19       THE WITNESS:  Would you read it back, please.
20       (Whereupon, the record was read by the
21       reporter.)
22       Q.  (By Mr. Mullin)  When you say "the

---

Page 65

1   reference listed drug," what are you referring to?
2        A.  That is the brand drug for which the ANDA
3   or abbreviated drug application references to be
4   about the bioequivalent and the therapeutic
5   equivalent to.
6        Q.  And what was the -- the policy or the
7   guideline at Mylan in the period when you joined
8   the company up through September of 2003 with
9   regard to the relationship of the brand drug AWP
10  and the price that was established at Mylan for its
11  product?
12       MR. ESCOBAR:  Objection to the form; no
13  foundation.
14       THE WITNESS:  As indicated, it was a function
15  of the brand price of what our proposed AWP would
16  be.  Typical proposed pricing would be 89 percent of
17  the reference listed drug AWP.
18       Q.  (By Mr. Mullin)  When you say the
19  "proposed AWP," what are you referring to?
20       A.  The -- the proposed AWP that we would come
21  up with for submission to the third-party
22  databases.

---

17  (Pages 62 to 65)

Cunard, Robert G.                                    October 26, 2007
                        Atlanta, GA

Page 90

1    MR. ESCOBAR: Objection to the form and asked
2 and answered.
3    THE WITNESS: WAC as well as all the pricing
4 came through my area of pricing and contracts. So
5 as supervisor of that area, it was under my
6 responsibility.
7    Q.  (By Mr. Mullin)  Do you know a fellow by
8 the name of Dan King?
9    A.  Yes.
10   Q.  Who is Dan King?
11   A.  Actually, I know two Dan Kings. I believe
12 the one you're referring to is a national account
13 manager for Mylan.
14   Q.  And he was there when you were there?
15   A.  Yes.
16   Q.  All right.  Did he predate you?
17   A.  Yes.
18   Q.  And was he there when you left?
19   A.  Yes.
20   Q.  And is he still there now?
21   A.  I don't know.
22   Q.  What were Mr. King's responsibilities

Page 91

1 while you were at Mylan?
2    A.  As I knew it -- and once again, Mr. King
3 didn't report to me, he was on the sales side. But
4 he had national account responsibility as a
5 salesperson.
6    Q.  Territory base, particular customer base;
7 what was the scope of his responsibilities?
8    A.  It was my understanding that those were
9 all done customer based. They were not aligned
10 geographically.
11   Q.  And who are his customers?
12   A.  I -- I won't recall the exact list. I
13 know one of his customers was Albertson's. I
14 believe another one was the Opti-Source group,
15 which was a wholesale purchasing group, and HEB.
16   Q.  I'm sorry?
17   A.  HEB.
18   Q.  What's that?
19   A.  That is a grocery chain in Texas.
20   Q.  And when you say Opti-Source is a
21 wholesale purchasing group, for what type of
22 entity?

Page 92

1    A.  For independent wholesalers.
2    Q.  Going back for a second to -- to WAC,
3 during the period August '89 through September of
4 2003, was there any rule of thumb or -- with regard
5 to setting what the WAC was at Mylan?
6    MR. CUTHBERTSON: He said it again.
7    MR. ESCOBAR: We're going to have a standing
8 agreement that when you say '89 you mean '99,
9 right?
10   MR. MULLIN:  Let -- let me see if I can
11 correct it. Okay.
12   MR. ESCOBAR: Well, I'll give you the standing
13 --
14   Q.  (By Mr. Mullin)  Focusing --
15   MR. ESCOBAR: -- agreement.
16   Q.  (By Mr. Mullin)  -- focusing on the time
17 period August '99 through September 2003, was there
18 any practice or policy at Mylan with regard to the
19 establishment of the WAC price?
20   MR. ESCOBAR: Objection to the form and asked
21 and answered.  I think you asked it, Mr. Mullin,
22 the exact question a little while ago.

Page 93

1    THE WITNESS: That -- there was not a policy.
2 The practice, as I believe I outlined earlier, was
3 product by product based on the competitive
4 situation in the marketplace.
5    Q.  (By Mr. Mullin)  And when you say "the
6 competitive situation in the marketplace," that
7 would be the -- the WAC prices of -- of other
8 competing generic pharmaceutical manufacturers?
9    MR. ESCOBAR: Objection to the form.
10   THE WITNESS: That would be any pricing
11 information that was available from competing
12 products, be it WAC or any other price point.
13   Q.  (By Mr. Mullin)  And would -- would --
14 contract prices for competing manufacturers, are
15 you saying that that would influence Mylan's
16 establishment of its WAC?
17   A.  Yes.
18   Q.  And -- and how would that work; how would
19 the contract price of a competing manufacturer
20 influence Mylan's WAC?
21   MR. ESCOBAR: Objection to the form.
22   THE WITNESS: The -- the WAC and contract

24  (Pages 90 to 93)

Cunard, Robert G.                                    October 26, 2007
                        Atlanta, GA

Page 94

1  prices are -- are all related, in that there are
2  specific customer discounts that apply to WAC. So
3  they all tie in as far as the understanding of
4  discounts that apply to what price points and the
5  economic or the financial impact of those different
6  prices as they -- as they interrelate on the sale
7  of a product.
8      Q. (By Mr. Mullin) In addition to -- well,
9  let -- let me back up.
10     You -- you -- I think you said WAC was the
11 invoice price of Mylan to wholesalers. Is that
12 right?
13     MR. ESCOBAR: Objection to the form; asked and
14 answered and mischaracterizes the testimony.
15     THE WITNESS: WAC is the invoice price and the
16 price that wholesalers and distributors pay for the
17 product.
18     Q. (By Mr. Mullin) Is it true that in many
19 instances, wholesalers and distributors would
20 receive discounts, rebates, or chargebacks with
21 regard to product that had been invoiced at WAC?
22     MR. ESCOBAR: Objection to the form.

Page 95

1      THE WITNESS: Could you please read that back?
2      (Whereupon, the record was read by the
3      reporter.)
4      THE WITNESS: Again, it varies product by
5  product and customer by customer. There may be
6  discounts associated with that WAC invoice price.
7      Q. (By Mr. Mullin) And I understand that
8  there may be.
9      I'm asking you whether or not it would
10 generally be true that the majority of sales made
11 at WAC would be subject to some type of a -- a
12 discount, a rebate, or a chargeback?
13     MR. ESCOBAR: Objection to the form.
14     THE WITNESS: I believe that's a different
15 question. But to answer, yes, the majority of
16 sales to the wholesaler and distributor range would
17 have discounts applied to the WAC price.
18     Q. (By Mr. Mullin) And did you have price
19 authority with regard to establishing contract
20 prices with customers?
21     A. Yes, that was in the area of my
22 responsibility.

