# EXHIBIT L

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 03-11865 PBS

---------------------------------------x

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | : CONFIDENTIAL |
| Plaintiff, | : VIDEOTAPED |
| v | : 30(B)(6) |
| MYLAN LABORATORIES, INC., BARR | : DEPOSITION OF |
| LABORATORIES, INC., DURAMED | : STEPHEN B. |
| PHARMACEUTICALS, INC., IVAX | : KRINKE |
| CORPORATION, WARRICK PHARMACEUTICALS | : |
| CORPORATION; WATSON PHARMACEUTICALS, | : SEPTEMBER 25, |
| INC., SCHEIN PHARMACEUTICALS, INC., | : 2007 |
| TEVA PHARMACEUTICALS USA, INC., PAR | : |
| PHARMACEUTICAL, INC., DEY, INC., | : MORGANTOWN, |
| ETHEX CORPORATION, PUREPAC | : WEST VIRGINIA |
| PHARMACEUTICAL CO., and ROXANE | : |
| LABORATORIES, INC., | : |
| Defendants | : |

---------------------------------------x

**Page 2**

APPEARANCES:

Attorneys for the Plaintiff

    THE COMMONWEALTH OF MASSACHUSETTS
    Office of the Attorney General
    Medicaid Fraud Control Unit
    One Ashburton Place, RM 1813
    Boston, Massachusetts 02108-1598
    BY: PETER A. MULLIN
    Assistant Attorney General
    peter.mullin@ago.state.ma.us

    -and-

    ROBERT C. MOLVAR
    Assistant Attorney General
    robert.molvar@ago.state.ma.us
    (617) 727-2200

(CONTINUED)

**Page 3**

APPEARANCES: (CONTINUED)

    Attorneys for the Defendant
    Mylan Laboratories, Inc.
    KELLEY DRYE & WARREN,
    101 Park Avenue,
    New York, New York 10178-0002
    BY: WILLIAM A. ESCOBAR
    wescobar@kelleydrye.com

    -and-

    BRIAN CUTHBERTSON, Esquire
    brian.cuthbertson@mylanlabs.com

VIDEOGRAPHER: GREG DIEFENBAUGH

**Page 4**

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Stephen B. Krinke | Mr. Mullin | 005 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Krinke 001, | MAMylan006249 to 6252 | 078 |
| Exhibit Krinke 002, | MAMylan006253 to 6256 | 103 |
| exhibit Krinke 003, | MAMylan064027 to 4041 | 118 |
| Exhibit Krinke 004, | MAMylan006286 to 6299 | 162 |
| Exhibit Krinke 005, | MYLCA 000121 to 123 | 200 |
| Exhibit Krinke 006, | MYLCA 000111 to 113 | 213 |
| Exhibit Krinke 007, | MYLCA 000105 to 106 | 218 |
| Exhibit Krinke 008, | MAMylan006275 | 266 |
| Exhibit Krinke 009, | MAMylan006276 to 6279 | 278 |
| Exhibit Krinke 010, | MAMylan036559 to 6564 | 289 |
| Exhibit Krinke 011, | MAMylan006272 to 6274 | 293 |
| Exhibit Krinke 012, | MAMylan006257 to 6258 | 302 |
| Exhibit Krinke 013, | WiMylan011825 | 312 |
| Exhibit Krinke 014, | MAMylan005344 | 329 |

**Page 5**

PROCEEDINGS

    VIDEOGRAPHER: The time is now 9:23 and we're now on the record.
    Would counsel please introduce themselves and who they represent.
    MR. MULLIN: Good morning. Peter Mullin and Robert Molvar, Assistant Attorney Generals for the Commonwealth of Massachusetts.
    MR. ESCOBAR: William Escobar of Kelley Drye & Warren on behalf of Mylan.
    MR. CUTHBERTSON: Excuse me. Brian Cuthbertson, Mylan Laboratories.
    VIDEOGRAPHER: Would the Court Reporter please swear in the witness?

