# EXHIBIT P

Page 1

```
 1               CAUSE NO. D-1-GV-07-001259

 2                      - - - -

 3   THE STATE OF TEXAS          )IN THE DISTRICT COURT
                                 )            OF
 4   ex rel.                     )
                                 )
 5        VEN-A-CARE OF THE      )
          FLORIDA KEYS, INC.     )
 6                               )
             Plaintiffs,         )
 7                               )TRAVIS COUNTY, TEXAS
          vs.                    )
 8                               )
     SANDOZ, INC. f/k/a GENEVA   )
 9   PHARMACEUTICALS, INC., EON  )
     LABS,                       )
10                               )
     MYLAN PHARMACEUTICALS, INC.,)
11   MYLAN LABORATORIES, INC.,   )
     UDL LABORATORIES, INC.,     )
12                               )
     TEVA PHARMACEUTICALS USA,   )
13   INC. f/k/a LEMMON           )
     PHARMACEUTICALS, INC., COPLEY)
14   PHARMACEUTICALS, INC. IVAX  )
     PHARMACEUTICALS, INC., SICOR )
15   PHARMACEUTICALS, INC., and  )
     TEVA NOVOPHARM, INC.,       )
16                               )201st JUDICIAL
          Defendants.            )DISTRICT
17

18

19

20

21                      - - - -

22      VIDEOTAPE DEPOSITION OF: DAVID L. WORKMAN

23                      - - - -

24

25
```

## Page 2

1    DATE:  October 15, 2008
        Wednesday, 9:00 a.m.
2
3    LOCATION:  Springhill Suites
        1910 Hunters Way
4        Morgantown, West Virginia
5
     TAKEN BY:  State of Texas
6
7    REPORTED BY:  JoAnn M. Brown, RMR, CRR
        Notary Public
8        Reference No. JB09091
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1   APPEARANCES (CONTINUED):
2       FOR THE STATE OF CALIFORNIA:
        Eliseo Sisneros, Esq.
3    consuelo.gutierrez@doj.ca.gov
        DEPUTY ATTORNEY GENERAL STATE OF CALIFORNIA
4    110 West "A" Street, Suite 1100
        San Diego, California  92108
5    P 619-688-6043
6
        FOR THE STATES OF ALABAMA AND MISSISSIPPI:
7    H. Clay Barnett, III, Esq.
        clay.barnett@beasleyallen.com
8    BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
        272 Commerce Street
9    Post Office Box 4160
        Montgomery, Alabama  36103
10   P 334-269-2343
        F 334-954-7555
11
12       FOR THE DEFENDANTS MYLAN PHARMACEUTICALS, INC.,
        MYLAN LABORATORIES, INC., UDL LABORATORIES,
13       INC.:
        William A. Escobar, Esq.
14   wescobar@kelleydrye.com
        KELLEY DRYE & WARREN, LLP
15   101 Park Avenue
        New York, New York  10178
16   P 212-808-7771
        F 212-808-7897
17       -and-
        Erik C. Nath, Esq.
18   erik.nath@mylan.com
        MYLAN, INC.
19   1500 Corporate Drive
        Canonsburg, PA  15317
20   P 724-514-1846
        F 724-514-1871
21
22       ALSO PRESENT:
        John M. Lockwood, M.D., Ven-A-Care of the Florida
23   Keys
        Joseph Hagan, Videographer
24
25

## Page 3

1       VIDEOTAPE DEPOSITION OF DAVID L. WORKMAN,
     a witness, called by the State of Texas for
2    examination, in accordance with the Texas Rules of
     Civil Procedure, taken by and before JoAnn M. Brown,
3    RMR, CRR, a Court Reporter and Notary Public in and
     for the Commonwealth of Pennsylvania, at the
4    Springhill Suites, 1910 Hunters Way, Morgantown,
     West Virginia, on Wednesday, October 15, 2008,
5    commencing at 8:56 a.m.
6
     APPEARANCES:
7
        FOR THE STATE OF TEXAS:
8    Archie Carl Pierce, Esq.
     cpierce@w-g.com
9    Christopher A. Shuley, Esq.
     cshuley@w-g.com
10   WRIGHT & GREENHILL, P.C.
     221 West 6th Street, Suite 1800
11   Austin, Texas  78701
     P 512-476-4600
12   F 512-476-5382
13
        FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.:
14   Adam D. Miller, Esq.
     amiller@elllaw.com
15   ENGSTROM, LIPSCOMB & LACK, P.C.
     10100 Santa Monica Boulevard, 12th Floor
16   Los Angeles, California  90067
     P 310-552-3800
17   F 310-552-9434
        -and-
18   Glenn W. MacTaggart, Esq.
     gmactaggart@phmy.com
19   PRICHARD HAWKINS MCFARLAND & YOUNG
     Union Square, Suite 600
20   10101 Reunion Place
     San Antonio, Texas  78216
21   P 210-477-7419
     F 210-477-7469
22
23
24
25

