# EXHIBIT X

## THE NEW YORK STATE ELDERLY PHARMACEUTICAL INSURANCE COVERAGE PROGRAM
### (HEREINAFTER REFERRED TO AS "EPIC")

### MANUFACTURER DRUG REBATE AGREEMENT

This Agreement is made on Oct. 3, 1991 by and between The People of the State of New York, acting by and through the Program for Elderly Pharmaceutical Insurance Coverage (EPIC) and MYLAN PHARMACEUTICALS, INC.; (Labeler Code 00378), hereinafter referred to as the Manufacturer at MORGANTOWN, WV, 26505, and shall be interpreted pursuant to the laws of the State of New York,

WHEREAS, Section 547-j(3) of the New York State Executive Law authorizes drug rebates for the EPIC Program; and

WHEREAS, EPIC desires to implement a rebate agreement intended to decrease the cost of EPIC covered drugs; and

WHEREAS, EPIC agrees to make payments for drugs of the manufacturer utilized by EPIC enrollees; and

WHEREAS, the Manufacturer agrees to provide to EPIC a rebate for such utilized drugs;

NOW, THEREFORE, for and in consideration of mutual promises and covenants herein set forth, the parties agree as follows:

*Marilyn W. Desmond*

## I.   DEFINITIONS

Terms used in this agreement shall have the same meaning as those defined in the Manufacturer's Agreement with the Secretary of Health and Human Services pursuant to Section 1927 of the Social Security Act (42 U.S.C., 1396s), except as otherwise expressly provided herein:

(a)   "Best Price" means, with respect to a Covered Outpatient Drug of the Manufacturer for a calendar quarter, the lowest price at which the manufacturer sells the Covered Outpatient Drug to any purchaser in the United States in any pricing structure (including capitated payments), in the same quarter for which the AMP is computed.   Best price includes prices to wholesalers, retailers, nonprofit entities, or governmental entities within the United States (excluding Depot Prices and Single Award Contract Prices of any agency of the Federal Government).   Federal Supply Schedule prices are included in the calculation of the best price.

The best prices shall be inclusive of cash discounts, free goods, volume discounts, and rebates (other than rebates under Section 1927 of the Social Security Act or under any agreement with, or law, rule, or order of, any state, state agency or subdivision thereof).

It shall be determined on a unit basis without regard to special packaging, labeling or identifiers on the dosage form or product or package, and shall not take into account prices that are Nominal in amount. For Bundled Sales, the allocation of the discount is made proportionately to the dollar value of the units of each drug sold under the bundled arrangement.   The best price for a quarter shall be adjusted by the Manufacturer if cumulative discounts, rebates or other arrangements subsequently adjust the prices actually realized.

(b)   "Covered Outpatient Drug." as defined in section 547(a)(1) of the NYS Executive Law, means a drug dispensed subject to a legally authorized prescription pursuant to section 6810 of the New York State Education Law, and insulin, insulin syringes and insulin needles but shall not include any drug determined by the commissioner of the federal food and drug administration to be ineffective or unsafe.

(c)   "EPIC Utilization Information", means the information on the total number of units of each dosage form and strength of the Manufacturer's Covered Outpatient Drugs for which claims were approved during a quarter under the New York State EPIC Program.   This information is based on claims approved by EPIC during a calendar quarter and not drugs that were dispensed during a calendar quarter (except it shall not include drugs dispensed prior to April 1, 1991).   The EPIC Utilization Information to be supplied includes:   1) NDC number (including package size code); 2) Product Name; 3) total number of claims approved per NDC during the quarter; 4) total charges allowed for claims approved per NDC during the quarter; 5) total amount paid per NDC during the quarter; 6) EPIC cost share percentage per NDC during the quarter; 7) total units dispensed per NDC for claims approved during the quarter; and 8) total number of rebate units per NDC

for claims approved during the quarter.  EPIC may, at its option, compute the total rebate anticipated, based on its own records, but it shall remain the responsibility of the manufacturer to correctly calculate the rebate amount based on its correct determination of AMP and Best Price.

(d)  "Rebate Units" means the number of units for each NDC which have been paid for by EPIC during the quarter and which have been dispensed on or after the effective date of this agreement.  Rebate units are calculated as total units dispensed multiplied by EPIC cost share percent.

(e)  "Unit" means drug unit in the lowest identifiable amount (e.g., tablet or capsule for solid dosage forms, milliliter for liquid forms, grams for ointments or creams, etc.).  The manufacturer will specify the unit for each dosage form and strength of each Covered Outpatient Drug in accordance with the instructions developed by the Health Care Financing Administration for purposes of the Federal Medicaid Rebate program under Section 1927 of the Social Security Act.

## II.  MANUFACTURER'S RESPONSIBILITIES

In order for EPIC to authorize that a participating provider pharmacy receive payment for the Manufacturer's drugs under Executive Law Section 547-j, the Manufacturer agrees to the following:

(a)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*Dispute Resolution* →

(b)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*Marilyn Desmond*

B) (i) for quarters (or periods) beginning after March 31, 1991, and before January 1, 1993, the greater of—

    (I)  the difference between the average manufacturer price (after deducting customary prompt payment discounts) and 87.5 percent of such price for the quarter (or other period); or

    (II) the difference between the average manufacturer price for a drug and the best price for such quarter for such drug. (except that for calendar quarters beginning after March 31, 1991, and ending before January 1, 1992, the rebate shall not exceed 25 percent of the average manufacturer price; and for calendar quarters beginning after December 31, 1991, and ending before January 1, 1993, the rebate shall not exceed 50 percent of the average manufacturer price); and

(ii) for quarters beginning after December 31, 1992, the greater of—

    (I)  the difference between the average manufacturer price for a drug and 85 percent of such price, or

    (II) the difference between the average manufacturer price for a drug and the best price for such quarter for such drug.

(iii) In the case of a covered outpatient drug approved for marketing after April 1, 1991, any reference in this calculation to April 1, 1991, shall instead refer to the first day of the first month during which the drug was marketed.

(c)  The Manufacturer authorizes that unit rebate amount information provided by the Manufacturer to HCFA and by HCFA to the NYS Medicaid Program according to section 1927 of the Federal Social Security Act, may be released by the NYS Medicaid Program to the EPIC Program to further the purpose of this Agreement. The manufacturer shall agree to provide more detailed supporting documentation at EPIC's request in those instances where there are significant differences between the EPIC unit rebate amounts and that established for the NYS Medicaid Program.

(d)  Except as provided under IV(b), the Manufacturer agrees to make such rebate payments for the first calendar quarter, beginning April 1, 1991, within 60 days and within 30 days for all subsequent quarters after receiving from EPIC the EPIC Utilization Information defined in Appendix D.

Rebate payments which are not made by the due date as required in this section and section IV(c) shall be subject to an interest charge calculated at a rate of 10 percent per annum.

(e)  This rebate Agreement between EPIC and the Manufacturer, if entered into prior to September 1, 1991, is retroactive to April 1, 1991.  Rebate Agreements entered into on or after September 1, 1991, shall be effective on April 1, 1992, unless such Agreement specifically provides that rebates will be retroactively calculated as if the Agreement had been in effect on April 1, 1991.

