# EXHIBIT 2

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X

IN RE PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION) Master File No.

-----------------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:        ) Judge Patti B.

City of New York, et al. v. Abbott) Saris

Laboratories, et al. Civil Action )

No. 04-cv-06054 et al.           )

-----------------------------X

- and -

COMMONWEALTH OF KENTUCKY

FRANKLIN CIRCUIT COURT - DIV. 1

-----------------------------------X

COMMONWEALTH OF KENTUCKY ex rel. ) CIVIL ACTION NO.

JACK CONWAY, ATTORNEY GENERAL    ) 04-CI-1487

     v.                          )

ALPHARMA USPD, INC., et al.      )

-----------------------------------X

VIDEOTAPED DEPOSITION OF TIMOTHY CATLETT

MAY 7, 2008

1    A.   I am not aware of that.  I would
2    imagine it would be large based on population
3    size.  I would guess it would be one of the
4    largest, but I am not sure exactly where it
5    ranks.
6    Q.   Now, Barr -- if Barr was the first
7    generic manufacturer to launch a product, Barr
8    set its AWPs at approximately 10 percent below
9    the brand AWP; is that correct?
10        MS. WALKER:  Objection to form.
11   A.   Generally that's been our policy,
12   that's our approach.  That's the methodology we
13   use.
14   Q.   Barr set the WAC in that scenario at
15   approximately 20 percent of the brand WAC -- 20
16   percent below the brand WAC?
17   A.   Approximately, yes.
18   Q.   And if Barr is the first to market for
19   a generic product, is that considered a sole
20   source generic?
21        MS. WALKER:  Objection to the form.
22        MS. CICALA:  Let me rephrase that.

Catlett, Timothy    HIGHLY CONFIDENTIAL    May 7, 2008
Woodcliff, NJ

62

1    Q.    Barr is sometimes not the first to
2  market; is that correct?  With its generic
3  product?
4    A.    We are not always first.
5    Q.    If Barr is not first, does it still set
6  its AWP at approximately 10 percent below the
7  brand AWP?
8    A.    Best -- that's our general policy to
9  the best of my recollection, that's -- my tenure,
10  that's what we have done.
11    Q.    If Barr is not the first to market with
12  its generic product, it sets its WAC based on
13  market conditions; is that correct?
14    A.    Certainly market conditions would come
15  into play, yes.
16    Q.    And what is meant by the term market
17  conditions?
18    A.    What current pricing structures may be
19  in the marketplace from competitive products.
20    Q.    What do you mean by current pricing
21  structures?
22    A.    Where other competitors may be setting

Catlett, Timothy        HIGHLY CONFIDENTIAL         May 7, 2008
                        Woodcliff, NJ

                                                              67

1   principles of our business, some of the basic

2   principles of our business.

3       Q.   When Barr is the first generic to

4   market, it could set its AWP at a greater

5   percentage below the brand AWP; isn't that right?

6            MS. WALKER:  Objection to form.

7       A.   Please read back the question.

8            (Record read.)

9       A.   When it's the first generic to market

10  it could set it at a greater percentage than the

11  10 percent we talked about?

12      Q.   Yes.

13      A.   We could.  We could set it at a higher

14  percentage.  You said lower percentage?

15      Q.   I did, yes.

16      A.   Yes.  Could be lower.  There have been

17  drugs that we have marketed that have been

18  higher.

19      Q.   There have been drugs that Barr has

20  marketed where Barr has set an AWP higher than

21  the brand AWP?

22      A.   Yes, higher than 10 percent.

1    Q.    Can you give me an example of such a
2    drug?
3    A.    Tamoxifen.  For years, when it was --
4    when we action marketed a product -- there have
5    been unusual situations.  Situations following
6    the end of litigation with AstraZeneca we
7    marketed Tamoxifen for a seven or eight or nine-
8    year period where the AWP varied very little
9    versus the brand product.  In fact, it was the
10   same for a great period of time.
11   Q.    Other than that particular example, can
12   you recall other examples where Barr's AWP has
13   been set at a level that was higher than 10
14   percent below the brand AWP?
15   A.    Ciprofloxacin for a period of years.
16   Q.    And can you describe why Barr's price
17   reporting practice for Cipro was that way?
18   A.    Because it was based upon the
19   settlement of some patent litigation with the
20   innovator, which allowed us to bring a lower cost
21   product to the marketplace before patent expiring
22   and within the context of the settlement that we

Catlett, Timothy    HIGHLY CONFIDENTIAL    May 7, 2008
Woodcliff, NJ

69

1  had and the economics of it, that's the only
2  place we could have priced it to allow us to
3  bring that product to market, to the market.
4  Otherwise, it would have not made any commercial
5  sense for Barr.
6      Q.   Can you think of any examples other
7  than Tamoxifen and Cipro where Barr has set its
8  AWP at a level higher than 10 percent below the
9  brand?
10     A.   Those are the two that come to mind.
11 Tamoxifen.  If there are any others, it would be
12 one or two and I can't think of any right now.
13 And there may not be any others.
14     Q.   Circling back, there is nothing to
15 prevent Barr generally from setting its AWPs for
16 its generic products when it's first to market at
17 a level lower than 10 percent discount off of the
18 brand AWP; isn't that true?
19          MS. WALKER:  Objection, asked and
20 answered.  Form.
21     A.   Barr is free to set its AWP.
22     Q.   And what do you mean by that?

