**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————
)
IN RE PHARMACEUTICAL INDUSTRY            )       MDL NO. 1456
AVERAGE WHOLESALE PRICE                  )       Civil Action No. 01-12257-PBS
LITIGATION                               )       Subcategory Case No. 03-10643-PBS
———————————————————            )
)
THIS DOCUMENT RELATES TO:                )       Judge Patti B. Saris
)
*The City of New York, et al.,*          )
)
*v.*                                     )
)
*Abbott Laboratories, et al.*            )
———————————————————            )

**DEFENDANT TEVA PHARMACEUTICALS USA, INC.'S RESPONSE TO**
**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED**
**MATERIAL FACTS AS TO TEVA**

Pursuant to Rule 56.1 of the Local Rules of this Court, Defendant Teva Pharmaceuticals

USA, Inc. ("Teva") hereby submits its Response to Plaintiffs' Local Rule 56.1 Statement of

Undisputed Material Facts As to Teva ("Plaintiffs' Teva-Specific Statement").  Teva's responses

correspond to the numbered paragraphs set forth in Plaintiffs' Teva-Specific Statement and

identify those issues which are undisputed as well as those issues for which there is a genuine

dispute as to one or more material facts.[1]  Teva also refers the Court to Defendants' Response to

Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts Applicable to All

Defendants, filed this same date.

---

[1]   Teva does not respond herein to the headings in Plaintiffs' Teva-Specific Statement.  To the extent these
headings purport to state or characterize facts, such facts or characterizations are not properly supported with
citations to the record, as is required by Local Rule 56.1.  To the extent a response is required, Teva disputes
any facts or characterizations contained in these headings.

1.     The Teva drugs and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto.  This exhibit also sets forth Teva's Published AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limit ("FUL") and Teva's AMPs.  The exhibit notes which NDCs were associated with package sizes that set the FUL.

**Teva's Response to Alleged Fact No. 1:**  Disputed.  Teva does not dispute that Exhibit A to Plaintiffs' Teva-Specific Statement purports to (1) list the Teva drugs and NDCs that Plaintiffs have examined in connection with their motion, (2) set forth Teva's published AWPs and WACs for these drugs and NDCs, any operative FUL, and Teva's AMPs, and (3) note which NDCs are associated with the package sizes that set the FUL.  Teva disputes that Plaintiffs' Exhibit is an accurate and/or complete portrayal of the AWP and WAC prices, the operative FULs, and AMPs for these Teva drugs and NDCs for any given time period.  Teva further disputes that Plaintiffs' Exhibit accurately reflects or updates the prices for these Teva drugs and NDCs and/or the dates that they become effective.  Further, Teva objects to Alleged Fact No. 1 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006).  Moreover, Teva objects to Alleged Fact No. 1 insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

2.     The specific Teva drugs at issue are: Clonazepam .5mg Tablet; Enalapril Maleate 20mg Tablet; Metroprolol 100mg Tablet and Ranitidine 150mg Tablet.

**Teva's Response to Alleged Fact No. 2:**  Teva does not dispute that Teva's Clonazepam 0.5mg tablet, Enalapril Maleate 20mg tablet, Metroprolol 100mg tablet, and Ranitidine 150mg tablet are drugs at issue in Plaintiffs' Motion for Partial Summary Judgment.  However, Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

3.      Teva has entered into and executed the federal Medicaid rebate agreement pursuant to 42 U.S.C. § 1396r-8. *See* Answer of Teva Pharmaceuticals USA, Inc.'s and Sicor Inc.'s Answer and Affirmative Defenses to Revised Amended Consolidated Complaint ("Teva Answer") [Dkt #4823] at ¶ 132.

**Teva's Response to Alleged Fact No. 3:**    Teva does not dispute that Teva Pharmaceuticals USA, Inc. has entered into and executed a Medicaid Rebate Agreement with the Secretary of Health and Human Services on behalf of all States.  However, Teva states that this fact is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

4.      Teva participates voluntarily in the state Medicaid programs, including the New York State Medicaid Program.  *See* Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6)(John Wodarczyk) dated 10/10/06 ("Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep.") (Exhibit B) at 20:19-21:11.

**Teva's Response to Alleged Fact No. 4:**  Teva does not dispute Alleged Fact No. 4. However, Teva states that this fact is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

5.      Teva knew that eligibility for reimbursement by third party payors like Medicaid was an important issue for its customers as the reimbursement determines revenue for its customers.  See Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6) (John Denman) dated 4/16/08 ("Teva 30(b)(6)(Denman) 4/16/08 Dep.") (Exhibit C) at 34:9-37:16, 192:19-193:21.

**Teva's Response to Alleged Fact No. 5:**  Disputed.  Teva disputes that it "knew that eligibility for reimbursement by third party payors like Medicaid was an important issue for its customers."  Teva also disputes that reimbursement is determinative of its customers' overall revenue.  Plaintiffs have not provided any evidentiary basis for these assertions, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Further, the testimony cited by Plaintiffs does not support their assertions.  Rather, in the cited testimony, Mr. Denman testified only that reimbursement was "relevant" to Teva's customers, and that the amount of reimbursement to Teva's customers determines their revenue for "certain products."  Deposition of John Denman, Apr. 16, 2008 ("4/16/08 Denman Dep.") at 193:12-21 (Ex. 1).  Further, the

purported "important[ce]" of Medicaid reimbursement to Teva's customers is immaterial to Plaintiffs' motion. Finally, Teva objects to Alleged Fact No. 5 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement. *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1 (D. Mass. 2006). Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation. *See* Fed. R. Evid. 602.

6. Teva knew that state Medicaid agencies reimbursed based on WAC, AWP and FUL (or state MAC lists) for Teva drugs. *See* Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6) (John Wodarczyk) dated 8/23/07 ("Teva 30(b)(6)(Wodarczyk 8/23/07 Dep.") (Exhibit D) at 92:7-17; Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6)(Paul Krauthauser) dated 1/29/08 ("Teva 30(b)(6) (Krauthauser) 1/29/08 Dep.") (Exhibit E) at 77:6-10, 103:21-104:8; Teva 30(b)(6)(Denman) 4/16/08 (Dep. (Exhibit C) at 34:9-35:2, 152:14-21.

