# EXHIBIT 5

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3                           - - -

 4    THE COMMONWEALTH OF           :

 5    MASSACHUSETTS,                :

 6              Plaintiff,          :

 7                                  :

 8              vs.                 :HIGHLY

 9                                  :CONFIDENTIAL

10    MYLAN LABORATORIES,           :

11    INC., et al.,                 :CIVIL ACTION NO.

12              Defendants.         :03-11865 PBS

13                           - - -

14              Videotaped 30(b)(6) deposition of

15    JOHN G. WODARCZYK, taken pursuant to notice, at the

16    Residence Inn, 1110 Bethlehem Pike, North Wales,

17    Pennsylvania, on Thursday, August 23rd, 2007,

18    beginning at approximately 9:00 a.m., before David

19    Walsh, Registered Professional Reporter and Notary

20    Public, and Michael Mullen, Videotape Operator,

21    there being present:

22                           - - -
```

1  product?

2  A.    As far as I know, it's 90 percent or

3  less.

4  Q.    Would you agree that if it had reported

5  a lesser amount then 90 percent, it would have

6  received designation as a generic?

7  A.    As far as I know, yes.

8  Q.    Okay.  Was Teva aware that many third

9  party payers and government programs used AWP

10 as a basis for reimbursement to pharmacies?

11 A.    This is my understanding that AWP, along

12 with WAC, and along with federal upper limit

13 and max are all used in determining what each

14 state would use for reimbursement.  I'm not a

15 reimbursement expert, but I know the states

16 use a variety of prices that are available,

17 AWP being one of them.

18 Q.    My question is somewhat broader, and I'm

19 asking you not as an individual, but as the

20 representative of Teva.

21       Throughout the relevant time period, has

22 Teva been aware that many third party payers,

1   catalogue which was available to the -- all of
2   our customers.
3   Q.   Again, beginning in 2002?
4   A.   I don't know at what point. It was
5   included in the catalogue. That's a question
6   you can ask Paul Krauthauser. He was around
7   longer than I.
8   Q.   And with regard to its wholesale
9   acquisition cost, did Teva ever make any
10  communication, have any communications, with
11  the Commonwealth of Massachusetts with regard
12  to what its wholesale acquisition cost
13  represented?
14  A.   I don't believe so, but certain sales
15  are made at WAC.
16  Q.   Okay. And has Teva ever made any
17  disclaimers with anyone relating to its WAC
18  price similar to the disclaimers that you
19  mentioned relating to AWP prices?
20  A.   Well, I'm not a pricing person, but I
21  wouldn't see it as relevant for WAC because
22  there are some wholesalers that pay WAC and we

Page 174

```
 1   information provided by First DataBank?
 2   A.   Not that I know of.
 3   Q.   Okay.  I think you said that you were
 4   aware that people I assume in the marketing
 5   department would actually check the data
 6   received from First DataBank and make sure
 7   that they had accurately reported the
 8   information that the company had sent them; is
 9   that right?
10   A.   That's what I believe, yes.
11   Q.   In addition, are you aware as to whether
12   or not the First DataBank would send
13   information to the company and ask the company
14   to respond and verify whether or not what
15   First DataBank had was accurate?
16   A.   I think First DataBank would send a
17   receipt that they received the e-mail, but
18   that's about it or it's just a return receipt
19   through the communications department.  That's
20   something you can ask Paul Krauthauser.
21   Q.   I think you've told us that one of the
22   areas that you have been responsible for is
```

1   program?

2            MS. LEVY:  Objection;

3   foundation.

4            THE WITNESS:  I believe

5   Medicaid would represent I've heard maybe

6   10 percent of Teva sales, give or take.

7   BY MR. MULLIN:

8   Q.   And would you agree with me that that

9   makes it a substantial portion of the

10  company's sales?

11           MS. LEVY:  Objection to form.

12           THE WITNESS:  10 percent,

13  substantial, yes.

14  BY MR. MULLIN:

15  Q.   Okay.  And is there any unit or group

16  within the company that follows the Medicaid

17  program and essentially tries to stay on top

18  of any changes in Medicaid?

19  A.   In terms of reimbursement?

20  Q.   In terms of the program in general, but

21  reimbursement in particular.

22  A.   I have government pricing and the only

Page 184

```
 1    areas my group is concerned with is processing
 2    of Medicaid claims and any changes that CMS
 3    would have to the calculation of AMPs or best
 4    price or ASPs or with the VA, with how the VA
 5    pricing should be calculated or for 340B, how
 6    the 340B pricing should be calculated.
 7    Q.    Okay.  So, it's not your group?
 8    A.    I don't think it's any Teva group that I
 9    know of.
10    Q.    Are you aware of anyone at Teva in
11    general maintaining current or up-to-date with
12    regard to changes in Medicaid reimbursement?
13    A.    Not that I know of.
14    Q.    Okay.  From time-to-time Teva, during
15    the relevant time period, would launch new
16    drugs; is that right?
17    A.    Time-to-time, yes.
18    Q.    And in connection with the launch, what
19    documentation would Teva typically prepare?
20    A.    Well, we talked about what would be
21    prepared for First DataBank or Medispan or Red
22    Book.  Pricing would be negotiated with our
```