# EXHIBIT 1

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MASSACHUSETTS

------------------------------X

IN RE: PHARMACEUTICAL      :   MDL No. 1456

INDUSTRY AVERAGE WHOLESALE :

PRICE LITIGATION           :   Master File No.

                           :   01-12257-PBS

                           :

This Document Relates to:  :

                           :

City of New York, et al.,  :

    vs.                    :

Abbott Laboratories, et al.:

------------------------------X


Wednesday, April 16, 2008

- - -

H I G H L Y

C O N F I D E N T I A L

- - -

VIDEOTAPE DEPOSITION OF TEVA GROUP

BY JOHN W. DENMAN, R.Ph.

Teva Group (John W. Denman, R.Ph.) HIGHLY CONFIDENTIAL                April 16, 2008
North Wales, PA

34

1  private insurance plans, for example?
2      A.  Yes, private insurance plans,
3  employers, government plans.  Not -- not everyone
4  used AWP.  There are a number of different
5  mechanisms to establish reimbursement, but that -
6  - AWP was one of them that some of the third-
7  party payors did use.  PBMs.  Uhm, Wal-Mart
8  itself.
9      Q.  And you mentioned government plans used
10 AWP.  Would you include Medicaid in the phrase
11 "government plan"?
12     A.  Some -- I -- some government plans
13 would use AWP or a fraction of AWP or a
14 negotiated portion of AWP, but others would use
15 WAC.  Others would use a MAC list.  Others would
16 use, uhm, federal upper limits.
17         There's a number of different
18 reimbursement mechanisms that government and
19 third-party payors use to try to determine what
20 the actual ingredient cost was for the
21 medications, or trying to fairly reimburse the
22 pharmacists for their time and activity, uhm, and

1   the ingredient cost of the medication that was
2   being dispensed to their patients.
3        Q.   So is it correct, then, that these
4   third-party payors would -- would use the AWP as
5   part of their determination of what to reimburse
6   Wal-Mart when Wal-Mart dispensed a drug?
7             MS. LEVY:  Objection.  Mischaracterizes
8   the witness' testimony.
9             You can answer the question.
10            THE WITNESS:  Can you repeat the
11  question?
12            MS. CICALA:  I will -- I will rephrase
13  the question.
14            THE WITNESS:  Thank you.
15  BY MS. CICALA:
16       Q.   Why was third-party reimbursement
17  relevant to Wal-Mart?
18       A.   Third-party reimbursement is a part of
19  doing business.  Uhm, anyone familiar with
20  pharmacy would understand that many -- a great
21  proportion of prescriptions filled today at, uhm,
22  any of the retail outlets or mail order

72

1   Q. You understand what I mean when I refer
2   to the exclusive manufacturer?
3   A. If we are -- would you like to clarify?
4   Q. Certainly.
5       It's -- it's correct, is it not, that
6   when -- when patent protection for a brand
7   expires, typically one generic manufacturer has a
8   six-month period of exclusive marketing and
9   manufacturing rights for a therapeutically-
10  equivalent drug; correct?
11  A. That's correct.
12  Q. And I would imagine, on occasion, Teva
13  was the exclusive manufacturer for certain
14  generic products when the band -- brand patent
15  expired; correct?
16  A. Correct.
17  Q. And in such instance, would Teva set
18  the AWP at 10 percent below the brand AWP, as you
19  have just described?
20  A. That was our general practice, yes.
21  Q. And that was also Teva's general
22  practice when Teva was not the exclusive

73

1  manufacturer of the generic product?

2    A.   Yes, ma'am.

3    Q.   Do you know whether Teva could have set

4  -- withdrawn.

5         And you said Teva set the -- the AWP

6  for its products at 10 percent below the brand

7  AWP in order to ensure a generic indicator in the

8  publishing compendium; is that correct?

9    A.   That's correct.

10   Q.   Such generic indicator would have been

11 secured if Teva set its AWP at 20 percent below

12 the brand; correct?

13   A.   Possibly.  I -- I need to again state

14 that the AWP/SWP is a -- a -- a list price, uhm,

15 that is submitted for others' purposes.  It has,

16 again, no purpose for the manufacturer, no

17 purpose for the retailer.  The purpose is for the

18 insurance company, and they require some figure

19 to be, uhm, populated.  And that population,

20 again, as we decided, was 10 percent of the brand

21 AWP, uhm, for generally all -- all products

22 within Teva.

Teva Group (John W. Denman, R.Ph.) HIGHLY CONFIDENTIAL                April 16, 2008
North Wales, PA

74

1    Q.    And --
2    A.    So there was no -- the -- it was -- it
3  was a very simple exercise, not one that required
4  a lot of thought, a lot of, uhm, debate.  It was
5  just an exercise to populate that value.
6    Q.    Did Teva also, between 1997 and 2005 --
7  withdrawn.
8          Teva reported AWPs or SWPs for every
9  active NDC; correct?
10   A.    To the best of my knowledge, yes,
11 ma'am.
12   Q.    Did Teva also report WACs for Teva NDCs
13 between 1997 and 2005?
14   A.    To some of the databases that requested
15 it.  Uhm, WACs, again, would be a value that we -
16 - we could provide.
17   Q.    From your -- from your answer, it
18 sounds as if Teva did not always report WACs to
19 all publishing compendia; is that correct?
20   A.    Again, to the best of my knowledge,
21 that would be correct.
22   Q.    What factors influenced whether Teva

75

1  would report a WAC for a particular NDC to the
2  publishing compendia?
3      A.   It would be, again, at the request of
4  the compendium.  If it was something they
5  requested, it was something we would provide.
6      Q.   Do you know why the compendium would
7  sometimes request a WAC?
8      A.   No, ma'am.
9      Q.   Do you have any responsibility in your
10 current position at Teva for the reporting of
11 WACs to publishing compendia?
12     A.   That function is under my current
13 responsibility.  Do I do that myself?  No, but a
14 member of my team or members of my team have that
15 responsibility, yes, ma'am.
16     Q.   Does Teva report WACs for its drugs to
17 the publishing compendia today?
18     A.   If the compendium requests the
19 information, we -- we absolutely provide it.
20     Q.   So, then, is it your testimony from
21 1997 through to the present, Teva is only
22 reporting WACs to the publishing compendia when

1   A.   Generally, yes.

2   Q.   Given that you have testified as Teva's
3   corporate representative that reimbursement is
4   not relevant to Teva, can you explain why this
5   chart appears in this analysis?

6   A.   Correct.  Because if the -- the title
7   of this whole document is U.S. generic market
8   overview, and as -- as you -- as you said many
9   times today, that reimbursement is part of the
10  market, and because it's part of the market, it's
11  included in this presentation.

12  Q.   But your testimony has been that it is
13  not relevant to Teva; correct?

14  A.   Correct, it is not relevant to Teva.
15  It is relevant to my customers, but it is not
16  relevant to Teva.

17  Q.   And it's relevant to your customers
18  because reimbursement -- because the amount that
19  they are reimbursed determines their revenue for
20  dispensing particular products; correct?

21  A.   For certain products, yes.

22  Q.   Okay.  Do you see on page 10 that this