# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

\- - - - - - - - - - - - - - - -

(cross captions appear on following pages)

Videotaped deposition of SUE GASTON

Volume II

Washington, D.C.

Wednesday, March 19, 2008

9:00 a.m.

Page 408

**Do you recall that?**
A. I don't recall.
**Q. Would it be consistent with your memory that when OBRA -- when Congress passed OBRA '90 that Congress dictated that CMS set FULs when there were three A-rated --**
A. Yes. Yes.
**Q. So in the early period of time prior to OBRA '90 coming into effect CMS would only have set a FUL if all drugs were A-rated or therapeutically equivalent as the regulation says, but post OBRA '90 the definition was expanded?**
A. Correct.
**Q. But to your knowledge the regulation wasn't changed?**
A. Correct.
**Q. And I keep using a term and I want to make sure the jury understands, which is A-rated. What is A-rated? Would you explain that?**
A. Here again, I've been out of it for years. But it's my understanding that they have

Page 409

to be therapeutically and pharmaceutically equivalent.
**Q. And what does that mean?**
A. That's all the farther I can get. I don't get into the details of it.
**Q. Those are terms, though, that the FDA, the Food and Drug Administration, defines?**
A. Correct.
**Q. And an A rating is a Food and Drug Administration rating, is it not?**
A. That's my understanding.
**Q. And an A rating is the rating that the Food and Drug Administration attaches to a drug when it's deemed to be therapeutically and pharmaceutically equivalent, correct?**
A. Correct.
**Q. Looking at Exhibit 1, and specifically the FUL regulation, as I understand it there were basically two criteria that had to be satisfied before CMS would begin to look at establishing a FUL. The first was, as we've talked about, there had to be for a while all therapeutically**

Page 410

**equivalent drugs or then three therapeutically equivalent drugs, and the second criteria, as I understand it, was there had to be at least three suppliers listed in Red Book, Blue Book or Medi-Span; is that correct?**
A. Yes. We said in a national compendia.
**Q. And the national compendia are what?**
A. We considered that Red Book, Blue Book and Medi-Span.
**Q. Were actually any other pricing sources that CMS looked at or considered national compendia?**
A. No.
**Q. Just so we have I think a common understanding about how the process worked, once those criteria were deemed to be satisfied then the process became picking a price and multiplying that price by 150 percent to set the FUL, correct?**
A. The system did that.
**Q. The FUL system?**
A. The FUL system.

Page 411

**Q. So just mechanically -- I think you described this the last time, but tell me if my understanding is incorrect. There was a program called FULs that did some data crunching and then there was manual review that went on after that; is that correct?**
A. Correct.
**Q. So essentially you as the individual responsible for setting FULs at particular points in time would have gotten a printout from the FULs system and then you would have embarked on a manual review after that?**
A. Correct.
**Q. But basically the process was that either the system or you picked a price and that price was multiplied by 150 percent to set the FUL, correct?**
A. Correct.
MR. BUEKER: I ask the court reporter to mark a document that bears the Bates number HHD 175-0849 on the bottom right-hand corner as New York Counties Exhibit 2 for identification,

Page 416

A. Yes.
**Q. Is that your handwriting?**
A. I can't say.
**Q. How about "discontinued (they no longer manufacturer)," the printing?**
A. That's not my handwriting.
**Q. Okay. But Exhibit 2 is a document with which you're familiar?**
A. Correct.
**Q. And I take from your initials at the bottom right-hand corner that you had some involvement in the manual review process that went on before a FUL was set for 100-milligram metoprolol?**
A. Correct.
**Q. I'd like you to hang on to that. I'm going to flip back and forth between that and another document that's labeled at the top transmittal number 37, that I'd like to have marked as New York Counties Defendants' Exhibit 3 for identification, please.**
**(Exhibit NY Counties 003 was marked for identification.)**

Page 417

BY MR. BUEKER:
**Q. Ms. Gaston, do you have in front of you Exhibit 3 for identification?**
A. Yes.
**Q. And would you describe for the record what Exhibit 3 is?**
A. This is transmittal number 37 of the federal upper limit drug list dated November 20th 2001.
**Q. And what is a -- I take it it's a CMS transmittal?**
A. Yes.
**Q. What is a CMS transmittal? How is it used in connection with the FUL program?**
A. The -- I don't know about in 2001. But previously the federal upper limit drug list was published in the state Medicaid manual. And then we started publishing it on our webpage. So we would use the transmittal numbers because of the state Medicaid manual issuance.
**Q. I see. And if I take from that then the purpose of a CMS transmittal to the extent these FULs were still being recorded in state Medicaid manuals was to communicate to the states that you were making changes to the FULs?**

Page 418

A. Correct.
**Q. And you recognize transmittal 37 to be one of those transmittals by which CMS was transmitting to the state a new set of FULs?**
A. Correct.
**Q. And you can tell from the top that transmittal number 37 was sent to the states on November 20th 2001, right?**
A. Correct.
**Q. And there's a bold line about a third of the way down Exhibit 3 which provides a date when these FULs needed to be implemented by, correct?**
A. Correct.
**Q. And what is that date?**
A. November 20th 2001. And no later than January 22nd -- I'm sorry. "The November 20th 2001 FUL list should be implemented no later than January 22nd 2002."

Page 419

**Q. So by January -- this transmittal was essentially telling the states that by January 22nd 2002 these were the FULs that had to be in place?**
A. Correct.
**Q. Would you turn with me to page 12, please? And do you see the third entry down on page 12 on Exhibit 3 is for metoprolol?**
A. Yes.
**Q. And you see the second line there is for the 100-milligram strength, right?**
A. Correct.
**Q. And that's the FUL that -- Exhibit 2 relates to setting a FUL for the 100-milligram strength of metoprolol?**
A. Correct.
**Q. And you see that the -- you would agree with me that Exhibit 2 reflects the calculation that resulted in the FUL that's published in transmittal 37, correct?**
A. Correct.

