# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3   -------------------------------X

 4   In Re:  PHARMACEUTICAL         )

 5   INDUSTRY AVERAGE WHOLESALE     )  MDL No. 1456

 6   PRICE LITIGATION               )  Civil Action No.

 7   -------------------------------X  01-12257-PBS

 8   THIS DOCUMENT RELATES TO:      )

 9   United States of America ex    )  CONFIDENTIAL

10   rel. Ven-A-Care of the         )

11   Florida Keys, Inc., et al.     )  DEPOSITION OF

12   v. Dey, Inc., et al., Civil    )  RUSSELL JOHNSTON

13   Action No. 05-11084-PBS; and   )

14   United States of America ex    )  December 10, 2008

15   rel. Ven-A-Care of the         )  9:39 a.m.

16   Florida Keys, Inc., et al.,    )

17   v. Boehringer Ingelheim Corp.,)  New York, NY

18   et al., Civil Action No.       )

19   07-10248-PBS                   )

20   -------------------------------X

21

22
```

Page 26

1  A. I think I would state the same, I have
2  no visibility nor experience with any
3  organization other than Dey, L.P. in that regard.
4  Q. Okay. As an employee of Dey do you
5  have any belief or understanding as to whether or
6  not the United States government has approved of
7  Dey's practice of publishing average wholesale
8  prices or causing the publication of average
9  wholesale prices that are higher than the actual
10 prices at which Dey's drugs are sold to the
11 retail classes of trade?
12     MR. DOYLE: Objection as to form.
13 A. And that's a long question.
14     I don't have any visibility as to what
15 the federal government's policy or practice is
16 with respect to AWP.
17 Q. All right. So you don't have any
18 opinion on that one way or the other?
19     MR. DOYLE: Objection as to form.
20 A. No.
21 Q. Have you read any government reports
22 about issues relating to average wholesale

Page 27

1  prices?
2  A. Not that I can recall specifically.
3  Q. Now, the question that I asked you a
4  moment or two ago related to the federal
5  government. I'll ask you the same question
6  relating to state Medicaid agencies, but just for
7  the record I'll restate the question so hopefully
8  it will be clear.
9      Do you have any belief or understanding
10 regarding whether state Medicaid agencies
11 approved of Dey's practice of causing a
12 publication of average wholesale prices that are
13 higher than prices actually paid in the
14 marketplace by retail -- by the retail class of
15 trade for Dey's drugs?
16     MR. DOYLE: Objection as to form.
17 A. In providing the pricing to the
18 industry, as my department did, I can't think of
19 any circumstance where we had questions or any
20 concern expressed to us from the recipients of
21 the pricing communication. So I would say, no, I
22 have no knowledge of that issue.

Page 28

1  Q. Okay. To your knowledge did Dey ever
2  contact anybody in the federal government to ask
3  if it was okay to publish average wholesale
4  prices that were higher than prices that were
5  normally paid for Dey's drugs?
6      MR. DOYLE: Objection as to form.
7  A. And not to my knowledge, I certainly
8  didn't.
9  Q. Do you know whether or not anybody at
10 Dey ever contacted any state Medicaid agency to
11 find out whether it was okay for Dey to report
12 and cause to be published AWPs that were higher
13 than actual market prices?
14     MR. DOYLE: Objection as to form.
15 A. Not to my knowledge.
16 Q. And the same question with regard to
17 any Medicare carriers, do you know whether
18 anybody at Dey contacted any Medicare carrier to
19 ask whether it was okay to report and cause to be
20 published average wholesale prices that were
21 higher than actual market prices?
22 A. No. Again, not to --

Page 29

1      MR. DOYLE: Objection to form.
2  A. -- my knowledge.
3  Q. And excuse me if I sound a little
4  repetitive. I'll ask some similar questions
5  regarding WAC prices.
6      WAC prices, am I correct in
7  understanding that Dey's wholesale acquisition
8  cost, the prices that Dey reports, reflect the
9  amount shown generally on the invoices that Dey
10 submits to wholesalers for its drugs?
11 A. It is the invoice price to wholesalers
12 for our products.
13 Q. Okay. Typically when Dey sells to a
14 wholesaler is there a contract price which is
15 lower than the WAC price?
16 A. When we sell to a wholesaler?
17 Q. Yes.
18     MR. DOYLE: Objection as to form.
19 A. No.
20 Q. No?
21 A. (Shaking head.)
22 Q. Does Dey offer -- provide certain

Page 30

1  discounts to wholesalers?
2      A.  Only in certain instances.
3      Q.  The -- well, isn't there always a 2
4  percent prompt pay discount?
5      A.  Yes.  If, in fact, the invoice is paid
6  promptly, yes.
7      Q.  Okay.  Is it Dey's experience that
8  wholesalers do pay their bills within the period
9  governed by the prompt pay discount?
10         MR. DOYLE:  Objection as to form.
11     A.  And I have no experience or knowledge
12 on that, that would be something for the accounts
13 receivable department.
14     Q.  Okay.
15     A.  I have no idea.
16     Q.  Does Dey offer -- sometimes offer
17 rebates to wholesalers?
18     A.  Not to my knowledge, no.
19     Q.  Is it your testimony that the net
20 amount that the wholesaler pays to Dey is always
21 the WAC price?
22         MR. DOYLE:  Objection as to form.

Page 31

1      A.  No.  And let me speak about rebates.
2          No, let me -- besides the prompt pay
