# EXHIBIT D

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3    ---------------------------------X

 4    IN RE PHARMACEUTICAL INDUSTRY      )

 5    AVERAGE WHOLESALE PRICE LITIGATION)

 6    ---------------------------------X Volume 1

 7    THIS DOCUMENT RELATES TO:         ) MDL NO. 1456

 8    The City of New York, et al.,     ) Civil Action

 9        v.                            ) No. 01-12257-PBS

10    Abbott Laboratories, et al.       )

11    ---------------------------------X

12    THIS DOCUMENT RELATES TO:         )

13    State of California, ex rel.      )

14    Ven-A-Care v. Abbott Laboratories,)

15    Inc., et al., Case No.            )

16    03-cv-11226-PBS                   )

17    ---------------------------------X

18              THURSDAY, MAY 15, 2008

19         DEPOSITION OF DEY, L.P. AND DEY, INC.

20              BY PAMELA MARRS

21    Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

22              Registered Merit Reporter
```

Page 74

1    treat asthma and COPD.
2          And it -- is -- most of our products
3    are inhalation products. Epipen is a little bit
4    different than -- than our other products.
5          It has a lot of added benefits such as
6    sterility, reduced treatment time, a variety of
7    other things.
8          Q.   And that's a combination of two generic
9    products that Dey had been selling for many
10   years, correct, Ipratropium Bromide and
11   Albuterol?
12         A.   That's correct.
13         Q.   Since at least 1992 Dey has regularly
14   reported pricing information to -- to pricing
15   compendia such as First DataBank, Redbook and
16   Medispan; correct?
17         A.   I know that we send price notifications
18   to some, if not all, of those.
19         First DataBank is the one I'm most
20   familiar with.
21         Q.   So you're saying that you know that Dey
22   sends pricing notifications to First DataBank,

Page 75

1    but you're uncertain about Medispan and Redbook?
2          A.   Which -- is there one in there that's
3    the blue book -- that's referred to as "the blue
4    book"?
5          I know that there are other price
6    reporting agencies we send information to, but
7    I'm not sure if what we did back in the early
8    nineties is the same as what we do today.
9          But there are -- there's more than one
10   firm that we send our prices to, yes.
11         Q.   And to answer your question, yes, there
12   is or was a blue book --
13         A.   Which one is --
14         Q.   -- that was purchased by the company
15   that owns First DataBank.
16         A.   Oh. So that is First DataBank. Okay.
17         Q.   And when Dey has reported its pricing
18   information to these pricing compendia, it
19   typically has reported both a WAC and an AWP for
20   its drugs; correct?
21         A.   That's correct.
22         Q.   And "WAC" is Wholesaler Acquisition

Page 76

1    Cost?
2          A.   "WAC" is the invoice price at which we
3    sell to the wholesalers at.
4          Q.   By the acronym "WAC" stands for
5    Wholesaler Acquisition Costs; correct?
6          A.   That's what it stands for, yes.
7          Q.   And "AWP" stands for Average Wholesale
8    Price?
9          A.   That's what the words say. Definition
10   is, obviously, in question.
11         Q.   When you say "The definition -- the
12   definition is obviously in question," just taking
13   the words "Average Wholesale Price," Dey did sell
14   its products to wholesalers; correct?
15         A.   Dey sold its products to wholesalers,
16   yes.
17         Q.   And when it sold its products to
18   wholesalers, there was a price for those drugs to
19   the wholesalers; correct?
20         A.   Which is commonly referred to as "WAC,"
21   which is the invoice price to the wholesalers.
22         Q.   Okay. Then -- then the wholesalers, in

Page 77

1    turn, sold those drugs generally to pharmacies or
2    another provider; correct?
3          A.   That's correct.
4          Q.   And the wholesaler would charge a price
5    when it sold that Dey product to a provider;
6    correct?
7          A.   Correct.
8          Q.   And, if it sold that product at
9    different prices mathematically, one could do an
10   average of those prices; correct?
11         MR. DOYLE: Objection as to form.
12         THE WITNESS: Are you talking about
13   sales from the wholesaler to their customers?
14         MR. AZORSKY: Yes.
15         THE WITNESS: Could you get the
16   wholesaler's data and do a mathematical
17   calculation?
18         Is that what you're asking?
19         MR. AZORSKY: It is, yes.
20         THE WITNESS: Yes, you could -- you
21   could get the information that the wholesaler has
22   in their system and do a math calculation.

Page 90

1          So my only point is there are other
2     customer groups that get different discounts.
3          **Q.   So are you saying that Dey categorizes**
4     **a customer as a wholesaler -- depending upon**
5     **whether that entity services contract customers**
6     **of Dey?**
7          A.   Generally speaking -- I can't right now
8     think of somebody we call a "wholesaler" who
9     doesn't have at least some element of chargeback
10    activity.
11         **Q.   Can you -- tell me how Dey defines a**
12    **"direct sale" and "indirect sale."**
13         A.   A "direct sale" is something that is
14    shipped out of Dey's distribution center and goes
15    to a customer.  An invoice is issued to that
16    customer.
17         An "indirect sale" is a sale that takes
18    place between our direct customer and a contract
19    customer such as a hospital.
20         And the only way we have any visibility
21    as to what those indirect sales are is because
22    they come back through the system as a

Page 91

1     chargeback.
2          **Q.   Does Dey consider all sales to**
3     **wholesalers to be direct sales?**
4          A.   Yes, those are all direct sales.
5          **Q.   And then the indirect sale is when the**
6     **wholesaler then services one of Dey's contract**
7     **customers?**
8          A.   That's correct.
9          **Q.   In addition to the prompt pay discount**
10    **what other discounts or rebates do wholesalers**
11    **receive that would generate profit to the**
12    **wholesaler from such indirect sales?**
13         MR. DOYLE:  Objection as to form.
14         THE WITNESS:  Other types of rebates --
15    well, a chargeback is not a rebate.  That's a
16    different kind of concept.
17         But there are rebates that over time
18    have been paid to the wholesalers.
19         There's something called a "source
20    program" whereby the wholesaler has -- and I
21    don't know all the details, but they basically
22    will for a fee publish your product in their

Page 92

1     catalog offering to customers, and they have
2     their own marketing programs for those products.
3          So you can benefit from participating
4     in the source programs by, you know, having extra
5     sales effort on your products, and they -- they
6     get the preferred status in the catalog.
7          And there have been rebates paid on
8     that for some time.  I don't recall when they
9     started, but -- I would say in the nineties
10    sometime.
11         You know, every wholesaler has their
12    own unique way of doing business.
13         There's something in some contracts
14    called an "admin fee" which we categorize as a
15    rebate.  New to the industry in past years is
16    something called a "distribution services
17    agreement" or "IMA fee," which is only on the
18    brand products, not on the generic products, but
