# EXHIBIT I

Page 300

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3    ----------------------------------X

 4    IN RE PHARMACEUTICAL INDUSTRY      )

 5    AVERAGE WHOLESALE PRICE LITIGATION)

 6    ----------------------------------X Volume 1

 7    THIS DOCUMENT RELATES TO:          ) MDL NO. 1456

 8    The City of New York, et al.,      ) Civil Action

 9       V.                              ) No. 01-12257-PBS

10    Abbott Laboratories, et al.        )

11    ----------------------------------X

12    THIS DOCUMENT RELATES TO:          )

13    State of California, ex rel.       )

14    Ven-A-Care v. Abbott Laboratories,)

15    Inc., et al., Case No.             )

16    03-cv-11226-PBS                    )

17    ----------------------------------X

18                      JULY 10, 2008

19         DEPOSITION OF DEY, L.P. AND DEY, INC.

20            BY PAMELA MARRS - VOLUME II

21

22    Reported By: WENDY L. VAN MEERBEKE, CSR No. 3676
```

Page 449

1  describing Dey's knowledge and understanding of
2  the laws, practices and policies of -- of the
3  Medicare reimbursement of Dey's drugs during the
4  time period that we're talking about in this
5  case?
6        MS. GIULIANA: Objection. Form.
7        THE WITNESS: And I guess I'm probably
8  more prepared to talk about the global Medicare
9  reimbursement, which is basically that it was --
10 prior to now, it was an AWP-based system.
11 Eventually, it sort of migrated to minus 90 or 95
12 and then to minus 85.
13       MR. HENDERSON:
14    Q. Minus five, you mean?
15    A. Minus five, yeah, yeah, yeah. So it
16 was 95 percent of AWP. And now we're on ASP plus
17 six system plus dispensing fee in both cases.
18 And that there are a variety of other -- federal
19 upper limit can come in to limit the
20 reimbursement rate.
21       I mean, it's -- and that there are a
22 lot of reports which you have these binders of

Page 450

1  which indicate that it's basically a flawed
2  system and that there's been a lot of controversy
3  over whether or not the reimbursement rates are
4  reasonable.
5     Q. Okay. Has it been important in Dey's
6  business to understand how Medicare reimbursement
7  applies with respect to Dey's drugs?
8        MS. GIULIANA: Objection. Form.
9        THE WITNESS: It's important from the
10 standpoint if it affects the customer and if the
11 customer brings it up as an issue in their
12 business. And sometimes they do and sometimes
13 they don't. You know, it seems to come up more
14 frequently when -- when there is an inequity
15 amongst -- amongst competitors for common drugs.
16       MR. HENDERSON:
17    Q. Okay. Turning to -- well, let me back
18 up.
19       Your answer about why it's sometimes
20 important for Dey to understand how Medicare
21 reimburses for Dey's drugs, is that -- I'll
22 withdraw the question.

Page 451

1        Turning to page -- Exhibit 31, a
2  memorandum from Rob Ellis to distribution, on
3  page DL60039, it has a discussion regarding
4  Medicare -- regarding Medicare. Is that fair
5  enough?
6     A. Yes.
7     Q. And it describes -- starts off by
8  describing four regional Medicare carriers?
9     A. Yes.
10    Q. And that first sentence also refers in
11 parentheses to nebulizer solutions?
12    A. Yes.
13    Q. In March of 1993, did Dey manufacture
14 and sell nebulizer solutions?
15    A. Yes.
16    Q. What were those?
17    A. Most of our products, saline -- let's
18 see. What year did you say? '93. It's
19 albuterol, saline. Cromolyn wasn't approved yet.
20 So eventually cromolyn would have been in that
21 category. But in '90 -- in '93, it may have just
22 have been purified water, saline and albuterol

Page 452

1  were the main ones. Metaproterenol may have been
2  in there. I'll spell it for you later.
3     Q. And on the top of the next page, 60040,
4  it says,
5        "For your information, any questions
6  concerning Medicare or Medicaid should now be
7  directed to Carrie Jackson. She has assumed
8  those responsibilities and will answer questions
9  and provide follow-up as needed." Do you yourself
10 have knowledge of Carrie Jackson assuming
11 responsibilities concerning Medicare or Medicaid
12 information?
13       MS. GIULIANA: Objection. Form.
14       THE WITNESS: I don't recall it as I
15 sit here today, but I obviously got this memo so
16 I must have known it at the time.
17       MR. HENDERSON:
18    Q. Is it fair to conclude that Dey did
19 assign to Carrie Jackson responsibilities
20 concerning Medicare or Medicaid information?
21       MS. GIULIANA: Objection. Form.
22       THE WITNESS: There's -- yes. Some

Page 457

1   I'm not saying I've never seen it. I just don't
2   recall it.
3       Q. Okay. Well, I'll suggest to you that
4   Mr. Uhl testified that he prepared this document
5   and he presented it at Dey's 1994 national sales
6   meeting.
7       MS. GIULIANA: Objection. Form.
8   Mischaracterizes his testimony.
9       MR. HENDERSON:
10      Q. Regardless of whether I've
11  mischaracterized it, I'll represent to you that
12  that's my characterization of his testimony. But
13  accepting for the moment that characterization,
14  does Dey have any information that would suggest
15  that that testimony was incorrect?
