# EXHIBIT P

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - -

 4    IN RE:  PHARMACEUTICAL         )   MDL NO. 1456

 5    INDUSTRY AVERAGE WHOLESALE     )   CIVIL ACTION

 6    PRICE LITIGATION               )   01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO       )

 8    U.S. ex rel. Ven-a-Care of     )   Judge Patti B. Saris

 9    the Florida Keys, Inc.         )

10         v.                        )   Chief Magistrate

11    Abbott Laboratories, Inc.,     )   Judge Marianne B.

12    No. 06-CV-11337-PBS            )   Bowler

13    - - - - - - - - - - - - - - - -

14         (cross captions appear on following pages)

15

16

17          Videotaped deposition of SUE GASTON

18                      Volume I

19

20                      Washington, D.C.

21                      Thursday, January 24, 2008

22                      9:00 a.m.
```

Gaston, Sue
Washington, DC
January 24, 2008

Page 222

1   state.
2       (Exhibit Abbott 461 was
3       marked for
4       identification.)
5       MR. TORBORG: I'm told that we have five
6   minutes left on the tape and it's within about an
7   hour. So let's go ahead and take a break here.
8       THE VIDEOGRAPHER: This is the end of
9   tape 4. Off the record at 3:17.
10      (Recess.)
11      THE VIDEOGRAPHER: This is the beginning
12  of tape 5 in the deposition of Ms. Gaston. On the
13  record at 3:43.
14      MR. TORBORG: Welcome back, Ms. Gaston.
15      THE WITNESS: Thank you.
16      MR. TORBORG: I wanted to cover
17  something, some housekeeping matters on the record
18  very quickly. I understand from Ms. Martinez that
19  there are some additional documents from Ms.
20  Gaston's files or legacy files that are yet to be
21  produced. Is that right?
22      MS. MARTINEZ: Yes.

Page 223

1       MR. TORBORG: And those are ones that
2   you're working on currently and we intend to
3   schedule a second day with Ms. Gaston so that we can
4   go over those documents.
5       MS. MARTINEZ: I believe what you told me
6   is that you'd look at them and see if you need an
7   additional day.
8       MR. TORBORG: That's true.
9       MS. MARTINEZ: But naturally --
10      MR. TORBORG: I will need an additional
11  day anyway.
12      MS. MARTINEZ: Okay. That's what I
13  thought.
14      MR. TORBORG: Okay.
15      BY MR. TORBORG:
16  Q.  Okay. Going back to the subject of
17  federal upper limits, Ms. Gaston, I want to ask just
18  a few very general background questions about how
19  the process worked at HCFA, who was involved in what
20  aspects and things of that nature. Earlier you
21  testified or you identified three people at CMS who
22  were involved in establishing the FULs. I believe

Page 224

1   you said from 1991 through 2003 when you were doing
2   that, correct?
3   A.  Correct.
4   Q.  And those three people were -- three
5   additional people were Peter Rodler, Cindy Bergin
6   and Gail Sexton?
7   A.  Gail Sexton worked on the FULs after
8   2003.
9   Q.  Did she have any involvement with FULs
10  prior to 2003?
11  A.  No.
12  Q.  What was she doing prior to 2003?
13  A.  I'm not sure. She was employed by CMS
14  around that time, but I don't know exactly when she
15  started.
16  Q.  And Mr. Rodler I understand was somebody
17  who had been at HCFA and the Medicaid Bureau prior
18  to you being there?
19  A.  Correct.
20  Q.  And then at some point he retired or
21  moved on?
22  A.  Correct.

Page 225

1   Q.  Do you know when he retired or moved on?
2   A.  No.
3   Q.  Can you give me a sense? Was it early
4   '90s, late '80s?
5   A.  I'm guessing it was in the '90s. Not in
6   the late '90s, but I'm not sure.
7   Q.  And Cindy Bergin, when did she work at
8   CMS on the FUL issues?
9   A.  She was hired -- I'm not sure exactly the
10  date -- probably eight or nine years ago. And I
11  mentored here on the FULs until I left in 2003.
12  Q.  So she would have been someone that was
13  working on FUL issues starting in the mid to late
14  '90s; is that fair to say?
15  A.  That's fair to say.
16  Q.  And did you work with Mr. Rodler on the
17  federal upper limit issues or did you sort of
18  succeed his duties?
19  A.  He taught me how to handle the federal
20  upper limit program. And then when he left I took
21  it over.
22  Q.  And did Cindy Bergin take it over from

57 (Pages 222 to 225)

Gaston, Sue  
Washington, DC  
January 24, 2008

Page 226

1  you --
2  A.  Yes.
3  Q.  And then at some point is it your
4  understanding that Gail Sexton took it over from
5  Cindy Bergin or were they both working on it?
6  A.  She -- Cindy trained Gail and then Gail
7  took it over when Cindy left the area.
8  Q.  So it sounds to me -- and please tell me
9  if I'm mischaracterizing this or misunderstanding
10  this -- that the mechanics of the FUL program were
11  handled primarily by one person, but there was some
