# EXHIBIT Q

Sexton, Gail
Washington, DC

May 20, 2008

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - - - - - -

4    IN RE: PHARMACEUTICAL           ) MDL NO. 1456

5    INDUSTRY AVERAGE WHOLESALE      ) CIVIL ACTION NO.

6    PRICE LITIGATION                ) 01-CV-12257-PBS

7    - - - - - - - - - - - - - - - - - - - - - - - -

8    THIS DOCUMENT RELATES TO:                    )

9    The City of New York v. Abbott Labs., et al.     )

10   (S.D.N.Y. No. 04-CV-06054)                  )

11   County of Suffolk v. Abbott Labs., et al.        )

12   (E.D.N.Y. No. 03-CV-229)                    )

13   County of Westchester v. Abbott Labs., et al.    )

14   (S.D.N.Y. No. 03-CV-6178)                   )

15   County of Rockland v. Abbott Labs., et al.       )

16   (S.D.N.Y. No. 03-CV-7055)                   )

17   [Caption continues on Next Page]            )

18

19                       Washington, D.C.

20                       Monday, May 20, 2008

21                       9:30 a.m.

22        VIDEOTAPED DEPOSITION OF GAIL SEXTON

Sexton, Gail                                                                                                                May 20, 2008
Washington, DC

Page 58

1   like Exhibit 4 generated?
2        A.   It can be generated at any point.
3   Generally I would print out a pricing sheet when
4   I was evaluating a drug and I would keep a hard
5   copy as this for any drugs that there were
6   changes made in the federal upper limit system.
7        Q.   How about drugs for which you evaluated
8   and decided not to make a change?  Would you keep
9   copies of those?
10       A.   My process was that if I did not make a
11  change to the federal upper limit list, if I did
12  not increase or decrease or add or delete a drug,
13  I would make a notation onto the system which we
14  had the capability to do.
15       And I also had a follow-up book that I
16  compiled where if a drug did not meet the
17  criteria, if it was -- we did not have the A-
18  rated drugs, if we did not have a sufficient
19  amount of A ratings, if we did not have a
20  sufficient amount of suppliers, or in the case
21  where if the federal upper limit, once it was
22  calculated, was higher than the AWP price or the

Page 59

1   majority of the AWP prices, then we would
2   generally not set a FUL on those drug
3   ingredients, because the AWP -- well, a couple
4   years ago the average AWP on a national basis was
5   I think AWP minus 12 percent for drug
6   reimbursement, estimated acquisition costs for
7   drug reimbursement for a drug that did not have a
8   federal upper limit.
9        And if a drug did not -- if the FUL was
10  calculated to be higher than an AWP price then
11  generally we did not put a federal upper limit on
12  it because we would be setting a higher limit
13  than what was already established in regulation
14  because EAC reimbursement or estimated
15  acquisition costs were AWP minus a percentage.
16       Q.   In other words, if the FUL that would
17  have been set would have been higher than AWP it
18  wouldn't have resulted in a cost savings for the
19  Medicaid program and so you didn't set a FUL?
20       MR. FAUCI:  Objection, form.
21       A.   Correct.  That was generally the
22  thinking, why a FUL would not be set.

Page 60

1        Q.   Mechanically, once you got a printout
2   from the FULs system like Exhibit 4, what if
3   anything would you do before CMS established a
4   federal upper limit for a particular drug?
5        A.   What would I do with this sheet?
6        Q.   What additional steps if any would you
7   take?
8        A.   Well, generally I would make a notation
9   on the sheet what drug the federal upper limit
10  was set on and show the calculation of the 150
11  percent times the lowest priced drug, the lowest
12  priced available drug, because there could be
13  situations where the lowest priced drug was not
14  available.  So I may put that calculation on the
15  sheet and perhaps that the FUL was not higher
16  than AWP.  Just general notations for my own
17  knowledge.
18       Q.   Anything else that you would do before
19  -- any other steps or additional information you
20  would seek before CMS established a FUL?
21       MR. FAUCI:  Objection, form.
22       A.   There were times when we would call or

