# EXHIBIT W

Page 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3    ---------------------------------X

4    IN RE PHARMACEUTICAL INDUSTRY        )

5    AVERAGE WHOLESALE PRICE LITIGATION)

6    ---------------------------------X Volume 1

7    THIS DOCUMENT RELATES TO:          ) MDL NO. 1456

8    The City of New York, et al.,      ) Civil Action

9       V.                              ) No. 01-12257-PBS

10   Abbott Laboratories, et al.        )

11   ---------------------------------X

12   THIS DOCUMENT RELATES TO:          )

13   State of California, ex rel.       )

14   Ven-A-Care v. Abbott Laboratories,)

15   Inc., et al., Case No.             )

16   03-cv-11226-PBS                    )

17   ---------------------------------X

18              WEDNESDAY, MAY 14, 2008

19          DEPOSITION OF DEY, L.P. AND DEY, INC.

20                  BY GARY WALKER

21   Reported by:  LAURA AXELSEN, CSR NO. 6173

22              RMR, CRP, CLR

Dey, L.P. and Dey, Inc. (Gary Walker)                                          May 14, 2008

Napa, CA

Page 198

1   much each of those shelf cartons was charged or
2   rather how much the customer was charged for each
3   unit, correct?
4       A.   Yes.  Yes.
5       Q.   And that's extended to the amount
6   billed, or is the amount billed obtained in some
7   other way?
8       A.   No, sorry.  Yes, should be the units
9   times the unit price, so get you the amount
10  billed.
11      Q.   Is that a calculation you that did in
12  your program, or is that pulled out of the
13  record?
14      A.   That's pulled out of the record.
15      Q.   Okay.  And it shows that there was an
16  available prompt pay discount at that time of
17  $83.98 or one percent of the amount billed.
18      A.   Yes, and that's an amount that I
19  calculated.
20      Q.   Okay.  What does the rest of that
21  record show us about that transaction?
22      A.   The contract I.D. they used to purchase

Page 199

1   it under.
2       Q.   Whose contract is that?
3       A.   I don't know.
4       Q.   So the -- that contract could be
5   someone else's contract besides Access Diabetic
6   Supply?
7       A.   Potentially, but then since the first
8   three letters begin with ADS, without really
9   knowing the whole thing, but looks like it could
10  be an acronym for Access Diabetics Supplies.  So
11  my guess would be that it was maybe contracted
12  specifically for this customer.
13      Q.   Okay.  And what do we know about this
14  transaction from the field denominated default
15  price?
16      A.   That would be the list price or the
17  that customer type customer for a homecare
18  pharmacy customer type.
19      Q.   Do you know which list price it would
20  be?
21      A.   This value would come out of the ESP
22  table.

Page 200

1       Q.   So is the -- is the list price, does it
2   have some kind of acronym that is applied to it,
3   like AWP or WAC?
4       A.   Not directly for all customer types,
5   but if it's a wholesaler, that price would be
6   WAC.  If this was wholesaler customer type that
7   default price in the spreadsheet would be WAC.
8       Q.   Is unit price two derived from ESP, or
9   was it in the record?
10      A.   It was in the record.  I don't know.
11  Somebody else may have put that two on there.  I
12  don't think any database would have had the two.
13      Q.   Okay.  Well, there was a -- was there
14  already a unit price in here at some point?
15  Yeah, there's a unit price, which is the first
16  record in the first field in the -- on page
17  three.
18          MS. GIULIANA:  Yeah, right, when I went
19  back to count the number of fields, your
20  spreadsheet has one more than what we supplied.
21  So somehow in your --
22          THE WITNESS:  Oh.

Page 201

1           MS. GIULIANA:  -- copying it, I think
2   maybe they doubled it.
3           MR. WINGET-HERNANDEZ:  No, actually, I
4   don't think so.
5           MS. GIULIANA:  Okay.
6           MR. DOYLE:  Where did you count --
7           MR. WINGET-HERNANDEZ:  There's two
8   fields that are a function of the --
9           MS. GIULIANA:  Okay.
10          MR. WINGET-HERNANDEZ:  -- database that
11  creates it.  One is the I.D. field, which is the
12  record I.D., which is the very first field, and
13  the next one is the -- you said it earlier, it's
14  a SRCID.
15          MR. DOYLE:  Source code?
16          THE WITNESS:  But that's nothing that
17  we supplied.
18      Q.   Right.  My point exactly.  You can't --
19  you can't count those two fields because those
20  two fields --
21      A.   Right.
22      Q.   -- were a function of our system --

51 (Pages 198 to 201)

Dey, L.P. and Dey, Inc. (Gary Walker)                                    May 14, 2008

Napa, CA

Page 266

1  rebate.  That would I guess be paid at a later
2  date because it says rebates on sales defined
3  under preferred product allowance under Schedule
4  C.
5      Q.  Okay.  Where would -- where would that
6  **1.5 percent rebate as defined under preferred**
7  **products allowance under Schedule C appear in**
8  **your BPCS system?  Where would you set that up in**
9  **the BPCS system?**
10         MR. DOYLE:  Objection as to form.
11         THE WITNESS:  It would be set up as a
12  rebate, and again, depending on the time period,
13  could have been done Excel spreadsheets or Access
14  database or on AS/400.
15      Q.  Well, in this case, we're looking at
16  **the time period beginning January 1, 1999, right?**
17  **You see that on page one?**
18      A.  Yes.  Yes.  Yes.
19      Q.  **So beginning in January the 1st of**
20  **1999, where would it be set up?**
21      A.  I would guess probably the Access
22  database.

