**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

——————————————————————

|   |   |   |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | Civil Action No. 01-12257-PBS |
| LITIGATION | ) | Subcategory Case No. 03-10643-PBS |
| —————————————————————— | ) | |
|   | ) | |
| THIS DOCUMENT RELATES TO: | ) | Judge Patti B. Saris |
|   | ) | |
| *The City of New York, et al.,* | ) | |
|   | ) | |
| *v.* | ) | |
|   | ) | |
| *Abbott Laboratories, et al.* | ) | |
| —————————————————————— | ) | |

**DEFENDANTS IVAX CORPORATION AND IVAX PHARMACEUTICALS, INC.'S
RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED
MATERIAL FACTS AS TO IVAX**

Pursuant to Rule 56.1 of the Local Rules of this Court, Defendants Ivax Corporation and

Ivax Pharmaceuticals, Inc. ("Ivax") hereby submit their Response to Plaintiffs' Local Rule 56.1

Statement of Undisputed Material Facts As to Ivax.  ("Plaintiffs' Ivax-Specific Statement").[1]

Ivax's responses correspond to the numbered paragraphs set forth in Plaintiffs' Ivax-Specific

Statement and identify those issues which are undisputed as well as those issues for which there

is a genuine dispute as to one or more material facts.[2]  Ivax also refers the Court to Defendants'

---

[1]   Ivax Corporation is a holding company that does not manufacture or sell pharmaceutical products.  Ivax Pharmaceuticals, Inc. is Ivax Corporation's operating company that manufactured and/or sold the Ivax drugs at issue in this litigation.  "Ivax" shall hereinafter refer solely to Ivax Pharmaceuticals, Inc., which is the only Ivax defendant material to Plaintiffs' motion.

[2]   Ivax does not respond herein to the headings in Plaintiffs' Ivax-Specific Statement.  To the extent these headings purport to state or characterize facts, such facts or characterizations are not properly supported with citations to the record, as is required by Local Rule 56.1.  To the extent a response is required, Ivax disputes any facts or characterizations contained in these headings.

Response to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts Applicable to All Defendants, filed this same date.

1.      The Ivax drugs and NDCs that have been examined on this motion are set forth in Exhibit A hereto.  This exhibit also sets forth Ivax's Published AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limit ("FUL") and Ivax's AMPs.  The exhibit notes which NDCs are associated with package sizes that set the FUL.

**Ivax's Response to Alleged Fact No. 1:**  Disputed.  Ivax does not dispute that Exhibit A to Plaintiffs' Ivax-Specific Statement purports to (1) list the Ivax drugs and NDCs that Plaintiffs have examined in connection with their motion, (2) set forth Ivax's published AWPs and WACs for these drugs and NDCs, any operative FUL, and Ivax's AMPs, and (3) note which NDCs are associated with the package sizes that set the FUL.  Ivax disputes that Plaintiffs' Exhibit is an accurate and/or complete portrayal of the AWP and WAC prices, the operative FULs, and AMPs for these Ivax drugs and NDCs for any given time period.  Ivax further disputes that Plaintiffs' Exhibit accurately reflects or updates the prices for these Ivax drugs and NDCs and/or the dates that they become effective.  Further, Ivax objects to Alleged Fact No. 1 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings).  Moreover, Ivax objects to Alleged Fact No. 1 insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

2.      The specific Ivax drugs at issue are the Albuterol .83 MG/ML Solution, Albuterol 90 MCG Inhaler, Cefadroxil 500 MG Capsule, Enalapril Maleate 20 MG Tablet, Isosorbide Mononitrate 60 MG Tablet, Lorazepam 1MG Tablet, Metroprolol 100 MG Tablet and Ranitidine 150 MG Tablet.

**Ivax's Response to Alleged Fact No. 2:**  Ivax does not dispute that Ivax's Albuterol 0.83mg solution, Albuterol 90mcg inhaler, Cefadroxil 500mg capsule, Enalapril Maleate 20mg tablet, Isosorbide Mononitrate 60mg tablet, Lorazepam 1mg tablet, Metroprolol 100mg tablet, and Ranitidine 150mg tablet are drugs at issue in Plaintiffs' Motion for Partial Summary Judgment.

3.      Ivax has entered into and executed the federal Medicaid rebate agreement pursuant to 42 U.S.C. § 1396r-8.  *See* Ivax Corporation's and Ivax Pharmaceutical Corporation's Answer and Affirmative Defenses to the Revised First Amended Complaint ("Ivax Answer")[Dkt #4822] at 132.

**Ivax's Response to Alleged Fact No. 3:**  Ivax does not dispute that Ivax Pharmaceuticals, Inc. has entered into and executed the federal Medicaid Rebate agreement with the Secretary of Health and Human Services on behalf of all States.  However, Ivax disputes that Alleged Fact No. 3 is material to Plaintiffs' Motion for Partial Summary Judgment.

4.      Ivax participates in and is aware of State Medicaid reimbursement formulas, including those of New York State Medicaid Program.  *See* Deposition of Thomas Stuart Blake dated 1/24/08 ("Blake 1/24/08 Dep.")(Exhibit C) at 61:21-62:4; Deposition of Corrine Hogan dated 2/6/08 ("Hogan 2/6/08 Dep.")(Exhibit D) at 68:17-70:9; Deposition of Ivax Corporation 30(b)(6)(Corrine Hogan) dated 6/17/08 ("Ivax 30(b)(6)(Hogan) 6/17/08 Dep.")(Exhibit E) at 36:22-37:19; Exhibit F (Deposition of Trisha Sarfas dated 3/19/09 ("Sarfas 3/19/09 Dep.") Exhibit 3 (April 8, 1999 memo circulating information on each State's reimbursement and substitution program)).

**Ivax's Response to Alleged Fact No. 4:**  Disputed.  As an initial matter, Ivax disputes Alleged Fact No. 4 to the extent that it permits an inference that Ivax possessed any more or less awareness of reimbursement practices than that which was generally available public knowledge based on the statutory scheme for reimbursement.  Ivax does not dispute that it participates in state Medicaid programs, including the New York State Medicaid Program.  Ivax disputes that it is "aware of State Medicaid formulas, including those of [the] New York State Medicaid Program" on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this

statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.   Moreover, Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Indeed, the testimony cited does not support Plaintiffs' statement.  Rather, Mr. Blake testified only that he was generally "aware of Medicaid reimbursement for pharmaceuticals."  Deposition of Thomas Stuart Blake, Jan. 24, 2008 ("1/24/08 Blake Dep.") at 61:21-62:4 (Ex. 1).  Ms. Hogan testified only that she "vaguely" understood how state Medicaid programs work.  Deposition of Corrine Hogan, June 17, 2008 ("6/17/08 Hogan Dep.") at 37:17-19 (Ex. 3).  The document cited by Plaintiffs refers only to unspecified "information pertaining to each State's Medicaid reimbursement and substitution program."  Exhibit 3 to Deposition of Trisha Sarfas, March 19, 2009 ("3/19/09 Sarfas Dep.") (Ex. 13).

5.     Ivax knew that eligibility for reimbursement by Medicaid was an important issue for its customers.  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 36:4-14; Bloom 2/4/09 Dep. (Exhibit B) at 24:5-16.

