# EXHIBIT 12

Hogan, Corinne        HIGHLY CONFIDENTIAL        February 6, 2008
Fort Lauderdale, FL

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-CV-11865-PBS

- - - - - - - - - - - - - - - - - - x

THE COMMONWEALTH OF MASSACHUSETTS,  )

        Plaintiff,  )

-against-  )

MYLAN LABORATORIES, INC., et al.,  )

        Defendants.  )

- - - - - - - - - - - - - - - - - - x

(Caption continued on next page)


         Fort Lauderdale, Florida

         Wednesday, February 6, 2008


H I G H L Y   C O N F I D E N T I A L


Videotaped Deposition of CORINNE HOGAN, held at One East Broward Boulevard, Suite 1101, Fort Lauderdale, Florida, 33301, commencing at 9:31 a.m., before Donald W. McKay, RMR, CRR, a Notary Public for the State of Florida.

Hogan, Corinne          HIGHLY CONFIDENTIAL          February 6, 2008
                        Fort Lauderdale, FL

62

1           THE VIDEOGRAPHER:  Okay.  We're now
2    back on the record, on videotape No. 2.  The time
3    is 10:37.
4    BY MR. MULLIN:
5        Q.   Looking again at Exhibit 2, if you
6    would turn to page 24, that has a slide relating
7    to WAC, W-A-C, wholesale acquisition cost.
8        A.   Yes.
9        Q.   And it says, "Invoice price that
10   wholesalers pay."  Is that your understanding?
11       A.   Yes.  We actually called it WIP, W-I-P.
12   That's interchangeable with WAC.
13       Q.   And WIP would stand for wholesale
14   invoice price?
15       A.   Correct.
16       Q.   And would most sales to wholesalers be
17   subject to some type of price reduction?
18       A.   That's way broad, so let's go -- say
19   that again now.
20       Q.   I think you said that WAC and WIP were
21   interchangeable terms at IVAX.
22       A.   Yes.  Right.

63

1   Q.   And I think you said WIP was wholesale
2   invoice price.
3   A.   Right.
4   Q.   Would most of those invoices be subject
5   to some kind of a discount, a rebate, a
6   chargeback, some kind of a price reduction?
7   A.   Yes.
8   Q.   And if you had to put a percentage on
9   that, what percentage would you put on it?
10  A.   Fifty percent.
11  Q.   Looking at page 24 of Exhibit 2, it
12  says, "Wholesale real cost is the WAC less cash
13  discounts, rebates and chargebacks." And it
14  basically explains the difference in the payment
15  terms between retail customers and wholesale
16  customers.
17  A.   The fourth bullet point?
18  Q.   Right.
19  A.   Okay.
20  Q.   And is that your understanding, that
21  wholesalers usually collect from their customers
22  prior to having to pay their manufacturer -- pay

73

1   Red Book?
2       A.   I don't know that.
3       Q.   If you would, if you'd turn to page 29,
4   there is some reimbursement terms that are listed
5   there.
6       A.   Um-hmm.
7       Q.   And the second one is spread.  Are you
8   familiar with the term spread?
9       A.   Yes.
10      Q.   What is spread?
11      A.   **My understanding, it's the**
12  **reimbursement amount that a pharmacy would**
13  **receive.**
14      Q.   How did you come to your understanding
15  relating to the term "spread"?
16      A.   **Just through years in the office.  From**
17  **our original pricing managers -- Ofelia Perez, I**
18  **guess, was the first person that would have**
19  **introduced me to the concept.**
20      Q.   Based on your experience in the
21  industry, is spread a commonly understood term
22  among sales and marketing people in the

Hogan, Corinne			HIGHLY CONFIDENTIAL			February 6, 2008
				Fort Lauderdale, FL

74

1   pharmaceutical industry?
2        A.    Yeah.  I would think so.
3        Q.    If you would turn to -- I guess it's
4   page 31.
5        A.    Okay.
6        Q.    The term "spread" is defined there as
7   the difference between reimbursement and the net
8   cost on scripts paid by Medicaid or a PBM.  Do
9   you see that definition?
10       A.    Yes.  Yes, I do.
11       Q.    And is that consistent with your
12  understanding of the term "spread"?
13       A.    Yeah.  I'd say that's an accurate
14  description.
15       Q.    And by PBM, what's that?
16       A.    Pharmacy benefit manager.
17       Q.    And then, the second bullet point on
18  the slide is that spread is interchangeable with
19  profit.  Is that consistent with your
20  understanding of the term?
21       A.    That spread is interchangeable -- I
22  guess that would be the profit that the pharmacy

87

1  none probably isn't an accurate answer.

2          Bob Shanks was director of marketing at
3  the time.  Him -- and he had a product manager
4  that was named Lew Soars.  They had put together
5  a launch for clozapine.  I remember when Kim
6  came, they had many day-long meetings, talking
7  about the product, that I was not involved in.

