**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| *The City of New York, et al.* | ) ) |
| *v.* | ) ) |
| *Abbott Laboratories, Inc., et al.* | ) ) |

MDL NO. 1456
Civil Action No. 01-12257-PBS
Subcategory Case No. 03-10643-PBS

Judge Patti B. Saris

## DEFENDANTS PAR PHARMACEUTICAL COMPANIES, INC.'S AND PAR PHARMACEUTICAL, INC.'S RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO PAR

Pursuant to Rule 56.1 of the Local Rules of this Court, Defendants Par Pharmaceutical Companies, Inc. and Par Pharmaceutical, Inc. ("Par") submit the following responses to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Par Pharmaceutical Companies, Inc. and Par Pharmaceutical, Inc. (hereinafter "Plaintiffs' Par-Specific Statement") [Master Dkt. No. 6067; Sub. Dkt. No. 68].[1] Par's responses correspond to the numbered paragraphs set forth in Plaintiffs' Par-Specific Statement and identify those issues which are undisputed and those issues for which there exists a genuine issue of disputed material fact.[2] Par also refers the Court to Defendants' Joint Response to Plaintiffs' Local Rule 56.1

---

[1] Par Pharmaceutical Companies, Inc. is a holding company that does not manufacture and/or sell pharmaceutical products. Par Pharmaceutical, Inc. is Par Pharmaceutical Companies, Inc.'s operating company that manufactured and/or sold the drugs at issue in this litigation with respect to the Par defendants. "Par" shall hereinafter refer solely to Par Pharmaceutical, Inc., which is the only Par defendant whose conduct is material to plaintiffs' motion for partial summary judgment. To the extent a response is required as to the parent company, all purported statements of undisputed material fact are disputed as to Par Pharmaceutical Companies, Inc.

[2] Par does not respond herein to the headings in Plaintiffs' Par-Specific Statement, which are not properly supported with citations to the record, as required by Local Rule 56.1. To the extent a response is required, Par disputes any purported statements of fact or characterization of facts in those headings.

Statement of Undisputed Material Facts Related to Federal Upper Limits and Applicable to All Thirteen FUL Defendants, filed on June 15, 2009 in opposition to Plaintiffs' Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-B (hereinafter "plaintiffs' motion").

<u>**INTRODUCTION**</u>

Par objects to Plaintiffs' Par-Specific Statement to the extent that it fails to comply with Local Rule 56.1, which requires "a concise statement of the *material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation*."  Local Rule 56.1 (emphasis added).  Several of the assertions in Plaintiffs' Par-Specific Statement lack citations to factual support in the record.  Even where plaintiffs provide citations to factual support in the record, in some instances, the cited material does not support the "fact" for which it is cited.  Plaintiffs' Par-Specific Statement also offers "facts" that are not material to plaintiffs' motion.  Because of plaintiffs' failure to comply with Local Rule 56.1, Plaintiffs' Par-Specific Statement should be rejected, and their motion should be denied.  *See, e.g.*, *Dale v. H.B. Smith Co., Inc.*, 910 F. Supp. 14, 20 (D. Mass. 1995) (denying summary judgment motion when party made 56.1 statements that were argumentative, conclusory, and unsupported by record evidence); *see also O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings as required by Local Rule 56.1); *St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d 183, 186 n. 1 (D. Mass. 2005) (refusing to consider a summary judgment movant's immaterial facts).

## SPECIFIC RESPONSES

1.      The PAR drugs and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto. This exhibit also sets forth PAR's Published AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limit ("FUL") and Par's AMPs. The exhibit notes which NDCs are associated with package sizes that set the FUL.

**PAR'S RESPONSE TO PARAGRAPH 1:**  Par does not dispute that Exhibit A to Plaintiffs' Par-Specific Statement purports to (i) list the Par drugs and NDCs that have been examined in connection with Plaintiffs' motion; (ii) set forth published AWPs and WACs for those drugs and NDCs, any operative FUL, and Par's AMPs; and (iii) note which NDCs are associated with the package sizes that set the FUL.  Par disputes the data set forth in Exhibit A to the extent that it is not properly supported by evidence in the record.  Plaintiffs have cited no evidentiary basis for the data set forth in Exhibit A, as required by Local Rule 56.1.  Par further disputes that the alleged facts relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in setting FULs.  *See* Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, filed on May 15, 2009 ("Defs.' 56.1 Stmt."), at ¶ 34 [Master Dkt. No. 6054; Sub. Dkt. No. 55].  Par further disputes that it provided WACs for its generic products to the pricing compendia as a general practice.  *See* Par's Response to Paragraph 12, *infra*.

2.      The specific PAR drugs at issue are the Clonazepam .5 MG Tablet, Enalapril Maleate 20 MG Tablet, Metropolol 100 MG Tablet and Ranitidine 150 MG Tablet.

**PAR'S RESPONSE TO PARAGRAPH 2:**  Par does not dispute that Par's Clonazepam .5 MG Tablet is a drug at issue in plaintiffs' motion.  Par disputes that the specific Par drugs properly at issue in plaintiffs' motion as to Par include Enalapril Maleate 20 MG Tablet, Metoprolol 100 MG Tablet, or Ranitidine 150 MG Tablet.  Plaintiffs have cited no evidentiary basis for this assertion, as required by Local Rule 56.1.  Revised Exhibit B to

Plaintiffs' Revised First Amended Consolidated Complaint ("RFACC") does not list Metoprolol

100 MG Tablet as a drug at issue in this litigation with respect to Par.  *See* Revised Exhibit B to

Plaintiffs' RFACC, at Exhibit B-27 [Master Dkt. No. 4754].  Nor does Revised Exhibit B

identify any Par NDC for Enalapril Maleate 20 MG Tablet or Ranitidine 150 MG Tablet as being

at issue with respect to Plaintiffs' claims relating to the Federal Upper Limit.  *See id.*; *see also*

Plaintiffs' RFACC, at ¶¶ 15, 146 [Master Dkt. No. 4780] and Revised Exhibit A [Master Dkt.

