# EXHIBIT B

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X

IN RE PHARMACEUTICAL INDUSTRY      ) MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION) Master File No.

------------------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:          ) Judge Patti B.

City of New York, et al. v. Abbott) Saris

Laboratories, et al. Civil Action )

No. 04-cv-06054 et al.             )

------------------------------X

- and -

COMMONWEALTH OF KENTUCKY

FRANKLIN CIRCUIT COURT - DIV. 1

------------------------------------X

COMMONWEALTH OF KENTUCKY ex rel. ) CIVIL ACTION NO.

JACK CONWAY, ATTORNEY GENERAL    ) 04-CI-1487

    v.                           )

ALPHARMA USPD, INC., et al.      )

------------------------------------X

VIDEOTAPED DEPOSITION OF PAR PHARMACEUTICALS

(NICK DIMAIO), MAY 6, 2008

**Page 50**

1  virtually never at WAC for a generic drug;
2  correct?
3      MR. DUEFFERT: Objection to form.
4      A.  They are using, their net price is
5  different. They have different net prices. See,
6  the wholesalers service our other contracts so
7  they are buying product from us and they are
8  servicing other contracts at a negotiated price.
9      The chargeback is used just to make
10 them whole for any of that product that went out
11 lower than their wholesale acquisition cost.
12 They can very well sell product at wholesale
13 acquisition cost. In that case there would be no
14 chargeback. They will pay at WAC. They will
15 sell at WAC. There's no chargeback. That's --
16 that happens as well.
17     Q.  I want to be fair, Mr. DiMaio. Before
18 I show you the next exhibit, I want to ask you
19 once again whether or not you will tell this jury
20 under oath that Par sells any drugs to
21 wholesalers at WAC being the net cost that the
22 wholesaler pays.

**Page 51**

1      MR. DUEFFERT: Objection to form. Move
2  to strike the sidebar. I will ask Mr. Archibald
3  to stop giving speeches before he asks questions.
4      A.  I think what we have to -- what you
5  have to say is they purchase at WAC. After
6  chargebacks, that is ultimately, then, if you
7  want to look at that as their net purchase, that
8  would be defined as their net purchase. Now not
9  every product, though, and every sale has
10 chargebacks.
11     Q.  Fine. Let me show you what's been
12 marked as Exhibit 3. Please take a look at that.
13     (Exhibit DiMaio 003, March 22,
14 2005 Memo to Karen Andrus at Par, marked for
15 identification.)
16     Q.  And is that --
17     MR. ARCHIBALD: Can I see your copy,
18 please? Thank you.
19     Q.  Is that a March 22, 2005 memo to Karen
20 Andrus at Par regarding price protection?
21     MR. DUEFFERT: I will instruct the
22 witness to take his time and review the document

**Page 52**

1  carefully.
2      Objection to foundation.
3      A.  This doesn't look like any reference to
4  any price protection.
5      Q.  That's not my question, Mr. DiMaio. Is
6  it an e-mail to Karen Andrus regarding Amerinet
7  pricing?
8      MR. DUEFFERT: Objection, foundation.
9      A.  If I'm reading this, it just says that
10 it's to Karen from Ryan stating that there's an
11 understanding that Par will have the ability to
12 take annual price increases.
13     Q.  Karen Andrus is the director of
14 contract management at Par; correct, or was?
15     A.  She was, yes.
16     Q.  She was a direct report to you;
17 correct?
18     A.  Right.
19     Q.  And take a look at page 2 where Karen
20 Andrus responds as follows, quote: Par does not
21 sell any products after all is said and done at
22 WAC. We are a generic company and all sales are

**Page 53**

1  through contracts, end quote.
2      Did I read that correctly, Mr. DiMaio?
3      A.  Yes.
4      Q.  Is it still your testimony to the jury
5  that Par sells its products at WAC, some of its
6  products at WAC?
7      A.  Yes, we do.
8      Q.  Let's talk about the contracts that Ms.
9  Andrus referred to. What percentage of your
10 generic sales are pursuant to a contract?
11     A.  Again, it's skewed much heavily towards
12 contracting so a great percentage of our sales
13 are sold at a negotiated contract price.
14     Q.  By a great majority, can you quantify
15 that? Is it greater than 90 percent?
16     A.  I don't have the hard facts. I would
17 say that 90 percent of the products are sold --
18 90 percent of the -- it's just that piece with
19 the wholesalers, right, because there's a big
20 piece of our business that they buy at WAC.
21 After chargebacks, so the net effect of our
22 business is that, you know, 90 percent would be a

**54**

1  good number to say, you know, 90 percent of what
2  we sell is, ultimately goes through a contract.
3      MR. ARCHIBALD: Let's take a break.
4  Apparently there are some people that want to
5  call in. Henderson usually takes care of that.
6  I apologize.
7      THE VIDEOGRAPHER: Going off the
8  record. The time is 9:41.
9      (Recess taken from 9:41 a.m. to
10 9:56 a.m.)
11     (Mr. Zucker and Mr. Lynn are now
12 participating by telephone.)
13     THE VIDEOGRAPHER: We are going back on
14 the record. The time is now 9:56 a.m.
15     Q. Mr. DiMaio, we were, before the break,
16 we were --
17     MR. DUEFFERT: Jeff. I think someone
18 on the phone wanted to make a statement before we
19 begin.
20     MR. ZUCKER: This is Jim Zucker for
21 Bristol-Myers Squibb. I want to state for the
22 record that we reserve the right to assert any

