# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| *The City of New York, et al.* | ) ) |
| *v.* | ) ) |
| *Abbott Laboratories, et al.* | ) ) ) |

MDL NO. 1456
Civil Action No. 01-12257-PBS
 Subcategory Case No: 03-10643-PBS

Judge Patti B. Saris

### PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS SUPPORTING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' "FUL FRAUD" CLAIMS

Pursuant to Rule 56.1 of the Local Rules of this Court,  Plaintiffs, the City of New and

New York Counties in MDL 1456 (hereinafter "plaintiffs"), hereby submit their Response to

Defendants' Local Rule 56.1 Statement of Undisputed Material Facts Supporting Defendants'

Joint Motion for Summary Judgment on Plaintiffs' "FUL Fraud" Claims ("Statement").  Where

necessary, plaintiffs counter-designate undisputed facts in opposition to Defendants' joint

motion.  Additionally, plaintiffs incorporate herein by reference their Local Rule 56.1 Statements

as to all Defendants and as to each individual defendant[1] submitted in support of Plaintiffs'

---

[1]Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts Related to Federal Upper Limits (FULs) and Applicable to All Thirteen Defendants (the "FUL Thirteen") [Dkt: 6060; NYDkt: 62] ("Common 56.1 [Dkt: 6060; 62]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Barr Laboratories, Inc. [Dkt: 6062; NYDkt: 63]  ("Barr 56.1 [Dkt: 6062; 63]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Dey L.P. and Dey, Inc. [Dkt: 6063; NYDkt: 64] ("Dey 56.1 [Dkt: 6063; 64]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Ethex Corporation [Dkt: 6064; NYDkt: 65] ("Ethex 56.1 [Dkt: 6064; 65]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Ivax Corporation and Ivax Pharmaceuticals Inc. [Dkt: 6065; NYDkt: 66] ("Ivax 56.1[Dkt: 6065; 66]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Mylan Laboratories Inc., Mylan Pharmaceuticals Inc. and UDL Laboratories Inc. [Dkt: 6066; NYDkt: 67] ("Mylan 56.1 [Dkt: 6066; 67]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Par Pharmaceuticals Companies, Inc. and Par Pharmaceutical, Inc. [Dkt: 6067; NYDkt: 68] (Par 56.1 [Dkt: 6067; 68]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Purepac Pharmaceutical Co. [Dkt: 6068; NYDkt: 69] ("Purepac 56.1 [Dkt: 6068; 69]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as

Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-b ("Plaintiffs' Motion"), the Declaration of Harris L. Devor, dated May 15, 2009, in support of plaintiffs' motion [Dkt. No. 6061; 61], and Appendix A to Plaintiffs' Memorandum of Law in Support of plaintiffs' motion. [Dkt. Nos. 6076, Subdocket No. 77].

## GENERAL RESPONSES AND OBJECTIONS

Plaintiffs generally object to defendants' (the "FUL Thirteen's") Statement on the grounds that it ignores entirely and repeatedly that CMS's starting point for setting the FUL (the FULs printout or "array") was typically based on false pretenses due to the FUL Thirteen's submission of false pricing information to the government, in contravention of law and regulation.

Plaintiffs also dispute that the Statement presents only material facts. Even if true, the majority of "facts" presented would not in any way alter defendants' liability under N.Y. Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government that cause inflated FULs to issue because the "facts" do not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

Plaintiffs reserve all evidentiary objections to the record presented by the "FUL Thirteen" defendants.

---

to Boehringer Ingelhein Roxane, Inc. [Dkt: 6069; NYDkt: 70] ("Roxane 56.1 [Dkt: 6069; 70]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Sandoz, Inc. [Dkt: 6070; NYDkt: 71] ("Sandoz 56.1 [Dkt: 6070; 71]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Teva Pharmaceuticals USA, Inc. [Dkt: 6071; NYDkt: 72] ("Teva 56.1 [Dkt: 6071; 72]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Schering Corporation, Schering-Plough Corporation and Warrick Pharmaceuticals Corporation [Dkt: 6072; NYDkt: 73] ("Schering-Warrick 56.1 [Dkt: 6072; 73]"); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. [Dkt: 6073; NYDkt: 74] ("Watson 56.1[Dkt: 6073; 74]"); and, Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Wyeth [Dkt: 6074; NYDkt: 75] ("Wyeth 56.1 [Dkt: 6074; 75]").

Plaintiffs counter-designate all referenced deposition excerpts, affidavits, and exhibits referred to plaintiffs' responses herein.

## SPECIFIC RESPONSES AND OBJECTIONS

**1.    The national pricing compendia publish Average Wholesale Prices, Wholesale Acquisition Costs, and Direct Prices.  Transcript of Deposition of Sue Gaston ("Gaston Tr.") at 145:5 - 145:10, attached to the Declaration of Kim B. Nemirow (hereinafter "Nemirow Decl.") as Ex. A.**

<u>Response</u>:  Plaintiffs do not dispute the facts set forth in this paragraph.

**2.    A product is considered "therapeutically equivalent" if it is "A-rated" by the Food and Drug Administration ("FDA") in its publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book."  42. C.F.R. § 447.332(a)(ii).**

<u>Response</u>:   Plaintiffs do not dispute the facts set forth in this paragraph but note that defendants' own expert, Sumanth Addanki, explains that the Orange Book is not the only source for determining a drug's therapeutic equivalency.  *See* Addanki Aff. at Ex. 3, n.7 (explaining that First Data Bank's NDDF publishes the therapeutic equivalence ratings for drugs in the variable "Expanded Orange Book Code" and Red Book publishes the therapeutic equivalence for drugs in the variable ("Orange Book Code")); *see also* Transcript of Deposition of Gail Sexton ("Sexton Tr.") at 103:3-104:18 (testifying that if the drug was A-rated in the pricing compendia, but not A-rated in the Orange Book, that drug could set the FUL) (attached as Exhibit A to the Affidavit of Joanne M. Cicala, sworn to June 15, 2009 and submitted in opposition to defendants motion ("Cicala Opp. Aff.").

**3.    CMS was free to update FULs periodically and did so at its discretion. Nemirow Decl. Ex. A (Gaston Tr. At 530:3 - 530:13).**

<u>Response</u>:  Disputed.  The cited pages do not support the Statement.  Ms. Gaston testified that around the time that CMS first began establishing FULs, in 1991, CMS tried to update the entire FULs list annually.  *See* Deposition of Sue Gaston (March 19, 2008)("Gaston, Sue (March

19, 2008) at 530:3-531:11, attached as Exhibit B to the Cicala Opp. Aff.  Later, CMS began to update particular FULs on an as-needed basis.  *See id.*

**4.     In formal transmittals by which CMS communicated FULs to State Medicaid programs, CMS identified the dates of the published prices on which it had relied when setting the FULs.  Affidavit of Dr. Sumanth Addanki ("Addanki Aff."), at ¶ 10.**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph.

**5.     In Case Management Order No. 33, the Court directed each side to select five drugs that were reimbursed by New York Medicaid on the basis of FULs for "targeted" discovery.  *See* CMO 33, *In re Pharm. Indus. Avg. Wholesale Price Litig.*, No. 01-CV-12257-PBS, MDL No. 1456 (D. Mass. Sept 14, 2007) [Docket No. 4745].  Because both sides chose enalapril maleate, there were nine drugs, identified by the Generic Code number or GCN, assigned by First Databank to a "therapeutically equivalent" group of drugs, that became of the subject of the targeted FUL discovery:  (1) albuterol 0.083% solution (GCN 5309); (2) albuterol 90 mcg. inhaler (GCN 5037); (3) cefadroxil 500 mg. (GCN 9089/48268); (4) clonazepam 0.5 mg. tablet (GCN 4560); (5) enalapril maleate 20 mg. tablet (GCN 386); (6) isosorbide mononitrate 60 mg. tablet SA (GCN 17927); (7) lorazepam 1 mg. tablet (GCN 3758); (8) metropolol tartrate 100 mg. tablet (GCN 5131); and (9) ranitidine 150 mg. tablet (GCN 11673).  *See* Addanki Aff., at ¶ 9.**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph.

*The Empirical Evidence*

**6.     For the nine GCNs or drugs that were the subject of the targeted FUL discovery, between 1997 and 2005 (the discovery period specified by the Court in CMO 33), CMS established 31 different FULs.  *See id.* at ¶ 8 & Exs. 3-5.**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph.

**7.     Of the 31 FULs that CMS established for the target drugs during the relevant time, CMS would have established a lower FUL in 23 out of 31 cases (nearly 75% of the time) had CMS followed the rule set forth in the FUL regulation – *i.e.*, had CMS established the FUL by multiplying the lowest available published price by 150%.  *Id.* at ¶ 11 & Ex. 3.**

Response:  Disputed.   Had CMS reviewed a FULs printout containing published prices for defendants at or about the level of their true prices during the times CMS was reviewing published prices to set or modify the FUL, CMS would have considered those lower prices and the FUL would have been lower.  Plaintiffs counter-designate the Declaration of Susan E. Gaston

(sworn to June 15, 2009)("Gaston Dec.") at ¶7 (Attached as Exhibit C to the Cicala Opp. Aff.).

Plaintiffs' drug by drug rebuttal and counter-designations follow:

**(1)      Albuterol .83 MG/ML Solution (GCN 05039)**

The Albuterol .83 MG/ML Solution was manufactured by defendants Dey, Ivax, Roxane, Sandoz, and Schering-Warrick.  During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Albuterol .83 MG/ML Solution in June 1997, April 2001 and the 3 months prior to May 8, 2005.  *See* Addanki Aff. at Exh. 3.

In June 1997, CMS set the FUL based on the lowest published price.  *Id.*  Had Dey, Ivax and Schering-Warrick reported published prices at or about the level of one or more of their AMPs and/or Devor WACs at this time when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *See* Cicala Opp. Aff. at Exh. D.

In April 2001, had Dey, Ivax and Schering-Warrick reported published prices at or about the level of one or more of their AMPs or Devor WACs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

During the same time period, had Roxane reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id.*

In the 3 months prior to May 8, 2005, had Ivax and Schering-Warrick reported published prices at or about the level of one or more of their AMPs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been

5

used to set a "lowest alternative FUL".  *Id.*  During the same time period, had Dey and Ivax reported published prices at or about the level of one or more of the Devor WACs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In summary, had CMS reviewed a FULs printout containing published prices for Dey, Ivax, Roxane, Sandoz, and Schering-Warrick at or about the level of one or more of their AMPs or Devor WACs during the three times CMS was reviewing published prices to set or modify the FUL for Albuterol .83 MG/ML Solution, CMS would have considered those lower prices and the FUL would have been lower.  *See* Gaston Dec. at ¶7 (Cicala Opp. Aff. at Exh. C); *see also* Declaration of Harris L. Devor In Support of Plaintiffs'' Motion For Partial Summary Judgment On Issues Relating To The Federal Upper Limit And Under New York Social Services Law §145-b ("Devor PSJ Decl.") [Dkt #6061, NY Dkt# 61], at Exhibits B-1 to B-17.

### (2)    Albuterol 90 MCG Inhaler (GCN 05037)

The Albuterol 90 MCG Inhaler was manufactured by defendants Dey, Ivax, Sandoz, Schering-Warrick, and Watson.  During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Albuterol 90 MCG Inhaler in June 1997, January 2000, and in the 3 months prior to March 11, 2003 and May 8, 2005.  *See* Addanki Aff. at Exh. 3.

In June 1997, had Dey, Ivax and Schering-Warrick reported published prices at or about the level of one or more of their AMPs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *See* Cicala Opp.  Aff. at Exh. E.

In January 2000, had Dey, Ivax and Schering-Warrick reported published prices at or about the level of one or more of their AMPs or Devor WACs when CMS was reviewing published prices

to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.* In January 2000, had Watson reported published prices at or about the level of one or more of their AMPs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.*

In the 3 months prior to March 11, 2003, had Ivax and Schering-Warrick reported published prices at or about the level of one or more of their AMPs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.* Also, during the same time period, had Dey and Schering-Warrick reported published prices at or about the level of one or more of the Devor WACs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id*.

In the 3 months prior to March 11, 2003, had Ivax reported published prices at or about the level of one or more of their Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL. *Id.*

In the 3 months prior to May 8, 2005, CMS selected the lowest published price that could have set the FUL for Albuterol .83 MG/ML Solution. *Id*. Had Ivax and Schering-Warrick reported published prices at or about the level of one or more of their AMPs and/or Devor WACs at this time when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL. *Id*.

