# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL INDUSTRY : MDL No. 1456

AVERAGE WHOLESALE PRICE        :

LITIGATION                     : Master File No.

                               : 01-12257 PBS

CITY OF NEW YORK, et al.       :

        v.                     : JUDGE PATTI B. SARIS

ABBOTT LABORATORIES, et al.    :


                Videotaped 30 (b)(6) deposition of

WYETH (DOMINICK BARTONE), taken pursuant to notice

before Adam D. Miller, Registered Professional

Reporter and Certified Shorthand Reporter, in the

law offices of Reed Smith LLP, 2500 One Liberty

Place, 1650 Market Street, Philadelphia,

Pennsylvania, on Thursday, May 22, 2008, beginning

at approximately 9:06 a.m., there being present:

30 (b)(6) Wyeth (Dominick Bartone)                    May 22, 2008
Philadelphia, PA

10  (Pages 34 to 37)

---

34

1    Q.  Have you ever heard the phrase "labeler
2  code"?
3    A.  Yes.
4    Q.  And what does that phrase mean?
5    A.  Company with the product registration.
6    Q.  My understanding is that the first five
7  digits of an NDC consist of the labeler code; is
8  that correct?
9    A.  Depends on the format.
10    Q.  Okay.  In what way does it depend on the
11  format?
12    A.  There are some products that have a
13  four-digit labeler and a five product sequence on a
14  four.
15    Q.  Do you -- are you familiar generally with
16  the Ativan and lorazepam products at Wyeth?
17    A.  Yes.
18    Q.  And is it correct that Wyeth no longer
19  manufactures lorazepam?
20    A.  We no longer distribute -- we no longer
21  distribute in the U.S.  I, I can't say for sure
22  whether we manufacture the product somewhere in the

---

35

1  world.
2    Q.  Okay.  Thank you.  Does -- do you know
3  whether Wyeth distributes or manufactures Ativan at
4  this time?
5    A.  No to distribution.
6    Q.  Do you know when Wyeth ceased to
7  distribute Ativan?
8    A.  Approximately the fall of 2003.
9    Q.  Do you know when Wyeth ceased
10  distributing lorazepam?
11    A.  Sometime in 2003.
12    Q.  Do you recognize the labeler codes that
13  appear among the NDCs in Exhibit 3 as being Wyeth
14  labeler codes?
15    A.  Wyeth or its subsidiary divisions.
16    Q.  And is it fair to say that Wyeth or its
17  subsidiary divisions manufactured the NDCs that we
18  see in Bartone Exhibit 3?
19    A.  Yes.
20    Q.  Is that fair to say that Wyeth sold the
21  NDCs that we see in Exhibit 3?
22    A.  Yes.

---

36

1    Q.  You referred early to -- earlier to Wyeth
2  ceasing distribution of lorazepam.  Do you recall
3  that?
4    A.  Yes.
5    Q.  What do you mean by the word
6  "distribution" in that context?
7    A.  Booking the direct sale for it.
8    Q.  So when I asked you if, if Wyeth sold the
9  NDCs in Exhibit 3 and you said yes, does that mean
10  the same to you as distributing the NDC?
11    A.  Yes.
12    Q.  Thank you.  Ativan is a brand drug;
13  correct?
14    A.  Yes.
15    Q.  What's your understanding of what a brand
16  drug is, generally?
17    A.  The innovator product; generally, first
18  in the class.
19    Q.  And is it fair to say that lorazepam is a
20  generic version of Ativan?
21    A.  Yes.
22    Q.  Do you know if Wyeth was first to market

---

37

1  with lorazepam?
2    A.  I do not.
3    Q.  In, in the course of your work at Wyeth,
4  in your capacity as an associate director or
5  director of customer trade operations, were Ativan
6  and lorazepam among the Wyeth products that you
7  ever discussed with any of your customers?
8    A.  Ativan, yes; lorazepam, no.
9       (Discussion held off the record.)
10  BY MS. CICALA:
11    Q.  Do you know whether any of the customers
12  for whom you had responsibility purchased lorazepam
13  from Wyeth?
14    A.  I have knowledge of some.
15    Q.  Can you describe what knowledge you have.
16    A.  Awareness that they were purchasing our
17  generic line, which, which may or may not have
18  included lorazepam.
19    Q.  And, and yet I believe you just testified
20  that you, you recall that you did not discuss
21  lorazepam with your customers at any time; is that
22  correct?

---

30 (b)(6) Wyeth (Dominick Bartone)
Philadelphia, PA

May 22, 2008

12  (Pages 42 to 45)

---

**42**

1 specific activities that you were engaged in with
2 regard to the direct, to the direct customers'
3 purchase of the Wyeth products?
4     **A.  More collaboration with my counterpart in**
5 **the generics division on communications between the**
6 **brand products, where I had responsibility, and the**
7 **generic products, where I did not.**
8     Q.  So, then, is it fair to say that there is
9 a, there's someone who, who holds your title in the
10 generics division or there was someone who held a
11 title comparable to yours in the generics division?
12     **A.  Responsible -- comparable**
13 **responsibilities.  I'm uncertain of the exact**
14 **title.**
15     Q.  And do you know who that person was
16 between 1997 and '05?
17     **A.  Could you restate the time period,**
18 **please.**
19     Q.  1997 through 2005.
20     **A.  Yes; for part of it I know.**
21     Q.  Okay.  Could you give me that name.
22     **A.  Okay.  Kevin Fortier.**

