# EXHIBIT A

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL            ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       ) CIVIL ACTION NO.

PRICE LITIGATION                 ) 01-CV-12257-PBS

- - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:                          )

The City of New York v. Abbott Labs., et al.       )

(S.D.N.Y. No. 04-CV-06054)                          )

County of Suffolk v. Abbott Labs., et al.          )

(E.D.N.Y. No. 03-CV-229)                            )

County of Westchester v. Abbott Labs., et al.      )

(S.D.N.Y. No. 03-CV-6178)                           )

County of Rockland v. Abbott Labs., et al.         )

(S.D.N.Y. No. 03-CV-7055)                           )

[Caption continues on Next Page]                   )


Washington, D.C.

Monday, May 20, 2008

9:30 a.m.

VIDEOTAPED DEPOSITION OF GAIL SEXTON

46

1 topics of conversation. And there were probably
2 very few, but I'm sure there were times when I
3 did speak with her about the program in general.
4     Q. But is it fair to say you wouldn't be
5 knowledgeable about the process, for example,
6 that Ms. Gaston used to establish FULs during
7 the period of time where she was the lead?
8         MR. FAUCI: Objection, form.
9     A. No.
10    Q. Or the information on which she chose
11 to rely while she was the lead for setting FULs?
12        MR. FAUCI: Objection, form.
13    A. No.
14    Q. Or the objectives that she sought to
15 achieve when she was setting FULs? You wouldn't
16 have any knowledge of that?
17        MR. FAUCI: Objection, form.
18    A. No, I would not.
19    Q. Just so we set out a clear time period
20 here, it's my understanding that CMS hasn't
21 updated its FUL list since December of 2006. Is
22 that consistent with your understanding?

47

1     A. That's correct.
2     Q. And the reason that CMS hasn't updated
3 a FUL list since 2006 is because of the advent of
4 the DRA?
5     A. Correct.
6     Q. And what do you understand me to mean
7 by the DRA, just so the term is clear on the
8 record?
9     A. The DRA is the Deficit Reduction Act of
10 2005. And there were several provisions passed
11 in the Deficit Reduction Act that changed the
12 federal upper limit program, changed the
13 definition of a multiple source drug, changed the
14 methodology by which the federal upper limit is
15 calculated.
16    Q. What methodology for calculating the
17 federal upper limit was proposed in the DRA?
18        MR. FAUCI: Objection, form.
19    A. The DRA establishes the federal upper
20 limit to be 250 percent of the lowest average
21 manufacturer price for the lowest therapeutically
22 and pharmaceutically equivalent average

48

1 manufacturer price within a drug group.
2     Q. Sounds like you've stated that before.
3 What is an average manufacturer's price?
4         MR. FAUCI: Objection, form.
5     A. The average manufacturer price, my
6 understanding of that is the price that the
7 wholesaler obtains the drug from the
8 manufacturer.
9     Q. Is it otherwise known as AMP?
10    A. Yes.
11    Q. And there's a statutory definition of
12 AMP or average manufacturer's price, correct?
13        MR. FAUCI: Objection, form.
14    A. In our drug rebate rule, our major rule
15 that we published in July of 2007, even though I
16 did not have the lead on the AMP definition or
17 the entities that were included or excluded from
18 AMP, that is discussed in that regulation.
19    Q. But there's a definition of AMP that
20 exists to your knowledge?
21        MR. FAUCI: Objection, form.
22    A. I believe that there is in the drug

49

1 rebate agreement.
2     Q. Okay. And in your role as the program
3 lead on FULs you say that the FUL list hasn't
4 been updated since December of 2006, correct?
5     A. Correct.
6     Q. So it fair then to assume that the DRA
7 methodology, the 250 percent of AMP, hasn't been
8 implemented as of today?
9         MR. FAUCI: Objection, form.
10    A. Correct. We have not published any
11 federal upper limit prices under that
12 methodology.
13    Q. So then is it fair to assume that the
14 period of time for which you've reviewed and
15 updated the FUL list really is December of 2004
16 to December of 2006, so it's the 2005-2006
17 period?
18        MR. FAUCI: Objection, form.
19    A. At some point after October 31st 2004
20 until December 2006 as far as the updates on the
21 FUL.
22    Q. I'm from here on out going to try and

Sexton, Gail                                                    May 20, 2008
Washington, DC

16 (Pages 58 to 61)

---

58

1   like Exhibit 4 generated?
2       A.  It can be generated at any point.
3   Generally I would print out a pricing sheet when
4   I was evaluating a drug and I would keep a hard
5   copy as this for any drugs that there were
6   changes made in the federal upper limit system.
7       Q.  How about drugs for which you evaluated
8   and decided not to make a change?  Would you keep
9   copies of those?
10      A.  My process was that if I did not make a
11  change to the federal upper limit list, if I did
12  not increase or decrease or add or delete a drug,
13  I would make a notation onto the system which we
14  had the capability to do.
15          And I also had a follow-up book that I
16  compiled where if a drug did not meet the
17  criteria, if it was -- we did not have the A-
18  rated drugs, if we did not have a sufficient
19  amount of A ratings, if we did not have a
20  sufficient amount of suppliers, or in the case
21  where if the federal upper limit, once it was
22  calculated, was higher than the AWP price or the

---

59

1   majority of the AWP prices, then we would
2   generally not set a FUL on those drug
3   ingredients, because the AWP -- well, a couple
4   years ago the average AWP on a national basis was
5   I think AWP minus 12 percent for drug
6   reimbursement, estimated acquisition costs for
7   drug reimbursement for a drug that did not have a
8   federal upper limit.
9           And if a drug did not -- if the FUL was
10  calculated to be higher than an AWP price then
11  generally we did not put a federal upper limit on
12  it because we would be setting a higher limit
13  than what was already established in regulation
14  because EAC reimbursement or estimated
15  acquisition costs were AWP minus a percentage.
16      Q.  In other words, if the FUL that would
17  have been set would have been higher than AWP it
18  wouldn't have resulted in a cost savings for the
19  Medicaid program and so you didn't set a FUL?
20          MR. FAUCI:  Objection, form.
21      A.  Correct.  That was generally the
22  thinking, why a FUL would not be set.

---

60

1       Q.  Mechanically, once you got a printout
2   from the FULs system like Exhibit 4, what if
3   anything would you do before CMS established a
4   federal upper limit for a particular drug?
5       A.  What would I do with this sheet?
6       Q.  What additional steps if any would you
7   take?
8       A.  Well, generally I would make a notation
9   on the sheet what drug the federal upper limit
10  was set on and show the calculation of the 150
11  percent times the lowest priced drug, the lowest
12  priced available drug, because there could be
13  situations where the lowest priced drug was not
14  available.  So I may put that calculation on the
15  sheet and perhaps that the FUL was not higher
16  than AWP.  Just general notations for my own
17  knowledge.
18      Q.  Anything else that you would do before
19  -- any other steps or additional information you
20  would seek before CMS established a FUL?
21          MR. FAUCI:  Objection, form.
22      A.  There were times when we would call or

---

61

1   I would call the manufacturers or the suppliers
2   to determine if a drug was available.  If -- and
3   some of these drugs were looked at, most of them,
4   on a case-by-case basis because there were times
5   when we would have three or more suppliers but
6   perhaps we were missing a wholesale acquisition
7   cost, for instance.
8           And I would try to get the wholesale
9   acquisition cost from maybe First Databank like
10  the e-mail to Rojan, because if you could obtain
11  every wholesale acquisition cost you would be --
12  in other words, if you just looked at the prices
13  that were on the pricing sheet and there was a
14  wholesale acquisition cost that was missing, that
15  could have had a lower wholesale acquisition cost
16  than the prices that were shown and perhaps you
17  were falsely setting a higher federal upper limit
18  than you would have to.  However, we were not
19  always successful at getting that information
20  from the suppliers.
21      Q.  When you say wholesale acquisition
22  cost, do you mean WAC?

---

Sexton, Gail                                        May 20, 2008
Washington, DC

25 (Pages 94 to 97)

94

1  would -- when the FULs system would show that
2  message.
3      Q.  Okay.  And why do that further manual
4  intervention?
5      A.  Well, I learned -- and it could have
6  been from the paper compendia that I did the
7  second checks on I learned of other suppliers
8  that were marketing this drug.  So I tried to
9  determine if they were still marketing and at
10  what price to see exactly what the availability
11  was in the market, because there was a lot of
12  concern raised by the pharmacy community about
13  this drug and that it was not available.
14      Q.  At the federal upper limit price?
15      A.  Or that it was even not available,
16  adequate supply.
17      Q.  Is the notation "FULs price not greater
18  than another supplier" something that in your
19  experience is automatically generated by the
20  system?
21      A.  I really don't think I ever noticed
22  those messages or the messages that come

95

1  out.  They come out kind of in a different color
2  or small at the bottom of the system when you're
3  looking at the screen.  And that's not something
4  I would generally look at or look for.
5      Q.  Okay.  So it wasn't a flag that caused
6  you to do anything differently than would have
7  been done with other drugs for which you were
8  establishing a federal upper limit?
9      A.  No, it would not have.
10      Q.  But is it fair to say then that there's
11  a manual review process that you undertake with
12  regard to each federal upper limit that you
13  established?
14          MR. FAUCI:  Objection, form.
15      A.  I wouldn't say each.  I would say in
16  cases where I saw that manual intervention could
17  have changed the price, changed the federal upper
18  limit, or where it appeared that perhaps the
19  criteria was not met and that further
20  intervention should have been taken.
21      Q.  How would you identify those situations
22  in which manual intervention might change the FUL

96

1  price?
2      A.  Could you repeat that?
3      Q.  Sure.  How would you identify -- what
4  criteria would you use to identify situations in
5  which your manual intervention might change the
6  FUL price that was set?
7      A.  Well, for instance, if I saw a price
8  that was -- that looked to be an outlier price,
9  maybe far lower than the other prices, I may call
10  that supplier to determine was the NDC available
11  at that price, so as not to set an unfairly low
12  price on an outlier that was not available.  If I
13  saw -- comparing to the paper compendia, if I saw
14  that there were other suppliers other than what
15  was noted in the system then I would call those
16  suppliers.
17          Is that what you mean?
18      Q.  Yeah.  I'm just trying to understand
19  the criteria that you used to decide when you'd
20  want to manually intervene in the process.
21      A.  Right.  If the paper compendia maybe
22  showed a different amount of suppliers and there

97

1  was a possibility that you did have three
2  suppliers, just that the system was not showing
3  three suppliers, or in the case of an outlier
4  drug, or in the case where a drug supplier was
5  shown, an NDC was shown, but there was no price
6  at all, you would try to determine the price.
7      Q.  You used the term outlier price and you
8  said I didn't want to set a FUL that was unfair.
9  What did you mean by that?
10          MR. FAUCI:  Objection, form.
11      A.  Well, in cases -- if I saw -- maybe
12  there was a WAC for two cents and then maybe all
13  the other WACs were 80 cents and above, or
14  something to that effect, that would be a case
15  where you may want to call to verify, if you
16  could, if you would -- the suppliers did not
17  always provide you with the information
18  requested.  You were not an account holder.  But
19  that would be a case perhaps.
20          We didn't have to verify, but that
21  would just be a good practice to make the attempt
22  if you could.

Sexton, Gail                                                May 20, 2008
Washington, DC

27 (Pages 102 to 105)

102

1      A.  Yes.
2      Q.  Do you know where you would have gotten
3  that rating?
4      A.  From the compendia.  The only other
5  source would have been the compendia, the paper
6  compendia.  Because it appears that there were
7  several other suppliers that were not listed in
8  the system.
9      Q.  Okay.  And so when you say the paper
10  compendia, by that you mean Red Book, Blue Book
11  or Medi-Span?
12      A.  Correct.
13      Q.  And in Blue Book, anyway, a
14  therapeutically equivalent rating is ZA rated,
15  right?
16          MR. FAUCI:  Objection, form.
17      A.  No.  An A-rated would be
18  therapeutically equivalent in Blue Book.
19      Q.  Do you know in Blue Book how Blue Book
20  indicates that something is A-rated or
21  therapeutically equivalent?
22      A.  It should be an A.  A should be used by

103

1  all the compendia as a therapeutic equivalency
2  rating.
3      Q.  But you would sometimes rely on the
4  compendia for determining the therapeutic
5  equivalence of a product for at least the second
6  step in the process?
7          MR. FAUCI:  Objection, form.
8      A.  I would use the FDA Orange Book.  But
9  in -- as you looked through individual drugs and
10  you did further evaluations you would see that
11  there were other sources that would give you a
12  therapeutic equivalency rating.
13      Q.  And so when something didn't appear in
14  the Orange Book you'd go look at those other
15  sources like you did in Exhibit 9?
16      A.  You could look at other sources, but
17  not to establish whether a drug met the criteria.
18  If a drug did not have the three A ratings or the
19  two, depending on whether there was another
20  formulation, I don't know that you would have
21  then gone to the compendia to try to get that
22  information.  But only a drug already met the

104

1  criteria but then other suppliers appear to be
2  there and then you would gather the information
3  on those suppliers.
4      Q.  Okay.  So let me just make sure -- I
5  know I've spent a lot of time on this.  Let me
6  make sure I get the point.  So using the Andrx
7  example, because Andrx isn't in the Orange Book
8  that A rating wouldn't have been considered in
9  terms of whether or not the inhaler was eligible
10  for a FUL, correct?
11      A.  Correct.
12          MR. FAUCI:  Objection, form.
13      Q.  But then in terms of whether or not
14  Andrx's published price could set the FUL,
15  because it was A-rated in someplace other than
16  Orange Book, that is a price that you would have
17  used?
18      A.  Correct.
19      Q.  I think I get it.
20          MR. BUEKER:  I ask the court reporter
21  to mark for identification as Sexton Exhibit 11 a
22  one-page document that bears the Bates number HHD

105

1  175-1057.
2          (Exhibit Sexton 011 was marked for
3  identification.)
4  BY MR. BUEKER:
5      Q.  Ms. Sexton, please take a look at
6  Exhibit 11 and let me know when you've had a
7  chance to do so.
8      A.  (Reading.) Okay.
9      Q.  Would you state for the record what
10  Exhibit 11 is?
11      A.  It's a pricing sheet generated from the
12  FULs software system.
13      Q.  And there's handwriting on Exhibit 11,
14  right?
15      A.  Yes.
16      Q.  Whose handwriting is that?
17      A.  Mine.
18      Q.  And would you read for the record what
19  your handwriting says?
20      A.  "3/06 per Deirdra in meeting with
21  NACDS, albuterol will be deleted due to PTAG
22  feedback, limited supply issue and costs."  PTAG

Sexton, Gail                                                      May 20, 2008
Washington, DC

29 (Pages 110 to 113)

---

**110**

1       MR. FAUCI:  Objection, form.
2       **A.  It appears that it was a supply issue.**
3       Q.  And that decision was made in part
4    based on feedback that Deirdra Duzor, your
5    superior, received from the National Association
6    of Chain Drug Stores?
7       **A.  And feedback that I received as well.**
8    **And like I said, this was a gray area.  And**
9    **that's why I took it to Deirdra Duzor to make the**
10   **decision.**
11      Q.  But a judgment was made to remove the
12   FUL?
13      **A.  Correct.**
14      Q.  Apart from through the PTAG and through
15   the National Association of Chain Drug Stores,
16   how else did you receive feedback on issues like
17   availability in the marketplace?
18      **A.  It was from pharmacy providers or**
19   **states.  I would receive e-mails about -- and**
20   **other drugs as well on supply issues or cost**
21   **issues.**
22      Q.  Was there a formalized process

---

**111**

1    established or how did you receive that feedback?
2       **A.  No.  There was no formalized process**
3    **established.  But the providers would contact me**
4    **generally by e-mail, sometimes by written letter,**
5    **that a drug was not available or a drug was not**
6    **available at cost or within the federal upper**
7    **limit reimbursement amount.**
8       Q.  How frequently did you get that kind of
9    feedback from providers in the marketplace?
10      **A.  I would say fairly often.  Not so much**
11   **just about this drug, but all drugs.**
12      Q.  And what if anything did you do in
13   reaction to the feedback you were receiving about
14   a market availability?
15      **A.  I would look at the availability in the**
16   **compendia or I may call suppliers or check -- you**
17   **know, verify price availability per the criteria.**
18      Q.  And can you think of instances in which
19   you made a decision to change the federal upper
20   limit based on the feedback you were receiving?
21      MR. FAUCI:  Objection, form.
22      **A.  I can't remember individual drugs or**

---

**112**

1    ingredient, route, strength, dose, product
2    groups.  But yes, changes were made to the
3    federal upper limit based on a pharmacy provider
4    giving us feedback.  Not because they gave us
5    feedback, but it would be the impetus for me to
6    further evaluate the drug.
7       Q.  I know in 2001, which I know was before
8    your time, CMS established a mailbox, an e-mail
9    mailbox for feedback, at least on a particular
10   federal upper limit list.  I'm wondering if that
11   in your tenure still existed.
12      **A.  Not that I know of.**
13      Q.  So to the extent that you got feedback
14   by e-mail it would come to your e-mail address
15   personally?
16      **A.  Correct.**
17      Q.  Would you talk to wholesalers in an
18   effort to determine market availability?
19      **A.  No.  I would only talk to the companies**
20   **listed on in the compendia to determine**
21   **availability or price, or try to determine.**
22      Q.  I think we're finally done with

---

**113**

1    albuterol.
2       MS. OBEREMBT:  Not all of us.
3       MR. BUEKER:  I ask the court reporter
4    to mark as Sexton Exhibit 12 for identification a
5    one-page document that's Bates labeled HHD 175-
6    2024.
7          (Exhibit Sexton 012 was marked for
8    identification.)
9    BY MR. BUEKER:
10      Q.  Please tell me when you've had a chance
11   to take a look at Exhibit 12, Ms. Sexton.
12      **A.  (Reading.) Okay.**
13      Q.  Would you state for the record what
14   Exhibit 12 is?
15      **A.  It's a pricing sheet generated from the**
16   **federal upper limit software system.**
17      Q.  And there's handwriting on Exhibit 12.
18   Whose handwriting is that?
19      **A.  That would be my handwriting.**
20      Q.  What drug does Exhibit 12 pertain to?
21      **A.  Isosorbide mononitrate.**
22      Q.  Can we refer to it as ISMN?

---

Sexton, Gail                                    May 20, 2008
Washington, DC

30 (Pages 114 to 117)

---

**114**

1      A.  I've never referred to it as that.
2      Q.  Okay.  I'll try and say that isosorbide
3  --
4      A.  Oh.  Can we refer to it?
5      Q.  Yes.
6      A.  Oh.  Sure.
7      Q.  Would that be okay?
8      A.  I thought "did I refer to it" --
9      Q.  No.  Can we, because I can't say the
10  name.
11      MR. FLESSNER:  That's mononitrate.
12      Q.  So Exhibit 12 pertains to the 60-
13  milligram tablet form of ISMN?
14      A.  Extended release tablet.
15      Q.  Extended release tablet.  Okay.  And we
16  see the note that we saw on one of the albuterol
17  slides that says "FUL price not greater than
18  another supplier."  Do you see that?
19      A.  Yes.
20      Q.  And that's a note that's generated by
21  the FUL system, but again, not one that you would
22  have paid any attention to?

---

**115**

1      MR. FAUCI:  Objection, form.
2      A.  I'm not saying I wouldn't pay attention
3  to it.  It's generally not something I would have
4  used to determine whether a FUL was -- whether
5  the criteria was met to place a FUL on a drug.
6      Q.  Is it a flag that would have caused you
7  to do further follow-up?
8      A.  No.
9      Q.  In what instances would you have paid
10  attention to it?
11      A.  I don't know that I would have, really,
12  at all.
13      Q.  Okay.  There's a note under -- well,
14  before we go there, from your handwritten note I
15  take it that it's Ethex' Blue Book price that was
16  the basis for the federal upper limit being
17  established for this drug?
18      A.  Correct.
19      Q.  And we see a notation down in the lower
20  left-hand corner, some dates and then it looks
21  like "called."  Is that "called" down there?
22      A.  Yes.

