## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br>Subcategory Case No. 03-10643-PBS |
| THIS DOCUMENT RELATES TO:<br><br>    *The City of New York, et al.*<br><br>*v.*<br><br>    *Abbott Laboratories, et al.* | ) ) Judge Patti B. Saris<br>)<br>)<br>)<br>)<br>) |

### SUPPLEMENTAL AFFIDAVIT OF JOANNE M. CICALA

Joanne M. Cicala, being duly sworn, deposes and says as follows:

1.  I am a partner at Kirby McInerney LLP and counsel for the City of New York and all New York Counties in MDL 1456, except Nassau and Orange.  In this capacity, I am personally knowledgeable about the matters ser forth herein.  This supplemental affidavit is submitted in further Opposition to SmithKline Beecham Corporation, d/b/a GlaxoSmithKline's ("GSK's") Motion for Partial Summary Judgment [Dkt. No.5707]

2.  Attached as Exhibit A is a true and complete copy of relevant excerpts from the SEC Form 20-F for GlaxoSmithKline PLC for the fiscal year ended December 31, 2005, dated March 3, 2006.

3.  Attached as Exhibit B is a true and complete copy of relevant excerpts from and exhibits to of the June 3, 2009 deposition of GSK's 30(b)(6) corporate designee on the subject of GSK Rebates, Mr. David Brown.

4.   Attached as Exhibit C is a true and complete copy of the Transcript of Motion Hearing, dated April 16, 2009, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, Cause No. 01-12257-PBS.

5.   Attached as Exhibit D is a true and complete excerpt from GSK's rebate data table entitled, GSK's CN_REB_FEE_HLDR_V, detailing rebates paid to GPOs.

6.   Attached as Exhibit E is a true and complete correct excerpt of the January 14, 2009 deposition of Eric M. Gaier, Ph.D., taken in connection with GSK's motion.

7.   Attached as Exhibit F is a true and complete excerpt from GSK's rebate data tables entitled, GSK's CN_REB_FEE_HLDR_V, detailing rebates paid to TPPs.

8.   Attached as Exhibit G are two charts.  The first is Exhibit 24 to the GSK 30(b)(6) Rebate Deposition of June 3, 2009.  It was prepared by GSK counsel. The second is a chart prepared by plaintiffs and based on Exhibit 24.

9.   Attached as Exhibit H is a true and complete excerpt from GSK's rebate data tables entitled, GSK's CN_REB_FEE_HLDR_V, detailing rebates paid to PBMs.

Joanne M. Cicala

Sworn to before me on this 16th day of June, 2009.

Notary Public

JANICE E TOGAL
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-27-2012

# Cicala Supplemental Affidavit
# In Further Opposition to GSK
# Motion For Summary Judgment

# Exhibit A

As filed with the Securities and Exchange Commission on March 3, 2006

## SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549

# FORM 20-F

---

☐   Registration statement pursuant to Section 12(b) or (g) of the Securities Exchange Act of 1934

OR

☒   Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
For the fiscal year ended December 31, 2005

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☐   SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number 1-15170

# GlaxoSmithKline plc
*(Exact name of Registrant as specified in its charter)*

**England**
(Jurisdiction of incorporation or organization)

**980 Great West Road, Brentford, Middlesex TW8 9GS England**
(Address of principal executive offices)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Name of Each Exchange On Which Registered** |
|---|---|
| American Depositary Shares, each representing 2 Ordinary Shares, Par value 25 pence | New York Stock Exchange |

Securities registered or to be registered to Section 12(g) of the Act:

**None**
(Title of class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**
(Title of class)

---

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

☒ Yes   ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

☐ Yes   ☒ No

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (check one):

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark which financial statement item the registrant has elected to follow.

☐ Item 17   ☒ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

☐ Yes   ☒ No

Back to Contents

Operating and financial review and prospects

## 2005 Year
continued

### Critical accounting policies

The consolidated Financial statements are prepared in accordance with International Financial Reporting Standards, as adopted for use in the European Union, following the accounting policies approved by the Board and described in Note 2 to the financial statements, 'Accounting policies'. Management is required to make estimates and assumptions that affect the amounts of assets, liabilities, revenue and expenses reported in the financial statements. Actual amounts and results could differ from those estimates. The following are considered to be the critical accounting policies adopted.

### Turnover

Revenue is recognised when title and risk of loss is passed to the customer and reliable estimates can be made of relevant deductions. Gross turnover is reduced by rebates, discounts, allowances and product returns given or expected to be given, which vary by product arrangements and buying groups. These arrangements with purchasing organisations are dependent upon the submission of claims some time after the initial recognition of the sale. Accruals are made at the time of sale for the estimated rebates, discounts or allowances payable or returns to be made, based on available market information and historical experience. Because the amounts are estimated they may not fully reflect the final outcome, and the amounts are subject to change dependent upon, amongst other things, the types of buying group and product sales mix. The level of accrual is reviewed and adjusted quarterly in the light of historical experience of actual rebates, discounts or allowances given and returns made and any changes in arrangements. Future events could cause the assumptions on which the accruals are based to change, which could affect the future results of the Group.

The Group's largest business is US pharmaceuticals, and the US market has the most complex arrangements for rebates, discounts and allowances. The following briefly describes the nature of the arrangements in existence in the Group's US pharmaceuticals business.

- The US Medicaid programme is a state-administered programme providing assistance to certain poor and vulnerable patients. In 1990, the Medicaid Drug Rebate Program was established to reduce state and federal expenditure on prescription drugs. GSK participates by providing rebates to states. Accruals for Medicaid rebates are calculated based on the specific terms of individual state agreements using a combination of historical experience, product and population growth, anticipated price increases and the impact of contracting strategies. No impact of the Medicaid Part D arrangements was seen in 2005, but they are expected to affect the level of discounts given in 2006.

- GSK has arrangements with certain key parties, whereby the party is able to buy products from wholesalers at lower prices. A chargeback represents the difference between the invoice price to the wholesaler and the indirect customer's contractual discounted price. Accruals for estimating chargebacks are calculated based on the terms of each agreement, historical experience and product growth rates.

- Customer rebates are offered to key managed care and group purchasing organisations and other direct and indirect customers. These arrangements require the customer to achieve certain performance targets relating to value of product purchased, formulary status or pre-determined market shares relative to competitors. The accrual for these rebates is estimated based on the specific terms in each agreement, historical experience and product growth rates.

- Cash discounts are offered to customers to encourage prompt payment. These are accrued for at the time of invoicing and adjusted subsequently to reflect actual experience.

- Where there is historical experience of customer returns, GSK records an accrual for estimated sales returns by applying historical experience of customer returns to the amounts invoiced, together with market related information such as stock levels at wholesalers, anticipated price increases and competitor activity.

A reconciliation of gross turnover to net turnover for the US pharmaceuticals business is as follows:

|  | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
|  | £m | % | £m | % | £m | % |
| Gross turnover | 11,875 | 100 | 10,835 | 100 | 11,825 | 100 |
| Chargebacks | 786 | 7 | 732 | 7 | 851 | 7 |
| US Government and State programmes | 775 | 6 | 734 | 7 | 628 | 5 |
| Managed care and group purchasing organisation rebates | 686 | 6 | 575 | 5 | 567 | 5 |
| Cash discounts | 227 | 2 | 208 | 2 | 226 | 2 |
| Customer returns | 155 | 1 | 86 | 1 | 86 | 1 |
| Prior year adjustments | (34) | – | (51) | (1) | (93) | (1) |
| Other items | 174 | 1 | 126 | 1 | 150 | 1 |
| Total deductions | 2,769 | 23 | 2,410 | 22 | 2,415 | 20 |
| Net turnover | 9,106 | 77 | 8,425 | 78 | 9,410 | 80 |

The increase in customer returns in 2005 arose from product recalls following the manufacturing issues at the Cidra plant and increased generic competition.

The total accruals for rebates, discounts, allowances and returns in the US pharmaceuticals business at 31st December 2005 and 31st December 2004 were as follows:

|  | At 31st December 2005 £m | At 31st December 2004 £m |
|---|---|---|
| Chargebacks | 56 | 50 |
| US Government and State programmes | 417 | 362 |
| Managed care and group purchasing organisation rebates | 401 | 297 |
| Cash discounts | 27 | 19 |
| Customer returns | 146 | 97 |
| Other | 53 | 31 |
| Total | 1,100 | 856 |

# Cicala Supplemental Affidavit
# In Further Opposition to GSK
# Motion For Summary Judgment

# Exhibit B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL NO. 1456 CIVIL ACTION: 01-CV-12257-PBS


------------------------------------------------------------

IN RE:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

------------------------------------------------------------


825 Third Avenue

New York, New York

June 3, 2009

9:45  a.m.


VIDEOTAPED DEPOSITION of DAVID B. BROWN  before S. Arielle Santos, Certified Shorthand Reporter, Certified LiveNote Reporter and Notary Public.


HUDSON REPORTING & VIDEO                    1-800-310-1769

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 14

DAVID B. BROWN

1  
2  describing purchase or provider rebates in his
3  affidavits?
4       A    I do remember purchase-based rebates,
5  yes.
6       Q    And what is a "purchase-based
7  rebate?"
8       A    It is a rebate or a discount that we
9  offer to purchasers that is not at the time of
10 original purchase but they can earn either by
11 performing or across time.
12      Q    And why are purchasers offered such
13 discounts?
14      A    Basically to compete in the
15 therapeutic class that we are dealing with so that we
16 can -- our patients can have access to the drugs.
17      Q    It's fair to say that GSK offers
18 these purchase-based rebates to encourage purchasers
19 to use GSK products?
20      A    Can I rephrase it or --
21      Q    Sure.
22      A    Basically, we offer purchase-based
23 rebates so that patients can get our product, that
24 the -- the purchasers will dispense and use our
25 product or medically appropriate.

Page 15

DAVID B. BROWN

1  
2       Q    So is it fair to say that without
3  offering purchase-based rebates patients could not
4  access GSK products?
5       A    No, that's not fair to say.
6       Q    Okay.  So then why does GSK offer
7  purchase-based rebates?
8       A    Again, to compete.
9       Q    With whom?
10      A    With the other drugs in the class
11 that are being used for that therapy and really as to
12 lower the cost of the drug to the purchasers so -- so
13 that it would have value and they would use it.
14      Q    How is lowering cost to purchasers
15 help GSK compete?
16           MR. HEROLD:  I will object
17      unless you identify which purchasers
18      you are talking about -- hospitals,
19      pharmacies.  A very broad question.
20 BY MS. CICALA:
21      Q    Can you answer my question?
22      A    If you will again -- if you will
23 narrow it down to which purchasers you are talking
24 about.
25      Q    Which purchasers were you referring

Page 16

DAVID B. BROWN

1  
2  to when you defined purchase-based rebates as
3  discounts offered -- offered?
4       A    I was -- I was -- in my head, I was
5  thinking of hospitals.
6       Q    Any others?
7       A    The only others I can think of are
8  long-term care facilities.
9       Q    Can you think of any other purchasers
10 to whom GSK offers purchase-based rebates?
11      A    It would be -- I mean, we did offer
12 for a short period of time to wholesalers for a
13 limited amount of drugs, a limited period.  Within
14 again the -- the purchaser segment, you have home
15 health, you have surgical centers.  Also included in
16 a purchaser would be a Staff Model Health Maintenance
17 Organization, HMO.
18      Q    What is a Staff Model HMO?
19      A    It is a pharmacy that's closed to the
20 public.  Basically, it's owned and operated by --
21 it's an insurance company is what I think of.  And it
22 dispenses products just to the members of that
23 insurance company.
24      Q    Can you think of any other purchasers
25 to whom GSK offers purchase-based rebates?

Page 17

DAVID B. BROWN

1  
2       A    Off the top of my head, no.
3       Q    Okay.
4           MS. CICALA:  Can you mark
5      this Exhibit 2?
6           (Whereupon the exhibit is
7      marked.)
8  BY MS. CICALA:
9       Q    Mr. Brown, I will represent to you
10 this is a document that we created.  It's entitled
11 "Summary of Databases Concerning Rebate Data Produced
12 by GSK for the WAC List Price Test."
13           And I will represent to you that this
14 is, as I said, the document we created.  It lists
15 the -- the three files we received from GSK
16 containing rebate data in the context of this
17 litigation.
18           And if I could ask you to look at the
19 three files listed in this Exhibit 2 and tell me
20 whether you recognize the description of the three
21 files.
22      A    I do.
23      Q    Would it be acceptable to you in
24 terms of shorthand for me to refer to these files as
25 the institution file holder file and the customer

New York                Hudson Reporting & Video          New Jersey
Connecticut          Nationwide 1-800-310-1769          Pennsylvania

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 30

DAVID B. BROWN

1  what that is.
2
3     Q    And Dr. Gaier, in fact, used this
4  particular information in his -- in his analysis;
5  isn't that right?
6     A    I am not familiar enough to answer
7  that.
8     Q    Okay.
9     MS. CICALA:  Exhibit 6.
10    (Whereupon the exhibit is
11  marked.)
12  BY MS. CICALA:
13    Q    Mr. Brown, we are just -- we are
14  going to return to the subject of GPOs for -- for a
15  moment, and I will represent to you that what I put
16  before you as Exhibit 6 is -- is -- again, it was an
17  exhibit to Mr. DeFore's affidavit, which you have
18  seen. It's an extract from the holder database that
19  was produced to plaintiffs in this litigation, and it
20  is a full extract from that data set of what appeared
21  to be rebates paid by GSK to GPOs. And if you could
22  turn to the fourth page of this document, you will
23  see that their -- the data reflects rebates paid to
24  Novation, LLC; Novation/UHC Acute. And then on the
25  next -- on the next page Novation/VHA Acute.

Page 31

DAVID B. BROWN

1  Do you see that?
2     MR. HEROLD:  Objection to the
3  form.  You have characterized this
4  document in a certain way, which I
5  think is inconsistent with what
6  these entities -- what this data
7  reflects.  And I am just going to
8  note that objection for the record.
9  BY MS. CICALA:
10    Q    Mr. Brown, the counsel's objection
11  gets to the heart of what I am going with my
12  question in fact, so I -- I am sure I can cure this.
13  In -- in looking at the data in the folder file, if
14  we see -- and let's focus on Novation, for example.
15    Do you see in the middle of -- of --
16  of page 4 a payment of -- a rebate amount of
17  $1,450,817 from the year 2001?
18    A    I see that reference, yes.
19    Q    And do you see next to the rebate
20  amount in the column entitled "Business Name" it says
21  Novation, LLC?
22    A    I do see that.
23    Q    Does this -- does this indicate that
24  GSK paid a rebate of $1.4 million to Novation, LLC?

Page 32

DAVID B. BROWN

1
2     A    No.
3     Q    Can you explain what this data tells
4  us?
5     A    It is a -- roll-up of all the
6  rebates paid to the hospitals that are members of
7  Novation.  You will actually see that in the
8  institution level file, so this is a duplicate.
9     Q    Do you know if there are other
10  businesses in the GSK data apart from GPOs where one
11  table would contain a roll-up of detail that was
12  contained in other tables?
13    A    Yes.
14    Q    And which other businesses -- in
15  which -- for which other businesses might that occur?
16    A    In our PBM and IPA rebates, it --
17  it's actually the reverse.  The rebate is paid to the
18  contract holder which is the pharmacy benefit
19  management company or the third-party payer.  The
20  institutional level table will have data showing how
21  that was earned, that is you can add it up --
22  basically, the rebate was paid to the holder.
23    MS. CICALA:  Mark this as 7
24  please.
25    (Whereupon the exhibit is

Page 33

DAVID B. BROWN

1
2  marked.)
3  BY MS. CICALA:
4     Q    Mr. Brown, Exhibit 7 are extracts
5  from the customer rebate file, the holder rebate file
6  and the institutional rebate file concerning rebates
7  to PBMs.
8     And I'm -- based on the testimony
9  that you just gave, could you ex- -- could you
10  explain for the record which files, meaning the
11  customer or the holder or the institution, would show
12  the rebate that was -- that was paid to the holder?
13    A    For -- and again, I am not a data
14  expert so you are getting the best of my knowledge.
15    Q    Okay.
16    A    The rebates paid to the holder, that
17  holder file would have the rebates paid to the
18  third-party payers. It also will have the rebates on
19  the aggregate basis paid to the members of the
20  hospital underneath the GPO. It also should have all
21  the other rebates paid to other types of entities.
22    Q    What -- can you explain what -- what
23  are the rebates then that appear in the institution
24  table for as it concerned PBMs?
25    A    I would have to see the record to

9 (Pages 30 to 33)

Page 38

DAVID B. BROWN

1
2 to businesses in the MGC Plan?
3     A    I would say that is not correct.
4     Q    Okay.  Exhibit 8 contains rebate
5 amounts associated with assorted Humana business
6 entities; correct?
7     A    Exhibit 8 shows from the
8 institutional file where this business entity has a
9 rebate amount attached to it, yes.
10     Q    Does -- does that indicate that GSK
11 paid that rebate amount to that business entity?
12     A    It is my understanding that does not.
13     Q    What does this data indicate?
14     A    This is -- again, what I was saying,
15 it is the reverse, this is where the contract was set
16 up to measure performance at the individual plan
17 underneath and then we pay at the national level, at
18 the contract holder level.
19     Q    So what -- what -- what do you mean
20 when you say, "The contract was set up to measure
21 performance?"
22     A    Performance is basically access of
23 our products on a formulary or it can be market
24 share.  And with some national plans, the individual
25 plans underneath in their local region can have a

Page 39

DAVID B. BROWN

1
2 different formulary.  So we would measure that
3 performance access at that level.
4     Q    And then is it correct the -- the
5 holder receives rebates based on the performance of
6 -- of the -- of the individual plans?
7     A    Without looking at each contract, but
8 yes, that's in general, correct.  It is a rolled up
9 to the holder.
10     Q    So then is it -- now, turning to
11 Exhibit 9 for a moment.
12     Exhibit 9 is -- contains rebate data
13 associated with Humana, assorted Humana entities from
14 the holder table; correct?
15     A    I actually don't know for sure, but
16 my assumption would be this would be a duplicate
17 record of what is held in the holder table.
18     Q    Just -- I'm -- I'm sorry.  I am just
19 not clear on your -- on your last answer.
20     What would be a duplicate record?
21     A    The rebate amount.
22     Q    The rebate amount set forth in
23 Exhibit 8 would be duplicative of the amount set
24 forth in Exhibit 9?
25     A    Again --

Page 40

DAVID B. BROWN

1
2     MR. HEROLD:  Objection to the
3 form because these are your exhibits
4 that you prepared.  We have no way
5 of knowing, you know, how you did
6 it, which ones are complete,
7 incomplete, et cetera.  So I don't
8 know how he can answer that
9 question.
10     MS. CICALA:  That's fine.
11 Let me rephrase.
12 BY MS. CICALA:
13     Q    Can you explain what you meant a
14 moment ago when you said that it was your under- --
15 that it was your belief that -- that -- that one of
16 -- that something was duplicative of something else?
17     A    And again, it -- I'm reacting to the
18 exhibits you have given me.  To me, if you looked in
19 the database itself, the data that you got in the
20 customer data, basically, it's set up to hold
21 customer information.  The rebate holder tables, the
22 rebates that we pay and at the institution level is
23 actually where you get down to where it is earned, so
24 to speak, and that's my understanding of the
25 databases.  If you show me an exhibit that's proposed

Page 41

DAVID B. BROWN

1
2 to show rebate dollars in the customer data, my
3 assumption is that that would be a duplicate record
4 to what is in the holder table.
5     Q    The -- is it correct to say that the
6 -- the amounts reflected in the holder table
7 associated with the Humana -- the rebate amounts
8 reflected in the holder table that we have identified
9 as Exhibit 9, and I am not asking you to confirm the
10 accuracy of the numbers that are set forth here, I am
11 representing to you that these are the numbers that
12 we extracted from your data.
13     Assuming -- assuming the accuracy of
14 the rebate -- the rebate numbers that we see in
15 Exhibit 9 and that we have accurately associated them
16 with the business name, can you -- can you confirm
17 that those would be rebates that were paid to the
18 Humana entities that are listed in the exhibit?
19     MR. HEROLD:  Objection to the
20 form.
21     You can answer.
22     THE WITNESS:  My
23 understanding is the holder table
24 does hold the rebates that we pay to
25 the contract holder.

New York                    Hudson Reporting & Video              New Jersey
Connecticut          Nationwide 1-800-310-1769          Pennsylvania

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 42

                    DAVID B. BROWN
1
2    BY MS. CICALA:
3         Q    And in the context -- withdrawn.
4    Now, you see in the -- in Exhibit 9 Humana has -- the
5    Humana entities listed there has the business type
6    code of IPA.
7         A    I do see that, yes.
8         Q    And earlier, we -- you testified --
9    you agreed that in Exhibit 8, the business type code
10   for the Humana entities was MGC?
11        A    I see that, yes.
12        Q    Can you explain to me why there would
13   be different business types associated with the
14   Humana entities?
15        A    Again, my assumption is there -- they
16   were actually talking about two different Humanas,
17   they're talking about the National Humana.  The
18   contract holder and IPA is just an internal term we
19   use to -- to designate the third-party payer
20   insurance company.  In Exhibit 8, the managed care
21   plan, you are at a different level.  You are talking
22   about the individual plans underneath that major
23   third-party payer.
24        Q    What does IPA stand for?
25        A    Again, it's an internal code that we

Page 43

                    DAVID B. BROWN
1
2    use just to designate, let's say, third-party payer
3    rebate.
4         Q    Do you know what the initials stand
5    for?
6         A    If you're talking about from the
7    industry side, it could be an individual practice
8    association or individual physician association.
9              MS. CICALA:  Mark this as 11.
10             (Whereupon the exhibit is
11        marked.)
12   BY MS. CICALA:
13        Q    Mr. Brown, we have marked as
14   Exhibit 11 an excerpt from GSK's Form 20-F for the
15   fiscal year ended December 31, 2005, and if I could
16   direct your attention to the fifth page of this
17   exhibit.
18        A    (Reviewing.)
19             MR. HEROLD:  One marked 132?
20             MS. CICALA:  Yes.
21   BY MS. CICALA:
22        Q    And focusing on the second column,
23   the first bullet on this page, which I will just read
24   into the record, it reads, "Customer rebates are
25   offered to key managed care and group purchasing

Page 44

                    DAVID B. BROWN
1
2    organizations and other direct and indirect
3    customers."
4              Do you see that?
5         A    I do.
6              MR. HEROLD:  Objection.  You
7         haven't read the whole thing, but go
8         ahead.  You don't have to.  I am
9         just noting that for the record.
10             MS. CICALA:  Yeah, and I will
11        read on.
12   BY MS. CICALA:
13        Q    Focusing on the first sentence --
14   first sentence there, Mr. Brown, would -- would you
15   agree that customer rebates are offered to key
16   managed care and group purchasing organizations and
17   other direct and indirect customers?
18        A    We do offer rebate contracts to
19   entities both purchasers and then entities that
20   represent third-party payers, yes.
21        Q    So you agree that you offer rebates
22   to managed care and group purchasing organizations
23   and other direct and indirect customers?
24        A    Again, as broad term, but yes.
25        Q    Okay.  And do you -- can you explain

Page 45

                    DAVID B. BROWN
1
2    what is meant by the term -- by the word "key" in
3    this sentence?
4         A    I can't, no.
5         Q    Does GSK offer customer rebates to
6    all of its customers or everyone with whom it -- it
7    does business?
8              MR. HEROLD:  Objection to the
9         form.
10             THE WITNESS:  Again, we do
11        not offer rebates to all our
12        customers.
13   BY MS. CICALA:
14        Q    How does GSK determine which
15   customers it will offer rebates to?
16             MR. HEROLD:  Objecting to the
17        use of the word "customers," unless
18        you define it.
19             THE WITNESS:  Again, could
20        you be specific which customers you
21        are talking about?
22   BY MS. CICALA:
23        Q    Well, let's use the language from the
24   -- from GSK 20-F, which says, "Customer rebates" --
25   and we'll -- we'll -- we'll go through this segment

12  (Pages 42 to 45)

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 46

DAVID B. BROWN

1
2   by segment.  "Customer rebates are offered to key
3   managed care and group purchasing organizations."
4   That's what the 20-F says.
5          How does GSK determine which managed
6   care and group purchasing organizations to offer
7   customer rebates to?
8      A    There are actually two very different
9   types of customers.
10     Q    Let's start then with managed care.
11     A    Okay.
12     Q    How does GSK determine which managed
13  care entities it will offer customer rebates to?
14     A    There's a couple key things we look
15  at.  One, it is the decision is -- first off, does
16  the managed care entity have a formulary where they
17  have looked at the clinical effectiveness of our
18  products, their safety, and then they compare them
19  against other products within that therapeutic class,
20  say a respiratory product against other respiratory
21  products, and then they made the decision that they
22  want us to compete on price so that their members can
23  have access to our products.  And where we need to,
24  we will compete on price to meet competition.
25     Q    And when you would say "compete on

Page 47

DAVID B. BROWN

1
2   price," what do you mean?
3      A    It's basically the cost of the
4   product to the third-party payer.
5      Q    So GSK would -- may offer a customer
6   rebate in order to reduce the cost of the product to
7   the third-party payer?
8      A    To the third-party payer --
9          MR. HEROLD:  Objection to the
10  form.
11         THE WITNESS:  -- I am not
12  sure.
13         MR. HEROLD:  Sorry.
14  BY MS. CICALA:
15     Q    And are there any other -- you have
16  identified two general reasons why GSK would offer
17  customer rebates to managed care entities:  One, does
18  it have a formulary; and two, if they want GSK to
19  compete on price.
20         Can you think any other reasons GSK
21  would offer rebates to a managed care entity?
22     A    We are with -- consistent with good
23  medical practice, we would like to grow our business.
24  And again, we are competing in a therapeutic class,
25  so it is a performance based where it increases our

Page 48

DAVID B. BROWN

1
2   share within that class.
3      Q    And when you say "class there," what
4   do you mean?
5      A    Therapeutic class of the drug.
6      Q    And how does offering a rebate permit
7   you to grow your business within a class?
8      A    Again, our purpose is to have the
9   members or patients of the third-party payer, the
10  insurance company, Medicaid even, have access to our
11  product and for the third party to reimburse.  And by
12  allowing that unrestricted access, then we can grow
13  our business consistent with good medical practice
14  and where the doctors are prescribing.
15     Q    Turning to group purchasing
16  organizations, how does GSK determine which group
17  purchasing organizations to offer rebates to?
18         MR. HEROLD:  Objection to the
19  form.
20         THE WITNESS:  Again, a group
21  purchasing organization is
22  representative of the hospitals and
23  we normally don't offer rebates to
24  GPOs, we actually offer discounted
25  pricing to the members that can

Page 49

DAVID B. BROWN

1
2   include a rebate if we wanted to
3   have a performance criteria that is
4   not offered -- that discount is not
5   offered at the time of the original
6   purchase by that hospital.  And --
7   and then, it is the same reason we
8   are looking to have access of the
9   patients of that hospital to our
10  medicines.
11  BY MS. CICALA:
12     Q    So the -- the reasons for offering
13  customer rebates to GPOs are -- are therefore similar
14  to the reasons for offering to managed care entities?
15         MR. HEROLD:  Objection to the
16  form.
17         THE WITNESS:  Let -- let me
18  just give you the reason why we
19  would do a GPO.
20  BY MS. CICALA:
21     Q    Thank you.
22     A    Okay.  And that would be basically
23  that the GPO, their pharmacy and therapeutics group
24  has looked at our product, assess it for the clinical
25  safetiness and effectiveness.  They have looked at

New York          Hudson Reporting & Video          New Jersey
Connecticut       Nationwide 1-800-310-1769          Pennsylvania

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 50

DAVID B. BROWN

1
2 other products within the class. They deem them
3 similar and then we would offer a discount to
4 compete.
5       Q      Here, we are talking about GPOs such
6 as Novation, for example, or GeriMed?
7            MR. HEROLD:  Object.
8        Objection to the form.  He testified
9        over and over the rebate goes to the
10       hospital, not the GPO.  So I just
11       don't want the record to be unclear
12       on that.
13            But you can answer.
14       THE WITNESS:  And again, the
15       prices offered to the hospital and
16       the rebate is offered to the
17       hospital who are members of Novation
18       or GeriMed or the others that you
19       mentioned.
20 BY MS. CICALA:
21       Q      Okay.  Understood.
22            Is it correct that the -- that the
23 GPO is the entity who asks GSK for the discount or
24 rebate?
25       A      They negotiate on behalf of their

Page 51

DAVID B. BROWN

1
2 members.
3       Q      Understood.  The rebate is paid to
4 the member?
5       A      They negotiate the price and the
6 rebates paid to the member.
7       Q      Does the G- -- is the GPO the entity
8 that requests the discount or rebate?
9       A      It is a funny way to say it, but we
10 do negotiate with the GPO on behalf of the members,
11 yes.
12       Q      Okay.  Okay.  We're turning to the
13 first sentence that we have been focused on in the
14 20-F.  It also provides the customer rebates are
15 offered to other direct and indirect customers.  For
16 what reasons would -- would GFK -- GSK offer customer
17 rebates to -- well, let me start this way.
18            Do you know what is meant by "other
19 direct and indirect customers?"
20       A      I don't know the specifics of what
21 they are covering in this line.  I know what it means
22 to me.
23       Q      A direct customer is a customer who
24 purchases products directly from GSK without the
25 involvement of a wholesaler typically; isn't that

Page 52

DAVID B. BROWN

1
2 right?
3       A      A direct purchaser, yes, they would
4 purchase directly from us.
5       Q      And is it correct that direct
6 purchasers typically have contracts governing their
7 relationship with GSK?
8       A      No, it's not.
9       Q      Okay.  There -- you have -- there are
10 direct purchase -- GSK has customers who purchase
11 directly who has no contract; is that right?
12       A      That is correct.
13       Q      Why -- why would GSK offer customer
14 rebates to any direct customers?
15       A      Again, if you're talking -- I have to
16 use an example of a direct customer.  Most direct
17 customers don't get rebates offered to them.  If
18 there is a direct customer that has, again, looked at
19 it from a pharmacy and therapeutics standpoint, they
20 deem that they have looked at the safety, the
21 effectiveness, they agree that our product is
22 effective, they have looked at other products in the
23 class, they see them as similar, we compete to have
24 access of our products to the patients of that direct
25 purchaser.

Page 53

DAVID B. BROWN

1
2       Q      And correct -- what do you mean here
3 when you say that you compete to have access?
4            What -- what form does that
5 competition take?
6       A      We offer a discount.
7       Q      And why would GSK offer customer
8 rebates to indirect customers?
9       A      And again, I will have to define what
10 an indirect customer is to me --
11       Q      Thank you.
12       A      -- because I can't do it there.  An
13 indirect customer to me basically goes back up the
14 line of the GPO.  The indirect customer is somebody
15 that doesn't buy direct from GSK.  They buy through a
16 wholesaler.  But they have a contract with GSK that
17 outlines what price they are going to -- they should
18 be -- they should buy at absent the wholesaler
19 markup.  That indirect customer could be government,
20 could be hospital which you have just covered with
21 GPO, and it could be a staff model HMO.
22       Q      Returning now to the 20-F, the -- the
23 next sentence in the paragraph we have been focused
24 on reads, "These arrangements require the customer to
25 achieve certain performance targets relating to the

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 54

DAVID B. BROWN

1
2  value of product purchased, formulary status or
3  predetermined market shares relative to competitors."
4      Do you see that?
5      A   I do.
6      Q   And is that consistent with your
7  understanding of -- of why GSK pays customer rebates
8  to the identified entities?
9      A   I'm -- I'm not sure I understand some
10  of the terminology they used like value of product
11  purchased.  I do go back to my statements before, we
12  compete to have -- so patients could have access to
13  our products.  That is controlled mainly by
14  formulary.  And then we do have performance based to
15  grow our volume consistent with good med- -- medical
16  practice through market share agreements.
17      Q   Now, GSK, as we've -- as we've
18  discussed earlier, GSK does pay rebates to PBMs;
19  correct?
20      A   On behalf of the third-party payers
21  that they represent, yes, we do.
22      Q   GSK also pays rebates to PBMs in
23  connection with the PBMs own mail order activity,
24  does it not?
25      A   We pay the rebate based on both

Page 55

DAVID B. BROWN

1
2  retail and mail order volume.  We don't
3  differentiate.
4      Q   And what do you mean when you refer
5  to retail volume?
6      A   The PBM has a pharmacy network that
7  includes predominantly retail based pharmacies and
8  then it can or cannot have a mail order pharmacy.
9      Q   And --
10      MR. HEROLD:  We have been
11      going for more than an hour.  Is
12      this a good time for a break?
13      MS. CICALA:  As soon as we
14      finish this subject.  Bear with me
15      for two minutes, Fred.  Thanks.
16  BY MS. CICALA:
17      Q   And are the reasons that GSK pays
18  rebates to PBMs consistent with the reasons that you
19  offered with respect to managed care and group
20  purchasing organizations?
21      A   It's actually slightly different.
22      Q   How so?
23      A   We view as -- the PBM as a middleman
24  representing the third-party payers to us.  And what
25  they are doing on behalf of the third-party payers

Page 56

DAVID B. BROWN

1
2  is, again, the same thing they are looking at, the
3  efficacy and safety of our drug, doing a comparison,
4  seeing how it is effective versus the other drugs in
5  the class, and then they negotiate on half -- behalf
6  of the third-party payers to reduce the cost of the
7  drug to the third-party payers.
8      Q   The rebate itself in the context of
9  the PBM is paid to the PBM; isn't that right, not the
10  third-party payer?
11      A   It is paid to the PBM, but our
12  understanding is it's predominantly passed through to
13  the third-party payer.
14      Q   Hm-hm.  And what -- what is the basis
15  of that understanding?
16      A   Basically, industry knowledge,
17  government reports where they'll cite that there may
18  be a range, but on average, 70 to 90 percent of the
19  rebate is passed onto the third-party payer.
20      Q   Do -- do GSK's contract with PBM --
21  withdrawn.
22      Do you know whether GSK requires PBMs
23  to pass on the rebate it -- rebates it receives?
24      A   It would be in each specific
25  contract.  I would have to look at each contract.

Page 57

DAVID B. BROWN

1
2      Q   Do you have any understanding one way
3  or the other whether that's an aspect of the
4  contracts, that GSK has with its PBMs?
5      A   We normally don't address that, no.
6      Q   Okay.  Why don't we take a few minute
7  break and then we will resume.
8      THE VIDEOGRAPHER:  This marks
9      the end of Videotape Number 1.  The
10      time is 10:58 a.m.  We are going off
11      the record.
12      (Whereupon a recess is
13      taken.)
14      THE VIDEOGRAPHER:  This marks
15      the beginning of Videotape Number 2.
16      The time is 11:14 a.m.  I am going
17      back on the record.
18  BY MS. CICALA:
19      Q   Mr. Brown, returning to Exhibit 11,
20  the 20-F.  And the second sentence -- sentence of
21  that exhibit, which reads, "These arrangements
22  require the customer to achieve certain performance
23  targets relating to value of product purchased
24  formulary status or predetermined market shares
25  relative to competitors."

