UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*The City of New York, et al.*<br><br>v.<br><br>*Abbott Laboratories, et al.* | ) MDL NO. 1456<br>) Civil Action No. 01-12257-PBS<br>) Subcategory Case No. 03-10643-PBS<br>)<br>) Judge Patti B. Saris<br>) |

## SECOND SUPPLEMENTAL AFFIDAVIT OF HARRIS L. DEVOR

Harris L. Devor, being duly sworn, deposes and states as follows:

Counsel for the Plaintiffs in the matter of The City of New York, et al v. Abbott Laboratories, Inc., et al (the "Litigation") has asked me to prepare this affidavit (my "Second Supplemental Affidavit") in support of their Supplemental Memorandum of Law in Opposition to Defendant Smithkline Beecham Corporation, D/B/A GlaxoSmithKline's ("GSK's") Motion for Partial Summary Judgment.

## I. MATERIALS CONSIDERED

1. As part of the analysis in preparation of this Second Supplemental Affidavit, I, or staff working under my supervision, have reviewed Defendant Smithkline Beecham Corporation, D/B/A GlaxoSmithKline's ("GSK's") Memorandum of Law in Support of its Motion for Partial Summary Judgment in the New York County Cases ("GSK's Memorandum of Law"), the Reply Brief Of [GSK] In Support Of Its Motion For Partial Summary Judgment In The New York County Cases, (the "GSK PSJ Reply"), both (a) the Affidavit of Eric M. Gaier, Ph.D. (the "Gaier Affidavit") and (b) the Supplemental Affidavit from Dr. Gaier (the "Gaier Supplemental Affidavit"), including all related exhibits thereto and the underlying analysis - in electronic format - as produced by Dr. Gaier, as well as GSK's 1997 through 2005 (the "relevant timeframe") transactional direct sales, chargeback, and commercial rebate data (as produced in this or related litigation).

2. In addition, I, or staff working under my supervision, have reviewed the additional utilization rebate data provided by GSK's counsel on May 7, 2009 and June 9, 2009 for the years 1997-2005, related to the 262 NDCs at issue in GSK's Memorandum of Law.

## II. SCOPE OF ASSIGNMENT

3. In connection with this Second Supplemental Affidavit, I have been specifically asked by Plaintiffs' counsel to perform the following for each relevant GSK drug product for the relevant timeframe:

- a WAC List Price Test to determine, in the manner prescribed by the Court's findings from the "Track One" MDL trial, whether GSK's net sales prices were "at or about" the published WAC (i.e., at 95% or more of published WAC) and

- an AWP Spread Test determining the difference between GSK's average sales price ("ASP") to providers for subject NDCs and the published AWP for corresponding GSK NDCs.

4.      This Second Supplemental Affidavit presents the results of these computations (including in exhibits attached hereto) and a description of the methodology underlying the performance of the two tasks described above.

## III.    QUALIFICATIONS

5.      My work as an accountant and auditor for the past 36 years, as well as in the litigation services I have provided over the past 25 years, most specifically in the context of the numerous matters listed in the Devor Affidavit (amongst others) relating to the reporting of prices to pricing compendia by pharmaceutical manufacturers, for which I have been engaged, has provided me extensive experience in the review, consideration, and analysis of pharmaceutical product pricing, reporting, the determination of AWP, WAC and of net prices paid by both wholesalers and pharmaceutical providers, as well as a familiarity with accounting records, other documents generated and maintained by corporations, and database and other query language tools used to analyze the data provided by GSK and Dr. Gaier and to both compute net sales prices for purposes of the WAC List Price Test and perform an AWP Spread test. A summary of my analysis and related conclusions, in the context of my experience with such matters and my review of the items set forth in the "Materials Considered" section above, is set forth herein, below.

