UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>  *The City of New York, et al.*<br>*v.*<br>  *Abbott Laboratories, et al.* | ) <br>)  MDL NO. 1456<br>)  Civil Action No. 01-12257-PBS<br>)  Subcategory Case No: 03-10643-PBS<br>)<br>)  Judge Patti B. Saris<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO SMITHKLINE BEECHAM CORPORATION, D/B/A GLAXOSMITHKLINE'S (GSK'S) MOTION FOR PARTIAL SUMMARY JUDGMENT**

### INTRODUCTION

All of GSK's Customer Rebates (GSK's nomenclature[1]) are paid for exactly the same reason: to increase demand for and sales of GSK products[2]. All of GSK's Customer Rebates are paid based on volume and at the NDC and unit level[3]. All of GSK's Customer Rebates reduce GSK's sales price for its products[4]. GSK's public filings make clear that to arrive at GSK's net sales or net revenue for the products in its US Pharmaceutical Line one must deduct all "Customer Rebates" (GSK's nomenclature) from Gross Sales. *See* GSK's 2005 Form 20-F (Exh. A to Cicala Supp. Aff.) Thus, given the purpose of the WAC List Price Test, which is to

---
[1] *See for example,* GlaxoSmithKline Form 20-F for the fiscal year ended December 31, 2005, filed March 3, 2006 ("GSK's 2005 20-F") at 64, available at http://www.gsk.com/investors/reps05/20F-2005.pdf. "Customer rebates are offered to key managed care and group purchasing organizations and other direct and indirect customers. These arrangements require the customer to achieve certain performance targets relating to value of product purchased, formulary status or pre-determined market shares relative to competitors." *See* Exhibit A to the Supplemental Affidavit of Joanne M. Cicala, sworn to June 16, 2009 ("Cicala Supp. Aff.").
[2] *See* Section I, *infra*.
[3] *See* GSK 30(b)(6) Rebate Deposition (David Brown) (Exh. B to Cicala Supp Aff.) June 3, 2009 ("30(b)(6) Rebate Dep.") at 154:25-156:16,
[4] *See id.* at 67:11-68:3.

determine GSK's net sales price and net revenue for its products[5], all GSK Customer Rebates must be included. *See* Transcript of Motion Hearing, dated April 16, 2009, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, Civ. No. 01-12257-PBS (hereinafter "Hearing Transcript"), at 40, (On how to do FTC test, "I would want to include all rebates…. So utilization, that's just a rebate by any other name . . . .") (attached as Exh. C to Cicala Supp. Aff.)

Yet, in effort to avoid liability under the test, GSK has taken a litigation position, against all of its data detailing the billions in rebates paid to increase sales, and against its documents and testimony (including the testimony of its June 3, 2009 30(b)(6) corporate designee for rebate topics) that, when considering its net sales price per unit and its net revenue per unit, GSK's Customer Rebates should be broken into "provider" and "utilization" categories and only rebates paid to the "provider" category are relevant. [6]

There is no support anywhere for the proposition GSK is advancing. Neither GSK's data nor its documents nor its public filings[7] make any distinction between provider and utilization rebates - nor could they given the features shared by both. *See* discussion *infra* at 5-8. Even GSK's expert can barely muster a distinction. *Compare* Supplemental Affidavit of Eric M. Gaier, Ph.D., sworn to Mar. 4, 2009 (hereinafter "Gaier Suppl. Aff.") [Dkt. No. 5940] at 9 ("[P]urchase-

---

[5] *see* Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline's ("GSK's") Memorandum of Law in Support of its Motion for Partial Summary Judgment in the New York County Cases (hereinafter "GSK Mem.") [Dkt. No. 5707] at 15

[6] GSK has argued, incorrectly, that plaintiffs' expert, Harris Devor, agrees with GSK's approach. In support, GSK has pointed to footnote 2 of Mr. Devor's February 11, 2009 Affidavit submitted in opposition to GSK's Motion for Partial Summary Judgment [Dkt. No. 5893] ("the Devor Affidavit") which reads "[i]t is not my position that all PBM rebates should be included. Rather, only those rebates attributable to PBM Mail Order operations would properly be included, and are in my analysis".  The footnote is connected to Mr. Devor's discussion of how Dr. Gaier did not do what he said when conducting the WAC List Price test.  Mr. Devor's position regarding the proper application of this test is set forth in the Devor Second Supp. Aff. .

