# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL NO. 1456 <br><br> CIVIL ACTION: 01-CV-12257-PBS <br> Subcategory Docket: 06-CV-11337-PBS |
| THIS DOCUMENT RELATES TO | ) ) ) | Judge Patti B. Saris |
| *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.,* No. 06-CV-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

## DECLARATION OF STEVEN J. YOUNG

I, Steven J. Young, hereby depose and state as follows:

1.     I am over the age of 18.  I have personal knowledge of, and am competent to testify about, the matters set forth herein.

2.     I have been retained by the Defendant Abbott Laboratories Inc. to serve as an expert witness, offering expert opinion testimony, in the above-captioned matter.  I am submitting this Declaration in support of Abbott Laboratories Inc.'s Motion *in Limine* To Preclude Certain Opinions Proffered by Plaintiffs' Expert Mark G. Duggan, Ph.D.

3.     Attached hereto is a true and correct copy of the Expert Report of Steven J. Young, dated March 6, 2009, that I prepared in connection with my engagement:

4.     If called to testify at trial, I would testify in a manner consistent with the opinions expressed in this expert report.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on *June 25*, 2009 in Chicago, Illinois.

Steven J. Young

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE PHARMACEUTICAL** ) | **MDL NO. 1456** |
| **INDUSTRY AVERAGE WHOLESALE** ) | **Civil Action No. 1-12257-PBS** |
| **PRICE LITIGATION** ) | |

| | |
|---|---|
| ) | **MASTER FILE NO.** |
| **THIS DOCUMENT RELATES TO:** ) | |
| *United States of America ex rel.* ) | **Judge Patti B. Saris** |
| *Ven-a-Care of the Florida Keys,* ) | |
| *Inc., v. Abbott Laboratories, Inc.* ) | |
| ) | |

**EXPERT REPORT OF STEVEN J. YOUNG**

# Table of Contents

I.     Qualifications and Compensation ............................................................. 1

II.    Scope of My Report ............................................................................... 3

III.   Summary of Opinions ............................................................................ 4

IV.    Abbott Products at Issue ........................................................................ 5

    A.     How Abbott Sold the Products ........................................................ 6

    B.     Abbott's Primary Customers ........................................................... 7

V.     Product Administration and Reimbursement ........................................... 8

    A.     Medicare and Medicaid Reimbursement ......................................... 8

       1.     The Medicare Program ........................................................ 8

       2.     The Medicaid Program ......................................................... 9

       3.     Medicare and Medicaid Hospital Reimbursement ................. 10

    B.     Compensation to Providers for Dispensing and
       Administration Costs ..................................................................... 10

VI.    Dr. Duggan's Methodology ................................................................... 11

VII.   Dr. Duggan's Analysis of Reimbursement Paid for These Products ...... 12

    A.     Dr. Duggan's Medicaid Reimbursement Calculation .................... 12

       1.     Dr. Duggan Did Not Consider the Interrelationship of Product
          Cost and Dispensing Fees .................................................. 12

       2.     Dr. Duggan Limited His Review of Actual Claims Data ........... 14

       3.     Dr. Duggan Extrapolated To Unanalyzed Populations ........... 16

          a) Dr. Duggan's Methodology Did Not Consider the
            Variability of Medicaid Reimbursement Across States ............. 17

          b) Dr. Duggan's Methodology Did Not Consider the
            Variability of Dispensing Fees ................................................ 19

    B.     Dr. Duggan's Medicare Reimbursement Calculations .................. 21

VIII.  Dr. Duggan's Analysis of "But For" Reimbursement for These
    Products ............................................................................................... 22

**A.** **Dr. Duggan's Creation of His "Calculated Price" to Contracted Pharmacies**................................................. 23

**B.** **Dr. Duggan's Medicaid "But For" Reimbursement Calculations** ............................................................ 25

**C.** **Dr. Duggan's Medicare "But For" Reimbursement Calculations** ............................................................ 26

**IX.** **Dr. Duggan's "DIFFERENCEs" Are Also Impacted By Various Other Factors** ................................................................. 29

**A.** **Analysis of Dr. Duggan's "DIFFERENCE" Period**.......................... 29

**B.** **Dr. Duggan's "DIFFERENCE" Includes Claims That Have Been Resolved** ....................................................... 30

**C.** **Dr. Duggan's "DIFFERENCE" Does Not Account for the Rebates Paid by Abbott to Every State Medicaid Program** ......... 31

**X.** **Other Opinions**.................................................................... 31

**A.** **Available Sources of Product Pricing Information** ..................... 31

**B.** **Context for Spread Allegations**.................................... 33

**C.** **Analysis of Unit Sales**............................................... 34

**D.** **Annual Price Changes** ................................................ 34

## I.    Qualifications and Compensation

1)    I have been a consultant to the health care industry for approximately twenty five years.  I have substantial experience with health insurance reimbursement, pharmaceutical pricing and the related distribution channels.  My Curriculum Vitae and listing of testimony is attached as Exhibit 1.

2)    I have substantial experience related to pharmaceutical manufacturer pricing for both branded and generic products.  I have worked with pharmaceutical companies in performing detailed analyses of their pricing, charge-backs, and rebate data.

3)    I have advised clients in various industries that sell commercial products to the government, including furniture, security equipment, durable medical equipment, secure communications systems, pharmaceuticals and satellite telephones.  My work with these clients has included extensive analysis of pricing, discounting and rebate data for disclosure to the government.

4)    I have substantial experience in analyzing private insurance companies' claims data and reimbursement schedules.  For example, I have worked with health insurance companies to analyze their claims and membership data to assess their Medicare coordination of benefits processes.

5)    I have extensive experience assisting insurance and managed care companies with their reimbursement processes and practices, the related claims processing systems and output, contractual agreements, claims system assessments and validation procedures, and assessments of medical management practices.

6)      I have experience working with Medicare Fiscal Intermediaries and Medicare Carriers to assist them with various government contracting requirements and the transitioning of Medicare claims processing activities to a successor contractor.  I am therefore familiar with the operating structure of these organizations and their reimbursement processes.

7)      I have experience assisting insurance and managed care companies in structuring and preparing proposals to perform managed care support contracts for the Department of Defense under the TRICARE program, which provides health insurance to active duty and retired military personnel and their families.  My work has focused on assisting managed care companies structure and price operations to perform all requirements of the contract, including claims processing, customer service, provider relations, provider contracting, utilization management, and quality management.  As part of these engagements, I have worked closely with the insurance companies' management as well as their actuarial and technical experts to make overall strategic pricing assessments relating to the various components of health care pricing and their related administrative costs.

8)      I am being compensated at an hourly rate of $425.00.  No portion of my firm's compensation is dependent on the nature of my findings or on the outcome of this matter.  A list describing the data and information I relied upon is attached as Exhibit 2.

## II.    Scope of My Report

9)    The United States has brought suit against Abbott Laboratories Inc. ("Abbott") relating to the pricing and marketing of certain pharmaceutical products manufactured and sold by Abbott, and the payments made by the Medicare and Medicaid programs to providers for those products.  It is my understanding that the United States contends that Abbott caused the Medicare and Medicaid programs to pay "excessive reimbursements" to providers that dispensed or administered certain products from 1991 to 2001.[1]  The products at issue are certain national drug codes (NDCs) of vancomycin, dextrose, sodium chloride and sterile water.

10)    In support of its claims that Abbott caused the Medicare and Medicaid programs to pay "excessive reimbursements" to providers, the United States has served two expert reports from Dr. Mark G. Duggan.  Using a variety of data sets, and relying upon certain work conducted by two firms (Myers & Stauffer and Steck Consulting), Dr. Duggan has described his work as follows:

> This Report calculates a $108.2 million difference between (1) what the federal government reimbursed for certain pharmaceutical products provided to Medicaid and Medicare recipients during the eleven-year period 1991 to 2001 and (2) what the federal government would have reimbursed for the same products during the same period if prices reflective of the actual prices at which Abbott was transacting business had been used for the AWP, WAC and Direct Price of Abbott's products.[2]

---

[1] See The United States' First Amended Complaint, Case 1:01-cv-12257-PBS, Document 4281 Filed June 4, 2007.

[2] See Dr. Duggan's Report dated June 19, 2008, p. 2.

11)     Dr. Duggan later revised his calculation to $107.1 million in a
supplemental report dated January 23, 2009.[3]

12)     I have been asked by counsel for Abbott to review, evaluate, and
comment upon the analysis conducted by Dr. Duggan that led to his $107.1 million
"DIFFERENCE" calculation.

13)     Finally, given my experience in the health care field, I have been asked to
comment upon certain assertions made in the United States First Amended Complaint.

## III.   Summary of Opinions

14)     My primary (but not exhaustive) concerns with Dr. Duggan's approach
and his conclusions fall within the following categories:

- Dr. Duggan calculated his "DIFFERENCE" by limiting his analysis to a
  small sub-population of Medicare and Medicaid reimbursement data
  (limited in both time and scope).

  o Dr. Duggan extrapolated this limited information to other sub-
    populations including other states (Medicaid), other geographic
    regions (Medicare) and other time periods (eleven years) that he
    chose not to analyze, in spite of the variability over time and
    among these populations.

  o Dr. Duggan calculated a "DIFFERENCE" for Medicare payments
    during the relevant time period, acknowledging that he included
    units sold not by Abbott but by other manufacturers.

- Dr. Duggan created his "Calculated Price"[4] by limiting his analysis to
  less than 2% of sales, selecting only negotiated contract sales to
  certain pharmacy customers.[5]

---

[3] See Dr. Duggan Report dated January 23, 2009, Section I.

[4] I have been unable to find a single defined term used by Dr. Duggan in his report (e.g., he uses
"pharmacy average price," "average pharmacy specific price, "average pharmacy indirect price,"
"alternative price," etc.).  For convenience, I use the term Dr. Duggan's "Calculated Price."

