# EXHIBIT D

Page 1

```
            UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      )  Judge Patti B. Saris

the Florida Keys, Inc.          )

    v.                          )  Chief Magistrate

Abbott Laboratories, Inc.,      )  Judge Marianne B.

No. 06-CV-11337-PBS             )  Bowler

- - - - - - - - - - - - - - - -

        (caption continues on following pages)




  Videotaped deposition of JOHN M. LOCKWOOD, M.D.

                  Volume I


                    Washington, D.C.

                    Thursday, December 6, 2007

                    9:00 a.m.
```

Page 2

```
 1      IN THE DISTRICT COURT OF TRAVIS COUNTY, TEXAS
 2           201st JUDICIAL DISTRICT
 3    ----------------
 4    THE STATE OF TEXAS,        )
 5    ex rel. VEN-A-CARE OF THE  )
 6    FLORIDA KEYS, INC.,        )
 7          Plaintiffs,    ) Cause No. GV401286
 8       vs.               )
 9    ABBOTT LABORATORIES INC., et )
10    al.,                  )
11          Defendants.     )
12    ----------------
13
14       Videotaped deposition of JOHN M. LOCKWOOD,
15    M.D., held at the law offices of Jones Day, 51
16    Louisiana Avenue, N.W., Washington, D.C. 20001-2113,
17    the proceedings being recorded stenographically by
18    Jonathan Wonnell, a Registered Professional Court
19    Reporter and Notary Public of the District of
20    Columbia, and transcribed under his direction.
21
22
```

Page 3

```
 1          APPEARANCES OF COUNSEL
 2
 3     On behalf of the United States of America:
 4          RENEE BROOKER, ESQ.
 5          U.S. Department of Justice
 6          Civil Division, Commercial Litigation
 7          601 D Street, N.W., Room 9918
 8          Washington, D.C. 20004
 9          (202) 616-3797
10          renee.brooker@usdoj.gov
11
12     On behalf of the State of Texas:
13          MARGARET MOORE, ESQ.
14          Office of the Attorney General of
15           the State of Texas
16          301 West 15th
17          Austin, Texas 78701
18          (512) 936-1319
19
20
21
22   (Cont'd)
```

Page 4

```
 1          A P P E A R A N C E S (Cont'd)
 2
 3     On behalf of Ven-A-Care of the Florida
 4        Keys, Inc.:
 5          JAMES JOSEPH BREEN, ESQ.
 6          ALISON WARREN SIMON, ESQ.
 7          The Breen Law Firm
 8          5755 North Point Parkway, Suite 39
 9          Alpharetta, Georgia 30022
10          (770) 740-0008
11          jbreen@breenlaw.com
12
13     On behalf of Abbott Laboratories, Inc.:
14          R. CHRISTOPHER COOK, ESQ.
15          LOUIS P. GABEL, ESQ.
16          Jones Day
17          51 Louisiana Avenue, N.W.
18          Washington, D.C. 20001-2113
19          (202) 879-3939
20          christophercook@jonesday.com
21          lgabel@jonesday.com
22   (Cont'd)
```

Page 5

```
 1          A P P E A R A N C E S (Cont'd)
 2
 3     On behalf of Dey, Inc. and Dey, L.P.
 4        and Mylan:
 5          WILLIAM ESCOBAR, ESQ.
 6          Kelley, Drye & Warren LLP
 7          101 Park Avenue
 8          New York, New York 10178
 9          (212) 808-7771
10          wescobar@kelleydrye.com
11
12     On behalf of Roxane Laboratories and
13        Boehringer Ingelheim:
14          ERIC GORTNER, ESQ.
15          Kirkland & Ellis
16          200 East Randolph Drive
17          Chicago, Illinois 60601
18          (312) 861-2285
19          egortner@kirkland.com
20
21
22   (Cont'd)
```

2 (Pages 2 to 5)

07b8784e-4541-48af-bfa3-f915a559fc7d

Page 94

1    Q.  Any tape recording made of the
2  conversation?
3    A.  I don't think so.  No.  I don't think -
4  - I don't know if that's legal to do in Florida
5  anyway, but I don't think there was any tape
6  recording, no.  No.
7    Q.  Any contemporaneous memorandum created
8  or other documents memorializing the contents of
9  the conversation, to your knowledge?
10   A.  I suspect there may have been.  I don't
11 know.
12   Q.  Other than that instance that was
13 described to you by Mr. Bentley, are there any
14 other instances in which your aware of an Abbott
15 representative attempting to sell its product
16 based upon the difference between reimbursement
17 amounts and acquisition cost?
18       MR. BREEN:  Objection to form.
19   A.  Not to me.  I don't -- I wasn't privy
20 to those discussions for instance with the
21 hospital or hospital pharmacy.  I don't know.
22 But I would think that hospitals would still be

Page 95

1  interested in that, certainly in the '80s DRGs
2  were coming into their own, but many private
3  insurance companies still paid on list prices and
4  that sort of thing.
5    Q.  The information that you described to
6  me about acyclovir and the difference between
7  either direct price, if it's AWP or it's AWP and
8  it's cost, is that all information that Mr.
9  Bentley provided to you or did you obtain any of
10 that information in any other way?
11   A.  You're probably better off asking him.
12 But it was my understanding or recollection of
13 this that those prices were sent to us either
14 directly from Abbott or through a GPO that Abbott
15 was working with that I think we were part of.
16 I'd be much better on that if I had the document
17 in front of me, obviously.
18   Q.  Well, my question actually relates to
19 your knowledge as opposed to Mr. Bentley's or
20 broader than that.  Do you have any source of
21 knowledge of this event other than through Mr.
22 Bentley?

