# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
|      v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

(captions continue on following pages)

Videotaped deposition of LUIS E. COBO

Volume I

Washington, D.C.

Friday, January 18, 2008

8:00 a.m.

|  | Page 2 | Page 4 |
|---|---|---|

Page 2

1    IN THE DISTRICT COURT OF TRAVIS COUNTY, TEXAS
2         201st JUDICIAL DISTRICT
3    ----------------
4    THE STATE OF TEXAS,        )
5    ex rel. VEN-A-CARE OF THE  )
6    FLORIDA KEYS, INC.,        )
7         Plaintiffs,     ) Cause No. GV401286
8    vs.                        )
9    ABBOTT LABORATORIES INC., et )
10   al.,                       )
11        Defendants.      )
12   ----------------
13
14        Videotaped deposition of LUIS E. COBO, held at
15   the law offices of Jones Day, 51 Louisiana Avenue,
16   N.W., Washington, D.C. 20001-2113, the proceedings
17   being recorded stenographically by Jonathan Wonnell,
18   a Registered Professional Court Reporter and Notary
19   Public of the District of Columbia, and transcribed
20   under his direction.
21
22

Page 4

1      A P P E A R A N C E S (Cont'd)
2
3      On behalf of Ven-A-Care of the Florida Keys,
4          Inc.:
5          JAMES JOSEPH BREEN, ESQ.
6          The Breen Law Firm
7          5755 North Point Parkway, Suite 39
8          Alpharetta, Georgia 30022
9          (770) 740-0008
10         jbreen@breenlaw.com
11
12     On behalf of Abbott Laboratories, Inc.:
13         R. CHRISTOPHER COOK, ESQ.
14         LOUIS P. GABEL, ESQ.
15         Jones Day
16         51 Louisiana Avenue, N.W.
17         Washington, D.C. 20001-2113
18         (202) 879-3939
19         christophercook@jonesday.com
20         lgabel@jonesday.com
21
22

Page 3

1      A P P E A R A N C E S   O F   C O U N S E L
2
3      On behalf of the United States of America:
4          RENEE BROOKER, ESQ.
5          U.S. Department of Justice
6          Civil Division, Commercial Litigation
7          601 D Street, N.W., Room 9918
8          Washington, D.C. 20004
9          (202) 616-3797
10         renee.brooker@usdoj.gov
11
12     On behalf of the State of Texas:
13         MARGARET MOORE, ESQ.
14         Office of the Attorney General of the
15          State of Texas
16         301 West 15th
17         Austin, Texas 78701
18         (512) 936-1319
19
20
21
22

Page 5

1      A P P E A R A N C E S (Cont'd)
2
3      On behalf of Dey, Inc. and Dey, L.P. and
4          Mylan:
5          WILLIAM ESCOBAR, ESQ.
6          Kelley, Drye & Warren LLP
7          101 Park Avenue
8          New York, New York 10178
9          (212) 808-7771
10         wescobar@kelleydrye.com
11
12     On behalf of Roxane Laboratories and
13         Boehringer Ingelheim:
14         ERIC GORTNER, ESQ.
15         Kirkland & Ellis
16         200 East Randolph Drive
17         Chicago, Illinois 60601
18         (312) 861-2285
19         egortner@kirkland.com
20
21
22

