# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. MDL No. 1456

Civil Action No. 01-12257-PBS


In Re:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

------------------------------------------------

IN THE DISTRICT COURT OF

TRAVIS COUNTY, TEXAS

Cause No. GV401286


THE STATE OF TEXAS

Ex rel.

VEN-A-CARE OF THE FLORIDA KEYS,

INC.,

     Plaintiffs

v.

ABBOTT LABORATORIES, INC., et al.,

     Defendants.                                Volume 1

------------------------------------------------

(Captions continue on next pages.)

208e3b26-ba24-458c-acda-c73a539c9a54

Page 2

```
 1           VIDEOTAPE DEPOSITION
 2                   OF
 3         ZACHARY TAYLOR BENTLEY II
 4         Wednesday, March 5, 2008
 5         9:05 a.m. - 5:20 p.m.
 6               21st Floor
 7         2 South Biscayne Boulevard
 8           Miami, Florida 33131
 9
10  Reported by: Sherilynn McKay, RMR, CRR
11  Notary Public, State of Florida
12          UNITED STATES DISTRICT COURT
13         FOR THE DISTRICT OF MASSACHUSETTS
14         Civil Action No. 03-cv-11865-PBS
15  THE COMMONWEALTH OF MASSACHUSETTS,
16      Plaintiff,
17
18  - against -
19
20  MYLAN LABORATORES, INC., et al.
21      Defendants.
22  --------------------------------------------------
```

Page 3

```
 1   IN THE DISTRICT COURT OF THE FOURTH JUDICIAL
 2    DISTRICT OF THE STATE OF IDAHO IN AND FOR THE
 3                 COUNTY OF ADA
 4            Case No. CV OC 0701847
 5
 6   STATE OF IDAHO,
 7      Plaintiff
 8   vs.
 9   ALPHARMA USPD INC., et al.,
10      Defendants.
11  --------------------------------------------------
12   Commonwealth OF KENTUCKY FRANKLIN CIRCUIT COURT
13      DIV 1 CIVIL ACTION NO. 04-CI-1487
14
15   COMMONWEALTH OF KENTUCKY
16   Ex rel, JACK CONWAY ATTORNEY GENERAL
17      Plaintiff,
18   v.
19   ALPHARMA USPD, INC., et al.
20      Defendants.
21  --------------------------------------------------
22
```

Page 4

```
 1   COMMONWEALTH OF KENTUCKY FRANKLIN CIRCUIT COURT
 2      FRANKLIN CIRCUIT COURT - DIV III
 3          CIVIL ACTION NO. 03-CI-1134
 4   COMMONWEALTH OF KENTUCKY,
 5      Plaintiff
 6   vs.
 7   ABBOTT LABORATORIES, INC.,
 8      Defendant.
 9
10      IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY,
11       ALABAMA MASTER DOCKET NO. CV-2005-219
12
13  In the Matter of
14  ALABAMA MEDICAID PHARMACEUTICAL
15  AVERAGE WHOLESALE PRICE LITIGATION
16  --------------------------------------------------
17
18                    - - -
19
20
21
22
```

Page 5

```
 1          A P P E A R A N C E S
 2   For Abbott Labs:
 3       JONES DAY
 4       By: R. CHRISTOPHER COOK, ESQ.
 5       51 Louisiana Avenue, N.W.
 6       Washington, DC 20001-2113
 7       christophercook@jonesday.com
 8
 9   For Ven-A-Care of the Florida Keys:
10       THE BREEN LAW FIRM
11       By: JAMES JOSEPH BREEN, ALISON WARREN SIMON
12       and ANDREW SHELDON, ESQS.
13       Suite 110
14       3350 S.W. 148th Avenue
15       Miramar, Florida 33027
16       jbreen@breenlaw.com
17        - and -
18       GOODE, CASSEB, JONES, RIKLIN, CHOATE &
19        WATSON, P.C.
20       By: JOHN E. CLARK, ESQ.
21       2122 North Main Avenue
22       San Antonio, Texas 78212
```

Page 278

1  over and over.
2      A.  448.  Yes, sir.
3      Q.  And while you're pulling out Exhibit 448,
4  I'll mark two more exhibits, Exhibit 555 and
5  Exhibit 556.
6      (Deposition Exhibit Bentley 555 and
7  Exhibit Bentley 556 was marked for identification.)
8      THE WITNESS:  Right.
9      MR. COOK:  This is 555, Jim.
10     MR. BREEN:  Thank you.
11     MR. COOK:  You're welcome.  And this is
12 Exhibit 556.
13     Again, I apologize to the people in the back
14 seats.
15 BY MR. COOK:
16     Q.  Mr. Bentley, if you could look first at
17 Exhibit 555.
18     A.  Okay.  Uh-huh.
19     Q.  This is a series of documents produced by
20 Ven-A-Care with Bate's Nos. 28201 through 28203.
21     A.  Yes.
22     Q.  And it is a series of three copies of

