# EXHIBIT N

Page 1

```
        UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

----------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

----------------------------------X


        IN THE CIRCUIT COURT OF

       MONTGOMERY COUNTY, ALABAMA

----------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

        Plaintiff,                 :  CV-05-219

    v.                             :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

        Defendants.                :

----------------------------------X
```

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                        May 4, 2007
                           New York, NY

Page 2

1  STATE OF WISCONSIN    CIRCUIT COURT    DANE COUNTY
2  ----------------------------------X
3  STATE OF WISCONSIN,         : CASE NO.
4       Plaintiff,             : 04-CV-1709
5    v.                        :
6  AMGEN INC., et al.,         :
7       Defendants.            :
8  ----------------------------------X
9
10          IN THE COURT OF COMMON PLEAS
11             FIFTH JUDICIAL CIRCUIT
12 ----------------------------------X
13 STATE OF SOUTH CAROLINA, and    :   STATE OF
14 HENRY D. McMASTER, in his official : SOUTH CAROLINA
15 capacity as Attorney General for   : COUNTY OF
16 the State of South Carolina,       : RICHLAND
17      Plaintiff,              :
18   v.                         : CIVIL ACTION:
19 MYLAN LABORATORIES, INC.     : 07-CP-40-0283
20      Defendant.              :
21 ----------------------------------X
22

Page 3

1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2         IN AND FOR LEON COUNTY, FLORIDA
3  THE STATE OF FLORIDA
4  ex rel.
5  -----------------x
6  VEN-A-CARE OF THE FLORIDA        :
7  KEYS, INC., a Florida            :
8  Corporation, by and through its  :
9  principal officers and directors, :
10 ZACHARY T. BENTLEY and           :
11 T. MARK JONES,                   :
12       Plaintiffs,                :
13     vs.           : Civil Action
14 MYLAN LABORATORIES, INC.; MYLAN   : No.: 98-3032G
15 PHARMACEUTICALS INC.; NOVOPHARM   : Judge:
16 LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17 TEVA PHARMACEUTICAL INDUSTRIES    : Gary
18 LTD., TEVA PHARMACEUTICAL USA;    :
19 and WATSON PHARMACEUTICALS, INC.  :
20      Defendants.                  :
21 -----------------x
22

Page 4

1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2             STATE OF MISSOURI
3  ------------------x
4  STATE OF MISSOURI, ex rel.,      :
5  JEREMIAH W. (JAY) NIXON,         :
6  Attorney General,                :
7  and                              :
8  MISSOURI DEPARTMENT OF SOCIAL    :
9  SERVICES, DIVISION OF MEDICAL    : Case No.:
10 SERVICES,                        : 054-1216
11      Plaintiffs,    : Division
12                     : No. 31
13     vs.             :
14 DEY INC., DEY, L.P., MERCK KGaA,  :
15 EMD, INC., WARRICK                :
16 PHARMACEUTICALS CORPORATION,      :
17 SCHERING-PLOUGH CORPORATION, and  :
18 SCHERING CORPORATION,             :
19      Defendants.                  :
20 ------------------x
21
22

Page 5

1            New York, New York
2            Friday, May 4, 2007
3
4
5        Videotaped Deposition of BRUCE C.
6  VLADECK, Ph.D., a witness herein, called for
7  examination by counsel for Abbott Laboratories in
8  the above-entitled matter, pursuant to Subpoena,
9  the witness being duly sworn by JOMANNA DEROSA, a
10 Notary Public in and for New York, taken at the
11 offices of Jones Day, 222 East 41st Street, New
12 York, New York, at 8:38 a.m. on Friday, May 4,
13 2007, and the proceedings being taken down by
14 Stenotype by JOMANNA DEROSA, and transcribed under
15 her direction.
16
17
18
19
20
21
22

                                          2 (Pages 2 to 5)

                    Henderson Legal Services
                         202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

