# EXHIBIT R

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY    MDL No. 1456

AVERAGE WHOLESALE PRICE          Master File No.

LITIGATION                       01-CV-12257-PBS

THIS DOCUMENT RELATES TO:

United States of America, ex rel.

Ven-A-Care of The Florida Keys,

Inc., et al. vs. Boehringer

Ingelheim Corporation, et al.,

Civil Action No. 07-10248-PBS

(Captions continued on following pages.)

     VIDEOTAPED DEPOSITION OF PAUL CHESSER, a Witness, taken on behalf of the Defendants, before Robin Prouty, CCR No. 868, pursuant to Notice on the 24th day of June, 2008, at the offices of Kutak Rock, LLP, 124 West Capitol Avenue, Suite 2000, Little Rock, Arkansas.

| Page 2 | Page 4 |
|---|---|
| 1  IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA | 1  State of Alabama v. Baxter |
| 2   | 2  Healthcare Corporation, |
| 3  In the Matter of: | 3  No. 2005-219.15 |
| 4  ALABAMA MEDICAID PHARMACEUTICAL | 4  State of Alabama v. Baxter |
| 5  AVERAGE WHOLESALE PRICE | 5  International, Inc. |
| 6  LITIGATION            Master Docket No. | 6  No. 2005-219.16 |
| 7                CV-2005-219 | 7  State of Alabama v. Bayer |
| 8  This Document Relates to: | 8  Corporation, |
| 9  State of Alabama v. Abbott | 9  No. 2005-219.17 |
| 10 Laboratories, Inc., | 10 State of Alabama v. Bayer |
| 11 No. 2005-219.01 | 11 Pharmaceuticals Corporation |
| 12 State of Alabama v. Agouron | 12 No. 2005-219.18 |
| 13 Pharmaceuticals, Inc. | 13 State of Alabama v. Bayer |
| 14 No. 2005-219.02 | 14 Healthcare, LLC |
| 15 State of Alabama v. Alcon | 15 No. 2005-219.19 |
| 16 Laboratories, Inc. | 16 State of Alabama v. Biovail |
| 17 No. 2005-219.03 | 17 Pharmaceuticals, Inc., |
| 18 State of Alabama v. Allergan, | 18 No. 2005-219.20 |
| 19 Inc. | 19 State of Alabama v. Boehringer |
| 20 No. 2005-219.04 | 20 Ingelheim Corporation |
| 21 State of Alabama v. Alpharma, | 21 No. 2005-219.21 |
| 22 Inc. | 22 State of Alabama v. Boehringer |

| Page 3 | Page 5 |
|---|---|
| 1  No. 2005-219.05 | 1  Ingelheim Pharmaceuticals, Inc. |
| 2  State of Alabama v. Alza | 2  No. 2005-219.22 |
| 3  Corporation | 3  State of Alabama v. Bristol-Myers |
| 4  No. 2005-219.06 | 4  Squibb Company |
| 5  State of Alabama v. Amgen, | 5  No. 2005-219.23 |
| 6  Inc. | 6  State of Alabama v. Eisai, Inc., |
| 7  No. 2005-219.07 | 7  No. 2005-219.25 |
| 8  State of Alabama v. Andrx | 8  State of Alabama v. Eli Lilly & |
| 9  Corporation, | 9  Company |
| 10 No. 2005-219.08 | 10 No. 2005-219.26 |
| 11 State of Alabama v. Andrx | 11 State of Alabama v. Endo |
| 12 Pharmaceuticals, Inc. | 12 Pharmaceuticals, Inc. |
| 13 No 2005-219.09 | 13 No. 2005-219.27 |
| 14 State of Alabama v. Aventis | 14 State of Alabama v. Ethex |
| 15 Pharmaceuticals, Inc. | 15 Corporation |
| 16 No. 2005-219.12 | 16 No. 2005-219.28 |
| 17 State of Alabama v. Aventis | 17 State of Alabama v. Forest |
| 18 Behring, LLC, | 18 Laboratories, Inc. |
| 19 No. 2005-219.13 | 19 No. 2005-219.29 |
| 20 State of Alabama v. Barr | 20 State of Alabama v. Forest |
| 21 Laboratories, Inc., | 21 Pharmaceuticals, Inc. |
| 22 No. 2005-219.14 | 22 No. 2005-219.30 |

