# EXHIBIT AC

Reed, Larry                                                September 26, 2007
                              Baltimore, MD

Page 1

```
             UNITED STATES DISTRICT COURT

           OF THE DISTRICT OF MASSACHUSETTS

------------------------------x

IN RE:  PHARMACEUTICAL        :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :   CIVIL ACTION

PRICE LITIGATION              :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-A-Care of    :   Judge Patti B.

The Florida Keys, Inc.,       :      Saris

           Plaintiff,         :

     vs.                      :

ABBOTT LABORATORIES, INC.,    :   Chief Magistrate

No. 06-CV-11337-PBS           :   Judge Marianne B.

           Defendants.        :      Bowler

------------------------------x

                       VOLUME I

              Baltimore, Maryland

              Wednesday, September 26, 2007

Videotape Deposition of:

           LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing
```

Reed, Larry                                                                September 26, 2007

Baltimore, MD

|  | Page 2 |
|---|---|
| 1 | at 9:26 a.m., at the law offices of |
| 2 | Hogan & Hartson, 111 South Calvert Street, |
| 3 | Baltimore, Maryland, before Dawn A. Jaques, |
| 4 | Certified Shorthand Reporter and Notary Public in |
| 5 | and for the State of Maryland, when were present |
| 6 | on behalf of the respective parties: |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | (CAPTIONS CONTINUED) |

|  | Page 4 |
|---|---|
| 1 | IN THE COURT OF THE SECOND JUDICIAL CIRCUIT |
| 2 |    IN AND FOR LEON COUNTY, FLORIDA |
| 3 | THE STATE OF FLORIDA |
| 4 | ex rel. |
| 5 | -----------------------------x |
| 6 | VEN-A-CARE OF THE FLORIDA   : |
| 7 | KEYS, INC., a Florida       : |
| 8 | Corporation, by and through : |
| 9 | its principal officers and  : |
| 10 | directors, ZACHARY T.       : |
| 11 | BENTLEY and T. MARK JONES,  : |
| 12 |      Plaintiffs,   : |
| 13 |      vs.           : |
| 14 | MYLAN LABORATORIES, INC.,   : Civil Action No.: |
| 15 | MYLAN PHARMACEUTICALS, INC.,: 98-3032G |
| 16 | NOVOPHARM LTD., SCHEIN      : |
| 17 | PHARMACEUTICAL, INC., TEVA  : Judge William L. |
| 18 | PHARMACEUTICAL INDUSTRIES   :    Gary |
| 19 | LTD, TEVA PHARMACEUTICAL USA,: |
| 20 | WATSON PHARMACEUTICALS, INC.,: |
| 21 |      Defendants.   : |
| 22 | -----------------------------x |

|  | Page 3 |
|---|---|
| 1 |     IN THE CIRCUIT COURT |
| 2 |   OF MONTGOMERY COUNTY, ALABAMA |
| 3 | ------------------------x |
| 4 | STATE OF ALABAMA,       : |
| 5 |    Plaintiff,   : Case No. |
| 6 |    vs.          : CV-05-219 |
| 7 | ABBOTT LABORATORIES,    : |
| 8 | INC., et al.,          : Judge Charles |
| 9 |    Defendants.  :    Price |
| 10 | ------------------------x |
| 11 | |
| 12 | |
| 13 |  IN THE CIRCUIT COURT OF THE FIRST CIRCUIT |
| 14 |         STATE OF HAWAII |
| 15 | ----------------------------x |
| 16 | STATE OF HAWAII,        : |
| 17 |    Plaintiff,   : Case No. |
| 18 |    vs.          : 06-10720-04-EEH |
| 19 | ABBOTT LABORATORIES, et al., : Judge Eden |
| 20 |    Defendants.  : Elizabeth Hifo |
| 21 | ----------------------------X |
| 22 | |

