# TAB 1

NO. GV3-03079

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| ex rel. VEN-A-CARE OF THE FLORIDA KEYS, INC., Plaintiff(s), | ) | |
| vs. | ) | TRAVIS COUNTY, TEXAS |
| ROXANE LABORATORIES, INC., BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., BEN VENUE LABORATORIES, INC., and BOEHRINGER INGELHEIM CORPORATION, Defendant(s). | ) | 201ST JUDICIAL DISTRICT |

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

SHELDON BERKLE

JANUARY 27TH, 2005

VOLUME 1 OF

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF SHELDON BERKLE, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on the 27th of January, 2005, from 9:01 a.m. to 5:15 p.m., before CAROLYN J. FORD, Registered Professional Reporter and Notary Public, State of Florida at Large, reported by machine shorthand at the Doubletree Guest Suites, 12200 Tamiami Trail North, Naples, Florida, pursuant to the Texas Rules of Civil Procedure and the provisions attached previously.

**have or not have.**

Q Let me see the organizational chart.

MR. BREEN: What's our next exhibit number?

MR. CRAWFORD: 139.

MR. McCONNICO: It should be a lot more than that. It sure seems like we're past that.

MR. CRAWFORD: We can skip 100 if you want to, I guess.

MR. COVAL: This is the second case.

MR. BREEN: 139, you said?

MR. CRAWFORD: 139, I believe.

(Exhibit No. 139, Organizational Chart, was marked for identification.)

Q [By Mr. Breen] I'm going to hand you Exhibit 139.

MR. COVAL: Is there a Bates on that?

MR. BREEN: Yes, sir. It's ROX-01438

MR. COVAL: Thank you.

MR. BREEN: Sure.

Q [By Mr. Breen] Have you ever seen this before?

**A I'm sure I probably have seen it. I mean, I don't recall specifically seeing this particular layout, but certainly I'm familiar with organization charts.**

Q You -- you see you're -- you're on there as executive VP --



**A Correct.**

Q -- BU Ethical Pharmaceuticals, S. Berkle?

**A Correct.**

Q That's you; right?

**A That's me.**

Q That would be the business unit?

**A Yes, that's correct.**

Q And the business unit was basically Boehringer Ingelheim, Roxane Laboratories -- Boehringer Ingelheim being BIPI, Boehringer Ingelheim Pharmaceuticals, Inc., the U.S. company and later Ben Venue Laboratories all rolled into one?

**A The business unit concept which, by the way, was changed subsequently. You know, I'm not sure I would have 100 percent agreement on this. As an example where it has under me BV and RLI multisource, T. Russillo --**

Q Yes, sir.

**A -- that really should have been a dotted line as opposed to a straight line.**

Q Why?

**A Because I didn't have exclusive responsibility for that end of the business. I had a strategic responsibility, but not an operational day-to-day responsibility.**

Q So if the -- well, this -- because that's the



generic business. Is that what you're saying?

**A Correct.**

Q So who was minding the store when it came to the generic business from a sales and marketing perspective?

**A There was a chief executive of Roxane Laboratories.**

Q Who was that?

**A That was -- at that point it would have been Mr. Jerry Wojta. And for Ben Venue, which is also mentioned, that's what BV stands for, that was Mr. Tom Russillo.**

Q So who was responsible for making sure that the German executives in Ingelheim understood what they needed to understand regarding this business of reporting prices that were pertinent to state Medicaid reimbursement?

**A I think you're being too specific. I think the responsibility for information flow to the German parent company laid in the hands of the CEO which was Mr. Gerstenberg.**

Q Was Roxicodone a branded pharmaceutical?

**A No, it was not.**

Q Then why was it represented to be a branded pharmaceutical?

**A And I'm not clear on who would make that representation. I have no idea who would make that**



**representation.**

Q So if they --

**A It may have been stated as a branded generic, but certainly in my life, in my pool, it would not be considered a branded pharmaceutical.**

Q How would it be reimbursed by the Medicaid programs, as a brand or a generic?

**A I have no idea because I wasn't involved with that business.**

Q Who had primary responsibility for the Boehringer U.S. operations advertising budget when you were the vice -- senior vice president for sales and marketing?

**A Are you referring to the branded business or the generic business?**

Q Were there two different budgets?

