# TAB 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

| | |
|---|---|
| IN RE: PHARMACEUTICAL | ) MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) CIVIL ACTION |
| PRICE LITIGATION | ) 01-CV-12257-PBS |

-------------------------------X

| | |
|---|---|
| THIS DOCUMENT RELATES TO | ) |
| United States of America, et al,) | Judge Patti B. |
| Ven-a-Care of the Florida Keys, ) | Saris |
| Inc., | ) |
| vs. | ) |
| Boehringer Ingelheim, Corp., | ) Chief Magistrate |
| et al. | ) Judge Marianne B. |
| Civil Action 07-10248-PBS | ) Bowler |

-------------------------------X


(Cross-caption appears on following page)

VIDEOTAPED DEPOSITION OF SHELDON BERKLE

VOLUME I

Naples, Florida

Friday, October 31, 2008

26

1   Altus?
2      A.  May 2005.
3      Q.  Prior to that time where did you work?
4      A.  Just prior to that I had been retired
5   for just over a year, and prior to that with
6   Boehringer Ingelheim in the United States, and
7   prior to that in Canada.
8      Q.  When you say Boehringer Ingelheim in
9   the United States, do you mean Boehringer
10  Ingelheim Pharmaceuticals, Incorporated?
11     A.  Correct.
12     Q.  Is it okay if we refer to that
13  sometimes today as BIPI?
14     A.  Yes.
15     Q.  Is BIPI part of a larger family of
16  companies?
17        MR. GASTWIRTH:  Objection to form.
18        THE DEPONENT:  Yes, it is.
19  BY MR. FAUCI:
20     Q.  Is that -- Is it okay if I call that
21  sometimes the Boehringer Ingelheim family of
22  companies?

27

1         MR. GASTWIRTH:  Objection to form.
2         THE DEPONENT:  Are you referring to the
3   U.S. family or to the worldwide family?
4   BY MR. FAUCI:
5      Q.  To the worldwide family I guess.  If I
6   -- If I use Boehringer Ingelheim family, I'm
7   talking about the whole broad --
8      A.  The whole shebang.
9      Q.  The whole shebang.
10     A.  That's fine.
11     Q.  When did your employment begin with any
12  Beohringer entity and the Beohringer Ingelheim
13  family of companies?
14     A.  1973.
15     Q.  With what entity?
16     A.  Boehringer Ingelheim Canada.
17     Q.  And obviously that's a Canadian
18  company?
19     A.  Correct.
20     Q.  Was there a point in time when you
21  transferred to Boehringer Ingelheim's American
22  operations?

28

1      A.  Yes, there was.
2      Q.  When was that?
3      A.  It was November 1994.
4      Q.  And when did you stop working for
5   Boehringer Ingelheim's American operations?
6      A.  The end of 2003.
7      Q.  Upon transfer to the U.S., which
8   specific entity did you work for?
9      A.  BIPI.
10     Q.  BIPI.  What was your position there?
11     A.  Executive vice president.
12     Q.  Executive vice president.
13        Did you have -- Did you have a position
14  at any other Boehringer Ingelheim entities in
15  America at that time?
16        MR. GASTWIRTH:  Objection to form.
17        THE DEPONENT:  I was a vice president
18  for BI Corporation.
19  BY MR. FAUCI:
20     Q.  Is it okay if we refer to that as BIC?
21     A.  Sure.
22     Q.  What about a company known as Roxane

29

1   Laboratories, did you have a position with them?
2         MR. GASTWIRTH:  Objection to form.
3         THE DEPONENT:  No.
4   BY MR. FAUCI:
5      Q.  Can you describe in general the
6   business of BIPI in the 1994 time frame.  By
7   business I mean, among other things, what types
8   of products was the company marketing or selling?
9      A.  Again, it was involved in the research;
10  basic research, clinical research and marketing
11  sales of human pharmaceuticals.  It was a
12  relatively smaller company in the U.S.
13  pharmaceutical business.  And we were involved in
14  a couple therapeutic areas at that point,
15  respiratory medicine predominantly.
16     Q.  Were most of BIPI's products branded
17  drugs or generic drugs?
18     A.  Branded drugs.
19     Q.  Can you describe the business of BIC at
20  about the same time, the 1994 time frame.
21     A.  My understanding of what BIC was was
22  really as a holding company for the U.S.

30

1    Q.  Is it fair to say that BIC didn't have
2  any active business of its own?
3    A.  Correct.
4    Q.  Can you -- Are you familiar with a
5  company known as Roxane Laboratories?
6    A.  Yes, I am.
7    Q.  Can you describe their business
8  generally.
9       MR. GASTWIRTH:  Objection to form.
10      THE DEPONENT:  My understanding of
11  Roxane is that its predominant business was
12  involved in the generic or multi-source business.
13  BY MR. FAUCI:
14    Q.  When you use the term "multi-source",
15  is that -- is that a synonym for generic?
16    A.  Yes.
17    Q.  Did Roxane also have a different --
18  another type of product known within Roxane as
19  branded generic?
20    A.  Yes, they did.
21      MR. GASTWIRTH:  Objection to form.
22  BY MR. FAUCI:

31

1    Q.  Can you tell me what the difference is
2  between a multi-source or --
3       MR. GASTWIRTH:  Just hold on for one
4  second.
5       MR. FAUCI:  Sure.
6       MR. GASTWIRTH:  Okay.  Thanks.
7  BY MR. FAUCI:
8    Q.  Can you tell me the difference between
9  a multi-source or generic product and a branded
10  generic product.
11    A.  Again, my understanding is a multi-
12  source product is a product in which there are
13  several companies marketing the same chemical
14  entity with really no differentiation in terms of
15  the quality aspects of those drugs.
16       Branded generics in my estimation is
17  then again not so different in the sense that
18  these products are still marketed by multiple
19  companies; however, there is a brand name
20  attached to that generic drug and there is an
21  attempt to try to differentiate those branded
22  generics from each other.

32

1    Q.  Thank you.
2       You said earlier that BIC is something
3  like a holding company?
4    A.  Yes.
5       MR. GASTWIRTH:  Objection to form.
6  BY MR. FAUCI:
7    Q.  Can you tell me the relationship
8  between BIC and BIPI.
9       MR. GASTWIRTH:  Objection to form.
10      THE DEPONENT:  Again, BIPI was a
11  division of BIC.  There were multiple divisions
12  within the United States.
13  BY MR. FAUCI:
14    Q.  Do you consider -- Strike that.
15      I'm going to show you a document that
16  the court reporter has marked as Exhibit 2.
17      (Exhibit Berkle 002 was marked.)
18  BY MR. FAUCI:
19    Q.  Do you recognize this document?
20    A.  Not specifically, no, I do not.
21    Q.  Please read the -- the top of the
22  document I read it says job description; is that

33

1  correct?
2    A.  Correct.
3       MR. GASTWIRTH:  And if you need a few
4  minutes to look at the document --
5  BY MR. FAUCI:
6    Q.  By all means.  Whenever I give you a
7  document take a couple minutes to look at it.
8    A.  Sure.  Absolutely.
9    Q.  So the top of the document says job
10  description; that's correct?
11    A.  Yes.
12    Q.  Can you read what it says below that.
13  Just the next line.
14    A.  Head of Business Unit Ethical
15  Pharmaceuticals United States.
16    Q.  And then directly below that in
17  parentheses.
18    A.  Executive vice president Boehringer
19  Ingelheim Pharmaceuticals, Inc.  Vice president
20  Boehringer Ingelheim Corp.  Corporation, sorry.
21    Q.  Were these the position or positions
22  that you were ultimately hired for in or around

46

1  BY MR. FAUCI:
2      Q.  Take a moment to familiarize yourself
3  with the document.  Whenever you're ready, you
4  can tell me if you recognize this document.
5      **A.  That's fine.**
6      Q.  Do you recognize this document?
7      **A.  Not specific.  You know, I can't**
8  **remember it specifically.**
9      Q.  Do you see in the upper left-hand
10  corner it says employee bulletin?
11      **A.  Yes, I do.**
12      Q.  Which company issued this employee
13  bulletin?
14          MR. GASTWIRTH:  Objection to form.
15          THE DEPONENT:  I really don't know.
16  BY MR. FAUCI:
17      Q.  Do you know whether this employee
18  bulletin would have been sent to BIPI employees?
19      **A.  I would assume it was.**
20      Q.  Do you know whether it would have been
21  sent to Roxane employees?
22          MR. GASTWIRTH:  Objection to form.

