# TAB 4

```
                    Ciarelli, Gregg (DEY) - 2002-06-26 - TX.txt
00001
  1                     CAUSE NO. GV002327
  2   THE STATE OF TEXAS          )    IN THE DISTRICT COURT
      ex rel.                     )
  3       VEN-A-CARE OF THE       )
          FLORIDA KEYS, INC.      )
  4                               )
              Plaintiffs,         )
  5                               )
      VS.                         )    TRAVIS COUNTY, TEXAS
  6                               )
      DEY, INC.; ROXANE           )
  7   LABORATORIES, INC. and      )
      WARRICK PHARMACEUTICALS     )
  8   CORPORATION,                )
                                  )
  9           Defendants.         )    53rd JUDICIAL DISTRICT
 10
 11      **********************************************
              ORAL AND VIDEOTAPED DEPOSITION OF
 12                   GREGG P. CIARELLI
                  WEDNESDAY, JUNE 26, 2002
 13      **********************************************
 14
 15        ORAL AND VIDEOTAPED DEPOSITION OF GREGG P.
 16   CIARELLI, produced as a witness at the instance of the
 17   Plaintiffs and duly sworn, was taken in the
 18   above-styled and numbered cause on the 26th day of June
 19   2002, from 8:04 a.m. to 1:27 p.m., before Randall N.
 20   Finch, CSR in and for the State of Texas, reported by
 21   machine shorthand, at the offices of Boehringer
 22   Ingelheim, Inc., 900 Ridgebury Road, Ridgefield,
 23   Connecticut, pursuant to Notice, the Texas Rules of
 24   Civil Procedure and the provisions as previously set
 25   forth.
00002
  1                    A P P E A R A N C E S
  2   FOR THE PLAINTIFF STATE OF TEXAS:
  3           MR. JOE CRAWFORD
              MR. JARRETT ANDERSON
  4           Office of the Attorney General
              State of Texas
  5           P.O. Box 12548
              Austin, Texas 78711-2548   (512) 475-4300
  6                                      (512) 474-1062 Fax
  7   FOR THE RELATOR:
  8           MR. JAMES JOSEPH BREEN
              The Breen Law Firm, P.A.
  9           8201 Peters Road, Suite 1000
              Plantation, Florida 33324  (954) 916-2713
 10                                      (954) 916-2714 Fax
                  -and-
 11           MR. JOHN E. CLARK (Of Counsel)
              Goode Casseb Jones Riklin Choate &
 12           Watson, P.C.
              2122 North Main Avenue
 13           P.O. Box 120480
              San Antonio, Texas 78212-9680  (210) 733-6030
 14                                      Fax (210) 733-0330
                  -and-
 15           MS. JOY CLAIRMONT
              Berger & Montague
 16           1622 Locust Street
                               Page 1
```

```
                       Ciarelli, Gregg (DEY) - 2002-06-26 - TX.txt
    23  entity for any reason?
    24      A.    No.
    25      Q.    There's just the two, government reimbursement
00067
     1  for Medicaid --
     2      A.    That's what I'm familiar with, yes.
     3      Q.    -- and then the -- you said the -- the
     4  rebates?
     5      A.    We pay rebates to the state, also.
     6      Q.    Do you know whether or not AWP is used in
     7  connection with either or both of those instances?
     8      A.    Would you rephrase the question?
     9      Q.    Do you know whether or not the AWP information
    10  that's compiled under the supervision of Ms. Ferrara is
    11  used in either or both of those situations?
    12      A.    No, I do not.
    13      Q.    Are you familiar with the -- the term WAC?
    14      A.    Yes.
    15      Q.    What does WAC -- what does the acronym --
    16      A.    Wholesale acquisition cost.
    17      Q.    Do you know what the purpose of that number
    18  is?
    19      A.    That's the invoice price we sell to our
    20  customers.
    21      Q.    Do you know if that is a net cost or gross
    22  cost?
    23      A.    It has nothing to do with cost.  It's the
    24  price we charge to our customers.
    25      Q.    Do you know whether or not that invoice -- you
00068
     1  called it invoice price?
     2      A.    Yes.
     3      Q.    Do you know whether or not that invoice price
     4  bears any actual relationship to what those customers
     5  actually in the end pay for a particular product?
     6      A.    That's the number that appears on the invoice.
     7      Q.    And my question is:  Do you -- do you know
     8  whether or not that number that appears on the invoice
     9  bears any relationship to the amount of money that
    10  eventually and finally changes hands?
    11      A.    There are other discounts that are -- that net
    12  the price down.
