# TAB 9

1

STATE OF CONNECTICUT

SUPERIOR COURT                    COMPLEX LITIGATION

#x07 CV-03-0083296-S (CLD)        DOCKET at TOLLAND

---

STATE OF CONNECTICUT,         )

    Plaintiffs,              )

                              )

    vs.                       )

                              )

DEY, INC., ROXANE              )

LABORATORIES, INC., WARRICK    )

PHARMACEUTICALS CORP.,         )

SCHERING-PLOUGH CORP., and     )

SCHERING CORPORATION           )

    Defendants.              )

                              )

DEPOSITION OF RICHARD A. FELDMAN, R.Ph.

FRIDAY, 18 NOVEMBER, 2005

9:08 AM

Richard A. Feldman R.Ph.  HIGHLY CONFIDENTIAL            November 18, 2005
Quincy, MA

Page 46

1    A. No.
2    Q. Did you have any input into contracting
3  during this time period?
4    A. Yes.
5    Q. What kind of input would you provide?
6    A. Competitive information.
7    Q. And what kind of competitive information
8  were you providing to the contracts department --
9  well, were you providing?
10   A. Restate it again.
11   Q. What kind of competitive pricing
12 information were you providing?
13   A. Pricing, manufacturers, hearsay.
14   Q. I'm sorry, what was the last one?
15   A. Hearsay.
16      MR. COVAL: Objection.
17   Q. And when you say, "hearsay," are you
18 referring to things that customers would tell you
19 or tell your representatives about various things?
20   A. Yes.
21   Q. Whether -- and generally, that would be
22 competitive information, what the competitors are

Page 47

1  doing out there?
2    A. Yes.
3    Q. You mentioned manufacturers as a type of
4  information you would provide to contracting. What
5  does that -- what does that mean to you?
6    A. Manufacturers that would be coming out
7  with a product launch, same product.
8    Q. So, a type of information that you would
9  provide to the contracting department might be with
10 respect to new competition that might be coming out
11 with respect to drugs that Roxane already has on
12 the market?
13   A. Yes.
14   Q. And then the other issue -- the other
15 topic you mentioned for competitive information was
16 pricing. And are you -- you're referring to
17 pricing of competitive products, is that right?
18   A. Yes.
19   Q. And how would you get that information?
20   A. Verbal, government awards.
21   Q. Verbal. When you say, "verbal," do you
22 mean verbal from either your national or regional

Page 48

1  account directors or the individual that worked
2  underneath them?
3    A. Possibly, yes.
4    Q. And during this time period with Roxane,
5  were you calling directly on some wholesalers?
6  Were you going on a call -- were you going on sales
7  calls with some of your -- the employees that
8  worked underneath you?
9    A. Yes.
10   Q. So, it's possible you could get some of
11 this competitive information directly during one of
12 those sales calls, correct?
13   A. It's possible.
14   Q. How often did you go on these sales calls?
15   A. Intermittently.
16   Q. Once a quarter or more often than that?
17   A. It varied.
18   Q. Were you involved in pricing at Roxane
19 during this time period?
20   A. No.
21   Q. Were you involved in pricing to the extent
22 it was related to a specific customer for contract

Page 49

1  issues?
2    A. Yes.
3    Q. For example, if you had competitive
4  information about a particular wholesaler -- if you
5  had competitive information from one of your
6  customer wholesalers about competitive product
7  pricing, you would use that information or pass
8  that information on up to the contracting
9  department to ensure that Roxane put out the best
10 or most competitive price?
11   A. Yes.
12   Q. Did you have any input on setting or
13 determining average wholesale price for Roxane's
14 products?
15   A. No.
16   Q. Who set AWP at Roxane during this time
17 period, which is 1996 to 2004?
18   A. Marketing.
19   Q. And to the best of your recollection, who
20 was in the marketing department during that time
21 period?
22   A. Judy Waterer and Lesli Paoletti. I forget

Page 50

1  how you spell it.
2    Q.  And were they both still there when you
3  left in March of 2004?
4    A.  Yes. I'm not sure.
5    Q.  And you're not sure because they were
6  still employed by Boehringer Ingelheim, but they
7  may have been in different positions, is that why?
8    A.  I'm not sure on that.
9    Q.  Do you know if they were employed by
10 Boehringer Ingelheim or Roxane when you left in
11 March of 2004?
12   A.  Say that again.
13   Q.  Do you know if either of the -- do you
14 know if Judy or Lesli were still employed by Roxane
15 or Boehringer Ingelheim when you left in March of
16 2004?
17   A.  They were not.
18   Q.  They were not. Do you know who they were
19 -- where they went?
20   A.  I believe Bedford Labs.
21   Q.  And it's Bedford Labs -- is it your
22 understanding that Bedford is in some way owned by

Page 51

1  Boehringer Ingelheim?
2    A.  Yes.
3    Q.  Did you have any input on setting
4  wholesale acquisition costs for Roxane's products?
5    A.  No.
6    Q.  Who had responsibility for determining
7  wholesale acquisition cost?
8    A.  Marketing department.
9    Q.  And again, that would have been Judy
10 Waterer and Lesli Paoletti during this time period?
11   A.  Yes.
12   Q.  Did they have other people working in the
13 marketing department; you just can't recall exactly
14 who they were?
15   A.  I believe so.
16   Q.  And did you stay in the same position
17 during your entire career with Roxane in Boehringer
18 Ingelheim?
19   A.  I had a title change.
20   Q.  And when was that?
21   A.  I don't remember.
22   Q.  And what was the title -- you were -- you

