# TAB 10

1

NO. CV3-03079

THE STATE OF TEXAS                          IN THE DISTRICT COURT OF

- - - - - - - - - - - - - - x

THE STATE OF TEXAS
ex rel.
    VEN-A-CARE OF THE
    FLORIDA KEYS, INC.

            Plaintiffs,

vs                                          TRAVIS COUNTY, TEXAS

ROXANE LABORATORIES, INC.,
BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,
BEN VENUE LABORATORIES, INC.,
and BOEHRINGER INGELHEIM
CORPORATION

            Defendants.                     201st JUDICIAL DISTRICT

- - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF JIM KING

        Taken before Lori Miller, Licensed Shorthand Reporter, a Notary Public in and for the State of Connecticut, pursuant to Notice and the Connecticut Practice Book, at The Inn at Ethan Allen, 21 Lake Avenue Extension, Danbury, Connecticut, on December 3, 2004, commencing at 9:30 a.m.

194

1  and I'll read from the bottom of the paragraph, Jim has
2  also been asked to take a lead role in addressing and
3  implementing sales force compliance programs given the
4  recent introduction of the PhRMA Marketing Code and OIG
5  guidelines. Did I read that correctly?
6      A   Yes.
7      Q   Okay. And is that in fact what happened in
8  2002, that you became responsible for implementing OIG
9  guidelines, among other things, for the BIPI sales
10 force?
11     A   That's correct.
12     Q   Were there some type of tentative OIG
13 guidelines that were published at that point in 2002?
14     A   I'm not sure whether OIG guidelines had been
15 published at that time. If they had not been, they
16 followed soon thereafter.
17     Q   When you were given that responsibility, how
18 was it that you and others at BIPI knew that there were
19 OIG guidelines?
20     A   I believe when this was published, I was vice
21 president of sales, and as such would have received
22 these guidelines directly from our legal department when
23 they were published, if they had been published by then.
24 I'm not sure of the time window.
25         MR. WINGARD: Just for the record, since

195

1  I don't know what your answer might be, I
2  just have to caution you to the extent that
3  Mr. Anderson asked you a question that would
4  cause you to reveal substantive
5  communications between yourself and the
6  legal department at Boehringer, if you let
7  us know, so that I can assert the proper
8  objection.
9      A   Understand.
10 BY MR. ANDERSON:
11     Q   Do you maintain a copy of the OIG guidelines?
12     A   I believe I have a copy of the OIG guidelines,
13 yes.
14     Q   Currently, in your office, there's a folder
15 and you have a physical printout of the OIG guidelines;
16 is that right?
17     A   That's correct.
18     Q   And you had those for some time now, correct?
19     A   Correct.
20     Q   And you feel like you're familiar with those,
21 don't you?
22     A   Yes.
23     Q   What steps have you taken to make sure that
24 the BIPI sales force is in compliance with those OIG
25 guidelines?

196

1      A   We've instituted a training program, three
2  modules of which sales representatives have to take
3  every year, and it's followed as to who takes it and who
4  doesn't. These were instituted, I believe, two years
5  ago, or soon thereafter this, and we mandated that the
6  representatives go through these training modules every
7  year, as well as incorporating a modicum of training
8  with OIG guidelines and the new sales rep hire
9  curriculum. Those are the things that have been done.
10     Q   Are other personnel at BIPI made aware of the
11 OIG guidelines other than sales representatives?
12         MR. WINGARD: Object; form.
13     A   I don't know. My opinion is, yes, they
14 probably are, but I really don't know
15 BY MR. ANDERSON:
16     Q   Do you train your employees on the OIG
17 guideline provisions that pertain to AWP?
18     A   No, not sales force employees.
19     Q   Do you train the BIPI employees or otherwise
20 admonish them to not to discuss AWP reimbursements in
21 selling drug products?
22     A   No, we do not.
23     Q   Why is that?
24     A   We pay very little attention to pricing with
25 respect to training the new sales reps.

