# TAB 11

1

```
---------------------------------------------x
UNITED STATES OF AMERICA, ex rel,
VEN-A-CARE, FLORIDA KEYS, INC.,
                        Plaintiffs,
                        Case No. 07-10248
        -against-
BOEHRINGER INGELHEIM CORPORATION,
et al.,
                        Defendants.
---------------------------------------------x
```

                    May 19, 2009

                    9:00 a.m.


                 CONFIDENTIAL

        Deposition of JONATHAN R. MACEY, taken at
the offices of Kirkland & Ellis, Citigroup Center,
153 East 53rd Street, New York, New York, before
Georgette K. Betts, a Certified Shorthand
Reporter, Registered Professional Reporter and
Notary Public within and for the States of New
York and New Jersey.

Macey, Jonathan R.                CONFIDENTIAL                May 19, 2009
                                   New York, NY

                                                        12 (Pages 42 to 45)

```
                                      42
 1      Q.  And the documents -- you possessed the
 2   documents in hard copy?
 3      A.  Correct.
 4      Q.  Did anybody help you review them?
 5      A.  No.
 6      Q.  Did anybody help you review, draft or
 7   edit your report in any way, shape or form, other
 8   than attorneys at Kirkland & Ellis?
 9      A.  No.
10      Q.  Just to be clear, did you take notes at
11   any point in time in your review of the documents?
12      A.  No.
13      Q.  Over the next two days, February 16th
14   and February 17th the invoice reflects a
15   conference call with defense counsel lasting five
16   and a half and 8.25 hours.  Who was on those
17   calls?
18          MS. RIVERA:  Wait, I don't think you're
19   characterizing that correctly.  It says conference
20   call with K&E and document review.  Conference
21   call K&E, document review, and document drafting
22   those periods of time.

                                      43
 1          MR. FAUCI:  I wasn't aware that I
 2   characterized them other than as conference calls
 3   with Kirkland & Ellis.
 4          MS. RIVERA:  Right.  I'm saying there's
 5   additional descriptions of what happened here in
 6   that time.
 7          MR. FAUCI:  The document will speak for
 8   itself.
 9      Q.  Who was on those February 16th and
10   February 17th conference calls?
11      A.  Okay.  Just so the record is clear,
12   because I'm afraid my invoice may not be a model
13   of clarity given the previous few minutes
14   discussion, these are meant to be separate items
15   in the sense that there was a conference call with
16   K&E semicolon and separate by myself document
17   review.  So I did not engage in a document review
18   with Kirkland & Ellis either -- on any of these
19   calls that I specifically -- that I can remember.
20   So the conference call would have lasted a very
21   short period of time and the document review would
22   be the major component of this time --

                                      44
 1      Q.  Thank you.
 2      A.  -- submission.
 3      Q.  That helps clarify things.
 4          Move ahead to the conference call on
 5   February 23rd, what does the entry "document
 6   review" mean?
 7      A.  Document review means I reviewed
 8   documents.  I read material, depositions,
 9   documents, the material that we previously
10   discussed that comprise Exhibit Number 3.
11      Q.  In any of these conference calls that
12   are reflected with Kirkland & Ellis, did you,
13   prior to or during one of those calls, at any time
14   did you send a copy of your report to defense
15   counsel?
16      A.  No.
17          MR. FAUCI:  I think we're at a natural
18   time for a two-minute break.
19          (Recess.)
20   BY MR. FAUCI:
21      Q.  As I understand it you've been retained
22   by defendants in this case to serve as an expert

                                      45
 1   witness; is that correct?
 2      A.  Yes.
 3      Q.  What is your area of expertise?
 4      A.  My areas of expertise are corporate
 5   governance, corporate control, ordinary and
 6   standard business practices among parent,
 7   subsidiaries and affiliate corporations, and
 8   economic and public policy related to corporate
 9   groups and relationships among parent, subsidiary
10   and affiliate corporations.
11      Q.  What do you mean by corporate
12   governance?
13      A.  Corporate governance refers to all of
14   the institutions and mechanisms that go into
15   determining how decision making and controls
16   within corporations occur.
17      Q.  Are corporate governance and corporate
18   control different concepts?
19      A.  Yes.
20      Q.  What do you mean by corporate control?
21      A.  So corporate control means the issue of
22   who controls the decision making within a company.
```

Macey, Jonathan R.          CONFIDENTIAL              May 19, 2009
                            New York, NY

13 (Pages 46 to 49)

---

**46**

1  Q. And is it fair to say that corporate
2  governance -- well, what is corporate governance
3  then?
4  **A. So corporate governance is the**
5  **institutions, mechanisms and processes that relate**
6  **to it, influence decision making and control.**
7  Q. And corporate control is the issue of
8  who makes decisions?
9  **A. Right. So you can think of corporate**
10 **control as kind of a who, and corporate governance**
11 **as kind of a how.**
12 Q. Based on your work in this case, do you
13 hold certain opinions about the defendants'
14 corporate governance?
15 **A. Yes.**
16 Q. What are those opinions?
17 **A. Well there are a number of opinions,**
18 **essentially they -- just for the sake of trying to**
19 **be precise and complete, they're the opinions that**
20 **are generally described on pages 4 and 5 of my**
21 **report and then other opinions as those opinions**
22 **are sort of explained and elaborated upon in the**

**47**

1  **subsequent pages of the report.**
2  MR. FAUCI: Why don't we just introduce
3  your report as an exhibit.
4  (Whereupon, expert report of
5  Jonathan R. Macey, was marked as Exhibit Macey 005
6  for identification, as of this date.)
7  Q. Is this a true and accurate copy of your
8  expert report?
9  **A. Yes, it's a true and accurate copy of my**
10 **expert report without the attachments.**
11 Q. Is that your signature on page 37?
12 **A. Yes, it is.**
13 Q. If I can direct your attention to
14 paragraph 2 of your report, it states that you
15 have been asked to provide your opinion regarding
16 issues of corporate governance related to the
17 interaction and relationships between the four
18 defendant corporations.
19    Do you see that?
20 **A. Yes, I do.**
21 Q. What issues of corporate governance were
22 you asked to provide opinions?

**48**

1  **A. Well, I think, essentially, the**
2  **corporate governance issues described in the**
3  **remainder of that paragraph there. Issues related**
4  **to the relationships among the various entities**
5  **that are named, you know, BIRI, BIC, BIPI, Roxane**
6  **and whether they operated as separate and**
7  **independent corporate entities.**
8  **I also analyzed whether these**
9  **relationships were consistent with ordinary and**
10 **customary business practices as well as sound,**
11 **good public policy related to corporate**
12 **governance. And then as explained in**
13 **subparagraphs A to E these are kind of further**
14 **corporate governance issues that I opined about.**
15 Q. Your opinions in this case relate to the
16 interaction and relationships among the defendant
17 corporations; is that correct?
18 **A. Well among others, that's certainly part**
19 **of my opinion, yes.**
20 Q. The four defendant corporations being
21 Roxane Laboratories, Inc., Boehringer Ingelheim
22 Roxane, BIPI and BIC?

