# TAB 15

1

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

----------------------------X

In Re:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )  MDL No. 1456

PRICE LITIGATION                )  Civil Action No.

----------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:       )

United States of America ex     )

rel. Ven-a-Care of the          )

Florida Keys, Inc., et al.      )

v. Boehringer Ingelheim         )

Corp., et al., Civil Action     )

No. 07-10248-PBS                )

----------------------------X

          The videotaped 30(b)(6) deposition of

Roxane Laboratories, Inc., Roxane Laboratories, Inc.

n/k/a Boehringer Ingelheim Roxane, Inc., Boehringer

Ingelheim Pharmaceuticals, Inc., and Boehringer

Ingelheim Corporation by JAMES F. McINTYRE

                    Chicago, Illinois

                Thursday, February 26, 2009

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

6  (Pages 18 to 21)

18

1          MS. RIVERA:  Object to form.
2    BY THE WITNESS:
3          A.  Yes, but there may be times I want to
4    clarify which company we're talking about.
5    BY MR. FAUCI:
6          Q.  I'm -- I think it's important to be as
7    specific as possible on that, so I'll try -- when I
8    refer to the worldwide family or the group of
9    companies to -- we'll call them Boehringer
10   Ingelheim.  But if you need clarification, ask.
11         At any time have you been employed by any
12   Boehringer Ingelheim entities other than Roxane
13   Labs or Boehringer Ingelheim Roxane?
14         A.  No.
15         Q.  What is your position?
16         A.  I'm the functional controller for
17   operations.
18         Q.  What does the functional controller for
19   operations do?
20         A.  In addition to -- just basically handling
21   all the accounting activities for the manufacturing
22   entity, we do all the financial analyses for the

19

1    manufacturing entity, closing of the books on a
2    monthly basis, variance analysis, anything -- any
3    financial analysis that's rated -- related to the
4    manufacturing function.
5          Q.  How long have you been in that position?
6          A.  Since June of 1996.
7          Q.  So is the position you occupy the same as
8    when you were employed by Roxane Laboratories prior
9    to 2005?
10         A.  Yes.
11         Q.  Where did you work prior to coming to
12   Roxane?
13         A.  Prior to '96, I worked for a company
14   called Borden, Inc. for three years; and prior to
15   that, I worked for Kraft.
16         Q.  Is Borden, Inc. a pharmaceutical company?
17         A.  No.  It's a dairy company.
18         Q.  Are you an accountant?
19         A.  Yes.
20         Q.  Did you meet with anyone in preparation
21   for today's deposition?
22         A.  Yes.

20

1          Q.  Who?
2          A.  Met with bar -- my counsel on three
3    different occasions.
4          Q.  By your counsel, do you mean Ms. Rivera?
5          A.  Yes.
6          Q.  Was anyone else present at any of those
7    meetings?
8          A.  Co-counsel.
9          Q.  Can you be more specific on "co-counsel"?
10         A.  Meghan Dolan from Kirkland & Ellis,
11   Sheila Denton.
12         Q.  How long were those meetings?
13         A.  They lasted roughly eight hours, I guess,
14   a day.
15         Q.  Each one?
16         A.  Yes.
17         Q.  Are you familiar with a company called
18   Boehringer Ingelheim Pharmaceuticals, Incorporated?
19         A.  Yes.
20         Q.  If I refer to that company as BIPI today,
21   will you understand that I mean Boehringer
22   Ingelheim Pharmaceuticals --

21

1          A.  Yes.
2          Q.  -- Incorporated?
3          Describe in general the business of BIPI
4    from 1996 to the present.
5          A.  BIPI is the -- the branded side of the
6    Boehringer Ingelheim family, so they're -- they
7    sell branded products, patent protected products.
8          Q.  Have you ever had any responsibilities
9    for any portions of BIPI's business?
10         A.  Yes.
11         Q.  Can you describe that?
12         A.  The -- when I was hired, I was brought on
13   as the manufacturing controller, responsible for
14   manufacturing.  BIPI, in addition to Roxane, both
15   had manufacturing activities.  In 1996, BIPI was in
16   the process of closing their manufacturing facility
17   and moving the production to either a facility in
18   Mexico or to the Roxane facility in Columbus.
19   During that time that the manufacturing facility in
20   -- in Ridgefield was being closed down, I provided
21   the financial analysis related to the manufacturing
22   operations there.

Roxane Laboratories, Inc (James F. McIntyre)                              February 26, 2009

Chicago, IL

7  (Pages 22 to 25)

| 22 |
|---|
| 1    Q.  When was it closed down? |
| 2    A.  I think all but one activity was closed |
| 3  down by 1999. |
| 4    Q.  The manufacturing facility in Ridgefield, |
| 5  did it make drugs primarily for BIPI? |
| 6    A.  Yes. |
| 7    Q.  Did it make any drugs for Roxane? |
| 8    A.  No. |
| 9    Q.  Are you familiar with a company called |
| 10  Boehringer Ingelheim Corporation? |
| 11    A.  Yes. |
| 12    Q.  If I refer to that company as BIC today, |
| 13  will you understand that I mean Boehringer |
| 14  Ingelheim Corporation? |
| 15    A.  Yes. |
| 16    Q.  Can you describe in general the business |
| 17  of BIC from 1996 to the present? |
| 18    A.  BIC was the U.S. holding company or |
| 19  parent company -- |
| 20    Q.  Did -- |
| 21    A.  -- of the U.S. subsidiaries. |
| 22    Q.  Sorry.  Did it have any business of its |

| 23 |
|---|
| 1  own, any active businesses? |
| 2    A.  No, to my knowledge. |
| 3    Q.  Did you ever have any responsibilities on |
| 4  behalf of BIC? |
| 5    A.  No. |
| 6    Q.  Do you understand that you've been |
| 7  designated by BIC, BIPI and Roxane to testify as a |
| 8  corporate representative on certain topics |
| 9  identified in the United States' notice of |
| 10  deposition? |
| 11    A.  Yes. |
| 12    Q.  I'm going to show you what the court |
| 13  reporter will mark as Exhibit 1, which is a copy of |
| 14  a notice of deposition. |
| 15      (WHEREUPON, a certain document was |
| 16  marked Exhibit McIntyre 001, for identification.) |
| 17  BY MR. FAUCI: |
| 18    Q.  Take a moment to familiarize yourself |
| 19  with it.  My first question will be:  Have you seen |
| 20  this document? |
| 21    A.  Yes. |
| 22    Q.  Are you prepared to testify on behalf of |

| 24 |
|---|
| 1  the defendants on the designated topics; that is, |
| 2  12, 13, 15, 16 and 17, as those topics have been |
| 3  narrowed by agreements between the parties? |
| 4    A.  Yes. |
| 5    Q.  You could put that aside. |
| 6      Do you recall that in or around 2003, |
| 7  2004 time frame, Boehringer Ingelheim reviewed the |
| 8  structure of its businesses in the United States? |
| 9    A.  Yes. |
| 10    Q.  Did this review include BIPI? |
| 11      MS. RIVERA:  Object to form. |
| 12  BY THE WITNESS: |
| 13    A.  There were BIPI employees that were part |
| 14  of the project team, yes. |
| 15  BY MR. FAUCI: |
| 16    Q.  Let me ask the question a different way. |
| 17  Was the structure of BIPI's businesses part of the |
| 18  review? |
| 19    A.  No. |
| 20    Q.  Was Roxane part of the review? |
| 21    A.  Yes. |
| 22    Q.  Why did they under -- defendants |

| 25 |
|---|
| 1  undertake such a review? |
| 2    A.  The -- the Roxane business as it was |
| 3  structured then was really a combination of two |
| 4  businesses, a manufacturing business and a -- and a |
| 5  sales and marketing business.  The review was to |
| 6  try to separate those businesses to improve line of |
| 7  sight for management and to -- to be able to gauge |
| 8  and measure the performance of the manufacturing |
| 9  business separate from the sales and marketing |
| 10  business.  Judge the manufacturing business based |
| 11  on manufacturing metrics and be able to judge the |
| 12  sales and marketing business based on selling -- |
| 13  sales metrics. |
| 14    Q.  I'd like to introduce -- have you look at |
| 15  what the court reporter's marked as Exhibit 2. |
| 16      (WHEREUPON, a certain document was |
| 17  marked Exhibit McIntyre 002, for identification.) |
| 18  BY MR. FAUCI: |
| 19    Q.  This appears to be an April 19, 2004, |
| 20  series of slides.  The first slide has Hermann |
| 21  Tetzner's name on it. |
| 22    A.  Yes. |

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

9  (Pages 30 to 33)

30

1  the difference between a -- a reporting that is in
2  terms of legal entities as opposed to reporting in
3  terms of businesses?
4      A.  Well, Roxane Laboratories is a legal
5  entity.  But the sales is sales and marketing, and
6  -- and the operations piece is a manufacturing.  We
7  report separately in terms of -- of the -- the
8  performance results for those two segments of that
9  particular company, so we really had two businesses
10  within that one legal entity.  And that's what the
11  organization was trying to -- reorganization was
12  trying to fix.
13      Q.  Why was this regarded as something that
14  needed to be fixed?
15      A.  The -- the manufacturing business, who
16  was -- the COO was Rob Fromuth, reported directly
17  to the CEO of the U.S.
18      Q.  Mr. Fromuth was a Roxane employee?
19      A.  Yes.
20      Q.  And who did he report to?
21      A.  Marti Carroll, CEO of the U.S. of BIC.
22      Q.  CEO -- CEO of BIC?

31

1      A.  Yes.  And he was responsible for
2  operations, our manufacturing.
3      Q.  I believe the question I had asked
4  earlier was:  Why was this situation regarded as a
5  problem that needed to be fixed?
6      A.  Well, the sales and marketing side of the
7  business, who was the vice president or general
8  manager of the -- the -- the multi-source or the
9  generic business for Roxane Laboratories, reported
10  to someone different.
11      Q.  Who was that person?  Who -- who was the
12  person in charge of the marketing and sales of
13  Roxane Laboratories?
14      A.  Paul Kersten.
15      Q.  When was Mr. Kersten in charge of that?
16      A.  Oh, at least since 2001.  I don't know if
17  it goes back any further than that.
18      Q.  And who did he report to?
19      A.  He reports to -- at that time, 2001, Tom
20  Russillo.
21      Q.  Do you know who Mr. Russillo reported to?
22      A.  Marti Carroll.

32

1      Q.  When did Marti Carroll become the CEO of
2  BIC?
3      A.  End of 2002 or early 2003, I'm not sure.
4      Q.  Do you know who's -- who his predecessor
5  was?
6      A.  Werner Gerstenberg.
7      Q.  And so prior to, when Mr. Gerstenberg was
8  CEO of BIC, would Tom Russillo have reported to him
9  then?
10      A.  Yes, I would suspect so.
11      Q.  The second paragraph reads, "This system
12  often does not convey clearly the performance of
13  our businesses and leads to complexity in
14  interpreting how each business is faring.  The
15  accounting reconciliations between the legal
16  entities and the businesses reduce but do not
17  remove this complexity."  Do you see that?
18      A.  Yes.
19      Q.  What is an accounting reconciliation?
20      A.  To identify -- basically identifying the
21  costs that are related to the marketing side of the
22  business versus the manufacturing side of the

33

1  business.
2      Q.  What do you mean, "identifying"?
3      A.  I'm sorry?
4      Q.  Can you clarify what you mean by
5  "identifying the" --
6      A.  If we --
7      Q.  -- "costs"?
8      A.  -- want to separate, we can identify
9  which costs go with the sales -- sales side of the
10  business versus which costs go with the
11  manufacturing side of the business.  By having
12  those two legal entities together, that was a diff
13  -- that was a challenge.
14      Q.  When would an accounting reconciliation
15  have been performed?
16      A.  Every month.
17      Q.  Do you know if Roxane and BIPI had their
18  own internal accounting systems?
19      A.  Roxane and BIPI -- beginning --
20      MS. RIVERA:  Object to form.  Sorry.
21      MR. FAUCI:  It's all right.
22  BY THE WITNESS:

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

10  (Pages 34 to 37)

---

34

1      A.   Beginning in December of 2000, we were on
2   the same system, but we were separate legal
3   entities.  So within that system, we had our own
4   accounting --
5   BY MR. FAUCI:
6      Q.   Separate --
7      A.   -- records.
8      Q.   Separate accounting staffs?
9      A.   In part, yes.  Before 2001, yes, there
10  was completely separate accounting staffs.
11     Q.   And after 2001?
12     A.   After 2001, some of the accounting was
13  centralized with BIPI as a central service and that
14  charge -- and they were charged back -- Roxane was
15  charged back for that service.
16     Q.   What do you mean, "Roxane was charged
17  back for that service"?
18     A.   The costs -- the costs associated with
19  performing that accounting service for Roxane was
20  charged back to the Roxane legal entity.
21     Q.   I'll have some more questions about that
22  later.  I think we'll stick with this document now.

