# TAB 19

# Condensed Transcript

SUPERIOR COURT
COMPLEX LITIGATION
DOCKET at TOLLAND
Docket No. X07 CV-03-0083296-S (CLD)

STATE OF CONNECTICUT,
    Plaintiff,

vs.

DEY, INC., ROXANE LABORATORIES, INC.,
WARRICK PHARMACEUTICALS CORP.,
SCHERING-PLOUGH CORP.
AND SCHERING CORPORATION,
    Defendants.

## CONFIDENTIAL DEPOSITION OF

### JOHN POWERS

October 11, 2005
9:10 a.m.

52 East Gay Street
Columbus, Ohio

Lori M. Barnes, RPR



**setdepo**
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**49**

1  get approval from anyone as high as Ed Tupa,
2  the vice president of marketing, or the vice
3  president of finance. I'm trying to get a
4  little more grasp on this concept -- a little
5  more information as to what you generally
6  understood these pricing guidelines to be.
7  There were separate pricing guidelines for
8  different products or markets That's really
9  where I'm going with this question.
10     A.   There were different strategies for
11 different markets. There were, of course,
12 different prices for different products,
13 different customers. And relative to contract
14 prices, a floor, a bottom bid price, was
15 created for each product or NDC.
16     Q.   And the floor bid price, is that
17 specific to the product?
18     A.   Yes.
19     Q.   So it's not specific to the type
20 of customer ordering the product; is that
21 correct?
22     A.   Correct.
23     Q.   Did you participate in the
24 calculation or determination or management of
25 the floor bid price?

**50**

1      A.   Yes.
2      Q.   What was your role in establishing
3  or maintaining the floor bid price
4  information?
5      A.   Establishing it.
6      Q.   And how did you do that?
7      A.   A review of competitive pricing
8  information, consultation with product
9  management and company management, vice
10 president of marketing, finance.
11     Q.   And with respect to competitive
12 pricing information as to the establishment of
13 floor bid prices, is that the same type of
14 competitive information that we talked about
15 earlier that was used when you were
16 establishing an offer price?
17     A.   Correct.
18     Q.   Were there any other additional
19 types of information that were used to
20 establish these floor bid prices?
21     A.   We would look over time at the
22 success rate of winning contracts at offered
23 prices, which may affect a change in the
24 minimum bid price.
25     Q.   And that gets back to the bid

**51**

1  book; is that correct?
2      A.   Yes.
3      Q.   So, over time if a particular
4  product continues to lose or is not awarded
5  on contracts, then that may create a
6  situation where you and the contract
7  department may re-evaluate a particular floor
8  bid price for a particular product?
9      A.   Yes.
10     Q.   Do the floor bid prices that we're
11 talking about that existed for each NDC
12 number have any other names at Roxane?
13     A.   There was a minimum bid price.
14     Q.   And isn't it true, then, that
15 minimum bid price is essentially what we've
16 been calling the floor bid price?
17     A.   You could say that, yes.
18     Q.   Are there any differences between
19 the two that you can recall?
20     A.   The terminology we use is minimum
21 bid price.
22     Q.   And with respect to the minimum
23 bid price, did it mean exactly what it says,
24 minimum bid price? Was it a price that below
25 which contracts could not price a particular

**52**

1  NDC product?
2      A.   We were able to propose alternate
3  prices with the approval of the product
4  manager, the vice president of marketing and
5  the vice president of finance.
6      Q.   And was that a written process?
7      A.   Yes.
8      Q.   And would it require your
9  signature?
10     A.   Yes.
11     Q.   And also the signatures or
12 sign-offs of the heads of those other
13 departments?
14     A.   Yes.
15     Q.   And in what situations would Roxane
16 go beneath the minimum bid price for a
17 particular NDC product?
18     A.   As a minimum bid price was
19 established, we all understood it was a fluid
20 number. And in the event an opportunity for
21 significant sales or sales retention was
22 jeopardized by the continuation of a bid
23 price that was no greater than that minimum
24 bid price, all of us were challenged to
25 support why we felt a different bid price


setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

### Page 53

1. needed to be considered, either for one
2. particular offer or a general change in the
3. minimum bid price.
4.     Q.   And when minimum bid prices were
5. being established or re-evaluated for change,
6. did you get input from the individuals at
7. Roxane who were responsible for manufacturing
8. a particular NDC?
9.     A.   Rarely.
10.    Q.   Did you get information about how
11. much it actually costs to produce the NDC?
12.    A.   We had that information available
13. to us.
14.    Q.   And where did you get that
15. information from?
16.    A.   The computer system. There was a
17. particular program in which we could look at
18. the component costs per NDC, and the printed
19. bid book also included cost information.
20.    Q.   And was that cost information
21. updated on a regular basis?
22.    A.   As the bid book was reprinted, you
23. would see any changes that had occurred in
24. the cost structure of that product.
25.    Q.   Were there situations during your

### Page 54

1. time period at Roxane in the contract
2. department where the department reviewed all
3. of the minimum bid prices for all of its
4. products?
5.     A.   Yes.
6.     Q.   When did that occur?
7.     A.   On at least a quarterly basis.
8.     Q.   What did that process involve?
9.     A.   A review of contract sales by NDC
10. as well as a review of awards and losses for
11. those NDCs.
12.    Q.   And with respect to Roxane's
13. products, generally speaking, would the trend
14. for minimum bid prices go down over time or
15. go up over time?
16.    A.   For generic prices the minimum bid
17. prices generally went down.
18.    Q.   So we talked about minimum bid
19. price here a little bit. Are you familiar
20. with whether the minimum bid price is
21. regulated by either state or federal
22. regulations?
23.    A.   No.
24.    Q.   You are not familiar with that
25. topic?

