**TAB 20**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Master File No.

LITIGATION                       ) 01-12257-PBS

_____  )

                                 )

THIS DOCUMENT RELATES TO:        ) VIDEOTAPED

                                 ) DEPOSITION OF

United States of America ex rel. ) THOMAS RUSSILLO

Ven-a-Care of the Florida Keys,  )

Inc., v. Boehringer Ingelheim    ) JANUARY 8, 2009

Corp. et al., Civil Action No.   )

07-10248-PBS, and The City of    )

New York et al. v. Abbott        )

Laboratories et al., Civil       )

Action No. 03-10643-PBS.         )

_____  )


(Cross-noticed captions on following pages.)

Russillo, Thomas

Irvine, CA

January 8, 2009

7 (Pages 22 to 25)

**22**

1    Q  Are you familiar with a company called
2  Bedford Labs?
3    **A  Yes, I am.**
4    Q  What is that?
5    **A  That was the name of our generic division,**
6  **Ben Venue's generic division.**
7    Q  So Bedford Laboratories is a part of
8  Ben Venue.  Is that fair to say?
9    **A  That's right.  That's correct.**
10    Q  And are you familiar with a company called
11  Boehringer Ingelheim Pharmaceuticals, Incorporated?
12    **A  Yes.**
13    Q  If I refer to that as BIPI today, will you
14  understand that I mean Boehringer Ingelheim
15  Pharmaceuticals, Incorporated?
16    **A  Yes.**
17    Q  Can you describe in general the business of
18  BIPI as of 1998?  By business I mean, among other
19  things, the types of products the company marketed
20  and sold.
21    **A  To the best of my knowledge, BIPI included**
22  **Ben Venue Laboratories, Roxane Laboratories, a**

**23**

1  **consumer health business, and branded products.**
2    Q  To your knowledge, Roxane Laboratories was a
3  part of BIPI?
4    **A  I believe it was.**
5    Q  Were you ever an employee of BIPI?
6    **A  I think -- I'm not sure.  I told you**
7  **earlier, my paycheck came from Ben Venue.**
8    Q  Your paycheck came from Ben Venue?
9    **A  Yes.**
10    Q  Did your paycheck ever come from any other
11  Boehringer Ingelheim entities from the period of
12  November 1997 until 2005?
13    **A  I don't believe so.**
14    Q  Did you have any responsibility for any
15  portions of BIPI's business?
16    **A  Yes.**
17    Q  What responsibilities were those?
18    **A  At what point in time are you talking about?**
19    Q  Take me from 1998 up to the present, to the
20  best of your ability.
21    **A  From 1997, November 1997, at the time of the**
22  **acquisition, I was retained in my current title,**

**24**

1  retained as president and chief operating officer
2  of Ben Venue Laboratories.
3        So Ben Venue Laboratories, its contract
4  manufacturing division, and Bedford Laboratories,
5  its generic marketing arm for injectables
6  manufactured by Ben Venue, was under my
7  responsibility.
8        Sometime at the end of 1998, I was also
9  given additional responsibilities for the Roxane
10  multisource business.
11    Q  Did you ever have any responsibilities for
12  the branded drug business?
13    **A  No, I did not.**
14    Q  What is Roxane Laboratories?
15    **A  Roxane Laboratories, as I understood them,**
16  **was a Columbus-based manufacturing operation that**
17  **had some branded products and multisource products.**
18    Q  And to your knowledge, you were never paid
19  by Roxane Laboratories?
20    **A  That is correct.**
21    Q  But in the course of your employment with
22  Ben Venue Laboratories, from some point in 1998

**25**

1  onwards, you had responsibility for part of
2  Roxane's business?
3    **A  That's correct.**
4    Q  I'm going to show you a document that the
5  court reporter will mark as Exhibit 1.
6        (Exhibit Russillo 001 is marked.)
7    Q  BY MR. FAUCI:  As a general ground rule for
8  whenever I show you a document, take time to
9  familiarize yourself with it.  If it's a lengthy
10  document, I will try and direct your attention to
11  specific points of it.
12        Are you familiar with this document?
13    **A  I don't recall actually seeing this**
14  **document, but -- so I have to say no, I'm not**
15  **familiar with this document.**
16    Q  At the top, it says "Roxane Laboratories,
17  Inc., Unanimous Written Consent of Directors."  Do
18  you see that?
19    **A  Yes, I do.**
20    Q  If you look at the last paragraph, beginning
21  with the word "resolved."
22    **A  Yes.**

Russillo, Thomas

January 8, 2009

Irvine, CA

---

**26**

1    Q  Can you read that section for me?
2    A  "Resolved that, effective October 23, 1998,
3    Mr. Thomas R. Russillo, President and Chief
4    Operating Officer of this Corporation's affiliate,
5    Ben Venue Laboratories, Inc., of Bedford, Ohio, be,
6    and he hereby is, assigned responsibility for the
7    Marketing of Multisource Products, Medical Affairs,
8    Drug Regulatory Affairs, and Scientific Affairs
9    functions of this Corporation."
10   Q  What does it mean that you were assigned
11   responsibility for these functions?
12   A  I'm not sure what this meant.  I only know
13   what happened.
14   Q  Did you regard Ben Venue and Roxane as
15   separate companies?
16   A  Yes, I did.
17   Q  If you were an employee of Ben Venue, why do
18   you think you were put in charge of Roxane's
19   marketing department?
20   A  I was put in charge of Roxane's multisource
21   marketing because they marketed generics, and Ben
22   Venue had been marketing generics since 1992.

**27**

1    Q  From November 1997 -- oh, sorry.  Strike
2    that.
3        From the date of this document,
4    October 1998, is it accurate to say that you were
5    in charge for the marketing of multisource products
6    at Roxane?
7        MS. RIVERA:  Object to form.
8        THE WITNESS:  I'm not sure of the exact date
9    it happened.  It was at the end of 1998.
10   Q  BY MR. FAUCI:  If you look at the bottom, it
11   says, "In witness whereof, we have duly signed this
12   instrument effective as of the 14th day of October,
13   1998."
14       Do you see that?
15   A  Yes, I do.
16   Q  From that point on, do you think it's fair
17   to say that you were in charge of Roxane's
18   marketing?
19       MS. RIVERA:  Object to form.
20       THE WITNESS:  I'm not sure that that's fair
21   to say.  No.
22   Q  BY MR. FAUCI:  Was there a point in time at

**28**

1    which you became in charge of Roxane's marketing
2    department for multisource drugs?
3    A  Yes, there was.
4    Q  And was that around the 1998 time frame?
5    A  The end of 1998, yes.
6    Q  Was there anyone at Roxane that you had to
7    report to regarding marketing decisions for
8    Roxane's multisource products?
9        MS. RIVERA:  Object to form.
10       THE WITNESS:  Werner Gerstenberg was the
11   president of Roxane Laboratories.  As such, I had
12   an obligation to keep him informed as to what was
13   going on.
14   Q  BY MR. FAUCI:  How often did you talk to
15   Mr. Gerstenberg?
16   A  I would say weekly.
17   Q  If you made a marketing decision on a
18   Roxane's product, did you have to run it by
19   Mr. Gerstenberg?
20   A  Not normally, no.
21   Q  Were there occasions when you needed to have
22   Mr. Gerstenberg approve a Roxane marketing

**29**

1    decision?
2    A  Those occasions would have been limited.
3    And they would have been at my discretion to advise
4    him, as he was my supervisor.
5    Q  When might you have advised him of a
6    decision that you wanted his sign-off on?
7    A  I don't recall any specific ones.
8    Q  Was there anyone at Boehringer Ingelheim
9    that you had to report to regarding marketing
10   decisions for Roxane's multisource products?
11       MS. RIVERA:  Object to form.
12       THE WITNESS:  As I said earlier, I reported
13   to Werner Gerstenberg.  So anything that I did as
14   either Ben Venue COO or as head of multisource
15   business, ultimately I reported to Werner.
16       So anything that I thought was -- that he
17   was in need of being aware of, I would advise him
18   of.
19   Q  BY MR. FAUCI:  Did you ever report to Shelly
20   Berkle?
21   A  No, I did not.
22   Q  Other than Mr. Gerstenberg, can you think of

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

                                    9  (Pages 30 to 33)

---

**30**

1   anyone else that you reported to during your time
2   from 1998 to the present -- to the end of your time
3   at Roxane?
4      A  Yes.
5      Q  Who else?
6      A  I reported -- Werner Gerstenberg retired in,
7   I believe, December of 2003 and was replaced by
8   Marty Carroll as the new CEO.  I reported to him.
9      Q  Anyone else?
10     A  I can't think of anyone.
11     Q  You said Roxane also marketed branded
12  products?
13     A  At some point in time, yes.
14     Q  Are you familiar with the term "branded
15  generic"?
16     A  Yes.
17     Q  What is a branded generic?
18     A  As the name would indicate, it is a generic
19  that has been given a brand name.
20     Q  Who had responsibility for marketing
21  Roxane's branded generics?
22     A  At what point in time?

---

**31**

1      Q  1998 onwards.
2      A  Some of the branded generics became the
3   responsibility of Roxane multisource at the end of
4   1998.  So I had responsibility, people who worked
5   for me had responsibility.
6      Q  Can you think of anyone else that had
7   responsibilities for Roxane's branded generics?
8      A  As I said, not all branded generics at
9   Roxane were my responsibility.
10     Q  Do you know whose responsibility they were?
11     MS. RIVERA:  Object to form.
12     Q  BY MR. FAUCI:  Do you know -- let me
13  rephrase that question.
14     For the drugs at Roxane that you did not
15  have responsibility for marketing for, who was in
16  charge of marketing?
17     MS. RIVERA:  Object to form.
18     MR. FAUCI:  That's a horrible question.  Let
19  me rephrase that.
20     Q  For the branded generic drugs at Roxane, can
21  you tell me who had responsibility for marketing
22  decisions?

