# TAB 22

274

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - - -X

In re:  PHARMACEUTICAL INDUSTRY     :

AVERAGE WHOLESALE PRICE             : MDL No. 1456

LITIGATION                          : Civil Action No.

                                    : 01-12257-PBS

_____      : Judge Patti B. Saris

                                    : Magistrate Judge

United States of America ex rel.    : Marianne B. Bowler

Ven-a-Care of the Florida Keys,     :

Inc. v. Boehringer Ingelheim        :

Corp., et al. CIVIL ACTION NO.      :

07-10248-PBS                        : VOLUME II

- - - - - - - - - - - - - - - - -X

        -caption continues-


     Continued Videotaped deposition of MARK SHAFFER

taken at the offices of Jackson Lewis LLP, 90 State

House Square, 8th Floor, Hartford, Connecticut  06103,

before Clifford Edwards, LSR, Connecticut

351

1  oxycodone 5-milligram?
2     A. Again, just going off the bullet points
3  on this particular slide and it has a breakdown of
4  those points.
5     Q. It indicates that the pharmacy profit
6  margin would be $29.15.
7     Correct?
8     A. Under this example and this scenario,
9  that's what it's pointing out.
10    Q. Okay. The next page has an example for
11 the Roxicodone 15-milligram.
12    A. Yes, it does.
13    Q. It shows a profit of $39.60?
14    A. That's what it's showing on this slide.
15 Yes.
16    Q. Okay. Indicating, does it not, that the
17 Roxicodone 15-milligram would be more profitable to
18 the pharmacist?
19    MS. RIVERA: Object to form.
20    A. I can't speak on profit.
21    But in these two scenarios, it's pretty
22 straightforward the way the scenarios are broken

352

1  down.
2  BY MS. POLLACK:
3     Q. Now, if you look at the last page that
4  has text in this presentation. There's a
5  presentation that has the logo or may be a page
6  that has -- right.
7     There's some examples of objections that
8  a salesperson might hear from a potential customer.
9     Is that correct?
10    A. I don't know the context of it.
11    It does say objections and responses.
12    Q. Okay. The second one says, "I carry one
13 SKU in this category."
14    What's an SKU?
15    A. It's my understanding an SKU is the
16 number assigned to a particular product.
17    Q. To a product or type of drug?
18    A. I'm not sure.
19    I thought every product had an SKU.
20    Q. Okay. Do you recall what the suggested
21 response was if the salesman got an objection from
22 a customer that I carry only one SKU in this

353

1  category?
2     A. I don't recall. No.
3     Q. Okay. When you were, I'll call it, a
4  basic level salesperson in the early part of the
5  1990s, what was the title of that position again?
6     A. It was regional director of
7  pharmaceutical affairs.
8     Q. Okay. But that was a basic salesperson
9  --
10    A. Yes.
11    Q. -- in lay terms?
12    A. Yes, it was.
13    Q. When you were regional director of
14 pharmaceutical affairs, were you required to fill
15 out any kind of call sheet?
16    A. What do you mean by "call sheets"?
17    Q. When you called on a potential customer,
18 did you have to fill out I called on X pharmacy on
19 this date, and here's what we talked about, that
20 kind of thing?
21    A. Yes, we did.
22    Q. Were those sheets kept?

354

1     A. From what I recall, there were forms that
2  we filled out on a weekly basis and cards that had
3  all of our physician contacts.
4     And we had physician call goals. We
5  filled out the cards and sent them in so that was
6  the call reporting done on physicians.
7     Q. What about for retail pharmacies?
8     A. I don't recall.
9     I don't think there were cards for the
10 pharmacies. I think it was just for the
11 physicians.
12    Q. During the time that you were in the
13 sales area, do you recall being asked to destroy
14 sales training materials?
15    A. Which time frame are you -- I mean, can
16 you clarify which time frame?
17    Q. From the early '90s to 2000?
18    A. I don't recall specifically any pieces or
19 programs that we were asked to destroy.
20    Q. So Roxane didn't have a policy that after
21 you went to a training meeting, you were supposed
22 to destroy the materials you received?

