**TAB 23**

Sykora, Robert C.                                December 4, 2008
                          Atlanta, GA

                                                              1

                    UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


    In re:  PHARMACEUTICAL       ) MDL No. 1456
    INDUSTRY AVERAGE WHOLESALE   ) Civil Action No.
    PRICE LITIGATION             ) 01-12257-PBS
    _____ )
    THIS DOCUMENT RELATES TO:    )
    United States of America,    )
    et al. v. Ven-a-Care of the  )
    Florida Keys, Inc. v.        )
    Boehringer Ingelheim Corp.,  )
    et al., CIVIL ACTION NO.     )
    07-10248-PBS                 )
                                - - -

            Videotaped deposition of ROBERT C.
        SYKORA, taken pursuant to the stipulations
        agreed to herein, before Suzanne Beasley,
        Registered Professional Reporter and Notary
        Public, at 1031 Virginia Avenue, Atlanta,
        Georgia, on the 4th day of December, 2008,
        commencing at the hour of 10:38 a.m.

**74**

1  lessened?
2     A.  I don't know if it was lessened, but it
3  wasn't maximized.
4     Q.  And do you have any understanding what
5  she meant by the latter part of that statement,
6  "it can be difficult to explain when questioned"?
7     A.  I do not.
8     Q.  If -- why would it be difficult to
9  explain an AWP increase by just simply stating
10 the truth, which is it was raised to compete with
11 other generics?
12        MR. KAVANAUGH:  Objection to form.
13        THE WITNESS:  Can you repeat the
14 question?
15 BY MR. ANDERSON:
16    Q.  Would it be difficult to explain AWP
17 increases by simply stating the truth, which is
18 they were done to compete with generic
19 competitors' AWPs?
20        MR. KAVANAUGH:  Objection to form.
21        THE WITNESS:  In my opinion, no.
22 BY MR. ANDERSON:

**75**

1     Q.  Why not?
2     A.  Because it's the truth.
3     Q.  Is there anything inappropriate about
4  raising AWPs to compete with other generic drugs'
5  AWPs?
6     A.  In my opinion, no.
7     Q.  Do you have any type of background in
8  Medicare and Medicaid fraud and abuse laws?
9     A.  I do not.
10    Q.  Have you ever considered Medicare and
11 Medicaid fraud and abuse laws in the context of
12 AWP increases?
13    A.  I have not.
14    Q.  Are you aware of any Office of
15 Inspector General guidelines about AWP price
16 setting?
17        MR. KAVANAUGH:  Objection to form.
18        THE WITNESS:  I am not.
19 BY MR. ANDERSON:
20    Q.  Would you agree that if you had
21 familiarity with those laws, it may impact
22 whether or not the raising of AWPs to compete and

**76**

1  sell drugs may or may not be illegal?
2        MR. KAVANAUGH:  Objection to form.  It
3  assumes facts not in evidence.  It's an improper
4  hypothetical and lacks foundation.
5        You can answer.
6        THE WITNESS:  If there was a law that
7  said you couldn't do it, I personally wouldn't do
8  it.
9  BY MR. ANDERSON:
10    Q.  Do you agree, Mr. Sykora, that Ms.
11 Waterer was primarily looking to you to provide
12 the support from the customers as to the
13 rationale for increasing the AWPs?
14    A.  She was looking for information from
15 me, yes.
16    Q.  And the reason she was looking for that
17 information from you was that you were ultimately
18 the boss of all the national account managers?
19    A.  I was the boss of the people who would
20 gather the information.  Marketing determined
21 where the AWP would be.  Sales just helped gather
22 information in the field so they could make

**77**

1  whatever decision was necessary at the end of the
2  day.
3     Q.  Do you have any understanding that
4  pricing actions by the marketing department,
5  including Ms. Waterer or Ms. Paoletti, were
6  unauthorized by --
7         MR. KAVANAUGH:  Objection to form.
8  BY MR. ANDERSON:
9     Q.  -- by Roxane?
10    A.  I do not have any knowledge of that.
11    Q.  Do you ever recall Ms. Waterer or Ms.
12 Paoletti or Mr. Russillo, or anyone else, for
13 that matter, being disciplined for raising AWPs
14 without authority?
15    A.  I'm not aware of that.
16        (Exhibit Sykora 006 was marked for
17 identification.)
18 BY MR. ANDERSON:
19    Q.  If you could, take a look at what's
20 been marked as deposition Exhibit 006.
21    A.  Okay.
22    Q.  Have you finished your review of

**Page 78**

1  Exhibit 006?
2    A.  I have.
3    Q.  Is this the document you saw yesterday
4  with Mr. Kavanaugh?
5    A.  It is.
6    Q.  And this is an e-mail exchange between
7  you, Ms. Waterer, and then there's copies to Mr.
8  Feldman and Mr. Russillo, correct?
9    A.  Correct.
10   Q.  And it's dated July 7th, which is just
11 a couple of days after the July 5th conversation
12 we just saw, correct?
13   A.  Correct.
14   Q.  All right.  And I'm looking now, sir,
15 at your message dated July 7th at 2:25 p.m. to
16 Ms. Waterer, and you copy Mr. Feldman and Mr.
17 Russillo.  Specifically I'm looking down at the
18 second paragraph.  Do you agree that paragraph
19 pertains to AWPs on Roxane products?
20   A.  It does.
21   Q.  And I'll read for the benefit of the
22 jury.  Quote, I feel that you've thrown Furo onto

**Page 79**

1  my lap when the entire generic line AWPs need to
2  be reviewed and adjusted.  The most consistent
3  complaint I hear from retail customers is our
4  AWPs.
5        Did I read that correctly?
6    A.  Correct.
7    Q.  Is that a true statement?
8    A.  For that time, it might have been, yes.
9    Q.  All right.  Do you have any reason to
10 believe that that statement as you wrote it in
11 July of 2000 was wrong?
12   A.  No.
13   Q.  Does that statement refresh your memory
14 that in fact, customers were complaining to you
15 and your sales force about AWPs being too low on
16 Roxane products?
17   A.  **They were too low, yes.  Or the**
18 **customers were complaining they were too low,**
19 **yes.**
20   Q.  And was that in your experience costing
21 Roxane sales?
22   A.  Probably, yes.

