**TAB 25**

SUPERIOR COURT
COMPLEX LITIGATION
DOCKET at TOLLAND

STATE OF CONNECTICUT,
      Plaintiff,

  vs.                          Docket No.
                              X07 CV-03-0083296-S(CLD)
DEY, INC., ROXANE LABORATORIES, INC.,
WARRICK PHARMACEUTICALS CORP.,
SCHERING-PLOUGH CORP.
AND SCHERING CORPORATION,
      Defendants
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CONFIDENTIAL

DEPOSITION OF

THOMAS VIA

October 18, 2005
9:30 a.m.

52 East Gay Street
Columbus, Ohio

Lori M. Barnes, RPR

**38**

1  that time period?
2      A.  Contract compliance at hospital
3  pharmacies.
4      Q.  And what would you do to ensure
5  compliance at a hospital pharmacy?
6      A.  Review sales data against contract
7  information.
8      Q.  And who would provide you the
9  contract information?
10     A.  The office, corporate office.
11     Q.  Roxane's corporate office would
12 provide that information?
13     A.  Yes.
14     Q.  And do you know if that department
15 was headed -- Do you know who headed that
16 particular department at that time?
17     A.  At that time, no.
18     Q.  Did you also make sales calls to
19 pharmacists during this time period?
20     A.  Yes.
21     Q.  And what would those sales calls
22 consist of?
23     A.  Contract compliance at the hospital
24 as well as retail pharmacy to ensure stocking
25 of promoted products.

**39**

1      Q.  Did you have any sales aids that
2  you used when you called on retail
3  pharmacies?
4      A.  I don't recall.
5      Q.  You don't recall whether you did
6  or did not?
7      A.  Correct.
8      Q.  Did you use any sales aids with
9  respect to your discussions or interactions
10 with hospital pharmacies?
11     A.  Yes.
12     Q.  What kind of tools were you using
13 with respect to hospital pharmacies?
14     A.  Visual aid and clinical studies for
15 Oramorph SR.
16     Q.  Oramorph was a pain medication,
17 correct?
18     A.  Correct.
19     Q.  Was it also a scheduled pain
20 medication?
21     A.  Yes.
22     Q.  Were you sampling Oramorph SR
23 during that time period?
24     A.  No.
25     Q.  Not even through the mail sampling?

**40**

1      A.  No.
2      Q.  Were you sampling any of the other
3  products that you were making sales calls on
4  with respect to this time period?
5      A.  No.
6      Q.  Did you discuss any reimbursement
7  issues with retail pharmacies that you called
8  on during that time period?
9      A.  No.
10     Q.  Did you discuss average wholesale
11 price with retail pharmacies during that time
12 period?
13     A.  I don't recall.
14     Q.  So you may have or you may not
15 have, you just can't recall at this point; is
16 that correct?
17         MR. COVAL: Objection to form.
18 You can answer.
19         THE WITNESS: I'm sorry?
20         MR. COVAL: I said, "Objection to
21 form," but you can answer.
22     A.  Correct.
23     Q.  You just don't have a recollection
24 one way or another; is that right?
25     A.  Correct.

**41**

1      Q.  How about with respect to the
2  hospital pharmacies that you called on during
3  that time period, did you discuss
4  reimbursement with any of those customers
5  during this time period?
6      A.  No.
7      Q.  Did you discuss AWP or average
8  wholesale products with any of those customers
9  during this time period?
10     A.  No.
11     Q.  Did any of the visual aids that
12 you used during this time period have
13 information about average wholesale price in
14 them?
15     A.  No.
16     Q.  Did any of the visual aids during
17 this period contain any information about
18 reimbursement?
19     A.  No.
20     Q.  Do you know if Roxane has a
21 department that maintains a historical detail
22 information?
23     A.  No, I don't know.
24     Q.  Do you know anyone at Roxane who
25 would have that kind of information?

**42**

1  A. Possibly.
2  Q. Who would that be?
3  A. Judy Waterer.
4  Q. And what makes you -- What is the
5  basis of your contention that she may have
6  that type of information?
7  A. She's in marketing.
8  Q. Do you know when Judy Waterer
9  started with Roxane?
10 A. No.
11 Q. I think we went through the 1994
12 time period. Now, Tom, did you switch
13 positions in 1994?
14 A. Yes.
15 Q. And what was your new position in
16 1994?
17 A. Product manager.
18 Q. And how long did you remain in
19 that position?
20 A. Approximately three and a half
21 years.
22 Q. So, if my math is right, that
23 takes us to the 1997-1998 time period,
24 correct?
25 A. Yes.

**43**

1  Q. Was that a position with Roxane?
2  A. Yes.
3  Q. Who did you report to in that
4  position, Tom?
5  A. Ed Tupa and Gary Ellexson.
6  Q. Can you spell Gary's last name,
7  please?
8  A. E-L-L-E-X-S-O-N, I think.
9  Q. Was Gary above Ed?
10 A. No.
11 Q. Equal to Ed?
12 A. No.
13 Q. So Gary was below Ed; is that
14 correct?
15 A. Correct.
16 Q. What was Ed's title?
17 A. Vice president of sales and
18 marketing.
19 Q. What about Gary Ellexson, what was
20 his title at that time?
21 A. Director of marketing.
22 Q. And you mentioned that your title
23 was product manager. Was there a particular
24 product that you managed?
25 A. Yes.

