**TAB 27**

Page 308

[1] CAUSE NO. GV002327
[2] THE STATE OF TEXAS ) IN THE DISTRICT COURT
    ex rel. )
[3] VEN-A-CARE OF THE )
    FLORIDA KEYS, INC., )
[4] Plaintiffs, )
[5] VS. ) TRAVIS COUNTY, TEXAS
[6] DEY, INC.; ROXANE )
    LABORATORIES, INC.; WARRICK )
[7] PHARMACEUTICALS CORPORATION; )
    SCHERING-PLOUGH CORPORATION; )
[8] SCHERING CORPORATION; )
    LIPHA, S.A.; MERCK-LIPHA, S.A.;)
[9] MERCK, KGAA; AND EMD )
    PHARMACEUTICALS, INC., )
[10] Defendants. ) 53RD JUDICIAL DISTRICT
[11]
     ORAL AND VIDEOTAPED DEPOSITION OF
[12]
     JUDY WATERER
[13] VOLUME II
     APRIL 1ST, 2003
[14]
[15] ORAL AND VIDEOTAPED DEPOSITION OF
[16] JUDY WATERER, produced as a witness at the instance of
[17] the State of Texas and duly sworn, was taken in the
[18] above-styled and numbered cause on the 1st of April,
[19] 2003, from 9:06 a.m. to 6:10 p.m., before
[20] Debra L. Sietsma, CSR in and for the State of Texas,
[21] reported by machine shorthand, at the offices of
[22] Vorys, Sater, Seymour & Pease, L.L.P., 2100 One
[23] Cleveland Center, Cleveland, Ohio, pursuant to the
[24] Texas Rules of Civil Procedure and the provisions as
[25] previously set forth.

Page 309

[1] APPEARANCES
[2]
[3] FOR THE PLAINTIFF, STATE OF TEXAS:
[4]    MS. CYNTHIA O'KEEFFE
       Office of the Attorney General
[5]    State of Texas
       Post Office Box 12548
[6]    Austin, Texas 78711-2548
[7] FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8]    MR. JARRETT ANDERSON
       Attorney at Law
[9]    2411 Hartford Road
       Austin, Texas 78703
[10]
     FOR DEFENDANT DEY, INC.:
[11]
     MS. LEILA R. PITTAWAY
[12]   Coudert Brothers
       1114 Avenue of the Americas
[13]   New York, New York 10036-7703
[14] FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15]   MR. STEPHEN E. McCONNICO
       MR. R. ERIC HAGENSWOLD
[16]   Scott, Douglass & McConnico, L.L.P.
       One American Center, Fifteenth Floor
[17]   600 Congress Avenue
       Austin, Texas 78701
[18]
         - and -
[19]
       MR. PAUL J. COVAL
[20]   Vorys, Sater, Seymour and Pease, L.L.P.
       52 East Gay Street
[21]   P.O. Box 1008
       Columbus, Ohio 43216-1008
[22]
     FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
[23] SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[24]   MR. JOHN P. MCDONALD
       Locke Liddell & Sapp, L.L.P.
[25]   2200 Ross Avenue, Suite 2200
       Dallas, Texas 75201-6776

Page 500

 1  A: To me, when I hear "Medicaid," what comes to
 2  my mind is Medicaid rebate. That's — that's the
 3  relationship our company has with Medicaid.
 4  Q: Do you recall approximately when Roxane began
 5  considering doing an across-the-board WAC decrease on
 6  dozens of SKUs?
 7  A: I know we did it. We did a small subset
 8  first and then the whole rest of it. I don't remember
 9  the specific time frame.
10     (Exhibit 855 marked).
11  Q: (BY MR. ANDERSON) Ms. Waterer, I'm going to
12  hand you what's been marked as Deposition Exhibit 855,
13  ROX-TX-14599 sequentially through 14608. It's a
14  composite exhibit, and it was produced by Roxane in
15  this litigation.
16     Steve, you're welcome to take a look at
17  it, if you want.
18  MR. MCCONNICO: Thank you.
19  MR. ANDERSON: I've highlighted some
20  portions of it.
21  MR. MCCONNICO: Thank you.
22  MR. ANDERSON: Sure.
23  Q: (BY MR. ANDERSON) You're welcome to review
24  the entire exhibit, Ms. Waterer.
25  A: Thank you.

