**TAB 29**

# Judy Waterer
## May 9, 2007

          IN THE CIRCUIT COURT OF
          MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,
      Plaintiff,
vs.              CIVIL ACTION NO. 2005-219
ABBOTT LABORATORIES, INC.,
et al.,
      Defendants.

----------------------------------------

  IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
            STATE OF HAWAII

STATE OF HAWAII,
      Plaintiff,
vs.              CIVIL NO. 06-1-0720-04 EEH
ABBOTT LABORATORIES, INC.,
et al.,
      Defendants.

----------------------------------------

        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS

THE COMMONWEALTH OF MASSACHUSETTS,
      Plaintiff,
vs.                C.A. NO. 03-11865 PBS
MYLAN LABORATORIES, INC.,
et al.,
      Defendants.

      *    *    *    *    *    *    *    *

                VOLUME I

   The videotaped deposition of JUDY WATERER,
VOLUME I, was taken before Cornelia J.
Baker, Certified Court Reporter and
Certified Shorthand Reporter, as
Commissioner, on Wednesday, May 9, 2007,
commencing at approximately 10:13 a.m., in
the law offices of Kirkland & Ellis, 153
East 53rd Street, New York, New York
pursuant to the stipulations set forth
herein.

Judy Waterer
May 9, 2007

Page 34

1          entities?
2          MS. WITT:  I believe she can.
3      A.  A number of years ago --
4          MS. WITT:  Wait and let him ask
5          a question.
6          THE WITNESS:  I'm sorry.
7  BY MR. CARTER:
8      Q.  What's the relationship between
9  BIRI and Roxane?
10     A.  A number of years ago --
11         MR. WINGET-HERNANDEZ:  Object-
12         ion to form.
13     A.  A number of years ago the
14  manufacturing component and the sales,
15  marketing, and development component were
16  separated, so that now when we refer to BIRI,
17  we're referring to the manufacturing site in
18  Columbus, Ohio.  And when we refer to Roxane,
19  we're talking about sales, marketing, and
20  development, which is in Bedford, Ohio --
21  mostly in Bedford, and reports through Tom
22  Murphy.
23         MR. HEIDLAGE:  Ms. Waterer, if
24         you could keep your voice
25         up, that would be very

Page 35

1          helpful.  Thank you.
2      Q.  And how are those entities
3  related to Ben Venue?
4      A.  I think it's reporting only.
5      Q.  Where's Ben Venue located?
6      A.  Bedford, Ohio.
7      Q.  Now, isn't there a German
8  parent company involved in Roxane's corporate
9  structure?
10         MS. WITT:  Object to the form.
11     A.  There's a German company that
12  is in some way involved.  I think that may be
13  BIC that goes to Germany.  I'm not exactly
14  sure.  I'd have to see charts to know.
15     Q.  Is BIC a family-owned business?
16     A.  I believe that corporate is
17  family owned.  I'm not sure of the structure
18  of the individual components.
19     Q.  Is it a German family that owns
20  BIC?
21     A.  I have no direct knowledge of
22  that, but it is my understanding.
23     Q.  Do you know the name of the
24  family?
25     A.  I would assume it's Boehringer.

Page 36

1      Q.  What is the difference,
2  Ms. Waterer, between a brand drug and a
3  generic drug?
4      A.  How do you mean?
5      Q.  Well, can you define for me,
6  based on your own personal knowledge, what a
7  brand drug is?
8      A.  A brand drug is a drug with a
9  brand name that's marketed and sold as a
10  brand.
11     Q.  And what's a generic drug?
12     A.  A generic drug means a
13  chemically identical and by FDA defined as
14  identical and substitutable and equivalent to
15  whatever brand it's, it's made to be a copy
16  of.
17     Q.  And in the scheme of brand
18  drugs and generic drugs, what does Roxane
19  sell?
20     A.  Primarily, generic.
21     Q.  But also some brand?
22     A.  Yes.
23     Q.  What form do Roxane's drugs
24  come in?  I'm assuming pill form?
25     A.  Yes.

Page 37

1      Q.  Inhalants?
2      A.  Yes.
3      Q.  Injectables?
4      A.  No.  There was one injectable
5  that we no longer have.
6      Q.  What was that?
7      A.  I believe it was Emethadone.
8      Q.  Are some of Roxane's drugs
9  self-administered?
10     A.  I don't know what you mean by
11  that.
12     Q.  Pills that people can take on
13  their own.
14     A.  Yes.
15     Q.  Are some of Roxane's drugs
16  physician administered?
17     A.  Not to my knowledge.  I mean, I
18  guess, anything, a doctor could give it to
19  you or . . .
20     Q.  How long have you been employed
21  by Roxane?
22     A.  I started with Roxane in 1996.
23     Q.  Tell me what your -- generally
24  what your duties have been with Roxane since
25  1996 to the present.

10 (Pages 34 to 37)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 38

1      A. When I came on board, I became
2  responsible for the Multisource Business
3  Unit, all of the marketing activities
4  associated with that, establishing the
5  department, setting that up; and then more
6  recently moving into focusing on the future
7  of Roxane.
8      Q. Tell the Jury what a
9  multisource drug is.
10      A. It's a broad definition, but it
11  generally means that it's a drug that's
12  available through more than one supplier.
13      Q. Have your duties with Roxane
14  included setting prices for drugs?
15      A. Yes.
16      Q. Have you been involved in the
17  setting of prices of Roxane's drugs from 1996
18  to the present?
19      A. Not in the last two to four
20  years, but from '96 up until that time, yes.
21      Q. Do you know what the
22  approximate annual revenues of Roxane are?
23      A. I'd have to look that up.  I
24  don't have that on the top of my --
25      Q. Any idea?

Page 39

1      A. I would say in the ballpark of
2  300 million, but it would be a very rough
3  guesstimate.
4      Q. Annually?
5      A. Yeah.
6      Q. Are you aware that state
7  Medicaid programs purchase drugs that are
8  sold by Roxane?
9      A. I'm aware that state
10  Medicare -- I'm sorry, did you say Medicare
11  or --
12      Q. Medicaid.
13      A. That state Medicaid programs --
14  I'm not aware that they buy them.  I'm aware
15  that they may reimburse pharmacies that
16  dispense them in some manner, and that's
17  relatively recent knowledge.
18      Q. Okay.  Do you have any idea of
19  what percentage of Roxane's revenues are
20  attributable to state Medicaid agencies
21  reimbursing pharmacies or pharmacists for
22  drugs?
23      MS. WITT:  I object to the form
24      of the question, and that's
25      beyond the scope of the

Page 40

1      Notice for the deposition.
2      Q. Do you know?
3      A. I have a broad general
4  impression based upon how much rebate we pay,
5  and the impression's that it's a very minor
6  percentage.
7      Q. You understand, Ms. Waterer,
8  that Roxane, as a company, has chosen to
9  participate in state Medicaid programs?
10      A. Yes.
11      Q. And Roxane participates in
12  state Medicaid programs in Alabama, correct?
13      A. Yes.
14      Q. And Hawaii?
15      A. Let me stipulate, I don't know
16  that we participate by state.  I think it's
17  just one, either you're in it or you're not.
18      Q. Right.
19      A. And we're in it, so I assume
20  that that means it's throughout the country.
21      Q. Very well.  And when you say
22  Roxane's in it, Roxane voluntarily agrees to
23  become part of the Medicaid drug program and
24  that's pursuant to federal law, correct?
25      A. Yes.

Page 41

1      Q. Roxane certainly could, if it
2  wanted to, could decide not to participate in
3  state Medicaid drug programs, correct?
4      A. I don't believe so.
5      Q. What do you mean?
6      A. I don't believe that we could
7  exist as a pharmaceutical company unless we
8  agreed to participate in the programs,
9  because nobody would buy our drugs.  So it's
10  pretty much required.
11      Q. Right.  So voluntary
12  participation in state Medicaid drug programs
13  is important to Roxane's existence, correct?
14      A. Again, with regard to
15  voluntary, we could not be in business if we
16  didn't.
17      Q. Very good.  And when Roxane
18  voluntarily chooses to participate in a
19  Medicaid program, would you agree that Roxane
20  has a duty to familiarize itself with
21  Medicaid laws and comply with those laws?
22      MS. WITT:  Object to the form.
23      A. As the laws pertain to the
24  manufacturing and distribution of the
25  product, yes.

11 (Pages 38 to 41)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 62

1        A.  I believe so.  And again, we
2   need to discuss price, not contract price.
3        Q.  Is it fair to say that since
4   1991, Roxane has reported prices to First
5   DataBank?
6        A.  I believe so.
7        Q.  These prices reported to First
8   DataBank are reported electronically,
9   correct?
10        A.  I'm not sure.  In fact, I am
11   sure, because it -- well, it may be
12   electronic now.  In the '90s, we used to get
13   paper copies to go through and correct and
14   mail back, so it hasn't always been
15   electronic.
16        Q.  Tell me about this process in
17   the '90s where you got copies and you
18   corrected it and sent them back.
19        A.  The pricing compendia would
20   occasionally send us a voluminous report and
21   say, Please check this for accuracy.  And we
22   would go through and verify if their records
23   matched our records.  And if they didn't,
24   we'd cross it out and put in the correct
25   price, as we knew it, and send it back and

Page 63

1   hope that they would adjust it.
2        Q.  These voluminous reports would
3   have the prices that Roxane reported,
4   correct?
5        A.  Yes -- well, it wasn't always
6   accurate.  But more often than not, yes.
7        Q.  And these third-party compendia
8   would send the prices to Roxane and say,
9   Roxane, verify these prices, tell us if
10   they're correct, and if they're incorrect,
11   change them accordingly; is that right?
12        A.  In the mid '90s, yes.
13        Q.  And Roxane would do that?
14        A.  Yes.
15        Q.  And you were a part of that
16   process?
17        A.  Indirectly, but yes.
18        Q.  Do you know if that
19   specifically happened with First DataBank?
20        A.  I don't remember which one sent
21   it.
22        Q.  Are you familiar with the term
23   "National Drug Data File"?
24        A.  No.
25        Q.  Why does Roxane report prices

Page 64

1   to First DataBank?
2        A.  Our customers require it.
3        Q.  And when you say your customers
4   require it, who are the customers?
5        A.  The pharmacies.
6        Q.  Do you know why the pharmacies
7   require it?
8        A.  Never thought about it.
9        Q.  And at least today and in the
10   recent past, all of this reporting is done
11   electronically, correct?
12        A.  I don't know.
13        Q.  You don't know?
14        A.  No.
15        Q.  Who's the person at Roxane who
16   would know the most about how Roxane's prices
17   are reported to third-party compendia?
18        A.  Probably Lesli Paoletti.
19        Q.  Now, who is Lesli Paoletti?
20        A.  She heads up the marketing of
21   the existing products now.
22        Q.  Does she report to you?
23        A.  No longer.
24        Q.  How long did she report to you?
25        A.  Several years.  I don't

Page 65

1   remember the exact time frame.
2        Q.  Who does she report to now?
3        A.  Paul Kersten.
4        Q.  And what's his title?
5        A.  General manager, Roxane.
6        Q.  Can you distinguish between,
7   for instance, First DataBank and Red Book?
8            MS. WITT:  Object to the form.
9        A.  I don't think so.
10        Q.  What about, can you distinguish
11   between First DataBank or Red Book or
12   Medispan?
13        A.  I don't know what you're . . .
14        Q.  Do you recognize those entities
15   as being third-party compendia?
16        A.  Yes.
17        Q.  And do you know that Roxane
18   reports prices to those entities?
19        A.  I believe that's correct.
20        Q.  And do you know that those
21   entities, in turn, publish prices to various
22   payors including state Medicaid agencies?
23        A.  I'm not aware of who they
24   publish it to.  But I am aware that, as I
25   said before, that they sell their data to

17 (Pages 62 to 65)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

---

**Page 66**

1  people interested in purchasing it.
2       Q. You're not aware as to whether
3  or not some of those purchasers are state
4  Medicaid agencies?
5       A. I have no way of knowing who
6  their purchasers are.
7       Q. Do you know how state Medicaid
8  agencies find out drug prices that they use
9  to reimburse?
10      A. No.
11      Q. Who at Roxane would know that?
12      A. I doubt anybody.
13      MS. WITT: Can we take a break
14         when you're at a good spot?
15      MR. CARTER: We'll take one
16         right now.
17      MS. WITT: Great.
18      THE VIDEOGRAPHER: We're going
19         off the Record. This is
20         the end of Tape No. 1. The
21         time is 11:07 a. m.
22      (A brief recess was taken.)
23      THE VIDEOGRAPHER: Beginning of
24         Tape No. 2. The time is
25         11:30 a.m.

---

**Page 67**

1       MR. WINGET-HERNANDEZ: While
2         off the Record, Ms. Witt
3         and I had a short exchange
4         concerning the last offer
5         that she made for us to
6         limit our questions. I
7         would simply like to state
8         that Hawaii certainly
9         agrees that the only states
10        that are involved in this
11        deposition are the states
12        of Alabama, Hawaii, and
13        Massachusetts. And that
14        when I ask questions about
15        the operations of Hawaii's
16        Medicaid program, I mean by
17        those questions to limit
18        the Witness to testify
19        about -- specifically about
20        the Hawaii Medicaid
21        Agency's operations.
22          But I also
23        indicated, and I think
24        Ms. Witt has agreed, that
25        there are general questions

---

**Page 68**

1       about general knowledge
2       that Roxane may have about
3       the operation of state
4       Medicaid, generally, that
5       are important, relevant,
6       and applicable to the
7       claims that have been
8       lodged by the three states
9       that are here. And I
10      anticipate that I will be
11      asking questions such as
12      those.
13  BY MR. CARTER
14      Q. Ms. Waterer, we have been
15  discussing a little bit about prices reported
16  to third-party compendia, correct?
17      A. Yes.
18      Q. And we've talked about how
19  third-party compendia includes First DataBank
20  and Red Book, correct?
21      A. Among others, yes.
22      Q. When Roxane reports prices to
23  First DataBank and others, does Roxane report
24  an AWP price?
25      A. Yes.

---

**Page 69**

1       Q. What is an AWP price?
2       A. It's the way -- what we mean at
3  Roxane when we use AWP, it's a price that's
4  generally set most commonly at a product
5  launches at 10 percent below the brand's AWP.
6  I don't believe it has like an actual
7  definition, but it's kind of a functional
8  term of what number we put when we see that.
9       Q. AWP means Average Wholesale
10  Price, correct?
11      A. I believe it's an acronym for
12  Average Wholesale Price. I don't know that
13  there's a literal meaning of Average
14  Wholesale Price that it's associated with.
15      Q. How does Roxane define Average
16  Wholesale Price?
17      A. I think, as I said before, we
18  use it as a functional term. It is most
19  commonly at launch tied to a brand's AWP. It
20  is most commonly set at 10 percent below the
21  brand's AWP when a product launches. And for
22  the most part, that's about as much as we
23  think about AWP.
24      Q. What is a Wholesale Acquisition
25  Cost?

