**TAB 53**

# ASSET PURCHASE AGREEMENT

by and between

Roxane Laboratories, Inc.

and

Elan Pharma International Limited

Dated as of September 28, 2001

VA_615974_9.DOC

Highly Confidential
BOEH01046045

TABLE OF CONTENTS

Page

SECTION 1.   DEFINITIONS. ....................................................................................................1

SECTION 2.   PURCHASE AND SALE. .................................................................................10

SECTION 3.   PURCHASE PRICE. ..........................................................................................15

SECTION 4.   CLOSING AND CLOSING DATE. ..................................................................17

SECTION 5.   REPRESENTATIONS AND WARRANTIES OF SELLER. ...........................17

SECTION 6.   REPRESENTATIONS AND WARRANTIES OF BUYER. ............................24

SECTION 7.   CONDITIONS TO CLOSING. ..........................................................................26

SECTION 8.   COVENANTS OF SELLER. .............................................................................29

SECTION 9.   COVENANTS OF BUYER. ..............................................................................30

SECTION 10.  ADDITIONAL COVENANTS AND AGREEMENTS OF THE
             PARTIES. ...........................................................................................................32

SECTION 11.  INDEMNIFICATION. .......................................................................................37

SECTION 12.  TERMINATION. ...............................................................................................41

SECTION 13.  MISCELLANEOUS. ..........................................................................................42

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | -- | Form of Bill of Sale |
| Exhibit B | -- | Form of Trademark Assignment |
| Exhibit C | -- | Form of Copyright Assignment |
| Exhibit D | -- | Form of Duraclon Assignment and Assumption Agreement |
| Exhibit E | -- | Form of Manufacturing Agreement |
| Exhibit F | -- | Form of Trademark Agreement |
| Exhibit G | -- | Form of Elan Parent Guaranty |
| Exhibit H | -- | Form of Interim Distribution Services Agreement |
| Exhibit I | -- | Form of Intellectual Property Assignment |
| Exhibit J | -- | Form of BIC Guaranty |
| Exhibit K-1 | -- | Form of Seller Transfer of Ownership Letters to FDA |
| Exhibit K-2 | -- | Form of Buyer Transfer of Ownership Letters to FDA |

Highly Confidential

BOEH01046046

| | | |
|---|---|---|
| Exhibit L | -- | Form of Domain Name Transfer Agreement |
| Exhibit M | -- | Form of Interim Regulatory Services Agreement |
| Exhibit N | -- | Form of Non-Compete Agreement |
| Exhibit O | -- | Rights of Reference |

## SCHEDULES

Seller Disclosure Schedule

Buyer Disclosure Schedule

Highly Confidential

BOEH01046047

This ASSET PURCHASE AGREEMENT, dated as of September 28, 2001 (this "Agreement"), is made by and between ROXANE LABORATORIES, INC., a Delaware corporation ("Seller"), and ELAN PHARMA INTERNATIONAL LIMITED, a private limited company organized under the laws of the Republic of Ireland ("Buyer").

WITNESSETH:

WHEREAS, Seller is engaged in, among other things, the business of manufacturing, marketing and selling pharmaceutical products;

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, certain assets, and to assume certain liabilities, in each case relating to Seller's palliative care pharmaceutical business, which the parties agree will be achieved pursuant to the purchase and sale of the Acquired Assets (as defined herein) and the assumption by Buyer of the Assumed Liabilities (as defined herein), all on the terms and subject to the conditions set forth herein;

WHEREAS, in connection with such purchase and sale, Seller has required that Elan Corporation plc, a public limited company organized under the laws of the Republic of Ireland and the ultimate parent company of Buyer ("Elan plc"), guarantee performance by Buyer of Buyer's payment and indemnification obligations under this Agreement and certain other agreements contemplated hereby, and Elan plc has agreed to provide such a guarantee; and

WHEREAS, in connection with such purchase and sale, Buyer has required that Boehringer Ingelheim Corporation, a Delaware corporation ("BIC"), guarantee performance by Seller of Seller's indemnification obligations under this Agreement and certain other agreements contemplated hereby, and BIC has agreed to provide such a guarantee;

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements herein contained, the Parties hereto, intending to be legally bound, agree as follows:

SECTION 1. DEFINITIONS.

