# TAB 053A

(d) <u>NDAs</u>.  The New Drug Applications and any and all supplements, amendments and annual reports thereto set forth on Schedule 2.1(d) (collectively, the "NDAs").

(e) <u>Product Registration Data</u>.  The "Product Registration Data" shall consist of the following with respect to each of the Products (including electronic copies where no hard copies exist):

(i) all regulatory files relating thereto, other than the NDAs, including, but not limited to any licenses (to the extent transferable), and minutes of meetings and telephone conferences with the FDA, validation data, pre-clinical and clinical studies and tests related to the Products (other than the Extain Studies and the Disclosure Studies), and all audit reports of clinical studies, plus all investigational new drug applications and amendments, annual reports and safety reports associated therewith, drug master files, FDA approvals for export, documents relating to Phase IV studies and pediatric studies, as well as any foreign equivalents of any of the foregoing, which are in Seller's possession or control, and all correspondence with the FDA regarding the marketing status of such Product; and

(ii) all records maintained under current Good Manufacturing Practices ("GMPs") or other record keeping or reporting requirements of the FDA, the DEA, the Environmental Protection Agency, the Occupational Safety and Health Administration or any other United States or foreign regulatory authorities, including, but not limited to, FDA warning letters, FDA Notices of Adverse Finding Letters, FDA audit reports (including any comments on such reports), all other correspondence and communications with regulatory agencies in connection with such Product (including any advertising and promotion documents and 2253 forms), adverse event files, complaint files, manufacturing records; as well as any foreign equivalents of any of the foregoing which are in Seller's possession or control;

(f) <u>Duraclon Agreements</u>.  Subject to the Duraclon Assignment and Assumption Agreement, certain rights and obligations of Seller under the Duraclon Agreements.  It is understood and agreed that Seller is not assigning or transferring any Contracts to Buyer, and Buyer is not assuming any Contracts from Seller, except as expressly provided herein.

(g) <u>Included Know-How</u>.  The Included Know-How.

(h) <u>Marketing and Pricing Data</u>.  All Marketing and Pricing Data.

(i) <u>Pain Institute</u>.  All items relating to the Pain Institute as set forth on Schedule 2.1(i).

(j) <u>Roxi Trademarks</u>.  The Roxi Trademarks.

2.2 <u>Excluded Assets</u>.  Buyer expressly understands and agrees that any assets of Seller which are not set forth in Section 2.1 above are excluded from the transactions contemplated hereunder (the "Excluded Assets").  The Excluded Assets include, without limitation, the following:

11

Highly Confidential BOEH01046058

(a) cash, cash equivalents and accounts receivable as of the Closing Date; all prepayments, deferred assets, overpayments or other receivables for taxes;

(b) any and all of Seller's manufacturing and other facilities, fixtures and equipment used in the manufacture and sale of the Products or in connection with the Business or otherwise;

(c) the Excluded Know-How; and

(d) inventory of all Products, including, without limitation, all finished goods, packaging materials, raw materials and work-in-process.

2.3 <u>Assumption of Liabilities</u>. Upon the terms and subject to the conditions of this Agreement, Buyer agrees to assume, effective as of Closing, and subsequently to pay, honor and discharge when due, all of the Assumed Liabilities. Notwithstanding anything to the contrary contained herein, except for the Assumed Liabilities, Buyer shall not assume and shall not be liable or responsible for any liability of Seller, including, without limitation, the Excluded Liabilities.

2.4 <u>Excluded Liabilities</u>. Other than the Assumed Liabilities and except as otherwise specifically provided in the Manufacturing Agreement and the Interim Services Agreements, Buyer shall not assume or be deemed to have assumed or guaranteed, or otherwise be responsible for, any other liability, obligation, or claim of any nature, whether direct or indirect, for any debts, obligations or liabilities of Seller or its Affiliates relating to the Acquired Assets, the Business or otherwise, without regard to whether such debt, obligation or liability is known, knowable, or unknown, matured or unmatured, liquidated or unliquidated, fixed or contingent, arising out of acts, omissions or occurrences prior to Closing or any conditions existing prior to Closing, even if such actions, omissions or conditions continue thereafter, and regardless of whether or not such claims are listed on any schedule hereto. Without limiting the generality of the foregoing, all liabilities and obligations of Seller and its Affiliates, other than the Assumed Liabilities, shall be retained and remain obligations and liabilities of Seller and its Affiliates (the "Excluded Liabilities") and none of the following shall be "Assumed Liabilities" for the purposes of this Agreement:

