**TAB 053B**

the Products was debarred or otherwise deemed to be ineligible to provide services in connection with any of the Products at the time such services were provided to Seller.

(i)      Seller and its employees, and, to Seller's Knowledge, all contract manufacturers, packagers, and other Persons involved in the manufacture, processing, testing, promoting or advertising of the Products are in compliance with all applicable FDA regulations with respect to the Products.

(j)      All filings and notices required to be delivered to any Governmental or Regulatory Authority with respect to any of the Products have been made on a timely basis, except where the failure to make such filings and notices on a timely basis would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(k)      Seller (with respect to the Business) and the Products are in compliance with the Federal Controlled Substances Act and applicable DEA and state regulations, including, but not limited to, record keeping, reporting, registration, security, labeling, and quota requirements, except where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.10    Litigation.  There are no Actions or Proceedings currently pending before any Governmental or Regulatory Authority, nor to the Knowledge of Seller, threatened or reasonably anticipated against Seller relating to, affecting or arising in connection with (a) the Acquired Assets or the Business; (b) this Agreement or the Transaction Documents; or (c) the transactions contemplated by this Agreement or the Transaction Documents.  Seller is not subject to any Order that could reasonably be expected to materially impair or delay the ability of Seller to perform its obligations hereunder.  Section 5.10 of the Seller Disclosure Schedule lists all Actions or Proceedings to which Seller has been a party during the two (2) year period prior to the Closing with respect to any of the Acquired Assets, the Products or the Business.

5.11    Compliance with Laws; Permits.

(a)      With respect to the Business and the Products only, Seller has not violated any Applicable Law (other than any Environmental Laws which are the subject of Section 5.12), except for violations that have not had and could not reasonably be expected to have a Material Adverse Effect, and Seller has not received any written notice alleging any violation of any Applicable Law.

(b)      With respect to the Business and the Products only, Seller has obtained all Permits, except for Permits the absence of which could not reasonably be expected to have a Material Adverse Effect.  All of the Permits are in full force and effect and, to the Knowledge of Seller, have been duly and validly issued, except for Permits the absence of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Except as set forth in Section 5.11 of the Seller Disclosure Schedule, there is no Action or Proceeding by any Governmental or Regulatory Authority pending or, to the Knowledge of Seller, threatened seeking the revocation or suspension of any Permits.

22

(c)     Seller is not operating and has not operated the Business anywhere outside the United States of America.

5.12    Environmental Matters.  Seller has operated the Business in compliance with all Environmental Laws, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  There is no pending or, to the Knowledge of Seller, threatened Action or Proceeding by any Person or Governmental or Regulatory Authority, or written notice of any violation of, or formal administrative proceeding relating to, arising under or involving any Environmental Laws involving the Business.

5.13    Material Contracts.  Section 5.13 of the Seller Disclosure Schedule sets forth each material Contract to which Seller is a party that (i) relates to the marketing, sale, licensing or distribution of any of the Products or the operation of the Pain Institute; (ii) has been entered into with any Governmental or Regulatory Authority with respect to the manufacture, marketing, distribution or sale of the Products or the operation of the Pain Institute; (iii) contains covenants not to compete or otherwise restricts the manufacture, marketing, distribution or sale of the Products or the operation of the Pain Institute; or (iv) provides for coupons, rebates, chargebacks, promotions, discounts or advertising of any of the Products.  Each of the Duraclon Agreements is in full force and effect and constitutes a legal, valid and binding agreement, enforceable in accordance with its terms against Seller; and Seller has performed all of its required material obligations under, and is not in material violation or breach of or default under, any of the Duraclon Agreements.  To the Knowledge of Seller, the other parties to the Duraclon Agreements are not in material violation or breach of or default under any of the Duraclon Agreements.  Seller has made available to Buyer complete and correct copies of all of the Duraclon Agreements.

5.14    Brokerage.  No broker, finder or similar agent has been employed by or on behalf of Seller, and no Person with which Seller has had any dealings or communications of any kind is entitled to any brokerage commission, finder's fee or any similar compensation, in connection with this Agreement or the transactions contemplated hereby.

