# TAB 053C

compensation obtained by Buyer as a result of a resolution of the Medicaid Rebate Matter, if any.

10.3   Expenses.  Seller and Buyer shall each bear its own direct and indirect expenses incurred in connection with the negotiation and preparation of this Agreement and the consummation and performance of the transactions contemplated hereby. Notwithstanding the foregoing, Buyer shall pay all registration and/or administration fees required in connection with any filings required by the HSR Act.

10.4   Customers and Suppliers.  Seller and Buyer shall, in order to facilitate an orderly transfer of the Business to Buyer, cooperate with each other in notifying all customers of and suppliers to the Business and other interested parties of the consummation of the transactions contemplated hereby.

10.5   Actions with Respect to Closing.  Each of Seller and Buyer hereby agrees to use all reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper to consummate and make effective the transactions contemplated by this Agreement, including such actions as may be reasonably necessary to obtain approvals and consents of Governmental or Regulatory Authorities and other Persons; provided that no Party shall be required to (i) pay money (other than as expressly required pursuant to this Agreement), or (ii) assume any other material obligation not otherwise required to be assumed by this Agreement.

10.6   Publicity.  Neither Seller nor Buyer (nor any of their respective Affiliates) shall issue any press release or make any public announcement with respect to this Agreement and the transactions contemplated hereby without obtaining the prior written consent of the other Party, except as may be required by applicable law upon the advice of counsel and only if the disclosing Party provides the non-disclosing Party with a reasonable opportunity to first review the release or other public announcement.

10.7   Extain Rights.  In partial consideration of Buyer's payment of the Purchase Price, Seller hereby grants to Buyer the following rights described in this Section 10.7. As used in this Section 10.7, the term "Extain Rights" shall mean any right of Seller to manufacture, market, distribute or sell Extain™ (Oxycodone Extended Release Tablets) (hereinafter "Extain") in the US Territory.  Buyer acknowledges and agrees that (i) Seller shall be under no obligation to pursue or not withdraw any application before the FDA regarding Extain, and (ii) there can be no assurance that the FDA will approve Seller's application regarding Extain.

(a)   Right of First Refusal. During the period commencing on the Closing Date and ending six (6) months following the later of (i) the date on which Buyer receives the Approval Notice (as defined below) or (ii) the date on which Buyer obtains a final, unappealable resolution of all pending Actions or Proceedings with respect to Extain (the "Extain Period"), if Seller desires to sell, assign or transfer the Extain Rights, Seller shall first offer to sell the Extain Rights to Buyer before offering such Extain Rights to any other Person. Seller shall negotiate exclusively with Buyer in good faith the terms for the sale of the Extain Rights for not less than a ninety (90) day period. If Buyer and Seller are not able

Highly Confidential  BOEH01046080

within ninety (90) days after such offer to mutually agree on the terms for a sale of the Extain Rights, then the right of first refusal contained in this Section 10.7(a) shall terminate and shall be of no further force or effect.

(b) <u>Option</u>. During the Extain Period, Seller shall provide prompt written notice to Buyer (the "Approval Notice") within two (2) days after the date on which Seller receives notification from the FDA that marketing and sale of Extain by Seller is permitted. Buyer shall have the right to notify Seller at any time during the Extain Period if Buyer desires to offer to purchase the Extain Rights ("Buyer's Expression of Interest"), and within fifteen (15) days after the date of Buyer's Expression of Interest, Buyer has the right to provide an offer to Seller setting forth the terms and conditions upon which Buyer desires to purchase the Extain Rights. Following receipt of such offer, Seller and Buyer shall negotiate in good faith the terms for the sale of the Extain Rights. If Buyer and Seller are not able within ninety (90) days after such offer to mutually agree on the terms for a sale of the Extain Rights, then Seller may, subject to its obligations pursuant to Section 10.7(a) hereof, proceed to commercialize Extain and the option contained in this Section 10.7(b) shall terminate and shall be of no further force or effect.

