# Exhibit B

Docket # X07 CV03 – 0083296 S (CLD)

| | |
|---|---|
| STATE OF CONNECTICUT | :    SUPERIOR COURT |
| | : |
| v. | :    COMPLEX LITIGATION DOCKET |
| | :    AT TOLLAND |
| | : |
| DEY, INC., | : |
| DEY LIMITED PARTNER, INC., | |
| DEY, L.P., | |
| ROXANE LABORATORIES, INC., | : |
| WARRICK PHARMACEUTICALS CORP. | : |
| SCHERING-PLOUGH CORPORATION, | : |
| AND SCHERING CORPORATION, | :    MARCH 5, 2004 |

# REVISED COMPLAINT

## FIRST COUNT (Dey Defendants)

1. The plaintiff, State of Connecticut, represented by Richard Blumenthal, Attorney General of the State of Connecticut, acting at the request of James T. Fleming, Commissioner of Consumer Protection, brings this action pursuant to the Connecticut Unfair Trade Practices Act, Chapter 735a of the Connecticut General Statutes, and more particularly, Conn. Gen. Stat. §§ 42-110m and 42-110o, for the purpose of seeking appropriate relief for violations of Conn. Gen. Stat. § 42-110b(a).

2. Defendant DEY, INC., formerly known as DEY LABORATORIES, INC. ("DEY") is a corporation organized under the laws of the State of Delaware with its principal offices in Napa, California. At all times material to this complaint, DEY, INC. has transacted business in the State

1

CT 000007

of Connecticut by, including but not limited to, manufacturing, selling and distributing pharmaceutical products that are the subjects of this action which are ultimately sold or distributed to providers in the State of Connecticut.

3.  Defendant DEY LIMITED PARTNER, INC. is a corporation organized under the laws of the State of Delaware with its principal offices in Napa, California. At all times material to this complaint, DEY LIMITED PARTNER, INC. has transacted business in the State of Connecticut by, including but not limited to, manufacturing, selling and distributing pharmaceutical products that are the subjects of this action which are ultimately sold or distributed to providers in the State of Connecticut.

4.  Defendant DEY, L.P. is a limited partnership organized under the laws of the State of Delaware with its principal offices in Napa, California. At all times material to this complaint, DEY, L.P. has transacted business in the State of Connecticut by, including but not limited to, manufacturing, selling and distributing pharmaceutical products that are the subjects of this action which are ultimately sold or distributed to providers in the State of Connecticut.

5.  Upon information and belief, all acts committed by or on behalf of DEY, INC. were also committed by or on behalf of DEY LIMITED PARTNER, INC. and DEY, L.P. DEY, INC., DEY LIMITED PARTNER, INC. and DEY, L.P. are collectively referred to as "DEY DEFENDANTS".

6.  Each of the Dey Defendants has, during all times relevant to this complaint, engaged in the trade or commerce of manufacturing, selling and/or distributing pharmaceutical products which are ultimately sold or distributed to providers in the State of Connecticut.

2

7.   Whenever reference is made in this complaint to any representation, act or transaction of any of the Dey Defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents or representatives while actively engaged in the course and scope of their employment, did or authorized such representations, acts, or transactions on behalf of said defendants.

## I.   REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER THE CONNECTICUT MEDICAL ASSISTANCE PROGRAM.

8.   The State of Connecticut Department of Social Services ("DSS") administers the Medical Assistance Program. The Medical Assistance Program includes the Connecticut Medicaid program, as well as the Connecticut Pharmaceutical Assistance Contract to the Elderly and the Disabled ("ConnPACE"), State Administered General Assistance ("SAGA"), General Assistance ("GA") and Connecticut AIDS Drug Assistance Program ("CADAP"). The Medical Assistance Program pays for medical benefits, including prescription drugs, for certain low income and disabled Connecticut residents. The Medical Assistance Program reimburses physicians, pharmacists, and other health care providers for certain drugs prescribed for, dispensed, and/or administered to, Medical Assistance Program recipients.

9.   Within the Medical Assistance Program many drugs are paid for on a fee for service basis, in some cases (i.e. Medicaid) with no copayment, and in other cases (i.e. ConnPACE) with a small copayment. This fee for service program includes certain drugs which are dispensed by pharmacies in accordance with prescriptions as well as certain drugs administered to Medical Assistance Program recipients by a physician or other health care provider.

3

10. The Medical Assistance Program will pay for fee for service drugs dispensed by a pharmacy after the pharmacy or other provider submits a claim for payment to the Medical Assistance Program or the designated claims payment agent of the Medical Assistance Program.

11. The Medical Assistance Program will pay for fee for service drugs administered to a Medical Assistance Program recipient by a physician or other provider following the physician's or other provider's submission of a claim for payment to the Medical Assistance Program or the designated claims payment agent of the Medical Assistance Program. Such a claim may include a charge for the office visit as well as a separate charge for the administered drug.

12. The amount that the Medical Assistance Program pays for drugs on a fee for service basis is governed by various Connecticut laws and regulations governing the Medical Assistance Program and its component programs.

13. Under Conn. Gen. Stat. §17b-280 and Regulations of Connecticut State Agencies §17-134d-81b, the Medical Assistance Program generally reimburses fee for service drugs which are dispensed by a pharmacy to a Medical Assistance Program recipient on the basis of: (a) the "federal acquisition cost/federal upper limit ..." ("FAC" or "FUL") or (b) the "estimated acquisition cost" ("EAC") as follows: (1) where there is no FAC or FUL the amount reimbursed is the lowest of the EAC, the usual and customary charge or the amount billed, and (2) where there is a FAC or FUL the amount reimbursed is the lowest of the FAC or FUL, the EAC, the usual and customary charge or the amount billed.

4

14. Under Conn. Gen. Stat. §17b-280, and Regulations of Connecticut State Agencies §§17b-262-448(q), 17b-262-462(j), and 17b-262-611(b)(4), the Medical Assistance Program generally reimburses for fee for service drugs that are administered to a Medical Assistance Program recipient by a provider on the basis of the EAC. The EAC is utilized by DSS in promulgating fee schedules for providers that administer drugs.

15. Under Conn. Gen. Stat. §17b-494 and Regulations of Connecticut State Agencies §17b-490 *et seq.* as modified by Regulations of Connecticut State Agencies §17b-262-684 *et seq.*, ConnPACE reimburses for fee for service drugs that are dispensed by a pharmacy to a Medical Assistance Program recipient as follows: (1) for the period prior to January 1, 2002 at the "reasonable cost" (defined in Regulations of Connecticut State Agencies §17b-490(c)) of the drug, minus a copayment, with the option of paying the price paid directly by the pharmacy to the manufacturer for the drug, minus a copayment; and, (2) for the period beginning January 1, 2002, the lowest of (a) the EAC minus a copayment, (b) the FUL minus a copayment, (c) the billed amount minus a copayment, or (d) the usual and customary charge minus a copayment.

16. Under Regulations of Connecticut State Agencies §§17-134d-81b(9) and 17b-262-685(12) the EAC is the DSS's "best estimate of the price as related to the *average wholesale price generally and currently paid by providers* for a drug marketed or sold by a particular manufacturer or labeler, as identified by the national drug code (NDC)." (Emphasis added).

17. The Connecticut Medical Assistance Program utilizes "Average Wholesale Price" ("AWP") as a benchmark or reference point to determine the EAC. The term "Average

Wholesale Price" is defined by Regulations of Connecticut State Agencies §§17-134d-81b(1), 17b-262-685(2) and 17b-262-685(12). Under these regulatory provisions the Connecticut Medical Assistance Program looks to nationally recognized publications or national drug databases which obtain their pricing information directly from manufacturers when reporting "Average Wholesale Price".

18. In addition, beginning January 1, 2003, pursuant to Conn. Public Act #02-1, § 118 (May 9, 2002 Special Session) and Conn. Public Act #02-7, §104 (May 9, 2002 Special Session) maximum allowable costs have been established for certain generic prescription drugs based upon, but not limited to, actual acquisition costs.

19. Based upon the above requirements the Connecticut Medical Assistance Program generally pays or has paid pharmacists and certain other providers an EAC as follows, excluding any applicable copayments: (1) for the period prior to October 1, 1995, the AWP of the drug minus 8%, plus a dispensing fee; (2) for the period beginning October 1, 1995, the AWP minus 12%, plus a dispensing fee; and, (3) beginning January 1, 2003, the AWP minus 40%, plus a dispensing fee, for certain generic drugs. Where there is a FUL and the FUL is lower than the EAC, the Connecticut Medical Assistance Program payment is capped by the FUL.

20. Based upon the above requirements, the Connecticut Medical Assistance Program generally pays physicians or other health care providers for certain drugs administered to Medical Assistance Program recipients an EAC as follows: 90.25% of the AWP.

6

II.    **THE SCHEME: ARTIFICIALLY INFLATING THE AWP AND OTHER PRICING INFORMATION.**

A.    **The Defendants Misrepresented AWP and Other Pricing Information That Was Utilized By the Medical Assistance Program.**

21. (a).    Dey Defendants' marketing and sales staff actively gathered and analyzed information concerning drug reimbursement under state and federal government health care benefit programs for those drugs identified in Table 1-1.

(b).    Dey Defendants conducted surveys of the reimbursement methodologies and claims submission coding systems used by state prescription drug benefit programs, including the Connecticut Medical Assistance Program, which were applicable to Dey Defendants' drugs in order to determine reimbursement. Such reimbursement methodologies and coding systems comprise a state's applicable EAC, the benchmark or reference point used to determine the EAC, the dispensing fee, applicable Healthcare Common Procedure Coding System ("HCPCS") Level II, Level III or local codes or such other means by which a state determines reimbursement for a drug identified in Table 1-1.

(c).    Dey Defendants' marketing and sales staff regularly updated and disseminated the drug reimbursement information for state and federal health care programs to their sales and marketing staff, as well as to their customers. This information was routinely provided through powerpoint presentations, reimbursement updates, reimbursement spreadsheets and worksheets, summaries, cost comparisons and call-in centers or hotlines established by Dey Defendants for their customers.

7

(d).     At all times relevant to this complaint, Dey Defendants were aware of the drug reimbursement methodology used by the Connecticut Medical Assistance Program to reimburse enrolled providers for their drugs.

22. State and federal government health plans, as well as numerous commercial health care third-party payers, use information reported by various commercial price reporting services, including specific information concerning drug prices, in determining the calculation of the reimbursement amount for the covered prescription drug benefit.

23. (a) From January, 1993 through the present, Dey Defendants have made price representations of the AWPs for those drugs identified in Table 1-1, directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc.  Dey Defendants' price representations of its AWPs were contained in new drug product announcements and introductions, price verifications, price revisions, price books and/or retail/wholesale price catalogs that were made to the price reporting services via mail, facsimile, electronic mail and/or over the telephone. These price reporting services did not independently determine Dey Defendants' AWPs and thus relied on the AWPs reported to them by Dey Defendants. Thus, Dey Defendants knew that the AWPs they reported to the price reporting services were the AWPs that would be reported to state and federal government health care programs, including the Connecticut Medical Assistance Program and the Medicare Part B program.

8

(b) In addition to reporting the AWPs for their drugs, Dey Defendants also made price representations of the Wholesale Acquisition Cost ("WAC"), the Direct Price ("DP"), and/or its net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price, and/or suggested list price for those drugs identified in Table 1-1 directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Dey Defendants made these price representations knowing that price reporting services used these price representations to report the WAC and/or the DP for Dey Defendants' drugs identified in Table 1-1. In addition, Dey Defendants made these price representations knowing that the price they reported, and which were the basis of the WAC and/or DP reported by the price reporting services, did not reflect the actual average net purchase price paid by the majority of purchasers of these drugs. Dey Defendants further knew that each of the price reporting services would add a specific percentage markup to its reported prices, which was determined by Dey Defendants and communicated to the price reporting service, and which the price reporting service added to Dey Defendants' WAC and/or their DP for those drugs in order to calculate the AWP for Dey Defendants' drugs. Thus, Dey Defendants knew that the pricing information they reported to the price reporting services would directly affect the AWPs that the price reporting services would report to state and federal government health care programs, including the Connecticut Medical Assistance Program and the Medicare Part B program.

(c) The Connecticut Medical Assistance Program and the Centers for Medicare & Medicaid Services utilize the AWPs Dey Defendants reported to the price reporting services or

9

which were derived from the WAC, DP, net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price and/or suggested list prices information Dey Defendants reported to the price reporting services, in order to determine the amount of reimbursement and copayment paid to providers who dispensed or administered Dey Defendants' drugs that are identified in Table 1-1.

(d) In addition to reporting the AWP, WAC, DP, net prices, retail/wholesale prices, catalog prices, net wholesale prices, wholesale purchase prices and/or suggested list prices for its drugs directly to the price reporting services, Dey Defendants also made price representations of its AWPs for the drugs identified in Table 1-1 directly to the Connecticut Medical Assistance Program.

**B.    The Defendants Manipulated the "Spread" Between the Reported AWP and the Actual Average Cost of a Drug.**

24. In truth and in fact, the Dey Defendants' actual average wholesale prices for those drugs identified in Table 1-1, were considerably lower than the AWPs they reported to the reporting services.

25. The Dey Defendants refers to the difference between the reported AWP and the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs as the "spread" or, alternatively, "return to practice" or "return on investment."

