# Exhibit E

Gerald J. Pappert, Attorney General
**COMMONWEALTH OF PENNSYLVANIA**
16th Floor, Strawberry Square
Harrisburg, PA 17120

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

**COMMONWEALTH OF PENNSYLVANIA**
by **GERALD J. PAPPERT**, in his capacity as
Attorney General of the Commonwealth of
Pennsylvania,

**PLAINTIFF,**

No.: _____

v.

**TAP PHARMACEUTICAL PRODUCTS, INC.; ABBOTT
LABORATORIES; TAKEDA CHEMICAL INDUSTRIES,
LTD.; ASTRAZENECA PLC; ZENECA, INC.;
ASTRAZENECA PHARMACEUTICALS LP;
ASTRAZENECA LP; BAYER AG; BAYER
CORPORATION; GLAXOSMITHKLINE, P.L.C.;
SMITHKLINE BEECHAM CORPORATION; GLAXO
WELLCOME, INC.; PFIZER, INC.; PHARMACIA
CORPORATION; JOHNSON & JOHNSON; AMGEN, INC.;
BRISTOL-MYERS SQUIBB COMPANY; BAXTER
INTERNATIONAL INC.; AVENTIS PHARMACEUTICALS,
INC.; BOEHRINGER INGELHEIM CORPORATION;
SCHERING-PLOUGH CORPORATION; DEY, INC.,**

**DEFENDANTS.**

## CIVIL ACTION COMPLAINT

The Commonwealth of Pennsylvania, by and through its Attorney General [hereinafter Athe

Commonwealth≅], brings this action on behalf of the Commonwealth=s general economy and the

departments, bureaus and agencies of the Commonwealth as injured purchasers and/or reimbursers

of prescription drugs, and as representative of, and as *parens patriae* on behalf of the citizens of

Pennsylvania [hereinafter APennsylvania Consumers≅], to obtain compensatory, punitive and other

damages, restitution, civil penalties, injunctive and other equitable relief, as more fully set forth below, and, upon information and belief, avers as follows:

## INTRODUCTION

1.      Since 2001, federal criminal and civil actions against various prescription drug companies named herein[1] [the ACriminal Actions≅][2] have returned billions of dollars to the federal treasury.  To date, however, the Commonwealth has not been fully compensated for the harm caused by the admittedly wrongful conduct of these drug companies in the Criminal Actions, and no Pennsylvania Consumers have been compensated  This lawsuit seeks to recover for the Commonwealth and Pennsylvania Consumers the money wrongfully paid for overcharges in the cost of prescription drugs as a result of the wrongful conduct detailed herein since at least 1991 through the present [Athe relevant time period≅].

---

[1]      The drug companies named in the Criminal Actions are TAP Pharmaceutical Products, Inc. (ATAP≅), Zeneca, Inc., AstraZeneca Pharmaceuticals LP and AstraZeneca LP (collectively AAstraZeneca≅), Bayer Corporation (ABayer≅), GlaxoSmithKline (AGSK≅) and Pfizer Corporation (APfizer).  [These defendants are collectively referred to in this Complaint as the ACriminal Defendants.≅]

[2]      The Criminal Actions are: *USA v. TAP Pharmaceutical Products Inc.*, 1:01cr10354-WGY (D. Mass.); *USA v. AstraZeneca Pharmaceuticals LP*, 1:03cr00055(D. Del.); *USA v. Bayer Corp.*, 1:03-cr-10118-RGS (D. Mass.); *USA v. SmithKlineBeecham Corp. d/b/a GlaxoSmithKline* (D. Mass.); and *USA v. Pfizer Inc.* (D. Mass.).

2.     As part of the aforesaid Criminal Actions, seven (7) of the principal drug companies named in this lawsuit pled guilty to and/or agreed to settle criminal charges of having engaged in unlawful marketing and sales practices with respect to certain of their prescription drugs reimbursed under federal programs, such as Medicare, and state programs, such as Medicaid, and they paid record fines and civil penalties for this admittedly wrongful conduct.

3.     As to the admittedly wrongful conduct of these Criminal Defendants, the Commonwealth was partially compensated by the settlements of the Criminal Actions for losses suffered by the State=s Medicaid Program for certain drugs of the Criminal Defendants that were reimbursed under the Pennsylvania Medicaid Program.  These drugs are Lupron[7], Zoladex[7], KOaTE[7], Kogenate[7], Cipro[7], Flonase[7], Paxil[7], and Lipitor[7] [the ASubject Drugs≅].  The Commonwealth seeks by this action to compel the Criminal Defendants to make full restitution under the laws of Pennsylvania to the Commonwealth for all payments made for the Subject Drugs by the Commonwealth, other than the Commonwealth=s Medicaid payments, and for all payments [both Medicaid and non-Medicaid] made by the Commonwealth for all other drugs manufactured, distributed, marketed and sold by the Criminal Defendants that are subject to the claims set forth herein.

4.     Since no Pennsylvania Consumer has been compensated by the Criminal Actions for any payments made for the Subject Drugs, the Commonwealth also seeks by this action to compel the Criminal Defendants to make full restitution to Pennsylvania Consumers for all drug overpayments, including payments for the Subject Drugs, suffered as a result of the wrongful conduct of the Criminal Defendants.

3

5.     Lastly, the Commonwealth seeks to prohibit and permanently enjoin such wrongful conduct in the future and thereby gain the benefit of significant savings.

6.     The Commonwealth believes and therefore avers that all of the drug companies named in this lawsuit have engaged in a long-standing and far-reaching pattern of wrongful conduct with respect to their marketing and sales of prescription drugs in the Commonwealth of Pennsylvania.  With regard to at least 7 companies, this wrongful conduct has been confirmed by guilty pleas and/or legal settlements.

7.     In brief, the drug companies named in this lawsuit have engaged in an unfair and deceptive marketing and sales scheme and conspiracy to provide improper incentives and inducements to medical providers and other purchasers of their prescription drugs and drug products [collectively Adrugs≅] to promote the sale of Defendants= drugs at inflated prices throughout the Commonwealth of Pennsylvania to the detriment of both the Commonwealth and Pennsylvania Consumers.  This unfair and deceptive marketing and sales scheme and conspiracy caused harm to the Commonwealth and Pennsylvania Consumers by causing the Commonwealth and Pennsylvania Consumers to pay significantly more for Defendants= drugs than they otherwise would have paid in the absence of Defendants= wrongful conduct.

8.     This case does not concern the efficacy of the drugs and drug products sold by the Defendants.  Instead, this lawsuit seeks legal redress for the unfair and deceptive marketing and sales acts and practices of the named Defendant pharmaceutical companies who have profited from their wrongful acts and practices at the expense of the Commonwealth and Pennsylvania Consumers.  As a result of Defendants= wrongful conduct, the Commonwealth and Pennsylvania Consumers have suffered.

## THE PARTIES, JURISDICTION AND VENUE

### PLAINTIFF

9.     Plaintiff is the Commonwealth of Pennsylvania.  The Commonwealth brings this action by its Attorney General, Gerald J. Pappert, in its capacity as sovereign and in its proprietary capacity on behalf of departments, bureaus and agencies of the Commonwealth and as representative of, and as *parens patriae* on behalf of, Pennsylvania Consumers.

