# Exhibit M

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456

Master File No. 01-CV-12257-PBS

- - - - - - - - - - - - - - - - - - -x

IN RE:   PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

_____

THIS DOCUMENT RELATES TO:

United States of America ex rel.

Ven-A-Care of the Florida Keys, Inc.,

et al., v. Dey, Inc., et al.,

Civil Action No. 05-11084-PBS

- - - - - - - - - - - - - - - - - - -x

(Cross caption follows on next page.)

July 23, 2008

9:01 a.m.


VOLUME IV


Continued Videotaped Deposition

of JOHN LOCKWOOD, M.D.

1079

1  not sure, that was also a distributor type
2  wholesaler.
3      So we had a number of sources that
4  involved pricing directly from wholesalers, both
5  distributor type wholesalers and full line
6  wholesalers as well as GPO prices.
7      Q.  What's the distinction you draw between
8  distributor type wholesalers and full line
9  wholesalers?
10     A.  You know, I don't draw a lot of
11 distinctions.  They both have the same wholesale
12 license, as far as I know, in most states; but in
13 many circumstances, but not all circumstances,
14 distributors tend to buy low and sell higher, and
15 they don't do chargebacks; whereas many of the
16 full line wholesalers are in the business of
17 buying high and selling lower, which involves the
18 whole chargeback mechanism, if -- if there is a
19 contract involved.
20     So, um, and it's interesting that if
21 you buy at the list price from McKesson, the list
22 price at McKesson is many times much, much higher

1080

1  than the purchase price at a distributor/
2  wholesaler.
3      So I think they're all wholesalers,
4  there are different in how they do business with
5  providers or, you know, with those that can buy
6  the drugs.
7      Q.  Let me summarize and make sure I got
8  all the categories that you mentioned in terms of
9  your sources of pricing.
10     One category were generic wholesalers
11 like J.J. Balan and Anda, for instance.
12     Another category would be GPOs like
13 Innovatix and Servall; is that right?
14     A.  Yes.
15     Q.  And perhaps Florida Infusion but you
16 are not sure?
17     A.  Well, Florida Infusion is not really a
18 GPO, they are a wholesaler, distributor type
19 wholesaler.
20     Q.  That's right, that's a possibility but
21 you are not sure?
22     A.  I'm not sure if they carried the

1081

1  inhalant drugs or not, I think they did; but I
2  know that J.J. Balan and Anda did for sure, we
3  purchased drugs from them.
4      Q.  And that covers the categories of
5  sources of information of Roxane's pricing?
6      A.  Well, and full line wholesalers like
7  McKesson and you can buy either their list price
8  or at contract price if you had a GPO
9  relationship that worked through McKesson.
10     Q.  I believe Servall was one of McKesson's
11 GPOs?
12     A.  Yes, correct.
13     Q.  Do you mind refreshing my memory as to
14 when Ven-A-Care became a Servall member?
15     A.  I just looked at that actually
16 yesterday.  March of 2000 I believe is when we
17 became a Servall member, and we started getting
18 Servall prices, as I recall, almost immediately
19 after, after signing the contract; but prior to
20 that they were an Innovatix member.
21     We were not buying direct from the
22 company.  I don't believe we've made any effort to

1082

1  buy direct from the company, at least I'm not
2  aware of any.
3      Q.  When you say "not buying direct from
4  the company," you mean not buying directly from
5  Roxane itself?
6      A.  Yes, we didn't do that; but, um,
7  meaning we didn't call the company directly to
8  purchase drug.  How you define "direct" is a
9  whole other issue, but I think that's -- I think
10 that's it.
11     Now there may be other companies that I
12 didn't mention that we had sources from, for
13 instance we did have, you know, there were some
14 other GPOs that we may have had access to in the
15 1995 time range that had Roxane products, but not
16 ipratropium, obviously, because it didn't hit the
17 market until later.
18     Q.  Do you remember approximately when
19 Roxane's ipratropium bromide did hit the market?
20     A.  You know, my recollection is '96-97
21 time frame.
22     Q.  I take it Ven-A-Care has never signed a

1103

1  is eight years later, you don't remember what was
2  written, if anything, about Roxane in that
3  disclosure statement; right?
4      A.  No, because we would include pricing
5  information and for some companies we might have
6  more explicit materials than others. We might
7  have marketing flyers or faxes or a variety of
8  things that might speak to the issue, and for
9  other companies we didn't. But the disclosure
10 statements tended to identify all of those.
11     Q.  Okay. So sitting here today you don't
12 know, in terms of the exhibits or documents about
13 Roxane's pricing, you can't remember what, if
14 anything, was in there?
15     A.  I can't tell you the contents of that
16 other than I -- it would have been a compilation
17 of pricing information and other evidence that we
18 gathered over time for Roxane.
19     Q.  Now I recall from your last day of
20 testimony, which was a couple months ago, that
21 you had mentioned collecting information from
22 Servall, which was that McKesson-connected GPO,

1104

1  on about 25 NDC's?
2      A.  Yes, sir.
3      Q.  And you sent that information on to the
4  Boston attorney's office; do you remember that?
5      A.  Yes, sir, yes.
6      Q.  And I think you testified that was
7  sometime in early 2000; does that sound right to
8  you?
9      A.  Well, in part I looked at some -- I
10 looked at that Servall document yesterday to look
11 at that issue and we signed the contract in March
12 of 2000 and it took me a little time to figure
13 out how to make all that work and print and do
14 things and provide that information to the
15 government, but it was sometime during 2000, to
16 the best of my recollection, meaning I don't
17 think it was in March of 2000, um, but it was
18 probably by, I would think, by April when we were
19 doing this, we had figured out how to run the
20 software and were able to print out individual
21 pricing reports, and a very simple thing to do
22 for the ipratropium drugs for Roxane, and then we

1105

1  were able to figure out how to print the entire
2  data set to a file and then import that data set
3  into something like Microsoft Access; so we
4  ultimately provided the government the pricing on
5  all the NDCs that were in the McKesson database.
6          So my recollection of how this happened
7  would be that we printed individual sheets, I
8  believe in April or prior to this, um, but the
9  entire data dump, so to speak, of the whole
10 database occurred later within the year and we
11 updated that database at I think 10 or 11 or 12
12 points in time between 2000 and 2002 so that we
13 had a data dump of ballpark 25,000 NDCs that we
14 gave to the government on 10 or 11 occasions at
15 varying points in time during that time period
16 and after.
17     Q.  What was the purpose of sending that to
18 the government?
19     A.  We were attempting to disclose as much
20 information as we could to the Federal
21 Government, and ultimately the States, about
22 pharmaceutical pricing so that they could

1106

1  understand for themselves what was happening,
2  they could look for, you know, for themselves at
3  the type of pricing that was occurring and on a
4  variety of different drugs.
5      Q.  So from that database they could
6  theoretically look up Roxane's NDCs that you had
7  listed in the Complaint and see whether your
8  pricing was the real pricing that could be
9  obtained?
10     A.  Yes, sir, and then ultimately we were
11 able to figure out a way to duplicate the
12 program, actually the Econolink program, and gave
13 them a laptop with a functioning version of the
14 Econolink program on it that they could basically
15 run the program and -- and show them what it was
16 like to be a pharmacist looking at the Econolink
17 program and the prices that were available.
18     Q.  When did you do that? When did you get
19 the laptop with the functioning software?
20     A.  I would say late 2000 or perhaps early
21 2001, I'd have to look, but somewhere or, yeah,
22 late 2000 to maybe mid 2001, I'd have to look

1107

exactly, but sometime when that became available we turned that over to the Government so they could look at the entire range.

