# Exhibit N

1059

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL          :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      :   CIVIL ACTION

PRICE LITIGATION                :   01-CV-12257-PBS

- - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:       :

U.S. ex rel. Ven-a-Care of      :   Hon.  Patti B. Saris

the Florida Keys, Inc.          :

     v.                         :

Dey, Inc., et al.               :

No. 05-11084-PBS                :

- - - - - - - - - - - - - - -x


          (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)


          CONTINUED DEPOSITION OF T. MARK JONES

                    Washington, D.C.

                Tuesday, December 9, 2008

                        VOLUME IV

**1200**

1 contract price for any of these Roxane NDCs?
2     MR. BREEN: Objection. Form.
3     THE WITNESS: Do I have evidence? No.
4     (Exhibit Roxane 201 was marked for
5 identification.)
6 BY MR. GORTNER:
7    Q. I'm going to hand you what I'm marking
8 as Roxane Exhibit 201.
9    A. Okay.
10   Q. This appears to be another ANDA invoice
11 for a Roxane Ipratropium Bromide. And it's dated
12 December 10th, 2001. Is this a document that
13 Ven-A-Care would keep in the ordinary course of
14 its business?
15   A. Yes.
16   Q. And you can see here that it appears to
17 be purchasing two Ipratropium Bromide products
18 with Roxane NDCs on or about this date; is that
19 right?
20   A. Yes.
21   Q. I take it you can't testify whether
22 this particular document had been included in any

**1201**

1 of Ven-A-Care's disclosure statements to the
2 government?
3    **A. I don't. I mean, let me give you a**
4 **general statement. I think whenever we had**
5 **invoices that proved pricing, we -- we provided**
6 **them to the -- to the government.**
7    Q. I understand that. You just don't know
8 for sure --
9    **A. Right.**
10   Q. -- if these particular documents --
11   **A. Correct.**
12   Q. -- were.
13     Mr. Jones, when I reviewed the document
14 production by Ven-A-Care, I found invoices for --
15 like these that we've just been going over for --
16   **A. Uh-huh.**
17   Q. -- for Roxane's Ipratropium Bromide.
18 But as I look at the drugs listed on Exhibit B of
19 the United States's complaint, I did not find any
20 invoices for any of the other drugs that are
21 listed there. Is it likely that -- that Roxane
22 did not -- I mean, I'm sorry -- that Ven-A-Care

**1202**

1 did not purchase those drugs during the course of
2 its investigation?
3    **A. Yes. That would be likely.**
4    Q. Okay. So the actual purchases that --
5 that Ven-A-Care made were exclusively for
6 Roxane's Ipratropium Bromide product, and then
7 the other products, Ven-A-Care's investigation
8 was looking at the McKesson Econolink pricing,
9 for instance?
10   **A. Yes.**
11   Q. I take it, then, it's fair to say that
12 for all of Roxane's drugs listed here in Exhibit
13 B of the United States's complaint, Ven-A-Care
14 never submitted a claim for Medicare
15 reimbursement for any of those Roxane NDCs?
16     MR. BREEN: Did you say "Medicaid"?
17     THE WITNESS: "Medicare" he said.
18     MR. BREEN: Thank you.
19     THE WITNESS: I think that I could say
20 no, we didn't.
21 BY MR. GORTNER:
22   Q. And I'll ask the same question for all

**1203**

1 of these Roxane NDCs listed in Exhibit B. Ven-A-
2 Care never submitted a claim for reimbursement to
3 any Medicaid program?
4    **A. I'm much less likely to say no, because**
5 **it's a possibility that we did.**
6    Q. Okay.
7    **A. I'd have to maybe look at the invoices,**
8 **just to make sure, or the EOBs, to see if I don't**
9 **find an 00054 number.**
10   Q. Well, let's -- let's look at these
11 drugs right now, in terms of your recollections
12 sitting here today. Is there any drug that you
13 can say that Ven-A-Care submitted a Medicaid
14 claim on?
15   **A. (Viewing documents.) I don't believe**
16 **so.**
17   Q. And then I take it that since Ven-A-
18 Care only purchased Ipratropium Bromide, that it
19 never dispensed any of the other drugs to a
20 patient at any point?
21   **A. Not to my knowledge.**
22   Q. Okay. And the purchases that I saw for

1204

1 Ipratropium Bromide were all in the 2000 onward
2 period. Is that accurate?
3     A.  That's what I've seen. I mean, that's
4 what I'm seeing here. Yeah.
5     Q.  So when Ven-A-Care was purchasing
6 Ipratropium Bromide, it was purchasing it for --
7 for purposes of its investigation in this
8 litigation?
9     A.  That, and demonstrating, and, you know,
10 showing it when we're doing presentations. We --
11 we would frequently purchase medication for that
12 reason as well.
13     Q.  You're referring to presentations?
14     A.  So you could see it. See it.
15     Q.  I apologize for interrupting you.
16 You're referring to when you made presentations
17 to state Medicaid agencies or the federal
18 government?
19     A.  Anyone that we were making
20 presentations to.
21     Q.  Okay.
22     A.  I'm not saying that's exactly what this

1205

1 was for. I'm just saying that's a possibility.
2     Q.  It wasn't to dispense to a patient,
3 though, right?
4     A.  Not to my knowledge, no.
5     Q.  None -- none of the purchases of
6 Roxane's drugs were dispensed to a patient?
7     A.  No.
8     Q.  "No" in that's a correct statement?
9     A.  No. He is correct. Yes.
10     Q.  Ven-A-Care never had a direct contract
11 with Roxane to purchase drugs? What I mean by
12 that is, as -- as I imagine you've learned in
13 this litigation, Roxane, at various times, has
14 had direct contracts with retail pharmacies --
15     A.  Right.
16     Q.  -- through which they purchase --
17     A.  Right.
18     Q.  -- drugs based on that contract with
19 Roxane. I take it Ven-A-Care never had a direct
20 contract like that with Roxane?
21     A.  No. You're talking about like their
22 contracts with RDI or ANDA is a -- is a good

