# EXHIBIT 44B

1  if you are buying it from one wholesaler, you
2  are getting the same price, all the different
3  other -- the suppliers are getting the same or
4  different pricing.
5  Q.    All I'm asking is what this page is
6  telling us.
7  A.    This page is telling us that there was a
8  high of .3167 and a low of .130. That's what it
9  was showing. And that's from purchase from the
10 wholesaler.
11 Q.    And those are purchases of Albuterol from
12 wholesalers, right?
13 A.    Yes.
14 Q.    In 1995?
15 A.    Whatever year this was.
16 Q.    1995, right?
17 A.    Yeah, '95. I don't know. That's what the
18 date of the -- I don't know when we got the
19 prices, though.
20 Q.    And for all you know, there were higher
21 prices out there, right?
22 A.    No, all we know is what we have.

1030

1  Q.    And at the time, AWP is about 43 cents for
2  Albuterol?
3  A.    I don't remember, but I could look.
4              MR. AZORSKY:  Objection,
5  form.
6              THE WITNESS:  What report was
7  this one?
8  BY MR. MERKL:
9  Q.    '96.
10 A.    I don't know.  It looks like it was -- I
11 don't know exactly what the reimbursement was at
12 that time, but that sounds like it was around
13 the number.
14 Q.    So some suppliers were paying 75, 80
15 percent below AWP, some were paying only 25
16 percent below AWP?
17 A.    I don't know your exact calculations, but
18 there are varying pricing.
19             MR. DRAYCOTT:  Does that
20 conclude your questions with respect to Dey 17?
21             MR. MERKL:  Yes.
22             MR. DRAYCOTT:  We need to

1031

1   state for the record that it appears as we were
2   reviewing this document that we inadvertently
3   failed to redact patient identifying information
4   from this exhibit.  So what we are going to do
5   is, we will provide those redactions in a
6   caption which explains that it is patient
7   identifying information is being redacted and
8   supply both you and the court reporter with a
9   substitute Dey 17.
10                  MR. MERKL:  Fine, no
11  objection.
12                  MR. DRAYCOTT:  Thanks.
13                  MR. MERKL:  Actually, we may
14  have discussed this previously, and this could
15  be -- maybe it was a different -- I don't have
16  any problem at all with what you are
17  suggesting.
18                  MR. DRAYCOTT:  I remember it
19  coming up.  I think the simplest thing to do,
20  rather than --
21                  MR. MERKL:  Just basically
22  blot the column.

1   MR. DRAYCOTT: Yes, what we
2   will do -- and referring to like HHD 010917,
3   there is actually an HIC number and a
4   beneficiary column. That is information that
5   should have been redacted. We propose limiting
6   the redaction just to those two columns, which
7   doesn't appear to be information that is
8   significant for your purposes, and then we
9   indicate that patient identifying information
10  has been redacted there, provide you and the
11  court reporter with new copies of this, and then
12  we would ask you to substitute a new document
13  for what's now marked Dey 17.
14                  MR. MERKL: Okay, do you want
15  to take a break?
16                  MR. DRAYCOTT: Sure.
17                  THE VIDEO TAPE OPERATOR: Off
18  the video, 10:17.
19                           - - -
20                  (Whereupon a short break was
21  taken at this time.)
22                           - - -

1  Robert Zone, dated February 13, 1995.  It
2  appears to be 21 pages long, starting at Counsel
3  Stamp HHD 011-0311.
4                         - - -
5                  (Whereupon the court reporter
6  marked document as Exhibit Dey 047 for
7  identification.)
8                         - - -
9  BY MR. MERKL:
10 Q.    Mr. Vito, do you recognize Dey Exhibit
11 47?
12 **A.    It looks like it is a fax from Doctor Zone**
13 **to myself.**
14 Q.    And who is Doctor Zone?
15 **A.    I believe he was the medical director at**
16 **the DMERC from Cigna.**
17 Q.    What is the DMERC from Cigna?
18 **A.    I believe they are the durable medical**
19 **equipment regional carrier.**
20 Q.    What does that mean?
21 **A.    They are the ones that process the**
22 **claims.  I think there were four DMERCs in**

1035

1   place, and this was one of the four DMERCs.
2   Q.   Well, they were a government contractor
3   that handled Medicare claims?
4   **A.   I believe they were contracted by CMS to**
5   **handle claims for durable medical equipment.**
6   Q.   And those are Medicare claims?
7   **A.   For durable medical equipment.**
8   Q.   And what is durable medical equipment?
9   **A.   I think it is equipment that can stand**
10  **repeated use, but again, off the top of my -- I**
11  **think it would be better if I could just -- it**
12  **is in one of our reports as it is defined,**
13  **durable medical equipment.**
14  Q.   And nebulizers are durable medical
15  equipment, right?
16  **A.   Yes.**
17  Q.   And nebulizers are what you use to use
18  Albuterol, right?
19  **A.   Yes.**
20  Q.   So among the claims that Doctor Zone was
21  handling was Albuterol claims for Medicare,
22  right?

