# EXHIBIT 46

Jones, T. Mark - Vol. III                    December 8, 2008
                    Washington, DC

705

                  UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

    - - - - - - - - - - - - - - -x

    IN RE:  PHARMACEUTICAL        :   MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE    :   CIVIL ACTION

    PRICE LITIGATION              :   01-CV-12257-PBS

    - - - - - - - - - - - - - - -x

    THIS DOCUMENT RELATES TO:     :

    U.S. ex rel. Ven-a-Care of    :   Hon.  Patti B. Saris

    the Florida Keys, Inc.        :

         v.                       :

    Dey, Inc., et al.             :

    No. 05-11084-PBS              :

    - - - - - - - - - - - - - - -x


           (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)


             CONTINUED DEPOSITION OF T. MARK JONES

                      Washington, D.C.

                  Monday, December 8, 2008

                       VOLUME III

Jones, T. Mark - Vol. III                    December 8, 2008
Washington, DC

786

1    amended complaint that Ven-A-Care disagrees with?

2         A.   In the allegations?

3         Q.   Yes.

4         A.   No.

5         Q.   Turn to pages 10 and 11, please.

6         A.   Okay.

7         Q.   Now, you see that there is a list of

8    drugs and there is an NDC listed for each of the

9    drugs, right?

10        A.   Correct.

11        Q.   Does Ven-A-Care allege to be the direct

12   and independent -- I'm sorry, strike that.  Does

13   Ven-A-Care allege to have direct and independent

14   knowledge of the information, and is the original

15   source of the information on which the

16   allegations relating to each of these NDCs is

17   based?

18             MR. BREEN:  Objection to form.  And I

19   will state for the record that this gets to the

20   core of our primary objection to the

21   designations.  And that is, this chick and the

22   egg issue between original source and what have

Jones, T. Mark - Vol. III                December 8, 2008

Washington, DC

787

1    you.  Having said that, I'll let the witness

2    answer to the best of his ability.

3    BY MR. KATZ:

4         Q.   Go ahead.

5         A.   Could you repeat that, please?

6         Q.   On an NDC by NDC basis, or a drug by

7    drug basis, does Ven-A-Care allege to be the

8    original source of the information?

9         A.   Ven-A-Care typically gave all of its

10   pricing and cost information in its complaints,

11   and to the federal government.  Yes.  Ven-A-Care

12   has provided the federal government with, you

13   know, our price and cost information as being an

14   industry insider.  I think Ven-A-Care certainly

15   can say this information came from within Ven-A-

16   Care, yes.

17        Q.   And so Ven-A-Care contends that it has

18   direct knowledge with respect to each of these

19   NDCs, is that right?

20        A.   Yes.

21        Q.   And that direct knowledge would relate

22   to pricing, is that what you said?

Jones, T. Mark - Vol. III                                    December 8, 2008
                          Washington, DC

788

1          A.    Our pricing and cost records.    Correct.

2          Q.    Any other types of knowledge?

3          A.    I believe all of our information came

4     from our pricing records, GPO records, wholesale

5     records.   Now, we did have some companies

6     courting us like Pulmidose that would give us

7     information and prices on them as well.    But no,

8     we had GPO -- contracts with several GPOs.    We

9     had McKesson wholesaler.   We had, you know,

10    traditional wholesalers.   We had the special

11    wholesalers like JJ Balan, and ANDA and RDI.    Our

12    information definitely came from that

13    marketplace.

14    BY MR. KATZ:

15         Q.    What is Pulmidose?

16         A.    Pulmidose was a company that was

17    courting Ven-A-Care and Criticare back in the

18    '90s.   It was sort of a split fee situation where

19    Pulmidose would supply a particular amount of

20    drugs, and then pay a fee for supplying it.

21    There was some issues back in the '90s when they

22    didn't allow DME companies to bill for the

Jones, T. Mark - Vol. III                          December 8, 2008
                        Washington, DC

799

1            MR. LYNCH:  That would really help.

2            MR. BREEN:  I know it will.  And we may

3     be at that point that we'll do that, as long as

4     we have an agreement that it's not a general

5     waiver of anything.  But let's see what happens

6     during the next break.

7     BY MR. KATZ:

8         Q.   You mentioned the OIG, that would be

9     the Office of Inspector General of the Department

10    of Health and Human Services, right?

11        A.   Yes.

12        Q.   And you're aware, as a general matter,

13    that the OIG put out reports going back to the

14    1980s comparing AWPs to provider's actual

15    acquisition costs, right?

