# EXHIBIT A

# ORIGINAL COMPLAINT

# Filed on or About
# June 23, 1996



EXHIBIT
Abbott
414A

CASE NO._____

5.    For such other and further relief as the Court deems just and equitable.

Further, the Relator, VEN-A-CARE, on its behalf, requests that it receive thirty

percent (30%) of the proceeds of this action or settlement of this action collected by the

UNITED STATES, plus an amount for reasonable expenses incurred, plus reasonable

attorneys' fees and costs of this action.

### DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Respectfully submitted,

Atlee W. Wampler, III
Florida Bar No. 311227

James J. Breen
Florida Bar No. 297178
WAMPLER, BUCHANAN & BREEN, P.A.
900 Sun Bank Building
777 Brickell Avenue
Miami, Florida  33131
Telephone (305) 577-0044
Fax (305) 577-8545

# ORIGINAL COMPLAINT

# Filed on or About
# June 23, 1996



EXHIBIT
Abbott
414A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION

UNITED STATES OF AMERICA )
)
Ex Rel.    VEN-A-CARE OF THE )
FLORIDA KEYS, INC. )
)
Plaintiff, )
)
v. )
)
ABBOTT LABORATORIES; )
)
)
)
)
)
)
)
)
)
)
)
)
)
Defendants. )



MAGISTRATE JUDGE
GARBER

95 - 1354
CIV - MARCUS

CIVIL ACTION NO. _____

COMPLAINT AND
DEMAND FOR JURY TRIAL FILED
IN CAMERA AND UNDER SEAL

## COMPLAINT
## FOR MONEY DAMAGES AND CIVIL PENALTIES UNDER THE FALSE
## CLAIMS ACT 31 U.S.C. §§3729-3732

COMES NOW, the UNITED STATES OF AMERICA ("UNITED STATES" or "GOVERNMENT"), by and through VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VEN-A-CARE" or "the Relator"), and by the undersigned attorneys on behalf of the UNITED STATES and on the Relator's own behalf and brings this action against ABBOTT LABORATORIES;

CASE NO._____

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████, (sometimes referred to collectively as, "DEFENDANT DRUG MANUFACTURERS"), and other drug manufacturers not yet joined in this action, for money damages and civil penalties arising out of the DEFENDANT DRUG MANUFACTURERS' violations of the Federal False Claims Act, 31 U.S.C., §§ 3729-3732.

I.

## SUMMARY OF THE ACTION

1.     This is an action for damages, treble damages, civil penalties and costs against the DEFENDANT DRUG MANUFACTURERS arising from their repeated and knowing reporting of grossly inflated, false and fraudulent cost and price information regarding certain pharmaceutical products specified herein and manufactured and/or sold by them.  The false and fraudulent price and cost information was knowingly reported in a manner whereby it was used by the United States Medicare program and by federally funded States' Medicaid Programs in setting reimbursement amounts paid for pharmaceuticals sold by the DEFENDANT DRUG MANUFACTURERS.  As a direct and proximate result of the grossly inflated price and cost information reported by the DEFENDANT DRUG MANUFACTURERS, the Medicare and Medicaid programs set allowed charges for pharmaceuticals  specified  herein of the DEFENDANT DRUG MANUFACTURERS that

2

CASE NO._____

were many times greater than the average acquisition costs paid by the providers/suppliers

for the drugs that were manufactured and/or distributed by the DEFENDANT DRUG

MANUFACTURERS and many times greater than the mark-up over true cost that the

Medicare and Medicaid programs intended to pay persons and entities supplying the

pharmaceuticals to Medicare and Medicaid beneficiaries.  For example, Defendants

████████████████████████████████falsely reported price and cost information relating

to the drug ██████████ and thus caused the Medicare and Medicaid programs to pay

reimbursement amounts for ██████████ which exceeded by approximately 900% a

reasonable reimbursement based upon the drug's true average acquisition cost. As a

direct and proximate result, the UNITED STATES sustained damages in excess of

$300,000,000 for years 1993, 1994, and 1995 to date in the form of federal funds

expended for excessive reimbursement for ██████████.  The DEFENDANT DRUG

MANUFACTURERS knew or should have known that their false and fraudulent reports of

price and cost information would cause the Medicare and State Medicaid programs to pay

grossly excessive and unreasonable reimbursement for their pharmaceutical products and

that said reimbursement would, in significant part, be paid by the United States

Government.  The Government has sustained damages in excess of TWO BILLION

DOLLARS ($2,000,000,000.00) as a result of the false and fraudulent information

knowingly supplied by the DEFENDANT DRUG MANUFACTURERS and other drug

manufacturers not yet joined in this action. Accordingly, the United States Government is

3

CASE NO._____

entitled to recover treble damages in excess of SIX BILLION DOLLARS ($6,000,000,000),

plus civil penalties and costs pursuant to **31 U.S.C. §3729, et. seq.**

II.

**THE PARTIES**

2.     The Plaintiff in this action is the UNITED STATES. At all times material to

this civil action, the United States Department of Health and Human Services ("HHS"), The

Health Care Financing Administration ("HCFA"), and The Bureau of Program Operations

("BPO") were agencies and instrumentalities of the UNITED STATES and their activities,

operations and contracts in administering the Medicare program were paid from UNITED

STATES' funds. The UNITED STATES and its subcontractors performing on behalf of the

UNITED STATES provided Medicare benefits to qualified beneficiaries which included

reimbursement for the pharmaceuticals specified herein manufactured by the

DEFENDANT DRUG MANUFACTURERS and relied upon the false and fraudulent price

and cost information presented by the DEFENDANT DRUG MANUFACTURERS in setting

reimbursement amounts.

3.     The States, United States Territories, and the District of Columbia provided

Medicaid benefits to qualified beneficiaries which included reimbursement for the

pharmaceuticals manufactured by the DEFENDANT DRUG MANUFACTURERS and relied

upon the false and fraudulent price and cost information presented by the DEFENDANT

DRUG MANUFACTURERS in setting reimbursement amounts. A significant part of said

4

CASE NO._____

Medicaid reimbursement was paid from United States Government funds pursuant to **42 U.S.C. § 1396(b).**

4.     The Relator, VEN-A-CARE, is a corporation organized under the laws of the State of Florida, with its principal offices in Key West, Florida. The Relator is an infusion pharmacy and provides pharmaceuticals, such as the intravenous and injectable drugs specified in this complaint, as a Medicare Part B supplier and as a Medicaid provider. The Relator has direct and independent knowledge of the information, and is the "original source" of the information on which these allegations are based within the meaning of **31 U.S.C. §3730(e)(4)(A) and (B)**. The Relator has standing to bring this action pursuant to **31 U.S.C. §3730(b)(1)**. The information upon which these allegations are based was voluntarily provided by the Relator to the Federal Government and States beginning in 1991 and thereafter has been frequently supplemented by the Relator.

5.     The Defendant, ABBOTT LABORATORIES ("ABBOTT"), is a corporation organized under the laws of Illinois with its principal offices in Abbott Park, Illinois. At all times material to this civil action, ABBOTT has transacted business in the federal judicial district of the Southern District of Florida by, including but not limited to, selling and distributing pharmaceutical products to purchasers within the Southern District of Florida.

6.     

5

CASE NO._____

7.

8.

9.

6

CASE NO._____

10. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

11. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████

12. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████

13. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

CASE NO._____

14. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

15. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

16.     The Defendants specified in paragraphs 5 through 15 are sometimes referred to herein collectively as the "DEFENDANT DRUG MANUFACTURERS". Any and all acts alleged herein to have been committed by each of the DEFENDANT DRUG MANUFACTURERS were committed by said Defendant's officers, directors, employees, or agents who at all times acted on behalf of their respective DEFENDANT DRUG MANUFACTURER.

8

CASE NO._____

III.

### JURISDICTION & VENUE

17.    Jurisdiction is founded upon the **Federal False Claims Act, 31 U.S.C. §3729-32**, specifically **31 U.S.C. §3732**, and also **28 U.S.C. §§1331, 1345**.

18.    Venue in the Southern District of Florida is appropriate under **31 U.S.C. §3732(a)** in that each of the DEFENDANT DRUG MANUFACTURERS transacted business in the Southern District of Florida by selling directly or through wholesalers pharmaceutical products in the Southern District of Florida which the respective Defendants knew would be supplied to Medicare and Medicaid beneficiaries and for which the DEFENDANT DRUG MANUFACTURERS knew that grossly excessive and unreasonable reimbursement would be paid to the providers/suppliers by the Medicare and Medicaid programs.

19.    A copy of this Complaint and written disclosure of substantially all material evidence and information The Relator possesses have been served on the Government pursuant to **Rule 4(I), Fed.R.Civ.P.**, prior to the filing of this Complaint in camera and under seal by delivering a copy of the summons, Complaint, material evidence and information to the United States Attorney for the Southern District of Florida and by sending a copy of the summons, Complaint, material evidence and information by certified mail to the Attorney General of the United States at Washington, District of Columbia.

20.    The Relator alleges, based on information and belief: (A) that no allegation or transaction of defrauding the United States was made prior to the filing of this Complaint

9

CASE NO._____

in public disclosures regarding the subject matter herein against any of the DEFENDANT

DRUG MANUFACTURERS; (B) that none of the DEFENDANT DRUG MANUFACTURERS

was named in public disclosures made prior to the filing of this Complaint regarding the

subject matter herein; and (C), if the Court makes a finding against the Relator as to the

allegations set forth in (A) and/or (B), that the Relator has direct and independent

knowledge of the information on which these allegations are based within the meaning of

**31 U.S.C. §3730(e)(4)(A)** and **(B)** and has voluntarily provided the information to the

Government before filing this Complaint which is based on the information provided by the

Relator to the Government.

**IV.**

### BACKGROUND OF HOW UNITED STATES MONEYS ARE
### PAID FOR PHARMACEUTICALS UNDER "PART B" OF THE
### MEDICARE PROGRAM AND THE MEDICAID PROGRAM

21.     As one of its functions, HHS, through HCFA, provides health insurance

benefits to aged and disabled Americans pursuant to the provisions of the Medicare

program, **Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq.**

22.     The Medicare program provides covered health care benefits to certain

targeted populations such as those persons who are over age 65, persons who are

disabled, and persons who have end stage renal disease ("ESRD").

23.     The Medicare program is divided into two distinct parts: (A) Medicare Part A

(Hospital Insurance for the Aged and Disabled) covers services and goods furnished by

10

CASE NO._____

hospitals, home health agencies, hospices, and skilled nursing facilities; and (B) Medicare

Part B (Supplementary Medical Insurance for the Aged and Disabled) covers physician

services, and a range of other noninstitutional services, such as durable medical

equipment ("DME"), oxygen concentrators, diagnostic laboratory tests, X-rays, and certain

limited pharmaceutical products and supplies.

24.     The United States Government partially funds state sponsored medical

assistance programs for the poor pursuant to **Title XIX of the Social Security Act** through

federal matching payments which includes a minimum of fifty percent (50%) for covered

prescription drugs.  **42 U.S.C. § 1396 et seq.**

25.     The States, United States Territories and the District of Columbia are

required to implement a State Health Plan containing certain specified minimum criteria for

coverage and reimbursement in order to qualify for federal matching funds for Medicaid

expenditures.  **42 U.S.C. §1396a(a)(30)(A).**

26.     State Health Plans must, in part, provide for reimbursement for prescription

drugs pursuant to a formula approved by the Secretary of HHS which determines

maximum allowable reimbursement charges as a percentage of the suppliers' estimated

Average Acquisition Cost ("AAC") determined for each drug manufactured by each

manufacturer whose prescription drugs qualify for Medicaid reimbursement.

27.     This case focuses on those pharmaceuticals that are covered under Part B

of the Medicare program and under the states' Medicaid programs which are sold and

distributed by the DEFENDANT DRUG MANUFACTURERS and for which the Medicare

11

CASE NO._____

Part B carriers and states' Medicaid Programs rely on average wholesale price ("AWP") and AAC data reported by the drug manufacturers and distributors in order to establish reimbursement amounts.

28.     HCFA administers the Medicare program. HCFA awards cost-reimbursement contracts to private companies to evaluate and to process Medicare beneficiaries' claims for payment on behalf of HCFA. Under Part A, HCFA refers to contractors as "intermediaries". Under Part B, HCFA refers to contractors as "carriers." Under Part B, HCFA pays the carriers to process claims for covered benefits supplied to eligible beneficiaries and to make payments to the suppliers or to the Medicare beneficiaries for the covered services rendered under Medicare Part B. **42 U.S.C. §1395j et seq**.

29.     Congress has mandated that Medicare pay no more than eighty percent (80%) of the reasonable charge for Part B pharmaceutical claims from federal funds. **42 U.S.C. §1395(l) et seq.**

30.     Part B pharmaceutical claims are submitted in one of two ways. The first is by submitting to the Part B carriers a completed (hard copy) HCFA 1500 Form. The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy HCFA 1500 Form is transmitted to the Medicare Part B carriers. Two HCFA 1500 Form versions were used during the time relevant to these proceedings. HCFA Form 1500 (1/84) was used by the Medicare program for Part B pharmaceutical claims filed on or after January, 1984. In or about December 1990, HCFA created HCFA Form 1500 (12/90) and required its use for pharmaceutical claims

12

CASE NO._____

submitted on or after May 1, 1992. Either HCFA Form 1500 (12/90) or HCFA Form 1500

(1/84) could be used for Part B pharmaceutical claims from December, 1990 through April,

1992.

31.     Beneficiaries claims are processed by the carriers as either "assigned", those

claims for which payment is made by the carrier directly to the suppler, or "unassigned",

those claims for which payment is made by the carrier directly to the beneficiaries.

32.     Upon information and belief, the vast majority (in excess of 90%) of

pharmaceutical claims are made on an assigned basis.

33.     The Medicare program requires its Part B carriers to follow applicable

regulations and HCFA guidelines specified in its Medicare Medicare Part B Carriers Manual

(HCFA Pub. 15) in determining reasonable reimbursement amounts for covered

pharmaceuticals.  Part B carriers have determined reimbursement amounts for covered

pharmaceuticals at a set percentage over and above the carrier's estimate of the supplier's

cost for the pharmaceuticals.  (**HCFA Pub. 15, §5202**) The carriers estimate costs on the

basis of the AWP of the pharmaceutical.

34.     HCFA categorizes Part B covered pharmaceutical drugs by an alphanumeric

code and requires its carriers to refer to such pharmaceuticals in this manner.

35.     In order to estimate suppliers' costs for specific pharmaceuticals, Medicare

Part B Carriers and the State Medicaid programs acquire price and cost information from

entities equipped to do specialized data collection of information from which to estimate

average wholesale price ("AWP") (the price charged to the supplier purchasing the drug

13

CASE NO._____

or supply in question) or average acquisition cost ("AAC") (the supplier's cost in acquiring the drug or supply in question).

36.     Medical Economics, Inc. and the Hearst Corporation are nationally recognized companies that specialize in gathering pharmaceutical wholesale and direct price data, and publishing such information in such publications as "The Red Book" which is published by Medical Economics and "The Blue Book" which is published by the Hearst Corporation. The Hearst Corporation also, through its First Data Bank Division, provides an automated data base service containing pharmaceutical price and cost information.

37.     The Relator, prior to filing this action conducted certain surveys of (1) the Medicare Part B Carriers; (2) the individual state Medicaid programs; and (3) the entities specified in the preceding paragraph that gather and report pharmaceutical price and cost information. Said surveys established:

    a.     That the majority of the Medicare Part B Medicare Carriers rely upon price and cost information supplied by Medical Economics ("The Red Book") in setting reimbursement amounts for pharmaceuticals.

    b.     That more than 90% of the individual state Medicaid programs rely upon price and cost information supplied by the Hearst Corporation's First Data Bank service in setting reimbursement amounts for pharmaceuticals.

    c.     That Medical Economics, Inc. and The Hearst Corporation both rely solely upon information provided by the DEFENDANT DRUG MANUFACTURERS in reporting AWPs and direct prices for the pharmaceuticals at issue in this cause.

14

CASE NO._____

38.    HCFA and each State Medicaid program utilize National Drug Codes ("NDC") assigned by the Food and Drug Administration to identify each individual drug for each manufacturer.  Estimates of AAC are made for each such NDC coded drug for each manufacturer and separate maximum allowable reimbursement rates are established for each such NDC coded drug.

39.    State Medicaid programs follow a similar method to determine AACs for each drug as is followed by the Medicare Part B carriers.   Unlike Part B Medicare reimbursement, however, separate maximum allowable reimbursement rates are established for each NDC coded drug.

40.    The pharmaceuticals at issue in this civil action are administered intravenously or intramuscularly and are ordinarily sold by the manufacturer or wholesalers directly to specialty infusion pharmacies, such as the Relator, to physicians or outpatient clinics which then supply the drugs and related supplies to the patient.  Data regarding AWP and AAC for such pharmaceuticals are collected by Medical Economics and the Hearst Corporation directly from manufacturers, such as the DEFENDANT DRUG MANUFACTURERS.

15

CASE NO._____

**VI.**

## THE FRAUD SCHEME PERPETRATED BY THE
## DEFENDANT DRUG MANUFACTURERS ON THE
## MEDICARE AND MEDICAID PROGRAMS

41.     Beginning on or before June 23, 1989 and continuing to date, each of the

DEFENDANT DRUG MANUFACTURERS has knowingly engaged in a fraudulent course

of conduct designed to cause the Medicare and Medicaid programs to reimburse

providers/suppliers of their pharmaceuticals, including but not limited to those specified in

this complaint in amounts that grossly exceed a reasonable reimbursement.

