# EXHIBIT P

**Sealed**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD

UNITED STATES OF AMERICA )   FILED <u>IN CAMERA</u> AND UNDER
<u>ex rel.</u> )   SEAL PURSUANT TO
)   31 U.S.C. § 3730
VEN-A-CARE OF THE )
FLORIDA KEYS, INC. )
a Florida Corporation, )   06 - 21363 - CIV - ASG
by and through its principal )
officers and directors, )
ZACHARY T. BENTLEY and )
T. MARK JONES, )
                              Plaintiff, )
)
vs. )
)
ABBOTT LABORATORIES, INC., )
)
                              Defendant. )

### THE GOVERNMENT'S NOTICE OF ELECTION TO INTERVENE
### <u>IN PART AND TO DECLINE TO INTERVENE IN PART</u>

Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(2) and (4), the United States

notifies the Court of its decision to intervene in part of *United States ex rel. Ven-A-Care v.*

*Abbott, et al.,* Civil Action No. 95-1354-CIV-GOLD (the action), and to decline to intervene in

part of the action. The United States intervenes in that part of the action which alleges Medicaid

and Medicare fraud with respect to Abbott Laboratories, Inc. (Abbott) for the following drugs

and Healthcare Common Procedural Coding System (HCPCS) billing codes:

| DRUG | NDC# |
|------|------|
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |



CIVIL ACTION NO: 95-1354-CIV-GOLD

| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792323 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |

| **HCPCS** | **Description** |
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |

2

CIVIL ACTION NO: 95-1354-CIV-GOLD

| | |
|---|---|
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

The United States declines to intervene in that part of the action against Abbott as to all other drugs or HCPCS codes identified in this action. The United States is filing its complaint against Abbott along with this intervention notice.

Although the United States declines to intervene in a portion of the action against Abbott, we respectfully refer the Court to 31 U.S.C. § 3730(b)(1), which allows the relator to maintain the declined portion of the action against Abbott in the name of the United States; providing, however, that the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." Id. Therefore, the United States requests that, should either the relator or the defendant propose that the part of the action against Abbott in which the United States has not intervened be dismissed, settled, or otherwise discontinued, this Court solicit the written consent of the United States before ruling or granting its approval.

Furthermore, pursuant to 31 U.S.C. § 3730(c)(3), the United States requests that all pleadings filed in this action, even as to the non-intervened part of this action against Abbott, be served upon the United States; the United States also requests that all orders issued by the Court be sent to the Government's counsel. The United States reserves its right to order any deposition

3

CIVIL ACTION NO: 95-1354-CIV-GOLD

transcripts and to intervene in the portion of this action against Abbott in which it is declining to intervene today, for good cause, at a later date.

Finally, the United States requests that a redacted copy of the relator's complaint[1] identifying all of its Medicaid and Medicare claims against Abbott, this Notice, and the attached proposed Order be unsealed. The United States requests that all other papers on file in this action remain under seal because in discussing the content and extent of the United States' investigation, such papers are provided by law to the Court alone for the sole purpose of evaluating whether the seal and time for making an election to intervene should be extended.

A proposed order accompanies this notice.

DATED this ___*17th*___ day of March, 2006.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

MARK A. LAVINE
ANA MARIA MARTINEZ
JEFFREY DICKSTEIN
Assistant U.S. Attorneys
99 N.E. 4th Street
Miami, FL   33132
Phone:  (305) 961-9003

---

[1]  Relator is filing a redacted version of its complaint at the same time this notice is being filed.

4

CIVIL ACTION NO: 95-1354-CIV-GOLD

Fax: (305) 536-4101
Fla. Bar No. 648876
Mark.Lavine@usdoj.gov


MICHAEL F. HERTZ
JOYCE R. BRANDA
RENÉE BROOKER
JUSTIN DRAYCOTT
GEJAA T. GOBENA
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this _____ day of March, 2006 to:

James J. Breen
Alison Simon
The Breen Law Firm, P.A.
P.O. Box 297470
Pembroke Pines, FL 33029-7470

ASSISTANT UNITED STATES ATTORNEY

# EXHIBIT Q



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD

UNITED STATES OF AMERICA          )     **FILED <u>IN CAMERA</u> AND UNDER**
<u>ex rel.</u>                            )     **SEAL PURSUANT TO**
                                  )     **31 U.S.C. § 3730**
    VEN-A-CARE OF THE            )
    FLORIDA KEYS, INC.           )
    a Florida Corporation,       )
    by and through its principal )
    officers and directors,      )
    ZACHARY T. BENTLEY and        )
    T. MARK JONES,               )
              Plaintiff,   )
                                  )
vs.                               )
                                  )
    ABBOTT LABORATORIES, INC.,    )
                                  )
              Defendant.   )

## COMPLAINT

The United States brings this fraud action against Abbott Laboratories, Inc. and Hospira,

Inc. (collectively "Abbott") to recover losses sustained by the Medicare and Medicaid programs.

Over the course of several years, Abbott reported inflated pharmaceutical prices that it knew

Medicare and Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical

products. Abbott's actual sales prices for its pharmaceutical products were far less than the

prices reported by Abbott. By knowingly reporting inflated prices – often 1000% higher than

Abbott's actual prices – Abbott ensured its customers received inflated reimbursement and

profits from Medicare and Medicaid. Abbott then used the public fisc as a marketing tool,

actively promoting government-funded "spreads" between (1) its fraudulently inflated prices and

(2) its actual sales prices as an inducement to its customers. These efforts allowed Abbott to

increase its profits by boosting sales for its drugs.

CIVIL ACTION NO: 95-1354-CIV-GOLD

## I. NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties

under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other

monetary relief under the common law or equitable theories of fraud and unjust enrichment.

2.      The United States bases its claims on Abbott having caused the submission of

false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1), and having

made and used false statements to get false or fraudulent claims paid by the United States in

violation of 31 U.S.C. § 3729(a)(2).

3.      Within the time frames detailed below, Abbott engaged in a fraudulent scheme

that caused the Medicare and Medicaid programs to pay excessive reimbursement to Abbott's

customers, *e.g.*, pharmacies, physicians, hospitals, home health agencies, nursing homes, home

infusion companies, clinics and physicians (hereafter referred to collectively as "Customers"). In

furtherance of this scheme, Abbott reported false, fraudulent and inflated drug prices for certain

drugs (listed in ¶¶ 31 and 35 below) to several price reporting compendia that the Medicare and

Medicaid programs relied upon to set reimbursement rates for Abbott's customers. A chart

setting out examples showing the difference between the prices at which Abbott actually sold its

drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**. Abbott knew that

the Medicare and Medicaid programs relied on Abbott's reported prices to those compendia to

set reimbursement rates for claims submitted for Abbott's drugs. Abbott then sold the drugs for

far lower prices, and marketed to existing and potential Customers the government-funded

"spread" between the inflated reimbursement amounts and the actual acquisition costs of the

2

CIVIL ACTION NO: 95-1354-CIV-GOLD

drugs to boost its sales and profits.

4.      Abbott knew that its false price reporting and marketing efforts would cause its Customers to submit claims for fraudulently inflated Medicaid and Medicare reimbursement.

5.      Abbott's fraudulent scheme to induce Customers to purchase its products by ensuring that federal reimbursement rates for those products would be set at artificially inflated levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), common law and numerous state laws.

6.      To get fraudulent claims paid by the United States, Abbott also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states.  These statements violated the FCA, common law and various state laws.

7.      The United States timely asserts the causes of action alleged herein based on the filing of relator's complaint in this action.

## II. JURISDICTION

8.      The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over Abbott pursuant to 31 U.S.C. § 3732(a) because Abbott resides or transacts business in the Southern District of Florida.

## III. VENUE

9.      Venue is proper in the Southern District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Abbott resides or transacts business in this District.

3

CIVIL ACTION NO: 95-1354-CIV-GOLD

## IV.  PARTIES

10.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration), which administer the Medicare and Medicaid programs.

11.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation organized under the laws of Florida, with its principal offices in Key West, Florida.  Ven-A-Care is a pharmacy licensed to provide the prescription drugs specified in this Complaint and has been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider. Ven-A-Care's principal officers and directors include John M. Lockwood, M.D., Zachary Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida.  The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a lawsuit on behalf of the United States to recover damages for false claims.  Ven-A-Care brought this action against Abbott on behalf of itself and the United States.

12.     Defendant Abbott is a corporation organized under the laws of Illinois with its principal offices in Abbott Park, Illinois.  At all times material to this civil action, Abbott has transacted business in the Southern District of Florida by selling and distributing its drugs, including but not limited to those identified in this Complaint, to purchasers within the Southern District of Florida.

13.     Defendant Hospira, Inc. ("Hospira") is a corporation organized in 2003 under the laws of Illinois with its principal offices in Abbott Park, Illinois.  At all times material to this

4

CIVIL ACTION NO: 95-1354-CIV-GOLD

action, Hospira has transacted business in the Southern District of Florida by selling and

distributing its drugs, including but not limited to those identified in this Complaint, to

purchasers within the District of Southern District of Florida.  The Abbott drugs at issue in this

action were manufactured by Abbott's Hospital Products Division ("HPD") until 2004, when

Abbott spun off the HPD as a separate corporate entity, Hospira.

## V.  THE LAW

### A.    The False Claims Act

14.    The FCA provides in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an
> officer or employee of the United States Government or a member of the Armed
> Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government
>
> * * *
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person . . . .
> (b) For purposes of this section, the terms  "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729.

15.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for

CIVIL ACTION NO: 95-1354-CIV-GOLD

violations occurring on or after September 29, 1999.

