# EXHIBIT T



EXHIBIT
Abbott 292

# Medicaid Pharmacy Bulletin

Volume 1, No. 1

JANUARY-FEBRUARY 1987

# Medicaid Reimbursement for the Pharmacy Component of Home I.V. Therapy

## Medicaid Coverage of Home Intravenous (I.V.) Therapies May Be an Effective Way to Reduce Overall Program Costs.

The growing use of home I.V. therapies has become an important issue within the Medicaid pharmacy community. These treatments, characterized by extensive use of pharmaceutical products, introduce a variety of financial, administrative and clinical issues to Medicaid pharmacy that have yet to be resolved.

A recent study of Medicaid reimbursement for home parenteral therapies in Colorado documented that home I.V. therapies can result in significant financial savings in comparison to those administered in the traditional inpatient setting. This study, conducted by the School of Pharmacy at the University of Colorado Health Sciences Center, is described in a report entitled "The Budgetary Impact of Home Parenteral Therapy in a State Medicaid Program--A Cost Analysis and Recommendations." The cost comparisons derived from the study indicate considerable savings for patients receiving parenteral antibiotic, nutrition, pain management and hydration therapy at home instead of in the hospital. With 62 patients utilizing 1,361 days of home health care services, there was a reported savings of over $310,000, or approximately $5,000 per patient, in hospital costs.[1]

## Increased Medicaid Pharmacy Budgets Are Needed to Further Develop Home I.V. Therapy Reimbursement Programs.

The findings of this study make a strong case for Medicaid reimbursement for home I.V. therapy. In most states, Medicaid programs do provide a degree of coverage for these treatments. However, in general, current Medicaid phar-

See *Medicaid*, page 2

---

[1]"The Budgetary Impact of Home Parenteral Therapy in a State Medicaid Program--A Cost Analysis and Recommendations," Vaughn L. Culbertson, Pharm.D., et al., School of Pharmacy, University of Colorado Health Sciences Center.

## Introductory Issue

Lederle Laboratories is pleased to present the first issue of **Medicaid Pharmacy Bulletin**. This publication is designed to assist the Medicaid pharmacy community in keeping abreast of the latest program management practices and developments in health care policy that affect Medicaid pharmacy.

We encourage you to submit information about your state's pharmacy program that you feel may be of interest to your colleagues in other Medicaid programs throughout the country. All submissions, comments, questions and correspondence may be addressed to: Pamela Schaeffer, RESCON, Inc.,
8294 D Old Courthouse Road,
Tysons Corner, Va.  22180
(703) 821-8110.

Provided as a service to Medicaid by Lederle Laboratories, Wayne, N.J.

*Lederle*

# 2

From *Medicaid*, page 1

macy budgets are not adequate to cover the myriad of products utilized in home I.V. therapy. Unless funding is sufficiently expanded to support increased utilization of home I.V. therapy, the cost-saving and clinical benefits of such treatments cannot be fully realized.

### It May Be Necessary to Redistribute Overall Medicaid Budgets to Ensure Coverage of Home I.V. Products.

In the University of Colorado study, the authors state that it may be necessary to transfer portions of hospitalization budgets to pharmacy budgets in order to obtain the overall Medicaid program savings achievable by providing home I.V. therapy coverage. Table 1 illustrates the potential savings associated with providing TPN, parenteral pain management and parenteral hydration therapy at home as opposed to in the hospital. Since it is hospital costs that are significantly reduced by the provision of home I.V. therapy, it seems appropriate to use these savings to subsidize the additional pharmacy expenses incurred.

### Many Medicaid Pharmacy Programs Lack Specific Policies and Guidelines With Which to Manage Home I.V. Reimbursement.

Medicaid home I.V. therapy programs are constrained not only by limited pharmacy budgets

but also by a critical absence of administrative policies and procedures. For a variety of reasons, policies and procedures used to manage reimbursement for other outpatient drugs cannot be applied to the management of reimbursement for home I.V. treatment components. Among the major home I.V. management policy issues that need further consideration by the Medicaid pharmacy community are:

1. The development of pricing mechanisms for home I.V. medications.

2. The development of reimbursement strategies for home I.V. supplies.

3. The automation of systems to process home I.V. therapy claims.

4. The establishment of specific requirements to be met by providers of home I.V. products.

5. The expansion of pharmacy budgets to cover home I.V. therapy products.

## 1. THE DEVELOPMENT OF PRICING MECHANISMS FOR HOME I.V. MEDICATIONS.

### The Establishment of a Fair and Reasonable Pricing Methodology for Home I.V. Products is a Major Concern of Most State Medicaid Programs.

One of the major obstacles to the development of adequate home I.V. pricing methodologies is

**Medicaid Pharmacy Bulletin Advisory Panel**

Steven P. Bradford, Pharm.D.
Nevada (702) 855-4869
Joseph L. Fine, R.Ph., M.P.A.
Maryland (301) 225-5351
Ronald E. Graham, Pharm.D.
Tennessee (615) 741-0213
Myrle A. Myers, R.Ph., M.S.
Colorado (303) 294-2535

**Medicaid Pharmacy Bulletin** is prepared for Lederle Laboratories by RESCON, Inc., Tysons Corner, Va.

The editorial content of this publication is based on information obtained from sources believed to be reliable. However, no guarantee can be made about the accuracy or completeness of the information contained herein. The ideas and opinions expressed in this publication do not necessarily reflect those of the sponsor or any state Medicaid agency.

the fact that the dispensing of home I.V. medications is more complex than the dispensing of other outpatient drugs. Usually Medicaid pharmacy programs reimburse for outpatient drugs an amount which is determined by the individual program to be the provider's estimated acquisition cost (EAC) plus a dispensing fee. In most states, EAC is derived by a formula using the Average Wholesale Price (AWP) as the base figure.

**Providers and Pharmacist Consultants Concur That it is Not Appropriate to Apply the Same Ingredient-Based Pricing Mechanisms to Home I.V. Medications as Those Applied to Other Outpatient Drugs.**

For lack of a better alternative, some state Medicaid programs use the same ingredient-based formula they apply to other legend drugs when

**3**

providers are paying with volume and trade discounts. These discounts are generally not revealed in drug pricing publications such as the *Red Book*, the *Blue Book* and *Medispan*. Consequently, programs are reluctant to increase reimbursement for home I.V. medications, suspecting that reported costs for these substances may already be exaggerated.

**Failure to Include Adequate Economic Incentives for Dispensing Home I.V. Medications May Discourage Provider Participation in These Programs.**

In spite of the reservations about overcompensating providers for home I.V. medications, most

| | No. of Recipients | Total Cost of Home Treatment Billed To Medicaid | Total Cost of Comparable Treatment in Hospital | Total Net Savings |
|---|---|---|---|---|
| 1. TPN | 3 | $ 33,520.22 | $ 59,850.00 | $ 26,329.78 |
| 2. Pain Management: | 5 | $ 16,640.74 | $ 96,705.00 | $ 80,064.26 |
| 3. Hydration | 12 | $ 1,950.45 | $ 35,280.00 | $ 33,329.55 |

**Table 1. Comparison of Hospital and Home I.V. Therapy Costs.**
*Home Health Care Services - Colorado Medicaid*

Source: "The Budgetary Impact of Home Parenteral Therapy in a State Medicaid Program—A Cost Analysis and Recommendations," The University of Colorado Health Sciences Center, Vaughn Culbertson, Pharm.D., et al., Table 5.

calculating reimbursement for home I.V. medications. Most pharmacist consultants are not convinced that this process reflects actual provider costs for home I.V. reimbursement.

Home I.V. treatments are frequently a combination of multiple drug entities, dispensed in varying doses and administered several times daily. Although individual doses may be minimal to moderate in quantity, over an entire treatment period large volumes of medications are generally administered. It is, therefore, difficult to estimate, based on single, daily or even weekly administrations, the purchase prices

pharmacist consultants believe that providers should be compensated at a level that accounts for the costs of preparing, storing and delivering these products. However, determinations about what these costs are and how they can be integrated into reimbursement formulas have not yet been established.

The system of adding a set dispensing fee to ingredient-based reimbursement, used to arrive at compensation for other legend drugs, clearly falls short of responding to the costs of preparing home I.V. medications. On the other hand,
See *Medicaid*, page 4

# 4

From *Medicaid,* page 3

in the absence of reliable information about drug prices, many pharmacy program administrators have shied away from instituting policies specifically for home I.V. drug reimbursement. As a result, many programs resort to case by case determinations of reimbursement for these treatments.

In some states, the procedures for home I.V. therapy reimbursement are so unclear that programs choose to authorize only a small number of the requests submitted for such treatments.

A Few Medicaid Pharmacy Programs Use Systematic Methods of Arriving at Reimbursement for Home I.V. Medications.

Washington State Medicaid has developed specific formulas to calculate payment for home I.V. medications. See Table 2.

Normally, the program reimburses for legend drugs at 89% of the AWP (considered to be the EAC in Washington) plus a dispensing fee that averages out to $3.40 per prescription. In recognition of the increased time and effort required to prepare compounded parenteral solutions, Washington Medicaid pays providers the 89% of AWP plus a compounding fee of $1.14 for every 5 minutes spent preparing a compounded mixture ($1.14 is the minimum amount to be paid for any compounded mixture taking less than 5 minutes to prepare).