Page 96

1      Q. And at any given time, would your
2  authority with regard to contract prices be in
3  written form?
4      A. I don't understand the question.
5      Q. Would -- would there be some kind of a
6  document that would say that you had authority to
7  discount prices to a certain level, but if it was
8  going to be greater than that level, it required
9  higher level of approval or?
10     A. In the pricing and contracts department,
11 there were preestablished bid levels that different
12 individuals in the department could utilize. And
13 yes, any pricing that was recommended outside of
14 those bid levels would go through a series of
15 escalating approvals.
16     Q. And -- and what were the -- the various
17 levels of escalating approval?
18     A. It varied product by product and customer
19 by customer based on the -- the deviation from the
20 bid list as well as the annual financial impact of
21 the transaction.
22     MR. MULLIN: Let me mark this document as

Page 97

1  Exhibit Cunard 001.
2      (Whereupon, Exhibit Cunard 001 was marked
3  for identification.)
4      Q. (By Mr. Mullin) I'm showing you what's
5  been marked as Exhibit Cunard 001.
6      I'd represent to you that this was produced to
7  the Commonwealth by Mylan and it has a Bates number
8  that ends in 73007.
9      Do you recognize this document?
10     A. No, I don't.
11     Q. Do you -- you see up in the top right-hand
12 corner it says, "Section 4-C, Attachment 11 -- 11,
13 bid processing"?
14     And it appears to be a form and it appears
15 that you could plug in a customer name and it
16 appears to have signature lines for various people
17 with dollar amounts next to their names.
18     Is this -- does this document relate to the
19 various escalating levels of approval that you
20 referenced?
21     MR. ESCOBAR: Objection to the form; no
22 foundation.

25  (Pages 94 to 97)

Cunard, Robert G.                                      October 26, 2007
                              Atlanta, GA

---

Page 118

1   that back.
2        (Whereupon, the record was read by the
3        reporter.)
4        THE WITNESS:  Yes, the pricing was my
5   responsibility.
6        Q.  (By Mr. Mullin)  Okay.  Including the
7   strategy, right?
8        MR. ESCOBAR:  Objection to the form.
9        THE WITNESS:  I don't know what pricing
10  strategy would be.
11       Q.  (By Mr. Mullin)  You're familiar with the
12  word "strategy", aren't you?
13       A.  Yes.
14       Q.  Okay.  And you're familiar with the word
15  "pricing", aren't you?
16       A.  Yes.
17       Q.  All right.  And don't companies develop
18  strategies when they're deciding how to price their
19  product?
20       MR. ESCOBAR:  Objection to the form.
21       THE WITNESS:  As my understanding would be,
22  pricing would be a tactic to lead to a broader

---

Page 119

1   strategy, but I don't see it (sic) pricing strategy
2   per se.
3        Q.  (By Mr. Mullin)  In any event, whatever
4   the -- the -- the pricing for the product that
5   launched in November '99 was one of your
6   responsibilities, correct?
7        A.  Yes.
8        Q.  This document indicates that with regard
9   to this drug, the first point under pricing
10  strategy was "maximize reimbursement profitability
11  for the pharmacy."
12       Do you -- having looked at this document, was
13  it ever the policy of the company while you were
14  there with regard to establishing its prices to
15  maximize reimbursement profitability for the
16  pharmacy?
17       MR. ESCOBAR:  Objection to the form.
18       THE WITNESS:  No, it was not.
19       Q.  (By Mr. Mullin)  All right.  Can you think
20  of any reason why this would -- that would be
21  recorded in this document?
22       A.  I don't know.  As I look at that

---

Page 120

1   statement, I think it's fundamentally flawed in
2   that as -- a generic pharmaceutical manufacturer
3   cannot control pharmacy profitability.
4        Q.  You can certainly influence their
5   revenues, right?
6        MR. ESCOBAR:  Objection to the form; no
7   foundation.
8        THE WITNESS:  No.
9        Q.  (By Mr. Mullin)  You can't influence their
10  revenues at all?
11       MR. ESCOBAR:  Objection to the form.
12       THE WITNESS:  No.
13       Q.  (By Mr. Mullin)  You essentially sell
14  pharmaceuticals ultimately for use by pharmacies in
15  filling prescriptions, right?
16       MR. ESCOBAR:  Objection to the form.
17       THE WITNESS:  Yes.
18       Q.  (By Mr. Mullin)  And that's the essence of
19  Mylan's business, isn't it, manufacture and
20  distribute pharmaceuticals so prescriptions can be
21  filled and people can use them to deal with medical
22  conditions, right?

---

Page 121

1        A.  Yes.
2        Q.  And you're aware that pharmacies
3   frequently are paid by third-party payers for the
4   prescriptions that they fill, right?
5        A.  Yes.
6        Q.  And you're aware that many third-party
7   payers base their reimbursement to the pharmacy for
8   a prescription on reported prices?
9        MR. ESCOBAR:  Objection to the form; no
10  foundation.
11       THE WITNESS:  Please repeat that for me.
12       (Whereupon, the record was read by the
13       reporter.)
14       THE WITNESS:  I'm aware that there's different
15  methodologies for third-party reimbursement.
16       Q.  (By Mr. Mullin)  And -- and some of them
17  are AWP-based, right?
18       A.  Yes.
19       Q.  Some of them are WAC-based?
20       A.  Yes.
21       Q.  Okay.  And essentially, Mylan sets both of
22  those, right?

---

31 (Pages 118 to 121)

Cunard, Robert G.                                    October 26, 2007
                        Atlanta, GA

---

Page 122

1      MR. ESCOBAR: Objection to the form and
2  misrepresents the evidence.
3      THE WITNESS: As indicated previously, we
4  develop a proposed AWP that is submitted. And --
5  and, yes, we establish a WAC based on a competitive
6  scene -- scenario of the market.
7      Q.  (By Mr. Mullin) And to the extent that
8  the AWPs are higher and WACs are higher, the
9  reimbursement to the pharmacy is going to be
10  higher, isn't it?
11      MR. ESCOBAR: Objection to the form.
12      THE WITNESS: I don't know.
13      Q.  (By Mr. Mullin) Can you think of any way
14  that having a higher AWP would not result in a
15  higher reimbursement to a pharmacy for every
16  third-party payer who's AWP-based?
17      MR. ESCOBAR: Objection to the form.
18      THE WITNESS: Well, there's many other points
19  that are used in reimbursements, such as MAC and
20  other elements as well. So yes, I could see cases
21  where an AWP is not relevant in the reimbursement.
22      Q.  (By Mr. Mullin) All right. Sometimes