    STEPHEN BERNARD KRINKE
being first duly sworn, was examined and deposed as follows:

    EXAMINATION
BY MR. MULLIN:

**Page 70**

1  brand new product releasing, it would need to be
2  at least 10 percent below the brand to be a
3  generic.
4      Q. And if it's more than 10 percent,
5  you'll still get generic designation; is that
6  right?
7          MR. ESCOBAR: Objection to the form.
8      A. I don't know if you would or not. It
9  would depend on how the databases characterize
10 you.
11     Q. If a generic manufacturer reported an
12 AWP to the national reporting services that was
13 15 percent below the branded product, can you
14 think of any circumstance or reason why the
15 product would not get generic designation?
16         MR. ESCOBAR: Objection to the form.
17     A. I would think it would be a possibility
18 that it would not.
19     Q. And on what basis or reason?
20         MR. ESCOBAR: Objection to the form.
21     A. Depending on the number of competitors
22 you have and how the database decides to

**Page 71**

1  characterize you, you are at the mercy of their
2  designation of what you are, brand or generic.
3      Q. And how would the number of competitors
4  influence whether or not the brand designated you
5  as a generic if you were 15 percent below the
6  brand price, rather than 10 percent below the
7  brand price?
8          MR. ESCOBAR: Objection to the form.
9      A. The database, First Databank as an
10 example, has a formula unbeknownst to the
11 manufacturers that takes into account many
12 things, including the number of competitors and
13 their prices and the brand, and they determine if
14 you are a brand or a generic.
15     Q. I think you said that you played a role
16 in setting Mylan's AWPs for a period of time; is
17 that right?
18         MR. ESCOBAR: Objection to the form.
19 Mischaracterizes the testimony.
20     Q. Is that correct, sir?
21     A. Please ask me again.
22     Q. I think you said that you did play a

**Page 72**

1  role in connection with establishing Mylan's AWPs
2  in the course of your employment at the company -
3  -
4          MR. ESCOBAR: Objection.
5      Q. -- correct?
6          MR. ESCOBAR: Objection to the form.
7  Mischaracterizes the testimony. You can answer.
8      A. I was given an assignment to review
9  existing Mylan products' AWPs.
10     Q. Did you play any other role, other than
11 this reviewing existing AWPs?
12         MR. ESCOBAR: Objection to the form.
13     A. Not that I recall.
14     Q. Did you typically play any role in
15 connection with the launch of new products with
16 regard to the establishment of AWPs?
17         MR. ESCOBAR: Objection to the form.
18     A. Not with new products, no.
19     Q. And the review, was it on one occasion
20 or more than one occasion?
21     A. I believe it was one occasion.
22     Q. And what, if anything, did you do in

**Page 73**

1  connection with this review?
2      A. I compared all Mylan products to
3  Mylan's competitors and adjusted the AWPs as I
4  thought necessary.
5      Q. Okay.
6          And how did you find the competitors'
7  AWPs?
8      A. By using one or two trade resources.
9      Q. All right.
10         Which ones?
11     A. Price Alert and/or Red Book.
12     Q. What's Price Alert?
13     A. A price reporting service that provides
14 the AWP for some products.
15     Q. And who puts that out?
16     A. I believe it was a publication of First
17 Databank.
18     Q. And what's Red Book?
19     A. Red Book is the same type of service,
20 reporting AWPs.
21     Q. Does it cover some products that Price
22 Alert didn't?

**Page 126**

1  A. No.
2  MR. ESCOBAR: Objection to the form.
3  Q. In the course of your employment at
4  Mylan, have you become aware that Mylan typically
5  usually with regard to any new product will
6  establish a price for wholesaler auto
7  substitution plans?
8  MR. ESCOBAR: Objection to the form.
9  A. I'm not aware of a specific auto
10 substitution price in the Mylan system of
11 pricing.
12 Q. Do you ever play any role in
13 establishing an auto substitution price?
14 A. I do not.
15 Q. C-O-N, what's that?
16 A. I have no idea.
17 Q. No idea?
18 A. No.
19 Q. And "Big Chain," any idea what that is?
20 A. I would imagine it was large
21 warehousing chains.
22 Q. But it would strictly be imagination?