## Page 5

1                INDEX
2    Examination by Mr. Pierce - - - - - - - - 6
     Examination by Mr. Miller - - - - - - - - 126
3    Examination by Mr. Barnett - - - - - - - - 253
4    Certificate of Court Reporter - - - - - - - - 276
     Errata Sheet - - - - - - - - - - - - - - - - 277
5    Notice of Non-Waiver of Signature - - - - - - - 278
6            EXHIBIT INDEX
7    EXHIBIT                          PAGE
8    1                                25
9    2                                36
10   3                                36
11   4A - 4L                          62
12   5                                127
13   6                                129
14   7                                133
15   8                                151
16   9                                161
17   10                               175
18   11                               187
19   12                               201
20   13                               209
21   14                               214
22   15                               220
23   16                               232
24   17                               239
25   18                               263

Page 102

1     get into in light of some previous responses
2     you gave me.
3 A.  Yes. Could I expand on my last answer?
4 Q.  Certainly.
5 A.  I don't remember if I was in a decision-making
6     process. I don't know if I was involved in a
7     policy decision. I don't remember that. I
8     believe we would get clarity under the
9     interpretation.
10         It has been Mylan's policy,
11     throughout time, to be in compliance, and from
12     our founder's own belief of doing things right
13     or not at all, I believe our interpretation or
14     how we submitted forms, meaning Mylan as a
15     company or Steve on behalf of Mylan, was done
16     appropriately, and I know of no reason why we
17     would establish a policy not to do so.
18 Q.  But as I understood your previous testimony,
19     you're not part of any process that attempted
20     to interpret these forms?
21         MR. ESCOBAR: Objection to the form.
22 A.  I was not.
23 Q.  Okay. Thank you, Mr. Workman.
24         Are you ready to proceed to the
25     general discussion of WAC and educate me a

Page 103

1     little bit about that, please, sir?
2 A.  Yes.
3 Q.  Okay. When Mylan sets a WAC, what is it?
4 A.  What do you mean by the question "what is it"?
5 Q.  Does Mylan set its WAC?
6         Does Mylan -- when we talk about a
7     WAC number, is that a number that Mylan has
8     set itself for its products?
9 A.  Yes.
10 Q.  Okay. And what is it after they've set it?
11 A.  Are you asking me the price or are you asking
12     me what it represents?
13 Q.  What it represents is probably a better way to
14     ask the question.
15         What does it represent?
16 A.  It is our invoice pricing to our wholesalers.
17     It is representative of the wholesale
18     acquisition cost.
19 Q.  And how is it representative of the wholesale
20     acquisition cost other than it is on the
21     invoice?
22 A.  It is what we invoice wholesalers when they
23     purchase our product. They are responsible
24     for the payment of that invoice.
25 Q.  And what is it, other than being put on the

Page 104

1     invoice, that makes it an average of wholesale
2     cost?
3         MR. ESCOBAR: Objection to the form.
4 A.  It is not an average.
5 Q.  Okay.
6 A.  It is a price point that is representative of
7     the wholesale acquisition cost.
8 Q.  All right. Is there any negotiation with the
9     customer as to what the WAC will be?
10 A.  No, I don't believe there is.
11 Q.  Okay. And so when we go through these
12     exhibits with negotiations, the bid process,
13     the internal documents, there's no document
14     that's going to reflect a negotiation with the
15     customer as to where you've set the WAC?
16 A.  No.
17 Q.  Okay. Because they negotiate a price other
18     than WAC with you, correct?
19         They don't care what the WAC is as
20     far as what they're paying for the product?
21 A.  Meaning our wholesalers?
22 Q.  Yes.
23 A.  Yes, we do negotiate another price with the
24     wholesalers. That is for their source program
25     and auto-sub program, and let me explain