(f)  The manufacturer shall continue to make Rebate Payments to EPIC on all of its Covered Outpatient Drugs for the duration of this Agreement and EPIC Utilization Information reports that payment was made for that drug so long as such Covered Outpatient Drug was dispensed under the Manufacturer's NDC number, regardless of whether the Manufacturer continues to market that drug.  If no sales are reported by the Manufacturer during a quarter, the AMP and Best Price last reported shall be used in calculating rebates.

### III.  EPIC'S RESPONSIBILITIES

(a)  EPIC each quarter must promptly notify pharmacies of those Manufacturers that have entered into a rebate agreement.  EPIC must also promptly notify pharmacies regarding any changes to the list of Covered Outpatient Drugs.

(b)  EPIC will report EPIC's Utilization Information for the quarter to the Manufacturer, within 90 days of the last day of the initial quarter and within 60 days of the last day of each subsequent quarter, and in a manner prescribed by EPIC.  This information is shown in Appendix C.

(c)  EPIC shall maintain electronic claim records for the most recent four quarters that will assist manufacturers in verifying the utilization information provided by EPIC.  EPIC reserves the right to charge the manufacturer an amount sufficient to cover the costs of providing such data.

### IV.  DISPUTE RESOLUTION

(a)  In the event that for any quarter a discrepancy in EPIC Utilization Information or payment is alleged by either party to this agreement, the party must provide written notice of the discrepancy, by NDC number, to the other party.  Discrepancies in utilization data must be reported to EPIC prior to the due date for payment of rebate for that quarter.  Discrepancies in payments must be reported to the manufacturer within 45 days following the due date for that payment.

(b)  If the Manufacturer in good faith disputes EPIC's Utilization Information, the Manufacturer shall pay EPIC that portion of the rebate amount claimed which is not disputed no later than the date for payment of the rebate for that quarter as prescribed in II(d) of this Agreement.  If the dispute is resolved after negotiation, the balance due, if any, will be paid or credited by the Manufacturer or the State by the due date of the next quarterly payment as required in II(d) of this Agreement.

(c)  EPIC and the Manufacturer will use their best efforts to resolve any disputes within 60 days of receipt of the written notice of discrepancy.  In the event that EPIC and the Manufacturer are not able to resolve a dispute within 60 days, EPIC shall appoint an administrative law judge who shall review written submissions by both parties and make a written finding thereon.  Both EPIC and the manufacturer shall implement this finding unless within 30 days the matter is brought before a court of competent jurisdiction.

(d)   Appropriate adjustments to rebate payments will be made no later than 30 days following the finding of the administrative law judge.

(e)   The manufacturer has the right to audit EPIC utilization data using mutually agreeable audit procedures.  Quarterly EPIC utilization data sorted by zip code of the dispensing pharmacies will be made available on demand for those manufacturer's drugs which are among the top 300 most commonly used drugs.  EPIC reserves the right to charge the manufacturer an amount sufficient to cover the costs of providing such zip code specific information.  The manufacturer has the right of access to EPIC audit findings with respect to pharmacy purchasing of their products when such utilization information is under dispute.

## V.   CONFIDENTIALITY PROVISIONS

(a)   Information disclosed by the Manufacturer in connection with this Agreement is confidential and will not be disclosed, except as required by State or Federal Law.

(b) The Manufacturer will maintain the confidentiality of EPIC Utilization Information and use such information only for purposes approved by the Department, as in furtherance of Executive Law, Article 19K.  If the Manufacturer audits this information or receives additional information on such data, that information shall also be held confidential.  The Manufacturer agrees to abide by applicable State confidentiality statutes, regulations and other properly promulgated policy.

(c)   Notwithstanding the nonrenewal or termination of this Agreement for any reason, these confidentiality provisions will remain in full force and effect.

(d)   The manufacturer hereby applies to EPIC for an exception to the disclosure of information under Public Officers Law, Article 6 (Freedom of Information) concerning information supplied by the manufacturer for a determination of best price under this agreement.  The exceptions applied for are Public Officers Law sections 87.2(c) and (d).  The information if disclosed by EPIC would impair contract awards and cause substantial injury to the competitive position of the manufacturer.

(e)   Both parties hereto shall inform and train, if necessary, its respective employees, agents, advisors, consultants and officials regarding the confidential nature of such data and shall cause such persons (including any board or committee) to keep such data and information confidential.

## VI.   NONRENEWAL AND TERMINATION

(a)   This Agreement shall be effective for an initial period of one year beginning April 1, 1991, and shall be automatically renewed for additional terms of one year, unless the Manufacturer or EPIC give written notice of intent not to renew the Agreement at least 90 days before the end of the Contract period.

(b)   The Manufacturer may terminate the Agreement for any reason upon no less than 60 days prior written notice of the termination.  Termination shall become effective the earlier of the first day of the next calendar quarter following the Manufacturer's 60 day prior notice of termination, or the ending date of the term of the Agreement if notice has been given, in accordance with VII(a).

(c)   EPIC may terminate the Agreement for violations of this Agreement or other good cause upon 60 days prior written notice.

(d)   If this rebate Agreement is not renewed or is terminated, EPIC and the Manufacturer agree not to enter into another rebate Agreement until a period of one calendar quarter has elapsed from the effective date of the termination, unless EPIC finds good cause for earlier reinstatement.

## VII.   GENERAL PROVISIONS

(a)   Notice and reports required to be given pursuant to the terms and provisions of this Agreement will be sent in writing.

Notice and Reports to the Manufacturers will be sent to:

Frank DeGeorge, Manager of Accounting and Taxation

Mylan Pharmaceuticals Inc.

781 Chestnut Ridge Road

Morgantown, WV 26505-2730

Notice and Reports to EPIC will be sent to:

Executive Director
NYS Elderly Pharmaceutical Insurance Coverage (EPIC) Program
Empire State Plaza,
Corning Tower - Room 401
Albany, New York  12237

(b)   In the event of a transfer in ownership of the Manufacturer, the Manufacturer shall assign its rights and responsibilities under this Agreement, to the new owner, subject to the conditions specified in Section 2 of Appendix A.

(c)   Nothing in this Agreement will be construed to require or authorize the commission of any act contrary to law.  If any provision of this Agreement is found to be invalid by a court of law, this Agreement will be construed in all respects as if any invalid or unenforceable provision were eliminated, and without any effect on any other provision.

(d)   Nothing in this Agreement shall be construed as a waiver or relinquishment of any legal rights of the Manufacturer or EPIC under the Constitution, the Social Security Act, other Federal laws, or State laws.

(e)  Any ambiguities in this Agreement shall be interpreted in the manner which best effectuates the statutory scheme.

(f)  This Agreement may be amended in writing subject to approval by the New York State Comptroller.

(g)  In the event that a due date falls on a weekend, Federal or State holiday, the report or other item will be due on the first business day following that weekend, Federal or State holiday.

## VIII.  APPENDIX

Appendices A, B, and C are attached hereto and are made part of this Agreement.  The Appendix A, "Standard Clauses for all New York State Contracts," supersedes any and all prior versions thereof heretofore applicable to this agreement.  If there is a conflict between Appendix A and any terms and conditions in the contract, then Appendix A will supersede these provisions.