71

1    publishing compendia?
2        A.    We don't have multiple AWPs.
3        Q.    So if Barr reports an AWP to First
4    DataBank it's reporting the same AWP to Medi-Span
5    and Red Book; correct?
6        A.    I certainly hope so.  If any situation
7    didn't take place it would have been a mistake.
8        Q.    And --
9        A.    I know of none.
10       Q.    Okay.  And to the extent Barr reports
11   AWPs to others such as its customers, they would
12   receive the same AWP that Barr has reported to
13   the publishers; correct?
14       A.    It certainly would be our intent to
15   report the same AWP.  If they asked for it,
16   that's what we would report.
17       Q.    And has that been Barr's practice since
18   1995?
19       A.    Has what been?
20       Q.    To report the same AWP to all the
21   publishing compendia for its products.
22       A.    Certainly since I have been at Barr,

1   that has always been our intent.
2       Q.   And Barr -- who at Barr during your
3   tenure there actually reported the AWPs to the
4   compendia?
5       A.   We have a bids and pricing group so
6   that responsibility falls within the bids and
7   pricing group.
8       Q.   Barr reports its WACs to the publishing
9   compendia as well; is that true?
10          MS. WALKER:   Objection to form.
11  Compound.
12      A.   Barr does report its WACs to some,
13  maybe all, of the third -- of the compendiums we
14  have talked about today.
15      Q.   Has Barr reported WACs for its products
16  since 1995 --
17      A.   I know it's a change that took place
18  while I was there.  I don't know exactly when it
19  happened.
20      Q.   So there was some period of time after
21  you arrived at Barr in which Barr was not
22  reporting WACs to the publishers; is that right?

```
 1      A.    I believe there was a period of time
 2 where the publishers were requesting only AWP
 3 information and that's what was provided.  Then
 4 the request for providing WAC pricing was
 5 received and we provided the WAC pricing.
 6      Q.    Okay.  And is it fair to say that when
 7 Barr reported a WAC to the publishing compendia,
 8 it reported the same WAC to each publisher?
 9      A.    That would certainly be our intent, to
10 provide the same WAC to each publisher.
11      Q.    There's only one WAC for each Barr
12 product; is that correct, at a given time?
13      A.    There's only one WAC for each Barr
14 product.  Now, since the acquisition of Pliva,
15 Pliva had a different pricing structure and we
16 have been trying to fold their products into the
17 Barr methodology.
18      Q.    Fair enough.
19      A.    That's very recent.
20      Q.    When was the acquisition generally of
21 Pliva?
22      A.    We started the integration process.  We
```

Catlett, Timothy    **HIGHLY CONFIDENTIAL**    May 7, 2008
Woodcliff, NJ

80

1        If I can direct your attention to the
2  second paragraph in the left-hand column, under
3  the header understanding AWP.  The document
4  reads, quote: AWP represents an average price
5  which a wholesaler would charge a pharmacy for a
6  particular product.
7        Did I read that correctly?
8        MS. WALKER:  Objection to the form.
9    A.    **Yes, that's the first sentence in the**
10  **second paragraph.**
11    Q.    Is that definition of AWP consistent
12  with how -- with Barr's definition of AWP?
13    A.    **This is from 1991.**
14    Q.    Understood.  Nevertheless, is that
15  definition consistent with Barr's?
16    A.    **In 1991?**
17    Q.    At any point in time.
18    A.    **It's not consistent with the definition**
19  **since I have been at Barr.**
20    Q.    What is Barr's definition of AWP?
21    A.    **Average -- our definition of AWP is,**
22  **you know -- yes, the definition is correct, it's**

81

```
 1    average wholesale price.  That's what the acronym
 2    stands for.  But what that means -- we refer to
 3    it as a reference price.
 4         Q.   And as you've already testified, Barr
 5    sets the AWP in relationship to the brand AWP;
 6    correct?
 7         A.   That's correct.
 8         Q.   Barr doesn't set the AWP based on the
 9    average prices from the wholesaler to the
10    retailer?
11         A.   That's correct.
12         Q.   Okay.
13              Let me put before you what's marked as
14    Catlett Exhibit 10.  It's another document
15    produced to us by First DataBank in our
16    litigation entitled PriceAlert dated June 15,
17    1999.  If I can again draw your attention to the
18    second paragraph that begins with the words:  As
19    you know.
20              The document reads:  As you know, AWP
21    represents the average wholesale price:  The
22    average price a wholesaler will charge a customer
```