**Teva's Response to Alleged Fact No. 6:** Disputed. As an initial matter, Teva disputes Alleged Fact No. 6 to the extent it permits an inference that Teva possessed any more or less awareness of reimbursement practices than that which was generally available public knowledge based on the statutory scheme for reimbursement. To the extent Alleged Fact No. 6 purports to suggest that the *reason* Teva reported pricing information was so that pharmacists could be paid by third party payors, Teva objects. Taken as a whole, the deposition testimony of Teva's witnesses is directly to the contrary, explicitly explaining that Teva was *required* to report "a number of characteristics along with AWP and a WAC" in order to be listed as a generic by First DataBank. *See*, *e.g.*, Deposition of Richard Foster, Feb. 20, 2008 ("2/20/08 Foster Dep.") at 74 (Ex. 2); Deposition of Paul Krauthauser, Jan. 29, 2008 ("1/29/08 Krauthauser Dep.") at 64-65 (Ex.3).

Furthermore, Teva objects to Alleged Fact No. 6 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial

Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* Deposition of Sue

Gaston, March ("3/19/08 Gaston Dep.") at 457:20-458:7 ("Q. What role if any did AWP play in

setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a

FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).

Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary

Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch*

*& Birch, LLP*, 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005) (refusing to consider immaterial

facts as part of a motion for summary judgment).

Teva also disputes Alleged Fact No. 6 to the extent it is not properly supported by

evidence in the record.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Mr. Wodarczyk, Mr.

Krauthauser, and Mr. Denman testified only that Teva understood that AWP, WAC, FUL, and

MAC were used by "third party payors and government programs" as a basis for reimbursement

to pharmacies.  *See* Deposition of John Wodarczyk, Aug. 23, 2007 ("8/23/07 Wodarczyk Dep.")

at 92:8-17 (Ex. 5); 1/29/08 Krauthauser Dep. at 77:6-10, 103:21-104:8 (Ex. 3); 4/16/08 Denman

Dep. at 34:9-35:2 (Ex. 1).  Plaintiffs have not cited any evidence concerning Teva's knowledge

that state Medicaid agencies, and New York's Medicaid agency in particular, reimbursed based

on AWP, WAC, and FUL (or state MAC lists).

7.      Teva knew that the FUL was used by state Medicaid agencies and set based on
published prices.  *See* Deposition of Eugene Cioschi 2/12/08 Dep. ("Cioschi 2/12/08 Dep.")
(Exhibit F) at 160:2-17.

**Teva's Response to Alleged Fact No. 7**:  Disputed.  Teva disputes Alleged Fact No. 7 to

the extent it is not properly supported by evidence in the record.  Further, Teva disputes that the

Centers for Medicaid and Medicare Services ("CMS") did in fact set FULs based on published

prices and according to federal regulatory requirements, and answers that the undisputed record

shows that CMS very often chose to disregard these requirements when setting FULs.  *See generally* Affidavit of Summanth Addanki, dated May 15, 2009; *see also* 42 C.F.R. § 447.332.

8.      Teva sets one WAC and one AWP or SWP for each of its products.  See Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 25:1-4; *see also Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) at *7.  Teva's AWP and SWP are interchangeable.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 49:2-9.

**Teva's Response to Alleged Fact No. 8:**  Disputed in part.  Teva does not dispute that it sets one WAC for each of its products.  Teva disputes Plaintiffs' Alleged Fact No. 8 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.  In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.  *See* Deposition of Patricia Kay Morgan, Nov. 30, 2007 ("11/30/07 Morgan Dep.") at 33, 149 (Ex. 6).  Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank.  *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

Teva disputes the second sentence of Alleged Fact No. 8 to the extent the term "interchangeable" is vague and ambiguous.  To the extent Plaintiffs contend that AWP, like SWP, is a "suggested" or reference price, Teva does not dispute such assertion.  However, Teva objects to Alleged Fact No. 8 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in

6

which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they

did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial

Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d

at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

9.      At all times, from 1997 to 2005, Teva's general practice was to set the AWP or
SWP for its drugs at 10% of the brand AWP when it was the first to introduce the generic drug.
*See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 106:8-15; Teva 30(b)(6)(Denman)
4/16/08 Dep. (Exhibit C) at 70:15-73:2, 135:14-18.  When Teva was not the first to introduce the
drug, then Teva would analyze the AWPs of the competition and if the competition was not at
10% of the brand then Teva would probably match the competition.  *See* Teva
30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 79:11-80:11.

**Teva's Response to Alleged Fact No. 9:**  Disputed.  As an initial matter, Teva objects to

Alleged Fact No. 9 insofar as it relies on, refers to, or otherwise mentions AWP, which has no

relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider

AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did

AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which

CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.")

(Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial

Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d

at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Further, with respect to the first sentence of Alleged Fact No. 9, Teva disputes that its

"general practice"—as the first manufacturer to introduce a generic drug—"was to set the AWP

or SWP for its drugs at 10% of the brand AWP" (*i.e.*, 90 percent below the brand AWP).

Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule

56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Mr. Denman and Mr. Krauthauser testified that

when Teva was the first manufacturer to introduce a generic drug, Teva's "general practice" was

to set its AWP at 10 percent *below* the brand AWP.  4/16/08 Denman Dep. at 72:12-20 (Ex. 1); 1/29/08 Krauthauser Dep. at 106:8-15 (Ex. 3).

With regard to the second sentence of Alleged Fact No. 9, Teva disputes that its practice—where it was not the first manufacturer to introduce a generic drug—was to "analyze the AWPs of the competition and if the competition was not at 10% of the brand [*i.e.*, 90 percent below the brand AWP] then Teva would probably match the competition."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Mr. Denman testified that when Teva was not the first manufacturer to introduce a generic drug, Teva set its AWP at 10 percent *below* the brand AWP.  4/16/08 Denman Dep. at 72:21-73:2 (Ex. 1).  However, if Teva's competitors were "at a particular point which was 10 percent at one time" but not at the time Teva entered the market, then Teva "would probably match that."  1/29/08 Krauthauser Dep. at 79:6-80:2 (Ex. 3).

Moreover, Teva disputes Plaintiffs' Alleged Fact No. 9 in that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database.  *See* 11/30/07 Morgan Dep. at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?  A. That's correct.") (Ex. 6); *id.* at 33:6-10 ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct?  A. That's correct.") (Ex.6); *id.* at 33:11-20 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6).  In order for a product to be classified by First

DataBank as a generic, Teva's SWP had to be at least 10 percent off the corresponding brand's AWP.  *See* 1/29/08 Krauthauser Dep. at 72-73, 75 (Ex. 3).