Page 428

A. Correct.

**Q. Do you know why that wasn't used to set the FUL in this case?**

A. No. I'm not real sure.

**Q. I mean, it does look to me from the notation over on the right that somebody called and that was a product that was deemed to be available, right?**

A. Correct.

**Q. So you have a manufacturer, anyway, who's got available product at a lower published price, but it wasn't used for the FUL, correct?**

A. Correct. Sometimes discretion was used with this too. You might look at that price and if that price still appears to be too low that it would make the product available out there, then you would check to see if there's another manufacturer that might be a step up that's closer, but that could still allow you to set a reasonable FUL price.

**Q. I see. So sometimes discretion was used to ensure that the FUL was reasonable?**

Page 429

A. And available.

**Q. And available?**

A. Yeah.

**Q. And the reason you used that discretion was to make sure that providers -- you didn't set a FUL that was so low that providers couldn't acquire the product on the marketplace, correct?**

A. Correct.

**Q. And so you don't know for certain, but it's possible that one of the reasons that the Caraco price wasn't used here was discretion was exercised and it was deemed maybe that this was too low?**

A. It could be too low or Caraco only distribute to maybe limited amount of states and not all states. That's something else to keep in consideration.

**Q. Okay. But there was in any event a manual review process and discretion exercised and a choice that CMS made not to use that price correct?**

A. Correct.

Page 430

MR. BUEKER: Okay. I have I think run out of tape. So perhaps we could set this to the side, have some lunch and we'll come back this afternoon.

THE WITNESS: Okay.

THE VIDEOGRAPHER: This is the end of tape 2. Off the record at 12:25.

(Whereupon, at 12:25 p.m. a lunch recess was taken.)

Page 431

AFTERNOON SESSION

(1:16 p.m.)

Whereupon,

SUE GASTON,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified as follows.

EXAMINATION RESUMED BY COUNSEL FOR THE WARRICK PHARMACEUTICALS, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION

THE VIDEOGRAPHER: This is the beginning of tape 3 in the deposition of Ms. Gaston. On the record at 1:16.

MR. BUEKER: Can I ask the court reporter to mark as three page exhibit that has the Bates number HHD 175-0850 through 0852 as New York Counties Defendants' Exhibit 4 for identification, please.

(Exhibit NY Counties 004 was marked for identification.)

Page 432

BY MR. BUEKER:

**Q. Ms. Gaston, do you have in front of you what's been marked as Exhibit 4 for identification?**

A. Yes.

**Q. And would you agree with me that Exhibit 4 is a three page exhibit consisting of three separate e-mails?**

A. Correct.

**Q. And are you familiar with e-mails like those reflected in Exhibit 4?**

A. It looks familiar.

**Q. What is it?**

A. From my recollection, there was a period of time where we were soliciting comments from states or I think some of the pharmacy associations on a FUL list that was placed out there without manual review. And we established a federal upper limit e-mail box where they could send in their comments to give us some feedback on this draft FUL list.

**Q. And that FUL list that you're referring**

Page 433

**to that was sent out without manual review, that took place in 2000, right?**

A. I'm not sure. It appears so because of the date on the e-mail.

**Q. But in or about 2000?**

A. Correct.

**Q. And you said you set up an e-mail mailbox to get complaints?**

A. Feedback.

**Q. Feedback? Sorry.**

**And did you get a lot of feedback? Did CMS get a lot of feedback?**

A. I can't remember.

**Q. Okay. Just looking at the e-mails that are contained in Exhibit 4, it looks like you got feedback here from Albertson's, Omni Care and it looks like Eckerd or Brooks Pharmacy. I take it one source of feedback was the pharmacy community, pharmacists?**

A. Correct.

**Q. And you also said associations and --**

A. Yeah. State Medicaid agencies.

Page 434

**Q. Okay. Do you recall the nature of the feedback at all?**

A. Basically they were giving us feedback whether they felt that the FUL prices or the drugs were correctly on the FUL list or needed adjust or shouldn't -- or weren't available. I think it was feedback about the whole list that was put out at that time.

**Q. Okay. Do you recall what if anything CMS did in response to receiving feedback?**

A. I can't remember. I don't know if we just reverted back to the list that was still in place. I don't have a recollection of that.

**Q. Do you know whether CMS withdrew the list that had been sent out without manual review?**

A. I would assume that that's what occurred.

**Q. Other than in this time period, the 2000 to 2001 time period, were there other ways in which CMS received feedback on its FULs?**

A. Yes.

Page 435

**Q. How?**

A. We would get phone calls, e-mails, sometimes letters or faxes.

**Q. And who would receive that feedback?**

A. I would. Or Larry Reed.

**Q. And what kind of feedback would CMS typically receive?**

A. It would be comments maybe from the pharmacy saying that the product is not available or that the pricing appears to be either too low or too high. Mostly availability issues.

**Q. And when you got feedback from some source that a drug wasn't available, what if any steps would CMS take?**

A. What we would do is call the manufacturer or wholesaler and verify if that was a fact. Sometimes it might be just one state that's having an availability problem. But we have to make sure that it's an availability problem that would affect the FUL list for all the states.