3  and certain stocking discounts that may be
4  provided to the wholesaler in the event of a new
5  warehouse or stocking a new product, if the
6  wholesaler has its own GPO function with respect
7  to that contract there could be some rebate
8  components.
9      Q.  Is the WAC price that Dey reports for
10 its drugs higher than the average of the actual
11 net price paid by wholesalers for its drugs after
12 discounts?
13         MR. DOYLE:  Objection as to form.
14     A.  And again, I -- wholesale acquisition
15 cost is the invoice price charged every
16 wholesaler for every Dey product.
17     Q.  I understand that.
18     A.  And we've talked prompt pay as a
19 possibility if, in fact, the invoice is paid on
20 time, and so with respect to selling it to the
21 wholesaler that's normally the landscape.
22     Q.  Is the --

Page 32

1  Dey has contracts with wholesalers,
2  correct?
3      A.  We have a few contracts with
4  wholesalers, yes.
5      Q.  When you say a few are you saying that
6  Dey sells to a lot of wholesalers without
7  contracts?
8      A.  The sale to a wholesaler -- and I can
9  certainly mention the biggest -- the largest
10 three, AmerisourceBergen, Cardinal, and McKesson,
11 in selling it to them there's no contract
12 involved in that.  It's an invoice by invoice,
13 purchase order by purchase order arrangement.
14 Purchase orders come in at the products priced at
15 WAC, invoicing is at WAC.
16     Q.  Are these sales -- let me back up.  I'm
17 going to come back to this topic a little later.
18         Do you expect to be changing jobs or
19 leaving Dey in the reasonably near future?
20     A.  Most likely, yes.
21     Q.  Do you have an end date in mind for
22 your employment for Dey?

Page 33

1      A.  I don't, at this point it's at the
2  company's discretion.
3      Q.  Do I understand correctly that the
4  company is planning to close and sell its
5  facilities in Napa, California?
6      A.  That's my understanding, yes.
7      Q.  And that's been publicly known now for
8  some time?
9      A.  I believe the announcement came in
10 September, yes.
11     Q.  And am I correct in thinking that no
12 date has been set for your departure, anyway?
13     A.  Not officially yet, no.
14     Q.  Have many employees at Dey been laid
15 off in the last couple of months in connection
16 with this announcement?
17     A.  Not yet, no.  I think it's still early
18 on in the process.
19     Q.  Do you know who is going to perform
20 your functions after you stop working at Dey?
21     A.  No, I don't.
22     Q.  Have you received any notifications

Page 66

1  federal regulations at 42 CFR Part 447.
2         This relates -- I'll tell you, sir,
3  that this relates to -- these are federal
4  regulations relating to the Medicaid program.
5         And I draw your attention to the first
6  page in the upper right-hand corner, the section
7  entitled 447.301 entitled "Definitions" and the
8  definition of "Estimated acquisition cost." And
9  it says, "Estimated acquisition cost means the
10 agency's best estimate of the price generally and
11 currently paid by providers for a drug marketed
12 or sold by a particular manufacturer or labeler
13 in the package size of the drug most frequently
14 purchased by providers."
15        Sir, have you ever read this definition
16 before?
17    A.   Most recently in relation to this
18 deposition I read the -- I don't recall what the
19 statement was, but it summarized what the issue
20 at hand was, and that this paragraph was quoted
21 in that.
22    Q.   Okay. So this was in preparation for

Page 67

1  your deposition today?
2     A.  Yes.
3     Q.  Tell me how --
4         What did you do to prepare for this
5  deposition?
6     A.  I met with counsel over the last two
7  days, as well as one day about several weeks ago.
8     Q.  And did you review various documents?
9     A.  We did.
10    Q.  So do I understand you to say that this
11 definition was quoted in one of the documents you
12 saw?
13    A.  It was, and I can't recall the name of
14 the document, but it was, I gather, the
15 government's statement of the issue being dealt
16 with.
17    Q.  Okay. Before your preparation for this
18 deposition had you ever read that definition
19 before?
20    A.  I probably have. I've seen similar
21 summaries. I wasn't even a part of Dey until
22 five years after this one was published, so I

Page 68

1  probably would have seen a different iteration of
2  the same kinds of information. I can't recall
3  specifically when or when I would have seen it.
4     Q.  Okay. In your capacity as the manager
5  of sales and marketing services and now manager
6  of contracts, senior manager of contracts, have
7  you had an understanding that state Medicaid
8  agencies reimburse providers for certain Dey
9  drugs that are dispensed to Medicaid
10 beneficiaries?
11    A.  Yes, I understand that.
12    Q.  And do you understand that Medicaid
13 agencies reimburse in general on a methodology
14 that often uses as a component average wholesale
15 price data that is published by First DataBank?
16        MR. DOYLE: Objection as to form.
17        He can answer that, but that's a false
18 statement based on the claims data, okay?
19        And you can't be giving witnesses
20 things that are false. The claims data doesn't
21 reflect what you just said.
22        MR. HENDERSON: Let me rephrase the