19    it's a fee you pay to the wholesaler for certain
20    services they provide to you, including data and
21    the whole distribution framework.
22         There are some trade show

Page 93

1     participations and things like that.
2          **Q.   And each of these different sorts of**
3     **incentives that Dey provides to wholesalers is**
4     **something that Dey keeps track of and accounts**
5     **for in its Accounting Department; correct?**
6          MR. DOYLE:  Objection as to form.
7          THE WITNESS:  The Accounting Department
8     is responsible for, in effect, executing the
9     agreement.
10         So Sales and Marketing enters in to an
11    agreement of some type with the customer, and
12    then the contract is effectively passed off to
13    Accounting to process whatever transaction is
14    required by the contract.
15    BY MR. AZORSKY:
16         **Q.   But the Finance Department does issue**
17    **different kinds of reports, and we'll go through**
18    **some of those this afternoon, but they do in --**
19    **in those reports calculate a net price to the**
20    **wholesaler, and those are net of these different**
21    **incentives that are paid; isn't that correct?**
22         MR. DOYLE:  Objection as to form.

24 (Pages 90 to 93)

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                      May 15, 2008
                                    Napa, CA

| Page 98 | Page 100 |
|---|---|
| 1 BY MR. AZORSKY:<br>2 **Q. Okay. And when did the Sales Analytic**<br>3 **Department come in to being?**<br>4 A. You know, I don't know exactly.<br>5 It was probably -- at least by 2002,<br>6 but I don't -- I don't know how much sooner than<br>7 that.<br>8 **Q. Now, looking at this document -- first**<br>9 **of all, it's called a "pricing matrix."**<br>10 **Have you heard of that term before?**<br>11 A. Well, you know, I -- I do recall<br>12 hearing the term "matrix."<br>13 I guess what I had in my -- my mind was<br>14 a document I've seen that set a floor price that<br>15 the Reps could sell to customers at, which is not<br>16 this document, so maybe I just have the term<br>17 mixed up -- or maybe we have another document<br>18 that's called the same thing.<br>19 I don't know.<br>20 **Q. Well, at least for this kind of pricing**<br>21 **matrix we have a document that lists in the**<br>22 **lefthand column "customer type;" correct?** | 1 **Q. Setting forth a price to the provider;**<br>2 **correct?**<br>3 A. Correct, a price between Dey and the<br>4 provider, not the price from the wholesaler to<br>5 the provider.<br>6 **Q. Which would result in a chargeback from**<br>7 **the wholesaler to Dey?**<br>8 A. Correct.<br>9 **Q. Because in every case the contract**<br>10 **price is lower than the WAC, which is the**<br>11 **invoiced price to the wholesaler; correct?**<br>12 A. I don't know of any case where the<br>13 wholesale price would be greater than WAC.<br>14 **Q. Can you think of any instance in which**<br>15 **the -- the contract price is equal to WAC?**<br>16 A. Not off the top of my head.<br>17 I mean, we have hundreds of contracts.<br>18 That -- you know, by definition that<br>19 wouldn't be necessary, because then the customer<br>20 could just buy it from the wholesaler at WAC.<br>21 **Q. Now, in this pricing matrix, looking**<br>22 **across, there's a column that is entitled** |

| Page 99 | Page 101 |
|---|---|
| 1 A. Correct.<br>2 **Q. And divides customers in to different -**<br>3 **- different types.**<br>4 **Are these what Dey recognizes as**<br>5 **different classes of trade, these customer types?**<br>6 A. Generally speaking, yes.<br>7 Source programs are not a customer<br>8 type.<br>9 A source -- as you can see by the<br>10 names, those are wholesalers. So those we would<br>11 call wholesalers, not source, but -- and some of<br>12 these are largely indirect.<br>13 So, for example, long-term care, I<br>14 believe most of those customers buy indirectly<br>15 through a wholesaler, not directly from Dey, but,<br>16 generally speaking, these are similar to our<br>17 customer types.<br>18 **Q. And, again, when long-term care**<br>19 **customers buy indirectly, they're -- they're**<br>20 **buying pursuant to contracts with Dey?**<br>21 A. Yeah. Every indirect sale through a<br>22 wholesaler would have a contract behind it. | 1 **"Factors that apply to all products," and within**<br>2 **that there is "admin fee," "incentive rebate,"**<br>3 **and "tracings rebate."**<br>4 **Are you familiar with those -- those --**<br>5 **what it refers to as "factors"?**<br>6 A. Well, I don't -- "tracings rebate" is<br>7 not familiar to me, but there seems to be nothing<br>8 in that column.<br>9 So I don't recall what that is.<br>10 **Q. Okay. But an "admin fee," I assume,**<br>11 **refers to an administration fee; is that correct?**<br>12 A. That's correct.<br>13 **Q. And what is an "administration fee"?**<br>14 A. Admin -- there are two types of admin<br>15 fees.<br>16 What traditionally I would call an<br>17 "admin fee" is a fee that's paid to the GPO, and<br>18 -- you know, in the early years I think that that<br>19 was primarily the only thing that "admin fees"<br>20 referred to.<br>21 But in later years there are certain<br>22 wholesaler contracts that refer, I believe, to an |

Henderson Legal Services, Inc.

202-220-4158                                                  www.hendersonlegalservices.com

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                    May 15, 2008
Napa, CA

Page 126

1      A.  And I might be remembering the name
2   wrong, but there was at one point in time an
3   Excel spread sheet that came out of -- I don't
4   recall if it came out of Sales or Marketing right
5   now -- that established these floor prices.
6      MR. AZORSKY:  Can I have this marked,
7   please.
8        (Exhibit Marrs 006 was marked for
9   Identification.)
10      MR. AZORSKY:  Paul, I don't have extra
11   copies of this, so I'll show this to you first,
12   and then if you could hand this to the witness.
13      MR. DOYLE:  Sure.
14      MR. AZORSKY:  This is also marked
15   "highly confidential," and it's -- looks like
16   it's dated 1996, so I'll ask you to take a look
17   at it for -- for purposes of declassifying that
18   as well.
19      MS. GIULIANA:  And I also just want to
20   say on the record that I think that we have
21   already declassified a number of these documents
22   and also categories of these documents by letter.

Page 127

1        I just -- I don't -- you know, I can't
2   tell you specifically, so I just, you know, don't
3   want anyone to think that this is -- you know,
4   this still has the designation, because it may
5   have already been withdrawn, but we'll look at it
6   and just let you know for purposes of the
7   deposition.
8        And we can agree that this document is
9   not confidential.
10      MR. DOYLE:  Yeah.  If it's possible --
11   I mean, we can go through this, but if it's
12   possible if you've got other documents and
13   there's somebody copying them over lunch it just
14   becomes much easier -- you know what I mean -- to
15   deal with them.
16        I mean, it's very -- especially with
17   fairly technical documents -- and you've got a
18   bunch of people here, too, but --
19        Is this the only copy or do you have
20   another copy?
21      MR. AZORSKY:  No.  We didn't have a lot
22   of copies of this.

Page 128

1      MR. DOYLE:  Okay.
2   BY MR. AZORSKY:
3      Q.  But my question, Ms. Marrs, is whether
4   this is the type of document you were referring
5   to that sets forth the floor prices that was
6   available to -- to Sales Reps to negotiate prices
7   with customers and potential customers.