16      MS. GIULIANA: Objection. Form.
17      THE WITNESS: The only thing I would
18  say about this the more I look at it, there's all
19  this detail information here. The national sales
20  meeting -- let's see. In '94, we had a much
21  smaller sales force.
22      The national sales meeting was

Page 458

1   typically to a broader audience and then they
2   would have these break-out sessions to a smaller
3   group of people. So if it was presented at the
4   national sales meeting, I would be surprised if
5   it was presented in the broader group. But I
6   don't really have any information one way or the
7   other. It just -- it looks like a very -- I
8   don't want to say -- it's not a glitzy kind of
9   document you would present to a large group of
10  people. It looks very kind of amateurish the way
11  it's been prepared in terms of the -- the look to
12  it.
13      Usually at the national sales meeting,
14  things were a little glitzier in terms of the way
15  they looked. They were more professionally
16  prepared. But I -- I don't know one way or the
17  other who or how this was presented.
18      MR. HENDERSON:
19      Q. All right. Aside from your -- aside
20  from what you've just said, are you aware of any
21  other information or evidence to suggest that Mr.
22  Uhl was misstating or was incorrect when he

Page 459

1   testified that he presented this at the 1994
2   national sales meeting?
3       MS. GIULIANA: Objection. Form. It
4   mischaracterizes his testimony.
5       THE WITNESS: I don't have any
6   information one way or the other.
7       MR. HENDERSON:
8       Q. Okay. Thank you. I'd like to turn now
9   to topic six. I'm sorry. I want to -- I want to
10  move -- I want to go to topic seven and then I'll
11  come back to six. Have you read to yourself the
12  topic that's described in paragraph seven of the
13  United States' cross-notice, which is Exhibit 1?
14      A. I have.
15      Q. And I think previously today you've
16  indicated that it was industry practice -- that
17  Dey was simply following industry practice when
18  it set its AWPs for its generic products.
19      MS. GIULIANA: Objection. Form.
20      MR. HENDERSON:
21      Q. Am I characterizing your testimony
22  fairly?

Page 460

1       MS. GIULIANA: Same objection.
2       THE WITNESS: I think what I said was
3   that it -- it was my understanding it was
4   industry practice to set AWPs for generics at a
5   percentage off of the brand and that that
6   information was generally obtained from Ed
7   Edelstein at First DataBank when his advice was
8   sought by Bob Mozak.
9       MR. HENDERSON:
10      Q. Okay. So I -- to prepare for this
11  particular topic, what did you do?
12      A. This week, nothing. Before, I do
13  recall reading a transcript of a deposition where
14  the contact with Ed Edelstein was referenced.
15  It's something that I have just generally heard
16  from the attorneys as well as Mr. Mozak in the
17  course of providing documents for this
18  litigation.
19      Other than the reference to Mr.
20  Edelstein, I don't recall a specific document
21  right now that talked about industry practice.
22  It was more just what he indicated to me.

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II

Napa, CA

July 10, 2008

Page 537

1     A. I believe that's what is represented in
2 these documents in Exhibit 33. And if I could
3 just add one thing, because before when we spoke
4 about this question, we were focused on the AWP
5 piece. We didn't really talk about the WAC
6 piece, which to me is confusing because it says,
7 "WACs that were higher than actual wholesale
8 acquisition costs."
9     Well, by definition -- by Dey's
10 definition and I believe by industry definition -
11 - although I'm not 100 percent sure if everyone
12 in the industry does this. Our WAC is our
13 invoice price to the wholesaler. So from our
14 standpoint, WAC equals invoice price -- actual
15 invoice price. So to me these are saying the
16 same thing.
17     Q. Okay. Let's discuss that topic.
18 You're right. Our previous questions and your
19 testimony was -- did not cover the WAC issue.
20     You said Dey's WACs are Dey's invoice
21 prices?
22     A. To wholesalers.

Page 538

1     Q. To wholesalers. And do you equate the
2 invoice price with actual acquisition cost?
3     A. Well, if -- if wholesale -- if the
4 acronym WAC means wholesale acquisition cost,
5 then our definition is that WAC equals the
6 invoice price -- an undiscounted invoice price to
7 the wholesaler.
8     Q. When a wholesaler buys product from
9 Dey, the cost of acquiring that product -- is
10 that cost always WAC?
11     A. The invoice always goes out at WAC. I
12 mean, maybe over the years there has been an
13 exception or two, but the general practice is,
14 any invoice that goes out with the product when
15 it's shipped to the customer to -- to a wholesale
16 customer is at WAC.
17     Q. I didn't ask you about invoice. I
18 asked you about the cost to the wholesaler.
19     A. Well, at the point of shipment, that is
20 the cost to the wholesaler.
21     MS. GIULIANA: Objection to form.
22     MR. HENDERSON:

Page 539

1     Q. The wholesaler's acquisition cost is --
2 includes discounts and rebates and such; isn't