12  overlap in training.  Is that right?
13      MS. MARTINEZ:  Objection, form.
14  A.  Generally speaking.  There were periods
15  when it was just one person.  And then when there
16  were two, even though one was training they were
17  both working on it.
18  Q.  And did you first get involved -- is it
19  your recollection that a transition between yourself
20  and Mr. Rodler happened in the early '90s; is that
21  fair to say?
22  A.  When Pete retired then I took it over.

Page 227

1  Q.  And was there anyone else working on the
2  FUL issues besides yourself from that point until
3  Cindy Bergin came on in the mid to late '90s?
4  A.  There was a period of time where I
5  trained Altamease Arnold, but --
6  Q.  Was she in your office?
7  A.  She was in our office.  But she was
8  never -- she never really worked on the program per
9  se.
10  Q.  When you say per se, what do you mean by
11  that?  Officially or what does that mean?
12  A.  She never really learned the program to
13  work on it.
14  Q.  What does it mean to learn the program?
15  A.  When you try to teach someone the program
16  but they choose not to absorb what you're teaching.
17  Q.  Got it.  Is she still working at CMS?
18  A.  No.
19  Q.  When did she leave CMS?
20  A.  She retired last year.
21  Q.  What was her position at CMS?
22  A.  Health insurance specialist.

Page 228

1  Q.  Was that the same position that you had?
2  A.  Yes.
3  Q.  So you were equals, so to speak?
4  A.  Most of the analysts in our area are all
5  health insurance specialists.
6  Q.  Okay.  And you indicated that Mr. Reed
7  would have some input into the FULs and I think you
8  used the word even the final say.
9  A.  Correct.
10  Q.  What does that mean?
11  A.  He's the division director.
12  Q.  So what would the extent of his
13  involvement be with FULs?  When would he get
14  involved?
15  A.  Throughout -- whenever necessary he was
16  there to discuss issues that might need to be
17  discussed.  The final publication he was aware of
18  and would have to give his okay in order to send it
19  through or any letters that would go through
20  generally were from an authority higher than me.
21  Q.  Can you tell me what kind of issues would
22  come up in the FUL program that would necessitate

Page 229

1  his involvement?
2  A.  Maybe just general discussion.
3  Especially when I was the only one working on the
4  FUL program, just a general discussion of maybe
5  particular drugs, the pricing just somebody to have
6  an open discussion about how we're setting the
7  prices, because there's manual review involved.
8  Q.  What do you mean when you say there's
9  manual review involved?  And we'll get into a little
10  bit more the mechanics, but generally speaking what
11  do you mean by that?
12  A.  Generally you have paper that you work
13  from.  You have the compendia with all the drug
14  numbers on it and the pricing.  And sometimes you
15  have to make determinations if it looks like a drug
16  is truly available or not, whether you should follow
17  up and see if it's available.  Sometimes it's better
18  to discuss it with someone to see that you're
19  looking at it the same way that they might be
20  looking at it.
21  Q.  When you say truly available, do you
22  remember is the product available from a particular

58 (Pages 226 to 229)

Page 230

1  manufacturer, whether it be because they quit making
2  the drug or they have a shortage of the drug? Is
3  that what you're talking about?
4      A.   I think what I'm talking about, at least
5  preliminarily, is we have printouts from the
6  compendia. And just looking at the printouts,
7  sometimes there might be pricing that looks like
8  it's not updated in the compendia source. So you
9  might want to discuss and say does this look like
10 it's maybe old pricing, maybe we should follow up
11 and see if it's still available. Has the pricing
12 been updated, is the drug still out there, because a
13 lot of times the compendia might not be totally up
14 to date.
15     Q.   How much of your time, if you could
16 estimate, in your position as a health insurance
17 specialist from '91 to 2003, roughly, did you spend
18 on the FUL program?
19     A.   I really can't say. There was a period
20 of time when we were trying to get a publication out
21 where I could spend the majority of my time working
22 on it. I had other duties, so the FULs couldn't

Page 231

1  take up all of my time every day. It just depended
2  on what activity occurred. You would stop. You
3  would work on the FULs. Then I would go back to my
4  other areas.
5      Q.   Did you work -- are you a five-day
6  employee every week or did you work part time during
7  this time?
8      A.   During the 2003 --
9      Q.   During the '91 through 2003 time period?
10     A.   I was an eight hour a day, five day --