Page 61

1   I would call the manufacturers or the suppliers
2   to determine if a drug was available.  If -- and
3   some of these drugs were looked at, most of them,
4   on a case-by-case basis because there were times
5   when we would have three or more suppliers but
6   perhaps we were missing a wholesale acquisition
7   cost, for instance.
8        And I would try to get the wholesale
9   acquisition cost from maybe First Databank like
10  the e-mail to Rojan, because if you could obtain
11  every wholesale acquisition cost you would be --
12  in other words, if you just looked at the prices
13  that were on the pricing sheet and there was a
14  wholesale acquisition cost that was missing, that
15  could have had a lower wholesale acquisition cost
16  than the prices that were shown and perhaps you
17  were falsely setting a higher federal upper limit
18  than you would have to.  However, we were not
19  always successful at getting that information
20  from the suppliers.
21       Q.   When you say wholesale acquisition
22  cost, do you mean WAC?

16 (Pages 58 to 61)

Sexton, Gail                                                                                     May 20, 2008
Washington, DC

Page 70

1  calculations, correct?
2      A.  Yes.
3      Q.  Describe for me the manual review or
4  calculations that you did.
5      A.  Well, the system actually calculates
6  the federal upper limit.  But just as a general
7  notation the way I was taught I would document
8  the price, the source of the lowest price and
9  what the source code, which is the compendia
10  code, and just for my own purposes put the
11  calculation, spell out the calculation.
12      Q.  In other words, you were confirming the
13  calculation that the system had done?
14      A.  Yes.  Mm-hmm.
15      Q.  And you say you identified the source.
16  And by that you mean the lowest published price
17  on which the FUL was based?
18          MR. FAUCI:  Objection, form.
19      A.  Yes.
20      Q.  And in this instance what is that
21  source?
22      A.  Hi-Tech Pharmacal Company.

Page 71

1      Q.  Okay.  So for the -- in the March of
2  2005 time period the FUL for the .083 albuterol
3  sulfate solution would have been based on Hi-
4  Tech's WAC?
5      A.  Correct.
6      Q.  And what's the significance of the B
7  written in quotations next to the word Hi-Tech on
8  Exhibit 7?
9      A.  B is the source code and B stands for
10  Blue Book, which is First Databank's compendia.
11      Q.  And what are the other source codes?  I
12  see an R.
13      A.  R is for Red Book and M is for Medi-
14  Span.
15      Q.  And are those the three sources of
16  published prices that CMS used while you were the
17  FUL program lead?
18      A.  Yes.
19      Q.  Were there any other pricing sources
20  during the October of 2004 to December 2006 time
21  period that CMS used for pricing information?
22          MR. FAUCI:  Objection, form.

Page 72

1      A.  Not that I'm aware of.  Are you
2  referring to if we would call a supplier as well?
3  Are you counting that as a source?
4      Q.  No.  I hadn't thought of that.  So in
5  terms of publications there were I guess three
6  publications?
7      A.  Yes.  To my knowledge.
8      Q.  And in addition to publications what if
9  any other sources of information did you use in
10  establishing federal upper limits?
11      A.  Any other pricing, sources of pricing?
12      Q.  Yes.
13      A.  Well, if we would call a supplier and
14  obtain pricing information directly from a
15  supplier, if we were trying to verify or obtain
16  pricing, that would be another source, I guess.
17  But as far as the publications, the compendia,
18  these were the three that I knew of that were
19  used.  I was not aware of any other pricing
20  compendia.
21      Q.  Okay.  There's a handwritten note at
22  the bottom of Exhibit 7 that reads to me three