Page 267

1      Q.  **And during the time that you have**
2  **worked in the IT department at Dey, have you had**
3  **occasion to review documents of this sort in**
4  **order to determine how to set up these discounts**
5  **within the BPCS system?**
6      A.  No, that's usually not my role.  It's
7  usually that the accounts receivable department
8  or rebate department would actually set it it up
9  and configure that, read these documents,
10  interpret them, and say okay, now I need to set
11  up BPCS in a certain way.
12      Q.  **Oh, okay.  So there would be a user in**
13  **the finance department so --**
14      A.  Yes.
15      Q.  **-- who would read a document such as**
16  **this and put the information into the BPCS system**
17  **in their area?**
18      A.  That would be my understanding.  I
19  don't know also if other people get involved in
20  the interpretation of this or quite what process
21  it goes through to interpret these.
22         MR. DOYLE:  Which is exactly why I

Page 268

1  objected to your showing it to him.
2         MR. WINGET-HERNANDEZ:  Very well.
3         MR. DOYLE:  Nothing to do with his
4  role.
5      Q.  **Okay.  Are you familiar -- and I'll**
6  **show you page -- I'll direct your attention to**
7  **page number two, with rebate called a base full-**
8  **line rebate.  Have you ever heard of such a**
9  **rebate?**
10      A.  Yes, I have.
11      Q.  **Where would that base full-line rebate**
12  **be reflected in the BPCS system?**
13      A.  Given this is 1999, I believe it would
14  most likely show up in the rebate agreement
15  rebate Access database, unless it's something
16  that this was maybe a type that database couldn't
17  calculate.  Then it probably would be done off
18  line Excel spreadsheet, but I still think
19  probably see at least the rebate amount reflected
20  in that Access database.
21      Q.  **Is there a point since '99 where base**
22  **full line rebates have been incorporated into the**

Page 269

1  **BPCS system?**
2      A.  I believe I've heard of that rebate
3  being now on the AS/400 in our current rebate
4  system.  I've heard about this rebate before.  I
5  don't know all the terms of it, but I've heard.
6      Q.  **The way you're answering my question**
7  **suggests to me that perhaps it's on the AS/400**
8  **but not in the BPCS system.**
9      A.  Right, because, again, we have a rebate
10  system designed to calculate the rebate, and if
11  it's based on BPCS data, it will look to BPCS to
12  get, like, sales data, transactional data, or
13  even a chargeback system for transactional data.
14      Q.  **What about the preferred products**
15  **rebate; do you recognize that type of rebate?**
16      A.  I've heard the name before, yes.
17      Q.  **And do you know whether that sort of**
18  **rebate is now incorporated into the AS/400**
19  **system?**
20      A.  If it's still an active, I believe it
21  would be.  I've heard the term, so I guess it
22  would be.

Dey, L.P. and Dey, Inc. (Gary Walker)                                          May 14, 2008
                                    Napa, CA

Page 289

1    a second.

2              MR. WINGET-HERNANDEZ:  Sure.  Thank

3    you.

4              VIDEO OPERATOR:  This concludes today's

5    deposition of Gary Walker.  We are off the record

6    at 5:01 p.m.

7                   (Whereupon, the deposition was

8    adjourned at 5:01 p.m.)

9

10

11

12

13

14

15              Signed under Penalty of Perjury:

16

17

18              _____

19              GARY WALKER

20

21              _____

22              Date

Page 290

```
1                          CERTIFICATE

2

3          I, the undersigned, a Certified Shorthand Reporter,

4     State of California, hereby certify that the witness in the

5     foregoing deposition was by me first duly sworn to testify

6     to the truth, the whole truth, and nothing but the truth in

7     the within-entitled cause; that said deposition was taken at

8     the time and place therein stated; that the testimony of the

9     said witness was reported by me, a disinterested person, and

10    was thereafter transcribed under my direction into

11    typewriting; that the foregoing is a full, complete, and

12    true record of said testimony; and that the witness was

13    given an opportunity to read it and, if necessary, correct

14    said deposition and to subscribe the same.

15             I further certify that I am not of counsel or

16    attorney for either or any of the parties in the foregoing

17    deposition and caption named, nor in any way interested in

18    the outcome of the cause named in said caption.

19             Executed this 28th day of May, 2008.

20

21                                           ―

22                     LAURA AXELSEN, C.S.R. 6173
```

PLF EXHIBIT 15
WITNESS Walker
DATE 5/16/3/
L. AXELSEN, C.S.R.