**<u>Ivax's Response to Alleged Fact No. 5:</u>**  Disputed.  Ivax disputes that Alleged Fact No. 5 is material to Plaintiffs' Motion for Partial Summary Judgment.  Further, Ivax disputes that it "knew that eligibility for reimbursement by Medicaid was an important issue for its customers" on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Indeed, the testimony cited does not support Plaintiffs' statement.  Ms. Hogan's testimony does not relate at all to this alleged fact.  Ms. Bloom testified only that Ivax's "customers are very concerned about their reimbursement."  Deposition of Kim Bloom, Feb. 4, 2009 ("2/4/09 Bloom Dep.") at 24:9-11 (Ex. 4).  Moreover,

Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

6.      Corrine Hogan testified, "I think that our customers would say that we were required to participate in [Medicaid], yes." *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 36:8-10.

**Ivax's Response to Alleged Fact No. 6:**  Ivax does not dispute Alleged Fact No. 6.  Ivax disputes any suggestion that it was, in fact, required to participate in Medicaid.  Regardless, this alleged fact is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

7.      Ivax knew that AWP and WAC were used for state Medicaid reimbursement purposes.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 69:10-70:6.  Kim Bloom testified that it was important to have Ivax products approved for Medicaid because "[a] pharmacy is not going to use your product if they're not going to be reimbursed."  *Id.* at 71:1-8.

**Ivax's Response to Alleged Fact No. 7:**  Disputed.  Ivax disputes that Alleged Fact No. 7 is material to Plaintiffs' Motion for Partial Summary Judgment.  Further, Ivax disputes Alleged Fact No. 7 to the extent that it permits an inference that Ivax possessed any more or less awareness of reimbursement practices than that which was generally available public knowledge based on the statutory scheme for reimbursement.  To the extent that Alleged Fact No. 7 purports to suggest that the *reason* Ivax reported pricing information was so that pharmacists could be paid by third party payors, Ivax objects.

Furthermore, Ivax objects to Alleged Fact No. 7 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* Deposition of Sue Gaston, March 19, 2008 ("3/19/08 Gaston Dep.") at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial

Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005) (refusing to consider immaterial facts as part of a motion for summary judgment).

8.      At all times, from 1997 to 2005, at the time of launch of a new product Ivax set an AWP and a WAC for each of its drugs as well as the pricing "buckets" for each of its customers. *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 56:17-57:21.

**Ivax's Response to Alleged Fact No. 8:**  Disputed in part. Ivax disputes Alleged Fact No. 8 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony. Ms. Hogan testified only that between 1997 and 2003, *when Ivax was "exclusive,"* it set an AWP, a WAC, and pricing "buckets" for different customer types.  6/17/08 Hogan Dep. at 56:12-57:21 (emphasis added) (Ex. 3).   Accordingly, Ivax disputes that "[a]t all times, from 1997 to 2005, at the time of launch of a new product[,] Ivax set an AWP and a WAC for each of its drugs as well as the pricing 'buckets' for each of its customers" on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

Furthermore, Ivax objects to Alleged Fact No. 8 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St.*

*Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

9.      Ivax's standard practice was to set the AWP for its drugs at 89.5% of the brand AWP as published by First Databank to obtain the generic drug indicator and be deemed a generic.   Deposition of Ivax Corporation 30(b)(6)(Trisha Sarfas) dated 8/22/07 ("Ivax 30(b)(6)(Sarfas) 8/22/07 Dep.") (Exhibit G) at 154:11-155:11.  Ivax admits that it would have been deemed a generic if its AWP had been at 75% of the brand AWP the drug would still have been deemed a generic.  *Id.* at 155:13-20.

**Ivax's Response to Alleged Fact No. 9:**  Disputed.  While Ivax does not dispute that, in general, Ivax's AWPs were approximately 89.5% of the equivalent brand's AWP, Ivax objects to Alleged Fact No. 9 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Ivax further objects to Alleged Fact No. 9 to the extent that it is misleading and mischaracterizes the evidence.  Plaintiffs' statement incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database.  *See* Deposition of Patricia Kay Morgan, Nov. 30, 2007 ("11/30/07 Morgan Dep.") at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?  A. That's correct.") (Ex. 6); *id.* at 33:6-10 ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue

Book AWP fields, correct? . . . A. That's correct.") (Ex. 6); *id.* at 33:11-20 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6).

In addition, First DataBank would run a statistical analysis, utilizing an algorithm, and if that product fell within a single standard deviation of where other competitors in the marketplace were setting their AWPs, it was coded a generic. *See id.* at 149 ("The computer determines the most common package size for the products that are in a GCN. . . . It then determines the mean of the AWP for those most common package size. It does a standard deviation of . . . that mean, and excludes any product that is more than one standard deviation above that mean or more than one standard deviation below that mean.") (Ex. 6). Accordingly, adjustments needed to be made when competitors' prices changed in the marketplace. After the product was launched, then Ivax did not typically or usually suggest an increase for its AWP, even if the brand had done so. *See* Deposition of Corrine Hogan, Feb. 6, 2008 ("2/6/08 Hogan Dep.") at 149 (Ex. 12).

Ivax also disputes Plaintiffs' statement insofar as it implies that it was Ivax, rather than First DataBank, that established the protocols on how the AWPs of secondary and subsequent generic market entrants were established. In particular, Ivax's witnesses testified that upon launching a generic pharmaceutical product, Ivax would provide First DataBank with its suggested AWP which would be set at slightly more than 10% off the brand AWP. *See, e.g.*, *id.* at 147 (Ex. 12); Deposition of Robert Shanks, Feb. 22, 2008 ("2/22/08 Shanks Dep.") at 48-49 ("[W]hen you went to market [with a drug] you had to be listed in the pricing services, you know, like First Data Bank. They required . . . you . . . to be in there because if you didn't have your [AWP] number in there when people submitted bid proposals, [you would not be able to sell your product.] . . . And in order to be listed as a generic, they required your AWP be at least

8

ten percent lower than the brand.") (Ex. 7).  Ivax did so because decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.  *See* 2/6/08 Hogan Dep. at 147 (Ex. 12); 2/22/08 Shanks Dep. at 48-49 (Ex. 7); 11/30/07 Morgan Dep. at 33, 149 (Ex. 6). Ivax further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including consideration of what was required by First DataBank to achieve the generic indicator), all of which existed within the heartland of the protocols established by First DataBank.  *See* Deposition of Trisha Sarfas, Aug. 22, 2007 ("8/22/07 Sarfas Dep.") at 148, 323 (Ex. 11).

10.    While Ivax wanted to be deemed a generic, it also wanted to be in line with the competition.  *See* Sarfas 3/19/09 Dep. (Exhibit H) at 65:5-13.  If the competition was at 50% below the brand AWP, then Ivax would set its AWP to be comparable.  *Id.* at 66:7-11.

**Ivax's Response to Alleged Fact No. 10:**  Disputed. Ivax objects to Alleged Fact No. 10 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 5). Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment). Ivax disputes that it "wanted to be deemed a generic, [and] it also wanted to be in line with the competition" on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See*

9

Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602. Furthermore, this alleged fact is not properly supported by the testimony cited.  Ms. Sarfas testified only that in determining pricing, "[t]he important thing is that my pricing across the spectrum is comparable to the competition."  3/19/09 Sarfas Dep. at 65:5-13 (Ex. 9).