8          So I guess anything that I did was done
9  -- I was executing.  Bob said, this is the price
10 we're going to launch at.  Great.  That's the
11 price we put in the system.

12      Q.   And in connection with the launch and
13 your discussions with Bob and with Kim, were you
14 given any guidance with regard to your contract
15 price responsibilities and how the company was
16 going to respond to contract pricing requests
17 from customers?

18      A.   All of that was controlled through
19 marketing.

20      Q.   Okay.

21      A.   So I was merely an executor.  And not
22 even me -- not me personally; in my department.

93

1    Q.    And would those prices get reported to
2    any price reporting services?
3    A.    Absolutely not.
4    Q.    All right.  And what was the policy or
5    the practice at IVAX during the relevant time
6    period with regard to the confidentiality of
7    contract prices?
8    A.    Yeah.  Your previous question said
9    reported to any other services.  And I had said
10   absolutely not, in reference to a First DataBank
11   or a Red Book or something like that.  But AMP's
12   or CMS calculations, of course, were reported.
13   So I don't know if that's the reporting agency
14   you're speaking of.
15   Q.    And AMP refers to an average
16   manufacturer's price?
17   A.    Yeah.  Sorry.
18   Q.    And that's a price that the company had
19   to calculate in connection with the Medicaid
20   rebate program?
21   A.    Yes.
22   Q.    And that price would get reported to

94

1    the Centers for Medicare and Medicaid Services?
2         A.   CMS, as I understand.
3         Q.   And that's an agency of the Federal
4    Government?
5         A.   I guess, yeah.
6         Q.   And that was in connection with the
7    Medicaid rebate program.  Is that right?
8         A.   Yes.  State Medicaids.
9         Q.   And those rebates get paid by the
10   manufacturer to the various state Medicaid
11   programs.
12        A.   That's my understanding.  Um-hmm.
13        Q.   With regard to the prices that IVAX was
14   charging customers, the contract prices, what was
15   the practice at IVAX with regard to whether those
16   were confidential or not confidential?
17        A.   Highly confidential.
18        Q.   And when you say "highly confidential,"
19   what do you mean?
20        A.   We would not disclose those prices to
21   any outside party.
22        Q.   Why not?

Hogan, Corinne          HIGHLY CONFIDENTIAL          February 6, 2008
                        Fort Lauderdale, FL

110

1    Q.   Okay.  You have no personal knowledge
2  with regard to this particular piece of paper.
3  Right?
4    A.   I do not.
5    Q.   But looking at it, does it refresh
6  recollections for you that customers were
7  frequently concerned about the spread on IVAX's
8  products?
9    **A.   No.  I can't say that.  I think -- in**
10 **general, I can say that customers are running**
11 **their business.  And if we said in the previous**
12 **slides that reimbursement equals profit, then**
13 **that was their -- of course, they made decisions**
14 **based on their profitability.  They're running a**
15 **business.  So I would assume that, yeah, they've**
16 **got to look at spread.**
17           MR. MULLIN:  I think we need to change
18 a tape.  So let's take a break.
19           THE VIDEOGRAPHER:  Right.  Let me go
20 off the record.  The time is 11:36.
21           (Thereupon, a recess was taken,
22 after which the following proceedings were had:)

Hogan, Corinne        HIGHLY CONFIDENTIAL        February 6, 2008
                      Fort Lauderdale, FL

111

1         THE VIDEOGRAPHER:  All right.  We are
2    back on the record, on videotape No. 3.  The time
3    is 11:42.
4    BY MR. MULLIN:
5         Q.   Ms. Hogan, I think one of the customers
6    that you mentioned earlier was ANDA.  Is that
7    right?
8         A.   **Yes.**
9         Q.   A-N-D-A?
10        A.   **Yes.**
11        Q.   And I think you said that that was a
12   distributor business.  Is that correct?
13        A.   **Correct.**
14        Q.   And I think you said that you were
15   involved with contract pricing to ANDA for
16   clozapine.  Is that right?
17        A.   **Yes.**
18        Q.   And that -- was there also a customer
19   at IVAX, VIP?
20        A.   **Yes.**
21        Q.   What was VIP?
22        A.   **It's called Value in Pharmaceuticals.**

1   They're in, I think, Niagra, New York.  They were
2   acquired by ANDA.
3       Q.   And in the course of your employment in
4   the pharmaceutical industry, have you become
5   aware that sometimes what customers will say to a
6   manufacturer is that the manufacturer's spread on
7   a product is not as good as someone else's
8   spread, and they're going to have to switch which
9   supplier, which source they're using, depending
10  upon the spread?
11           MS. LEVY:  Objection, vague, and a
12  generalization.  You can answer the question to
13  the extent you know.
14           THE WITNESS:  So the question -- I'll
15  just summarize it -- is has any customer ever
16  said, your spread is not as good as your
17  competitor's? Is that what you're asking me?
18  BY MR. MULLIN:
19      Q.   Yes.  From time to time, have you
20  become aware that customers say that to generic
21  pharmaceutical manufacturers?
22      A.   Yes.  I'm sure they have.