No. 4871].

> 3.     PAR has entered into and executed the federal Medicaid
> rebate agreement pursuant to 42 U.S.C. § 1396r-8.  *See* Answer of
> Defendants Par Pharmaceuticals Companies, Inc. and Par
> Pharmaceutical, Inc. to Plaintiffs' Revised First Amended
> Consolidated Complaint [Dkt #4827] ("PAR Answer") at ¶132;
> *see also* Deposition of PAR Pharmaceuticals 30(b)(6)(Nick
> DiMaio) dated 5/6/08 ("PAR 30(b)(6)(DiMaio) 5/6/08 Dep.")
> (Exhibit B) at 27:14-18.

**PAR'S RESPONSE TO PARAGRAPH 3:**  Par does not dispute that Par

Pharmaceutical, Inc. has entered into and executed the federal Medicaid Rebate Agreement with

the Secretary of Health and Human Services on behalf of all States.  Par disputes Paragraph 3 to

the extent that it implies that Par Pharmaceutical Companies, Inc. entered into and executed the

Rebate Agreement, which was executed on behalf of Par Pharmaceutical, Inc.  *See* Declaration

of Andrew T. Boone in Support of Par's Response to Plaintiffs' Local Rule 56.1 Statement of

Undisputed Material Facts as to Par  ("Boone Decl."), Exh. A (Par's Rebate Agreement).

> 4.     PAR participates voluntarily in the state Medicaid
> programs, including the New York State Medicaid Program.  *See*
> PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 150:7-13.

**PAR'S RESPONSE TO PARAGRAPH 4:**  Par does not dispute the facts set

forth in Paragraph 4.

5.     PAR knew that eligibility for reimbursement by Medicaid was a very important issue for its customers and in fact was required to ensure that that its drugs were Medicaid reimbursable. *See* Deposition of Karen Andrus dated 10/16/07 ("Andrus Dep.") (Exhibit C) at 46:16-48:10; Deposition of Julie Trendowicz dated 4/1/09 ("Trendowicz 4/1/09 Dep.") (Exhibit D) at 165:18-21.

**PAR'S RESPONSE TO PARAGRAPH 5:**  Par does not dispute that Ms.

Andrus testified that having Par products listed in the databases was "very important to [Par's]

customers" and that pharmacies could get reimbursed by third-party payors only for products

listed in the databases.  Except as noted, Par disputes Paragraph 5 to the extent that it

mischaracterizes Ms. Andrus's testimony as being specific to Medicaid.  In addition, Par does

not dispute that Ms. Trendowicz testified that Par's customers required Par to ensure that its

drugs were Medicaid reimbursable.

6.     PAR knew that the AWPs and WACs for PAR drugs were used for reimbursement purposes, including for state Medicaid reimbursement purposes.  *See* Trendowicz 4/1/09 Dep. (Exhibit D) at 125:20-126:14, 129:20-131:18; Andrus Dep. (Exhibit C) at 46:16-48:10.

**PAR'S RESPONSE TO PARAGRAPH 6:**  Par disputes that the alleged facts

relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in

setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Par further disputes the assertion in Paragraph 6

that it "knew that the AWPs and WACs for [its] drugs were used for reimbursement purposes,

including state Medicaid reimbursement purposes."  Plaintiffs do not provide an evidentiary

basis for this assertion, because the cited testimony does not support this asserted fact.  Par does

not dispute that it knew that AWPs and WACs could be used as bases for reimbursement, but Par

disputes that Par was aware that any particular entity or third-party payor, including state

Medicaid agencies, actually used AWPs and WACs in setting reimbursement rates or in

reimbursing for any particular Par product.  *See, e.g.*, Boone Decl., Exh. B (30(b)(6) Deposition

of Nick DiMaio, May 6, 2008 (Vol. I) ("DiMaio 5/6/08 Dep."), at 88:10-12 ("Q.  Do you know

how FUL is by the federal government?  A.  No, I don't."); *id.*, Exh. C (30(b)(6) Deposition of

Nick DiMaio, July 31, 2008 (Vol. II) ("DiMaio 7/31/08 Dep."), at 543:13-16) ("A.  I know that

Medicaid reimburses for . . . for Medicaid prescriptions.  What I don't know is how they

reimburse or how they set that reimbursement.").  Par further disputes that it provided WACs for

its generic products to the pricing compendia as a general practice.  *See* Par's Response to

Paragraph 12, *infra*.

> 7.      PAR sets one WAC and one AWP for each of its products.
> *See* PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 313:10-12.

**PAR'S RESPONSE TO PARAGRAPH 7:**  Par disputes that the alleged facts

relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in

setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Notwithstanding the immateriality of the alleged

facts relating to AWPs, Par does not dispute that, at any given time, Par has only one WAC and

one AWP for each of its products and that Par sets that WAC and AWP.

> 8.      At all times, from 1997 to 2005, at the time of launch of a
> new product PAR set an AWP either: (i) at around 10% of the
> brand AWP if PAR was first to introduce the generic drug; or, (ii)
> if PAR was not the first, then since AWPs in the generic industry
> are consistent across the board, then PAR would set the AWP in
> line with the competition on the market.  *See* PAR
> 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 42:2-43:4; *see also*
> *Commonwealth of Mass. v. Mylan*, 2008 WL 5650859
> (D.Mass)("*Mylan*") at *5.