**55**

1  and all objections to testimony in the first
2  portion of the transcript because we were not
3  able to attend the deposition because there was
4  not a telephone in the room and we were not able
5  to hear any of the testimony.
6      MR. ARCHIBALD: No problem.
7      Q. Mr. DiMaio, before the break, we were
8  about to get into contract pricing. Before we
9  do, I want to finish up with the OIG or Office of
10 the Inspector General 2003 guidelines which you
11 have -- are not familiar with.
12     Take a look where we left off on the
13 bottom of page 23736 under average wholesale
14 price. The last sentence reads: To the extent
15 that a manufacturer controls the spread, it
16 controls the customers' profit. Continue on to
17 the next page.
18     Average wholesale price is the
19 benchmark often used to set reimbursement for
20 prescription drugs under the Medicare part B
21 program. For coverage -- for covered drugs and
22 biologicals Medicare part B generally reimburses

**56**

1  at 95 percent of average wholesale price. 42 USC
2  1395 U.S. sub O. Similarly made state Medicare
3  programs and other bears base reimbursement for
4  drugs and biologicals on AWP, end quote.
5      With regard to that last sentence, were
6  you aware that many state Medicaid programs
7  reimbursed providers for Par drugs on AWP?
8      MR. DUEFFERT: Objection to form.
9  Objection to the extent it's outside the noticed
10 subject matter.
11     A. No. For branded products. For generic
12 products, AWP is not a good indication. It might
13 be the case for branded drugs, but clearly on
14 generic products, for the most part, there's
15 limits set on reimbursement and I don't think
16 that's -- could be stated true that AWP for
17 generic drugs. It's different than branded
18 drugs.
19     Q. You are talking about the state MAC or
20 maximum allowable cost; correct?
21     A. That's one ceiling. Then there's
22 probably hundreds and hundreds of different

**57**

1  payors and determine how they reimburse for
2  generic drugs. But the maximal allowable cost,
3  the federal upper limit, are just, you know, part
4  of that subset.
5      Q. I just want to talk about Medicaid,
6  state Medicaid programs. The state MACs are one
7  of the upper limits and the other upper limits is
8  the FUL or federal upper limit; correct?
9      A. I am familiar with the federal upper
10 limit as a ceiling for reimbursement.
11     Q. But you are not familiar with the state
12 MAC concept?
13     A. I am familiar with MACs, maximum
14 allowable cost, the terminology, as well.
15     Q. Is it important to Par that there be a
16 spread between the MAC or the acquisition or
17 contract price of a Par drug?
18     MR. DUEFFERT: Objection to form.
19     A. For Par, we base our pricing on
20 competitive conditions in the marketplace so we
21 don't look at, you know, the limits on
22 reimbursement don't affect the way we price

Par Pharmaceuticals (Nick DiMaio)  May 6, 2008
Woodcliff, NJ

16 (Pages 58 to 61)

## Page 58

1  drugs. We are commodity driven. The market
2  determines our pricing for our drugs.
3      Q. I appreciate that answer, but I didn't
4  quite understand it.
5      So Par doesn't worry about the spread
6  between MAC and acquisition cost?
7      MR. DUEFFERT: Objection. Move to
8  strike the sidebar. Objection to the speeches.
9      A. We don't control that. It's out of our
10 control, those limits. So we didn't impact that.
11 So we don't -- we don't run our business and we
12 don't price based on something that we can't
13 control.
14     Q. Well, you can't control the MAC, but
15 you can certainly control your contract price;
16 correct?
17     MR. DUEFFERT: Objection to form.
18     A. Our contract price is negotiated, yes.
19 We establish our contract price.
20     Q. So if the MAC stays the same, you could
21 decrease the contract price, thereby increasing
22 the spread; correct?

## Page 59

1      MR. DUEFFERT: Objection to form.
2  Incomplete hypothetical.
3      A. We -- that's not the basis for our
4  pricing. Our pricing, we, as a business, we try
5  to, in a commodity market, of course we try to
6  price our product at the point that the market
7  will allow us to price. It has nothing to do
8  with, you know, what you are referring to as
9  spread or upper limit or anything like that. We
10 are commodity-based. The market drives our
11 pricing decisions.
12     Q. Let me show you what's been marked as
13 Exhibit 43.
14         (Exhibit DiMaio 043, Document,
15 Bates number 0489985 with a Kentucky prefix and
16 it has a question dated May 11, 2003, marked for
17 identification.)
18     Q. This is a, I'll represent to you, a
19 document that's been produced by Par. It has a
20 Bates number 0489985 with a Kentucky prefix and
21 it has a question dated May 11, 2003.
22     Do you see all that?

## Page 60

1      A. Yes, I see the document.
2      Q. I want you to look. It says the vendor
3  is Par. And it has some -- a description of
4  drugs and the bid price, bid price needed, rebate
5  of 15 percent.
6      Do you see all that?
7      A. Yes, I do.
8      Q. Now, in the right-hand column, they've
9  got comments. Do you see that?
10     A. Yes.
11     MR. DUEFFERT: Objection, just on form.
12 You say "they." Are you representing that "they"
13 is a Par generated document?
14     MR. ARCHIBALD: I don't know.
15     Q. Have you ever seen these type of
16 documents before, Mr. DiMaio?
17     A. I don't recognize this document, no.
18     Q. Then I'll direct you to the comment
19 section. Look at the lower right-hand corner.
20 It states that the MAC or the state MAC is 7.76.
21 Got to get us below MAC.
22     Do you see that?