In sum, had CMS reviewed a FULs printout containing published prices for Dey, Ivax, Sandoz, Schering-Warrick, and Watson at or about the level of one or more of their AMPs or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Albuterol 90 MCG Inhaler, CMS would have considered those lower prices and the FUL would have been lower.  *See* Gaston Decl. at ¶7 (Cicala Opp. Aff. at Exh. C); *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61] at B-18 to B-22.

### (3)     Cefadroxil 500 MG Capsule (GCN 09089/48262)

The Cefadroxil 500 MG Capsule was manufactured by defendants Barr, Ivax and Sandoz. During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Cefadroxil 500 MG Capsule in October 1996, April 2001 and approximately in the 3 months prior to March 11, 2003.  *See* Addanki Aff. at Exh. 3.  On each of occasions, CMS selected the lowest published price that could have set the FUL for Cefadroxil 500 MG Capsule.  *Id.*

Had CMS reviewed a FULs printout containing published prices for Barr, Ivax and Sandoz at or about the level of one or more of their AMPs or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Cefadroxil 500 MG Capsule, CMS would have considered those lower prices and the FUL would have been lower.  *See* Gaston Decl. at ¶ 7, ¶ 15, ¶ 17_(Cicala Opp. Aff. at Exh. C); Exhibit F to Cicala Opp. Aff; *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61] at B-23 to B-29.

### (4)     Clonazepam .5 MG Tablet (GCN 04560)

The Clonazepam .5 MG Tablet was manufactured by Mylan, Par, Purepac, Sandoz, Teva and Watson.  During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Clonazepam .5 MG in June 1997, April 1998, January 2000 and April 2001.  *See* Addanki Aff. at Exh. 3.

In June 1997, had Purepac and Teva reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL. *See* Cicala Opp. Aff. at Exh. G.

In April 1998, CMS selected the lowest published price that could have set the FUL for Clonazepam .5 MG Tablet.  *See* Addanki Aff. at Exh. 3.  Had Mylan, Par, Purepac, Teva and Watson reported published prices at or about the level of one or more of their AMPs and/or Devor WACs in April 1998 when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  Cicala Opp. Aff. at Exh. G.

In January 2000, had Mylan, Par, Purepac and Teva reported published prices at or about the level of one or more of their AMPs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id*.

In January 2000, had Mylan and Par reported published prices at or about the level of one ore more of the Devor WACs during that time, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id*.

In January 2000, had Par reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id*.

In April 2001, had Mylan, Purepac and Teva reported published prices at or about the level of one or more of their AMPs, those alternative published prices would have been lower

than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In April 2001, had Mylan reported published prices at or about the level of one or more of the Devor WACs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.*

In April 2001, had Par, Purepac, Sandoz, Teva and Watson reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id.*

In sum, had CMS reviewed a FULs printout containing published prices for Mylan, Par, Purepac, Sandoz, Teva and Watson at or about the level of their AMPs or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Clonazepam .5 MG Tablet, CMS would have considered those lower prices and the FUL would have been lower. *See* Gaston Decl. at ¶ 7(Cicala Opp. Aff. at Exh. C); *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61] at Exhibits B-30 to B-38.

**(5)    Enalapril Maleate 20 MG Tablet (GCN 00386)**

The Enalapril Maleate 20 MG Tablet was manufactured by defendants Ivax, Mylan, Par, Purepac, Sandoz, Teva and Watson.  During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Enalapril Maleate 20 MG Tablet approximately in the 3 months prior to August 24, 2003.  *See* Addanki Aff. at Exh. 3.

In the 3 months prior to August 24, 2003, had Ivax, Mylan, Par, Purepac, Sandoz, Teva and Watson reported published prices at or about the level of one or more of their AMPs and/or

Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  Cicala Opp. Aff. at Exh. H..

Had CMS reviewed a FULs printout containing published prices for Ivax, Mylan, Par, Purepac, Sandoz, Teva and Watson at or about the level of one or more of their AMPs and/or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Enalapril Maleate 20 MG Tablet, CMS would have considered those lower prices and the FUL would have been lower.  *See* Gaston Decl. at ¶ 7(Cicala Opp. Aff at Exh C); *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61], at Exhibits B-39 to B-49.

**(6)     Isosorbide Mononitrate 60 MG Tablet  (GCN 17297)**

Isosorbide Mononitrate 60 MG Tablet was manufactured by defendants Ethex, Ivax, Purepac, and Schering-Warrick.  During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Isosorbide Mononitrate 60 MG Tablet in April 2001 and approximately in the 3 months prior to July 21, 2005.  *See* Addanki Aff. at Exh. 3.

During April 2001, CMS selected the lowest published price that could have set the FUL for Isosorbide Mononitrate 60 MG Tablet.  *Id.*  Had Ethex, Ivax, Purepac, and Schering-Warrick reported published prices at or about the level of one or more of their AMPs and/or Devor WACs in April 2001 when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *See* Cicala Opp. Aff. at Exh. I.

During the 3 months prior to July 21, 2005, had Ethex and Scherring-Warrick reported published prices at or about the level of one or more of their AMPs when CMS was reviewing published prices to set or modify the FUL, the alternative published price would have been lower

than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.*

Had CMS reviewed a FULs printout containing published prices for Ethex, Ivax, Purepac, and Schering-Warrick at or about the level of one ore more of their AMPs or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Isosorbide Mononitrate 60 MG Tablet, CMS would have considered those lower prices and the FUL would have been lower. *See* Gaston Decl. at ¶ 7(Cicala Opp. Aff. at Exh. C); *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61] at Exhibits B-50 to B-54**.**

### (7)     Lorazepam 1 MG Tablet (GCN 03758)

The Lorazepam 1 MG Tablet was manufactured by Ivax, Mylan, Purepac, Sandoz, Watson and Wyeth.  During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Lorazepam 1 MG Tablet in June 1997, April 1998 and January 2000. *See* Addanki Aff. at Exh. 3.

In June 1997, had Ivax, Mylan and Sandoz reported published prices at or about the level of one or more of their AMPs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *See* Cicala Opp. Aff.  at Exh. J.

In June 1997, had Ivax and Sandoz reported published prices at or about the level of one or more of their AMPs and/or the Devor WACs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id.*

In January 2000, had Ivax reported published prices at or about the level of one or more of their AMPs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.*

In April 1998 and January 2000, had Ivax, Mylan, Purepac, Sandoz, Watson and Wyeth reported published prices at or about the level of one or more of their AMPs and/or the Devor WACs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL. *Id.*

Had CMS reviewed a FULs printout containing published prices for Ivax, Mylan, Purepac, Sandoz, Watson and Wyeth at or about the level of one or more of their AMPs or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Lorazepam 1 MG Tablet, CMS would have considered those lower prices and the FUL would have been lower. *See* Gaston Decl. at ¶7 (Cicala Opp. Aff.); *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61] at Exhibits B-55 to B-66**.**

### (8)     Metoprolol 100 MG Tablet (GCN 05131)

The Metoprolol 100 MG Tablet was manufactured by Ivax, Mylan, Par, Sandoz, Teva and Watson. During the relevant time period (1997-2005), CMS reviewed published prices to set the FUL for Metoprolol 100 MG Tablet in June 1997, April 1998, January 2000, April 2001 and approximately in the 3 months prior to October 28, 2004. *See* Addanki Aff. at Exh. 3.

In the 3 months prior to October 28, 2004, CMS selected the lowest published price that could have set the FUL for Metoprolol 100 MG Tablet. *Id.* Had Mylan, Par, Sandoz, Teva and Watson reported published prices at or about the level of one or more of their AMPs and/or

Devor WACs during this period when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *See* Cicala Opp. Aff. at Exh. K.

In June 1997, had Mylan, Sandoz and Teva reported published prices at or about the level of one or more of their AMPs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In June 1997, had Teva reported published prices at or about the level of one or more of their Devor WAC, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In June 1997, had Mylan, Par and Watson reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id.*

In April 1998, had Sandoz and Teva reported published prices at or about the level of one or more of their AMPs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In April 1998, had Mylan, Par, Teva and Watson reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id.*

In January 2000 and April 2001, had Mylan, Sandoz, Teva and Watson reported published prices at or about the level of one or more of their AMPs when CMS was reviewing

14

published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In January 2000 and April 2001, had Sandoz and Watson reported published prices at or about the level of one or more of their Devor WAC, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*  In April 2001, had Mylan reported published prices at or about the level of one or more of their Devor WAC, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In January 2000, had Mylan, Par and Teva, and in April 2001, had Teva, reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id.*

Had CMS reviewed a FULs printout containing published prices for Ivax, Mylan, Par, Sandoz, Teva and Watson at or about the level of one or more of their AMPs or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Metoprolol 100 MG Tablet, CMS would have considered those lower prices and the FUL would have been lower.  *See* Gaston Decl. at ¶ 10, ¶ 12(Cicala Opp. Aff. at Exh. C); *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61] at Exhibits B-67 to B-76**.**

### (9)    Ranitidine 150 MG Tablet  (GCN 11673)

The Ranitidine 150 MG Tablet was manufactured by Ivax, Mylan, Par, Roxane, Sandoz, Teva and Watson.  During the relevant time period (1997-2005), CMS reviewed published prices

to set the FUL for Ranitidine 150 MG Tablet in January 2000, April 2001 and in the 3 months prior to September 24, 1998 and May 5, 2005.  *See* Addanki Aff. at Exh. 3.

In the 3 months prior to September 24, 1998, had Mylan, Roxane, Sandoz, and Watson reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *See* Cicala Opp. Aff. at Exhibit L.

In January 2000, had Mylan, Par, Sandoz and Watson reported published prices at or about the level of one or more of their AMPs when CMS was reviewing published prices to set or modify the FUL, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.*

In January 2000, had Sandoz reported published prices at or about the level of one or more of the Devor WAC, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In January 2000, had Par, Roxane and Watson reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL.  *Id.*

In April 2001, had Mylan, Par and Sandoz reported published prices at or about the level of one or more of their AMPs or Devor WAC, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL".  *Id.*

In April 2001, had Mylan and Watson reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL. *Id.*

In the 3 months prior to May 5, 2005, had Par, Sandoz and Watson reported published prices at or about the level of one or more of their AMPs, those alternative published prices would have been lower than the lowest published price which Dr. Addanki says could have been used to set a "lowest alternative FUL". *Id.*

In the 3 months prior to May 5, 2005, had Par and Teva reported published prices at or about the level of one or more of their AMPs and/or Devor WACs, those alternative published prices would have been lower than the lowest published price which CMS selected to set the FUL. *Id.*

Had CMS reviewed a FULs printout containing published prices for Ivax, Mylan, Par, Roxane, Sandoz, Teva and Watson at or about the level of one or more of their AMPs or Devor WACs during the times CMS was reviewing published prices to set or modify the FUL for Ranitidine 150 MG Tablet, CMS would have considered those lower prices and the FUL would have been lower. *See* Gaston Decl. at ¶ 7(Cicala Opp. Aff. at Exh. C); *see also* Devor PSJ Decl. [Dkt #6061, NY Dkt# 61] at Exhibits B-77 to B-84**.**

Further responding, the statement is vague and inaccurate in its reference to CMS following the "rule set forth in the FUL regulation". As written, plaintiffs cannot admit or deny this portion of the statement.

Plaintiffs dispute and object to the Statement insofar as it seeks to establish as fact that CMS did not comply with Federal laws or regulations governing the FUL program and FUL setting practices and ignores that defendants' submission of false WACs, in contravention of

governing law and regulation, meant that CMS's starting point for setting any FUL (the FULs Printout) was based on false pretenses and entirely unreliable.

The undisputed purpose of the FUL program was to take advantage of competitive pricing in the generic market place while maintaining access. This required CMS to ensure that the prices it considered for setting any FUL were actually available in the marketplace. There is no record evidence that CMS ever departed from that rule.

Further responding, plaintiffs dispute and object to the Statement insofar as it present improper argument suggesting that CMS's actions, as opposed to defendants' submission of false prices, resulted in the FUL being set higher than it should have been. Had defendants' reported accurate prices the outliers would not have appeared to be outliers.

Further responding, plaintiffs dispute that this statement presents a material fact. Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**8.    For all but two of the FULs at issue here (*i.e.*, for 29 out of 31 FULs), during the period for which the FUL remained in effect, there existed at least one published price that, if used, would have resulted in a lower FUL for some portion of, and many times the entire period for which the FUL remained in effect.  *Id*. at ¶ 12 & Ex. 4.**

<u>Response</u>:   Disputed.  The statement is legally irrelevant and immaterial.  CMS was not under an obligation to set a FUL whenever a new price was published.