---

**43**

1     Q.  And would Mr. Fortier have been your
2 counterpart throughout that time period?  I
3 recognize, of course, there was a break when you
4 went off to work on Enbrel; but apart from that
5 break.
6     **A.  He may not have been there the complete**
7 **time.  But a portion, both on my part and his part**
8 **--**
9     Q.  Uh-huh.
10     **A.  -- yes.**
11     Q.  And Wyeth no longer distributes generic
12 products; is that correct?
13     **A.  Yes.**
14     Q.  Does Mr. Fortier still work for Wyeth?
15     **A.  No.**
16     Q.  Do you know where he works now?
17     **A.  No.**
18     Q.  Do you know when he left Wyeth?
19     **A.  Approximately end of 2006.**
20     Q.  Do you know what title Mr. -- what title Mr.
21 Fortier held upon his departure?
22     **A.  No.**

---

**44**

1     Q.  Do you know generally what his
2 responsibilities were when he left Wyeth?
3     **A.  Yes.**
4     Q.  Can you describe those.
5     **A.  He was a member of our public policy**
6 **group, primarily in administering the relationship**
7 **between trade associations and, and, Wyeth.**
8     Q.  Which -- which, which types of customer
9 segments of direct customer -- withdrawn.
10     Which direct customers did you have the
11 most interaction with between 1997 and 2005?
12     **A.  Specific customers?**
13     Q.  Yes.
14     **A.  AmerisourceBergen, Cardinal, McKesson,**
15 **CVS, Walgreens, Rite Aid.**
16     Q.  So AmerisourceBergen, Cardinal, McKesson
17 are the three largest wholesalers in the country;
18 correct?
19     **A.  Yes.**
20     Q.  Did you work with any other wholesalers?
21     **A.  Yes.**
22     Q.  Did you work with some regional

---

**45**

1 wholesalers?
2     **A.  Yes.**
3     Q.  And wholesalers are direct customers of
4 Wyeth; correct?
5     **A.  Yes.**
6     Q.  Did the, did the wholesalers with whom
7 you worked have contracts with Wyeth to purchase
8 Wyeth drugs?
9     **A.  Specific to Ativan and lorazepam?**
10     Q.  Yeah; contracts that would have included
11 those products.
12     **A.  They may have.**
13     Q.  Can you specifically recall whether they
14 did?
15     **A.  No.**
16     Q.  Is it possible that the wholesaler --
17 withdrawn.
18     Did, did Wyeth have contracts --
19 generally, apart from Ativan and lorazepam -- in
20 place with the three large wholesalers between '97
21 and '05?
22     **A.  Within our generics division, we may**

---

30 (b)(6) Wyeth (Dominick Bartone)                    May 22, 2008
Philadelphia, PA

17  (Pages 62 to 65)

---

**62**

1  submitted a purchase order and product was
2  delivered to Wyeth, what role would you, would you
3  play in your capacity as assistant director?
4      A.  Of distribution?
5      Q.  No, I'm sorry; of customer and trade
6  operations.
7      A.  Any questions regarding the application
8  of those selling policies that I mentioned earlier;
9  any, any general issue about the ordering,
10  delivery, receipt of the product.
11      Q.  If the customer had any questions
12  regarding the price it was being charged for the
13  product, would you be involved in that sort of
14  discussion as well?
15      A.  If there was an initial inquiry, yes.
16      Q.  And would that be true whether it was a
17  brand or a generic product at issue?
18      A.  No.
19      Q.  So you would only get involved if there
20  was -- if it was one of the brand products; is that
21  right?
22      A.  Yes.

---

**63**

1      Q.  And if there was a generic, a question
2  regarding a generic product, it would go to your
3  counterpart in the generics division?
4      A.  I assume.
5      Q.  Fair enough.  Thank you.  The -- you also
6  had responsibility, you mentioned, for CVS,
7  Walgreen, and Rite Aid; is that correct?
8      A.  I believe, I believe the question was
9  most of my customer interactions were.
10  Responsibility, we would have had an account
11  manager.
12      Q.  Going back to the wholesalers for a
13  moment, would there have been account managers at
14  Wyeth for the wholesalers?
15      A.  Yes.
16      Q.  And -- okay.  Do you know who the account
17  managers were for the three major wholesalers
18  between '97 and '05?
19      A.  No.
20      Q.  How would the account managers'
21  responsibility for the wholesalers differ from your
22  responsibility for the wholesalers?

---

**64**

1      A.  My responsibilities were driven around
2  application of our selling policies and the
3  order-fulfillment process.  Their responsibilities
4  were as sales individuals.
5      Q.  Okay.  And so there would have been
6  account managers for the retail customers -- direct
7  retail customers as well; is that right?
8      A.  Yes.
9      Q.  Do you know, between '97 and '05, whether
10  the direct retail customers purchased or had
11  contractual relationships with Wyeth?
12      A.  Branded side?  Generic side?
13      Q.  Either.
14      A.  Yes.
15      Q.  Did the direct retail customers have,
16  have contracts that concerned both brand and
17  generic products?
18          MS. DAVIDSON:  Objection.
19  BY MS. CICALA:
20      Q.  Let me rephrase.
21          Let's use CVS as an example.  Between '97
22  and '05, do you know whether CVS had a, had a

---

**65**

1  contract with Wyeth?
2      A.  No, not specifically.
3      Q.  Is that fair to say, however, that large
4  retail chains may have had direct -- may have had
5  -- withdrawn.
6          In the -- speaking about CVS, do you know
7  how -- do you know who would have determined what
8  price CVS paid to Wyeth for the drugs CVS purchased
9  directly from Wyeth?
10      A.  Prices would have been determined through
11  a process that included a number of disciplines.
12      Q.  And how would those, how would those
13  prices be communicated to the retail customer?
14      A.  Catalog prices, through the communication
15  of our catalog, trade product catalog.  I'm unaware
16  of how contract prices would have been communicated
17  to them.
18      Q.  So it is correct, then, that if a
19  contract was in place, there would have been
20  contract prices communicated; and, if not, the
21  price would have been based on a catalog price?
22      A.  Yes.