---

**116**

1      Q.  What if anything does that notation
2  indicate to you?
3      A.  That I called those two suppliers --
4  the Ethex, there was no WAC, so I see why I would
5  have called them.  The Purepac, I don't know why,
6  just looking at this pricing sheet, why I would
7  have called them.  Well, it looks like they were
8  the lowest published price, but we did not have a
9  WAC on the Warrick or the Ethex.  That's what it
10  looks like to me.
11      Q.  Okay.
12      A.  So to determine whether there was a
13  lower WAC out there, that looks like that was the
14  impetus for the calls.
15      Q.  And so let me just -- there's a T in
16  the far left-hand column of the chart up at the
17  top.  Do you see -- next to the Purepac?
18      A.  Yes.
19      Q.  What if anything does that T mean?
20      A.  It means it's temporarily unavailable.
21  And per my product group note that Purepac was
22  discontinued at this time, therefore we could

---

**117**

1  input a T in the system, meaning temporarily
2  unavailable, whereby the FUL would be calculated
3  based on another WAC price or another lowest
4  published price, to take it out of the
5  calculation.
6      Q.  To make sure I understand this, you
7  would have called Purepac and I guess learned
8  that it had been -- their NDC for this drug had
9  been discontinued?
10      MR. FAUCI:  Objection, form.
11      A.  Correct.  That's what it appears.
12      Q.  And so you would have taken it out of
13  the calculation and been looking for the next
14  lowest --
15      A.  Correct.
16      Q.  -- published price?
17      A.  Yes.
18      Q.  And it looks like you settled on Ethex
19  as the lowest published price?
20      A.  Yes.
21      Q.  But that you got that price not from
22  the pricing compendia; it was not one that was

---

Sexton, Gail                                           May 20, 2008
Washington, DC

---

118

1  published in the pricing compendia; you got it
2  from some other source?
3  **A.  Yes.  By calling the supplier.**
4  MR. BUEKER:  I'd like to ask the court
5  reporter to mark as Sexton Exhibit 13 for
6  identification a one-page document that's labeled
7  HHD 175-2109.
8  (Exhibit Sexton 013 was marked for
9  identification.)
10  BY MR. BUEKER:
11  Q.  When you've had a chance to look at
12  Exhibit 13, Ms. Sexton, please let me know.
13  **A.  (Reading.)  Okay.**
14  Q.  Would you state for the record what
15  Exhibit 13 is?
16  **A.  It's a pricing sheet generated from the**
17  **federal upper limit software system.**
18  Q.  Okay.  And for what drug?
19  **A.  Lorazepam, one milligram tablet.**
20  Q.  And again, there's handwriting on
21  Exhibit 13.  Whose handwriting is that?
22  **A.  Mine.**

---

119

1  Q.  And would you read for me what that
2  handwriting says?
3  **A.  "2/05, only one WAC under FUL, no**
4  **changes made."**
5  Q.  So is it fair to say that Exhibit 13
6  reflects your consideration of whether to change
7  the FUL for lorazepam and a decision not to
8  change it at this time?
9  **A.  Correct.**
10  MR. BUEKER:  I ask the court reporter
11  to mark as Sexton Exhibit 14 a document that
12  states at the top, "Transmittal number 37 -
13  federal upper limit drug list, and has the date
14  underneath November 20th 2001.
15  (Exhibit Sexton 014 was marked for
16  identification.)
17  BY MR. BUEKER:
18  Q.  Ms. Sexton, just generally what is a
19  CMS transmittal?
20  **A.  Well, transmittal number 37 actually**
21  **was the last -- what I would call the last**
22  **complete update of the FUL list.  And on our**

---

120

1  **website we have the transmittal number 37 lists**
2  **all the drugs that were on the federal upper**
3  **limit list at that time, November 2001.  And then**
4  **a subsequent document called changes made to**
5  **transmittal number 37, which also appears on our**
6  **website, contains additions, deletions, price**
7  **increases and decreases, from this complete list.**
8  Q.  So just so I understand it, Exhibit 14,
9  transmittal number 37, would have been a complete
10  list of the federal upper limits as they had been
11  established -- well, in November of 2001?
12  **A.  Correct.**
13  Q.  It just so happens I have the update.
14  MR. BUEKER:  Let's ask the court
15  reporter to mark as Exhibit 15 the -- what is a
16  document that's labeled at the top "Federal Upper
17  Limit (FUL) changes to transmittal number 37."
18  (Exhibit Sexton 015 was marked for
19  identification.)
20  BY MR. BUEKER:
21  Q.  Ms. Sexton, is Exhibit Number 15 the
22  update from the CMS website that you were talking

---

121

1  about just a minute ago?
2  **A.  Correct.**
3  Q.  And it says up at the top "current as
4  of 12/19/2006."  You and I talked earlier about
5  the fact that that's the last time CMS has
6  updated its FUL prices, correct?
7  **A.  Correct.**
8  Q.  So Exhibit 15 reflects any changes that
9  CMS has made to federal upper limits since
10  November 20th 2001?
11  **A.  Correct.**
12  Q.  So if there's been no change reflected
13  in Exhibit 15 then the FUL price that remains in
14  effect today is the price shown in transmittal
15  number 37, Exhibit 14?
16  **A.  It should be.**
17  Q.  Would you turn with me to page 11 of
18  Exhibit 14?  And would you state for the record -
19  - would you tell me with reference to Exhibit 14
20  what federal upper limit CMS had established for
21  the 1 milligram tablet of lorazepam in 2001?
22  **A.  0.5718.**

---

Sexton, Gail

May 20, 2008

Washington, DC

33 (Pages 126 to 129)

126

1    **A.   Well, I haven't looked through this**
2    **entire Exhibit 15.**
3        Q.   Okay.  Take a minute and do that.
4    **A.   Okay.  (Witness complies.)**
5        MR. FAUCI:  John, are you representing
6    that lorazepam does not appear?
7        MR. BUEKER:  Yeah.  I'm pretty
8    confident she won't find it.  I didn't, but --
9        MR. FAUCI:  And we're just talking
10   about the 1 milligram?
11       MR. BUEKER:  We're just talking about
12   the 1 milligram.
13   **A.   Okay.  I only saw the 2-milligram.**
14       Q.   Right.  So would you agree with me that
15   as of, say, February of 2005, the federal upper
16   limit for the 1 milligram lorazepam tablet
17   remained .5718?
18   **A.   It appears that it did, yes.**
19       Q.   Turning back to Exhibit 13 for a
20   moment, Exhibit 13 shows that the federal upper
21   limit system calculated a lower federal upper
22   limit for the 1 milligram of lorazepam in

127

1    February of 2005.  Right?
2    **A.   Mm-hmm.**
3        Q.   And CMS chose not to implement that
4    lower federal upper limit in February 2005,
5    correct?
6    **A.   That's what it looks like here.**
7        Q.   And the lower federal upper limit that
8    the CMS FULs system calculated was based on the
9    Major Pharmaceuticals' WAC price of .077?
10   **A.   Correct.**
11       Q.   And we see that the United Research
12   Laboratories WAC of .3812 still remains?
13   **A.   URL looks like that was unavailable.**
14       Q.   Well, your package note indicates that
15   it was unavailable until April of 2003, correct?
16   **A.   Oh, okay.**
17       Q.   In any event, the FUL system was
18   picking up a lower published price that CMS
19   decided not to use in setting the federal upper
20   limit, correct?
21   **A.   Mm-hmm.**
22       MR. FAUCI:  Objection, form.

128

1        Q.   I'm sorry.  Did you --
2    **A.   That's what it appears.  I don't know**
3    **if there were any other pricing sheets or**
4    **documentation on this.**
5        Q.   But at least on Exhibit 13, one pricing
6    sheet CMS -- you in particular -- had before you
7    a lower published price that was not used to set
8    the federal upper limit?
9    **A.   Mm-hmm.**
10       Q.   That's correct?
11   **A.   Yes.**
12       MR. BUEKER:  I ask the court reporter
13   to mark as Sexton Exhibit 17 an OIG report that's
14   titled "Addition of qualified drugs to the
15   Medicaid federal upper limit list."
16       (Exhibit Sexton 017 was marked for
17   identification.)
18   BY MR. BUEKER:
19       Q.   Take your time with Exhibit 17 and then
20   I'll have some questions.
21   **A.   (Reading.)  Okay.**
22       Q.   Are you familiar with Exhibit 17, Ms.

129

1    Sexton?
2    **A.   Yes.  I have seen this report.**
3        Q.   You testified earlier that one of your
4    responsibilities as the program lead on FULs was
5    to help CMS comment on OIG reports.  Is this one
6    of the reports you recall helping CMS to comment
7    on?
8    **A.   This report was evolving right at the**
9    **time that I was hired by CMS.  I don't know at**
10   **what stage, but I remember maybe putting together**
11   **a draft response to this.  And I don't know if**
12   **that was in response to the OIG's draft or their**
13   **final report or what.  I know this was all**
14   **evolving at the time.**
15       Q.   You're aware that one of the kind of
16   major conclusions of this OIG report was that CMS
17   wasn't adding qualified drugs, meaning drugs
18   eligible for the federal upper limit, to the
19   federal upper limit list fast enough and that was
20   costing Medicaid significant dollars, right?
21       MR. FAUCI:  Objection.
22   **A.   Yes.**

Sexton, Gail                                    May 20, 2008
                    Washington, DC

---

### 134

1    Q. Ms. Sexton, at the top of Exhibit 18
2 there's a response from Mr. Reed. Do you see
3 that?
4    **A. Yes. To Kim.**
5    Q. And who might Kim be?
6    **A. The only person I would know would be**
7 **Kim Howell who's on the pharmacy division. I**
8 **can't verify that's the Kim. But that's --**
9    Q. Okay. Mr. Reed says "Could you try
10 MDR?" Do you know what MDR stands for?
11   **A. Medicaid drug rebate system. Our**
12 **database system for MDR.**
13   Q. What kind of information is on the MDR
14 system?
15   **A. Labeler information, NDCs, prices,**
16 **average manufacturer prices, best prices.**
17   Q. So the AMPs and best prices that
18 manufacturers report quarterly to CMS are
19 contained on the MDR system?
20      MR. FAUCI: Objection to form.
21   **A. I believe so.**
22   Q. Are AMPs information that you've ever

### 135

1 used in terms of setting federal upper limits?
2    **A. At this point in time?**
3    Q. At this point in time.
4    **A. In 2004 -- no.**
5    Q. Have you ever set a federal upper limit
6 based on an AMP?
7    **A. No. Not during this time. I mean,**
8 **with the DRA changes where AMPs come into play**
9 **with the federal upper limit we have looked at**
10 **AMPs in regard to multiple-source drugs. But not**
11 **during this time frame, I have not.**
12   Q. Did you ever use AMPs as a reference
13 point when you were setting federal upper limits
14 based on the published prices?
15   **A. Not that I recall. No.**
16   Q. Turn with me back to Exhibit 17,
17 please, and specifically to pages 20 and 21.
18 Pages 20 and 21 are the response that CMS sent to
19 OIG in response to the December 2004 report on
20 federal upper limits, correct?
21   **A. Correct.**
22   Q. And the response is sent out under the

### 136

1 signature of Mark McClellan?
2    **A. Yes.**
3    Q. What role did Mr. McClellan have at the
4 time, December of 2004, at CMS?
5    **A. He would have been the administrator of**
6 **CMS, the agency.**
7    Q. Does that mean that he's the highest
8 ranking official at CMS?
9    **A. Yes. I believe so.**
10   Q. Turn with me to page 21, the paragraph
11 that begins while.
12   **A. Mm-hmm.**
13   Q. Mr. McClellan writes in the second
14 sentence "Before a drug is placed on the FUL list
15 it is important to be certain that the products
16 listed are actually available in the
17 marketplace." Did I read that correctly?
18   **A. Correct.**
19   Q. Would you agree with Mr. McClellan that
20 it was important to make that determination
21 before a federal upper limit was added?
22   **A. I would agree that it's -- that it**

### 137

1 **would be important to make sure they are**
2 **available, if possible. If we could possibly**
3 **determine that.**
4    Q. And if you could possibly determine
5 it's important to make sure they're available at
6 the federal upper limit price, correct?
7       MR. FAUCI: Objection, form.
8    **A. Not at the federal upper limit price,**
9 **but at the published price. That would be -- the**
10 **price that we would verify if we called a**
11 **supplier would be their published price, not the**
12 **federal upper limit price, or that drugs were**
13 **available at the federal upper limit price.**
14   Q. Would you agree with Mr. McClellan in
15 the next sentence that "New drugs may be in
16 limited supply or unavailable nationwide"?
17   **A. Would I agree with that statement?**
18   Q. Yes. In your experience.
19   **A. I couldn't answer that in my**
20 **experience.**
21   Q. Would you agree with Mr. McClellan in
22 the next sentence that "CMS manually verifies

---

---

138

1  that the FUL drugs continue to be available for
2  manufacturers and suppliers to assure current
3  market availability"?
4        MR. WINGET-HERNANDEZ: Objection, form.
5  You need to read that again.
6        A.  When possible we would manually verify
7  that drugs were available.
8        Q.  That was one of the reasons you
9  undertook the manual verification process that
10  we've been talking about this morning?
11        A.  Yes, correct.
12        Q.  One of the other things that you've
13  tried to do through the manual verification
14  process is, as Mr. McClellan states in the second
15  sentence, to make sure that they're actually
16  available in the marketplace before establishing
17  a federal upper limit, correct?
18        MR. FAUCI:  Objection to form.
19        A.  It says before a drug is placed on the
20  FUL list, right, it is important to make certain
21  that the products are actually available in the
22  marketplace, yes.  And that would be the reason

---

139

1  that we would attempt manual verifications on the
2  drugs.
3        Q.  Okay.  You mentioned earlier
4  maintaining a FUL follow-up book?
5        A.  Mm-hmm.
6        Q.  In what form?  Hard copy, electronic?
7        A.  It's a hard copy separated into the
8  reason that the FUL could not be applied at the
9  time:  We didn't have the proper amount of A-
10  rated drugs, if we did not have three suppliers
11  or if the FUL was higher than AWP.
12        Q.  Are any of the documents we've looked
13  at today from that book?
14        A.  No.  This was a handwritten book that I
15  compiled just so that each month when -- or each
16  quarter when I would go WAC to publish a new
17  federal upper limit update I could re-check
18  multiple-source drugs that didn't previously
19  qualify for a FUL but may qualify for a FUL at a
20  future date.
21        Q.  Were you asked to provide a copy of
22  that book to the lawyers from CMS or DOJ in

---

140

1  connection with this case?
2        A.  I don't remember.
3        Q.  Do you recall producing a copy of that
4  book to any of the lawyers involved in this case?
5        A.  I really don't remember if I did or
6  not.  Or if I was asked to or --
7        MR. BUEKER:  Laurie, I'll represent
8  that I haven't seen it in our production.  I
9  don't know if you've seen it or you think it's
10  been produced.  But if it hasn't I would ask that
11  it be produced.
12        MS. OBEREMBT:  We'll check on that for
13  you.
14        MR. BUEKER:  I think I'm about done.
15  If I might have five minutes.  I don't know what
16  people's schedules are and what the witness'
17  preference is with regard to lunch.  Maybe we'll
18  go off the record and we'll see from there.
19        THE VIDEOGRAPHER:  Off the record at
20  12:27.
21        (Recess.)
22        (Exhibit Sexton 019 was marked for

---

141

1  identification.)
2        THE VIDEOGRAPHER:  On the record at
3  12:39.
4  BY MR. BUEKER:
5        Q.  Welcome back, Ms. Sexton.  I've had
6  during the break the court reporter mark as
7  Sexton Exhibit 19 for identification a three-page
8  document that bears in the lower right-hand
9  corner the Bates label on the first page NASMD-
10  0001304.  Do you have Exhibit 19 in front of you?
11        A.  Yes.
12        Q.  Exhibit 19 -- what is Exhibit 19?
13        A.  The minutes from a Pharmacy Technical
14  Advisory Group conference call from March 16th
15  2006.
16        Q.  At the top of page 1 of Exhibit 19
17  there's a list of people who participated in that
18  meeting, correct?
19        A.  Correct.
20        Q.  And you see that you are one of the
21  individuals who participated in that particular
22  PTAG meeting?

150

1    Q.  And yet it also shows that the source
2 code up above in the printed material is B also
3 for First Databank?
4    **A.  Where it's listed in the -- on the**
5 **pricing sheet?**
6    Q.  Yes, ma'am.
7    **A.  Yes.  Yes.  Mm-hmm.  That price would**
8 **have been from First Databank, Blue Book.**
9    Q.  Okay.  So if the pricing sheet or if
10 the computer generated portion of the pricing
11 sheet shows that the price listed for Ethex's
12 isosorbide mononitrate is zero, then how did you
13 go about getting the price of 13 and a half cents
14 for Ethex from First Databank as shown in your
15 notes below?
16    **A.  Well, it looks like I called Ethex to**
17 **obtain the price.  And the source -- I cannot**
18 **recall, but an assumption I would make is that**
19 **because, again, First Databank is the only**
20 **compendium that listed any pricing for Ethex for**
21 **this drug.**
22    Q.  Okay.  When you note -- or for that

151

1 matter, even if you don't write it down, when you
2 called the companies that were listed on the
3 pricing sheet, what did you say to them in order
4 to get the information that you were seeking?
5        MR. FLESSNER:  Objection to form.
6        MR. BUEKER:  I join in the objection.
7        MR. WINGET-HERNANDEZ:  What's the
8 objection?
9        MR. FLESSNER:  It's not what she said.
10        MR. BUEKER:  It's also overly broad and
11 vague.
12        MR. WINGET-HERNANDEZ:  Okay.
13 BY MR. WINGET-HERNANDEZ:
14    Q.  Let me ask you a different question.
15 I'm going to try to meet the objections if I can.
16 Did you testify earlier that you sometimes called
17 the companies that are listed on the pricing
18 sheets for some purpose?
19    **A.  Yes.**
20    Q.  And what purpose did you call them for?
21    **A.  To determine if that supplier was still**
22 **-- still had the NDC available and if it was**

152

1 **available at that price.  We would try to -- we**
2 **would attempt to get both pieces of that**
3 **information.**
4    Q.  And when you say that price, what price
5 are you referring to?
6    **A.  The price that is listed or if there**
7 **was a zero we would try to obtain what the WAC**
8 **price is.**
9    Q.  In order to determine whether the drug
10 was available at the price that was listed on the
11 pricing sheet, what would you have asked the
12 company?
13        MR. FLESSNER:  Objection.
14    **A.  I would ask them -- I would give them**
15 **the NDC number and ask if that product was**
16 **available and could they supply -- like in the**
17 **case of Warrick Pharmaceuticals where there's a**
18 **zero, just using that as an example, I would ask**
19 **if they had a current WAC price available if the**
20 **drug was available.**
21    Q.  And can you say whether they typically
22 had a response to that question for you?