15 (Pages 54 to 57)

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 58

DAVID B. BROWN

1
2       Do you see that sentence?
3       A    I do.
4       Q    I believe you testified before we
5  took our short break that you weren't sure what was
6  meant by value of product purchased; is that right?
7       A    The way it was phrased, correct.
8       Q    Do you -- do you have an
9  understanding of what is meant by requiring a
10  customer to achieve certain performance targets?
11       A    We do have performance targets in our
12  contracts, yes, and they do achieve them.
13       Q    And is it fair to say that a
14  performance target provision of the contract informs
15  the customer that if they move a certain -- a certain
16  market share or purchase a certain amount of GSK
17  product, they would receive a rebate?
18       A    Again, that was kind of confusing.
19  Our performance are outlined in the contract.  Some
20  of them are based on market share versus competitors,
21  and when they achieve that level, they would get a
22  rebate.  And it -- and its -- depends on what kind of
23  customer you are talking about.
24       Q    In the context of PBMs can you
25  describe generally whether there are performance

Page 59

DAVID B. BROWN

1
2  targets in PBM contracts?
3              MR. HEROLD:  You are talking
4         about PBMs, not customers; is that
5         right?
6              MS. CICALA:  I am talking
7         about PBMs.
8              MR. HEROLD:  Okay.
9  BY MS. CICALA:
10       Q    This -- the paragraph in -- in -- in
11  the 20-F is referring to customer rebates being
12  offered to assorted entities.  Let me ask the
13  witness.
14              Do you -- are customer rebates paid
15  to PBMs?
16       A    And again, to my other answer, they
17  are paid to PBMs on behalf of the third-party payers
18  they represent.  And our -- and our intent is to pass
19  it on to those third-party payers to reduce the cost.
20       Q    So as you testified, the GSK
21  contracts with the PBM don't normally address whether
22  the PBM is passing on?
23       A    That is correct.
24       Q    Okay.  And before the break, you made
25  reference to -- to an understanding that perhaps 70

Page 60

DAVID B. BROWN

1
2  to 90 percent of rebates paid to PBMs are passed onto
3  third-party payers; is that right?
4       A    I did, yes.
5       Q    And where does that understanding
6  come from?
7       A    I read the report by HHS to the
8  president in 2000, and they did outline it there.
9       Q    Have you seen a reference to the 70
10  to 90 percent elsewhere?
11       A    There are certain industry
12  publications presentations by consultants that don't
13  reference 70 to 90, but they reference two-thirds
14  substantial, words like that.
15       Q    Do you have any understanding what
16  percentages -- withdrawn.
17              The -- the relevant time period for
18  discovery in our case is 1997 through 2005, I will
19  represent that to you.
20              Do you have any understanding whether
21  the percentages you are talking about, the 70 to
22  90 percent, would apply throughout that time period?
23       A    I don't have any reference to that
24  other than, again, the third party, and they didn't
25  reference a time period.  The HS -- HHS report, I

Page 61

DAVID B. BROWN

1
2  think, was in 2000, if I am correct.
3       Q    Would you have copies with you here
4  today of the documents that you are just referred to?
5       A    No, I didn't bring anything with me.
6              MS. CICALA:  Counsel, any
7         objection to providing us with the
8         copies of the documents to which
9         Mr. Brown is referring.
10              MR. HEROLD:  No objection to
11         providing the HHS report.  You can
12         get it on the internet.
13              MS. CICALA:  And there are
14         lots of HHS reports, I am sure you
15         know.
16              How -- any objection to
17         producing whatever the industry
18         presentations were that Mr. Brown is
19         referring to?
20              MR. HEROLD:  I don't know
21         exactly what he's referring to, so
22         it's hard for me to say, but I think
23         he testified that he found things on
24         the internet.  And we could attempt
25         to find what -- what he found.

16  (Pages 58 to 61)

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 66

DAVID B. BROWN

1
2  and product returns given or expected to be given,
3  which vary by product arrangement and by buying
4  groups."
5      Q      Do you -- do you understand that --
6  well, withdrawn.
7          Is -- is turnover essentially the
8  same as revenue in the context of this 20-F?
9          Do you know?
10         MR. HEROLD:  Objection to the
11     form.
12         THE WITNESS:  Turnover to me
13     are sales.
14  BY MS. CICALA:
15     Q      Okay.  And so can you explain what is
16  meant by the sentence "Gross turnover is reduced by
17  rebate discounts, allowances and products returns
18  given or expected to be given, which vary by product
19  arrangements and buying groups?
20         MR. HEROLD:  I am objecting
21     to this.  This is beyond the scope
22     of the deposition.  You're asking
23     him now to become an accountant on
24     net revenue issues, which is very
25     different than what he was

Page 67

DAVID B. BROWN

1
2      designated for.
3  BY MS. CICALA:
4      Q      Just respond briefly.  I'm -- I'm
5  asking about the impact of rebates on revenue, which
6  is within the scope in so far as it concerns rebates.
7      A      Could you ask me the question again?
8      Q      Sure.  I would like your
9  understanding of the second sentence that -- that
10  begins with the word "gross turnover?"
11     A      Okay.  And I will start with the word
12  "gross turnover" to me means total sales of GSK.
13  It's not customer specific, but it's probably product
14  specific.  And it's -- it's just all customer types,
15  all the arrangements either direct, pretty much it's
16  got to be direct sales.  And then to get to a net
17  number, net realized by GSK, not what we sold it at
18  but the net realized by GSK, you would include
19  deductions that would include rebates to purchasers
20  and non-purchasers, chargebacks, which are basically
21  to purchasers.  There are other discount like the
22  cash discount offered to purchasers and then
23  allowances.
24     Q      So GS -- the -- the net amount
25  realized by GSK would take into account all of the

Page 68

DAVID B. BROWN

1
2  items you just identified?
3      A      Including returns.
4      Q      Including returns, okay.  And when
5  GSK accrues for estimated -- do you -- do you
6  understand the process by which GSK estimates the
7  rebates for which it must accrue?
8      A      Again, it's pretty broad.  I do have
9  an understanding of the estimation process for
10  rebates by customer-type purchaser, non-purchaser,
11  the -- like.
12         MR. HEROLD:  Are you talking
13     about for accounting now or for --
14     for something else?  I just want to
15     be clear.
16         MS. CICALA:  I am -- I am
17     talking simply about the -- what
18     information regarding rebates GSK
19     reviews when it's accruing for them.
20         MR. HEROLD:  So accruing for
21     account as opposed, for example,
22     calculation of the AMPs or something
23     else?  That is what I am getting
24     there.
25         MS. CICALA:  Yes, for

Page 69

DAVID B. BROWN

1
2  accounting purposes.
3          MR. HEROLD:  For accounting?
4          MS. CICALA:  For accounting
5     purposes.
6          MR. HEROLD:  All right.
7  BY MS. CICALA:
8      Q      So it's -- it's -- let's -- let's
9  talk about specific customer types.
10         If GSK is -- is accruing for rebates
11  paid to Staff Models -- Staff Model HMOs, what
12  information would GSK review in order to determine
13  how much to -- it needs to accrue for?
14     A      For Staff Model HMO?
15     Q      Yeah.
16     A      We would look at their past
17  purchases.  They are in-direct purchasers to the
18  wholesaler, but they are on a contract price.  So we
19  do have their purchase data.  We would look at the
20  individual contract for each Staff Model including
21  any performance conditions, and then we would
22  estimate for the time period that we are accruing for
23  what our expectation was of their performance.
24     Q      And if GSK is accruing for rebates
25  paid to PBMs, what would GSK look at -- look at in

18  (Pages 66 to 69)

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 70

DAVID B. BROWN

1
2  that context?
3           MR. HEROLD: Objection. Same
4      objection.
5           THE WITNESS: Are you talking
6      about for the accounting purposes?
7  BY MS. CICALA:
8      Q    Yes.
9      A    To build -- again, with the PBM, we
10  would look at the contract for the PBM, the
11  third-party payers that they represent, whether they
12  are adding third-party payers or subtracting
13  third-party payers.
14     Q    Can you explain -- yes.
15          Can you explain what you mean by
16  that?
17     A    To us, again, the PBM is representing
18  third-party payers and the volume of their -- the
19  sales that we are talking about that we are going to
20  look at are based on the members of the payers.  The
21  PBM doesn't have members.  They represent employers,
22  even government, private third-party payers.  And in
23  a contract cycle, they can have members be added and
24  members go out.
25     Q    So is it fair to say, though, that

Page 71

DAVID B. BROWN

1
2  the objective is to look at the volume of sales that
3  are taking place?
4           MR. HEROLD: Objection to the
5      form.
6           THE WITNESS: It is a -- it
7      is a funny way to say it.  It's
8      looking at the utilization of the
9      members of the third-party payers
10     underneath that PBM contract.  The
11     PBM doesn't take possession.  We
12     don't sell to a PBM.
13  BY MS. CICALA:
14     Q    Unless they have a mail-order
15  pharmacy?
16     A    We don't sell to them either, yeah.
17     Q    Those -- those mail-order pharmacies
18  would be indirect customers?
19     A    They are an indirect customer.  They
20  buy it through a wholesaler, correct.
21     Q    And presumably when you're accruing
22  for rebates to be paid to PBMs you're also reviewing
23  the sales taking place within the mail order
24  component of the PBMs activities?
25     A    Again, we are looking -- we don't

Page 72

DAVID B. BROWN

1
2  differentiate between retail and mail pharmacy.  It's
3  not the sale, it is the utilization of the members as
4  prescriptions are being filled and accumulated.
5  Hence, utilization rebate, that is the title usage.
6      Q    And if you're -- if GSK is accruing
7  for rebates to be paid to -- to GPOs, what
8  information would GSK review?
9           MR. HEROLD: Objection to the
10         form.  He's testified that they
11         don't pay rebates to GPS.
12  BY MS. CICALA:
13     Q    And I -- all evidence, to the
14  contrary, I am not trying to be slick about this.
15  When -- when GSK is accruing for rebates paid to the
16  GPO members, how does -- what information does GSK
17  review?
18     A    It looks more at a Staff Model
19  because the -- we are talking about the hospitals
20  underneath the GPO -- the long term facility, the
21  surgical centers, the members of the GPO who actually
22  do take possession of our product.  They are indirect
23  purchasers to the wholesaler.  So we are looking at
24  their purchase pattern with the data we get from the
25  wholesaler and then we look at the individual

Page 73

DAVID B. BROWN

1
2  contract.  And if there are performance requirements,
3  we will estimate where we think they are going to
4  perform for the time period that we are accruing.
5      Q    The -- the PBM contracts may have
6  performance requirements as -- as well; correct?
7      A    The PBM contracts do have performance
8  -- can, yes.
9      Q    And so if -- if they have them, would
10  that be reviewed by GSK when accruing for the rebates
11  to the PBM as well?
12     A    We would look at the individual
13  contracts of the PBM and try to estimate where we
14  think the members, the utilization come in as
15  performance requirements.
16     Q    What is the -- why does GSK pay
17  rebates to the extent it does?
18          Why does it pay rebates to PBMs
19  connected with the -- with performance?
20          MR. HEROLD: Objection to the
21     form.
22          THE WITNESS: We actually pay
23     rebates so that the -- to reduce the
24     cost of the third-party payers so
25     their -- their members can have

New York          Hudson Reporting & Video          New Jersey
Connecticut      Nationwide 1-800-310-1769          Pennsylvania

25bf314b-2764-43c3-91cf-e0c66c6af4ab

DAVID B. BROWN

1
2  access to our product.  Performance
3  takes two parts, basically access,
4  formulary access is probably the key
5  one.  And again, it goes back to the
6  pharmacy and therapeutic committee
7  that looks at the safety and
8  efficacy as we compare against the
9  products in our class and then how
10  the value that we bring, the cost.
11  And then again, consistent with good
12  medical practice in a competitive
13  therapeutic class, we would like
14  more of our product to be used so we
15  will do a market share performance.
16  BY MS. CICALA:
17      Q      To -- to encourage usage of your
18  product?
19      A      To ensure access of our product and
20  then to get the right economic value to the payer as
21  far as a cost comparison to our competitors.
22      Q      Returning to -- to the 20-F under the
23  section -- the -- the header turnover, do you see the
24  sentence that begins with "Accruals are made at the
25  time of sale." If you can look in the middle of that

DAVID B. BROWN

1
2  paragraph.
3      A      I do see that.
4      Q      Can you -- can you read that sentence
5  into the record for me, please?
6      A      "Accruals are made at the time of
7  sale for the estimated rebates, discounts for
8  allowances payable or returns to be made based on
9  available market information and historical
10  experience."
11      Q      And with regard to rebates, is it --
12  is it -- is that -- is that sentence consistent with
13  your understanding of when accruals are made for
14  rebates?
15      MR. HEROLD:  Objection unless
16  you clarify this as for accounting
17  purposes.
18      MS. CICALA:  For accounting
19  purposes.
20      THE WITNESS:  Yeah.  I'm --
21  I'm sorry.  I get -- I read the
22  sentence above it, and so I got
23  distracted.  Can you ask your
24  question again?
25  BY MS. CICALA:

DAVID B. BROWN

1
2      Q      Sure.  In the -- for accounting
3  purposes, is it -- is it your understanding that
4  accruals are made at the time of sale for the
5  estimated rebates based on available market
6  information and historical experience?
7      A      Again, I am not an accountant but
8  that is my understanding of it, to the best of my
9  knowledge.
10      Q      Okay.  Thank you.
11      Now, on the same page here, the 20-F,
12  do you see in the lower right corner there is a chart
13  that is described as being a reconciliation of gross
14  turnover to net turnover to the U.S. pharmaceutical
15  business?
16      A      Up -- up on the title, it says
17  "reconciliation," I do see that.
18      Q      Okay.  And it sets forth information
19  through the years 2005, 2004 and 2003.
20      Do you see that?
21      A      I do.
22      Q      And focusing for a moment on 2005, I
23  just want to make sure that we understand what this
24  chart is representing.
25      Do you see that -- for 2005 listed as

DAVID B. BROWN

1
2  gross turnover we see 11,000,000,875 pounds?
3      A      I do see that.
4      Q      And from your earlier testimony,
5  gross turn -- gross turnover means gross sales; is
6  that right?
7      A      That's my understanding.
8      Q      Okay.  And then the next century
9  shows a chargeback -- a chargeback of 786 million
10  pounds; is that right?
11      A      I am having trouble lining up the
12  lines, but I -- I think that's right.  Okay.
13      Q      And continuing, it then appears that
14  we have U.S. government and state programs 775
15  million pounds; is that right?
16      A      That is correct.
17      Q      And then it appears we have managed
18  care and group purchasing organization rebates, 686
19  million pounds; correct?
20      A      That is correct.
21      Q      And then the chart continues on the
22  following page and has information relating to cash
23  discounts, customer returns, prior year adjustments
24  and other items.
25      Do you see that?

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 86

1                DAVID B. BROWN
2       A    Yes.
3       Q    Has the -- in this context, has
4    the -- has the -- has -- has the entity with
5    formulary control informed GSK that -- that it has --
6    that there was competition within the therapeutic
7    class -- let me rephrase.
8            How does GSK know whether there's
9    competition in the therapeutic class?
10      A    A couple of ways.  One, there's
11   public data.  We know what therapeutic class our
12   products are in.  We also track our competitors'
13   products in that class, what our attributes are, what
14   the value our product brings versus the value that
15   our competitors' products bring.
16           So there's internal review.  And then
17   in negotiating with either the third-party payer
18   directly or with the PBM on behalf of the third-party
19   payers, they will tell us that there's competition in
20   the class.
21      Q    And they are telling you this even
22   though -- even though the GSK product at issue is a
23   brand drug; right?
24      A    Can you say that again?  I must have
25   missed that.

Page 87

1                DAVID B. BROWN
2       Q    The TPP is informing GSK that there's
3    competition in the class even though the GSK product
4    at issue is a brand-brought product?
5       A    Correct.
6       Q    In this context, has the TPP
7    concluded that the patient would be equally served by
8    any of the competing products?
9       A    Their pharmacy and technology --
10   their therapeutic committee, when they do a review,
11   will say that there are -- I am not sure I am using
12   the right word, but equivalent or can be used,
13   multiple products can be used.
14      Q    So GSK has to offer a rebate or some
15   other incentive in order for the TPP to select its
16   product over the equivalent product; is that right?
17           MR. HEROLD:  Objection to the
18       form.
19           THE WITNESS:  Can you restate
20       it again?  I'm sorry.
21   BY MS. CICALA:
22      Q    When the TPP has concluded that there
23   are equivalent products in the therapeutic class, GSK
24   can decide to offer a rebate or some incentive to the
25   TPP to place its version of the equivalent product on

Page 88

1                DAVID B. BROWN
2    the formulary versus a competitor's?
3       A    That, actually, probably is going
4    further than I would say.  We offer rebates to the
5    third-party payers to impact the value of our product
6    versus competitors, reduce our costs.  Mainly, we are
7    looking for access of our product on that third-party
8    payers formulary, and rarely is it -- have anything
9    to do with what is the positioning of their
10   competitor product.
11      Q    Okay.  And what do you mean when you
12   say positioning of the competitor product?
13      A    Again, maybe I used too much industry
14   jargon.  But basically, it's on the formula listed on
15   the formulary.
16      Q    And it's correct, isn't it, that GSK
17   will offer varying incentives depending on whether
18   it's going to be an exclusive product within a
19   therapeutic class or whether there will be other
20   products listed as well?
21      A    Again, it's dependent on the
22   negotiation with the third-party payer.  You can
23   offer for different -- and I will use the word
24   "position" -- differently their positioning on the
25   formulary, like it will be listed as one of two on

Page 89

1                DAVID B. BROWN
2    the formulary to be covered, or one of three or even
3    exclusive, it means it is the only product on the
4    formulary.
5       Q    And is it fair to say that GSK will
6    pay more of a rebate in connection with an exclusive
7    placement in general than it would if it was one of
8    the three?
9       A    That is fair in general.
10      Q    And is that -- sticking with that
11   general proposition, would that hold true across the
12   board for all the -- withdrawn.
13           Do you know, Mr. Brown, if the data
14   that GSK uses with it's estimating rebates for
15   accrual purposes for -- in the -- in a accounting
16   context is the same data that's been provided to --
17   that's reflected in Exhibit 2 to this deposition,
18   which is the list of the files that's been provided
19   to plaintiffs?
20      A    Let me find it.  That one.  Okay.
21           Depending on which table you are
22   talking about, but if you're talking to where you
23   have got it at, the holder level and it's got the
24   utilization -- and again, it depends on which type of
25   contract you are talking about.  Purchasers, it will

New York              Hudson Reporting & Video          New Jersey
Connecticut           Nationwide 1-800-310-1769         Pennsylvania

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 98

1          DAVID B. BROWN
2  continue to refer to defendant as GSK.
3          Is that acceptable to everyone even
4  though this particular agreement says Glaxo Wellcome,
5  Inc.?
6          MR. HEROLD:  Unless objected
7  to, it's acceptable.
8          MS. CICALA:  Okay.  Fair
9  enough.  Thank you, Fred.
10  BY MS. CICALA:
11     Q    So Roman Numeral V, is it fair to say
12  that this particular section concerns the terms and
13  conditions upon which GSK would pay rebates to the
14  HMO?
15     A    It outlines the performance
16  conditions and then how we would pay, yes.
17     Q    Okay.  And under Sub B-1, which is a
18  rebate calculation and payment, and then Sub 1
19  describes how rebates are calculated, the agreement
20  reads, quote, Rebates for a formulary product shall
21  be calculated by multiplying the applicable rebate
22  percentage, paren, as outlined in the rebate exhibit,
23  closed paren, by total sales for the formulary
24  product.
25          Do you see that?

Page 99

1          DAVID B. BROWN
2     A    I do.
3     Q    So does -- is it fair to say that in
4  the context of Exhibit 12, the agreement is
5  contemplating GSK is -- will pay rebates to the HMO
6  based on the total sales for the formulary product?
7     A    That is correct, by that HMO and MIT.
8     Q    Okay.  And then turning to the very
9  last page of the exhibit, is it correct that -- that
10  this last page, which is Bates 235305, lists the
11  products that the agreement concern and the two types
12  of rebates that are offered?
13     A    It does.
14     Q    Okay.  And one is the primary product
15  rebate and one is a secondary product rebate;
16  correct?
17     A    That is the headings, yes.
18     Q    And can you describe -- can you tell
19  from looking at this last page or otherwise, the
20  difference between a primary product and a secondary
21  product rebate?
22     A    Are you talking about in the data or
23  in the performance required to get the rebate.
24     Q    In general, what is the difference
25  between a primary product rebate and a secondary

Page 100

1          DAVID B. BROWN
2  product rebate?
3     A    The Staff Model HMO performs at one
4  level to get the primary product rebate and has
5  additional requirements to get the secondary product
6  rebate.
7     Q    And what do you mean when you say
8  it -- if it -- that it performs at a certain level to
9  get the primary product rebate?
10     A    I would have to flip back to the
11  original.
12     Q    Certainly.
13     A    And back to where we were
14  (reviewing), all right.
15          It basically -- the performance
16  conditions are formulary status.
17     Q    And for the record, what page are you
18  referring to?
19     A    Page 3.  And then you would add it to
20  the last page, page 13 where it outlines which
21  products they are talking about to be on the
22  formulary.
23     Q    And so if additional Glaxo Wellcome
24  products are -- withdrawn.
25          So depending on the scope of the

Page 101

1          DAVID B. BROWN
2  placement of Glaxo's products on the formulary, the
3  rebates -- the rebate is contingent -- I am going to
4  withdraw and rephrase the question.
5          Now, it's correct that the rebates
6  that Glaxo is paying are determined as a percentage
7  of total sales, correct, in the context?
8     A    Total sales of the HMO, yes.
9     Q    All right.  Okay.  And here, the HMO
10  is entitled to a secondary rebate if it meets
11  additional performance objectives; correct?
12     A    That is correct.
13     Q    Okay.  And I notice -- if you could
14  turn, please, to page 2 of the agreement, not the
15  amendment but the agreement --
16     A    Uh-hmm.
17     Q    -- which is Bates 235294.
18          Do you see there's Roman Numeral III
19  eligibility?
20     A    Correct.
21     Q    And do you see that there's a
22  paragraph that reads, "The HMO agrees that any Glaxo
23  Wellcome product purchased under this agreement shall
24  be for its, quote, own use as defined by the U.S.
25  Supreme Court in Abbott Labs v. Portland Retail

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 102

DAVID B. BROWN

1
2  Druggist Association, et cetera?"
3      A   I do.
4      Q   Do you have any understanding of why
5  that particular provision is in this contract?
6      A   As far as the legal understanding?
7      Q   Any understanding whatsoever.  And I
8  realize this may be beyond the scope.
9      A   I can only tell you my interpretation
10 of it, and it is that we wanted this pricing in
11 the -- to be only -- to be used for the members of
12 the HMO, not to be in the retail setting, not to
13 be able for people to walk off the street and get
14 their drugs filled from this -- from this Staff
15 Model.
16     Q   Okay.  Thank you.  So here, because
17 the Staff Model HMO is running a closed pharmacy that
18 is to be -- that is only open to certain members; is
19 that right?
20     A   Members of the HMO, correct.
21     Q   Okay.  So you didn't want this -- so
22 you just -- you wanted to be sure that they -- that
23 the -- that the -- withdrawn.
24         So the provision is here to ensure
25 that the closed pharmacy -- that the drugs are

Page 103

DAVID B. BROWN

1
2  not made available to others at the prices that they
3  were made available to the closed pharmacy?
4      A   I think I understood your question.
5          Could you say it one more time and
6  then --
7      Q   Probably not.
8      A   Okay.
9      Q   Yes, of course I can.
10         You wanted to be ensured that the
11 drugs at MIT was purchasing pursuant to this
12 agreement and obtaining rebates for -- were for MIT's
13 own use in the context of its Staff HMO Model.
14     A   Correct.  To be filled -- to be
15 dispensed to their members.
16     Q   Only?
17     A   Only.
18     Q   Got it.  Thank you.
19         (Whereupon Exhibit 13 is
20 Marked.)
21 BY MS. CICALA:
22     Q   We have marked as Exhibit 13 an
23 undated Staff Model HMO contract produced to us in
24 this litigation with Bates GSK-MDL-OMNI05-0235235
25 through 234.  And while the document is not dated, I

Page 104

DAVID B. BROWN

1
2  will note for the record it was executed apparently
3  in February of 1999 and the signatures of the parties
4  appear at Page 235242.
5          And my question here, Mr. Brown, Is
6  it correct that this is a Staff Model HMO Agreement
7  between Glaxo Wellcome, Inc. and Corporate Health
8  Dimensions?
9      A   It appears to be our standard
10 template, yes.
11     Q   And you see on the first page, it
12 contains the same language we saw in Exhibit 12, HMOs
13 or entities with capabilities that allow them to
14 affect pharmaceutical product usage.
15         Do you see that?
16     A   I do.
17     Q   And on the second page, you see under
18 letter F, there's again the reference to total sales
19 and its total sales are defined as they were in the
20 prior exhibit.
21         Do you see that?
22     A   I do see that, yes.
23     Q   And on the third page of this
24 exhibit, you see that there's performance rebates
25 under Roman Numeral Letter -- Roman Numeral V.

Page 105

DAVID B. BROWN

1
2          Do you see that?
3      A   I do, yes.
4      Q   Now, this particular Staff Model HMO
5  Agreement only provides for primary product rebate;
6  correct?
7      A   Yes.
8      Q   But nevertheless, though, that rebate
9  is calculated based on the total sales; correct?
10     A   The purchases of the HMO, correct.
11     Q   Are the terms that we are seeing,
12 the -- that I've just focused in on, on Exhibit 13,
13 are those -- are those part of the standard template
14 for GSK or Glaxo Wellcome Staff Model HMO agreements?
15     A   Based on my recollection and
16 knowledge, yes.
17     Q   Okay.
18         (Whereupon Exhibit 14 is
19 Marked.)
20 BY MS. CICALA:
21     Q   Now, we have marked as Exhibit 14 a
22 document produced to plaintiffs in this litigation
23 with the Bates GSK-MDL-OMNI02-0067599 through 603.
24         And if you could -- if you could take
25 a moment just to flip through this document, you will

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 142

DAVID B. BROWN

1
2  that it was executed by Glaxo Wellcome, Inc. and
3  Caremark and the signatures appear at Bates 25279.
4          Mr. Brown, have you seen this
5  particular document before?
6      A    I have not.
7      Q    And would you agree that this is an
8  agreement between Glaxo Wellcome, Inc. and Caremark?
9      A    It is.
10     Q    And Caremark is a PBM; correct?
11     A    My knowledge of Caremark is it is a
12  PBM, yes.
13     Q    And the -- if you could focus on the
14  last sentence of the first large paragraph under
15  "Witnesseth," I will read it in to the record.  "The
16  purpose of this agreement is to delineate the terms
17  and conditions by which Glaxo Wellcome shall
18  reimburse Caremark based upon the dispensing of Glaxo
19  Wellcome products to individual members by Caremark's
20  own mail service pharmacies and by various
21  pharmacies," quote, "participating pharmacies,"
22  closed quote, "which have agreed to provide such
23  services to Caremark and its individual members."
24          Do you see that?
25     A    I do.

Page 143

DAVID B. BROWN

1
2      Q    So it's fair to say that this
3  document governs -- withdrawn.
4          The document provides for the payment
5  of rebates by GSK to Caremark; correct?
6      A    (Reviewing.)  Yes.
7      Q    And the rebates are paid on the basis
8  of market share; is that right?
9      A    It is comparing to the national
10  market share, yes.
11     Q    And the units that serve as the basis
12  for the rebates are -- are units of GSK products that
13  are delivered either through Caremark's own
14  mail-order pharmacy or any participating pharmacy;
15  correct?
16     A    It is through their pharmacy network
17  which includes Caremark's --
18     Q    Own --
19     A    -- own mail order.
20     Q    Okay.  Do the rebates -- does the
21  contract provide for a different rebate to Caremark
22  depending whether the product is dispensed through a
23  participating pharmacy or Caremark's own mail-order
24  pharmacy?
25     A    I would assume not but let me check

Page 144

DAVID B. BROWN

1
2  real quick (Reviewing).  I would say no.
3      Q    So focusing on if we may on Exhibit E
4  to the document, which is Bates 25285, and it sets
5  forth for example rebate percentage rates for -- for
6  four different products; correct?
7      A    Correct.
8      Q    Zofran, Valtrex, Zovirax and Lanoxin,
9  yes?
10     A    Yes.
11     Q    And the -- and the rebate amounts
12  that we see set forth in Exhibit E would apply based
13  on the performance -- based on the total performance
14  of Caremark; is that right?
15     A    Total performance of the
16  participating members and the third-party payers
17  represented by Caremark but regardless of which
18  pharmacy they are dispensing, yes.
19     Q    Okay.  And from your earlier
20  testimony, I understand that one of the reasons that
21  GSK pay -- would pay rebates of this nature to
22  Caremark was because of Caremark's -- was with
23  Caremark's control of -- of its own formulary; is
24  that correct?
25     A    No.

Page 145

DAVID B. BROWN

1
2      Q    Okay.  Why is GSK paying these
3  rebates to Caremark?
4      A    For the placement of formulary on the
5  third-party payers represented by Caremark in this
6  agreement.
7      Q    And the -- can you explain what you
8  mean -- what you mean by that?
9      A    The third-party payers are the two
10  payers of the drug and they have used this Caremark
11  as their intermediary between us and them and
12  Caremark provides services that include pharmacy
13  and -- and therapeutic review, includes after that
14  review development of a formulary or recommended
15  formulary to the payers whether they accept or not,
16  and includes negotiating rebates on their behalf with
17  manufacturers.
18     Q    And so the -- these rebates are paid
19  to Caremark in connection with that formulary
20  placement?
21     A    They are paid to Caremark, yes, to be
22  passed on to the third party.
23     Q    And is -- where in this contract does
24  it -- does GSK instruct Caremark to pass on the
25  rebates to -- to the third party?

25bf314b-2764-43c3-91cf-e0c66c6af4ab

Page 146

DAVID B. BROWN

1  
2     A     It may not, I would have to see.
3  (Reviewing).  It does not.
4     Q     Now, in -- in all the rebates paid --
5  withdrawn.
6     20.
7     (Whereupon the Exhibit is
8  Marked.)
9  BY MS. CICALA:
10    Q     We have marked as Exhibit 20 a
11  document produced to plaintiffs litigation
12  GSK-MDL-OMNI02-0067695 through 716, it appears to be
13  an agreement between SmithKline Beecham
14  pharmaceuticals and ProVantage Pharmacy Benefit
15  Management Services, the cover letter is dated
16  June 22nd, 1999, and, Mr. Brown, are you familiar
17  with ProVantage Prescription Benefit Management
18  Services?
19    A     I do know they are a PBM.
20    Q     Are they a large PBM?
21    A     Compared --
22    Q     Compared to Caremark?
23    A     No.
24    Q     Do you know -- and is it fair to say
25  that this agreement provides for the payment of

Page 147

DAVID B. BROWN

1  
2  rebates by SmithKline Beecham to ProVantage upon --
3  upon certain performance by ProVantage?
4     A     I am not familiar with this language
5  but it does look like it outlines the conditions for
6  rebate payment, so yes.
7     Q     And do you know whether ProVantage
8  had its -- back in 1999 or during the term of this
9  agreement, had its own mail-order pharmacy?
10    A     I do not.
11    Q     If you could turn to page -- to
12  paragraph 3.1 of the agreement which is on page 67700
13  under 3.1 where it says "rebate payment," is it --
14  is -- is it correct that the GSK or Smith -- SB is
15  contemplating -- contemplating the payment of rebates
16  based on the total number of units dispensed by
17  participating pharmacies pursuant to this contract?
18    A     It says "paid to ProVantage a rebate
19  for each product dispensed to participants at
20  participating pharmacies," yes.
21    Q     Okay.  So then the -- so the rebate
22  amount -- the rebates paid to ProVantage are based on
23  the -- withdrawn.
24     If you could turn to Exhibit A of the
25  agreement, you will see a reference to access rebates

Page 148

DAVID B. BROWN

1  
2  and performance conditions.
3     And is it correct that subsection 1
4  here contemplates the payment of access rebates for
5  certain eligible uses of -- of particular GSK SB
6  drugs?
7     A     Following the formulary of each plan
8  sponsor, yes.
9     Q     And is it correct that -- is it
10  correct that SB was contemplating -- contemplating
11  paying a greater rebate for restricted formulary than
12  an open formulary?
13    A     I have to read it real quick, I am
14  not familiar but I can.
15    Q     Sure.  And just if it helps, if you
16  turn to the very next page at the top, you will see a
17  chart that appears to -- to say that the answer to my
18  question is yes?
19    A     Oh.  Yes.
20    Q     Yes?
21    A     Yes.
22    Q     Okay.  And -- and the reason for the
23  difference there is that restricted formulary
24  placement is -- has greater value to -- to SB than
25  open formulary placement in terms of encouraging

Page 149

DAVID B. BROWN

1  
2  greater market share for its product?
3     A     It has -- it allows more access to
4  our product to the patients of the planned sponsors.
5     Q     More access of your product and less
6  access to somebody else's, yes?
7     A     To our competitor product, yes.
8     (Whereupon Exhibit 21 is
9  Marked.)
10    (Whereupon Exhibit 22 is
11  Marked.)
12  BY MS. CICALA:
13    Q     Mr. Brown, we have marked as
14  Exhibit 21 is -- is an extract of an Excel
15  spreadsheet that was produced to us by GSK on May 7,
16  2009, the extract comes from the file entitled
17  "Highly Confidential GSK 2003, 2005 Utilization
18  Data."  And we -- we did not replicate the entire
19  file for this exhibit because itself would have been
20  600 pages.
21     And Exhibit 22 is a letter, cover
22  letter to me from Mr. Herold regarding the data that
23  is -- that's included in Exhibit 21 and my question
24  is whether you have seen either Exhibit 21 or
25  Exhibit 22 before?

Page 154

DAVID B. BROWN

1
2  process you -- you extracted all -- the utilization
3  data for all -- for the relevant rebates during this
4  time period?
5      A    Yes.
6      Q    So is it fair to say that -- that --
7  withdrawn.
8          Let's take a break, and go off the
9  record.
10         THE VIDEOGRAPHER:  The time
11     is 3:06 p.m.  We are going off the
12     record.
13         (Whereupon a Recess is
14     Taken.)
15         THE VIDEOGRAPHER:  The time
16     is 3:26 p.m.  We are going back on
17     the record.
18  BY MS. CICALA:
19     Q    Hi, Mr. Brown.  Can you provide --
20  could you provide unit-level information for all
21  rebates paid by GSK '03 to '05?
22     A    Unit level -- you mean at the
23  prescription level, is that what you're talking
24  about?
25     Q    I mean, in Exhibit 21 you were -- the

Page 155

DAVID B. BROWN

1
2  data supplied to us on May 7th gave us -- gave us
3  information regarding the units that resulted in
4  rebate payment of a certain amount for a certain NDC.
5  Is that unit-type of information available for all
6  rebates as opposed to just the -- the rebates that
7  the May 7th production concerns?
8      A    Yes, to my knowledge, it is.
9          MS. CICALA:  I could
10     follow-up with a letter, Fred, but I
11     am going to request you a level of
12     detail for -- for all the rebates to
13     make the data significantly easier
14     for us all to work with.
15         MR. HEROLD:  I don't -- I
16     would want to ask some questions
17     about that, including whether are
18     you talking all utilization rebates
19     or purchase-based rebates as well?
20         MS. CICALA:  All rebates.
21         MR. HEROLD:  Is that right,
22     even for purchase-based rebates, all
23     the data?
24         THE WITNESS:  The units are
25     the packs that we sell, that they

Page 156

DAVID B. BROWN

1
2  buy?
3          MR. HEROLD:  Hm-hm.
4  BY MS. CICALA:
5      Q    Right.
6      A    I -- I am going through my head and
7  do you mind?
8      Q    Not at all.
9      A    Hopefully I won't get in trouble
10  here, Medicaid third-party payer, we have the units
11  at the NDC level for Medicaid, purchase-based rebates
12  plus staff model if we have any left, hospital,
13  long-term care, those are based on the chargeback
14  system so we have those units, this is basically all
15  the utilization based to third-party payers either
16  through the PBM, IPA type.  I -- I think we do, yes.
17     Q    Okay.  And from your earlier
18  testimony it sounded like generating this, at least
19  as it concerned the -- the PBM entity -- the PBM and
20  TPP and -- and other entities, didn't take a
21  particularly long time so hopefully this wouldn't be
22  a particularly burdensome exercise but we would -- we
23  would like to request production of the unit
24  information for those years given that it appears at
25  least to be available.