## IV.    DISCUSSION OF COMPUTATIONS AND RESULTS
### WAC List Price Test Calculation

6.      The computations underlying the WAC List Price Test in this Second Supplemental Affidavit differ from the computations of net sales prices submitted in my prior Affidavit of February 11, 2009. The computations described and summarized within my Affidavit dated February 11, 2009 were performed in response to the Gaier Affidavit and attempted merely to correct for a limited number of errors that I had identified in Dr. Gaier's computations of net sales prices. The computations I performed in connection with that Affidavit, therefore, did not attempt to compute what I believed to be my version of the WAC List Price test for the subject GSK NDCs, nor attempt to perform the WAC List Price Test in the manner I would deem most conservative and appropriate using the data made available to me by GSK.

7. The computations and results discussed herein, however, reflect my view of the proper application of the WAC List Price Test, using such data.

8. Accordingly, these calculations appropriately account for all chargebacks, rebates, and prompt pay discounts paid by GSK to any entity in GSK's pharmaceutical distribution chain. Many of the discounts paid by GSK, and included within the data made available to me, could not be tied directly to the original direct sale transaction. Thus, I have employed a method of applying these discounts which, in my view, best reflects net discounts at the unit level to perform the WAC List Price Test.

### *Discussion of Methodology Regarding Direct Sales and Discounts*

9. The first phase of my computations under the WAC List Price Test prescribed by this Court involved consideration of "direct sales." My computations start by analyzing all of GSK's direct sales units found in Dr. Gaier's intermediate file titled "Direct_Sales_Subject." For each NDC at issue and for each year possible in the relevant timeframe, given the data made available to me, I have computed the total number of units sold by GSK that were discounted by an amount that was at least 5% of WAC.

10. In taking this approach, I began with the presumption (which is supported by the data) that nearly all initial direct sale transactions are at or below WAC. Therefore, any individual transaction that reflects a per unit net discount of at least 5% of WAC indicates that the GSK net sale price for the units associated with that transaction was no greater than 95% of WAC, the threshold established by this Court for the WAC List Price Test. A discount of at least 5% is equivalent to a sale of less than or equal to 95%.

### *Prompt Pay Discount*

In performing the aforementioned computations, every direct sale made by GSK is assumed to have been sold at a 2% prompt-pay discount from the WAC, pursuant to the GSK PSJ Reply. (GSK PSJ Reply, p. 14, footnote 18)

11. For each direct sale transaction, I have calculated the per unit net discount as a percentage of WAC by combining the 2% prompt pay discount with any additional direct sale discount

4

percentage per unit, based on the transaction unit price. If the net, per unit discount was at least 5%, the unit quantity associated with the direct sale and/or related discounts was placed into a "fail" category, set aside and exempted from future per unit reductions. Otherwise, the unit quantity remained in the "pass" category and the associated units were retained for consideration of the potential impact of chargebacks or rebates.

### *Discussion of Methodology Regarding Chargebacks*

12. As discussed by Dr. Gaier and in both my initial and Supplemental Affidavits, chargebacks reduce the net sales price of GSK's drugs. GSK has provided Plaintiffs chargeback data (which resides in Dr. Gaier's intermediate file) within a file/database entitled "Chargeback_Sales_Subject". For each chargeback unit found in this file, I have calculated the per unit net discount as a percentage of WAC by combining the 2% prompt pay discount with the per unit chargeback percentage from WAC. If the net, per unit discount, after applying chargebacks, was at least 5%, the unit quantity associated with the chargeback was placed into the "fail" category, set aside and exempted from future per unit reductions. Otherwise, the unit quantity remained in the "pass" category and the associated units were retained for consideration of the impact of rebates.

### *Discussion of Methodology Regarding Rebates*

13. After considering the effect of per unit percentage discounts related to chargebacks, for subject NDCs, my computations in the context of the WAC List Price test considered the impact, if any, on those prices from rebates that had been paid by GSK on particular units.