[7] GSK's public filings make clear that to arrive at GSK's net sales or net revenue for the products in its US Pharmaceutical Line one must deduct all "Customer Rebates" (GSK's nomenclature) from Gross Sales. *See* GSK's 2005 20-F (Exh. A to Cicala Supp. Aff.), at 64, ("Gross [revenue] is reduced by ***rebates***, discounts, allowances and product returns given or expected to be given, which vary by product arrangements and buying groups.") (emphasis added).

based rebates are earned by certain providers and other entities in recognition of the volume of pharmaceutical product actually purchased. . . . ") *with id*. ("'[U]tilization-based rebates' are earned by certain PBMs, third-party payors, and other entities in recognition of the manufacturer's overall 'market share' of a pharmaceutical product utilized by their members.").[8] Substitute the word "utilized" with "purchased" in the foregoing and the definitions are substantively identical. In both cases, as in the case of all Customer Rebates paid by GSK, the Customer Rebates are offered and paid, pursuant to contract, at the NDC and unit level, to incentivize sales of GSK's products and based on volume. *See* discussion *infra* at 5-8.

When all "Customer Rebates" are properly included in the WAC List Price Test, then on an aggregate basis between 1997-2005, 113 of the 262 NDCs at issue, representing $786.4 million in at-issue expenditures fail the test. When viewed on an annual, (rather than aggregate) basis, the expenditures associated with failing NDCs increase to $803.1 million. *See* Second Supplemental Affidavit of Harris L. Devor, sworn to June 16, 2009 ("Devor Second Supp. Aff.") and Exhibit A thereto. These results further demonstrate why GSK's motion must fail.

Moreover, even if the Court should disagree that all GSK "Customer Rebates" must be included in the WAC List Price Test, GSK is not entitled to the relief sought by its motion. As noted in plaintiffs' prior submissions, the WAC List Price Test was one prong of a three prong analysis for liability in the context of Mass Gen L. ch93a. *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 491 F.Supp.2d 20, 101-102 (D. Mass. 2007) (hereinafter "Track One Opinion"), *Id*. The other two prongs ask were there "spreads above the 30%

---

[8] Dr. Gaier also averred that both purchase and utilization rebates were paid based on the entities' ability to increase sales of GSK's products. *See* Gaier Suppl.Aff. at 9, defining purchase rebates as rebates "earned by certain providers and other entities in recognition of the volume of pharmaceutical product actually purchased. For example, a provider might earn a 10% rebate for a particular NDC if it purchases more than 100 units a month." Dr. Gaier also defined utilization based rebates as being earned by inducing purchases of GSK's products, stating that utilization rebates are "earned by certain PBMs, third-party payors, and other entities in recognition of the manufacturer's overall 'market share' of a pharmaceutical product utilized by their members. . . . PBM rebates are earned through market share utilization of GSK products . . . ." *See id*. at 9-10.

yardstick expected in the industry", *id*., and "did the defendant engage in a proactive scheme to market the spread to doctors by encouraging them to purchase drugs because of their profitability rather than their therapeutic qualities." *Id*. GSK expressly did not move on either. *See* GSK Mem. at 1-2[9].   This fact alone means that GSK is not entitled to the relief sought by its motion. There is every good reason to believe that on a full record it will be established that GSK did compete on spread for at least certain of its products (*i.e.*, those which faced competition in their therapeutic class) and that, as set forth in the Devor Second Supp. Aff., when all rebates are properly considered 43% of the at-issue NDCs *fail* (i.e. have spreads greater than 30% on an annual basis) the ASP/AWP spread test.  Devor Second Supp. Aff. at Exhibit B. *See also,* Sections II and III, *infra.*