[5] I compared the direct and indirect sales for the customer categories analyzed by Dr. Duggan
(A003, A007, and M070) found in Dr. Duggan's Table 4 and Table 9 to total sales for these products.

- Dr. Duggan ignored the important relationship between ingredient cost and dispensing/administration fees in arriving upon the total reimbursement for a Medicare and Medicaid provider.

- Beyond these fundamental problems, Dr. Duggan's "DIFFERENCE" is overstated due to certain other assumptions he appears to have made and certain calculation errors.

15)     I disagree with Dr. Duggan both in concept (i.e., that his proposed approach is appropriate) and in application (i.e., that he properly implemented his proposed methodology).  I will expand on my concerns below.

16)     I have also been asked to provide additional opinions related to the allegations in this matter.  These opinions are included in Section X. of this report and relate to:

- Available sources of product pricing information

- Context for spread allegations

- Analysis of unit sales

- Annual price changes

## IV.    Abbott Products at Issue

17)     The four Abbott Products named in this complaint – dextrose, sodium chloride, sterile water and vancomycin (referred to collectively as "products") -- are generic hospital solutions and intravenous antibiotics.  Unlike self-administered drugs, most of these products are bulky solutions that typically involve unique storage, mixing, maintenance, and distribution requirements.  In addition, the products require administration by a healthcare professional rather than the patient.

18)     These products have been on the market for decades and face extensive competition.  Abbott marketed and sold the products through its former Hospital

Products Division to customers that negotiate a contract with Abbott ("Contract" purchases).[6] The products were also available for purchase by end purchasers without a negotiated contract with Abbott ("Non-contract" purchases). Abbott's primary customers included hospitals, wholesalers, distributors and government purchasers.

## A.    How Abbott Sold the Products

19)    Healthcare providers were able to purchase these products directly from Abbott or through a wholesaler or distributor. When the provider purchased directly from Abbott, Abbott distributed the product to the customer. Some customers were able to negotiate a contract with Abbott but arrange to take delivery of the products through a wholesaler. This allowed customers ordering many products from many different manufacturers to streamline inventory and delivery. For those purchases, the wholesaler would honor the negotiated contract price with Abbott's customer, and seek from Abbott any difference between the customer contract price and the amount originally paid by the wholesaler to Abbott for the product.[7]

20)    Providers that did not have a negotiated contract with Abbott purchased Abbott's product either directly from Abbott, or indirectly from a wholesaler or distributor. Situations in which a customer might purchase a product without negotiating a contract could include small customers that purchase in small volumes or customers that had contracts with other manufacturers but experienced supply problems. Wholesalers and distributors made Non-contract sales of Abbott's products

---

[6] On May 1, 2004, Abbott divested its Hospital Products Division and is no longer in this business.

[7] This amount is referred to as a "chargeback."

at whatever price the market would bear.  Abbott had no visibility to the price paid by these providers.  Figure 1 illustrates the distribution process.



## B.    Abbott's Primary Customers

21)    Abbott's primary customers for these products were hospitals.  My review of Abbott's sales data during the relevant time period in this case reflects that approximately 83% of sales for these particular products were to hospitals.  The remaining sales of these products were to other customers including wholesalers, distributors, government programs, and other non-hospital healthcare providers (e.g. home health care services, outpatient clinics and other pharmacies).

22)    Figure 2 below illustrates Abbott's sales for the products at issue during the relevant time period.



## V.    Product Administration and Reimbursement

## A.    Medicare and Medicaid Reimbursement

23)    When a provider administers these products to a patient, it seeks

reimbursement.  Some patients have private insurance or are covered by certain

government programs like Medicare and Medicaid.  This case involves reimbursement

by Medicare and Medicaid to providers.  The Medicare and Medicaid programs are

administered by the Centers for Medicare and Medicaid Services ("CMS") (formerly

known as the Health Care Financing Administration ("HCFA")), which is part of the

United States Department of Health and Human Services ("HHS").

### 1. The Medicare Program

24)    The Medicare program provides health care coverage for people over the

age of 65, individuals with certain disabilities or with End Stage Renal Disease ("ESRD").

During the relevant time period, Medicare reimbursed for these products under

Medicare Part B.[8]  In order to administer the day to day operations and process the claims for Medicare Part B throughout the United States, CMS contracted with commercial insurance companies, such as Blue Cross Blue Shield plans ("Carriers").  For example, there were 28 different carriers in 1997.[9]

25)     Under Medicare Part B, physician claims for drug reimbursement are not based on the drug manufacturer's National Drug Code (NDC), but are instead based on "J-codes."  The J-code claim submission system is the established industry-wide basis for coding, billing, processing and paying for physician-administered drugs.  This universal structure was established through the Healthcare Common Procedure Coding System ("HCPCS") maintained by CMS.  For products that are sourced from more than one manufacturer (e.g. multi-source or generic drugs), J-codes are based on the category of drug.  In those circumstances, many manufacturers' products are included within a single J-code.

## 2. The Medicaid Program

26)     The Medicaid program provides health care benefits to certain low-income individuals and families fitting into an eligibility group defined by federal and state law.  The federal government outlines general guidelines for the program, and each state establishes, with approval of CMS, the requirements for their own program.  During the period at issue, each Medicaid program provided reimbursement to providers under a prescription drug benefit.

---

[8] Medicare Part B covers reimbursement for physician administered drugs outside of the hospital setting.  Medicare Part A, which covers hospital inpatient reimbursement, is not at issue in this case.

[9] See CMS, Part B Carrier Locality Codes after December 31, 1996. Report Prepared By CMS September 17, 2004.

27)     CMS also administers the Medicaid Drug Rebate Program which requires a drug manufacturer to enter into a national rebate agreement with the Department of Health and Human Services (HHS) for states to receive Federal funding for outpatient drugs dispensed to Medicaid patients.[10]  The Drug Rebate Program was designed to allow the state Medicaid programs to decrease drug expenditures by requiring manufacturers to pay a rebate to each state based on the state's utilization of the manufacturer's drugs.

### 3.  Medicare and Medicaid Hospital Reimbursement

28)     Under Medicare and Medicaid, Abbott's primary customers (hospitals) were generally reimbursed for the total service rendered (i.e., surgery) and not separately reimbursed for the drugs administered as part of the service.  Accordingly, the issues in this case do not apply in the hospital setting.  Dr. Duggan acknowledged this fact by excluding hospitals from his analyses.

## B.     Compensation to Providers for Dispensing and Administration Costs

29)     Both Medicare and Medicaid programs have recognized the need, when setting reimbursement, to evaluate both the costs associated with product purchases as well as the costs associated with both dispensing and administration of the product ("dispensing/administration").  Medicare reimbursement to providers has included a

---

[10] See Schondelmeyer report dated June 20, 2008, p. 16.

product reimbursement and a separate administration fee.[11]  Similarly, Medicaid has

reimbursed providers for both an ingredient cost and a dispensing/administration fee.[12]

30)     The Abbott products in this case are more expensive to administer and

dispense than other drugs such as self-administered outpatient drugs (e.g. pills)

because, for example:

- A medical professional must take extra steps to prepare and administer these products to the patient intravenously.

- Treatment occurs over an extended period of time (i.e., hours and sometimes days).

- A pharmacy professional must measure and/or mix the product with other products to allow for safe administration (e.g., vancomycin is an antibiotic that is mixed with a solution and administered intravenously).

- Because these products are primarily solutions, they are sold in bags and other large packages that require extra storage space and special delivery methods.[13]

## VI.   Dr. Duggan's Methodology

31)     Dr. Duggan calculated his "DIFFERENCE" by comparing the amount he

contends was reimbursed to providers, and an amount that he believes would have

been paid utilizing his "Calculated Price" to contracted pharmacies.  With this

"Calculated Price" Dr. Duggan created alternative published prices including AWP, WAC,

---

[11] See Payment for Medicare Part B Drugs, Herb Kuhn, Director, CMS testimony before House Subcommittee on Health of the Committee on Ways and Means, Thursday, July 13, 2006.

[12] See "Study of Medi-Cal Pharmacy Reimbursement" Prepared for the California Department of Health Services, prepared by Myers and Stauffer, June 2002, p. 12.

[13] See National Home Infusion Association FAQ at www.nhia.org/faqs.

and Direct Price that he then used to determine his "but for" reimbursement for Medicare and Medicaid.[14]

*Duggan's Reimbursement Paid – Duggan's "But For" Reimbursement = Difference*

## VII. Dr. Duggan's Analysis of Reimbursement Paid for These Products

32)    Dr. Duggan attempted to quantify the actual reimbursement paid by Medicaid and Medicare by analyzing reimbursement claims information for a limited number of states and carriers and for limited time periods, and he extrapolated the results to other reimbursement populations for the entire country for the entire eleven year period that he chose not to analyze.[15]

## A.    Dr. Duggan's Medicaid Reimbursement Calculation

### 1. Dr. Duggan Did Not Consider the Interrelationship of Product Cost and Dispensing Fees

33)    The reimbursement paid to providers for these products is comprised of both product and dispensing/administration costs.  It is well established that payors and providers view both components together when assessing the adequacy of the reimbursement.  Dr. Duggan failed to consider the important interrelationship between these components of reimbursement.  The high cost of dispensing/administering these particular products increases the importance of this interrelationship.

34)    Myers & Stauffer performed an analysis of dispensing costs by reviewing data collected on over 100 surveys.

---

[14] Dr. Duggan calculated his alternative published prices for AWP by adding 25% to his "Calculated Price."

[15] Dr. Duggan has not calculated differences for Arizona or Ohio.  See footnote 18 on page 25 of Dr. Duggan's report dated June 19, 2008 and Section I in Dr. Duggan's report dated January 23, 2009.