Page 96

1        MR. BREEN:  Objection to form.
2    A.  I would say that just based -- I mean,
3  I have knowledge of the paperwork that was
4  generated surrounding it.  And I don't know -- I
5  don't have the documents in front of me.  There
6  are prices represented on documents that I have
7  looked at.  And I believe as I recall there was a
8  fax from Dennis Walker that I have looked at.
9  That would be my knowledge.
10   Q.  So there are documents and there's a
11 conversation with Mr. Bentley that form the basis
12 of your knowledge.  My question is are there any
13 other sources of knowledge for this particular
14 event for you?
15       MR. BREEN:  Objection to form.
16   A.  Well, not that I know of right now.
17   Q.  You're familiar with the term marketing
18 the spread, correct?
19   A.  I am.
20   Q.  Is it your understanding that the
21 manner in which hospitals are reimbursed is such
22 that marketing the spread is not relevant to

Page 97

1  hospital purchases of IV fluids?
2        MR. BREEN:  Objection, form.
3    A.  I would say no.  That would not be my
4  understanding, no.
5    Q.  Really?  How is marketing the spread
6  relevant to the sale of IV fluids to hospitals?
7    A.  Well, I think you have to look at it
8  historically.  Prior to the 1980s, prior to DRGs
9  being invented, diagnostic related grouping
10 reimbursement by Medicare, hospitals were
11 routinely billing the government and everyone, I
12 assume, based on some type of list price type
13 thing.  I don't have the actual billings in front
14 of me.
15   Q.  Wait a minute.  It's your understanding
16 that hospitals were filling out their cost
17 reports based upon list price rather than based
18 upon their actual invoice cost?
19       MR. BREEN:  Objection, form.
20   A.  My understanding of this is that prior
21 to DRGs hospitals didn't fill out a bunch of cost
22 reports.

25 (Pages 94 to 97)

Lockwood, M.D., John M. PORTIONS HIGHLY CONFIDENTIAL    December 6, 2007
Washington, DC

Page 98

1    Q.  It's your understanding that hospitals
2  under Medicare Part A were not filling out cost
3  reports prior to DRGs?
4       MR. BREEN:  Objection to form.
5    A.  I'm not trying to tell you I'm the
6  world's expert on that.  But cost reports, in my
7  understanding, are an entity that came along with
8  diagnostic related grouping and that hospitals
9  were asked to give their cost reports and they
10 were evaluated and then a DRG payment was
11 assigned in that hospital.
12      But when I started practicing that was
13 very much in its infancy.  If you had Blue
14 Cross/Blue Shield insurance, private insurance,
15 which a significant number of patients had back
16 then -- it was cheaper -- or any private
17 insurance at that point in time, the hospital had
18 the ability to bill that insurance company on
19 whatever it wanted to bill on.  And it's my
20 understanding that that was not uncommon for them
21 to bill based on list prices.
22   Q.  You do understand that hospital

Page 99

1  services are paid under Medicare part A, correct?
2       MR. BREEN:  Objection, form.
3    A.  Well, you're talking about Medicaid.
4    Q.  Yes.
5    A.  I'm talking about, in the discussion I
6  was just having, about private insurance.
7    Q.  Leave aside for a moment private
8  insurance.  You understand that this particular
9  lawsuit relates to Medicare and Medicaid
10 reimbursement, correct?
11   A.  I understand that, yes.
12   Q.  So for a moment let's set aside private
13 insurance.  Is it your understanding that at all
14 relevant times since 1968, hospital services have
15 been paid by Medicare part A?
16      MR. BREEN:  Objection, form.
17   A.  I think so.  But I don't know -- I
18 wouldn't hold myself out to be an expert on that
19 billing that was occurring in 1970.  But it was
20 my understanding that cost reporting is something
21 that came along with DRGs that came in much
22 later.

Page 100

1    Q.  But it's your understanding that --
2  well, when did DRGs come into effect?
3       MR. BREEN:  Objection to form.
4    A.  My recollection is the early '80s.
5    Q.  So this lawsuit of course relates to
6  1991 through 2001, correct?
7    A.  Yes, sir.
8    Q.  And Texas relates to what period of
9  time?
10   A.  I don't know the limits of that.
11   Q.  Some longer period of time, I assume?
12   A.  I don't know.
13   Q.  During all times relevant to this
14 particular lawsuit hospitals have been paid based
15 upon DRGs, correct?
16      MR. BREEN:  Objection, form.
17   A.  Yes, that would be correct.
18   Q.  Is there any way to your knowledge that
19 Abbott could market the spread to hospitals for
20 their IV fluids if the hospitals are being
21 reimbursed based upon DRGs?
22   A.  Yes, sir.  Based upon the hospital's

Page 101

1  reimbursements by private insurance companies,
2  which was a significant portion of hospital
3  billings and probably still is a significant
4  portion of hospital billings.  Now, as private
5  insurance tried to emulate Medicare, I'm sure
6  there are a variety of ways that billing has
7  occurred.
8       But a huge portion of the hospital
9  marketplace during the time of this lawsuit was
10 based on private insurance payments where
11 charging list prices for anything was fairly
12 common.  I think everybody is aware of the $5
13 aspirin concept from hospitals.  So that do I
14 think hospitals were able to bill list prices to
15 private insurance during the course of this
16 lawsuit?  My answer to that would be yes.
17      Now, there's another aspect of hospital
18 billing which is private insurance based, which
19 is outpatient, and in particular outpatient
20 chemotherapy and those sorts of things.  I think
21 some people have a mistaken idea that all that
22 outpatient chemotherapy occurs in oncologist's

26 (Pages 98 to 101)

Page 102

1   offices, that certainly the hospital in Key West,
2   which is a small hospital, bearing between 80 and
3   120 beds or so in general at any one point in
4   time, had an outpatient department where they
5   delivered chemotherapy to patients and they
6   billed private insurance.
7           In fact it was right next to the
8   outpatient department where I took my outpatient
9   surgery patients. So it was common for me to
10  walk by and see a patient receiving an infusion.
11  And if they had private insurance during the time
12  we're talking about it's my understanding that it
13  would be very common for the hospital to bill
14  list price to the insurance company for those IV
15  fluids that they were using.
16          Now, I understand that that may or may
17  not impact Medicare. But it certainly impacts
18  the hospital's bottom line. I don't know exactly
19  what the national average of Medicare patients is
20  in hospitals. But I would guess it's 50 percent
21  -- government sponsored patients is 50 or 60
22  percent.