                                                        2 (Pages 2 to 5)

```
                                          Page 30
 1  tell you that I sat here and I remember a certain
 2  conference that I went to and we had, it was a great
 3  insight into Medicare billing.  No.
 4       Q.   Was there any discussion at any of these
 5  seminars that you can recall about how it is that
 6  pharmacists either were required to or should fill
 7  out claim forms when communicating their billed
 8  charge to Medicaid or Medicare?
 9            MR. BREEN:  Objection, form.
10       A.   Yes.
11       Q.   What do you recall about that?
12       A.   Going over in the Florida Medicaid in
13  particular, going over the billing reimbursement and
14  how the system is set up in order to take -- their
15  collection of information was reliant on a certain
16  amount of information being transmitted.  And from
17  that the electronic system would then automatically
18  select a payment.
19            And like I said, it was an online
20  adjudication process.  So if there were any
21  corrections or adjustments to be made based on the
22  information that was being transmitted from the
```

```
                                          Page 31
 1  pharmacy, then that would happen electronically.
 2  And then there would be a feedback to the pharmacist
 3  submitting the claim and the results of the claim
 4  and how it was handled were shown.
 5       Q.   We've mentioned it a couple of times in
 6  passing, but you have worked in the past both for
 7  Ven-A-Care, which as I understand it was an infusion
 8  pharmacy, correct?
 9       A.   Correct.
10       Q.   And you have worked in the past for the
11  Cobo Pharmacy, which as I understand it was a retail
12  pharmacy?
13       A.   Correct.  A community pharmacy, yes.
14       Q.   Could you tell me what are the years for
15  which you were working as a pharmacist for the Cobo
16  Pharmacy?
17       A.   As a pharmacist -- I grew up in the
18  pharmacy.  But as a pharmacist when I came out of
19  the University of Florida in 1976 I immediately
20  started working at Cobo Pharmacy with my father.  I
21  eventually purchased the pharmacy and continued its
22  operation until -- I think the closing time was June
```

```
                                          Page 32
 1  1 of 2000.
 2       Q.   Why did you close the pharmacy?
 3       A.   We had just come off of a long and hard
 4  battle through Ven-A-Care.  It was a very exhaustive
 5  thing and a very demanding things and we were able
 6  to get a reward on that based on the conclusion of
 7  the claim that was finally settled by the
 8  government.  And it gave me the opportunity to get
 9  out of the community type of practice and start
10  dedicating my time completely in Ven-A-Care.
11       Q.   Do I hear you telling me that you made a
12  lot of money and didn't need to make money in a
13  community pharmacy anymore?
14            MR. BREEN:  Objection, form.
15       A.   Say that again.
16       Q.   As I hear what you're telling me, it
17  sounds like you made a lot of money through
18  litigation with Ven-A-Care and no longer needed to
19  run a pharmacy in order to make a living?
20            MR. BREEN:  Objection, form.
21       A.   Well, I could have run the pharmacy and
22  continued to make a living.  I was not not making a
```

```
                                          Page 33
 1  living running the pharmacy.
 2       Q.   Right.  But you didn't need that money
 3  anymore?
 4       A.   It was just that my interest from that
 5  point on -- prior to that I had to juggle pharmacy
 6  schedules and my time demand back and forth between
 7  Ven-A-Care and Cobo Pharmacy.  I'm having to hire
 8  part time or full time pharmacists when I can find
 9  it.  I mean, it was a lot to fulfill my obligation
10  with Ven-A-Care.  And as a result of that lawsuit
11  that we won, yeah, it enabled me to make that
12  transition, correct.
13       Q.   How much money did you receive from the
14  settlement that you're referring to in 2000?
15            MR. BREEN:  Objection, form.
16       A.   Personally I -- I think it was before
17  taxes $2.4 million.  Before taxes.  I hope that's an
18  accurate number.
19       Q.   Was that the first payout of money from a
20  litigation from settlement that you had received
21  from Ven-A-Care?
22            MR. BREEN:  Objection to form.  I'm going
```