Page 279

1  essentially the same document with different
2  facsimile transmission lines on the top, that is
3  from Dennis Walker to Zack, dated May 30th, 1997.
4  Correct?
5      A.  Yes.
6      Q.  And then Exhibit 556 is a facsimile
7  transmission to T. Reed Stephens from Zack, Mark
8  and Dr. John, dated the same date, a memorandum,
9  and some attachments.  Correct?
10     A.  Yes.
11     Q.  And the preexisting Exhibit 448 is a copy
12 of that May 30th, 1997 memorandum.  Correct?
13     A.  Yes.
14     Q.  Turning your attention to Exhibit 448.
15 Does Exhibit 448, the memorandum, accurately
16 describe events that occurred on May the 30th,
17 1997?
18     A.  Yes.
19     Q.  Did you draft that memorandum?
20     A.  I believe I did, yes.
21     Q.  And this relates to the facsimile that is
22 marked as Exhibit 555.  Correct?

Page 280

1      A.  Correct.
2      Q.  And I assume you are the "Zack" on the
3  "to" line of the fax cover sheet marked as Exhibit
4  555?
5      A.  I assume I'm that Zack too.
6      Q.  And Dennis Walker is an employee of Abbott
7  Alternate Site Product Sales.  Correct?
8      A.  To the best of my knowledge, when he faxed
9  this, he was.
10     Q.  Mr. Walker had a telephone conversation
11 with you on May 30th, 1997, as I understand?
12     A.  Correct.
13     Q.  Tell me about that telephone conversation.
14     A.  I called our group purchasing
15 organization, the best of my knowledge, and was
16 asking about a new Abbott drug that they didn't
17 know anything about, so they gave me Mr. Walker's
18 phone number, and said -- actually, I think they
19 gave me Michael Heggie's name and number, and I
20 think that Dennis Walker returned my call for Mr.
21 Heggie.
22     Q.  The drug that you were asking about was

Page 281

1  Acyclovir?
2      A.  Correct.
3      Q.  And that's a generic version of Zovirax?
4      A.  Zovirax, yes.
5      Q.  Had Abbott yet begun selling its Acyclovir
6  at this point?
7      A.  No.  That was what was very interesting,
8  was in fact, the prices were falling rather
9  precipitously in the marketplace, and there hadn't
10 even been, to my knowledge, a generic to hit the
11 market yet.
12     Q.  So for whatever reasons, the competitive
13 marketplace was pushing the price down even before
14 the first unit of Acyclovir had been sold,
15 according to your observations.  Correct?
16     A.  That would be my observations, correct.
17     Q.  To the extent that Ven-A-Care was a
18 purchaser of Acyclovir, that would, of course,
19 benefit Ven-A-Care.  Correct?
20     A.  Yes.
21     Q.  Was Ven-A-Care seeing patients at this
22 time?

71 (Pages 278 to 281)

Page 282

1     MR. BREEN: Objection to form.
2     THE WITNESS: Yes. Apparently we still were,
3  because you showed me earlier some claims that were
4  dated 1997. I didn't think we had any patients by
5  that time, but we may have had a handful. I was
6  pretty much doing legal work on the various cases,
7  so I was kind of not really knowing what was going
8  on exactly as far as the infusion pharmacy part.
9  BY MR. COOK:
10    Q.  So when you called the GPO and then called
11  Abbott, you were not inquiring about a product that
12  you intended to purchase and administer to a
13  patient. Correct?
14    A.  Well, we had patients prior that we had
15  administered Zovirax to, so it was certainly
16  conceivable that we could have another patient that
17  needed Acyclovir.
18    Q.  Did you expect to have a patient that
19  needed Acyclovir?
20    MR. BREEN: Objection to the form.
21    THE WITNESS: I don't know whether I expected
22  or not.