Page 74

1   A.  The New York City Rand Institute was a
2   -- an extremely unsuccessful effort to a joint
3   venture between the Rand Corporation and the City
4   of New York to:
5       "Bring modern system science to
6   problems of urban government."
7       I worked largely in the areas of white
8   collar productively, municipal labor relations,
9   and spent a small amount of time on a health
10  project advising an old charitable organization
11  in New York about the organization and the future
12  of the health services they provided.
13      At Columbia, I was a member of the
14  faculty of the School of Public Health, the
15  faculty of the Department of Political Science
16  after a while, and had an appointment at a
17  research center, the Center For Community Health
18  Systems, which did health services research on
19  urban health problems, and I taught and did
20  research and wrote on issues of health policy and
21  health care.
22  Q.  In your positions with the Rand

Page 75

1   Institute and with Columbia University, did you
2   have any work involving reimbursement for
3   prescription drugs?
4   A.  Not that I'm aware of.  I think there
5   were a couple of articles or book reviews or
6   things of that stuff in my early days at Columbia
7   when I was still sort of looking for focus about
8   the drug development process and about FDA
9   regulation of -- of drugs and the drug
10  development process, but not having to do with
11  reimbursement, per se.
12      And as I began to focus more in
13  particular areas after a little while there, I
14  didn't do any work having to do with drugs or
15  drug pricing.
16  Q.  Between 1979 and 1982, when you were
17  Assistant Commissioner at the New Jersey State
18  Department of Health, did that position involve,
19  in any way, reimbursement for drugs?
20  A.  No.
21  Q.  From 1982 to 1983, while you were
22  assistant vice president at the Robert Wood

Page 76

1   Johnson Foundation, did you have any exposure to
2   reimbursement for drugs?
3   A.  No.
4       MS. BROOKER:  Objection.  Form.  Sorry.
5       THE WITNESS:  Sorry.
6   Q.  Between 1983 and 1993, while you were
7   president of the United Hospital Fund, did that
8   have anything to do with reimbursement for
9   prescription drugs?
10      MS. BROOKER:  Objection.  Form.
11  A.  That did not.  Again, the New York AIDS
12  Advisory Council was very much involved in issues
13  of the pricing for AZT and some of the other
14  first generation anti-retro virals.
15  Q.  And -- and tell me what was the
16  involvement of the -- you said it was the
17  council?
18  A.  The New York State AIDS Advisory
19  Council.
20  Q.  The New York State AIDS Advisory
21  Council.  What was the involvement of the New
22  York State AIDS Advisory Council and issues of --

Page 77

1   of drug reimbursement and pricing?
2       MS. BROOKER:  Objection.  Form.
3   A.  Primarily to state objections to the
4   level of the prices associated with the drugs, to
5   encourage the FDA to expedite approval of
6   competitor drugs to AZT, and to argue for
7   discounts for the so-called ADAP program, which
8   was a federally funded state-administered program
9   to help finance purchase of anti-HIV drugs for
10  non-Medicaid eligible patients.
11  Q.  Now, at some point in 1993 you became
12  administrator of the Health Care Financing
13  Administration.  Correct?
14  A.  Yes, sir.
15  Q.  Generally known by the acronym HCFA?
16  A.  That's right.
17  Q.  All caps, H-C-F-A.
18      When in 1993 did you become
19  administrator of HCFA?
20  A.  I was sworn in in late May.  I believe
21  the 22nd of it.
22  Q.  And you held that position until 1997?

20 (Pages 74 to 77)

Vladeck, Ph.D., Bruce C.  May 4, 2007
New York, NY

Page 78

1    A.  That's correct.
2    Q.  When in 1997 did you resign?
3    A.  My last day in that position was
4  September 13th, 1997.
5    Q.  Is there any activity, prior to May of
6  1993, whether professional activity, employment,
7  in which you had some involvement in or you
8  studied Medicare or Medicaid reimbursement for
9  prescription drugs?
10       MS. BROOKER:  Objection.  Form.
11   A.  Other than the issues with AIDS drugs
12  that I've just described, no.
13   Q.  How did you come to be the
14  administrator for HCFA?
15   A.  Well, I can't entirely answer that
16  question.  I believe I was recommended to
17  Secretary Shalala by several mutual friends.  And
18  I believe, for a variety of reasons, the White
19  House in this case deferred to the Secretary for
20  a recommendation, although not on the final
21  decision.  And then I went through a variety of
22  vetting processes.  I came out the other end.