2 (Pages 2 to 5)

Page 154

1  concerns still had to do with they didn't want
2  somebody who was not up to speed in this area to
3  look at this report and draw conclusions that were
4  not merited.
5      Q.  Now, these other areas that are outlined in
6  this -- in this paragraph, such as contribution of
7  the Medicaid business to other store sales and
8  dispensing costs, did HCFA ever request that you
9  analyze these particular factors in reimbursement
10 under Medicaid?
11     A.  Not that I'm aware of.
12     Q.  Do you recall any effort by OIG taken on
13 its own accord to look at these other factors laid
14 out in this paragraph?
15     A.  Not that I'm aware of.
16     Q.  Would the Region 6 office be the office
17 that would have conducted these additional audits on
18 these additional topics?
19         MR. DRAYCOTT:  Objection, time frame.
20     Q.  (By Mr. Heck)  You can answer.
21     A.  It's conceivable that at some point here --
22 and I would be unaware of that OEI might have done

Page 155

1  something that might have touched one of these areas
2  in some of their studies, but I am not aware of it.
3      Q.  And you indicated that up until recently,
4  OEI generally focused on Medicare work, correct?
5      A.  Correct.
6      Q.  So are you aware of any effort that OEI
7  took to look at Medicaid dispensing fees or the
8  contribution of Medicaid business to other store
9  sales?
10         MR. DRAYCOTT:  Objection, asked and
11 answered.
12     Q.  (By Mr. Heck)  I'm asking if OEI ever.  Are
13 you aware of any?
14     A.  I'm not aware.
15     Q.  Okay.  Now, if we move to the next
16 paragraph, it indicates there was a multistate -- or
17 I'm sorry, multistage sampling procedure.  Do you
18 know what's meant by that?
19     A.  I am not a state sampling expert, but it's
20 because we pulled samples within -- we pulled a
21 sample of states, and within the states, we pulled a
22 stratified sample of pharmacies in each stage.  So

Page 156

1  that's why it's two stage, multistage.
2      Q.  Do you know who would have conducted that
3  process of picking the states and the pharmacies?
4      A.  It would have been random numbers
5  generated.
6      Q.  And do you know who would have overseen
7  that process of the random number generator?
8      A.  I would have done the random numbers using
9  the software that we have.
10     Q.  When you say random numbers, you
11 indicated -- were the states selected by a random
12 number --
13     A.  Yes.
14     Q.  -- generator?  Just generally, how did that
15 process work?
16     A.  I don't remember exactly.  You've got 50
17 states and the District of Columbia.  Did we exclude
18 any?  Arizona was excluded because -- and Tennessee
19 was excluded.  So you really had 49 states and the
20 District.  So we took -- I probably put them in
21 alphabetical order, if I'm guessing right, and
22 assigned them each a number, and then pulled a

Page 157

1  random sample of 12 from the universe of 50.
2      Q.  And why did you select the states in this
3  manner?
4      A.  So -- so it would be random and
5  statistically valid.
6      Q.  So it's your understanding that you
7  selected states randomly in order to ensure a
8  nationwide -- a valid nationwide sample; is that
9  correct?
10     A.  Correct.
11     Q.  Now, it says here that 11 states were
12 examined -- I guess 10 states and the District of
13 Columbia.  That number was originally 12, correct?
14     A.  Correct.
15         MR. HECK:  Mark an exhibit.
16         (Whereupon, Exhibit Roxane 080
17 was marked for identification by the reporter.)
18         MR. HECK:  We're at 80 already?  This
19 is Roxane 80.
20     Q.  (By Mr. Heck)  Now, can you take a moment
21 to just quickly look at this document?
22     A.  Okay.