|  | Page 5 |
|---|---|
| 1 |  FRANKLIN CIRCUIT COURT - DIVISION II |
| 2 |     CIVIL ACTION NO. 03-CI-1134 |
| 3 | |
| 4 | -----------------------------X |
| 5 | COMMONWEALTH OF KENTUCKY,   : |
| 6 |     Plaintiff,   : |
| 7 |     vs.          : Judge |
| 8 |                  : Crittenden |
| 9 | ABBOTT LABORATORIES, INC.,  : |
| 10 |     Defendant.   : |
| 11 | -----------------------------X |
| 12 | |
| 13 |  STATE OF WISCONSIN CIRCUIT COURT |
| 14 |          DANE COUNTY |
| 15 |           Branch 9 |
| 16 | ------------------------x |
| 17 | STATE OF WISCONSIN,    : |
| 18 |     Plaintiff,  : |
| 19 |     vs.         : Case No. |
| 20 | AMGEN, INC., et al.,   : 04-CV-1709 |
| 21 |     Defendants. : |
| 22 | ------------------------x |

2 (Pages 2 to 5)

Henderson Legal Services
202-220-4158

Reed, Larry                                                September 26, 2007
Baltimore, MD

**Page 70**

1   the DVA prices.
2     Q.  Because the Department of Veterans
3   Affairs purchases drugs directly from drug
4   manufacturers, correct?
5     A.  I'm not sure if it's directly or if
6   it's through contracts, through a wholesaler.  I
7   don't know.
8     Q.  Have you had any involvement with those
9   purchases at all?
10    A.  Involvement in what way?
11    Q.  Negotiating prices with manufacturers
12  and Department of Veterans Affairs.
13    A.  No.
14    Q.  Do you know the individual who is
15  responsible for that?
16    A.  I know some individuals that work on
17  that program.  I know at least -- I'll correct
18  that now.  At this point, I know one individual.
19    Q.  And who is that?
20    A.  Mel Noel.
21    Q.  Now, average manufacturer's -- average
22  manufacturer prices were something that were

**Page 71**

1   defined by statute, correct?
2     A.  They were defined by statute and
3   further defined by rebate agreement and other --
4   other guidance that was issued by the agency.
5     Q.  There has been, over the years, some
6   uncertainty with how average manufacturer --
7   average manufacturer prices should be calculated,
8   correct?
9         MS. MARTINEZ:  Objection to form.
10        THE WITNESS:  There have been questions
11  about how to calculate average manufacturer
12  price.
13  BY MR. TORBORG:
14    Q.  And CMS provided guidance to
15  manufacturers to resolve those uncertainties,
16  correct?
17    A.  Again, there would be a definition in
18  the rebate, there would be things called
19  manufacturer releases that would address AMP, and
20  most recently, there is a notice of proposed
21  rulemaking and a final reg that define AMP.
22    Q.  You refer to manufacturer releases.

**Page 72**

1   Can you tell me what those are?
2     A.  Manufacturer releases are documents
3   that are put out by the agency, sub-regulatory
4   guidance that address certain issues in the Drug
5   Rebate Program for states and manufacturers.
6     Q.  Are those done on a regular periodic
7   basis or as needed when issues arise?
8     A.  They're done as needed.
9     Q.  Do you have an estimate of how many of
10  those releases have been issued since inception
11  of the program?
12    A.  Of manufacturer releases?
13    Q.  Yes.
14    A.  I don't, no.  I don't have an estimate.
15    Q.  If you had to ballpark, is it more than
16  10?
17    A.  It's more than 10.
18    Q.  More than 25?
19    A.  You're closing in real quick on how
20  much I know here.  It's more than 25, but I --
21  roughly that's probably the best I could do.
22  It's --