**A Absolutely.**

Q So when the budgets were reported to and approved by the German executives, you sent two budgets up, one for brands and one for generics?

**A Absolutely.**

Q Okay. So who's responsible for the advertising budget for generics?

**A Again, when I was still employed, the last person would have been Mr. Tom Russillo as the president of Roxane and Ben Venue Laboratories.**

Q And who was responsible for the advertising budget for brands?
A **Myself.**
Q Now, are you aware that the budget for advertising and marketing for the Boehringer Ingelheim U.S. operations was substantially greater than the budget for research and development during the years that you were the executive -- or the vice president for sales and marketing?
MR. McCONNICO: Objection; form.
A **I'm certainly -- you know, I'm not aware of that at all and I'm not sure. Are you referring -- again, are you referring to branded business? Are you referring to generics business?**
Q [By Mr. Breen] Well, let's take the branded business since you had control of that budget.
A **Right.**
Q What was bigger, the budget for advertising or the budget for research and development?
A **Research and development.**
Q How about the generic side?
A **I have no idea.**
Q Did you ever supervise Judy Waterer?
A **No.**
Q She was not in your chain of command?



A **Correct.**
Q How about Christine Ferrara?
A **Again, she reported into someone who reported to me.**
Q Did Judy Waterer report to somebody that reported to you?
A **Again, for a period of time when I had a dotted relationship with Roxane, in other words, through about 1999. After that, not.**
Q Did you ever have responsibility for Roxane's ipratropium bromide meter dose inhaler?
A **No.**
Q Don't know anything about it?
A **I did not say I didn't know anything about it. I'm most certainly aware that they launched a generic version of a brand Atrovent that I was responsible for in the United States.**
Q You were responsible for the brand Atrovent; correct? God bless you.
A **Right.**
Q God bless you. So you never conveyed any orders or directions from the German executives to Judy Waterer or anybody else regarding the Roxane meter dose inhaler?
A **I did not convey orders. I may have been involved in discussions, but never being -- I was not**



**responsible for conveying orders.**
Q Why would you be involved in discussions about Roxane's meter dose inhaler between the German parent executives and people at Judy Waterer's level?
A **Again, it wouldn't have been with Judy Waterer's level, at her level. It would have been with superiors to her. So, again, I would be involved in discussions because, again, we marketed Atrovent, the brand. And Roxane was a sister company. And, therefore, there was cross fertilization of general information about our experiences with Atrovent.**
Q Who was Roseann Press?
A **Roseann Press was my administrative assistant.**
Q Was the Combivent meter dose inhaler a brand or a generic?
A **A brand.**
Q Was the proposed Combivent unit dose product a brand or a generic?
A **Again, if we're talking about Combivent as a unit dose, a potential unit dose vial form of -- available form to deliver the medication, then that in my mind is a brand.**
Q So the Atrovent unit dose product --
A **Uh-huh.**
Q -- that was a brand; correct?



A **Correct.**
Q And you were responsible for it?
A **Yes.**
Q Including any arrangements to deeply discount it to hook big clients?
A **I'm -- I'm not aware of anything referring to that.**
Q You don't know Rick Powell, do you?
A **I'm sorry?**
Q You don't know Rick Powell, do you?
A **I never heard of him.**
Q Never heard of him?
A **No.**
Q Ever heard of RDI, a respiratory -- a respiratory company RDI?
A **Again, I'm aware of the name, but I don't know any details.**
Q Ever heard of Accurate Pharmacy?
A **No.**
Q Well, who -- who approved the prices that the branded products that you were responsible for in the sales and marketing business could be sold at?
A **Again, they would have to have the approval of the CEO, Mr. Gerstenberg, and with the parent company.**
Q For the branded products?

Q And we have -- if you can go to the top of it which is the text of this e-mail that we're referring to, did you prepare this?

**A Again, I can't remember specifically that I prepared this. I don't know. I can't remember the details, but I assume that if my signature is there that certainly I would be aware of the fact that that memo would say going out.**

Q Well, this is an e-mail. It's not really signed but it says "Regards, Shelly"; do you see that?

**A Yes.**

Q Was that common for you to dictate something, have Ms. Press send it --

**A Yes.**

Q -- under your -- with your name under it?