47

1          THE DEPONENT:  It's possible.
2  BY MR. FAUCI:
3      Q.  Do you have any reason to believe it
4  wasn't sent to Roxane employees?
5      **A.  I don't know whether it was or wasn't**
6  **to be honest with you.**
7      Q.  Do you see at the second page that this
8  document was signed by--I might mispronounce his
9  name--Werner Gerstenberg?
10      **A.  Yes.  And that's correct by the way.**
11      Q.  Thank you.
12          Who is Mr. Gerstenberg?
13      **A.  Mr. Gerstenberg was the CEO of**
14  **Boehringer in the United States.**
15      Q.  And by Boehringer in the United States,
16  do you mean BIPI?
17      **A.  I mean all the divisions.  The total**
18  **company.**
19      Q.  So was he the CEO of BIC?
20      **A.  You know, again, I don't know what the**
21  **legal aspects were, but he was basically the**
22  **overall country manager for the United States.**

48

1      Q.  Including Roxane?
2      **A.  Including Roxane.**
3      Q.  Did you report to Mr. Gerstenberg?
4      **A.  Yes, I did.**
5      Q.  Was there anyone in between you and Mr.
6  Gerstenberg in the hierarchy of the corporation
7  or were you pretty much directly reporting to
8  him?
9          MR. GASTWIRTH:  Objection to form.
10          THE DEPONENT:  I reported directly to
11  Mr. Gerstenberg.
12  BY MR. FAUCI:
13      Q.  On the first page in the fourth
14  paragraph down, can you just read the first
15  sentence into the record.
16      **A.  Starting with Shelly's duties?**
17      Q.  Yes.  Thank you.
18      **A.  Shelly's duties will mainly focus on**
19  **the strategic alignment of our ethical**
20  **pharmaceutical business in the U.S. and he will**
21  **be responsible for the operating result for this**
22  **area.**

49

1      Q.  What is the strategic alignment of our
2  ethical pharmaceutical business?
3      **A.  Again, I think it is relative to what**
4  **we have spoken about before.  For those products**
5  **being used for the treatment of diseases in human**
6  **beings.  So for -- again, on the strategic level**
7  **for products marketed within BIPI and Roxane**
8  **Laboratories.**
9      Q.  In the next sentence it states, As in
10  other countries business will develop in line
11  with the strategy of the strategic business unit
12  (SBU) ethical pharmaceuticals BIGmbH.  What is
13  the strategic business unit ethical
14  pharmaceuticals BIGmbH?
15      **A.  Again, on a global basis Boehringer was**
16  **organized within a business unit framework.  So**
17  **as we've talked about a business unit --**
18  **strategic business unit in the United States, you**
19  **can expand that from various operative units**
20  **around the world into the parent company which**
21  **had a head of strategic business unit ethical**
22  **pharmaceuticals.**

50

1    Q.  If you'd turn to page two.
2    A.  Yeah.
3    Q.  The first paragraph.  The first
4  sentence says, In order to create a unified
5  management for our ethical pharmaceutical
6  business in the U.S, Edward Tupa, vice president
7  sales and marketing, Roxane Laboratories, and
8  Fred Duy -- Is that correct?
9    A.  Correct.
10    Q.  -- vice president business planning and
11  development also of Roxane Laboratories will
12  report to Shelly.
13    A.  Will report functionally to Shelly.
14    Q.  Will report functionally to Shelly.
15  Thank you.
16    A.  Key word.
17    Q.  Who is Mr. Tupa?
18    A.  Mr. Tupa worked within the Roxane
19  business entity.
20    Q.  Do you know what his responsibilities
21  were at Roxane?
22    A.  Responsible as it says here for sales

51

1  and marketing of Roxane products.
2    Q.  Would that include multi-source
3  products?
4    A.  Yes.
5    Q.  Would it include branded generic
6  products?
7    A.  Yes.
8    Q.  What does it mean that Mr. Tupa
9  reported functionally to you?
10    A.  Basically that means there was a dotted
11  line responsibility to me and a direct report and
12  responsibility to the president of Roxane
13  Laboratories.
14    Q.  A dotted line responsibility.  Can you
15  explain what that means.
16    A.  Again, I go back to what I've said
17  before.  I really had a strategic involvement
18  with Roxane, not an operational day-to-day
19  involvement.
20    Q.  And Fred Duy, can you tell me a little
21  bit more about his responsibilities.
22    A.  Basically, as it says here, business

52

1  development.  So really looking at opportunities
2  for new business within the Roxane business
3  entity.
4    Q.  The employee bulletin states that you
5  were the executive vice president of BIPI.
6    A.  Correct.
7    Q.  And it also says that you were a vice
8  president of BIC; is that correct?
9    A.  Correct.
10    Q.  How were these -- Were there different
11  job responsibilities as executive vice president
12  of BIPI and vice president of BIC, or were they
13  the same type of responsibilities?
14      MR. GASTWIRTH:  Objection to form.
15      THE DEPONENT:  Again, my primary
16  responsibility was within BIPI.  You know, and
17  again, I reemphasize that it was directed towards
18  growing the branded business within BIPI.
19      BIC really -- I would define it as a
20  holding company.  And I was an officer within
21  BIC, but BIC really didn't have a direct
22  business, as we've talked about before.

53

1  BY MR. FAUCI:
2    Q.  Were you an officer at any other -- any
3  other Boehringer Ingelheim companies besides BIPI
4  and BIC?
5      MR. GASTWIRTH:  Objection to form.
6      THE DEPONENT:  No.
7  BY MR. FAUCI:
8    Q.  Which company paid your salary?
9    A.  I believe it was BIPI that paid my
10  salary.
11    Q.  Did you receive a salary from BIC?
12    A.  No.
13    Q.  Did you sit on any boards of directors
14  for Boehringer Ingelheim companies?
15      MR. GASTWIRTH:  Objection to form.
16      THE DEPONENT:  The only board -- The
17  only direct position I believe I had was with --
18  was with Roxane Laboratories.
19  BY MR. FAUCI:
20    Q.  Do you know approximately how long you
21  served on the Roxane board?
22    A.  Off the top of my head I can't

58

1    A. I -- A slight variation of that. I
2 think this refers to the Roxane component of the
3 strategic business unit. It doesn't refer to the
4 BIPI component, which is purely branded.
5    Q. So there was --
6    A. Really three.
7    Q. I'm sorry. What do you mean by really
8 three?
9    A. Again, this is -- this refers only to
10 Roxane Laboratories.
11   Q. Okay.
12   A. Okay? That's --
13   Q. And so there was a Roxane Laboratories
14 component of the business unit?
15   A. Yes. According to -- According to this
16 anyway definition.
17   Q. The third sentence down in the same
18 paragraph it says, Sales and marketing for
19 branded generics will report to BIPI
20 counterparts. Are branded generics, are those
21 Roxane products?
22   A. Yes, they were.

59

1    Q. Why are Roxane sales and marketing
2 reporting to their BIPI counterparts?
3        MR. GASTWIRTH: Objection to form.
4 That's not what this document says.
5 BY MR. FAUCI:
6    Q. Well, I can -- Let's just look at the
7 sentence. It says, Sales and marketing for
8 branded generics will report to BIPI
9 counterparts. Can you tell me what -- what you
10 think that sentence means?
11   A. Well, I can tell you what the situation
12 actually was.
13   Q. Okay. That's --
14   A. Okay. And -- And again, because I
15 certainly can't recall having seen this document,
16 and I certainly didn't write this document.
17       The situation was that there were
18 people within the Roxane organization, within the
19 Roxane business unit, business entity that had
20 responsibility for the day-to-day operations and
21 the various functions, including marketing and
22 sales.

60

1        And as I think we talked about
2 previously in the document, just slightly above
3 that particular line, there's two components of
4 the Roxane business, multi-source generic and
5 branded generic.
6        So for the branded generic products
7 there was only a few of them. Those people
8 within the Roxane business entity did report
9 functionally to designated people within the BIPI
10 organization, but the day-to-day operations were
11 still conducted by Roxane people.
12   Q. Okay. The last sentence of this same
13 paragraph reads, The contracting and pricing
14 departments will be combined for ROI and BIPI.
15 Do you recall if this -- if this happened?
16   A. This happened really from the
17 administrative perspective, so that there was --
18 you know, the actual establishment of pricing or
19 contracting was done by individuals within the
20 Roxane business entity, but the processing of the
21 administration, the submission of prices, were
22 done by a central unit within -- within BIPI that

61

1 had that responsibility for both BIPI and Roxane.
2    Q. Why were they combined in this way?
3    A. Again, it was -- it was a synergistic
4 decision in the sense of rather than having two
5 separate organizations making submissions it made
6 sense to -- from an efficiency point of view to
7 combine that.
8    Q. And submissions to who?
9    A. To wherever, you know, pricing or
10 contract -- contracts had to be submitted to.
11       MR. FAUCI: I think it's a good time
12 for a quick break.
13       THE DEPONENT: Sure.
14       THE VIDEOGRAPHER: It's 9:59. We're
15 going off the record.
16       (Short break was taken.)
17       (Exhibit Berkle 005 was marked.)
18       THE VIDEOGRAPHER: It's 10:24. We're
19 back on the record.
20 BY MR. FAUCI:
21   Q. Welcome back, Mr. Berkle.
22   A. Thank you.