    13      Q.    Okay.  And do you know if those other
    14  discounts always appear on invoices, 100 percent of the
    15  time?
    16      A.    Some do.  Cash discounts.
    17      Q.    When you say cash discounts, what do you have
    18  in mind?
    19      A.    There are terms based on the customer paying
    20  the invoice at a certain period of time, and if they
    21  pay it they receive that discount.
    22      Q.    Is that sometimes referred to as a prompt pay
    23  discount?
    24      A.    Yes.
    25      Q.    Is that a discount that's typically one, two
00069
     1  or maybe three percent if paid in 30 days?  Is that
     2  what you're talking about?
     3      A.    Primarily two percent, to my recollection.
     4      Q.    Two percent if you pay the invoice within 30
     5  days?
     6      A.    Yes, I believe so.
     7      Q.    What other deductions, discounts or by any
                                   Page 29
```

```
                    Ciarelli, Gregg (DEY) - 2002-06-26 - TX.txt
 8    other word might be, to your knowledge, deducted from
 9    an invoice price to a customer?
10         A.   That is the only discount I'm aware that
11    appears on the invoice.
12         Q.   All right.  What about anything that does not
13    appear on the invoice that would ultimately result in a
14    lesser price being paid than what is stated on the
15    invoice?
16         A.   Rebate programs.
17         Q.   Rebate programs?  And we'll talk more about
18    that, but let's go ahead and make a list.  Any other
19    categories of price reductions that may not appear on
20    the invoice but may be applied?
21         A.   Chargebacks.
22         Q.   Anything else?
23         A.   Nothing else that I'm aware of.
24         Q.   So prompt pay discounts, rebates and
25    chargebacks?
00070
 1         A.   Yes.
 2         Q.   Rebates, what's your understanding of rebates?
 3    How -- how do they work?
 4         A.   Marketing comes up with programs to offer to
 5    our customers to be competitive.
 6         Q.   Do you have anything to do with the -- direct
 7    involvement with computation or the management of any
 8    rebate program?
 9         A.   The administration of those rebate programs.
10         Q.   The administration of them?
11         A.   Yes.
12         Q.   Explain your answer to me in that regard,
13    please.
14         A.   People who report to me are responsible for
15    making sure that the -- whatever the contractual
16    agreement with that rebate program, the calculations
17    are performed and the payments are made to the -- to
18    the customers.
19         Q.   And in this list of persons under you, who
20    would that be?
21         A.   That would have been under John Powers'
22    organization.
23         Q.   Okay.
24         A.   That would be rebate -- rebate programs for
25    multisource, rebate programs for managed health care
00071
 1    organizations and Medicaid rebates.
 2         Q.   And on rebates programs, are there typically
 3    rebates involved in invoices for branded drugs?
 4         A.   Yes, managed care rebates.  Not on the
 5    invoice, though.
 6         Q.   But they don't appear on the invoice?
 7         A.   No, they do not appear on the invoice.
 8         Q.   But for managed care -- and I think I
 9    understand, but you tell me what you mean when you say
10    managed care, please.
11         A.   PBMs, HMOs.
12         Q.   How about wholesalers or chain warehouses?
13         A.   No.
14         Q.   Do those people participate in rebates for
15    branded drugs?
16         A.   For managed care rebates, no.
17         Q.   Do you know why that is?
18         A.   I don't know.
                                 Page 30
```

```
                  Ciarelli, Gregg (DEY) - 2002-06-26 - TX.txt
  19      Q.   With respect to -- well, you told me your
  20 supervision extends only to drugs that are sold by
  21 BIPI.  Is that right?
  22      A.   No.
  23      Q.   You do -- oh, that's right, Mr. Powers is
  24 under you and he's Roxane.  Correct?
  25      A.   He was back in this time period, yes.
00072
   1      Q.   Okay.  Okay.  Well, let's now talk about
   2 chargebacks.  Explain to me what a chargeback is.
   3      A.   A chargeback is the final price that we give
   4 to a -- an indirect customer that the wholesaler would
   5 deliver and invoice the customer for.
   6      Q.   When you say indirect customer, tell me what
   7 you mean by that.
   8      A.   We don't receive payment directly from that
   9 customer.
  10      Q.   The indirect customer would be the one that
  11 actually eventually receives the -- the product, such
  12 as a pharmacist?
  13      A.   No, more -- more likely a hospital.
  14      Q.   Is it possible that a pharmacist or a pharmacy
  15 or a group of pharmacies could be an indirect customer
  16 for chargeback purposes?