Page 52

1  started out as director of trade, is that right?
2    A.  Yes.
3    Q.  And what was your new title?
4    A.  Executive director of trade and pharmacy
5  affairs.
6    Q.  Did you have any new job responsibilities
7  when you became executive director?
8    A.  The pharmacy affairs.
9    Q.  And what does -- what were your new
10 responsibilities with respect to pharmacy affairs?
11   A.  Professional associations and some
12 educational programs.
13   Q.  "Professional associations," do you mean
14 professional associations that pharmacists might
15 belong to?
16   A.  Yes.
17   Q.  And would you, on occasion, have made
18 presentations or spoken to those types of
19 associations while you were with Roxane?
20   A.  No.
21   Q.  Did you attend professional association
22 meetings during this time period with Roxane?

Page 53

1    A.  Yes.
2    Q.  Do you recall situations -- do you recall,
3  while attending these meetings, that Medicare or
4  Medicaid reimbursement would be a topic for these
5  -- at any of these meetings?
6    A.  Yes.
7    Q.  Was that a common topic at these meetings?
8    A.  Define "common" for me, I mean --
9    Q.  Well, let me put it this way: You
10 attended more than one of these meetings, correct?
11   A.  Yes.
12   Q.  And would Medicare or Medicaid
13 reimbursement have come up as a topic at more than
14 one of these meetings?
15   A.  Yes.
16   Q.  So, based on all of your experience in the
17 industry, starting back when you graduated from
18 pharmacy school, and working up through your
19 experience with Roxane, which, I think, takes us
20 through 2004, the reimbursement -- is it your
21 understanding that reimbursement is an important
22 issue to these retail pharmacists?

Richard A. Feldman R.Ph.   HIGHLY CONFIDENTIAL         November 18, 2005
                            Quincy, MA

**74**

1 litigation involved in this matter. So, if you
2 were -- recall ever seeing any documents in those
3 contexts, then that would be privileged
4 communication. But I think his question is outside
5 of those contexts, correct?
6     MR. GOLDENBERG: Correct.
7   A. I don't recall.
8   Q. Do you still keep in contact with Mark
9 Pope?
10  A. Not for a long, long time.
11  Q. Do you know if he's still in the wine
12 business in California?
13  A. I believe he is.
14  Q. Do you know the name of the company?
15  A. Yes.
16  Q. What's the name of the company?
17  A. Bounty Hunters.
18  Q. Bounty -- is it a wine company, Bounty
19 Hunters Wine Company?
20  A. I don't know how he classes his company,
21 but he sells wine and other stuff.
22  Q. What other -- do you know what other stuff

**75**

1 he sells other than wine?
2   A. Cigars, glassware, chachkis. I don't
3 know. I don't know.
4   Q. Is that chachkas or chachkis?
5   A. Let's check. I don't know. I guess more
6 than one chachka is a chachki, right? I don't
7 know.
8   Q. Okay. So, in 2001 you transitioned to the
9 new -- well, you transitioned to become a
10 Boehringer Ingelheim employee where you had
11 responsibility only for BI branded products, is
12 that right?
13  A. Yes.
14  Q. Did you have any interaction after the
15 2001 time period with Roxane employees?
16  A. None, you know -- no, from a business
17 standpoint.
18  Q. Was there, like, a transition period?
19  A. Yes.
20  Q. How long did that transition period last?
21  A. Not very long. I mean, it was very
22 informal.

**76**

1   Q. The transition was very informal, is that
2 what you mean?
3   A. Yes.
4   Q. And Karen Strelau was the individual who
5 was essentially taking over the responsibilities
6 that you may have had with respect to Roxane
7 products, is that correct?
8   A. Yes.
9   Q. Did Judy Waterer and Lesli Paoletti --
10 well, let's start with -- did Judy Waterer
11 transition to Boehringer Ingelheim in 2001?
12  A. No.
13  Q. Did Judy Waterer transition to Bedford in
14 2001?
15  A. I don't remember if that was right away or
16 not.
17  Q. So, in 2001 did Roxane have a separate
18 marketing department from Boehringer Ingelheim?
19  A. Yes.
20  Q. Did -- prior to 2001, do you recall Roxane
21 having any branded products?
22  A. Yes.

**77**

1   Q. And what were the branded products?
2   A. Viramune, V-i-r-a-m-u-n-e, Roxicodone,
3 R-o-x-i-c-o-d-o-n-e, Oramorph, O-r-a-m-o-r-p-h.
4   Q. Was Roxicet also a branded Roxane product?
5   A. Yes. R-o-x-i-c-e-t.
6   Q. And Oramorph you mentioned. Was there
7 also a -- is that separate from a product called
8 Oramorph SR?
9   A. No.
10  Q. It's the same thing, in your mind?
11  A. I think it's the same thing.
12  Q. And is Oramorph a tablet or liquid or
13 both?
14  A. Geeze, I don't remember.
15  Q. It was an oral product, correct?
16  A. Yes.
17  Q. Were all of these branded products oral?
18  A. Yes.
19  Q. Were all of the multisource products that
20 Roxane had oral as well?
21  A. Well, you've got to start defining "oral."
22  Q. Were some injectable, based on your