197

1      Q   When you talk about the field sales force, you
2  encompass within that the Roxanne brand drugs, right?
3      A   Correct.
4      Q   So, to the extent we're talking about the BIPI
5  sales force that you're training on the OIG guidelines,
6  including Roxane representatives who sell, quote
7  unquote, brand drugs, right?
8      A   Correct. That's right now, and, then, the
9  last two years only Viramune, only Viramune, that's a
10 Roxanne product, that is a previous Roxane product, and
11 it's being promoted by the field sales force.
12     Q   What about Oramorph, how is that product
13 promoted?
14     A   I have no idea.
15     Q   I think you testified earlier in your tenure
16 at BI you have had responsibility for the sales force
17 that promoted Oramorph, correct?
18     A   Correct.
19     Q   And roughly what time frame was that that you
20 were responsible for that drug product?
21     A   Probably '99, somewhere in the summer of '99
22 to the summer of '00. We had a palliative care sales
23 force. It was disbanded I believe right around in April
24 or May of 2000.
25     Q   Okay. Now, backing up, in your experience at

198

1  BI or Roxane brand products, who is it that normally
2  sets the AWP on a product?
3      A   That's an interesting question. We really
4  never set an AWP on the branded side. We set only
5  wholesale acquisition costs, and our entire conversation
6  about product before we launch it, it's all about
7  wholesale acquisition costs.
8          AWP, traditionally, with our company as well
9  as another company I have been with previously, and I'm
10 assuming that most of the other companies in the
11 industry are the same, is a traditional increase from
12 your wholesale acquisition cost to the AWP. We hardly
13 ever speak about AWP in business or in training -- I
14 never speak about it in training sales reps.
15     Q   What is the standard markup at Boehringer
16 Ingelheim's offered WAC to the product --
17     A   Sixteen two-thirds percent.
18     Q   So, in other words, for the jury, that means
19 that you would multiply a given WAC by 1.1666 and you
20 would get an AWP on that product?
21     A   Theoretically, yes.
22     Q   Now, would that same basic formula hold true
23 for Roxane's brand drugs?
24     A   Yes.
25     Q   Do you recall whether or not Oramorph had

199

1  therapeutic competition from another product?
2      A   Yes, they did.
3      Q   And what was that drug called?
4      A   Perdue Fredericks. Product was exactly the
5  same.
6      Q   And what type of product is Oramorph?
7      A   Synthetic morphine, for pain; mostly for
8  cancer patients.
9      Q   And would Perdue's product have been a
10 synthetic morphine as well?
11     A   Exact same product.
12     Q   In your experience as being the compliance --
13 well, strike that.
14         Are you the compliance officer for Boehringer
15 Ingelheim Pharmaceuticals?
16     A   No.
17     Q   Who is?
18     A   Tim Schmidt -- oh, all right officer, I
19 believe is Ed Miller.
20     Q   What position does Tim Schmidt hold.
21     A   He is the compliance, director of compliance
22 for sales and marketing.
23     Q   So, would you say that Mr. Schmidt holds a
24 position that's parallel to yours?
25     A   No. I was relieved of the compliance piece

200

1  about four months ago, about that, or when Tim actually
2  came on board. He's a new hire. I don't actually do
3  this anymore. I had him for about four or five months.
4      Q   Is it fair to say Tim took your compliance
5  responsibility from you?
6      A   It is fair.
7      Q   Did I understand your testimony a few moments
8  ago that he is in charge of the compliance training for
9  the sales force as well as the marketing force at
10 Boehringer?
11     A   Correct.
12     Q   But when you were in charge of compliance for
13 of the sales force, you did not have any marketing
14 responsibilities?
15     A   Correct.
16     Q   Why was it that Mr. Schmidt was, it was
17 determined he would have compliance responsibility for
18 both units?
19     A   I really don't know. Mr. Fontaine made that
20 decision, and he brought Tim Schmidt on board. I don't
21 know.
22     Q   Did you do anything to train Mr. Schmidt?
23     A   No.
24     Q   Do you know what Mr. Schmidt has done, or
25 anybody else for that matter, to train the Boehringer

201

1  marketing department on the OIG guidelines?
2      A   No, I do not.
3      Q   Do you or anyone at your direction ever train
4  the Boehringer marketing team on the OIG guidelines?
5      A   No, I never did. If that's your question, nor
6  did I ever direct anybody to do so.
7      Q   What's your basic understanding of the OIG
8  guidelines regarding AWP?
9      A   I really don't know much about AWP and the OIG
10 guidelines.
11     Q   Do you recall reading portions of the OIG
12 guidelines which deal with AWP?
13     A   It was not an area of focus of interest for
14 me, because we don't really train our sales force on
15 AWP, or pricing in general. Our sales force is kind of
16 removed from the pricing piece with respect to drugs.
17     Q   What's your understanding of the kickbacks
18 provision of the OIG guidelines?
19     A   My interpretation of it is that we have to
20 avoid even the appearance of kickbacks, especially when
21 there's Medicaid involved. Any kind of government
22 sponsored/paid for prescriptions involved, we have to
23 avoid even the appearance of kickbacks.
24         So, we have to be extremely cautious about
25 spending money on people who are capable of writing