**49**

1  **A. Yes.**
2  Q. Are you offering opinions regarding the
3  corporate governance of any other companies or
4  entities within the Boehringer Ingelheim family of
5  companies?
6  **A. Well in the course of my document review**
7  **and formulating my opinion I also examined the**
8  **corporate governance of an additional corporation**
9  **which was part of this corporate group called Ben**
10 **Venue Incorporated. So I have -- so some of my**
11 **opinions, as discussed in the report, also relate**
12 **to that corporate entity.**
13 Q. Did you consider Boehringer Ingelheim
14 Services Center at all in forming your opinions?
15 **A. Yes.**
16 Q. Can you think of any other corporate
17 entity that you considered in forming your
18 opinions in this case other than the four
19 defendants, Ben Venue, and Boehringer Ingelheim
20 Service Center?
21 **A. Not offhand, no.**
22 Q. Further down in paragraph 2 of your

---

```
                                         50
 1  report it states that the purpose of your opinion
 2  is to analyze and, where appropriate, draw
 3  conclusions about whether the relationships among
 4  these entities were normal and typical parent and
 5  sibling corporate relationships.
 6       Do you see that?
 7    A.  Yes.
 8    Q.  Which corporate relationships did you
 9  analyze in this case?
10    A.  The corporate relationships that I
11  analyzed were the relationship between BIC and
12  Roxane, the relationship between BIC and BIPI, the
13  relationship between Roxane and BIPI, the
14  relationship between Roxane and Ben Venue, and
15  then the kind of shared services that were -- and
16  the shared services and contracts that existed
17  among these entities also including the shared
18  services company that we discussed a moment ago.
19    Q.  Boehringer Ingelheim Services Center?
20    A.  Yes.
21    Q.  Focusing on the relationship between
22  Roxane and BIC, did you determine that this
```

```
                                         51
 1  corporate relationship was normal and typical?
 2    A.  Yes, on the basis of my research and
 3  practical experience in the area of corporate
 4  governance it's my opinion that the relationship
 5  between BIC, as a parent holding company, and
 6  Roxane was well within the normal range with
 7  respect to corporate governance relationships and
 8  corporate formalities and corporate separateness
 9  and maintaining an actual corporate identity on
10  behalf of both of those, with respect to both of
11  those entities.
12    Q.  Did you identify any aspects to the
13  relationship between Roxane and BIC that were
14  atypical?
15    A.  Any that were atypical?  Well, it's my
16  opinion that every company is in some ways -- or
17  every company and every relationship is in certain
18  ways unique, but I don't recall any of the factors
19  that I looked at as being kind of outside the
20  normal range or even atypical in a
21  parent/subsidiary relationship, so sitting here
22  right now I can't think of any.
```

```
                                         52
 1    Q.  You examined the relationship between
 2  BIPI and BIC, correct?
 3    A.  Yes.
 4    Q.  Did you determine that this corporate
 5  relationship was normal and typical?
 6    A.  Yes.
 7    Q.  And did you identify any aspects to this
 8  relationship that you thought were atypical?
 9    A.  No.
10    Q.  What about between BIPI and Roxane, did
11  you determine that that corporate relationship was
12  normal and typical?
13    A.  Yes.
14    Q.  And did you identify any aspects of that
15  relationship that were atypical?
16    A.  No.
17    Q.  Please explain the process by which you
18  evaluated whether the relationships among the
19  defendant corporations were, quote, normal and
20  typical, quote?
21    A.  Okay.  I think I describe this, I'll
22  just kind of, if I could -- let me see if I can
```

```
                                         53
 1  locate this.
 2       So essentially I kind of did -- I did
 3  the following things:  I looked at -- I took as my
 4  baseline the two sort of two things, number one,
 5  general patterns of corporate behavior, that is,
 6  ordinary and customary corporate relationships in
 7  parents and subsidiaries and in affiliate or what
 8  I sometimes call sibling corporations.  Then I
 9  looked at, in addition to ordinary and customary
10  sort of practice, I looked at the sort of economic
11  and public policy rationales related to the
12  justification for giving these entities limited
13  liability.  So in other words, I looked at both
14  kind of ordinary and customary business procedure
15  and then the cost and benefits of those ordinary
16  and customary kind of business practices among
17  relationships.
18       Then I looked at the history of the
19  companies, you know, particularly Roxane, how it
20  came to be part of the BIC corporate family, if
21  you will, and how the relationship and
22  interactions between and among these entities
```

54

1  began and then evolved over time.
2      As we talked about earlier, I looked at
3  the ordinary kind of corporate formalities.  I
4  also looked at capitalization and the financial
5  condition of Roxane.  And other kinds of things,
6  financial transactions, and, finally, I looked at
7  Matthew Perri's opinions and his deposition to the
8  extent that he had a different perspective than I
9  did with respect to some of these issues.
10     Q.  Did you employ any particular
11 methodology in reviewing these materials?
12     A.  Yes, as I said before, my methodology
13 involved kind of a two-part approach.  One,
14 looking at, comparing the actual interactions
15 among these companies that I observed with
16 ordinary and customary business practice and what
17 I regard as kind of industry norm, and then
18 applying standards, long economic analysis of the
19 public policy justification, the public policy
20 benefits and costs associated with those to reach
21 a determination as to whether what the specific
22 facts in this case that I looked at and these

55

1  particular relationships especially as they kind
2  of evolved over time were both number one, normal
3  and consistent with kind of U.S. corporate
4  practice and, two, whether they presented any
5  particular sort of -- what we would call kind of
6  an externality or cost or policy issues or
7  problems.
8      Q.  By what standards do you measure whether
9  corporate relationships are, quote, normal and
10 typical, quote?
11     A.  Again, I measure them by two standards.
12 The first standard is whether they are consistent
13 with standard practice with what we observe other
14 similarly situated, similarly organized
15 corporations doing.  And two, whether there are
16 any kind of special problems associated with a
17 particular form of or particular pattern of
18 behavior among parents and subsidiaries or sibling
19 corporations.
20     Q.  Did you compare the corporate
21 relationships in this case to any other particular
22 sets of corporate relationships among companies?

56

1     A.  In the U.S. there are generally a couple
2  of broad sort of sets of patterns of corporate
3  governance relationships that I am familiar with
4  and; that is to say, there are holding company
5  relationships with their operating companies, and
6  there are operating companies that also are parent
7  companies.  So I compared -- I looked at whether
8  or not BIC operated as a typical holding company,
9  because some companies that hold them -- that sort
10 of claim to be holding companies are in fact
11 operating companies.  So I looked at that.  And I
12 looked at, on the basis of sort of the way that
13 various kinds of corporations are organized in the
14 U.S. particularly financial firms and then
15 obviously nonfinancial firms.  In this case where
16 there are some differences in organizational
17 structure and corporate governance I looked at
18 that to see how these corporations fit within the
19 larger pattern.
20     Q.  Are there any corporate groups of
21 companies that you specifically compared the
22 corporate relationships you observed in this case

57

1  to?
2      A.  Again, the corporate relationships that
3  exist follow two kind of large patterns.  The
4  financial and the nonfinancial, so I compared the
5  companies in this case, which are nonfinancial
6  firms, to corporate governance relationships among
7  nonfinancial firms.
8      Q.  Did you compare the relationships to any
9  specific firms or just to a generalized standard
10 of behavior among nonfinancial firms in general?
11     A.  Two -- well, again in my experience and
12 the basis of my research there is a pattern among
13 nonfinancial firms, that is -- that differs from
14 financial firms and I compared BIC to that.  So it
15 would be all nonfinancial firms which in my view
16 have observable similarities about the way that
17 they operate.
18     Q.  So there wasn't a particular set of
19 companies that you looked at as a comparison?
20     A.  Correct.
21     Q.  Is the standard of what are normal and
22 typical corporate relationships informed by law?