---

35

1          Moving down on this slide, it says, "The
2   purpose of the proposed restructuring is,
3   therefore, to align the U.S. organization with the
4   actual businesses."  Do you see that?
5      A.   Yes.
6      Q.   What steps were taken to align the U.S.
7   organization with the actual businesses?
8      A.   Well, that's what the reorganization was
9   all about, was to separate the Roxane legal entity
10  into the two business units that were a part of
11  that, the manufacturing business unit and the sales
12  business unit.
13     Q.   If I can direct your attention to the
14  next page, the slide on the top.  Do you see where
15  it lists various changes to the U.S. business over
16  time?
17     A.   Yes.
18     Q.   What is "the acquisition of BVL"?
19     A.   BVL was a company that was acquired by
20  Boehringer Ingelheim in 1997.
21     Q.   Is that Ben Venue Labs?
22     A.   Yes, it is.

---

36

1      Q.   And how did that represent a change to
2   Boehringer Ingelheim's businesses in the U.S.?
3      A.   Well, BVL was another generic company
4   that had a very distinct product line.  Their
5   technology was different than any other
6   technologies within the Boehringer family of
7   companies.
8      Q.   I don't know if I've asked this, but
9   "BVL" stands for Ben Venue Labs?
10     A.   Yes.
11     Q.   Was Ben Venue Labs part of this legal
12  entity discussion?
13     A.   No.
14     Q.   The next bullet point down says, the
15  "rationalization of the RLI business," open
16  parentheses, "allocation to BIPI and" Ben Venue --
17  "and BVL," close parentheses.  Do you see that?
18     A.   Yes.
19     Q.   How was RLI's business allocated to BIPI?
20         MS. RIVERA:  Object to form.
21  BY THE WITNESS:
22     A.   I'm not sure what that means, 'cause it

---

37

1   wasn't allocated to BIPI.
2   BY MR. FAUCI:
3      Q.   Sitting here today, do you have a sense
4   of what that bullet point means?
5      A.   No, I don't.
6      Q.   Skipping down two bullet points, it says,
7   "introduction of the shared services concept."
8      A.   Yes.
9      Q.   What is the shared service and con --
10  services concept?
11     A.   That some -- or certain services are
12  centralized under the BIPI umbrella, but they
13  perform services and charge those services back to
14  the subsidiaries, similar to what I just mentioned
15  about the accounting activities.
16     Q.   So this is separate from the Boehringer
17  Ingelheim Services Center?
18     A.   No, I think it's making reference to the
19  Boehringer Ingelheim Services Center.
20     Q.   I'm just trying to be clear.  Are you
21  familiar with an entity known as the Boehringer
22  Ingelheim Services Center?

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

11  (Pages 38 to 41)

---

**38**

1     A.  Yes.
2     Q.  Can we call that BISC?
3     A.  Yes.
4     Q.  Is BISC a separate entity than BIPI?
5     A.  At that time, yes.
6     Q.  Were there shared services that were
7  located in BIPI?
8        MS. RIVERA:  Object to form.
9  BY THE WITNESS:
10    A.  Shared services that were located in
11  BIPI?  Yes.
12  BY MR. FAUCI:
13    Q.  And were there shared services that were
14  housed in the BISC?
15    A.  Yes.
16    Q.  Which shared services were in BIPI?
17    A.  The accounting that I previously
18  mentioned, the -- I believe at that time tax was
19  part of BIPI, legal services, I believe, were part
20  of BIPI.  Those are a couple that come to mind.
21    Q.  And so --
22    A.  HR and IT services.

---

**39**

1     Q.  So those departments would be housed in
2  Connecticut?
3     A.  Yes.
4     Q.  And they'd be composed of BIPI employees?
5        MS. RIVERA:  I object to form, and I
6  don't know if we can specify a time frame, 'cause -
7  - just figure out what time frame we're talking
8  about.
9  BY MR. FAUCI:
10    Q.  When did the shared services concept come
11  into being?
12    A.  Specifically relating to the BISC?
13    Q.  No, specifically related to those
14  services that were located at BIPI.
15    A.  Well, it depends on the function.
16    Q.  Why don't we go function by function
17  then.
18    A.  Okay.
19    Q.  Do you know when a shared services
20  function for accounting came into being at BIPI?
21    A.  2001.
22    Q.  Tax?

---

**40**

1     A.  As far as I know, tax since I've been
2  with the company in '96, so.
3     Q.  Legal?
4     A.  Since the beginning of my tenure.
5     Q.  HR?
6     A.  Again, since the beginning of my tenure.
7     Q.  And IT?
8     A.  Yes.
9     Q.  Beginning of your --
10    A.  Beginning --
11    Q.  -- tenure?
12    A.  -- of tenure.
13    Q.  And so I guess my question, the time
14  frame is from 1996 to the present.  Those various
15  functions, accounting, tax, legal, HR, IT, were
16  those departments composed of BIPI employees?
17    A.  Yes, the best of my knowledge.
18    Q.  And those departments had
19  responsibilities on behalf of Roxane?
20    A.  They were centralized services that were
21  performed by Roxane -- or for Roxane and charged
22  back to Roxane.

---

**41**

1     Q.  What type of services would be located in
2  the BISC?
3     A.  The heavy transactional type services;
4  accounts payable, payroll, customer service,
5  accounts receivable.
6     Q.  Can you try and distinguish for me the
7  types of work that would be done -- the
8  transactional services that would be done in the
9  BISC from the accounting work that was done by BIPI
10  staff?
11    A.  Well, the BISC related activities were
12  primarily more clerical level activities, heavy
13  transactions, processing invoices and that kind of
14  thing,, whereas the -- the accounting service were
15  higher level, general accounting type functions
16  with professionals mainly.
17    Q.  If I can direct your attention to the
18  next page of the same Exhibit 2.  It shows a
19  organizational chart of the Boehringer Ingelheim
20  Corporation and its 100 percent owned subsidiaries,
21  and it's its current structure as of April 19,
22  2004, do you see that?

---

Roxane Laboratories, Inc (James F. McIntyre)                                    February 26, 2009

Chicago, IL

12  (Pages 42 to 45)

---

42

1    A.  Yes.
2    Q.  And do you see that various entities are
3 listed as 100 percent owned subsidiaries of BIC,
4 including BIPI and Roxane?
5    A.  Yes.
6    Q.  And do you see that under BIPI, there's a
7 note that says, quote, "'Hidden,'" end quote,
8 "corporate functions such as HR, legal, IT, F&A"?
9    A.  Yes.
10    Q.  Does that reflect the discussion we had a
11 few moments ago, that some of these shared services
12 for the various Boehringer Ingelheim entities were
13 located in BIPI?
14    A.  I don't know specifically what's meant by
15 the term "hidden."
16    Q.  Does this note comport with your
17 recollection, though, that these functions were
18 located within BIPI but were provided for the
19 broader corporate family?
20       MS. RIVERA:  Object to form.
21 BY THE WITNESS:
22    A.  Yes.

---

43

1 BY MR. FAUCI:
2    Q.  What is "F&A"?
3    A.  I believe it's fina -- finance and
4 accounting --
5    Q.  Finance and accounting.
6    A.  -- but I don't know that for sure.
7    Q.  How many people, to the best of your
8 knowledge, were located in the finance and
9 accounting group at BIPI?
10    A.  I really don't know.
11    Q.  Do you have a sense of how many were in
12 the legal group?
13    A.  No.
14    Q.  And did Roxane have its own legal
15 department?
16    A.  Can you reference a time frame?
17    Q.  At any time from 1996 to the present, do
18 you know if Roxane had its -- did Roxane -- let me
19 strike that.
20       At any time from 1996 to the present, did
21 Roxane have its own legal department?
22       MS. RIVERA:  I object to form and

---

44

1 foundation and beyond the scope of the subpoena.
2       If you know the answer, you can answer.
3 BY MR. FAUCI:
4    Q.  You may answer.
5    A.  There's one attorney that's part of
6 Roxane now --
7    Q.  Who is that?
8    A.  -- part of BIRI actually, is part of
9 BIRI.
10    Q.  Who is that?
11    A.  Andrea Kochensparger.
12    Q.  When did she -- when was she hired?
13    A.  Around 2005, I think.
14    Q.  You can keep that one handy 'cause we're
15 probably going to go back to that, but let me show
16 you what the court reporter will mark as Exhibit 3.
17       (WHEREUPON, a certain document was
18 marked Exhibit McIntyre 003, for identification.)
19 BY MR. FAUCI:
20    Q.  It's a lengthy document, so take a moment
21 to familiarize yourself, and look up when you're
22 ready.

---

45

1       If it helps, most, if not all, of my
2 questions will be about the sixth page of the
3 document, which is a chart lists, "Current Support
4 Structures By Functional Area."
5    A.  Okay.
6       MR. FAUCI:  For the record, this document
7 is a lengthy document.  It's entitled, "Legal
8 Entity Discussion - Executive Summary," it's dated
9 November 17, 2003, and the name underneath it is
10 James P. Mellody.
11 BY MR. FAUCI:
12    Q.  Do you know who Mr. Mellody is?
13    A.  Yes.
14    Q.  Who is he?
15    A.  He's vice president of sale -- purchasing
16 and the project leader on this particular project.
17    Q.  He's VP of purchasing for which entity?
18    A.  BIPI.
19    Q.  Did he have any responsibilities on
20 behalf of Roxane?
21    A.  No.
22    Q.  And do you know if he worked for BIC?