### Page 55

1.     A.   No.
2.     Q.   Are you familiar with any price
3. utilized at Roxane that is subject to either
4. federal or state reporting regulations?
5.     A.   Yes.
6.     Q.   Which price is that?
7.     A.   Any prices offered are reported to
8. the federal government for Medicaid
9. reimbursement.
10.    Q.   And would that include NBPs?
11.    A.   No.
12.    Q.   Would it include wholesale
13. acquisition costs?
14.    A.   Yes.
15.    Q.   Would it include average wholesale
16. price?
17.    A.   I don't believe so, no.
18.    Q.   Other than wholesale acquisition
19. costs, what other prices is it your
20. understanding that those reporting requirements
21. encompass?
22.    A.   Selling prices.
23.    Q.   And do those selling prices reflect
24. rebates, discounts or free goods?
25.    A.   Yes.

### Page 56

1.     Q.   And how is Roxane's system set up
2. to track these rebates, discounts or free
3. goods so that these prices are reported
4. accurately?
5.         MR. COVAL: Objection to the form.
6.     A.   My understanding is that the
7. accounting finance IT group created systems to
8. capture the appropriate sales data creating a
9. final report for the individuals responsible
10. for providing that information to the federal
11. government.
12.    Q.   Do you know who was responsible
13. for overseeing that creation of that data at
14. Roxane?
15.    A.   Over time it was the responsibility
16. of the heads of the three departments that I
17. mentioned.
18.    Q.   And those three departments were
19. finance --
20.    A.   -- accounting and IT.
21.    Q.   Would those selling prices that are
22. reported pursuant to those regulations, did
23. they also reflect administrative fees that may
24. have been paid to various Roxane customers?
25.        MR. COVAL: Object to form. Go



setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**197**

1  other than Cyclophosphamide?
2  A. Today I have, yes.
3  Q. But in your normal operations or
4  normal daily business activities with Roxane
5  do you recall seeing charts similar to this
6  for other products?
7  A. I don't recall.
8  Q. So you may have, but you just
9  can't recall as you sit here today, correct?
10 A. That's correct.
11 Q. Okay. That's it for 23.
12 Actually, if you would look at that real
13 quick again, if you look at the second email,
14 March 21, 2000, Tony Pera, P-E-R-A --
15 A. Yes.
16 Q. -- he's with Roxane U.S., is that
17 correct, based on the address?
18 A. No, he's with BICLE.
19 Q. Okay. What's BICLE mean to you?
20 A. Boehringer Ingelheim, Cleveland.
21 Q. And the same would be true for Tom
22 Russillo?
23 A. Russillo, yes.
24 Q. And so was it -- In your dealings
25 with the contract department at Roxane, were

**198**

1  there instances where you would interact with
2  Boehringer Ingelheim employees?
3  MR. COVAL: Objection.
4  Q. Let me ask it a different way.
5  Would you interact with Boehringer Ingelheim
6  employees during your normal operations in the
7  Roxane contracting department?
8  A. Yes.
9  Q. And who would some of those
10 employees, Boehringer Ingelheim employees, have
11 been?
12 A. My boss, Gregg Cirelli at this
13 time was a Boehringer Ingelheim employee.
14 Q. And when did Boehringer Ingelheim
15 purchase or take over Roxane, as far as you
16 can recall?
17 MR. COVAL: Objection to form.
18 A. Boehringer Ingelheim purchased
19 Phillips Roxane Laboratories in 1978.
20 Q. And you started in 1977, correct?
21 A. Yes.
22 Q. Did you interact with Boehringer
23 Ingelheim employees dating as far back as
24 1977?
25 A. No.

**199**

1  Q. I'm sorry, 1978?
2  A. No.
3  Q. When did the interactions begin?
4  A. I don't recall.
5  Q. Was it in the 1990s?
6  A. May have been.
7  Thereupon, Powers Exhibit-24 was
8  marked for purposes of identification.
9  Q. John is reviewing a document that
10 is two pages long, RoxCT0051246 through
11 RoxCT0051247. This is a series of emails
12 starting back on April 28, 2000 at 11:30 a.m.
13 -- I'm sorry, 11:31 a.m., going through April
14 28, 2000, 2:20 p.m.
15 A. Okay. I've read it.
16 Q. Okay. And do you recognize these
17 series of emails as the type of communication
18 you would come across during your tenure in
19 the contract department at Roxane?
20 A. Yes.
21 Q. Okay. And what are these emails?
22 A. It's regarding a possibility for a
23 contract price for Cyclophosphamide with Giant
24 Eagle.
25 Q. And that's based -- Your summary

**200**

1  of the document is based on your reading of
2  it, correct?
3  A. Correct.
4  Q. And when do you last recall seeing
5  this document prior to today, if at all?
6  A. I don't recall the document at
7  all.
8  Q. At the top of this is an email
9  from you to Carl Ciardelli, correct?
10 A. Yes.
11 Q. It is dated April 28, 2000?
12 A. Yes.
13 Q. So at least as to that portion it
14 was prepared by you, correct?
15 A. Yes.
16 MR. COVAL: Jeff, I'm going to
17 register a continuing objection to a
18 discussion of Cyclophosphamide. The plaintiffs
19 in this case were ordered by the Court to
20 identify the drugs at issue in the case and
21 had an opportunity to do so, and this isn't
22 one. I want to register a continuing
23 objection with respect to any discussion on
24 drugs that are not at issue in this case.
25 MR. GOLDENBERG: Just so -- I



**setdepo**
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com