---

**32**

1      MS. RIVERA:  Object to form.
2      THE WITNESS:  There were many branded
3   generics.  Some of those branded generics were
4   retained by the multisource division.  So for those
5   products, I would have still had responsibility.
6      The others, the ones that were not -- they
7   were branded generics, but they were not part of
8   the multisource business, those products were
9   transferred to BIPI.
10     Q  BY MR. FAUCI:  Who would have had
11  responsibility for those products at BIPI?
12     A  Well, there was a group of Roxane employees
13  who managed the branded Roxane business.
14     Q  Can you tell me who those people are?
15     A  Again, they changed at various times.  Ed
16  Tupa would be the name that comes to mind.
17     Q  Did Shelly Berkle have responsibility for
18  Roxane's branded generic products?
19     A  My recollection is that Ed Tupa at some
20  point in time reported to Shelly.
21     Q  Do you know if Mr. Berkle had responsibility
22  for Roxane's branded generic products at any point

---

**33**

1   in time?
2      MS. RIVERA:  Object to form.  Asked and
3   answered.
4      THE WITNESS:  I think he had oversight of
5   that, just like I had oversight of multisource
6   business.
7      Q  BY MR. FAUCI:  I'm going to direct your
8   attention to the names at the bottom of this
9   document, Exhibit 1.  Who is Walter Poerschmann?
10     A  Walter Poerschmann was a German-based
11  employee of Boehringer Ingelheim, who was head -- I
12  think he was head of North America and South
13  America Ethical Pharmaceuticals.
14     Q  What does Ethical Pharmaceuticals mean?
15     A  Branded pharmaceuticals.
16     Q  What about Philip Franks?
17     A  Philip Franks was, I believe, the general
18  counsel at the time.
19     Q  And Sheldon Berkle.  Can you tell me who he
20  was?
21     A  He was head of Ethical Pharmaceuticals
22  business unit.

---

Russillo, Thomas

January 8, 2009

Irvine, CA

13 (Pages 46 to 49)

---

46

1    whether Roxane's generic business was included in
2    the business unit Ethical Pharmaceuticals?
3         A  It doesn't change my opinion.
4         Q  Do you have any sense why Mr. Berkle would
5    make that representation to the BIC board?
6         MS. RIVERA:  Object to form and foundation.
7         THE WITNESS:  I believe that on an
8    organization chart, that's the way it was set up;
9    but in actuality, that is not the way it was
10   operated.
11        Q  BY MR. FAUCI:  Was it common for Roxane
12   business to be discussed at BIC board meetings?
13        MS. RIVERA:  Object to form and foundation.
14        THE WITNESS:  I wasn't at BIC board meetings
15   all the time, so I don't know how many or what was
16   discussed.
17        Q  BY MR. FAUCI:  Do you have a recollection as
18   to approximately how many you attended?
19        A  No, I don't.
20        Q  Was it more than one?
21        A  I would imagine so.
22        Q  Let's look at a new document that the court

---

47

1    reporter will mark as Exhibit 4.
2         (Exhibit Russillo 004 is marked.)
3         Q  BY MR. FAUCI:  This document says, "Roxane
4    Laboratories, Inc., Budget 1999," and it appears to
5    be an organizational chart.
6         Take a moment to familiarize yourself with
7    it, and let me know verbally when you're ready for
8    a question.
9         A  Yes, I'm ready.
10        Q  Do you see that Mr. Berkle, as head of the
11   business unit Ethical Pharmaceuticals, appears in
12   this organizational chart?
13        A  Yes, I do.
14        Q  Do you have any knowledge as to why
15   Mr. Berkle would be appearing in a Roxane Labs
16   organizational chart?
17        A  I can only surmise why.
18        Q  What would that be?
19        A  That would be --
20        MS. RIVERA:  Object to form.  Calls for
21   speculation.
22        Go ahead.

---

48

1         THE WITNESS:  I would assume it's because he
2    was head of branded business, and there was a
3    portion of the Roxane products that were in the
4    branded business.
5         Q  BY MR. FAUCI:  And he was responsible for
6    those?
7         MS. RIVERA:  Object to form.
8         THE WITNESS:  Ultimately.
9         Q  BY MR. FAUCI:  Below Mr. Berkle, your name
10   is listed as "BV and RLI Multisource."  Do you see
11   that?
12        A  Yes, I do.
13        Q  Does RLI refer to Roxane?
14        A  RLI refers to Roxane Labs, Incorporated.
15        Q  And is this entry in the chart consistent
16   with your recollection that from 1990 -- in the
17   1999 time frame, you were in charge of the
18   multisource business at both Roxane and Ben Venue?
19        A  Would you repeat that question?
20        MR. FAUCI:  Can you repeat that question,
21   please?
22        (Record is read.)

---

49

1         THE WITNESS:  My title is correct, if that's
2    the question you're asking.
3         Q  BY MR. FAUCI:  And functionally, would you
4    agree that you were responsible for the marketing
5    department at Ben Venue and Roxane?
6         A  Yes.
7         Q  Below you, it lists "Manager, Multisource,
8    J. Waterer."
9         A  Yes.
10        Q  Who is J. Waterer?
11        A  Judy Waterer was the manager of marketing.
12        Q  Did she report to you?
13        A  Yes, she did.
14        Q  What were her job responsibilities?
15        A  She was responsible for the Roxane
16   multisource product portfolio, marketing of those
17   products, setting of prices, and coordination with
18   the salespeople.  She was responsible for preparing
19   pipeline models, for forecasting sales.
20        Q  Which prices?
21        A  Judy was responsible for all Roxane product
22   pricing, Roxane multisource product pricing.

---

Russillo, Thomas                                          January 8, 2009
                        Irvine, CA

14  (Pages 50 to 53)

50

1    Q  Average wholesale pricing?
2    A  She would have set the AWP.  Yes.
3    Q  Wholesale acquisition costs?
4    A  Yes.
5    Q  And contract pricing?
6    A  Yes.
7    Q  What's a contract price?
8    A  A contract price is a specific price to a
9    specific customer.
10   Q  Is the contract price typically lower than
11   the WAC price?
12   A  Contract price, to my knowledge, is almost
13   always lower than the WAC price.
14   Q  How often did you interact with Ms. Waterer?
15   Daily?
16   A  Some days -- sometimes daily.  Sometimes not
17   for days at a time.
18   Q  The chart also lists "Marketing Controller,
19   G. Ciarelli."  Who is G. Ciarelli?
20   A  Gregg Ciarelli was within the finance
21   department, the controller for the branded business
22   unit.

51

1    Q  Was he a Boehringer Ingelheim person?
2       MS. RIVERA:  Object to form.
3       THE WITNESS:  Let's see.  Let me find his
4    name on here.
5    Q  BY MR. FAUCI:  It's two over from you.
6    A  I see it.  Okay.
7    Q  Under "Executive VP, Shelly Berkle."
8    A  Yeah, yeah.  My understanding is he reported
9    to Shelly, so who -- again, I don't know who wrote
10   his paycheck.
11   Q  Did he have responsibility for Roxane?
12      MS. RIVERA:  Object to form and foundation.
13      THE WITNESS:  He had within his group, the
14   contracting division.  And the contracting was a
15   shared service.  The shared services within his
16   group were responsible for the multisource Roxane
17   products.
18   Q  BY MR. FAUCI:  What does a marketing
19   controller do?
20   A  A lot of different stuff.  I mean, you'd
21   have to ask him what he does specifically.
22   Q  Did you interact with him?

52

1    A  Yes.
2    Q  What would you interact with him about?
3    A  Probably along two lines.  It would have
4    been organizationally how his people were
5    performing and how accurate and timely they were in
6    processing our orders.
7       Most likely, that would be the major
8    discussions I would have with him.
9    Q  Anything else?
10   A  Probably individually, but very
11   sporadically, talk of -- discussions about pricing.
12   Q  Average wholesale prices?
13   A  Possibly.
14   Q  Taking a step back, can you just describe to
15   me in general terms what it is the marketing
16   department did at Roxane?
17   A  You're talking about generic marketing at
18   Roxane?
19   Q  Yes.  I'm talking about the portion of the
20   marketing department that you had responsibility
21   for, which I understand is the multisource part of
22   the business.

53

1    A  Yes.  And you'd like to know what Judy
2    Waterer's responsibilities were?
3    Q  What yours and Judy Waterer's
4    responsibilities were.
5    A  Okay.  Responsible for merchandising the
6    portfolio of products that Roxane multisource was
7    either selling currently or developing for the
8    future.
9    Q  Let me try and make this more focused for
10   you.  Can you describe the marketing department's
11   involvement with the launch of a new product?
12   A  Yes, I can.  The marketing department would
13   probably put together a sales plan, a marketing
14   plan, with projected pricing, projected volume,
15   profit and loss.
16   Q  Projected AWPs?
17   A  Yes.
18   Q  Would the marketing department actually set
19   the AWP?
20   A  Yes.
21   Q  Is it fair to say that you and Ms. Waterer
22   would be responsible for setting the AWP?

Henderson Legal Services, Inc.