355

1    A.  I don't recall, again, the specific ones.
2        I recall generally that over time there
3    may have been some communications on outdated
4    materials or whatever, and marketing would send out
5    what is the common practice to the field.
6        But I don't recall specifics on which
7    products or --
8    Q.  Would marketing send those memos out when
9    the price changed, for example, and say destroy any
10   old price sheets or something like that?
11   A.  I don't recall any memo along those
12   lines.  No.
13   Q.  Okay.  You told us previously that toward
14   the end of the year 2000, Roxane no longer had
15   salespeople selling the Oramorph and the
16   Roxicodone.
17       Do you remember that testimony?
18   A.  Yes, I do.
19   Q.  How were those products distributed by
20   Roxane at that time?
21   A.  I'm not sure what you mean by
22   "distributed."

356

1    Q.  Didn't Roxane continue to sell those
2    products to customers?
3    A.  It's my understanding that after our
4    sales force was dissolved, that for a period of
5    time, I don't know how long, those products were
6    still on market.  I don't recall those products
7    coming off market.
8    Q.  And I'm asking:  How were they
9    distributed after that?
10       Maybe that's not the right word, but how
11   is it that they were sold after that period of
12   time?
13   A.  They were sold by filling prescriptions
14   the physicians wrote to the pharmacies.
15       The pharmacies would fill prescriptions
16   like they always did.
17   Q.  So Roxane was selling to the wholesalers,
18   we can assume after that time?
19   A.  I believe Roxane always sold to the
20   wholesalers.
21   Q.  If I was a pharmacist in January 2001 and
22   I wanted a bottle of the Roxicodone 50-milligram

357

1    tablet, how would I get it?
2    A.  You would order it from your wholesaler.
3    Q.  Who was marketing the product to the
4    wholesaler in that time frame at Roxane?
5    A.  I can't speak for whatever happened after
6    they dissolved our sales division.
7    Q.  Okay.  But it is your understanding the
8    product was available in the marketplace for some
9    period of time?
10   A.  Again, I don't recall those products
11   being withdrawn from the market.
12   Q.  Okay.  All right.
13       (THEREUPON, EXHIBIT SHAFFER 032,
14       MEMO DATED 12/21/00, WAS MARKED
15       FOR IDENTIFICATION.)
16   BY MS. POLLACK:
17   Q.  Marking as Shaffer 32 a memo from Mr.
18   Shaffer to the Roxane palliative care sales force
19   dated December 21, 2000.
20       It's marked Shaffer 001859 through 60.
21   A.  Okay.
22   Q.  Do you recall sending out this memo?

358

1    A.  I don't recall.
2    Q.  Okay.  Do you have any reason to believe
3    you didn't send out this memo?
4    A.  I -- I don't know.
5    Q.  Okay.  The subject is PC promo materials.
6    It asks each of the persons receiving it to sign a
7    form indicating that "All Roxane Laboratories
8    palliative care and manual sales, promotional
9    materials, training binders, IMS DDD data, and hard
10   copy account records have been destroyed."
11       Is that correct?
12   A.  That's correct.
13   Q.  You have no recollection of sending this
14   out?
15   A.  No.  This is the time frame when the
16   entire division was dissolved.
17       Everybody was out of a job.  I don't
18   remember sending this out, but this obviously is
19   something I may have sent out because of the
20   division being dissolved.
21   Q.  Do you remember signing a document like
22   this?

359

1    A. I don't remember.

2    Q. Okay. What is a hard copy account

3 record?

4    **A. Hard copy account records, I believe**

5 **would be binders where people kept information on**

6 **their customers, account records.**

7    Q. Is that something an individual

8 salesperson would keep in the course of his --

9    **A. I think --**

10    Q. -- business?

11    **A. -- most salespeople have some kind of**

12 **records of their -- of their customers. Yes.**

13    Q. So there wasn't a company form called a

14 hard copy account?

15    **A. Not that I recall.**

16    Q. Something like that?

17    **A. No.**

18    Q. What type of IMS DDD data is referred to

19 her?

20    **A. I don't know specifically which data.**

21    **But as I mentioned earlier IMS does**

22 **provide DDD data which is pharmacy level data.**

360

1    Q. Does DDD provide data on physicians --

2    **A. Yes.**

3    Q. -- too?

4    **A. IMS provides physician data.**

5    Q. DDD is a division or subsidiary --

6    **A. I believe it is, yes.**

7    Q. -- of IMS?

8    MS. POLLACK: Okay. Why don't we take

9 two minutes off the record?

10    THE VIDEOGRAPHER: Going off the record

11 at 11:20.

12    (THEREUPON, THERE WAS A DISCUSSION

13    OFF THE RECORD.)

14    THE VIDEOGRAPHER: We are now back on the

15 record at 11:21.