**Page 80**

1    Q.  Continuing on, I'm picking up at the
2  next full sentence.  Quote, I realize there is
3  political pressure on AWP currently, but it
4  should not run our business.
5        Did I read that correctly?
6    A.  Correct.
7    Q.  What political pressure were you aware
8  of about AWP?
9    A.  **I believe they're talking about the**
10 **pressure from Boehringer Ingelheim.**
11   Q.  Political pressure being pressure from
12 BI down to Roxane?
13   A.  Correct.
14   Q.  What was that pressure?
15   A.  **We were in that transition period.  I**
16 **think it was just not too long before that that**
17 **they gave us our severance packages, and so**
18 **everybody was kind of -- at Roxane was a little**
19 **perturbed.  They weren't great severance**
20 **packages.  Most of us were not offered jobs.**
21       Even myself, I was ultimately offered a
22 job, but not until three months later.  And so at

**Page 81**

1  this stage of the game, as far as I knew, I was
2  getting what I thought was a substandard
3  severance package, and, you know, and no
4  opportunity for a -- you know, to further my
5  career, to live in Columbus, Ohio, which is where
6  I wanted to live at the time, so to tell you the
7  truth, I was mad and everybody else at the
8  facility was mad as well at BI.
9    Q.  How would the severance packages -- and
10 I can appreciate that you may have been upset
11 about the severance packages, but how did those
12 connect with AWPs?
13   A.  Just -- they didn't connect directly
14 with AWPs.  It's just that there was a lot of --
15 there was angst, I guess, in the building between
16 BI and Roxane employees.
17   Q.  Yes, sir.  I can understand that on the
18 severance packages.  But if you look at the
19 sentence you wrote, you say there's political
20 pressure on AWP currently, and if I'm
21 understanding you correctly, you're saying you
22 think that was political pressure coming from BI

**198**

1  Fauci. I'm an attorney with the United States
2  Attorney's Office in Boston, Massachusetts. I'm
3  one of the attorneys representing the United
4  States in this matter. I just have a few
5  followup questions following Mr. Anderson's
6  examination.
7       Starting in 1997, you came to work for
8  the Boehringer Ingelheim family of companies; is
9  that correct?
10      MR. KAVANAUGH: Objection to form.
11      THE WITNESS: I came to work
12 specifically for Roxane Laboratories, correct,
13 which is --
14 BY MR. FAUCI:
15      Q. You worked specifically for Roxane
16 Laboratories?
17      A. I did.
18      Q. I believe you testified earlier that
19 you received your paycheck from a different
20 entity; is that correct?
21      A. That is correct.
22      Q. Which entity was that?

**199**

1       A. That was Boehringer Ingelheim.
2       Q. Was it just Boehringer Ingelheim -- was
3  it Boehringer Ingelheim Pharmaceuticals,
4  Incorporated?
5       A. That I do not know.
6       Q. But it was not Roxane Laboratories?
7       A. That is correct.
8       Q. And you just stated that your primary
9  job responsibility was on behalf of Roxane
10 Laboratories?
11      A. Correct.
12      Q. Was it also on behalf of Boehringer
13 Ingelheim?
14      A. There were times that Boehringer
15 Ingelheim would use the resources of the national
16 account group to launch new products.
17      Q. Can you tell me in general terms what
18 was the business of Boehringer Ingelheim around
19 the 1997 time frame?
20      MR. KAVANAUGH: Objection to form.
21      THE WITNESS: Promotion of branded
22 prescription items to physicians.

**200**

1  BY MR. FAUCI:
2       Q. And can you tell me the same for Roxane
3  Laboratories around 1997?
4       A. There were two components. One was the
5  promotion of branded prescription items to
6  physicians, and the other was a generic
7  pharmaceutical business.
8       Q. And your position in 1997, what was
9  that?
10      A. Director of national accounts.
11      Q. What is a national account?
12      A. A national account, some organizations
13 might call it trade relations department, that
14 was responsible for interaction with large
15 customers, such as wholesalers as well as chain
16 drugstores, whether they warehouse products or
17 not.
18      Q. What's a wholesaler?
19      A. A wholesaler is a company that
20 distributes pharmaceuticals between the
21 manufacturer and the pharmacy.
22      Q. How many national account managers

**201**

1  reported to you?
2       A. I believe it was seven.
3       Q. Can you remember who they were?
4       A. Yeah, I could pull out that
5  organizational chart and look.
6       Q. Do you know if they were Roxane
7  employees or BI employees?
8       A. That I do not know.
9       Q. How often did these national account
10 managers report to you? Was it on a daily basis?
11 Was it weekly?
12      A. It's potential I could talk to any one
13 of them on any given day.
14      Q. Did they report to you in writing,
15 orally, or both?
16      A. Both.
17      Q. Tell me the day-to-day job function of
18 a national account manager.
19      A. Each one was responsible for in essence
20 a geography that contained national accounts,
21 either large wholesalers or large chain
22 pharmacies, and they would call on the corporate