**44**

1  Q. What was that product?
2  A. Oramorph SR, Roxanol, Roxicodone,
3  Ipratropium Bromide Unit Dose Vial, Duraclon.
4  Q. Can you spell that?
5  A. D-U-R-A-C-L-O-N. That's it.
6  Q. And do you recall how many other
7  product managers there were at Roxane during
8  that time period?
9  A. It depends on when it is during
10 that time period.
11 Q. Okay. How about at the beginning
12 of that time period, 1994?
13 A. There was one additional.
14 Q. Who was that?
15 A. Tom Sawyer.
16 Q. Do you recall what products he was
17 the manager for?
18 A. Marinol, Viramune, V-I-R-A-M-U-N-E.
19 That's it.
20 Q. How about as we progress to the
21 1997 time period, were there additional
22 product managers at that time?
23 A. Yes.
24 Q. Who were they?
25 A. Alex Dusek, D-U-S-E-K. He was --

**45**

1  I'm sorry.
2  Q. What products did Mr. Dusek manage?
3  A. He was co-product manager on
4  Viramune and Azathioprine.
5  Q. So was Tom Sawyer still in a
6  position as product manager in 1997, as you
7  recall?
8  A. I don't recall. He may have left
9  the company at that point.
10 Q. Okay. In addition to Alex Dusek,
11 were there any other product managers other
12 than yourself?
13 A. Yes. Jerry Sincich.
14 Q. Any others?
15 A. Yes. Judy Waterer.
16 Q. Any others?
17 A. Ed Gunn, G-U-N-N.
18 Q. And can you recall any others?
19 A. No.
20 Q. With respect to Jerry Sincich, do
21 you recall the products that he managed?
22 A. Not with any degree of certainty.
23 Q. What about Judy Waterer?
24 A. The multi-source product line.
25 Q. Is it your understanding that

46

1   multi-source also means generics?
2   A.   Yes.
3   Q.   Ed Gunn, do you recall what
4   products he was manager for?
5   A.   No.
6   Q.   Is Ed Gunn still with Roxane?
7   A.   No.
8   Q.   Is he with Boehringer Ingelheim?
9   A.   No.
10  Q.   What about Jerry Sincich, is he
11  with Roxane still?
12  A.   No.
13  Q.   Is he with Boehringer Ingelheim?
14  A.   No.
15  Q.   So you indicated in 1994 through
16  1997 you became product manager for these
17  five products that you listed. Was that
18  considered a promotion?
19  A.   Yes.
20  Q.   Did you have sales representatives
21  working underneath you at that time?
22  A.   No.
23  Q.   Did you have sales representatives
24  reporting to you at that time?
25  A.   No.

47

1   Q.   Did you get any information from
2   the sales force during that time period?
3   A.   Yes.
4   Q.   What kind of information would you
5   get from the sales force during that time
6   period?
7   A.   **Competitive information.**
8   Q.   Any other types of information that
9   you would receive from the sales force?
10  A.   Not that I recall.
11  Q.   And what types of information did
12  you receive that you considered to be
13  competitive information?
14  A.   **Promotional activities.**
15  Q.   Anything else?
16  A.   No.
17  Q.   Did you receive competitive pricing
18  information from your sales force?
19  A.   I don't recall.
20  Q.   You don't recall one way or
21  another whether you did or did not?
22       MR. COVAL: Objection to form.
23  A.   Correct.
24  Q.   Is that -- Is competitive pricing
25  information something that you obtained in

48

1   your prior position before you became product
2   manager?
3       MR. COVAL: Objection to form.
4   A.   No.
5   Q.   Did you collect any competitive
6   information in your position as a regional
7   director of pharmaceutical affairs?
8   A.   Yes.
9   Q.   What kind of competitive
10  information did you collect during that 1991
11  to 1994 time period?
12  A.   **Promotional activities of**
13  **competition.**
14  Q.   And what kind of information did
15  that include when you say "promotional
16  activity"?
17  A.   **Clinical studies, file cards, leave**
18  **behind information.**
19  Q.   When you say "leave behind," is
20  that materials that another sales rep may
21  have left behind with one of your customers?
22  A.   Yes.
23  Q.   Did you obtain competitive pricing
24  information from any pharmacists during that
25  time period?

49

1   A.   No.
2   Q.   What about the 1994 to 1997 time
3   period, did you obtain any competitive
4   information from any pharmacists during that
5   time period?
6   A.   No.
7   Q.   So we just talked about the type
8   of sales force information that you received
9   during the 1994-1997 time period as a Roxane
10  product manager. What were your specific job
11  responsibilities as a Roxane product manager?
12  A.   **Developing promotional strategies**
13  **for the products, launching new products,**
14  **forecasts, sales forecasts, sales and**
15  **production forecasts.**
16  Q.   Let me clarify that. Forecasting
17  sales and production was one of your
18  responsibilities, correct?
19  A.   Yes.
20  Q.   Anything else that you can
21  remember, Tom?
22  A.   **Budget, expense budget. That's it.**
23  Q.   Did you have any responsibilities
24  for organizing sales meetings?
25  A.   No. I presented at sales