Page 501

 1  Q: My first question is: This document has a
 2  cover letter dated March 13th of 1998; is that
 3  correct?
 4  A: Yes.
 5  Q: And the first bullet point is "WAC/AWP
 6  Changes." Is that correct?
 7  A: Correct.
 8  Q: And then attached to the letter is a listing
 9  of — of all of Roxane's drugs and the new AWP, the
10  new WAC, the old AWP and the old WAC. Is that
11  correct?
12  A: Yes. I — I think it's all of the products.
13  I don't know if there were a couple left off the
14  change.
15  Q: All right. But you don't have any reason to
16  think that there were any products left off here, do
17  you?
18  A: I — I really don't remember.
19  Q: Okay.
20  A: I don't know if that's the whole list or just
21  the ones that were changed. I know it's the ones that
22  were changed.
23  Q: But there are some on here that didn't change
24  at all, correct?
25  A: I didn't see it —

Page 502

 1  Q: You haven't had a chance to —
 2  A: — in that much detail but —
 3  Q: Okay. Well, we're going to get into that;
 4  and we may point out a few that didn't change at all.
 5     Now, that's dated March 13th of '98; and
 6  that's when the WAC decrease and the AWP changes were
 7  implemented, correct?
 8  A: Yes.
 9  Q: And that was not only sent to Roxane's
10  customers, but that was sent to the pricing services?
11  A: Yes.
12  Q: Was this sent to First DataBank?
13  A: Rich would have sent it. He was doing all
14  the communications with First DataBank at that point.
15  It would have been his responsibility to send it. I
16  would have to assume that he did send it.
17  Q: Well, since in December of '97 Roxane had
18  chose to no longer publish WAC prices to First
19  DataBank, would Roxane have sent those new WACs?
20  A: They would have sent just the AWPs then.
21  Q: Right. Just the AWPs?
22  A: Correct.
23  Q: Okay.
24  A: I believe so.
25  Q: Now, I also would like to point your

Page 503

 1  attention to Tupa Exhibit 652; and this was a two-page
 2  exhibit, ROX-TX-01264 and 1265.
 3     Steve?
 4  MR. MCCONNICO: No.
 5  Q: (BY MR. ANDERSON) Okay. This was used in
 6  the deposition of Mr. Tupa, your former boss; and it's
 7  written by you to Mr. Gerstenberg, and you copied
 8  Mr. Tupa. It's dated February 7th, '98 —
 9  A: Okay.
10  Q: — titled "WAC Adjustment Implementation
11  Update." If you could, take a look at that, and then
12  I'll have some questions about that as well.
13     Do you recall roughly when Roxane
14  started analyzing whether or not they should do a WAC
15  adjustment?
16  A: When they started, no.
17  Q: Would it have been several months prior to
18  February 7th of '98?
19  A: I believe — I — I believe it's even
20  referred to in here. We did something that we called
21  baby WAC and big WAC; and baby WAC was run the year
22  before we implemented the big WAC, as a trial balloon.
23  If big WAC happened in '98, baby WAC would have been
24  third or fourth quarter '97.
25  Q: And when you say "baby WAC," are you

Page 516

A: Uh-huh.

Q: Wouldn't it be appropriate on this generic drug, hydrochlorothiazide, for a Medicaid program to base reimbursement on a WAC there?

MR. MCDONALD: Object to the form.

THE WITNESS: It's — one could argue whether it's a generic drug.

Q: (BY MR. ANDERSON) Okay. Well, is that the WAC that's being charged in the marketplace?

A: WAC is the price that wholesalers buy every one of our products for.

Q: And you've raised the WAC on that product because the market prices have gone up, correct?

A: We've raised the price on that product, it looks like, probably by consumer price index, because it's like a brand product.

Q: And if a Medicaid program didn't pay off of WAC on that product, would your customers be upset?

MR. MCDONALD: Object to the form.

THE WITNESS: I — I don't know what would or wouldn't upset them if they didn't base it on WAC and based it on something else that made sense. I don't think anybody would object. I don't know. I — I don't — I — I didn't set this up. It was in existence before I think generics even began.

Page 517

Q: (BY MR. ANDERSON) When you were at Roxane, you controlled the AWP and the WAC prices, correct?

MR. MCCONNICO: Objection, form.

THE WITNESS: I had influence over them.

Q: (BY MR. ANDERSON) You set those prices; and then ultimately Ed Tupa authorized the publishing of those prices, correct?

A: I instituted changes to the prices, and on new-launch products I set them; but I did not create the pricing that was there prior to me getting there.

Q: Well, that's a good point. And, for instance, we had questioning today about hydromorphone.

When you got to Roxane, you raised the AWP on that generic product, didn't you?

A: Yes.

Q: And that went out and Medicaids reimbursed based upon that increased AWP?

A: I brought the AWP into standard with everybody else so that we not — were not getting discriminated against in purchasing decisions. Did I go out and set a new price that was designed to impact the reimbursement on a program I didn't know existed to influence a buying decision, no. I just leveled the playing field. I tried to take away a

Page 518

disadvantage because analysis said that was causing it. Apparently the systems that were in place were forcing us to be disadvantaged.

Q: When you lowered the WAC on the haloperidol product from $450 to $33, did you notify the Medicaids of that decrease?

A: I don't notify Medicaid of anything.

Q: Did you notify First DataBank of that decrease?

A: We don't report WACs to First DataBank.

Q: Did you report to First DataBank the increase in AWP?

A: We report AWPs, whether they go up or down or stay the same, to First DataBank.

Q: Well, that's a good point.