---

18  (Pages 66 to 69)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 74

1        A.  I'd have to speculate.  I don't
2   know.
3        Q.  Does Roxane ever change the
4   AWPs that are reported to First DataBank?
5        A.  Roxane has changed AWPs and
6   subsequently reported the changes.
7        Q.  And do the changes -- well,
8   what has to happen for Roxane to change an
9   AWP?
10       A.  I don't understand.
11       Q.  Why would Roxane change an AWP?
12       A.  We have products in a variety
13  of categories.  Some of our products, where
14  the competitive environment will permit us to
15  take a price increase, we would take a price
16  increase.  Somewhat the way a brand product
17  might, as the cost of living goes up, we
18  would take a price increase.  That would be
19  one example.
20       Q.  Does Roxane ever change AWPs
21  based on customer concerns?
22       A.  I can recall one example.
23       Q.  Tell me what you remember about
24  that example.
25       A.  We had a product, Furosemide --

Page 75

1   I think it was Furosemide.
2        THE COURT REPORTER:  What was
3        that?
4        THE WITNESS:  I think it was
5        Furosemide, F-U-R-O-S-E-
6        M-I-D-E.
7        A.  Competitive situations, we'd
8   never really sold much.  I think we had less
9   than a one- or two-percent market share.
10  Sold virtually none of it.
11       The competitive situation
12  changed in the marketplace.  A number of
13  vendors came to us and said, Hey, we never
14  looked at you or talked to you about it
15  before, because we were happy with our
16  vendor.  Now we're not.  Can you give us a
17  bid?
18       We gave them very competitive
19  bids.  And the feedback that we got from the
20  customers was not joy that we'd given them
21  competitive bids, but frustration, because
22  they indicated that our AWP was out of line
23  with everybody else's in the market, and they
24  would be unable to award us any business at
25  that AWP.

Page 76

1        Q.  And what did Roxane do as a
2   result of those customer concerns?
3        A.  After quite a few months of
4   analysis and verification that it wasn't just
5   one customer that was saying this, we ended
6   up bringing our pricing in line with
7   everybody else's in the business.
8        Q.  I mean, in part, competitive-
9   ness drives the AWP that Roxane reports,
10  correct?
11       MS. WITT:  Object to the form.
12       A.  I think it's probably a
13  mischaracterization of the importance of AWP.
14  AWP is almost always the same for everybody,
15  so it's not something that people consider.
16       Q.  Well, you know that state
17  Medicaid agencies consider AWP when they
18  reimburse, correct?
19       A.  I've become aware of that, yes.
20       Q.  What do you mean when you say
21  you've become aware of that?
22       A.  This litigation in various
23  forms has been going on for many, many, many
24  years.  And because of it, I've learned a lot
25  of things that I wouldn't normally need to

Page 77

1   know for my day-to-day activities.
2        Q.  Didn't you know back as early
3   as 1996 that state Medicaid agencies
4   reimbursed based on AWP?
5        A.  I don't know if I knew
6   specifically state.  I would say that I had a
7   general awareness that private-party
8   insurers, that AWP may be of -- something
9   that they tied reimbursement to.
10       I don't recall having specific
11  knowledge as to an individual state or a
12  program.
13       Q.  But you've known since as early
14  as 1996 when you started with Roxane that the
15  AWP that Roxane reported was relied upon by
16  certain payors when they reimbursed, correct?
17       A.  In a broad general sense,
18  that's -- as I said before, aware that
19  certain payors, primarily private payors,
20  have some formulas that tied to that, yes.
21       Q.  There is no other reason or
22  purpose for Roxane to report AWPs, other than
23  the fact that certain payors rely on that AWP
24  when they reimburse, correct?
25       A.  No.

20  (Pages 74 to 77)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

Page 98

1 is AWP.
2        Q. Do you have any knowledge as to
3 how the Alabama Medicaid Agency interprets
4 AWP?
5            MS. WITT: Object to the form.
6        A. No. I would assume like the
7 industry does.
8        Q. Why would you assume that?
9        A. Because it's an industry term,
10 and they're choosing to use it. So I would
11 assume that they know what it means.
12        Q. Would it be reasonable for the
13 Alabama Medicaid Agency to assume that the
14 Average Wholesale Price actually means the
15 Average Wholesale Price?
16            MS. WITT: Object to the form
17                of the question; beyond the
18                scope of the deposition
19                notice.
20        A. Again, you're saying the same
21 question that Average Wholesale Price means.
22 I will tell you that AWP is AWP. I don't
23 know that we've defined what Average
24 Wholesale Price means to Alabama. So I
25 don't -- I'm -- I just don't know how to

Page 99

1 answer your question.
2        Q. Are you familiar with the term
3 "spread"?
4        A. Yes.
5        Q. Are you familiar with the
6 phrase "marketing the spread"?
7        A. Yes.
8        Q. Well, how would you define
9 spread?
10        A. Difference between two numbers.
11        Q. How would you define spread in
12 the terms of a reported AWP?
13            MS. WITT: Object to the form.
14        A. I would have to know what the
15 second number was.
16        Q. Isn't there a spread between
17 the reported AWP and the actual AWP?
18        A. If you chose to look at the
19 difference -- wait a minute. Now, you're
20 doing it again. I don't know what you mean
21 by actual AWP.
22        Q. Isn't there a difference
23 between the reported AWP and the actual
24 acquisition cost of Roxane's drugs?
25        A. Actual acquisition price.

Page 100

1 You're talking about WAC? There is a
2 difference between AWP and WAC, yes.
3        Q. Is there a formula that Roxane
4 uses to determine the difference between AWP
5 and WAC?
6        A. In some instances, yes, it's
7 product specific.
8        Q. Give me an example of how
9 they're tied together.
10        A. In general, they're not.
11 During an early launch period when you have
12 no idea what the market price is going to be,
13 one may be inclined to use a similar
14 difference between AWP and WAC as what the
15 brand did.
16            In other instances where you
17 have more market intelligence or more
18 information, you might place the WAC
19 otherwise. So it's really very product
20 specific. There's not an overall formula
21 that's applied universally.
22        Q. Would you understand and
23 interpret the spread to be the difference
24 between the net acquisition cost paid by a
25 purchaser and the amount of reimbursement

Page 101

1 received --
2            (Brief interruption)
3        A. If the specific --
4        Q. Do you mind if we start over?
5            Would you interpret the spread
6 to mean the difference between the net
7 acquisition cost paid by a purchaser and the
8 amount of reimbursement received by that
9 purchaser?
10            MS. WITT: Object to the form.
11        A. If somebody were to define
12 spread the way that you just did, then for
13 that instance, that's how spread would be
14 defined.
15        Q. It's a difference in that
16 instance between what was paid and what was
17 reimbursed, correct?
18        A. The cost versus the
19 reimbursement at a pharmacy level is how you
20 want to define that spread in that case.
21        Q. Do you know whether or not
22 pharmacies or pharmacists ever choose
23 particular drugs based on a spread?
24            MS. WITT: Object to the form;
25            lack of foundation.

26  (Pages 98 to 101)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 102

1    A. I don't know how they pick
2  drugs, so I can't -- I've never been a
3  purchaser at a retail pharmacy.
4    Q. Is Roxane concerned with the
5  methods used by pharmacists to select drugs?
6    A. We're concerned that they --
7  that we'd be on a level playing field, and
8  that they'd be willing to accept our product.
9  We generally compete on contract price.
10   Q. Well, what's the relevance of
11 contract price to a pharmacist if that
12 pharmacist didn't purchase the drugs directly
13 from Roxane and receives compensation by way
14 of reimbursement?
15     MS. WITT:  Object to the form.
16   A. I'm -- what's the relevance of
17 the contract price?  They want to buy it as
18 cheaply as they can.
19   Q. Well, I mean, there's no
20 contract price involved at that level,
21 correct?  I mean, when you have a pharmacist
22 who is making drug decisions based on a
23 spread, the pharmacist's concern is the
24 spread, not the contract price, correct?
25     MS. WITT:  Object to the form.

Page 103

1    A. I don't know what pharmacists
2  are deciding on.
3    Q. Is it your testimony that
4  Roxane is simply not concerned with the
5  methods that pharmacists use to pick drugs?
6    A. We don't have knowledge.  When
7  we go out and we try to get business awarded,
8  we compete based upon contract price.
9    Q. Has Roxane ever concerned
10 itself with the spread as it relates to the
11 pharmacists' reimbursement?
12   A. If there was an exceptional
13 instance where our pricing was out of line --
14 I think I talked about, I believe it was
15 Furosemide -- in an exceptional case where it
16 was brought to our attention, we might take
17 steps to bring ourselves into the average or
18 norm of what everybody else is doing.
19     But in the industry, most
20 everybody's pricing is set very similar so
21 that the spread issue isn't something that
22 generally comes up.  If everybody's pricing
23 is in the same average area, you're competing
24 on the contract price.  That's generally what
25 occurs in the negotiation.

Page 104

1    Q. So it's your testimony that
2  Roxane has never concerned itself with the
3  competitor's price and tried to market the
4  spread to gain market share away from that
5  competitor?
6    A. It -- again, on a very rare
7  instance, there may have been something that
8  had to do with the difference in AWPs.  It
9  would not be our general practice.  It would
10 be a very rare occasion.
11   Q. But it has happened, correct?
12   A. Okay.  Give me the question
13 again, because I want to make sure it's very
14 specific.
15   Q. Has Roxane ever concerned
16 itself with marketing the spread to the
17 extent that it attempted to market the spread
18 and gain market share from a competitor?
19     MS. WITT:  Object to the form.
20   A. It's possible.
21   Q. It's very possible, isn't it?
22     MS. WITT:  Object to the form.
23   A. I don't have any -- I can't
24 recollect that.
25   Q. I mean, there's no purpose in

Page 105

1  marketing the spread other than to gain
2  market share, correct?
3    A. What do you mean when you say
4  "market the spread"?
5    Q. You don't know what that means?
6    A. I want to make sure that it
7  means the same to both of us.  I've heard it
8  defined different.
9    Q. You tell me what it means.
10   A. When I hear the term "market
11 the spread," being a marketing person, I
12 think that it is an active initiative, a
13 directive to go out and make this your
14 standard process for selling.
15   Q. And Roxane has utilized that
16 tactic, correct?
17   A. I believe there may have been a
18 few instances of it, yeah.  I don't recall
19 any specifics.
20   Q. What's an FUL?
21   A. Don't know.
22   Q. Ever heard the term "federal
23 upper limit"?
24   A. I may have.  I don't remember.
25   Q. Speaking on behalf of Roxane,

27 (Pages 102 to 105)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 198

1      Q.  You can see that this document
2   discusses WAC and AMP, do you see that?
3      A.  I see WAC.
4      Q.  Look at the bottom left-hand
5   corner on the first page.
6      MS. WITT:  You said AMP.
7      MR. CARTER:  How many times
8         have I done that today?
9      A.  AWP.
10     Q.  Let me start over.
11     A.  Okay.
12     Q.  You see that this document
13   talks about WAC and AWP, correct?
14     A.  Yes.
15     Q.  Now, on the next page, it
16   discusses an AWP spread.  And down in the
17   right-hand corner, Patient Prescription
18   Payment, Medicaid; do you see that?
19     A.  Yes.
20     Q.  Did anyone on the generic side,
21   to your knowledge, ever create documents
22   similar to this?
23     A.  Similar to which particular
24   documents?
25     Q.  This one.

Page 199

1      A.  The four -- not to my
2   knowledge.
3      Q.  Do you know whether or not
4   there are Roxane documents dealing with
5   generics that talk about patient prescription
6   payment and Medicaid?
7      A.  Not that I recall.
8      Q.  Is there any substantial
9   difference in the way Roxane markets its
10  generics versus how it markets its brand
11  drugs?
12     A.  They're about as close to
13  totally different as two things could be.
14     Q.  Explain that to me, please.
15     A.  Typically, a brand product is
16  sold by a very, very large sales force that
17  calls primarily on physicians and generally
18  sells on the clinical merits of the product.
19  It's a very scientific, clinical-type sale.
20        Typically, on the generic
21  side -- and I think you've seen me
22  struggle -- we don't even know what the drugs
23  are used for.  Our market strategy is to
24  very, very oversimplify --
25        (Brief telephonic interruption.)

Page 200

1      A.  -- to terribly oversimplify it,
2   on the generic side, we don't really know
3   what a doctor is.  We don't really have
4   interest in what the product is used for.  By
5   definition, our product is the same as the
6   brand.  So our customer base is going to be
7   pharmacies, people that actually purchase the
8   product.  So we don't speak to a physician.
9   It's just very terribly different.
10     MR. CARTER:  All right.  Let's
11        take a break, and let me
12        organize a little bit.
13     MS. WITT:  Okay.
14     THE VIDEOGRAPHER:  Going off
15        the Record at 4:24 p.m.
16     (Whereupon a brief recess was
17        taken.)
18     THE VIDEOGRAPHER:  We're back
19        on the Record at 4:38 p.m.
20  BY MR. CARTER:
21     Q.  All right.  Let me show you
22   what I'm going to mark as Plaintiffs' Exhibit
23   16.  Tell me, please, ma'am, if you recognize
24   that.
25     (Whereupon Plaintiffs' Roxane

Page 201

1         Waterer No. 16 was marked for
2         identification and attached
3         hereto.)
4      (Witness reviewed document.)
5      A.  Yes.
6      Q.  What is this, please, ma'am?
7      A.  This is an e-mail about having
8   Bob Sykora pull together some market research
9   from Tom Russillo to support an explanation
10  of why we should raise our AWP on Furosemide.
11     Q.  What was your opinion?  Did you
12  want to raise the AWP?
13     A.  I wanted to bring AWP into line
14  with the competitors.  The gist of it is that
15  if we didn't do that, we were out of the
16  market.
17     Q.  Okay.  And you posed a question
18  or, I guess, Issue No. 2, to Robert Sykora in
19  the bottom e-mail, the July 7th, 2000,
20  e-mail, correct?
21     A.  Yes.
22     Q.  And the issue there is whether
23  or not to increase the AWP of Furosemide,
24  correct?
25     A.  Yes.