1.1    Definitions. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Action or Proceeding" means any action, suit, proceeding, arbitration, Order, inquiry, hearing, assessment with respect to fines or penalties or litigation (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental or Regulatory Authority or other Person.

"Affiliate" shall mean, with respect to any Person, any Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. A Person

1

or entity shall be regarded as in control of another entity if it owns or controls, directly or indirectly, (i) in the case of corporate entities at least fifty percent (50%) (or the maximum ownership interest permitted by law) of the equity securities in the subject entity entitled to vote in the election of directors and, (ii) in the case of an entity that is not a corporation, at least fifty percent (50%) (or the maximum ownership interest permitted by law) of the equity securities or other ownership interests with the power to direct the management and policies of such subject entity or entitled to elect the corresponding management authority; provided, however, that the term "Affiliate" shall not include subsidiaries or other entities in which a Party or its Affiliates owns a majority of the ordinary voting power necessary to elect a majority of the board of directors or other governing board, but is restricted from electing such majority by contract or otherwise, until such time as such restrictions are no longer in effect.

"Applicable Laws" shall mean all laws, treaties, statutes, ordinances, judgments, decrees, directives, rules, injunctions, writs, regulations, orders, interpretations, authorizations and permits relating to, or of any Governmental or Regulatory Authority having jurisdiction over, the Business or the Acquired Assets, as may be in effect from time to time.

"Approval Notice" shall have the meaning set forth in Section 10.7(b).

"Assumed Liabilities" means (i) all accounts payable incurred by Buyer or an Affiliate of Buyer with respect to the Business following the Closing, (ii) all liabilities and obligations that Buyer has expressly assumed or agreed to assume under this Agreement, (iii) subject to the terms of the Duraclon Assignment and Assumption Agreement, all liabilities and obligations under or pursuant to the Duraclon Agreements to be performed by Buyer or its Affiliates following the Closing (except as may result from any breach or failure to perform by Seller on or prior to Closing), and (iv) except as otherwise provided in the Manufacturing Agreement and except for matters for which Seller would be obligated to indemnify Buyer pursuant to Section 11.2(a) hereof, all liabilities and obligations arising from Products sold or manufactured by or on behalf of Buyer after Closing, including without limitation, product liability claims.

"Ben Venue" shall mean Ben Venue Laboratories, Inc., a Pennsylvania corporation.

"BIC" shall have the meaning set forth in the Recitals hereto.

"BIC Guaranty" shall mean the Guaranty, dated as of the Closing Date, by BIC of Seller's or its Affiliates' indemnification obligations under this Agreement and certain other agreements contemplated hereby, in substantially the form attached hereto as Exhibit J.

"Bill of Sale" shall have the meaning set forth in Section 2.5(a)(i).

"BI Parent" shall have the meaning set forth in Section 10.9(a).

"BIPI" shall mean Boehringer Ingelheim Pharmaceuticals, Inc., a Delaware corporation.

Highly Confidential                                                                                                  BOEH01046049

"Business" shall mean the manufacture, having manufactured, marketing, distribution, and sale of the Products and the operation of the Pain Institute, as conducted by Seller.

"Buyer Disclosure Schedule" shall have the meaning set forth in Section 6.

"Buyer Governmental Consent" shall have the meaning set forth in Section 6.4.

"Buyer Indemnified Parties" shall have the meaning set forth in Section 11.2(a).

"Buyer Third Party Consent" shall have the meaning set forth in Section 6.5.

"Buyer's Expression of Interest" shall have the meaning set forth in Section 10.7(b).

"Closing" shall have the meaning set forth in Section 4.

"Closing Date" shall have the meaning set forth in Section 4.

"CMS" shall mean the Centers for Medicare and Medicaid Services (formerly the Health Care Finance Administration).

"Competing Products" shall have the meaning set forth in Section 10.9(a)(i).

"Confidential Information" shall have the meaning set forth in Section 13.1(b).