(a) all obligations, liabilities, costs and damages relating to the ownership and operation of the Business prior to Closing, including all liabilities with respect to (i) any Product manufactured or sold prior to Closing, except as otherwise provided in the Manufacturing Agreement or the Interim Services Agreement, and (ii) any violation of any Applicable Law, including any Environmental Law, prior to Closing;

(b) any obligation, liability or deferred credit for taxes arising from or with respect to the Acquired Assets or the operations of the Business which is incurred in or attributable to any period ending prior to Closing;

(c) any obligation, liability, costs and damages relating to any advances, loans, notes or other obligations (including the interest incurred thereon) owed by Seller; and

Highly Confidential                                                                                                    BOEH01046059

(d) any obligations, liability, costs and damages relating to any Environmental Claim in respect of the Business arising from or relating to actions, inactions, events or conditions arising or occurring prior to Closing.

2.5 Deliveries.

(a) By Seller. In order to effectuate the sale, assignment, transfer and conveyance contemplated by this Section 2, Seller shall execute and deliver, or shall cause to be executed and delivered, to Buyer at the Closing the following:

(i) a Bill of Sale substantially in the form attached hereto as Exhibit A (the "Bill of Sale");

(ii) a Trademark Assignment substantially in the form attached hereto as Exhibit B (the "Trademark Assignment");

(iii) a Copyright Assignment substantially in the form attached hereto as Exhibit C (the "Copyright Assignment");

(iv) the Duraclon Assignment and Assumption Agreement;

(v) an Intellectual Property Assignment substantially in the form attached hereto as Exhibit I (the "Intellectual Property Assignment");

(vi) the Manufacturing Agreement;

(vii) the Trademark Agreement;

(viii) the Interim Distribution Services Agreement;

(ix) the Interim Regulatory Services Agreement;

(x) the BIC Guaranty;

(xi) Product Transfer of Ownership Letters to the FDA in substantially the form attached hereto as Exhibit K-1;

(xii) the Non-Compete Agreement;

(xiii) a Domain Name Transfer Agreement substantially in the form attached hereto as Exhibit L (the "Domain Name Transfer Agreement");

(xiv) the certificates, consents and other documents to be delivered pursuant to Section 7 hereof; and

(xv) all other such bills of sale, certificates of title and such other documents or instruments of assignment, transfer or conveyance, as Buyer reasonably may deem necessary to vest in or confirm to Buyer full and complete title to, and the right to use

Highly Confidential
BOEH01046060

and enjoy, the Acquired Assets, hereby agreed to be, and intended to be, conveyed and transferred to Buyer.

The Parties acknowledge that they will work together to transfer physical possession of the Acquired Assets following the Closing and that Seller will need to retain certain of the Acquired Assets for some period following the Closing in order to perform its obligations under the Manufacturing Agreement and the Interim Services Agreements.

(b)  By Buyer.  In order to effectuate the sale, assignment, transfer and conveyance contemplated by this Section 2, Buyer shall execute and deliver, or shall cause to be executed and delivered, to Seller at the Closing the following:

(i)  that portion of the Purchase Price due at Closing pursuant to Section 3.2 hereof;

(ii)  the Trademark Assignment;

(iii)  the Copyright Assignment;

(iv)  the Duraclon Assignment and Assumption Agreement;

(v)  the Intellectual Property Assignment;

(vi)  the Manufacturing Agreement;

(vii)  the Trademark Agreement;

(viii)  the Interim Distribution Services Agreement;

(ix)  the Interim Regulatory Services Agreement;

(x)  the Elan Parent Guaranty;

(xi)  Product Transfer of Ownership Letters to the FDA in substantially the form attached hereto as Exhibit K-2;

(xii)  the Non-Compete Agreement;

(xiii)  the Domain Name Transfer Agreement; and

(xiv)  the certificates, consents and other documents to be delivered pursuant to Section 7 hereof.