5.15    Operations.  Since January 1, 2001, except as set forth in Section 5.15 of the Seller Disclosure Schedule, there has not been any event resulting in, or that is reasonably likely to result, individually or in the aggregate, in a Material Adverse Effect.  Without limiting the generality of the foregoing, since January 1, 2001, Seller has not, with respect to the Business:

(a)     failed to comply with its material obligations under any Contract;

(b)     taken any action inconsistent with maintaining and preserving the goodwill of customers and suppliers;

(c)     failed to maintain its books, accounts and records in the usual, regular and ordinary manner on a basis consistent with past practice;

(d)     sold, leased or otherwise disposed of or agreed to sell, lease or otherwise dispose of, any assets, properties, rights or claims other than sales of inventory and

Highly Confidential                                                                                 BOEH01046070

use and disposal of assets in the Ordinary Course of Business at prices, in quantities and on terms consistent with past practice;

(e)    accelerated the volume of sales of any of the Products to its customers in excess of quantities consistent with past practice (including increasing any pipeline stock of any of the Products above the level reasonably necessary to meet current and reasonably forecasted near term future Product demand);

(f)    incurred or become subject to, nor agreed to incur or become subject to, any debt, obligation or liability, contingent or otherwise, that in any way would adversely affect Buyer's ownership of the Business; or

(g)    taken or omitted to take any action which could reasonably be expected to have a Material Adverse Effect.

5.16    Disclosure.  This Agreement and the exhibits and schedules attached hereto and the written statements, documents, certificates or other written materials prepared and supplied to Buyer by or on behalf of Seller with respect to the transactions contemplated hereby (including those items provided to Buyer by Seller for due diligence purposes), when taken as a whole, do not contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading.

5.17    No Other Representations or Warranties.  Except as expressly provided in this Agreement and the Transaction Documents, Seller does not make any representation or warranty about the Products, the Acquired Assets or the Business whatsoever. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE TRANSACTION DOCUMENTS, (A) SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATEVER OR AS BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, AND (B) SELLER SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED OR STATUTORY WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR WARRANTY OF NONINFRINGEMENT.

SECTION 6.   REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer hereby represents and warrants to Seller, that as of the date hereof, subject to such exceptions as are specifically disclosed in the disclosure schedule (referencing appropriate Sections hereof) supplied by Buyer to Seller and dated as of the date hereof (the "Buyer Disclosure Schedule"), which Buyer Disclosure Schedule shall be deemed representations and warranties of Buyer as if made herein:

6.1    Organization, Good Standing, Power.  Buyer is a private limited company duly organized, validly existing and in good standing under the laws of the Republic of Ireland. Buyer has the requisite corporate power and authority to own, operate and lease the properties that it purports to own, operate or lease and to carry on its business as it is now being conducted and is duly licensed or qualified as a foreign corporation in each domestic or

Highly Confidential

BOEH01046071

foreign jurisdiction in which the nature of the business conducted by it or the character or the location of the properties owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations or financial condition of Buyer or on the ability of Buyer to consummate the transactions contemplated by this Agreement and the Transaction Documents to which Buyer is a party.

6.2     Corporate Authorization.  The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents to which Buyer is a party, and the consummation of the transactions contemplated hereby and thereby, are within Buyer's corporate powers and have been duly authorized by all necessary corporate action on the part of Buyer.  The Board of Directors or Executive Committee of the Board of Directors of Buyer has taken all action required by applicable law or its organizational documents to be taken by it to authorize the execution and delivery of this Agreement and the Transaction Documents by Buyer and the consummation of the transactions (including the performance by Buyer of its obligations) contemplated hereunder and thereunder.  This Agreement is, and the Transaction Documents to which Buyer is a party (when executed and delivered by Buyer in accordance with the provisions hereof and assuming the due execution and delivery hereof and thereof by the other parties thereto) will be, legal, valid and binding obligations of Buyer, in each case enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization, or similar laws from time to time in effect which affect the enforcement creditors' rights generally and by legal and equitable limitations on the availability of specific performance and other equitable remedies against Buyer.

6.3     Non Contravention.  The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents to which Buyer is a party do not and will not (a) contravene or conflict with the Certificate of Incorporation or Bylaws (or similar organizational documents) of Buyer, (b) contravene or conflict with or constitute a violation of any applicable law, or (c) result in the creation of any Lien or Other Encumbrance, or constitute a default under or give rise to any right of termination, cancellation or acceleration of any right under any provision of any agreement, contract or other instrument binding upon Buyer or by which any of Buyer's assets are or may be bound, except for the creation of such Liens or Other Encumbrances, defaults, termination, cancellation or acceleration of any right or any obligation of Buyer which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations or financial condition of Buyer or on the ability of Buyer to consummate the transactions contemplated hereby..