10.8 <u>Multi-Product Contracts</u>. Section 10.8 of the Seller Disclosure Schedule sets forth a complete and correct list of each Contract to which Seller is a party and pursuant to which Seller sells any of the Products, together with other pharmaceutical products of Seller, to a third party (the "Multi-Product Contracts"). Seller has made available to Buyer copies of all Multi-Product Contracts; provided that such copies may have been redacted to prevent disclosure of information not related to any of the Products. From and after the Closing Date, Buyer shall honor and perform all obligations and liabilities of Seller under and pursuant to each Multi-Product Contract with respect to supplying the applicable Product to the applicable third party until such time as Seller has terminated each such Multi-Product Contract as provided below. Seller agrees that after the Closing Date it will not take any action with respect to any Multi-Product Contract that would extend the term of such Multi-Product Contract with respect to any of the Products, create or agree to any additional obligations with respect to any of the Products, or otherwise adversely affect Buyer or the Business, without the prior written consent of Buyer, although Seller may enter into a separate agreement with such third parties, provided that such agreements do not contain any provisions relating to the Products or the Business. Seller further agrees that Seller shall terminate the rights and obligations of Seller with respect to the Products under each such Multi-Product Contract, to the extent permitted by the terms thereof, as soon as practicable after the Closing, but no later than sixty (60) days after Closing.

10.9 <u>Non-Competition</u>.

(a) <u>Activities in US Territory</u>. Each of Seller and, as provided in the Non-Compete Agreement, Boehringer Ingelheim International GmbH, a German limited liability company ("BI Parent"), agrees that for a period of four (4) years commencing on the Closing Date, neither Seller, BI Parent nor any of their respective Affiliates shall, in the US Territory:

(i) directly or indirectly, develop, manufacture, market or distribute any product with substantially the same formulation as any of the Products

Highly Confidential   BOEH01046081

(collectively, the "Competing Products") or own, manage, operate, control, or participate in the ownership, management, operation, or control of, or be connected as a stockholder, partner, member, joint venturer, consultant, agent, or otherwise with, any Person that develops, manufactures, markets or distributes any Competing Product; provided, however, that (A) passive investment by Seller, BI Parent and/or any of their Affiliates, which shall not exceed twenty percent (20%) in the aggregate, in a Person who develops, manufactures, markets or distributes any Competing Product shall not be deemed to be a violation of this Section 10.9(a); (B) nothing herein shall restrain or prevent Seller, BI Parent and/or any of their Affiliates from purchasing or otherwise acquiring any Person (or part thereof) that engages in the activities restricted pursuant to this Section 10.9 if such Person's total sales to unaffiliated entities attributable to Competing Products on the date of such purchase or acquisition or thereafter do not exceed twenty percent (20%) of such Person's total sales; (C) Seller and Ben Venue may manufacture Competing Products on behalf of Affiliates (with the exception of Seller and all of its Affiliates that are incorporated and/or domiciled in the US Territory (collectively, the "US Affiliates")), provided that such Competing Products are distributed, marketed and sold solely outside the US Territory after the Closing Date; and (D) notwithstanding anything to the contrary contained in this Agreement, Seller and Buyer acknowledge and agree that none of Roxiprin, Roxicet, and Roxilox is, or shall be deemed to be, a Competing Product so long as such products do not have substantially the same formulation as any of the Products;

(ii) call upon, solicit, direct, take away, provide products or services to, or attempt to call upon, solicit, direct, take away or provide products or services to, or accept any orders of business from any customers of the Products for Competing Products;

(iii) solicit any employee of Buyer or its Affiliates employed in the Business to terminate such employee's employment with Buyer or its Affiliates, or agree to hire any such employee or former employee of Buyer or its Affiliates (unless at least twelve (12) months have passed since the termination of such employee's employment with Buyer or its Affiliates); or

(iv) directly or indirectly request or advise any present or future supplier, service provider or financial resource of the Business to withdraw, curtail or cancel the furnishing of such service or resource to the Business.