26. The Dey Defendants knowingly and intentionally created a "spread" on its drugs and used the "spread" to increase their market share of these drugs, thereby increasing their own profits.

10

Specifically, the Dey Defendants induced health care providers to purchase their pharmaceuticals, rather than those of competitors, by marketing the wider "spread" on each of the defendants' pharmaceuticals to the providers, knowing that the larger "spreads" would allow the health care providers to receive more money, and make more of a profit, at the expense of the Connecticut Medical Assistance Program.

27. The Dey Defendants knowingly and intentionally inflated the prices they reported as the AWPs for their pharmaceuticals, including those identified in Tables 1-1. The Dey Defendants knew that their inflation of prices reported as the AWPs for its pharmaceuticals would cause the Connecticut Medical Assistance Program to pay providers excessive amounts for these pharmaceuticals, which had the effect of causing the Connecticut Medical Assistance Program to unknowingly subsidize defendants' schemes to retain and/or increase its market share.

28. The inflated AWPs of the Dey Defendants greatly exceeded the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the Dey Defendants in conducting their ordinary business affairs. Thus the Dey Dfendants' AWPs for these drugs bears no relation to any purchase price at which a provider is able to procure these drugs. Moreover, the Dey Defendants' AWPs bear no relation to the "average wholesale price" as that term is defined in Regulations of Connecticut State Agencies §§17-134d-81b(1), 17b-262-685(2) and 17b-262-685(12).

29. Table 2-1 attached to this complaint illustrates the inflated AWPs of the Dey Defendants and the impact of those AWPs on the "spread" for the drugs identified in said tables.

11

30. At the same time that the Dey Defendants were inflating their reported AWPs used by the Connecticut Medical Assistance Program they were lowering the prices they charged to health care providers for their pharmaceuticals, thus creating increasingly dramatic "spreads" to sell more of their drugs, and/or increasing their spreads to be larger than the spreads of their competitors in order to retain or increase their market share.

31. Upon information and belief, in addition to manipulating its reported AWPs and other pricing information, the Dey Defendants used free goods, "educational grants" and other incentives to induce health care providers to use its pharmaceuticals, all of which lowered the actual prices of the pharmaceuticals and created even wider "spreads."

### III.   VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA").

32. In the course of the aforementioned trade or commerce, from and including January 1, 1993, the Dey Defendants has made or caused to be made, directly or indirectly, explicitly or by implication, representations of the AWPs of its pharmaceuticals to various reporting services including First Data Bank (f/n/a the *Blue Book*) and/or Medical Economics, Inc. (the *Red Book*).

33. In truth and in fact, the AWPs provided to these reporting services were false as they did not represent true average wholesale prices in that:

(a) the actual average wholesale prices paid by pharmacies, physicians and other health care providers were significantly lower than those which were reported, and/or

(b) the reported AWPs did not include offsets to the actual sales prices of specified pharmaceuticals, such as discounts, rebates, off-invoice pricing, free goods, cash

payments, chargebacks, and/or other financial incentives which further lowered the actual average wholesale prices of these pharmaceuticals.

34. The Dey Defendants made the foregoing misrepresentations with the knowledge and/or intent that the Connecticut Medical Assistance Program would use the reported AWPs in its reimbursement methodology, resulting in pharmacies, physicians and other health care providers being reimbursed at higher rates and therefore, increasing the "spread" on the Dey Defendants' pharmaceuticals.

35. The Dey Defendants marketed this artificially created "spread" as a financial benefit to health care providers in order to influence the providers to administer and/or purchase their pharmaceutical products.

36. As a direct result of the defendants' misrepresentations, the Connecticut Medical Assistance Program has been injured by having to pay grossly excessive amounts for the Dey Defendants' pharmaceuticals on a fee for service basis.

37. The Dey Defendants' misrepresentations, as alleged herein, have been and are material, false, and likely to mislead and, therefore, constitute deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## SECOND COUNT (Dey Defendants)

1. – 37. Paragraphs 1 through 37 of the First Count are hereby made paragraphs 1 through 37 of the Second Count as if fully set forth.

38. Dey Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

## THIRD COUNT (Dey Defendants)

1. – 37.  Paragraphs 1 through 37 of the First Count are hereby made paragraphs 1 through 37 of the Third Count as if fully set forth.

38. Dey Defendants' course of wrongful conduct is immoral, unethical, oppressive, unscrupulous and causes substantial injury.

39. Dey Defendants' course of wrongful conduct alleged herein violates the public policy of the State of Connecticut which prohibits the offering or the payment of cash or a benefit to influence the purchase of goods or services for which reimbursement is claimed from a state or federal agency, as embodied in Conn. Gen. Stat. §53a-161d.

40. The Dey Defendants' acts and practices, as alleged herein, constitute unfair acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## FOURTH COUNT (Dey Defendants)

1. – 40.  Paragraphs 1 through 40 of the Third Count are hereby made paragraphs 1 through 40 of the Fourth Count as if fully set forth.

41. Dey Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

## FIFTH COUNT (Dey Defendants)

1. - 7.  Paragraphs 1 through 7 of the First Count are hereby made paragraphs 1 through 7 of the Fifth Count as if fully set forth.

14

I.    **REIMBURSEMENT   FOR   PRESCRIPTION   DRUGS   FOR CONSUMERS UNDER MEDICARE.**

8.  The federal Medicare program pays for a portion of the cost of a limited number of prescription drugs.

9.  Medicare is a health benefit program created by federal law for individuals who are 65 and older or who are disabled. 42 U.S.C. §§1395, *et seq*. Medicare is divided into two primary components: Medicare Part A and Medicare Part B.

10. Medicare Part A is funded primarily by a federal payroll tax, premiums paid by Medicare beneficiaries and appropriations from Congress. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§1395e — 42 U.S.C. §§1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

11. Medicare Part B is optional to beneficiaries and covers some healthcare benefits not provided by Medicare Part A. Medicare Part B is funded by appropriations from Congress and premiums paid by Medicare beneficiaries who choose to participate in the program. 42 U.S.C. §§1395j — 42 U.S.C. §§1395w-4. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting. These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and anti-emetics (drugs which control the side effects caused by chemotherapy), and drugs

administered through durable medical equipment such as a nebulizer. 42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

12. The drugs listed in Tables 3-1 are drugs that may be covered by Medicare Part B.

13. Medicare generally uses the "average wholesale price" ("AWP") in determining the amount that a provider will be paid for a drug. The adjusted cost that Medicare will allow for drugs others than multi-source drugs is the lower of the actual charge or 95% of the AWP for the drug. For multi-source drugs the adjusted cost that Medicare will allow is "the lesser of the median average wholesale price for all sources of the generic form of the drug … or the lowest average wholesale price of the brand name forms of the drug…" 42 CFR §405.517(c). Prior to November 1998 the adjusted cost that Medicare allowed for drugs other than multi-source drugs was the lower of the estimated acquisition cost or the average wholesale price. Prior to November 1998 for multi-source drugs the adjusted cost that Medicare allowed was the lower or the estimated acquisition cost or the wholesale price that was "the median price from all sources of the generic form of the drug." 56 Federal Register 59621 (November 25, 1991). Medicare will pay 80% of this adjusted cost and the Medicare beneficiary is responsible for the remaining 20% as a copayment. 42 U.S.C. §1395l(a); 42 U.S.C. §1395u(o). If the Medicare beneficiary is also a Connecticut Medicaid recipient, then the 20% copayment is actually paid for by DSS.

II.  **THE SCHEME: ARTIFICIALLY INFLATING THE AWP AND OTHER PRICING INFORMATION.**

A.  **The Defendants Misrepresented Pricing Information That Was Utilized To Pay To Determine Reimbursement For Drugs Provided To Connecticut Consumers Who Were Medicare Beneficiaries.**

14. (a).  Dey Defendants marketing and sales staff actively gathered and analyzed information concerning drug reimbursement under federal government health care benefit programs for those drugs identified in Table 3-1

(b).  Dey Defendants collected Medicare Part B reimbursement regulations and policies, and identified applicable HCPCS Level II and Level III codes and the reimbursement amount linked to a HCPCS code, for their drugs identified in Table 3-1, and which were reimbursed under such program, including reimbursement for beneficiaries residing in the State of Connecticut who are entitled to coverage for those drugs identified in Table 3-1 that are covered under Medicare Part B.

(c).  Dey Defendants' marketing and sales staff regularly updated and disseminated the drug reimbursement information for federal health care programs to their sales and marketing staff, as well as to their customers. This information was routinely provided through powerpoint presentations, reimbursement updates, reimbursement spreadsheets and worksheets, summaries, cost comparisons and call-in centers or hotlines established by Dey Defendants for their customers.

(d).  At all times relevant to this complaint, Dey Defendants were aware of the drug reimbursement methodology used by the Centers for Medicare & Medicaid Services and/or

17

Medicare contractors for beneficiaries residing in the State of Connecticut who are entitled to coverage for Dey Defedants' drugs identified in Table 3-1 and covered under Medicare Part B.

15. State and federal government health plans, as well as numerous commercial health care third-party payers, use information reported by various commercial price reporting services, including specific information concerning drug prices, in determining the calculation of the reimbursement amount for the covered prescription drug benefit.

16. (a) From January, 1993 through the present, Dey Defendants have made price representations of the AWPs for those drugs identified in Table 3-1, directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Dey Defendants' price representations of its AWPs were contained in new drug product announcements and introductions, price verifications, price revisions, price books and/or retail/wholesale price catalogs that were made to the price reporting services via mail, facsimile, electronic mail and/or over the telephone. These price reporting services did not independently determine Dey Defendants' AWPs and thus relied on the AWPs reported to them by Dey Defendants. Thus, Dey Defendants knew that the AWPs they reported to the price reporting services were the AWPs that would be reported to federal government health care programs, including the Medicare Part B program.

(b) In addition to reporting the AWPs for its drugs, Dey Defendants also made price representations of the Wholesale Acquisition Cost ("WAC"), the Direct Price ("DP"), and/or their net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase

price, and/or suggested list price for those drugs identified in Table 3-1 directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Dey Defendants made these price representations knowing that price reporting services used these price representations to report the WAC and/or the DP for Dey Defendants' drugs identified in Table 3-1.   In addition, Dey Defendants made these price representations knowing that the price they reported, and which were the basis of the WAC and/or DP reported by the price reporting services, did not reflect the actual average net purchase price paid by the majority of purchasers of these drugs.   Dey Defendants further knew that each of the price reporting services would add a specific percentage markup to its reported prices, which was determined by Dey Defendants and communicated to the price reporting service, and which the price reporting service added to Dey Defendants' WAC and/or its DP for those drugs in order to calculate the AWP for Dey Defendants' drugs.   Thus, Dey Defendants knew that the pricing information they reported to the price reporting services would directly affect the AWPs that the price reporting services would report to federal government health care programs, including the Medicare Part B program.

(c) The Centers for Medicare & Medicaid Services utilize the AWPs Dey Defendants reported to the price reporting services or which were derived from the WAC, DP, net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price and/or suggested list prices information Dey Defendants reported to the price reporting services, in order

19

to determine the amount of reimbursement and copayment paid to providers who dispensed or administered Dey Defendants' drugs that are identified in Table 3-1..

**B.     The Defendants Manipulated the "Spread" Between the Reported AWP and the Actual Average Cost of a Drug.**

17. In truth and in fact, the Dey Defendants' actual average wholesale prices for those drugs identified in Table 3-1 were considerably lower than the AWPs they reported to the reporting services.

18. The Dey Defendants refer to the difference between the reported AWP and the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs as the "spread" or, alternatively, "return to practice" or "return on investment."

19. The Dey Defendants knowingly and intentionally created a "spread" on its drugs and used the "spread" to increase its market share of those drugs identified in Table 3-1, thereby increasing their own profits. Specifically, the Dey Defendants induced health care providers to purchase their pharmaceuticals, rather than those of competitors, by marketing the wider "spread" on each of the defendants' pharmaceuticals to the providers, knowing that the larger "spreads" would allow the health care providers to receive more money, and make more of a profit, at the expense of Medicare and CT Medicare beneficiaries.

20. The Dey Defendants knowingly and intentionally inflated the prices they each reported as the AWPs for their pharmaceuticals, including those identified in Tables 3-1. The Dey Defendants knew that their inflation of prices reported as the AWPs for their pharmaceuticals

20

would cause Medicare and CT Medicare beneficiaries to pay providers excessive amounts for these pharmaceuticals, which had the effect of causing Medicare and CT Medicare beneficiaries to unknowingly subsidize Dey Defendants' schemes to retain and/or increase its market share.

21. The inflated AWPs of the Dey Defendants greatly exceeded the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs. Thus the Dey Defendants' AWPs for these drugs bears no relation to any purchase price at which a provider is able to procure these drugs.

22. Table 4-1 attached to this complaint illustrates the inflated AWPs of the Dey Defendants and the impact of those AWPs on the "spread" for the drugs identified in said table.

23. At the same time that the Dey Defendants were inflating their reported AWPs used by Medicare they were lowering the prices they charged to health care providers for their pharmaceuticals, thus creating increasingly dramatic "spreads" to sell more of their drugs, and/or increasing their spreads to be larger than the spreads of their competitors in order to retain or increase their market share.