10.     The Attorney General, as the chief law officer of the Commonwealth of Pennsylvania pursuant to Article IV ∋ 4.1 of the Pennsylvania Constitution, is statutorily authorized to initiate and maintain this action, and does so, pursuant to the Commonwealth Attorneys Act, 71 PA. STAT. ∋ 732-204 and the Unfair Trade Practice and Consumer Protection Law, 73 PA. STAT. ∋∋ 201-1, *et seq.* This action is also maintained pursuant to the Attorney General=s common law *parens patriae* powers.

11.     The Attorney General deems these proceedings to be in the public interest pursuant to 73 PA. STAT. ∋ 201-4.

### DEFENDANTS

12.     The Defendants named in this Complaint include all of their predecessor entities and all their past and present component, subsidiary and affiliate entities.

13.     The acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

5

<u>The TAP Defendants</u>

14.     Defendant, TAP Pharmaceutical Products, Inc. (ATAP≅), is an Illinois corporation with its principal place of business located at 675 North Field Drive, Lake Forest, Illinois.

15.     Defendant, Abbott Laboratories (AAbbott≅), is an Illinois corporation with its principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois.  Abbott owns 50% of TAP, and Abbott executives comprise 50% of TAP=s Board of Directors.

16.     Defendant, Takeda Chemical Industries, Ltd. (ATakeda≅), is a Japanese company with its principal place of business located at 1-1 Doshomachi 4-chome, Chuo-ku, Osaka, Japan. Takeda owns 50% of TAP, and Takeda executives comprise 50% of TAP=s Board of Directors.

17.     TAP, Abbott and Takeda (collectively, the ATAP Defendants≅) are highly diversified  healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the TAP Defendants include Lupron[7] (leuprolide acetate for depot suspension), which is used in the treatment of prostate cancer in men, endometriosis and infertility in women, and central precocious puberty in children, as well as Prevacid[7] and Calcijex[7], among others.

<u>The AstraZeneca Defendants</u>

18.     Defendant, AstraZeneca PLC (AAstraZeneca PLC≅), is a British corporation with its principal place of business located at 15 Stanhope Gate, London W1K 1LN, U.K.  AstraZeneca PLC was formed on April 6, 1999 through the merger of Astra AB of Sweden and Zeneca Group PLC of the United Kingdom.  Until April 1999, Defendant Zeneca, Inc. (AZeneca≅), a Delaware corporation

with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware, was a subsidiary of Zeneca Group PLC (UK).

19.     Defendant, AstraZeneca Pharmaceuticals LP (AAstraZeneca≅), is a Delaware limited partnership with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware.

20.     Defendant, AstraZeneca LP (AAstraZeneca LP≅), is a Delaware limited partnership with its principal place of business located at 725 Chesterbrook Boulevard, Wayne, Pennsylvania.

21.     AstraZeneca PLC, Zeneca, AstraZeneca, and AstraZeneca LP (collectively, the AAstraZeneca Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the AstraZeneca Defendants include Zoladex[7] (goserelin acetate), which is used in the treatment of prostate cancer in men, endometriosis and infertility in women, and central precocious puberty in children, as well as Cefotan[7], Elavil Injection, Faslodex[7], Foscavir[7], Merrem[7], Tenormin[7] Injection and Xylocaine Injection, among others.

<u>The Bayer Defendants</u>

22.     Defendant, Bayer AG (ABayer AG≅), is a German corporation with its principal place of business located at 51368 Leverkusen, Germany.  Bayer AG acquired Cutter Laboratories, Inc. (ACutter≅) in 1974 and Miles Laboratories, Inc. (AMiles≅) in 1978 and the two companies are now subsidiaries of Bayer AG.

23.     Defendant, Bayer Corporation (ABayer≅), is a Delaware corporation with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania.

7

24.     Bayer AG and Bayer (collectively, the ABayer Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the Bayer Defendants include Viadur[7] (leuprolide acetate implant), a drug that is licensed from Alza Corporation, a subsidiary company of Defendant Johnson & Johnson, and treats prostate cancer in men, and as well as KOaTE[7], Kogenate[7], Cipro[7], Flonase[7], and Paxil[7], among others.

<u>The GSK Defendants</u>

25.     Defendant, GlaxoSmithKline P.L.C. (AGlaxoSmithKline≅), is an English public limited company with its principal place of business located at 980 Great West Road, Brentford, Middlesex, TW8 9GS, England.  With the merger of Glaxo Wellcome, Inc. and SmithKline Beecham Corporation in 2000, GlaxoSmithKline became the second largest drug company in the world today.

26.     Defendant Glaxo Wellcome, Inc. (AGlaxo≅), is a North Carolina corporation with its principal place of business located at 5 Moore Drive, Research Triangle Park, North Carolina.

27.     Defendant SmithKline Beecham Corporation (ASmithKline≅), is a Pennsylvania corporation with its principal place of business located at One Franklin Plaza, 200 North 16th Street, Philadelphia, Pennsylvania.

28.      GlaxoSmithKline, SmithKline and Glaxo (collectively, the AGSK Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  Prior to the

8

merger of Glaxo and SmithKline, two of the drugs of the GSK Defendants included Kytril[7] (granisetron) and Zofran[7] (ondansetron), which are used in the treatment of patients undergoing cancer chemotherapy, among others.

The Pfizer Defendants

29.     Defendant, Pfizer, Inc. (APfizer≅), is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York.  With the merger of Pfizer and Pharmacia Corporation in 2002, Pfizer became the largest drug company in the world today.

30.     Defendant, Pharmacia Corporation (APharmacia≅), is a Delaware corporation with its principal place of business located at 100 Route 206 North, Peapack, New Jersey.  Pharmacia was created in April 2000 through the merger of Pharmacia & Upjohn (AP&U≅) with Monsanto Company (AMonsanto≅) and its G.D. Searle (ASearle≅) unit.

31.     Pfizer, Pharmacia, P&U, Monsanto and Searle (collectively, the APfizer Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the Pfizer Defendants include Lipitor[7] (atorvastatin calcium), a drug used to lower cholesterol, Trelstar[9] Depot (triptorelin pamoate), for the treatment of prostate cancer, among others.

The Amgen Defendants

32.     Defendant Amgen, Inc. (AAmgen≅) is a California corporation with its principal place of business located at One Amgen Center Drive, Thousand Oaks, California.  In 2002, Amgen

acquired Immunex Corporation (AImmunex≅), a Washington corporation with its principal place of business located at 51 University Street, Seattle, Washington.

33.     Amgen and Immunex (collectively, the AAmgen Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the Amgen Defendants include Epogen[7] (epoetin alfa), Aranesp[7] (darbepoetin alfa), and Neupogen[7] (filgrastim (G-CSF)), which are used in the treatment of patients undergoing cancer chemotherapy, among others.