Q. I messed up the question earlier. I just wanted to clarify the question. My question was when did you give the Federal Government the laptop with the functioning Econolink software, and I think you said somewhere late 2000 or around then?

A. Yes, late 2000 or perhaps 2001, I could try to find the date at some point, but yes.

Q. Now, what kind of information is available through this Econolink Servall database?

A. It has an AWP column -- well, let's first of all say it has the NDC number, it has the company, the package size, a variety of just core information about the product --

Q. Okay.

A. -- that tells you essentially what product you've got.

It then has a column for the AWP, which

1108

my understanding is McKesson got a download from First DataBank for that periodically; you had a column telling you the date that AWP had been updated by McKesson, it may or may not be the exact AWP that was in the market at that time but the date that it had been updated; and it gave you the list price at McKesson which in some -- in general we believe was relatively close to the WAC price, within five percent usually of McKesson's acquisition cost; and it gave us contract price if a contract was available on that product, and the dates, relevant information like that.

And then the program would allow you to look for drugs by any variety of methods, the McKesson Econolink number, by NDCN, buyer brand name and by generic name, and perhaps some other things that were internal McKesson things.

So you could look up drug in a number of different ways and then you would find if there were generics to the drug or not, and there was one aspect of it where you could -- they

1109

actually had a little thing where it would show you the spread and it was labeled spread between the AWP and the acquisition cost that was calculated by the software. It was user-friendly information about drugs and prices and would show you the difference between the contract price and the AWP or the list price and the AWP.

Q. When you say it would show you the spread or the difference between the AWP and the contract price or the list price, would it show it to you in a numeric form? In other words a difference in dollars between them or as a percent?

A. In numerics, a dollar amount.

There is -- the Econolink manual actually speaks to that spread, I don't know if you want to call it window, or it's essentially a, you know, you could push a button and it would bring up at some point a small window that would show the AWP and your purchase price and give you a spread dollar difference, and they called it

1110

the spread.

Q. That was the actual word that was used on the database?

A. Yes, sir.

Q. When you say "contract price," what was your understanding of what contract price represented?

A. Um, the contract price, um, would represent a GPO price and which in general was a Servall price. There may be a few drugs that Servall didn't have that would be covered by that, I believe -- and I believe were covered by Innovatix pricing, and we had some discussion, as I recall, with McKesson about that because normally you have one GPO but if a GPO doesn't cover all the drugs you are allowed to have a backup, so to speak, for additional drugs. So the prices were the Servall contract prices, and there's not always a contract on every -- on every drug.

Manufacturers bid to be on those contracts. If they don't win the bid then they're

1111

not on there. But there is then also a list price, which is a price you can buy at without a contract.

Q. You said a little bit earlier it was very simple to pull up Roxane's ipratropium bromide through this process. How would that happen? How would you pull up the price if you wanted to look at what Roxane's ipratropium bromide was and in particular an AWP versus its spread; what would you do mechanically?

A. You would click on the Econolink Icon on the computer, you would open the software program, and you had a number of choices from the menu and you could -- and you could essentially look at the items in the catalog of drug prices, and when you brought up -- if you typed in NDC number, you could search by NDC number, you could search by generic name, when it brought up the drug it had two ways of producing information, one was called a long form, which presented all the information on that drug on one sheet of paper, and it had a short form which presented

1112

all the information on that drug in smaller print, usually from left to right on -- on a sheet of paper; and I think there was a little more information in the long form than the short form, as I recall, but I'm not 100 percent sure of that, but I believe that was the case.

Q. Approximately how long would it take you to do this if you were going to, let's say, calculate the spread and get this pricing information on an NDC of Roxane of ipratropium bromide; how much time would it take you to generate this?

A. Well, you know, if you had an NDC in mind you could type the NDC in, the pricing information popped up immediately, and it had the AWP and the list price and the contract price and you could do the mathematics yourself, or there was another way to go into the software where you would bring up the window that would calculate it for you, it would do the math for you. So you could do it either way, whichever you preferred.

Q. Couple of minutes per NDC or something

1113

like that?

A. Oh, I wouldn't say that long. I mean how long it takes you to type in the number, the information popped up immediately, it was immediate, and however long it took you to do the math in your head, which, you know, if you want to calculate to the penny that's one thing, but if the AWP is $30.00 and your purchase price is 10, well, or 9.98, you know, you're going to, based on the AWP spread is going to be about $20.00, I mean, and you could bring up a whole host of drugs under a generic listing, for instance Albuterol or ipratropium, and would list all the generic ipratropiums and sometimes even the brand, list them all in a line across, and you could look at which one had the best AWP and which one had the lowest purchase price.

Q. Okay, so maybe even less than one minute per NDC?

A. Yes, I would say very -- I would say very quickly.

Q. Going back to, well, actually let me

1114

connect this back to the disclosure statement.

Do you recall whether any of these printouts from the Econolink, the Servall information we're talking about, was sent along with the disclosure statement that we're talking about in paragraph 19 of Roxane 90?

A. I believe they were, but I don't -- I can't tell you a 100 percent, but I would say that by April of 2000, by April 10th I believe we had functioning Econolink Servall prices and, you know, you had to learn how to use these things and one of the easier things to do would be to print a simple sheet, so I believe they were there, yes.

Q. Let's move ahead to paragraph 30 of Roxane 90, which is on page 15. And if you wouldn't mind just briefly reviewing paragraph 30, which carries over to page 16, and I have a couple of questions to ask you about this paragraph.

[Witness peruses document.]

A. Okay.

1115

1  Q. In particular, at the top of page 16,
2  last sentence of paragraph 29 you talk about the
3  Relator's, that being Ven-A-Care's, investigation
4  that revealed that each of the defendants,
5  presumably including Roxane, when responding to
6  Texas Medicaid either affirmatively lied about
7  their true prices or omitted material information
8  to mislead Texas.
9      Do you see allegation?
10 A. Yes, I do, um hum.
11 Q. Can you explain to me what the basis of
12 that allegation was.
13 A. Well, we -- and I need to sort of sort
14 through the dates and times about exactly what we
15 had and when -- but we very quickly started
16 working with the State of Texas, especially once
17 we -- well, the benefit of the -- one of the
18 benefits of the Econolink software was that we
19 could easily pull up NDCs and drugs and look at
20 pricing very quickly as opposed to having to have
21 a huge stack of paper to sort through.
22     So at some point we had been working

1116

1  with the State of Texas for a while and we worked
2  with the Texas Medicaid Program and they asked us
3  to really come out and look at a lot of their
4  drugs, as many as we could tolerate looking at,
5  to help them find discrepancies between, um,
6  prices that they were paying or prices that were
7  reported to them.
8      Sometimes the difference was that they
9  were reported one WAC and -- and we felt we could
10 show that McKesson was buying the drug at a
11 different WAC, or perhaps they reported a certain
12 number and they were showing them that the
13 contract prices that we thought were often widely
14 available were much lower; but we went through
15 that process, and as part of that -- of helping
16 them with that they at some point made available
17 information to us showing what manufacturers had
18 reported to them, and Texas requires that you
19 fill out a form and list a variety of prices on
20 that form, and we were at times working with the
21 Attorney Generals and the Medicaid program people
22 to compare our prices to the prices that were