1206

1 example.
2     Q.  Or -- yes. And I'm also referring to
3 contracts that Roxane might have with --
4     A.  End users.
5     Q.  I'm sorry. Let me -- just make sure --
6     A.  I'm sorry.
7     Q.  -- the record is clear.
8     A.  I'm sorry.
9     Q.  I'm also referring to contracts that
10 Roxane might have with the end-used pharmacies.
11 Ven-A-Care never had a contract like that,
12 correct?
13     A.  No.
14     Q.  Ven-A-Care's purchases of Roxane's
15 products were limited to Ipratropium Bromide and
16 to purchases through entities like GPOs or
17 wholesalers distributors; is that correct?
18     A.  Yes. If you're asking me did we
19 purchase them directly from Roxane? Is that what
20 you're -- no. We did not purchase directly from
21 Roxane.
22     Q.  And I take it Ven-A-Care never called

1207

1 Roxane directly to ask for price quotes?
2     A.  No.
3     Q.  No, you did not?
4     A.  No. We did not.
5     Q.  I'm sorry. There's double negatives
6 are difficult.
7     A.  I'm sorry.
8         MR. BREEN: Particularly, there was a
9 double negative in the question, and then another
10 double negative in the answer.
11 BY MR. GORTNER:
12     Q.  Did Ven-A-Care ever receive any letters
13 directly from Roxane announcing prices?
14     A.  I don't -- I can't say no for sure. I
15 don't recall any off the top of my head. But
16 Ven-A-Care frequently got fliers from
17 manufacturers, when they were talking about a
18 drug or a change in, you know, maybe the way it
19 was packaged or increasing a price or decreasing
20 a price. I mean, that wasn't infrequent.
21         I don't -- do I -- do I know if Ven-A-
22 Care was on that mailing list? I don't know. I

1204

1  Ipratropium Bromide were all in the 2000 onward
2  period. Is that accurate?
3      A.  That's what I've seen. I mean, that's
4  what I'm seeing here. Yeah.
5      Q.  So when Ven-A-Care was purchasing
6  Ipratropium Bromide, it was purchasing it for --
7  for purposes of its investigation in this
8  litigation?
9      A.  That, and demonstrating, and, you know,
10 showing it when we're doing presentations. We --
11 we would frequently purchase medication for that
12 reason as well.
13     Q.  You're referring to presentations?
14     A.  So you could see it. See it.
15     Q.  I apologize for interrupting you.
16 You're referring to when you made presentations
17 to state Medicaid agencies or the federal
18 government?
19     A.  Anyone that we were making
20 presentations to.
21     Q.  Okay.
22     A.  I'm not saying that's exactly what this

1205

1  was for. I'm just saying that's a possibility.
2      Q.  It wasn't to dispense to a patient,
3  though, right?
4      A.  Not to my knowledge, no.
5      Q.  None -- none of the purchases of
6  Roxane's drugs were dispensed to a patient?
7      A.  No.
8      Q.  "No" in that's a correct statement?
9      A.  No. He is correct. Yes.
10     Q.  Ven-A-Care never had a direct contract
11 with Roxane to purchase drugs? What I mean by
12 that is, as -- as I imagine you've learned in
13 this litigation, Roxane, at various times, has
14 had direct contracts with retail pharmacies --
15     A.  Right.
16     Q.  -- through which they purchase --
17     A.  Right.
18     Q.  -- drugs based on that contract with
19 Roxane. I take it Ven-A-Care never had a direct
20 contract like that with Roxane?
21     A.  No. You're talking about like their
22 contracts with RDI or ANDA is a -- is a good

1206

1  example.
2      Q.  Or -- yes. And I'm also referring to
3  contracts that Roxane might have with --
4      A.  End users.
5      Q.  I'm sorry. Let me -- just make sure --
6      A.  I'm sorry.
7      Q.  -- the record is clear.
8      A.  I'm sorry.
9      Q.  I'm also referring to contracts that
10 Roxane might have with the end-used pharmacies.
11 Ven-A-Care never had a contract like that,
12 correct?
13     A.  No.
14     Q.  Ven-A-Care's purchases of Roxane's
15 products were limited to Ipratropium Bromide and
16 to purchases through entities like GPOs or
17 wholesalers distributors; is that correct?
18     A.  Yes. If you're asking me did we
19 purchase them directly from Roxane? Is that what
20 you're -- no. We did not purchase directly from
21 Roxane.
22     Q.  And I take it Ven-A-Care never called

1207

1  Roxane directly to ask for price quotes?
2      A.  No.
3      Q.  No, you did not?
4      A.  No. We did not.
5      Q.  I'm sorry. There's double negatives
6  are difficult.
7      A.  I'm sorry.
8          MR. BREEN: Particularly, there was a
9  double negative in the question, and then another
10 double negative in the answer.
11 BY MR. GORTNER:
12     Q.  Did Ven-A-Care ever receive any letters
13 directly from Roxane announcing prices?
14     A.  I don't -- I can't say no for sure. I
15 don't recall any off the top of my head. But
16 Ven-A-Care frequently got fliers from
17 manufacturers, when they were talking about a
18 drug or a change in, you know, maybe the way it
19 was packaged or increasing a price or decreasing
20 a price. I mean, that wasn't infrequent.
21         I don't -- do I -- do I know if Ven-A-
22 Care was on that mailing list? I don't know. I

1208

1 think that if Ven-A-Care was on that mailing list
2 in 2000, they would have pulled us off real fast,
3 if that says anything. You know what I'm saying?
4     Q.  Well, let -- let me break it down a
5 little bit.  To prepare to testify today as the
6 corporate designee of Ven-A-Care --
7     A.  Uh-huh.  Right.
8     Q.  -- you -- I take it you spoke with
9 counsel --
10    A.  Yes.
11    Q.  -- and discussed -- let me just finish
12 the question.
13        And discussed communications that Ven-
14 A-Care had had with Roxane over the years.  Is
15 that right?
16    A.  Yes.
17    Q.  And you also, I take it, reviewed
18 documents or indices of documents to see what
19 types of communications Ven-A-Care had with
20 Roxane?
21    A.  Yes.
22    Q.  Did any of that preparation or

1209

1 investigation lead you to believe today that
2 Roxane, in fact, ever sent correspondence, either
3 a letter or fax directly from Roxane to Ven-A-
4 Care, advertising prices for its drug products?
5     A.  No.
6     Q.  Do you have any reason, sitting here
7 today, to believe that Roxane in fact ever did
8 such a thing, such as sending advertisements on
9 its products directly to Ven-A-Care?
10    A.  I guess the reason I answered the way I
11 did is, because we're talking about 20 years
12 here, and, you know, back in thousands and
13 thousands and thousands of documents.  No.  I
14 don't think it happened.  I'm just -- I don't
15 want to rule out the possibility that it may have
16 happened somewhere in the past.  That's all.
17    Q.  And you're not aware of any document in
18 your production -- and I'll represent to you that
19 we have found no such document that would in fact
20 be an advertisement from Roxane or a pricing
21 sheet from Roxane announcing its prices to Ven-A-
22 Care.