1  A.  Yes.
2  Q.  And this fax he sent to you, do you recall
3  getting the fax?
4  A.  **I don't recall, but I'm sure I got it. If**
5  **it was sent from him to me, I'm pretty sure I**
6  **must have had it.**
7  Q.  In the course of your investigation and
8  the work you were doing, you were in
9  communication with Doctor Zone from time to
10 time, right?
11 A.  **Yes, I was.**
12 Q.  What kind of information was Doctor Zone
13 talking to you about?
14 A.  **Oh, multiple pieces of information.**
15 Q.  What kind of pieces of information as it
16 concerned prescription drugs?
17 A.  **Some prescription drugs, some about**
18 **glucose strips, some about other items.**
19 Q.  How about inhalation drugs?
20 A.  **Some about that, for sure.**
21 Q.  What were you talking to him about about
22 inhalation drugs?

1037

1   A.   Probably the coverage requirements.  I
2   think we did some look at that, as well as the
3   pricing.
4   Q.   So he would talk to you about the pricing
5   of inhalation drugs?
6   A.   Well, I think he became aware of our work
7   in the area.
8   Q.   And did he give you any information about
9   prices?
10  A.   Apparently, there seems to be something in
11  here, and if this was part of the fax, then he
12  did.
13  Q.   What is it he sent you that concerned drug
14  pricing?
15  A.   In this document that you gave me, I guess
16  the next to the last page, it has something from
17  Dey Laboratories.  It says:  Send payment to Dey
18  Laboratories.
19  Q.   Right, it is a payment invoice, right?
20  A.   I think.  I didn't have a chance to look
21  at it carefully, but --
22  Q.   Take a look.

1   A.   It says send payment to.
2   Q.   And it describes Dey drugs there, right?
3   A.   If it was a Dey Laboratory -- I guess it
4   would be Dey drugs.
5   Q.   And what kind of Dey drugs are covered by
6   this invoice?
7   A.   It looks like it is Albuterol, Cromolyn
8   and I couldn't -- I don't read -- I can't read
9   the last one, something sodium.
10  Q.   In the right-hand column, there appear to
11  be prices?
12  A.   There appear to be prices.
13  Q.   So in February of 1995, Doctor Zone sent
14  you an invoice showing Dey prices for Albuterol
15  and Cromolyn?
16  A.   Yes.
17  Q.   Do you recall that happening on more than
18  one occasion?
19  A.   I do not recall.
20            MR. AZORSKY:  Objection to
21  form.
22  BY MR. MERKL:

1039

1   Q.    Is this the type of information that you
2   used in doing your work at OIG on inhalation
3   drug prices?
4   **A.    No, we didn't use this.**
5   Q.    You didn't look at invoices?
6   **A.    We looked at invoices, but not this one.**
7   **On our reports, we had to have a methodology.**
8   **We couldn't just say we got one invoice and said**
9   **something about that invoice. We had to have a**
10  **methodology. You saw our jobs.**
11  Q.    Right, but when you were working on the
12  report, you did look at this invoice when he
13  sent it to you, right?
14  **A.    I don't know exactly -- well, let me see.**
15  **It was sent in 1995. I would imagine, if we**
16  **were working on a report at that time, that we**
17  **would have seen this as well, yes.**
18  Q.    You would have considered it along with
19  everything else?
20              MR. AZORSKY: Objection,
21  form.
22              THE WITNESS: Well, we would

1  have just had it as part of information, because
2   -- the information that appears in our report,
3  so it is based on only the work that we have
4  done that's clearly identified in the
5  methodology of our work.
6  BY MR. MERKL:
7  Q.    But when you get information from other
8  sources, you just don't ignore it, do you?
9  **A.    No, but that could be used as information**
10 **that came from another source, and you can see**
11 **what it says.  You could also look at it to see**
12 **how it compares to some of the things that you**
13 **might be getting yourself.**
14 Q.    Well, this is a '95 invoice.  Is it
15 possible that this invoice was what gave you the
16 idea to do the report?
17                 MR. AZORSKY:  Objection to
18 form.
19                 THE WITNESS:  No.
20 BY MR. MERKL:
21 Q.    Why do you say that?
22 **A.    Because I think we were doing the reports**