16        A.   I'm aware that the OIG put out reports

17    going back to the '80s.  I'm not sure that I can

18    testify that I know exactly what those reports

19    are off the top of my head.

20        Q.   Well, when you first contacted the OIG,

21    and informed them that Ven-A-Care believed that

22    there was a difference between AWPs and actual

Jones, T. Mark - Vol. III                    December 8, 2008
                     Washington, DC

800

1    acquisition costs, is it your contention that

2    this was new information being provided to the

3    OIG?

4              MR. BREEN:  Objection.  Form.

5              THE WITNESS:  Well, when we first

6    contacted the OIG, it was back in the earlier

7    '90s, and it was with Miss Penniston and Kitty

8    Ahern.  And I think she was out of the D.C. or

9    Baltimore office.  I can't be for sure.

10             But most of what our conversations were

11   about, were about TPN, you know, the price

12   discrepancies in IDPN and TPN.  And subsequently,

13   the difference between acquisition cost and the

14   reimbursement amounts in the marketplace.

15             So it started out with them and then it

16   made its transition into Rob Vitto.  And I think

17   we started discussing this issue with Rob Vitto

18   back, I want to say as early as late '95.  And a

19   lot of -- we spent a lot of time with Rob in the

20   early 1996 period, giving him information on the

21   Albuterol drugs or the inhalants, because he was

22   developing a report for the inhalant drugs.

Jones, T. Mark - Vol. III                    December 8, 2008
                        Washington, DC

801

1    BY MR. KATZ:

2        Q.   I'm not sure that you answered my

3    question, so let me ask it a different way.

4        A.   Okay.

5        Q.   When you first started -- when Ven-A-

6    Care first started communicating with the OIG,

7    the concept that AWP exceeded the actual

8    acquisition cost of pharmacies, is it Ven-A-

9    Care's contention that that was new information

10   being provided to the OIG?

11              MR. BREEN:  Objection.  Form.

12              THE WITNESS:  What Ven-A-Care provided

13   to the OIG was something the OIG hadn't seen

14   before.  The OIG didn't realize that -- I mean, I

15   looked at some reports that they did, and we

16   discussed it with them.  They did differences

17   between WAC and AWP, acquisition cost, you know,

18   the difference between the WAC and the AWP being

19   the difference between acquisition cost.

20              I don't know that the OIG -- I didn't

21   feel like the OIG knew that there were 300

22   percent differences, thousand percent

Jones, T. Mark - Vol. III                     December 8, 2008
                        Washington, DC

802

1    differences.  That was all new information to the

2    OIG, in my mind, and in Ven-A-Care's mind.

3    BY MR. KATZ:

4        Q.   Okay.  So it's Ven-A-Care's contention

5    that the new information being provided with

6    respect to the comparison between AWP and actual

7    acquisition costs were these very large spreads,

8    in the hundreds and maybe thousands of percents?

9            MR. BREEN:  Objection.  Form.

10           THE WITNESS:  I don't want to get

11   nailed down to the large spreads, because a 50

12   percent spread on a big drug can be as

13   significant as a thousand percent on a small

14   drug.  The way we approached it, we had had

15   experience with Immune Care, and the Immune Care

16   venture was about splitting the fees on the

17   profits from drugs.

18           So we had been looking at drugs with

19   spreads that allowed pharmacies and physicians to

20   split fees with.  So that -- that was our

21   approach to the OIG.  So when we came in, what we

22   came in with was, here are spreads on drugs,

Jones, T. Mark - Vol. III                        December 8, 2008
Washington, DC

803

1    here's pharmaceutical companies using those

2    spreads to market it, to secure market share, to

3    get physicians to prescribe it.  And we were a

4    prime example of having suffered that problem in

5    the marketplace.

6    BY MR. KATZ:

7         Q.   Okay.  But sticking with the large

8    spreads, would that be something that was

9    communicated by Ven-A-Care to the federal

10   government with respect to Dey's drugs starting

11   in 1995?

12        A.   We communicated -- we gave them the

13   pricing that we had for Dey Labs inhalant drugs

14   in 1995.  Yes.

15        Q.   Did Ven-A-Care tell anyone from the

16   federal government, and you can specify who, that

17   there were spreads in excess of 100 percent for

18   Dey's drugs starting in 1995?

19             MR. BREEN:  Objection.  Form.

20             THE WITNESS:  I don't exactly recall

21   the spreads for Dey's drugs in 1995.  I'd have to

22   look at it to testify accurately.  I'm sure Ven-

Jones, T. Mark - Vol. III                    December 8, 2008
                    Washington, DC

815

1    chargeback the $30 to Dey, right?