42.     Said fraudulent course of conduct entailed intentionally reporting AWPs and

AACs on an ongoing basis and failing to provide accurate information regarding AWPs and

AACs for pharmaceuticals manufactured, sold and/or distributed by the DEFENDANT

DRUG MANUFACTURERS.

43.     The   false   information   reported   by   the   DEFENDANT   DRUG

MANUFACTURERS included AWPs and AACs that exceeded by more than one thousand

percent (1,000%) for some drugs the true and correct price charged by the DEFENDANT

DRUG MANUFACTURERS to suppliers purchasing the pharmaceuticals directly from the

manufacturer or distributor.   Such grossly and fraudulently inflated AWP and AAC

information caused the Medicare and Medicaid programs to establish reimbursement rates

for the pharmaceuticals at issue that grossly exceeded a reasonable reimbursement based

upon a reasonably accurate estimate of AWP or AAC.

16

CASE NO._____

44.     The grossly excessive Medicare and Medicaid reimbursement rates available to suppliers and physicians for the pharmaceuticals in question acted as an inducement to suppliers and physicians to purchase said pharmaceuticals from the manufacturers or distributors who had caused the Medicare and Medicaid programs to establish reimbursement rates enabling the supplier or physician to realize the greatest possible profit over and above the true cost of the pharmaceutical set by the manufacturer or distributor.

45.     At all times material to this civil action the DEFENDANT DRUG MANUFACTURERS were well aware that their false reports of AWP and AAC were causing the Medicare and Medicaid programs to establish grossly inflated reimbursement rates for the pharmaceuticals about which the DEFENDANT DRUG MANUFACTURERS provided false information. The DEFENDANT DRUG MANUFACTURERS perpetuated their fraudulent course of conduct for the express purpose of indirectly and directly maximizing their respective economic gains on the pharmaceuticals in question and with the knowledge that fraudulent conduct would cause the Medicare and Medicaid programs to expend federal moneys in the form of grossly excessive and unreasonable reimbursement.

46.     The Relator has conducted surveys of the Medicare Part B carriers and the state medicaid programs to determine whether reimbursement amounts for the pharmaceuticals at issue in this action are based upon the price and cost information reported to Medical Economics and the Hearst Corporation by the DEFENDANT DRUG

17

CASE NO._____

MANUFACTURERS. Each of the Medicare Part B carriers and state medicaid programs surveyed confirmed that reimbursement amounts set for the pharmaceuticals at issue in this case have, at all times material to this action, been based upon the price and cost information gathered by Medical Economics and the Hearst Corporation.

47.    The Relator has conducted an investigation to verify that the Defendants knew or should have known that the price and cost information reported by them about the pharmaceuticals at issue in this case was grossly, falsely and flagrantly inflated. The Relator determined through its investigation that:

a.    The DEFENDANT DRUG MANUFACTURERS each reported falsely inflated price and cost information to Medical Economics and the Hearst Corporation about the pharmaceuticals at issue in this case.

b.    The true prices charged by the DEFENDANT DRUG MANUFACTURERS for the pharmaceuticals at issue in this case were far less than the false prices reported by the DEFENDANT DRUG MANUFACTURERS.

c.    The DEFENDANT DRUG MANUFACTURERS each participated in the Medicaid rebate program mandated by the Omnibus Budget Reconcilliation Act of 1990 ("OBRA '90") and thus were required to pay rebates to the State Medicaid programs based upon their average price for the pharmaceuticals at issue in this case.

d.    When reporting average manufacturers' prices for OBRA '90 rebate purposes, the DEFENDANT DRUG MANUFACTURERS reported prices based upon their true sales prices, demonstrating their awareness of their true sales prices. Therefore,

18

CASE NO._____

when it benefited the DEFENDANT DRUG MANUFACTURERS to report their true prices

to cause the lowest amount of rebate to be paid by them to the states, they used their true

prices.

e.     When reporting prices to Medical Economics and Hearst Corporation

for the pharmaceuticals at issue in this case, the DEFENDANT DRUG MANUFACTURERS

falsely reported amounts far in excess of those reported for OBRA '90 rebate purposes.

Therefore, when it benefited the DEFENDANT DRUG MANUFACTURERS to report

highest prices to maximize the reimbursement amount for the providers/suppliers from the

Medicare and Medicaid programs, they used the false and grossly inflated prices.


## VII.

## THE SPECIFIC FRAUDULENT ACTS AND FALSE STATEMENTS OF DEFENDANT ABBOTT

48.     Beginning on or before January 1, 1993 and continuing through the present

date, Defendant ABBOTT knowingly and fraudulently caused the Medicare program and

the states' Medicaid programs throughout the United States and its territories to pay

grossly excessive and unreasonable reimbursement for certain pharmaceuticals

manufactured or distributed by Defendant ABBOTT. But for the said actions of Defendant

ABBOTT and/or those persons and entities acting directly or indirectly in concert with

Defendant ABBOTT, the Medicare and Medicaid programs would not have paid grossly

excessive and unreasonable reimbursement for said pharmaceuticals. The actions

19

CASE NO.

committed by Defendant ABBOTT that caused the Medicare and Medicaid programs to pay grossly unreasonable and excessive reimbursement included, but were not necessarily limited to, knowingly and intentionally presenting false and fraudulent price and cost information which Defendant ABBOTT knew would be relied upon by the Medicare and Medicaid programs in setting reimbursement amounts for the pharmaceuticals manufactured or distributed by Defendant ABBOTT.

49.    The Relator has not yet determined all of the pharmaceuticals for which the Defendant ABBOTT published false price and cost information and has not yet determined all of the years during which such false information was published. The Relator's investigation has, however, established the specific facts alleged in the following paragraphs with respect to Defendant ABBOTT and the Relator reserves the right to amend this Complaint to add information gathered in the discovery process and through further investigation.

50.    Defendant ABBOTT, knowingly and fraudulently published false prices and/or caused Medical Economics ("Red Book") and/or Hearst Corporation ("Blue Book") to publish false average wholesale prices ("AWP") and/or false direct prices ("DP") during, or immediately prior to, the years specified below with respect to the pharmaceuticals specified below. For the purposes of specificity, particularity and clarity, the said false price and cost information has been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and

20

CASE NO._____

"DP" reflects the false price and cost information provided by the Defendant ABBOTT. The information under the Relator's Cost column reflects the true price that Defendant ABBOTT charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the prices charged to the Relator are equal to or greater than the true average direct price and the true AWP for the drug. The following specific information reflects the false price and cost information knowingly provided by Defendant ABBOTT:

## a. DRUG: SODIUM CHLORIDE 0.9%

### NDC NO.: 00074158302

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $8.06 | | | $9.12 | $7.68 | $1.19 |
| 1994 | $8.30 | $9.57 | | $9.57 | $8.06 | $1.10 |
| 1995 | $8.55 | $9.86 | | $9.86 | $8.30 | $1.10 |

### NDC NO.:  00074158603

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $9.90 | | | $11.20 | $9.43 | $1.19 |
| 1994 | $10.20 | $11.75 | | $11.76 | $9.90 | $1.08 |
| 1995 | $10.51 | $12.11 | | $12.11 | $10.20 | $1.08 |

21

CASE NO._____

## NDC NO.: 00074798309

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $8.22 | | | $9.29 | $7.83 | $1.01 |
| 1994 | $8.47 | $9.76 | | $9.76 | $8.22 | $1.03 |
| 1995 | $8.72 | $10.05 | | $10.05 | $8.47 | $1.03 |

### b. DRUG: LIPOSYN II 10%

## NDC NO. 00074979021

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $33.18 | | | $37.53 | $31.60 | $6.63 |
| 1994 | $34.18 | $39.40 | | $39.40 | $33.18 | $6.35 |
| 1995 | $35.21 | $40.59 | | $40.59 | $34.18 | $6.35 |

## NDC NO.: 00074979001

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $31.29 | | | $35.39 | $29.80 | $7.56 |
| 1994 | $32.23 | $37.19 | | $37.16 | $31.29 | $6.67 |
| 1995 | $33.20 | $38.27 | | $38.27 | $32.23 | $6.68 |

## NDC NO.: 00074979003

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $50.64 | | | $57.27 | $48.23 | $7.15 |
| 1994 | $52.16 | $57.88 | | $60.14 | $50.64 | $6.45 |
| 1995 | $53.72 | $61.94 | | $61.94 | $52.16 | $6.46 |

22

CASE NO._____

## c. DRUG: VANCOMYCIN HCL

### NDC NO. 00074433201

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|---|---|---|---|---|---|---|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $24.72 | | | $27.95 | $23.54 | $3.75 |
| 1994 | $25.46 | $29.35 | | $29.36 | $24.72 | $3.20 |
| 1995 | $26.48 | $30.23 | | $29.36 | $24.72 | $3.51 |

### NDC NO. 00074653301

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|---|---|---|---|---|---|---|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $49.42 | | | $55.90 | $47.07 | $7.50 |
| 1994 | $50.90 | $58.68 | | $58.69 | $49.42 | $6.40 |
| 1995 | $52.94 | $60.44 | | $58.69 | $49.42 | $7.02 |

## d. DRUG: DEXTROSE 5% IN WATER

### NDC NO. 00074152203

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|---|---|---|---|---|---|---|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $8.16 | | | $9.23 | $7.77 | $1.20 |
| 1994 | $8.40 | $9.69 | | $9.69 | $8.16 | $1.14 |
| 1995 | $8.65 | $9.97 | | $9.98 | $8.40 | $1.14 |

### NDC NO. 00074792209

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|---|---|---|---|---|---|---|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $9.01 | | | $10.18 | $8.58 | $1.11 |
| 1994 | $9.28 | $10.69 | | $10.69 | $9.01 | $1.12 |
| 1995 | $9.56 | $11.02 | | $11.02 | $9.28 | $1.12 |

CASE NO._____

## e. DRUG: LIPOSYN II 20%

**NDC NO. 00074979101**

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $44.75 | | | $50.61 | $42.62 | $10.01 |
| 1994 | $46.09 | $53.18 | | $53.14 | $44.75 | $9.58 |
| 1995 | $47.47 | $54.73 | | $54.73 | $46.09 | $9.58 |

24

CASE NO._____

## NDC NO. 00074979103

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $73.77 | | | $83.43 | $70.26 | $10.91 |
| 1994 | $75.98 | $84.31 | | $87.60 | $73.77 | $10.36 |
| 1995 | $78.26 | $90.23 | | $90.23 | $75.98 | $10.36 |

## f. DRUG: LACTATED RINGERS

## NDC NO. 00074795309

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $10.30 | | | $11.64 | $9.81 | $1.27 |
| 1994 | $10.61 | $12.23 | | $12.23 | $10.30 | $1.12 |
| 1995 | $10.93 | $12.60 | | $11.22 | $9.45 | $1.14 |

## g. DRUG: DEXTROSE 5% WITH SODIUM CHLORIDE 0.9%

## NDC NO. 00074794109

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $9.84 | | | $11.12 | $9.37 | $1.21 |
| 1994 | $10.14 | $11.68 | | $11.68 | $9.84 | $1.22 |
| 1995 | $10.44 | $12.04 | | $12.04 | $10.14 | $1.23 |

## h. DRUG: DEXTROSE IN WATER 50%

## NDC NO. 00074151805

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $23.46 | | | $26.52 | $22.34 | $3.12 |
| 1994 | $24.16 | $27.86 | | $27.85 | $23.46 | $2.87 |
| 1995 | $24.88 | $28.69 | | $28.69 | $24.16 | $2.88 |

CASE NO._____

## i.  DRUG: DEXTROSE IN WATER 70%

### NDC NO. 00074151905

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $29.05 | | | $32.85 | $27.67 | $3.75 |
| 1994 | $29.92 | $34.50 | | $34.49 | $29.05 | $3.67 |
| 1995 | $30.82 | $35.53 | | $35.53 | $29.92 | $3.57 |

## j.  DRUG: AMINOSYN II 8.5%

### NDC NO. 00074108805

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $121.85 | | | $137.80 | $116.05 | $9.17 |
| 1994 | $125.51 | $144.69 | | $144.69 | $121.85 | $9.07 |
| 1995 | $129.28 | $149.04 | | $149.04 | $125.51 | $9.08 |

## k.  DRUG: AMINOSYN II 10%

### NDC NO. 00074109005

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $139.00 | | | $157.20 | $132.38 | $11.33 |
| 1994 | $143.17 | $165.06 | | $165.06 | $139.00 | $11.15 |
| 1995 | $147.47 | $170.01 | | $170.01 | $143.17 | $11.15 |

26

CASE NO._____

## I. DRUG: AMINOSYN II 15%

**NDC NO. 00074712207**

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S COST |
|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | |
| 1993 | $417.01 | | | | | $56.13 |
| 1994 | $429.52 | $495.20 | | $495.18 | $417.00 | $38.95 |
| 1995 | $442.41 | $510.06 | | $510.04 | $429.59 | $38.95 |

51.     As a direct and proximate result of the false price and cost information knowlingly provided by Defendant ABBOTT, as specified in the preceding paragraph, the United States incurred damages in excess of $1,000,000 in the form of grossly excessive and unreasonable reimbursements paid by the Medicare and Medicaid programs for the pharmaceuticals about which the Defendant provided false price and cost information.

### VIII.

### THE SPECIFIC FRAUDULENT ACTS AND FALSE STATEMENTS OF ██████████████

52.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

27

CASE NO._____

# PAGES 27 THROUGH 59

# HAVE BEEN COMPLETELY REDACTED

# WHICH INCLUDES THE END OF

# PARAGRAPH 52

# THROUGH PARAGRAPH 83

CASE NO._____

## XVI.

## THE DAMAGE TO THE UNITED STATES CAUSED
## BY THE FRAUDULENT CONDUCT OF
## THE DEFENDANT DRUG MANUFACTURERS

84.     The Medicare and Medicaid programs reasonably relied upon the false price and cost information knowingly reported by the DEFENDANT DRUG MANUFACTURERS.

85.     The Medicare and Medicaid programs' reliance on the false price and cost information was detrimental in that, as a direct and proximate result of said reliance, grossly excessive and unreasonable amounts were paid as reimbursement for the pharmaceuticals of the DEFENDANT DRUG MANUFACTURERS.

86.     The Medicare and Medicaid programs intended to establish reimbursement rates based upon an estimate of the average cost of the pharmaceutical to the person or entity supplying the pharmaceutical to beneficiaries.

87.     The Relator's cost for each of the pharmaceuticals at issue in this cause represents an amount equal to or greater than the true average acquisition cost of the pharmaceuticals at issue to persons and entities supplying them to Medicare and Medicaid beneficiaries.

88.     The false price and cost information knowingly reported by the DEFENDANT DRUG MANUFACTURERS caused the Medicare and Medicaid programs to expend federal dollars which substantially exceeded a reasonable reimbursement for the pharmaceuticals manufactured or distributed by the DEFENDANT DRUG MANUFACTURERS.

60

CASE NO._____

89.    The UNITED STATES has sustained damages as the direct and proximate result of the false information reported by the DEFENDANT DRUG MANUFACTURERS equal to the amount of federal dollars expended to pay reimbursements for pharmaceuticals which exceeded a reasonable reimbursement based upon average acquisition costs to suppliers of the pharmaceuticals.

90.    By way of example, only, Defendants ██████████████████████ ███████falsely reported price and cost information relating to the drug ████████and thus caused the Medicare and Medicaid programs to pay reimbursement amounts for ████████████ which exceeded by approximately 900% a reasonable reimbursement based upon the drug's true average acquisition cost.  As a direct and proximate result, the UNITED STATES sustained damages in excess of $300,000,000 for years 1993, 1994, and 1995 to date in the form of federal funds expended for excessive reimbursement for ████████.

91.    The total damages to the UNITED STATES in the form of federal funds expended to pay excessive reimbursement through the Medicare and Medicaid programs as a result of the acts of the DEFENDANT DRUG MANUFACTURERS exceeds $500,000,000 for the years 1993, 1994 and 1995 to date.

92.    This action seeks the recovery of all damages sustained by the UNITED STATES during all years as a result of false price and cost information reported by the DEFENDANT DRUG MANUFACTURERS and other drug manufacturers not yet joined as

61

CASE NO._____

named defendants in this action for their pharmaceuticals consistent with the specific conduct alleged herein.

93.    In the alternative, each of the DEFENDANT DRUG MANUFACTURERS and others not yet charged herein, engaged in a similar course of tortious and fraudulent conduct directed at a common victim, the United States, from on or before June 23, 1989 and continuing to the present date and accordingly each Defendant is jointly and severally liable for the combined amount of damages sustained by the United States as a result of said tortious and fraudulent conduct.

## COUNT I

## FALSE CLAIMS ACT; CAUSING PRESENTATION OF FRAUDULENT CLAIMS

94.    This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT LABORATORIES; ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████, under the False Claims Act, **31 U.S.C. §§3729-3732.**

95.    Plaintiff realleges and incorporates by reference paragraphs 1 through 93 as if fully set forth herein and further alleges as follows:

62

CASE NO._____

96.     The DEFENDANT DRUG MANUFACTURERS from a date on or before June 23, 1989 to the present date, knowingly [as defined in §3729(b)] caused to be presented to officers or employees of the UNITED STATES GOVERNMENT fraudulent claims [as explained in **United States v. Neifert-White, 390 US 228, 232-233 (1968)**] for payment or approval, in that the DEFENDANT DRUG MANUFACTURERS presented to Hearst Corporation/First Data Bank and Medical Economics, false and fraudulent claims of price and cost information of the DEFENDANT DRUG MANUFACTURERS' pharmaceuticals specified herein, to cause the UNITED STATES to pay out sums of money to the providers and suppliers of the DEFENDANT DRUG MANUFACTURERS' pharmaceuticals grossly in excess of the true costs for obtaining the specified pharmaceuticals from the DEFENDANT DRUG MANUFACTURERS, resulting in great financial loss to the UNITED STATES.