**B.    The Federal Anti-Kickback Statute**

16.    Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to protect the integrity of Medicare and Medicaid.  Congress strengthened the statute in

1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would

not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b)

and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L.

No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

17.    The anti-kickback statute prohibits any person or entity from making or accepting

payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical items, including items provided under Medicare and Medicaid.  In pertinent part,

the statute provides:

> (b) Illegal remuneration
>
>> (1) whoever knowingly and willfully solicits or
>> receives any remuneration (including any kickback,
>> bribe, or rebate) directly or indirectly, overtly or
>> covertly, in cash or in kind –
>>
>>> (A) in return for referring an individual to a
>>> person for the furnishing or arranging for the
>>> furnishing of any item or service for which
>>> payment may be made in whole or in part
>>> under a Federal health care program, or
>>>
>>> (B) in return for purchasing, leasing,
>>> ordering, or arranging for or recommending
>>> purchasing, leasing, or ordering any good,

6

facility, service, or item for which payment
may be made in whole or in part under a
Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be
fined not more than $25,000 or imprisoned for not more than five
years, or both.

(2) whoever knowingly and willfully offers or pays any
remuneration (including any kickback, bribe, or rebate)
directly or indirectly, overtly or covertly, in cash or in kind
to any person to induce such person --

(A) to refer an individual to a person for the
furnishing or arranging for the furnishing of any
item or service for which payment may be made in
whole or in part under a Federal health care
program, or

(B) to purchase, lease, order or arrange for or
recommend purchasing, leasing or ordering any
good, facility, service, or item for which payment
may be made in whole or in part under a Federal
health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not
more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Those who violate the statute also are subject to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of up to $50,000 per violation and up to three times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

CIVIL ACTION NO: 95-1354-CIV-GOLD

## VI.  THE FEDERAL HEALTHCARE PROGRAMS

18.     Medicaid and Medicare were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

**A.      The Medicaid Program**

19.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

20.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. § 1396a.

21.     The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50%, and as high as 83%.

22.     The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

23.     The Medicaid programs of all states reimburse for prescription drugs.

24.     The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

25.     By becoming a participating supplier in Medicaid, suppliers agree to

8

CIVIL ACTION NO: 95-1354-CIV-GOLD

abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

**B.     The Medicare Program**

26.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  42 U.S.C. §§ 426-426a, 1395o.

27.     HHS is responsible for the administration and supervision of the Medicare program.  CMS is an agency of HHS and directly administers the Medicare program.  The Medicare program has several parts, including Medicare Part B ("Supplementary Medical Insurance for the Aged and Disabled"), which covers physician services, as well as durable medical equipment ("DME") and certain drug products and supplies.  42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

28.     Medicare Part B generally covers drugs which are provided either:  (a) incident to a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (*e.g.*, certain oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit.  42 C.F.R. §§ 405.517, 414.701.

29.     During the relevant time period, CMS contracted with private insurance carriers ("Contractors") to administer and pay Part B claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the Contractors act on behalf of CMS.  42 C.F.R. § 421.5(b).

9

CIVIL ACTION NO: 95-1354-CIV-GOLD

30.    Contractors receive, process and pay claims under Medicare Part B for drugs from various Medicare providers and suppliers.  Typically, once a contractor approves a claim, the contractor then submits a payment request to a Medicare bank account funded by federal funds.

C.    **Drug Reimbursement Under Medicaid and Medicare**

31.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA provides for the assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the National Drug Code ("NDC").  FDA has assigned approximately 170,000 NDCs to drug products.  The drugs and corresponding NDCs at issue in this case are listed below:

| DRUG | NDC# |
| --- | --- |
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |

10

CIVIL ACTION NO: 95-1354-CIV-GOLD

| | |
|---|---|
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |
| Sodium Chloride Injection | 00074798436 |
| Sodium Chloride Injection | 00074798437 |
| Sodium Chloride Injection | 00074798509 |
| Water for Injection1000 ml | 00074799009 |

        32.    Drug manufacturers, such as Abbott, have not typically submitted claims for

reimbursement to federal health care programs.  Instead, Abbott marketed its products to its

Customers, who then purchased the product either directly or through wholesalers based on a

price the customers negotiated with Abbott.  In addition to using wholesalers, Customers also

purchased Abbott products through group purchasing organizations ("GPO"), who negotiated

prices on behalf of Abbott's Customers.

        33.    Abbott's Customers then submitted claims for payment for Abbott products to

Medicare and Medicaid after dispensing or administering the Abbott drug.

11

CIVIL ACTION NO: 95-1354-CIV-GOLD

34.     For the most part, in the Medicaid program, claims submitted by retail pharmacies are processed and tracked using the NDC of the drug.

35.     The Medicare program generally uses the Healthcare Common Procedural Coding System ("HCPCS") to reimburse for drugs.  The HCPCS which utilizes 5-digit alphanumeric codes to identify and bill for medical products and supplies.  The codes at issue here are listed below:

| HCPCS | Description |
|-------|-------------|
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

36.     During the relevant period, Abbott usually reported prices to various price publishers and services on an annual basis.  The price publishers used the information to publish pricing compendia.

37.     The reimbursement amounts for claims submitted by Abbott's Customers were directly influenced by Abbott's false price representations.  The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining the reimbursement rates for prescription drugs.  Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs.  Abbott

12

CIVIL ACTION NO: 95-1354-CIV-GOLD

documents also show that the company actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

38.     No governmental payor knew of or sanctioned Abbott's conduct as set forth in this Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its Customers to purchase those products.

**D.     Medicaid Reimbursement Formulas**

39.     When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public. To determine the EAC for a covered drug, State Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of HHS. 42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

40.     While the specific reimbursement formulas vary from state to state, the various State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the EAC as set by the states,  (b) the maximum allowable cost ("MAC") set by the state Pharmaceutical Reimbursement Boards, or (c) the providers' usual and customary charge.  For multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more than those limits. 42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

41.     The states' methodology for arriving at EAC includes:

A.      discounting a percentage off of the Average Wholesale Price ("AWP");

B.      adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

13

      C.     requiring the drug companies to certify prices directly in writing to the Medicaid program in response to state requests for particular pricing information.

      42.     AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient.  WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail Customer.

      43.     While the majority of states use published AWPs to calculate reimbursement, approximately nine states (Alabama, Arkansas, Colorado, Florida, Maryland, Massachusetts, Ohio, Rhode Island, and Texas) use the wholesale acquisition cost ("WAC") to set the EAC.

      44.     The AWPs and WACs relied upon by the State Medicaid programs have generally been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the "Publishers" and their various publications and data services are hereinafter referred to as "Price Publications."

      45.     In addition to relying on the manufacturers' reported prices as published in the Price Publications, some State Medicaid programs also received price representations directly from manufacturers, and relied on these representations to confirm the accuracy of the figures they use to determine state reimbursement amounts.  For example, the State of Texas required drug companies to submit their prices directly to the Texas Medicaid program in a signed

CIVIL ACTION NO: 95-1354-CIV-GOLD

certification attesting to the accuracy of the price information.

### E.    Medicare Reimbursement Formulas

46.    From 1992 through 1997, Medicare based its reimbursement for multi-source generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic forms of a drug. 42 C.F.R. § 405.517 (1992-1998). In general, Medicare relied on median AWPs to set reimbursement rates.

47.    From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug. Balanced Budget Act of 1997, 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1998).

48.    From 1999 through 2004, Medicare based its reimbursement for all generic forms of a drug at the lower of (1) 95% of the median published AWP for the drug; or (2) the AWP of the least expensive brand-name drug. 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).

49.    After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment. If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

50.    Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium known as the *Drug Topics Red Book* ("*Red Book*"), as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

15

## VII. ABBOTT'S SCHEME

51.     From at least on or before January 1, 1991, and continuing through January 2001, Abbott defrauded the United States by knowingly causing the Medicare and Medicaid programs to pay false or fraudulent claims for dextrose solutions, sodium chloride solutions, sterile water, and Vancomycin.

52.     The specific dextrose solutions, sodium chloride solutions, sterile water, and Vancomycin products at issue herein are identified by NDC or HCPCS Code in ¶¶ 31 and 35 above and are hereinafter referred to jointly as the "Drugs."

53.     Dextrose solutions, sodium chloride solutions, and sterile water are generic, water-based solutions used to facilitate the intravenous infusion of other drugs and for fluid replacement, and are commonly referred to as large volume parenterals ("LVPs").

54.     Vancomycin is a powerful, intravenous antibiotic that Abbott has sold as a generic drug since 1988.

55.     Abbott marketed and sold its products, including the Drugs, to Customers.

56.     The Customers purchased the products either directly from Abbott, through a GPO contract or through wholesalers.

57.     The amount paid by a Customer was typically based on a price negotiated with Abbott or the GPO.

58.     Regardless of the method of purchase, Abbott's Customers submitted claims for payment to Medicare and Medicaid when an Abbott product was administered to a program beneficiary. The claims submitted by Abbott's Customers were paid at amounts directly

16

CIVIL ACTION NO: 95-1354-CIV-GOLD

influenced by Abbott's false and fraudulent prices.

59.     Abbott routinely disseminated false pricing information for the Drugs to the
Pricing Publications.  Abbott employees typically reported the false and fraudulent prices to the
Price Publications annually, although it was sometimes done more often.  On most occasions,
Abbott reported inflated "List Prices" or "Direct Prices" (both referred to hereinafter as DP),
WACs and/or AWPs.  A DP is supposed to reflect the price paid by a Customer that buys drugs
directly from Abbott and not through a wholesaler.