Washington's reimbursement for enteral products does not include a compounding fee since enteral supplements are generally prepackaged by commercial suppliers. However, Washington Medicaid has acknowledged that the cost of enteral products is relatively high, particularly for local pharmacists not purchasing in sufficiently large quantities for volume discounts. The program compensates for this reduced profit-margin by reimbursing at 89% of AWP plus 25% (of 89% AWP) for commercial enteral products.

Washington State Medicaid has found that while this approach does not eliminate underpayment or overpayment in every case, on the average, and over the long run, it produces results fairly consistent with provider costs.

| Table 2: Various State Medicaid Pricing Strategies for Home Parenteral Medications. | |
| --- | --- |
| **State** | **Medication Pricing System** |
| Massachusetts | Products from $  0-$ 25          50% mark up |
| | Products from $ 25-$100          45% mark up |
| | Products from $100-$200          40% mark up |
| | Products from $200-$300          35% mark up |
| | Products from $300 and above     30% mark up |
| Montana | The lower of usual and customary charge OR Up to 2 1/2 times the cost of ingredients plus a $2.00-$3.75 dispensing fee. |
| Oregon | 80% of usual and customary charge. |
| Washington | 89% AWP plus a $1.14 per 5 minutes compounding fee. |

HHC002-0391

South Carolina Medicaid currently uses the same formula to determine payment for home I.V. medications that it uses for other outpatient drugs. Reimbursement for all legend drugs is calculated by starting with AWP, subtracting 7 1/2% and adding a $3.40 dispensing fee. The Medicaid Pharmacy Program in South Carolina is concerned that payment based on this formula does not offer adequate economic incentives for providers of home I.V. medications. In an effort to address this perceived inadequacy, South Carolina is exploring ways to build these incentives into the formula described above, when calculating reimbursement for these drugs. To date, none of the formulas reviewed has become a matter of policy or practice, but those involved in this project feel that an appropriate methodology will soon be established.

## 2. THE DEVELOPMENT OF REIM-   BURSEMENT STRATEGIES FOR   HOME I.V. SUPPLIES.

Reimbursement for the Ancillary Products (Supplies) Used in Home I.V. Therapy Has Introduced a New Administrative Dimension to Medicaid Pharmacy Operations.

Home I.V. therapy is distinguished from other drug treatments by the different supplies required and the quantities of these supplies that are utilized. There are substantial differences from one state program to another in the extent to which reimbursement for ancillary home I.V. products is a function of the pharmacy program. Some reimburse for only the drug component and none of the ancillary supplies, others cover primarily drugs but include a few non-drug items as specified by the program, and still others provide coverage for all home I.V. therapy medications as well as all the supplies.

A Large Number of Pharmacy Programs Have Policies That Limit Reimbursement to Medications Only.

New York, Georgia and Texas are among the states which limit Medicaid pharmacy coverage solely to pharmaceuticals. In these and other programs governed by similar policy, the supplies and equipment associated with home

**5**

I.V. therapy are reimbursed through other parts of the Medicaid program such as the home health or durable medical equipment departments.

Some Pharmacy Programs Have Policies That Limit Coverage to Medications and a Few Specified Supplies Used in Home I.V. Therapy.

Minnesota Medicaid, for instance, restricts its pharmacy coverage to legend drugs and the containers used to hold I.V. medications. In Maryland, the pharmacy department reimburses for legend drugs as well as hypodermic needles and syringes.

Multidepartmental Responsibility for Home I.V. Product Reimbursement Can Lead to Overbilling.

In programs organized so that more than one department is billed for home I.V. products, it is sometimes possible for providers to simultaneously bill multiple departments for the same item or items. Without extensive interdepartmental communication and constant monitoring for these practices, it is likely that this activity can go unnoticed in programs with multidepartmental coverage.

A Few Pharmacy Programs Reimburse for All Medications and Supplies Utilized in Home I.V. Therapy.

Programs utilizing this approach must contend with keeping track of the variety and quantities of products involved in these treatments. These arrangements are cumbersome because all bills for products are processed through one department. However, because all billing information is examined by one department it is easier to discourage duplicate billing, to evaluate the continuity of treatment packages, and to monitor provider cost containment efforts.

See *Medicaid,* page 6

**6**

From *Medicaid*, page 5

A centralized approach to reimbursing for home I.V. products not only makes utilization review and monitoring more precise, but also streamlines billing procedures for providers. Under this system, pharmacists who provide both the medications and supplies for home I.V. therapy (most often these are supplied by the same provider) need only submit one bill to a single location.

## Reimbursement for Supplies Represents a Major Portion of Total Medicaid Home I.V. Therapy Expenses.

There is a general consensus within the Medicaid pharmacy community that there exists a critical lack of reliable information about the prices of ancillary home I.V. supplies. Pharmacist consultants are concerned that this results in substantial amounts of money overspent on these items.

Some of these products appear in the *Red Book*, *Blue Book* and *MediSpan*, but none of these publications provides a complete list of supplies and there are no other catalogues from which to obtain this information. Medicaid payors are left without adequate sources to verify billing information about these products and must depend almost entirely on the honesty of providers.

Most programs rely on published AWP prices when they are available and unverified provider reports of prices when they are not. However, even when published prices for these items can be found, the quantities in which they are purchased by providers are so enormous, it is difficult to estimate actual acquisition costs with volume discounts.

In most states, reimbursement for supplies is based on EAC and is calculated in much the same way EAC for drugs is calculated, i.e., based on AWP plus or minus a percentage of AWP. For example, Washington reimburses for supplies at 89% of AWP plus 15%. Since verification for many of these products is difficult to obtain, it is questionable whether or not this methodology accurately pinpoints cost plus a reasonable economic incentive.

The Medicaid Program in Minnesota utilized a unique approach to this problem. A variety of providers from throughout the state were brought together to supply the program with information about prices for home I.V. supplies. These providers produced pricing recommendations based on what they believed to be fair and reasonable prices for these products. Minnesota Medicaid refers to these recommendations when establishing reimbursement amounts for these items.

## 3. THE AUTOMATION OF SYSTEMS TO PROCESS HOME I.V. THERAPY CLAIMS.

### Computer Programs to Expedite the Process of Determining Reimbursement Have Not Yet Been Developed for Home I.V. Medications.

For the most part, automated systems are used to process outpatient drug bill claims submitted to Medicaid programs. Unfortunately, little has been done to develop automated systems to process claims for compounded medications. As previously mentioned, frequently home I.V. solutions are a combination of multiple drug entities prepared specifically for each individual patient. The individualized composition of each home I.V. medication package has inhibited development of computerized systems through which to process data for reimbursement. Consequently, reimbursement determinations for home I.V. drugs in most Medicaid programs are derived through manual calculations performed on a case by case basis. These procedures, which are both cumbersome and time-consuming, contribute to delays in compensating providers. Furthermore, they increase the likelihood of inconsistent and inaccurate reimbursement.

## Standardizing the Components of Home I.V. Medication Packages May Be the Key to More Efficient and Cost Effective Reimbursement Systems.

In an effort to simplify the process of determining reimbursement for compounded home I.V. medications, a few states have initiated projects aimed at standardizing the ingredients in these solutions. Certain home I.V. treatments administered routinely do not differ radically from one compound to another. If some of these solutions can be standardized, corresponding reimbursement amounts can be attached to each one, enabling bill claims processing to be executed through a computer.

In the spring of 1986, Minnesota Medicaid launched two separate but related projects to standardize home I.V. solutions and their corresponding reimbursement amounts. One is an attempt to standardize reimbursement for the 50 most commonly requested parenteral medications and the other ventures to do the same for parenteral nutritional products.

Minnesota's experience indicates that many compounded home I.V. medications can be standardized by ingredients and that even in cases where acids and dextrose in varying quantities are added, the cost differential is insignificant. Minnesota has attached code numbers for billing purposes to each compounded mixture. Each digit in the code number represents the name, strength and volume of the products contained. The assigned code numbers and the prices that correspond to each coded compound are easily insertable into automated systems. When these systems are further refined, the tasks of calculating and monitoring reimbursement for home I.V. medications will be considerably simplified. It will also enable providers to obtain information in advance about the reimbursement amounts for these products. A secondary gain will be a reduction of time spent on negotiating payment between providers and the Medicaid program.

Other states implementing similar programs include Washington and South Carolina. It is anticipated that what will ultimately emerge from these efforts will be reasonable, adequate and consistent pricing levels for home I.V. substances, increased speed in reimbursing providers and reduced administrative burden for Medicaid pharmacy personnel.

## 7

## 4. THE ESTABLISHMENT OF SPECIFIC REQUIREMENTS TO BE MET BY PROVIDERS OF HOME I.V. PRODUCTS.

### The Risks Associated With Intravenous Administration of Substances Raise Serious Concerns About Provider Compliance With Standard Preparation Procedures.

The intravenous administration of drugs carries a higher potential for complications than does the administration of drugs through other routes. However, one risk factor associated with intravenous therapy, i.e., the development of infection, may be reduced when treatment is provided in the home rather than in the hospital. The procedures used in the preparation and storage of home I.V. products have a direct bearing on the reduction of complications. It is, therefore, sound clinical as well as economic policy for Medicaid pharmacy programs to focus attention on home I.V. provider capabilities and protocols.