---

Page 123

1  even with a higher AWP, it won't result in a higher
2  price because of MACs or FULs or other caps on
3  reimbursement, right?
4      A.  Yes.
5      Q.  But to the extent that a drug wasn't
6  subject to a MAC or a FUL, it would -- if -- if
7  it's pure AWP-based reimbursement, the higher the
8  reimbursement, it always results in a -- the higher
9  the AWP, it always results in a higher
10  reimbursement to the pharmacy?
11      MR. ESCOBAR: Objection to the form; calls for
12  speculation.
13      THE WITNESS: I believe the mathematics would
14  be true. If the reimbursement methodology didn't
15  change, a higher AWP would reflect a higher
16  reimbursement.
17      Q.  (By Mr. Mullin) And with regard to --
18  FULs are federal upper limits, right?
19      A.  Yes.
20      Q.  And sometimes there's a state upper limit
21  as well?
22      A.  I'm not aware of that -- that specific

---

Page 124

1  terminology. But yes, states can set their own MAC
2  or -- or some kind of maximum cost.
3      Q.  And with regard to federal upper limits
4  and for the period of time that you were at Mylan
5  or at least up through September of 2003, the
6  federal upper limit was set at 150 percent of the
7  lowest reported price as long as there were at
8  least three reported prices for a generic product?
9      MR. ESCOBAR: Objection to the form.
10      THE WITNESS: I'm not aware of the exact
11  methodology per se on those.
12      Q.  (By Mr. Mullin) Are -- are you aware that
13  the upper limit prices were -- were based on
14  looking at what the reported prices were and then
15  applying a percentage mark-up to whatever the
16  lowest reported price was for the therapeutic
17  equivalents?
18      MR. ESCOBAR: Objection to the form and no
19  foundation.
20      THE WITNESS: No, I was not.
21      Q.  (By Mr. Mullin) You -- I think you said
22  you were aware that some third-party payers based

---

Page 125

1  their reimbursement on the WAC price; is that
2  right?
3      A.  Yes.
4      Q.  And -- and Mylan would set the WAC?
5      MR. ESCOBAR: Objection to the form.
6      THE WITNESS: There was a WAC established for
7  every product launch and -- and maintained moving
8  forward.
9      Q.  (By Mr. Mullin) In connection with that
10  launch, Mylan would report that price to First
11  DataBank and Medi-Span, right?
12      A.  Yes, as part of requirements for having
13  the product listed.
14      Q.  And the higher you set the -- the WAC, the
15  higher the reimbursement, right?
16      MR. ESCOBAR: Objection to the form.
17      Q.  (By Mr. Mullin) For those third-party
18  payers that used WAC as the basis for their
19  reimbursement?
20      MR. ESCOBAR: Same objection.
21      THE WITNESS: As discussed with AWP,
22  mathematically the same methodology applied to a

---

32  (Pages 122 to 125)

Cunard, Robert G.                                    October 26, 2007
                           Atlanta, GA

---

Page 126

1   higher price would yield a higher reimbursement.
2       Q.  (By Mr. Mullin)  So that a pharmacy can --
3   I mean a manufacturer can influence the revenue
4   that the pharmacy receives in connection with the
5   -- filling a prescription with Mylan's products --
6       MR. ESCOBAR:  Objection --
7       Q.  (By Mr. Mullin)  -- correct?
8       MR. ESCOBAR:  -- objection to the form; no
9   foundation.
10      THE WITNESS:  No, because the other variables
11  don't control.  There's many variables that would
12  go into a reimbursement methodology.  You don't
13  control them.
14      Q.  (By Mr. Mullin)  Like what?
15      A.  Like the percentage discount.  Like a MAC.
16  Like an FUL.  Or the implementation or application
17  of any of those.
18      Q.  Well -- okay.  That -- whatever the
19  percentage discount is, if you increase the WAC, as
20  long as you're applying the same percentage as a
21  matter of mathematics, the -- the resulting
22  number's always going to be higher if you start

---

Page 127

1   with a higher WAC, right?
2       MR. ESCOBAR:  Objection to the form.  And
3   you're calling now for speculation about what are a
4   myriad of different programs.
5       THE WITNESS:  As answered previously,
6   mathematically, yes, it -- it's very simple.
7       Q.  (By Mr. Mullin)  Do you recall
8   discussions, conversations at Mylan with regard to
9   establishing reported prices, AWPs and WACs, about
10  being concerned at maximizing revenue for
11  pharmacies?
12      MR. ESCOBAR:  Objection to the form.
13      THE WITNESS:  No.
14      Q.  (By Mr. Mullin)  Do you recall any
15  discussion of that at any time while you were at
16  Mylan?
17      MR. ESCOBAR:  Objection to the form.
18      THE WITNESS:  Could you rephrase that, please.
19      MR. MULLIN:  Could you read it back.
20      (Whereupon, the record was read by the
21      reporter.)
22      THE WITNESS:  Would you repeat the previous

---

Page 128

1   question, please.
2       (Whereupon, the record was read by the
3       reporter.)
4       THE WITNESS:  No.
5       Q.  (By Mr. Mullin)  No recollection
6   whatsoever on that topic?
7       MR. ESCOBAR:  Objection to the form; asked and
8   answered.
9       Q.  (By Mr. Mullin)  Is that right?
10      A.  Yes, that is correct.
11      Q.  Okay.  Any recollection of discussion of
12  spreads?
13      MR. ESCOBAR:  Objection to the form.  What do
14  you mean by spreads?
15      MR. MULLIN:  Spreads between the contract
16  price and the AWP price.
17      MR. ESCOBAR:  Objection to the form.
18      Q.  (By Mr. Mullin)  Do you recall any
19  discussion, conversation, that ever coming up at
20  Mylan while you were working there?
21      MR. ESCOBAR:  Objection to the form.
22      THE WITNESS:  No.

---

Page 129

1       Q.  (By Mr. Mullin)  Did people ever send you
2   e-mails saying that customers were reporting that
3   someone else had a better spread and, therefore,
4   they were less willing or maybe even unwilling to
5   buy Mylan's product?
6       MR. ESCOBAR:  Objection to the form.
7       THE WITNESS:  Not that I recall.
8       Q.  (By Mr. Mullin)  Do you know Jodi
9   Eichelberger?
10      A.  Yes.
11      Q.  Who's Jodi Eichelberger?
12      A.  Jodi Eichelberger was an employee of UDL,
13  which is an institutional -- or was an
14  institutional division of Mylan.
15      Q.  When you say "an institutional division,"
16  what do you mean?
17      A.  The company focused on hospital and
18  long-term care customer -- pharmacy customers.
19      Q.  Selling pharmaceuticals in blister packs
20  for individual doses?
21      A.  Yes.
22      Q.  And was that Jodi's position in or about

---

33  (Pages 126 to 129)

Cunard, Robert G.                                    October 26, 2007
                          Atlanta, GA

---

Page 210

1     THE WITNESS: They complement each other but
2  are distinct.
3     Q.  (By Mr. Mullin)  And at Mylan, didn't you
4  work closely with the sales people?
5     MR. ESCOBAR: Objection to the form.
6     THE WITNESS: No, not on a regular basis.
7     Q.  (By Mr. Mullin)  And do you have any
8  opinion as to whether or not a -- a template that
9  calculated the reimbursement of Mylan's product as
10 compared to a brand product and other generics
11 would be a valuable or not a valuable selling tool?
12    MR. ESCOBAR: Objection to the form. Calls
13 for speculation and no foundation.
14    THE WITNESS: No, I don't have an opinion.
15    Q.  (By Mr. Mullin)  And you don't have any
16 memory of people at Mylan having this; is that
17 right?
18    MR. ESCOBAR: Objection to the form.
19    THE WITNESS: That's correct.  I don't recall
20 this.
21    Q.  (By Mr. Mullin)  Let me -- did you ever --
22 do you know someone at Mylan by the name of R.