**Page 127**

1  You wouldn't have any information or
2  basis as to what that was?
3  MR. ESCOBAR: Objection to the form.
4  A. I was not involved in the pricing and
5  contract decisions and setting these prices.
6  Therefore, I'm only -- can only speculate what
7  "Big Chain" means.
8  Q. The second grid says "Meeting
9  Discussion."
10 Do you see that?
11 A. Yes.
12 Q. And if you compare the AWP column for
13 the 25 milligram strength, do you see that the
14 AWP in the second grid, the lower grid, is a
15 nickel more than in the upper grid?
16 A. Yes.
17 Q. And that the price for the 100
18 milligram tablets is approximately $48.00 more,
19 or something in that order of magnitude?
20 MR. ESCOBAR: Are you talking about the
21 AWP column?
22 MR. MULLIN: Yes.

**Page 128**

1  MR. ESCOBAR: Okay.
2  THE WITNESS: Mm-hmm. Yes.
3  BY MR. MULLIN:
4  Q. What, if any, role did you play in
5  connection with establishing those prices?
6  A. I don't believe I had any role.
7  Q. Do you believe you attended this
8  meeting?
9  A. I don't know for sure, although my
10 name's on there, which leads me to believe I
11 possibly did.
12 Q. Is it your recollection that in the
13 summer of '99, you didn't play any role in the
14 establishment of prices at Mylan for a Clozapine
15 launch?
16 MR. ESCOBAR: Objection to the form.
17 A. I don't recall having any involvement
18 or making recommendations for product pricing on
19 this product, no.
20 Q. If you look up at the top of page one,
21 there's a caption that says, "New Product Pricing
22 Decisions," and then underneath that it says

**Page 129**

1  "Unapproved."
2  Do you see that?
3  A. I do not. Oh, here? I do see that,
4  yeah.
5  Q. In the summer of 1999, who had
6  authority to approve prices for Mylan for a new
7  product launch?
8  A. I don't know.
9  Q. If you would, sir, would you turn to
10 page two of Exhibit Krinke 003.
11 I think you said you recognized this
12 New Product Launch announcement; is that right?
13 A. Yes.
14 Q. What role, if any, would you typically
15 play in this process?
16 MR. ESCOBAR: Objection to the form.
17 A. New product announcements are generally
18 written by someone, other than myself, and my
19 name is attached at the bottom as the -- due to
20 my pharmacist degree title or my title.
21 Q. What unit, department or person would
22 typically prepare the New Product Announcement?

**146**

1  MR. ESCOBAR: Objection to the form,
2  and that's the same question you asked about four
3  questions ago.
4     A. That's the only two reasons I can think
5  of.
6     Q. During the relevant time period, did
7  Mylan ever change its WAC prices?
8        MR. ESCOBAR: Objection to the form.
9     A. I don't know.
10    Q. You reported WACs to First Databank;
11 right?
12    A. On a new product launch.
13    Q. Did you also report changes after
14 launch?
15    A. I did not.
16    Q. In general, you didn't have that
17 responsibility?
18    A. That's correct.
19    Q. And who did have that responsibility?
20    A. The pricing and contracts department.
21    Q. To the best of your knowledge, were
22 there occasions when Mylan changed its WAC after

**147**

1  launch?
2     A. I would have no way of knowing.
3     Q. Sure you would. Maybe you talked to
4  the head of pricing and contracts and said, "Hey,
5  today we're sending in some new prices to First
6  Databank."
7        MR. ESCOBAR: Objection to the form.
8  Argumentative. He's answered the question.
9     A. I would have no way of knowing if they
10 were changing, when or why.
11    Q. You have no information as to when or
12 why, any reason, circumstances that would cause
13 Mylan to change reported WACs?
14       MR. ESCOBAR: Objection to the form and
15 asked and answered.
16    A. I don't know why Mylan would change
17 their WACs, when they would change their WACs, or
18 what have you. I was not involved in the
19 decision process to do that.
20    Q. I guess you've been in the sales
21 department -- sales and marketing department at
22 Mylan since '92; right?