Page 105

1     something else, that our sales to wholesalers
2     have evolved over time, and it has changed
3     significantly, and there's many processes and
4     different transactions that are involved now,
5     and what I'm referring to in this testimony is
6     that mechanism today. However, historically,
7     we invoiced wholesalers at WAC, and that was
8     their price for all of the product that they
9     purchased from us. All right? There was a
10     full-line wholesale agreement in which we
11     would provide a discount, and that could be a
12     percentage off that. That was their net price
13     points.
14         There was an initiative by a
15     wholesaler that occurred where they had
16     warehouses full of multiple manufacturers for
17     the same product, and they wanted to eliminate
18     multiple manufacturers for the same product in
19     their warehouse, and I believe the customer
20     was Bergen Brunswig, and they created an auto-
21     sub/source program where they contacted all
22     the manufacturers and they said, we are going
23     to put our entire stocking portfolio out to
24     bid to all the manufacturers, and this is how
25     you respond to this bid, and this is what

1  transactions you need to perform.  And it was
2  competitive bid processing, and from what we
3  understood, the most aggressive or the lowest
4  price won their warehouse space, and instead
5  of a pharmacy ordering up Mylan's product,
6  they would just order up the product in
7  general, and whoever's product was stored in
8  inventory in that warehouse space would then
9  be shipped to their customers.  So, that was
10  the evolution of the source program.
11        Today, we invoice wholesalers at
12  WAC.  They're responsible for that invoice.
13  They sell to pharmacies under a source
14  program.  They sell to pharmacies that are
15  members under our third-party contracts.  They
16  also sell to pharmacies that are on neither a
17  third-party contract or their source program.
18        When they do sell a product out
19  under their source program or under a third-
20  party contract, at a designated negotiated
21  contract price, a chargeback is processed, and
22  a chargeback is the difference between WAC and
23  that contract price.  If they sell it to a
24  pharmacy that is not a part of a third-party
25  contract or not a part of their source

1  program, we would not receive a chargeback for
2  that, so they would be responsible for that
3  invoice.
4        Again, WAC is the invoice price to
5  the wholesaler.  We have prompt payment terms
6  to those wholesalers.  Generally, it's a 2
7  percent discount if it's paid within a certain
8  time period.  So, there is an evolution over
9  time of -- WAC is a real price, and
10  wholesalers, their net prices were based upon
11  that WAC price, but, over time, it evolved
12  where they established their own contract and
13  their own contract price, and that was for
14  their source program, not their entire book of
15  business.
16  Q.   I appreciate that very much.
17        Let me follow up with this for my
18  clarification -- your answer was excellent,
19  but that doesn't mean I can understand every
20  aspect of it.  But you said wholesalers are
21  responsible for that invoice, and you used the
22  term "responsible", and I want to try to see
23  if there's a way to determine how often that
24  invoice WAC price is paid in full, and,
25  therefore, does it represent a true

1  acquisition cost?
2        Do you know how often, percent-wise
3  or however you want to define it, that, in
4  fact, Mylan customers pay the full WAC invoice
5  without any reduction from any source?
6        MR. ESCOBAR:  Objection to the form.
7  A.   We have some products in our line right now
8  that the only price point that we charge is
9  WAC.  So, those do exist, yes, and let me
10  explain this.
11  Q.   Can I ask you to identify those products?
12        MR. ESCOBAR:  Let him --
13  A.   You could.
14        MR. ESCOBAR:  Let him answer the
15  question.
16  Q.   Okay.  Help me remember to ask you for those
17  products.  Go ahead and give me your
18  explanation.
19  A.   Now, when an order comes in from a wholesaler,
20  it is not for one bottle and it's not for one
21  product, it is a multiple-line order, and what
22  we ship to them has multiple lines on that as
23  well.  Okay?  So, that invoice is created for
24  the products that were shipped under that
25  order.  Like I said, not for one bottle, not