## IX.  SIGNATURES

FOR THE ELDERLY PHARMACEUTICAL INSURANCE COVERAGE (EPIC) PROGRAM

By: _Marilyn W. Dumond_

Title:  Deputy Director, EPIC Program

Date: _July 19, 1991_

ACCEPTED FOR THE MANUFACTURER

By: _R. D. Jackson_

Title:  Vice President, Sales

Name of Manufacturer:  Mylan Pharmaceuticals Inc.

Manufacturer Address:  781 Chestnut Ridge Road

Morgantown, WV 26505-2730

Manufacturer Labeler Code(s):  00378

Date:  October 2, 1991

Attach corporate acknowledgement.

## PRIVATE CORPORATION ACKNOWLEDGEMENT

STATE OF WEST VIRGINIA )

                     ss:

COUNTY OF MONONGALIA    )

_R. P. Jackson_ On the _3rd_ day of _October_, 1991, before me personally came _____, to me known, who, being by me duly sworn, did depose and say that he is the Vice President of Sales of Mylan Pharmaceuticals Inc., 781 Chestnut Ridge Road, Morgantown, WV 26505-2730, the corporation described in and which executed the above instrument; that he knows the seal of said corporation, the seal affixed to said instrument is such corporate seal; that is was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
DAWN J. BETO
781 CHESTNUT RIDGE ROAD
MORGANTOWN, WV 26505
My Commission Expires August 7, 2001

_Dawn J. Beto_
NOTARY PUBLIC

(e)   Any ambiguities in this Agreement shall be interpreted in the manner which best effectuates the statutory scheme.

(f)   This Agreement may be amended in writing subject to approval by the New York State Comptroller.

(g)   In the event that a due date falls on a weekend, Federal or State holiday, the report or other item will be due on the first business day following that weekend, Federal or State holiday.


VIII.   APPENDIX

Appendices A, B, and C are attached hereto and are made part of this Agreement.   The Appendix A, "Standard Clauses for all New York State Contracts," supersedes any and all prior versions thereof heretofore applicable to this agreement.   If there is a conflict between Appendix A and any terms and conditions in the contract, then Appendix A will supersede these provisions.


IX.   SIGNATURES

FOR THE ELDERLY PHARMACEUTICAL INSURANCE COVERAGE (EPIC) PROGRAM

By: _Marilyn W. Dumond_____

Title:   Deputy Director, EPIC Program

Date:   _July 19, 1991_____

ACCEPTED FOR THE MANUFACTURER

By: _R. D. Jackson_____

Title:   Vice President, Sales

Name of Manufacturer:   Mylan Pharmaceuticals Inc.

Manufacturer Address:   781 Chestnut Ridge Road

Morgantown, WV 26505-2730

Manufacturer Labeler Code(s):   00378

Date:   October 2, 1991


Attach corporate acknowledgement.

## PRIVATE CORPORATION ACKNOWLEDGEMENT

STATE OF WEST VIRGINIA )

                                    ss:

COUNTY OF MONONGALIA   )

R.P. Jackson On the 3rd day of October, 1991, before me personally came R.P. Jackson, to me known, who, being by me duly sworn, did depose and say that he is the Vice President of Sales of Mylan Pharmaceuticals Inc., 781 Chestnut Ridge Road, Morgantown, WV 26505-2730, the corporation described in and which executed the above instrument; that he knows the seal of said corporation, the seal affixed to said instrument is such corporate seal; that is was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
DAWN J. BETO
781 CHESTNUT RIDGE ROAD
MORGANTOWN, WV 26505
My Commission Expires August 7, 2001

NOTARY PUBLIC

# APPENDIX A

## STANDARD CLAUSES FOR ALL NEW YORK STATE CONTRACTS

The parties to the attached contract, license, lease, amendment or other agreement of any kind (hereinafter, "the contract" or "this contract") agree to be bound by the following clauses which are hereby made a part of the contract (the word "Contractor" herein refers to any party other than the State, whether a contractor, licensor, licensee, lessor, lessee or any other party):

1. **EXECUTORY CLAUSE**. In accordance with Section 41 of the State Finance Law, the State shall have no liability under this contract to the Contractor or to anyone else beyond funds appropriated and available for this contract.

2. **NON-ASSIGNMENT CLAUSE**. In accordance with Section 138 of the State Finance Law, this contract may not be assigned by the Contractor or its right, title or interest therein assigned, transferred, conveyed, sublet or otherwise disposed of without the previous consent, in writing, of the State and any attempts to assign the contract without the State's written consent are null and void. The Contractor may, however, assign its right to receive payment without the State's prior written consent unless this contract concerns Certificates of Participation pursuant to Article 5-A of the State Finance Law.

3. **COMPTROLLER'S APPROVAL**. In accordance with Section 112 of the State Finance Law (or, if this contract is with the State University or City University of New York, Section 355 or Section 6218 of the Education Law), if this contract exceeds $5,000 ($20,000 for certain S.U.N.Y. and C.U.N.Y. contracts), or if this is an amendment for any amount to a contract which, as so amended, exceeds said statutory amount, or if, by this contract, the State agrees to give something other than money, it shall not be valid, effective or binding upon the State until it has been approved by the State Comptroller and filed in his office.

4. **WORKERS' COMPENSATION BENEFITS**. In accordance with Section 142 of the State Finance Law, this contract shall be void and of no force and effect unless the Contractor shall provide and maintain coverage during the life of this contract for the benefit of such employees as are required to be covered by the provisions of the Workers' Compensation Law.

**5.   NON-DISCRIMINATION REQUIREMENTS.   In accordance with Article 15 of the Executive Law (also known as the Human Rights Law) and all other State and Federal statutory and constitutional non-discrimination provisions, the Contractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, age, disability or marital status. Furthermore, in accordance with Section 220-e of the Labor Law, if this is a contract for the construction, alteration or repair of any public building or public work or for the manufacture, sale or distribution of materials, equipment or supplies, and to the extent that this contract shall be performed within the State of New York, Contractor agrees that neither it nor its subcontractors shall, by reason of race, creed, color, disability, sex or national origin:  (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract.  If this is a building service contract as defined in Section 230 of the Labor Law, then, in accordance with Section 239 thereof, Contractor agrees that neither it nor its subcontractors shall, by reason of race, creed, color, national origin, age, sex or disability:  (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract.  Contractor is subject to fines of $50.00 per person per day for any violation of Section 220-e or Section 239 as well as possible termination of this contract and forfeiture of all moneys due hereunder for a second or subsequent violation.**

**6.   WAGE AND HOURS PROVISIONS.   If this is a public work contract covered by Article 8 of the Labor Law or a building service contract covered by Article 9 thereof, neither Contractor's employees nor the employees of its subcontractors may be required or permitted to work more than the number of hours or days stated in said statutes, except as otherwise provided in the Labor Law and as set forth in prevailing wage and supplement schedules issued by the State Labor Department.  Furthermore, Contractor and its subcontractors must pay at least the prevailing wage rate and pay or provide the prevailing supplements, including the premium rates for overtime pay, as determined by the State Labor Department in accordance with the Labor Law.**

**7.   NON-COLLUSIVE BIDDING REQUIREMENT.   In accordance with Section 139-d of the State Finance Law, if this contract was awarded based upon the submission of bids, Contractor warrants, under penalty of perjury, that its bid was arrived at independently and without collusion aimed at**

restricting competition. Contractor further warrants that, at the time Contractor submitted its bid, an authorized and responsible person executed and delivered to the State a non-collusive bidding certification on Contractor's behalf.