87

```
 1      A.   Since it's not a number they know or we
 2 know.
 3      Q.   First DataBank does report prices that
 4 are labeled AWP, does it not?
 5      A.   Yes.
 6      Q.   And the prices that First DataBank
 7 reports as AWPs are the prices that you have
 8 supplied to First DataBank; correct?
 9      A.   That's correct.
10           MS. WALKER:  Objection.  Foundation.
11      Q.   This has been marked as Catlett Exhibit
12 15.  It's a September 1995 excerpt of a
13 communication from the National Pharmaceutical
14 Council entitled Pharmaceutical Benefits Under
15 State Medical Assistance Benefit Programs.
16           Are you familiar with that National
17 Pharmaceutical Council, Mr. Catlett?
18      A.   I've heard of them.  I don't know much
19 about them.
20      Q.   Are you aware they are a council
21 comprised of prescription drug manufacturers?
22      A.   Yes.
```

1      A.    Yes.

2      Q.    Do you know why Barr would have done
3  that?

4      A.    Standard format.

5      Q.    Would the customer have requested it?

6      A.    May or may not have.  Lots of customers
7  under bid proposals and RFPs always use -- supply
8  that data field to be filled out and I think over
9  time it became industry practice, at least within
10 Barr, since lots of bids and so forth request it,
11 that we adopted the format that customers
12 provided us.

13     Q.    Do you know whether customers request
14 that that field be filled out?

15     A.    I don't know specifically why.  The
16 data is available to them.

17     Q.    You see there it says list price?  Or,
18 I'm sorry, it says list and there's a dollar
19 figure underneath it in one of the middle column?

20     A.    Yes.

21     Q.    Do you know what that refers to?

22     A.    No, I don't.  That's not a comment we

156

1  you know, competitive product in the marketplace.
2  He couldn't sell our product.  He needed to have
3  a new net price and to get him at the net price,
4  you increase the rebates because he has no
5  electronic capabilities.
6       Q.   So is it fair to say for Cefadroxil,
7  Barr provided its customers either rebates at
8  substantial rebates, along the lines of what this
9  document reflects, or chargebacks?
10      A.   Depending upon what the capabilities of
11 the customer, yes, to meet the competitive forces
12 in the marketplace.
13      Q.   Okay.  Thank you.
14           Shall we break for 30 minutes for
15 lunch?
16           MS. WALKER:  That's fine.
17           MS. CICALA:  Thank you very much.
18           THE VIDEOGRAPHER:  Going off the
19 record.  The time is now 12:41.
20           (Luncheon recess is taken until
21 1:28 p.m.)
22

222

```
 1      Q.   Right.
 2      A.   Maybe a wholesaler, maybe by chain.
 3  Direct customer or indirect customer.  We saw
 4  examples today of indirect customers that got
 5  rebates.
 6      Q.   In light of the Barr discounts off of
 7  the invoice price that are offered to
 8  wholesalers, do you know of any situations since
 9  1995 in which a wholesaler has actually paid WAC
10  for a targeted drug?
11      A.   For a targeted drug?  Do you mean drug
12  on the list?  If it wasn't on the wholesaler
13  source program, they would have, you know, they
14  could potentially paid WAC.  If it's not on one
15  of their programs -- rebates for the wholesalers
16  are for specific programs.
17           Some wholesalers did get a base rebate
18  so they would have got some rebate level.  But
19  there were some wholesalers that only,
20  distributors that I believe, only got rebates on
21  what they put in their source programs.  So there
22  are -- there were definitely product purchased at
```

Catlett, Timothy  HIGHLY CONFIDENTIAL  May 7, 2008
Woodcliff, NJ

223

1  WAC. They might have got the 2 percent prompt
2  pay terms.
3         (Exhibit Catlett 035, Copy of
4  February 4, 2005 revised pricing document to Dina
5  Gabrielle from Teri Mouro Sherman, Bates stamped
6  BARR-AWP-KY-029107 through 29110, marked for
7  identification.)
8         (Exhibit Catlett 036, Copy of Barr
9  Laboratories Cardinal Health source products
10 document, Bates stamped BARR-AWP-KY-032921
11 through 32924, marked for identification.)
12     Q.  Mr. Catlett, let me show you what's
13 been marked, two exhibits, one Exhibit 35, the
14 other one Exhibit 36.
15         For the record, Exhibit 35 is a letter,
16 actually it's multipage exhibit consisting of
17 three letters from Barr to AmerisourceBergen;
18 correct?
19     A.  Yes, all three are to
20 AmerisourceBergen.
21     Q.  If you walk with me through the letter,
22 it's -- how would you refer to this, as a pricing

1          So if you are -- defining spread as the
2   difference between AWP and some acquisition cost,
3   then simple subtraction exercise.
4       Q.   We talked a little bit earlier about
5   why Barr includes its AWPs when it sends its bid
6   proposals to customers; correct?
7       A.   Correct.
8       Q.   You stated it's the standard --
9            MS. WALKER:  Objection to form.
10      A.   I think I testified it became the
11  standard practice because customers asked for it.
12      Q.   And what's your understanding of what
13  is Barr's understanding of the reason that
14  customers ask for it?
15      A.   To the best of my knowledge they want
16  to make sure that one has been established.  I
17  think too many times customers have been taken on
18  particularly new products where maybe the data
19  hasn't been loaded.  So they are looking for some
20  type of recommendations from us that you have
21  indeed established an AWP and provided it to the
22  third party data services.