Teva also disputes Plaintiffs' Alleged Fact No. 9 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.   In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.  *See* 11/30/07 Morgan Dep. at 33, 149 (Ex. 6).  Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank.  *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

10.     Teva set the AWP or SWP for its drugs at 10% discount to the brand AWP to obtain the generic drug indicator and be deemed a generic.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 72:10-73:9.

**Teva's Response to Alleged Fact No. 10:**  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 10 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Moreover, Teva disputes Alleged Fact No. 10 in that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database. *See* 11/30/07 Morgan Dep. at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?  A. That's correct.") (Ex. 6); *id.* at 33:6-10 ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct?   A. That's correct.") (Ex. 6); *id.* at 33:11-20 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6).  In order for a product to be classified by First DataBank as a generic, Teva's SWP had to be at least 10 percent off the corresponding brand's AWP.  *See* 1/29/08 Krauthauser Dep. at 72-73, 75 (Ex. 3).

Teva also disputes Plaintiffs' Alleged Fact No. 10 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.   In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.  *See* 11/30/07 Morgan Dep. at 33, 149 (Ex. 6).  Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank.  *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

11.    Teva admits that it would still have been deemed a generic if its AWP or SWP had been at a 15% or 20% discount to the brand AWP.  *Id.* at 73:11-18.

**Teva's Response to Alleged Fact No. 11:**  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 11 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co., LLP*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva also disputes Alleged Fact No. 11 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.  In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding. *See* 11/30/07 Morgan Dep. at 33:1-20, 149:12-20 (Ex. 6).  Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank.  *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

12.    Teva set its AWP as high as it could or at least at what the market would bear for its products depending on the competition.  *Id*. at 73:19-74:8.

**Teva's Response to Alleged Fact No. 12:**  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 12 insofar as it relies on, refers to, or otherwise mentions AWP, which has

no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co., LLP*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Furthermore, Teva disputes that it "set its AWP as high as it could or at least at what the market would bear for its products depending on the competition."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva disputes Alleged Fact No. 12 in that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database.  *See* 11/30/07 Morgan Dep. at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?  A. That's correct.") (Ex. 6); *id.* ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct?  A: That's correct.") (Ex. 6); *id.* at 33:6-10 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A: That's correct.") (Ex. 6).  In order for a product to be classified by First DataBank as a generic, Teva's SWP had to be at least 10 percent off the corresponding brand's AWP.  *See* 1/29/08 Krauthauser Dep. at 72-73, 75 (Ex. 3).

Teva also disputes Alleged Fact No. 12 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.  In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding. *See* 11/30/07 Morgan Dep. at 33:1-20, 149:12-20 (Ex. 6).  Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank.  *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

13.     If a competitor increased its AWP, Teva would respond by raising its own AWP so as not to disadvantage it customers in their reimbursement from third party payors.  See Cioschi 2/12/08 Dep. (Exhibit F) at 133:2-20.

**Teva's Response to Alleged Fact No. 13:**  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 13 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva further disputes Plaintiffs' statement that "[i]f a competitor increased its AWP, Teva would respond by raising its own AWP."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

Mr. Cioschi testified only that the question of whether Teva would raise its AWP was a "product by product situation."  Deposition of Eugene Cioschi, Feb. 12, 2008 ("2/12/08 Cioschi Dep.") at 133:2-12 (Ex. 7).  Teva also disputes Plaintiffs' statement that "[i]f a competitor increased its AWP, Teva would respond by raising its own AWP so as not to disadvantage it customers in their reimbursement from third party payors," on the grounds that the cited deposition testimony pertains only to a drug not at issue in Plaintiffs' Motion for Partial Summary Judgment.  *See id.* at 133 (Ex. 7).  Accordingly, Teva disputes that this statement is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva also disputes that it raised its AWPs "so as not to disadvantage its customers in their reimbursement from third party payors."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Teva's longstanding corporate policy prohibits consideration of reimbursement in setting or changing its AWPs.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("[I]n no event will SWP be set for any generic drug in order to increase the reimbursement spread to providers over competing drugs.") (Ex. 10).  Plaintiffs have not cited any evidence that indicates that Teva ever departed from this policy.

14.    At all times, from 1997 to 2005, at the time of launch of a new product Teva initially set the WAC for its generic drugs typically at 75% of the AWP or SWP.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 164:22-167:5; Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep.") (Exhibit D) at 94:5-14.  When Teva was not the first to introduce the generic drug, then Teva would analyze the WACs of the competition and set its WAC comparably with the competition.  *Id.*

**Teva's Response to Alleged Fact No. 14:**  Disputed.  As an initial matter, Teva disputes Plaintiffs' statement insofar as it inappropriately fails to take into account materially distinct

14

scenarios in which varying factors have an effect on establishing an appropriate WAC. Specifically, Plaintiffs' statement misstates the situation when Teva is the sole generic on the market, because in such circumstances Teva's standard was to set the WAC for that exclusive generic product at 80 percent of the SWP/AWP of the corresponding branded product. *See* 2/20/08 Foster Dep. at 92 (Ex. 2). When there are multiple generic equivalents on the market at the same time, Teva did not use any predetermined percentage off the branded products' AWP for its WAC, because in those circumstances Teva's WACs could vary (based on numerous factors) in relation to a particular SWP/AWP. *See id.* at 206-07 (Ex. 2). Moreover, Teva disputes the alleged fact insofar as it disregards several factors Teva evaluates in determining the appropriate level at which to set its WACs. *See* 2/20/08 Foster Dep. at 207 (noting that in analyzing how to arrive at the appropriate WAC invoice price, he would assess "[h]ow many competitors are there, how low is my AWP cost, how low is my lower manufacturing costs, what are my discounts that I have to give off WAC so I can understand what those numbers would be. Those would all factor into my calculation.") (Ex. 2). Furthermore, Teva disputes that it *always* set its WAC at 75 percent of AWP, and Plaintiffs have not provided any evidentiary basis for this assertion. *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

15.    Teva did not sell to small wholesalers at WAC. *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep.") (Exhibit E) at 174:4-16.