**Q. And what if you learn that, for**

Page 456

**Q. And Ms. Bergin's note indicates that in this instance CMS did not set a FUL because the FUL price would have been equal to Major's AWP; is that correct?**
A. Correct.
**Q. Are you familiar with making that kind of a decision not to set a FUL when it was equal to an AWP?**
A. Yes.
**Q. Why would CMS decline to set a FUL when the FUL was equal to an AWP?**
A. Because states have other methodologies they can use for reimbursement. And their regular reimbursement methodology would be a percentage off of AWP. That would be a reasonable reimbursement rate for other drugs. So the purpose of setting the FUL price is to try to set reasonable reimbursement. And that would kind of counter what the states were doing with their other reimbursement methodology.
**Q. I see. So just like we talked about there morning, one of the objectives of the FUL program is cost savings?**

Page 457

A. Correct.
**Q. And so if you set a FUL that was equal to an AWP it wouldn't really result in any cost savings to the state?**
A. Correct.
**Q. And so in this case, if I understand what's going on here with cefadroxil in 2001, basing a FUL on the lowest published price seemed to result in a FUL that was too low, right?**
A. It appeared that way because of the compendia information that we have.
**Q. And setting a FUL -- not using that lowest published price but moving up to the next seemed to result in a FUL that was too high?**
A. Correct.
**Q. And so CMS declined to set a FUL given the published prices that were out there?**
A. Correct.
**Q. Let me just digress here for a second. What role if any did AWP play in setting FULs?**
A. Generally, it did not.

Page 458

**Q. Can you think of any instance in which CMS based a FUL on the published AWP price?**
A. I can't think of a situation where they did.
**Q. In other words, other than being used to check whether there was going to be cost savings that resulted, FUL was basically -- or -- I'm sorry -- AWP was basically irrelevant for the FUL calculation?**
MS. MARTINEZ: Objection, form.
MR. WINGET-HERNANDEZ: Objection, form.
A. It was used in the methodology just for consideration, but I don't know of any times when it would have been used to set a FUL price.
**Q. So in terms of a basis of calculation, the price on which the FUL was based, AWP was irrelevant?**
**MR. WINGET-HERNANDEZ: Objection, form.**
MS. MARTINEZ: Objection, form.
A. We wouldn't have used AWP.
**Q. Why would CMS not have used AWP?**
A. Because we know that states will be reimbursing for drugs at a percentage off of AWP. That's one of the methodologies they could use. And we will let states reimburse according to that methodology. Setting a FUL using the AWP wouldn't achieve the cost savings where if they did it with their own methodology, a percentage off of AWP, they would be achieving savings.

Page 459

**Q. You can set that aside. But don't worry, I have others that look like it.**
A. I'm sure.
**Q. Can I ask the court reporter to mark as Exhibit 8 -- New York Counties Defendants' Exhibit 8 for identification a one-page document labeled HHD 175-0276.**
**(Exhibit NY Counties 008 was marked for identification.)**
BY MR. BUEKER:
**Q. Ms. Gaston, you have in front of you Exhibit 8?**
A. Yes.
**Q. And Exhibit 8, again, looks to be to you a printout from the FULs system for 500-**

**right?**
A. Correct.
**Q. Was that CMS's practice, to use a subset of the states?**
A. It wasn't a practice. It was just using our judgment.
**Q. I see. So there wasn't a commonly established -- there wasn't a practice or a policy on how to determine the most commonly available package size; that was something that was left to your discretion?**
A. Correct.
**Q. Okay. And just so I get the bounds of the discretion, the overall objective obviously was to find the most commonly available package size and utilization tended to be a pretty good measure of that, right?**
A. Correct.
**Q. So whether it was looking at some subset of the states or all the states, utilization was generally what CMS looked at?**
A. In these types of situations, yes.

**Q. Is that written down anywhere to your knowledge?**
A. Not that I'm aware of.
**Q. So it's not in the regulation or a manual or something that, you know, outsiders would know?**
A. No. We always reference the most commonly used package size.
**Q. Right. But how that most commonly used package size is determined is something that's less to CMS's discretion?**
A. Correct.
**Q. And there aren't to your knowledge written guidelines about how to exercise that discretion?**
A. Correct.
MR. WINGET-HERNANDEZ: John, I know it's quick. It's right after lunch. So as soon as you can find a chance for a break, that would be great.
MR. BUEKER: Okay. Give me a couple more minutes to do this and we'll take a break.

MR. WINGET-HERNANDEZ: Sure.
BY MR. BUEKER:
**Q. Would it surprise you to learn that the package sizing in which CMS actually wound up basing the FUL in this time period was actually the 100? I'm sorry. Was actually the 50.**
MS. MARTINEZ: Objection, form.
A. I can't explain that.
**Q. Okay?**
MR. BUEKER: We'll take a break here.
THE VIDEOGRAPHER: Off the record at 1:57.
(Recess.)
THE VIDEOGRAPHER: On the record at 2:11.
(Exhibit NY Counties 009 was marked for identification.)
BY MR. BUEKER:
**Q. Back on the record. Let me place in front of you, Ms. Gaston, what's been marked as New York Counties Defendants' Exhibit 9 for identification. And before the break we were**

**talking about cefadroxil and I asked you whether or not it surprised you that in this time period actually the FUL was set on the 50 package size of cefadroxil?**
A. Mm-hmm.
**Q. I just wanted to show you that in fact the cefadroxil was based on 50. If you look with me at Exhibit 9 for a minute. Exhibit 9 for the record again is a transmittal from CMS?**
A. Yes.
**Q. Okay. And it's a transmittal in the June 7th 2004 time period, correct?**
A. Correct.
**Q. And if you just turn to page do you see the second entry down is for cefadroxil?**
A. Correct.
**Q. And the 50 over at the end of that line, the 500-milligram base, is the package size in which the FUL was set?**
A. Correct.
**Q. Right? And of course that doesn't line up with Exhibit 8 because Exhibit 8 is calculated**

Page 468

**on package sizes of 100?**

MS. MARTINEZ: Objection, form.

A. Actually, Exhibit 8 is calculated on the package size of 50, the FUL that's established here on the printout. But the work that was done on the bottom was evaluating the different package sizes.