Page 69

1  question.
2     Q.  Do you have any understanding of the
3  methodologies that state agencies used to
4  reimburse for drugs?
5     A.  I think my knowledge would be very
6  general and very limited in that I don't get
7  involved in the reimbursement. There are 50
8  states, their iterations are all a little bit
9  different, to my understanding, or can be. And
10 ultimately I couldn't testify one way or another
11 as to what -- how a particular state reimburses
12 within their Medicaid program.
13    Q.  Do you know -- have any understanding
14 as to whether or not states in general have used
15 average wholesale price information from First
16 DataBank for purposes of determining the
17 reimbursement amounts they pay for certain Dey
18 drugs?
19        MR. DOYLE: Objection as to form.
20    A.  I'm aware that AWP is one component
21 that states use. How they use it and what the
22 formulas are and what the end result is, that I'm

Page 102

1  Before I ask you to explain that, does
2  Dey have a distinction between direct contracts
3  and indirect contracts?
4  A.  A difference in what way?
5  Q.  Does it refer to some contracts as
6  indirect contracts?
7  A.  It is possible a customer could have a
8  contract price for a Dey product and have both a
9  direct and an indirect contract.  In some
10 instances we may, in fact, indicate that on our
11 name of the contract.
12 Q.  Okay.  And is a direct contract a
13 contract between the customer and Dey whereby the
14 customer will purchase Dey products and the --
15 and Dey will ship a product directly to that
16 customer?
17     MR. DOYLE:  Objection as to form.
18 A.  It -- essentially, yes.
19 Q.  Wholesalers, for example, if you have a
20 contract with a wholesaler that's a direct
21 contract, normally speaking?
22     MR. DOYLE:  Objection as to form.

Page 103

1  A.  And again, in general wholesaler, the
2  class of trade of a wholesaler, in buying product
3  from us their purchasing product from us is not
4  covered under an agreement.
5  Q.  Okay.  What about Anda Generics, for
6  example, we looked at Exhibit 7, which is a
7  contract --
8  A.  Right.
9  Q.  -- between Dey and Anda Generics
10 covering the sale of Dey products, would this be
11 considered a direct contract?
12 A.  This would be considered a direct -- I
13 mean, they're purchasing it from us alone.
14 Q.  Okay.  Now, in the case of an indirect
15 contract, is that a contract whereby Dey agrees
16 to sell -- I'm -- agrees that its product will be
17 -- let me back up.  If I can explain it in my
18 words and then you can tell me how wrong I am.
19     Is an indirect contract a contract in
20 which Dey agrees that the customer will purchase
21 Dey's product for a given amount, a given price,
22 and the customer instead of receiving the product

Page 104

1  directly from Dey, the customer will actually
2  acquire the product through a wholesaler?
3  A.  Essentially, yes, through a full
4  service wholesaler, yes.
5  Q.  All right.  And in the case of indirect
6  contracts do the customers ever in your
7  experience pay for Dey products at or above Dey's
8  WAC price?
9      MR. DOYLE:  Objection as to form.
10 A.  I have no visibility to what the
11 purchaser is actually invoiced from a wholesaler,
12 I have no visibility to that.
13 Q.  Do you have any reason to believe that
14 customers who purchased drugs under an indirect
15 contract ever pay at or above WAC?
16     MR. DOYLE:  Objection as to form.
17 A.  And again, I have no visibility to it.
18 It's possible.
19 Q.  With regard to the agreement between
20 Dey and the indirect contract customer, does --
21 these agreements frequently have prices that are
22 agreed to between Dey and the customer, correct?

Page 105

1  A.  Yes.
2  Q.  Are those prices in your experience
3  ever at or above the WAC price?
4      MR. DOYLE:  Objection as to form.
5  A.  No.  I think the nature of a contract
6  price within this industry is it is providing the
7  product to a customer at -- the agreed upon price
8  is something less than WAC.
9  Q.  For an indirect contract?
10 A.  Or a direct.
11 Q.  Okay.  And in the case of an indirect
12 contract, if the price that is agreed upon
13 between Dey and the customer is less than WAC --
14 let me revise the question.
15     If the price that is agreed upon
16 between Dey and the indirect customer is less
17 than the -- less than the WAC, if I imagine it
18 correctly there's a potential for the wholesaler
19 to lose money if the wholesaler pays WAC, for
20 example, and the customer agrees to pay less and
21 acquires it through the wholesaler.
22     How is that issue dealt with in the

Page 106

1  case of an indirect contract?
2       MR. DOYLE: Objection as to form.
3       A.  Well, one issue at hand is in the case
4  of a contract such as a group purchasing
5  organization contract, those purchases of Dey
6  products on that contract are almost exclusively
7  indirect. Not 100 percent, it's possible one --
8  a member could buy direct, but most don't.
9       And I have also no visibility to
10 whatever is an upcharge from the wholesaler to
11 the buyer, whether it be a GPO member, whether it
12 be a chain drugstore member. I have no
13 visibility to whatever their arrangement is
14 between them. And so, again, what they
15 ultimately sell it for, as far as whether they're
16 losing money, I have no visibility to that.