8      A.  No, this is not the document.
9      Q.  Okay.  What is this?
10      A.  This is -- in the early years we had
11   certain list prices for -- for different customer
12   types.
13        So -- you know, you can see on here we
14   had a retail price, a wholesale price.
15        Over time it became irrelevant because
16   there were not different prices for different
17   customers from an invoice price.
18        It became much more a negotiation
19   process.  So every customer was negotiating their
20   own prices, and there really wasn't a standard
21   price, per se, and there were -- but at the time,
22   when there were these separate price lists for

Page 129

1   different customer categories, there were
2   individual price sheets.
3        So there would be a price sheet for
4   wholesale, a price sheet for retail.
5        Like I said, it became meaningless
6   because, you know, it became a negotiation point,
7   but this was really the summarization of those
8   list price sheets so that one -- they appeared
9   all in one place.
10        It was an internal document that just
11   summarized that information.
12      Q.  Were prices to wholesalers uniform
13   across -- different wholesalers so that WAC was
14   the same regardless of which wholesaler a drug
15   was being sold to?
16      MR. DOYLE:  Objection as to form.
17      THE WITNESS:  Generally speaking, as
18   far as I know, we've -- the wholesale price has
19   always been the same for different wholesalers,
20   McKesson, Cardinal, et cetera, et cetera.
21   BY MR. AZORSKY:
22      Q.  And when setting an AWP for a drug to

33 (Pages 126 to 129)

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                    May 15, 2008

Napa, CA

Page 130

1    be reported to the pricing compendia at the time
2    a generic product was launched, it was Dey's
3    practice to set AWP at or near 10 percent below
4    the brand AWP; is that correct?
5        A.  It's my understanding that that was the
6    guidance that was given to us by First DataBank.
7    Ed Edelstein had a conversation or maybe it was a
8    memo, I don't recall which, with Bob Mozak, and
9    that was the guidance that was given in terms of
10   how to establish an AWP for a generic product at
11   launch.
12       Q.  Do you know exactly what Mr. Edelstein
13   said to anyone at Dey in that regard?
14       MR. DOYLE:  Objection as to form.
15       THE WITNESS:  I don't know exactly.
16       I've seen it -- I've heard it referred
17   to with Bob when he was at Dey.
18       I've seen it referred to in a
19   deposition, but -- I didn't personally have the
20   conversation or see the document, if there was
21   one, issued by First DataBank.
22   BY MR. AZORSKY:

Page 131

1        Q.  And you were --
2        A.  That's always been my understanding
3    from -- from what Bob said back in the days when
4    he actually was still working at Dey.
5        Q.  And you weren't personally present
6    during that conversation; correct?
7        A.  I was not personally present.
8        Q.  My question was, though, whether it was
9    Dey's practice to set AWP at the time of the
10   launch of a generic product at or near 10 percent
11   below the brand AWP.
12       A.  It's my understanding that based on the
13   advice from First DataBank that's how we
14   established the AWP on launch.
15       Q.  Well, regardless of whether it was on
16   advice from anyone, is that, in fact, what Dey
17   did, it set AWP at approximately at or about 10
18   percent below the brand AWP?
19       A.  It's my general understanding.
20       I'd have to go back and actually do the
21   calculations to make sure that that is correct
22   and it wasn't 12, or 13, or 15 percent, but

Page 132

1    throughout my time in preparing for various
2    depositions that's what I've always been told by
3    -- Bob specifically, but, you know, I've heard it
4    from other people as well.
5        Q.  And has it historically been typically
6    the case that Dey does not change the AWP once
7    it's been set at the time of launch of a new
8    product?
9        A.  For generic products, that's correct.
10       It's, again, my understanding that
11   that's an industry practice, that AWP is not
12   changed.
13       For the brands the AWP does change over
14   time as price increases are implemented for the
15   brand products, because with brand products
16   prices tend to go up, not down.
17       The AWP is raised a corresponding
18   amount.
19       Q.  And when you say "it's industry
20   practice," what -- what source are you drawing
21   upon to understand the industry practice with
22   respect to setting or changing AWP?

Page 133

1        A.  Again, I'm just going back to
2    conversations with internal people that, you
3    know, that was our understanding of what was
4    expected in the -- in the industry.
5        Q.  Okay.
6        A.  And, in fact, we had a situation once
7    where First DataBank actually lowered our AWP and
8    customers called and complained and basically
9    threatened not to buy our product.
10       Q.  So the way it works is that Dey
11   determines a suggested AWP before the launch of a
12   new product; correct?
13       A.  Dey reports a -- an AWP for a product
14   before it's launched to the reporting services,
15   yes.
16       Q.  And the reporting services publish the
17   AWPs that are reported to it by Dey; correct?
18       MR. DOYLE:  Objection.  Objection as to
19   form.
20       THE WITNESS:  And let me make one
21   correction.
22       We actually recently have stopped

34 (Pages 130 to 133)

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                                                    May 15, 2008

Napa, CA

Page 134

1   reporting or sending AWP for new products.
2        So for Cyanokit, when we launched that,
3   we didn't set an AWP.  We let First DataBank do
4   it, just as a supplement to my last question.
5        And what was your last question?  Do we
6   --
7   BY MR. AZORSKY:
8        Q.  That First DataBank has published the
9   AWPs that Dey reported to it.
10       MR. DOYLE: Objection as to the form.
11       THE WITNESS: What I know is -- is that
12   First DataBank does report AWPs.
13       I know in the early years there was
14   evidence in the files in the form of a fax or a
15   document that came back from First DataBank where
16   it looked like Dey was maybe checking off things
17   on this document, and in more recent years we
18   send to the reporting services a letter that
19   says, you know, here's the new WAC, or whatever
20   we're telling them, and we ask them to sign an
21   acknowledgement indicating that they've received
22   it.

Page 135

1        We do not -- we do not now -- and I'm
2   not sure if we even did then, other than this
3   piece of paper we got from them actually
4   physically look in the published document to see
5   if our prices were input correctly.
6   BY MR. AZORSKY:
7        Q.  But Dey does know that the prices that
8   are reported in First DataBank, Medispan, and
9   Redbook are the prices that were reported to it
10   by Dey; correct?
11       MR. DOYLE: Objection as to form.
12       THE WITNESS: No.  That's what I was
13   trying to explain.
14       In the early years they would send us a
15   piece of paper back, not the -- not the published
16   document, but a confirmation form, where we would
17   look at it, it appears from the documentations
18   I've looked at, and validate that that was, in
19   fact, what we sent them.
20       That doesn't happen any longer.
21       What we do now is we send them a letter
22   notifying them of a price change, and we ask them