3 that fair to say?
4     MS. GIULIANA: Objection to form.
5     THE WITNESS: Well, I think we're back
6 to definitions because, you know, again, in these
7 documents -- and I'm not sure which one right
8 now, it talks about the fact that everyone knew
9 that WAC, which is equivalent to the invoice
10 price to the wholesaler, was an undiscounted
11 price. It's been disclosed in government
12 reports. It's been disclosed on our reports
13 since, I think, '99 that we sent to the Medicaid
14 agencies.
15     So if you choose to define it some
16 other way, we can talk about what you mean. But
17 from a -- from a big-picture standpoint, WAC to
18 me means the undiscounted price to the
19 wholesaler.
20     MR. HENDERSON:
21     Q. Okay. For purposes --
22     A. And it's the actual invoice price.

Page 540

1     Q. Okay. For purposes of topics eight and
2 nine, I'd like to ask you to assume that the
3 actual -- the words "actual wholesale acquisition
4 costs" means the net costs including discounts
5 and rebates --
6     MS. GIULIANA: Objection.
7     MR. HENDERSON:
8     Q. -- and other price and chargebacks.
9 Okay?
10     MS. GIULIANA: Objection to the form.
11     THE WITNESS: I can assume that, but
12 that's not what the words say to me, so I would
13 suggest the words should have been different if
14 you meant net price.
15     MR. HENDERSON:
16     Q. I understand.
17     A. So maybe when you ask the question, you
18 can use, you know, "discounted price" as opposed
19 to "wholesale" -- "actual wholesale acquisition
20 cost," because that's not what I actually means
21 to me.
22     Q. If I use the shorthand term "actual net

61 (Pages 537 to 540)

Page 541

1  acquisition cost," is that something you can
2  understand?
3      MS. GIULIANA: Objection to the form.
4      THE WITNESS: It might be better if you
5  said, "net of all chargebacks, discounts and
6  allowances."
7      MR. HENDERSON:
8  Q. Okay. I will try to meet you on that.
9  Let's come back very briefly to topic eight.
10 With regard to -- I think you've just told me
11 Dey's belief about whether or not -- let me start
12 over again.
13     I think you've already told me that
14 Dey's belief has been that the United States
15 government has had knowledge of Dey's practice of
16 causing publication of WACs that were higher than
17 the actual discounted wholesale acquisition
18 costs.
19     MS. GIULIANA: Objection to the form.
20     MR. HENDERSON:
21 Q. Did I -- is my understanding correct?
22 A. It's the net price to the wholesaler

Page 542

1  after discounts. "Acquisition" is what's hanging
2  me up a little because it sounds so much like the
3  acronym.
4      But yes, I believe that the government
5  knew that WAC was not a discounted price.
6  Q. Okay.
7  A. And that ultimately, the wholesalers
8  could receive other discounts that were not in
9  the WAC invoice price.
10 Q. Okay. And to move things along, is
11 your testimony the same with regard to topic
12 eight, that Dey believes that the United States
13 government approved and acquiesced in Dey's
14 practice of causing the publication of WACs that
15 were higher than the net discounted wholesale
16 acquisition cost?
17     MS. GIULIANA: Objection to the form.
18     THE WITNESS: Since the government knew
19 that it was an undiscounted price and took no
20 action until just recently, really, to change the
21 reimbursement formula, then, yes, I would say
22 they acquiesced to it. And in the case of

Page 543

1  Medicaid where they were approving the
2  methodologies, approved it to the extent the
3  state formula or methodology had WAC in the
4  calculation.
5      MR. HENDERSON:
6  Q. All right. And with regard to
7  subtopics A, B, C and D of topics eight and nine,
8  is your testimony about the -- who held the
9  belief, the time period and the documents and
10 other information that informed -- that formed
11 the basis for those beliefs -- is it essentially
12 the same as you've already testified to today?
13     MS. GIULIANA: Objection to the form.
14     MR. HENDERSON:
15 Q. In regard to --
16     MS. GIULIANA: Same objection.
17     THE WITNESS: Let me modify what I said
18 earlier just a bit. When we were talking before,
19 we were focused on AWP.
20     MR. HENDERSON:
21 Q. Yes.
22 A. The AWP issue -- AWP is not as widely

Page 544

1  known in the company because it doesn't affect
2  most people.
3      WAC, on the other hand -- I would
4  venture a guess that almost anyone who deals with
5  an invoice or a WAC price in the contracts area,
6  for example, or even a salesperson, an accounting
7  person, they all know that WAC is an undiscounted
8  price because they know that there are
9  subsequently chargebacks issued and rebates
10 issued in some cases that ultimately reduce the
11 credits that are issued to the wholesalers.
12     So it's a broader -- the WAC situation
13 is much more broadly known in terms of what it
14 represents than AWP.
15 Q. More broadly known within government
16 circles?
17 A. In terms of --
18     MS. GIULIANA: Objection to the form.
19     THE WITNESS: It's more broadly known
20 within Dey in terms of individuals because it's
21 something that they deal with in the business.
22 You know, there's an invoice that has WAC on it,