11     Q.   Five day a week employee?
12     A.   Correct.
13     Q.   All right. Could you walk me through
14 the -- let me see if it helps facilitate the
15 discussion to find a document here that might help
16 us talk about this a bit.
17                 (Exhibit Abbott 462 was
18                  marked for
19                  identification.)
20          BY MR. TORBORG:
21     Q.   For the record, what I've marked as
22 Abbott Exhibit 462 bears the Bates numbers HHC

Page 232

1  902-0446. Ms. Gaston, if you would take a look at
2  that document and let me know if that's a document
3  that you're familiar with.
4      A.   Yes. I am familiar with it.
5      Q.   Could you tell us what this document is?
6      A.   It looks like it's just an overview of
7  the federal upper limit program.
8      Q.   Did you play a part in drafting this
9  document?
10     A.   I may have. I'm not sure.
11     Q.   Ms. Gaston, can you walk me through
12 basically what you did to establish federal upper
13 limits for drugs? Can you just walk me through the
14 process?
15     A.   Do you want me to use this exhibit?
16     Q.   If it helps --
17     A.   Okay.
18     Q.   -- that would be fine. I'm just trying
19 to have you -- put me back in your office back in
20 the mid-'90s or whenever you were working on this
21 and tell me what you did.
22     A.   Well, first of all we have an

Page 233

1  application. I'm going to talk about it in
2  reference to the application that's used that houses
3  this information. But our systems folks when it's
4  time to set a FUL or put out a new list of FUL
5  drugs, the system folks will obtain the FDA Orange
6  Book data and they'll pull that into their system.
7  And there are some standards within that program
8  that look for the criteria that's sort of detailed
9  in this handout here.
10         Once that criteria is met then the system
11 will pull in the latest compendia data and then
12 they'll merge the two. And the compendia data,
13 there's some criteria in there too. But they try to
14 match the compendia data to the drugs pulled from
15 the FDA. And they match them together and then the
16 application -- and I'm simplifying this -- but the
17 application will have in there FUL groups, which
18 include like all NDC numbers, and it will have the
19 FUL group, the drug names, the NDC number and then
20 the compendia and the compendia pricing in there.
21         So it will have the source, if it's Red
22 Book, Blue Book, Medi-Span, and then it will have

Page 234

1    the prices. It will have an AWP price, a direct
2    price or WAC price. If there's not a price it'll
3    just be blank in any of those categories. And then
4    the system, the application itself -- from my
5    recollection -- it's been a while since I've used
6    it. But it will determine a FUL price where it can.
7          Then we apply some manual review just to
8    assure we have -- there's some edits and I can't
9    remember all of those. But we want to make sure
10   that it's using -- because it's supposed to use the
11   lowest price in published compendia, and we want to
12   make sure that that lowest price is a true price,
13   that it's using a true price to establish a FUL.
14         So there's a manual review that's applied
15   to some of the drugs where the pricing might not
16   look right in there or there's missing pricing. But
17   basically there's a lot of manual review that's
18   included before the final FUL listing will come out.
19      Q.   Okay. I appreciate that. I'm going to
20   try to follow up on each of those steps as best I
21   can. You indicated that there was a system
22   involved.

Page 235

1       A.   It's an application.
2       Q.   I think I've seen some documents that
3    indicate the FUL process was computerized?
4       A.   Correct.
5       Q.   Right? Is that what you're talking about
6    when you talk about the system?
7       A.   Yeah. It's an application that they use.
8       Q.   And what kind of application is it?
9       A.   I'm not a techie person. I don't know.
10   It's on the computer. It's an application. I don't
11   know what more -- how to describe it.
12      Q.   Was the application set up before you
13   started working on it or did you --
14      A.   No.
15      Q.   -- take part in setting it up?
16      A.   When I first started working on FULs it
17   was in our mainframe. The activity would occur in
18   our mainframe. They took it from the mainframe and
19   put it into an application that they can use on the
20   computer, if that helps.
21      Q.   And do you recall -- was there someone --
22   you mentioned systems folks. Was there somebody at

Page 236

1    CMS in the systems department that was involved in
2    this?
3       A.   In the switch to the new application?
4       Q.   Yeah. And basically the FUL program in