Page 73

1  WACs then a less than sign, FUL, dash, FUL, less
2  than sign, AWP, minus.  Do you see that?
3      A.  Yes.
4      Q.  Is that note that you made?
5      A.  Yes.
6      Q.  What does that note mean?
7      A.  Three WACs less than the FUL meant that
8  we saw that there were three wholesale
9  acquisition costs or three prices that would be
10  available to the providers that were less than
11  the federal upper limit.  In other words, there
12  were -- we could see that there were NDCs
13  available within the federal upper limit.
14      Q.  Why did you look at that?
15      A.  Basically because when I was taught the
16  program that is one of the criteria that they had
17  looked at as far as in setting a federal upper
18  limit.  And so that was just something I
19  documented on every sheet.  However, that's not -
20  - there were no set amount of wholesale
21  acquisition costs that would be looked at as far
22  as when I did the FULs that would have to be less

Sexton, Gail                                                                 May 20, 2008
Washington, DC

Page 74
1  than the FUL.
2      Q.  And who taught you to do this kind of
3  analysis?
4      MR. FAUCI:  Objection, form.
5      A.  Cindy Bergin taught me the FULs
6  program.
7      Q.  Did she explain to you why this kind of
8  analysis was done?
9      MR. FAUCI:  Objection, form.
10     A.  Over the course of time the pharmacy
11  community had -- they raised a lot of concern and
12  in fact on an ongoing basis whether NDCs were
13  available at the federal upper limit
14  reimbursement amount.  And to my knowledge it was
15  used kind of as a checkpoint system to say, well,
16  we can see where there are prices that are less
17  than the federal upper limit where drugs could be
18  obtained within the reimbursement amount.
19     Q.  So is that a check on availability?
20     MR. FAUCI:  Objection, form.
21     A.  A check on -- well, availability and
22  cost.

Page 75
1      Q.  Let me make sure I got it.  So the
2  reason you'd look to see whether there were WACs
3  less than the federal upper limit is to determine
4  whether there was drugs available on the
5  marketplace at that federal upper limit price?
6      MR. FAUCI:  Objection, form.
7      A.  That's why I documented, because that
8  was just how I learned -- that's how I was
9  taught.  That's one thing that was looked at.
10  However, I did not set a FUL based on that
11  criteria.  It was just something that I guess at
12  some point was looked at.
13     Q.  But it was a check that you continued
14  to do during the period of time October 2004 to
15  December 2006, correct?
16     MR. FAUCI:  Objection, form.
17     A.  Yes.
18     Q.  And the second part of that statement
19  says "FUL less than AWP minus"; is that correct?
20     A.  That's not a minus.  That's just a
21  marking.  It's just "FUL less than AWP."
22     Q.  Okay.  I think you explained it,

Page 76
1  certainly.  But why would you look at that?  Why
2  would you make that comparison?
3      A.  Because EAC or estimated acquisition
4  cost for drugs that did not have a federal upper
5  limit or even for drugs that had a federal upper
6  limit were AWP minus a percent and that varied by
7  state.  And if a FUL was calculated to be higher
8  than the majority of the AWPs, then it did not --
9  it would not yield cost savings to set a federal
10  upper limit that was higher than an EAC already
11  established by a state.
12     Q.  Do you recall in your time where you
13  were the program lead on FULs ever establishing a
14  FUL based on a published AWP?
15     MR. FAUCI:  Objection, form.
16     A.  I don't recall there -- I remember rare
17  occasions when an AWP would be calculated in the
18  system to be the lowest price.  Very rare
19  occasions.
20     Q.  On those occasions do you ever recall
21  establishing a FUL or was that a situation where
22  the drug wasn't -- a FUL wasn't established for

Page 77
1  the drug because it wouldn't have resulted in a
2  cost savings?
3      MR. FAUCI:  Objection, form.
4      A.  I would not have set a FUL based on
5  that if that was the lowest published price.  But
6  I don't recall if that was ever the case where a
7  federal upper limit was set on a drug with the
8  AWP.
9      Q.  Just so I'm clear, you don't ever
10  recall setting a FUL based on an AWP?
11     MR. FAUCI:  Objection, form.
12     A.  I'm not saying that I haven't.  I just
13  don't -- I don't recollect ever doing that.
14     Q.  But if you ever did, it would be a rare
15  occasion?
16     MR. FAUCI:  Objection, form.
17     A.  I would say that it was rare that the
18  AWP price was ever the lowest price.
19     MR. BUEKER:  We've been going for about
20  an hour.  Do you want to take a break here and
21  we'll come back in five or ten minutes?  What's
22  good for you?