# Cardinal Health

## GENERIC WHOLESALE SERVICE AGREEMENT

This Agreement is made as of January 1, 1999, between Cardinal Health◆ ("Cardinal") whose address for purposes of this Agreement is 5555 Glendon Court, Dublin, Ohio 43016 and Dey L.P. ("Supplier") whose address is set forth under its name on the signature page of this Agreement.

### Background Information

A.   Supplier is in the business of manufacturing and/or marketing generic pharmaceutical products.

B.   Cardinal is a broad-line wholesale distributor of generic pharmaceutical products.

C.   Supplier desires to appoint Cardinal as an authorized distributor of all generic pharmaceutical products manufactured and/or marketed by Supplier except for those listed on Schedule A attached hereto and made a part hereof (collectively, the "Products") and agrees to sell the Products to Cardinal. Cardinal desires to accept such appointment and agrees to purchase the Products from Supplier on the terms and subject to the conditions described in this Agreement.

### Statement of Agreement

Supplier and Cardinal hereby agree as follows:

1.   **Appointment of Cardinal.**  Supplier hereby appoints Cardinal as a non-exclusive, authorized distributor of the Products, and Cardinal hereby accepts that appointment on the terms and subject to the conditions described in this Agreement.  As an authorized distributor, Cardinal may purchase such quantities of the Products as Cardinal deems necessary or appropriate to fill its customers' orders from time to time.

2.   **Orders for the Products.**  Cardinal will transmit orders for the Products to Supplier using a mutually acceptable automated order entry system or such other means as may be agreed upon by the parties.  Cardinal shall have no obligation to accept automatic shipments of any Product or maintain any particular level of inventory of any Product.

3.   **Inventory.**  If at any time during the term of this Agreement, Cardinal's wholesale acquisition cost from Supplier for any Product is decreased, then Supplier shall issue a credit (the "floor stock adjustment") to Cardinal in an amount equal to the difference between (a) Cardinal's wholesale acquisition cost from Supplier of Cardinal's then-current inventory of that Product as of the later of the (i) date Cardinal purchased that Product or (ii) date of Supplier's last effective price change for the Product for which Cardinal received a floor stock adjustment, and (b) the value of Cardinal's then-current inventory of that Product, determined using the decreased price for all such inventory.  For purposes of this section, "Cardinal's then-current inventory" shall include all Products purchased directly from Dey held by Cardinal's distribution centers, all Products owned by Cardinal at any store owned or operated by a customer of Cardinal and held by such customer on consignment (as defined on Schedule F), and all Products purchased directly from Dey "in transit" to or from such distribution centers or customer stores on the effective date of such price decrease.  Cardinal will notify Supplier of the amount of any credit due

DEY-BO-0131744

pursuant to this section within 90 days following the effective date of such price decrease, and Cardinal will apply a debit memo at the time such notice is given to Supplier. Supplier reserves the right to audit Cardinal's inventory adjustment documentation. No credit will be issued for product purchased from suppliers other than Dey L.P.

4.   **Terms of Sale and Shipment.** Supplier shall sell each Product to Cardinal at a price no higher than Supplier's wholesale list price for such Product in effect on the date of Cardinal's order and deliver the Products F.O.B. to those distribution centers specified in Cardinal's order or such other locations as may be agreed upon by the parties in the case of drop shipment orders, in either such case, freight prepaid. Except as otherwise provided in this Agreement, Supplier shall give Cardinal written notice at least twenty-four hours prior to the effective date of an increase or decrease in Supplier's list price of any Product.

Title and risk of loss to the Products shall remain with Supplier until shipment is received at the specified destination. If Cardinal requests special routing of a shipment which results in a higher transportation cost than would be incurred as a result of the routing selected by Supplier, then the extra cost incurred by Supplier shall be added to Supplier's invoice.

5.   **Payment Terms.** Unless otherwise agreed by both parties, all orders for the Products shall be invoiced by Supplier on the date shipped. Cardinal will be entitled to a cash discount for all purchases under this Agreement as set forth in Schedule B attached hereto and incorporated herein by this reference.

6.   **Performance Incentives.**

a.   **Base Full-Line Rebate.** Cardinal shall earn a base rebate on the full-line of Products purchased on a direct basis by Cardinal under this Agreement (the "Base Full-Line Rebate") as set forth in Schedule C attached hereto and made a part hereof.

b.   **Preferred-Products Rebate.** To support Cardinal with its promotion of Supplier's Products via the preferred products activities listed in Schedule C (the Products included in such programs "Preferred Products"), Supplier agrees to provide a rebate (the "Preferred-Products Rebate") as set forth in Schedule C. *See Amendment for New Sch "C"*

The Base Full-Line Rebate and Preferred-Products Rebate are collectively referred to herein as the "Rebates". Calculation of all Rebates and similar promotional incentives will be based on Cardinal's Net Purchases (as defined below) of Products. For purposes of this Agreement, "Net Purchase" means Cardinal's wholesale acquisition cost from Supplier without reduction for cash or off-invoice discounts or other Rebates multiplied by total direct purchases of Product by Cardinal from Supplier less floor stock adjustments, chargebacks, and returns. Each Rebate provided for herein is separate and distinct from all other Rebate or similar programs and will be paid by Supplier regardless of achievement by Cardinal under any other Rebate or under this Agreement or any other agreement or arrangement between Cardinal and Supplier. This rebate agreement supersedes any other oral or written rebate or similar program between Cardinal and Supplier.