11.    Ivax sets its WAC when it is the first generic manufacturer to enter the market as a function of the published brand WAC, typically around 30-35% below the published brand WAC.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 91:3-13; Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 68:7-19.

**Ivax's Response to Alleged Fact No. 11**:  Disputed.  As an initial matter, Ivax objects to Alleged Fact No. 11 to the extent that it is misleading and mischaracterizes the evidence. Plaintiffs' statement incorrectly purports to state the universe of policies regarding how WACs were ascertained for Ivax's products during the relevant time period.  For example, Ivax witnesses have testified that with regard to Clozapine, its WAC (also called WIP, or Wholesaler Invoice Price) was set at 16.67 percent below the brand's direct price, and not Plaintiffs' alleged universal 30 to 35 percent below the brand's WAC.  *See* Exhibit 11 to 2/22/08 Shanks Dep. (Ex. 8); 2/22/08 Shanks Dep. at 153-160 (Ex. 7).  Accordingly, Ivax disputes Alleged Fact No. 11.

12.    Ivax would often set its Premier Retail Price to chain pharmacies at 50% of the published brand WAC, then establish its customer "pricing buckets" upward and finally setting its WAC above all the customer "pricing buckets."  See Bloom 2/4/09 Dep. (Exhibit B) at 43:19-46:7.  If Ivax was not the first to enter the market and competition existed then it was Ivax practice to set its WAC as low as competitively possible but in line with the published WACs of the competition.  *See* Hogan 2/6/08 Dep (Exhibit D) at 91:14-18; Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 68:14-19.

**Ivax's Response to Alleged Fact No. 12**:  Disputed.  As an initial matter, Ivax objects to Alleged Fact No. 12 to the extent that it is misleading and mischaracterizes the evidence. Plaintiffs' statement incorrectly purports to state the universe of policies regarding how WACs

were ascertained for Ivax's products during the relevant time period and other pricing was determined.   Accordingly, Ivax disputes Alleged Fact No. 12.

13.    In addition to the AWP and WAC "pricing buckets", Ivax maintained "pricing buckets" for each of its customer types: Distributor, Premier Retail (chains), Retail (independent pharmacies), Compliant Buying Group (retail GPOs), Non-Compliant Buying Group (retail pharmacies), Managed Health Care (institutional/hospital), and Government (Prisons, Federal Supply Schedule).   *See* Bloom 2/4/09 Dep. (Exhibit B) at 36:15-42:3.   All customer "pricing buckets" were below the WAC with Premier Retail (chains) being the best price offered by Ivax, and the WAC was below the AWP.   *Id.* at 42:8-43:14.   The Premier Retail (chains) and the Distributor "pricing buckets" are net prices, while the others are contract prices.   *Id.* at 49:23-51:8.

**Ivax's Response to Alleged Fact No. 13:**   Disputed.   Ivax disputes Alleged Fact No. 13 on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1.   *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1.   In particular, Ivax disputes that it maintained "AWP and WAC 'pricing buckets.'"   Ivax also disputes that it "maintained 'pricing buckets' for each of its customer types," that the Compliant Buying Group consisted of retail GPOs, and that the Non-Compliant Buying Group consisted of retail pharmacies.   Plaintiffs have not provided any evidentiary basis for these assertions, as is required by Local Rule 56.1. *O'Brien*, 440 F. Supp. 2d at 5 n.1.

Further, Ivax objects to Alleged Fact No. 13 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.   CMS did not consider AWPs in setting FULs.   *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?   A. Generally, it did not.   Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 5).   Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.   *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

14.     At all times, from 1997 to 2005, Ivax reported both AWP and WAC for its drugs to all three of the national compendia – First DataBank, RedBook and Medi-Span. *Id.* at 74:22-76:2; 156:9-20; Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 127:1-9, 322:1-323:16, 327:22-328:6; *see also Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) ("Mylan") at *6.

**Ivax's Response to Alleged Fact No. 14:** Disputed.  While Ivax does not dispute that at times Ivax provided AWPs and WACs for its drugs to First DataBank, Ivax disputes that it reported AWPs and WACs for its drugs to the pricing compendia "[a]t all times, from 1997 to 2005," and Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *O'Brien*, 440 F. Supp. 2d at 5 n.1.

Further, Ivax disputes Alleged Fact No. 14 because the deposition testimony it cites provides an insufficient evidentiary basis in support of these alleged facts.  In particular, the complete testimony of Ivax's witnesses explains that while Ivax did provide First DataBank with its WACs and AWPs, it did so because these pricing points were a prerequisite for its products to receive First DataBank's generic indicator, and thus be selected by customers and dispensed by providers.  *See* 8/22/07 Sarfas Dep. at 148-149, 323 (Ex. 11).  WAC is understood in the industry to represent an invoice price off of which chargebacks and rebates to retailers or wholesalers are calculated.  *See*, *e.g.*, 42 U.S.C. § 1395w-3a(c)(6)(B) (providing that the "term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, *not including prompt pay or other discounts, rebates or reductions in price*, . . . as reported in wholesale price guides or other publications of drug or biological pricing data.") (emphasis added).  First DataBank collected AWP and WAC pricing information because its entire business model was premised on providing an electronic resource for pricing points to its customers.  *See* 8/22/07 Sarfas Dep. at 147 (Ex. 11).  Accordingly, Ivax disputes Plaintiffs' statements to the extent that they omit these

reasons for which Ivax provided WACs and AWPs to First DataBank for the subject drugs sold by Ivax during the relevant time period.  *See id.* at 253 (Ex. 11).

Ivax objects to Alleged Fact No. 14 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Moreover, Ivax disputes Plaintiffs' statements insofar as they misstate, mischaracterize and/or misunderstand the manner in which First DataBank populates its AWP field.  *See, e.g.*, 11/30/07 Morgan Dep. at 17-18, 19, 27-29, 31-33 (Ex. 6).  First DataBank populates its BlueBook AWP with numbers based on surveys of wholesalers.  *See id.* at 32 ("Q. Based on First DataBank's definition, AWP is a price based on information from the wholesaler, not the manufacturer, correct?  A. That's correct.") (Ex. 6).  Further, Ivax disputes Plaintiffs' statements to the extent that they incorrectly imply that manufacturers, and not First DataBank, are in control of populating the AWP field in the database.  *Id.* at 33 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?  A. That's correct.") (Ex. 6); *id.* ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct? . . . A.

That's correct.") (Ex. 6); *id.* ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6).

Ivax further objects to Plaintiffs' statements in that Plaintiff fails, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any admissible evidence in support thereof.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statements because they lack adequate foundation.  *See* Fed. R. Evid. 602.  In addition, Ivax disputes Plaintiffs' Statement insofar as it represents that Ivax "reported" any prices to First DataBank or any other entity.

15.    Ivax knew and controlled the AWPs and WACs for its drugs that were published by the national drug pricing compendia knowing that its WACs and AWPs would then be used by state Medicaid agencies.  *See* Sarfas 3/19/09 Dep. (Exhibit H) at 31:22-32:4, 35:20-25; 37:18-38:1, 193:18-24; 195:12-196:9; Bloom 2/4/09 Dep. (Exhibit B) at 74:22-76:2; 156:9-20.