Hogan, Corinne          HIGHLY CONFIDENTIAL          February 6, 2008
                        Fort Lauderdale, FL

132

1    Q.  Is it fair, is it accurate, to say that
2 contract prices were independent of AWP and WAC
3 prices?
4           MS. LEVY:  Objection.  Lack of
5 foundation.
6           THE WITNESS:  If you're asking me when
7 I changed a contract price, did I look at AWP or
8 WAC?  No, I never did.
9 BY MR. MULLIN:
10   Q.  You would not look at those two prices.
11   A.  No.
12   Q.  And that contract prices would
13 frequently change when AWP and WAC would remain
14 the same.
15   A.  Yeah.
16   Q.  And in general, it was true that over
17 time, certainly for multi-source generics, that
18 contract prices would decline?
19           MS. LEVY:  Objection.  Lack of
20 foundation and improper hypothetical.
21           You can answer.
22           THE WITNESS:  Contract prices declined

Hogan, Corinne    **HIGHLY CONFIDENTIAL**    February 6, 2008
Fort Lauderdale, FL

147

1    approve or merely to recommend?

2        A.    **I would say recommend.**

3        Q.    Okay. And who was it that had the

4    approval authority?

5        A.    **First, they would come to me, and then,**

6    **of course, I would have to go to Finance and to -**

7    **- and sometimes the president of the company.**

8        Q.    I think you've told us that with regard

9    to AWP, that at least at launch, it would

10    typically be set at slightly more than ten

11    percent below the brand AWP. Is that right?

12        A.    **That's right.**

13        Q.    And I think you said that was in order

14    to obtain generic designation by First DataBank

15    and other price reporting services.

16        A.    **Correct.**

17        Q.    If the company had established its AWP

18    at 15 or 20 percent below the brand AWP, you

19    would have also received brand -- generic

20    designation. Isn't that right?

21        A.    **Yes.**

22        Q.    And why did the company pick the

148

1   maximum amount it could set an AWP and still get
2   brand -- generic designation?
3       A.   The only reason I would say is for
4   competitive reasons.
5       Q.   Why would that help you competitively?
6       A.   If your customers remember
7   reimbursement equals profit on your slide -- so
8   our customers, that's how they make money.  So if
9   we're at a competitive disadvantage because they
10  can't make as much money on our product as they
11  do every other generic out there, I would be at a
12  disadvantage.
13      Q.   And over time after launch, if the
14  brand increased its AWP, what, if anything, would
15  IVAX do with regard to IVAX's AWP?
16      A.   I would say most of the time, it didn't
17  change.  I would say sometimes it probably
18  increased along with the brand, and sometimes it
19  would decrease along with the competition.  So it
20  just wasn't a regularly reviewed pricing.
21      Q.   Can you think of any reason why a
22  generic company would reduce its AWP other than

149

1  to maintain generic designation?
2       A.   Not that quick off the top of my head,
3  no, I can't.
4       Q.   And in those circumstances where a
5  brand company increased an AWP, typically,
6  usually, would IVAX and the other generic
7  manufacturers increase their AWP as well?
8       A.   Typically, usually, I don't think so.
9  I wouldn't think they did.  Not typically,
10 usually.
11      Q.   If the brand increased its AWP, that
12 would have the effect of increasing the spread
13 from using the branded product?
14      A.   Well, if the brand raised their AWP
15 because their WAC is based on AWP, it means they
16 just raised their price.  That's all it means.
17      Q.   Well, they might have changed their
18 WAC, but not their contract price.  Right?
19      A.   There is no contract price in a brand,
20 as I'm aware.
21      Q.   Well, wouldn't the -- if there are
22 generic competitors, didn't the brand sometimes

Hogan, Corinne      **HIGHLY CONFIDENTIAL**      February 6, 2008
Fort Lauderdale, FL

167

1    much product as they wanted to produce.

2    **A.    Correct.**

3    Q.    Now, I think you said that in general,

4   over time, the prices of generic products, multi-

5   source products, would decline. Is that right?

6    **A.    Yes.**

7    Q.    With regard to albuterol kits, were

8   there times when the contract prices would

9   decline, but the AWP and the WAC would either

10   remain the same or increase?

11    **A.    Remain the same, not increase.**

12    Q.    And why would AWP and WAC remain the

13   same if contract prices were decreasing?

14    **A.    Yeah. We talked about that before.**

15   **Had said that you have to remain competitive with**

16   **your AWP and your WAC's for your customers.**

17    Q.    And in order to remain competitive, you

18   need to have an AWP and a WAC that's comparable

19   to your competitors?

20    **A.    Yes.**

21    Q.    And is that because the reimbursement

22   for competitors is based on AWP and/or WAC?