**PAR'S RESPONSE TO PARAGRAPH 8:**  Par disputes that the alleged facts

relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in

setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Par further disputes that plaintiffs have provided an

evidentiary basis for the time period prior to Mr. DiMaio's employment with Par in 1998.

Except as noted and notwithstanding the immateriality of the alleged facts relating to AWPs, Par

does not dispute the facts set forth in Paragraph 8.

> 9.     Nick DiMaio testified that AWPs for PAR generic products
> are set at the product launch and PAR will only "manage our
> AWPs so they compete or they're comparable with our
> competitive AWPs, so you'll find our AWPs typically match most
> all the competitors."   *See* PAR 30(b)(6)(DiMaio) 5/6/08 Dep.
> (Exhibit 1) at 132:14-1336.   When lower prices are offered to
> pharmacies, PAR does not typically lower the AWP because
> "there's no financial incentive for [PAR] to manage AWP in that
> way."   *Id.* at 133:8-134:2.

**PAR'S RESPONSE TO PARAGRAPH 9:**  Par disputes that the alleged facts

relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in

setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Notwithstanding the immateriality of the alleged

facts relating to AWPs, Par does not dispute that Mr. DiMaio's testimony is consistent with the

first sentence of Paragraph 9.  Par disputes the second sentence of Paragraph 9 to the extent that

it mischaracterizes Mr. DiMaio's testimony and Par's reason for not lowering its AWPs as lower

prices were offered to customers.  As Mr. DiMaio testified:

> Q.     Does Par lower the AWP to match the new lower prices
> that are given to retail pharmacies?
>
> A.     Yeah, that's -- we typically don't -- there's no financial
> incentive for us to manage AWP in that way.  So -- and
> typically what happens, then, more competitors come in,
> limits are established so the AWP, it doesn't matter where
> it was because reimbursement isn't based on it.  So that's
> why we typically don't manage it.  It's typically set and it
> stands alone and we move on to contract negotiated pricing.

Boone Decl., Exh. B (DiMaio 5/6/08 Dep. at 133:14-134:2).

> 10.     At all times, from 1997 to 2005, at the time of launch of a
> new product PAR set a WAC for each drug it sold typically at 20%
> of the WAC for the bioequivalent branded drug.  As competition
> increases in the generic market, PAR quickly lowered its WAC
> prices to stay competitive.   *See* Deposition of PAR
> Pharmaceuticals 30(b)(6)(Nick DiMaio) dated 8/16/07 ("PAR
> 30(b)(6)(DiMaio) 8/16/07 Dep.") (Exhibit E) at 153:18-154:12; *see*

*also Mylan*, 2008 WL 5650859 at *5.

**PAR'S RESPONSE TO PARAGRAPH 10:**  Par disputes that plaintiffs have provided an evidentiary basis for the time period prior to Mr. DiMaio's employment with Par in 1998.  Par does not dispute that, after that time and through 2005, it often initially set its WAC prices for newly-launched drugs at a discount of approximately twenty percent to the bioequivalent branded drug's WAC.  Par likewise does not dispute that competition in the generic drug market quickly drove WAC prices down.

> 11.    At all times, from 1997 to 2005, PAR provided the AWP for its generic drugs to all three of the national pricing compendia - First DataBank, RedBook and Medi-Span.  *See* Andrus Dep. (Exhibit C) at 45:11-46:8; *see also* PAR Answer [Dkt #4827] at ¶10.  PAR expected the AWPs it submits to the compendia like First Databank to be published.  *See* PAR 30(b)(6)(DiMaio) 5/6/08 (Exhibit B) at 162:7-21.

**PAR'S RESPONSE TO PARAGRAPH 11:**  Par disputes that the alleged facts relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Par further disputes that plaintiffs have provided an evidentiary basis for the time period prior to Ms. Andrus's and Mr. DiMaio's employment with Par in 1998.  Except as noted and notwithstanding the immateriality of the alleged facts relating to AWPs, Par does not dispute that, after that time and through 2005, Par submitted the AWPs for its generic products to First DataBank, RedBook, and Medi-Span, and that Par expected those AWPs to be published by the compendia.

> 12.    PAR maintains that it does not directly report a WAC for each PAR generic drug to the pricing compendia; however, PAR knew that the national pricing compendia collected and reported WAC prices for PAR drugs.  *See* Andrus Dep. (Exhibit C) at 99:4-13; *see also* Mylan, 2008 WL 5650859 at *16-17.

**PAR'S RESPONSE TO PARAGRAPH 12:**  Par does not dispute that, as a general practice, it does not and did not supply WACs for any of its generic products to the pricing compendia.  Nor does Par dispute that it discovered on one or more occasions that the pricing compendia reported in their databases WAC prices for certain of its drugs.  However, Par disputes that it "knew" that the national pricing compendia "collected and reported WAC prices" for Par drugs, and disputes any inference that Par approved of any compendium's collection or use of such data.  As Ms. Andrus testified:

> A.   We did not provide First DataBank with our WACs, so we did not want them listed at all.  We cannot control any of the databases' sources for our information.  The fact that they might be able to get it from one of our customers is not us providing them with that information.  And nor was it arranged that way.

Boone Decl., Exh. D (Deposition of Karen Andrus, October 16, 2007 ("Andrus Dep."), at 108:6-12).