## Page 61

1      A. Yes.
2      Q. Turn to the next page. And towards the
3  bottom of the comments, it states: State MAC is
4  $19.48. Need better spread between cost and
5  reimbursement.
6      Do you see that?
7      A. Yes.
8      Q. It's your testimony to the jury here
9  today that Par never considers the spread between
10 cost and reimbursement when pricing its drugs?
11     MR. DUEFFERT: Objection to form.
12     A. These, typically what happens, these
13 kinds of comments are generated from the field
14 where a pharmacy would say, you know, for some
15 reason your pricing is below the MACs allowable
16 cost. So typically it's common for feedback from
17 customers saying you are pricing your product at
18 X and the MAC is, you know, X minus something.
19     So these comments are consistent with
20 what we would get from the field, and of course,
21 then, we would have to -- we would address that
22 and say you may want to talk to your -- the

**Page 62**

1  companies, Medicaid, insurance payers, because
2  there seems to be a problem. You are not getting
3  reimbursed to cover the cost of these drugs.
4      Q.  Well, these comments refer not to the
5  state lowering its MAC, but that Par needs to
6  have a better spread between cost and
7  reimbursement; correct?
8          MR. DUEFFERT:  Objection to form.
9      A.  That's what I'm saying. That would be
10 common for customers to say we're not making --
11 we can't get reimbursed properly based on your
12 cost. That's common.
13     Q.  And you understand that's important to
14 your -- especially your retail customers;
15 correct?
16     A.  It's a concern of the retail customers
17 when the reimbursement levels fall below the
18 acquisition cost.
19     Q.  Because Par needs to lower its prices
20 if a competitor has a price with a better spread;
21 correct?
22         MR. DUEFFERT:  Objection to form.

**Page 63**

1      A.  No. What typically happens, we are
2  dictated -- our pricing is dictated by market, so
3  we are pricing these generics at the -- what the
4  market will allow. So there's so much pricing in
5  a commodity market that allows you to price in a
6  particular competitive pricing range.
7          This is common -- this happens commonly
8  when limits are established and pricing changes
9  occur. We typically revert these pharmacies back
10 and let them bring up the issue that
11 reimbursement is not satisfactory.
12     Q.  But you occasionally let people, your
13 retail customers, know that your drugs are priced
14 below the MAC and that they will make a profit?
15     A.  We don't -- we are very clear at Par
16 not to get involved with reimbursement because
17 it's too complex. So we price our products
18 accordingly and then reimbursement is an issue
19 that we are aware of. It becomes an issue when
20 reimbursement doesn't satisfy a customer's need
21 for being reimbursed for purchases.
22         But it's very difficult for us and as a

**Page 64**

1  practice, we typically price our products based
2  on market and because reimbursement is so varied
3  and there's so many plans, it's just very
4  difficult to keep track of reimbursement. It's
5  just not a good business practice for us.
6      Q.  Mr. DiMaio, let me show you what's been
7  marked as Exhibit 60.
8          (Exhibit DiMaio 060, Document
9  dated October 10, 2001, marked for
10 identification.)
11     Q.  It's got your name up at the top, Nick
12 DiMaio; correct?
13     A.  Yes.
14     Q.  Dated October 10, 2001; correct?
15     A.  That's correct.
16     Q.  It's talking about Wisconsin Medicaid;
17 correct?
18     A.  Correct.
19     Q.  It has some correspondence. It has --
20 talks about Shopko for generic Prozac which is
21 Fluoxetine 20 milligrams; correct?
22     A.  Correct.

**Page 65**

1      Q.  And then on the last page there's an
2  October 2001 letter. By the way, Shopko is a
3  retail chain of pharmacies; correct?
4      A.  That's correct.
5      Q.  There's a letter from you dated
6  October, 2001 to Healthcare Professionals;
7  correct?
8      A.  Correct.
9      Q.  And it states: As you may be aware,
10 Wisconsin Medicaid has instituted MAC pricing for
11 all strength and dosage forms of generic
12 Fluoxetine.
13         Correct?
14     A.  Correct.
15     Q.  You are notifying stores like Shopko
16 that in this case Wisconsin State Medicaid
17 program has MAC programs; correct?
18     A.  Correct.
19     Q.  You are telling them that the capsules
20 -- well, I don't want to paraphrase. Let's just
21 read it.
22         To continue, quote:  It has come to our

**Page 82**

1  contract price, WAC price, AWP, because we have
2  so many price points on the same product.
3    Q.  But you only publish one price;
4  correct?
5    A.  We publish -- there's an AWP price, and
6  again, as we stated, WAC pricing is the actual
7  price all the wholesalers pay.  And then there's
8  contract pricing that we give.  So there's
9  multiple price points.
10   Q.  But you only give one price to the
11 pricing compendium such as First DataBank, Red
12 Book and Medi-Span; correct?
13   A.  They require a price to load the
14 product into their system.  We use AWP as the
15 price to fulfill that obligation.
16   Q.  My question, Mr. DiMaio, is you only
17 give one price to the pricing compendium and that
18 is AWP; correct?
19       MR. DUEFFERT:  Objection to form. Asked
20 and answered.
21   A.  We supply AWP pricing.
22   Q.  So I am correct?