Further responding, the phrase "would have resulted in a FUL for some portion and, many times, the entire period for which the FUL remained in effect" is too vague as to have any meaning whatsoever.  Plaintiffs cannot admit or deny this portion of the statement.

Further responding, plaintiffs admit that because defendants submitted false prices to CMS, on certain occasions the FULs printout contained WACs that appeared to be outliers or were associated with drugs that were not nationally available and thus CMS did not set the FUL based on those WACs because to do so would have been counter to the FUL program objectives. *See* Sexton, Gail (May 20, 2008) 96:3-17 (Cicala Opp. Aff. at Exhibit A); *see* Gaston, Sue (March 19, 2008) 427:21-429:22; 444:16-445:13 (Cicala Opp. Aff. at Exhibit B).  Had CMS reviewed a FULs printout containing published prices for defendants at or about the level of their true prices during the times CMS was reviewing published prices to set or modify the FUL, CMS would have considered those lower prices and the FUL would have been lower.  Gaston Aff. at ¶ 7 (Cicala Opp. Aff. at Exh. C).

Further responding, plaintiffs incorporate herein the drug by drug rebuttal from their response to statement #7 above.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**9.    For 25 out of the 31 FULs at issue here, during the period in which the FUL was in effect, there was *always* a lower published price in effect upon which a lower FUL could have been set.  *Id*.  (emphasis in original).  In at least two instances, a lower price was published between the date the FUL was set by CMS and the date the FUL became effective.**

Response:  Plaintiffs admit that because defendants submitted false prices to CMS, on certain occasions the FULs printout contained WACs that appeared to be outliers or were associated with drugs that were not nationally available and thus CMS did not set the FUL based

on those WACs because to do so would have been counter to the FUL program objectives. *see* Sexton, Gail (May 20, 2008) 96:3-17 (Cicala Opp. Aff. at Exhibit A); *see* Gaston, Sue (March 19, 2008) 427:21-429:22; 444:16-445:13 (Cicala Opp. Aff. at Exhibit B).   Had defendants reported accurate prices, those accurate prices would have been considered by CMS and the FUL likely would have been lower. *See* Gaston Dec. at ¶7 (Cicala Opp. Aff. at Exh. C).

Further responding, plaintiffs incorporate herein the drug by drug rebuttal from their response to statement #7 above.

Plaintiffs also dispute that this statement presents a material fact.   Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs,  knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

Further responding, the statement is legally irrelevant and immaterial.   There is no authority for the proposition that CMS was under an obligation to set FUL whenever a new price was published.

**10.   For 25 out of the 31 FULs that were the subject of the targeted discovery, a different FUL would have resulted if CMS had complied with all of the regulatory requirements.  *Id*. at ¶ 8 & Ex. 3.**

Response:  Disputed.  A different FUL would have resulted had defendants submitted accurate prices.  Gaston Dec. at ¶ 7 (Cicala Opp. Aff. at C).

Further responding, plaintiffs dispute and object to the Statement insofar as it present improper argument suggests that CMS's actions, as opposed to defendants' submission of false prices, resulted in the FUL being set higher than it should have been.  Had defendants' reported

accurate prices, CMS would have considered them. *Id.*  The outliers would not have appeared to be outliers. *Id.* at Exhibits E, F, *e.g.*

Further responding, plaintiffs incorporate herein the drug by drug rebuttal from their response to statement #7 above.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, this statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs,  knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

Further responding, the statement is legally irrelevant and immaterial.  CMS was not under an obligation to set FUL whenever a new price was published.

**11.  Dr. Addanki was unable to discern any pattern in CMS's departure from the regulatory requirements when establishing FULs.  *Id*. at ¶¶ 8, 19.**

Response:  Plaintiffs do not dispute that Dr. Addanki has testified that he was unable to discern any pattern in what he characterizes as CMS's departure from the regulatory requirements when establishing a FUL.

Plaintiffs dispute any suggestion that CMS's actions, as opposed to defendants' submission of false prices, resulted in the FUL being set higher than it should have been.  Had defendants' reported accurate prices the outliers would not have appeared to be outliers.  Had defendants reported accurate prices, CMS would have considered them and likely would have set a lower FUL.  Gaston Dec. at ¶ 7(Cicala Opp. Aff at Exh. C)

Plaintiffs dispute that there was no discernable pattern in how CMS set the FUL.  CMS officials testified that they were required to ensure availability at the reported price and cost savings.  *See* Gaston Dec. at ¶ 7; Gaston, Sue (January 24, 2008) 257:3-12 (Cicala Opp. Aff. at

Exh. B).  If CMS found that the drug with the lowest published price was not available due to raw material shortage, limited supply to only a few states, discontinuation of the product, or temporary unavailability, CMS would not set a FUL on that published price.  *See* Gaston, Sue (March 19, 2008) 469:22-473:11, 426:19-427:20, 429:9-22, 435:12-436:6 (Cicala Opp. Aff. at Exh. B); Sexton, Gail (May 20, 2008) 136:10-139:2 (Cicala Opp Aff at Exh. A).

If CMS found that the published prices were incorrect or outdated, CMS would not set a FUL on such published prices.  CMS questioned whether the published price information was correct and whether a drug was actually available when there was an "outlier" price.  *See* Sexton, Gail (May 20, 2008) 96:3-97:22 (Cicala Opp. Aff at Exh. A).  An outlier price is a price that is "far lower than the other prices" that appear in the compendia.  *See id*.  When there was an outlier price, Ms. Sexton testified that she would call the supplier of the drug to verify whether the drug was available at that price.  *Id*.  CMS exercised discretion and would not base the FUL on an outlier if CMS believed that it would create a FUL that was so low that providers would not be able to acquire the product.  Gaston, Sue (March 19, 2008) 427:21-429:22; 441:22-445:13 (Cicala Opp. Aff. at Exh. B).  *See* Brief of the United States on the Federal Upper Limit, *In re Pharm. Indus. Avg. Wholesale Price Litig.*, No. 01-CV-12257-PBS, MDL No. 1456 (filed June 28, 2007) (Dkt. No. 4413 )p. 2-3, *citing* 51 Fed. Reg. at 29563.

### The CMS Testimony

**12.  Sue Gaston was the CMS employee responsible for setting FULs from April 1991 through February of 2003.  Nemirow Decl. Ex. A (Gaston Tr. at 40:7- 40:10, 45:2 – 45:12).**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph.

**13.  Gail Sexton was the CMS employee responsible for setting FULs beginning in 2004.  Transcript of Deposition of Gail Sexton ("Sexton Tr.") at 49:13 – 50:21, attached to Nemirow Decl. as Ex. B.**

<u>Response</u>:  Plaintiffs do not dispute the facts set forth in this paragraph except that Ms.

Sexton testified that she was responsible for setting FULs beginning in November 2004.  *See*

Sexton, Gail (May 20, 2008) 49:13-21 (Cicala Opp. Aff. at Exh. A).

**14.  Ms. Sexton testified that the nine drugs that were selected for targeted FUL discovery, and which formed the basis for Dr. Addanki's study, are not unique, and that the process used to set the FULs for these drugs is representative of the process for establishing FULs more generally.  Nemirow Decl. Ex. B (Sexton Tr. at 31:4 – 31:22, 33:1 – 33:9).**

<u>Response</u>:  Plaintiffs do not dispute the facts set forth in this paragraph.

**15.  Ms. Gaston and Ms. Sexton testified that CMS used a computer program ("the FULs System") to gather both Orange Book data and pricing data from the three national compendia and to initially calculate FULs for those drugs that met the specified criteria. Then, CMS officials would engage in a "manual review" process because "we want to be sure that that lowest price is a true price."  Nemirow Decl. Ex. A (Gaston Tr. at 232:22 – 241:7, 410:14 – 411:18, 416:10 - 416:15, 429:18 – 429:22, 432:14 – 432:21, 533:5 – 533:10); Nemirow Decl. Ex. B (Sexton Tr. at 89:2 – 89:5, 93:13 – 94:13) (stating that Ms. Sexton conducted "further manual interventions" into the FUL for albuterol because she had "learned of other suppliers that were marketing this drug"); *id*. at 95:15 – 95:20 (stating that she would conduct a manual review "in cases where I saw that manual intervention could have changed the price, changed the federal upper limit, or where it appeared that perhaps the criteria was not met and that further intervention should have been taken"); *id*. at 138:6 – 138:7 ("When possible we would manually verify that drugs were available."); *id*. at 147:8 – 147:15 (stating that upon finding "an outlier situation" she would "do some manual verifications on whether that NDC was available and available at that price").**

<u>Response</u>:   Disputed. Defendants' paragraph ignores that because of defendants'

submission of false prices, the FULs print out which served as the "starting point" for setting

FUL, was false and unreliable.  Further responding, CMS officials testified that they did not

engage in a manual review process every time a FUL was established.  Gaston, Sue (March 19,

2008) 533:5-10 (Cicala Opp. Aff at Exh. B); Sexton, Gail (May 20, 2008) 95:10-20 (Cicala Opp

Aff. at Exh. A).  CMS officials engaged in a manual review only when they believed it was

necessary to ensure access and cost savings.  *see* Gaston Dec. at ¶ 4, ¶ 5 (Cicala Opp. Aff. at

Exh. C).

**16.   Ms. Gaston further testified that the manual review was used to determine whether a drug was "truly available or not" and whether or not "you should follow up and see if it's available."  Nemirow Decl. Ex. A (Gaston Tr. at 229:8 – 230:14).**

Response:  Disputed.  Ms. Gaston testified that she engaged in a manual review when the drug with the lowest published price was not available and when there was a question as to whether the published price information was correct.  *See* Gaston, Sue (January 24, 2008) 255:18-257:12 (Cicala Opp. Aff. at Exh. B).  Such action was necessary given the objectives of the FUL program.  *See* Gaston, Sue (January 24, 2008) 216:14-19, 245:12-246:16 (*Id.*); *see* Gaston, Sue (March 19, 2008) 329:10-331:3 (*Id.*) ; *see* Brief of the United States on Federal Upper Limit, *In re Avg. Wholesale Price Litig.*, No. 01-CV-12257-PBS, MDL No. 1456 (filed June 28, 2007) [Docket No. 4413], p. 2-3.

**17.   During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for clonazepam, on which someone had crossed out the FUL generated by the FULs System, $0.1199, and written in a different, higher FUL, $0.2455.  Nemirow Decl. Ex. A (Gaston Tr. at 441:22 – 442:5 & Ex. 5).**

Response:  Disputed.  Ms. Gaston was presented with a misleading 2001 FULs printout for Clonazepam which contained false prices for Mylan, Teva, and Purepac.  At deposition, Ms. Gaston testified that the difference between lowest published WAC ($0.0799) and the next lowest WAC ($0.16370) caused CMS to believe that setting the FUL on the lowest published WAC would have created an unreasonably low FUL.  *See* Gaston, Sue (March 19, 2008) 444:16-445:13 & Exh. 5 (Cicala Opp. Aff. at Exh. B). ("Q:  Do you know why CMS chose not to set a FUL on the basis of that lower published price?  A:  I could give you my opinion. Q:  Sure.  A: That here again what I think they were trying to do was since there's such a difference between the .07 and then the next price of .16370, that we wanted to make sure that the FUL price that's set is a reasonable price and that we'll be assured the availability of the drug.  So we went up to the next lowest price.").  If CMS had seen a FULs print out with true WACs for Mylan, Teva and

Par, however, $0.0799 would not have looked like an outlier.  Gaston Dec. at ¶ 7 (Cicala Opp.

Aff. Exh. C).  Mylan Teva and Par all had true WACs lower than $0.0799.  see *Id*.  The same is

true with respect to defendants' AMPs.  *See* Cicala Opp. Aff at Exh. C and G.  The following

defendants' AMPs are less than Major Pharmaceuticals' WAC ($0.07990):  Mylan, Par, Teva

and Purepac.  *Id.*

**18.    Ms. Gaston testified that the lowest published price was not used when setting the FUL for clonazepam because CMS "wanted to make sure that the FUL price that's set is a reasonable price and that we'll be assured the availability of the drug" and that therefore "we went up to the next lowest price."  Nemirow Decl. Ex. A (Gaston Tr. at 442:21 – 445:13).**

Response:  Disputed. Ms. Gaston testified that she did not use the lowest published price

because there was "such a difference between the [lowest published price of $0.0799] and the

next price ($0.16370) … that [they] wanted to make sure that the FUL price that's set is a

reasonable price…"  Gaston, Sue (March 19, 2008) 444:20-445:4 (Cicala Opp. Aff. at Exh. B).