---

30 (b)(6) Wyeth (Dominick Bartone)
Philadelphia, PA

May 22, 2008

18  (Pages 66 to 69)

### 66

1    Q.  And did all -- do you know whether all
2 classes of trade would pay the same catalog price
3 if there was no contract in place?
4    MS. DAVIDSON:  Objection.
5    THE WITNESS:  During that period -- I
6 don't directly recall the specifics of that time
7 period.
8 BY MS. CICALA:
9    Q.  Do you know whether the catalog prices
10 were set based on class of trade or whether there
11 was only one catalog price for each product?
12    **A.  During that specified time period, I**
13 **can't recall.**
14    Q.  Do you know whether the, the catalog
15 prices you've referred to include prices for both
16 brands and generics?
17    **A.  Refer to when?**
18    Q.  When -- you made reference to catalog
19 prices; correct?
20    **A.  Yes.**
21    Q.  Was there an actual catalog that existed
22 at Wyeth between '97 and '05 that contained prices

### 67

1 for Wyeth products?
2    **A.  Yes.**
3    Q.  And did it include prices for both the
4 branded and generic lines?
5    **A.  We had a separate catalog for that**
6 **company.**
7    Q.  For which company?
8    **A.  Yeah, I'm sorry.  Generic.  There were**
9 **two separate catalogs.**
10    Q.  There was a -- was there a catalog for
11 Wyeth brands and a separate catalog for ESI Lederle
12 generics?
13    **A.  Yes.**
14    Q.  And, and the -- were the prices that were
15 contained in these catalogs set through the process
16 that you've described that involved a variety of
17 disciplines?
18    **A.  Yes.**
19    Q.  Do you know whether those who set the
20 prices through the variety of disciplines set
21 prices for both the brands and the generics?
22    **A.  Could you restate.**

### 68

1    Q.  Do you know whether the same group of
2 individuals set the prices for both the brands and
3 the generics?
4    **A.  No.**
5    Q.  You do not know?
6    **A.  I don't know.**
7    Q.  Okay.  That's fine.  Do you know, whether
8 between '97 and '05, Wyeth had any contractual
9 relationships with any of the major chain retail
10 stores?
11    **A.  Would you restate the time period,**
12 **please.**
13    Q.  1997 through 2005.
14    **A.  Yes, I believe we did.**
15    Q.  Can you recall any specific retail chain
16 with whom Wyeth had a contractual relationship?
17    **A.  No, I cannot.**
18    Q.  But -- and yet you believe they did
19 exist; correct?
20    **A.  Yes.**
21    Q.  And would the contracts with the chain
22 retails include pricing terms?

### 69

1    **A.  Yes.**
2    Q.  Do you know, do you know between '95 and,
3 and -- between 19 -- let me rephrase.
4    Do you know between 1997 and 2005 what
5 percentage of Wyeth's sales to -- direct sales to
6 the retail chains would have been governed by a
7 contract?
8    **A.  No.**
9    Q.  Do you think that more than 50 percent of
10 sales would have been governed by a contract?
11    **A.  I have no perspective.**
12    Q.  Okay.  Where a retail chain had a
13 contract with Wyeth to purchase Wyeth products,
14 would that contract include both generic and brand
15 products?
16    **A.  No.**
17    Q.  What would it, what would it include?
18    **A.  Generics.**
19    Q.  Do you know why the contract would be
20 limited to generics?
21    **A.  No.**
22    Q.  Would, would retail chains buy brand

30 (b)(6) Wyeth (Dominick Bartone)                    May 22, 2008
Philadelphia, PA

24 (Pages 90 to 93)

90

1    Q.  And I just wanted to circle back to
2 confirm your testimony that Wyeth may offer
3 additional discounts and promotions on its branded
4 products to classes of trade --
5    **A.  Other --**
6    Q.  -- other than wholesalers and retailers;
7 correct?
8    **A.  Yes.**
9    Q.  Whereas for the generic products, the
10 discounts and promotions may go, may go directly to
11 the wholesalers and the retailers?
12    **A.  Yes.**
13    Q.  Do you see under No. 1 it say, Customer
14 acquires new pharmacies?
15    **A.  Yes, I see that.**
16    Q.  And a second sentence reads -- well, take
17 a moment, please, to read that paragraph.
18    **A.  Okay.**
19    Q.  And let me know when you're ready for a
20 question.
21    **A.  Okay.**
22    Q.  Do you know what is meant in the second

91

1 sentence by the phrase "one free shelf-keeping
2 unit"?
3    **A.  Yes.  That would be one unit of the NDC**
4 **presentation.  So it would be specific to product,**
5 **description, strength, and size of presentation.**
6    Q.  And just to read this, these first two
7 sentences into record, Routinely, an independent
8 retailer may open a new store, a chain drugstore
9 may acquire new stores, or a hospital may open a
10 new pharmacy.  In these situations, ESI Lederle may
11 offer, on a first-order basis, one free
12 shelf-keeping unit (SKU) for each product that is
13 on contract with this pharmacy.
14    Did I read that accurately?
15    **A.  Yes.**
16    Q.  So can you explain exactly what is meant
17 by these two sentences.
18    Let me rephrase -- go ahead.  I'm sorry.
19    MS. DAVIDSON:  I was going to --
20    MS. CICALA:  Yeah.  Let me rephrase.
21    MS. DAVIDSON:  -- object, but that's
22 fine.