153

1        MR. BUEKER:  Objection.
2        MS. REID:  Objection.
3        MR. FLESSNER:  Objection.
4    **A.  Sometimes they would.  Sometimes if I**
5 **would call a supplier they would only give the**
6 **information to account holders.  They would ask**
7 **if I was an account holder.  And of course I was**
8 **not an account holder.  So I would say the**
9 **majority of the time they did give the**
10 **information, but there were numerous times where**
11 **they did not, they would not give the**
12 **information.**
13    Q.  If the information that was printed on
14 the pricing sheet showed a WAC of zero, what
15 would you ask the supplier in order to determine
16 what was the WAC?
17    **A.  If the product was available and could**
18 **they give me a current WAC price.**
19    Q.  Can you estimate as you sit here today
20 over the course of your experience as the lead
21 person for the FUL program about what proportion
22 of the time you made these calls where there was

02/09/2005

# Federal Upper Limit System



EXHIBIT
Sexton 13
5/20/08   BW

Product Group : 959
Strengths : 1MG
...utes : ORAL
...gredients : LORAZEPAM

Package Size :  100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.82950 | 0.00000 | M | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.82950 | 0.07700 | B | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.82950 | 0.07700 | R | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| T | 0.00000 | 0.83770 | 0.00000 | M | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.00000 | M | 00781/1404/01 | SANDOZ | |
| T | 0.00000 | 0.83770 | 0.00000 | M | 53489/0358/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| T | 0.00000 | 0.83770 | 0.38120 | B | 53489/0358/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| T | 0.00000 | 0.83770 | 0.38120 | B | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| T | 0.00000 | 0.83770 | 0.38120 | R | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| T | 0.00000 | 0.83770 | 0.38120 | R | 53489/0358/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.83770 | 0.38190 | B | 00781/1404/01 | SANDOZ | |
| | 0.00000 | 0.83770 | 0.38190 | R | 00781/1404/01 | SANDOZ | |
| | 0.00000 | 0.88000 | 0.00000 | M | 00591/0241/01 | WATSON PHARMA | |
| | 0.00000 | 0.88000 | 0.38140 | B | 00591/0241/01 | WATSON PHARMA | |
| | 0.00000 | 0.88000 | 0.38140 | R | 00591/0241/01 | WATSON PHARMA | |
| | 0.00000 | 0.88250 | 0.00000 | M | 00228/2059/10 | PUREPAC | |
| | 0.00000 | 0.88250 | 0.00000 | M | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88250 | 0.00000 | R | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88250 | 0.38190 | B | 00228/2059/10 | PUREPAC | |
| | 0.00000 | 0.88250 | 0.38190 | R | 00228/2059/10 | PUREPAC | |
| | 0.00000 | 0.88250 | 0.39750 | R | 63304/0773/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88250 | 0.40200 | B | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 1.31490 | 0.00000 | M | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.00000 | 1.31490 | 1.05190 | B | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.00000 | 1.31490 | 1.05190 | R | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.39750 | 0.88250 | 0.00000 | M | 63304/0773/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.39750 | 0.88250 | 0.39750 | B | 63304/0773/01 | RANBAXY PHARMACEUTICALS, INC. | |

FULs Price : .1155
Percent Difference : 0.00
High Price : 3.00000

Prior FULs Price : .1155
Source Code : 0
Low Price : R

**\*\*\*FULs Price not greater than another supplier\*\*\***

2/05 - only 1 wac under
FUL - no change made -

**Package Size Notes:**
t=url/mutual temp. unavailable until April 2003 (1/03)

**Product Group Notes:**
0

EXHIBIT B

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL       )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

PRICE LITIGATION             )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO     )

U.S. ex rel. Ven-a-Care of   )  Judge Patti B. Saris

the Florida Keys, Inc.       )

     v.                      )  Chief Magistrate

Abbott Laboratories, Inc.,   )  Judge Marianne B.

No. 06-CV-11337-PBS          )  Bowler

- - - - - - - - - - - - - - -

     (cross captions appear on following pages)

Videotaped deposition of SUE GASTON

Volume I

Washington, D.C.

Thursday, January 24, 2008

9:00 a.m.

|  | 46 |
|---|---|
| 1 | Q.   And did you work with anyone else in that |
| 2 | area at HCFA? |
| 3 | A.   Yes. |
| 4 | Q.   Who else was involved in that? |
| 5 | A.   When I first started, Pete Rodler. |
| 6 | MR. WINGET-HERNANDEZ:  Could you spell it |
| 7 | for us? |
| 8 | THE WITNESS:  Rodler, R-o-d-l-e-r. |
| 9 | Q.   Anyone else? |
| 10 | A.   Cindy Bergin.  I mentored her later. |
| 11 | Q.   Her last name is spelled out? |
| 12 | A.   B-e-r-g-i-n. |
| 13 | Q.   Is she still with HCFA? |
| 14 | A.   Yes. |
| 15 | Q.   Is her name still Cindy Bergin? |
| 16 | A.   Yes. |
| 17 | Q.   Who else? |
| 18 | A.   That was it. |
| 19 | Q.   Can you recall anyone else during your |
| 20 | time from 1991 to February of 2003 who was involved |
| 21 | in the federal upper limit program? |
| 22 | MS. MARTINEZ:  Objection, form. |

|  | 47 |
|---|---|
| 1 | Oh, you can answer.  I make these little |
| 2 | form objections.  Don't worry. |
| 3 | THE WITNESS:  Okay. |
| 4 | A.   Not that I can remember. |
| 5 | Q.   What was the nature of Mr. Reed, your |
| 6 | boss', involvement with the FULs, as we'll call |
| 7 | them?  Federal upper limits, FULs, is that correct? |
| 8 | A.   Correct. |
| 9 | Q.   What was the nature of his involvement in |
| 10 | the FULs? |
| 11 | A.   Well, he had last say on anything that |
| 12 | was sent out or published. |
| 13 | Q.   So did you discuss issues related to the |
| 14 | FUL program with Mr. Reed? |
| 15 | A.   Yes. |
| 16 | Q.   Anyone else besides Mr. Reed you recall |
| 17 | having discussions about the FUL program with? |
| 18 | A.   Can you be more specific with your |
| 19 | question? |
| 20 | Q.   Is there anyone else within HCFA that you |
| 21 | discussed issues relating to the federal upper limit |
| 22 | program with? |

|  | 48 |
|---|---|
| 1 | A.   Relating to the work that I did on FULs? |
| 2 | Q.   Yes. |
| 3 | MS. MARTINEZ:  Objection, form. |
| 4 | A.   Only the people that I worked with, Pete |
| 5 | Rodler or Cindy Bergin. |
| 6 | MR. COOK:  What is the nature of the form |
| 7 | objection?  Maybe I'm missing something. |
| 8 | MS. MARTINEZ:  Time period.  Just for the |
| 9 | record, I think you're only addressing during the |
| 10 | 1991 to 2003. |
| 11 | MR. TORBORG:  Correct. |
| 12 | MS. MARTINEZ:  And I just -- if that's |
| 13 | the period of time that you're referring to I have |
| 14 | no objection. |
| 15 | MR. WINGET-HERNANDEZ:  My objection was |
| 16 | lack of foundation.  I don't think you've |
| 17 | established that there was anything called a FUL |
| 18 | program. |
| 19 | BY MR. TORBORG: |
| 20 | Q.   In your job today are you still working |
| 21 | on issues relating to the FUL program? |
| 22 | A.   No. |

|  | 49 |
|---|---|
| 1 | Q.   Do you know who's handling those issues |
| 2 | today? |
| 3 | A.   Gail Sexton. |
| 4 | Q.   Anyone else? |
| 5 | A.   Not that I'm aware of. |
| 6 | Q.   Did you talk with anyone else about the |
| 7 | federal upper limit program from April 1991 through |
| 8 | February 2003 besides those within HCFA? |
| 9 | A.   When you say talk to anyone else -- |
| 10 | Q.   About issues relating to the FUL program |
| 11 | besides those within HCFA. |
| 12 | MS. MARTINEZ:  Objection, form. |
| 13 | A.   Do you mean for establishing the price -- |
| 14 | for doing -- |
| 15 | Q.   Anything. |
| 16 | A.   For anything. |
| 17 | Q.   I'm starting broad and hope to narrow it |
| 18 | down. |
| 19 | MR. WINGET-HERNANDEZ:  Objection, form. |
| 20 | MS. MARTINEZ:  My objection is to the |
| 21 | breadth, so you know.  Difficult to answer. |
| 22 | A.   Yeah.  I find it difficult to answer. |

Gaston, Sue                                              January 24, 2008
Washington, DC

14 (Pages 50 to 53)

---

50

1  There's times when I would call various states to go
2  ahead some feedback from them on availability of
3  drugs or various questions like that.
4      Q.  Do you recall discussing issues relating
5  to the federal upper limit program with anyone else
6  besides those within HCFA and states,
7  representatives of states?
8          MS. MARTINEZ:  Objection, form.
9      A.  Here again, I'm not sure what you mean by
10  discussing.  But I would call drug manufacturers to
11  verify pricing that's published in compendia.
12      Q.  All right.  Tell me about those
13  conversations.
14          MS. MARTINEZ:  Objection, form.
15      Q.  Who were they with and what you recall
16  being discussed?
17          MS. MARTINEZ:  Objection, form.
18      A.  I don't recall who it would be with.  I
19  can just answer in general terms that if something
20  was questionable in the pricing compendia then we
21  would try to call the manufacturer to verify
22  availability.

---

51

1      Q.  Did you discuss with drug manufacturers
2  anything other than availability of the drugs?
3      A.  Sometimes we would try to verify the
4  price that's published in the compendia if it was
5  still current.
6      Q.  And by price, are we talking about
7  average wholesale price or something more than that?
8      A.  Average wholesale price, direct price or
9  wholesale acquisition cost.
10      Q.  Do you recall any discussions with anyone
11  from Abbott Laboratories concerning pricing?
12      A.  I don't recall.
13      Q.  Why would you be making those contacts
14  with drug manufacturers?
15      A.  To verify that the information in the
16  drug compendia was accurate in order to be able to
17  set an accurate federal upper limit amount.
18      Q.  And when you say accurate, what do you
19  mean by that?
20      A.  Following federal guidelines on setting
21  the upper limit reimbursement amount, we used the
22  compendia.  So we wanted to make sure the

---

52

1  information was current.
2      Q.  Did you believe that the average
3  wholesale prices in the compendia represented the
4  average amount at which people could buy drugs from
5  wholesalers?
6          MS. MARTINEZ:  Objection, form.
7      A.  I couldn't make that statement.
8      Q.  You weren't -- when you were having
9  conversations with drug manufacturers, you weren't
10  asking them something like is this the average price
11  at which you sell drugs to wholesalers?
12      A.  No.
13      Q.  Okay.  As you probably have guessed
14  already, given the nature of this suit and where you
15  worked at CMS, my questions will largely focus on
16  the topic of state Medicaid programs payment to
17  providers for dispensing drugs to Medicaid
18  beneficiaries.  Do you understand that topic?
19      A.  Yes.
20      Q.  As well as issues relating to the federal
21  upper limit program.  In your experience at CMS what
22  was CMS's role when it came to the amounts that

---

53

1  state Medicaid programs reimburse for drugs?
2          MS. MARTINEZ:  Objection, form.
3      A.  Could you explain your question?
4      Q.  Yeah.  What I'm trying to get is you
5  worked on what state Medicaid programs paid
6  providers for dispensing drugs.  Is that right?
7      A.  We looked at their state plan amendments.
8  That would have that information in there.
9      Q.  Okay.  Besides reviewing state plan
10  amendments what else did HCFA, now CMS, do when it
11  came to the topic of state Medicaid programs payment
12  for drugs?
13          MS. ALBEE:  Objection.
14          MS. MARTINEZ:  Objection, form.
15      A.  Could you give me some more detail?
16      Q.  I'm just trying to figure out what CMS's
17  role was when it came to what state Medicaid
18  programs paid for drugs, apart from approval of the
19  state plan amendments.
20      A.  We would encourage the states to set
21  reimbursement amounts that follow federal guidelines
22  and that were reasonable and supportable.

---

94

1          MS. MARTINEZ:  Objection, form.
2      A.  I retained the documents.
3      Q.  All of them?
4      A.  I can't say all of them.  What was
5   pertinent to what I was working on at that time.
6      Q.  But if it didn't relate to what you were
7   working on at the time, you didn't make an effort to
8   keep them; is that right?
9          MS. MARTINEZ:  Objection, form.
10     A.  I can't answer that.
11     Q.  Did you use e-mail?
12     A.  Yes.
13     Q.  When did you start using e-mail?
14     A.  I can't remember.
15     Q.  Was it during the time that you were
16  working on state plan amendments and federal upper
17  limits?
18     A.  Yes.
19     Q.  Did you have e-mail correspondence on
20  those subjects with anyone?
21     A.  Yes.
22     Q.  Was that something that you did

95

1   regularly?
2      A.  Yes.
3      Q.  And where are those e-mails today?
4          MS. MARTINEZ:  Objection, form.
5      A.  I don't know.
6      Q.  Did you take any efforts to keep any
7   e-mails?
8          MS. MARTINEZ:  Objection, form.
9      A.  From that period?
10     Q.  Yes.
11     A.  I really -- I'm not sure.
12     Q.  Do you have a sense on your computer --
13  what is the approximate date of the oldest e-mail
14  that you have access to on your computer?
15     A.  I have no idea.
16     Q.  Did you correspond by e-mail with people
17  who administered the state Medicaid programs?
18     A.  Yes.
19     Q.  Relating to the way in which they paid
20  for drugs?  Is that a topic you e-mailed them about?
21     A.  Are you saying relating to state plan
22  amendments?

96

1      Q.  That and anything else dealing with
2   payment of drugs.
3          MS. MARTINEZ:  Objection, form.
4      A.  Yes.
5      Q.  Is that something that you did regularly?
6      A.  When it was necessary.
7      Q.  Do you recall being asked to search for
8   documents relating to drug pricing litigation on or
9   around 2003?
10     A.  I wouldn't -- I can't remember
11  specifically that time frame.
12     Q.  But you recall an effort being made to
13  search for documents relating to drug pricing
14  litigation; is that fair to say?
15     A.  Correct.
16     Q.  And what involvement did you have in that
17  search?
18     A.  I just searched my folders to see if I
19  had any information that was relevant to the
20  request.  And generally the request would come
21  through Larry's division, through policy, and they
22  would copy me to see if we had any documents.  And

97

1   if I did I would share them back with the policy
2   folks and they would submit the document request.
3      Q.  Did you have any documents?
4      A.  I may have.
5      Q.  You don't recall?
6      A.  I don't recall.
7      Q.  Did you search your hard drive in your
8   computer for documents that may have been responsive
9   to the document requests?
10     A.  I may have.
11         MR. TORBORG:  Okay.  We'll mark this as
12  our next exhibit.  I think I have ten copies of
13  these, of the newly marked exhibits.  I'll let you
14  all fight about who gets the copies and who has to
15  share.
16             (Exhibit Abbott 453 was
17             marked for
18             identification.)
19         MS. MARTINEZ:  There's only four on the
20  plaintiff's side.  Could we have one more on the
21  plaintiff's side?  Thanks.
22         MR. TORBORG:  Now, when you say

Gaston, Sue                                    January 24, 2008
                    Washington, DC

                                    55 (Pages 214 to 217)

| 214 |
|---|

1  as you might guess from this document, I'm now
2  moving to the subject of federal upper limits for
3  the series of questions for you on this exhibit.
4        My first question will be if you're
5  familiar with this regulation.
6      **A.  I've seen it before.  I'm not that**
7  **familiar with it at this point.**
8      Q.   But it's something that you would have
9  reviewed in connection with your role in the federal
10 upper limit program; is that fair to say?
11       MS. MARTINEZ:  Objection, form.  I just
12 want to clarify.  The document, the Federal Register
13 has the regulation at the end and the beginning part
14 is the preamble and the issuance of it.  The
15 regulation is towards the end.
16     **A.  I would be more familiar with the reg.**
17 **I'm sure that I probably had the preamble available**
18 **to me.  But working on the federal upper limit we**
19 **would actually use the reg.**
20     Q.   Okay.  So if I could ask you to go to
21 page 687 --
22     **A.  What?**

| 215 |
|---|

1      Q.   687.  The Bates page 687 in the bottom
2  right-hand corner.
3      **A.  Okay.**
4      Q.   The second column there is a section
5  called part 447, payments for services?
6      **A.  Correct.**
7      Q.   And there's the rest of that page and
8  then the next page, is that the actual federal upper
9  limit regulation --
10     **A.  Yes.**
11     Q.   -- amongst other things?
12     **A.  Right.**
13     Q.   I take it you had no involvement in the
14 drafting of this regulation prior to its issuance.
15 Is that fair to say?
16     **A.  Correct.**
17     Q.   The summary, if you go back to the first
18 page of Abbott Exhibit 284, there's a section in the
19 first column that says "background of the existing
20 system."  Do you see that?
21     **A.  Yes.**
22     Q.   The second paragraph there says "The

| 216 |
|---|

1  department rules are intended to ensure that the
2  federal government acts as a prudent buyer for drugs
3  under certain federal health programs."  Do you see
4  that?
5      **A.  Yes, I do.**
6      Q.   And is it your understanding that federal
7  upper limits applied to certain multiple source
8  drugs that satisfy criteria; is that right?
9      **A.  Correct.**
10     Q.   And why would you need to establish an
11 upper limit for multiple source drugs?
12       MR. WINGET-HERNANDEZ:  Objection, form.
13       MS. MARTINEZ:  Objection, form.
14     Q.   Do you have an understanding of what the
15 purpose of the FUL program was?
16     **A.  Yes.**
17     Q.   What was your understanding?
18     **A.  To set a reimbursement amount for states**
19 **to achieve savings for states and Medicaid.**
20     Q.   Why not just use the average wholesale
21 price of these multiple source drugs to set the
22 reimbursement amount?

| 217 |
|---|

1        MS. MARTINEZ:  Objection, form.
2      **A.  Because the regulations say to use the**
3  **lowest price in the published compendia.**
4      Q.   Do you have an understanding of why this
5  regulation existed, why you didn't just use the
6  average wholesale price as published in the
7  compendia?
8        MR. WINGET-HERNANDEZ:  Objection to form.
9        MS. MARTINEZ:  Objection, form.
10     **A.  I don't understand the rationale.  I had**
11 **nothing to do with the development of the**
12 **regulation.**
13     Q.   So in your work on federal upper limits
14 you had no idea of what the purpose of the program
15 was?
16     **A.  The purpose of the program is to achieve**
17 **savings.  I don't know the purpose of the statement**
18 **you made before, of the pricing, you know, what was**
19 **involved in the methodology.  I understand the**
20 **purpose of the program.**
21     Q.   And it was to achieve savings on payment
22 for multiple source drugs, correct?

Gaston, Sue                                                January 24, 2008
Washington, DC

62 (Pages 242 to 245)

---

242

1    book or something?
2         MR. TORBORG:  I think it's dated on the
3    side 1996.
4         MS. MARTINEZ:  Right.  I'm just saying
5    for the record, we're not going to have an exhibit,
6    so --
7         MR. TORBORG:  Sure.  That's a good idea.
8    I'll do that.
9         BY MR. TORBORG:
10   Q.   Ms. Gaston, do you recognize that book?
11   A.   Yes.
12   Q.   Okay.  Could you tell us what it is?
13   A.   It's the FDA Orange Book.
14   Q.   It's a hard copy version dated 1996?
15   A.   Correct.
16   Q.   And the FDA publishes its Orange Book
17   once every year; is that right?
18   A.   I'm not sure.
19   Q.   Okay.  In any event, this one at the side
20   says it's 1996?
21   A.   Correct.
22   Q.   And is it your understanding that the

---

243

1    Orange Book has different sections, one of which is
2    titled Product Drug Cost Listing or something like
3    that?  If you look at the top page there.
4    A.   Are you talking about in here?  It's been
5    years since we've I've looked at one of these books,
6    so --
7    Q.   If you look at the spot that I showed
8    you, where your finger is, what does the top of that
9    say?  I can't remember exactly.
10   A.   "Prescription drug product list."
11   Q.   Do you know what that means?
12   A.   Prescription drug product list.
13   Q.   So that's a list of prescription products
14   in the Orange Book --
15   A.   Okay.
16   Q.   -- by alphabetical order?  Is that what
17   it looks like?
18   A.   That's what it looks like.
19   Q.   And looking at vancomycin hydrochloride
20   there, there are a number of different manufacturers
21   listed; is that right?
22   A.   Correct.