Page 157

DAVID B. BROWN

1
2      A    Okay.
3          MR. HEROLD:  We will take
4     that under advisement.
5          MS. CICALA:  Understood.
6  BY MS. CICALA:
7      Q    Thank you.  I had just a couple of
8  quick follow-ups on the Caremark contract which is
9  Exhibit 19.
10         And just -- just for the record,
11  Mr. Brown, are you able to confirm that this is a
12  true and complete copy of the agreement between Glaxo
13  Wellcome and Caremark?
14     A    It does look that way, yes.
15     Q    Okay.  And which -- are the subject
16  of -- of the formulary, isn't -- isn't it true that
17  the formulary that is of interest to GSK when it --
18  when it offers rebates to Caremark is the formulary
19  there that -- that Caremark it -- itself has
20  established that it wants its members to adopt?
21     A    Actually, don't agree.  I mean, we do
22  reference their national formulary, I think that may
23  be the term that's used.  I have to look to see.  But
24  basically for the utilization to be eligible for a
25  rebate, the -- the third-party payers -- the members

Page 158

1          DAVID B. BROWN
2  of the third-party payers have to be covered on a
3  formulary.
4       Q    But just directing your attention, if
5  I could, to the middle of paragraph 2 on the first
6  page, and you are certainly welcome to read the
7  entire paragraph --
8       A    Hm-hm.
9       Q    -- or whatever else you would like in
10  the document.  But there's a sentence beginning "in
11  the event."  It says "in the event."
12       A    I'm sorry, I am lost.  Where are you
13  reading?
14       Q    I'm sorry to go too quickly.
15  Paragraph 2, member organizations.
16       A    Oh, member organizations.
17       Q    Yes.
18       A    I'm sorry.
19       Q    Okay.  Paragraph number 2.
20       A    Okay.
21       Q    Member organizations.  There's a
22  sentence beginning "in the event."
23       A    I see that, yes.
24       Q    "In the event Glaxo Wellcome
25  determines that Caremark cannot enforce its formulary

Page 159

1          DAVID B. BROWN
2  in the member organization.  Glaxo Wellcome may, at
3  its discretion, deny reimbursement of such claim
4  submitted on behalf of said member organization."
5       A    I see that, yes.
6       Q    The -- the formulary -- the -- the
7  objective here for GSK is to ensure formulary
8  placement for all of Caremark's customers for the GSK
9  products; is that right?
10       A    That is correct.
11       Q    Earlier this -- early this morning,
12  we had marked Exhibit 3, which was the list of
13  customers or the list of business types or classes of
14  trade contained within the rebate files that were
15  produced to plaintiffs by GSK.  The three-page
16  document; right?
17          And -- and my -- my question to you
18  is -- is, reviewing the customers in Exhibit 3, do
19  you see any that -- does it look like a complete list
20  of entities to whom GSK has paid rebates?
21          MR. HEROLD:  Objection to the
22  form.
23          THE WITNESS:  It -- it
24  actually has entities that we do not
25  pay rebates to.

Page 160

1          DAVID B. BROWN
2  BY MS. CICALA:
3       Q    Okay.
4       A    It has entities that we don't sell
5  to.  It has entities that we do pay rebates to.
6       Q    Okay.  Do you see -- as you review
7  it, do you see entities or -- or types of businesses
8  that appear to be missing?
9       A    (Reviewing.)
10          There might be one or two missing.
11       Q    Such as?
12       A    Wholesale.  But beyond that, I have
13  to really study it.
14       Q    Well, let me -- let me ask -- let's
15  try this.
16          MS. CICALA:  What are we up
17  to?
18          THE REPORTER:  23.
19          MS. CICALA:  Okay.
20          (Whereupon the Exhibit is
21  Marked.)
22  BY MS. CICALA:
23       Q    Yeah.  You may -- you may need those.
24          MS. CICALA:  Off the record.
25          THE VIDEOGRAPHER:  The time

Page 161

1          DAVID B. BROWN
2  is 3:34 p.m.
3          We are going off the record.
4          MS. CICALA:  Okay.  We are
5  back on.  I'm sorry.
6          There was a confusion with
7  the exhibit.
8          THE VIDEOGRAPHER:  All right.
9  BY MS. CICALA:
10       Q    Mr. Brown, I'll rep --  I'm sorry.
11          THE VIDEOGRAPHER:  It's okay.
12  You may continue.
13  BY MS. CICALA:
14       Q    Thank you.
15          I will represent to you Exhibit 23 is
16  a document that we have created.  And in an effort to
17  confirm that the information that we have been
18  supplied is -- is comprehensive, we have entitled the
19  document "Comparison of GSK unit sales" from the GSK
20  2005, 20-F to the net sales from GSK's data
21  production.  That is the first page.  And then the
22  second concerns 2004 and the third concerns 2003.  So
23  those pages are mislabeled.  My apologies for that.
24          We're focusing on the first page.
25  The -- what you see on the first page in the first

# STAFF MODEL HMO AGREEMENT

## Glaxo Wellcome Agreement Number 400625

This HMO Agreement is entered into as of _____, 1999, by and between Glaxo Wellcome Inc., having a place of business at Five Moore Drive, P O Box 13398, Research Triangle Park, NC, 27709 ("Glaxo Wellcome") and Corporate Health Dimensions, having a place of business at 13 British American Blvd, Latham, NY, 12110 ("HMO") (the "Agreement").

### WITNESSETH:

WHEREAS, Glaxo Wellcome is in the business of researching, developing, manufacturing and marketing prescription pharmaceutical products in the United States;

WHEREAS, HMOs are entities with capabilities that allow them to affect pharmaceutical product usage, including the usage of Glaxo Wellcome Products;

WHEREAS, HMO wishes to provide quality pharmaceutical products, including Glaxo Wellcome Products, on a cost effective basis, by obtaining discounts and rebates from Glaxo Wellcome, upon the terms and conditions set out in this Agreement;

NOW, THEREFORE, for and in consideration of the mutual promises and obligations contained in this Agreement, the parties agree as follows:

I.      Definitions. For the purposes of this Agreement, the following terms shall have the following meanings:

A.  "Agreement" shall mean this HMO Agreement entered into between Glaxo Wellcome and HMO.

B.  "Glaxo Wellcome Product(s)" shall mean the designated dosage forms and strengths of the prescription pharmaceutical products approved by the FDA for marketing by Glaxo Wellcome and marketed by Glaxo Wellcome in the United States as outlined in the Product and Pricing Exhibit.

C.  "Formulary Management Services" shall mean pharmacy benefit design and effective compliance interventions with physicians, pharmacists, Provider Organizations, or Members by HMO including but not limited to (i) formulary design and development in association with a team of qualified health care professionals; (ii) effective routine communications to physicians, pharmacists or Members regarding the utilization of prescription pharmaceutical products included in the HMO Formulary; (iii) the ability to deny prescriptions for non-formulary drugs (e.g., NDC lock-out capabilities, ability to affect NDC selection); (iv) retrospective drug utilization review; (v) drug step-therapy protocols; (vi) physician, pharmacist or Member education with respect to Formulary Products, and (vii) differential co-pays; (viii) an established prior authorization system, including but not limited to, approval of non-formulary drugs via telephone.

D.  "Formulary Product" shall mean a Glaxo Wellcome Product within a therapeutic class as listed in the Glaxo Wellcome Therapeutic Class Definition Exhibit that has been included on the HMO's Formulary, without restrictions that would negatively differentiate the Glaxo Wellcome Product from any other product listed in the Therapeutic Class Exhibit, during the entire Quarter in accordance with the terms of this Agreement.


EXHIBIT 13

ClibPDF - www.fastio.com
Highly Confidential under Protective Order/MDL No. 1456          GSK-MDL-OMNI05-0235235

E.  "Therapeutic Class" shall mean all prescription pharmaceutical products within the relevant class of products listed in the Glaxo Wellcome Therapeutic Class Definition Exhibit during the Term of this Agreement. New products that enter the market that compete with or within the Therapeutic Classes as stated in this Agreement shall be deemed added to the applicable defined Therapeutic Class effective on the first day of the calendar quarter following the product entry into the market.

F.  "Total Sales" shall mean the sum of Glaxo Wellcome Products purchased by the HMO either directly from Glaxo Wellcome or indirectly through wholesalers under this Agreement.

G.  "NWP" or "Net Wholesale Price" shall mean the U.S. Dollar wholesale price published by a third party source such as First Data Bank for each Glaxo Wellcome Product, by National Drug Code (NDC) number, during the applicable period.

II.    Term. Except as otherwise provided herein, the Agreement shall become effective the later of 01/01/1999 or thirty (30) days after Glaxo Wellcome executes the Agreement (the "Effective Date") and shall terminate on 12/31/2001, unless it is earlier terminated according to the Termination Section below.

The proposed terms and conditions contained herein shall be open and subject to negotiation for a period of thirty (30) days from the date HMO receives this Agreement ("Offer Termination Date"). If this Agreement in not executed by both parties by the Offer Termination Date, Glaxo Wellcome withdraws this proposal. This Agreement was delivered on _____.

III.    Eligibility. To be eligible to purchase Glaxo Wellcome Products under this Agreement, the HMO must comply with the terms and conditions of this Agreement.

The HMO agrees that any Glaxo Wellcome Product purchased under this Agreement shall be for its "own use", as defined by the United States Supreme Court in Abbott Laboratories et. al. v. Portland Retail Druggist Association, Inc., 425 U.S. 1 (1976), or in DeModena v. Kaiser Foundation Health Plan, Inc., 743 F.2d 1388 (9th Cir. 1984).

HMOs located in Maine are not eligible to purchase under this Agreement.

IV.    Glaxo Wellcome Products.

A.  Glaxo Wellcome agrees to provide HMO Glaxo Wellcome Products and discounts as identified in the Product and Pricing Exhibit.

B.  Changes in Glaxo Wellcome Product Line. In the event that Glaxo Wellcome no longer sells in the United States a Glaxo Wellcome Product that is subject to this Agreement, either because Glaxo Wellcome has sold the Glaxo Wellcome Product or has sold the rights to market and/or sell the Glaxo Wellcome Product to a third party or otherwise (e.g., a decision to withdraw the Glaxo Wellcome Product from the market), then that Glaxo Wellcome Product shall be deemed deleted from this Agreement. Glaxo Wellcome shall give to HMO such notice as is reasonable under the circumstances, specifying where practical the date upon which the Glaxo Wellcome Product shall no longer be included in this Agreement (the "Product Termination Date"). Glaxo Wellcome shall pay no further rebates for that Glaxo Wellcome Product for utilization of that Glaxo Wellcome Product after the Product Termination Date, and HMO is released from all requirements hereunder with respect to such Glaxo Wellcome Products after the Product Termination Date.

ClibPDF - www.fastio.com
Highly Confidential under Protective Order/MDL No. 1456
GSK-MDL-OMNI05-0235236

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

C. Glaxo Wellcome Product Requirement. HMO shall be eligible for the discounted price as stated on the Product Pricing Exhibit, for each Formulary Product.

V.   Performance Rebates.

A. Primary Product Rebate. In addition to any other discount, HMO shall be eligible for a 5% rebate on Amerge Total Sales and a 6% rebate on Imitrex Total Sales provided that both Amerge and Imitrex are Formulary Products.

B. Rebate Period. The Rebate Period under this Agreement shall be paid quarterly effective January 1st, 1999 through the period of the Contract.

C. Rebate Calculation and Payment.

1. Glaxo Wellcome will pay rebates which shall be calculated based on the Total Sales for the Formulary Products as outlined in the Rebate Exhibit of this Agreement for each Rebate Period, in the form of a check to the HMO or a credit through the appropriate wholesaler. The total amount of the rebate check for the Glaxo Wellcome Products must be equal to or greater than $100.00 for each Rebate Period. If this minimum is not met, the rebate will not be paid for the Rebate Period. Rebate amounts will not be accumulated from one Rebate Period to the next. Payment by Glaxo Wellcome will be made approximately ninety (90) days after the end of each Rebate Period. Notwithstanding anything herein to the contrary, rebates shall not be paid for any claims (including any requests for adjustments or corrections related to any prior claims) submitted by HMO later than six (6) months following the termination or expiration of this Agreement.

2. If HMO elects to stop participating under this Agreement or otherwise becomes ineligible after the first day of a Rebate Period, or if this Agreement is terminated by either party during a Rebate Period, then Glaxo Wellcome shall not pay any rebates to such HMO for its purchases during that Rebate Period.

3. All rebates, if any, are conditioned upon Glaxo Wellcome's receipt of data from a third party data source. HMO acknowledges that Glaxo Wellcome currently uses data from Drug Distribution Data (DDD) to make these measurements. Glaxo Wellcome has the right to change third party data sources as it deems necessary.

VI.   Purchase Terms.

A. Direct Purchases. If HMO purchases Glaxo Wellcome Products directly from Glaxo Wellcome, such purchases shall be subject to Glaxo Wellcome's then current standard terms of sale, including, without limitation, terms related to shipping, prompt pay discounts, returned goods and minimum order limitations.

B. Indirect Purchases. If any Glaxo Wellcome Products are purchased through a wholesaler, any associated service charges are additional to the Agreement Prices and must be negotiated with and paid directly to that wholesale vendor by the HMO. Glaxo Wellcome shall not be responsible for any back orders or product deliveries handled by a third party.

VII.   Termination.

A. Termination for Convenience. This Agreement may be terminated by either party, in whole or in part, without cause, by giving the other party thirty (30) days advance written notice thereof.

3

ClibPDF - www.fastio.com

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

B. Termination for Cause. In the event of a material breach of this Agreement by either party, the party alleging the breach shall give written notice thereof to the other party. If such breach is not cured in all material respects within fifteen (15) days after such notice, the non-breaching party may terminate this Agreement as of the termination date set forth in a written notice provided to the breaching party.

C. Termination Due to Effect of Laws. If, after the Effective Date of this Agreement, there shall be any judicial, legislative, or administrative action, interpretation, enforcement, promulgation, decree, order, judgment, law, ruling or regulation (a) relating to any of (i) the pricing of prescription drugs or (ii) the terms of this Agreement or the rebates set forth herein, and (b) which adversely affect the business of Glaxo Wellcome or the HMO, the parties shall negotiate in good faith to amend this Agreement to be consistent with such law, etc. If the parties are unable to reach an agreement within thirty (30) days, either party may immediately terminate the Agreement in whole or in part.

D. Termination Due to Insolvency. In the event HMO files for protection from creditors under the bankruptcy laws, whether voluntary or involuntary, Glaxo Wellcome may immediately terminate this Agreement by written notice to HMO.

E. Effect of Termination. In the event of termination of this Agreement for any reason (i) Glaxo Wellcome shall pay all rebates due and payable pursuant to the terms of this Agreement through the date of termination, and (ii) no rebates shall be payable to HMO for Glaxo Wellcome Products purchased either directly or indirectly after the effective date of such termination.

VIII. Waiver. A waiver of a breach of any provision of this Agreement shall not constitute a waiver of any subsequent breach of the provision or any other provision. Failure of Glaxo Wellcome to enforce at any time or, from time to time, any provision of this Agreement shall not be construed as a waiver thereof.

IX. Audit. During the Term of this Agreement and for two (2) years thereafter, Glaxo Wellcome shall have the right, or shall have the right to engage an independent firm, to audit HMO to verify their performance and compliance with their obligations under the Agreement. Glaxo Wellcome or such independent auditing firm will be authorized to have complete and unrestricted access to any and all information reasonably required to perform the procedures, as agreed upon by Glaxo Wellcome and HMO, as well as any and all other information reasonably necessary to perform procedures pursuant to this section of the Agreement. HMO shall have the right to specify certain confidential or proprietary information that should not be disclosed to Glaxo Wellcome; provided, however, that information shall be made available on an unrestricted basis to the independent auditing firm, as necessary, for such firm to perform procedures requested by Glaxo Wellcome pursuant to this section of the Agreement. Any and all information required will be requested by Glaxo Wellcome and/or the independent auditing firm from HMO and HMO will make all reasonable efforts to ensure the requested information is made available to the independent auditing firm or Glaxo Wellcome within a specified period of time as agreed to by Glaxo Wellcome and HMO.

Any data or information provided by Glaxo Wellcome to HMO pursuant to this Section shall be used by HMO solely for the express purpose for which it is provided, and HMO shall maintain the confidentiality of all such data or information.

Any data or information provided by HMO to Glaxo Wellcome shall be used by Glaxo Wellcome and its agents as provided for in the section above, solely for the express purpose for which it is provided, and Glaxo Wellcome and its agents shall maintain the confidentiality of all such data.

4

Highly Confidential under Protective Order/MDL No. 1456

GSK-MDL-OMNI05-0235238

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

X.    Pricing.

A. Existing Glaxo Wellcome Products. Except as otherwise provided herein, the pricing hereunder for the Glaxo Wellcome Products shall remain unchanged for the first twelve months of the Agreement. Thereafter, Glaxo Wellcome may adjust the price of any Glaxo Wellcome Product once each contract year; provided, however, that throughout the Term of this Agreement, HMO's percentage discount from Net Wholesale Price ("NWP") on each Glaxo Wellcome Product shall remain equal to each of their respective discounts reflected in the Product and Pricing Exhibit at the time the Agreement was executed. The new price will become effective thirty (30) days following price adjustment as provided herein.

B. Best Price. If Glaxo Wellcome determines in good faith (e.g., if there is any change in any Glaxo Wellcome Product's net wholesale price or change in legislation) or Glaxo Wellcome receives any notice, opinion, determination, or ruling from the Health Care Financing Administration that the discounts and rebates provided under this Agreement may establish a lowered federal "Best Price," as that term is defined in Section 1927(c)(1)(C) of the Social Security Act (Public Law 74-271, 42 U.S.C. Section 1396r-8(c)(1)(C), then Glaxo Wellcome reserves the right to immediately make any and all adjustments to the Glaxo Wellcome Product discount, so as to avoid establishment of such lowered federal Best Price.

C. Generic Availability. In the event a generic version of a Glaxo Wellcome Product becomes available on the market in the United States, Glaxo Wellcome reserves the right to adjust the price(s) upon 30 days notice.

XI.    Miscellaneous.

A. Amendments. The Agreement may be modified or amended only in writing by a duly authorized agent of each party.

B. Confidentiality.

1. General Provisions. HMO and Glaxo Wellcome understand and agree that, in the performance of this Agreement, each party may have access to private or confidential information of the other, including but not limited to trade secrets, marketing and business plans, customer lists, financial information, personnel information, technical information, processes, formulas, procedures and operations (collectively, "Confidential Information"). Each party agrees that: (i) all Confidential Information shall remain the exclusive property of the owner, and (ii) it shall maintain, and shall use prudent methods to cause its employees and agents to maintain the confidentiality and secrecy of the Confidential Information and shall use the Confidential Information solely in connection with its duties and obligations under this Agreement. Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it (i) is or becomes a part of the public domain through no act or omission on the part of the receiving party; (ii) is in the receiving party's possession, without actual or constructive knowledge of an obligation of confidentiality with respect thereto, at or prior to the time of disclosure under this Agreement; (iii) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; (iv) is independently developed by the receiving party without reference to the disclosing party's Confidential Information; or (v) is released from confidential treatment by written consent of the disclosing party. Nothing herein shall prevent either party from complying with a legal obligation to disclose Confidential Information. Upon the expiration or termination of this Agreement for any reason, each party, at its expense, shall promptly return to the other or destroy all copies of the other party's Confidential Information. This Section shall survive the termination of the Agreement.

5

ClibPDF - www.fastio.com
Highly Confidential under Protective Order/MDL No. 1456                    GSK-MDL-OMNI05-0235239

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

G. Overpayment and Underpayment. Overpayments and underpayments of any rebates shall be rectified immediately upon discovery by the erring party or within thirty (30) days of the receipt of written notice of such overpayment or underpayment. In the event that Glaxo Wellcome discovers that rebates in excess of actual earned amounts have been paid to HMO, Glaxo Wellcome may deduct such overpayment from future payments. In the event that Glaxo Wellcome reasonably believes that any or all of the rebate amount submitted by HMO is incorrect, Glaxo Wellcome may request that an audit, as described in the Audit Section, be instituted for such disputed amount. If no future payments are owed by Glaxo Wellcome, HMO shall refund to Glaxo Wellcome the overpayment within thirty (30) days after receipt of Glaxo Wellcome's written request for such payment.

H. Force Majeure. The obligations of either party to perform under this Agreement will be excused during each period of delay caused by acts of God or by shortages of power or materials or government orders which are beyond the reasonable control of the party obligated to perform ("Force Majeure Event"). In the event that either party ceases to perform its obligations under this Agreement due to the occurrence of a Force Majeure Event and its expected duration is thirty (30) days or less, the non-performing party shall take all reasonable steps to recommence performance of its obligations under this Agreement as soon as possible. In the event that any Force Majeure Event delays a party's performance for more than thirty (30) days following notice by such party pursuant to this Agreement, the other party may terminate this Agreement immediately upon written notice to such party.

I. Severability. In the event any term or provision of the Agreement is declared illegal or unenforceable or in conflict with any law or regulation, the validity of any other term or provision of the Agreement shall not be affected thereby.

J. Independent Contractors. The parties hereto are independent contractors engaged in the operation of their own respective businesses. Nothing herein shall be deemed or construed to create any other relationship between the parties.

K. Assignment. This Agreement is non-assignable by either party, whether by operation of law or otherwise, without the prior written consent of the other party; however, Glaxo Wellcome may without the consent of the other party assign its duties, rights and obligations under this Agreement in whole or in part to a subsidiary or affiliate or to an entity which purchases all or substantially all of Glaxo Wellcome's assets or which is merged with or consolidated into Glaxo Wellcome.

L. Entire Agreement. This Agreement constitutes the entire agreement between Glaxo Wellcome and HMO in relation to the subject matter hereof and supersedes all prior agreements and understandings on any nature between the parties in relation hereto.

M. State Laws. The HMO shall comply with applicable reporting requirements to any health care corporation, health care insurer, other third party reimburser, or any patient imposed pursuant to the following laws: Mass. Gen. L. Ch. 175H, (3, Mich. Comp. Laws (752.1004; Minn. Stat. (62J.23; R.I. Gen. Laws (5-48.1).

N. Governing Law. The Agreement shall be governed by and construed according to the laws of the State of North Carolina without regard to conflicts or choice of law principles.

The undersigned duly authorized representatives of the parties hereby execute this Agreement as of the dates below written.

7

ClibPDF - www.fastio.com
Highly Confidential under Protective Order/MDL No. 1456

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

Glaxo Wellcome Inc.:                          Corporate Health Dimensions:

_W Colin Burner_                              _Shan C. Lewis, PharmD._
Name                                          Name

_VP. Glaxo Wellcome_                          _VP, Clinical Services_
Title                                         Title

_2/22/99_                                     _2/11/99_
Date                                          Date



8

ClibPDF - www.fastio.com

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

## Product Pricing Exhibit

| NDC # | Product Description | NWP | % Discount | Contract Price |
|---|---|---|---|---|
| 00173-0561-00 | AMERGE® tab 1.0mg 9's    blister | $111.87 | 10.0000% | $100.68 |
| 00173-0562-00 | AMERGE® tab. 2.5mg 9s    blister | $111.87 | 20.0000% | $89.50 |
| 00173-0449-02 | IMITREX® inj 0.5ml 12mg/ml 5s vials | $180.42 | 7.0000% | $167.79 |
| 00173-0449-01 | IMITREX® inj 12mg/ml 0.5ml 2s pfld srng | $73.26 | 7.0000% | $68.13 |
| 00173-0479-00 | IMITREX® inj 12mg/ml stat dose kit | $77.34 | 7.0000% | $71.93 |
| 00173-0478-00 | IMITREX® inj 12mg/ml stat dose rfl 2's | $73.26 | 7.0000% | $68.13 |
| 00173-0523-00 | IMITREX® nasal spray 20mg 6s | $91.41 | 7.0000% | $85.01 |
| 00173-0524-00 | IMITREX® nasal spray 5mg 6s | $91.41 | 7.0000% | $85.01 |
| 00173-0460-02 | IMITREX® tab 25mg 9s | $106.94 | 7.0000% | $99.45 |
| 00173-0459-00 | IMITREX® tab 50mg 9s | $106.94 | 7.0000% | $99.45 |

ClibPDF - www.fastio.com

Highly Confidential under Protective Order/MDL No. 1456                    GSK-MDL-OMNI05-0235243

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

## Glaxo Wellcome Therapeutic Class Definitions Exhibit

| Therapeutic Purpose | Glaxo Wellcome (GW) Products | *Therapeutic Class |
|---|---|---|
| Treatment of migraine headaches | Imitrex and Amerge | All forms of Imitrex, Zomig, Amerge, Maxalt, Migranal, and 5HT Agonists marketed in the U.S. after 12/1/97 and during the Term of this Agreement. |

10

ClibPDF - www.fastio.com

Highly Confidential under Protective Order/MDL No. 1456

GSK-MDL-OMNI05-0235244

Corporate Health Dimensions
Glaxo Wellcome Agreement Number 400625
February 08, 1999

**REBATE EXHIBIT**

**TABLE 1**

| Product | Rebate |
|---------|--------|
| Amerge | 5% |
| Imitrex | 6% |

<u>Primary Product Rebate</u>.  In addition to any other discount, HMO shall be eligible for a 5% rebate on Amerge Total Sales and a 6% rebate on Imitrex Total Sales provided that both Amerge and Imitrex are Formulary Products.

11

ClibPDF - www.fastio.com

Classes of Trade from the ORS HLDR Table

Source File: \\syndevsql\e$\GSK\AG-
0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| Business Type Description |
| --- |
| PBM |
| RETAIL WHOLESALER |
| Medicare PBM |
| RETAIL CHAIN |
| ADAP Programs |
| IPA |
| HOSPITAL |
| GROUP PURCHASING ORGANIZATION |
| HOSPITAL SYSTEM |
| Long Term Care |
| NURSING HOME PROVIDER |
| Medicare IPA |
| STAFF MODEL HMO |
| CITY, COUNTY, STATE |
| FEDERAL |
| UNIVERSITY |
| RXREWARDS |
| MGC PLAN |
| HOME HEALTH CARE |
| ONCOLOGY CLINIC |
| ALTERNATE HEALTH CARE |
| SURGICAL CENTER |
| Medicare HMO |
| Physician Office & Clinic |
| PHYSICIANS GROUP |
| PATIENT ASSISTANCE |
| Alternate & Home Health |

GLX-MHC 181

## GlaxoWellcome

304399
G36539

### GLAXO WELLCOME INC.

### REIMBURSEMENT AGREEMENT

This Reimbursement Agreement is made as of the 19 TH day of NOVEMBER 1996, by and between GLAXO WELLCOME INC., a North Carolina Corporation of Five Moore Drive, P. O. Box 13438, Research Triangle Park, North Carolina, 27709 ("GLAXO WELLCOME") and CAREMARK, INC., Pharmaceutical Services Group, a California Corporation, of 2211 Sanders Road, Northbrook, IL 60062 ("Caremark").

### WITNESSETH:

Glaxo Wellcome and its affiliates are in the business of manufacturing and selling pharmaceutical products in the United States, including those products listed on the attached Exhibit A and as further defined in paragraph 5 below (the "Glaxo Wellcome Products"). Caremark is in the business of administering pharmacy benefit services for employers, HMOs, PPOs, insurers and other payors ("Member Organizations") and their employees or patients ("Individual Members"). The purpose of this Agreement is to delineate the terms and conditions by which Glaxo Wellcome shall reimburse Caremark based upon the dispensing of Glaxo Wellcome Products to Individual Members by Caremark's own mail service pharmacies and by various pharmacies ("Participating Pharmacies") which have agreed to provide such services to Caremark and its Individual Members.

NOW, THEREFORE, for and in consideration of the mutual promises and obligations contained in this Agreement, the parties agree as follows:

1.  **Term.** The term of this Agreement shall commence as of April 1, 1996, and shall terminate on December 31, 1999, unless it is terminated sooner pursuant to Section 8 below.

2.  **Member Organizations.** Caremark represents to Glaxo Wellcome that it has entered into agreements with the Member Organizations under which Caremark agrees to administer and provide the pharmacy benefit for the Individual Members. For a pharmacy claim to qualify for rebate processing from Glaxo Wellcome, an active Caremark formulary must be in place with the Member Organization. The formulary and/or pharmacy benefit must be managed and enforced by Caremark and Glaxo Wellcome shall have the right to verify said formulary management. Evidence that formulary management exists by Caremark shall include, but shall not be limited to: 1) ability to institute electronic messaging with the payer and/or sponsor of the pharmacy benefit (entity financially at risk); 2) ability to affect NDC selection (lockout capabilities); and 3) physician, patient, and pharmacy education. In the event Glaxo Wellcome determines that Caremark cannot enforce its formulary in the Member Organization, Glaxo Wellcome may, at its discretion, deny reimbursement of such claims submitted on behalf of said Member Organization. All claims must be electronically processed by Caremark or another electronic claims processor. Additionally, non-funded (e.g. consumer cards) and paper-processed claims are not eligible for reimbursement. Any Member Organization or claim that does not meet the above-stated criteria shall not be included in data submitted for reimbursement. Caremark will provide a list of eligible Member Organizations as described in Section 5 upon signature of this contract and shall become Exhibit B.. Glaxo Wellcome reserves the right to delete any Member Organization from the list. Caremark will be notified and if a Member Organization is excluded, Caremark will have the ability to dispute. Caremark will also provide quarterly updates to the list of eligible Member Organizations and Glaxo Wellcome reserves the right to delete any subsequent organization from that list. Any Member Organization currently included on any other Member Organization list of a Managed Care Organization with which Glaxo Wellcome has an Agreement shall not be eligible for rebates under this Reimbursement Agreement, unless Caremark is responsible for the pharmacy benefit management for that existing organization and can authenticate this fact to Glaxo Wellcome.

**Glaxo Wellcome Inc.**

Five Moore Drive          Telephone
PO Box 13398              919 248 2100
Research Triangle Park
North Carolina 27709

1

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

## HIGHLY CONFIDENTIAL

GSK-MDL-ZN01- 025273



EXHIBIT

19

GLX-MHC 181

3.  **Participating Pharmacies.** Caremark represents to Glaxo Wellcome that it has entered into agreements with the Participating Pharmacies under which the Participating Pharmacies agree to dispense pharmaceutical products to Individual Members for their own use, in accordance with Caremark's conditions of sale and dispensing. Caremark's mail service pharmacies shall not violate Caremark's "own use" requirements. A current list of the Participating Pharmacies is attached as Exhibit C. Caremark shall maintain and keep current the list of Participating Pharmacies and shall provide the then current list, upon request, annually to Glaxo Wellcome. Caremark further represents that there are currently no dispensing physicians that are among the Participating Pharmacies, and that it will not hereafter include any dispensing physicians among the participating pharmacies.

4.  **Audit.**

    Glaxo Wellcome shall have the right to engage an independent auditing firm acceptable to both parties to perform appropriate procedures necessary to verify Caremark's performance and compliance with its obligations pursuant to the Agreement. Such independent auditing firm will be authorized to have complete and unrestricted access to any and all information required to perform the procedures requested, as well as any and all other information reasonably necessary to perform procedures pursuant to this section of the Agreement. Caremark shall have the right to specify certain confidential or proprietary information that should not be disclosed to Glaxo Wellcome; provided, however, that information shall be made available on an unrestricted basis to the independent auditing firm as necessary, for such firm to perform necessary procedures to determine Caremark's compliance with the Agreement, which auditing firm shall be under an agreement of confidentiality not to disclose confidential or proprietary information to Glaxo Wellcome or any third party. The procedures requested by Glaxo Wellcome to be performed ·-- -- pursuant to this section of the Agreement, as well as any and all information required, will be communicated by Glaxo Wellcome and the independent auditing firm to Caremark and Caremark will make all reasonable efforts to ensure the requested information is made available to the independent auditing firm within a specified period of time as agreed to by Glaxo Wellcome and Caremark. Caremark will conduct reasonable audits of Participating Pharmacies with respect to claims submitted by Participating Pharmacies for Glaxo Wellcome Products dispensed to Individual Members and shall provide the methodology and results of such audits to Glaxo Wellcome upon the conclusion of such audits.

    Any data or information provided by Glaxo Wellcome to Caremark pursuant to this Section shall be used by Caremark solely for the express purpose for which it is provided, and Caremark shall maintain the confidentiality of all such data or information.

    Any data or information provided by Caremark to Glaxo Wellcome shall be used by Glaxo Wellcome and its agents as provided for in the section above, solely for the express purpose for which it is provided, and Glaxo Wellcome and its agents shall maintain the confidentiality of all such data or information.

5.  **Quarterly Reports.** Caremark shall furnish to Glaxo Wellcome throughout the term of this Agreement quarterly reports, in an electronic format specified below and further defined in Exhibit D, with respect to each Glaxo Wellcome Product listed on Exhibit A which are sold and dispensed by the Participating Pharmacies to Individual Members, excluding any and all Medicaid or Medicare Members, during the preceding calendar quarter. All data must be submitted within six (6) months of the last day of the quarter of concern. The quarterly reports shall include but shall not be limited to, at a minimum, the following data. The following is a description of Electronic Data Submission mapping elements. For a detailed description of items below, see attached Exhibit D National Council For Prescription Drug Programs (NCPDP) flat file formats."

Prescription Level Rebate Data Standard

1.  Summary by Glaxo Wellcome Product NDC of total units dispensed to Individual Members.

2

GSK-MDL-ZN01- 025274

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts.

**HIGHLY
CONFIDENTIAL**

GLX-MHC 181

2. Report by NDC of each Glaxo Wellcome Product dispensed to Individual Members. This report must include:

   a. Date Dispensed
   b. Date Paid
   c. Prescription Number
   d. Quantity Dispensed
   e. Member Organization Reimbursement
   f. Product Size
   g. Pharmacy Identification Code

Plan Data and Formulary Standard

3. Membership report by Member Organization including:

   a. Member Organization name and address
   b. Number of lives
   c. Effective date with Caremark for all forthcoming Member Organizations
   d. Type of Member Organization (including employers, health maintenance organizations such as IPAS, Staff Model, PPOS, etc.)
   e. Plan Identification Code

4. Detail report containing Caremark's market share information (prescription level) for all products listed on Exhibit A-1.

Tape Submissions:

   3480 non-label cartridge
   3420 non-label reel to reel

Diskette Submissions:

   3/4 diskette with a ASCII text file(s)
   either semicolon, comma or asterisk delimited

6. **Reimbursement.** Within sixty (60) days of receipt of quarterly reports from Caremark as provided above, Glaxo Wellcome shall reimburse Caremark as indicated below and as more fully set forth on Exhibit E. For the purposes of this Agreement, "Glaxo Wellcome Products" shall mean all designated dosage forms and strengths of the products listed on Exhibit A and any reformulations or new dose forms (excluding generics and OTC) of any such products, provided, however, that reformulations of a product to treat a significantly different clinical disease state for which the product is not presently indicated shall be deemed a new product and not included in the definition of "Glaxo Wellcome Products" and will not be included in the Glaxo Wellcome product sales dollar volume. The exclusion for significantly different clinical disease states in the preceding sentence shall only apply if any particular use of the product can be determined by a unique NDC; if not, the product shall not be excluded as a new product. The parties agree to enter into good faith negotiations promptly after any such new product, whether developed, acquired or licensed by Glaxo Wellcome, becomes available with the objective of such new product becoming subject to this Agreement, if mutually

3

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025275

GLX-MHC 181

agreed. All rebates will be calculated and paid on the basis of sales of Glaxo Wellcome Products valued at the net wholesale price in effect on the last day of the quarter. With the exception of Lanoxin, rebates will not apply to Glaxo Wellcome Products that are or become generically available. When the products listed in Exhibit A are purchased through a wholesaler, the price to be paid, including any associated service charges, must be negotiated with and paid directly to that vendor.

A.   Base Rebate. When on a quarterly basis, compared to the National Retail Average TRx market share for each of the Glaxo Wellcome Products listed in Exhibit A, the Caremark TRx brand share for each Glaxo Wellcome Product meets the National Retail Average for the applicable Glaxo Wellcome Product for the applicable therapeutic class listed in Exhibit A-1, Glaxo Wellcome shall pay Caremark a base rebate ("Base Rebate") for each of the Glaxo Wellcome Products listed in Exhibit A in the percentage amounts listed on Exhibit E. The Base Rebate shall be calculated for the entire Caremark book of approved Rx Drug Plan business by multiplying the designated percentage by the quarterly Glaxo Wellcome Product sales dollar volume expressed at the net wholesale price in effect on the last day of the quarter.

B.   Performance Rebate. When on a quarterly basis, compared to the National Retail Average TRx market share for each of the Glaxo Wellcome Products listed in Exhibit A, the Caremark TRx Brand Share for each Glaxo Wellcome Product exceeds the National Retail Average for the applicable Glaxo Wellcome Product for the applicable therapeutic class listed in Exhibit A-1, Caremark shall be eligible for a performance rebate ("Performance Rebate") in the percentage amounts as set forth in Exhibit E, multiplied by the quarterly Glaxo Wellcome Product sales dollar volume expressed at the net wholesale price in effect on the last day of the quarter. The Performance Rebate for each product shall be calculated for the entire Caremark's book of approved Rx Drug Plan business.