### *Utilization Rebates (ORS)*

14. The "utilization" rebate data previously provided to Plaintiffs' by GSK included unit information that did not accurately represent the number of units for which GSK had paid utilization rebates. GSK has subsequently provided Plaintiffs' with de-duplicated unit information for utilization rebates in files entitled "Highly_Confidential_GSK_1997_2002_ Utilization_Data.xls" and "Highly_Confidential_GSK2003_2005_Utilization_Data.xls." The unit information within these files was merged with records from GSK's separate rebate file - entitled "\\syndevsql\e$\GSK\AG0035644\1997_2005_Data\ORS\HIGHLY_CONFIDENTIAL

_CN_REB_FEE_HLDR_V.txt" - which provides the dollar amounts of utilization rebates paid by GSK in each year during the relevant timeframe, by NDC.

15.  Combining the utilization rebate dollar amounts with the utilization rebate unit amounts has allowed me to calculate per unit utilization rebate amounts and discount percentages. After including rebates, I again computed the per unit net discount as a percentage of WAC by combining the 2% prompt pay discount with the utilization rebate per unit discount percentage based on the rebate amount and units. If the net, per unit discount, after applying ORS utilization rebates, was at least 5%, the unit quantity was placed into the "fail" category, set aside and exempted from future per unit reductions. Otherwise, the unit quantity remained in the "pass" category and the associated units were retained for consideration of the impact of additional rebates for which data was made available by GSK.

*ORS Purchase Rebates and IMHC Rebates*

16.  For purchase rebates referred to by GSK as "ORS" and other rebates classified as "IMHC," it was necessary for me to determine, for purposes of the WAC List Price Test, whether the units tied to such rebates had already been placed in the "fail" as a result of previously-applied discounts, chargebacks, or utilization rebates. This was done by comparing the customer number associated with the ORS Purchase or IMHC rebates to discounted direct sale or chargeback units that had already been classified as "failed."

17.  If the units associated with the rebate had already been found to have "failed" (i.e., net discounts were 5% or more of WAC), the ORS Purchase or IMHC rebates were ignored. For units that had not already been classified as "failed," I attempted to give effect to these additional rebates.

18.  Unresolved issues in determining the unit quantities related to ORS Purchase and IMHC rebates, however, did not allow for the determination of per unit impact in the same manner employed for ORS utilization rebates. As such, I determined the per unit rebate percentage discount for ORS Purchase and IMHC rebates based on the de-duplicated *utilization* rebate data received from GSK by NDC and year. Specifically, I took the percentage of WAC of the per unit *utilization* rebate data discussed above and used that percentage to project the number of

6

units to which GSK's ORS Purchase and IMHC rebates applied. For example, if GSK's utilization rebates for a particular NDC and year averaged 5% of WAC, I have assumed that the ORS Purchase and IMHC rebates for that NDC and year were also 5% of WAC in order to determine the units applicable to any particular rebate. My determination of per unit percentages of WAC for ORS Purchase and IMHC rebates were, then, applied to subject units in the same manner as other discounts, chargebacks, or utilization rebates for purposes of the WAC List Price Test.

19.     Ultimately, I again computed the per unit net discount as a percentage of WAC by combining the 2% prompt pay discount with the per unit rebate percentage, in this case based on the rebate amount and projected units. If the net, per unit discount, after applying additional rebates, was at least 5%, the unit quantity was placed into the "fail" category. Otherwise, the unit quantity remained in the "pass" category.

### *Final Calculations*

20.     The final step in my analysis entailed determining, for each NDC at issue and for each calendar year in the relevant timeframe, the percentage of sales at or near WAC, as prescribed in this Court's description of the WAC List Price Test. This step was performed by taking the quantity of units remaining in the "pass" category and determining the ratio of those units to the total unit quantity of the original direct sales. If the ratio was greater than or equal to 50%, I concluded that the NDC (for a particular year) had "passed" the WAC List Price Test. If the ratio was less than 50%, I concluded that the NDC (for a particular year) had "failed" the WAC List Price Test.