## ARGUMENT

I. **ALL GSK CUSTOMER REBATES DISCOUNTS AND INCENTIVES ARE PAID FOR SAME REASON AND MUST BE INCLUDED IN WAC LIST PRICE TEST; 113 OUT OF 262 NDCS FAIL TEST**

GSK sells its drugs to direct customers.  *See* GSK Mem. at 3-4.  *See also* Statement of Undisputed Material Facts in Support of Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline's ("GSK's") Motion for Partial Summary Judgment in the New York County Cases [Dkt. No. 5708] at ¶4.  Direct customers are wholesaler and non-wholesalers.  *Id*. The parties agree that where GSK is selling to a non-wholesaler, the WAC List Price Test is to be

---

[9]   *See also* Reply Brief of Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline's ("GSK's") in Support of its Motion for Partial Summary Judgment in the New York County Cases (hereinafter "GSK Reply") at 1-2.   *See also* Statement of Undisputed Material Facts in Support of Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline's (GSK's") Motion for Partial Summary Judgment in the New York County Cases (hereinafter "GSK Statement of Facts") at ¶ 27 ("GSK is not presently moving for summary judgment on the basis of the AWP "spreads" of its drugs . . . .").   *See also* Hearing Transcript at 21:25-22:4 ("MR. HEROLD: But that's it.  Now the plaintiffs attack the spread test too, and I'm happy to get to that.  THE COURT: The 30 percent.  MR. HEROLD: Correct.  Even though we're not moving on that.").

conducted by subtracting all rebates, discounts, incentives paid from the initial invoice price. There is no issue here.

The parties disagree as to how the WAC List Price Test is to be conducted in the context of GSK sales to wholesalers. An understanding of these sales, and the substantial downstream incentives rebates and discounts GSK pays in connection with these transactions will make clear why plaintiffs' view is correct.

GSK's initial sale of drugs to wholesalers is generally undiscounted, except for the prompt pay discount which GSK pays to all its direct customers. *See* GSK Mem. at 11. However, as stated above, GSK pays rebates, discounts and other incentives further down the distribution chain on the initially undiscounted units. GSK agrees that many of these downstream rebates, discounts and other incentives should be included in the WAC List Price Test. Illogically, however, and without any record support, GSK seeks to exclude other discounts that are, on their face, clearly paid for the exact same reason: to move market share.[10]

For example, GSK pays chargebacks to wholesalers for certain units sold directly to wholesalers and then re-sold to indirect entities. *See* GSK Reply at 9. These chargebacks are paid to the wholesalers on the basis of GSK contracts with the chargeback-triggering entity. *Id*.

---

[10] *See* GSK Reply at 14 ("PBMs, as well as major third-party payors who operate their own formularies (referred to in GSK's database as 'IPAs') often receive rebates for placing a drug on a formulary and moving the overall 'market share' of the drug for their members."). *See* Gaier Suppl. Aff. at 9 ("By way of background, purchase-based rebates are earned by certain providers and other entities in recognition of the volume of pharmaceutical product actually purchased."). *See also* 30(b)(6) Rebate Dep. at 38:7-39:9 (agreeing that in general, the "holder" receives rebates based on the performance of individual plans); 53:22-54:16 ("[W]e compete to have – so patients could have access to our products. That is controlled mainly by formulary. And then we do have performance based to grow our volume consistent with good med – medical practice through market share agreements."); 57:19-58:23 ("Some of them are based on market share versus competitors, and when they achieve that level, they would get a rebate."); 73:22-74:21 (performance rebates paid to PBMs are based on "formulary access," "safety and efficacy," "value," and "in a competitive therapeutic class, we would like more of our product to be used so we will do a market share performance."), 143:4-10 (with respect to a contract between GSK and Caremark, the basis for rebate payments "is comparing the national market share."), 147:21-149:7 (agreeing that a contract between GSK and ProVantage providing for restricted formulary placement "allows more access to our product" and less access "[t]o our competitor product, yes.").