35)     With respect to the higher cost of dispensing these products, Myers &

Stauffer reported that:

> The data suggests that dispensing cost ranging from $20 to $40 per intravenous prescription would be considered typical. . . . It is therefore possible that some pharmacies could very well have dispensing costs in excess of $40 per prescription.[16]

36)     Myers & Stauffer noted the critical interrelationship between ingredient

cost reimbursement and dispensing fees:

> Based on the results of the acquisition cost study performed simultaneously with the dispensing cost survey and the assumption of the Department's current ingredient reimbursement formula of AWP minus 5%, it is estimated that such an average prescription would yield a margin on ingredients of approximately $42.  This margin typically allows for adequate reimbursement of the pharmacy's dispensing cost.   So long as the ingredient reimbursement rate remains at AWP minus 5% or any other relatively "high" level, the need for the Department to set a separate dispensing fee for intravenous drugs is somewhat mitigated by the margins realized on ingredient reimbursement.[17]

37)     The combined effect of the interrelationship and the magnitude of the

under-reimbursement for dispensing these drugs was proven in practice in the State of

Utah in 2000.  Myer & Stauffer explained this real world example as follows:

> In recent years, some states have dealt with the issue of intravenous prescription reimbursement rates *in light of reduced reimbursement*.  For example, the state of Utah recently adopted "revised AWPs" for certain products based on the recommendations of the United States Department of Justice and the National Association of Medicaid Fraud Control Units (NAMFCU). . . .  Subsequent to the adoption of these prices, intravenous and home infusion pharmacies alleged that the margins on ingredient

---

[16] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement*.  Prepared for the California Department of Health Services, June 2002, p. 59-60.

[17] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement*.  Prepared for the California Department of Health Services, June 2002, p. 59-60.

reimbursement were no longer sufficient such that they could accept the typical Medicaid dispensing fee.  As a result of these allegations, the state of Utah created alternate dispensing fees. . .[18]

## 2. Dr. Duggan Limited His Review of Actual Claims Data

38)    Rather than analyzing actual claims data from every state at issue over the entire time period, Dr. Duggan chose to calculate his Medicaid "DIFFERENCE" by extrapolating from a limited number of states for a limited period of time.[19]  Dr. Duggan limited his analysis of actual detailed claims data to 10 states.

- In no state did he look at actual claims data over the entire 11 year time period (e.g., Dr. Duggan only analyzes 5 quarters of actual claims data for Michigan).

- Within the 10 states where Dr. Duggan chose to analyze some actual detailed claims data, he simply extrapolated the results from the earliest available quarter to all other quarters where he did not look at actual claims data at all.[20]

  o Setting aside the issues with his extrapolation, Dr. Duggan's analysis included numerous errors.  For example, Dr. Duggan improperly applied his "DIFFERENCE" amount to the states of Michigan and Missouri resulting in an overstatement of "DIFFERENCE" in excess of $500,000.

- Dr. Duggan ignored actual claims data for certain states with significant Medicaid utilization and enrollment such as Texas, Ohio and Pennsylvania.  (See Exhibit 3).

39)    Figure 3 identifies the limited actual Medicaid claims data reviewed by Dr. Duggan.

---

[18] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement,* prepared for the California Department of Health Services, June 2002, p. 59-60.

[19] Dr. Duggan was provided with actual claims data for at least 8 other states (which he chose not to review).

[20] Dr. Duggan also extrapolated the number of claims with a "DIFFERENCE" for periods that he did not analyze using a random number generator to determine those he counts as "DIFFERENCE" claims.

Figure 3
Dr. Duggan's Actual Claims Data Reviewed

### 3. Dr. Duggan Extrapolated To Unanalyzed Populations

40)     Dr. Duggan extrapolated his results from the 10 states to the unanalyzed 38 other states.  Dr. Duggan has not articulated a sufficient basis for assuming that the populations he extrapolated from are comparable to the populations he extrapolated to. Instead, he merely:

- Confirmed that the 38 states used AWP or WAC in some fashion in their reimbursement methodologies.[21]

- Dr. Duggan attempted to compare the average cost per claim (1999-2001) for the 10 states he chose to analyze to the other 38 states that he chose not to analyze.  Myers & Stauffer's reports, however, indicate that such comparisons would be meaningless due to the way that claims were submitted to Medicaid for these products.  Specifically, Myers & Stauffer finds:

  > There is some difficulty, however, in determining an average dispensing cost . . . There is a significant inconsistency in the way in which pharmacies count the number of intravenous prescriptions dispensing.  A pharmacy may mix and deliver many "dispensings" of a daily intravenous solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions. Alternatively, some pharmacies count each daily dispensing individually. [22]

41)     Dr. Duggan has not articulated a sufficient basis for assuming that the reimbursement methodologies of his 10 states are similar to the 38 states to which he extrapolates.  A review of Myers & Stauffer's analyses would suggest that such

---

[21] See Dr. Duggan report dated June 19, 2008, p. 79.

[22] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement,* prepared for the California Department of Health Services, June 2002, p. 59-60.

extrapolation is not appropriate given the variability of reimbursement and dispensing fee methodologies implemented by different states at different times.[23]

### a) Dr. Duggan's Methodology Did Not Consider the Variability of Medicaid Reimbursement Across States

42)      Dr. Duggan made no attempt to determine the basis of payment for the claims for which he seeks recovery in this case but rather assumes liability for all of the claims for which he calculated a "DIFFERENCE".  Figure 4 illustrates one of many examples of the variability in the per unit reimbursement for a single sodium chloride NDC for which Dr. Duggan calculates a "DIFFERENCE."



Figure 4
Kentucky Claims:
Sodium Chloride .9% VIAL (NDC 00074-8810)

---

[23] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology for all states provided.

43)    Dr. Duggan used actual claims data for the 10 states for limited periods. Dr. Duggan then extrapolated from those 10 states to aggregate spending data for the 38 other states by NDC and by quarter.  It is important to note that the aggregate spending data (i.e., SMRF and SDUD data) included dispensing fees.  I have identified a number of problems arising from Dr. Duggan's extrapolation of actual Medicaid claims data to his unanalyzed populations.  For example:

- For some quarters he extrapolated data from as little as one quarter of a single state to 38 other states. [24]  For example, as illustrated in Figure 3, Illinois was the only basis of extrapolation to all 38 other states in 1991.[25]

- Dr. Duggan did not consider the wide variation of product reimbursement formulas across states.[26]

  o For example, Dr. Duggan ignored data for certain high volume states (such as Texas) with lower Medicaid reimbursements as a result of MAC programs in arriving at his 10-state analyzed population.[27]  He also extrapolated to other lower volume states (such as Maryland) with lower Medicaid reimbursements as a result of MAC programs.[28]

  o In his revised report, Dr. Duggan has excluded Ohio claims data from his extrapolation.  Removing Ohio from the analysis increased Dr. Duggan's "DIFFERENCE" for the unanalyzed 38 states by $792,908.  This demonstrates the impact one state can have on Dr. Duggan's extrapolation.  Dr. Duggan has acknowledged that the

---

[24] Dr. Duggan also improperly duplicated "DIFFERENCE" for the states of Alabama and Hawaii in certain periods.

[25] In addition to the 38 other states, Dr. Duggan applied his "DIFFERENCE" ratio from Illinois to the state of Indiana for the entire period.

[26] See HHD006-0060.

[27] See Determination of the Cost of Dispensing Pharmaceutical Prescriptions For the Texas Vendor Drug Program Prepared for the Texas Health and Human Services Commission August 2002, p. 7.

[28] See Fine Dep. 12/9/08 MD Department of Health and Mental Hygiene Exhibit 13 (MD0021454 – MD0021497).

"DIFFERENCE" increase is due to the fact that Ohio used MACs which lowered the state's reimbursement for these products.[29]

o  Dr. Duggan did not consider individual states' definitions of Usual and Customary (U&C).  None of the 10 states that he analyzed defined U&C as the lowest price paid by Third Party Payors (TPPs), while at least five of the 38 states did (e.g., Massachusetts, Arkansas, Georgia, Rhode Island, and Vermont).[30]

o  Dr. Duggan ignored the impact of the publication of the Department of Justice AWP's (DOJ AWP's) by including a difference for claims paid after the implementation of the DOJ AWP's and claims paid using the DOJ AWP's. [31]

o  Dr. Duggan calculated a "DIFFERENCE" on transactions that were not paid based on the states' articulated reimbursement methodology (e.g., Dr. Duggan included a "DIFFERENCE" for Florida claims paid based on AWP when Florida's reimbursement methodology called for the use of a WAC).

- Dr. Duggan ignored individual states' intentions to provide a margin to providers related to the reimbursement for drugs.[32]

### b) Dr. Duggan's Methodology Did Not Consider the Variability of Dispensing Fees

44)    One of the most significant problems in Dr. Duggan's extrapolations is his

failure to account for the differences across states in both amount and treatment of

dispensing fees for these products.

- As discussed previously, Myers & Stauffer found that the average cost of dispensing these products ranged between $20 and $40 with various states addressing dispensing fees in various ways.  Myers & Stauffer's documentation indicates that at least 15 of the 38 states that Dr. Duggan chose not to analyze had enhanced dispensing and/or

---

[29] See Dr. Duggan report dated January 23, 2009, section I.

[30]  See HHD127-0023 – HHD127-0025 (For example, the state of Massachusetts defines Usual and Customary as "the lowest price for a given volume of drugs that a pharmacy charges to or accepts as payment from any purchaser or reimburser, including those with contracts that represent less than one percent of the pharmacy's total prescriptions revenue").

[31] See Program Memorandum Intermediaries/Carriers. Transmittal AB-00-86. September 8, 2000.

[32] See Dubberly Dep. December 15, 2008, p. 331.

compounding fees for these products during the relevant time period.[33]

- For each of his 10 states, Dr. Duggan calculated "the average value of the ratio of "DIFFERENCE" to the amount of the Medicaid spending on these claims" for each NDC and quarter.[34] This average represents the percentage by which total Medicaid spending would have allegedly decreased, had Dr. Duggan's revised prices been used in the 10 states' reimbursement calculations. He then applied his ratio of "DIFFERENCE" for the analyzed populations to unanalyzed populations. The "DIFFERENCE" calculation for the population he analyzed and the total Medicaid spending for the population he extrapolated to included both dispensing fee and product reimbursement.