Page 103

1           But I'll bet about everybody in this
2   room has got private insurance and that if you
3   had to go to the hospital and be treated in their
4   outpatient department that the hospital would
5   bill your private insurance, and if they could,
6   unless it was previously negotiated, they would
7   bill list price, would be my expectation.
8       Q.  So it's your testimony that Abbott had
9   an opportunity to market the spread for IV fluids
10  to hospitals, correct?
11          MR. BREEN: Objection, form.
12      A.  I believe there was an opportunity for
13  that in the private insurance marketplace
14  certainly in the early '90s and as private
15  insurance has evolved, I don't know where that is
16  right now.
17      Q.  Are you aware of any evidence that
18  Abbott did market the spread for these products
19  to any hospital?
20          MR. BREEN: Objection, form.
21      A.  They didn't market it to me. No.
22      Q.  I'm asking you a different question.

Page 104

1       A.  Okay.
2       Q.  Are you aware of any evidence that
3   Abbott did market the spread to any hospitals?
4       A.  Including Abbott documents that I've
5   seen?
6       Q.  Let's start with your personal
7   knowledge and not from documents you've reviewed
8   in the context of this case.
9           MR. BREEN: Objection, form.
10      A.  I would say in my personal knowledge I
11  don't have evidence of that. But in the Abbott
12  documents I reviewed during the course of this
13  case I have seen evidence of that, yes.
14      Q.  Can you point me to specific documents?
15      A.  I'm sure I could if I had those
16  available to me or if perhaps I was allowed to by
17  my attorneys that I could show you a number of
18  documents that in my mind clearly show evidence
19  of Abbott marketing the spread to a variety of
20  different types of customers, including nursing
21  homes, nursing home chains, large providers in
22  general, very large providers, detailed computer

Page 105

1   analyses of the spread, the profit benefit of
2   using Abbott's pharmaceuticals over using Baxter
3   or Magaw's pharmaceuticals or someone else's,
4   those type of detailed computer analyses.
5       Q.  Were those provided to a hospital?
6           MR. BREEN: Objection to form.
7       A.  I looked at a lot of documents. I'll
8   have to think for a minute. I'm trying to run
9   through a catalog of those documents in my mind.
10      Q.  I can short circuit that. Is it fair
11  to say that to the extent that you've reviewed
12  any evidence in this case your memory would be
13  imperfect in terms of trying to remember what
14  evidence supports what particular allegation
15  sitting here at the deposition without those
16  documents?
17      A.  Yes. I would say that I can't
18  necessarily remember all of the documents I've
19  looked at, or the ones that I think would be
20  responsive to questions about Abbott marketing
21  the spread to hospitals or others.
22      Q.  And you would agree with me that when

27 (Pages 102 to 105)

Page 106

1  we're talking about your personal experience and
2  personal knowledge, you would have a better grasp
3  of that, one would hope?
4        MR. BREEN:  Objection.
5     A.  Sure, although it's been a few years --
6  there's no question about that -- at this point.
7     Q.  Do you have any personal knowledge
8  whatsoever about Abbott marketing the spread?
9        MR. BREEN:  Objection, form.
10    A.  No one from Abbott has marketed the
11 spread to me or -- other than Mr. Bentley,
12 someone that I can clearly think of in my
13 personal recollection, right now.  I can't think
14 of any.
15    Q.  Have you seen Abbott market the spread?
16       MR. BREEN:  Objection, form.
17    A.  I can't say that with my eyes other
18 than by looking at the documents that I have seen
19 it.
20    Q.  And have you in any other way, whether
21 hearing, smelling, tasting, feeling, perceived
22 Abbott marketing the spread other than reading

Page 107

1  documents in this case?
2        MR. BREEN:  Objection, form.
3     A.  Well, not that I'm aware of right now.
4  Not that I can answer to.  No.
5     Q.  What's your understanding of what the
6  drugs are that are involved in the Texas case?
7     A.  The Texas case involves some IV fluids,
8  some infusion drugs, some oral drugs, which are
9  mainly erythromycin type drugs, and I think some
10 nutritionals that are like Pedialyte and some
11 other more high tech drugs that are marketed by
12 Abbott, PPD.  I cannot give you a complete list.
13 My recollection is it's -- it may be several
14 hundred drugs.  I don't -- I can't tell you right
15 now.
16    Q.  As to the drugs in the Texas case, do
17 you have any personal knowledge of whether Abbott
18 marketed the spread for those drugs?
19       MR. BREEN:  Objection, form.
20    A.  Well, other than documents that I have
21 seen where I think Abbott was marketing the
22 spread in my personal -- did anyone ever come to

Page 108

1  me with an Abbott drug and market the spread on
2  those, other than Mr. Bentley, none that I can
3  think of, no.
4     Q.  You understand that there are published
5  prices for all of the drugs involved in both the
6  DOJ and the Texas litigation, correct?
7     A.  Yes, sir.
8     Q.  Do you have personal knowledge of how
9  Abbott set any of those prices?
10       MR. BREEN:  Objection to form.
11    A.  Meaning was I there when Abbott set the
12 price, wherever that was?  No.  I wasn't there.
13 I have some general understanding of
14 manufacturers setting prices in the marketplace.
15    Q.  Is that specific to Abbott?
16    A.  I would say it's more general knowledge
17 about how manufacturers set prices in the
18 marketplace.
19    Q.  How did you come to that understanding
20 of how manufacturers set prices in the
21 marketplace?
22    A.  Well, I think, going back to being a

Page 109

1  physician, certainly I was always under the
2  impression that manufacturers set their own
3  prices.  I mean, it wouldn't make sense that they
4  would do anything else.  If I were writing a
5  prescription for something, if a drug rep is here
6  I would think that the price that my patient
7  would pay for that drug would be in some way
8  related to what Abbott had set its price for or
9  any other drug company, for that matter, so that
10 I had I would say a general concept in my mind as
11 a physician that if a drug costs $5 a pill that a
12 significant portion of that $5 a pill was related
13 to where the manufacturer set the price.
14       I understand that there are others in
15 the supply chain, retailers and wholesalers, who
16 I very well would expect to make some kind of a
17 profit on the transaction, but that whether a
18 drug cost $5 a pill or $2 a pill was in some way
19 related to the manufacturer setting the price.
20       As I became more familiar with what was
21 going on in Ven-A-Care I learned things about Red
22 Book, a pricing compendia, and read what they