9 (Pages 30 to 33)

```
                                        Page 102                                              Page 104
 1   in regard to those types of communications that      1   entire Ven-A-Care corporation sitting at this
 2   counsel just mentioned and document reviews that     2   deposition between the three of us here today?
 3   I've been involved in.  You know, certainly data and 3      Q.   Yes, I do.
 4   charts and things that I have put together -- not    4      A.   We all work together.  And the structure
 5   been responsible for creating, but have been         5   of our business besides being business partners
 6   responsible for helping to gather data -- that have  6   we're very longtime friends.  And, you know, we've
 7   been used in some of the complaint amendments or     7   all been president at some time or vice president
 8   just have been used in the various databases and     8   and officers of the corporation.  But I think that
 9   charts and representations that Ven-A-Care has       9   we oftentimes sit together and we share and
10   produced over the years or has in its possession.   10   depending on what the issue or the topic or what the
11      Q.   Is there anything more that you can tell    11   demand is will determine on who's going to speak.
12   me about anything that you know that Abbott has done12      Q.   So if I were looking to determine what
13   that's in any way wrongful?                         13   Ven-A-Care's position is on a particular matter
14           MR. BREEN:  Same objection, same            14   there's not one person to whom I could go to get
15   instruction.                                        15   that answer; is that correct?
16      A.   I think the development of the home         16           MR. BREEN:  Objection, form.
17   infusion industry that Abbott participated in I     17      A.   There could be one person that you could
18   think certainly is an area that I think was wrongful 18   go to that would have more insight and more
19   and part of the problem that we're dealing with     19   involvement, you know, in that regard that has more
20   today.                                              20   of an affinity for that.  And depending on what area
21      Q.   Again, you know about that because of       21   of interest you have that might determine who that
22   documents you've read and research you've done,     22   person would be.

                                        Page 103                                              Page 105
 1   correct?                                             1      Q.   Mine was a question more of authority
 2           MR. BREEN:  Objection, form.                 2   than knowledge.  Is there a single person at
 3      A.   Well, I think that was also an item of --    3   Ven-A-Care who is in charge of the show?
 4   in one of the depositions that I attended it was     4           MR. BREEN:  Objection to form.
 5   also an issue that I think was brought up.  But yes, 5      A.   Well, again, we have a president.  If
 6   by and large I think with the documents, insight     6   that fills the legal requirement for that person,
 7   from a deposition and discussions, I think that      7   that figurehead of authority, certainly you know
 8   would pretty much be it.                             8   that sometimes going to the president or the CEO
 9      Q.   Mr. Cobo, who currently speaks on behalf     9   doesn't give you the type of information you may be
10   of Ven-A-Care?                                      10   wanting.  So sometimes you have to go to other than
11           MR. BREEN:  Objection, form.                11   the president.  And again, we don't have that type
12      Q.   I can give you an example.                  12   of stringent structure, but depending on what time
13      A.   Yeah.                                       13   frame over the past 15, whatever the number of years
14      Q.   Abbott, for example.  The CEO runs the      14   it's been since our inception -- 20 years -- it
15   company and he has various other officers who have  15   would probably determine who you would want to speak
16   responsibilities and it devolves down in a fairly   16   to to get the best representative answer.
17   rigid hierarchy as in any other major corporation.  17           And I'm not trying to avoid your answer
18   Does Ven-A-Care have anything similar where people  18   here, but --
19   have responsibilities that go from the top down and 19      Q.   Who has been president of Ven-A-Care over
20   are divvied up?                                     20   the years?
21           MR. BREEN:  Objection, form.                21      A.   Initially I was.  I can't tell you the
22      A.   I assume you realize that you have the      22   time that it changed, but I would want to say it was
```

Cobo, Luis E.                                                              January 18, 2008

|  | Page 106 |
|---|---|
| 1 | probably in the mid-'90s. Zack Bentley became |
| 2 | president. Let's see. And then in -- upon Zack |
| 3 | taking his leave of absence then Mark Jones became |
| 4 | president. And so it's been us three. |
| 5 | Q. So Mr. Jones currently is president of |
| 6 | Ven-A-Care, correct? |
| 7 | A. Yes, sir. |
| 8 | Q. Is it your understanding -- let me step |
| 9 | back two steps. When you gave me your understanding |
| 10 | of the litigation and the issues it involved and |
| 11 | your knowledge of Abbott's conduct, were you |
| 12 | testifying with respect to both the DOJ and the |
| 13 | Texas case or do you have a different understanding |
| 14 | as to the Texas case? |
| 15 | MR. BREEN: Objection, form. |
| 16 | A. I think I answered in a rather broad |
| 17 | fashion to cover both aspects of obviously Medicaid |
| 18 | and Medicare concerns. And I did that |
| 19 | intentionally. So I would think that that from my |
| 20 | perspective is the answer that I would want to |
| 21 | commit to. I think that covers the federal and |
| 22 | Texas case. |