Page 283

1  BY MR. COOK:
2     Q.  In fact, you had so few patients for
3  Ven-A-Care at this time that you were surprised to
4  see that there were any Medicare claims at all for
5  any product in 1997 just a minute ago. Correct?
6     MR. BREEN: Objection. Form.
7     THE WITNESS: Yeah. Here again, you misspoke.
8  You said Medicare, and you showed me Medicaid
9  claims.
10    MR. COOK: I can restate it.
11  BY MR. COOK:
12    Q.  You were surprised a minute ago to see any
13  claims whatsoever for Ven-A-Care having a patient
14  in 1997. Correct?
15    A.  Yes.
16    Q.  And so you had no concrete expectation to
17  have a patient who needed Acyclovir as of May 30th,
18  1997. Correct?
19    MR. BREEN: Objection. Form.
20    THE WITNESS: I -- you know, we had maintained
21  our clean room to the various clean room standards.
22  We had inventory. So essentially if a physician

Page 284

1  called us, or an insurance company, we were
2  certainly in business and able to provide or
3  dispense medications.
4  BY MR. COOK:
5     Q.  But I'm talking about your motivations.
6  Did you talk to Dennis Walker because you were
7  looking to obtain a supply of Acyclovir to give to
8  patients, or because you were looking to improve
9  your position in a lawsuit?
10    MR. BREEN: Objection. Form.
11    THE WITNESS: Well, I think it would have been
12  two-fold. One, we probably did buy some Acyclovir
13  to keep on hand, and I wouldn't characterize it as
14  to improve our position in a lawsuit. I would
15  characterize it as to find out what was transpiring
16  in the marketplace.
17  BY MR. COOK:
18    Q.  What did you do with the Acyclovir that
19  you purchased?
20    MR. BREEN: Objection. Form.
21    THE WITNESS: You'd have to ask Mr. Cobo or
22  Mr. Jones. I assume we would have it on hand or

Page 285

1  have returned it if it went out of expiration, if
2  it sat on our shelves, or we would have dispensed
3  it to a patient.
4  BY MR. COOK:
5     Q.  Do you have any reason to believe it was
6  dispensed to a patient?
7     MR. BREEN: Objection. Form.
8     THE WITNESS: I don't know one way or the
9  other.
10  BY MR. COOK:
11    Q.  In fact, at this time, Ven-A-Care was
12  buying very small amounts of infusion drugs.
13  Correct?
14    A.  That would be a correct statement.
15    Q.  Those very small amounts were being used
16  to assist Ven-A-Care in putting together
17  presentations and Complaints in connection with its
18  lawsuits. Correct?
19    A.  We did use some materials, but understand
20  we also, like I said, maintained our premises and
21  our clean room to the regulatory standards, and you
22  can't hold yourself out as a pharmacy and all of

72 (Pages 282 to 285)

Page 286

1  the sudden you get a prescription for a drug and
2  say, well, I can't start the patient because I
3  don't have product on hand.
4      Q.  How often was that clean room being used
5  in 1997?
6      A.  You would have to ask Mr. Jones or Mr.
7  Cobo.  Like I say, I was surprised to see the
8  Medicaid claims.  But, you know, that wasn't my job,
9  and I would be traveling for weeks at a time.  I
10 had no idea what was going on back at Key West.
11     Q.  Isn't it true that you kept the clean room
12 up so that you could keep your license as a
13 pharmacy, so that you could continue to gather
14 evidence to support your lawsuits?
15     MR. BREEN:  Objection.  Form.
16     THE WITNESS:  I would -- I would take issue
17 with that.  We kept our clean room up to standards
18 only for the purpose of utilizing it to clean room
19 standards.  We did not have to keep our clean room
20 up to the regulatory standards in order to continue
21 gathering information just to -- just for that.  We
22 did use the information that we were provided --

Page 287

1  that we were obtaining, and turned it over to the
2  government as soon as it came in.
3      I think you'll see that Mr. Walker sent me
4  this fax on May 30th, at some time, and that same
5  day I was reporting that very issue to, I can't
6  remember who this went out to, but it certainly
7  went to Mr. Stephens, it certainly may have gone to
8  Mr. Vito at the Office of Inspector General, it may
9  have gone to -- I don't know who else it would have
10 gone to, but I would have hoped that it went to as
11 many people as possible that could have -- that
12 could benefit from this information.
13 BY MR. COOK:
14     Q.  This wasn't the first time that you had
15 passed on to the Department of Justice information
16 that Ven-A-Care had obtained from drug
17 manufacturers.  Correct?
18     A.  I passed on everything that I could
19 possibly lay my hands on as fast as I possibly
20 could.
21     Q.  Ven-A-Care -- the Department of Justice
22 was fully aware that Ven-A-Care was continuing to