Page 79

1    Q.  What were your job responsibilities as
2  administrator of HCFA?
3    A.  Well, the major responsibilities are
4  administration of the Medicare and Medicaid
5  programs.  Under the Social Security Act, almost
6  all the administrative responsibilities are
7  delegated to the Secretary.  Almost all of those
8  -- for Titles 18 and 19, almost all of those are
9  redelegated to the administrator.
10   Q.  What are not delegated?  That was a
11  messy question.
12       What responsibilities for Medicare and
13  Medicaid administration are not delegated by the
14  Secretary to the administrator?
15   A.  Well, the --
16       MS. BROOKER:  Objection.  Form.
17   A.  -- the -- there is a -- a board of
18  trustees for the hospital insurance supplementary
19  medical insurance trust funds, which are
20  statutory.  The HCFA administrator serves as
21  Secretary to both of those boards.  Their only
22  actual authority is to issue reports, but that's

Page 80

1  an issue of some significance.
2       There are other issues of -- I think
3  that's -- there are -- there are certain issues
4  of -- having to do with legal matters that are
5  assigned directly to the Inspector General, or in
6  some cases -- and I don't know if this is by law
7  or regulation or just custom -- our reserve for
8  the Department of Justice.
9       So, for example, when the agency is
10  involved in civil litigation authority to enter
11  into a settlement, it belongs with the Department
12  of Justice.
13       Again, I don't know whether that's
14  statutory or regulatory.  Things of that sort.
15   Q.  To whom did you report as administrator
16  of HCFA?
17   A.  Secretary Shalala.
18   Q.  I assume that some people reported to
19  you as well?
20   A.  Yes.
21   Q.  How many?
22   A.  Well, the agency, in its entirety,

Page 81

1  employed just over 4,000 people during my period
2  as administrator.  The number of direct reports
3  was probably 10, plus or minus; 10 to 15,
4  counting personal staff.
5    Q.  Did you have, personally, much
6  interaction with the regional offices for HCFA?
7    A.  I tried to, yes.
8    Q.  And how about state Medicaid agencies?
9        MS. BROOKER:  Objection.  Form.
10   A.  We met quarterly with the Executive
11  Committee of the Association of State Medicaid
12  Directors.  I tried to attend at least part of
13  all those meetings.  I also, for reasons ranging
14  from pre-existing personal relationships to
15  political sensitivities, had direct
16  communications from time to time with individual
17  state Medicaid directors.
18       In most instances, I had very little
19  interaction with state Medicaid officials below
20  the director level.
21   Q.  Would you have any interaction, while
22  you were administrator of HCFA, with

21 (Pages 78 to 81)

Vladeck, Ph.D., Bruce C.                                     May 4, 2007
                         New York, NY

Page 142

1   Q.  And for a brand name drug, would you --
2   at the time, did you expect that there would be
3   much variation between various purchasers based
4   upon volume purchases of the brand name drug?
5   A.  I believe we had a perception that the
6   bigger the purchaser, the larger the discount
7   they were likely to be able to achieve; that the
8   very largest pharmacy chains, for instance, or
9   hospital group purchasing operations, probably
10  received the most favorable prices, but that that
11  would be -- and that some small independent
12  pharmacies might actually pay average wholesale
13  price as described in the compendia; that there
14  would be a range below that in which most of the
15  prices would actually occur.
16  Q.  Turning to generic drugs for a minute,
17  what do you understand to be the differences
18  between the market for brand name drugs and the
19  market for generic drugs?
20      MS. BROOKER:  Objection.  Form.
21  A.  If we're going back to 1997 --
22  Q.  Correct.

Page 143

1   A.  -- I think it's fair to say that I had
2   really only a very limited understanding of the
3   marketplace for generic drugs and an even more
4   limited understanding of the difference between
5   the market for generic drugs and for brand drugs.
6       And, again, my perception at the time
7   was that that was likely more like a commodity
8   market in which there was probably more
9   purchasing power on the part of the large
10  purchasers, but not the same ability to raise
11  prices on the up-side to small purchasers that
12  prevailed on the brand name side.
13  Q.  I'd like to focus you just for a
14  minute, before we turn to a specific document,
15  about a particular generic drug.  I think you
16  mentioned commodities.  Are you familiar with
17  sodium saline solution?
18  A.  Yes.
19  Q.  It's a bag of salt water, essentially.
20  Correct?
21  A.  That's correct.
22  Q.  Would you agree with me that you can't