Page 313

```
            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - -x
IN RE:   PHARMACEUTICAL INDUSTRY      :  MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION :     CIVIL ACTION

THIS DOCUMENT RELATES TO:             :  01-CV-12257-PBS

United States of America ex rel.      :

Ven-a-Care of the Florida Keys,       :

Inc., v. Boehringer Ingelheim         :

Corp., et al., Civil Action No.       :

07-10248-PBS and United States of     :

America, ex rel. Ven-A-Care of the    :  Hon. Patti B.

Florida Keys, Inc., v. Abbott         :    Saris

Laboratories, Inc., Civil Action      :

Nos. 06-11337-PBS and                 :

07-CV-11618-PBS                       :
- - - - - - - - - - - - - - - - - -x

     (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

                     Washington, D.C.

                     Tuesday, October 28, 2008

                     VOLUME II

                     PAUL CHESSER
```

Page 314

```
 1              CAUSE NO. D-1-GV-07-001259
 2    ---------------x IN THE DISTRICT COURT
 3    THE STATE OF TEXAS,        :
 4    ex. rel                    :
 5    VEN-A-CARE OF THE FLORIDA  :
 6    KEYS, INC.                 : TRAVIS COUNTY, TEXAS
 7             Plaintiffs,   :
 8        v.              :
 9    SANDOZ, INC., f/k/a GENEVA :
10    PHARMACEUTICALS, INC., EON :
11    LABS, MYLAN                :
12    PHARMACEUTICALS, INC., MYLAN : 201ST JUDICIAL DISTRICT
13    LABORATORIES, INC., UDL    :
14    LABORATORIES, INC., TEVA   :
15    PHARMACEUTICALS USA, INC., :
16    f/k/a LEMMON PHARMACEUTICALS, :
17    INC., COPLEY PHARMACEUTICALS, :
18    INC., IVAX PHARMACEUTICALS, :
19    INC., SICOR PHARMACEUTICALS, :
20    INC., and TEVA NOVOPHARM, INC.,:
21             Defendants.   :
22    ---------------x
```

Page 315

```
 1       Continued Videotaped Deposition of PAUL CHESSER,
 2    a witness herein, called for examination by counsel
 3    for Roxane in the above-entitled matter, pursuant to
 4    notice, the witness being duly sworn by SUSAN L.
 5    CIMINELLI, a Notary Public in and for the District of
 6    Columbia, taken at the offices of Kirkland & Ellis,
 7    655 Fifteenth Street, N.W., Washington, D.C., at 9:16
 8    a.m., and the proceedings being taken down by
 9    Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and
10    transcribed under her direction.
```

Page 316

```
 1    APPEARANCES:
 2
 3       On behalf of Boehringer Ingelheim and Roxane:
 4          JARED T. HECK, ESQ.
 5          Kirkland & Ellis LLP
 6          200 East Randolph Drive
 7          Chicago, IL  60601
 8          (312) 861-3452
 9
10       On behalf of Dey LP, Inc., Dey LP, Dey, Inc.,
11       Mylan, Inc., and Mylan Pharmaceuticals:
12          MICHAEL J. MALONEY, ESQ.
13          Kelley Drye & Warren LLP
14          101 Park Avenue
15          New York, NY  10178
16          (212) 808-7697
```

Page 317

```
 1    APPEARANCES CONTINUED:
 2
 3       On behalf of Bristol-Myers Squibb:  (Via phone)
 4          DIANNE M. PETERSON, ESQ.
 5          Hogan & Hartson LLP
 6          875 Third Avenue
 7          New York, New York 10022
 8           (212) 918-3000
 9
10       On behalf of Abbott Laboratories:
11          R. CHRISTOPHER COOK, ESQ.
12          Jones Day
13          51 Louisiana Avenue, N.W.
14          Washington, D.C.  20001-2113
15          (202) 879-393
```

2 (Pages 314 to 317)

Page 462

1   Q.   Now, if we go to the second paragraph, it
2   describes this multistage sampling procedure.  I
3   think we went into this last time, but can you just
4   run me through what's meant by multistage sampling
5   procedure?
6       A.   Well, the different stage -- the first
7   stage were the states.  And then within each state,
8   we selected different strata, rule changes and rule
9   independence, everything changed, and then within
10  each stratum, we selected a sample of pharmacies.  So
11  three stages.
12      Q.   Well, with regard to that second strata,
13  why did you look at the various types of pharmacies
14  differently?
15      A.   Why did we stratify on the rural, the
16  urban, the chain and independent?
17      Q.   Correct, why did you do that?
18      A.   I think that primarily stemmed from the
19  reviews that were done probably the one in '84.  Bill
20  Shrigley was still involved in that, and that was
21  part of the criticism I believe he said of that
22  review was that you didn't take into consideration