**Page 73**

1     Q.  Somewhere between 25 and 50 is your
2   best estimate?
3     A.  No.
4         MR. HERNANDEZ:  Objection, form.
5         THE WITNESS:  But they're listed on our
6   website, so it's a fairly easy matter to go back
7   and say exactly how many they are.  They're both
8   -- they're -- again, they're on our website.
9   BY MR. TORBORG:
10    Q.  Average manufacturer prices were
11  defined to include the impact of any discounts or
12  rebates; is that right?
13    A.  Average manufacturer price would
14  include discounts to -- that affected the price
15  to the retail class of trade, certain discounts.
16    Q.  Were you involved in drafting the
17  legislation or commenting on the legislation such
18  that those discounts and rebates would be
19  included in the calculation?
20    A.  I don't remember my involvement on that
21  level of detail.
22    Q.  But someone thought to define AMP to

19 (Pages 70 to 73)

Henderson Legal Services
202-220-4158

6beda74d-d4ef-4589-b133-19d88d943a5d

Reed, Larry  September 26, 2007
Baltimore, MD

Page 74

1  include the impact of discounts and rebates; is
2  that fair to say?
3       MS. MARTINEZ:  Objection to form.
4       THE WITNESS:  The rebate definition
5  does I believe have a -- have language in it that
6  addresses that issue.
7  BY MR. TORBORG:
8     Q.  I've heard something -- I've seen
9  something in the documents to something called
10 the Medicaid Bureau?
11    A.  Correct.
12    Q.  What is that?
13    A.  The Medicaid Bureau was a precursor,
14 predecessor of -- in the agency that had
15 responsibility for the Medicaid issues.
16    Q.  And did that entity change its name at
17 some point?
18    A.  At some point it did.  It changed its
19 name to the Centers for -- the Center for
20 Medicaid & State Operations.
21    Q.  And you worked within that
22 organization, correct?

Page 75

1     A.  Which one?
2     Q.  Both the Medicaid Bureau and the Center
3  for Medicaid & State Operations?
4     A.  Correct.
5     Q.  I want to go back -- I sort of got off
6  track.  I wanted to go back to tracing through.
7          I believe you said in 1995 you took a
8  different position in connection with the
9  reorganization of HCFA, correct?
10    A.  Correct.
11    Q.  Was your job basically the same even
12 though the reorganization had shifted your title
13 and perhaps the division you worked in?
14    A.  It was a bit different.  A technical
15 director has non-management responsibilities, and
16 there were other areas in the new -- new group --
17 I'm sorry, I can't -- just can't remember the
18 name of that group -- that I also worked on.
19    Q.  What do you mean by "non-management
20 responsibilities"?
21    A.  There's two tracks basically.  There's
22 a division director, which has personnel and

Page 76

1  management responsibilities, and a technical
2  director, which has technical and expert
3  responsibilities, if you will.
4     Q.  And you took this position in 1995.
5  How long did you have that job?
6     A.  Technical director -- there's been
7  various permutations since that time of being a
8  technical director or a division director, and at
9  this point, I am a technical director.
10    Q.  Even today?
11    A.  Again, with different -- different, if
12 you will, stops in between.
13    Q.  What stops in between are there?
14    A.  A technical director, and for a while I
15 served as the director -- the deputy director of
16 the division, I had responsibility for this area,
17 and, for a short while, as a director.
18    Q.  When you say "this area," do we mean
19 drug reimbursement?
20    A.  Among other areas, correct.
21    Q.  What other areas?
22    A.  Hospital reimbursement, upper payment

Page 77

1  limits.
2     Q.  Upper payment limits, is that something
3  that relates to drugs?
4     A.  Upper payment limits does relate to
5  drugs and it does relate to other services within
6  the Medicaid program.
7     Q.  Okay.  And when did you have that
8  position?
9     A.  Which one?
10    Q.  The deputy director position.
11    A.  Deputy director was early -- the early
12 2000s.  Around 2002, it was a team -- a team that
13 reported to the head of CMSO, with two team
14 leaders that was separated out of that group.
15    Q.  Is that something called the pharm
16 team?
17    A.  Correct.  It was called the pharmacy
18 team at that point?  Yes, it was.
19    Q.  When did the pharm -- the pharmacy team
20 start?
21    A.  The pharmacy team was -- started around
22 mid 2002.

20 (Pages 74 to 77)