**A Yes.**

Q All right. Did she ever do that to your knowledge without your authority?

**A No.**

Q She didn't impersonate Shelly, she did what you told her to; right?

**A Absolutely.**

Q Okay. So it says (as read): We just received word from Ingelheim.

Now Ingelheim being the executives of the German



parent corporation in Ingelheim; correct?

**A Correct.**

Q (As read): That we have to revise our 1997 budget and long-term sales forecast.

**A Uh-huh.**

Q Do you recall the German executives telling you that you must revise your 1997 budget and long-term sales forecast?

**A No, I don't recall that.**

Q Would that be unusual for them to say something like that?

**A I think in any budget procedure you have a lot of back and forth before the final budget is approved. So I think it's quite a norm -- normal thing to occur within budget discussions.**

Q Why couldn't the U.S. corporations just approve their own budget?

**A Again, I think any business where you have a parent company, a multi-national company, the parent has the ultimate authority in approving budgets on a worldwide basis. I think that's norm within business. I don't care whether it's pharmaceuticals or otherwise.**

Q Even the details of the -- of the business plan?

**A I don't know what you mean by details.**

Q Well, let's look at this a little further then.



(As read): Although I have not received the details in writing, this has been communicated to me verbally. As a forewarning some of the things we will have to review include --

What kind of details were you waiting for?

**A Details, again, I think is all relative. Certainly within any budget you would have different departmental, different functional expense areas. You would have sales forecasts for the major products. And that's what I would interpret as meaning details. Not if, you know, this person should do that or that person should do that, that's not the type of thing that they would get involved in.**

Q All right. The first one says (as read): Removal of -- how do you pronounce that?

**A Enlimomab.**

Q (As read): Enlimomab for the planning period.

What was enlimomab?

**A Enlimomab was a product within research at the early stage development within the R&D area of Boehringer Ingelheim. It happened to be a U.S. discovered product. And obviously what -- you know, again, I can't remember specifically, but it would have been a product that perhaps development would occur outside of the existing planning period.**



Q Was what was that drug for?

**A I can't even recall.**

Q Did it ever come on line?

**A No, it did not.**

Q Do you know why?

**A I assume the clinical data did not warrant advancing it through to the regulatory stage.**

Q (As read): Review of melo --

**A Meloxicam.**

Q -- meloxicam sales forecast. What is meloxicam?

**A Meloxicam was -- is -- was and is marketed under the brand name MOBIC. It is used for arthritic conditions.**

Q So what would they mean by review the sales forecast for the MOBIC or meloxicam drug?

**A Again, there would have been discussion between the U.S. operation and the parent company as to what the market potential would be for that product. So, again, that's part of the normal process of finalizing budgets.**

Q The next one (as read): Adjustment of introduction of ipratropium MDI, Roxane, from April 1, 19 -- April 1st to October 1st, 1997 with the resultant implications for both Roxane and BIPI budgets, both sales and promotional expenses.

Do you see that?

A Yes, I do.
Q Why are you telling the generic side or conveying information that the German executives say you're going to have to do about a generic product? Why are you involved in conveying that information?
A Again, this happens to be a generic product of a Boehringer branded product. And as a result there are obvious implications for the branded product once -- excuse me, the generic is launched. And it was natural for the sister companies to have -- share information and convey -- the branded company to convey their experience of the marketplace to their sister company.
Having responsibility for the strategic responsibility for the business unit which was in existence at that time, then I would facilitate discussion between the two units. But anything beyond that in terms of the specific details of the generic launch were established by the Roxane organization.
Q Number four (as read): Review of Persantin, slash, ASA press.
A Right. That -- that refers to a branded product Aggrenox which was being scheduled for launch within the planning period.
Q What do the German executives at Ingelheim, Germany have to do with the price of that particular drug



in the United States?
A Again, the parent company had to agree to the establishment of price -- launch prices for any branded product.
Q All right. Do they have to agree to any price reductions for a branded product?
A In most cases we would inform them certainly from an informational point of view. Sometimes they got involved, sometimes they didn't get involved. And, again, in my experience in my tenure in the United States, I'm not aware of reducing prices within the branded marketplace.
Q If prices had been reduced in the branded marketplace, would it have been your responsibility to take action to modify reports of those prices that were used for government reimbursement programs?
A Again, people in my organization would have made recommendations which I would approve if that was to occur.
Q Would you have ever allowed a situation to occur in the branded side where the price of a brand was reduced, but you didn't tell the entities reporting those prices to the government so that you could keep the reimbursement up even though the price went down?
A Well, I can say that if that was ever to happen