74

1      MR. GASTWIRTH: I'm -- And just to
2  respond to that commentary by counsel, I'm not
3  instructing the witness not to answer these
4  questions, I'm just objecting to the extent that
5  questions are being asked about documents that
6  were not provided to the witness about his
7  understanding of terms or phrases within
8  documents he's never seen before.
9      MR. BREEN: You're giving this witness
10  the answer. It's improper and I object to it.
11      MR. GASTWIRTH: Okay.
12      THE DEPONENT: Could you repeat the
13  question.
14  BY MR. FAUCI:
15      Q. Sure. The language I read, the bolded
16  language in paragraph three --
17      **A. Uh-huh. Right.**
18      Q. -- does that language -- do you
19  understand -- can you tell me what you understand
20  that language to mean?
21      **A. Yeah. How do I -- How do I answer**
22  **that? You know, I read it. I under -- you know,**

75

1  **based on what it says here -- You know, I'm just**
2  **going to repeat what it says. It says that the -**
3  **- a pharmacy is reimbursed by the payer on a**
4  **formula AWP less a defined percentage plus a**
5  **dispensing fee. So ultimately the money that**
6  **goes to the pharmacy.**
7      **Now, other than reading it and taking**
8  **it exactly what it says, I don't know whether**
9  **it's right or wrong or -- you know, I certainly**
10  **don't offer any other opinion beyond what the**
11  **actual words say.**
12      Q. Did Roxane ever set AWPs for its
13  products to ensure that a pharmacist made a
14  larger profit margin when he or she dispensed the
15  Roxane product?
16      MR. GASTWIRTH: Objection. Can I hear
17  that question back for a second, please.
18      THE COURT REPORTER: Actually, Counsel,
19  can you repeat that.
20  BY MR. FAUCI:
21      Q. Sure. Do you know if Roxane ever set
22  AWPs for its products to ensure that a pharmacist

76

1  made a larger profit margin when he or she
2  dispensed a Roxane product?
3      MR. GASTWIRTH: Objection to form.
4      THE DEPONENT: As I said before, I was
5  not involved in the day-to-day operations of
6  Roxane or in basically how they set their prices
7  in general or how they marketed their generic
8  drugs. I really did not get involved. So I am
9  not aware whether they did or didn't do the type
10  of thing that you said.
11  BY MR. FAUCI:
12      Q. And I'll ask a similar question. Do
13  you recall if Roxane ever promoted the profit
14  margin available on its products as a reason for
15  a pharmacist to dispense the product?
16      MR. GASTWIRTH: Objection.
17      THE DEPONENT: I'm not aware of that.
18  BY MR. FAUCI:
19      Q. Are you familiar with the
20  pharmaceutical product known as Ipratropium
21  Bromide?
22      **A. Yes, I am.**

77

1      Q. What is that?
2      **A. Ipratropium Bromide is a human**
3  **pharmaceutical product that was originated within**
4  **Boehringer research and marketed as an original**
5  **brand named Atrovent marketed by BIPI in the**
6  **United States. It is used in the treatment of**
7  **chronic obstructive lung disease.**
8      Q. Is Atrovent a BIPI product?
9      **A. Yes, it is.**
10      Q. And is it fair to characterize Atrovent
11  as a branded product?
12      **A. Yes, it is.**
13      Q. And Ipratropium Bromide, is it fair to
14  say that's a generic equivalent of Atrovent?
15      **A. Yes, it is.**
16      Q. Were you involved in any way in making
17  decisions about the marketing or pricing of
18  Ipratropium Bromide?
19      MR. GASTWIRTH: Objection to form.
20      THE DEPONENT: You're talking about the
21  generic version?
22  BY MR. FAUCI:

122

1    A. No.
2    Q. Who -- Have you seen this document?
3    A. I can't recall.
4    Q. Do you have any reason to believe that
5  you didn't see it?
6    A. I can't answer that yes or no.
7    Q. Is it -- This is a marketing plan for
8  Ipratropium Bromide; is that correct?
9    A. It appears to be.
10   Q. Is it likely you would have been sent a
11  copy of a document like that?
12        MR. GASTWIRTH: Objection to form.
13        THE DEPONENT: It's possible.
14  BY MR. FAUCI:
15   Q. I'm going to direct your attention to
16  page five. It's the internal page numbers.
17  There's a bunch of Bates numbers below, but --
18   A. Right. Yeah.
19   Q. It says pricing. Do you see that?
20   A. Yes, I do.
21   Q. Can you read me the first two
22  sentences.

123

1    A. Under pricing?
2    Q. Yes.
3    A. Pricing of the IB UDV will need to
4  follow the traditional parameters of a generic
5  product. Specifically AWP will be brand less 10
6  percent or $44.06 for the 25-count package. WAC
7  will be AWP less 40 percent or $26.44 for the 25-
8  count package.
9    Q. Is that -- Is it your under -- In your
10  understanding is it typical that the AWP for a
11  generic product would be AW -- would be brand
12  less 10 percent?
13        MR. GASTWIRTH: Objection to form.
14        THE DEPONENT: Again, my familiarity
15  was primarily with the branded products where we
16  set a wholesale acquisition cost and that I
17  cannot tell you what precisely is common relative
18  to AWP which from my perspective was familiar --
19  was more associated with generic drugs.
20  BY MR. FAUCI:
21   Q. The next sentence, The reason this type
22  of price structure is used for a generic launch

124

1  is to create an attractive spread between WAC and
2  AWP encouraging accounts to convert from the
3  brand name to the generic product as quickly as
4  possible.
5        Do you have any reason to dispute that
6  the purpose of the pricing structure was as it is
7  stated in the marketing plan; i.e., to create an
8  attractive spread between the WAC and AWP
9  encouraging accounts to convert from the brand
10  name to the generic product as quickly as
11  possible?
12        MR. GASTWIRTH: Objection to form.
13        THE DEPONENT: Yeah. The only comment
14  I'll make to that is that, you know, certainly my
15  understanding was -- on pricing for Roxane was to
16  ensure that they were competitive. Beyond that
17  I'm not prepared to make any comments.
18  BY MR. FAUCI:
19   Q. Would you have approved of this plan
20  had you seen that the stated reason for the
21  pricing structure was to create an attractive
22  spread between WAC and AWP?

125

1        MR. GASTWIRTH: Objection to form.
2        THE DEPONENT: I'm not going to
3  speculate on that. In general I've said to you
4  before that I really did not get involved in the
5  details of pricing for the generic products
6  within the Roxane line.
7  BY MR. FAUCI:
8    Q. I think we're going to move on from
9  that document.
10   A. Okay.
11        MR. FAUCI: It is 11:57. I'm happy to
12  keep going. Lunch isn't here.
13        MR. GASTWIRTH: That would be fine.
14        MR. FAUCI: Stop whenever people are
15  ready.
16  BY MR. FAUCI:
17   Q. I'm going to show you a document the
18  court reporter will mark as Exhibit 15.
19        (Exhibit Berkle 015 was marked.)
20  BY MR. FAUCI:
21   Q. Please take a moment.
22   A. Okay.

126

1    Q.  Have you seen this document?
2    A.  I don't recall.
3    Q.  It looks like an early version of an e-
4  mail.
5    A.  You're right.
6    Q.  It seems to be from Jim King.  Regards,
7  Jim King.  Do you see that at the bottom?
8    A.  Yes, I do.
9    Q.  Who's Jim king?
10   A.  Jim King was vice president of sales
11 reporting to me.
12   Q.  For BIPI?
13   A.  For BIPI.  For BIPI, sorry.
14   Q.  Did he have responsibility for Roxane
15 as well?
16   A.  No, he did not.
17   Q.  In the "to" line it's to a bunch of
18 different groups it seems; all RDs.  What does
19 that mean?
20   A.  Regional directors that would have been
21 reporting directly to Jim King.
22   Q.  Would they be in the trade relations

127

1  group?
2    A.  No.
3    Q.  What -- What group would they be in?
4  Where do they fall in the company?
5    A.  What's called the sales group.
6  Basically responsible for medical representatives
7  calling on physicians.
8    Q.  And those people, would they be BIPI
9  employees?
10   A.  Yes, they would.
11   Q.  And they would be responsible just for
12 BIPI products?
13   A.  Yes.
14   Q.  What about DMs?
15   A.  DM stands for direct managers and they
16 report to the regional directors.
17   Q.  And then reps?
18   A.  Reps are individual sales reps
19 reporting to the DMs.
20   Q.  And all these people are BIPI?
21   A.  Yes, they are.
22   Q.  Subject, Atrovent IB solution.  Do you

128

1  see that?
2    A.  Yes, I do.
3    Q.  I'm going to look at the second
4  paragraph.
5    A.  Uh-huh.
6    Q.  Just so you are clear on sales
7  commissions, if Roxane's Ipratropium Bromide is
8  sold or if an Atrovent solution is sold, you get
9  credit for it.  It is in the corporation's best
10 interest to shift business to Roxane as quickly
11 as possible.
12       Did sales personnel -- BIPI sales
13 personnel get credit for sales whether or not
14 they were BIPI products or Roxane products?
15       MR. GASTWIRTH:  Objection to form.
16       THE DEPONENT:  I can only --
17 BY MR. FAUCI:
18   Q.  Go ahead.
19   A.  I can only say according to this they
20 did.
21   Q.  Do you have any reason to believe they
22 didn't?