  17      A.   Not that I am aware of.
  18      Q.   You say typically would be what, a --
  19      A.   Hospital.
  20      Q.   And that would be back up here under your
  21 contract proposals --
  22      A.   Through the bid award process, yes.
  23      Q.   The bid -- the bid award?
  24      A.   The bid process, yes.
  25      Q.   A hospital would -- you have dealings and
00073
   1 negotiations with a hospital for a bid and you would
   2 come to an agreement, your organization would sign the
   3 agreement and the hospital would sign the agreement,
   4 and under that agreement they would be entitled to
   5 receive your products at a certain agreed price.
   6 Correct?
   7      A.   Yes.
   8      Q.   But those products would not come directly
   9 from BIPI or Roxane.  They would instead go through a
  10 wholesaler or some other --
  11      A.   Primarily, yes.
  12      Q.   Okay.  Chargebacks, are there chargebacks in
  13 the arena of branded drugs?
  14      A.   Yes.
  15      Q.   Is that pretty universal for branded drugs,
  16 that there be chargebacks?
  17      A.   Yes, I believe so.
  18      Q.   So that's -- that's not the exception.  It's
  19 pretty much the rule.
  20      A.   Yes.
  21      Q.   And these -- the rule involving chargebacks
  22 for branded drugs, would that be limited exclusively to
  23 hospitals, or to other end users as well?
  24      A.   It's primarily hospitals, I believe.
  25      Q.   Would this include HMOs, also?  Would they be
00074
   1 on the -- on the list for receiving chargebacks for
   2 branded drugs?
   3      A.   Only -- only a staff model HMO would receive
                                 Page 31
```

```
                    Ciarelli, Gregg (DEY) - 2002-06-26 - TX.txt
 4   that, a -- a person who physically takes possession of
 5   the -- the -- the pharmaceutical product.
 6        Q.    You used a word or a term I'm not familiar
 7   with.  Staff model, did you say?
 8        A.    Yes.
 9        Q.    And I don't know what staff model means.  What
10   does that mean?
11        A.    That's a -- that would mean that the HMO
12   actually has an in-house pharmacy and they distribute
13   the products to their members only.
14              MR. McCONNICO:  Joe, I need to make a
15   quick call around 10:00.  Just take your time, you
16   know, whenever's a good stopping spot.  Somewhere in
17   there I need to make a quick call.
18              MR. CRAWFORD:  Okay.  Well, Steve, we've
19   been going an hour and really this is probably about as
20   good a time to break as any, if it's all right with
21   you.
22              MR. McCONNICO:  Yeah, that's fine.  I
23   mean, just make it good for you.
24              VIDEOGRAPHER:  We're off the record at
25   9:56 a.m.
00075
 1              (Brief recess from 9:56 to 10:16 a.m.)
 2              VIDEOGRAPHER:  Back on the record at
 3   10:16 a.m.  (Begins Confidential portion of transcript)
 4        Q.    (By Mr. Crawford)  Mr. Ciarelli, before we
 5   started back your lawyer was kind enough to bring
 6   something to my attention, and it has to do with an
 7   earlier person we discussed by the name of -- and I'm
 8   still not good at French pronunciations -- St. Jacques?
 9        A.    Yes.
10        Q.    And that was a person that after 15 years left
11   the employment of BIPI, my understanding is under terms
12   other than voluntary, and you had expressed some
13   reluctance to tell me why.  And so I would like to
14   renew my question to you to the state of your knowledge
15   if -- if -- whatever you know, I would like to know why
16   this gentleman separated from BIPI.
17        A.    His management style and the direction that we
18   were taking the -- his function were going in a
19   different direction, and we decided for the -- you
20   know, for the sake of this individual and the company
21   it would be best for him to part company.
22        Q.    Based upon -- based upon that answer, then,
23   may -- may I be correct in assuming that it was not for
24   any reason having to do with misfeasance or any type of
25   criminal activity or anything like that?
00076
 1        A.    No.  No.
 2        Q.    To your knowledge, was this gentleman under
 3   threat of any indictment or criminal charges by any
 4   state or federal law enforcement agency for anything
 5   having to do with what his job duties were?
 6        A.    Not that I am aware of, no.
 7        Q.    To your knowledge, was he ever, before he left
 8   the employment of BIPI, called in to talk to the Office
 9   of Inspector General of the FBI or any state or federal
10   prosecutor for anything having to do with his
11   employment?
12        A.    Not that I am aware of, no.
13        Q.    All right.  Thank you.
14              MR. McCONNICO:  Could we have an
                               Page 32
```