**58**

1    A.  Well in a sort of indirect way it is;
2  that is to say, I don't look at law in figuring
3  out what ordinary and standard practice is, but
4  my, I think as a matter of kind of sociology or
5  anthropology people within corporations,
6  particularly their lawyers, are going to be aware
7  of what law is and will tailor corporate behavior
8  in kind of what is known as in the shadow of the
9  law.  So in a kind of a feedback effect way, you
10  know, the law would be relevant, although I'm not
11  looking at the law as the sort of cause, but in
12  the background it may shape what I observe in
13  studying corporate governance, it's likely to have
14  shaped that.
15    Q.  What are the sources you look to for a
16  standard of ordinary and typical corporate
17  behavior?
18    A.  The sources I look to are what
19  corporations actually do; that is to say, I study
20  corporate relationships, I study corporate groups,
21  and I study the interactions among these groups
22  from a wide variety of perspectives and so it's a

**59**

1  matter of my research and experience as to, you
2  know, what literally what it is that we observe in
3  kind of the landscape of U.S.  business.
4    Q.  Is there literature on the issue of what
5  are normal and typical corporate relationships,
6  academic literature?
7    A.  There are a variety of studies that are
8  related.  They're kind of a variety of branches of
9  research that feed -- that kind of feed into this
10  but this is more or less, you know, observing what
11  actually goes on.  Although there certainly are,
12  you know, books that touch on this issue.
13    Q.  Does the standard of what are normal and
14  typical corporate relationships vary from state to
15  state?
16    A.  No.  In the U.S. there's essentially --
17  these corporate governance relationships are
18  really national in scope; that is to say, if you
19  think about a corporation that is, you know, maybe
20  headquartered in Atlanta like Coca-Cola or in some
21  other city that their corporate governance
22  relationships will -- the relationships among the

**60**

1  various corporate entities follow certain kind of
2  patterns and best corporate governance patterns
3  and patterns of behavior that are not unique to
4  any particular region or state.
5    Q.  I just want to try and be clear on this.
6  So you compared what you observed about Roxane and
7  the Boehringer defendants' corporate relationships
8  to a generalized standard of what constitutes
9  ordinary and typical behavior among nonfinancial
10  firms?
11    A.  And relationships, interactions.  In
12  other words, looking at what they did versus what
13  we would -- what would be characterized as
14  ordinary or normal behavior.
15    Q.  Describe a normal and typical or
16  ordinary parent corporate relationship?
17    A.  In a normal or typical parent
18  relationship is characterized by -- is defined by,
19  I should say, control by the parent corporation of
20  the subsidiary corporation, so that generally we'd
21  expect to see 50 percent, usually far higher than
22  that, of voting equity owned or controlled by the

**61**

1  parent corporation.  So that in every
2  parent/subsidiary corporation context, by
3  definition, there is the potential for control of,
4  you know, the subsidiary by the parent
5  corporation.
6        Then we would have in a typical
7  situation essentially the appointment, but
8  formally speaking, the election of the
9  subsidiaries' board of directors by the parent
10  corporation.  We would see this characterized by
11  the subsidiary corporation having relationships
12  with external third parties and having
13  relationships with the parent and having various
14  relationships with sibling or affiliate companies
15  within the corporate group, all of which could be
16  described in greater detail as having particular
17  characteristics.
18    Q.  Do you agree that as a holding company
19  BIC did not have any active businesses of its own?
20    A.  Correct, yes.
21    Q.  What was BIC's primary purpose?
22    A.  BIC's primary purpose was essentially as

Page 66

1  Q. Are there other officers for a company
2  that you would consider top officers besides the
3  CEO?
4  A. Well, again it depends on the business,
5  but the person in charge of the finances generally
6  would be the other kind of key person.
7  Q. What about vice presidents in charge of
8  certain aspects of the operating business?
9  A. From the standpoint of comparing really
10 officers with directors those people would really
11 be in a little bit of a different category.
12 Q. They generally have more responsibility
13 for day-to-day functioning?
14 A. Well all of the officers -- that's what
15 the officers are supposed to do. The difference
16 is not so much day-to-day versus non day-to-day,
17 rather the difference would be with respect to
18 kind of more discrete or specialized function as
19 opposed to kind of an overall responsibility for
20 the firm as a whole.
21 Q. Is there a difference in your mind
22 between discrete and global responsibilities on

Page 67

1  one hand and strategic or high level and day-to-
2  day responsibilities on the other?
3     MS. RIVERA: Object to form.
4  A. I think -- if I understood your question
5  correctly, I think there are a number of
6  distinctions in that question. So, there are
7  difference between strategic decision making and
8  nonstrategic decision making. And I think there
9  are also differences between global nonstrategic
10 decision making and discrete nonglobal decision-
11 making. So you'd have two employees, like one
12 could be a CEO who's -- or a comptroller or
13 financial officer who are involved in every single
14 aspect of the firm but much of their work may not
15 be strategic. And then you could have somebody
16 with a specialized function, say, in research or
17 accounting or law or whatever, who may be -- who
18 is also a nonstrategic but is not global because
19 they're involved only in a specific aspect of a
20 company's business.
21 Q. In general terms, as compared to a board
22 of directors, a corporation's officers are tasked

Page 68

1  with managing its operations; is that correct?
2  A. Can you give that to me again?
3     (Record read.)
4  A. Yes, the day-to-day business.
5  Q. And officers can include the president,
6  the treasurer, the CEO, the CFO, positions like
7  that are officers?
8  A. Well with respect to your last question,
9  just in terms of the operations of the business it
10 would include -- yeah, it would include a broad
11 sort of group of people, yes. So in terms of
12 running the day-to-day business, that would
13 include a fairly broad group of people.
14 Q. Is it your opinion that it is routine
15 for holding companies to provide certain services
16 to subsidiaries such as legal, IT, financial and
17 accounting services?
18 A. Yes.
19 Q. Did BIC provide such services to its
20 subsidiaries?
21 A. My recollection here is that most of the
22 kind of shared services were provided by a

Page 69

1  separate company with respect to certain of these
2  services or with respect to others that BIPI
3  provided those services.
4  Q. Is it normal and typical that such
5  services would be provided by one subsidiary
6  corporation to another?
7  A. Yes, very common.
8  Q. What is that opinion based on?
9  A. It's based on my own experience as well
10 as research and analysis.
11 Q. Is it typical that one subsidiary
12 corporation will emerge as the primary operating
13 company within a group of subsidiary corporations?
14 A. I'm not quite sure I understand what you
15 mean. I will say that it is extremely common that
16 for one subsidiary among a group of subsidiaries
17 to, for lack of a better term, really to be -- I
18 don't know, kind of the alpha subsidiary, to be
19 the subsidiary that's the most profitable, that
20 gets the most attention, the most resources, its
21 businesses evolve over time, some just become more
22 important than others as a consequence of the

**Page 70**

1 market really.
2   Q. And in such a circumstance is it typical
3 for the alpha subsidiary to participate in the
4 management of other subsidiary corporations?
5   A. What would be -- well, just to be very
6 clear here, I want to make it something that I
7 think is important to clarify is -- at the risk of
8 stating the obvious but I think it's necessary, a
9 corporation of course is an inanimate object, as
10 the saying goes. It has no -- what is the term,
11 no soul to damn, no body to kick or something like
12 that. So corporations cannot act, period. They
13 have to have -- there have to be individuals who
14 in, you know, corporations to act, so it's -- so a
15 caveat to that is, you know, it's just a matter of
16 corporate governance it's imperative to kind of
17 figure out some way to figure out to determine
18 when a corporation is acting for many, many, many,
19 many, many reasons and when, you know, individuals
20 within the corporation are either acting on their
21 own behalf or acting as agents for other
22 corporations.