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

13  (Pages 46 to 49)

---

46

1      A.  I don't know.
2      Q.  Do you know why he was project leader for
3  this project?
4      A.  No, I don't know specifically why he was
5  project leader for this particular project.  I am -
6  - I'm aware that Mr. Mellody has good project
7  management skills, and that may have been why he
8  was chosen to lead this particular project.
9      Q.  Both BIPI and Roxane are owned by BIC, is
10  that correct?
11      A.  That's correct.
12      Q.  Do you have any reason why a BIPI
13  employee would be in charge of a project discussing
14  the reorganization of its sister corporation,
15  Roxane?
16      A.  Well, Mr. Mellody was the project leader.
17  The -- the project team that was reviewing and
18  doing all the analysis of the various options and
19  scenarios was made up of employees from all the
20  legal entities.
21      Q.  Looking at page six, it's entitled,
22  "Current Support Structure by Functional Area."  Do

---

47

1  you see that?
2      A.  Yes.
3      Q.  Do you see where it says, "Contracting,"
4  the second bullet down?
5      A.  Yes.
6      Q.  "Services/Support Currently Provided," in
7  that column, it says, "Contracting," open
8  parentheses, "including VA, slash, PHS and
9  Medicaid," close parentheses, "pricing and
10  reporting services for BIPI and RLI."  And do you
11  see that?
12      A.  Yes.
13      Q.  Did BIPI and RLI share a common
14  contracting function?
15      MS. RIVERA:  Hold on.  I just want to put
16  a objection on the record.  I object that the
17  questions -- detailed questions about the shared
18  services aspects are beyond the scope of the
19  subpoena topics that Mr. McIntyre has been
20  designated to testify about.
21      As they relate to the 2005 corporate
22  reorg, then I can see that that's related to topic

---

48

1  13, I believe.  But I object as beyond the scope
2  for any, you know, detailed questions about the
3  shared services beyond that connection.  So
4  anything Mr. McIntyre testifies to in that regard
5  would be in his personal capacity.
6  BY MR. FAUCI:
7      Q.  Mr. McIntyre, the 2005 reorg, the process
8  that led to that, was that called the "Legal Entity
9  Project"?
10      A.  I don't know specifically that that was
11  the title, but --
12      Q.  You turn to the first page of this
13  document, do you see that this is "Legal Entity
14  Discussion"?
15      A.  Yes.
16      Q.  It is your understanding that this series
17  of slides relates to the -- a discussion of whether
18  or not and how to divide the Roxane business?
19      A.  Yes.
20      Q.  I think my question, then, was:  Is it
21  your understanding that -- or did Roxane and BIPI
22  share a common contracting function?

---

49

1      MS. RIVERA:  And again I just want to
2  make sure it's clear for the record that detailed
3  questions about the shared services outside the
4  context of how they relate to the legal entity
5  reorganization in 2005, I object to is beyond the
6  scope of the subpoena.
7      But go ahead and answer, Jim.
8  BY THE WITNESS:
9      A.  Okay.  Well, I think it's -- this, to my
10  knowledge, the -- that it was shared, but it was
11  charged back to the individual companies, just like
12  all these other shared services that are listed on
13  this particular page that we've already discussed.
14  BY MR. FAUCI:
15      Q.  Thank you.  So turning your attention
16  back to Exhibit 2 -- actually, just more generally,
17  you've said earlier that these various services
18  were charged back to Roxane?
19      A.  Yes.
20      Q.  What does that mean?
21      A.  It means the cost of performing that
22  service was -- was charged to Roxane and reflected

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

14 (Pages 50 to 53)

50

1   in their cost.
2       Q.  Was that done annually, quarterly?
3       A.  That was done monthly.
4       Q.  Was Roxane billed?
5       A.  I don't --
6           MS. RIVERA:  Object to form.
7   BY THE WITNESS:
8       A.  I don't know that there was a specific
9   invoice created, but we were all in the same
10  system, so it was able to -- it was all done within
11  the system.
12  BY MR. FAUCI:
13      Q.  On an accounting basis?
14      A.  Yes.
15      Q.  How were the amounts to be charged back
16  determined?
17      A.  It depends on the service.  There are
18  various drivers determined for each service.
19      Q.  What's -- I'm sorry, go ahead.
20      A.  At the beginning of the year, the service
21  provider functions, which is basically this list,
22  where the -- would -- would develop their annual

51

1   operating budgets, and then based on whatever the
2   serve -- whatever the drivers are for a certain
3   activity, there would be a rate established, and
4   then each of the legal entities would be charged
5   back based on that rate and a -- and the amount of
6   usage of the service they -- they had.
7       Q.  Let's try and narrow it down.  Let's
8   stick with legal.
9       A.  Okay.
10      Q.  Who determined the -- well, if you could
11  walk me through the process, maybe just focusing on
12  legal, about how Roxane was charged for those
13  services.
14      A.  The legal department would -- would
15  develop their annual operating budget, they would
16  present it to all the receivers of the legal
17  services, the -- those -- the -- the receivers of
18  that service, so basically the legal entities,
19  would -- would have approve -- would be able --
20  would -- would approve that particular budget or
21  challenge that budget.
22          And then based on the number of hours

52

1   that were estimated to be used within each legal
2   entity, the -- the legal entities would -- would be
3   charged back an hourly -- based on an hourly rate.
4   But they'd -- they would have first -- first right
5   of -- right of refusal on the budget.
6       Q.  When was the budget compiled?
7       A.  At the beginning of the budget process.
8       Q.  Was it a yearly budget?
9       A.  Yes.
10      Q.  Would the budgets contain projections for
11  how much -- what percentage of the legal services
12  would go to Roxanne, what percent would go to BIPI?
13      A.  Yes.
14      Q.  What were those projections based on?
15      A.  Based on historical average hours.  And
16  then what would happen is on a -- on an ongoing
17  basis throughout the year, they would be trued up
18  based on if -- if one legal entity was using more
19  of a service than another, they would true that up
20  so that the -- the appropriate legal entity was
21  charged by the end of the year.
22      Q.  Did personnel in the legal department log

53

1   how much of their time was spent performing tasks
2   on behalf of each entity?
3       A.  I don't --
4           MS. RIVERA:  Object --
5   BY THE WITNESS:
6       A.  -- know.
7           MS. RIVERA:  -- to form and foundation.
8   BY THE WITNESS:
9       A.  I don't know for sure if they did that.
10  BY MR. FAUCI:
11      Q.  So how was it trued up?  What was the --
12  what was the mechanism for deciding whether or not
13  this projection was accurate for a given month or
14  quarter?
15          MS. RIVERA:  Object to form and
16  foundation and again entire line of questioning
17  beyond the scope of the subpoena.
18          But if you know, Jim.
19  BY THE WITNESS:
20      A.  I -- I don't know specifically.
21          MR. ANDERSON:  This is Jarrott Anderson.
22  And I want to note for the record that it's the

Roxane Laboratories, Inc (James F. McIntyre)                                          February 26, 2009

Chicago, IL

19 (Pages 70 to 73)

70

1   background noise coming from the speakerphone, not
2   stenographically recorded.)
3       MR. FAUCI: I believe we're on Exhibit
4   No. 5.
5           (WHEREUPON, a certain document was
6   marked Exhibit McIntyre 005, for identification.)
7   BY MR. FAUCI:
8       Q. It's an October 9, 2003, e-mail from
9   Ursula Bartels to Jim Mellody, subject is:
10  "Surfacing issues in the multisource
11  restructuring." Are you familiar with this
12  document?
13      A. No.
14      Q. Do you know who Ms. Bartels is?
15      A. At that time, she was head legal counsel
16  for Boehringer Ingelheim.
17      Q. I'm looking at the third paragraph down,
18  the second line, Ms. Bartels writes, "Presently,
19  our patent department is responsible for Roxane
20  patent work." Do you see that?
21      A. Yes.
22      Q. What patent work did Roxane require?

71

1       A. I don't know.
2           MS. RIVERA: I'm sorry, what was your
3   question?
4           MR. FAUCI: What patent work did Roxane
5   require?
6   BY MR. FAUCI:
7       Q. Did Roxane pay BIPI for work done by
8   BIPI's patent department?
9       A. If the patent department did work, then
10  Roxan -- it would've been charged back to Roxane.
11  I don't know that they did any patent work. I'm
12  not familiar with what they would have done.
13      Q. And that charge back would have been
14  similar --
15      A. Similar to all the others we've
16  discussed.
17          (WHEREUPON, there was a short
18  interruption.)
19  BY MR. FAUCI:
20      Q. A little while ago I asked you a few
21  questions about Ipratropium Bromide, do you
22  remember that?

72

1       A. Yes.
2       Q. And do you remember that we discussed the
3   Ipratropium Bromide was the generic equivalent of
4   Atrovent?
5       A. Yes.
6       Q. And that Atrovent was a BIPI product?
7       A. Correct.
8       Q. Are you aware that in 1996 Roxane
9   launched Ipratropium Bromide several months in
10  advance of the expiration of patent exclusivity for
11  Atrovent?
12      A. Yes.
13      Q. Do you know whether Roxane obtained from
14  BIPI a license to preemptively launch Ipratropium
15  Bromide?
16      A. I'm aware that they paid a royalty.
17      Q. What do you mean, "they paid a royalty"?
18      A. It paid an 11 percent royalty to BIPI in
19  order to -- sell Ipratropium Bromide.
20      Q. How was that determined, 11 percent?
21      A. Earlier -- early agreements between BIPI
22  and -- and -- and BII at -- that negotiated royalty

73

1   percentage, and that had been validated by outside
2   third-party consultants, that it was arm's length.
3       Q. I'm sorry, what is "BII"?
4       A. Boehringer Ingelheim International.
5       Q. What is that?
6       A. It's the parent, German parent.
7       Q. And so there was royalty agreements
8   between BII and BIPI?
9       A. Yes.
10      Q. And those were at 11 percent?
11      A. Ten or 11 percent. Ten percent, I think.
12      Q. Who would be paying royalty -- would BIPI
13  be paying royalties to BII, or vice versa?
14      A. Depends on which product, but BIPI -- and
15  in the case of Ipratropium Bromide, BIPI was paying
16  BII.
17      Q. Do you mean in the case of Atrovent?
18      A. Yes. Atrovent, yeah.
19      Q. And so BII held the patent for Atrovent?
20      A. Yes.
21      Q. And BIPI paid BII 11 percent royalty?
22      A. Ten or 11. I'm not --

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

20  (Pages 74 to 77)

74

1     Q.  I'm -- I'm talking about the relationship
2   between Roxane and BIPI.
3     A.  Uh-huh.
4     Q.  We've established that Ipratropium
5   Bromide is the generic equivalent of Atrovent.
6   Roxane paid BIPI the same 11 or -- ten or 11
7   percent royalty that BIPI in turn paid to BIII --
8     A.  Yes.
9     Q.  -- BII?
10    A.  Yes.
11    Q.  Was there anything done to establish that
12  ten or 11 percent was an appropriate royalty rate
13  for a generic manufacturer to pay the holder of a
14  branded patent?
15    A.  Third-party consultants were brought in
16  to -- to validate that that was an arm's length
17  rate.
18    Q.  Who?
19    A.  At that time, KPMG.
20    Q.  Is that the same auditing firm that
21  established that 11 percent was an appropriate
22  royalty rate as between BIPI and BIII?