Russillo, Thomas

January 8, 2009

Irvine, CA

15 (Pages 54 to 57)

---

**54**

1     A  For the most part, I would not be personally
2  involved.  Judy would propose an AWP; and for the
3  most part, I would have approved it.
4     Q  Was there anyone else that was involved in
5  decisions to set AWPs for Roxane's multisource
6  products?
7     A  Not normally.
8     Q  What is your understanding of what an
9  average wholesale price or AWP is?
10     A  It's not what it says it is.  It's not an
11  average wholesale price.
12         It is a misnomer or an arbitrary term that
13  is used in the generic business to report yourself
14  to the database companies that you are marketing a
15  generic product.
16     Q  So did Roxane report its AWPs to pricing
17  compendia?
18     A  Yes, they did.
19     Q  Were you aware that starting in the
20  1998-1999 time frame, there were investigations
21  into inflated AWPs?
22     A  Yes.

---

**55**

1         MS. RIVERA:  Object to form.
2         THE WITNESS:  Yes, I was.
3         MR. FAUCI:  I'm going to show you a document
4  the court reporter will mark as Exhibit 5.
5         (Exhibit Russillo 005 is marked.)
6     Q  BY MR. FAUCI:  Please take a moment to
7  familiarize yourself with it.  Continue to
8  familiarize yourself with it as necessary, but I'm
9  going to ask if you understand that this is a
10  letter from a Paul Coval, counsel for Bedford
11  Laboratories, that's addressed to the Honorable Tom
12  Bliley, Chairman, Committee on Commerce, US House
13  of Representatives.
14         Do you see that?
15     A  Yes, I do.
16     Q  And do you see that you're copied on this
17  letter?
18     A  Yes, I do.
19     Q  Who is Paul Coval?
20     A  Paul Coval, to the best of my recollection,
21  was an attorney based in Columbus, who was an
22  outside -- part of an outside firm that was

---

**56**

1  retained by Ben Venue.
2     Q  Do you know if he represented Roxane?
3     A  I don't recall specifically whether he
4  worked for Roxane as well.
5     Q  Call your attention to the first paragraph.
6         MS. RIVERA:  And let me just object for a
7  second.  I'm going to object to the relevance of
8  this.
9         Bedford and Ben Venue are not defendants in
10  this case, so investigations into Ben Venue and
11  Bedford's practices are not relevant to this case.
12         And this deposition was not noticed for
13  Mr. Russillo's employment at Bedford Labs.
14         MR. FAUCI:  I'm going to request that
15  counsel refrain from making speaking objections.  I
16  don't think that's a proper objection in this
17  deposition.
18         Object for the record.
19         MS. RIVERA:  That's what I'm doing.
20         MR. FAUCI:  Okay.  But I think "objection"
21  will suffice.
22     Q  Mr. Coval writes in the first paragraph, "We

---

**57**

1  are writing as counsel on behalf of Bedford
2  Laboratories in response to your letter of July 19,
3  1999, to Thomas Russillo."
4         Do you see that?
5     A  Yes, I do.
6     Q  And it says that, "in which you request
7  certain information and documents regarding the
8  pricing of Bedford's products generally and
9  specifically its pricing for the generic
10  product" -- I'm going to have trouble pronouncing
11  this -- "Leucovorin."
12         Do you see that?
13     A  Yes, I do.
14     Q  Do you recall receiving a letter from
15  Councilman Bliley about Bedford's pricing?
16         MS. RIVERA:  Object to form.
17         THE WITNESS:  I generally recall there was a
18  letter.  I don't recall the content of the letter.
19     Q  BY MR. FAUCI:  Did you receive letters from
20  the chair of the Committee on Commerce frequently?
21     A  No.
22     Q  Do you recall that counsel drafted a letter

---

Russillo, Thomas                                January 8, 2009
                        Irvine, CA

25 (Pages 94 to 97)

---

**94**

1    Q   Turn your attention to Step 3, the paragraph
2  starting, "Product manager to coordinate following
3  departments/personnel."
4        Do you see that?
5    A   No, I don't.
6    Q   Do you see Step 3?
7    A   I see Step 3.  Okay, the second?
8    Q   The second bolded --
9    A   Yeah, I have it.
10   Q   And then for an AWP change, do you see that
11  Mr. Feldman, executive director, trade and pharmacy
12  affairs, is to compose a letter to the pricing
13  compendia?
14   A   Yes.
15   Q   Is that consistent with your recollection
16  that Mr. Feldman would notify the pricing compendia
17  when Roxane changed its AWP?
18   A   It all depends on the time.  This is a
19  procedure -- I don't know if it was ever
20  implemented or not.
21       In that 2000, 2001 time frame, Feldman was
22  there, so I guess he could have been doing that.

---

**95**

1  Subsequent to that, Judy was in charge of that.
2    Q   Was it your understanding that if Roxane
3  changed the AWP, that change would be reported to
4  the pricing compendia?
5    A   Yes.
6    Q   If a WAC changed, do you know if Roxane
7  would notify the pricing compendia?
8    A   I'm not sure whether we were reporting WACs
9  or not.
10   Q   Can you think of a reason why you wouldn't
11  be reporting WACs?
12   A   I don't believe there was any requirement to
13  report WACs.
14   Q   Skip ahead to Step 5.  It's two pages
15  turned, where it says, "Create gold sheet for
16  product if AWP or NWDA changes."
17       Do you see that?
18   A   Yes.
19   Q   And then it says, "Gold sheet standard form
20  (Roxane) is to be used to notify internal personnel
21  of price changes, packaging changes, as well as
22  additions and deletions to product line.  Note:

---

**96**

1  Only AWP is to be listed for multisource, as WAC is
2  not for general publication."
3        Does this refresh your recollection as to
4  whether or not Roxane published its WAC prices?
5    A   No, it doesn't.
6    Q   You just don't know one way or the other?
7    A   I don't know whether this procedure was ever
8  implemented or not.
9    Q   My question is do you -- does this document
10  refresh your recollection as to whether in fact
11  Roxane reported its WAC pricing?
12   A   It doesn't.
13   Q   In your opinion, would it be appropriate for
14  Roxane to lower its WACs on a product but not
15  report the new WAC to the pricing compendia?
16       MS. RIVERA:  Object to form.
17       THE WITNESS:  I don't know whether it's
18  appropriate or not.  I don't think there was any
19  requirement to report any WAC prices to the pricing
20  compendia.
21       MR. FAUCI:  I'm going to show you a document
22  marked Exhibit 12.

---

**97**

1        (Exhibit Russillo 012 is marked.)
2    Q   BY MR. FAUCI:  It's a September 22, 2000,
3  e-mail from Joe Puma.  And it's attaching a file
4  called "!Reorg_PAC_2.ppt," also a document labeled
5  "091800 minutes final.doc."
6        Take a moment to familiarize yourself with
7  Exhibit 12 and tell me when you're ready for
8  questions.
9    A   Okay.
10   Q   Who's Joe Puma?
11   A   I don't know.
12   Q   He writes on the first page of this, the
13  e-mail transmitting the attachment, "On the
14  PowerPoint presentation, slide 6, please correct
15  the spelling for Tom Russillo.
16       "You may also want to include that in
17  addition to WAC changes (not always increases), Tom
18  Russillo in coordination with Judy Waterer (Assoc.
19  Director, Multisource Products) also review and
20  recommend AWP changes for the line."
21       Do you see that?
22   A   Yes.

---

Russillo, Thomas

January 8, 2009

Irvine, CA

26 (Pages 98 to 101)

---

**98**

1    Q   Is it consistent with your recollection that
2    you and Mr. Waterer reviewed and recommended AWP
3    changes for the multisource line of products?
4    A   I don't recall doing that.  No.
5    Q   You don't recall doing what?
6    A   Recommending AWP changes.
7    Q   Do you recall approving AWP changes?
8    A   I do.
9    Q   Did you ever ask anyone at Boehringer
10   Ingelheim to sign off on an AWP change that you
11   were involved with?
12       MS. RIVERA:  Object to form.
13       THE WITNESS:  There would have been -- it
14   would have been at my discretion.  I would have
15   asked Werner Gerstenberg, if I thought there was a
16   sensitive AWP issue.
17   Q   BY MR. FAUCI:  Is there anyone else you
18   would have talked to about a sensitive AWP issue?
19   A   No.
20   Q   What would make an AWP issue sensitive?
21   A   Well, at this time --
22       MS. RIVERA:  Hold on.  Object to form.