16    MS. POLLACK: Thank you, Mr. Shaffer.

17 I have no further questions at this time.

18 I don't know if counsel on the phone have any

19 questions.

20    MR. WINGET-HERNANDEZ: This is Michael

21 Winget-Hernandez. I have no questions at this

22 time.

361

1    MS. RIVERA: Okay. This is Maria Rivera.

2 I'd like to take just a quick 10-minute -- 10- to

3 15 minute break. And I have a short redirect to

4 do. Then, we can wrap it up.

5    THE VIDEOGRAPHER: Going off the record

6 at 11:22.

7    (THEREUPON, THERE WAS A RECESS

8    TAKEN.)

9    THE VIDEOGRAPHER: We are now back on

10 record at 11:41.

11    CROSS-EXAMINATION

12 BY MS. RIVERA:

13    Q. Mr. Shaffer, I just wanted to go back and

14 clarify a few things that you discussed over today,

15 and the last time we met for the record.

16    I'm going to start with the documents and

17 the issues that we talked about today. And then,

18 I'll go back to a couple things we discussed during

19 the first day of your deposition.

20    **A. Okay.**

21    Q. Okay. Let me hand you your exhibits so

22 you have them.

362

1    If you could just go back to Shaffer 23

2 which is the May 6, 1999, e-mail from John Powers

3 regarding Oramorph pricing.

4    Do you have that?

5    **A. Okay. I have it.**

6    Q. Okay. And I just wanted to clarify when

7 -- what Mr. Powers is talking about here is a

8 change to the contract prices of Oramorph.

9    Is that correct?

10    MR. FAUCI: Objection. Form.

11    **A. That's correct.**

12 BY MS. RIVERA:

13    Q. Does it have anything to do or can you

14 tell from this e-mail whether there were any

15 changes to the AWP at that time for Oramorph?

16    **A. No.**

17    Q. Okay. That's all. On the next two

18 exhibits were Shaffer 24 and 25 had to do with the

19 launch of Azathioprine.

20    Do you recall these?

21    **A. Yes, I have it here.**

22    Q. Okay. And you may have testified to

363

1  this.
2      But just so it's clear, do you have any
3  recollection of you or your sales force promoting
4  Azathioprine for Roxane?
5      **A.  I don't recall it being one of the**
6  **promoted products.**
7      Q.  What do you mean by "one of the promoted
8  products"?
9      **A.  Our core promoted products that we spent**
10  **obviously a lot of time on and we promoted to**
11  **physicians.**
12     Q.  Okay.  And did your -- what type of
13  products did your sales force and the Roxane sales
14  force focus on?
15     **A.  They were basically brand and branded**
16  **generics.**
17     Q.  Okay.  And was Azathioprine either a
18  brand or branded generic drug?
19     **A.  No, just a generic drug.**
20     Q.  Do you have any recollection of having
21  any of your bonuses tied to the promotion or the
22  sales of Azathioprine?

364

1      **A.  I don't recall.**
2      Q.  Okay.  And can you clarify for me, did
3  the Roxane sales force that you were on and you
4  were an area manager for and director of have
5  responsibility for selling to wholesalers or chain
6  pharmacies?
7      **A.  No, we did not.**
8      Q.  Who was responsible for those sales?
9      **A.  We had a trade group.**
10     Q.  Okay.  And that trade group was separate
11  from your sales force?
12     **A.  Yes, it was.**
13     Q.  Okay.  Okay.  If you could take out
14  Shaffer 27, which is the Doug Bieryl presentation
15  on Roxicodone.
16     Excuse me.
17     **A.  I have it in front of me.**
18     Q.  Okay.  And I'm going to have the same
19  problem Rose did.
20     About halfway through, there is a slide
21  that says "launch update."  It has title "activity
22  and implementation."