Page 50

```
 1   meetings.
 2      Q.   With respect to the first job
 3   responsibility that you mentioned, which was
 4   developing promotional strategies, how did you
 5   perform that job responsibility? What did
 6   you do?
 7      A.   We looked at what the competition
 8   was doing and developed promotional detail
 9   aids to counteract the detailing of our
10   competition as well as promote the benefits
11   of our products.
12      Q.   Were you involved in pricing as
13   part of the developing of promotional
14   strategies?
15      A.   Not that I recall.
16      Q.   Do you know whose responsibility at
17   Roxane developing pricing was during that time
18   period?
19      A.   I believe it was Ed Tupa.
20      Q.   Do you know if Ed worked with
21   anyone else with respect to pricing
22   information?
23      A.   I believe so.
24      Q.   Who else did he work with?
25      A.   I can't say with any degree of
```

Page 51

```
 1   certainty.
 2      Q.   So you mention that you looked at
 3   the competition, and you also developed detail
 4   aids during this time period. Was that
 5   specifically for the five products that you
 6   mentioned earlier, Oramorph SR, Roxanol,
 7   Roxicodone, Ipratropium Bromide UDV and
 8   Duraclon?
 9      A.   Yes.
10      Q.   During this time period, did the
11   detail aids contain information about pricing?
12      A.   Could you provide more detail in
13   your question, please?
14      Q.   Did the detail aids that you
15   helped develop during that time period contain
16   information relevant to the customer about the
17   cost, the acquisition cost for those products?
18           MR. COVAL: Objection to form.
19      A.   Acquisition to who?
20      Q.   To the person -- To the customer
21   who is being detailed?
22      A.   Yes.
23      Q.   And what kind of pricing
24   information would it have -- would it
25   contain?
```

Page 52

```
 1      A.   Wholesale acquisition pricing for
 2   Oramorph SR and MS Contin.
 3      Q.   What is MS Contin?
 4      A.   It's a sustained release morphine
 5   sulfate tablet.
 6      Q.   And is that an additional product
 7   that you had responsibility for during the
 8   1994 to the 1997 time period?
 9      A.   No, that was a competitive product.
10      Q.   So the detail aid that you're
11   referring to had wholesale acquisition cost
12   information for Oramorph SR?
13      A.   Yes, I believe.
14      Q.   Did that same detail aid also have
15   pricing information as to MS Contin?
16      A.   Yes.
17      Q.   Do you recall if that pricing
18   information for MS Contin was also the
19   wholesale acquisition cost for that product?
20      A.   I believe it was.
21      Q.   Did that detail aid also contain
22   any information about average wholesale price?
23      A.   I don't believe so.
24      Q.   Did it contain any other kind of
25   pricing information?
```

Page 53

```
 1      A.   No.
 2      Q.   And what was the purpose of
 3   including the WAC for Oramorph and the WAC
 4   for a competitive product?
 5      A.   To show the cost advantage of
 6   using Oramorph SR over the competition.
 7      Q.   When you say "cost advantage," are
 8   you referring to the cost advantage to the
 9   pharmacist?
10      A.   No, to the patient.
11      Q.   To the end user?
12      A.   Yes.
13      Q.   Do you know who the manufacturer
14   was for MS Contin?
15      A.   Purdue Frederick.
16      Q.   And was it your understanding that
17   the WAC for Oramorph was lower than the WAC
18   for MS Contin at that time period?
19      A.   Yes.
20      Q.   Were there any other detail aids
21   that you can recall that contained pricing
22   information?
23      A.   No.
24      Q.   Did any of those detail aids that
25   you helped develop during that time period,
```

Page 58

1  assigning it -- between you and Ed of
2  assigning it to another product manager?
3      A.   Yes, on my part.
4      Q.   And what were those conversations
5  involving?
6      A.   I felt that my time was pretty
7  much taken up by my current responsibilities,
8  and I wouldn't have time to launch the
9  product.
10     Q.   And what was Ed's response to your
11 concerns?
12     A.   He felt that I could handle it.
13     Q.   And so you were ultimately assigned
14 responsibility for the launch, correct?
15     A.   Yes.
16     Q.   And did you request assistance with
17 respect to the Ipratropium Bromide launch?
18 Did you request any assistance from Ed Tupa?
19     A.   I don't recall.
20     Q.   Did you receive any assistance
21 during the launch of Ipratropium Bromide from
22 any third parties?
23     A.   Yes.
24     Q.   From whom did you receive
25 assistance?

Page 59

1      A.   Boehringer Ingelheim as well as
2  Mark Pope.
3      Q.   With respect to the Duraclon
4  launch, which occurred in 1996, was that also
5  something that Ed Tupa assigned to you?
6      A.   Yes.
7      Q.   And did you receive any outside
8  assistance or third-party assistance during
9  that launch?
10     A.   Yes.
11     Q.   And from whom did you receive such
12 assistance?
13     A.   Our ad agency.
14     Q.   I'm sorry?
15     A.   The advertising agency.
16     Q.   Do you recall the name of that ad
17 agency?
18     A.   No.
19     Q.   Any other assistance that you
20 received for that particular product?
21     A.   No.
22     Q.   You mentioned Boehringer Ingelheim.
23 What kind of assistance did you receive from
24 Boehringer Ingelheim for the launch of
25 Ipratropium Unit Dose Vials?