If you could, do you know whether or not a single AWP of all these drugs listed in 855 went down?

A: No.

Q: Not a single one?

A: I don't know. I'd have to go through and look at it.

Q: But, yet, several went up, didn't they?

A: On the brand products they went up. I don't know if any went down. I'd have to study it.

Page 519

Q: Well, take your time. Flip through that and tell me if any of those AWPs went down.

A: There's nine pages. I'm on Page 6. I haven't found one; so if any did, it would have been very few.

Q: All right. Now, earlier I mentioned briefly if you knew a gentleman named Jim Rowenhorst; is that right?

A: Yes.

Q: And your — your response was that you had heard the name but you couldn't —

A: I probably met him; but he's not somebody that I know well enough that, if I saw him again, I'd be "There's Jim."

Q: All right.

A: He would be familiar to me.

Q: Have you reviewed some documents recently pertaining to communications you had with Mr. Rowenhorst?

A: I don't think so, no.

Q: Have you reviewed any documents recently that pertained to the WAC and AWP changes implemented in March of '98?

A: I don't think so. I don't recall.

Q: If I could, I'd like you to take a look at

Page 580

with it?" I wouldn't have seen the proposal.

Q: Would the spreadsheet that you would have reviewed also had competitors' competing offers on a product as well as their AWP?

A: Currently — well, we've had so many different ways of doing it. Oh, I'm sorry. I don't know if it would be on the spreadsheet; but we would try to have that information so we could understand where the market was set, figuring we'd have to meet or beat that to be competitive.

Q: In making that analysis as to how to be competitive, would you analyze your competitors' bid prices?

A: Yes.

Q: In making that analysis as to how to be competitive, would you analyze your competitors' AWPs?

A: No.

Q: Then how would you go about addressing GeriMed's concern that there be a increased revenue through a better spread?

A: I think that's their issue in their decision-making. I never saw that. I just agree or — I — I would approve or disapprove pricing and

Page 581

terms on the bid.

Q: Other than the marketing department, was there any other department at Roxane that controlled the setting and publication of AWP pricing?

A: Over time — let me think. For the duration of time that I was there, the responsibility very quickly shifted to me. The publication of it — contracts handled some kinds of notifications, and Rich Feldman handled some kinds of reporting. Over time it varied.

Q: Other than the marketing department, were there other departments at Roxane that controlled the setting and publication of WAC pricing?

A: I think that would be the same answer.

Q: Now, if I could, I'll — I'll draw your attention to page ROX-TX-04066, which also is part of Exhibit 251, and I'll read this for the benefit of the jury.

"Reimbursement Assistance. The GeriMed binder and emphasis system provide item-by-item detailed printouts and screens with the state MACs and calculations per state. The GeriMed program identifies the lowest-cost product and the best spread for the particular state."

Did I read that correctly?

Page 582

[1] A: Yes.
[2] Q: Would you have had any involvement in
[3] addressing GeriMed's concerns regarding the best
[4] spread in that context?
[5] A: It sounds to me like GeriMed was providing
[6] this information to their own members, so no. I don't
[7] recall even ever seeing this document, so I couldn't
[8] have done anything to respond to it.
[9] Q: Are you aware that in the generic industry,
[10] and the brand industry, for that matter, that GeriMed
[11] would provide information such as the difference
[12] between AWP and cost to its members?
[13] A: No.
[14] Q: Are you aware that in the pharmaceutical
[15] industry that wholesalers would provide information to
[16] their pharmacy customers regarding the spread between
[17] AWP and cost on pharmaceuticals?
[18] MR. MCDONALD: Object to the form.
[19] THE WITNESS: I know they published —
[20] or at least I used to know. When I was calling on
[21] them, I saw that they frequently published AWPs and
[22] they frequently published what their price in the
[23] catalog was going to be to the customer. I don't
[24] recall them ever putting an association between the
[25] two.

Page 583

[1] Q: (BY MR. ANDERSON) Have you ever seen or
[2] heard about software that major wholesalers offer to
[3] their customers?
[4] A: Wholesalers derive a significant portion of
[5] their earnings from software systems that they supply
[6] their customers, yes.
[7] Q: So you're aware that they are offering that
[8] type of service?
[9] A: I'm aware that they're offering software. My
[10] understanding of the software that — software that
[11] they were offering, as far as I understood it, was
[12] more efficient ways to order. I don't know — I have
[13] no knowledge of wholesalers supplying a software
[14] package that would tell a customer how to cherry-pick
[15] a product, so I don't know.
[16] Q: Have you — have you ever heard of the fact
[17] that softwares — strike that.
[18] Have you ever heard of the fact that
[19] wholesalers offer software to pharmacy customers that
[20] calculates the spread between AWP and cost on NDC
[21] numbers?
[22] A: I —
[23] MR. MCDONALD: Object to the form.
[24] MR. HAGENSWOLD: Object to form.
[25] THE WITNESS: I'm not really aware of