51  (Pages 198 to 201)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

1     Q.  And in Point No. 2 Robert says,
2  towards the end, Tom is aware of the AWP
3  situation and will support the increase --
4  I'm sorry.  That's your statement, correct?
5     A.  In the center?  I'm looking at
6  Point No. 2.
7     Q.  Point No. 2, towards the bottom
8  where it says, Tom is aware.  Point No. 2 at
9  the bottom.  Your e-mail to Bob.
10     A.  Tom is aware of the AWP -- so
11  yes.
12     Q.  And is that Tom Via?
13     A.  No.  That's Tom Russillo.
14     Q.  Okay.  And Tom had to sign off
15  on any AWP increase?
16     A.  He had to sign off on price
17  changes.
18     Q.  Okay.  And Robert responds back
19  to you and says, I feel that you've thrown
20  Furo into my lap when the entire generic line
21  AWPs needs to be reviewed and adjusted.  The
22  most consistent complaint I hear from retail
23  customers is our AWPs.  And then he says, I
24  realize there is political pressure on AWP
25  currently, but it should not run our

1  business.
2        Do you know what he meant by,
3  Political pressure on AWP currently?
4     A.  I think you have to ask him.
5  I'm not sure whether that was an internal or
6  external reference.
7     Q.  Was there political pressure on
8  AWP changes both internally and externally in
9  July of 2000?
10     A.  It's really hard for me to put
11  my brain back to what the world was in 2000.
12  Because this is at least a year or two after,
13  I think, the Texas litigation, I think that
14  anything that had to do with AWP was of
15  concern to us in-house.
16     Q.  He goes on to say, Logic
17  dictates that no matter what the AWP is, if
18  Big Brother wants to punish, they will.  So
19  why not make some money meanwhile?  Do you
20  see that?
21     A.  Yes.
22     Q.  Do you think the reference to
23  "Big Brother" means that he's talking about
24  external political pressure on AWPs?
25        MS. WITT:  Object to the form,

1        and outside the scope of
2        the deposition notice.
3     A.  When I read this, I believe --
4  and Bob would have to answer as to what he
5  was referring to -- but I believe that they
6  were -- that he was referring to our
7  corporate parents.
8     Q.  When he referred to "Big
9  Brother," you think that means the corporate
10  parents?
11     A.  I've -- it's not -- there's
12  been occasions when that term has been used
13  to -- in reference to corporate parents.
14     Q.  Why would corporate parents
15  punish you for increasing the AWP?
16     A.  I don't know.
17     Q.  I mean, the goal of increasing
18  the AWP, I mean, granted, you want to bring
19  it in line, but the goal is to sell more
20  drugs, right?
21     A.  I believe this is why it was
22  going through Tom Russillo to make sure that
23  corporate was in line with it.  And it
24  appears in this that Bob was bristling at
25  being asked to get this information.

1     Q.  Well, certainly, the corporate
2  parents -- and when you say "corporate
3  parents," are you talking about the outfit in
4  Germany?
5     A.  Germany or Connecticut or on up
6  the line, yeah.
7     Q.  Well, I mean, have you or Bob
8  ever been punished by the corporate parents
9  in Germany?
10     A.  Not directly, no.
11     Q.  Have you or Bob ever been
12  punished by the corporate parents in
13  Connecticut?
14     A.  We've been put on tasks forces.
15  It's -- you know, with this, you have to talk
16  to Bob.
17     Q.  Right.
18     A.  He was speaking very
19  emotionally.  I told you what I believe it
20  means.  And I think beyond that, I can't
21  speculate further as to what his intentions
22  were.
23     Q.  Is Bob still employed by
24  Roxane?
25     A.  No.

52 (Pages 202 to 205)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 218

1  of THE COMMONWEALTH OF MASSACHUSETTS,
2  Plaintiff, versus MYLAN LABORATORIES, INC.,
3  et al., Defendants, C.A. No. 03-11865 PBS,
4  now pending in the United States District
5  Court, District of Massachusetts; and that
6  the foregoing pages contain a true and
7  accurate transcription of the examination of
8  said witness by counsel for the parties set
9  out herein; that the reading and signing of
10  said deposition was not waived by witness
11  and counsel for the parties.
12      I further certify that I am neither of
13  kin nor of counsel to the parties to said
14  cause, nor in any manner interested in the
15  results thereof.
16      This the 24th day of May, 2007.
17
18
19
        Cornelia J. Baker
20      Certified Shorthand Reporter,
        Certified Court Reporter and
21      Notary Public for the
        State of Alabama
22
23      My Commission expires 6/9/08.
24
25

Page 219

1        IN THE CIRCUIT COURT OF
         MONTGOMERY COUNTY, ALABAMA
2
    STATE OF ALABAMA,
3        Plaintiff,
     vs.       CIVIL ACTION NO. 2005-219
4    ABBOTT LABORATORIES, INC.,
     et al.,
5        Defendants.
6    ---------------------------------------
7    IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
         STATE OF HAWAII
8
    STATE OF HAWAII,
9        Plaintiff,
     vs.       CIVIL NO. 06-1-0720-04 EEH
10   ABBOTT LABORATORIES, INC.,
     et al.,
11       Defendants.
12   ---------------------------------------
13      UNITED STATES DISTRICT COURT
        DISTRICT OF MASSACHUSETTS
14
    THE COMMONWEALTH OF MASSACHUSETTS,
15       Plaintiff,
     vs.       C.A. NO. 03-11865 PBS
16   MYLAN LABORATORIES, INC.,
     et al.,
17       Defendants.
18   * * * * * * * * *
19      VOLUME II
20   The videotaped deposition of JUDY WATERER,
     VOLUME II, was taken before Cornelia J.
21   Baker, Certified Court Reporter and
     Certified Shorthand Reporter, as
22   Commissioner, on Thursday, May 10, 2007,
     commencing at approximately 9:37 a.m., in
23   the law offices of Kirkland & Ellis, 153
     East 53rd Street, New York, New York
24   pursuant to the stipulations set forth
     herein.
25

Page 220

1    * * * * * * *
2       APPEARANCES
3
4    Representing the State of Alabama:
5       MR. CLINTON C. CARTER
        MR. W. DANIEL "DEE" MILES, III
6       Attorneys at Law
        Beasley, Allen, Crow, Methvin,
7        Portis & Miles, P.C.
        272 Commerce Street
8       Montgomery, Alabama  36104
9
10   Representing the State of Hawaii:
11      MR. MICHAEL WINGET-HERNANDEZ
        Attorney at Law
12      Winget-Hernandez, L.L.C.
        3112 Windsor Road, #228
13      Austin, Texas  78703
14
15   Representing the State of Massachusetts:
16      MR. RICHARD C. HEIDLAGE
        MR. ROBERT C. MOLVAR
17      Attorneys at Law
        The Commonwealth of Massachusetts
18      One Ashburton Place
        Boston, Massachusetts  02114
19
20
21   Representing Roxane Laboratories, Inc:
22      MS. HELEN WITT
        Attorney at Law
23      Kirkland & Ellis, L.L.P.
        200 East Randolph Drive
24      Chicago, Illinois  60601
25

Page 221

1    (continued Appearances)
2    Participating by Teleconference,
     Representing Roxane Laboratories:
3
4       MR. MICHAEL MOORE
        Attorney at Law
        Locke, Liddell & Sapp
5       2200 Ross Avenue, Suite 2200
        Dallas, Texas  75201
6
7    Also present:
8       MS. NICOLE MADDOX
9       MR. JEFF S. BAKER, CLVS
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

56  (Pages 218 to 221)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 250

1  entity than had previously exercised
2  authority and had responsibility for them.
3  Do you know what I'm talking about?
4        A.  Vaguely, yeah.
5        Q.  Okay.  Well, that's kind of a
6  vague description of our discussion.
7             What I'm trying to get you to
8  tell me is what happened when, at this time
9  prior to the legal entity restructuring, that
10  resulted in certain drugs being transferred
11  to another company?
12        A.  I'm not sure I understand the
13  question.
14        Q.  Okay.  Well, you remember we
15  had a little discussion earlier about a time
16  when, in about 2002 or so, certain drugs were
17  moved from one organization to another,
18  right?
19        A.  I guess.  Oh, the multisource
20  products moved to the Roxane legal entity.
21        Q.  Okay.  I guess --
22        A.  From what we were referring to
23  previously as old Roxane.
24        Q.  And when did that happen?
25        A.  I believe that the assets

Page 251

1  transferred when the restructure occurred.
2  And to the best of my recollection, I think
3  it was 2005, but I'm not sure.
4        Q.  Okay.  So when the old Roxane
5  Laboratories, Incorporated, became Boehringer
6  Ingelheim Roxane, Incorporated, on the one
7  hand, and Roxane Laboratories, Incorporated,
8  on the other, the multisource products --
9  responsibility for the multisource products
10  was transferred from the old Roxane
11  Laboratories, Inc., to the new Roxane
12  Laboratories, Inc., correct?
13        A.  Correct.
14        Q.  And what happened to
15  responsibility for the brand products at that
16  time?
17        A.  Those had already been
18  transferred to BIPI years earlier.
19        Q.  Okay.  I think this may have
20  been the point that we were talking about
21  earlier.  There was a point in time, prior to
22  the legal reorganization, when the brand
23  products were transferred from the old Roxane
24  Laboratories, Incorporated, to Boehringer
25  Ingelheim Pharmaceuticals, Incorporated,

Page 252

1  correct?
2        A.  I understand that the
3  responsibility for the product management of
4  it transferred.  I'm not certain when the
5  transfer of the actual asset occurred.
6        Q.  Can you describe in laymen's
7  terms what you mean by "the transfer of the
8  asset"?
9        A.  When you market a product, you
10  own intellectual property associated with it.
11  There's an ownership for the ANDA or the NDA.
12  There's patent rights associated with it.
13  And those can be very separate from a
14  marketing license to market it, so -- I mean,
15  in summary, I'm not certain when what I just
16  described as the asset moved to BIPI on those
17  products.  I know that responsibility for
18  marketing and the marketing team that
19  supported them in the product management
20  moved to BIPI in the early 2000s.
21        Q.  Okay.  So that -- so that I'm
22  clear:  I think what you're telling me is
23  that at some point in the early 2000s,
24  Boehringer Ingelheim Pharmaceuticals,
25  Incorporated, entered into a marketing

Page 253

1  license with Roxane Laboratories,
2  Incorporated, to market its branded products.
3             And then sometime later, the
4  actual intellectual property and other
5  ownership rights that Roxane Laboratories,
6  Incorporated, had in those brand products was
7  transferred to Boehringer Ingelheim
8  Pharmaceuticals, Incorporated.  Is that what
9  you're telling me?
10        A.  No.  What I'm saying is I don't
11  know if they did a licensing and then a
12  transfer or if they transferred it all.  I'm
13  not certain what the sequence of events was
14  and the timing that ultimately led to them
15  having possession of it.
16        Q.  But to be clear:  Your
17  testimony is that responsibility for the
18  marketing was transferred to Boehringer
19  Ingelheim Pharmaceuticals, Incorporated,
20  before the transfer of the assets, to your
21  recollection, right?
22        A.  Again, no.  I'm not sure when
23  they moved it, they all moved together or if
24  it happened at a later date.
25        Q.  Okay.  That's clear.  Thank

64  (Pages 250 to 253)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 254

1  you.
2          Would you tell me, please, if
3  you recall, what the names of the branded
4  drugs were that were transferred back then in
5  the early 2000s from the old Roxane
6  Laboratories, Incorporated, to Boehringer
7  Ingelheim Pharmaceuticals, Incorporated?
8          A. I'll do my best. It will be a
9  partial list, because I was not intimately
10 involved with the branded products. I'll
11 recall the ones that come to mind. Viramune
12 was one. Roxicodone, Oramorph.
13         MR. MILES: Which? I'm sorry.
14         THE WITNESS: Oramorph.
15         A. It's possible that Marinol
16 went, but that might have -- we might have
17 lost that product before it transferred.
18 That was something from another company.
19         Q. What was the other company?
20         A. I don't recall. Those are the
21 ones I recall. I'm sure it's not complete.
22         Q. If we come across one later on,
23 we'll add it to the list.
24         The list that you just gave me,
25 Viramune, Roxicodone, Oramorph, and Marinol

Page 255

1  are brands that you remember were transferred
2  to Boehringer Ingelheim Pharmaceuticals,
3  Incorporated, in the early 2000s, right?
4          A. With the possible exception of
5  Marinol, because I'm not certain if that was
6  still around at that time.
7          Q. Did you ever have any
8  responsibility for setting prices or handling
9  product management or any responsibilities at
10 all when you worked for the old Roxane
11 Laboratories, Incorporated, for the four
12 products that we just named?
13         A. No.
14         Q. So it's clear to you today that
15 you were never involved in any pricing
16 decisions concerning Viramune, Roxicodone,
17 Oramorph, or Marinol, right?
18         MS. WITT: Object to the form
19         of the question.
20         A. I would say in a direct
21 capacity, I had no responsibility for that.
22 It's possible as part of the management team
23 that I might have been copied on a e-mail or
24 been in a meeting where something was
25 mentioned, but I don't recall any of those

Page 256

1  events.
2          Q. It's clear, anyway, I think,
3  from your prior testimony, that when you came
4  to Roxane Laboratories, Inc., you came with
5  certain knowledge and skills that were
6  primarily in the multisource arena; isn't
7  that fair?
8          A. My most current experience had
9  been in the multisource arena.
10         Q. And I don't mean to discount
11 your experience at all. I mean, it's clear
12 from the Record that you'd been involved in
13 the drug industry, both brand and generic,
14 for a number of years before you came to
15 Roxane, and that you came to Roxane with a
16 wealth of experience in both.
17         But the reason why you came to
18 Roxane in the first place was basically to
19 run the marketing side of their multisource
20 business, wasn't it?
21         A. It was a -- it was a position
22 that was an evolving position. At the time
23 that I came, the belief was that it was going
24 to be to set up programs. I was actually
25 titled Program Manager. As I got there and

Page 257

1  became immersed in the job, it became clear
2  that the greater need was more multisource in
3  general and to run the multisource business,
4  so it -- it was a previously unfilled
5  position that essentially I had to carve out.
6          Q. Well, one of the reasons why
7  the position was evolving was that Roxane
8  was engaged in a -- Roxane Laboratories,
9  Incorporated, the old RLI, was actually
10 increasing its emphasis on multisource
11 products; isn't that true?
12         A. I don't know that increasing
13 its emphasis would be appropriate. At that
14 time, the brands were growing much faster
15 than the generics, and the generics were
16 somewhat stagnating. I think they were just
17 looking for experience in a generics' market.
18         Q. Okay. So your testimony is
19 that at the time that you arrived, there was
20 already a developed business at the old
21 Roxane Laboratories, Incorporated, in the
22 generic industry, but that it was languishing
23 and that you were brought in to give it
24 direction, right?
25         A. That's what it evolved into,

65 (Pages 254 to 257)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 278

1  like that, right?
2      A. I believe that's correct, with
3  the exception of the 0054.
4      Q. Right. And the 0054 -- the
5  0054 actually corresponds to an entity that
6  has an application for a drug on file with
7  the Food and Drug Administration; are you
8  aware of that?
9      A. My under -- I'm not sure how it
10  evolved. It's my understanding that
11  manufacturers are assigned a code that they
12  put in front of all of their products.
13      Q. And is it also your
14  understanding that the manufacturers
15  themselves assign the rest of the number?
16      A. I can only speak from the
17  experience that I have. And that's my
18  understanding.
19      Q. Okay. Let's look for a moment
20  at these drugs. Azathioprine, is that a
21  brand or a generic drug?
22      A. That's a generic.
23      Q. And so -- well, is it a drug
24  that had been launched already when you
25  arrived on the scene at the old RLI in 1996

Page 279

1  or was it launched subsequently?
2      A. I think it was already
3  launched.
4      Q. Okay. Was it -- do you know
5  whether it was a young drug in its product
6  life cycle or whether it had been around a
7  long time?
8      A. I think it had launched shortly
9  before I got there.
10      Q. Are you aware that Azathioprine
11  is a generic immunosuppressant that helps
12  prevent, for example, kidney transplant
13  patients from rejecting the donor's organs?
14      A. That sounds familiar, yes.
15      Q. Okay. Do you have any other
16  understanding of what Azathioprine is used
17  for?
18      A. Not particularly. We don't
19  focus on indications.
20      Q. I understand. And I'm not
21  going to question you at length about what
22  their indications are. Really, my interest
23  is just to try to just gain a very general
24  understanding so that we can distinguish one
25  of these drugs from the other.