"Contract" means any commitment, contract, purchase order, lease, or other agreement, whether written or oral.

"Copyright Assignment" shall have the meaning set forth in Section 2.5(a)(iii).

"Copyrights" shall have the meaning set forth in Section 2.1(b).

"DEA" shall mean the United States Drug Enforcement Administration.

"Disclosing Party" shall have the meaning set forth in Section 13.1(a).

"Disclosure Studies" shall mean, collectively, the studies referenced in Table 2 of Exhibit O.

"Discontinued Product" shall have the meaning set forth in Section 3.3(b).

"Domain Names" shall have the meaning set forth in Section 2.1(c).

"Domain Name Transfer Agreement" shall have the meaning set forth in Section 2.5(a)(xiii).

"Duraclon Agreements" shall mean the following agreements:

3

Highly Confidential                                                                                                                           BOEH01046050

(a) License Agreement dated November 1, 1996, between Seller and Fujisawa Healthcare, Inc. (as successor to Fujisawa USA, Inc.) (the "Duraclon License Agreement");

(b) Manufacturing Agreement dated November 1, 1996, as amended May 15, 1998, between Seller and Fujisawa Healthcare, Inc. (as successor to Fujisawa USA, Inc.); and

(c) Asset Purchase Agreement dated November 1, 1996, as amended (i) by a letter agreement dated November 7, 1997, and (ii) a Second Amendment to Manufacturing Agreement dated as of May 15, 1998, between Seller and Fujisawa Healthcare, Inc. (as successor to Fujisawa USA, Inc.), but only as to the indemnification rights of Seller as set forth in Section 8a thereof and as to the liabilities and obligations set forth in Sections 5(b)(v), 7(b), 7(d) (but only as it relates to the asset purchase transaction that is the subject of such agreement), 7(e), 10(a) and 10(b).

"Duraclon Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreement by and among Buyer, Seller and Fujisawa Healthcare, Inc., a Delaware corporation, dated as of the Closing Date, in substantially the form attached hereto as Exhibit D, relating to the assignment by Seller, and the assumption by Buyer, of the Duraclon Agreements.

"Duraclon Rights" shall mean the intellectual property rights licensed to Seller pursuant to the Duraclon License Agreement.

"Elan Net Sales" shall mean, with respect to each Product, the gross revenues derived by Buyer and its Affiliates from the sale of such Product in the United States to third parties following the Closing, less:

(a) normal and customary quantity, trade or cash discounts and credits for returns, in each case relating to such Product, which shall not, in the aggregate, exceed six percent (6%) of the gross revenues derived from the sale of such Product;

(b) normal and customary chargebacks and rebates granted to healthcare organizations, governments and governmental agencies and other purchasers and reimbursers of such Product in the ordinary course of business; and

(c) sales and other excise taxes and duties directly related to the sale, transportation or delivery of such Product, but only to the extent that such items are itemized on the invoice and paid by the purchaser of such Product. Taxes assessed against Buyer's and/or its Affiliate's income derived from such sale are not deducted from Elan Net Sales.

Each of the items set forth in clauses (a) and (b) above shall be deducted from the gross revenues of Buyer and its Affiliates only to the extent charged against Buyer or its Affiliates and evidenced in Buyer's or its Affiliates' books and records of account. Deductions shall be determined in accordance with GAAP. If any of the Products are sold

Highly Confidential BOEH01046051

for compensation other than cash, Elan Net Sales shall be calculated based on the gross list price of such Product on the date of sale.

Sales or intercompany transfers of any Product by and between Buyer and its Affiliates are not sales to a third party and shall be excluded from Elan Net Sales calculations for all purposes; provided, however, that the ultimate sale of such Products to a third party shall be included in Elan Net Sales calculations as if such sale initially had been made to such third party.

"Elan Parent Guaranty" shall mean the Guaranty, dated as of the Closing Date, by Elan plc of certain of Buyer's or its Affiliates' obligations under this Agreement and certain other agreements contemplated hereby, in substantially the form attached hereto as Exhibit G.