2.6  Assignability and Consents.  Notwithstanding anything to the contrary contained in this Agreement, if the sale, assignment, transfer, conveyance or delivery or attempted sale, assignment, transfer, conveyance or delivery to Buyer of any asset that would be an Acquired Asset would require any authorizations, approvals, consents or waivers from any Governmental or Regulatory Authority or other Person (other than any authorization, approval, consent or waiver pursuant to the Hart-Scott-Rodino Antitrust Improvements Act

14

Highly Confidential
BOEH01046061

of 1976, as amended (the "HSR Act"), to which this Section 2.6 shall not apply) and such authorizations, approvals, consents or waivers shall not have been obtained prior to the Closing, then in such case the Closing shall proceed without the sale, assignment, transfer, conveyance or delivery of such asset and this Agreement shall not constitute an agreement for the sale, assignment, transfer, conveyance or delivery of such asset; provided that nothing in this Section 2.6 shall be deemed to waive the rights of Seller or Buyer not to consummate the transactions contemplated by this Agreement if the conditions to Seller's or Buyer's obligations set forth in Section 7.2 or Section 7.3, respectively, have not been satisfied. In the event that the Closing proceeds without the sale, assignment, transfer, conveyance or delivery of any such asset, then following the Closing, the Parties shall use their reasonable efforts, and cooperate with each other, to obtain promptly such authorizations, approvals, consents or waivers; provided, however, that neither Seller nor Buyer shall be required to pay any consideration to obtain any such authorization, approval, consent or waiver. Pending such authorization, approval, consent or waiver, the Parties shall cooperate with each other in any mutually agreeable, reasonable and lawful arrangements designed to provide to Buyer the benefits of use of such asset and to Seller the benefits, including any indemnities, that, in each case, it would have obtained had the asset been conveyed to Buyer at the Closing. To the extent that Buyer is provided the benefits pursuant to this Section 2.6 of any Contract, Buyer shall (x) perform for the benefit of the other parties thereto the obligations of Seller thereunder and (y) shall satisfy any related liabilities with respect to such Contract that, but for the lack of an authorization, approval, consent or waiver to assign such obligations or liabilities to Buyer, would be Assumed Liabilities. Once authorization, approval, consent or waiver for the sale, assignment, transfer, conveyance or delivery of any such asset not sold, assigned, transferred, conveyed or delivered at the Closing is obtained, Seller shall assign, transfer, convey and deliver such asset to Buyer at no additional cost to Buyer.

SECTION 3. PURCHASE PRICE.

    3.1    Purchase Price. Subject to Section 3, the purchase price for the Acquired Assets in U.S. Dollars shall be Two Hundred Million Dollars ($200,000,000) (the "Purchase Price"). The Purchase Price shall be paid by Buyer to Seller as provided in Section 3.2.

    3.2    Payment of Purchase Price. Subject to the terms and conditions set forth herein, Buyer shall deliver the Purchase Price to or at the direction of Seller as follows:

    (a)    on the Closing Date, by wire transfer of immediately available funds, U.S. Eighty Million Dollars ($80,000,000), to the bank account(s) designated by Seller by notice to Buyer delivered no later than two (2) business days prior to Closing;

    (b)    on or before the first anniversary of the Closing Date, by wire transfer of immediately available funds, U.S. Thirty Million Dollars ($30,000,000), to the bank account(s) designated by Seller by notice to Buyer delivered no later than two (2) business days prior to such anniversary date;

    (c)    on or before the second anniversary of the Closing Date, by wire transfer of immediately available funds, U.S. Thirty Million Dollars ($30,000,000), to the

Highly Confidential BOEH01046062

bank account(s) designated by Seller by notice to Buyer delivered no later than two (2) business days prior to such anniversary date;

(d) on or before the third anniversary of the Closing Date, by wire transfer of immediately available funds, U.S. Thirty Million Dollars ($30,000,000), to the bank account(s) designated by Seller by notice to Buyer delivered no later than two (2) business days prior to such anniversary date; and

(e) on or before the fourth anniversary of the Closing Date, by wire transfer of immediately available funds, U.S. Thirty Million Dollars ($30,000,000), to the bank account(s) designated by Seller by notice to Buyer delivered no later than two (2) business days prior to such anniversary date.