6.4     Governmental Authorization.  The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents to which Buyer is a party and the consummation by Buyer of the transactions contemplated hereby and thereby will not require any notice to, declarations or filing with, or the consent, waiver, approval or authorization of, any governmental or regulatory authority, including any Governmental or Regulatory Authority or foreign authority (each, a "Buyer Governmental Consent"), except as contemplated by Section 10.1 or as set forth in Section 6.4 of the Seller Disclosure Schedule, other than where the failure to obtain such consent, approval or authorization, or to give or

Highly Confidential                                                                                      BOEH01046072

make any such notice or filing, would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations or financial condition of Buyer or on the ability of Buyer to consummate the transactions contemplated hereby.

6.5     Buyer Third Party Consents.  There is no Contract or other instrument binding upon Buyer or any Permit requiring a consent with respect to the execution, delivery and performance of this Agreement and the Transaction Documents to which Buyer is a party, or the consummation of the transactions contemplated hereby and thereby (each such consent, a "Buyer Third Party Consent" and together the "Buyer Third Party Consents").

6.6     Litigation.  There are no Actions or Proceedings pending against Buyer, or to the Knowledge of Buyer, threatened or reasonably anticipated against Buyer, relating to, affecting or arising in connection with (a) this Agreement or the Transaction Documents, or (b) the transactions contemplated by this Agreement or the Transaction Documents.  Buyer is not subject to any Order that could reasonably be expected to materially impair or delay the ability of Buyer to perform its obligations hereunder.

6.7     Financial Capability.  Buyer has, or readily has access to, sufficient funds to pay the Purchase Price and to perform its obligations under the Assumed Liabilities on the terms and subject to the conditions contemplated by this Agreement.

6.8     Brokerage.  No broker, finder or similar agent has been employed by or on behalf of Buyer, and no Person with which Buyer has had any dealings or communications of any kind is entitled to any brokerage commission, finder's fee or any similar compensation, in connection with this Agreement or the transactions contemplated hereby.

SECTION 7.    CONDITIONS TO CLOSING.

7.1     Conditions to the Obligations of Each Party.  The obligation of each Party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of the following conditions:

(a)     Termination or Expiration of HSR Waiting Period.  Any required waiting periods (and any extension thereof) applicable to the consummation of the Agreement under the HSR Act shall have expired or been terminated.

(b)     No Injunction or Other Governmental Action.  No Order shall be issued by any Governmental or Regulatory Authority, nor any applicable law shall be in effect, that would prevent the consummation of the transactions contemplated by this Agreement.

(c)     Governmental Consents.  All Seller Governmental Consents and Buyer Governmental Consents shall have been obtained or made, as the case may be.

7.2     Conditions to the Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions (subject in each case to the right of Seller to waive any such condition):

26

(a)     Representations and Warranties True.  All of the representations and warranties of Buyer contained in this Agreement or in any written statement, certificate, schedule or other document delivered pursuant hereto or in connection with the transactions contemplated hereby shall be true and correct in all respects on and as of the Closing Date as if made on and as of the Closing Date.

(b)     Covenants and Agreements Performed.  Buyer shall have performed in all respects each obligation and each agreement and complied in all material respects with any covenant to be performed and complied with by Buyer hereunder at or prior to the Closing Date.

(c)     Buyer Third Party Consents.  All Buyer Third Party Consents shall have been obtained or made, as the case may be.

(d)     Payment of Portion of Purchase Price.  Buyer shall have delivered to or at the direction of Seller that portion of the Purchase Price required by Section 3.2(a) to be paid at Closing.

(e)     Delivery of Elan Parent Guaranty.  Buyer shall have delivered or shall have caused to be delivered the Elan Parent Guaranty.

(f)     Manufacturing Agreement.  Buyer shall have executed and delivered to Seller the Manufacturing Agreement.

(g)     Trademark Agreement.  Buyer shall have executed and delivered to Seller the Trademark Agreement.

(h)     Interim Distribution Services Agreement.  Buyer shall have executed and delivered, or caused to be executed and delivered, to Seller the Interim Distribution Services Agreement.