(b) <u>Activities in Worldwide Territory</u>. Each of Seller and BIPI, as provided in the Non-Compete Agreement, agrees that for a period of four (4) years commencing on the Closing Date, neither Seller nor BIPI nor any of their respective US Affiliates shall assist or enable any Affiliate of Seller or BI Parent to develop, manufacture, market or distribute any Competing Product in the Worldwide Territory; provided, however, Seller and Ben Venue may manufacture Competing Products on behalf of Affiliates (with the exception of Seller and all of its US Affiliates), provided that such Competing Products are distributed, marketed and sold solely outside the US Territory after the Closing Date.

(c) In the event that any portion of this Section 10.9 shall be determined by any court of competent jurisdiction to be unenforceable, including by reason of its being

Highly Confidential                                                                                                   BOEH01046082

extended over too great a period of time or too large a geographic area or over too great a range of activities, it shall be interpreted in accordance with Section 13.10 hereof. It is the desire and intent of the Parties that the provisions of this Section 10.9 shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which such enforcement is sought.

(d) Each of Seller and, as provided in the Non-Compete Agreement, BI Parent and BIPI (collectively, the "Seller Group"), agrees that a violation on their part of any covenant contained in this Section 10.9 shall cause irreparable damage to Buyer and consequently, the Seller Group further agrees that Buyer shall be entitled to an injunction restraining any further violation of such covenant by the Seller Group. Notwithstanding anything to the contrary contained in this Agreement, such right to an injunction shall be cumulative and in addition to all other remedies that Buyer may have, including, but not limited to, recovery of damages.

10.10 <u>Future Improvements</u>. Nothing herein shall restrict Buyer's right, after the Closing, to develop, make, acquire, manufacture or have manufactured, market, distribute or sell, anywhere in the world, the Products and any technical improvements, modifications, inventions or discoveries, whether patented or unpatented, that are derived from any of the Products.

10.11 <u>Further Assurances</u>.

(a) On and after the Closing Date, Seller shall from time to time, at the request of Buyer, (i) execute and deliver, or cause to be executed and delivered, such other instruments of conveyance and transfer and take such other actions as Buyer may reasonably request, in order to more effectively consummate the transactions contemplated hereby and to vest in Buyer good and marketable title to the Acquired Assets (including assistance in the collection or reduction to possession of any of the Acquired Assets) and (ii) use its commercially reasonable efforts to obtain all consents and waivers and to resolve all material impracticalities of assignment or transfer necessary to convey the Acquired Assets to Buyer.

(b) On and after the Closing Date, Buyer shall from time to time, at the request of Seller, take such actions as Seller may reasonably request, in order to more effectively consummate the transactions contemplated hereby, including Buyer's assumption of the Assumed Liabilities.

10.12 <u>Bulk Transfer Laws</u>. Buyer hereby waives compliance by Seller with the provisions of the bulk transfer laws of any applicable jurisdiction.

10.13 <u>Acknowledgement</u>. The Parties acknowledge that Buyer is acquiring all of Seller's right, title and interest in and to the Acquired Assets and that, following the Closing and except as provided in this Agreement or any other Transaction Document, Seller has no right, title or interest in and to any of the Acquired Assets, and shall not use the Acquired Assets or attack, dispute or contest the validity of Buyer's ownership of the Trademarks.

10.14 <u>Adverse Experience Reporting and Product Complaints</u>. Seller shall promptly submit to Buyer all adverse drug experience information and product complaints brought to

Highly Confidential                                                                                                              BOEH01046083

the attention of Seller following the Closing in respect of any of the Products, as well as any material events and matters concerning or affecting the safety or efficacy of any of the Products. Without limiting the foregoing, Seller shall notify Buyer of any serious adverse or unexpected event brought to the attention of Seller following the Closing in respect of any of the Products within three (3) business days from the date Seller receives notice of such serious adverse or unexpected event.