24. Upon information and belief, in addition to manipulating its reported AWPs and other pricing information, the Dey Defendants used free goods, "educational grants" and other incentives to induce health care providers to use its pharmaceuticals, all of which lowered the actual prices of the pharmaceuticals and created even wider "spreads."

21

### III.   VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA").

25. In the course of the aforementioned trade or commerce, from and including January 1, 1993, the Dey Defendants have made or caused to be made, directly or indirectly, explicitly or by implication, representations of the AWPs of their pharmaceuticals to various reporting services including First Data Bank (f/n/a the *Blue Book*) and/or Medical Economics, Inc. (the *Red Book*).

26. In truth and in fact, the AWPs provided to these reporting services were false as they did not represent true average wholesale prices in that:

   (a) the actual average wholesale prices paid by pharmacies, physicians and other health care providers were significantly lower than those which were reported, and/or

   (b) the reported AWPs did not include offsets to the actual sales prices of specified pharmaceuticals, such as discounts, rebates, off-invoice pricing, free goods, cash payments, chargebacks, and/or other financial incentives which further lowered the actual average wholesale prices of these pharmaceuticals.

27. The Dey Defendants made the foregoing misrepresentations with the knowledge and/or intent that Medicare would use the reported AWPs in their reimbursement methodology, resulting in pharmacies, physicians and other health care providers being reimbursed at higher rates and therefore, increasing the "spread" on the Dey Defendants' pharmaceuticals.

28. The Dey Defendants marketed this artificially created "spread" as a financial benefit to health care providers in order to influence the providers to administer and/or purchase their pharmaceutical products.

22

29. As a direct result of the defendants' misrepresentations, Medicare and Connecticut Medicare beneficiaries have been injured by having to pay grossly excessive amounts for each of the Dey Defendants' pharmaceuticals, including Connecticut Medicare beneficiaries in some instances paying a deductible for a drug that was greater than the actual cost of the drug.

30. The Dey Defendants' misrepresentations, as alleged herein, have been and are material, false, and likely to mislead and, therefore, constitute deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## SIXTH COUNT (Dey Defendants)

1. – 30.  Paragraphs 1 through 30 of the Fifth Count are hereby made paragraphs 1 through 30 of the Sixth Count as if fully set forth.

31. Dey Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

## SEVENTH COUNT (Dey Defendants)

1. – 30.  Paragraphs 1 through 30 of the Fifth Count are hereby made paragraphs 1 through 30 of the Seventh Count as if fully set forth.

31. Dey Defendants' course of wrongful conduct is immoral, unethical, oppressive, unscrupulous and has caused substantial injury.

32. Dey Defendants' course of wrongful conduct alleged herein violates the public policy of the State of Connecticut which prohibits the offering or the payment of cash or a benefit to influence the purchase of goods or services for which reimbursement is claimed from a state or federal agency, as embodied in Conn. Gen. Stat. §53a-161d.

33. Dey Defendants' acts and practices, as alleged herein, constitute unfair acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## EIGHTH COUNT (Dey Defendants)

1. – 33.  Paragraphs 1 through 33 of the Seventh Count are hereby made paragraphs 1 through 33 of the Eighth Count as if fully set forth.

34.  Dey Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

## NINTH COUNT (Roxane Defendant)

1.  The plaintiff, State of Connecticut, represented by Richard Blumenthal, Attorney General of the State of Connecticut, acting at the request of James T. Fleming, Commissioner of Consumer Protection, brings this action pursuant to the Connecticut Unfair Trade Practices Act, Chapter 735a of the Connecticut General Statutes, and more particularly, Conn. Gen. Stat. §§ 42-110m and 42-110o, for the purpose of seeking appropriate relief for violations of Conn. Gen. Stat. § 42-110b(a).

2.  Defendant ROXANE LABORATORIES, INC. ("ROXANE") is a corporation organized under the laws of the State of Delaware with its principal offices in Columbus, Ohio, and is a subsidiary of BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., headquartered in Ridgefield, CT. At all times material to this complaint, ROXANE has transacted business in the State of Connecticut by, including but not limited to, manufacturing, selling and distributing pharmaceutical products that are the subjects of this action, which are ultimately sold or distributed to providers in the State of Connecticut.

24

3.   Roxane has, during all times relevant to this complaint, engaged in the trade or commerce of manufacturing, selling and/or distributing pharmaceutical products which are ultimately sold or distributed to providers in the State of Connecticut.

4.   Whenever reference is made in this complaint to any representation, act or transaction of Roxane, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents or representatives while actively engaged in the course and scope of their employment, did or authorized such representations, acts, or transactions on behalf of said defendants.

## I.   REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER THE CONNECTICUT MEDICAL ASSISTANCE PROGRAM.

5.   The State of Connecticut Department of Social Services ("DSS") administers the Medical Assistance Program. The Medical Assistance Program includes the Connecticut Medicaid program, as well as the Connecticut Pharmaceutical Assistance Contract to the Elderly and the Disabled ("ConnPACE"), State Administered General Assistance ("SAGA"), General Assistance ("GA") and Connecticut AIDS Drug Assistance Program ("CADAP"). The Medical Assistance Program pays for medical benefits, including prescription drugs, for certain low income and disabled Connecticut residents. The Medical Assistance Program reimburses physicians, pharmacists, and other health care providers for certain drugs prescribed for, dispensed, and/or administered to, Medical Assistance Program recipients.

6.   Within the Medical Assistance Program many drugs are paid for on a fee for service basis, in some cases (i.e. Medicaid) with no copayment, and in other cases (i.e. ConnPACE) with

25

a small copayment. This fee for service program includes certain drugs which are dispensed by pharmacies in accordance with prescriptions as well as certain drugs administered to Medical Assistance Program recipients by a physician or other health care provider.

7. The Medical Assistance Program will pay for fee for service drugs dispensed by a pharmacy after the pharmacy or other provider submits a claim for payment to the Medical Assistance Program or the designated claims payment agent of the Medical Assistance Program.

8. The Medical Assistance Program will pay for fee for service drugs administered to a Medical Assistance Program recipient by a physician or other provider following the physician's or other provider's submission of a claim for payment to the Medical Assistance Program or the designated claims payment agent of the Medical Assistance Program. Such a claim may include a charge for the office visit as well as a separate charge for the administered drug.

9. The amount that the Medical Assistance Program pays for drugs on a fee for service basis is governed by various Connecticut laws and regulations governing the Medical Assistance Program and its component programs.

10. Under Conn. Gen. Stat. §17b-280 and Regulations of Connecticut State Agencies §17-134d-81b, the Medical Assistance Program generally reimburses fee for service drugs which are dispensed by a pharmacy to a Medical Assistance Program recipient on the basis of: (a) the "federal acquisition cost/federal upper limit ..." ("FAC" or "FUL") or (b) the "estimated acquisition cost" ("EAC") as follows: (1) where there is no FAC or FUL the amount reimbursed is the lowest of the EAC, the usual and customary charge or the amount billed, and (2) where

there is a FAC or FUL the amount reimbursed is the lowest of the FAC or FUL, the EAC, the usual and customary charge or the amount billed.

11. Under Conn. Gen. Stat. §17b-280, and Regulations of Connecticut State Agencies §§17b-262-448(q), 17b-262-462(j), and 17b-262-611(b)(4), the Medical Assistance Program generally reimburses for fee for service drugs that are administered to a Medical Assistance Program recipient by a provider on the basis of the EAC. The EAC is utilized by DSS in promulgating fee schedules for providers that administer drugs.

12. Under Conn. Gen. Stat. §17b-494 and Regulations of Connecticut State Agencies §17b-490 *et seq.* as modified by Regulations of Connecticut State Agencies §17b-262-684 *et seq.*, ConnPACE reimburses for fee for service drugs that are dispensed by a pharmacy to a Medical Assistance Program recipient as follows: (1) for the period prior to January 1, 2002 at the "reasonable cost" (defined in Regulations of Connecticut State Agencies §17b-490(c)) of the drug, minus a copayment, with the option of paying the price paid directly by the pharmacy to the manufacturer for the drug, minus a copayment; and, (2) for the period beginning January 1, 2002, the lowest of (a) the EAC minus a copayment, (b) the FUL minus a copayment, (c) the billed amount minus a copayment, or (d) the usual and customary charge minus a copayment.

13. Under Regulations of Connecticut State Agencies §§17-134d-81b(9) and 17b-262-685(12) the EAC is the DSS's "best estimate of the price as related to the *average wholesale price generally and currently paid by providers* for a drug marketed or sold by a particular manufacturer or labeler, as identified by the national drug code (NDC)." (Emphasis added).

27

14. The Connecticut Medical Assistance Program utilizes "Average Wholesale Price" ("AWP") as a benchmark or reference point to determine the EAC. The term "Average Wholesale Price" is defined by Regulations of Connecticut State Agencies §§17-134d-81b(1), 17b-262-685(2) and 17b-262-685(12). Under these regulatory provisions the Connecticut Medical Assistance Program looks to nationally recognized publications or national drug databases which obtain their pricing information directly from manufacturers when reporting "Average Wholesale Price".

15. In addition, beginning January 1, 2003, pursuant to Conn. Public Act #02-1, § 118 (May 9, 2002 Special Session) and Conn. Public Act #02-7, §104 (May 9, 2002 Special Session) maximum allowable costs have been established for certain generic prescription drugs based upon, but not limited to, actual acquisition costs.

16. Based upon the above requirements the Connecticut Medical Assistance Program generally pays or has paid pharmacists and certain other providers an EAC as follows, excluding any applicable copayments: (1) for the period prior to October 1, 1995, the AWP of the drug minus 8%, plus a dispensing fee; (2) for the period beginning October 1, 1995, the AWP minus 12%, plus a dispensing fee; and, (3) beginning January 1, 2003, the AWP minus 40%, plus a dispensing fee, for certain generic drugs. Where there is a FUL and the FUL is lower than the EAC, the Connecticut Medical Assistance Program payment is capped by the FUL.

17. Based upon the above requirements, the Connecticut Medical Assistance Program generally pays physicians or other health care providers for certain drugs administered to Medical Assistance Program recipients an EAC as follows: 90.25% of the AWP.

## II.   THE SCHEME: ARTIFICIALLY INFLATING THE AWP AND OTHER PRICING INFORMATION.

### A.   The Defendants Misrepresented AWP and Other Pricing Information That Was Utilized By the Medical Assistance Program.

18. (a).   Roxane's marketing and sales staff actively gathered and analyzed information concerning drug reimbursement under state and federal government health care benefit programs for those drugs identified in Table 1-2.

(b).   Roxane conducted surveys of the reimbursement methodologies and claims submission coding systems used by state prescription drug benefit programs, including the Connecticut Medical Assistance Program, which were applicable to Roxane's drugs in order to determine reimbursement.   Such reimbursement methodologies and coding systems comprise a state's applicable EAC, the benchmark or reference point used to determine the EAC, the dispensing fee, applicable Healthcare Common Procedure Coding System ("HCPCS") Level II, Level III or local codes or such other means by which a state determines reimbursement for a drug identified in Table 1-2.

(c).   Roxane's marketing and sales staff regularly updated and disseminated the drug reimbursement information for state and federal health care programs to its sales and marketing staff, as well as to its customers.   This information was routinely provided through powerpoint

presentations, reimbursement updates, reimbursement spreadsheets and worksheets, summaries, cost comparisons and call-in centers or hotlines established by Roxane for its customers.

(d).    At all times relevant to this complaint, Roxane was aware of the drug reimbursement methodology used by the Connecticut Medical Assistance Program to reimburse enrolled providers for its drugs.

19. State and federal government health plans, as well as numerous commercial health care third-party payers, use information reported by various commercial price reporting services, including specific information concerning drug prices, in determining the calculation of the reimbursement amount for the covered prescription drug benefit.

20. (a) From January, 1993 through the present, Roxane has made price representations of the AWPs for those drugs identified in Table 1-2, directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Roxane's price representations of its AWPs were contained in new drug product announcements and introductions, price verifications, price revisions, price books and/or retail/wholesale price catalogs that were made to the price reporting services via mail, facsimile, electronic mail and/or over the telephone.  These price reporting services did not independently determine Roxane's AWPs and thus relied on the AWPs reported to them by Roxane. Thus, Roxane knew that the AWPs it reported to the price reporting services were the AWPs that would be reported to state and federal government health care programs, including the Connecticut Medical Assistance Program and the Medicare Part B program.

(b) In addition to reporting the AWPs for its drugs, Roxane also made price representations of the Wholesale Acquisition Cost ("WAC"), the Direct Price ("DP"), and/or its net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price, and/or suggested list price for those drugs identified in Table 1-2 directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc.  Roxane made these price representations knowing that price reporting services used these price representations to report the WAC and/or the DP for Roxane's drugs identified in Table 1-2.  In addition, Roxane made these price representations knowing that the price it reported, and which were the basis of the WAC and/or DP reported by the price reporting services, did not reflect the actual average net purchase price paid by the majority of purchasers of these drugs.  Roxane further knew that each of the price reporting services would add a specific percentage markup to its reported prices, which was determined by Roxane and communicated to the price reporting service, and which the price reporting service added to Roxanee's WAC and/or its DP for those drugs in order to calculate the AWP for Roxane's drugs. Thus, Roxane knew that the pricing information it reported to the price reporting services would directly affect the AWPs that the price reporting services would report to state and federal government health care programs, including the Connecticut Medical Assistance Program and the Medicare Part B program.