<u>The Schering Defendants</u>

34.     Defendant Schering-Plough Corporation (ASchering-Plough≅) is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey.  A wholly-owned subsidiary company of Schering-Plough is Warrick Pharmaceuticals Corporation (AWarrick≅), a Delaware corporation with its principal place of business located at 6100 Neil Road #500, Reno, Nevada.

35.     Schering-Plough and Warrick (collectively, the ASchering Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the Schering Defendants include Proventil[7], which is used in the treatment of obstructive airways disease, among others.

<u>The Bristol-Myers Defendants</u>

10

36.     Defendant, Bristol-Myers Squibb Company (ABristol-Myers≅), is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York. Bristol-Myers includes Oncology Therapeutics Network Corporation (AOTN≅), a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405, South, San Francisco, California, and Apothecon, Inc. (AApothecon≅), with a principal place of business located in Princeton, New Jersey (collectively Athe Bristol-Myers Defendants≅).

37.     The Bristol-Myers Defendants are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs and drug products purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs and drug products of the Bristol-Myers Defendants include Etopophos[7] (etoposide) and VePesid[7] (etoposide), which are used in the treatment of various cancers, among others.

<u>The J&J Defendants</u>

38.     Defendant, Johnson & Johnson (AJ&J≅) is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. J&J includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs, including, but not limited to, the following:

    1.     Alza Corporation (AAlza≅) with its principal place of business located at 1900 Charleston Road, Mountain View, California, acquired from Defendant Abbott in 2000;

2.     Centocor, Inc. (ACentocor≅), a Pennsylvania corporation with its principal place of business located at 244 Great Valley Parkway, Malvern, Pennsylvania; and

3.     Ortho Biotech, Inc. (AOrtho≅), a New Jersey corporation with its principal place of business located at 700 U.S. Highway, Route 202 South, Raritan, New Jersey.

39.     J&J, Alza, Centocor and Ortho (collectively Athe J&J Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the J&J Defendants include Viadur[7], a drug that treats prostate cancer, Procrit[7], a drug that treats anemia in cancer patients, Remicade[7], a drug that treats rheumatoid arthritis, and Topamax[7], a drug that treats epilepsy, among others.

<u>The Aventis Defendants</u>

40.     Defendant Aventis Pharmaceuticals, Inc. (AAventis≅) is a Delaware corporation with its principal place of business located at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey.  Aventis includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs, including, but not limited to, the following:

1.     Aventis Behring L.L.C. (AAventis Behring≅), an Illinois limited liability corporation with its principal place of business located at 1020 First Avenue, King of Prussia, Pennsylvania;

12

2.     Hoechst Marion Roussel, Inc. (AHoechst≅), a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri;

3.     Centeon, L.L.C. (ACenteon≅), a Pennsylvania corporation with its principal place of business located at 1020 First Avenue, King of Prussia, Pennsylvania; and

4.     Armour Pharmaceuticals (AArmour≅), a Pennsylvania corporation with its principal place of business located at 500 Arcola Road, Collegeville, Pennsylvania.

41.     Aventis, Aventis Behring, Hoechst, Centeon, and Armour (collectively, the Aventis Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the Aventis Defendants include Anzemet[7] (dolasteron mesylate), which is used in the treatment of cancer patients, and Monoclate-P (factor viii), an antihemorrahagic drug, among others.

<u>The Baxter Defendants</u>

42.     Defendant Baxter International Inc. (ABaxter International≅) is a Delaware corporation with its principal place of business located at One Baxter Parkway, Deerfield, Illinois. Baxter includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs, including, but not limited to, the following:

1.    Baxter Healthcare Corporation (ABaxter Healthcare≅), a Delaware corporation with its principal place of business located at One Baxter Parkway, Deerfield, Illinois; and

2.    Immuno-U.S., Inc. (AImmuno≅), a Michigan corporation with its principal place of business located at 1200 Parkdale Road, Rochester, Michigan.

43.    Baxter International, Baxter Healthcare and Immuno (collectively, Athe Baxter Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the Baxter Defendants include Recombinate (factor viii) and other factor viii drugs, which are used to treat hemophilia, among others.

The Boehringer Defendants

44.    Defendant, Boehringer Ingelheim Corporation (ABoehringer≅), is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut.  Boehringer includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs, including, but not limited to, the following:

1.    Bedford Laboratories (ABedford≅), an Ohio corporation with its principal place of business located at 300 Northfield Road, Bedford, Ohio;

2.    Ben Venue Laboratories, Inc. (ABen Venue≅), a Delaware corporation with its principal place of business located at 300 Northfield Road, Bedford, Ohio; and

14

3.      Roxane Laboratories, Inc. (ARoxane≅), an Ohio corporation with its principal place of business located at Post Office Box 16532, Columbus, Ohio.

45.    Boehringer, Bedford, Ben Venue and Roxanne (collectively Athe Boehringer Defendants≅) are highly diversified healthcare companies that individually, and in combination with one another, engage in the business of manufacturing, distributing, marketing and selling prescription drugs to the Commonwealth and Pennsylvania Consumers.  The drugs of the Boehringer Defendants include various albuterol and ipratropium bromide drug products, which are used in the treatment of obstructive airways disease, and etoposide, which is used in the treatment of various cancers, among others.

## Dey

46.    Defendant, Dey, Inc. (ADey≅), is a Delaware corporation with its principal place of business located at 2751 Napa Valley Corporate Drive, Napa, California.  Dey is a highly diversified healthcare company that engages in the business of manufacturing, distributing, marketing and selling prescription drugs to the Commonwealth and Pennsylvania Consumers.  Dey=s drugs include AccuNeb[9] and other drugs used in the treatment of obstructive airways disease, among others.

### JURISDICTION AND VENUE

47.    The jurisdiction of this Court is founded upon 42 PA. CONS. STAT. ANN. ∋ 761 which gives the Commonwealth Court jurisdiction over actions by the Commonwealth government, including those brought by any officer thereof acting in his official capacity.

48.    This Court has personal jurisdiction over each Defendant either because the Defendant resides in Pennsylvania , does business in Pennsylvania and/or has the requisite minimum contacts with Pennsylvania necessary to constitutionally permit the Court to exercise jurisdiction.

15

49.     The Commonwealth brings this action exclusively under the common law and statutes of the Commonwealth of Pennsylvania.  No federal claims are being asserted.  No aspect of the claims asserted herein is brought pursuant to any federal law, including either Medicare or ERISA, nor is any aspect of the claims asserted herein brought for the purpose of interpreting a federal contract, including the terms of the settlement agreements with each of the Criminal Defendants, or the terms of an ERISA plan.  Similarly, no attempt is being made to recover pursuant to claims that were resolved as part of the aforesaid Criminal Actions.  To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law, or a claim for recovery of benefits under an ERISA plan, such claim is expressly and undeniably disavowed and disclaimed by the Commonwealth.

### THE UNLAWFUL CONDUCT AT ISSUE

#### THE UNLAWFUL SCHEME AND CONSPIRACY

50.     As set forth in the Introduction to this Complaint, the drug companies named in this lawsuit have engaged in an unfair and deceptive marketing and sales scheme and conspiracy to provide improper incentives and inducements to medical providers and other purchasers of their drugs to promote the sale of Defendants= drugs at exorbitant prices throughout the Commonwealth of Pennsylvania, to the detriment of both the Commonwealth and Pennsylvania Consumers.