1117

1  reported to Texas.
2  Q. When was this project when you reviewed
3  these documents?
4  A. Well, we started that in early 2000, is
5  my recollection, um, and what I recall about it
6  is that the Econolink software made that much
7  more -- much easier to do, because we had the
8  information electronically, we could do a
9  printout, for instance, you could not only search
10 an NDC you could search an NDC range.
11     So if Roxane's labeling code is 00054,
12 you could query the system for NDCs 00054 with
13 all zeros through 00054 all nines, and it would
14 then give you a printout of all of the Roxane
15 drugs with their AWPs, their list prices and
16 their contract prices so that we could look at a
17 manufacturer much easier, we could go print out
18 and look at it and compare those and compare
19 those to the reports that had been given to Texas
20 or for the prices that Texas was paying or both.
21 Q. And the Econolink also had the WACs in
22 it, didn't it?

1118

1  A. Well, it had a -- the list price as
2  best we could determine was within five percent
3  of the WAC, so it was very close representation
4  of McKesson's actual acquisition cost, in their
5  mind at least, their -- what they're going to
6  call WAC, which I would probably prefer to call
7  their invoice price.
8  Q. Now, did you share the Econolink
9  software with the State of Texas Medicaid
10 personnel?
11 A. Yes, we did. Pricing information-wise
12 initially, and then ultimately we gave the State
13 of Texas a laptop with a functioning version of
14 Econolink.
15 Q. When was that?
16 A. And -- and ultimately printouts --
17 well, ultimately I believe the databases that we
18 created from the printouts, by importing a text
19 file into Microsoft Access it allows you to
20 manipulate the data in more ways. You can divide
21 AWP by list price very simply in a column; you
22 can divide AWP by contract price very simply in a

1139

1  I've just handed you what's been marked
2  as Roxane 96, it appears to be a document that's
3  Bates labeled VAC MDL 43246 through 43247. It
4  appears to be a cover sheet fax from Ven-A-Care
5  to Rob Vito, dated April 5, 2000, and then
6  attached to it appears to be a printout from
7  McKesson of a product sold to Ven-A-Care on March
8  29, 2000.
9      Do you recognize this document?
10     A.  Yeah, this is actually, I think this is
11 an invoice.  I mean it says invoice at the top of
12 it.  So it's invoice verification and these --
13 the 11.72 and the I guess 28.12 appear to match
14 up for those NDC numbers; but I would suspect, at
15 least, that based on the date of this that these
16 purchases I suspect are based on the Servall
17 contract, I'm at least suspicious that they are,
18 or if not then the Innovatix contract with
19 McKesson.
20     So you can see that they're, you're
21 correct, the 11.72 is a little cheaper than the
22 price in the preceding page of 12.95, yes, and

1140

1  apparently we did send these to Rob Vito.
2      Q.  So does it appear to you that the
3  purchase that's indicated on or about March 29,
4  2000 in Roxane 96 is the source of the prices
5  that you have listed here at the top of page 46
6  of the Complaint?
7      A.  Well, whether they were the source or
8  not, they certainly would be a source. Whether
9  they are the only one or not, you know, I don't
10 know what the, you know, I don't know if these
11 are the Servall contract prices or if they would
12 be the Innovatix contract prices or if there
13 would be a difference in those; but yeah, they
14 are consistent with I think what's in the
15 Complaint.
16     Q.  And these prices that are listed for
17 the two ipratropium bromide NDCs for Roxane on
18 Roxane 96 Exhibit, if these were subject to the
19 Servall contract these are the prices that would
20 be available to all the members that were part of
21 the Servall GPO; is that right?
22     A.  Yes, sir.

1141

1      Q.  Do you have any idea how many members
2  were in the Servall GPO around March 2000?
3      A.  Well, Servall was a GPO, it was my
4  understanding that was for small independent
5  pharmacies that typically didn't have a lot of
6  revenue and based on their revenue couldn't get
7  better deals.
8      So if you were a very high volume,
9  independent pharmacy McKesson would bring you
10 into what I think was called McKesson Select,
11 which was their GPO, but if you weren't high
12 enough volume for them they would kind of point
13 you to Servall.  But I'm sure Servall would be,
14 my guess would be had several thousand members,
15 but they would be all small, independent
16 pharmacies without high volume, so by no means
17 the best prices in the marketplace.
18     Q.  I just want to be clear that these
19 particular prices, as far as you knew, would be
20 available to thousands of these small,
21 independent pharmacies like Ven-A-Care.
22     A.  That is correct, and if they were

1142

1  Innovatix prices they would also be available to
2  people who fit into the correct category at
3  Innovatix.
4      Q.  And could they be non-contract prices,
5  could these have been prices that were available
6  directly to any member, any properly ordering
7  pharmacy from McKesson?
8      A.  I don't -- I don't think the -- I don't
9  think the McKesson list price is on this invoice
10 and I'm -- my recollection is that the McKesson
11 list price was not $11.72, and if we were buying
12 without a contract I think we would be paying the
13 McKesson list price, which would be a higher
14 number than this, and I don't know what that
15 number is.
16     Q.  Okay.
17     MR. GORTNER:  Let's take a brief break.
18     THE VIDEOGRAPHER:  The time is 3:11.
19 We're going off the record. End of tape four.
20     (Whereupon, a brief recess was taken).
21     THE VIDEOGRAPHER:  The time is 3:27.
22 We're back on the record.  Tape number five.

1155

1  carriers, I suspect that Mark Jones and Zach
2  Bentley would probably have nor information on
3  that particular issue.
4      Q.  Would you turn to page 20 of the
5  Complaint.  This is referring to Roxane 92.  I
6  want to focus your attention on paragraph 42
7  which carries over from page 20 and 21, and in
8  particular Ven-A-Care alleges that the defendants
9  use various forms of media to publicize the price
10 and costs of their drugs, and what I want to do
11 is tick through some of these categories and have
12 you tell me whether you know if Roxane, in fact,
13 used any of these methods for its ipratropium
14 bromide drug as alleged in this Complaint.
15     So let's start with direct mailings or
16 electronic communications to pharmacies, for
17 instance, which Ven-A-Care was; do you contend --
18 that's okay, go 'head.
19     A.  I, um, well, I can speak to some of
20 these.  The very first would be that some
21 manufacturers, when they do price updates, send
22 pricing updates directly to the state Medicaid

1156

1  agencies, and one example of that by Roxane would
2  be in fact that Roxane is required to send their
3  prices directly to the State of Texas Medicaid
4  Program by the rules of their program, so that
5  Roxane did do that, I can say --
6      Q.  Let me interrupt you for a moment,
7  sorry, Dr. Lockwood, it would be quicker, let me
8  ask more specific questions that way I think it
9  will be quicker to ask the information I'm
10 actually looking for, which is did Roxane ever
11 directly mail Ven-A-Care a price sheet, for
12 instance, or an advertisement?
13     A.  I'm not aware of one in our documents.
14 I guess there could be.  I'm not aware of one
15 and/or whether we were marketed by a GPO on
16 Roxane's products. I found one for Dey that we
17 spoke about earlier after having looked for it,
18 but I don't recall one right now.
19     Q.  Okay.  Do you recall ever seeing an
20 advertisement, a publication like Medical
21 Economics for Roxane's ipratropium bromide
22 product?