1210

1     A.  No.  The only documents I think that it
2 -- and, actually, I read this in Dr. Lockwood's
3 deposition as well -- where we did -- where we
4 did the -- the New Jersey Medicaid, and we got
5 all those documents with all the pharmaceutical
6 advertisements.  I haven't been through those in
7 ages.  So, you know, that's -- again I'm not -- I
8 don't think it really even really addresses your
9 -- your question.
10       MR. BREEN:  What he's talking about is
11 an assembly of documents that I think was
12 formally produced by the United States in these
13 cases with a, quote, New Jersey Medicaid group of
14 documents.
15 BY MR. GORTNER:
16    Q.  And you're not aware of any documents
17 than that that were in fact documents that were
18 Roxane specific?
19    A.  Not -- no.
20    Q.  And those documents of course wouldn't
21 be documents that were sent to Ven-A-Care?
22    A.  No.

1211

1     Q.  Did a Roxane salesperson ever visit
2 Ven-A-Care or call a Ven-A-Care representative to
3 discuss its -- Roxane's drug products?
4     A.  No.
5     Q.  Has anyone at Ven-A-Care ever had any
6 contact, outside of this litigation, with any
7 Roxane employees?
8     A.  Not that I'm aware of, no.
9     Q.  During the course of Ven-A-Care's
10 investigation, did it ever speak with any
11 wholesaler to discuss Roxane's pricing practices
12 or to see whether Roxane had any -- any
13 involvement in the pricing that a wholesaler was
14 setting for Roxane products?
15       MR. BREEN:  Objection.  Form.
16       THE WITNESS:  So what you're asking,
17 did anyone from Ven-A-Care talk to a wholesaler
18 about prices and prices that Roxane was
19 submitting to the wholesaler?
20 BY MR. GORTNER:
21    Q.  Correct.
22    A.  I don't know.  I mean, I don't think I

1212

1  can answer that question a hundred percent
2  accurately.  I don't -- I mean, I don't know.
3      Q.  What would it -- what would require for
4  you to be able to answer that question?
5      A.  I guess I'd have to ask Lewis, John or
6  even Zach.  I don't know if Zach has ever talked
7  to whole -- I mean, Zach was noted for picking up
8  phones and calling people.  So --
9      Q.  So you can't answer one way or the
10 other right now?
11     A.  I don't want to, because I don't know a
12 hundred percent whether he did or not.
13     Q.  But you never did?
14     A.  No.  I didn't.
15     Q.  And you don't know for a fact that
16 anyone --
17     A.  I don't know for a fact, no.
18         MR. BREEN:  That's a question you want
19 him to inquire of other members of Ven-A-Care on
20 --
21         MR. GORTNER:  Sure.
22         MR. BREEN:  -- to find out?  I'll be

1213

1  happy to do that.
2          MR. GORTNER:  Okay.
3          THE WITNESS:  And Lewis frequently
4  talked to wholesalers, too, so -- and I'm not
5  saying that if they did, that would be the
6  substance, but --
7          MR. BREEN:  I did not prepare him for
8  that specific question, so I'll be happy to
9  follow up on it later.
10 BY MR. GORTNER:
11     Q.  Mr. Jones, prior to Ven-A-Care filing
12 its first complaint in April of 2000, did Ven-A-
13 Care have any inside information with regard to
14 Roxane's business practices?  And do you
15 understand what I mean by "inside information"?
16     A.  The inside information Ven-A-Care had
17 was Roxane's pricing.
18     Q.  The published pricing in the
19 marketplace.
20     A.  Well, the contract pricing, the pricing
21 through the pharmaceutical provide -- you know,
22 the -- the wholesalers, the GPOs, the

1214

1  pharmaceutical distributors.
2      Q.  All right.  And let -- let me clarify.
3  Let me actually define what I mean by "inside
4  information," and we can come up with a different
5  term, actually, which is:  Did -- did Ven-A-Care
6  have any information, in terms of how Roxane
7  internally, in its own business, set its
8  published AWPs or its published WAC prices?
9          MR. BREEN:  Objection to form.
10         THE WITNESS:  Ven-A-Care only knew that
11 First DataBank and Red Book were the compendia
12 that drug manufacturers submitted their prices
13 for.
14         Those were the prices -- or those
15 published prices were the ones that were used for
16 reimbursement.  We had Roxane's price list, and
17 that's what we had.  Did we know Roxane's inside
18 employees talking about doing it?  No, we did
19 not.
20 BY MR. GORTNER:
21     Q.  And that -- that last statement goes to
22 the question I'm asking you, is that:  During the

1215

1  course of your investigation, outside of
2  documents or testimony that you've obtained in
3  this litigation, did Ven-A-Care have any
4  information about how Roxane's employees
5  determined contract prices for drugs?
6      A.  Outside of the investigation, no.
7      Q.  Well, in other words, I'm not asking
8  outside of the investigation.  I'm asking outside
9  of documents or testimony that you received
10 during the course of this litigation from Roxane,
11 did Ven-A-Care have any information about how
12 Roxane's employees set contract prices on its
13 products?
14     A.  So you're asking me other than what
15 I've learned in the investigation?
16     Q.  Right.
17         MR. BREEN:  No.  That's not what he's
18 asking you.
19         THE WITNESS:  I'm -- I'm confused.
20         MR. BREEN:  He's -- he's separating --
21 he's distinguishing between the discovery
22 process, what we learned, what you learned in the

**1220**

1  A. Do you mean how they reconciled?
2  Q. Correct.
3  A. No.
4  Q. And Ven-A-Care wasn't privy to any
5  communications that Roxane had between Roxane and
6  group purchasing organizations such as Innovatix
7  or ServAll?
8      MR. BREEN: Objection. Form.
9      THE WITNESS: Only if Roxane -- and I
10 can't recall if they did. Only if Roxane would
11 have submitted one of those, you know, price
12 change sheets or contract change sheets to the
13 particular GPO, the GPO would pass it down to the
14 purchaser, then that would be a way for Ven-A-
15 Care, or anyone, to find it out.
16 BY MR. GORTNER:
17 Q. If that occurred --
18 A. If that occurred. I'm just talking
19 hypothetical.
20 Q. You don't know if that occurred?
21 A. I don't recall if it happened at all.
22 Q. And if that did occur, would that be

**1221**

1  the extent of your knowledge?
2      MR. BREEN: Objection. Form.
3      THE WITNESS: Of that issue, yes.
4      Are we getting close to a place where
5  we can eat lunch?
6      MR. GORTNER: Sure. Sure. Let's take
7  a break.
8      THE VIDEOGRAPHER: Going off the record
9  at 11:55 a.m.
10     (Whereupon, at 11:55 a.m., the
11 deposition in the above-entitled matter was
12 recessed, to reconvene at 1:00 p.m., this same
13 day.)