2        A.    Yes.

3        Q.    And this is a concept that was

4    explained to the state and federal government

5    agencies, right?

6        A.    I believe it was a part of our

7    presentations.

8        Q.    And with respect to the federal

9    government, since 1995, Ven-A-Care has

10   continuously provided pricing information

11   relating to Dey's drugs, right?

12       A.    I believe it was 1995 when Ven-A-Care

13   first provided the pricing information for Dey's

14   drugs.

15       Q.    And you can look on the interrogatory

16   responses if it refreshes your recollection.

17       A.    That's what it says.

18       Q.    So 1995, right?

19       A.    1995.

20       Q.    Where did Ven-A-Care obtain the pricing

21   information which it provided to the federal

22   government?

Jones, T. Mark - Vol. III                    December 8, 2008
Washington, DC

816

1              MR. BREEN:  Objection.  Form.

2              THE WITNESS:  Well, I believe -- and I

3      need to look at it to be sure, but we had GPOs in

4      '95 that had Dey's prices in there.  We also had

5      wholesalers that would give us prices all the

6      time.

7      BY MR. KATZ:

8         Q.   And there were few occasions where Ven-

9      A-Care obtained some prices directly from Dey?

10        A.   I know that Lewis Cobo had some

11     communications with Dey.  I wasn't aware of them.

12     I mean, I've seen -- I've seen the document where

13     one of the sales reps were talking to Lewis.  So

14     yes, he could have gotten them directly from Dey.

15        Q.   And then Mr. Cobo would then have

16     provided that information to Ven-A-Care and Ven-

17     A-Care would then have provided that information

18     to the federal government, is that right?

19             MR. BREEN:  Objection.  Form.

20             THE WITNESS:  Well, I think Mr. Cobo,

21     if he was at Ven-A-Care doing it, would do it for

22     Ven-A-Care.

Jones, T. Mark - Vol. III                    December 8, 2008
                        Washington, DC

828

1    Kentucky.  And basically, it's a -- it looks like

2    it's a quote for inhalant drugs and some of the

3    services that are available through Pulmidose.

4         Q.   Would all of these inhalant drugs

5    listed in this letter be Dey's drugs?

6         A.   Well, it's not listed, so it could be

7    Dey's drugs, it could be Warrick's drugs, it

8    could be Alpharma's, if Alpharma's was out.

9         Q.   Now, this letter was then faxed to Mark

10   Lavine, right?

11        A.   That's the cover sheet -- that's what

12   it says down on the bottom, yes.

13        Q.   And it was faxed to Mr. Lavine on

14   August 25th, 1995, right?

15        A.   Yes.

16        Q.   And it was faxed from Zachary Bentley

17   of Ven-A-Care, right?

18        A.   Yes.

19        Q.   And Mr. Lavine is an Assistant U.S.

20   Attorney with the United States Department of

21   Justice, right?

22        A.   Yes.

Jones, T. Mark - Vol. III                    December 8, 2008
Washington, DC

846

1   that?

2        A.    Yes.  But there are also specialty

3   wholesalers, like Balan and RDI, and you know,

4   ANDA, that you buy what you buy as net-net, and

5   there is no chargebacks.  And they are pretty

6   significant providers or suppliers of aerosol --

7   aerosolized drugs.  So that would have been one

8   of the focuses we would have been -- would have

9   made.

10  BY MR. KATZ:

11       Q.    With respect to WAC, Ven-A-Care would

12  have explained there were rebates, chargebacks,

13  and other price reductions that might affect the

14  final net price to the purchaser?

15       A.    If we were talking about traditional

16  wholesalers, yes.

17            THE VIDEOGRAPHER:  The time is 11:31

18  a.m.  This completes tape number one.

19                 (Recess.)

20                 (Exhibit Dey 304 was marked for

21  identification.)

22            THE VIDEOGRAPHER:  The time is 11:42

Jones, T. Mark - Vol. III                    December 8, 2008
Washington, DC

847

1    a.m.  This begins tape number two.

2    BY MR. KATZ:

3        Q.   Mr. Jones, I've handed you a document

4    marked Dey Exhibit 304.

5        A.   Yes.

6        Q.   You've had a chance to take a look at

7    it?

8        A.   I've looked at it.  Yes.

9        Q.   Briefly describe what this document is

10   for the record.

11       A.   This is a contract price, effective

12   September 15th, '93 from CPN PPO group purchasing

13   organization with the vendor being Dey Labs.