97.     Because of the DEFENDANT DRUG MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of two (2) billion dollars ($2,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(1)**

## COUNT II

## FALSE CLAIMS ACT; CAUSING FALSE STATEMENTS TO BE USED TO GET FALSE CLAIMS PAID BY THE GOVERNMENT

98.     This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT LABORATORIES;

63

CASE NO._____

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████, under the **False Claims Act, 31 U.S.C. §§3729-3732**.

99.    Plaintiff realleges and incorporates by reference paragraphs 1 through 93 as if fully set forth herein and further alleges as follows:

100.    The DEFENDANT DRUG MANUFACTURERS, from a date on or before June 23, 1989 to the present date, knowingly [as defined in **§3729(b)**] caused false statements to be used to get false claims [as explained in **United States v. Neifert-White, 390 US 228, 232-233 (1968)**] to be paid by the GOVERNMENT, in that the DEFENDANT DRUG MANUFACTURERS, caused false statements of price and cost information of the DEFENDANT DRUG MANUFACTURERS' pharmaceuticals specified herein to be used by Hearst Corporation/First Data Bank and Medical Economics to get the DEFENDANT DRUG MANUFACTURERS' false claims of price and cost information of their pharmaceuticals specified herein to be paid by the GOVERNMENT to the providers and suppliers of the DEFENDANT DRUG MANUFACTURERS' pharmaceuticals, which claims were grossly in excess of the true costs for obtaining the specified pharmaceuticals from the DEFENDANT DRUG MANUFACTURERS, resulting in great financial loss to the UNITED STATES.

64

CASE NO._____

101.    Because of the DEFENDANT DRUG MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Two Billion Dollars ($2,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(2)**.

## COUNT III

### FALSE CLAIMS ACT; CAUSING FALSE STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT

102.    This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT LABORATORIES; ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████, under the **False Claims Act, 31 U.S.C. §§3729-3732**.

103.    Plaintiff realleges and incorporates by reference paragraphs 1 through 93 as if fully set forth herein and further alleges as follows:

104.    The DEFENDANT DRUG MANUFACTURERS, from a date on or before June 23, 1989 to the present date, knowingly [as defined in **§3729(b)**] caused false statements to be used to conceal an obligation to pay money to the GOVERNMENT, in that: (1) the DEFENDANT DRUG MANUFACTURERS knew that the UNITED STATES' Medicare program and the States' Medicaid programs were using the DEFENDANT DRUG

CASE NO._____

MANUFACTURERS' false claims of price and cost information presented to Hearst Corporation/First Data Bank and Medical Economics for purposes of computing formulae of average wholesale price ("AWP") and/or average acquisition costs ("AAC") to pay sums of money to the providers and suppliers of the DEFENDANT DRUG MANUFACTURERS' pharaceuticals for supplying the specified list of pharmaceuticals to Medicare and Medicaid beneficiaries; the DEFENDANT DRUG MANUFACTURERS knew that sums of money paid by the UNITED STATES and State Governments to the providers and suppliers of the DEFENDANT DRUG MANUFACTURERS' pharmaceuticals were grossly in excess of the true costs for obtaining the specified pharmaceuticals from the DEFENDANT DRUG MANUFACTURERS; the DEFENDANT DRUG MANUFACTURERS knew the obligation of the UNITED STATES Medicare Part B carriers and State Governments to recoup governments' funds paid in excess of reasonable costs from the providers and suppliers of the DEFENDANT DRUG MANUFACTURERS' pharamaceuticals; and the DEFENDANT DRUG MANUFACTURERS concealed from the UNITED STATES Medicare Part B carriers and State Governments an obligation of the providers and suppliers of the DEFENDANT DRUG MANUFACTURERS' pharmaceuticals to pay recoupment monies to the UNITED STATES and State Governments, resulting in great financial loss to the UNITED STATES and State Governments.

105.   Because of the DEFENDANT DRUG MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Two Billion Dollars ($2,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(7).**

66

CASE NO._____

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff, UNITED STATES, demands and requests that judgment be entered in its favor and against Defendants ABBOTT LABORATORIES; ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████, on Counts I, II and III of the Complaint as follows:

1.     On Count I (False Claims Act; Causing Presentation of False Claims) for triple the amount of the UNITED STATES' damages, plus civil penalties of TEN THOUSAND DOLLARS ($10,000.00) for each false claim;

2.     On Count II (False Claims Act; Causing False Statements To Be Used To Get False Claims Paid By The GOVERNMENT) for triple the amount of UNITED STATES' damages plus civil penalties of TEN THOUSAND DOLLARS ($10,000.00) for each false statement;

3.     On Count III (False Claims Act; causing False Statements To Be Used To conceal An Obligation To Pay Money To The GOVERNMENT) for triple the amount of the UNITED STATES' damages plus civil penalties of TEN THOUSAND DOLLARS ($10,000.00) for each false or fraudulent claim paid;

4.     For all fees and costs of this civil action; and

67

CASE NO._____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___23___ day of June, 1995, I caused an original

and a copy of this Complaint to be filed under seal and in camera for sixty (60) days and

not to be served on the Defendants named herein until order of this Honorable Court.

I HEREBY CERTIFY that on this ___23___ day of June, 1995, I caused a copy of this

Complaint and written disclosure of substantially all material evidence and information the

Relator, VEN-A-CARE possesses to be served on the Government pursuant to Rule 4(i),

Fed.R.Civ.P., prior to the filing of this Complaint by delivering a copy of the Summons,

Complaint, material evidence and information to the United States Attorney for the

Southern District of Florida, and by sending a copy of the Summons, Complaint, material

evidence and information by Certified Mail, Return Receipt Requested, to the Attorney

General of the United States in Washington, D.C.

Respectfully submitted,

Atlee W. Wampler, III
Florida Bar No. 311227

James J. Breen
Florida Bar No. 297178
WAMPLER, BUCHANAN & BREEN, P.A.
900 Sun Bank Building
777 Brickell Avenue
Miami, Florida  33131
Telephone (305) 577-0044
Fax (305) 577-8545

F:\CLIENTS\3027\COMPL2.AWW  qja6/23/95 (6)

69

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | |
| | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti Saris |
| | ) | |
| *United States of America ex rel. Ven-a-Care of* | ) | (Original Complaint Filed in the |
| *the Florida Keys, Inc., v. Abbott Laboratories,* | ) | Southern District of Florida, Case No. |
| *Inc.,* | ) | 06-21303-CIV-GOLD/TURNOFF) |
| CIVIL ACTION NO. 06-11337-PBS | ) | |

## THE UNITED STATES' FIRST AMENDED COMPLAINT

The United States brings this fraud action against Abbott Laboratories, Inc. ("Abbott") to recover losses sustained by the Medicare and Medicaid programs. Over the course of several years, Abbott reported inflated pharmaceutical prices that it knew Medicare and Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical products. Abbott's actual sales prices for its pharmaceutical products were far less than the prices reported by Abbott. By knowingly reporting inflated prices – often 1000% higher than Abbott's actual prices – Abbott ensured its customers received inflated reimbursement and profits from Medicare and Medicaid. Abbott then used the public fisc as a marketing tool, actively promoting government-funded "spreads" between (1) its fraudulently inflated prices and (2) its actual sales prices as an inducement to its customers. In addition, Abbott operated its own home infusion pharmacies and entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of third party reimbursements for its drugs. These efforts allowed Abbott to increase its profits by boosting sales for its drugs.



DEPOSITION
EXHIBIT
547 Cobo
VM 3/4/8

## I. NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of fraud and unjust enrichment.

2.      The United States bases its claims on Abbott having **submitted and** caused the submission of false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1), and having made and used false statements to get false or fraudulent claims paid by the United States in violation of 31 U.S.C. § 3729(a)(2).

3.      Within the time frames detailed below, Abbott engaged in a fraudulent scheme that caused the Medicare and Medicaid programs to pay excessive reimbursement to Abbott's customers, *e.g.*, pharmacies, physicians, hospitals, home health agencies, nursing homes, home infusion companies, clinics and physicians (hereafter referred to collectively as "Customers"). In furtherance of this scheme, Abbott reported false, fraudulent and inflated drug prices for certain drugs (listed in ¶¶ 30 and 34 below) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set reimbursement rates for Abbott's customers. A chart setting out examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**. Abbott knew that the Medicare and Medicaid programs relied on Abbott's reported prices to those compendia to set reimbursement rates for claims submitted for Abbott's drugs. Abbott then sold the drugs for far lower prices, and marketed to existing and potential Customers the government-funded

2

"spread" between the inflated reimbursement amounts and the actual acquisition costs of the drugs to boost its sales and profits.

4.      Abbott knew that its false price reporting and marketing efforts would cause its Customers to submit claims for fraudulently inflated Medicaid and Medicare reimbursement.

5.      Abbott's fraudulent scheme to induce Customers to purchase its products by ensuring that federal reimbursement rates for those products would be set at artificially inflated levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), common law and numerous state laws.

6.      To get fraudulent claims paid by the United States, Abbott also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states.  These statements violated the FCA, common law and various state laws.

7.      The United States timely asserts the causes of action alleged herein based on the filing of relator's complaint in this action.

## II. JURISDICTION

8.      The United States' original Complaint in this matter was filed on March 16, 2006 in the Southern District of Florida.[1]  The case was transferred to Multi-District Litigation ("MDL") No. 1456 on July 27, 2006.  The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise

---

[1] This case originated in the Southern District of Florida as Case No. 06-21303-CIV-GOLD/TURNOFF.  The United States understands that this matter will be transferred back to the Southern District of Florida for trial upon the completion of these MDL proceedings.

personal jurisdiction over Abbott pursuant to 31 U.S.C. § 3732(a) because Abbott resides or

transacts business in the District of Massachusetts.

### III. VENUE

9.     Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28

U.S.C. § 1391(b) and (c) because Abbott resides or transacts business in this District.[2]

### IV. PARTIES

10.     The United States brings this action on behalf of the Department of Health and

Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly

known as the Health Care Financing Administration), which administer the Medicare and

Medicaid programs.

11.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation

organized under the laws of Florida, with its principal offices in Key West, Florida.  Ven-A-Care

is a pharmacy licensed to provide the prescription drugs specified in this Complaint and has

been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider.

Ven-A-Care's principal officers and directors have included John M. Lockwood, M.D., Zachary

Bentley, Luis Cobo and T. Mark Jones, who are each citizens of the United States and reside in

Key West, Florida.  The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a

lawsuit on behalf of the United States to recover damages for false claims.  Ven-A-Care brought

this action against Abbott on behalf of itself and the United States.

---

[2] Abbott also resides or transacts business in the Southern District of Florida as well.
Thus, venue is also proper in that District.

12.     Defendant Abbott is a corporation organized under the laws of Illinois with its

principal offices in Abbott Park, Illinois.  At all times material to this civil action, Abbott has

transacted business throughout the United States, selling and distributing its drugs, including but

not limited to those identified in this Complaint, to purchasers within this District.

## V.  THE LAW

### A.     <u>The False Claims Act</u>

13.     The FCA provides in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an
> officer or employee of the United States Government or a member of the Armed
> Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government
>
> * * *
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person . . . .
> (b) For purposes of this section, the terms  "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729.

14.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for

violations occurring on or after September 29, 1999.

5

**B.**     **The Federal Anti-Kickback Statute**

15.     Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to protect the integrity of Medicare and Medicaid.  Congress strengthened the statute in

1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would

not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b)

and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L.

No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

16.     The anti-kickback statute prohibits any person or entity from making or accepting

payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical items, including items provided under Medicare and Medicaid.  In pertinent part,

the statute provides:

> (b) Illegal remuneration
>
> > (1) whoever knowingly and willfully solicits or
> > receives any remuneration (including any kickback,
> > bribe, or rebate) directly or indirectly, overtly or
> > covertly, in cash or in kind –
> >
> > > (A) in return for referring an individual to a
> > > person for the furnishing or arranging for the
> > > furnishing of any item or service for which
> > > payment may be made in whole or in part
> > > under a Federal health care program, or
> > >
> > > (B) in return for purchasing, leasing,
> > > ordering, or arranging for or recommending
> > > purchasing, leasing, or ordering any good,
> > > facility, service, or item for which payment

6

> may be made in whole or in part under a
> Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.

> (2) whoever knowingly and willfully offers or pays any
> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind
> to any person to induce such person --

> (A) to refer an individual to a person for the
> furnishing or arranging for the furnishing of any
> item or service for which payment may be made in
> whole or in part under a Federal health care
> program, or

> (B) to purchase, lease, order or arrange for or
> recommend purchasing, leasing or ordering any
> good, facility, service, or item for which payment
> may be made in whole or in part under a Federal
> health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Those who violate the statute also are subject to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of up to $50,000 per violation and up to three times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

## VI. THE FEDERAL HEALTHCARE PROGRAMS

17.     Medicaid and Medicare were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

### A.     The Medicaid Program

18.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

19.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. § 1396a.

20.     The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50%, and as high as 83%.

21.     The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

22.     The Medicaid programs of all states reimburse for prescription drugs.

23.     The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

8

24.    By becoming a participating supplier in Medicaid, suppliers agree to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

**B.    The Medicare Program**

25.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. 42 U.S.C. §§ 426-426a, 1395o.

26.    HHS is responsible for the administration and supervision of the Medicare program. CMS is an agency of HHS and directly administers the Medicare program. The Medicare program has several parts, including Medicare Part B ("Supplementary Medical Insurance for the Aged and Disabled"), which covers physician services, as well as durable medical equipment ("DME") and certain drug products and supplies. 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

27.    Medicare Part B generally covers drugs which are provided either: (a) incident to a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (*e.g.*, certain oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit. 42 C.F.R. §§ 405.517, 414.701.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

28.     During the relevant time period, CMS contracted with private insurance carriers

("Contractors") to administer and pay Part B claims from the Medicare Trust Fund.  42 U.S.C.

§ 1395u.  In this capacity, the Contractors act on behalf of CMS.  42 C.F.R. § 421.5(b).

29.     Contractors receive, process and pay claims under Medicare Part B for drugs from

various Medicare providers and suppliers.  Typically, once a contractor approves a claim, the

contractor then submits a payment request to a Medicare bank account funded by federal funds.

## C.     Drug Reimbursement Under Medicaid and Medicare

30.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires

pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of

every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA provides for the

assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the

National Drug Code ("NDC").  FDA has assigned approximately 170,000 NDCs to drug

products.  The drugs and corresponding NDCs at issue in this case are listed below:

| DRUG | NDC# |
|---|---|
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |

10

| | |
|---|---|
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |
| Sodium Chloride Injection | 00074798436 |
| Sodium Chloride Injection | 00074798437 |
| Sodium Chloride Injection | 00074798509 |
| Water for Injection1000 ml | 00074799009 |
| Acyclovir Sodium 500 mg | 00074442701 |
| Acyclovir Sodium 1 gm | 00074445201 |

31.     Drug manufacturers, such as Abbott, have not typically submitted claims for

reimbursement to federal health care programs. Instead, Abbott marketed its products to its

Customers, who then purchased the products either directly or through wholesalers based on a

price the Customers negotiated with Abbott. In addition to using wholesalers, Customers also

purchased Abbott products through group purchasing organizations ("GPO"), who negotiated prices on behalf of Abbott's Customers. However, as described in ¶¶ 111-138 below, Abbott also had a business unit that, among other activities, operated home infusion pharmacies and actually submitted reimbursement claims for drugs on behalf of various clients.

32.     Abbott's Customers then submitted claims for payment for Abbott products to Medicare and Medicaid after dispensing or administering Abbott drugs. Medicare and Medicaid reimbursed some of the claims submitted by Abbott's home infusion pharmacies. In other instances, Abbott administered reimbursement claims for certain home infusion clients and collected portions of those clients' Medicare and Medicaid reimbursements as compensation for those services.

33.     For the most part, in the Medicaid program, claims submitted by retail pharmacies are processed and tracked using the NDC of the drug.

34.     The Medicare program generally uses the Healthcare Common Procedural Coding System ("HCPCS") to reimburse for drugs. The HCPCS utilize 5-digit alphanumeric codes to identify and bill for medical products and supplies. The codes at issue here are listed below:

| HCPCS | Description |
|-------|-------------|
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

35.    During the relevant period, Abbott usually reported prices to various price publishers and services on an annual basis.  The price publishers used the information to publish pricing compendia.

36.    The reimbursement amounts for claims submitted by Abbott or Abbott's Customers for the drugs at issue in this Complaint were directly influenced by Abbott's false price representations.  The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining the reimbursement rates for prescription drugs.  Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs.  Abbott documents also show that the company actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

37.    No governmental payor knew of or sanctioned Abbott's conduct as set forth in this Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its Customers to purchase those products.

**D.    Medicaid Reimbursement Formulas**

38.    When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public. To determine the EAC for a covered drug, State

13

Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of HHS. 42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

39.     While the specific reimbursement formulas vary from state to state, the various State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the EAC as set by the states, (b) the maximum allowable cost ("MAC") set by the state Pharmaceutical Reimbursement Boards, or (c) the providers' usual and customary charge. For multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more than those limits. 42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

40.     The states' methodology for arriving at EAC includes:

      A.     discounting a percentage off of the Average Wholesale Price ("AWP");

      B.     adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

      C.     requiring the drug companies to certify prices directly in writing to the Medicaid program in response to state requests for particular pricing information.

41.     AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient. WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail Customer.