60.     When Abbott reported a DP, some Price Publications (*e.g.*, *Blue Book*, which
provided pricing information for the vast majority of the state Medicaid programs) calculated
Abbott's AWPs by applying a markup – usually 18.75% – to the DPs.  Abbott was aware of how
the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that
its DPs ultimately controlled the AWP reported by the Price Publications for many of its
products.  Abbott reported WACs for several of its drugs as well, but during the time period
covered by the Complaint, the Price Publications used Abbott's DPs (plus the standard markup)
to set the AWPs used by the Medicaid and Medicare programs.

61.     In some circumstances, Abbott itself calculated and supplied the AWP which it
sought to have published.

62.     For example, in a January 16, 1996 letter from Abbott's Reimbursement Manager
to Medi-Span, Abbott directly reported AWPs for two of its products.

63.     Abbott documents also confirm its knowledge that the DPs it reported directly
impacted the AWP.  In a March 20, 1995 e-mail between Abbott employees regarding the

17

reporting of new Vancomycin DPs, one employee notes, "Please notify Red Book and Medi-Span of these changes ASAP. They are the sources for creating the AWP that is important to [Abbott's] Alternate Site [sales division]."

64.     Abbott also submitted false and fraudulent prices directly to state Medicaid programs. In an October 1, 1997, Abbott "Medicaid Coordinator" Tena Brown represented in a letter to the State of Texas Medicaid Program that the price on Abbott's Vancomycin 1 GM Fliptop vial- sterile, NDC 00074-6533-01 ("Vancomycin 1 GM FTV") was $583.70 for a package of 10, or $58.37 a unit. That led the Texas Medicaid program to set reimbursement for Vancomycin 1 GM FTV at that price ($58.37 a unit). At the time, a Customer could purchase Vancomycin 1 GM FTV for $5.53 per unit through a GPO called Oncology Solutions.

65.     With extremely few exceptions, Abbott reported increasingly higher prices for the Drugs from at least on or before January 1, 1991 through 2001. At the same time, the prices Abbott actually charged to its Customers decreased or remained the same.

66.     Abbott knew that the prices which it reported to the Price Publications directly affected reimbursement amounts paid by the Medicaid and Medicare programs. As Abbott's Manager for Reimbursement noted in an April 26, 1995 memorandum, "[h]aving a published [DP] that is high allows a provider to bill at that list price." The false or fraudulent prices Abbott reported to the Price Publications inflated government reimbursement amounts on claims submitted by Abbott's Customers for the Drugs. A chart setting out some examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**.

18

67.     Abbott manipulated its DPs, AWPs and WACs to induce its Customers to purchase Abbott's products, including the Drugs, by marketing the resulting huge profits to its Customers.

68.     Neither the Medicaid nor the Medicare programs knew of or sanctioned Abbott's conduct as set forth in this Complaint, *i.e.*, the deliberate manipulation of its published prices to induce its Customers to purchase the Drugs.

### A.     <u>Vancomycin</u>

69.     Abbott first introduced its generic Vancomycin in 1988.  Abbott's scheme to defraud the United States by causing inflated Vancomycin reimbursements ran from approximately 1989 through 2001.  Over that time period, Medicare and Medicaid paid in excess of $75 million for Abbott's Vancomycin.

70.     During that time period, Abbott reported increasingly higher DPs and AWPs for Vancomycin to the Price Publications while the actual contract prices at which Abbott sold Vancomycin to its Customers decreased significantly.

71.      Abbott sold its Vancomycin in several doses and forms.  The Vancomycin 1 GM FTV was the most common dose of Vancomycin reimbursed by Medicare and Medicaid. Abbott's false and fraudulent price reporting on its Vancomycin 1 GM FTV represents how Abbott reported false and fraudulent prices on its other Vancomycin products.

72.     When Abbott first introduced its Vancomycin 1 GM FTV in 1988, the published per unit AWP was $25.20.  By early 2001, Abbott reported false prices that drove the AWP for Vancomycin 1 GM FTV to $76.42.  At the same time, the price at which Abbott's Vancomycin

Case 1:01-cv-12257-PBS   Document 6211-7   Filed 06/29/09   Page 28 of 56

was widely available to purchasers decreased to under $4.00 by early 2001; the difference (and potential profit) between the reported price and the actual selling price for Vancomycin 1 GM FTV was as great as $72.42 a dose, or more than 18 times the actual price at which Abbott sold Vancomycin 1GM FTV.

73.     Abbott fully controlled and manipulated the AWPs for Vancomycin 1 GM FTV to boost its Vancomycin sales at the expense of third party payors, including Medicare and Medicaid.

74.     Abbott's manipulation of its reported Vancomycin prices between 1989 and 2001 created spreads sufficient to induce increased sales of that drug. Internal memoranda from senior Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on several of its drugs, including Vancomycin. Those efforts proved successful; the percentage of Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to approximately 70% in 2000.

75.     Abbott's reporting of Vancomycin prices in 1995 exemplifies the manner in which Abbott manipulated the price of Vancomycin to maintain and grow its market share. In March 1995, Abbott temporarily reported dramatically lower DPs and AWPs for Vancomycin. Prior to the March 1995 DP/AWP price change, the Price Publications listed a per unit DP of $50.90 for Abbott's Vancomycin 1 GM FTV, and a per unit AWP of $60.44 for that drug.

76.     In late March 1995, Abbott reported a new DP of $15.00 for a unit of Vancomycin 1 GM FTV. Based on this new information from Abbott, the Price Publications published revised per unit prices for Vancomycin 1 GM FTV. They reported a DP of $15.00 and an AWP

20

CIVIL ACTION NO: 95-1354-CIV-GOLD

of $17.81.

77.     Abbott received numerous complaints from Customers over the resulting decrease in the spread. Abbott deliberated internally on whether and by how much Abbott should again increase its spread so that it could reestablish the inducement that had come to be expected by its Customers. Abbott documents show Abbott's pricing personnel carefully considering the additional profits they could generate for Abbott's Customers if they artificially re-inflated the reported prices for Vancomycin 1 GM FTV at various levels.

78.     Abbott subsequently reversed its earlier decision to lower its reported prices and instead raised its reported Vancomycin prices. In early May 1995, Abbott reported a new per unit DP for its Vancomycin 1 GM FTV of $32.95. The revised AWP for Abbott's Vancomycin 1 GM FTV became $39.13 (once the Price Publication applied the standard markup).

79.     That reported price increase proved insufficient. Later that same month (May 1995), Abbott reported yet another set of prices for Vancomycin. The DP Abbott reported for its Vancomycin 1 GM FTV rose to $52.94 and its AWP rose to $62.86 (once the Price Publication applied the standard markup).

80.     Thereafter, Abbott reported higher Vancomycin DPs and AWPs to the Publishers each year, despite decreases in its actual prices to Customers for Vancomycin over that same period. The AWP for Abbott's Vancomycin 1 GM FTV peaked at $76.42 per unit in early 2001 at the same time that the actual sales price was less than $4 per unit.

81.     The false prices reported by Abbott directly impacted the amount Medicaid and Medicare reimbursed for Vancomycin. For example, in 1999 Abbott's Vancomycin 1 GM FTV

21

CIVIL ACTION NO: 95-1354-CIV-GOLD

was widely available for approximately $4.75 a unit. Yet, Abbott reported a per-unit

Vancomycin DP in 1999 – which served as the baseline for determining the AWP – to First

DataBank of $64.35. As a result, the 1999 AWP for Vancomycin 1 GM FTV was set at $76.42.

82.    New York State's Medicaid program relied on the First DataBank prices to set its

reimbursement rate for the Vancomycin 1 GM FTV. New York State's Medicaid reimbursement

rate for the Vancomycin 1 GM FTV in 1999 was $68.77; the AWP for Vancomycin 1 GM FTV

was $76.42 at the time. New York's reimbursement for Vancomycin 1 GM FTV was AWP

minus 10%, a reimbursement formula generally similar to those of other states. Abbott's false

price representations created a profit spread of approximately $64.02 for Abbott's Customers, on

a drug that Abbott sold to those same Customers for approximately $4.75 a unit. The spread

between the New York state Medicaid reimbursement for Vancomycin 1 GM FTV – directly

influenced by Abbott's false price reporting – and the actual acquisition cost was 1,348%. The

profit to Abbott's Customers was 13.5 times the typical acquisition cost for the drug.

83.    Abbott's practice of price manipulation continued into early 2001. At that time,

Abbott reported new, lower WACs to the Price Publications for many of its drugs, including

Vancomycin, without also reporting new DPs or AWPs. At the time Abbott submitted the new

prices in early 2001, it had been under investigation by the Government for pricing fraud; in

October 2001, an Abbott joint venture, TAP Pharmaceuticals, Inc. paid $875 million to the

Government to resolve its criminal responsibility and civil liability for fraudulent pricing and

kickbacks in connection with the marketing of a drug called Lupron. When Abbott submitted

reduced WACs, First DataBank changed the way it calculated Abbott's AWP. First Databank

personnel set new AWPs for Abbott products by applying a 25% markup to the newly supplied WACs instead of setting Abbott's AWPs by applying a 18.75% markup to Abbott's still inflated DPs. Abbott tried to convince First DataBank personnel not to set Abbott's AWP by reference to these new, lower WACs; Abbott wanted First DataBank to continue to use Abbott's then still inflated DPs to maintain its inflated AWPs. First DataBank refused Abbott's request.

84.     The switch to using the lowered WACs drastically dropped Abbott's reported AWPs in 2001. For Abbott's Vancomycin 1 GM FTV, the AWP dropped from $76.42 per unit in early 2001 (when AWP was determined using the inflated DPs) to $17.72 per unit in 2001 (when AWP was set using the revised, lowered WACs). By 2002, the AWP for this product was down to $6.06 a unit.