As a general rule, Medicaid programs mandate pharmacy providers to be licensed by the State Board of Pharmacy. Most State Boards of Pharmacy do not have specific requirements for providers of home I.V. products. The Maryland State Board of Pharmacy, however, is currently developing regulatory policies "that will affect Maryland pharmacists that dispense outpatient parenteral preparations...." The regulations will establish requirements for training and expertise, equipment and facilities, storage, record-keeping and procedures used in preparing medications.

This initiative is intended to lower the risk potential associated with home I.V. therapy. It will also serve as a cost-savings measure by potentially reducing the expense of treating complications brought on by ill-equipped providers.

See *Medicaid*, page 8

**8**

rom *Medicaid*, page 7

## THE EXPANSION OF PHARMACY BUDGETS TO COVER HOME I.V. THERAPY PRODUCTS.

### harmacy Budgets Should Be Adjusted to eet the Additional Expense of Providing ome I.V. Products.

Findings such as those reported in the Colora-
o study effectively demonstrate the potential
dvantages of improved and increased Medi-
aid home I.V. coverage. It appears that sub-
stantial program savings can be a primary
outcome of additional funding for such treat-
ments. In order to maximize the benefits of Me-
dicaid coverage for home I.V. therapy, what are
also needed are refined reimbursement sys-
tems for the multitude of products involved.

In general, Medicaid pharmacy budgets have
not been expanded to meet the additional
expenses of home I.V. therapy. More studies
are needed to illustrate to policymakers the
benefits that could be achieved through
further development and expansion of these
programs. Until more funds are available, it
may be necessary to transfer portions of Medi-
caid hospitalization budgets to pharmacy
budgets in order to obtain the overall savings
made possible by the home I.V. therapy alterna-
tive. ∎

# Third Party Liability

### deral Regulations Require Medicaid rograms to Use the Cost Avoidance ethod of Reimbursement.

New Health Care Financing Administration
CFA) regulations, effective May 12, 1986, re-
ire that state Medicaid programs determine
ether third party liability (TPL) exists, thereby
suring that other insurance carriers assume
e financial responsibility for Medicaid services
fore Medicaid funds are expended. This ne-
ssitates the establishment of a cost avoidance
stem of reimbursement by each state Medi-
d program, in which providers bill other liable
rd party insurers first, leaving Medicaid as
e payor of last resort.

### ate Medicaid Programs Can Request a iver of the Use of Cost Avoidance.

n alternative to cost avoidance is pay and
ase (P&C), a system in which the provider
s the Medicaid program for all claims, leaving
e Medicaid agency to pursue TPL. However,
tes cannot use P&C unless (1) an applica-
n for a waiver, including documentation of the
st effectiveness of using P&C, is submitted to
e regional HCFA office, and (2) the state was
using P&C before November 12, 1985
(publication date of the regulations). Regula-
tions specified January 12, 1986, as the
deadline for submitting waiver applications, but
some regional offices will still consider applica-
tions. These include Regions VI, VII and VIII.
The goal of the regional offices is to work
closely with the various state Medicaid
programs to ensure compliance with federal
regulations and a cost effective TPL program,
according to a HCFA spokesperson.

### Many States Opt to Use Pay and Chase in the Medicaid Pharmacy Program.

A number of states have submitted
applications to waive cost avoidance in
the pharmacy program, having determined that
pay and chase is more suitable for this program.
Many of these Medicaid programs reported
that the Medicaid pharmacists in their states
were outraged at the prospect of having to
utilize cost avoidance, which they believed
would substantially increase administrative
costs.

HHC002-0395

## The Medicaid Pharmacy Program is Not Well Suited to Cost Avoidance.

**9**

Cost avoidance is difficult in Medicaid pharmacy since pharmacies are not adequately equipped to pursue and file large numbers of relatively inexpensive duplicate third party claims. In most cases they do not have adequate staffing or equipment to perform additional third party billing as do other providers, nor are they easily able to incorporate the added administrative burden in a cost effective manner. The pharmacy coverage offered by other third party insurers varies widely from plan to plan; while it is relatively easy to devise a system in which other insurance coverage is indicated on a Medicaid card, it is difficult to specify which drugs are included in the coverage, whether the coverage is still in effect, and whether there is a deductible to be met (in which case the Medicaid program would be liable).

In addition, "most insurance companies reimburse pharmacy services at only 70%-80% of the provider's billed charges. This would require pharmacies to bill Medicaid for the balance, resulting in the pharmacy absorbing the cost of multiple billings."[1] The administrative costs can end up exceeding the cost of the claim, since the average cost per pharmacy claim is quite small.

Many Medicaid pharmacy directors feel that cost avoiding pharmacy claims may jeopardize provider participation in the various Medicaid programs, "if a pharmacist judges the inconvenience of billing requirements to be greater than the value of Medicaid's business."[2]

## Insufficient Data Result in Rejected Waivers.

Some of the waiver applications were rejected on the basis of inadequate or insufficient cost effectiveness data. No guidelines were published by HCFA for performing such an analysis, other than the requirement that administrative costs must be included when determining the cost effectiveness of P&C and that the P&C method of reimbursement must be as cost effective as the cost avoidance method. A few states circumvented this problem by consulting data and information already collected and compiled by other states in their region. The regional HCFA offices aided the situation by granting extensions to many states to allow more time to collect data or implement the new TPL programs.

## HCFA Can Rescind or Amend Waivers.

Although regional HCFA offices have the authority to rescind waivers if the cost effectiveness of the TPL program changes, more often than not they will amend the waiver, thus enabling a state to change or modify its existing reimbursement method. Regulations state that individual Medicaid programs must monitor the cost effectiveness of their TPL programs and report any changes to the regional office. The main goal, however, according to spokespersons from both the Region V and Region VII HCFA offices, is overall cost savings in the Medicaid program.

∎

---

[1] "Documentation in Support of Colorado's Request to Waive Federal Requirements to Cost Avoid Nursing Home, Pharmacy, EPSDT, and HCBS Claims." Third Party Resource Section, Colorado Dept. of Social Services, March 11, 1986.

[2] Ibid.

# 10

# State Medicaid Agencies React to Proposed PHIP, CIP and Revised MAC Program

The Health Care Financing Administration's (HCFA) proposed regulations to establish limits on payments for drugs in the Medicaid Program have met with considerable criticism from a majority of the state Medicaid programs.

Forty-two state Medicaid programs submitted comments to HCFA about these alternatives by the October 19th deadline for submission. Although numerous and diverse points are raised by the various state programs, their comments reflect a consensus on several key issues.

As a group, state programs appear to be particularly concerned about:

1) the extent to which the regulation alternatives will increase administrative burden and costs,

2) the potential impact of the regulations on provider participation in the Medicaid Program,

3) the validity of HCFA's projections about program cost savings to result from implementation of the regulations, and

4) the elimination of existing and successful cost containment strategies.

### Administrative Time and Costs of CIP Could Outweigh the Benefits.

State Medicaid programs indicate that of all the alternatives outlined in the proposal, CIP is the most complex and expensive to implement. Several states point out that the amount of time and the costs involved in developing statewide screens of usual and customary charges in each state would be tremendous. Furthermore, existing auditing and billing systems would have to be revamped to accommodate the pricing system under the CIP alterna-

tive. Since the PHIP and Revised MAC pricing systems are similar to those that are currently implemented under the Federal MAC Program, it is believed that either of these would be less costly to implement than CIP. Generally, state programs feel that if any of these alternatives are adopted it should be the Revised MAC because it would have the least impact on their already limited administrative budgets.

### If Provider Participation is Reduced, Serious Access Problems Could Arise.

According to Medicaid law, HCFA is charged with the responsibility for ensuring adequate compensation for pharmacist participation in the Medicaid Program.[1] A number of comments from state Medicaid programs express concern that this statutory provision will not be upheld if the proposed regulations go into effect. It is anticipated that those pharmacies able to utilize economies of scale to purchase and sell drugs at lower prices are most likely to benefit, especially from the PHIP and CIP options. Small, independent pharmacies, unable to compete successfully under the PHIP or CIP options or to absorb the potential losses brought about by an expanded number of products subject to MAC limits, may be forced to drop out of Medicaid programs. As the Michigan Medicaid Program points out, often one or two pharmacists serve most of the Medicaid recipients

---

[1] "A Memorandum of Law Applicable to Review of Medicaid Drug Reimbursement Rules," Paul Bator, P of Law, University of Chicago.

in a certain area. If primary Medicaid pharmacy providers are forced to withdraw from programs, in some areas recipients may be left without an alternative provider within reasonably close proximity.

## State Programs Doubt That Either PhIP or CIP Will Produce HCFAs Cost Saving Projections.

Given the wide range of usual and customary prices charged by the various types of providers, many state programs have concluded that CIP would require not just one screen of charges per state but rather multiple screens. Designing and monitoring such a multitiered system would constitute a significant administrative burden to which many state programs object.

In the interest of minimizing administrative burden and costs to state Medicaid programs, the CIP proposal suggests that price updates be conducted no more than once a year. While programs generally favor steps to reduce excessive administrative activities, in this case they feel that annual updates would not adequately keep up with ongoing market price fluctuations.