---

Page 211

1  Moldin, M-o-l-d-i-n?
2     A.  Yes.
3     Q.  Who is that?
4     A.  For a period of time, Richard Moldin was
5  the president of Mylan Laboratories.
6     Q.  So that would be the president of the
7  parent company of Mylan Pharmaceuticals?
8     A.  That is correct.
9     Q.  So that would be your boss's boss when you
10 were there?
11    MR. ESCOBAR: Objection to the form.
12    THE WITNESS: I believe the time Mr. Moldin
13 was there, I reported to Mr. DeBone who reported to
14 Mr. Moldin.
15    Q.  (By Mr. Mullin)  Okay. Do you have any
16 recollection of ever sending any templates to Mr.
17 Moldin that he could use to compare drugs?
18    MR. ESCOBAR: Objection to the form.
19    Q.  (By Mr. Mullin)  The reimbursement of
20 drugs?
21    A.  Not that I recall, no.
22    Q.  Did you deal with Richard Moldin on a

---

Page 212

1  day-to-day basis?
2     A.  Not on a day-to-day basis, no.
3     Q.  Would you think -- would you say it would
4  be unusual or an exception to be dealing directly
5  with Mr. Moldin when you were at Mylan?
6     A.  He was there a limited amount of time.  I
7  couldn't say it would be unusual or exceptional,
8  but I did not have daily communication with Mr.
9  Moldin.
10    Q.  Do you have a recollection of sending him
11 any templates or spreadsheets that would allow him
12 to compare reimbursement on Mylan's drugs versus
13 various other drugs?
14    A.  Not that I recall, no.
15    Q.  Any new tools that the company had that it
16 was distributing to its sales force and you wanted
17 to let him know what was going on; anything like
18 that ring any bells with you?
19    A.  No, not that I recall.
20    MR. MULLIN:  Let's -- I'll have our next
21 number. Let's mark this as Exhibit Cunard 012.
22       (Whereupon, Exhibit Cunard 012 was marked

---

Page 213

1  for identification.)
2     Q.  (By Mr. Mullin)  I'd ask you to look at
3  what's been marked Exhibit Cunard 012.
4     I'd represent to you that this is a document
5  that was produced to the Commonwealth by the
6  California Attorney General's Office who
7  represented to us that it was provided to them by
8  Mylan and to a House committee and that the
9  redactions that are shown on here were done by
10 Mylan.
11    And if you look at the very top, it appears to
12 be an e-mail from you to R. Moldin, right?
13    A.  The copy is a little run together, but
14 yeah, I believe that's the case.
15    Q.  And it's dated April 24, 2000, right?
16    A.  Yes, sir.
17    Q.  And at that time, you were the director of
18 pricing and contracts, right?
19    A.  That is correct.
20    Q.  So there was a VP between you and Mr.
21 Moldin, right?
22    MR. ESCOBAR: Objection to the form.

---

                        54  (Pages 210 to 213)

Cunard, Robert G.                                    October 26, 2007
                          Atlanta, GA

Page 214

1    THE WITNESS: Yes, that is correct.
2    Q. (By Mr. Mullin) So he would have been
3  three levels above you?
4    MR. ESCOBAR: Objection to the form.
5    THE WITNESS: I don't know the exact levels.
6  But -- but yes, there would have been an additional
7  person from what I had outlined earlier.
8    Q. (By Mr. Mullin) So it would be fair to
9  say he was your boss's boss's boss?
10    MR. ESCOBAR: Objection for the form.
11    THE WITNESS: Yes, I think that would be
12  accurate.
13    Q. (By Mr. Mullin) You say, "Dear Mr.
14  Moldin, please find attached Drug 7 information per
15  your request. The spreadsheets are a little
16  complex, but hopefully they will make sense."
17    Then you had attached three spreadsheets,
18  right; is that what the document shows?
19    A. Yes, that's what it appears.
20    Q. All right. And one is called price
21  comparison and you -- underneath that you say,
22  "Outlines current Drug 7 generic and proposed Mylan

Page 215

1  prices par -- prior to cash discount and Medicaid."
2    Right?
3    A. Yes, that's what it says.
4    Q. Then the next attachment that you have is
5  Mylan versus TEVA versus Drug Roman numeral VII and
6  you say, "Outlines the reimbursement model
7  comparing Mylan's Drug 7 to TEVA generic and Drug
8  Roman numeral VII. Quoted prices are at wholesaling
9  chains."
10    And then the third attachment is Drug 7
11  projections; is that right; that's the title that's
12  listed there?
13    A. Yes.
14    Q. And then you say, "Represents the
15  projected Drug 7 conversion rate."
16    What's the conversion rate with regard to the
17  launch of a pharmaceutical?
18    A. The conversion rate is the rate that the
19  generic captures the brand market share.
20    Q. Okay. And do you have a recollection of
21  sending price comparison documents to Mr. Moldin,
22  including comparisons that would permit the

Page 216

1  comparison of one generic to another generic and
2  reimbursement -- what the reimbursement was going
3  to be on the various products?
4    MR. ESCOBAR: Objection to the form.
5    THE WITNESS: I don't recall the specific
6  reimbursement piece, but I do recall in this
7  instant (sic), there was confusion in the
8  marketplace as there were two products that were
9  both the same molecule extended release but they
10  were not interchangeable with one another. And
11  there was confusion in the marketplace around the
12  pricing dynamics that we were trying to remedy.
13    Q. (By Mr. Mullin) And this was with regard
14  to the generic versions of Procardia?
15    A. Our product was the -- the Mylan product
16  was the generic name and equivalent version of
17  Procardia XL. There was another product named that
18  was nifedipine extended release as well. However,
19  it was bioequivalent and interchangeable with the
20  brand product Adalat CC. And the fact that the two
21  products shared the same molecule name and extended
22  release, there was confusion in the marketplace.