**148**

1     A. Yes.
2     Q. At any time between '92 and today, has
3  there ever been a time when there were periodic
4  meetings of the staff in sales and marketing?
5        MR. ESCOBAR: Objection to the form.
6     A. Yes.
7     Q. With what frequency?
8     A. Infrequently.
9     Q. Was there ever a regular Monday morning
10 meeting or Wednesday morning meeting, a
11 particular day of the week when the VP would have
12 the staff in?
13    A. To -- for what reason?
14    Q. For a periodic meeting, go over what's
15 happening, people report on things that are going
16 on, coordinating the activities of the
17 department.
18    A. Well, depending on who the VP was at
19 the time, some would have more frequent meetings
20 than others.
21    Q. Who liked to have meetings?
22       MR. ESCOBAR: Objection to the form.

**149**

1     A. Everybody had meetings.
2     Q. Did any of them have a periodic regular
3  meeting? A set time?
4        MR. ESCOBAR: Objection to the form.
5     A. The one specific example I can think of
6  would be Bob Kinard holding staff meetings on a
7  fairly frequent basis.
8     Q. When you say "fairly frequent," give me
9  some idea.
10       Is that weekly?
11    A. Anywhere from weekly to monthly.
12    Q. And who typically would attend Kinard's
13 staff meetings?
14    A. Everybody that was a direct report to
15 him.
16    Q. And in the course of any meetings of
17 the staff, did you become aware of any reasons
18 why Mylan was changing WAC prices?
19       MR. ESCOBAR: Objection to the form.
20    A. No.
21    Q. During the relevant time period, '98 to
22 2003, who had authority at Mylan to set contract

**190**

1  A. Not specifically to Massachusetts.
2  Q. Over the relevant time period '98 to
3  2003, what percentage of Mylan's sales were
4  reimbursed by the Medicaid program?
5  A. I would not know that.
6  Q. Do you have any information in that
7  regard?
8       MR. ESCOBAR: Objection to the form.
9  A. No.
10 Q. Are you aware of anyone at Mylan ever
11 trying to track that, calculate that, figure that
12 out?
13      MR. ESCOBAR: Same -- objection to the
14 form.
15 A. In order to pay the appropriate
16 Medicaid rebates, someone would have to track
17 that information, I believe.
18 Q. They'd figure out -- I guess they get
19 utilization information from the states; is that
20 right?
21      MR. ESCOBAR: Objection to the form.
22 Q. Let me back up.

**191**

1       To the best of your knowledge, who at
2  the company has been responsible for Average
3  Manufacturer's Price and the Medicaid rebates
4  that Mylan has to pay to the various states?
5  A. In the relevant time frame?
6  Q. Yes.
7  A. I don't know who did it in those days.
8  Q. Who does it now?
9  A. Today, it's a gentleman named Jim
10 Abrams.
11 Q. Okay.
12      Do you have -- what's your best
13 information as to what percentage of Mylan's
14 sales have been reimbursed by the Medicaid
15 program?
16      MR. ESCOBAR: Objection to the form.
17 I'm not sure I understand your question when you
18 say -- I mean, there is no reimbursement to
19 Mylan.
20      MR. MULLIN: I understand that.
21      MR. ESCOBAR: There's no reimbursement
22 of Mylan's sales, so what does that mean?