1  for one invoice price.  There are many
2  transactions that occur, meaning sales to
3  third-party contracts, sales to -- under their
4  own source program, we receive returned
5  merchandise from them, we receive chargebacks
6  from them, and it is not a transaction or an
7  invoice that is paid in a vacuum.  There are
8  many moving parts to that invoice, including
9  the 2 percent prompt payment.
10        So, are they responsible for that in
11  full?  Yes, but that invoice is reconciled
12  under other transactions through our accounts
13  receivable department, and this is not a
14  one-time purchase.  This is a continual
15  process between the manufacturer and the
16  wholesaler.
17  Q.   And it's done primarily electronically?
18  A.   We do invoice electronically.  We do
19  chargebacks and chargeback reconciliations
20  electronically.  They submit orders to us
21  electronically as well.
22  Q.   And for your big customers, your big
23  wholesalers, your big chains, your big GPOs,
24  do you all, in fact, have some sort of
25  computer interface to accomplish that?

Page 118

1 Q. And they pay that WAC without any reduction,
2 other than the 2 percent prompt pay, because
3 there's no circumstances for them to reduce
4 it?
5 A. Yes.
6 Q. And is this something separate and apart from
7 the situations you've already told me about?
8 These customers?
9 A. Well, another piece of that is where they
10 purchase our product and maybe they do service
11 a third-party contract and maybe they do have
12 a source program, however, that product is not
13 on a third-party contract that they would
14 service or it is not under their source
15 program.
16 Q. And does it still fall in the category of what
17 you told me about previously? It happens, but
18 it's a small amount of the business, and it
19 happens rarely?
20 A. I don't know the frequency, but I'm talking
21 about other products that we may have contract
22 prices with and not just a subset of the
23 products that I just described.
24 If a wholesaler orders a product and
25 warehouses a product or for a particular

Page 119

1 customer who is requesting our product,
2 however, that product is not under a third-
3 party contract that they service or even under
4 their source program, that is another
5 illustration of how a wholesaler could order
6 and be responsible for the full WAC, because
7 we would not be receiving a chargeback either
8 for a third party or for their source program.
9 Q. And how often does that happen?
10 A. I don't know the frequency, but it does
11 happen, and it's for other products other than
12 the subset of products that I described.
13 Q. And can you give us any -- is it less than 1
14 percent of the business, 2 percent, whatever
15 number you're comfortable with telling me?
16 A. I don't know. I do know it happens. I don't
17 know if it happens frequently, infrequently or
18 on a case-by-case basis. I imagine it's a
19 case-by-case basis, and once it occurs, then
20 either a group or the wholesaler itself would
21 call us and want to negotiate contract
22 prices. However, it does occur.
23 Q. Okay. When you're involved in the bidding
24 process -- which is part of pricing and
25 contracts' duties and responsibilities,

Page 120

1 correct?
2 A. Yes.
3 Q. -- do you routinely and usually send out an
4 AWP and a WAC to those customers who are
5 involved in the bidding process?
6 A. We do send out an AWP with our offers. To the
7 wholesalers, we send out our WAC.
8 Q. When -- those price point references that
9 we've talked about, A, B, C or A, B, C and D?
10 A. Yes.
11 Q. And when those bidding processes end up in a
12 contract --
13 A. Yes.
14 Q. -- and the price is going down for a
15 particular product -- we saw some examples in
16 the exhibits we talked about, correct?
17 A. Yes.
18 Q. -- and if the price goes down and that range
19 of prices goes down for a class of trade, does
20 the WAC go down with it?
21 A. At times.
22 Q. And give us the circumstances when the WAC
23 would go down with it?
24 A. This is a highly-competitive industry where
25 our products are commoditized quickly after

Page 121

1 launch or at launch, depending upon the timing
2 of our approval. We establish our AWP. We
3 establish our WAC. They are independent of
4 each other. Our AWP is less than the brand.
5 Our WAC is less than the AWP. For any
6 particular product, for any particular
7 customer, for any particular circumstance,
8 prices may be different. Our WAC is our
9 wholesale acquisition cost, the price that we
10 invoice to our wholesalers. We negotiate and
11 bid contract prices. Over time, those
12 contract prices may erode. Over time --
13 Q. Go down?
14 A. Yes, go down, and, at times, we have increased
15 contract prices, but we assess our contract
16 prices with our costs, and we try to manage
17 our business.
18 Now, with this WAC and with a third-
19 party contract that purchases the product
20 primarily through the wholesaler, there is
21 that 2 percent prompt pay liability and also
22 the difference between WAC and their contract
23 price that we try to management. Now, every
24 product and every situation and every
25 competitive bid is different, but we try to