8.  **INTERNATIONAL BOYCOTT PROHIBITION.**  In accordance with Section 220-f of the Labor Law and Section 139-h of the State Finance Law, if this contract exceeds $5,000, the Contractor agrees, as a material condition of the contract, that neither the Contractor nor any substantially owned or affiliated person, firm, partnership or corporation has participated, is participating, or shall participate in an international boycott in violation of the federal Export Administration Act of 1979 (50 USC App. Sections 2401 et seq.) or regulations thereunder. If such Contractor, or any of the aforesaid affiliates of Contractor, is convicted or is otherwise found to have violated laws or regulations upon the final determination of the United States Commerce Department or any other appropriate agency of the United States subsequent to the contract's execution, such contract, amendment or modification thereto shall be rendered forfeit and void. The Contractor shall so notify the State Comptroller within five (5) business days of such conviction, determination or disposition of appeal (2 NYCRR 105.4).

9.  **SET-OFF RIGHTS.**  The State shall have all of its common law, equitable and statutory rights of set-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amounts due and owing to the State with regard to this contract, any other contract with any State department or agency, including any contract for a term commencing prior to the term of this contract, plus any amounts due and owing to the State for any other reason including, without limitation, tax delinquencies, fee delinquencies or monetary penalties relative thereto. The State shall exercise its set-off rights in accordance with normal State practices including, in cases of set-off pursuant to an audit, the finalization of such audit by the State agency, its representatives, or the State Comptroller.

10.  **RECORDS.**  The Contractor shall establish and maintain complete and accurate books, records, documents, accounts and other evidence directly pertinent to performance under this contract (hereinafter, collectively, "the Records"). The Records must be kept for the balance of the calendar year in which they were made and for six (6) additional years thereafter. The State Comptroller, the Attorney General and any other person or entity authorized

conduct an examination, as well as the agency or agencies involved in this contract, shall have access to the Records during normal business hours at an office of the Contractor within the State of New York or, if no such office is available, at a mutually agreeable and reasonable venue within the State, for the term specified above for the purposes of inspection, auditing and copying.  The State shall take reasonable steps to protect from public disclosure any of the Records which are exempt from disclosure under Section 87 of the Public Officers Law (the "Statute") provided that:  (i) the Contractor shall timely inform an appropriate State official, in writing, that said records should not be disclosed; and (ii) said records shall be sufficiently identified; and (iii) designation of said records as exempt under the Statute is reasonable.  Nothing contained herein shall diminish, or in any way adversely affect, the State's right to discovery in any pending or future litigation.

### 18. IDENTIFYING INFORMATION AND PRIVACY NOTIFICATION:

#### (a) FEDERAL EMPLOYER IDENTIFICATION NUMBER and/or FEDERAL SOCIAL SECURITY NUMBER.

All invoices or New York State standard vouchers submitted for payment for the sale of goods or services or the lease of real or personal property to a New York State agency must include the payee's identification number, i.e., the seller's or lessor's identification number.  The number is either the payee's Federal employer identification number or Federal social security number, or both such numbers when the payee has both such numbers.  Failure to include this number or numbers may delay payment.  Where the payee does not have such number or numbers, the payee, on his invoice or New York State standard voucher, must give the reason or reasons why the payee does not have such number or numbers.

#### (b) PRIVACY NOTIFICATION.

(1)  The authority to request the above personal information from a seller of goods or services or a lessor of real or personal property, and the authority to maintain such information, is found in Section 5 of the State Tax Law.  Disclosure of this information by the seller or lessor to the State is mandatory.  The principal purpose for which the information is collected is to enable the State to identify individuals, businesses and others who have been delinquent in filing tax returns or may have understated their tax liabilities and to generally identify persons affected by the taxes administered by the

Commissioner of Taxation and Finance.  The information will be used for tax administration purposes and for any other purpose authorized by law.

(2)  The personal information is requested by the purchasing unit of the agency contracting to purchase the goods or services or lease the real or personal property covered by this contract or lease.  The information is maintained in New York State's Central Accounting System by the Director of State Accounts, Office of the State Comptroller, AESOB, Albany, New York 12236.

12.   EQUAL EMPLOYMENT OPPORTUNITIES FOR MINORITIES AND WOMEN:   In accordance with Section 312 of the Executive Law, if this contract is:  (i) a written agreement or purchase order instrument, providing for a total expenditure in excess of $25,000.00, whereby a contracting agency is committed to expend or does expend funds in return for labor, services, supplies, equipment, materials or any combination of the foregoing, to be performed for, or rendered or furnished to the contracting agency; or (ii) a written agreement in excess of $100,000.00 whereby a contracting agency is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon; or (iii) a written agreement in excess of $100,000.00 whereby the owner of a State assisted housing project is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon for such project, then:

(a) The contractor will not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, age, disability or marital status, and will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination.  Affirmative action shall mean recruitment, employment, job assignment, promotion, upgradings, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation.

(b) at the request of the contracting agency, the Contractor shall request each employment agency, labor union, or authorized representative of workers

with which it has a collective
bargaining or other agreement or
understanding, to furnish a written
statement that such employment agency,
labor union or representative will not
discriminate on the basis of race,
creed, color, national origin, sex, age,
disability or marital status and that
such union or representative will
affirmatively cooperate in the
implementation of the contractor's
obligations herein; and
(c) the Contractor shall state, in all
solicitations or advertisements for
employees, that, in the performance of
the State contract, all qualified
applicants will be afforded equal
employment opportunities without
discrimination because of race, creed,
color, national origin, sex, age,
disability or marital status.

Contractor will include the provisions of "a", "b" and
"c", above, in every subcontract over 125,000.00 for the
construction, demolition, replacement, major repair,
renovation, planning or design of real property and
improvements thereon (the "Work") except where the Work is
for the beneficial use of the Contractor.  Section 312 does
not apply to:  (i) work, goods or services unrelated to this
contract; or (ii) employment outside New York State; or
(iii) banking services, insurance policies or the sale of
securities.  The State shall consider compliance by a
contractor or subcontractor with the requirements of any
federal law concerning equal employment opportunity which
effectuates the purpose of this section.  The contracting
agency shall determine whether the imposition of the
requirements of the provisions thereof duplicate or conflict
with any such federal law and if such duplication or
conflict exists, the contracting agency shall waive the
applicability of Section 312 to the extent of such
duplication or conflict.  Contractor will comply with all
duly promulgated and lawful rules and regulations of the
Governor's Office of Minority and Women's Business
Development pertaining hereto.

13.   CONFLICTING TERMS.  In the event of a conflict
between the terms of the contract (including any and all
attachments thereto and amendments thereof) and the terms of
this Appendix A, the terms of this Appendix A shall control.

7.

14. **GOVERNING LAW**. This contract shall be governed by the laws of the State of New York except where the Federal supremacy clause requires otherwise.

15. **LATE PAYMENT**. Timeliness of payment and any interest to be paid to Contractor for late payment shall be governed by Article XI-A of the State Finance Law to the extent required by law.

16. **NO ARBITRATION**. Disputes involving this contract, including the breach or alleged breach thereof, may not be submitted to binding arbitration (except where statutorily authorized) but must, instead, be heard in a court of competent jurisdiction of the State of New York.