**Teva's Response to Alleged Fact No. 15:**  Disputed.  Teva disputes that it "did not sell to small wholesalers at WAC."  As an initial matter, Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1. *See O'Brien*, 440 F. Supp. 2d at 5 n.1. Indeed, Mr. Krauthauser testified that "there are *some* wholesalers, small wholesalers that we have that don't buy at WAC. . . ."  1/29/08 Krauthauser Dep. at 174:9-16 (emphasis added) (Ex. 3).  Teva's WAC prices in many instances actually *were* the prices that Teva charged its

customers in the marketplace, and the prices at which Teva invoices its wholesalers.  *See* 8/23/07

Wodarczyk Dep. at 159:8-15 (explaining that "certain sales are made at WAC") (Ex. 5); 2/20/08

Foster Dep. at 90-91 ("The WAC price is what the wholesalers would essentially buy the product

for.") (Ex. 2); *id.* at 91 ("Q.  [W]hen [the product] was shipped to a wholesaler [it] would be

invoiced at the WAC price?  A.  As far as I recall, while I was at TEVA, yes. ") (Ex. 2).

16.    Teva knew that in the generic market place that its contract prices and WACs would go down over time and that generally AWPs would go unchanged over the same time period.  *See id*. at 177:18-178:20; Cioschi 2/12/08 Dep. (Exhibit F) at 61:1-62:4.

**Teva's Response to Alleged Fact No. 16:**  Disputed.  As an initial matter, Teva states

that it has literally hundreds of NDCs and therefore disputes Plaintiffs' attempt to characterize,

based on this limited testimony, the movement of every single contract price for every single

Teva pharmaceutical product in the whole of Teva's product line.  Teva disputes Alleged Fact

No. 16 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal

Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this

statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be

admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to

Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

Plaintiffs' Motion for Partial Summary Judgment concerns specific Teva NDCs, from a specific

time frame, which had particularized movements in contract prices for varying (and drug-

specific) reasons, including supply concerns, competitive reasons, and the like.  *See* 1/29/08

Krauthauser Dep. at 95-97, 182-83, 217-220 (Ex. 3).

Further, Teva disputes Alleged Fact No. 16 to the extent it is not properly supported by

evidence in the record.  Plaintiffs have cited no evidentiary basis for the assertion that "Teva

knew that in the generic market place that its contract prices and WACs would go down over

time and that generally AWPs would go unchanged over the same time period."  *See O'Brien*,

440 F. Supp. 2d at 5 n.1.  To the contrary, Mr. Krauthauser testified that, in a market with multiple competitors, "typically a contract price would tend to go down" and that "over time you may see a reduction in WAC."  1/29/08 Krauthauser Dep. at 177:18-178-20 (Ex. 3).  Teva disputes that this occurred in every case (or even in most cases), and Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Similarly, Plaintiffs have failed to provide any evidentiary basis for the assertion that "AWPs would go unchanged over the same time period."  *See id.*

17.    At all times, from 1997 to 2005, Teva provided the WAC and either an AWP or SWP for its generic drugs to the national pricing compendia – First DataBank, RedBook and Medi-Span.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 57:4-19, 104:9-17, 178:22-179:11; Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep. (Exhibit D) at 81:11-82:1; Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 74:8-75:19; *see also Mylan*, 2008 WL 5650859 at *7.

**Teva's Response to Alleged Fact No. 17:**  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 17 insofar as it relies on, refers to, or otherwise mentions AWP or SWP, which have no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP or SWP are material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d  at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

In addition, Teva disputes Plaintiffs' Statement insofar as it asserts that Teva "reported" any prices to First DataBank or any other entity.  Further, Teva disputes Alleged Fact No. 17 on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by

Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1.  Teva disputes that it reported WACs to

First DataBank, RedBook, and MediSpan "[a]t all times, from 1997 to 2005."  Plaintiffs have not

provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*,

440 F. Supp. 2d at 5 n.1.  Indeed, Mr. Denman testified that Teva provided WACs only to "some

of the databases that requested it" and "did not always report WACs to all publishing

compendia."  4/16/08 Denman Dep. at 74:8-75:19 (Ex. 1).

18.     The SWPs and AWPs for Teva drugs were always the same.   *See* Teva
30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 135:4-6, 199:12-15.

**Teva's Response to Alleged Fact No. 18:**  Disputed.  As an initial matter, Teva objects

to Alleged Fact No. 18 insofar as it relies on, refers to, or otherwise mentions AWP or SWP,

which have no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS

did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What

role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any

instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation

where they did.") (Ex. 4).   Accordingly, Teva disputes that AWP or SWP are material to

Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and*

*Marine Ins. Co.*, 379 F. Supp. 2d  at 186 n.1 (refusing to consider immaterial facts as part of a

motion for summary judgment). Further, Teva disputes Alleged Fact No. 18 on the grounds that

Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1.

*See O'Brien*, 440 F. Supp. 2d 3, 5 n.1.

19.     Teva knew and controlled the AWPs and WACs for its drugs that were published
by the national drug pricing compendia like First Databank.  *See* Cioschi 2/12/08 Dep. (Exhibit
F) at 110:17-111:2.   Teva was in communication with First Databank about its prices and
received information from First Databank that would show Teva WACs, AWPs and SWPs for
Teva drugs and Teva would verify if the information provided was correct.   *See* Teva
30(b)(6)(Wodarczyk) 8/23/07 Dep. (Exhibit D) at 172:14-174:20; Teva 30(b)(6)(Krauthauser)
1/29/08 Dep. (Exhibit E) at 227:12-229:15.  When Teva made a change to its published prices,
Teva would confirm that First Databank received the price changes.  *Id.*

**Teva's Response to Alleged Fact No. 19:**  Disputed.  Teva disputes Alleged Fact No. 19 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony.  In particular, Teva disputes Plaintiffs' statement insofar as it permits an inference that Teva actively "verified" the prices reported by First DataBank.  In fact, the testimony cited by Plaintiffs provides that Teva only intermittently observed First DataBank's benchmark pricing figures, and did so merely to ensure that there were no misunderstandings surrounding SWP levels.  *See* 2/12/08 Cioschi Dep. at 110-11 (Ex. 7).  Teva disputes that it "knew and controlled the AWPs and WACs for its drugs that were published by the national drug pricing compendia like First DataBank."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