**Q. We'll try it this way. Exhibit 3 -- do you have Exhibit 3?**

A. Mm-hmm.

**Q. If you turn to page 4 of Exhibit 3, the third entry up from the bottom, that's the same cefadroxil we've been talking about?**

A. Correct.

**Q. And that FUL is set on the basis of a package size of 50?**

A. Correct.

**Q. And so if you lay the two transmittals, the 2004 transmittal and the January 2002 transmittal, next to one another as kind of book-ends -- I'll represent to you I'm not aware of another transmittal between -- throughout this**

Page 469

**time period the cefadroxil FUL was set on the basis of the 50 package size, correct?**

A. Yes.

**Q. And turning back to Exhibit 8 it says -- Ms. Bergin wrote "100 looks like the most commonly used package size," right?**

A. Correct.

**Q. Presumably as a result of her analysis here?**

A. Correct.

**Q. You don't know why she reached that conclusion that the FUL was set on the 50 package size?**

A. Right. I don't know.

**Q. Okay. We're done with cefadroxil.**

MR. BUEKER: Let's mark as Exhibit 10 for identification a four-page document that's Bates labeled HHD 170-1050 through 1053.

(Exhibit NY Counties 010 was marked for identification.)

BY MR. BUEKER:

**Q. Do you have Exhibit 10 in front of you?**

Page 470

A. Yes, I do.

**Q. Do you recognize Exhibit 10?**

A. Yes.

**Q. What do you recognize it to be?**

A. It's a screen shot of the FUL application.

**Q. And it's for the drug albuterol 90-microgram inhaler, correct?**

A. Correct.

**Q. And is that your handwriting down at the bottom of page 1 of Exhibit 10?**

A. Yes.

**Q. And would you read into the record the first bit of handwriting that begins "temp"?**

A. "Temp delete due to raw material shortage."

**Q. So "MTL" is material?**

A. Correct.

**Q. And what does that mean?**

A. Apparently we must have done some research on this and we were told that there is a raw material shortage, so we would temporarily

Page 471

delete it from the FULs and look at it the next time we would reevaluate.

**Q. Okay. And then there are three lines that say -- that begin "delete" and a check mark over to the right down in the right-hand corner. That's also your handwriting?**

A. Yes.

**Q. And what does that mean? What do those lines tell you?**

A. I'm assuming that it was -- here again, it's been a while -- but that we delete this drug product from the FUL list, delete it from -- there's a memo that goes out with updates. So apparently this must have been on there. So delete it from the memo. And delete the NDC probably from the application at this point.

**Q. Okay. And those checkmarks indicate that that was done, right?**

A. That's my understanding, yes.

**Q. So the FUL was removed in or about October of 2000, correct? If it helps you, there's a date at the bottom of the screen print**

Page 472

**on each of the pages that says -- I guess you can confirm -- October 24th 2000.**

A. I know when this was done. But I don't know the date to see when it was removed from the FULs. But this was put into the application at that time.

**Q. So in or about October of 2000 you were removing the FUL -- CMS removed the FUL for the albuterol inhaler?**

A. Correct.

**Q. And the reason -- why did CMS remove the FUL from the inhaler at this point?**

A. Because it looks like from the note here that we found out that it was temporarily deleted because we found out there was a raw material shortage.

**Q. And why would that cause CMS to want to remove the FUL for the albuterol inhaler?**

A. Because if the product is not available then it wouldn't make sense to put a FUL price on it.

**Q. And in removing the FUL CMS understood**

Page 473

**that, I assume, that states would start reimbursing for the inhaler at a higher price?**

MS. MARTINEZ: Objection, form.

A. Well, they would reimburse it at their state methodology. They also can MAC it if they want to, put it subject to their state MAC. So whatever that price is, they determine that.

**Q. But because of an access issue CMS thought it was appropriate to remove the FUL at this time?**

A. Correct.

MR. BUEKER: Can I ask the court reporter to mark a seven page document that's Bates labeled at the bottom HHD 175-1065 through 1071 as Exhibit 11, New York Counties Defendants' Exhibit 11 for identification, please?

(Exhibit NY Counties 011 was marked for identification.)

BY MR. BUEKER:

**Q. Let me know when you're ready.**

A. (Reading.) Okay. I'm ready.

**Q. Okay. You would agree with me,**

Page 474

**wouldn't you, that the first page of Exhibit 11 is a printout from the FULs system like we've been looking at before -- like we've been looking at in several of the other exhibits that have been marked today?**

A. Correct.

**Q. And it's a printout from the FULs system for the 90-microgram albuterol inhaler and it's dated 8/17/2001?**

A. Correct.

**Q. And this again is the printout from the FULs system that would have been the basis for the manual review that would have followed with regard to setting a FUL for the 90-microgram inhaler, correct?**

A. Correct.

**Q. And is that your handwriting down at the bottom of Exhibit 11?**

A. On the right-hand side.

**Q. Just so we're clear about what you mean by the right-hand side, would you read into the record that which you wrote?**

Page 475

A. "Work up new FUL based on" -- it looks like "$7."

**Q. Okay. And whose handwriting is on the left-hand side of the page, if you know?**

A. Cindy Bergin's.

**Q. Okay. And there's -- down at the bottom there's -- it looks to me written "FDB prices? OIB prices?" Do you see that?**

A. I see that.

**Q. And is that your handwriting?**

A. That's my handwriting.

**Q. And there's an X crossing that handwriting out, correct?**

A. Correct.

**Q. Do you know what that means, "FDB prices? OIB prices?"?**

A. No, I don't.

**Q. Do you know why you wrote that?**

A. No. Unless we were just trying to check current prices.

**Q. Is that something that CMS did in setting FULs, check current prices?**

Page 496

**12 reflects the manual evaluation that was being done in the October 2001 time period as to whether or not to establish or reestablish a FUL for -- or revise the FUL for the 90-microgram albuterol inhaler?**