17      Q.  My question was a lousy one.
18      I'm really asking you to briefly tell
19 us what a chargeback is and its purpose.
20      A.  A chargeback is an electronic process
21 whereby a wholesaler sells a product to an end
22 user at a contract price. The contract price is

Page 107

1  negotiated between the pharmaceutical company and
2  the buyer, the end user. The wholesaler agrees
3  to honor that price.
4       And so when the wholesaler sells a
5  carton of or a unit of that product to that end
6  user at a contract price that's less than WAC,
7  they file electronically what's called a
8  chargeback. And it is an electronic transmission
9  to the pharmaceutical company. The
10 pharmaceutical company then -- their system will
11 issue a response, an electronic transmission,
12 which provides a credit to the wholesaler, the
13 difference between the WAC price, wholesale
14 acquisition cost, and the contract price.
15      Q.  Okay. Now, just coming back to Exhibit
16 7, in the case of a contract like this would the
17 contracts department enter information into its
18 computer system once a contract was executed?
19      A.  The contracts department would, yes.
20      Q.  Okay. And would they enter the pricing
21 information that's contained in the contract?
22      A.  We would enter the pricing -- the

Page 108

1  contract price would go into our system.
2       Q.  All right. Would the contracts
3  department enter information about any rebates
4  that are provided for in the contract?
5       A.  No, not a rebate. The only other field
6  would be something like an administration fee for
7  a purchasing organization.
8       Q.  All right.
9       A.  But rebates, no.
10      Q.  And presumably the contracts
11 department, there would be information that
12 includes the effective dates of the contract?
13      A.  The term, start and end date, yes.
14      Q.  And, of course, basic information, the
15 name of the customer and other similar foundation
16 information.
17      A.  The contract, the agreement, yes. The
18 name of the parties and the term of the agreement
19 and...
20      Q.  All right. Now, moving on to Exhibit
21 8. This is a letter from your predecessor, Gary
22 Stone, to Dan Movens at Anda Generics, dated

Page 109

1  January 21, 1999, which is roughly six months
2  after the date of the contract.
3       A.  Yes.
4       Q.  Is it fair to say that Dey is in this
5  letter confirming the lowering of some contract
6  prices for certain of Dey's products?
7       MR. DOYLE: Objection as to form.
8       (Witness looks at document.)
9       A.  Based on the cover letter, which I'm
10 seeing this for the first time, it certainly
11 seems to indicate that they are reducing the
12 contract price for the items stated on the cover
13 letter.
14      Q.  Is it -- has it been typical for Dey to
15 periodically agree to price reductions for
16 contract -- for products covered under a
17 contract?
18      MR. DOYLE: Objection as to form.
19      A.  If I may point out that several of the
20 products indicated on the Exhibit 8 cover sheet
21 are not listed on Exhibit A of Exhibit 7, so I
22 don't know -- I can't say specifically what the

Page 150

1  was condensed to one so that they had one page
2  that they could reference to depending on who
3  they were speaking with.
4      Q.  And before I ask you more questions
5  about this just look at the next page, which is
6  an "Average Wholesale Price List."
7          And you'll see that the average
8  wholesale price list does not have any
9  confidential designation at the top of the page.
10 I understand it's been stamped confidential over
11 on the right, but my understanding is that that's
12 for litigation purposes.  But at the top of the
13 spreadsheet --
14         MR. DOYLE:  I think you're wrong,
15 Bunker.  If you look at --
16         MR. HENDERSON:  Yes.  I understand.  I
17 retract that statement.
18     Q.  In any event you'll see on the cheat
19 sheet it has "Company Confidential" both at the
20 top and the bottom.
21         Now with respect to the cheat sheet, do
22 you have an understanding as to whether or not

Page 151

1  that was something that would be provided to
2  customers?
3      A.  Is it my understanding that the cheat
4  sheet would be provided to customers?
5      Q.  Right.
6      A.  It would not be provided to customers
7  or it should not be.
8      Q.  Okay.  So what was its purpose, why did
9  people at Dey use this?
10     A.  And again, as I stated, it simply was a
11 way to summarize what -- seven different pages
12 down to one.  And in my experience in inside
13 sales, when you were on the phone with somebody
14 you don't have to look through seven pieces of
15 paper, you only have one in front of you that you
16 could reference.
17     Q.  And this has for most of Dey's generic
18 products at that time, it has pricing
19 information; is that right, on the right-hand
20 side of the page, these columns -- these numbers
21 reference prices?
22     A.  It would be -- and this goes back to

Page 152

1  another question -- within the system at that
2  time, the default pricing within our systems were
3  set to these depending on the class of trade.
4      Q.  Are these WAC prices or some other
5  prices?
6      A.  It was the price by class of trade
7  within our system.  So in absence of any contract