Page 136

1   to sign off and send back to us a confirmation
2   that they received the information.
3        We do not then go and -- and verify
4   that they've posted the correct amount, which
5   became obvious when this whole issue happened
6   with the generic products in 2003, where they
7   lowered our AWP.
8        We didn't actually know anything about
9   it until customers started calling and
10   complaining.
11   BY MR. AZORSKY:
12       Q.  So in addition to reporting an AWP Dey
13   reports a WAC price; correct?
14       A.  That's correct.  We send them
15   information on WAC as it changes.
16       Q.  And, in fact, historically Dey has
17   reduced its WAC prices on their generic drugs
18   from time-to-time; correct?
19       A.  Correct.
20       As the price of the marketplace has
21   come down we've also reduced our reported WAC.
22       Q.  Now, Dey does that on a -- on a

Page 137

1   periodic basis; correct?
2        A.  It -- it was done on a periodic basis
3   in the past.  Lately the price hasn't changed
4   that much in the market, so there hasn't been a
5   WAC decrease for -- for quite a while now.
6        Q.  But when there was a decrease in WAC
7   prices in the marketplace, did Dey report the
8   change in WAC on a regular basis such as
9   annually?
10       A.  No.  The notification was made when the
11   change actually happened.
12       So that there would be no need to
13   notify them if nothing changed.  They would --
14   the Contracts Department more recently, at one
15   point it was the Marketing Department, would
16   notify the reporting agencies when the actual WAC
17   decrease occurred.
18       Q.  So every time Dey lowered its prices to
19   wholesalers it reported the change in WAC?
20       A.  Well, I would probably have to --
21       MR. DOYLE: Objection as to form.
22       THE WITNESS: -- check the documents to

35 (Pages 134 to 137)

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                May 15, 2008

Napa, CA

Page 138

1  verify that every single time it changed we
2  reported, but it was the intention to report when
3  there was a decrease in WAC to the -- to the
4  reporting services.
5  BY MR. AZORSKY:
6      **Q.  Well, since the early nineties Dey has**
7  **reported declines in its reported WAC to First**
8  **DataBank, and despite the fact that Dey typically**
9  **reduces the WAC prices in their products the AWP**
10 **has remained constant throughout the life of the**
11 **product; is that correct?**
12     MR. DOYLE:  You're talking about
13 generics; right?
14 BY MR. AZORSKY:
15     **Q.  Generic products.**
16     A.  For generic products the AWP was not
17 reduced at the same time the WAC was reduced, and
18 on the notifications to the reporting agency it
19 was clearly set forth since 1999 that, you know,
20 AWP was not a real price.  It also indicated that
21 WAC was not a discounted price.
22     MR. HENDERSON:  Move to strike as

Page 139

1  nonresponsive.
2      MR. DOYLE:  Move to strike?
3      You guys really don't want to hear
4  that; do you?
5      MR. AZORSKY:  No.  It's not that.
6      We'd like answers to our questions, not
7  legal arguments from the witness every time she
8  can try and slip them in.
9      MR. DOYLE:  The fact is we notified
10 everybody in '99 about WAC.  That's not a legal
11 argument.  It's a fact.
12     MR. AZORSKY:  It wasn't the question,
13 and before '99 I think you did not make such
14 statements.
15 BY MR. AZORSKY:
16     **Q.  When Dey reported AWP, it reported the**
17 **same AWP to all of the pricing compendia;**
18 **correct?**
19     A.  The intention was to do so unless an
20 error was made.  That's my understanding.
21     Again, I haven't looked at every single
22 price reporting letter, but that was the

Page 140

1  intention.
2      **Q.  Have you -- the ones that you looked**
3  **at, did you see any different AWP reported to**
4  **different compendia?**
5      A.  No, but I'm just aware of a memo that
6  was sent -- I believe it wasn't sent to all
7  people, it was just one of the price reporting
8  agencies, but I'd have to look at the document to
9  verify.
10     **Q.  Are you referring to Helen Burnham's**
11 **memo?**
12     A.  Yes.
13     **Q.  But there she was reporting a WAC**
14 **change, I believe.  And my question refers to**
15 **AWP.**
16     A.  Oh.  I'm sorry.
17     I thought you were talking about any
18 price change.
19     **Q.  No.**
20     A.  Could you ask the question again.
21     **Q.  Sure.**
22     **Did -- did Dey report the change in AWP**

Page 141

1  **to all pricing compendia?**
2      A.  To the best of my knowledge.  I don't
3  know of any exceptions to that.
4      **Q.  And but for the one incident that you**
5  **were referring to, so far as you know, Dey**
6  **reported the same WAC to all pricing compendia as**
7  **well; correct?**
8      A.  As far as I know, yeah, that's correct.
9      **Q.  Aside from AWP and WAC did Dey report**
10 **any other prices or types of prices to the**
11 **pricing compendia?**
12     A.  Based on my conversations with Russ
13 Johnson, I'm not aware of any, no.
14     **Q.  Do you know of any instances in which**
15 **Dey objected to a price published by any of the**
16 **pricing compendia?**
17     MR. DOYLE:  Objection as to form.
18     THE WITNESS:  The incident I referred
19 to earlier in 2003, we -- First DataBank lowered
20 our AWP, and we objected because customers were
21 refusing to buy our product because we were not
22 on a level playing field with everybody else, and

Henderson Legal Services, Inc.

202-220-4158                                         www.hendersonlegalservices.com

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                    May 15, 2008

Napa, CA

Page 142

1  so the same product was in the marketplace at
2  different AWPs, which created a favorable
3  advantage for the other competitors, so we did
4  object to that through a Court action.
5  BY MR. AZORSKY:
6      Q.  And that was an instance where First
7  DataBank published not the AWP as reported by
8  Dey, but, rather, established an AWP based upon a
9  WAC; is that correct?
10     A.  It's --
11         MR. DOYLE:  Objection as to form.
12         THE WITNESS:  It's my recollection that
13  we reported a WAC decrease but not a change in
14  AWP, but they took that WAC decrease as a trigger
15  to then recalculate AWP, and I don't recall the
16  exact calculation they made, but we were not
17  notified, and, as I said, the customers were
18  quite unhappy about it.
19  BY MR. AZORSKY:
20     Q.  So Dey took First DataBank to Court
21  over that?
22     A.  We did.

Page 143

1      Q.  And did that result in a settlement?
2      A.  I don't know if it was a settlement, or
3  a dismissal, or --
4          MR. DOYLE:  There was a TRO in place
5  for, I think, about a year or two -- two years,
6  it was a long TRO, and ultimately withdrew the
7  action, because I think First DataBank had
8  essentially changed its position overall.
9          It wasn't actually a settlement.  It
10  was essentially a -- you know, they changed their
11  system.
12         THE WITNESS:  And our only objection
13  was that we wanted everyone to be on a level
14  playing field and they were treating Dey
15  differently than the other companies.
16  BY MR. AZORSKY:
17     Q.  Aside from that instance in 2003 did
18  Dey ever object to a published price?
19         MR. DOYLE:  Objection as to form.
20         THE WITNESS:  I'm not aware of an
21  objection to the prices other than that.
22  BY MR. AZORSKY:

Page 144

1      Q.  How does Dey set its WAC?
2      A.  WAC is similar to AWP, set at launch,