```
 1   today's deposition of Pamela Marrs.  This also

 2   marks the end of tape number four, Volume II.

 3   Going off the record.  The time is 4:56.

 4                (Thereupon the deposition was

 5   adjourned at 4:56 P.M.)

 6

 7

 8

 9

10

11

12        Signed under penalty of perjury:

13

14

15        _____

16                   PAMELA MARRS

17

18        _____

19                      Date

20

21

22
```

Page 575

```
 1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2

 3

 4              I, WENDY L. VAN MEERBEKE, Certified Shorthand

 5   Reporter of the State of California, do hereby certify

 6   that I took the deposition of PAMELA MARRS at 875

 7   Bordeaux Way, Napa, California, California, on July 10,

 8   2008.

 9              I further certify that said witness was duly

10   sworn to testify the truth, the whole truth, and

11   nothing but the truth, and that the foregoing testimony

12   was taken by me and is true and accurate to the best of

13   my knowledge, skill, and ability.

14              I further certify that I am not related by

15   blood or by marriage to any of the parties hereto or

16   their counsel, and that I am in no way interested in

17   the outcome hereof.  Dated this 21st day of July, 2008,

18   at Sacramento, California.

19

20   _____

21   WENDY L. VAN MEERBEKE, CSR #3676

22                         --oOo--
```