5    general. Who was involved in loading data --
6       A.   The systems support was Dona Kaufman.
7    D-o-n-a.
8       Q.   Was there anyone else you recall or was
9    she the primary person?
10      A.   There was someone before her, but he no
11   longer works for CMS and I can't remember his name.
12   But she was the main one for the new application.
13      Q.   Do you know if she's still there today?
14      A.   Yes.
15      Q.   Do you recall when the new application --
16   when you moved from the mainframe to the new
17   application?
18      A.   Time?
19      Q.   Yes. When that happened.
20      A.   After '95.
21      Q.   Prior to 1995 was the process still
22   computerized bringing in information from the

Page 237

1    compendia and that kind of information?
2       A.   It was brought into the mainframe.
3       Q.   Just brought into a different computer in
4    other words? I'm not a techie either.
5       A.   I'm just saying mainframe because that's
6    what I know.
7       Q.   And do you know what the application is
8    called?
9       A.   FULs.
10      Q.   FULs. Now, the Orange Book has a place
11   in this process, correct?
12      A.   Right.
13      Q.   And could you tell us what the Orange
14   Book is and what impact it had?
15      A.   The FDA Orange Book. It lists the drugs
16   that are grouped by the FDA. If you have an Orange
17   Book available, I think they have on the front
18   page -- yeah -- the Orange Book can explain it much
19   better than I can. But -- yeah.
20      Q.   I'm handing you our only copy of the
21   Orange Book.
22      A.   But they get this electronically and it

Page 238

1  just has drugs by ingredient names. And they don't
2  have NDC numbers or anything in here. But they pull
3  data from the Orange Book where the criteria that's
4  in the regulation -- so it meets that criteria. And
5  they just pull what they can from there. There's
6  other type of system criteria in there that picks
7  the drugs that are selected for the FULs. But it
8  pulls it from the Orange Book first.
9      Q.   So they have an electronic version of the
10 Orange Book?
11     A.   They -- it's my understanding they do
12 now.
13     Q.   Do you know when they first started using
14 an electronic version of the Orange Book versus some
15 other method of getting the Orange Book data into
16 this computer?
17     A.   I really don't know.
18     Q.   Do you recall at some point somebody had
19 to go through the manual copy of the Orange Book --
20     A.   Oh, no. They wouldn't go through the
21 manual. They would just request the data from FDA.
22 I think the data now is available and they could go

Page 239

1  on the Web or someplace in FDA's website and obtain
2  the data now.
3      Q.   But it was all done to your knowledge --
4  as far as you can recall it was done electronically
5  in some way?
6      A.   Correct.
7      Q.   Somebody would set up a program that
8  would, say, identify the drugs that meet the FUL
9  criteria and then down those into a file, something
10 called Orange Book or something like that? Is that
11 how it worked?
12     A.   You would have to talk to our systems
13 folks. I just know that they would get -- they had
14 the criteria set in there and however it works, you
15 know. I mean, we're simplifying it, but I'm not a
16 data person. We just tell them what we need from
17 the Orange Book and they set up their criteria on
18 how they're going to get it and how it's selected.
19     Q.   And do you recall what the criteria was
20 for a drug to qualify for the FUL program?
21     A.   I'm going to read it from here. But it
22 says -- well, all the formulations of the drug

Page 240

1  products approved by the FDA are A-rated which are
2  therapeutically equivalent and then there must be
3  two rated A in the Orange Book. And then there's
4  another criteria where they can also allow a B-rated
5  drug when the A-rated drug products -- when there's
6  three A-rated drug products in the Orange Book.
7      Q.   Okay. So if not all the drugs within a
8  drug product group are rated A, then you have to
9  have three that are rated A?
10     A.   Correct, to allow a B-rated product.
11     Q.   Now, would the B-rated product or a
12 product that's not rated A, would that still be
13 governed by the FUL?
14     A.   If it's included in this, yes.
15     Q.   What involvement would you have in the
16 review of the Orange Book data and what gets on the
17 Orange Book lists in the computer?
18     A.   I have nothing to do with that.
19     Q.   Who was involved in that?
20     A.   If you're saying reviewing it --
21     Q.   Just who was involved in deciding which
22 drugs from the Orange Book, whether it be manual or

Page 241

1  electronic, get put into your FUL computer?
2      A.   The system folks would download the drugs