20 (Pages 74 to 77)

Sexton, Gail                                                                                    May 20, 2008
Washington, DC

Page 86

1  listed in the paper compendia.  So I would always
2  look at all resources to make sure that a drug
3  that was an A was an A across the board or a B
4  across the board or if it was not listed in one
5  with any therapeutic equivalency rating that I
6  would find it from another source.
7      Q.  Let me see if I understand the last
8  part of the statement and then we'll go back.  If
9  something wasn't listed as therapeutically
10  equivalent, as A-rated in the hard copy
11  publication of the Orange Book, you might go look
12  someplace else to see --
13      A.  Well, not to initially establish if the
14  drug would meet the criteria for a FUL.
15      Q.  The process for establishing whether a
16  drug met the FUL criteria, you only looked at the
17  Orange Book for that part of the process?
18      A.  Correct.
19      Q.  And by the Orange Book the hard copy
20  Orange book that FDA publishes; is that correct?
21      A.  Well, I always used the electronic
22  copy.  In fact, I don't know that it was

Page 87

1  published in a hard copy.  I don't know that.  I
2  always used -- this is a printout of the online -
3  - off of the website, the Orange Book.  That's
4  the only source basically that I have used.
5      Q.  But unless that online source -- this
6  online source from the FDA is the only place you
7  would have looked in determining whether a drug
8  was eligible for a FUL?
9      A.  Correct.
10      MR. FAUCI:  Objection, form.
11      Q.  And then let me make sure I have the
12  basic premise.  To your recollection there's no
13  instance in which you, during the period of time
14  you were the program lead on FULs, established a
15  federal upper limit based on the published price
16  of a B-rated drug; is that correct?
17      A.  Not to my knowledge.  I don't recollect
18  setting a FUL on a B-rated drug.
19      Q.  Okay.  But in the process of trying to
20  determine whether the drug with the lowest price
21  was A-rated or B-rated you might look at sources
22  beyond just the online Orange Book?

Page 88

1      A.  As a cross-check we did have those
2  ratings in our software system.
3      Q.  Okay.  Other than the online Orange
4  Book and your software system, was there anywhere
5  else you would have gone to look to see if
6  something was therapeutically equivalent?
7      A.  Not no, not to my knowledge.  Just the
8  compendia or the FDA sources.
9      MR. BUEKER:  Can I ask the court
10  reporter to mark as Sexton Exhibit 9 for
11  identification a one-page document Bates labeled
12  HHD 175-1058?
13      (Exhibit Sexton 009 was marked for
14  identification.)
15  BY MR. BUEKER:
16      Q.  Ms. Sexton, let me know when you've had
17  a chance to look at Sexton Exhibit 9.
18      A.  Okay. (Reading.) Okay.
19      Q.  Exhibit 9, first of all, appears to me
20  to be a printout from the federal upper limited
21  system with your handwriting on it.  Is that
22  true?

Page 89

1      A.  Yes.
2      Q.  And Exhibit 9 pertains to the 0.09
3  microgram albuterol inhaler, the same drug we
4  were talking about in Exhibit 8, correct?
5      A.  Correct.
6      Q.  And just so we understand what's going
7  on at the top of Exhibit 8, it looks like the WAC
8  for IVAX's albuterol inhaler has been crossed
9  out; is that correct?
10      A.  Yes.
11      Q.  And written to the right of that it
12  says "new WAC" and then "0.2911."  Do you see
13  that?
14      A.  Yes.
15      Q.  What significance, if any, does that
16  notation have to you?
17      A.  Well, the new WAC would be used to set
18  the FUL.  It would change from the original WAC
19  to increase the FUL.  And from memory we had a
20  lot of concern raised from the pharmacy community
21  on the availability of this drug.  And so further
22  evaluation was done to determine the exact