Supplier will forward to Cardinal within 30 business days following the last day of each month all information regarding floor stock adjustments and returns effected during that month. Cardinal will invoice Supplier monthly for the amount of all Rebates earned by Cardinal. Supplier will cause Cardinal to receive payment in full on all such invoices no later than 20 business days following the date of Cardinal's invoice. Supplier and Cardinal will work together in good faith and on a timely basis to resolve any reasonable discrepancies in Rebate invoices regarding which Supplier has notified Cardinal within 90 calendar days of the date of such invoice. Payment by Supplier under one Rebate or similar program shall in no respect satisfy or nullify Supplier's obligation to pay Cardinal under any other Rebate or similar program.

7.   **Promotional Allowances.**

2

DEY-BO-0131745

a.     All periodic allowances (each a "Promotional Allowance") provided by the Supplier to Cardinal during the term of this Agreement for promotional activities by Cardinal will be calculated based on the applicable promotional allowance percentage multiplied by Cardinal's wholesale acquisition cost from Supplier for the applicable Products.

b.     Cardinal will be entitled to a minimum 5% billback on the initial purchase of any Preferred Product added to any Preferred Product program and any Preferred Product not previously stocked by a Cardinal distribution facility.

c.     Cardinal will not be required to provide any particular level of promotional or marketing activities with respect to or on behalf of any Product and will not be prohibited from providing customized promotional or marketing services with respect to any other products or on behalf of other suppliers, except as provided for elsewhere in this Agreement.

8.     Setoff Rights.  If and to the extent either party fails to pay, reimburse, or credit the other for any amount owed when due under this Agreement, then the party to whom such amount is owed will have the right to setoff such amount against amounts otherwise due from it.  Both parties will use best efforts to resolve Dey billing and Cardinal payment exception issues in a timely manner.

9.     Supplier Service Level/Price Guarantees.

a.     Service Level.  Supplier acknowledges and agrees that Cardinal has made service level guarantees to its customers which are based on Cardinal's ability to fill orders in a timely fashion and that  Cardinal will incur financial penalties if Cardinal is unable to satisfy these commitments.  Supplier agrees to work with Cardinal on service levels and provide prompt notification on any backorders.  Cardinal will be unable to satisfy its obligations to its customers if Supplier does not maintain the service level set forth in this Agreement.  Therefore, Supplier agrees to provide Cardinal with an average monthly service level (the "Service Level") of at least 97% calculated as set forth in Schedule D attached hereto and made a part hereof.

If Supplier fails to maintain a 97% or better average monthly Service Level for Cardinal, then Cardinal will be entitled to a credit toward future purchases calculated as set forth in Schedule D.  Whether or not Supplier has satisfied the Service Level, for any Product that Supplier is unable or unwilling to supply to Cardinal, Cardinal will be entitled to a credit toward future purchases in an amount equal to the difference between the price at which Cardinal or its consignment customers purchase Products from a secondary multi-source supplier as a result of Supplier's failure to supply the Product and the price Supplier would have charged Cardinal for such Product if Supplier had been able to supply such Product.

b.     Price.  Supplier guarantees that during the term of this Agreement the contract prices to Cardinal for Preferred Products will not increase more frequently than once per twelve-month period.  No such increase may be effected during the first twelve-months of this Agreement.  Written notice of any such price increase must be delivered to Cardinal at least 30 days prior to the effective date of such increase, and the notice must contain all price increases to be effective for the following twelve months.  Notwithstanding the foregoing, Supplier may reasonably increase the price of a Preferred Product to Cardinal following 30 days prior written notice thereof if Supplier can reasonably demonstrate to Cardinal that Supplier's standard manufacturing cost (calculated as agreed to by the parties) for such Preferred Product has increased 10% or more.

10.     Returned Goods and Recalls.  Cardinal will have the right to return to Supplier and receive full credit for all Products Cardinal chooses to return to Supplier up to twelve months past product expiration date.  No special procedures or prior approval from Supplier will be required to authorize such returns; provided, however, Cardinal will provide Supplier with notice of intended returns.  These return guidelines

DEY-BO-0131746

will be in effect for all Products directly purchased by Cardinal from Supplier, exclusive only of specialty or promotional program purchases specifically exempted by mutual written consent of the parties.

Supplier shall reimburse Cardinal for the full amount of all reasonable costs and expenses incurred by Cardinal in connection with Cardinal's performance of any recall services or assistance relating to the Products.