**Ivax's Response to Alleged Fact No. 15:**  Disputed.  As an initial matter, Ivax objects to Alleged Fact No. 15 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Ivax objects to Alleged Fact No. 15 to the extent that it is misleading and mischaracterizes the evidence.  Plaintiffs' statement incorrectly implies that manufacturers, and

not First DataBank, are in control of populating the AWP field in the database.  *See* 11/30/07 Morgan Dep. at 33 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?  A. That's correct.") (Ex. 6); *id.* ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6); *id.* ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6).

In addition, First DataBank would run a statistical analysis, utilizing an algorithm, and if that product fell within a single standard deviation of where other competitors in the marketplace were setting their AWPs, it was coded a generic.  *See id*. at 149 ("The computer determines the most common package size for the products that are in a GCN. . . . It then determines the mean of the AWP for those most common package size.  It does a standard deviation of . . . that mean, and excludes any product that is more than one standard deviation above that mean or more than one standard deviation below that mean.") (Ex. 6).  Accordingly, adjustments needed to be made when competitors' prices changed in the marketplace.  After the product was launched, then Ivax did not typically or usually suggest an increase for its AWP, even if the brand had done so.  *See* 2/6/08 Hogan Dep. at 149 (Ex. 12).

Ivax also disputes Plaintiffs' statement insofar as it implies that it was Ivax, rather than First DataBank, that established the protocols on how the AWPs of secondary and subsequent generic market entrants were established.  In particular, Ivax's witnesses testified that upon launching a generic pharmaceutical product, Ivax would provide First DataBank with its

suggested AWP which would be set at slightly more than 10 percent off the brand AWP.  *See, e.g.*, 2/6/08 Hogan Dep. at 147 (Ex. 12); 2/22/08 Shanks Dep. at 48-49 ("[W]hen you went to market [with a drug] you had to be listed in the pricing services, you know, like First Data Bank. They required . . . you . . . to be in there because if you didn't have your [AWP] number in there when people submitted bid proposals, [you would not be able to sell your product.] . . . And in order to be listed as a generic, they required your AWP be at least ten percent lower than the brand.") (Ex. 7).  Ivax did so because decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.  *See* 2/6/08 Hogan Dep. at 147 (Ex. 12); 2/22/08 Shanks Dep. at 48-49 (Ex. 7); 11/30/07 Morgan Dep. at 33, 149 (Ex. 6).  Ivax further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including consideration of what was required by First DataBank to achieve the generic indicator), all of which existed within the heartland of the protocols established by First DataBank.  *See* 8/22/07 Sarfas Dep. at 148, 323 (Ex. 11).

Furthermore, Ivax disputes that it "knew and controlled the AWPs and WACs for its drugs that were published by the national drug pricing compendia" on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1 (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings).  Moreover, Ivax objects to Alleged Fact No. 15 insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

16.     Both Redbook and First Databank would send requests to Ivax to verify the accuracy of the AWPs and WACs for its drugs and Ivax would respond with corrections if errors were found.  *See* Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 254:12-256:7; Sarfas 3/19/09 Dep. (Exhibit H) at 193:18-194:3; 195:12-196:9; Exhibit I (Sarfas 3/19/09 Dep. Exhibit 21 (Excerpt of a Redbook Product Listing Verification for Ivax drugs signed 10/16/03)).

**Ivax's Response to Alleged Fact No. 16:**  Ivax admits that Ivax subscribed to First

DataBank and that it periodically verified the accuracy of First DataBank data with respect to

Ivax's subject drugs.  However, Ivax disputes Plaintiffs' characterization of these facts for the

following reasons.  As an initial matter, Ivax objects to this statement to the extent that it is

misleading and mischaracterizes the cited testimony.  As Ivax's witnesses have made clear, Ivax

subscribed to First DataBank and provided and reviewed WACs and AWPs because these

pricing points were a prerequisite for their products to receive First DataBank's generic

indicator, and thus be selected by customers and dispensed by providers.  *See* 8/22/07 Sarfas

Dep. at 148-149, 323 (Ex. 11).  WAC is understood in the industry to represent a maximum,

invoice price, off which chargebacks and rebates to retailers or wholesalers are calculated.  *See*,

*e.g.*, 42 U.S.C. § 1395w-3a(c)(6)(B) (providing that the "term 'wholesale acquisition cost'

means, with respect to a drug or biological, the manufacturer's list price for the drug or

biological to wholesalers or direct purchasers in the United States, *not including prompt pay or

other discounts, rebates or reductions in price*, . . . as reported in wholesale price guides or other

publications of drug or biological pricing data.") (emphasis added).  First DataBank collected

AWP and WAC pricing information because its entire business model was premised on

providing an electronic resource for pricing points to its customers.  *See* 8/22/07 Sarfas Dep. at

147 (Ex. 11).  Accordingly, Ivax disputes the Plaintiffs' statement to the extent that it omits these

reasons for which Ivax provided WACs and AWPs to First DataBank for the subject drugs sold

by Ivax during the relevant time period.  *See id.* at 253 (Ex. 11).

Furthermore, Ivax objects to Alleged Fact No. 16 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Moreover, Ivax disputes Plaintiffs' statement insofar as it misstates, mischaracterizes and/or misunderstands the manner in which First DataBank populates its AWP field.  *See, e.g.*, 11/30/07 Morgan Dep. at 17-18, 19, 27-29, 31-33 (Ex. 6).  First DataBank populates its BlueBook AWP with numbers based on surveys of wholesalers.  *See id.* at 32 ("Q. Based on First DataBank's definition, AWP is a price based on information from the wholesaler, not the manufacturer, correct?  A. That's correct.") (Ex. 6).  Further, Ivax disputes Plaintiffs' statement to the extent that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database.  *Id.* at 33 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?  A. That's correct.") (Ex. 6); *id.* ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6); *id.* ("Q. During the time period you were employed by First DataBank,

manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6).

17.   Ivax subscribed to First Databank services to monitor both its published prices and that of its competitors.  *See* Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 256:9-20.

**Ivax's Response to Alleged Fact No. 17:**  Disputed.  Ivax admits that Ivax subscribed to First DataBank and that it periodically verified the accuracy of First DataBank data with respect to Ivax's subject drugs.  However, as Ivax's witnesses have made clear, Ivax subscribed to First DataBank and provided and reviewed WACs and AWPs because these pricing points were a prerequisite for their products to receive First DataBank's generic indicator, and thus be selected by customers and dispensed by providers.  *See* 8/22/07 Sarfas Dep. at 148-149, 323 (Ex. 11). Ivax does not dispute that it subscribed to First DataBank publications.  Ivax disputes that it subscribed to First DataBank "to monitor both its published prices and [those] of its competitors," and Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

Ivax objects to Alleged Fact No. 17 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

18.   Ivax admits that its reported AWPs were not tethered to the actual prices that anyone pays or to the WAC.  *See* Sarfas 3/19/09 Dep. (Exhibit H) at 33:6-34:8, 61:22-24; Ivax

30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 87:22-88:4; *see also Mylan*, 2008 WL 5650859 at *6.

**Ivax's Response to Alleged Fact No. 18:** Disputed.  Ivax objects to Alleged Fact No. 18 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 5). Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment). Furthermore, Ivax disputes that its "reported AWPs were not tethered to the actual prices that anyone pays or to the WAC, on the grounds that Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

19.     Ivax's reported WACs and AWPs that had no relationship to contract prices, nor could they be used to determine the actual cost of a drug to anyone.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 156:21-157:2; *Mylan* at *6.