Ms. Andrus served as Par's primary contact with the national pricing compendia and is the person most knowledgeable about Par's communications with those compendia.  *See id.*, Exh. D (Andrus Dep. at 45:20-46:3); *id.*, Exh. D (Andrus Dep. at 61:4-6); *id.*, Exh. B (DiMaio 5/6/08 Dep. at 165:20-166:5) (testifying that correspondence with First DataBank would come from Ms. Andrus's group).  Whenever Ms. Andrus learned that the pricing compendia had populated a field with data purporting to be Par's WAC prices, Ms. Andrus would direct the compendia to remove Par's WAC prices or "zero out" the data.  *See, e.g., id.*, Exh. D (Andrus Dep. at 59:21-60:4) (confirming Par's policy "to zero out or remove the WACs whenever it found out that one of the reporting services, whether it be Red Book, First DataBank or Medi-Span, was reporting WACs for Par products"); *see also, e.g., id.*, Exh. D  (Andrus Dep. at 52:3-5) ("And we also had [Red Book] remove our WAC pricing from any of their databases so that they

9

would not publish it or put it on any other source."); *id.*, Exh. D  (Andrus Dep. at 100:13-21) ("I

recall seeing printouts from the databases with a WAC price listed for us, yes.  And I recall

crossing them out and asking them to zero them out."); *id.*, Exh. D  (Andrus Dep. at 111:17-21)

("It was consistent with our policy for the whole -- for the databases not to have anything

populated in the WAC price list.  And we did what we could in order to get them to zero those

prices out.").

> 13.     Karen Andrus testified that PAR provided WACs to any
> customer or entity that was not a reporting service.  *See id.* at
> 52:18-22, 58:15-59:8.   Nick DiMaio testified that PAR did not
> provide WAC pricing to First Databank because First Databank
> already had it anyway so there was no reason to provide it. *See*
> PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 84:13-85:12.
> However, according to a document produced by First Databank, on
> May 27, 2003 Marissa Caputo of PAR emailed to Theresa Castro of
> First DataBank the WAC pricing for PAR's generic drug Torsemide.
> *See*  PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 354:16-
> 355:19; Exhibit F (PAR 30(b)(6)(DiMaio) 5/6/08 Dep. Exhibit 82
> (5/27/03 email from Marissa Caputo (PAR) to Theresa Castro
> (FDB))).

**PAR'S RESPONSE TO PARAGRAPH 13:**  Par does not dispute that Ms.

Andrus testified that Par provided its WACs to "[p]retty much anybody that asked, other than the

databases."  Boone Decl., Exh. D (Andrus Dep. at 52:20-22).  Nor does Par dispute that Mr.

DiMaio testified that "essentially they had our WAC pricing anyhow."  *Id.*, Exh. B (DiMaio

5/6/08 Dep. at 85:3-6).  However, Par disputes plaintiffs' characterization of Ms. Andrus's and

Mr. DiMaio's testimony to the extent that Paragraph 13 suggests that Par would have supplied

WAC prices to the compendia had those compendia not otherwise had access to WACs for Par

products.  As Mr. DiMaio testified:

> A.     My understanding is they needed a price to load the
>        product.
>
> Q.     But when they ask you for WACs, you refused; correct?

> A.    There was -- yes.  There was no reason to do that since we
> were already supplying AWP and our products were being
> loaded.

*Id.*, Exh. B (DiMaio 5/6/08 Dep. at 84:11-17).  Ms. Andrus has also testified regarding Par's

concern that, if Par did choose to supply its WAC prices to the compendia, competing

manufacturers could use the published WACs in an effort to determine Par's contract pricing.

*See id.*, Exh. D (Andrus Dep. at 125:15-19).  Moreover, Par's policy was to request that the

pricing compendia remove or "zero out" WAC pricing whenever Par learned that the compendia

were populating their databases with purported WAC prices for Par products.  *See* Par's

Response to Paragraph 12, *supra*.

Par further disputes that WAC prices for Torsemide, which is not a drug at issue

in plaintiffs' motion (or in this litigation as to Par), are material to plaintiffs' motion.  Par further

disputes any inference that Par communicated to First DataBank or other pricing compendia

WAC prices for its generic products as a general practice.  Ms. Andrus served as Par's primary

contact with the pricing compendia and is the person most knowledgeable about Par's

communications with those compendia.  *See* Par's Response to Paragraph 12, *supra*.  As Ms.

Andrus testified, Par did not provide WAC prices to the pricing compendia and, when Par

discovered that those compendia were populating their databases with purported WACs for Par

products, Par would request that the compendia remove or "zero out" those WACs.  *See id.*  Ms.

Andrus also testified:

> Q.    You said earlier in your prior answer that during the time
> that Par did not provide a WAC, it's your understanding
> that Par, while you were there, never did provide a WAC;
> correct?
>
> A.    Yes.  If any WAC was provided, it would have been an
> error.  And it would have been a mistake.  But it was -- it
> was not anything that normally we -- we made a mistake
> on.

11

Boone Decl., Exh. D (Andrus Dep. at 93:16-94:1).

> 14.     PAR knew and controlled the AWPs and WACs for its drugs
> that were published by the national pricing compendia. PAR would
> periodically get National Drug Data File Product Update Reports
> from First Databank showing AWP and WAC (WHLNET) pricing
> for PAR drugs and requesting that PAR verify and update its
> published pricing. *See* Andrus Dep. (Exhibit C) at 99:4-13, 100:3-
> 21, 111:14-113:22; Exhibit G (Andrus Dep. Exhibit 8 (email with
> attachment from Karen Andrus to Nick DiMaio and Marissa Caputo
> dated 9/14/04 addressing an email string between First Databank and
> Cardinal concerning PAR's published AWPs and WACs for its
> drugs.)).

**PAR'S RESPONSE TO PARAGRAPH 14:** Par disputes that the alleged facts

relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in

setting FULs. *See* Defs.' 56.1 Stmt., at ¶ 34.  Notwithstanding the immateriality of the alleged

facts relating to AWPs, Par does not dispute that it (i) set the AWPs and WACs for its drugs; (ii)

provided AWPs for its drugs to the pricing compendia; and (iii) expected that the pricing

compendia would publish those AWPs.  Except as noted, Par disputes that it "knew and

controlled the AWPs and WACs for its drugs that were published by the national pricing

compendia."  Plaintiffs have not provided any evidentiary basis for this assertion, as required by

Local Rule 56.1.  As a general practice, Par did not provide WAC prices to the pricing

compendia and, when Par learned that those compendia were populating their databases with

purported WACs for Par products, Par would request that the compendia remove or "zero out"

those WACs.  *See* Par's Response to Paragraph 12, *supra*.