**Page 83**

1    A.  That is correct.
2    Q.  You do not provide them with WACs;
3  correct?
4    A.  We, at Par, we have not provided -- we
5  were asked to provide one pricing to one product
6  and they asked for our AWP.  We have submitted
7  that.  That's how we -- that's what we did at
8  Par.
9    Q.  In fact, Mr. DiMaio, First DataBank
10 over the years has consistently asked Par for WAC
11 prices in addition to AWPs; correct?
12       MR. DUEFFERT:  Objection to form.
13   A.  No, I think there's change.  At some
14 point they have come back and asked for
15 additional pricing.  We felt -- we weren't
16 mandated and we felt our system, there's nothing
17 wrong with the way we are submitting pricing, so
18 we elected to continue and had no issues with
19 providing AWP pricing.
20   Q.  But you did have issues with providing
21 them with WAC prices; correct?
22   A.  No issues.

**Page 84**

1    Q.  But you never would; correct?
2    A.  Never required to.
3    Q.  I understand you are not required to.
4  You are not required to report AWPs, are you?
5    A.  We have -- we felt that we were
6  required to report a price associated with a
7  product to get loaded into their systems.
8    Q.  But that was an internal decision on
9  your part and you were not required by anyone to
10 submit AWPs to First DataBank; correct?
11   A.  My understanding is they needed a price
12 to load the product.
13   Q.  But when they ask you for WACs, you
14 refused; correct?
15   A.  There was -- yes. There was no reason
16 to do that since we were already supplying AWP
17 and our products were being loaded.
18   Q.  Over a period of time, and I know you
19 have seen these in your other deposition, Kay
20 Morgan at First DataBank and others, asked Par
21 for WACs so that they could accurately load those
22 prices into their databases; correct?

**Page 85**

1        MR. DUEFFERT:  Objection to form.
2  Objection to reference to prior deposition.
3    A.  The request for WAC pricing,
4  essentially they had our WAC pricing anyhow so we
5  felt there was no reason to provide them and
6  there was no mandate for us to do that.
7    Q.  But you say they had it anyhow?
8    A.  It was available anyhow, so there was -
9  - we made a decision that, you know, we'll just
10 continue to submit as we had in the past and it
11 seemed to be sufficient to get our products
12 loaded in the databases.
13       THE VIDEOGRAPHER:  About two minutes
14 left on the tape.
15   Q.  Have you ever submitted contract prices
16 to First DataBank?
17       MR. DUEFFERT:  Objection to form.
18   A.  I am not aware of that.
19   Q.  The answer is no; correct?
20       MR. DUEFFERT:  Objection to form.
21   A.  I am not aware of us submitting
22 contract pricing to First DataBank.

**Page 86**

1    Q. So over the eight or more years that
2 you were with Par, the only price you have
3 submitted to First DataBank was AWPs; correct?
4    A. I believe that's correct.
5    Q. And you are aware that state Medicaid
6 agencies and Medicare Part B reimbursed based on
7 First DataBank and Red Book's published prices;
8 correct?
9        MR. DUEFFERT: Objection to form.
10    A. No. That's where I'm not clear on
11 that. Simply because many generic products there
12 were already established ceilings, so AWP as a
13 point of reimbursement did not -- was not
14 significant. It didn't impact anything.
15 Reimbursement rates had already been established.
16    Q. When a product, a generic product goes
17 off patent, there is a period --
18        MR. DUEFFERT: Jeff, generic product
19 going off patent?
20        MR. ARCHIBALD: Thank you, counsel.
21 Appreciate it.
22    Q. When a branded product goes off patent,

**Page 87**

1 there is a period of time when there is no
2 federal upper limit or state MAC; correct?
3        MR. DUEFFERT: Objection to form.
4 Incomplete hypothetical.
5    A. I know there's a lag between upper
6 limits being published. At the point a generic
7 is introduced, so there's some point in time
8 where there may not be a federal upper limit.
9    Q. And during that time, you understand
10 that those drugs would be reimbursed by Medicaid
11 to Medicaid providers at AWP minus a percentage
12 typically; correct?
13        MR. DUEFFERT: Objection to form.
14    A. I don't know how products are
15 reimbursed. Intuitively, though, the system
16 seems to adjust itself because as a single
17 source, pricing in the market is not driven down
18 by competitors so that's the reason for me why
19 upper limits aren't established, because
20 reimbursements, however they are established when
21 a generic is launched, seems to be reasonable.
22        You'll notice that when many players

**Page 88**

1 enter the market, pricing then in the generic
2 market falls. Limits are established for
3 reimbursement. So the system seems to correct
4 itself over time and I can understand why federal
5 upper limits are not set, because the market
6 pricing is such that, you know, there would be no
7 -- the pricing would be at different levels based
8 on the number of competitors in the market. So
9 it seems it works.
10    Q. Do you know how FUL is set by the
11 federal government?
12    A. No, I don't.
13    Q. You are just speculating?
14        MR. DUEFFERT: Objection.
15    A. I don't know. I've noticed that the
16 upper limit is usually established when there is
17 multiple players. How it's set and how that
18 pricing is set and the formulas that it used, I
19 don't know.
20        MR. ARCHIBALD: We need to change tapes
21 so we'll start where we left off.
22        MR. DUEFFERT: Can we take a break for

**Page 89**

1 five minutes?
2        MR. ARCHIBALD: Sure.
3        THE VIDEOGRAPHER: Going off the
4 record. This is the end of Tape No. 1 and the
5 time is 10:33.
6        (Recess taken from 10:35 a.m. to
7 10:45 a.m.)
8        THE VIDEOGRAPHER: Going back on the
9 record. This is the beginning of Tape No. 2 in
10 the deposition of Nick DiMaio. The time is now
11 10:42.
12    Q. Before the break, Mr. DiMaio, we were
13 talking about how Medicaid sets maximum or
14 federal upper limits and that sort of thing and
15 your knowledge thereof.
16        You are aware that Medicaid uses data
17 as supplied by First DataBank and Medi-Span to
18 calculate the reimbursement levels; correct?
19        MR. DUEFFERT: Objection to form.
20    A. Yes, I am not aware of how they
21 calculate the upper limit. I am not aware of
22 that.