Had CMS had been presented with a more accurate FULs print out, it would have seen that

$0.0799 was a reasonable price.  Mylan, Teva and Par's true WACs for Clonazepam were all

below $0.0799. Cicala Opp. Aff at Exh. T  And Mylan, Par, Teva and Purepac's AMPs were less

than $0.0799.  *Id.*   CMS would have considered these lower alternative prices when setting the

FUL for Clonazepam and likely would have set a lower FUL.  *See* Gaston Dec. at ¶ 7 (Cicala

Opp. Aff. at Exh. C).

**19.    During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for lorazepam, on which someone had crossed out the FUL generated by the FULs System, $0.2999, and written in a different, higher FUL, $0.5718.  Nemirow Decl. Ex. A (Gaston Tr. at 445:1 – 445:10 & Ex. 6).**

Response:  Disputed.  The cited testimony does not support the statement.  Moreover,

Ms. Gaston testified that CMS chose the second lowest WAC to set the FUL for lorazepam

because, given the prices that appeared in the FULs print out, it appeared that using the lowest

published WAC (Major's $0.1990 WAC) would have resulted in an unreasonably low FUL.  *See* Gaston, Sue (March 19, 2008) 449:11-451:19 and Exhibit Gaston 006 (Cicala Opp. Aff. at Exh. B).

Had CMS been presented with a more accurate FULs printout, it would have seen that the Major Pharmaceuticals' $0.1999 WAC was not an outlier.  *See* Cicala Opp. Aff. at Exhs. J,

M-1 and M-2.  Had Wyeth (ESI Lederle), Sandoz (Geneva Pharmaceuticals), Mylan and Purepac reportedWACs at or about their AMPs, those alternative WACs all would have been lower than $0.1990.  *Id.*

**20.   Ms. Gaston testified that CMS used a price other than the lowest published price for lorazepam as the basis for the FUL to ensure that the FUL was set at a "reasonable" level.  Nemirow Decl. Ex. A (Gaston Tr. at 446:1 – 446:10, 450:6 – 453:1).**

Response:  Disputed. Ms. Gaston testified that CMS did not use the lowest published price on this occasion because the FULs system gave its warning ("FULs price not greater than another supplier") that basing the FUL on the lowest published price (Major Pharmaceuticals $0.19990)) resulted in a FUL that was not greater than the other published prices.  *See* Gaston, Sue (March 19, 2008) 448:7-451:19, Exhibit Gaston 006 (Cicala Opp. Aff. at Exh. B). Therefore, CMS concluded that basing the FUL on the lowest published price would not be a reasonable FUL.  *Id*.  Gaston testified that basing a FUL on the lowest published price in such event would create an availability issue.  *Id*.

Had CMS been presented with a more accurate 2001 Lorazepam FULs printout, containing true prices from defendants, the FULs printout before CMS would have looked like Exhibits M-1or M-2  to the Cicala Opp. Aff.  Exhibit M-1 presents what the FULs print out would have been if defendants reported the Devor WACs instead of their false WACs.  Exhibit M-2 presents what the FULs print out would have been if defendants reported prices at or about

their AMPs, instead of their false WACs.  In either case, there would have been no warning because a FUL set on the (Major Pharmaceuticals $0.19990) would not have been "not greater than another supplier".  Indeed, Purepac's true WAC of $0.28297 creates a FUL of $0.5718, which is greater than at least 5 suppliers' true WACs. Such a result would not create availability concerns.  Similarly, Exhibit M-2 that adds defendants' AMPs to the original prices in the FULs printout shows that Purepac's AMP of $0.04909 creates a FUL that is greater than at least 3 suppliers' true prices.

**21.  During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for cefadroxil, on which someone had crossed out the FUL generated by the FULs System, $1.2749, and written in a different, higher FUL, $2.9000.  Nemirow Decl. Ex. A (Gaston Tr. at 453:12 – 453:15 & Ex. 7).**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph but note that Ms. Gaston testified that CMS did not use the lowest published WAC ($0.84990) in this instance because it created a FUL that was not greater than any other published WACs in the FULs printout and therefore, resulted in an unreasonable FUL.  *See* Gaston, Sue (March 19, 2008) 455:3-456:5 and Exhibit Gaston 007 (Cicala Opp. Aff. at Exh. B).  However, when CMS attempted to use the next highest price (Zenith Labs (Ivax) WAC of $1.955), CMS found it created a FUL that was equal to Major Pharmaceuticals' AWP.  *See* Gaston, Sue 455:17-22 (Id.). Therefore, CMS declined to set a FUL because of the understanding that setting a FUL that is equal to AWP would defeat the cost savings purpose of the FUL program.  *See* Gaston, Sue (March 19, 2008) 456:1-5; 456:10-457:6, 458:21-459:8 (Id.).

Had CMS been presented with a more accurate FULs print out, containing true prices from defendants, the FULs printout before CMS would have looked like Exhibits E or F  to the Gaston Dec. (Cicala Opp. Aff. at C).  Gaston Decl. Exhibit E presents what the FULs print out would have been if defendants reported the Devor WACs instead of their false WACs.  Gaston

Dec. Exhibit F presents what the FULs print out would have been if defendants reported prices at or about their AMPs, instead of their false WACs.   All of these alternative WACs would have produced a FUL below the Major AWP and the lowest WAC ($0.84990) (Major Pharmaceuticals) would not have appeared to be an outlier.  *Id.*

**22.   Ms. Gaston testified that the FUL for cefadroxil that had been calculated by the FULs System required "some manual review" because the price on which it had been based "seemed much lower than all the other published prices."  Nemirow Decl. Ex. A (Gaston Tr. at 455:6 – 455:12).**

Response:  Plaintiffs incorporate their response to #20 above herein.

**23.   During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for metroprolol tartrate, which showed a FUL generated by the FULs System of $0.0816 and a handwritten notation that the "new FUL' was $0.0914.  Nemirow Decl. Ex. A (Gaston Tr. at 419:18 – 419:22 & Ex. 2).**

Response:   Plaintiffs do not dispute the facts set forth in this paragraph but emphasize that Ms. Gaston testified that CMS declined to use the lowest published WAC ($0.05440) which belonged to Geneva (now Sandoz) because it was "temporarily unavailable."  *See* Gaston, Sue (March 19, 2008) 426:3-427:9 (Cicala Opp. Aff at Exh. B).  Ms. Gaston explained that a FUL set on a price for a product that is unavailable creates an unrealistic FUL.  Gaston, Sue (March 19, 2008) 427:10-16 (*id*.).  Ms. Gaston testified further than CMS declined to set a FUL on the next lowest published WAC, non-defendant Caraco Pharmaceutical Laboratories' WAC of $.0569 because the price was an outlier. *See* Gaston, Sue (March 19, 2008) 428:10-429:22; *see* Gaston Exh. 002 (*Id*.).  Ms. Gaston explained further explained that Caraco might distribute to only a limited number of states and that could be an additional reason why its price was not used to set the FUL.  *Id.*  Therefore, CMS used a WAC of $.0609 to set the FUL.  *See* Gaston, Sue (March 19, 2008) 424:16-425:14; Exhibit Gaston 002 (*id*).

Had CMS been presented with a more accurate FULs printout, containing true prices from defendants, the FULs printout before CMS would have looked like Exhibits N-1 or N-2 to the Cicala Opp. Aff.  Exhibit N-1 presents what the FULs print out would have been if defendants reported the Devor WACs instead of their false WACs.  Exhibit N-2 presents what the FULs print out would have been if defendants reported prices at or about their AMPs, instead of their false WACs.  *Id.*

Had CMS been presented a more accurate FULs printout containing defendants' true prices, the Caraco WAC would not have appeared as an outlier.  Defendants Geneva, Mylan, Teva and Watson all have lower true WACs than $0.0569.  See Gaston Dec. at exhibits N-1 and N-2.

Any one of the four alternative WACs presented in Gaston Dec. Exh. N-2 would have resulted in a lower FUL.  Gaston Dec. at ¶ 12.  CMS would most likely have chosen the Mylan price of $0.02971 to set the FUL of $0.0446.  *Id.*

**24.  Ms. Gaston testified that CMS did not use a lower published price to calculate the FUL for metroprolol tartrate because it had discovered that the manufacturer that had reported that lower price was "temporarily out of stock" and that a FUL resulting from that price "might not be a realistic price."  Nemirow Decl. Ex. A (Gaston Tr. at 425:15 – 427:20).**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph but emphasize that Ms. Gaston testified that FULs cannot be set on unavailable prices given the access objectives of the FUL program.  *See* Gaston, Sue (March 19, 2008) 426:14-427:16 (Cicala Opp. Aff at Ex. B).  Creating FULs on prices for products that are not available for purchase violates one of the two policy objectives behind setting FULs:  ensuring the drugs listed in the compendia are actually available in the market before establishing the FUL.  *See* Brief of the United States on the Federal Upper Limit, *In re Pharm. Indus. Avg. Wholesale Price Litig.*, No. 01-CV-12257-

PBS, MDL No. 1456 (filed June 28, 2007) [Dkt. # 4413] p. 3; *citing* Department of Health and Human Services, Office of Inspector General, Addition of Qualified Drugs to the Medicaid Federal Upper Limit List 21 (2004) (comments of Mark McClellan, CMS Administrator, to Daniel Levinson, Acting Inspector General).

Further responding, plaintiffs incorporate their response to Statement # 23 herein.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**25.  Ms. Sexton testified that, in February of 2005, the FULs System calculated a FUL for lorazepam, one of the drugs at issue, based on a published price of $0.077, but that Ms. Sexton chose not to change the previous FUL, which had been based on a published price of $0.3812.  Nemirow Decl. Ex. B (Sexton Tr. at 126:14 – 128:11).**

<u>Response</u>:  Plaintiffs do not dispute the facts set forth in this paragraph and emphasize that that CMS did not update the FUL with the new lowest published price of $0.077 because it would have created a FUL that appeared unreasonably low in that it would have been greater than only 1 WAC.  *See* Sexton, Gail (May 20, 2008) 118:14-119:9, 126:14-128:11 and Sexton Exhibit 013 (Cicala Opp. Aff. at Exh. A).  Had CMS been presented with a more accurate FULs print out, containing true prices from defendants, the FULs printout before CMS would have looked like Exhibits O-1_or O-2 to the Cicala Opp. Aff.   Exhibit O-1 presents what the FULs print out would have been if defendants reported the Devor WACs instead of their false WACs. Exhibit O-2 presents what the FULs print out would have been if defendants reported prices at or about their AMPs, instead of their false WACs.  In either case, CMS would have seen multiple

WACs lower than the $0.077 WAC.  *Id.*  CMS would have considered these lower WACs and likely would have set a lower FUL.  Gaston Dec. at ¶ 7.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**26.   Ms. Gaston testified that when she was setting FULs, she would base FULs on B-rated drugs, rather than A-rated drugs, as long as three A-rated drugs were listed in the Orange Book.  Nemirow Decl. Ex. A (Gaston Tr. at 523:15 – 524:11, 525:8 – 525:13).**

Response:  Disputed.  Ms. Gaston testified that she "could" rather than "would" set FULs on B-rated drugs as long as there were three A-rated drugs listed in the Orange Book.  *See* Gaston, Sue (March 19, 2008) 523:15-524:11, 525:8-13 (Cicala Opp. Aff. at Exh. B).

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**27.   Ms. Sexton testified that, when she set a FUL for a particular drug, she would consider drugs that were not listed as A-rated in the Orange Book, and set the FUL according to that price.  Nemirow Decl. Ex. B (Sexton Tr. at 104:13 – 104:18) (regarding the FUL for the 90 mcg. albuterol inhaler).**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph except that Ms. Sexton testified that if the drug was A-rated in the pricing compendia, but not A-rated in the Orange Book, that drug could set the FUL.  *See* Sexton, Gail (May 20, 2008) 103:3-104:18 (Id. at Exh. A).  Plaintiffs further note that consistent with Ms. Sexton's testimony, Dr. Addanki

relied upon the the "A" rating as published by First Databank in the variable "Expanded Orange Book Code" or the Red Book variable "Orange Book Code."  *See* Addanki Aff. at Ex. 3, n.7.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**28. Ms. Gaston testified that when CMS set the FUL for cefadroxil, one of the subject drugs, the FUL was not based on the most common package size.  Nemirow Decl. Ex. A (Gaston Tr. at 446:19 – 469:14) (recognizing that while the most common package size was found to be the 100-count of cefadroxil, the FUL had been set on the 50-count package size).**

<u>Response</u>:  Disputed because the statement is not specific as to time period and because the cited reference does not support the statement.  In response to questions regarding the process for setting the FUL for cefadroxil in 2002, Ms. Gaston testified that Cindy Bergin's handwritten note on Gaston Exhibit 008 reads, "100 looks like the most commonly used package size." Gaston, Sue (March 19, 2008) 466:19-469:14; Exhibit Gaston 008 (Cicala Opp. Aff. at Exh. B).