92

1    MS. CICALA:  Let me rephrase the
2 question.
3 BY MS. CICALA:
4    Q.  Are you familiar with the practice of ESI
5 Lederle offering free shelf-keeping units when new
6 pharmacies are opened?
7    **A.  Yes.**
8    Q.  Was that a routine practice by ESI
9 Lederle with respect to new pharmacies?
10    **A.  I only have knowledge in my role as**
11 **corporate designee that it did occur.  I can't**
12 **speak to the frequency.**
13    Q.  Okay.  And can you explain what is meant,
14 though, when this sentence reads "one free
15 shelf-keeping unit for each product that is on
16 contract"?
17    MS. DAVIDSON:  Objection.
18    THE WITNESS:  It appears that it would
19 mean for a new site they would receive a no-charge
20 package, NDC shelf-keeping unit, for their new
21 store.
22 BY MS. CICALA:

93

1    Q.  A single package?
2    **A.  That's the description I'm reading in**
3 **that second sentence; yes.**
4    Q.  Okay.  And when the sentence refers to
5 "for each product that is on contract," I assume --
6 is it correct that that refers to the contract
7 between the, these -- the pharmacy and ESI Lederle
8 for the generic products that the, that the
9 pharmacy is purchasing?
10    **A.  That would be my interpretation; yes.**
11    Q.  Let's go down to, to No. 2, which is
12 entitled:  Wholesaler or warehousing chain acquires
13 or constructs a new distribution warehouse.
14    If you could read that paragraph and let
15 me know when you're ready for a question.
16    **A.  Okay.**
17    Q.  Actually, I have one, I have one
18 follow-up, I have one follow-up question on the
19 free shelf-keeping units.  Are you aware whether
20 Wyeth ever provided free shelf-keeping units for
21 any of its branded products to any of its
22 customers?

30 (b)(6) Wyeth (Dominick Bartone)                    May 22, 2008
Philadelphia, PA

25  (Pages 94 to 97)

94

1          MS. DAVIDSON: Objection.
2          THE WITNESS: Ever?
3    BY MS. CICALA:
4       Q.  Ever.
5       A.  And to any?
6       Q.  Between '97 and '05 -- and let's keep it
7    focused on Ativan and lorazepam --
8       A.  Okay.
9       Q.  -- and -- on Ativan.
10      A.  No, I do not believe so.
11      Q.  And do you know why Wyeth would not have
12   provided free units of Ativan?
13      A.  No, I do not.
14      Q.  But you feel confident that no free units
15   were provided?
16         MS. DAVIDSON: Objection.
17         THE WITNESS: Yes, I'm fairly confident.
18   BY MS. CICALA:
19      Q.  Thank you.  So going back now to, to No.
20   2 on the same, on the same page of Exhibit 5,
21   reading the second sentence, When a wholesaler or
22   warehousing chain opens a new distribution center,

95

1    ESI Lederle may extend an extra 30 days dating on
2    their initial stocking order for all products.
3         Do you see that?
4       A.  Yes.
5       Q.  Do you know what is meant by the phrase
6    "extending an extra 30 days dating on their initial
7    stocking order"?
8       A.  Each shipment would be covered by an
9    invoice with a due date and a prompt-pay discount.
10   This would appear to be extending the prompt-pay
11   discount for an additional 30 days over the normal
12   standard terms of prompt-pay.
13      Q.  So, in other words, the customer would
14   have additional time to pay Wyeth for the generic
15   and still -- the customer would still be able to
16   qualify for a two percent prompt-pay?
17      A.  Yes.
18      Q.  What was the standard prompt-pay
19   discount, if you recall, to, to warehouse -- to,
20   I'm sorry, to wholesalers?
21      A.  I, I do not recall --
22      Q.  That's okay.

96

1       A.  -- specifically the generic.
2       Q.  Okay.  Let's go to the next page, please,
3    which is page 7 of Exhibit 5.
4         Actually, let me ask one follow-up
5    question with regard to point 2.  Do you recall
6    instances where Wyeth extended the, the timeframe
7    the customer could, could pay and still receive the
8    prompt-pay discount with respect to Wyeth brand
9    products -- with respect to Ativan?
10      A.  Yes, I do.
11      Q.  And what scenarios would have triggered
12   that sort of extension for Ativan?
13      A.  A, a new location for a wholesaler.
14      Q.  Okay.  Thank you.
15      A.  Uh-huh.
16      Q.  On page 7, No. 3 refers to:  Customer
17   adds new SKU to their contract.
18         Do you see that?
19      A.  Yes, I do.
20      Q.  And the first sentence reads, When a
21   pharmacy customer adds a new item to their
22   contract, ESI Lederle may extend a one-time ten