---

244

1    Q.   Which manufacturers are there?
2         MS. MARTINEZ:  Excuse me.  Just for the
3    record, could we have -- again, since we have no
4    exhibit, could we have the page that she's looking
5    at, page number for the record?
6         THE WITNESS:  3-302.
7    A.   Fujisawa, Lilly and I think that's it.
8    Q.   Can I take a look at that real quick?
9    A.   Mm-hmm.
10   Q.   Did you see one for Abbott?
11   A.   Oh, okay.  You're over here too.  It's
12   also on page 3-303.  Is this a continuation over
13   here of this?
14   Q.   That's the way that I read it, but --
15        MS. MARTINEZ:  Since we can't see what --
16   A.   Okay.  Ledderle, it looks like they're in
17   here too.  Abbott, Elkins.  Okay.  That's it.
18   Q.   Now, based on your understanding, are
19   there any of those vancomycin products that are not
20   rated A?
21   A.   It doesn't appear that way.
22   Q.   So under the regulatory and statutory

---

245

1    criteria vancomycin hydrochloride would qualify as a
2    drug product that would satisfy the FUL criteria; is
3    that right?
4         MR. WINGET-HERNANDEZ:  Objection, form.
5         MS. MARTINEZ:  Objection, form.
6    A.   I would say no, because -- just because
7    it's A-rated.  This is an injection.
8    Q.   Okay.
9    A.   So I don't know if this product -- if
10   this is an injectable, then there are certain
11   products that are in the included on the FUL.
12   Q.   And we'll talk about that in a bit.  Why
13   don't we talk about it now.  Why are not injectable
14   products included on the FUL?
15        MR. WINGET-HERNANDEZ:  Objection, form.
16   A.   When I started to work on the FULs
17   injectable products were not included.  And it's my
18   understanding that the purpose of the FUL program is
19   to set reimbursement rates on drugs that are
20   generally used by the Medicaid population in an
21   outpatient-type, like a pharmacy-type setting, most
22   commonly used products.  And it's my understanding

---

Gaston, Sue

January 24, 2008

Washington, DC

63 (Pages 246 to 249)

---

246

1    that injectables and other products many times are
2    provided in a physician's office and other type of
3    settings where they might not be claimed separately.
4    They might be included in a payment, like a
5    physician payment.
6            Also, injectables, many times when
7    they're billed on the claim form they're not --
8    they're billed with codes rather than NDC numbers,
9    which means that the states may not be paying for
10   them through their pharmacy benefit but through
11   another means, such as a physician's visit or a
12   hospital or something like that.
13           So many times what we're trying to do
14   with the FULs is use most commonly used drugs and
15   covered outpatient drug type, so like tablets and
16   capsules.
17       Q.   Is there anything in the regulations or
18   statutes that limit the FUL program to tablets or
19   capsules or other drugs that are commonly
20   administered in the outpatient setting?
21       A.   Not that I know of.
22       Q.   That was just the -- when you started

---

247

1    working on the FULs that was just the way that HCFA
2    approached it, you did not establish FULs on the
3    injectables?
4        A.   Correct.
5        Q.   And did you ever receive any explanation
6    about why that was?
7        A.   I can't say specifically there was an
8    explanation.  I think you learn this as you work
9    with the program.
10       Q.   But you would agree with me that the
11   Orange Book page that I showed you does show that in
12   1996 there were at least two versions of vancomycin
13   that were rated A in the Orange Book?
14       A.   Correct.
15           MS. MARTINEZ:  Objection, form.
16       Q.   And so -- I want to get back to this
17   computer business.  Was the computer program
18   specifically designed to not include injectables or
19   how did that work?
20       A.   You'd have to talk to the data folks.  We
21   were not including injectables.  I don't know what
22   criteria they put in there.

---

248

1        Q.   Because if the initial identification of
2    drugs that satisfied the criteria was just two or
3    more A-rated drugs or three or more A-rated drugs if
4    one of them was not A-rated, and that was done by
5    computer presumably that would bring in injectable
6    drugs like vancomycin, right?
7            MS. ALBEE:  Objection.
8        A.   No.  There are still more criteria.  You
9    still have the Orange Book criteria, but there are
10   still criteria that the systems folks put in to look
11   for the type of drugs that the FUL prices are set
12   on.
13       Q.   So is it your understanding that HCFA
14   specifically set up the computer program to identify
15   and exclude injectable drugs?
16           MS. MARTINEZ:  Objection, form.
17       A.   In one part of the process, yes.
18       Q.   And do you know in what part of the
19   process that was done?
20       A.   No, I don't.
21       Q.   Did you have any part in that process of
22   either manually excluding the injectables drugs or

---

249

1    setting up a computer program such that those drugs
2    would be moved aside?
3        A.   The basic criteria for the system was
4    developed before I got there.
5        Q.   Who would be the best person to ask about
6    why it was that injectables were specifically
7    excluded from the FUL program?
8            MR. WINGET-HERNANDEZ:  Objection, form.
9            MS. MARTINEZ:  Objection, form.
10       A.   I don't know.  Pete Rodler was the first
11   one I know that worked on FULs.  That's the only
12   person I could think of.
13       Q.   Are these other -- now, we've talked a
14   little bit about Exhibit 462 that talks about the
15   Orange Book data.  And we talked about the criteria
16   already, correct?  And now you've identified I think
17   another criteria, which is to exclude injectable
18   drugs, right?
19           MS. MARTINEZ:  Objection, form.
20       A.   Correct.
21       Q.   Is that criteria written down anywhere?
22           MR. WINGET-HERNANDEZ:  Objection, form.

---

Gaston, Sue

January 24, 2008

Washington, DC

65 (Pages 254 to 257)

---

254

1    Q.   Is that fair to say?
2    A.   Yup.
3    Q.   Do you know which compendia they used?
4    A.   Red Book, Blue Book and Medi-Span.
5    Q.   They Would use all three?
6    A.   Correct.
7    Q.   Do you know if they used all three from
8    1991 when you got involved through 2003?
9    A.   I can't remember.  I know there was a
10   time when I think Medi-Span and First Databank might
11   have merged.  But I would still -- from my
12   recollection I think there was still separate
13   pricing under both of them.  So from my recollection
14   it was always three.
15   Q.   Did you have a hard copy of the Red Book
16   or the Blue Book on your desk or in your cubicle?
17   A.   Red Book I would have a copy.  Just
18   their -- I think it's a monthly publication.
19   Q.   Did you have a copy of the Orange Book?
20   A.   At times.
21   Q.   And then -- so you've got the Orange Book
22   data loaded.  Is it fair to say that that's in one

---

255

1    file or one spot on the computer but then you've got
2    the compendia data loaded in another spot?
3    A.   I can't speak for the systems aspect of
4    it.  We just -- we see it -- in the application we
5    see the end result of the Orange Book and the
6    compendia merged together.
7    Q.   Okay.  So there's a program that merges
8    the two together and automatically identifies drugs
9    that meet the Orange Book criteria, any other
10   criteria we've discussed and also have available
11   information in the compendia data; is that right?
12   A.   Correct.
13   Q.   And that's when you get involved; is that
14   fair to say?
15   A.   Correct.
16   Q.   You don't get involved before that?
17   A.   Correct.
18   Q.   Can you take me from that point in time
19   through the publication of the FUL list to the
20   public?
21   A.   From what I remember what we would do is
22   just go through the various groups.  I think there

---

256

1    were -- I can't remember exactly, but there were
2    certain drug groups that might show up that need to
3    be manually looked at because there might not be
4    enough suppliers or there might not be enough
5    pricing.  And I can't remember what else might be
6    said in there.
7         But we would go through.  And then when
8    instances like that would occur that what we would
9    do is sometimes print off that information and then
10   research to see if the information in the compendia
11   was incorrect or if it is correct then we can sort
12   of go in there and work with what -- you know, try
13   to make a decision whether it should be included or
14   not.
15   Q.   How did you become aware of potential
16   issues that may arise?  Did people contact you and
17   you looked at things in response to their concerns
18   or was there a methodology that you followed to spot
19   issues?
20        MS. MARTINEZ:  Objection, form.
21   A.   Are you asking me -- when you say
22   potential issues, you mean raised by individuals

---

257

1    or -- I don't know when you mean by potential
2    issues.
3    Q.   Well, we talked about there was a manual
4    review of this.  You wouldn't just take whatever the
5    computer spat out and make that the FUL list?
6    A.   Correct.
7    Q.   There was a manual review involved to
8    identify some issues.  I think you've talked about
9    some of them here today.  Availability of the drug,
10   whether the pricing information was still correct.
11   Any other issues that you recall?
12   A.   They are the two main ones, yeah.
13   Q.   How would you go about identifying those
14   issues?  Like how do you -- there's a lot of drugs
15   on the FUL list.  How would you go about figuring
16   that stuff out?
17   A.   I can't remember exactly, because I
18   haven't dealt with the application for years.  But
19   there was something in the application that would
20   alert us to certain drugs that needed the manual
21   review.  Maybe it was the fact that the system
22   couldn't come up with a price because something

287

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

        v.                    )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -

        (cross captions appear on following pages)


            Videotaped deposition of SUE GASTON


                        Volume II


                        Washington, D.C.

                        Wednesday, March 19, 2008

                        9:00 a.m.

---

**328**

1    at all to attempt to get FULs established for
2    infusion or injectable drugs?
3        **A. No, I don't.**
4        Q. Do you recall, Ms. Gaston, yourself
5    thinking in the mid-1990s when you were becoming
6    aware of the large differences between
7    acquisition cost and AWP for infusion and
8    injectable drugs why aren't we establishing FULs
9    for these drugs?
10        MS. MARTINEZ: Objection, form.
11        Q. Do you recall having that thought in
12   your head?
13        **A. I had the thought in my head. But the**
14   **thought in my head is just trying to capture more**
15   **drugs for savings to the states. Whether it was**
16   **injectables or unit dose or anything outside of**
17   **the basic criteria, I thought about trying to**
18   **expand it to include additional drugs just for**
19   **cost saving purposes.**
20        Q. Do you recall becoming aware of any
21   other classes of drugs outside of infusion and
22   injectable drugs where you were becoming aware of

---

**329**

1    the large differences between acquisition cost
2    and AWPs?
3        MS. MARTINEZ: Objection, form.
4        MS. ALBEE: Objection, form.
5        **A. Here again, when I'm working with the**
6    **FUL program I'm looking at it just to try to**
7    **include more drugs. I'm not looking at it -- at**
8    **a class of drugs and where there might be a**
9    **difference in the pricing.**
10        Q. You testified a second ago that you
11   were concerned or you wanted to try to achieve
12   more cost savings for Medicaid, correct?
13        **A. Correct.**
14        Q. And the FUL program was a tool that CMS
15   could use to do that, correct?
16        **A. Correct.**
17        Q. And you understood the purpose of the
18   FUL program was to mitigate against certain
19   manufacturers having high AWPs, correct?
20        MS. MARTINEZ: Objection, form.
21        **A. Can you repeat that?**
22        Q. You understood that the purpose of the

---

**330**

1    FUL program was to mitigate against certain
2    manufacturers having high AWPs on their drugs?
3        MS. MARTINEZ: Objection, form.
4        **A. The purpose of the FUL program was to**
5    **set a reasonable reimbursement rate for states.**
6        Q. And do you have an understanding about
7    -- as the person who was in charge of the FUL
8    program from the early '90s through I think 2003,
9    2004 -- is that about --
10        **A. 2003.**
11        Q. 2003. Do you have an understanding of
12   why was this program created? Why not just take
13   the AWPs for each manufacturer's drugs straight
14   from the compendia?
15        **A. It was in regulations. The FUL program**
16   **was in regulations.**
17        Q. But did you have an understanding of
18   the purpose behind it?
19        **A. Yes, I did.**
20        Q. And your understanding was what?
21        **A. It's to set -- the federal government**
22   **sets a reimbursement rate for states and is**

---

**331**

1    **trying to achieve savings. We're trying to set**
2    **reasonable reimbursement rates for certain**
3    **generic drugs.**
4        Q. Do you recall taking any steps, whether
5    it be merely a conversation with Mr. Reed or
6    someone else in your office to establish federal
7    upper limits for infusion and injectable drugs?
8        **A. The conversation could have come up. I**
9    **know it was discussed about including those in**
10   **FULs, but it was just a conversation.**
11        Q. And the conversation, was that with Mr.
12   Reed?
13        **A. I can't say. It probably included Mr.**
14   **Reed, because he was my supervisor.**
15        Q. Who else would have been included in
16   that?
17        **A. I don't know. It depends on who I was**
18   **mentoring at the time.**
19        Q. Did you have conversations with anyone
20   outside of CMS about setting federal upper limits
21   for infusion and injectable drugs?
22        **A. I don't recall that, no.**

424

1  before I go any further, let me -- I may have
2  misspoke and I want to make sure the record is
3  clear. Looking down at the bottom I think I said
4  -- we identified some text that began with 10/17.
5  And I think I said 2000. But that actually may
6  be 2001. Do you see that?
7      A. Yes. It's not very clear.
8      Q. It's not very clear. But whether it's
9  -- given the date up in the top left-hand corner
10 of 8/21/2001, it's more likely that you made your
11 note on October 17th of 2001, correct?
12     A. Correct.
13     Q. And that -- what follows the 10/17/2001
14 is in fact your note?
15     A. Correct.
16     Q. Now, to -- let's just understand a
17 little bit about what you wrote in the bottom
18 right-hand corner. The .0609 is the price on
19 which this FUL is being set, correct?
20     A. Correct.
21     Q. And you're multiplying that by 150
22 percent to get the .0914 that we see appears in

425

1  Exhibit 3, transmittal 37?
2      A. Correct.
3      Q. And so if I wanted to find out what
4  manufacturer's price set the FUL in this
5  instance, what I'd do is go up to the list of
6  prices above and I'd look for the .0609, right?
7      A. Yes.
8      Q. And so if I do that I go up and I see
9  that it actually was Mutual Pharmaceuticals' WAC
10 that set the FUL in this instance; is that
11 correct?
12     A. It appears that way.
13     Q. Well, the --
14     A. Yes. Yes.
15     Q. Okay. And what -- just so we're clear,
16 what Exhibit 2 is a list of published prices from
17 three national pricing compendia that CMS had in
18 front of it when it was establishing this FUL,
19 correct?
20     A. Correct.
21     Q. And there are lower published prices on
22 this list than the .0609 that was used to set the

426

1  FUL, correct?
2      A. Correct.
3      Q. For example, if you look down almost to
4  the bottom, Geneva Pharmaceuticals, Inc., there's
5  a published pharmaceutical price of Geneva
6  Pharmaceuticals, Inc. of .0544 which was less
7  that was used to set the FUL?
8      A. That one has a line through it and it
9  says "discontinued."
10     Q. Right. So that wasn't used to set the
11 FUL. But that's something you would have had to
12 make a telephone call to find out?
13     A. Probably.
14     Q. What does the T over in the left-hand
15 column mean? Do you recall?
16     A. I think it means it's temporarily
17 unavailable. It's a code that can be put into
18 the FULs application.
19     Q. So if you or a colleague of yours calls
20 one of these manufacturers and learns that Geneva
21 Pharmaceuticals is temporarily out of stock of
22 metoprolol, you would put a T in the FULs system?

427

1      A. Correct.
2      Q. And that would be to ensure that the
3  Geneva price didn't get used as the basis for the
4  FUL?
5      A. Correct.
6      Q. And why would you do that?
7      A. Because if the product is in the
8  available you don't want to said a FUL price on a
9  product that is not available.
10     Q. Why not?
11     A. Because it might not be a realistic
12 price. That product could be unavailable for
13 three years but they're still reporting it to the
14 compendia. So if it's not a realistic price then
15 there's no sense in setting the FUL price based
16 on that.
17     Q. And by realistic price you mean a price
18 that's high enough that providers could acquire
19 the product in the market place?
20     A. Correct.
21     Q. Caraco Pharmaceuticals also has a lower
22 reported price, right, of .0569?

Gaston, Sue - Vol. II

March 19, 2008

Washington, DC

428

1     A.  Correct.
2     Q.  Do you know why that wasn't used to set
3  the FUL in this case?
4     A.  No.  I'm not real sure.
5     Q.  I mean, it does look to me from the
6  notation over on the right that somebody called
7  and that was a product that was deemed to be
8  available, right?
9     A.  Correct.
10    Q.  So you have a manufacturer, anyway,
11 who's got available product at a lower published
12 price, but it wasn't used for the FUL, correct?
13    **A.  Correct.  Sometimes discretion was used**
14 **with this too.  You might look at that price and**
15 **if that price still appears to be too low that it**
16 **would make the product available out there, then**
17 **you would check to see if there's another**
18 **manufacturer that might be a step up that's**
19 **closer, but that could still allow you to set a**
20 **reasonable FUL price.**
21    Q.  I see.  So sometimes discretion was
22 used to ensure that the FUL was reasonable?

429

1     **A.  And available.**
2     Q.  And available?
3     **A.  Yeah.**
4     Q.  And the reason you used that discretion
5  was to make sure that providers -- you didn't set
6  a FUL that was so low that providers couldn't
7  acquire the product on the marketplace, correct?
8     **A.  Correct.**
9     Q.  And so you don't know for certain, but
10 it's possible that one of the reasons that the
11 Caraco price wasn't used here was discretion was
12 exercised and it was deemed maybe that this was
13 too low?
14    **A.  It could be too low or Caraco only**
15 **distribute to maybe limited amount of states and**
16 **not all states.  That's something else to keep in**
17 **consideration.**
18    Q.  Okay.  But there was in any event a
19 manual review process and discretion exercised
20 and a choice that CMS made not to use that price,
21 correct?
22    **A.  Correct.**

430

1     MR. BUEKER:  Okay.  I have I think run
2  out of tape.  So perhaps we could set this to the
3  side, have some lunch and we'll come back this
4  afternoon.
5     THE WITNESS:  Okay.
6     THE VIDEOGRAPHER:  This is the end of
7  tape 2.  Off the record at 12:25.
8        (Whereupon, at 12:25 p.m. a lunch
9  recess was taken.)

431

1     A F T E R N O O N   S E S S I O N
2        (1:16 p.m.)
3
4  Whereupon,
5        SUE GASTON,
6  the witness testifying at the time of recess,
7  having been previously duly sworn, was further
8  examined and testified as follows.
9
10       EXAMINATION RESUMED BY COUNSEL FOR
11 THE WARRICK PHARMACEUTICALS, SCHERING-PLOUGH
12 CORPORATION AND SCHERING CORPORATION
13       THE VIDEOGRAPHER:  This is the
14 beginning of tape 3 in the deposition of Ms.
15 Gaston.  On the record at 1:16.
16       MR. BUEKER:  Can I ask the court
17 reporter to mark as three page exhibit that has
18 the Bates number HHD 175-0850 through 0852 as New
19 York Counties Defendants' Exhibit 4 for
20 identification, please.
21       (Exhibit NY Counties 004 was
22 marked for identification.)

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

432

1  BY MR. BUEKER:
2      Q.  Ms. Gaston, do you have in front of you
3  what's been marked as Exhibit 4 for
4  identification?
5      A.  Yes.
6      Q.  And would you agree with me that
7  Exhibit 4 is a three page exhibit consisting of
8  three separate e-mails?
9      A.  Correct.
10      Q.  And are you familiar with e-mails like
11  those reflected in Exhibit 4?
12      A.  It looks familiar.
13      Q.  What is it?
14      A.  From my recollection, there was a
15  period of time where we were soliciting comments
16  from states or I think some of the pharmacy
17  associations on a FUL list that was placed out
18  there without manual review.  And we established
19  a federal upper limit e-mail box where they could
20  send in their comments to give us some feedback
21  on this draft FUL list.
22      Q.  And that FUL list that you're referring

433

1  to that was sent out without manual review, that
2  took place in 2000, right?
3      A.  I'm not sure.  It appears so because of
4  the date on the e-mail.
5      Q.  But in or about 2000?
6      A.  Correct.
7      Q.  And you said you set up an e-mail
8  mailbox to get complaints?
9      A.  Feedback.
10      Q.  Feedback?  Sorry.
11          And did you get a lot of feedback?  Did
12  CMS get a lot of feedback?
13      A.  I can't remember.
14      Q.  Okay.  Just looking at the e-mails that
15  are contained in Exhibit 4, it looks like you got
16  feedback here from Albertson's, Omni Care and it
17  looks like Eckerd or Brooks Pharmacy.  I take it
18  one source of feedback was the pharmacy
19  community, pharmacists?
20      A.  Correct.
21      Q.  And you also said associations and --
22      A.  Yeah.  State Medicaid agencies.