The maximum rebate percentage payable for each product under the terms of the Agreement shall be the percentages so designated on Exhibit E. For the purpose of this paragraph 5, the term National Retail Average shall mean the national retail pharmacy total prescription brand share, which includes all retail activity, as reported by IMS or Walsh.

7.   Formulary. Subject to other contractual obligations and Caremark customers' plan design requirements, as previously disclosed to Glaxo Wellcome, all Glaxo Wellcome Products covered by this agreement and for which a rebate is made available shall be available throughout Caremark's administration programs and/or system without restrictions which would differentiate the availability of the Glaxo Wellcome Product from any other product within that therapeutic class. No electronic activity that disadvantages Glaxo Wellcome Products in their therapeutic class will be allowed. Subject to other contractual obligations and Caremark customers' plan design requirements, as previously disclosed to Glaxo Wellcome, Caremark agrees to waive any Maximum Allowable Cost limitations or any mandatory substitution with regard to Lanoxin.

8.   Termination.

8.1   In the event of a material breach of the Agreement by either party, the party alleging the breach shall give written notice thereof to the other party. If such breach is not cured in all material respects within thirty (30) days of such notice, the non-breaching party may terminate the Agreement immediately. This Agreement may be terminated by either party, in whole or in part, with or without cause, by giving the other party sixty (60) days' advance written notice thereof.

4

GSK-MDL-ZN01-025276

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

GLX-MHC 181

8.2    If (i) there shall hereafter be changes to any existing law, statute, rule or regulation (or interpretation of any thereof) or (ii) if any law, statute, or rule or regulation (or interpretation of any thereof) shall hereafter be promulgated, enacted, enforced or otherwise applied; or (iii) if any decree, order, judgment or permanent injunction shall be entered or enforced by any court of competent jurisdiction or any other government agency relating to the pricing of prescription drugs, the terms of the Agreement or relating to the Rebates called for hereunder, which adversely and materially affect the business of Glaxo Wellcome or Caremark, the affected party may terminate the Agreement, upon not less than thirty (30) days prior written notice to the other party.

8.3    In the event a termination notice is given pursuant to Section 8.1 or 8.2, if requested by the non-terminating party, the terminating party shall, during the period after notice has been given and before the date of termination, meet with the other party and discuss any proposals for amending the Agreement. In the event of a termination by Glaxo Wellcome, pursuant to Section 8.1 above, rebates shall accrue up to the date of notice of termination and only such accrued amount shall be payable by Glaxo Wellcome. In the event Caremark shall terminate this Agreement pursuant to Section 8.1, or Glaxo Wellcome or Caremark terminate this Agreement pursuant to Section 8.2, rebates shall accrue until the effective date of termination. Glaxo Wellcome shall pay Caremark all rebates earned up to that date.

## 9. Confidentiality.

9.1    The terms and provisions of the Agreement are confidential. Caremark and Glaxo Wellcome each agree not to make any public announcement of the existence of the Agreement and not to disclose the terms or provisions of the Agreement to any party (except by Caremark as reasonably necessary to market and implement its programs and fulfill its obligations hereunder) without the prior written consent of the other party, unless disclosure is required by applicable law or regulations. Glaxo Wellcome agrees that the concepts, procedures and operations of or relating to programs implemented pursuant to the Agreement are confidential and proprietary to Caremark and Glaxo Wellcome agrees not to use or disclose any such information to any other party without the prior written consent of Caremark.

9.2    Nothing herein shall preclude (i) disclosure of the terms and provisions of the Agreement to counsel any parent of a party for the purpose of regulatory compliance, monitoring compliance with the Agreement, or rendering legal advice concerning the Agreement, or (ii) disclosure of the terms and provisions of the Agreement to independent auditors of a party or parent of a party.

## 10. Miscellaneous.

10.1    Amendment. The Agreement may be modified or amended only in writing signed by a duly authorized representative of each party. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

10.2    Severability. In the event any term or provision of the Agreement is declared illegal or unenforceable or in conflict with any law or regulation, the validity of any other term or provision of the Agreement shall not be affected thereby.

10.3    Independent Contractors. The parties hereto are independent contractors engaged in the operation of their own respective business. Nothing herein shall be deemed or construed to create any other relationship between the parties.

GSK-MDL-ZN01- 025277

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

HIGHLY
CONFIDENTIAL

GLX-MHC 181

10.4    Dispute Resolution: Arbitration.  Both parties agree to meet and confer in good faith to resolve any controversy or claim arising out of or relating to the Agreement or the breach thereof.  Unless otherwise prohibited by law, any such controversy or claim which cannot be so resolved shall be submitted to binding arbitration.  Unless the parties agree in writing to modify the procedure of such arbitration, the following procedure shall be followed:  Arbitration may be initiated by either party making a written demand for arbitration to the other party within a reasonable time from the date the claim, dispute, or controversy arose, but in no event later than the date legal proceedings would be barred by applicable statute of limitations.  The party making such demand shall designate a competent and disinterested arbitrator in such written demand.  Within thirty days of such demand, the other party shall designate a competent and disinterested arbitrator and shall give written notice of such designation to the party making the initial demand for arbitration.  Within thirty days after such notices have been given, the two arbitrators so designated shall select a third competent and disinterested arbitrator and give notice of such selection to both parties.  If the two arbitrators designated by the parties are unable to agree on a third arbitrator within thirty days, then upon request of either party such third arbitrator shall be randomly selected from a list of available arbitrators as provided by the local Delaware chapter of the American Arbitration Association.  The arbitrators shall then hear and determine the question or questions in dispute, and the decision in writing of any two arbitrators shall be binding upon the parties.  The arbitration shall be held at a location to be determined by the parties or the three arbitrators.  Each party shall pay its chosen arbitrator, and shall bear equally the expenses of the third arbitrator and all other expenses of the arbitration, provided that attorney's fees and expert witness fees are not deemed to be expenses of arbitration but are to be borne by the party incurring them.  Except as otherwise provided in this Agreement, arbitration shall be governed by the Commercial Rules of the American Arbitration Association.

10.5    Eligibility.  None of the provisions of this Agreement shall apply to outpatient prescription drugs provided to any person who is eligible for and receiving outpatient prescription drug benefits under Title XVIII and Title XIX of the Social Security Act and the calculation of any rebate hereunder shall not include any outpatient prescription drugs reimbursed under Title XVIII and Title XIX of the Social Security Act.

Caremark represents and warrants that to the extent required by law (including any requirements under the Employee Retirement Income Security Act of 1974, as amended), it will disclose the existence or any other aspect of this Agreement to any party with whom it contracts for administrative services.

11.6    Notice.  Any notice to be given hereunder by any party to any other party shall be deemed to have been given (a) if mailed, at the time when mailed in any general or branch office of the United States Parcel Service, enclosed in a registered or certified postage-paid envelope, provided that any notice of change of address shall be effective only upon receipt, (b) if sent by facsimile transmission, when so sent and receipt acknowledged by an appropriate telephone or facsimile receipt or (c) if sent by other means, when actually received by the party to which such notice has been directed, in each case at the respective addresses or number set forth below or such other address or number as such party may have fixed by notice.

If to Caremark Inc.:
    Caremark Inc., Pharmaceutical Services Group
    2211 Sanders Road
    Northbrook, IL 60062

    Attention:    Jay Messeroff
            Vice President, Pharmaceutical Trade Relations
            With a copy to General Counsel

6

GSK-MDL-ZN01- 025278

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GLX-MHC 181

If to Glaxo Wellcome:
  Glaxo Wellcome Inc.
  Five Moore Drive
  Research Triangle Park, NC 27709

Attention:   Stephen F. Stefano
             Vice President and General Manager
             Health Management Division
Fax:         (919) 483-7503
             With a copy to General Counsel

11.7    Entire Agreement.  The Agreement constitutes the entire Agreement between Glaxo Wellcome and Caremark in relation to the subject matter hereof and supersedes all prior agreements and understandings of any nature between the parties in relation hereto.

11.8    Indemnification.  Each party (the "Indemnifying Party") shall indemnify and hold harmless the other party (the "Indemnified Party") from and against any and all losses, damage, liabilities, costs, expenses (including attorney's fees) and any other claims whatsoever which the Indemnified Party may suffer arising out of or relating to this Agreement if the claim against the Indemnified Party arises out of the negligent acts or omissions of the Indemnifying Party or its employees and agents, and Caremark shall be indemnified and held harmless by Glaxo Wellcome for claims alleging product liability regarding Glaxo Wellcome products.

11.9    Assignment.  This Agreement is non-assignable by either party, whether by operation of law or otherwise, without the prior written consent of the other party, however, either party may without the consent of the other party assign its duties, rights and obligations under this Agreement in whole or in part to a subsidiary or affiliate or to an entity which purchases all or substantially all of such party's assets or which is merged with or consolidated into such party.

11.10   Governing Law.  This Agreement shall be governed by and construed according to the laws of the State of North Carolina without regard to conflicts or choice of law principles.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

GLAXO WELLCOME INC.                          CAREMARK, INC.

_____             _____
Name                                         Name         Jay Meltsner

_____             _____
Vice President Managed Health Care           VP Chain Trade Relations
Title                                        Title

_____             _____
1/16/97                                      11/15/96
Date                                         Date

Approved As To
Legal Form
Date: 10/24/96 LAB

7

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

GSK-MDL-ZN01- 025279

GLX-MHC 181



EXHIBIT A

PRODUCTS

Lanoxin

Valtrex
Zofran
Zovirax

8

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

HIGHLY
CONFIDENTIAL

REDACTED MATERIAL

GSK-MDL-ZN01- 025280

GLX-MHC 181

**Exhibit A-1**

**Therapeutic Class Definitions**

Zovirax, Valtrex          Zovirax, Valtrex, and Famvir
(All forms)

Lanoxin                   Lanoxin and Digoxin
(Tablet form only)

Zofran                    Zofran, Kytril, Compazine, Reglan,
(Injection and Oral forms only)   Metoclopramide, Tigan

9

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

GSK-MDL-ZN01- 025281

HIGHLY
CONFIDENTIAL

REDACTED MATERIAL

GLX-MHC 181

Exhibit B

Eligible Plans

(To be provided by Caremark)



10

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025282

GLX-MHC 181

Exhibit C

Participating Pharmacies

(To be provided by Caremark)



11

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025283

GLX-MHC 181

**Exhibit D**

**Example Format**

(To be provided by Glaxo Wellcome)



CAREMARK SHALL BEST ATTEMPT TO PROVIDE ALL NECESSARY DATA ~~IN ATTEMPTING~~ REQUIRED TO DEMONSTRATE PERFORMANCE & ADHERENCE TO THIS AGREEMENT. SOME BUT NOT NECESSARILY ALL OF THE DATA DETAIL IN THE FOLLOWING LAYOUT (EXHIBIT D) WILL BE PROVIDED.

Caremark will provide all information outlined in Section 5.2

12

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025284

GLX-MHC 181

**Exhibit E**

**Rebate Percentage Rates**



| Product | Basic Rebate Nat'l Share [2] | Performance Rebate for TRx Brand Share Performance Above National Retail Average [1] | | | |
|---|---|---|---|---|---|
| | | +0 to 2 Pct. Pts. | +2.1 to 4 Pct. Pts. | +4.1 to 6 Pct. Pts. | Over 6 Pct. Pts. [3] |
| Zofran | 1.0% | 1.5% | 2.0% | 2.5% | 3.0% |
| Valtrex | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
| Zovirax | 0.5% | 1.5% | 2.0% | 2.5% | 3.0% |
| Lanoxin | 1.0% | N/A | N/A | N/A | N/A |

*Performance Rebates are calculated using the percentages listed in the appropriate column, not to be deemed a cumulative total.

[1]  Performance Rebates include the Basic Rebate for the product.

[2]  If Caremark's share for a brand falls below the national TRx market share then rebates are not applicable for the claims utilization for the brand for the quarter.

[3]  Maximum Rebate Percentage Rate Payable under the contract.



13

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY**
**CONFIDENTIAL**
REDACTED MATERIAL

GSK-MDL-ZN01- 025285

EXHIBIT D (Cont'd)

**NCPDP
PLAN & FORMULARY TRACKING
FLAT FILE LAYOUT (DRAFT)**

*Plan Data and Formulary Standard*            *Proposal Document*

### Plan Data Elements

| | | |
|---|---|---|
| Contract ID Number | Contractual Agreement # | Contract ID. |
| Pharmacy Industry Contracting Organization (PICO) Name | | Pharmaceutical manufacturer entering into a rebate contract. |
| Pharmacy Management Organization (PMO) Name | | Any organization entering into contracts for pharmaceutical products |
| PMO ID Code Qualifier | 11=DEA #<br>21=HIN #<br>31=Tax ID Number<br>93=Manufacturer assigned<br>ZZ=Mutually agreed | Code designating the system/method of code structure used for the PMO Identifier Code. |
| PMO ID Code | (See PMO Qualifier Field) | Code identifying the rebate request. (PMO). |
| PMO Total Covered Lives | 9N | Control Total |
| Report Period Start Date | 10A | CCYY-MM-DD<br>Beginning date of the period for which the membership is reported. |
| Report Period End Date | 10A | CCYY-MM-DD<br>Ending date of the period for which the membership is reported. |
| Plan Enrollees[1] | 9N | The total number of subscribers (employees) |
| Plan Name | 30A | The name of the plan. |
| Plan ID Code | 17A | Code identifying the PMO's clients/plans (PMO). |
| Plan Group Affiliation No. | 17A | PMO assigned number used to group individual groups under the plan to which they belong. |
| Plan ID Number Qualifier | 11=DEA #<br>21=HIN #<br>31=Tax ID Number<br>93=Manufacturer assigned<br>ZZ=Mutually agreed | Code designating the system/method of code structure used for the PMO's clients/plans. Identifier Code. |

[1] Enrollees - the number of subscribers (i.e. employees).

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

GSK-MDL-ZN01- 025286

EXHIBIT D (Cont'd)

**NCPDP**
**PLAN & FORMULARY TRACKING**
**FLAT FILE LAYOUT (DRAFT)**



| Plan Data and Formulary Standard | | Proposal Document |
|---|---|---|
| Plan Type | 4A | 1000 = Alternate Site Infusion |
| | | 1010 = Blues Plan |
| | | 1020 = Blues HMO |
| | | 1030 = Blues Self Insured Employer Groups |
| | | 1040 = Claims Processor |
| | | 1050 = Chain Pharmacy |
| | | 1060 = Clinic |
| | | 1065 = Cash Card |
| | | 1070 = Employer Group |
| | | 1080 = Union Empl. Group |
| | | 1090 = Salaried Empl. Group |
| | | 1100 = Hourly Empl. Group |
| | | 1110 = Retired Empl. Group |
| | | 1115 = COBRA Empl. Group |
| | | 1120 = Family Plan |
| | | 1130 = Home Health |
| | | 1140 = Hospital |
| | | 1150 = HMO Group |
| | | 1160 = HMO IPA |
| | | 1170 = HMO Network |
| | | 1180 = HMO Staff |
| | | 1190 = HMO Combo/Mixed |
| | | 1200 = Indemnity Insurer |
| | | 1210 = Integrated Carve Out |
| | | 1220 = Long Term Care Prov. |
| | | 1230 = Mail Order |
| | | 1240 = Medicaid |
| | | 1250 = Nursing Home |
| | | 1260 = Not Classified |
| | | 1270 = Other (specify in descrip) |
| | | 1280 = Phcy. Benefit Mgr (PBM) |
| | | 1290 = PPO Full Service |
| | | 1300 = PPO General Medical/Surgical |
| | | 1310 = PPO Specialty |
| | | 1320 = PPO Workers Comp |
| | | 1330 = Preferred Phcy. Provider for Mgd. Cash Scripts |
| | | 1340 = State Govt.-Self Insured Employer Group |
| | | 1350 = Third Party Admin. (TPA) |
| | | 1360 = Workers Compensation |

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025287

EXHIBIT D (Cont'd)

**NCPDP**
**PLAN & FORMULARY TRACKING**
**FLAT FILE LAYOUT (DRAFT)**

Plan Data and Formulary Standard                    *Proposal Document*

| Eligible Plan | Yes = Y<br>No = N | This flag indicates whether or not the plan is eligible for rebates as stated in the contractual agreement between the PMO and PICO. |
|---|---|---|
| Plan Street Address | 30A | The street address of the plan. |
| Plan City Address | 13A | The city where the plan is located. |
| Plan State Address | 2A | The state where the plan is located. |
| Plan Zip Code Address | 10A | The zip code of the plan. |
| Plan Type of Service | 4A | 3000 = Mail Order<br>3010 = Cash Retail<br>3020 = Managed Retail<br>3030 = Combination<br>3040 = Other (specify in descrip)<br>3050 = Not Classified |
| Plan Degree Managed (contractually agreed definition) | 4A | 2000 = Claims Processing only<br>2010 = Formulary Management<br>2020 = Disease Management<br>2030 = Intervention<br>2040 = Other (specify in descrip)<br>2050 = Not Classified |
| Calculation Method (for alternate reporting methods) | 1 = Beginning of Period<br>2 = End of Period<br>3 = Average of Period<br>4 = Minimum Count<br>5 = Maximum Count | Time period associated with membership |
| Membership Qualifier | 1A | 1 = Enrollees<br>2 = Beds<br>3 = Retail Stores |
| Covered Lives Qualifier[2] | Actual = A<br>Calculated = C<br>Projected = P | The code indicating if covered lives is actual or calculated. |
| Calculation Multiplier | 5A | The factor used to calculate covered lives from number of enrollees. |
| Plan Total Covered Lives | | The total number of covered lives for the plan |

[2] Actual Covered Lives - the number of enrollees plus the actual number of family members included.
Calculated Covered Lives - the number of enrollees multiplied by a factor (generally 2.3) to include family members, if the actual number is not available.

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

GSK-MDL-ZN01- 025288

EXHIBIT D (Cont'd)

*NCPDP*
*PLAN & FORMULARY TRACKING*
*FLAT FILE LAYOUT (DRAFT)*

Plan Data and Formulary Standard

*Proposal Document*

Plan Data Elements, cont'd

| | | |
|---|---|---|
| Plan Change Date | 10A | Date of addition, deactivate or replacement |
| Effective Date of Covered Lives Information | | The point in time for which the enrollment information is effective. |
| Enrollment Information Qualifier | Monthly = M Quarterly = Q | The code indicating the time period for the covered lives number. |
| Plan Eligibility Date | | When plan was added to the Contract Organization |
| Plan Termination Date | | When plan terminated its affiliation with the Contract Organization |
| Plan "Change" Identifier | Addition = A Change = C (including termination) Delete = D | The action to be taken with the information transmitted as it relates to the Plan. |
| Plan Total Formularies | 4N | Number of formularies for the plan |
| Plan Total Adjudicators | 4N | Number of adjudicators for the plan |
| Filler | 30A | |

Sub-record

| | | |
|---|---|---|
| Plan Formulary Date | | When the formulary was effective for the plan |
| Plan Formulary Identifier | Alphanumeric | Code identifying which Contract Organization formulary is used by this plan |

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025289

# GlaxoWellcome

EXHIBIT H

TABLE 1

CONTRACT NO. 304002



| NDC# | PRODUCT DESCRIPTION | OLD PRICE | EXP DATE | NEW PRICE | DATE / EXCEPTIONS |
|---|---|---|---|---|---|
| 0173-0130-93 | ALKERAN® I.V. INJ 50 MG | | | | |
| 0173-0086-15 | ANECTINE® FLO-PACK 1000MG VIAL | | | | |
| 0173-0071-95 | ANECTINE® INJ 20 MG/ML 10ML | | | | |
| 0173-0085-15 | ANECTINE® FLO-PACK 500MG VIAL | | | | |
| 0173-0418-00 | CEPTAZ® 10GM/100ML 6S | | | | |
| 0173-0416-00 | CEPTAZ® 1GM/100ML 10S | | | | |
| 0173-0414-00 | CEPTAZ® 1GM/25ML 25S | | | | |
| 0173-0417-00 | CEPTAZ® 2GM/100ML 10S | | | | |
| 0173-0415-00 | CEPTAZ® 2GM/10ML 25S | | | | |
| 0173-0230-44 | DIGIBIND® INJ 40MG | | | | |
| 0173-0207-01 | EXOSURF NEONATAL® INJ 10ML | | | | |
| 0173-0434-00 | FORTAZ® ADD VTG 1GM 25S | | | | |
| 0173-0435-00 | FORTAZ® ADD VTG 2GM 10S | | | | |
| 0173-0412-00 | FORTAZ® SOL FRZ PRMX IV 1GM/50ML 24S | | | | |
| 0173-0380-32 | FORTAZ® 1GM/100ML 10S | | | | |
| 0173-0378-35 | FORTAZ® 1GM/25ML 25S | | | | |
| 0173-0413-00 | FORTAZ® SOL FRZ PRMX IV 2GM/50ML 24S | | | | |
| 0173-0381-32 | FORTAZ® 2MG/100ML 10S | | | | |
| 0173-0379-34 | FORTAZ® 2GM/50ML 10S | | | | |
| 0173-0377-31 | FORTAZ® 500MG/15ML 25S | | | | |
| 0173-0382-37 | FORTAZ® 6MG/100ML 6S | | | | |
| 0173-0449-02 | IMITREX® INJ 0.5ML 12 MG/ML 5S VIALS | | | | |
| 0173-0598-71 | IMURAN® INJ 100MG 20ML | | | | |
| 0173-0262-10 | LANOXIN® INJ PEDIATRIC 0.1MG/ML | $ 36.76 | | $ 37.86 | A |
| 0173-0260-10 | LANOXIN® INJ 0.5MG 2ML 10S | $ 14.44 | | $ 14.87 | A |
| 0173-0260-35 | LANOXIN® INJ 0.5MG 2ML 50S | $ 36.75 | | $ 37.85 | A |
| 0173-0705-44 | MIVACRON® INJ 2MG/ML 5ML 10S | | | | |
| 0173-0705-95 | MIVACRON® INJ 2MG/ML 10ML 10S | | | | |
| 0173-0542-00 | MIVACRON® INJ 2MG/ML 20ML 10S M | | | | |
| 0173-0538-00 | MIVACRON® 50ML X 3 | | | | |
| 0173-0656-01 | NAVELBINE® INJ 10MG 1ML | | | | |
| 0173-0656-75 | NAVELBINE® INJ 50MG 5ML | | | | |
| 0173-0543-01 | NIMBEX® 10MG/ML 20ML VIAL | | | | |
| 0173-0540-50 | NIMBEX® 2MG/ML 5ML VIAL | | | | |
| 0173-0546-00 | NIMBEX® 2MG/ML 10ML MDV | | | | |
| 0173-0763-44 | NUROMAX® INJ 1MG/ML 5ML MDV 10S | | | | |
| 0173-0545-00 | TRACRIUM® INJ 10MG/ML 10ML MDV | | | | |
| 0173-0940-44 | TRACRIUM® INJ 10MG/ML 5ML 10S | | | | |
| 0173-0350-57 | TRANDATE® INJ 5MG/ML 40ML | | | | |
| 0173-0350-58 | TRANDATE® INJ 5MG/ML 20ML | | | | |

Glaxo Wellcome Inc.

Five Moore Drive
PO Box 13398
Research Triangle Park
North Carolina 27709

Telephone
919 483 2100

Page 1

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

HIGHLY REDACTED MATERIAL
CONFIDENTIAL

GSK-MDL-ZN01- 025290

EXHIBIT H

TABLE 1

CONTRACT NO. 304002



| NDC# | PRODUCT DESCRIPTION | OLD PRICE | EXP DATE | NEW PRICE | DATE / EXCEPTIONS |
|---|---|---|---|---|---|
| 0173-0483-00 | ULTIVA™ INJ 1MG 10S | | | | |
| 0173-0484-00 | ULTIVA™ INJ 2MG 10S | | | | |
| 0173-0485-00 | ULTIVA™ INJ 5MG 10S | | | | |
| 0173-0957-10 | VASOXYL® INJ 20MG 1ML 10S | | | | |
| 0173-0638-93 | WELLCOVORIN INJ 100MG | | | | |
| 0173-0362-38 | ZANTAC® INJ 25MG/ML 2ML 10S | | | | |
| 0173-0363-00 | ZANTAC® INJ 25MG/ML 40ML | | | | |
| 0173-0363-01 | ZANTAC® INJ 25MG/ML 6ML | | | | |
| 0173-0441-00 | ZANTAC® INJ PRMXD 50MG/50ML 24S | | | | |
| 0173-0354-35 | ZINACEF® 1.5GM/25ML 25S | $ 160.00 | | $ 160.00 | 01/01/96 – 12/31/01 |
| 0173-0356-32 | ZINACEF® 1.5GM/100ML 10S | $ 66.50 | | $ 66.50 | 01/01/96 – 12/31/01 |
| 0173-0437-00 | ZINACEF® ADD VTG 1.5GM 10S | $ 65.00 | | $ 65.00 | 01/01/96 – 12/31/01 |
| 0173-0425-00 | ZINACEF® SOL FRZ PRMX IV 1.5GM/50ML 24S | $ 193.44 | | $ 193.44 | 01/01/96 – 12/31/01 |
| 0173-0400-00 | ZINACEF® 7.5GM/100ML 6S | $ 187.18 | | $ 187.18 | 01/01/96 – 12/31/01 |
| 0173-0352-31 | ZINACEF® 750MG/15ML 25S | $ 80.00 | | $ 80.00 | 01/01/96 – 12/31/01 |
| 0173-0353-32 | ZINACEF® 750MG/100ML 10S | $ 34.50 | | $ 34.50 | 01/01/96 – 12/31/01 |
| 0173-0436-00 | ZINACEF® ADD VTG 750MG 25S | $ 82.50 | | $ 82.50 | 01/01/96 – 12/31/01 |
| 0173-0424-00 | ZINACEF® SOL FRZ PRMX IV 750GM/50ML 24S | $ 116.64 | | $ 116.64 | 01/01/96 – 12/31/01 |
| 0173-0442-02 | ZOFRAN® INJ 2MG/ML 2ML 5S | $ 82.50 | 01/14/98 | $ 81.68 | 01/15/98 – 12/31/01 |
| 0173-0442-00 | ZOFRAN® INJ 2MG/ML 20ML | $ 165.00 | | $ 165.00 | 01/01/96 – 12/31/01 |
| 0173-0461-00 | ZOFRAN® INJ PRMXD 32MG/50ML | $ 792.00 | | $ 792.00 | 01/01/96 – 12/31/01 |
| 0173-0952-01 | ZOVIRAX® POWDER 1000MG 20ML 10S | $ 794.78 | | $ 460.00 | 01/01/96 – 12/31/01 |
| 0173-0995-01 | ZOVIRAX® POWDER 500MG 10ML 10S | $ 397.88 | | $ 230.00 | 01/01/96 – 12/31/01 |

PRICE EXCEPTIONS: A: Glaxo Wellcome shall have the right to increase the bid price in each successive contract year only by CPI. The price increase will be effective on January 1 of each contract year.

CONTRACT PERIOD: This amendment will begin January 15, 1998 and will terminate on December 31, 2001.

Page 2

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

HIGHLY CONFIDENTIAL
REDACTED MATERIAL

GSK-MDL-ZN01- 025291

GLX-MHC 181

## Exhibit D

### Example Format

(To be provided by Glaxo Wellcome)

CAREMARK SHALL BEST ATTEMPT TO PROVIDE ALL NECESSARY DATA
~~INFORMATION~~ REQUIRED TO DEMONSTRATE PERFORMANCE & ADHERENCE of
TO THIS AGREEMENT. SOME BUT NOT NECESSARILY ALL its
OF THE DATA DETAIL IN THE FOLLOWING LAYOUT (EXHIBIT D)
WILL BE PROVIDED.

Caremark will provide all information outlined in of
Section 5.2. Glaxo

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts



## HIGHLY
## CONFIDENTIAL

GSK-MDL-ZN01- 025284



# SB
## SmithKline Beecham
### Pharmaceuticals

June 22, 1999

Maren Spangler, R. Ph.
Director of Trade Relations
ProVantage Health Services, Inc.
13555 Bishops Court, Suite 201
Brookfield, WI 53005

Dear Ms. Spangler:

Enclosed for your files is the signed original of ProVantage's contract with SmithKline Beecham. A copy will be sent to your SB Account Manager, Ed McHugh.

To complete our documentation, please send the current list of ProVantage Plan Sponsors (referenced in Exhibit B of your contract) directly to my attention.

Please note that Vioxx was approved by the FDA and is now included in the Relafen Product Category (referenced in Exhibit A of your contract).

If you have any questions regarding this matter, please contact Ed McHugh, at (608) 249-4895.

Thank you for your interest in our products.

Sincerely,

Michelle M. Smith
Contract Manager

cc:    Ed McHugh
       Rebate Files

Enclosure (1)



EXHIBIT
20

Highly Confidential under Protective Order/MDL No. 1456



**SmithKline Beecham**
*Pharmaceuticals*

ProVantage Prescription Benefit Management Services
And
SmithKline Beecham Pharmaceuticals

## AGREEMENT

The following sets forth the agreement between SmithKline Beecham Pharmaceuticals, a division of SmithKline Beecham Corporation (hereafter "SB") and ProVantage Prescription Benefit Management Services Inc. (hereafter "ProVantage").

### BACKGROUND:

WHEREAS, ProVantage is a prescription benefit manager with respect to various health care pharmacy benefit programs adopted by Plan Sponsors for their eligible employees and eligible dependents; and

WHEREAS, as part of ProVantage's prescription benefit management program, it has offered to act as the Plan Sponsors' exclusive formulary management agent; and

WHEREAS, SB desires that its Products be included in ProVantage's formulary and is willing to pay a rebate payment based on utilization of its Products to ProVantage with respect to Products dispensed to Participants, subject to the terms of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants contained herein, the parties agree, intending to be legally bound, as follows:

I.    DEFINITIONS.

As used in this Agreement, the following terms shall have the following meaning (such meaning to be equally applicable to both the singular and plural forms of the terms defined):

1.1    "Contract Period" means April 1, 1999 through March 31, 2001.

1.2    "Eligible Uses" of Product shall mean Product dispensed to Participants of ProVantage's Plan Sponsors through Participating Pharmacies.

Highly Confidential under Protective Order/MDL No. 1456

1.3    "Formulary" means a document listing various pharmaceutical products which has been developed by ProVantage for utilization by Participating Pharmacies, physicians, other health care providers, Plan Sponsors and/or Participants for the purpose of guiding the prescribing, dispensing and acquisition of pharmaceutical products in the most commonly prescribed therapeutic categories.  ProVantage has developed two separate formularies: 1) its standard formulary and 2) its Advantage Formulary.  All Products shall be included in ProVantage's standard formulary and only select products as determined in ProVantage's sole discretion may be included in ProVantage's Advantage Formulary.  All references to Formulary herein shall mean ProVantage's standard formulary unless specifically noted otherwise.

1.4    "Participant" means any person who is eligible for coverage of prescription benefits under a Plan administered by ProVantage.

1.5    "Participating Pharmacies" means the retail and mail service pharmacies engaged by ProVantage or any of the Plans to fill prescriptions to Participants.

1.6    "Plan" means any group or individual health care plan, program or other arrangement offered by any Plan Sponsor which has appointed ProVantage to manage the pharmacy benefit for such plan, program or arrangement, including the use of the Formulary and management of the prescription drug benefit.  For purposes of clarification, the term "Plan" shall not include so-called consumer or cash-paying customer discount cards/programs or 100% co-pay plans for which the Plan Sponsor does not subsequently provide a substantial reimbursement.

1.7    "Plan Sponsor" means the employer, union, association, insurance company, Health Maintenance Organization, or other payor which has an agreement with ProVantage and is obligated to make payments for prescription benefits provided to the Participants and from whom ProVantage has obtained the right to obtain from manufacturers reimbursement on drugs utilized.  A list of Plan Sponsors is attached hereto and marked as Exhibit "B".  This Agreement applies only to those Plan Sponsors currently under contract with ProVantage and listed on Exhibit "B" hereto.  New Plan Sponsors will only become eligible for the terms of this Agreement upon the mutual agreement of ProVantage and SB.  In order to add Plan Sponsors to this Agreement, ProVantage shall notify SB in writing of its request to add such Plan Sponsor to this Agreement, which notice shall include a reasonable description of the Plan Sponsor and its operations. If SB does not deliver written notice reasonably objecting to the inclusion of any of such Plan Sponsors within sixty (60) days, the Plan Sponsors shall be deemed accepted and approved under this Agreement effective on the date the Plan commenced with ProVantage, provided that acceptance of a Plan Sponsor shall not mean that SB is required to pay Rebates with respect to utilization unless all of the conditions required for payment of such Rebates are met.

1.8   "Products" means the pharmaceutical products listed on Exhibit "A" attached hereto and made a part hereof.

1.9   "Rebates" means the aggregate of the rebates offered by SB as set forth on Exhibit "A" attached hereto with respect to Products dispensed to Participants of Plans administered by ProVantage.

II.   OBLIGATIONS OF PROVANTAGE.  In addition to the other obligations contained in this Agreement and in the Exhibits attached hereto, ProVantage shall satisfy the following:

2.1   Formulary Status.  ProVantage will document to SB proof of formulary status required by this Agreement for each Product for each of the Plan Sponsor in the form of a summary list stating the product formulary status by Plan Sponsor.  ProVantage will provide SB with a copy of its formulary and the formularies of each of its Plan Sponsors in the event that the Formularies have been materially revised and the revision affects the terms of this Agreement. In addition, upon SB's reasonable request, ProVantage will provide SB with additional documentation regarding the formulary status of SB products such as a pharmacy newsletter, minutes from a P&T committee meeting, position paper, or other official communication tool reasonably acceptable to SB. Rebates will only be paid for Eligible Uses of Products for those of ProVantage's Plan Sponsors which provide this documentation.

2.2   Communication.  ProVantage will communicate the formulary status of SB Products to its Plan Sponsors promptly after the effective date of this Agreement and before any Rebates will be paid by SB under this Agreement.

2.3   Pharmacy Agreements.  ProVantage will, upon reasonable request, provide in an acceptable form to SB proof that ProVantage has secured the sole right to control the pharmacy formulary and to contract for rebates or discounts on pharmaceutical products for each Plan.

2.4   Quarterly Report of Product Use by Participants.  Throughout the Contract Period, ProVantage shall furnish SB with quarterly reports, in a format which complies with NCPDP standards, with respect to each Product which is sold and dispensed by Participating Pharmacies to Participants during the preceding calendar quarter.  Each such quarterly report shall include relevant market share and usage data by Plan Sponsor for all products within the SB Product Categories, including at a minimum usage on the specific markets and products necessary to calculate the Rebates due from SB under this Agreement.  In addition, the data must be grouped by plan design category for calculation of Access Rebates, Additional Access Rebates, and Performance Rebates.  Such quarterly report shall be delivered to SB within sixty (60) days of the

conclusion of each calendar quarter. In the event that ProVantage fails to deliver the quarterly report within the 60-day period, SB shall be entitled to extend the date in which payment required under Paragraph 3.3 is due by the number of days the quarterly report was delayed. ProVantage shall be responsible for assuring that Rebates are only requested on Eligible Uses of Product. It is understood and agreed that Participant confidentiality prohibits ProVantage from furnishing the name of any Participant. ProVantage represents that certain Plan Sponsors have contracted with States to provide a fully capitated health plan to certain state and federal participants. The parties agree that this Agreement shall cover Product dispensed to Participants who are participants under such state and federal programs, except for any Product dispensed to participants in the Medicaid or other state or federal programs for which reimbursement may be sought from Medicaid or other government programs outside of the capitated plan (and data shall not be reported to SB hereunder with respect to any Product utilization which is subject to such exception).

2.5    <u>Maintenance/Audit of Records</u>.  Throughout the Contract Period and for a period of one year thereafter, ProVantage shall maintain (1) documentation of all relevant and necessary product prescription usage data for Products included in all SB Product Categories defined herein for each individual Plan Sponsor, (2) documentation to demonstrate each such individual Plan Sponsor's compliance with the performance requirements set forth in this Agreement, (3) documentation demonstrating the satisfaction of the performance requirements set forth herein applicable to ProVantage and each Plan Sponsor, and (4) other documentation required to demonstrate the satisfaction of performance conditions or compliance with the requirements for reimbursement hereunder (together, the "Documentation"). Subject to Article V below, SB, and its authorized representatives, shall have the right at its own cost, upon reasonable prior written notice to ProVantage, to audit all documentation at ProVantage's primary place of business location during normal working hours for purposes of assuring the appropriateness of any and all reimbursement claimed and/or paid under this Agreement and to assess performance under this Agreement, and shall have the right to audit the systems and processes used by ProVantage relevant to the Documentation to assure that market share and Rebate calculations are performed accurately and/or performance requirements are satisfied.