21.     Based on the foregoing analysis, which attempts to replicate that which has been described as the WAC List Price Test by this Court, it is my conclusion that 1115 of the annual NDC computations (for 260 of the 262 subject GSK NDCs) pass the WAC List Price test and 715 of the annual NDC computations (for the 260 of the 262 subject GSK NDCs) fail the WAC List Price Test. In total, only 147 of the 260 NDCs for which I could perform my analysis pass the WAC List Price Test over the relevant timeframe, compared to Dr. Gaier's conclusion that 208 NDCs passed the test. In connection therewith, the results of my computations indicate that $786,377,266 of Plaintiffs' total $2,338,004,480 in expenditures during the relevant timeframe

7

were for NDCs failing the WAC List Price Test. See Exhibit A to this Second Supplemental Affidavit, with summary results at page 38 thereto.

## AWP Spread Test Calculation

### *Overview of AWP Spread Test Methodology*

22. My AWP Spread Test analysis was conducted by computing, for each NDC and year, the Average Sales Price ("ASP") to providers of subject GSK NDCs and then comparing that ASP to a weighted average of the published AWPs for the corresponding NDC and year.

23. My computations of ASP started with an analysis of the direct sales between GSK and the provider classes of trade found in Exhibit C to this Second Supplemental Affidavit.

24. In addition, I included in my computations the sales to wholesalers used by Dr. Gaier in his own AWP Spread calculations, to capture the effect of sales made by wholesalers to provider entities that were both subject to chargebacks and not subject to chargebacks.

25. GSK's rebate payments (a) to the relevant classes of trade found in Exhibit C and (b) to PBMs were subtracted from the sales prices to providers, where applicable, to arrive at ASP.

### *Discussion of the Computations*

26. For each NDC at issue, and for each quarterly period within the relevant timeframe for which relevant data was made available to me, I aggregated all of the direct sales found in GSK's direct sales data to the provider classes of trade found in Exhibit C to this Second Supplemental Affidavit during the 12 months preceding the end of the quarter. I also aggregated all of the wholesaler sales to the relevant classes of trade used by Dr. Gaier in his analysis of AWP Spreads for the same 12 month period. I then aggregated provider credits and rebates (including PBM credits and rebates) processed between GSK and customers in the provider classes of trade for the same 12 month period and subtracted those aggregated amounts from the aggregation of units sold (for both direct and indirect sales, in total) over the same 12-month period to arrive at an average price, as of the end of a particular quarter. This represented my estimated measure of ASP, the computation of which was performed using both manufacturer-provided transactional data and the sales to wholesalers used by Dr. Gaier in his own AWP Spread calculations.

27.    In order to perform and summarize the AWP Spread Test on an annual basis, which is the manner in which the test was performed by Dr. Gaier, I next determined a calendar year ASP by computing a unit-weighted average of the four, quarterly ASPs (discussed in the preceding paragraphs) that fell within each calendar year.

28.    Finally, in order to determine a "spread," as that term has been defined and used by this Court, for each NDC for each year, I compared the calendar-year, unit-weighted average ASP to a weighted average of First Databank AWPs for the same twelve month period.

### *Results*

29.    The results of this analysis are that 749 out of 1941 annual spread computations (39%) reflect a spread of greater than 30%. This number compares to Dr. Gaier's conclusion, using *wholesaler* data, that only 269 out of 1933 annual spread computations (14%) reflected a spread of greater than 30%.

30.    Similarly, the results of my AWP Spread Test challenge Dr. Gaier's conclusion that 99.6% of Plaintiffs' expenditures for GSK's drugs at issue were for drugs with an AWP Spread of 30% or less. My revised analysis shows that not more than 37% of Plaintiffs' expenditures for GSK's drugs at issue ($854,625,383 of total expenditures of $2,339,661,459) were for drugs with an AWP Spread of 30% or less. See Exhibit B to this Second Supplemental Affidavit, with summary results at page 47 thereto.

June 16, 2009

_____
Harris L. Devor

Subscribed and sworn to before me this ____ day of June, 2009.

_____
Notary Public