5

Despite the fact that GSK does not directly transfer the physical drug unit to these indirect entities, GSK acknowledges that the incentives offered them should be included in the WAC List Price Test.  *See* GSK Mem. at 11.

Second, GSK pays rebates to GPOs pursuant to contract and based on the GPO members' purchases.  *See* 30(b)(6) Rebate Dep. at 48:15-49:10 and 53:12-54:16 (Exh. B to Cicala Supp. Aff.).  The rebates are paid based on the GPO's ability to move market share.  *Id*. at 53:12-54:16, stating that rebates are paid to GPO members based on formulary access and are "performance based to grow our volume consistent with good med—medical practice through market share agreements."   Between 1997-2005 alone, GSK paid $147.53 million in rebates to GPOs.  *See* GSK CN_REB_FEE_HLDR_V rebate table (Exh. D to Cicala Supp. Aff.).

Third, GSK pays purchase-based rebates to Staff Model HMOs based on their members' purchases.  *See* 30(b)(6) Rebate Dep. at 16:9-23 and 102:16-103:17.  The rebate is paid per unit and at the NDC level..  *Id.* at 154:25-156:16.  As with all other rebates, the rebates paid to Staff Model HMOs are paid based on total sales.  *See id*. at 98:11-99:7 and 102:16-105:16 ; *see also* 30(b)(6) Rebate Dep. Exhibit 13 (contract between Glaxo Wellcome, Inc. and Corporate Health Dimensions, a staff model HMO).  (Exh. B to Cicala Supp. Aff.)

Fourth, GSK pays rebates to other indirect entities pursuant to contract, based on volume, at the NDC and unit level..  *See* Gaier Suppl. Aff. at 9.  (rebates are earned by certain providers and **other entities** in recognition of the volume of pharmaceutical product actually purchased).  This includes wholesalers, hospitals, long-term care facilities, home health, and surgical centers.  *See e.g.* 30(b)(6) Rebate Dep. at 15:25-17.  (Exh. B to Cicala Supp. Aff.) In its supplemental filings on this motion, GSK included these rebates in the WAC List Price Test.

GSK's also pays Customer Rebates to PBMs[11], IPAs and other TPPs. These are the Customer Rebates in dispute ('the disputed Customer Rebates"). The disputed Customer Rebates total over 34 % of total rebates paid by GSK between 1997-2005. *See* GSK CN_REB_FEE_HLDR_V rebate table  (Exh H to Cicala Supp. Aff). The disputed Customer Rebates share all of the same characteristics as GSK's other Customer Rebates. They are paid based on contracts with GSK (*see* 30(b)(6) Rebate Dep. at 32:16-22 and 41:22-42:6) (Exh. B to Cicala Supp. Aff.), they are paid at the NDC and unit level and based on volume (*see id*. at 38:4-39:9, 54:22-55:3, 146:10-147:20, and 154:25-156:16),[12] they are paid to increase GSK's sales,[13] they are paid on quarterly basis[14]. Hence, when GSK is describing its "Customer Rebates" in its 20-F, it includes these. *Id.* at 69:24-71:12; *see also* GSK 2005 Form 20-F at 64. (Exh. A to Cicala Supp. Aff.)  When GSK is calculating its net revenue or net sales, it includes these. *Id.* And of course that makes sense, Customer Rebates are paid to increase GSK sales, at the unit level, at the NDC level, and based on volume.