45)     The unique nature of these products combined with the related variability of dispensing fees makes it inappropriate to assume consistency between the populations as it relates to dispensing fee. Dr. Duggan did nothing to establish that the ratio of dispensing fees to total payments was consistent between the analyzed and the unanalyzed populations.

46)     For example, Nevada (one of the 38 unanalyzed states) paid home health providers an enhanced dispensing fee of $16.80 per dose for the first medication and $5.60 per dose for second medication given concurrently.[35] Given the enhanced dispensing fee for home IV drugs paid by Nevada, it is not surprising that Nevada's average payment per claim is relatively high. Dr. Duggan's analysis ignored the impact of these types of dispensing fees and improperly applied the "DIFFERENCE" factor from

---

[33] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology for all states provided.

[34] Dr. Duggan's "ratio of DIFFERENCE" is calculated by giving equal weight to each NDC quarter for which he has actual claims data. States with no claims data in that NDC quarter have a weight of zero. See Dr. Duggan p. 78.

[35] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology – Nevada.

the 10 states to Nevada.  I can provide more examples of this phenomenon across the

38 states, where Dr. Duggan's "DIFFERENCE" is not based upon actual claims data.

47)     The significant variability of dispensing fees and the higher incidence of

enhanced dispensing fees for home IV drugs in the 38 states causes Dr. Duggan's

"DIFFERENCE" for the 38 states to be unreliable.

## B.     Dr. Duggan's Medicare Reimbursement Calculations

48)     Because J-codes used in Medicare reimbursement do not identify the

manufacturer of the drug for which the claim has been submitted, the Medicare claims

data does not identify claims submitted for any products manufactured by Abbott.  Dr.

Duggan has not identified any Medicare claims submitted for any products

manufactured by Abbott.  Dr. Duggan assigned 100% of the "DIFFERENCE" to Abbott

and does not consider the source of the product.

49)     Rather than analyzing reimbursement practices from every Medicare

carrier over the entire time period, Dr. Duggan chose to calculate his Medicare

"DIFFERENCE" by extrapolating from a limited number of carriers for a limited period of

time.  For example:

- Dr. Duggan analyzed the actual median calculations for a limited
  number of carriers and time periods and extrapolated the results to all
  carriers for eleven years.[36]

- For those J-codes and time periods for which Dr. Duggan calculated a
  Medicare Part B "DIFFERENCE" it appears that he only analyzed
  approximately 5% of the Medicare carrier median array calculations.
  Figure 5 identifies the quarters for which Dr. Duggan analyzed actual

---

[36] Dr. Duggan also extrapolated the number of claims with a "DIFFERENCE" for periods that he
did not analyze using a random number generator to determine those he counts as "DIFFERENCE" claims.

carrier median array calculations for the J-codes at issue in arriving at his Medicare Part B "DIFFERENCE."

**Figure 5**
**Dr. Duggan's Actual Claims Data Reviewed**

| Carrier | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|
| AdminaStar | | | | | | | | | |
| AETNA | | | | | | | | | |
| Alabama Blue Shield | | | | | | | | | |
| All Others | | | | | | | | | |
| Arkansas Blue Shield | | | | | | | | | |
| BCBSFL | | | | | | | | | |
| California Blue Shield | | | | | | | | | |
| Cigna | | | | | | | | | |
| Empire Blue Shield | | | | | | | | | |
| Kansas Blue Shield | | | | | | | | | |
| Metra Health | | | | | | | | | |
| National Heritage | | | | | | | | | |
| Nationwide | | | | | | | | | |
| North Dakota Blue Shield | | | | | | | | | |
| Other Region 5 | | | | | | | | | |
| Pennsylvania Blue Shield | | | | | | | | | |
| South Carolina Blue Shield | | | | | | | | | |
| Texas Blue Shield | | | | | | | | | |
| TOLIC | | | | | | | | | |
| Western Blue Shield | | | | | | | | | |
| WPS | | | | | | | | | |

Key: · Claims Only   ■ Claims and Array   ☐ No "DIFFERENCES"

- Dr. Duggan's assessment of reimbursement is limited to the product portion of the Medicare claims and ignored the administration fee.

## VIII.  Dr. Duggan's Analysis of "But For" Reimbursement for These Products

50)    As previously mentioned, Dr. Duggan calculated a difference by comparing his assessment and extrapolation of reimbursement paid to the reimbursement he contends should have been paid in his "but for" world.  Dr. Duggan creates a "Calculated Price" and uses that as part of his formula to generate a "but for" reimbursement amount.

*Duggan's Reimbursement Paid – Duggan's "But For" Reimbursement = Difference*

**A.    Dr. Duggan's Creation of His "Calculated Price" to Contracted Pharmacies**

51)    In creating his "Calculated Price," Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers. [37]  By focusing only on this very limited set of transactions, Dr. Duggan failed to properly consider prices paid by other customers such as a provider who purchased either directly from Abbott at a different price or directly from a wholesaler or distributor at an unknown price.  Non-contract sales, for example, are at higher prices and have a significant impact.  Dr. Duggan incorrectly assumed that calculating an average by looking at less than 2% of Contract pharmacy sales is appropriate. [38]

52)    Figure 6 illustrates the significant number of wholesaler and distributor sales to Non-contract end purchasers compared to the retail pharmacy Contract sales Dr. Duggan analyzed.

---

[37] See footnote 5.

[38] Dr. Duggan relied on indirect contract sales to pharmacies in every state except California during the period 1995-2001.  See Dr. Duggan's report dated June 19, 2008, p. 47.



53)     In fact, according to Dr. Schondelmeyer, wholesalers and distributors "add a markup and fees to the manufacturer's drug product cost to cover the cost of distribution and other services they provide."[39]  Dr. Duggan's approach would therefore result in many providers, such as those without negotiated contracts with Abbott, who purchased from a wholesaler or distributor, being reimbursed below the price they paid for the product.

54)     Figure 7 provides two examples that would have been reimbursed less than the amount they paid under Dr. Duggan's methodology.

---

[39] See Schondelmeyer report dated June 20, 2008 page 17.

**Figure 7**

**Under-Reimbursement to Providers Under Dr. Duggan's Methodology**

| | Transaction #1 | | | | Transaction #2 | | | |
|---|---|---|---|---|---|---|---|---|
| | SODIUM CHLORIDE 0.9% SOLN | | | | DEXTROSE 5%/WATER IV SOLN. | | | |
| | NDC: 00074710113 | | | | NDC: 00074792203 | | | |
| | Date of Service: 12/21/1998 | | | | Date of Service: 6/14/2001 | | | |
| | Provider: MEMORIAL COMM HOSP PHARM | | | | Provider: SPRINGVILLE PHARMACY INC | | | |
| | Wisconsin (AWP Less 10%) | | | | New York (AWP Less 10%) | | | |
| | **Price Per Unit** | **Units** | **Disp. Fee** | **Total** | **Price Per Unit** | **Units** | **Disp. Fee** | **Total** |
| Dr. Duggan's "But For" Reimbursement | $ 0.03247 | 100 | $4.88 | $ 8.53 | $ 0.00185 | 3500 | $4.50 | $ 11.77 |
| Provider Reimbursed Amount | $ 0.20 | 100 | $4.88 | $ 24.50 | $ 0.00280 | 3500 | $4.50 | $ 14.30 |
| Difference | | | | $ (15.97) | | | | $ (2.53) |

## B.    Dr. Duggan's Medicaid "But For" Reimbursement Calculations

55)    Without any consideration for the adequacy of the total reimbursement to the provider, Dr. Duggan created his "but for" reimbursement by adding a 25% mark-up to his "Calculated Price" to contracted pharmacies for each NDC and substituting the result into each state's reimbursement methodology.[40]  Extrapolation of the results of Dr. Duggan's 10-state analysis to the remaining states, without analyzing the comparability of the analyzed and unanalyzed populations would lead to anomalous results.

- For example, inserting his "Calculated Price" to contracted pharmacies into the reimbursement methodology used by Kansas (AWP less 50%) would result in the majority of Kansas providers being reimbursed significantly less than the amount they paid. (See Figure 8 below).

- Similarly, Dr. Duggan's approach would lead to illogical results when MACs or other payment limits are in place even for the Contracted pharmacies he chose to analyze.  As just one example, Dr. Duggan's approach would have the state of Maryland paying much less than

---

[40] Dr. Duggan's "but for" reimbursement adjustment of 25% is inconsistent with Congress's decision to implement the Deficit Reduction Act of 2005 where a factor of 250% was added to the Average Manufacturer Price in arriving at the Federal Upper Limit (FUL) reimbursement level for drugs.

acquisition cost.[41]  Dr. Duggan acknowledged that he did not focus on the impact of this issue. [42] (See Figure 8 below).

| | State Reimbursement Methodology | Dr. Duggan "Calculated Price" | State Reimbursement | Dr. Duggan's "But For" Reimbursement | Contracted Provider Loss |
|---|---|---|---|---|---|
| **Kansas** | AWP - 50% | $ 6.69 | (6.69*1.25)*50% = 8.37 | $ 4.18 | $ (2.51) |
| **Maryland** | MAC | $ 6.69 | $ 9.63 | $ 2.17 | $ (4.52) |

Figure 8
"But For" Calculation 1995 Q1: for Vancomycin 1GM Vial
(NDC 00074653301)

- Dr. Duggan ignored the important relationship between product cost and dispensing/administration fee in his "but for" world by employing his "all else equal" methodology.[43] Dr. Duggan failed to properly adjust dispensing/administration fees when he lowered his product reimbursement levels. The need for this adjustment has been recognized by State Medicaid Agencies and the consultants that advised them.

- Dr. Duggan did not consider any factors that states are required to assess in determining reimbursement levels (e.g., access to care issues, geographic differences, variability of prices paid by providers, etc.).