28 (Pages 106 to 109)

Page 110

1  said about some things. I looked at what I could
2  from First Databank and other pricing compendia.
3  And occasionally we were able to obtain older
4  compendia that sometimes described how prices
5  were set in one way, and more recent compendia
6  that really showed how prices were at least
7  represented perhaps in a different way.
8       So that through reading and
9  understanding about the marketplace I think I
10 developed some understanding of how prices are
11 represented in the marketplace by manufacturers.
12    Q.  And you obtained that understanding
13 through essentially research, correct?
14       MR. BREEN: Objection to form.
15    A.  Yes, I would say that would be true.
16    Q.  Do you have any personal knowledge
17 about any Abbott marketing activities whatsoever?
18       MR. BREEN: Objection to form.
19    A.  Well, other than the ones that I've
20 previously described, already testified to, I
21 can't think of any others right now, other than
22 what I've talked about.

Page 111

1     Q.  Do you have personal knowledge of any
2  of the Abbott marketing activities that you've
3  already talked about?
4       MR. BREEN: Objection, form.
5     A.  I guess, you know, what I would
6  describe as Abbott representatives in the
7  hospital and around that sort of thing, I assume
8  that's personal knowledge.
9     Q.  Do you have any personal knowledge
10 regarding Abbott's communications with compendia?
11      MR. BREEN: Objection, form.
12    A.  Other than documents in this lawsuit, I
13 would say no. Or these lawsuits, I would say no.
14    Q.  Do you have any personal knowledge of
15 Abbott's communications with any state or federal
16 health care programs?
17      MR. BREEN: Objection to form.
18    A.  Other than documents in these lawsuits,
19 I would say no.
20      MR.COOK: The form objection, Jim, just
21 so I might be able to refine my questions, what
22 is it?

Page 112

1       MR. BREEN: Well, you're using the term
2  personal knowledge in each of your questions.
3  And I just think that creates a certain amount of
4  ambiguity.
5       MR. COOK: Okay. I can clear that up.
6       MR. BREEN: I don't want to mince
7  words, but what is personal knowledge to a
8  layperson.
9  BY MR. COOK:
10    Q.  What do you understand personal
11 knowledge to refer to when I ask you the question
12 whether you have personal knowledge of something?
13    A.  That's a good question. Because I was
14 asking you whether it's related to -- the
15 knowledge I have of documents in this lawsuit is
16 to me very personal knowledge, whereas if you're
17 describing activities other than in this lawsuit
18 as being my personal knowledge, then that would
19 probably be a different thing. And that's why
20 I'm trying, at least, to differentiate those.
21    Q.  Sure. To resolve Mr. Breen's concern,
22 if we could agree that for purposes of our

Page 113

1  discussion I am trying to differentiate between
2  things that you have personally observed, seen,
3  heard, touched, smelled or tasted as your
4  personal knowledge, and I'm differentiating that
5  from knowledge that you have obtained through
6  speaking to witnesses who have observed that
7  event or documents relating to those events --
8     A.  Okay.
9     Q.  -- specifically documents in this
10 particular case. And to the extent that any
11 particular knowledge falls in a gray area, I'd
12 appreciate it you raising it for me. But is that
13 a distinction that you think we can work with?
14    A.  I will try to do that with you, yes,
15 sir.
16    Q.  Sure. Do you have any personal
17 knowledge of any misstatements that have been
18 made by Abbott?
19    A.  Well, I guess I believe that I've read
20 a large number of misstatements about
21 pharmaceutical pricing in Red Book or other
22 compendia. Whether that fits your definition of

07b8784e-4541-48af-bfa3-f915a559fc7d

Lockwood, M.D., John M. PORTIONS HIGHLY CONFIDENTIAL                December 6, 2007
Washington, DC

Page 194

1  couple of different sources.
2      Q.  If you would turn your attention to
3  Exhibit Abbott 414D, do you recognize Exhibit
4  Abbott 414D?
5      A.  Yes, sir.
6      Q.  What is that?
7      A.  It is the fourth amended complaint
8  filed in this lawsuit in the Southern District of
9  Florida.
10     Q.  Did you participate in the decision
11 whether to file the fourth amended complaint
12 that's marked as Exhibit Abbott 414D?
13     A.  Yes, sir.
14     Q.  What role did you have in making the
15 decision to file this amended complaint?
16     A.  Once again, I discussed changes that
17 were made in this complaint or this amendment and
18 discussed how we would present it, what we would
19 talk about, proofreading it.  I suspect I was
20 involved in creating some of the charts, or at
21 least in digging out information that was placed
22 in the charts and bringing all that together with

Page 195

1  the attorneys and giving it to them and working
2  with them on what would be this final product.
3      Q.  Are any of the allegations made in
4  Exhibit Abbott 414D based upon your personal
5  knowledge?
6          MR. BREEN:  Objection, form.
7      A.  Well, once again, I guess it depends
8  how we define personal knowledge.  But I think my
9  answer to that is no.  I think it's Ven-A-Care's
10 information and --
11     Q.  When you say Ven-A-Care's information,
12 you're referring to information that
13 representatives of Ven-A-Care gleaned from third
14 party sources, correct?
15         MR. BREEN:  Objection, form.
16     A.  Well, I think we gleaned the
17 information from the prices available to Ven-A-
18 Care.  These were confidential trade secret
19 information.  I think even Abbott has declared
20 these prices to be trade secrets.  And we had a
21 number of different sources from which we could
22 get that information.  But they were clearly Ven-