Page 107
1  Q. Do you have a personal stake in the
2  outcome of this litigation? That is, the DOJ case
3  and the Texas case.
4     A. Well, I've invested a lot of time and
5  emotion and personal money and what have you into a
6  case, into something that I think is worthy and
7  worthwhile. And the only stake I would have is in
8  the event that either or both are successful in this
9  case.
10    Q. So if a jury were to return a verdict for
11 the defendant in either case you would be out money
12 and time and effort and emotion that you've expended
13 on the case, correct?
14        MR. BREEN: Objection, form.
15    A. If the jury --
16    Q. Were to return a verdict for the
17 defendant in either case, you would lose the money,
18 time, effort and emotion that you've invested into
19 the case, correct?
20        MR. BREEN: Objection, form.
21    A. Well, the money, time, energy and effort
22 is already lost. You don't get that back. It would

Page 108
1  just be a verdict for the defendant and that would
2  be it.
3     Q. How much money have you invested in these
4  cases?
5        MR. BREEN: Objection, form.
6     A. Well, for years on and off we've had to
7  fund our litigation. We've had -- from the office
8  there were times when the well ran dry. There were
9  times in the early days when we were taking cuts in
10 salary, not receiving anything and watching any
11 monies that had been accumulated or saved dwindle.
12 And it was a part of the reason that I had to stop
13 and devote more and more time into Cobo Pharmacy and
14 allow the new direction that Ven-A-Care was taking
15 and energy because we were losing in business.
16       I can't tell you how much money. After
17 2000 the money that we had set aside to into the
18 business to run the business had ran out. And Mark
19 Jones, John Lockwood and myself funded the company,
20 didn't take salaries, over a period of time started
21 working off of a line of credit from the bank and
22 essentially funded that aspect of the business.

Page 109
1     How much that all has been over the
2  course of time, I really am not sure what that
3  figure would be. I'd have to get some sort of an
4  accounting. But between us we've had to go out on a
5  limb a couple of million dollars, I'd say. And as
6  lawsuits were settled and we've gotten money back in
7  we've been able to replace those funds. But there
8  was certainly no certainty of that when we were
9  going through that.
10    Q. So if you were to ballpark it you'd say
11 you have at least a million or two dollars invested
12 in the case?
13    A. If I had to ballpark it for those
14 considerations, you know, I would have to say so,
15 subject to review by my accountant.
16    Q. On the other hand, if the jury were to
17 return a verdict in favor of the plaintiffs is it
18 fair to say that you stand to gain potentially
19 millions of dollars from this case?
20       MS. BROOKER: Objection, form.
21    A. That would all depend on what the jury
22 ruled in favor of either the state of Texas or the

28 (Pages 106 to 109)

Page 272

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. MDL No. 1456

Civil Action No. 01-12257-PBS

-----------------------------------X

In Re:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

-----------------------------------X

(Captions continue on next page.)


VOLUME II

CONTINUED VIDEOTAPE DEPOSITION

OF LUIS COBO


Tuesday, March 4, 2008

21st Floor

2 South Biscayne Boulevard

Miami, Florida 33131


Reported by:  Sherilynn McKay, RMR, CRR

Notary Public, State of Florida

Page 273

```
 1        IN THE DISTRICT COURT OF
 2          TRAVIS COUNTY, TEXAS
 3          Cause No. GV401286
 4  ------------------------------------X
 5  THE STATE OF TEXAS
 6
 7  Ex rel.
 8
 9  VEN-A-CARE OF THE FLORIDA KEYS,
10  INC.,
11
12      Plaintiffs
13
14  v.
15
16  ABBOTT LABORATORIES, INC., et al.,
17
18      Defendants.
19  ------------------------------------X
20
21
22      (Captions continue on next page.)
```

Page 274

```
 1       UNITED STATES DISTRICT COURT
 2       FOR THE DISTRICT OF MASSACHUSETTS
 3        Civil Action No. 03-cv-11865-PBS
 4  ------------------------------------X
 5  THE COMMONWEALTH OF MASSACHUSETTS,
 6
 7      Plaintiff,
 8
 9  - against -
10
11  MYLAN LABORATORIES, INC., et al.
12
13      Defendants.
14  ------------------------------------X
```