Page 288

1  have communications with drug manufacturers to, in
2  part, gather evidence such as this that's marked as
3  Exhibit 556.  Correct?
4      MR. BREEN:  Objection.  Form.
5      THE WITNESS:  I think -- you know, it's hard
6  for me to say what the government knew, what we
7  were doing, or what we weren't doing.  When you say
8  "the government knew," you know, I can't sit here
9  and say what the government knew and what they
10 didn't know.
11 BY MR. COOK:
12     Q.  Did Mr. Stephens or anybody else at the
13 Department of Justice caution you not to be
14 communicating directly with the drug manufacturers
15 in this case?
16     MR. BREEN:  Objection.  Form.  And before the
17 witness answers, I want to consult with DOJ counsel
18 outside.
19     MR. COOK:  Sure.  Off the record.
20     THE VIDEOGRAPHER:  4:09 p.m.  Off the record.
21     (Recess taken.)
22     THE VIDEOGRAPHER:  The time is 4:12 p.m.  We

Page 289

1  are back on the record.
2      MS. ST. PETER-GRIFFITH:  At this time, the
3  United States instructs that it is asserting a
4  common interest privilege and defers to counsel for
5  Ven-A-Care to appropriately instruct the witness.
6      MR. COOK:  Are you instructing the witness not
7  to answer whether he was told not to communicate
8  with Abbott?
9      MR. BREEN:  Based upon communications with
10 counsel for either Ven-A-Care or counsel for the
11 United States at this particular point in time, to
12 the extent those communications involved either
13 legal advice or services, or a common investigation
14 or evaluation of facts or evidence, I would
15 instruct the witness not to answer.
16     I believe that your question precisely falls
17 in that category, and therefore I'm structuring him
18 as an employee of the company that the company
19 desires that he not answer that question, based
20 upon attorney-client and common interest privilege.
21 BY MR. COOK:
22     Q.  Mr. Bentley, were you aware that as of May

73 (Pages 286 to 289)

Page 290

1  30, 1997, the Department of Justice and other
2  aspects of the government had issued civil
3  investigative demands and subpoenas to Abbott?
4      MR. BREEN: Objection. Form.
5      THE WITNESS: I was aware that there had been
6  subpoenas sent out, yes.
7  BY MR. COOK:
8      Q. Including to Abbott. Correct?
9      A. Yes.
10     Q. Were you aware that Abbott was represented
11 by counsel as of May 30th, 1997?
12     MR. BREEN: Objection. Form.
13     THE WITNESS: I don't -- I do not know.
14 BY MR. COOK:
15     Q. And May 30th, 1997, were you aware of any
16 limitations on communicating with represented party
17 in litigation?
18     A. No.
19     Q. You had no idea that it might be
20 inappropriate for you to speak to a represented
21 party in this way. Correct?
22     A. I would say generally so, yes.

Page 291

1      Q. You knew generally it was inappropriate?
2      A. Oh, no, I'm sorry. I didn't know that it
3  was, if in fact it was wrong, that I was doing
4  something wrong.
5      Q. And are you accepting your counsel's
6  instruction not to tell me whether anybody from the
7  Department of Justice or, frankly, your counsel,
8  warned you against speaking with represented
9  parties?
10     MR. BREEN: That's my advice.
11 BY MR. COOK:
12     Q. And are you taking that instruction?
13     A. Yes.
14     Q. Did anyone other than counsel caution you
15 against communicating with represented parties?
16     A. No.
17     Q. I want to get back to a -- something you
18 mentioned a little bit earlier. You indicated that
19 of the small amounts of infusion drugs that you
20 would keep on hand at Ven-A-Care, if they went out
21 of date you would return them to the manufacturer.
22 Correct?

Page 292

1      A. They would be returned. I'm not positive
2  they always went back to the manufacturers. I
3  think there was some company that actually has a
4  service, that I guess is common amongst pharmacies,
5  that takes possession of outdated merchandise and
6  properly destroys it and notifies, I guess the FDA,
7  of the amount and quantities of what's been
8  destroyed.
9      Q. Would you receive a credit for the cost of
10 the drug that had gone out of date?
11     A. Generally speaking, I believe so, yes.
12     Q. Was any of the drug for which you received
13 a credit that it went out of date used as part of
14 presentations to the government or other attempts
15 to further your litigation against the drug
16 manufacturers?
17     MR. BREEN: Objection to form.
18     Can I have the question read back?
19     (The question was read by the reporter as
20 above recorded.)
21     MR. BREEN: Objection. Form.
22     THE WITNESS: Well, if we returned it for