Page 144

1   get much more commoditized in a bag of salt water
2   in the drug market?
3   A.  The only quibble I would provide to
4   that question is I never really thought of it as
5   classically being part of the pharmaceutical
6   market.  It was such a -- it was really a
7   hospital supply kind of market.  It was such a
8   standard product that even though it was FDA
9   regulated and -- and sterility issues were so
10  forth, it tended to be -- hospitals tend to stock
11  it, for example, in sterile supplies, put it on
12  their cost report as part of sterile supplies
13  rather than through their pharmacies.
14  Q.  But a home infusion provider reimbursed
15  under Part B, for example, might be reimbursed
16  for sodium saline solution.
17      Was that your understanding in '97?
18      MS. BROOKER:  Objection.  Form.
19  A.  Yes, but whether that was as a supply
20  or a drug, I honestly couldn't tell you.  I would
21  have thought of it as a supply.
22  Q.  Turning to the market of it, whether we

Page 145

1   call it a drug or -- or a supply, did you have an
2   understanding, in 1997, of what the market would
3   look like for a product such as sodium saline
4   solution?
5       MS. BROOKER:  Objection.  Form.
6       MR. BREEN:  Objection.  Form.
7   A.  Yes, I did.
8   Q.  And what was your understanding?
9   A.  Well, I actually -- in the 1980s, I
10  believe, when I was first becoming involved in
11  some of these issues in health care economics was
12  the first development of hospital group
13  purchasing operations, and I recall -- and the
14  first widespread circulation of the -- of "Modern
15  Healthcare," the magazine, and I recall monthly
16  headlines in "Modern Healthcare" about group
17  purchasing operations being -- achieving
18  discounts of 98 and 99 percent in their purchase
19  of basic infusion products and sterile supplies.
20      So, my perception was that on the
21  supply market, which, again, I understood and
22  still would contend is actually a separate market

                                        37 (Pages 142 to 145)

Vladeck, Ph.D., Bruce C.  May 4, 2007
New York, NY

Page 146

1  from the pharmaceutical market that list prices,
2  are essentially entirely meaningless and that
3  only the weakest and smallest scale buyers pay
4  anything close to it.
5      Q.  And so, as of 1993, for example, would
6  you be surprised if a single bag of sodium saline
7  solution sold to a provider who bought maybe five
8  would pay $10 per bag, and a large purchaser who
9  bought a very large volume would pay less than a
10 dollar?
11         MS. BROOKER:  Objection.  Form.
12     A.  I would not have been surprised.
13     Q.  Okay.  So, to that extent that --
14 President Clinton referring to a 10-to-1 ratio is
15 something that would be consistent with your
16 understanding of that particular market.
17 Correct?
18         MS. BROOKER:  Objection.  Form.
19     Q.  I'm sorry.  You have to verbalize.
20     A.  Again, I would have thought that market
21 was a subset of the supplies market rather than
22 the drug market.

Page 147

1      Q.  That was my question.  But you would
2  have distinguished between the drug market, where
3  10-to-1 would not -- you would not expect to see.
4  Correct?
5      A.  That's correct.
6      Q.  And the supply market, where sodium
7  saline solution would be found, where there could
8  be a huge variation between a small purchaser
9  purchasing at list price and a very large
10 purchaser purchasing at 99 percent off of list
11 price?
12         MS. BROOKER:  Objection.  Form.
13     A.  I would have made such a distinction,
14 and I would not have been surprised to see those
15 sorts of differentials of the supply market.
16     Q.  And in between the commodities supply
17 market of sodium saline and the patent-protected
18 market of a brand name drug, would you expect
19 generic drugs to be somewhere between those two
20 extremes?
21         MS. BROOKER:  Objection.  Form.
22         MR. BREEN:  Objection.  Form.