Page 463

1   that the pharmacy in the middle of Montana is at a
2   disadvantage compared to one in New York City.
3       Q.   So something -- let me start again.  Based
4   on the 1994 audit, there was some concern that
5   pharmacies at different levels, whether rural or
6   urban, or chain or independent, that they could
7   obtain drugs at different costs from the other types
8   of pharmacies, is that correct?
9       A.   No.  Based on the '84 audit.  The -- the
10  original audit.
11      Q.   Did I say '94?
12      A.   Yes.
13      Q.   Okay.  So after the 1984, there was some
14  concern that you did not express the results in terms
15  of these various different types of pharmacies in
16  different locales, is that correct?
17      A.   Correct.
18      Q.   Because there is an understanding that
19  state -- that various types of pharmacies, whether
20  geographically or chain versus independent, they
21  could obtain drugs at different discounts from AWP,
22  is that right?

Page 464

1       A.   Correct.
2       Q.   And this is the reason you provided the
3   similar stratification for the 1994 audit, correct?
4       A.   Yes.
5       Q.   And you continued to stratify based on
6   this for this 1999 audit, is that right?
7       A.   Yes.
8       Q.   Now, last time you indicated -- let's step
9   back.  How -- when you received invoices from the
10  pharmacies that were ultimately selected, how did you
11  determine which drugs you would look at on those
12  invoices?
13      A.   We looked at every drug.
14      Q.   And every drug from those invoices that
15  you happen to receive would be included in the
16  analysis for the discount of AWP, correct?
17      A.   Yes.  Unless we at some point were unable
18  to identify an AWP.
19      Q.   And where did you acquire those AWPs?
20      A.   The State of Florida provided us with the
21  price -- I think they contracted with First DataBank.
22      Q.   So was this a computer program or was this

Page 465

1   a book?
2       A.   It was an Access database file.
3       Q.   So this Access database file from First
4   DataBank, if you could find an AWP in that file that
5   corresponded to the line item on an invoice, you
6   would consider that or you would incorporate that
7   drug or that invoice into the study, correct?
8       A.   Yes.
9       Q.   Is it accurate that you didn't exclude any
10  particular types of drugs from the analysis that you
11  were performing?
12      A.   We didn't include any over the counter
13  products.
14      Q.   But if it was a legend drug or a
15  prescription drug, you would have included that in
16  this study, correct?
17      A.   And we had a price for it.
18      Q.   And if you had an AWP price for it,
19  correct?
20      A.   Correct.
21      Q.   And is it also accurate that you didn't
22  exclude any manufacturer's drugs in particular from

39 (Pages 462 to 465)

Page 614

1      MR. BEIMERS: Objection.
2      THE WITNESS: I have no idea. I mean,
3  it's -- maybe unusual is not the right word, but --
4      BY MR. COOK:
5  Q.  Surprising?
6  A.  Maybe.
7  Q.  Why would it be surprising?
8  A.  Because we don't have a -- we don't issue
9  press -- I guess we do issue press releases, but it's
10 not typical to do it by the start of an audit.  It's
11 more -- you typically see a press release announcing
12 the results of, you know --
13 Q.  Now, the information contained in this
14 magazine article in November of 1994, that
15 information would have been available from someone
16 from OIG, some people at CMS, correct?
17 A.  The 11 states that participated in the --
18 Q.  That was my next question.  It also would
19 have been available from the various people who you
20 met with in August of 1994 in Richmond, Virginia,
21 right?
22 A.  Correct.

Page 615

1  Q.  And there is nothing particularly secret
2  about the information that's contained in this
3  newspaper article, right?
4  A.  No.
5  Q.  And other than the fact that the study was
6  expanded, would you agree with me that this is a fair
7  and accurate description of the study that you
8  initiated in August of 1994?
9  A.  Yes.
10     MR. DRAYCOTT: Objection.
11     THE WITNESS: Yeah.  And the review wasn't
12 expanded.  By November, we already had it laid out.
13 Our estimate was going to be based on 48, not 60.  We
14 were taking a sample of 60, but 12 of those weren't
15 going to be included in our estimates, so even from
16 that standpoint, it's accurate.
17     BY MR. COOK:
18 Q.  Do you recall whether there was any other
19 publicity surrounding the beginning of this study?
20     MR. BEIMERS: Objection.
21     THE WITNESS: I don't recall that.
22     BY MR. COOK:

Page 616

1  Q.  Now, as the study went forward, by the
2  nature of the methodology that you used, there were
3  in each state, 60 pharmacies that became aware of the
4  study that OIG was doing, correct?
5  A.  Yes.
6  Q.  You indicated in your first day of
7  deposition that you received lots of calls from these
8  pharmacies, do you recall that?
9  A.  Sure.
10 Q.  Your name was in the letter, and your
11 telephone number, as I recall, that went to these
12 pharmacies, right?
13 A.  Correct.
14 Q.  When you spoke to these pharmacies, do you
15 have any recollection of specific conversations that
16 you had with any of these pharmacies?
17 A.  I don't know that I remember specific
18 conversations.  I do remember that -- a lot of
19 questions related to do we have to do this.
20 Q.  What was your answer to those who asked
21 whether you had to do this?
22 A.  I always told them we believed that they

Page 617

1  did.
2  Q.  Do you recall any other topics that were
3  discussed in these -- in these conversations?
4      MR. DRAYCOTT: Objection.
5      THE WITNESS: No.  Not specifically.
6      BY MR. COOK:
7  Q.  Did any of the pharmacies ask you what it
8  was that OIG was doing?
9  A.  I don't recall that being -- I mean, my
10 recollection of the letter was pretty explanatory
11 when it came to the purpose of this.
12 Q.  If any of the pharmacies had asked you for
13 additional detail about what it is that you were
14 looking into, is that something that you would have
15 been free to share with the pharmacies?
16     MR. DRAYCOTT: Objection.
17     THE WITNESS: Sure.
18     BY MR. COOK:
19 Q.  I mean, there is nothing secret about the
20 fact that you were comparing average whole sale
21 prices to pharmacy acquisition costs, right?
22 A.  Correct.

77 (Pages 614 to 617)

Page 618

1  Q. Was OIG investigating the pharmacies for
2  any kind of inappropriate conduct, for fraud, as part
3  of this investigation?
4  A. No.
5  Q. I'd like to follow up a little bit about
6  some testimony that you gave about the nontraditional
7  pharmacies. Just as a preliminary matter, are you
8  familiar with what types of products Abbott
9  manufactures that are at issue here in this lawsuit?
10  A. Not exactly. No.
11  Q. We'll get back to it in a little more
12  detail later, but I can represent to you that the
13  products that are at issue include sodium saline
14  solution, dextrose solution, vancomycin, an IV
15  antibiotic, sterile water for injection, all of which
16  -- and I'll let Justin correct me if I'm wrong -- all
17  of which can fairly be described, I think, as
18  infusion or IV fluids of some sort or another.
19      Would it be your understanding that those
20  are the types of products that would be dispensed by
21  pharmacies falling within the category of
22  nontraditional pharmacies in your study in 1994?

Page 619

1  A. I would say that the injectables did show
2  up in much more significant numbers in the
3  nontraditional category.
4  Q. As I understand it, the nontraditional
5  category was included as a separate category
6  specifically at the request of Medicaid pharmacy
7  directors who attended your August 30 and 31st, 1994
8  meeting in Richmond, right?
9  A. That is correct.
10  Q. Do you recall whether one pharmacy
11  director in particular or a group of them were
12  particularly interested in breaking out
13  nontraditional pharmacies?
14  A. I do not recall.
15  Q. What was their concern about
16  nontraditional pharmacies being included within the
17  traditional pharmacies as part of your analysis?
18      MR. BEIMERS: Objection.
19      THE WITNESS: They were concerned that,
20  when we got our list of pharmacy providers, Medicaid
21  providers, they would be in that list if we didn't
22  identify them and isolate them, they would have a

Page 620

1  chance to show up on our sample. Their belief was
2  that these pharmacies typically bought at a lower
3  discount than a typical retail pharmacy.
4      BY MR. COOK:
5  Q. Did you get a feel for whether those lower
6  discounts were a product of the nature of the
7  pharmacies, or instead a product of the nature of the
8  products that those pharmacies were dispensing?
9      MR. DRAYCOTT: Objection.
10      MS. ALBEE: Objection. Form.
11      THE WITNESS: That wasn't part of the
12  discussion.
13      BY MR. COOK:
14  Q. They just said if you include those in
15  your sample, they are going to be outliers
16  essentially on the low side?
17      MR. BEIMERS: Objection.
18      THE WITNESS: Yes. They said they are
19  going to distort our number. If they show up in our
20  sample, we'll end up penalizing -- they were trying
21  to protect the retail pharmacies.
22      BY MR. COOK:

Page 621

1  Q. And so you would agree with me that it was
2  their expectation that these nontraditional
3  pharmacies had deeper discounts than the retail
4  pharmacies, right?
5  A. Yes.
6  Q. Did they quantify that in any way during
7  this August 1994 meeting, just how much deeper the
8  discounts they expected were for nontraditional
9  pharmacies?
10  A. No.
11  Q. Did anybody describe for you in any degree
12  of generality why it was that these nontraditional
13  pharmacies got deeper discounts?
14  A. I don't recall that being part of the
15  discussion.
16  Q. Was there anybody of the Medicaid pharmacy
17  directors with whom you spoke in August of 1994 who
18  disagreed about -- with the expectation that
19  nontraditional pharmacies receive deeper discounts?
20  A. I don't recall anybody disagreeing.
21  Q. As I recall in the reports that you
22  published in 1997, and then again in 2002, the OIG,

Chesser, Paul - Vol. II                                          October 28, 2008
                           Washington, DC

                                                                    Page 622
 1   you writing, laid out the fact that the
 2   nontraditional pharmacies were excluded from the
 3   sample precisely because they were expected to have
 4   larger discounts, correct?
 5       A.   Correct.
 6       Q.   In the comments that you received or the
 7   conversations that you had with various people after
 8   those reports were published or while you were
 9   conducting the study, did anybody take issue with the
10   expectation that nontraditional pharmacies received
11   deeper discounts than retail pharmacies?
12       A.   I don't recall anybody taking issue.
13       Q.   And as you conducted your study and
14   reviewed invoice prices, did your empirical analysis
15   confirm what you had been told that nontraditional
16   pharmacies received deeper discounts than retail
17   pharmacies?
18       A.   Yes.
19       Q.   And as I understand it, you met again in
20   about September of 1995 with these Medicaid pharmacy
21   directors or their proxies who came to Richmond
22   again, right?

                                                                    Page 623
 1       A.   Yes.
 2       Q.   Am I correct that the data that you
 3   reported to those Medicaid pharmacy directors in
 4   September of 1995 confirmed what they expected to
 5   learn with respect, in general, to the difference
 6   between AWPs and acquisition costs?
 7           MR. DRAYCOTT:  Objection.
 8           THE WITNESS:  Yes.
 9           BY MR. COOK:
10       Q.   And specifically as to nontraditional
11   pharmacies, the deeper discounts that you reported to
12   these pharmacy directors from Medicaid also confirmed
13   their belief that there would be deeper discounts in
14   that nontraditional pharmacy segment, correct?
15       A.   Correct.
16           MR. DRAYCOTT:  Objection.
17           BY MR. COOK:
18       Q.   You had said in day one of your deposition
19   that one of the reasons for pulling the
20   nontraditional pharmacies out of the analysis was
21   because of criticisms that had been leveled at
22   earlier studies that included those nontraditional

                                                                    Page 624
 1   pharmacies in the sample.  Do I have that correct?
 2       A.   I don't recall that being an issue.
 3       Q.   You also said that it was a great idea to
 4   exclude the nontraditional pharmacies from the
 5   sample, to set them aside, and to exclude them from
 6   the calculations?
 7           MR. BEIMERS:  Objection.
 8           BY MR. COOK:
 9       Q.   Do you recall -- I take it from that that
10   you agreed with the notion of separating them out and
11   excluding them from the overall calculations?
12       A.   I did after we analyzed the data.
13       Q.   All right.  So you accepted it as a
14   possibility, looked at the data, and then empirically
15   determined whether the expectations of these pharmacy
16   directors was true that it would skew the results by
17   including the nontraditional pharmacies, correct?
18       A.   Yes.
19       Q.   What about the data caused you to believe
20   that the nontraditional pharmacies received deeper
21   discounts than the retail pharmacies?
22       A.   When you go look at the results.  I mean,