that would never occur.
Q Wouldn't occur?
A Absolutely not.
Q Would you allow it to occur?
A Absolutely not.
Q Okay. Now, moving down to review of Duraclon --
A Yes.
Q -- in the Roxane forecast. What's Duraclon?
A Duraclon was a branded product. It was an injectable quantity. And at that point in time Roxane marketed predominantly multisource products, generic products, but they also had some branded products in their line. At a later date when we reorganized, any branded products were taking out -- taken out of the Roxane line.
Q But at this particular point in time in 1996, if Roxane was working with a branded product, then you would have some operational responsibility for marketing with respect to that product?
A Correct.
Q Okay. And then review of the tam --
A Tamsulosin.
Q -- tamsulosin price.
A Correct. Tamsulosin is marketed under the trademark Flomax.
Q That's a brand?



A Branded product.
Q This was your personal request. And then, seven (as read): Inclusion of up to date Mirapex forecast?
A Mirapex is a branded product used in the treatment of Parkinson's disease.
Q And then (as read): Tentative revision of Combivent introduction. I'll have to feed this into you.
A Again, Combivent is a branded product and we were looking towards trying to develop data sufficient for regulatory approval.
Q And then it goes on to number nine (as read): Review and confirmation of all product pricing long term. Ed, please review this for Roxane. I would like to see all the recommended pricing for BIPI.
A Right. So, in other words, I'm conveying the message that I received from parent company, but I'm saying Ron -- Ed, the Roxane multisource products, that's your responsibility. Anything to do with the branded products, you know, or relative to BIPI I would look at. But it doesn't indicate that I would be looking at the generic prices.
Q Well, Ed Tupa is the Ed here; right?
A Correct.
Q So when you say to Ed, Look at this for Roxane, you knew that Roxane also manufactured some brands; right?

as head of marketing and sales vice president. And I'd ask that you explain to the Court and the jury that if you were not the most senior executive in the area of marketing and sales during your last years at Boehringer Ingelheim Corporation, why is it that you are identified as such on the corporate data sheets that I've handed to you and on the e-mail correspondence from the corporate counsel's office?

**A Again, if you look at these exhibits, 144, it identifies me as vice president head of marketing and sales ethical pharmaceuticals. Ethical pharmaceuticals refers to the branded pharmaceuticals. That is a common term used within the industry to refer to branded pharmaceuticals. The others state prescription medicines, but in the world of Boehringer Ingelheim, prescription medicines is the branded medicine business. At that point -- at this point in time there was another individual responsible for the multisource generic business in the United States referring both to Roxane Laboratories and Ben Venue Laboratories who I had responsibility.**

Q All right. Well, since Boehringer Ingelheim Corporation was the senior parent in the United States --

**A Yes.**

Q -- you've agreed to that; right?

**A Correct.**



Q Can you please identify on the corporate data sheets which list the officers and directors of Boehringer Ingelheim Corporation anybody else that had responsibility for sales and marketing at the senior executive level for Boehringer Ingelheim Corporation?

**A Again, this -- my knowledge is that this -- from my point of view this refers to the branded business. And my responsibility at this point in time was strictly for the branded business, period.**

Q In passing information through from the German parent from time to time, it was relevant to the generic business?

**A Prior to this, but not subsequent to this.**

Q In other words, once you became the vice president for sales and marketing of the corporate American parent, you no longer had any responsibility for passing information down the chain that might relate to the generic side; but before you were the vice president for the corporate parent, you did have that responsibility?

**A I would like to clarify that because I don't agree with your statement. At this point in time it identifies me as head of marketing and sales, either ethical pharmaceuticals or prescription medicines, which refers to the brand business, period.**



**Prior to this point in time, I headed what they called the business unit which involved pharmaceuticals in general. And I had a strategic involvement with both the branded business and the multisource, but not a day-to-day operational responsibility for the multisource business.**

Q When did you stop having a marketing and sales executive responsibility for the business unit that you just testified about?