129

1    A.  No, I don't.
2    Q.  Had you seen this e-mail or known of
3  this, would you have approved of BIPI people
4  getting credit for Roxane sales?
5    A.  I would have been aware of it and I
6  would have approved it.
7    Q.  You would have approved it?
8    A.  Yeah.  The reason being is that -- and
9  again, I'm making certain assumptions here, that
10 this was during only -- this was only for a
11 period of time.  Okay.  And this was the period
12 of time when Roxane was preemptively launching
13 Ipratropium Bromide.
14       Okay.  So the agreement was that
15 Boehringer medical reps would still be promoting
16 the compound to physicians and to hospital
17 physicians, therefore, trying to grow the market
18 penetration of Ipratropium within the respiratory
19 marketplace.
20       And because they were putting an effort
21 but allowing -- but allowing Roxane to sell a
22 generic version during that exclusive period that

182

BY MR. FAUCI:

2    Q.   Who was that?  Do you recall who the
3    CFO was?
4    A.   At that -- I don't know what -- What's
5    the date here?
6    Q.   I think the date is around the 1998
7    time frame.  Signed 8/25/98.
8    A.   Probably Holger Huels.
9    Q.   And just for the record it was signed
10   by the wholesaler on 8/25/98 and by Roxane Labs
11   on 10/28/98.
12   A.   Gotcha.
13   Q.   Moving on.  I'm going to mark as
14   Exhibit 26 -- I shouldn't do that, let the court
15   reporter do that.
16        (Exhibit Berkle 026 was marked.)
17        MR. FAUCI:  Just so counsel for the
18   Defendant knows, this is an amended notice of
19   deposition.
20   BY MR. FAUCI:
21   Q.   Have you ever seen this document?  Feel
22   free to read it.

183

1    A.   Yes.
2    Q.   When was the first time?
3    A.   This is the amended copy?
4    Q.   Yes.  Although I can represent that the
5    only change on that from there to the original is
6    the location.
7    A.   So the original was about a week ago.
8    Q.   Were you asked to look for documents
9    prior to this deposition?
10   A.   Yes, I was.
11   Q.   Did you find any?
12   A.   No, I did not.
13   Q.   Where did you look?
14   A.   Where did I look?  In my home.
15   Q.   That's good enough.
16   A.   Yeah.
17   Q.   When you left BIPI in late 2003, were
18   you asked to look for documents or search for e-
19   mails in connection with the Texas case that
20   we've talked about previously or any other case
21   involving allegations about average wholesale
22   price?

184

1         MR. GASTWIRTH:  Objection to form.
2         THE DEPONENT:  The Texas case was after
3    I had retired from BIPI.
4    BY MR. FAUCI:
5    Q.   When you left, were you -- That's fine.
6    The question is, when you left, did anybody tell
7    you that you should look through your documents
8    and set aside certain documents?
9    A.   No.
10        MR. GASTWIRTH:  Objection to form.
11   BY MR. FAUCI:
12   Q.   What number was that, 26?
13   A.   26, yeah.
14   Q.   I'm going to show you a document which
15   the court reporter will mark as 27.
16        (Exhibit Berkle 027 was marked.)
17   BY MR. FAUCI:
18   Q.   Take a moment to familiarize yourself.
19   A.   Okay.
20   Q.   Turning to the second page.
21   A.   All right.
22   Q.   Actually just go to the back.  There's

185

1    two documents here.  There's a cover one.
2    A.   Yes.
3    Q.   I'm going to mostly focus on the second
4    part of it.  Is it fair to say that you drafted
5    pages two through four of this?
6    A.   I'm sorry?
7    Q.   Is it fair to say that you drafted
8    pages two through four of this?
9    A.   It's got my signature on it so I assume
10   that's so.
11   Q.   Do you recall drafting this?
12   A.   Not specifically.
13   Q.   Is this an employee bulletin?  Do you
14   see that at the top?
15   A.   Yes.
16   Q.   Who do you -- Who did you understand
17   that this employee bulletin would go to?
18   A.   I would assume that it was directed
19   towards BIPI and Roxane employees.
20   Q.   I'm going to look at the paragraph
21   beginning, As we are all aware.  Do you see that?
22   A.   Yes.

186

1    Q.  As we are all aware, we have taken
2  several steps in the past two years to increase
3  the level of business unit collaboration and
4  focus across organizations; e.g., business unit
5  operating committee, ethical pharmaceutical
6  committee.
7        Would you agree that -- Is that your
8  recollection now that over the past two years
9  leading up to 1998 you took several steps to
10  increase the level of business unit
11  collaboration?
12    **A.  Again, the goal would be to create eff**
13  **-- efficiencies and synergies where it made**
14  **sense.  However, Roxane and BIPI were always**
15  **separate entities, they were always separate**
16  **management within each entity and the day-to-day**
17  **business for each of those entities was done**
18  **within that entity.**
19    Q.  It says, The changes I will describe in
20  this announcement build on this foundation.
21  These changes also are designed to build on the
22  strengths of Boehringer Ingelheim

187

1  Pharmaceuticals, Inc., BIPI, Roxane Laboratories
2  and Ben Venue Laboratories while achieving much
3  greater synergy across the entire business unit.
4  Do you see that?
5    A.  Yes, I do.
6    Q.  We've talked about synergy a bit
7  earlier today.  What does it mean to increase the
8  synergy across the entire business unit?
9    **A.  Again, to do away with wasted effort in**
10  **the sense that you have duplication of -- of**
11  **effort in various functions.  And where it made**
12  **sense to amalgamate services that were common to**
13  **the various companies and divisions, then we**
14  **attempted to do that.  But, again, the day-to-day**
15  **operations for each of those businesses was**
16  **conducted and carried out by management within**
17  **those divisions.**
18    Q.  If you look at the next page, the first
19  bullet point.
20    A.  Okay.
21    Q.  We want to expand our important multi-
22  source business by capitalizing on and

188

1  strengthening the synergy between our solid
2  liquid dosage and injectable multi-source
3  businesses.  Is that what you talked about
4  earlier with Ben Venue being an injectable
5  company?
6    **A.  Correct.  So the solid liquid dose was**
7  **-- referred to Roxane and the injectable referred**
8  **to Ben Venue.**
9    Q.  It says, I've asked Tom Russillo to
10  take on this critical and complex challenge.
11  Multi-source marketing within RLI, Roxane, now
12  will report to Tom.  Who's Tom Russillo?
13    **A.  Tom Russillo was president of Ben Venue**
14  **Laboratories and obviously with this change took**
15  **over responsibility for the multi-source business**
16  **within Roxane as well.**
17    Q.  Was Tom Russillo at Ben Venue prior to
18  its acquisition by the Boehringer Ingelheim
19  family?
20    **A.  Yes, he was.**
21    Q.  Do you know if Russillo came to work
22  for Roxane?

189

1        MR. GASTWIRTH:  Objection to form.
2        THE DEPONENT:  I believe he was a Ben
3  Venue employee, but you would have to check that
4  with people more in the know than I.
5  BY MR. FAUCI:
6    Q.  But it's fair to say regardless of who
7  he formally worked for that Roxane employees
8  reported to him?
9    A.  Yes.
10    Q.  I'm going to look down at another
11  bullet point.  It says, To ensure that we are
12  bringing BIPI's medical and drug regulatory
13  affairs' knowledge to bear on both our multi-
14  source and specialty products, Roxane's, or
15  RLI's, medical and drug regulatory affairs'
16  current product will report with Doug Wilson's
17  BIPI medical/DRA organization.  What are the
18  medical and drug regulatory affairs departments?
19    **A.  Again, these are the people within that**
20  **organization that are responsible for conducting**
21  **clinical research and for liaising with the FDA.**
22    Q.  It says that RLI's medical and drug

190

1 regulatory affairs will report within Doug
2 Wilson's BIPI/DRA organization. Why was that?
3   **A. Again, in order to create efficiencies.**
4   Q. What type of efficiencies could that
5 create?
6   **A. BIPI had a large department, you know,**
7 **consisting of many more physicians,**
8 **statisticians, et cetera. So it would allow**
9 **Roxane -- people responsible for these areas to**
10 **tap into the larger BIPI medical regulatory**
11 **organization.**
12   Q. Next bullet point it says, RLI branded
13 and specialty products. Are those branded
14 generics?
15   MR. GASTWIRTH: Objection to form.
16   THE DEPONENT: I assume it's branded
17 generics.
18 BY MR. FAUCI:
19   Q. Our RLI branded and specialty products
20 will become an important component of our
21 national and international business strategy. We
22 want to expand our support to these products by

191

1 increasing the degree of collaboration between
2 the marketing of RLI product lines and BIPI
3 product lines. Do you see that?
4   **A. Yes, I do.**
5   Q. How would increasing the degree of
6 collaboration between Roxane and BIPI marketing
7 be beneficial?
8   **A. Again, this was specific to the branded**
9 **-- RLI branded products. So at that time BIPI of**
10 **course had a much greater expertise and**
11 **experience in marketing these types of products.**
12   **Keep in mind that Roxane was made up of**
13 **a couple different types of businesses. The**
14 **multi-source, which was very -- and then they had**
15 **these so-called branded generics, which they**
16 **hoped to market more along the lines of a true**
17 **original brand such as contained in the BIPI**
18 **product line.**
19   **And strategically we made the decision,**
20 **fine, let's see what we could do and it made**
21 **sense to combine, you know, at certain levels the**
22 **reporting relationship to add to be able -- to be**

192

1 **able to allow Roxane to benefit from the**
2 **expertise within BIPI.**
3   **But, again, I emphasize that the day-**
4 **to-day operations were conducted for the Roxane**
5 **branded products -- branded generic products**
6 **within the Roxane structure.**
7   Q. Next bullet point it says, BIPI and RLI
8 contacting will be combined into a single
9 organization. What are BIPI and RLI contracting?
10   I'm on the next page, I'm sorry, the
11 last bullet point.
12   **A. Okay. Again, these are the -- this is**
13 **the department that would set up contracts with**
14 **purchasing groups or distributors of the BIPI and**
15 **Roxane products.**
16   Q. What do you mean set up contracts?
17   **A. Again, if there was a -- a distribution**
18 **agreement that was negotiated with a purchasing**
19 **group or a wholesaler or a -- you know, any other**
20 **distributor, that a contract would be put**
21 **together representing the terms of the agreement**
22 **between the two parties.**