**Page 71**

1       So the answer to your question is
2 complicated based on that, which is, one, it is
3 exceedingly common for, as I mentioned earlier,
4 for people in a sibling company or in a subsidiary
5 company to play multiple roles, to be agents both
6 of the company that the sort of alpha company or
7 one company within a corporate group and other
8 companies within the corporate group. It's also
9 common for the subsidiary company to deal -- a
10 subsidiary company to deal with other subsidiary
11 companies and for those companies to have
12 interactions and relationships.
13      I just -- the point I want to make in
14 brief is simply that these are two very different
15 things. It's one thing to say a company is acting
16 on behalf of another company, and that occurs
17 sometimes and it also occurs sometimes that
18 individuals within a subsidiary company are acting
19 on behalf of that subsidiary company and they may
20 at various times act on behalf of other subsidiary
21 companies, so we see both going on simultaneously
22 and I saw both going on with respect to BIPI's

**Page 72**

1 relationship to Roxane.
2   Q. Can you turn to paragraph 21 of your
3 report?
4   A. Okay.
5   Q. I'm looking at the second sentence. You
6 say that holding companies routinely nominate and
7 elect boards of directors of their subsidiary
8 companies, participate in the management of their
9 subsidiaries, provide advice and strategy and
10 financial support, and perform various services
11 for their operating subsidiaries including tax
12 reporting, legal services, accounting services and
13 cash management services.
14      Do you see that?
15  A. Yes.
16  Q. My question is, is it typical for one
17 subsidiary corporation to do all of those things
18 for another subsidiary corporation?
19  A. Yes, I understood that question when you
20 asked it before and yes.
21  Q. And based on your review of the
22 materials in this case, is it your opinion that

**Page 73**

1 BIPI, in fact, performed many of the functions
2 identified in paragraph 21?
3      MS. RIVERA: Object to form.
4   A. Yes. To put it as clearly as I can, as
5 I talked a moment ago, companies evolve at
6 different rates and in different ways and it may
7 be that in a subsidiary's development it requires
8 certain services, say, legal service as an
9 internal legal function before other subsidiaries
10 within the group. And having already established
11 a legal function in subsidiary A, it often is
12 efficient, and the reason the holding companies
13 are considered to be, you know, efficient in the
14 economies that before -- in situations where it
15 might otherwise not be cost effective or efficient
16 for another subsidiary to, as a free standing
17 entity create such a function, it could be
18 economical for it to utilize the services provided
19 by the other subsidiary. So that's why it's
20 extremely common for affiliate companies to
21 perform these services. And holding companies
22 frequently have, not always, but very frequently

**70**

1  market really.
2     Q. And in such a circumstance is it typical
3  for the alpha subsidiary to participate in the
4  management of other subsidiary corporations?
5     A. What would be -- well, just to be very
6  clear here, I want to make it something that I
7  think is important to clarify is -- at the risk of
8  stating the obvious but I think it's necessary, a
9  corporation of course is an inanimate object, as
10 the saying goes. It has no -- what is the term,
11 no soul to damn, no body to kick or something like
12 that. So corporations cannot act, period. They
13 have to have -- there have to be individuals who
14 in, you know, corporations to act, so it's -- so a
15 caveat to that is, you know, it's just a matter of
16 corporate governance it's imperative to kind of
17 figure out some way to figure out to determine
18 when a corporation is acting for many, many, many,
19 many, many reasons and when, you know, individuals
20 within the corporation are either acting on their
21 own behalf or acting as agents for other
22 corporations.

**71**

1         So the answer to your question is
2  complicated based on that, which is, one, it is
3  exceedingly common for, as I mentioned earlier,
4  for people in a sibling company or in a subsidiary
5  company to play multiple roles, to be agents both
6  of the company that the sort of alpha company or
7  one company within a corporate group and other
8  companies within the corporate group. It's also
9  common for the subsidiary company to deal -- a
10 subsidiary company to deal with other subsidiary
11 companies and for those companies to have
12 interactions and relationships.
13        I just -- the point I want to make in
14 brief is simply that these are two very different
15 things. It's one thing to say a company is acting
16 on behalf of another company, and that occurs
17 sometimes and it also occurs sometimes that
18 individuals within a subsidiary company are acting
19 on behalf of that subsidiary company and they may
20 at various times act on behalf of other subsidiary
21 companies, so we see both going on simultaneously
22 and I saw both going on with respect to BIPI's

**72**

1  relationship to Roxane.
2     Q. Can you turn to paragraph 21 of your
3  report?
4     A. Okay.
5     Q. I'm looking at the second sentence. You
6  say that holding companies routinely nominate and
7  elect boards of directors of their subsidiary
8  companies, participate in the management of their
9  subsidiaries, provide advice and strategy and
10 financial support, and perform various services
11 for their operating subsidiaries including tax
12 reporting, legal services, accounting services and
13 cash management services.
14        Do you see that?
15    A. Yes.
16    Q. My question is, is it typical for one
17 subsidiary corporation to do all of those things
18 for another subsidiary corporation?
19    A. Yes, I understood that question when you
20 asked it before and yes.
21    Q. And based on your review of the
22 materials in this case, is it your opinion that

**73**

1  BIPI, in fact, performed many of the functions
2  identified in paragraph 21?
3        MS. RIVERA: Object to form.
4     A. Yes. To put it as clearly as I can, as
5  I talked a moment ago, companies evolve at
6  different rates and in different ways and it may
7  be that in a subsidiary's development it requires
8  certain services, say, legal service as an
9  internal legal function before other subsidiaries
10 within the group. And having already established
11 a legal function in subsidiary A, it often is
12 efficient, and the reason the holding companies
13 are considered to be, you know, efficient in the
14 economies that before -- in situations where it
15 might otherwise not be cost effective or efficient
16 for another subsidiary to, as a free standing
17 entity create such a function, it could be
18 economical for it to utilize the services provided
19 by the other subsidiary. So that's why it's
20 extremely common for affiliate companies to
21 perform these services. And holding companies
22 frequently have, not always, but very frequently

**74**

1  have a very small number of employees. They're
2  really set up to sort of management the investment
3  part and not to provide operational functions.
4     Q.  Is it appropriate for one subsidiary
5  company to participate in the management of
6  another subsidiary company?
7        MS. RIVERA:  Object to form.
8        MR. FAUCI:  What's the objection?
9        MS. RIVERA:  What do you mean by
10 management, it's very vague.
11    Q.  Go ahead.
12    A.  Oh, I'm sorry.  As I mentioned before,
13 it's extremely common, routine, beyond routine,
14 normal for personnel within subsidiaries to be
15 actively involved in the management and operations
16 of sibling companies because, as I mentioned, it's
17 extremely common to see people in these various
18 corporate groups wear a multitude of hats.  And
19 it's also extremely common for companies,
20 subsidiary companies to contract with each other
21 and to have interactions of a variety of kinds so
22 that the expertise of one is utilized or the