75

1     A.  I don't know that, that they were
2   involved in.
3     Q.  And so this ten or 11 percent was paid by
4   Roxane for the life of Ipratropium Bromide?
5     MS. RIVERA:  Object to form.
6   BY THE WITNESS:
7     A.  Until the product was discontinued, yes.
8   BY MR. FAUCI:
9     Q.  Okay.  What -- my questions earlier --
10  let's introduce an exhibit.
11    MR. FAUCI:  Which exhibit are we on?
12    (WHEREUPON, a certain document was
13  marked Exhibit McIntyre 006, for identification.)
14    MS. DENTON:  What exhibit are we on?
15    MR. FAUCI:  Six.
16    MS. RIVERA:  Six.
17    MS. DENTON:  I thought this was six.
18    MS. RIVERA:  That was five.
19    MR. FAUCI:  That was five.
20    MS. DENTON:  Okay.
21  BY MR. FAUCI:
22    Q.  Have you -- are you familiar with this

76

1   document?
2     A.  No.
3     Q.  Do you see the --
4     MR. FAUCI:  For the record, this document
5   says, "For Internal Use Only.  Why stay with Roxane
6   Ipratropium Bromide?"
7   BY MR. FAUCI:
8     Q.  The bottom paragraph on the first page,
9   can you read the first sentence, starting with
10  "Roxane launched."
11    A.  "Roxane launched Ipratropium Bromide
12  eight months in advance of generic availability."
13    Q.  And then can you read the sentence
14  starting with, "This strategy cost."
15    A.  "This strategy cost the innovator company
16  a lot of money."
17    Q.  Do you know who Shelly Berkle is?
18    A.  Yes.
19    Q.  Who's Mr. Berkle?
20    A.  At the time -- he's no longer with the
21  company, but at the time, he was head of marketing.
22    Q.  For --

77

1     A.  For --
2     Q.  -- who?
3     A.  For BIPI.
4     Q.  I'm going to read you a very brief
5   section from Mr. Berkle's October 31, 2008,
6   deposition in Florida, page 148.  Mr. Berkle says
7   in reference to the decision to allow Roxane to
8   launch Ipratropium Bromide preemptively, that this
9   cost BIPI money.  I'll read you what he says.
10    "Answer:  Again, in the context that
11  Roxane preemptively launched Ipratropium prior to
12  any other generic competitors had a cost from a
13  BIPI perspective.  It allowed sales for the Roxane
14  product at a lesser price than the branded price at
15  a time when Atrovent still was patent protected."
16    MS. RIVERA:  I'm --
17  BY MR. FAUCI:
18    Q.  Do you see that?
19    MS. RIVERA:  Jeff, can you tell me where
20  you are?
21    MR. FAUCI:  Oh, sure.  I'm on page 148.
22  Did I give you the right --

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009

Chicago, IL

21 (Pages 78 to 81)

---

78

1        MS. RIVERA:  Yeah, I was just several
2   pages in.
3        MR. FAUCI:  I'm on the top paragraph.
4        MS. RIVERA:  Okay.
5        MR. FAUCI:  I'll read it again.
6   BY MR. FAUCI:
7        Q.  Mr. Berkle says:  "Again, in the context
8   that Roxane preemptively launched Ipratropium prior
9   to any other generic competitors had a cost from a
10  BIPI perspective.  It allowed sales for the Roxane
11  product at a lesser price than the branded price at
12  a time when Atrovent still was patent protected."
13       My question to you is:  Did Roxane pay
14  any money to BIPI for the right to market
15  Ipratropium Bromide at a time when BIPI still had a
16  patent protection for Atrovent?
17       A.  They paid the 11 percent royalty.
18       Q.  The same 11 percent royalty they paid
19  after Atrovent was no longer patent protected?
20       A.  Yes.
21       MR. FAUCI:  What are we on, Exhibit 7?
22  I'm going to introduce Exhibit 7.

---

79

1        (WHEREUPON, a certain document was
2   marked Exhibit McIntyre 007, for identification.)
3   BY MR. FAUCI:
4        Q.  This is a series of e-mails in the August
5   to October 1999 time frame.  I'm going to direct
6   your attention to the third page of the document,
7   an e-mail -- feel free to read it all to get
8   familiarized at any time.  I'm focusing on the
9   August 9, 1999, e-mail from Ann Maloney, sent at
10  1:18 p.m.  Do you see that?
11       A.  Yes.
12       MS. RIVERA:  Yeah, Jim, you should make
13  sure you look at the whole document just to make
14  sure you're familiar with it.
15       Ready?
16       THE WITNESS:  Yes.
17  BY MR. FAUCI:
18       Q.  Ms. Maloney writes -- well, do you know
19  who Ms. Maloney is?
20       A.  Yes.
21       Q.  Who is she?
22       A.  Well, she's no longer with the company.

---

80

1   She was -- I don't know exact -- I don't recall her
2   exact position at this time.
3        Q.  It's a e-mail.  The subject of the e-mail
4   is:  "Atrovent UDV," and then it says, "AM11,"
5   slash, "US."  Ms. Maloney writes, "BIPI is the
6   holder for the Atrovent NDA.  Roxane distributes
7   the generic product Ipratropium Bromide legally out
8   of the NDA.  Also, Novation distributes Ipratropium
9   Bromide out of the NDA.  All three products are
10  manufactured by Roxane."  Do you see that?
11       A.  Yes.
12       Q.  Does this refresh your recollection as to
13  whether at least by 1999 Roxane had filed an ANDA
14  for Ipratropium Bromide UDV?
15       A.  It doesn't say that they filed an ANDA.
16       Q.  And it actually says that Roxane
17  distributes the generic product out of the NDA,
18  which was held by BIPI; correct?
19       A.  Correct.
20       Q.  It also says that all three products are
21  manufactured by Roxane.  Do you see that?
22       A.  Yes.

---

81

1        Q.  Roxane manufactured Atrovent?
2        A.  Yes.
3        Q.  When did that start?  Focusing on the
4   Atrovent UDV.
5        A.  UDV, 1993, I believe.
6        Q.  Did Roxane sell Atrovent to BIPI?
7        MS. RIVERA:  Object to form.
8   BY THE WITNESS:
9        A.  Yes, they would've sold the -- the
10  Atrovent UDV would've been sold to -- to -- to BIPI
11  by RLI.
12  BY MR. FAUCI:
13       Q.  And then BIPI would turn around and
14  market and sell the products to customers under a
15  BIPI label?
16       A.  That's correct.
17       Q.  Were there written contracts evidencing
18  sales of Atrovent from Roxane to BIPI?
19       A.  Yes, I believe there was a 1993 contract
20  manufacturing agreement.
21       Q.  And that contract would have governed for
22  the life of Atrovent UDV?

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

22 (Pages 82 to 85)

82

1      A.  My recollection is, it's a ten-year
2  contract, renewable.
3      Q.  How was the price -- the sale price from
4  Roxane to BIPI determined?
5      A.  Cost plus.
6      Q.  What does that mean?
7      A.  Manufacturing cost plus some -- some
8  markup.
9      Q.  What does "manufacturing cost" mean?
10     A.  Manufacturing cost is the cost of all the
11 ingredients plus labor and overhead.
12     Q.  Where did Roxane get the ingredients?
13     A.  The -- the active ingredient would have
14 come from BII.  The Ipratropium Bromide is the
15 active ingredient.
16     Q.  And they would have purchased that from
17 the German parent?
18     A.  Yes.
19     Q.  And they --
20     A.  Well, I can't be sure.  It could've come
21 from BIPI, 'cause BIPI purchased Ipratropium from
22 other products, but -- but it's a BII product.

83

1      Q.  So they would buy the -- active
2  ingredient -- Roxane would buy the active
3  ingredient from another Boehringer Ingelheim
4  entity?
5      A.  Yes.
6      Q.  And then Roxane would manufacture it?
7      A.  Yes.
8      Q.  And you said that the cost included what
9  else besides the ingredient costs?
10     A.  Labor and overhead.
11     Q.  What's included in overhead?
12     A.  General plan overhead, depreciation of
13 the equipment, depreciation of building, travel
14 expenses.  There's a whole list of items that are
15 part of overhead.
16     MR. FAUCI:  I think we need to take a
17 break.
18     THE VIDEOGRAPHER:  We are off the record
19 at 10:39 a.m. with the end of tape number one.
20     (WHEREUPON, a recess was had.)
21     (WHEREUPON, MS. DOLAN left the
22 deposition proceedings.)

84

1      THE VIDEOGRAPHER:  We are back on the
2  record at 10:50 a.m. with the start of tape number
3  two.
4  BY MR. FAUCI:
5      Q.  We were just talking about the process by
6  which Roxane sold Atrovent to BIPI.  Do you
7  remember that?
8      A.  Yes.
9      Q.  And you said that it sold it at cost
10 plus, do you recall that?
11     A.  Yes.
12     Q.  And we were trying to educate me and the
13 jury on what cost plus meant.  And you said that
14 cost includes the ingredient costs, the labor costs
15 and the overhead costs, do you recall that?
16     A.  Yes.
17     Q.  What's the plus?
18     A.  The margin.
19     Q.  Do you recall what the margin was?
20     A.  No.  In the 1993 contract, we were unable
21 to determine exactly what the margin would have
22 been and how that pricing was determined for that -

85

1  - and during that time frame.
2      Q.  So what was the result?
3      A.  I'm not sure I understand the question.
4      Q.  Oh, when you say you were unable to
5  determine what the margin was, what do you mean?
6  In preparation for today?
7      A.  Yes.
8      Q.  But there was a margin in the 1993
9  contract that --
10     A.  I'd have to --
11     Q.  -- presumably?
12     A.  -- believe that there was, yes.
13     Q.  Do you know what the margin was at any
14 point in time from 1996 to the present?
15     A.  Yes.
16     Q.  What was it, and when did it become that?
17     A.  We're talking specifically about
18 Ipratropium Bromide UDVs?
19     Q.  Atrovent UDV.
20     A.  Atrovent -- Atrovent UDVs.  Well,
21 Atrovent UDVs were discontinued in 2003, so --
22     Q.  Okay.

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

23 (Pages 86 to 89)

86

1     A. -- but be -- up until 2003, the margin
2  was based -- was 2.2 percent, based on full cost.
3     Q. What does that mean, "based on full
4  cost"?
5     A. Well, it includes the cost of the active
6  ingredient.
7     Q. In addition to the labor and the
8  overhead?
9     A. Labor and the overhead, that's --
10    Q. How was --
11    A. -- correct.
12    Q. -- the 2.2 percent figure arrived at?
13    A. 2.2 percent on total cost is -- gives --
14 gives the same absolute margin or absolute profit
15 as ten percent on cost minus API.
16    Q. What is "API"?
17    A. Active pharmaceutical ingredient; that's
18 the Ipratropium Bromide. The way we do things
19 today is we charge ten percent on only third-party
20 acquired materials.
21    Q. Materials acquired from outside --
22    A. Outside, nonaffiliate companies. If it

87

1  has affiliate material in there, we subtract that
2  from the total cost, because that affiliate
3  material already has some markup, so we don't --
4  it's not fair to mark it up twice.
5     Q. Okay. So focusing on the Atrovent UDV,
6  that there would be some markup applied to the
7  ingredient that Roxane would have purchased from
8  either BIPI or BII?
9     A. Based -- yes, based on the way we do it
10 now or did it in -- from -- up until 2003.
11    Q. And so based on the way it was done up
12 until 2003?
13    A. Yes.
14    Q. And because of that, the margin from
15 Roxane to BIPI was only 2.2 percent, is that
16 correct?
17    A. At that time, yes. We don't know what it
18 was back in '93.
19    Q. When did it become 2.2 percent?
20    A. About that time, 2001, 2002.
21    Q. And it stayed that way until 2003?
22    A. Yeah, we discontinued the product.

88

1     Q. And I understand that the -- why the 2.2
2  was used in place of the ten percent, but how was
3  the 2.2 number arrived at?
4     A. Because it gave the same -- as I
5  mentioned, it gave the same level of profit as
6  using ten percent on a cost excluded the API.
7     Q. Was it negotiated?
8     A. Yes, and later -- later validated by
9  outside consultants.
10    Q. And would this 2.2 percent or ten percent
11 markup have been true on all the products that
12 Roxane manufactured for Boehringer Ingelheim
13 entities?
14    A. Yes.
15    Q. Let me show you a document marked Exhibit
16 8.
17        (WHEREUPON, a certain document was
18 marked Exhibit McIntyre 008, for identification.)
19 BY THE WITNESS:
20    A. 1998 Expectation and Budget.
21 BY MR. FAUCI:
22    Q. It's a September 30, 1998, document, that

89

1  says, "Commentary, 1998 Expectation, 1999 Budget,
2  Roxane Laboratories, Incorporated." Take a moment
3  to familiarize yourself with it, but I will be
4  asking you questions about specific parts.
5     A. Okay. Okay.
6     Q. Are you familiar with this document?
7     A. I've never seen this particular one, but
8  I'm somewhat familiar with it, yes.
9     Q. What is an expectation?
10    A. Expectation is an update of the current
11 year. So when you start out the year, you have
12 your budget; later in the year, we do an update of
13 what that budget is and what the expectation -- I
14 mean, what we're gonna come in at the end of --
15 the end of the year. So it's our projection for
16 what our actual costs or what our actual will be by
17 December 31st.
18    Q. So it's --
19    A. So it has no actual numbers, per se, in
20 there.
21    Q. It's the revised budget based on the
22 year-to-date?