---

**99**

1        THE WITNESS:  At this point in time, I was
2    very sensitive to the AWP litigation that was
3    floating around.
4    Q   BY MR. FAUCI:  So as of the late 1990s, you
5    were aware that there was investigations into
6    inflated AWPs?
7    A   Yes, I was.
8    Q   Let's turn to the first page of the exhibit,
9    of the attachment, where it says, "Impact of June
10   2000, BU Reorganization on PAC Process."
11   A   Yes.
12   Q   Was there a reorganization of the business
13   unit in or around June 2000?
14   A   Yes, there was.
15   Q   What was the result of that?
16   A   The result of that was, as best I recall,
17   the pricing decision committees, as you've shown me
18   in the previous things, were implemented on the
19   brand side, and we were left pretty much on the
20   side to do our own thing, on the multisource side.
21   Q   Turn to page 4 of the document, where it
22   says "PTC Team Post-June 2000."  What is the PTC

---

**100**

1    team?
2    A   It's -- it was rolled into the PAC, I
3    believe, at this point in time.
4    Q   And the permanent members:  Do you see
5    those?
6    A   Yes, I do.
7    Q   "Ciarelli, Diez, Ellexson, Hankins, King,
8    Powers, Sykora, Terrillion, Marketing Controller
9    Elizabeth Cochran."
10   A   Yes.
11   Q   Who are each of those people, to the best of
12   your recollection?  Which companies did they work
13   for?
14       I can make it easier.  Did any of those
15   people work for Roxane Laboratories post-June 2000?
16   A   I don't know for sure.  John Powers and Bob
17   Sykora were Roxane -- I think were Roxane
18   employees.
19   Q   Were the rest of those BIPI employees?
20   A   They were on the brand side.  I would
21   imagine they were BIPI.
22   Q   The third bullet point down, it says,

---

**101**

1    "G. Ciarelli, H. Diez, and J. King to collaborate
2    to provide leadership to team and make final calls
3    on difficult decisions."
4    A   Yes.
5    Q   "If a decision cannot be made, the issues
6    are brought to S. Berkle."
7    A   Yes.
8    Q   Do you see that?
9    A   Yes.
10   Q   Would those difficult decisions have to do
11   with Roxane multisource products?
12   A   No.
13   Q   What about Roxane's branded generic
14   products?
15       MS. RIVERA:  Object to form, foundation.
16       THE WITNESS:  I believe they could.  I don't
17   know how they handled those.
18   Q   BY MR. FAUCI:  Page 6 of the same exhibit
19   says "PTC and Multisource."  Do you see that?
20   A   Yes.
21   Q   "Multisource is addressed by the PTC team
22   only when administrative, legal, and government

---

Russillo, Thomas                                    January 8, 2009
                        Irvine, CA

146

1   issues around AWPs.
2      Q  BY MR. FAUCI:  Did it give you pause to
3   approve an AWP increase at this time?
4         MS. RIVERA:  Object to form.
5         THE WITNESS:  You know, I don't -- I can't
6   remember what I was thinking back in 1999.  All I
7   did -- all I do remember is that there were issues
8   around AWP, and it was my job to make certain that
9   what I did was both legal and appropriate.
10     Q  BY MR. FAUCI:  It says below in that e-mail,
11  the last line, "Gregg is in agreement."  Who's
12  Gregg?
13     A  I believe that would be Gregg Ciarelli,
14  because he's copied on this e-mail.
15     Q  Would you have sought out Gregg's approval
16  or Gregg's agreement before you did this?
17     A  No, I would not.
18     Q  Why would you have said, "Gregg is in
19  agreement"?
20     A  Because he would be processing the changes
21  that were being proposed here.
22     Q  I understand that.  But why would you be

147

1   concerned that he would agree with the decision to
2   raise the AWPs?  Why would his agreement matter?
3         MS. RIVERA: Object to form.
4         THE WITNESS:  It isn't necessarily
5   agreement.  I don't know.  I don't remember at the
6   time why I said that.
7      Q  BY MR. FAUCI:  It's a three-line e-mail, and
8   you're authorizing the increase of AWPs, and you're
9   saying Gregg is in agreement; is that correct?
10     A  Yeah.
11        MS. RIVERA:  Object to form.  You're
12  skipping a whole sentence in the e-mail, Jeff.
13        MR. FAUCI:  I understand that.
14     Q  Let's just read the whole thing.  "Go ahead
15  and implement the $131.08 and $144.18 AWP change as
16  well as the new pricing for Alprazolam Intensol.
17        "Price changes for M/S, except in certain
18  cases which will be more clearly defined later, do
19  not need to go to a pricing committee.  Gregg is in
20  agreement.  Tom."
21     A  Right.
22     Q  What does it mean that prices didn't need to

148

1   go to a pricing committee?
2      A  I was reminding him that I had the authority
3   to make these changes and that they didn't need to
4   go through the PAC prices.
5      Q  Who were you reminding?
6      A  Gregg.
7      Q  Gregg?  The e-mail's to Richard Feldman and
8   Judy Waterer, and it's copied to Gregg Ciarelli.
9      A  That's right.  You've shown me all the
10  e-mails.  There was a lot of discussion going on at
11  this point in time about how prices were being set
12  up by the various divisions.
13        I was just reminding people here that
14  multisource was not part of that PAC, and we had
15  the authority -- I had the authority to agree to
16  the price change.
17     Q  So you're saying that Gregg is in agreement
18  that you had authority to make this price change?
19     A  That's right.
20     Q  Why didn't this go to a pricing committee?
21     A  Because there was not a pricing committee
22  for multisource products.

149

1      Q  There had been an effort or an exploration
2   of whether it made sense to set up a pricing
3   committee.  We went through those documents.
4         Do you remember that?
5      A  Yes, I do.
6      Q  Do you recall why a pricing committee wasn't
7   set up?
8      A  I think the nature of the business was so
9   different from the branded business that coming up
10  with a common committee was just not possible.
11     Q  Let's look at Exhibit 22.  I know we're
12  approaching lunch.
13        (Exhibit Russillo 022 is marked.)
14        MS. RIVERA:  The more we can get through,
15  the better.
16     Q  BY MR. FAUCI:  This is a September 8, 1999,
17  e-mail from Lesli Paoletti to Tom Russillo,
18  "Subject:  Azathioprine/Alprazolam Pricing."
19        Do you see that?
20     A  Yes.
21     Q  Ms. Paoletti writes, "Tom, by your
22  signature, please confirm executive pricing

Russillo, Thomas

Irvine, CA

January 8, 2009

43  (Pages 166 to 169)

---

**166**

1  documentation would consist of.
2      Q  And so as long as she showed you that the
3  AWP change was necessary to make Roxane's AWPs as
4  high as its competitors, that would be enough for
5  you to approve it?
6      A  In general, that would probably be enough.
7      Q  Were you concerned about the government's
8  investigations into AWP inflations?
9      A  Absolutely.
10     Q  Let's look at the top e-mail from
11  Ms. Waterer.  She says, "Bob, got the information
12  yet?  Discussed it with Tom; and depending on the
13  strength of the customer information you can pull
14  together, he'll support it.  No guarantees of
15  getting it through."
16         Do you see that?
17     A  Yes, I do.
18     Q  If you were -- if it was your decision as to
19  whether or not to approve it, why wouldn't there be
20  any guarantee of getting it through?
21     A  I don't know what she was referring to when
22  she said that.  She could have been referring no

---

**167**

1  guarantee that I would approve it, no guarantee
2  that documentation would be considered adequate by
3  me.  There's a whole different bunch of things.
4      Q  Could she have meant that there was no
5  guarantee that you'd be able to convince higher-ups
6  to approve this?  "This" being the AWP increase.
7      MS. RIVERA:  Object to form.
8      THE WITNESS:  She may not have been sure who
9  I would talk to, if anyone, about it.
10     Q  BY MR. FAUCI:  But it's your testimony that
11  you would not have needed to talk to anybody to
12  improve this -- approve this?
13     A  In this particular case, depending on what
14  was going on, I probably would not have.  I think
15  it was my testimony before that if I thought it was
16  significant, I might have reviewed it with Werner
17  Gerstenberg.
18     Q  Do you have any recollection as to whether
19  or not you reviewed an AWP increase in or around
20  July 2000 with Werner Gerstenberg?
21     A  No, I don't.  I don't remember.
22     Q  You don't recall?

---

**168**

1      A  I don't remember.
2      Q  One way or the other?
3      A  I don't remember.
4      Q  Did you talk to anyone in the legal
5  department about this?
6      A  I don't recall the incident.
7      Q  Well, you said you were aware that AWP
8  inflations were being investigated by the
9  government; is that correct?
10     A  Yes, I did.
11     Q  And the incident we're talking about is a
12  decision to raise the AWPs on Roxane's furosemide
13  products; correct?
14     A  Yes.
15     Q  Do you think it's likely that you would have
16  discussed this with people in the legal department?
17     MS. RIVERA:  Object to form.
18     THE WITNESS:  I can't tell you that.  I
19  don't know.
20     Q  BY MR. FAUCI:  Let's look at Exhibit 25.
21     (Exhibit Russillo 025 is marked.)
22     Q  BY MR. FAUCI:  This is a series of e-mails

---

**169**

1  dated July 7, 2000.  Subject is "Cardinal Counter
2  and Furosemide."
3      I'm going to direct your attention to the
4  bottom e-mail from the -- or the middle e-mail from
5  Mr. Sykora to Judy Waterer.  And it's copied to
6  several people, including yourself.
7      Do you see that?
8      A  Yes.
9      Q  Actually, let's look at the e-mail below,
10  from Ms. Waterer, sent at 11:10 a.m, paragraph
11  no. 2.  Ms. Waterer writes, "I agree" --
12     MS. RIVERA:  Sorry, Jeff.  I think he needs
13  a minute to look over the whole thing.
14     MR. FAUCI:  Sure.  Why don't you just tell
15  me when you're ready for questions about
16  Exhibit 25.
17     MS. RIVERA:  Thank you.
18     THE WITNESS:  Okay.
19     Q  BY MR. FAUCI:  I'm looking at the e-mail
20  from Ms. Waterer as it spills over to the second
21  page, paragraph no. 2.
22     Ms. Waterer writes, "I agree that time is

---

Russillo, Thomas

Irvine, CA

January 8, 2009

44 (Pages 170 to 173)

---

**170**

1 ripe on furosemide." Do you see that?

2     **A** Yes, I do.