365

1      **A.  I apologize.  I'm having a hard time --**
2      Q.  That's okay.
3      **A.  -- getting to the launch update slide**
4  **here.**
5      **I have it.**
6      Q.  Okay.  And do you recall what year this
7  was that these presentations were given in the
8  launch of Roxicodone occurred?
9      **A.  This was in 2000.**
10     Q.  Okay.  And what does this launch update
11  slide reflect?
12     **A.  It reflects different time lines for**
13  **activities with the launch.**
14     Q.  Okay.  And does it show that the retail
15  stocking would go from approximately September 22nd
16  to November 10th?
17     **A.  Yes.  That's what it shows.**
18     Q.  Okay.  And then the last thing says that
19  the beginning promotion to physicians would begin
20  on November 13th?
21     **A.  Yes.**
22     Q.  Okay.  Does that indicate that the sales

366

1  to physicians or the promotion to physicians would
2  occur only after this retail stocking effort
3  occurred?
4      **A.  Yes.**
5      **I recall that was our strategy.**
6      Q.  Okay.  So is it consistent with your
7  recollection that your sales force did not actually
8  start promoting Roxicodone 15- and 30-milligram to
9  physicians until around November 13th?
10     **A.  That sounds correct.**
11     Q.  Okay.  And so prior to that time, there
12  wouldn't be many prescriptions being written or
13  filled for Roxicodone 15- or 30-milligrams?
14     MS. POLLACK:  Objection.  Form.
15     MR. FAUCI:  Objection.  Form.
16     **A.  We did not start selling to the**
17  **physicians until after we adequately -- we felt**
18  **that retail stores were stocked.**
19  BY MS. RIVERA:
20     Q.  And do you know if there were any
21  prescriptions that were written or filled prior to
22  the time that it was promoted to physicians?

379

1 to a few things, issues that were raised the first
2 day of your deposition back in May.
3     A.  few times in your -- in your first
4 day, you used the term "Boehringer Ingelheim."
5     Which Boehringer Ingelheim entity were
6 you referring when you said that?
7     MS. POLLACK:  Object.
8 A.  BIPI.
9     MS. POLLACK:  I'm going to object to
10     form.
11     But go ahead.
12 BY MS. RIVERA:
13     Q.  What does BIPI stand for?
14     A.  Boehringer Ingelheim Pharmaceuticals,
15 Incorporated.
16     Q.  In your day-to-day activities when you
17 were a member of the Roxane sales force or you were
18 the manager or director of the sales force, did you
19 have interaction with any BIPI or Boehringer
20 Ingelheim Corporation employees?
21     A.  No, I did not.
22     Q.  And the person that you reported to as a

380

1 member of the Roxane sales team was a Roxane
2 employee?
3     A.  Yes, he was.
4     Q.  And you considered yourself a Roxane
5 employee at that time?
6     A.  Yes, I did.
7     Q.  And you received a Roxane paycheck?
8     A.  Yes, I did.
9     Q.  And did Roxane have a separate sales
10 force from -- and I'll use the term BIPI?
11     A.  Yes, they did.
12     MR. FAUCI:  Objection.  Form.
13 BY MS. RIVERA:
14     Q.  Did Roxane have a separate marketing
15 department at the time from BIPI?
16     MS. POLLACK:  Objection to form.
17     A.  Yes, they did.
18 BY MS. RIVERA:
19     Q.  And other than the sales meetings that I
20 think you mentioned there may have been a few BIPI
21 employees at during the time you were on the Roxane
22 sales force, did you have any other interaction

381

1 with BIPI or BIC employees?
2     A.  No, I did not.
3     Q.  And the entire time that you were with
4 Roxane, were you in the sales department that
5 entire time?
6     A.  Yes, I was.
7     Q.  Were you ever in -- in the marketing
8 department?
9     A.  No, I wasn't.
10     Q.  And there was a separate marketing
11 department.
12     Correct?
13     A.  Yes, there was.
14     Q.  Were you ever in the contracts
15 department?
16     A.  No, I was not.
17     Q.  Was there a separate contracts department
18 at the time?
19     A.  Yes, there was.
20     Q.  Okay.  Were you ever in the trade
21 relations department?
22     A.  No, I wasn't.

382

1     Q.  Okay.  Did you have any involvement
2 during your time at Roxane in setting the prices
3 for Roxane products?
4     A.  No, I did not.
5     Q.  Okay.  So you didn't have any involvement
6 in setting the AWPs or the WACs for the various
7 Roxane products?
8     A.  No, I did not.
9     Q.  Did you have any involvement in changing
10 the prices of any Roxane products?
11     A.  No, I did not.
12     Q.  Did you have any involvement in reporting
13 any prices, Roxane product prices, to any third
14 party pricing compendia?
15     A.  No, I did not.
16     Q.  Do you know which prices Roxane reported
17 to the various pricing compendia?
18     MR. FAUCI:  Objection.  Form.
19     A.  No, I do not.
20 BY MS. RIVERA:
21     Q.  Do you know why Roxane reported prices to
22 the various pricing compendia?