Page 60

1      A.   The overview of the respiratory
2  market.
3      Q.   And which Boehringer Ingelheim
4  employees provided that assistance to you?
5      A.   I know there were several. One
6  that comes to mind is Scott Richardson.
7  Beyond that, I couldn't name any.
8      Q.   Do you recall what Scott's title
9  was during that time period with Boehringer
10 Ingelheim?
11     A.   I believe he was a product
12 manager.
13     Q.   Did he have familiarity -- Was it
14 your understanding that Scott Richardson had
15 familiarity with this particular market,
16 meaning chronic obstructive pulmonary disease
17 or breathing?
18     A.   Yes.
19     Q.   Is it also your understanding that
20 Boehringer Ingelheim had other products for
21 that market during that time period?
22     A.   Yes.
23     Q.   What were the other products that
24 Boehringer Ingelheim had?
25     A.   It was Atrovent MDI as well as

Page 61

1  Atrovent Unit Dose Vial.
2      Q.   Is it fair then to characterize
3  Ipratropium Bromide UDV as the generic of
4  Atrovent UDV?
5      A.   Yes.
6      Q.   Atrovent UDV was a Boehringer
7  Ingelheim product, correct?
8      A.   Correct.
9      Q.   What was Atrovent MDI? How does
10 Atrovent MDI differ from Atrovent UDV?
11     A.   Delivery mechanism.
12     Q.   How is Atrovent MDI delivered?
13     A.   A meter dose inhaler.
14     Q.   And how --
15     A.   That doesn't require additional
16 equipment for delivery of the medication.
17     Q.   What about Atrovent UDV, how is
18 that delivered?
19     A.   It's a vial of solution that's
20 placed into a nebulizer and is inhaled via
21 the nebulizer.
22     Q.   Ipratropium Bromide UDV would then
23 also be delivered using a nebulizer; is that
24 correct?
25     A.   Yes.

Page 62

Q. Was there any other assistance that you received from Boehringer Ingelheim, other than -- I know you said there were others --
A. Correct.
Q. -- including Scott Richardson. Can you be more specific as to the type of information he provided to you?
A. More specific than an overview? No.
Q. When you say "overview," you mean an overview of the respiratory market, correct?
A. Overview and history of Atrovent within that market.
Q. And what's your recollection of the history with respect to Atrovent in that market?
A. That there was a segment of the market that was overlooked on the launch of Atrovent.
Q. Which segment?
A. Home healthcare, and they addressed that.
Q. When you say "overlooked," does that mean that it was not -- Atrovent was

Page 63

not made available to that market?
A. It wasn't taken into consideration when production was planned.
Q. And was there a shortage as a result of that?
A. Yes.
Q. Do you recall how long of a time period that shortage continued?
A. No.
Q. You mentioned it was addressed, correct?
A. Yes.
Q. Do you know how it was addressed?
A. Just in discussion.
Q. No, I mean how was it addressed ultimately to alleviate the shortage, if it ever was?
A. I don't recall.
Q. There were discussions, though, apparently about the shortage?
A. Correct.
Q. Were you involved in those discussions?
A. I believe I was present, yes.
Q. And when you say you were present,

Page 64

are you referring to the time relative to the Ipratropium Bromide launch when you are getting the overview and the historical perspective?
A. Yes.
Q. So did you have meetings, actual meetings, where you met with these BI employees?
A. To the best of my knowledge, just one meeting.
Q. And do you recall approximately when that meeting occurred?
A. It would have been prior to the launch, so I can't give you an exact date.
Q. Would it be months before the launch?
A. Yeah, probably so.
Q. And do you recall the location of that meeting?
A. Roxane.
Q. And was that in Connecticut then?
A. No, I'm sorry, it was in Roxane Laboratories at Columbus, Ohio.
Q. And do you recall who was in attendance? I know you said that Scott

Page 65

Richardson was there, but were there other Roxane employees?
A. There were other BI employees, and then I believe Ed Tupa was there. I'm sure there were other Roxane employees, but I don't recall who they were.
Q. The other -- You also mentioned Mark Pope as a third party that was brought in. What was your understanding of the role Mark Pope was supposed to play?
A. He was an outside consultant to help develop the marketing plan for the product.
Q. And who brought Mark Pope in?
A. I can't be certain who brought him in.
Q. Did Ed Tupa? Do you know if Ed Tupa played any role in bringing Mark Pope aboard?
A. I would assume so, but I don't know that with any degree of certainty.
Q. And so did you work directly with Mark Pope during this launch period for Ipratropium Bromide UDV?
A. Yes.

86

1  national presence or more of a regional
2  presence?
3     A.  More of a regional.
4     Q.  So that would be throughout
5  Wisconsin or other states?
6     A.  Primarily Wisconsin with a presence
7  in Montana.
8     Q.  Somebody has to be in Montana,
9  right?
10    A.  I guess.
11    Q.  So we have that you called on
12 group-purchasing organizations during that time
13 period, and then you also picked up this
14 regional wholesaler, D&K, and then a regional
15 drugstore, ShopKo. Were there any other
16 responsibilities during this time period?
17    A.  No.
18    Q.  And what is your understanding of
19 how Roxane's sales force changed, if at all,
20 during this 1997-2000 time period?
21    A.  It was approximately toward the end
22 of 2000, I believe Roxane limited their
23 palliative care sales force.
24    Q.  And you called that the palliative
25 care sales force; is that correct?