Page 280

1      A. Okay.
2          MR. WINGET-HERNANDEZ: Let's go
3          ahead and change the tape,
4          take a quick break, and get
5          right back into this. I'd
6          like to go through it just
7          as quickly as we can, but
8          it will take a few minutes.
9      THE VIDEOGRAPHER: We're going
10          off the Record. This is
11          the end of Tape No. 6. The
12          time is 10:48 a.m.
13      (Whereupon a brief recess was
14          taken.)
15      THE VIDEOGRAPHER: We're back
16          on the Record. This is the
17          beginning of Tape No. 7.
18          The time is 10:59 a.m.
19  BY MR. WINGET-HERNANDEZ:
20      Q. Regarding Azathioprine,
21  Ms. Waterer, have you had the responsibility
22  for Azathioprine from the time that you came
23  to Roxane Laboratories, Inc., the old Roxane
24  Laboratories, Inc., until today?
25          MS. WITT: Object to the form.

Page 281

1      A. No.
2      Q. Have you had any kind of
3  responsibility for Azathioprine at all?
4      A. Yes.
5      Q. Describe your responsibility
6  for me respecting Azathioprine.
7      A. I managed the product for the
8  period of time -- I can't remember exactly
9  when I took it over. It would have been
10  probably within the first year that I was
11  employed. I don't remember the particular
12  time. And it would have continued up
13  until -- again, I don't remember the
14  particular time that it transitioned over. I
15  would say two to four years ago.
16      Q. Transitioned over to whom?
17      A. My responsibility -- oh, I'm
18  sorry. It would have been fully Lesli
19  Poaletti's when my responsibilities changed.
20      Q. Okay. I guess we probably
21  ought to go into that. Because we didn't
22  really talk about that, did we, about your
23  responsibilities changing?
24      A. I believe it was in the prior
25  testimony that you didn't want to go over

71  (Pages 278 to 281)

Judy Waterer
May 9, 2007

Page 282

1  again.
2       Q. Oh, okay.
3       MR. WINGET-HERNANDEZ: Well, I
4        apologize, Helen, I do want
5        to go into it briefly.
6       Q. When you say "when my
7  responsibilities changed," what are you
8  talking about?
9       A. My responsibilities have
10 evolved over time to be entirely future
11 focused. I work with product development,
12 identifying products that are going to be
13 developed internally and launched far in the
14 future. I have virtually nothing to do with
15 existing product lines any longer. That
16 occurred gradually over time.
17      Initially, Lesli reported to me
18 and over time was willing to take over the
19 existing products. So now she has full
20 responsibility for product from launch
21 forward.
22      Q. The transition that you say
23 took place over time from your focusing on
24 existing products to your focusing on future
25 products, how long did that transition last,

Page 283

1  approximately?
2       A. In some ways, I would say from
3  the day she was hired. In more official
4  terms, I can't remember the exact transition
5  date. But I would say somewhere between two
6  and four years ago, my focus became much more
7  increasingly devoted entirely to development,
8  and her focus became increasingly devoted
9  entirely to existing. There was a point when
10 I believe that the structure changed, and she
11 began reporting to Paul instead of to me to
12 reflect the change. I don't know the
13 specific data, though.
14      Q. Do you know what year it
15 occurred in?
16      A. I don't recall. But somewhere
17 two to four years ago.
18      Q. Okay. So in order to find out
19 when officially you no longer had
20 responsibility for existing products, one
21 would have to look to see when Lesli Poaletti
22 was moved from under your supervision to
23 Paul's supervision, correct?
24      A. That would have been a pivotal
25 moment with it. But it wasn't a black and

Page 284

1  white transition. It was gradual.
2       Q. I understand. But to the
3  extent that one would be looking for a
4  pivotal moment, as you put it, that would
5  define the end of your responsibilities
6  toward existing products, would that be the
7  pivotal moment?
8       A. That would be the formal
9  recognition of it. I don't recall if it had
10 actually transitioned to that a while before
11 and it just didn't change the reporting yet
12 officially or what. It would be an
13 approximation of the time.
14      Q. Okay. And in order to be as
15 precise as we can, do you know whether -- I
16 mean, I understand you've testified that you
17 don't know whether you may have ceased to
18 have responsibilities with respect to
19 existing products at some point prior to that
20 pivotal moment, but do you have a sense of
21 approximately how much time, say a month or a
22 quarter or six months or a year before that
23 pivotal moment you may have no longer had
24 responsibilities for existing products?
25      A. It was such an evolution and

Page 285

1  gradual process that that would be the
2  closest we could pin it as to get that date.
3  But with regards to specifics on an
4  individual product, I don't know.
5       Q. Okay. Then I need to ask the
6  question in a sort of little bit more
7  open-ended way, but I'll try to be clear:
8  With respect to Azathioprine, is it fair to
9  say that until -- that from the time that you
10 joined the old Roxane Laboratories, Inc., in
11 1996, roughly, until the time that Lesli
12 Poaletti took over responsibility for
13 existing products, you were the product
14 manager for Azathioprine?
15      A. We didn't have a title Product
16 Manager for me ever. From the time Lesli
17 came on board -- I can't remember. I think
18 she came on board as Associate Product
19 Manager and then Product Manager. When she
20 first came on board, she took the liquids.
21 And then as she developed into the position,
22 she was given the responsibility for the
23 solids. So it truly evolved.
24      Q. Okay.
25      A. Through the period of time that

72 (Pages 282 to 285)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 290

1 see whether it was approved via the ANDA or
2 the NDA process.
3          MS. WITT:  Now, let me just
4          clarify my objection.  It's
5          not to it being branded or
6          generic, it's that you're
7          in effect asking this
8          Witness whether BIPI ever
9          sold calcium carbonate or
10         whether Ben Venue ever sold
11         calcium carbonate.  And
12         she's not here designated
13         to have knowledge about
14         those.  So when you ask her
15         did any other Boehringer
16         company ever sell it,
17         you're asking her for
18         information.  And in her
19         capacity as a Roxane
20         witness, it would be
21         binding on Roxane.  And I'm
22         not willing to let her
23         testify on what other
24         Boehringer companies may or
25         may not have sold, because

Page 291

1          we clearly haven't
2          investigated that or tried
3          to prepare her for that for
4          this deposition.
5          MR. WINGET-HERNANDEZ:  Thank
6          you for clearing that up.
7          I apologize for making that
8          little explanation
9          necessary, but it was very
10         helpful.
11 BY MR. WINGET-HERNANDEZ:
12      Q.  This question is not a question
13 of Boehringer Ingelheim Roxane.  Right now,
14 I'm asking Judy Waterer:  Do you know, Judy
15 Waterer, whether calcium carbonate was ever
16 sold by any other Boehringer Ingelheim entity
17 other than either the old Roxane
18 Laboratories, Inc., or the new Roxane
19 Laboratories, Inc.?
20      A.  Are you talking about calcium
21 carbonate broadly or are you talking about
22 calcium carbonate 1250 milligram per five ML
23 suspension.
24      Q.  Let's start by talking about it
25 broadly, calcium carbonate at all, in any

Page 292

1 form that's not some kind of a calcium
2 carbonate that goes by a brand name.
3      A.  It may or may not be included
4 in formulations of other drugs.  I'm not
5 aware of it.
6      Q.  All right.  Then, specifically,
7 the drug calcium carbonate, are you aware of
8 any other Boehringer Ingelheim entity selling
9 calcium carbonate?
10      A.  As calcium carbonate?
11      Q.  As calcium carbonate, besides
12 the old and the new Roxane Laboratories,
13 Inc.?
14      A.  I don't recall it.
15      Q.  Okay.  Now we're going to shift
16 back into your corporate designee deposition,
17 okay?
18      A.  Okay.
19          MS. WITT:  We should get hats.
20          MR. WINGET-HERNANDEZ:  We
21          should.  I need one anyway.
22 BY MR. WINGET-HERNANDEZ:
23      Q.  Do you recognize the generic
24 drug Ipratropium Bromide that's listed?
25      A.  Yes.

Page 293

1      Q.  And did either you or Lesli
2 Poaletti have responsibility generally for
3 Ipratropium Bromide from roughly the time
4 that you arrived in 1996 until the present?
5      A.  Yes.
6      Q.  Had Ipratropium Bromide
7 launched prior to your arrival in 1996?
8      A.  Yes.
9      Q.  Switching hats for a moment and
10 asking you about your personal knowledge:  Do
11 you know whether Ipratropium Bromide was ever
12 sold as such?
13      A.  As Ipratropium Bromide?
14      Q.  As Ipratropium Bromide, yes,
15 ma'am, by any other Boehringer Ingelheim
16 entity?
17      A.  As Ipratropium Bromide, no.
18      Q.  All right.  And to be clear, I
19 think what you're suggesting is that under
20 the brand name, it might have been sold by
21 some other Boehringer entity, correct?
22      A.  Correct.
23      Q.  And that brand name would have
24 been what?
25      A.  Atrovent, A-T-R-O-V-E-N-T.

74  (Pages 290 to 293)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 294

1        Q.  Do you recognize the drug --
2   well, before I go on, Ipratropium Bromide is
3   an inhalant that's -- it's a bronchodilator,
4   correct?
5        A.  It could be.  I don't
6   specifically recall it's mechanism of action.
7        Q.  Do you recall that it was a
8   drug that was used to treat chronic
9   obstructive pulmonary disorder?
10        A.  Sounds familiar.  I don't
11   really recall.
12        Q.  Do you recognize lithium
13   carbonate as a generic drug?
14        A.  Can you define what you mean by
15   generic drug?
16        Q.  In general, a generic would be
17   a drug that is approved through an ANDA
18   process.  I'm not talking --
19        A.  That's the definition you'd
20   like me to use specific to this?
21        Q.  I'm trying to stick with what
22   you told us yesterday.
23        A.  Okay.
24        Q.  Does that sound familiar?
25        A.  That's a general -- that's one

Page 295

1   general definition.
2        Q.  Okay.  Well, let's get into
3   this a little bit.  First of all, does
4   Lithium Carbonate, to your recollection --
5   strike that.
6          Is Lithium Carbonate a generic
7   by that definition?
8        A.  I believe that's accurate.
9        Q.  To what extent is Lithium
10   Carbonate perhaps not considered a generic?
11        A.  Lithium carbonate, we have in
12   several different formations.  In this,
13   you're specifically asking about the capsule.
14   I'm recalling that some of the Lithium
15   Carbonates, we are the only Lithium Carbonate
16   available in the U.S.  So regardless of
17   whether it was approved through the ANDA or
18   NDA process, it would have been -- and I
19   don't remember if this is the one that was --
20   had multiple competitors or had no
21   competitors, but there's a difference between
22   defining it as how it's approved versus how
23   it's marketed.
24        And the difference there, for
25   marketing purposes, it sounds like you're

Page 296

1   saying is the difference between being a sole
2   source generic and being a multisource
3   generic, right?
4        A.  That would work.
5        Q.  Is there a better description
6   that you prefer?
7        A.  What's difficult is a number of
8   our products straddle a unique definition and
9   are very hard to put in a crystal-clear box.
10   So that's as good of an explanation as we
11   could work with on this one.
12        Q.  Is the particular Lithium
13   Carbonate formulation that gives you pause in
14   this context one of those products that you
15   have that defies a crystal-clear
16   categorization?
17        A.  I'm recalling that at certain
18   points in time, Lithium Carbonate in one or
19   another formulation, we were the sole
20   supplier.  I don't remember whether it was
21   this particular one.
22        Q.  Is it fair to say that in the
23   business, in the drug business, when you have
24   a generic drug and you're the only supplier,
25   that that's called a sole-source generic?

Page 297

1        A.  That's frequently used in a
2   situation where there is an existing brand,
3   and there is only one generic alternative.
4        Q.  This formulation of lithium --
5        A.  Wait a minute.  Wait a minute.
6   I can't talk to industry terms.  I would say
7   in that situation, we would call that
8   probably sole generic.  And sole-source
9   generic, depending on the context, might mean
10   that there was no brand, that it was the only
11   one.
12        Q.  Okay.  So are you suggesting to
13   me that this formulation that you've been
14   talking about of Lithium Carbonate that only
15   Roxane had, that there was also no brand
16   version of that formulation?
17        A.  I believe at points in time --
18   this is going way back.
19        Q.  Okay.
20        A.  I think a brand may have exited
21   the market, leaving us the only -- I would
22   really have to dig back in and go through the
23   specifics.
24        Q.  Thank you.  We'll just move on.
25   Did either you or -- well, let me back up.

75  (Pages 294 to 297)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

Page 302

1    Q.  Well, can you tell me what you
2  think it's indicated for?
3    A.  I'm thinking that it was to
4  treat wasting disorder in AIDS patients, but
5  I'm not certain.  I don't know if I'm mixing
6  it up with something else.
7    Q.  And is that because it's an
8  appetite stimulant?
9    A.  I didn't really get into the
10  mechanism of it.
11    Q.  Well, isn't Marinol sort of
12  unique and interesting and in some ways
13  controversial?
14    MS. WITT:  Object to the form.
15    A.  I was not the brand manager.  I
16  don't know a whole lot about it, so . . .
17    Q.  Okay.  Well --
18    A.  If you'd get more specific, I
19  can see if it triggers a memory.
20    Q.  Sure, sure.  You understand
21  that Marinol is a synthetic form of THC,
22  right?
23    A.  Correct.
24    Q.  And THC is the active aspect of
25  the elicit drug marijuana, right?