"Environmental Claim" shall mean any claim, investigation or notice (written or oral) by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or fatalities, or penalties) arising out of, based on or resulting from (a) the presence, release or threatened release into the environment of, or human exposure to, any Materials of Environmental Concern at any location, whether or not owned or operated by Seller or (b) activities or conditions forming the basis of any violation, or alleged violation of, or liability or alleged liability under, any Environmental Law.

"Environmental Laws" shall mean all applicable Federal, state and local laws, statutes, rules, regulations, ordinances (including any amendments thereto), including but not limited to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., and the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., orders, decrees, plans, codes, judgments, injunctions, notice or demand letters, prohibitions, obligations, schedules, timetables, standards, conditions or requirements issued, entered, approved or promulgated thereunder, relating to pollution or protection of human health or the environment, including laws relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern in, into, onto or upon the environment (including, without limitation, ambient air, surface water, ground water, or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, collection, accumulation, storage, disposal, transport, or handling of Materials of Environmental Concern.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Know-How" shall mean any and all Know-How owned or controlled by Seller or its Affiliates other than the Included Know-How, including, without limitation, Know-How related to Seller's product(s) other than the Products.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expiration Date" shall have the meaning set forth in Section 11.1.

5

Highly Confidential
BOEH01046052

"Extain" shall have the meaning set forth in Section 10.7.

"Extain Period" shall have the meaning set forth in Section 10.7(a).

"Extain Studies" shall mean, collectively, the studies referenced in Table 1 of Exhibit O.

"FDA" shall mean the United States Food and Drug Administration.

"GAAP" shall mean United States generally accepted accounting principles, consistently applied.

"GMPs" shall have the meaning set forth in Section 2.1(e)(ii).

"Governmental or Regulatory Authority" shall mean any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any state, county, city or other political subdivision thereof.

"HSR Act" shall have the meaning set forth in Section 2.6.

"Improvements" shall mean technical improvements, modifications, inventions or discoveries, whether patented or unpatented, that are developed, made or acquired or are being developed, made or acquired by Seller on or before the Closing Date and that are derived from or constitute additions or improvements to any Product including, but not limited to, any new additional dosage forms or strengths, new oral and non-oral formulations, generic versions, new/additional drug delivery systems, pro-drugs, analogues or process improvements.

"Included Know-How" shall mean (a) any and all Know-How owned by Seller exclusively related to the Products and (b) the Improvements exclusively related to the Products.

"Indemnified Party" shall have the meaning set forth in Section 11.3.

"Indemnifying Party" shall have the meaning set forth in Section 11.3.

"Intellectual Property" shall mean the Licensed Intellectual Property and the Purchased Intellectual Property.

"Intellectual Property Assignment" shall have the meaning set forth in Section 2.5(a)(v).

"Interim Distribution Services Agreement" shall mean the Interim Distribution Services Agreement by and between Seller and Buyer, dated as of the Closing Date, in substantially the form attached hereto as Exhibit H.

Highly Confidential

BOEH01046053

"Interim Regulatory Services Agreement" shall mean the Interim Regulatory Services Agreement by and between Seller and Buyer, dated as of the Closing Date, in substantially the form attached hereto as Exhibit M.

"Interim Services Agreements" shall mean, collectively, the Interim Distribution Services Agreement and the Interim Regulatory Services Agreement.

"Know-How" shall mean all information and materials, including without limitation, any and all product specifications, product designs, plans, technology, ideas, concepts, trade secrets, manufacturing and packaging processes, technical information, expertise, skill, practice, inventions, procedures, manufacturing formulae, manufacturing directions, manufacturing specifications, manufacturing validation data, component specifications, test methods, preclinical, clinical, toxicology and stability data, validation data of analytical methods and know-how whether or not patentable.

"Knowledge" with respect to any Party, shall mean the knowledge, after due inquiry and investigation, of the management personnel (or Persons performing similar functions) of such Party or other Persons with primary or supervisory responsibility for or daily involvement with the Business.

"Licensed Intellectual Property" shall mean the trademarks (other than the Trademarks) and any other rights licensed from Seller to Buyer pursuant to, and subject to the terms of, the Trademark Agreement.