3.3   Other Consideration.

(a) In addition to the payment of the Purchase Price pursuant to Sections 3.1 and 3.2, and subject to the terms and conditions set forth herein, if, during any Measurement Year beginning on the Closing Date and ending on the fourth anniversary date of the Closing Date (the "Royalty Term"), aggregate Elan Net Sales for all Products on a combined basis exceed U.S. Eighty Million Dollars ($80,000,000) (the "Sales Threshold"), Buyer shall pay to Seller an amount equal to five percent (5%) of the difference determined by subtracting the Sales Threshold from Elan Net Sales for that Measurement Year. Buyer shall make the payments, if any, required by this Section 3.3 by wire transfer of immediately available funds, denominated in U.S. Dollars, to the bank account(s) designated by Seller by notice to Buyer, within ninety (90) days following the end of each Measurement Year in which aggregate Elan Net Sales exceed the Sales Threshold. For purposes of this Section 3.3, "Measurement Year" shall mean the twelve (12) month period commencing October 1st and ending September 30th.

(b) If during the Royalty Term, Buyer or its Affiliate shall, for any reason, other than for "Reasons Out of Buyer's Control" (as defined below), cease to sell any of the Products (hereinafter a "Discontinued Product"), such Discontinued Product shall be considered as having contributed to Elan Net Sales for the purposes of making the calculations required by Section 3.3. In such event, Elan Net Sales for such Discontinued Product shall be the larger of (a) Seller's net sales of the Product for the twelve (12) month period immediately prior to the Closing Date or (b) Elan Net Sales for the Product for the twelve (12) month period immediately prior to it becoming a Discontinued Product. For the purposes of this Section 3.3(b), "Reasons Out of Buyer's Control" means any reason for discontinuing the sale of a Product relating to the safety of such Product, adverse regulatory action with respect to such Product or any reason outside of Buyer's control caused by an event of force majeure.

(c) In the event that Buyer sells, licenses or otherwise disposes of the rights it has acquired hereunder at any time during the Royalty Term, the gross revenues derived from sales of the Products by the purchaser, licensee or other transferee (subject to the deductions set forth in clauses (a) through (c) of the definition of Elan Net Sales) shall be deemed to be Elan Net Sales for purposes of this Section 3.3. Nothing contained in this

16

Highly Confidential

BOEH01046063

Agreement shall prevent Buyer from including a provision in any relevant sales, license or other disposition agreement requiring such purchaser, licensee or other transferee to reimburse Buyer for such purchaser's, licensee's or other transferee's proportional share of any payments required to be made by Buyer to Seller pursuant to this Section 3.3.

3.4   Taxes. If Buyer is required to deduct or withhold for or on account of any tax required by applicable laws or regulations, Buyer will (i) pay to the relevant authorities the full amount required to be deducted or withheld and (ii) forward to Seller an official receipt (or certified copy) or other documentation reasonably acceptable to Seller evidencing payment to such authorities. Seller will be responsible for all taxes assessed on the basis of its net income, alternative or minimum tax, gross income or receipts. Buyer will be responsible for all taxes assessed on the basis of its net income, alternative or minimum tax, gross income or receipts.

3.5   Late Payments. In the event any amounts due to Seller from or on behalf of Buyer pursuant to this Section 3 are not made prior to or on the date that such amounts are due, Buyer shall pay Seller interest on such amounts at the rate of seven percent (7%) per annum from the date such amounts were due up to and including the date that such amounts are received by Seller.

SECTION 4.   CLOSING AND CLOSING DATE.

Unless this Agreement shall have been terminated pursuant to Section 12.1, on the terms and subject to the conditions of this Agreement, the closing of the purchase and sale of the Acquired Assets, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated hereby (the "Closing"), shall take place at such time, date and place as mutually agreed to by the Parties. For purposes of this Agreement, all transactions consummated at the Closing shall be deemed to be effective as of 5:00 p.m. Eastern Standard Time on the date of the Closing (the "Closing Date").

SECTION 5.   REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby represents and warrants to Buyer, that as of the date hereof, subject to such exceptions as are specifically disclosed in the disclosure schedule (referencing appropriate Sections hereof) supplied by Seller to Buyer and dated as of the date hereof (the "Seller Disclosure Schedule"), which Seller Disclosure Schedule shall be deemed to be representations and warranties of Seller as if made herein:

5.1   Organization, Good Standing, Power. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has the requisite corporate power and authority to own, operate and lease the properties that it purports to own, operate or lease (including the Acquired Assets) and to carry on its business as it is now being conducted (including the Business) and is duly licensed or qualified as a foreign corporation in each domestic or foreign jurisdiction in which the nature of the business conducted by it (including the Business) or the character or the location of the properties owned or leased by it (including the Acquired Assets) makes such licensing or