(i)     Interim Regulatory Services Agreement.  Buyer shall have executed and delivered to Seller the Interim Regulatory Services Agreement.

(j)     Duraclon Assignment and Assumption Agreement.  Buyer shall have executed and delivered to Seller the Duraclon Assignment and Assumption Agreement.

(k)     Domain Name Transfer Agreement.  Buyer shall have executed and delivered to Seller the Domain Name Transfer Agreement.

(l)     Trademark Assignment.  Buyer shall have executed and delivered to Seller the Trademark Assignment.

(m)     Copyright Assignment.  Buyer shall have executed and delivered to Seller the Copyright Assignment.

(n)     Intellectual Property Assignment.  Buyer shall have executed and delivered to Seller the Intellectual Property Assignment.

27

BOEH01046074

(o)     <u>Non-Compete Agreement</u>.  Buyer shall have executed and delivered the Non-Compete Agreement.

(p)     <u>Officers' Certificate</u>.  Buyer shall have delivered to Seller a certificate, dated as of the Closing Date, signed by a duly authorized officer of Buyer to the effect that the conditions set forth in Sections 7.2(a) and (b) have been satisfied at the Closing Date, and that Buyer is not in default under any provision of this Agreement.

(q)     <u>Incumbency Certificate</u>.  Buyer shall have delivered to Seller an incumbency certificate, dated as of the Closing Date, including specimen signatures, as to the incumbency of each of Buyer's officers who have executed this Agreement and any other agreement or instrument to be delivered to Seller at the Closing.

(r)     <u>Other Documents</u>.  Buyer shall have delivered to Seller all such other documents reasonably requested by Seller relating to the existence of Buyer, the authority of Buyer to enter into the transactions contemplated by this Agreement and similar matters.

7.3     <u>Conditions to the Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions (subject in each case to the right of Buyer to waive any such condition):

(a)     <u>Representations and Warranties True</u>.  All of the representations and warranties of Seller contained in this Agreement or in any written statement, certificate, schedule or other document delivered pursuant hereto or in connection with the transactions contemplated hereby shall be true and correct in all respects on and as of the Closing Date as if made on and as of the Closing Date.

(b)     <u>Covenants and Agreements Performed</u>.  Seller shall have performed in all respects each obligation and each agreement and complied in all material respects with any covenant to be performed and complied with by Seller hereunder at or prior to the Closing Date.

(c)     <u>Seller Third Party Consents</u>.  All Seller Third Party Consents shall have been obtained or made, as the case may be.

(d)     <u>Delivery of BIC Guaranty</u>.  Seller shall have delivered or shall have caused to be delivered the BIC Guaranty.

(e)     <u>Bill of Sale</u>.  Seller shall have executed and delivered to Buyer the Bill of Sale.

(f)     <u>Manufacturing Agreement</u>.  Seller shall have executed and delivered to Buyer the Manufacturing Agreement.

(g)     <u>Trademark Agreement</u>.  Seller shall have executed and delivered to Buyer the Trademark Agreement.

28

BOEH01046075

(h)     <u>Interim Distribution Services Agreement</u>.  Seller shall have executed and delivered to Buyer the Interim Distribution Services Agreement.

(i)     <u>Interim Regulatory Services Agreement</u>.  Seller shall have executed and delivered to Buyer the Interim Regulatory Services Agreement.

(j)     <u>Duraclon Assignment and Assumption Agreement</u>.  Seller shall have executed and delivered to Buyer the Duraclon Assignment and Assumption Agreement.

(k)     <u>Domain Name Transfer Agreement</u>.  Seller shall have executed and delivered to Buyer the Domain Name Transfer Agreement.

(l)     <u>Trademark Assignment</u>.  Seller shall have executed and delivered to Buyer the Trademark Assignment.

(m)     <u>Copyright Assignment</u>.  Seller shall have executed and delivered to Buyer the Copyright Assignment.

(n)     <u>Intellectual Property Assignment</u>.  Seller shall have executed and delivered to Buyer the Intellectual Property Assignment.

(o)     <u>Marketing and Pricing Data</u>.  Seller shall have delivered to Buyer the Marketing and Pricing Data.

(p)     <u>Non-Compete Agreement</u>.  Each of BIPI and BI Parent shall have executed and delivered the Non-Compete Agreement.

(q)     <u>Officers' Certificate</u>.  Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, signed by a duly authorized officer of Seller to the effect that the conditions set forth in Sections 7.3(a) and (b) have been satisfied at the Closing Date, and that Seller is not in default under any provision of this Agreement.   .