10.15 Marketing Authorizations. Except as otherwise expressly provided in the Interim Services Agreements or the Manufacturing Agreement, Buyer shall be solely responsible and liable for taking all actions, paying all fees and conducting all communication with the appropriate Governmental or Regulatory Authority required by Applicable Law in respect of the Marketing Authorizations relating to any Product manufactured by or on behalf of Buyer after the Closing Date, including preparing and filing all reports (including annual reports) with the appropriate Governmental or Regulatory Authority. For purposes of this Section 10.15, "Marketing Authorizations" shall mean the approval to market each of the Products from the FDA, whether as a result of an NDA, the Drug Efficacy Study Implementation ("DESI") program or as a pre-1938 drug having been generally recognized as being safe.

10.16 Recalls. Except as otherwise expressly provided in the Interim Services Agreements or the Manufacturing Agreement, Buyer shall be solely responsible and liable for conducting all voluntary and involuntary recalls, stop sales or other related actions (collectively "Recalls") of units of any Products after the Closing Date relating to Products sold by or on behalf of Seller prior to the Closing Date; provided, however, that, subject to Buyer's compliance with this Section 10.16, Seller shall reimburse Buyer for all of its reasonable direct out of pocket costs and expenses, including notification, shipping and handling charges and amounts refunded or credited to customers incurred in respect of any Recalls relating to the Products sold by or on behalf of Seller prior to the Closing Date and deemed necessary by Buyer in Buyer's commercially reasonable judgment. Buyer shall reasonably consult with Seller and take into consideration Seller's reasonable recommendations regarding such Recalls, provided that Buyer shall not be required to consult with Seller in advance to the extent exigent circumstances preclude prior consultation. In addition, Buyer shall use commercially reasonable efforts to mitigate the costs and expenses associated with any such Recall.

SECTION 11. INDEMNIFICATION.

11.1 Survival of Representations and Warranties. The representations and warranties of Seller and Buyer contained in Sections 5 and 6 of this Agreement shall survive the Closing and remain in full force and effect until the fourth (4th) anniversary of the Closing Date (the "Expiration Date"); provided, however, that the representations and warranties of Seller set forth in Sections 5.8, 5.9 and 5.12 hereof shall survive the Closing and remain in full force and effect until the seventh (7th) anniversary of the Closing Date. All representations and warranties contained in Section 5 and Section 6 of this Agreement (other than the representations and warranties contained in Sections 5.8, 5.9 and 5.12 hereof) and all claims with respect thereto shall terminate on the Expiration Date; provided that if notice of any claim for indemnification pursuant to Section 11.2(a)(i) or 11.2(b)(i) shall have

Highly Confidential                                                                                                                         BOEH01046084

been given prior to the Expiration Date and such notice describes with specificity the circumstances with respect to which such indemnification claim relates, such indemnification claim shall survive until such time as such claim is finally resolved.

11.2   Indemnification.

(a)   Seller hereby indemnifies Buyer and its Affiliates and their respective officers, directors, employees, agents and representatives (collectively, the "Buyer Indemnified Parties") against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including, without limitation, reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) (collectively, "Loss") incurred by any Buyer Indemnified Party to the extent arising out of or resulting from:

(i)   any misrepresentation or breach of warranty made or to be performed by Seller pursuant to this Agreement or the Non-Compete Agreement;

(ii)   any breach of any covenant or agreement made or to be performed by Seller pursuant to this Agreement or the Non-Compete Agreement;

(iii)   the failure of Seller to satisfy any Excluded Liability;

(iv)   any recall, warranty claim, product liability claim or other claim which arises from or relates to Products manufactured or sold by or on behalf of Seller prior to the Closing Date, except as otherwise provided in the Manufacturing Agreement;

(v)   any claim asserted by a third party which arises from or relates to any Lien or Other Encumbrance on the Acquired Assets, or any other lien or security interest of any nature whatsoever on the Acquired Assets, which arose prior to the Closing as a result of any action or inaction by Seller;

(vi)   any failure by Seller to comply with laws, ordinance or regulations respecting bulk sales; or

(vii)   Seller's ownership or use of the Acquired Assets or operation of the Business at and prior to the Closing.