(c) The Connecticut Medical Assistance Program and the Centers for Medicare and Medicaid Services utilize the AWPs Roxane reported to the price reporting services or which

31

were derived from the WAC, DP, net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price and/or suggested list prices information Roxane reported to the price reporting services, in order to determine the amount of reimbursement and copayment paid to providers who dispensed or administered Roxane's drugs that are identified in Table 1-2.

(d) In addition to reporting the AWP, WAC, DP, net prices, retail/wholesale prices, catalog prices, net wholesale prices, wholesale purchase prices and/or suggested list prices for its drugs directly to the price reporting services, Roxane also made price representations of its AWPs for the drugs identified in Table 1-2 directly to the Connecticut Medical Assistance Program.

**B.    The Defendants Manipulated the "Spread" Between the Reported AWP and the Actual Average Cost of a Drug.**

21. In truth and in fact, Roxane's actual average wholesale prices for those drugs identified in Table 1-2 were considerably lower than the AWPs it reported to the reporting services.

22. Roxane refers to the difference between the reported AWP and the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs as the "spread" or, alternatively, "return to practice" or "return on investment."

23. Roxane knowingly and intentionally created a "spread" on its drugs and used the "spread" to increase its market share of these drugs, thereby increasing its own profits. Specifically, Roxane induced health care providers to purchase its pharmaceuticals, rather than those of competitors, by marketing the wider "spread" on Roxane's pharmaceuticals to the providers,

32

knowing that the larger "spreads" would allow the health care providers to receive more money, and make more of a profit, at the expense of the Connecticut Medical Assistance Program.

24. Roxane knowingly and intentionally inflated the prices it each reported as the AWPs for their pharmaceuticals, including those identified in Tables 1-2. Roxane knew that its inflation of prices reported as the AWPs for its pharmaceuticals would cause the Connecticut Medical Assistance Program to pay providers excessive amounts for these pharmaceuticals, which had the effect of causing the Connecticut Medical Assistance Program to unknowingly subsidize Roxane's schemes to retain and/or increase its market share.

25. The inflated AWPs of Roxane greatly exceeded the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to Roxane in conducting its ordinary business affairs. Thus Roxane's AWPs for these drugs bears no relation to any purchase price at which a provider is able to procure these drugs. Moreover, the Roxane's AWPs bear no relation to the "average wholesale price" as that term is defined in Regulations of Connecticut State Agencies §§17-134d-81b(1), 17b-262-685(2) and 17b-262-685(12).

26. Table 2-2 attached to this complaint illustrates the inflated AWPs of Roxane and the impact of those AWPs on the "spread" for the drugs identified in said tables.

27. At the same time that Roxane was inflating its reported AWPs used by the Connecticut Medical Assistance Program it was lowering the prices they charged to health care providers for its pharmaceuticals, thus creating increasingly dramatic "spreads" to sell more of its drugs,

and/or increasing its spreads to be larger than the spreads of its competitors in order to retain or increase its market share.

28.   Upon information and belief, in addition to manipulating its reported AWPs and other pricing information, Roxane used free goods, "educational grants" and other incentives to induce health care providers to use its pharmaceuticals, all of which lowered the actual prices of the pharmaceuticals and created even wider "spreads."

### III.   VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA").

29. In the course of the aforementioned trade or commerce, from and including January 1, 1993, Roxane has made or caused to be made, directly or indirectly, explicitly or by implication, representations of the AWPs of its pharmaceuticals to various reporting services including First Data Bank (f/n/a the *Blue Book*) and/or Medical Economics, Inc. (the *Red Book*).

30. In truth and in fact, the AWPs provided to these reporting services were false as they did not represent true average wholesale prices in that:

(a) the actual average wholesale prices paid by pharmacies, physicians and other health care providers were significantly lower than those which were reported, and/or

(b) the reported AWPs did not include offsets to the actual sales prices of specified pharmaceuticals, such as discounts, rebates, off-invoice pricing, free goods, cash payments, chargebacks, and/or other financial incentives which further lowered the actual average wholesale prices of these pharmaceuticals.

34

31. Roxane made the foregoing misrepresentations with the knowledge and/or intent that the Connecticut Medical Assistance Program would use the reported AWPs in its reimbursement methodology, resulting in pharmacies, physicians and other health care providers being reimbursed at higher rates and therefore, increasing the "spread" on Roxane's pharmaceuticals.

32. Roxane marketed this artificially created "spread" as a financial benefit to health care providers in order to influence the providers to administer and/or purchase its pharmaceutical products.

33. As a direct result of the Roxane's misrepresentations, the Connecticut Medical Assistance Program has been injured by having to pay grossly excessive amounts for Roxane's pharmaceuticals on a fee for service basis.

34. Roxane's misrepresentations, as alleged herein, have been and are material, false, and likely to mislead and, therefore, constitute deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## TENTH COUNT (Roxane Defendant)

1. – 34.  Paragraphs 1 through 34 of the Ninth Count are hereby made paragraphs 1 through 34 of the Tenth Count as if fully set forth.

35.  Roxane has violated Conn. Gen. Stat. §42-110b(a) willfully.

## ELEVENTH COUNT (Roxane Defendant)

1. – 34.  Paragraphs 1 through 34 of the Ninth Count are hereby made paragraphs 1 through 34 of the Eleventh Count as if fully set forth.

35

35. Roxane's course of wrongful conduct is immoral, unethical, oppressive, unscrupulous and causes substantial injury.

36. Roxane's course of wrongful conduct alleged herein violates the public policy of the State of Connecticut which prohibits the offering or the payment of cash or a benefit to influence the purchase of goods or services for which reimbursement is claimed from a state or federal agency, as embodied in Conn. Gen. Stat. §53a-161d.

37. Roxane's acts and practices, as alleged herein, constitute unfair acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

**TWELFTH COUNT (Roxane Defendant)**

1. – 37.  Paragraphs 1 through 37 of the Eleventh Count are hereby made paragraphs 1 through 37 of the Twelfth Count as if fully set forth.

38. Roxane has violated Conn. Gen. Stat. §42-110b(a) willfully.

**THIRTEENTH COUNT (Roxane Defendant)**

1. - 4.  Paragraphs 1 through 4 of the Ninth Count are hereby made paragraphs 1 through 4 of the Thirteenth Count as if fully set forth.

    I.      REIMBURSEMENT FOR PRESCRIPTION DRUGS FOR CONSUMERS UNDER MEDICARE.

5. The federal Medicare program pays for a portion of the cost of a limited number of prescription drugs.

36

6.   Medicare is a health benefit program created by federal law for individuals who are 65 and older or who are disabled. 42 U.S.C. §§1395, *et seq*. Medicare is divided into two primary components: Medicare Part A and Medicare Part B.

7.   Medicare Part A is funded primarily by a federal payroll tax, premiums paid by Medicare beneficiaries and appropriations from Congress. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§1395e — 42 U.S.C. §§1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

8.   Medicare Part B is optional to beneficiaries and covers some healthcare benefits not provided by Medicare Part A. Medicare Part B is funded by appropriations from Congress and premiums paid by Medicare beneficiaries who choose to participate in the program. 42 U.S.C. §§1395j — 42 U.S.C. §§1395w-4. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting. These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and anti-emetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

9.   The drugs listed in Tables 3-2 are drugs that may be covered by Medicare Part B.

10. Medicare generally uses the "average wholesale price" ("AWP") in determining the amount that a provider will be paid for a drug. The adjusted cost that Medicare will allow for drugs others than multi-source drugs is the lower of the actual charge or 95% of the AWP for the drug. For multi-source drugs the adjusted cost that Medicare will allow is "the lesser of the median average wholesale price for all sources of the generic form of the drug ... or the lowest average wholesale price of the brand name forms of the drug..." 42 CFR §405.517(c). Prior to November 1998 the adjusted cost that Medicare allowed for drugs other than multi-source drugs was the lower of the estimated acquisition cost or the average wholesale price. Prior to November 1998 for multi-source drugs the adjusted cost that Medicare allowed was the lower or the estimated acquisition cost or the wholesale price that was "the median price from all sources of the generic form of the drug." 56 Federal Register 59621 (November 25, 1991). Medicare will pay 80% of this adjusted cost and the Medicare beneficiary is responsible for the remaining 20% as a copayment. 42 U.S.C. §1395l(a); 42 U.S.C. §1395u(o). If the Medicare beneficiary is also a Connecticut Medicaid recipient, then the 20% copayment is actually paid for by DSS.

## II.   THE SCHEME: ARTIFICIALLY INFLATING THE AWP AND OTHER PRICING INFORMATION.

### A.   The Defendants Misrepresented Pricing Information That Was Utilized To Pay To Determine Reimbursement For Drugs Provided To Connecticut Consumers Who Were Medicare Beneficiaries.

11. (a).   Roxane's marketing and sales staff actively gathered and analyzed information concerning drug reimbursement under federal government health care benefit programs for those drugs identified in Table 3-2.

38

(b).     Roxane collected Medicare Part B reimbursement regulations and policies, and identified applicable HCPCS Level II and Level III codes and the reimbursement amount linked to a HCPCS code, for its drugs identified in Table 3-2, and which were reimbursed under such program, including reimbursement for beneficiaries residing in the State of Connecticut who are entitled to coverage for those drugs identified in Table 3-2 that are covered under Medicare Part B.

(c).     Roxane's marketing and sales staff regularly updated and disseminated the drug reimbursement information for federal health care programs to its sales and marketing staff, as well as to its customers.   This information was routinely provided through powerpoint presentations, reimbursement updates, reimbursement spreadsheets and worksheets, summaries, cost comparisons and call-in centers or hotlines established by Roxane for its customers.

(d).     At all times relevant to this complaint, Roxane was aware of the drug reimbursement methodology used by the Centers for Medicare & Medicaid Services and/or Medicare contractors for beneficiaries residing in the State of Connecticut who are entitled to coverage for Roxane's drugs identified in Table 3-2 and covered under Medicare Part B.

12. State and federal government health plans, as well as numerous commercial health care third-party payers, use information reported by various commercial price reporting services, including specific information concerning drug prices, in determining the calculation of the reimbursement amount for the covered prescription drug benefit.

39

13. (a) From January, 1993 through the present, Roxane has made price representations of the AWPs for those drugs identified in Table 3-2, directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Roxane's price representations of its AWPs were contained in new drug product announcements and introductions, price verifications, price revisions, price books and/or retail/wholesale price catalogs that were made to the price reporting services via mail, facsimile, electronic mail and/or over the telephone. These price reporting services did not independently determine Roxane's AWPs and thus relied on the AWPs reported to them by Roxane. Thus, Roxane knew that the AWPs it reported to the price reporting services were the AWPs that would be reported to federal government health care programs, including the Medicare Part B program.

(b) In addition to reporting the AWPs for its drugs, Roxane also made price representations of the Wholesale Acquisition Cost ("WAC"), the Direct Price ("DP"), and/or its net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price, and/or suggested list price for those drugs identified in Table 3-2 directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Roxane made these price representations knowing that price reporting services used these price representations to report the WAC and/or the DP for Defendant's drugs identified in Table 3-2. In addition, Roxane made these price representations knowing that the price it reported, and which were the basis of the WAC and/or DP reported by the price reporting services, did not reflect the actual average net purchase price paid by the majority of purchasers

40

of these drugs.  Roxane further knew that each of the price reporting services would add a specific percentage markup to its reported prices, which was determined by Roxane and communicated to the price reporting service, and which the price reporting service added to Roxane's WAC and/or its DP for those drugs in order to calculate the AWP for Roxane's drugs. Thus, Roxane knew that the pricing information it reported to the price reporting services would directly affect the AWPs that the price reporting services would report to federal government health care programs, including the Medicare Part B program.

(c) The Centers for Medicare & Medicaid Services utilize the AWPs Roxane reported to the price reporting services or which were derived from the WAC, DP, net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price and/or suggested list prices information Roxane reported to the price reporting services, in order to determine the amount of reimbursement and copayment paid to providers who dispensed or administered Roxane's drugs that are identified in Table 3-2..

**B.      The Defendants Manipulated the "Spread" Between the Reported AWP and the Actual Average Cost of a Drug.**

14. In truth and in fact, Roxane's actual average wholesale prices for those drugs identified in Table 3-2 were considerably lower than the AWPs it reported to the reporting services.

15. Roxane refers to the difference between the reported AWP and the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to Roxane in conducting its ordinary business affairs as the "spread" or, alternatively, "return to practice" or "return on investment."

41

16. Roxane knowingly and intentionally created a "spread" on its drugs and used the "spread" to increase its market share of those drugs identified in Table 3-2, thereby increasing its own profits. Specifically, Roxane induced health care providers to purchase its pharmaceuticals, rather than those of competitors, by marketing the wider "spread" on Roxane's pharmaceuticals to the providers, knowing that the larger "spreads" would allow the health care providers to receive more money, and make more of a profit, at the expense of Medicare and CT Medicare beneficiaries.

17. Roxane knowingly and intentionally inflated the prices it reported as the AWPs for its pharmaceuticals, including those identified in Table 3-2. Roxane knew that its inflation of prices reported as the AWPs for its pharmaceuticals would cause Medicare and CT Medicare beneficiaries to pay providers excessive amounts for these pharmaceuticals, which had the effect of causing Medicare and CT Medicare beneficiaries to unknowingly subsidize Roxane's schemes to retain and/or increase its market share.