51.     This unfair and deceptive marketing and sales scheme and conspiracy caused harm to the Commonwealth and Pennsylvania Consumers by causing the Commonwealth and Pennsylvania Consumers to pay more for Defendants= drugs than they otherwise would have paid in the absence of Defendants= conduct.

52.     The marketing and sales scheme and conspiracy detailed herein was formulated as part of an overall plan and agreement of the Defendants to engage in unlawful and improper methods of competition in the marketing and sales of their drugs and was carried out through a variety of overt acts and practices to unlawfully obtain orders to purchase or prescribe Defendants= drugs that were paid for by the Commonwealth and Pennsylvania Consumers.  These acts and practices include straightforward *Aquid pro quo*≅ arrangements such as direct cash payments, as well as the provision of free goods and drug samples for sale to patients, the provision of profits from spreads and other direct financial inducements from Defendants.

53.     The goal of the marketing and sales scheme and conspiracy was to cause Defendants= drugs to be favored by medical providers and other purchasers above all other drug therapies and modes or methods of healthcare treatment for particular health conditions.

54.     Broadly speaking, there were at least four (4) types of acts and practices at the heart of Defendants= marketing and sales scheme and conspiracy:

1.      establishing and promoting Aspreads≅ on prescription drugs (Apromotion of spreads≅);

2.      providing free goods and drug samples with the knowledge and/or expectation that medical providers and other purchasers would charge the Commonwealth and Pennsylvania Consumers for such free goods and drug samples (Aprovision of free goods and drug samples≅);

3.      providing other financial incentives and inducements, as detailed more fully herein, to induce sales of Defendants= drugs at exorbitant prices (Aother financial inducements≅); and

17

4.       engaging in efforts to fraudulently conceal and suppress Defendants=
wrongful conduct to maintain the scheme and conspiracy (Afraudulent
concealment≅).

Each of these acts and practices is described more fully below.

55.       The guilty pleas, settlements, and admissions of fault of the Criminal Defendants, by
and through the Criminal Actions, implicate these Defendants in what is known to be a far reaching
and widespread scheme in the pharmaceutical industry to unlawfully increase market share and
profits for their products.  The underlying wrongful conduct admitted by the Defendants involved in
these resolutions is evidence that many of the Defendants herein have already admitted conduct in
the marketing and sales of their drug products in Pennsylvania which the Commonwealth contends
violates the common law and statutes of Pennsylvania as set forth herein.  These guilty pleas and
settlements also demonstrate that the Commonwealth and Pennsylvania Consumers have been
harmed by the admitted wrongdoing of certain Defendants for which these Defendants should pay
damages to the Commonwealth and Pennsylvania Consumers.

56.       In January 2001, Bayer agreed to settle the federal criminal investigation into Bayer=s
marketing and sales practices with respect to KOaTE[7] and Kogenate[7], and Bayer paid $14 million to
the federal and state governments.  Then, in 2003, Bayer AG agreed to plead guilty to federal
criminal charges and paid fines and civil penalties totaling more than $257 with respect to the federal
criminal investigation of the Bayer Defendants for, *inter alia*, illegally relabeling its drug Cipro[7] in
order to circumvent the Medicaid Rebate Program, 42 U.S.C. ∋ 1396r-8 thus defrauding the State
Medicaid programs of millions of dollars in rebate payments.

57.     In October 2001, the TAP Defendants, in order to resolve federal criminal charges, agreed to have Defendant TAP plead guilty to federal criminal and civil fraud charges for, among other things, conspiring to violate the Prescription Drug Marketing Act (APDMA≅) by, *inter alia*, providing free samples of Lupron[7] to medical providers A knowing and expecting≅ that these medical providers would charge patients for such free samples.  This conspiracy admitted by the TAP Defendants was in violation of the federal conspiracy statute, 18 U.S.C. ϶ 371 (Conspiracy to Commit Offense or to Defraud United States).  TAP agreed to pay over $890 million in fines and civil penalties to the federal government and the fifty (50) states, including the Commonwealth for its Medicaid losses.

58.     Like the TAP Defendants, in 2003, certain of the AstraZeneca Defendants agreed to plead guilty to criminal charges similar to those brought against the TAP Defendants.  In particular, these AstraZeneca Defendants pled guilty to federal criminal and civil fraud charges for, among other things, conspiring to violate the PDMA by, *inter alia*, providing free samples of Zoladex[7] to medical providers A knowing and expecting≅ that these medical providers would charge patients for such free samples.  This conspiracy admitted by the AstraZeneca Defendants was in violation of the federal conspiracy statute, 18 U.S.C. ϶ 371 (Conspiracy to Commit Offense or to Defraud United States).  The AstraZeneca Defendants paid $354.9 million in damages and fines to the federal and state governments.

59.     Like Bayer, in 2003, GlaxoSmithKline PLC agreed to resolve a federal criminal investigation and to pay fines and civil penalties to the federal and state governments totaling more than $86 million to resolve claims against the GSK Defendants similar to those made against the Bayer Defendants.

60.     Lastly, in 2003, Pfizer also agreed to resolve a federal criminal investigation into its marketing and sales practices.   Pfizer admitted providing unrestricted Aeducational grants≅ to customers designed to hide the true best price of Lipitor[7].  While this case does not involve any Abest price≅ claims, the wrongdoing admitted by Pfizer that led to liability under federal law also provides evidence of liability under state law  B evidence of Pfizer=s participation in the unfair and deceptive scheme and conspiracy in this case, including, but not limited to, evidence that Pfizer provided improper incentives and inducements to encourage sales of its products at inflated prices.

61.     While a portion of the federal settlement proceeds from the above-described cases has been returned to the states, including the Commonwealth, the Commonwealth has not been compensated fully for its losses from the wrongful conduct that these guilty pleas or civil settlements evidence.

62.     Moreover, the Criminal Actions have not compensated Pennsylvania Consumers who were beneficiaries under federal programs like CHAMPUS and Medicare, and who paid inflated percentage co-pays as the result of the Defendants= conduct.

63.     Also, since the federal government has not investigated, charged and/or settled with all of the pharmaceutical companies alleged herein to be involved in the unfair and deceptive scheme and conspiracy set forth in this Complaint, absent this litigation, the Commonwealth and Pennsylvania Consumers would not be able to recover the full amount of their damages caused by the conspiracy.

Promotion of Spreads

64.     Much of the market for prescription drugs and drug products involves the prescription and sale of drugs to patients at prices based, in whole or part, on the AAverage Wholesale Price,≅ or

the AAWP,≅ for such drugs.  The AWP is not an Aaverage≅ of Awholesale≅ prices, as its name

suggests, but instead is a price that is controlled and set by the Defendant drug manufacturers.

65.     The Defendants report the AWPs for their drugs to various pricing compendia, such

as the *Red Book* and *First Data Bank*, which, in turn, publish these AWPs in reference books that are

used and relied upon by both the public and private sector.  The Defendants encourage medical

providers and other purchasers of Defendants= drugs to use the AWPs set by the Defendants in

billing the Commonwealth and Pennsylvania Consumers for Defendants= drugs prescribed and sold

to patients throughout Pennsylvania.