1157

1      A.  You know maybe, and I would have to
2  look.  I don't -- I don't know that I want to
3  absolutely claim that that's the case, but that
4  does ring a bell in my mind, that they may have
5  had some small advertising things in the Redbooks
6  or whatever that I would probably have to look to
7  see; but there's something ringing a little bell
8  that perhaps there were some in, like, Medical
9  Economics.
10     Q.  But you don't know for certain right
11 now?
12     A.  I would not say for certain, no.
13     Q.  And if Ven-A-Care had, in fact,
14 received or had a copy of such an advertisement
15 would it have produced it in this litigation?
16     A.  If we found it and knew we had it, yes,
17 if -- we certainly would have tried to if we
18 found it, yes.
19     Q.  How about any advertisements by Roxane
20 with respect to ipratropium bromide and drug
21 topics?
22     A.  Um, I don't recall one right now, but

1158

1  could I absolutely say that it is the case, no, I
2  couldn't.
3      Q.  How about any ads by Roxane regarding
4  ipratropium bromide in PDR generics?
5      A.  I would have to look.  I can't tell you
6  now that there was or wasn't.  I don't recall
7  one.
8      Q.  And you don't recall any advertisements
9  provided directly to physicians or pharmacists by
10 any Roxane drug company representatives?
11     A.  Um, no, I don't recall any by
12 representatives from -- from Roxane, the company;
13 as I said, it may -- sometimes there is some
14 marketing material from the GPOs, I would have to
15 go look.
16     Q.  Now, is there any GPO in particular
17 that you think or believe may have marketed
18 Roxane's drugs to you?
19     A.  I don't, um, I don't have one in mind
20 in particular but, for instance, I saw a
21 document, this J.J. Balan document, they would
22 often telemarket to us on inhalation drugs in

1159

general and say look, are you in the market for, you know, Albuterol or ipratropium or solutions or inhalers or this or whatever, and then if we said yes they would send us the, you know, the current prices that were available and if there were discounts or rebates or whatever associated with that they would do that, and the J.J. Balan that I looked at here, as I recall, had some Roxane drugs on it.

Q. It didn't exclusively list Roxane drugs though, did it? It had other companies' drugs?

A. Yes, sir, definitely. In fact, some of them really marketed a host of inhalation drugs from maybe several manufacturers. They were looking to generate sales, no question.

Q. Do you have any recollection of any GPO, including J.J. Balan, marketing specifically Roxane's ipratropium bromide to you?

A. Um, right now I don't, I don't have any that I can think of. It would be me going through the documents that have been supplied to you and looking for them. I can't -- I can't

1160

maintain that I remember every document.

Q. I'm not asking you about whether you have a document that has a Roxane price on it; what I'm asking you very clearly is whether sitting here today you have any recollection of a GPO person on the phone or in person marketing specifically a Roxane drug to you.

A. I don't, but the guy who took most of those phone calls would be Luis Cobo, as the pharmacist at Ven-A-Care he took -- would take the calls from telemarketers, from wholesalers. They all wanted to speak to the pharmacist.

Q. That's not surprising.

A. And we let them.

Q. Looking at paragraph 43 on page 21 of Roxane Exhibit 92, under 43 a) you mention examples of advertisements routinely delivered by defendants, including ones that were delivered to the State of New Jersey's Medicaid Pharmacy Program; do you see that?

A. Yes.

Q. Can you just explain to me generally

1161

what is the basis of that allegation and whether it involves Roxane, in particular?

A. Well, throughout the course of the investigation we talked to a number of Medicaid programs and program directors, and at one point we talked to a guy who was the program director of New Jersey Medicaid and he told us that he had, as I recall, several cabinets full of pricing information, flyers, whatever, advertising, marketing information, that had been sent to him by pharmaceutical manufacturers, and we thought that would be interesting stuff to look at.

So we talked to him about it, asked him if we could look at it, and my recollection is we contacted Reed Stephens at the Department of Justice and he agreed to travel from Washington to New Jersey and we went to New Jersey and we rented a copying machine and we copied, um, I don't remember exactly how many pages, but it was a lot of pages of information sent from pharmaceutical manufacturers directly to state

1162

Medicaid about a whole host of things, many times announcing a new drug, many times including the pricing information, sometimes not, and -- and then we, I guess, filed that, those copies, and, um, it gave us some insight I think into the fact that there was a lot more paperwork going to state Medicaid programs than what one might have suspected; and, in fact, many manufacturers were worried that pricing changes and updates that were going through the compendia were not being picked up quickly enough and that they wanted, if they raised their AWP they wanted the state Medicaid programs to become aware of that immediately.

Q. Do you recall whether there were documents from Roxane in that collection that you copied?

A. I do not.

MR. GORTNER: Jim, I don't believe these documents have been produced in this litigation.

MR. BREEN: I'll have to check. If they

1163

1  were requested they were produced, if they were
2  -- but I'll have to check. I know the ones he's
3  talking about.
4      Q. And then in terms of when you reviewed
5  documents at the Texas Medicaid office in circa
6  2000 that we were talking about earlier today,
7  did you make copies and retain those documents?
8      A. I would have to look. I would say
9  this, we sometimes made copies of essentially the
10 print screen from the Texas Vendor Drug Program's
11 computer system that showed what they were
12 paying, and that allowed us to have copies of
13 those so that we could compare that to what we
14 were paying.
15     Whether we have a copy of the actual
16 files that were submitted by the manufacturers to
17 Texas Medicaid I'd have to look, I don't know if
18 we -- I don't know if we copied those files or I
19 don't know if we were allowed to copy those
20 files. I don't recall. We were allowed to look
21 at them.
22     Q. Are there any more state Medicaid

1164

1  agencies where you were allowed to copy documents
2  of this sort related to manufacturer reports?
3      A. No, I -- I don't think -- I think we
4  asked a number of Medicaid programs if they had
5  that sort of thing, and most of them sort of
6  routinely said that they looked at them and threw
7  them away. Whether they entered data from them
8  or those sorts of things I don't specifically
9  know, but I think most Medicaid programs said
10 that they got what they, you know, might have
11 referred to as sort of junk mail or whatever from
12 manufacturers that they often threw away; but
13 whether they acted on some of it or not, um, you
14 know, I think some of them may have, I don't
15 know.
16     Q. Now, if we could turn to page 146 of
17 Roxane 92, and in particular on page 146 and 147
18 it appears that Ven-A-Care is again reporting in
19 these two boxes its cost of about, of around --
20 from around March of 2000 for ipratropium bromide
21 that's at issue; do you see them?
22     A. Yes, sir.