**1222**

1          AFTERNOON SESSION
2            (1:13 p.m.)
3
4  Whereupon,
5          T. REED JONES,
6  the witness on the stand at the time of recess,
7  having been previously duly sworn, was further
8  examined and testified as follows:
9
10    EXAMINATION BY COUNSEL FOR DEFENDANT ROXANE
11 BY MR. GORTNER: (RESUMED)
12     THE VIDEOGRAPHER: The time is 1:13
13 p.m. We're back on the record.
14 Q. Welcome back, Mr. Jones.
15 A. Thank you.
16 Q. Was Ven-A-Care ever a member of -- of
17 Novation?
18 A. Novation the GPO?
19 Q. Correct. Novation GPO.
20 A. I don't recall. It's possible. But I
21 don't recall off the top of my head.
22 Q. What do you know about Novation GPO?

**1223**

1  A. Not a whole lot. I mean, nothing in
2  particular specifically.
3  Q. Are you aware that Novation GPO
4  predominantly, in some instances, exclusively
5  sells to hospital members?
6  A. I have some understanding of that, yes.
7  Q. Would that lead you to believe that it
8  was unlikely that Ven-A-Care was a member of
9  Novation GPO?
10 A. Yeah.
11 Q. Did Ven-A-Care ever obtain prices on
12 Novation's Nova Plus version of Ipratropium
13 Bromide?
14 A. I don't know. I don't -- it doesn't
15 sound familiar to me.
16 Q. Do you recall whether your
17 investigation of Roxane ever included these Nova
18 Plus Ipratropium Bromide products?
19 A. Well, I don't know. I don't remember
20 having Novation as a GPO. I mean, I don't know
21 that we even investigated Novation, or, you know,
22 looked at it, or at least I didn't.

1224

1    Q. So it's fair to say that, then, that
2  wasn't something that you would have been
3  reporting prices to the government on?
4    **A. I don't -- if I have it -- if I didn't**
5  **have it, and I wasn't -- you know, I wasn't using**
6  **it, then, no, I wouldn't have reported prices. I**
7  **don't think, you know.**
8    Q. Mr. Jones, prior to Ven-A-Care filing
9  its initial qui tam complaint against Roxane in
10 April of 2000, did Ven-A-Care have any direct
11 knowledge of how Roxane trained its sales forces?
12   **A. No.**
13   Q. So it's fair to say Ven-A-Care didn't
14 have any knowledge of how Rox -- whether Roxane
15 trains its sales forces on the significance of
16 Medicare or Medicaid reimbursement, for instance?
17      MR. BREEN: Objection. Form.
18      THE WITNESS: I'm sorry. Repeat that.
19      MR. GORTNER: I'll withdraw -- I'll
20 withdraw the question.
21      THE WITNESS: Okay.
22      MR. GORTNER: It's a confusing

1225

1  question.
2       THE WITNESS: Okay.
3  BY MR. GORTNER:
4    Q. I think you answered it, because you
5  testified you didn't know how they trained their
6  sales forces at all.
7    **A. No.**
8    Q. And prior to filing the first complaint
9  in April of 2000, did Ven-A-Care have any direct
10 knowledge of whether Roxane's sales personnel had
11 ever actively marketed the spread to any of
12 Roxane's customers?
13      MR. BREEN: Objection. Form.
14      THE WITNESS: Other than using our
15 industry insider price list and prices, I don't
16 know that Ven-A-Care had any information about
17 their sales force and what they were doing at
18 that point, no.
19 BY MR. GORTNER:
20   Q. Okay. So in terms of the sales force -
21 - and please correct me if I'm saying this
22 incorrectly.

1226

1       The extent of Ven-A-Care's knowledge
2  with respect to Roxane's sales force practices
3  for its general information about the industry
4  and in terms of specifics to Roxane, Ven-A-Care
5  knew Roxane's published prices and some of the
6  prices that were offered through GPOs and
7  wholesalers, correct?
8    A. Yes.
9    Q. But it didn't have any direct knowledge
10 of what Roxane's sales forces were actually doing
11 with particular customers in terms of what they
12 were saying to customers?
13   **A. Ven-A-Care had a general idea of how**
14 **the industry operated. You know, we -- we**
15 **certainly had had experiences with all kinds of**
16 **sales reps, but not necessarily Roxane sales**
17 **reps.**
18   Q. All right. And that was my question.
19   **A. Right.**
20   Q. I understand --
21   **A. Right.**
22   Q. -- you've testified extensively about

1227

1  the industry knowledge.
2    **A. Right.**
3    Q. My limited question is: Did you have
4  any specific knowledge about Roxane's sales force
5  practices themselves?
6    **A. No.**
7    Q. Now, subsequent to filing that
8  complaint in April of 2000, did -- did Ven-A-Care
9  come to obtain knowledge about how Roxane's --
10 how Roxane trained its sales forces?
11   **A. Well, Ven-A-Care continued its**
12 **investigation of the prices, making sure that it**
13 **followed the prices. No. I -- I don't know that**
14 **-- outside of the government investigation, you**
15 **know, depositions and documents, Ven-A-Care, its**
16 **investigation was all from its insider**
17 **information.**
18   Q. Okay.
19   **A. Prices.**
20   Q. So the answer is no, and -- and -- and
21 let me just try to restate or re-ask a question
22 so that it's real clear for the record.