14   Let's see what else it says.

15       Q.   Well, we can go through it.

16       A.   Okay, if you want.

17       Q.   So CPN PPO, that's a GPO, right?

18       A.   Yes.

19       Q.   And Ven-A-Care was a member of the GPO

20   at the time?

21       A.   Yes.

22       Q.   Now, the prices provided to Ven-A-Care

Jones, T. Mark - Vol. III                    December 8, 2008
                      Washington, DC

848

1    would be the same prices that would have been

2    available to any members of this GPO, right?

3         A.    Not necessarily.  Sometimes the way

4    GPOs work was, you know, depending on your class

5    of trade, you know --

6         Q.    Well, how many members were in this GPO

7    at this time if you know, approximately?

8         A.    I don't know.

9         Q.    Was it more than a hundred?

10        A.    I suspect more than a hundred.

11        Q.    More than a thousand?

12        A.    That I couldn't tell you.

13        Q.    What -- do you know whether or not Ven-

14   A-Care had a class of trade in this GPO?

15        A.    Well, we were typically called closed

16   pharmacies, closed shop pharmacies.

17        Q.    So you believe it's possible that these

18   prices would have been only available for closed

19   shop pharmacies?

20             MR. BREEN:  Objection.  Form.

21             THE WITNESS:  I'm not saying that --

22   I'm just saying it's possible that there were

Jones, T. Mark - Vol. III                                December 8, 2008
                              Washington, DC

                                                                    849

1    different pricing tiers.  There were -- you know,

2    the GPOs also serviced nursing homes.  They

3    serviced, you know, other long-term care

4    facilities.  They may have serviced physicians'

5    offices, you know --

6    BY MR. KATZ:

7        Q.    Did Ven-A-Care contact CPN PPO to

8    request this information?

9        A.    I don't recall exactly how we got to

10   CPN PPO.  You notice it's a Boca Raton, Florida

11   GPO.  They could have very easily, you know,

12   looked in the books, and looked for all the

13   closed shops and contacted those.  This guy's

14   name was Mike Fabrizi, I do remember him, and he

15   was pretty active in recruiting members for his

16   GPO.

17       Q.    So Mike Fabrizi is a representative of

18   CPN PPO?

19       A.    Yes.  That's his signature on the

20   second page.

21       Q.    Okay.  If you go to the payment terms,

22   it says, 2 percent 30.  Do you know what that

Jones, T. Mark - Vol. III                    December 8, 2008
                    Washington, DC

854

1    documents that was included in there?

2          A.   I don't recall.

3               MR. BREEN:   Objection to form.

4               (Exhibit Dey 305 was marked for

5    identification.)

6    BY MR. KATZ:

7          Q.   I've handed you a document marked Dey

8    Exhibit 308, and for the record, this appears to

9    be a letter from Dey to Mike Fabrizi of the GPO,

10   Community Pharmacy Network.   Is that accurate?

11         A.   That's what it looks like, yes.

12         Q.   And it's dated August 30th, 1995,

13   right?

14         A.   Yes.

15         Q.   And it contains prices for Dey's

16   Albuterol Sulfate inhalation solution unit dose,

17   right?

18         A.   Yes.

19         Q.   For three NDCs, right?

20         A.   Yes.

21         Q.   Okay.   Where did Ven-A-Care obtain this

22   document?

Jones, T. Mark - Vol. III                          December 8, 2008
                         Washington, DC

855

1          A.   I believe that this would have been
2    given to us through the GPO.  Mike Fabrizi would
3    have given it to us.  That's to notify us that
4    there was a price change.
5          Q.   Did the GPO ordinarily forward these
6    types of documents to -- to its members such as
7    Ven-A-Care?
8          A.   They always -- they generally informed,
9    you know, the pharmacies when there were price
10   changes.
11         Q.   And they would do that by forwarding
12   documents like this?
13         A.   Uh-huh.
14         Q.   That's yes?
15         A.   Yes.
16         Q.   So all of the members of the GPO would
17   have received a document like this, which is a
18   copy of the letter Dey sent to Community Pharmacy
19   Network, right?
20         A.   I don't want to speak for all the
21   members.  I mean, I don't know --
22         Q.   Well, at least all of the members in

Jones, T. Mark - Vol. III                    December 8, 2008
Washington, DC

856

1    Ven-A-Care's class of trade?

2              MR. BREEN:  Objection to form.

3              THE WITNESS:  I kind of just want to

4    say, I know Ven-A-Care did.  I know what you're

5    saying, but I don't know that I can testify to

6    all the members.  I don't know what they got.