42.     While the majority of states use published AWPs to calculate reimbursement, approximately six states (Alabama, Florida, Maryland, Massachusetts, Rhode Island and Texas) have used the wholesale acquisition cost ("WAC") to set the EAC.

43.     The AWPs and WACs relied upon by the State Medicaid programs have generally

been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other

price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price

publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the

Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span, Inc.

are hereafter referred to as the "Publishers" and their various publications and data services are

hereinafter referred to as "Price Publications."

44.     In addition to relying on the manufacturers' reported prices as published in the

Price Publications, some State Medicaid programs also received price representations directly

from manufacturers, and relied on these representations to confirm the accuracy of the figures

they use to determine state reimbursement amounts.  For example, the State of Texas required

drug companies to submit their prices directly to the Texas Medicaid program in a signed

certification attesting to the accuracy of the price information.

**E.     Medicare Reimbursement Formulas**

45.     From 1992 through 1997, Medicare based its reimbursement for multi-source

generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic

forms of a drug.  42 C.F.R. § 405.517 (1992-1998).  In general, Medicare relied on median

AWPs to set reimbursement rates.

46.     From January 1, 1998, until December 31, 1998, Medicare based its

reimbursement for all generic forms of a drug at 95% of the median AWP for the drug.  Balanced

Budget Act of 1997, 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1998).

47.     From 1999 through 2004, Medicare based its reimbursement for all generic forms of a drug at the lower of (1) 95% of the median published AWP for the drug; or (2) the AWP of the least expensive brand-name drug.  42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).

48.     After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment.  If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

49.     Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium known as the *Drug Topics Red Book* ("*Red Book*"), as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

## VII.  ABBOTT'S SCHEME

50.     From at least on or before January 1, 1991, and continuing through 2001,  Abbott defrauded the United States by knowingly causing the Medicare and Medicaid programs to pay false or fraudulent claims for dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium.

51.     The specific dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium products at issue herein are identified by NDC or HCPCS Code in ¶¶ 30 and 34 above and are hereinafter referred to jointly as the "Drugs."

52.     Dextrose solutions, sodium chloride solutions, and sterile water are generic, water-based solutions used to facilitate the intravenous infusion of other drugs and for fluid replacement, and are commonly referred to as large volume parenterals ("LVPs").

53.     Vancomycin is a powerful, intravenous antibiotic that Abbott has sold as a generic drug since 1988.

54.     Acyclovir Sodium ("Acyclovir") is an antiviral drug used to treat several opportunistic viral infections, some of which are associated with HIV/AIDS.

55.     Abbott marketed and sold its products, including the Drugs, to Customers.

56.     The Customers purchased the products either directly from Abbott, through a GPO contract or through wholesalers.

57.     The amount paid by a Customer was typically based on a price negotiated with Abbott or the GPO.

58.     Regardless of the method of purchase, Abbott's Customers submitted claims for payment to Medicare and Medicaid when an Abbott product was administered to a program beneficiary.  The claims submitted by Abbott's Customers were paid at amounts directly influenced by Abbott's false and fraudulent prices.

59.     Abbott routinely disseminated false pricing information for the Drugs to the Pricing Publications.  Abbott employees typically reported the false and fraudulent prices to the Price Publications annually, although they sometimes did so more often.  On most occasions, Abbott reported inflated "List Prices" or "Direct Prices" (both referred to hereinafter as LP), WACs and/or AWPs.  A LP is supposed to reflect the price paid by a Customer that buys drugs directly from Abbott and not through a wholesaler.

60.     When Abbott reported a LP, some Price Publications (*e.g., Blue Book*, which provided pricing information for the vast majority of the state Medicaid programs) calculated

17

Abbott's AWPs by applying a markup – usually 18.75% – to the LPs. Abbott was aware of how the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that its LPs ultimately controlled the AWP reported by the Price Publications for many of its products. Abbott reported WACs for several of its drugs as well, but during the time period covered by the Complaint, the Price Publications used Abbott's LPs (plus the standard markup) to set the AWPs used by the Medicaid and Medicare programs.

61.    In some circumstances, Abbott itself calculated and supplied the AWP which it sought to have published.

62.    For example, in a January 16, 1996 letter from Abbott's Reimbursement Manager to Medi-Span, Abbott directly reported AWPs for two of its products.

63.    Abbott documents also confirm its knowledge that the LPs it reported directly impacted the AWP. In a March 20, 1995 e-mail between Abbott employees regarding the reporting of new Vancomycin LPs, one employee notes, "Please notify Red Book and Medi-Span of these changes ASAP. They are the sources for creating the AWP that is important to [Abbott's] Alternate Site [sales division]."

64.    Abbott also submitted false and fraudulent prices directly to state Medicaid programs. In an October 1, 1997, Abbott "Medicaid Coordinator" Tena Brown represented in a letter to the State of Texas Medicaid Program that the price on Abbott's Vancomycin 1 GM Fliptop vial- sterile, NDC 00074-6533-01 ("Vancomycin 1 GM FTV") was $583.70 for a package of 10, or $58.37 a unit. That led the Texas Medicaid program to set reimbursement for

Vancomycin 1 GM FTV at that price ($58.37 a unit). At the time, Abbott sold Vancomycin 1 GM FTV to certain Customers for $5.53 per unit, through a GPO called Oncology Solutions.

65.     With extremely few exceptions, Abbott reported increasingly higher prices for the Drugs from at least on or before January 1, 1991 through 2001. At the same time, the prices Abbott actually charged to its Customers decreased or remained the same.

66.     Abbott knew that the prices which it reported to the Price Publications directly affected reimbursement amounts paid by the Medicaid and Medicare programs. As Abbott's Manager for Reimbursement noted in an April 26, 1995 memorandum, "[h]aving a published [LP] that is high allows a provider to bill at that list price." The false or fraudulent prices Abbott reported to the Price Publications inflated government reimbursement amounts on claims submitted by Abbott's Customers for the Drugs. A chart setting out some examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**.

67.     Abbott manipulated its LPs, AWPs and WACs to induce its Customers to purchase Abbott's products, including the Drugs, by marketing the huge profits that would result to its Customers.

68.     Abbott was well aware of how the Government used its pricing information to reimburse Abbott products. For example, Abbott organized an internal entity known as the "Medicare Working Group." The group (1) was organized by high level Abbott executives, (2) involved representatives responsible for reimbursement issues from all major Abbott divisions, and (3) discussed and organized efforts to influence government reimbursement for drugs.

69.     Documents from the Medicare Working Group establish that Abbott knew that AWP is based upon Abbott's reported price plus, according to the Medicare Working Group documents, "a mark-up of 15-20%." Minutes from a January 21, 1997 meeting note that this AWP based on Abbott's reported prices is subsequently reported in "the Red Book, Blue Book and Medispan Book and is used by Medicare, Medicaid and Commercial insurance carriers to determine reimbursement levels."

70.     Neither the Medicaid nor the Medicare programs knew of or sanctioned Abbott's conduct as set forth in this Complaint, *i.e.*, the deliberate manipulation of its published prices to induce its Customers to purchase the Drugs. Abbott never disclosed the price reporting practices for the Drugs identified in this Complaint to the Medicaid or Medicare programs.

**A.     Vancomycin**

71.     Abbott first introduced its generic Vancomycin in 1988. Abbott's scheme to defraud the United States by causing inflated Vancomycin reimbursements ran from approximately 1989 through 2001. Over that time period, Medicare and Medicaid paid in excess of $75 million for Abbott's Vancomycin.

72.     During that time period, Abbott reported increasingly higher LPs and AWPs for Vancomycin to the Price Publications while the actual contract prices at which Abbott sold Vancomycin to its Customers decreased significantly.

73.     Abbott sold its Vancomycin in several doses and forms. The Vancomycin 1 GM FTV was the most common dose of Vancomycin reimbursed by Medicare and Medicaid.

20

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Abbott's false and fraudulent price reporting on its Vancomycin 1 GM FTV represents how

Abbott reported false and fraudulent prices on its other Vancomycin products.

74.     When Abbott first introduced its Vancomycin 1 GM FTV in 1988, the published

per unit AWP was $25.20. By early 2001, Abbott reported false prices that drove the AWP for

Vancomycin 1 GM FTV to $76.42. At the same time, the price at which Abbott's Vancomycin

was widely available to purchasers decreased to under $4.00 by early 2001; the difference (and

potential profit) between the reported price and the actual selling price for Vancomycin 1 GM

FTV was as great as $72.42 a dose, or more than 18 times the actual price at which Abbott sold

Vancomycin 1GM FTV.

75.     Abbott fully controlled and manipulated the AWPs for Vancomycin 1 GM FTV to

boost its Vancomycin sales at the expense of third party payors, including Medicare and

Medicaid.

76.     Abbott's manipulation of its reported Vancomycin prices between 1989 and 2001

created spreads sufficient to induce increased sales of that drug. Internal memoranda from senior

Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on

several of its drugs, including Vancomycin. Those efforts proved successful; the percentage of

Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to

approximately 70% in 2000.

77.     Abbott's reporting of Vancomycin prices in 1995 exemplifies the manner in

which Abbott manipulated the price of Vancomycin to maintain and grow its market share. In

March 1995, Abbott temporarily reported dramatically lower LPs and AWPs for Vancomycin.

21

Prior to the March 1995 LP/AWP price change, the Price Publications listed a per unit LP of

$50.90 for Abbott's Vancomycin 1 GM FTV, and a per unit AWP of $60.44 for that drug.

78.     In late March 1995, Abbott reported a new LP of $15.00 for a unit of Vancomycin

1 GM FTV.  Based on this new information from Abbott, the Price Publications published

revised per unit prices for Vancomycin 1 GM FTV.  They reported a LP of $15.00 and an AWP

of $17.81.

79.     Abbott received numerous complaints from Customers over the resulting

decrease in the spread.  Abbott deliberated internally on whether and by how much Abbott

should again increase its spread so that it could reestablish the inducement that had come to be

expected by its Customers.  Abbott documents show Abbott's pricing personnel carefully

considering the additional profits they could generate for Abbott's Customers if they artificially

re-inflated the reported prices for Vancomycin 1 GM FTV at various levels.

80.     Abbott subsequently reversed its earlier decision to lower its reported prices and

instead raised its reported Vancomycin prices.  In early May 1995, Abbott reported a new per

unit LP for its Vancomycin 1 GM FTV of $32.95.  The revised AWP for Abbott's Vancomycin 1

GM FTV became $39.13 (once the Price Publication applied the standard markup).

81.     That reported price increase proved insufficient.  Later that same month (May

1995), Abbott reported yet another set of prices for Vancomycin.  The LP Abbott reported for its

Vancomycin 1 GM FTV rose to $52.94 and its AWP rose to $62.86 (once the Price Publication

applied the standard markup).

82. Thereafter, Abbott reported higher Vancomycin LPs and AWPs to the Publishers each year, despite decreases in its actual prices to Customers for Vancomycin over that same period. The AWP for Abbott's Vancomycin 1 GM FTV peaked at $76.42 per unit in early 2001 at the same time that the actual sales price was less than $4 per unit.

83. The false prices reported by Abbott directly impacted the amount Medicaid and Medicare reimbursed for Vancomycin. For example, in 1999 Abbott's Vancomycin 1 GM FTV was widely available for approximately $4.75 a unit. Yet, Abbott reported a per-unit Vancomycin LP in 1999 – which served as the baseline for determining the AWP – to First DataBank of $64.35. As a result, the 1999 AWP for Vancomycin 1 GM FTV was set at $76.42.

84. New York State's Medicaid program relied on the First DataBank prices to set its reimbursement rate for the Vancomycin 1 GM FTV. New York State's Medicaid reimbursement rate for the Vancomycin 1 GM FTV in 1999 was $68.77; the AWP for Vancomycin 1 GM FTV was $76.42 at the time. New York's reimbursement for Vancomycin 1 GM FTV was AWP minus 10%, a reimbursement formula generally similar to those of other states. Abbott's false price representations created a profit spread of approximately $64.02 for Abbott's Customers, on a drug that Abbott sold to those same Customers for approximately $4.75 a unit. The spread between the New York state Medicaid reimbursement for Vancomycin 1 GM FTV – directly influenced by Abbott's false price reporting – and the actual acquisition cost was 1,348%. The profit to Abbott's Customers was 13.5 times the typical acquisition cost for the drug.

85. Abbott's practice of price manipulation continued into early 2001. At that time, Abbott reported new, lower WACs to the Price Publications for many of its drugs, including

23

Vancomycin, without also reporting new LPs or AWPs. At the time Abbott submitted the new

prices in early 2001, it had been under investigation by the Government for pricing fraud. In

addition, members of the House Ways and Means Committee accused Abbott of engaging in

price reporting misconduct that threatened public safety in the fall of 2000; the Centers for

Disease Control had expressed concerns that over-prescription of Vancomycin could lead to the

growth in the population of Vancomycin-resistant bacteria. Also, in October 2001, an Abbott

joint venture, TAP Pharmaceuticals, Inc. paid $875 million to the Government to resolve its

criminal responsibility and civil liability for fraudulent pricing and kickbacks in connection with

the marketing of a drug called Lupron. When Abbott submitted reduced WACs, First DataBank

changed the way it calculated Abbott's AWP. First Databank personnel set new AWPs for

Abbott products by applying a 25% markup to the newly supplied WACs instead of setting

Abbott's AWPs by applying a 18.75% markup to Abbott's still inflated LPs. Abbott tried to

convince First DataBank personnel not to set Abbott's AWP by reference to these new, lower

WACs; Abbott wanted First DataBank to continue to use Abbott's then still inflated LPs to

maintain its inflated AWPs. First DataBank refused Abbott's request. Ultimately, Abbott

reduced its LPs and WACs to reflect the average sales price for the Drugs on April 30, 2001.

86. The switch to using the lowered WACs drastically dropped Abbott's reported

AWPs in 2001. For Abbott's Vancomycin 1 GM FTV, the AWP dropped from $76.42 per unit in

early 2001 (when AWP was determined using the inflated LPs) to $17.72 per unit in 2001 (when

AWP was set using the revised, lowered WACs). By 2002, the AWP for this product was down

to $6.06 a unit.

24

87.     As a result of the drop in AWP, the spread on the reimbursement by Medicare and Medicaid was reduced from $60-$70 a unit to approximately $2.00 a unit.

88.     Abbott's Customers recognized that Abbott was responsible for creating and maintaining the spread. Numerous Customers complained to Abbott or the group purchasing organizations (GPOs) who negotiated prices on behalf of Abbott's Customers. A large Customer of Abbott went so far as to demand restitution for the almost $10.5 million in lost profits due to the decrease in spread resulting from Abbott's 2001 submission of lowered prices to the reporting agencies.

89.     Internal memoranda from senior Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on several of its drugs, including Vancomycin, as an inducement to purchase Abbott's drugs.

90.     Abbott's share of the Medicaid market has dropped steadily since the more accurate prices started being published in 2001 and thereafter went from approximately 70% in early 2001 to approximately 20% in 2004.

**B.      Large Volume Parenterals**

91.     In addition to false price reporting for Vancomycin, Abbott engaged in similar conduct with respect to its LVPs.

92.     LVPs are essentially sterile water, usually mixed with either salt (sodium chloride) or sugar (dextrose). LVPs are cheap to produce and are sold at very low prices.

93.     One of the most commonly utilized Abbott LVPs was 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 ("5% Dextrose 500 ml").

25

94.     In 1993, Abbott's 5% Dextrose 500 ml could be widely purchased for as little as $1.80 for a 500ml bag.

95.     The Red Book AWP for 5% Dextrose 500 ml in 1993 was $8.72.

96.     Two years later, in 1995, the price for Abbott's 5% Dextrose 500ml was widely available for even less; one wholesaler was selling it at $1.50 for a 500 ml bag.

97.     During the same two year period from 1993 to 1995 that the actual prices dropped, Abbott twice reported higher prices to the Price Publications for 5% Dextrose 500 ml. The AWP – based on Abbott's representations – increased by 5% in 1994 to $9.16 and was increased by an additional 3% in 1995 to $9.43.

98.     Thus, while Abbott's price to the wholesaler dropped by 20% between 1993 and 1995 (from $1.80 to $1.50), Abbott caused its AWP to increase by 8%. By 1995, the spread between the AWP and the resale price of that wholesaler was 628%.

99.     Abbott sold these products directly to Customers at prices comparable to those offered by the wholesaler.

100.    Abbott continued to report increasing prices for 5% Dextrose 500 ml after 1995. By reporting increasingly inflated LPs, Abbott caused the Red Book AWP for 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 to increase in 1996 to $9.71, in 1997 to $10.20, in 1998 to $10.71, in 1999 to $11.25 and in 2000 to $11.80. Medicaid and Medicare used these reported prices to set their reimbursement levels. At the same time, Abbott regularly sold the product to its Customers for $1.50 or less per bag of the water-based solution.

26

101. Abbott's reporting of increasingly false and fraudulent prices for its 5% Dextrose 500ml reflects the manner in which Abbott implemented its scheme for all of the LVPs during the relevant time period. Abbott engaged in identical conduct with respect to the "prices" and marketing of the other LVP products and package sizes identified by NDC and HCPCS code in ¶¶ 30, 34 of this Complaint.

102. Abbott used the false and fraudulent prices Abbott reported to the Price Publications for these water solutions to manipulate reimbursement; the reported prices did not reflect the actual prices Abbott was charging to its Customers.

103. Due to Abbott's conduct, Abbott's Customers submitted inflated claims to Medicare and Medicaid and received millions of dollars in inflated reimbursement for these water and water-based solutions. Abbott profited off the scheme by increasing its sales volume and profits. Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that amount.