85.     As a result of the drop in AWP, the spread on the reimbursement by Medicare and Medicaid was reduced from $60-$70 a unit to approximately $2.00 a unit.

86.     Abbott's Customers recognized that Abbott was responsible for creating and maintaining the spread. Numerous Customers complained to Abbott or the group purchasing organizations (GPOs) who negotiated prices on behalf of Abbott's Customers. A large Customer of Abbott went so far as to demand restitution for the almost $10.5 million in lost profits due to the decrease in spread resulting from Abbott's 2001 submission of lowered prices to the reporting agencies.

87.     Internal memoranda from senior Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on several of its drugs, including Vancomycin, as an inducement to purchase Abbott's drugs.

23

CIVIL ACTION NO: 95-1354-CIV-GOLD

88.     Abbott's share of the Medicaid market has dropped steadily since the more accurate prices started being published in 2001 and thereafter from approximately 70% in early 2001 to approximately 20% in 2004.

**B.    Large Volume Parenterals**

89.     In addition to false price reporting for Vancomycin, Abbott engaged in similar conduct with respect to its LVPs.

90.     LVPs are essentially sterile water, usually mixed with either salt (sodium chloride) or sugar (dextrose).  LVPs are cheap to produce and are sold at very low prices.

91.     One of the most commonly utilized Abbott LVPs was 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 ("5% Dextrose 500 ml").

92.     In 1993, Abbott's 5% Dextrose 500 ml could be widely purchased for as little as $1.80 for a 500ml bag.

93.     The Red Book AWP for 5% Dextrose 500 ml in 1993 was $8.72.

94.     Two years later, in 1995, the price for Abbott's 5% Dextrose 500ml was widely available for even less; one wholesaler was selling it at $1.50 for a 500 ml bag.

95.     During the same two year period from 1993 to 1995 that the actual prices dropped, Abbott twice reported higher prices to the Price Publications for 5% Dextrose 500 ml. The AWP – based on Abbott's representations –  increased by 5% in 1994 to $9.16 and was increased by an additional 3% in 1995 to $9.43.

96.     Thus, while Abbott's price to the wholesaler dropped by 20% between 1993 and 1995 (from $1.80 to $1.50), Abbott caused its AWP to increase by 8%.  By 1995, the spread

24

CIVIL ACTION NO: 95-1354-CIV-GOLD

between the AWP and the resale price of that wholesaler was 628%.

97.   Abbott sold these products directly to Customers at prices comparable to those offered by the wholesaler.

98.   Abbott continued to report increasing prices for 5% Dextrose 500 ml after 1995. By reporting increasingly inflated DPs, Abbott caused the Red Book AWP for 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 to increase in 1996 to $9.71, in 1997 to $10.20, in 1998 to $10.71, in 1999 to $11.25 and in 2000 to $11.80. Medicaid and Medicare used these reported prices to set their reimbursement levels. At the same time, Abbott regularly sold the product to its Customers for $1.50 or less per bag of the water-based solution.

99.   Abbott's reporting of increasingly false and fraudulent prices for its 5% Dextrose 500ml reflects the manner in which Abbott implemented its scheme for all of the LVPs during the relevant time period. Abbott engaged in identical conduct with respect to the "prices" and marketing of the other LVP products and package sizes identified by NDC and HCPCS code in ¶¶ 31, 35 of this Complaint.

100.   Abbott used the false and fraudulent prices Abbott reported to the Price Publications for these water solutions to manipulate reimbursement; the reported prices did not reflect the actual prices Abbott was charging to its Customers.

101.   Due to Abbott's conduct, Abbott's Customers submitted inflated claims to Medicare and Medicaid and received millions of dollars in inflated reimbursement for these water and water-based solutions. Abbott profited off the scheme by increasing its sales volume and profits. Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for

25

CIVIL ACTION NO: 95-1354-CIV-GOLD

Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that amount.

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

102.    Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

103.    Abbott knowingly caused to be presented false or fraudulent claims for payment or approval to the United States for the Drugs for reimbursement that were substantially higher than providers' actual acquisition costs for the Drugs and based on reported prices that were fraudulently and artificially manipulated by Abbott.  Abbott knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted.

104.    By virtue of the false or fraudulent claims that Abbott caused to be made, the United States has suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for each violation occurring on or after September 29, 1999.

26

CIVIL ACTION NO: 95-1354-CIV-GOLD

## SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False
Records or Statements to Cause Claims to be Paid)
(31 U.S.C. § 3729(a)(2))

105.    Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

106.    Abbott knowingly made, used, or caused to be made or used, false records or

statements – *i.e.*, the false certifications and representations made or caused to be made by

defendants to state Medicaid programs when seeking to ensure that the Medicaid programs

would reimburse for the Drugs, and the false representations to the Publishers upon which

Medicare and Medicaid relied – to cause false or fraudulent claims paid or approved by the

United States.

107.    By virtue of the false records or false statements made by Abbott, the United

States suffered damages and therefore is entitled to treble damages under the False Claims Act,

to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each

violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for

each violation occurring on or after September 29, 1999.

## THIRD CAUSE OF ACTION

(Unjust Enrichment)

108.    Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

109.    This is a claim for the recovery of monies by which Abbott has been unjustly

enriched, including profits earned by Abbott because of illegal inducements Abbott arranged to

be paid to its Customers.

27

CIVIL ACTION NO: 95-1354-CIV-GOLD

110.   By obtaining monies as a result of its violations of federal and state law, Abbott was unjustly enriched, and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

111.   By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Abbott on sales to Customers to whom it arranged for unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## FOURTH CAUSE OF ACTION

### (Common Law Fraud)

112.   Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

113.   Abbott made material and false representations concerning the prices of the Drugs with knowledge of their falsity or reckless disregard for the truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon Abbott's misrepresentations by making payments on the false claims.

114.   Had the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States, the United States would not have paid for Abbott products.

115.   By reason of these payments, the United States has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Abbott, jointly and severally, as follows:

28

CIVIL ACTION NO: 95-1354-CIV-GOLD

1.    On the First and Second Causes of Action, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Third Cause of Action, for the damages sustained and/or amounts by which Abbott was unjustly enriched, including an accounting of all revenues unlawfully obtained by Abbott, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Abbott, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.    On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

29

CIVIL ACTION NO: 95-1354-CIV-GOLD

DATED this _____ day of March, 2006.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY


MARK A. LAVINE
ANA MARIA MARTINEZ
JEFFREY W. DICKSTEIN
Assistant U.S. Attorneys
99 N.E. 4th Street
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101
Fla. Bar No. 648876
Mark.Lavine@usdoj.gov


MICHAEL F. HERTZ
JOYCE R. BRANDA
RENÉE BROOKER
JUSTIN DRAYCOTT
GEJAA T. GOBENA
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088

30

## EXHIBIT 1 – Selected Abbott AWPs, Actual Prices, And Spreads

| DRUG/DOSAGE | NDC | YEAR | RED BOOK AWP | FIRST DATABANK AWP | AVERAGE AWP | PRICE TO RELATOR | ESTIMATED DOLLAR VALUE OF SPREAD | ESTIMATED GROSS PROFIT MARGIN OF SPREAD |
|---|---|---|---|---|---|---|---|---|
| SOLUTION 5%  1000 ml | 00074792209 | 2001 | $165.59 | $165.48 | $165.54 | $14.95 | $150.59 | 1007.26% |
| SOLUTION 5%  1000 ml | 00074794109 | 2001 | $180.83 | $180.72 | $180.78 | $16.36 | $164.42 | 1004.98% |
| DEXTROSE SOLUTION 5%  5 | 00074792336 | 2001 | $996.55 | $996.80 | $996.68 | $97.98 | $898.70 | 917.22% |
| DEXTROSE SOLUTION 5% 500 ml | 00074792203 | 2001 | $283.29 | $283.20 | $283.25 | $25.56 | $257.69 | 1008.16% |
| DEXTROSE SOLUTION 5% 79 | 00074792202 | 2001 | $283.29 | $283.20 | $283.25 | $25.56 | $257.69 | 1008.16% |
| SOLUTION 5% AND 0.225% NACL | 00074792409 | 2001 | $180.83 | $180.72 | $180.78 | $13.93 | $166.85 | 1197.74% |
| SOLUTION 5% AND 0.45% NACL | 00074792609 | 2001 | $180.83 | $180.72 | $180.78 | $16.36 | $164.42 | 1004.98% |
| DEXTROSE SOLUTION 70% 7 | 00074712007 | 2001 | $486.78 | $486.72 | $486.75 | $52.21 | $434.54 | 832.29% |
| CHLORIDE SOL 5% KCL/NACL 1000 ml | 00074790209 | 2001 | $259.78 | $259.68 | $259.73 | $25.43 | $234.30 | 921.35% |
| SODIUM CHLORIDE 0.9% 100 ml 48's | 00074710123 | 1999 | $638.97 | $671.04 | $655.01 | $57.12 | $597.89 | 1046.72% |
| SODIUM CHLORIDE 0.9% 50 | 00074613803 | 2001 | $362.52 | $362.64 | $362.58 | $26.07 | $336.51 | 1290.79% |
| SODIUM CHLORIDE 0.9% 50 ml 48's | 00074710113 | 1999 | $638.97 | $671.04 | $655.01 | $57.12 | $597.89 | 1046.72% |
| SODIUM CHLORIDE BAC FTV | 00074196607 | 2001 | $56.11 | $56.00 | $56.06 | $6.66 | $49.40 | 741.67% |
| SODIUM CHLORIDE FTV 0. | 00074488810 | 2001 | $47.80 | $47.75 | $47.78 | $5.33 | $42.45 | 796.34% |
| SODIUM CHLORIDE FTV 0. | 00074488820 | 2001 | $55.52 | $55.50 | $55.51 | $7.99 | $47.52 | 594.74% |
| SODIUM CHLORIDE SOL .45 | 00074798509 | 2001 | $166.73 | $166.68 | $166.71 | $13.16 | $153.55 | 1166.76% |
| SODIUM CHLORIDE SOL .9% | 00074710102 | 2001 | $406.70 | $406.80 | $406.75 | $48.56 | $358.19 | 737.62% |
| SODIUM CHLORIDE SOL .9% 1000 ml | 00074798309 | 2001 | $151.19 | $151.08 | $151.14 | $13.80 | $137.34 | 995.18% |
| SODIUM CHLORIDE SOL 0.9% | 00074613802 | 2001 | $135.24 | $168.60 | $151.92 | $11.76 | $140.16 | 1191.84% |
| SODIUM CHLORIDE SOL 0.9% | 00074613822 | 2001 | $353.97 | $354.00 | $353.99 | $26.07 | $327.92 | 1257.83% |
| SODIUM CHLORIDE SOL 0.9% | 00074713809 | 2001 | $216.74 | $216.70 | $216.72 | $11.50 | $205.22 | 1784.52% |
| SODIUM CHLORIDE SOL 0.9% | 00074797205 | 2001 | $112.43 | $112.32 | $112.38 | $29.91 | $82.47 | 275.71% |
| SODIUM CHLORIDE SOL 0.9% | 00074798436 | 2001 | $996.55 | $996.80 | $996.68 | $86.90 | $909.78 | 1046.92% |
| SODIUM CHLORIDE SOL 0.9% | 00074798437 | 2001 | $996.55 | $996.80 | $996.68 | $86.90 | $909.78 | 1046.92% |
| SODIUM CHLORIDE SOL 0.9% 250 ml | 00074798302 | 2001 | $278.73 | $278.64 | $278.69 | $24.28 | $254.41 | 1047.80% |
| SODIUM CHLORIDE SOL 0.9% 500 ml | 00074798303 | 2001 | $278.73 | $278.64 | $278.69 | $25.30 | $253.39 | 1001.52% |
| VANCOMYCIN ADV 1GM | 00074653501 | 2001 | $274.91 | $274.90 | $274.91 | $67.95 | $206.96 | 304.57% |