HCFA maintains that PhIP would necessarily generate program savings by alleviating administrative delays and costs inherent in the current MAC program. However, cost comparison data submitted to HCFA refute this assertion. For example, Michigan Medicaid calculates that it would be more costly in Michigan to administer a PhIP limit on acetaminophen with codeine 30 mg. (projected as $77,000 annually) than to maintain its entire existing state MAC system which includes almost 100 drug entities.[2]

## States With Their Own Programs Are Satisfied With Their Results.

Currently, about 28 states implement their own generic substitution programs in addition to the Federal MAC. In general, state program officials are pleased with the results of their individual programs and find the prospect of installing a new system unnecessary and in some cases counterproductive.

**11**

Several states have generic substitution laws that would dilute the effect of PhIP or CIP. For example, according to Indiana law, generic substitution cannot occur unless the prescribing physician gives his consent, the patient agrees to substitute and the dispensing pharmacist believes that dispensing the generic version will not harm the patient.[3] If the PhIP or CIP proposals are enacted, pharmacists in Indiana will still be bound by these mandates listed above, preventing them from dispensing generics unless these conditions are met.

Because drug needs, availability and prices vary significantly from state to state, state programs tend to be in favor of state and local discretion over federal determination of pricing policies. Should the proposed regulations go into effect, states that wish to maintain their own programs will have to obtain a state waiver to do so. Waiver application requires a state to provide substantial evidence to prove that its own program will obtain at least the cost savings available through the federal program. This could, and most likely would, act as a deterrent to the development of creative cost containment initiatives at the state level. ■

---

[2] Michigan Medicaid, Comments submitted to HCFA.

[3] Indiana Code 16-6-8. 1-2.



# Legislative and Regulatory Update

## FEDERAL

The Health Care Financing Administration (HCFA) has received strong recommendations from The American Pharmaceutical Association (APhA), the National Association of Chain Drug Stores (NACDS) and the National Association of Retail Druggists (NARD) to fund demonstration projects that would examine options for reimbursement mechanisms in the Medicaid Prescription Drug Program. "HCFA data show more than 50% of all Medicaid paperwork is triggered by drug claims" but that these claims "constitute 6%-8% of the total program expenditures." (From Medicaid Prescription Reimbursement Reform, APhA, June 1986.)

Two alternatives were offered by APhA, NACDS and NARD: The first was a voucher system in which recipients receive numbered certificates similar to a checking account. Each voucher could represent a certain dollar amount or a specific prescription. Similar programs have been successful in Alabama and with Delaware Blue Cross/Blue Shield.

The second alternative involves the use of "smart cards," similar to electronic banking cards, which would be coded with a recipient's medical history and eligibility information. This system would enable pharmacists to receive instantaneous prescription information and verification of eligibility. More importantly, though, this system would reduce paperwork, expedite payment, and potentially decrease waste, fraud and abuse. To date no action has been taken on this issue.

## STATE

### Michigan
The Michigan House of Representatives is considering a bill which would permit, under the Medicaid program, medical services to be provided in the home, if charges are not greater than they would be in institutions. This bill would also require that an initial medical evaluation and medical orders be given for any services provided over a long period of time. (From IHPP "Major changes in Medicaid policy...")

### New York
Under a proposed state Medicaid regulation designed to eliminate reimbursement for fraudulent sales of certain medical supplies, New York would require authorization by the state Social Services Department for specific medical supplies before payment for these items would be issued. These supplies include such things as heating pads, elastic stockings and vaporizers.

### North Carolina
In an attempt to reduce Medicaid pharmacy costs, North Carolina Medicaid amended its rules and regulations to define "Usual and Customary Charge." North Carolina Medicaid currently reimburses the lower of MAC, EAC or AWP plus a $3.36 dispensing fee for each different drug dispensed during a month, or the pharmacist's usual and customary charge (U&C). U&C is now defined as the lowest price a pharmacist is willing to accept from any third party payor. For example, a pharmacist who is dispensing prescriptions at cost through a contract with an HMO must now dispense at that lower level for Medicaid recipients.

### South Carolina
Beginning October 1, 1986, South Carolina Medicaid has increased its monthly prescription limit from three to four, on insulin syringes (S.C. Medicaid's number one prescription item), and antibiotics for home I.V. therapy. South Carolina Medicaid ensured funding for this increase by re-budgeting. ∎

# EXHIBIT U

Newark, DE

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE           ) Civil Action No.

LITIGATION                        ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,   )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,   )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

--------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 346

1  packaging, the staff is there.  So I'm not sure I
2  could agree there's a difference in cost, if you
3  go with my presumption that you have a baseline
4  staff.
5      Q.  What about the costs for a home IV
6  pharmacy to dispense a compounded prescription?
7  Would you agree that Delaware was aware that
8  those costs exceeded the standard costs to
9  dispense a bottle of pills from a traditional
10 pharmacy?
11      MS. HEALY SMITH:  Objection.
12      THE WITNESS:  So just to be clear,
13 you've changed the type of questions you're
14 asking and were asking, based on the Division's
15 policy, whether that there was a separate or a
16 different methodology for reimbursement on IV add
17 mixture.
18 BY MS. RAMSEY:
19      Q.  No, I wasn't asking about a separate
20 policy.  I was asking about knowledge of the
21 specific increased costs for a home IV company to
22 administer IV drugs?

Page 347

1      A.  I want to make sure that I'm answering
2  the question correctly, so I need it --
3      MS. SHUTTEE:  Do you need to have it
4  read back to you?
5      THE WITNESS:  -- read back to me.  I'm
6  sorry.
7      MS. RAMSEY:  Actually, I can go ahead
8  and have a document marked.
9  BY MS. RAMSEY:
10      Q.  Okay.  I am handing the witness what
11 has been previously marked as Abbott Exhibit 578.
12      A.  Do you want me to put this away now?
13      Q.  You can keep it handy.  We'll probably
14 be looking at it from time to time.
15      MS. HEALY SMITH:  You don't have one
16 more copy handy, do you?
17      MS. RAMSEY:  No.
18      THE COURT REPORTER:  Do you want this
19 marked again?
20      MS. RAMSEY:  No, it can stay marked as
21 Abbott 578.
22      THE COURT REPORTER:  Oh.  Okay.

Page 348

1      THE WITNESS:  Wow, something before my
2  time.
3      Sorry.  I couldn't help myself.  I know
4  we're on record still.
5      1988.
6      MS. SHUTTEE:  Yeah.
7  BY MS. RAMSEY:
8      Q.  Now, after you have a moment to review
9  this document, let me know, and I'll direct you -
10 - you don't have to read it page by page, but
11 just familiarize yourself.
12      And for the record this is a Medicaid
13 Pharmacy Bulletin that's dated January to
14 February, 1988, titled Developing an Effective
15 Reimbursement Methodology for Home IV Therapy.
16      First of all, are these Medicaid
17 Pharmacy Bulletins documents that you received in
18 your work with Delaware Medicaid?
19      A.  Not the ones that were sponsored by
20 Lederle, but the ones that came after Lederle.  I
21 think the first one I received were by Parke-
22 Davis.

Page 349

1      Q.  Do you know whether Delaware Medicaid
2  was provided with these pharmacy bulletins prior
3  to your arrival in 1993?
4      MS. HEALY SMITH:  Objection.
5      THE WITNESS:  My assumption is that the
6  manufacturers and labelers have a pretty good
7  national list and when they want to mail the
8  Medicaid Programs they have a contact for each
9  program.
10 BY MS. RAMSEY:
11      Q.  Is that a yes?
12      A.  What was the exact question again?
13      Q.  I believe that I asked whether you had
14 any knowledge as to whether Delaware Medicaid
15 received Medicaid Pharmacy Bulletins prior to
16 your arrival.
17      A.  Other than what I just stated, I would
18 say, no, I don't have specific knowledge.
19      Q.  Okay.  So they could have or they might
20 not have?
21      A.  Correct.
22      Q.  Okay.  But you indicated that you did

20  (Pages 346 to 349)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

Page 350

1  begin receiving these at some point?
2      A.  Yes.
3      Q.  Okay.  Do you recall when that was?
4          MS. SHUTTEE:  Strike that -- I'm sorry.
5  I said strike that.  That's not what I meant to
6  say.
7          Excuse me.  When you said receiving
8  these, did you --
9          MS. RAMSEY:  Medicaid Pharmacy
10  Bulletins.
11          MS. SHUTTEE:  -- mean these from
12  Lederle or these from Parke-Davis or these from
13  another provider.
14          MS. RAMSEY:  Any Medicaid pharmacy
15  provider.
16          MS. HEALY SMITH:  Any Medicaid.
17  Thank you very much.  Pardon for my
18  interruption.
19          THE WITNESS:  My recollection of
20  receiving Medicaid Pharmacy Bulletin goes fairly
21  back to when I first started.  They were valuable
22  publications, but exactly when I started to

Page 351

1  receive them, I don't know.
2  BY MS. RAMSEY:
3      Q.  Okay.
4      A.  It would have been in the early to mid-
5  '90s.
6      Q.  Now, the first column, the title is
7  home intravenous IV reimbursement is a complex
8  issue for Medicaid Pharmacy Programs.
9          And then the second paragraph it
10  states, because home IV therapy involves a host
11  of additional pharmacy services; storage,
12  preparation, delivery, patient instruction, et
13  cetera, it is generally agreed that it is more
14  expensive to dispense this type of medication
15  than to dispense other outpatient drugs.
16          Did I read that correctly?
17      A.  You read it correctly.
18      Q.  And do you agree with that sentence?
19      A.  No.
20      Q.  Why not?
21      A.  Because some of the functions that are
22  mentioned are not specific to the dispensing

Page 352

1  function and more subject to other facets of
2  delivering health care.
3      Q.  Such as what?
4      A.  Such as delivery.
5      Q.  And what about compounding?
6      A.  Preparation is what's listed here.  And
7  in some situations preparation may be longer,
8  yes.
9          I also would disagree with patient
10  instruction being part of the dispensing
11  application or function for these products.  In
12  most situations that I am aware of with IV-
13  administered drugs, you're going to have a home
14  health component, such as a visiting nurse, and,
15  therefore, I believe that the charges associated
16  with patient instructions would be done onsite at
17  the home or the facility where the person was
18  receiving the drug.
19      Q.  So you do agree that there are
20  additional costs and services that home IV
21  providers would incur versus a traditional retail
22  pharmacist dispensing a drug; is that correct?