Page 217

1  But they were not interchangeable with one another.
2    Q. And who was the manufacturer of Adalat?
3    A. Oh. I believe at the time it was Bayer.
4  I'm -- I'm not sure who purchased them or where
5  that company would be today.
6    Q. And do you have a recollection of sending
7  Mr. Moldin documents relating to what the
8  comparison was on the reimbursement for various
9  drugs?
10    MR. ESCOBAR: Objection to the form. Are you
11  asking if he has a recollection of sending the
12  document that you're looking at now?
13    MR. MULLIN: Ever, with regard to anything.
14    MR. ESCOBAR: Can you just try to rephrase it
15  so we -- we have, like, a complete question.
16    Q. (By Mr. Mullin) Mr. Cunard, do you have a
17  recollection of sending attachments, forms,
18  spreadsheets that permitted the comparison of the
19  reimbursement on one of Mylan's product versus the
20  reimbursement on some competing manufacturers'
21  products to Mr. Moldin?
22    A. I do not recall that, no. I don't believe

                              55 (Pages 214 to 217)

Cunard, Robert G.                                    October 26, 2007
                            Atlanta, GA

Page 222

1     A.  Yes, that appears to be the case.
2     Q.  And you're aware -- you were aware back
3  when you were with Mylan that each state has its
4  own Medicaid program?
5     A.  Yes.
6     Q.  And that each state set its own criteria
7  as to the basis on which it was going to reimburse
8  under -- for prescription drugs under its Medicaid
9  program?
10    MR. ESCOBAR:  Objection to the form.
11    Q.  (By Mr. Mullin)  Is that right?
12    A.  I wasn't aware of the -- exactly the --
13  the methodology or how that was obtained, but
14  through various publications, it was clear that
15  there were differences among the programs.
16    Q.  Okay.  If you would, sir, would you turn
17  to page 2 of Exhibit Cunard 013 and look at the
18  column for the Commonwealth of Massachusetts.  I
19  think it's the fourth column if you go across
20  horizontally.
21    Do you see that?
22    A.  I do.

Page 223

1     Q.  And under the brand reimbursement
2  criteria, do you see in line 3 reimbursement is WAC
3  plus and the entry is 10 percent?
4     A.  Yes.
5     Q.  And a dispensing fee of $3?
6     A.  Yes.
7     Q.  And a copay of 50 cents?
8     A.  Yes.
9     Q.  And then an AWP is plugged in, a WAC price
10  is plugged in, and a reimbursement is calculated.
11    Do you see that, the 126.83?
12    A.  Yes.
13    Q.  Then there's a dispensing fee and a -- a
14  copay and it comes up with a total reimbursement of
15  130.33.
16    Do you see that?
17    A.  Yes.
18    Q.  And the cost to the pharmacy, the invoice
19  price is 115.30?
20    A.  Yes.
21    Q.  And it calculates that the profit to the
22  pharmacy at invoice is 15.03.

Page 224

1     Do you see that?
2     A.  Yes.
3     Q.  And the -- the net profit or the profit at
4  net to the pharmacy is 15.03?
5     A.  Yes.
6     Q.  Then it does the same thing for generic
7  reimbursement; is that right?
8     A.  Yes, that appears to be the case.
9     Q.  And they plug in the generic AWP, the
10  124.50?
11    A.  Yes.
12    Q.  And for a -- a pharmacy cost, they plug in
13  81.30?
14    A.  Yes, I see that.
15    Q.  And the profit at net to the pharmacy
16  using the generic product is 19.76?
17    A.  Yes.
18    Q.  And interpreting this chart or comparison
19  worksheet, does it appear to you that the
20  conclusion here is that the pharmacy makes more
21  money using the generic than the brand product?
22    MR. ESCOBAR:  Objection to the form.

Page 225

1     THE WITNESS:  Well, as the model outlines,
2  19.76 is greater than 15.03, yes.
3     Q.  (By Mr. Mullin)  Do you have a
4  recollection of having a document like this at
5  Mylan that people used?
6     A.  I do not, no.
7     Q.  Is this the document that you sent to Mr.
8  Moldin?
9     A.  No.
10    Q.  Do you think this would be valuable to a
11  salesman?
12    A.  I don't --
13    MR. ESCOBAR:  Objection to the form; calls for
14  speculation.
15    THE WITNESS:  I don't know.
16    Q.  (By Mr. Mullin)  You have no idea
17  whatsoever whether it would be valuable or not to a
18  salesman?
19    MR. ESCOBAR:  Objection to the form; calls for
20  speculation.
21    THE WITNESS:  No.
22    Q.  (By Mr. Mullin)  Can you think of any

                              57  (Pages 222 to 225)

Cunard, Robert G.                                          October 26, 2007
                            Atlanta, GA

---

Page 254

1    019.
2        Q.  (By Mr. Mullin)  Mr. Cunard, I'm going to
3    show you what's been marked as Exhibit Cunard 019.
4        It's a series of e-mails.  At least the -- the
5    one at the very top of the very page is from Mike
6    Hatch to you.  It appears to attach some
7    information relating to Anthem.
8        Are you familiar with a customer by the name
9    of Anthem?
10       A.  Yes, I am.
11       Q.  This document was produced to the
12   Commonwealth by California AG's office.  They
13   represented to us they got it from Mylan, that it
14   was also produced to a committee of the Congress.
15   It has redactions and we've been told the
16   redactions were done by Mylan.
17       In going through the document, it all appears
18   to relate to the same topic or at least the first
19   six or seven pages, although some of the e-mails
20   are repeated.
21       Why don't I let you look at this just so you
22   can become familiar with it.  Then I'm going to

---

Page 255

1    direct your attention to page 2 to an e-mail from
2    you to Bob Potter dated 8/8/01 at 2:33 p.m.
3        MR. MULLIN:  You can disregard the last four
4    pages of Exhibit Cunard 019.  I think they're
5    documents that we previously looked at.
6        Mr. Escobar, if you prefer, I'm going to pull
7    the last four pages off of this.
8        MR. ESCOBAR:  I think that would be the -- a
9    better way to go.
10       MR. MULLIN:  All right.  Let's remove the last
11   four pages.
12       MR. ESCOBAR:  Why don't you do this.
13       MR. MULLIN:  Right now, Exhibit Cunard 019,
14   the first page has a Bates number MYLCA-000114 and
15   the numbers run continuously to MYLCA-000120.
16   There's also a set of Bates numbers on here, MYL
17   that end in 88 and run through 94.  So there's two
18   numbers on each page.
19       Q.  (By Mr. Mullin)  All right.  Mr. Cunard,
20   have you had a chance to look at this at least a
21   little bit and become familiar with what this is
22   about?