**192**

1  BY MR. MULLIN:
2  Q. Do you understand the question?
3  A. No, I don't.
4  Q. You know that Medicaid reimburses
5  pharmacies for Mylan Pharmaceuticals, along with
6  other drugs; right?
7  A. They reimburse pharmacists for
8  prescriptions filled with a myriad of
9  manufacturers.
10 Q. Including Mylan.
11 A. Including Mylan.
12 Q. Yes.
13      Of Mylan's total sales, to the best of
14 your information, what percentage of Mylan's
15 total sales are ultimately reimbursed by the
16 Medicaid program?
17      MR. ESCOBAR: Same objection. There is
18 no reimbursement of Mylan sales, so I don't
19 understand the question.
20 Q. I'd ask you to answer.
21 A. I'm confused on the question.
22 Q. All right.

**193**

1       Medicaid reimburses pharmacists for
2  filling prescriptions; correct?
3  A. Yes.
4  Q. Mylan sells pharmaceuticals to
5  pharmacies and wholesalers; correct?
6       MR. ESCOBAR: Objection to the form.
7  A. Yes -- can I just correct? Not
8  directly to pharmacies.
9  Q. You sell to some pharmacies directly,
10 don't you?
11      MR. ESCOBAR: Objection to the form.
12 A. We sell to chain warehousing
13 pharmacies.
14 Q. Okay.
15      And of your total sales -- of Mylan's
16 total sales, what percentage of those sales is
17 the prescription for which those drugs are put
18 reimbursed by Medicaid?
19      MR. ESCOBAR: Objection to the form.
20 A. I have no idea.
21 Q. Do you have any idea whether it's two
22 percent, 10 percent, 20 percent?

**194**

1  A. I do not.
2  Q. Do you know of anybody at Mylan that
3  tries to track reimbursement and what are the
4  sources of reimbursement to pharmacists for Mylan
5  Pharmaceuticals?
6      MR. ESCOBAR: Objection to the form.
7  A. No.
8  Q. Are you familiar with something known
9  as the Federal Upper Limit?
10 A. Yes.
11 Q. What's that?
12 A. Federal Upper Limit is a price
13 established by, in the relevant time frame, HCFA,
14 and that is the amount per tablet or capsule or
15 unit or what have you that they will reimburse a
16 pharmacist.
17 Q. It sets a maximum price, an upper-limit
18 price?
19      MR. ESCOBAR: Objection to the form.
20 A. A Federal Upper Limit, yes.
21 Q. Okay.
22      And what is your understanding as to

**195**

1  how the Federal Upper Limit was calculated during
2  the relevant time period?
3      MR. ESCOBAR: Objection to the form.
4  A. It was a formula based on a review of
5  what they called the Compendia that required at
6  least three products, brand or generic, and the
7  Federal Upper Limit was established as 150
8  percent of the lowest published Compendia price.
9  Q. And is it only AWPs, or is it AWPs and
10 WACs were considered in deciding which numbers to
11 use?
12     MR. ESCOBAR: Objection to the form.
13 Calls for speculation.
14 A. It was whatever the lowest published
15 price was in the Compendia.
16 Q. And you became familiar with the
17 Federal Upper Limit in the course of your duties
18 and responsibilities at Mylan?
19 A. I was aware of it during my tenure at
20 Mylan.
21 Q. Did you ever have occasion to discuss
22 the Federal Upper Limit with anyone as to whether

**196**

1  or not it was limiting reimbursement for Mylan's
2  products?
3      MR. ESCOBAR: Objection to the form.
4  A. I don't see how Federal Upper Limit
5  could limit the reimbursement of Mylan's
6  products.
7  Q. Well, if the Federal Upper Limit was
8  set at a level that was resulting in a level of
9  reimbursement that made the drug unattractive to
10 pharmacies, that might influence Mylan's sales?
11     MR. ESCOBAR: Objection to the form.
12 A. Ask me the question again, please.
13 Q. Did you ever have occasion to discuss
14 Federal Upper Limits with anyone at Mylan and
15 their impact on Mylan's sales of its
16 pharmaceuticals?
17     MR. ESCOBAR: Objection to the form.
18 Calls for speculation. Assumes facts not in
19 evidence.
20 A. Mylan's sales? I can't think of an
21 occasion.
22 Q. Let me switch the topic for a moment