Page 162

1  A.  That's an acronym. I'm not entirely sure what
2      the HCFA acronym stands for. I think it's
3      actually what CMS now.
4  Q.  So, it's a governmental agency of some type?
5  A.  Yes.
6  Q.  So, HCFA FUL -- F-U-L, in caps -- List. This
7      is the subject matter.
8          I see, towards the bottom, that you
9      are part of the e-mail string, and do you
10     remember this particular e-mail?
11 A.  No.
12 Q.  Do you remember getting an e-mail like it?
13 A.  No.
14 Q.  Would you get e-mails relating to FUL on any
15     kind of regular basis?
16 A.  No.
17 Q.  Do you know whether or not you've ever gotten
18     an -- strike that.
19         Have you ever received a FUL list
20     other than in this e-mail?
21 A.  I don't know.
22 Q.  You can't remember any other time -- well,
23     actually, as you sit here today, you can't
24     remember any time that you received one,
25     correct?

Page 163

1  A.  I don't recall this e-mail. I don't recall
2      receiving similar e-mails. As stated in your
3      prior question, I may have. I may have looked
4      at these.
5          The majority of my time today is
6      looking at our prices to our customers and
7      responding to our customer inquiries. This is
8      not a project, an assignment, an analysis that
9      is a regular work of myself or anyone in our
10     department.
11         MR. MILLER: I think we have to
12     change the tape, so why don't we just take a
13     five-minute break.
14         THE VIDEOGRAPHER: We're going off
15     the record. The time indicated is 2:01 p.m.
16     Stand by. This is the end of disk two.
17             - - - -
18     (There was a recess in the proceedings.)
19             - - - -
20         THE VIDEOGRAPHER: We're back on the
21     record. The time indicated on the screen is
22     2:18 p.m. This is beginning of disk three.
23     You may proceed.
24 BY MR. MILLER:
25 Q.  I think, just before we went off the record,

Page 164

1      we were talking about FUL, and you stated it's
2      a federal upper limit.
3          What is that, if you know?
4  A.  I believe it's a limit on which CMS has
5      decided to reimburse pharmacies at.
6  Q.  And do you know who sets the FUL?
7  A.  I believe CMS.
8  Q.  And do you know when the FUL -- under what
9      circumstances a FUL is set?
10 A.  No.
11 Q.  And do you know what are the consequences, if
12     any, if one of your generic products were to
13     no longer be governed by a FUL?
14         MR. ESCOBAR: Objection to the form.
15 A.  Could you repeat the question, please?
16 Q.  Yes.
17         If one of Mylan's generic products
18     which had been subject to a FUL had -- was
19     then no longer subject to a FUL, all right,
20     what are the consequences of that for Mylan
21     and its pricing, if any?
22         MR. ESCOBAR: Objection to the form.
23 A.  I don't believe that it would be a consequence
24     to Mylan.
25 Q.  Would that be an opportunity at that time, if

Page 165

1      the FUL is lifted on a particular product, for
2      you to then raise your AWP?
3  A.  I believe that it would allow the pharmacy to
4      charge more. I believe that Mylan could raise
5      its price. However, I don't believe that that
6      ability to do so is solely dependent upon
7      whether an FUL exists or not.
8  Q.  Well, would it be accurate, if you know,
9      whether a FUL is always or almost always lower
10     than AWP?
11 A.  I don't know.
12 Q.  Is that your answer?
13 A.  Yes.
14 Q.  Well, you don't know the interplay between FUL
15     and AWP? Would that be an accurate statement?
16         MR. ESCOBAR: Objection to the form.
17 A.  Yes, I don't know.
18 Q.  Do you even know what FULs are used for by
19     Mylan?
20         MR. ESCOBAR: Objection to the form.
21 A.  I don't believe we use FULs.
22 Q.  So, it would be of little concern to Mylan and
23     the sales teams to Mylan whether or not there
24     was a federal upper limit on any particular
25     Mylan product?