17. **SERVICE OF PROCESS**. In addition to the methods of service allowed by the State Civil Practice Law & Rules ("CPLR"), Contractor hereby consents to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Contractor's actual receipt of process or upon the State's receipt of the return thereof by the United States Postal Service as refused or undeliverable. Contractor must promptly notify the State, in writing, of each and every change of address to which service of process can be made. Service by the State to the last known address shall be sufficient. Contractor will have thirty (30) calendar days after service hereunder is complete in which to respond.

August, 1989



## EPIC DRUG REBATE DATA ELEMENTS
## PRESCRIPTION DRUG DATA SUBMISSION FROM MANUFACTURERS TO EPIC

| Description | Size |
|---|---|
| Labeler code, 1st segment of NDC | (05) |
| Product code, second segment of NDC | (04) |
| Package size code, third segment of NDC | (02) |
| Period Covered, Calendar Quarter and Year | (03) |
| Product FDA Registration Name | (63) |
| Drug Category:  Single Source, Innovator Multiple Source, or Noninnovator Multiple Source | (01) |
| DESI Drug Indicator | (01) |
| FDA Therapeutic Equivalence Explanation Code | (02) |
| Unit Type:  cc, ml, tablet, etc. | (03) |
| Units per package size code | (10) |
| Average Manufacturer's Price | (11) |
| Baseline AMP | (11) |
| Best Price | (11) |
| FDA Approval Date | (06) |
| Date Drug Entered Market | (06) |
| Drug Termination Date | (06) |
| Drug Type (Rx or OTC) Indicator | (01) |
| Correction Record Flag | (01) |



## MANUFACTURER DATA ELEMENT DEFINITION

********************************************************

DATA ELEMENT NAME:   Labeler Code

DATA DEFINITION:   First segment of National Drug Code that identifies the manufacturer, labeler, relabeler, packager, repackager or distributor of the drug.

SPECIFICATIONS:   Numeric values only; 5 digit field, right-justified and 0-filled for 4-digit labeler codes.

********************************************************

DATA ELEMENT NAME:   Product Code

DATA DEFINITION:   Second segment of National Drug Code dispensed factors.

SPECIFICATIONS:   Numeric values only; 4 digit field, right-justified and 0-filled.

********************************************************

DATA ELEMENT NAME:   Package Size Code

DATA DEFINITION:   Third segment of National Drug Code.

SPECIFICATIONS:   Numeric values only; 2 digit field, right-justified and 0-filled.

********************************************************

DATA ELEMENT NAME:   Period Covered

DATA DEFINITION:   Calendar quarter and year covered by data submission.

SPECIFICATIONS:   Numeric 3-digit field, QYY

Valid Values for Q:
      1 = January 1 - March 31
      2 = April 1 - June 30
      3 = July 1 - September 30
      4 = October 1 - December 31

Valid Values for YY:  last two digits of calendar year covered.

For Baseline Data Submission, indicate third quarter of 1990 as 390.

## MANUFACTURER DATA ELEMENT DEFINITION

**************************************************************************

**DATA ELEMENT NAME:**   Product FDA Registration Name

**DATA DEFINITION:**   Product name as it appears on FDA registration form.

**SPECIFICATIONS:**   Alpha-numeric values; 63 characters, left justified.

**************************************************************************

**DATA ELEMENT NAME:**   Drug Category

**DATA DEFINITION:**   Classification of drug for purposes of rebate calculations.

**SPECIFICATIONS:**   Alpha-numeric values; 1 character

Valid Values:   N = Non-innovator Multiple Source
S = Single Source
I = Innovator Multiple Source

**************************************************************************

**DATA ELEMENT NAME:**   DESI Drug Indicator

**DATA DEFINITION:**   A DESI (Drug Efficacy Study Implementation) drug is any drug that lacks substantial evidence of effectiveness and is subject by the FDA to a Notice of Opportunity for Hearing (NOH).  This includes drugs which are identical, related or similar to DESI drugs.

**SPECIFICATIONS:**   Numeric value, 1 digit

Valid Values: 0 = not DESI drug
1 = DESI drug

**************************************************************************

## MANUFACTURER DATA ELEMENT DEFINITION

**************************************************************************

**DATA ELEMENT NAME:** Therapeutic Equivalence Explanation Code

**DATA DEFINITION:** The classification as contained in the FDA publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (the FDA Orange Book) for the last day of the calendar quarter for which the rebate payment is being made.

**SPECIFICATIONS:** Alpha-numeric values, 2 character field

Valid Values:
AA
AB
AN
AO
AP
AT
BC
BD
BE
BN
BP
BR
BS
BT
BX
BB - Not rated

**************************************************************************

**DATA ELEMENT NAME:** Units Per Package Size Code

**DATA DEFINITION:** Total number of units, as defined in the Unit Type field, in the smallest dispensable container or entity for the product defined by the full NDC.

**SPECIFICATIONS:** Numeric values, 10 digit field: 7 whole number and 3 decimal places

Example 1: For a 17 microgram inhaler, the unit type would be a UGM and the units per package size would be 17.

Example 2: For a tablet, regardless of the package size, the unit type would be a TAB and the units per package size would be 1.



### MANUFACTURER DATA ELEMENT DEFINITION

**************************************************************************

**Example 3:** For a powder-filled vial, the unit type would be PFV and the units per package size would be 1.

**Example 4:** For a package of 12 suppositories, the unit type would be SUP and the units per package size would be 12.

**Example 5:** For a package of 6 transdermal patches, the unit type would be TDP and the units per package size would be 6.

**Example 6:** For a 100 Ml ampule, the unit type would be ML and the units per package size would be 100.

**Example 7:** For a bottle containing 50 Cubic Centimeters of cough syrup, the unit type is CC and the units per package size is 50.

**Example 8:** If a package contains a mix of different unit types such as a tube of ointment and a suppository, the unit type would be KIT and the units per package size would be 1.

Examples 4 and 5 assume that 12 and 6 are the smallest dispensable entities. However, if a package contains multiple units which can be dispensed individually or in smaller retail units in a package, then the units per package size would be 1 in each example.

**************************************************************************

### AMP (Average Manufacturer's Price)

The Average Manufacturer's Price per unit per product code only for the period covered. If a drug is distributed in 3 package sizes, there will still be only one AMP for the product, which will be the same for all package sizes.

**SPECIFICATIONS:** Numeric values, 11 digit field: five whole numbers and 6 decimal places. Compute to 7 decimal places, and round to 6 decimal places.

## MANUFACTURER DATA ELEMENT DEFINITION

********************************************************************

**DATA ELEMENT NAME:**    Baseline AMP (Average Manufacturer's Price).

NOTE:  This data is optional and only applicable for the initial submission, and for drugs approved by the FDA after 10/01/90.

**DATA DEFINITION:**    The Average Manufacturer's Price per unit per product code only for the quarter ending September 30, 1990.  If a drug is distributed in 3 package sizes, there will still be only one AMP for the product, which will be the same for all package sizes.

**SPECIFICATIONS:**    Numeric values, 11 digit field:  five whole numbers and 6 decimal places.  Compute to 7 decimal places, and round to 6 decimal places.

********************************************************************

**DATA ELEMENT NAME:**    Best Price

**DATA DEFINITION:**    The lowest price available from the labeler to any wholesaler, retailer, nonprofit entity, or governmental entity within the United States (excluding depot prices and single award contract prices of any agency of the Federal Government).