Teva disputes that it "received information from First DataBank that would show Teva WACs, AWPs and SWPs for Teva drugs" and would "verify if the information provided was correct."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See id.*  Moreover, Teva disputes Plaintiffs' statement because it improperly seeks to establish an alleged fact (that First DataBank sent Teva a list of NDCs each year for verification purposes) on an inadequate evidentiary basis.  *See* Fed. R. Evid. 602.  Specifically, the deposition testimony cited does not support the proposition that First DataBank sent a list of prices to Teva for verification.  In fact, deposition testimony from Teva witnesses specifically provides the opposite; *viz.*, that Teva was unaware of any formal system of verification.  *See* 1/29/08 Krauthauser Dep. at 228 (Q. "[D]id Teva receive from First DataBank printouts of the information that Teva -- that First DataBank was publishing relating to Teva and ask Teva to verify the accuracy of the information?" A: "I'm not aware of that.") (Ex. 3); 2/20/08 Foster Dep. at 145-46 (expressing a lack of knowledge of any such process of verification occurring on

any regular basis) (Ex. 2).  Indeed, Mr. Krauthauser testified that he was not aware of any situation in which Teva received printouts or "turnaround documents" from First DataBank that Teva used to verify the accuracy of First DataBank's published AWPs or WACs for Teva's drugs.  1/29/08 Krauthauser Dep. at 228:1-15 (Ex. 3).  *See also* 8/23/07 Wodarczyk Dep. at 174:11-19 ("Q. In addition, are you aware as to whether or not the First DataBank would send information to the company and ask the company to respond and verify whether or not what First DataBank had was accurate?  A. I think First DataBank would send a receipt that they received the email, but that's about it. . . .") (Ex. 5).

Teva further disputes the alleged facts insofar as they misstate, mischaracterize and/or misconstrue the cited deposition testimony by suggesting that Teva employees contacted First DataBank to confirm price changes.  To this end, the deposition testimony of a Teva witness makes clear that Teva does not make subsequent efforts, following the initial notification of a price change, to contact First DataBank to confirm the receipt of price changes.  *See* 8/23/07 Wodarczyk Dep. at 174:11-19 (Ex. 5).  Rather, Teva may, on occasion, ask First DataBank to "verify with a particular company that they're, in fact, still marketing a product."  1/29/08 Krauthauser Dep. at 228-29 (Ex. 3).

To the extent Alleged Fact No. 19 concerns AWP, Teva disputes that Alleged Fact No. 19 is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).

20.    Teva subscribed to First Databank Price Alert (hardcopy), First Databank Price Probe (CD) and First Databank AnalySource (internet) services to monitor both the Teva published prices and that of its competitors.  *See* Cioschi 2/12/08 Dep. (Exhibit F) at 113:22-116:15; *see also* Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep.") (Exhibit B) at 38:17-40:1.  John

Wodarczyk testified that he had never heard of the pricing compendia publishing a price different than the one Teva provided. *See* Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep. (Exhibit B) at 40:2-7.

**Teva's Response to Alleged Fact No. 20**: Disputed.  Teva disputes Allege Fact No. 20 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony.  In particular, Teva disputes Plaintiffs' statement insofar as it permits an inference that Teva actively "monitor[ed]" the prices reported by First DataBank.  In fact, the testimony cited by Plaintiffs provides that Teva only intermittently observed First DataBank's benchmark pricing figures, and did so merely to ensure that there were no misunderstandings surrounding SWP levels.  *See* 2/12/08 Cioschi Dep. at 110-11 (Ex. 7).  Of course, this practice would occasionally include determining whether Teva's SWPs were in line with the AWPs of its competitors.  *See id.* (Ex. 7).  As such, Teva disputes Plaintiffs' statement because Plaintiffs, absent any evidence, improperly transpose an occasional check for accuracy into an active and unvarying "monitor[ing]" of First DataBank's price figures.  *See id.* (Ex. 7).  For similar reasons, Teva disputes the suggestion that there was any "formal" procedure in place to "monitor" what prices First DataBank reported.  *Id.* (Ex. 7).

Teva further objects to Plaintiffs' statement in that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

21.     Teva does not sell its generic drugs at AWP.  *See* Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep. (Exhibit B) at 45:1-10.

**Teva's Response to Alleged Fact No. 21:**  While Teva does not dispute that it did not invoice or sell generic drugs at AWP,  Teva objects to Alleged Fact No. 21 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

22.     Teva admits that its reported AWPs or SWPs were not tethered to the actual prices that anyone pays.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 107:2-108:11; Exhibit H (Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. Exhibit 5 (Sales and Marketing Policies and Procedures dated August 14, 2003).

**Teva's Response to Alleged Fact No. 22:**  Disputed.  Teva objects to Alleged Fact No. 22 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005) (refusing to consider immaterial facts as part of a motion for summary judgment).

In addition, Teva disputes Plaintiffs' Statement insofar as it asserts that Teva "reported"

any prices to First DataBank or any other entity.  Further, Teva disputes Alleged Fact No. 22 on

the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by

Local Rule 56.1, and the testimony cited does not support Plaintiffs' assertions.  *See O'Brien*,

440 F. Supp. 2d 3, 5 n.1.

23.    Teva considers its contract prices to customers to be highly confidential and says publication of the contract prices would be competitively harmful.  *Id.*  Teva's confidential contract prices were normally below WAC.  *See* Deposition of Eugene Cioschi 7/11/08 Dep. ("Cioschi 7/11/08 Dep.") (Exhibit G) at 181:11-17.

**Teva's Response to Alleged Fact No. 23:**  Disputed.  Teva objects to Alleged Fact No.

23 to the extent that it misstates, mischaracterizes and/or misconstrues the deposition testimony

and other evidence cited in support thereof.  While Teva does not dispute the fact that pricing

information was deemed to be confidential in a sense, Teva certainly disputes that it ever

concealed its true prices from third party payors such as the New York Medicaid.  Further, Teva

further disputes Plaintiffs' statement that "contract prices were normally below WAC" on the

grounds that Teva's WAC prices in many instances actually *were* the prices that Teva charged its

customers in the marketplace, and the prices at which Teva invoices its wholesalers.  *See* 8/23/07

Wodarczyk Dep. at 159:8-15 (explaining that "certain sales are made at WAC") (Ex. 5); 2/20/08

Foster Dep. at 90-91 ("The WAC price is what the wholesalers would essentially buy the product

for.") (Ex. 2); *id.* at 91 ("Q.  [W]hen [the product] was shipped to a wholesaler [it] would be

invoiced at the WAC price?  A.  As far as I recall, while I was at TEVA, yes. ") (Ex. 2).  Further,

Teva disputes that Alleged Fact No. 23 is material to Plaintiffs' motion.

24.    Contract prices are the "real prices" that Teva's customers actually pay Teva, which were not reported to the pricing compendia.  *See* Cioschi 2/12/08 Dep. (Exhibit F) at 72:11-73:5.  For any given Teva product at any given time typically the AWP was the highest price, then the WAC and then the contract prices would be below WAC.  *Id.* at 60:16-22.