A. Correct.

**Q. And Exhibit 3 is the CMS transmittal that comes out November 20th 2001, so shortly after the analysis we see in Exhibit 12?**

A. Correct.

**Q. And if you flip to the second page, page 2, of Exhibit 3 you'll see that there's no FUL established for the 90-microgram albuterol inhaler? There's other albuterol FULs but not for the inhaler, correct?**

A. Correct.

**Q. Which is consistent with the note you wrote in Exhibit 12, remove FUL greater than most AWPs, correct?**

A. Correct.

**Q. So in other words, CMS didn't establish or reestablish a FUL -- or revise the FUL for the**

Page 497

**90-microgram inhaler in this 2001 time period; it actually removed the FUL?**

A. Correct.

**Q. And it did so despite the fact there are shown on this sheet a series of manufacturers' reported published prices, right?**

A. Correct.

**Q. There's a published price for Warrick, there's a published price for Schering, Martec, Zenith and Glaxo-Wellcome, among others?**

A. I think Schering is discontinued.

**Q. Oh, I'm sorry. You're right. But the note at the bottom -- Ms. Bergin's note at the bottom would indicate that there were at least reported published prices for Warrick, Martec and Zenith?**

A. Correct.

**Q. In other words, there were three manufacturers who were reported published prices for the 90-microgram inhaler?**

A. Correct.

**Q. And so in other words the conditions**

Page 498

**necessary for CMS to establish a FUL were met at this time?**

MS. MARTINEZ: Objection, form.

A. The conditions were met, but the pricing condition wasn't met.

**Q. What pricing condition was that?**

A. It was that if you would take the prices that are remaining and multiply by 150 percent you're going to have a price that's, it looks like, over what the AWPs are. So you're sort of defeating the purpose of the FUL program.

**Q. Which was, again, soft savings?**

A. Soft savings to the states. The states can set their own reimbursement level at that point.

**Q. So as we've kind of seen throughout, CMS is trying to establish a FUL that's not too low and not too high to achieve a cost savings, but also not set it too low to create an access issue; that's the balance CMS is trying to strike?**

A. Correct.

Page 499

**Q. And you did that -- the balance was struck, sometimes the computer program worked as it was supposed to and that balance was struck by the computer program, but other times it was the result of manual intervention?**

A. Correct.

**Q. And the manual intervention resulted in CMS making a choice in its discretion, correct?**

A. Correct.

MR. BUEKER: Anyone keeping track of how many drugs we've covered?

MS. MARTINEZ: No.

MR. BUEKER: Well, we're going to do another one. Can I ask the court reporter to mark as Exhibit 13 for identification a five page document that's Bates labeled HHD 175-1073 to 1077.

(Exhibit NY Counties 013 was marked for identification.)

BY MR. BUEKER:

**Q. Not a rush, but just let me know when you're ready.**

Page 532

**thought was appropriate to incorporate into the process of setting FULs you incorporated that information?**

A. For the updates, yes.

**Q. And then annually or some other period of time, at least you began annually at the beginning, there were these systematic updates of the entire list?**

A. Correct.

**Q. Separate and apart from that, what triggered the decision to actually add a new drug to the list?**

A. Most of the time it came out on a new run that we would do. So if we're looking at updating the whole entire FUL list, that's when the new drugs would show up.

**Q. Let me see if I understand. So the FUL system -- when you do the update of the entire list, the FUL system would go back to Orange Book and identify all the drugs that were eligible and also pull in the published prices. So at that time if a drug had gone generic and was now --**

Page 533

**met the minimum criteria, it would get pulled in and you would at least get one of the printouts we've been looking at like Exhibit 18?**

A. Correct.

**Q. And then you begin a manual review process at that point to decide whether or not to set a FUL?**

A. If it was necessary. It might have enough information we wouldn't have to do a manual review.

**Q. Okay. And there may also have been other instances in which you got the information and decided even though the drug met the minimum criteria in the regulation, for some other reason it wouldn't result in a cost savings or the FUL that would be derived on the basis of the published prices would be too low, you might decide not to set a FUL at that point even though it was eligible?**

A. Yes, if there was a reason not to set it.

**Q. Okay. It sounds like in terms of**

Page 534

**setting brand-new FULs at the very least they would have been picked up as a part of the complete or the entire update process?**

A. Correct.

**Q. And at that point, just like with any of the other FULs, CMS would have made a determination as to whether it made sense to add a FUL, whether it was reasonable to add a FUL at that time?**

A. Correct.

**Q. Can you remember instances in which a drug was new, came on -- a new drug was identified as a result of the annual update process and CMS decided not to set a FUL?**

A. I can't remember that.

**Q. You can't remember specific examples?**

A. Correct.

**Q. But don't doubt that it happened?**

A. It could have happened.

MS. MARTINEZ: Objection, form.

**Q. Is there anything else other than having the annual update or receiving information**

Page 535

**from industry sources that would have caused CMS in your time period, '91 and 2003, to update the FUL list?**

A. That's all I can think of.

MR. BUEKER: Okay. Well, that's all I have.

THE WITNESS: Okay.

MR. BUEKER: I appreciate your time.

THE WITNESS: You're welcome.

MR. BUEKER: I think some of the others here may still have questions.

THE VIDEOGRAPHER: This is the end of tape 4. Off the record at 355.

(Recess.)

THE VIDEOGRAPHER: This is the beginning of tape 5 in the deposition of Ms. Gaston. On the record at 3:57.

EXAMINATION BY COUNSEL FOR DEY, INC., DEY, L.P. AND MYLAN

BY MS. REID:

**Q. Good afternoon. My name again is Sarah**

have been cross noticed in the event that I'm not provided the opportunity to ask those questions. Thank you.