8  price this would be the price a customer would
9  pay for the product if they bought it from us
10 directly.
11     Q.  Provided the customer was within that
12 class of trade?
13     A.  Yes.
14     Q.  Okay.  And were these prices generally
15 in your experience above, at, or below Dey's WAC
16 price for the drug?
17         MR. DOYLE:  Objection as to form.
18     A.  I don't know.  They vary all over the -
19 - if you look at the prices that I'm looking at
20 here they are -- span a wide variety of prices.
21 I don't know what WAC is at that point.  I assume
22 that would be the second column wholesaler, and

Page 153

1  they are both above and below.
2      Q.  So you think -- and obviously I
3  understand you're not sure because you don't have
4  the WAC prices in front of you -- you think that
5  some may be above WAC and others may be below
6  WAC?
7      A.  If, in fact, the wholesaler column is
8  the wholesale acquisition cost as of that date,
9  you'll see that the various list price is some
10 are above that and some are below that.
11     Q.  Okay.  So if a sales rep were
12 discussing the sale of product to Dey or
13 discussing a contract, would the sales rep use
14 this as a handy reference point for price
15 discussions?
16     A.  They would use it for themselves.
17     Q.  Okay.
18     A.  Again, if the customer were to be
19 interested in buying product directly from us and
20 did not have any contract price and GPO
21 membership price, then this could help identify
22 what the price would be from Dey directly.

Page 166

1  relationship to Dey's -- the prices at which
2  Dey's products are actually sold by wholesalers?
3         MR. DOYLE: Objection as to form.
4      A.  And in the similar question I think it
5  -- it's impossible to know.  It depends on the
6  product, the lifetime of the product, the number
7  of other issues going on in the marketplace, and
8  what the wholesaler sells it for to the end user.
9  Without a contract price for me to be able to
10 reference, I don't know what they sell it for.
11     Q.  For Dey's -- for any of the drugs shown
12 on this last page of Exhibit 18, do you have any
13 knowledge or understanding of any predictable
14 relationship between the average wholesale price,
15 published average wholesale price, and the prices
16 at which at Dey's drugs are sold by wholesalers?
17        MR. DOYLE: Objection as to form.
18     A.  And I don't have any information about
19 that one way or another.
20     Q.  So do you know -- is it your testimony
21 then that the only reason Dey provided this to
22 customers was because they asked for it?

Page 167

1         MR. DOYLE: Objection as to form.
2      A.  It was a price point, data point that
3  was public knowledge, provided to -- you know, as
4  required and requested to the public.  It wasn't
5  -- again, it was provided if the customer needed
6  it.
7      Q.  Mr. Johnston, you must understand, I'm
8  sure, that pharmacies were historically
9  reimbursed based largely on AWP, don't you
10 understand that?
11        MR. DOYLE: Objection as to form.
12     A.  I've been with the organization 17
13 years.  Back in 1993 I think I hardly knew much
14 of anything.
15     Q.  Today you know that, don't you?
16        MR. DOYLE: Objection as to form.
17        Again, Bunker, I said this this
18 morning, what you're saying is not true based on
19 the claims data.  You're making false statements
20 to a witness.
21        Objection as to form.
22     Q.  Do you know that today?

Page 168

1      A.  And I do not know that today.
2      Q.  Do you understand or have you ever
3  understood that a majority of third-party payer
4  programs, including Medicaid, for decades have
5  calculated their reimbursements using a benchmark
6  pricing figure reported as average wholesale
7  price or AWP?
8      A.  I have with respect to third-party
9  payers, private party payers, insurance
10 companies, I have no visibility to what they pay
11 or reimburse a pharmacy, or a hospital, or a
12 patient for a product.
13     Q.  And do you today or have you ever
14 understood that the majority of government
15 programs, including Medicaid, have calculated
16 their reimbursements using a benchmark pricing
17 figure or reference price reported as average
18 wholesale price or AWP?
19        MR. DOYLE: Objection as to form.
20     A.  And I am aware that by -- each state
21 reimburses health care providers for the products
22 based on calculations that may involve AWP, FUL,

Page 169

1  MAC, and I don't know ultimately by state how
2  that's done.
3      Q.  So you do understand that states may
4  use AWP as a basis for reimbursing?
5         MR. DOYLE: Objection as to form.
6      A.  And as one of many, it's my
7  understanding they do.
8      Q.  Okay.  Do you recognize that a reason
9  why purchasers of Dey products would want to see
10 AWP prices in an average wholesale price list,
11 such as is attached to Exhibit 18, would be in
12 order for them to determine how much
13 reimbursement they would get?
14        MR. DOYLE: Objection as to form.
15     A.  Unless the customer told me
16 specifically why they wanted the information, I
17 would have no idea why they would want the
18 information.
19     Q.  Do you know why Dey reported the
20 average wholesale prices that it did?
21        MR. DOYLE: Objection as to form.
22     A.  Speaking from the time that my