3  and it's a percentage off of the AWP, which, in
4  turn, is a percentage off of the brand price.
5      Q.  And the decision as to the exact number
6  while Mr. Mozak was Vice President of Sales and
7  Marketing was made by him; is that correct?
8      A.  Yeah.  Pretty much Bob was in charge of
9  that type of thing.
10     Q.  And that was a business decision that
11  he made as Vice President of Sales and Marketing;
12  correct?
13     A.  Yes.
14     Q.  And the WAC as reported by Dey to the
15  pricing compendia does not account for
16  chargebacks, rebate incentives, and fees;
17  correct?
18         It's -- it's not net of those?
19     A.  No.
20         MR. DOYLE:  Objection as to form.
21         THE WITNESS:  The WAC that's reported
22  is the invoice price to the customer -- to the

Page 145

1  wholesaler.
2  BY MR. AZORSKY:
3      Q.  Not reflected --
4      A.  And it does not --
5      Q.  -- in chargebacks, rebates, or
6  discounts; right?
7      A.  And use it does not include
8  chargebacks, rebates.
9      Q.  Or discounts?
10     A.  Or discounts.
11     Q.  What is a "FUL"?
12     A.  "FUL" stands for Federal Upper Limit.
13     Q.  How is a FUL set?
14     A.  It's a percentage -- I think it's 150
15  percent of a -- some published price, but it's my
16  understanding there's some controversy over
17  exactly what it's 150 percent of, the lowest
18  price in the market or something like that.
19         I'm not clear on the definition based
20  on my conversations with some others.
21     Q.  Your conversations with who?
22     A.  Well, I've spoken with the attorneys.

37 (Pages 142 to 145)

Page 146

1        We talked to a couple of salespeople to
2    try and understand if they dealt with that in
3    their everyday activities, and they really --
4    it's not something that they deal with in their
5    positions, Jerry Crank specifically.
6        Louis Fayant and Gary Stone are the
7    people that I talked to about it.
8        Q.  So what's your -- what's your best then
9    understanding --
10       Strike that.
11       What is Dey's best understanding of how
12   FULs are set?
13       MR. DOYLE:  Objection as to form.
14       THE WITNESS:  That it's 150 percent of
15   -- now I don't remember.
16       I guess it is lowest WAC or AWP, I
17   don't recall, but -- but -- but, again, it's not
18   clear if that has been consistently followed and
19   exactly how some of the calculations were done.
20       So there seems to be a disconnect
21   between a strict definition and what was actually
22   done in the calculations.

Page 147

1        It's not something -- based on the
2    conversations I had with internal people it's
3    just not something we really used.
4        You know, it may have come up in
5    conversations with Sales Reps, but it's not
6    something that was part of the everyday sales
7    activity or particularly useful in the business.
8    BY MR. AZORSKY:
9        Q.  So you're not certain whether the FUL
10   was actually set according to a particular
11   formula, but you are aware that there was a
12   particular formula in place for setting a WAC; is
13   that?
14       MR. DOYLE:  Setting a FUL, you mean.
15   BY MR. AZORSKY:
16       Q.  Or setting a FUL.
17       I'm sorry.
18       For setting an FUL?
19       A.  I'm aware that there is a stated
20   definition of FUL that's 150 percent of this
21   thing I've forgotten, I apologize, but that
22   there's some controversy or lack of clarity

Page 148

1    around what that price that they applied the 150
2    percent is -- how it's determined.
3        Q.  When you say there's a controversy
4    about that, what -- what's the nature of the
5    controversy?
6        A.  Well, when I was being prepared for my
7    deposition, I was trying to understand it, and I
8    asked some questions, and the responses I got
9    were, you know, that there's some -- some
10   controversy over exactly what the number that the
11   150 percent is applied to represents, and I don't
12   recall the specifics.
13       I apologize.
14       You know, it's not a term we really use
15   in our business, so it's not something I
16   retained, I guess.
17       Q.  And so you're not aware of where this
18   controversy arises or the nature of the
19   controversy?
20       A.  It was something that I was told during
21   my prep.
22       When our internal people couldn't

Page 149

1    answer the question, then, you know, I was trying
2    to understand with the attorneys.  So --
3        Q.  And, of, course Dey knows that Medicaid
4    reimbursements can be based upon AWPs; correct?
5        MR. DOYLE:  Objection as to form.
6        THE WITNESS:  Well, I mean, I've seen
7    charts prepared that summarize reimbursement by
8    state for Medicaid, and it -- in some cases it's
9    AWP minus.
10       I'm also aware of the fact that the
11   state has the opportunity to set a MAC, to use
12   usual and customary and use other benchmarks in
13   setting price, that it's not -- I don't believe
14   that it's required to use AWP minus, but it is
15   one of the options available to the states.
16   BY MR. AZORSKY:
17       Q.  And Dey knows that, in fact, some
18   states do base their Medicaid reimbursement upon
19   AWP; correct?
20       MR. DOYLE:  Objection as to form.
21       THE WITNESS:  I guess I'm not sure how,
22   if we've actually tracked to know what the rate

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                                    May 15, 2008
Napa, CA

Page 166

1        So I'm not sure how that ties in to the
2   -- AWP reference.
3   BY MR. AZORSKY:
4        Q.  But, if you want to look through the
5   document, --
6        A.  It doesn't say, so I -- I don't know if
7   there are other states.  I don't know what that
8   means in the context of this document.
9        Just pointing it out.  I mean, if you
10  look at the "reimbursed basis" column in the memo
11  --
12       Q.  Some of them are based upon AWP?
13       A.  Yes.  Yes, they are.
14       Q.  Some are based upon WAC; correct?
15       A.  There's a reference to WAC on -- in the
16  memo as well.
17       Q.  And Dey knows apart from this
18  memorandum prepared by Carrie Jackson that
19  Medicaid rebates -- I'm sorry -- Medicaid
20  reimbursements can also be based upon Federal
21  upper limit; correct?
22       A.  Yes.  Federal upper limit is applied in

Page 167

1   the case of our drugs.  I think Albuterol had a
2   FUL for some period of time.
3        Q.  And, in fact, Dey is aware that other
4   third party payers aside from Medicaid reimburse
5   based upon AWP or WAC?
6        MR. DOYLE:  Objection as to form.
7        THE WITNESS:  I guess I'm more familiar
8   with the formulas on the Medicaid side, because
9   I've seen some actual documents on that.
10       I don't -- I don't know that I've seen
11  any documents on the third party side that say
12  that.
13  BY MR. AZORSKY:
14       Q.  So, in other words, Dey has no
15  information one way or the other?
16       MR. DOYLE:  Objection as to form.
17  That's not what she said.
18       THE WITNESS:  I can't say that Dey has
19  no information.  That's not something that I --
20  we were focused more on this Medicaid in my prep,
21  so I haven't seen any documents on the third
22  party side.

Page 168

1   BY MR. AZORSKY:
2        Q.  So is that something that you could
3   look at and be prepared to answer the next
4   session of this deposition?
5        A.  Sure.
6        Q.  Are you familiar with the phrase "AMP"?
7        A.  Yes, I am.
8        Q.  What is that?
9        A.  Average Manufacturer's Price.
10       Q.  And from 1997 to 2005 Dey has reported