3  from the Orange Book. If further review is needed,
4  if some of the drugs are questionable, if they met
5  the criteria and maybe weren't on there before, then
6  we would look at those drugs to verify that they did
7  meet the criteria.
8      Q.   Let me ask you a specific question here.
9  And I'll give you my copy of this.
10          MR. TORBORG: And Ms. Martinez, you can
11 look on with her if you'd like.
12          MS. MARTINEZ: I'm going to try to stay
13 away from that videotape.
14          THE WITNESS: Thanks.
15          BY MR. TORBORG:
16     Q.   Specifically, on this top page, the right
17 column is a drug under the prescription drug product
18 list by the name vancomycin hydrochloride.
19          MS. MARTINEZ: Give me one second just to
20 glance at what it is.
21          Counsel, would you like to lay out a
22 little bit of foundation, like maybe the date of the

Gaston, Sue  
Washington, DC  
January 24, 2008

Page 250

1   A.   I don't know.
2   Q.   Have you ever seen a policy memorandum or
3   any other memorandum that discusses why injectables
4   are specifically excluded from the FUL program?
5        MS. MARTINEZ:  Objection, form.
6   A.   I'm not aware of that.
7   Q.   Are you aware of any other criteria that
8   HCFA has used to eliminate drugs that might
9   otherwise satisfy the regulatory or statutory
10  criteria?
11  A.   I think unit dose.
12  Q.   Can you explain a little bit -- that unit
13  stuff always makes my head spin.
14  A.   Just the little individual unit dose
15  packets, like little individual blister tablets that
16  might be in the little blister pack that are
17  generally distributed within a hospital setting.
18  Q.   And why are those -- do you understand
19  why those are excluded?
20  A.   Here again, what I think they're trying
21  to focus on is what's the drugs that are commonly
22  used and dispensed by the pharmacies.

Page 251

1   Q.   Any other exclusion criteria that you're
2   aware of?
3   A.   They may not want to capture the infusion
4   bags because here again that's generally used in an
5   impatient setting and not dispensed at the pharmacy.
6   Q.   Do you know if that's the fact that the
7   FUL program does not cover infusion bags?  Is that
8   something that you're aware of?
9   A.   As far as I know they don't.
10  Q.   And infusion bags would be what type of
11  products?
12  A.   I really can't say at this point.
13  Q.   Saline solution?
14  A.   Okay, fine.
15  Q.   Is that one?
16  A.   Yeah.
17  Q.   Dextrose-type solutions?
18  A.   That's my understanding.
19  Q.   And the rationale for exclusion of those
20  is the same as the rationale for excluding the
21  injectable drugs?
22  A.   Correct.

Page 252

1   Q.   Any other criteria you're aware of?
2   A.   That's all I can think of.
3   Q.   And do you know if the blister pack or
4   the infusion bag exclusions are written down
5   anywhere?
6   A.   I'm not aware of that.
7   Q.   Are -- I'm sorry.
8   A.   The systems folks, they might have
9   written criteria.  I really don't know and I can't
10  speak for them.  But I'm not aware of any.
11  Q.   Do you recall any discussions about --
12  apart here today in the deposition, of course --
13  about why infusion bags, blister packs and
14  injectable drugs are not included in the FUL list?
15  A.   You mean specific discussions?
16  Q.   Or general discussions.  Anything you
17  recall.
18  A.   I'm sure that it was discussed over the
19  years just within the process of working on the
20  FULs.
21  Q.   Do you know if HCFA has since changed the
22  way that it does FULs so that any of those three

Page 253

1   categories' exclusions are no longer excluded?
2   A.   I have no idea.
3   Q.   Okay.  I think that the next step you
4   discussed was the pulling in of the compendia
5   data --
6   A.   Correct.
7   Q.   -- into the mainframe or later the
8   application, correct?
9   A.   Correct.
10  Q.   And was that done with electronic copies
11  of the compendia data?
12  A.   I don't know.  I don't know how they
13  obtained that data.  I would assume it's electronic,
14  but I don't know.
15  Q.   But you did not sit down with a copy of
16  the Red Book or the Blue Book, a manual copy, and
17  input things into a computer?
18  A.   No.
19  Q.   Right?  What you know is that by the time
20  you got involved somebody had already loaded the
21  data into the system?
22  A.   Correct.

Henderson Legal Services, Inc.  
202-220-4158                                                                  www.hendersonlegalservices.com

Page 286

1          SIGNATURE OF WITNESS

2

3

4

5

6

7

8          _____

9                    SUE GASTON

10

11   Subscribed and sworn to and before me

12   this _____ day of _____, 20____.

13

14

15   _____

16          Notary Public

17

18

19

20

21

22