23 (Pages 86 to 89)

Sexton, Gail

May 20, 2008

Washington, DC

Page 90

1  availability in the market, prices and
2  availability.
3      Q.  And it looks like from Exhibit 9 that
4  one of the things that you did to determine
5  availability in the marketplace was to call IVAX
6  and ask IVAX about its WAC; is that correct?
7      MR. FAUCI:  Objection, form.
8      A.  I cannot recall, but that would have
9  been -- either that or contacting First Databank,
10 Rojan or someone.  But more than likely I called
11 IVAX.  But it was determined that there was a
12 different WAC for that drug.
13     Q.  Down in the bottom of the page there's
14 a column labeled "contact."  Do you see that?
15     A.  Okay.  Yes.  Then I did contact them.
16 Mm-hmm.
17     Q.  So you contacted IVAX and learned that
18 their --
19     A.  Correct.
20     Q.  -- WAC price had been increased; is
21 that correct?
22     A.  Correct.

Page 91

1      Q.  The FUL system itself had calculated a
2  federal upper limit on the basis of the old IVAX
3  WAC, correct?
4      A.  Correct.
5      Q.  And so what you did was make some
6  telephone calls to confirm the FUL calculation
7  and revise the FUL based on what you had learned?
8      A.  Correct.
9      Q.  And we see a notation that's the same
10 as -- over on the right-hand side of the page
11 there's a notation that starts "03/2006."  Do you
12 see that?
13     A.  Zero?
14     Q.  Referring to --
15     A.  Yes.  Yes.
16     Q.  And would you read into the record what
17 it says next to 03/2006?
18     A.  "FULs set on IVAX WAC.  Three WACs less
19 than FUL.  FUL less than AWP."
20     Q.  And what did you mean when you wrote
21 that?
22     A.  Meaning the FUL, the federal upper

Page 92

1  limit, was set on the IVAX NDC.  And we had three
2  WACs of the available suppliers there that --
3  three WACs that were less than the calculated
4  FUL.  And the calculated FUL was less than the
5  AWP.
6      Q.  And again, why did you make those
7  comparisons?
8      A.  Well, that was just the notation that
9  we -- a documentation that was done as far as the
10 WACs being -- how many WACs less than the FUL.
11 FUL less than AWP because it would not have been
12 -- it would not have rendered savings for the
13 Medicaid program to set a FUL that was higher
14 than the AWP, according -- per our prior
15 conversation on that.
16     Q.  And the notation about WACs, why was
17 that?
18     A.  To note that there were at least three
19 NDCs that were available less than the calculated
20 FUL.
21     Q.  Okay.  There's a -- under the chart in
22 bold there's a typed notation which I haven't

Page 93

1  seen before which starts with three stars and
2  then says "FULs price not greater than another
3  supplier."  Do you see that?
4      A.  Yes.
5      Q.  Is that generated by the FULs system?
6      A.  Yes.
7      Q.  In what circumstances is that notation
8  generated?
9      A.  I'm interpreting that to mean that the
10 calculated FULs price was not higher than the
11 NDCs listed, the WAC prices.
12     Q.  So in other words, there's not another
13 WAC price -- other than the WAC price that's used
14 to set the federal upper limit as calculated by
15 the system, there's not another WAC price that's
16 lower than that FUL calculated by the system; is
17 that correct?
18     MR. FAUCI:  Objection, form.
19     A.  Right.  In the system, but as you can
20 see there was further manual interventions done
21 on this drug from other suppliers that the FULs
22 system would not take into account when they

24 (Pages 90 to 93)

Sexton, Gail                                                              May 20, 2008
Washington, DC