11.    Contract Administration and Chargeback Procedures.  Cardinal will recognize and administer those contracts between Supplier and customers of Cardinal ("Supplier Contracts") pursuant to which Supplier and such customers have established prices at which the customer may purchase certain Products, subject to the continued validity of Supplier Contracts in accordance with applicable law.  Cardinal's Standard Policy on Chargeback Reversals and Audits, as modified and attached, (a current copy of which Supplier hereby acknowledges has been made available to Supplier, the "Chargeback Policy") will govern the administration of the Supplier Contracts under this Agreement.

12.    Term and Termination.  The initial term of this Agreement will begin as of the date set forth on the first page of this. Agreement (the "Commencement Date") and will continue until the two-year anniversary of the Commencement Date (the "Initial Term").  At the expiration of the Initial Term, this. Agreement will renew automatically for successive one-year periods upon the same terms and conditions, unless or until either party provides written notice of non-renewal to the other party at least 90 days prior to the end of the then-current term.  Notwithstanding the foregoing, either party may effect an early termination of this Agreement upon the default of a material provision of this Agreement by the other party and that party's failure to cure such default within 20 days following written notice from the nondefaulting party.  Any reference in this Agreement to the "term of this Agreement" shall include the Initial Term and any renewal periods.  Either party may terminate this Agreement for any reason with 30 days written notice. This Agreement is subject to annual review by both parties.

13.    Confidential Information.  In connection with the ongoing relationship between Supplier and Cardinal, each party may gain access to proprietary information of the other which may be considered confidential by the party providing such information, and each party shall use the same care to prevent disclosure, publication, or dissemination to any third party of the other party's confidential information as is used to protect its own confidential information, but not less than reasonable care.  However, information generated, compiled or stored by Cardinal reflecting the purchase and resale of Products to its customers, excluding those customers who purchase products under "Supplier contracts" and excluding information on pricing of products to Cardinal and rebates to Cardinal, does not constitute the confidential information of Supplier, and Cardinal will be entitled to utilize all such information in any manner deemed appropriate by it.  Supplier understands and agrees that Cardinal may, in its sole discretion, elect to sell warehouse withdrawals, sales, and other data to IMS/DDD and/or other third parties without contribution to Supplier.

14.    Warranty and Indemnification.  Supplier hereby warrants that the Products are and shall be manufactured and delivered to Cardinal in conformity with the Federal Food, Drug and Cosmetic Act, as amended, and all other applicable laws, rules, and regulations.  Supplier shall defend, indemnify, and hold harmless Cardinal and its affiliates, customers, directors, officers, employees and representatives from and against any and all claims, losses, damages, costs, and expenses (including without limitation reasonable attorneys' fees) arising directly or indirectly out of: (a) injury or death to person or property alleged to have been caused by any defect in the Products (exclusive of defects shown to be solely attributable to Cardinal's negligence in handling such Products); and (b) "class of trade" pricing, if any, maintained by Supplier from and after the effective date of this Agreement, including without limitation those arising out of Cardinal's administration of Supplier Contracts.  Cardinal shall notify Supplier of any such indemnifiable claim promptly following Cardinal's receipt of written notice of such claim.  The warranty and indemnification provisions of this section shall survive any termination or expiration of this Agreement. Dey's standard Indemnity Agreement provisions apply (see attached).

4

Highly Confidential

DEY-BO-0131747

15.   **Insurance.** During the term of this Agreement and thereafter as may be necessary to cover claims associated with Products purchased by Cardinal (whether before, during or after such term), Supplier shall obtain, pay for, and keep in full force and effect comprehensive general liability insurance with one or more reputable insurance carriers (including coverage for product liability and personal injury damages) in an amount not less than $10 million per claim made.  Cardinal shall be designated as an "additional insured" under all such insurance policies, and Supplier shall deliver to Cardinal certificates evidencing the existence and continuation of such insurance from time to time upon Cardinal's request.

16.   **Compliance with Laws.** Each party shall comply in all material respects with all federal, state, and local laws (and any regulations promulgated thereunder) which are now or hereafter become applicable to the manufacture, purchase, handling, sale, or distribution of the Products.

17.   **Audit and Inspection.** During the term of this Agreement, upon reasonable prior notice and during normal business hours, either party shall be entitled to audit and inspect those relevant records which are maintained by the other party in direct connection with its performance under this Agreement.  In no event shall any such audit or inspection relate to any transaction or event which occurred more than twelve months prior to the date of such audit or inspection.  Supplier chargeback audits shall be governed by the additional terms and conditions contained in the Chargeback Policy.

18.   **Relationship of the Parties.** The relationship among the parties is and shall be that of independent contractors.  This Agreement does not establish or create a partnership or joint venture among the parties.