**Ivax's Response to Alleged Fact No. 19:** Disputed.  Although Ivax does not dispute that "AWP is not linked to a contract price or a WAC price," 6/17/08 Hogan Dep. at 87:22-88:1 (Ex. 3), Ivax disputes that its reported WACs "had no relationship to contract prices, nor could they be used to determine the actual cost of a drug to anyone."  Indeed, Ms. Sarfas testified that some wholesalers pay WAC as their net price.  3/19/09 Sarfas Dep. at 79:23-80:2 ("There are some customers that actually do pay WAC.") (Ex. 9). Ivax objects to Alleged Fact No. 19 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.

*See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not.   Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 5).   Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.   *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

20.     Ivax never calculated an average of the wholesale prices that it believed was being paid by pharmacists.   *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 203:9-204:16. Ivax knew that none of its customers in the competitive market pay AWP for generic drugs.   *See* Bloom 2/4/09 Dep. (Exhibit B) at 24:3-4; Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 323:18-22.

**Ivax's Response to Alleged Fact No. 20:**   While Ivax does not dispute that Ivax did not "calculate[ ] an average of the wholesale prices that it believed [were] being paid by pharmacists," Ivax disputes any suggestion that it was required to calculate the actual acquisition costs paid by pharmacists for its drugs or that AWP is anything other than a reference price that Ivax sets to obtain a generic indicator from the pricing compendia.   *See* 8/22/07 Sarfas Dep. at 323:18-22 (Ex. 11).   Plaintiffs have not provided any evidentiary basis for any such assertions. *See O'Brien*, 440 F. Supp. 2d at 5 n.1.   Further, Ivax objects to Alleged Fact No. 20 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.   CMS did not consider AWPs in setting FULs.   *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?   A. Generally, it did not.   Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 5).   Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.   *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

21.     Ivax knew that the real wholesale cost accounts for chargebacks, rebates, discounts and other pricing incentives and allowances that got the wholesaler to its net price.  *See* Sarfas 3/19/09 Dep. (Exhibit H) at 78:23-79:3.

**Ivax's Response to Alleged Fact No. 21:**  Disputed.  Ivax disputes Alleged Fact No. 21

on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required

by Local Rule 56.1.   *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Further, WAC is defined as "the

manufacturer's list price . . . to wholesalers or direct purchasers in the United States, not

including prompt pay or other discounts, rebates or reductions in price. . . ."  *See* 42 U.S.C.

§ 1395w-a(c)(6)(B).  To the extent Plaintiffs define "real wholesale cost" as net sales price to a

wholesaler, Ivax admits that it understood that wholesalers often receive chargebacks, rebates,

and discounts that reduce their invoice price to their net price.  Ivax disputes that *all* wholesalers

received such chargebacks, rebates, and discounts on all products, and disputes that "real

wholesale cost" is lower than WAC for all of its wholesaler customers for all products.  *See*

3/19/09 Sarfas Dep. at 79:23-80:2 ("There are some customers that actually do pay WAC.") (Ex.

9).  Ivax also disputes any suggestion that WAC is anything other than a wholesaler's invoice

price or list price.  *Id*. at 79:12-25 (Ex. 9); *see also* 42 U.S.C. § 1395w-3a(c)(6)(B).

22.     Approximately 90% of Ivax sales to wholesalers are subject to chargebacks.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 66:17-67:10.

**Ivax's Response to Alleged Fact No. 22:**  Disputed.  Ivax disputes that Alleged Fact No.

22 is material to Plaintiffs' Motion for Partial Summary Judgment.  WAC is understood in the

industry to represent an invoice price off of which chargebacks and rebates to retailers or

wholesalers are calculated.  *See*, *e.g.*, 42 U.S.C. § 1395w-3a(c)(6)(B) (providing that the "term

'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list

price for the drug or biological to wholesalers or direct purchasers in the United States, *not*

*including prompt pay or other discounts, rebates or reductions in price*, . . . as reported in

wholesale price guides or other publications of drug or biological pricing data.") (emphasis added).  Further, Ivax objects to Plaintiffs' statement on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

23.    Ivax knew that less than five (5) percent of its sales are at WAC or WAC plus.  *See* Ivax 30(b)(6)(Sarfas) 8/22/07 Dep. (Exhibit G) at 324:1-3.

**Ivax's Response to Alleged Fact No. 23:**  Disputed.  Ivax disputes that Alleged Fact No. 23 is material to Plaintiffs' Motion for Partial Summary Judgment.  WAC is understood in the industry to represent an invoice price off of which chargebacks and rebates to retailers or wholesalers are calculated.  *See*, *e.g.*, 42 U.S.C. § 1395w-3a(c)(6)(B) (providing that the "term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, *not including prompt pay or other discounts, rebates or reductions in price*, . . . as reported in wholesale price guides or other publications of drug or biological pricing data.") (emphasis added).  Further, Ivax objects to Plaintiffs' statement on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

24.    Ivax does not set its WAC at the net price that the wholesalers pay for Ivax drugs.  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 32:5-12.  All of Ivax's contract prices to

its customers were below the WAC and generated chargebacks to the wholesalers. *Id.* at 62:14-63:4. The net price that customers pay for Ivax drugs through a wholesaler can range from 90% to 10% of the published WAC, and on average the net prices actually paid for Ivax drugs was at a 50% discount of the published WAC. *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 69:13-70:6.

**Ivax's Response to Alleged Fact No. 24:** Disputed. As an initial matter, Ivax disputes Alleged Fact No. 24 on the grounds that Ivax's WAC prices in many instances correlate to either the prices that Ivax charged its customers in the marketplace, or the price at which wholesalers are actually invoiced, or both. *See* 2/6/08 Hogan Dep. at 62-63 (Ex. 12); *see also* 1/24/08 Blake Dep. at 203-04 ("WAC [prices] would be changed more frequently. And the reason for that, if you want the reason for that, it's because there are some people who actually buy at WAC. . . . All the wholesalers buy at WAC.") (Ex. 1); *id.* at 253 ("Q. But almost nobody buys at WAC, right? A. The wholesalers are the only people that every buy at WAC, *and they buy everything at WAC*.") (emphasis supplied) (Ex. 1). Indeed, every single Ivax product sold to wholesalers is sold at WAC. *Id.* at 203 ("All the wholesalers buy at WAC.") (Ex. 1).

Ivax also objects to Plaintiffs' statement to the extent that it implies that WAC should be "set at the net price that the wholesalers pay for Ivax drugs." WAC is defined as "the manufacturer's list price . . . to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price. . . ." *See* 42 U.S.C. § 1395w-a(c)(6)(B). To the extent Plaintiffs define "net price" as net sales price to a wholesaler, Ivax admits that it understood that wholesalers often receive chargebacks, rebates, and discounts that reduce their invoice price to their net price. Ivax disputes that *all* wholesalers received such chargebacks, rebates, and discounts on all products, and disputes that "net price" is lower than WAC for all of its wholesaler customers for all products. *See* 3/19/09 Sarfas Dep. at 79:23-80:2 ("There are some customers that actually do pay WAC.") (Ex. 9). Ivax also disputes any

suggestion that WAC is anything other than a wholesaler's invoice price or list price. *Id.* at 79:12-25 (Ex. 9); *see also* 42 U.S.C. § 1395w-3a(c)(6)(B).