With respect to the second sentence of Paragraph 14 and notwithstanding the

immateriality of the alleged facts relating to AWPs, Par does not dispute that it received one or

more National Drug Data File Product Update Reports from First DataBank showing AWP and

WHLNET pricing for Par products and requesting that Par verify and update its pricing, but Par

disputes that it received such reports "periodically."  *See, e.g.*, Boone Decl., Exh. D (Andrus Dep. at 60:12-15) (testifying that First DataBank would send material on Par's pricing only when First DataBank or Par "had a question").  Par further disputes any suggestion or inference that the "WHLNET" data listed by First DataBank accurately depicted any Par WAC prices.  As Ms. Andrus testified: "I recall more situations where the databases would have incorrect WACs listed or incorrect information listed, and that would prompt me to try to have the database zero out that information."  *Id.*, Exh. D (Andrus Dep. at 132:19-133:1).

> 15.    PAR responded to the Product Listing Verifications relied upon by Redbook requesting PAR to verify the accuracy of the AWPs and WACs for its drugs that Redbook published with any changes or corrections.  *See* Deposition of Kristen Minne (Redbook) dated 11/18/08 ("Minne 11/18/09 Dep.") (Exhibit H) at 303:10-305:16; Exhibit I (Minne 11/18/08 Dep. Exhibit 67 (Redbook Product Listing Verification for PAR signed by Marissa Caputo on 9/11/03)).  The Product Listing Verification signed by Marissa Caputo on 9/11/03, shows that PAR did not instruct Redbook to not publish the WACs prices listed or that the WAC should be set at $0.00.  *See id.*

**PAR'S RESPONSE TO PARAGRAPH 15:**  Par disputes that the alleged facts relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Notwithstanding the immateriality of the alleged facts relating to AWPs, Par does not dispute that (i) Par responded to one or more Product Listing Verifications received from Redbook and (ii) Ms. Minne of Redbook testified that Redbook relied on Par to verify the accuracy of pricing for Par's products.  Par also does not dispute that attached as Exhibit I to Plaintiffs' Par-Specific Statement is a Red Book® Product Listing Verification signed by Marissa Caputo and dated either 9/11/03 or 9/12/03, but Par disputes that the document does not instruct Redbook not to publish the WAC prices listed therein or that the WAC should be set at $0.00.  With respect to Par's Clonazepam 0.5 mg

Tablet, the only drug at issue in plaintiffs' motion as to Par, there is a notation in Exhibit I that

the drug has been "discontinued."  Par further disputes that this document is representative of

Par's general business practices with respect to responding to requests by Redbook to verify

AWP and WAC prices.  *See* Par's Response to Paragraphs 12 & 13, *supra*.

> 16.    PAR subscribed to First Databank Price Alert service to
> monitor both its published prices and that of its competitors as well
> as the HCFS MACs or Federal Upper Limits (FUL). *See* PAR
> Pharmaceuticals 30(b)(6)(Nick DiMaio) dated 7/31/08 ("PAR
> 30(b)(6)(DiMaio) 7/31/08 Dep.") (Exhibit J) at 398:9-399:22.
> According to Nick DiMaio, PAR knew WACs were being
> published, but PAR "never told them to eliminate WAC pricing."
> *See* PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 164:3-9.

> **<u>PAR'S RESPONSE TO PARAGRAPH 16</u>:** Par disputes Paragraph 16.

Specifically, Par responds as follows:

> First, Par does not dispute that it subscribed to Price Alert, but Par disputes

plaintiffs' characterization of Par's motivation for doing so.  As Mr. DiMaio testified:

> A.    We would -- several reasons.  It would identify players in
> each of our generic categories, who actually was marketing
> products.  It was a good way for us to identify our
> competition.  When new people entered the market, we
> knew that their product was active by way of their
> introduction into the -- into the publication.

> Q.    Beyond tracking your competitors' activities, what other
> activities, if any, did Price Alert have?

> A.    From a business perspective, it didn't impact on business
> practices.  It was just information on NDC numbers,
> descriptions, HCFA MACS, when they were published;
> and I believe it also published AWP.  So it was a reference
> guide for those -- those four items.

Boone Decl., Exh. C (DiMaio 7/31/08 Dep. at 399:7-22).

> Second, Par does not dispute that, beginning sometime in 2004 or 2005, Mr.

DiMaio learned on one or more occasions that purported WAC prices for certain Par products

were being published in Analy$ource, but Par otherwise disputes plaintiffs' characterization of Mr. DiMaio's testimony.  *See id.*, Exh. E (30(b)(6) Deposition of Nick DiMaio, August 16, 2007, at 252:19-253:18).  In addition, Par does not dispute that Mr. DiMaio testified that "[w]e never told them to eliminate WAC pricing," but Par disputes plaintiffs' characterization of Mr. DiMaio's testimony to the extent Paragraph 16 suggests that Par did not request that First DataBank remove or "zero out" the published WAC prices for its products or that Par otherwise authorized First DataBank to publish WAC prices for its products.  *See* Par's Response to Paragraph 12, *supra*.

> 17.     PAR maintained the view that if it did not send its WAC to the national pricing compendia that "PAR is not responsible for what FUL/MAC HCFA sets based on WACs."  *See* Exhibit K (Andrus Dep. Exhibit 20 (email from Andrus to DiMaio dated 9/25/03)).