**Page 130**

1  A. It's the offer, yes.
2  Q. Do you know whether that was accepted?
3  A. No.
4  Q. I show you what's marked as Exhibit 16.
5       (Exhibit DiMaio 016, Letter dated
6  October 12, 1998 to Kinray, Incorporated from
7  Karen Andrus, marked for identification.)
8  Q. This is just another example of prices
9  to a wholesaler. It's a letter dated October 12,
10 1998 to Kinray, Incorporated from Karen Andrus;
11 correct?
12 A. Yes.
13 Q. Par's quoting some prices to Kinray;
14 correct?
15 A. Yes.
16 Q. I note this is a wholesaler; correct?
17 A. Yes.
18 Q. It's not a retail pharmacy; correct?
19 A. Correct.
20 Q. And yet you are putting only two prices
21 here, the new invoice price in one column, right
22 next to the only other column which is AWP;

**Page 131**

1  correct?
2  A. Correct.
3  Q. Why would you do that?
4  A. It's very consistent with all our
5  offers when we provide invoice price and AWP.
6  Kinray does not buy at WAC pricing. They buy at
7  a negotiated price.
8  Q. Oh. So this is a wholesaler that
9  doesn't buy at WAC?
10 A. Yeah. Remember there's -- they are a
11 distributor and many of the distributors buy at
12 negotiated pricing. Again, I think the only
13 three wholesalers that buy at WAC are the three
14 large wholesalers.
15 Q. I stand corrected.
16    I note that you are lowering the Kinray
17 price here in the third column which is
18 handwritten; correct?
19    MR. DUEFFERT: Objection to form.
20 A. I don't think we are lowering the price
21 there. I don't know what the handwritten -- it
22 might have been -- it looks like -- I don't know

**Page 132**

1  what it looks like, but it's clearly not the new
2  invoice price.
3  Q. What is it? Do you have any idea?
4  A. It looks like this was a price increase
5  letter.
6  Q. That's what I'm getting at. It seems
7  that there was a price increase.
8     Do you know whether the AWP was
9  increased at the time the new invoice price was
10 increased?
11    MR. DUEFFERT: Objection to form.
12 A. I wouldn't know that.
13 Q. Let's talk about that for a moment.
14    When does Par lower or raise its AWPs
15 that it sets upon the launch of a new generic
16 product?
17    MR. DUEFFERT: Objection, form.
18 A. We, on a new generic product, you will
19 find that the AWPs pretty much are set at day one
20 and they stay pretty consistent.
21 Q. The same? Do you mean consistent, the
22 same?

**Page 133**

1  A. Yeah. It's really -- we manage our
2  AWPs so they compete or they're comparable with
3  our competitive AWPs, so you'll find our AWPs
4  typically match most of all the competitors. AWP
5  pricing is very consistent across all the generic
6  industry.
7  Q. I appreciate that.
8     My next question is if AWP stays the
9  same and you see price erosion after the launch
10 of a new generic product, meaning the price goes
11 down because of competition, you follow me so
12 far?
13 A. Correct.
14 Q. Does Par lower the AWP to match the new
15 lower prices that are given to retail pharmacies?
16 A. Yeah, that's -- we typically don't --
17 there's no financial incentive for us to manage
18 AWP in that way. So -- and typically what
19 happens, then, more competitors come in, limits
20 are established so the AWP, it doesn't matter
21 where it was because reimbursement isn't based on
22 it. So that's why we typically don't manage it.

**134**

1  It's typically set and it stands alone and we
2  move on to contract negotiated pricing.
3      Q.  When you say it's not based --
4  reimbursement is not based on AWP, we've already
5  discussed that there's a certain time period when
6  there aren't enough generics in the marketplace
7  and there's no FUL, that generics are reimbursed
8  on AWP; correct?
9      A.  Well, we said -- I am not sure how they
10 are reimbursed, but they are not based on an
11 upper limit.  But then again, the pricing
12 typically on a single source generic, is much
13 higher and so AWP, if that is how products are
14 reimbursed, are fair assessment to do so.
15     Q.  Well, I'll give you an example of
16 Kentucky.  In Kentucky they didn't set any state
17 MACs until 2003 and the only thing that they had
18 in place is an upper limit on generic reimbursed
19 was FUL.
20         Do you follow me so far?
21         MR. DUEFFERT:  Objection to form.
22 Assumes facts not in evidence.