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.  Defendants' reported prices for the 50 count package size of cefadroxil were no more accurate than their reported prices for the 100 count.  *see* Exhibits B-23 to B29 and Exhibit C for defendants Barr, Ivax and Sandoz to the Declaration of Harris L. Devor In Support of Plaintiffs' Motion for Partial

Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social

Services Law § 145-b, filed May 15, 2009 (Dkt # 6061, NY Dkt. # 61).

**29.   Ms. Sexton testified that, when she set the FUL for isosorbide mononitrate, she called the manufacturer to determine their unpublished WAC price and set the FUL according to that information.   Nemirow Decl. Ex. B (Sexton Tr. at 113:20 – 113:21, 117:12 – 118:3).**

Response:   Disputed because statement is not specific as to time period and because the

cited reference does not support the statement. Ms. Sexton did not testify that she asked for the

manufacturer's  "unpublished WAC."  Ms. Sexton testified that since the compendia did not

have a WAC published for Ethex's isosorbide product, on or about May 6, 2005, Ms. Sexton

called Ethex to obtain their WAC. *See* Sexton, Gail (May 20, 2008) 116:1-14; Exhibit Sexton

012 (Cicala Opp. Aff. at Exh. A).   Ethex's reported WAC at that time was $0.1350.  *See* Sexton

Exhibit 12 attached as part of Exhibit A to the Cicala Opp. Aff.  This WAC was false and

inflated.  Had Ethex reported a WAC that was at or about its AMP price, the Ethex WAC would

have been $0.05239, at the unit level.  *See* Exhbit C to the Declaration of Harris L. Devor in

Support of Plaintiffs' Motion for Partial Summary Judgment on Issues Relating to the Federal

Upper Limit and Under New York Social Services Law § 145-b, filed May 15, 2009 (Dkt #

6061, NY Dkt. # 61).

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the

statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen.

Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in

that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants

always submitted false WACs or AWPs, or that inflation exceeded 30%.

**30.   Dr. Addanki found that the FUL for cefadroxil between January 1, 1997 and August 31, 1998 was based on an out-of-date price.  Addanki Aff., at ¶ 11 n.5.**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**31.   Ms. Gaston testified that CMS removed the FUL for the 90 MCG albuterol inhaler upon learning of a shortage of the drug's raw material because "if the product is not available, then it wouldn't make sense to put a FUL price on it."  Nemirow Decl. Ex. A (Gaston Tr. at 470:7 – 472:21).**

Response:  Disputed because statement is not specific as to time period at issue and is misleading.  Ms. Gaston testified that the FUL for the 90 MCG albuterol inhaler was removed in or about October 2000 due to supply issues.  Gaston Tr. 470:7-472_21.  Responding further, Ms. Gaston testified that in 2001 CMS endeavored to set a FUL for this drug but did not because of cost savings concerns. *See* Gaston, Sue (March 19, 2008) 496:17-498:15 (Cicala Opp. Aff. at Exh. B) Specifically, Ms. Gaston testified that a FUL based on.  Warrick or Ivax's WACs were so high that any FUL based on them would have been higher than published AWPs.  *See* Gaston, Sue (March 19, 2008) 496:21-497:3, 497:18-498:15; 496:17-498:15 (*id.*)

Had CMS been presented with a more accurate FULs print out, containing true prices from Warrick and Ivax, the FULs printout before CMS would have looked like Exhibits P-1 or P-2 to the Cicala Opp. Aff.   Exhibit P-1 presents what the FULs print out would have been if Warrick and Ivax reported the Devor WACs instead of their false WACs.  Exhibit P-2 presents what the FULs print out would have been if defendants reported prices at or about their AMPs, instead of their false WACs.  In either case, CMS would have seen multiple WACs that could

have been used to set a FUL below the reported AWPs.  And CMS would have considered those prices and likely set a lower FUL.  Gaston Dec. at ¶ 7 (Cicala Opp. Aff. at Exh. C).

Further responding, it is indisputable that there was a FUL in place for the 90 MCG albuterol inhaler from October 1, 1997 through December 7, 2000 and from March 11, 2003 through December 31, 2005.  *See* Addanki Exhibit 3. Further responding, plaintiffs incorporate their drug by drug rebuttal from Response to Statement #7 herein.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**32.   Similarly, CMS removed FULs for the .083% albuterol solution and lorazepam during the period at issue.  *See* Addanki Aff., at Ex. 3.**

<u>Response</u>:  Disputed because the statement is misleading and not sufficiently specific as to time period.  Defendants have submitted no record evidence why CMS did not set or renew FULs for the 083% albuterol solution for the time period from 12/7/97 to 1/21/02, or for lorazepam for the time period from 2/12/98 to 8/31/1998.  Further responding, the statement is disputed as legally and factually irrelevant in the context of defendants' instant motion which concerns plaintiffs' claims for fraud in respect of FUL reimbursements only.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**33.   Ms. Gaston testified that CMS officials would not use a particular published price if that manufacturer "only distribute[d] to maybe [a] limited amount of states and not all states."  Nemirow Decl. Ex. A (Gaston Tr. at 429:9 – 429:17).**

Response:  Disputed insofar as the statement is unspecific as to time.  Further responding, plaintiffs do not dispute that Ms. Gaston testified as set forth above with respect to her tenure setting FULs at CMS.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**34.   CMS officials would decline to set a FUL when the FUL was equal to an AWP because States' "regular reimbursement methodology would be a percentage off of AWP," such that setting a FUL that was equal to AWP "would kind of counter what the states were doing with their other reimbursement methodology."  Nemirow Decl. Ex. A (Gaston Tr. at 456:10 – 456:20) (discussing the FUL for cefadroxil); *see also* Nemirow Decl. Ex. B (Sexton Tr. at 76:20 – 77:13) (stating that she could not recall ever having set a FUL based on an AWP).  Ms. Gaston testified that CMS "wouldn't have used AWP" when establishing FULs because "[s]etting a FUL using the AWP wouldn't achieve the cost savings."  Nemirow Decl. Ex. A (Gaston Tr. at 458:15 – 459:7); *see also* Nemirow Decl. Ex. B (Sexton Tr. at 58:15 – 59:8) ("[I]f the federal upper limit, once it was calculated, was higher than the AWP price or the majority of the AWP prices, then we would generally not set a FUL on those drug ingredients, because the AWP – well, a couple years ago the average AWP on a national basis was I think AWP minute 12 percent for drug reimbursement, estimated acquisition costs for drug reimbursement for a drug that did not have a federal upper limit.").**

Response:  Plaintiffs dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

. **35.   CMS did not have any written policy in place for employees to follow in setting FULs, and CMS officials individually made decisions about whether and at what rate to set a FUL on a case-by-case basis.  Nemirow Decl. Ex. A (Gaston Tr. at 250:2 – 250:6, 252:3 – 252:6, 464:7 – 465:16); Nemirow Decl. Ex. B (Sexton Tr. at 60:22 – 61:7).**

Response:  Disputed because statement is unclear as to time period and citations do not support statement.  Further responding, the FUL regulations govern how FULs were set and the deposition testimony makes clear that CMS officials consistently worked to achieve objectives of access and cost savings within FUL program.  *see* Gaston, Sue (January 24, 2008) 216:14-19 (Cicala Opp. Aff. at Exh. B); *see also* Gaston, Sue (March 19, 2008) 329:10-331:13 (*id*.).

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**36.   CMS officials were informally taught by other CMS officials how to exercise their discretion to set FULs manually so as to meet the dual objectives of cost savings and access.  Nemirow Decl. Ex. A (Gaston Tr. at 225:16 – 226:7); Nemirow Decl. Ex. B (Sexton Tr. at 73:14 – 74:22).**

Response:  Plaintiffs incorporate their response to statement 35 herein.

### *CMS's Objectives When Setting FULs*

**37.   When asked about CMS's objectives when establishing FULs, Sue Gaston testified as follows:**

> **Q.   So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct?**
>
> **A.   Correct.**

**Nemirow Decl. Ex. A (Gaston Tr. at 451:12 – 451:19).**

Response:   Plaintiffs do not dispute that Ms. Gaston gave the above testimony in response to the question posed.  Plaintiffs dispute that this statement presents a material fact. Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

38.   In summary, Ms. Gaston further testified as follows:

Q.   So as we've kind of seen throughout, CMS is trying to establish a FUL that's not too low and not too high to achieve a cost savings, but also not set it too low to create an access issue; that's the balance CMS is trying to strike?

A.   Correct.

Q.   And you did that – the balance was struck, sometimes the computer program worked as it was supposed to and that balance was struck by the computer program, but other times it was the result of manual intervention?

A.   Correct.

Q.   And the manual intervention resulted in CMS making a choice in its discretion, correct?

A.   Correct.

Nemirow Decl. Ex. A (Gaston Tr. at 498:16 – 499:9).

Response:  Plaintiffs do not dispute that Ms. Gaston gave the above testimony. Plaintiffs object to defendants' prefacatory statement. The questions and answers speak for themselves.

Plaintiffs dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it

does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

*CMS's Investigations into Market Conditions*

**39.   Ms. Gaston testified that she had access to the AMP information that manufacturers reported to CMS.   Nemirow Decl. Ex. A (Gaston Dep. at 528:1 – 528:3) ("Q. Would you have had access to that AMP information?   A. Yes.").**

Response:  Disputed to the extent the statement seeks to establish as fact that CMS could use AMPs for reimbursement purpose, ignores that AMPs were confidential and ignores that AMPs are not published prices or WACs.   Ms. Gaston also testified that CMS did not use AMPs in setting FULs.   Gaston, Sue (March 19, 2008) 528:1-6 (Cicala Opp. Aff at Exh. B).   Ms. Gaston also testified that she did not have responsibility for collecting AMPs submitted for the Medicaid rebate program, and that a separate group within the CMSO was responsible for the AMP data submitted to CMS.   *See* Gaston, Sue (March 19, 2008) 527: 10-22 (*id.*).   AMPs are confidential under the federal Medicaid Rebate Agreement.   *See* 42 U.S.C. § 1396r-8(b)(3)(D); *see also* Ms. Gaston also testified that AMPs were confidential and could not be used for reimbursement.  Gaston Dec. at ¶ 6.

Plaintiffs also dispute that this statement presents a material fact.   Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**40.   CMS officials received feedback from members of the pharmacy community and from State Medicaid agencies about "whether they felt that the FUL prices or the drugs were correctly on the FUL list or needed [to be] adjusted"; whether the product was "available"; and whether "the pricing appears to be either too low or too high."  Nemirow Decl. Ex. A (Gaston Tr. at 433:14 – 434:8, 435:8 – 435:11); *see also* Nemirow Decl. Ex. B**

**(Sexton Tr. at 110:14 – 110:21) (stating that in addition to feedback from industry groups, she received feedback "from pharmacy providers or states").**

Response:   Disputed because statement is unclear as to time period and the cited references do not support the statement.   CMS witnesses testified that during the 2000 time period, CMS solicited comments from states and pharmacy associations regarding a draft FUL list CMS created without engaging in any manual review process.   *See* Gaston, Sue (March 19, 2008) 432:14-433:6; Exhibit Gaston 0104 (Cicala Opp. Aff. at Exh. B).   The type of feedback CMS received was whether the FUL prices were listed correctly or whether the drugs on the list were available.   *Id.*   There is no testimony that CMS received feedback from pharmacies that informed CMS of actual transaction prices paid by pharmacies.   *Id.*

At other times outside of the above described 2000 time period, when CMS received feedback from pharmacies, the feedback usually concerned availability of the drug.   *See* Gaston, Sue (March 19, 2008) 434:19-435:11 (Id.).   Pharmacies may have also notified CMS that the FUL price was either "too low or too high."   *Id.* at 435:6-11.   When CMS received feedback that a drug was not available, CMS would call the manufacturer to verify if it was true.   *Id.* at 435:12-21.   Note that whatever was ultimately used was based on a WAC.   Again, pharmacies did not inform CMS of their actual transaction prices, and no matter what feeback CMS received, CMS ultimately based the FUL on a WAC.   *See* Gaston Dec. at ¶ 3 (Cicala Opp. Aff. at Exh. C).