97

1    percent discount on the initial stocking order.
2    Correct?
3       A.  Yes.
4       Q.  So does this mean that when a, when a
5    wholesaler or -- when any customer adds a generic
6    ESI product to their inventory, the customer
7    qualifies for this ten percent discount?
8          MS. DAVIDSON: Objection.
9          THE WITNESS:  Could you restate that.
10   BY MS. CICALA:
11      Q.  I'll rephrase the question.  Do you know
12   how often this, this ten percent discount was, was
13   actually provided to customers who added new items
14   to their contracts?
15      A.  No, I do not.
16      Q.  Would the individual contracts that, that
17   Wyeth had with its generics customers contain
18   detail on whether the customer was entitled to that
19   one-time ten percent discount for the addition of a
20   new product?
21      A.  I don't know.
22      Q.  Do you know whether Wyeth extended any

98

1  sorts of one-time discounts for initial stocking of
2  brand products by its customers?
3      MS. DAVIDSON:  Objection.  Just time
4  period, product.
5  BY MS. CICALA:
6      Q.  With regard to Ativan, between '97 and
7  '05, do you know if, if Wyeth ever extended one-,
8  one-time discounts related to initial stocking
9  orders?
10     **A.  To the best of my recollection, no.**
11     Q.  Item No. 4 is entitled:  Pharmacy
12  customer agrees to add at least five new SKUs to
13  their contract.
14         Do you see that?
15     A.  Yes.
16     Q.  And the first sentence reads, When
17  pharmacy customers add a significant number of SKUs
18  to their contracts, they may qualify for an
19  additional dating incentive.
20         Correct?
21     A.  Yes.
22     Q.  The dating incentive referred to here is

99

1  similar to the dating incentive referred to in item
2  No. 2 regarding the prompt-pay discount; is that
3  right?
4      **A.  It appears to be.**
5      Q.  Okay.  Item No. 5 is entitled:  Free
6  goods and part of a negotiated contract.
7          Do you see that?
8      A.  Yes.
9      Q.  The first sentence reads, As part of a
10  bid for an account, free goods maybe offered in
11  lieu of further price reduction.
12          Do you see that?
13     A.  Yes.
14     Q.  And do you understand that Wyeth did
15  provide free generics in lieu of price reductions
16  to certain of its customers on occasion?
17     **A.  In my role as corporate designee, I**
18  **became aware of free-goods offers that may have**
19  **occurred.  I'm unaware whether they occurred as a**
20  **result of this clause or the previous clause.**
21     Q.  And are you aware of free-goods offers
22  that occurred for both generics and brands, for

100

1  both Ativan and lorazepam?
2      **A.  During the time period indicated -- I'm**
3  **sorry.  Could you...**
4      Q.  Sure.  Are you aware of free goods being
5  offered for lorazepam or Ativan between '97 and
6  '05?
7      **A.  Either of those?**
8      Q.  Yes.
9      **A.  Directly aware, no.  I assume lorazepam**
10  **may have been offered through one of these clauses**
11  **that we just reviewed.**
12     Q.  Okay.  Do you, do you have any
13  understanding of why a Wyeth customer would prefer
14  free goods in lieu of a price reduction?
15     **A.  No.**
16     Q.  From your testimony earlier this morning,
17  you were not, you were not involved in negotiation
18  of prices with your customers; isn't that right?
19     **A.  Yes.**
20     Q.  Did you ever have a customer ask you for
21  free goods?
22     **A.  No.**

101

1      Q.  Throughout your entire tenure at, at
2  Wyeth, did you ever have occasion where customers
3  would communicate with you their desire to have a
4  price reduced?
5      **A.  No.**
6      Q.  In, in your capacity as a corporate
7  designee, are you aware how Wyeth would respond if,
8  for example, a retail customer asked for a price
9  reduction?
10     **A.  On the branded side?**
11     Q.  On the, on the -- let's start with
12  branded side.  We can talk about Ativan
13  specifically.
14     **A.  Historically, on the branded side, we**
15  **would, we would not entertain such a request.**
16     Q.  And why is that?
17     **A.  I'm not certain of the contracting**
18  **strategy.**
19     Q.  What if there was no contract in place
20  and you were asked for a reduction off of a catalog
21  price of Ativan?  Do you know, as a corporate
22  designee, how Wyeth would respond?

30 (b)(6) Wyeth (Dominick Bartone)
Philadelphia, PA

May 22, 2008

30 (Pages 114 to 117)

---

**114**

1  refresh your recollection as to who was the
2  director of business analysis between '97 and '05?
3      **A.  I believe he's the individual I named.**
4      Q.  I'm sorry.  I thought you weren't sure he
5  was head of business analysis.  But thank you.
6      **A.  Uh-huh.  Chargeback and operations, I'm**
7  **uncertain of.**
8      Q.  Thank you.  I appreciate that.
9          The next title is assistant vice
10  president, retail.  Are you able to read the
11  signature that appears next to that title?
12      **A.  Yes.**
13      Q.  And what is that, please?
14      **A.  John E. Shaughnessy.**
15      Q.  Would Mr. Shaughnessy have responsibility
16  for Wyeth brands, in addition to Lederle generics?
17      **A.  During this time period, post dissolution**
18  **of the ESI division, Mr. Shaughnessy did work on**
19  **the branded side; not at the same time.**
20      Q.  Do you recall when the dissolution of the
21  ESI division was?
22      **A.  2003.**