434

1      Q.  Okay.  Do you recall the nature of the
2  feedback at all?
3      A.  Basically they were giving us feedback
4  whether they felt that the FUL prices or the
5  drugs were correctly on the FUL list or needed
6  adjust or shouldn't -- or weren't available.  I
7  think it was feedback about the whole list that
8  was put out at that time.
9      Q.  Okay.  Do you recall what if anything
10  CMS did in response to receiving feedback?
11      A.  I can't remember.  I don't know if we
12  just reverted back to the list that was still in
13  place.  I don't have a recollection of that.
14      Q.  Do you know whether CMS withdrew the
15  list that had been sent out without manual
16  review?
17      A.  I would assume that that's what
18  occurred.
19      Q.  Other than in this time period, the
20  2000 to 2001 time period, were there other ways
21  in which CMS received feedback on its FULs?
22      A.  Yes.

435

1      Q.  How?
2      A.  We would get phone calls, e-mails,
3  sometimes letters or faxes.
4      Q.  And who would receive that feedback?
5      A.  I would.  Or Larry Reed.
6      Q.  And what kind of feedback would CMS
7  typically receive?
8      A.  It would be comments maybe from the
9  pharmacy saying that the product is not available
10  or that the pricing appears to be either too low
11  or too high.  Mostly availability issues.
12      Q.  And when you got feedback from some
13  source that a drug wasn't available, what if any
14  steps would CMS take?
15      A.  What we would do is call the
16  manufacturer or wholesaler and verify if that was
17  a fact.  Sometimes it might be just one state
18  that's having an availability problem.  But we
19  have to make sure that it's an availability
20  problem that would affect the FUL list for all
21  the states.
22      Q.  And what if you learn that, for

Gaston, Sue - Vol. II

March 19, 2008

Washington, DC

39 (Pages 436 to 439)

---

436

example, a manufacturer had discontinued a
particular drug that had been used to set the
FUL?  What would you do then?

    **A.  Then we would reevaluate whether the
FUL should be removed or if the FUL price should
be adjusted.**

    Q.  And in the case of a low price that had
been removed, the adjustment would have been one
that was upward?

    **A.  Well, we would look at the most recent
FUL application page for that particular drug and
look at the most current pricing that we have and
see if a new price should be established.**

    Q.  And if you say FUL application page you
mean something like Exhibit 2?

    **A.  Correct.**

    Q.  Let's parse the time periods a little
bit here.  Prior to 2000/2001 where you were
receiving feedback on your FULs, on CMS's FULs?

    **A.  We always receive feedback on the FULs.**

    Q.  So throughout the entire time period
'91 to 2003 you can recall receiving feedback on

---

437

the FULs?

    **A.  Correct.  Just not by the FUL e-mail
address.  We established that for that one
particular situation.**

    Q.  Did CMS leave in place the mailbox, the
mail means of receiving feedback, post 2000/2001?

    **A.  I don't know.**

    Q.  So in terms of -- I'll refer to the e-
mail as a systematic way of receiving feedback.
Other than the e-mail systematic way of receiving
feedback, were there other systematic ways in
which CMS received feedback on its FULs?

    **A.  We would still receive faxes.  I think
in this particular situation we wanted the
feedback in writing.  So if we received phone
calls we would ask them to follow up in writing.**

    Q.  I see.  Do you recall receiving written
complaints in the 2000 period from the National
Association of Chain Drug Stores?

    **A.  Yes.**

    Q.  Tell me about that.  What do you
recall?

---

438

    **A.  Just that they had complaints about the
-- some of the FUL prices or -- I can't remember
if availability was an issue for them.  And they
also wanted to receive a file with all the NDC
numbers of the FUL drugs.**

    Q.  Did they tell you why they wanted to
receive that?

    **A.  I can't recall.**

    Q.  When you say they had complaints about
the FUL prices what do you mean?  What kind of --
what was the nature of the complaint?

    **A.  I can only guess because it's been so
long.  But generally I would assume that they're
complaining that the FUL prices were probably set
too low.  They could have been complaining --
maybe the availability of the drugs too.**

    Q.  And when you say too low, in other
words, that the FUL was -- I'm sorry.  Go ahead.
What do you mean by too low?

    **A.  Okay.  In their -- I think because they
have a lot of pharmacies that they're
representing and if they feel that the prices are**

---

439

**too low they feel the pharmacies can't purchase
them at the FUL prices.**

    Q.  And do you recall CMS doing anything in
response to the complaint from the National
Association of Chain Drug Stores?

        MS. MARTINEZ:  Objection, form.

    **A.  I do want to clarify, that what I'm
talking about with the National Association of
Chain Drug Store complaints is during the period
of time when we sent out -- the one that I'm
addressing anyhow, is during this period of time.**

    Q.  I didn't mean to imply otherwise.

    **A.  I just wanted to make sure I'm clear.**

    Q.  And your counsel objected, to let me
see -- in the 2000/2001 time period you recall
CMS receiving a complaint from the National
Association of Chain Drug Stores.  What if any
action do you recall CMS taking in response to
that particular complaint?

    **A.  CMS took their complaints or
suggestions or issues, whatever they had, along
with all the other ones, and then whatever**

---

440

1    happened with that draft that was put out at that
2    time I can't recall.
3        Q.  Other than the 2000/2001 draft list, do
4    you recall another instance in which CMS
5    circulated a FUL list without manual review and
6    got a series of complaints?
7        A.  I don't recall that.
8        Q.  So in your mind at least 2000/2001,
9    that instance is unique?
10       A.  Yes.
11           MR. BUEKER:  I ask the court reporter
12   to mark a one-page document with the Bates number
13   HHD 175-1492 as New York Counties Defendants'
14   Exhibit 5 for identification, please.
15           (Exhibit NY Counties 005 was
16   marked for identification.)
17   BY MR. BUEKER:
18       Q.  Ms. Gaston, the court reporter his
19   placed in front of you what has been marked as
20   New York Counties Defendants' Exhibit 5 for
21   identification.  And this I apologize is where
22   this might begin to get repetitive.  But Exhibit

441

1    5 you would agree is a printout from the FULs
2    system from August of 2001, correct?
3        A.  Correct.
4        Q.  And it's a printout from the FUL's
5    system that relates to the 0.5-milligram strength
6    of clonazepam?
7        A.  Can I just back up?  You said August
8    2001.  I don't have a date on mine.
9        Q.  Okay.  Fair point.  The copy wasn't
10   well done.
11           MS. REID:  John, do you want to give me
12   her mine?
13           MR. BUEKER:  Sure.
14           MS. MARTINEZ:  Could I just look at it?
15           MR. BUEKER:  Sure.  Perhaps we could
16   substitute that as the one for the record,
17   please?
18           (Whereupon, Exhibit NY Counties
19   005 was replaced with a better photocopy of the
20   same document.)
21   BY MR. BUEKER:
22       Q.  Ms. Gaston, I apologize for you.  You

442

1    now have in front of you what's been marked as
2    Exhibit 5 for identification.  And you would
3    agree with me that it's an August 2001 printout
4    from the FULs system?
5        A.  Yes.
6        Q.  And it relates to the 0.5-milligram
7    strength of clonazepam?
8        A.  Correct.
9        Q.  Which I'll represent to you is one of
10   the nine drugs that are at issue in the focused
11   discovery in the New York Counties.  Is that your
12   handwriting down at the bottom of the page?
13       A.  No.
14       Q.  That's Ms. Bergin's handwriting?
15       A.  Correct.
16       Q.  But nonetheless you recognize Exhibit 5
17   to be the printout from the FULs system that's
18   kind of the basis for the manual review that CMS
19   would have done in terms of setting this FUL?
20       A.  Correct.
21       Q.  And if you'd turn back with me to page
22   5 of Exhibit 3, can we agree that the 0.2455

443

1    that's written at the bottom of page 5 is
2    actually what becomes the FUL in November of 2001
3    for the 5-milligram strength for clonazepam?
4        A.  Correct.
5        Q.  And looking at Exhibit 3, what you see
6    is that that's set on the basis of a Blue Book
7    price?  That's the B?
8        A.  Correct.
9        Q.  And on the package size of 100?
10       A.  Correct.
11       Q.  Turning back to Exhibit 5, and there's
12   Ms. Bergin's writing down at the bottom.  This
13   FUL appears to have been set on the basis of
14   Purepac's WAC?
15       A.  Correct.
16       Q.  And if you go up and look, Purepac's
17   WAC at this time as reported by Blue Book was
18   0.16370, correct?
19       A.  Correct.
20       Q.  And you see in this FULs printout from
21   CMS again that there were lower published prices
22   that CMS was considering when setting this FUL,

444

1  correct?
2      A.  Correct.
3      Q.  For example, Teva Pharmaceuticals,
4  Inc., a few up from the bottom, has a lower
5  published price?
6      A.  Correct.
7      Q.  But there's a T over in the left-hand
8  column which we established earlier I think meant
9  that one was maybe temporarily unavailable?
10     A.  Correct.
11     Q.  But if you look up at Major
12  Pharmaceuticals, as an example, up at the top,
13  Major has a lower published price in both Red
14  Book and Blue Book, correct?
15     A.  Correct.
16     Q.  Do you know why CMS chose not to set a
17  FUL on the basis of that lower published price?
18     A.  I could give you my opinion.
19     Q.  Sure.
20     A.  That here again what I think they were
21  trying to do was since there's such a difference
22  between the .07 and then the next price of

445

1  .16370, that we wanted to make sure that the FUL
2  price that's set is a reasonable price and that
3  we'll be assured the availability of the drug.
4  So we went up to the next lowest price.
5      Q.  And when you say reasonable, what do
6  you mean in that context?
7      A.  That we feel that the pharmacies will
8  be able to purchase this drug at the FUL price.
9      Q.  So in other words, you thought it was
10  reasonable to ignore a published price that was
11  maybe too low in CMS's view so that you
12  established a reasonable FUL, correct?
13     A.  Correct.
14     Q.  I think we can set Exhibit 5 to the
15  side. We'll do another one that looks exactly
16  like it. If the court reporter could mark as
17  Exhibit 6 for identification New York Counties
18  Defendants' Exhibit 6 for identification HHD 175-
19  2110. And I do confirm that this one has a date.
20          (Exhibit NY Counties 006 was
21  marked for identification.)
22  BY MR. BUEKER:

446

1      Q.  Ms. Gaston, you recognize Exhibit 6 to
2  be again a printout from the FULs system?
3      A.  Correct.
4      Q.  And Exhibit 6 is dated August of 2001,
5  correct?
6      A.  Correct.
7      Q.  And this is the printout that relates
8  to establishing a FUL in this case for the 1
9  milligram strength of lorazepam?
10     A.  Correct.
11     Q.  Which I'll represent to you is another
12  one of the nine drugs that are the subject of
13  focused discovery in the New York Counties case.
14  I take it that's not your handwriting down at the
15  bottom of Exhibit 6?
16     A.  Correct.
17     Q.  That's again, Ms. Bergin's handwriting?
18     A.  Yes.
19     Q.  But you are familiar with Exhibit 6 and
20  recognize it to be a printout from the FULs
21  system that would have been the basis on which
22  CMS began its manual review of this FUL?

447

1      A.  Yes.
2      Q.  I want to ask you about some text
3  that's written in the middle of the page in bold
4  and it's preceded by a couple of stars. It says
5  "FULs price not greater than another supplier."
6  Do you see that?
7      A.  Yes.
8      Q.  Is that text that the FULs system in
9  your experience would have put on a page like
10  this?
11     A.  Correct.
12     Q.  Explain to me what that means.
13     A.  I think it was checking on the
14  supplier. It has to make sure there's at least
15  three suppliers. And here again, I haven't dealt
16  with this for a while, so I need to refresh my
17  memory.
18     Q.  Well, let me see if we can get at it
19  this way. Just above that text do you see a low
20  price?
21     A.  Correct.
22     Q.  And you see that it's .1999?

448

1      A. Correct.
2          MR. WINGET-HERNANDEZ: Objection, form.
3   I apologize. I withdraw that objection. I just
4   was confused about what number you were looking
5   at.
6   BY MR. BUEKER:
7      Q. Okay. And you see there's a number
8   that's crossed out that's .2999 over in the left-
9   hand side just before the bolded text we were
10  talking about?
11     A. Correct.
12     Q. And that -- because it's cut off,
13  perhaps it would help to refer to Exhibit 5. But
14  that's the FUL price that the FULs system
15  calculated, correct --
16     A. Correct.
17     Q. -- the crossed out number .2999?
18     A. Correct.
19     Q. And that FUL number that's calculated
20  by the system would have been based on this low
21  price of .1999, correct?
22     A. Correct.

449

1      Q. And if you go up and look at the list
2   of published prices above, you would agree with
3   me that there's no published price that's below
4   that .2999 number, right?
5      A. Correct.
6      Q. Except the one price in which the FUL
7   was based?
8      A. Yes.
9      Q. Or I shouldn't say based. Was
10  calculated by the system.
11         So does that help to refresh your
12  recollection that indeed this warning, "FULs
13  price not greater than another supplier," was
14  essentially an occasion that the FULs system had
15  detected that by basing a FUL on the lowest
16  published price the FUL was being set at below
17  the next published price?
18     A. Correct.
19     Q. Is that a warning -- you talked the
20  last time in your last deposition about certain
21  flags that the system had to tell you and your
22  colleagues that you needed to conduct a manual

450

1   review. Is this one of those flags?
2      A. Yes.
3      Q. And why was it important that the FULs
4   system cautioned you to look at or manually
5   review a FUL that was set in this manner?
6      A. Because if we allowed the FUL to be set
7   at this price then it would be an availability
8   issue.
9      Q. In other words, that if you allowed a
10  FUL to be set at this price based on this lowest
11  published price, then you'd have an availability
12  issue and that's a problem, it's not a reasonable
13  FUL?
14     A. Correct.
15     Q. And so that number is crossed out and a
16  different number is written in that's .5718,
17  right?
18     A. For the FUL price.
19     Q. For the FUL price.
20     A. Correct.
21     Q. And that appears to be based on from
22  the note on the bottom a United Research Labs or

451

1   URL's WAC?
2      A. Correct.
3      Q. And URL's WAC was not the lowest
4   published price in this instance, right? Because
5   we've seen for example Major Pharmaceuticals had
6   a lower published price?
7      A. Well, I thought you meant excluding
8   that published price.
9      Q. No. I didn't mean that.
10     A. Yeah. Major's was the next lowest.
11  The next lowest was URL.
12     Q. So what we see in Exhibit 6 is another
13  situation in which, exercising its discretion,
14  CMS chose to set a FUL not based on the lowest
15  published price but based on the next lowest
16  published price because that's what was
17  reasonable to do in terms of ensuring access,
18  correct?
19     A. Correct.
20     Q. And for the record, why is it that CMS
21  would have chosen to ignore the lowest published
22  price?

452

1  MS. MARTINEZ: Objection, form.
2  **A. Because setting the FUL on the lowest**
3  **published price here might not allow us to have a**
4  **reasonable FUL price for this drug.**
5  Q. Okay. Let me see if I can cure Ani's
6  objection. Why would CMS have chosen to have
7  ignored the lowest published price in setting a
8  FUL for the 1 milligram lorazepam in 2001?
9  MS. MARTINEZ: Objection, form. Just
10  to let you know, one of my objections is to you
11  were stating that CMS is ignoring the price, the
12  characterization of ignoring.
13  MR. BUEKER: Okay. Didn't use? Is
14  that better?
15  MS. MARTINEZ: Did not use. Yeah.
16  MR. BUEKER: Okay.
17  BY MR. BUEKER:
18  Q. Just for the record, why is it that CMS
19  chose not to use the lowest published price in
20  setting the FUL for lorazepam in 2001?
21  **A. Because we wanted to assure that the**
22  **FUL price was a reasonable price. So we chose to**

453

1  **ignore Major's lowest price.**
2  Q. I think we can set Exhibit 6 to the
3  side. I warned you this was going to get
4  repetitive. May I ask the court reporter to mark
5  as New York Counties Defendants' Exhibit 7 for
6  identification a one-page document that's labeled
7  HHD 175-0009 in the bottom right-hand corner. I
8  was looking for one that's got the best date.
9  (Exhibit NY Counties 007 was
10  marked for identification.)
11  BY MR. BUEKER:
12  Q. Ms. Gaston, do you have in front of you
13  what's been marked as Exhibit 7 for
14  identification?
15  **A. Yes.**
16  Q. And this is, again, a printout from the
17  CMS's FUL system and it's dated in the upper
18  left-hand corner 7/24/2001?
19  **A. Correct.**
20  Q. And this is the same kind of printout
21  we've been looking at in other examples; it's
22  just that this one is now for the 500 milligrams

454

1  strength of cefadroxil?
2  **A. Correct.**
3  Q. And I'll represent cefadroxil is
4  another one of the drugs at issue in the New York
5  Counties case.
6  Is that your handwriting at the bottom
7  of Exhibit 7?
8  **A. No.**
9  Q. Whose handwriting is that is that?
10  **A. It's Cindy Bergin's.**
11  Q. But nevertheless, you're familiar with
12  the form of Exhibit 7; it's a printout from the
13  FULs system?
14  **A. Correct.**
15  Q. Can you read into the record what Ms.
16  Bergin wrote in her handwriting at the bottom of
17  the page?
18  **A. She said on 7/25 "The FUL was too low**
19  **at 1.2749, but when I raised it it became equal**
20  **to Major's AWP. That means delete for now."**
21  Q. Can you help me understand what she was
22  doing here?

455

1  **A. It appears that the FUL price the**
2  **system generated needed to be evaluated --**
3  Q. We've got another one of those notes,
4  right? The FUL price not greater than another
5  supplier?
6  **A. Correct. And so we needed to do some**
7  **manual review. It looks like the low price that**
8  **it was based on --**
9  Q. It looks like Major?
10  **A. -- was Major. And it seemed extremely**
11  **low. Not extremely. But it seemed much lower**
12  **than all the other published prices.**
13  Q. And so the next, as I understand it,
14  the next highest published price after Major's
15  was Zenith Labs?
16  **A. Correct.**
17  Q. And when you used a Zenith Labs price
18  as I understand it you got something -- you
19  multiplied that by 150 percent to calculate what
20  a FUL might be, you get a number that was
21  equivalent to Major's AWP?
22  **A. That's what it appears.**

Gaston, Sue - Vol. II

March 19, 2008

Washington, DC

---

**456**

1    Q.  And Ms. Bergin's note indicates that in
2    this instance CMS did not set a FUL because the
3    FUL price would have been equal to Major's AWP;
4    is that correct?
5        **A.  Correct.**
6        Q.  Are you familiar with making that kind
7    of a decision not to set a FUL when it was equal
8    to an AWP?
9        **A.  Yes.**
10       Q.  Why would CMS decline to set a FUL when
11   the FUL was equal to an AWP?
12       **A.  Because states have other methodologies**
13   **they can use for reimbursement.  And their**
14   **regular reimbursement methodology would be a**
15   **percentage off of AWP.  That would be a**
16   **reasonable reimbursement rate for other drugs.**
17   **So the purpose of setting the FUL price is to try**
18   **to set reasonable reimbursement.  And that would**
19   **kind of counter what the states were doing with**
20   **their other reimbursement methodology.**
21       Q.  I see.  So just like we talked about
22   there morning, one of the objectives of the FUL

---

**457**

1    program is cost savings?
2        **A.  Correct.**
3        Q.  And so if you set a FUL that was equal
4    to an AWP it wouldn't really result in any cost
5    savings to the state?
6        **A.  Correct.**
7        Q.  And so in this case, if I understand
8    what's going on here with cefadroxil in 2001,
9    basing a FUL on the lowest published price seemed
10   to result in a FUL that was too low, right?
11       **A.  It appeared that way because of the**
12   **compendia information that we have.**
13       Q.  And setting a FUL -- not using that
14   lowest published price but moving up to the next
15   seemed to result in a FUL that was too high?
16       **A.  Correct.**
17       Q.  And so CMS declined to set a FUL given
18   the published prices that were out there?
19       **A.  Correct.**
20       Q.  Let me just digress here for a second.
21   What role if any did AWP play in setting FULs?
22       **A.  Generally, it did not.**

---

**458**

1    Q.  Can you think of any instance in which
2    CMS based a FUL on the published AWP price?
3        **A.  I can't think of a situation where they**
4    **did.**
5        Q.  In other words, other than being used
6    to check whether there was going to be cost
7    savings that resulted, FUL was basically -- or --
8    I'm sorry -- AWP was basically irrelevant for the
9    FUL calculation?
10       MS. MARTINEZ:  Objection, form.
11       MR. WINGET-HERNANDEZ:  Objection, form.
12       **A.  It was used in the methodology just for**
13   **consideration, but I don't know of any times when**
14   **it would have been used to set a FUL price.**
15       Q.  So in terms of a basis of calculation,
16   the price on which the FUL was based, AWP was
17   irrelevant?
18       MR. WINGET-HERNANDEZ:  Objection, form.
19       MS. MARTINEZ:  Objection, form.
20       **A.  We wouldn't have used AWP.**
21       Q.  Why would CMS not have used AWP?
22       **A.  Because we know that states will be**

---

**459**

1    **reimbursing for drugs at a percentage off of AWP.**
2    **That's one of the methodologies they could use.**
3    **And we will let states reimburse according to**
4    **that methodology.  Setting a FUL using the AWP**
5    **wouldn't achieve the cost savings where if they**
6    **did it with their own methodology, a percentage**
7    **off of AWP, they would be achieving savings.**
8        Q.  You can set that aside.  But don't
9    worry, I have others that look like it.
10       **A.  I'm sure.**
11       Q.  Can I ask the court reporter to mark as
12   Exhibit 8 -- New York Counties Defendants'
13   Exhibit 8 for identification a one-page document
14   labeled HHD 175-0276.
15           (Exhibit NY Counties 008 was
16   marked for identification.)
17   BY MR. BUEKER:
18       Q.  Ms. Gaston, you have in front of you
19   Exhibit 8?
20       **A.  Yes.**
21       Q.  And Exhibit 8, again, looks to be to
22   you a printout from the FULs system for 500-

---

Henderson Legal Services, Inc.