2.6    <u>Over-Payments</u>.  If it shall be determined through an audit pursuant to Section 2.5 or otherwise, that all or any part of any payment by SB was not required pursuant to Section III, ProVantage shall refund to SB such overpayment within forty-five (45) days of written notification including the presentation of reasonable documentation of the alleged overpayment by SB.

III.    <u>OBLIGATIONS OF SB</u> .  In addition to the other obligations contained in this Agreement and in the Exhibits attached hereto, SB shall satisfy the following:

Highly Confidential under Protective Order/MDL No. 1456

3.1 <u>Rebate Payment</u>. SB shall pay to ProVantage a Rebate for each Product dispensed to Participants at Participating Pharmacies during the Contract Period as provided in Exhibit "A" attached hereto and subject to satisfaction of the performance conditions contained therein. The Rebates shall be calculated on the basis of a single unit of Product as specified in Exhibit "A" (per unit rebate rate) and the total number of units dispensed. In the event that the Rebate is based upon Products' market share, and SB is unable to supply sufficient Products to meet ProVantage's needs due to material shortage, recall or any other reason, ProVantage's Rebate shall be based upon the greater of: a) the per unit rebate rate received for such Products in the most recent full quarter not affected by the Product shortage, or b) the base rebate rate.

3.2 <u>Administrative Fee</u>. In consideration of ProVantage's record-keeping and reporting obligations herein, SB shall pay to ProVantage, in addition to the Rebate, an administrative fee in an amount equal to one percent (1%) of the wholesale acquisition cost ("WAC") of all Products purchased during each calendar quarter. WAC is the price SB charges its wholesalers for its Products. In addition, ProVantage shall disclose the existence of this administrative fee to its Plan Sponsors.

3.3 <u>Payment</u>. The payment of Rebates and Administrative Fees shall be made on a quarterly basis within sixty (60) days after SB's receipt of the quarterly report described in Section 2.4. A standard remittance report shall accompany such payment. Final determination of acceptability of market usage data will be made by SB in its reasonable discretion. Rebates will be paid based on WAC of Product at the time of purchase.

IV. <u>TERM AND TERMINATION</u>.

4.1 <u>Term</u>. The term of this Agreement shall be for the Contract Period unless i) terminated earlier pursuant to Section 4.2 below, or ii) extended by mutual agreement of the parties.

4.2 <u>Termination</u>.

a. This Agreement may be terminated by either party if:

    i. The other party has committed a material breach of the terms of this Agreement and such breach has not been cured, within thirty (30) days of receipt of a written notice of such breach; or

    ii The other party becomes insolvent, is dissolved or liquidated, makes a general assignment of the benefit of its creditors, files or has filed against it a petition in bankruptcy, or has a receiver appointed for a substantial part of its assets.

Highly Confidential under Protective Order/MDL No. 1456

b. This Agreement may be terminated by ProVantage effective on the last day of any calendar quarter upon written notice to SB in the event that ProVantage acquires, is acquired by or merges with or enters into any other form of joint venture or any business combination with any other business entity, which combination gives ProVantage or its Plan Sponsors access to another drug formulary which, in ProVantage's sole discretion, is more advantageous to ProVantage.

c. This Agreement may be terminated by either party with respect to a particular Product or Products in the event that SB ceases promotion, distribution or production of any such Products for any reason, provided that such termination shall only be effective for such discontinued Product or Products.

d. In the event that any change in Federal or State law, rule, regulation or policy relating to prescription drugs, the sale or pricing of prescription drugs, or prescription drug benefits (including any change resulting from the issuance of new laws, rules, or regulations), or in the interpretation or application of any such law, rule, or regulation, would or does have a material effect upon (1) a party's performance under this Agreement, (2) the amount of payment of reimbursement (net of any required rebates) to a party resulting from the sale or products as contemplated by this Agreement, or (3) the pricing or rebates a party would be required to offer to other persons not a party to this Agreement, the affected party may notify the other party in writing of its desire to renegotiate this Agreement., If the parties are unable to successfully conclude such negotiations within thirty (30) days after the date notice was sent, the party sending the notice may terminate this Agreement after the end of such 30-day period upon written notice to the other party.

4.3   SB shall pay to ProVantage all Rebates and Administrative Fees with respect to the Products dispensed to Participants through the date of termination within sixty (60) days of SB's receipt of the final report and ProVantage agrees that Products shall be included on the Formulary through such date of termination.

V.   CONFIDENTIALITY AND NON-DISCLOSURE.

5.1   This Agreement and all information which is provided by either party pursuant to the Agreement are confidential. Without limiting the foregoing, confidential information includes market share data, utilization information, any lists of Plan Sponsors and/or Plans, any Plan Sponsor or Participant information, financial data, and any other proprietary information concerning ProVantage's or SB's business. Each party agrees to maintain all such information confidential and agrees not to make use of or disclose any confidential information to any third party unless such party obtains a written

Highly Confidential under Protective Order/MDL No. 1456   GSKMDLOMNI02-0067701

release from the other party. Each party further agrees to limit access to such information to only those of its officers and employees who shall reasonably need to know such information pursuant to the terms of this Agreement. This provision shall not apply to information that is in the public domain or becomes public during the term of this Agreement through no fault of any party hereto.

5.2.     The obligations assumed by each party under Section 5.1 shall survive any expiration or termination of this Agreement for a period of two (2) years.

## VI.   INDEMNIFICATION AND INSURANCE.

6.1   SB shall indemnify, defend and hold ProVantage, its shareholders, directors, and employees, and the Plans harmless from and against any and all costs, liabilities, claims or causes of actions, and expenses connected therewith, penalties and judgments (including reasonable attorney's fees) caused by or as a result of SB's Products hereunder being adulterated or misbranded as defined by the Federal Food, Drug and Cosmetic Act or SB's failure to manufacture such products in compliance with FDA Good Manufacturing Practices, or SB's negligence or willful misconduct in the manufacture of its Products provided that ProVantage provides notice and cooperation as set forth below.

6.2   ProVantage shall promptly notify SB of any claim asserted against it for which indemnification is sought, and shall promptly deliver to SB a true copy of any such claim including, but not limited to, a true a copy of any summons or other process, pleading or notice issued in any lawsuit or other proceeding to assert or enforce such claim. SB reserves the right to control the investigation, trial and defense of such lawsuit or action (including all settlements and negotiations to effect settlement) and any appeal arising therefrom and to employ or engage attorneys of its own choice. ProVantage may, at its own cost, participate in the investigation, trial and defense of such lawsuit or action and any appeal arising therefrom. ProVantage, its employees, agents, servants, and representatives shall provide full reasonable cooperation to SB at all times during the pendency of the claim or lawsuit, including without limitation, providing SB with all information available and in its possession concerning the claim.

6.3   SB shall obtain and maintain during the Contract Period, a General Commercial Liability insurance policy or self-insurance program with limits of no less than THREE MILLION DOLLARS per person, per occurrence, including a products liability endorsement. SB shall provide ProVantage with a certificate evidencing such coverage or evidence of such self-insurance program upon execution of this Agreement.

## VII.  DISPUTE RESOLUTION.

7.1   In the event that in any quarter a discrepancy or error in the data provided pursuant to Section 2.4 is discovered by SB, which SB and ProVantage in good faith are unable to resolve, SB will provide written notice of the discrepancy or error to ProVantage prior to the due date of any payment required under Section III.  In such event, SB shall pay that portion of the Rebate and Administrative Fee which is not in dispute within the required due date as described in Section III.

7.2   SB and the ProVantage will use their best efforts to resolve the discrepancy or error within thirty (30) days of the receipt of the notification.

7.3   Nothing in this Section shall preclude the right of the SB, in accordance with Section 2.5 to audit the data provided by ProVantage.

VIII.   <u>MISCELLANEOUS</u>.

8.1   <u>Amendment</u>.  This Agreement may not be amended or modified except in writing signed by duly authorized representatives of SB and ProVantage, and in the case of SB, only by a representative from its Philadelphia office.

8.2   <u>Assignment</u>.  The rights or obligations or this Agreement may not be assigned, delegated, transferred, conveyed or sold without the prior written consent of the other party; provided, however, that SB may assign, delegate, transfer, convey or sell its rights and/or obligations under this Agreement to a parent, subsidiary, or affiliate or to an entity into which SB is merged or consolidated or to a purchaser of all or substantially all of the assets or SB or as a part of a corporate reorganization; and provided that ProVantage may assign, delegate, transfer, convey or sell its rights and/or obligations under this Agreement to a parent, subsidiary, or affiliate or to an entity into which ProVantage is merged or consolidated or to a purchaser of all or substantially all of the assets of ProVantage.

8.3   <u>Notices</u>.  All notices under this Agreement shall be in writing and deemed duly given when mailed by certified mail, postage prepaid to the following address:

SB:                SmithKline Beecham Pharmaceuticals
                   One Franklin Plaza
                   P.O. Box 7929
                   Philadelphia, PA, 19101-7929
                   Attn: Strategic Contract Management, PBM Segment, FP1220

ProVantage:        ProVantage Prescription Benefit Management Services, Inc.
                   13555 Bishops Court, Suite 201
                   Brookfield, WI 53005
                   Attn: Maren Spangler, R. Ph.

GSKMDLOMNI02-0067703

8.4   Severability. The provisions of this Agreement are severable and, if any part of it is found to be unenforceable, the other provisions shall remain fully valid and enforceable.  This Agreement shall survive the termination of any provisions contained herein.

8.5   Entire Agreement.  This Agreement, including all exhibits and attachments, is the entire agreement between the parties and supersedes any prior representations or agreements between the parties, oral or otherwise, with respect to the subject matter thereof.

8.6   Third Party Beneficiary Rights. Nothing in this Agreement shall confer any benefits or rights on any person or firm other than the parties to this Agreement.

8.7   Paragraph and Other Headings.  All headings contained in this Agreement are for reference purposes only and are not to be construed as part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

8.8   Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Wisconsin, without regard to its conflict of laws principles.

8.9   Additional Terms.  Exhibit "A" hereto contains additional terms and conditions relating to the performance of ProVantage and SB hereunder, and such terms are incorporated herein and made a part of this Agreement.  In the event of any conflict between the terms in Exhibit "A" and the terms of this Agreement, the terms set forth in this Agreement shall control.

8.10  Other Agreements.  In the event that SB has an existing Agreement to provide discounts, rebates or any other payment to any Plan on Products dispensed to Participants thereof, ProVantage shall not be eligible to receive discounts, rebates or any other payments with respect to such Plan.  SB shall notify ProVantage in writing of any such situation promptly after it becomes aware of such situation.  In the event that SB contracts with an entity acting on behalf of (or claiming to be acting on behalf of) any Plan to provided discounts, rebates or any other payments on units dispensed to Participants of such Plans, SB shall have the right to withhold the payment of discounts, rebates and other payments under this Agreement pending resolution of the issue as to which entity is entitled to such payments.  If SB reasonably determines that the other entity, not ProVantage, is entitled to such payments, SB is not required to make payments to ProVantage under this Agreement.  SB shall notify ProVantage in writing of any such situation promptly after it becomes aware of such situation.  ProVantage shall cooperate with SB in attempting to reach an appropriate resolution of such situation and ProVantage shall notify SB in writing of any such client contracts with SB.

8.11  Compliance with Law.  ProVantage will comply with applicable provisions of 42 U.S.C. 1320a-7b prohibiting illegal remunerations (including any kickback,

GSKMDLOMNI02-0067704

bribe or rebate).  Further, ProVantage represents that at all times during the
Contract Period, either paragraph (1) or (2) is true with respect to each Plan:

1.     such Plan does not cover any Medicare or Medicaid beneficiaries to
       which this Agreement applies; or

2.(a)  such Plan covers Medicare or Medicaid beneficiaries to which this
       Agreement applies but all such beneficiaries are covered under risk
       contracts; and/or

(b)    if such Plan covers Medicare or Medicaid beneficiaries under contracts
       that are not risk contracts, with respect to the rebates provided to
       ProVantage under this Agreement, ProVantage and such Plan will
       comply with one of the Safe Harbors set forth at 42 C.F.R. 1001.952
       (h) or (1) by, among other things, appropriately reporting the rebates to
       the Medicare/Medicaid programs.

8.12  Geographic Scope.  The pricing and terms of this Agreement shall apply only to
ProVantage and Plan locations in the Continental U.S., Alaska and Hawaii
provided, however, that the pricing and terms of this Agreement shall not apply
to locations, if any, in the State of Maine that are not (a) a hospital licensed
under Title 22 of the Maine Statutes or (b) an organization that is exempt from
federal income taxation because it meets the requirements of Section 501(c)(3)
of the U.S. Internal Revenue Code.  In addition, in the event that any law, rule
or regulation (such as a state unitary pricing or anti-discount law) or
interpretation thereof is enacted, implemented or modified such that it would
prohibit or restrict in any material way the provision of pricing, discounts or
rebates described in this Agreement or would require SB to provide the same or
similar pricing to other purchasers or users of SB's Products to which SB would
not normally provide such pricing or terms, SB may exclude from the terms of
this Agreement locations in such states upon written notice to ProVantage.

Agreed to and Accepted:

SmithKline Beecham Pharmaceuticals            ProVantage Prescription Benefit
(a division of SmithKline Beecham Corporation)   Management Services, Inc.

By: _____                By: _____

Title: _Contract Manager_____              Title: _Executive Vice President_

Date: _6/21/99_____                Date: _6/11/99_____

## EXHIBIT "A"

## PRODUCTS/REBATES

The following additional terms and conditions apply with respect to Eligible Uses (as defined above) of *Augmentin* (amoxicillin/clavulante potassium), *Paxil* (paroxetine HCl), *Famvir* (famciclovir), and *Relafen* (nabumetone) (known individually as the "Product" and collectively as the "Products") by each Plan Sponsor (as defined above) of ProVantage.

I.    Access Rebates and Performance Conditions:

A.  SB will pay ProVantage Access Rebates on all Eligible Uses of *Augmentin, Paxil, Famvir,* and *Relafen* during the Contract Period according to the following schedule and the formulary design each Plan Sponsor has in effect at the time of such Eligible Use. Formularies are classified into one of the two following design categories:

1.   "Open Formulary" – A formulary and plan design that does not qualify as a "Restricted Formulary."   This would include all Plan Sponsors with formularies controlled by co-pay differentials between formulary and non-formulary branded products of less than $15.00

2.   "Restricted Formulary" – A formulary and plan design that limits the number of available competitive branded products within a SB Product Category and limits or restricts accessibility to non-formulary branded products as follows: (1) at least one (1) of the competitive products defined as in the respective SB Product Categories is not included on the formulary; and (2) claims processing is on-line for Plan Sponsor members under full point-of-sale controls such as on-line pharmacy edits and formulary messaging, and (3) the Plan Sponsor provides no funded coverage for non-formulary branded products in the same Product Category as an SB product, or NDC lock-out is in place which prohibits ProVantage or the Plan Sponsor from reimbursing for a non-formulary branded product, or there is a patient incentive program with a co-pay differential between formulary and non-formulary branded products of at least $15.00.

3.   If at any time during the Contract Period a ProVantage Plan Sponsor changes its plan design category as described above, ProVantage will qualify to receive the applicable Access Rebate below for the new plan design category beginning with the quarter after which SB is notified of the Plan Sponsor's changed plan design category and continuing throughout the Contract Period as long as the Plan Sponsor maintains the qualifications for the applicable plan design category.

Highly Confidential under Protective Order/MDL No. 1456    GSKMDLOMNI02-0067706

B. SB will pay ProVantage the following Access Rebates on all Eligible Uses of *Augmentin, Paxil, Famvir,* and *Relafen* (the "Products") provided all performance terms and conditions are fulfilled:

| SB Products | Open Formulary | Restricted Formulary |
|---|---|---|
| *Augmentin* | 2% | 4% |
| *Paxil* | 2% | 5% |
| *Famvir* | 1% | 4% |
| *Relafen* | 5% | 5% |

1.   ProVantage shall include and maintain and SB will only pay Access Rebates on Eligible Uses of Products where Products are on the ProVantage Formulary and on the Plan Sponsor Formularies on an unrestricted basis, fully reimbursable for all approved indications and dosages of such Products throughout the Contract Period, and in addition, the Products appear on the  Formulary in a no less favorable position than any other product in the respective Product Categories as defined below, except however, that ProVantage is entitled to assign relative net cost rankings to Products at ProVantage's reasonable discretion applied in a consistent fashion relative to competitive products.  (SB will only pay rebates to ProVantage with respect to a Plan Sponsor for those quarters during the Contract Period in which the respective Plan Sponsor includes the Product on formulary on an unrestricted basis, fully reimbursable for all approved indications and dosages and in no less favorable position than any other brand name product in the same Product Category and without restrictions that are not applicable to all branded products in the same Product Category.)

2.   Neither ProVantage nor a ProVantage Plan Sponsor places restrictions on the reimbursement for Eligible Uses of the Products during the Contract Period, and no unfavorable differential co-pays are applied to the Products nor actions taken that adversely affect Product Market Share by ProVantage or by a ProVantage Plan Sponsor relative to other similar branded products in the same therapeutic class on the Formulary.

3.   ProVantage shall recommend and encourage participating ProVantage Plan Sponsors to include such Products on their formularies on an unrestricted basis, fully reimbursable (excluding co-pays and adverse NDC edits) for all approved indications and dosages throughout the Contract Period in a no less cost favorable position than any other branded product within such Products' respective Product Category, and without restrictions that are not applicable to all brand name products in such Product Category.  In addition, the Products are added to each Plan Sponsor's formulary in a no less favorable position than any other product in the respective Product Categories as defined below.

4.   ProVantage must communicate and document to SB ProVantage's Plan Sponsors' formulary status of the Products within forty-five (45) days following

GSKMDLOMNI02-0067707

the effective date of this Agreement. These communications, as described below, will be available to SB so that the SB field force may increase awareness of the formulary status of Products. The formulary status of the Product(s) must be documented in ProVantage's Formulary booklet or guide, if one is produced, or a pharmacy newsletter, minutes from a P&T committee meeting, position paper, or other official communication tool from ProVantage.

5. ProVantage and ProVantage's Plan Sponsors shall not initiate or engage in any program designed to prefer any brand name product over any SB Product in the same Product Category or otherwise negatively impact the marketing, sales, and/or market share of any SB Product except that (1) for Plan Sponsors electing to use the AdVantage Formulary, ProVantage and such Plan Sponsor may engage in activities that favor one branded product over another branded products on such formulary (including SB drugs) and (2) for Plan Sponsors electing to use the Standard Formulary, ProVantage may at the request of such Plan Sponsor engage in such activities that favor one branded product over another branded product if such activities are initiated solely by the Plan Sponsor (or other agents of the Plan Sponsor and not by ProVantage). Notwithstanding the foregoing, ProVantage and/or Plan Sponsor may choose to implement treatment guidelines or step therapy programs and position products where appropriate. (In the event ProVantage or Plan Sponsor takes any activity against a SB Product, SB shall not be obligated to pay ProVantage any rebates or discount payments for such Product on utilization of such Product by such Plan Sponsor.)

6. ProVantage must document to SB that participating individual ProVantage Plan Sponsors have communicated and documented to participating providers the formulary status of the Products on each Plan Sponsor's respective formulary within forty-five (45) days after the effective date of this Agreement or the Product addition to formulary. (Copies of form letters with ProVantage's signed confirmation that such documentation has been communicated to participating providers within the required time frame are acceptable.)

II. **Additional Access Rebates**

A. If ProVantage and Plan Sponsor(s) satisfy the performance conditions required for Access Rebates set forth in Section I of this Exhibit, and the individual Plan Sponsor satisfies the additional formulary restrictions and plan design below, ProVantage is eligible for the following Additional Access Rebates on its Plan Sponsors' Eligible Uses of Products, on a plan-by-plan criterion, during a calendar quarter.

1. *Paxil*

   a. If a ProVantage Plan Sponsor limits the number of available competitive branded products within the *Paxil* Product Category to three (3): *Paxil* and two others, and NDC blocks Prozac, and limits or restricts accessibility to

other non-formulary branded products as follows: (1) The Plan Sponsor provides no funded coverage for non-formulary branded products in the same Product Category or (2) NDC lock out is in place which prohibits ProVantage or the Plan Sponsor from reimbursing for a non-formulary branded product or (3) there is a patient incentive program with a co-pay differential of at least $15.00, then SB shall pay ProVantage a one-percent (1%) Additional Access Rebate earned on such *Paxil* Eligible Uses by such Plan Sponsor.

b.  If a ProVantage Plan Sponsor limits the number of available competitive branded products within the *Paxil* Product Category to two (2): *Paxil* and one other, and limits or restricts accessibility to a non-formulary branded product as follows: (1) The Plan Sponsor provides no funded coverage for non-formulary branded products in the same Product Category or (2) NDC lock out is in place which prohibits ProVantage or the Plan Sponsor from reimbursing for a non-formulary branded product or (3) there is a patient incentive program with a co-pay differential between formulary and non-formulary products of at least $15.00, then SB shall pay ProVantage a two percent (2%) Additional Access Rebate earned on such *Paxil* Eligible Uses by such Plan Sponsor.

c.  If a ProVantage Plan Sponsor limits the number of available competitive branded products within the *Paxil* Product Category to two (2): *Paxil* and one other, and NDC blocks either Prozac or Zoloft, and limits or restricts accessibility to other non-formulary branded products as follows: (1) The Plan Sponsor provides no funded coverage for non-formulary branded products in the same Product Category or (2) NDC lock out is in place which prohibits ProVantage or the Plan Sponsor from reimbursing for a non-formulary branded product or (3) there is a patient incentive program with a co-pay differential between formulary and non-formulary products of at least $15.00, then SB shall pay ProVantage a three percent (3%) Additional  Access Rebate earned on such *Paxil* Eligible Uses by such Plan Sponsor.

d.  If a ProVantage Plan Sponsor limits the number of available competitive branded products within the *Paxil* Product Category to one (1): *Paxil* and limits or restricts accessibility to non-formulary branded products by putting in place a NDC lock out which prohibits ProVantage or the Plan Sponsor from reimbursing for a non-formulary branded product, then SB shall pay ProVantage a four percent (4%) Additional Access Rebate earned on such *Paxil* Eligible Uses by such Plan Sponsor.

2. *Relafen*

a.  If a ProVantage Plan Sponsor limits the number of available competitive branded NSAID products within the *Relafen* Product Category to one

NSAID: *Relafen*, and limits or restricts accessibility to non-formulary branded NSAID products as follows: (1) The Plan Sponsor provides no funded coverage of non-formulary branded NSAID products, or (2) NDC lock out is in place which prohibits ProVantage or Plan Sponsor from reimbursing for non-formulary branded NSAID products, or (3) there is a patient incentive program with a co-pay differential between formulary and non-formulary branded NSAID products of at least $15.00, then SB shall pay ProVantage a three percent (3%) Additional Access Rebate earned on such *Relafen* Eligible Uses by such Plan Sponsor.

    b.  If a ProVantage Plan Sponsor limits the number of available competitive branded products within the *Relafen* Product Category to two: *Relafen* and one Cox-2 product, and limits or restricts accessibility to all non-formulary branded products as follows: (1) The Plan Sponsor provides no funded coverage of any non-formulary branded products, and (2) NDC lock out is in place which prohibits ProVantage or Plan Sponsor from reimbursing for any non-formulary branded products, and has in place programs/protocols in place for failure on NSAIDs before Cox-2 therapy, then SB shall pay ProVantage a four percent (4%) Additional Access Rebate earned on such *Relafen* Eligible Uses by such Plan Sponsor.

B.  If at any time during the Contract Period a ProVantage Plan Sponsor changes its plan design category as described below, ProVantage will qualify to receive the applicable Additional Access Rebate for the new plan design category beginning with the quarter after which SB is notified of the Plan Sponsor's change in plan design category and continuing throughout the Contract Period of this Agreement as long as the Plan Sponsor maintains the qualifications for the applicable plan design category.

C.  SB will only pay Additional Access Rebates on Eligible Uses of Products where Products are on Plan Sponsor Formularies on an unrestricted basis, fully reimbursable for all approved indications and dosages of such Products throughout the Contract Period in a no less cost favorable position than any other branded product within such Products' respective Product Category, and without restrictions that are not applicable to all brand name products in such Product Category. In addition, the Products are added to each Plan Sponsor's formulary in a no less favorable position than any other product in the respective Product Category.

D.  ProVantage must communicate and document to SB ProVantage's Plan Sponsors' formulary status of the Products within forty-five (45) days following the effective date of this Agreement.

III.  <u>Performance Rebates</u>

A.  If ProVantage and Plan Sponsor(s) satisfy the performance conditions required for Access Rebates set forth in Section I of this Exhibit, ProVantage is eligible for the

Highly Confidential under Protective Order/MDL No. 1456

following additional Performance Rebates on its Plan Sponsors' Eligible Uses of Products, on a plan-by-plan criterion, during a calendar quarter if the individual ProVantage Plan Sponsor achieves the Product Market Share in such calendar quarter set forth in the following schedules.

*1. Augmentin*

| Adult Market Share % | Performance Rebate % | Pediatric Market Share % |
|---|---|---|
| >=14% | 1% | >=29% |
| >=15% | 2% | >=30% |
| >=16% | 4% | >=32% |
| >=18% | 6% | >=34% |
| >=20% | 8% | >=36% |
| >=22% | 9% | >=38% |
| >=25% | 10% | >=40% |

a. Notwithstanding the above schedule, the maximum *Augmentin* Performance Rebate shall be limited to an amount that, when combined with any administration fees, any Access Rebate, any Additional Access Rebates, and other discount payments earned with respect to utilization by ProVantage and Plan Sponsor(s), does not exceed 15%.

b. *Augmentin* Market Share is defined as the percent of Eligible Uses achieved by *Augmentin* in the *Augmentin* Adult and Pediatric Product Categories measured against total uses in such Product Categories measured in Days of Therapy. (See Attachments "A" and "B".)

c. The *Augmentin* Adult Product Category is defined as *Augmentin*, Biaxin, Ceclor, Ceclor-CD, cefaclor, Ceftin, Cedax, Cefzil, Cipro, Dynabac, Floxin, Lorabid, Levaquin, Maxaquin, Omnicef, Raxar, Suprax, Trovan, Vantin, Zagam, Zithromax, and any other beta-lactamase inhibiting or broad-spectrum oral antibiotic approved by the FDA during the Contract Period.

d. The *Augmentin* Pediatric Product Category is defined as *Augmentin*, Biaxin, Ceclor, Ceclor-CD, cefaclor, Ceftin, Cefzil, Cedax, Lorabid, Omnicef, Suprax, Vantin, Zithromax, and any other beta-lactamase inhibiting or broad spectrum oral antibiotic approved by the FDA during the Contract Period.

*2. Paxil*

| *Paxil* Market Share % | Performance Rebate % |
|---|---|
| >=24% | 1% |
| >=26% | 2% |

Highly Confidential under Protective Order/MDL No. 1456

| | |
|---|---|
| >=28% | 3% |
| >=30% | 4% |
| >=32% | 5% |
| >=34% | 6% |
| >=36% | 7% |
| >=38% | 8% |

a. Notwithstanding the above schedule, the maximum *Paxil* Performance Rebate shall be limited to an amount that when combined with any administration fees, any Access Rebate, any Additional Access Rebates, and other discount payments earned with respect to utilization by ProVantage and Plan Sponsor(s) does not exceed 15%.

b. *Paxil* Market Share is defined as the percent of Eligible Uses achieved by *Paxil* in the *Paxil* Product Category measured against total uses in such *Paxil* Product Category measured in prescriptions.

c. The *Paxil* Product Category is defined as *Paxil*, Prozac, Zoloft, Luvox, Serzone, Celexa, Effexor, and any other like antidepressant agent approved by the FDA during the Contract Period.

3. *Famvir*

| *Famvir* Market Share % | Performance Rebate % |
|---|---|
| >=17% | 2% |
| >=19% | 3% |
| >=21% | 4% |
| >=23% | 5% |
| >=25% | 6% |
| >=27% | 7% |
| >=29% | 8% |
| >=31% | 9% |
| >=34% | 10% |

a. Notwithstanding the above schedule, the maximum *Famvir* Performance Rebate shall be limited to an amount that when combined with any administration fees, any Access Rebate, any Additional Access Rebates, and other discount payments earned with respect to utilization by ProVantage and Plan Sponsor(s) does not exceed 15%.

b. *Famvir* Market Share is defined as the percent of Eligible Uses achieved by *Famvir* in the Famvir Product Category measured against total uses in the *Famvir* Product Category measured in prescriptions.

GSKMDLOMNI02-0067712

c. The *Famvir* Product Category is defined as the oral formulation of *Famvir*, Valtrex, Zovirax, acyclovir, and any other oral antiviral approved by the FDA during the Contract Period.

4. *Relafen*

| *Relafen* Market Share % | Performance Rebate % |
|---|---|
| >=30% | 1% |
| >=32% | 2% |
| >=34% | 3% |
| >=36% | 4% |
| >=38% | 5% |
| >=40% | 6% |
| >=42% | 7% |
| >=44% | 8% |

a. Notwithstanding the above schedule, the maximum *Relafen* Performance Rebate shall be limited to an amount that, when combined with any administration fees, any Access Rebate, any Additional Access Rebates, and other discount payments earned with respect to utilization by ProVantage and Plan Sponsor(s) under this Agreement, does not exceed 15%.

b. *Relafen* market Share is defined as the percent of Eligible Uses achieved by *Relafen* in the *Relafen* Product Category measured against total uses in such *Relafen* Product Category measured in prescriptions.

c. The *Relafen* Product Category is defined as *Relafen*, Daypro, Lodine, Lodine XL, Voltaren, Voltaren XR, Oruvail, Naprelan, EC-Naprosyn, Arthrotec, Celebrex, and any other branded NSAID or Cox-2 product approved by the FDA during the Contract Period.

EXHIBIT "B"

PLAN SPONSORS

[Current list of Plan Sponsors to be provided by ProVantage and approved by SB before

the start of this Agreement.]

Highly Confidential under Protective Order/MDL No. 1456

GSKMDLOMNI02-0067714

## Attachment A

## Augmentin Adult Market Share

The *Augmentin* Adult Market Share shall be calculated as set forth below. *Augmentin* Adult Market Share shall be measured in terms of Days of Therapy (DOT) based on the following:-

Three 250mg *Augmentin* tablets equal 1 DOT  (NDC# 0029-6075-27 and 0029-6075-31)

Two 500mg *Augmentin* tablets equal 1 DOT  (NDC# 0029-6080-12 and 0029-6080-31)

Two 875mg Augmentin tablets equal 1 DOT (NDC# 0029-6086-12 and 0029-6086-21)

| | |
|---|---|
| Three Ceclor pulvules equal 1 DOT | Two Lorabid pulvules equal 1 DOT |
| Three cefaclor capsules equal 1 DOT | Two Vantin tablets equal 1 DOT |
| Two Biaxin tablets equal 1 DOT | One Cedax tablet equals 1 DOT |
| Two Ceclor-CD tablets equal 1 DOT | One Suprax tablet equals 1 DOT |
| Two Cefzil tablets equal 1 DOT | One Zithromax capsule equals 1 DOT |
| Two Cipro tablets equal 1 DOT | One Zagam tablet equals 1 DOT |
| Two Dynabac tablets equal 1 DOT | One Levaquin tablet equals 1 DOT |
| Two Floxin tablets equal 1 DOT | Two Raxar tablets equal 1 DOT |
| One Trovan tablet equals 1 DOT | Two Omnicef tablet equals 1 DOT |
| Two Ceftin tablet equals 1 DOT | One Maxaquin tablet equals 1 DOT |

Any other beta-lactamase inhibiting or brand name broad spectrum oral antibiotic approved by the FDA during the Contract Period shall be included in the market share calculation.

Market Share will be calculated according to the following formula:

Total # *Augmentin* Adult Days of Therapy (DOT)
Total # *Augmentin* DOT + Total cefaclor DOT + Total Ceclor DOT + Total Ceftin DOT + Total Floxin DOT + Total Cipro DOT + Total Lorabid DOT + Total Ceclor-CD DOT + Total Cefzil DOT + Total Biaxin DOT + Total Maxaquin DOT + Total Suprax DOT + Total Vantin DOT + Total Zithromax DOT + Total Dynabac DOT + Total Cedax DOT + Total Zagam DOT + Total Levaquin DOT + Total Trovan DOT + Total Raxar DOT + Total Omnicef DOT+ any other beta-lactamase inhibiting or brand name broad spectrum oral antibiotic approved by the FDA during the Contract Period

GSKMDLOMNI02-0067715

## Attachment B

## Augmentin Pediatric Market Share

The *Augmentin* Pediatric Market Share shall be calculated as set forth below. *Augmentin* Pediatric Market Share shall be measured in terms of Days of Therapy (DOT) based on the following:

Two *Augmentin* BID chewable tablets equal 1 DOT
(NDC# 0029-6071-12 and 0029-6072-12)

Three *Augmentin* TID regimen chewable tablets equal 1 DOT
(NDC# 0029-6073-47 and 0029-6074-74)

15ml of *Augmentin* TID regimen oral suspension equal 1 DOT
(NDC# 0029-6085-22 and 0029-6085-23,
NDC# 0029-6085-39 and 0029-6090-22,
NDC# 0029-6090-23 and 0029-6090-39)

10ml of *Augmentin* BID regiment oral suspension equal 1 DOT
(NDC# 0029-6087-29 and 0029-6087-39,
NDC# 0029-6087-51 and 0029-6092-29,
NDC# 0029-6092-39 and 0029-6092-51)

15ml of Ceclor oral suspension  equal 1 DOT     10ml of Biaxin suspension equal 1 DOT

15ml of cefaclor oral suspension equal 1 DOT     10ml of Vantin suspension equal 1 DOT

20ml of Ceftin suspension equal 1 DOT     5ml of Suprax suspension equal 1 DOT

10ml of Lorabid suspension equal 1 DOT     5ml of Zithromax suspension equal 1 DOT

10ml of Cefzil suspension equal 1 DOT     10ml of Cedax suspension equal 1 DOT

10ml of Omnicef suspension equal 1 DOT

Any other beta-lactamase inhibiting or brand name broad spectrum oral antibiotic approved by the FDA during the Contract Period shall be included in the market share calculation.

Market Share will be calculated according to the following formula:

Total # *Augmentin*  Days of Therapy (DOT)
Total # *Augmentin* DOT + Total cefaclor DOT + Total Ceclor DOT + Total Ceftin DOT +
+ Total Lorabid DOT + Total Cefzil DOT + Total Biaxin DOT +  Total Suprax DOT + Total Vantin
DOT + Total Zithromax DOT + Total Cedax DOT + Total Omnicef DOT + any other beta-
lactamase inhibiting or brand name broad spectrum oral antibiotic approved by the FDA during
the Contract Period.

Highly Confidential under Protective Order/MDL No. 1456

# Cicala Supplemental Affidavit
# In Further Opposition to GSK
# Motion For Summary Judgment

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
                                    )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )
WHOLESALE PRICE LITIGATION          )  Pages 1-52
                                    )




MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
April 16, 2009, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 18

1      MR. HEROLD:  Correct.
2      THE COURT:  They're doing it on the average?
3      MR. HEROLD:  They're averaging, correct.  So
4  they're taking this 84 percent circle here, and they're just
5  making it fail.  They're essentially throwing the red circle
6  into the white circle and turning it all sort of pink, even
7  though there's no getting around the fact that nine out of
8  ten, or 84 percent, actually, of the sales are at WAC minus
9  2 with no discount.  That's what they're doing.  And we
10  think it simply makes no sense, your Honor, and it's
11  inconsistent with the purpose of the test and the purpose of
12  the FTC guidelines, which is --
13      THE COURT:  And what happens when you throw in the
14  direct sales to CVS, et cetera?  What percentage of your
15  sales fall into that third category?
16      MR. HEROLD:  It's about 17 percent of sales, your
17  Honor, and about 88 percent of them pass, okay?
18      THE COURT:  So I need the aggregate, right?
19      MR. HEROLD:  Yes.
20      THE COURT:  If we're talking about basically
21  under -- I'm not saying it's the gospel.  I looked the last
22  time at the FTC guidelines because most of these unfair
23  trade practices acts are called little FTC acts, so people
24  look at the guidelines.  I mean, it's not rocket science,
25  and that's how I got there.