To ignore these disputed Customer Rebates in the context of the WAC List Price Test would eviscerate that test because it would allow GSK to exclude from its sales price

---

[11] GSK pays rebates to PBMs for two types of drugs that PBMs pay for. First, PBMs receive rebates for drugs dispensed by the PBM through its Mail Order pharmacy. Second, PBMs receive rebates for drugs paid for by the PBM, but dispensed through the network of retail pharmacies the PBM contracts with to dispense drugs to the PBMs' TPP clients. (*See* Written Tutorial of Dr. Meredith Rosenthal, dated December 3, 2004, at 16, "When a PBM establishes retail networks, it contracts with retail pharmacies on reimbursement amounts for drugs dispensed by the pharmacy" to members of health plans. Pursuant to these contracts, "the PBMs will pay the pharmacies the cost of the pharmaceutical and the dispensing fees" for pharmaceuticals dispensed to members of health plans.). *Id*. As explained below, although GSK attributes these rebates to the "PBM's third-party payor" (*see* Supplemental Affidavit of Eric M. Gaier, Ph.D. at 10 n.20), these rebates are paid to PBMs. The PBM's TPP client pays the PBM for these drugs pursuant to a negotiated rate. The negotiated rate paid by the TPP is greater than the amount the PBM pays the retailers in its network.
[12] *See also* 30(b)(6) Rebate Dep. Exhibit 19 (contract between Glaxo Wellcome, Inc. and Caremark, dated Nov. 19, 1996, stating and highlight language) and Exhibit 20 (contract between SmithKline Beecham and ProVantage Pharmacy Benefits Management Services, dated June 22, 1999).
[13] *See* GSK Reply at 14 ("PBMs as well as major third-party payors who operate their own formularies (referred to in GSK's database as 'IPAs') often receive rebates for placing a drug on a formulary and moving the overall 'market share' of the drug for their members.") (footnote omitted).
[14] *See e.g.* 30(b)(6) Rebate Dep. Exhibit 19 at p. 4 (Glaxo Wellcome, Inc. Reimbursement Agreement with Caremark, Inc. providing for the payment of base rebates and performance rebates on a quarterly basis).

calculations one of its largest categories of discounts paid *on the basis of sales.*. It would also require the Court to ignore the fact that GSK has acknowledged that these Customer Rebates are paid for same reason that rebates are paid to all other customers which is to increase GSK sales. *See Section I, supra* at p. 6.  It would ignore GSK's own SEC Form 20-F which presents the disputed Customer Rebates in the same category as all other Customer Rebates.  *See* GSK 2005 Form 20-F at 64.

In addition, it would improperly ignore that PBMs have much more in common with providers than say, TPPs.  Consider the following undisputed facts: GSK pays PBMs rebates for mail order operations, where PBMs physically purchase and sell drugs to their TPP clients.  *See* Gaier Dep. at 52:8-53:6 (Exh. E to Cicala Supp. Aff.).  GSK also pays PBMs rebates for drugs dispensed by any other non-mail order pharmacies.  *See* 30(b)(6) Rebate Dep. at 54:22-55:3 (Exh. B to Cicala Supp. Aff.).  GSK does not differentiate between the two types of pharmacies when paying rebates. *Id.*  A single contract governs the rebates and the rebates are paid at the NDC and unit level and are based on for the total volume of GSK units.  *See* Gaier Suppl. Aff. at 9 ("'[U]tilization-based rebates' are earned by certain PBMs, third-party payors, and other entities in recognition of the manufacturer's overall 'market share' of a pharmaceutical product utilized by their members.").