## C.    Dr. Duggan's Medicare "But For" Reimbursement Calculations

56)    Without any consideration for the adequacy of the total reimbursement to the provider, Dr. Duggan created his "but for" reimbursement by adding a 25% mark-up to his "Calculated Price" to contracted pharmacies for each NDC and substituted the result into each carrier's median array calculation.

- Dr. Duggan's "but for" reimbursement amount led to illogical results. For example, Dr. Duggan arrived at 9 different "but for"

---

[41] See Fine Dep. December 9, 2008 MD Department of Health and Mental Hygiene Exhibit 13 (MD0021454 – MD0021497).

[42] See Duggan Dep. February 17, 2009, p. 768 – 770.

[43] See Duggan Dep. February 17, 2009 p. 770 – 771.

reimbursement amounts for one J-code for the same period of time. (See Figure 9).[44]

| Carrier | J-code | "But For" Median | Price Source |
|---|---|---|---|
| CIGNA | J3370 | $ 2.74 | Cigna array for 1999Q2 |
| Other Region 5 | J3370 | $ 3.74 | No carrier array identified |
| WPS Other Region 5 Nationwide | J3370 | $ 3.94 | No carrier array identified |
| WPS Other Region 5 | J3370 | $ 4.02 | No carrier array identified |
| Other Region 5 | J3370 | $ 4.23 | WPS array for 1997Q3 |
| BCBSFL | J3370 | $ 4.97 | No carrier array identified |
| Metra Health | J3370 | $ 5.31 | Metra Health array for 1998Q1 |
| CIGNA | J3370 | $ 5.42 | No carrier array identified |
| BCBSFL Metra Health | J3370 | $ 6.06 | BCBSFL array for 1998Q2 Metra Health array for 1998Q2 |

**Figure 9**
**Dr. Duggan's "But For" Array Medians for 1998 Q2**

- Dr. Duggan did not consider the relationship between product cost and administration fees in determining his "but for" Medicare reimbursement.  When Congress changed Medicare reimbursement to use a Medicare "Average Sales Price" ("ASP") method, it increased the administration fees to appropriately compensate providers.[45]  Figure 10 illustrates the increase in administration fees for three common administration codes associated with these products.

---

[44] Dr. Duggan's insertion of his "Calculated Price" into the carrier median arrays did not always produce a revised median.  For example, Dr. Duggan's "Calculated Price" resulted in no change in the median Medicare reimbursement for Metra Health's J7060 for quarter 2, 1997.  It should be noted that Dr. Duggan still did generate a "DIFFERENCE" for this J-code even though his array analysis indicated no "DIFFERENCE" should exist.

[45] See Payment for Medicare Part B Drugs, Herb Kuhn, Director, CMS testimony before House Subcommittee on Health of the Committee on Ways and Means, Thursday, July 13, 2006.

**Figure 10**

**Medicare Administration Fees - Post 2002**

| Carrier: 80303 (BCBS/Empire NY) | | | Non-Facility | | | | |
|---|---|---|---|---|---|---|---|
| Number | Description | HCPCS Code [1] | 2003 | 2004 | 2005 | 2006 | 2007 |
| 1 | Chemotherapy, infusion method | 96410, G0359, 96413 | $ 64.18 | $ 233.69 | $ 190.37 | $ 185.25 | $ 178.24 |
| 2 | IV Infusion therapy, 1 hour | 90780, G0345, 90760 | $ 46.31 | $ 126.59 | $ 69.44 | $ 67.83 | $ 65.90 |
| 3 | Chemotherapy, push technique | 96408, G0357, 96409 | $ 40.70 | $ 166.25 | $ 134.64 | $ 131.13 | $ 128.50 |

1) Changes in HCPCS as reported by American Society of Clinical Oncology, "2006 Coding Changes for Drug Administration Services".

- Looking at the difference in the administration fee, as seen in Figure 10, between 2003 and 2007 the increase in administration fee is significantly higher than Dr. Duggan's average per claim "DIFFERENCE" across all J-codes analyzed as seen in Figure 11 below.

**Figure 11**

**Average Dr. Duggan Medicare Part B "DIFFERENCE" per Claim**

| J-code (Part B) | "DIFFERENCE" Per Claim |
|---|---|
| J3370 | $8.44 |
| J7050 | $4.08 |
| J7030 | $1.68 |
| J7040 | $1.40 |
| J7060 | $1.14 |

- The Figure 12 below displays the example of combined drug and administration reimbursements associated with sodium chloride (J7050 and 90780) as a result of the Medicare Modernization Act (MMA) of 2003.  This figure illustrates that (1) the product reimbursement is relatively small in relationship to the administration fee reimbursement and (2) the total reimbursement to the provider actually increased after MMA adjusted product reimbursement to ASP and administration fee to full payment.



IX.   **Dr. Duggan's "DIFFERENCEs" Are Also Impacted By Various Other Factors**

A.   **Analysis of Dr. Duggan's "DIFFERENCE" Period**

57)    I have been asked by counsel to quantify the percentage of "DIFFERENCE" attributable to the time period before the filing of the complaint in this matter on June 23, 1995.  I have determined that amount is 18% of Dr. Duggan's "DIFFERENCE".  Stated another way, 82% of Dr. Duggan's "DIFFERENCE" is attributable to the time period after the filing of the original complaint.  I will be prepared to quantify other time periods as deemed appropriate.

58)    I was also asked to chart Dr. Duggan's calculated "DIFFERENCE" for the period from 1991-2000.  Figure 13 depicts this chart.



Figure 13

Dr. Duggan Total "DIFFERENCE" by Year

**B.      Dr. Duggan's "DIFFERENCE" Includes Claims That Have Been Resolved**

59)      Dr. Duggan calculated the "DIFFERENCE" for the Federal share of Medicaid for all states.[46]  I have been advised that certain settlements have been reached that resolve Medicaid claims for the products at issue.  I will be prepared at trial to quantify any offsets that should be made to the government's proposed "DIFFERENCE" on this basis.

60)      In addition, various Medicaid and Medicare providers have returned funds to the government related to incorrect or inappropriate claims during this eleven year period.  Dr. Duggan has not considered the impact of this recoupment.

---

[46] See Dr. Duggan's report dated June 19, 2008, p.77.

## C.   Dr. Duggan's "DIFFERENCE" Does Not Account for the Rebates Paid by Abbott to Every State Medicaid Program

61)   Dr. Duggan ignored Medicaid rebates in his calculations of "DIFFERENCE." As discussed earlier, Abbott made quarterly submissions to CMS of its AMP and issued rebate checks to each state Medicaid program resulting in a net reduction in the Medicaid expenditures for Abbott products.  For purposes of his calculations, he has not offset his "DIFFERENCE" by the Medicaid rebates paid by Abbott for the products for the relevant time period.

## X.   Other Opinions

62)   I have also been asked my opinion with the respect to the following issues:

## A.   Available Sources of Product Pricing Information

63)   During the relevant time period, there was a variety of pricing information available to the government.  For example:

- Myers & Stauffer conducted various provider purchase price and dispensing cost surveys on behalf of state Medicaid agencies during the relevant time period.  Some of these states in fact overlapped the states analyzed by Dr. Duggan including California, Kentucky, Florida, New Jersey, and Louisiana.  In addition, Myers & Stauffer performed similar projects for many of the states Dr. Duggan chose not to analyze.[47]

- On a quarterly basis, Abbott provided CMS with its Average Manufacturer Prices (AMP).  AMP is calculated based on a formula prescribed by the government and reflects prices to the retail class of trade.  In addition, each state Medicaid program had the ability to discern AMP from the various exchanges between the parties with respect to Abbott's Medicaid Rebate payments because the rebate is calculated as a percentage of AMP for these products.

---

[47] See KYDMSPL1022497.

- Abbott also provided the Veterans Administration with pricing information reflecting the discounted pricing available to some of its largest customers in the course of assisting the government in establishing the Federal Supply Schedule (FSS) pricing for Abbott's products.

- State Medicaid programs had visibility to transaction prices in the course of processing claims information.  For example, many claims were submitted and paid at amounts below the AWP-based reimbursement, and reflected discounts available to certain providers (See e.g., Figure 4).  In addition, some states required providers to submit information regarding their actual acquisition cost.[48]

- State Medicaid programs had visibility to transaction prices through the administration of 340B/Public Health Service programs where the providers were required to submit their actual acquisition costs to the state.

- The government had access to other market based pricing information (e.g., IMS Health).

- Starting in 1994, First DataBank began calculating and publishing a "BaseLine Price."  According to User Manual, "[t]he BaseLine concept involves all prices, shows the current market price and reflects changes in the market as they occur."[49]

- State Medicaid agencies determined their own state Maximum Allowable Cost ("MAC") to limit reimbursement of generic products for which the prices pharmacies paid differed significantly from the published prices.[50]  In certain cases states used the Federal Upper Limit (FUL) as their state MAC price.  These are generic products that the government could have implemented an FUL but the government elected not to do so.[51]

---

[48] See, e.g., HHD006-0060.

[49] See 2001 BMW032-0020 -0026.

[50] See "Study of Medi-Cal Pharmacy Reimbursement" Prepared for the California Department of Health Services. Prepared by Myers and Stauffer, June 2002, page 6.

[51] The majority of the NDCs in this matter met the requirements to have a FUL calculated, but the CMS did not do so.

## B.   Context for Spread Allegations

64)     In my view it is important to put into context the purported size of the alleged spreads by looking at those spreads not in terms of a percentage but rather in terms of dollars per package.  The complaint displays the dollars associated with the spreads on a case price; however, providers do not dispense the products to patients at the case level and Abbott's published prices for these products are reported at the package level.  I believe that a package (not per case) pricing is a more meaningful comparison when looking at provider reimbursement data.  I compared Dr. Duggan's "but for" price at the package level to the published price to quantify the variance between the AWP and Dr. Duggan's "but for" price at a package level.  This analysis indicates that large percentage spreads do not translate into large dollar spreads. Figure 14 below illustrates the spread associated with three of these products.