Page 196

1  A-Care's insider prices and the prices that were
2  available for us to buy these products at.
3      Q.  But you don't know whether Ven-A-Care
4  actually paid any of those prices for any of the
5  drugs that are the subject of this lawsuit,
6  correct?
7          MR. BREEN:  Objection, form.
8      A.  At this point in time I don't know.  I
9  don't know if we -- we did buy some products
10 and/or had some products available that when we
11 went to discuss the case with the Department of
12 Justice or with the state where we might show
13 them what an IV bag of fluid looked like for
14 demonstration purposes.
15         So we bought some for that purpose.
16 Whether we were using old ones that we bought
17 previously or whether we ordered new ones in 2002
18 or in and about that time frame, I don't recall.
19 I don't know.  But we occasionally had some that
20 we showed to government entities so they'd
21 understand what we were talking about.
22     Q.  You would agree with me, would you not,

Page 197

1  that any purchases that Ven-A-Care made of Abbott
2  products after 1996 were not to administer to a
3  patient, but were for demonstrative purposes in
4  connection with your litigation activities?
5          MR. BREEN:  Objection, form.
6      A.  I don't know, because I can't tell you
7  exactly when Ven-A-Care saw its last patient.  I
8  don't know when that date was.  My recollection
9  is we treated some patients after 1996.  But I
10 don't have that information with me right now
11 that I could tell you the answer to.  And I'm
12 probably not the best person to know the answer
13 to that.
14     Q.  Leaving aside the few patients that
15 Ven-A-Care treated after 1995, 1996, would you
16 agree with me that any other purchases made of
17 Abbott products would have been made solely for
18 the purpose of obtaining demonstrative exhibits
19 for Ven-A-Care's litigation purposes?
20         MR. BREEN:  Objection, form.
21     A.  I can tell you we did buy some products
22 -- whether it was Abbott's or not, I don't know -

Page 234

```
 1   only people who knew the real prices were
 2   pharmacy insiders who were getting those prices.
 3       Q.  In fact the trade secrets to which you
 4   referred to are prices offered by GPOs to any
 5   pharmacy that wants to join the GPO, correct?
 6           MR. BREEN:  Objection to form.
 7       A.  That would be one form of prices.
 8   There are also prices you can get directly from a
 9   wholesaler.
10       Q.  And those would be offered to any
11   infusion pharmacy or a pharmacy that wanted to
12   purchase those drugs from the wholesaler,
13   correct?
14       A.  They would be, yes.
15       Q.  And so these trade secrets that you
16   refer to that Ven-A-Care had, they were not
17   unique in any way to Ven-A-Care, correct?
18           MR. BREEN:  Objection to form.
19       A.  Well, I think to the extent that
20   manufacturers require them to be unique, they are
21   unique to Ven-A-Care and pharmacies like Ven-A-
22   Care.
```

Page 235

```
 1       Q.  Is it your understanding that the
 2   prices at which Ven-A-Care purchased drugs from a
 3   wholesaler that were manufactured by Abbott were
 4   in some way unique to Ven-A-Care?
 5       A.  Well, I may be -- what I'm trying to
 6   say is that Ven-A-Care had its own agreement that
 7   made it a unique agreement.  But I agree with you
 8   that the prices we're talking about were
 9   available to many pharmacies.
10       Q.  And the information that Ven-A-Care
11   provided to the government regarding the
12   difference between those prices and published
13   prices was not unique, correct?
14           MR. BREEN:  Objection to form.
15       A.  Well, I guess I would disagree.  I
16   think that they were unique in that they were not
17   prices that were readily available to just
18   anyone.
19       Q.  Maybe I'm misunderstanding.  What's
20   your understanding of the word "unique"?
21       A.  Well, I think what I'm trying to say is
22   that the prices that Ven-A-Care could get were
```

Page 236

```
 1   certainly prices that other pharmacies could get.
 2   And in fact from that we drew knowledge in
 3   understanding the marketplace.
 4       Q.  But what do you understand the word
 5   "unique" to mean?
 6           MS. BROOKER:  Objection to form.
 7       A.  I guess I'm trying to explain it in
 8   this circumstance.  If that's what you want.
 9       Q.  No.  I just want to know -- when you
10   used the word "unique" in your description of
11   Ven-A-Care's allegations, I want to know what you
12   mean by the word "unique"?
13       A.  In this reference I mean unique in that
14   most people didn't have them.  You would have to
15   be a pharmacy like Ven-A-Care or similar to Ven-
16   A-Care in some way to have those, so that they
17   were not prices that were available to just
18   anyone walking around on the street.
19       Q.  Anyone walking around the street hardly
20   has need to purchase a bag of sodium chloride,
21   correct?
22       A.  Well, from time to time they pay for
```

Page 237

```
 1   them as part of their care and treatment.
 2       Q.  But they don't purchase them, do they?
 3           MR. BREEN:  Objection to form.
 4       A.  Well, they purchase them from an
 5   infusion pharmacy or a hospital.
 6       Q.  There's a class of entities in this
 7   country which purchase infusion drugs from GPOs
 8   and wholesalers, correct?
 9       A.  Yes, sir.
10       Q.  What is that class of entities?
11       A.  Well, I think it includes pharmacies
12   and physicians and others that have the right to
13   own and have those drugs for resale.
14       Q.  Of that class of people who among them
15   do not have access to the same information that
16   Ven-A-Care had with respect to the pricing for
17   Abbott drugs?
18           MR. BREEN:  Objection to form.
19       A.  I believe that the other pharmacies
20   that were in the same class of trade as Ven-A-
21   Care had the same pricing available in general
22   that Ven-A-Care had.
```

Page 238

1  Q. So Ven-A-Care's information was unique
2  in the sense that all other pharmacies had access
3  to it?
4     MR. BREEN: Objection to form.
5  A. I think it was unique in that unless
6  you were a pharmacy with that type of
7  information, meaning it was insider information
8  that most people don't have. And that you would
9  have to be a pharmacy like Ven-A-Care to have
10 that information. So it's -- I mean, it may not
11 be unique among the pharmacies like Ven-A-Care.
12 But it's a unique piece of information that
13 describes what's going on in that segment of the
14 marketplace.
15 Q. I understand unique to mean one of a
16 kind, there is no other. Do you have a different
17 understanding of the word "unique"?
18 A. Well, perhaps I should use a better
19 word for you or a different word. I just think
20 that Ven-A-Care had information that most people
21 didn't have and that you would have to be a
22 pharmacy like Ven-A-Care to have that