Page 275

```
 1              A P P E A R A N C E S
 2
 3  For Abbott Labs:
 4       JONES DAY
 5       By: R. CHRISTOPHER COOK, ESQ.
 6       51 Louisiana Avenue, N.W.
 7       Washington, DC 20001-2113
 8       christophercook@jonesday.com
 9
10  For Ven-A-Care of the Florida Keys:
11       THE BREEN LAW FIRM
12       By: JAMES JOSEPH BREEN, ESQ.
13           ALISON WARREN SIMON, ESQ.
14           ANDREW SHELDON, ESQ.
15       Suite 110
16       3350 S.W. 148th Avenue
17       Miramar, Florida 33027
18       jbreen@breenlaw.com
19
20
21
22  (CONTINUED)
```

Page 276

```
 1        A P P E A R A N C E S (CONTINUED)
 2
 3  For the United States Department of Justice:
 4       UNITED STATES DEPARTMENT OF JUSTICE
 5       By: ANN ST. PETER-GRIFFITH, ESQ.
 6       99 NE 4th Street
 7       Miami, Florida 33132
 8
 9  For Roxane Labs, Boehringer Ingelheim and Ben
10  Venue Laboratories:
11       KIRKLAND & ELLIS
12       By: ERIC GORTNER, ESQ.
13       200 East Randolph Drive
14       Chicago, Illinois 60601-6636
15       egortner@kirkland.com
16
17  For Dey, Inc. and Mylan:
18       KELLEY DRYE
19       By: WILLIAM A. ESCOBAR, ESQ.
20       101 Park Avenue
21       New York, New York 10178-0002
22       wescobar@kelleydrye.com
```

2 (Pages 273 to 276)

Page 389

 1  part of that energy.
 2     Q. In the August 11, 1994 letter, am I
 3  correct that Ven-A-Care was giving to its carrier
 4  a partial refund of reimbursement for parental
 5  nutrition solutions under CPT Codes 4184 and
 6  4186.
 7     A. That's what it states, yes.
 8     Q. In the September 1994 letter, Ven-A-
 9  Care was giving to Palmetto a partial refund of
10  reimbursement for payments received and claims
11  submitted under CPTC Code B4186 for parental
12  nutrition solution lipids. Correct?
13     A. That's what it states, correct.
14     Q. And in Exhibit 542, likewise Ven-A-Care
15  was making a partial refund to Medicare for
16  reimbursement that it received for parental
17  nutrition solutions under CPT code 4197. Is that
18  correct?
19     A. Again, that's what the letter states,
20  correct, yes.
21     Q. Do these represent all of the payments
22  that Ven-A-Care received prior to the date of

Page 390

 1  each letter for each of these CPT codes?
 2     A. I do not know.
 3     Q. So it's possible that Ven-A-Care
 4  retained some of the money for other patients and
 5  other services that it provided aside from these
 6  few that it refunded. Correct?
 7       MR. BREEN: Objection. Form.
 8       THE WITNESS: It is possible, yes.
 9  BY MR. COOK:
10     Q. Just taking Exhibit 540, which relates
11  to payments for CPT Code 4184 and 4186, do you
12  know what CPT Code B4184 and 4186 represent?
13     A. I don't have specific recollection. I
14  seem to remember that this was billing that was
15  done based on the lipid content percentage, in
16  this case the twenty -- ten percent and 20
17  percent concentrations. The amounts I don't
18  recall if they're up to a liter of each or 500
19  mils of each. I don't specifically recall, no.
20     Q. Well, just judging from the size of the
21  stack here, for Exhibits 540, 541 and 542, and
22  the number of claims described in those three

Page 391

 1  exhibits, can you tell me whether this is likely
 2  all of the claims that Ven-A-Care submitted to
 3  Medicare for parental nutrition solution lipids
 4  prior to July 5th, 1995?
 5     A. I cannot represent what that would be,
 6  no. We were not a large Medicare provider, and I
 7  just don't have the breakdown of what those
 8  claims would have been. I'm sorry.
 9     Q. Was the purpose of these letters to
10  repay to Medicare all of the profit that Ven-A-
11  Care had made by administering these specific
12  parental nutrition services?
13       MR. BREEN: Objection. Form.
14       THE WITNESS: I can only quote what it
15  says in No. 4, that also be reimbursing any
16  Medicare secondary carrier or patients who have
17  made copayments based on Medicare's original
18  determination of the, quote, reasonable charges.
19       So the reasonable charges do contain
20  profit that I'm aware of.
21  BY MR. COOK:
22     Q. Do Exhibits 540, 541 and 542 attach all