Page 293

1  credit, we couldn't have used it as -- for
2  demonstrative purposes, because we wouldn't have
3  had it.
4  BY MR. COOK:
5      Q. You never used a bottle as a prop in a
6  presentation and then returned it back to
7  Ven-A-Care?
8      MR. BREEN: Objection. Form.
9      THE WITNESS: Oh, I -- yeah. But, I mean, we
10 didn't -- we didn't ask for credit for a product,
11 and not return it for credit and then use it as a
12 prop.
13 BY MR. COOK:
14     Q. No. I'm simply asking did you ever have a
15 product that you had in stock, use it as a prop,
16 and then after it went out of date return it back
17 to get a credit?
18     A. You know, I don't know. I assume that --
19 well, not assume. To the best of my knowledge,
20 pharmacies are not allowed to have on their shelves
21 products that are expired.
22     And there's a company, I think I remember the

Page 294

1  name now, it's called One Box Return, and you just
2  put all your drugs in there, they can be from any
3  of the different manufacturers, and you mail it
4  back to them, and they take care of everything
5  else, and then you get a credit to your wholesaler.
6      Q.  You'd agree with me that's pretty ironic,
7  wouldn't you?
8      A.  What's pretty ironic?
9      Q.  That Ven-A-Care would buy single unit, use
10 it as a prop in order to further a lawsuit against
11 a manufacturer, and then return it to the
12 manufacturer for a credit when it doesn't
13 administer it to a patient?
14     MR. BREEN:  Objection.  Form.
15     MS. ST. PETER-GRIFFITH:  And, Chris, I have to
16 tell you, when you ask that question, you said
17 return it to Ven-A-Care, you didn't say return it
18 to Abbott.
19     MR. COOK:  You're right.
20 BY MR. COOK:
21     Q.  You'd agreed with me that to the extent
22 that you got refunded for, by the manufacturer, for

Page 295

1  a product that you used in order to further a
2  lawsuit against that manufacturer, that's somewhat
3  ironic?
4      MR. BREEN:  Objection.  Form.
5      THE WITNESS:  No.  Actually, I think it's
6  pretty sad, if you want to know the truth.  It's
7  sad that we had to do that, and that your client
8  couldn't have spoken the truth about the real
9  prices in the marketplace.
10 BY MR. COOK:
11     Q.  Mr. Bentley, how much truth did you speak
12 to Mr. Walker on May 30th, 1997, about the purpose
13 of your phone call with him?
14     MR. BREEN:  Objection.  Form.
15     THE WITNESS:  I don't believe Mr. Walker asked
16 me what the purpose of my call was.
17 BY MR. COOK:
18     Q.  Did you volunteer it?
19     A.  I simply asked him if he could give me the
20 prices for Acyclovir, that I knew that Abbott was
21 coming out with a generic.  I think one page is
22 missing from this other document, and that is we

Page 296

1  had an announcement from Abbott saying that they
2  were coming out with a cost cutting generic.  And I
3  don't see that in this exhibit.
4      Q.  In fact, you asked Mr. Walker if he could
5  please send you the AWP information for Acyclovir.
6  Correct?
7      A.  No.  I had the AWP information, because
8  here it is in the Red Book.  I asked Mr. Walker if
9  he would send me my price.  I think Mr. Walker did
10 this because I asked him about the spread between
11 Abbott's generic Acyclovir versus Fujisawa, which
12 was the other company that had announced that they
13 were going to have a generic competitor in the
14 marketplace.
15     Q.  So it's your testimony that when Mr.
16 Walker wrote in his facsimile cover sheet, quote:
17 Listed below is your Automated Health Technologies
18 price for Acyclovir and the AWP information you
19 requested, close quote, it's your testimony that
20 Mr. Walker was making that up, that you requested
21 the AWP information?
22     A.  No.