Page 148

1      A.  That would be a question I never
2  thought about before today.  But today I would
3  say that we always made the distinction between -
4  - between drugs and -- and supplies.  And, again,
5  I would fall back on the Medicare green eyeshade
6  distinction between what's sterile supplies and
7  what's pharmacy.
8         MR. COOK:  Let's take a break.
9         THE VIDEOGRAPHER:  The time is 11:28
10 a.m.  We're going off the record, concluding Tape
11 No. 2 in the deposition of Dr. Bruce Vladeck in
12 the matter of In re Pharmaceutical Average
13 Wholesale Price Litigation.
14         (Recess taken.)
15         THE VIDEOGRAPHER:  The time is 11:46
16 a.m.  We're going back on the record, starting
17 Tape No. 3 of the deposition of Dr. Bruce Vladeck
18 in the matter of In re Pharmaceutical Average
19 Wholesale Price Litigation.
20     Q.  Doctor, based upon what we were talking
21 about just before the break, would it be fair to
22 say that while you were administrator of HCFA,

Page 149

1  you did not understand published average
2  wholesale price to be the average of prices at
3  which wholesalers were selling their drugs to
4  their customers?
5      A.  It would -- it would be fair to say
6  that I did not believe it was, in fact, an
7  empirical estimate, that rather it was a -- an
8  amount reported by the manufacturer to -- of the
9  compendium compilers or whatever, yes.
10     Q.  And, again, akin to a sticker price?
11     A.  That's correct.
12     Q.  Where did you get that understanding?
13     A.  I believe that was probably what my
14 staff explained to me when I first encountered
15 the concept sometime after I took office.
16     Q.  Do you recall anybody within HCFA who
17 was under the belief that average wholesale price
18 was an average of prices at which wholesalers
19 sold drugs to customers?
20         MS. BROOKER:  Object to form.  And I
21 would just instruct the witness, just, you know,
22 be mindful of not disclosing deliberations,

38 (Pages 146 to 149)

Page 285

```
        UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

----------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

----------------------------------X


         IN THE CIRCUIT COURT OF

      MONTGOMERY COUNTY, ALABAMA

----------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

         Plaintiff,                :  CV-05-219

    v.                             :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

         Defendants.               :

----------------------------------X
```

```
                                                    Page 286
 1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
 2  ---------------------------------X
 3  STATE OF WISCONSIN,          : CASE NO.
 4        Plaintiff,             : 04-CV-1709
 5     v.                        :
 6  AMGEN INC., et al.,          :
 7        Defendants.            :
 8  ---------------------------------X
 9
10         IN THE COURT OF COMMON PLEAS
11            FIFTH JUDICIAL CIRCUIT
12  ---------------------------------X
13  STATE OF SOUTH CAROLINA, and    :  STATE OF
14  HENRY D. McMASTER, in his official : SOUTH CAROLINA
15  capacity as Attorney General for  :  COUNTY OF
16  the State of South Carolina,     :  RICHLAND
17        Plaintiff,             :
18     v.                        : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.     : 07-CP-40-0283
20        Defendant.             :
21  ---------------------------------X
22
```

```
                                                    Page 287
 1    IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2        IN AND FOR LEON COUNTY, FLORIDA
 3  THE STATE OF FLORIDA
 4  ex rel.
 5  ------------------x
 6  VEN-A-CARE OF THE FLORIDA      :
 7  KEYS, INC., a Florida          :
 8  Corporation, by and through its :
 9  principal officers and directors, :
10  ZACHARY T. BENTLEY and         :
11  T. MARK JONES,                 :
12        Plaintiffs,              :
13     vs.                        : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN  : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM  : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES   : Gary
18  LTD., TEVA PHARMACEUTICAL USA;  :
19  and WATSON PHARMACEUTICALS, INC. :
20        Defendants.              :
21  ------------------x
22
```

```
                                                    Page 288
 1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2            STATE OF MISSOURI
 3  ------------------x
 4  STATE OF MISSOURI, ex rel.,    :
 5  JEREMIAH W. (JAY) NIXON,       :
 6  Attorney General,              :
 7  and                            :
 8  MISSOURI DEPARTMENT OF SOCIAL  :
 9  SERVICES, DIVISION OF MEDICAL  : Case No.:
10  SERVICES,                      : 054-1216
11        Plaintiffs,        : Division
12                           : No. 31
13     vs.                   :
14  DEY INC., DEY, L.P., MERCK KGaA, :
15  EMD, INC., WARRICK            :
16  PHARMACEUTICALS CORPORATION,  :
17  SCHERING-PLOUGH CORPORATION, and :
18  SCHERING CORPORATION,         :
19        Defendants.             :
20  ------------------x
21
22
```

```
                                                    Page 289
 1              New York, New York
 2              Thursday, June 21, 2007
 3
 4       CONTINUED Videotaped Deposition of
 5  BRUCE C. VLADECK, Ph.D., a witness herein, called
 6  for examination by counsel for Abbott Laboratories
 7  in the above-entitled matter, pursuant to
 8  Subpoena, the witness being duly sworn by JOMANNA
 9  DEROSA, a Notary Public in and for New York, taken
10  at the offices of Jones Day, 222 East 41st Street,
11  New York, New York, at 8:54 a.m. on Thursday, June
12  21, 2007, and the proceedings being taken down by
13  Stenotype by JOMANNA DEROSA, and transcribed under
14  her direction.
15
```