                                                                    Page 625
 1   almost every case the nontraditional stratum had a
 2   bigger discount.  And I don't know if that was the
 3   case in every case, but it was pretty prevalent.  And
 4   in some cases, the discounts were substantially
 5   significantly more.
 6       Q.   In the 90 percent or greater range, would
 7   it be fair to say?
 8       A.   Well, if you were looking at the
 9   multisource drugs with no pull, but I'm just talking
10   about when you go by that brand and generics --
11       Q.   And this may be a good time to turn to
12   that, but in terms of distinguishing drugs and
13   grouping drugs, I take it what you're telling me is
14   that from your empirical review of the data back in
15   1994, you saw differences between the way brand drugs
16   were priced with respect to AWP and the way generic
17   drugs were priced with respect to AWP, correct?
18       A.   Yes.
19       Q.   And then did you also see as a subset of
20   that differences between the way the drugs dispensed
21   by nontraditional pharmacies, those generics differed
22   from the generics dispensed by retail pharmacies?

                                                       79 (Pages 622 to 625)

Chesser, Paul - Vol. II                                          October 28, 2008
                                Washington, DC

Page 626

1    A.   I don't know about that. What I -- what I
2    recall about going painstakingly over every one of
3    those rows of data, that the injectables seemed to
4    have large discounts. And it was a challenge to know
5    whether you were using the correct units.
6    Q.   Could you explain that to me? How is --
7    how is that? What was the challenge there?
8    A.   Well, I went back and reviewed everything
9    where the discount was over a certain -- I don't
10   remember what percent I used, or under a certain.
11   And without a doubt, I had to go back and look at
12   more NDCs that turned out to be injectables than
13   anything else.
14        And part of the problem -- it was even a
15   challenge to go back -- I used the Red Book as my
16   reference. What they would show as the number of
17   units for a particular NDC. That was the challenge,
18   was getting -- making sure you were using the right
19   units, because if I remember right at '94, we had
20   a -- I don't think we had the package price. I think
21   we had the unit price. I think we had to convert
22   everything to unit price to be able to compare it to

Page 627

1    AWP.
2         So the challenge, when you got to the
3    injectables, was there might be, say, a thousand
4    milligrams but it's -- are there 10 of them in the
5    package or not. And that was -- and ultimately, what
6    proved to be the most reliable source for me was to
7    go to the actual invoice, and see -- read the
8    description of what the quantity was on that invoice.
9    I couldn't necessarily rely on what the Red Book
10   showed, or I think it was in 2000, '99 review, I was
11   actually trying to use First DataBank's quantity for
12   each NDC. But I spent more time on injectables than
13   anything else in my review, investigating odd
14   numbers.
15   Q.   Because if it were a thousand milliliter
16   bag, you could be off by a factor of a thousand if
17   there were no --
18   A.   20 or -- I mean, the packaging of those is
19   -- it's not the same from one reference source to
20   another. And plus, I had to look up a lot of them
21   because there were really significant discounts on
22   some of them.

Page 628

1    BY MR. COOK:
2    Q.   When you say significant discounts --
3    A.   90 plus percent.
4    Q.   The analysis that you conducted of the
5    invoices that were pulled in 1994, am I correct from
6    my review of the spreadsheets that you had largely
7    completed the analysis of those invoices and created
8    the spreadsheets and done the basic calculations by
9    April or May of -- of 1995? Or would you have to go
10   back and look at the documents to see?
11   A.   Yeah. I don't -- I don't remember.
12   Q.   Okay. You had certainly collected all
13   your data by that point, right?
14   A.   I don't even know the answer to that for
15   sure.
16   Q.   But the documents would show presumably?
17   A.   Yes.
18   Q.   And just so we are clear, when you're
19   referring to injectables, can you give me some
20   examples of what types of drugs you're talking about
21   with -- or products you're talking about with respect
22   to injectables?