**A It was approximately the time of these memos. I can't remember precisely, but I know it was around 2000.**

Q Okay. So up until 2000 you had a marketing and sales executive responsibility to some degree for the business unit including the generic pharmaceuticals?

**A Correct.**

Q Did your job function change significantly in 2000 when you were appointed vice president for sales and marketing for Boehringer Ingelheim Corporation?

**A It changed substantially in the sense that I no longer had any relationship to the generic or multisource business.**

Q Let me show you what's been -- what we marked. We'll have this one marked first.

MR. BREEN: Pardon me? Yeah. I'll get it.

(Exhibit No. 149, New Release, was marked for identification.)



MR. COVAL: 149, is that correct?

MR. McCONNICO: Cynthia, do you have a copy of this 149?

MR. BREEN: Yeah. I'm sorry. I thought I handed it to you.

MR. McCONNICO: Thank you.

Q [By Mr. Breen] This purports to be a news release or immediate release Bates stamped B-I-C J-U-R-I-S 0037 and 0038. It says (as read): Boehringer Ingelheim announces changes in U.S. ethical pharmaceutical business unit, dated January 28, 1999, Ridgefield, Connecticut.

**A Okay.**

Q Now, did you -- were you responsible for this news release?

**A I -- I would say yes.**

Q As a matter of fact, you're -- you're -- it says (as read): With the recent acquisition of Ben Venue Laboratories, Inc., Sheldon Berkle, executive vice president and head business unit, Ethical Pharmaceuticals, Boehringer Ingelheim Corporation, USA has announced some recent changes in the business unit.

Do you see that?

**A Yes, I do.**

Q And even the title says (as read): Boehringer Ingelheim announces changes in U.S. ethical pharmaceutical

Roxane's generic ipratropium bromide as being of the same quality as Boehringer's brand Atrovent?

**A Again, I'm not aware of the details that would have been used in the marketing statements by Roxane.**

MR. BREEN: Let's have this one marked as the next exhibit. I'll give you yours first, Steve.

MR. McCONNICO: Thanks. I appreciate, Jim.

MR. COVAL: 150?

THE COURT REPORTER: Yes.

(Exhibit No. 150, E-mail dated 10/20/97, was marked for identification.)

Q [By Mr. Breen] This is Bates labeled ROX 5980. It purports to be an e-mail from Edward Tupa dated Monday, October 20th, 1997, to Dr. Kirk Shepard, to Jim King, to various other individuals one of whom is Mr. Shelly Berkle. Now, Dr. Kirk Shepard, where did he work?

**A He -- he worked in Connecticut.**

Q The same thing --

**A -- the Connecticut office.**

Q The same with Dr. Wolfgang Baiker?

**A Yes.**

Q Were they U.S. nationals or were they over here from the German parent?

**A Dr. Baiker was from the German parent working within the U.S. organization. Dr. -- Dr. Shepard is a**



**national.**

Q And you see that one of the addressees is a Mr. Feldman, Richard Feldman?

**A Correct.**

Q A copy went to your administrative assistant, Roseann Press?

**A Uh-huh, yes.**

Q A copy went to Judy Waterer of Roxane?

**A Yes.**

Q And the subject is BUOC. Do you know what BUOC is?

**A Business unit operating committee.**

Q Now, this business unit operating committee was a committee involved in operations; right?

**A Yes. But, again, more on a strategic level as opposed to a detailed level.**

Q And this is when you were the executive vice president for sales and marketing for the business unit; correct?

**A Yes.**

Q So -- but that's -- but you didn't have any operational responsibility for multisource?

**A Correct.**

Q Even though -- and multisource then was never part of the business unit operating committee's agenda;



correct?

**A Again, not in the details. Dr. Shepard sat on that committee. And, again, I don't recall this memo at all and it doesn't necessarily mean that this subject would have been discussed at the operating committee.**

Q All right. Well, let's read the memo. It says (as read): As a miscellaneous item, I need to bring up a topic at BUOC regarding our difficulty maintaining the ipratropium bromide UDV business. We have known that Dey came in with the advantage of a bundle of three products, ipratropium, albuterol and cromolyn, as well as a more user-friendly package and these advantages would be difficult for us to compete with. We assumed that the home care market would be their greatest opportunity. That turned out to be true at the beginning. We did not expect they would be able to carry the same clout over the hospital and retail side. That no longer appears to be a valid assumption. Our market share in these later markets is falling significantly.