193

1   Q. Next sentence it says, John Powers will
2 lead the day-to-day management of this operation.
3 He did lead the day-to-day management for BIPI
4 and Roxane?
5   MR. GASTWIRTH: Objection to form.
6   THE DEPONENT: You know, I recall that
7 he was predominantly involved on the Roxane's
8 products, but I can't recall specifically beyond
9 that.
10 BY MR. FAUCI:
11   Q. You drafted this document, correct?
12   **A. I did. This was also ten years ago.**
13   Q. I'm going to ask you to go back to the
14 second page. The first page of this document,
15 second page of the exhibit.
16   **A. Right.**
17   Q. By the year 2004, very beginning, our
18 ethical pharmaceutical business is expected to
19 generate in the USA more than 40 percent of
20 Boehringer Ingelheim's worldwide ethical
21 pharmaceutical business. I'm just trying to
22 understand what that means. Can you tell me what

226

1    A.  I believe it was -- The committee was
2  put in place certainly for BIPI products, but I
3  don't want to say that I'm absolutely sure it was
4  for Roxane only because of what I told you
5  previously.  I knew that there were discussions
6  taking place to divest of part of the branded
7  generic line and -- relative to Viramune.  So I'm
8  not -- my memory fails me.  I'm not a hundred
9  percent sure.
10    Q.  You can put that aside now for real.
11    A.  Okay.
12    Q.  Are you familiar with the
13  pharmaceutical product known as Furosemide?
14    A.  As an ex-pharmacist, yes.
15    Q.  When were you a pharmacist?
16    A.  Many years ago.  I graduated with a
17  pharmacy degree.  I really didn't -- I practiced
18  for an extremely short period of time.
19    Q.  What is Furosemide?
20    A.  Furosemide is a generic name for a
21  diuretic, a so-called water pill.
22    Q.  Was it a BIPI product?

227

1    A.  No, it was not.
2    Q.  Do you know if it was a Roxane product?
3    A.  I think it was within the Roxane multi-
4  source product line.
5    Q.  It's not a brand of generic, is it?
6    A.  It is not.
7    Q.  I'm going to hand you Exhibit Number
8  32.
9        (Exhibit Berkle 032 was marked.)
10    THE DEPONENT:  Okay.
11  BY MR. FAUCI:
12    Q.  Are you familiar with this document?
13    A.  No, I'm not.
14    Q.  Who's Judy Waterer again?
15    A.  She was a Roxane employee.
16    Q.  Do you know who Lesli Paoletti was?
17    A.  You know, the name is vaguely familiar,
18  but I couldn't even tell you what position she
19  held.  She was a Roxane employee.
20    Q.  She was at Roxane?
21    A.  Yeah.
22    Q.  It's an e-mail from Lesli Paoletti to

228

1  Judy Waterer.  It says, Attached is a document
2  called standby statement, Furosemide price
3  change.  Do you see that?
4        MR. GASTWIRTH:  Objection.  Form.
5        THE DEPONENT:  Yes, I do.
6        MR. GASTWIRTH:  I believe you just
7  switched the from and the to.
8  BY MR. FAUCI:
9    Q.  Fair enough.  The document is from Judy
10  Waterer to Lesli Paoletti.  I stand corrected.
11        It says, Here's a shot at it, please
12  make modifications as you see fit, then pass it
13  by Pam Demala.  Who's Pam Demala?
14    A.  Pam Demala was a BIPI -- either BIPI or
15  BIC employee, I'm not sure, but certainly within
16  the BI side, in the public relations area.
17    Q.  Why would a Furosemide price change be
18  passed by Pam Demala?
19    A.  I haven't got a clue.
20    Q.  And it says that, You may need to call
21  her and let her know the background, she'll
22  probably want to pass it by Berkle and Russillo

229

1  as well.  Any idea why Ms. Waterer would think
2  that Pam Demala would want to pass it by you?
3    A.  I don't know.  And the only other
4  comment I would make is I'm not sure in the
5  timing but there's somewhere in 2000 that we --
6  we totally changed the structure of the
7  organization and I really was no longer involved
8  in the Roxane business after that point in time.
9  So I don't know whether this coincides with that
10  time period or not.
11    Q.  Do you remember around this time Roxane
12  -- Do you have any knowledge about the fact that
13  around this time Roxane raised the AWPs for its
14  Furosemide products?
15        MR. GASTWIRTH:  Objection.  Form.  I'm
16  sorry.  Can I hear that back, please.
17        (Record was read by the court
18  reporter.)
19        MR. FAUCI:  I can read it again if
20  you'd like.
21        MR. GASTWIRTH:  Thanks.
22  BY MR. FAUCI:

230

1    Q.  Do you have any recollection whether
2  around the 2000 time frame Roxane raised the AWPs
3  for its Furosemide products?
4    A.  I'm not aware.
5    Q.  We can move on from that document.
6    Can we go off the record for two
7  minutes.
8    THE VIDEOGRAPHER:  It's 3:14.  We're
9  going off the record.
10    (Short break was taken.)
11    (Exhibit Berkle 033 was marked.)
12    THE VIDEOGRAPHER:  It's 3:28.  We're
13  going back on the record.
14  BY MR. FAUCI:
15    Q.  Mr. Berkle, I've handed you what's been
16  marked as Exhibit 33.
17    A.  Yes.
18    Q.  Can you take a moment to familiarize
19  yourself with it.
20    A.  Okay.
21    Q.  What's the subject line of this e-mail?
22    A.  It says Furosemide tablet AWP

231

1  adjustment.
2    Q.  Have you read or seen this before?
3    A.  No, I have not.
4    Q.  That's all.  We're going to do another
5  document.
6    (Exhibit Berkle 034 was marked.)
7  BY MR. FAUCI:
8    Q.  The court reporter has handed you
9  what's been marked as Exhibit 34.  It's a very
10  lengthy document.  Feel free to read it, but I'm
11  going to direct your attention to specific parts
12  of it, so just tell me when you feel ready to
13  have some questions -- have some questions asked.
14    MR. BREEN:  Did you already mark this
15  one?
16    MR. FAUCI:  Yep.  34.
17    THE DEPONENT:  Okay.
18  BY MR. FAUCI:
19    Q.  Do you recognize this document?
20    A.  Not specifically.
21    Q.  Look at the first page.  It appears to
22  be an e-mail from Fred Duy.  Who's he?

232

1    A.  Fred was a Roxane employee.
2    Q.  And it's sent to you, Shelly Berkle?
3    A.  Yes, it is.
4    Q.  Subject, Roxicodone 15/30mg launch
5  plan.  Do you see that?
6    A.  Yes, I do.
7    Q.  And then does the attachment to this e-
8  mail appear to be a launch plan for Roxicodone?
9    A.  It certainly appears to be at least a
10  summary of a launch plan.  Highlights.
11    Q.  Is Roxicodone a Roxane product?
12    A.  Yes, it was.
13    Q.  Second sentence of the e-mail, The
14  strategy is essentially what you saw in
15  Tarrytown.  What's Tarrytown?
16    A.  It's -- Tarrytown is a town in New York
17  State close -- just across the border from
18  Connecticut.
19    Q.  What brought you to Tarrytown?
20    A.  I'm sorry?
21    Q.  What brought you to Tarrytown?
22    A.  Well, there's a conference that was

233

1  utilized frequently for meetings by -- by the
2  BIPI people, BIPI/Roxane people.
3    Q.  Do you recall -- The strategy is
4  essentially what you saw in Tarrytown.  Do you
5  recall being exposed to strategies relating to a
6  launch document in Tarrytown?
7    A.  I can't -- I can't remember
8  specifically that meeting.  You know, certainly I
9  was at multiple meetings over the years in
10  Tarrytown, but I can't remember the details.
11    Q.  It goes on to say that, It--I think the
12  strategy--has been updated and expanded with
13  specific tactics by Doug Bierl with input from
14  lots of people here and in Ridgefield.  Who's
15  Doug Bierl?
16    A.  I haven't got a clue.
17    Q.  What's Ridgefield?
18    A.  Ridgefield is the town -- location of
19  BI Pharmaceuticals.
20    Q.  Where was Roxane?
21    A.  In Columbus, Ohio.
22    Q.  Ridgefield means BIPI?

310

1    A.  Again, as I testified earlier during
2  the day, on a strategic level, but I was not
3  involved on the -- in the day-to-day operations
4  and certainly not involved in the pricing
5  decisions in general.
6    Q.  Do you still have your exhibits handy?
7    A.  They're on the floor next to me.
8    Q.  Okay.  May I ask you just to put them
9  up on the table.  I'm going to refer to a few of
10  them now.
11    A.  Sure.
12    Q.  If I can draw your attention to Exhibit
13  35, please.
14    A.  Okay.
15    Q.  Is Exhibit 35 a memorandum with the
16  subject heading recommended pricing Roxicodone?
17    A.  Yes.
18    Q.  And it's dated August 22nd, 2000?
19    A.  Yes.
20    Q.  Do you recall that Mr. Fauci asked you
21  some questions about this document?
22    A.  Yes, I do.