**75**

1  services of one are utilized for the benefit or
2  the benefit of the other.  The issue is always,
3  from a corporate governance perspective and from a
4  perspective of evaluating whether this is
5  appropriate or not, is whether or not it's
6  possible to figure out where one of these
7  subsidiary ends and the other one begins.  So just
8  to be -- just as a very general matter, a lot of
9  your -- a lot of your questions kind of -- this
10 question, I should say, takes the form of is it
11 normal for a subsidiary to provide services for
12 another subsidiary, and I just want to make it
13 clear, from my perspective this kind of jumps into
14 the question kind of midway in the analysis in the
15 sense that, generally, what one of the things I'm
16 doing in this report and in my analysis in this
17 case, is trying to figure out, you know, are these
18 companies separate and distinct, do they operate
19 as separate and distinct businesses with kind of
20 unique integrity as discrete entities.  And so
21 when, you know, you say to me, well is BIPI
22 providing services to Roxane let's say, that

**76**

1  already assumes part of my analysis, which is fine
2  I just want to make it clear, and that is, you
3  know, we have separate, identifiable entities,
4  BIPI and Roxane, so that we can tell who's doing
5  what for whom at all purposes.  And from the
6  standpoint of sort of my methodology and analysis
7  that's a very important distinction among various
8  kinds of corporate governance relationships that
9  we observe.
10    Q.  You've opined that the corporate
11 relationship between Roxane and BIPI was, quote,
12 normal and typical, correct?
13    A.  Right.
14    Q.  And you've opined that the corporate
15 relationship between Roxane and its parent, BIC,
16 was, quote, normal and typical correct?
17    A.  Yes.
18    Q.  I understand from paragraph 21 of your
19 report that it is routine for holding companies to
20 provide various services for their operating
21 subsidiaries?
22    A.  Correct.

**77**

1     Q.  Is it also routine for -- and I
2  understand from your testimony -- correct me if
3  I'm wrong -- that it is also your opinion that it
4  is routine for one subsidiary to provide those to
5  another?
6     A.  Correct.
7     Q.  Is it routine for one subsidiary to not
8  provide such services to another?
9     A.  Well that's a difficult question.  In
10 other words, it would be very surprising to see a
11 holding company with two subsidiaries particularly
12 if they're in, you know, where there are economies
13 of scale or efficiencies to see no services being
14 performed.  So if you've said, oh, here are a
15 couple of subsidiaries and there are no
16 relationships or interactions between the two, I'd
17 say that is extremely rare.
18    Q.  What services did you see Roxane provide
19 BIPI?
20    A.  My recollection is that Roxane had a
21 couple of sales forces and that one of these sales
22 forces would occasionally, particularly with

## Page 78

1  respect to new product launches by BIPI products,
2  go around and kind of include the BIPI product in
3  its kind of marketing and sales or whatever. So I
4  saw that. There were some other things, too, I
5  believe, I don't know that might or might not be
6  described -- I would describe them as, you know,
7  to the extent that the services are, you know --
8  there are services where there's kind of give and
9  take on both sides in my observations these were
10 situations in which, you know, Roxane provided a
11 service and received a benefit of some sort. And
12 BIPI may have done the same.
13     Q.  Are you aware of whether any Roxane
14 employees served in corporate officer or
15 management positions within BIPI?
16     A.  Whether any Roxane people were in
17 management positions in BIPI; I don't recall.
18     Q.  Do you recall whether any BIPI employees
19 served in management capacities in Roxane?
20     A.  There was a time when an officer at
21 BIPI, Sheldon Berkle, was involved in certain
22 oversight responsibilities involving certain

## Page 79

1  Roxane products, but in those situations he really
2  wasn't doing anything by or on behalf of BIPI, I
3  would not characterize him as a BIPI agent. I
4  would say that he was wearing two hats and he was
5  operating as a Roxane person.
6      Q.  Are you aware of whether he held any
7  employment position with Roxane?
8      A.  As I said before, it's my understanding
9  -- it's my belief and opinion that Mr. Berkle
10 operated -- was acting as an agent of -- was
11 acting as an agent of Roxane, so in that sense he
12 was a Roxane agent within the commonly held
13 understanding of that term.
14     Q.  Can one -- if someone's an employee of
15 BIPI, you owe fiduciary duties to your employer,
16 correct?
17     A.  Under state law if you're a -- fiduciary
18 duties are typically limited to the very top
19 officers CEO, CFO and the directors. And that the
20 other employees have obligations of good faith and
21 fair dealing in their relationships with their
22 firm for, you know, lower level employees is not

## Page 80

1  dictated by fiduciary duties but rather by the
2  terms of their employment contract.
3      Q.  So if Mr. Berkle was an employee of BIPI
4  he owed certain duties to BIPI that were incident
5  to his employment, correct?
6      A.  That's correct.
7      Q.  What were the duties that he would owe
8  to Roxane if he was not an employee of Roxane?
9      A.  Well, as I mentioned before, he was an
10 agent of Roxane and as such he owed duties as an
11 agent. So in acting as an agency capacity the --
12 somebody who was working -- it it's very common
13 for corporations to have nonemployees who are
14 agents who have the same kinds of duties that
15 officers and directors would have.
16     Q.  Is there a test to look at to determine
17 whether -- when an employee of one company
18 participates in another company and is not
19 employed by that company, is there a test to
20 determine when he is acting as an employee of
21 company A or as an agent of company B?
22     A.  Yes.

## Page 81

1      Q.  What is that?
2      A.  So, the typical agency test is whether
3  the agent is -- on whose behalf the agent is
4  acting and whether the principal, which is the
5  entity on whose behalf the agent is acting, has
6  agreed to accept the services of the agent. So
7  the idea is that if you have, you know -- again,
8  extremely common for people to serve two hats,
9  that means they have dual agency relationships at
10 various levels within holding companies and their
11 subsidiaries. And so while in some situations it
12 may be -- that I've observed actually, it may be
13 difficult to tell how -- in what capacity someone
14 is operating. For a variety of reasons, peculiar
15 to this case, it's extremely easy to tell, for
16 example, when Mr. Berkle is acting for Roxane and
17 when Mr. Berkle is acting for BIPI.
18     Q.  What are those reasons?
19     A.  Well, for one thing, both -- at all
20 relevant times that I've observed in this case,
21 Roxane manufactured particular products that were
22 wholly separate and distinct from the products

**82**

1  that BIPI manufactured. So that fact is by no
2  means true for every, you know, subsidiary
3  situation. Often subsidiaries will -- separate
4  subsidiaries will be in exactly the same line of
5  business and manufacture the same product.
6       So when Mr. Berkle is interacting with a
7  Roxane product or engaged in oversight with
8  respect to a Roxane product, it's not confusing
9  because one can't say, oh, that's also a BIPI
10 product so we don't really know what he's doing.
11 It's not a situation, this is very common where
12 somebody can say, you know, this is something that
13 -- this is a decision made that applies to both
14 companies. These are decisions sometimes Mr.
15 Berkle would make decisions that related to BIPI
16 and sometimes he would make decisions when he was
17 working for -- was serving as an agent for Roxane.
18 So that's one of the kind of peculiarities of kind
19 of the fact pattern in this case that was relevant
20 to my analysis.
21     Q. Do you know whether Mr. Berkle was ever
22 paid by Roxane?