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

32 (Pages 122 to 125)

122

1   wholesaler could go -- end up -- the sale could end
2   up at any number of different possible end
3   customers, whereas a sale to a chain customer, it's
4   only going to end up at that particular customer?
5        MS. RIVERA:  Object to form and
6   foundation.
7        Go ahead.
8   BY THE WITNESS:
9        A.  I don't know for certain, but I --
10  BY MR. FAUCI:
11       Q.  And just so the record is clear, your
12  testimony is that the benefit to BIPI here is that
13  it was moving short dated inventory?
14       A.  Correct.
15       MR. FAUCI:  Can you mark this as Exhibit
16  15.
17       (WHEREUPON, a certain document was
18  marked Exhibit McIntyre 015, for identification.)
19  BY MR. FAUCI:
20       Q.  Showing you what the court reporter has
21  marked as Exhibit 15.  It's a Roxane Laboratories,
22  Inc. Unanimous Written Consent of Directors.  The

123

1   first paragraph starting with "Resolved" states,
2   "Resolved that, the year-end closing for 1996 be,
3   and it hereby is, approved and the Balance Sheet
4   and Profit and Loss Statement of this Corporation
5   as of December 31, 1996, be, and they hereby are,
6   ratified and adopted in the form attached."  Do you
7   see that?
8        A.  Yes.
9        Q.  What is the balance sheet?
10       A.  A balance sheet is where you list your
11  assets and liabilities.
12       Q.  And a profit and loss statement?
13       A.  That's your income statement.  It defines
14  your sales and net income.
15       Q.  Would Roxane's Board of Directors approve
16  each of these for Roxane each year?
17       A.  I don't know, but --
18       Q.  Does it appear that Roxane's Board of
19  Directors is approving the balance sheet and profit
20  and loss statement for Roxane as of the fiscal year
21  1996?
22       A.  I see that's what it says here, yes.

124

1        Q.  Who would have compiled the profit and
2   loss statement and the balance sheet?
3        A.  At this time frame, 1997, the --
4        Q.  Year-end 1996.
5        A.  The finance department for Roxane
6   Laboratories.
7        Q.  Can you name people that would have been
8   involved?
9        A.  Yeah.  None of those people are with the
10  company any longer, but, yes, I can name them.
11       Q.  Who?
12       A.  John Swartz would have been the
13  controller for that side of the business that was -
14  - it would have been his department that created or
15  --
16       Q.  If you turn to the statement of income,
17  it's a few pages in, it says, "Roxane Laboratories,
18  Inc.'s Statement of Income."
19       A.  I have it.
20       Q.  It shows the net sales at $233,776,000
21  for the budget, do you see that?
22       A.  Yes.

125

1        Q.  And then the actual for 1996 was
2   $253,565,000?
3        A.  Yes.
4        Q.  A little further down is an entry,
5   "operating income."  Can you explain what
6   "operating income" is?
7        A.  Operating income is basically net sales
8   minus all of your operating expenses.
9        Q.  And then all the way down is the net
10  income after tax, can you explain what that is?
11       A.  It's your income after tax.
12       Q.  It's the total income that Roxane
13  received for the year after --
14       A.  After they pay taxes, yes.
15       Q.  They pay taxes, and after they paid
16  everything else?
17       A.  Yes.
18       MS. RIVERA:  Object to form.
19  BY MR. FAUCI:
20       Q.  And for 1996, Roxane had net income of
21  $39 million, approximately?
22       A.  Yes.

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

33 (Pages 126 to 129)

---

126

1     Q.  Can you turn to the statement of
2  financial position.  What are retained earnings?
3     A.  Retained earnings is the cumulative
4  effect -- or the accumulation of net income from
5  various years.
6     Q.  And so for the year-end 1996, Roxane's
7  retained earnings were $131 million?
8     A.  Yes.
9     Q.  This would have included the $39 million
10 in income from 1996?
11    A.  Should have, yes.
12    Q.  Do you see slightly above that, it says,
13 "Loans from affiliates"?
14    A.  Yes.
15    Q.  What is a loan from affiliate?
16    A.  And specifically, I don't know what this
17 is.  But typically it just represents funds that
18 would have been loaned from either BIC for meet --
19 to meet a particular purpose.
20    Q.  So they would have been loans from one
21 Boehringer Ingelheim entity --
22    A.  Affiliate.

127

1     Q.  -- to Roxane?
2     A.  That's correct.
3     Q.  And here, they're $31 million; correct?
4     A.  Correct.
5     Q.  Would these loans be supported by a note?
6     A.  I don't know.
7     Q.  Do you know if there'd be any written
8  documentation underlying these loans?
9     A.  I don't know.
10    Q.  Who would set the terms of the loan?
11    A.  I don't know back into 1996.
12    Q.  Who would set them now?
13    A.  The terms are established by the LIBOR
14 rate, that's the London interbank offer bank --
15 exchange, and that's established at the beginning
16 of each month with BI Corporate.
17    Q.  So that's the interest?
18    A.  Yes, that's the interest rate plus -- the
19 affiliate companies would pay the LIBOR rate plus
20 25 basis points or an extra quarter percent above
21 that.
22    Q.  You could put that aside.  I'm going to

128

1  show you Exhibit 16.  This is a similar document,
2  except it's from the year-end 1997.
3        (WHEREUPON, a certain document was
4  marked Exhibit McIntyre 016, for identification.)
5  BY MR. FAUCI:
6     Q.  If you'd turn to the statement of income,
7  it's a few pages in, does this reflect that
8  Roxane's income from 1997 was $40 million,
9  approximately?
10    A.  Net income after tax?
11    Q.  Yes.
12    A.  Yes.
13    Q.  And if you turn the page to the statement
14 of financial position --
15    A.  Uh-huh.
16    Q.  -- the retained earnings have increased
17 to $171 million, is that correct?
18    A.  Yes.
19    Q.  And if you look above, it's -- the loans
20 to affiliates are now $27 million, is that correct?
21        MS. RIVERA:  Wait, what page are you on?
22 I'm sorry.

129

1        MR. FAUCI:  Oh, I'm sorry.  I'm on the
2  statement of financial position.  It's
3  BOEH04600262.
4        MS. RIVERA:  Okay.  And you're on which
5  line?
6        MR. FAUCI:  I'm looking at "Loans from
7  affiliates."
8        MS. RIVERA:  Okay.
9  BY MR. FAUCI:
10    Q.  Do you see that that's $27 million?
11    A.  Yes.
12    Q.  Would that reflect that some portion of
13 the loans had been paid off in 1997?
14    A.  Yes.
15    Q.  Would that -- would Roxane's repayment of
16 that loan be reflected as a debit somewhere on an
17 income statement?
18        MS. RIVERA:  Object to form.
19 BY THE WITNESS:
20    A.  No.
21 BY MR. FAUCI:
22    Q.  What would that loan have been paid out

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

40  (Pages 154 to 157)

---

154

1       A.  Opina Project was the project -- the
2   overriding project where the -- the manufacturing
3   facility in Connecticut was to be shut down and the
4   production moved to either our Mexico or our
5   Columbus facility --
6       Q.  After --
7       A.  -- for --
8       Q.  -- that production line was shut down,
9   was there any use made of it at all?
10      A.  Of the manufacturing facility?
11      Q.  In Connecticut, yes.
12      A.  Yes, they mostly turned it to office
13  space.
14      Q.  Were you aware that certain expenses
15  related to that project were booked on the -- in
16  the accounts of Roxane?
17      A.  I was not aware that any Opina Project
18  expenses were booked to Roxane.
19      Q.  Were -- were any allocations made out of
20  the Opina Project to companies other than BIPI?
21      A.  Not to my knowledge.
22      Q.  At the time of the project, were any

---

155

1   drugs that were owned by BIPI -- and I'm talking
2   about ownership of the drugs, I'm not talking about
3   sales of a particular vial or something -- were
4   they transferred to Roxane?
5       MS. RIVERA:  At the time of what project,
6   Ros?
7       MS. POLLACK:  Opina Project.
8   BY THE WITNESS:
9       A.  Was -- let me understand your question.
10  Was ownership transferred?
11  BY MS. POLLACK:
12      Q.  Of any --
13      A.  Was that --
14      Q.  -- drugs.
15      A.  -- your que -- I'm sorry.
16      Q.  Of any drugs that had belonged to BIPI.
17      A.  Not that I'm aware of.
18      Q.  Did Roxane have any contracts with BIPI
19  to distribute BIPI drugs?
20      A.  During what time frame?
21      Q.  From 1996 to 2005.
22      A.  In 2005, there was an agreement between

---

156

1   BIRI and BIPI to manufacture and distribute drugs.
2       MS. RIVERA:  Wait for a question.
3   BY MS. POLLACK:
4       Q.  Prior to 2005, isn't it correct that
5   Roxane marketing personnel marketed drugs that were
6   owned by BIPI?
7       MS. RIVERA:  Object to form.
8   BY THE WITNESS:
9       A.  Not to my knowledge.
10  BY MS. POLLACK:
11      Q.  Are you familiar with a drug called
12  Viramune?
13      A.  Yes.
14      Q.  Is that a product that's sold by BIPI?
15      A.  Yes.
16      Q.  Is that a product for which BIPI has the
17  NDA?
18      A.  Yes.
19      Q.  Okay.  Was that product for a period of
20  time marketed by Roxane?
21      A.  Yes.
22      Q.  And was there a distribution agreement by

---

157

1   which that product, which was owned by BIPI but
2   marketed by Roxane?
3       A.  There was a license agreement.
4       Q.  To Roxane?
5       A.  Yes.  Roxane paid BIPI a 11 percent
6   royalty.
7       MS. RIVERA:  And I'm just gonna object
8   for the record that questions relating to the sale
9   and transfer of Viramune are beyond the scope of
10  the notice as we discussed with the DOJ during
11  various meet and confers.  So that to the extent
12  Mr. McIntyre has knowledge of this, it would be
13  based on his personal knowledge.
14      MS. POLLACK:  The objection is noted.
15  BY MS. POLLACK:
16      Q.  Are you familiar with a drug called
17  Oramorph?
18      A.  Yes.
19      Q.  Was that a drug that was marketed by
20  Roxane at least prior to 2001?
21      A.  Yes.
22      Q.  Who owned the trademark for that drug?

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

41 (Pages 158 to 161)

---

158

1      A.  My understanding is Roxane did.
2      Q.  Was the trademark for that drug ever
3  owned by BIPI?
4      A.  Not to my knowledge.
5      Q.  If I ask you the same question for
6  Roxicodone --
7      A.  Yes.
8      Q.  -- was that a drug that was marketed by
9  Roxane prior to 2001?
10     A.  Yes.
11     Q.  Did Roxane own the trademark for that
12  drug?
13     A.  Best of my knowledge, yes.
14     Q.  Let me ask you a question about the
15  distribution agreement for Viramune.  Do you know
16  when, if at all, that distribution agreement ended?
17        MS. RIVERA:  Do you mean the licensing
18  agreement, Ros?
19        MS. POLLACK:  Sorry, the licensing
20  agreement.
21  BY THE WITNESS:
22     A.  The licensing agreement ended in 2001.