3     **Q** A few lines down, she says, "Tom is aware of

4 the AWP situation and will support the increase

5 provided we have solid supporting information. The

6 change will be submitted as soon as we receive the

7 necessary information from you."

8     What do you understand her to mean when you

9 say -- when she says that, "Tom will support the

10 increase"?

11     **A** I will approve it.

12     **Q** So just like champion equaled approved,

13 support equals approved as well?

14     **A** Exactly. She's reiterating the same thing

15 she said in the previous e-mail two days ago.

16     **Q** And so by support the increase, she means

17 that you'll approve it?

18     **A** Yes.

19     **Q** Uh-huh. Let's look at the e-mail from Bob

20 Sykora on the next page -- the first page. I'm

21 looking at paragraph 2, third line down.

22     Mr. Sykora writes, "I realize there is

---

**171**

1 political pressure on AWP currently, but it

2 shouldn't run our business." Do you see that?

3     **A** Yes, I do.

4     **Q** Is the political pressure on AWP the fact

5 that government was investigating AWP inflations?

6     MS. RIVERA: Object to form. Calls for

7 speculation.

8     THE WITNESS: Would you repeat that, please?

9     MR. FAUCI: Let me rephrase that.

10     **Q** Do you see that you're copied on

11 Mr. Sykora's e-mail?

12     **A** Yes, I do.

13     **Q** As you read what he writes, do you

14 understand -- what do you understand him to mean by

15 political pressure on AWP?

16     MS. RIVERA: Object to form.

17     THE WITNESS: I think he is referring to the

18 fact that he is aware that there are lawsuits

19 pending on AWPs and there are perceptions that AWPs

20 have been used incorrectly in the industry.

21     **Q** BY MR. FAUCI: He goes on to write, "Logic

22 dictates that no matter what the AWP is, if big

---

**172**

1 brother wants to punish, they will, so why not make

2 some money meanwhile."

3     Do you see that?

4     **A** Yes, I do.

5     **Q** What do you understand Mr. Sykora to be

6 referring to when he writes "big brother"?

7     MS. RIVERA: Object to form and foundation.

8     THE WITNESS: I don't know for sure. I can

9 only speculate who he meant.

10     **Q** BY MR. FAUCI: Have you ever heard of the

11 government referred to as big brother?

12     **A** Yes.

13     **Q** And you know the government was concerned

14 about inflated AWPs?

15     **A** Yes.

16     **Q** As early as 1999?

17     **A** Yes, I do.

18     **Q** Can you think of any reason why Boehringer

19 Ingelheim would be upset with Roxane for raising

20 its AWPs on furosemide?

21     MS. RIVERA: Object to form.

22     THE WITNESS: What do you mean by Boehringer

---

**173**

1 Ingelheim?

2     **Q** BY MR. FAUCI: BIC and/or BIPI.

3     MS. RIVERA: Object to form and foundation.

4     THE WITNESS: Yeah. You mean that the

5 company would be upset?

6     **Q** BY MR. FAUCI: Yeah. The question is can

7 you think of any reason why BIC and/or BIPI would

8 punish Roxane for raising its AWPs?

9     MS. RIVERA: Object to form and foundation.

10     THE WITNESS: I don't know whether in this

11 case the AWP was actually raised or not. All I

12 know is that I would have reviewed it. If I

13 thought it was justified, I would have approved it.

14     And I believe that the people you're

15 referring to, BIC or BIPI or whomever, would not

16 have had any objection. I wouldn't have signed off

17 on it if I thought there was going to be a problem.

18     **Q** BY MR. FAUCI: You wouldn't have signed off

19 on it without their approving?

20     **A** I wouldn't have signed off on it if I

21 thought it was going to be a problem.

22     If I was concerned about it, I would have

---

Russillo, Thomas

Irvine, CA

January 8, 2009

45  (Pages 174 to 177)

---

174

1    called Werner Gerstenberg and told him what I
2    thought was going on and what I thought should be
3    done.  And then he would have either agreed or
4    disagreed.
5         Q   So do you think you consulted with Werner
6    Gerstenberg about the decision as to whether or not
7    to raise AWPs for Roxane?
8         A   Don't recall.
9         Q   For furosemide, I apologize.
10        A   I don't recall.
11        Q   In the top e-mail from Ms. Waterer, the
12   second paragraph down, she writes, "You've
13   indicated that AWP on furosemide is critical now
14   and that we'd have real business opportunities if
15   we could change it.  As you've been informed, Tom
16   is prepared to take furosemide up the line."
17            Do you see that?
18        A   Yes.
19        Q   Who would you be taking furosemide up the
20   line to?
21        A   I believe she's referring to that if I
22   needed to, I would take it up the line.

---

175

1         Q   To who?
2         A   Werner Gerstenberg.
3         Q   Anyone else?
4         A   No.
5         Q   Where is Werner Gerstenberg based?
6         A   Connecticut.
7         Q   What was his job function?
8         A   He was the CEO of -- now, let's take it in
9    respect.  In this particular case, he would have
10   been acting as the president of Roxane.
11        Q   Was he also the president of other
12   Boehringer Ingelheim companies?
13        A   Yes, he was.
14        Q   Which companies, to your knowledge?
15        A   I believe he was the president of BIC.
16        Q   Which was the parent company based in
17   Connecticut?
18        A   Yes.
19        Q   Can you think of any other Roxane employees
20   that were based in Connecticut?
21        A   Can I think of any?
22        Q   Yeah.

---

176

1         A   There were thousands of Roxane employees --
2    oh, in Connecticut.  Sorry.
3         Q   Based in Connecticut.
4         A   Roxane actual employees.  Let me think about
5    that.  There actually may have been a couple.
6            We had a number of situations where people
7    worked for a subsidiary but were officed other
8    places, so there may have been.  I can't think
9    right now of any.
10        Q   Can't think of any off the top of your head?
11        A   Not specifically, no.
12        Q   I'm going to show you Exhibit 26.
13            (Exhibit Russillo 026 is marked.)
14        Q   BY MR. FAUCI:  Take a moment to familiarize
15   yourself with this e-mail, but my questions will
16   just be focusing on the top couple lines.
17        A   Okay.
18        Q   The e-mail I'm going to focus your attention
19   on is from Tom Russillo, dated July 7, to Bob
20   Sykora, Judy Waterer, Richard Feldman.
21            Do you see that in this e-mail you were
22   responding to the e-mail we just discussed in

---

177

1    Exhibit 25, where Mr. Sykora was discussing the AWP
2    increase for furosemide?
3         A   It would appear that's correct.  Yes.
4         Q   Can you read your response?
5         A   "Bob, I assure you it's real.  To get the
6    approval we need from Connecticut, though, we need
7    some hard info.  Don't shoot the messenger.  Judy
8    is only doing what I asked her to do.  Rich can
9    assure you of the mood in BI."
10        Q   Does "Connecticut" mean Boehringer
11   Ingelheim?
12            MS. RIVERA:  Object to form.
13            THE WITNESS:  It could mean Boehringer
14   Ingelheim.  I suspect it does here.
15        Q   BY MR. FAUCI:  What approval would you need
16   from Boehringer Ingelheim?
17            MS. RIVERA:  Object to form.
18            THE WITNESS:  I believe Judy was under the
19   impression that I needed approval, and I may have
20   told her that so that she wouldn't just be
21   bombarding me with requests.
22        Q   BY MR. FAUCI:  Just to be clear, who wrote

---

Henderson Legal Services, Inc.

Russillo, Thomas                                        January 8, 2009
                              Irvine, CA

**178**

1    this e-mail I asked you to read?
2        A  I wrote it.
3        Q  Did you need approval from Boehringer
4    Ingelheim to make a decision to raise the AWPs on
5    furosemide?
6        MS. RIVERA:  Object to form.
7        THE WITNESS:  It would have -- as I've told
8    you before, it would have depended on the
9    situation.
10       I would have evaluated all the data and made
11   the decision.  If I needed to go to Connecticut, in
12   this case to Werner Gerstenberg, I would.
13       Q  BY MR. FAUCI:  Well, we're talking about
14   this situation, which is a proposed increase on
15   AWPs for furosemide in July 2000.
16       A  Uh-huh.
17       Q  And you write, "To get the approval we need
18   from Connecticut, though, we need some hard info."
19       Did you need approval from Boehringer
20   Ingelheim?
21       MS. RIVERA:  Object to form.
22       THE WITNESS:  I did not need approval from

**179**

1    Boehringer Ingelheim in Connecticut, unless I felt
2    there were circumstances that I needed to review
3    with Werner Gerstenberg.
4        Q  BY MR. FAUCI:  And do you recall if you felt
5    as if there were circumstances you needed to review
6    that related to the AWP increase for furosemide?
7        A  I don't recall at this point in time,
8    because I didn't have the data yet.
9        Q  You just have no recollection one way or the
10   other?
11       A  No.  I'd have to see the next series of
12   e-mails and information that would have passed.
13       Q  So it's possible that depending on what the
14   sales justification looked like, you might have
15   felt the need to go to Boehringer Ingelheim; is
16   that correct?
17       A  It is possible.
18       MS. RIVERA:  Object to form.
19       Q  BY MR. FAUCI:  And you don't know one way or
20   another whether you did?
21       A  No, I don't.
22       Q  Did you regard the decision to raise AWPs on

**180**

1    furosemide as sensitive?
2        MS. RIVERA:  Object to form.
3        THE WITNESS:  I regarded any decision to
4    raise AWPs as needing to be justified.
5        Q  BY MR. FAUCI:  You write, "Rich can assure
6    you of the mood in BI."  Do you see that?
7        A  Yes.
8        Q  Is "Rich" Richard Feldman?
9        A  I believe that's who I'm referring to.  Yes.
10       Q  What do you mean, the mood in BI?
11       A  The mood at Boehringer Ingelheim was the
12   same as mine.  It was very sensitive to AWP
13   changes.
14       Q  Because of its awareness of the lawsuits
15   that had been filed?
16       A  Yes.
17       Q  You can put that aside.  I'm going to show
18   you an exhibit marked Exhibit 27.
19       (Exhibit Russillo 027 is marked.)
20       Q  BY MR. FAUCI:  This is a somewhat lengthy
21   document.  Take a moment to review it, and just
22   indicate to me when you're ready for a question.