87

1     A.  Correct.
2     Q.  And how many members were there of
3  the palliative sales force in 2000?
4     A.  Approximately 35 to 50. Then
5  there was an HIV sales force also that was
6  approximately the same size that moved over
7  to Boehringer Ingelheim as a complete sales
8  force.
9     Q.  And when you say "to Boehringer
10 Ingelheim," do you mean the company we're
11 referring to as BIPI?
12    A.  Correct.
13    Q.  And how large was the HIV sales
14 force at that time?
15    A.  I believe they were approximately
16 35 to 50 as well.
17    Q.  And the palliative sales force that
18 was eliminated around the 2000 time period,
19 what products were they -- Let me ask you
20 this: Were they detailing up to 2000?
21    A.  Yes.
22    Q.  And what product were they
23 detailing?
24    A.  Oramorph SR, Roxanol, Roxicodone.
25 I believe that's it.

88

1     Q.  Who was in charge of that sales
2  force?
3     A.  Mark Shaffer.
4     Q.  Was he in charge in the 2000 time
5  period?
6     A.  Yes, I believe he was.
7     Q.  Do you know -- I may have asked
8  you this earlier. Do you know if Mark
9  Shaffer is still with Roxane?
10    A.  No, he is not.
11    Q.  Do you know if he's with
12 Boehringer Ingelheim or BIPI?
13    A.  Yes, he's with BIPI.
14    Q.  Do you know in what capacity he is
15 employed by BIPI?
16    A.  Director of senior care, I believe
17 is his title.
18    Q.  And do you know where Mark Shaffer
19 is based now?
20    A.  Richfield, Connecticut.
21    Q.  How many other national account
22 managers were there during the 1997 to 2000
23 time period?
24    A.  Four, I believe.
25    Q.  And who were they, if you can

89

1  recall?
2     A.  Mike Doan, Dawn Gordon, Colin
3  Carr-Hall, Anthony Tavolaro, and then we also
4  had Steve Snyder, Penny Hawthorne. That's it
5  for national account managers.
6     Q.  And who did you report to during
7  the 1997-2000 time period?
8     A.  I reported to three different
9  people.
10    Q.  And who were those people?
11    A.  Initially it was Gerry Walsh, with
12 a G, I believe, Bob Sykora, Rich Feldman.
13    Q.  And did you report to all three
14 during the same time period?
15    A.  You mean simultaneously?
16    Q.  Correct.
17    A.  No.
18    Q.  You reported to each of these
19 three individuals at some point during the
20 '97 through 2000 time period, correct?
21    A.  Correct.
22    Q.  Who was your first --
23    A.  Gerry Walsh.
24    Q.  And then Bob Sykora?
25    A.  Correct.

**Page 150**

1  MS. NEMIROW: This is Kim Nemirow.
2  Can we get the Bates number on Exhibit 5,
3  please?
4  MR. GOLDENBERG: On five? That is
5  ROX-CA 002090 and ROX-CA 002091.
6  MS. NEMIROW: Thank you.
7  MR. GOLDENBERG: Sure.
8  Now we're on Exhibit 6. This is
9  -- The front page of this is a fax
10 transmission from Pope & Associates to Tom
11 Via from Mark Pope dated April 9, 1996, Bates
12 No. ROX-CA 002094. The second page begins
13 with a Ipratropium Bromide UDV market overview
14 and runs all the way through ROX-CA 002112,
15 and it appears to relate to the product
16 launch of Ipratropium Bromide UDV.
17 THE WITNESS: Okay.
18 BY MR. GOLDENBERG:
19 Q. If you would, this document --
20 taken in conjunction with the prior document,
21 which was Exhibit 5 -- in that first sentence
22 in particular in Exhibit 5 where Mark Pope
23 says to you, "Thanks for the fax of the
24 proposed IBUDV product launch," do you see
25 that?

**Page 151**

1  A. Yes.
2  Q. Is this, what we're now calling
3  Exhibit 6, if you take away the first page,
4  which is the fax memorandum, the next series
5  of pages beginning with ROX-CA 002095 through
6  2112, do you see those pages?
7  A. Yes.
8  Q. Is that a draft version of the
9  Ipratropium Bromide product launch?
10 A. Yes.
11 MR. COVAL: I would object. Are
12 you asking -- Just so I'm clear, Jeff, are
13 you asking whether this is the document that
14 Pope refers to in the March 28th --
15 MR. GOLDENBERG: Yeah, that's one
16 way to phrase it.
17 THE WITNESS: That, I don't know.
18 MR. COVAL: This is April 9, that
19 would have been after that.
20 THE WITNESS: I don't know if this
21 is the document that he refers to.
22 MR. COVAL: Date-wise it would be
23 inconsistent.
24 BY MR. GOLDENBERG:
25 Q. This is a version -- When I say

**Page 152**

1  "this," Exhibit 6 is a version of the
2  Ipratropium Bromide UDV product launch,
3  correct?
4  A. In draft form, yes.
5  Q. Whether it's the same draft version
6  that Mark Pope is referring to in Exhibit 6,
7  it doesn't appear to be correct?
8  MR. COVAL: Exhibit 5 you mean.
9  A. Correct, I don't know if it is the
10 same or not.
11 Q. Okay. Specifically with respect to
12 Exhibit 6, do you recognize this document as
13 something that you received during your time
14 at Roxane?
15 A. I don't recall that I did, but the
16 fax was addressed to me.
17 Q. You don't have any reason to
18 believe that you wouldn't have received this,
19 correct?
20 A. No. And, in fact, there are
21 notations that are my handwriting.
22 Q. Where do you see such notations?
23 Can you give us the Bates number on the
24 bottom?
25 A. ROX-CA 002098.