Page 303

1    A.  Correct.  One of them,
2  probably.
3    Q.  I beg your pardon?
4    A.  It's probably one of the active
5  things in it.
6    Q.  Right, right.  It's the main
7  one that people talk about?
8    A.  Correct.
9    Q.  All right.  And so does that --
10  does remembering that trigger any personal
11  memory that you have of discussions at Roxane
12  Laboratories, Inc., about what this synthetic
13  component of marijuana was designed to treat?
14    A.  I think I mentioned earlier
15  that, to the best of my recollection, it was
16  to treat wasting disease.
17    Q.  But you have no recollection,
18  as you sit here today, of why that was the
19  case?
20    A.  I don't recall, as you said,
21  whether it's an appetite stimulant or whether
22  it impacts the metabolism or -- I really
23  don't recall.
24    Q.  In any case, did either you or
25  Lesli Poaletti ever have responsibility for

Page 304

1  this branded product?
2    A.  No.
3    Q.  Who was responsible for
4  Marinol?
5    A.  I don't recall.
6    Q.  The next drug on the list, do
7  you see it there?
8    A.  Let me go backwards.
9    A.  Yes, ma'am.
10    A.  The branded products,
11  ultimately, at a point in time -- all of the
12  product managers reported through Gary
13  Ellexson, who was in charge of all of the
14  branded product managers.  I don't remember
15  which specific product manager had Marinol.
16  But for a period of time, it would have gone
17  through Gary Ellexson at Roxane.
18    Q.  Oh, okay.  So what you're doing
19  right now is you're helping me with a little
20  bit more information about my last question
21  that we didn't have a moment ago?
22    A.  Yes.
23    Q.  Did Gary Ellexson ever report
24  to you?
25    A.  No.

Page 305

1    Q.  Was he -- was Gary Ellexson
2  within Roxane Laboratories, Incorporated,
3  old?
4    A.  Yes.
5    Q.  And this was prior to the
6  transition of branded products to Boehringer
7  Ingelheim Pharmaceuticals, Incorporated?
8    A.  I believe it was prior and
9  after.
10    Q.  So the gentleman stayed at
11  Roxane Laboratories, Inc., is what you're
12  saying?
13    A.  To the best of my recollection,
14  he moved with the products.
15    Q.  Oh, okay.  To be clear:  I
16  think what you're suggesting is -- and please
17  correct me if I'm wrong -- that the branded
18  product Marinol was within the product line
19  of the old Roxane Laboratories, Inc., at some
20  point during your tenure there, correct?
21    A.  Yes.
22    Q.  But that today, it is no
23  longer?
24    A.  Correct.
25    Q.  Do you recall when that

334.262.3332  Baker & Baker Reporting and Video Services, Inc.  334.262.3332
888.253.3377  Certified Court Reporters and Certified Legal Video Specialists  888.253.3377

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 454

1    (A brief recess was taken.)
2        THE VIDEOGRAPHER: This is the
3        beginning of Tape No. 11.
4        We're on the Record at
5        4:56 p.m.
6    BY MR. WINGET-HERNANDEZ:
7        Q. Ms. Waterer, is it fair to say
8    that Boehringer Ingelheim Roxane knows and
9    understands that the AWP prices that it
10   reports for its products are much higher than
11   any price that it would ever expect for a
12   retail pharmacy to pay?
13       MS. WITT: Object to the form.
14       A. I don't know. I would agree
15   that the AWP is not a price that Roxane
16   charges any customer and that it is higher
17   than what I would expect them to generally --
18   a retail store to generally pay.
19       Q. I'd like to get a little
20   housekeeping detail sort of out of the way.
21   We had talked earlier about these documents,
22   and I can never remember the range. I think
23   it's Exhibit 22 through Exhibit 51. What I'm
24   going to do here is, I'm going to show you
25   what's been marked Plaintiffs' Exhibit No. 28

Page 455

1    and ask you a couple of questions about it.
2    And after I get your answers, then I'll make
3    another statement on the Record.
4        Do you recognize Plaintiffs'
5    Exhibit No. 28 as correspondence between
6    Roxane Laboratories, Inc., and one of the
7    pricing compendia, in this case Red Book?
8        (Whereupon Plaintiffs' Roxane
9        Waterer No. 28 was marked for
10       identification and attached
11       hereto.)
12       (Witness reviewed document.)
13       A. Yes.
14       Q. And if you'll turn for me to
15   page 13873, that is a letter from Roxane to
16   Red Book, correct?
17       A. Yes.
18       Q. And it references both pricing
19   corrections and deletions of products and
20   other alterations to the product listing that
21   Red Book carries in its published product,
22   correct?
23       (Witness further reviewed
24       document.)
25       A. Yes.

Page 456

1        Q. Do you recognize the author?
2        A. Yes.
3        Q. Well, who is it?
4        A. Jan Kirby.
5        Q. Is that a person who is
6    authorized to communicate with Red Book in
7    order to make sure that Red Book had the
8    information that Roxane wanted it to have in
9    connection with the publication of Roxane's
10   published prices?
11       A. Yes.
12       Q. And finally, if you'll turn
13   to --
14       A. Can I make a comment on this?
15       Q. Yes. Go ahead.
16       A. While the original
17   communication came from us, there appears to
18   be a lot of notes on it that I do not believe
19   were on what we sent them.
20       Q. That's fair. Go ahead and look
21   at Bates No. 13876. That is the beginning of
22   a fairly voluminous document that has a
23   title, right, Product Verification Form, or
24   something like that?
25       A. Product Listing Verification,

Page 457

1    Medical Economics.
2        Q. Okay. Do you recognize that
3    sort of document as the thing that we were
4    talking about or that you were talking about
5    earlier wherein the pricing compendia would
6    ask Roxane to check to make sure that the
7    prices that it was going to publish or that
8    it intended to publish in its publication
9    were the prices that Roxane wanted to be
10   published?
11       A. With a minor correction. My
12   understanding is this is what they were
13   currently publishing. And we had a chance to
14   go back and correct anything that they were
15   publishing incorrectly.
16       Q. Okay. And really my question
17   goes to whether you recognize that this
18   product verification form, or whatever it's
19   called, was the instrument that you used in
20   the context of the Red Book to verify prices?
21       A. In this case, yes.
22       Q. Does it comport with Boehringer
23   Ingelheim Roxane, Inc.'s, knowledge and
24   recollection that this was the median that
25   was used in the normal course to accomplish

115 (Pages 454 to 457)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 458

1    that purpose?
2        A.  I'm not sure how frequently it
3    occurred to call it normal.  It is something
4    that I'm familiar with that we at least
5    worked with a couple of times.
6        Q.  Certainly not unusual.
7        A.  Correct.
8        MR. WINGET-HERNANDEZ:  Okay.
9            I'm not going to ask any
10           more than that about the
11           remaining documents in the
12           range that I just
13           described, probably much
14           less, and certainly much
15           less regarding those
16           documents that turn out not
17           to have that form attached
18           to it.  And I'm stating
19           this for the Record so that
20           you can look through those
21           documents and satisfy
22           yourselves that between now
23           and tomorrow morning that
24           you can testify in response
25           to my questions.

Page 459

1        MS. WITT:  Okay.  If the
2            homework assignment is
3            really just to have a
4            chance for her to look at
5            them -- because the only
6            question that I've heard
7            that we could answer going
8            through, because the
9            questions were kind of
10           document specific, other
11           than in this correspondence
12           between Roxane and Red
13           Book, which we can
14           certainly verify.  But
15           other than that, I'm not
16           sure there's other specific
17           questions that I'll
18           necessarily be able to
19           identify for Ms. Waterer
20           overnight to say easily.
21               We might have to go
22           through the documents one
23           by one if you want to ask
24           about specific document-
25           related questions as

Page 460

1            opposed to -- I thought we
2            were just going to go
3            through and look and say,
4            Bates Nos.  X, Y, and Z are
5            correspondence.  But if
6            you've got more substantive
7            questions, I'm afraid we're
8            probably going to have to
9            go through them document by
10           document.
11       MR. WINGET-HERNANDEZ:  I'm
12           guilty as charged.
13           Whenever I get a document
14           and I have a witness to
15           tell me about it, I can't
16           resist asking all of these
17           damn questions, but I . . .
18       MS. WITT:  Why don't we just
19           try to do it tonight so
20           we're finished.  Because I
21           really don't want to take
22           too much of Massachusetts's
23           time tomorrow.  And this
24           doesn't sound, based on
25           those questions, like this

Page 461

1            is going to be a forty-five
2            minute exercise.
3        MR. WINGET-HERNANDEZ:  Let's
4            whip through it.  I do have
5            a couple of other documents
6            that I wanted to ask
7            questions about, but maybe
8            I can just leave those
9            until in the morning.
10   BY MR. WINGET-HERNANDEZ:
11       Q.  I'll show you what's been
12   marked Plaintiffs' Exhibit No. 22.  Can you
13   tell me --
14       MS. WITT:  At the risk of
15           getting into the camera
16           realm, and I want to at
17           least be able to see the
18           document as the Witness is
19           looking at it.
20       Q.  Can you identify that document
21   as correspondence between Roxane and Red
22   Book, Ms. Waterer?
23           (Whereupon Plaintiffs' Roxane
24           Waterer No. 22 was marked for
25           identification and attached

116  (Pages 458 to 461)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

Page 494

```
 1           understand your position.
 2           MR. WINGET-HERNANDEZ:  I have a
 3           feeling, Helen, that you
 4           and I are going to be able
 5           to work things out.
 6      MS. WITT:  Let's hope so.
 7           MR. WINGET-HERNANDEZ:  Thank
 8           you for taking your time to
 9           appear here today, and
10           thank you also for going a
11           bit beyond the time that we
12           were originally scheduled
13           to go.
14      THE VIDEOGRAPHER:  This is the
15           end of Tape No. 11 and the
16           conclusion of Day 2 in the
17           continuing deposition of
18           Judy Waterer.
19               We're going off the
20           Record at 5:41 p.m.
21      (Whereupon the continuing
22       videotaped deposition of JUDY
23       WATERER, VOLUME II recessed at
24       5:41 p.m.)
25
```

Page 496

```
 1   Circuit, State of Hawaii; and in the matter
 2   of THE COMMONWEALTH OF MASSACHUSETTS,
 3   Plaintiff, versus MYLAN LABORATORIES, INC.,
 4   et al., Defendants, C.A. No. 03-11865 PBS,
 5   now pending in the United States District
 6   Court, District of Massachusetts; and that
 7   the foregoing pages contain a true and
 8   accurate transcription of the examination of
 9   said witness by counsel for the parties set
10   out herein; that the reading and signing of
11   said deposition was not waived by witness
12   and counsel for the parties.
13       I further certify that I am neither of
14   kin nor of counsel to the parties to said
15   cause, nor in any manner interested in the
16   results thereof.
17       This the 24th day of May, 2007.
18
19
20
                Cornelia J. Baker
21              Certified Shorthand Reporter,
                Certified Court Reporter and
22              Notary Public for the
                State of Alabama
23
24       My Commission expires 6/9/08.
25
```

Page 495

```
 1
 2       * * * * * * * * * *
 3       REPORTER'S CERTIFICATE
 4       * * * * * * * * * *
 5   STATE OF ALABAMA)
 6   COUNTY OF MONTGOMERY)
 7
 8       I, Cornelia J. Baker, Certified Court
 9   Reporter, Certified Shorthand Reporter, and
10   Notary Public in and for the State of
11   Alabama at Large, do hereby certify that on
12   Thursday, May 10, 2007, pursuant to notice
13   and stipulation on behalf of the Plaintiffs,
14   I reported the videotaped deposition of JUDY
15   WATERER, VOLUME II, who was first duly sworn
16   by me to speak the truth, the whole truth,
17   and nothing but the truth, in the matter of
18   STATE OF ALABAMA, Plaintiff, versus ABBOTT
19   LABORATORIES, INC., et al., Defendants,
20   Civil Action No. 2005-219, now pending in
21   the Circuit Court of Montgomery County,
22   Alabama; and STATE OF HAWAII, Plaintiff,
23   versus ABBOTT LABORATORIES, INC., et al.,
24   Defendants, Civil No. 06-1-0720-04 EEH, now
25   pending in the Circuit Court of the First
```

Page 497

```
 1         IN THE CIRCUIT COURT OF
             MONTGOMERY COUNTY, ALABAMA
 2
     STATE OF ALABAMA,
 3       Plaintiff,
     vs.     CIVIL ACTION NO. 2005-219
 4   ABBOTT LABORATORIES, INC.,
     et al.,
 5       Defendants.
 6   ----------------------------------
 7    IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
             STATE OF HAWAII
 8
     STATE OF HAWAII,
 9       Plaintiff,
     vs.     CIVIL NO. 06-1-0720-04 EEH
10   ABBOTT LABORATORIES, INC.,
     et al.,
11       Defendants.
12   ----------------------------------
13        UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
14
     THE COMMONWEALTH OF MASSACHUSETTS,
15       Plaintiff,
     vs.     C.A. NO. 03-11865 PBS
16   MYLAN LABORATORIES, INC.,
     et al.,
17       Defendants.
18       * * * * * * * * *
             VOLUME III
19    The videotaped deposition of JUDY WATERER,
20   VOLUME III, was taken before Cornelia J.
     Baker, Certified Court Reporter and
21   Certified Shorthand Reporter, as
     Commissioner, on Friday, May 11, 2007,
22   commencing at approximately 8:42 a.m., in
     the law offices of Kirkland & Ellis, 153
23   East 53rd Street, New York, New York
     pursuant to the stipulations set forth
24   herein.
25
```

125  (Pages 494 to 497)

334.262.3332  Baker & Baker Reporting and Video Services, Inc.  334.262.3332
888.253.3377  Certified Court Reporters and Certified Legal Video Specialists  888.253.3377

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 522

1  responding for both of those -- that one
2  entity that carried over?
3       A.  If it's limited to pre-2005, I
4  believe that the split didn't occur --
5       Q.  Okay.
6       A.  -- legally.  I'm not positive,
7  but I think it was '05.
8       Q.  Direct your attention to page
9  three, which has -- which is the attachment,
10 Matters on Which Roxane Shall Testify on
11 Deposition Pursuant to Federal Rules of Civil
12 Procedure 30(b)(6); do you see that?
13      A.  Yes.
14      Q.  And the first item is Roxane's
15 legal relationship to any of its corporate
16 affiliates.  Just explain to the Jury what
17 the scope of your understanding, your
18 knowledge, of that topic is.
19      A.  Actually, I was able to
20 clarify.  And where I was not confident using
21 the term "subsidiary" before, it is indeed
22 subsidiary.
23      Q.  When you say "it is a
24 subsidiary" --
25      A.  Roxane Laboratories, Inc.