"Lien or Other Encumbrance" shall mean, with respect to any asset, any mortgage, lien, pledge, security interest, claim, charge, option, right of first refusal or other encumbrance, restriction or limitation of any kind in respect of such asset.

"Manufacturing Agreement" shall mean the Manufacturing Agreement, dated as of the Closing Date, in substantially the form attached hereto as Exhibit E, which provides for the manufacture by Seller of certain of the Products for Buyer for the period specified therein subsequent to the Closing.

"Marketing and Pricing Data" shall mean all market research, marketing plans, media plans, advertising, promotional and marketing books and records, customer lists, sales data, price lists, sales training materials, Product labels and inserts and all films, artwork, photography and other graphic materials related thereto, and all other pricing, advertising and promotional information in the possession or control of Seller and used in connection with the Business, but excluding any such items to the extent that (a) any Applicable Law prohibits their transfer or disclosure to Buyer or (b) any transfer or disclosure to Buyer thereof would subject Seller to any contractual liability.

"Material Adverse Effect" shall mean any event, change, circumstance or effect that is or reasonably could be expected to be (a) materially adverse to the business, assets, operations, results of operations or financial condition of the Business, taken as a whole, or any of the Products, other than any event, change, circumstance or effect relating (i) to the economy in general, or (ii) in general to the industries in which the Business operates and not specifically relating to the Business; provided that the Business, taken as a whole, is not

7

Highly Confidential
BOEH01046054

materially disproportionately affected as compared to other Persons engaged in such industry by such event, change, circumstance or effect; or (b) materially adverse to the ability of a Party to consummate any of the transactions contemplated hereby.

"Materials of Environmental Concern" shall mean all chemicals, pollutants, contaminants, wastes, toxic substances, petroleum, petroleum products and hazardous substances (as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14)), or solid or hazardous wastes as now defined under any Environmental Laws.

"Measurement Year" shall have the meaning set forth in Section 3.3.

"Medicaid Rebate Matter" shall have the meaning set forth in Section 10.2.

"Multi-Product Contracts" shall have the meaning set forth in Section 10.8.

"NDAs" shall have the meaning set forth in Section 2.1(d).

"Non-Compete Agreement" shall mean the letter agreement, dated as of the date hereof, among Buyer, BIPI and BI Parent in the form attached hereto as Exhibit N.

"Non-Disclosing Party" shall have the meaning set forth in Section 13.1(a).

"Order" means any writ, judgment, decree, injunction or similar order of any Governmental or Regulatory Authority (in each such case whether preliminary or final).

"Ordinary Course of Business" means such action that is consistent with the practices of the Business as undertaken by Seller from January 1, 2001 to Closing.

"Pain Institute" shall mean the marketing, educational and grant programs and related databases operated by Seller prior to the Closing Date and referred to as the "Pain Institute."

"Parties" shall mean Buyer and Seller.

"Party" shall mean each of Buyer and Seller.

"Permits" shall mean all permits, licenses, registrations, reviews, Orders, certifications, consents, approvals and any other authorizations of any Governmental or Regulatory Authority, including, without limitation, the DEA and the FDA, that are required to own, maintain or otherwise operate any aspect of the Business.

"Person" shall mean a natural person, a corporation, a partnership, a limited liability company, an association, a trust, a joint venture, or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Products" shall mean the following:

>   DURACLON® (Clonidine Hydrochloride Injection),
>   100 μg/mL and 500 μg/mL

Highly Confidential
BOEH01046055

ORAMORPH® SR (Morphine Sulfate) Sustained
Release Tablets, 15 mg, 30 mg, 60 mg and 100 mg

ROXICODONE™ Tablets (Oxycodone HCl Tablets USP)
5 mg, 15 mg and 30 mg

ROXICODONE™ Oral Solution (Oxycodone HCl Oral Solution USP)
5 mg/5 mL

Oxycodone *Intensol*™ (Oxycodone HCl Oral Solution, Concentrate)
15 mg/0.75 mL (currently marketed as ROXICODONE™ INTENSOL™
20 mg/mL)

ROXANOL™ Morphine Sulfate, (Immediate Release) Oral Solution
(Concentrate) 20 mg per mL

ROXANOL™-T Morphine Sulfate, (Immediate Release), Oral Solution
(Concentrate) 20 mg per mL (Tinted Flavored)

ROXANOL 100™ Morphine Sulfate Oral Solution (Concentrate)
100 mg per 5 mL

"Product Registration Data" shall have the meaning set forth in Section 2.1(e).