Highly Confidential                                                                                                                              BOEH01046064

qualification necessary, except where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

    5.2    Corporate Authorization. The execution, delivery and performance by Seller of this Agreement and each agreement or instrument contemplated by this Agreement (collectively, the "Transaction Documents") to which Seller is a party, and the consummation of the transactions contemplated hereby and thereby, are within Seller's corporate powers and have been duly authorized by all necessary corporate action on the part of Seller. The Board of Directors of Seller has taken all action required by applicable law, its Certificate of Incorporation and Bylaws to be taken by it to authorize the execution and delivery of this Agreement and the Transaction Documents by Seller and the consummation of the transactions (including the performance by Seller of its obligations) contemplated hereunder and thereunder. This Agreement is, and the Transaction Documents to which Seller is a party (when executed and delivered by Seller in accordance with the provisions hereof and assuming the due execution and delivery hereof and thereof by the other parties thereto) will be, legal, valid and binding obligations of Seller, in each case enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization, or similar laws from time to time in effect which affect the enforcement creditors' rights generally and by legal and equitable limitations on the availability of specific performance and other equitable remedies against Seller.

    5.3    Non-Contravention. The execution, delivery and performance by Seller of this Agreement and the Transaction Documents to which Seller is a party do not and will not (a) contravene or conflict with the Certificate of Incorporation or Bylaws of Seller, (b) contravene or conflict with or constitute a violation of any applicable law, or (c) result in the creation of any Lien or Other Encumbrance upon any of the Acquired Assets, or constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or to any obligation by Seller or to a loss of any benefit relating to the Business to which Seller is entitled under any provision of any Contract or other instrument binding upon Seller or by which any of the Acquired Assets are or may be bound, except for the creation of such Liens or Other Encumbrances, defaults, termination, cancellation or acceleration of any right or any obligation by Seller or to any loss of benefit which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

    5.4    Governmental Authorization. The execution, delivery and performance by Seller of this Agreement and the Transaction Documents to which Seller is a party and the consummation by Seller of the transactions contemplated hereby and thereby will not require any notice to, declarations or filing with, or the consent, waiver, approval, or authorization of, any Governmental or Regulatory Authority or foreign authority (each, a "Seller Governmental Consent"), except as contemplated by Section 10.1 or as set forth in Section 5.4 of the Seller Disclosure Schedule, other than where the failure to obtain such consent, approval or authorization, or to give or make any such notice or filing, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

18

Highly Confidential
BOEH01046065

5.5     Seller Third Party Consents.  Section 5.5 of the Seller Disclosure Schedule sets forth each Contract or other instrument binding upon Seller or any Permit requiring a consent with respect to the execution, delivery and performance of this Agreement and the Transaction Documents to which Seller is a party, or the consummation of the transactions contemplated hereby and thereby (each such consent, a "Seller Third Party Consent" and together the "Seller Third Party Consents").

5.6     Title to Acquired Assets.  Seller is the sole and exclusive legal and equitable owner of the Acquired Assets and has good and marketable title to the Acquired Assets, free and clear of any Lien or Other Encumbrance.  Upon the Closing, Buyer will receive good and marketable title to all of the Acquired Assets, free and clear of any Lien or Other Encumbrance.

5.7     Acquired Assets.  The Acquired Assets and those rights that will be licensed to Buyer pursuant to the Trademark Agreement include all of the assets and properties that are owned or licensed by Seller with respect to the marketing and sale of the Products and the operation of the Pain Institute and that are reasonably required to manufacture, sell and ship the Products after the Closing, with the exception of any manufacturing and other facilities, fixtures and equipment used in the manufacture and sale of the Products or in connection with the Business or otherwise, in substantially the manner and substantially to the extent manufactured, sold and shipped by Seller.  No Affiliate of Seller has been or is involved in the operation of the Business in any material respect and no Affiliate of Seller owns or licenses any assets or properties reasonably necessary for Buyer to produce or sell the Products or operate the Pain Institute as contemplated herein.  Seller possesses or controls all material Product Registration Data.