(r)     <u>Incumbency Certificate</u>.  Seller shall have delivered to Buyer an incumbency certificate, dated as of the Closing Date, including specimen signatures, as to the incumbency of Seller's officers who have executed this Agreement and any other agreement or instrument to be delivered to Buyer at the Closing.

(s)     <u>Other Documents</u>.  Seller shall have delivered to Buyer all such other documents reasonably requested by Buyer relating to the existence of Seller, the authority of Seller to enter into the transactions contemplated by this Agreement and similar matters.

SECTION 8.   <u>COVENANTS OF SELLER</u>.

8.1     <u>Preservation of Business</u>.  From the date hereof to and including the Closing Date, Seller will use all reasonable efforts to preserve the Business intact, and to preserve for Buyer the good will of the suppliers, customers and others having business relations with the Business.

29

BOEH01046076

8.2    Operation of Business.  From the date hereof until the Closing Date, Seller will continue to operate the Business consistent with Seller's current practice.  From the date hereof until the Closing Date, Seller will not, without first obtaining the written consent of Buyer (which consent shall not unreasonably be withheld):

(a)    place any Lien or Other Encumbrance on any Acquired Asset, or allow any such Lien or Other Encumbrance to be placed or remain on any Acquired Asset; or

(b)    enter into any transaction or make any agreement or commitment relating to or concerning the Acquired Assets or the Business, other than in the Ordinary Course of Business (including, without limitation, increasing any pipeline stock of any of the Products above the level reasonably necessary to meet current and reasonably forecasted near term future Product demand).

8.3    Access to Information.  Subject to applicable law, Seller agrees that on and after the Closing Date, Seller will afford promptly to Buyer and its authorized representatives reasonable access (including the right to make copies at Buyer's expense, as appropriate), during normal business hours and upon reasonable written notice, to information regarding the Business, the Acquired Assets and to related personnel of the Business; provided that (i) Buyer shall not interfere unreasonably with the conduct of the business of Seller and (ii) any such review by Buyer shall be subject to the confidentiality provisions set forth in Section 13.1 below.

8.4    Notices of Certain Events.  Seller shall promptly notify Buyer of any of the following events that occur prior to the Closing Date:

(a)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any notice or other communication from any Governmental or Regulatory Authority in connection with the Business or the transactions contemplated by this Agreement; and

(c)    any Actions or Proceedings commenced or, to the Knowledge of Seller, threatened against, relating to or involving or otherwise affecting Seller or the Business that, if pending on the date of this Agreement would have been required to have been disclosed pursuant to Section 5.10 or that relate to the consummation of the transactions contemplated by this Agreement.

SECTION 9.   COVENANTS OF BUYER.

9.1    Access to Information.

(a)    Subject to applicable law, Buyer agrees that on and after the Closing Date Buyer will afford promptly to Seller and its authorized representatives reasonable access (including the right to make copies at Seller's expense, as appropriate) at reasonable times during normal business hours and on reasonable written notice to the books and records

Highly Confidential                                        BOEH01046077

of Buyer relating to the Business, and Buyer's employees and auditors, to the extent necessary to permit Seller to determine any matter relating to Seller's rights and obligations hereunder (except with respect to Section 3.3 which is addressed in Section 9.1(b) below); provided that (i) Seller shall not interfere unreasonably with the conduct of the business of Buyer and (ii) any such review shall be subject to the confidentiality provisions set forth in Section 13.1 below.

(b)     For a period of six (6) years after the Closing Date, Seller shall, upon twenty (20) days' prior written notice and no more often than one (1) time per year, have the right to have a certified public accounting firm reasonably acceptable to Buyer, examine the relevant books and records of Buyer for the previous two (2) years to verify the accuracy of Buyer's calculation of Elan Net Sales. The audits shall be conducted during reasonable business hours. The cost of all audits conducted pursuant to this Section 9.1(b) shall be borne by Seller unless such auditors find that Buyer's calculation of Elan Net Sales were inaccurate by more than five percent (5%) of the amount of the applicable calculation and such inaccuracy resulted in Seller not being paid in accordance and consistent with the requirements of this Agreement, in which event, the cost of the audit shall be borne by Buyer. Any review of books and records pursuant to this Section 9.1(b) shall be subject to the confidentiality provisions set forth in Section 13.1 below.