(b)   Buyer hereby indemnifies Seller and its Affiliates and their respective officers, directors, employees, agents and representatives (collectively, the "Seller Indemnified Parties") against and agrees to hold each of them harmless from any and all Loss incurred by any Seller Indemnified Party to the extent arising out of or resulting from:

(i)   any misrepresentation or breach of warranty made or to be performed by Buyer pursuant to this Agreement;

(ii)   any breach of any covenant or agreement made or to be performed by Buyer pursuant to this Agreement;

38

Highly Confidential

BOEH01046085

(iii) the failure of Buyer to satisfy any Assumed Liability;

(iv) except for the matters for which Seller would be obligated to indemnify Buyer under Section 11.2(a), Buyer's or its Affiliates ownership or use of the Acquired Assets or operation of the Business after the Closing; or

(v) except for the matters for which Seller would be obligated to indemnify Buyer under Section 11.2(a), any recall, warranty claim, product liability claim or other claim which arises from or relates to Products manufactured or sold by or on behalf of Buyer on and after the Closing Date, except as otherwise provided in the Manufacturing Agreement.

11.3 Notice and Opportunity To Defend. Promptly, but in no event later than ninety (90) days, after receipt by a Party hereto of notice of any claim which could give rise to a right to indemnification pursuant to Section 11.2, such Party (the "Indemnified Party") shall give the other Party (the "Indemnifying Party") written notice describing the claim in reasonable detail. The failure of an Indemnified Party to give notice in the manner provided herein shall not relieve the Indemnifying Party of its obligations under this Section, except to the extent that such failure to give notice materially prejudices the Indemnifying Party's ability to defend such claim. The Indemnifying Party shall have the right, at its option, to compromise or defend, at its own expense and by its own counsel, reasonably acceptable to the Indemnified Party, any such matter involving the asserted liability of the party seeking such indemnification. If the Indemnifying Party shall undertake to compromise or defend any such asserted liability, it shall promptly (and in any event not less than five (5) days after receipt of the Indemnified Party's original notice) by written notice notify the Indemnified Party of its intention to do so, and the Indemnified Party shall cooperate in a reasonable manner with the Indemnifying Party and its counsel in the compromise of, or defense against, any such asserted liability. All costs and expenses incurred in connection with such cooperation shall be borne by the Indemnifying Party. If the Indemnifying Party elects not to compromise or defend the asserted liability, fails to notify the Indemnified Party of its election to compromise or defend as herein provided, fails to admit its obligation to indemnify under this Agreement with respect to the claim, or the claim could result in the Indemnified Party becoming subject to injunctive relief or relief other than the payment of money damages, the Indemnified Party shall have the right, at its option, to pay, compromise or defend such asserted liability by its own counsel. Notwithstanding the foregoing, neither the Indemnifying Party nor the Indemnified Party may settle or compromise any claim without the written consent of the other; provided, however, that consent to settlement or compromise shall not be unreasonably withheld; provided further, however, that if the Indemnifying Party does not assume or otherwise diligently pursue the defense of any claim pursuant to this Section 11.3, then the Indemnified Party may settle or compromise the claim without the consent of the Indemnifying Party. In any event, the Indemnified Party and the Indemnifying Party may participate, at their own expense, in the defense of such asserted liability; provided that such expense shall be borne by the Indemnifying Party if (A) the employment of counsel by the Indemnified Party has been specifically authorized in advance by the Indemnifying Party in writing, (B) the Indemnifying Party has failed to assume the defense and employ counsel in a reasonably active and diligent manner in accordance with this Section 11.3 (in which case the Indemnified Party shall control the defense) or (C) if the