18. The inflated AWPs of Roxane greatly exceeded the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to Roxane in conducting its ordinary business affairs. Thus Roxane's AWPs for these drugs bears no relation to any purchase price at which a provider is able to procure these drugs.

19. Table 4-1 attached to this complaint illustrates the inflated AWPs of Roxane and the impact of those AWPs on the "spread" for the drugs identified in said table.

42

20. At the same time that Roxane was inflating its reported AWPs used by Medicare it was lowering the prices it charged to health care providers for its pharmaceuticals, thus creating increasingly dramatic "spreads" to sell more of its drugs, and/or increasing its spreads to be larger than the spreads of its competitors in order to retain or increase its market share.

21. Upon information and belief, in addition to manipulating its reported AWPs and other pricing information, Roxane used free goods, "educational grants" and other incentives to induce health care providers to use its pharmaceuticals, all of which lowered the actual prices of the pharmaceuticals and created even wider "spreads."

### III.   VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA").

22. In the course of the aforementioned trade or commerce, from and including January 1, 1993, Roxane has made or caused to be made, directly or indirectly, explicitly or by implication, representations of the AWPs of its pharmaceuticals to various reporting services including First Data Bank (f/n/a the *Blue Book*) and/or Medical Economics, Inc. (the *Red Book*).

23. In truth and in fact, the AWPs provided to these reporting services were false as they did not represent true average wholesale prices in that:

(a) the actual average wholesale prices paid by pharmacies, physicians and other health care providers were significantly lower than those which were reported, and/or

(b) the reported AWPs did not include offsets to the actual sales prices of specified pharmaceuticals, such as discounts, rebates, off-invoice pricing, free goods, cash

43

payments, chargebacks, and/or other financial incentives which further lowered the actual average wholesale prices of these pharmaceuticals.

24. Roxane made the foregoing misrepresentations with the knowledge and/or intent that Medicare would use the reported AWPs in their reimbursement methodology, resulting in pharmacies, physicians and other health care providers being reimbursed at higher rates and therefore, increasing the "spread" on Roxane's pharmaceuticals.

25. ERoxane marketed this artificially created "spread" as a financial benefit to health care providers in order to influence the providers to administer and/or purchase its pharmaceutical products.

26. As a direct result of Roxane's misrepresentations, Medicare and Connecticut Medicare beneficiaries have been injured by having to pay grossly excessive amounts for each of the Roxane's pharmaceuticals, including Connecticut Medicare beneficiaries in some instances paying a deductible for a drug that was greater than the actual cost of the drug.

27. Roxane's misrepresentations, as alleged herein, have been and are material, false, and likely to mislead and, therefore, constitute deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## FOURTEENTH COUNT (Roxane Defendant)

1. – 27.   Paragraphs 1 through 27 of the Thirteenth Count are hereby made paragraphs 1 through 27 of the Fourteenth Count as if fully set forth.

28. Roxane has violated Conn. Gen. Stat. §42-110b(a) willfully.

44

## FIFTEENTH COUNT (Roxane Defendant)

1. – 27.   Paragraphs 1 through 27 of the Fourteenth Count are hereby made paragraphs 1 through 27 of the Fifteenth Count as if fully set forth.

28. Roxane's course of wrongful conduct is immoral, unethical, oppressive, unscrupulous and has caused substantial injury.

29. Roxane's course of wrongful conduct alleged herein violates the public policy of the State of Connecticut which prohibits the offering or the payment of cash or a benefit to influence the purchase of goods or services for which reimbursement is claimed from a state or federal agency, as embodied in Conn. Gen. Stat. §53a-161d.

30. Roxane's acts and practices, as alleged herein, constitute unfair acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## SIXTEENTH COUNT (Roxane Defendant)

1. – 30.   Paragraphs 1 through 30 of the Fifteenth Count are hereby made paragraphs 1 through 30 of the Sixteenth Count as if fully set forth.

31. Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

## SEVENTEENTH COUNT (Warrick/Schering Defendants)

1.   The plaintiff, State of Connecticut, represented by Richard Blumenthal, Attorney General of the State of Connecticut, acting at the request of James T. Fleming, Commissioner of Consumer Protection, brings this action pursuant to the Connecticut Unfair Trade Practices Act, Chapter 735a of the Connecticut General Statutes, and more particularly, Conn. Gen. Stat. §§ 42-

110m and 42-110o, for the purpose of seeking appropriate relief for violations of Conn. Gen. Stat. § 42-110b(a).

2. Defendant WARRICK PHARMACEUTICALS CORPORATION ("WARRICK") is a corporation organized under the laws of the State of Delaware with its principal offices in Reno, Nevada, although on information and belief its principal offices are actually in the State of New Jersey. At all times material to this complaint, WARRICK has transacted business in the State of Connecticut by, including but not limited to, manufacturing, selling and distributing pharmaceutical products that are the subjects of this action which are ultimately sold or distributed to providers in the State of Connecticut.

3. Defendant SCHERING-PLOUGH CORPORATION ("SCHERING-PLOUGH") is a corporation organized under the laws of the State of New Jersey with its principal offices in Kenilworth, New Jersey. At all times material to this complaint, SCHERING-PLOUGH has transacted business in the State of Connecticut by, including but not limited to, manufacturing, selling and distributing pharmaceutical products that are the subjects of this action which are ultimately sold or distributed to providers in the State of Connecticut. SCHERING-PLOUGH conducts much of its pharmaceutical business through Schering Laboratories, described by it as "the U.S. pharmaceutical arm of Schering-Plough Corporation."

4. Defendant SCHERING CORPORATION ("SCHERING") is a corporation organized under the laws of the State of New Jersey with its principal offices in Madison, New Jersey. At all times material to this complaint, SCHERING has transacted business in the State of Connecticut by,

including but not limited to, manufacturing, selling and distributing pharmaceutical products that are the subjects of this action which are ultimately sold or distributed to providers in the State of Connecticut.

5. SCHERING CORPORATION and WARRICK CORPORATION are wholly owned subsidiaries of SCHERING-PLOUGH CORPORATION. SCHERING CORPORATION is responsible for sales and marketing of brand name drugs. WARRICK CORPORATION is responsible for sales and marketing of generic drugs. SCHERING-PLOUGH CORPORATION is the parent corporation of numerous other corporations including defendant WARRICK CORPORATION and defendant SCHERING CORPORATION. Defendants SCHERING CORPORATION, WARRICK CORPORATION and SCHERING-PLOUGH CORPORATION are collectively referred to as "WARRICK/SCHERING DEFENDANTS."

6. The Warrick/Schering Defendants have, during all times relevant to this complaint, engaged in the trade or commerce of manufacturing, selling and/or distributing pharmaceutical products which are ultimately sold or distributed to providers in the State of Connecticut.

7. Whenever reference is made in this complaint to any representation, act or transaction of any of the Warrick/Schering Defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents or representatives while actively engaged in the course and scope of their employment, did or authorized such representations, acts, or transactions on behalf of said defendants.

47

I.    REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER THE
      CONNECTICUT MEDICAL ASSISTANCE PROGRAM.

8.   The State of Connecticut Department of Social Services ("DSS") administers the Medical

Assistance Program. The Medical Assistance Program includes the Connecticut Medicaid

program, as well as the Connecticut Pharmaceutical Assistance Contract to the Elderly and the

Disabled ("ConnPACE"), State Administered General Assistance ("SAGA"), General Assistance

("GA") and Connecticut AIDS Drug Assistance Program ("CADAP"). The Medical Assistance

Program pays for medical benefits, including prescription drugs, for certain low income and

disabled Connecticut residents. The Medical Assistance Program reimburses physicians,

pharmacists, and other health care providers for certain drugs prescribed for, dispensed, and/or

administered to, Medical Assistance Program recipients.

9.   Within the Medical Assistance Program many drugs are paid for on a fee for service

basis, in some cases (i.e. Medicaid) with no copayment, and in other cases (i.e. ConnPACE) with

a small copayment. This fee for service program includes certain drugs which are dispensed by

pharmacies in accordance with prescriptions as well as certain drugs administered to Medical

Assistance Program recipients by a physician or other health care provider.

10. The Medical Assistance Program will pay for fee for service drugs dispensed by a

pharmacy after the pharmacy or other provider submits a claim for payment to the Medical

Assistance Program or the designated claims payment agent of the Medical Assistance Program.

11. The Medical Assistance Program will pay for fee for service drugs administered to a

Medical Assistance Program recipient by a physician or other provider following the physician's

48

or other provider's submission of a claim for payment to the Medical Assistance Program or the designated claims payment agent of the Medical Assistance Program. Such a claim may include a charge for the office visit as well as a separate charge for the administered drug.

12. The amount that the Medical Assistance Program pays for drugs on a fee for service basis is governed by various Connecticut laws and regulations governing the Medical Assistance Program and its component programs.

13. Under Conn. Gen. Stat. §17b-280 and Regulations of Connecticut State Agencies §17-134d-81b, the Medical Assistance Program generally reimburses fee for service drugs which are dispensed by a pharmacy to a Medical Assistance Program recipient on the basis of: (a) the "federal acquisition cost/federal upper limit ..." ("FAC" or "FUL") or (b) the "estimated acquisition cost" ("EAC") as follows: (1) where there is no FAC or FUL the amount reimbursed is the lowest of the EAC, the usual and customary charge or the amount billed, and (2) where there is a FAC or FUL the amount reimbursed is the lowest of the FAC or FUL, the EAC, the usual and customary charge or the amount billed.

14. Under Conn. Gen. Stat. §17b-280, and Regulations of Connecticut State Agencies §§17b-262-448(q), 17b-262-462(j), and 17b-262-611(b)(4), the Medical Assistance Program generally reimburses for fee for service drugs that are administered to a Medical Assistance Program recipient by a provider on the basis of the EAC. The EAC is utilized by DSS in promulgating fee schedules for providers that administer drugs.

15. Under Conn. Gen. Stat. §17b-494 and Regulations of Connecticut State Agencies §17b-490 *et seq.* as modified by Regulations of Connecticut State Agencies §17b-262-684 *et seq.*, ConnPACE reimburses for fee for service drugs that are dispensed by a pharmacy to a Medical Assistance Program recipient as follows: (1) for the period prior to January 1, 2002 at the "reasonable cost" (defined in Regulations of Connecticut State Agencies §17b-490(c)) of the drug, minus a copayment, with the option of paying the price paid directly by the pharmacy to the manufacturer for the drug, minus a copayment; and, (2) for the period beginning January 1, 2002, the lowest of (a) the EAC minus a copayment, (b) the FUL minus a copayment, (c) the billed amount minus a copayment, or (d) the usual and customary charge minus a copayment.

16. Under Regulations of Connecticut State Agencies §§17-134d-81b(9) and 17b-262-685(12) the EAC is the DSS's "best estimate of the price as related to the *average wholesale price generally and currently paid by providers* for a drug marketed or sold by a particular manufacturer or labeler, as identified by the national drug code (NDC)." (Emphasis added).

17. The Connecticut Medical Assistance Program utilizes "Average Wholesale Price" ("AWP") as a benchmark or reference point to determine the EAC. The term "Average Wholesale Price" is defined by Regulations of Connecticut State Agencies §§17-134d-81b(1), 17b-262-685(2) and 17b-262-685(12). Under these regulatory provisions the Connecticut Medical Assistance Program looks to nationally recognized publications or national drug databases which obtain their pricing information directly from manufacturers when reporting "Average Wholesale Price".

50

18. In addition, beginning January 1, 2003, pursuant to Conn. Public Act #02-1, § 118 (May 9, 2002 Special Session) and Conn. Public Act #02-7, §104 (May 9, 2002 Special Session) maximum allowable costs have been established for certain generic prescription drugs based upon, but not limited to, actual acquisition costs.

19. Based upon the above requirements the Connecticut Medical Assistance Program generally pays or has paid pharmacists and certain other providers an EAC as follows, excluding any applicable copayments: (1) for the period prior to October 1, 1995, the AWP of the drug minus 8%, plus a dispensing fee; (2) for the period beginning October 1, 1995, the AWP minus 12%, plus a dispensing fee; and, (3) beginning January 1, 2003, the AWP minus 40%, plus a dispensing fee, for certain generic drugs. Where there is a FUL and the FUL is lower than the EAC, the Connecticut Medical Assistance Program payment is capped by the FUL.

20. Based upon the above requirements, the Connecticut Medical Assistance Program generally pays physicians or other health care providers for certain drugs administered to Medical Assistance Program recipients an EAC as follows: 90.25% of the AWP.

**II.    THE SCHEME: ARTIFICIALLY INFLATING THE AWP AND OTHER PRICING INFORMATION.**

**A.    The Defendants Misrepresented AWP and Other Pricing Information That Was Utilized By the Medical Assistance Program.**

21. (a).    Warrick/Schering Defendants' marketing and sales staff actively gathered and analyzed information concerning drug reimbursement under state and federal government health care benefit programs for those drugs identified in Table 1-3.

51

(b).     Warrick/Schering Defendants conducted surveys of the reimbursement methodologies and claims submission coding systems used by state prescription drug benefit programs, including the Connecticut Medical Assistance Program, which were applicable to Warrick/Schering Defendants' drugs in order to determine reimbursement. Such reimbursement methodologies and coding systems comprise a state's applicable EAC, the benchmark or reference point used to determine the EAC, the dispensing fee, applicable Healthcare Common Procedure Coding System ("HCPCS") Level II, Level III or local codes or such other means by which a state determines reimbursement for a drug identified in Table 1-3.