66.     The AWPs reported by Defendants do not represent prices actually paid in the

Commonwealth of Pennsylvania by any medical provider or other purchaser of Defendants= drugs.

67.     Instead, the Defendants inflated the AWPs for their drugs in order that public and

private payors of their drugs would pay prices for the drugs far in excess of any price actually paid by

medical providers and other purchasers.

68.     In addition to controlling and setting the prices paid by the Commonwealth and

Pennsylvania Consumers for their drugs B the AWPs B Defendants also control and set the prices

paid by their customers, the medical providers and other purchasers of their drugs.  These acquisition

costs B *i.e.* the costs to acquire Defendants= drugs B are far below the AWP-based prices paid by the

Commonwealth and Pennsylvania Consumers throughout the relevant time period.

69.     The Defendants deeply discount the acquisition costs for their drugs far below the

AWP-based prices paid by the Commonwealth and Pennsylvania Consumers for these same drugs in

order to create Aspreads≅ between the acquisition costs and the AWPs.

21

70.     By controlling and inflating the prices paid by patients and other payors, such as the Pennsylvania Consumers and the Commonwealth, Defendants created and manipulated the spreads for drugs sold directly to medical providers and for drugs sold through Pharmacy Benefit Managers and drugs sold to other direct purchaser intermediaries by controlling and manipulating the discounts and rebates that affect the spreads.

71.     The Defendants have unlawfully promoted and marketed spreads, and the profits to be realized therefrom, to their customers throughout the relevant time period, and have fraudulently concealed and/or suppressed these spreads from the Commonwealth and Pennsylvania Consumers.

72.     The TAP Defendants and the AstraZeneca Defendants labeled the spreads for their drugs AReturn to Practice≅ or ARTP≅ in order to conceal and suppress the fact that the spreads for these companies= drugs were being marketed as profits and improper financial incentives and inducements.  While it is unknown at this time whether other Defendants adopted the same exact description of their sales and marketing scheme to promote spreads, it is believed and therefore averred that all other Defendants marketed their spreads as a Areturn≅ and/or Aprofit≅ to Defendants= customers.

73.     Since all Defendants have controlled both the prices paid by their customers [*i.e.* the acquisition costs] and the prices paid by their customers= customers [*i.e.* the AWPs], they have promoted the spread between these two prices as an incentive or inducement to prescribe and sell Defendants= drugs.  Defendants= marketing and sales practices have resulted in a perverted Acompetitive≅ environment whereby the Defendants have sought to continually raise, inflate and fix the AWPs for their drugs, which, in turn, has allowed Defendants to increase the prices paid by their

customers in order to continually increase their sales and the profits realized by both Defendants and their customers for Defendants= drugs.

74.     This Acompetitive≅ environment has not benefited either the Commonwealth or Pennsylvania Consumers.  Instead, it has had the opposite effect.  By Acompeting≅ on spreads, Defendants have caused the Commonwealth and Pennsylvania Consumers to pay more for Defendants= drugs than they otherwise would have paid in the absence of Defendants= conduct.

Specific Examples of Promotion of Spreads

Prostate Cancer Drugs

75.     In the early 1990=s, there were two alternative drug therapies for prostate cancer, Lupron[7], manufactured, distributed, marketed and sold by the TAP Defendants, and Zoladex[7], manufactured, distributed, marketed and sold by the AstraZeneca Defendants.  Both of these drugs had spreads, which were promoted to these Defendants= customers in order to induce medical providers and other purchasers to recommend and prescribe drug therapies B like Lupron[7] and Zoladex[7] B over other available prostate cancer treatments.

76.     Despite the fact that the acquisition cost for Lupron[7] has traditionally been much greater than the acquisition cost of other prostate cancer drugs, such as Zoladex[7], because the AWPs (and therefore the spreads) also have been greater, Lupron[7] has garnered the greatest share of the market for prostate cancer treatment during the relevant time period.  The same is true of other physician-administered drugs (which tend to be very costly healthcare treatments.) The most expensive drug therapies, *i.e.* those with the highest AWPs, tend to be the most widely prescribed

and recommended.  It is believed and therefore averred that one reason for this phenomenon is that Defendants= spreads have induced greater prescription and sales of Defendants= drugs.

Other Cancer Drugs

77.     As with the TAP Defendants, the AstraZeneca Defendants, the Bayer Defendants, the Pfizer Defendants, and the J&J Defendants, all of whom have employed spreads for their respective prostate cancer drugsB all Defendants named herein have established and promoted spreads for their respective cancer drug therapies, including, but not limited to, the drugs specifically named in this Complaint.

78.     In addition to the foregoing examples, the TAP Defendants [Calcijex[7]], the GSK Defendants [with respect to their drugs Kytril[7], Zofran[7]], the Aventis Defendants [with respect to their drugs Anzemet[7]], the Amgen Defendants [with respect to their drugs Epogen[7], Aranesp[7], and Neupogen[7]], the J&J Defendants [with respect to their drug Procrit[7]], the Bristol-Myers Squibb Defendants [with respect to their drugs Etopophos[7] and VePesid[7]], and the Boehringer Defendants [with respect to their drug etoposide] all have engaged in the aforesaid conduct of creating and promoting spreads with respect to cancer treatments.

Other Drugs

79.     All Defendants have Acompeted≅ in the establishment, maintenance, control, promotion and marketing of spreads for drugs used to treat various other ailments as well, such as Prevacid[7] [the TAP Defendants], Cefotan[7], Elavil Injection, Faslodex[7], Foscavir[7], Merrem[7], Tenormin[7] Injection and Xylocaine Injection [the AstraZeneca Defendants], KOaTE[7], Kogenate[7], and Cipro[7] [the Bayer Defendants], Lipitor[7] and Synarel[7] [the Pfizer Defendants], Remicade[7] and Topamax[7] [the J&J Defendants], Monoclate-P [the Aventis Defendants], and Recombinate [the Baxter Defendants].

80.     For example, the J&J Defendants= drug Remicade[7] is presently the only drug treatment for rheumatoid arthritis that is reimbursed by the Medicare Program. Until 2002, J&J=s website for Remicade[7] contained a spreadsheet that demonstrated for medical providers how much money they could make by billing Medicare for Remicade[7] at AWP.  As a result, Remicade[7] has been the most widely prescribed and sold rheumatoid arthritis treatment.

81.     All Defendants have chosen to compete on increasing the AWPs and decreasing the acquisition costs for their drugs, thereby increasing the spreads, rather than to compete to lower the prices paid by the Commonwealth and Pennsylvania consumers on the basis, in whole or in part, on the AWP=s for the Defendant=s drugs.