1165

1      Q. Those appear to be roughly the same
2  prices as were in the earlier Complaints;
3  correct?
4      A. Yes, I think the 12.95 price changed
5  and 11.70 was substituted in the first chart and
6  11.70 is used in the second chart.
7      Q. Let's turn now to Roxane 93, which is
8  Ven-A-Care's Third Amended Complaint filed
9  February 15, 2005, and in particular I want to
10 draw your attention to Exhibit 1, which is at the
11 back of the Complaint, and in Exhibit 1 it
12 appears that you list a series of Roxane NDCs
13 that you are now alleging fraud with regard to;
14 do you see that?
15     A. Yes.
16     Q. Can you explain how it was that in 2005
17 you added so many drugs from a single ipratropium
18 bromide drug to all these Roxane drugs?
19     A. Um, I think we made essentially a
20 tactical decision with the attorneys to add in
21 more drugs. Um, the pricing for many of these
22 drugs was certainly available from the Econolink

1166

1  software, we had the Servall pricing, but we had
2  prices on some of these NDC numbers that went
3  back a number of years and we made a decision to
4  add these NDCs in to the Complaint.
5      Q. Now, before filing this Complaint on
6  February 15, 2005, the Texas Ven-A-Care Complaint
7  against Roxane had been unsealed; isn't that
8  right?
9      A. Um, yeah, I think so. I would think we
10 were, yes, yes.
11     Q. Isn't it true that you'd received
12 documents from Roxane produced in the Texas
13 litigation before February 15, '05?
14     A. I would expect.
15     Q. And there had been depositions of
16 Roxane personnel before February 15, 2005; do you
17 remember that?
18     A. I would think so, um hum, yes.
19     Q. Did you review the Texas documents that
20 were produced by Roxane?
21     A. As part of the Texas case we looked at
22 Roxane documents, yes.

1167

Q. And you reviewed them before February 15, '05; isn't that right?
A. Yes, sir.
Q. And did you attend any of the depositions of Roxane personnel in the Texas case?
A. I don't think I -- I don't think I did, I think Mr. -- Mr. Jones I think attended all of those, or not all of them but many of them. I did go to some other, I think, third party depositions where the Roxane attorneys were involved, but I don't think that I went to a deposition of a Roxane employee personally, I don't think so.
Q. Do you recall Department of Justice had an attorney at some of the Texas depositions of Roxane personnel?
A. It's my understanding that they did, yes.
Q. Do you remember who that was or if there were different ones?
A. I think there were different ones, but

1168

George Henderson I think was one of the attorneys who attended some of the Roxane depositions, yes.
Q. Do you remember if Mr. Stephens was at some of the depositions?
A. You know, he may have been, I don't -- I don't know, but that may be the case, yes.
Q. And how did your review of Texas documents or the depositions taken in the Texas case inform your allegations in this Complaint?
   MR. BREEN: Objection to form.
A. I don't think it -- I mean I think we used -- in filing this Complaint we used the pricing information that we had. I could look, but I'm not aware of Ven-A-Care ever using any documents obtained in or any subpoenaed documents in filing our Complaints, um, I'm not aware of that ever happening.
Q. Let's turn to page 102 of the Complaint and in particular paragraph 188.
A. Okay.
Q. Maybe you could quickly review that paragraph and I'll ask you a couple of questions

1169

about it.
   (Witness peruses exhibit.)
A. Okay.
Q. There is a statement in there, paragraph No. 188, where Ven-A-Care alleges that Roxane's AWPs and WACs are in some cases more than 500 percent of its AMPs.
   Do you see that statement about the defendants and AWPs and WACs in some cases being more than 500 percent of their AMPs?
A. Yes, I see the statement.
Q. Can you explain how Ven-A-Care knew that? What is the basis of that statement?
A. Well, um, it was a -- a line of assumptions in general, because we didn't have AMP from manufacturers, we didn't have them, it's that simple, but what we did know was that for some drugs that the prices that we were paying were some of the higher prices in the marketplace not the lower prices in the marketplace, and we believed that as much, as you said earlier, that, that anybody with a Servall contract could buy at

1170

those prices, anybody with an Innovatix contract or anybody with a McKesson Select contract or in fact anybody who was a legitimate purchaser in the marketplace who was truly in business and trying to make a living, we believed that virtually all of these people were availing themselves of contract pricing or discounted pricing in one form or another, and we made an assumption that in essence if, you know -- I'll give you just a hypothetical, which I can't guess, if you gave me some time I might be able to work one out for someone's drug here -- but if the reported WAC is $50.00 on a product and we believed, based on our survey of the marketplace, that no one in the marketplace could be paying more than $5.00 for that product or no prudent purchaser in the marketplace could be paying more than $5.00, we would imagine that the AMP for that product would be somewhere around $5.00 or at least a large enough discrepancy between the $50.00 reported WAC and a marketplace that we see that centering around $5.00 --

1171

Q. Let me interrupt you just for a moment, and I apologize, Dr. Lockwood, because I think you answered my question, which is when you used the phrase A-M-P or AMP in this paragraph, you were referring to a guesstimate by Ven-A-Care of what the AMP should be not the actual AMP numbers?

A. Precisely, absolutely, definitely.

Q. At any point did you ask to receive AMPs from the Federal Government?

MS. ST. PETER-GRIFFITH: I'm going to object to the form of the question.

MR. BREEN: Me too.

MR. GORTNER: Let me try to rephrase it.

Q. Did you ever request AMPs from any federal entity?

MS. ST. PETER-GRIFFITH: I'm going to object to the form of the question. It's the substance that, you know, I'm directing -- that I have a concern about, because it suggests that there's an opportunity to do that. That's the

1172

basis of my objection.

MR. GORTNER: Okay. I appreciate that.

MR. BREEN: May I suggest one of those "do you recall" or "do you know" before you ask him to answer the question? Do you know what I'm saying?

MR. GORTNER: Let's take a step back.

Q. Do you recall or do you know whether you, in fact, I mean did you have a belief -- scratch that.

Did Ven-A-Care have a belief as to whether it could ask any federal entity to receive AMP information as part of its investigation?

A. You are going to have to read that back to me, I'm sorry, I have to understand that better.

Q. Did Ven-A-Care have a belief as to whether it could ask any federal entity to receive AMP information as part of its investigation?

A. I think the way I can answer this is to

1173

say that there might be circumstances where the government, state or federal, might ask us to look at something or might ask us to look at an AMP or a best price, um, in regarding these pricing cases; but I don't think we ever believed that we were empowered to get that as part of an investigation alone, necessarily.

I think at some point, you know, I don't know, this is lawyers stuff, um, once we become party to some litigation whether we have the right to subpoena that is a whole other issue, I guess, I don't know; but we weren't using some AMP information that we got from anybody to make these kinds of statements. We were saying that there are situations where the marketplace is so different from the reported prices that the AMPs can't possibly be based on our look at the market, they can't possibly be even close.

Q. Going back to what you said a moment ago, did you ever receive AMP information with respect to any manufacturer?

1174

MS. ST. PETER-GRIFFITH: Objection to form.

MR. BREEN: Objection to form. And also object to the last response as non-responsive.

A. Um, we were asked to look at -- if you mean received did somebody hand me a document or tell me to look at a document that may have had an AMP on it as part of a lawsuit, yeah, yeah.

Q. Who asked you to look at it?

A. Oh, any number of, I mean Attorney Generals or U.S. Attorneys may have had me look at a document that had AMP on it because I --

MR. BREEN: I'm going to object at this time getting into the "because" on the grounds of attorney-client privilege.