**1228**

1    The information that Ven-A-Care had
2    about how Roxane trained its sales forces or what
3    Roxane's sales forces were telling customers,
4    that information comes exclusively from
5    depositions or documents or things that have been
6    obtained through discovery in these cases.  Is
7    that fair to say?
8        MR. BREEN:  Objection.  Form.
9        I'd ask that that question be read
10   back, because there was a helicopter going over,
11   and I'm not sure if I heard --
12       MR. GORTNER:  Sure.
13       MR. BREEN:  -- to the end.  So if you
14   could read that back for the witness, I'd
15   appreciate it.  Please listen to the question.
16       THE REPORTER:  Question :  The answer
17   is no, and let me just try to restate or re-ask a
18   question so it's real clear for the record.  The
19   information that Ven-A-Care had about how Roxane
20   trained its sales forces or what Roxane's sales
21   forces were telling customers, that information
22   comes exclusively from depositions or documents

**1229**

1    or things that have been obtained through
2    discovery in these cases.  Is that fair to say?
3        MR. BREEN:  Objection.  Form.
4    BY MR. GORTNER:
5        Q.  Do you understand the question, Mr.
6    Jones?
7        **A.  You're trying to bifurcate and say that**
8    **everything that Ven-A-Care learned about Roxane's**
9    **sales force was only through the investigation**
10   **and the discovery process.**
11       Q.  I actually want to separate those two -
12   - those two things, and maybe we can get some
13   clarity about that.
14       A.  Uh-huh.
15       Q.  And let's see if we can agree on -- on
16   this, Mr. Jones.
17       A.  Okay.
18       Q.  The -- the -- Ven-A-Care's
19   investigation, when I'm referring to Ven-A-Care's
20   investigation, I'm referring to the process by
21   which you gathered information through your own -
22   - through Ven-A-Care's own means.  What I mean by

**1230**

1    that is, things like the pricing information that
2    you were able to obtain --
3        A.  Right.
4        Q.  -- from McKesson and distributors; the
5    advertisements, any sales contacts that Ven-A-
6    Care received.  That I'm referring to as Ven-A-
7    Care's investigation.  I'm trying to draw a
8    distinction between that and testimony and
9    documents that were produced by Roxane in the
10   Texas litigation, for instance, or in this
11   litigation.
12       Does that -- does that distinction make
13   sense to you?
14       A.  Yes.
15       Q.  Okay.  With that distinction in mind,
16   what I'm trying to now ask you is:  In terms of
17   the information that Ven-A-Care came to obtain
18   after April of 2000 with respect to Roxane's
19   training of its sales forces, is it fair to say
20   that whatever information Ven-A-Care had about
21   how Roxane trained its sales forces came from
22   materials in the litigation?

**1231**

1        MR. BREEN:  Objection.  Form.
2        THE WITNESS:  I'm -- I'm afraid to
3    commit to that absolutely because I don't, off
4    the top of my head, remember exactly every
5    interaction, everything that we learned, whom we
6    spoke with.  And I'm not saying I spoke with
7    Roxane's sales force.  I could have been speaking
8    with someone outside of all that.
9        In general, we didn't have a lot of
10   knowledge about what Roxane was doing with their
11   sales force.  But I don't want to state on the
12   record that we never knew anything outside of
13   that.  Do you understand what I'm saying?
14   BY MR. GORTNER:
15       Q.  I understand that.  I guess the
16   question now is:  Sitting here today, are you
17   aware of any information that you obtained,
18   outside of documents produced in this litigation
19   or testimony obtained in this litigation, with
20   respect to Roxane's training of its sales forces?
21       MR. BREEN:  Objection.  Form.
22       THE WITNESS:  I'll concede and say

1232

1  right at this moment, I can't recall, you know,
2  any information that would make me say anything
3  else, so --
4      BY MR. GORTNER:
5      Q.  Now, on the second topic with respect
6  to what Roxane's sales forces may or may not have
7  been communicating to customers about the spread,
8  would you agree with me that whatever information
9  Ven-A-Care has obtained, following the April 2000
10 filing of this complaint, was obtained through
11 documents or testimony in litigation involving
12 Roxane?
13         MR. BREEN:  Objection.  Form.
14         THE WITNESS:  Well, the more I think
15 about it, there was also all the congressional
16 stuff that we were dealing with.  And I also sat
17 in the congressional hearing with Roxane
18 employees like Leslie Paoletti.  So I -- so I had
19 interaction with people like that outside of the
20 investigation or outside of knowing Roxane's
21 intimate information.  You know what I'm saying?
22 That's where I'm confused, because --

1233

1      BY MR. GORTNER:
2      Q.  No.  I under -- I understand that.  And
3  let me -- I'll certainly -- let me include that
4  in the question as well, is that aside from
5  Roxane's statements in congressional hearings and
6  the documents and testimony provided in
7  litigation involving Roxane, did Ven-A-Care have
8  any other source of information with respect to
9  what Roxane's sales forces were telling customers
10 regarding the spread?
11         MR. BREEN:  Objection.  Form.
12         THE WITNESS:  Well, I mean, the only
13 way I could reduce it down and feel totally
14 comfortable with this -- with this yes-or-no
15 answer is, if I was able to say, "Look.  We -- we
16 were GPO customers.  GPOs frequently represented
17 Roxane's prices, just like they represented
18 Warrick's or Dey's or Abbott's.
19         And when they represented them, they
20 often would give you the price.  They'd give you
21 the spread amount.  So that's, to me, marketing
22 the spread.  That's something that a sales force

1234

1  person would do or be in charge of.  Was it --
2  was it someone personal doing it?  No.  But it
3  was the GPO marketing spread with Roxane product.
4      BY MR. GORTNER:
5      Q.  Okay.  So you're referring to this --
6  this -- the category you're distinguishing are --
7  are communications from GPOs, for instance, to --
8  to Ven-A-Care?
9      A.  Right.  Because you're trying to --
10 what you're doing is, you're asking me to
11 distinguish marketing and -- and sales reps and
12 what they do and what they say.
13     Q.  Well, let me just take a step back.
14        Are you -- I am trying to refer to
15 individuals that you -- that we could agree on
16 that were Roxane employees versus employees of a
17 GPO, okay?  Can we make that distinction?
18     A.  Yes.
19     Q.  Okay.  So my question here is that what
20 you're referring to in this case were situations
21 where GPO employees have communications with Ven-
22 A-Care.  Okay.  Sticking with that particular