7    BY MR. KATZ:

8         Q.   So you don't know what prices were

9    available to the other GPO members?

10        A.   It depended on their membership

11   criteria.  I would suspect there is similar.

12        Q.   Do you know if this document was

13   provided to any government agency?

14        A.   I don't know for sure.

15        Q.   Would this be the type of document that

16   Ven-A-Care would have forwarded on to the federal

17   government?

18        A.   What we would have probably done was

19   create some kind of a pricing matrix chart, and

20   use that as the backup for the price change.  We

21   frequently followed the price changes in the

22   marketplace and compared them.

Jones, T. Mark - Vol. III                    December 8, 2008
                    Washington, DC

860

1    Remember, this is evolutionary for us.  We were

2    learning as we went.

3        Q.    But in any event, this general concept

4    that the AWPs for generic drugs stayed the same

5    while contract prices dropped over time was

6    something that Ven-A-Care informed the federal

7    government of at least since in the '90s?

8            MR. BREEN:  Objection.  Form.

9            THE WITNESS:  We informed the OIG and

10   the federal government of the discrepancy

11   between, yes, AWP, WAC, and the prices in the

12   marketplace.  Yes.

13   BY MR. KATZ:

14       Q.    Okay.  I'm going to hand you a document

15   previously marked Dey Exhibit 215.  Take a look

16   at it.  And if it will help you, I'm just going

17   to focus on the first three pages.

18       A.    Okay.

19       Q.    Have you seen this document before?

20       A.    Yes.

21       Q.    And talking about the exhibit as a

22   whole, can you describe it for the record?

Jones, T. Mark - Vol. III                                    December 8, 2008
Washington, DC

861

1        A.    This is a facsimile that Mr. Bentley

2   sent to Mr. Vitto on March 19th of '96, and it's

3   sort of a compilation of information on inhalant

4   drugs.  Dey's are included in it, but also Ivax,

5   Zenith Goldline.

6        Q.    Why was Mr. Bentley sending this

7   information to Mr. Vitto?

8        A.    At this time?

9        Q.    Yes.

10        A.    This would have been the time we were

11   working with Mr. Vitto.  He was doing a report on

12   inhalant drugs, the cost of inhalant drugs, and

13   we were helping -- we were giving him prices.

14        Q.    So Mr. Vitto requested this information

15   from Ven-A-Care?

16        A.    Yes.

17        Q.    And Mr. Vitto asked Ven-A-Care to

18   provide information relating to Dey's drugs?

19        A.    For any inhalant drugs that we had.

20        Q.    Okay.  That would include Dey's drugs?

21        A.    It would include Dey's drugs, yes.

22        Q.    And it was -- you're not contending

Jones, T. Mark - Vol. III                         December 8, 2008
                    Washington, DC

862

1    that it was Ven-A-Care's idea to prepare this

2    report, are you?

3         A.    Which report are you talking about?

4         Q.    The OIG report.  You mentioned that Mr.

5    Vitto was preparing an OIG report, and that's why

6    he wanted this information, right?

7         A.    Uh-huh.

8         Q.    Do you know what that report was

9    called?

10        A.    I want to say it's the cost of

11   inhalation drugs or --

12        Q.    Was it the 1996 Albuterol report?

13        A.    It could be the Albuterol.

14        Q.    Or it could have been the nebulizer

15   drug report?

16        A.    There was one before it that just

17   looked at the increase in utilization of inhalant

18   drugs in the country, and this one was the one

19   where we actually work with the pricing out in

20   the pharmaceutical community with them.

21        Q.    And these were reports initiated by the

22   OIG, right?

Jones, T. Mark - Vol. III                    December 8, 2008
                    Washington, DC

863

1        A.    Yes.

2        Q.    And the OIG was aware of Ven-A-Care's

3  existence because Ven-A-Care had been

4  communicating with the OIG at this point in time,

5  right?

6        A.    At some point since the early '90s,

7  different, you know, areas of the OIG, yes.

8        Q.    Did the OIG, to your knowledge, contact

9  any other pharmacies and ask them for

10  information?

11        A.    I don't know.  I mean, they may have --

12  they may have tried to get information from other

13  pharmacies, yes.

14        Q.    Other than --

15        A.    I don't know, though.

16        Q.    Other than performing surveys and

17  formally requesting information, did any other

18  pharmacies provide informal information such as

19  Ven-A-Care is doing here?

20        A.    To whom, the OIG?

21        Q.    Yes.

22        A.    So you're asking me if I know if the