## C. Acyclovir Sodium

104. Acyclovir Sodium (Acyclovir) is an antiviral drug used to treat several infections. The brand version, called Zovirax, was originally manufactured by Glaxo Welcome, Inc. Abbott began selling its generic version of the drug on April 22, 1997.

105. At the time Abbott launched its versions of Acyclovir in 1997, it reported a LP of $80.00 for the 500MG Dose of its generic version of Acyclovir (NDC#00074-4427-01). The

27

1997 Blue Book AWP for Abbott's Acyclovir Sodium 500MG was $95.00 (reflecting the standard price publication mark up on Abbott products of 18.75%).

106.    By 1999, Abbott had raised its reported LP for its Acyclovir Sodium 500MG to $88.20; the AWP for that dose of Abbott's Acyclovir Sodium had risen to $104.74.

107.    Yet, competition among manufacturers of Acyclovir drove the contract prices for the drug down sharply. In 1997, Abbott's Acyclovir Sodium 500MG could be purchased for $30.00. By 2000, the typical purchase price for Abbott's Acyclovir Sodium 500MG had eroded to around $11.

108.    Thus, the spread on Abbott's Acyclovir went from as much as 316% at product launch in 1997 to as much as 960% by 2000.

109.    Abbott actively marketed the reimbursement spread on Acyclovir to Customers, including Ven-A-Care, the relator in this matter. Ven-A-Care operated a home infusion pharmacy that largely serviced HIV/AIDS patients. On or around May 30, 1997, an Abbott national account manager directly marketed the spread on its Acyclovir Sodium to Ven-A-Care. That national account manager sent documents reflecting the spread on Abbott's Acyclovir and had conversations with Ven-A-Care where he explicitly marketed the spreads on Abbott's Acyclovir products.

110.    On April 30, 2001, Abbott reported new LPs and WACs for its Acyclovir products. As noted above, the price reporting compendia changed the method it used to calculate Abbott's AWP. First Databank began using Abbott's WAC and applying a 25% markup. The LP for Abbott's Acyclovir Sodium 500MG dropped from $88.20 to $4.00; the WAC dropped to

28

$3.81. The per unit AWP – based on a 25% markup from the $3.81 WAC – for Abbott's

Acyclovir Sodium 500MG dropped from $104.74 to $4.76. The revised LP, WAC and AWP

was in keeping with the actual contract price for Abbott's Acyclovir Sodium 500MG, which by

mid-2001 was around $4.00 a unit.

**D.**     **Abbott's Home Infusion Pharmacies, Home Infusion Partnerships and Consignment Arrangements.**

**1.**     **Home Infusion Pharmacies**

111.     From approximately 1982 until, upon information and belief, 2003, Abbott owned

and operated its own Home Infusion Pharmacies ("Abbott HI Pharmacies") as part of its Hospital

Products Division's ("HPD"), Alternate Site Home Infusion Department.

112.     Abbott's HI Pharmacies were located at various times in Atlanta, Georgia,

Chicago, Illinois, Los Angeles, California, and in New Jersey. At some point in that period, the

Abbott HI Pharmacy in Atlanta Georgia closed.

113.     Abbott billed Medicare and Medicaid for products and services dispensed by the

Abbott HI Pharmacies using Abbott's EIN number and Abbott's own Medicare and Medicaid

provider codes.

114.     Abbott HI Pharmacies stocked and dispensed Abbott products, including, without

limitation, products identified in this Amended Complaint in ¶ 30, as well as other products

produced and sold by Abbott and other manufacturers. Upon information and belief, Abbott

stocked its own products at or near the manufacturing costs for those products. Upon

information and belief, Abbott was able to acquire other manufacturers' drugs at reduced,

contracted prices.

115.    The Abbott HI Pharmacies billed Medicare and Medicaid through the "Abbott Reimbursement Department" in Abbott's HPD Alternate Site Home Infusion Department.

116.    Each of the Abbott HI Pharmacies would operate as follows:

A.    The Abbott HI Pharmacies would receive patient prescriptions from physicians, hospitals, outpatient clinics or other care providers.

B.    Abbott's Reimbursement Department would ascertain whether the referred patient was eligible for reimbursement for his or her prescription costs through Medicare, Medicaid or a third party insurer.

C.    Upon receipt of the prescriptions, the Abbott HI Pharmacies would fill the prescription and would, upon information and belief, at times provide pharmacist services.

D.    After the prescriptions were filled by an Abbott HI Pharmacy, the Abbott Reimbursement Department would bill either Medicare, Medicaid or a third-party insurer for the dispensed drug or product, depending upon patient eligibility.

E.    For those patients covered under Medicare or Medicaid, a reimbursement clerk in the Abbott Reimbursement Department would complete a paper or, at a later point, an electronic, Medicare HCFA 1500 form seeking reimbursement from Medicare or a Medicaid reimbursement form.

117.    The HCFA 1500 forms or Medicaid reimbursement forms submitted by the Abbott Reimbursement Department would reflect Abbott's EIN number and provider number as the entity to be reimbursed.

Case 1:01-cv-12257-PBS Document 4311 Filed 06/25/09 Page 39 of 134

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

118.    Depending upon the drug and the state program, Medicaid would typically pay to Abbott the AWP or WAC-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.   Medicare would typically pay to Abbott the AWP-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.  Abbott would retain for itself as a profit the difference between the cost of the drug or product to Abbott and the amount of the AWP-based reimbursement ("Abbott HI Pharmacy spread").

119.    Upon information and belief, Abbott did not disclose the Abbott HI Pharmacy spreads to the Medicare or Medicaid programs when it submitted reimbursement forms.

120.    The amounts Abbott HI Pharmacies were reimbursed by Medicare and Medicaid regularly exceeded the cost to Abbott in stocking and dispensing the drugs and products dispensed by the Abbott HI Pharmacies – including its own.

121.    In the case of the Abbott Drugs identified in this Complaint, Abbott's HI Pharmacies were reimbursed inflated amounts for any claims they submitted for those Drugs due to Abbott's fraudulent price reporting scheme.

## 2.    Abbott's Home Infusion Partnerships and Consignment Arrangements

122.    From approximately 1984 until, upon information and belief, 2003, Abbott HPD's Alternate Site Home Infusion Department entered into home infusion partnerships ("HI Partnerships") with various hospitals, care facilities and other medical entities.  These HI Partnerships permitted Abbott's home infusion partners ("HI Partners") or – in some instances Abbott – to bill government health programs on behalf of its HI Partners for the Drugs identified in ¶ 30 at inflated reimbursement levels.

123.    Abbott had at least 20 to 25 home infusion partners ("HI Partners") in these partnerships including, but not limited to:[3] University of Michigan's HomeMed, Children's Memorial Hospital of Chicago, Care Partners, Baylor, Harris Methodist, UniHealth, Intermountain, Cedars Sinai, University of Virginia, Seattle Children's Hospital, Cleveland Clinic, and University Hospitals of Cleveland.

124.    Abbott entered into standard partnership agreements with the HI Partners and others.  Under the terms of the partnership agreements, Abbott would:

A.    Provide its HI Partners Abbott drugs and products free of charge on a consignment basis, including but not limited to, the Drugs identified in ¶ 30 of this Complaint;

B.    Provide its HI Partners agreed upon services, including, on occasion, "reimbursement services;" and

C.    Add the HI Partner to a group purchasing organization of which Abbott was a member, so that the HI Partner, or Abbott on behalf of the HI Partner, could purchase drugs and products that Abbott did not manufacture or sell ("Other Non-Abbott products") at a substantially reduced contract rate.

125.    The HI Partner would dispense the drugs or products from its pharmacy.  If the drug or product was an Abbott product, that product would be a consigned product that the HI

---

[3] These HI partners are described herein as identified by an Abbott witness. For some of these HI partners, the witness did not provide full and complete name information.

Partner would not pay for on an individual basis, or at any time prior to when the HI Partner

billed Medicare or Medicaid.

126.    As part of its "reimbursement" services for some HI Partners, Abbott's

Reimbursement Department would submit claims to Medicare, Medicaid and other third party

payors for drugs, medical devices and medical services on the HI Partner's behalf, using the HI

Partner's EIN number and Medicare and Medicaid provider codes.

127.    For patients covered under Medicare or Medicaid, an Abbott reimbursement clerk

in the Reimbursement Department would complete a paper or, at a later point, electronic,

Medicare HCFA 1500 form seeking reimbursement from Medicare, or the appropriate Medicaid

reimbursement form seeking reimbursement from a State Medicaid program on behalf of the HI

Partner.

128.    Abbott provided reimbursement services to, among others, Care Partners,

University of Michigan, Children's Hospital and the University of Virginia.

129.    If Abbott was providing reimbursement services to an HI Partner, Abbott's

Reimbursement Department would collect reimbursements from Medicare, Medicaid and other

third party payors for claims submitted on behalf of that HI Partner.  Those reimbursement

amounts were collected in lock box bank accounts that, upon information and belief, were

maintained in the name of the HI Partner or Abbott.

130.    Upon information and belief, Abbott would never bill the HI Partners for the

drugs and products it consigned to them, and would never expect payment for them.  Abbott's

payment for the consigned Abbott drugs would be some percentage of the HI Partner's entire pool

of collections from Medicare, Medicaid and third party payors, regardless of whether it was Abbott or the HI Partner that submitted the claim.

131.    Under the Consignment Partnership Agreements, the HI Partners would never pay Abbott individual amounts for the drugs or products consigned to the HI Partner. The Medicare and Medicaid drug reimbursements were used by Abbott to compensate it for billing and consulting services not related to the provision of patient care.

132.    For example, a December 1996 Consignment Partnership Agreement, required a HI Partner to pay Abbott 45.1 % of its gross revenue collections for all of its IVIG treatment, including any administration fee and/or any drug ingredient cost. Thus, Abbott would receive a percentage of any inflated reimbursement spreads for the Drugs identified in ¶ 30 of this Complaint that were provided to its HI Partners on consignment.

133.    Abbott never disclosed to the Medicare or Medicaid programs that it was directly profiting from the reimbursement spreads in the above-described arrangement with the HI Partners.

134.    If an HI Partner would not contract for reimbursement services, the HI Partner would submit the claims to Medicare and Medicaid and directly collect the reimbursements. However, Abbott would still consign its drugs and products to the HI Partner and still share in a percentage of the total collections collected by the HI Partner.

135.    Several state Medicaid programs would reimburse for Abbott drugs covered by this arrangement at amounts tied to the AWPs or WACs for those drugs. Medicare also reimbursed for Abbott drugs covered by these arrangements at amounts tied to the AWPs for the

34

Abbott drugs. That amount would then be paid to the HI Partner, who in turn would provide a percentage share to Abbott of its entire collections as payment for various types of categories of services.

136. The cost to Abbott in stocking the HI Partner's warehouses with Abbott and non-Abbott drugs and products was far less than the amounts reimbursed by Medicare and Medicaid for those drugs and products.

137. Abbott did not disclose to the Medicare and Medicaid programs that the drugs and products it sought reimbursement for from Medicare or Medicaid actually cost Abbott far less to consign to the HI Partner than the ultimate Medicare or Medicaid reimbursement amount.

138. In the case of the Abbott Drugs identified in this Complaint, Abbott's percentage of HI Partner reimbursements Abbott that collected was improperly inflated due to Abbott's fraudulent price reporting scheme.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

139. Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

140. Abbott knowingly caused or caused to be presented false or fraudulent claims for payment or approval to the United States for the Drugs for reimbursement that were substantially higher than providers' actual acquisition costs for the Drugs and based on reported prices that were fraudulently and artificially manipulated by Abbott. Abbott knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted.

35

141.    By virtue of the false or fraudulent claims that Abbott caused to be made, the

United States has suffered damages and therefore is entitled to multiple damages under the False

Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to

$10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up

to $11,000 for each violation occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False
Records or Statements to Cause Claims to be Paid)
(31 U.S.C. § 3729(a)(2))

142.    Plaintiff repeats and realleges  ¶¶ 1 through 138 as if fully set forth herein.

143.    Abbott knowingly made, used, or caused to be made or used, false records or

statements – *i.e.*, the false certifications and representations made or caused to be made by

defendants to state Medicaid programs when seeking to ensure that the Medicaid programs

would reimburse for the Drugs, and the false representations to the Publishers upon which

Medicare and Medicaid relied – to cause false or fraudulent claims paid or approved by the

United States.

144.    By virtue of the false records or false statements made by Abbott, the United

States suffered damages and therefore is entitled to treble damages under the False Claims Act,

to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each

violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for

each violation occurring on or after September 29, 1999.

36

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

### THIRD CAUSE OF ACTION

(Unjust Enrichment)

145.     Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

146.     This is a claim for the recovery of monies by which Abbott has been unjustly enriched, including (1) profits earned by Abbott through its HI Pharmacies and Consignment Partnership Agreements and (2) profits from increased sales resulting from the illegal inducements that Abbott arranged to be paid to its Customers.

147.     By obtaining monies as a result of its violations of federal and state law, Abbott was unjustly enriched, and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

148.     By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Abbott on sales to Customers to whom it arranged for unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

### FOURTH CAUSE OF ACTION

(Common Law Fraud)

149.     Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

150.     Abbott made material and false representations concerning the prices of the Drugs with knowledge of their falsity or reckless disregard for the truth, with the intention that the United States act upon the misrepresentations to its detriment. The United States acted in justifiable reliance upon Abbott's misrepresentations by making payments on the false claims.

37

151.    Had the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States, the United States would not have paid for Abbott products.

152.    By reason of these payments, the United States has been damaged in an as yet undetermined amount.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Abbott, jointly and severally, as follows:

1.    On the First and Second Causes of Action, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Third Cause of Action, for the damages sustained and/or amounts by which Abbott was unjustly enriched, including an accounting of all revenues unlawfully obtained by Abbott, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Abbott, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.    On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852

Dated: June 4, 2007

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' FIRST AMENDED COMPLAINT** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated: June 4, 2007

/s/ Mark A. Lavine
Mark A. Lavine

40

EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUME, et al. CIVIL ACTION NO. 01-12257-PBS
   Plaintiffs              .
                               .
   V.                       . BOSTON, MASSACHUSETTS
                               . JULY 20, 2007
ABBOTT LABORATORIES, et al .
   Defendants             .
. . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States: John Neil, Esquire
                          Justin Draycott, Esquire
                          United States
                          Department of Justice
                          601 D Street, NW
                          Patrick Henry Building, Room 9028
                          Washington, DC  20004
                          202-307-1088

                          Gejaa T. Gobena, Esquire
                          United States Department of
                          Justice
                          601 D Street NW
                          Patrick Henry Building, Room 9028
                          Washington, DC 20004
                          202-307-1088

   For Abbott Labs.:      James R. Daly, Esquire
                          Jones, Day, Reavis & Pogue
                          77 West Wacker Drive
                          Chicago, IL 60601-1692
                          312-782-3939

```
For the Relator:       Jared Anderson, Esquire
                       The Breen Law Firm, P.A.
                       3562 Old Milton Parkway
                       Alpharetta, GA 30005
                       770-740-0008

For State of Texas:    Raymond Winter, Esquire
                       300 W. 15th
                       9th Floor
                       Austin, TX 78701
```

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

**MARYANN V. YOUNG**
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1

<u>**I N D E X**</u>

2  Proceedings                                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                      P R O C E E D I N G S

2          (Court called into session)

3              THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is July 20, 2007.  The case of Citizens For

5    Consume et al. v. Abbott Laboratories et al., Civil Action No.

6    01-12257 will now be heard.  Would counsel please identify

7    themselves for the record.

8              MR. NEIL:  John Neil on behalf of the United States.

9              MR. GOBENA:  Gejaa Gobena on behalf of the United

10   States.

11             MR. DRAYCOTT:  Justin Draycott on behalf of the

12   United States.

13             THE COURT:  Thank you.

14             MR. DALY:  Good morning, Your Honor, Jim Daly on

15   behalf of Abbott Laboratories.

16             THE COURT:  Thank you.

17             MR. ANDERSON:  Good morning, Your Honor, Jared

18   Anderson counsel for the Relator.

19             MR. WINTER:  Good morning, Your Honor.  I'm Raymond

20   Winter, counsel for the state of Texas.

21             THE COURT:  All right, thank you very much.  Well

22   we're start with these and take them in the order in which they

23   were filed.  So the first is Docket Entry No. 3959 which is

24   Abbott's renewed motion to compel.  Mr. Daly?

25             MR. DALY:  Your Honor, is this the one on the

4

1   deliberative process privilege?

2          THE COURT:  It is.

3          MR. DALY:  We have two--

4          THE COURT:  It is.

5          MR. DALY:  --motions today on, motions to compel.

6   Thank you, Your Honor.

7          THE COURT:  You're welcome.

8          MR. DALY:  The – as the Court is well aware, the

9   government has sued Abbott for fraud.  They've sued Abbott for

10  violations under the False Claims Act.  They've claimed that we

11  mislead them and deceived them and made misrepresentations.

12  They claim in their complaint that they reasonably relied on

13  the things that Abbott told them in their price

14  representations.  They said they didn't know about the spreads.

15  They said they would have acted differently had they known.

16  And they say that Abbott withheld information that was critical

17  to the government's consideration and deliberations about what

18  kind of reimbursement methodology to use.  That's the essence

19  of the complaint against us.