**EXHIBIT 1 -- Selected Abbott AWPs, Actual Prices, And Spreads**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| VANCOMYCIN ADV 500 ml | 00074653401 | 2001 | $137.63 | $137.60 | $137.62 | $34.61 | $103.01 | 297.62% |
| VANCOMYCIN FTV 1GM | 00074653301 | 2001 | $764.16 | $764.16 | $764.16 | $42.07 | $722.09 | 1716.40% |
| VANCOMYCIN FTV 500 ml | 00074433201 | 2001 | $382.14 | $382.10 | $382.12 | $21.09 | $361.03 | 1711.85% |
| VANCOMYCIN VL 5GM | 00074650901 | 2001 | $171.90 | $171.90 | $171.90 | $21.03 | $150.87 | 717.40% |
| WATER INJECTION BAC 30 ml | 00074397703 | 2001 | $57.00 | $57.00 | $57.00 | $6.12 | $50.88 | 831.37% |
| WATER INJECTION FTV 10 ml | 00074488710 | 2001 | $42.75 | $42.75 | $42.75 | $5.33 | $37.42 | 702.06% |

# EXHIBIT R

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456   Master File No. 01-CV-12257-PBS

------------------------------------X

In re:  PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION   )

------------------------------------X

United States of America ex rel      )

Ven-A-Care of the Florida Keys,      )

Inc., et al. v. Dey, Inc., et al.,   )

Civil Action No. 05-11084-PBS        )

------------------------------------X

United States of America ex rel      )

Ven-A-Care of the Florida Keys, Inc.,)

et al. v. Boehringer Ingelheim Corp.,)

et al., Civil Action No. 07-10248-PBS)

------------------------------------X

30(b)(6) DEPOSITION OF THE STATE OF ALASKA

DEPARTMENT OF HEALTH AND SOCIAL SERVICES

DESIGNEE:  DAVID CAMPANA

Thursday, August 21, 2008

Anchorage, Alaska

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

Page 186

1   throughout the year.
2       Q.   Did you review those publications when
3   they came in?
4       A.   Yes.
5       Q.   Were you ever contacted by the staff
6   who published the Medicaid pharmacy bulletin for
7   your thoughts?
8       A.   I don't remember or recall any specific
9   instance.  I may have been contacted.
10      Q.   It's my understanding that the Medicaid
11  Pharmacy Bulletin had a rotating advisory panel
12  that was made up of state pharmacy personnel like
13  yourself?
14      A.   Yes.
15      Q.   Were you ever a member of the advisory
16  panel?
17      A.   No, I was not.  Did you hear that?
18      Q.   No.
19      A.   No, I was not part of that advisory
20  panel for the Medicaid Pharmacy Bulletin.
21      Q.   Do you still have copies of these
22  bulletins in your files?

Page 187

1       A.   I have seen some.  I don't remember if
2   I have those now or not.
3       Q.   Did you look for them as something to
4   produce in response to the document requests
5   issued in the state litigation?
6       A.   I don't recall.
7           MR. TORBORG:  Counsel, we would ask
8   that a search be done of his files for any of
9   these newsletters that may still exist.
10      Q.   Do you know how long, Mr. Campana,
11  these Medicaid Pharmacy Bulletins were published?
12      A.   They were published up into the -- at
13  least the mid-nineties.
14      Q.   Do you recall if the focal point of
15  this publication was reimbursement pharmacy
16  issues at state Medicaid?
17      A.   Can you repeat that question?
18      Q.   Do you recall if the focus of these
19  newsletters was reimbursement issues that arose
20  in state pharmacy programs?
21      A.   That was often a title or a focus of
22  these bulletins.

Page 188

1       Q.   And do you recall if these bulletins
2   discussed the issue of average wholesale price
3   and its relationship to the cost to pharmacies?
4       A.   I don't recall that.
5       Q.   May have happened, you just don't
6   recall?
7       A.   That's correct.
8       Q.   Now, we discussed earlier Alaska's
9   reimbursement system for home IV, right?
10      A.   Yes.
11      Q.   In the 1990s, in addition to a
12  dispensing fee of $11.46, you were paying a
13  compounding fee of $10 every 15 minutes, right?
14      A.   Correct.
15      Q.   Do you have any insight as to how
16  Alaska's reimbursement of intravenous
17  prescriptions compared with that of other states?
18      A.   It was generally higher than other
19  states.
20      Q.   How did you become aware of that?
21      A.   Through different surveys or different
22  questionnaires that we completed.

Page 189

1       Q.   What questionnaires would you have
2   completed?
3       A.   I don't recall any specific one, but I
4   know over the years that I have completed
5   questionnaires on that type of question.
6       Q.   Do you retain -- did you retain copies
7   of those?
8       A.   Yes, I have a binder of some years of
9   copies of questionnaires that I completed.  I
10  don't know what the limits of that binder are,
11  but it's got some years of those questionnaires.
12      Q.   Have those been provided to counsel for
13  production, do you know?
14      A.   I don't believe so.
15          MR. TORBORG:  Counsel, we would ask
16  that those be -- documents be preserved and be
17  produced in the state litigation.
18          MR. BURNHAM:  Just so there is no
19  mistake, I'm not keeping track of these requests.
20  I'm expecting that anybody that wants some more
21  documents, that they will be sending us something
22  in writing to which we can respond, but I'm not

48  (Pages 186 to 189)

b402ad78-7827-456e-987c-3331b70c1138

David L Campana and State of Alaska 30(b)(6)                     August 19, 2008
Anchorage, AK

Page 90

1  competition have anything to do with patent
2  protection?
3      A.  Yes.
4          MR. BURNHAM:  Objection, foundation.
5  BY MR. MANGI:
6      Q.  What is the relationship between those
7  two things?
8          MR. BURNHAM:  Objection, foundation.
9          THE WITNESS:  A brand named drug, when
10 it's an innovator, comes out onto the market and
11 with its patent, there is a certain amount of
12 protection on that patent.  When that patent is
13 up, then a generic manufacturer can bring that
14 drug in.  And when they bring it in, they bring
15 it in at a discount off of the brand name's
16 selling price.
17 BY MR. MANGI:
18     Q.  Do you have an understanding as to why
19 they do that?
20     A.  Because of competition.
21     Q.  And when a generic manufacturer is able
22 to enter the market, in other words, when patent

Page 91

1  protection is expired, is it fair to say, sir,
2  that whoever wants to can enter that market
3  space?
4      A.  Well, what time period are you asking
5  about?
6      Q.  Well, let's talk about today, to begin
7  with.
8      A.  Okay.  Today there is a period of
9  exclusivity where it's given to one or two
10 manufacturers that they can produce that drug.
11 And that's about six months.
12     Q.  And that is to provide an incentive for
13 entry into the market, correct, sir?
14         MR. BURNHAM:  Objection, foundation.
15         THE WITNESS:  I don't know that.
16 BY MR. MANGI:
17     Q.  Fair enough.  After that period
18 expires, then any number of generic manufacturers
19 can enter the market space, correct?
20     A.  That's right.
21     Q.  And if you go back further in time,
22 similarly when generics enter the market and more

Page 92

1  than one enters, and then they start to compete
2  with each other, as well as with the brand
3  manufacturer if they remain in the space, right?
4      A.  Yes.
5          MR. HENDERSON:  Objection.
6  BY MR. MANGI:
7      Q.  And it's that competition that results
8  in prices going down, right?
9          MR. BURNHAM:  Objection, foundation.
10         THE WITNESS:  That competition should
11 make prices go down.
12 BY MR. MANGI:
13     Q.  Now, throughout this time period, sir,
14 when you were in pharmacy school right up until
15 1990, was it generally your understanding that in
16 most cases generic drugs were going to be cheaper
17 than branded drugs?
18     A.  Yes.
19     Q.  Now, they will be cheaper for both a
20 cash paying-customer as well as for a third-party
21 payer, such as a private insurer or a Medicaid
22 entity, correct?