Page 353

1          MS. HEALY SMITH:  Objection.
2          THE WITNESS:  Yes.  To some degree.
3  BY MS. RAMSEY:
4      Q.  How did Delaware reimburse provider of
5  home IV medications --
6          MS. HEALY SMITH:  Objection.
7  BY MS. RAMSEY:
8      Q.  -- during the relevant time period?
9      A.  Can you redefine the relevant time
10  period?
11      Q.  Beginning in 1991 and going through
12  approximately 2001.
13      A.  We reimbursed the pharmacy providers
14  for the ingredient costs plus a $3.65 dispensing
15  fee.
16      Q.  Were there any additional -- strike
17  that.
18          Did Delaware provide any additional
19  reimbursement or compensation other than the
20  ingredient costs and the $3.25 dispensing fee?
21      A.  We reimbursed a dispensing fee of
22  $3.65.

21 (Pages 350 to 353)

7e3b40ac-6aba-43aa-8f67-e3aa33ec80ce

# EXHIBIT V

Baltimore, MD

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | |
|---|---|
| IN RE: PHARMACEUTICAL ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE ) | CIVIL ACTION |
| PRICE LITIGATION ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ) | |
| U.S. ex rel. Ven-a-Care of ) | Judge Patti B. Saris |
| the Florida Keys, Inc. ) | |
| v. ) | Chief Magistrate |
| Abbott Laboratories, Inc., ) | Judge Marianne B. |
| No. 06-CV-11337-PBS ) | Bowler |

- - - - - - - - - - - - - - -

Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE

Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

Henderson Legal Services, Inc.

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 82

1     A.   Initially.  And then Lederley was bought
2  out by Pfizer and -- that's how that works, you know.
3     Q.   And you were on the advisory board of the
4  Medicaid Pharmacy Bulletin for a time?
5     A.   Yes, I was.
6     Q.   As best I understand, the first publication
7  was in 1987.  Does that sound right?
8     A.   That sounds about right.
9     Q.   And you were on the advisory panel for how
10 long?
11    A.   I believe three years.
12    Q.   Were you on it after the three years were
13 up at any time?
14    A.   Yes.  Another two years.  They did it in
15 rotation.  I don't recall the second time.
16    Q.   Now, where did the publishers of the
17 Medicaid Pharmacy Bulletin get their information?
18    A.   From the Medicaid pharmacy administrators.
19    Q.   So --
20    A.   The panel got together and they discussed
21 what topics would be important to the other pharmacy
22 Medicaid administrators and then the company that

Page 83

1  published it would do their editorial work and write
2  up an article on this, do the investigation on it.
3  And then it would be submitted back to the panel for
4  review, editing and whatever before it would be
5  released.
6     Q.   Did you find that those bulletins were a
7  useful source of information?
8     A.   Yes, they were.
9     Q.   They had very reliable information in them?
10    A.   Absolutely.
11    Q.   Do you know -- did you maintain copies of
12 those?
13    A.   I did.  Before I left I had a whole book on
14 it.  I don't know -- I think I threw them out.
15    Q.   When you left the department -- let me back
16 up.
17    A.   I don't think I left it with the
18 department.  I didn't.
19    Q.   Did you take it with you?
20    A.   I think I did and I think I then discarded
21 it.
22    Q.   When did you throw them away?

Page 84

1     A.   2005.
2     Q.   Why did you throw them away?
3     A.   I was just cleaning.  I just had a lot of
4  papers.
5     Q.   Do you know how someone can get copies of
6  past issues of this publication?
7     A.   You'd have to probably inquire with
8  Parexel.  That was the last one -- it's no longer in
9  publication, by the way.
10    Q.   Did anything take its place?
11    A.   No.
12    Q.   When you left the department what did you
13 do with your files that you had?
14    A.   I left the files there.
15    Q.   You didn't take anything with you?
16    A.   No.  Other than my own personal
17 information, personal articles.
18    Q.   So you got to clean out your office and
19 start over.  That sounds like a good idea to me.  Any
20 other publications you can recall?
21    A.   I don't know what you're asking.
22    Q.   Relating to Medicaid pharmacy issues apart

Page 85

1  from the Green Sheets, Medicaid Pharmacy Bulletins and
2  the other ones we discussed.
3     A.   No.  Not that I can think of.  Oh.  There
4  is a compendia that comes out from the National
5  Pharmaceutical Council that does a survey of all
6  Medicaid programs.  You may have --
7     Q.   I know what you're talking about.
8     A.   Right.  Every state gets that and we used
9  it for review.
10    Q.   I'd like to hand you what we've marked
11 previously as Abbott Exhibit 81.  Mr. Fine, Abbott
12 Exhibit 81 is a document titled "Prescription drug
13 prices:  Are we getting our money's worth?  A majority
14 staff report of the Special Committee On Aging, United
15 States Senate."  Do you see that?
16    A.   I guess it's right before me.
17    Q.   Okay.  And have you seen this document
18 yourself before?
19    A.   No.
20    Q.   Do you know if the department followed the
21 work of the Special Committee On Aging, United States
22 Senate?  To see if it helps your recollection at all

22  (Pages 82 to 85)

0bd2b054-a753-a4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008

# Baltimore, MD

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | )  MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | )  CIVIL ACTION |
| PRICE LITIGATION | )  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) |
| U.S. ex rel. Ven-a-Care of | )  Judge Patti B. Saris |
| the Florida Keys, Inc. | ) |
| v. | )  Chief Magistrate |
| Abbott Laboratories, Inc., | )  Judge Marianne B. |
| No. 06-CV-11337-PBS | )  Bowler |

- - - - - - - - - - - - - - -


Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE


Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 202

1  that a pharmacist who deals with one of the two major
2  local wholesalers -- and generally pharmacies purchase
3  drugs from one predominant wholesaler and had the
4  second as a backup when they couldn't get the drug.
5       So each local wholesaler carried at least
6  one or two lines of generic drugs.  And the
7  methodology was to take the lowest price of each one
8  of the two wholesalers and then pick the highest price
9  of the two so that any pharmacy using their own source
10 of supply could get the drug for that price and
11 wouldn't have to switch wholesalers just to get that
12 drug to meet the price.  Okay?
13      So we were able to get it with the
14 compliance of the two local wholesalers that they
15 worked with us on this.  It evolved that after several
16 years one local wholesaler went out of business and a
17 national company, McKesson, bought out the other local
18 wholesaler, Lowie.  Bought it out.  So therefore now
19 we were seeing pharmacists getting drug products from
20 a Virginia firm, Bergen Brunswick, and from McKesson,
21 predominantly.  And now we're dealing with national
22 wholesalers who didn't wish to work with us directly

Page 203

1  in setting up our state MAC or the IDC.
2       So we had to find some way to get drug
3  pricing, their files.  And what we did is we went to
4  pharmacies who had business with them, pharmacists
5  that belonged to Maryland pharmacist association who
6  knew it was for the common good anyway and we were
7  able to borrow their files.
8       Q.   So you got pricing information from either
9  wholesalers or a pharmacist who cooperated with the
10 department in giving --
11      A.   But it was from wholesalers.  It was always
12 wholesale prices.  It was the wholesaler file.  But
13 since they wouldn't let us use it directly we had to
14 go through them to get the files.
15      Q.   When you say wholesale file --
16      A.   Meaning the price list.  The drug price
17 list.
18      Q.   We're not talking about the compendia here?
19      A.   No.  Maryland did not use compendia,
20 meaning we did not use First Databank and/or Medi-Span
21 to set our IDC.  We were determined to set our state
22 MAC or IDC based on what local -- what our pharmacists

Page 204

1  could get the drug for if they were working and buying
2  the product from a wholesaler that was selling in
3  Maryland.
4       Q.   And this process of going to get wholesale
5  price lists from either a wholesaler or a pharmacist,
6  some of that was just part of your job, right?
7       A.   Correct.
8       Q.   Something you felt you needed to do to get
9  fair pricing for drugs?
10      MS. YAVELBERG:  Objection, form.
11      A.   Well, the feel -- it's not my feeling.
12 It's what Maryland decided to do to get fair pricing
13 to their pharmacists who fill prescriptions for
14 Maryland medical assistance recipients.
15      Q.   And you received cooperation from the
16 pharmacy providers in this effort?
17      MS. YAVELBERG:  Objection, form.
18      A.   Yes.  Yes.  The pharmacy providers worked
19 with us.
20      Q.   Now, you used two different prices for each
21 drug on the IDC list; is that right?
22      A.   We used two different sources of prices.