---

Page 256

1        A.  Yes, I have.
2        Q.  And the -- the customer seems to be
3    Anthem?
4        A.  Yes.
5        Q.  And what's Anthem?
6        A.  Anthem is a (sic) insurance program that
7    has a mail order pharmacy associated with it.
8        Q.  And it appears that somebody at Anthem was
9    raising a -- a question or an issue about Medicaid
10   reimbursement in Ohio for some -- for a drug?
11       MR. ESCOBAR:  Objection to the form;
12   mischaracterizes the document.
13       THE WITNESS:  I don't see it as raising an
14   issue, but just presenting a scenario.
15       Q.  (By Mr. Mullin)  Okay.  And turning to
16   page 2 of Exhibit Cunard 019, which has a Bates
17   number in the lower right-hand corner ending in
18   115, there's an e-mail from you to Bob Potter with
19   copies to Joe Duda and Bob Claeys.
20       And you say, "Bob, Bob, and Joe, something
21   doesn't jibe with his reimbursement rates.
22   Everything I have on Ohio puts them at AWP minus 11

---

Page 257

1    percent for Medicaid or MAC, which this should not
2    have being (sic) an exclusive.  The 152 price being
3    offered is the same spread in comparison to AWP as
4    the 15-milligram, which they have purchased 565
5    bottles through 7/31.  So must be okay.  Need more
6    info what the issues are.  Thanks, Bob."  And then I
7    guess it has the name Bob Potter under there.
8        Did you in the course of performing your
9    duties at Mylan make efforts to keep up on what the
10   reimbursement rates were for various Medicaid
11   programs around the country?
12       MR. ESCOBAR:  Objection for the form and asked
13   and answered.
14       THE WITNESS:  I did not make an effort to keep
15   up on it, but as I indicated earlier, the
16   information was published in at least one trade
17   journal on somewhat of a regular basis that would
18   show Medicaid reimbursements by state.
19       Q.  (By Mr. Mullin)  And what journal was
20   that?
21       A.  I believe it was Drug Topics.  I'm not
22   sure of the exact.

---

65  (Pages 254 to 257)

Cunard, Robert G.                                    October 26, 2007
                        Atlanta, GA

---

Page 258

1       Q.  And is that, like, an annual issue or a
2  quarterly issue or something like that or was it
3  every month or?
4       A.  Drug Topics was at least monthly and
5  perhaps more frequent.  They didn't publish that
6  information monthly, but it was numerous times
7  during the year, I believe.
8       Q.  And that's something that you had; you
9  maintained Drug Topics and -- and the issues that
10 had the -- the Medicaid information?
11      MR. ESCOBAR:  Objection to the form.
12      THE WITNESS:  I didn't really maintain it, but
13 I -- I typically kept the issues of Drug Topics,
14 all the issues.
15      Q.  (By Mr. Mullin)  All right.  And was one
16 of your reasons or part of your reasons for doing
17 the fact that from time to time, you would consult
18 with it when issues or questions would
19 arise about Medicaid reimbursements?
20      MR. ESCOBAR:  Objection to the form.
21      THE WITNESS:  It was a -- it was a source of
22 reference as issues may arise.

---

Page 259

1       Q.  (By Mr. Mullin)  And were you aware of
2  others at Mylan who also kept copies of Drug
3  Topics?
4       A.  I'm not aware.  They may or may not have.
5       Q.  Was there some kind of a library within
6  sales and marketing?
7       A.  No.
8       Q.  How about the -- the marketing people; did
9  they maintain some kind of a bookcase or collection
10 of industry publications?
11      A.  There were some publications.  They were
12 mainly to maintain copies of our advertisement that
13 ran in those journals.
14      MR. MULLIN:  Let me mark this document as --
15 Exhibit Cunard 020 is our next one.
16      (Whereupon, Exhibit Cunard 020 was marked
17 for identification.)
18      Q.  (By Mr. Mullin)  I'm showing you what's
19 been marked Exhibit Cunard 020.
20      I'd represent to you that it's a document that
21 was produced to the Commonwealth by Mylan in
22 response to a document request.  The Bates number

---

Page 260

1  ends -- on the first page ends in 2318263 and the
2  next page ends in 64.
3       And if you look down at the bottom of the
4  first page, it seems to be an e-mail from Karen
5  Konkus, K-o-n-k-u-s, the manager of pharmaceutical
6  pricing at Omnicare in Covington, Kentucky, and
7  that it was forwarded by Christine McArdle --
8  McArdle at Mylan.
9       Who's Christine McArdle?
10      A.  Christine McArdle was a clerical person
11 within the pricing and contracts group.
12      Q.  And are you familiar with Karen Konkus?
13      A.  I am not, no.
14      Q.  Are you familiar with Omnicare?
15      A.  Yes.
16      Q.  What's Omnicare?
17      A.  Omnicare is an operator of long-term care
18 pharmacies for nursing homes.
19      Q.  And was Omnicare a customer?
20      A.  Yes.
21      Q.  Significant one?
22      MR. ESCOBAR:  Objection for the form.

---

Page 261

1       THE WITNESS:  I don't recall.
2       Q.  (By Mr. Mullin)  Well, Ms. Konkus writes,
3  "As Omnicare continues to monitor closely the
4  Medicaid changes with HCFA and FULs within our
5  states of operation, we need your help.  Dave
6  Kramer -- Kramer director of Medicaid relations
7  will be contacting you shortly to set up a
8  procedure to receive ongoing electronic updates for
9  WACs and AWPs.  Dave's phone number here at the
10 corporate office is" -- and then there's a phone
11 number -- "and his e-mail address is" -- and
12 there's an e-mail address.  "Thanks in advance for
13 your help on this matter."
14      Christine forwarded this e-mail to you; is
15 that right?
16      A.  Yes, it appears to be the case.
17      Q.  And Christine said to you, "I got this
18 message from Karen Konkus at Omnicare Heartland.
19 Should I forward this -- who should I forward this
20 to?"
21      Right?
22      A.  Yes.

---

66  (Pages 258 to 261)

Cunard, Robert G.                                    October 26, 2007
                          Atlanta, GA

Page 262

1    Q.  And you forward it to Joe Duda, right?
2    A.  Yes.
3    Q.  And you told him basically, "Please
4  contact Mr. Kramer.  We can do this.  However, need
5  to discuss what format and how they would like to
6  receive it.  We can send via e-mail or perhaps via
7  conventional EDI depending upon their capabilities.
8  Let's discuss."
9    Medicaid reimbursement is a huge issue for
10 nursing homes and long-term pharmacies -- long-term
11 care pharmacies?
12   MR. ESCOBAR:  Objection to the form.  Calls
13 for speculation; no foundation; and also seems to
14 be completely unrelated to this document.  I'm not
15 sure what you -- before you ask the question.
16   THE WITNESS:  I don't know what the relative
17 importance of Medicaid is to those facilities.
18   Q.  (By Mr. Mullin)  Okay.  At least this
19 company Omnicare claimed Ms. Konkus has a director
20 of Medicaid relations, Mr. Kramer.
21   In -- in agreeing to have Mr. Duda contact
22 them and work this out, was part of your reasoning