**197**

1  and come back to Federal Upper Limits later.
2      To your knowledge, has Mylan ever
3  provided spreadsheets or templates to its sales
4  force for the comparison of reimbursement under
5  the Medicaid program for Mylan Pharmaceuticals
6  and other competing pharmaceuticals?
7      MR. ESCOBAR: Objection to the form.
8  A. Not that I'm aware of.
9  Q. Has -- to your knowledge, has Mylan
10 ever created any templates to compare the
11 reimbursement between Mylan's pharmaceuticals and
12 other drugs under the Medicaid program?
13     MR. ESCOBAR: Objection to the form.
14 A. I have -- yes. I have seen a template.
15 Q. Would you describe it for me?
16 A. It was what you just mentioned, a
17 comparison.
18 Q. Comparison of what?
19 A. Comparison of Mylan against competitors
20 and brand products.
21 Q. Where did you see it?
22 A. At Mylan.

**214**

1  corner, or at least Mylan, end in 85 through 87.
2  They also have Mylan California numbers, Mylan
3  111 through 113.
4  BY MR. MULLIN:
5     Q. The question would be whether you've
6  ever seen this document before.
7     A. I believe I've seen this document
8  before.
9     Q. On how many occasions?
10    A. One, that I recall.
11    Q. When was that?
12    A. In the last two weeks.
13    Q. Where were you when you saw it?
14    A. With Mylan counsel.
15    Q. Where was that?
16    A. At Mylan.
17    Q. Whereabouts at Mylan?
18       A particular conference room, a
19 particular location?
20       MR. ESCOBAR: What are the -- what
21 bearing does that have on anything?
22       MR. MULLIN: I'm testing his

**215**

1  recollection.
2     A. In the building on Chestnut Ridge Road,
3  Fourth Floor.
4     Q. Who was present at the time?
5     A. The two attorneys that are with me
6  today.
7     Q. And only those two?
8     A. Yes.
9     Q. What role, if any, did you play in the
10 creation of this document?
11       MR. ESCOBAR: Objection to the form.
12    A. I don't believe I had any role in the
13 creation of these document.
14    Q. To whom was this document distributed
15 at Mylan?
16       MR. ESCOBAR: Objection to the form.
17 Assumes facts not in evidence.
18    A. I'm not aware of anyone that received
19 this document.
20    Q. If you would, would you turn to the
21 second page of Exhibit Krinke 006, and I think
22 the fourth column is labeled "Massachusetts."

**216**

1     Do you see that?
2     A. Yes.
3     Q. Are you familiar with the Mass Medicaid
4  reimbursement protocol for pharmaceuticals?
5        MR. ESCOBAR: Objection to the form.
6     A. Not specifically, but I don't know the
7  exact formula, if that's what you're asking me.
8     Q. Are you aware that Massachusetts is a
9  WAC state?
10    A. Yes.
11       MR. ESCOBAR: Objection. Objection to
12 the form.
13    Q. And if you look in column four, it
14 indicates that brand reimbursement is based on
15 AWP minus 10 for Massachusetts?
16       MR. ESCOBAR: Objection to the form.
17    A. I don't see that, no.
18    Q. Do you see the, "Brand Reimbursement
19 Criteria"?
20    A. Yes.
21    Q. And you see a line that says,
22 "Reimbursement, WAC plus"?