**SPECIFICATIONS:**    Numeric values, 11 digit field:  five whole numbers and 6 decimal places.  Compute to 7 decimal places, and round to 6 decimal places.



### MANUFACTURER DATA ELEMENT DEFINITION

************************************************************************

**DATA ELEMENT NAME:** Unit Type

**DATA DEFINITION:** Basic measurement that represents the smallest unit by which the drug can be measured. The rebate amount will be calculated per unit.

Example: for drugs that are dispensed in capsules or tablets, the Unit Type would be a capsule or tablet. The rebate amount would be calculated per capsule or tablet. For liquids, the unit type would be a milliliter. The rebate amount would be calculated per milliliter.

**SPECIFICATIONS:** Alpha-Numeric values; 3 character field, left justified
Valid Values:

| | | | |
|---|---|---|---|
| AHF | = refers only to Anti-Hemophilic Factor (AHF) | ML | = Milliliter |
| CAP | = Capsule | OIS | = Ocular Insert |
| CC | = Cubic Centimeter | PFV | = Powder Filled Vials |
| GM | = Gram | | |
| KIT | = use for products containing | SUP | = Suppository |
| | | | = Transdermal Patch |
| MG | = Milligram | UCI | = Microcurie |
| | | UGM | = Microgram |
| | | | = Micromolar |

************************************************************************

**DATA ELEMENT NAME:** FDA Approval Date

Date of FDA Approval of drug, if approved after

numeric values; 6 digit field

Valid Values: 0 = Original Record
1 = Correction Record

## MANUFACTURER DATA ELEMENT DEFINITION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**  Date Drug Entered Market

**DATA DEFINITION:**  First day of the first month that the drug was marketed for the entire month.

**SPECIFICATIONS:**  Numeric values; 6 digit field
MMDDYY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**  Date Termination Date

**DATA DEFINITION:**  Date drug withdrawn from market or no longer distributed by labeler.

**SPECIFICATIONS:**  Numeric values; 6 digit field
MMDDYY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**  Drug Type Indicator

**DATA DEFINITION:**  Indicator to show whether this drug product can be acquired only by prescription or can be acquired Over-The-Counter (OTC).

1 = Rx
2 = OTC

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**  Correction Record Flag

**DATA DEFINITION:**  Indicates that this record corrects and replaces a record already submitted for the initial submission.

**SPECIFICATIONS:**  Numeric one-digit field

Valid Values:  0 = Original Record
1 = Correction Record

**EPIC UTILIZATION INFORMATION**
**RECORD FROM EPIC TO MANUFACTURERS QUARTERLY**

**Description**

| | |
|---|---|
| EPIC Code | (02) |
| Period Covered, Calendar Quarter and Year | (01) |
| Labeler Code, 1st segment of NDC | (03) |
| Product Code, second segment of NDC | (04) |
| Package Size Code, third segment of NDC | (03) |
| Product FDA Registration Name (Abbr.) | (10) |
| Total Number of Claims (per NDC) | (06) |
| Total Allowed Charges (per NDC) | (10) |
| Total EPIC Payments (per NDC) | (10) |
| EPIC Cost Share Percentage (per NDC) | (05) |
| Total Units Dispensed (per NDC) | (10) |
| Rebate Units (per NDC) | (12) |
| Correction Record Flag | (01) |

1 = January
2 = April
3 = July - September 30
4 = October 1 - December 31

Valid Values for YY:   last two digits of current year.

DATA ELEMENT NAME:   Labeler Code

DEFINITION:   First segment of National Drug Code that identifies the manufacturer, labeler, or distributor of the drug.

SPECIFICATIONS:   Numeric Values only, 5 digit field, right-justified and zero filled for 4 digit

DATA ELEMENT NAME:   Product Code

DEFINITION:   Second segment of National ...

SPECIFICATIONS:   Numeric Values only, 4 digit field, right-justified and zero filled

*(signature)* Marjorie Desmond

## DATA ELEMENT DEFINITION

**********************************************************************

**DATA ELEMENT NAME:** EPIC Code

**DATA DEFINITION:** Two character abbreviation for EPIC (EP)

**SPECIFICATIONS:** Alpha-numeric, 2 positions

**********************************************************************

**DATA ELEMENT NAME:** Period covered

**DATA DEFINITION:** Calendar quarter and year covered by data submission

**SPECIFICATIONS:** Numeric 3 digit field, QYY

Valid Values for Q:

1 = January 1 - March 31
2 = April 1 - June 30
3 = July 1 - September 30
4 = October 1 - December 31

Valid Values for YY:  last two digits of calendar year covered

**********************************************************************

**DATA ELEMENT NAME:** Labeler Code

**DATA DEFINITION:** First segment of National Drug Code that identifies the manufacturer, labeler, or distributor of the drug.

**SPECIFICATIONS:** Numeric Values only, 5 digit field, right-justified and zero filled for 4 digit labeler codes

**********************************************************************

**DATA ELEMENT NAME:** Product Code

**DATA DEFINITION:** Second segment of National Drug Code

**SPECIFICATIONS:** Numeric Values only, 4 digit field, right-justified and zero filled

**********************************************************************



## DATA ELEMENT DEFINITION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**   Package Size Code

**DATA DEFINITION:**   Third segment of National Drug Code

**SPECIFICATIONS:**   Numeric Values only, 2 digit field, right-justified
and zero filled

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**   Product FDA Registration Name (Abbr.)

**DATA DEFINITION:**   First 10 characters of Product FDA Registration name.

**SPECIFICATIONS:**   Alpha-Numeric Values, 10 positions.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**   Total Number of Claims

**DATA DEFINITION:**   Number of claims approved per NDC during the quarter.

**SPECIFICATIONS:**   Numeric Values, 6 digits, whole numbers only.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**   Total Allowed Charges

**DATA DEFINITION:**   Total amount of billed charges EPIC allowed for claims
approved per NDC during the quarter.  This amount is
the lower of billed charges or average wholesale price
plus dispensing fee for copay claims and journey
billed charges for deductible claims.

**SPECIFICATIONS:**   Numeric Values, 10 digits:  8 whole numbers and 2
decimals places.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DATA ELEMENT NAME:**   Total EPIC Payments

**DATA DEFINITION:**   Total amount of EPIC payments for approved claims per
NDC's during the quarter including dispensing fees.

**SPECIFICATIONS:**   Numeric Values, 10 digits:  8 whole numbers and 2
decimals places.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DATA ELEMENT DEFINITION

*********************************************************************

**DATA ELEMENT NAME:** EPIC Cost Share Percent

**DATA DEFINITION:** Total EPIC payments divided by total allowed charges expressed as a percent.

**SPECIFICATIONS:** Numeric Values, 5 digits: 3 whole numbers and 2 decimals.

*********************************************************************

**DATA ELEMENT NAME:** Total Units Dispensed

**DATA DEFINITION:** The total number of units dispensed per NDC, for claims approved during the quarter. Drugs dispensed before April 1, 1991, will not be included.