**Teva's Response to Alleged Fact No. 24:**  Disputed.  As an initial matter, AWPs are not (and never have been) intended to represent actual contract prices, as the State of New York was well aware.  *See generally* L.R. 56.1 Stmt. of Undisputed Material Facts Supporting Defs.' Jt. Mot. for Summary Judgment on Pls.' "FUL Fraud" Claims, (Dkt. 6054) (D. Mass., 01-cv-12257-PBS).  Although Teva does not dispute that contract prices "were not reported to the pricing compendia," Teva disputes that this fact is material to Plaintiffs' Motion for Partial Summary Judgment.  Further, Teva disputes any suggestion that contract prices are the *only* "real prices" that Teva's customers pay or that the AWPs and WACs submitted to the pricing compendia are not "real prices."  Plaintiffs have not provided any evidentiary basis for such assertions, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

 With regard to the second sentence of Alleged Fact No. 24, Teva does not dispute that, as a general matter, AWPs for a Teva product were higher than WACs and contract prices are generally below WACs.  Teva disputes any suggestion that all customers paid contract prices or that customers' contract prices were *always* lower than WAC.  Plaintiffs have not provided any evidentiary basis for these assertions, as is required by Local Rule 56.1.  *See id.*

 Finally, Teva objects to Alleged Fact No. 24 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and*

*Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

25.     Teva knew the WAC price to the wholesalers did not include chargebacks, discounts, rebates, billbacks and other incentives Teva offered that got the wholesalers to their net cost. *See* Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 219:14-226:6, 261:19-267:4; Exhibit I (Teva 30(b)(6)(Denman) 4/16/08 Dep. Exhibit 20 (comparison of net price to wholesalers Cardinal and McKesson after chargebacks, rebates, discounts and other price allowances for Ursodiol and Albuterol)).

**Teva's Response to Alleged Fact No. 25:**  Disputed.  As an initial matter, Teva's WAC prices in many instances actually *were* the prices that Teva charged its customers in the marketplace, and the prices at which Teva invoices its wholesalers.  *See* 8/23/07 Wodarczyk Dep. at 159:8-15 (explaining that "certain sales are made at WAC") (Ex. 5); 2/20/08 Foster Dep. at 90-91 ("The WAC price is what the wholesalers would essentially buy the product for.") (Ex. 2); *id.* at 91 ("Q. [W]hen [the product] was shipped to a wholesaler [it] would be invoiced at the WAC price?  A. As far as I recall, while I was at TEVA, yes. ") (Ex. 2).

Moreover, it is factually confounding to allege that a manufacturer's WAC should somehow equal a net price, despite the long-standing and well-settled historical fact (codified in the Medicare Modernization Act of 2003) that WAC is and always has been understood to be a list invoice price that does not include any potential discounts, rebates or chargebacks.  *See* 42 U.S.C. § 1395w-3a(c)(6)(B) (providing that the "term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, *not including prompt pay or other discounts, rebates or reductions in price*, . . . as reported in wholesale price guides or other publications of drug or biological pricing data.") (emphasis added).

Further, Teva objects to Alleged Fact No. 25 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible

evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1. Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

26.    More than 90% of Teva sales are below WAC after discounts, rebates and chargebacks.  See Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep. (Exhibit D) at 160:14-21; Teva 30(b)(6)(Krauthauser) 1/29/08 Dep.") (Exhibit E) at 174:17-175:11; *see also Mylan*, 2008 WL 5650859 at *7.

**Teva's Response to Alleged Fact No. 26:**  Disputed.  Teva disputes that Alleged Fact No. 26 is material to Plaintiffs' motion and disputes that "[m]ore than 90% of Teva sales are below WAC after discounts, rebates, and chargebacks."  Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

Finally, it is factually confounding to allege that a manufacturer's WAC should somehow equal a net price, despite the long-standing and well-settled historical fact (codified in the Medicare Modernization Act of 2003) that WAC is and always has been understood to be a list invoice price that does not include any potential discounts, rebates or chargebacks.  *See* 42 U.S.C. § 1395w-3a(c)(6)(B) (providing that the "term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, *not including prompt pay or other discounts, rebates or reductions in price*, . . . as reported in wholesale price guides or other publications of drug or biological pricing data.") (emphasis added).

27.    Teva admits that in setting its AWP as high as possible that Teva's AWP was a "fictitious" price that Teva knew was being used for reimbursement.  Teva set its AWP as high

as possible so as not to disadvantage its customers and maximize the reimbursement to its customers.  *See* Cioschi 2/12/08 Dep. (Exhibit F) at 84:12-85:2.

**Teva Response to Alleged Fact No. 27:**  Disputed.  Teva objects to Alleged Fact No. 27 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 4). Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).   Further, Teva disputes that it set its AWP "as high as possible."  Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.   Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Mr. Cioschi testified that Teva set the AWP for its drugs at 10 percent below the brand AWP in order to be designated as a generic drug by the pricing compendia.  2/12/08 Cioschi Dep. at 83:16-84:8 (Ex. 7); *see also* Exhibit 5 to 1/29/08 Krauthauser Dep. ("SWP is set at 10% below the referenced brand on which the ANDA is based, because 10% is the minimum discount off the referenced brand needed to ensure a drug will be treated as a generic by the pricing compendia.") (Ex. 10).  Teva could have set its AWP at a higher level, but it would not have received a generic designation.  1/29/08 Krauthauser Dep. at 73:2-9 (Ex. 3).

With respect to the second sentence of Alleged Fact No. 27, Teva disputes that it set its AWP "so as not to disadvantage its customers and maximize the reimbursement to its customers."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  While one effect of setting the AWP for a generic drug at 10 percent below brand AWP is to maximize the reimbursement for that drug (to the extent reimbursement is based on AWP), Teva did not consider reimbursement in setting its AWP.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("Teva does not consider reimbursement in setting its prices, and in no event will SWP be set for any generic drug in order to increase the reimbursement spread to providers over competing drugs.") (Ex. 10).

28.     Teva says that marketing of the spread between a published AWP or SWP and the actual cost at which a pharmacy purchases Teva drugs is inherent in the reimbursement system. Teva competes on the basis of spread when lowering contract prices.   See Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 114:19-115:11.