MS. MARTINEZ: On behalf of the United States, the United States just reserves its right in the United States versus Abbott, the United States versus Dey and the United States versus Roxane to ask questions of Ms. Gaston.

THE VIDEOGRAPHER: This deposition adjourns at 5:14 and consists of five tapes.

(Whereupon, at 5:14 p.m. the deposition was adjourned.)

________________________

SUE GASTON

Subscribed and sworn to and before me this ________ day of ____________________, 20____.

____________________________________

Notary Public

**Albuterol .083% Solution**
**As of June 1997**

| NDC | Manufacturer | Case Size | Obsolete Date | Min Price | | | | | Other Prices | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Price | Source | Compendia | Price Eff Date | Price Term Date | AWP | DP |
| 00603100540 | QUALITEST | 25 | 10/14/2004 | 0.1327 | WAC | B | 4/28/1997 | 10/14/2004 | 0.4056 | 0.1327 |
| 00536267704 | RUGBY | 25 | 8/1/1999 | 0.1437 | WAC | B | 12/1/1996 | 8/1/1999 | 0.4333 | 0.2973 |
| 49502069760 | DEY LABS. | 60 | 2/2/2004 | 0.1483 | WAC | R | 3/15/1997 | 12/31/1997 | 0.4306 | 0.3300 |
| 49502069761 | DEY LABS. | 60 | | 0.1483 | WAC | R | 3/15/1997 | 12/31/1997 | 0.4306 | 0.3300 |
| 49502069703 | DEY LABS. | 25 | 2/2/2004 | 0.1500 | WAC | R | 3/15/1997 | 12/31/1997 | 0.4307 | 0.3533 |
| 49502069733 | DEY LABS. | 30 | 1/1/2004 | 0.1500 | WAC | R | 3/15/1997 | 12/31/1997 | | |
| 49502069724 | DEY LABS. | 25 | | 0.1500 | WAC | R | 3/15/1997 | 12/31/1997 | 0.4307 | 0.3533 |
| 49502069729 | DEY LABS. | 30 | | 0.1500 | WAC | R | 3/15/1997 | 12/31/1997 | | |
| 00182801026 | GOLDLINE DRUG | 60 | 6/22/2000 | 0.1567 | WAC | B | 4/28/1997 | 6/22/2000 | 0.4033 | 0.0000 |
| 00781915093 | GENEVA PHARM. | 25 | 4/1/1999 | 0.1671 | WAC | B | 5/20/1997 | 4/1/1999 | 0.4333 | 0.1788 |
| 00677152272 | UNITED RESEARCH | 25 | 5/31/2001 | 0.1683 | WAC | B | 3/15/1996 | 5/31/2001 | 0.4267 | |
| 00472083123 | ALPHARMA US | 25 | | 0.1933 | WAC | B | 12/28/1995 | 3/22/1998 | 0.4033 | |
| 00182801024 | GOLDLINE DRUG | 25 | 6/22/2000 | 0.1999 | WAC | B | 4/28/1997 | 6/22/2000 | 0.4033 | 0.0000 |
| 00904773117 | MAJOR PHARM. | 25 | 2/15/2002 | 0.2079 | WAC | R | 11/1/1996 | 8/31/2000 | 0.4167 | |
| 00186149117 | ASTRA PHARM. | 60 | 1/4/1999 | 0.2784 | WAC | B | 1/2/1997 | 1/11/1998 | 0.3480 | |
| 00186149104 | ASTRA PHARM. | 25 | 1/4/1999 | 0.2815 | WAC | B | 1/2/1997 | 1/11/1998 | 0.3518 | |
| 00839786035 | H L MOORE | 60 | 1/1/1998 | 0.3011 | DP | B | 4/7/1994 | 1/1/1998 | 0.4065 | |
| 00839786018 | H L MOORE | 25 | 1/1/1998 | 0.3012 | DP | B | 4/7/1994 | 1/1/1998 | 0.4067 | |
| 00839781610 | H L MOORE | 25 | 1/1/1998 | 0.3012 | DP | B | 4/7/1994 | 1/1/1998 | 0.4067 | |
| 59930150008 | WARRICK PHARM | 25 | 7/30/2003 | 0.3300 | WAC | B | 9/3/1993 | 7/30/2003 | 0.4033 | 0.0000 |
| 59930150006 | WARRICK PHARM | 60 | 5/1/2002 | 0.3300 | WAC | B | 8/1/1993 | 5/1/2002 | 0.4033 | 0.0000 |
| 59930151702 | WARRICK PHARM | 60 | | 0.3300 | DP | R | 8/1/1993 | | 0.4033 | |
| 59930151701 | WARRICK PHARM | 24 | | 0.3438 | DP | R | 9/1/1993 | | 0.4201 | |
| 00173041900 | ALLEN & HANBURY | 25 | 8/18/2000 | 0.3961 | WAC | B | 1/21/1997 | 9/10/1997 | 0.4754 | |
| 00085020901 | SCHERING CORP. | 25 | 10/1/2002 | 0.4521 | WAC | B | 1/10/1997 | 9/2/1997 | 0.5427 | |
| 53014007560 | CELLTECH PHARM | 60 | | 0.4948 | WAC | B | 6/17/1996 | | 0.5938 | |
| 00085180601 | SCHERING CORP. | 24 | | 0.5427 | AWP | R | 1/10/1997 | 9/2/1997 | | |
| 53014007525 | CELLTECH PHARM | 25 | | 0.5500 | WAC | B | 6/17/1996 | | 0.6597 | |