```
 1    rights at the end of the day to compel this

 2    witness to return.

 3              MR. DOYLE:  You can reserve your

 4    rights, but as far as I'm concerned those 40

 5    minutes count against you, not against us, to

 6    your 14 hours.

 7              THE VIDEOGRAPHER:  We're going off the

 8    record, the time is 5:01 p.m.  This is the end of

 9    today's deposition of Russell Johnston, volume 1.

10    Six videotapes were used.  We're going off the

11    record.

12              (Time noted:  5:01 p.m.)

13

14

15

16              _____

17                    RUSSELL JOHNSTON

18

19    Subscribed and sworn to before me

20    this _____ day of _____, 2008.

21    _____      _____

22    (Notary Public)         My Commission Expires:
```

```
 1              C E R T I F I C A T E

 2     STATE OF NEW YORK  )

 3                        : ss.

 4     COUNTY OF NEW YORK )

 5              I, DONALD R. DePEW, a Registered

 6     Professional Reporter, Certified Realtime Reporter

 7     and Notary Public within and for the State of

 8     New York, do hereby certify:

 9              That RUSSELL JOHNSTON, the witness whose

10     deposition is hereinbefore set forth, was duly

11     sworn by me and that such deposition is a true

12     record of the testimony given by the witness.

13              I further certify that I am not related

14     to any of the parties to this action by blood or

15     marriage, and that I am in no way interested in

16     the outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18     my hand this _____ day of _____, 2008.

19

20

21                              _____

22                              DONALD R. DePEW, RPR, CRR
```