11  AMPs as required by the Federal Rebate Statute;
12  is that correct?
13       A.  We have submitted the prices quarterly
14  using our best efforts to comply with the law,
15  yes.
16       Q.  And those best efforts to comply with
17  the law were efforts to calculate an AMP in
18  accordance with law and report that AMP; correct?
19       A.  Yes, and the reason I hedge a little is
20  the law is not always clear on these
21  calculations, so we've through outside counsel,
22  and consultants, and a variety of other sources

Page 169

1   done our best job to interpret some of the
2   language that can be vague at times.
3        Q.  And based upon Dey's best efforts they
4   calculated an AMP which they, in turn, reported
5   as required by the Federal Rebate Statute;
6   correct?
7        A.  We've made quarterly submission, yes.
8        Q.  Of the A --
9        A.  Of AMP, yes.
10       Q.  I'd like to review with you the -- some
11  of the major launches of generic drugs that Dey
12  had from the early to the -- to the late 1990s.
13       A.  Okay.
14       Q.  In March of 1992 Dey launched its
15  Albuterol unit dose product, Albuterol sulfate
16  inhalation solution 0.083 percent solution in the
17  25s package, NDC 657-03; is that correct?
18       Do you -- would it help to have --
19       A.  I don't know it was specifically March,
20  but I know it was early 1992.
21       Q.  And in June of 1992 Dey launched the
22  Albuterol unit product in a 60s package?

43 (Pages 166 to 169)

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                                May 15, 2008

Napa, CA

Page 174

1      MS. GIULIANA: No, no, no.
2      THE WITNESS: Well, that's when the
3  letter is dated. I would assume the letter would
4  approximate when it was launched.
5  BY MR. AZORSKY:
6      Q. Well, because it does says "Dey
7  Laboratories is pleased to introduce Albuterol
8  Inhalation Aerosol," that would tend to indicate
9  that probably went out at or about the time of
10  launch; is that correct?
11     A. That's logical. I just don't remember
12  the exact date, but I know it was 1996.
13     Q. And turning to Marrs 11, this is a
14  launch of -- Ipratropium Bromide Inhalation
15  Solution, .02 (sic.) percent, 2.5 milliliter in
16  the 25s and 60 packages; correct?
17     A. Yes, it is.
18     Q. And the letter says, "We began shipping
19  the product on January 10, 1997."
20        Do you see that?
21     A. I do.
22     Q. But the letter is dated January 13,

Page 175

1  1996?
2     A. Yes, it is.
3     Q. Do you know which of those two dates is
4  incorrect? Because one obviously is.
5     A. I think '97. I don't remember January.
6        Again, I'm not very good on the months,
7  but I'm pretty sure that Ipratropium was launched
8  in '97.
9     Q. So, once again, this letter is misdated
10  and probably was January 19; correct?
11     A. Most likely, yes.
12        MR. WINGET-HERNANDEZ: Gary?
13        MR. AZORSKY: Yes.
14        MR. WINGET-HERNANDEZ: You misspoke.
15  You said "January 13." The letter said "January
16  10th."
17        You might want to --
18        THE WITNESS: No. You're on the --
19  mine says "January 13th."
20        MR. AZORSKY: I'm talking about the
21  date of the letter at the top.
22        MR. WINGET-HERNANDEZ: I'm sorry. I'm

Page 176

1  the one who's wrecking the record here.
2  BY MR. AZORSKY:
3     Q. And I'm handing you what's been marked
4  as Marrs Exhibit 12, and this is a letter to Dey
5  Customer signed by Robert Mozak dated March 1996
6  saying that "Dey Laboratories is pleased to
7  introduce Albuterol Sulfate Inhalation Solution
8  .5 percent, 20 milliliter, which was manufactured
9  for Dey by Glaxo Wellcome."
10        Is that -- is that correct?
11     A. Well, the letter doesn't say -- oh,
12  yeah, it does here.
13        Yes, that's correct.
14     Q. Okay. And so that product was launched
15  in or about March of 1996?
16     A. Again, I don't know the month, but it
17  was '96, as I recall.
18     Q. Did -- did Dey normally send out
19  letters introducing new products at or about the
20  time of the launch of that new product?
21     A. Typically that's when it would occur,
22  yes.

Page 177

1     Q. Would it occur within -- typically
2  within two weeks of the launch of the product?
3     A. You know, I -- I don't know the timing.
4        I mean, again, logic would say that
5  they would send the letter out at or about the
6  time of the launch.
7        I don't know any cases where that
8  didn't happen, but I wasn't really involved with
9  the specific dates.
10     Q. So you have no reason to believe and no
11  information that that product wasn't launched in
12  or about March of 1996; correct?
13     A. No, I have nothing that would suggest
14  otherwise.
15     Q. And I'm handing you what's been marked
16  as Marrs Exhibit 13.
17        And this is an interoffice memorandum
18  from Todd Galles dated November 13, 1996 Re:
19  Albuterol Inhalation Aerosol Refill Launch saying
20  "It is finally launch time for Albuterol
21  Inhalation Aerosol Refill."
22        Does this indicate to you or are you

45 (Pages 174 to 177)

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                    May 15, 2008

Napa, CA

---

Page 178

1  otherwise aware that Dey launched its Albuterol
2  Inhalation Refill in or about November of 1996?
3      A.  Assuming we ultimately shipped when
4  anticipated in the letter, yes.
5      Q.  Do you have any reason to believe that
6  -- that that product was not shipped when
7  indicated in that letter?
8      A.  I don't -- I don't know of a delay, but
9  it seems like there was -- there had been some
10 previous problems, because normally you would
11 expect that that would be launched when you
12 launched the regular product.
13     So I don't recall what the difficulties
14 were, but I don't -- I don't recall the delay at
15 all, quite frankly, but I don't -- I don't bring
16 anything with me in terms of document review that
17 would suggest it wasn't launched.
18     Q.  Okay.  And I'm handing you what's been
19 marked Marrs Exhibit 14.
20     And this is an interoffice memorandum
21 from Todd Galles dated January 13, 1997, Re:
22 Ipratropium Bromide Inhalation Solution Launch,

---

Page 179

1  saying "It's finally launch time for Ipratropium
2  Bromide Inhalation Solution.  Orders are being
3  received and Dallas will ship to large wholesale,
4  warehousing chains and major RGDs beginning
5  February 1, 1997."
6      By the way what is an "RGD"?
7      A.  Retail generic distributor.  It's a
8  customer type.
9      Q.  Okay.  And does this indicate to you or
10 do you otherwise recall that Dey launched its
11 Ipratropium Bromide Inhalation Solution 02
12 percent, 2.5 milliliters in the 25s and 60
13 packages in January 1997?
14     A.  I recall it was early '97 that we
15 launched.
16     MR. DOYLE:  This would seem to go with
17 11 and resolve the date issue on 11, unless I'm -
18 -
19     MR. AZORSKY:  Yes, it does.
20     THE WITNESS:  Can we go off the record
21 for a second?
22     I'm having a wire management problem

---

Page 180

1  down here.
2      MR. AZORSKY:  Sure.  Let's go off the
3  record.
4      VIDEOGRAPHER:  We're going off the
5  record at 2:16 p.m.
6      (Discussion off the record)
7      VIDEOGRAPHER:  We are back on the
8  record at approximately 2:17 p.m.
9  BY MR. AZORSKY:
10     Q.  And I am handing you what has been
11 marked as Marrs Exhibit 15, ask you to take a
12 look at that.
13     This is a letter on Dey letterhead to
14 Kathy Gutgesell, First DataBank, signed by Eve
15 Gagrell Gmeiner, Associate Product Manager for
16 Dey, Re:  New product announcement:  Dey