Page 94

1  would -- when the FULs system would show that
2  message.
3      Q.  Okay.  And why do that further manual
4  intervention?
5      A.  Well, I learned -- and it could have
6  been from the paper compendia that I did the
7  second checks on I learned of other suppliers
8  that were marketing this drug.  So I tried to
9  determine if they were still marketing and at
10 what price to see exactly what the availability
11 was in the market, because there was a lot of
12 concern raised by the pharmacy community about
13 this drug and that it was not available.
14     Q.  At the federal upper limit price?
15     A.  Or that it was even not available,
16 adequate supply.
17     Q.  Is the notation "FULs price not greater
18 than another supplier" something that in your
19 experience is automatically generated by the
20 system?
21     A.  I really don't think I ever noticed
22 those messages or the messages that would come

Page 95

1  out.  They come out kind of in a different color
2  or small at the bottom of the system when you're
3  looking at the screen.  And that's not something
4  I would generally look at or look for.
5      Q.  Okay.  So it wasn't a flag that caused
6  you to do anything differently than would have
7  been done with other drugs for which you were
8  establishing a federal upper limit?
9      A.  No, it would not have.
10     Q.  But is it fair to say then that there's
11 a manual review process that you undertake with
12 regard to each federal upper limit that you
13 established?
14         MR. FAUCI:  Objection, form.
15     A.  I wouldn't say each.  I would say in
16 cases where I saw that manual intervention could
17 have changed the price, changed the federal upper
18 limit, or where it appeared that perhaps the
19 criteria was not met and that further
20 intervention should have been taken.
21     Q.  How would you identify those situations
22 in which manual intervention might change the FUL

Page 96

1  price?
2      A.  Could you repeat that?
3      Q.  Sure.  How would you identify -- what
4  criteria would you use to identify situations in
5  which your manual intervention might change the
6  FUL price that was set?
7      A.  Well, for instance, if I saw a price
8  that was -- that looked to be an outlier price,
9  maybe far lower than the other prices, I may call
10 that supplier to determine was the NDC available
11 at that price, so as not to set an unfairly low
12 price on an outlier that was not available.  If I
13 saw -- comparing to the paper compendia, if I saw
14 that there were other suppliers other than what
15 was noted in the system then I would call those
16 suppliers.
17         Is that what you mean?
18     Q.  Yeah.  I'm just trying to understand
19 the criteria that you used to decide when you'd
20 want to manually intervene in the process.
21     A.  Right.  If the paper compendia maybe
22 showed a different amount of suppliers and there

Page 97

1  was a possibility that you did have three
2  suppliers, just that the system was not showing
3  three suppliers, or in the case of an outlier
4  drug, or in the case where a drug supplier was
5  shown, an NDC was shown, but there was no price
6  at all, you would try to determine the price.
7      Q.  You used the term outlier price and you
8  said I didn't want to set a FUL that was unfair.
9  What did you mean by that?
10         MR. FAUCI:  Objection, form.
11     A.  Well, in cases -- if I saw -- maybe
12 there was a WAC for two cents and then maybe all
13 the other WACs were 80 cents and above, or
14 something to that effect, that would be a case
15 where you may want to call to verify, if you
16 could, if you would -- the suppliers did not
17 always provide you with the information
18 requested.  You were not an account holder.  But
19 that would be a case perhaps.
20         We didn't have to verify, but that
21 would just be a good practice to make the attempt
22 if you could.

25 (Pages 94 to 97)

Sexton, Gail                                                                May 20, 2008

Washington, DC

Page 138

1  that the FUL drugs continue to be available for
2  manufacturers and suppliers to assure current
3  market availability"?
4        MR. WINGET-HERNANDEZ:  Objection, form.
5  You need to read that again.
6     A.  When possible we would manually verify
7  that drugs were available.
8     Q.  That was one of the reasons you
9  undertook the manual verification process that
10 we've been talking about this morning?
11    A.  Yes, correct.
12    Q.  One of the other things that you've
13 tried to do through the manual verification
14 process is, as Mr. McClellan states in the second
15 sentence, to make sure that they're actually
16 available in the marketplace before establishing
17 a federal upper limit, correct?
18       MR. FAUCI:  Objection to form.
19    A.  It says before a drug is placed on the
20 FUL list, right, it is important to make certain
21 that the products are actually available in the
22 marketplace, yes.  And that would be the reason