19.   **Notices.** Any notice or other communication required or desired to be given to any party under this Agreement shall be in writing and shall be deemed given when:  (a) deposited in the United States mail, first-class postage prepaid, and addressed to that party at the address for such party set forth at the end of this Agreement; (b) delivered to Federal Express, Airborne, or any other similar express delivery service for delivery to that party at that address; or (c) sent by facsimile transmission, with electronic confirmation, to that party at its facsimile number set forth at the end of this Agreement.  Any party may change its address or facsimile number for notices under this Agreement by giving the other party notice of such change.

20.   **Governing Law/Venue.** All questions concerning the validity or meaning of this Agreement or relating to the rights and obligations of the parties with respect to performance under this Agreement shall be construed and resolved under the laws of the State of Ohio.  The parties hereby designate the Court of Common Pleas of Franklin County, Ohio as the court of proper jurisdiction and venue for any actions or proceedings relating to this agreement; irrevocably consent to such designation, jurisdiction, and venue; and waive any objections or defenses relating to jurisdiction or venue with respect to any actions or proceedings initiated in such court.

21.   **Severability.** The intention of the parties is to comply fully with all laws and public policies, and this Agreement shall be construed consistently with all laws and public policies to the extent possible.  If and to the extent that any arbitration panel or other court of competent jurisdiction determines that it is impossible to construe any provision of this Agreement consistently with any law or public policy and consequently holds that provision to be invalid, such holding shall in no way affect the validity of the other provisions of this Agreement, which shall remain in full force and effect.

22.   **Complete Agreement.** This full-line generic pharmaceutical Agreement contains the entire agreement between the parties and supersedes all prior or contemporaneous discussions, negotiations, representations, warranties, or agreements relating to supply of full-line generic pharmaceuticals, including without limitation any previous wholesale distribution agreement entered into between Supplier or its affiliates and any of the individual companies comprising Cardinal.  No changes to this Agreement will be made or be binding on either party unless made in writing and signed by each party.

5

Highly Confidential

23.    **Assignment.** Neither party shall have the right to assign this Agreement to any third party without the prior written consent of the other party; provided, however, that Cardinal and Dey shall be permitted to assign this Agreement to any of their respective subsidiaries or affiliates.

24.    **Signature Authority.** Each signatory to this Agreement represents and warrants to the other that he or she has signature authority and is empowered on behalf of his or her respective party or execute this Agreement.

_Dey, L. P._
(Name of Supplier)

By: _Charles A Rice_

Print Name: _Charles A. Rice_

Title: _President & CEO_

Address of Supplier:

_2751 Napa Valley Corporate Drive_
_Napa, CA. 94558_

Facsimile Number: _707 224 8916_

Cardinal Health*

By: _____

Print Name: _R. M. Perez_

Title: _EVP_

Address of Cardinal:

Attention: Sr. Vice President – Purchasing
5555 Glendon Court
Dublin, Ohio 43016

Facsimile Number: 614-717-6000

*The terms "Cardinal" and "Cardinal Health" shall include the following affiliated operating companies: Cardinal Syracuse, Inc., a New York corporation (Syracuse, New York); Marmac Distributors, Inc., a Connecticut corporation (Hartford, Connecticut); James W. Daly, Inc., a Massachusetts corporation (Peabody, Massachusetts); Ohio Valley-Clarksburg, Inc., a Delaware corporation (Wheeling, West Virginia); Chapman Drug Company, a Tennessee corporation (Knoxville, Tennessee); Cardinal Florida, Inc., a Florida corporation (Lakeland, Florida); Cardinal Mississippi, Inc. a Mississippi corporation (Richland, Mississippi); Solomons Company, a Georgia corporation (Savannah, Georgia); Whitmire Distribution Corporation, a Delaware corporation (Folsom, California); Humiston-Keeling, Inc., an Illinois corporation (Calumet City, Illinois); Behrens Inc., a Texas corporation (Waco, Texas); Red Key, Inc., an Ohio corporation and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("CHI"), as may be designated by CHI.

DEY-BO-0131749

Highly Confidential

**RESOLUTION AGREEMENT**

The undersigned, being the CEO of Dey L.P., a _____ limited partnership (the "Corporation"), hereby certifies that Robert F. Mozak, the Executive VP of Sales and Marketing of the Corporation is duly authorized to execute the above Generic Wholesale Service Agreement on behalf of the Corporation.

Date:_____

Name:  Charles A. Rice
Title: CEO

VOID
_____ 2/8/99

7

DEY-BO-0131750

Highly Confidential

**SCHEDULE A**   *See amendment for New Sch. "A"*

EXCLUSION TO LIST OF PRODUCTS

EpiPen® Auto-Injector 0.3mg
EpiPen® Jr. Auto-Injector 0.15mg
Astech® Peak Flow Meter
Ace Holding Chamber
EasiVent Valved Holding Chamber

DEY-BO-0131751

Highly Confidential

**SCHEDULE B**

<u>Cash Discount</u>

Cardinal shall be entitled to a cash discount equal to 2% for all invoices paid within 30 days of Cardinal's receipt of same. The cash discount will be calculated based on Cardinal's wholesale acquisition cost from Supplier for each Product. In lieu of additional invoice dating for cash discounts, Supplier will provide Cardinal with an incremental 1.5% rebate on sales as defined under Preferred Products Allowance under Schedule C.