With respect to the first sentence of Alleged Fact No. 24, while Ivax does not dispute that it would "sell [to] wholesalers at a WAC price, and there's discounts there, chargebacks, et cetera, to get down to net pricing, contract pricing," 6/17/08 Hogan Dep. at 32:5-12 (Ex. 3), Ivax disputes that net price is lower than WAC for *all* of its wholesaler customers for all products. Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1. *See O'Brien*, 440 F. Supp. 2d at 5 n.1. Indeed, Ms. Sarfas testified that some wholesalers pay WAC as their net price. *See* 3/19/09 Sarfas Dep. at 79:23-80:2 ("There are some customers that actually do pay WAC.") (Ex. 9).

With respect to the second sentence of Alleged Fact No. 24, Ivax disputes that "[a]ll of Ivax's contract prices to its customers were below the WAC. . . ." This alleged fact is not properly supported by the evidence in the record. *See O'Brien*, 440 F. Supp. 2d at 5 n.1. Ms. Hogan was referring only to "major wholesalers" who pay WAC, and not to smaller wholesalers who may or may not pay WAC. 6/17/08 Hogan Dep. at 62:12-63:4 (Ex. 3).

With respect to the third sentence of Alleged Fact No. 24, Ivax disputes that the "net price that customers pay for Ivax drugs through a wholesaler can range from 90% to 10% of the published WAC. . . ." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1. *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

25.     Ivax also sells its drugs to distributors, who differ from wholesalers in that the distributor buys at a net price and typically services retail independent pharmacies. *See* Bloom 2/4/09 Dep. (Exhibit B) at 34:11-20. Ivax does not invoice generic distributors at WAC like it does wholesalers, but instead invoices distributors at a net price, which is below WAC, and is determined based on what was being paid in the marketplace. *See id.* at 35:6-36:6.

**Ivax's Response to Alleged Fact No. 25:** Ivax does not dispute that, at times, it invoiced generic products to non-wholesaler distributors at prices other than WAC.  To the

extent Alleged Fact No. 25 purports to assert that Ivax did so on all occasions and/or with respect

to all such non-wholesaler distributors, Ivax disputes such assertion on the grounds that

Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to

proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P.

56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence");

*O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statement on the basis

that it lacks adequate foundation.  *See* Fed. R. Evid. 602. Ivax states that this alleged fact is

immaterial to Plaintiffs' Motion for Partial Summary Judgment.

26.     The WAC and AWP for Ivax drugs typically did not change even though the
pricing to Ivax's customers would typically decrease over time.  *See* Hogan 2/6/08 Dep. (Exhibit
D) at 132:16-133:1; 167:3-11.  Corinne Hogan testified that this occurred so customers could
make more money on the reimbursement.  *Id.* at 167:12-168:2.

**<u>Ivax's Response to Alleged Fact No. 26</u>:**  Disputed.  With respect to the first sentence of

Alleged Fact No. 26, Ivax disputes that "the WAC and AWP for Ivax drugs typically did not

change even though the pricing to Ivax's customers would typically decrease over time."  This

alleged fact is not properly supported by the evidence in the record, as required by Local Rule

56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  While Ms. Hogan testified that, in general, the

prices of generic drugs decrease over time, the cited testimony that WAC and AWP "remain[ed]

the same" related to a single product:  Albuterol kits.  2/6/08 Hogan Dep. at 167:3-11 (Ex. 12).

Further, Ivax disputes this statement because Ivax's witnesses testified that Ivax did not consider

adjusting WAC and AWP levels when contract prices were being set.  *See id*. at 132 (Ex. 12).  In

addition, Ivax objects to this statement to the extent that it is misleading and mischaracterizes the

deposition testimony cited.

With respect to the second sentence of Alleged Fact No. 26, Ivax disputes that it

decreased its contract prices and kept its AWPs and WACs constant "so customers could make

more money on reimbursement."   Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Ms. Hogan testified in the abstract only that to remain competitive, a manufacturer must have an AWP and a WAC comparable to that of its competitors.

Moreover, Ivax states that during the relevant time period Ivax had literally hundreds of NDCs.   Therefore, Ivax objects to Plaintiffs' attempt to characterize, based on this limited testimony, the movement of every single contract price for every single Ivax pharmaceutical product in the whole of Ivax's product line.   Ivax also disputes Plaintiffs' statement on the grounds that Plaintiff fails, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Plaintiffs' Motion for Partial Summary Judgment concerns specific Ivax NDCs, from a specific time frame, which had particularized movements in contract prices for varying (and drug-specific) reasons, including supply concerns, competitive reasons, and the like.

Furthermore, Ivax objects to Alleged Fact No. 26 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St.*

*Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

27.     Ivax admitted to the United States Congress that "all or substantially all" of its net revenue sales occur at more than 5% below the WAC for its drugs.  See Exhibit J (August 15, 2003 letter from Ivax CEO Rafick Henein to Anthony Cooke Esq., Counsel for the Subcommittee on Oversight and Investigations, Committee on Energy & Commerce in response to Committee Chairmen Tauzin's and Greenwood's June 26, 2003 letter) at p. 3.

**Ivax's Response to Alleged Fact No. 27**:  Disputed.  While Ivax does not dispute Alleged Fact No. 27, Ivax disputes that this alleged fact is material to Plaintiffs' Motion for Partial Summary Judgment.

28.     Ivax defined "spread" in a PowerPoint presentation as "the difference between reimbursement and net cost on scripts paid by Medicaid or PBM – interchangeable with profit." *See* Hogan 2/6/08 Dep. (Exhibit D) at 73:7-75:5; Blake 1/24/08 Dep. (Exhibit C) at 130:22-132:6; *see also Mylan*, 2008 WL 5650859 at *6.  The definition of reimbursement spread was commonly known in the pharmaceutical industry and by any competent sales person.  *See id.*

**Ivax's Response to Alleged Fact No. 28**:  Disputed.  Ivax disputes Alleged Fact No. 28 to the extent it represents that Ivax's "PowerPoint presentation" defines "spread" as the difference between reimbursement and net costs.  As an initial matter, the testimony cited by Plaintiffs for this generalized proposition was limited in scope to sales of one drug (not at issue in Plaintiffs' Motion for Partial Summary Judgment), Clozapine, to pharmacists.  *See* 2/6/08 Hogan Dep. at 73-74 (Ex. 12); 1/24/08 Blake Dep. at 130-31 (Ex. 1).  Further, Ivax disputes Plaintiffs' statement because it fails to set forth the complete substance of the "PowerPoint presentation" as alleged.  In particular, these very pages make clear that if Ivax's Clozapine is dispensed in lieu of the brand product, the effect will be that the reimbursement amount for state Medicaid agencies, including New York Medicaid, will be significantly lower.  *See* Exhibit 7 to 1/24/08 Blake Dep. (Ex. 1).  Put differently, the Plaintiffs' statements improperly omit the fact that Ivax's marketing strategy related to Clozapine *actually saved the State money overall*.  In addition, and as Ivax's witnesses have testified, Ivax provided WACs and AWPs because First

DataBank required those pricing points in order to ensure that its publications provided data that was compatible with the systems of their customers. *See* 8/22/07 Sarfas Dep. at 147 (Ex. 11); 2/22/08 Shanks Dep. at 54 ("It's a requirement by data bases that you have to give [AWP].") (Ex. 7).