**PAR'S RESPONSE TO PARAGRAPH 17:**  Par does not dispute that as a general practice it did not send WACs for its products to the national pricing compendia, and does not dispute that Ms. Andrus wrote that "Par is not responsible for what FUL/MAC HCFA sets based on WACs?," but Par disputes Paragraph 17 to the extent that it mischaracterizes Ms. Andrus's email.  *See* Boone Decl., Exh. D (Andrus Dep. at 174:8-18) (testifying that she was "questioning Nick to understand what the issue was").  Par further disputes Paragraph 17 to the extent that it mischaracterizes Par's motivation for not providing WAC prices to the compendia. *See* Par's Response to Paragraph 13, *supra*.  Par further disputes Paragraph 17 to the extent that it suggests that Par knew how CMS was, in fact, setting FULs.  *See* Par's Response to Paragraph 6, *supra*.

> 18.     None of PAR's customers ever purchased PAR drugs at AWP, and in fact its customers purchased PAR drugs at prices far below AWP.  *See* Trendowicz 4/1/09 Dep. (Exhibit D) at 79:7-15.

**PAR'S RESPONSE TO PARAGRAPH 18:**  Par disputes that the alleged facts relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Notwithstanding the immateriality of the alleged facts relating to AWPs, Par does not dispute the facts set forth in Paragraph 18.

> 19.    PAR knew that prices for its generic drugs typically decreased over time and that if PAR kept its AWPs unchanged that its customers' profit spread would increase with the price erosion. *See* PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 182:17-184:15; Exhibit L (PAR 30(b)(6)(DiMaio) 5/6/08 Dep. Exhibit 40 (1/18/05 email from Mike Burton (PAR) to Charles Burnett (Costco) stating, "Generally our AWP does not follow pricing down, so you (sic) spread will increase with erosion.")).

**PAR'S RESPONSE TO PARAGRAPH 19:**  Par disputes that the alleged facts relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  In addition,  Par does not dispute that the prices for its generic drugs typically decreased over time, but Par disputes plaintiffs' characterization of Mr. DiMaio's testimony and disputes that Par "knew . . . that if PAR kept its AWPs unchanged that its customers' profit spread would increase with the price erosion."  As Mr. DiMaio testified:

> Q.    . . . Is it a typical occurrence for your retail customers like Costco, that if you introduce a new generic, that where there's price erosion, that there will be an increase in margin because of the spread?
>
> * * *
>
> A.    No, the price can decrease.  Again, when you speak about margin, typically what happens, you know, there's some reimbursement at that point.  There's more competition is coming in.  The price is going down.  And there's a limit.  I mean plans will only reimburse so much so the AWP doesn't really matter because plans don't look at AWP or they'll come up with a MAC of their own.
>
> A lot of insurance plans now are not using AWP.  So the

> margin, that's why we don't comment on margin, because
> there's too many plans and too many reimbursement issues
> just to say that AWP can impact margin.

Boone Decl., Exh. B (DiMaio 5/6/08 Dep. at 184:16-185:15).

> 20.     PAR initially invoices the three national wholesalers
> (Cardinal Health, AmerisourceBergen and McKesson) for the
> purchase of PAR products at WAC but thereafter they receive
> chargebacks, discounts, rebates, billbacks and other incentives from
> PAR that get the wholesalers to their net cost.   *See*   PAR
> 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 49:3-51:10.

**PAR'S RESPONSE TO PARAGRAPH 20:**  Par does not dispute that Par

invoices the three national wholesalers at WAC for the purchase of Par products at WAC, and

that oftentimes those wholesalers thereafter receive discounts and other reductions in price that

impact the wholesalers' net costs.  However, Par disputes that a chargeback is a form of

incentive to wholesalers and further disputes that a wholesaler necessarily receives a chargeback

in connection with every sales transaction.  *See* Boone Decl., Exh. B (DiMaio 5/6/08 Dep. at

50:9-16) (testifying that the "chargeback is used just to make [the wholesalers] whole" and that,

in certain instances, wholesalers do not receive a chargeback).  Par further disputes Paragraph 20

to the extent that it suggests that a wholesaler is necessarily entitled to a rebate or other reduction

in price under the terms of every sales contract with Par.  Plaintiffs' have not provided an

evidentiary basis for any such assertion, because the cited testimony does not support that

asserted fact.

> 21.     At least 90% of PAR sales are contract sales that are below
> WAC and are subject to chargebacks. *See* PAR 30(b)(6)(DiMaio)
> 5/6/08 (Exhibit B) at 53:8-54:2, 81:4-8; PAR 30(b)(6)(DiMaio)
> 8/16/07 Dep. (Exhibit E) at 179:16-22.

**PAR'S RESPONSE TO PARAGRAPH 21:**  Par disputes Paragraph 21.

Plaintiffs do not provide an evidentiary basis for the facts asserted in Paragraph 21, because the

cited testimony does not support those asserted facts.  Nevertheless, Par does not dispute that Mr.

DiMaio testified that 90% of Par's generic sales are pursuant to a contract and that sales made

through wholesalers pursuant to a contract are subject to a chargeback.  *See* Boone Decl., Exh. B

(DiMaio 5/6/08 Dep. at 53:16-54:2) (testifying that he did not have the "hard facts" at hand).

> 22.     PAR also sold its drugs to distributors, which differed from wholesalers in that the distributor only carried generic drugs and the wholesalers carried both brand and generic drugs.  *See* Trendowicz 4/1/09 Dep. (Exhibit D) at 38:3-11.  PAR maintained different pricing for distributors and wholesalers and depending on the product the distributor would get the better pricing.  *Id.* at 38:12-39:7. PAR does not invoice distributors at WAC but instead at a direct or contract price that would typically be lower than the WAC for the drug.  *Id.* at 75:10-25.