**135**

1      Q.  I want you to assume that all to be
2  true.
3      A.  Okay.
4      Q.  Now, if Par is competing with, let's
5  say Ivax, and there's only two generics in the
6  market, there's not going to be an FUL; is there?
7          MR. DUEFFERT:  Same objections.
8      A.  I am not sure, again, how it's stated.
9  It could be -- there could be -- I am not sure
10 how or when FUL is put together or when -- what
11 their criteria and the timing of that.  I am not
12 quite sure.
13     Q.  But under that scenario, if there's no
14 FUL, then those generic products at Par would be
15 reimbursed at AWP minus a percentage, whatever
16 the state Medicaid had for their drugs; correct?
17         MR. DUEFFERT:  Same objections.
18     A.  If that's how they are doing it, I am
19 not an expert on, but if that's the case, then
20 however they decide to reimburse, we don't get
21 involved in those decisions.
22     Q.  But that would be important to your

**136**

1  retail customers, wouldn't it?
2          MR. DUEFFERT:  Same objections.
3      A.  Again, that's their profit on their
4  business.  Our profit on our business is not tied
5  to AWP, so it's not a concern of ours.
6      Q.  Well, it would be a concern, Mr.
7  DiMaio, if your customers could make more profit
8  selling a Par drug as opposed to another generic
9  manufacturer's, because the Par drug had a
10 greater spread; correct?
11         MR. DUEFFERT:  Same objection.
12 Incomplete hypothetical.  Argumentative.
13     A.  Again, we present our pricing based on
14 negotiated price.  The customer makes those
15 decisions on what products to choose based on
16 supply, quality and pricing.  That's a customer
17 decision on what commodity -- what commodity to
18 pick and we just have to compete on offering a
19 competitive price product.
20     Q.  Generic drugs -- let me back up to some
21 basics.
22         You understand that the pharmacist

**137**

1  typically has a decision on which generic drug to
2  dispense; correct?
3      A.  I think that's changing because a lot
4  of the decisions are driven by there's the
5  wholesalers or the warehouse or the corporate on
6  what generics they are dispensing.
7      Q.  But as a basic rule, you understand
8  that pharmacists have the decision on which
9  generic drug to dispense; correct?
10         MR. DUEFFERT:  Objection to form.
11 Asked and answered.
12     A.  I think it's a little bit different on
13 the generic side because those products are being
14 chosen for them.  And so they are buying on
15 programs where generic has already been selected
16 for them.
17     Q.  Let's use Walgreens which has its own
18 chain distribution centers as an example.
19 Walgreens makes that choice; correct?
20     A.  Walgreens has a generic formula, it
21 will choose the generic of choice.
22     Q.  And one way that Par can distinguish

**162**

1  A. I don't -- I disagree from our
2  perspective in the way we manage the pricing. I
3  can't comment on how the customers, the total
4  selection process that the customers go through
5  on selecting generic drugs. That's not my -- I
6  can't comment on that.
7  Q. Do you know how First DataBank
8  determines AWPs?
9      MR. DUEFFERT: Objection to the form.
10  A. No, I don't. I don't. We typically,
11  in Par's case, we supply those AWPs.
12  Q. And Par expects First DataBank to
13  publish what you supply them; correct?
14  A. That's been the case in my years at
15  Par.
16  Q. A hundred percent of the time; correct?
17  A. I can't say that. Assuming that's
18  happened. I'm not sure if it's happened a
19  hundred percent of the time.
20  Q. But close to a hundred percent?
21  A. I would think that it's very close.
22  Q. Occasionally, First DataBank would

**163**

1  publish a WAC; correct?
2      MR. DUEFFERT: Objection to form.
3  A. You can go into the database and find
4  WAC pricing.
5  Q. When that occurred, did Par take any
6  affirmative action to get rid of those published
7  prices?
8      MR. DUEFFERT: Objection to the form.
9  He said the database was populated. He did not
10  say those WACs were published.
11      MR. ARCHIBALD: Let's back up. That's
12  even better.
13  Q. Were those WAC prices ever published?
14  A. There's -- pricing -- I am not sure.
15  We subscribe to a service of pricing and can get
16  history on WAC pricing, AWP. WAC pricing is
17  populated in that service.
18  Q. Who do you purchase that service from?
19  A. It was a -- one of the pricing service
20  -- Medi-Span or First DataBank. One of them.
21  Q. In fact, Par subscribed to First
22  DataBank service; correct?

**164**

1  A. The hard copy. I believe it was the
2  hard copy.
3  Q. So if you saw a WAC in a First DataBank
4  database, you would ask First DataBank to zero it
5  out or get rid of it; correct?
6  A. No. We would never influence getting
7  rid of WAC pricing because they publish WAC
8  pricing. We knew that they were doing that. We
9  never told them to eliminate WAC pricing.
10  Q. Have you ever read Ms. Andrus'
11  testimony?
12  A. No.
13  Q. Have you ever read Ms. Trendowicz's
14  testimony?
15  A. No.
16  Q. Would you defer to them in that regard
17  as to whether Par has ever tried to zero out WACs
18  with First DataBank?
19  A. I, in my experience, I'm not aware of
20  that happening.
21  Q. Who was your primary contact with First
22  DataBank?

**165**

1  A. Typically would be the contracts
2  department. So at the time I was at Par, it
3  would have been Karen would be the -- she was in
4  charge of supplying pricing.
5  Q. Karen Andrus; correct?
6  A. Correct.
7  Q. So she would be more knowledgeable than
8  you with regard to the contacts made with First
9  DataBank?
10     Is that fair?
11     MR. DUEFFERT: Objection to the form.
12  A. She could -- she had the wherewithal to
13  contact them and supply them pricing if that's
14  what you are asking.
15  Q. No. I am asking who would be the most
16  knowledgeable at Par with regard to contacts with
17  First DataBank?
18  A. Contacts meaning -- I am not sure I
19  understand the question.
20  Q. Asking First DataBank to do anything
21  with the numbers that you provide to them.
22     MR. DUEFFERT: Objection to form.