Plaintiffs also dispute that this statement presents a material fact.   Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**41.    In response to feedback that a drug was not available, CMS officials would "call the manufacturer or wholesaler and verify if that was a fact." Nemirow Decl. Ex. A (Gaston Tr. at 435:12 – 435:21); *see also* Nemirow Decl. Ex. B (Sexton Tr. at 111:12 – 111:17) (stating that in response to feedback, Ms. Sexton "would look at the availability in the compendia" or "call suppliers").**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph.  Plaintiffs note that CMS witnesses testified that when CMS officials called manufacturers to verify a WAC or obtain a missing WAC, CMS would only request an updated WAC.  Gaston, Sue (January 24, 2008) 50:4-52:12; Sexton, Gail (March 20, 2008) 151:14-153:18 (Cicala Opp Aff. at A).   Ms. Gaston has averred that her general practice was always to set a FUL based on a WAC.  Gaston Aff. at ¶ 3(Id. at Exh. C).

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**42.    CMS officials telephoned drug manufacturers, wholesalers, or a compendia publisher when the databases did not provide the WAC for a particular NDC or to determine whether a drug was available.  Nemirow Decl. Ex. B (Sexton Tr. at 60:22 – 61:20)  ("There were times when we would call or I would call the manufacturer or the suppliers to determine if a drug was available. . . .[S]ome of these drugs were looked at, most of them, on a case-by-case basis because there were times when we would have three or more suppliers but perhaps we were missing a wholesale acquisition cost, for instance."); *id.*  ("[I]f you just looked at the prices that were on the pricing sheet and there was a wholesale acquisition cost that was missing, that could have had a lower wholesale acquisition cost than the prices that were shown. . . .")  *id.* at 116:1 – 116:14 ("So to determine whether there was  a lower WAC out there, that looks like that was the impetus for the calls.").**

Response:  Plaintiffs do not dispute the facts set forth in this paragraph except that Ms. Sexton testified that she did not call wholesalers, but that she only called the companies listed in the compendia to determine availability of the drug or the price of the drug.  Sexton,

Gail (May 20, 2008) 112:17-21 (Cicala Opp. Aff. at Exh. A ). When CMS called a manufacturer, CMS would only request an updated WAC.  Gaston, Sue (January 24, 2008) 50:4-52:12; Sexton, Gail (March 20, 2008) 151:14-153:18 (*Id.*).   *See also* Gaston Aff. at ¶ 3(Cicala Opp. Aff. at Exh. C).

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**43.   Ms. Gaston testified that she would sometimes review state MAC prices to "verifiy that the FUL price that we establish is in the ballpark" and "looks realistic for states."  Nemirow Decl. Ex. A (Gaston Tr. at 478:17 – 479:9).**

<u>Response</u>:  Disputed because statement is vague as to frequency of such review and time period.  Further responding, Ms. Gaston testified that  CMS never used MACs to set a FUL.  Gaston (March 19, 2008) 478:11-481:3 (Cicala Opp. Aff. at Exh. B).   CMS always used WACs to set FULs.  Gaston Dec. at ¶ 3.

Plaintiffs also dispute that this statement presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs,  knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

***The Deficit Reduction Act of 2005***

**44.   In 2006, Congress passed the Deficit Reduction Act ("DRA"), which amended the FUL statute, 42 U.S.C. § 1396r-8, so as to require CMS to "substitute 250 percent of the average manufacturer price (as computed without regard to customary prompt pay**

discounts extended to wholesalers) for 150 percent of the published price." Pub. L. No. 109-171, § 6001, 120 Stat. 4, 54-55 (2006).

<u>Response</u>:  Plaintiffs dispute that this statement presents a material fact.  It concerns legislative activity outside the relevant time period.  In addition, even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**45.   Congress changed the formula for calculating FULs "[i]n an effort to lower inflated Federal upper limit amounts and bring Medicaid reimbursement for generic drugs more in line with actual costs." Dep't of Health & Human Servs., Office of Inspector Gen., *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program* 10 (June 2007) (OEI-03-06-00400), *available at* http://www.oig.hhs.gov/oei/reports/oei-03-06-00400.pdf; *see also* Congressional Budget Office, *Cost Estimate: S. 1932: Deficit Reduction Act of 2005*, at 37 (Jan. 27, 2006), *available at* http://www.cbo.gov/ftpdocs/70xx/doc7028/s1932conf.pdf.**

<u>Response</u>:  Disputed in part.  Plaintiffs do not dispute that the cited language appears in the OIG report, however plaintiffs dispute that this is a material fact, given that the OIG report was prepared outside the relevant time period (1997-2005).  Further responding, the OIG report supports plaintiffs' assertions that defendants' published prices were false and not "in line with actual costs".

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, that inflation exceeded 30%.

46.   The Congressional Budget Office estimated that calculating FULs as 250% of AMP would "reduce Medicaid spending by $3.6 billion over the 2006–2010 period and $11.8 billion over the 2006–2015 period." *Id.*

Response:  Plaintiffs incorporate their response to Statement #45 herein.

47.   In December 2006, the Government Accountability Office ("GAO") sent Congress the results of a study the GAO had conducted comparing FULs calculated using the new formula established by the DRA, with retail pharmacy acquisition costs. Gov't Accountability Office, *Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs* (Dec. 22, 2006) (GAO-07-239R), *available at* http://www.gao.gov/new.items/d07239r.pdf. The GAO found that "[t]he AMP-based FULs [it] estimated using AMP data from first quarter 2006 were lower than average retail pharmacy acquisition costs from the same period for 59 of the 77 drugs in [its] sample." *Id.* at 4.

Response:  Plaintiffs dispute this presents a material fact.  The December 2006 GAO study occurred after the time period for defendants' relevant motion.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

48.   The GAO further determined that "[f]or [its] entire sample of 77 multiplesource outpatient prescription drugs . . . these estimated AMP-based FULs were, on average, 36 percent lower than average retail pharmacy acquisition costs for the first quarter of 2006." Id.

Response:  Plaintiffs incorporate their response to Statement #47 herein.

49.   In June 2007, the Office of Inspector General of the Department of Health and Human Services ("OIG") published the results of a study it had conducted of the effect of basing FULs on AMP as required by the DRA. *See generally* Dep't of Health & Human Servs., Office of Inspector Gen., *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program* 10 (June 2007) (OEI-03-06-00400), *available* at http://www.oig.hhs.gov/oei/reports/oei-03-06-00400.pdf. As part of that study, OIG concluded, "[b]ased on pricing and sales data provided by distributors," that for 19 of the 25 drugs studied (those with the highest Medicaid reimbursement in dollar terms),

"average pharmacy acquisition costs would have been higher than the new Federal upper limit amounts." Id. at 11.

Response:  Plaintiffs dispute this presents a material fact.  The June 2007 OIG study occurred after the time period for defendants' relevant motion.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

50.    On July 17, 2007, CMS published a final rule implementing the FUL formula established by the DRA. Medicaid Program; Prescription Drugs, 72 Fed. Reg. 39,142 (July 17, 2007).

Response:  Plaintiffs dispute this presents a material fact.  The July 17, 2007 final ruling implementing the above-referenced FUL formula occurred after the time period for defendants' relevant motion.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

51.    On November 7, 2007, the National Association of Chain Drug Stores ("NACDS") and the National Community Pharmacists Association ("NCPA") filed a complaint against the Department of Health and Human Services, the Secretary of the Department of Health and Human Services, CMS, and the Acting Administrator of CMS. See generally Complaint, Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs., No. 07-cv-02017-RCL (D.D.C. Nov. 7, 2007) [Docket No. 1].

Response:   Plaintiffs dispute this presents a material fact.   The November 7, 2007 NACDS and NCPA complaint occurred after the time period for defendants' relevant motion.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**52.   Citing the OIG and GAO studies as support, the complaint sought a declaration that the CMS regulation effectuating the DRA was illegal, a declaration that the public posting of AMPs was illegal, and injunctions prohibiting CMS from implementing the regulation and publicly posting AMPs.** *Id.* **at 2-3, 16-17.**

Response:   Plaintiffs dispute this presents a material fact.   The November 7, 2007 NACDS and NCPA complaint occurred after the time period for defendants' relevant motion.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**53.   On December 17, 2007, the Court granted NACDS and NCPA's motion for a preliminary injunction and enjoined CMS from implementing the regulation effectuating the FUL formula established by the DRA. Order of December 17, 2007,** *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.***, No. 07-cv-02017-RCL (D.D.C. Nov. 7, 2007) [Docket No. 36].**

Response:   Plaintiffs dispute this presents a material fact.   The December 17, 2007 court order occurred after the time period for defendants' relevant motion.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false

prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**54.   As part of the order granting the motion for preliminary injunctive relief, the Court found that implementation of the proposed regulation was "likely to cause Plaintiffs to suffer irreparable harm for which no adequate remedy at law exists as Plaintiffs' members will not be able to recover from the Defendants if the AMP Rule is implemented, and thousands of Plaintiffs' member pharmacies are expected to be forced to reduce hours and services, forced out of the Medicaid program, or forced to close."** *Id*. **at 1.**

Response:  Disputed in part.  Plaintiffs do not dispute that a court granted a preliminary injunction, however plaintiffs object to its relevance insofar as the action discussed occurred outside the time period of this litigation (1997-2005).  Plaintiffs further object insofar as the injunction was based on the fact that CMS allegedly violated the Administrative Procedure Act, which is irrelevant to the fact that defendants published false prices that caused the FUL to be inflated and caused plaintiffs to over reimburse for Medicaid prescription drugs.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**55.   As part of the order granting the motion for preliminary injunctive relief, the Court found that "[i]ssuance of a preliminary injunction will serve the public interest as . . . Medicaid beneficiaries may find access to their retail community pharmacies reduced or eliminated should the injunction not be issued." Id. at 2.**

Response:  Disputed in part.  Plaintiffs do not dispute that a court granted a preliminary injunction, however plaintiffs object to its relevance insofar as the action discussed occurred outside the time period of this litigation (1997-2005).  Plaintiffs further object insofar as the

injunction was based on the fact that CMS allegedly violated the Administrative Procedure Act, which is irrelevant to the fact that defendants published false prices that caused the FUL to be inflated and caused plaintiffs to over reimburse for Medicaid prescription drugs.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**56.   On July 15, 2008, Congress enacted the Medicare Improvements for Patients and Providers Act of 2008 ("MIPPA"), which provided that the pre-DRA FUL formula, which was 150% of the lowest published price, "shall continue to apply through September 30, 2009, for purposes of the availability of Federal financial participation for such payments," and which further stated that CMS "shall not, prior to October 1, 2009, finalize, implement, enforce, or otherwise take any action (through promulgation of regulation, issuance of regulatory guidance, use of Federal payment audit procedures, or other administrative action, policy, or practice, including a Medical Assistance Manual transmittal or letter to State Medicaid directors) to impose the specific upper limit established under section 447.514(b) of title 42, Code of Federal Regulations as published on July 17, 2007." MIPPA, Pub. L. No. 110-275, § 203, 122 Stat. 2494 (2008); *see also* Congressional Research Serv., *P.L. 110-275: The Medicare Improvements for Patients and Providers Act of 2008*, at 29 (July 23, 2008) ("In the interim, FUL formulas remain calculated by CMS as equal to 150% of the published price for the least costly therapeutic equivalent.").**

Response:  Disputed in part.  Plaintiffs do not dispute that Congress enacted MIPPA, however plaintiffs object to its relevance insofar as the Act occured outside the time period of this litigation (1997-2005).  Plaintiffs further object insofar as the circumstances surrounding the Act injunction was based on the fact that the Act was implemented merely in order for CMS to study the effect of using AMP as a basis for calculating the FUL, which is irrelevant to the fact that defendants published false prices that caused the FUL to be inflated and caused plaintiffs to over reimburse for Medicaid prescription drugs.

In addition, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.

**New York State and the FUL**

**57.    Cesar A. Perales "served as the Commissioner of the New York Department of Social Services from January 1983 until November 1991," during which period "the New York Department of Social Services was responsible for, among other things, administering New York's Medicaid program."  Affidavit of Cesar A. Perales, at ¶ 1 (hereinafter "Perales Aff.").**

Response:  Plaintiffs do not dispute that Mr. Perales' affidavit avers to the above facts, butplaintiffs dispute that this statement presents a material fact.  Not only does Mr. Perales' tenure at the New York State Department of Social Services ("NYS-DSS") precede the operative time period in this case (1997-2005), but the NYS-DSS has not had any responsibility for Medicaid since 1996 when Medicaid was transferred to the New York State Department of Health ("NYS-DOH").   Mr. Perales' testimony concerning his tenure as Commissioner of NYS-DSS in the 1980s is immaterial to the New York State Department of Health.  Plaintiffs note that the FUL Thirteen have presented no record evidence whatsoever concerning New York Medicaid during the operative time period or even during the time when the program was (and is) under the bailiwick of the New York State Department of Health.