---

**115**

1      Q.  So prior to '03, Mr. Shaughnessy would
2  not have had any involvement with the Wyeth brands;
3  is that right?
4      **A.  That's right.**
5      Q.  The next title is assistant vice
6  president, institutional.  Do you know what is
7  meant by the word "institutional" in that title?
8      **A.  We would normally refer to our hospital,**
9  **GPO, long-term care segment of customers as**
10  **"institutional."**
11      Q.  Did Wyeth, did Wyeth offer contract
12  pricing for either brands or generics to its GPO
13  customers?
14      **A.  Yes.**
15      Q.  And GPO, we mean "group purchasing
16  organization"; correct?
17      **A.  Yes.**
18      Q.  Can you name some of Wyeth's larger GPO
19  customers between '97 and 2005?
20      **A.  Yes.  Novations, Broadlane.**
21      Q.  Premier?
22      **A.  Premier.**

---

**116**

1      Q.  Would Wyeth consider its GPO customers
2  direct or indirect?
3      **A.  In the context of my role as trade, I**
4  **would refer to them as indirect.**
5      Q.  Is it fair to say that Wyeth's GPO
6  customers would negotiate contract prices for Wyeth
7  products, and then the GPO members would be able to
8  purchase the Wyeth products at those prices?
9      **A.  Yes.**
10      Q.  And to the extent those purchases
11  occurred through a wholesaler, the wholesaler would
12  receive a chargeback if the contract price was
13  lower than what the wholesaler had paid; correct?
14      **A.  Yes.**
15      Q.  If you could take a look back at the
16  chart on page 2 of Exhibit 4 that we had looked at
17  earlier.
18      **A.  Sure.**
19      Q.  And I'm looking at the various customers
20  that are out -- that appear in the boxes to the
21  left of the manufacturer in that chart.  Could you
22  -- can you put GPOs into one of those boxes, from

---

**117**

1  Wyeth's perspective?
2      **A.  No, I could not.**
3      Q.  Do you have any sense, between '97 and
4  '05, of what percentage of Wyeth's sales were made
5  to its GPO customers?
6      **A.  This appears to be product, physical**
7  **product flow.**
8      Q.  Uh-huh.
9      **A.  But no.  To answer your question, no.**
10      Q.  Okay.  Did Wyeth offer contract pricing
11  to its long-term-care customers?
12      **A.  I'm, I'm unsure.**
13      Q.  Do you know if Wyeth, Wyeth offered
14  contract pricing for its generic products to its
15  long-term-care customers?
16      **A.  No, I don't.**
17      Q.  Okay.  Can you name some of the large --
18  some of Wyeth's large long-term-care customers
19  between '97 and '05?
20      **A.  We, we weren't focused on that segment at**
21  **all.  A brief period in, in 2002, I think, we**
22  **attempted to develop some relationships.  And I**

---

Henderson Legal Services, Inc.

202-220-4158          www.hendersonlegalservices.com

30 (b)(6) Wyeth (Dominick Bartone)                          May 22, 2008
                    Philadelphia, PA

32 (Pages 122 to 125)

122

1   for our product to accurately forecast for our
2   sales process, as well as our production process.
3   They led the process, over various disciplines, to
4   establish our catalog pricing.  And they led the
5   contract team, which was also a part of reviewing
6   our response and our contracting platform and the
7   application of all of those within our various
8   systems and processes.
9         The functions are now split into two
10  separate groups.
11      Q.  What are the names of the groups that the
12  functions are split into?
13      A.  Excuse me.  Three separate groups:
14  pricing department —
15      Q.  Uh-huh.
16      A.  — forecasting department, and the
17  healthcare systems contracting department.
18      Q.  Does Mr. Tiedemann still work at Wyeth?
19      A.  No, he does not.
20      Q.  Do you know where he works now?
21      A.  He's retired.
22      Q.  You made reference to the contract team;

123

1   is that right?
2       A.  Team?
3       Q.  You said one of the activities was to --
4   of the pricing, forecasting, and contract
5   department concerned contracts; correct?
6       A.  Yes.
7       Q.  And contracts with any customers who had
8   such contracts; is that right?
9       A.  Yes.
10      Q.  And did this department concern both the
11  generics and branded product lines?
12      A.  Yes.
13      Q.  So if you today wanted to review the
14  contracts that existed for both the Wyeth and the
15  brand product lines to certain classes of trade,
16  would you be reviewing files that were maintained
17  by this particular department?
18      A.  Yes.
19      Q.  And do you know if those files still
20  exist?
21      A.  For the time period we're talking about?
22      Q.  '97 through '05.

124

1       A.  I'm not sure of the retention.  Certainly
2   for a part of the period.
3          MS. CICALA:  Okay.  Let's take our lunch
4   break.
5          THE VIDEO SPECIALIST:  Off the record at
6   12:46.
7          LUNCHEON RECESS
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

125

1          A F T E R N O O N   P R O C E E D I N G S
2          THE VIDEO SPECIALIST:  We are on the
3   record at 1:38.
4   BY MS. CICALA:
5       Q.  Hi, Mr. Bartone.  You understand you're
6   still under oath from this morning?
7       A.  I do.
8       Q.  Okay.  We spoke, we spoke this morning
9   about contract pricing and catalog prices.  Do you
10  recall that generally?
11      A.  Yes.
12      Q.  Is there a general relationship between
13  contract prices and catalog price for Ativan and --
14  let me rephrase.
15         Is there any general relationship between
16  contract prices for lorazepam and catalog prices
17  for lorazepam?
18      A.  Not that I'm aware.
19      Q.  Would, would you know whether contract
20  prices for lorazepam would tend to be lower than or
21  higher than catalog prices?
22      A.  They would be lower.