464

1   right?
2       A.  Correct.
3       Q.  Was that CMS's practice, to use a
4   subset of the states?
5       A.  It wasn't a practice.  It was just
6   using our judgment.
7       Q.  I see.  So there wasn't a commonly
8   established -- there wasn't a practice or a
9   policy on how to determine the most commonly
10  available package size; that was something that
11  was left to your discretion?
12      A.  Correct.
13      Q.  Okay.  And just so I get the bounds of
14  the discretion, the overall objective obviously
15  was to find the most commonly available package
16  size and utilization tended to be a pretty good
17  measure of that, right?
18      A.  Correct.
19      Q.  So whether it was looking at some
20  subset of the states or all the states,
21  utilization was generally what CMS looked at?
22      A.  In these types of situations, yes.

465

1       Q.  Is that written down anywhere to your
2   knowledge?
3       A.  Not that I'm aware of.
4       Q.  So it's not in the regulation or a
5   manual or something that, you know, outsiders
6   would know?
7       A.  No.  We always reference the most
8   commonly used package size.
9       Q.  Right.  But how that most commonly used
10  package size is determined is something that's
11  less to CMS's discretion?
12      A.  Correct.
13      Q.  And there aren't to your knowledge
14  written guidelines about how to exercise that
15  discretion?
16      A.  Correct.
17          MR. WINGET-HERNANDEZ:  John, I know
18  it's quick.  It's right after lunch.  So as soon
19  as you can find a chance for a break, that would
20  be great.
21          MR. BUEKER:  Okay.  Give me a couple
22  more minutes to do this and we'll take a break.

466

1           MR. WINGET-HERNANDEZ:  Sure.
2   BY MR. BUEKER:
3       Q.  Would it surprise you to learn that the
4   package sizing in which CMS actually wound up
5   basing the FUL in this time period was actually
6   the 100?  I'm sorry.  Was actually the 50.
7           MS. MARTINEZ:  Objection, form.
8       A.  I can't explain that.
9       Q.  Okay?
10          MR. BUEKER:  We'll take a break here.
11          THE VIDEOGRAPHER:  Off the record at
12  1:57.
13          (Recess.)
14          THE VIDEOGRAPHER:  On the record at
15  2:11.
16          (Exhibit NY Counties 009 was
17  marked for identification.)
18  BY MR. BUEKER:
19      Q.  Back on the record.  Let me place in
20  front of you, Ms. Gaston, what's been marked as
21  New York Counties Defendants' Exhibit 9 for
22  identification.  And before the break we were

467

1   talking about cefadroxil and I asked you whether
2   or not it surprised you that in this time period
3   actually the FUL was set on the 50 package size
4   of cefadroxil?
5       A.  Mm-hmm.
6       Q.  I just wanted to show you that in fact
7   the cefadroxil was based on 50.  If you look with
8   me at Exhibit 9 for a minute.  Exhibit 9 for the
9   record again is a transmittal from CMS?
10      A.  Yes.
11      Q.  Okay.  And it's a transmittal in the
12  June 7th 2004 time period, correct?
13      A.  Correct.
14      Q.  And if you just turn to page do you see
15  the second entry down is for cefadroxil?
16      A.  Correct.
17      Q.  And the 50 over at the end of that
18  line, the 500-milligram base, is the package size
19  in which the FUL was set?
20      A.  Correct.
21      Q.  Right?  And of course that doesn't line
22  up with Exhibit 8 because Exhibit 8 is calculated

Gaston, Sue - Vol. II

March 19, 2008

Washington, DC

468

1  on package sizes of 100?
2      MS. MARTINEZ:  Objection, form.
3      **A.  Actually, Exhibit 8 is calculated on**
4  **the package size of 50, the FUL that's**
5  **established here on the printout.  But the work**
6  **that was done on the bottom was evaluating the**
7  **different package sizes.**
8      Q.  We'll try it this way.  Exhibit 3 -- do
9  you have Exhibit 3?
10      **A.  Mm-hmm.**
11      Q.  If you turn to page 4 of Exhibit 3, the
12  third entry up from the bottom, that's the same
13  cefadroxil we've been talking about?
14      **A.  Correct.**
15      Q.  And that FUL is set on the basis of a
16  package size of 50?
17      **A.  Correct.**
18      Q.  And so if you lay the two transmittals,
19  the 2004 transmittal and the January 2002
20  transmittal, next to one another as kind of book-
21  ends -- I'll represent to you I'm not aware of
22  another transmittal between -- throughout this

469

1  time period the cefadroxil FUL was set on the
2  basis of the 50 package size, correct?
3      **A.  Yes.**
4      Q.  And turning back to Exhibit 8 it says -
5  - Ms. Bergin wrote "100 looks like the most
6  commonly used package size," right?
7      **A.  Correct.**
8      Q.  Presumably as a result of her analysis
9  here?
10      **A.  Correct.**
11      Q.  You don't know why she reached that
12  conclusion that the FUL was set on the 50 package
13  size?
14      **A.  Right.  I don't know.**
15      Q.  Okay.  We're done with cefadroxil.
16      MR. BUEKER:  Let's mark as Exhibit 10
17  for identification a four-page document that's
18  Bates labeled HHD 170-1050 through 1053.
19          (Exhibit NY Counties 010 was
20  marked for identification.)
21  BY MR. BUEKER:
22      Q.  Do you have Exhibit 10 in front of you?

470

1      **A.  Yes, I do.**
2      Q.  Do you recognize Exhibit 10?
3      **A.  Yes.**
4      Q.  What do you recognize it to be?
5      **A.  It's a screen shot of the FUL**
6  **application.**
7      Q.  And it's for the drug albuterol 90-
8  microgram inhaler, correct?
9      **A.  Correct.**
10      Q.  And is that your handwriting down at
11  the bottom of page 1 of Exhibit 10?
12      **A.  Yes.**
13      Q.  And would you read into the record the
14  first bit of handwriting that begins "temp"?
15      **A.  "Temp delete due to raw material**
16  **shortage."**
17      Q.  So "MTL" is material?
18      **A.  Correct.**
19      Q.  And what does that mean?
20      **A.  Apparently we must have done some**
21  **research on this and we were told that there is a**
22  **raw material shortage, so we would temporarily**

471

1  **delete it from the FULs and look at it the next**
2  **time we would reevaluate.**
3      Q.  Okay.  And then there are three lines
4  that say -- that begin "delete" and a check mark
5  over to the right down in the right-hand corner.
6  That's also your handwriting?
7      **A.  Yes.**
8      Q.  And what does that mean?  What do those
9  lines tell you?
10      **A.  I'm assuming that it was -- here again,**
11  **it's been a while -- but that we delete this drug**
12  **product from the FUL list, delete it from --**
13  **there's a memo that goes out with updates.  So**
14  **apparently this must have been on there.  So**
15  **delete it from the memo.  And delete the NDC**
16  **probably from the application at this point.**
17      Q.  Okay.  And those checkmarks indicate
18  that that was done, right?
19      **A.  That's my understanding, yes.**
20      Q.  So the FUL was removed in or about
21  October of 2000, correct?  If it helps you,
22  there's a date at the bottom of the screen print

---

**472**

1  on each of the pages that says -- I guess you can
2  confirm -- October 24th 2000.
3      **A.  I know when this was done.  But I don't**
4  **know the date to see when it was removed from the**
5  **FULs.  But this was put into the application at**
6  **that time.**
7      Q.  So in or about October of 2000 you were
8  removing the FUL -- CMS removed the FUL for the
9  albuterol inhaler?
10     **A.  Correct.**
11     Q.  And the reason -- why did CMS remove
12 the FUL from the inhaler at this point?
13     **A.  Because it looks like from the note**
14 **here that we found out that it was temporarily**
15 **deleted because we found out there was a raw**
16 **material shortage.**
17     Q.  And why would that cause CMS to want to
18 remove the FUL for the albuterol inhaler?
19     **A.  Because if the product is not available**
20 **then it wouldn't make sense to put a FUL price on**
21 **it.**
22     Q.  And in removing the FUL CMS understood

---

**473**

1  that, I assume, that states would start
2  reimbursing for the inhaler at a higher price?
3      MS. MARTINEZ:  Objection, form.
4      **A.  Well, they would reimburse it at their**
5  **state methodology.  They also can MAC it if they**
6  **want to, put it subject to their state MAC.  So**
7  **whatever that price is, they determine that.**
8      Q.  But because of an access issue CMS
9  thought it was appropriate to remove the FUL at
10 this time?
11     **A.  Correct.**
12     MR. BUEKER:  Can I ask the court
13 reporter to mark a seven page document that's
14 Bates labeled at the bottom HHD 175-1065 through
15 1071 as Exhibit 11, New York Counties Defendants'
16 Exhibit 11 for identification, please?
17     (Exhibit NY Counties 011 was
18 marked for identification.)
19 BY MR. BUEKER:
20     Q.  Let me know when you're ready.
21     **A.  (Reading.)  Okay.  I'm ready.**
22     Q.  Okay.  You would agree with me,

---

**474**

1  wouldn't you, that the first page of Exhibit 11
2  is a printout from the FULs system like we've
3  been looking at before -- like we've been looking
4  at in several of the other exhibits that have
5  been marked today?
6      **A.  Correct.**
7      Q.  And it's a printout from the FULs
8  system for the 90-microgram albuterol inhaler and
9  it's dated 8/17/2001?
10     **A.  Correct.**
11     Q.  And this again is the printout from the
12 FULs system that would have been the basis for
13 the manual review that would have followed with
14 regard to setting a FUL for the 90-microgram
15 inhaler, correct?
16     **A.  Correct.**
17     Q.  And is that your handwriting down at
18 the bottom of Exhibit 11?
19     **A.  On the right-hand side.**
20     Q.  Just so we're clear about what you mean
21 by the right-hand side, would you read into the
22 record that which you wrote?

---

**475**

1      **A.  "Work up new FUL based on" -- it looks**
2  **like "$7."**
3      Q.  Okay.  And whose handwriting is on the
4  left-hand side of the page, if you know?
5      **A.  Cindy Bergin's.**
6      Q.  Okay.  And there's -- down at the
7  bottom there's -- it looks to me written "FDB
8  prices? OIB prices?"  Do you see that?
9      **A.  I see that.**
10     Q.  And is that your handwriting?
11     **A.  That's my handwriting.**
12     Q.  And there's an X crossing that
13 handwriting out, correct?
14     **A.  Correct.**
15     Q.  Do you know what that means, "FDB
16 prices? OIB prices?"?
17     **A.  No, I don't.**
18     Q.  Do you know why you wrote that?
19     **A.  No.  Unless we were just trying to**
20 **check current prices.**
21     Q.  Is that something that CMS did in
22 setting FULs, check current prices?

---

476

1    A.  In the compendia.
2    Q.  Did CMS ever check prices other than
3  prices that are listed in the compendia?
4    A.  Other than calling.  We would call the
5  wholesale -- you know, to verify, we would call
6  wholesalers or the manufacturers.
7    Q.  Can you turn with me to the fifth page
8  of Exhibit 11?  It's a page that has a Moore
9  Medical up in the top left-hand column and a
10 Bates number HHD 175-0169 in the lower right-hand
11 corner.
12   A.  I see it.
13   Q.  Do you know what Moore Medical Supply
14 is?
15   A.  No.  Just -- I mean, I've heard of
16 them, but I don't know specifically what they
17 are.  They purchase, I guess, drugs and supplies.
18   Q.  You say they purchase drugs and
19 supplies.
20   A.  I'm assuming.  I don't know.
21   Q.  Purchase drugs and supplies from whom?
22   A.  I don't know.

477

1    Q.  Are they a wholesaler or a place that a
2  provider could purchase drugs?
3    A.  I don't know.
4    Q.  Do you know what you meant when you
5  wrote "Work up new FUL based on $7"?
6    A.  No.
7    Q.  Was it your practice to -- I mean, do
8  you ever recall trying to establish a FUL based
9  on a target that you would come up with like
10 this?
11   A.  No.
12       MS. MARTINEZ:  Objection, form.
13   Q.  Do you recall trying to work up with
14 FUL in the $7 range for the albuterol inhaler?
15   A.  No.
16   Q.  Turn with me to the last page.  Do you
17 recognize the last page of Exhibit 11?
18   A.  No, I don't.  Except for the writing at
19 the top.
20   Q.  And what's the writing at the top?
21   A.  It says Texas Medicaid.  So this might
22 be their -- a copy of their MAC listing.

478

1    Q.  Well, the next line down, right, where
2  there are a bunch of circles are MAC -- some of
3  the column headings are MAC?
4    A.  Right.
5    Q.  Does that help you identify this as the
6  Texas MAC list?
7    A.  Because it says Texas at the top, it
8  could be.
9    Q.  And that's your handwriting, right?
10   A.  It could be.
11   Q.  Do you ever remember in establishing
12 FULs going out and looking at various states' MAC
13 lists?
14   A.  Sometimes we would for -- not for
15 establishing, but just for analysis and
16 verification.
17   Q.  What kind of analysis and verification
18 would you do using a state MAC list?
19   A.  Make sure to verify that the FUL price
20 that we establish is in the ballpark, that it
21 looks realistic.  Sometimes we don't have a lot
22 of feedback from the compendia.

479

1    Q.  Mm-hmm.
2    A.  So we want to make sure that if we're
3  setting it it's something that looks realistic
4  for states.
5    Q.  And to look realistic for states to use
6  the term kind of in the ballpark, what do you
7  mean?
8    A.  So that it's available; that a price
9  isn't something that the state couldn't reach.
10   Q.  So if I kind of follow the analysis you
11 might have done, you would have been looking to
12 see that the FUL price that you were setting was
13 either right at or slightly above where the state
14 MAC prices were; is that correct?
15   A.  Not necessarily.
16   Q.  Okay.
17   A.  It would just be used in the analysis.
18   Q.  I'm just trying -- let me ask the
19 question again.  How would the state MACs have
20 been used in the analysis?  Maybe I'm missing
21 something.
22   A.  The FUL prices are set on what we have

480

1    in the compendia source.
2       Q.  Mm-hmm.
3       A.  Sometimes the compendia source isn't
4    real easily to be read.  There's sometimes
5    availability problems.  So we set a price and we
6    still want to make sure that we're being
7    realistic with the price, that it's going to be a
8    price that states will be able to use in the FUL
9    program.  So sometimes we would check.  I know
10   Texas had it on their webpage.  I don't know if
11   other states did.  Once in a while we would check
12   to see that we were being reasonable in our
13   analysis using the compendia source.
14      Q.  And how would the state MAC list tell
15   you if you were being reasonable?
16      A.  Because generally, especially Texas,
17   they were pretty up to date with setting their
18   MACs, which helped us because sometimes a
19   compendia source isn't as current.  Because the
20   manufacturers don't submit the pricing it isn't
21   current, the updated pricing.  So it helps us to
22   validate that we are using current prices and

481

1    that they aren't outdated.  So it was just
2    something that we could do a comparison and see
3    that our prices were a realistic price.
4       Q.  Okay.  And what comparison would you
5    have had to observe between, say, the Texas MAC
6    list and the FUL to conclude that the FUL that
7    CMS was setting was reasonable?
8       A.  You mean --
9       Q.  How would the two had to have compared
10   for you to --
11      A.  Well, if Texas was -- even if they were
12   a little lower than us, then we know that they
13   were -- if they were extremely lower than us then
14   we might have to do more research and check the
15   compendia sources to dig a little built deeper to
16   make sure that we had real prices from them.  Or
17   if they were extremely high we might do the same
18   thing and say, well, let's check and make sure
19   that we're using realistic prices for
20   establishing the FUL.
21      Q.  What if Texas was only a little bit
22   higher?  Would that have been a signal of any kind

482

1    to you?
2       A.  No.  Then I think we would feel like
3    we're in the ballpark.
4       Q.  It would have been okay to you --
5    strike that.
6          It would have been okay to CMS for the
7    FUL to be slightly lower than a state MAC?
8       A.  It depends on the supporting data that
9    we have from the compendia sources too.  It's not
10   just using that MAC.  But we can't just depend on
11   one state either.  If we feel that we can support
12   the FUL price that we set by the compendia source
13   and that we've checked the compendia sources,
14   then that would be fine.
15      Q.  What were some of the other state MAC
16   programs besides Texas that you recall looking
17   at?
18      A.  Maybe New York.  I can't remember any
19   other states.
20      Q.  Wisconsin?
21      A.  I can't remember.
22      Q.  Turning back with me to the first page

483

1    of Exhibit 11, do you see a P in the far left
2    hand column?  It seems to correspond with the
3    cross-outs?
4       A.  Correct.
5       Q.  Do you know what P meant?
6       A.  I think it was permanently removed.
7       Q.  Okay.  That's consistent with my
8    recollection.  I just wanted to confirm that we
9    were on the same page there.
10         Just so we understand kind of what's
11   going on in Exhibit 11, the low price down there
12   at the bottom, that's a .26470.  Do you see that?
13      A.  Yes.
14      Q.  And that would have been the price that
15   the FULs system used to calculate a FUL, right?
16      A.  Correct.
17      Q.  And that would have been a price that
18   you were manually reviewing to see if it was
19   reasonable?
20      A.  Correct.
21      Q.  And it looks like that was based on
22   Martec Pharmaceuticals, Inc.'s Red Book or -- I'm

Gaston, Sue - Vol. II

March 19, 2008

Washington, DC

492

1    been marked, Ms. Gaston, as New York Counties
2    Defendants' Exhibit 12 for identification?
3        **A.  Yes.**
4        Q.  And Exhibit 12, at least the first page
5    of Exhibit 12, looks to be a printout from the
6    FULs system, correct?
7        **A.  Correct.**
8        Q.  And again, this is the printout from
9    the FULs system that would have been the
10   beginning for the manual review process that CMS
11   engaged in before establishing a FUL?
12       **A.  Correct.**
13       Q.  And the next two pages of Exhibit 12
14   for identification are e-mails like we looked at
15   earlier that were sent to the e-mail mailbox that
16   CMS established to get feedback on the 2000/2001
17   FUL list, correct?
18       **A.  Correct.**
19       Q.  And these are feedback as it relates to
20   the albuterol 90-microgram inhaler, correct?
21       **A.  Correct.**
22       Q.  And the first page of Exhibit 1, that's

493

1    a FUL printout that also relates to the 90-
2    microgram inhaler?
3        **A.  Correct.**
4        Q.  And --
5        MS. MARTINEZ:  Mr. Bueker, are you
6    saying 90 or 9?
7        MR. BUEKER:  90 microgram.  It's .09
8    milligram.  90 microgram.
9        MS. MARTINEZ:  Okay.  Got it.
10   BY MR. BUEKER:
11       Q.  Can you identify the handwriting on the
12   first page of Exhibit 12?  Is any of that your
13   handwriting?
14       **A.  Yes.**
15       Q.  What's your handwriting?  What portions
16   of the handwriting on Exhibit 12 are yours?
17       **A.  At the top it says "Note: NDC number**
18   **includes inhaler and refills."**
19       Q.  Mm-hmm.
20       **A.  Some of the little notes on the right**
21   **that say "call."**
22       Q.  Mm-hmm.