Page 19

1      MR. HEROLD:  Understood.
2      THE COURT:  So the issue is, that's their test,
3  which says all sales.  I don't think there's a serious
4  problem -- maybe I'm wrong -- about excluding charities.
5      MR. HEROLD:  Right.
6      THE COURT:  So assume that we're talking about all
7  sales, has somebody done the number for all units as the
8  denominator?
9      MR. HEROLD:  Yes, your Honor.  That's exactly
10  what's in Table 1 that I just gave to you.  They're all
11  included.  And, as I said, the numbers get better from GSK's
12  perspective when you include the direct sales.
13      THE COURT:  Well, that's what you said, right.
14      MR. HEROLD:  Right, because the direct sales pass
15  at about an 88 percent rate, okay?  And in fact some of
16  these 16 percent where there is a chargeback, they don't
17  fail because it's a small discount.  There is a discount,
18  but it's small.  It's less than WAC minus 5, okay?  And the
19  numbers that are presented in that table and are explained
20  in Dr. Gaier's affidavit account for all of them.  They have
21  the denominator that includes all sales other than charity,
22  okay?  It's just that this is the only attack the plaintiffs
23  made, the key attack.
24      THE COURT:  And is this the only issue, as far as
25  you can tell?

Page 20

1      MR. HEROLD:  Well, there's one other issue --
2  well, I should say "no."  There are other issues that the
3  plaintiffs raise, but none of them matter.  This is the only
4  one that matters, okay, in terms of changing the results
5  from more than 50 percent to less than 50 percent.  The
6  other issues that they raise --
7      THE COURT:  If you took their approach per drug --
8  well, let's assume they win everything, how many of your
9  drugs would you still say pass the FTC test?
10      MR. HEROLD:  You mean if you took --
11      THE COURT:  If you took their averaging approach.
12      MR. HEROLD:  Their approach to the wholesalers?
13  Well, I think they say there are about 111 NDCs that still
14  pass, although they don't really say that because they say
15  that this wholesaler issue would flunk all but 111.  But
16  then there are other issues that they talk about that they
17  say matter that really don't matter.
18      THE COURT:  And then there's the other issue which
19  I've actually not thought about in a long time till I hit
20  yours.  So suppose you had some huge spread of 1,000 percent
21  or something between AWP and the actual price paid by the
22  government, something that's upsetting, all right, and I
23  went with your methodology but I was concerned about that
24  spread, do any of them -- you say in your papers somewhere
25  that none flunk the gag test.

Page 21

1      MR. HEROLD:  Right.  Your Honor, we also showed
2  you the results of the 30 percent test, the AWP spread test.
3      THE COURT:  Right.
4      MR. HEROLD:  And of the 208 NDCs, I think four
5  don't pass, and they're very small sellers.
6      THE COURT:  Four don't pass the 30 percent, or
7  four don't pass --
8      MR. HEROLD:  The 30 percent.  They all pass the
9  WAC list price, and there are only four, and they're small
10  sellers, that don't pass the AWP spread, all right?  Now --
11      THE COURT:  And what are their spreads on those
12  four?  How bad does it get?  What's the worst of them?
13      MR. HEROLD:  Your Honor, I have to look at the
14  table.  I can't answer that off the top of my head.
15      THE COURT:  Are we up near 1,000 percent?
16      MR. HEROLD:  No, no.  No, they're not.
17      THE COURT:  I think some of the drugs I found were
18  too high were like two or three.
19      MR. HEROLD:  Yes, they're nothing like that.
20  These are brand-name drugs, your Honor.  And typically, if
21  it doesn't pass, and there are only four out of 208, it's
22  because it's facing generic competition; it's become a
23  multi-source drug, and there's more discounting.
24      THE COURT:  Sure.
25      MR. HEROLD:  But that's it.  Now, the plaintiffs

Page 22

1  attack the spread test too, and I'm happy to get to that.
2          THE COURT:  The 30 percent.
3          MR. HEROLD:  Correct.  Even though we're not
4  moving on that --
5          THE COURT:  I remember we sort of put that on our
6  back burner to see if there was going to be expert testimony
7  on that because I felt that this, while the plaintiffs in
8  the big class action stuck with that 30 percent yardstick, I
9  couldn't stick the others with it.  On the other hand, at
10 this point the federal government has gone with the
11 30 percent test and the massive class action.  So it would
12 take a lot to persuade me to change, but maybe they can.
13         MR. HEROLD:  Understood.
14         THE COURT:  So has there been an expert report on
15 that?
16         MR. HEROLD:  Well, we have submitted the results
17 of the straightforward application of the 30 percent test,
18 which the plaintiffs have tried to undercut, but we haven't
19 fully completed discovery on everything necessary to deal
20 with that test because in part it deals with payor
21 expectations.  Whereas, the WAC list price test is a legal
22 test based on the FTC guidelines.  So we felt it was
23 appropriate --
24         THE COURT:  Okay, you thought this would
25 streamline it.

Page 23

1          MR. HEROLD:  Right, exactly.
2          THE COURT:  So, in your view, if I agree with you,
3  are there any drugs left?
4          MR. HEROLD:  Well, there are still drugs left for
5  GSK that aren't in the 208 that we moved on.
6          THE COURT:  So how many are left afterwards?
7          MR. HEROLD:  There are about 62?  No, wait.  It's
8  262 minus 208, whatever that is, your Honor.  I think it's
9  54?  But, again, the ones that are left account for less
10 than 2 percent of the New York expenditures at issue.
11         THE COURT:  Okay, thank you.
12         MR. HEROLD:  They're small drugs.
13         THE COURT:  You know, I've really got to focus
14 because I have a sentencing at --
15         MR. HEROLD:  Your Honor, if I can just --
16         THE COURT:  No, actually, you've now gone --
17         MR. HEROLD:  I'll save it for rebuttal.
18         THE COURT:  You'll have to save it.
19         MR. HEROLD:  Thank you, your Honor.
20         THE COURT:  I need to give Ms. Cicala enough time,
21 and I've got a really busy morning.  I have four cases on.
22 Just when I thought things couldn't get busier, I had a
23 motion for an emergency preliminary injunction last night,
24 so I am busy.
25         MR. HEROLD:  No problem.

Page 24

1          THE COURT:  Okay, thank you.  And you've all done
2  such a great job briefing, as usual, but this is just
3  helpful and explanatory.
4          MS. CICALA:  Good morning, your Honor.
5          THE COURT:  Good morning.
6          MS. CICALA:  Preliminarily, I just wanted to
7  remind that in the context of the class trial, your Honor
8  made very clear the WAC test was one part of a three-prong
9  test; and as Mr. Herold has just acknowledged, GSK has not
10 moved on the spread test, which was another prong of your
11 Honor's three-prong test.  And with regard to the third
12 prong which concerned marketing, GSK has not moved on the
13 basis of marketing one way or the other.  So just as an
14 initial matter, plaintiffs' view is, even if GSK is entirely
15 right regarding the methodology of the WAC list price test,
16 the motion still would have to be denied because one prong
17 is not enough.  And in fact, your Honor --
18         THE COURT:  Just help me out because their
19 position has an intuitive appeal.
20         MS. CICALA:  Understood.
21         THE COURT:  We didn't focus on it, but if I ruled
22 on it as opposed to saying it's premature, wouldn't it help
23 you settle the case?
24         MS. CICALA:  It would not.  Well, perhaps it would
25 for an inappropriately low amount of money, and I say that,

Page 25

1  your Honor, for a number of reasons.  First, I have to take
2  issue with a few of the characterizations that Mr. Herold
3  made regarding GSK's economic incentives in the brand arena
4  and the extent to which a brand's pill case has been
5  developed before this Court.
6          THE COURT:  Can I back up for just one minute.  Do
7  you agree with him that that was the methodology that you
8  followed and that he followed, that you basically averaged?
9          MS. CICALA:  I would say that we have both
10 averaged, but we've averaged in different ways.  What GSK --
11         THE COURT:  I just want to understand.  Before we
12 get into the legal argument, I just want to understand the
13 methodology, which was not crystal clear from the briefs.
14         MS. CICALA:  Fair enough.  What GSK has done is
15 has averaged GSK's net sales price, what it says its net
16 sales price is, to different customer segments, to
17 providers, to indirect customers --
18         THE COURT:  No, but they say quite clear that they
19 haven't averaged, that they've gone unit by unit, and that
20 they basically have taken into account the chargebacks per
21 unit.
22         MS. CICALA:  Yes, what we have done and what they
23 have done is look at a net sales price at a unit level.
24 They come up with a net sales price for different customer
25 traunches.  We say, do not bifurcate, do not divide up your

738c421b-2de5-454c-87ac-ac25b6625282

Page 38

1  50 percent or more sales took place within 5 percent of WAC.
2  And the genuine issue --
3          THE COURT:  What discovery do you need to get
4  there?
5          MS. CICALA:  We need deposition of the GSK witness
6  on the subject of their PBMs, of their contracts with --
7          THE COURT:  Why haven't you done that yet?
8          MS. CICALA:  We have noticed the deposition,
9  counsel has resisted it, and we are going to have to meet
10 and confer and work that out and file a motion to compel,
11 unless your Honor directs that we're entitled to the
12 deposition right now.
13         THE COURT:  I may get there.  So --
14         MS. CICALA:  I would like to get there because I
15 do think this is ripe for a summary judgment.  This issue is
16 ripe.  I mean, this issue can be resolved in this manner,
17 but the record is not before the Court at this time.
18         THE COURT:  So who do you want to do, the GSK
19 person for --
20         MS. CICALA:  We want to do the person at GSK with
21 the most knowledge of their contracts with the three major
22 PBMs throughout the class period and the basis for the
23 rebates that were paid.
24         THE COURT:  Okay, thank you.  Let me just hear a
25 rebuttal here.

Page 39

1          MR. HEROLD:  Thank you, your Honor.
2          THE COURT:  And then I am just amazed, actually,
3  that I -- we need to do a discovery cutoff.  This case has
4  been going on a long time, and this needs to end.  So do you
5  have an opposition to doing the GSK rebate person?
6          MR. HEROLD:  We don't think it's necessary, your
7  Honor, for reasons I'd like to explain.
8          THE COURT:  Yes, you'd better do it now because
9  even if I go with you on the methodology, I would want to be
10 confident that the pass/fail test was correctly done.
11         MR. HEROLD:  Understood, your Honor.  With respect
12 to where the record is, your Honor, GSK's expert's position
13 is that these utilization rebates to PBMs should not be
14 counted at all in the WAC list price.
15         THE COURT:  So there is another methodological
16 issue.
17         MR. HEROLD:  Correct.
18         THE COURT:  All right.
19         MR. HEROLD:  But it doesn't matter because if you
20 count them, it doesn't change anything.  That's the second
21 point.  The first point is, they shouldn't count, all right?
22 The reason they shouldn't count, your Honor, and if you turn
23 to the next slide that we had, I was going to get into
24 this -- yes, here we go.  These are rebates, your Honor, as
25 we all agree, that are paid based on how many units of a

Page 40

1  drug are dispensed.  They have nothing to do with the price
2  of the drug, nothing.
3          THE COURT:  You know what, I'm not going to buy
4  that position.
5          MR. HEROLD:  All right.
6          THE COURT:  Okay, so, now, you have a strong
7  argument -- I don't know where I'm going to end up -- at
8  least it's getting me thinking -- on how do I think about
9  the FTC test.
10         MR. HEROLD:  Right.
11         THE COURT:  But I would want to include all
12 rebates.
13         MR. HEROLD:  Okay.
14         THE COURT:  So utilization, that's just a rebate
15 by any other name, so --
16         MR. HEROLD:  Understood.  But understood, your
17 Honor, the plaintiffs, their expert, Mr. Devor, says quite
18 clearly that all PBM rebates should not be included.  He
19 recognizes that a lot of these PBMs --
20         THE COURT:  You mean, there are some kinds of
21 rebates and not others?
22         MR. HEROLD:  Medicaid rebates are included.  They
23 don't have any -- they lower what the payor pays.  They have
24 nothing to do with the purchase price of the pharmacy.
25         THE COURT:  If Medicaid pays, I'm not so worried,

Page 41

1  but if you pay, I am.
2          MR. HEROLD:  Right.  No, we pay the rebates to
3  Medicaid.
4          THE COURT:  Oh, oh --
5          MR. HEROLD:  But they have nothing to do with the
6  purchase price --
7          THE COURT:  You know, I don't feel like I can
8  assess that, but I do think, in general, rebates count.
9          MR. HEROLD:  Right, okay.  But their expert --
10 there's no disagreement about this -- their expert concedes
11 that not all of these utilization rebates should count.  He
12 recognizes, for example, if you pay a rebate to a PBM, a lot
13 of them are passed on to the insurance company.  They have
14 nothing to do with mail order pharmacy purchases.  All he
15 says --
16         THE COURT:  I want to know what the actual price
17 is that each sale accounts for.  So assume, at least for
18 these purposes, I want to know what utilization rebates are
19 so I can make a decision.  If they're included --
20         MR. HEROLD:  Understood.
21         THE COURT:  If they're included -- Medicaid
22 rebates are different.  They're paid by statute to the
23 state.  I don't know --
24         MR. HEROLD:  Right.
25         THE COURT:  I guess my first instinct is, you'd be

**Cicala Supplemental Affidavit
In Further Opposition to GSK
Motion For Summary Judgment**

**Exhibit D**

Exhibit D
GPO Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| S | 1997 | $236,713 | AmeriNet | GPO | Excluded |
| S | 1998 | $258,128 | AmeriNet | GPO | Excluded |
| S | 1999 | $208,897 | AmeriNet | GPO | Excluded |
| S | 2000 | $151,879 | AmeriNet | GPO | Excluded |
| S | 2001 | $295,867 | AmeriNet | GPO | Excluded |
| A | 2001 | $3,820 | AmeriNet | GPO | Excluded |
| S | 2002 | $253,748 | AMERINET | GPO | Excluded |
| A | 2002 | $4,352 | AmeriNet | GPO | Excluded |
| S | 2002 | $421,010 | AMERINET ACUTE | GPO | Excluded |
| S | 2003 | $840,076 | AMERINET ACUTE | GPO | Excluded |
| S | 2004 | $896,816 | AMERINET ACUTE | GPO | Excluded |
| S | 2005 | $707,837 | AMERINET ACUTE | GPO | Excluded |
| S | 1998 | $3,524 | AmeriNet Fox Chase | GPO | Excluded |
| S | 1999 | $1,816 | AmeriNet Fox Chase | GPO | Excluded |
| S | 2000 | $4,621 | AmeriNet Fox Chase | GPO | Excluded |
| S | 2001 | $1,186 | AmeriNet Fox Chase | GPO | Excluded |
| S | 2002 | $672 | AmeriNet Fox Chase | GPO | Excluded |
| S | 1999 | $73,137 | Amerinet Options | GPO | Excluded |
| S | 2000 | $227,283 | Amerinet Options | GPO | Excluded |
| S | 2001 | $70,273 | Amerinet Options | GPO | Excluded |
| S | 1997 | $8,538 | AmeriNet/Intermountain Healthcare | GPO | Excluded |
| S | 1998 | $44,710 | AmeriNet/Intermountain Healthcare | GPO | Excluded |
| S | 1999 | $13,470 | AmeriNet/Intermountain Healthcare | GPO | Excluded |
| S | 1997 | $681 | AmeriNet/OSF Healthcare System | GPO | Excluded |
| S | 1998 | $18,270 | AmeriNet/OSF Healthcare System | GPO | Excluded |
| S | 1999 | $6,515 | AmeriNet/OSF Healthcare System | GPO | Excluded |
| S | 1998 | $44,945 | AMERINET/VIRGINIA MASON MEDICAL CENTER | GPO | Excluded |
| S | 1999 | $12,456 | AMERINET/VIRGINIA MASON MEDICAL CENTER | GPO | Excluded |
| S | 2003 | $18,572 | ARMADA HEALTHCARE CORP LLC | GPO | Excluded |
| S | 2004 | $15,270 | ARMADA HEALTHCARE CORP LLC | GPO | Excluded |
| S | 2005 | $1,233 | ARMADA HEALTHCARE CORP LLC | GPO | Excluded |

Exhibit D

GPO Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis

Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| S | 2002 | $292,300 | Broadlane, Inc. | GPO | Excluded |
| S | 2003 | $1,180,403 | Broadlane, Inc. | GPO | Excluded |
| A | 2003 | $2,803 | Broadlane, Inc. | GPO | Excluded |
| S | 2004 | $1,093,221 | Broadlane, Inc. | GPO | Excluded |
| A | 2004 | $38,505 | Broadlane, Inc. | GPO | Excluded |
| S | 2005 | $1,167,337 | Broadlane, Inc. | GPO | Excluded |
| A | 2005 | $266 | Broadlane, Inc. | GPO | Excluded |
| S | 1997 | $81,214 | CATHOLIC MATERIALS MANAGEMENT | GPO | Excluded |
| S | 1998 | $29,663 | CATHOLIC MATERIALS MANAGEMENT | GPO | Excluded |
| S | 1999 | $1,157 | CATHOLIC MATERIALS MANAGEMENT | GPO | Excluded |
| S | 2002 | $99,669 | CHPC ACUTE | GPO | Excluded |
| S | 2003 | $380,830 | CHPC ACUTE | GPO | Excluded |
| S | 2004 | $575,321 | CHPC ACUTE | GPO | Excluded |
| S | 2005 | $542,137 | CHPC ACUTE | GPO | Excluded |
| S | 2002 | $99,669 | CHPPS | GPO | Excluded |
| S | 2003 | $380,830 | CHPPS | GPO | Excluded |
| S | 2004 | $575,321 | CHPPS | GPO | Excluded |
| S | 2005 | $542,137 | CHPPS | GPO | Excluded |
| S | 1999 | $306,940 | CONSORTA | GPO | Excluded |
| S | 2000 | $392,997 | CONSORTA | GPO | Excluded |
| A | 2000 | $2,356 | CONSORTA | GPO | Excluded |
| S | 2001 | $459,331 | CONSORTA | GPO | Excluded |
| S | 2002 | $692,390 | CONSORTA | GPO | Excluded |
| S | 2003 | $799,091 | Consorta | GPO | Excluded |
| S | 2004 | $917,799 | Consorta | GPO | Excluded |
| S | 2005 | $1,109,100 | Consorta | GPO | Excluded |
| S | 2003 | $7,007 | FIRST CHOICE MANAGEMENT SERVICES | GPO | Excluded |
| A | 2003 | $212 | FIRST CHOICE MANAGEMENT SERVICES | GPO | Excluded |
| S | 2004 | $8,547 | FIRST CHOICE MANAGEMENT SERVICES | GPO | Excluded |
| S | 2005 | $4,945 | FIRST CHOICE MANAGEMENT SERVICES | GPO | Excluded |
| S | 1997 | $15,597 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |

2 of 8

Exhibit D
GPO Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| S | 1998 | $47,552 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 1999 | $52,549 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 2000 | $65,142 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 2001 | $44,718 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 2002 | $62,856 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 2003 | $37,900 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 2004 | $29,315 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 2005 | $110,988 | HC PHARMACY CENTRAL, INC. | GPO | Excluded |
| S | 1997 | $100,171 | HEALTH SERVICES CORP OF AMERICA | GPO | Excluded |
| S | 1998 | $119,575 | HEALTH SERVICES CORP OF AMERICA | GPO | Excluded |
| S | 1999 | $182,894 | HEALTH SERVICES CORP OF AMERICA | GPO | Excluded |
| S | 2000 | $238,185 | HEALTH SERVICES CORP OF AMERICA | GPO | Excluded |
| S | 2001 | $279,767 | HEALTH SERVICES CORP OF AMERICA | GPO | Excluded |
| S | 2002 | $206,928 | HEALTH SERVICES CORP OF AMERICA | GPO | Excluded |
| S | 1997 | $57,865 | HOSPITAL CENTRAL SERVICES COOP | GPO | Excluded |
| S | 1998 | $30,842 | HOSPITAL CENTRAL SERVICES COOP | GPO | Excluded |
| S | 1997 | $14,537 | HOSPITAL PURCHASING SERVICE | GPO | Excluded |
| S | 2002 | $1,486 | INNOV PUR CONCPTS IPC | GPO | Excluded |
| S | 2001 | $31,809 | Innovative Purchasing Concepts | GPO | Excluded |
| S | 2002 | $32,374 | Innovative Purchasing Concepts | GPO | Excluded |
| S | 2003 | $20,274 | Innovative Purchasing Concepts - IPC | GPO | Excluded |
| S | 2004 | $14,100 | Innovative Purchasing Concepts - IPC | GPO | Excluded |
| S | 2005 | $14,565 | Innovative Purchasing Concepts - IPC | GPO | Excluded |
| S | 1997 | $3,160 | INSOURCE HEALTH SERVICES | GPO | Excluded |
| S | 1998 | $785 | INSOURCE HEALTH SERVICES | GPO | Excluded |
| S | 1999 | $29,216 | INSOURCE HEALTH SERVICES | GPO | Excluded |
| S | 2000 | $44,245 | INSOURCE HEALTH SERVICES | GPO | Excluded |
| S | 2001 | $44,309 | INSOURCE HEALTH SERVICES | GPO | Excluded |
| S | 2002 | $29,579 | INSOURCE HEALTH SERVICES | GPO | Excluded |
| S | 1998 | $288 | JOINT PURCHASING CORPORATION | GPO | Excluded |
| S | 1999 | $556 | JOINT PURCHASING CORPORATION | GPO | Excluded |

Exhibit D
GPO Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| S | 2000 | $39 | JOINT PURCHASING CORPORATION | GPO | Excluded |
| S | 2001 | $1,688 | JOINT PURCHASING CORPORATION | GPO | Excluded |
| S | 2002 | $5,451 | JOINT PURCHASING CORPORATION | GPO | Excluded |
| S | 2003 | $12,149 | MANAGED HEALTHCARE ASSOCIATES | GPO | Excluded |
| S | 2004 | $7,352 | MANAGED HEALTHCARE ASSOCIATES | GPO | Excluded |
| S | 2005 | $14,894 | MANAGED HEALTHCARE ASSOCIATES | GPO | Excluded |
| S | 1997 | $69,607 | MAYO PHARMACY PURCHASING GROUP | GPO | Excluded |
| S | 1998 | $47,001 | MAYO PHARMACY PURCHASING GROUP | GPO | Excluded |
| S | 1999 | $48,718 | MAYO PHARMACY PURCHASING GROUP | GPO | Excluded |
| S | 2000 | $22,383 | MAYO PHARMACY PURCHASING GROUP | GPO | Excluded |
| S | 2002 | $347,532 | MedAssets HSCA, Inc. | GPO | Excluded |
| A | 2002 | $3,374 | MedAssets HSCA, Inc. | GPO | Excluded |
| S | 2003 | $1,238,223 | MedAssets HSCA, Inc. | GPO | Excluded |
| S | 2004 | $1,781,520 | MedAssets HSCA, Inc. | GPO | Excluded |
| A | 2004 | $2,631 | MedAssets HSCA, Inc. | GPO | Excluded |
| S | 2005 | $1,926,771 | MedAssets HSCA, Inc. | GPO | Excluded |
| A | 2005 | $64,177 | MedAssets HSCA, Inc. | GPO | Excluded |
| S | 1997 | $17,213 | MEDMANAGEMENT | GPO | Excluded |
| S | 1997 | $67,855 | MHA/MEDECON | GPO | Excluded |
| A | 1997 | $2,889 | MHA/MEDECON | GPO | Excluded |
| S | 1998 | $17,676 | MHA/MEDECON | GPO | Excluded |
| S | 1999 | $10,476 | MHA/MEDECON | GPO | Excluded |
| S | 2000 | $9,345 | MHA/MEDECON | GPO | Excluded |
| A | 2000 | $5,575 | MHA/MEDECON | GPO | Excluded |
| S | 2001 | $19,270 | MHA/MEDECON | GPO | Excluded |
| S | 2002 | $23,667 | MHA/MEDECON | GPO | Excluded |
| S | 1997 | $21,756 | NATIONAL PURCHASING ALLIANCE | GPO | Excluded |
| S | 1998 | $2,315 | NATIONAL PURCHASING ALLIANCE | GPO | Excluded |
| S | 1999 | $1,044 | NATIONAL PURCHASING ALLIANCE | GPO | Excluded |
| S | 2003 | $42 | NATIONAL PURCHASING ALLIANCE | GPO | Excluded |
| S | 1997 | $11,960 | NEW JERSEY HOSPITAL ASSOCIATIO | GPO | Excluded |

4 of 8

Exhibit D
GPO Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| S | 1998 | $18,661 | NEW JERSEY HOSPITAL ASSOCIATIO | GPO | Excluded |
| S | 2001 | $1,450,817 | Novation LLC | GPO | Excluded |
| S | 2002 | $6,275,646 | Novation LLC | GPO | Excluded |
| A | 2002 | $177,375 | Novation LLC | GPO | Excluded |
| S | 2003 | $6,587,834 | Novation LLC | GPO | Excluded |
| A | 2003 | $178,423 | Novation LLC | GPO | Excluded |
| S | 2004 | $6,358,578 | Novation LLC | GPO | Excluded |
| A | 2004 | $43,901 | Novation LLC | GPO | Excluded |
| S | 2005 | $6,413,454 | Novation LLC | GPO | Excluded |
| A | 2005 | $1,204 | Novation LLC | GPO | Excluded |
| S | 1997 | $574,784 | Novation/UHC Acute | GPO | Excluded |
| S | 1998 | $479,095 | Novation/UHC Acute | GPO | Excluded |
| S | 1999 | $765,625 | Novation/UHC Acute | GPO | Excluded |
| A | 1999 | $9,292 | Novation/UHC Acute | GPO | Excluded |
| S | 2000 | $847,290 | Novation/UHC Acute | GPO | Excluded |
| S | 2001 | $772,431 | Novation/UHC Acute | GPO | Excluded |
| A | 2001 | $45,274 | Novation/UHC Acute | GPO | Excluded |
| S | 1997 | $577,378 | Novation/VHA Acute | GPO | Excluded |
| S | 1998 | $908,597 | Novation/VHA Acute | GPO | Excluded |
| S | 1999 | $2,191,006 | Novation/VHA Acute | GPO | Excluded |
| A | 1999 | $25,258 | Novation/VHA Acute | GPO | Excluded |
| S | 2000 | $2,984,659 | Novation/VHA Acute | GPO | Excluded |
| A | 2000 | $38,773 | Novation/VHA Acute | GPO | Excluded |
| S | 2001 | $2,928,265 | Novation/VHA Acute | GPO | Excluded |
| A | 2001 | $15,331 | Novation/VHA Acute | GPO | Excluded |
| S | 1997 | $89,042 | OWEN HEALTHCARE | GPO | Excluded |
| S | 1998 | $145,664 | OWEN HEALTHCARE | GPO | Excluded |
| S | 1999 | $154,364 | OWEN HEALTHCARE | GPO | Excluded |
| A | 1999 | $46,796 | OWEN HEALTHCARE | GPO | Excluded |
| S | 2000 | $191,284 | OWEN HEALTHCARE | GPO | Excluded |
| S | 2001 | $415,722 | OWEN HEALTHCARE | GPO | Excluded |

Exhibit D
GPO Rebates From GSK's HDLR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HDLR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| A | 2001 | $21,727 | OWEN HEALTHCARE | GPO | Excluded |
| S | 2002 | $421,679 | OWEN HEALTHCARE | GPO | Excluded |
| S | 1997 | $121,524 | PACT | GPO | Excluded |
| S | 1998 | $165,083 | PACT | GPO | Excluded |
| S | 1999 | $98,791 | PACT | GPO | Excluded |
| S | 2000 | $359,641 | PACT | GPO | Excluded |
| S | 2001 | $734,809 | PACT | GPO | Excluded |
| S | 2002 | $1,246,703 | PACT | GPO | Excluded |
| S | 2003 | $1,625,455 | PACT | GPO | Excluded |
| S | 2004 | $450,464 | PACT | GPO | Excluded |
| A | 2004 | $4,296 | PACT | GPO | Excluded |
| S | 2004 | $1,412,585 | PACT Acute | GPO | Excluded |
| S | 2005 | $2,154,228 | PACT Acute | GPO | Excluded |
| A | 2005 | $2,500 | PACT Acute | GPO | Excluded |
| S | 2002 | $4,514,165 | PREMIER LLP, INC. | GPO | Excluded |
| A | 2002 | $159,935 | PREMIER LLP, INC. | GPO | Excluded |
| S | 2003 | $10,163,367 | PREMIER LLP, INC. | GPO | Excluded |
| A | 2003 | $37,117 | PREMIER LLP, INC. | GPO | Excluded |
| S | 2004 | $11,444,774 | PREMIER LLP, INC. | GPO | Excluded |
| A | 2004 | $93,877 | PREMIER LLP, INC. | GPO | Excluded |
| S | 2005 | $11,558,440 | PREMIER LLP, INC. | GPO | Excluded |
| A | 2005 | $32,519 | PREMIER LLP, INC. | GPO | Excluded |
| S | 1997 | $5,594,156 | PREMIER, INC. | GPO | Excluded |
| S | 1998 | $4,427,298 | PREMIER, INC. | GPO | Excluded |
| A | 1998 | $19,115 | PREMIER, INC. | GPO | Excluded |
| S | 1999 | $4,683,438 | PREMIER, INC. | GPO | Excluded |
| S | 2000 | $5,687,617 | PREMIER, INC. | GPO | Excluded |
| A | 2000 | $7,125 | PREMIER, INC. | GPO | Excluded |
| S | 2001 | $7,086,427 | PREMIER, INC. | GPO | Excluded |
| A | 2001 | $98,598 | PREMIER, INC. | GPO | Excluded |
| S | 2002 | $3,907,068 | PREMIER, INC. | GPO | Excluded |

Exhibit D

GPO Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis

Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| A | 2002 | $105,055 | PREMIER, INC. | GPO | Excluded |
| S | 1997 | $17,515 | REGIONAL GROUPS PURCHASING NET | GPO | Excluded |
| S | 1998 | $1,537 | REGIONAL GROUPS PURCHASING NET | GPO | Excluded |
| S | 2004 | $119,798 | RESOURCE OPTIMIZATION & INNOVATION, LLC | GPO | Excluded |
| S | 1997 | $63,377 | SHARED SERVICES HEALTHCARE INC | GPO | Excluded |
| S | 1998 | $40,199 | SHARED SERVICES HEALTHCARE INC | GPO | Excluded |
| S | 1999 | $26,920 | SHARED SERVICES HEALTHCARE INC | GPO | Excluded |
| S | 2000 | $3,522 | SHARED SERVICES HEALTHCARE INC | GPO | Excluded |
| S | 2001 | $4,809 | SHARED SERVICES HEALTHCARE INC | GPO | Excluded |
| S | 2002 | $7,120 | SHARED SERVICES HEALTHCARE INC | GPO | Excluded |
| S | 1997 | $188,693 | SISTERS OF THE SORROWFUL MOTHE | GPO | Excluded |
| S | 1998 | $151,305 | SISTERS OF THE SORROWFUL MOTHE | GPO | Excluded |
| S | 1999 | $12,160 | SISTERS OF THE SORROWFUL MOTHE | GPO | Excluded |
| S | 1999 | $6,427 | STRATEGIC PURCHASING INITIATIVES | GPO | Excluded |
| A | 1999 | $2,532 | STRATEGIC PURCHASING INITIATIVES | GPO | Excluded |
| S | 2000 | $790 | STRATEGIC PURCHASING INITIATIVES | GPO | Excluded |
| S | 1997 | $129,166 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| S | 1998 | $172,730 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| S | 1999 | $172,102 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| S | 2000 | $236,426 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| A | 2000 | $15,913 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| S | 2001 | $407,761 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| A | 2001 | $118 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| S | 2002 | $643,301 | TENET HEALTHSYSTEM MEDICAL INC | GPO | Excluded |
| S | 1997 | $35,669 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |
| S | 1998 | $45,405 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |
| U | 1998 | $421 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |
| S | 1999 | $73,073 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |
| S | 2000 | $145,963 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |
| S | 2001 | $153,327 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |
| A | 2002 | $98,399 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |

Exhibit D

GPO Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis

Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| A | 2003 | $11,314 | THE JOHNS HOPKINS HOSPITAL | GPO | Excluded |
| Total Rebates | | $147,537,727 | | | |

# Cicala Supplemental Affidavit
# In Further Opposition to GSK
# Motion For Summary Judgment

# Exhibit E

Gaier, Ph.D., Eric                                    January 14, 2009
                        New York, NY

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE         ) 01-12257-PBS

LITIGATION                      ) Master File No.

-------------------------------X Subcategory Case

THIS DOCUMENT RELATES TO:       ) No. 03-10643-PBS

CITY OF NEW YORK, et al.,       )

        -v-                     )

ABBOTT LABORATORIES, et al.,    )

-------------------------------X


                January 14, 2009
                   9:39 a.m.


    Videotaped Deposition of ERIC GAIER, Ph.D.,

taken by Plaintiffs, pursuant to Notice, at the

offices of Kirby McInerney, LLP, 825 Third

Avenue, New York, New York, before SUZANNE

PASTOR, a Shorthand Reporter and Notary Public

within and for the State of New York.

2985d566-d29c-4d2d-83a6-af8dc1fcbe0f

Gaier, Ph.D., Eric                              January 14, 2009
                         New York, NY

Page 50

1    A.  So these are -- there are four types of
2  rebates that are identified by code in the GSK
3  databases.  And I forget the three letters.  The
4  purchase ones -- we've grouped the three that are
5  not utilization based.  The purchase-based are
6  associated with the sale of the product.
7    Q.  And so the code that we've marked as
8  Exhibit 6 demonstrates that you broke out the
9  purchase from the utilization rebates, right?
10   A.  Yes.  At this point because they'll be
11 processed separately.  As I said earlier, all the
12 purchase rebates will be included and we will
13 parse out the utilization rebates so that we keep
14 only those associated with providers.
15   Q.  Who made the decision to treat rebates
16 in the manner that you do?
17   A.  Myself in conjunction with my staff.
18   Q.  And why did you feel it was appropriate
19 to break out the purchase and utilization rebates?
20   A.  Well, for ease of processing at one
21 level because, as I said, we're going to keep all
22 the purchase ones.  The utilization ones is a way

Page 51

1  to exclude the rebates that are provided mainly to
2  payors and PBMs, which are not associated with the
3  sale of the product.  And so we researched how one
4  would make those exclusions in the data, and these
5  codes give you that ability.
6    Q.  What do you mean when you say "payors"
7  in this context?  You said utilization rebates are
8  --
9    A.  Party payors, CIGNA, insurance
10 companies.  I mean, we're looking here mainly at
11 commercial.  I do think there's some federal
12 rebates as well.  But those are the -- that's what
13 I have in mind when I say "payors."
14   Q.  Focussing for a moment on the
15 utilization rebates paid to payors, is it correct
16 you wanted to exclude those because the rebates
17 paid to the third party payors does not impact the
18 underlying sales price for the NDC?
19   A.  Right.  WAC is -- here we're looking at
20 testing WAC, which is list price into the
21 wholesaler chain and is used also for direct sales
22 as well.  So that has nothing to do with the

Page 52

1  payors or the PBMs.
2    Q.  From your prior testimony in
3  Massachusetts, I know that you are aware that PBMs
4  sometimes operate mail order pharmacies.
5    A.  Correct.
6    Q.  Are PBMs paid utilization rebates in
7  connection with that activity?
8    A.  So my understanding is this is exactly
9  how the purchase-based rebates versus the
10 utilization-based rebates separate, so that you
11 can get and apply the purchase-based rebates that
12 are coming from the mail order pharmacy operations
13 of a particular PBM but exclude the utilization-
14 based that are coming from, say, their formularies
15 or other arrangements they may have with a
16 particular manufacturer.
17   Q.  So is it your understanding that Glaxo
18 does not pay utilization rebates to PBMs in
19 connection with their mail order activities?
20   A.  That would not be under the provider
21 utilization category, right.
22   Q.  What do you mean when you say "provider

Page 53

1  utilization category"?
2    A.  Well, I'm speaking generally of
3  pharmacies, physicians in the case of physician-
4  administered drugs.  Those who dispense the
5  product, which would include mail order
6  pharmacies.
7    Q.  So is it correct to say that your
8  intention in excluding the utilization rebates was
9  to exclude those rebates that were paid to
10 entities that were not actually purchasing the
11 drugs?
12   A.  Right.  So that's why I say we processed
13 these separately.  We look at the utilization-
14 based rebates and keep those that are associated
15 with a provider, as I've been describing it, and
16 exclude those that are associated with a payor or
17 PBM.  And that's why we've separated them here for
18 processing.
19   Q.  And is it correct that you make those
20 exclusions on the basis of whether the entity is
21 categorized as retail or something other than
22 retail within the GSK data?