Also undisputed is that PBMs - particularly the big 3 to whom GSK has paid $2.27 billion in rebates 1997-2005, *(see* GSK CN_REB_FEE_HLDR_V rebate table (Exh. H to Cicala Supp. Aff.)) -- exert enormous leverage and control over the sales of manufacturers' products given their membership and control of national formularies.  GSK pays rebates to these entities based on volume of product sold. (*see* 30(b)(6) Rebate Dep. at 154:25-156:16; *see e.g.* 30(b)(6) Rebate Dep. Exhibit 19 at pp. 4  and 13 (Glaxo Wellcome Inc. Reimbursement Agreement with

Caremark, Inc. providing that "[t]he Base Rebate shall be calculated for the entire Caremark book of approved Rx Drug Plan business by multiplying the designated percentage by the quarterly Glaxo Wellcome Product sales dollar volume," and "Caremark shall be eligible for a performance rebate in the percentage amounts as set forth in Exhibit E, multiplied by the quarterly Glaxo Wellcome Product sales dollar volume . . . ."). Indisputable also is that PBMs have much in common with traditional retail providers. Each PBM negotiates a contract price with the Pharmacy and separately negotiates a higher contract price with their TPP clients, thereby profiting on every sale. *See* Written Tutorial of Dr. Meredith Rosenthal, dated December 3, 2004 (hereinafter "Rosenthal Tutorial"), at 18.

> [T]he PBM will pay the pharmacies the cost of the pharmaceutical and the dispensing fees for all of the prescriptions that they have filled. The amount paid to the pharmacies for the pharmaceutical itself is almost always the average wholesale price (AWP) minus a prenegotiated discount, which is about 15% on branded pharmaceuticals and 13%-25% on generics. However, the amount collected from the client (payor) for the pharmaceutical is typically slightly more than the amount paid to the pharmacy, a discount of say 13% off of AWP. This "spread," which is a function of AWP, is another source of revenue for the PBMs.

*See* Rosenthal Tutorial at 16.

Given the objective of determining the net price at which GSK sold its products relative to GSK's reported WAC , there is no rational basis for excluding the PBM rebates given the control the PBM has both over GSK's sales, the fact that PBM rebates are paid for precisely the same reasons as all other customer rebates, the fact that GSK itself groups PBM rebates in its "Customer Rebate" class in its public filings, and given the shared characteristics, just described, between PBMs and other providers. *See* Exhibit A to the Cicala Supp. Aff. and 30(b)(6) Rebate Dep at 154:25-156:16.

b.  **When All Utilization Rebates Are Accounted For, 113 NDCs (Rrepresenting $786.4 Million in Expenditures) Fail The WAC List Price Test**

Plaintiffs have recalculated the WAC List Price Test to account for all the disputed Customer Utilization Rebates and to account for GSK's sales to wholesalers for which GSK paid chargebacks as separate transactions. As set forth fully in the Second Supplemental Affidavit of Harris Devor, (see Devor Second Supp. Aff.), this work demonstrates that on an aggregate basis between 1997-2005, 113 of the 262 NDCs at issue Exhibit B, representing $786.4 million in at-issue expenditures fail the test. When viewed on an annual, (rather than aggregate) basis, the expenditures associated with failing NDCs increase to $803.1 million. *See* Devor Second Supp. Aff. at Exh. B.

II.  **EVEN THOUGH IT IS A BRAND COMPANY, THE EVIDENCE SHOWS THAT GSK COMPETES ON SPREAD WITHIN ITS THERAPEUTIC CLASS**

GSK has repeatedly stated that it pays rebates to increase sales and to increase market share.[15] This is precisely the sort of incentivizing that concerned the Court in the MDL Track One Trial, hence the Court's interest in evidence of marketing the spread to physicians in that case (Prong One of Three Prong Test). *See Track One Opinion* at 101-102. Here, entities with formulary control stand in the shoes of the physician in that they are the ones determining whose products are most widely used. *See* Rosenthal Tutorial at 12. GSK has supplied no record evidence to demonstrate that they did not compete on spread or market spread or engage in the sorts of incentivizing for the drugs at issue that concerned the Court in the class case. This fact alone requires denial of the relief sought by GSK's motion because the WAC list price test, by itself, is not dispositive. *Track One Opinion* at 105. Beyond that, however, GSK could not present such a record to this Court because the evidence collected to date, including the testimony of GSK's 30(b)(6) witness on rebates from June 3, 2009 confirms, just as plaintiffs