**Figure 14**

**Dollar Value of Spread Using Dr. Duggan's "But For"**

| NDC | Drug Name | Year | Quarter | AWP Per Package | "But For" Per Package | Dollar Spread | Spread % |
|-----|-----------|------|---------|-----------------|----------------------|---------------|----------|
| 00074798309 | SODIUM CHLORIDE 0.9% SOLN | 1997 | 1 | 10.87000 | 0.96685 | 9.90315 | 1024% |
| 00074792209 | DEXTROSE 5%/WATER IV SOLN. | 1997 | 2 | 12.51000 | 1.05939 | 11.45061 | 1081% |
| 00074799009 | STERILE WATER FOR INJECTION | 1998 | 2 | 12.12000 | 1.09990 | 11.02010 | 1002% |

65)     I have been asked to evaluate the dollar value difference for a product for which Judge Patti Saris found no liability after the Track 1 MDL trial.[52]  The spread percentage was approximately 30% and the dollar value of the spread per package was between $176 and $207 depending upon the NDC.  The dollar spread for Abbott's products were significantly lower than these amounts.

---

[52] See Findings of Fact and Conclusions of Law, Track 1 MDL-1456, June 21, 2007, p.167.

## C.     Analysis of Unit Sales

66)     I have been asked to compare Abbott's unit sales between 2001 and

2002.  As seen in Figure 15, I have found that the unit sales are higher in 2002 than

2001.

| Figure 15 | | |
|---|---|---|
| Direct Sales Total Units | | |
| | **2002** | **2001** |
| **Total Units** | **335,866,492** | **315,801,246** |

## D.     Annual Price Changes

67)     I have been asked to quantify the number of price changes published by

First DataBank ("FDB") for the products at issue.  I determined that FDB published at

most eleven price changes for these products between 1991 and 2001 (approximately

one change per year).

Executed on:  March 6, 2009                    By: _____

Steven J. Young
Huron Consulting Services LLC

Exhibit 1A

# Steven J. Young
**Managing Director**

P 312 583 8763
F 312 583 8701
syoung@huronconsultinggroup.com

550 West Van Buren Street
Chicago, Illinois 60607

**Curriculum Vitae**

Steve began his career with Arthur Andersen in 1983 where he became a partner in 1995. He became a Managing Director in Huron Consulting Group's Healthcare practice in May of 2002.

Professional experience
Steve has 25 years of experience assisting healthcare clients with complex financial, contractual and regulatory compliance, systems and government contracting issues. His work focuses upon the quantification of the impact of historical contractual or regulatory compliance issues; Investigations and disputes associated with those contractual or regulatory issues, preparation of proposals and pricing submissions under cost based, competitive and commercial pricing contracts; and various operational consulting projects within the healthcare industry.  This work normally entails analyzing large data sets and/or statistical sampling to quantify the impact of the issue being addressed as part of the dispute, investigation of compliance review, working with operations personnel from various functional areas to understand the historic practices and governing contractual relationships and requirements, presenting of the results to outside counsel, arbitrators or the court.  In addition, Steve works with companies' management and general counsels to review compliance procedures of the company, assisting in the preparation and implementation of corrective actions through systems and related procedures improvements, and testing of the companies' processes and resulting outcomes to assess compliance with the contractual or regulatory requirements.  This work also includes voluntary disclosures to regulatory bodies or negotiated settlements to contractual disagreements by commercial entities.

Steve has an extensive background in serving the unique financial and operating needs of companies in the health care industry, but he has also done work in the office furniture, engineering, electronics, and communications.  Some of his specific areas of expertise are:

_Pharmaceutical and DME Experience_

Steve performed various projects for pharmaceutical manufacturers to analyze sales, chargeback, rebate and other pricing data to assess compliance with government regulations such as Medicaid Rebate Act, Veterans Healthcare Act, Medicare Part B ASP and FSS contract requirements and has worked with clients to quantify the financial aspects of contractual relationships related to managed care, distribution or co-promotion agreements entered into by his clients.

- Analyzed the companies historic practices and assessed inconsistencies with guidance letters issued by the applicable Federal Agency.
- Assessed a pharmaceutical company's cost allocation to product lines as a consulting expert in a litigation matter.
- Assisted a pharmaceutical company in performing a royalty audit under the provisions of their joint marketing agreement.
- Served as an expert witness for various pharmaceutical manufacturers related to class action litigation matters associated with pharmaceutical pricing and reimbursement issues.  This included extensive work and analysis of manufacturer, wholesaler, pharmacy benefit manager, provider and health insurance data involved in the distribution and reimbursement of pharmaceutical drugs.
- Served as an expert witness related to a dispute between two manufacturers regarding the proper payments under a co-promotion agreement including various revenue and cost issues associated with quantifying the appropriate payments required under the agreement.
- Downloaded historical sales, chargeback and rebate data for each of the companies NDCs to integrate the data from various sources to arrive at comprehensive best price and average manufacturer price in accordance with the specific Federal guidance, and Steve presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.

- Tested manufacturers recalculations of historic pricing submissions, identified findings that were corrected by the manufacturer and presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.
- Performed compliance reviews, voluntary disclosures and investigation support related to Federal Supply Schedule contracts including identification and differentiation of most favored customer pricing, commercial contract reviews to establish pricing and concessions disclosures, and quantification of potential issues in rebuttal to Federal audits or investigations.
- Assisted in the preparation of computer extracts, work flows and procedures to maintain compliance with the applicable pricing requirements.
- Served as an expert in an arbitration dispute between a Pharmaceutical Manufacturer and a PBM regarding the appropriateness of rebates billed by the PBM over the course of a two year contract.

*Healthcare Claims Processing and Reimbursement*

Steve has had various experience assisting health plans analyze historical claims processing and reimbursement issues to identify overpayment or underpayments related to those issues and prepare, execute and support the related refunds or recoveries. Steve has:

- Assisted Health Plans extract large data sets to quantify the historic impact of certain system and process deficiencies related to compliance with Medicare Secondary Payment requirements.
- Assisted Health Plans analyze historical reimbursements for compliance with various provider contract, state regulatory requirements (such as prudent layperson and prompt pay) or subcontracted outsourcing agreements.
- Assisting a Health Plan in assessing a claims processing conversion to analyze claims data and the underlying data sources to identify incorrect payments under the new system and determine the root cause and propose corrective actions to the system logic or the underlying claims processor workflows. Performing stratified statistical samples of paid and denied claims to quantify the historical impact and potentially restate medical cost trends for establishing premium increases.

*Other experience*

In addition to the areas discussed above Steve has experience related to various other regulatory and government contract issues including:

- Claims for equitable adjustment related to contract changes
- FSS Defective pricing and price reduction compliance reviews in numerous industries
- Defective pricing reviews
- Accounting, compliance and administrative procedure preparation and review
- Indirect Rate Determination and submission
- Performing attestation engagements related to various compliance and pricing areas.
- Labor reporting system reviews
- Contract administration control reviews
- Compliance training assessments and presentations
- Interpreting and complying with Cost Accounting Standards (CAS) and the cost principles of the Federal Acquisition Regulation (FAR)
- Preparing CASB Disclosure Statements and determining the cost impact of cost accounting changes and violations of the Standards
- Contract Accounting and Project Reporting system design and implementation


Education & certification
- Bachelor's Degree in Accounting, Northern Illinois University
- Certified Public Accountant (Illinois)

Professional associations
- American Institute of Certified Public Accountants
- Illinois CPA Society
- Associate Member of the Public Contract Law Section of the ABA and a co-chair of the healthcare public contract law committee
- Member of Health Care Compliance Association and National Contract Management Association

Exhibit 1B

# RECENT TESTIMONY OF STEVEN J. YOUNG AT DEPOSITION, HEARING OR TRIAL

HARRY E. STETSER, DALE E.NELSON, and MICHAEL de MONTBRUN, individually and on behalf of themselves and all others similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC.; ABBOTT LABORATORIES; TAKEDA CHEMICAL INDUSTRIES, LTD.; JOHNSON & JOHNSON; ETHICON ENDO-SURGERY, INC.; INDIGO LASER CORPORATION; DAVID JETT; CHRISTOPHER COLEMAN; SCOTT HIDALGO; and EDDY JAMES HACK, Defendants; STATE OF NORTH CAROLINA, NEW HANOVER COUNTY, SUPERIOR COURT DIVISION FILE NO. 1-CV-5268; Deposition taken on June 1 and 2, 2004.

IN RE: LUPRON MARKETING AND SALES PRACTICES LITIGATION (MDL 1430), U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, MASTER FILE NO. 01-CV-10861; Deposition taken on July 13, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01; Deposition taken on August 13, 2004.

IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION, U.S. DISTRICT COURT DISTRICT OF MASSACHUSETTS, MDL NO. 1456, CIVIL ACTION NO.01-12257; Testimony taken November 18 and 19, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01; Hearing Testimony on April 20, 2005.

ADVANCEPCS HEALTH L.P., Claimant, v. TAKEDA PHARMACEUTICALS AMERICA, INC., Respondent, AMERICAN ARBITRATION ASSOCIATION, COMMERCIAL ARBITRATION TRIBUNAL, CASE NO. 76 193 00202 04 JMLE; Deposition taken on August 26, 2005.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Deposition taken on December 9, 2005.

SACRED HEART HEALTH SYSTEM, INC., ET AL., Plaintiffs, vs. HUMANA MILITARY HEALTHCARE SERVICES, INC., Defendant, IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION, CASE NO. 3:07-cv-62-MCR/EMT; Deposition taken on December 21, 2007.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Deposition taken on September 30, 2008.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Testimony at trial on December 16, 2008.