Page 239

1  information.
2  Q. Or you could read the report that's
3  marked as Exhibit Abbott 158, correct?
4  A. I don't see anything in this report
5  that talks about Abbott's prices or what Abbott
6  did or didn't do or -- I don't see Abbott's name
7  in this report.
8  Q. You're familiar with the June 10, 1996
9  Barron's article entitled Hooked On Drugs that's
10 cited at page 1 of this report, correct?
11 A. Yes. I've read that article.
12 Q. You would agree with me that the
13 information that's contained in that article was
14 hardly limited to pharmacies and infusion
15 pharmacies, correct?
16 A. You know, I have a general recollection
17 of what was in that article. But I don't know --
18 I don't recall now if they named specific
19 manufacturers or not or specific drugs or
20 specific information.
21 Q. But you would agree with me that
22 Barron's is a fairly widely circulated

Page 240

1  publication, correct?
2  A. Yes, sir.
3  Q. And to the extent that there was
4  information contained in that report, that it
5  would hardly be unique to Ven-A-Care?
6     MS. BROOKER: Objection, form.
7     MR. BREEN: Objection, form.
8  A. Well, I think that -- I'm not sure. I
9  think I need -- I'm not sure I understand the
10 question. Could you give it to me again?
11 Q. When you refer to unique information
12 forming the basis of Ven-A-Care's allegations
13 against Abbott, you would agree with me that
14 information contained in a Barron's article would
15 not be unique to Ven-A-Care?
16    MR. BREEN: Objection, form.
17 A. Well, it would not be Ven-A-Care's
18 information necessarily.
19 Q. If I could get you to turn to Exhibit
20 Abbott 199. It going to be in another volume.
21 Volume 9.
22 A. I'm sorry. Which tab?

Page 241

1  Q. Exhibit Abbott 199.
2  A. Yes.
3  Q. Do you recognize Exhibit Abbott 199?
4  A. It's a complaint it looks like filed by
5  the United States of America ex rel. Ven-A-Care
6  of the Florida Keys.
7  Q. Have you see that document before?
8     MR. BREEN: You are saying Exhibit
9  Abbott 199, correct?
10    MR. COOK: Yes, sir.
11 A. I don't know. I'm not sure. I may
12 have, but I'm not sure that I've seen this.
13 Q. Well, what I'd like to ask you is
14 whether there are any allegations contained in
15 Exhibit Abbott 199 about which you have direct
16 knowledge; not based upon reading someone else's
17 documents, not based upon somebody else telling
18 you about an event that occurred, but direct
19 knowledge?
20    MR. BREEN: Objection to form.
21 Q. And it sounds as if you may need time
22 to read that, so why don't you take a break, let

Page 242

 1  you read that and come back on the record and
 2  I'll ask you.
 3      A.  Okay.
 4          THE VIDEOGRAPHER:  Off the record at
 5  4:03.
 6          (Recess.)
 7          THE VIDEOGRAPHER:  On the record at
 8  4:16.
 9  BY MR. COOK:
10      Q.  Dr. Lockwood, do you have direct
11  knowledge regarding any of the allegations
12  contained in Exhibit Abbott 199, which is the
13  complaint filed by the Department of Justice to
14  intervene in this case against Abbott?
15          MR. BREEN:  Objection, form.
16      A.  Well, I'm not entirely sure what you
17  mean by allegations.  But what I would say is
18  that the first page of this complaint and the
19  second page and certainly the third page are -- I
20  don't know if you want it call them a recital,
21  but it's the government explaining what I
22  perceived to be Ven-A-Care's allegations in Ven-

Page 243

 1  A-Care's complaints.
 2          They're -- during the course of the
 3  complaint there are explanations I assume of a
 4  lot of the programs and there are examples of
 5  findings that I believe based on what I'm seeing
 6  came from the government's investigation of some
 7  of these drugs.  And the last page, I think --
 8  let me look -- I wouldn't say last page.  It's I
 9  guess Exhibit 1 would be a better description --
10  contains Ven-A-Care's prices in the column price
11  to relator.  And the various other -- some other
12  prices in the marketplace and the amounts of the
13  spread and -- so that at the core of this
14  complaint is Ven-A-Care's pricing information.
15          And I don't know if they're
16  allegations, but whatever -- I guess allegations.
17  I'm not sure I know the legal definition of that
18  word -- of what Ven-A-Care has said was occurring
19  in the marketplace, that Abbott was reporting
20  inflated prices that induced customers to buy
21  their drug.  And that -- I don't know if you want
22  to call it my knowledge.  It's Ven-A-Care's

Page 244

 1  knowledge.  I have that knowledge for Ven-A-Care
 2  or I was involved with looking at that knowledge,
 3  the prices over a period of time and the price
 4  reporting by Abbott, that appears to be the very
 5  foundation for this complaint.
 6          There are parts of this complaint that
 7  appear to be parts of the government's
 8  investigation, but they are our unique knowledge
 9  and understanding of the marketplace.
10      Q.  That would be the unique knowledge and
11  understanding that's shared by tens of thousands
12  of pharmacies across the country, correct?
13          MR. BREEN:  Objection, form.
14      A.  I don't know if the other pharmacies
15  sat down and looked seriously at what Abbott was
16  doing or not.  I assume what they probably looked
17  at was the price they could buy Abbott's products
18  and the reimbursement that they could get from
19  government programs.  And I think that knowledge
20  was not unique to Ven-A-Care but was probably
21  known by every pharmacy that could buy these
22  drugs, and/or did buy those drugs.