Page 392

 1  of the instances in which Ven-A-Care made in
 2  excess of the 40 percent mark-up described in
 3  your letter to the carriers in Exhibits 540, 541,
 4  542?
 5     A. I couldn't tell you for sure.
 6     Q. You signed the letters. Correct?
 7     A. I signed two of the letters, yes.
 8     Q. Was this review of Ven-A-Care's past
 9  billings in 1994 done at your review -- done at
10  your request?
11     A. No.
12     Q. You were president of Ven-A-Care.
13  Correct?
14     A. Correct.
15     Q. Did you know that this review was being
16  done?
17     A. I was aware that there was always
18  reviews, investigations, information that was
19  being looked at and evaluated within the scope of
20  Ven-A-Care's businesses, practices.
21     Q. What did this particular review consist
22  of?

31 (Pages 389 to 392)

Page 521

1  interaction in relationship between Abbott, the
2  marketing of their products, and the different
3  routes that we had as far as purchasing their
4  products.
5     Q.  What steps did Abbott take to market
6  its infusion products to you, Mr. Cobo?
7        MR. BREEN:  Objection.  Form.
8        THE WITNESS:  We would be marketed
9  through -- I'm trying to -- GPOs that would have
10 Abbott contracts that would need to be renewed,
11 drug wholesalers that represented some of the
12 Abbott contracts and would participate in their
13 reimbursement -- or rather providing the Abbott
14 products based on the Abbott contracts that were
15 had by providers, and Ven-A-Care in particular.
16       We certainly were provided with Abbott
17 pricing catalogs and access to Abbott prices that
18 were available through some of the relationships
19 that were had by various GOPs and/or wholesalers.
20 BY MR. COOK:
21    Q.  Are there any other allegations in
22 Exhibit 547 that you witnessed with your own

Page 522

1  eyes, Mr. Cobo?
2     A.  Thirty-six, "Abbott documents show that
3  the company actively marketed the government-
4  funded profits or 'spreads' on its drug created"
5  -- this would I think encompass a lot of the
6  pricing lists that again I just stated that we
7  had received from various GPOs and wholesalers
8  and pricing catalogs from Abbott.  All those
9  were, in our eyes, certainly representations of
10 the spread.
11    Q.  Mr. Cobo, you've seen documents from
12 other manufacturers that describe the difference
13 between AWP and acquisition cost.  Correct?
14    A.  Yes.
15    Q.  You've seen computer programs from
16 other manufacturers that would calculate the
17 amount of money that one would make by purchasing
18 a drug and obtaining reimbursement based upon
19 AWP.  Correct?
20    A.  Computer programs by manufacturers?
21    Q.  Yes.
22    A.  I can't tell you that outside of the

Page 523

1  scope of documents in discovery and things like
2  that that I've come across specifically computer
3  programs from drug manufacturers.
4     Q.  In fact, Mr. Cobo, you've never seen an
5  Abbott advertisement for any of the drugs listed
6  in paragraph 30 that markets the difference
7  between average wholesale price and acquisition
8  cost for those drugs, have you?
9        MR. BREEN:  Objection.  Form.
10       THE WITNESS:  Well, again, my concept
11 of marketing the spread is as basic and
12 fundamental as making a representation of a
13 price, whether it's a contract price, average
14 wholesale price, all those things, you know,
15 serve to provide information which is reflective
16 of the spread, and I consider those as
17 representations of marketing the spread.
18 BY MR. COOK:
19    Q.  So it's your testimony that Abbott
20 marketed the spread by offering lower prices to
21 customers?  Do I have that correct?
22       MR. BREEN:  Objection.  Form.