Page 297

1      MR. BREEN:  Objection.  Form.
2      THE WITNESS:  I'm simply telling you I do not
3  remember asking him for the AWP information,
4  because, you know, I had the information from the
5  June update that comes at the beginning of June.
6  So I already had the AWP.
7  BY MR. COOK:
8      Q.  But you have no reason to question the
9  accuracy of Mr. Walker's assertion in this
10 facsimile that in fact you did request the AWP
11 information?
12     MR. BREEN:  Objection.  Form.
13     THE WITNESS:  I can't sit here and tell you
14 one way or the other.  I assume that he probably
15 put that on there to show me the spread between
16 Abbott's AWP and the cost.
17 BY MR. COOK:
18     Q.  Or it could be, as he states in the
19 facsimile cover sheet, that he's giving you the
20 information that you requested.  Correct?
21     MR. BREEN:  Objection.  Form.
22     THE WITNESS:  You can certainly draw that

75 (Pages 294 to 297)

Page 298

1 conclusion.
2 BY MR. COOK:
3   Q.  Mr. Walker had no idea that this facsimile
4 was likely to be an exhibit in litigation, did he?
5   MR. BREEN:  Objection.  Form.
6   THE WITNESS:  People who commit crimes
7 generally don't look at the trail they leave behind
8 them, when they go to commit a crime.
9 BY MR. COOK:
10   Q.  It's your testimony that Mr. Walker was
11 committing a crime here.  Is that what you're
12 telling me?
13   MR. BREEN:  Objection.  Form.
14   THE WITNESS:  I think that he was clearly
15 giving me this information to market the spread for
16 Abbott and encourage me to buy Abbott's Acyclovir
17 over that of their competitors, Fujisawa.
18 BY MR. COOK:
19   Q.  To the extent that you asked Mr. Walker to
20 send you the AWP information, you were asking Mr.
21 Walker to commit a crime.  Is that your testimony?
22   MR. BREEN:  Objection.  Form.

Page 299

1   THE WITNESS:  I did not ask Mr. Walker to make
2 up any of these prices.  These are the prices that
3 were represented to me by your employee.
4 BY MR. COOK:
5   Q.  Did Mr. Walker call you or did you call
6 him originally?
7   A.  I told you, to the best of my knowledge, I
8 telephoned Michael Heggie, Mr. Walker returned Mr.
9 Heggie's phone call.
10   Q.  During that conversation you were keenly
11 aware that your conversation and any documents that
12 resulted from it would be an issue in litigation.
13 Correct?
14   MR. BREEN:  Objection.  Form.
15   THE WITNESS:  Yes.  I had really hoped that we
16 could get a wiretap.
17 BY MR. COOK:
18   Q.  You hoped that you could get a wiretap.
19 What did you do to try to get a wiretap?
20   MR. BREEN:  Objection.  Form.
21   MS. ST. PETER-GRIFFITH:  And hold it.  Hold
22 it.  To the extent that this question calls for

Page 300

1 anything that falls within our common interest
2 privilege, I'm going to ask Mr. Breen to
3 appropriately instruct the witness.
4   MR. BREEN:  Again, any discussions that the
5 witness had with counsel for Ven-A-Care, for
6 counsel for the United States regarding that topic,
7 I would request the witness not answer the
8 questions based upon the attorney-client and common
9 interest privilege.
10   THE WITNESS:  I think I can answer your
11 question.
12   MR. ESCOBAR:  I didn't understand.  Your
13 objection is, and you're instructing him not to
14 answer -- hang on a second -- as to whether -- I
15 just want to understand, Jim.  You're instructing
16 the witness not to answer whether the follow-up, a
17 question that follows up on what the witness said
18 about hoping to get a wiretap, you're not going to
19 allow follow-up questions to that on the basis that
20 somehow that is a privileged communication?
21   MR. BREEN:  I'm instructing the witness that I
22 believe that any communications he had with counsel

Page 301

1 or the United States' counsel about the matter is
2 privileged.
3   MR. ESCOBAR:  About wiretapping.
4   MS. ST. PETER-GRIFFITH:  About the
5 investigative process.
6   MR. BREEN:  About the overall matter, is
7 privileged.  That's all I'm telling him.  If he had
8 a personal desire to get a wiretap and he just said
9 it in the answer to a question, I'm instructing the
10 witness that any discussions he had with counsel
11 not to disclose them, that's all.
12   THE WITNESS:  I believe I can answer outside
13 of that.  Could I have a moment with counsel?
14   MR. COOK:  Let's go off the record.
15   THE VIDEOGRAPHER:  4:24 p.m., off the record.
16   (Recess taken.)
17   THE VIDEOGRAPHER:  4:27.  Back on the record.
18   THE WITNESS:  Okay, Mr. Cook.  Sorry.
19   MR. BREEN:  Hold on, hold on.  Let's get the
20 question back that you want to follow up on, just
21 so I'm understanding.
22   MR. COOK:  She can read the question.

76 (Pages 298 to 301)