                                          2 (Pages 286 to 289)

Page 462

1    Q.    So, based on your understanding
2 when you were running HCFA, Dr. Vladeck, the state
3 Medicaid people who were designing and
4 administering the reimbursement methodology of the
5 states would have, through HCFA, access to AMP,
6 average manufacturer price, data.  Right?
7         MS. BROOKER:  Objection.  Form.
8         MR. BREEN:  Objection.  Form.
9    A.    In the generic sense that the
10 agencies -- the state agencies that administered
11 Medicaid would have access to it.  Whether it was
12 the same people in those agencies who administered
13 the rebate program and made policy about
14 reimbursement policy, I wouldn't know.
15   Q.    Okay.  But in terms of -- let's --
16 let's talk in terms of agency, since people might
17 change over time.
18         But the agencies that ran Medicaid
19 in each of the states, which were the agencies
20 responsible for implementing the reimbursement
21 methodologies, those agencies would have access,
22 through HCFA, to AMP data from the states.

Page 463

1    Right?
2         MS. BROOKER:  Objection.  Form.
3    A.    Yes.
4    Q.    So, for example, looking back at
5 Exhibit Dey 022, the one-page sheet that we had
6 that had all the reimbursement basis, the
7 responsible directors of the Medicaid agencies of
8 these -- of each of these states would be able to
9 peruse AMP data and compare that to what they were
10 reimbursing on.  Right?
11        MR. BREEN:  Objection.  Form.
12        MS. BROOKER:  Objection.  Form.
13        MR. BATES:  Objection to form.
14   A.    When you talk about "perusing,"
15 again, I don't -- I don't know if they'd even be
16 aware that their agencies had it.  But if they
17 were, depending on how their agencies were
18 organized, they might very well be.
19   Q.    So, it was entirely -- it was
20 entirely possible for the heads of a state
21 Medicaid agency to look at the AMP data on AMP
22 prices and at the same time look at data as to

Page 464

1 what they were reimbursing for those drugs.  That
2 was entirely possible.  Right?
3         MS. BROOKER:  Objection.  Form.
4         MR. BREEN:  Objection.  Form.
5    A.    It's -- I don't know any reason why
6 it wouldn't be possible.
7    Q.    And within your agency, within
8 HCFA, certainly people within HCFA could sit down
9 and compare the AMP data, for example, for Dey's
10 Albuterol, and see what the AMP was and compare
11 what the AWP was.  Right?
12        That was -- that was information
13 that they had in the agency?
14        MS. BROOKER:  Objection.  Form.
15   A.    I believe the -- the way we
16 interpreted the confidentiality provisions of the
17 statute was that the people directly involved in
18 the administration of the Medicaid drug rebate
19 program could have chosen to do so, yes.
20   Q.    Right.  So, somebody in -- in HCFA
21 that was involved with the rebate program could
22 one day look at the AMP for Dey's Albuterol and

Page 465

1 compare it to an AWP for Dey's Albuterol?
2         MS. BROOKER:  Objection.  Form.
3    A.    Presumably, yes.
4    Q.    And based on your understanding of
5 AWP and AMP, as you've indicated in the course of
6 this deposition and your prior session, you would
7 expect that the AWP -- there was a spread between
8 the AMP and the AWP.  Right?
9         MS. BROOKER:  Objection.  Form.
10   A.    Yes.
11   Q.    And that would be because the AMP
12 reported to HCFA would include a number of
13 specified discounts.  Isn't that right?
14        MS. BROOKER:  Objection.  Form.
15   A.    I don't know what you mean by
16 "specified discounts," but it was my impression
17 that, again, on average, the AMPs would have been
18 for single-source drugs in the range of 15 to 20
19 percent below the AWP, on average, and, for
20 generic drugs, as I've learned in the course of
21 this proceeding, as much as 25 to 40 percent below
22 AWP, on average.