Page 629

1    A.   Saline solution.
2    Q.   So dextrose solution, for example, would
3    be an injectable? Would you agree that sterile water
4    would be an injectable?
5    A.   Yes.
6    Q.   If it were an IV bag, an IV solution
7    antibiotic would be an injectable?
8    A.   Yes.
9    Q.   Do you know who Dr. Bruce Vladeck is?
10   A.   He was the administrator at CMS for a
11   little while.
12   Q.   He was the administrator from 1992 to
13   1997. Does that sound right?
14   A.   Close enough.
15   Q.   Close enough. He testified earlier in
16   this case, and testified that with respect to
17   infusion products, injectable products, such as
18   sodium saline solution, that his expectation was that
19   he would see discounts of 99 percent obtainable
20   through GPOs. Would that be consistent with the
21   empirical data that you reviewed in 1994?
22        MR. DRAYCOTT: Objection.

80 (Pages 626 to 629)

Page 630

 1       THE WITNESS: I don't -- I don't know that
 2  I looked at the data sufficiently to be able to draw
 3  that conclusion.
 4       BY MR. COOK:
 5    Q.   Would it surprise you to see discounts in
 6  the 90 percent plus range for these injectables?
 7    A.   No. It was very common.
 8    Q.   Did you find that these products tended to
 9  be expensive products?
10       MR. DRAYCOTT: Objection.
11       THE WITNESS: No. I don't think they
12  were.
13       BY MR. COOK:
14    Q.   So a bag of saline, based upon your review
15  of actual tens of thousands of pages of actual data,
16  what would you expect to pay for a bag of saline
17  solution?
18    A.   Not much.
19       MS. ALBEE: Objection. Form.
20       BY MR. COOK:
21    Q.   70 cents, a dollar?
22    A.   Oh, I don't -- it's been too long.

Page 631

 1    Q.   I'm told that we need to change the tape,
 2  so it's a good time for a break.
 3       THE VIDEOGRAPHER: This concludes volume
 4  II, tape three, in the deposition of Paul Chesser.
 5  Off the record at 4:29.
 6       (Recess.)
 7       THE VIDEOGRAPHER: Here begins volume II,
 8  tape four, in the deposition of Paul Chesser. On the
 9  record at 4:34.
10       BY MR. COOK:
11    Q.   Just in terms of timing, so I can place us
12  in time, Mr. Chesser, the OAS investigation into the
13  difference between average wholesale price and
14  pharmacy acquisition cost was begun sometime prior to
15  August of 1994, correct?
16    A.   August of '94 is when we had the meeting
17  with the state folks in Richmond, so sometime barely
18  before that.
19    Q.   All right. So I'm just trying to get sort
20  of a starting point of when the investigation
21  commenced. Is there a formal commencing of an
22  investigation, a document or an event that you sort

Page 632

 1  of look at as commencing an investigation?
 2       MR. BEIMERS: Objection.
 3       THE WITNESS: In this case, no. And at
 4  that time no. When we do -- we do audit start
 5  notices a lot currently. I don't know that we did
 6  them always at that time.
 7       BY MR. COOK:
 8    Q.   Certainly by August 30th of 1994, in this
 9  case, you had commenced your audit, correct?
10    A.   Correct.
11    Q.   Is there a difference, and I don't know
12  the answer, is there a difference between an audit
13  and an investigation in OIG parlance?
14    A.   Yes.
15    Q.   What is the difference?
16    A.   Well, we have in addition to the Office of
17  Audit Services, we have an Office of Investigations.
18  These are all special agents who are criminal
19  investigators who work on criminal as well as civil
20  cases. And a lot of times in conjunction with the
21  Department of Justice.
22    Q.   And what's an audit as opposed to an

Page 633

 1  investigation?
 2    A.   An audit is just looking to see whether
 3  some criteria has -- is being complied with or not.
 4  Not necessarily whether it's legal or illegal. It's
 5  just whether it's economic -- economical and
 6  efficient way to provide services, or something along
 7  those lines.
 8    Q.   So you're still investigating it in the
 9  sense that you're looking at facts, but you're not
10  necessarily investigating it because someone has made
11  an accusation of improper conduct?
12    A.   Correct. We are not looking for criminal
13  or civil.
14    Q.   Do you have any procedure that you -- that
15  you use when you come across evidence of fraud or
16  abuse in the course of an audit?
17    A.   Yes. I personally haven't had to deal
18  with that, but we are supposed to contact OI
19  immediately because the rules of evidence are
20  different when you're in a criminal environment than
21  they are during an audit.
22    Q.   In the course of your 1994 investigation,