Is that something that you were -- had any interest in as the executive vice president for sales and marketing of the business unit?

**A Again, in the case of ipratropium which was a unique case because the branded product was marketed by Boehringer Ingelheim Pharmaceuticals. There was a sharing**



**of information to make sure everybody on both sides -- in other words, both with Roxane and Boehringer, knew it was occurring in the marketplace. But anything to do with the establishment of pricing was decided within the Roxane organization, had to be approved by the CEO of the Roxane -- or the president of the Roxane organization. And, again, opinions would perhaps be offered between the two sister companies, but wouldn't necessarily dictate what occurred within the Roxane organization.**

Q Well, okay. So Mr. Tupa is talking about the significant declining of the market share for the ipratropium UDV business; do you see that?

**A Yes, I do.**

Q Is that the brand Atrovent business or is that the multisource ipratropium business or is it both?

**A I would -- I would assume it refers to the Roxane business because he had responsibility for the multisource and not for the branded.**

Q It goes on to say (as read): We now need to bring greater strength to our offering by utilizing the power of the BIPI and Roxane respiratory products.

Do you see that?

**A Yes, I do.**

Q Now, what respiratory products -- what multisource respiratory products did BIPI offer?

A None.
Q So is he talking about multisource there or is he talking about brand?
A He would, I assume, be referring perhaps to Atrovent. But, again, what he says and what was, you know, ultimately done isn't necessarily the same thing. He would have no responsibility for the branded product. Again, because there was a constant sharing of information, there could be suggestions from one to the other but not necessarily acted upon.
Q Let me go on. It says (as read): This is in keeping with our strategic imperative to be a leader in respiratory products.
Do you see that?
A Yes, I do.
Q Did he make a misrepresentation when he said that?
A In which way?
Q Well, was -- did -- did Boehringer have a strategic imperative to be a leader in respiratory products?
A I think we discussed that already. There was a global strategy to be a world leader in respiratory products. Roxane was one small cog within that strategy.
Q It goes on to say (as read): What I propose is a



rebate to wholesalers and central warehousing drug chains, amount to be still being worked on, but one percent as a target, to commit to all of our respiratory products.
Do you see that?
A Yes, I do.
Q (As read): This move would offset the advantages Dey brings to the market. We have seen what the move of a major wholesaler from our product on their, quote, source program to Dey has done to sales. We must find a means to bring this business back. I believe the bundle rebate would have significant appeal.
Do you see that?
A Yes, I do.
Q So he's talking about bundling the Roxane multisource with the Boehringer brand; correct?
A I have no idea. He -- perhaps that may be one interpretation, but I can't tell you that's what it refers to specifically.
Q Well, is it your testimony that Mr. Tupa is not recommending a unified marketing approach for the Boehringer brand ipratropium bromide known as Atrovent and the Roxane ipratropium multisource product?
A I -- I can't attest to that. That may be one interpretation. And, again, it doesn't mean that it was necessarily followed. Again, people -- we opened -- we



operated on an open basis and many individuals make many recommendations and suggestions. Mr. Tupa's responsibility was for driving the Roxane business. If he came up with an idea of perhaps that would help his side of the business, he could state it. It doesn't necessarily mean that it would be accepted and followed.
Q Well, let me ask this question: During your entire tenure at the Boehringer Ingelheim U.S. operations, was there ever a unified or combined marketing strategy that encompassed the Roxane multisource ipratropium product and the Boehringer branded Atrovent ipratropium product?
A No.
Q Never?
A No.
Q You're sure about that?
A I can't be 100 percent sure. In my recollection I don't believe so.
Q Well, if there was a unified strategy to market these two products together, the branded Atrovent and the generic ipratropium bromide, who would be the senior executive in the sales and marketing function responsible for such a unified strategy in the U.S.?
A I don't think we should speculate on that sort of thing.