311

1    Q.  Do you see that there's some signature
2  blocks on the bottom of this first page?
3    A.  Yes, I do.
4    Q.  Can you please tell me who those
5  signature blocks appear to be for.
6    A.  One is for myself and one is for my
7  immediate boss Werner Gerstenberg.
8    Q.  Does the signature actually appear
9  under my name with respect to this recommended
10  pricing for Roxicodone document?
11    A.  No, it does not.
12    Q.  Earlier this afternoon you testified
13  that your focus would have been on WAC in
14  connection with your involvement at BIPI,
15  correct?
16    MR. FAUCI:  Objection.  Form.
17    THE DEPONENT:  Yes.
18  BY MR. GASTWIRTH:
19    Q.  Would you have ever been focused on WAC
20  with respect to Roxane's multi-source business?
21    A.  No.  I just reiterate what my question
22  was -- my answer was on the previous question

312

1  where I was not involved in pricing for multi-
2  source products in general.
3    Q.  Can I direct your attention to the
4  document that's been marked Exhibit 31, please.
5    A.  Okay.  Got it.
6    Q.  This document is an e-mail dated May
7  3rd, 2001 from Dan Gerrity, correct?
8    A.  Correct.
9    Q.  And it says, Please review the attached
10  draft pricing policy?
11    A.  Yes.
12    Q.  And behind it -- behind the first page
13  there beginning on page D0120629 there appears to
14  be a pricing policy and procedure memorandum.
15    A.  Yes, I see that.
16    Q.  Do you know if this pricing policy and
17  procedure memorandum was actually ever finalized?
18    A.  I can't recall whether it was finalized
19  in this -- precisely the same way as it is laid
20  out here.  There was a procedure put in place,
21  but I certainly don't recall whether it was
22  exactly the same as -- as outlined.

313

1    Q.  And does this pricing -- this draft
2  pricing policy and procedure memorandum, does it
3  relate to only brand products for Boehringer
4  Ingelheim Pharmaceuticals, Inc., BIPI and Roxane?
5    MR. FAUCI:  Objection.  Form.
6    THE DEPONENT:  I believe that's true.
7    MR. BREEN:  Also objection leading.
8  BY MR. GASTWIRTH:
9    Q.  I'd like to direct your attention to
10  Exhibit 27, please.
11    A.  Yeah, I have it.
12    Q.  Okay.  The last page of Exhibit 27,
13  please.
14    A.  Okay.
15    Q.  Do you recall that Mr. Fauci earlier
16  today directed you to -- your attention to the
17  bullet point that begins BIPI -- about three
18  paragraphs down, BIPI and RLI contracting will be
19  combined into a single organization?
20    A.  Yes, I see that.
21    Q.  During the time period when you were
22  employed by BIPI, did BIPI always enter into

314

1  separate contracts with its customers?
2       MR. FAUCI:  Objection.  Form.
3       THE DEPONENT:  Yes.
4  BY MR. GASTWIRTH:
5    Q.  Are you aware of whether Roxane entered
6  into separate contracts with its customers during
7  the time period that you were employed by BIPI?
8    **A.  I believe so.**
9    Q.  Mr. Fauci asked you a few questions
10 about documents that you produced in connection
11 with this litigation.  Do you remember those?
12      MR. FAUCI:  Objection.  Form.
13      THE DEPONENT:  I remember generally
14 some question relative to that.
15 BY MR. GASTWIRTH:
16   Q.  And do you recall that Mr. Fauci asked
17 you that when you left BIPI did anyone ask you to
18 look for any documents?
19   **A.  Again, I don't remember the specific**
20 **question.**
21   Q.  But you remember that kind of line of
22 inquiry?

315

1    **A.  Yes.**
2    Q.  Did you ever -- Did you leave your
3  documents at BIPI when you left the BIPI
4  organization?
5       MR. FAUCI:  Objection.  Form.
6       THE DEPONENT:  All my -- whatever
7  documents were in my possession I left at the
8  Boehringer offices.
9  BY MR. GASTWIRTH:
10   Q.  Okay.  And you understand that
11 documents have been produced in connection with
12 this litigation?
13   **A.  Yes.**
14   Q.  May I direct your attention to Exhibit
15 16, please.
16   **A.  I have it.**
17   Q.  Do you recall a line of inquiry by Mr.
18 Fauci concerning some substitution of Atrovent
19 for some Ipratropium Bromide sales?
20   **A.  Yes.**
21   Q.  Can I direct your attention to the
22 third paragraph, please, of this document,

316

1  Exhibit 16.
2    **A.  The one that says "In order to solve"?**
3    Q.  Yes.  Can you read that first line,
4  please.
5    **A.  In order to solve this unique**
6  **situation, starting today BIPI will be billed --**
7  **filling selected contracted Roxane Ipratropium**
8  **Bromide orders for a set period of time not to**
9  **exceed the end of 1996 or 300,000 units, bracket,**
10 **boxes of 25, bracket.**
11   Q.  Do you believe that the substitution of
12 Atrovent for Ipratropium Bromide was a unique
13 situation?
14      MR. FAUCI:  Objection.  Form.
15      THE DEPONENT:  Yeah.  I would say
16 absolutely it was unique.  It was a one-off
17 situation.
18 BY MR. GASTWIRTH:
19   Q.  So you're not -- do you recall any
20 other instances when -- when BIPI drugs were
21 substituted for Roxane drugs?
22   **A.  No, I do not.**

317

1    Q.  As executive vice president for BIPI
2  would it have been important for you to
3  understand the release of the generic Ipratropium
4  Bromide product by Roxane?
5    **A.  Yes.  Absolutely.**
6    Q.  Why?
7    **A.  Again, BIPI marketed the Atrovent**
8  **brand.  It was an important revenue driver.  BIPI**
9  **was aware that the patent would be ending --**
10 **exclusivity would be ending at a specific period**
11 **of time.  Also Roxane being a sister company we**
12 **believed that by working together we could**
13 **benefit the overall BI U.S. family of companies**
14 **in the long term if we could work together.**
15   Q.  As executive VP for BIPI did you have
16 any involvement in the setting of prices for the
17 Ipratropium Bromide, the generic?
18   **A.  The generic?  No, I didn't.**
19      **Can I qualify that I was aware, you**
20 **know, of the price that was ultimately set for**
21 **that because of the joint interest of both**
22 **parties.**

318

1    Q.  Did you ever tell Roxane what the
2  prices should be for Ipratropium Bromide though
3  as executive VP of BIPI?
4    **A.  No, I didn't.**
5    Q.  At the very beginning of today you
6  described BIPI and Roxane as being two separate
7  businesses in 1994.
8    **A.  That's correct.**
9    Q.  During your entire tenure at BIPI, so
10  from 1994 to 2003, do you believe that Roxane and
11  BIPI remained two separate businesses?
12    MR. FAUCI:  Objection.  Form.
13    MR. BREEN:  Objection.  Form.
14    THE DEPONENT:  Yes, I do.
15  BY MR. GASTWIRTH:
16    Q.  Do you believe that BIPI and Roxane
17  were two separate businesses from the time period
18  1994 until 2003?
19    MR. BREEN:  Objection.  Form.
20    MR. FAUCI:  Objection.  Form.
21    THE DEPONENT:  Yes, I do.
22  BY MR. GASTWIRTH:

319

1    Q.  Mr. Berkle, during your tenure at BIPI
2  did you view Roxane, BIPI and BIC as separate
3  independent companies?
4    MR. FAUCI:  Objection.  Form.
5    THE DEPONENT:  Yes, I did.
6  BY MR. GASTWIRTH:
7    Q.  Did you treat -- During your tenure at
8  BIPI did you treat Roxane, BIPI and BIC as
9  separate independent companies?
10    **A.  Yes.**
11    Q.  Did Roxane have separate offices from
12  BIPI?
13    **A.  Yes.**
14    Q.  Where were Roxane's offices located?
15    **A.  Columbus, Ohio.**
16    Q.  Where were BIPI's offices located?
17    **A.  Ridgefield, Connecticut.**
18    Q.  Did BIC have separate offices from both
19  BIPI and Roxane?
20    **A.  BIC was situated at Ridgefield,**
21  **Connecticut.**
22    Q.  Did Roxane and BIPI have their own

320

1  employees?
2    **A.  Yes, they did.**
3    MR. FAUCI:  Objection.  Form.
4  BY MR. GASTWIRTH:
5    Q.  Did Roxane and BIPI have separate
6  payrolls?
7    MR. BREEN:  Objection.
8    MR. FAUCI:  Objection.  Form.
9    THE DEPONENT:  I believe so.  As far as
10  I know.
11  BY MR. GASTWIRTH:
12    Q.  Did BIPI and Roxane sell different
13  drugs?
14    MR. FAUCI:  Objection.  Form.
15    THE DEPONENT:  Yes.
16  BY MR. GASTWIRTH:
17    Q.  Did BIPI sell different drugs from
18  Roxane?
19    **A.  Yes.  Again, just going back to the**
20  **previous question, other than, you know, when you**
21  **mean drug, Ipratropium obviously was a similar**
22  **chemical entity.**