**83**

1     A. It's my understanding, and my opinion
2  was predicated on the kind of belief and
3  assumption that Mr. Berkle was paid by BIPI and
4  never received -- and did not receive a Roxane
5  paycheck.
6     Q. Was he an employee of BIPI?
7     A. He was an agent of --
8     Q. I'm sorry, was he an employee of Roxane?
9  I believe I said BIPI.
10    A. Right. Again, he was in agency
11 relationship with Roxane. Roxane was the
12 principal. He was the agent. And whether he was
13 -- how that was thought of, it might have been an
14 employee/employment relationship, it could have
15 been a consulting. There are many, many kind of
16 different vague and not very useful ways of
17 characterizing that. But to my way of thinking
18 and my experience, the accurate way of
19 characterizing Mr. Berkle's relationship with
20 Roxane is that he served a dual -- in what is
21 known as dual agency capacity. He was an agent
22 both for Roxane and for BIPI in various

**84**

1  capacities.
2     Q. Do you have an opinion as to whether or
3  not Mr. Berkle was an employee of Roxane?
4     A. Again, I would say he is an agent. I
5  don't have an opinion about whether an
6  employee/employer relationship existed, no.
7        MR. FAUCI: Let's take a couple minute
8  break.
9        (Recess.)
10    Q. Can I ask you to turn to paragraph 2 of
11 your report again?
12    A. Certainly.
13    Q. Paragraph 2 of your report also states
14 that you analyzed whether defendant corporations
15 operated as separate and independent corporate
16 entities.
17       Do you see that?
18    A. Yes, I do.
19    Q. Can you describe what it means for a
20 corporation to function as a separate and
21 independent corporate entity?
22    A. Yes. So, basically the test here is

**85**

1  whether or not sufficient distinctions among the
2  corporations have been made such that it's
3  possible to tell when one corporation ends and
4  when the next corporation begins, so that there's
5  sufficient difference in the product orientation
6  and in the -- and that there's, you know, when
7  we're talking about, you know, the parent and the
8  sibling we can have some degree of certainty that
9  if we're talking about, say for example, a
10 particular asset, we can say well, that asset
11 belongs to the parent or that asset belongs to the
12 sibling and that we don't allow kind of people to
13 make determinations at their kind of whim and
14 caprice about, you know, who owns what and the
15 like.
16    Q. The test is whether or not you can tell
17 when one corporation begins and another ends; is
18 that correct?
19    A. Yes.
20    Q. And the criteria you look to include
21 product -- different products?
22    A. So that would be -- that would certainly

**86**

be, you know, that's not a -- that's not a necessary condition, but it's certainly relevant in this case. There would be situations -- I only mention this to be clear that there are situations I've observed where subsidiaries have virtually identical products and services and yet kind of corporate separateness is nonetheless respected. It's just where they have different businesses it's simply easier.

Q. Another criteria you mentioned was when you can tell when an asset belongs to one corporation or another?

A. Right.

Q. Are there other criteria you look to in determining whether or not a corporation operated as a separate and independent corporate entity?

A. Well, those are -- so, that's the -- those are the major touchstones of the analysis; that is to say, that as in every country including this one companies are in some shape or fashion permitted to be organized and corporations are permitted to own other corporations and

**87**

corporations exist therefore under common ownership. And, you know, the question is given that that's the case when should there be some -- you know, when should we make a determination when does public policy suggest that these, you know, kind of formal distinctions should be ignored, and basically they should be ignored when these -- it becomes difficult or impossible to make these determinations because when it's difficult or impossible to make those determinations, then you can get, you know, inappropriate strategic behavior, the kind of inappropriate strategic behavior that we're trying -- that one wants to avoid.

Q. Difficult and impossible to make what kind of determinations?

A. When it's difficult or impossible to tell when one company ends and when another one begins, you can get bad policy results when that is the case.

Q. Is it your opinion that BIPI operated as an independent company?

**88**

A. Yes.

Q. And Roxane?

A. Yes.

Q. Is this opinion or these opinions based on your review of any particular documents?

A. My opinion is based on the totality of the record I tried to take into account.

Q. Is there academic literature on the issue of what it means for a corporation's operations to be independent or separate and distinct?

A. Excuse me. Is there --

Q. Academic literature on the issue of standard by which you measure whether a corporation's operations are independent or separate and distinct?

A. Generally speaking, there are kind of best corporate governance practices and there is policy analysis of why this is -- I think it's generally accepted that this is the appropriate form of analysis and there are certainly academic work as to why that -- you know, analyzing why

**89**

this is the appropriate kind of analysis to take.

Q. The analysis being when -- whether or not you can determine when one corporation begins and another ends?

A. Correct.

Q. And I'm sorry to be repetitive, I just want to be clear on it. The criteria you looked to in making that are if companies have separate products and whether it is possible to tell whether an asset belongs to one entity or another, are there any others?

A. Well, in other words, so there are many, many things one looks at and the goal of looking at these many things is to make that determination. So we look at things like, does the company have a board of directors, does the company have assets, and the goal of looking at all these various factors, these various particular facts is to be able to make a judgment about whether the company is a discrete, distinguishable entity from its siblings and/or from its parent.

Macey, Jonathan R.                CONFIDENTIAL                May 19, 2009
                                   New York, NY

31 (Pages 118 to 121)

**Page 118**

1  looking for that, what caused you to look for
2  that?
3     A.  Well as a general matter I'm very
4  interested in shared services and it's an area of
5  some focus in people who are interested in, you
6  know, corporate relationships, et cetera.  And I
7  vaguely remember that there had been, you know,
8  some kind of -- I don't know what you'd call them,
9  kind of seminars on this and so I was just
10 generally doing a search looking for kind of
11 booklets or seminars and I was interested to see,
12 in this particular case, that the particular
13 subsidiary in this case, the shared services
14 subsidiary I call it, was actually mentioned in
15 the brochure as being an industry leader in this
16 regard.
17     MR. FAUCI:  I'm at a sort of big switch
18 so --
19     MS. RIVERA:  Okay.
20     MR. FAUCI:  -- I can either start now
21 and go for another ten minutes or we can just take
22 a break now.

**Page 119**

1      MS. RIVERA:  It's up to you, would you
2  rather go for a little bit longer?
3           (Discussion off the record.)
4           (Luncheon recess:  11:57 a.m.)

**Page 120**

1           A F T E R N O O N   S E S S I O N
2                 (12:52 a.m.)
3
4      MS. RIVERA:  I want to just -- can I say
5  one thing on the record before we start again,
6  Jeff?
7      MR. FAUCI:  Sure.
8      MS. RIVERA:  First, I wanted to say that
9  earlier the government asked for a copy of
10 Professor Macey's March invoice, and while it was
11 my understanding that had been produced previously
12 along with our response to the subpoena, to the
13 extent it has not, I have now provided Mr. Fauci a
14 copy of Professor Macey's invoice for his time in
15 March.
16     I also just want to state on the record,
17 even though we've discussed this off the record,
18 that Professor Macey has to be done and his
19 deposition needs to be concluded by 4:00 p.m.
20 tomorrow.  And that we gave the government notice
21 of this I think more than a week ago.  And to the
22 extent we need to make up that extra hour, we

**Page 121**

1  notified the government we would be willing to
2  start early tomorrow.  I just want to put on the
3  record that he does have to leave at 4:00 p.m.,
4  but we're willing to accommodate that by starting
5  early tomorrow if need be.
6      MR. FAUCI:  I will just say I have no
7  idea whether the invoice was or was not produced
8  and it certainly may have, so don't take anything
9  I've said as a representation that it wasn't
10 produced previously.  Thank you for giving us now.
11     I think at the end of the day we can
12 decide whether we need to start at eight or not.
13     MS. POLLACK:  Let me just say I agree
14 with that.  But I was never given notice that Mr.
15 Macey was not available after four tomorrow.
16     MR. FAUCI:  An e-mail was sent to me and
17 Laurie Oberman, Roz.
18     MS. POLLACK:  Yes, but I was not
19 notified of that, I just want the record to
20 reflect that.
21
22        JONATHAN R. MACEY,