---

159

1  BY MS. POLLACK:
2      Q.  And why was that?
3      A.  2001 was the year that Roxane divested
4  itself of the pain medication products, which
5  included the Roxicodone and the Oramorph we just
6  discussed.  As a result of that divestment, the
7  sales force that marketed those products was -- was
8  eliminated; and as a result, BIPI took the product
9  back.  And at the same time, BIPI had a -- another
10  aged related drug in development.  And with that
11  product coming online soon, they wanted -- they had
12  the combination of those two A drugs that they
13  would be marketing.
14     Q.  What was the term of the license
15  agreement that Roxane had for Viramune; in other
16  words, was it yearly, monthly?
17     A.  Viramune license agreement.
18        MS. RIVERA:  Object to form, beyond the
19  scope of the notice.
20        If you know.
21  BY THE WITNESS:
22     A.  Yeah, I don't -- I don't recall what the

---

160

1  term -- the length -- by "term," you mean length of
2  term, I assume.
3  BY MS. POLLACK:
4      Q.  Right.  Length of time.
5      A.  I -- I don't recall.
6      Q.  Do you recall if Roxane paid any fee to
7  terminate that license agreement in 2001?
8      A.  No, but they -- they would just have
9  discontinued paying the royalty.
10     Q.  Well, Mr. Fauci marked a number of year-
11  end statements and balance sheets earlier today.
12  Are you familiar with the fact that on occasion
13  Roxane made short-term advances to affiliates?
14     A.  Yes.
15     Q.  Okay.  When would those kinds of advances
16  be made?
17     A.  Well, just similar to the short-term
18  loans, all of that, either advances or loans,
19  they're all part of the cash pooling process that
20  takes place with all the activity that goes on
21  between the companies.
22     Q.  When there was a short-term advance to an

---

161

1  affiliate made by Roxane, would there be any
2  documentation relating to that advance?
3      A.  It would be in -- in the internal
4  accounting records.
5      Q.  Would there be a note signed?
6      A.  I don't know if there'd be a note signed.
7      Q.  Would -- would there be any kind of
8  letter agreement or contract re -- relating to that
9  advance?
10     A.  I don't know.
11     Q.  Would there be interest associated with
12  the short-term advance?
13     A.  Yes, there should be, based on that LIBOR
14  rate we discussed earlier, on the affiliate loan.
15     Q.  When you say, "there should be," were
16  there, in fact, interest terms associated with the
17  short-term --
18     A.  Yes --
19     Q.  -- investment --
20     A.  -- there were interest terms.
21     Q.  And would the interest be paid by a
22  bookkeeping line item?

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

42 (Pages 162 to 165)

162

1    A.  If -- well, what do you mean by
2    "bookkeeping line item" --
3    Q.  Yeah --
4    A.  -- please?
5    Q.  -- let me -- let me rephrase that.
6         How would the interest payments be made?
7    A.  It would be made as part of the -- the
8    accounting records.
9    Q.  Would actual cash transfer from one
10   entity to another?
11   A.  Again, that's all part of the -- all of
12   these loans and things are all part of the cash
13   pooling and the -- and the -- and the netting of
14   the -- the affiliate transactions that take place.
15   Q.  Could you describe what you mean by "the
16   cash pooling."
17   A.  The -- Boehringer uses what's called a
18   zero balance cash, so every -- every legal entity
19   has their own bank account, so to speak.  But at
20   the end of the day, the -- the bank where all these
21   accounts are just kind of sweeps all that cash into
22   one pool.  And then they still record the quant --

163

1    the amount of cash by legal entities, but that --
2    they pool it all together so that they can invest
3    that money to earn interest.
4    Q.  Is that --
5    A.  It's much -- much --
6    Q.  -- money invested on behalf of BIC?
7    A.  It's invested on behalf of all the legal
8    entities.
9    Q.  Is the money swept out of that pool daily
10   and -- and sent out of the country?
11   A.  It's swept out of the pool daily.  I
12   don't know that it's swept -- or sent out of the
13   country, no.
14   Q.  If Mr. --
15   A.  It remains --
16   Q.  -- Tetzner --
17   A.  -- in -- it remains in BIC's -- it
18   remains in BIC's account or in fund with all the --
19   with all the individual legal entities.  It's kept
20   track of by the legal entity account numbers, but
21   it's all in one pool.
22   Q.  But if Mr. Tetzner had testified that the

164

1    money in the pool was swept out daily and sent to
2    Germany, you wouldn't have any reason to disagree
3    with that?
4    A.  I wouldn't, no.
5    Q.  Can you take a look at Exhibit 8, that
6    Mr. Fauci asked you about earlier.
7    A.  Yes.
8    Q.  And on page 23, it states that the "MDI
9    and SM standard based upon bulk material being
10   transferred to RLI at zero cost.  This assumption
11   is no longer valid."
12   A.  Yes.
13   Q.  Yes, you read that.  Does that indicate
14   to you that prior to a change being reflected in
15   the budget, the cost of goods sold were being
16   reflected at a zero cost --
17        MS. RIVERA:  Object to form.
18   BY MS. POLLACK:
19   Q.  -- for the MDI and the SM products?
20   A.  And I think I testified earlier that I
21   was unaware what the -- what the accounting change
22   meant, so I couldn't speak to this.

165

1    Q.  It doesn't say to you that whatever the
2    accounting change meant, it was a change from zero
3    to something else?
4        MS. RIVERA:  Object to form.
5    BY THE WITNESS:
6    A.  I -- I see that's what it says, but I
7    can't speak to it.
8    BY MS. POLLACK:
9    Q.  Now, this statement also indicates that
10   there's something called the self medication
11   product.
12        MS. RIVERA:  Where are you, Ros?
13        MS. POLLACK:  Right on that same page on
14   the --
15        MS. RIVERA:  Oh, okay.
16        MS. POLLACK:  -- standard cost of goods
17   sold, self medication product.
18        MS. RIVERA:  I got it.
19        MS. POLLACK:  You see that?
20        MS. RIVERA:  Yep.
21        Sorry, Jim.
22   BY MS. POLLACK:

Roxane Laboratories, Inc (James F. McIntyre)                                    February 26, 2009

Chicago, IL

44 (Pages 170 to 173)

170

1    16, you'll see that, TXEX?
2        A.  Yes.
3        Q.  And -- and the anomalies in current
4    structure progress -- or box, I should say, the
5    third bullet point, "The Ridgefield plant is owned
6    by BIPI;" is that correct?
7        A.  Prior to 2005, that's correct.
8        Q.  And what, if anything, was being
9    manufactured at the Ridgefield plant?
10       A.  At this time, there was only one
11   particular product that had never transferred as
12   part of that Opina Project we discussed, so there
13   was one manufacturing line still there.
14       Q.  What product was that?
15       A.  Combivent MDI inhalers.
16       Q.  Was that being manufactured by BIPI or
17   Roxane?
18       A.  Well, prior to 2005, it was BIPI.  As
19   part of the reorg, it became Roxane -- or BIRI,
20   excuse me, BIRI.
21       Q.  When you say it became part of BIRI,
22   could you explain what you meant -- mean?

171

1        A.  Well, that the assets associated with
2    that manufacturing were now part of the BIRI legal
3    entity.  The employees that produced the product
4    were -- became BIRI legal entity employees.
5        Q.  How was the Ridgefield plant transferred
6    to BIRI, if that's what happened?
7            MS. RIVERA:  Object to form.
8    BY THE WITNESS:
9        A.  Well, the Ridgefield plant in and of
10   itself was not.  It was just the equipment to
11   produce this particular product.
12   BY MS. POLLACK:
13       Q.  What transferred to BIRI?
14       A.  I'm sorry?
15       Q.  I'm trying to understand your testimony.
16   The equipment to produce the product was
17   transferred to B-I-R-I?
18       A.  Yes, as well as the employees that
19   produced the product.
20       Q.  Did the equipment and the employees
21   remain in the Ridgefield plant?
22       A.  Yes.

172

1        Q.  Is there any lease agreement between BIRI
2    and BIPI with regard to that plant?
3        A.  No lease agreement, per se, but the space
4    that we occupy we pay for through an allocation of
5    -- basically would be an occupancy charge for the
6    space that we occupy.
7        Q.  So the plant still belongs to BIPI?
8        A.  Yes, the facility belongs to BIPI.
9        Q.  Was there a reason that the facility was
10   not transferred -- let me rephrase that.
11           Was the reason that the ownership of that
12   Ridgefield plant was not transferred to BIRI along
13   with the equipment and the employees?
14       A.  They needed the space for office.  The
15   rest of the plant was converted to office space.
16       Q.  And whose office space is that?
17       A.  BIPI.
18       Q.  I want to ask one more question about the
19   Viramune sale.  You testified that Roxane paid a
20   royalty to BIPI on sales that were made, is that
21   correct?
22       A.  Up through 2001.

173

1        Q.  Through 2001.  How was the income from --
2    from the sales booked?
3            MS. RIVERA:  I just want to put a
4    continuing objection on the record to the -- beyond
5    the scope of the Viramune discussion.
6    BY MS. POLLACK:
7        Q.  How was -- was that booked by Roxane?
8        A.  The income from the sale -- from Viramune
9    sales to third parties was booked by --
10       Q.  Yes.
11       A.  -- Roxane, yes.
12       Q.  Okay.  I'd like to talk a little bit more
13   about Exhibit 2.  If you'll turn to the next page,
14   page 17 at the bottom.  And this is describing --
15   and this is for the new legal entities that were
16   proposed to be created, is that correct?
17       A.  Which -- which side are you looking at?
18       Q.  At the top of the page marked at the --
19       A.  The advan -- the one that says
20   "Advantages"?
21       Q.  Yeah.
22       A.  Yes, this is talking that the advantages

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

45 (Pages 174 to 177)

174

1  of one of the options, the preferred option.
2      Q.  And the third bullet says, "Moves
3  employees under the legal entity to which they
4  report;" is that correct?
5      A.  That's correct.
6      Q.  So there were people who were employed by
7  one company but reporting to another, is that what
8  that means?
9      A.  Yes, specifically the manufacturing
10  situation we just discussed.
11      Q.  Are you talking about the Combivent?
12      A.  Yes.
13      Q.  Well, weren't these people prior to 19 --
14  I'm sorry, prior to 2005, who were manufacturing
15  Combivent, BIPI employees?
16      A.  That's correct.
17      Q.  And that prior to 2005, Combivent was a
18  BIPI drug; right?
19      A.  That's correct.  It still is.
20      Q.  So why would you have to move them under
21  the legal entity which -- to which they report when
22  they were already under the legal entity to which

175

1  they reported?
2      A.  Because -- because the -- the Roxane
3  manufacturing people were responsible for that
4  manufacturing line.  And those manufacturing people
5  in BIPI were reporting to people in Roxane, or BIRI
6  after the 2005 split.  And that's why this comment
7  says move people -- move people -- employees under
8  the legal entity to which they report.  That was
9  one of the anomalies of the -- of our organization,
10  that the 2005 organization wanted to -- wanted to
11  correct.  Remember, the overriding driver of the
12  reorganization was to separate the two businesses
13  that were part of the Roxane business prior to 2005
14  and part of the Roxane legal entity.
15      Q.  But the Combivent was part of BIPI prior
16  to 2005?
17      A.  That's correct, the manufacturing was,
18  yes, but managed --
19      Q.  And --
20      A.  -- by BIRI people.
21      Q.  I'm sorry, I didn't hear that.
22      A.  But managed by Roxane manufacturing