**181**

1        A  You want me to read all of this?  Are we
2    planning to go through the whole thing, or --
3        Q  Just be familiar with it.  I'll direct you
4    where I'm going to ask my questions.
5        A  All right.  Then I'm going to have to read
6    all of it.  Let's give it a try.  Is this for me?
7        MS. RIVERA:  Yeah.
8        Q  BY MR. FAUCI:  This document appears to be
9    an e-mail sent from Robert Sykora to Judy Waterer,
10   July 25, 2000.  Several people are copied,
11   including yourself.
12       Subject is "Furosemide Tablet AWP
13   Adjustment."  Ms. Waterer writes, "Per your
14   request, attached is a sales justification for an
15   upward adjustment in the AWPs of furosemide
16   tablets."
17       Do you see that?
18       A  Yes, I do.
19       MS. RIVERA:  Jeff, just to clarify, it's
20   from Bob Sykora to Judy Waterer.
21       MR. FAUCI:  So Mr. Sykora writes that.
22       MS. RIVERA:  Yes.

Russillo, Thomas
January 8, 2009
Irvine, CA

49  (Pages 190 to 193)

190

1      A  I do.
2      Q  Did you have any concern with raising the
3  AWPs for this product to a level more than 14 times
4  higher than the average contract price?
5          MS. RIVERA:  Object to form.
6          THE WITNESS:  No, because it was the same
7  AWP as Mylan.
8      Q  BY MR. FAUCI:  So as long as Mylan's AWP was
9  high, that high, it was okay?
10         MS. RIVERA:  Object to form.
11         THE WITNESS:  "High" is a word -- I don't
12  use the word "high."
13     Q  BY MR. FAUCI:  What if Mylan's AWP was $300?
14         MS. RIVERA:  Jeff, you've got to let him
15  finish his answer.
16     Q  BY MR. FAUCI:  I apologize.  Finish it.
17     A  Okay.  It doesn't matter what the number is.
18  We were trying to be competitive.  If Mylan's AWP
19  is $300, we probably would have raised it to $300
20  to be competitive.
21     Q  Do you think it mattered to Medicaid and
22  Medicare agencies what the AWP was?

191

1          MS. RIVERA:  Object to form, foundation.
2  Calls for speculation.
3      Q  BY MR. FAUCI:  You're aware that Medicaid
4  and Medicare relied on AWPs in setting their
5  reimbursement.  You've already testified to that;
6  correct?
7      A  I testified that they relied on a discount
8  from AWP for setting their reimbursement.
9      Q  Do you think it mattered to Medicare and
10  Medicaid what the AWPs were?
11         MS. RIVERA:  Object to form and foundation.
12         THE WITNESS:  I suppose it mattered.
13     Q  BY MR. FAUCI:  But it didn't matter to
14  Roxane?
15     A  Well, what mattered most --
16         MS. RIVERA:  Object to form.
17         THE WITNESS:  -- was their discount, not the
18  AWP.
19     Q  BY MR. FAUCI:  Now that we've looked a
20  little bit into the actual decision to raise AWPs
21  and your approval of that decision, does any of
22  this refresh your recollection as to whether or not

192

1  this is a decision that you would have taken to
2  Werner Gerstenberg?
3      A  Based on the data that I've seen here and
4  the quick review, I would say I probably did not.
5      Q  What was the type of decision you would take
6  to him?
7      A  If we were raising an AWP without adequate
8  justification, meaning I didn't see a competitor's
9  analysis that showed we were just blending in with
10  the rest.
11     Q  So with knowledge the AWP investigations
12  were going on, and with knowledge that this AWP
13  increase raised the AWPs to 14 times the average
14  contract price, that would not have been reason for
15  you to go to Mr. Gerstenberg and say, "Is this
16  okay?"
17     A  I can't answer your question exactly,
18  because this -- as you've seen from the e-mail
19  trails on this and others, there were a number of
20  these going on.
21         Once I had established Werner Gerstenberg's
22  position on this, I would have implemented it.

193

1  So -- and I don't remember eight years ago how
2  concerned he was.
3          I might have brought it to him.  I don't
4  think I did, because we've had others before that.
5  I knew where he stood.
6      Q  Would you have done this without feeling
7  comfortable that Mr. Gerstenberg was okay with it?
8      A  I can't tell you at the time.  I don't know
9  whether I went to him or not.
10     Q  You said you knew where he stood.  What do
11  you mean by that?
12     A  I knew that his position was if we were
13  meeting competitors, to stay competitive and that's
14  why we were raising the AWP, we would not be
15  perceived as taking advantage of the AWP.
16     Q  Where did you get that understanding of
17  Mr. Gerstenberg's position from?
18     A  Over many conversations with him.
19     Q  Did you have those -- was anybody else
20  involved in those conversations?
21     A  There may have been.  I don't -- I don't
22  recall the specific conversations.

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

51 (Pages 198 to 201)

---

**198**

1    to Ven-a-Care asking questions as separate from
2    their role as co-counsel on the DOJ's case.
3        Go ahead.
4        MR. FAUCI:  Clarification.  The objection is
5    to Ven-a-Care asking questions in anything other
6    than their capacity as co-counsel in the DOJ case?
7        MS. RIVERA:  In their capacity as -- like I
8    said, it's our position that the DOJ is the only
9    defendant in this case --
10       MR. ANDERSON:  Plaintiff.
11       MS. RIVERA:  Sorry.  The only plaintiff in
12   the case that has the right to ask questions.  And
13   so to the extent you are allowing Mr. Anderson to
14   ask questions on behalf of the DOJ, that's okay.
15          EXAMINATION
16   BY MR. ANDERSON:
17       Q  All right.  Good afternoon, Mr. Russillo.
18       A  Hi.
19       Q  I'm going to have some followup questions
20   for you.  I hope that it won't take too long, and
21   we'll try to get out of here on time.
22       I'm going to move from topic to topic, so

---

**199**

1    bear with me.  I've got some big-picture questions
2    initially.
3        You've been in the pharmaceutical industry
4    for many years; correct?
5        A  Yes, I have.
6        Q  To this day, you're in the pharmaceutical
7    industry as a key executive at Watson; correct?
8        A  Yes.
9        Q  How many years total have you been in the
10   drug industry?
11       A  32.
12       Q  32.  And we've spent some time today talking
13   about your roles at Ben Venue, which was a division
14   of Boehringer; correct?
15       MS. RIVERA:  Object to form.
16       THE WITNESS:  It was an operating division,
17   subsidiary, of BIC.  Yeah, yeah.
18   BY MR. ANDERSON:  Boehringer Ingelheim
19   Corporation is what you mean by BIC?
20       A  Yes.
21       Q  Okay.  How many years were you with
22   Boehringer Ingelheim companies?

---

**200**

1        A  I was with Boehringer Ingelheim from
2    November 1997 until December of 2004.
3        Q  And the November '97 date is the date of the
4    acquisition of Ben Venue by a Boehringer company?
5        A  That's correct.
6        Q  How many years had you been with Ben Venue
7    prior to that date?
8        A  From May of 1990 until November '97.
9        Q  What companies had you worked for in the
10   drug industry prior to 1990?
11       A  Prior to that, I worked for Wyeth-Ayerst and
12   Baxter International.
13       Q  In those roles, did you have
14   responsibilities for the sales or marketing of
15   generic drugs?
16       A  At Baxter, I did.
17       Q  What types of drugs, generally?
18       A  General generics.  We were supplying
19   hospitals in the Middle East, Africa, and parts of
20   Asia.
21       Q  And it was a full product line, or was it a
22   typical type of product?