**Page 153**

1  Q. And you're talking about -- There
2  is a series of numbers written off on the
3  left-hand side; is that right?
4  A. Yes.
5  Q. What you're saying is that is your
6  handwriting, correct?
7  A. Yes.
8  Q. Based on your review of this
9  document, what is it?
10 A. It is the -- It's a draft of the
11 marketing -- or the launch plan for marketing
12 Ipratropium Bromide Unit Dose Vials.
13 Q. And this particular draft contains
14 bold script comments from Mark Pope, correct?
15 MR. COVAL: Objection to form.
16 A. Based on his comment on the fax
17 memorandum, yes.
18 Q. And your assessment of this
19 document is based on your review of it,
20 correct?
21 A. Correct.
22 Q. When do you recall last seeing
23 this document prior to today outside of a
24 privilege?
25 A. I don't recall seeing it.

154

1  Q. If you look at the top of the
2  front of that fax cover sheet, and you see
3  what appears to be some scribble there next
4  to the name Mark Pope, do you recognize that?
5  A. That's Mark's initials or
6  signature. I don't know if it was his full
7  signature or just initials.
8  Q. And do you have a recollection of
9  accepting most of the changes or suggestions
10 that Mark Pope made in this draft?
11     MR. COVAL: Objection.
12 A. I don't have a recollection one
13 way or the other.
14 Q. So you may have, but you just
15 don't recall?
16     MR. COVAL: Objection.
17 A. Correct.
18 Q. Okay. I'm finished with that
19 document.
20     MR. GOLDENBERG: This is Exhibit
21 7. We're on Exhibit 7, which is Bates RoxCT
22 0060403 through RoxCT 0060419, and it is on
23 the front page entitled "Ipratropium Inhalation
24 Solution UDV Marking Plan," and it says,
25 "Prepared by Tom Via," and it's dated April

155

1  17, 1996.
2     BY MR. GOLDENBERG:
3  Q. Are you finished, Tom?
4  A. Yes.
5  Q. Do you recognize this document as
6  one that you would come across or produce
7  during your time period at Roxane?
8  A. Yes.
9  Q. What is this document?
10 A. It's the marketing plan for the
11 launch of Ipratropium Bromide Unit Dose Vials
12 for Roxane Laboratories.
13 Q. And your assessment of this
14 document is based on your review of it,
15 correct?
16 A. Yes.
17 Q. And when do you last recall seeing
18 this document prior to today outside of a
19 privileged situation?
20 A. It would have been preparation for
21 the Texas deposition.
22     MR. COVAL: That's privileged.
23     THE WITNESS: Is it?
24     MR. COVAL: Yes. Aside from that.
25     THE WITNESS: What about at the

156

1  deposition itself?
2     MR. COVAL: At the deposition
3  itself is fine.
4     THE WITNESS: I don't remember if
5  I did or not.
6     MR. COVAL: Well, that's your
7  answer.
8     THE WITNESS: I can't recall the
9  specific date, but I have seen this before.
10    BY MR. GOLDENBERG:
11 Q. Okay. Let's move on then. Was
12 this document -- This document was prepared
13 by you, correct, because it has your name on
14 the bottom?
15 A. Correct.
16 Q. This was prepared in the regular
17 course of your business activities with
18 Roxane, correct?
19 A. Correct.
20 Q. And also this was prepared as part
21 of your regular job duties, responsibilities
22 with Roxane, correct?
23 A. Correct.
24 Q. And when was this document created?
25 A. It was dated April 17, 1996. I

157

1  have no reason to believe it wasn't anything
2  other than that date.
3  Q. And this is -- I just want to be
4  clear. This is a document that you prepared,
5  correct?
6  A. Well, yeah.
7  Q. You are the author of this
8  document, correct?
9  A. Yes, with input from others.
10 Q. Okay. From whom did you receive
11 input?
12 A. I would have received input from
13 Ed Tupa and from Mark Pope based on the
14 previous exhibit that you showed me.
15 Q. Okay. After reviewing this
16 document, which is Exhibit 7, do you recall
17 now whether you adopted most of Mr. Pope's
18 suggestions?
19 A. It appears as though that was the
20 case.
21 Q. A few questions about this
22 particular document. If you go to the first
23 page and you look at the heading, it says,
24 "Market overview." Do you see that?
25 A. Yes.