Page 523

1       Q.  So Roxane Laboratories, Inc.,
2  is a subsidiary of --
3       A.  -- BI Corporation.
4       Q.  Boehringer Ingelheim
5  Pharmaceuticals, Inc.; is that correct?
6       A.  No.
7       Q.  Okay.
8       A.  Boehringer Ingelheim
9  Pharmaceuticals, Inc., is also, I believe --
10 I'm not -- I believe that that also would be
11 a subsidiary of BI Corporation.  But that's
12 not an area I'm prepared for, so . . .
13      Q.  Boehringer Ingelheim
14 Corporation is the corporate parent of Roxane
15 Laboratories, Inc.; is that correct?
16      A.  Yes.
17      Q.  Okay.  Let me direct your
18 attention to Paragraph 2, Roxane's
19 operational relationship to any of its
20 corporate affiliates; do you see that?
21      A.  Yes.
22      Q.  Do you feel that you are
23 knowledgeable of the subject matter of the
24 operational relationship between Roxane
25 Laboratories, Inc. -- which I'm going to call

Page 524

1  Roxane for the purposes of this deposition --
2  and its sister corporations?
3       A.  Yes.
4       Q.  Okay.  I understand that you
5  are also going to be testifying as a
6  knowledgeable person with regard to Paragraph
7  3?
8       A.  Yes.
9       Q.  And let me direct your
10 attention now -- we've spoken about Paragraph
11 4 with regard to the transactional data.  And
12 we'll get to specific records, other specific
13 records, later in the deposition, so I'm
14 going to skip that for now.
15      With regard to the topic of
16 Paragraph No. 5, is that a topic with which
17 you are familiar?
18      A.  Yes.
19      Q.  And do you feel today that you
20 can give a complete, knowledgeable, and
21 binding -- complete and knowledgeable answers
22 with regard to how Roxane determines what it
23 will report as AWP or WAC or other price?
24      A.  If I can, again, specify that
25 my area of knowledge on this is limited to

Page 525

1  the multisource product Line.
2       MS. WITT:  I should have
3         included that in the carve-
4         out.
5       MR. HEIDLAGE:  Okay.
6  BY MR. HEIDLAGE:
7       Q.  Let me direct your attention
8  down to Paragraph 8 and just ask you to read
9  that.
10      By the way, you have seen this
11 before; is that correct?
12      A.  Yes.
13      Q.  Let me direct your attention to
14 Paragraph 8.
15      Are you prepared to speak to
16 the subject matter of how and the extent to
17 which Roxane's procedures with regard to
18 reporting its AWP, WAC, or other price to
19 First Databank with regard to multisource
20 products is different from the procedures
21 that it used with regard to any other
22 products?
23      A.  I'm not sure I understand the
24 question.
25      Q.  Well, I'm just trying to deal

132  (Pages 522 to 525)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 534

1       To distinguish -- I think it's
2    really important to understand the generics
3    are not driven by the traditional marketing,
4    what one might think of as a
5    feature-and-benefit piece and going in and
6    creating this.  What we tended to do on most
7    of the new products was create a one-page ad
8    that was what we would call an awareness ad,
9    which typically had a picture of the product
10   on it and "now available" on a banner across
11   the top.
12       Depending on the type of drug
13   it was, requirements may or may not have
14   required us to include the package insert on
15   the back page.  And for the most part, that
16   was the only thing that a customer would have
17   seen if a sales representative had been
18   interested in getting it to them.  Normally,
19   they didn't, because it really didn't add any
20   value to the conversation.
21       Q.  When you say -- I mean, you
22   were not directly involved in sales calls
23   most of the time; is that correct?
24       A.  Yes.
25       Q.  I mean, so how did you become

Page 535

1    familiar and able to testify with regard to
2    the kind of conversation that would occur
3    with your customers?
4       A.  During the sales meetings,
5    sales representatives would review what was
6    going on.  They would have individual account
7    reviews.
8       I did occasionally ride with a
9    sales representative.  And their management
10   team took great pangs to make me aware of any
11   misinformation I might have with regard to
12   the willingness of their people or the
13   appropriateness of the sales pieces.
14       And in terms of them not using
15   the sales pieces, I can pretty much guarantee
16   that, because we typically only sent out 25
17   or 50.  And they usually got thrown away and
18   weren't reordered, so . . .
19       Q.  Could you describe for the Jury
20   who the real customers are for Roxane and
21   the -- in its sales business?
22       A.  I guess the simplest
23   explanation would be a relatively limited
24   number of individuals who had the authority
25   to make purchasing decisions for moderately

Page 536

1    large blocks of pharmaceutical business.  In
2    other words, the buyer or purchaser for a
3    buying group, the buyer or purchaser for a
4    warehousing chain, someone who was in that
5    role.
6       Q.  I think yesterday you gave some
7    examples of each of these customers.  But
8    just so the Jury can understand who we are
9    talking about, with regard to warehousing
10   chains, could you just give some examples of
11   what a warehousing chain might -- I mean,
12   what kind of companies are warehousing
13   chains?
14       A.  It might be a Rite Aid,
15   a Walgreen's, a Wal-Mart, a CVS, that type of
16   . . .
17       Q.  In other words, the large chain
18   pharmacies often would have their own
19   warehouses, and so you would call those a
20   warehousing chain, correct?
21       A.  Yes.
22       Q.  And the person that you would
23   target for a sales call with regard to -- or
24   for marketing or sales and so on, would be
25   the buyer for the chain; is that correct?

Page 537

1       A.  It would be the buyer that was
2    responsible for multisource products at the
3    chain.  Sometimes they separated it;
4    sometimes they were together.
5       Q.  And generally, how many of
6    those kinds of customers are there?  How many
7    people are there that you're dealing with?
8       A.  At the large warehousing chain?
9       Q.  Yes.
10       A.  Five or six.  Then there's a
11   mid tier, but there's not a whole lot of
12   customers.
13       Q.  And just as a general matter,
14   can you explain to the Jury what a sales call
15   with regard to Roxane's drugs would focus on
16   when you were approaching the buyer for a
17   large chain?
18       A.  It would most likely depend on
19   the time of year.  Some of the chains had
20   like an open-bid cycle, where at a certain
21   period, they would put out a bid and ask all
22   of the companies to respond and then decide
23   who they would award.  So there were calls
24   during that time period trying to determine
25   how our bid was being perceived; whether we

135  (Pages 534 to 537)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 538

1   were in the running, if there were specific
2   products that we had to lower price on,
3   getting any information that we could.
4           Another type of call, a
5   maintenance call, would be touching base with
6   the customer to review the contract and their
7   buying patterns, to go over service levels
8   and make sure that we were providing them
9   with everything that they would expect, take
10  care of any problems.
11          Along with that, at times
12  intermittently, a customer may indicate that
13  for one reason or another he's thinking of
14  switching vendors and mention that there may
15  be an opportunity for an individual drug.  At
16  which point they would negotiate as to
17  whether or not Roxane might be in the running
18  to be selected for the change.  Mostly that
19  type of thing.
20      Q.  What kind of issues would
21  determine whether or not Roxane was in the
22  running for supplying a multisource drug?
23      MS. WITT:  Object to the form
24          of the question.
25      A.  I can tell you that our sales

Page 539

1   force has told us comments from the customers
2   about what's important to them.  And the most
3   important thing that we hear from the sales
4   force is ease of doing business.  In other
5   words, when they order the product, is it
6   available; is it shipped without being
7   broken; does it show up when it's supposed
8   to; is there virtually no backorders; when
9   there's any kind of contract or pricing
10  questions or disputes, is it easy to
11  communicate back and forth?
12          The next one would be really
13  the history and experience with the company,
14  if they've developed a comfort level.
15          Probably, one of the lower
16  things on the priority would be price.  And
17  although that sounds counterintuitive, in our
18  business, almost any company will match
19  almost any comp -- it's a total commodity
20  business.  So it's almost as if price is a
21  given, whatever the market price is what
22  you supply the product as.  And most
23  companies, until that comes below cost of
24  goods, will meet that price.
25          So the customer is going to

Page 540

1   accept that as a given and differentiate
2   among relationship, ease of doing business,
3   and just experience.
4       Q.  At any time in these sales
5   calls, have you been -- strike that.
6           Have you ever been informed
7   that at any time in these sales calls to
8   chain warehouse buyers that the customer was
9   concerned about your average wholesale price?
10      A.  I can recall one specific time
11  period vividly.  There may have been others.
12      Q.  And is the one time period that
13  you're speaking about the circumstance with
14  regard to Furosemide that you testified about
15  either yesterday or the day before?
16      A.  Yes.
17      Q.  Any others?
18      A.  Not that I recall.  There -- I
19  would have little doubt that there may have
20  been other occasions.
21      Q.  And why would the Average
22  Wholesale Price that you're reporting have
23  any significance for the customer?
24      A.  The customers let us know that
25  many of their reimbursement programs may be

Page 541

1   tied to AWP so that if our AWP -- the
2   customer is trying to make the awards based
3   on the bid price.  And if a company's AWP is
4   significantly out of line with all of the
5   competitors, by picking the lowest bid price,
6   he could be making a decision that would be
7   less profitable for his company.  So in the
8   instances where customers would bring that
9   up, it would become part of the sales call.
10          But most -- most frequently,
11  AWPs really fall within a very normal average
12  range, so that it's rarely a consideration or
13  brought up in the conversation with the sales
14  rep.  It's as if there's an exception or
15  something unusual about it that it might
16  become a discussion point.
17      Q.  At any time did -- in your
18  experience, was there a situation in which
19  you as the Director of Marketing, or head of
20  marketing, had concluded that the -- your
21  AWPs were higher than your competitors and,
22  therefore, you had a competitive advantage
23  against your competitors, and you instructed
24  your salespeople to point that out to the
25  customers?

334.262.3332  Baker & Baker Reporting and Video Services, Inc.  334.262.3332
888.253.3377  Certified Court Reporters and Certified Legal Video Specialists  888.253.3377

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 562

1  group was dismantled.  The individual, Chris
2  Marsh, who had been involved in contracting
3  with Roxane, relocated to the central place
4  in Connecticut and took on the role of doing
5  contracts, of doing our Roxane contracting
6  from a different site.
7       Q.  Okay.  And I'm sorry I don't
8  recall.  I know that you've testified about
9  Mr. or Mrs. Marsh before.  Is that a male or
10 a female?
11      A.  Oh, female.
12      Q.  Did Mrs. Marsh -- is she now
13 located in Connecticut?
14      A.  Yes.
15      Q.  And she's an employee of an
16 entity other than Roxane Laboratories,
17 Incorporated; is that correct?
18      A.  Correct.
19      Q.  Okay.  Is she a lawyer, by the
20 way?
21      A.  I don't believe so.
22      Q.  Okay.  So is it fair to say
23 that the contract administration function for
24 Roxane is now being carried out by either its
25 corporate parent or one of its affiliates?

Page 563

1       A.  By a sister company, yes.
2       Q.  Okay.  And that's Boehringer
3  Ingelheim Pharmaceuticals, Incorporated; is
4  that correct?
5       A.  I believe that's who she
6  reports through.  I'm not positive of her
7  line.  We have a service -- I believe even
8  today we have a service contract with them
9  for the services that they provide to us.
10      Q.  Are there other services that
11 your sister corporation provides to Roxane?
12      A.  Some of our financial work is
13 done, and I -- again, I believe it's -- I
14 believe the individual is BIPI, but I'm not
15 sure if he's BIPI or another individual.  To
16 the best of my knowledge, it's BIPI.
17      Q.  What kind of services does --
18 well, strike that.
19          First of all, does this person
20 that you're referring to have a name?  I'm
21 sure he has a name.  Do you know the name of
22 the person who provides these services?
23      A.  There's been an individual in
24 Connecticut that provides us assistance with
25 our financial numbers.  The name of the

Page 564

1  individual has changed over the years.
2       Q.  Okay.  So it's a function
3  that's there --
4       A.  Yes.
5       Q.  -- and different individuals
6  have performed that function; is that
7  correct?
8       A.  Yes.
9       Q.  And, in general, what kinds of
10 financial services do they perform for you?
11      A.  They communicate our budgets,
12 compile them.  They access the sales reports
13 and put them together into a format that's
14 digestible and send that to us in some cases
15 on a weekly basis.  I would call it basic
16 financial housekeeping.
17      Q.  Are there certain financial
18 things that are done by Roxane Laboratories,
19 Incorporated, and then others that are
20 performed under the service contract or
21 services arrangement that you have with your
22 sister corporation, period?
23      A.  Again, it's varied over the
24 time period.  In '96 when I came on board, we
25 had in-house finance that what they provided

Page 565

1  was moved to Connecticut.  I don't remember
2  the year.  Probably sometime around or a
3  little bit before the time the contracting
4  moved.  Things were -- there was an
5  initiative to centralize some of the
6  functions.
7       Q.  Do the employees in -- at
8  Roxane have either Internet or some other
9  kind of access to financial records, I mean,
10 for the day-to-day business?
11          MS. WITT:  Object to the form
12          of the question.
13      Q.  I'm sorry.  I'm going to strike
14 the question, and I'm going to start over
15 again.  Actually, I think I'm going to leave
16 it at this point.
17          In the -- with regard to the
18 contracts that Roxane has with its
19 wholesalers, do you have direct input into
20 any of the particular terms?
21      A.  Again, things have varied over
22 time.  In the -- you know, when I first came
23 on board, I don't think I had ever seen one.
24 At various times, portions of them may have
25 been presented where the wholesalers were

142  (Pages 562 to 565)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 566

1  pretty much dictating what the terms would be
2  in order to participate that would have -- I
3  don't remember the specifics -- but been
4  outside of what we would accept as normal
5  customary business, and we wouldn't want to
6  do that.
7        So the people that were
8  responsible for reviewing contracts would
9  highlight that and say, These are differences
10  that are jumping out.  Do you want to cave on
11  a couple of them, keep a couple, how do you
12  want to proceed?  And depending on the
13  decisions that we made, they would amend the
14  contract to reflect what we were willing to
15  do.
16        Q.  Who was responsible for
17  negotiating the financial terms of the
18  contracts with the wholesalers?
19        A.  That would have been a
20  combination of the sales marketing and the
21  contract.  Contracting group has a broad
22  guideline that if it falls within that, they
23  can go ahead and send it out.  If it's
24  outside of that, then it would have to go
25  through various levels of the authority for

Page 567

1  change.  And over time, those levels and the
2  individuals involved has changed and evolved
3  with the business.
4        Q.  Now, just directing your
5  attention to the document that's in front of
6  you.  I think you've said you've never seen
7  it before, but is that the kind of contracts
8  that you would have with a wholesaler for a
9  source program?
10        MS. WITT:  Object to the form
11        of the question.
12        A.  Without taking a good hour to
13  look it over, I really couldn't answer on it.
14        It appears to be a Cardinal
15  letterhead of a standard agreement.  So if we
16  take it on face value that this is what
17  Cardinal may have presented as an agreement,
18  I don't know how else to answer it unless you
19  want me to take the time to study it.
20        Q.  Before we go any further, then,
21  I'm going to ask that we mark that as a next
22  exhibit for identification.
23        Just for the Record, Exhibit 71
24  is a document that is marked, Highly
25  Confidential, Attorneys' Eyes Only.  It is

Page 568

1  Bates No. RLI-TX25155 through RLI-TX25174.
2        (Whereupon Plaintiffs' Roxane
3        Waterer No. 71 was marked for
4        identification and attached
5        hereto.)
6        (Witness reviewed document.)
7  BY MR. HEIDLAGE
8        Q.  And, Ms. Waterer, I'd just like
9  to, you know, point out to you or alert you
10  to the fact that the agreement appears to be
11  between Cardinal Health Provider Pharmacy
12  Services and Boehringer Ingelheim
13  Pharmaceuticals, Inc.  Do you see that?
14        A.  Yes.
15        Q.  Is it possible that -- and you
16  may not now the answer to this -- and I know
17  this is beyond the scope of at least this
18  phase of the deposition -- but would -- can
19  you tell from the agreement whether Cardinal
20  can purchase or does purchase Roxane's drugs
21  pursuant to this agreement?
22        A.  Is there a list of drugs
23  attached?
24        Q.  I don't know.
25        MS. WITT:  Exhibit A.  It's on

Page 569

1        page 25160.
2        MR. HEIDLAGE:  Thank you.
3        A.  These are all BIPI products.
4        Q.  Have they always been BIPI
5  products?
6        A.  Yes -- or, let me clarify that.
7  To my knowledge, I haven't known them to be
8  somebody else's.  Whether BIPI got them from
9  somebody else and then later marketed them, I
10  don't know.  They're all BIPI brand names.
11        Q.  Let me show you a document
12  that --
13        MR. HEIDLAGE:  Well, first of
14        all, let's go ahead and
15        mark that as the next
16        exhibit.
17        I apologize.  I do
18        have copies.  Let me give
19        them to you.  And my
20        objective today is to give
21        out all the copies I can,
22        so I don't have to carry
23        them back.
24        MS. WITT:  Can we go off the
25        Record for a second?