"Purchased Intellectual Property" shall mean the Included Know-How, the Trademarks, the Copyrights and the Domain Names.

"Purchase Price" shall have the meaning set forth in Section 3.1.

"Reasons Out of Buyer's Control" shall have the meaning set forth in Section 3.3(b).

"Roxi Trademarks" shall mean the trademarks "Roxiprin," "Roxicet" and "Roxilox," including all applications, renewals, registrations and common law rights thereof.

"Roxicodone Studies" shall mean, collectively, the studies referenced in Table 3 of Exhibit O.

"Royalty Term" shall have the meaning set forth in Section 3.3(a).

"Sales Threshold" shall have the meaning set forth in Section 3.3(a).

"Seller Disclosure Schedule" shall have the meaning set forth in Section 5.

"Seller Governmental Consent" shall have the meaning set forth in Section 5.4.

"Seller Group" shall have the meaning set forth in Section 10.9(d).

"Seller Indemnified Parties" shall have the meaning set forth in Section 11.2(b).

Highly Confidential
BOEH01046056

"Seller Third Party Consent" shall have the meaning set forth in Section 5.5.

"Trademarks" shall have the meaning set forth in Section 2.1(a).

"Trademark Agreement" shall mean the Trademark Agreement, dated as of the Closing Date, in substantially the form attached hereto as Exhibit F, which provides for, among other things, the licensing of the Licensed Intellectual Property from Seller to Buyer.

"Trademark Assignment" shall have the meaning set forth in Section 2.5(a)(ii).

"Transaction Documents" shall have the meaning set forth in Section 5.2.

"US Affiliates" shall have the meaning set forth in Section 10.9(a)(i).

"US Territory" shall mean the United States of America and all of its territories and possessions, including, without limitation, the District of Columbia, Puerto Rico and the US Virgin Islands.

"Worldwide Territory" shall mean the entire world.

SECTION 2.  PURCHASE AND SALE.

2.1  Acquired Assets.  Upon the terms and subject to the conditions of this Agreement, Seller shall sell, assign, transfer and convey to Buyer at Closing, free and clear of all Liens and Other Encumbrances, all of Seller's right, title and interest in, to and under the assets listed below (the "Acquired Assets"), and Buyer shall purchase such Acquired Assets and assume the Assumed Liabilities:

(a)  Trademarks.  All of Seller's right, title and interest to the trademarks set forth on Schedule 2.1(a), including all applications, renewals, registrations and common law rights thereof, together with all documentation associated therewith, including any prior-right agreements or consent letters pertaining to such trademarks (collectively, the "Trademarks"). "Trademarks" shall also include any distinctive trade dress, logos, related common law rights and service marks owned or used by Seller and solely associated with the Business, each as set forth on Schedule 2.1(a). "Trademarks" shall not include any trademark not listed on Schedule 2.1(a), including, without limitation, the trademarks "Roxane Laboratories," "Roxane," "Boehringer Ingelheim Pharmaceuticals, Inc." and "Boehringer" and any variations thereon and related logos or symbols.

(b)  Copyrights.  All of Seller's right, title and interest in and to the copyrights in all advertising, marketing and promotional materials solely associated with the Products or the Pain Institute, including, without limitation, those set forth on Schedule 2.1(b) (collectively, the "Copyrights").

(c)  Domain Names.  The domain names, including all applications, renewals and registrations thereof, each as set forth on Schedule 2.1(c), and all associated portals, websites, website content and images solely associated with the Products or the Pain Institute (collectively, the "Domain Names").

Highly Confidential                                                                                                           BOEH01046057