5.8     Intellectual Property.  Except as set forth in Section 5.8 of the Seller Disclosure Schedule, (i) the Intellectual Property and the Duraclon Rights include all the intellectual property and proprietary rights required for the manufacture, marketing, use, distribution and sale of the Products and the conduct of the Business in substantially the manner and substantially to the extent conducted by Seller, (ii) no Action or Proceeding relating to the Intellectual Property or, to the Knowledge of Seller, the Duraclon Rights, has been instituted and is pending, or to Seller's Knowledge, threatened; (iii) there are no royalty, commission or similar obligations on Seller applicable to the Intellectual Property or the Duraclon Rights, or any material licenses, sublicenses or agreements with third parties relating to or involving the Intellectual Property or the Duraclon Rights; (iv) except as provided in the Duraclon Agreements, Seller has not agreed to indemnify any Person for or against any infringement by the Intellectual Property or the Duraclon Rights; (v) to Seller's Knowledge, none of the Intellectual Property or the Duraclon Rights or any of the Products or methods of conducting the Pain Institute infringes upon or otherwise violates the rights of any Person; (vi) all registered or filed items of the Intellectual Property currently being used are properly registered or filed, as the case may be, and have been properly maintained under all Applicable Laws, other than where the failure to register properly or file or to maintain properly such registered or filed items of the Intellectual Property, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (vii) to Seller's Knowledge, all of the Duraclon Rights currently being used that are registered or filed are properly registered or filed, as the case may be, and, to Seller's Knowledge, have

19

Highly Confidential                                                                                                      BOEH01046066

been properly maintained under all Applicable Laws, other than where the failure to register properly or file or to maintain properly such registered or filed items, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Seller owns all right, title and interest in and to, or has a license, sublicense or other permission to use, all of the Intellectual Property and the Duraclon Rights and, with respect to the owned Intellectual Property, owns such Intellectual Property free and clear of all Liens or Other Encumbrances. Seller has not received any written notice from any Person, nor does Seller have Knowledge, (x) that the operation of the Business as currently conducted infringes or misappropriates the intellectual property rights of any Person, (y) that any Person has infringed or misappropriated or is infringing or misappropriating any of the Intellectual Property or the Duraclon Rights or (z) that any of the trademarks contained in the Intellectual Property or the Duraclon Rights are confusingly similar, or likely to cause confusion, with any trademark of any other Person. There are no patents or patent applications owned or licensed by Seller with claims covering any of the Products or that are necessary for the manufacture, marketing, distribution or sale of any of the Products. Except for the Extain Studies and the Disclosure Studies, Seller has made available to Buyer copies of all studies and opinions of which Seller has Knowledge and which are in Seller's possession or control, if any, relating to any such Intellectual Property or the Duraclon Rights or any infringement of or by any such Intellectual Property or the Duraclon Rights, all of which are listed on Section 5.8 of the Seller Disclosure Schedule.

5.9   Regulatory Status.

Except as set forth in Section 5.9 of the Seller Disclosure Schedule:

(a)   Seller is the lawful holder of the NDAs. The regulatory status of each of the Products is set forth in Section 5.9 of the Seller Disclosure Schedule.

(b)   All of the NDAs are in full force and effect and, to the Knowledge of Seller, all of the NDAs have been duly and validly issued. There is no Action or Proceeding by any Governmental or Regulatory Authority pending or, to the Knowledge of Seller, threatened seeking the recall of any of the Products or the revocation or suspension of any of the NDAs. Seller has made available to Buyer complete and correct copies of the NDAs, including both hard copies and electronic copies, if any.

(c)   Seller has no Knowledge of any information suggesting that (i) the Products that are the subject of an NDA cannot be marketed pursuant to the applicable NDA or (ii) the Products not covered by an NDA cannot continue to be marketed in the United States of America substantially in the manner previously marketed by Seller and with the same marketing claims and materials that are being or have been used by Seller. Seller has taken all necessary steps to ensure that each Product can continue to be marketed under the applicable NDA or other applicable product registration, except to the extent the failure to take such steps would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Seller does not represent and warrant that the FDA will not, at some future date, require the submission of a new drug application or additional information for Products not covered by an NDA or require the submission of additional information for

Highly Confidential                                                                                                                                      BOEH01046067

Products covered by an NDA; provided, however, that Seller has no Knowledge that the FDA plans to take any such actions.

(d) Seller has no Knowledge of any facts which are reasonably likely to cause (i) market withdrawal, recall or suspension of any of the Products, (ii) a change in the marketing classification of any of the Products, (iii) a material change in the labeling of any of the Products or (iv) a termination or suspension of marketing of any of the Products.