(c)     (i)     Seller hereby grants to Buyer (and any successor in interest to the line of products currently sold under the trademark Roxicodone ("Roxicodone")) a right of reference and access to the Extain Studies for use by Buyer (and/or such successor in interest) in connection with FDA approval and regulatory compliance matters with respect to Roxicodone. Buyer hereby grants to Seller (and any successor in interest to Extain) a right of reference and access to the Roxicodone Studies for use by Seller (and/or such successor in interest) in connection with FDA approval and regulatory compliance matters with respect to Extain.

(ii)     Promptly upon request of Buyer, Seller shall provide to Buyer protocols relating to each of the Disclosure Studies. Buyer acknowledges and agrees that Seller shall retain all right, title and interest in and to the Disclosure Studies, and Buyer shall have no right of reference or access to the Disclosure Studies. Notwithstanding the foregoing, Buyer shall have the right during the sixty (60) day period following delivery of the protocols to notify Seller that Buyer has a reasonable belief that one or more of the Disclosure Studies contain data that is materially relevant to Roxicodone and that Buyer desires to have a mutually agreed upon third party expert review the content of the Disclosure Studies. In the event that the third party expert determines that a Disclosure Study contains data that is materially relevant to Roxicodone, such study shall be treated as an Extain Study hereunder, and Buyer shall have the rights set forth in Section (i) hereof. In the event that such third party expert determines that a Disclosure Study contains data that is materially relevant to Roxicodone, then Seller shall pay the reasonable fees and expenses of such third party expert. In the event that such third party expert determines that a Disclosure Study does not contain data that is materially relevant to Roxicodone, then Buyer shall pay the reasonable fees and expenses of such third party expert.

31

Highly Confidential

BOEH01046078

(iii)    In the event that Buyer decides, in its sole discretion, to publish data from the Roxicodone Studies, Seller and its Affiliates shall have the right of authorship with respect to such publication, subject to Buyer's approval concerning the content of any such publication. Buyer reserves the right to decline to publish any such data at any time.

9.2    Notices of Certain Events  Buyer shall promptly notify Seller of any of the following events that occur prior to the Closing Date:

(a)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any notice or other communication from any Governmental or Regulatory Authority in connection with the transactions contemplated by this Agreement; and

(c)    any Actions or Proceedings commenced or, to the Knowledge of Buyer, threatened against, relating to or involving or otherwise affecting Buyer that, if pending on the date of this Agreement would have been required to have been disclosed pursuant to Section 6.6 or that relate to the consummation of the transactions contemplated by this Agreement.

SECTION 10. ADDITIONAL COVENANTS AND AGREEMENTS OF THE PARTIES.

10.1    Governmental Filings.  Each Party shall cooperate fully with the other in preparing and filing all notices, applications, submissions, reports and other instruments and documents that are necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated by this Agreement, including Seller's reasonable cooperation in the efforts of Buyer to obtain any consents and approvals of any Governmental or Regulatory Authority required for Buyer to be able to own the Acquired Assets. Without limiting the generality of the foregoing, Seller and Buyer will, as promptly as practicable following the date of this Agreement, as applicable, file or supply, or cause to be filed and supplied, any additional notifications and information required to be filed or supplied pursuant to the HSR Act.

10.2    Medicaid Rebate Matter.  Seller has informed Buyer that, as of the date of this Agreement, there is an unresolved issue between Seller and CMS regarding the proper classification of one of the Products, Oramorph, for purposes of the Medicaid Rebate Act, 42 U.S.C. 1396r-8 (the "Medicaid Rebate Matter"). From and after the Closing, Seller agrees that it shall take no further action of any kind to resolve the Medicaid Rebate Matter, including, but not limited to, communicating with any Governmental or Regulatory Authority concerning such matter. Seller shall promptly deliver to Buyer (no later than five (5) days after Seller's receipt) any correspondence Seller receives respecting the Medicaid Rebate Matter after the Closing. Buyer may, in Buyer's sole and absolute discretion, attempt to resolve the Medicaid Rebate Matter in any manner and on any terms Buyer chooses; provided, that nothing herein shall obligate Buyer to take any action to resolve the Medicaid Rebate Matter. Buyer and Seller agree to share, on a pro rata basis, any credits or other

Highly Confidential

BOEH01046079