Highly Confidential

BOEH01046086

Indemnified Party and the Indemnifying Party are both named parties to the proceeding and the Indemnified Party has reasonably concluded that there may be one or more legal defenses that are different from or in addition to those available to the Indemnifying Party (in which case the Indemnifying Party shall not have the right to assume the defense of such action on behalf of the Indemnified Party and the Indemnifying Party shall be liable for all reasonable legal expenses incurred by the Indemnified Party in furtherance thereof). If the Indemnifying Party chooses to defend any claim, the Indemnified Party shall make available to the Indemnifying Party any books, records or other documents within its control that are necessary or appropriate for such defense. Notwithstanding anything to the contrary in this Section 11.3, (a) the Party conducting the defense of a claim shall (i) keep the other Party informed on a reasonable and timely basis as to the status of the defense of such claim (but only to the extent such other Party is not participating jointly in the defense of such claim) and (ii) conduct the defense of such claim in a prudent manner and (b) the Indemnifying Party shall not cease to defend, settle or otherwise dispose of any claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld).

    11.4    Indemnification Costs and Expenses.

(a)    The costs and expenses, including fees and disbursements of counsel, incurred by an Indemnified Party in connection with any claim for which the Indemnifying Party is obligated to indemnify hereunder shall be reimbursed on a quarterly basis by the Indemnifying Party.

(b)    No Indemnifying Party will have any obligations under Sections 11.2(a)(i), (ii), (v) and (vi) or 11.2(b)(i) and (ii) until the cumulative aggregate amount of the Losses incurred or suffered by the Indemnified Party which the Indemnifying Party is otherwise subject to under this Agreement exceeds $1,000,000, in which case, the entire amount of Loss shall be covered. The cumulative aggregate amount of Losses for which any Indemnifying Party shall be liable pursuant to Sections 11.2(a)(i), (ii), (v) and (vi) or 11.2(b)(i) and (ii), as the case may be, shall not exceed that portion of the Purchase Price that has been paid by Buyer to Seller pursuant to Section 3.2 hereof as of the date that the Indemnifying Party receives from the Indemnified Party the written notice described in the first sentence of Section 11.3.

(c)    The amount of any Loss for which indemnification is provided under this Section 11 shall be reduced to take account of any net tax benefit arising from the incurrence or payment of any such Loss or from the receipt of any such indemnification payment and shall be reduced by the insurance proceeds received and any other amount recovered, if any, by the Indemnified Party with respect to any Loss. If any Indemnified Party shall have received any payment pursuant to this Section 11 with respect to any Loss and shall subsequently have received insurance proceeds with respect to such Loss, then such Indemnified Party shall pay to the Indemnifying Party an amount equal to the difference (if any) between (i) the sum of the amount of those insurance proceeds or other amounts received and the amount of the payment by such Indemnifying Party pursuant to this Section 11 with respect to such Loss and (ii) the amount necessary to fully and completely indemnify and hold harmless such Indemnified Party from and against such Loss; provided, however, in no event will such Indemnified Party have any obligation pursuant to this sentence to pay to

Highly Confidential    BOEH01046087

such Indemnifying Party an amount greater than the amount of the payment by such Indemnifying Party pursuant to this Section 11 with respect to such Loss.

11.5 <u>Exclusive Remedy</u>. Absent fraud, after the Closing, and except as to Buyer's payment obligations hereunder, the failure of Seller to pay, perform or discharge any Excluded Liability and Buyer's rights to injunctive relief pursuant to Section 10.9 hereof, the indemnification provided in Section 11.2 shall be the exclusive remedy for any Losses arising out of matters covered in Sections 11.2(a) and 11.2(b) hereof.

SECTION 12. <u>TERMINATION</u>.