(c).     Warrick/Schering Defendants' marketing and sales staff regularly updated and disseminated the drug reimbursement information for state and federal health care programs to their sales and marketing staff, as well as to their customers.   This information was routinely provided through powerpoint presentations, reimbursement updates, reimbursement spreadsheets and worksheets, summaries, cost comparisons and call-in centers or hotlines established by Warrick/Schering Defendants for their customers.

(d).     At all times relevant to this complaint, Warrick/Schering Defendants were aware of the drug reimbursement methodology used by the Connecticut Medical Assistance Program to reimburse enrolled providers for their drugs..

22. State and federal government health plans, as well as numerous commercial health care third-party payers, use information reported by various commercial price reporting services,

52

including specific information concerning drug prices, in determining the calculation of the reimbursement amount for the covered prescription drug benefit.

23. (a) From January, 1993 through the present, Warrick/Schering Defendants have made price representations of the AWPs for those drugs identified in Table 1-3, directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc.  Warrick/Schering Defendants' price representations of their AWPs were contained in new drug product announcements and introductions, price verifications, price revisions, price books and/or retail/wholesale price catalogs that were made to the price reporting services via mail, facsimile, electronic mail and/or over the telephone.  These price reporting services did not independently determine Warrick/Schering Defendants' AWPs and thus relied on the AWPs reported to them by Warrick/Schering Defendants. Thus, Warrick/Schering Defendants knew that the AWPs they reported to the price reporting services were the AWPs that would be reported to state and federal government health care programs, including the Connecticut Medical Assistance Program and the Medicare Part B program.

(b) In addition to reporting the AWPs for its drugs, Warrick/Schering Defendants also made price representations of the Wholesale Acquisition Cost ("WAC"), the Direct Price ("DP"), and/or its net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price, and/or suggested list price for those drugs identified in Table 1-3 directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc.  Warrick/Schering Defendants made these price representations knowing

53

that price reporting services used these price representations to report the WAC and/or the DP for Warrick/Schering Defendants' drugs identified in Table 1-3.  In addition, Warrick/Schering Defendants made these price representations knowing that the price they reported, and which were the basis of the WAC and/or DP reported by the price reporting services, did not reflect the actual average net purchase price paid by the majority of purchasers of these drugs. Warrick/Schering Defendants further knew that each of the price reporting services would add a specific percentage markup to its reported prices, which was determined by Warrick/Schering Defendants and communicated to the price reporting service, and which the price reporting service added to Warrick/Schering Defendants's WAC and/or its DP for those drugs in order to calculate the AWP for Warrick/Schering Defendants' drugs.  Thus, Warrick/Schering Defendants knew that the pricing information they reported to the price reporting services would directly affect the AWPs that the price reporting services would  report to state and federal government health care programs, including the Connecticut Medical Assistance Program and the Medicare Part B program.

(c) The Connecticut Medical Assistance Program and the Centers for Medicare & Medicaid Services utilize the AWPs Warrick/Schering Defendants reported to the price reporting services or which were derived from the WAC, DP, net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price and/or suggested list prices information Warrick/Schering Defendants reported to the price reporting services, in order to determine the

amount of reimbursement and copayment paid to providers who dispensed or administered Warrick/Schering Defendants' drugs that are identified in Table 1-3.

(d) In addition to reporting the AWP, WAC, DP, net prices, retail/wholesale prices, catalog prices, net wholesale prices, wholesale purchase prices and/or suggested list prices for its drugs directly to the price reporting services, Warrick/Schering Defendants also made price representations of its AWPs for the drugs identified in Table 1-3 directly to the Connecticut Medical Assistance Program.

**B.      The Defendants Manipulated the "Spread" Between the Reported AWP and the Actual Average Cost of a Drug.**

24. In truth and in fact, the defendants' actual average wholesale prices for those drugs identified in Table 1-3 were considerably lower than the AWPs they reported to the reporting services.

25. Warrick/Schering Defendants refer to the difference between the reported AWP and the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to Warrick/Schering Defendants in conducting their ordinary business affairs as the "spread" or, alternatively, "return to practice" or "return on investment."

26. Warrick/Schering Defendants knowingly and intentionally created a "spread" on its drugs and used the "spread" to increase its market share of these drugs, thereby increasing its own profits. Specifically, Warrick/Schering Defendants induced health care providers to purchase its pharmaceuticals, rather than those of competitors, by marketing the wider "spread" on each of

Warrick/Schering Defendants' pharmaceuticals to the providers, knowing that the larger "spreads" would allow the health care providers to receive more money, and make more of a profit, at the expense of the Connecticut Medical Assistance Program.

27. Warrick/Schering Defendants knowingly and intentionally inflated the prices they reported as the AWPs for their pharmaceuticals, including those identified in Tables 1-3. Warrick/Schering Defendants knew that their inflation of prices reported as the AWPs for their pharmaceuticals would cause the Connecticut Medical Assistance Program to pay providers excessive amounts for these pharmaceuticals, which had the effect of causing the Connecticut Medical Assistance Program to unknowingly subsidize Warrick/Schering Defendants' schemes to retain and/or increase their market share.

28. The inflated AWPs of Warrick/Schering Defendants greatly exceeded the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to Warrick/Schering Defendants in conducting their ordinary business affairs. Thus Warrick/Schering Defendants' AWPs for these drugs bears no relation to any purchase price at which a provider is able to procure these drugs. Moreover, Warrick/Schering Defendants' AWPs bear no relation to the "average wholesale price" as that term is defined in Regulations of Connecticut State Agencies §§17-134d-81b(1), 17b-262-685(2) and 17b-262-685(12).

29. Table 2-3 attached to this complaint illustrate the inflated AWPs of Warrick/Schering Defendants and the impact of those AWPs on the "spread" for the drugs identified in said tables.

30. At the same time that Warrick/Schering Defendants were inflating their reported AWPs used by the Connecticut Medical Assistance Program they were lowering the prices they charged to health care providers for their pharmaceuticals, thus creating increasingly dramatic "spreads" to sell more of their drugs, and/or increasing their spreads to be larger than the spreads of their competitors in order to retain or increase their market share.

31. Upon information and belief, in addition to manipulating its reported AWPs and other pricing information, Warrick/Schering Defendants used free goods, "educational grants" and other incentives to induce health care providers to use its pharmaceuticals, all of which lowered the actual prices of the pharmaceuticals and created even wider "spreads."

### III.   VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA").

32. In the course of the aforementioned trade or commerce, from and including January 1, 1993, Warrick/Schering Defendants have made or caused to be made, directly or indirectly, explicitly or by implication, representations of the AWPs of their pharmaceuticals to various reporting services including First Data Bank (f/n/a the *Blue Book*) and/or Medical Economics, Inc. (the *Red Book*).

33. In truth and in fact, the AWPs provided to these reporting services were false as they did not represent true average wholesale prices in that:

(a) the actual average wholesale prices paid by pharmacies, physicians and other health care providers were significantly lower than those which were reported, and/or

57

(b) the reported AWPs did not include offsets to the actual sales prices of specified pharmaceuticals, such as discounts, rebates, off-invoice pricing, free goods, cash payments, chargebacks, and/or other financial incentives which further lowered the actual average wholesale prices of these pharmaceuticals.

34. Warrick/Schering Defendants made the foregoing misrepresentations with the knowledge and/or intent that the Connecticut Medical Assistance Program would use the reported AWPs in its reimbursement methodology, resulting in pharmacies, physicians and other health care providers being reimbursed at higher rates and therefore, increasing the "spread" on Warrick/Schering Defendants' pharmaceuticals.

35. Warrick/Schering Defendants marketed this artificially created "spread" as a financial benefit to health care providers in order to influence the providers to administer and/or purchase their pharmaceutical products.

36. As a direct result of the Warrick/Schering Defendants' misrepresentations, the Connecticut Medical Assistance Program has been injured by having to pay grossly excessive amounts for Warrick/Schering Defendants' pharmaceuticals on a fee for service basis.

37. The Warrick/Schering Defendants' misrepresentations, as alleged herein, have been and are material, false, and likely to mislead and, therefore, constitute deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

**EIGHTEENTH COUNT (Warrick/Schering Defendants)**

1. – 37.  Paragraphs 1 through 37 of the Seventeenth Count are hereby made paragraphs 1 through 37 of the Eighteenth Count as if fully set forth.

38.  Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

**NINETEENTH COUNT (Warrick/Schering Defendants)**

1. – 37.  Paragraphs 1 through 37 of the Seventeenth Count are hereby made paragraphs 1 through 37 of the Nineteenth Count as if fully set forth.

38. Warrick/Schering Defendants' course of wrongful conduct is immoral, unethical, oppressive, unscrupulous and causes substantial injury.

39. Warrick/Schering Defendants' course of wrongful conduct alleged herein violates the public policy of the State of Connecticut which prohibits the offering or the payment of cash or a benefit to influence the purchase of goods or services for which reimbursement is claimed from a state or federal agency, as embodied in Conn. Gen. Stat. §53a-161d.

40. Warrick/Schering Defendants' acts and practices, as alleged herein, constitute unfair acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

**TWENTIETH COUNT (Warrick/Schering Defendants)**

1. – 40.  Paragraphs 1 through 40 of the Nineteenth Count are hereby made paragraphs 1 through 40 of the Twentieth Count as if fully set forth.

41. Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

59

## TWENTY-FIRST COUNT (Warrick/Schering Defendants)

1. - 7.   Paragraphs 1 through 10 of the Seventeenth Count are hereby made paragraphs 1 through 7 of the Twenty-First Count as if fully set forth.

### I.     REIMBURSEMENT   FOR   PRESCRIPTION   DRUGS   FOR CONSUMERS UNDER MEDICARE.

8.   The federal Medicare program pays for a portion of the cost of a limited number of prescription drugs.

9.   Medicare is a health benefit program created by federal law for individuals who are 65 and older or who are disabled. 42 U.S.C. §§1395, *et seq.* Medicare is divided into two primary components: Medicare Part A and Medicare Part B.

10. Medicare Part A is funded primarily by a federal payroll tax, premiums paid by Medicare beneficiaries and appropriations from Congress. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§1395e — 42 U.S.C. §§1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

11. Medicare Part B is optional to beneficiaries and covers some healthcare benefits not provided by Medicare Part A. Medicare Part B is funded by appropriations from Congress and premiums paid by Medicare beneficiaries who choose to participate in the program. 42 U.S.C. §§1395j — 42 U.S.C. §§1395w-4. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting. These typically include drugs administered by a

60

physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and anti-emetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

12. The drugs listed in Table 3-3 are drugs that may be covered by Medicare Part B.

13. Medicare generally uses the "average wholesale price" ("AWP") in determining the amount that a provider will be paid for a drug. The adjusted cost that Medicare will allow for drugs others than multi-source drugs is the lower of the actual charge or 95% of the AWP for the drug. For multi-source drugs the adjusted cost that Medicare will allow is "the lesser of the median average wholesale price for all sources of the generic form of the drug ... or the lowest average wholesale price of the brand name forms of the drug..." 42 CFR §405.517(c). Prior to November 1998 the adjusted cost that Medicare allowed for drugs other than multi-source drugs was the lower of the estimated acquisition cost or the average wholesale price. Prior to November 1998 for multi-source drugs the adjusted cost that Medicare allowed was the lower or the estimated acquisition cost or the wholesale price that was "the median price from all sources of the generic form of the drug." 56 Federal Register 59621 (November 25, 1991). Medicare will pay 80% of this adjusted cost and the Medicare beneficiary is responsible for the remaining 20% as a copayment. 42 U.S.C. §1395l(a); 42 U.S.C. §1395u(o). If the Medicare beneficiary is also a Connecticut Medicaid recipient, then the 20% copayment is actually paid for by DSS.

61

## II.   THE SCHEME: ARTIFICIALLY INFLATING THE AWP AND OTHER PRICING INFORMATION.

### A.   The Defendants Misrepresented Pricing Information That Was Utilized To Pay To Determine Reimbursement For Drugs Provided To Connecticut Consumers Who Were Medicare Beneficiaries.

14. (a).   Warrick/Schering Defendants' marketing and sales staff actively gathered and analyzed information concerning drug reimbursement under federal government health care benefit programs for those drugs identified in Table 3-3.

(b).   Warrick/Schering Defendants collected Medicare Part B reimbursement regulations and policies, and identified applicable HCPCS Level II and Level III codes and the reimbursement amount linked to a HCPCS code, for their drugs identified in Table 3-3, and which were reimbursed under such program, including reimbursement for beneficiaries residing in the State of Connecticut who are entitled to coverage for those drugs identified in Table 3-3 that are covered under Medicare Part B.

(c).   Warrick/Schering Defendants' marketing and sales staff regularly updated and disseminated the drug reimbursement information for federal health care programs to their sales and marketing staff, as well as to their customers.  This information was routinely provided through powerpoint presentations, reimbursement updates, reimbursement spreadsheets and worksheets, summaries, cost comparisons and call-in centers or hotlines established by Warrick/Schering Defendants for their customers.

(d).   At all times relevant to this complaint, Warrick/Schering Defendants were aware of the drug reimbursement methodology used by the Centers for Medicare & Medicaid Services

62

and/or Medicare contractors for beneficiaries residing in the State of Connecticut who are entitled to coverage for Warrick/Schering Defedants' drugs identified in Table 3-3 and covered under Medicare Part B.