82.     All Defendants have conspired and agreed with one another, and with medical providers and their other purchasers, to maintain and charge inflated AWPs, to establish and realize profits from the spreads for drugs, and to otherwise engage in the unlawful Acompetition≅ of creating, maintaining, realizing and promoting the profits from spreads for drugs.  As a result of such

improper marketing and sales scheme, and the conspiracy and agreement of all Defendants to take part in such scheme, the Commonwealth and Pennsylvania Consumers have been harmed by paying more for drugs than they otherwise would have paid in the absence of Defendants= unlawful conduct.

83.     The unlawfulness of Defendants= marketing and sales scheme through the utilization of spreads is evidenced by the fact that TAP, AstraZeneca and Bayer all must report to the federal government today what have been deemed their actual Aaverage sales prices≅ or AASPs≅ for certain of their drugs B as part of their respective Corporate Integrity Agreements in the Criminal Actions. These ASPs are intended to represent the true average sales prices for these Defendants= drugs because they are prices that are net of all discounts, including free goods, rebates and other financial incentives offered to Defendants= customers.  It is believed and therefore averred that these Criminal Defendants have not acted alone with respect to their admittedly wrongful marketing and sales activities with respect to spreads; rather, it is averred that they acted with the acknowledgment and agreement of the other Defendants named herein to so act.

Provision of Free Goods and Drug Samples

84.     Defendants provided free goods, drug samples and non-billed units of their drugs (collectively Afree goods and drug samples≅) to medical providers and other purchasers with the knowledge and the expectation that medical providers and other purchasers that are the recipients of such free goods and samples would charge consumers to whom the free goods and samples were administered, in order to induce the  providers and other purchasers thereof to prescribe and sell Defendants= drugs over competing drugs or alternative forms of medical care and treatment.

85.     Apart from the use of free goods and drug samples as a A*quid pro quo*≅ incentive or inducement, certain Defendants are known to have used free goods and drug samples as a method of providing hidden price concessions or reductions in the acquisition costs for their drugs.  These Defendants provided such free goods and drug samples with the knowledge and expectation that the free goods would be billed by Defendants= customers to the Commonwealth and Pennsylvania Consumers.

86.     Defendants= offers of free goods and drug samples included not only free shipments of drugs and drug samples, but also free product bundled with other products, such as Abuy ten get one free≅ deals, as well as other arrangements to provide credit, or to forgo payment, for product already delivered.

87.     Defendants used the provision of free goods and drug samples as another form of improper incentive or inducement to cause medical providers and other purchasers to prescribe and sell Defendants= drugs.

88.     The Commonwealth and Pennsylvania Consumers were harmed by Defendants= conduct in providing free goods and drug samples as an inducement in at least two ways: (1) by paying for the costs of the free goods and drugs samples unlawfully billed, and (2) by otherwise paying the inflated AWPs for Defendants= drugs as a result of Defendants= use of free goods and drug samples as an improper A*quid pro quo*≅ incentive to promote the sales of their drugs.

89.     Defendant TAP=s guilty plea to conspiracy, which plea was approved by both Abbott and Takeda, each of whom controlled one-half of TAP=s Board of Directors, involved an admission by TAP to conspiring to violate the PDMA by, *inter alia*, providing free samples of Lupron[7] to

27

medical providers Aknowing and expecting≅ that these medical providers would charge patients for such free samples. As a result, Medicare, Medicaid, and other insurance programs administered by the Commonwealth suffered losses, as did Pennsylvania Consumers, for having paid for those free samples. Although the TAP Defendants paid over $890 million in fines and civil penalties to the federal government as part of said guilty plea, no money was paid to the Commonwealth for losses suffered under Commonwealth programs, other than Medicaid, and no money was paid to Pennsylvania Consumers.

90.     In its guilty plea to federal conspiracy charges, AstraZeneca also admitted that it conspired to violate the PDMA by, *inter alia*, providing free samples of Zoladex[7] to medical providers Aknowing and expecting≅ that these medical providers would bill patients for such free samples. As a result, Medicare, Medicaid, and other insurance programs administered by the Commonwealth suffered losses, as did Pennsylvania Consumers, for having paid for those free samples. Although the AstraZeneca Defendants paid $354.9 million in fines and penalties to federal and state governments, including the Commonwealth, no money was paid to the Commonwealth, other than Medicaid, for losses suffered under Commonwealth programs and no money was paid to Pennsylvania Consumers.

91.     The Amgen Defendants have been implicated indirectly in the wrongful conduct of providing free goods and drug samples by the criminal guilty plea and settlement one of their largest customers, National Medical Care (ANMC≅). NMC pled guilty to federal criminal charges for having billed Medicare for free samples of Amgen Defendant drugs provided by the Amgen Defendants.

Other Financial Inducements

28

92.     Other financial inducements include the provision of trips, consulting opportunities, seminars, gifts, meals and other cash payments.

93.     All Defendants provided such incentives and inducements in order to promote the sale of their drugs at inflated prices.

Fraudulent Concealment

94.     Defendants= scheme and conspiracy included efforts to conceal and suppress their acts and practices, such as the marketing and manipulation of the spreads on prescription drugs.

95.     Defendants concealed their fraudulent conduct from the Commonwealth and Pennsylvania Consumers by controlling the process and methodology by which their AWPs were set. Defendants also prevented the Commonwealth and Pennsylvania Consumers from knowing what the actual acquisition costs were to medical providers and others for their drugs, and they concealed and suppressed from the Commonwealth and Pennsylvania Consumers their provision of free goods and drug samples and other inducements to medical providers and others to induce them to prescribe Defendants= drugs.  Moreover, Defendants= wrongful conduct was of such a nature as to be self-concealing.

96.     The Commonwealth and Pennsylvania Consumers were diligent in pursuing an investigation of the claims asserted in this Complaint.  Through no fault of their own, neither the Commonwealth nor Pennsylvania Consumers received inquiry notice or learned of the factual basis for their claims in this Complaint or their injuries suffered therefrom until recently.  In fact, while the recent federal criminal investigations have uncovered a pattern of unlawful conduct by the Defendants involving the promotion of spreads and the provision of free goods and drug samples, among other things, neither the Commonwealth nor Pennsylvania Consumers know today what the

spreads are, or have been, for Defendants= various prescription drugs because only the Defendants and their customers know the actual acquisition costs for the drugs net of all discounts, incentives and inducements.

97.    By reason of the foregoing, the claims of the Commonwealth and Pennsylvania Consumers are timely under any applicable statute of limitations pursuant to the discovery rule and/or the doctrine of fraudulent concealment.

98.    The Defendants have been aware of their wrongful conduct and conspiracy since at least 1991, and probably before that time.

99.    The Defendants= failure to properly disclose their wrongful conduct and conspiracy, and other acts and omissions as alleged herein, was and is willful, intentional, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of the Commonwealth and Pennsylvania Consumers.

### HOW THE SCHEME AND CONSPIRACY HARMED THE COMMONWEALTH AND PENNSYLVANIA CONSUMERS

100.    The Commonwealth reimburses Defendants for prescription drugs provided to its citizens under the terms of certain programs, such as the Medicaid program , the Pharmaceutical Assistance Contract for the Elderly, or APACE≅ program, as well as other programs for Commonwealth employees, teachers, state employees and others not specifically mentioned herein.