THE WITNESS: Okay.

MR. BREEN: And I'll instruct the witness not to answer any of the because's. If you'll let me talk to the witness I think I can assist you to get through this, because I think there is some confounding of issues here pre- and post-discovery.

1179

1  A. Okay.
2  Q. Did any states ask you to review AMP
3  information as part of this DOJ litigation?
4  A. For Roxane?
5  Q. Um hum.
6  A. For Roxane, no, none that I'm aware of,
7  no, no.
8  Q. Okay. How about at any point in time,
9  have you ever been asked by any states to review
10 AMP information pertaining to Roxane?
11     MR. BREEN: As part of this litigation,
12 the February 2007 litigation?
13     MR. GORTNER: I'm asking for any
14 litigation.
15     MR. BREEN: Now we are into any
16 litigation?
17     MR. GORTNER: Yes.
18     MR. BREEN: Okay. I'll object to the
19 form of the question and I'll instruct the
20 witness not to answer because it's so broad it's
21 going to necessarily encompass things that may be
22 covered by attorney-client privilege and work

1180

1  product privilege.
2     MR. GORTNER: Let's break it down to
3  cases that have been unsealed.
4  Q. Are you aware of a variety of state AGs
5  that have sued Roxane in this AMP litigation?
6  A. Okay.
7  Q. With respect to cases ongoing, cases
8  that have been unsealed -- and this should deal
9  with the sealed situation -- have any of those
10 states asked you to review AMP information
11 pertaining to Roxane?
12 A. I don't think I recall seeing AMP
13 information on Roxane, you know, I don't remember
14 seeing it on Roxane, period.
15    If we did see it it would have been
16 part of the litigation in Texas once it was
17 unsealed and being litigated; but I don't think,
18 I don't have a recollection right now of seeing
19 Roxane's AMPs in that case.
20    MR. GORTNER: Let's take a short break.
21    THE VIDEOGRAPHER: The time is 4:23. We
22 are going off the record.

1181

1  (Discussion held off the record.)
2  (Whereupon, a brief recess was taken).
3     THE VIDEOGRAPHER: The time is 4:33.
4  We're back on the record. Tape number 6.
5        CONTINUED EXAMINATION
6  BY MR. GORTNER:
7  Q. Dr. Lockwood, during Ven-A-Care'S
8  investigation of Roxane it never had an inside
9  source, like an employee or someone who worked at
10 Roxane, giving it information, did it?
11 A. No, not -- no.
12 Q. And no one at Ven-A-Care ever,
13 obviously, worked at Roxane; isn't that right?
14 A. That's correct.
15 Q. And had anyone at Ven-A-Care outside
16 this litigation ever had communications with
17 anyone from Roxane?
18 A. Well, I think I could only speak for
19 myself. I haven't. I haven't called the company
20 or something like that directly.
21 Q. Are you aware if any of the principals
22 of Ven-A-Care have ever had contact with a Roxane

1182

1  employee or representative outside of this
2  litigation?
3  A. Not that I'm aware of, no.
4  Q. Is it fair to say that in terms of
5  Ven-A-Care's knowledge of what occurred
6  internally at Roxane's business, all that
7  information would come from either documents or
8  testimony in this litigation?
9     MR. BREEN: Objection to form.
10 A. Well, I don't think that Ven-A-Care had
11 -- well, I think what Ven-A-Care had was the
12 market prices and its view of the marketplace and
13 that formed the basis for our Complaints.
14    We didn't have a source of knowledge
15 inside of Roxane that would allow us to know
16 something about what was going on at Roxane.
17    To the extent that we became familiar
18 with any of that it would be during the course of
19 litigation.
20 Q. Okay. So let my take you through a
21 couple of specific categories and make sure that
22 we're in agreement in terms of what Ven-A-Care

1183

1  did or did not know about these practices outside
2  of the litigation.
3       How Roxane internally calculated its
4  AWPs, Ven-A-Care didn't know anything about that;
5  correct?
6       MR. BREEN: Objection to form.
7       A. I think what we always believed was
8  that companies were always responsible for their
9  AWPs and internally how Roxane decided what AWP
10 was is not something that we or what they
11 reported was not something that we knew, no.
12      Q. And the same would go for a WAC, right,
13 what Roxane internally understood WAC to
14 represent, Ven-A-Care didn't have direct
15 knowledge of that outside the litigation?
16      A. We knew what we thought WAC represented
17 and what was going on in the marketplace; but no,
18 we didn't know what Roxane was doing regarding or
19 how they decided to report a WAC or not report a
20 WAC.
21      Q. And the same would be for how Roxane
22 internally determined the actual sales prices for

1184

1  their drugs at issue in this litigation?
2       A. Absolutely. I think we have -- I mean
3  I understand how the marketplace works and I
4  understand that they might have to respond to
5  price cuts by other manufacturers in the
6  marketplace but -- so I understand, I believe we
7  understand that -- but as to when Roxane decided
8  to cut a price or raise a price, that was their
9  own internal business.
10      Q. And you didn't know -- Ven-A-Care
11 didn't know anything about that?
12      A. No, we didn't have knowledge.
13         What we -- the knowledge we had was the
14 knowledge that was in the marketplace that was
15 proprietary to us and/or the marketplace that
16 only people that could buy these drugs might
17 know.
18      Q. Okay. It's fair to say that outside of
19 this litigation Ven-A-Care didn't know anything
20 about how Roxane trained its sales force, for
21 instance?
22      A. No, we wouldn't -- we didn't know

1185

1  anything about how they did sales training, that
2  would be correct.
3       Q. And didn't know anything about how
4  Roxane internally decided to market its drugs;
5  isn't that right?
6       MR. BREEN: Objection to form.
7       A. Well, only, not internally, but only
8  what we saw externally, meaning our view of the
9  marketplace that came to us being a small
10 pharmacy.
11      Q. Now, did any Roxane representative ever
12 market the spread on any of its drugs to
13 Ven-A-Care?
14      A. I'm not aware of that, as I said,
15 whether some -- we got some GPO flyer or
16 something like, that I'm not aware of one. If we
17 have one I expect it's in the documents we've
18 produced; but no, I don't know of one right now.
19      Q. But you are not aware of any Roxane
20 salesperson --
21      A. No, sir.
22      Q. Let me just finish the question so it's

1186

1  clear on the record.
2       A. I'm sorry.
3       MR. BREEN: Playing the Great Karnac
4  here. Excuse me.
5       THE WITNESS: I'm sorry.
6       Q. You are not contending that any Roxane
7  salesperson or employee ever marketed a spread on
8  any of Roxane's drugs to Ven-A-Care?
9       MR. BREEN: Objection to form.
10      A. No, I'm not aware of any Roxane
11 salesperson coming to Ven-A-Care and knocking on
12 the door or calling us directly, who is a Roxane
13 employee and marketing to us, I'm not aware of
14 that, no.
15      Q. Now, outside of the documents and
16 testimony in this litigation, did Ven-A-Care have
17 any information as to any discussions that Roxane
18 may have had with GPOs that were selling its
19 drugs?
20      MR. BREEN: Objection to form.
21      A. No, I mean only to the extent that we
22 -- that we might see something coming from a, um,