1235

1  interaction, do you have any information that a -
2  - any GPO employee ever discussed the spread on
3  Roxane's products with a Ven-A-Care person?
4      A.  Other than putting it in writing, no.
5      Q.  And you mean by "putting it in writing"
6  are things like ads for products that might
7  include Roxane's products under a GPO letterhead?
8      A.  That could be one form, or price lists
9  that calculate out the AWP and the spread between
10 the AWP and the -- and the cost.
11         And I -- and I -- and I don't have a
12 problem telling you, I never had a conversation
13 with a Roxane employee about that, if that's what
14 you are wanting me to say.
15     Q.  I'm not wanting you to say anything.
16 I'm just asking questions and trying to
17 understand --
18     A.  I know.  I understand.
19     Q.  -- what Ven-A-Care knew, during the
20 course of its investigation, about the training
21 of Roxane's sales employees and what Roxane's
22 sales employees were telling customers.  That's

1236

1  what I'm trying to find out from you.
2         And if I'm understanding your responses
3  correctly, it's that Ven-A-Care did not have
4  information, outside of this litigation or
5  congressional hearings, as to what Roxane's sales
6  employees were telling customers, if anything,
7  about the spread?
8     A.  Ven-A-Care had its assumptions.  Ven-A-
9  Care, because it was an industry insider,
10 understood the way the market worked and what it
11 -- and had assumptions about it, but Ven-A-Care
12 never had a particular conversation with a Roxane
13 employee about that.
14    Q.  Nor did Ven-A-Care have information
15 about particular conversations that Roxane
16 employees actually had with customers with
17 respect to the spread?
18         MR. BREEN: Objection. Form.
19         THE WITNESS: Well, I know that --
20 well, never mind.  I -- I just have a hard time
21 answering that question, because I don't -- I
22 don't understand the boundary on it, you know,

1237

1  what Ven-A-Care knew when and how.  And I just
2  want to commit to saying Ven-A-Care didn't know
3  anything, because Ven-A-Care knew a lot.  It was
4  out there instructing, you know, a lot of people
5  about what was happening in the marketplace, how
6  drugs were being sold, how drugs were being
7  marketed.
8  BY MR. GORTNER:
9     Q.  I understand that, Mr. Jones.  My
10 question is just -- is very simple to you:  Did
11 Ven-A-Care have any information, prior to filing
12 its April 2000 complaint, specifically about what
13 Roxane's sales force were saying to customers
14 about the spread, if anything?
15    A.  I'm not a hundred percent sure.
16    Q.  And right now, as the corporate
17 designee for Ven-A-Care, you're not aware of any
18 information that would lead you to believe that
19 Ven-A-Care in fact had such information?
20         MR. BREEN: Objection. Form.
21         THE WITNESS: Right. Yes.
22 BY MR. GORTNER:

1238

1     Q.  During the course of its
2  investigations, did Ven-A-Care ever investigate
3  Roxane's profits?
4     A.  Roxane the company's profits?
5     Q.  Uh-huh.
6     A.  I would -- I suspect that we did some
7  kind of corporate query on Roxane.  It wasn't
8  unusual, for at least the attorneys or the
9  paralegals, to do a query on the corporation,
10 just for all of the legal reasons that you had to
11 know what that corporation, what the name was,
12 you know, well, who was the owner or where they -
13 - what -- what -- who are they related to.  All
14 that stuff.
15    Q.  Do you know whether Ven-A-Care ever
16 investigated Roxane's profitability with respect
17 to the drugs that are being alleged in the
18 current complaint in this case?
19    A.  Directly related to the drugs?  I don't
20 think so, no.
21    Q.  Did Ven-A-Care ever study whether
22 Roxane's market share changed because of a change

1239

1  in any published AWP or WAC price?
2     A.  Well, I think that one of the things
3  that Dr. Lockwood always did was take these drugs
4  and put them in -- in queries, look at
5  utilization, look at price changes, you know.
6  And he -- he actually did track.  We have always
7  tracked stuff like that in general.  We weren't
8  as sophisticated as John is.  You know, John will
9  -- John will put it on a computer now and take it
10 and look it, look at -- look at the drug, look at
11 the price, look at the price change, see what
12 utilizations are, if utilizations have changed.
13 I believe he's -- I think he's testified to that
14 as well.
15    Q.  Do you know for a fact whether Ven-A-
16 Care did such an investigation with respect to
17 the NDCs or other drugs at issue in this case?
18 And what I mean by "this case" is the Department
19 of Justice case against Roxane.
20    A.  Uh-huh.  I think that -- I believe that
21 Ven-A-Care at least looked at the Ipratropiums,
22 the inhalants, and then probably broke it down

**1252**

1    Q. Okay. And what, if anything, did Ven-
2 A-Care know, as a result of its direct and
3 independent investigation, about Roxane's
4 decision, in 1996, to develop a pricing strategy
5 for the launch Ipratropium Bromide?
6    A. Well, what Ven-A-Care knew, because it
7 had the pricing, insider pricing, we knew -- Ven-
8 A-Care knew that they had created a spread
9 between AWP and its purchase price. We knew that
10 they reported their -- their AWPs and WACs to Red
11 Book and Blue Book. We knew that Red Book and
12 Blue Book would then be used as a reimbursement,
13 a reimbursement mechanism for Medicare and
14 Medicaid, and we knew that they sold their drugs
15 through wholesalers, and we knew they sold them
16 also through specialty -- specialty pharmacies --
17 or specialty wholesalers. I'm sorry.
18    And basically by doing that, they
19 created the spread, and they were able to gain
20 their market. I mean, that was easy to see. In
21 fact, that's why that -- that chart was so
22 important.

**1253**

1    Q. The Ipratropium Bromide chart?
2    A. Right. And it wasn't specific to
3 Roxane. It was just an Ipratropium Bromide
4 chart.
5    Q. Right. Did you ever mention Roxane in
6 connection with that chart during these
7 presentations that you made to states and the
8 federal government?
9    A. I believe that when we were making
10 those presentations, we mentioned the players,
11 you know, like Roxane, Dey.
12    Q. Okay. And Roxane, Dey would have been
13 the main players?
14    A. The main two that we were looking at,
15 yes.
16    Q. Okay. Looking at paragraph 63, just
17 the first line of paragraph 63, it reads, "In
18 another example of defendant's fraudulent
19 conduct, in August 2000, employees at BIPI, in
20 concert with employees of Roxane, decided to
21 falsely increase the AWPs on Roxane's Furosamide
22 products for the express purpose of creating a

**1254**

1 spread that would gain the company increased
2 market share."
3    What did Ven-A-Care know, if anything,
4 about this allegation that employees at BIPI
5 acted in concert with Roxane here?
6    A. I think that this is a -- an example of
7 something found in discovery. This would be the
8 Furo train, I believe, the furosemide. And I
9 actually believe this -- this related to Leslie
10 Paoletti's testimony in the congressional
11 hearings that we were at.
12    Q. And the Furo train, you're referring to
13 an e-mail document?
14    A. An e-mail document, yes.
15    Q. And it was an e-mail document that was
16 produced in the -- I think first in the Texas
17 litigation?
18    A. Perhaps. Perhaps.
19    Q. Okay. So that -- that's -- the basis
20 of that allegation comes --
21    A. Yes.
22    Q. -- from that -- that e-mail?