20          Meanwhile there are a host of documents that the

21  government, about 600 in total, that the government has

22  withheld on the basis of what they call the deliberative

23  process privilege.  They have, for example, they've withheld

24  all drafts of any document, whether it's a letter or a report

25  or anything, claiming that drafts are inherently deliberative,

5

1    whatever that means.  We've cited cases that say that being a

2    draft doesn't mean anything under the deliberative process

3    privilege.  They have minutes of meetings between OIG which has

4    done all of these reports that the Court has seen in other

5    context where they, when they get ready to do a report all the

6    OIG folks get together and talk about what they're going to do

7    and why they're doing it.  And then when they're done they ship

8    a copy of it over to CMS, the plaintiff agency, and then they

9    have a meeting and they talk about it.  That's called the exit

10   conference.  And there are minutes and notes and memoranda

11   written about those where people are sitting around talking

12   about the spreads, talking about how AWP is much higher than

13   AAC or actual acquisition costs or average sales price.  And

14   they talk about it back and forth and somebody writes up

15   minutes.  That's the consideration and the deliberation of the

16   facts that they say in their complaint that they don't have and

17   yet all of that stuff is being kept from us.

18           There are listings in both privilege logs of the OIG

19   and CMS that talk about consideration of alternative proposals

20   for recommendations.  In fact there's one that says alternative

21   Medicare Part B reimbursement mechanisms and the pros, cons and

22   potential impact of each.  That's this case.  That's what were

23   they – as Judge Saris has said over and over again she wants to

24   know what they were doing, what they were thinking, what they

25   agreed to, what they didn't agree to and what they understood

6

1 and what they didn't understand.  Here's a document on the

2 privilege log that says they're considering all these

3 alternatives.  Not only doing that, but examining and

4 discussing the pros and cons and potential impact of each.  And

5 yet that goes to the heart of their claim.  It goes to the

6 heart of Abbott's defense and we don't have it.  So we have all

7 these and there's a tremendous amount of examples that we can

8 use but there are 600.  And so what it boils down to is they

9 say we didn't know.  They say they reasonably relied.  They say

10 that we misled the federal government and caused them damages,

11 but we're not going to give you the documents that show what we

12 knew and what we thought and what we considered.  It's a fraud

13 claim--

14            THE COURT:  You'll get your chance.

15            MR. DALY:  There's no reasonable reliance.

16            THE COURT:  Just sit back and relax.

17            MR. NEIL:  Sorry, Your Honor.

18            MR. DALY:  These documents are documents that are

19 written within OIG.  People writing draft reports, people

20 writing memoranda's talking about all the data that they're

21 collecting, all the stuff that shows the disparity between

22 actual acquisition cost and AWP, documents within CMS,

23 documents between those agencies when they get together and

24 talk about it.  Documents - we've asked them for the

25 legislative affairs documents.  They just told us, no, you're

7

1   not getting them cause that's talking about laws and things we

2   thought about when we were thinking about what kind of

3   methodology we might follow and you can't have them.

4   Deposition transcripts, we've cited them in the briefs, we've

5   attached the transcripts, asking people, you know, in

6   depositions, well you had a meeting, did you talk about

7   alternatives?  Direct you not to answer.  Well, can you at

8   least tell me whether alternatives were discussed?  Direct you

9   not to answer.  That's the deliberative process privilege.

10  They're taking this thing so broadly and so expansively that,

11  you know, the everyday decisions about what word to write in a

12  report is trying to be wrapped up in the deliberative process

13  privilege cause every minute that goes by is some kind of a

14  decision or another and they just stretch this thing beyond

15  anything that the deliberative process privilege would mention

16  and, or would countenance.

17          Now what I'd like to propose, Judge, is that we've

18  cited the law in our brief.  When the plaintiff comes in, and

19  the plaintiff is the United States government, and the

20  plaintiff comes in and sues for fraud, says it doesn't

21  reasonably rely – that it reasonably relied on our

22  representations, says it didn't know and says that it would

23  have acted differently and says that we withheld information

24  from them that would have caused them to take a different

25  course.  That the law, and we cite, you know, really a bunch of

8

1   cases, but we do have the *Garner Supply* case which we cited

2   from this district and we do have the *Department of Economic*

3   *Development v. Arthur Anderson*, which is a Southern District of

4   New York case, two leading cases on the subject.  They

5   basically say when what the government knew and understood is

6   at issue, where adjudication of fraud claims turns on issues of

7   knowledge, reliance and causation, all of which apply to fraud

8   and the False Claims Act, direct evidence of causation is

9   irreplaceable, and they ordered that all this stuff be turned

10  over.

11          So our position is that when the plaintiff brings the

12  action and puts what it knew and puts what it relied on at

13  issue in the case you can't then say, oh, well you know, we did

14  all that but you can't see what we actually thinking.  You

15  can't see what we were actually doing and thinking about and

16  talking about within our own agencies and between agencies and

17  that's not fair.  And, you know, we have a lot of other

18  arguments that, which I'm happy to go through with the Court

19  but – arguments about, you know, where's the prejudice here?  I

20  mean, we're talking about meetings that we had 15 years ago or

21  10 years ago or five years ago or indeed 20 years ago that no

22  one's going to be chilled about.  I mean the law has changed,

23  the Medicare Modernization Act has been entered into, a variety

24  of arguments like that.  Procedural arguments where they did

25  not come in, they haven't identified the prejudice.

9

1          They haven't identified what decision cause to be

2    wrapped within the deliberative process privilege it has to be

3    a pre-decisional document that relates to an identified

4    decision that was ultimately made.  They haven't done that for

5    any document on their list.  And they come in with affidavits

6    only after we file our motion to compel in which we've cited

7    several cases that that alone, the failure to come in on day

8    one with an agency head or a senior person within the agency to

9    claim and identify the privilege in the first instance without

10   waiting for a motion to compel, that that alone is reason

11   enough to wipe out the privilege.

12          So I can go through that.  I can go through examples

13   with the Court.  We can look at the privilege logs itself if

14   you want but my proposal would be we don't have to do any of

15   that and the Court shouldn't have to do any of that if the

16   privilege does not apply.  And I think clearly under the case

17   law it doesn't, so if the Court wants to hear from the

18   government on that maybe it makes sense.

19          THE COURT:  All right.  Why shouldn't I grant your

20   brother's motion?

21          MR. NEIL:  Thank you, Your Honor.  Your Honor, my

22   brother is asking this Court to vitiate or to entirely

23   eliminate an exceptionally important governmental privilege in

24   order to obtain information that, one, they already have access

25   to and, two,--

10

1          THE COURT:  Well, explain yourself--

2          MR. NEIL:  --from other sources.

3          THE COURT:  Explain yourself on that.

4          MR. NEIL:  Let me explain myself.  I think the best

5   way to do that is to look into a specific context.  Let's take

6   a look at the OIG privilege log.  Abbott has requested the work

7   paper files from a very, very large number of OIG audits and

8   inspection reports.  What have we produced in response to my

9   brother's request for production in the OIG context?  Well we

10  produced the reports themselves.  We've produced CMS's comments

11  on those reports.  We produced OIG's response to CMS's formal

12  comments on those reports.  We've produced all of the

13  underlying facts and data--

14          THE COURT:  We're not arguing about what you've

15  produced.

16          MR. NEIL:  Fair enough, Your Honor, but--

17          THE COURT:  It's about what you haven't produced.

18          MR. NEIL:  What we have not produced is a very, very

19  narrow fraction of what we've produced in this case.  Mr. Daly

20  suggested that it's important to his client's to obtain

21  information about what individuals in the government thought,

22  knew, understood, about drug reimbursement.  They have access

23  to that.  They've deposed the authors of any number of these

24  OIG reports.  They've asked them specifically what fact did you

25  rely on?  What did you know about the drug reimbursement

11

1   system?  What did you know about my client's conduct?  All

2   kinds of specific questions.  Those have not generated a

3   request not to answer.  They have access to all of this

4   information.

5          THE COURT:  Then why are you objecting – if those

6   have not generated objections, why are you concerned about the

7   underlying documents?

8          MR. NEIL:  Because the underlying, well, certain

9   underlying documents.  There are certain categories of

10  underlying documents that we've asserted a privilege over and

11  the reasons are set forth in the attached declarations.

12  Essentially, I mean for example in the OIG, you know, in the

13  OIG declaration by Robert Vito who's a regional inspector

14  general with the Office of Inspector General, he, Mr. Vito set

15  forth the process by which inspection reports are finalized.

16  There's a very vigorous internal process in which drafts are

17  circulated, program staff make comments on those drafts, make

18  suggestions, and then the draft is finalized after a meeting

19  with CMS in which representatives from both sides hash out

20  various issues and concerns.  Then at the end of that process

21  CMS comments, OIG finalizes the report and the entire product

22  is published.

23          Mr. Daly and Abbott has access to the final report.

24  They have access to CMS's final formal comments.  And they have

25  access to OIG's response to CMS's formal comments.  They can

12

1   ask individuals within OIG what they thought, what they knew,

2   what they understood and those kinds of questions won't

3   generate objections on this basis.  The drafts themselves and

4   the comments on the drafts of these OIG reports are really the

5   core of the deliberative process.  It is the process of

6   individuals within the Office Inspector General hashing out,

7   debating, discussing, noting objections to a non-final document

8   that then eventually is finalized.  I think Mr. Vito

9   articulated the harm that he felt would come to his program

10  staff if those kinds of comments, if the program staff knew

11  that those kinds of comments were going to be fought over in

12  litigation 10 or 15 years down the road.

13          So the situation with CMS, not to focus exclusively

14  on OIG.  The situation with the CMS in the carrier logs is

15  somewhere.  Abbott filed a request for production - well, let

16  me step back.  In response to subpoenas the United States

17  received in 2004 when the United States was a third party in

18  this MDL, The United States produced documents to a large

19  number of defendants including Abbott.  We produced 115,000

20  pages of documents approximately in response to that subpoena.

21  We withheld approximately 600 documents on deliberative process

22  grounds.  In the instant case Abbott filed a request for

23  production asking for all of the documents that we withheld on

24  deliberative process grounds in our response to the subpoena.

25  We did a re-review and agreed to release about 200 such

13

1  documents but we retained the privilege of approximately 400

2  of those documents.

3        Abbott's got 115,000 pages of documents from that CMS

4  production.  They deposed three former CMS administrators, APEX

5  witnesses, and they deposed them for a total of five days with

6  a sixth day scheduled.  They've asked these administrators

7  about their conversations with Congress, conversations with

8  congressional staff, conversations within the agency that

9  aren't deliberative.  They've obtained an enormous amount of

10 information from these individuals about what they knew, what

11 they understood, what they believed about drug reimbursements,

12 about Abbott, about any number of topics.

13        So what we're trying to protect here is not an

14 extraordinary amount of information.  We're, you know, Abbott

15 has access to information about what the government knew,

16 understood and believed in, you know, a variety of ways.  We're

17 producing that information.  We're continuing to produce that

18 information.  And Abbott can, you know, continue to ask

19 witnesses about it.  We're only withholding a very, very narrow

20 band of documents and a very, very narrow set of information

21 that goes to the core of the deliberative process.  We've been

22 judicious.

23        One other point before we turn back to my brother,

24 there's a real question about the relevance to the specific

25 allegations in this case of the documents on the logs.  One

14

1   thing that Judge Saris has really made clear on a number of

2   statements and rulings that when evaluating issues in this MDL,

3   you really have to look at it on a company by company, drug by

4   drug basis.  I know that Your Honor has embraced that reasoning

5   in a number of your own rulings.  Precious few of the documents

6   on any of these privilege logs involve Abbott at all.  They

7   don't mention Abbott drugs.  They don't mention Abbott the

8   company.  Of the more than 600 documents on the three logs, a

9   very, very rough calculation that I did, if you include Lupron

10  which is not an Abbott drug but is a drug manufactured by TAP

11  in which Abbott is a joint venture, I counted about 60, 60

12  documents that even mentioned Abbott in any way.  That's

13  something I would have to confirm by going to the documents

14  themselves but about 60 documents--

15          THE COURT:  Are you willing to give those 60 over?

16          MR. NEIL:  I don't think they're relevant but I'd be

17  willing to give them to you for an *in camera* review.

18          THE COURT:  I'm glad you're willing.

19          MR. NEIL:  It's better than 600, Your Honor.  So that

20  would be one sort of compromise step that I think we could take

21  here that might facilitate this.

22          THE COURT:  Okay.  I'll think about it.  You know,

23  the two least favorite words for Judges are *in camera* and pro

24  se.

25          MR. NEIL:  We'll understand.  Thank you.

15

1        THE COURT:  Enjoy being a juror, Mr. Shapiro?

2        MR. SHAPIRO:  Would you make me decide?

3        THE COURT:  No.

4        MR. DALY:  Your Honor, a couple of things.

5        THE COURT:  Just briefly, Mr. Daly, and then we'll

6   move on to the next motion.

7        MR. DALY:  Certainly.  If you look at the deposition

8   testimony that we've cited in our briefs and attached, one of

9   things that I think is important to mention is that we've

10  deposed a lot of people.  We're asking them about meetings and

11  events and decisions that were made five, 10, 15 years ago

12  because that's all within the period that the government is

13  suing us for.  Witness after witness is saying I don't

14  remember.  That's 10 years ago, I can't – how can you expect

15  them to remember that?  And we're like, well, we wish we hadn't

16  taken so long but it's not our doing, so these documents are a

17  critical source of information for us.  And one thing that the

18  Court did not hear in Mr. Neil's presentation is any basis for

19  having the privilege apply.

20        They don't address the legal argument that when you

21  put reliance, causation, lack of knowledge, you misled us, you

22  withheld from us, at issue, which they've done by the

23  allegations of their complaint, it's out the window.  You

24  didn't hear anything about that because there's nothing to say.

25  And I think it's a policy position of the government that they

16

1   try to maintain these privileges wherever they can.  But in

2   this case as the cases we've cited have held, when you put it

3   at issue when it is at issue, it's gone.  And giving the 60

4   documents, I mean I definitely object to that.  I don't think

5   we need an *in camera* review of anything here because as a legal

6   matter they have – the privilege doesn't apply because they've

7   put those deliberations, they've put the reasons why they did

8   what they did and didn't do what they didn't do at issue by

9   suing us for fraud.  And I do object to getting 60, Judge.  And

10  I do object to getting an *in camera* review, and I don't have

11  the sense the Court wants to do it today certainly but, you

12  know, I'd be prepared to walk through all 400 with them and I

13  think you'd see, I even have some examples, but we're talking

14  about things that are--

15          THE COURT:  400 or 600?

16          MR. NEIL:  Your Honor, there are approximately 600

17  documents on the three logs.

18          THE COURT:  Yeah.

19          MR. DALY:  But--

20          THE COURT:  All right.  I've heard enough on that.

21  So let's move on to docket entry No. 4135, which is Abbott's

22  motion to compel United States and the Relator for adequate

23  responses.

24          MR. DALY:  Your Honor, this is our motion to compel,

25  which I think through the happening of events and the passage

17

1    of time and some discussions and some additional productions

2    has limited itself to three broad areas which I'll try to get

3    through very quickly.  The first one relates to our

4    interrogatory 3 which simply asks for who received copies of

5    the various OIG reports and other studies, GAO reports, things

6    that were done, all of the documents that the Court has seen

7    several times in various iterations depending on what motion is

8    before you.  But we've said, okay, who got those?  And, you

9    know, they've objected and said well we can't go tell you

10   everybody who got it because we don't know.  So we've said,

11   okay, that makes sense.  I'm not asking you to certify

12   everybody who ever got one of these things but can you at least

13   give us a distribution list?  I mean was there a distribution

14   list, you know, and it would change over time as to who would

15   get this.  Is there a person or persons that we can talk to who

16   could tell us who circulated these things?  Things of that

17   nature of a very general nature and we've been foreclosed on

18   that and we would like to have that.

19           THE COURT:  All right.  Why not, Mr. Draycott?

20           MR. DRAYCOTT:  First of all, they can't have it to

21   the extent we have it and the exhibits to the government's

22   opposition to the motion to compel demonstrates how we've been

23   trying to turn precisely this information over and have been

24   trying to make it available.  And it in fact has been turned

25   over and has been used by Abbott at deposition and if the Court

18

1    will permit me I'll refer Your Honor to a couple of the

2    exhibits.

3           First it's important to understand the process of the

4    generation of these reports and where the critical interaction

5    is.

6           THE COURT:  Well, let's just cut right to it.  Is

7    there somebody who would know?

8           MR. DRAYCOTT:  No.  I think if Your Honor would

9    permit me, I'll explain why this is – what the process is.

10   There is an inspection is begun at within different offices at

11   OIG.  The report is generated and what is a critical, well

12   there's what's called a final draft of that report.  That draft

13   is then sent over to in this case, CMS and CMS then comments on

14   it.  Now with respect to – and later a final draft comes out

15   and attaches a memorandum which contains the agency comments.

16   That draft is then posted on an OIG website and has been for

17   years and that is just available and out there in the public

18   domain.  So this distribution--

19          THE COURT:  Starting in what year was it posted on

20   the website?

21          MR. DRAYCOTT:  I don't – I was afraid Your Honor

22   might ask that--

23          THE COURT:  Then you should have known.

24          MR. DRAYCOTT:  Well, it's as long as – I've been

25   trying actually to find that out.  It's been as long as I can

19

1    remember and as long as anybody can remember so as long as

2    it's been available, but we'll certainly obtain that

3    information.  But there's no doubt those reports have been

4    generated and posted and they've been in the public domain.

5    But if Your Honor will permit me, with respect to--

6             THE COURT:  Do you have any idea, Mr. Daly, about –

7    are you familiar with this website or?

8             MR. DALY:  Yes, Your Honor.  I don't know the year

9    that it started either, Judge, I apologize.

10            MR. DRAYCOTT:  But that, at any rate that is how

11   these reports are currently posted.  So if I may back up to the

12   final draft and direct your attention – the other thing that

13   Mr. Neil explained is that with respect to that final draft

14   it's then, there's then a referral about the final draft.  And

15   so that's the draft that then goes to the agency and which it

16   gets the agency response.  And so the final report is this

17   thing from the final draft is the critical issue.