Page 93

1      A.  Yes.
2      Q.  Is it your understanding, sir, that
3  generally payers for drugs prefer the use of
4  generics versus branded drugs when clinically
5  appropriate?
6          MR. BURNHAM:  Objection, foundation.
7          THE WITNESS:  Yes.  They try to push
8  the generic drugs.
9  BY MR. MANGI:
10     Q.  Why is that?
11     A.  Because --
12         MR. BURNHAM:  Same objection.
13         THE WITNESS:  -- of a money saving.
14 BY MR. MANGI:
15     Q.  Now, we have spoken about benchmark
16 prices.  Did you come to an understanding, sir,
17 at any point during this time period, from 1960s
18 right up until 1990, whether the differential
19 between the benchmark price and the actual price
20 being paid by a pharmacy for drugs was greater
21 for generic drugs than it was for branded drugs?
22     A.  Yes, I've come across that information.

24  (Pages 90 to 93)

81c181cd-f4a8-4675-90be-7bc59aa45575

David L Campana and State of Alaska 30(b)(6)                    August 19, 2008
Anchorage, AK

Page 94

```
 1      Q.   What is your understanding of what
 2   happens in that area?
 3           MR. BURNHAM:  During what time period?
 4   BY MR. MANGI:
 5      Q.   Let's start with -- well, back up.
 6   When you say you have come across that
 7   information, when did you first become aware of
 8   that phenomenon?
 9      A.   I don't remember time period.
10      Q.   Would it be fair to say it's a long
11   time ago?
12      A.   Yeah.
13           MR. HENDERSON:  Objection.
14   BY MR. MANGI:
15      Q.   In other words, would you say that's --
16   perhaps bucketed by decades, would it be fair to
17   say that's perhaps sometime in the '60s or the
18   '70s as opposed to the '80s or the '90s?
19      A.   It's hard to say when I became aware of
20   that.
21      Q.   Well, would it be fair to say it was
22   before 1990?
```

Page 95

```
 1      A.   Yes.
 2      Q.   And what generally did you become aware
 3   of, sir?
 4      A.   That the net cost to the pharmacy for
 5   generics that have been out for a long time was
 6   very low compared to the benchmark.
 7      Q.   And benchmark that we are talking about
 8   here, so the record is clear, is AWP, correct?
 9      A.   Correct.
10      Q.   So in other words, at some point prior
11   to 1990, you became aware that when generics come
12   into the market, there is increased competition,
13   correct?
14           MR. BURNHAM:  Objection, foundation.
15           THE WITNESS:  There is increased
16   competition the longer the generic is available.
17   BY MR. MANGI:
18      Q.   And one manner in which that increased
19   competition manifests itself in the market is
20   increasing discounts, correct?
21           MR. BURNHAM:  Objection, foundation.
22           THE WITNESS:  Yes.
```

Page 96

```
 1   BY MR. MANGI:
 2      Q.   In other words, it's price competition
 3   between the different manufacturers of the
 4   generic product?
 5      A.   Yes.
 6      Q.   And as a result of that price
 7   competition, there becomes a greater differential
 8   between benchmark AWP and the actual price
 9   that pharmacies are paying than exists for
10   branded drugs, correct?
11           MR. HENDERSON:  Objection.
12           THE WITNESS:  Yes, there is a greater
13   differential.
14   BY MR. MANGI:
15      Q.   And indeed, the extent of that
16   differential will depend on the number of
17   generics and the extent of competition, correct?
18           MR. HENDERSON:  Objection.
19           THE WITNESS:  The number of
20   manufacturers making that drug.
21   BY MR. MANGI:
22      Q.   Absolutely.  And to put it another way,
```

Page 97

```
 1   then, if there is just one generic manufacturer
 2   that's in the market competing only with the
 3   manufacturer of the brand, that's a different
 4   situation from where, let's say, there are five
 5   generic manufacturers all putting the same drug
 6   in the marketplace, correct?
 7      A.   Correct.
 8      Q.   In the latter situation where you have
 9   many manufacturers selling what's essentially the
10   same drug, there will be a greater degree of
11   competition because they are all competing with
12   each other for the same market space, correct?
13      A.   Correct.
14      Q.   And in that situation, there will be
15   more discounts and a greater differential between
16   the published AWP and the actual price pharmacies
17   are paying than there would be where there is
18   little competition, correct?
19           MR. BURNHAM:  Objection, foundation.
20           MR. HENDERSON:  Objection.
21           THE WITNESS:  Yes.
22   BY MR. MANGI:
```

25  (Pages 94 to 97)

81c181cd-f4a8-4675-90be-7bc59aa45575

David L Campana and State of Alaska 30(b)(6)                      August 19, 2008
Anchorage, AK

Page 98

1    Q.   And is it fair to say, sir, that the
2  extent of the differential, therefore, is a
3  product of and a function of marketplace
4  competition?
5        MR. BURNHAM:  Same objection.
6        THE WITNESS:  Yes.
7  BY MR. MANGI:
8    Q.   Is it fair to say, sir, that there is,
9  therefore, no predictable relationship between
10  the AWP of a generic drug and the actual price
11  that a pharmacy is paying to purchase that
12  generic drug?
13        MR. BURNHAM:  Objection, form.
14        MR. HENDERSON:  Objection.
15        THE WITNESS:  I have never seen a
16  formula to exactly determine that.
17  BY MR. MANGI:
18    Q.   In other words, you understand that
19  it's just something that's going to vary for
20  generic drugs depending on the extent of
21  competition, correct?
22        MR. BURNHAM:  Objection.

Page 99

1        THE WITNESS:  Yes.
2  BY MR. MANGI:
3    Q.   And you have understood that going back
4  a number of years.  You are not sure when
5  exactly, but certainly since before 1990 you have
6  had that understanding, correct?
7    A.   Yes.
8    Q.   Now, are you familiar, sir, with --
9  withdraw that.  Let's turn to the area of branded
10  drugs now and focus on that for a moment.  As you
11  have testified this morning, sir, AWP has played
12  different roles in the marketplace at different
13  times, correct?
14        MR. BURNHAM:  Objection, foundation,
15  misstates his testimony.
16  BY MR. MANGI:
17    Q.   Let me clarify the question.  When you
18  first came into the pharmacy area, indeed when
19  you were in pharmacy school, one function that
20  AWP served was as a benchmark or a starting price
21  from which discounts were applied to get to the
22  actual price that a pharmacy would pay to

Page 100

1  purchase drugs, correct?
2    A.   Yes.
3        MR. BURNHAM:  Objection, misstates his
4  testimony.
5        MR. HENDERSON:  Objection.
6  BY MR. MANGI:
7    Q.   I'm sorry.  I didn't hear your answer,
8  sir.
9    A.   Please rephrase the question or ask the
10  question.
11    Q.   Sure.  A lot of objections makes it
12  hard to hear.  Let's back up.
13        When you were in pharmacy school, as
14  you have testified this morning, you came to
15  understand that one function that AWP served in
16  the marketplace was to serve as a benchmark price
17  or a starting price from which discounts would be
18  applied to get to the actual price that a
19  pharmacy would pay to purchase a drug, correct?
20        MR. BURNHAM:  Objection, misstates --
21        MR. HENDERSON:  Objection.
22        MR. BURNHAM:  Misstates his testimony.

Page 101

1        THE WITNESS:  The average wholesale was
2  a benchmark and discounts were taken off of that.
3  BY MR. MANGI:
4    Q.   Then you -- you continued with your
5  career, you came out of pharmacy school, you went
6  to work in a few different pharmacies.  And --
7  sorry.  Let me rephrase that question.  You then
8  came out of pharmacy school; you went to work in
9  a few different pharmacies in Montana and in
10  Alaska; and you saw that in practice; whereas,
11  you saw that the actual price being paid was
12  different from and lower than the AWP, correct?
13    A.   Yes.
14    Q.   And of course, the degree of
15  information you had about that was different from
16  pharmacy to pharmacy, correct?
17    A.   Yes.
18    Q.   In other words, at Turner Drugs in
19  Montana, you saw the actual invoices.  At Pay-N-
20  Save, purchasing was done centrally and you only
21  knew about some of discounts; but generally you
22  understood that that basic fact remained true,

26 (Pages 98 to 101)

81c181cd-f4a8-4675-90be-7bc59aa45575

# EXHIBIT S

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

MDL NO. 1456

NO. 01-CV-12257-PBS

JUDGE PATTI SARIS

MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

Page 242

1  something like that?
2      A.  Yes.
3      Q.  When did you start on that e-mail
4  distribution?
5      A.  Oh, it's been several years.
6      Q.  Do you still have those e-mails on your
7  computer?
8      A.  I have some e-mails.
9      Q.  Now, this collection of documents was
10  produced in sequential order.  All appear to be
11  different e-mails concerning reimbursement for
12  compounding home IV-type issues of the type we were
13  just talking about.  I would like to ask you to go
14  to the Bates page ending 768.  Are you there?
15      A.  Yes.
16      Q.  The bottom of the page is an e-mail from
17  Rachel Broussard.  She was on your staff?
18      A.  Yes.
19      Q.  Is on your staff?
20      A.  (Witness nods head affirmatively.)
21      Q.  She e-mailed a distribution to the state
22  Medicaid administrators; is that right?