Page 205

1  In other words, a source price from one wholesaler and
2  a source price from another wholesaler.  We used two
3  wholesalers' prices that were doing business in
4  Maryland.
5       Q.   And then you paid at the higher of those
6  two prices, correct?
7       A.   We selected the line of generic drugs that
8  had the lowest price for each wholesaler and picked
9  the highest price of those two.  Highest of the
10 lowest, if you can understand that.  So therefore any
11 pharmacy could get it and stay with their same
12 wholesaler they normally did business with.
13      MR. TORBORG:  Why don't I mark this as our
14 next exhibit.  This will be Abbott Maryland 16.
15      (Exhibit Abbott Maryland 016
16          was marked for
17          identification.)
18      BY MR. TORBORG:
19      Q.   For the record, this bears the Bates
20 numbers MD 0019258 through 63.  And I'd like to ask
21 you just about the first page for now.  Do you
22 recognize this document, Mr. Fine?

52  (Pages 202 to 205)

0bd2b054-a753-4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                December 9, 2008

## Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

    v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -


Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE


Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

## Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

---

Page 186

1  Bates page 215. the last column purports to list
2  Maryland Medicaid reimbursement and it says -- there's
3  a couple asterisks next to it and it says "Maryland's
4  Medicaid reimbursements obtained from Maryland medical
5  care policy Medicaid pharmacy." That would be Mr.
6  Tetkoski's group?
7      MS. YAVELBERG: Objection, form.
8      A.  What is normally said by -- and this is not
9  something that Maryland Medicaid -- the inquiry came
10 to the policy administration. The policy
11 administration would have answered that. But the
12 reimbursement would come from the operations
13 administration. So I don't know what -- they could
14 have mixed things up. Because reimbursements don't
15 necessarily, unless there was an inquiry on what was
16 paid on a drug -- and I don't see a worksheet here of
17 any sort for inquiry. So I wouldn't know.
18     Q.  If we go to the third row -- fourth row I
19 guess -- it says "Abbott" and then there's -- this is
20 a vancomycin hydrochloride 500 milligrams.
21     A.  Mm-hmm.
22     Q.  This purports to on the far right column

---

Page 187

1  indicate Maryland Medicaid reimbursement at different
2  points in time. Do you see that? 10/95 and 11/95 and
3  then 9/96. Do you see that?
4      A.  Yes.
5      Q.  In October of 1995 this chart at least
6  indicates the Medicaid reimbursement for Maryland was
7  $29.12, right?
8      A.  That's what's on this chart.
9      Q.  And then it goes down to $6.54 in November
10 of 1995, right?
11     A.  That's what's on the chart.
12     Q.  Now, taking apart the chart, just asking
13 for your general recollection, do you recall -- do you
14 know why -- or do you know if Maryland decreased its
15 reimbursement for injectable drugs like vancomycin
16 around this time?
17     MS. YAVELBERG: Objection to form.
18     A.  I do not know. I do not know. I'm trying
19 to -- I can't speculate because I don't know what had
20 happened at that point in time.
21     (Exhibit Abbott Maryland 012
22     was marked for

---

Page 188

1      identification.)
2      BY MR. TORBORG:
3      Q.  This document bears the Bates numbers MD
4  203081. It appears to be a July 25th 1995 --
5      A.  Excuse me. This is an internal memo.
6      Q.  Yes.
7      A.  Okay.
8      Q.  This was produced by the State of Maryland.
9      A.  Okay. Produced by the State of Maryland
10 internally for internal use. Anyone copied here were
11 Maryland employees.
12     Q.  Yes.
13     A.  It was not sent to the public.
14     Q.  I can't tell you if this was sent to the
15 public.
16     A.  I'm saying this was not sent to the public.
17 It was internal.
18     Q.  Okay. The subject is the new
19 interchangeable drug cost list.
20     A.  Mm-hmm.
21     Q.  This was from Patricia Burkholder and she
22 was in the policy group, did you say?

---

Page 189

1      A.  Yes.
2      Q.  And it's to Joseph Millstone who was the
3  director of the policy group?
4      A.  Mm-hmm.
5      Q.  Copied to Frank Tetkowsi. We know who he
6  is. How do I pronounce the next one?
7      A.  Tuong.
8      Q.  Tuong?
9      A.  Nguyen.
10     Q.  Where was she?
11     A.  She did the pricing. She was a pharmacist
12 and did the pricing for compounded prescriptions and
13 expensive drugs.
14     Q.  And then Ronald Poole?
15     A.  He assisted in setting up the pricing
16 modality. He was an aide.
17     Q.  Was Ms. Nguyen in the policy group or the
18 operations group?
19     A.  She was originally in the policy group and
20 then moved to the operations group when operations
21 took over all of pharmacy.
22     Q.  If you go to the second paragraph of this

48  (Pages 186 to 189)

Henderson Legal Services, Inc.

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008
Baltimore, MD

Page 190

1  memo, Ms. Burkholder states "In addition to the
2  regular drugs being added, injectable drugs are also
3  being added. There is no prohibition in the state law
4  or regulation against these types of drugs from being
5  on the IDC list, but for some reason injectables have
6  never been on." Do you see that?
7      A.   Yes.
8      Q.   And do you recall that at some time in 1995
9  the department began to put a state MAC on injectable
10  drugs?
11      A.   Yes.
12      Q.   What caused Maryland Medicaid to do that?
13      A.   What we noticed is injectable drugs were
14  becoming generically available and also the Orange
15  Book -- and we're talking FDA, bioequivalency
16  standards -- was rating the injectable drugs. And
17  this could be another source of cost containment.
18      Q.   At previous times did the Orange Book not
19  rate injectable drugs?
20      A.   They did, but again we're looking for cost
21  containment where possible.
22      Q.   What was the purpose for your comment about

Page 191

1  the Orange Book was now rating injectable drugs?
2      A.   Initially -- I didn't say not. They may
3  have, but it wasn't significant. Injectables -- the
4  idea of rating the injectables being bioequivalent,
5  you can't substitute for a generic unless it's rated
6  in a bioequivalent category. And it was becoming more
7  prevalent so we looked at it as a cost containment
8  source.
9      Q.   Whose idea was it to put a state MAC on
10  injectables?
11      A.   Well, I was part of that discussion. And
12  again, it was a discussion -- what we did, we
13  converged the policy and the operations and compliance
14  pharmacy oriented people. Again, there's always the
15  pressures of looking at how can we cut costs and we
16  get together and we look at things. It's not unusual
17  for state government to do that.
18      Q.   Do you know why the injectables were not on
19  the MAC list prior to this time?
20      A.   As I said before, it wasn't prominent that
21  the injectable drugs were rated as bioequivalent. In
22  reviewing the Orange Book, just as a review, looking

Page 192

1  for sources of savings, we saw that there were areas
2  there that we could save on.
3      Q.   If you could go back to the Abbott cross
4  notice to the schedule 1. This lists the NDCs at
5  issue in the United States case against Abbott.
6      A.   Okay.
7      Q.   And included in here are various injectable
8  drugs and infusion products, correct?
9      A.   Yes.
10      Q.   Did the State of Maryland place MACs on
11  these products in around 1995?
12      A.   I don't know unless I see what the IDC list
13  looked like at the time. I can't recall. I don't
14  know if these are the particular drugs that were
15  addressed or some of these were.
16      Q.   Did you do anything to determine for
17  purposes of your testimony here today whether or not
18  the State of Maryland put state MACs on these
19  products?
20      A.   I don't know for certainty.
21      MS. YAVELBERG:  I believe that the State of
22  Maryland did produce their IDC list on an annual basis

Page 193

1  to defendants.
2      MR. TORBORG:  Mark this as Abbott Maryland
3  13.
4          (Exhibit Abbott Maryland 013
5          was marked for
6          identification.)
7      BY MR. TORBORG:
8      Q.   Mr. Fine, this document bears -- this is
9  another document that was produced by Maryland. It
10  bears the Bates number MD 0021454 through 496. Do you
11  see this?
12      A.   Yes.
13      Q.   Do you know what this document is?
14      A.   It's a compilation of the drugs that were
15  addressed as being on the interchangeable drug list.
16      Q.   From December 21st 1994 through March 17th
17  1999; is that right?
18      A.   Yes.
19      Q.   Did you have any part in compiling this
20  document?
21      A.   Personally, no.
22      Q.   Do you know who would have done this?