Page 263

1  that the customer wanted this information because
2  of the impact that your WACs and your AWPs can have
3  in their reimbursement from the Medicaid programs?
4    MR. ESCOBAR:  Objection to the form.  Calls
5  for speculation as to the third party, the
6  customer, and mischaracterizes the document on
7  which your question was apparently based.
8    THE WITNESS:  I asked Mr. Duda to contact the
9  customer to facilitate making this happen just
10 because it was a customer and they had requested
11 information that we could relatively easily
12 provide.  As to what their use for that information
13 was, it was insignificant to me.
14   Q.  (By Mr. Mullin)  It's always good to know
15 why customers want things?
16   MR. ESCOBAR:  Objection to the form.
17   THE WITNESS:  Not necessarily, no.
18   Q.  (By Mr. Mullin)  It's usually good to know
19 why customers wants things?
20   MR. ESCOBAR:  Objection to the form.
21   THE WITNESS:  Not necessarily, no.
22   Q.  (By Mr. Mullin)  You got any idea why they

Page 264

1  wanted that information?
2    MR. ESCOBAR:  Objection for the form.  And
3  you're asking him to speculate about a third
4  party's actions.
5    THE WITNESS:  No.  And as I indicated, I had
6  no issue on providing that as that -- it was not in
7  conflict with any of our business interests.
8    Q.  (By Mr. Mullin)  David Workman, did he
9  report to you for a period of time?
10   A.  Yes.
11   Q.  And what was Mr. Workman's position at the
12 company when he reported to you?
13   A.  As I recall, when I joined the company,
14 Mr. Workman was also a coordinator within the
15 pricing area responsible for direct customer
16 pricing.  He was later brought back to the pricing
17 area again and as a -- and I believe the title was
18 director.
19   Q.  For contracts --
20   A.  He was --
21   Q.  -- contract pricing?
22   A.  In the pricing and contracts area, yes.

Page 265

1    Q.  And over the course of time that you
2  worked at Mylan, you got to know Mr. Workman?
3    A.  Yes.  And I knew Mr. Workman before
4  joining Mylan.
5    Q.  And how did you know him?
6    A.  As a customer of Mylan, I had met him on
7  several occasions.
8    Q.  You -- that's when you were with Rite Aid?
9    A.  Rite Aid and Value Drug.
10   Q.  And he'd come out on sales calls?
11   A.  No.  No.
12   Q.  You just talked to him over the phone
13 about your account?
14   A.  No.  I was invited on several occasions
15 for plant visits and to tour the Mylan facilities
16 in Morgantown.  During those visits, I met Mr.
17 Workman.
18   Q.  And are you aware of Mr. Workman doing a
19 study while you were at Mylan maybe in connection
20 with a college course he was taking about
21 establishing a training program at Mylan for a --
22 internal training within sales and marketing

Cunard, Robert G.                                    October 26, 2007
                          Atlanta, GA

Page 270

1    delivers inadequate service to Mylan's customers.
2    Examples of the problems were as follows." And the
3    first bullet point is, "Lack of knowledge of
4    pharmacy reimbursement scenarios from Mylan
5    products."
6        Did you find that to be the case?
7        MR. ESCOBAR:  Objection to the form.  And
8    you're asking him to -- I'm not sure what you're
9    asking him.
10       MR. MULLIN:  I'm asking whether or not he
11   found that to be the case.
12       MR. ESCOBAR:  Did -- did he find what to be
13   the case?
14       MR. MULLIN:  That individuals within the sales
15   and marketing department at Mylan lacked knowledge
16   of pharmacy reimbursement scenarios for Mylan
17   products.
18       MR. ESCOBAR:  Objection to the form.
19       THE WITNESS:  I don't recall ever doing any
20   kind of evaluation to determine their understanding
21   of pharmacy reimbursement, so I -- I -- I can't say
22   I had any opinion on the topic.

Page 271

1        MR. MULLIN:  Well, I think that completes our
2    examination of this witness.
3        MR. ESCOBAR:  Okay.  We'll take a few minutes.
4    I'll have some questions for the witness and then
5    we can dismiss.
6        MR. MULLIN:  Okay.
7        THE VIDEOGRAPHER:  4:32.  We're off the
8    record.
9        (Whereupon, a recess was taken.)
10       THE VIDEOGRAPHER:  4:40.  We're back on the
11   record.
12             EXAMINATION
13   BY MR. ESCOBAR:
14       Q.  Good afternoon, Mr. Cunard.
15       I'm ask you -- I'm going to ask you a few
16   questions following up on -- on Mr. Mullin's
17   examination.
18       Just to put it in context, I think you
19   described generally that during the time you were
20   at Mylan from 1999 to 2006, your principal function
21   was in the area of pricing and contracts.  Is that
22   right?

Page 272

1        A.  Yes, that's where the majority of my time
2    was spent.
3        Q.  And as a general proposition, was a lot of
4    your activity revolving around negotiating with
5    customers or coming up with pricing that customers
6    -- that you would have with customers on a contract
7    basis?
8        A.  Yes.
9        Q.  Now, Mr. Mullin asked you questions
10   throughout the day talking about reimbursement,
11   sometimes about Medicaid reimbursement.
12       Did -- to your knowledge, did Mylan receive
13   any money or any reimbursement from Medicaid in
14   connection with Mylan's sales of drugs?
15       A.  No.
16       Q.  Was it your understanding that the
17   reimbursement that Mr. Mullin mentioned or Medicaid
18   reimbursement was something that was paid by
19   federal and state governments to providers that
20   dispensed the products?
21       A.  Yes, that's correct.
22       Q.  And Mylan is -- I think you described that

Page 273

1    Mylan is a company that is engaged in the sale of
2    generic pharmaceutical products, right?
3        A.  Yes, that's correct.
4        Q.  And did Mylan participate in a market that
5    you would view as a competitive one?
6        A.  Yes.
7        Q.  And what were the general basis (sic) on
8    which you perceived that you competed with other
9    companies with respect to the sale of
10   pharmaceutical products?
11       A.  As indicated earlier, price, supply,
12   value-added services, CE programs --
13       MR. MULLIN:  I'm sorry.  I couldn't hear you.
14       THE WITNESS:  Price, supply, value-added
15   services such as continuing education programs,
16   quality of product, reliability, reputation.
17       Q.  (By Mr. Escobar)  And generally within --
18   and in your experience during the time that you
19   were at Mylan, was -- were Mylan's products viewed
20   favorably in the market and had the requisite
21   approvals by government agencies?
22       A.  Yes.