**217**

1     A. Yes.
2     Q. And under "Massachusetts," it's "WAC
3  plus 10 percent"?
4     A. Yes.
5     Q. Okay.
6        And is that consistent with your
7  understanding of Mass Medicaid's reimbursement
8  for pharmaceuticals?
9        MR. ESCOBAR: Objection to the form of
10 the question.
11    A. I'm not familiar with that formula for
12 a brand product in Massachusetts, no.
13    Q. Did you have occasion to discuss this
14 comparison worksheet with Jason Harper?
15    A. I don't recall discussing this
16 worksheet with Jason Harper.
17    Q. If you wanted to find this document on
18 the electronic files of Mylan Pharmaceuticals,
19 what would you do?
20       MR. ESCOBAR: Objection to the form.
21    A. I would have no way of knowing how to
22 get -- find this document, other than asking for

**238**

1  good idea.
2  BY MR. MULLIN:
3      Q.  It is a pretty good idea to try and
4  sell stuff, isn't it?
5          MR. ESCOBAR: Objection to the form of
6  the question, and you're arguing with the witness
7  now.
8      A.  There's no way of knowing who or at
9  what level might have put this information
10 together or how much knowledge -- how
11 knowledgeable they might have been in suggesting
12 that.
13     Q.  Would you agree with me that a
14 manufacturer trying to see pharmaceuticals to
15 pharmacies, that maximizing the pharmacies'
16 profitability on the product is a good way to try
17 and sell the product?
18         MR. ESCOBAR: Objection to the form.
19     A.  That's not Mylan's focus of selling
20 products to our customers. As I mentioned, we
21 don't know what kind of contracts they sign with
22 third-party payers, so we just try to sell them

**239**

1  the product at the price that they can live with
2  and that we are happy with, and what happens
3  after that is their responsibility.
4      Q.  Mylan sells some product directly to
5  pharmacies; correct?
6          MR. ESCOBAR: Objection to the form.
7      A.  Pharmacies? Specifically to a
8  pharmacy?
9      Q.  Pharmacies, yes.
10     A.  No.
11     Q.  You sell to chain drug stores?
12     A.  We sell the chain warehouses, not the
13 individual chain drug stores.
14     Q.  You -- you -- you sell to the company
15 that owns the chain drug stores --
16     A.  Yes.
17     Q.  -- right?
18         MR. ESCOBAR: Objection to the form of
19 the question.
20     Q.  You also negotiate prices with non-
21 warehousing chains?
22     A.  Contract prices, yes.

**240**

1      Q.  And you're aware that many third-party
2  payers reimburse on the basis of AWP?
3          MR. ESCOBAR: Objection to the form.
4  We've gone through this this morning and you're
5  mischaracterizing what are a myriad of different
6  kinds of plans and methodologies.
7      Q.  You may answer, sir.
8      A.  There are a myriad of plans and
9  reimbursing in various fashions.
10     Q.  And many of them are based on AWP?
11         MR. ESCOBAR: Objection to the form of
12 the question, and you're characterizing it.
13     A.  I would not say many, because I don't
14 know how many.
15     Q.  Are you aware that some reimburse on
16 the basis of AWP?
17     A.  Yes.
18     Q.  Okay.
19         And to the extent that the company has
20 a higher AWP, then the reimbursement to the
21 pharmacy will be greater for any given price that
22 the company sells at; correct?

**241**

1          MR. ESCOBAR: Objection to the form of
2  the question, and that is precisely the exact
3  same question you asked several times this
4  morning, and I don't think it's fair for you to
5  keep going back to the same thing. If you have
6  new questions for the witness, let's go to those.
7      Q.  You may answer, sir.
8      A.  Again, I need the question again,
9  please.
10     Q.  You're aware that some third-party
11 payers reimburse on the basis of AWP; right?
12     A.  Yes.
13         MR. ESCOBAR: Objection. Asked and --
14     Q.  You're aware that --
15         COURT REPORTER: Wait. I'm sorry?
16         MR. ESCOBAR: Objection. Asked and
17 answered.
18 BY MR. MULLIN:
19     Q.  You're aware that Mylan sells its
20 product at contract prices.
21         MR. ESCOBAR: Objection to --
22     Q.  Right?