**SPECIFICATIONS:** Numeric Values, 12 digits: 9 whole numbers and 3 decimals.

*********************************************************************

**DATA ELEMENT NAME:** Rebate Units

**DATA DEFINITION:** Total units dispensed multiplied by EPIC cost share percent.

**SPECIFICATIONS:** Numeric Values, 12 digits: 9 whole numbers and 3 decimals places.

*********************************************************************

**DATA ELEMENT NAME:** Correction Flag

**DATA DEFINITION:** Indicator that this record is a correction.

**SPECIFICATIONS:** Numeric Values, 1 digit

Valid values:  0 = original record
               1 = correction record

*********************************************************************

## THE NEW YORK STATE ELDERLY PHARMACEUTICAL INSURANCE COVERAGE PROGRAM (HEREINAFTER REFERRED TO AS "EPIC")

## MANUFACTURER DRUG REBATE AGREEMENT

This Agreement is made on Oct. 3, 1991 by and between The People of the State of New York, acting by and through the Program for Elderly Pharmaceutical Insurance Coverage (EPIC) and MYLAN PHARMACEUTICALS, INC.; (Labeler Code 00378), hereinafter referred to as the Manufacturer at MORGANTOWN, WV, 26505, and shall be interpreted pursuant to the laws of the State of New York,

WHEREAS, Section 547-j(3) of the New York State Executive Law authorizes drug rebates for the EPIC Program; and

WHEREAS, EPIC desires to implement a rebate agreement intended to decrease the cost of EPIC covered drugs; and

WHEREAS, EPIC agrees to make payments for drugs of the manufacturer utilized by EPIC enrollees; and

WHEREAS, the Manufacturer agrees to provide to EPIC a rebate for such utilized drugs;

NOW, THEREFORE, for and in consideration of mutual promises and covenants herein set forth, the parties agree as follows:

Marilyn W Desmond

## I.   DEFINITIONS

Terms used in this agreement shall have the same meaning as those defined in the Manufacturer's Agreement with the Secretary of Health and Human Services pursuant to Section 1927 of the Social Security Act (42 U.S.C., 1396S), except as otherwise expressly provided herein:

(a)  "Best Price" means, with respect to a Covered Outpatient Drug of the Manufacturer for a calendar quarter, ██████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ best price includes prices to wholesalers, retailers, nonprofit entities, or governmental entities within the United States (excluding Depot Prices and Single Award Contract Prices of any agency of the Federal Government).  Federal Supply Schedule prices are included in the calculation of the best price.

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

It shall be determined on a unit basis without regard to special packaging, labeling or identifiers on the dosage form or product or package, and shall not take into account prices that are Nominal in amount. For Bundled Sales, the allocation of the discount is made proportionately to the dollar value of the units of each drug sold under the bundled arrangement.  The best price for a quarter shall be adjusted by the Manufacturer if cumulative discounts, rebates or other arrangements subsequently adjust the prices actually realized.

(b)  "Covered Outpatient Drug," as defined in section 547(a)(1) of the NYS Executive Law, means a drug dispensed subject to a legally authorized prescription pursuant to section 6810 of the New York State Education Law, and insulin, insulin syringes and insulin needles but shall not include any drug determined by the Commissioner of the rental Hygiene or administration to be ineffective or unsafe.

(c)  "EPIC Utilization Information", means the information of the total number of units of each dosage form and strength of the Manufacturer's Covered Outpatient Drugs for which claims were approved during a quarter under the New York State EPIC Program.  This information is based on claims approved by EPIC during a calendar quarter and not drugs that were dispensed during a calendar quarter (except it shall not include drugs dispensed prior to April 1, 1991).  The EPIC Utilization Information to be supplied includes:  1) NDC number (including package size code); 2) Product Name; 3) total number of claims approved per NDC during the quarter; 4) total charges allowed for claims approved per NDC during the quarter; 5) total amount paid per NDC during the quarter; 6) EPIC cost share percentage per NDC during the quarter; 7) total units dispensed per NDC for claims approved during the quarter; and 8) total number of rebate units per NDC

for claims approved during the quarter. EPIC may, at its option, compute the total rebate anticipated, based on its own records, but it shall remain the responsibility of the manufacturer to correctly calculate the rebate amount based on its correct determination of NDC and Best Price.

(d) "Rebate Units" means the number of units for each NDC which have been paid for by EPIC during the quarter and which have been dispensed on or after the effective date of this agreement. Rebate units are calculated as total units dispensed multiplied by EPIC cost share percent.

(e) "Unit" means drug unit in the lowest identifiable amount (e.g., tablet or capsule for solid dosage forms, milliliter for liquid forms, gram for ointments or creams, etc.). The manufacturer will specify the unit for each dosage form and strength of each Covered Outpatient Drug in accordance with the instructions developed by the Health Care Financing Administration for purposes of the Federal Medicaid Rebate program under section 1927 of the Social Security Act.

## II. MANUFACTURER'S RESPONSIBILITIES

In order for EPIC to authorize that a participating provider pharmacy receive payment for the Manufacturer's drug under Executive Law Section 547-j, the Manufacturer agrees to the following section

(a) At the time of execution of this Agreement, the Manufacturer will provide EPIC with the information for all Covered Outpatient Drugs for the initial quarter of 4/1/91 through 6/30/91 contained and attached in Appendix I. This list shall be updated quarterly, within 30 days of the end of the quarter. The Manufacturer subsequently report will disclose all new NDC numbers and continue to list those NDC numbers no longer marketed.

(b) The Manufacturer shall calculate and except as provided under Section IV(b) of this Agreement, make a timely Rebate Payment to EPIC for the Manufacturer's Covered Outpatient Drugs which have been paid for by EPIC during the preceding quarter and which have been dispensed, on or after the effective date of this Agreement. The Unit Rebate amount for each NDC will be identical to the NDC unit rebate calculated in accordance with paragraph one of subdivision (a) of Section 1927 of the Federal Medicaid Security Act. Calculation of this Unit rebate is as follows:

The amount to be paid to EPIC for a calendar quarter for each dosage form and strength of drug shall be equal to the product of —

1. The total number of rebate units of that dosage form and strength dispensed under the EPIC Program, and

Marilyn Diamond

B)(i) for quarters (or periods) beginning after March 31, 1991, and before January 1, 1993, the greater of —

    (I)  the difference between the average manufacturer price (after deducting customary prompt payment discounts) and 87.5 percent of such price for the quarter (or other period), or

    (II)  the difference between the average manufacturer price for a drug and the best price for such quarter for such drug (except that for calendar quarters beginning after March 31, 1991, and ending before January 1, 1992, the rebate shall not exceed 25 percent of the average manufacturer price; and for calendar quarters beginning after December 31, 1991, and ending before January 1, 1993, the rebate shall not exceed 50 percent of the average manufacturer price); and

  (ii) for quarters beginning after December 31, 1992, the greater of —

    (I)  the difference between the average manufacturer price for a drug and 85 percent of such price, or

    (II)  the difference between the average manufacturer price for a drug and the best price for such quarter for such drug.

  (iii) In the case of a covered outpatient drug approved for marketing after April 1, 1991, any reference in this calculation to April 1, 1991, shall instead refer to the first day of the first month during which the drug was marketed.

(c) The Manufacturer authorizes that unit rebate amount information provided by the Manufacturer to HCFA and by HCFA to the NYS Medicaid Program according to section 1927 of the Federal Social Security Act, may be released by the NYS Medicaid Program to the EPIC Program to further the purpose of this Agreement. The Manufacturer further agrees to provide detailed supporting documentation at EPIC's request in those instances where there are significant differences between the EPIC unit rebate amount and that established for the NYS Medicaid Program.