**Teva's Response to Alleged Fact No. 28**:  Disputed.  Teva objects to Alleged Fact No. 28 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4). Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva's corporate representative testified that it was never Teva's policy to market the spread.  *See* 1/29/08 Krauthauser Dep. at 120-21 ("As the individual responsible for pricing during part of the relevant time frame I know that we don't quote, unquote, market the spread.  I

know from speaking with Linda [Nase, the previous individual responsible] that that was also the case during her time frame.") (Ex. 3); *see also* Exhibit 5 to 1/29/08 Krauthauser Dep. ("A spread between published SWP and actual retail pharmacy acquisition price is built into the reimbursement system and is the product of price competition.  It is Teva's intent to maximize its sales and profitability through competitive pricing; *however, in no event shall Teva employees or agents market the reimbursement spread to providers as a factor for purchasing the company's products*.") (emphasis added) (Ex. 10).

Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

The evidence also clearly shows that Teva's methodology for establishing AWPs/SWPs was primarily based on adherence to the protocols established by First DataBank, and that such pricing figures were established without regard to changes in reimbursement.  *See* 8/23/07 Wodarczyk Dep. at 183:15-184:9 ("Q. And is there any unit or group within the company that follows the Medicaid program and essentially tries to stay on top of any changes in Medicaid?  A. In terms of reimbursement?  Q. In terms of the program in general, but reimbursement in particular.  A. I have government pricing and the only areas my group is concerned with is processing of Medicaid claims and any changes that CMS would have to the calculation of AMPs or best price or ASPs or with the VA, with how the VA pricing should be calculated or for 340B, how the 340B pricing should be calculated.  Q. Okay.  So, it's not your group?  A. I don't think it's any Teva group that I know of.  Q. Are you aware of anyone at Teva in general

maintaining current or up-to-date with regard to changes in Medicaid reimbursement?  A. Not

that I know of.") (Ex. 5); 2/20/08 Foster Dep. at 185-86 (in discussing the methodology of

establishing AWPs/SWPs, "[m]y issue was not reimbursement.") (Ex. 2).

In addition, Teva disputes Plaintiffs' statement to the extent it purports to suggest that the

reason Teva provided pricing figures in its product catalogues was so that pharmacists and third

party payors could determine the "spread."   Once again, the deposition testimony of Teva's

witnesses is directly to the contrary, explicitly explaining that Teva was *required* to report "a

number of characteristics along with AWP and a WAC" in order to be listed as a generic by First

DataBank.  *See, e.g.*, 2/20/08 Foster Dep. at 74 (Ex. 2); 1/29/08 Krauthauser Dep. at 64-65

(explaining that pricing information was reported so that Teva products could be dispensed as a

low-cost alternative) (Ex. 3).

Finally, with respect to the first sentence of Alleged Fact No. 28, Teva disputes that

"marketing of the spread between a published AWP or SWP and the actual cost at which a

pharmacy purchases Teva drugs is inherent in the reimbursement system."   Plaintiffs have not

provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*,

440 F. Supp. 2d at 5 n.1.

29.    Teva knew that when it raised the AWP or SWP for a Teva drug that
reimbursement based on AWP would increase.   See Teva 30(b)(6)(Denman) 4/16/08 Dep.
(Exhibit C) at 150:15-151:11.   Teva knowingly raised AWPs if it had room to increase the
reimbursement to its customers.  *See Cioschi* 2/12/08 Dep. (Exhibit F) at 148:3-19.

**Teva's Response to Alleged Fact No. 29:**  Disputed.  Teva objects to Alleged Fact No.

29 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or

bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in

setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in

setting FULs? A. Generally, it did not.  Q. Can you think of any instance in which CMS based a

FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).

Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary

Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1

(refusing to consider immaterial facts as part of a motion for summary judgment).  Further, Teva

disputes that it "knowingly raised AWPs if it had room to increase the reimbursement to

customers."  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of

Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.

*See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in

evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement

on the basis that it lacks adequate foundation.   *See* Fed. R. Evid. 602. Moreover, Teva's

longstanding corporate policy prohibits consideration of reimbursement in setting or changing its

AWPs.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("[I]n no event will SWP be set for any generic

drug in order to increase the reimbursement spread to providers over competing drugs.") (Ex.

10).

     30.    Teva competed on spread by raising its AWP or SWP instead of lowering the
price to its customer.  *See* Cioschi 7/11/08 Dep. (Exhibit G) at 197:20-201:1; Exhibit J (Cioschi
7/11/08 Dep. Exhibit 42 (email string in November 2000 recommending an AWP increase in
response to the wholesaler Bindley Western's request that the AWP spread be increased to 35%
to help sell a Teva drug to Bindley's pharmacy customers)); *see also* Exhibit K (Teva
30(b)(6)(Krauthauser) 1/29/08 Dep. Exhibit 4 (email from Paul Krauthauser (Teva) to Rick
Foster (Teva) suggesting that Teva raise the SWP on Methazolamide instead of lowering the
WAC or contract price to bid for Caremark's business).

     **Teva's Response to Alleged Fact No. 30:**  Disputed.  As an initial matter, Teva objects

to Alleged Fact No. 30 insofar as it relies on, refers to, or otherwise mentions AWP, which has

no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not

consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any

did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in

which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005) (refusing to consider immaterial facts as part of a motion for summary judgment).

Further, Teva disputes that it "competed on spread by raising its AWP or SWP instead of lowering the price to its customers."  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Teva's longstanding corporate policy prohibits consideration of reimbursement in setting or changing its AWPs.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("[I]n no event will SWP be set for any generic drug in order to increase the reimbursement spread to providers over competing drugs.") (Ex. 10); *see also* 1/29/08 Krauthauser Dep. at 115:12-15 ("Q. In some instances have generic products competed on the basis of increasing AWPs?  A. I can't think of anything off the top of my head where that's the case.") (Ex. 3), and the cited evidence does not indicate that Teva ever departed from this policy.  Mr. Cioschi's testimony relates to one particular instance in which a customer requested that Teva raise the AWP for R-Tannate Pediatric Suspension—a product not at issue in Plaintiffs' Motion for Partial Summary Judgment.  Deposition of Eugene Cioschi, July 11, 2008 ("7/11/08 Cioschi Dep.") at 198:13-199:16 (Ex. 8).  While Mr. Cioschi suggested to his superiors that Teva increase the AWP to match its competitors' AWPs, *id.* at 199:20-200:1 (Ex. 8), Mr. Cioschi did not know whether his suggestion was acted upon.  *Id.* at

200:12-14.   Similarly, Mr. Krauthauser testified that he suggested increasing the SWP for Methazolamide—a product not at issue in Plaintiffs' motion—because a communication from a customer alerted Teva that the brand had increased its SWP and there was now more than a 10 percent difference between Teva's SWP and the brand AWP.   1/29/08 Krauthauser Dep. at 115:20-116:17 (Ex. 3).   However, these is no indication whether the SWP for Methazolamide was ever changed.