**Albuterol .083% Solution**
**As of June 1997**

| NDC | Manufacturer | Case Size | Obsolete Date | FLB AWP | FLB DP | FLB WAC | FLB Min Price | FLB Price Effective Date | FLB Price Term Date | FLB Min Price * 1.5 | FLB Min Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 00603100540 | QUALITEST | 24 | 10/14/2004 | 0.4056 | 0.1327 | 0.1327 | 0.1327 | 4/28/1997 | 10/14/2004 | 0.1990 | WAC |
| 00536287704 | RUGBY | 25 | 8/1/1999 | 0.4333 | 0.2973 | 0.1437 | 0.1437 | 12/1/1996 | 8/1/1999 | 0.2156 | WAC |
| 00182801028 | GOLDLINE DRUG | 60 | 8/22/2000 | 0.4033 | 0.0000 | 0.1567 | 0.1567 | 4/28/1997 | 8/22/2000 | 0.2350 | WAC |
| 00781915093 | GENEVA PHARM. | 25 | 4/1/1999 | 0.4333 | 0.1788 | 0.1671 | 0.1671 | 6/20/1997 | 4/1/1999 | 0.2506 | WAC |
| 00677162272 | UNITED RESEARCH | 25 | 5/31/2001 | 0.4267 | | 0.1683 | 0.1683 | 3/15/1996 | 5/31/2001 | 0.2524 | WAC |
| 00472083123 | ALPHARMA US | 25 | | 0.4033 | | 0.1933 | 0.1933 | 12/28/1995 | 3/22/1998 | 0.2900 | WAC |
| 00182801024 | GOLDLINE DRUG | 25 | 8/22/2000 | 0.4033 | 0.0000 | 0.1999 | 0.1999 | 4/28/1997 | 8/22/2000 | 0.2998 | WAC |
| 00186148117 | ASTRA PHARM. | 60 | 1/4/1999 | 0.3480 | | 0.2784 | 0.2784 | 1/2/1997 | 1/11/1998 | 0.4176 | WAC |
| 00186148104 | ASTRA PHARM. | 25 | 1/4/1999 | 0.3616 | | 0.2815 | 0.2815 | 1/2/1997 | 1/11/1998 | 0.4222 | WAC |
| 00904773117 | MAJOR PHARM. | 25 | 2/15/2002 | 0.4067 | | 0.2953 | 0.2953 | 10/10/1994 | 8/31/2000 | 0.4430 | WAC |
| 00839780035 | H L MOORE | 60 | 1/1/1998 | 0.4066 | 0.3011 | | 0.3011 | 4/7/1994 | 1/1/1998 | 0.4517 | DP |
| 00839784018 | H L MOORE | 25 | 1/1/1998 | 0.4067 | 0.3012 | | 0.3012 | 4/7/1994 | 1/1/1998 | 0.4518 | DP |
| 00839781810 | H L MOORE | 25 | 1/1/1998 | 0.4067 | 0.3012 | | 0.3012 | 4/7/1994 | 1/1/1998 | 0.4518 | DP |
| 49502069700 | DEY LABS. | 60 | 2/2/2004 | 0.4033 | 0.0000 | 0.3300 | 0.3300 | 5/30/1996 | 12/31/1997 | 0.4950 | WAC |
| 49502069703 | DEY LABS. | 25 | 2/2/2004 | 0.4033 | 0.0000 | 0.3300 | 0.3300 | 5/30/1996 | 12/31/1997 | 0.4950 | WAC |
| 49502069733 | DEY LABS | 30 | 1/1/2004 | 0.4033 | | 0.3300 | 0.3300 | 5/30/1996 | 12/31/1997 | 0.4950 | WAC |
| 59930150008 | WARRICK PHARM. | 25 | 7/30/2003 | 0.4033 | 0.0000 | 0.3300 | 0.3300 | 9/3/1993 | 7/30/2003 | 0.4950 | WAC |
| 59930150006 | WARRICK PHARM. | 60 | 5/1/2002 | 0.4033 | 0.0000 | 0.3300 | 0.3300 | 6/1/1993 | 5/1/2002 | 0.4950 | WAC |
| 00173041900 | ALLEN & HANBURY | 25 | 8/18/2000 | 0.4754 | | 0.3961 | 0.3961 | 1/21/1997 | 9/10/1997 | 0.5942 | WAC |
| 00085020001 | SCHERING CORP. | 25 | 10/1/2003 | 0.5427 | | 0.4521 | 0.4521 | 1/16/1997 | 9/2/1997 | 0.6782 | WAC |
| 53014007590 | CELLTECH PHARM | 60 | | 0.5938 | | 0.4948 | 0.4948 | 6/17/1996 | | 0.7422 | WAC |
| 53014007525 | CELLTECH PHARM | 25 | | 0.6597 | | 0.5500 | 0.5500 | 6/17/1996 | | 0.8250 | WAC |
| 49502069761 | DEY LABS. | 60 | | | | | | | | | |
| 49502069724 | DEY LABS. | 25 | | | | | | | | | |
| 49502069729 | DEY LABS. | 30 | | | | | | | | | |
| 59930151702 | WARRICK PHARM | 60 | | | | | | | | | |
| 59930151701 | WARRICK PHARM | 24 | | | | | | | | | |
| 00085180601 | SCHERING CORP. | 24 | | | | | | | | | |