17 Laboratories Ipratropium Bromide Inhalation
18 Solution 30s.
19     And does this indicate to you or are
20 you otherwise aware that Dey introduced its
21 Ipratropium Bromide product in the 30-pack -- in
22 August 1997?

---

Page 181

1      A.  That's what the memo implies, yes.
2      Q.  And is that your understanding as well?
3      A.  I didn't recall that the 30-pack was
4  introduced later, but that's what the memo says.
5      I have no reason not to believe it.
6      MR. AZORSKY:  Can I have this marked,
7  please.
8      (Exhibit Marrs 016 was marked for
9  Identification.)
10 BY MR. AZORSKY:
11     Q.  Ms. Marrs, I'm handing you what's been
12 marked as Marrs Exhibit 16 and ask you to take a
13 look at that.
14     I will represent to you, and you may be
15 able to tell from the Bates number at the bottom,
16 that this is a document produced by Dey in the
17 AWP litigation, and it appears to be a page from
18 a publication called "Drug Topics."
19     Are you familiar with "Drug Topics"?
20     A.  No, I'm not.
21     Q.  The name at the top is "Todd Galles" in
22 handwriting.

---

46 (Pages 178 to 181)

Henderson Legal Services, Inc.

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                      May 15, 2008

Napa, CA

Page 182

1          **Do you see that?**
2     A.   I do.
3     **Q.   And who is Todd Galles?**
4     A.   Todd Galles is the gentleman I referred
5  to previously.  He used to be a Product Manager
6  at Dey in the Marketing Department.
7     **Q.   And do you recognize the handwriting in**
8  **which his name is written?**
9     A.   I could guess, but I'm not sure.  So --
10    **Q.   Well, would you --**
11    A.   It look like a secretary's handwriting,
12  Colleen Gruhn.
13    **Q.   Colleen?**
14    A.   Gruhn.
15    **Q.   G-r-u-e-n?**
16    A.   u-h-n, I think.
17    **Q.   And it appears from the bottom this is**
18  **a page from a publication called "Drugs Topics"**
19  **December of 1995.**
20         **Do you see that?**
21    A.   I do.
22    **Q.   And this page lists in the -- in the**

Page 183

1  **center column -- well, first of all, in the**
2  **lefthand column it lists states, and in the**
3  **middle column lists the ingredient reimbursement**
4  **basis for Medicaid for each of the states.**
5          **Do you see that?**
6     A.   I do.
7     **Q.   Does this indicate to you that Dey kept**
8  **track of Medicaid reimbursement formulas to the**
9  **various states --**
10         MR. DOYLE:  Objection --
11  BY MR. AZORSKY:
12    **Q.   -- beyond February of 1994?**
13         MR. DOYLE:  Objection as to form.
14         THE WITNESS:  It indicates to me that
15  somebody sent to Todd a piece of -- a page out of
16  a -- a trade journal that, you know, was
17  providing him a factual information.
18  BY MR. AZORSKY:
19    **Q.   What on this document indicates to you**
20  **that this was sent to Mr. Galles?**
21    A.   The upper righthand corner with his
22  name on it.

Page 184

1          I assume that that is somebody sending
2  the document to him, and they -- interoffice mail
3  or something.
4     **Q.   Oh.  So this may have been sent by one**
5  **person at Dey to Mr. Galles' attention?**
6     A.   Well, I don't know.
7          I just know sometimes if I'm going to
8  forward a document to somebody I'll write their
9  name on it and my secretary will distribute it.
10         I don't know for sure that that's what
11  happened here, but that would be my guess if I
12  were guessing.
13    **Q.   Just so I understand Dey's position,**
14  **I'd like to be as clear as possible, is it your**
15  **testimony or understanding that Dey did not keep**
16  **track of Medicare and Medicaid program changes to**
17  **those programs?**
18         MR. DOYLE:  Objection as to form.
19         THE WITNESS:  I don't know if there was
20  a -- you know, I've seen the Carrie Jackson
21  report.  Now I've seen this.
22         I know that we had also an AWP listing

Page 185

1  that was sometimes given to the Sales Reps.
2          What I don't know and what I'm not
3  aware of is if it was updated on a structured,
4  regimented basis every, you know, "X" days or
5  months.
6          MR. AZORSKY:  Okay.
7          THE WITNESS:  I know that there are
8  documents I have seen that have AWP on it that
9  were provided to the Sales Reps in case customers
10  asked them questions about it.
11         Well, that was AWP, though, not the
12  reimbursement rate that I'm remembering.
13         So -- I mean, the documents that I've
14  seen from the company at this point don't show
15  evidence that there was a monthly report or any
16  regular report that was distributed to people
17  that had this kind of information on it.
18         I'm not saying that people weren't
19  generally aware that that was the reimbursement
20  formula in some way.
21         I -- I haven't seen documents that
22  would suggest it was tracked in a regimented and

Henderson Legal Services, Inc.

202-220-4158                                                    www.hendersonlegalservices.com

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                                        May 15, 2008
                                        Napa, CA

Page 186

1  structured way.
2      **Q.  Fair enough.**
3      **And I did not mean to suggest in my**
4  **question that Dey kept track of it on a -- in a**
5  **regimented manner.**
6      **Rather, my question was whether Dey**
7  **kept track of changes to the Medicare or Medicaid**
8  **programs.**
9      MR. DOYLE:  Objection as to form.
10     THE WITNESS:  Program --
11 BY MR. AZORSKY:
12     **Q.  Not necessarily on a weekly or monthly**
13 **regimented basis, but periodically the sales**
14 **force and the Marketing Department were aware of**
15 **how their drugs were being reimbursed by the**
16 **different Medicaid agencies around the country.**
17     MR. DOYLE:  Objection as to form.
18     THE WITNESS:  What I have seen that was
19 provided to the Sales Reps from corporate was an
20 AWP price list.
21     I don't know if it was called "price
22 list," but a list of AWPs that was -- that was

Page 187

1  given to the Sales Rep just for their information
2  in case customers asked.
3      What I'm not aware of, other than
4  having seen the Carrie Jackson memo -- I don't
5  recall seeing documents that talked about
6  reimbursement in terms of the formula by state.
7      It was more just a general AWP
8  worksheet for reference.
9  BY MR. AZORSKY:
10     **Q.  Well --**
11     A.  Which is -- I mean, it's -- granted,
12 AWP was part of it, but I don't recall seeing on
13 that spread sheet the specific formula by state.
14     **Q.  Okay.  But Dey was aware that -- that**
15 **many states reimbursed for -- drugs dispensed to**
16 **Medicaid recipients based upon AWP and WAC, as**
17 **you've previously testified; correct?**
18     A.  Based on the documents I've seen it's -
19 - it appears some people were aware of that, yes.
20     I don't think it was a -- perhaps maybe
21 in the Sales organization it was broader.  I
22 don't think it was a corporate -- something that

Page 188

1  people knew broadly throughout corporate.
2      It was something that I've seen
3  referred to in documents that would suggest that
4  at least certain sales people were aware of it.
5      **Q.  So certain salespeople were aware of it**
6  **and certain marketing people were aware of it;**
7  **correct?**
8      A.  And certain marketing people, yes.
9      MR. AZORSKY:  Okay.  May I have this
10 marked, please.
11     (Exhibit Marrs 017 was marked for
12 Identification.)
13     THE WITNESS:  Sorry.
14     MR. AZORSKY:  You're wonderfully
15 organized.