Page 139

1  that we would attempt manual verifications on the
2  drugs.
3     Q.  Okay.  You mentioned earlier
4  maintaining a FUL follow-up book?
5     A.  Mm-hmm.
6     Q.  In what form?  Hard copy, electronic?
7     A.  It's a hard copy separated into the
8  reason that the FUL could not be applied at the
9  time:  We didn't have the proper amount of A-
10 rated drugs, if we did not have three suppliers
11 or if the FUL was higher than AWP.
12    Q.  Are any of the documents we've looked
13 at today from that book?
14    A.  No.  This was a handwritten book that I
15 compiled just so that each month when -- or each
16 quarter when I would go WAC to publish a new
17 federal upper limit update I could re-check
18 multiple-source drugs that didn't previously
19 qualify for a FUL but may qualify for a FUL at a
20 future date.
21    Q.  Were you asked to provide a copy of
22 that book to the lawyers from CMS or DOJ in

Page 140

1  connection with this case?
2     A.  I don't remember.
3     Q.  Do you recall producing a copy of that
4  book to any of the lawyers involved in this case?
5     A.  I really don't remember if I did or
6  not.  Or if I was asked to or --
7        MR. BUEKER:  Laurie, I'll represent
8  that I haven't seen it in our production.  I
9  don't know if you've seen it or you think it's
10 been produced.  But if it hasn't I would ask that
11 it be produced.
12       MS. OBEREMBT:  We'll check on that for
13 you.
14       MR. BUEKER:  I think I'm about done.
15 If I might have five minutes.  I don't know what
16 people's schedules are and what the witness'
17 preference is with regard to lunch.  Maybe we'll
18 go off the record and we'll see from there.
19       THE VIDEOGRAPHER:  Off the record at
20 12:27.
21       (Recess.)
22       (Exhibit Sexton 019 was marked for

Page 141

1  identification.)
2        THE VIDEOGRAPHER:  On the record at
3  12:39.
4  BY MR. BUEKER:
5     Q.  Welcome back, Ms. Sexton.  I've had
6  during the break the court reporter mark as
7  Sexton Exhibit 19 for identification a three-page
8  document that bears in the lower right-hand
9  corner the Bates label on the first page NASMD-
10 0001304.  Do you have Exhibit 19 in front of you?
11    A.  Yes.
12    Q.  Exhibit 19 -- what is Exhibit 19?
13    A.  The minutes from a Pharmacy Technical
14 Advisory Group conference call from March 16th
15 2006.
16    Q.  At the top of page 1 of Exhibit 19
17 there's a list of people who participated in that
18 meeting, correct?
19    A.  Correct.
20    Q.  And you see that you are one of the
21 individuals who participated in that particular
22 PTAG meeting?

Sexton, Gail                                                                                    May 20, 2008

Washington, DC

Page 146

1  Winget-Hernandez?
2        MR. WINGET-HERNANDEZ:  Well, yeah.  I
3  do have a couple of follow-up questions.
4
5        EXAMINATION BY COUNSEL FOR THE
6  CITY OF NEW YORK AND ALL NEW YORK COUNTIES OTHER
7  THAN NASSAU AND ORANGE; AND THE STATES OF ALASKA,
8  HAWAII, IDAHO, ILLINOIS, KENTUCKY, SOUTH CAROLINA
9  AND WISCONSIN
10  BY MR. WINGET-HERNANDEZ:
11        Q.  It wasn't entirely clear to me, Ms.
12  Sexton, why it was that you made the notations on
13  the pricing sheets of the number of WACs that
14  were below the FUL that you were setting.  Could
15  you describe the reason for that again?  And the
16  confusion for me was what it had to do with the
17  feedback you were getting from the pharmacy
18  industry.
19        MR. BUEKER:  Objection as to form.
20        Q.  Can you explain what impact the
21  pharmacy industry had on those notations, if any?
22        A.  Well, it was documented only because