9

DEY-BO-0131752

Highly Confidential

**SCHEDULE C** *See Amendment -restated*

### Base Full-Line Rebate

Cardinal shall be entitled to a rebate of 1% on the full-line of Net Purchases of Products, under this Agreement, which will be paid on a monthly basis, if the **Ipratropium Bromide** product line is added as a Preferred Product under the Source program, as amended by Addendum to Schedule C.

For purposes of illustration only:

If Cardinal purchases 10 units of a Product at $1.00 per unit and Cardinal sells 1 unit of Product at a contract cost of $.75:

|  |  |  |
|---|---|---|
| Invoice |  | $10.00 |
| Less: | Floor stock adjustments ($.05 per unit) | (.50) |
|  | Returns (1 unit) | (.95) |
|  | Chargeback dollars | (.25) |
| Total Net Purchases Qualifying for Rebate |  | $8.30 |
| Rebate Due to Cardinal ($8.30 x 1%) |  | $0.083 |

### Preferred-Products Allowance

Supplier agrees to provide Cardinal a Preferred-Products Allowance equal to an additional 16.5% or 6.5% depending on the product for a total of 17.5% or 7.5% of the Net Purchases of Preferred Products (see Schedule E) purchased by Cardinal under this Agreement, which will be paid on a monthly basis. These Preferred Products include those Products sold under the following Preferred-Products activities, as well as any similar programs developed by Cardinal from time to time pursuant to which Products are specially promoted by Cardinal:

CardinalACCESS™
CardinalSOURCE™
Cardinal's Generic Alliance
LeaderSOURCE™,
ManagedSOURCE™
PreferredSOURCE™
SOURCE Secondary

10

DEY-BO-0131753

Highly Confidential

## ADDENDUM TO SCHEDULE C

Preferred Products

The following products will be awarded under this agreement on a preferred product basis:

> Albuterol Sulfate Inhalation Solution 0.083%, 3mL, 30/ctn., NDC 49502-0697-33
> Ipratropium Bromide Inhalation Solution 0.02%, 2.5mL, 25/ctn., NDC 49502-0685-03
> Ipratropium Bromide Inhalation Solution 0.02%, 2.5mL, 30/ctn., NDC 49502-0685-33
> Ipratropium Bromide Inhalation Solution 0.02%, 2.5mL, 60/ctn., NDC 49502-0685-60

Preferred Products will be considered such that no "identical" product will be contracted by Cardinal provided Dey's pricing and incentives remain market competitive. A product will be considered to be "identical" to the products on this agreement if the drug product has the identical active ingredient(s) and the same strength concentration as the products subject to this agreement.

Dual Awarded Products

The following products will be awarded under this agreement on a dual award basis:

> Albuterol Sulfate Inhalation Solution 0.083%, 3mL, 25/ctn., NDC 49502-0697-03
> Albuterol Sulfate Inhalation Solution 0.083%, 3mL, 60/ctn., NDC 49502-0697-60

Preferred-Products Performance

Incremental source business gains on awarded Dey products (Albuterol and Ipratropium) must meet or exceed $6,000,000.00 in net purchases in year 1 of this agreement to qualify for the monthly 1% Base Full-Line Rebate listed under Schedule C. The base level will be reviewed annually based on mutual agreement.

Highly Confidential

DEY-BO-0131754

## SCHEDULE D – SERVICE LEVEL CALCULATION

Cardinal will calculate the average monthly Service Level of Supplier based on the purchase and delivery activity during the preceding three calendar months. (For example, the average Service Level calculation for June will be based on the purchasing and delivery activity for the months of March, April and May.) For purposes of this Agreement, "Service Level" for any particular month will be calculated by dividing the total lines of Products shipped to Cardinal during that month by the number of lines of Products ordered by Cardinal during that month. Items of Product for which the Supplier has provided Cardinal written notice of a backorder will be excluded from the Service Level calculation.

If Supplier fails to maintain a 97% or better Service Level for Cardinal for any particular month, then Cardinal will be entitled to a credit toward future purchases in an amount equal (a) the percentage difference between 97% and the actual Service Level percentage achieved by the Supplier for that month, multiplied by (b) the average total purchases of Products made by Cardinal from Supplier during the three months for which the Service Level was calculated for the month in which the Service Level failure occurred. Specialty or promotional program purchases are excluded from this service level calculation.

12

Highly Confidential

DEY-BO-0131755

**SCHEDULE F - CONSIGNMENT CUSTOMERS**

Kmart Corporation

14

Highly Confidential

DEY-BO-0131757

# CARDINAL HEALTH

## STANDARD POLICY ON CHARGEBACK REVERSALS AND AUDITS

The following represents the standard policy of Cardinal Health® ("Cardinal") pertaining to the prior sale of product under contract ("chargebacks") and the processing, reversal and audits of chargebacks, as well as certain related matters. Depending upon the individual facts and circumstances associated with a supplier's administrative procedures for chargeback related matters (e.g. the extent of use of EDI, electronic funds transfer, and other factors that contribute to or detract from Cardinal's ability to efficiently deal with chargeback matters), Cardinal reserves the right to modify any or all of the following terms and conditions.