Furthermore, Ivax objects to Alleged Fact No. 28 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 5). Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Moreover, Ivax disputes Plaintiffs' statement because Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of these statements. *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1. Moreover, Ivax objects that Plaintiffs' statement that "spread" was "commonly known in the pharmaceutical industry and by any competent sales person" lacks proper foundation. *See* Fed. R. Evid. 602.

Finally, Ivax disputes Alleged Fact No. 28 is material to Plaintiffs' Motion for Partial Summary Judgment. Further, Ivax disputes any suggestion that it ever marketed the spread with respect to the products at issue in Plaintiffs' motion, *see*, *e.g.*, 2/4/09 Bloom Dep. at 80:25-81:23

(Ivax did not have a "strategy" to market the spread) (Ex. 4), and Plaintiffs have not provided

any evidentiary basis for any such an assertion, as is required by Local Rule 56.1.  *See O'Brien*,

440 F. Supp. 2d at 5 n.1.

29.     Ivax knew that spread between contract price and reimbursement was a factor in a
customer's buying decision.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 113:2-115:24 (customer
Gerimed telling Ivax it is considering spread and increased revenues); 121:18-122:21
(acknowledging that customer informed Ivax of it was interested in AWP spread).  Kim Bloom,
who worked with pharmaceutical pricing since 1988, testified that this was not a secret in the
industry.  *Id.* at 80:19-81:17.

**Ivax's Response to Alleged Fact No. 29:**  Disputed.  Ivax disputes Alleged Fact No. 29

because it misrepresents the cited testimony and is incomplete and misleading.  Ivax is aware

that pharmacies seek to make a profit on the drugs they dispense.  *See* 1/24/08 Blake Dep. at 79

(Ex. 1).  Indeed, as Ivax's witnesses have explained, pharmacies are running a business and

therefore presumably are making purchasing decisions based on profitability.  *See* 2/6/08 Hogan

Dep. at 110, 112 (Ex. 12).  But these truisms do not support Alleged Fact No. 29.  To the

contrary, the complete deposition testimony of Ivax's witnesses plainly demonstrates that generic

drug companies for the most part compete entirely on price.  Moreover, this proposed fact is

particularly inappropriate for piecemeal judicial fact-finding before trial because it consists of

selective quotations taken out of context.  The jurors should have the opportunity to assess each

witnesses' testimony as it is delivered in the courtroom, without the confusion of having isolated

quotes read to them from the bench at the start of the trial.

Further, Ivax disputes that "factor[s]" in a "customer's buying decision" are material to

Plaintiffs' Motion for Partial Summary Judgment.

30.     Ivax would be at a competitive disadvantage if other manufacturers had higher
AWPs than Ivax.  *Id.* at 210:8-210:23.  Ivax knew that raising an AWP did not have any
ramifications on anything other than reimbursement.  *Id.* at 211:9-12.

**Ivax's Response to Alleged Fact No. 30:**  Disputed.  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Ivax likewise objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Ivax objects to Alleged Fact No. 30 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment). Further, Ivax disputes that it "would be at a competitive disadvantage if other manufacturers had higher AWPs than Ivax." This alleged fact is not properly supported by the evidence in the record.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Ms. Bloom testified only that Ivax would be at a competitive disadvantage if other manufacturers had higher AWPs and Ivax's were "much lower."  2/4/09 Bloom Dep. at 210:14-2 (Ex. 4).

31.     Ivax notified customers such as RX Solutions, a mail order pharmacy, of the percentage spread between Ivax's Reported AWP and the RX solutions contract pricing. *See id.* at 87:20-90:21; Exhibit K (Bloom 2/4/09 Dep. Exhibit 4 (May 21, 2003 Price Decrease & Increase Notification to RX Solutions)).

**Ivax's Response to Alleged Fact No. 31:**  Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Ivax objects to Alleged Fact

30 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or

bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in

setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in

setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a

FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).

Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary

Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1

(refusing to consider immaterial facts as part of a motion for summary judgment). While Ivax

does not dispute that, in response to a customer request, it provided information about the

percentage difference between the AWP and the customer's contract price, Ivax disputes any

suggestion by Plaintiffs that Ivax marketed the spread with respect to the products at issue in

Plaintiffs' motion, *see, e.g.*, 2/4/09 Bloom Dep. at 80:25-81:23 (Ivax did not have a "strategy" to

market the spread) (Ex. 4), and Plaintiffs have not provided any evidentiary basis for such an

assertion.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

    32.    Ivax knew that the reimbursement spread basically marketed itself as it was self-
evident to Ivax's pharmacy customers for all of its drugs given that the customers knew how they
would be reimbursed by Medicaid.  *See* Blake 1/24/08 Dep. (Exhibit C) at 67:1-19.

    **Ivax's Response to Alleged Fact No. 32:**  Disputed.  Plaintiffs have failed, contrary to

the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence,

admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring

moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d

at 5 n.1.  Ivax likewise objects to Plaintiffs' statement on the basis that it lacks adequate

foundation.  *See* Fed. R. Evid. 602.  Ivax objects to Alleged Fact No. 32 insofar as it relies on,

refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion

for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08

Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?   A. Generally, it did not.   Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).   Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).   Further, Ivax disputes that it "knew that the reimbursement spread basically marketed itself" and also disputes any suggestion by Plaintiffs that Ivax marketed the spread for the products at issue in Plaintiffs' motion.  2/4/09 Bloom Dep. at 80:25-81:23 (Ivax did not have a "strategy" to market the spread) (Ex. 4), and Plaintiffs have not provided any evidentiary basis for such an assertion.   *See* *O'Brien*, 440 F. Supp. 2d at 5 n.1.

33.     If spread on Ivax drugs ever came up in discussions with pharmacists, it would be discussed.  *Id.* at 82:16-83:17.

**Ivax's Response to Alleged Fact No. 33:**  Disputed.  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Ivax likewise objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Ivax objects to Alleged Fact No. 33 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?   A. Generally, it did not.   Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).   Accordingly,

Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).  While Ivax does not dispute that Mr. Blake testified that, in marketing Clozapine to specialty pharmacies, "if it ever came up about spreads, then I'm sure we would discuss it," 1/24/08 Blake Dep. at 83:8-10 (Ex. 1), Ivax disputes any suggestion that Ivax regularly discussed "spread" with pharmacists, *see*, *e.g.*, 2/4/09 Bloom Dep. at 80:25-81:23 (Ivax did not have a "strategy" to market the spread) (Ex. 4), and Plaintiffs have not provided any evidentiary basis for such an assertion.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

34.    Ivax analyzed and prepared bid pricing based upon spread calculations between AWP and the customer's price to win the business of customers like the Pharmacy Benefits Manager ("PBM") Caremark.  *See* Exhibits L (Deposition of Susan Randall dated 4/16/09 ("Randall 4/16/09 Dep."); Exhibit 14 (spreadsheet, note and email string in December 2002 concerning a bid price to Caremark and the fact that it must have a spread of at least 60% between AWP and contract price to win Caremark's business)); Exhibit M (Randall 4/16/09 Dep. Exhibit 15 (email dated 7/22/03 from Susan Randall (Ivax) to James Matas (Ivax) discussing the preparation of a bid price to Caremark at 65% off of AWP)).