**PAR'S RESPONSE TO PARAGRAPH 22**:  Par does not dispute that Ms.

Trendowicz's testimony is consistent with the facts set forth in Paragraph 22, but Par disputes

Paragraph 22 to the extent that it mischaracterizes Ms. Trendowicz's testimony as support for

any asserted facts other than her general beliefs about the practices of certain Par customers.  Par

does not dispute that it typically maintained different price points for different Par customers that

depended on, among other factors, the product.  Par likewise does not dispute that the prices at

which it invoiced the customers to whom Ms. Trendowicz referred as "distributors" were

typically lower than WAC.

> 23.     PAR knew that its customers routinely analyzed the reimbursement spreads by comparing their contract price and the reimbursement prices to gauge their profitability.  *Id.* at 123:22-124:18.

**PAR'S RESPONSE TO PARAGRAPH 23**:  Par disputes that its customers'

business practices are material to plaintiffs' motion.  Notwithstanding the immateriality of

Paragraph 23, Par does not dispute that Ms. Trendowicz's testimony is consistent with Paragraph

23 to the extent Paragraph 23 refers to certain customers of Par.

24.    PAR knew that AWP was used by its customers to determine profitability between their price and the reported AWP for PAR drugs.  S*ee* Deposition of Julie Trendowicz dated 9/25/07 ("Trendowicz 9/25/07 Dep.") (Exhibit M) at 61:8-62:21.  Pharmacy Benefit Managers (PBMs) like Caremark and Express Scripts purchased drugs from manufacturers, including PAR, based on negotiations expressed as a percentage off of AWP.  *See* Trendowicz 4/1/09 Dep. (Exhibit D) at 133:19-134:25 (explaining that Caremark had informed PAR that its selling price would need to be at 92% off AWP).  PAR knew that the only reason to negotiate off of AWP was to determine what the reimbursement spread on a drug was going to be.  *Id.* at 135:1-10.

**PAR'S RESPONSE TO PARAGRAPH 24:**  Par disputes that the alleged facts relating to AWPs are material to plaintiffs' motion, because CMS did not consider AWPs in setting FULs.  *See* Defs.' 56.1 Stmt., at ¶ 34.  Par further disputes that its customers' business practices are material to plaintiffs' motion.  Notwithstanding the immateriality of Paragraph 24, Par does not dispute that Ms. Trendowicz's testimony is consistent with the first two sentences of Paragraph 24, but Par disputes plaintiffs' characterization of Ms. Trendowicz's testimony in the third sentence of Paragraph 24.  As Ms. Trendowicz testified:

Q.    Okay.  And is there any reason why this transaction would be framed in terms of a percent off of AWP other than to allow the parties to the transaction to figure out what the reimbursement spread is going to be on the drug?

\* \* \*

A.    I don't know.

Boone Decl., Exh. F (Deposition of Julie C. Trendowicz, April 1, 2009, at 135:1-7).

25.    PAR knew that its customers determined profitability based on reimbursement spreads and often informed PAR that its competitors had better reimbursement spreads in order to give PAR an opportunity to compete with them.  *Id.* at 122:5-123:2.

**PAR'S RESPONSE TO PARAGRAPH 25:**  Par disputes that its customers' business practices are material to plaintiffs' motion.  Notwithstanding the immateriality of

Paragraph 25, Par does not dispute that (i) Ms. Trendowicz testified that she knew that customers

would look at the difference between AWPs and contract prices and (ii) on at least one occasion,

one of Par's customers (ESI) informed Par that it had received a competitive offer for a particular

product (imipramine) that included a larger discount off of AWP.   Except as noted, plaintiffs

have not provided an evidentiary basis for the assertions that Par "knew that its customers

determined profitability based on reimbursement spreads and often informed PAR that its

competitors had better reimbursement spreads in order to give PAR an opportunity to compete

with them," because the cited testimony does not support those asserted facts.  Specifically, Ms.

Trendowicz's testimony was limited to a single communication, which was authored by a third

party and related to a single product that is not at issue in plaintiffs' motion.

> 26.    PAR knew that when a MAC or FUL was in place that its
> customers used the MAC/FUL to determine the profit spread
> between its cost for PAR drugs and the MAC/FUL.  *See* PAR
> 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 185:21-187:11; Exhibit
> N (PAR 30(b)(6)(DiMaio) 516/08 Dep. Exhibit 41 (Mail order
> pharmacy CFI of New Jersey's Request for Generic Contract
> Proposal for 1999-2000 showing the spread between the MAC or
> AWP and PAR's bid price)).

**PAR'S RESPONSE TO PARAGRAPH 26:**  Par disputes that its customers'

business practices are material to plaintiffs' motion.  Par further disputes that plaintiffs have

provided an evidentiary basis for the facts set forth in Paragraph 26, because the testimony and

document cited do not support the asserted facts with respect to Par's knowledge of the conduct

of its customers.  Rather, the cited testimony and document merely establish that one customer

(CFI) sent to Par a document that included a column for "Mac" and that this column appears to

include data provided by the customer.

> 27.    PAR marketed drugs based on the reimbursement spread
> between the price to pharmacies and reimbursement based upon the
> FUL.  *See e.g.,* Exhibit O (PAR 30(b)(6)(DiMaio) 5/6/08 Dep.

20

> Exhibit 34 (PAR presentation titled, "McKesson/Par Penicillin Opportunity" showing that pharmacies could make a 69% profit from the FUL (HFCA/MAC))).