**166**

1    A. I am not aware of those documents. The
2    correspondence would come from our contract group
3    to First DataBank.
4    Q. That's Karen Andrus?
5    A. Karen Andrus' group.
6    Q. Next topic.
7        Does Par -- has Par, prior to January
8    1, 2005, ever calculated average sales prices?
9    A. Average sales price? I'm sure there's
10   many ways to calculate that, but depending on
11   what it's used for and the document, you can
12   calculate an average sales price by a number of
13   different methods. I don't think there's any
14   clear formula to calculate ASP.
15   Q. But Par did calculate ASPs; correct?
16       MR. DUEFFERT: Objection to form.
17   A. We would do -- ASPs could be calculated
18   very easily by taking the number of units divided
19   by the dollars. I mean the dollars divided by
20   the number of units and you would get an ASP.
21   Then I am not sure, you know, that would give a
22   ballpark on what our average sales price, but a

**167**

1    lot of times it doesn't include a lot of the
2    things that really get us to our net pricing.
3    Q. But you certainly could have done that
4    had you chosen to do that; correct?
5        MR. DUEFFERT: Objection to form.
6    A. I mean we could do it on any one of
7    hundreds of analysis. I am not sure of what you
8    are asking as far as, you know, how it's
9    calculated or did we or what it was used for. I
10   am not sure.
11   Q. I am not asking anything about --
12   except whether or not Par could calculate an ASP
13   or average selling price, where the average
14   selling price was the net selling price to its
15   retail class of trade customers.
16       MR. DUEFFERT: Objection to form.
17   A. We would -- we could do -- I mean could
18   we do that? I mean --
19   Q. Yes.
20   A. -- I'm sure it could be done.
21   Q. Let me show you what's been marked as
22   Exhibit 32.

**168**

1        (Exhibit DiMaio 032, Spreadsheet
2    that includes ASPs for Amerisource, marked for
3    identification.)
4    Q. Is that a price list or spreadsheet
5    that includes ASPs for Amerisource? I assume
6    that's AmerisourceBergen contract?
7        MR. DUEFFERT: Objection. Use of
8    incomplete document.
9    A. Again, this just looks like simply --
10   this looks like a simple spreadsheet where
11   somebody is dividing dollars by units.
12   Q. Just one example of what you were
13   saying that you can calculate ASP many different
14   ways; correct?
15       MR. DUEFFERT: Objection to form.
16   A. I think we have to define ASP. This is
17   just a gross ASP here.
18   Q. But you could -- could you calculate
19   net ASP for any given class of trade?
20   A. We would have to bill that from
21   individual accounts and build that up and then
22   collect all that data and build a class of trade.

**169**

1    Q. Didn't you do that for particular
2    customers such as Walgreens?
3        MR. DUEFFERT: Objection to form.
4    A. For purposes of gross sales divided by
5    units, but I am not sure -- it's just a
6    barometer. It's not reported. I'm not sure, you
7    know, what we -- we could do that, but I am not
8    sure where you are trying to ask --
9    Q. I am not going anywhere. I wondered
10   whether you were capable of doing it. I think
11   you answered my question. Let's move on.
12       MR. DUEFFERT: Objection to form.
13   Exhibit 32 pertains exclusively to penicillin
14   which is not a target drug.
15   Q. Take a look at Exhibit 33.
16       (Exhibit DiMaio 033, E-Mail dated
17   April 12, 2006 to Nicholas DiMaio, marked for
18   identification.)
19   Q. That's an e-mail dated April 12, 2006
20   to you; correct?
21   A. Yes.
22   Q. And it refers, the subject is

**Page 174**

1  is selling that product for $1.65, I am not so
2  sure where they are getting this retail cost.
3       Q.  Well, Mr. DiMaio, this is a Par
4  document; correct?
5       A.  Correct.
6       Q.  And it is essentially telling McKeeson
7  how it can make a profit by showing on page 4,
8  that if the retail cost is $1.65, and the federal
9  upper limit or the HCFA MAC is $2.78, McKeeson's
10 retail customers make a percent profit of 69
11 percent; correct?
12      MR. DUEFFERT: Objection. Same
13 objection. Amoxicillin and penicillin are not
14 target drugs.
15      A.  If I have to do the math it looks like
16 there's a 69 percent difference here and the
17 calculation, they are getting reimbursed 2.78 for
18 $1.65 --
19      Q.  So it's showing McKeeson how McKeeson's
20 customers can make money off the spread because
21 they can sell a Par product at far below the
22 federal upper limit. Right?