Further responding, nothing in Mr. Perales' affidavit or the exhibits thereto alters defendants' liability under N.Y. Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or

AWPs, or that inflation exceeded 30%.  Nothing in Mr. Perales affidavit reveals knowledge of true WACs or AWPs, knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.  *See* Mylan at *21.

**58.   In 1986, Mr. Perales, on behalf of NYDSS, commented on the three alternative methods that HCFA was considering for setting upper limits for multisource and generic drug reimbursement.  *Id*. at ¶ 2.**

Response:  Plaintiffs do not deny that on or about October 3, 1986, Mr. Perales signed the letter attached as Exhibit A ("Perales 1986 Letter") to his affidavit in which Mr. Perales commented on the three methods for setting upper limits set forth in 51 FR 29560.  *See* Perales Affidavit [Dkt #6057], Exhibit A.

Plaintiffs deny this presents a material fact given (a) it concerns 1986, which is outside the operative time period (1997 to 2005) for the claims that are the subject of the FUL Thirteen's motion; (b) it concerns NYS-DSS which has not run New York Medicaid since 1996, prior to the operative time period; (c) it does not present facts that would alter, in any way, defendants' liability under 145-b, GBL 349 or plaintiffs' common law causes in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%, *see* Mylan at *21 (government knowledge by a key employee alone will not as a matter of law support a government knowledge defense without knowledge of spreads and approval thereof); (d) it is ambiguous in that there is no record evidence of what Mr. Perales meant by "advertised price" or "price quoted in the Red or Blue Books"; (e) the use of the words "may not" indicates that any issue of inaccuracy of the Red Book or Blue Book prices is ambiguous and uncertain, therefore, not a fact.

Plaintiffs object to the Statement on the grounds that the FUL Thirteen fail to proffer admissible evidence in support of this Statement.  *See* Fed.R.Civ.P. 56(e)(1) (requiring moving

party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006). Moreover, plaintiffs object to the Statement insofar it lacks foundation. *See* Fed.R.Evid. 602. Mr. Perales admits in his Affidavit that the 1986 Letter was prepared at his direction; therefore, no foundation has been set that he had personal knowledge of the contents or meaning of the Perales 1986 Letter beyond the mere fact that he instructed that the letter be prepared, he signed it and it was sent.

Plaintiffs dispute the Statement and object to the evidentiary basis of the alleged facts insofar as the FUL Thirteen rely on out-of-court statements to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c), 802; *Noviello v. City of Boston,* 398 F. 3d 76, 85 (1st Cir. 2005); *La Rou v. Ridlon,* 98 F.3d 659, 663 (1st Cir. 1996) (finding portions of a party's affidavit recounting inadmissible hearsay to be incompetent on summary judgment). Nothing in Mr. Perales Affidavit or the Perales 1986 Letter establishes that Mr. Perales had personal knowledge of the composition and authenticity of the prices in Red Book or Blue Book to which the letter refers or the extent of any inflation. On its face the letter is ambiguous, to wit: the letter reads, "the advertised price found in the Red Book or the Blue Book <u>may not</u> reflect the actual purchase price (APC)" and "the pharmacists' acquisition cost is <u>likely</u> to be lower than the price quoted in the Red or Blue Books." (Emphasis added). *See* Perales 1986 Letter at 1.

**59.   In his letter, Mr. Perales stated that New York "is not in favor of the Pharmacists' Incentive Program" ("PhIP") – the proposal to base FULs on published prices, which HCFA ultimately adopted. *Id*. Ex. A, at 1.**

<u>Response</u>: Denied as written. The statement is misleading and inaccurate. Mr. Perales states that on October 3, 1986, New York was not in favor of the Pharmacists Incentive Program ("PhIP") that was described in 51 Fed Register 29560. The 1986 Perales Letter clearly articulates that New York State Department of Social Services was not in favor of the PhIP

program given the concern that "pharmacists must be allowed to make unlimited substitution of drugs"; and, use of the published prices for the 100 Count package size as a basis for an upper limit would not result in cost savings given that most pharmacies could purchase drugs in larger quantities (and for less). *See* Perales 1986 Letter at 1.

Plaintiffs deny this presents a material fact given (a) it concerns 1986, which is outside the operative time period (1997 to 2005) for the claims that are the subject of the FUL Thirteen's motion; (b) it concerns NYS-DSS which has not run New York Medicaid since 1996, prior to the operative time period; (c) it does not present facts that would alter, in any way, defendants' liability under 145-b, GBL 349 or plaintiffs' common law causes in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%, *see* Mylan at *21 (government knowledge by a key employee alone will not as a matter of law support a government knowledge defense without knowledge of spreads and approval thereof); (d) it is ambiguous in that there is no record evidence of what Mr. Perales meant by "advertised price" or "price quoted in the Red or Blue Books"; (e) the use of the words "may not" indicates that any issue of inaccuracy of the Red Book or Blue Book prices is ambiguous and uncertain, therefore, not a fact.

Subject to the above response, plaintiffs do not dispute that in 1987, the federal regulation defining the procedure for establishing the Federal Upper Limit for multiple source drugs was changed to:

> an amount established by HCFA that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size.

42 C.F.R. § 447.332(b), 52 FR 28658 (July 31, 1987).

**60.   In his letter to HCFA, Mr. Perales stated that  "the advertised price found in the Red Book or the Blue Book may not reflect the actual purchase price (APC)" and "the pharmacists' acquisition cost is likely to be lower than the price quoted in the Red or Blue Books."  *Id*.**

Response:  Plaintiffs admit that Mr. Perales letter to HCFA includes the quoted language.

Plaintiffs deny this presents a material fact given (a) it concerns 1986, which is outside the operative time period (1997 to 2005) for the claims that are the subject of the FUL Thirteen's motion; (b) it concerns NYS-DSS which has not run New York Medicaid since 1996, prior to the operative time period; (c) it does not present facts that would alter, in any way, defendants' liability under 145-b, GBL 349 or plaintiffs' common law causes in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%, *see* Mylan at *21 (government knowledge by a key employee alone will not as a matter of law support a government knowledge defense without knowledge of spreads and approval thereof); (d) it is ambiguous in that there is no record evidence of what Mr. Perales meant by "advertised price" or "price quoted in the Red or Blue Books"; (e) the use of the words "may not" indicates that any issue of inaccuracy of the Red Book or Blue Book prices is ambiguous and uncertain, therefore, not a fact.

Plaintiffs further respond that the Perales 1986 Letter, on its face, reveals that its primary concern was that setting an upper limit on the price "quoted" for the 100 count package size may not lead to cost savings since most pharmacies purchased in larger (cheaper) quantities.  *See* Perales 1986 Letter at 1 ("Generic or multiple source drug prices are competitively low for larger quantities enabling all pharmacies large and small to purchase at lower cost.  There are very few pharmacies which could not purchase drugs in quantities larger than 100 tablets/capsules or pints.").  The paragraph in the letter indicates that the statement concerning published prices is

related to the issue of using the 100 count price as opposed to larger quantities, not the published price itself.

Responding further, plaintiffs object to the Statement on the grounds that the FUL Thirteen have not proffered admissible evidence in support of it.  *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).  The Statement insofar it lacks adequate foundation.  *See* Fed.R.Evid. 602.  Mr. Perales admits in his Affidavit that the 1986 Letter was prepared at his direction; therefore, no foundation has been set that he had personal knowledge of the contents or meaning of the Perales 1986 Letter beyond the mere fact that he instructed that the letter be prepared, he signed it and it was sent.  Moreover, no foundation has been established identifying exactly what "advertised" or "quoted" prices in Blue Book or Red Book to which Mr. Perales is referring.

Plaintiffs dispute the Statement and object to the evidentiary basis of the alleged facts insofar as the FUL Defendants rely on out-of-court statements to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c), 802; *Noviello v. City of Boston,* 398 F. 3d 76, 85 (1st Cir. 2005); *La Rou v. Ridlon,* 98 F.3d 659, 663 (1st Cir. 1996) (finding portions of a party's affidavit recounting inadmissible hearsay to be incompetent on summary judgment).

Plaintiffs counter-designate 51 Fed Reg 29,560 which establishes that in 1987, CMS believed spreads for generics were in the same 20-25% range as brands.

**61.   In his letter, Mr. Perales stated that under the PhIP program, "the Medicaid program may not realize savings in an appreciable amount since the markup of the acquisition costs will be significant."  *Id.***

<u>Response</u>:  Plaintiffs admit that Mr. Perales letter to HCFA includes the quoted language.
Plaintiffs deny this presents a material fact given (a) it concerns 1986, which is outside the

operative time period (1997 to 2005) for the claims that are the subject of the FUL Thirteen's motion; (b) it concerns NYDSS which has not run New York Medicaid since 1996, prior to the operative time period; (c) it does not present facts that would alter, in any way, defendants' liability under 145-b, GBL 349 or plaintiffs' common law causes in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%, *see* Mylan at *21 (government knowledge by a key employee alone will not as a matter of law support a government knowledge defense without knowledge of spreads and approval thereof); (d) it is vague and ambiguous and entirely unclear what Mr. Perales meant by "acquisition costs".

Further responding, Mr. Perales statement that calculation of the upper limit based on the mark-up of 150% of "acquisition costs" reasonably suggests that Mr. Perales thought the prices in the Red Book and Blue Book were representative of pharmacy acquisition costs.

**62.   Mr. Perales' letter "reflects, among other things, New York Department of Social Services' understanding as of 1986 that a pharmacy's acquisition cost for a drug is likely to be lower than the prices quote[d] in third-party pricing compendia such as the Red Book or First DataBank."  *Id*. at  ¶3.**

Response:  Plaintiffs dispute and object to this Statement as inaccurate, incomplete and misleading insofar as it seeks to establish as fact New York Medicaid's understanding of prices "quoted" in 1986.

Further responding, plaintiffs deny this presents a material fact given (a) it concerns 1986, which is outside the operative time period (1997 to 2005) for the claims that are the subject of the FUL Thirteen's motion; (b) it concerns NYDSS which has not run New York Medicaid since 1996, prior to the operative time period; (c) it does not present facts that would alter, in any way, defendants' liability under 145-b, GBL 349 or plaintiffs' common law causes in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always

submitted false WACs or AWPs, or that inflation exceeded 30%. *See* Mylan at *21 (government knowledge by a key employee alone will not as a matter of law support a government knowledge defense without knowledge of spreads and approval thereof); (d) it is vague and ambiguous and entirely unclear what Mr. Perales meant by "acquisition costs".

Plaintiffs further note that Mr. Perales' Affidavit in and of itself creates a question of reliability and lack of personal knowledge as Mr. Perales admits he did not draft the twenty-three (23)_year old letter but instead had it "prepared at [his] direction." *See* Perales Affidvait at 3.

The letter speaks for itself and clearly shows that, in the wholly irrelevant time frame of 1986, it states that: i) was not in favor of the PhIP because pharmacists must be allowed unlimited substitution of drugs; (ii) did not think that the published prices for the 100 count sizes reflected savings from buying larger sizes that were available; and, (iii) deemed the prices of Red Book and Blue Book to be reflective pharmacies' actual acquisition costs, but was uncertain if these prices might be lower.  Moreover, Plaintiffs further respond that the 1986 Perales Letter states that New York Medicaid "strongly supports the proposed survey of drug wholesalers for assurances that the drugs proposed for MAC limits are widely and consistently available at the MAC prices."  *See* Mr. Perales Affidavit Exhibit A at p. 2.

Subject to the above response, plaintiffs do not dispute that Mr. Perales' affidavit contains the quoted portion of the Statement.

**63.   In 1994, the New York State Legislature amended the New York Social Services Law so as to require that "if [a] drug dispensed is a multiple source prescription drug for which an upper limit has been set by the federal health care financing administration," New York would reimburse providers for that drug at "an amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug."  N.Y. Soc. Serv. Law § 367-a(9)(b)(i) (McKinney 1994).**

<u>Response</u>:  Plaintiffs do not deny that in 1994 the New York State Legislature amended the New York Social Services Law §367-a(9)(b)  as follows:

"(b) for drugs dispensed by pharmacies:

(i) if the drug dispensed is a multiple source prescription drug for which an upper limit has been set by the federal health care financing administration, an amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug, and

(ii) if the drug dispensed is a multiple source prescription drug or a brand-name prescription drug for which no specific upper limit has been set by such federal agency, the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public. Estimated acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less ten percent thereof, and updated monthly by the department.