30 (b)(6) Wyeth (Dominick Bartone)                    May 22, 2008
Philadelphia, PA

33 (Pages 126 to 129)

126

1      Q.  Would that be true in all the cases where
2  a contract was in place for lorazepam?
3          MS. DAVIDSON:  Objection.
4          THE WITNESS:  I can't speak to all
5  contracts.
6  BY MS. CICALA:
7      Q.  In general, they would be lower, though;
8  correct?
9      A.  I believe so.
10      Q.  Were you -- are, are you aware of any
11  specific instances where a customer paid a higher
12  price for lorazepam, pursuant to a contract, than a
13  catalog price?
14      A.  No, I'm not aware.
15          MS. CICALA:  Let's mark this as Exhibit
16  6.
17          (Exhibit Bartone 006 was marked for
18  identification.)
19  BY MS. CICALA:
20      Q.  Mr. Bartone, we've placed in front of you
21  what's been marked as Exhibit 6.  It's a document
22  provided to us in the litigation.  It bears the

127

1  title Wholesalers Rebate.  And it appears to be a
2  template of a contract between ESI Lederle and a --
3  and someone.
4          Have you seen this, this form of document
5  before?
6      A.  Yes, I have.
7      Q.  And, and have you seen it in the course
8  of -- are you familiar with this document from your
9  work at Wyeth or from meetings with counsel?
10      A.  From meetings with counsel.
11      Q.  In the -- as a corporate designee for
12  Wyeth, are you aware of whether this represents a
13  standard template of what a wholesaler agreement
14  between ESI Lederle and a wholesaler might be?
15      A.  Yes, I am aware of it.
16      Q.  And it is a template of such an
17  agreement?
18      A.  Yes.
19      Q.  But is it correct that you -- I'll
20  rephrase.
21          Have you ever seen an actual wholesaler
22  rebate agreement?

128

1      A.  During the timeframe specified?
2      Q.  Between '97 and '05.
3      A.  No, I have not.
4      Q.  Is that fair to say that if Wyeth had a
5  contract in place with a wholesaler, the form of
6  that contract would generally be similar to the
7  form of the template that's been marked as Exhibit
8  6?
9          MS. DAVIDSON:  Objection.
10          THE WITNESS:  I believe that's true.
11  BY MS. CICALA:
12      Q.  Do you know who prepared -- who at Wyeth
13  would have prepared this particular template?  And
14  by "who" I mean a person or a department.
15      A.  It would have been prepared as a result
16  of that process that I spoke of several times this
17  morning.  Which department documented it, I cannot
18  speak to that.
19      Q.  So you don't know if it was the contracts
20  department or the pricing department or some other
21  department?
22      A.  That actually prepared it, that's, that's

129

1  true.
2      Q.  Okay.  You'll see under, under point 1 it
3  says, ESI Lederle agrees to and -- agrees -- and
4  then sub A is two percent 60 days net 61 days
5  unless otherwise specified on invoice.
6          Correct?
7      A.  Yes.
8      Q.  That's a reference to the prompt-pay
9  discount; is that right?
10      A.  Yes.
11      Q.  Letter B provides, To provide a quarterly
12  rebate of, paren -- a percentage not filled in --
13  excluding chargeback units adjustments, and returns
14  on all contracted products, parens, see attached
15  list of contracted items, close parens, based upon
16  the quarterly purchases.
17          Did I read that correctly?
18      A.  Yes, you did.
19      Q.  Do you know whether it was standard
20  practice to have payments of quarterly rebates to
21  wholesalers by ESI Lederle when contracts were in
22  place?

30 (b)(6) Wyeth (Dominick Bartone)
Philadelphia, PA

May 22, 2008

34 (Pages 130 to 133)

---

### 130

1     **A. Only based on that phrase -- my reading**
2 **that phrase. I have no direct knowledge of it.**
3     Q. As, as corporate designee for Wyeth, do
4 you know whether Wyeth routinely offered quarterly
5 rebates to the wholesalers along the lines of what
6 we see in sub B on this template?
7     **A. That would be my interpretation of the**
8 **document.**
9     Q. Can you explain how this quarterly read
10 back would -- I'm sorry. Let me rephrase.
11     Can you explain how this quarterly rebate
12 would operate?
13     MS. DAVIDSON: Objection.
14     THE WITNESS: No. Only in, only in the
15 most general terms.
16 BY MS. CICALA:
17     Q. I'll take those general terms.
18     **A. There would be a calculation of the**
19 **actual purchases by the contracted party. There**
20 **would be a net amount calculated as a result of**
21 **these three exclusions. A total amount would be**
22 **arrived at. And either a credit to their account**

### 131

1 **or a check would be issued for that totaling**
2 **amount.**
3     Q. The sub B here makes a reference to an
4 attached listing, listing of contracted items;
5 correct?
6     **A. Yes, it does.**
7     Q. Do -- in a typical wholesaler rebate
8 contract, would that attached listing be a list of
9 drugs?
10     **A. I don't know.**
11     Q. I'm constrained to use this template
12 because I don't have any actual contracts.
13     **A. Uh-huh.**
14     Q. You see reference in sub B to the phrase
15 "contracted products"?
16     **A. Yes.**
17     Q. Is that a reference to drugs?
18     **A. I believe so, yes.**
19     Q. Do you know the range of percentage
20 rebates that were paid to wholesalers pursuant to
21 wholesaler rebate contracts between '97 and '05?
22     **A. No, I don't.**