494

1        **A.  It looks like it says "10/30, remove**
2    **FUL, greater than most AWPs."  And I think that's**
3    **it.**
4        Q.  Okay.  When you say call, who were you
5    going to call?
6        MR. WINGET-HERNANDEZ:  Objection, form.
7        **A.  We call the manufacturer, Warrick, as**
8    **indicated here, Martec, Glaxo, Schering.**
9        Q.  And what was the purpose of calling the
10   manufacturer?
11       **A.  To check on availability and to try to**
12   **verify, if we can, a WAC price.**
13       Q.  Do you recall Schering or Warrick ever
14   confirming a WAC price for you?
15       **A.  I would only know if there were**
16   **notations.  I can't remember.**
17       Q.  And I think you said "Remove FUL
18   greater than most AWPs."  And I think that's
19   "SEG" under that; is that right?
20       **A.  That's me, right.**
21       Q.  And those are your initials?
22       **A.  Yes.**

495

1        Q.  In other words, you were concluding
2    that the FUL ought to be removed here, right?
3        **A.  That's what it appears.**
4        Q.  Well, if we go look at a transmittal
5    37, Exhibit 3, which was the transmittal that
6    came out --
7        MS. MARTINEZ:  Transmittal 37 is
8    Exhibit 9.
9        MR. BUEKER:  No.  That's an updated
10   version.
11       MS. MARTINEZ:  Oh, I see.
12       MR. BUEKER:  That's June 2004.  Exhibit
13   3 is the original transmittal 37.  It's the one
14   that came out kind of right after this time
15   period.  Let me see if I can establish a timeline
16   here, Ani.
17   BY MR. BUEKER:
18       Q.  Exhibit 12, Ms. Gaston, up in the top
19   left- hand corner bears a date October 12th 2001,
20   correct?
21       **A.  Correct.**
22       Q.  And this is the evaluation -- Exhibit

Gaston, Sue - Vol. II

Washington, DC

March 19, 2008

54 (Pages 496 to 499)

496

1    12 reflects the manual evaluation that was being
2    done in the October 2001 time period as to
3    whether or not to establish or reestablish a FUL
4    for -- or revise the FUL for the 90-microgram
5    albuterol inhaler?
6        **A.   Correct.**
7        Q.   And Exhibit 3 is the CMS transmittal
8    that comes out November 20th 2001, so shortly
9    after the analysis we see in Exhibit 12?
10       **A.   Correct.**
11       Q.   And if you flip to the second page,
12   page 2, of Exhibit 3 you'll see that there's no
13   FUL established for the 90-microgram albuterol
14   inhaler? There's other albuterol FULs but not for
15   the inhaler, correct?
16       **A.   Correct.**
17       Q.   Which is consistent with the note you
18   wrote in Exhibit 12, remove FUL greater than most
19   AWPs, correct?
20       **A.   Correct.**
21       Q.   So in other words, CMS didn't establish
22   or reestablish a FUL -- or revise the FUL for the

497

1    90-microgram inhaler in this 2001 time period; it
2    actually removed the FUL?
3        **A.   Correct.**
4        Q.   And it did so despite the fact there
5    are shown on this sheet a series of
6    manufacturers' reported published prices, right?
7        **A.   Correct.**
8        Q.   There's a published price for Warrick,
9    there's a published price for Schering, Martec,
10   Zenith and Glaxo-Wellcome, among others?
11       **A.   I think Schering is discontinued.**
12       Q.   Oh, I'm sorry.  You're right.  But the
13   note at the bottom -- Ms. Bergin's note at the
14   bottom would indicate that there were at least
15   reported published prices for Warrick, Martec and
16   Zenith?
17       **A.   Correct.**
18       Q.   In other words, there were three
19   manufacturers who were reported published prices
20   for the 90-microgram inhaler?
21       **A.   Correct.**
22       Q.   And so in other words the conditions

498

1    necessary for CMS to establish a FUL were met at
2    this time?
3        MS. MARTINEZ:  Objection, form.
4        **A.   The conditions were met, but the**
5    **pricing condition wasn't met.**
6        Q.   What pricing condition was that?
7        **A.   It was that if you would take the**
8    **prices that are remaining and multiply by 150**
9    **percent you're going to have a price that's, it**
10   **looks like, over what the AWPs are.  So you're**
11   **sort of defeating the purpose of the FUL program.**
12       Q.   Which was, again, soft savings?
13       **A.   Soft savings to the states.  The states**
14   **can set their own reimbursement level at that**
15   **point.**
16       Q.   So as we've kind of seen throughout,
17   CMS is trying to establish a FUL that's not too
18   low and not too high to achieve a cost savings,
19   but also not set it too low to create an access
20   issue; that's the balance CMS is trying to
21   strike?
22       **A.   Correct.**

499

1        Q.   And you did that -- the balance was
2    struck, sometimes the computer program worked as
3    it was supposed to and that balance was struck by
4    the computer program, but other times it was the
5    result of manual intervention?
6        **A.   Correct.**
7        Q.   And the manual intervention resulted in
8    CMS making a choice in its discretion, correct?
9        **A.   Correct.**
10       MR. BUEKER:  Anyone keeping track of
11   how many drugs we've covered?
12       MS. MARTINEZ:  No.
13       MR. BUEKER:  Well, we're going to do
14   another one.  Can I ask the court reporter to
15   mark as Exhibit 13 for identification a five page
16   document that's Bates labeled HHD 175-1073 to
17   1077.
18       (Exhibit NY Counties 013 was
19   marked for identification.)
20   BY MR. BUEKER:
21       Q.   Not a rush, but just let me know when
22   you're ready.

Gaston, Sue - Vol. II                                     March 19, 2008
Washington, DC

60 (Pages 520 to 523)

---

520

1  printouts that we've been looking at kind of
2  throughout the day, right?
3      A.  Correct.
4      Q.  And this one is dated up in the top
5  left-hand corner 2/15/2005, which is actually
6  after you had left your position in the policy
7  area at CMS?
8      A.  Correct.
9      Q.  Okay.  So you haven't seen Exhibit 18
10  before?
11      A.  No.
12      Q.  But you are familiar with the form of
13  Exhibit 18; it's a printout from the FUL system?
14      A.  Correct.
15      Q.  And can you identify the handwriting on
16  Exhibit 18?
17      A.  No, I can't.
18      Q.  That's not Ms. Bergin's handwriting?
19      A.  No.  I'm not a hundred percent sure.  I
20  don't think it is.
21      Q.  Can you read into the record what's
22  written on the right-hand side that begins "three

---

521

1  can"?
2      A.  It says "Three can have three suppliers
3  as long as the A drives the FUL.  The other two B
4  can still serve as suppliers."
5      Q.  Okay.  And it looks like up above on
6  the right-hand side next to each of the three,
7  there are three manufacturers shown in Exhibit
8  18?
9      A.  Correct.
10      Q.  And it looks like there's a BN or an AB
11  rating -- those are Orange Book ratings?
12      A.  Correct.
13      Q.  -- written next to each of the
14  manufacturers?
15      A.  Correct.
16      Q.  And it looks like in this case the
17  Warrick and Schering albuterol inhalers are B-
18  rated and the Ivax inhaler is B-rated, correct?
19      A.  Correct.
20      Q.  And this is an instance in which CMS
21  set a FUL despite the fact that there was only
22  one A-rated product, correct?

---

522

1      A.  I can't say that, because I don't know
2  what the Orange Book reflects.
3      Q.  I'm sorry.  I don't know -- what do you
4  mean?
5      A.  I mean, I don't know if the Orange Book
6  -- when the system pulls down the information
7  from the Orange Book, did it show more than the
8  information here?
9      Q.  Well, I think, if we turn -- maybe we
10  can answer your question.  If we turn to the next
11  several pages of Exhibit 18.
12      A.  Okay.
13      Q.  Do you recognize that to be the online
14  version of the FDA's Orange Book?  Right?
15      A.  I've never seen it like this.
16      Q.  Oh, okay.
17      A.  If this is the Orange Book, it looks
18  like there's more than -- this is the .09?
19      Q.  Yup.
20      A.  You're showing one, two, three, four A-
21  rated.  Five A-rated.
22      Q.  Oh, okay.

---

523

1      A.  And one B-rated.
2      Q.  Even though the CMS system is only
3  picking up --
4      A.  Yeah.  And I don't understand -- unless
5  -- here again, these are the manufacturers.  They
6  might not -- I don't know.  Maybe they're not
7  selling it or giving the pricing to the
8  compendia.  Because they're not showing up.  So
9  maybe these guys are selling it for them.  I
10  don't know.
11      Q.  Okay.  But this is after your time, so
12  --
13      A.  Correct.  And I'm just addressing the
14  basic criteria.
15      Q.  All right.  We'll set Exhibit 18 to the
16  side.  Well, before I do, could a B-rated drug --
17  let's assume the ratings here are accurate.
18  Could Warrick or Schering, which are B-rated
19  drugs, actually have been the basis for the FUL -
20  - published prices be the basis for the FUL?
21      A.  I can speak to when I was doing the
22  FUL.

---

Gaston, Sue - Vol. II                                    March 19, 2008
Washington, DC

61 (Pages 524 to 527)

---

524

1    Q.  Yeah.
2         MR. WINGET-HERNANDEZ:  Objection, form.
3    **A.  And as long as there were -- I can't**
4    **remember exactly.  I think it was as long as**
5    **there were three A-rated you could include the B-**
6    **rated drugs.**
7    Q.  And if you included the B-rated drugs
8    then the B-rated drugs could be the basis for the
9    FUL?
10        MR. WINGET-HERNANDEZ:  Objection, form.
11   **A.  From what I remember, yes.**
12        **MR. WINGET-HERNANDEZ:  In the interests**
13   **of time, John, are you interested -- I mean, I'd**
14   **like to offer you the basis of my objection so**
15   **that you can cure it.**
16        MR. BUEKER:  Sure.
17        MR. WINGET-HERNANDEZ:  I think when you
18   use the term basis in that context that it's not
19   clear, that it's vague and that it would be much
20   clearer and preferable if you would use a term
21   like formed the price that the FUL was calculated
22   on or something like that.  Because it's clear --

---

525

1    it seems based on the testimony that basis -- I
2    mean, they're basing the --
3         MR. BUEKER:  Okay.  I get your
4    objection.  Let me see if I can cure it.  I can't
5    promise to be able to do that.
6         MR. WINGET-HERNANDEZ:  Sure.
7    BY MR. BUEKER:
8    Q.  In your experience, setting a FUL from
9    1991 to 2003, it's your testimony that the
10   published price for a drug that was B-rated, that
11   published price could still be the basis for the
12   FUL that CMS set?
13   **A.  From what I remember, yes.**
14   Q.  I understand from your testimony back
15   in January that in addition to your job
16   responsibilities in terms of setting FULs you
17   also had some responsibilities for the Medicaid
18   rebate program?
19   **A.  Correct.**
20   Q.  For the record, what is the Medicaid
21   rebate program?
22   **A.  The Medicaid rebate program was enacted**

---

526

1    in '90.  It began in '91.  It's a program that if
2    drug manufacturers wish to participate they sign
3    a rebate agreement with CMS.  And what will occur
4    is that the states will provide the
5    manufacturers' drugs to their Medicaid population
6    and in return the drug manufacturers pay rebate
7    dollars to the states and the federal government
8    gets their share.  That's kind of the short
9    version.
10   Q.  No.  It's a good version.  As I
11   understand it, for a manufacturer's drugs to be
12   reimbursable by Medicaid they had to sign a
13   rebate agreement, right?
14   **A.  Correct.**
15   Q.  And agree to pay rebates to the states?
16   **A.  Correct.**
17   Q.  And what were your responsibilities
18   when it came to the Medicaid rebate program?
19   **A.  Any policy-related issues that would**
20   **come up pertaining to the rebate program.**
21   Q.  Can you give me an example?
22   **A.  Answering questions to explain the**

---

527

1    **program.  Interpreting -- we didn't have a**
2    **regulation.  So trying to interpret parts of the**
3    **program, interpret the statute for states or for**
4    **drug manufacturers.**
5    Q.  Did you have any administrative
6    responsibilities when it came to the Medicare
7    rebate program?
8    **A.  What type of administrative**
9    **responsibilities?**
10   Q.  Well, for example, I understand that
11   under the Medicaid rebate program manufacturers
12   had to submit AMPs and best price?  That's how
13   the rebate got calculated, right.
14   **A.  Correct.**
15   Q.  Did you have any responsibility for
16   collecting the AMP and best price information?
17   **A.  No.  That's another staff that takes**
18   **care of that.**
19   Q.  What staff takes care of that?
20   **A.  They're called the operations staff.**
21   **Actually, they're in a separate group, in a**
22   **separate division within CMSO.**

Gaston, Sue - Vol. II                                    March 19, 2008
Washington, DC

62 (Pages 528 to 531)

---

528

1     Q.  Would you have had access to that AMP
2  information?
3     A.  Yes.
4     Q.  Did you ever use that AMP information
5  in setting FULs?
6     A.  No.
7     Q.  Did you ever use that AMP information
8  in terms of evaluating and the approval of state
9  Medicaid plans?
10    **A.  State Medicaid plans are for the**
11  **states.  So we really wouldn't use AMPs.**
12    Q.  Well, as I understand it, one of your
13  responsibilities -- one of your other
14  responsibilities was approving state Medicaid
15  plans, right?
16    A.  Correct.
17    Q.  And to get approval, one of the things
18  a state had to demonstrate was the reasonableness
19  of its reimbursement rates?
20    **A.  Correct.  Their methodology.**
21    Q.  Their methodology.
22    A.  Correct.

---

529

1     Q.  And I guess what I'm wondering is in
2  examining the reasonableness of the methodology,
3  the reasonableness of the reimbursement rates the
4  state was proposing to pay, if you ever looked at
5  AMP information.
6     A.  No.
7     Q.  Switching back to putting your FUL hat
8  back on, what if anything did CMS do to monitor
9  when drugs were coming off patents and therefore
10  going generic?
11    **A.  Well, when I was doing the FUL program**
12  **basically I just waited to get notification if**
13  **somebody would let me know.  I really didn't do**
14  **anything proactively, because I just didn't have**
15  **the capability of doing it or the time.**
16    Q.  Is it different today?  Do you know?
17    **A.  I don't know.**
18    Q.  And who typically will let you know
19  that something came off patent and therefore went
20  generic?
21    **A.  Industry folks.  I can't say**
22  **specifically.  But sometimes pharmacies might**

---

530

1  **have an idea.  So they would call and let us know**
2  **if something was occurring.**
3     Q.  So how was it that you determined when
4  it was time to update or set a new FUL?
5     **A.  It's been a while.  But from what I**
6  **remember, we were on a schedule.  I can't**
7  **remember if it was once a year.  And then**
8  **periodically we would update the FULs list with**
9  **memos.  And then we would come out and produce a**
10  **whole new FUL list.  I think we tried to do it**
11  **once a year.  I can't remember the schedule after**
12  **that.  I think we got to a point where it was on**
13  **an as-needed basis.**
14    Q.  Okay.  So let me try and unpack that a
15  little bit, because it seems like there were a
16  couple of things going on.  It sounds like on
17  some periodic basis, and you think maybe
18  annually, CMS tried to update the entire FUL
19  list?
20    **A.  Correct.  And that was probably earlier**
21  **in the program, like earlier when I was there.**
22    Q.  So not towards the 2003 end of time,

---

531

1  but rather towards the 1991 time period?
2     **A.  Correct.  From what I remember.**
3     Q.  Okay.  And from what you remember in
4  the interim between those kind of full -- excuse
5  the pun -- updates to the FUL list, there were
6  memos or smaller updates?
7     **A.  Correct.**
8     Q.  And those smaller updates obviously
9  didn't update the entire list; just particular
10  FULs?
11    **A.  Correct.**
12    Q.  As to those smaller interim -- can I
13  call them interim updates?
14    **A.  Yes.**
15    Q.  As to those smaller interim updates,
16  how would you decide which FULs got updated then?
17    **A.  We would get current compendia**
18  **information.  Sometimes we would just do further**
19  **research when we received e-mails or calls about**
20  **certain drugs.**
21    Q.  So there was no systematic way of doing
22  it; it was as you learned information that you

---

528

1    Q.   Would you have had access to that AMP
2 information?
3    A.   Yes.
4    Q.   Did you ever use that AMP information
5 in setting FULs?
6    A.   No.
7    Q.   Did you ever use that AMP information
8 in terms of evaluating and the approval of state
9 Medicaid plans?
10   **A.   State Medicaid plans are for the**
11 **states.  So we really wouldn't use AMPs.**
12   Q.   Well, as I understand it, one of your
13 responsibilities -- one of your other
14 responsibilities was approving state Medicaid
15 plans, right?
16   A.   Correct.
17   Q.   And to get approval, one of the things
18 a state had to demonstrate was the reasonableness
19 of its reimbursement rates?
20   **A.   Correct.  Their methodology.**
21   Q.   Their methodology.
22   A.   Correct.