14  (Pages 50 to 53)

2985d566-d29c-4d2d-83a6-af8dc1fcbe0f

# Cicala Supplemental Affidavit
# In Further Opposition to GSK
# Motion For Summary Judgment

# Exhibit F

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
| --- | --- | --- | --- | --- | --- |
| U | 2003 | $41,488,576 | Aetna Health Management, Inc. | IPA | Excluded |
| U | 2004 | $47,893,403 | Aetna Health Management, Inc. | IPA | Excluded |
| U | 2005 | $52,310,461 | Aetna Health Management, Inc. | IPA | Excluded |
| U | 1997 | $1,735,425 | Aetna/U.S. Healthcare | IPA | Excluded |
| U | 1997 | $3,709,541 | Aetna/US Healthcare | IPA | Excluded |
| U | 1998 | $11,696,647 | Aetna/US Healthcare | IPA | Excluded |
| U | 1999 | $17,811,445 | Aetna/US Healthcare | IPA | Excluded |
| U | 2000 | $27,524,601 | Aetna/US Healthcare | IPA | Excluded |
| U | 2001 | $48,389,956 | Aetna/US Healthcare | IPA | Excluded |
| U | 2002 | $48,897,623 | Aetna/US Healthcare | IPA | Excluded |
| U | 1997 | $1,248,186 | Anthem Prescription | IPA | Excluded |
| U | 1998 | $3,345,608 | Anthem Prescription | IPA | Excluded |
| U | 1999 | $5,534,486 | Anthem Prescription | IPA | Excluded |
| U | 2000 | $7,103,190 | Anthem Prescription | IPA | Excluded |
| U | 2001 | $8,617,572 | Anthem Prescription | IPA | Excluded |
| U | 2002 | $6,075,645 | Anthem Prescription | IPA | Excluded |
| U | 2002 | $552,185 | Argus Health Systems, Inc. | IPA | Excluded |
| U | 2003 | $491,171 | Argus Health Systems, Inc. | IPA | Excluded |
| U | 2004 | $664,780 | Argus Health Systems, Inc. | IPA | Excluded |
| U | 2005 | $736,194 | Argus Health Systems, Inc. | IPA | Excluded |
| U | 2001 | $459,520 | Argus Health Systems, Inc./PharmFinance | IPA | Excluded |
| U | 2002 | $222,678 | Argus Health Systems, Inc./PharmFinance | IPA | Excluded |
| U | 2001 | $51,289 | Aultcare | IPA | Excluded |
| U | 2002 | $148,374 | Aultcare | IPA | Excluded |
| U | 2003 | $93,247 | Aultcare | IPA | Excluded |
| U | 2004 | $70,171 | Aultcare | IPA | Excluded |
| U | 2005 | $135,973 | Aultcare | IPA | Excluded |
| U | 2005 | $96,593 | AvMed Inc. dba AvMed Health Plans | IPA | Excluded |
| U | 2002 | $4,811,812 | BCBS of Alabama | IPA | Excluded |
| U | 2003 | $5,617,411 | BCBS of Alabama | IPA | Excluded |
| U | 2004 | $6,484,170 | BCBS of Alabama | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2005 | $6,326,969 | BCBS of Alabama | IPA | Excluded |
| U | 2003 | $2,392,860 | Blue Care Network of Michigan | IPA | Excluded |
| U | 2004 | $2,386,999 | Blue Care Network of Michigan | IPA | Excluded |
| U | 2005 | $1,223,591 | Blue Care Network of Michigan | IPA | Excluded |
| U | 1999 | $2,166,065 | Blue Cross Blue Shield of Alabama | IPA | Excluded |
| U | 2000 | $2,574,513 | Blue Cross Blue Shield of Alabama | IPA | Excluded |
| U | 2001 | $3,951,642 | Blue Cross Blue Shield of Alabama | IPA | Excluded |
| U | 2000 | $82,267 | Blue Cross Blue Shield of Arizona | IPA | Excluded |
| U | 2001 | $219,354 | Blue Cross Blue Shield of Arizona | IPA | Excluded |
| U | 2002 | $255,191 | Blue Cross Blue Shield of Arizona | IPA | Excluded |
| U | 2005 | $221,568 | Blue Cross Blue Shield of Arizona | IPA | Excluded |
| U | 1997 | $289,492 | Blue Shield of California | IPA | Excluded |
| U | 1998 | $1,374,962 | Blue Shield of California | IPA | Excluded |
| U | 1999 | $2,260,599 | Blue Shield of California | IPA | Excluded |
| U | 2000 | $3,130,388 | Blue Shield of California | IPA | Excluded |
| U | 2001 | $5,265,949 | Blue Shield of California | IPA | Excluded |
| U | 2002 | $7,474,088 | Blue Shield of California | IPA | Excluded |
| U | 2003 | $10,732,394 | Blue Shield of California | IPA | Excluded |
| U | 2004 | $11,197,943 | Blue Shield of California | IPA | Excluded |
| U | 2005 | $11,591,570 | Blue Shield of California | IPA | Excluded |
| U | 2003 | $218,846 | Bluegrass Family Health | IPA | Excluded |
| U | 2004 | $520,803 | Bluegrass Family Health | IPA | Excluded |
| U | 2005 | $48,444 | Bluegrass Family Health | IPA | Excluded |
| U | 2002 | $319,787 | Care Choices | IPA | Excluded |
| U | 2003 | $339,764 | Care Choices | IPA | Excluded |
| U | 2004 | $266,304 | Care Choices | IPA | Excluded |
| U | 1998 | $282,869 | Care Choices HMO | IPA | Excluded |
| U | 1999 | $351,697 | Care Choices HMO | IPA | Excluded |
| U | 2000 | $392,811 | Care Choices HMO | IPA | Excluded |
| U | 2001 | $486,897 | Care Choices HMO | IPA | Excluded |
| U | 2005 | $3,284,559 | Carefirst Blue Cross Blue Shield | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2001 | $112,328 | CarePlus Health Plans, Inc. | IPA | Excluded |
| U | 2002 | $697,196 | CarePlus Health Plans, Inc. | IPA | Excluded |
| U | 2003 | $154,067 | CarePlus Health Plans, Inc. | IPA | Excluded |
| U | 2004 | $225,478 | CarePlus Health Plans, Inc. | IPA | Excluded |
| U | 2005 | $120,945 | CarePlus Health Plans, Inc. | IPA | Excluded |
| U | 2002 | $412,063 | CHD Meridian, LLC | IPA | Excluded |
| U | 2003 | $510,597 | CHD Meridian, LLC | IPA | Excluded |
| U | 2004 | $515,120 | CHD Meridian, LLC | IPA | Excluded |
| U | 2005 | $626,715 | CHD Meridian, LLC | IPA | Excluded |
| U | 1997 | $1,905,589 | Cigna Health Corporation | IPA | Excluded |
| U | 1998 | $4,378,047 | Cigna Health Corporation | IPA | Excluded |
| U | 1999 | $6,903,987 | Cigna Health Corporation | IPA | Excluded |
| U | 2000 | $12,112,911 | Cigna Health Corporation | IPA | Excluded |
| U | 2001 | $16,066,318 | Cigna Health Corporation | IPA | Excluded |
| U | 2002 | $26,118,519 | Cigna Health Corporation | IPA | Excluded |
| U | 2003 | $24,234,038 | Cigna Health Corporation | IPA | Excluded |
| U | 2004 | $22,107,016 | Cigna Health Corporation | IPA | Excluded |
| U | 2005 | $19,164,487 | Cigna Health Corporation | IPA | Excluded |
| U | 2002 | $15,230 | City of Chicago | IPA | Excluded |
| U | 2003 | $6,904 | City of Chicago | IPA | Excluded |
| U | 2004 | $2,664 | City of Chicago | IPA | Excluded |
| S | 1998 | $28,708 | COLUMBIA MEDICAL PLAN | STAFFHMO | Excluded |
| S | 1999 | $35,609 | COLUMBIA MEDICAL PLAN | STAFFHMO | Excluded |
| S | 2000 | $65,310 | COLUMBIA MEDICAL PLAN | STAFFHMO | Excluded |
| S | 2001 | $10,486 | COLUMBIA MEDICAL PLAN | STAFFHMO | Excluded |
| U | 1997 | $90,251 | COMPCARE | IPA | Excluded |
| U | 1998 | $73,500 | COMPCARE | IPA | Excluded |
| U | 2002 | $183,451 | Comprehensive Health Management | IPA | Excluded |
| U | 2003 | $987,946 | Comprehensive Health Management | IPA | Excluded |
| U | 2004 | $1,209,367 | Comprehensive Health Management | IPA | Excluded |
| U | 2005 | $1,304,301 | Comprehensive Health Management | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2001 | $357,971 | Comprehensive Health Management, Inc. | IPA | Excluded |
| U | 2002 | $229,482 | Comprehensive Health Management, Inc. | IPA | Excluded |
| U | 2001 | $1,062 | Comprehensive Health Services, Inc. | IPA | Excluded |
| S | 1999 | $12,568 | Corporate Health Dimensions | STAFFHMO | Excluded |
| S | 2000 | $18,918 | Corporate Health Dimensions | STAFFHMO | Excluded |
| S | 2001 | $21,618 | Corporate Health Dimensions | STAFFHMO | Excluded |
| U | 2001 | $7,595 | Corporate Health Dimensions | STAFFHMO | Excluded |
| U | 1997 | $273,495 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 1998 | $771,839 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 1999 | $1,556,538 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 2000 | $2,702,007 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 2001 | $4,322,013 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 2002 | $6,258,995 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 2003 | $8,286,632 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 2004 | $6,360,307 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 2005 | $5,886,166 | COVENTRY PRESCRIPTION MGNT SERVICES, INC. | IPA | Excluded |
| U | 1998 | $54,060 | Dean Health Plan | IPA | Excluded |
| U | 1999 | $258,485 | Dean Health Plan | IPA | Excluded |
| U | 2000 | $382,501 | Dean Health Plan | IPA | Excluded |
| U | 2001 | $568,774 | Dean Health Plan | IPA | Excluded |
| U | 2002 | $632,278 | Dean Health Plan | IPA | Excluded |
| U | 2003 | $527,915 | Dean Health Plan | IPA | Excluded |
| U | 2004 | $61,240 | Dean Health Plan | IPA | Excluded |
| U | 1997 | $109,082 | DEANCARE HMO | IPA | Excluded |
| U | 1998 | $119,256 | DEANCARE HMO | IPA | Excluded |
| U | 1997 | $6,949,211 | EXPRESS SCRIPTS, INC. (IPA) | IPA | Excluded |
| U | 2001 | $3,472 | FALLON CLINIC | STAFFHMO | Excluded |
| U | 2002 | $22,936 | FALLON CLINIC | STAFFHMO | Excluded |
| U | 2002 | $39,328 | FLORIDA HEALTH CARE PLAN | IPA | Excluded |
| U | 2002 | $976 | Florida Health Care Plans, Inc. | STAFFHMO | Excluded |
| U | 2004 | $250 | Florida Health Care Plans, Inc. | STAFFHMO | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2005 | $22,708 | Florida Health Care Plans, Inc. | STAFFHMO | Excluded |
| U | 2001 | $472,546 | Florida Health Plan Management, Inc. | IPA | Excluded |
| U | 1997 | $13,237 | FOUNDATION HEALTH PLAN | IPA | Excluded |
| U | 2004 | $1,623,491 | Gateway Health Plan, LP | IPA | Excluded |
| U | 2005 | $1,644,981 | Gateway Health Plan, LP | IPA | Excluded |
| U | 2001 | $148,031 | Geisinger Health Plan | STAFFHMO | Excluded |
| U | 2002 | $320,127 | Geisinger Health Plan | STAFFHMO | Excluded |
| U | 2004 | $272,030 | Geisinger Health Plan | IPA | Excluded |
| U | 2002 | $48,387 | Group Health Cooperative | IPA | Excluded |
| U | 2003 | $69,643 | Group Health Cooperative | IPA | Excluded |
| U | 2004 | $63,196 | Group Health Cooperative | IPA | Excluded |
| U | 2005 | $15,258 | Group Health Cooperative | IPA | Excluded |
| U | 2002 | $184,579 | Group Health Cooperative HMO | STAFFHMO | Excluded |
| U | 2003 | $298,864 | Group Health Cooperative HMO | STAFFHMO | Excluded |
| U | 2004 | $211,326 | Group Health Cooperative HMO | STAFFHMO | Excluded |
| U | 2005 | $225,552 | Group Health Cooperative HMO | STAFFHMO | Excluded |
| U | 2000 | $9,426 | Group Health Cooperative of South Central WI | MGC PLAN | Excluded |
| U | 2001 | $16,444 | Group Health Cooperative of South Central WI | MGC PLAN | Excluded |
| U | 2002 | $5,417 | Group Health Cooperative of South Central WI | MGC PLAN | Excluded |
| U | 1999 | $2,352 | Harvard Pilgrim Health Care | STAFFHMO | Excluded |
| U | 2000 | $1,758 | Harvard Pilgrim Health Care | STAFFHMO | Excluded |
| U | 2001 | $633,551 | Harvard Pilgrim Health Care | IPA | Excluded |
| U | 2002 | $4,447,591 | Harvard Pilgrim Health Care | IPA | Excluded |
| U | 2002 | $20,414 | Harvard Pilgrim Health Care | STAFFHMO | Excluded |
| U | 2003 | $5,566,426 | Harvard Pilgrim Health Care | IPA | Excluded |
| U | 2004 | $4,860,180 | Harvard Pilgrim Health Care | IPA | Excluded |
| U | 2005 | $3,200,256 | Harvard Pilgrim Health Care | IPA | Excluded |
| U | 1997 | $336,546 | Harvard Pilgrim Health Care Medical Groups | IPA | Excluded |
| U | 1998 | $761,321 | Harvard Pilgrim Health Care Medical Groups | IPA | Excluded |
| U | 1999 | $850,363 | Harvard Pilgrim Health Care Medical Groups | IPA | Excluded |
| U | 2000 | $948,450 | Harvard Pilgrim Health Care Medical Groups | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2001 | $1,117,462 | Harvard Pilgrim Health Care Medical Groups | IPA | Excluded |
| U | 2002 | $305,075 | Harvard Pilgrim Health Care Medical Groups | IPA | Excluded |
| U | 1997 | $520,154 | Harvard Pilgrim Health Care Plan's IPA Division | IPA | Excluded |
| U | 1998 | $2,659,130 | Harvard Pilgrim Health Care Plan's IPA Division | IPA | Excluded |
| U | 1999 | $3,046,730 | Harvard Pilgrim Health Care Plan's IPA Division | IPA | Excluded |
| U | 2000 | $3,122,419 | Harvard Pilgrim Health Care Plan's IPA Division | IPA | Excluded |
| U | 2001 | $2,568,948 | Harvard Pilgrim Health Care Plan's IPA Division | IPA | Excluded |
| U | 2002 | $663,012 | Harvard Pilgrim Health Care Plan's IPA Division | IPA | Excluded |
| U | 2002 | $472,374 | Hawaii Medical Service Association | IPA | Excluded |
| U | 2003 | $1,542,272 | Hawaii Medical Service Association | IPA | Excluded |
| U | 2004 | $1,937,427 | Hawaii Medical Service Association | IPA | Excluded |
| U | 2005 | $1,997,647 | Hawaii Medical Service Association | IPA | Excluded |
| U | 1997 | $102,915 | HEALTH ALLIANCE MEDICAL PLANS | IPA | Excluded |
| U | 1998 | $62,668 | HEALTH ALLIANCE MEDICAL PLANS | IPA | Excluded |
| U | 2003 | $686,255 | Health Alliance Medical Plans | IPA | Excluded |
| U | 2004 | $651,791 | Health Alliance Medical Plans | IPA | Excluded |
| U | 2005 | $704,734 | Health Alliance Medical Plans | IPA | Excluded |
| U | 1997 | $161,000 | Health Alliance Plan | IPA | Excluded |
| U | 1998 | $284,268 | Health Alliance Plan | IPA | Excluded |
| U | 1999 | $72,519 | Health Alliance Plan | IPA | Excluded |
| U | 2000 | $339,156 | Health Alliance Plan | IPA | Excluded |
| U | 2001 | $771,428 | Health Alliance Plan | IPA | Excluded |
| U | 2002 | $2,170,025 | Health Alliance Plan | IPA | Excluded |
| U | 2003 | $1,994,698 | Health Alliance Plan | IPA | Excluded |
| U | 2004 | $1,696,590 | Health Alliance Plan | IPA | Excluded |
| U | 2005 | $1,740,654 | Health Alliance Plan | IPA | Excluded |
| U | 2002 | $176,060 | Health First Health Plan Inc. | IPA | Excluded |
| U | 2003 | $193,079 | Health First Health Plan Inc. | IPA | Excluded |
| U | 2004 | $173,542 | Health First Health Plan Inc. | IPA | Excluded |
| U | 2005 | $190,857 | Health First Health Plan Inc. | IPA | Excluded |
| U | 1997 | $5,077 | HEALTH INSURANCE PLAN OF | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 1997 | $1,431,860 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 1998 | $4,070,071 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 1999 | $6,670,025 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 2000 | $9,197,618 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 2001 | $15,341,758 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 2002 | $15,014,248 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 2003 | $14,461,375 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 2004 | $14,308,193 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 2005 | $13,134,201 | Health Net Pharmaceutical Services | IPA | Excluded |
| U | 2004 | $574,061 | Health Partners, Inc. | IPA | Excluded |
| U | 2005 | $564,917 | Health Partners, Inc. | IPA | Excluded |
| U | 2000 | $14,024 | HEALTH PLAN OF THE REDWOODS | IPA | Excluded |
| U | 2001 | $65,443 | HEALTH PLAN OF THE REDWOODS | IPA | Excluded |
| U | 1999 | $10,108 | Health Plan of the Upper Ohio Valley, Inc. | IPA | Excluded |
| U | 2000 | $46,246 | Health Plan of the Upper Ohio Valley, Inc. | IPA | Excluded |
| U | 2001 | $16,931 | Health Plan of the Upper Ohio Valley, Inc. | IPA | Excluded |
| U | 1997 | $72,634 | Health Plus of Michigan | IPA | Excluded |
| U | 1998 | $89,265 | Health Plus of Michigan | IPA | Excluded |
| U | 1999 | $56,996 | Health Plus of Michigan | IPA | Excluded |
| U | 2000 | $35,859 | Health Plus of Michigan | IPA | Excluded |
| U | 2001 | $72,473 | Health Plus of Michigan | IPA | Excluded |
| U | 2002 | $106,326 | Health Plus of Michigan | IPA | Excluded |
| U | 2003 | $118,096 | Health Plus of Michigan | IPA | Excluded |
| U | 2004 | $124,995 | Health Plus of Michigan | IPA | Excluded |
| U | 2005 | $137,967 | Health Plus of Michigan | IPA | Excluded |
| U | 1997 | $238,602 | HealthPartners | IPA | Excluded |
| U | 1998 | $517,730 | HealthPartners | IPA | Excluded |
| U | 1999 | $809,228 | HealthPartners | IPA | Excluded |
| U | 2000 | $999,874 | HealthPartners | IPA | Excluded |
| U | 2001 | $1,615,826 | HealthPartners | IPA | Excluded |
| U | 2002 | $3,226,206 | HealthPartners | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2003 | $3,867,599 | HealthPartners | IPA | Excluded |
| U | 2004 | $2,631,625 | HealthPartners | IPA | Excluded |
| U | 2005 | $3,654,570 | HealthPartners | IPA | Excluded |
| U | 2002 | $58,109 | HealthPlus of Michigan | IPA | Excluded |
| U | 2003 | $118,096 | HealthPlus of Michigan | IPA | Excluded |
| U | 2004 | $124,995 | HealthPlus of Michigan | IPA | Excluded |
| U | 2005 | $137,967 | HealthPlus of Michigan | IPA | Excluded |
| U | 1997 | $909,028 | HEALTHSOURCE RX | IPA | Excluded |
| U | 1998 | $249,954 | HIP Health Plan of New York | IPA | Excluded |
| U | 1999 | $689,640 | HIP Health Plan of New York | IPA | Excluded |
| U | 2000 | $931,440 | HIP Health Plan of New York | IPA | Excluded |
| U | 2001 | $1,026,283 | HIP Health Plan of New York | IPA | Excluded |
| U | 1997 | $3,262 | HIP of Greater New York | IPA | Excluded |
| U | 2002 | $2,077,784 | HIP of Greater NY | IPA | Excluded |
| U | 2003 | $2,463,256 | HIP of Greater NY | IPA | Excluded |
| U | 2004 | $2,426,328 | HIP of Greater NY | IPA | Excluded |
| U | 2005 | $2,875,735 | HIP of Greater NY | IPA | Excluded |
| U | 1997 | $30,690 | HIP OF NEW JERSEY INC | IPA | Excluded |
| U | 1997 | $48,287 | HIP PHARMACY SERVICES | IPA | Excluded |
| U | 1997 | $343,327 | HMSA Choice/Select | IPA | Excluded |
| U | 1998 | $450,748 | HMSA Choice/Select | IPA | Excluded |
| U | 1999 | $521,559 | HMSA Choice/Select | IPA | Excluded |
| U | 2000 | $584,637 | HMSA Choice/Select | IPA | Excluded |
| U | 2001 | $736,505 | HMSA Choice/Select | IPA | Excluded |
| U | 2002 | $582,305 | HMSA Choice/Select | IPA | Excluded |
| U | 1997 | $20,345 | HMSA Quest | IPA | Excluded |
| U | 1998 | $18,506 | HMSA Quest | IPA | Excluded |
| U | 1999 | $31,214 | HMSA Quest | IPA | Excluded |
| U | 2000 | $44,882 | HMSA Quest | IPA | Excluded |
| U | 2001 | $81,911 | HMSA Quest | IPA | Excluded |
| U | 2002 | $75,941 | HMSA Quest | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2001 | $488,645 | Horizon Mercy | MGC PLAN | Excluded |
| U | 2002 | $1,043,962 | Horizon Mercy | MGC PLAN | Excluded |
| U | 2003 | $848,864 | HORIZON MERCY | MGC PLAN | Excluded |
| U | 2004 | $608,125 | HORIZON MERCY | MGC PLAN | Excluded |
| U | 2005 | $517,232 | HORIZON MERCY | MGC PLAN | Excluded |
| U | 2002 | $805,714 | Horizon NJ Health | IPA | Excluded |
| U | 2003 | $848,864 | Horizon NJ Health | IPA | Excluded |
| U | 2004 | $608,125 | Horizon NJ Health | IPA | Excluded |
| U | 2005 | $517,232 | Horizon NJ Health | IPA | Excluded |
| U | 1997 | $943,052 | HUMANA | IPA | Excluded |
| U | 1997 | $47,266 | HUMANA FLORIDA | IPA | Excluded |
| U | 1998 | $2,705,415 | Humana Inc. | IPA | Excluded |
| U | 1999 | $4,340,817 | Humana Inc. | IPA | Excluded |
| U | 2000 | $7,096,142 | Humana Inc. | IPA | Excluded |
| U | 2001 | $10,084,143 | Humana Inc. | IPA | Excluded |
| U | 2003 | $2,079,141 | Humana, Inc. | IPA | Excluded |
| U | 2004 | $12,201,884 | Humana, Inc. | IPA | Excluded |
| U | 2005 | $12,249,954 | Humana, Inc. | IPA | Excluded |
| U | 1997 | $112,549 | IHC HEALTH PLANS, INC, (IPA) | IPA | Excluded |
| U | 1998 | $371,597 | IHC HEALTH PLANS, INC, (IPA) | IPA | Excluded |
| U | 1999 | $389,519 | IHC HEALTH PLANS, INC, (IPA) | IPA | Excluded |
| U | 2000 | $455,241 | IHC HEALTH PLANS, INC, (IPA) | IPA | Excluded |
| U | 2001 | $764,339 | IHC HEALTH PLANS, INC, (IPA) | IPA | Excluded |
| U | 2002 | $1,430,237 | IHC Health Plans, Inc. | IPA | Excluded |
| U | 2003 | $1,482,587 | IHC Health Plans, Inc. | IPA | Excluded |
| U | 2004 | $1,556,775 | IHC Health Plans, Inc. | IPA | Excluded |
| U | 2005 | $1,152,524 | IHC Health Plans, Inc. | IPA | Excluded |
| U | 1998 | $542,244 | Independent Health | IPA | Excluded |
| U | 1999 | $764,483 | Independent Health | IPA | Excluded |
| U | 2000 | $961,128 | Independent Health | IPA | Excluded |
| U | 2001 | $1,268,442 | Independent Health | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2002 | $655,596 | Independent Health | IPA | Excluded |
| U | 2002 | $636,459 | Independent Health Association | IPA | Excluded |
| U | 2003 | $1,109,721 | Independent Health Association | IPA | Excluded |
| U | 2004 | $715,454 | Independent Health Association | IPA | Excluded |
| U | 2005 | $603,432 | Independent Health Association | IPA | Excluded |
| U | 1997 | $97,738 | IPS (IPA) | IPA | Excluded |
| U | 1999 | $239,345 | John Deere Health Care Inc. | IPA | Excluded |
| U | 2000 | $407,330 | John Deere Health Care Inc. | IPA | Excluded |
| U | 2001 | $1,040,499 | John Deere Health Care Inc. | IPA | Excluded |
| U | 2002 | $710,621 | John Deere Health Care Inc. | IPA | Excluded |
| U | 2002 | $604,846 | John Deere Health Plan Inc. | IPA | Excluded |
| U | 2003 | $846,115 | John Deere Health Plan Inc. | IPA | Excluded |
| U | 2004 | $564,902 | John Deere Health Plan Inc. | IPA | Excluded |
| U | 2005 | $612,856 | John Deere Health Plan Inc. | IPA | Excluded |
| U | 2001 | $173,970 | Kaiser | STAFFHMO | Excluded |
| U | 2002 | $678,922 | Kaiser | STAFFHMO | Excluded |
| U | 2003 | $72,015 | Kaiser | STAFFHMO | Excluded |
| U | 2004 | $326,121 | Kaiser | STAFFHMO | Excluded |
| U | 2005 | $317,221 | Kaiser | STAFFHMO | Excluded |
| S | 2001 | $1,129,017 | KAISER PERMANENTE | STAFFHMO | Excluded |
| S | 2002 | $2,796,551 | KAISER PERMANENTE | STAFFHMO | Excluded |
| S | 2003 | $4,946,821 | Kaiser Permanente | STAFFHMO | Excluded |
| S | 2004 | $5,886,795 | Kaiser Permanente | STAFFHMO | Excluded |
| S | 2005 | $4,568,429 | Kaiser Permanente | STAFFHMO | Excluded |
| U | 2000 | $738,632 | Keystone Mercy Health Plan | IPA | Excluded |
| U | 2001 | $1,425,771 | Keystone Mercy Health Plan | IPA | Excluded |
| U | 2002 | $2,697,955 | Keystone Mercy Health Plan | IPA | Excluded |
| U | 2003 | $3,416,383 | Keystone Mercy Health Plan | IPA | Excluded |
| U | 2004 | $3,448,588 | Keystone Mercy Health Plan | IPA | Excluded |
| U | 2005 | $3,937,956 | Keystone Mercy Health Plan | IPA | Excluded |
| U | 2001 | $11,253 | Lifetime Health | STAFFHMO | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2002 | $9,022 | Lifetime Health | STAFFHMO | Excluded |
| U | 2003 | $964,636 | Lovelace Health Systems, Inc. | IPA | Excluded |
| U | 2004 | $678,220 | Lovelace Health Systems, Inc. | IPA | Excluded |
| U | 2005 | $661,414 | Lovelace Health Systerns, Inc. | IPA | Excluded |
| S | 2000 | $6,900 | Massachusetts Institute of Technology | STAFFHMO | Excluded |
| U | 2002 | $7,471 | Massachusetts Institute of Technology | STAFFHMO | Excluded |
| U | 2003 | $3,198 | Massachusetts Institute of Technology | STAFFHMO | Excluded |
| U | 2002 | $277,307 | Mayo Foundation for Medical Education & Research | IPA | Excluded |
| U | 2003 | $134,711 | Mayo Foundation for Medical Education & Research | IPA | Excluded |
| U | 2004 | $102,088 | Mayo Foundation for Medical Education & Research | IPA | Excluded |
| U | 2005 | $117,454 | Mayo Foundation for Medical Education & Research | IPA | Excluded |
| U | 2001 | $5,945 | Mayo Medical Ventures | IPA | Excluded |
| U | 2001 | $1,203,537 | Medica | IPA | Excluded |
| U | 2002 | $1,302,396 | Medica | IPA | Excluded |
| U | 2002 | $1,510,610 | Medica Health Plans | IPA | Excluded |
| U | 2003 | $2,832,019 | Medica Health Plans | IPA | Excluded |
| U | 2004 | $3,045,245 | Medica Health Plans | IPA | Excluded |
| U | 2005 | $3,050,565 | Medica Health Plans | IPA | Excluded |
| U | 1997 | $4,207 | MERCY CARE HEALTH PLAN | IPA | Excluded |
| U | 2001 | $114,294 | MERCY CARE HEALTH PLAN | IPA | Excluded |
| U | 2002 | $412,063 | Meridian Occupational Healthcare Associates, Inc. | IPA | Excluded |
| U | 2003 | $510,597 | Meridian Occupational Healthcare Associates, Inc. | IPA | Excluded |
| U | 2004 | $515,120 | Meridian Occupational Healthcare Associates, Inc. | IPA | Excluded |
| U | 2005 | $626,715 | Meridian Occupational Healthcare Associates, Inc. | IPA | Excluded |
| U | 1997 | $118,303 | M-Plan | IPA | Excluded |
| U | 1998 | $208,887 | M-Plan | IPA | Excluded |
| U | 1999 | $354,755 | M-Plan | IPA | Excluded |
| U | 2000 | $363,939 | M-Plan | IPA | Excluded |
| U | 2001 | $631,354 | M-Plan | IPA | Excluded |
| U | 2002 | $802,423 | M-Plan | IPA | Excluded |
| U | 2003 | $945,866 | M-Plan | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2004 | $895,214 | M-Plan | IPA | Excluded |
| U | 2005 | $789,887 | M-Plan | IPA | Excluded |
| U | 1997 | $276,598 | MVP Health Plan Inc. | IPA | Excluded |
| U | 1998 | $433,041 | MVP Health Plan Inc. | IPA | Excluded |
| U | 1999 | $844,432 | MVP Health Plan Inc. | IPA | Excluded |
| U | 2000 | $1,373,324 | MVP Health Plan Inc. | IPA | Excluded |
| U | 2001 | $1,767,240 | MVP Health Plan Inc. | IPA | Excluded |
| U | 1997 | $65,000 | NYLCARE Health Plans, Inc. | MGC PLAN | Excluded |
| S | 1998 | $277 | NYSA-ILA | STAFFHMO | Excluded |
| S | 1999 | $5,049 | NYSA-ILA | STAFFHMO | Excluded |
| U | 1997 | $37,889 | OCHSNER HEALTH PLAN | IPA | Excluded |
| U | 1998 | $159,903 | OCHSNER HEALTH PLAN | IPA | Excluded |
| U | 1999 | $214,635 | OCHSNER HEALTH PLAN | IPA | Excluded |
| U | 2000 | $135,943 | OCHSNER HEALTH PLAN | IPA | Excluded |
| U | 2001 | $261,130 | OCHSNER HEALTH PLAN | IPA | Excluded |
| U | 2002 | $430,439 | OCHSNER HEALTH PLAN | IPA | Excluded |
| U | 2003 | $456,023 | Ochsner Health Plan | IPA | Excluded |
| U | 2004 | $162,567 | Ochsner Health Plan | IPA | Excluded |
| U | 1997 | $792,593 | OXFORD HEALTH PLAN | IPA | Excluded |
| U | 2001 | $20,459 | PAN AM CAC MEDICAL CENTERS | STAFFHMO | Excluded |
| U | 1999 | $69,580 | Partners Health Plan | IPA | Excluded |
| U | 2000 | $30,525 | Partners Health Plan | IPA | Excluded |
| U | 1997 | $55,416 | PCA OF TEXAS | IPA | Excluded |
| U | 1997 | $57,100 | Pharmacy Service Corporation | IPA | Excluded |
| U | 1997 | $3,969 | PHOENIX HEALTH PLAN | IPA | Excluded |
| U | 1998 | $79,769 | PHP Healthcare Corporation | IPA | Excluded |
| U | 1997 | $50,632 | PHYSICIANS CORP OF AMERICA | IPA | Excluded |
| U | 1997 | $52,125 | Physicians Plus | IPA | Excluded |
| U | 1998 | $101,113 | Physicians Plus | IPA | Excluded |
| U | 1999 | $192,021 | Physicians Plus | IPA | Excluded |
| U | 2001 | $276,771 | Physicians Plus | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2002 | $560,839 | Physicians Plus | IPA | Excluded |
| U | 2003 | $581,938 | Physicians Plus | IPA | Excluded |
| U | 2004 | $506,084 | Physicians Plus | IPA | Excluded |
| U | 2005 | $476,534 | Physicians Plus | IPA | Excluded |
| U | 1997 | $602,244 | PREFERRED CARE (BC/BS OF AL) | IPA | Excluded |
| U | 1998 | $1,104,989 | PREFERRED CARE (BC/BS OF AL) | IPA | Excluded |
| S | 1998 | $123,502 | PREMIER | STAFFHMO | Excluded |
| U | 2002 | $1,103,309 | Presbyterian Health Plan, Inc. | IPA | Excluded |
| U | 2003 | $1,167,680 | Presbyterian Health Plan, Inc. | IPA | Excluded |
| U | 2004 | $686,284 | Presbyterian Health Plan, Inc. | IPA | Excluded |
| U | 2005 | $520,214 | Presbyterian Health Plan, Inc. | IPA | Excluded |
| U | 1997 | $3,033,433 | Prescription Solutions | IPA | Excluded |
| U | 1998 | $5,132,723 | Prescription Solutions | IPA | Excluded |
| U | 1999 | $7,490,682 | Prescription Solutions | IPA | Excluded |
| U | 2000 | $9,561,315 | Prescription Solutions | IPA | Excluded |
| U | 2001 | $9,666,182 | Prescription Solutions | IPA | Excluded |
| U | 2002 | $13,552,524 | Prescription Solutions | IPA | Excluded |
| U | 2003 | $13,263,950 | Prescription Solutions | IPA | Excluded |
| U | 2004 | $13,547,489 | Prescription Solutions | IPA | Excluded |
| U | 2005 | $15,810,668 | Prescription Solutions | IPA | Excluded |
| U | 2001 | $2,261,793 | Prescription Solutions - SB | IPA | Excluded |
| U | 2002 | $3,981,766 | Prescription Solutions - SB | IPA | Excluded |
| U | 2003 | $3,647 | Prescription Solutions - SB | IPA | Excluded |
| U | 1997 | $1,428,354 | PRUDENTIAL INSURANCE COMPANY | IPA | Excluded |
| U | 1998 | $3,548,497 | PRUDENTIAL INSURANCE COMPANY | IPA | Excluded |
| U | 1999 | $6,844,280 | PRUDENTIAL INSURANCE COMPANY | IPA | Excluded |
| U | 2000 | $2,470,969 | PRUDENTIAL INSURANCE COMPANY | IPA | Excluded |
| U | 2003 | $194,615 | Qualchoice Inc. | IPA | Excluded |
| U | 2004 | $346,679 | Qualchoice Inc. | IPA | Excluded |
| U | 2005 | $280,570 | Qualchoice Inc. | IPA | Excluded |
| U | 2001 | $751,726 | Regence BCBS Oregon | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2002 | $468,939 | Regence BCBS Oregon | IPA | Excluded |
| U | 2001 | $265,346 | Regence Blue Cross Blue Shield of Utah | IPA | Excluded |
| U | 2002 | $176,815 | Regence Blue Cross Blue Shield of Utah | IPA | Excluded |
| U | 1998 | $119,467 | Regence Blue Shield of Idaho | IPA | Excluded |
| U | 1999 | $156,581 | Regence Blue Shield of Idaho | IPA | Excluded |
| U | 2000 | $172,527 | Regence Blue Shield of Idaho | IPA | Excluded |
| U | 2001 | $352,046 | Regence Blue Shield of Idaho | IPA | Excluded |
| U | 2002 | $207,223 | Regence Blue Shield of Idaho | IPA | Excluded |
| U | 2001 | $383,430 | REGENCE BLUE SHIELD OF WA | IPA | Excluded |
| U | 2002 | $499,761 | REGENCE BLUE SHIELD OF WA | IPA | Excluded |
| U | 2002 | $3,477,610 | Regence Group | IPA | Excluded |
| U | 2003 | $6,249,509 | Regence Group | IPA | Excluded |
| U | 2004 | $4,424,224 | Regence Group | IPA | Excluded |
| U | 2005 | $3,293,388 | Regence Group | IPA | Excluded |
| U | 2002 | $112,119 | Rocky Mountain Health Plans | IPA | Excluded |
| U | 2003 | $235,591 | Rocky Mountain Health Plans | IPA | Excluded |
| U | 2004 | $213,366 | Rocky Mountain Health Plans | IPA | Excluded |
| U | 2005 | $258,736 | Rocky Mountain Health Plans | IPA | Excluded |
| U | 1999 | $31,382 | Rocky Mountain HMO | IPA | Excluded |
| U | 2000 | $81,737 | Rocky Mountain HMO | IPA | Excluded |
| U | 2001 | $192,633 | Rocky Mountain HMO | IPA | Excluded |
| U | 2002 | $114,760 | Rocky Mountain HMO | IPA | Excluded |
| U | 2002 | $112,119 | Rocky Mountain HMO Inc. | IPA | Excluded |
| U | 2003 | $235,591 | Rocky Mountain HMO Inc. | IPA | Excluded |
| U | 2004 | $213,366 | Rocky Mountain HMO Inc. | IPA | Excluded |
| U | 2005 | $258,736 | Rocky Mountain HMO Inc. | IPA | Excluded |
| U | 2000 | $201,288 | Scott & White Health Plan | STAFFHMO | Excluded |
| U | 2001 | $334,801 | Scott & White Health Plan | STAFFHMO | Excluded |
| U | 2002 | $96,872 | Scott & White Health Plan | STAFFHMO | Excluded |
| U | 1997 | $16,111 | Scott & White Health Plan (IPA) | IPA | Excluded |
| U | 1998 | $32,770 | Scott & White Health Plan (IPA) | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 1999 | $88,499 | Scott & White Health Plan (IPA) | IPA | Excluded |
| U | 2000 | $99,790 | Scott & White Health Plan (IPA) | IPA | Excluded |
| U | 2001 | $235,623 | Scott & White Health Plan (IPA) | IPA | Excluded |
| U | 2002 | $93,473 | Scott & White Health Plan (IPA) | IPA | Excluded |
| U | 1997 | $29,363 | Scott and White Health Plan | STAFFHMO | Excluded |
| U | 1998 | $121,476 | Scott and White Health Plan | STAFFHMO | Excluded |
| U | 1999 | $300,397 | Scott and White Health Plan | STAFFHMO | Excluded |
| U | 2000 | $64,711 | Scott and White Health Plan | STAFFHMO | Excluded |
| U | 2002 | $494,368 | Scott and White Health Plan | IPA | Excluded |
| U | 2003 | $689,853 | Scott and White Health Plan | IPA | Excluded |
| U | 2004 | $638,709 | Scott and White Health Plan | IPA | Excluded |
| U | 2005 | $643,242 | Scott and White Health Plan | IPA | Excluded |
| U | 2001 | $735,071 | Scrip Solutions, Inc. | IPA | Excluded |
| U | 2002 | $918,443 | Scrip Solutions, Inc. | IPA | Excluded |
| U | 2000 | $304,274 | Security Health Plan | IPA | Excluded |
| U | 2001 | $371,590 | Security Health Plan | IPA | Excluded |
| U | 2002 | $320,486 | Security Health Plan | IPA | Excluded |
| U | 2003 | $324,579 | Security Health Plan | IPA | Excluded |
| U | 2004 | $274,538 | Security Health Plan | IPA | Excluded |
| U | 2005 | $142,385 | Security Health Plan | IPA | Excluded |
| U | 2002 | $1,430,237 | SelectHealth Plans | IPA | Excluded |
| U | 2003 | $1,482,587 | SelectHealth Plans | IPA | Excluded |
| U | 2004 | $1,556,775 | SelectHealth Plans | IPA | Excluded |
| U | 2005 | $1,152,524 | SelectHealth Plans | IPA | Excluded |
| U | 1997 | $102,056 | Sentara Health Management | IPA | Excluded |
| U | 1998 | $223,776 | Sentara Health Management | IPA | Excluded |
| U | 1999 | $425,523 | Sentara Health Management | IPA | Excluded |
| U | 2000 | $668,642 | Sentara Health Management | IPA | Excluded |
| U | 2001 | $984,885 | Sentara Health Management | IPA | Excluded |
| U | 2002 | $1,151,607 | Sentara Health Management | IPA | Excluded |
| U | 2003 | $769,806 | Sentara Health Management | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2004 | $965,100 | Sentara Health Management | IPA | Excluded |
| U | 2005 | $1,138,925 | Sentara Health Management | IPA | Excluded |
| U | 2002 | $7,349 | Teamsters | STAFFHMO | Excluded |
| U | 2003 | $1,969 | Teamsters | STAFFHMO | Excluded |
| S | 2000 | $9,149 | Teamsters Care | STAFFHMO | Excluded |
| S | 2001 | $13,149 | Teamsters Care | STAFFHMO | Excluded |
| S | 2002 | $4,032 | Teamsters Care | STAFFHMO | Excluded |
| S | 1998 | $16,290 | THE HEALTH CARE PLAN INC | STAFFHMO | Excluded |
| U | 1998 | $131,847 | The Oath | IPA | Excluded |
| U | 1999 | $45,885 | The Oath | IPA | Excluded |
| U | 2000 | $27,952 | The Oath | IPA | Excluded |
| U | 2001 | $57,596 | The Oath | IPA | Excluded |
| U | 2002 | $3,480 | The Oath | IPA | Excluded |
| U | 2001 | $1,077,718 | The Regence Group | IPA | Excluded |
| U | 2002 | $2,319,908 | The Regence Group | IPA | Excluded |
| U | 2002 | $443,183 | Touchpoint Health Plan | IPA | Excluded |
| U | 2003 | $560,490 | Touchpoint Health Plan | IPA | Excluded |
| U | 2002 | $31,778 | Union Pacific Railroad Employees Health System | IPA | Excluded |
| U | 2003 | $44,592 | Union Pacific Railroad Employees Health System | IPA | Excluded |
| U | 2004 | $66,521 | Union Pacific Railroad Employees Health System | IPA | Excluded |
| U | 2005 | $66,527 | Union Pacific Railroad Employees Health System | IPA | Excluded |
| U | 2002 | $31,778 | Union Pacific Railroad Employees' Health System | IPA | Excluded |
| U | 2003 | $44,592 | Union Pacific Railroad Employees' Health System | IPA | Excluded |
| U | 2004 | $66,521 | Union Pacific Railroad Employees' Health System | IPA | Excluded |
| U | 2005 | $66,527 | Union Pacific Railroad Employees' Health System | IPA | Excluded |
| U | 2001 | $14,685 | Union Pacific REHS | IPA | Excluded |
| U | 2005 | $68,442 | Unity Health Plans Insurance Corp | IPA | Excluded |
| U | 2002 | $521,561 | Unity Health Plans Insurance Corporation | IPA | Excluded |
| U | 2003 | $607,271 | Unity Health Plans Insurance Corporation | IPA | Excluded |
| U | 2004 | $199,991 | Unity Health Plans Insurance Corporation | IPA | Excluded |
| U | 2005 | $96,262 | Unity Health Plans Insurance Corporation | IPA | Excluded |