---

[15] *See Section I, supra* at p. 6.

alleged (*See* Plaintiffs' First Amended Consolidated Complaint (hereinafter "FACC") [Dkt. No. 4304] at ¶¶ 481, 486-487.)[16] and the brands have repeatedly denied, GSK did face direct competition from other brands in its therapeutic class and did compete on the basis of spread in response to that competition and in order to secure formulary placement.  *See* 30(b)(6) Rebate Dep. at 15:6-13, 46:12-48:2, 49:22-50:4, and 86:8-87:5.  (Exh. B to Cicala Supp. Aff.)  On a full record, this point will be resolved

### III.   ASP/AWP SPREAD TEST

Plaintiffs have recalculated ASP/AWP spreads, as explained in the attached Second Supplemental Devor Affidavit.  Plaintiffs' calculations differ from those proffered by GSK in that plaintiffs include direct sales data to relevant providers as shown in GSK's transactional data (appropriate in the context of an ASP to relevant providers), and rebates paid to PBMs.  Devor Second Supp. Aff. at ¶¶22-28.

The results of these modifications to GSK's ASP/AWP spread test are presented in Exhibit B to the Devor Second Supp. Aff..  That Exhibit shows that of the $2.33 billion in expenditures at issue in plaintiffs' case, more than $1.45 billion is associated with NDCs that, on an annual basis, have spreads in excess of 30%. Put otherwise, 749 out of 1941 annual spread computations (38%) reflect a spread of greater than **30%.**  Devor Supp. Aff. at Exh. B, summary results at page 47 thereto. This number compares to Dr. Gaier's conclusion, using ***wholesaler*** data, that only 269 out of 1933 annual spread computations (14%) reflected a spread of greater than 30%. *See* Gaier Affidavit in Support of GSK's Motion at Attachment E.

---

[16]   *See e.g.,* 30(b)(6) Rebate Dep. at 86:8-87:5 ("Q.  The TPP is informing GSK that there's competition in the class even though the GSK product at issue is a brand-brought product? A Correct."  *See id*. at 157:24-158:3 PBM "utilization" rebates are paid only when "members of the third-party payers [clients of the PBM] have to be covered on a formulary."

## CONCLUSION

For all the foregoing reasons, plaintiffs respectfully submit that GSK's motion for partial summary judgment must be denied.

Dated:  June 16, 2009

                                                    Respectfully Submitted:

**KIRBY McINERNEY LLP**

     /s/
Joanne M. Cicala
James P. Carroll Jr.
Aaron D. Hovan
Jocelyn R. Normand

825 Third Avenue
New York, NY 10022
(212) 371-6600

*Counsel for the City of New York and New York Counties in MDL 1456 except Nassau and Orange*

Ross B. Brooks, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
**LEVY PHILLIPS &
KONIGSBERG, LLP**
800 Third Ave.
New York, NY 10022
(212) 605-6205
*Counsel for the County of Orange*

12

**CERTIFICATE OF SERVICE**

I certify that on June 16, 2009, a true and correct copy of the foregoing:

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO SMITHKLINE BEECHAM CORPORATION, D/B/A GALXOSMITHKLINE'S ("GSK's") MOTION FOR PARTIAL SUMMARY JUDGMENT

SUPPLEMENTAL AFFIDAVIT OF JOANNE M. CICALA, SWORN TO JUNE 16, 2009 WITH EXHIBITS; AND

SECOND SUPPLEMENTAL AFFIDAVIT OF HARRIS DEVOR, SWORN TO JUNE 16, 2009 WITH EXHIBITS

was served on all Counsel of Record by electronic service pursuant to Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

      /s/  Aaron D. Hovan
      Aaron D. Hovan