EXHIBIT 2

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| The United States' First Amended Complaint | Case 1:01-cv-12257-PBS | |
| Dr. Mark G. Duggan report dated June 19, 2008 | | PDF |
| Dr. Mark G. Duggan report dated January 23, 2009 | | PDF |
| Dr. Stephen W. Schondelmeyer report dated June 20, 2008 | | PDF |
| HHD108 | Abbott- 20071016-0001 | CD |
| HHD103 | Abbott- 20071002-0001 | CD |
| HHD145 | Abbott-20071127-0001 | CD |
| HHD153 | Abbott-20071210-0002 (Copy | CD |
| HHD150 | Abbott-20071210-0001 (Copy) | CD |
| HHD155 | 12/21/2007 | CD |
| HHD177 | Abbott-20080218-0002 (Copy) | CD |
| HHD201 | Abbott-20080325-0001 | CD |
| 1991 Direct Sales Data | ABT-DOJ 0351756 | CD |
| 1992 Direct Sales Data | ABT-DOJ 0351757 | CD |
| 1993, 1995, 1996 Direct Sales Data | ABT-DOJ 0351758 | CD |
| 1994 Direct Sales Data | ABT-DOJ 0351759 | CD |
| 1997-1999 Direct Sales Data | ABT-DOJ 0351760 | CD |
| 2000 & 2001 Direct Sales Data | ABT-DOJ 0351761 | CD |
| 2002 & 2003 Direct Sales Data | ABT-DOJ 0351762 | CD |
| 2003 Direct Sales | ABT-DOJ 0309999 | CD |
| 2002 Direct Sales | ABT-DOJ 0309998 | CD |
| 2001 Direct Sales | ABT-DOJ 0309997 | CD |
| 2000 Direct Sales | ABT-DOJ 0309996 | CD |
| 1999 Direct Sales | ABT-DOJ 0309995 | CD |
| 1998 Direct Sales | ABT-DOJ 0309994 | CD |
| 1997 Direct Sales | ABT-DOJ 0309993 | CD |
| 1996 Direct Sales | ABT-DOJ 0309992 | CD |
| 1995 Direct Sales | ABT-DOJ 0309991 | CD |
| 1994 Direct Sales | ABT-DOJ 0309990 | CD |
| 1993 Direct Sales | ABT-DOJ 0309989 | CD |
| 1991 & 1992 Direct Sales | ABT-DOJ 0309988 | CD |
| Indirect Sales- Jan-Dec (1991) | ABT-DOJ 0309974 | CD |
| Indirect Sales- Jan-Dec (1992) | ABT-DOJ 0309975 | CD |
| Indirect Sales- Jan-Dec (1993) | ABT-DOJ 0309976 | CD |
| Indirect Sales- Jan-Dec (1994) | ABT-DOJ 0309977 | CD |
| Indirect Sales- Jan-Dec (1995) | ABT-DOJ 0309978 | CD |
| Indirect Sales- Jan-Dec (1996) | ABT-DOJ 0309979 | CD |
| Indirect Sales- Jan-Dec (1997) | ABT-DOJ 0309980 | CD |
| Indirect Sales- Jan-Dec (1998) | ABT-DOJ 0309981 | CD |
| Indirect Sales- Jan-Dec (1999) | ABT-DOJ 0309982 | CD |
| Indirect Sales- Jan-Dec (2000) | ABT-DOJ 0309983 | CD |
| Indirect Sales- Jan-Dec (2001) | ABT-DOJ 0309984 | CD |
| Indirect Sales- Jan-Dec (2002) | ABT-DOJ 0309985 | CD |
| Indirect Sales- Jan-Jun (2003) | ABT-DOJ 0309986 | CD |
| Indirect Sales- Jul-Dec (2003) | ABT-DOJ 0309987 | CD |
| HHD124 | Abbott- 20071104-0001 (Copy) | CD |
| HHD229 | Abbott-20080423-0001 | CD |
| HHD235 | Abbott-20080515-5-0001 | CD |
| HHD237 | Abbott-20080520-S-0001 | CD |
| Abbott's AMP Data | ABT-DOJ 0236637 | CD |
| Idaho Medicaid Physicians Institutional | AWP- Idaho | CD |
| Report Definitions and Supplemental Information | AWP- Idaho | CD |
| 1997 Corrected Pharmacy (Medicaid Rx Claims) | AWP- Idaho | CD |
| 1993-2004 (Medicaid Rx Claims) | AWP- Idaho | CD |
| Idaho Medicare Claims Without Name & Date of Birth | AWP- Idaho | CD |
| 2005 (Medicaid Rx Claims) | AWP- Idaho | CD |
| HHD246 | Abbott-20080616-5-0001 | CD |
| Response by the State of Washington | | CD |
| HHD271 | Abbott- 20080814-5-0001 | CD |
| HHD277 | Abbott- 20080926-5-0001 | CD |
| AWP Claims- 2005-2006-Idaho | AWP- Idaho | CD |
| HHD314 | Abbott-20081212-S-0001 | CD |
| CO Pharmacy Reimbursement MethodologyRev12 02 08 | Myers and Stauffer | PDF |

EXHIBIT 2

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| California Pharmacy Reimbursement MethodologyRev12 03 08 | Myers and Stauffer | PDF |
| Arkansas Pharmacy Reimbursement MethodologyRev11 6 08 | Myers and Stauffer | PDF |
| Alaska Medicaid Pharmacy Reimbursement MethodologyRev10 28 08 | Myers and Stauffer | PDF |
| Alabama Medicaid Pharmacy Reimbursement MethodologyRev10 27 08(2) | Myers and Stauffer | PDF |
| WY Pharmacy Reimbursement MethodologyRev06 03 08(R) | Myers and Stauffer | PDF |
| WV Pharmacy Reimbursement MethodologyRev10 27 08 | Myers and Stauffer | PDF |
| WI Pharmacy Reimbursement MethodologyRev01 10 09) | Myers and Stauffer | PDF |
| WA Pharmacy Reimbursement MethodologyRev12 10 08 | Myers and Stauffer | PDF |
| VT Pharmacy Reimbursement MethodologyRev08 05 08(R) | Myers and Stauffer | PDF |
| VA Pharmacy Reimbursement MethodologyRev12 28 08 | Myers and Stauffer | PDF |
| Utah Medicaid Pharmacy Reimbursement MethodologyRev01 08 09 | Myers and Stauffer | PDF |
| TN Pharmacy Reimbursement MethodologyRev01 08 09 | Myers and Stauffer | PDF |
| Texas Medicaid Pharmacy Reimbursement MethodologyRev12 19 08 | Myers and Stauffer | PDF |
| SD Pharmacy Reimbursement MethodologyRev05 14 08(R) | Myers and Stauffer | PDF |
| SC Pharmacy Reimbursement MethodologyRev11 14 08 | Myers and Stauffer | PDF |
| RI Pharmacy Reimbursement MethodologyRev0725 | Myers and Stauffer | PDF |
| Pennsylvania Medicaid Pharmacy Reimbursement MethodologyRev12 16 08 | Myers and Stauffer | PDF |
| OR Pharmacy Reimbursement MethodologyRev08 19 08 | Myers and Stauffer | PDF |
| OK Pharmacy Reimbursement MethodologyRev10 31 08 | Myers and Stauffer | PDF |
| Ohio Medicaid Pharmacy Reimbursement MethodologyRev121208 | Myers and Stauffer | PDF |
| NY Pharmacy Reimbursement MethodologyRev12 01 08 | Myers and Stauffer | PDF |
| North Carolina Medicaid Pharmacy Reimbursement MethodologyRev12 20 08 | Myers and Stauffer | PDF |
| NM Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| New Jersey Medicaid Pharmacy Reimbursement MethodologyRev12 22 08 | Myers and Stauffer | PDF |
| New Hampshire Medicaid Pharmacy Reimbursement MethodologyRev10 17 08 | Myers and Stauffer | PDF |
| Nevada Medicaid Pharmacy Reimbursement MethodologyRev0604 | Myers and Stauffer | PDF |
| NE Pharmacy Reimbursement MethodologyRev11 17 08 | Myers and Stauffer | PDF |
| ND Pharmacy Reimbursement MethodologyRev12 02 08 | Myers and Stauffer | PDF |
| MT Pharmacy Reimbursement MethodologyRev10 24 08 | Myers and Stauffer | PDF |
| Missouri Medicaid Pharmacy Reimbursement MethodologyRev12 31 08 | Myers and Stauffer | PDF |
| Mississippi Medicaid Pharmacy Reimbursement MethodologyRev11 28 08 | Myers and Stauffer | PDF |
| Minnesota Medicaid Pharmacy Reimbursement MethodologyRev05 19 08(R) | Myers and Stauffer | PDF |
| Michigan Medicaid Pharmacy Reimbursement MethodologyRev12 28 08 | Myers and Stauffer | PDF |
| Massachusetts Medicaid Pharmacy Reimbursement MethodologyRev01 06 09 | Myers and Stauffer | PDF |
| Maryland Medicaid Pharmacy Reimbursement MethodologyRev06 09 08 | Myers and Stauffer | PDF |
| Maine Pharmacy Reimbursement MethodologyRev11 03 08(2) | Myers and Stauffer | PDF |
| Louisiana Medicaid Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| Kentucky Medicaid Pharmacy Reimbursement MethodologyRev11 03 08 | Myers and Stauffer | PDF |
| Kansas Medicaid Pharmacy Reimbursement MethodologyRev12 1 08 | Myers and Stauffer | PDF |
| Iowa Pharmacy Reimbursement MethodologyRev10 31 | Myers and Stauffer | PDF |
| Indiana Medicaid Pharmacy Reimbursement MethodologyRev01 07 09 | Myers and Stauffer | PDF |
| Illinois Medicaid Pharmacy Reimbursement MethodologyRev01 06 09 | Myers and Stauffer | PDF |
| Idaho Medicaid Pharmacy Reimbursement11 17 08 | Myers and Stauffer | PDF |
| Hawaii Medicaid Pharmacy Reimbursement MethodologyRev10 06 08 | Myers and Stauffer | PDF |
| Georgia Medicaid Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| Florida Pharmacy Reimbursement MethodologyRev 12 05 08 | Myers and Stauffer | PDF |
| District of Columbia Medicaid Pharmacy Reimbursement MethodologyRev09 12 08 | Myers and Stauffer | PDF |
| Delaware Medicaid Pharmacy Reimbursement MethodologyRev12 08 08 | Myers and Stauffer | PDF |
| Connecticut Medicaid Pharmacy Reimbursement MethodologyRev11 28 08 | Myers and Stauffer | PDF |
| Myers & Stauffer LC (T. Allan Hansen) - Dep dated 12-10-08 and Exhibits | KYSMSPL1022485 | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AK, AR and CA (AK 199812) | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AR 198906 | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AR 199405 Sched D G | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AR 199405 | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AR 199807 Sched F | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AR 199807 | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AR 200106 Acq | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - AR 200106 Disp | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - CA 2002 Acq | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - CA 2002 Disp | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - CA 2007 | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - CT, ID, IN and KS Reports (CT 198702) | Myers and Stauffer | PDF |
| 09_24_08 Myers & Stauffer Pharmacy Report - ID 1998 | Myers and Stauffer | PDF |