Page 245

 1      Q.  So what exactly is the unique knowledge
 2  that Ven-A-Care had as reflected in this
 3  complaint?
 4      A.  Well, I think unique in that we brought
 5  it to the government.  Very specific knowledge of
 6  the prices and the marketplace and the reported
 7  prices that -- at least to my reading, and this
 8  is -- the government's complaint, or at least all
 9  I see -- it's signed by government people -- that
10  appear to be the backbone of this complaint, to
11  me.
12          The other examples within it appear to
13  be part of the government's investigation to me
14  reading it now.
15      Q.  So it's your understanding that Ven-A-
16  Care's information wasn't unique; it was simply
17  unique that Ven-A-Care brought it to the
18  attention of the government?
19          MR. BREEN:  Objection, form.
20      A.  Well, I don't know if unique is the
21  best word.  We seem to be resolving everything
22  around unique.  What I would say is Ven-A-Care

07b8784e-4541-48af-bfa3-f915a559fc7d

Page 246

1  brought information to the government about
2  Abbott's false pricing, what we see as false
3  pricing, and the inducements that resulted as a
4  result of that in the marketplace.  And we
5  brought that information in a complaint.  And I
6  guess that makes it unique.  I think.  I perceive
7  that as unique.  There certainly were other
8  pharmacies in America who could have done that as
9  well.
10     Q.  Back to my original question, if you
11 could turn to page 1 of Exhibit Abbott 199, the
12 government's complaint, could you show me any
13 allegation on page 1 of the complaint as to which
14 you, Dr. Lockwood, have direct knowledge?
15     MR. BREEN:  Objection to form.
16     Q.  And when I say direct knowledge I mean
17 direct and independent knowledge, not dependent
18 upon something that you learned from someone
19 else.
20     MR. BREEN:  Objection to form.
21     A.  Well, I know that Abbott's actual sale
22 prices for pharmaceutical products for its

Page 247

1  pharmaceutical products listed there were far
2  less than the prices reported by Abbott.  I know
3  that myself.
4     Q.  How do you know that?
5     A.  By looking at Ven-A-Care's pricing
6  information.
7     Q.  I thought you told me a minute ago that
8  you don't know whether Ven-A-Care actually
9  purchased anything from Abbott?
10     MR. BREEN:  Objection to form.
11     Q.  Is that true?
12     A.  No, I didn't say that, sir, no.
13     Q.  So you have looked at invoices for Ven-
14 A-Care having purchased pharmaceutical products
15 manufactured by Abbott?
16     MR. BREEN:  Objection to form.
17     Q.  Is that true?
18     A.  I believe that to be true, yes.
19     Q.  Did you purchase pharmaceutical
20 products?
21     A.  Ven-A-Care did.
22     Q.  I asked whether you did.

Page 248

1     MR. BREEN:  Objection to form.
2     A.  I was not the one ordering that
3  product, no.
4     Q.  So someone told you that Ven-A-Care had
5  purchased the product from some source and that
6  the product was manufactured by Abbott, correct?
7     MR. BREEN:  Objection to form.
8     A.  Well, I would say they didn't have to
9  tell me.  I've looked at Ven-A-Care's pricing
10 information.  I have access to that and I have
11 personally looked at it.  And I know that Ven-A-
12 Care purchased some Abbott products.  How you
13 define that is up to you.  It seems like personal
14 knowledge to me, but --
15     Q.  And the personal knowledge to which you
16 refer, is it that summarized in Exhibit 1 to
17 Exhibit Abbott 199, the complaint?
18     MR. BREEN:  Objection to form.
19     A.  Oh, I don't think this is the complete
20 knowledge that Ven-A-Care has, no.
21     Q.  What's the earliest that Ven-A-Care
22 purchased any of the drugs listed in the

Page 249

1  government's complaint listed as Exhibit Abbott
2  199?
3     MR. BREEN:  Objection to form.
4     A.  I would think at least the early '90s
5  would be the earliest I know about.  Someone else
6  may know about purchases earlier than that.  But
7  I think I've seen invoices -- I think.  I believe
8  I have seen invoices of Ven-A-Care purchasing
9  Abbott's products that are in the early '90s.  I
10 don't have them in front of me.
11     Q.  Prior to 1995 you've seen invoices of
12 Ven-A-Care purchasing drugs listed in the
13 complaint, Exhibit Abbott 199, prior to 1995?  Is
14 that your testimony?
15     MR. BREEN:  Objection to form.
16     A.  I believe I may have.  I don't have
17 those invoices in front of me.  I can't match
18 them up to the list of products in the list.  But
19 I think I have seen some of that.  I don't -- I
20 think so.  I would have to match up the NDC
21 numbers and the invoices and see if they're the
22 same or not.  I don't know if they are.

Page 250

1       But I know that Ven-A-Care has
2  purchased Abbott IV fluids and Abbott's products
3  over the years on and off and I know they
4  purchased some in the early '90s and I've seen
5  some documentation of that.  And that's kind of
6  what I know, I think.
7       Q.  For your second day of deposition,
8  would you be kind enough to bring copies of any
9  invoices for any of the subject drugs that Ven-A-
10 Care purchased?
11      A.  I can look --
12          MR. BREEN:  I'll discuss that with the
13 witness and we'll let you know.
14      Q.  To the extent that you have knowledge
15 of prices paid by -- you, Dr. Lockwood, have
16 knowledge of prices paid by Ven-A-Care for Abbott
17 drugs -- however, that wouldn't be a purchase
18 that you made, correct?
19      A.  It would be a purchase Ven-A-Care made.
20      Q.  All right.  The reason that you have
21 knowledge that Abbott's actual sales prices
22 allegedly are far less than the prices reported

Page 251

1  by Abbott is because you've read price compendia
2  and you've locked at price lists, correct?
3          MR. BREEN:  Objection to form.
4       A.  Yes, sir.  I have.
5       Q.  It's not because you purchased any
6  Abbott products, correct?
7       A.  I personally have not purchased any,
8  no.
9       Q.  Are there any other allegations on page
10 1 of the complaint as to which you would contend
11 you have direct knowledge?
12      A.  I think what is on page 1 of the
13 complaint is the information that Ven-A-Care
14 brought to the government.  And there are other
15 locations in the complaint that Ven-A-Care
16 brought information to them.  But I think this is
17 Ven-A-Care's information that's on page 1 and
18 other places.
19          MR. COOK:  Could the court reporter
20 pleads read back the question that I asked the
21 witness?
22              (Whereupon, the requested portion