Page 524

1        THE WITNESS:  I think the issue is more
2  not just in offering lower prices, but in also
3  creating AWPs that in this particular instant
4  that are used by, you know, Medicaid and Medicare
5  for reimbursement.  You know, when there is a
6  large variance in the acquisition price, in the
7  average wholesale price that is represented, and
8  fraudulently so, I mean, I think that represents
9  the spread that we're discussing and I think is a
10 tool for marketing the spread.
11 BY MR. COOK:
12    Q.  Can you point to any other activity by
13 Abbott in which Abbott actively marketed the
14 spread for the drugs listed in Exhibit 30?
15    A.  Not immediately as I sit here right
16 now, no.
17    Q.  What other allegations in Exhibit 547
18 did you see with your own eyes, Mr. Cobo.
19    A.  Forty-two.  "While the majority of the
20 states published AWPs to calculate" -- "published
21 AWPs to calculate reimbursement, approximately
22 six states....have used wholesale acquisition

64 (Pages 521 to 524)

Page 525

1  cost (WAC) to set the EAC."
2       I have seen representations of the
3  reimbursement systems for various state Medicaid
4  programs.
5     Q.  Where did you see these
6  representations?
7     A.  Printed in the Red Book on a yearly or
8  biyearly basis they would publish a list of the
9  states and show the reimbursement formulas.  I
10 know prior to us having possession of some of the
11 Red Books, you know, we had gotten information
12 from states that were giving us their
13 reimbursement formulations.  And that's basically
14 where I've seen that representation.
15    Q.  But you personally have participated
16 only in the Florida Medicaid program.  Correct?
17    A.  Personally what?
18    Q.  Participated only in the Florida
19 Medicaid program.  Correct?
20    A.  That is correct.
21    Q.  You've never submitted a claim or
22 submitted a claim on behalf of anyone else to any

Page 526

1  other Medicaid program other than Florida's.
2  Correct?
3     A.  That is correct.
4     Q.  To the extent you have knowledge about
5  how any other state calculated its reimbursement
6  amounts, it's because you read it in publicly
7  available sources.  Correct?
8        MR. BREEN:  Objection.  Form.
9        THE WITNESS:  No.  I wouldn't say
10 publicly available sources.  There was a point in
11 time when -- I mean, Red Books were not available
12 publicly.  They were only available to
13 pharmacies.
14 BY MR. COOK:
15    Q.  Is it your testimony that the Red Book
16 doesn't sit in the Library of Congress even as we
17 speak?
18    A.  If it sits there now, I'm not sure.
19 But my only experience has been through the
20 practice of pharmacy.  I was not aware of the Red
21 Book sitting in the Library of Pharmacy, you
22 know, back in the late '80s, early '90s.  And it

Page 527

1  may have, and if it did, then I apologize, and
2  retract my statement.
3     Q.  What else have you seen with your own
4  eyes among the allegations in Exhibit 547?
5     A.  Well, with regard to 50, the United
6  States knowingly -- "Abbott defrauded the United
7  States by knowingly causing the Medicare and
8  Medicaid programs to pay false or fraudulent
9  claims for dextrose....sodium chloride solutions,
10 sterile water, Vancomycin, and Acyclovir."
11    Q.  You saw Abbott cause the
12 Medicare/Medicaid programs to pay false or
13 fraudulent claims?
14    A.  I saw claims that had been paid, and I
15 can't specifically tell you if it was some or all
16 of these unique products that certainly had
17 reimbursement amounts that were based on
18 fraudulent or false price reporting by Abbott on
19 its drug products.
20    Q.  Were these for Abbott products?
21    A.  I'm hesitating because I'd have to say
22 yes for some.  I just can't specifically go back

Page 528

1  and visualize each and every claim that I may
2  have seen.
3     Q.  Who submitted these claims?
4     A.  I think the scope, what I had seen
5  would have been through Medicare -- I mean, Ven-
6  A-Care's personal experience.
7     Q.  So these are Ven-A-Care claims.
8  Correct?
9     A.  They would have been Ven-A-Care claims.
10    Q.  So it's your testimony that Ven-A-Care
11 submitted false and fraudulent claims to the
12 Medicare and Medicaid program.  Correct?
13       MR. BREEN:  Objection.  Form.
14       THE WITNESS:  No.  It's my testimony
15 that Ven-A-Care participated in a program that
16 was undermined by Abbott and its false and
17 fraudulent price reporting and received claims
18 that it felt were based on those price reports
19 and tried to highlight that.
20 BY MR. COOK:
21    Q.  And just so I'm clear, none of Ven-A-
22 Care's Complaints attaches any claims submitted