Vladeck, Ph.D., Bruce C. - Vol. II                                                June 21, 2007
                              New York, NY

Page 466

1   Q.   Well, whatever the spread was, the
2   information was available to people within HCFA to
3   calculate it precisely.  Isn't that right?
4         MS. BROOKER:  Objection.  Form.
5   A.   If they had any reason to calculate
6   it precisely.
7   Q.   The information was all at HCFA to
8   do that.  Right?
9         MR. BREEN:  Objection.  Form.
10        MS. BROOKER:  Objection.  Form.
11  A.   I guess it was, to the extent it
12  was accurate.
13        MR. ESCOBAR:  Thank you.  We'll
14  take a break.
15        THE VIDEOGRAPHER:  The time is
16  12:32 p.m.  We're going off the record, concluding
17  Tape No. 8 in the deposition of Dr. Bruce Vladeck
18  in the matter of In re Pharmaceutical Industry
19  Average Wholesale Price Litigation.
20        (Luncheon recess:  12:32 p.m.)
21        THE VIDEOGRAPHER:  The time is 1:38
22  p.m.  We're going back on the record, starting

Page 467

1   with Tape No. 9.
2   Q.   Dr. Vladeck, we're back on the
3   record.
4         Did you discuss your testimony with
5   anyone?
6   A.   No.
7   Q.   If you go back to Exhibit Dey 023,
8   which is a copy of the rebate agreement?
9         Other than the rebate agreement,
10  are you aware of any other contract or agreement
11  that manufacturers had to enter into in connection
12  with having drugs reimbursed by Medicaid?
13  A.   No.
14  Q.   And the rebate agreement, is it
15  your understanding that the rebate agreement is
16  entered into by the manufacturer on one side and
17  by the Secretary on behalf of HHS and all the
18  states?
19  A.   That's my understanding.
20  Q.   So then as far as you understood
21  it, the states and the District of Columbia were
22  actually parties to the agreement.

Page 468

1   A.   That's my understanding, yes.
2   Q.   Now, was there any provision that
3   you're aware of in any statute or law or anything
4   that told manufacturers that they had to report
5   average wholesale price in a particular way,
6   similar to the way AMP is described?
7         MS. CONNOLLY:  Objection to form.
8   A.   No.  I'm not familiar of specific
9   instructions about reporting AWP.
10  Q.   And as far as you know no such
11  instructions existed.
12  A.   I don't know of any, no.
13  Q.   Now, if you turn to Page 7 of the -
14  - of the agreement itself in Exhibit Dey 023,
15  there's a Section 3 there entitled "Secretary's
16  Responsibilities"?
17        Do you see that?
18  A.   Yes.
19  Q.   And that section indicates the
20  responsibilities that the Secretary of Health and
21  Human Services has under the agreement?
22  A.   Yes.

Page 469

1   Q.   And those responsibilities --
2   strike that.
3         One of the things that the
4   Secretary had and the manufacturer agreed to were
5   that HHS could survey manufacturers to verify
6   manufacturer prices.  Right?
7         MS. BROOKER:  Objection.  Form.
8   A.   That's what it says, yes.
9   Q.   During your tenure as the head of
10  HCFA, do you know whether the department went out
11  and did anything to verify the manufacturer prices
12  of any manufacturer?
13  A.   I'm not aware of any surveys, no.
14  Q.   As far as you know, your agency,
15  HCFA, could have called manufacturers to ask them
16  to tell HCFA exactly how they calculated average
17  wholesale price.  You could have done that, right?
18        MS. LIANG:  Objection.
19        MS. BROOKER:  Objection.  Form.
20  A.   We certainly could have, yes.
21  Q.   Do you know whether HCFA ever did
22  that during the time you were its head?

47 (Pages 466 to 469)