(Exhibit No. 151, E-mail dated 11/22/95, was marked for identification.)
Q Would you please look at what has been handed -- what is the number on that one, 151, which purports to be an e-mail with some attachment from Ed Tupa to David Townley, Bates labeled ROX 04987, 988 and 989, dated 22 November 1995 at 6:02 p.m., and you are cc'd on it.
A Okay.
Q And if you look at the -- I mean, this is talking about sales and market projections for the unit dose vial product of albuterol, correct -- or rather ipratropium bromide?
A Amongst other products.
Q All right. And if you go to the next page there's a spreadsheet with some projections regarding ipratropium; correct?
A Yes.
Q And you see they've got the Roxane generic projections on there right next to Boehringer Ingelheim brand projections; do you see that?
A Yes.
Q And if you go back to the first page, the third paragraph down, it says (as read): In the U.S., Roxane will be launching a generic of Atrovent. Underlying the attached forecast is the assumption that Roxane will begin

a few weeks ago up in Boston and he's employed somewhere up there.

**A Correct.**

Q Do you know -- can you tell me the circumstances of Mr. Feldman leaving his employment with the BI companies?

**A My understanding that he was made a offer he couldn't refuse.**

Q I would -- I would want to ask you the same series of questions that I asked about Mr. Tupa. And that is with Mr. Feldman, as far as you know was there any reason that he was asked to consider going somewhere else?

**A I don't think so but, again, he left after I retired.**

Q Okay. James King, did he have a direct line or a dotted-line reporting responsibility to you?

**A Direct.**

Q Okay. And take a look at Exhibit 149.

**A Forty-nine.**

Q Yes, sir. I think that that's the press release, the news release.

**A One forty-nine?**

Q Yes, sir.

**A Okay.**

Q And this on the second page announces a promotion



for James King; correct?

**A Correct.**

Q And the date of this is, what, January 28th, 1999; correct?

**A Right.**

Q Now, do I understand that sometime after January 28, 1999, Mr. King was either demoted or dismissed?

**A No. In fact, he was promoted to a vice president level after that.**

Q Do you recall the precise title that he had as vice president?

**A Vice president sales.**

Q And on the org chart of 139, if he -- he was a BIPI employee; right?

**A Yes, he was.**

Q So he wouldn't be on 139?

**A Well, he's -- he's there. And, again, keep in mind that in 2000 there was a reorganization so that Mr. King, again, I can't recall the timing of his assignment to vice president, but it would have been for the BIPI line of business exclusively. Because as I indicated before, Roxane Ben Venue was really separated totally under the responsibility of Tom Russillo.**

Q That happened in 2000?



**A I believe it was 2000. I can't recall precisely.**

Q And then before that Mr. King did, in fact, work for Roxane?

**A He -- he worked for BIPI, but he had a responsibility for the branded side of Roxane, sales. And I think if you refer back to the memo you pointed out, to Memo 149, Exhibit 149, you know, it really referred to the branded responsibility.**

Q Okay. And do you know -- before his promotion to vice president, do you have any idea of how many people approximately were reporting to him as their supervisor?

**A Well, he would have had multiple regional sales directors in the field. So direct reports he would have had a dozen, maybe something like that.**

Q When he got promoted to vice president, did the number of people under his supervision decrease or increase?

**A It would have excluded any Roxane responsibility. But what did increase is the breadth of his organization as we were increasing sales force size -- size substantially.**

Q But my question is: Did the number of people that he was responsible for supervising increase or decrease when he was promoted to vice president?

**A It probably remained about the same.**



Q And as far as you know Mr. King was not demoted, disciplined or asked to leave, he just left?

**A Again, it happened after my retirement. It was my understanding it happened towards the end of 2004 and I was not there.**

Q Okay. Do you know who his supervisor was at the time that he left?

**A Yes. The individual that replaced me and Mr. Paul Fonteyne.**

Q F-o-n-t-a-n-e?

**A T-e-y-n-e.**

Q I would never have stumbled onto that spelling. Thank you. Once again refer to Exhibit 139, the organization chart there.

**A Uh-huh.**

Q Now, you have referred to direct lines and dotted lines; correct?

**A Correct.**

Q And this chart does, in fact, contain some dotted lines and some direct lines; correct?

**A Yes.**

Q But my understanding is you take the position that this chart is incorrect in that it has attributed to you more direct lines than it should; is that right?

**A That's right.**