321

1    Q.  But there was a separate Ipratropium
2  Bromide generic in Atrovent which was a brand of
3  generic, correct?
4    **A.  There was a differentiation based on**
5  **label.**
6    Q.  Can you please explain the
7  differentiation -- Strike that.
8      How were the drugs that were sold by
9  Roxane and BIPI different during the time period
10  that you were employed at BIPI?
11    **A.  BIPI sold unique original -- original**
12  **researched compounds and one -- one-unique, one**
13  **only type drugs.  And Roxane sold predominantly**
14  **products that were multi-source, meaning that**
15  **they were multiple competitors of the same**
16  **chemical entity on the marketplace.**
17    Q.  Do you believe that the prices are set
18  differently for branded drugs as compared to
19  generic drugs?
20    MR. FAUCI:  Objection.  Form.
21    THE DEPONENT:  I believe so.
22  BY MR. GASTWIRTH:

322

1    Q.  Did Roxane have different customers to
2  your knowledge as compared to BIPI?
3        MR. FAUCI:  Objection.  Form.
4        THE DEPONENT:  Yes, they did have
5  different customers.
6  BY MR. GASTWIRTH:
7    Q.  How so?
8    **A.  They probably had a broader breadth of**
9  **customers as opposed to BIPI.  BIPI sold**
10  **predominantly through wholesalers only, and**
11  **Roxane because of the nature of their business,**
12  **generic business, certainly sold through**
13  **wholesalers but other types of distributors as**
14  **well.  Although, again, for a period of time that**
15  **I can recall a good bulk of the business for**
16  **Roxane was directed through wholesales.**
17    Q.  Did BIPI have financial statements?
18    A.  Yes, they did.
19    Q.  Was BIPI's financial statements
20  separate from Roxane?
21    A.  Yes, they were.
22    Q.  Did BIPI have business plans?

323

1    A.  Yes, they did.
2    Q.  Do you know if Roxane had business
3  plans?
4    A.  Yes, they did.
5    Q.  Would BIPI's business plans have been
6  different than Roxane's business plans?
7    A.  Yes.
8        MR. FAUCI:  Objection.  Form.
9  BY MR. GASTWIRTH:
10    Q.  Did BIPI have growth forecasts?
11    A.  Yes.
12    Q.  Did Roxane have growth forecasts?
13    A.  Yes.
14    Q.  Would BIPI's growth forecast have been
15  different than Roxane's forecast?
16        MR. FAUCI:  Objection.  Form.
17        THE DEPONENT:  Yes.
18  BY MR. GASTWIRTH:
19    Q.  Did Roxane and BIPI have their own
20  sales forces?
21        MR. BREEN:  Objection.  Form.
22        THE DEPONENT:  Yes.

324

1  BY MR. GASTWIRTH:
2    Q.  Did Roxane and BIPI have their own
3  marketing departments?
4    A.  Yes.
5        MR. FAUCI:  Objection.  Form.
6  BY MR. GASTWIRTH:
7    Q.  Did Roxane and BIPI have their own
8  contract departments?
9    A.  Yes.
10    Q.  Mr. Berkle, during your tenure at BIPI
11  did you ever have any day-to-day operational
12  responsibility for Roxane's generic business?
13    A.  No, I didn't.
14        MR. FAUCI:  Objection.  Form.
15  BY MR. GASTWIRTH:
16    Q.  I'm sorry.  Can you repeat your answer,
17  please.
18    A.  No, I did not.
19    Q.  Mr. Berkle, in your position as VP of
20  BIC, did you ever have any day-to-day operational
21  responsibility for Roxane's generic business?
22    A.  No, I did not.

325

1    Q.  Mr. Berkle, do you believe that BIC had
2  any day-to-day operational responsibility over
3  Roxane's business?
4    A.  No, I do not.
5    Q.  Mr. Berkle, do you believe that the
6  German parent of Boehringer had any day-to-day
7  operational responsibility over BIPI's business?
8    A.  No, I do not.
9    Q.  Mr. Berkle, do you believe that the
10  German parent of Boehringer had any day-to-day
11  operational responsibility over Roxane?
12    A.  No, I do not.
13    Q.  Mr. Berkle, did BIPI have a board of
14  directors?
15    A.  Yes, it did.
16    Q.  Did Roxane have a board of directors?
17    A.  Yes, it did.
18    Q.  Were they separate board of directors?
19  That is, the board of directors for Roxane was
20  separate from the board of directors of BIPI?
21        MR. FAUCI:  Objection.  Form.
22        THE DEPONENT:  Yes, it was.

326

1  BY MR. GASTWIRTH:
2      Q.  And the board of directors for BIPI had
3  meetings?
4      A.  I believe --
5          MR. FAUCI:  Objection.  Form.
6          THE DEPONENT:  I believe it did.
7  BY MR. GASTWIRTH:
8      Q.  And did the board of directors for
9  Roxane have meetings?
10     A.  I believe it did.
11     Q.  Would the board of directors' meetings
12 for Roxane and BIPI have occurred at different
13 times?
14     A.  I believe that's true.
15     Q.  Roxane had some officers, correct?
16     A.  Yes.
17     Q.  Roxane had executives?
18     A.  Yes.
19     Q.  And BIPI had officers?
20     A.  Yes.
21     Q.  And BIPI had executives?
22     A.  Yes.

327

1      Q.  And BIC had a board of directors,
2  correct?
3          MR. FAUCI:  Objection.  Form.
4          THE DEPONENT:  That's correct.
5  BY MR. GASTWIRTH:
6      Q.  Mr. Berkle, who was the head of Roxane
7  during your employment at BIPI?
8      A.  That differed at different time
9  periods.  Certainly when I first came to the U.S.
10 it was Jerry Wojta who was the president.  There
11 was a period of time that Ed Tupa was the senior
12 manager at -- at Roxane.  And then certainly Tom
13 Russillo was the -- was the head of Roxane
14 Laboratories.
15         MR. GASTWIRTH:  Just take a moment.
16     I have no further questions.
17         MR. BREEN:  Just a few follow-up based
18 upon that.
19
20         EXAMINATION
21 BY MR. BREEN:
22     Q.  I'm going to ask a couple questions

328

1  that involved what counsel said, but stop before
2  you answer and let counsel have a chance to
3  object because he may have some attorney-client
4  privilege objections.
5          And -- And after I finished my
6  examination today, a few minutes ago, you did
7  have an opportunity to consult with counsel,
8  correct?
9      A.  Yes.
10     Q.  Okay.  And so first question, with
11 respect to the -- your testimony that you believe
12 Roxane had a board of directors, without going
13 into any discussions with counsel, can you tell
14 me who was on that board?
15     A.  I'll go back to I think I responded
16 earlier this morning that certainly Mr.
17 Gerstenberg was on that board, I was on that
18 board.  But beyond that, I really don't recall.
19     Q.  So you and Gerstenberg were on the
20 Roxane board?
21     A.  Correct.
22     Q.  And when did you have your last board

329

1  meeting for Roxane?
2      A.  I have no idea.
3      Q.  Do you have a present recollection of
4  sitting in a board meeting for Roxane
5  Laboratories?
6      A.  Very vague.
7      Q.  How many times did you have board
8  meetings for Roxane Laboratories?
9      A.  Again, I was trying to think, and I
10 don't recall the frequency of meetings.
11     Q.  How long were you on the board for
12 Roxane Laboratories?
13     A.  Again, I don't know the number of
14 years.
15     Q.  Was it one year?
16     A.  It was beyond one year, but I -- I just
17 don't know.
18     Q.  Was it the entire tenure that you were
19 with the company?
20     A.  I don't believe so.
21     Q.  Where did you have the board meetings
22 at?

354

1  directors for Roxane is identified?
2       MS. ROGERS:  Objection.  Form.
3       THE DEPONENT:  Yes, it does.
4  BY MR. GASTWIRTH:
5    Q.  And what is the date of this corporate
6  data sheet?
7    **A.  6/21/99.**
8    Q.  Does this corporate data sheet identify
9  the board of directors for Roxane as of 6/21/99?
10   **A.  It appears to.**
11   Q.  And who were the corporate directors as
12  of 6/21/99 for Roxane?
13   **A.  Mr. Gerstenberg, Mr. Poerschmann and**
14  **myself.**
15   Q.  Okay.  Now, Mr. Breen also suggested
16  that BIPI's board did not have annual meetings.
17  And --
18       MR. FAUCI:  Objection.  Form.
19  BY MR. GASTWIRTH:
20   Q.  -- I don't have all --
21       MR. BREEN:  Objection.  Form.  You miss
22  -- Counsel, you mischaracterized what I said.  I

355

1  asked this witness questions to test his
2  knowledge based upon testimony that you elicited,
3  Counsel.  So please stop mischaracterizing
4  anything I said.  You asked the man questions, he
5  gave you answers, I tested his knowledge.  That's
6  it.
7       MR. GASTWIRTH:  What exhibit are we on?
8  42?  If you can mark that Exhibit 42, please.
9       (Exhibit Berkle 042 was marked.)
10      MR. FAUCI:  Do you have a copy of it?
11      MR. GASTWIRTH:  I'm going to give it to
12  you in one second.
13  BY MR. GASTWIRTH:
14   Q.  Exhibit 42 states BIPI annual meeting
15  of the board of directors June 24th, 2003,
16  correct?
17   **A.  Correct.**
18   Q.  Based on this document, do you believe
19  that there was an annual meeting of the board of
20  directors for BIPI on June 24th, 2003?
21      MR. BREEN:  Objection.  Form.
22      THE DEPONENT:  I would believe that