**122**

1  reviously sworn, resumed and testified further as
2  follows:
3
4            EXAMINATION (Continued)
5  BY MR. FAUCI:
6       Q.  Professor Macey, I'm going to go back to
7  paragraph 2 of your report.
8       A.  Okay.
9       Q.  It says you evaluated whether Roxane
10 maintained operational control over its business,
11 including operational control over the pricing and
12 marketing of its products.
13          Do you see that?
14      A.  Yes, I do.
15      Q.  Did you form an opinion about this?
16      A.  Yes.
17      Q.  What is it?
18      A.  That Roxane did, as this phrase says,
19 operate as a separate and distinct corporate
20 entity, maintain that Roxane did maintain
21 operational control over its business, and that
22 that operational control included operational

**123**

1  control over the pricing and marketing of its
2  products.
3       Q.  Does your opinion encompass all of
4  Roxane's products or just the products identified
5  in the United States' complaint?
6       A.  My analysis included all Roxane's
7  general way of doing business, which would include
8  all of Roxane's products not just the ones
9  identified in the complaint.
10      Q.  Are you offering any opinion as to the
11 extent or nature of BIC's involvement in the
12 pricing and marketing of Roxane's products?
13      A.  Yes, to the extent that I reached
14 conclusions in the course of my analysis about
15 Roxane's operational control over its business,
16 and Roxane's marketing and pricing of its product,
17 I regard this operational control to be an
18 exclusive concept such that it would exclude other
19 entities including BIC.
20      Q.  Are you offering an opinion as to
21 whether or not BIC knowingly participated in
22 decisions to set inflated AWPs for Roxane's

**124**

1  products?
2       A.  Again, since Roxane, in my opinion,
3  exerted and maintained operational control over
4  the pricing and marketing of its products, then
5  this would exclude the notion that BIC was
6  exerting operational control simultaneously.
7       Q.  I'm sorry, my question is:  Are you
8  offering an opinion as to whether or not BIC
9  knowingly participated in the decision to set
10 inflated AWPs for Roxane's products?
11         MS. RIVERA:  Object to form.
12      A.  I guess I'm struggling a little bit
13 because I did reach an opinion about whether BIC
14 knowingly participated or contributed in any
15 pricing of any kind, so to that extent I did reach
16 -- I didn't draw any conclusions with respect to
17 whether prices were inflated or not.  I simply
18 reached conclusions with respect to the corporate
19 governance including who set prices.
20      Q.  Is it your opinion that BIC played no
21 involvement whatsoever in setting -- in the
22 decisions to set AWPs for Roxane's products?

**125**

1       A.  I don't recall seeing any evidence that
2  BIC was participating in setting prices or
3  marketing products that this was -- these
4  functions resided within Roxane.
5       Q.  Do you have an opinion as to whether BIC
6  or BIPI's conduct, to the extent it exists,
7  subjects them to liability under the False Claims
8  Act?
9       A.  Do I have a personal opinion?  I'm
10 sorry.
11      Q.  Are you offering an opinion as to
12 whether or not BIC and/or BIPI are liable under
13 the False Claims Act?
14      A.  Oh, I'm not -- I don't consider myself
15 an expert in the False Claims Act so I have not
16 analyzed -- I'm not offering any opinion with
17 respect to sort of ultimate liability or other --
18 my opinion is restricted to the issues I described
19 in my report, the corporate governance, corporate
20 control issues.
21      Q.  Have you analyzed what is the standard
22 for liability under the False Claims Act?

**158**

 1  materialized, isn't that a different question than
 2  whether or not Roxane and BIPI were part of the
 3  part of the Ethical Pharmaceuticals Business Unit?
 4     A.  Well, no.  Or to put it differently, I'm
 5  regarding -- if you look at the history of this
 6  Ethical Pharmaceuticals Business Unit it was
 7  basically an effort to achieve certain goals, that
 8  the idea was we're going to work to achieve
 9  certain goals, so I'd regard that as sort of the
10  idea.  And so to the extent that this -- that
11  there was an idea or a goal associated with this,
12  I think that one can make an assessment about
13  whether or not that goal was reached or achieved.
14     Q.  Starting with 1994, who was in charge of
15  the business unit?
16     A.  My recollection -- I can't recall
17  whether Mr. Berkle came in to the business unit in
18  '94 or '96, it's my recollection that he was in
19  charge from the beginning, although I may be
20  mistaken about that.
21     Q.  I direct your attention to paragraph 86
22  of your report.  You're talking about an October

**159**

 1  1998 reorganization.  I'm going to quote midway
 2  through the paragraph but feel free to read the
 3  whole paragraph.  You write: "To further these
 4  goals, certain BIPI employees were given high
 5  level supervisory roles over the sales and
 6  marketing of Roxane's brand and branded generic
 7  products."
 8     Who are you referring to?
 9     A.  I think this is actually very poorly
10  worded.  Here what I'm referring to is that for a
11  brief period of time with respect to certain of
12  Roxane's drugs, like Mr. Russillo who is placed in
13  as an agent with dual responsibilities, there were
14  some other people who were also, if you will,
15  seconded, given additional responsibilities beyond
16  their responsibilities to BIPI were also given
17  responsibilities at Roxane.
18     Q.  Who were they?
19     A.  So these people, my recollection is,
20  there was Leonetti, there were three -- I think
21  four of these people, I don't recall, Fulton and
22  Leonetti are two of them.  Ciarelli, I think maybe

**160**

 1  King, I'm not quite certain of all four of their
 2  names.  But the basic idea is that they were
 3  people at BIPI with expertise in one kind of
 4  subsegment of the Roxane constellation of
 5  products, if you will, that is branded generics
 6  and branded drugs and those people were brought
 7  in, as I say, not to, you know -- and, literally,
 8  as we see I think in this organizational chart,
 9  kind of layered into the Roxane organization.
10  They retained their roles at BIPI but they also
11  took over some responsibilities at, you know -- I
12  wouldn't say take over some responsibilities but
13  they were involved, as I think Mr. Berkle
14  testified, in with high level supervisory roles
15  over the sales and marketing of Roxane's branded
16  and branded generic products.
17     Q.  So we've identified Mr. Leonetti, Mr.
18  Fulton, Mr. Ciarelli and maybe Mr. King?
19     A.  I think that's right.
20     Q.  Are these -- these people were BIPI
21  employees, correct?
22     A.  It's my opinion and belief that prior to

**161**

 1  this 1998 corporate reorganization, these people
 2  were exclusively BIPI employees but at some point
 3  they moved over to -- they took on kind of a
 4  second hat, they took on a second job just in the
 5  way that Mr. Berkle did who had responsibilities
 6  both in Roxane and in BIPI.  These people were
 7  given responsibilities in Roxane -- in Roxane and
 8  in BIPI as well.
 9     Q.  Did they become Roxane employees?
10     A.  Again, they became agents of Roxane.  I
11  have no opinion about, you know, whether they
12  became employees, but they were acting as agents
13  of Roxane, to the extent they were involved in the
14  high level supervision of these subset products
15  for this 1998, late 1998 period of time.
16     Q.  Is there a test for determining when
17  someone becomes an agent of a company?
18     A.  Yes.
19     Q.  What is that?
20     A.  Okay.  So the test hasn't -- well, so
21  the test is whether or not someone is offered and
22  is willing to serve an organization, whether that