176

1  people.
2      Q.  The next bullet point, there's a line,
3  the oper -- the organization with the actual
4  businesses, what's meant by that?
5      A.  Again, given that the overriding driver
6  for the separation or for the reorganization was to
7  separate the two legal entities or to separate the
8  two businesses that were part of the Roxane legal
9  entity, we wanted to get the organization aligned
10  so that the manufacturing people were all part of
11  the manufacturing organization and the sales and
12  marketing people were part of the sales
13  organization, so that those two businesses could be
14  judged and -- their performance could be judged
15  independently.
16      Q.  And what does the last bullet point say
17  under "the advantages of the new legal entity"?
18      A.  At the -- way down at the bottom, the
19  "allows for separation of liability"?
20      Q.  Yes.  Could you read that into the
21  record, please.
22      A.  "Allows for separation of liability for

177

1  Marketing and Sales of Multisource and
2  manufacturing of Multisource products."  The intent
3  of that bullet is to -- is to -- we're really just
4  trying to align liability with the business, so if
5  manufacturing had a -- if there was a manufacturing
6  liability, the manufacturing legal entity was --
7  was accountable for that.  So we're just trying to
8  align liability with the business.
9      Q.  Whereas, prior to that time, any of those
10  liabilities would have been part of Roxane
11  Laboratories, Inc., which had both the
12  manufacturing and the sales for the multisource
13  product; is that correct?
14      A.  Excuse -- I -- I didn't hear your entire
15  question, so if you could repeat it, please.
16          MS. POLLACK:  Could you read it back?
17  Did you get it --
18          THE COURT REPORTER:  You trailed off --
19          MS. POLLACK:  -- the court reporter?
20          THE COURT REPORTER:  -- at the end for
21  me, too.
22  BY THE WITNESS:

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009
Chicago, IL

48 (Pages 186 to 189)

186

1      A.  I confirmed that with Judy Waterer.
2  BY MS. RIVERA:
3      Q.  Okay.  There was also some discussion
4  about some commitment agreements and rebates that
5  were paid.  Do you recall that discussion?
6      A.  Yes.
7      Q.  Okay.  It's in reference to Exhibit 17.
8          MS. RIVERA:  Oh, actually -- well, can
9  you mark --
10         MR. FAUCI:  I'm thinking it's on 17.
11         MS. RIVERA:  It's what?
12         MR. FAUCI:  Nothing.
13         MS. RIVERA:  Oh, you know what --
14  BY THE WITNESS:
15     A.  13.
16  BY MS. RIVERA:
17     Q.  Yeah, it's -- I'm looking at -- yeah, and
18  set that aside for one minute.  I wanted to mark
19  one more document with you on the last issue.
20         (WHEREUPON, a certain document was
21  marked Exhibit McIntyre 026, for identification.)
22  BY MS. RIVERA:

187

1      Q.  Okay.  The court reporter's handed you
2  what has been marked as Exhibit 26.
3          MS. RIVERA:  And for the record, the top
4  -- it's an e-mail chain, the top e-mail is from
5  Judy Waterer, dated November 4, 1996.
6  BY MS. RIVERA:
7      Q.  Do you see that?
8      A.  Yes, I do.
9      Q.  Okay.  If you would look to what looks
10  like the third e-mail on this page from John Swartz
11  to Ed Tupa.
12     A.  Yes, I have it.
13     Q.  Okay.  And that's dated Thursday, October
14  31st?
15     A.  Yes.
16     Q.  Okay.  If you could take a look at this,
17  it says, "This is regarding the RLI sales of
18  Ipratropium that will be filled with BIPI's
19  Atrovent."  That's referring to the substitution
20  that we were discussing?
21         MR. FAUCI:  Objection to the form.
22  BY MS. RIVERA:

188

1      Q.  Is that --
2      A.  Yes.
3      Q.  -- referring to the substitution that we
4  were discussing?
5      A.  Yes.
6      Q.  Okay.  He says, "I have listed below the
7  process I -- as I understand it, which was
8  implemented as of last Friday, October 25th."  Can
9  you read through that, and tell me whether that
10  supports your testimony as to whether BIPI booked
11  these sales, and there were no intra-company sales.
12         MR. FAUCI:  Objection to the form.
13  BY THE WITNESS:
14     A.  I see in point three that Judy Waterer is
15  going to communicate to the -- the BI Services
16  Center which orders will be processed as BIPI
17  invoices.
18  BY MS. RIVERA:
19     Q.  And what does that mean?
20     A.  So that confirms -- to me, that confirms
21  that BIPI was gonna book the sale for the -- that
22  entry.

189

1      Q.  Okay.  If Roxane had booked the sale,
2  what would you expect that to be?
3      A.  It would have referenced Roxane invoices.
4      Q.  Okay.  Okay.  Okay.  Now moving on to the
5  bundling and rebate agreements.  I believe you were
6  asked who booked and paid for the rebates on BIPI
7  products that are a part of this -- these
8  commitment and loyalty agreements.  Do you recall
9  that?
10     A.  Yes, I do.
11     Q.  Okay.
12         (WHEREUPON, a certain document was
13  marked Exhibit McIntyre 027, for identification.)
14  BY MS. RIVERA:
15     Q.  What number is that?  I'm sorry.
16     A.  27.
17     Q.  Thank you.  Okay.  You've been handed a
18  document, which is dated -- I'm sorry, which has
19  been marked Exhibit 27.  And in the first paragraph
20  there, it says, "After discussing the one percent
21  rebate for the branded product and in doing an
22  analysis," et cetera, "Shelly and I agree that the

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

49 (Pages 190 to 193)

190

1  one percent rebate should be charged against the
2  Roxane P&L."
3        What does that indicate to you in terms
4  of how rebates for BIPI products that were part of
5  Roxane loyalty or commitment agreements were
6  booked?
7     A.  They're going to be paid for by Roxane.
8     Q.  Okay.  And were you able to do any other
9  research to confirm that this is the way it worked
10 for -- for all of these various agreements?
11    A.  Yes, I confirmed this with Judy Waterer.
12    Q.  Okay.  So BIPI was not paying the rebate
13 even though the rebate was based on BIPI products?
14    A.  That's correct.
15        MR. FAUCI:  Objection to form.
16 BY MS. RIVERA:
17    Q.  Okay.  You were also asked some questions
18 about dividend payments from Roxane to BIC.  Do you
19 recall that discussion?
20    A.  Yes.
21    Q.  Okay.  What is the purpose of dividend
22 payments?

191

1     A.  Typically it's to return part of the
2  investment to the parent company.
3     Q.  Okay.  And is this a normal procedure
4  between subsidiary and parent companies?
5     A.  Yes.
6         MR. FAUCI:  Objection to form.
7  BY THE WITNESS:
8     A.  Yes.
9  BY MS. RIVERA:
10    Q.  Okay.  Based on your -- well, let me ask
11 you this:  Based on your -- sorry, strike that
12 again.
13        You were a member of Roxane's finance
14 department from 1996 to 2005, is that correct?
15    A.  That's correct.
16    Q.  Okay.  And as a member of Roxane's
17 finance department, were you familiar with Roxane's
18 financial condition during that time frame?
19    A.  Yes.
20    Q.  Okay.  And in preparation for this
21 deposition, did you review Roxane's financial
22 statements over time?

192

1     A.  Yes, I did.
2     Q.  Okay.  Based on your knowledge of
3  Roxane's financial condition and the -- the payment
4  of these dividends, do you believe that any of the
5  dividend payments that were made by Roxane to BIC
6  during the relevant time frame left Roxane
7  undercapitalized?
8         MR. FAUCI:  Objection --
9         MS. POLLACK:  Objection --
10        MR. FAUCI:  -- to the form.
11 BY THE WITNESS:
12    A.  No.
13 BY MS. RIVERA:
14    Q.  Okay.  And why not?
15    A.  'Cause --
16        MR. FAUCI:  Objection to the form.
17 BY THE WITNESS:
18    A.  They continued to have positive retained
19 earnings, and they also had positive working
20 capitals to fund their day-to-day operations.
21 BY MS. RIVERA:
22    Q.  Okay.  And during the time that you were

193

1  in Roxane's financial department, do you know if
2  Roxane -- you know, during the entire time they --
3  that you were in Roxane's financial department, if
4  you have -- if Roxane had sufficient working
5  capital to fund its day-to-day operations?
6         MR. FAUCI:  Objection to the form.
7  BY THE WITNESS:
8     A.  Yes.
9  BY MS. RIVERA:
10    Q.  Okay.  Was there ever a time when Roxane
11 was unable to pay its day-to-day obligations during
12 this time period?
13    A.  No.
14        MR. FAUCI:  Objection to the form.
15 BY MS. RIVERA:
16    Q.  Okay.
17        MS. RIVERA:  What's your objection?
18        MR. FAUCI:  Can you repeat the question?
19        THE COURT REPORTER:  "Question:  Okay" --
20        MR. FAUCI:  I can read it.
21        The objection is that I'm very unclear
22 what you mean by the phrase "day-to-day

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

50 (Pages 194 to 197)

194

1   operations," so I would say it's vagueness.
2        MS. RIVERA: Okay.
3   BY MS. RIVERA:
4        Q.  Are you aware -- let me just try to fix
5   it, even though I disagree with the -- do you
6   understand what I mean by "day-to-day operations,"
7   Mr. McIntyre?
8        A.  Yes.
9        Q.  And how would you describe the day-to-day
10  operations of Roxane?
11       A.  To be able to pay our bills, pay our --
12  our vendors, pay our employees, purchase --
13  purchase ingredients, raw materials for -- for
14  manufacturing.
15       Q.  Okay.  Okay.  So let me just ask it
16  again.  Based on that day-to-day -- based on that
17  definition of -- of day-to-day business, do you
18  believe based on your familiarity with Roxane's
19  financial con -- condition and your review of
20  Roxane's financial statements that Roxane had
21  sufficient capital to pay its day-to-day expenses -
22  -

195

1        MS. POLLACK: Objection as to form.
2        MS. RIVERA: I'm not done yet.
3        MS. POLLACK: Sorry.
4        MS. RIVERA: It's okay.
5   BY MS. RIVERA:
6        Q.  To pay its day-to-day expenses and fund
7   its day-to-day operations from 1996 through 2005?
8        MS. POLLACK: Objection to form.
9   BY THE WITNESS:
10       A.  Yes.
11  BY MS. RIVERA:
12       Q.  Okay.  And this is your view even though
13  at certain points of time Roxane paid dividends to
14  its parent comp -- corporation?
15       A.  Yes.
16       Q.  Okay.  Do you have any understanding
17  whether the capitalization and Roxane's ability to
18  pay and fund its -- its day-to-day operations was
19  taken into account when determining whether
20  dividends should be paid to -- to BIC or not?
21       MR. FAUCI: Objection.
22  BY THE WITNESS:

196

1        A.  Yes, there is a general rule, guideline
2   from our corporate parent, that the debt to equity
3   ratio shouldn't exceed a certain amount.  If it --
4   if it exceeded a certain amount, then dividends
5   would not be paid.
6   BY MS. RIVERA:
7        Q.  Okay.  Then there were some questions
8   specific to a dividend that was paid in 2002 from
9   Roxane to BIC, I think, in the amount of $320
10  million.  Do you remember that?
11       A.  Yes, I do.
12       Q.  Okay.  Were you able to determine why
13  that dividend payment was larger than dividend
14  payments that had been paid in the past, that Mr.
15  Fauci also referred you to?
16       A.  Yes.  There was a couple of things that
17  happened in the prior year that -- that resulted in
18  larger -- more income for Roxane.  First, we sold
19  the palliative care business, so the income was --
20  the income that Roxane reported in 2001 was a lot
21  larger than had been expected; two, there were some
22  tax issues pending that allowed us -- that was

197

1   gonna allow us to pay some additional dividends;
2   and, three, we hadn't paid a dividend in -- since
3   2000, so this -- the payment in 2002 was -- was a
4   catch-up for a two-year period.
5        Q.  Okay.
6        (WHEREUPON, a certain document was
7   marked Exhibit McIntyre 028, for identification.)
8   BY MS. RIVERA:
9        Q.  Okay.  Okay.  The court reporter has
10  handed you what's been marked as Exhibit 28.  Can
11  you tell me what this is?
12       A.  This is the 2001 year-end financial
13  commentary or commentary to the financial
14  statements.
15       Q.  Okay.  Are these documents that Roxane
16  generates in its normal course of business, or did
17  at this point in time?
18       A.  Yes.
19       Q.  And you're familiar with these kinds of
20  documents?
21       A.  Yes.
22       Q.  Okay.