---

**201**

1        A  It was a service line.  We were not the
2    manufacturers.  It was a business we had.  Hospital
3    supply, generic drug supply.
4        Q  Okay.  And you were overseas?
5        A  No.  I was in Deerfield, Illinois.
6        Q  But you were responsible for some of these
7    overseas operations?
8        A  No.  I was based in Deerfield.  I was not
9    responsible for the overseas operations.
10       Q  Just the marketing?  Okay.
11       A  I was responsible for a service division
12   whose job it was to broker products for other
13   companies, non-Baxter companies.
14       Q  Okay.  Now, if I'm understanding your
15   testimony correctly this morning, you've never been
16   employed by Roxane; correct?
17       A  No.  I've never been employed by Roxane.
18       Q  But you did have managerial control over
19   Roxane's marketing; correct?
20       A  Roxane's multisource marketing.
21       Q  Multisource marketing.  In the course of
22   your employment with which company were you

---

Russillo, Thomas

Irvine, CA

January 8, 2009

52 (Pages 202 to 205)

202

1    responsible for Roxane's marketing?
2        MS. RIVERA:  Object to form.
3        THE WITNESS:  I'm not sure what you mean by
4    which company.
5        Q  BY MR. ANDERSON:  Which company did you feel
6    like you were employed by when you were acting as
7    the chief operating officer of Roxane's marketing?
8        A  I was never chief operating officer.  I
9    was -- in the Boehringer world, I was head of the
10   multisource business, and I was president of Ben
11   Venue Laboratories.
12       Q  Okay.  I'll use that terminology then.
13           As president of Ben Venue Laboratories and
14   as the head of multisource marketing within the
15   Boehringer companies, which company did you
16   understand you were employed by?
17       A  Ben Venue.
18       Q  Okay.  Why were you, as an employee of Ben
19   Venue, responsible for Roxane marketing?
20       A  The decision to give me the responsibility
21   for Roxane marketing and sales was based on the
22   fact that Ben Venue had a very successful generic

203

1    business, Bedford Labs.  And Roxane had a very
2    questionable future in the business.  And so they
3    decided to give me that business to try to build it
4    up.
5        Q  And the predecessor executive in charge of
6    Roxane's marketing was Mr. Tupa; is that correct?
7        A  That's correct.
8        Q  And you were brought in to lend your
9    expertise in the generic field to Roxane's
10   marketing?
11       A  Yeah.  I mean, that's not exactly what was
12   going on here.  You've got -- I think we've
13   explained to you that the businesses were split.
14           The Roxane branded generics were transferred
15   to the Roxane branded division, and the multisource
16   business was transferred to Bedford, Ben Venue, Tom
17   Russillo.
18       Q  Did -- when that transfer occurred, did you
19   understand that you were directed to oversee the
20   Roxane multisource business by Boehringer
21   executives?
22       MS. RIVERA:  Object to form.

204

1        THE WITNESS:  My boss was, and always was,
2    Werner Gerstenberg.  So yes, I was instructed to
3    oversee that business under Werner Gerstenberg.
4        Q  BY MR. ANDERSON:  And you reported to Werner
5    Gerstenberg in his role as president and CEO of
6    BIC, Boehringer Ingelheim Corporation; correct?
7        A  Yes.
8        Q  Likewise, Mr. Berkle, as president of BIPI,
9    Boehringer Ingelheim Pharmaceuticals, Incorporated,
10   was reporting to Mr. Gerstenberg, president of BIC,
11   with respect to the Roxane branded drugs; correct?
12       A  I'm not sure.
13       MS. RIVERA:  Object to form.
14       THE WITNESS:  I'm not sure whether Shelly
15   was president of BIPI or not.
16       Q  BY MR. ANDERSON:  Okay.
17       A  He was head of the business unit Ethical
18   Pharmaceuticals.  And in that capacity, he reported
19   to Mr. Gerstenberg.
20       Q  And likewise, that reporting capacity
21   encompassed Mr. Berkle's oversight of Roxane's
22   branded products; correct?

205

1        MS. RIVERA:  Object to form and foundation.
2        THE WITNESS:  Yes, I believe so.
3        Q  BY MR. ANDERSON:  Would it be fair to say
4    that the Roxane multisource and branded products
5    were managed within the Boehringer Ingelheim
6    corporate framework after roughly 1999?
7        MS. RIVERA:  Object to form.
8        THE WITNESS:  Try -- I'm not sure what you
9    mean by the question.  Would you please try to
10   rephrase it or repeat it?
11       Q  BY MR. ANDERSON:  Would it be fair to say
12   that Boehringer Ingelheim was controlling the
13   marketing of Roxane multisource products and Roxane
14   branded products after roughly 1999?
15       MS. RIVERA:  Object to form.
16       THE WITNESS:  I can't define it the way
17   you're describing it.
18       Q  BY MR. ANDERSON:  How would you define it?
19       A  That Roxane Labs had two divisions within
20   Roxane:  One that handled the brand piece; one that
21   handled the multisource piece.  And the person who
22   oversaw them on the multisource side was me, and

Russillo, Thomas

January 8, 2009

Irvine, CA

69 (Pages 270 to 273)

---

270

1  companies were separated?
2  **A  I saw Roxane Labs as a separate operating**
3  **subsidiary.  I saw Ben Venue as a separate**
4  **operating subsidiary.  I saw BIPI as a separate**
5  **operating subsidiary.**
6  Q  What efforts were you aware of to keep the
7  companies operating separately?
8  MS. RIVERA:  Object to form.
9  THE WITNESS:  I don't know what you mean by
10  what efforts, but they were operating separately.
11  Q  BY MR. ANDERSON:  Do you agree that the
12  companies were sharing employees?
13  MS. RIVERA:  Object to form.
14  THE WITNESS:  There were some shared
15  services going on with the Roxane piece.  There
16  were some shared services going on with the BIPI
17  piece.  Yeah.  There were some shared services.
18  Yes.
19  Q  BY MR. ANDERSON:  Can you think of any
20  efforts that were undertaken to keep Roxane
21  separate from Boehringer Ingelheim Pharmaceuticals,
22  Incorporated?

---

271

1  MS. RIVERA:  Object to form.
2  THE WITNESS:  I'm really not sure what
3  you're asking me.  They were operating as separate
4  subsidiaries.
5  Q  BY MR. ANDERSON:  In what way?
6  **A  They had their own P&L.**
7  Q  When you say P&L, you're talking about
8  profit and loss?
9  **A  Yes.**
10  Q  So when it came to accounting for the sales
11  of each organization, the money was kept separate?
12  **A  I don't know where the money ended up, but**
13  **in individual -- obviously, it was consolidated as**
14  **a corporation.  But individual roll-ups started**
15  **with the subsidiary level, and the subsidiaries**
16  **paid for any shared services they received from the**
17  **parent corporation.**
18  Q  Do you recall that BIPI had a billing and
19  customer service center that serviced Roxane?
20  **A  Yes, they did.**
21  Q  And are you aware that Roxane revenues
22  generated on the sale of Roxane labeled drugs were

---

272

1  actually deposited into BIPI accounts?
2  MS. RIVERA:  Object to form and foundation.
3  Assumes facts not in evidence.
4  THE WITNESS:  The service center
5  back-charged Roxane for everything they did.
6  Q  BY MR. ANDERSON:  What do you mean by
7  back-charged?
8  **A  They allocated their costs.  Let's say they**
9  **were $100.  If 20 percent of their effort was**
10  **dedicated to Roxane, they charged Roxane's P&L**
11  **20 percent.  If 5 percent of it was dedicated to**
12  **CHC, which was the consumer health division, they**
13  **charged them.  Vet Medica, which was the veterinary**
14  **division, they charged them.**
15  **So any work that was done by legal, by**
16  **contract services, by HR, there was an allocation**
17  **that went out to the subsidiaries.  So they paid**
18  **for their services.**
19  Q  I appreciate that, sir.  I was asking a
20  slightly different question, which is, did you have
21  an understanding that Roxane billings ultimately
22  were deposited in accounts managed by BIPI?

---

273

1  MS. RIVERA:  Object to form, foundation.
2  Assumes facts not in evidence.
3  THE WITNESS:  If that was the case, it was
4  because contract services, a shared service, was
5  acting on our behalf and collecting our billings.
6  Q  BY MR. ANDERSON:  In that context, you're
7  talking about contract services managed by BIPI,
8  controlling the billings of Roxane; correct?
9  **A  Billings for Roxane --**
10  MS. RIVERA:  Object to form.
11  THE WITNESS:  -- billings for BIPI,
12  billings for consumer health, billings for any of
13  the subsidiaries for whom they were providing the
14  service.
15  Q  BY MR. ANDERSON:  The subsidiaries that
16  you're referring to are subsidiaries of which
17  company?
18  **A  Of BIC.**
19  Q  So really the subsidiaries are all
20  technically sister companies of BIPI?
21  **A  Yes.**
22  Q  But BIPI's the entity that had all of the

---

Russillo, Thomas                                    January 8, 2009
                         Irvine, CA

70  (Pages 274 to 277)

---

274

1   shared services, like billings and legal and HR;
2   correct?
3       A  That's why they charged us for it.
4       Q  Is there any relationship between BIPI and
5   Roxane, for instance, as parent and subsidiary?
6       MS. RIVERA:  Object to form.
7       THE WITNESS:  As parent and subsidiary?  No.
8       Q  BY MR. ANDERSON:  Okay.  Did BIPI own
9   Roxane?
10      A  No.
11      Q  So when you're talking about charging
12  subsidiaries, you're really talking about BIPI
13  charging technically sister corporations?
14      A  Absolutely.
15      Q  Okay.
16      A  Because each subsidiary had its own P&L
17  responsibility financially.  And so since they were
18  providing services, BIPI didn't want to pay for it.
19  They charged us.  It was budgeted and paid.
20      Q  Did you ultimately report on the Roxane P&L
21  to a board?
22      A  Yes.

---

275

1       Q  Which board?
2       A  The Roxane board and the Boehringer
3   Ingelheim Corporation board.
4       Q  Did you report to those boards separately?
5       MS. RIVERA:  Object to form.
6       THE WITNESS:  I'm not sure what you mean.  I
7   mean, as Roxane was an operating subsidiary, we
8   reported ourselves, our financials, to the board.
9   And that board -- that subsidiary then was rolled
10  up into the Boehringer Ingelheim subsidiary.
11      Q  BY MR. ANDERSON:  Yes, sir.  I'm asking a
12  question about the actual logistics of reporting to
13  the board.
14      When you were reporting on Roxane's profit
15  and loss to a board, were you meeting with the
16  Roxane board?
17      A  Yes.
18      Q  And at the exact same time, were you also
19  meeting with the Boehringer Ingelheim Corporation
20  board, because it was the same people --
21      A  No.
22      Q  -- comprising both boards?