1    Q.   You go down to the third
2    paragraph, which starts, "According to BIPI."
3    A.   Yes.
4    Q.   Why don't you go ahead and read
5    that paragraph?
6    A.   "According to" --
7    Q.   You don't need to read it into the
8    record. You can read it to yourself. I am
9    going to ask you a couple of questions.
10   A.   All right. Thanks. Okay.
11   Q.   This paragraph, does this give you
12   -- It appears that what you are trying to do
13   here -- tell me if I'm correct or not -- is
14   give some history as to Atrovent UDV, and
15   there was a supply problem that occurred soon
16   after the launch; is that correct?
17   A.   Correct.
18   Q.   What is your understanding of what
19   happened with respect to that shortage?
20   A.   When Boehringer launched the
21   product, they overlooked the health home care
22   product, and they built capacity, manufacturing
23   capacity, around the market that they were
24   aware of, which, based on this, was primarily
25   the hospital market. The home care market

1    was overlooked, resulting in a greater demand
2    than what was anticipated for the product,
3    and production capacity couldn't meet the
4    demand.
5    Q.   So was it your understanding, as a
6    result of being the person responsible for
7    the launch or overseeing the launch of
8    Ipratropium Bromide UDV for Roxane, that as a
9    result of that shortage compounding Ipratropium
10   Bromide became more common?
11        MR. COVAL: Objection.
12   A.   I don't know if it became more
13   common. It just wasn't displaced. If it
14   had been going on before, the commercially
15   available product didn't displace the practice
16   of compounding.
17   Q.   So home care agencies may have
18   been compounding prior to the launch of
19   Atrovent UDV, you just don't know; is that
20   right?
21   A.   Correct.
22   Q.   And then the last sentence in that
23   paragraph, it says, "This system was in
24   effect until the new RT lines were installed
25   at Roxane, and beginning in October of 1995,

1    the allotments were lifted." Is that
2    correct?
3    A.   That's what it says, yes.
4    Q.   So Roxane was producing Atrovent
5    UDV at a certain point; is that correct?
6    A.   Yes.
7    Q.   What are the RT lines, if you
8    know?
9    A.   I believe RT stand for respiratory
10   therapy.
11   Q.   And so those would have been
12   additional lines that were created at that
13   point; is that right?
14   A.   Correct.
15   Q.   And then if you would turn to the
16   second page, which is RoxCT 0060405, and look
17   at that first full paragraph.
18   A.   What was that number again?
19   Q.   It just is the second page. Are
20   you missing it? 60405.
21   A.   Oh, okay. Sorry. All right.
22   Q.   The reason you see multiple Bates
23   numbers is because this was produced in more
24   than one case, and we gave it two different
25   Bates numbers.

1         What is this paragraph relating to?
2    A.   Which paragraph?
3    Q.   The first full paragraph. Take
4    your time if you need to review it.
5    A.   Okay.
6    Q.   This paragraph is referring to a
7    portion of the potential market for
8    Ipratropium Bromide UDV known as the
9    compounding market; is that correct?
10   A.   I think it really pertains to the
11   total market, not just the compounding. It
12   does mention the compounding, but it does
13   show that the home healthcare segment of the
14   market is not reporting to IMS, and that's
15   the 40 percent of the market -- or 40
16   percent of the Boehringer Ingelheim sales
17   weren't captured by IMS. So, I mean, it's
18   just more than addressing compounding, it's
19   addressing the total market.
20   Q.   Part of that total market is made
21   up of those pharmacies or home care
22   pharmacies that were compounding, correct?
23   A.   Yes.
24   Q.   And it potentially is a significant
25   number of business; is that correct?

162

1  A.  That's what it states, yes.
2  Q.  If you would look at the last
3  sentence in that paragraph and read that
4  please?
5  A.  Into the record?
6  Q.  Yes.
7  A.  "It is likely that Roxane could
8  capture a significant portion of the
9  compounding market, providing the pricing
10 provides a large enough spread to maintain
11 acceptable profit levels."
12 Q.  Okay. With respect to your use of
13 the word "spread," what are you referring to
14 there?
15 A.  I'm not 100 percent certain what I
16 am referring to, but I can tell you what I
17 believe it is.
18 Q.  Are you referring to the spread
19 between the acquisition cost and the AWP?
20 A.  I believe that's what it is.
21 Q.  And when you say "profit levels,"
22 you are referring to the profit levels of the
23 home healthcare or the large home care
24 pharmacies that you reference earlier in that
25 paragraph, correct?

163

1  A.  The way it is stated here, yes.
2  Q.  So this would be an example, or
3  one instance at least, where the term
4  "spread" was utilized in a Roxane marketing
5  plan, correct?
6  A.  It was mentioned, yes.
7  Q.  And then, if you would, turn to
8  page .RoxCT 0060407.
9  A.  Okay.
10 Q.  And look -- There is a heading
11 there that says, "Pricing," correct?
12 A.  Correct.
13 Q.  Take a minute just to review that
14 first paragraph under the pricing heading.
15 A.  Okay.
16 Q.  In your earlier testimony today we
17 talked a little bit about what role, if
18 anything, you can recall that you played in
19 pricing.
20 A.  Right.
21 Q.  And I believe you said you didn't
22 have any recollection at that time of any
23 role that you played?
24 A.  Right.
25 Q.  It appears that, from the document

164

1  that you're the author of, you were having
2  some input into the pricing process; is that
3  correct?
4       MR. COVAL: Objection.
5  A.  It appears I made a recommendation,
6  yes.
7  Q.  What was that recommendation based
8  on from your review of this?
9  A.  That the AWP be established at 10
10 percent less than the brand or Atrovent Unit
11 Dose Vial and the WAC will be AWP less 40
12 percent.
13 Q.  Specifically with the AWP price
14 that you recommend here, that's consistent
15 with the document you saw earlier?
16 A.  Which document?
17 Q.  Let's go back and look at it,
18 because I'm not sure which one it was,
19 specifically where Mark Pope made a
20 recommendation of 10 percent less than the
21 brand. Let me see if I can find that for
22 you. It would be, I think, Exhibit 3,
23 February 23, 1996, Pope & Associates.
24 A.  The Denver trip report?
25 Q.  Correct.