143  (Pages 566 to 569)

334.262.3332  Baker & Baker Reporting and Video Services, Inc.  334.262.3332
888.253.3377  Certified Court Reporters and Certified Legal Video Specialists  888.253.3377

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

Page 594

1  included is a membership affiliation, the
2  price, and the customer identification:  What
3  when you say -- what is the price that you
4  are referring to?
5          A.  I think on this that I need to,
6  again, say that I am not the person that has
7  the information about the transaction.  So
8  I'm talking second, third, fourth hand
9  general understanding of what's occurring.
10  And I think if you want to get into very
11  specific details about the information that's
12  included in an EDI transmission -- if EDI is
13  even the proper vehicle that it comes
14  through -- that my understanding is that
15  someone else is going to talk to that.
16          Q.  Isn't your agreement with the
17  wholesaler that if a customer who has a
18  contract with Roxane comes to the wholesaler
19  to purchase the product, that the wholesaler
20  would sell the product to the customer for
21  the contract price?
22          A.  I would have to actually read
23  the contract.  I believe that the contract
24  says, if the wholesaler willingly provides
25  the customer, services that contract, we will

Page 595

1  reimburse him back down to that contract
2  price so that it makes him whole relative to
3  the customer.
4          I don't know what the specific
5  sentence is that you're trying to -- I don't
6  have recollection of an individual sentence
7  and the exact wording.
8          Q.  Okay.  I believe you testified
9  yesterday that you have some role in setting
10  prices; is that true?
11          A.  Yes.
12          Q.  And can you just describe for
13  the Jury what your role in setting prices has
14  been?
15          A.  Up until the last three or four
16  years, when there was a pricing issue, I or
17  somebody in my group would research it and
18  make recommendations as to what would be an
19  appropriate price to change or initiate on a
20  product.
21          Q.  Okay.  Let's start first with
22  the kinds of prices that you had -- up
23  through three or four years ago, you had
24  responsibility for setting.  First of all,
25  how about the AWP?

Page 596

1          A.  Yes.
2          Q.  Okay.  Were you the person who
3  set that price?  Did you have the authority
4  to set the price?
5          A.  No.
6          Q.  Okay.  And did you have to go
7  through a process to have an AWP established
8  for a product?
9          A.  Yes.
10          Q.  And what was that process?
11          A.  Again, it changed over time.
12  When I first came to the company, in order to
13  change any price or initiate any price, there
14  was a specific template that had to be filled
15  out with the recommendations.  And then it
16  had to be routed and approved through various
17  levels of management.  Who signed off on it
18  changed overtime.
19          Later in the course, when we
20  began reporting to Mr. Russillo, he could
21  give the yea or nay.  And it didn't have to
22  route further.  Although, I believe we still
23  included different members of management.
24          MR. HEIDLAGE:  I'm going to
25          apologize for this, but

Page 597

1          could you read back -- so I
2          don't waste your time --
3          could you read back that
4          answer, please?
5          (Whereupon the requested portion
6          of the Record was read by the
7          Court Reporter.)
8  BY MR. HEIDLAGE
9          Q.  Now, do you recall what kinds
10  of information were required be put onto the
11  template?
12          A.  When I first came on board, I
13  probably need to look at the template.  But
14  if it was a price change it would probably be
15  old price, new price.  It may have had
16  product cost information, because I think we
17  had to route it through finance back then.
18  It varied over time.
19          Q.  Okay.  Now, I'd really like to
20  focus first on the AWP.
21          A.  Uh-uh.
22          Q.  All right.  If you wanted to
23  establish or change the AWP for a product,
24  would you use this same template?
25          A.  At the -- I would say that we

150  (Pages 594 to 597)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 598

1  would use a template of -- we would use some
2  format.  As things changed over time, we
3  would use whatever seemed relevant at the
4  time.  Having a standardized form that was
5  used for the last, I don't know, twenty
6  years, whatever it was, the format would be
7  updated and changed.  So it wasn't, you know,
8  cast in stone that this will occur every
9  time.  It evolved like things do over, you
10 know, the ten or so years that we're
11 covering.
12        Q.  Well, you know, this was one of
13 the specific areas that you were designated
14 to testify about.  And I think that in the
15 first questions that I asked, you felt that
16 you could -- that you were knowledgeable
17 about the process and could speak to the
18 process of setting the AWP --
19        A.  Yes.
20        Q.  -- as one of the prices that
21 we've talked about and specifically referred
22 to.
23        A.  Uh-huh (affirmative response).
24
25        Q.  Did you do anything to remind

Page 599

1  yourself of the kinds of information that
2  were provided and the routing and so on to
3  establish an AWP, before this deposition?
4        MS. WITT:  Object to the form.
5        A.  Whatever -- I, I -- I'm not
6  understanding what you're asking.  If we
7  were, in theory, to change an AWP, we would
8  have put forth a proposal in some format.
9  Depending on what time frame it occurred in,
10 the format may have changed.  Depending on
11 whether it was an individual product or a
12 vast number of products, different formats
13 may have been more appropriate.
14        We would have put together a
15 document of some sort that said if it was a
16 change, this is what it used to be; this is
17 what we want it to be, and listed who at the
18 time was required to approve it and gotten
19 their signatures.  So it changed over time.
20        Q.  Ms. Waterer, I'm trying to help
21 the Jury understand what you actually did.
22 And I don't think from that answer that the
23 Jury could really understand what you did.
24 You said things may have happened; we may
25 have done stuff, whatever.

Page 600

1        But, you know, you're here to
2  testify about what actually did happen.  And
3  if there is a template that we should be
4  looking for, I mean, I don't know what to
5  look for.  In part, that's what the purpose
6  of this deposition is.
7        A.  Uh-uh.
8        Q.  Is there, was there a
9  template -- let me give you an example, and
10 go back and let's see if we can work through
11 this.
12        MS. WITT:  Well, let me move to
13           strike the commentary.
14        Q.  In yesterday or the day before,
15 there was a document that was produced and
16 that you identified as being the memorandum
17 that you had prepared in order to justify a
18 change in the Wholesale Acquisition Cost, the
19 WAC, right?
20        A.  That was a unique example.  If
21 you're talking about Furosemide, yes.
22        Q.  I'm talking about the WAC --
23        A.  Oh, I'm sorry.
24        Q.  -- a memo in which you went
25 through a process.  And the process that you

Page 601

1  went through, it appeared to be -- I don't
2  know if it was -- we'll get to that in a
3  moment.  I don't know whether that was unique
4  or whether it was something that was common.
5        But you wrote a memo to your
6  supervisor.  And in that memo you had a
7  recommendation of what you wanted to do, and
8  you had the reasons that you had wanted to do
9  it.  And you could kind of follow through
10 what your thinking was.
11        Now, if you were going to go to
12 your senior management, and you were
13 recommending either a change in an AWP to
14 increase it or to reduce it, as a general
15 matter -- you said that things change.
16        Well, we'll start from 1996
17 when you started with the company:  What
18 information did you have to provide your
19 senior management in order to justify that
20 change in the AWP?
21        MS. WITT:  Object to the form
22           of the question.  Is the
23           question, Tell me
24           everything that might have
25           happened at any time?

151 (Pages 598 to 601)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

Page 602

1    MR. HEIDLAGE: No, I would like
2       to know what did happen
3          from --
4       Q. And if you can't remember,
5  we'll work through. You can tell me what you
6  do remember and what information you did
7  provide. Not, you know . . .
8       A. I'm trying very hard to help
9  you. And I'm trying to figure out how I can
10  phrase it to answer your question, because
11  you're asking about what was done over a
12  ten-year period through multiple management
13  changes. And things changed over time. The
14  general answer that would apply throughout
15  that whole period would be that a document of
16  some sort that had the information that we
17  believed was appropriate enough information
18  for management to understand what they needed
19  to understand to authorize the price
20  increase, decrease, or change on it would
21  have been presented. And depending on the
22  time and depending on what the individual
23  circumstances of the change were, the
24  document may or may not have had expansive
25  explanations. And over time, who would have

Page 603

1  to approve that document would change.
2       But consistent throughout the
3  period as price changes were documented,
4  there was an approval process. There was a
5  document that said, This is what -- this is
6  what we propose the price become. And senior
7  management in some way, shape, or form
8  documented that they approved it.
9       When I first got there, there
10  was a document that they used routinely for
11  product launches that had information that
12  they felt was appropriate for product
13  launches on it. When we did unusual things
14  that may have required more justification or
15  explanation because they were outside of the
16  norm, as you described, it would have been
17  appropriate to develop something with a
18  rationale behind it to help explain it if
19  they wouldn't know otherwise.
20       If it was a fairly obvious
21  change, it could have been as simple as, This
22  is what we're proposing; do you agree? So
23  it's very specific. Always a document;
24  always an approval. Other than that, they're
25  individual.

Page 604

1       Q. Okay. Could you just explain
2  to the Jury what the function in Roxane's
3  business was played by the AWP?
4       A. The function of AWP?
5       Q. Yes.
6       A. I don't believe that AWP had a
7  function other than a number that was
8  required that we present for the multisource
9  business. I mean, it was defined by how we
10  set it. And most commonly, we set it at
11  10 percent off of the brands. That was the
12  industry standard. It wasn't something that
13  we used. It wasn't something that was a
14  number that was important to Roxane, except
15  to the extent that a customer would bring to
16  our attention if it was putting us in a
17  position where we were unable to sell
18  product.
19       Q. Now, I think you testified
20  yesterday about the Furosemide circumstance.
21  Is that what you're referring to when a
22  customer would bring to your attention that
23  your AWP was not high enough to permit them
24  to purchase the product?
25       A. In the -- yes, in that case.

Page 605

1       Q. In your experience, over that
2  ten-year period -- strike that.
3       I think what you said, just to
4  make certain that I understand your
5  testimony -- is it true that if you were
6  going to do a quote, unquote, price increase
7  to charge your customers more, that would
8  really have nothing to do with the AWP, would
9  it?
10       A. Generally, if we took a price
11  increase where we were going to charge our
12  customers more, if you mean by that contract
13  price would go up? Is that what you mean?
14       Q. That could be, yes.
15       A. I'm trying to clarify, so I can
16  answer your question.
17       Q. Right.
18       A. That would typically be in a
19  situation, I think I referred to before,
20  where our product was in a sole generic or
21  sole available product position in which
22  case, it would be subject to occasional price
23  increases, typically within -- or actually
24  well-below, typically, an annual CPI. So in
25  that case, we would occasionally take a price

334.262.3332  Baker & Baker Reporting and Video Services, Inc.  334.262.3332
888.253.3377  Certified Court Reporters and Certified Legal Video Specialists  888.253.3377

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 618

1  either them passing that through or incurring
2  extra expenses in set- up.
3      Q. Are these -- other than in the
4  initial launch of product or the trade show,
5  are there any discounts that a wholesaler may
6  receive?
7      A. There may be specific
8  individual instances. I'm not recalling any.
9  Those would be the typical ones.
10     Q. And how would one determine if
11 there are any other discounts that apply to a
12 purchase by a wholesaler?
13     A. It would be in the
14 transactional history.
15     Q. So is it your testimony that
16 the only way that a wholesaler reduces its
17 net cost in the chargeback system,
18 other than these small discounts at initial
19 launch and then if they have a trade show?
20     MS. WITT: Object to the form
21         of the question.
22     A. Let me clarify. I think I've
23 repeatedly stated that I do not consider the
24 chargeback a reduction in the wholesaler's
25 net cost. That's squaring-up what he has

Page 619

1  fronted, if you will, to one of the customers
2  that we have a contract arrangement with. So
3  that is not anything to do with the
4  wholesaler's net price, as I see it. That is
5  a contract price to another customer on
6  something that he's servicing.
7      So I will continue, when you
8  say that a chargeback is part of a
9  wholesaler's net price, to disagree in that
10 characterization.
11     The second part, I believe you
12 said that my testimony was that the only time
13 when a discount could ever occur would be in
14 those two specific instances. I believe my
15 testimony said that is the usual and
16 customary times where we would see that, but
17 there may be other instances which I'm not
18 recalling.
19     Q. Would these other instances be
20 pursuant to specific programs that were in
21 place, or would they relate only to single
22 individual sales?
23     A. Because I'm not recalling any
24 specifics, I don't know how to answer that.
25     Q. Now, I think you've testified

Page 620

1  that you were responsible, at least in part,
2  for establishing the WAC, the Wholesale
3  Acquisition Cost, for any particular drug; is
4  that correct?
5      A. Yes.
6      Q. Okay. And can you just
7  describe for the Jury the procedures that you
8  went through in order to establish a WAC for
9  a drug?
10     A. Again, it would depend on a
11 specific instance. Are you talking about the
12 approval procedures or the thought process?
13     Q. Well, let's start with the
14 approval procedures, first.
15     A. Okay. That would have been the
16 same as I described earlier for what we went
17 through on AWP. It would have been any price
18 changes would require a formal sign- off and
19 some sort of documentation and approval.
20     Q. And what are the levels that
21 are required for approval on the corporate
22 level?
23     A. Yeah. It's changed over time.
24 And I would probably have to refer to the
25 individual documents to get it a -- in each