(e) Seller has not received any communication, nor does Seller have any Knowledge of any facts which furnish any reasonable basis for believing that the reimbursement rate paid by governmental or private third party payers for any of the Products, has, is, or will be reduced such that it would have a material impact on the sale of any of the Products or the Business.

(f) Seller has made available to Buyer (i) all adverse drug experience information, (ii) customer complaints, (iii) investigations of complaints, (iv) FDA adverse event reports, and (v) reports of trends of adverse events, to the extent relating to the Products and to the extent that any of the foregoing is in Seller's possession. Except for the Extain Studies and the Disclosure Studies, Seller has made available to Buyer all pre-clinical, clinical and validation data and any risk assessments in its possession that have been generated to demonstrate the safety and/or effectiveness of each of the Products. The pre-clinical and clinical studies conducted with respect to each of the Products were conducted in compliance with then-applicable FDA regulations and Product Registration Data, except to the extent any non-compliance with such applicable FDA regulations and Product Registration Data would not reasonably be expected to have a Material Adverse Effect. The Product Registration Data accurately and completely describe the pre-clinical and clinical studies (other than the Extain Studies and the Disclosure Studies), except to the extent any failure to accurately or completely describe such studies would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(g) Seller (only with respect to the operation of the Business), and the Products (including the labeling thereof) are in compliance in all respects with all Applicable Law, except where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Seller has no Knowledge of any facts which furnish any reasonable basis for any notice of adverse findings, warning or other regulatory letters or sanctions, Section 305 notices, or other similar communication, and, since January 1, 1988, there have been no recalls, field notifications, alerts or seizures requested or, to the Knowledge of Seller, threatened relating to any of the Products or the Business. Seller has no Knowledge of any misstatements or material omissions relating to the Products or the Business in any regulatory submission or other document required to be maintained by Applicable Law and the accuracy of its regulatory submissions has not been contested by any Governmental or Regulatory Authority.

(h) No employee or officer of Seller, or to the Knowledge of Seller, any other Person, including any clinical investigator, involved in any services in connection with

21

the Products was debarred or otherwise deemed to be ineligible to provide services in connection with any of the Products at the time such services were provided to Seller.

(i) Seller and its employees, and, to Seller's Knowledge, all contract manufacturers, packagers, and other Persons involved in the manufacture, processing, testing, promoting or advertising of the Products are in compliance with all applicable FDA regulations with respect to the Products.

(j) All filings and notices required to be delivered to any Governmental or Regulatory Authority with respect to any of the Products have been made on a timely basis, except where the failure to make such filings and notices on a timely basis would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(k) Seller (with respect to the Business) and the Products are in compliance with the Federal Controlled Substances Act and applicable DEA and state regulations, including, but not limited to, record keeping, reporting, registration, security, labeling, and quota requirements, except where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.10 Litigation. There are no Actions or Proceedings currently pending before any Governmental or Regulatory Authority, nor to the Knowledge of Seller, threatened or reasonably anticipated against Seller relating to, affecting or arising in connection with (a) the Acquired Assets or the Business; (b) this Agreement or the Transaction Documents; or (c) the transactions contemplated by this Agreement or the Transaction Documents. Seller is not subject to any Order that could reasonably be expected to materially impair or delay the ability of Seller to perform its obligations hereunder. Section 5.10 of the Seller Disclosure Schedule lists all Actions or Proceedings to which Seller has been a party during the two (2) year period prior to the Closing with respect to any of the Acquired Assets, the Products or the Business.

5.11 Compliance with Laws; Permits.

(a) With respect to the Business and the Products only, Seller has not violated any Applicable Law (other than any Environmental Laws which are the subject of Section 5.12), except for violations that have not had and could not reasonably be expected to have a Material Adverse Effect, and Seller has not received any written notice alleging any violation of any Applicable Law.

(b) With respect to the Business and the Products only, Seller has obtained all Permits, except for Permits the absence of which could not reasonably be expected to have a Material Adverse Effect. All of the Permits are in full force and effect and, to the Knowledge of Seller, have been duly and validly issued, except for Permits the absence of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Except as set forth in Section 5.11 of the Seller Disclosure Schedule, there is no Action or Proceeding by any Governmental or Regulatory Authority pending or, to the Knowledge of Seller, threatened seeking the revocation or suspension of any Permits.

Highly Confidential                                                                                                    BOEH01046069