12.1 <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(i) by mutual written agreement of Seller and Buyer;

(ii) by either Seller or Buyer if the Closing shall not have been consummated on or before October 31, 2001, unless mutually extended by Seller and Buyer in writing;

(iii) by either Seller or Buyer if the United State Federal Trade Commission or the United States Department of Justice (or a court of competent jurisdiction) shall have issued a final, non-appealable order, decree or ruling or taken any other action in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement;

(iv) by either Party if the waiting period under the HSR Act has not expired or been terminated within six (6) months following the date of this Agreement;

(v) by Seller if any of the conditions for Seller's benefit set forth in Section 7 hereof shall have become incapable of fulfillment, and shall not have been waived by Seller; or

(vi) by Buyer if any of the conditions for Buyer's benefit set forth in Section 7 hereof shall have become incapable of fulfillment, and shall not have been waived by Buyer.

12.2 <u>Effects of Termination</u>. If this Agreement is terminated as permitted by Section 12.1, all further obligations of the Parties under this Agreement shall terminate without further liability of either Party to the other; provided that if such termination shall result from the willful failure of either Party to fulfill a condition to the performance of the obligations of the other Party or to perform a covenant of this Agreement or from a willful breach by either Party of this Agreement, such Party shall be fully liable for any and all losses incurred or suffered by the other Party as a result of such failure or breach. Notwithstanding the foregoing, Section 10.3 (relating to expenses), Section 10.6 (relating to publicity), Section 13.1 (relating to confidentiality) and Section 13.8 (relating to governing law) shall survive any termination of this Agreement pursuant to Section 12.1.

Highly Confidential                                                                                                                                                         BOEH01046088

SECTION 13. <u>MISCELLANEOUS</u>.

    13.1    <u>Confidentiality</u>.

    (a)    In addition to the restrictions contained in Sections 10.6 and 13.1(c), after the Closing, no Party (a "Disclosing Party") shall, without the prior written consent of the other Party (the "Non-Disclosing Party"), disclose to any Person Confidential Information (as defined below) of the Non-Disclosing Party, except to a Disclosing Party's or its Affiliates employees or representatives who need to know such information for any reason contemplated by this Agreement (and then only to the extent that such Persons are under an obligation to maintain the confidentiality of the Confidential Information), or use any Confidential Information of the Non-Disclosing Party for any reason other than contemplated by this Agreement unless such Disclosing Party has (i) consulted with the Non-Disclosing Party and obtained the Non-Disclosing Party's prior written consent, and (ii) been advised by counsel that disclosure is required to be made under applicable law or the requirements of a national securities exchange or another similar regulatory body. In the event that the Disclosing Party is requested or required by documents subpoena, civil investigative demand, interrogatories, requests for information, or other similar process to disclose any Confidential Information, the Disclosing Party shall provide the Non-Disclosing Party with prompt written notice of such request or demands or other similar process so that the Non-Disclosing Party may seek an appropriate protective order or, if such request, demand or other similar process is mandatory, waive the Disclosing Party's compliance with the provisions of this Section 13.1(a) as appropriate. The obligations of the Parties under this Section 13.1(a) shall remain in full force and effect for a period of ten (10) years following the Closing Date.

    (b)    The term "Confidential Information" as used in this Section 13.1 means (i) as to Buyer, all confidential information (other than Buyer Business Confidential Information) relating to the business and operations of Buyer and its Affiliates, and (ii) as to Seller, all confidential information relating to the business and operations of Seller and its Affiliates (other than the Business, the Acquired Assets and the Assumed Liabilities), including the Excluded Assets and the Excluded Liabilities or other obligations other than the Assumed Liabilities, in each of (i) and (ii) whether disclosed prior to or after the date hereof. The term "Confidential Information" does not include information which becomes generally available to the public other than as a result of disclosure by the Disclosing Party, or becomes available to the Disclosing Party on a non-confidential basis from a source other than the Non-Disclosing Party, provided that such source is not bound by a confidentiality agreement with the Non-Disclosing Party.