15. State and federal government health plans, as well as numerous commercial health care third-party payers, use information reported by various commercial price reporting services, including specific information concerning drug prices, in determining the calculation of the reimbursement amount for the covered prescription drug benefit.

16. (a) From January, 1993 through the present, Warrick/Schering Defendants have made price representations of the AWPs for those drugs identified in Table 3-3, directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Warrick/Schering Defendants' price representations of their AWPs were contained in new drug product announcements and introductions, price verifications, price revisions, price books and/or retail/wholesale price catalogs that were made to the price reporting services via mail, facsimile, electronic mail and/or over the telephone. These price reporting services did not independently determine Warrick/Schering Defendants' AWPs and thus relied on the AWPs reported to them by Warrick/Schering Defendants. Thus, Warrick/Schering Defendants knew that the AWPs they reported to the price reporting services were the AWPs that would be reported to federal government health care programs, including the Medicare Part B program.

63

(b) In addition to reporting the AWPs for their drugs, Warrick/Schering Defendants also made price representations of the Wholesale Acquisition Cost ("WAC"), the Direct Price ("DP"), and/or their net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price, and/or suggested list price for those drugs identified in Table 3-3 directly to the price reporting services First Data Bank (f/n/a the *Blue Book*), Medical Economics, Inc. (the *Red Book*) and Medi-Span, Inc. Warrick/Schering Defendants made these price representations knowing that price reporting services used these price representations to report the WAC and/or the DP for Warrick/Schering Defendants' drugs identified in Table 3-3. In addition, Warrick/Schering Defendants made these price representations knowing that the price they reported, and which were the basis of the WAC and/or DP reported by the price reporting services, did not reflect the actual average net purchase price paid by the majority of purchasers of these drugs. Warrick/Schering Defendants further knew that each of the price reporting services would add a specific percentage markup to its reported prices, which was determined by Warrick/Schering Defendants and communicated to the price reporting service, and which the price reporting service added to Warrick/Schering Defendants' WAC and/or their DP for those drugs in order to calculate the AWP for Warrick/Schering Defendants' drugs. Thus, Warrick/Schering Defendants knew that the pricing information they reported to the price reporting services would directly affect the AWPs that the price reporting services would report to federal government health care programs, including the Medicare Part B program.

(c) The Centers for Medicare & Medicaid Services utilize the AWPs Warrick/Schering Defendants reported to the price reporting services or which were derived from the WAC, DP, net price, retail/wholesale price, catalog prices, net wholesale price, wholesale purchase price and/or suggested list prices information Warrick/Schering Defendants reported to the price reporting services, in order to determine the amount of reimbursement and copayment paid to providers who dispensed or administered Warrick/Schering Defendants' drugs that are identified in Table 3-3.

**B.      The Defendants Manipulated the "Spread" Between the Reported AWP and the Actual Average Cost of a Drug.**

17. In truth and in fact, Warrick/Schering Defendants' actual average wholesale prices for those drugs identified in Table 3-3 were considerably lower than the AWPs they reported to the reporting services.

18. Warrick/Schering Defendants refer to the difference between the reported AWP and the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to Warrick/Schering Defendants in conducting their ordinary business affairs as the "spread" or, alternatively, "return to practice" or "return on investment."

19. Warrick/Schering Defendants knowingly and intentionally created a "spread" on their drugs and used the "spread" to increase their market share of those drugs identified in Table 3-1, 3-2 and 3-3, thereby increasing their own profits. Specifically, Warrick/Schering Defendants induced health care providers to purchase their pharmaceuticals, rather than those of competitors,

65

by marketing the wider "spread" on Warrick/Schering Defendants' pharmaceuticals to the providers, knowing that the larger "spreads" would allow the health care providers to receive more money, and make more of a profit, at the expense of Medicare and CT Medicare beneficiaries.

20. Warrick/Schering Defendants knowingly and intentionally inflated the prices they reported as the AWPs for their pharmaceuticals, including those identified in Table 3-3. Warrick/Schering Defendants knew that its inflation of prices reported as the AWPs for their pharmaceuticals would cause Medicare and CT Medicare beneficiaries to pay providers excessive amounts for these pharmaceuticals, which had the effect of causing Medicare and CT Medicare beneficiaries to unknowingly subsidize Warrick/Schering Defendants' schemes to retain and/or increase its market share.

21. The inflated AWPs of Warrick/Schering Defendants greatly exceeded the average of the wholesale price based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to Warrick/Schering Defendants in conducting their ordinary business affairs. Thus Warrick/Schering Defendants' AWPs for these drugs bears no relation to any purchase price at which a provider is able to procure these drugs.

22. Table 4-1 attached to this complaint illustrates the inflated AWPs of Warrick/Schering Defendants and the impact of those AWPs on the "spread" for the drugs identified in said table.

23. At the same time that Warrick/Schering Defendants were inflating their reported AWPs used by Medicare they were lowering the prices they charged to health care providers for their

66

pharmaceuticals, thus creating increasingly dramatic "spreads" to sell more of their drugs, and/or increasing their spreads to be larger than the spreads of their competitors in order to retain or increase their market share.

24.   Upon information and belief, in addition to manipulating its reported AWPs and other pricing information, Warrick/Schering Defendants used free goods, "educational grants" and other incentives to induce health care providers to use its pharmaceuticals, all of which lowered the actual prices of the pharmaceuticals and created even wider "spreads."

### III.   VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA").

25. In the course of the aforementioned trade or commerce, from and including January 1, 1993, Warrick/Schering Defendants has made or caused to be made, directly or indirectly, explicitly or by implication, representations of the AWPs of its pharmaceuticals to various reporting services including First Data Bank (f/n/a the *Blue Book*) and/or Medical Economics, Inc. (the *Red Book*).

26. In truth and in fact, the AWPs provided to these reporting services were false as they did not represent true average wholesale prices in that:

(a) the actual average wholesale prices paid by pharmacies, physicians and other health care providers were significantly lower than those which were reported, and/or

(b) the reported AWPs did not include offsets to the actual sales prices of specified pharmaceuticals, such as discounts, rebates, off-invoice pricing, free goods, cash

payments, chargebacks, and/or other financial incentives which further lowered the actual average wholesale prices of these pharmaceuticals.

27. Warrick/Schering Defendants made the foregoing misrepresentations with the knowledge and/or intent that Medicare would use the reported AWPs in their reimbursement methodology, resulting in pharmacies, physicians and other health care providers being reimbursed at higher rates and therefore, increasing the "spread" on each of the defendants' pharmaceuticals.

28. Warrick/Schering Defendants marketed this artificially created "spread" as a financial benefit to health care providers in order to influence the providers to administer and/or purchase their pharmaceutical products.

29. As a direct result of Warrick/Schering Defendants' misrepresentations, Medicare and Connecticut Medicare beneficiaries have been injured by having to pay grossly excessive amounts for Warrick/Schering Defendants' pharmaceuticals, including Connecticut Medicare beneficiaries in some instances paying a deductible for a drug that was greater than the actual cost of the drug.

30. Warrick/Schering Defendants' misrepresentations, as alleged herein, have been and are material, false, and likely to mislead and, therefore, constitute deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## TWENTY-SECOND COUNT (Warrick/Schering Defendants)

1. – 30.  Paragraphs 1 through 30 of the Twenty-First Count are hereby made paragraphs 1 through 30 of the Twenty-Second Count as if fully set forth.

68

31. Warrick/Schering Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

## TWENTY-THIRD COUNT (Warrick/Schering Defendants)

1. – 30. Paragraphs 1 through 30 of the Twenty-First Count are hereby made paragraphs 1 through 30 of the Twenty-Third Count as if fully set forth.

31. Warrick/Schering Defendants' course of wrongful conduct is immoral, unethical, oppressive, unscrupulous and has caused substantial injury.

32. Warrick/Schering Defendants' course of wrongful conduct alleged herein violates the public policy of the State of Connecticut which prohibits the offering or the payment of cash or a benefit to influence the purchase of goods or services for which reimbursement is claimed from a state or federal agency, as embodied in Conn. Gen. Stat. §53a-161d.

33. Warrick/Schering Defendants' acts and practices, as alleged herein, constitute unfair acts or practices in violation of Conn. Gen. Stat. §42-110b(a).

## TWENTY-FOURTH COUNT (Warrick/Schering Defendants)

1. – 33. Paragraphs 1 through 33 of the Twenty-Third Count are hereby made paragraphs 1 through 33 of the Twenty-Fourth Count as if fully set forth.

34. Warrick/Schering Defendants have violated Conn. Gen. Stat. §42-110b(a) willfully.

## DEMAND FOR RELIEF

WHEREFORE, pursuant to Conn. Gen. Stat. §§42-110m, 42-110o, the State of Connecticut requests the following relief:

1. A finding that each of the defendants has engaged in trade or commerce;

69

2.   A finding that each of the defendants has engaged in unfair or deceptive acts or practices in the course of trade or commerce which constitute violations of the Connecticut Unfair Trade Practices Act;

3.   An order preliminarily and permanently enjoining each of the defendants from the use of acts or practices that violate the Connecticut Unfair Trade Practices Act, including, but not limited to, the unlawful acts and practices pleaded in this Complaint;

4.   An order preliminarily and permanently enjoining each of the defendants to take whatever actions are necessary to abate the use of acts or practices that violate the Connecticut Unfair Trace Practices Act, including, but not limited to, the unlawful acts and practices pleaded in this Complaint;

5.   An order requiring each of the defendants to pay restitution to the State of Connecticut and to each and every person or entity of any sort that made payments for drugs that were excessive as a result of the acts or practices that violate the Connecticut Unfair Trade Practices Act, as alleged herein;

6.   An order requiring each of the defendants to submit to an accounting;

7.   An order requiring each of the defendants to pay a civil penalty in an amount not to exceed $5000 per violation for each willful violation of the Connecticut Unfair Trade Practices Act;

8.   An order requiring each of the defendants to pay the costs for the investigation and prosecution of this action, including reasonable attorneys' fees;

70

9.  Such other relief as is just and equitable to effectuate the purposes of this action.

Dated at Hartford, Connecticut, this 5th day of March, 2004.

**PLAINTIFF**
**STATE OF CONNECTICUT**

**RICHARD BLUMENTHAL**
*ATTORNEY GENERAL*

Robert B. Teitelman
Michael E. Cole
Clare E. Kindall
Karla A. Turekian
Antonia C. Conti
Garry Desjardins
*Assistant Attorneys General*

BY: _____
Robert B. Teitelman
Assistant Attorney General
*(Juris #085053)*
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel: (860)808-5355/ Fax: (860)808-5391
e-mail: robert.teitelman@po.state.ct.us

BY: _____
Michael E. Cole
Assistant Attorney General
*(Juris #417145)*
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel: (860)808-5040/ Fax: (860)808-5585
e-mail: michael.cole@po.state.ct.us

71

# CERTIFICATION

I hereby certify that a copy of the foregoing REVISED COMPLAINT was mailed or electronically delivered in accordance with Conn. Prac. Bk. § 10-12 on this 5th day of March, 2004, to all counsel of record, as follows:

Paul F. Doyle
William R. Golden, Jr.
Antonia F. Giuliana
Kelley Drye, LLP
101 Park Avenue
New York, NY 10178-0002
(212)808-7800

Mark S. Gregory
James E. Nealon
Kelley Drye, LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT 06901-3284
(203)351-8057

Paul J. Coval
Douglas L. Rogers
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
(614)464-5635

Theodore J. Tucci
Robinson and Cole
280 Trumbull Street
Hartford, CT 06103-3597
(860)275-8210

Brien T. O'Connor
John T. Montgomery
Crystal D. Talley
John R. Therien
Ropes & Gray
One International Place
Boston, MA 02110-2624
(617)951-7385

Andrew P. Gaillard
Maxwell Branson
Day, Berry & Howard
One Canterbury Green
Stamford, CT 06901-2047
(203)977-7550


Robert B. Teitelman
Assistant Attorney General

## TABLE 1-1

### DEY, INC./ DEY LIMITED PARTNER, INC./ DEY, L.P.

| DRUG | DOSAGE | NDC# |
|---|---|---|
| ALBUTEROL AEROSOL | 90 MCG | 49502-0303-17 |
| ALBUTEROL AEROSOL | 90 MCG | 49502-0333-17 |
| ALBUTEROL SULFATE | .83 MG/ML | 49502-0697-03 |
| ALBUTEROL SULFATE | .83 MG/ML | 49502-0697-33 |
| ALBUTEROL SULFATE | .83 MG/ML | 49502-0697-60 |
| ALBUTEROL SULFATE | 5 MG/ML | 49502-0105-01 |
| ALBUTEROL SULFATE | 5 MG/ML | 49502-0196-20 |
| CROMOLYN SODIUM | 20 MG/2ML | 49502-0689-02 |
| CROMOLYN SODIUM | 20 MG/2ML | 49502-0689-12 |
| IPRATROPIUM BROMIDE | .2 MG | 49502-0685-03 |
| IPRATROPIUM BROMIDE | .2 MG | 49502-0685-33 |
| IPRATROPIUM BROMIDE | .2 MG | 49502-0685-60 |