101.    For these programs, the reimbursement for the prescription drugs is based upon the AWP for the drug.  For example, the Commonwealth reimburses medical providers an amount equal to AWP minus ten percent, plus a dispensing fee, for drugs prescribed to patients in the Medicaid program.

102.    Thus, when drug companies intentionally inflate the AWP and lower the acquisition costs in order to manipulate and market the spread for drugs, the companies increase the reimbursement amount paid by the Commonwealth to medical providers in those programs.

103.    The Commonwealth also is a purchaser and/or reimburser of prescription drugs. For example, the Commonwealth purchases prescription drugs for its employees through the Pennsylvania Employees Benefit Trust Fund (the APEBTF≅) for its current and retired employees.

104.    The PEBTF has used a variety of Pharmacy Benefit Managers to administer the prescription drug benefits for the Commonwealth=s active and retired employees.  While the Pharmacy Benefit Managers have changed over time, each Pharmacy Benefit Manager has used AWP as a component of a formula to determine the Commonwealth=s prescription costs.

105.    Thus, when drug companies intentionally inflate the AWP in order to manipulate and market the spread for drugs, the companies increase the amounts paid by the Commonwealth for its employees and others, and also increases the co-pays paid by the employees themselves.

106.    Pennsylvania Consumers buy prescription drugs and many citizens pay for those drugs based in whole or in part on the AWP for the drugs.

107.    Like the Commonwealth, many Pennsylvania Consumers buy prescription drugs through a health plan administered by a Pharmacy Benefit Manager or insurer that uses AWP as a component of a formula to determine prescription drug costs, and computes a co-payment based upon the purchase price of the drug.

108.    Thus, when drug companies intentionally inflate the AWP in order to manipulate and market the spread for drugs, the companies increase the amounts paid by the Pennsylvania Consumers for prescription drugs that they purchase through these health plans.

31

109.    In particular, Pennsylvania Consumers who purchase prescription drugs under the Medicare program pay more for prescription drugs when AWP is intentionally inflated.  The Medicare program reimburses medical providers based upon the AWP for covered drugs.  Under the program, senior citizens participating in the federal Medicare program pay 20 percent of the allowable cost of drugs reimbursed (the federal government pays 80 percent).

110.    Thus, when drug companies intentionally inflate the AWP in order to manipulate and market the spread for drugs, the companies increase the Medicare co-payment required of senior citizen Pennsylvania Consumers.

### COUNT I
### UNJUST ENRICHMENT

111.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

112.    The Commonwealth and Pennsylvania Consumers have conferred benefits on Defendants.

113.    Defendants have appreciated and retained the benefits conferred on them by the Commonwealth and Pennsylvania Consumers.

114.    By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits from the Commonwealth and Pennsylvania Consumers under circumstances such that it would be inequitable and unjust for these Defendants to retain them without payment of value.

115.    For example, as more fully set forth herein, Defendants, through the spreads created and promoted by them for their drugs, have collected payments for drugs from the Commonwealth

32

and Pennsylvania Consumers which payments vastly exceeded the payments to which Defendants are entitled as a matter of law.

116. Defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them by the Commonwealth and Pennsylvania Consumers, either directly or indirectly. The claims of the Commonwealth and Pennsylvania Consumers seek to recover the payments made by Commonwealth Programs and Pennsylvania Consumers for Defendants= drugs.

117. The Commonwealth and Pennsylvania Consumers are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the profits derived by Defendants by means of the overcharges they imposed upon the Commonwealth and Pennsylvania Consumers.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT II
## MISREPRESENTATION/FRAUD

118. The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

119. By acting and/or failing to act as alleged in this Complaint, Defendants have negligently and/or intentionally misrepresented the prices of their drugs paid for by the Commonwealth and Pennsylvania Consumers and/or they have committed fraud on the Commonwealth and Pennsylvania Consumers.

120. Defendants, by their acts and omissions set forth herein, have knowingly, intentionally, recklessly and/or negligently have made false and fraudulent material statements and

33

representations and material omissions of facts relating to the costs of their drugs, which misrepresentations and/or omissions, include, but are not limited to, establishing and reporting inflated AWPs for their drugs; promoting spreads for such drugs to Defendants= customers; providing free goods and drug samples to their customers with the knowledge and/or expectation that such customer would charge for such free goods and drug samples; providing other incentives and inducements to their customers to unduly influence decisions about the prescription and sale of Defendants= drugs; and working alone and in conjunction their with co-Defendants, customers and others to conceal their conduct from the Commonwealth and Pennsylvania Consumers.

121.    Defendants intended that the Commonwealth and Pennsylvania Consumers would be misled by their aforesaid acts and omissions and would rely on their misrepresentations and omissions to their detriment.

122.    The Commonwealth and Pennsylvania Consumers were misled and did, reasonably and justifiably rely to their detriment on the misrepresentations and omissions by Defendants.

123.    As a direct and proximate result of Defendants= misrepresentations and omissions, and the concealment and suppression of that conduct by Defendants, the Commonwealth and Pennsylvania Consumers have suffered and will continue to suffer damages.

124.    In addition, Defendants concealed and suppressed and/or omitted material facts about their unlawful agreements and discussions with one another and others, and they concealed and suppressed their unlawful acts and omissions as set forth more fully herein.

125.    As a result of Defendants= acts of concealment and suppression, and their misrepresentations as to the true costs of their drugs, especially the fact that some of their drugs were provided for free, the Commonwealth and Pennsylvania Consumers were unaware of the

above-referenced facts, and would not have paid the artificially inflated prices for Defendants= drugs had they known of the facts Defendants misrepresented, concealed, suppressed and omitted.

126.    Indeed, one requirement of the federal government=s settlements of the criminal charges against TAP, Bayer, AstraZeneca and the GlaxoSmithKline Defendants is that all these Defendants must now report the true, average sales prices (or AASPs≅) of their respective drugs to the government and must allow regular auditing of their sales and marketing practices to ensure that, among other things, there is more transparency in pricing for the benefit of the Commonwealth and that a true average sales price for these Criminal Defendants= drugs is, in the future reported.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT III
## CIVIL CONSPIRACY

127.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

128.    As set forth more fully above, beginning at least as early as 1991, the exact date being unknown to the Commonwealth and Pennsylvania Consumers, and continuing thereafter until the present, Defendants, between and among themselves and others, entered into an agreement and/or otherwise engaged in a continuing conspiracy to deceive and defraud the Commonwealth and Pennsylvania Consumers by causing them to pay more for Defendants= drugs than they otherwise would have in the absence of Defendants= conspiracy.

129.    Pursuant to the widespread unfair and deceptive marketing and sales scheme and conspiracy alleged herein, and in furtherance thereof, Defendants and their co-conspirators engaged

in a wide range of activities, the purpose and effect of which was to deceive and defraud consumers, including Pennsylvania Consumers, and the states, including this Commonwealth, and to act or take substantial steps in furtherance of the conspiracy.  Those acts include the following:

1.   Defendants discussed and agreed among themselves and with their co-conspirators that they would provide free goods and drug samples to medical providers and other purchasers of their drugs and encouraged them to charge for such free goods and drug samples.