1187

1  GPO or from a wholesaler about Roxane's prices or
2  marketing their drugs, that would be our view of
3  the market, meaning what we would see, you know,
4  and that works, you know, I think that would
5  include any flyers, faxes, you know, other things
6  that we might get from wholesalers and/or GPOs.
7  That -- that was pretty much our view of the
8  market.
9      Q.  Let me be more precise in my question
10 because what my question --
11     A.  Okay.
12     Q.  -- is is whether Ven-A-Care, outside of
13 this litigation, had any information about
14 whether Roxane had discussions with GPOs about
15 the marketing of its drugs.
16     A.  Well, only to the extent that Roxane's
17 drugs were offered by GPOs, and to that extent I
18 think we would assume that Roxane had made some
19 contract or bid with that GPO to provide the
20 prices, but we were not in the middle of those
21 meetings or discussions; but we certainly knew if
22 a drug was being offered by a GPO that they had

1188

1  had discussions with Roxane regarding those
2  prices and the members who would qualify because
3  that's the sort of information they required from
4  us.
5      Q.  I understand that.  It's just fair to
6  say that you didn't know anything about what the
7  content of those discussions, if any, were?
8      A.  That would be correct, other than the
9  prices that we would see and/or any sales
10 materials that we might see as a result of that.
11     I would assume, in the example we made
12 earlier today, that Dey Laboratories was aware
13 that Servall was sending a flyer out advertising
14 its rebate.  I would believe that and infer that,
15 and if I saw a similar flyer on Roxane -- which I
16 can't produce for you now or tell you even exists
17 -- then I would make the assumption that Roxane
18 knew that the GPO was doing that.
19     Q.  You just didn't know that for a fact?
20        MR. BREEN:  Objection, form.
21     A.  I don't know that Roxane, that's
22 correct, I don't -- I wasn't in the conversation,

1189

1  I wasn't at the negotiation, that's correct.
2      Q.  And I would be correct in stating that
3  the same would apply to any communications
4  between Roxane and wholesalers, that Ven-A-Care
5  didn't have direct knowledge about any
6  communications between Roxane and wholesalers
7  outside of the information in this litigation?
8        MR. BREEN:  Objection to form, and I'd
9  ask that the court reporter read the question
10 back and the witness listen to it.
11        [The requested portion of the record
12 was read.]
13        MR. BREEN:  Objection to form.
14     A.  Well, I would just say, once again, and
15 I'll probably say it over and over again, that we
16 have our view of the marketplace and to the
17 extent that information is passed on to us from
18 wholesalers or GPOs, in the marketplace about
19 companies and their drugs, that we believe that
20 the company knows or is familiar with and is
21 responsible for the information being passed
22 along, if that includes prices or advertising or

1190

1  rebates, that we believe that it's reasonable and
2  correct to assume that the company is aware of
3  that; but beyond that I don't have information on
4  Roxane's internal workings and that that I think
5  sums it up.
6      Q.  Or Roxane's specific communications, if
7  there were any, between wholesalers and Roxane on
8  the drugs at issue in this litigation?
9        MR. BREEN:  Objection to form.
10     A.  I don't have those specific
11 communications, although I might have the
12 information from those.
13        For instance, what the price to Servall
14 members might be may have been on a communication
15 between Roxane and Servall and I suspect I could
16 infer that there absolutely was a communication
17 along those lines and I think I could rely on it.
18     Q.  Let's turn to Roxane Exhibit 94, which
19 is the United States Complaint that was unsealed
20 in late January of 2007.
21        Did you have a chance to review this
22 Complaint before it was unsealed, Dr. Lockwood?

1191

1  A. I don't -- I don't believe I read this
2  Complaint prior to it being filed. Um, the
3  Government doesn't necessarily ask me to approve
4  their Complaints. I may have participated in
5  information that's in the Complaint but I don't
6  think I -- I don't recall having the opportunity
7  to read the final Complaint and I'm not even sure
8  if I read a draft. I assume my attorneys did, but
9  I'm not so sure that I did.
10  Q. Do you understand that Ven-A-Care
11  subsequently adopted this Complaint as its
12  Complaint as well in this litigation?
13  A. I understand that that is the -- that
14  has or is what happened, yes, I understand that.
15  Q. Could you please turn to paragraph 61
16  on page 16 of this Complaint, and I'll ask you to
17  quickly review paragraph 61 and I'll have a few
18  questions about it.
19  (Witness peruses document.)
20  A. Okay, I've read it.
21  Q. Is it fair to characterize that
22  paragraph ascribing an alleged pricing strategy

1192

1  that Roxane developed in 1996 pertaining to the
2  launch of ipratropium bromide?
3  A. That appears to be what it talks about,
4  yes.
5  Q. Now, in light of what we were talking
6  about a moment ago, Ven-A-Care didn't have any
7  information, did it, outside of this litigation,
8  of what Roxane's pricing strategy was in 1996
9  with respect to ipratropium bromide?
10  MR. BREEN: Objection, form, asked and
11  answered.
12  A. Well, I guess there's a couple of ways
13  of looking at this paragraph, and the way that I
14  think Ven-A-Care would look at this paragraph is
15  that Ven-A-Care became aware of the price that
16  Roxane was reporting in the compendia, AWPs
17  and/or WACs, and we became aware of the prices
18  that we were seeing in the marketplace and we
19  were -- became aware that those prices were
20  decreasing in the marketplace while the reported
21  prices were in some circumstances, like the AWPs,
22  I believe they were staying the same or perhaps

1193

1  maybe for some drugs going up. The WACs might be
2  coming down but might not be coming down as
3  quickly as the retail prices.
4  From all of the pricing information
5  that we could glean from the information we had
6  available I think we could draw the assumptions
7  that Roxane was responsible for the AWPs and WACs
8  they were reporting, and they were also
9  responsible for their prices in the marketplace,
10  and to the extent that there were discrepancies
11  between those it was our impression that there
12  was a problem.
13  Did we have the internal documents that
14  talked about that, that problem? The answer is
15  no, no.
16  Were we able to infer from what we were
17  seeing in the marketplace that there might be
18  discussion along those lines? I can only tell
19  you what we could see, which was the reported
20  prices were -- were significantly higher than the
21  prices in the marketplace and we felt that that
22  created a problem on which we could base a

1194

1  Complaint but we didn't have the internal
2  knowledge of the internal documents that were
3  either there or not there.
4  Q. But you did obtain documents pertaining
5  to the launch of ipratropium bromide in the Texas
6  and other litigation, didn't you?
7  A. Certainly at some point when that
8  litigation was unsealed and litigated we saw
9  documents, yes, sir.
10  Q. And that was well before February 2007,
11  wasn't it?
12  A. Yes, sir.
13  Q. And you took depositions of Roxane
14  personnel before February of 2007 with respect to
15  the launch of ipratropium in 1996, didn't you?
16  A. Yes, we took or our attorneys took
17  depositions from Roxane employees, yes.
18  Q. It's not your testimony, is it, that
19  that deposition testimony, the documents that
20  Ven-A-Care reviewed, have nothing to do with the
21  allegations in paragraph 61, is it?
22  MR. BREEN: Objection, form.