**1255**

1    MR. BREEN: You mean -- when you say
2 "that allegation," can you -- to be real clear on
3 the record --
4    THE WITNESS: Number 63.
5    MR. BREEN: -- do you mean --
6    MR. GORTNER: The employees at BIPI in
7 concert with the employees of Roxane.
8    MR. BREEN: Okay.
9 BY MR. GORTNER:
10    Q. And I understand what your testimony
11 earlier was saying, is that -- is that Ven-A-Care
12 had the ability to see the published AWPs, for
13 certain Roxane products, in compendia, like Red
14 Book, for instance, and then through information
15 sources like the McKesson, Econolink or GPOs, or
16 other wholesalers, you could see the prices that
17 -- that were -- were there and could calculate
18 the difference between the two. That -- that's
19 something that Ven-A-Care was doing or was able
20 to do. Is that fair to say?
21    A. It's something Ven-A-Care did all the
22 time.

1256

1  Q. Okay. And from -- and from those two
2  pieces of information, the published AWP and the
3  -- the price that was offered by the particular
4  GPO or the wholesaler, when there was a spread,
5  Ven-A-Care would make the inference that Roxane
6  was purposely creating that spread. Is that a
7  fair statement?
8     A. Well, yeah. I mean, purposely in that
9  they are in control of their prices, and they're
10 the ones that submitted the prices to the
11 compendia.
12    Whether they submitted an AWP and a
13 WAC, or a WAC that was calculated to be in an
14 AWP, it was theirs. They owned it. It was their
15 responsibility.
16    Q. But that goes back to my earlier
17 question that Ven-A-Care didn't have a contact or
18 a source that worked within Roxane, so you had to
19 make inferences about --
20    A. Correct.
21    Q. -- what Roxane was intending to do?
22    A. Yeah. I'll agree with that.

1257

1  Q. Okay. I'm going to ask you a few
2  questions about disclosure statements.
3     Is it correct that at each point prior
4  or contemporaneous with filing a qui tam
5  complaint in this case, that Ven-A-Care submitted
6  what we've been referring to as a disclosure
7  statement or amendments to the disclosure
8  statement related to those particular complaints?
9     A. Ven-A-Care was in the habit of
10 submitting disclosure statements. It was also in
11 the habit of submitting just disclosures all the
12 time.
13    You know, whenever it found drugs that
14 it was interested in, using an amendment,
15 whenever it found any kind of information that
16 was appropriate to a particular case that was
17 maybe going to be amended, we would always give
18 it to someone in that, you know, either the DOJ,
19 the U.S. attorney, the OIG.
20    Q. Okay. Well, let's -- let's tick
21 through some of the disclosure statements. And
22 I'll represent to you that on the privilege log

1258

1  produced by Ven-A-Care, and perhaps in an
2  interrogatory response, Ven-A-Care has identified
3  that it, at points just before or at the time
4  they filed the amended complaints, that they were
5  submitting disclosure statements from them as to
6  the federal government. Okay?
7     What I wanted to ask you first is in
8  regard to the first disclosure statement. What -
9  - what was sent with relationship to the April
10 2000 complaint that's been marked previously as
11 Roxane 90?
12    Can you tell me what specific facts
13 Ven-A-Care disclosed to the government about
14 Roxane specifically, and in particular, Roxane's
15 sales prices on its drugs?
16    A. Well, what I would immediately be able
17 to say is, that we disclosed all of our price and
18 cost lists. You know, all of our GPO prices, all
19 our wholesale prices, any specialty wholesaler
20 prices, any -- any fliers that we had that may
21 represent, you know, any kind of marketing of
22 Roxane drugs.

1259

1     Let's see. If we had done any kind of
2  a corporate search, you know, any kind of a
3  relationship search, we would have submitted
4  that.
5     Q. Well, let's stick with Roxane's prices
6  for its drugs --
7     A. Uh-huh.
8     Q. -- in the marketplace, which, in the
9  instance of Ven-A-Care, would -- would refer to
10 prices that were offered by either group
11 purchasing organizations like ServAll or
12 Innovatix --
13    A. Uh-huh.
14    Q. -- or wholesalers like McKesson or
15 ANDA.
16    A. Uh-huh.
17    Q. Given that that was Ven-A-Care's source
18 for prices, what specific prices were provided to
19 the government on or before April 10th, 2000 in
20 that disclosure statement?
21    A. (No audible response.)
22    MR. BREEN: Can I make a suggestion?

1272

1  Can you tell me what specific facts
2  Ven-A-Care communicated to the government about
3  Roxane's drug prices?
4      MR. BREEN:  And I'm going to instruct
5  the witness, I'm going to allow the witness to
6  answer questions regarding factual information
7  that Ven-A-Care provided to the government
8  regarding Roxane's drug prices, but I'll ask that
9  the witness not divulge any information regarding
10 case strategy, theories of the cause of action,
11 or anything like that that were gleaned from
12 discussions with counsel or counsel for the
13 United States.
14     And if the witness has difficulty in
15 drawing the line there, let us know, and we'll
16 try to work it out together.
17     THE WITNESS:  So can I use the two
18 together?
19     MR. BREEN:  You can use two together.
20 Right now, I think Mr. Gortner's question is at
21 the time of the April 2000 original --
22     THE WITNESS:  14.  Yeah.