18            Now within the work papers if I can direct Your

19   Honor's attention to our Exhibit 4.  I don't know if you have

20   it in front of Your Honor--

21            THE COURT:  I don't.

22            MR. DRAYCOTT:  But what it is is these are rosters.

23   Now the material that hasn't been reviewed from these work

24   paper productions are the types of information they're set out

25   in Exhibit 4 which is a roster of the conference that occurred

20

1   between CMS and OIG regarding the report.  This is, if you'll

2   permit me to quote those, and this is where the rubber meets

3   the road, this is who was consulted on the final draft.  And if

4   you look at the first page of Exhibit 4 it identifies not only

5   the individuals but their affiliation within CMS.  So this is

6   the most direct, this is absolutely the core document if you

7   want to look at where the information that is being generated

8   in the context of inspection is going within CMS.  It's the

9   roster that reflects the exit conference with respect to that

10  draft.

11         THE COURT:  All right.  Mr. Daly, what do you think

12  is out there that you don't have?

13         MR. DALY:  Your Honor, we've asked in depositions,

14  for example, who's in charge of circulating the stuff.  Counsel

15  is talking about the pre-finalization of the report where you,

16  you have these meetings where people are talking about what the

17  reports say.  That's one of the things we want that they're

18  hiding under the deliberative process privilege.  But what I'm

19  asking for is where does the report go after it's done.  In

20  other words, before it was posted on the internet which can't

21  be any later in time than probably the late `90's and a lot of

22  these reports go back to 1992, 1991, even the late `80's.  Who

23  was in charge of circulating those?  We want to know what

24  federal agencies it went to.  We want to know who was in charge

25  of sending it to the states and by what means because a lot of

21

1   these are Medicaid--

2          THE COURT:  All right.  The government's ordered to

3   produce somebody to address these issues.

4          MR. DALY:  Thank you, Your Honor.

5          THE COURT:  Next?

6          MR. DALY:  Your Honor, the next category is what I'll

7   call generally documents gathered during their 11 year

8   investigation of Abbott before they unsealed.  And basically

9   what we're asking for here is to give us copies of subpoenas or

10  certificates of their civil investigative demands that you

11  served on third parties.  Give us the documents that you got

12  pursuant - I mean if we had been in litigation if they'd

13  unsealed we'd have all this stuff because they'd be Rule 45

14  subpoenas.  So they spent 11 years digging up stuff and dealing

15  with their investigation.  We'd like to have that.  We're not

16  asking for their work product.  We're asking for stuff that

17  they've got.  They've told us for example--

18         THE COURT:  Well let's narrow it into categories.

19         MR. DALY:  Okay.

20         THE COURT:  Other than stuff.

21         MR. DALY:  Sorry, Judge.  Witness statements, they've

22  told us that we can have those.  They say we've gotten them in

23  the Texas litigation.  We've asked, well, we--

24         THE COURT:  Okay, any additional witness statements

25  that have not been produced.

22

1          MR. DRAYCOTT:  They've all been produced.

2          MR. DALY:  We'd like them then to be produced in our

3    case because, you know, these cases are separate, and if that's

4    true then they should just reproduce them to us.  There aren't

5    that many.

6          THE COURT:  How many?

7          MR. DRAYCOTT:  There are a few categories of witness

8    statements.  There are six which we have confirmed were

9    produced.  These were voluntary statements that were taken for

10   six individuals.  They were turned over by the state of Texas

11   to Abbott in May of 2006.  I thought this was a frankly a dead

12   issue based on my conversation with other Abbott counsel.

13   They've absolutely got the witness statements.  The other

14   category of statements--

15         THE COURT:  So can you agree to that, Mr. Daly, that

16   in that category that you have them someplace?

17         MR. DALY:  If counsel is certifying that we have that

18   category through the Texas litigation--

19         THE COURT:  Okay, moot then.

20         MR. DALY:  --then I'll accept that, Your Honor.

21         MR. DRAYCOTT:  I'll give Mr. Daly the names of the

22   six individuals and if he, if for any reason Abbott doesn't

23   have them they can come back to us.

24         THE COURT:  All right.  What about the other

25   category?

23

1       MR. DRAYCOTT:  The other category is there is, there

2   are no, there are – the way the government can take statements

3   is pursuant to a CID.  We have no statements pursuant for a CID

4   but our federal CID, that is our Civil Investigative Demand

5   Statute places severe restrictions on what we can do by way of

6   dissemination of material that we, the, for example,

7   transcripts that we obtained.  That's not really the issue

8   because we don't have deposition transcripts.  The state of

9   Texas has its own False Claims Act under which it has a similar

10  procedure for taking something called an examination under

11  oath.  There was some coordination between the state of Texas

12  and the United States in which the United States has what are

13  called EUO's--

14       THE COURT:  How many people?

15       MR. DRAYCOTT:  --examinations under oaths.  Those,

16  all the EUO's that were taken by the state of Texas that we've

17  had access to have also been turned over to Abbott by the state

18  of Texas.  But as I explained to Abbott counsel was is that

19  given that I'm completely unfamiliar with restrictions on

20  dissemination of statements that were taken pursuant to a Texas

21  law--

22       THE COURT:  All right.

23       MR. DRAYCOTT:  --I would just prefer because of any,

24  because the state of Texas is better able to deal with

25  restrictions on dissemination if there are any in their

24

1   statute, that they get them from the state of Texas which

2   they've done.  There's a complete production of the EUO's by

3   the state of Texas to Abbott.  They've got them all.

4          THE COURT:  Okay.  He thinks you have them, Mr. Daly.

5   I want you to meet and confer to determine whether or not in

6   fact you do have them if you don't figure out a way to produce

7   them.

8          MR. DRAYCOTT:  With respect to the other category

9   which is the documents we have from a very - the documents that

10  we've obtained during the investigation, we have been

11  absolutely explicit from an early point in this case and indeed

12  I've made an attachment to our opposition all the transmittal

13  letters by which we have provided third party materials that we

14  obtained and it's only being produced.  There are some

15  documents which haven't and those have been the subject of

16  correspondence between myself and Abbott counsel where there is

17  pricing information from other companies that were included on

18  third party material.  We've asked them to respond how we

19  should deal with that.

20         THE COURT:  All right.  As to this category it sounds

21  as if Abbott may actually have the documents.  So sit down,

22  find out if in fact you have them.

23         MR. DALY:  Very well, Your Honor.

24         THE COURT:  Next category?

25         MR. DALY:  We would like, whether there's an EUO or a

25

1   formal statement, we would like a list of witnesses that the

2   government interviewed which, you know, cause there may be

3   people we want to go out and depose because it factored into

4   their investigation.

5           THE COURT:  Time period?

6           MR. DRAYCOTT:  Your Honor, just if I could--

7           MR. DALY:  Time period of their investigation, you

8   know, from `95 to 2006--

9           THE COURT:  All right.

10          MR. DALY:  --when they unseal it.

11          MR. DRAYCOTT:  Your Honor, on this category I think

12  the most significant thing is when I asked Abbott counsel

13  whether or not they would be willing to produce a list of

14  people they interviewed once they learned of the government's

15  investigation.  I was told in no uncertain terms that that was

16  privileged information.  It would not be something that would

17  be turned over by Abbott.

18          THE COURT:  Well you can file your motion to compel

19  if you--

20          MR. DRAYCOTT:  Your Honor, my point is I don't

21  believe that this is a proper - it is work product and what

22  Abbott did--

23          THE COURT:  The identities are work product?

24          MR. DRAYCOTT:  Yes, I think so, Your Honor.  This is

25  not, this is just who we decided to interview.  In the same way

26

1   - we're not suggesting that we're not going to turn over this

2   category of information because Abbott won't.  We think it's an

3   improper--

4           THE COURT:  What's your case?

5           MR. DRAYCOTT:  --request.

6           THE COURT:  What's your - give me a case that the

7   identities are work product.

8           MR. DRAYCOTT:  I think the ones cited in the brief

9   all go to that issue which is that the fact - even the

10  questions that are asked to that third party witness are

11  protected work product.

12          THE COURT:  We're not talking about the questions.

13  We're talking about the identity.

14          MR. DRAYCOTT:  Well, Your Honor, I think that what

15  I'm asking Your Honor to consider is whether or not Abbott is,

16  this is a credible argument that's not protected when Abbott is

17  asserting exactly the same privilege with respect to that

18  information when it's in Abbott's--

19          THE COURT:  That's a tit for tat.  That argument

20  doesn't--

21          MR. DRAYCOTT:  The question I'd respectfully ask Your

22  Honor to ask Mr. Daly is, is he willing to produce to us

23  precisely the same category of information that he is asking

24  the government to produce?

25          THE COURT:  No, I'm not going to ask him that.  You

27

1    want to file a motion, if you want to file a request you can

2    request and then we'll deal with it in turn.

3              MR. DRAYCOTT:  And also, Your Honor--

4              THE COURT:  I don't see any reason why - I don't see

5    that the identities of the individuals--

6              MR. DRAYCOTT:  Your Honor, it reflects - it is who we

7    elect to go out and interview.  It's a judgment about

8    investigative and it turns us to who the, who may have

9    information that's relevant.  It is absolutely reflects a

10   judgment about whether or not--

11             THE COURT:  All right.  I'll take another look at the

12   cases but my inclination is that I will probably permit it.

13   All right, Mr. Daly?

14             MR. DALY:  Your Honor, in terms of pre-unsealing and

15   investigation documents, the other thing we've asked for is the

16   Relator when it files its complaint it files something, it

17   gives to the government what's called a Relator's statement

18   which under the False Claims Act is an assimilation of the

19   facts, you know, as a matter of statute, of facts that upon

20   which they base the complaint that they filed that they then

21   give to the government with the complaint and say do you want

22   to intervene.  We have asked for the Relator's statement that

23   was filed with the or given to the government in connection

24   with the complaint that was filed against Abbott in 1995, and

25   we've also asked and could even do these together, who within

28

1   the government got that and who got the Relator's complaint?

2   So in other words, go back in time because this goes to

3   knowledge for example because it's got all these facts about

4   Abbott and others in there.  It's got all these facts about the

5   spread.  We would like to have those facts because they're just

6   facts, number one.  And then we want to know to whom within the

7   government was it distributed because that will tell us who got

8   the stuff, who knew, who read it and we can go talk to them if

9   necessary.

10          MR. DRAYCOTT:  There is clear case law that the

11   disclosure statement is a work product document.  With respect

12   to the facts therein this is a case in which relators have

13   served initial disclosures and have answered discovery from

14   Abbott.  The disclosure statement is not simply a listing of

15   facts, but it's an explanation as to the significance of those

16   facts.  It's a laying out of legal theory.  It's tying them

17   together.  With respect to the facts that are in relator's

18   possession that's turned over in the initial disclosures, it's

19   subject to discovery which is ongoing in this case.  The only

20   thing that the disclosure statement adds to that is it presents

21   the analysis of relator's counsels and lays out and ties up and

22   is a presentation of a legal theory associated with that.  It's

23   clear work product.  There's clear case law that it's protected

24   and there's just no need to turn it over.  It's also

25   irrelevant.  It doesn't – what Abbott has to defend against in

29

1   this case is the allegations in the complaint not what's in

2   the disclosure statement.  The disclosure statement is not part

3   of the file.  It's not by statute required to be served on in

4   the court.  It is just served on the Attorney General.  So it's

5   not a matter of them getting access to a document under seal

6   because it's not under seal because it's not ever served with a

7   court.  So it's not a matter of disclosing something that's

8   somehow part of the record in this case which any Court has

9   ever seen.  It's clearly a work product and there's just no

10  relevance here and there's no need for it given that all the

11  facts in relator's possession are, is evidence that can come

12  out in the course of discovery.

13          THE COURT:  All right.

14          MR. ANDERSON:  Your Honor, if I may because this is

15  also pending against the Relator, I'd also add that even

16  Abbott's case law cited in their briefs recognizes that opinion

17  work product is protected and that's only the portions of the

18  disclosures that they don't have.  All of the underlying facts

19  have been produced that were part of the disclosure.  So even

20  their precedent that they are relying upon in their briefing is

21  perfectly in tune with what the Relator has produced so far.

22          MR. DALY:  Your Honor, we're not seeking opinion work

23  product, I mean, they could redact this if need be.  But I

24  don't know how counsel can say that the facts upon which the

25  complaint that was filed against us in 1995 are irrelevant.

30

1    They are not irrelevant and we don't know that it's been

2    produced.  The government has refused to give it to us.  Maybe

3    they're saying that bits and pieces of it have been produced in

4    other context, I don't know.  But in terms of our request to

5    get the Relator's statement we've been completely foreclosed on

6    that.

7          MR. DRAYCOTT:  That's certainly not my position, Your

8    Honor.  The facts obviously they're entitled to.  What is

9    irrelevant is a theory that may be expressed, a legal opinion

10   that's expressed in a disclosure statement that isn't part of

11   the complaint is just not a legal theory that has to be

12   defended against in this case.

13         THE COURT:  All right, denied at this time.

14         MR. DALY:  Your Honor, what about the two issues that

15   I tied to that.  One, who got it within the government and then

16   who got the Ven-A-Care complaint that was filed in 1995?  Would

17   I be entitled to that?

18         THE COURT:  What is your position on that?

19         MR. DRAYCOTT:  Again, when we asked counsel for

20   Abbott whether or not they were going – Abbott's been aware of

21   this investigation from the first subpoena or first CID that

22   was served and their position in terms of who they spoke to

23   with the company about that investigation, when it occurred,

24   who they went to in the company for information about the

25   investigation, all of it according to Abbott is protected,

31

1  privileged information that they will not disclose.  We agree

2  with that position.  What we disagree with strenuously is that

3  somehow that these arguments only cut in one direction, that

4  the same type of information when it's being held by Abbott is

5  absolutely privileged and we agree it is privileged and it's

6  also irrelevant.  It's not, you know, who the government in its

7  judgment within another branch of government or anywhere else

8  elected to consult about a complaint is not the evidence in

9  this case.  And again, I want to make clear that we're not

10  objecting to this because Abbott won't turn it over.  I think

11  Your Honor should be very skeptical on argument that this is

12  somehow non-privileged information they're entitled to when

13  precisely the same category of information they're asserting a

14  privilege, won't turn it over and have said, you know, you

15  don't get it.

16        THE COURT:  All right, denied at this time.  Anything

17  else, Mr. Daly?

18        MR. DALY:  Yes, Your Honor.  The third – that was all

19  the investigatory information.  The final category is we've

20  asked for the government to produce to us their evidence of

21  false claims and false statements, kind of a basic aspect of

22  the case.  They've sued us under the False Claims Act.  We've

23  asked for them to identify the false statements we made, the

24  alleged misrepresentations.  What were they?  When were they?

25  What was wrong with them and what they should have been?

32

1   That's on the false statement side.  On the false claims side

2   under the False Claims Act, we've said, give us the false

3   claims and we've even offered for them to do representative

4   samples of both.  In other words for each year, for each NDC,

5   give us the misrepresentations or the representations, give us

6   the alleged false claims and we'll start there because it is a

7   large job.

8          One of the problems is that with Medicare for example

9   I think the Court's heard mention that there are, you know,

10  twenty some carriers that actually processed the claims for

11  Medicare, they all have different AWP's that they use so the

12  same drug Abbott's Vanco, for example, for one carrier might be

13  reimbursed at $3 and for another carrier it's $15.  Well, you

14  know what, the fraud claim that they make is going to be

15  different for each one of those.  So we've asked them to come

16  forward on that.  On the Medicaid side as the Court is aware,

17  the state has a slightly different and sometimes dramatically

18  different way to reimburse these drugs.  Some of them do a lot

19  of AWP's, some of them do it on other reporting prices.  Some

20  of them put max or FUL's, maximum allowable costs or federal

21  upper limit type numbers on them and so the government has sued

22  us for all of the reimbursements by the states under Medicaid,

23  and we think it's only fair that they have to come forward and

24  show us what's false and show us what it should have been.  And

25  giving us, which they're in the process of doing, claims

33

1   information, doesn't cut it because all claims information is

2   going to say that on such and such a date the state of

3   Connecticut paid $25 for a vial of Vanco and it's going to be,

4   you know, embedded in data.  That's not going to tell us what's

5   false, what it should have been or anything like that.  So

6   that's why we've offered at least preliminarily for them to do

7   a representative sample of these items NDC by NDC, year by

8   year.

9           THE COURT:  Why not?

10          MR. DRAYCOTT:  Absolutely they're entitled to the

11  claim data as I think Mr. Daly just indicated.  We are

12  endeavoring to produce it.  It is a time consuming process

13  because of the manner in which this data is maintained.  It's

14  an antiquated system.  We can't simply download the claims data

15  to a hard drive.  We have to - and we are now in consultation,

16  that is the technical components of the two offices with Abbott

17  trying to figure out the format in which the claims data can be

18  produced.  And there's two--

19          THE COURT:  All right, so you're going to get the

20  claims data.