Page 243

1      A.  Yes.
2      Q.  Do you recognize those names?
3      A.  Yes.
4      Q.  And she asked, "We are interested in
5  information regarding policies in reimbursement of
6  compound prescriptions.  Are other states
7  reimbursing pharmacy providers for compound
8  prescriptions?  If so, what is your policy for
9  reimbursing compounds, what is your reimbursement
10  methodology and do you reimburse a compound fee?"
11      Do you see that?
12      A.  Yes.
13      Q.  Do you recall Ms. Broussard seeking
14  information from other states concerning
15  reimbursement of compound prescriptions?
16      A.  Yes.
17      Q.  What motivated that?  Was it the Myers
18  and Stauffer report?
19      A.  No.  Occasionally, we will get calls on
20  compounding scrips, and we don't have any policies
21  so we were looking at other states' policies.
22      Q.  Do you know what, if anything, Louisiana

Page 244

1  did with the information it received?
2      A.  We haven't done anything yet.
3      Q.  Why is that?
4      A.  Probably because we have lots of other
5  things to do, so it is still on our to-do list.
6      Q.  If reimbursement were cut on the
7  ingredient side, the actual acquisition cost, is
8  that something you think would go to the top of
9  your list and re-create a separate fee for
10  compounding?
11      MR. FAUCI:  Objection.
12      THE WITNESS:  I don't know, it's a kind of
13  whatever-is-on-top-of-the-list sort of day here.
14  BY MR. TORBORG
15      Q.  And what runs the agenda on what is at
16  the top of the list?
17      A.  The secretary of the department.
18      Q.  And the secretary of the department gets
19  calls from providers?
20      A.  Yes.  Mostly we get calls from providers.
21      Q.  Do you recall getting phone calls from
22  providers concerning the need for a compounding

Page 245

1  fee?
2      A.  We have gotten a few calls, yes.
3      Q.  Do you recall what you have told them
4  about why it is Louisiana is not paying one?
5      A.  Rachel answers those calls primarily.  We
6  try to work with the pharmacist to, under our
7  existing policy, to go ahead and provide those
8  drugs.
9      Q.  Well, how about the payment of a separate
10  higher dispensing fee for compound prescriptions?
11      A.  That has not been addressed.
12      Q.  Okay.  If I could ask you to get out
13  Abbott Exhibit 292, which is one of the -- should
14  be on the top right underneath the stack there.  I
15  think I put it in order.  This is a document titled
16  "Medicaid Pharmacy Bulletin," dated
17  January/February 1997, titled "Medicaid
18  Reimbursement for the Pharmacy Component of Home IV
19  Therapy."
20      Do you see that?
21      A.  Yes.
22      Q.  And you recall getting these bulletins.

Page 246

1   Is that right?
2       A.  Yes.
3       Q.  And you were at some point a member of
4   the editorial staff.  Is that right?
5       A.  Yes.  For a short tenure.
6       Q.  And did you retain copies of these
7   bulletins?
8       A.  I don't believe I have them anymore.
9       Q.  If I wanted to get my hands on these,
10  what is the best way to get them, other than the
11  ones I have?  If I wanted to get all of the copies
12  of these, what is your -- do you have any guidance
13  for me about how I might do that?
14      A.  I do not, other than you would get a
15  pharmacy director that retained them all.
16      Q.  Was it your understanding that this was a
17  publication that was widely recognized in the state
18  Medicaid pharmacy administrator universe?
19      A.  Yes.
20      Q.  And do you recall when you were on the
21  advisory panel of this publication, that there were
22  annual meetings that were associated with this

Page 247

1   publication?
2       A.  I do not recall.
3       Q.  I would like to ask you to go to the
4   second page of Abbott Exhibit 92, under the Section
5   1, "The Development of Pricing Mechanisms for Home
6   IV Medications," it states, "The establishment of a
7   fair and reasonable pricing methodology for home IV
8   products is a major concern of most state Medicaid
9   programs.  One of the major obstacles to the
10  development of adequate home IV pricing
11  methodologies is the fact that the dispensing of
12  home IV medications is more complex than the
13  dispensing of other outpatient drugs."
14          Do you see that?
15      A.  Yes.
16      Q.  And was that something that you were
17  aware of throughout the time 1991 through 2001?
18      A.  I do not recall.
19      Q.  Do you recall when you started receiving
20  these bulletins?
21      A.  I do not.
22      Q.  Do you have any basis to disagree with

Page 248

1   the notion that dispensing home IV medications is
2   more complex than dispensing of other outpatient
3   drugs?
4       A.  I agree it is more complex.
5       Q.  Let me ask you to go to the next page. We
6   are on page 390.  It says, "Providers and
7   pharmacist consultants concur that it is not
8   appropriate to apply the same ingredient-based
9   pricing mechanisms to home IV medications as those
10  that apply to other outpatient drugs."
11          Do you see that?
12      A.  Yes.
13      Q.  Did you agree with that?
14      A.  I don't know that I agree with it. I
15  would say you would have to survey to determine
16  what is the appropriate structure of the pricing
17  mechanism that you utilize for home IV, although it
18  should probably be different than normal retail
19  business.
20      Q.  And if we go to the second paragraph
21  under that section, it states, "Home IV treatments
22  are frequently a combination of multiple drug

Page 249

1   entities dispensed in varying doses and dispensed
2   several times daily.  Although it may be minimal to
3   moderate in quantity over an entire treatment,
4   large volumes of medications are generally
5   administered.  It is therefore difficult to
6   estimate based on a single daily or even weekly
7   administration the purchase price these providers
8   are paying with volume and trade discounts. These
9   discounts are generally not revealed in drug
10  publications such as Red Book, Blue Book, and
11  DataBank. Consequently, programs are reluctant to
12  increase reimbursement for home IV medications,
13  suspecting that reported costs for these substances
14  may already be exaggerated."
15          Do you see that?
16      A.  Yes.
17      Q.  Do you have an understanding of what that
18  last sentence is saying?
19      A.  What I think it is saying is that the
20  programs -- and that would be the Medicaid programs
21  -- are reluctant to increase the reimbursement for
22  home IV based upon the increase in cost of the

30(b)(6) LA Dept of Health and Hospitals (Terrebonne, Mary Julia)                    November 7, 2008

## Baton Rouge, LA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL      *  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE *  MASTER FILE NO.

PRICE LITIGATION           *  01-CV-12257-PBS

                           *

THIS DOCUMENT RELATES TO:  *  JUDGE PATTI B.

U.S. EX REL. VEN-A-CARE OF *  SARIS

THE FLORIDA KEYS, INC. V.  *  MAGISTRATE

DEY INC., ET AL            *  MARIANNE BOWLER

NO. 05-11084-PBS, AND      *

U.S. EX REL VEN-A-CARE OF  *

THE FLORIDA KEYS, INC., ET *

AL V. BOEHRINGER INGELHEIM *  (Cross-noticed

CORP, ET AL                *   captions on

NO.07-10248-PBS            *   following pages.)

* * * * * * * * * * * * * *

        November 7, 2008

        Transcript of the videotaped Rule

30(b)(6) deposition of the LOUISIANA

DEPARTMENT OF HEALTH AND HOSPITALS through

MARY JULIA TERREBONNE

4f51dae7-223c-46dc-90f5-5835e793cf26

Baton Rouge, LA

Page 90

1      A.  Right.
2      Q.  How was it that -- And that dispensing
3  fee is significantly lower than at least what
4  Myers and Stauffer is indicating it cost to
5  dispense the home I.V. drug; is that right?
6      A.  I'm sorry.  Could you state your
7  question again?
8          MR. TORBORG:  Could I ask the court
9  reporter to read that one back?
10         (Whereupon the previous question was
11  read back by the court reporter.)
12         THE WITNESS:  I still don't get it.
13     The -- the report shows that it cost
14  more to dispense I.V.s [sic] prescriptions than
15  non-I.V. prescriptions.
16  BY MR. TORBORG:
17     Q.  And it's showing an unweighted mean
18  cost for pharmacies dispensing home I.V.
19  prescriptions of $18.57; correct?
20     A.  Correct.
21     Q.  But Louisiana is only paying at this
22  time $5.77; right?

Page 91

1      A.  Right.
2      Q.  How is it that Louisiana is able to
3  compensate the providers of home I.V. therapy
4  their cost to dispense those drugs?
5          MR. FAUCI:  Objection to the form.
6          THE WITNESS:  How is it?
7  BY MR. TORBORG:
8      Q.  Yes.
9      A.  Well, we do.  We pay them in accordance
10  with our current reimbursement methodology.
11     Q.  If you look to the footnote 8 on page
12  21 of the Myers and Stauffer report --
13     A.  Right.
14     Q.  -- that states -- Would you read that
15  into the record?
16     A.  "Although typical dispensing fees
17  reimburse less than the dispensing cost of I.V.
18  pharmacies, they are generally able to break even
19  based on the margin allowed on ingredient cost
20  reimbursement."
21     Q.  And do you have an understanding of --
22  of what that's saying?