49 (Pages 190 to 193)

0bd2b054-a753-4e97-a066-e37ff7ee308f

# Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | |
|---|---|
| IN RE: PHARMACEUTICAL | ) MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) CIVIL ACTION |
| PRICE LITIGATION | ) 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) |
| U.S. ex rel. Ven-a-Care of | ) Judge Patti B. Saris |
| the Florida Keys, Inc. | ) |
| v. | ) Chief Magistrate |
| Abbott Laboratories, Inc., | ) Judge Marianne B. |
| No. 06-CV-11337-PBS | ) Bowler |

- - - - - - - - - - - - - - -


Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE


Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008

## Baltimore, MD

Page 190

1   memo, Ms. Burkholder states "In addition to the
2   regular drugs being added, injectable drugs are also
3   being added. There is no prohibition in the state law
4   or regulation against these types of drugs from being
5   on the IDC list, but for some reason injectables have
6   never been on." Do you see that?
7       A.   Yes.
8       Q.   And do you recall that at some time in 1995
9   the department began to put a state MAC on injectable
10  drugs?
11      A.   Yes.
12      Q.   What caused Maryland Medicaid to do that?
13      A.   What we noticed is injectable drugs were
14  becoming generically available and also the Orange
15  Book -- and we're talking FDA, bioequivalency
16  standards -- was rating the injectable drugs. And
17  this could be another source of cost containment.
18      Q.   At previous times did the Orange Book not
19  rate injectable drugs?
20      A.   They did, but again we're looking for cost
21  containment where possible.
22      Q.   What was the purpose for your comment about

Page 191

1   the Orange Book was now rating injectable drugs?
2       A.   Initially -- I didn't say not. They may
3   have, but it wasn't significant. Injectables -- the
4   idea of rating the injectables being bioequivalent,
5   you can't substitute for a generic unless it's rated
6   in a bioequivalent category. And it was becoming more
7   prevalent so we looked at it as a cost containment
8   source.
9       Q.   Whose idea was it to put a state MAC on
10  injectables?
11      A.   Well, I was part of that discussion. And
12  again, it was a discussion -- what we did, we
13  converged the policy and the operations and compliance
14  pharmacy oriented people. Again, there's always the
15  pressures of looking at how can we cut costs and we
16  get together and we look at things. It's not unusual
17  for state government to do that.
18      Q.   Do you know why the injectables were not on
19  the MAC list prior to this time?
20      A.   As I said before, it wasn't prominent that
21  the injectable drugs were rated as bioequivalent. In
22  reviewing the Orange Book, just as a review, looking

Page 192

1   for sources of savings, we saw that there were areas
2   there that we could save on.
3       Q.   If you could go back to the Abbott cross
4   notice to the schedule 1. This lists the NDCs at
5   issue in the United States case against Abbott.
6       A.   Okay.
7       Q.   And included in here are various injectable
8   drugs and infusion products, correct?
9       A.   Yes.
10      Q.   Did the State of Maryland place MACs on
11  these products in around 1995?
12      A.   I don't know unless I see what the IDC list
13  looked like at the time. I can't recall. I don't
14  know if these are the particular drugs that were
15  addressed or some of these were.
16      Q.   Did you do anything to determine for
17  purposes of your testimony here today whether or not
18  the State of Maryland put state MACs on these
19  products?
20      A.   I don't know for certainty.
21          MS. YAVELBERG: I believe that the State of
22  Maryland did produce their IDC list on an annual basis

Page 193

1   to defendants.
2          MR. TORBORG: Mark this as Abbott Maryland
3   13.
4              (Exhibit Abbott Maryland 013
5              was marked for
6              identification.)
7          BY MR. TORBORG:
8       Q.   Mr. Fine, this document bears -- this is
9   another document that was produced by Maryland. It
10  bears the Bates number MD 0021454 through 496. Do you
11  see this?
12      A.   Yes.
13      Q.   Do you know what this document is?
14      A.   It's a compilation of the drugs that were
15  addressed as being on the interchangeable drug list.
16      Q.   From December 21st 1994 through March 17th
17  1999; is that right?
18      A.   Yes.
19      Q.   Did you have any part in compiling this
20  document?
21      A.   Personally, no.
22      Q.   Do you know who would have done this?

49 (Pages 190 to 193)

## Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0bd2b054-a753-4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008

## Baltimore, MD

---

Page 194

1    A.   It may have come out of our -- I'm looking
2  at the date here.  It may have come out of our policy
3  administration.
4    Q.   And this just covers the time period
5  December 21st 1994 through March 17th 1999, correct?
6    A.   Yes.
7    Q.   Any reason to believe any of the
8  information in here is not accurate?
9    A.   I can't make a decision otherwise.  I have
10 no other reason not to believe it.
11       MR. TORBORG:  We'll mark this as Abbott
12 Maryland Exhibit 14.
13              (Exhibit Abbott Maryland 014
14               was marked for
15               identification.)
16 BY MR. TORBORG:
17   Q.   This document bears the Bates number MD
18 0012980.  It appears to be a September 22nd 1998
19 memorandum from Tuong Nguyen?
20   A.   Nguyen.
21   Q.   Nguyen.  To the Medicaid pharmacy
22 administrator.  Who was the Medicaid pharmacy

---

Page 195

1  administrator at this time?
2    A.   What this is is a questionnaire to other
3  state pharmacy -- other states.  It's a questionnaire
4  to states.
5    Q.   Sure.  And -- that's a good point.  I knew
6  that when I read this document but for some reason I
7  saw that and asked a stupid question.  This, as you
8  said, appears to be a survey to various states asking
9  about their maximum allowable cost programs for
10 generic drugs, right?
11   A.   Mm-hmm.
12   Q.   Do you recall the department issuing such a
13 survey?
14   A.   I recall it, yes.  It was informational for
15 our department just to see what the other states were
16 doing.
17   Q.   If we go to item 6 it asks whether or not
18 those states excluded injectables from their state MAC
19 list.  Do you see that?
20   A.   Mm-hmm.
21   Q.   Do you know why Maryland asked that
22 question?

---

Page 196

1    A.   As a matter of asking questions for -- we
2  wanted to know the depth and breadth of their MAC
3  programs.
4    Q.   Do you know if other states were excluding
5  injectables?
6    A.   Other states were and others were
7  including.  I don't know which states.
8    Q.   Do you know why some states were excluding
9  them?
10   A.   I can't answer for other states.
11   Q.   Do you have any idea?
12   A.   It would be speculative.
13   Q.   Well, tell me what you know.
14       MS. YAVELBERG:  Objection, form.
15       MR. DAVIS:  Objection.
16   A.   I can only speak for Maryland.  Maryland
17 paid more attention -- you must understand that not
18 all states had a state MAC program.  We called it the
19 IDC program.  For those states that had an IDC program
20 Maryland was unique in we ran our own IDC program
21 manually ourselves, meaning that we didn't contract
22 with a vendor.  And it could be that the vendors who

---

Page 197

1  were hired had limitations on what they were able to
2  provide for the state.  And that's -- again, that's
3  just an opinion.
4    Q.   Do you recall at the time you were at the
5  department that HCFA did not establish federal upper
6  limits for injectable or infusion products?
7        MS. YAVELBERG:  Objection, form.
8    A.   You say infusion products.  I'm going to
9  call them injectables.
10   Q.   Okay.
11   A.   Originally injectables were not addressed.
12   Q.   By the federal government?
13   A.   Yes.
14   Q.   Has that changed?
15   A.   Yes.
16   Q.   When did that change?
17   A.   I don't know when it changed, but it
18 evolved that there are injectables now on the FUL.
19   Q.   Is that a relatively recent phenomenon?
20   A.   I can't say.  I can't say.  But if you look
21 at the FULs, now there are injectables.  I don't have
22 the sequence of when they were added.

---

50 (Pages 194 to 197)

## Henderson Legal Services, Inc.

0bd2b054-a753-4e97-a066-e37ff7ee308f

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008

## Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | )  MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | )  CIVIL ACTION |
| PRICE LITIGATION | )  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) |
| U.S. ex rel. Ven-a-Care of | )  Judge Patti B. Saris |
| the Florida Keys, Inc. | ) |
|      v. | )  Chief Magistrate |
| Abbott Laboratories, Inc., | )  Judge Marianne B. |
| No. 06-CV-11337-PBS | )  Bowler |

- - - - - - - - - - - - - - -

Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE

Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

0bd2b054-a753-4e97-a066-e37ff7ee308f

Page 198

1    Q.   Do you know why or do you have any insight
2  at all about why it is that HCFA did not have FULs on
3  injectables?
4         MS. YAVELBERG: Objection, form.
5    A.   It was not addressed one way or another in
6  the legislation as to whether there should be --
7  injectables were not excluded. I believe early on the
8  bioequivalency coming out of the Orange Book limited
9  the injectable -- addressing injectables early on. I
10  played a significant role in the establishment of the
11  first FUL working for Maryland. I worked with HCFA on
12  that first step.
13    Q.   You worked for HCFA?
14    A.   I worked with HCFA. I don't work for HCFA.
15  I didn't work for HCFA.
16    Q.   In establishing the original federal upper
17  limit list?
18    A.   Yes. Because I was doing drug pricing and
19  they had -- they needed someone with experience.
20    Q.   Who else did you work with?
21    A.   At that time?
22    Q.   Yes.

Page 199

1    A.   Peter Rodler from HCFA.
2    Q.   Is there anyone else that you worked with?
3    A.   No.
4    Q.   Now, at some point the Orange Book did rate
5  for bioequivalency injectable drugs, correct?
6    A.   Yes.
7    Q.   Do you know why at that point the federal
8  government did not establish a FUL?
9         MS. YAVELBERG: Objection, form.
10    A.   I cannot answer or speak for the federal
11  government.
12    Q.   You don't have any idea?
13    A.   No. Representing the State of Maryland. I
14  work for the federal government.
15    Q.   We've discussed already a little bit the
16  Maryland MAC program which was called the
17  interchangeable drug --
18    A.   Cost.
19    Q.   -- cost program, right?
20    A.   (Nods head).
21    Q.   Do you know when that started?
22    A.   It started -- it was '94. I mean '84 or

Page 200

1  '85. Something -- it was soon after the Orange Book
2  started getting published. I'm not certain of the
3  exact time. I don't know when. Sometime in the '80s,
4  early.
5         MR. TORBORG: Let's mark this as Abbott
6  Maryland 15.
7              (Exhibit Abbott Maryland 015
8               was marked for
9               identification.)
10         BY MR. TORBORG:
11    Q.   This document bears the Bates number MD
12  0019218 through 19. It's titled "sources of drug
13  pricing information."
14    A.   Right.
15    Q.   Are you familiar with this document?
16    A.   No, I'm not familiar -- I'm familiar with
17  the methodology. I don't have the -- I wasn't
18  instrumental in the write-up of just the procedure for
19  doing this.
20    Q.   Let's look at the first section, which
21  indicates it's from December '94 to June 2003. Do you
22  see that?