                          69  (Pages 270 to 273)

Cunard, Robert G.                                    October 26, 2007
                          Atlanta, GA

---

Page 274

1      Q.  Now, Mr. Mullin mentioned at the outset
2  that the reason the deposition was being taken is
3  because Massachusetts had sued Mylan and other
4  generic companies in a case that's now pending up
5  in Massachusetts.  And one of the allegations
6  that's being made by Massachusetts is that
7  Massachusetts was deceived into thinking that the
8  WAC price of Mylan's product was a price that was
9  net of rebates, chargebacks, discounts, and other
10 deductions.
11     Did -- to your knowledge, did anyone at Mylan
12 ever represent to the State of Massachusetts that
13 Mylan's WAC on its products was net of discounts,
14 chargebacks, rebates, and other -- other
15 deductions?
16     MR. MULLIN:  Objection; foundation and
17 misstates the allegations in the complaint.
18     MR. ESCOBAR:  You can answer.
19     THE WITNESS:  No.  I'm not aware any of such
20 representation.
21     Q.  (By Mr. Escobar)  And the -- Mylan's WAC
22 price, was that an actual invoice price that Mylan

---

Page 275

1  charged to its wholesale customers?
2      A.  Yes.
3      Q.  Did -- the suggestion in the allegations
4  in the complaint that Massachusetts has filed is
5  that Mylan would raise its WACs for the purpose of
6  increasing reimbursement.
7      In your experience dealing with the pricing
8  area and with WACs in particular, are there
9  negative consequences to Mylan if it just raises
10 its WACs for purposes of reimbursement?
11     A.  Yes.  As typically in the generic market,
12 over time you see price erosion as competition
13 continues and customers go through bid cycles, so
14 the -- the net price continues to erode.  An
15 increase of WAC where there's specific discounts
16 tied to it around the wholesale programs would
17 actually be counter-productive to the profitability
18 of Mylan.
19     Q.  And can you explain to the jury how it
20 would be that if you increase WACs while the prices
21 erode, as you put it, due to competition, how that
22 could have a negative consequence?

---

Page 276

1      A.  If a WAC price is increased for wholesale
2  and distributor com- -- customers, they pay their
3  cash discount or their prompt pay discount off of
4  invoice price, which is WAC.  They have
5  distribution service fees which are paid off the
6  invoice price, which is WAC.  There's often volume
7  incentives which are paid off WAC.  So inflating the
8  WAC price would increase the cost of all those
9  programs.  Absent a change on the net or the
10 contract price side, those increased costs would be
11 reflected directly in the profitability of Mylan's
12 products.
13     Q.  And in the -- in the time that you were at
14 Mylan working in the pricing area, would -- as a
15 general -- as a general proposition, would -- would
16 the company look at WACs to see if they had to be
17 reduced in order to avoid issues along the
18 chargeback issue that you mentioned?
19     MR. ESCOBAR:  Objection; leading.
20     MR. ESCOBAR:  You can answer.
21     THE WITNESS:  Adjustments to WAC that were
22 done proactively would be more around a decrease

---

Page 277

1  because that would decrease our costs to the
2  customer base and increase our profitability if we
3  were able to achieve that.
4      Q.  (By Mr. Escobar)  Now, Massachusetts has
5  provided in the course of this litigation some
6  damage calculations where they argue that they
7  should have been paying -- reimbursed.  And -- and
8  their allegation is that they were reimbursing on
9  the basis of WAC for three specific drugs,
10 clozapine, lorazepam, and phenytoin, and that they
11 were reimbursing on the basis of WAC which they
12 allege was false, and that they really should have
13 been paying on something much lower and are using
14 an AMP calculation to indicate what they believe
15 they should have been paying.
16     Are you familiar with the term "AMP"?
17     A.  Yes, I am.
18     MR. MULLIN:  Objection to the question in that
19 it misstates the allegations in the complaint and
20 the damage calculation.
21     MR. ESCOBAR:  Are you not calculating some
22 damages on the basis of some AMP number?

---

                                    70  (Pages 274 to 277)

Cunard, Robert G.                                      October 26, 2007
                              Atlanta, GA

Page 278

1      MR. MULLIN: We're calculating on the basis of
2  that. We're not saying that reimbursement should
3  have been based on that.
4      MR. ESCOBAR: But your -- your -- you are --
5  your calculations that you've given us are based
6  AMP, correct?
7      MR. MULLIN: That they're -- they're -- that's
8  the closest number we can find to the real WAC.
9      Q. (By Mr. Escobar) Okay. So at the moment,
10 Massachusetts is suggesting that this real WAC
11 should have been AMP.
12     So let me ask you, are you familiar with the
13 term "AMP"?
14     A. I am.
15     Q. And what do those letters stand for as you
16 understand it?
17     A. Average manufacturer price.
18     Q. And is that a -- tell us what average
19 manufacturer price is and what Mylan does with
20 that.
21     A. As I understand it, that is the -- a
22 calculation done for a given period of time

Page 279

1  representing net sales and corresponding units for
2  non-government business. It's a straight division
3  that comes up with an average price per dose as is
4  typically done, either tablet or capsule.
5  Currently, that's reported on a quarterly basis to
6  CMS.
7      Q. And CMS is a federal agency that oversees
8  the Medicaid program?
9      A. Yes.
10     Q. And is it your understanding that Mylan
11 reports AMPs in accordance with instructions for
12 calculating those AMPs that are provided by the
13 federal government?
14     A. Yes.
15     Q. Now, is it your understanding that the
16 reporting of AMP happens on a quarterly basis every
17 year?
18     A. Yes, that is correct.
19     Q. So based on -- during the time that you
20 were at Mylan, was it your understanding that the
21 CMS agency which oversees the Medicaid program was
22 receiving AMP information on Mylan's drugs?

Page 280

1      A. Yes.
2      Q. Mr. Mullin showed you some spreadsheets
3  and talked to you about spread and used that word
4  on -- several times during the course of your
5  testimony and pointed you to some documents.
6      Based on the reporting of AMP, is it your
7  understanding that people that run the Medicaid
8  program had information from Mylan from which they
9  could compare the AMP for a drug and the WAC or the
10 AWP number?
11     MR. MULLIN: Objection; foundation.
12     THE WITNESS: Yes. It's my understanding that
13 that information is available from CMS if
14 requested.
15     Q. (By Mr. Escobar) So as far as you know,
16 during the time that you were working at Mylan, the
17 -- the government agency that ran Medicaid could
18 look at both Mylan's AWP and WAC and compare it to
19 an AMP number; is that right?
20     MR. MULLIN: Objection; foundation.
21     Q. (By Mr. Escobar) Is that right?
22     A. Yes, that is correct.

Page 281

1      Q. Okay. Now, Mr. Mullin asked you and
2  showed you documents about various customers,
3  wholesalers, and other types of Mylan customers.
4      Was the federal government a customer of
5  Mylan's?
6      A. Yes.
7      Q. And what -- what kind of a customer were
8  they in terms of the terminology that you use to
9  describe customers?
10     A. They were a contract customer in that they
11 did not buy product directly from us, but sourced
12 it under a contract through the wholesale
13 distribution network.
14     Q. And the contract that the federal
15 government -- that was used in selling to the
16 federal government, did that have a name?
17     A. Yes. There's actually -- actually two
18 that I was aware of. One was the Veterans
19 Administration contract and the second one is the
20 Federal Supply Schedule more commonly known as FSS.
21     Q. And what was your familiarity with FSS?
22     A. FSS is just a -- a contract that pricing

                                   71 (Pages 278 to 281)