(d) Except as provided under IV(b), the Manufacturer agrees to make such rebate payments for the first calendar quarter, beginning April 1, 1991, within 60 days and within 30 days for all subsequent quarters after receiving from EPIC the EPIC Utilization Information defined in Appendix C. Rebate payments which are not made by the due date as required in this section and section IV(c) shall be subject to an interest charge calculated at a rate of 10 percent per annum.

(e) This rebate Agreement between EPIC and the Manufacturer, if entered into prior to September 1, 1991, is retroactive to April 1, 1991. Rebate Agreements entered into on or after September 1, 1991, shall be effective on April 1, 1992, unless such Agreement specifically provides that rebates will be retroactively calculated as if the Agreement had been in effect on April 1, 1991.

[illegible] manufacturer shall continue to make Rebate Payments to EPIC on all of [illegible] Outpatient Drugs for the duration of this Agreement and EPIC Utilization Information reports that payment was made for that drug so long as such Covered Outpatient Drug was dispensed under the Manufacturer's NDC number, regardless of whether the Manufacturer continues to market that drug. If no sales are reported by the Manufacturer during a quarter, the AMP and Best Price last reported shall be used in calculating rebates.

III. EPIC'S RESPONSIBILITIES

(a) EPIC each quarter must promptly notify pharmacies of those Manufacturers that have entered into a rebate agreement. EPIC must also promptly notify pharmacies regarding any changes to the list of Covered Outpatient Drugs.

(b) EPIC will report EPIC's Utilization Information for the quarter to the Manufacturer, within 90 days of the last day of the initial quarter and within 60 days of the last day of each subsequent quarter, and in a manner prescribed by EPIC. This information is shown in Appendix C.

(c) EPIC shall maintain electronic claim records for the most recent four quarters that will assist manufacturers in verifying the utilization information provided by EPIC. [illegible] manufacturer an amount sufficient to cover the costs of providing such data.

IV. DISPUTE RESOLUTION

(a) In the event that for any quarter a discrepancy in EPIC Utilization Information or payment is alleged by either party [illegible], the party must provide written notice of the discrepancy, by NDC number, to the other party. Discrepancies in utilization data must be reported to EPIC prior to the due date for payment of rebates for that quarter. Discrepancies in payments must be reported to the manufacturer within 45 days following the due date for that payment.

(b) If the Manufacturer in good faith disputes EPIC's Utilization Information, the Manufacturer shall pay EPIC that portion of the rebate amount claimed [illegible] not disputed no later than the date for payment of [illegible] as prescribed in II(d) of this Agreement. If [illegible] after negotiation, the balance due, if any, will be paid [illegible] Manufacturer or the State by the due date of the [illegible] as required in II(d) of this Agreement.

(c) EPIC and the Manufacturer will use their best efforts to resolve any disputes within 60 days of receipt of the written notice of discrepancy. In the event that EPIC and the Manufacturer are not able to resolve a dispute within 60 days, EPIC shall appoint an administrative law judge who shall review written submissions by both parties and make a written finding thereon. Both EPIC and the manufacturer shall implement this finding unless within 30 days the matter is brought before a court of competent jurisdiction.

Mary Diamond

(d)  Appropriate adjustments to rebate payments will be made no later than 30 days following the finding of the administrative law judge.

(e)  The manufacturer has the right to audit EPIC utilization data using mutually agreeable audit procedures.  Quarterly EPIC utilization data sorted by zip code of the dispensing pharmacies will be made available on demand for those manufacturer's drugs which are among the top 300 most commonly used drugs.  EPIC reserves the right to charge the manufacturer an amount sufficient to cover the costs of providing such zip code specific information.  The manufacturer has the right of access to EPIC audit findings with respect to pharmacy purchasing of their products when such utilization information is under dispute.

## V.   CONFIDENTIALITY PROVISIONS

(a)  Information disclosed by the Manufacturer in connection with this Agreement is confidential and will not be disclosed, except as required by State or Federal Law.

(b)  The Manufacturer will maintain the confidentiality of EPIC Utilization Information and use such information only for purposes approved by the Department, as in furtherance of Executive Law, Article 34C.  If the Manufacturer audits this information or receives additional information on such data, that information shall also be held confidential.  The Manufacturer agrees to abide by applicable State confidentiality statutes, regulations and other properly promulgated policy.

(c)  Notwithstanding the nonrenewal or termination of this Agreement for any reason, these confidentiality provisions will remain in full force and effect.

(d)  The manufacturer hereby applies to EPIC for an exemption to the disclosure of information under Public Officers Law, Article 6 (Freedom of Information) concerning information supplied by the manufacturer for a determination of best price under this agreement.  The exemptions applied for are Public Officers Law, section 87.2(c) and (d).  The information if disclosed by EPIC would impair contract awards and cause substantial injury to the competitive position of the manufacturer.

(e)  Both parties hereto shall inform and train, if necessary, its respective employees, agents, advisors, consultants and officials regarding the confidential nature of such data and shall cause such persons (including any board or committee) to keep such data and information confidential.

## VI.   NONRENEWAL AND TERMINATION

(a)  This Agreement shall be effective for an initial period of one year beginning April 1, 1991, and shall be automatically renewed for additional terms of one year, unless the Manufacturer or EPIC give written notice of intent not to renew the Agreement at least 90 days before the end of the Contract period.

(b)  The Manufacturer may terminate the Agreement for any reason upon no less than 60 days prior written notice of the termination.  Termination shall be made effective the earlier of the first day of the next calendar quarter following the Manufacturer's 60 day prior notice of termination, or the ending date of the term of the Agreement if notice has been given, in accordance with VII(a).

(c)  EPIC may terminate the Agreement for violations of this Agreement or other good cause upon 60 days prior written notice.

(d)  If this rebate Agreement is not renewed or is terminated, EPIC and the Manufacturer agree not to enter into another rebate Agreement until a period of one calendar quarter has elapsed from the effective date of the termination, unless EPIC finds good cause for earlier reinstatement.

## VII.  GENERAL PROVISIONS

(a)  Notice and reports required to be given pursuant to the terms and provisions of this Agreement will be sent in writing.

Notice and Reports to the Manufacturer will be sent to:

Frank DeGeorge, Manager of Accounting and Taxation

Mylan Pharmaceuticals Inc.

781 Chestnut Ridge Road

Morgantown, WV 26505-2730

Notice and Reports to EPIC will be sent to:

Executive Director
NYS Elderly Pharmaceutical Insurance Coverage (EPIC) Program
Corning Tower - Room 494
Albany, New York 12237

(b)  Neither the Manufacturer nor the grantor is assessable of the Manufacturer, the Manufacturer will assign its rights and responsibilities under this Agreement to the new owner, subject to the conditions specified in Section 3 of VII.

(c)  Nothing in this Agreement will be construed to require or authorize the commission of any act contrary to law.  If any provision of this Agreement is found to be invalid by a court of law, this Agreement will be construed in all respects as if such invalid or unenforceable provision were eliminated, and without any effect on any other provision.

(d)  Nothing in this Agreement shall be construed as a waiver or relinquishment of any legal rights of the Manufacturer or EPIC under the Constitution, the Social Security Act, other Federal laws, or State laws.