31.   Teva maintained "Effective Pharmacy Selling Tips", which instructed Teva sales people in the "Ask for Information" section to ask the pharmacist to compare AWP with the retail pricing in order to show the greater profit margin (spread) on the Teva product.   *See* Exhibit L (Cioschi 7/11/08 Dep. Exhibit 35 ("Effective Pharmacy Selling Tips")) at 2.

**Teva's Response to Alleged Fact No. 31:**   Disputed.   As an initial matter, Teva objects to Alleged Fact No. 31 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.   CMS did not consider AWPs in setting FULs.   *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).   Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.   *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment). Teva does not dispute that it produced a document entitled "Effective Pharmacy Selling Tips" relating to the branded drug Lofibra—a product not at issue in Plaintiffs' motion, *see* 7/11/08 Cioschi Dep. at 148:15-17 (Ex. 8); Exhibit 35 to 7/11/08 Cioschi Dep.—nor does Teva dispute that the document asks representative to "compare AWP and retail pricing to demonstrate greater profit margin with Lofibra."   *Id.*   However, Teva does dispute that (1) it produced such documents other than on this one occasion, (2) the document mentions or refers to the "spread,"

and (3) it "marketed the spread" on this or any other occasion.  Plaintiffs have failed, contrary to

the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence,

admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring

moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d

at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate

foundation.  *See* Fed. R. Evid. 602.  Indeed, Teva's longstanding corporate policy prohibits Teva

employees from "marketing the spread" to providers.  Exhibit 5 to 1/29/08 Krauthauser Dep.

("[I]n no event shall Teva employees or agents market the reimbursement spread to providers as

a factor for purchasing the company's products.") (Ex. 10).

32.     Teva knew that when a FUL or MAC was in place that it limited the
reimbursement that state Medicaid agencies were willing to pay to pharmacies for Teva drugs.
*See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 190:13-16.

**Teva's Response to Alleged Fact No. 32:**  Teva objects to Plaintiffs' statement on the

basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  However, Teva does not dispute

that FULs or MACs generally lower reimbursement.

33.     Teva had a strategy on at least one occasion to institute a change in the FUL.  The
strategy consisted of calling First Databank to eliminate products from its database, informing
CMS of a Teva price increase and soliciting chain drugs stores to call CMS to complain about
the FUL pricing.  All of this was an effort by Teva to get a FUL removed which would increase
reimbursement to its customers.  *See* Cioschi 2/12/08 Dep. (Exhibit F) at 162:6-164:8; Exhibit M
(Cioschi 2/12/08 Dep. Exhibit 10 (collections of documents including published prices and
emails in January and February 2003 discussing a strategy to get CMS to change the FUL to
solve the problem with a low FUL for the Teva drug Gemfibrozil)); *see also* Exhibit N (Cioschi
2/12/08 Dep. Exhibit 11 (email string dated in June 2000 discussing the successful results of
Teva's efforts to get CMS to change or delete FUL on several Teva drugs.)).

**Teva's Response to Alleged Fact No. 33:**  Disputed.  Teva does not dispute that on at

least one occasion and in response to its customers' requests, it communicated with CMS

concerning updates to the FULs for five Teva drugs to account for changes in the market prices

of those drugs.  Teva disputes that it "had a strategy" to institute changes in the FUL for any drug

and that it sought to change the FUL for any drug on any other occasion, including FULs for the particular Teva drugs at issue in Plaintiffs' Motion for Partial Summary Judgment.  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

34.     Teva was generally familiar with the 2003 OIG Guidelines.  *See* Teva 30(b)(6)(Denman) 4/16/08 (Dep. (Exhibit C) at 275:22-276:9.  Teva does not agree with the definition of spread in the OIG guidelines.  *Id*. at 279:2-16.

**Teva's Response to Alleged Fact No. 34:**  Disputed.  Teva disputes that it did "not agree with the definition of spread in the OIG Guidelines."  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602. Further, the testimony cited does not support Plaintiffs' statement.  Rather, Mr. Denman testified as to his understanding as a representative of Teva that the definition of "spread" in the OIG Guidelines was "incorrect" and noted that he did not agree with it.  Others testifying in the same capacity have defined "spread" more broadly and in a manner consistent with the definition in the OIG Guidelines.  1/29/08 Krauthauser Dep. at 95:6-8 ("Spread is just the difference between two numbers") (Ex. 3).  Further,  Teva's longstanding corporate policy characterized "spread" as the difference "between published SWP and actual pharmacy retail acquisition price."  Exhibit 5 to 1/29/08 Krauthauser Dep. (Ex. 10).

35.    At all times, from 1997 to 2005, Teva has calculated and reported on a quarterly basis the average manufacturer's price ("AMP") for all its products as required by the federal rebate statute.   See Krauthauser 1/29/08 Dep. (Exhibit E) at 180:3-8; Deposition of Teva Pharmaceuticals   USA,   Inc.   30(b)(6)(John   Wodarczyk)   dated   4/17/08   ("Teva 30(b)(6)(Wodarczyk) 4/17/06 Dep.") (Exhibit O) at 158:11-22.

**Teva's Response to Alleged Fact No. 35:**   Teva does not dispute that it calculates quarterly AMPs for all of its products and reports these AMPs to both CMS as well as New York Medicaid's EPIC Program.   Deposition of John Wodarczyk, April 17, 2008, ("4/17/08 Wodarczyk Dep.") at 220:4-220:11.


Dated:  June 15, 2009

*/s/ Jennifer G. Levy*
Jennifer G. Levy
Patrick M. Bryan
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

Robert J. Muldoon, Jr., BBO# 259480
Courtney A. Clark, BBO# 651381
SHERIN & LODGEN, LLP
101 Federal Street
Boston, MA  02110
Telephone:  (617) 646-2000
Facsimile:  (617) 646-2222

*Attorneys for Defendants Teva*
*Pharmaceuticals USA, Inc., Ivax*
*Corporation, Ivax Pharmaceuticals, Inc.,*
*and Barr Laboratories, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2009, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Court in MDL 1456.


/s/ *John K. Crisham*
John K. Crisham