| NDC | Redbook AWP | Redbook DP | Redbook WAC | Redbook Min Price | Redbook Price Effective Date | Redbook Price Term Date | Redbook Min Price * 1.5 | Redbook Min Source |
|---|---|---|---|---|---|---|---|---|
| 00603100540 | 0.4056 | | | 0.4056 | 10/29/1993 | | 0.6084 | AWP |
| 00536287704 | 0.4333 | | 0.1437 | 0.1437 | 11/1/1993 | | 0.2156 | WAC |
| 00182801028 | 0.4033 | | | 0.4033 | 1/13/1997 | | 0.6050 | AWP |
| 00781915093 | 0.4333 | | 0.1671 | 0.1671 | 6/20/1997 | | 0.2506 | WAC |
| 00677162272 | 0.4267 | | 0.1683 | 0.1683 | 3/15/1996 | 6/30/1997 | 0.2524 | WAC |
| 00472083123 | 0.4033 | | | 0.4033 | 12/28/1995 | 7/30/1997 | 0.6050 | AWP |
| 00182801024 | 0.4033 | | 0.1999 | 0.1999 | 10/1/1994 | | 0.2998 | WAC |
| 00186148117 | 0.4376 | | 0.2784 | 0.2784 | 1/2/1997 | | 0.4176 | WAC |
| 00186148104 | 0.4307 | | 0.2815 | 0.2815 | 1/2/1997 | | 0.4222 | WAC |
| 00904773117 | 0.4197 | | 0.2079 | 0.2079 | 11/1/1996 | 8/31/2000 | 0.3118 | WAC |
| 00839780035 | 0.4066 | 0.3011 | | 0.3011 | 4/7/1994 | | 0.4517 | DP |
| 00839784018 | 0.4067 | 0.3012 | | 0.3012 | 4/7/1994 | | 0.4518 | DP |
| 00839781810 | 0.4067 | 0.3012 | | 0.3012 | 4/7/1994 | | 0.4518 | DP |
| 49502069700 | 0.4306 | 0.3300 | 0.1483 | 0.1483 | 3/16/1997 | 12/31/1997 | 0.2225 | WAC |
| 49502069703 | 0.4307 | 0.3533 | 0.1500 | 0.1500 | 3/16/1997 | 12/31/1997 | 0.2250 | WAC |
| 49502069733 | | | 0.1500 | 0.1500 | 3/15/1997 | 12/31/1997 | 0.2250 | WAC |
| 59930150008 | | | | | | | | |
| 59930150006 | | | | | | | | |
| 00173041900 | 0.4763 | | 0.3961 | 0.3961 | 1/22/1997 | 9/10/1997 | 0.5942 | WAC |
| 00085020001 | | | | | | | | |
| 53014007590 | 0.5938 | | 0.4948 | 0.4948 | 6/17/1996 | | 0.7422 | WAC |
| 53014007525 | 0.6597 | | 0.5500 | 0.5500 | 6/17/1996 | | 0.8250 | WAC |
| 49502069761 | 0.4306 | 0.3300 | 0.1483 | 0.1483 | 3/16/1997 | 12/31/1997 | 0.2225 | WAC |
| 49502069724 | 0.4307 | 0.3533 | 0.1500 | 0.1500 | 3/16/1997 | 12/31/1997 | 0.2250 | WAC |
| 49502069729 | | | 0.1500 | 0.1500 | 3/15/1997 | 12/31/1997 | 0.2250 | WAC |
| 59930151702 | 0.4033 | 0.3300 | | 0.3300 | 8/1/1993 | | 0.4950 | DP |
| 59930151701 | 0.4201 | 0.3438 | | 0.3438 | 9/1/1993 | | 0.5157 | DP |
| 00085180601 | 0.5427 | | | 0.5427 | 1/10/1997 | 9/2/1997 | 0.8141 | AWP |

| NDC | Medispan AWP | Medispan DP | Medispan WAC | Medispan Min Price | Medispan Price Effective Date | Medispan Price Term Date | Medispan Min Price * 1.5 | Medispan Min Source |
|---|---|---|---|---|---|---|---|---|
| 00603100540 | | | 0.3049 | 0.3049 | 10/29/1993 | 9/2/1999 | 0.4574 | WAC |
| 00536287704 | | | | | | | | |
| 00182801028 | | | | | | | | |
| 00781915093 | | | | | | | | |
| 00677162272 | | | 0.1683 | 0.1683 | 3/15/1996 | 6/30/1997 | 0.2524 | WAC |
| 00472083123 | 0.4033 | | 0.1933 | 0.1933 | 7/1/1996 | 7/30/1997 | 0.2900 | WAC |
| 00182801024 | | | | | | | | |
| 00186148117 | | | 0.2784 | 0.2784 | 1/2/1997 | 1/11/1998 | 0.4176 | WAC |
| 00186148104 | | | 0.2815 | 0.2815 | 1/2/1997 | 1/11/1998 | 0.4222 | WAC |
| 00904773117 | 1.6667 | | | 1.6667 | 1/29/1998 | 4/19/1999 | 2.5000 | AWP |
| 00839780035 | | | | | | | | |
| 00839784018 | 0.4308 | | | 0.4308 | 4/8/1994 | 8/31/1997 | 0.6462 | AWP |
| 00839781810 | | | | | | | | |
| 49502069700 | | | 0.1917 | 0.1917 | 6/1/1996 | 7/31/1997 | 0.2876 | WAC |
| 49502069703 | | | 0.1933 | 0.1933 | 6/1/1996 | 7/31/1997 | 0.2900 | WAC |
| 49502069733 | | | 0.1933 | 0.1933 | 6/1/1996 | 7/31/1997 | 0.2900 | WAC |
| 59930150008 | | | | | | | | |
| 59930150006 | | | | | | | | |
| 00173041900 | 0.4763 | | 0.3961 | 0.3961 | 1/22/1997 | 8/11/1997 | 0.5942 | WAC |
| 00085020001 | 0.5427 | | 0.4521 | 0.4521 | 1/10/1997 | 9/2/1997 | 0.6782 | WAC |
| 53014007590 | | | | | | | | |
| 53014007525 | | | | | | | | |
| 49502069761 | | | | | | | | |
| 49502069724 | | | | | | | | |
| 49502069729 | | | | | | | | |
| 59930151702 | | | | | | | | |
| 59930151701 | | | | | | | | |
| 00085180601 | | | | | | | | |