16     I'm about to hand you a document marked
17 as Exhibit Marrs 17 and ask you to take a look at
18 that.
19     Now, this appears to be a faxed letter
20 on AmeriSource Corporation letterhead addressed
21 to Mr. Joseph Ruhmell of Dey Laboratories.
22     The fax dates appear to be October 17,

Page 189

1  2000 and October 23, 2000.
2      Do you see that?
3      A.  I see that, yes.
4      **Q.  And the letter is signed by Janet**
5  **Penner, Director, Multisource Rx Supply Chain**
6  **Management from AmeriSource Corporation; correct?**
7      A.  Correct.
8      **Q.  And in this letter AmeriSource says in**
9  **the second paragraph, "AmeriSource is taking this**
10 **opportunity to remind you of some of your**
11 **obligations with regard to the transactions**
12 **between us.  Your reporting of the prices at**
13 **which you sell to us should include all discounts**
14 **and rebates in whatever form."**
15     **Do you see that?**
16     A.  I do.
17     **Q.  And then at the bottom it says, "Please**
18 **sign and return this letter to show your**
19 **understanding of your obligations under current**
20 **law."**
21     **Do you see that?**
22     A.  I do.

Henderson Legal Services, Inc.

202-220-4158                                                    www.hendersonlegalservices.com

Page 298

1    30-second questions.

2              MR. DOYLE:  We'll see you in July then.

3              VIDEOGRAPHER:  This concludes today's

4    deposition of Pamela Marrs.

5              We are off the record at 4:59 p.m.

6                  (Thereupon the deposition was

7    adjourned at 4:59 p.m.)

8

9

10

11

12

13

14

15                  --o0o--

16     Signed under penalty of perjury:

17

18     _____

19             PAMELA MARRS

20

21     _____

22             Date

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                      May 15, 2008
                                   Napa, CA

Page 299

1                               --o0o--

2

3          I, CAROL NYGARD DROBNY, a Certified Shorthand

4     Reporter of the State of California, duly authorized to

5     administer oaths, do hereby certify:

6              That I am a disinterested person herein; that

7     the Witness, PAMELA MARRS, named in the foregoing

8     deposition was by me duly sworn to testify the truth,

9     the whole truth, and nothing but the truth; that the

10    deposition was reported in shorthand by me, CAROL NYGARD

11    DROBNY, a Certified Shorthand Reporter of the State of

12    California, and thereafter transcribed into typewriting.

13             That before completion of the deposition,

14    review of the transcript [ ] was [X] was not requested.

15    If requested, any changes made by the deponent (and

16    provided to the Reporter) during the period allowed are

17    appended hereto.

18             Dated:  May 19, 2008

19

20

21            _____

22            CAROL NYGARD DROBNY CSR #4018

11/13/96   WED 16:38 FAX 7012240495          DEY LABS               *** DALLAS OFFICE          ☒002

# I   N   T   E   R
# O   F   F   I   C   E

## DEY LABORATORIES
## MEMORANDUM

**TO:**   Territory Account Managers      **CC:**   M. Anderle
Inside Sales Representatives                D. Bronstein
National Account Managers                  M. Hannum
Regional Sales Managers                    R. Mozak
Contracts Department                       S. Schnars
Dallas and Napa DC's                       B. Tipton

**FROM:**   Todd Galles

**DATE:**   November 13, 1996

**RE:**   Albuterol Inhalation Aerosol Refill Launch

It is finally launch time for **Albuterol Inhalation Aerosol Refill**!!!  Orders have been placed with Glaxo and the product is on its way to Dallas.  We anticipate shipping orders as soon as November 15, 1996.  I realize this is short notice, but given the recent delays we were reluctant to say anything until we had product in transit.

As far as the delays, let's not get bogged down in the why's and how comes, because all it really boiled down to was our lawyers and their lawyers (of which they have many) protecting each other to the $N^{TH}$ degree.  The spirit of the strategic alliance remains intact and both companies are excited about the opportunity to work together again. Let's get out there and show them what Dey can do!

You each received an **Albuterol Inhalation Aerosol Refill** handout at your sales meeting earlier this Fall.  Let's review the contents and then I'll tell you about the updates.

Included in the handout were: launch plan overview, mock-up ad slick (09-650-02), "Refill Now Available" stickers and a sell sheet with the sticker attached showing the correct location, a sheet of 30 stickers, the chain new item fact sheet (gold), an empty sleeve for the trade letters, a copy of the Glaxo SNDA letter, and sample packaging including the label, shelf carton and package insert.

**DL 62018**


EXHIBIT 013
WIT: Marro
DATE: 5-15-08
CAROL NYGARD DROBNY

**CONFIDENTIAL**

DEY077-2233

Refill Launch Memo
Page 2
November 13, 1996

New updated materials are now available as listed and are enclosed with this mailing:

| | |
|---|---|
| 25 | ad slicks |
| 20 | sell sheets with stickers |
| 2 | sticker sheets |
| 5 | NIFS: whlsr-white |
| 5 | NIFS: chain-gold |
| 1 | set of trade letters (with inventory stock adjustment form) |
| 1 | cheat sheet |
| 5 | price sheet: whslr-orange |
| 5 | price sheet: Hosp-blue |
| 5 | price sheet: Retail-gold |
| 25 | price sheet: AWP-white |
| 1 | sample AWP Medicaid notification letter |
| 1 | sample WAC Medicaid notification letter |
| 1 | Medicaid Product Approval Record form (copy as needed) |

For your information, in the future we will only provide the following published price lists:
Wholesale (orange), Hospital (blue), Retail (gold), and AWP (white). In addition, you
will continue to receive the "Company Confidential" cheat sheet.

We have decided to take advantage of this opportunity and to inform our wholesalers of
a price reduction for the Kit.  Following is updated information for both DEY Albuterol
Inhalation Aerosol products.  Please note, in addition to the new Refill, the **Kit WAC
price has been lowered to $6.00** (effective 12/1/96):

| NDC Order Number | Description | Size | Units/Ctn | Ctns/Case | WAC | AWP |
|---|---|---|---|---|---|---|
| 49502-303-17 | Albuterol Inhalation Aerosol 17g  Kit | 200 Metered Inhalations | 1 | 144 | $6.00 Effective 12/1/96 | $21.70 |
| NEW 49502-303-27 | Albuterol Inhalation Aerosol 17g  Refill | 200 Metered Inhalations | 1 | 144 | $5.75 | $19.79 |

Included with the set of trade letters is a sample of the inventory adjustment form that
your wholesalers must use in order to have their inventory re-evaluated by Dey.  Their
deadline is December 10, 1996.

The following Pricing Databases have been informed regarding the launch of Refill:
First Data Bank, Medispan, Red Book, and Facts and Comparisons.

**DL 62019**

**CONFIDENTIAL**

DEY077-2234

11/13/96  WED 16:40 FAX 7072240495          DEY LABS          ⇒⇒⇒ DALLAS OFFICE          ☒004

Refill Launch Memo
Page 3
November 13, 1996

Medicaid, State Formulary and Drug Utilization Review locations have been notified.
Refill has already been approved in New Jersey and Texas. Most other states will
automatically approve it because it is a refill. **Action is required on your part:** Please
complete the attached Medicaid Product Approval Record form and return to Gaye
Lynn, no later than December 1, 1996. A sample of both the AWP and WAC letters are
attached.   As you are aware, some states utilize one or the other for reimbursement
calculations.

That's it for now.  Call us if you have any questions.  Good luck and good selling!

**DL 62020**

**CONFIDENTIAL**

DEY077-2235