Page 147

1  that was -- I was taught to do -- that was the
2  documentation to make on the pricing sheets.  And
3  it was my understanding that if a certain amount
4  of WACs were underneath the FUL then it provided
5  insight to us, to CMS, that a drug was obtainable
6  or how many drugs were obtainable at the federal
7  upper limit reimbursement amount, at or below.
8        For me personally, I would look at if -
9  - again, looking at an outlier situation, if the
10  FUL was calculated and it was calculated on a
11  drug that had a WAC of, say, 2 cents and
12  everything else was, you know, 80 cents, a
13  dollar, 1.50, that may be a reason to do some
14  manual verifications on whether that NDC was
15  available and available at that price.
16        Q.  Okay.  I'm going to ask you a little
17  bit about your verifications.
18        A.  Okay.
19        Q.  When you use the word suppliers to whom
20  are you referring?
21        A.  The companies listed in the compendia.
22        Q.  Do you have an understanding of whether

Page 148

1  the companies that are listed in the compendia
2  are the manufacturers or the wholesalers?  Are
3  they pharmacies?  Who are these people that are
4  listed in the compendia?
5        A.  Generally they are the -- I understand
6  them to be the manufacturers or even -- well, the
7  manufacturers, I would say.
8        Q.  Okay.
9        A.  I don't recall seeing some of the major
10  wholesaler names.  I can't say they were never in
11  there.  I don't recall seeing some of the major
12  wholesalers listed under the company names.
13        Q.  I'd like to turn your attention for a
14  moment to Exhibit Sexton Number 12.  Let me know
15  when you have it.
16        A.  Yes.  Mm-hmm.
17        Q.  Among your handwritten notes at the
18  bottom of the page I notice that there's a
19  character there that follows the word Ethex in
20  parentheses.  What is that character?
21        A.  Ethex in -- oh.  That's a B for Blue
22  Book or for First Databank pricing compendia.

Page 149

1        Q.  What does that mean?
2        A.  That means that the price from Ethex is
3  noted or could be found in First Databank
4  compendium or obtained from First Databank.
5        Q.  Okay.  And was there some reason as you
6  look at this document that you added the last
7  part of your answer there, "or could be obtained
8  from First Databank"?
9        MR. BUEKER:  Objection as to form.
10        Q.  What was the reason why you qualified
11  your answer a moment ago that that price could be
12  obtained from First Databank?
13        A.  I would say because that's the only
14  pricing compendium that lists Ethex as a supplier
15  in this list.
16        Q.  Okay.  There was a little bit of
17  confusion, at least for me, in listening to your
18  testimony before about this exhibit.  In looking
19  at the exhibit, if you look at the prices that
20  are shown for Ethex Corporation for this drug, it
21  lists zeros for WAC, doesn't it?
22        A.  Yes, for WAC.  Mm-hmm.

38 (Pages 146 to 149)

Page 159

1    videotaped deposition was adjourned.)

2

3

4

5

6

7                          _____

8                                GAIL SEXTON

9

10   Subscribed and sworn to and before me

11   this _____ day of _____, 20____.

12

13

14   _____

15          Notary Public

16

17

18

19

20

21

22

Sexton, Gail                                                                  May 20, 2008
Washington, DC

Page 160

```
 1    UNITED STATES OF AMERICA      )

 2

 3    DISTRICT OF COLUMBIA          )

 4              I, JONATHAN WONNELL, a Notary Public in and

 5    for the District of Columbia, do hereby certify that

 6    the within transcript is a true and accurate record of

 7    the testimony under oath and other proceedings in the

 8    above-entitled matter.

 9              I further certify that I am not a relative,

10    employee, attorney or counsel of any of the parties to

11    this action and that I am in no way interested in the

12    outcome of this matter.

13              IN WITNESS WHEREOF, I have hereunto set my

14    hand this _____ day of _____, 2008.

15

16

17

18              _____

19                        JONATHAN WONNELL

20

21    My Commission expires:

22    October 1, 2012
```