### I.   Chargeback Processing

Cardinal will recognize and administer contracts between suppliers and customers pursuant to which prices at which the customer may purchase certain products have been established, subject to the continued validity of such contracts in accordance with applicable law and the supplier's compliance with Cardinal's standard policy. Amounts owed by suppliers to Cardinal relating to chargebacks shall be paid to Cardinal within ten (10) business days following Cardinal's submission of a request for those amounts. Legitimate chargeback reconciliation issues should be resolved as soon as practicable with each party responding to the other within 60 days following receipt of documentation supporting those issues.

### II.   Chargeback Reversals on Contract Customer Returns

Upon Cardinal's issuing a credit to a contract customer related to the prior sale of product under contract (for which Cardinal previously billed and collected a chargeback from the supplier), the chargeback will be reversed and remitted to the supplier only under the following terms and conditions:

A.   Cardinal must receive back from the customer merchantable product (i.e., Cardinal must be able to return the item to its inventory for resale in the ordinary course of its business without special preparation, testing, handling or expense).

B.   The customer's return of the product must be due to an error by Cardinal (i.e., item or quantity shipped did not match the item or quantity ordered). Cardinal will not reverse the chargeback if the return is the result of an ordering or other error of the customer or supplier if the amount in question is less than $100. If the amount exceeds $100, then Cardinal will reverse the charge.

This chargeback reversal policy is necessary as the costs of administering the chargeback system of pricing continue to rise. More importantly, this policy will partially compensate Cardinal for its cost of administering contracts, chargebacks and chargeback reversals, including interpretation of the contract, loading and administering the contract, follow-up required to obtain renewals for expiring contracts,

15

Highly Confidential

DEY-BO-0131758

credit and rebill activities, reconciliation of chargeback differences, cost of handling product returns, inventory and chargeback receivable carrying costs, etc.

III.   **Supplier Chargeback Audits**

The supplier shall have the right to audit Cardinal's compliance with the respective contracts in force and related chargeback matters (including compliance with the chargeback reversal policy stated above) subject to the following terms and conditions:

A.   Chargeback audits will be limited to twenty-four months of historical information as of the date such audit begins.

B.   Cardinal shall have a reciprocal twelve month period to reconcile any differences that may arise with the supplier related to chargeback issues (including submission and other errors and regardless of whether such issues arise as part of a supplier chargeback audit).

C.   Supplier shall notify Cardinal's Vice President – Controller of an intent to perform an audit at least 30 days prior to beginning the audit, specifying the location to be audited and the time period to be covered. In the event that such timing is expected to create undue disruption in Cardinal's business, Cardinal shall have the right to delay the start of the audit for up to 30 additional days.

D.   Audits must be performed by bona fide, permanent employees of the supplier, subject to a confidentiality agreement to be prepared by Cardinal and signed by the supplier and such employees, prior to beginning the audit.

E.   Audits shall be performed at the Cardinal site that is being audited, or such alternate sites where appropriate records are located as Cardinal may designate.

F.   Audits shall be performed during the normal, customary office hours of the Cardinal site that is being audited.

G.   The existing accounting records of the Cardinal site being audited will be made available for audit, subject to the following limitations:

  1.   Electronic data will not be specially created.

  2.   Cardinal reserves the right to summarize the contents of all records containing sensitive or competitive information.

H.   Cardinal will bill the supplier for any direct out-of-pocket costs incurred in conjunction with a supplier requested audit, unless such audit reflects a deficiency of 5.0% or greater. Amounts billed will be deducted from

16

Highly Confidential

DEY-BO-0131759

Cardinal's next payment for current purchases, after completion of the audit.

I.   Any supplier claims arising from an audit must be supported by specific audit results related to specific transactions.  Extrapolation of results from one period to another will not be accepted.

J.   Any supplier claims arising from an .. audit must be submitted to Cardinal's Vice President - Controller within 30 days of completing the audit.  All claims must be accompanied by specific supporting details of the transactions that comprise the claim.  Cardinal shall then have 45 days to review the claim and advise the supplier of either acceptance or disagreement.

## IV.   Related Matters

A.   Cardinal shall be entitled to cash discounts based on the gross invoice price of all goods purchased from the supplier, regardless of whether a chargeback is ultimately claimed by Cardinal.

B.   Supplier shall provide Cardinal with a chargeback advance to cover the carrying costs involved in the chargeback process in an amount not to exceed $400,000.  Additionally, the chargeback advance will be reviewed and adjusted (if necessary) on a mutually agreed upon basis based on expansions in Cardinal-Dey business following the commencement date of the contract.

17

Highly Confidential

DEY-BO-0131760