**Ivax's Response to Alleged Fact No. 34:**   Disputed.  Ivax objects to Alleged Fact No. 34 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5). Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).  Ivax does not dispute that its customer, Caremark (1) requested a spread of 60 percent between the AWP and

contract price for Folic Acid 1mg tablets, and (2) requested a spread of 65 percent between the

AWP and contract price for Quinine Sulfate 325mg tablets—two products that are not at issue in

Plaintiffs' motion and therefore immaterial.  Ivax also does not dispute that, in response to both

requests, it attempted to structure its bid pricing to be responsive to Caremark's requests.  Ivax

disputes that, as a general practice, it "analyzed and prepared bid pricing based upon spread

calculations between AWP and the customer's price."  Ivax also disputes any suggestion that it

marketed the spread for drugs at issue in Plaintiffs' motion, *see, e.g.*, 2/4/09 Bloom Dep. at

80:25-81:23 (Ivax did not have a "strategy" to market the spread) (Ex. 4), and Plaintiffs have not

provided any evidentiary basis for such an assertion.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

35.     Ivax knew that if it increased its AWP in response to the competitive marketplace, which it did on occasion, that the reimbursement spread for a drug reimbursed on AWP would also increase.  *See* Bloom 2/4/09 Dep. (Exhibit B) at 98:9-99:12.

**Ivax's Response to Alleged Fact No. 35:**  Disputed.  Ivax objects to Alleged Fact No. 35

insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing

on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting

FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting

FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL

on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 5).  Ivax does

not dispute that, to the extent reimbursement is based on AWP, an increase in the AWP for a

particular drug will have the effect of increasing the reimbursement for that drug.  Ivax disputes

any suggestion that it increased its AWPs to increase a customer's reimbursement spread, and

Plaintiffs have not provided any evidentiary basis for such an assertion.  *See O'Brien*, 440 F.

Supp. 2d at 5 n.1.

36.     Ivax knew that if it kept its AWP constant and reduced the contract price for a drug that the effect would be to increase reimbursement profit for that drug to the pharmacy when reimbursed on an AWP calculation.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 182:14-183:9.

**Ivax's Response to Alleged Fact No. 36:** Disputed.  Ivax objects to Alleged Fact No. 36 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).  Moreover, Ivax objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Ivax disputes any suggestion that it lowered its contract prices to increase a customer's reimbursement spread, and Plaintiffs have not provided any evidentiary basis for such an assertion.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

37.     Ivax believed there was no competitive reason to be lower than the threshold AWP for generic designation (10% off brand AWP) because at a lower AWP its customers would make less profit on Ivax's drugs than its competitors who were at or near the threshold AWP.  *See* Hogan 2/6/08 Dep. (Exhibit D) at 147:22-148:12.

**Ivax's Response to Alleged Fact No. 37:** Disputed.  Ivax objects to Alleged Fact No. 37 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:21-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 5).  Accordingly, Ivax disputes that AWP is material to the Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1

(refusing to consider immaterial facts as part of a motion for summary judgment).  Moreover, Ivax objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

Ivax also disputes that it "believed there was no competitive reason to be lower than the threshold AWP for generic designation (10% off brand AWP) because at a lower AWP its customers would make less profit on Ivax's drugs than its competitors who were at or near the threshold AWP."  Further, Ivax disputes any suggestion that it considered its customers' reimbursement when it set its AWPs.  Plaintiffs have not provided any evidentiary basis for these assertions.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Indeed, Ms. Hogan testified that, over time after the launch of a new drug, the brand AWP would increase and Ivax's AWP would remain the same, meaning that Ivax's AWP was "lower than the threshold for generic designation." 2/6/08 Hogan Dep. at 148:13-20 (Ex. 12).

38.    Ivax knew of the Federal Upper Limit (FUL) and that it is a limitation on reimbursement below AWP that is set on published prices.  *See* Ivax 30(b)(6)(Hogan) 6/17/08 Dep. (Exhibit E) at 260:15-261:15; *see also* Bloom 2/4/09 Dep. (Exhibit B) at 144:10-145:2.

**Ivax's Response to Alleged Fact No. 38:**  Ivax disputes that it "knew of the Federal Upper Limit (FUL) and that it is a limitation on reimbursement below AWP that is set on published prices."  Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement. *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1.  Moreover, Ivax objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  In any event, Ms. Hogan testified only that she understood that there was a FUL but did not know what it was or how it was established.   6/17/08 Hogan Dep. at 260:15-261:6 (Ex. 3).   Ms. Bloom testified about MACs, not FULs.  2/4/09 Bloom Dep. at 144:10-145:2 (Ex. 4).

39.     Ivax notified customers when a drug it sold was no longer subject to the Federal Upper Limit knowing that the reimbursement would increase once the FUL restriction was removed.  *See* Exhibit N (Deposition of Jon Holden dated 4/28/09 Exhibit 8 (Letters dated and February 15, 2000 and March 17, 2000 from Jon Holden (Ivax) to Lynn King (Eckerd) discussing a price increase and informing Eckerd that the Federal Upper Limit had been removed thus "eliminating any reimbursement restrictions")).

**Ivax's Response to Alleged Fact No. 39**:  Ivax disputes that Alleged Fact No. 39 is material to Plaintiffs' Motion for Partial Summary Judgment.  Ivax does not dispute that it communicated with its customers concerning price changes, and on occasion it provided information that a drug was no longer subject to a FUL.  Ivax disputes that it provided such notifications on any regular or systematic basis, and Plaintiffs have not provided any evidentiary basis for such an assertion.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

40.     At all times, from 1997 to 2005, Ivax calculated and reported the average manufacturer's price ("AMP") for all its products on a quarterly basis as required by the federal rebate statute.  *See* Sarfas 3/19/09 Dep. (Exhibit H) at 31:13-18; Bloom 2/4/09 Dep. (Exhibit B) at 142:10-18; Hogan 2/6/08 Dep. (Exhibit D) at 93:8-94:12; *see also Mylan*, 2008 WL 5650859 at *30.

**Ivax's Response to Alleged Fact No. 40**:  Ivax does not dispute Alleged Fact No. 40.  However, this alleged fact is not properly supported by the evidence in the record.  *See O'Brien*, 440 F. Supp. 2d at 5 n.1.  Ms. Sarfas, Ms. Bloom, and Ms. Hogan all testified only concerning their general understanding that AMP was reported to CMS.  3/19/09 Sarfas Dep. at 31:13-18 (Ex. 9); 2/4/09 Bloom Dep. at 142:10-18 (Ex. 4); 2/6/08 Hogan Dep. at 93:8-94:12 (Ex. 12).

Dated:  June 15, 2009                          */s/ Jennifer G. Levy*
                                                Jennifer G. Levy
                                                Patrick M. Bryan
                                                KIRKLAND & ELLIS LLP
                                                655 Fifteenth Street, N.W.
                                                Washington, D.C.  20005
                                                Telephone:  (202) 879-5000
                                                Facsimile:  (202) 879-5200

Robert J. Muldoon, Jr., BBO# 259480
Courtney A. Clark, BBO# 651381
SHERIN & LODGEN, LLP
101 Federal Street
Boston, MA  02110
Telephone:  (617) 646-2000
Facsimile:  (617) 646-2222

*Attorneys for Defendants Teva
Pharmaceuticals USA, Inc., Ivax
Corporation, Ivax Pharmaceuticals, Inc.,
and Barr Laboratories, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2009, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Court in MDL 1456.

/s/ *John K. Crisham*
John K. Crisham