**PAR'S RESPONSE TO PARAGRAPH 27:** Par disputes Paragraph 27.

Specifically, Par disputes that Par's marketing practices are material to plaintiffs' motion. In addition, plaintiffs' do not provide an evidentiary basis for the facts set forth in Paragraph 27, because the document cited does not support those facts. The cited document does not indicate that it was presented to McKesson, nor does it establish that "Par marketed drugs based on the reimbursement spread between the price to pharmacies and reimbursement based upon the FUL." As Mr. DiMaio testified:

> Q.    So it's showing McKeeson (sic) how McKeeson's (sic) customers can make money off the spread because they can sell a Par product at far below the federal upper limit. Right?
>
> * * *
>
> A.    No, I think that's wrong. I think that's wrong. I am not sure. It doesn't show what the retailers are selling this product for. It only talks about cost.

Boone Decl., Exh. B (DiMaio 5/6/08 Dep. at 174:19-175:6). Moreover, the document cited refers exclusively to a single customer (McKesson) and a single product (amoxicillin) that is not at issue in plaintiffs' motion.

> 28.    Nick DiMaio testified that it was common that customers would request PAR to lower prices or increase spread as it related to their reimbursement and when a MAC/FUL was in place or. *See* PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 57:5-14, 60:18-62:12; Exhibit P (PAR 30(b)(6)(DiMaio) 5/6/08 Dep. Exhibit 43 (5/11/03 spreadsheet identifying PAR drugs and when a MAC/FUL was in place and requesting better pricing or an increase in their spread below the MAC/FUL)).

**PAR'S RESPONSE TO PARAGRAPH 28:** Par disputes that its customers' business practices are material to plaintiffs' motion. Par further disputes Paragraph 28 to the

extent that it mischaracterizes Mr. DiMaio's testimony.  Mr. DiMaio testified that it was

"common for customers to say we're not making -- we can't get reimbursed properly based on

your cost.  That's common."  Boone Decl., Exh. B (DiMaio 5/6/08 Dep. at 62:9-12).  Par further

disputes any suggestion that such a request by a customer would impact Par's pricing practices.

As Mr. DiMaio testified:

> Q.    Is it important to Par that there be a spread between the
> MAC or the acquisition or contract price of a Par drug?
>
> * * *
>
> A.    For Par, we base our pricing on competitive conditions in
> the marketplace so we don't look at, you know, the limits
> on reimbursement don't affect the way we price drugs.  We
> are commodity driven.  The market determines our pricing
> for our drugs.
>
> . . .
>
> A.    These, typically what happens, these kinds of comments are
> generated from the field where a pharmacy would say, you
> know, for some reason your pricing is below the MACs
> allowable cost.   So typically it's common for feedback
> from customers saying you are pricing your product at X
> and the MAC is, you know, X minus something.
>
> So these comments are consistent with what we would get
> from the field, and of course, then, we would have to -- we
> would address that and say you may want to talk to your --
> the companies, Medicaid, insurance payers, because there
> seems to be a problem.  You are not getting reimbursed to
> cover the cost of these drugs.

*Id.*, Exh. B (DiMaio 5/6/08 Dep. 57:19-58:2; 61:12-62:3).

> 29.    When a PAR product was not subject to a MAC or FUL,
> PAR marketed the fact that the customer could receive higher
> reimbursement.  *See*  Tredowicz 4/1/09 Dep. (Exhibit D) at 284:1-
> 291:22, 295:25-298:12.  PAR marketed the fact that its 20mg
> Fluoxitine Tablets were not subject to a MAC/FUL in order to
> get business away from its competitors who were selling
> 20mg Fluoxitine Capsules that were subject to a MAC/FUL.
> *Id.*

**PAR'S RESPONSE TO PARAGRAPH 29**:  Par disputes that its marketing practices and its practices with respect to drugs not subject to a FUL are material to plaintiffs' motion.  In addition, Par disputes the facts set forth in Paragraph 29 and disputes plaintiffs' characterization of Ms. Trendowicz's testimony, which was limited to a single product not at issue in plaintiffs' motion (fluoxetine), and which was limited to certain customers.

> 30.     PAR was not aware of the 2003 OIG Guidelines.  *See* PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 38:5-18.

**PAR'S RESPONSE TO PARAGRAPH 30**:  Par disputes that the 2003 OIG Guidelines are material to plaintiffs' motion.  Notwithstanding the immateriality of Paragraph 30, Par does not dispute that Mr. DiMaio testified that he, personally, was not aware of the 2003 OIG Guidelines.

> 31.     At all times**,** from 1997 to 2005, PAR has calculated on a quarterly basis the average manufacturer's price ("AMP") for all its products as required by the federal rebate statute. *See* PAR 30(b)(6)(DiMaio) 5/6/08 Dep. (Exhibit B) at 108:18-22.

**PAR'S RESPONSE TO PARAGRAPH 31**:  Par does not dispute the facts set forth in Paragraph 31.

Dated: June 15, 2009

Respectfully submitted,

PAR PHARMACEUTICAL COMPANIES, INC. AND
PAR PHARMACEUTICAL, INC.

By its attorneys,

WILLIAMS & CONNOLLY LLP

   /s/ Paul K. Dueffert
Paul K. Dueffert (*pro hac vice*)
Andrew T. Boone (*pro hac vice*)
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

BOND, SCHOENECK & KING, PLLC

S. Paul Battaglia
One Lincoln Center
Syracuse, NY 13202-1355
Telephone:  (315) 218-8277
Facsimile:  (315) 218-8100

### **CERTIFICATE OF SERVICE**

I certify that on June 15, 2009, a true and correct copy of the foregoing was served on all

Counsel of Record by electronic service pursuant to Case Management Order No. 2 by sending a

copy to LexisNexis File & Serve for posting and notification to all parties.


                                        /s/ Catherine K. Levy
                                        Catherine K. Levy