**Page 175**

1       MR. DUEFFERT: Same objection. Object
2  to the form.
3       A.  No, I think that's wrong. I think
4  that's wrong. I am not sure. It doesn't show
5  what the retailers are selling this product for.
6  It only talks about cost.
7       So I don't know if the retailers, they
8  have to, you know, what their profit is on this,
9  I mean what they are selling for -- they are only
10 max'd out -- they can only make $2.78 it looks
11 like as a ceiling. I don't know what they will
12 sell their product for. You really can't tell
13 from this.
14      Q.  Well, Mr. DiMaio, right above that it
15 shows an example of what the retail customer can
16 make if they have a retail cash sale; correct?
17      MR. DUEFFERT: Same objections.
18      A.  Right. And these would be not founded,
19 but these would be if they were selling for cash,
20 the nine fifty, if that were the selling price,
21 that would be the difference in profit.
22      Q.  So we have eliminated that sector, the

**Page 176**

1  cash sale. And now the last example refers to
2  Medicaid; correct?
3       MR. DUEFFERT: Same objection.
4       A.  It just identifies at that time, I'm
5  assuming what the MAC was on this particular
6  product.
7       Q.  And that MAC is a HCFA MAC which is
8  Medicaid; correct?
9       MR. DUEFFERT: Same objection.
10      A.  My understanding, yes, that's correct.
11      Q.  So what Par is telling McKeeson is that
12 their retail customers can make a 69 percent
13 profit off the spread?
14      MR. DUEFFERT: Same Objection, asked
15 and answered.
16      A.  No. We are assuming, right, that they
17 are paying $1.65. We are not sure. There's no
18 document to prove that. We are not sure if
19 that's the case. This is a worksheet.
20      But if in fact they were paying $1.65,
21 all this is saying is they are making a dollar
22 profit on dispensing a prescription. That's what

**Page 177**

1  I'm seeing here. That's all I am seeing. They
2  are doing prescription and they are getting paid
3  one dollar for it.
4       Q.  They are, in fact, getting paid 69
5  percent profit as Par tells McKeeson; correct?
6       MR. DUEFFERT: Objection, asked and
7  answered.
8       A.  No. This would be a worksheet and it
9  seems to me that there's nothing outrageous here
10 on a dollar profit on the pharmacist prescribing
11 this drug.
12      Q.  Let's take a look now at Exhibit 35.
13      (Exhibit DiMaio 035, June 10, 2004
14 letter from Par to Amerinet, marked for
15 identification.)
16      Q.  This is a June 10, 2004 letter from
17 Par, from your contracts manager, Karen Andrus,
18 to Amerinet; correct?
19      A.  Correct.
20      Q.  You are giving prices and offer to
21 Amerinet for Ciprofloxacin, also known as Cipro;
22 correct?

**182**

1   MR. ARCHIBALD: Correct.
2   MR. DUEFFERT: And the witness has
3   never seen this document before; correct?
4   MR. ARCHIBALD: I don't know.
5   A. So I see what you are referring to.
6   Q. Do you agree or disagree with that
7   statement?
8   A. I would have to say --
9   MR. DUEFFERT: I'll object to the form.
10  I'll object to foundation. The witness can try
11  to answer.
12  A. I mean I am just reading it for the
13  first time, so I would assume this is a statement
14  from Gensia talking about some of their products.
15  Agree or not agree, I don't have any comment on
16  this.
17  Q. Let's look at some documents you may
18  have a background on. Let me show you what's
19  been marked as Exhibit 40.
20          (Exhibit DiMaio 040, January 18,
21  2005 e-mail to Charles Burnett of Costco, marked
22  for identification.)

**183**

1   Q. Is Exhibit 40 a January 18, 2005 e-mail
2   to Charles Burnett of Costco?
3   A. Yes.
4   Q. And Karen Andrus of Par is copied on
5   it; correct?
6   A. Correct.
7   Q. Costco is a large retail organization,
8   it has many pharmacies; correct?
9   A. Correct.
10  Q. It states: Hi, Charlie. We did not
11  realize -- this is from Par to Costco; correct?
12  A. This is from Par to Charlie at Costco.
13  Q. From Mike Burton?
14  A. Yes.
15  Q. Hi, Charlie. We did not realize that
16  you had such an aggressive plan. Normally we
17  start with the smaller percentage off the brand
18  WAC. I will send you another letter with a
19  contract price of $38.30. Your 10 percent rebate
20  takes you to $35.
21  Did I read that correctly?
22  A. Yes.

**184**

1   Q. Now this is what I want to focus on,
2   the next two sentences: I think price will drop
3   after launch and I will keep you whole.
4   Generally our AWP does not follow pricing down so
5   your spread will increase with erosion.
6   Do you see that?
7   A. Yes.
8   Q. Is that what happened?
9   MR. DUEFFERT: For the record, this
10  document concerns Flonase which I don't believe
11  is a target drug in Kentucky or any other
12  jurisdiction.
13  A. I can't comment. I don't remember what
14  happened with pricing. I know Flonase did drop
15  significantly over the years.
16  Q. Is that a typical practice of -- strike
17  that.
18  Is it a typical occurrence for your
19  retail customers like Costco, that if you
20  introduce a new generic, that where there's price
21  erosion, that there will be an increase in margin
22  because of the spread?

**185**

1   MR. DUEFFERT: Objection to the form.
2   A. No, the price can decrease. Again,
3   when you speak about margin, typically what
4   happens, you know, there's some reimbursement at
5   that point. There's more competition is coming
6   in. The price is going down. And there's a
7   limit. I mean plans will only reimburse so much
8   so the AWP doesn't really matter because plans
9   don't look at AWP or they'll come up with a MAC
10  of their own.
11  A lot of insurance plans now are not
12  using AWP. So the margin, that's why we don't
13  comment on margin, because there's too many plans
14  and too many reimbursement issues just to say
15  that AWP can impact margin.
16  Q. Let me show you what's been marked as
17  Exhibit 41.
18          (Exhibit DiMaio 041, Request for
19  generic contract proposal for 1999 to 2000,
20  marked for identification.)
21  Q. This is a request for generic contract
22  proposal for 1999 to 2000. Correct?