(c) Notwithstanding subparagraph (i) of paragraph (b) of this subdivision, if a qualified prescriber certifies "brand medically necessary" or "brand necessary" in his or her own handwriting directly on the face of a prescription for a multiple source drug for which a specific upper limit of reimbursement has been established by the federal agency, in addition to writing "d a w" in the box provided for such purpose on the prescription form, payment under this title for such drug must be made under the provisions of subparagraph (ii) of such paragraph."

N.Y. Soc. Serv. Law § 367-a(9)(b) (West 1994)

**Harris Devor's Testimony and Report**

**64.   When Mr. Devor was asked whether he agreed "that CMS doesn't always set the FUL on the basis of the lowest published price," he responded, "As I believe I said before, that I thought there were instances where they did not, I think I was aware of that." Excerpts of the Transcript of Deposition of Harris L. Devor at 62:8 – 62:15, attached to Nemirow Decl. as Ex. D.**

Response:  Dispute in Part.  Plaintiffs do not dispute that Mr. Devor gave the cited testimony but dispute that this statement presents a material fact.  Plaintiffs counter designate Mr. Devor's testimony at 352:12-353:6, which sets forth the scope of his opinion as calculating an estimated measure of true AWPs and WACs from defendants' transactional data, then multiplying the estimated AWPs and WACs as well as AMPs by 150% to show what the FUL price would have been if those prices had been selected to select the FUL.  *See* relevant excerpts of the Deposition of Harris L. Devor, dated December 9-11, 2009 (Exh. Q to Cicala Opp. Aff.).

Neither Mr. Devor nor defendants' expert Sumanth Addanki are needed to provide factual testimony regarding what CMS did or did not do in the context of setting FULs.  Such facts are properly introduced through the testimony of the CMS witnesses.

**65.   During his deposition in this matter, when Mr. Devor was asked whether he had "computed what [he] believed the new FUL would have been if the Devor-estimated WACs and Devor-estimated AWPs were used to compute the FUL," he responded:**

> **A.     Again, I'm just struggling a little bit with the "would have been." What I did was compute it assuming that those prices, the estimated WACs and AWPs that I computed, were used to compute the FUL at 150 percent of those prices.**
>
> **Q.     What's the struggle with "would have been"?**
>
> **A.     I may be incorrect, but I thought there was something in the way you asked the question that insinuated that the FUL would have been that, period.  And I don't want to go to where-what CMS would have done with it.  They may have chosen not to use it.**
>
> **Q.     Because you just simply don't know what they would have done with it, right?**
>
> **MS. CICALA:  Object to form.**
>
> **A.     I didn't study what CMS would have done with it or not.  I mean, I understand what-the way FULs are calculated, what CMS would have done in a hypothetical sense, given the fact that Barr in this case would have reported the Devor WACs or the Devor AWPs, I would only be speculating what CMS would do with it.**

*Id*. at 468:7 – 469:14; *see also id*. at 457:16 – 457:18, 460:13 – 460:14, 469:15 – 469:17.

Response:  Plaintiffs incorporate their response to Statement # 64 herein.

**66.   When Mr. Devor was asked about whether it was his "opinion that had the manufacturers reported the lower AWPs and WACs that [he had] calculated, that CMS would have used those lower AWPs and WACs to set FULs," as well as similar questions addressing the same issue, the following exchanges took place:**

> **A.     That's not my opinion.  I have no opinions on it. . . .That's beyond the scope of what I was asked to do and not really relevant to what I was asked to do. . . .**

Q.     Is it your understanding that CMS always used the lowest published AWP or WAC?

A.     A know that's what the regulation itself says but I am not a hundred percent sure that they did that in all circumstances.

*Id.* at 57:1 – 58:18.

Q.     Does your analysis consider how Barr's products, 58202 and 58210, could have impacted the FUL set by CMS after Barr discontinued those products?

MS. CICALA:  Objection, beyond the scope.

A.     My analysis was to determine based on the data given an average WAC and an-an estimated average WAC and an estimated average AWP for a 12-month period prior to that date which then could have been reported.  It does not at all assume that that-that that would have impacted the ultimate FUL used or not, that's beyond the scope of what I was asked.

*Id.* at 516:8 – 516:21.

Q.     Well, for this product, Par's WAC could not possibly have influenced the federal upper limit no matter what those WACs were, isn't that right?

A.     Well, but, again, I have testified before, it is not within my knowledge range as to whether or not you know how CMS computed and how they should have computed a FUL.  To the extent-so, I mean, that's my answer.  It's beyond the scope of what I was asked to do.  It does not impact-none of what you have asked me impacts my computation which is really the cope of my assignment.

*Id.* at 741:6 – 741:18.

Q.     . . .[B]ecause your calculation was greater than the actual FUL, would you agree with me that for the periods in which you calculated a negative difference between the actual FUL and your estimated FUL, that Ivax's estimated AWP could not have impacted the FUL?

A.     And as I have said before, that was beyond the scope of what I was asked to do.  And I am not opining on how CMS actually computed its FUL or used the array of information.

*Id.* at 880:14 - 881:2.

Response:  Plaintiffs incorporate their response to Statement # 64 herein.

**67.   Dr. Sumanth Addanki has found that Mr. Devor "has analyzed only about 13 percent of the NDCs in the relevant GCNs with published prices during the period at issue."  *See* Addanki Aff., at ¶ 16.**

Response:   Disputed.   The quoted language does not appear in the Affidavit of Dr. Sumanth Addanki, dated May 14, 2009, at paragraph 16 or any where else in the affidavit.

Plaintiffs further deny and object to this statement as misleading and not presenting a material fact: (i) the number of NDCs during the relevant time period (1997-2005) is irrelevant as CMS was not required to set or change the FUL at any point; (ii) the NDCs at issue are those of the FUL Thirteen; and, (iii) the scope of Mr. Devor's assignment was limited to calculating true WACs and AWPs from the data produced by the FUL Defendants[2] and then calculating what the FUL would have been if based on the true prices and AMPs.

Further responding, it is undisputable that Dr. Addanki did not conduct any analysis whatsoever of Mr. Devor's specific treatment of defendants' data and has not presented a single substantive criticism of any of Mr. Devor's calculations.  Nor has Dr. Addanki make any effort to provide the Court with any alternative calculations to establish the veracity of defendants' WACs, as he has done previously and in the context of defending brand WACs.  *See* Schering's motion for a protective order, filed May 13, 2008 [Dkt. No. 5296] and affidavit of Sumanth Addanki, dated February 21, 2008, in support [Dkt. No. 5299]; declaration of Sumanth Addanki from MDL Track One Trial, filed December 1, 2006 [Dkt. No. 3430]; *In re Pharm. Indus.*

---

[2] Plaintiffs requested from each FUL Thirteen Defendant transactional data for the relevant time period (1997-2005) for the nine (9) GCN drugs.  Each defendant represented to plaintiffs that its production satisfied plaintiffs' request.

*Average Wholesale Price Litig.*, 491 F. Supp. 2d 20 (D. Mass. 2007);[3] *see also* Excerpts of the

Transcript of Deposition of Dr. Sumanth Addanki ("Addanki Depo.") at 160:20:12-162:15,

attached to Cicala Opp. Aff. as Ex. R.  Plaintiffs counter-designate the following testimony from

Dr. Addanki's deposition:

> Q.     . . . [Mr. Devor] made those calculations using defendants' own sales and transactional data; correct?
>
> A.     That's what he says.
>
> Q.     Do you doubt that that's so?
>
> A.     I haven't checked.  I haven't verified whether he has in fact done exactly what the calculations already said he did.
>
> Q.     Instead you reviewed his conclusions, correct, and you've evaluated them against industry standards, isn't that right?
>
> MR. BUEKER:  Objection to Form.
>
> A.     I've reviewed his results - -
>
> Q.     His results, right.
>
> A.     Yes.
>
> Q.     And you criticized them as they – you criticize them based on industry standards, or how they don't reflect industry standards; isn't that correct?
>
> A.     I have a whole section in my report that contains my opinions on his calculations.  I don't think I'd like to agree with the characterization that you just made.  That is simple one of them.

---

[3]In each of these submissions, defendants' expert performed a WAC List Price Test analysis or AWP/AMP spread test to demonstrate either (a) that more than 50% of defendants' sales were within 5% of WAC and/or (b) that the spreads between AMP and reported AWP were less than the 30% speed limit utilized by this Court in the MDL Track One Trial (*see* note 6, *infra*).  Defendants' expert conducts neither test in connection with the instant motion because defendants are entirely aware that the results would demonstrate – for every single NDC in every single quarter  the rampant falsity of every single WAC and AWP they reported.  See plaintiffs' individual 56.1 statements (Dkt. Nos. 6060-6074; 62-75) .

Q.   Well, you certainly don't offer alternative calculations to Mr. Devor's correct?

A.   That's correct.

*Id*. at 150:12-151:15.

Q   If you - - if you were to accept Mr. Devor's definition of WAC as a net price, as opposed to a list price, would you Dr. Addanki, be able to use defendants' own data to calculate that net price?

MR. BUEKER:  Objection to Form.

A.   Putting aside Mr. Devor's characterization of anything, if one wanted to calculate a net price, one could do it from transactions data, yes. Assuming that one had all the data needed.

*Id.* at 152:8-18.

Q.   Have you determined what any of the 13 defendants' WACs would be if they were calculated to net prices?

MR. PALERMO:  Objection to Form.

A.   As far as I can tell, you are asking me if I have calculated the defendants' net prices, and I have not.

*Id.* at 153:4-10.

Plaintiffs further counter-designate the following testimony from Mr. Devor's deposition:

Q.   Would you agree that the computations you did in this case are complicated?

MS. CICALA:      Objection to Form.

A.   On the contrary, I would say to ascertain -- to ascertain a net sales price from the manufacturer to the wholesaler or a sales – or a price that the provider pays to purchase the goods is one of the simplest things that a manufacturer could possibly compute.  Contains three or four numbers and that's it.  I don't know how anyone could indicate that -- could reach the conclusion that that's a complex computation. I just don't know how anybody could do that.  To me it's simple.

Q.   Let's take out - -

> A.     Now, it may have been more difficult for me because I am looking at that and it's not my data, it's manufacturers' data.  And in the course of receiving that data and that being provided to us, there is data that doesn't necessarily have full explanations or I'm just given limited amounts of data, but -- so that may be more complicated perhaps for me to do, but nonetheless I was able to do it.
>
> Think about, based on that, how easy it would be for a manufacturer to do, given their knowledge of their own system.

**Devor Depo. at 255:14-256:18.**

**68.   Dr. Sumanth Addanki has found that "[f]or about 46 percent of the NDC-quarter combinations for which *Mr. Devor's own exhibits* report a published WAC and FUL, the *published WAC* was already low enough to have produced a lower FUL, had CMS used it."  *Id.* at ¶ 17 & Ex. 6 (emphasis in original).**

Response:     Plaintiffs dispute that the sentence presents a material fact.  Even if true, the statement does not alter defendants' liability under New York Soc. Serv. L. §145-b, N.Y. Gen. Bus. Law §349 or plaintiffs' common law causes for submitting false prices to the government in that it does not reveal actual knowledge of true WACs or AWPs, or knowledge that defendants always submitted false WACs or AWPs, or that inflation exceeded 30%.  Further responding, plaintiffs' counter-designate the Gaston Dec., dated June 15, 2009 and attached as Exhibit C to the Cicala Opp. Aff. which avers that had defendants reported true prices, such true prices would have been considered when setting the FUL and likely would have led to a lower FUL.

Dated: June 15, 2009

> Respectfully submitted,
> **KIRBY McINERNEY, LLP**
> 825 Third Avenue
> New York, New York 10022
> (212) 371-6600
>
> /s/ Joanne M. Cicala
> By:   Joanne M. Cicala
>       James P. Carroll Jr.
>       Jocelyn R. Normand

63

Kathryn Allen

*Counsel for the City of New York and New York Counties in MDL 1456 except Nassau and Orange*

Ross B. Brooks, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
**LEVY PHILLIPS &
KONIGSBERG, LLP**
800 Third Ave.
New York, NY 10022

(212) 605-6205
*Counsel for the County of Orange*

## <u>CERTIFICATE OF SERVICE</u>

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS SUPPORTING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' "FUL FRAUD" CLAIMS, to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

Dated:  June 15, 2009

_____/s/_____
James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue,16th Floor
New York, NY 10022
(212) 371-6600