### 132

1     Q. Do you know who at Wyeth would know that?
2     **A. Our contracts group, certain members of**
3 **our chargeback group.**
4     Q. And those are two distinct groups, right,
5 the contracts group and the chargeback group?
6     **A. Yes, they are.**
7     Q. The chargeback group is, is dealing
8 primarily with chargebacks, obviously; right?
9     **A. The process of the chargebacks; yes.**
10     Q. Rebate are, rebates are different from
11 chargebacks, aren't they?
12     **A. In our -- could you clarify.**
13     Q. Are chargebacks and rebates the same?
14     **A. As the departments that we saw previously**
15 **or as transactions?**
16     Q. Does Wyeth -- let's, let's try it this
17 way. A chargeback is paid to a wholesaler when
18 the, when the wholesaler sells a product to one of
19 Wyeth's indirect customers at a price below the
20 wholesaler's --
21     **A. Yes.**
22     Q. -- acquisition cost; right?

### 133

1     **A. Yes.**
2     Q. And rebate, a rebate is something earned
3 by the wholesaler depending on a -- some other
4 contractual term between the wholesaler and Wyeth?
5     **A. Yes.**
6     Q. Okay. In sub B here we're talking about
7 rebates not chargebacks; right?
8     Let me rephrase. Sub B of this template
9 is providing for the payment of a rebate to the
10 wholesaler by Wyeth, and the amount of that rebate
11 is based on the net sales to the wholesaler;
12 correct.
13     **A. It's, it's based on the sales less**
14 **chargeback units, adjustments, and returns.**
15     Q. And I believe earlier when you, when you
16 were describing how this rebate operated, you used
17 the phrase "a net," a net price to the wholesaler.
18     **A. Oh, okay.**
19     MS. DAVIDSON: Objection to the extent
20 the record doesn't reflect the use of that word.
21     MS. CICALA: That's fine.
22 BY MS. CICALA:

---

30 (b)(6) Wyeth (Dominick Bartone)                May 22, 2008
Philadelphia, PA

45  (Pages 174 to 177)

---

174

1   on our policy.
2   BY MS. CICALA:
3       Q.  Okay.  So does that mean that the
4   contract price to the direct customer would be the
5   same as the contract price to the indirect or not?
6       A.  The con --
7       MS. DAVIDSON:  Objection.
8       Go ahead.
9       THE WITNESS:  The contract pricing
10  strategies that we've looked at today have no
11  relation to the direct or indirect purchasing
12  relationship of the retailer.
13  BY MS. CICALA:
14      Q.  Okay.  Thank you.  Do you know in general
15  whether --
16      A.  Excuse me.  One caveat:  with the
17  exception of those off-invoice terms and conditions
18  that we've looked at.
19      Q.  Such as the -- such as the provision of
20  free goods?
21      A.  Such as the additional dating,
22  prompt-pay.

---

175

1       Q.  Not the provision of free goods?
2       A.  I, I don't know --
3       Q.  Okay.
4       A.  -- that one specifically.
5       Q.  Okay.  Thank you.  Do you have any
6   understanding whether Wyeth's contract prices to
7   its direct customers were, were generally higher
8   than lower than its contract prices to its indirect
9   customers?
10      MS. DAVIDSON:  Objection.
11      THE WITNESS:  I have no understanding of
12  that.
13  BY MS. CICALA:
14      Q.  Okay.  You're familiar with the acronym
15  WAC, W-A-C?
16      A.  Yes.
17      Q.  And what is your understanding of that?
18      A.  I've heard it as "warehouse acquisition
19  costs" or "wholesaler acquisition costs."
20      Q.  And do you understand WAC to be
21  reflective of the net price paid a warehouse or a
22  wholesaler for a Wyeth project?

---

176

1       MS. DAVIDSON:  Objection.
2       THE WITNESS:  Could you define that,
3   please.
4   BY MS. CICALA:
5       Q.  If a wholesaler buys a generic from Wyeth
6   pursuant to a contract, the wholesaler is paying a
7   contract price; correct?
8       A.  Correct.
9       Q.  Is that contract price the same as the
10  WAC?
11      A.  I'm not sure if, in every aspect, if it
12  is.
13      Q.  Are you sure in any aspect if it is?
14      A.  In some aspects, WAC and catalog -- no.
15  No, I'm not sure.
16      Q.  When -- if a, if a, if a wholesaler -- if
17  there's no contract in place between Wyeth and a
18  wholesaler, concerning a a, a sale, what price does
19  the wholesaler pay Wyeth for the product?
20      A.  The catalog prices we've --
21      Q.  The direct --
22      A.  -- talked about today.

---

177

1       Q.  The direct prices?
2       A.  Direct.
3       Q.  And do you know if that's the same as the
4   WAC?
5       A.  In, in those instances, yes, I believe it
6   is.
7       Q.  Uh-huh.  And so these -- just to be
8   clear, the direct prices or the book prices are --
9   do not take into account any rebates that might be
10  paid to the wholesaler; is that right?
11      A.  That's right.
12      (Exhibit Bartone 010 was marked for
13  identification.)
14      MS. CICALA:  Sorry.
15      MR. WHITMAN:  Thank you.
16  BY MS. CICALA:
17      Q.  Mr. Bartone, what we've marked as Exhibit
18  10, I'll represent to you, is an except from --
19  that we've created.  And it's a form -- it's an
20  Excel spreadsheet that we've created using the
21  direct sales transactional data that has been
22  produced to us in this litigation.

---