529

1    Q.   And I guess what I'm wondering is in
2 examining the reasonableness of the methodology,
3 the reasonableness of the reimbursement rates the
4 state was proposing to pay, if you ever looked at
5 AMP information.
6    A.   No.
7    Q.   Switching back to putting your FUL hat
8 back on, what if anything did CMS do to monitor
9 when drugs were coming off patents and therefore
10 going generic?
11   **A.   Well, when I was doing the FUL program**
12 **basically I just waited to get notification if**
13 **somebody would let me know.  I really didn't do**
14 **anything proactively, because I just didn't have**
15 **the capability of doing it or the time.**
16   Q.   Is it different today?  Do you know?
17   **A.   I don't know.**
18   Q.   And who typically will let you know
19 that something came off patent and therefore went
20 generic?
21   **A.   Industry folks.  I can't say**
22 **specifically.  But sometimes pharmacies might**

530

1 **have an idea.  So they would call and let us know**
2 **if something was occurring.**
3    Q.   So how was it that you determined when
4 it was time to update or set a new FUL?
5    **A.   It's been a while.  But from what I**
6 **remember, we were on a schedule.  I can't**
7 **remember if it was once a year.  And then**
8 **periodically we would update the FULs list with**
9 **memos.  And then we would come out and produce a**
10 **whole new FUL list.  I think we tried to do it**
11 **once a year.  I can't remember the schedule after**
12 **that.  I think we got to a point where it was on**
13 **an as-needed basis.**
14   Q.   Okay.  So let me try and unpack that a
15 little bit, because it seems like there were a
16 couple of things going on.  It sounds like on
17 some periodic basis, and you think maybe
18 annually, CMS tried to update the entire FUL
19 list?
20   **A.   Correct.  And that was probably earlier**
21 **in the program, like earlier when I was there.**
22   Q.   So not towards the 2003 end of time,

531

1 but rather towards the 1991 time period?
2    **A.   Correct.  From what I remember.**
3    Q.   Okay.  And from what you remember in
4 the interim between those kind of full -- excuse
5 the pun -- updates to the FUL list, there were
6 memos or smaller updates?
7    **A.   Correct.**
8    Q.   And those smaller updates obviously
9 didn't update the entire list; just particular
10 FULs?
11   **A.   Correct.**
12   Q.   As to those smaller interim -- can I
13 call them interim updates?
14   **A.   Yes.**
15   Q.   As to those smaller interim updates,
16 how would you decide which FULs got updated then?
17   **A.   We would get current compendia**
18 **information.  Sometimes we would just do further**
19 **research when we received e-mails or calls about**
20 **certain drugs.**
21   Q.   So there was no systematic way of doing
22 it; it was as you learned information that you

532

1    thought was appropriate to incorporate into the
2    process of setting FULs you incorporated that
3    information?
4        A.  For the updates, yes.
5        Q.  And then annually or some other period
6    of time, at least you began annually at the
7    beginning, there were these systematic updates of
8    the entire list?
9        A.  Correct.
10       Q.  Separate and apart from that, what
11   triggered the decision to actually add a new drug
12   to the list?
13       A.  Most of the time it came out on a new
14   run that we would do.  So if we're looking at
15   updating the whole entire FUL list, that's when
16   the new drugs would show up.
17       Q.  Let me see if I understand.  So the FUL
18   system -- when you do the update of the entire
19   list, the FUL system would go back to Orange Book
20   and identify all the drugs that were eligible and
21   also pull in the published prices.  So at that
22   time if a drug had gone generic and was now --

533

1    met the minimum criteria, it would get pulled in
2    and you would at least get one of the printouts
3    we've been looking at like Exhibit 18?
4        A.  Correct.
5        Q.  And then you begin a manual review
6    process at that point to decide whether or not to
7    set a FUL?
8        A.  If it was necessary.  It might have
9    enough information we wouldn't have to do a
10   manual review.
11       Q.  Okay.  And there may also have been
12   other instances in which you got the information
13   and decided even though the drug met the minimum
14   criteria in the regulation, for some other reason
15   it wouldn't result in a cost savings or the FUL
16   that would be derived on the basis of the
17   published prices would be too low, you might
18   decide not to set a FUL at that point even though
19   it was eligible?
20       A.  Yes, if there was a reason not to set
21   it.
22       Q.  Okay.  It sounds like in terms of

534

1    setting brand-new FULs at the very least they
2    would have been picked up as a part of the
3    complete or the entire update process?
4        A.  Correct.
5        Q.  And at that point, just like with any
6    of the other FULs, CMS would have made a
7    determination as to whether it made sense to add
8    a FUL, whether it was reasonable to add a FUL at
9    that time?
10       A.  Correct.
11       Q.  Can you remember instances in which a
12   drug was new, came on -- a new drug was
13   identified as a result of the annual update
14   process and CMS decided not to set a FUL?
15       A.  I can't remember that.
16       Q.  You can't remember specific examples?
17       A.  Correct.
18       Q.  But don't doubt that it happened?
19       A.  It could have happened.
20           MS. MARTINEZ:  Objection, form.
21       Q.  Is there anything else other than
22   having the annual update or receiving information

535

1    from industry sources that would have caused CMS
2    in your time period, '91 and 2003, to update the
3    FUL list?
4        A.  That's all I can think of.
5            MR. BUEKER:  Okay.  Well, that's all I
6    have.
7            THE WITNESS:  Okay.
8            MR. BUEKER:  I appreciate your time.
9            THE WITNESS:  You're welcome.
10           MR. BUEKER:  I think some of the others
11   here may still have questions.
12           THE VIDEOGRAPHER:  This is the end of
13   tape 4.  Off the record at 355.
14           (Recess.)
15           THE VIDEOGRAPHER:  This is the
16   beginning of tape 5 in the deposition of Ms.
17   Gaston.  On the record at 3:57.
18
19           EXAMINATION BY COUNSEL FOR DEY,
20   INC., DEY, L.P. AND MYLAN
21   BY MS. REID:
22       Q.  Good afternoon.  My name again is Sarah

# Federal Upper Limit System

*[handwritten note in box]* NY Counties Defendants 2  3/19/08  JW

Product Group : 1067
Strengths : 100MG
Routes : ORAL
Ingredients : METOPROLOL TARTRATE

Package Size : 100
Dosage : TABLET
Exclusion Code :

*[handwritten: Notein 8th + 500w]*

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7773/60 | MAJOR PHARMACEUTICALS | *[disc]* |
| | 0.00000 | 0.65400 | 0.06180 | B | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.06180 | R | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.18180 | R | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.21110 | B | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.67410 | 0.00000 | R | 55370/0821/07 | MOVA LABORATORIES INC. | |
| | 0.00000 | 0.67860 | 0.00000 | B | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | M | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | R | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | M | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | R | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | B | 64376/0503/01 | BOCA PHARMACAL, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | M | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.00000 | 0.73850 | 0.00000 | R | 64376/0503/01 | BOCA PHARMACAL, INC. | |
| T | 0.00000 | 0.73850 | 0.05690 | B | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | *[called (Yes)]* |
| | 0.00000 | 0.73000 | 0.00000 | M | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.00000 | 0.73000 | 0.00000 | M | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.73000 | 0.08440 | R | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | *[discontinued (they no longer manufacture)]* |
| | 0.00000 | 0.76300 | 0.00000 | M | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| T | 0.00000 | 0.76300 | 0.06090 | M | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| T | 0.00000 | 0.76300 | 0.00090 | B | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.76300 | 0.06090 | R | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.76300 | 0.08600 | B | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.80100 | 0.00000 | M | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.80100 | 0.00000 | B | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | M | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.80100 | 0.00000 | M | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | R | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| T | 0.00000 | 0.80100 | 0.07250 | R | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | B | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.94280 | 0.00000 | M | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 0.94280 | 0.78570 | B | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 0.94284 | 0.78570 | R | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 1.15260 | 0.00000 | M | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.00000 | 1.15260 | 0.96050 | B | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| T | 0.00320 | 0.73990 | 0.05440 | R | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.10500 | 0.69750 | 0.09680 | B | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | *[disc]* |
| | 0.55070 | 0.65400 | 0.00000 | M | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.55070 | 0.65400 | 0.52320 | B | 59772/3693/02 | APOTHECON INC | |
| | 0.55070 | 0.65400 | 0.52320 | R | 59772/3693/02 | APOTHECON INC | |

FULs Price : .0816
Percent Difference : -36.74
High Price : 1.15260

Prior FULs Price : .1290
Source Code : R
Low Price : .05440

*[handwritten notes at bottom:]*

8/22 - Fut locks ok - 4 WACs all less than our price

.05140  Geneva NDC B
.0816   New Fut
X 150

$8
.06 09
X 150 %
.0914
New Fut
Seg

# Federal Upper Limit System

EXHIBIT
NY Counties
Defendants 5
3/19/08
DW

Product Group : 349
Strengths : 0.5MG
Routes : ORAL
'ients : CLONAZEPAM

Package Size : 100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---------|--------------|-----|-----|---------|------------|--------------|-----------|
| | 0.00000 | 0.69230 | 0.00000 | M | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | B | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | R | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.71370 | 0.00000 | B | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | B | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | B | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | M | 00093/0832/01 | TEVA PHARMACEUTICAL USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | M | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | R | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | R | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | R | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74910 | 0.00000 | R | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74910 | 0.00000 | B | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74910 | 0.16370 | R | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74910 | 0.16370 | M | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74950 | 0.00000 | R | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74950 | 0.00000 | M | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74950 | 0.18400 | B | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.84768 | 0.70640 | B | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.00000 | 0.84770 | 0.00000 | B | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.00000 | 0.84770 | 0.70640 | M | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| T | 0.09890 | 0.74900 | 0.09310 | R | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.59990 | 0.68390 | 0.56090 | B | 62269/0353/24 | INVAMED, INC. | |
| | 0.59990 | 0.71237 | 0.56990 | B | 62269/0353/24 | INVAMED, INC. | |
| | 0.59990 | 0.71240 | 0.00000 | M | 62269/0353/24 | INVAMED, INC. | |

FULs Price : .1199 .2455
Percent Difference : -56.56
High Price : .84770

Prior FULs Price : .2760
Source Code : R
Low Price : .07990

8/15 - 4 WACs are less than NF FuL - 100lb ok

.1637 ( Purepac NSDR
X 150
(.2455) New FuL

NYCo Def
5

08/01/2001

# Federal Upper Limit System



EXHIBIT
NY Counties
Defendants 6
3/19/08

Product Group : 959
Strengths : 1MG
Routes : ORAL
Ingredients : LORAZEPAM

Package Size : 100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.82950 | 0.00000 | M | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.82950 | 0.19990 | B | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.82950 | 0.19990 | R | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.83770 | 0.00000 | B | 59911/5812/01 | ESI LEDERLE INC. | |
| P | 0.00000 | 0.83770 | 0.00000 | B | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | M | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.00000 | M | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.00000 | R | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| P | 0.00000 | 0.83770 | 0.00000 | R | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.38120 | B | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.38120 | R | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.38190 | R | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.00000 | 0.88000 | 0.00000 | B | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | M | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | R | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88260 | 0.00000 | M | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88250 | 0.00000 | B | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | M | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | R | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88750 | 0.40200 | B | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.45770 | 0.83770 | 0.00000 | R | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.86770 | 1.08460 | 0.38190 | B | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.86770 | 1.08460 | 0.00000 | M | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08462 | 0.00000 | R | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08462 | 0.86770 | B | 00008/0064/02 | WYETH LABORATORIES | |

Price : 0.2999   .5718
Current Difference : -47.55
High Price : 1.08462

Prior FULs Price : .5718
Source Code : B
Low Price : .19990

**\*\*\*FULs Price not greater than another supplier\*\*\***

8/1 → FUL looks ok - five suppliers are less than our price

.38120 (URL NDC) R
$\lambda$   150
—————
.5718  → New FUL



# Federal Upper Limit System



Product Group : 250
Strengths : 500MG
Routes : ORAL
Ingredients : CEFADROXIL/CEFADROXIL HEMIHYDRATE

Package Size :  100
Dosage : CAPSULE
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 2.84650 | 0.84990 | B | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.84990 | B | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 2.29950 | R | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 3.19950 | 0.00000 | M | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 0.00000 | R | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 2.12330 | B | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.27950 | 0.00000 | M | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 0.00000 | R | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 1.95500 | B | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 1.95500 | R | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 2.12900 | B | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 2.12900 | R | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 2.56840 | 3.05000 | 0.00000 | M | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | B | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | R | 59772/7271/04 | APOTHECON INC | |

FULs Price : 1.2749 2.9000
Percent Difference : 0.00
High Price : 3.27950

Prior FULs Price : .0000
Source Code : B
Low Price : .84990

***FULs Price not greater than another supplier***

7/25- FUL was too low at 1.2749, but when I raised it, it became = to Major's AWP - delete for now

⑮

# Federal Upper Limit System



EXHIBIT
NY Counties
Defendants 8
3/19/08
gw

| | |
|---|---|
| Product Group : 250 | Package Size : 50 |
| Strengths : 500MG | Dosage : CAPSULE |
| Routes : ORAL | Exclusion Code : |
| Ingredients : CEFADROXIL/CEFADROXIL HEMIHYDRATE | |

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 3.22000 | 0.00000 | M | 59772/7271/03 | APOTHECON INC | |
| | 0.00000 | 3.22000 | 2.57600 | B | 59772/7271/03 | APOTHECON INC | |
| | 0.00000 | 3.37360 | 0.00000 | M | 00555/0582/10 | BARR LABORATORIES INC | |
| | 0.00000 | 3.37360 | 2.23880 | B | 00555/0582/10 | BARR LABORATORIES INC | |
| | 0.00000 | 3.45500 | 0.00000 | M | 00172/4058/48 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.45500 | 0.00000 | M | 63304/0582/50 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.45500 | 2.05260 | B | 00172/4058/48 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.45500 | 2.22420 | B | 63304/0582/50 | RANBAXY PHARMACEUTICALS, INC. | |
| | 4.13540 | 4.98274 | 4.13540 | B | 00087/0784/46 | BRISTOL-MYERS SQUIBB COMPANY | |
| | 4.13540 | 4.98280 | 0.00000 | M | 00087/0784/46 | BRISTOL-MYERS SQUIBB COMPANY | |

FULs Price : 3.0789
Percent Difference : 0.00
High Price : 4.98280

Prior FULs Price : 3.0789
Source Code : B
Low Price : 2.05260

#100 100b like the most commonly used size

**Package Size Notes:**
None

**Product Group Notes:**
0

| | (#50) 00172-4058-48 | (#100) 00172-4058-60 | (#50) 59772-7271-03 0087 0784-46 | (#100) 59772-7271-04 |
|---|---|---|---|---|
| rL | 2,366 | 21,465 | 3,650 | 5,487 |
| CA | — | | | |
| NY | 4,199 | 28,451 | 4,076 | 20,704 |
| NC | 927 | 6,292 | 2,654 | 5,437 |
| ID | 256 | 933 | — | — |
| MD | — | — | — | |

# Federal Upper Limit System

*Note: NSCF include Inhaler & Refills*

Product Group : 50
Strengths : 0.09MG
Routes : INHALATION
Ingredients : ALBUTEROL

Package Size : 17
Dosage : AEROSOL, METERED
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 1.16411 | 0.87058 | B | 59930/1560/02 | WARRICK PHARMACEUTICALS | |
| | 0.00000 | 1.16412 | 0.00000 | M | 59930/1560/02 | WARRICK PHARMACEUTICALS | |
| | 0.00000 | 1.16412 | 0.00000 | R | 59930/1560/02 | WARRICK PHARMACEUTICALS | |
| P | 0.00000 | 1.17647 | 0.00000 | M | 50111/0801/32 | SIDMAK LABORATORIES, INC. | |
| P | 0.00000 | 1.17647 | 0.26176 | B | 50111/0801/32 | SIDMAK LABORATORIES, INC. | |
| P | 0.00000 | 1.17647 | 0.26176 | R | 50111/0801/32 | SIDMAK LABORATORIES, INC. | |
| | 0.00000 | 1.25941 | 0.00000 | M | 59930/1560/01 | WARRICK PHARMACEUTICALS | |
| | 0.00000 | 1.25941 | 0.00000 | B | 59930/1560/01 | WARRICK PHARMACEUTICALS | |
| | 0.00000 | 1.25941 | 0.94470 | R | 59930/1560/01 | WARRICK PHARMACEUTICALS | |
| P | 0.00000 | 1.26470 | 0.28352 | B | 50111/0801/31 | SIDMAK LABORATORIES, INC. | |
| P | 0.00000 | 1.26471 | 0.00000 | M | 50111/0801/31 | SIDMAK LABORATORIES, INC. | |
| P | 0.00000 | 1.26471 | 0.28353 | R | 50111/0801/31 | SIDMAK LABORATORIES, INC. | |
| P | 0.00000 | 1.29411 | 0.80176 | B | 00677/1549/70 | UNITED RESEARCH LABORATORIES | |
| P | 0.00000 | 1.29412 | 0.00000 | M | 00677/1549/70 | UNITED RESEARCH LABORATORIES | |
| P | 0.00000 | 1.29412 | 0.35941 | R | 00677/1549/70 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 1.32235 | 0.00000 | M | 52555/0594/17 | MARTEC PHARMACEUTICALS, INC. | |
| P | 0.00000 | 1.32235 | 0.26471 | B | 52555/0594/17 | MARTEC PHARMACEUTICALS, INC. | |
| | 0.00000 | 1.55941 | 0.00000 | M | 00172/4390/19 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 1.55941 | 0.35294 | B | 00172/4390/19 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 1.55941 | 0.35294 | R | 00172/4390/19 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 1.69117 | 0.35294 | B | 00172/4390/18 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 1.69118 | 0.00000 | M | 00172/4390/18 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 1.69118 | 0.35294 | R | 00172/4390/18 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 1.77647 | 0.00000 | M | 00173/0321/98 | GLAXO WELLCOME INC. | |
| | 0.00000 | 1.77647 | 1.48059 | R | 00173/0321/98 | GLAXO WELLCOME INC. | |
| | 0.00000 | 1.77669 | 1.48058 | B | 00173/0321/98 | GLAXO WELLCOME INC. | |
| | 0.00000 | 1.81647 | 0.00000 | M | 00085/0614/03 | SCHERING CORPORATION | |
| | 0.00000 | 1.81647 | 0.00000 | R | 00085/0614/03 | SCHERING CORPORATION | |
| | 0.00000 | 1.81647 | 1.51352 | B | 00085/0614/03 | SCHERING CORPORATION | |
| | 0.00000 | 1.92765 | 0.00000 | M | 00173/0321/88 | GLAXO WELLCOME INC. | |
| | 0.00000 | 1.92765 | 1.60647 | R | 00173/0321/88 | GLAXO WELLCOME INC. | |
| | 0.00000 | 1.92776 | 1.60647 | B | 00173/0321/88 | GLAXO WELLCOME INC. | |
| | 0.00000 | 1.96941 | 0.00000 | M | 00085/0614/02 | SCHERING CORPORATION | |
| | 0.00000 | 1.96941 | 0.00000 | R | 00085/0614/02 | SCHERING CORPORATION | |
| | 0.00000 | 1.96941 | 1.64117 | B | 00085/0614/02 | SCHERING CORPORATION | |
| T | 0.26470 | 1.32235 | 0.26470 | B | 52555/0594/17 | MARTEC PHARMACEUTICALS, INC. | |

FULs Price : 1.3059
Percent Difference : 274.61
High Price : 1.96941

Prior FULs Price : .3486
Source Code : B
Low Price : .87058

**\*\*\*FULs Price not greater than another supplier\*\*\***

**Package Size Notes:**
zenith has new wac of $15.95 (5/17/01)
t=availability problems (warrick, martec, zenith, schering are all sporadically avail.) 8/14/01

**Product Group Notes:**
None

*(handwritten notes)*
Warrick yes
Schering no
Martec yes
zenith yes
Glaxo Wellcome

EXHIBIT
NY Counties
Defendants 12
3/19/08

**From:**      <FedUpperLimitForm@cms.hhs.gov>
**To:**        <ful@cms.hhs.gov>
**Date:**      Thu, Oct 4, 2001  3:58 PM
**Subject:**   Comments on Draft FUL Prices

Ingredient Name as Shown on FUL List:  ALBUTEROL
Dosage(s):  INHALATION
Strength(s):  0.09MG/INH
Package Size(s):  17
Less Than 3 Supplies:  X
FUL Too Low:
FUL Too High:
Source of Information:  Manufacturer, Wholesaler, First Data Bank
Contact Person:  Dave Kammerer
Facility and/or Organization:  Omnicare
Mailing Address:  100 East Rivercenter Blvd.
Contact E-Mail Address:  dkammerer@omnicare.com
Phone:
Web Site (if Available):

HHD175-0558

FUL - Comments on Draft FUL Prices                                                          Page 1

**From:** <FedUpperLimitForm@cms.hhs.gov>
**To:** <ful@cms.hhs.gov>
**Date:** Fri, Oct 5, 2001 12:51 PM
**Subject:** Comments on Draft FUL Prices

Ingredient Name as Shown on FUL List: ALBUTEROL
Dosage(s): INHALATION
Strength(s): 0.09MG/INH
Package Size(s): 17
Less Than 3 Supplies:
FUL Too Low: X
FUL Too High:
Source of Information: Manufacturer, Wholesaler, First Data Bank

Reference NDC# (the only NDC# where the WAC price times 1.5 equals the FUL price) has been discontinued or the manufacturer has supply problems

Contact Person: Dave Kammerer
Facility and/or Organization: Omnicare
Mailing Address: 100 East Rivercenter Blvd.
Contact E-Mail Address: dkammerer@omnicare.com
Phone:
Web Site (if Available):