Exhibit F
IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 1999 | $567,355 | Univera | IPA | Excluded |
| U | 2000 | $992,712 | Univera | IPA | Excluded |
| U | 2001 | $1,164,372 | Univera | IPA | Excluded |
| U | 2002 | $662,906 | Univera | IPA | Excluded |
| U | 2000 | $98,647 | UPMC Health Plan | IPA | Excluded |
| U | 2001 | $549,833 | UPMC Health Plan | IPA | Excluded |
| U | 2002 | $1,102,058 | UPMC Health Plan, Inc./Health Benefits, Inc. | IPA | Excluded |
| U | 2003 | $1,084,817 | UPMC Health Plan, Inc./Health Benefits, Inc. | IPA | Excluded |
| U | 2004 | $1,186,097 | UPMC Health Plan, Inc./Health Benefits, Inc. | IPA | Excluded |
| U | 2005 | $1,322,526 | UPMC Health Plan, Inc./Health Benefits, Inc. | IPA | Excluded |
| U | 2001 | $10,995 | Valitas Health Services | IPA | Excluded |
| U | 2002 | $179,613 | Valitas Health Services | IPA | Excluded |
| U | 2003 | $215,574 | Valitas Health Services | IPA | Excluded |
| U | 2004 | $28,907 | Valitas Health Services | IPA | Excluded |
| U | 2001 | $66,360 | Value Options | IPA | Excluded |
| U | 2002 | $233,739 | Value Options | IPA | Excluded |
| U | 2003 | $100,001 | Value Options | IPA | Excluded |
| U | 1998 | $27 | VHA Directions | IPA | Excluded |
| U | 1999 | $106,750 | VHA Directions | IPA | Excluded |
| U | 2000 | $160,829 | VHA Directions | IPA | Excluded |
| U | 2001 | $222,244 | VHA Directions | IPA | Excluded |
| U | 2002 | $945,490 | Vista Health Plan, Inc. | IPA | Excluded |
| U | 2003 | $957,856 | Vista Health Plan, Inc. | IPA | Excluded |
| U | 2004 | $875,694 | Vista Health Plan, Inc. | IPA | Excluded |
| U | 2005 | $550,792 | Vista Health Plan, Inc. | IPA | Excluded |
| U | 2001 | $11,934,971 | WellPoint Health Networks Inc. | IPA | Excluded |
| U | 2002 | $34,143,916 | WellPoint Health Networks Inc. | IPA | Excluded |
| U | 2003 | $38,827,714 | WellPoint Health Networks Inc. | IPA | Excluded |
| U | 2004 | $42,021,349 | WellPoint Health Networks Inc. | IPA | Excluded |
| U | 2005 | $52,914,213 | WellPoint Health Networks Inc. | IPA | Excluded |
| U | 1998 | $145 | WINSTON SALEM HEALTHCARE | STAFFHMO | Excluded |

**Exhibit F**

IPA / TPP Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis

Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 1999 | $161 | WINSTON SALEM HEALTHCARE | STAFFHMO | Excluded |
| U | 2004 | $43,685 | Winston-Salem Health Care | IPA | Excluded |
| **Total Rebates** | | **$1,321,981,850** | | | |

18 of 18

# Cicala Supplemental Affidavit
# In Further Opposition to GSK
# Motion For Summary Judgment

# Exhibit G





**EXHIBIT G***
Chart Prepared by Plaintiffs

Rebate To PBM/TPP Based On Member Utilization: Reduces Manufacturer's Net Revenue as well as Payer's Net Cost

PAYER SIDE

PURCHASER SIDE

Medicaid

TPPs and Health Plans

Passed-on Rebates

Contractual Payment to PBM

Contractual Reimbursement Rate (for All Manufacturers' Drugs) Paid for prescriptions To Members

PBMs

PBM-Owned Mail Order Pharmacy

Retail Pharmacy

NOT Owned by PBMs

Contract Sales

e.g. Hospitals, Gov't Sales that Generate Chargebacks

Direct Purchases

e.g. Retail Chains

Payment Set by Wholesaler

Payment Set by Wholesaler

Pills

Pills

Payment

Pills

Purchased-Based Rebates

Wholesaler

Payment

Pills

Payment

Pills

Manufacturer

Purchased-Based Rebates

Payment

Pills

Purchased-Based Rebates

*This is an adaptation of Defendants' Exhibit 24, marked at the Deposition of David Brown, June 3, 2009, illustrating Plaintiffs' characterization of the relationship between PBMs, mail-order and retail dispensers, and Third-Party Payors.

# Cicala Supplemental Affidavit
# In Further Opposition to GSK
# Motion For Summary Judgment

# Exhibit H

Exhibit H

PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis

Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2000 | $8,481 | 4D Pharmacy Management Systems | PBM | Excluded |
| U | 2001 | $28,460 | 4D Pharmacy Management Systems | PBM | Excluded |
| U | 2002 | $157,213 | 4D Pharmacy Management Systems | PBM | Excluded |
| U | 2003 | $239,299 | 4D Pharmacy Management Systems | PBM | Excluded |
| U | 2004 | $262,878 | 4D Pharmacy Management Systems | PBM | Excluded |
| U | 2005 | $177,282 | 4D Pharmacy Management Systems | PBM | Excluded |
| U | 1997 | $5,100,501 | Advance PCS | PBM | Excluded |
| U | 1998 | $8,816,225 | Advance PCS | PBM | Excluded |
| U | 1999 | $14,094,539 | Advance PCS | PBM | Excluded |
| U | 2000 | $10,575,963 | Advance PCS | PBM | Excluded |
| U | 2001 | $21,679,999 | Advance PCS | PBM | Excluded |
| U | 2002 | $101,796,683 | AdvancePCS | PBM | Excluded |
| U | 2003 | $105,910,792 | AdvancePCS | PBM | Excluded |
| U | 2004 | $84,659,067 | AdvancePCS | PBM | Excluded |
| U | 2005 | $65,729,942 | AdvancePCS | PBM | Excluded |
| U | 1997 | $14,457,735 | AdvancePCS Health Systems Inc. | PBM | Excluded |
| U | 1998 | $14,033,920 | AdvancePCS Health Systems Inc. | PBM | Excluded |
| U | 1999 | $19,566,186 | AdvancePCS Health Systems Inc. | PBM | Excluded |
| U | 2000 | $25,885,518 | AdvancePCS Health Systems Inc. | PBM | Excluded |
| U | 2001 | $22,780,839 | AdvancePCS Health Systems Inc. | PBM | Excluded |
| U | 2000 | $3,199,436 | AdvancePCS, L.P. | PBM | Excluded |
| U | 2001 | $2,582,463 | AdvancePCS, L.P. | PBM | Excluded |
| U | 1997 | $1,148,773 | AETNA HEALTH MGMT (PBM) | PBM | Excluded |
| U | 1998 | $1,368,740 | AETNA HEALTH MGMT (PBM) | PBM | Excluded |
| U | 1999 | $1,925,975 | AETNA HEALTH MGMT (PBM) | PBM | Excluded |
| U | 2000 | $1,181,674 | AETNA HEALTH MGMT (PBM) | PBM | Excluded |
| U | 1997 | $5,917 | AlaGap Data Systems , Inc. | PBM | Excluded |
| U | 1998 | $6,775 | AlaGap Data Systems , Inc. | PBM | Excluded |
| U | 2002 | $5,301,445 | Anthem Prescription Management | PBM | Excluded |
| U | 2003 | $11,651,273 | Anthem Prescription Management | PBM | Excluded |
| U | 2004 | $12,376,663 | Anthem Prescription Management | PBM | Excluded |

Exhibit H
PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2005 | $3,886,947 | Anthem Prescription Management | PBM | Excluded |
| U | 2002 | $67,794 | Benescript Services, Inc. | PBM | Excluded |
| U | 2003 | $20,169 | Benescript Services, Inc. | PBM | Excluded |
| U | 2002 | $8,876,673 | Caremark Inc. | PBM | Excluded |
| U | 2003 | $13,718,537 | Caremark Inc. | PBM | Excluded |
| U | 2004 | $16,514,025 | Caremark Inc. | PBM | Excluded |
| U | 2005 | $28,345,256 | Caremark Inc. | PBM | Excluded |
| U | 1997 | $1,340,442 | Caremark Inc., Prescription Service Division | PBM | Excluded |
| U | 1998 | $1,176,156 | Caremark Inc., Prescription Service Division | PBM | Excluded |
| U | 1999 | $1,090,078 | Caremark Inc., Prescription Service Division | PBM | Excluded |
| U | 2000 | $1,318,319 | Caremark Inc., Prescription Service Division | PBM | Excluded |
| U | 2001 | $3,973,103 | Caremark Inc., Prescription Service Division | PBM | Excluded |
| U | 2002 | $422,706 | Caremark Inc., Prescription Service Division | PBM | Excluded |
| U | 1997 | $1,181,434 | Cigna Health Corporation | PBM | Excluded |
| U | 1998 | $1,929,826 | Cigna Health Corporation | PBM | Excluded |
| U | 1999 | $2,868,572 | Cigna Health Corporation | PBM | Excluded |
| U | 2000 | $4,108,048 | Cigna Health Corporation | PBM | Excluded |
| U | 2001 | $4,444,792 | Cigna Health Corporation | PBM | Excluded |
| U | 2002 | $6,805,983 | Cigna Health Corporation | PBM | Excluded |
| U | 2003 | $5,991,153 | Cigna Health Corporation | PBM | Excluded |
| U | 2004 | $7,393,846 | Cigna Health Corporation | PBM | Excluded |
| U | 2005 | $6,996,668 | Cigna Health Corporation | PBM | Excluded |
| U | 1997 | $211,832 | COMPCARE HEALTH SERVICES | PBM | Excluded |
| U | 1998 | $13,936 | COMPCARE HEALTH SERVICES | PBM | Excluded |
| U | 1999 | $21,337,615 | Diversified Pharmaceutical Services Inc. | PBM | Excluded |
| U | 1997 | $8,311,846 | DIVERSIFIED PHARMACEUTICAL SVS | PBM | Excluded |
| U | 1998 | $17,658,292 | DIVERSIFIED PHARMACEUTICAL SVS | PBM | Excluded |
| U | 1999 | $4,843,820 | DIVERSIFIED PHARMACEUTICAL SVS | PBM | Excluded |
| U | 2000 | $26,108,070 | DIVERSIFIED PHARMACEUTICAL SVS | PBM | Excluded |
| U | 2003 | $16,777 | Envision Rx | PBM | Excluded |
| U | 2004 | $50,277 | Envision Rx | PBM | Excluded |

Exhibit H

PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis

Source File: \\syndevsql\e$\GSK\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2005 | $95,140 | Envision Rx | PBM | Excluded |
| U | 1998 | $6,993,173 | Express Scripts, Inc. | PBM | Excluded |
| U | 1999 | $6,593,958 | Express Scripts, Inc. | PBM | Excluded |
| U | 2000 | $17,991,780 | Express Scripts, Inc. | PBM | Excluded |
| U | 2001 | $48,377,021 | Express Scripts, Inc. | PBM | Excluded |
| U | 2002 | $35,085,627 | Express Scripts, Inc. | PBM | Excluded |
| U | 2003 | $42,058,335 | Express Scripts, Inc. | PBM | Excluded |
| U | 2004 | $40,931,240 | Express Scripts, Inc. | PBM | Excluded |
| U | 2005 | $49,208,170 | Express Scripts, Inc. | PBM | Excluded |
| U | 2001 | $185,447 | FIRST HEALTH GROUP CORP | PBM | Excluded |
| U | 2002 | $116,772 | FIRST HEALTH GROUP CORP | PBM | Excluded |
| U | 1997 | $999,025 | Health Net Pharmaceutical Services | PBM | Excluded |
| U | 1998 | $2,228,712 | Health Net Pharmaceutical Services | PBM | Excluded |
| U | 1999 | $1,158,122 | Health Net Pharmaceutical Services | PBM | Excluded |
| U | 2000 | $297,816 | Health Net Pharmaceutical Services | PBM | Excluded |
| U | 2001 | $375,310 | Health Net Pharmaceutical Services | PBM | Excluded |
| U | 1998 | $28,315 | Health Solutions Ltd dba Centrus Phcy Benefits | PBM | Excluded |
| U | 1999 | $97,838 | Health Solutions Ltd dba Centrus Phcy Benefits | PBM | Excluded |
| U | 2000 | $141,578 | Health Solutions Ltd dba Centrus Phcy Benefits | PBM | Excluded |
| U | 2001 | $500,187 | Health Solutions Ltd dba Centrus Phcy Benefits | PBM | Excluded |
| U | 2002 | $221,958 | Innoviant, Inc. | PBM | Excluded |
| U | 2003 | $411,434 | Innoviant, Inc. | PBM | Excluded |
| U | 2004 | $701,042 | Innoviant, Inc. | PBM | Excluded |
| U | 2005 | $1,044,378 | Innoviant, Inc. | PBM | Excluded |
| U | 1997 | $8,724 | IPS (FEMSCRIPT) | PBM | Excluded |
| U | 1998 | $38,450 | IPS (FEMSCRIPT) | PBM | Excluded |
| U | 1998 | $223,248 | Maxor National Pharmacy Services | PBM | Excluded |
| U | 2000 | $2 | Maxor National Pharmacy Services | PBM | Excluded |
| U | 2001 | $38,196 | Maxor National Pharmacy Services | PBM | Excluded |
| U | 2002 | $71,311 | Maxor National Pharmacy Services | PBM | Excluded |
| A | 2002 | $60 | Maxor National Pharmacy Services | PBM | Excluded |

3 of 8

Exhibit H
PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2003 | $59,469 | Maxor National Pharmacy Services | PBM | Excluded |
| U | 2004 | $16,861 | Maxor National Pharmacy Services | PBM | Excluded |
| U | 2005 | $7,472 | Maxor National Pharmacy Services | PBM | Excluded |
| U | 1998 | $96,282 | Maxor Nat'l Phcy Svcs Closed | PBM | Excluded |
| U | 1999 | $421,515 | Maxor Nat'l Phcy Svcs Closed | PBM | Excluded |
| U | 2000 | $532,226 | Maxor Nat'l Phcy Svcs Closed | PBM | Excluded |
| U | 2001 | $78,055 | Maxor Nat'l Phcy Svcs Closed | PBM | Excluded |
| U | 2002 | $17,691 | Maxor Nat'l Phcy Svcs Closed | PBM | Excluded |
| U | 1998 | $49,675 | Maxor Nat'l Phcy Svcs Preferred | PBM | Excluded |
| U | 1999 | $127,247 | Maxor Nat'l Phcy Svcs Preferred | PBM | Excluded |
| U | 2000 | $21,185 | Maxor Nat'l Phcy Svcs Preferred | PBM | Excluded |
| U | 2001 | $17,592 | Maxor Nat'l Phcy Svcs Preferred | PBM | Excluded |
| U | 2002 | $1,511 | Maxor Nat'l Phcy Svcs Preferred | PBM | Excluded |
| U | 1997 | $49,345 | Mayo Foundation for Medical Education & Research | PBM | Excluded |
| U | 1998 | $57,976 | Mayo Foundation for Medical Education & Research | PBM | Excluded |
| U | 1999 | $97,873 | Mayo Foundation for Medical Education & Research | PBM | Excluded |
| U | 2000 | $153,686 | Mayo Foundation for Medical Education & Research | PBM | Excluded |
| U | 2001 | $164,446 | Mayo Foundation for Medical Education & Research | PBM | Excluded |
| U | 1997 | $29,918,028 | MEDCO CONTAINMENT SERVICES | PBM | Excluded |
| U | 1998 | $50,594,496 | MEDCO CONTAINMENT SERVICES | PBM | Excluded |
| U | 1999 | $69,672,755 | MEDCO CONTAINMENT SERVICES | PBM | Excluded |
| U | 2000 | $78,380,908 | MEDCO CONTAINMENT SERVICES | PBM | Excluded |
| U | 2001 | $79,523,236 | MEDCO CONTAINMENT SERVICES | PBM | Excluded |
| U | 2001 | $1,247,635 | MedImpact | PBM | Excluded |
| U | 2002 | $2,617,085 | MedImpact | PBM | Excluded |
| U | 2002 | $1,883,715 | MedImpact Healthcare Sytems, Inc. | PBM | Excluded |
| U | 2003 | $3,359,322 | MedImpact Healthcare Sytems, Inc. | PBM | Excluded |
| U | 2004 | $1,846,542 | MedImpact Healthcare Sytems, Inc. | PBM | Excluded |
| U | 2005 | $2,152,335 | MedImpact Healthcare Sytems, Inc. | PBM | Excluded |
| U | 1997 | $821,445 | MEDIMPACT INC. (PBM) | PBM | Excluded |
| U | 1998 | $1,423,858 | MEDIMPACT INC. (PBM) | PBM | Excluded |

Exhibit H
PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 1999 | $1,687,817 | Medimpact Inc. (PBM) | PBM | Excluded |
| U | 2000 | $2,153,960 | Medimpact Inc. (PBM) | PBM | Excluded |
| U | 2001 | $4,194,138 | Medimpact Inc. (PBM) | PBM | Excluded |
| U | 2002 | $1,882,363 | MEDIMPACT INC. (PBM) | PBM | Excluded |
| U | 2001 | $39,726,693 | Merck-Medco Managed Care, L.L.C. | PBM | Excluded |
| U | 2002 | $163,055,987 | Merck-Medco Managed Care, L.L.C. | PBM | Excluded |
| U | 2003 | $144,689,817 | Merck-Medco Managed Care, L.L.C. | PBM | Excluded |
| U | 2004 | $127,523,123 | Merck-Medco Managed Care, L.L.C. | PBM | Excluded |
| U | 2005 | $140,757,615 | Merck-Medco Managed Care, L.L.C. | PBM | Excluded |
| U | 2002 | $3,289,816 | National Medical Health Card Systems, Inc. | PBM | Excluded |
| U | 2003 | $3,585,541 | National Medical Health Card Systems, Inc. | PBM | Excluded |
| U | 2004 | $3,207,733 | National Medical Health Card Systems, Inc. | PBM | Excluded |
| U | 2005 | $4,360,657 | National Medical Health Card Systems, Inc. | PBM | Excluded |
| U | 1997 | $1,605,880 | National Prescription Administrators Inc. | PBM | Excluded |
| U | 1998 | $2,423,768 | National Prescription Administrators Inc. | PBM | Excluded |
| U | 1999 | $3,217,645 | National Prescription Administrators Inc. | PBM | Excluded |
| U | 2000 | $1,564,829 | National Prescription Administrators Inc. | PBM | Excluded |
| U | 2001 | $4,768,651 | National Prescription Administrators Inc. | PBM | Excluded |
| U | 2002 | $2,584,970 | National Prescription Administrators Inc. | PBM | Excluded |
| U | 2004 | $1,587,102 | Navitus Health Solutions, LLC | PBM | Excluded |
| U | 2005 | $1,625,237 | Navitus Health Solutions, LLC | PBM | Excluded |
| U | 2005 | $7,952 | Navitus Health Solutions, LLC.-Badger Rx | PBM | Excluded |
| U | 1997 | $56,612 | Nexgen | PBM | Excluded |
| U | 1998 | $4,353 | Nexgen | PBM | Excluded |
| U | 1999 | $21,109 | Nexgen | PBM | Excluded |
| U | 2000 | $129,409 | NMHC Systems, Inc. | PBM | Excluded |
| U | 2001 | $221,527 | NMHC Systems, Inc. | PBM | Excluded |
| U | 1998 | $97,974 | PBM Plus | PBM | Excluded |
| U | 1999 | $238,325 | PBM Plus | PBM | Excluded |
| U | 2000 | $371,077 | PBM Plus | PBM | Excluded |
| U | 2001 | $511,588 | PBM Plus | PBM | Excluded |

Exhibit H

PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis

Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | Year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2002 | $5,610 | PBM Plus | PBM | Excluded |
| U | 2005 | $81,188 | Perform RX | PBM | Excluded |
| U | 1997 | $153,143 | PharmaCare, Inc. | PBM | Excluded |
| U | 1998 | $812,782 | PharmaCare, Inc. | PBM | Excluded |
| U | 1999 | $1,568,068 | PharmaCare, Inc. | PBM | Excluded |
| U | 2000 | $2,246,597 | PharmaCare, Inc. | PBM | Excluded |
| U | 2001 | $2,313,448 | PharmaCare, Inc. | PBM | Excluded |
| U | 2002 | $1,758,211 | PharmaCare, Inc. | PBM | Excluded |
| U | 2003 | $2,790,813 | PharmaCare, Inc. | PBM | Excluded |
| U | 2004 | $1,889,596 | PharmaCare, Inc. | PBM | Excluded |
| U | 2005 | $1,926,081 | PharmaCare, Inc. | PBM | Excluded |
| U | 2002 | $222,962 | Pharmaceutical Care Network | PBM | Excluded |
| U | 2003 | $829,189 | Pharmaceutical Care Network | PBM | Excluded |
| U | 2004 | $274,318 | Pharmaceutical Care Network | PBM | Excluded |
| U | 2005 | $81,141 | Pharmaceutical Care Network | PBM | Excluded |
| U | 2003 | $200,382 | Pharmaceutical Technologies Inc. | PBM | Excluded |
| U | 2004 | $210,821 | Pharmaceutical Technologies Inc. | PBM | Excluded |
| U | 2005 | $311,247 | Pharmaceutical Technologies Inc. | PBM | Excluded |
| U | 2001 | $17,553 | Pharmaceutical Technologies, Inc. (PTI) | PBM | Excluded |
| U | 2002 | $26,013 | Pharmaceutical Technologies, Inc. (PTI) | PBM | Excluded |
| U | 2001 | $443,831 | Prescription Solutions | PBM | Excluded |
| U | 2002 | $3,183,779 | Prescription Solutions | PBM | Excluded |
| U | 2003 | $1,816,301 | Prescription Solutions | PBM | Excluded |
| U | 2004 | $2,513,881 | Prescription Solutions | PBM | Excluded |
| U | 2005 | $2,907,179 | Prescription Solutions | PBM | Excluded |
| U | 1997 | $22,195 | PRESCRIPTION SOLUTIONS (PBM) | PBM | Excluded |
| U | 1997 | $1,689,671 | Prime Therapeutics Inc. | PBM | Excluded |
| U | 1998 | $1,834,105 | Prime Therapeutics Inc. | PBM | Excluded |
| U | 1999 | $2,394,915 | Prime Therapeutics Inc. | PBM | Excluded |
| U | 2000 | $2,421,904 | Prime Therapeutics Inc. | PBM | Excluded |
| U | 2001 | $3,065,268 | Prime Therapeutics Inc. | PBM | Excluded |

Exhibit H
PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 2002 | $1,999,502 | Prime Therapeutics Inc. | PBM | Excluded |
| U | 2002 | $3,440,526 | Prime Therapeutics, Inc. | PBM | Excluded |
| U | 2003 | $6,592,817 | Prime Therapeutics, Inc. | PBM | Excluded |
| U | 2004 | $6,142,223 | Prime Therapeutics, Inc. | PBM | Excluded |
| U | 2005 | $14,566,141 | Prime Therapeutics, Inc. | PBM | Excluded |
| U | 1999 | $2,210 | ProCare Rx | PBM | Excluded |
| U | 2001 | $396,377 | ProCare Rx | PBM | Excluded |
| U | 2002 | $158,056 | ProCare Rx | PBM | Excluded |
| U | 1997 | $736,740 | ProVantage Prescription Benefit Management Service | PBM | Excluded |
| U | 1998 | $1,361,169 | ProVantage Prescription Benefit Management Service | PBM | Excluded |
| U | 2003 | $29,897 | Provider Synergies | PBM | Excluded |
| U | 2004 | $65,836 | Provider Synergies | PBM | Excluded |
| U | 2005 | $157,323 | Provider Synergies | PBM | Excluded |
| U | 2000 | $18,204 | Provider Synergies, Inc. | PBM | Excluded |
| U | 2001 | $187,314 | Provider Synergies, Inc. | PBM | Excluded |
| U | 2002 | $248,890 | Provider Synergies, Inc. | PBM | Excluded |
| U | 2002 | $6,731 | Quality Pharmaceutical Services | PBM | Excluded |
| U | 2005 | $1,190,388 | Regence Group | PBM | Excluded |
| U | 2004 | $365,863 | RxAmerica | PBM | Excluded |
| U | 2005 | $376,499 | RxAmerica | PBM | Excluded |
| U | 1997 | $10,676 | Scott and White Prescription Services | PBM | Excluded |
| U | 1998 | $51,926 | Scott and White Prescription Services | PBM | Excluded |
| U | 1999 | $11,981 | Scott and White Prescription Services | PBM | Excluded |
| U | 2000 | $10,283 | Scott and White Prescription Services | PBM | Excluded |
| U | 2001 | $9,373 | Scott and White Prescription Services | PBM | Excluded |
| U | 2002 | $15,449 | Scott and White Prescription Services | PBM | Excluded |
| U | 2003 | $13,900 | Scott and White Prescription Services | PBM | Excluded |
| U | 2001 | $282,252 | Scrip Solutions, Inc. | PBM | Excluded |
| U | 2002 | $340,729 | Scrip Solutions, Inc. | PBM | Excluded |
| U | 2002 | $902,078 | ScripSolutions, Inc. | PBM | Excluded |
| U | 2003 | $778,234 | ScripSolutions, Inc. | PBM | Excluded |

Exhibit H
PBM Rebates From GSK's HLDR Table Improperly Excluded From Dr. Gaier's Analysis
Source File: \\syndevsql\e$\GSK\AG-0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL_CN_REB_FEE_HLDR_V.txt

| calc_basis_cd | year | Rebate Amount | Business Name | Business Type Description | Excluded |
|---|---|---|---|---|---|
| U | 1997 | $111,261 | TDI Managed Care Services, Inc. d-b-a Eckerd | PBM | Excluded |
| U | 1998 | $687,469 | TDI Managed Care Services, Inc. d-b-a Eckerd | PBM | Excluded |
| U | 1999 | $748,077 | TDI Managed Care Services, Inc. d-b-a Eckerd | PBM | Excluded |
| U | 2000 | $689,715 | TDI Managed Care Services, Inc. d-b-a Eckerd | PBM | Excluded |
| U | 2001 | $2,811,112 | TDI Managed Care Services, Inc. d-b-a Eckerd | PBM | Excluded |
| U | 2002 | $1,181,360 | TDI Managed Care Services, Inc. d-b-a Eckerd | PBM | Excluded |
| U | 2001 | $11,057 | The Community Partnership of Southern Arizona | PBM | Excluded |
| U | 2002 | $6,304 | The Community Partnership of Southern Arizona | PBM | Excluded |
| U | 1998 | $41,191 | Touchpoint Health Plan | PBM | Excluded |
| U | 1999 | $237,179 | Touchpoint Health Plan | PBM | Excluded |
| U | 2000 | $347,088 | Touchpoint Health Plan | PBM | Excluded |
| U | 2001 | $475,862 | Touchpoint Health Plan | PBM | Excluded |
| U | 2002 | $169,056 | Touchpoint Health Plan | PBM | Excluded |
| U | 2001 | $22,116 | USI Rx , Inc | PBM | Excluded |
| U | 2002 | $13,277 | USI Rx , Inc | PBM | Excluded |
| U | 1998 | $2,913,663 | VALUERX INC. (PBM) | PBM | Excluded |
| U | 1999 | $3,749,020 | VALUERX INC. (PBM) | PBM | Excluded |
| U | 2000 | $1,548,214 | VALUERX INC. (PBM) | PBM | Excluded |
| U | 2001 | $7,819,382 | WellPoint Health Networks Inc | PBM | Excluded |
| U | 2002 | $17,479,668 | WellPoint Health Networks Inc | PBM | Excluded |
| U | 2003 | $19,655,529 | WellPoint Health Networks Inc | PBM | Excluded |
| U | 2004 | $18,808,165 | WellPoint Health Networks Inc | PBM | Excluded |
| U | 2005 | $45,703,418 | WellPoint Health Networks Inc | PBM | Excluded |
| U | 1997 | $6,437,682 | WELLPOINT PHARMACY MANAGEMENT | PBM | Excluded |
| U | 1998 | $12,465,345 | WELLPOINT PHARMACY MANAGEMENT | PBM | Excluded |
| U | 1999 | $15,842,265 | WELLPOINT PHARMACY MANAGEMENT | PBM | Excluded |
| U | 2000 | $19,010,171 | WELLPOINT PHARMACY MANAGEMENT | PBM | Excluded |
| U | 2001 | $11,377,916 | WELLPOINT PHARMACY MANAGEMENT | PBM | Excluded |

**Total Rebates** $2,271,365,091