EXHIBIT 2

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| 09_24_08  Myers & Stauffer Pharmacy Report - IN 2004 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - IN 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199203 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 193310 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199705 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199909 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 199808 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 199908 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200006 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200011 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200012 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200012 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200111 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200310 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY and LA (KY 199801) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 199909 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 200103 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 20070301 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - MN, NV, OK, TX, WY (MN 2006) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - NV 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - OK 2000 OSEEGIB AUP | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - OK 2000 Pharmacy Benefit Design OSEEGIB | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - TX 200208 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199010 Sched F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199010 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199508 Sched B C F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199508 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199903 | Myers and Stauffer | PDF |
| Exhibit Abbott Maryland 13 (MD0021454 - MD0021497) | Duggan deposition | |
| HHD127-0023 - HHD127-0025 | | |
| Memorandum Intermediaries/Carriers. Transmittal AB-00-86. September 8, 2000 | | |
| http://www.pmewswire.co.uk/cgi/news/release?id=122086 | | |
| CMS, Part B Carrier Locality Codes After 12/31/1995 Report Prepared by CMS 9/17/04 | | |
| Testimony of Herb Kuhn before the House Subcommittee on Health of the Committee on Ways and Means July 13, 2006 | | |
| http://www.nhia.org/faqs.cfm | | |
| HHD006-0060 | | |
| Testimony of Jerry Dubberly on December 15, 2008 | | PDF |
| Testimony of Dr. Mark G. Duggan February 17, 2009 | | PDF |
| IMS Hospital Supply Index Data 1992 - 2003 | ABT-DOJ 0377285 | CD |
| Findings of Fact and Conclusions of Law, Track 1 MDL-1456, June 21, 2007, p.167. | | |
| BMW032-0020-0026 | | PDF |
| State of West Virginia vs. Warrick Pharm., et al. Civil Action No. 01-C-3011; Kanawha County (Stucky, J.) | | CD |

Exhibit 3

Exhibit 3

| State | Claims Data Received | CMS Utilization All Drugs [1]<br>Paid Amount | Rank | Medicaid Fee for Service Enrollment 1997 [2]<br># of Enrollees | Rank | CMS Utilization Stipulated Drugs [1]<br>Paid Amount | Rank |
|---|---|---|---|---|---|---|---|
| CALIFORNIA | X | $ 16,417,749,204 | 1 | 2,936,959 | 1 | $ 10,001,593 | 3 |
| NEW YORK | X | $ 13,807,473,246 | 2 | 1,635,754 | 3 | $ 8,748,113 | 5 |
| FLORIDA | X | $ 8,241,298,851 | 3 | 514,322 | 8 | $ 16,482,599 | 1 |
| TEXAS | X | $ 8,031,620,626 | 4 | 1,803,346 | 2 | $ 3,456,074 | 13 |
| OHIO | X | $ 6,248,293,493 | 5 | 742,435 | 5 | $ 5,836,390 | 9 |
| PENNSYLVANIA | X | $ 5,598,465,961 | 6 | 715,442 | 6 | $ 2,920,290 | 15 |
| ILLINOIS | X | $ 5,584,126,592 | 7 | 1,183,306 | 4 | $ 15,861,036 | 2 |
| MASSACHUSETTS | X | $ 4,391,802,312 | 8 | 254,476 | 16 | $ 1,930,850 | 22 |
| NORTH CAROLINA | X | $ 4,379,036,900 | 9 | 474,421 | 9 | $ 4,294,250 | 11 |
| NEW JERSEY | X | $ 4,171,671,273 | 10 | 300,236 | 14 | $ 9,642,486 | 4 |
| GEORGIA | X | $ 3,954,194,226 | 11 | 320,861 | 13 | $ 3,250,664 | 14 |
| LOUISIANA | X | $ 3,605,247,816 | 12 | 595,203 | 7 | $ 4,256,698 | 12 |
| MICHIGAN | X | $ 3,604,663,274 | 13 | 250,469 | 17 | $ 4,903,153 | 10 |
| KENTUCKY | X | $ 3,408,333,261 | 14 | 259,006 | 15 | $ 7,402,284 | 6 |
| MISSOURI | X | $ 3,269,943,106 | 15 | 350,287 | 12 | $ 6,360,406 | 8 |
| VIRGINIA | X | $ 2,739,334,082 | 16 | 215,276 | 20 | $ 2,599,335 | 17 |
| TENNESSEE [3] | | $ 2,499,227,518 | 17 | - | 49 | $ 243,918 | 42 |
| WASHINGTON [3] | X | $ 2,471,516,696 | 18 | - | 50 | $ 2,509,996 | 19 |
| WISCONSIN | X | $ 2,403,738,899 | 19 | 217,347 | 19 | $ 2,574,373 | 18 |
| ALABAMA | | $ 2,397,577,589 | 20 | 89,791 | 31 | $ 2,138,490 | 20 |
| SOUTH CAROLINA | X | $ 2,224,254,066 | 21 | 379,164 | 11 | $ 1,791,730 | 25 |
| INDIANA | X | $ 2,033,147,693 | 22 | 185,000 | 23 | $ 6,707,961 | 7 |
| MISSISSIPPI | | $ 2,004,932,074 | 23 | 462,305 | 10 | $ 1,892,501 | 23 |
| CONNECTICUT | X | $ 1,864,905,341 | 24 | 128,280 | 26 | $ 2,063,566 | 21 |
| MINNESOTA | X | $ 1,636,558,269 | 25 | 233,458 | 18 | $ 1,197,250 | 29 |
| MAINE | X | $ 1,537,944,918 | 26 | 143,013 | 24 | $ 300,399 | 40 |
| MARYLAND | | $ 1,506,745,317 | 27 | 117,496 | 27 | $ 1,735,601 | 26 |
| WEST VIRGINIA | | $ 1,461,160,998 | 28 | 185,189 | 22 | $ 1,283,144 | 28 |
| ARKANSAS | X | $ 1,389,789,038 | 29 | 108,067 | 28 | $ 2,723,668 | 16 |
| SOUTH DAKOTA | | $ 1,367,064,699 | 30 | 18,870 | 46 | $ 436,538 | 36 |
| OKLAHOMA | | $ 1,326,049,934 | 31 | 214,343 | 21 | $ 1,618,591 | 27 |
| OREGON | | $ 1,136,816,437 | 32 | 64,000 | 34 | $ 1,027,877 | 30 |
| IOWA | X | $ 927,844,495 | 33 | 129,386 | 25 | $ 601,602 | 35 |
| KANSAS | | $ 904,839,965 | 34 | 90,871 | 30 | $ 614,600 | 33 |
| NEBRASKA | | $ 892,935,884 | 35 | 51,153 | 37 | $ 760,370 | 32 |
| COLORADO | | $ 865,541,304 | 36 | 44,558 | 40 | $ 1,794,111 | 24 |
| UTAH | | $ 601,349,966 | 37 | 24,558 | 44 | $ 886,794 | 31 |
| RHODE ISLAND | | $ 587,096,408 | 38 | 43,218 | 42 | $ 415,287 | 37 |
| NEW MEXICO | | $ 488,235,374 | 39 | 103,108 | 29 | $ 61,788 | 47 |
| NEW HAMPSHIRE | | $ 425,889,194 | 40 | 61,820 | 36 | $ 84,390 | 46 |
| IDAHO | X | $ 416,754,362 | 41 | 48,125 | 39 | $ 95,856 | 45 |
| MONTANA | | $ 404,234,902 | 42 | 8,817 | 48 | $ 327,080 | 39 |
| HAWAII | X | $ 377,262,235 | 43 | 31,525 | 43 | $ 327,599 | 38 |
| DISTRICT OF COLUMBIA | | $ 369,205,769 | 44 | 44,279 | 41 | $ 43,888 | 50 |
| ALASKA | X | $ 330,494,681 | 45 | 87,475 | 32 | $ 61,299 | 48 |
| DELAWARE | | $ 309,673,884 | 46 | 15,500 | 47 | $ 243,786 | 43 |
| NEVADA | | $ 271,187,177 | 47 | 62,124 | 35 | $ 611,154 | 34 |
| VERMONT | | $ 264,417,769 | 48 | 74,039 | 33 | $ 48,139 | 49 |
| NORTH DAKOTA | | $ 264,096,811 | 49 | 21,008 | 45 | $ 210,056 | 44 |
| WYOMING | | $ 141,567,612 | 50 | 48,348 | 38 | $ 255,949 | 41 |
| **Total** | | $ 135,557,311,511 | | 16,088,034 | | $ 145,635,571 | |

Note - Dr. Duggan calculated damages on states shaded grey.
1) Source: http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp.
2) Source: http://www.cms.hhs.gov/MedicaidDataSourcesGenInfo/Downloads/mmcer97.pdf
3) Tennessee and Washington had waiver programs with no fee for service.