Page 252

1  was read by the reporter.)
2       A.  I think that these -- that everything
3  written on page 1 is information that Ven-A-Care
4  has knowledge of.  I don't know if you want to
5  break that down into different allegations or
6  even if they are different allegations, I don't
7  know.  You'd have to tell me if they're different
8  allegations on page 1.
9       Q.  My question was whether you have direct
10 knowledge.  Correct?  And you're not Ven-A-Care.
11          MR. BREEN:  Objection, form.
12      A.  Well, I guess I have represented Ven-A-
13 Care in some way for a number of years.  But --
14      Q.  But I'm asking what you have knowledge
15 of.  And there will be other representatives of
16 Ven-A-Care and they can tell me what they have
17 personal knowledge of.  But right now I'd like to
18 know what you have knowledge of.
19      A.  I have knowledge of Abbott reporting
20 inflated prices into the marketplace.
21      Q.  We've discussed how you obtained that
22 knowledge, by reading compendia and looking at

Page 253

1  price lists, correct?
2       A.  Yes, sir.
3          MR. BREEN:  Objection, form.
4       Q.  Are there any other allegations on this
5  page that you contend you, Dr. Lockwood, have
6  direct knowledge?
7       A.  I think everything on page 1 is stuff
8  that I am personally familiar with through
9  looking at Ven-A-Care's information.
10      Q.  So your personally familiar with the
11 information contained on page 1 because you read
12 documents, correct?
13          MR. BREEN:  Objection, form.
14      A.  Well, let me read it again.  I guess I
15 can go through it line by line.  If I start at
16 sentence number two, "Over the course of several
17 years Abbott reported inflated pharmaceutical
18 prices that it knew Medicare and Medicaid relied
19 upon to set reimbursement rates for Abbott's
20 pharmaceutical products."  And I have looked at
21 Abbott's reported prices over a number of years
22 in the compendia.

Page 375

```
 1   accurate?
 2        MR. BREEN:  Objection, form.
 3     A.  I would say that we made every effort
 4   to make it true and accurate, yes, sir.  And it
 5   was our feeling -- there may be typos that we
 6   missed, although we tried to find all those.
 7   There may be a variety of things that are not
 8   perfect, but we made every effort to try to do
 9   this right.
10     Q.  And then Exhibit 414D is the fourth
11   amended complaint filed on December 11, 2002.
12   Did you review Exhibit 414D before it was filed?
13     A.  Yes, sir.
14     Q.  And to the best of your ability are all
15   of the allegations contained in Exhibit 414D true
16   and accurate?
17     A.  Yes, sir.  To the best of our ability
18   we made every effort to make these accurate and
19   correct, along with our attorneys.  Yes.
20     Q.  In each of these successive complaints
21   there are later years of drug costs.  In the 1999
22   complaint, for example, page 190, there are costs
```

Page 376

```
 1   through 1997 and in the 2002 complaint there are
 2   costs alleged through 2001.  Do I have that
 3   correct?
 4     A.  If you could tell me the pages.
 5     Q.  Oh, sure.  Page 190 of Exhibit 414C.
 6   You'll see the chart goes through 1997, correct?
 7     A.  Yes, sir.
 8     Q.  And in Exhibit 414D the various charts,
 9   for example, on page 81, go through 2001.  Do I
10   have that correct?
11     A.  Yes, sir.
12     Q.  Was the relator continuing to purchase
13   products from Abbott into 2001?
14     A.  You know, I think I talked about that
15   in my last day of deposition.  And I'm not
16   exactly sure when the last patient was treated at
17   Ven-A-Care.  But I'm thinking it was somewhere in
18   1998.  And I do know we purchased some drugs or -
19   - I believe.  I think I know that we purchased
20   some drugs after that period of time that were
21   not used for patients, but we did make the
22   purchases.  And they were purchases of drugs to
```

Page 377

```
 1   use for demonstrative purposes.
 2     Q.  If you would turn to Exhibit 6 of
 3   Exhibit 414D.
 4     A.  What page?
 5     Q.  Exhibit 6.  There's no page number,
 6   unfortunately.  It's in the back and it's a 82
 7   page chart.
 8     A.  I'm sorry.  Wait.  I'm still not --
 9   Exhibit 6 in --
10     Q.  Yes.  In Exhibit 414D.
11     A.  D?
12     Q.  Yes.
13     A.  Oh, I'm sorry.  I thought you said B.
14   So 414D, and which --
15     Q.  Exhibit 6.
16     A.  Exhibit 6.  And it's at the end.  All
17   right.
18     Q.  It's an 82 page chart with three
19   columns entitled Defendant Drug and NDC Number.
20   And the title of the exhibit on the top of each
21   page is All Miami Price Fraud Drugs.  Do you see
22   that?
```

Page 378

```
 1     A.  Yes, sir?
 2     Q.  What does Exhibit 6 represent?
 3        MR. BREEN:  Objection to form.
 4     A.  It represents a list of NDC numbers and
 5   drugs that Ven-A-Care felt were fraud drugs.
 6     Q.  What's a fraud drug?
 7     A.  I guess a drug that might fit or does
 8   fit the allegations in the complaint.
 9     Q.  And what are those?
10     A.  Do you want me to tell you again what I
11   think the complaint is about or do you want me to
12   go through specific allegations --
13     Q.  No, sir.  You used the term fraud drug.
14   And each page of this chart has over a dozen
15   NDCs, correct?
16     A.  It looks like a fair number of them.
17     Q.  And there are 82 pages of this chart.
18   So we're talking about --
19     A.  16.
20     Q.  -- hundreds of NDCs, correct?
21     A.  You know, my recollection is that
22   somewhere near a thousand give or take.  It could
```