Page 529

1  by Ven-A-Care for the payment of any Abbott
2  products.  Do I have that correct?
3      A.  I believe -- not that I'm aware of.
4      Q.  And recognizing the limits of human
5  memory, to be clear, you're not able to point me
6  today to any specific claims that Ven-A-Care
7  submitted for Abbott products that Ven-A-Care
8  contends was false or fraudulent.  Correct?
9          MR. BREEN:  Objection.  Form.
10         THE WITNESS:  That's correct.  I could
11 not sit here today and do that.
12 BY MR. COOK:
13     Q.  And in terms of your testimony that you
14 witnessed with your own eyes, Abbott causing
15 Medicare and Medicaid to pay a false or
16 fraudulent claim, in fact, you didn't witness
17 Abbott do anything with respect to those claims,
18 did you?
19         MR. BREEN:  Objection.  Form.
20         THE WITNESS:  I witnessed the resultant
21 effect of Abbott's actions.  You know, I was not
22 present at Abbott's corporate headquarters when

Page 530

1  it was submitting fraudulent pricing information,
2  no.
3  BY MR. COOK:
4      Q.  What else in Exhibit 547 did you see
5  with your own eyes, Mr. Cobo?
6          MR. BREEN:  Objection.  Form.
7          THE WITNESS:  Sixty-five, where we --
8  "Abbott reported increasingly higher prices for
9  the drugs from at least on or before January 1,
10 1991 through 2001.  At the same time, the prices
11 that Abbott actually charged to its customers
12 decreased or remained the same."
13 BY MR. COOK:
14     Q.  And you witnessed this because you saw
15 on the one hand Abbott's published prices.
16 Correct?
17     A.  I saw the various representations that
18 Ven-A-Care had available to it, either in Pricing
19 compendia or its prices through contracts, GPO
20 prices, wholesale prices.  You know, we were able
21 to observe that phenomena.
22     Q.  So you saw this to the extent that you

Page 531

1  were able to compare published prices to price
2  lists available to Ven-A-Care to purchase these
3  GPOs and other sources.  Correct?
4      A.  Yeah, I guess that's correct, yes.
5      Q.  Are there any other allegations in
6  Exhibit 547 that you witnessed with your own
7  eyes?
8      A.  The scenario involving the fluctuation
9  of prices with Vancomycin with regard to its AWP
10 and the actual acquisition prices was something
11 that I also watched happen over the years,
12 through these same previously stated pricing
13 compendia, wholesale price list, contracts,
14 specialty wholesaler prices.
15     Q.  Is there -- are there any other facts
16 or alleged facts contained in Exhibit 547 that
17 you witnessed with your own eyes through any
18 means other than reading a published price list
19 or reading a price catalog available to Ven-A-
20 Care?
21         MR. BREEN:  Objection.  Form.
22         THE WITNESS:  That would also include

Page 532

1  electronic representations of such catalogs and
2  price lists as well.
3          And I guess the same would apply to the
4  other products, the large volume parentals, the
5  Acyclovir, you know, watching the fluctuations in
6  prices and the representations was something
7  that, you know, also was in that category of
8  products that I was able to personally see.
9          I think without really evaluating,
10 taking it apart line by line, I think that's a
11 general overview of some of the things that I've
12 specifically witnessed.
13         MR. COOK:  Very good.  Thank you.
14         We can go off the record for one
15 minute.  Mr. Escobar and I will change place of
16 the.
17         THE VIDEOGRAPHER:  The time is 3:57
18 p.m.  Going off the record.  End of videotape No.
19 6.
20         (Recess taken.)
21         THE VIDEOGRAPHER:  The time is 4:03
22 p.m.  We are back on the record.  Videotape No.

66 (Pages 529 to 532)