356

1  it's true based on this document.
2  BY MR. GASTWIRTH:
3    Q.  And does this document also have a
4  resolution for adoption of appointment of
5  officers?
6    **A.  It does.**
7    Q.  And were officers adopted at this
8  annual meeting for the board of directors for
9  BIPI?
10      MR. FAUCI:  Objection.  Form.
11      THE DEPONENT:  Yes, they were.
12  BY MR. GASTWIRTH:
13   Q.  And were you one of the officers that
14  was -- that was appointed at this annual meeting
15  that occurred on June 24, 2003 for BIPI?
16   **A.  Yes, I was.**
17   Q.  Does this document refresh your
18  recollection as to whether BIPI had annual
19  meetings of board of directors?
20      MR. BREEN:  Objection.  Form.
21      MR. FAUCI:  Objection.  Form.
22      THE DEPONENT:  Certainly I knew there

357

1  was meetings.  You know, my -- I couldn't
2  recollect the frequency, but it appears to be at
3  least there was an annual meeting.
4       MR. GASTWIRTH:  I am going to give you
5  -- If I could ask the court reporter to mark the
6  next one, two, three, four exhibits, 43, 44, 45
7  and 46, that would be great.  Thank you.
8       (Exhibit Berkle 043, Exhibit Berkle
9  044, Exhibit Berkle 045 and Exhibit Berkle 046
10  were marked.)
11      MR. BREEN:  Do you have any of these
12  for Roxane?
13      MR. GASTWIRTH:  I'm going through these
14  right now.
15  BY MR. GASTWIRTH:
16   Q.  Now, again, Mr. Berkle this is just
17  what I could locate in my car in response to the
18  suggestion that Roxane didn't have board of
19  minutes direct -- meetings of the board of
20  directors, BIC didn't and BIPI didn't.
21      MR. BREEN:  Counsel, I'm going to
22  object to the form.

358

1     MR. FAUCI: I completely agree.

2     MR. BREEN: And I have had it with this

3 mischaracterization. You asked the man a

4 question, I cross-examined to test his knowledge.

5 I don't want to hear about what's in your car or

6 what -- or you characterizing this stuff on the

7 record. That's totally improper. And it's

8 totally improper coaching also.

9     MR. FAUCI: You have the documents you

10 have. Ask questions about them.

11     MR. BREEN: So you can ask questions,

12 but stop mischaracterizing anything I

13 represented. I don't appreciate it.

14 BY MR. GASTWIRTH:

15     Q. Does -- Exhibit 43, Mr. Berkle, is it

16 an agenda for Boehringer Ingelheim Corporation,

17 BIC, the board of directors meeting for June 6,

18 1995?

19     **A. For July 6, 1995.**

20     MR. BREEN: Objection. Form.

21     THE DEPONENT: It appears to be.

22 BY MR. GASTWIRTH:

359

1     Q. Okay. And if I could direct your

2 attention to Exhibit 44, please. Is Exhibit 44

3 minutes of the meeting of the board of directors

4 for BIC July 16th, 1996?

5     MR. FAUCI: Objection. Foundation.

6     THE DEPONENT: It appears to be.

7 BY MR. GASTWIRTH:

8     Q. Can you please tell me who the board

9 members were for BIC July 16th, 1996.

10     **A. Chairman was Dr. Louis Fernandez, Mr.**

11 **Gerstenberg, Dr. Thomas Heil, Dr. Claus Rohleder,**

12 **Dr. Jere Goyan and Mr. Vaughn Bryson.**

13     Q. Can I direct your attention to Exhibit

14 45, please.

15     **A. Okay.**

16     Q. Exhibit 45 at the top says Boehringer

17 Ingelheim Corporation meeting of the board of

18 directors February 28th, 1997.

19     **A. That's correct.**

20     Q. Earlier today you testified as to

21 financial statements being prepared for some of

22 the Bert -- Boehringer entities, correct?

360

1     **A. That's correct.**

2     Q. Can you please flip to page 17 through

3 22 of this document. Did I mark that section?

4     **A. Yeah, here.**

5     Q. Okay. When you were talking earlier

6 about financial statements that were prepared by

7 the separate Boehringer entities, does pages 40 -

8 - 17 through 21 I believe represent financial

9 statements for Roxane?

10     **A. It appears to be, yes.**

11     MR. FAUCI: Objection. Form. Please

12 stop leading the witness.

13     THE DEPONENT: It appears to be true

14 what you asked.

15 BY MR. GASTWIRTH:

16     Q. Okay. And can I direct your attention

17 to the next exhibit, please.

18     **A. Uh-huh.**

19     Q. Exhibit 46.

20     **A. Oh, sorry. Okay.**

21     Q. Exhibit 46 is labeled minutes of the

22 meeting of the board of directors Boehringer

361

1 Ingelheim Corporation October 28th, 1998?

2     **A. Correct.**

3     Q. Can you please identify who the board

4 members were for BIC as of October 28th, 1998?

5     **A. I believe it's the same list. Dr.**

6 **Fernandez as chairman, Dr. -- Mr. Gerstenberg,**

7 **Dr. Jo -- no, it's somewhat different, Dr.**

8 **Johann, Dr. Heil, Dr. Goyan and Mr. Bryson.**

9     Q. And how many pages is the minutes for

10 this board meeting of BIC?

11     **A. I don't know if I can make that out.**

12 **The actual minutes were 17 pages.**

13     Q. And do the minutes reflect what took

14 place at this board of directors meeting?

15     MR. FAUCI: Objection. Foundation.

16     THE DEPONENT: I assume --

17     MR. FAUCI: How is he supposed to

18 answer that?

19 BY MR. GASTWIRTH:

20     Q. Okay. Mr. Berkle, were you invited to

21 attend this meeting of the board of directors for

22 BIC on October 28th, 1998? You can look at the

362

1  first page.
2  **A.  I was invited for a portion of this**
3  **meeting.**
4  Q.  Do you recall this meeting now?  Does
5  this document refresh your recollection?
6  **A.  I don't recall the specific meeting,**
7  **but I think I've testified earlier that I did sit**
8  **in frequently at BIC board meetings for a portion**
9  **of them when I was invited.**
10  MR. GASTWIRTH:  Okay.  I have no
11  further questions.
12
13  EXAMINATION
14  BY MR. BREEN:
15  Q.  All right.  Just a few based upon that.
16  I see a bunch of agendas here and
17  minutes of meetings of the board of directors of
18  Boehringer Ingelheim Corporation.
19  **A.  Uh-huh.**
20  Q.  Could you go through that stack of
21  things that counsel says he got out of his car
22  and pull out all the minutes of meetings of BIPI

363

1  and all the meetings of minutes of Roxane's
2  boards.
3  **A.  Here's BIPI.**
4  Q.  Was that a -- minutes of a meeting or
5  is that just a list of people that are appointed
6  to the board?
7  **A.  The pages I have really is a resolution**
8  **for adoption of appointment of officers at the**
9  **annual meeting of the board of directors for**
10  **BIPI.**
11  Q.  Any minutes of a meeting there in that
12  document?
13  **A.  No.**
14  Q.  Not like you saw for BIC, right?  For
15  BIC they've got -- they've got all these minutes
16  and agendas and all that stuff, right?
17  **A.  Well, in this particular document, no,**
18  **there's no minutes attached.**
19  Q.  Okay.  Well, go through all -- Take
20  your time because counsel brought all these
21  documents in from the trunk of his car, see if
22  there's any actual minutes and agendas of any

364

1  board meetings of Roxane or BIPI.
2  **A.  The Roxane documents reflect directors**
3  **and officers for Roxane.  There are no minutes**
4  **attached.**
5  Q.  Now, the fact of the matter is that
6  none of these documents cause you to sit here
7  right now and remember any -- attending any
8  particular board meeting for any particular
9  company, does it?
10  MR. GASTWIRTH:  Objection.  Form.
11  THE DEPONENT:  As I said, I was not a
12  member of the board of directors for BIPI.  I was
13  for Roxane, but I -- you know, I've stated before
14  and I'll stick to my statement that I don't
15  recall specifics.
16  BY MR. BREEN:
17  Q.  I understand that.  I'm not -- I'm not
18  arguing that, but counsel's questions were --
19  several times he said, quote, Does this refresh
20  your recollection.  That means something under
21  the rules of evidence, so I just want the record
22  to be clear.

365

1  The exhibits that counsel has shown you
2  in this -- since coming back into the room, none
3  of that causes you to sit here and have a present
4  recollection of having attended a particular
5  meeting, does it?
6  MR. GASTWIRTH:  Objection.  Form.
7  BY MR. BREEN:
8  Q.  When I say present recollection, you're
9  thinking back and in your own mind right now you
10  remember a particular meeting and being there.
11  **A.  I don't remember a specific meeting.**
12  Q.  Okay.  Now, this -- I'm not sure which
13  exhibit -- May I reach over here?
14  **A.  Sure.**
15  Q.  I just want to speed things up a little
16  bit.  I think it's this one.  Which one is this
17  one, do you know?  Which number?
18  **A.  45?**
19  MR. GASTWIRTH:  No.  It's --
20  THE DEPONENT:  Sorry.
21  MR. BREEN:  I'm sorry.  It looks like
22  it, but it's not that one.