162

1 organization or principal, as the agent's
2 principals, as the term is used, to act by and on
3 behalf of the principal. So the basic test for an
4 agent is kind of an offer and acceptance of
5 performing the role of an agent. And there is
6 absolutely no requirement in agency principals
7 that the agent be compensated by the principal in
8 the form of being an employee or kind of direct
9 cash, but the agency is, you know, is an extremely
10 well recognized concept in business organizations.
11     Q. You're aware that Werner Gerstenberg,
12 for instance, served as an employee of both Roxane
13 and BIC, correct?
14     A. Again, as I mentioned with respect to
15 these other people, my determination in terms of
16 corporate organization relate to fiduciary
17 relationships, agency relationships,
18 responsibilities of reporting. I have made no
19 determination about people's employment
20 relationships, although I will say that, generally
21 speaking, somebody who has a title of president
22 and COO is, generally speaking, is considered to

163

1 be an employee of the company for which they are a
2 president or COO.
3     Q. Are you aware of formal documents, board
4 minutes or otherwise, that designated either Mike
5 Leonetti, Greg Fulton, Jim King, Gregg Ciarelli to
6 be agents of Roxane?
7     A. The 1998 reorganization which gave these
8 people certain high level oversight
9 responsibilities would have satisfied the
10 requirements for the creation of an agency
11 relationship.
12     Q. Are there -- what are the requirements
13 for the creation of an agency relationship?
14     A. So the agent has to be willing to act on
15 the principal's behalf, in this case the agents
16 are the people who at BIPI who are being asked to
17 put on a second Roxane hat. And the principal has
18 to accept that the agent is going to be acting by
19 and on behalf of it, the principal.
20     Q. In that paragraph 86 of your report you
21 write that certain BIPI employees were given high
22 level supervisory roles, why did you refer to them

164

1 as BIPI employees if it's your testimony that they
2 are really also Roxane agents?
3     A. Right. Well two things -- and again the
4 first is that, as I mentioned earlier, I don't
5 think this is the most artfully worded paragraph
6 I've ever written, and second that it's my
7 recollection -- it was my belief at the time I
8 wrote this and still my belief that at the time
9 these people were sort of given their second hat,
10 they were, in fact, BIPI employees. That's what
11 they were exclusively BIPI -- you know, that they
12 didn't have an agency relationship prior to this.
13     Q. Prior to 1998?
14     A. Right. Prior to these October 1998
15 organizational changes.
16     Q. So it's your belief, as you sit here
17 today, that Mike Leonetti, Jim King, Gregg
18 Ciarelli, Greg Fulton's agency relationship
19 started with Roxane in 1998?
20     A. Sitting here right now, that's my
21 recollection.
22     Q. Are there circumstances when -- taking a

165

1 step back from there, the Roxane situation.
2     A. Okay.
3     Q. Are there circumstances when an employee
4 of one subsidiary works on behalf of another
5 subsidiary and does not thereby become an employee
6 -- an agent of the second subsidiary? I can give
7 that another shot if you want.
8     A. No, no, no. Well I just want to focus
9 on the term, you used the word on behalf of, so
10 the essence of an agency relationship is that as
11 an agent I'm working on behalf of the principal.
12 So I could -- so my answer to the question is, if
13 the person who's performing this capacity is doing
14 so knowingly and volitionally, and if the
15 principal has acquiesced or accepted the
16 relationship, then it's axiomatic that it's an
17 agency relationship because that's what an agency
18 relationship.
19     Q. Just to be clear, if we have a situation
20 with multiple corporations within a single
21 corporate family, when an employee of subsidiary A
22 accepts and does work on behalf of subsidiary B,

Macey, Jonathan R.　　CONFIDENTIAL　　May 19, 2009
New York, NY

43 (Pages 166 to 169)

---

**Page 166**

1  he automatically becomes an agent of B?
2  　A.  Again, if those conditions are met; that
3  is to say, that person then has a responsibility,
4  has a duty to act on that principal's behalf.  If
5  that's -- and subject to that principal's control.
6  So those are the definitions of an agent -- you
7  could imagine a situation where the person is
8  acting not on behalf of the subsidiary, the
9  principal but acting on behalf of, you know, the
10 original employer, in which case you would have a
11 -- you might not have an agency relationship.  But
12 as long as you're -- I accept your phraseology and
13 this person is actually acting not on behalf of
14 some other entity but on behalf of, you know,
15 Roxane, let's say, or the subsidiary that is
16 pursuant to which the employee is wearing this
17 second hat, then that's an agency relationship.
18 　Q.  In the Roxane case we have Shelly
19 Berkle, who was an employee of BIPI and you've
20 described him as an agent of Roxane; is that
21 correct?
22 　A.  Yes.

**Page 167**

1  　Q.  And Mike Leonetti, Greg Fulton, Jim
2  King, Gregg Ciarelli report to Shelly Berkle,
3  correct?
4  　A.  I believe that's correct.
5  　Q.  And so how would you determine whether
6  they are reporting to the principal, Roxane, or
7  the principal, BIPI?
8  　A.  Well two things:  One -- well, three
9  really.  One, this is not an uncommon situation.
10 It is, I think, the -- I would venture to say
11 virtually without exception one observes these
12 kind of dual relationships which involve somebody
13 who is accepting one paycheck from one company,
14 who is kind of seconded, if you will, or acting as
15 an agent wearing a second hat with respect to a
16 second company.  Point number two is the
17 implication behind your question is absolutely
18 correct, which is that sometimes it's very
19 difficult to tell.  And that's a problem.  Third,
20 however, in this case, because of the particular
21 facts of this case -- and I'm not talking about
22 any other, but with respect to this case where the

**Page 168**

1  companies -- it's easy to tell because these
2  companies actually have different, discrete
3  product and nobody is saying, that -- there are no
4  arguments that BIPI is not claiming any particular
5  products for its own and, you know, the
6  government, as far as I know, is not alleging that
7  these -- you know, certain products that were
8  Roxane products were really BIPI products, so, you
9  know, we can tell on whose behalf these people are
10 operating as agent because we know, we can see
11 whose company's products they were involved with,
12 even if it was at an extremely, you know, kind of
13 tangential and high level.
14 　　MR. FAUCI:  Why don't we take a five-
15 minute break.
16 　　(Recess.)
17 BY MR. FAUCI:
18 　Q.  Professor Macey, I'm going to show you
19 what's been marked by the court reporter as
20 Exhibit 8.
21 　　(Whereupon, employee bulletins
22 dated October 23, 1998, was marked as Exhibit

**Page 169**

1  Macey 008 for identification, as of this date.)
2  　Q.  Take a moment to familiarize yourself
3  with it and let me know when you're ready for a
4  question.
5  　　(Witness reviewing document.)
6  　A.  Okay.
7  　Q.  Is this a to Employees Bulletin both
8  dated October 23rd, 1998?
9  　A.  Yes.
10 　Q.  Have you reviewed these documents
11 before?
12 　A.  Yes, I have.
13 　Q.  Do you see that the first is signed by
14 Werner Gerstenberg?
15 　A.  Yes.
16 　Q.  And do you see that below that it says,
17 president, Boehringer Ingelheim Corporation?
18 　A.  Yes.
19 　Q.  Does that suggest to you that Mr. Berkle
20 was authoring this Employee Bulletin in the course
21 of his employment for Boehringer Ingelheim
22 Corporation?

---

Henderson Legal Services, Inc.

202-220-4158　　　　　　　　　　www.hendersonlegalservices.com