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

Chicago, IL

51 (Pages 198 to 201)

198

1           MR. FAUCI:  Objection to form.
2    BY MS. RIVERA:
3        Q.  If you would turn to the page that ends -
4    - if you see the BOEH numbers there --
5        A.  Uh-huh.
6        Q.  -- that ends in 452, it's a -- it's right
7    -- it's a commentary right after the income
8    statement.
9        A.  Total company income statement, right?
10       Q.  Yes.
11       A.  Yes, okay.  I have it.
12       Q.  Okay.  And it says, "2001 actual income
13   is 175 million," and it says under that, attribute
14   -- "Attributable to the Elan deal for the purchase
15   of pain/palliative care products line." Can you
16   tell me what that means in terms of how much Roxane
17   was paid for its divestment of the Elan palliative
18   care line?
19       A.  That -- well, this -- this would
20   represent the amount of income that they were made
21   -- made on this sale of the -- the line.
22       Q.  Okay.  So is that the same as saying that

199

1    Roxane made $175 million from the divestiture of
2    the Elan products?
3        A.  Yes.
4            MR. FAUCI:  Objection to form.
5    BY MS. RIVERA:
6        Q.  I mean the divestiture of the products to
7    -- to Elan.
8        A.  Yes.
9        Q.  Okay.  And can you tell from your
10   knowledge and from your review of the documents
11   whether that income was budgeted for in -- for
12   Roxane for 2001?
13       A.  I could -- yes, it was -- it was not
14   budgeted for.
15       Q.  Okay.  So is this consistent with your
16   testimony that in 2001 Roxane had a unbudgeted
17   influx of income in the amount of $175 million?
18       A.  Yes.
19       Q.  Okay.  And that contributed in part to
20   the reason why the 2002 dividend payment was
21   higher?
22       A.  That would be --

200

1            MR. FAUCI:  Objection --
2    BY THE WITNESS:
3        A.  -- correct.
4            MR. FAUCI:  -- to the form.
5    BY MS. RIVERA:
6        Q.  Okay.
7        A.  That is correct.
8        Q.  Were you able to determine, Mr. McIntyre,
9    whether the payment of the $320 million dividend in
10   2002 had anything to do with pending subpoenas or
11   litigation at Roxane?
12           MR. FAUCI:  Objection to the form.
13   BY THE WITNESS:
14       A.  Yes, I was able to determine from
15   conversations with Frank Palmer that it had nothing
16   to do with any litigation.
17   BY MS. RIVERA:
18       Q.  Okay.  Okay.  Just a few general
19   questions.  Between the time you were in Roxane's
20   financial department, between 1996 and 2005, did
21   you view Roxane as a separate company from BIC and
22   BIPI?

201

1            MR. FAUCI:  Objection --
2    BY THE WITNESS:
3        A.  Yes.
4            MS. RIVERA:  -- to the form.
5    BY THE WITNESS:
6        A.  Yes.
7            MS. RIVERA:  What's your objection?
8            MR. FAUCI:  It calls for a legal
9    conclusion.
10   BY MS. RIVERA:
11       Q.  Okay.  In your view, was Roxane a
12   separate company from BIC and BIPI?
13           MR. FAUCI:  Same objection.
14   BY THE WITNESS:
15       A.  Yes, they were a separate legal entity.
16   BY MS. RIVERA:
17       Q.  Okay.  And following the reorganization
18   in 2005, was it your opinion that BIRI was a
19   separate -- or did you consider BIRI a separate
20   company from BIC, BIPI and RLI at that point?
21       A.  Yes, it was -- again, it was a separate
22   legal entity, separate tax ID.

Roxane Laboratories, Inc (James F. McIntyre)                February 26, 2009

Chicago, IL

52  (Pages 202 to 205)

---

202

1      Q.  Okay.  And after the 2005 reorganization,
2   did you consider Roxane Laboratories as a separate
3   entity, as a separate corporation from BIC, BIPI
4   and BIRI?
5      A.  Yes.
6         MS. POLLACK:  Objection to form.
7   BY MS. RIVERA:
8      Q.  Okay.  And just so it's clear on the
9   record, between 1996 and 2005, did Roxane have
10  separate financial statements from BIC and BIPI?
11     A.  Yes.
12     Q.  Did it have a separate forecasting and
13  budget procedure?
14     A.  Yes.
15     Q.  Okay.  And after 2005, do you know if
16  both BIRI and Roxane continued to have separate
17  financial statements and budgets, both from each
18  other and from BIC and BIPI?
19     A.  Yes.
20     Q.  Okay.  Okay.  You had a short discussion
21  with Mr. Fauci about some manufacturing that Roxane
22  did for BIPI.  Do you recall that?

---

203

1      A.  Yes.
2      Q.  And I believe -- sorry.  I believe he
3   asked you if there were manufacturing or contracts
4   that governed the agreements between RLI and BIPI
5   with regard to that manufacturing.  Do you recall
6   that?
7      A.  That's correct, yes.
8      Q.  Okay.
9         (WHEREUPON, certain documents were
10  marked Exhibit McIntyre 029, Exhibit McIntyre 030 &
11  Exhibit McIntyre 031, for identification.)
12  BY MS. RIVERA:
13     Q.  Okay.  The court reporter's handed you
14  what have been marked as Exhibits 29, 30 and 31.
15  If you would look at Exhibit 29 first, and can you
16  tell me what this is?
17     A.  This is the 1993 contract manufacturing
18  agreement between Roxane Laboratories and BIPI.
19     Q.  Okay.  And on the second page of that
20  agreement, there's a section called, "Term of
21  Agreement"?
22     A.  Yes.

---

204

1      Q.  Okay.  And what does it say the term of
2   that agreement was?
3      A.  Ten years.
4      Q.  Okay.  And this is one of the contracts
5   you were referring to earlier in your testimony?
6      A.  Yes.
7      Q.  Okay.  If you would look at Exhibit 30,
8   and tell me what that is.
9      A.  This is the contract manufacturing
10  agreement between BIPI and BIRI.
11     Q.  And this one's dated September of two
12  thousand --
13     A.  Two thousand --
14     Q.  -- and five?
15     A.  That's correct.
16     Q.  Okay.  And at this point, this was after
17  the corporate reorganization?
18        MR. FAUCI:  Objection to form.
19  BY THE WITNESS:
20     A.  That's correct.
21  BY MS. RIVERA:
22     Q.  Okay.  And so BIRI has now taken over the

---

205

1   manufacturing for BIPI?
2         MR. FAUCI:  Objection to form.
3   BY THE WITNESS:
4      A.  Yes.
5   BY MS. RIVERA:
6      Q.  Okay.  And if you would look at -- well,
7   what ends in the Bates No. 315, a section called,
8   "Payments."  I think the section starts on the page
9   before.
10     A.  I have it.
11     Q.  Okay.  Okay.  And the -- the Section 7.2,
12  the last sentence says, "Thereafter, the parties
13  shall set the prices for drug products not less
14  than once per year based on BIRI's cost plus ten
15  percent."  Do you see that?
16     A.  Yes, I do.
17     Q.  Okay.  Is that consistent with your
18  testimony that the prices for the manufacturing, at
19  least as of 2005, that BIRI charged to BIPI was
20  based on cost plus ten percent?
21     A.  Okay.
22     Q.  Okay.  And I -- you may have gone over

---

Roxane Laboratories, Inc (James F. McIntyre)                    February 26, 2009

## Chicago, IL

53 (Pages 206 to 209)

---

206

1  this -- I think you did a little bit with Mr. Fauci
2  -- but can you tell me, just so it's clear, where
3  that ten percent figure came from?
4      A.  The ten percent was arrived at earlier
5  con -- contract negotiations between BIRI and BII
6  in Germany, and that was later validated by outside
7  consulting firm to be an arm's length rate.
8      Q.  Okay.  So this ten percent had been used
9  in prior contracts --
10     A.  Yes.
11     Q.  -- between affiliate companies?
12     A.  Yes.
13     Q.  Okay.  And you said it was validated by
14 third-party consultants.  Can you explain that to
15 me?
16     A.  Yeah.  The third-party consultant in 2004
17 did a study of comparable companies that had -- had
18 in the margins that they made, and they felt that
19 ours was equivalent to those that they had studied,
20 and that it was an arm's length rate.  And
21 subsequent to 2004, they -- on a yearly basis, they
22 would -- they would issue an opinion on that again.

---

207

1  So that was reviewed on an annual basis to see that
2  it remained an arm's length rate.
3      Q.  Okay.  And the comparable agreements they
4  looked at were other contract manufacturing
5  pharmaceutical agreements?
6      A.  Yes.
7          MR. FAUCI:  Objection to form.
8  BY THE WITNESS:
9      A.  Yes.
10 BY MS. RIVERA:
11     Q.  And do you know who the third-party
12 consultant was that performed those evaluations?
13     A.  Economic consulting firm called Valentine
14 and Barbaro.
15     Q.  Okay.  And then if you would look at
16 Exhibit 31.  And can you tell me what this document
17 is?
18     A.  This is the contract manufacturing
19 agreement between Roxane Laboratories and BIRI at
20 the time of the -- the split.
21     Q.  Okay.  And why -- why was there a
22 contract manufacturing agreement that needed to be

---

208

1  entered into between Roxane and BIRI at this point
2  in time?
3      A.  Because now BIRI was going to act as the
4  contract manufacturer for Roxane Laboratories now
5  that they were separate companies.
6      Q.  Okay.  And if you would again turn to the
7  payment section, which is section seven, at the
8  bottom of -- ends in Bates No. 299.  What were the
9  price terms for the contract between BIRI and RLI?
10     A.  Cost plus ten percent.
11     Q.  Okay.  And just for the record, you may
12 have said this, but just so it's clear, that this
13 contract manufacturing agreement is dated April 4,
14 2005?
15     A.  That's correct.
16         MS. RIVERA:  Okay.  Let me take two
17 minutes and just make sure that I'm done, so bore
18 you for two seconds.
19         THE VIDEOGRAPHER:  Should I change tape,
20 or are you going to have more?
21         MS. RIVERA:  Should we just change --
22 yeah, oh --

---

209

1          MS. DENTON:  Might as well.
2          MS. RIVERA:  Are you going to have any
3  follow-up or --
4          MR. FAUCI:  Why don't we take a break out
5  there, and we'll talk --
6          MS. RIVERA:  Okay.
7          MR. FAUCI:  -- whether if you're done
8  we're gonna have more --
9          MS. RIVERA:  Okay.
10         MR. FAUCI:  -- and I guess --
11         MS. RIVERA:  Yeah.
12         THE VIDEOGRAPHER:  We're off the record
13 at 3:01 p.m.
14         (WHEREUPON, a recess was had.)
15         (WHEREUPON, MR. WINGET-HERNANDEZ
16 disconnected telephonic communication.)
17         THE VIDEOGRAPHER:  We are back on the
18 record at 3:11 p.m.
19         MS. RIVERA:  I have nothing further right
20 now.
21         MR. FAUCI:  I have a few very quick
22 questions.

---