---

276

1       A  No.
2       Q  Were the boards different?
3       A  Yes.
4       Q  And did you have different board meetings?
5       A  There were different board meetings.
6       Q  When were they held, typically?
7       A  I was not involved with the Boehringer
8   Ingelheim Corporation board meetings except as an
9   invitee, as you saw in some of these documents from
10  the minutes.
11      Q  When were the Roxane meetings usually held?
12      A  Usually quarterly, sometimes more often.
13  They were not board meetings per se, as I testified
14  earlier.  They were operating committee meetings.
15      Q  What's the difference?
16      A  There wasn't really any difference.
17      Q  Well, was it a meeting with the board of
18  directors or not?
19      A  The board of directors participants were in
20  the meeting.
21      Q  Who were the board of directors
22  participants?

---

277

1       A  Depending on the time, it would have been --
2       MS. RIVERA:  I think he listed them before.
3       THE WITNESS:  Yeah.  But depending on the
4   time, it would have been Werner Gerstenberg.  It
5   would have been either Herman Tesner or Holger
6   Huels.  It would have been Shelly.  It would have
7   been myself.
8       And then we brought in other people, just
9   like the board for Boehringer brought in invitees
10  to explain what was going on.
11      Q  BY MR. ANDERSON:  Were there common
12  directors sitting on the board of BIC and Roxane?
13      A  Yes.
14      Q  How many were common to both boards?
15      MS. RIVERA:  Object to form and foundation.
16      THE WITNESS:  The only one I can say for
17  sure would be Werner Gerstenberg.
18      But I don't -- Holger Huels and Herman
19  Tesner, I'm not sure whether they were board
20  members or not, but I believe they were.  But
21  somebody else will have to fill that in for you.  I
22  don't know.

---

Russillo, Thomas

January 8, 2009

Irvine, CA

72  (Pages 282 to 285)

---

**282**

1  as a shared service attorney.
2      Q   Do you have any knowledge of any Medicaid
3  rules, regulations, laws, or other legal
4  requirements that were considered by the pricing
5  committee in approving AWPs or WAC prices?
6      MS. RIVERA:  Object to form.
7      THE WITNESS:  Personally?
8      Q   BY MR. ANDERSON:  Yes, sir.
9      A   That would have been the responsibility of
10  John Powers and the contracting people to consider
11  on anything that needed to be done.
12      Q   So the answer to my question is you don't
13  personally have any awareness that such
14  considerations were taken into account?
15      A   No.  That is not the answer to your
16  question.  I do not -- did not personally do it
17  myself.  I believe that John Powers and the other
18  folks who were responsible for Medicaid rebates
19  would have taken care of that.
20      Q   Well, I'm not asking about rebates, sir.
21  You know that Medicaid rebates aren't paid on WAC
22  or AWP; right?

---

**283**

1      A   Right, yes.  I do know that.
2      Q   I'm asking about WAC and AWP.
3      A   Yeah.
4      Q   Do you know of any persons on the pricing
5  committee, or part of this pricing approval
6  circulation process, considering anti-kickback
7  laws, Medicare and Medicaid laws, Medicare or
8  Medicaid fraudulent use laws, or anything similar
9  to that?
10      MS. RIVERA:  Object to form.
11      THE WITNESS:  I was not aware of any laws
12  that we would have been in danger of violating.
13  We've talked about AWP.  We were -- we believed we
14  were following all the requirements.
15      Q   BY MR. ANDERSON:  Which were what?
16      A   For AWP.
17      Q   I know.  What was your understanding of
18  those requirements?
19      A   That we were free to set AWP as we saw fit.
20      Q   So it was pretty much a decision that the
21  drug company got to make in a vacuum?
22      MS. RIVERA:  Object to form.

---

**284**

1      THE WITNESS:  No.  I wouldn't say that.  The
2  fact that the federal government got a discount
3  from that was something we were well aware of and
4  we knew they were well aware of.  So we didn't --
5      MR. ANDERSON:  Yeah.
6      THE WITNESS:  -- worry about it.
7      Q   BY MR. ANDERSON:  What discount are you
8  talking about?
9      A   In any pricing that they were paying.
10      Q   You're talking about the Medicaid rebate?
11      A   No.  I'm not talking about Medicaid rebate.
12  I'm talking about any pricing, anybody that was
13  buying for the government.
14      Q   Oh.  You're talking about like the federal
15  supply schedule?
16      A   Sure.
17      Q   Okay.  Well, let's set the federal supply
18  schedule aside.
19          I'm talking, sir, about the AWPs and WACs
20  that were being set by Roxane and then published to
21  Medicaid programs, particularly the AWPs.
22          Are you aware of anybody on the pricing

---

**285**

1  committee, or part of the pricing approval process,
2  considering any Medicaid laws, any Medicare or
3  Medicaid fraudulent abuse laws, any anti-trust -- I
4  mean, pardon me, anti-kickback laws, et cetera?
5      MS. RIVERA:  Object to form.
6      THE WITNESS:  Yes.  We were all aware of
7  them.  We were trained in anti-kickback laws.  We
8  knew what we could and couldn't do with rebates.
9  Yes.  So everybody took that into account.
10      Q   BY MR. ANDERSON:  What's your understanding
11  of how the anti-kickback laws impact the setting of
12  AWPs?
13      A   No setting.  It had nothing to do with the
14  setting of AWPs.
15      Q   Is that your personal understanding, or is
16  that what you understood through the training that
17  you received?
18      A   You're trying to put words in my mouth.
19          AWP was a number.  It had nothing to do
20  per se with anti-kickback or anything else.  It was
21  a number that we established.  How it was used is
22  another issue.

---

Russillo, Thomas                                              January 8, 2009
                              Irvine, CA

73 (Pages 286 to 289)

286

1      Q   Would you say you were the individual who
2   ultimately managed the pricing approval process or
3   the pricing committee that approved the Roxane AWPs
4   and WACs?
5      A   Ultimately, with the exception of that
6   little period of time that there was some question,
7   yes. I would say that.
8      Q   That little period of time being what, sir?
9      A   1998 through early 1999, where people
10  were -- we were trying to organize the way we
11  thought we were going to be divided up.
12     Q   Okay. Looking at Exhibit 11, which you just
13  had in front of you, I'm focusing your attention,
14  sir, on the last -- second to last page of
15  Exhibit 11. There's a reference there to the NWDA
16  sheets and the gold sheets.
17         And my question is do you recall that gold
18  sheets included AWPs?
19     A   I'm not positive. I'd have to look at a
20  gold sheet. But I believe they did, but I can't
21  swear to it.
22     Q   You mentioned earlier in your testimony that

287

1   gold sheets were created upon launch of a drug;
2   correct?
3      A   Launch of a drug, discontinuation of a drug,
4   change in pricing of a drug.
5      Q   And the gold sheets typically went out to
6   the Roxane sales force; correct?
7      A   Yes.
8      Q   And it's your best memory that the gold
9   sheets most likely included AWP information;
10  correct?
11     A   Yes.
12     Q   Why did the gold sheets include AWP
13  information?
14     A   For pricing reasons. Most prices were based
15  on discount from AWP.
16     Q   Most prices to whom?
17     A   To retail trade, to whomever we sold.
18     Q   It's your belief that when Roxane was
19  negotiating prices with drug stores, for instance,
20  they would do so based off AWP?
21     MS. RIVERA: Object to form.
22     THE WITNESS: They would negotiate? I'm not

288

1   sure what you mean, they would negotiate. I forgot
2   what you --
3      Q   BY MR. ANDERSON: Is it your understanding,
4   sir, that when Roxane would offer pricing to
5   customers such as chain drug stores, it would offer
6   that pricing as a percentage off of AWP?
7      MS. RIVERA: Object to form.
8      THE WITNESS: In some cases, yes.
9   Certainly, in cases where the pharmacy benefit
10  manager -- Medco Merck, we mentioned earlier. They
11  were used to getting the standard discount of 40,
12  50, 60 percent off of AWP.
13     Q   BY MR. ANDERSON: I understand that. Let's
14  set those managed care entities, like the pharmacy
15  benefit managers like Medco, aside. Okay?
16         I'm talking about pharmacies, independent
17  pharmacies represented through GPOs, group
18  purchasing organizations, or chain drug stores.
19     A   Uh-huh.
20     Q   Isn't it true, sir, that when Roxane
21  negotiated market pricing with GPOs, representing
22  pharmacies or chain drug stores, that they did so

289

1   on a dollar price as opposed to a percentage off
2   AWP?
3      A   They did both. They would give them a
4   contract price, and it usually was accompanied
5   with, "That's a 60-, 70-percent discount from AWP."
6      Q   Why do you find that that reference to AWP
7   in connection with the contract price was made?
8      MS. RIVERA: Object to form.
9      THE WITNESS: Why was the reference made?
10     Q   BY MR. ANDERSON: Yes, sir.
11     A   Just as a benchmark. People like to know
12  where their price stood.
13     Q   Is it also true that that reference to AWP
14  and contract price was an easy way for the pharmacy
15  to evaluate spread?
16     MS. RIVERA: Object to form.
17     THE WITNESS: Possibly, yes.
18     Q   BY MR. ANDERSON: Is it your testimony that
19  that's the typical mechanism by which Roxane
20  offered pricing to pharmacies?
21     MS. RIVERA: Object to form.
22     THE WITNESS: Is it my -- no. That's not my