165

1  A.  All right.
2  Q.  The second bullet point under
3  discussion points.
4  A.  Okay.
5  Q.  Do you see where it says, "I think
6  10 percent would be best?" Is that an
7  accurate reading?
8  A.  Yes.
9  Q.  Just to be clear, the entire
10 bullet reads, "Talley suggested that AWP
11 should be set at no lower than 20 percent
12 less than the brand.  I think 10 percent
13 would be best," correct?
14 A.  Correct.
15 Q.  And so in the actual memo or
16 marketing plan for the launch, which we're
17 looking at as Exhibit 7, brand less 10
18 percent is the AWP price that you were
19 recommending, correct?
20 A.  Correct.
21 Q.  And then you go on to make a
22 recommendation for WAC, which will be AWP
23 less 40 percent, correct?
24 A.  Correct.
25 Q.  And if a customer were to purchase

**Page 166**

1  at WAC a 25-count package, then that price
2  would come out to $26.44, correct?
3      A.   Correct.
4      Q.   And then I do have a question.
5  Again the term "spread" comes up in the next
6  sentence, which reads, "The reason this type
7  of price structure is used for generic launch
8  is to create an attractive spread between WAC
9  and AWP encouraging accounts to convert from
10 the brand name to generic product as quickly
11 as possible." Here, again, you're talking
12 about spread as being defined as the
13 difference between WAC and AWP, correct?
14     A.   Correct.
15     Q.   And how does this type of price
16 structure -- and I'm quoting your language
17 there -- create an attractive spread which
18 would then encourage accounts to then convert
19 from the brand to the generic?
20     A.   That would be profit for the
21 account, and they would -- If they were
22 making more money, they would be more likely
23 to convert from brand to generic.
24     Q.   So they would make more profit by
25 distributing to their customers the generic

**Page 167**

1  brand versus the brand?
2      A.   Yes.
3          MR. COVAL: Objection to form.
4      Q.   Then if you would look at this
5  same page where it says the wholesaler
6  heading.
7      A.   Uh-huh.
8      Q.   Go to that last paragraph where it
9  starts, "To obtain," do you see that?
10     A.   Yes.
11     Q.   It's a fairly short paragraph, and
12 it goes on to the next page. Why don't you
13 review that. You don't need to read it into
14 the record.
15     A.   Okay.
16     Q.   So, based on this paragraph, you're
17 making the recommendation as to wholesalers in
18 particular that Ipratropium Bromide UDV should
19 be placed on a wholesaler's source program
20 with an additional 10 percent rebate, bringing
21 the total price or the wholesaler price to
22 $23.80, correct?
23     A.   Correct.
24     Q.   If the wholesaler price is going
25 to be $23 -- What you're saying here is you

**Page 168**

1  established what the wholesaler price should
2  be prior to launch, correct? You're making a
3  recommendation it should be $23.80, correct?
4          MR. COVAL: Objection.
5      A.   For the source programs.
6      Q.   Do all wholesalers have source
7  programs or only some?
8      A.   I don't know.
9      Q.   You don't know. So it's possible
10 some wholesalers were getting it at 23.80?
11     A.   Yes.
12     Q.   But maybe not all, is that what
13 you're saying?
14     A.   Yes.
15     Q.   I think that's it for that. How
16 are you doing on your ability to --
17         MR. COVAL: Take a break.
18         (Recess taken.)
19         MR. GOLDENBERG: We're on Exhibit
20 8. This is a short document. It's two
21 pages. It's an interoffice memo from Tom Via
22 to Ed Tupa dated April 28, 1996, the subject
23 of which is Ipratropium Bromide UDV pricing
24 strategy for legal review. And it is Bates
25 No. ROX-CA 001981 through ROX-CA 001981.

**Page 169**

1          THE WITNESS: Okay.
2          BY MR. GOLDENBERG:
3      Q.   And if you would -- Let me ask
4  you a couple preliminary questions, Tom. You
5  recognize this document as something you
6  created during your time at Roxane, correct?
7      A.   Yes.
8      Q.   And based on your review of this
9  document, what is it?
10     A.   It appears to be a memo to Ed
11 Tupa regarding pricing strategy. It says for
12 legal review. Without reading the whole
13 thing, I'm not sure.
14     Q.   You're not sure. You can take the
15 time to review it to make sure that is an
16 accurate assessment. In fact, I want you to.
17     A.   Okay. I'm ready to go.
18     Q.   So what is this document?
19     A.   This was a document that was put
20 together for Ed to take to our attorneys for
21 review to make sure that it was going to
22 pass the Robinson-Patman test. And at the
23 time our attorney that was working on that --
24 Can I say that, who the attorneys were?
25         MR. COVAL: You can say who they