Page 621

1  time frame to get it a hundred percent
2  accurate.
3      Early on, it would go to
4  sign-offs, I believe included finance, and
5  Mr. Tupa. It may have included the other
6  senior level managers at Roxane. I don't
7  recall.
8      Q. If someone came to you and
9  said, you know, we need to find out how we
10 approved or who approved that WAC on that
11 product, is there any record that you would
12 go to in order to determine the answer to
13 that question?
14     A. We would look for the price
15 approval sign-off for that. And if it
16 occurred during the time period that we saved
17 records for that, we would likely have it
18 somewhere. If it occurred prior to the time
19 when we were instructed that we needed to
20 maintain those records, it would likely not
21 exist.
22     Q. Okay. And what is the time
23 period that you were instructed to maintain
24 the records?
25     A. I believe in 1998-ish, we were

156  (Pages 618 to 621)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 622

```
 1   instructed to save records for a small number
 2   of, as I recall, inhalation products.
 3   Subsequent to that, there were broader
 4   requirements.  Without laying out every
 5   document preservation notice -- I don't have
 6   the information of what we were required at
 7   each step.
 8            MS. WITT:  Let me caution you
 9                not to reveal substance of
10                any communications that you
11                received from attorneys
12                that may have included
13                attorney-client privileged
14                information or what we
15                refer to as work product
16                information, which I'm sure
17                Mr. Heidlage agrees is not
18                encompassed in his
19                question.
20   BY MR. HEIDLAGE:
21        Q.  And I certainly was not
22   intending to ask you for those kinds of
23   communications.  I'm really just trying to
24   pin down, you know, what kinds of records
25   exist and then where they are.  And if they
```

Page 623

```
 1   don't exist because there was a poor
 2   retention policy or something like that, we
 3   can go through that.
 4            So is it your understanding
 5   that prior to 19 -- that the records with
 6   regard to the approvals for price changes for
 7   the period prior to 1998 are no longer in
 8   existence?
 9        A.  May or may not be.  I don't
10   know.
11        Q.  Where would they be maintained
12   if they are in existence?
13        A.  If they were in existence and
14   were -- any of the products -- were relevant
15   to any of the products in the variety of
16   cases that we're involved in, they would have
17   been produced.  The originals would either
18   lie with our attorneys or Roxane in Columbus,
19   probably Roxane in Columbus, and most
20   recently, which I think is outside of the
21   relevant period, they would be in the product
22   files in the Cleveland area.
23        Q.  So is it your understanding
24   that at least for the drugs that are at issue
25   in the litigation between the Commonwealth of
```

Page 624

```
 1   Massachusetts and Roxane, that those
 2   documents, if they existed, would have been
 3   produced in connection with the litigation?
 4        A.  Absolutely.
 5        Q.  Okay.  And the form of at least
 6   one of the documents that would exist would
 7   be a sign-off sheet; is that correct?
 8        A.  Again, it evolved over time.
 9   It would have been early on a sign-off sheet.
10   I believe now that we use e-mail, and it
11   would have been, you know, a series of
12   e-mails stapled together saying that
13   everybody gave their approval that was
14   obligated.
15        Q.  And so those would be hard
16   documents of some kind that are put into a
17   paper file?
18        A.  Once it goes electronic, I'm
19   not certain whether it was maintained as a
20   hard copy, for example, in the product
21   history file or whether it was maintained
22   electronically in a computer e-mail file.
23   Whichever way that it existed would have been
24   produced.
25        Q.  Okay.  Now, is the -- can you
```

Page 625

```
 1   describe for the Jury what kinds of documents
 2   will be contained in a -- in what you've
 3   identified as a product history file?
 4        A.  I probably used a general term
 5   to review -- to refer to the type of file
 6   that I used to keep where I had my file
 7   separated by product name.  And if I had
 8   something that was relevant that I felt --
 9   before it was required to be held, if it was
10   something relevant that I felt that I needed
11   to have access to into the future, I would
12   have put it into a folder that was labeled
13   with that product name.  My e-mail files are
14   also separated that way.
15            Because of the number of
16   products that we have, it's common to see
17   that type of housekeeping within each
18   person's documents.
19        Q.  In the documentation that we
20   saw yesterday and some we'll see today, with
21   regard to Furosemide, do you know what files
22   those documents were contained in?
23        A.  I'm not trying to be circuitous
24   in answering this --
25            THE WITNESS:  -- and I'm
```

157 (Pages 622 to 625)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 678

1  which you now believe to have been incorrect
2  with regard to your testimony before?
3          A. I didn't read them at a level
4  of detail that I would have been able to do
5  that.
6          Q. Okay. At any time since those
7  depositions were taken, did you ever become
8  aware of the fact that any of your testimony
9  was erroneous?
10         A. Oh, yes.
11         Q. Okay. Do you recall what
12  matters you concluded were erroneous?
13         MS. WITT: I do want to object
14             to this line of questioning
15             in this particular
16             deposition since this is
17             her deposition as a
18             corporate deposition, and
19             those were not. So I think
20             that's beyond the scope.
21             Certainly it's not binding
22             Roxane testimony if you
23             want to use this time for
24             that. But I don't think
25             it's fairly within the

Page 679

1              scope of the Notice of
2              this.
3          MR. HEIDLAGE: Okay.
4          A. What I recall is that at the
5  time that I -- may I have a moment with
6  counsel?
7          Q. Sure.
8          MS. WITT: You can't talk about
9              discussions with counsel.
10             We're going to step
11             out for a second. She has
12             a privilege concern.
13         THE VIDEOGRAPHER: Going off
14             the Record at 2:04 p.m.
15         (Brief recess.)
16         THE VIDEOGRAPHER: Back on the
17             Record at 2:08 p.m.
18  BY MR. HEIDLAGE:
19         Q. Ms. Waterer, after conferring
20  with counsel, do you have an answer to that
21  question?
22         A. Can we restate the question to
23  get me oriented again?
24         (Wherupon the requested portion
25             of the Record was read by the

Page 680

1              Court Reporter.)
2          A. I don't recall the specific
3  matters. My general recollection is that
4  they, for the most part, concerned items
5  where, like we've had today, I had a word
6  stutter where I said one word and meant
7  another.
8              In situations where a topic may
9  have changed -- and I'm making this up as an
10  example -- but a topic may have changed from
11  discussing AWP to then discussing WAC, and I
12  might not have picked up that in the course
13  of the discussion that we had switched, and
14  we're now talking about a different specific
15  item. So I was still answering back to
16  earlier, because my brain hadn't caught up.
17             For the most part, that's what
18  I remember as the types of errors in it.
19         Q. As a result of concluding that
20  there were mistakes or errors in the
21  testimony, did you prepare an errata sheet
22  that was filed with the deposition then?
23         A. Yes.
24         Q. And so were all of the mistakes
25  or errors that you had concluded occurred,

Page 681

1  were those documented in an errata sheet?
2          A. No.
3          Q. So some were not?
4          A. None were.
5          Q. Step back for a second. I
6  think you testified that you -- that as a
7  result of learning of the mistakes that you
8  prepared an errata sheet, correct?
9          A. Let me help you out on this
10  one.
11         Q. Okay.
12         A. And it's going to be
13  nonresponsive.
14             My understanding at the time
15  was that the only changes I could make to an
16  errata sheet were those changes which would
17  represent an inaccuracy in the transcription
18  of what I said, as differentiated from an
19  inaccuracy in what I actually said.
20         Q. I see. Okay.
21         A. That's . . .
22         Q. Now, I want to go back to
23  the --
24         MR. WINGET-HERNANDEZ: You
25             notice I am not joining in

171 (Pages 678 to 681)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

Judy Waterer
May 9, 2007

Page 682

1            the objection.
2       Q.  Go back to the function of
3   reporting to -- prices to First DataBank that
4   Roxane did during the time period that you
5   were there.  How did that occur?
6       A.  I had a momentary blank.  I
7   missed the first three words of the question.
8       Q.  Okay.  We're going to go back
9   to actually the process that Roxane used for
10  reporting its prices to First DataBank.
11  Okay?
12      A.  Okay.
13      Q.  Okay.  And first of all, who
14  was responsible for that function during the
15  time that you were there?
16      A.  It changed over the years.  I
17  believe when I first got there that the
18  communication was done by an individual by
19  the name of Cheri Mayhew.  When Rich Feldman
20  came on board, he felt that the communication
21  should come from him.  So he was signatory on
22  the communications and went out that way.
23          I believe that it stayed at the
24  director level, sales management signatory on
25  the communications going forward, but I'd

Page 683

1   have to double-check.
2       Q.  When Ms. Mayhew was the person
3   who was filling out or making the reports to
4   First DataBank, what was her title or her
5   role?
6       A.  I would have to refer to an org
7   chart to get her title.  I'm only aware of
8   her role as it pertained to how she supported
9   me personally.  And in that, she was the
10  person that sent things to the pricing
11  compendia, and she was the person that worked
12  with our advertising people.  So I don't
13  remember her particular title.
14      Q.  I see.  But would she -- was
15  she a person who reported to you?
16      A.  No.
17      Q.  And who did she normally report
18  to?
19      A.  I'm not sure.
20      Q.  Okay.  Then you said that when
21  Mr. Feldman joined the company.  And that --
22  do you recall approximately when that
23  occurred?
24      A.  I think it was after me.  And I
25  can't remember whether it was like six months

Page 684

1   after me or a year and a half after me.  I
2   think it was the fall of '96 or -- I'm
3   unclear.
4       Q.  Okay.  And what was his
5   position?
6       A.  I believe he had several
7   different titles, but his position in terms
8   of responsibility was to be, I think he came
9   in initially as a director of the multisource
10  group, the sales group.  So at one point, his
11  title was Director of Trade Relations.  I
12  believe at the time he left he had been
13  either -- I think he was Executive Director
14  or Vice President, and it may have been trade
15  relations.  And then there were several
16  different title changes.  Again, org charts
17  would have to clarify that.
18      Q.  Do you -- what is your
19  understanding of his general duties and
20  responsibilities while he was there?
21      A.  He was in charge -- he was the
22  one that was most senior in the sales line
23  management of the multisource salespeople.
24      Q.  And how did it -- just going
25  back for a second, prior to his coming to

Page 685

1   Roxane, the responsibility for reporting to
2   First DataBank was yours; is that correct?
3       A.  No.
4       Q.  So I think you testified that
5   Ms. Mayhew supported you by reporting to
6   First DataBank?
7       A.  Yes.
8       Q.  And that's only because what
9   she was doing is, is performing a function
10  which was helpful to you; is that -- is that
11  the testimony?
12      A.  Reporting to First DataBank,
13  when I first came on board, was not part of
14  my responsibility.  If there is a price
15  change, it would have gone to her, and her
16  responsibility would have been to report it.
17  There was no authority of me over Cheri to
18  tell her to do it.  It was standard practice
19  when there was a price change that she got
20  the information and reported it to the
21  pricing compendia.  So it wasn't something
22  that I set up or controlled.  It just
23  happened.
24      Q.  At the time that the decision
25  not to report WACs to First DataBank

172  (Pages 682 to 685)

4d05a3e6-eaa3-4d91-9a88-82914339bcbc

# Judy Waterer
## May 9, 2007

Page 686

1  occurred, is it not -- was it not your
2  testimony that Mr. Feldman was an employee of
3  Roxane by that time?
4        A.  Yes.
5        Q.  And by that time, was -- did he
6  have the responsibility for reporting prices
7  and price changes to First DataBank?
8        A.  If by reporting, do you mean
9  signing the letter that was sent to them,
10  yes.  If you mean by having the
11  responsibility to report, did he physically
12  handle mailing or faxing the information to
13  the compendia, no.
14        Q.  Did -- to your knowledge, was
15  his unit or -- strike that.
16            To your knowledge, were the
17  records of any communications with First
18  DataBank after he joined the company
19  maintained in his department?
20        A.  I don't know if he kept copies
21  of his memos or not.
22        Q.  Okay.  Do you know whether his
23  files, his records, with regard to
24  communications with First DataBank were
25  produced in this litigation?

Page 687

1        A.  If they were available and
2  responsive, they were provided to counsel.
3  Counsel took all of the documents they had
4  and assessed what was responsive and
5  forwarded it.  That's my best attempt to
6  answer.  If they were there, they would have
7  been produced.
8        Q.  Now, one of the -- one of the
9  subject matters is the -- for this
10  deposition -- was the production of
11  documents.  Were you personally involved in
12  gathering documents for any of the
13  litigations?
14        A.  Yes.
15        Q.  And what did you do?
16        A.  I was, I would say, the
17  corporate designate to make sure that all of
18  the documents from sales and marketing were
19  gone through appropriately.  I was also
20  involved in helping determine who else within
21  the company might have responsive documents.
22  When it was time to pull the documents, I was
23  the representative that helped the
24  individuals collating the documents and going
25  through files, assuring that they had access

Page 688

1  to everything to go through.
2        Q.  Did you keep a log or create a
3  record of any kind of the documents that you
4  searched for and produced?
5            MS. WITT:  Is that a you,
6            Roxane or you, Judy Waterer
7            question?
8            MR. HEIDLAGE:  Actually, it's a
9            you, Roxane, question.
10        A.  My understanding -- and log was
11  the word I was searching for earlier -- my
12  understanding is that that function was
13  performed by the attorneys who pulled the
14  documents.  And our understanding is that --
15  that the logs that were created are no
16  longer -- we can't find them.  So . . .
17        Q.  Were they -- were the attorneys
18  who actually pulled the records, were they
19  corporate attorneys, or were they from
20  outside counsel?
21        A.  Outside counsel sent people
22  with expertise in that capability to our site
23  to pull the documents from my department.
24  Some other departments may have pulled their
25  own documents and sent them.

Page 689

1        Q.  When you say "my department,"
2  does that mean both sales and marketing, or
3  were you speaking of marketing only?
4        A.  That's a good point.  My
5  department is not sales.  But when I was
6  saying "my department", I was meaning the
7  Roxane sales and marketing group when we were
8  located in Columbus and then subsequently in
9  the greater Cleveland area.  And in those
10  cases, attorneys' designees came in and
11  pulled all of the documents for both.
12        Q.  Okay.  Let me go over a couple
13  of questions on Roxane's participation in the
14  Medicaid programs and just ask you a couple
15  of questions on that as follow ups to your
16  testimony from two days ago.
17            When you say that Roxane
18  participates in Medicaid, when you testified
19  to that; what did that mean to you?
20        A.  That meant to me that our
21  products are eligible for rebate to Medicaid
22  and that we pay Medicaid rebates on them.
23        Q.  Okay.  And I believe you
24  testified that if you did not participate
25  that you could not exist as a company, as a

334.262.3332  Baker & Baker Reporting and Video Services, Inc.  334.262.3332
888.253.3377  Certified Court Reporters and Certified Legal Video Specialists  888.253.3377

4d05a3e6-eaa3-4d91-9a88-82914339bcbc