    (c)    In addition to the restrictions contained in Sections 10.6 and 13.1(a), after the Closing, Seller shall not, without the prior written consent of Buyer, disclose to any Person Buyer Business Confidential Information (as defined below) of Buyer, except to Buyer's or its Affiliates employees or representatives who need to know such information for any reason contemplated by this Agreement (and then only to the extent that such Persons are under an obligation to maintain the confidentiality of the Buyer Business Confidential Information), or use any Buyer Business Confidential Information for any reason other than contemplated by this Agreement unless Buyer has (i) consulted with Seller and obtained Buyer's prior written consent, and (ii) been advised by counsel that disclosure is required to

Highly Confidential    BOEH01046089

be made under applicable law or the requirements of a national securities exchange or another similar regulatory body. In the event that Seller is requested or required by documents subpoena, civil investigative demand, interrogatories, requests for information, or other similar process to disclose any Buyer Business Confidential Information, Seller shall provide Buyer with prompt written notice of such request or demands or other similar process so that Buyer may seek an appropriate protective order or, if such request, demand or other similar process is mandatory, waive the Seller's compliance with the provisions of this Section 13.1(c) as appropriate. The term "Buyer Business Confidential Information" as used in this Section 13.1(c) means all confidential information relating to the Business, the Acquired Assets and the Assumed Liabilities.

(d)  This Section 13.1 supercedes and replaces in its entirety any prior confidentiality agreements between Seller or its Affiliates and Buyer or its Affiliates to the extent related to the transactions contemplated by this Agreement or any of the Products.

13.2  Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns; provided, however, that neither Seller nor Buyer may assign any of its rights, duties or obligations hereunder without the prior written consent of the other, which consent may not be unreasonably withheld, conditioned or delayed, except that Buyer may assign its rights, duties and obligations hereunder (or part thereof), without Seller's consent, to any Affiliate of Buyer, provided that any of the obligations assigned to such Affiliate that are covered by the Elan Parent Guaranty shall continue to be covered by the Elan Parent Guaranty.

13.3  Notices. All notices or other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or facsimile and confirmed in writing, or mailed first class, postage prepaid, by registered or certified mail, return receipt requested or by nationally recognized overnight courier that maintains records of delivery to the Parties (mailed notices shall be deemed to have been given on the date received), as follows:

If to Seller, as follows:

Roxane Laboratories, Inc.
c/o Boehringer Ingelheim Pharmaceuticals, Inc.
900 Ridgebury Road
PO Box 368
Ridgefield, CT 06877
Attn: President
Fax: (203) 791-6260

Highly Confidential                                                                                                                              BOEH01046090

with a copy to:

Roxane Laboratories, Inc.
c/o Boehringer Ingelheim Pharmaceuticals, Inc.
900 Ridgebury Road
PO Box 368
Ridgefield, CT 06877
Attn: General Counsel
Fax: (203) 791-6180

If to Buyer to:

Elan Pharma International Limited
c/o Elan International Services Ltd.
102 St. James Court, Flatts
Smiths FL04, Bermuda
Attention: Director
Fax: (441) 292-2224

with copy to:

Brobeck, Phleger & Harrison LLP
12390 El Camino Real
San Diego, CA 92130
Attn: Faye H. Russell, Esq.
Fax: (858) 720-2555

or in any case to such other address or addresses as hereafter shall be furnished as provided in this Section 13.3 by any Party hereto to the other Party.

13.4 Waiver. No delay on the part of Seller or Buyer in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of either Seller or Buyer of any right, power or privilege hereunder operate as a waiver of any other right, power or privilege hereunder, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. Any provision of this Agreement may be waived if, and only if, such waiver is in writing and signed by the Party against whom the waiver is to be effective.

13.5 Entire Agreement. This Agreement and the Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, understanding and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement.

13.6 Amendment. This Agreement may be modified or amended only by written agreement of the Parties hereto.

44

Highly Confidential

BOEH01046091

Highly Confidential

BOEH01046092