## TABLE 1-2

### ROXANE LABORATORIES, INC.

| DRUG | DOSAGE | NDC# |
|---|---|---|
| ALBUTEROL SULFATE | .083% | 00054-8063-11 |
| ALBUTEROL SULFATE | .083% | 00054-8063-13 |
| ALBUTEROL SULFATE | .083% | 00054-8063-21 |
| AZATHIOPRINE | 50 MG | 00054-4084-25 |
| CROMOLYN SODIUM | 20 MG | 00054-8167-21 |
| CROMOLYN SODIUM | 20 MG | 00054-8167-23 |
| FUROSEMIDE | 20 MG - 100 | 00054-4297-25 |
| FUROSEMIDE | 20 MG - 1000 | 00054-4297-31 |
| FUROSEMIDE | 40 MG - 100 | 00054-4299-25 |

| | | |
|---|---|---|
| FUROSEMIDE | 40 MG - 1000 | 00054-4299-31 |
| FUROSEMIDE (ORAL) | 10 MG/ML | 00054-3294-50 |
| HALOPERIDOL | 5 MG - 100 | 00054-4345-25 |
| HALOPERIDOL | 10 MG - 100 | 00054-4346-25 |
| HALOPERIDOL (LACTATE) | 2 MG/ML | 00054-3350-50 |
| HYDROMORPHONE | 8 MG | 00054-4370-25 |
| HYDROXYUREA | 500 MG | 00054-2247-25 |
| IPRATROPIUM BROMIDE | .2 MG/ML | 00054-8402-11 |
| IPRATROPIUM BROMIDE | .2 MG/ML | 00054-8402-13 |
| IPRATROPIUM BROMIDE | .2 MG/ML | 00054-8402-21 |
| IPRATROPIUM BROMIDE | .2 MG/ML | 00054-8404-11 |
| IPRATROPIUM BROMIDE | .2 MG/ML | 00054-8404-13 |
| IPRATROPIUM BROMIDE | .2 MG/ML | 00054-8404-21 |
| LACTULOSE | 10G/15ML | 00054-3486-63 |
| LIDOCAINE HCL VISCOUS | 20 MG/ML | 00054-3500-49 |
| LITHIUM CARBONATE | 300 MG - 100 | 00054-4527-25 |
| LITHIUM CARBONATE | 300 MG - 1000 | 00054-4527-31 |
| LITHIUM CARBONATE | 300 MG - 100 | 00054-2527-25 |
| LITHIUM CARBONATE | 300 MG - 1000 | 00054-2527-31 |
| MARINOL CAP | 5 MG | 00054-2602-11 |
| MEPERIDINE HCL | 50 MG/5 ML | 00054-3545-63 |
| MEPERIDINE HCL | 100 MG | 00054-4596-25 |
| METHADONE HCL | 40 MG | 00054-4547-25 |
| METHADONE HCL | 10 MG | 00054-4571-25 |
| NAPROXEN SODIUM | 550 MG | 00054-4639-25 |
| NEOMYCIN SULFATE | 500 MG | 00054-4600-25 |
| ORAMORPH SR | 30 MG | 00054-4805-25 |
| ORAMORPH SR | 60 MG | 00054-4792-25 |
| ORAMORPH SR | 100 MG | 00054-4793-25 |
| OXYCODONE W/ ACETAMINOPHEN | 5 – 500 MG | 00054-2795-25 |
| ROXICET | 5 – 325 MG - 100 | 00054-4650-25 |

| | | |
|---|---|---|
| ROXICET | 5 – 325 MG - 500 | 00054-4650-29 |
| ROXICODONE | 5 MG | 00054-4657-25 |
| SODIUM POLYSTYRENE SULFONATE | 15G/60 ML | 00054-3805-63 |

## TABLE 1-3

### WARRICK PHARMACEUTICALS CORPORATION/ SCHERING CORPORATION/ SCHERING-PLOUGH CORPORATION

| DRUG | DOSAGE | NDC# |
|---|---|---|
| ALBUTEROL AEROSOL | 90 MCG | 59930-1560-01 |
| ALBUTEROL SULFATE | .83 MG/ML | 59930-1517-01 |
| ALBUTEROL SULFATE | ..83 MG/ML | 59930-1517-02 |
| ALBUTEROL SULFATE | .83 MG/ML | 59930-1500-06 |
| ALBUTEROL SULFATE | .83 MG/ML | 59930-1500-08 |
| ALBUTEROL SULFATE | 2 MG/5ML | 59930-1510-05 |
| ALBUTEROL SULFATE | 5 MG/ML | 59930-1515-04 |
| CLOTRIMAZOLE | 1% CREAM | 59930-1570-02 |
| CLOTRIMAZOLE | 1% CREAM | 59930-1570-03 |
| CROMOLYN SODIUM | 20 MG | 59930-1509-01 |
| CROMOLYN SODIUM | 20 MG | 59930-1509-02 |
| ISOSORBIDE MONONITRATE | 30 MG | 59930-1502-01 |
| ISOSORBIDE MONONITRATE | 60 MG | 59930-1549-01 |
| ISOSORBIDE MONONITRATE | 120 MG | 59930-1587-01 |
| LABETALOL HCL | 100 MG | 59930-1602-01 |
| LABETALOL HCL | 200 MG | 59930-1636-01 |
| LABETALOL HCL | 300 MG | 59930-1653-01 |
| PERPHENAZINE | 4 MG | 59930-1603-01 |
| PERPHENAZINE | 8 MG | 59930-1605-01 |
| PERPHENAZINE | 16 MG | 59930-1610-01 |
| CLARITIN | 10 MG | 00085-0458-03 |
| CLARITIN D | 24 HOUR | 00085-1233-01 |

## TABLE 2-1

### DEY, INC./ DEY LIMITED PARTNER, INC./ DEY, L.P.

| DRUG | NDC # | YEAR | AWP | ACTUAL | SPREAD | CT % OVERCHARGE |
|------|-------|------|-----|--------|--------|-----------------|
| ALBUTEROL | 49502-0303-17 | 1996 | $ 21.70 | $ 3.25 | $ 18.45 | 488% |
| IPRATROPIUM BROMIDE | 49502-0685-03 | 2001 | $ 44.10 | $ 8.52 | $ 35.58 | 355% |
| IPRATROPIUM BROMIDE | 49502-0685-03 | 2000 | $ 44.10 | $ 11.45 | $ 32.65 | 239% |
| IPRATROPIUM BROMIDE | 49502-0685-03 | 1999 | $ 44.10 | $ 13.99 | $ 30.11 | 177% |

## TABLE 2-2

### ROXANE LABORATORIES, INC.

| DRUG | NDC # | YEAR | AWP | ACTUAL | SPREAD | CT % OVERCHARGE |
|------|-------|------|-----|--------|--------|-----------------|
| LITHIUM CARBONATE | 00054-4527-25 | 1994-1996 | $ 7.99 | $ 2.30 | $ 5.69 | 206% |
| IPRATROPIUM BROMIDE | 00054-8402-11 | 1999 | $ 44.06 | $ 12.25 | $ 31.81 | 217% |
| IPRATROPIUM BROMIDE | 00054-8402-11 | 2000 | $ 44.06 | $ 9.05 | $ 32.34 | 328% |

## TABLE 2-3

### WARRICK PHARMACEUTICALS CORPORATION/ SCHERING CORPORATION/ SCHERING-PLOUGH CORPORATION

| DRUG | NDC # | YEAR | AWP | ACTUAL | SPREAD | CT % OVERCHARGE |
|------|-------|------|-----|--------|--------|-----------------|
| ISOSORBIDE MONONITRATE | 59930-1549-01 | 1999 | $ 117.40 | $ 27.60 | $ 89.80 | 274% |
| ISOSORBIDE MONONITRATE | 59930-1549-01 | 2000-2001 | $ 117.40 | $ 27.68 | $ 89.72 | 273% |
| ALBUTEROL AEROSOL | 59930-1560-01 | 1998 | $ 21.41 | $ 2.95 | $ 18.46 | 539% |
| ALBUTEROL AEROSOL | 59930-1560-01 | 1999 | $ 21.41 | $ 2.79 | $ 18.62 | 575% |
| ALBUTEROL AEROSOL | 59930-1560-01 | 2000 | $ 21.41 | $ 5.26 | $ 16.15 | 258% |

# TABLE 3-1

# DEY, INC./ DEY LIMITED PARTNER, INC./ DEY, L.P.

| NDC | DRUG NAME | HCPCS CODE |
|---|---|---|
| 49502-0105-01 | Albuterol Sulfate .5% | J7618<br>J7625<br>K0504 |
| 49502-0196-20 | Albuterol Sulfate .5% | J7618<br>J7625<br>K0504 |
| 49502-0697-03 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 49502-0697-33 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 49502-0697-60 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 49502-0689-02 | Cromolyn Sodium | J7630<br>J7631<br>K0511 |
| 49502-0689-12 | Cromolyn Sodium | J7630<br>J7631<br>K0511 |
| 49502-0685-03 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |
| 49502-0685-33 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |
| 49502-0685-60 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |

77

# TABLE 3-2

## ROXANE LABORATORIES, INC.

| NDC | DRUG NAME | HCPCS CODE |
|---|---|---|
| 00054-8063-11 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 00054-8063-13 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 00054-8063-21 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 00054-8167-21 | Cromolyn Sodium 20 mg | J7630<br>J7631<br>K0511 |
| 00054-8167-23 | Cromolyn Sodium 20 mg | J7630<br>J7631<br>K0511 |
| 00054-8402-11 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |
| 00054-8402-13 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |
| 00054-8402-21 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |
| 00054-8404-11 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |
| 00054-8404-13 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |

| 00054-8404-21 | Ipratropium Bromide | J7644<br>J7645<br>K0518 |
|---|---|---|

## TABLE 3-3

## WARRICK PHARMACEUTICALS CORPORATION/ SCHERING CORPORATION/ SCHERING-PLOUGH CORPORATION

| NDC | DRUG NAME | HCPCS CODE |
|---|---|---|
| 59930-1515-04 | Albuterol  Sol 5 MG | J7618<br>J7619<br>J7625<br>K0504 |
| 59930-1500-06 | Albuterol  Sol .083% | J7619<br>J7620<br>K0505 |
| 59930-1500-08 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 59930-1517-01 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 59930-1517-02 | Albuterol Sulfate .083% | J7619<br>J7620<br>K0505 |
| 59930-1509-01 | Cromolyn Sodium | J7630<br>J7631<br>K0511 |
| 59930-1509-02 | Cromolyn Sodium | J7630<br>J7631<br>K0511 |

79

## TABLE 4-1

### (1) Dey, Inc./ Dey Limited Partner, Inc./ Dey, L.P.;
### (2) Warrick Pharmaceuticals Corporation/ Schering Corporation/
### Schering-Plough Corporation; & (3) Roxane Laboratories, Inc.

| Drug Name | | | | | | |
|---|---|---|---|---|---|---|
| Albuterol Sulfate* .083%/ J Code- J7619<br>NDC/ 49502-0697-03<br>       49502-0697-33<br>       49502-0697-60<br>NDC/ 00054-8063-11<br>       00054-8063-13<br>       00054-8063-21<br>NDC/59930-1517-01<br>       59930-1517-02<br>       59930-1517-06<br>       59930-1517-08 | | | | | | |
| | Approximate Provider Cost<br><br><br><br><br><br>(Column A) | Medicare Reimbursement<br><br><br><br><br><br>(Column B) | Medicare Reimbursement Based on Approximate Provider Cost of $22.50<br>(Column C) | "Spread" Retained By Provider<br><br><br><br><br>(Column D) | CT Consumer Overcharge in Dollars<br><br><br><br><br>(Column B-C) | CT Consumer Percentage Overcharge<br><br><br><br><br>(Column B/C) |
| Cost per mg. | $0.09 | $0.47 | | | | |
| Cost of typical monthly usage- (250 mg per month) | $22.50 | $117.50 | | $95.00 | | |
| Medicare share 80% | | $94.00 | $18.00 | | | |
| CT Consumer share 20% | | $23.50 | $4.50 | | $19.00 | 522% |
| *=Multi-source drug | | | | | | |

80

| Drug Name |
|---|
| Ipratropium Bromide*/ J Code- J7645 |
| NDC/ 49502-0685-03 |
|     49502-0685-33 |
|     49502-0685-60 |
| NDC/ 00054-8402-11 |
|     00054-8402-13 |
|     00054-8402-21 |
|     00054-8404-11 |
|     00054-8404-13 |
|     00054-8404-21 |
| NDC/59930-1500-06 |
|     59930-1500-08 |

|  | Approximate Provider Cost | Medicare Reimbursement | Medicare Reimbursement Based on Approximate Provider Cost of $59.00 | "Spread" Retained By Provider | CT Consumer Overcharge in Dollars | CT Consumer Percentage Overcharge |
|---|---|---|---|---|---|---|
|  | (Column A) | (Column B) | (Column C) | (Column D) | (Column B-C) | (Column B/C) |
| Cost per mg. | $1.18 | $3.34 |  |  |  |  |
| Cost of typical monthly usage- (50 mg per month) | $59.00 | $167.00 |  | $108.00 |  |  |
| Medicare share 80% |  | $133.60 | $47.20 |  |  |  |
| CT Consumer share 20% |  | $33.40 | $11.80 |  | $21.60 | 283% |
| *=Multi-source drug |  |  |  |  |  |  |

81