2.   Defendants discussed and agreed among themselves and with their co-conspirators that they would inflate the AWPs for their drugs.

3.   Defendants discussed and agreed among themselves and with their co-conspirators that they would establish, market and promote spreads between the AWPs and the actual acquisition costs for their drugs as an incentive and inducement for medical providers and other purchasers to prescribe, or cause to be prescribed, and to sell, or cause to be sold, their drugs instead of other drugs or alternative modes and methods of healthcare treatment.

4.   Defendants discussed and agreed among themselves and with their co-conspirators that they would provide other inducements and incentives to medical providers and others to prescribe, or cause to be prescribed, or to sell, or cause to be sold, their drugs, instead of other drugs or alternative modes and methods of healthcare treatment.

5.    Defendants discussed and agreed among themselves and with their co-conspirators that they would work together and with others to oppose and avoid efforts to reduce prescription drug costs and/or to change the way in which payors reimburse for prescription drugs, and that they would act to conceal and suppress their conduct to prevent detection by others, including the Commonwealth and Pennsylvania Consumers.

130.    Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy with intent, malice and/or with knowledge of the injury and damage it would cause to the Commonwealth and Pennsylvania Consumers and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

131.    As a direct and proximate result of Defendants= conspiracy as alleged herein, the Commonwealth and Pennsylvania Consumers have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

### COUNT IV
### VIOLATION OF THE PENNSYLVANIA
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

132.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

133.    The Commonwealth, and the individuals and other entities for which it brings the instant action are Apersons≅ within the meaning of 73 P.S.Ə 201-2(3).

134.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein, Defendants are engaging in trade or commerce directly or indirectly affecting the people of this Commonwealth within the meaning of 73 P.S. ∋ 201-2(3).

135.    The Defendants, by engaging in the practices set forth above, have:

1.    Misled the Commonwealth and the entities and consumers on whose behalf this action is brought that Defendants= drugs are being sold or provided at legally permissible prices;

2.    Forced consumers to pay inordinately high cash prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs;

3.    Improperly influenced medical providers and other purchasers through practices more fully set forth in preceding counts to prescribe drugs with inflated AWPs to the detriment of consumers;

4.    Engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

136.    The Pennsylvania Consumers purchased Defendants= products for personal, family or household use.

137.    Defendants= conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. ∋ 201-2(4), including, but not limited to, the following:

1.  causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. ∋ 201-2(4)(ii);

2.  representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. ∋ 201-2(4)(v);

3.  advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. ∋ 201-3(4)(ix);

4.  making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. ∋ 201-2(4)(xi);

5.  promising or offering prior to the time of sale to pay, credit or allow to pay buyer, any compensation or reward for the procurement of a contract for purchase of goods or services with another or others, or for the purpose of attempting to procure or procuring such as contract of purchase with such other person or persons when such payment, credit, compensation, or reward is contingent upon the occurrence of an event subsequent to the time of the signing of a contract to purchase within the meaning of 73 P.S. ∋ 201-2(4)(xii); and

6. engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion of misunderstanding within the meaning of 73 P.S. ∋ 201-2(4)(xxi).

138. Defendants= conduct more fully described herein, is, accordingly, proscribed and declared unlawful by 73 PA. STAT. ∋ 201-3.

139. Defendants= conduct as more full described herein was willful within the meaning of 73 P.S. ∋ 201-8.

140. The Attorney General has determined that these proceedings to enjoin Defendants= conduct are in the public interest.

141. The Commonwealth therefore seeks the entry of a permanent injunction restraining Defendants= unlawful conduct and mandating corrective measures pursuant to 73 P. S. ∋ 201-4.

142. The Commonwealth also requests that the Court require Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their prescription drugs during the period of time Defendants= unlawful conduct took place, pursuant to 73 P. S. ∋ 201-4.1.

143. In addition, and in light of Defendants= willful and violative conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

1. as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation per Defendant, and

2. as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation per Defendant.

40

144.    The violations by the Defendants include, but are not limited to:

1.    each sale to a medical provider or anyone else with the understanding and expectation that a medical provider will charge the patient at the inflated AWP price;

2.    each time the medical provider charges a patient at the inflated AWP price;

3.    each delivery of a free sample to a medical provider with the understanding and expectation that the provider will charge the patient for that free sample;

4.    each time the medical provider charges a patient for a free sample;

5.    each time an incentive is given to anyone to cause a patient to be billed at the inflated AWP;

6.    each time a patient is charged at the inflated AWP as a result of incentives given by or on Defendants behalf;

7.    each request for reimbursement made to a Commonwealth program;

8.    each publication of an inflated AWP; and

9.    each time a patient and/or his or her insurer is charged at an inflated AWP.

145.    Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violations of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

146.    As a result of the Defendants= unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## **AD DAMNUM**

WHEREFORE, the Commonwealth demands the following:

1.  Judgment in its favor, and against Defendants;

2.  Compensatory damages;

3.  The entry of an Order permanently enjoining each and every Defendant from continuing the deceptive and/or unfair acts or practices complained of herein, and requiring corrective measures;

4.  On behalf of itself and Pennsylvania Consumers, disgorgement by Defendants, and each of them, of all profits and gains earned in whole or in part through the unfair and/or deceptive acts or practices complained of herein;

5.  On behalf of itself and Pennsylvania Consumers, compensatory damages;

6.  On behalf of itself and Pennsylvania Consumers, statutory restitution ;

7.  On behalf of itself and Pennsylvania Consumers, exemplary and punitive damages in an amount in excess of the jurisdictional limit;

8.  In its own right, civil penalties in the amount of $1,000 per violation of the Unfair Trade Practice and Consumer Protection Law, and $3,000 per Defendant for each violation involving a victim 60 years old or older;

9.  All elements of interest, including but not limited to pre- and post-judgment interest;

10.     Attorneys fees, expert witness fees, costs of investigation, and other reasonably related costs, including court costs, litigation expenses, and fees;

11.     The entry of an Order permanently enjoining each and every Defendant from continuing the deceptive and/or unfair acts or practices complained of herein, and requiring corrective measures; and

12.     Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

The Commonwealth demands a trial by jury of all issues so triable in this cause.

Respectfully submitted,

**COMMONWEALTH OF PENNSYLVANIA**
**OFFICE OF THE ATTORNEY GENERAL**

By:_____
    Gerald J. Pappert, Attorney General
    (I.D. No. 53614)
    Alexis L. Barbieri, Executive Deputy Attorney General
    (I.D. No. 37272)
    Office of Attorney General
    16th Floor, Strawberry Square
    Harrisburg, PA 17120

    **KLINE & SPECTER**
    **A PROFESSIONAL CORPORATION**

    Shanin Specter, Esquire
    (I.D. No. 40928)
    Donald E. Haviland, Jr., Esquire
    (I.D. No. 66615)
    Louis C. Ricciardi, Esquire
    (I.D. No. 70734)
    1525 Locust Street, 19th Floor
    Philadelphia, PA 19102
    215-772-1000 telephone
    215-735-0957 facsimile

© 2004 KLINE & SPECTER
A PROFESSIONAL CORPORATION