1195

1   A.  I guess what I'm saying is, is that
2   within paragraph 61 I believe our -- are the
3   components of our core allegations in our earlier
4   Complaints.
5       These specific and any specific
6   reference to -- and I don't know that there's a
7   specific document referenced here, but it looks
8   that way at least -- would be part of the
9   government's investigations, whether it be State
10  or Federal, that became their view of Roxane, so
11  to speak.
12      We didn't have the ability, outside of
13  government, to have that view of Roxane.  So I
14  guess what I'm saying is I believe our core --
15  our core issues are found within this paragraph
16  but without the internal documents we certainly
17  didn't have internal documents to prove that.
18      I -- I could infer that Roxane was
19  developing a pricing strategy to have a
20  discrepancy between their AWPs and their WACs and
21  their market prices, just based on what I'm
22  seeing in the marketplace that they had made,

1196

1   because I'm assuming they're responsible for all
2   of this, they know what they're doing, they're a
3   large manufacturer with a marketing plan in a
4   marketplace environment and if they're eroding,
5   if prices are eroding in the marketplace and
6   they're keeping the prices up that are reported,
7   I believe they know what they're doing.
8       Q.  Dr. Lockwood, my question was simple, I
9   believe.
10      A.  Okay.
11      Q.  Which was, did prior to January 2007
12  Ven-A-Care receive documents from Roxane in the
13  Texas litigation that addressed the issue of
14  Roxane's ipratropium bromide launch in 1996?
15      A.  I would expect that we did, yes, in, in
16  that litigation, that -- that information other
17  than -- and the Texas litigation there was
18  information that was designated "attorneys eyes
19  only" information that we were not allowed to
20  see, and my recollection is Roxane used that
21  designation for a significant number of their
22  documents, um, but we saw documents as part of

1197

1   that litigation, yes, absolutely.
2       Q.  Do you have any reason to believe that
3   you did not see documents pertaining to Roxane's
4   ipratropium bromide launch in 1996 prior to the
5   unsealing of this Complaint, Roxane 94?
6       A.  Well, I guess what I would say is that
7   I think we saw documents that surrounded the
8   launch of ipratropium in '96 and the documents
9   that we at Ven-A-Care saw were -- the principals
10  of Ven-A-Care saw were documents that were not
11  labeled "attorneys eyes only," so there's a whole
12  host of documents out there that I haven't seen
13  is kind of my point.
14      There are a whole host of documents
15  that I have seen, and some of those surround the
16  launch, but I'm trying to decide if the documents
17  that I have seen really and fully and completely
18  support what's said in paragraph 61.  I don't
19  know.
20      I can't -- I can't, in my mind, come up
21  with a Roxane document that's sort of an aha!
22  moment for me that says aha! here's the document

1198

1   that says that that's the missing link.  I don't
2   -- I don't have that in my mind.  It may be
3   there, I may have seen it or it may be "attorneys
4   eyes only," I'm not sure.
5       Q.  You testified earlier that Mark Jones
6   did attend all the depositions taken of Roxane
7   personnel in the Texas litigation; isn't that
8   right?
9       A.  That's correct, and I would suggest
10  that Mr. Jones was probably generally more
11  knowledgeable about the litigation that occurred
12  in Texas with Roxane, that he was following that
13  case more closely than I was.
14      Q.  Let's take a look at paragraph 64 of
15  the Complaint on page 17.  I'd like you to look
16  over that paragraph quickly and let me know when
17  you are done reviewing it.
18      (Witness peruses exhibit.)
19      A.  Okay.
20      Q.  In particular there's a quote of a
21  Roxane senior marketing manager which claims to
22  quote in part that Roxane reported AWP and WAC

1195

1  A.  I guess what I'm saying is, is that
2  within paragraph 61 I believe our -- are the
3  components of our core allegations in our earlier
4  Complaints.
5       These specific and any specific
6  reference to -- and I don't know that there's a
7  specific document referenced here, but it looks
8  that way at least -- would be part of the
9  government's investigations, whether it be State
10 or Federal, that became their view of Roxane, so
11 to speak.
12      We didn't have the ability, outside of
13 government, to have that view of Roxane.  So I
14 guess what I'm saying is I believe our core --
15 our core issues are found within this paragraph
16 but without the internal documents we certainly
17 didn't have internal documents to prove that.
18      I -- I could infer that Roxane was
19 developing a pricing strategy to have a
20 discrepancy between their AWPs and their WACs and
21 their market prices, just based on what I'm
22 seeing in the marketplace that they had made,

1196

1  because I'm assuming they're responsible for all
2  of this, they know what they're doing, they're a
3  large manufacturer with a marketing plan in a
4  marketplace environment and if they're eroding,
5  if prices are eroding in the marketplace and
6  they're keeping the prices up that are reported,
7  I believe they know what they're doing.
8       Q.  Dr. Lockwood, my question was simple, I
9  believe.
10      A.  Okay.
11      Q.  Which was, did prior to January 2007
12 Ven-A-Care receive documents from Roxane in the
13 Texas litigation that addressed the issue of
14 Roxane's ipratropium bromide launch in 1996?
15      A.  I would expect that we did, yes, in, in
16 that litigation, that -- that information other
17 than -- and the Texas litigation there was
18 information that was designated "attorneys eyes
19 only" information that we were not allowed to
20 see, and my recollection is Roxane used that
21 designation for a significant number of their
22 documents, um, but we saw documents as part of

1197

1  that litigation, yes, absolutely.
2       Q.  Do you have any reason to believe that
3  you did not see documents pertaining to Roxane's
4  ipratropium bromide launch in 1996 prior to the
5  unsealing of this Complaint, Roxane 94?
6       A.  Well, I guess what I would say is that
7  I think we saw documents that surrounded the
8  launch of ipratropium in '96 and the documents
9  that we at Ven-A-Care saw were -- the principals
10 of Ven-A-Care saw were documents that were not
11 labeled "attorneys eyes only," so there's a whole
12 host of documents out there that I haven't seen
13 is kind of my point.
14      There are a whole host of documents
15 that I have seen, and some of those surround the
16 launch, but I'm trying to decide if the documents
17 that I have seen really and fully and completely
18 support what's said in paragraph 61.  I don't
19 know.
20      I can't -- I can't, in my mind, come up
21 with a Roxane document that's sort of an aha!
22 moment for me that says aha! here's the document

1198

1  that says that that's the missing link.  I don't
2  -- I don't have that in my mind.  It may be
3  there, I may have seen it or it may be "attorneys
4  eyes only," I'm not sure.
5       Q.  You testified earlier that Mark Jones
6  did attend all the depositions taken of Roxane
7  personnel in the Texas litigation; isn't that
8  right?
9       A.  That's correct, and I would suggest
10 that Mr. Jones was probably generally more
11 knowledgeable about the litigation that occurred
12 in Texas with Roxane, that he was following that
13 case more closely than I was.
14      Q.  Let's take a look at paragraph 64 of
15 the Complaint on page 17.  I'd like you to look
16 over that paragraph quickly and let me know when
17 you are done reviewing it.
18      (Witness peruses exhibit.)
19      A.  Okay.
20      Q.  In particular there's a quote of a
21 Roxane senior marketing manager which claims to
22 quote in part that Roxane reported AWP and WAC