1273

1      MR. BREEN:  -- original filing.
2      THE WITNESS:  What I have here in front
3  of me shows that we have -- we've produced ANDA
4  Generics, including invoices or an invoice.  We
5  produced Amerinet contract item listing by Bergen
6  Brunswig.
7  BY MR. GORTNER:
8      Q.  Let me interrupt you just a moment,
9  because we may be able to short circuit this.
10     You're looking at Roxane 202 right now.
11 You're looking at item one, ANDA Generics, which
12 has a variety of Bates label.  You can't tell me
13 right now --
14     **A.  No.**
15     Q.  -- whether that had Roxane-specific
16 information.  And, obviously, we haven't had this
17 document before this moment, so I can't tell you
18 right now whether there's Roxane information in
19 there.
20     MR. BREEN:  What we can do is, is see
21 the Ven-A-Care Bates number on the right-hand
22 corner?  That's the Ven-A-Care internal corporate

1274

1  control number.  Ms. Forrest is available today
2  to pull up any of those and crosswalk those to
3  the MDL production number, so that we can
4  actually point you to the produced document, if
5  you want to do it to any one of them, do a
6  sample, or do it after the deposition.  We'll do
7  it any way you want to do it.
8      MR. GORTNER:  Well, what I'm going to -
9  - yeah.  What I'm going to propose that we do, in
10 the interest of time, and what we have to cover
11 that's left, is, Jim, I'm going to take you up on
12 your offer to do this after the deposition, and
13 what we can do is agree to crosswalk the -- the
14 internal Bates numbers, or the documents that
15 were produced by disclosure statement to the ones
16 that are in the MDL -- the VAC MDL Bates labels
17 so that we can identify those documents in the
18 actual document production.
19     And I think that if we can reach
20 agreement to do that, that that will address the
21 large majority of the questions that we have.
22 There may be a few follow-ups or if there's going

1275

1  to be authentication suggestions.
2      MR. BREEN:  We can do that.  And I just
3  want to note, though, that the VA -- the Ven-A-
4  Care internal control numbers are on the produced
5  documents.  And we've made that clear in the
6  records custodian depositions and things like
7  that.  But we'll do it.  We'll help you with a
8  crosswalk.
9      MR. GORTNER:  Okay.
10 BY MR. GORTNER:
11     Q.  Well, then, let's -- let's move on to
12 another topic, then, Mr. Jones, which, hopefully,
13 will be less complicated.
14     Mr. Jones, I have a few questions, and
15 they're really, I think, clarifying questions
16 about Ven-A-Care's business during certain
17 periods of time prior to the filing of Ven-A-
18 Care's first complaint.
19     First of all, as I understand from
20 prior testimony, from both you and Dr. Lockwood
21 and different principals of Ven-A-Care, that is
22 it fair to say that the Medicare side -- or to be

**1276**

1  clear, Medicare patients were a small part of
2  Ven-A-Care's business?  Is that a fair
3  characterization?
4     A.  I believe that's a fair
5  characterization.
6     Q.  Or actually to be clear, I think -- I
7  think the testimony was that Medicare was a very
8  small part and Medicaid was a small part.
9     A.  Yes.
10    Q.  That's correct?
11    A.  That would be a good characterization.
12    Q.  And that by mid 1996, Ven-A-Care was
13 only seeing a few patients as part of its
14 practice; is that correct?
15    A.  Yes.  I think by 1996, we had pretty
16 much exhausted our patient base.  There were --
17 there were patients that we'd had that we had
18 kept that were long term, but we basically
19 weren't getting any -- any really new patients.
20        I think in '98, I treated my mother.  I
21 mean, that -- that's kind of where we were.  And
22 we were doing back billings on stuff that we

**1277**

1  never got.  But, you know, the Immune Care
2  venture essentially wiped us out.
3     Q.  Okay.  And they wiped you out by
4  sometime in the mid '90s?  Is that fair?
5     A.  I would say, you know, mid -- mid '90s.
6  I mean, the writing was on the wall.
7     Q.  Now, during its investigation of
8  Roxane, did Ven-A-Care ever acquire knowledge
9  that Roxane ever informed a provider on how to
10 fill out a Medicare or Medicaid claim form?
11    A.  You mean like either personally or
12 through some sort of a billing guide book or --
13 no.
14    Q.  You're not aware, are you, that anyone
15 affiliated with Roxane ever told a provider what
16 to fill in as, for instance, a usual and
17 customary charge in a Medicaid form?
18    A.  No.
19    Q.  And Roxane certainly never communicated
20 to Ven-A-Care any information on how it should
21 submit or not submit claims in this practice?
22    A.  No.

**1278**

1     Q.  I want to focus attention on Ven-A-
2  Care's investigations of inhalation drugs and
3  Ipratropium Bromide in particular.
4         You had indicated earlier that Ven-A-
5  Care had focused on Ipratropium Bromide fairly
6  early.  And what I mean by "fairly early" is
7  around the 1996-'97 time period, when generics
8  and Ipratropium Bromide from Roxane and Dey were
9  entering the market.  Is that correct?
10    A.  Yes.
11    Q.  And my understanding is that Ven-A-Care
12 was also involved in some OIG reports that had
13 been issued that addressed the Ipratropium
14 Bromide.  Do you have any recollection of that?
15    A.  The OIG reports -- well, we've helped
16 Rob Vitto on many occasions with drug pricing.  I
17 mean, from inhalation drugs to chemotherapy and
18 TP and all that stuff.  But the inhalation drug
19 report that I remember that he used a lot of our
20 information on, was the Albuterol report in '96.
21 And then later on there was -- I guess there was
22 -- I guess it was toward the late '90s, the

**1279**

1  Ipratropium.
2     Q.  Right.  The one I'm referring to -- and
3  I can pull a copy of it out in a moment -- is:
4  Do you recall there was a 1998 OIG report that
5  compared the payments that Medicare was making,
6  for a variety of drugs, including Ipratropium
7  Bromide and Albuterol, with the payments that the
8  Veteran's Administration was making?
9     A.  Vaguely I recall it, yes.
10    Q.  Is it accurate that Ven-A-Care supplied
11 pricing information to the OIG with respect to
12 the Ipratropium Bromide products in that case?
13    A.  I would say probably, yes.
14    Q.  Okay.  Do you recall whether that
15 report itself was at Ven-A-Care's suggestion?
16    A.  No.  I don't think it was at our
17 suggestion.  I mean, I don't remember it being at
18 our suggestion.
19        (Exhibit Roxane 205 was marked for
20 identification.)
21 BY MR. GORTNER:
22    Q.  I marked this as Exhibit 205, Mr.