21          MR. DRAYCOTT:  Well, just to be--

22          MR. DALY:  Right.  They're working on it, correct.

23          MR. DRAYCOTT:  --fair to Mr. Daly, I think there's

24  two components of what he's talking about in terms of the

25  damage analysis.  The other part of it of course is what the,

34

1    it reflects the amounts that were paid and the claims that

2    were paid with respect to the subject drugs at issue.  The

3    other component is of course what should have been paid by the

4    just as Abbott has requested data information from the

5    government.  We in the same way have asked for sales and

6    transaction data from Abbott.  That is only now beginning to be

7    forthcoming and there is a back and forth between other folks

8    in my office and Abbott trying to, you know, they appear to

9    have produced some electronic media with transactional data on

10   it.  We're now trying to figure out how to open it, how to read

11   it, figuring out what kind of format it's in.  Until all that

12   is done and we can figure out what the transactional prices

13   were which is then going to indicate the range of which the AWP

14   actually should have been reported, you know, that is just a

15   time consuming process and it requires information from Abbott

16   in order for us to then be able to come up with a damage

17   calculation which will then of course will be expressed in an

18   expert report and is going to be I think the subject of a

19   future round of discovery when it comes down to the expert

20   phase of this litigation, at least the expert phase of the

21   discovery process.  And it's just too earlier for the

22   government to, since we have not even been able to open yet the

23   Abbott transactional data that we certainly can't provide that

24   information yet.

25           MR. DALY:  Just as I said, they are giving us the

35

1   claims data.  My point about that is that our requests aren't

2   about the claims data.  Our request is about what's false.

3   What's the false statement?  What's the false claim?  And we

4   believe, and as I tried to explain, the data isn't going to

5   answer that.  The data is just going to give us a transaction

6   price of 20 or 30 or 10 or 15 or $20, whatever it might be.

7            THE COURT:  Well can you tell them how in what format

8   you want this into?

9            MR. DALY:  We have, Your Honor, in a letter.  It's

10  Exhibit 8 to our brief.  We've asked them to give us by NDC by

11  year for Medicaid, I'm sorry, Medicare, a statement of, you

12  know, what's false, what's the false statement?  What are you

13  saying we misrepresented?

14           THE COURT:  All right, why not?

15           MR. DRAYCOTT:  Well we've indicated – we've indicated

16  that it is the statement, the AWP statement through the

17  compendia which again is this is a, in order to answer this

18  question you have to understand the context in which these

19  claims are made which is that the AWP is not a--

20           THE COURT:  Trust me counsel, I understand.

21           MR. DRAYCOTT:  --is not, if I've been presumptuous I

22  apologize, Your Honor.  But the reported price actually doesn't

23  go to the government.  It goes to the private compendia.  And

24  that is a transaction which the government is not a direct

25  party and certainly that is an area of discovery that we're

36

1  taking against Abbott to get those statements.  But that's

2  going to be the core statement.  With respect to the claim then

3  that, the claim which is rendered false by that statement of an

4  inflated AWP is the one that's paid for the beneficiary and

5  that's the claims data we're trying to produce and we are in

6  the process of producing.  And I think the other part of this

7  is, is again the falsity is--

8         THE COURT:  All right, I'm going to wait until

9  everything's produced.  Denied without prejudice.  You can

10  renew it after you get a look at everything.

11         MR. DALY:  I understand, Your Honor.  Judge, that's

12  all that there is on that motion.

13         THE COURT:  All right.  So the final motion is the

14  motion for a protective order.

15         MR. DALY:  Yes, Your Honor.

16         THE COURT:  4135.

17         MR. DALY:  And that I believe is ours as well, Judge.

18         THE COURT:  Yep.

19         MR. DALY:  This is the argument concerning the

20  government's notice for a deposition of Myles White--

21         THE COURT:  Right.

22         MR. DALY:  --who is the chief executive officer and

23  the chairman of the board of my client, Abbott Laboratories.

24  As the CEO and chairman, Mr. White is protected from potential

25  harassment and abuse by the law that the Court's seen in the

37

1   briefs about what a party has to do in order to get an APEX

2   deposition.  The standard is clear that Mr. White must possess

3   what the cases call unique personal knowledge of the subjects

4   relevant to the case and the government must show that they

5   have attempted less burdensome means to get the same

6   information that they are seeking from the senior officer and

7   we've cited a variety of cases for those two points.

8           As to the second point about trying to exhaust other

9   means to get the information that they seek, the government

10  hasn't done anything.  They haven't said, they haven't argued

11  the point.  They say they don't have to.  Well, in fact, under

12  the case law they do because it makes sense to do it because,

13  you know, the law is there for a reason.  The law is there, you

14  only get these people when you have a real need to do it.  And

15  so we didn't even confer about this.  We attached the letter

16  that the government wrote to us following our meet and confer.

17  And this is the government's letter and they gave us four

18  reasons why they say that they want to take Mr. White's

19  deposition.

20          The first reason that they give in their letter is

21  that Mr. White was the recipient of a litigation hold memo that

22  went to about 70 other people.  You know, your typical form,

23  you know, there's litigation or there's an investigation,

24  please maintain your files.

25          THE COURT:  And has the letter been produced?

38

1          MR. DALY:  Yes, Your Honor.

2          THE COURT:  It has.

3          MR. DALY:  But the fact that somebody got a

4  litigation hold memo doesn't get you to take the deposition of

5  the CEO and chairman of the board of a company.  Unless the

6  Court has any questions, I don't have anything left to say

7  about that particular reason.

8          Reason number two, they say they want to inquire of

9  Mr. White about briefings that he may have gotten about

10 congressional inquiries or other investigations.  Well, by

11 defining it in that way about briefings is Mr. White is being

12 told things by other people.  By definition therefore he

13 doesn't have unique personal knowledge of the subject that he's

14 being briefed by others.  So I think that topic is outside the

15 scope of what they can do because it's not unique.  It's by

16 definition not unique.  And we've filed also a short affidavit

17 from Mr. White that confirms that.

18         The next reason given is that he was the addressee of

19 a letter written by Congressman Stark several years ago.  We've

20 cited the cases that indicate that getting a letter in the

21 course of a litigation or pre-litigation isn't something that's

22 subjects an APEX executive to a deposition.  Mr. White's

23 affidavit addresses this by saying that he, you know, he's

24 advised by others from time-to-time about, you know, pricing,

25 marketing, issues like that relating to the price of drugs and

39

1    so I think we've addressed that in the sense that there's no

2    indication that he has any unique knowledge about this and

3    getting a letter from a congressman in and of itself is not

4    reason to put somebody out for a deposition.

5            THE COURT:  And has the letter been produced?

6            MR. DALY:  Yes.  The government sent it so they have

7    it.

8            THE COURT:  Yeah.

9            MR. DALY:  It's out there.  It's something that's

10   been around for a number – I think it's a, I want to say it's a

11   2000 letter, Your Honor.

12           The final reason given is that they say that because

13   Mr. White is the CEO he's responsible for everything and,

14   therefore, he's responsible for Abbott's ethics and compliance

15   policy and we want to talk to him because he's the CEO.  If

16   that were true the CEO being responsible ultimately for

17   everything that goes on in a corporation they would be deposed

18   everyday, all day in any case against these sorts of companies,

19   and I don't think that that's reason enough.

20           I guess there was one more reason, Judge, and that is

21   they wanted to ask him about the TAP settlement, that's in

22   their letter which we attached.  The Court's already ruled that

23   out of the case in terms of discovery so I don't have anything

24   more to say about that particular issue.

25           So we had a meet and confer.  They gave us a letter,

40

1    it's attached.  That's what they say they want to do.  I don't

2    think that those fall within any categories.  They've done

3    nothing on any of those categories to see if, you know, by

4    written interrogatories or some other means, they can't get the

5    information that they are seeking.  They say they don't have to

6    do that, that they can just go right to the top.  I think the

7    law is to the contrary.

8            THE COURT:  All right, who's going to address that?

9            MR. NEIL:  It's me, Your Honor, thank you.  First of

10   all you might have been wondering why the state of Texas was

11   here, and my colleague Ray Winter from the state AG's office is

12   here because they've also noticed the deposition of Mr. White

13   in connection with their state case against Abbott.  In fact if

14   the Court grants this, I'm sorry, if the Court denies the

15   motion and Mr. White is deposed there will be several

16   plaintiffs and we'll obviously work with them to coordinate as

17   necessary any deposition.  But I don't want to be presumptuous.

18   Let me argue the merits first.

19           As Your Honor's well aware you've already allowed the

20   deposition of the CEO's in these cases.  I think AstraZeneca

21   attempted to get a protective order or didn't produce a CEO for

22   a deposition.  In the course of that there's a motion to compel

23   by the MDL plaintiff's and you recognized that there are very

24   important issues at stake in these cases and that corporate

25   wide knowledge about how the company decided the price of

41

1  spreads is something that's very important and is relevant to

2  this case.  So you allowed the deposition of AstraZeneca's CEO

3  when they didn't want to produce it.  And it's my understanding

4  also that you allowed the deposition of Bristol Myers Squibb or

5  if you didn't allow it they didn't fight it necessarily.  But

6  CEO's have been deposed in these cases cause they're very

7  significant cases.  And in fact on the government's side we've

8  allowed the deposition of three CMS administrators.  CMS

9  administrators are the equivalent of a CEO.  They run obviously

10  multi, hundreds of millions of dollars for federal program of

11  health care.  You know that.  And that's cause there are

12  important issues at stake and the government didn't try and

13  block those depositions, although Abbott's, you know, if you

14  try, it we tried to establish whether Abbott had shown the

15  specific knowledge of Abbott's conduct and possession of those

16  CMS people I think it'd be hard to do.

17        But more importantly let me go through the reasons.

18  Mr. Daly discussed the reasons that we articulated for taking

19  Mr. White's deposition and he didn't quite do them 100%

20  justice.

21        In September of 2000 the House Ways and Means

22  Committee was investigating Abbott at the same time the

23  government was and news broke.  And when the news broke of that

24  Abbott's CEO, Mr. White, was questioned about it and he made

25  various public statements.  He talked about how if there are

42

1    abuses in the system, they need to be fixed, the AWP system.

2    He talked about the structure of the regulations.  He talked

3    about the, you know, some of these allegations from the Ways

4    and Means Committee in 2000 might have been politically

5    motivated.  He displayed a deep knowledge of the issues that

6    were involved in terms of AWP pricing and the government

7    reimbursement for drugs.  That's not where the story ends

8    obviously.

9         In October of 2000 Congressman Stark, the ranking

10   democrat on the House Ways and Means Committee sent a letter to

11   Mr. White.  It wasn't just any letter, Your Honor.  Congressman

12   Stark basically went through and wrote a seven-page letter with

13   11 exhibits, it's an attachment to Abbott's motion for a

14   protective order as well as our opposition, where he went

15   through and systematically described what he thought was a

16   fraud that was being committed against the United States, the

17   same fraud that we're now suing Abbott on.  He went through and

18   he pointed out that none of this was sanctioned by any

19   governmental entity whether it was the executive branch or the

20   legislative branch.  And he also pointed out the public health

21   concerns that are arising from it cause one of the drugs that

22   we sued on is Vancomycin and there's over prescription of

23   Vancomycin which led to a real problem cause it's an antibiotic

24   last resort.  He wrote that letter in October of 2000.  It's

25   not everyday that a CEO gets a letter from a congressman

43

1    accusing the company of fraud.  And I think the United States

2    is entitled to ask Mr. White what he did when he received that

3    letter.

4            Now in the briefings Abbott writes that, you know,

5    there's no evidence that Mr. White got the letter.  Well, if he

6    didn't get the letter why did he put it in the affidavit he

7    submitted to the Court?  You know, there is a lot of factual

8    background that we need to find out what happened when that

9    letter was received.  Now something did happen when that letter

10   was received, Your Honor.  Abbott ended the fraud.  The

11   fraudulent scheme in this case ends in May of 2001.  And it

12   ends in May of 2001 and there are documents that we finally

13   received from Abbott that indicate that reason why the fraud

14   ended in May of 2001 was in part because the public scrutiny

15   that was coming from Congress and the press related to Abbott's

16   pricing policies could not justify, was not justified by the

17   amount of profit the company is earning.  And there's a

18   memorandum that discusses it that we have with our materials

19   that we submitted in our opposition.  But there's a direct link

20   between the letter from Congressman Stark to Mr. White to a

21   major corporate decision to end the way that Abbott was pricing

22   its drugs in our view ends the fraudulent scheme here.

23           In some respects Mr. White may very well be the hero

24   of the story for us in terms of being the one who decided that

25   as a corporate matter I'm the CEO, I'm tired of Congress coming

44

1   in and accusing us of fraud, we need to change what's going on

2   here.  And they did ultimately change it.  So he's at the core

3   of the end, the end of the fraud in this case.  And there's

4   nothing in the affidavit that he submitted that indicates

5   otherwise.  The only thing you have in the affidavit is a know

6   nothing affidavit, I don't know anything, what I knew I knew

7   from secondary sources.  Well as Your Honor knows from the

8   *Traveler's* decision in this district where Judge Collings said

9   that these kinds of know nothing affidavits, you know, are

10  subject to discovery, are subject to questioning because if

11  they didn't know anything it could be telling.  If Mr. White

12  got a letter from a congressmen accusing him of fraud and

13  throws it in the trash can well that actually goes to the

14  company's scienter cause under the False Claims Act if a

15  company CEO is deliberately ignorant when put on notice of a

16  fraud that's relevant to scienter.  And based on the

17  evidentiary record that we've seen he didn't just throw it

18  away.  Someone, Mr. White, and we'll find out from Mr. White

19  whether he was the hero of the story, ended the fraud and

20  that's what we want to get to the bottom of.  Thank you, Your

21  Honor.

22          THE COURT:  Briefly, Mr. Daly.

23          MR. DALY:  Yes, Your Honor.

24          THE COURT:  I'll get to you.

25          THE COURT:  Your Honor, the Stark letter as the

45

1    affidavits to the attached state was never responded to first

2    of all.  Second of all, as Mr. White says in his affidavit, you

3    know, events surrounding that would have been discussions with

4    counsel and they would be privileged.  One of the things that

5    you don't hear in the argument from the government is that any

6    suggestion that this individual's knowledge is unique, if they

7    want to know, and they do want to know and they have been

8    asking questions of others, you know, what happened?  Did you

9    get the Stark letter?  You know, what changes did you make, why

10   did you make them, et cetera, et cetera, et cetera, go ahead

11   and ask away.  But what they have to do to get Mr. White is

12   show that there's something unique about his knowledge because

13   the cases make clear that at most I think my brother, Mr.

14   Gobena, his argument would suggest that Mr. White might have

15   discoverable information.  The cases make clear that that's not

16   enough.  You need to have unique personal knowledge that you

17   can't get from anybody else and we've heard nothing that

18   remotely suggests that there's something that they can only get

19   from Mr. White.

20         THE COURT:  What's your response to that?

21         MR. NEIL:  My response is that a letter was sent from

22   a congress person to Mr. White, the CEO of the company.  The

23   only person who's going to know whether he received it, how he

24   reacted to it, the way he directed to do firsthand is going to

25   be Mr. White.  It's not going to be anyone else.  I don't think

46

1   the United States should be required to go and get hearsay

2   testimony--

3           THE COURT:  All right, you can ask him that in

4   written deposition questions, three written deposition

5   questions, and then you can renew this motion.

6           MR. NEIL:  Okay.

7           MR. GOBENA:  I take it then, Your Honor, that you

8   wouldn't want to hear from me on this?

9           THE COURT:  Well, if you'd like to speak I'll always

10  let you speak but I think that's going to be my approach.

11  Unless you have some further information beyond what's in your

12  papers as to his specific knowledge.

13          MR. GOBENA:  I do, Your Honor, I'll be brief.

14          THE COURT:  All right then.

15          MR. GOBENA:  First, I would ask that the Court review

16  the *Travelers'* opinion that came out of this district.

17          THE COURT:  I know the *Travelers'* opinion.

18          MR. GOBENA:  And I think it sets forth a standard

19  that is slightly different in significant ways than my brother,

20  Mr. Daly, set forth.  I think in pertinent part it does not

21  state that this knowledge has to be at the level that he

22  requires, but furthermore I want to say specifically that I

23  personally have taken the deposition of several witnesses and

24  this memo where pricing changes are instituted by Abbott and

25  explicitly mention the Stark letter, the 2000 Stark letter

47

1    addressed to Myles White individually, that is specifically

2    mentioned in the memo as a part of the reason why these changes

3    are being instituted.  That has been marked as Exhibit 940.  We

4    have asked several witnesses if they have seen that.  Do they

5    know anything about that memo and they all say no.

6            Now, the reason why I mention that is because this

7    letter from Congressman Stark went to Myles White.  However it

8    was delegated by Mr. White a response was provided.  The

9    response was not in a written response to Congressman Stark.  A

10   response was in the form of a change in their price reporting

11   and price setting conduct.  That I think is very pertinent.

12   And the *Travelers'* opinion says that when you have a case that

13   involves motive and intent getting testimony from the APEX

14   individual is critical because ultimately that has far more

15   probative value about what the corporation intended, what the

16   corporation motives were.

17           THE COURT:  Well, I'm not saying that you're not

18   going to be permitted to have that deposition, but what I'm

19   saying is as a preliminary matter I will allow three written

20   deposition questions on this limited area, and you can renew

21   the motion after that if you're not satisfied with the

22   information you get and you think you need then to have this

23   live deposition.  So it's a start.

24           MR. GRABINO:  I understand.  Thank you, Your Honor.

25           THE COURT:  All right.  So as to docket entry 3959,

48

1    the motion on deliberative process, I'm going to take that

2    under advisement and give you a short ruling.  As to 4135,

3    allowed in part and denied in part as set froth in the record

4    in open court.  And as to 4202, it's denied except to the

5    extent that you may file three written deposition questions as

6    set forth specifically in court.

7              All right, hearing nothing else – all right and I

8    appreciate counsel accommodating the change in the Court's

9    schedule.

10             MR. DALY:  Thank you very much, Judge.

11             MR. NEIL:  Thank you, Your Honor.

12             THE COURT:  You're welcome.

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

49

CERTIFICATION

1

2        I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young                    July 30, 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**