Page 92

1      A.  I believe what he's saying is that
2  there's a margin on the ingredient side, so
3  that's how they're generally able to dispense.
4      Q.  And this is something that -- that you
5  would have read back in 1999; correct?
6          MR. FAUCI:  Objection to form.
7          THE WITNESS:  Probably.
8  BY MR. TORBORG:
9      Q.  Okay.  And if you disagreed with that
10  footnote, would you have told Myers and Stauffer
11  that?
12     A.  Well, they were the surveyors, so they
13  had the information.  We were relying on --
14     Q.  Well, was it your understanding, Miss
15  Terrebonne, that because of the higher cost to
16  dispense home I.V. drugs and the fact that
17  Louisiana was only paying a $5.77 dispensing fee
18  for those drugs, that the margin being earned on
19  the ingredient cost was covering that cost to
20  dispense?
21         MR. FAUCI:  Objection to form.
22         THE WITNESS:  Based upon the survey

Page 93

1  results, yes.
2  BY MR. TORBORG:
3      Q.  Let's go to Abbott topic -- the Abbott
4  cross-notice, topic number 16.  This is titled
5  "DOJ AWPs," and the area of inquiry reads "Your
6  implementation of revised average wholesale price
7  information developed by the United States
8  Department of Justice and NAMFCU, the dates when
9  you did or did not implement the revised pricing
10  information, and the reasons why you did or did
11  not implement the revised pricing information."
12  Do you see that?
13     A.  Yes.
14     Q.  And do you have an understanding of
15  what we're getting at there?
16     A.  No.
17     Q.  Are you aware of the so-called DOJ AWP
18  effort?
19     A.  No.
20     Q.  Do you recall, just to see if it
21  refreshes your recollection at all, that around
22  1999 to 2000, there was an effort by the National

24  (Pages 90 to 93)

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

MDL NO. 1456

NO. 01-CV-12257-PBS

JUDGE PATTI SARIS

MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

Page 78

1    A.   We go to our drug file.
2    Q.   Where is that?
3    A.   That is in our MMIS system.
4    Q.   And where do the prices come from that
5  are in your drug file?
6    A.   First DataBank.
7    Q.   When you use the term average wholesale
8  price in your work, does it refer to prices that
9  were published by First DataBank or other price
10  services like that?
11    MR. FAUCI:  Object to the form.
12    THE WITNESS:  Yes.
13  BY MR. TORBORG
14    Q.   And you have discussed the term, or used
15  the term average wholesale price or AWP with your
16  colleagues in other states, correct?
17    A.   Have I used the term before?
18    Q.   That term has been used by your
19  colleagues in other states?
20    A.   Yes.
21    Q.   At meetings you attended, correct?
22    A.   Yes.

Page 79

1    Q.   From your personal experiences at
2  Louisiana Medicaid and from your interactions with
3  other state pharmacy administrators, do you believe
4  it is well-established in the industry that the
5  term average wholesale price refers to prices in
6  the drug compendia, such as the First DataBank?
7    MR. FAUCI:  Objection, form.
8    THE WITNESS:  I'm sorry, can you repeat the
9  question?
10  BY MR. TORBORG
11    Q.   From your personal experience working in
12  the Louisiana Department of Health and Hospitals
13  for over 20 years, and from your interactions with
14  other state pharmacy administrators, do you believe
15  it is well-established in the industry that the
16  term average wholesale price refers to prices in
17  the drug compendia, such as First DataBank?
18    A.   Yes, it is a price that is available to
19  First DataBank.
20    Q.   When you use the term AWP, you mean to
21  refer to prices in the compendia, correct?
22    MR. FAUCI:  Objection, form.

Page 80

1    THE WITNESS:  Yes.
2  BY MR. TORBORG
3    Q.   And that is how other state pharmacy
4  administrators have used the term as well, correct?
5    MR. FAUCI:  Objection, form.
6    THE WITNESS:  Yes.
7  BY MR. TORBORG
8    Q.   Do you believe it would be fair for
9  anyone to suggest that it is not well-established
10  that AWP refers to prices in the compendia?
11    MR. FAUCI:  Objection, form.
12    THE WITNESS:  Please repeat the question.
13  BY MR. TORBORG
14    Q.   Do you believe it would be fair for
15  anyone to suggest that it is not well-established
16  that the term average wholesale price refers to
17  prices in the drug compendia, such as First
18  DataBank?
19    A.   I think it is a price available through
20  First DataBank.  I know there is a lot going on
21  with First DataBank as well with the average
22  wholesale price, but average wholesale price is a

Page 81

1  benchmark used throughout the country for pricing.
2    Q.   And it refers to prices in the compendia,
3  correct?
4    A.   Yes.
5    (Exhibit Abbott 1050 was marked.)
6    MR. TORBORG:  For the record, what I have
7  marked as Abbott Exhibit 1050 bears Bates No.
8  JD-SUB-LA-001522 through 32.  For the record, these
9  were documents that were produced in response to
10  the subpoena to Ms. Terrebonne.  They were produced
11  to us without Bates numbers so we went ahead and
12  put some Bates numbers on them.  The JD refers to
13  Jones Day, and the SUB means subpoena, and LA
14  equals Louisiana.
15  BY MR. TORBORG
16    Q.   Ms. Terrebonne, if you would take a look
17  at that document and let me know if you are
18  familiar with it.
19    A.   I am.
20    Q.   Can you tell us what it is?
21    A.   It is the State Plan for Medicaid
22  Reimbursement for Drugs.

Baton Rouge, LA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL      *  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE *  MASTER FILE NO.

PRICE LITIGATION           *  01-CV-12257-PBS

                           *

THIS DOCUMENT RELATES TO:  *  JUDGE PATTI B.

U.S. EX REL. VEN-A-CARE OF *  SARIS

THE FLORIDA KEYS, INC. V.  *  MAGISTRATE

DEY INC., ET AL            *  MARIANNE BOWLER

NO. 05-11084-PBS, AND      *

U.S. EX REL VEN-A-CARE OF  *

THE FLORIDA KEYS, INC., ET *

AL V. BOEHRINGER INGELHEIM *  (Cross-noticed

CORP, ET AL                *   captions on

NO.07-10248-PBS            *   following pages.)

* * * * * * * * * * * * * *

        November 7, 2008

        Transcript of the videotaped Rule

30(b)(6) deposition of the LOUISIANA

DEPARTMENT OF HEALTH AND HOSPITALS through

MARY JULIA TERREBONNE

Henderson Legal Services, Inc.

4f51dae7-223c-46dc-90f5-5835e793cf26

30(b)(6) LA Dept of Health and Hospitals (Terrebonne, Mary Julia)                    November 7, 2008

## Baton Rouge, LA

Page 46

1  is my understanding of the legislation."
2       Sitting here today as the
3  representative for the State of Louisiana, do you
4  agree with your prior testimony on this point?
5       A.  Yeah.
6       Q.  Turn to page 44 of this document,
7  please.  On page 171 of your deposition
8  transcript, you and Mr. Torborg are discussing
9  the Myers and Stauffer survey of dispensing
10  costs.  Do you recall the Myers and Stauffer
11  survey of dispensing costs that's being discussed
12  here?
13       A.  I'm assuming that's the one that goes
14  back to 1999.
15       Q.  I can pull it out for you if you'd like
16  me to.
17       A.  Yeah.
18       Q.  This is Abbott Exhibit 1051, "A Survey
19  of Dispensing and Acquisition Costs of
20  Pharmaceuticals in the State of Louisiana."  It's
21  been previously marked.
22       MR. FAUCI:  Are we introducing this

Page 47

1  today?
2       MS. RANKIN:  Excuse me?
3       MR. FAUCI:  Are we introducing this
4  today?
5       MS. RANKIN:  I'm just using it to
6  refresh her recollection.  It's been previously
7  marked, so --
8       MR. FAUCI:  Oh.  Okay.
9  BY MS. RANKIN:
10       Q.  This is the exhibit that was being
11  discussed on page 171 of your deposition there.
12       A.  (Witness examines documents.)
13       Q.  And there is a discussion that starts
14  on line 15 of page 171 about an excerpt in this
15  report on page 6 which notes the -- Myers and
16  Stauffer's conclusion that, quote, "The discounts
17  from AWP for multiple-source drugs exhibited much
18  greater variation but averaged 32.6 percent for
19  drugs without FUL pricing and 69.6 percent for
20  drugs with FUL pricing."
21       MS. RANKIN:  For your benefit, that's
22  F-U-L, big caps, F-U-L, not f-u-l-l.

Page 48

1  BY MS. RANKIN:
2       Q.  And on page 172 Mr. Torborg asked you
3  if you knew that there was a wider variation for
4  discounts from AWP for generic drugs, and on line
5  14 of page 172 you say "Yes."
6       Sitting here today as a representative
7  for the State of Louisiana, do you agree with and
8  adopt this -- your prior testimony on this point?
9       A.  Yes, based on the survey.
10       Q.  The survey from 1999?
11       A.  Correct.
12       Q.  Please turn to page 47 of this
13  document, page 185 of your testimony.  Let me
14  know when you get there.
15       A.  (Witness examines documents.)  I'm
16  there.
17       Q.  On line 9 of page 185, Mr. Torborg asks
18  you:  As far as you can recall, you've always
19  been aware of the joke, quote, "AWP equals ain't
20  what's paid," unquote, and your response on line
21  13 is "Pretty much, yes.  It's a running joke,"
22  unquote.

Page 49

1       Sitting here today as the
2  representative for the State of Louisiana, is it
3  fair to say that the joke "AWP equals ain't
4  what's paid" is a running joke that's been known
5  for some time for the State of Louisiana?
6       MR. FAUCI:  Object to the form.
7       THE WITNESS:  I wouldn't say just for
8  the State of Louisiana.  It's just a common
9  statement.
10  BY MS. RANKIN:
11       Q.  But you're a representative for the
12  state -- you're a representative for the State of
13  Louisiana, and here you're acknowledging that
14  you've been aware of the AWP ain't what's paid
15  joke for as long as you can remember?
16       A.  Yes.
17       Q.  Is that right?
18       A.  Yes.
19       Q.  Sitting here today, would you like to
20  correct your testimony here?  Is there anything
21  erroneous in your testimony on this point?
22       A.  No.

13  (Pages 46 to 49)