Page 201

1    A.   Mm-hmm.
2    Q.   Does this document discuss the sources of
3  pricing information that the department used to set
4  its IDC prices?
5    A.   Yes.
6    Q.   And then it says in the section from
7  December '94 to June of 2003, the first paragraph,
8  "Acquisition cost prices for drugs purchased through
9  the wholesalers by pharmacy providers were obtained by
10  printing the microfiches available from the
11  wholesalers as supplied by one of the pharmacy
12  providers." Do you see that?
13    A.   Yes.
14    Q.   Could you elaborate on that a little bit
15  more, about where it is that you all got the prices
16  that you used to set the IDCs?
17    A.   Okay. Early on there were local
18  wholesalers who were locally owned. And we were
19  setting up an IDC list and we asked them for their
20  pricing files so we could work from that. The
21  methodology was not to encumber the pharmacist in the
22  price that he couldn't get the generic for, meaning

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 202

1   that a pharmacist who deals with one of the two major
2   local wholesalers -- and generally pharmacies purchase
3   drugs from one predominant wholesaler and had the
4   second as a backup when they couldn't get the drug.
5         So each local wholesaler carried at least
6   one or two lines of generic drugs.  And the
7   methodology was to take the lowest price of each one
8   of the two wholesalers and then pick the highest price
9   of the two so that any pharmacy using their own source
10  of supply could get the drug for that price and
11  wouldn't have to switch wholesalers just to get that
12  drug to meet the price.  Okay?
13        So we were able to get it with the
14  compliance of the two local wholesalers that they
15  worked with us on this.  It evolved that after several
16  years one local wholesaler went out of business and a
17  national company, McKesson, bought out the other local
18  wholesaler, Lowie.  Bought it out.  So therefore now
19  we were seeing pharmacists getting drug products from
20  a Virginia firm, Bergen Brunswick, and from McKesson,
21  predominantly.  And now we're dealing with national
22  wholesalers who didn't wish to work with us directly

Page 203

1   in setting up our state MAC or the IDC.
2         So we had to find some way to get drug
3   pricing, their files.  And what we did is we went to
4   pharmacies who had business with them, pharmacists
5   that belonged to Maryland pharmacist association who
6   knew it was for the common good anyway and we were
7   able to borrow their files.
8    Q.   So you got pricing information from either
9   wholesalers or a pharmacist who cooperated with the
10  department in giving --
11   A.   But it was from wholesalers.  It was always
12  wholesale prices.  It was the wholesaler file.  But
13  since they wouldn't let us use it directly we had to
14  go through them to get the files.
15   Q.   When you say wholesale file --
16   A.   Meaning the price list.  The drug price
17  list.
18   Q.   We're not talking about the compendia here?
19   A.   No.  Maryland did not use compendia,
20  meaning we did not use First Databank and/or Medi-Span
21  to set our IDC.  We were determined to set our state
22  MAC or IDC based on what local -- what our pharmacists

Page 204

1   could get the drug for if they were working and buying
2   the product from a wholesaler that was selling in
3   Maryland.
4    Q.   And this process of going to get wholesale
5   price lists from either a wholesaler or a pharmacist,
6   some of that was just part of your job, right?
7    A.   Correct.
8    Q.   Something you felt you needed to do to get
9   fair pricing for drugs?
10        MS. YAVELBERG:  Objection, form.
11   A.   Well, the feel -- it's not my feeling.
12  It's what Maryland decided to do to get fair pricing
13  to their pharmacists who fill prescriptions for
14  Maryland medical assistance recipients.
15   Q.   And you received cooperation from the
16  pharmacy providers in this effort?
17        MS. YAVELBERG:  Objection, form.
18   A.   Yes.  Yes.  The pharmacy providers worked
19  with us.
20   Q.   Now, you used two different prices for each
21  drug on the IDC list; is that right?
22   A.   We used two different sources of prices.

Page 205

1   In other words, a source price from one wholesaler and
2   a source price from another wholesaler.  We used two
3   wholesalers' prices that were doing business in
4   Maryland.
5    Q.   And then you paid at the higher of those
6   two prices, correct?
7    A.   We selected the line of generic drugs that
8   had the lowest price for each wholesaler and picked
9   the highest price of those two.  Highest of the
10  lowest, if you can understand that.  So therefore any
11  pharmacy could get it and stay with their same
12  wholesaler they normally did business with.
13        MR. TORBORG:  Why don't I mark this as our
14  next exhibit.  This will be Abbott Maryland 16.
15        (Exhibit Abbott Maryland 016
16              was marked for
17              identification.)
18        BY MR. TORBORG:
19   Q.   For the record, this bears the Bates
20  numbers MD 0019258 through 63.  And I'd like to ask
21  you just about the first page for now.  Do you
22  recognize this document, Mr. Fine?

52  (Pages 202 to 205)

0bd2b054-a753-4e97-a066-e37ff7ee308f

Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - -


Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE


Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

0bd2b054-a753-4e97-a066-e37ff7ee308f

## Baltimore, MD

| Page 222 |
|---|

1  prices product is based on percentages. And Maryland
2  holds that.
3      Q.   How so?
4      A.   Pardon me?
5      Q.   How has Maryland based the way it prices
6  products based on percentages?
7      A.   Because historically it's been this way in
8  pharmacy since I've been working -- since I was
9  working for the State of Maryland. And it still
10 continues.
11     Q.   Tell me how the State of Maryland uses
12 percentages to set its reimbursement for generic
13 drugs.
14     A.   Maryland uses -- if the drug product is not
15 part of the IDC then -- meaning there's no
16 interchangeability of the product. Not all products
17 are interchangeable, meaning they're not all
18 bioequivalent -- then it holds the normal formula of
19 estimating acquisition cost. And if you look at the
20 charts the estimated acquisition cost is based on the
21 wholesale acquisition cost plus 10 and direct and/or a
22 distributor and/or AWP minus.

| Page 223 |
|---|

1      Q.   That's how the methodology is done?
2      A.   Yes. And it is all percentages.
3      Q.   And Maryland knows that there are generic
4  drug products that don't fall within the IDC, correct?
5      A.   Absolutely.
6      Q.   And it's reimbursing those at the lesser
7  of --
8      A.   Correct.
9      Q.   -- AWP minus 10, WAC plus 10, et cetera,
10 right?
11     A.   Whichever is less.
12     Q.   And it knows that generic drugs are selling
13 at a higher discount from AWP than branded drugs,
14 correct?
15         MS. YAVELBERG: Objection, form.
16     A.   Maryland knows that, yes.
17     Q.   But it's still using the same percentage,
18 correct? The same discount percentage or for WAC the
19 add percentage?
20         MS. YAVELBERG: Objection, form.
21     A.   Yes.
22     Q.   Why is it doing that?

| Page 224 |
|---|

1      A.   I can't explain it any more than this was
2  the standards set.
3      Q.   Why don't I hand you what we'll mark as
4  Abbott Maryland 18.
5              (Exhibit Abbott Maryland 018
6              was marked for
7              identification.)
8         BY MR. TORBORG:
9      Q.   This bears the Bates number MD 0000113
10 through 116. Let me ask you if you recall this
11 document, Mr. Fine?
12     A.   Yes.
13     Q.   And can you tell us what this is?
14     A.   This is -- whenever there's a regulation
15 there must be notice for the regulation and there must
16 be an economic impact of the regulation given to the
17 public for them to see. This is for a change in the
18 annotated code of the regulations in the State of
19 Maryland.
20     Q.   And this one relates to the implementation
21 of a separate dispensing fee for home IV therapy,
22 correct?

| Page 225 |
|---|

1      A.   Correct.
2      Q.   And the document notes that the higher fee
3  will enable the program to more closely resemble the
4  actual expense of the compounding since much more
5  expense is involved in compounding this type of
6  prescription, right?
7      A.   Maryland recognized that, yes.
8      Q.   And do you recall the fee was $7.70?
9      A.   Yes.
10     Q.   Do you know how it is that Maryland came up
11 with that figure?
12     A.   I do not know how it arrived at the $7.70.
13 It was if anything budgetarily -- a budgetary issue of
14 what the proposed budget would allow. Every year
15 Maryland would have to propose initiatives, budgetary
16 changes, fee changes, et cetera, for the budget. And
17 this was a proposed rule that addressed that. But I
18 don't know how the 7.70 was arrived at.
19         MR. DAVIS: Off the record. Counsel, I see
20 that it's about 3:30 and you see to have a lot of your
21 outline remaining. Is that accurate?
22         MR. TORBORG: I'm skipping lots of parts if

57  (Pages 222 to 225)