# EXHIBIT AA



21665664

Sep 24 2008
1:21PM

# A Survey of Dispensing Costs of Pharmaceuticals in the State of Kansas

Prepared for the

Kansas Department of Social and Rehabilitation Services

September 1999



Myers and Stauffer LC

Certified Public Accountants

percent pharmacy labor (obviously, some labor must be devoted to generating the 25 percent nonprescription sales).

To determine the maximum percentage of total labor allowed, the following calculation was made:

$$\frac{0.3(Sales\ Ratio)}{0.1+(0.2)(Sales\ Ratio)}$$

### Inflation Factors

 All allocated costs for overhead and labor were totaled and multiplied by an inflation factor. Inflation factors are intended to reflect cost changes from the middle of the reporting period of a particular pharmacy to a common fiscal period ending December 31, 1999 (specifically from the midpoint of the pharmacy's fiscal year to the midpoint of the common fiscal period, June 30, 1999). The midpoint and terminal month indices used were taken from the U. S. Government Consumer Price Index (CPI), Urban Consumer (see Exhibit 10).

The use of inflation factors is necessary in order for pharmacy cost data from various fiscal years to be compared uniformly. Recent experience with pharmacy cost studies has indicated that the CPI may tend to overstate increases in dispensing cost over an extended time. This appears to be the result of increased cost containment pressures exerted on retail pharmacies by reduced reimbursement from managed care entities.

## Analysis and Findings

The dispensing costs for all pharmacies in the sample are summarized in the tables and paragraphs following. We present the findings for all pharmacies in the sample collectively, and also for subsets of the sample based on pharmacy characteristics.

There are several statistical measurements that may be used to express the central tendency of a distribution, the most common of which are the average, or mean, and the median (see sidebar). Our findings are presented in the forms of means and medians, both raw and weighted.



In many real world settings such as this dispensing cost survey, statistical "outliers" are a common occurrence. These outlier pharmacies have dispensing costs that are not typical of the majority of pharmacies. Medians are often preferred to averages in situations where the magnitude of outlier values results in an arithmetic average that does not represent what we think of as "average" or normal in the common sense. The measurement that is the most ideally suited for determining the typical cost of dispensing prescriptions to Medicaid recipients is the **median weighted by Medicaid volume**.

For all pharmacies in the sample, our findings are presented in Table 3.2.

> **Different Measures of Central Tendency:**
>
> **Unweighted mean:** simply the average cost for each pharmacy.
>
> **Weighted mean:** the average cost of all prescriptions dispensed by pharmacies included in the sample, weighted by prescription volume. The resulting number is the average cost for all prescriptions, rather than the average for all pharmacy as in the unweighted mean. This implies that low volume pharmacies have a smaller impact on the weighted average than high volume pharmacies. This approach, in effect, sums all costs in the sample and divides that sum by the total of all prescriptions in the sample. The weighting factor can be either total prescription volume or Medicaid prescription volume.
>
> **Median:** the value that divides a set of observations (such as dispensing cost) in half. In the case of this survey, the median is the dispensing cost such that the cost of one half of the pharmacies in the set are less than or equal to the median and the dispensing costs of the other half are greater than or equal to the median.
>
> **Weighted Median:** This is determined by finding the pharmacy observation that encompasses the middle value prescription. The implication is that one half of the prescriptions were dispensed at a cost of the weighted median or less, and one half were dispensed at the cost of the weighted median or more.
>
> Suppose, for example, that there were 1,000,000 Medicaid prescriptions dispensed by the pharmacies in the sample. If the pharmacies were arrayed in order of dispensing cost, the median weighted by Medicaid volume, is the dispensing cost of the pharmacy that dispensed the middle, or 500,000th prescription.

### Table 3.2 Cost Per Prescription – All Pharmacies

|  | Dispensing Cost |
|---|---|
| Median Weighted by Medicaid Volume | $5.53 |
| Median Weighted by Total Volume | $5.19 |
| Unweighted Median | $5.61 |
| Mean Weighted by Medicaid Volume | $8.10 |
| Mean Weighted by Total Volume | $5.94 |
| Unweighted Mean | $7.47 |

*(Dispensing Costs have been inflated to the common point of June 30, 1999)*

Chart 3.2 is a histogram of the dispensing cost for all pharmacies in the sample. There was a large disparity between the highest, $151.12, and lowest, $3.17, dispensing cost observed for pharmacies in the sample. The majority of pharmacies (121), however, had dispensing costs in the range of $4.00 to $6.00.

The most significant characteristic which affected pharmacy dispensing cost was the provision of intravenous (I.V.) solutions. Our analysis revealed significantly



Myers and Stauffer lc
Certified Public Accountants

**Chart 3.2**
**Dispensing Cost by Pharmacy**



**Average Pharmacy Dispensing Cost per Prescription**

higher costs of dispensing is associated with the 7 pharmacies in the sample that provided this service.

In every pharmacy dispensing study where information on I.V. solution dispensing activity has been collected by Myers and Stauffer, such activity has been found to be associated with higher dispensing costs. Discussions with pharmacists providing I.V. solutions indicate that the activities and costs involved in filling I.V. prescriptions are significantly different from the costs incurred by the typical retail (or long term care) pharmacy. The reasons for this difference include:

- costs of special equipment for mixing and storage of I.V. solutions;

- higher direct labor costs because most I.V. prescriptions must be mixed in the pharmacy, whereas the manual activities to fill a non-I.V. prescription are mainly limited to counting pills (or vials, etc.) and printing and affixing the label; and

- a pharmacy may mix and deliver many "dispensings" of a daily I.V. solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions.

This latter factor, in particular, can have a dramatic impact on increasing a pharmacy's apparent cost per prescription.

The differences in dispensing costs which were observed for providers of I.V. services compared to those pharmacies which did not offer I.V. services are summarized in Table 3.3.

Myers and Stauffer LC
Certified Public Accountants

22

### Table 3.3  Cost Per Prescription  - I.V. Versus non I.V. Pharmacies

| Type of Pharmacy | Number of Pharmacies | Unweighted Mean Cost | Standard Deviation | Mean Cost Weighted by TotalVolume |
|---|---|---|---|---|
| Pharmacies Dispensing I.V. Prescriptions | 7 | $48.93 | $51.72 | $27.42 |
| Pharmacies Not Dispensing I.V. Prescriptions | 188 | $5.93 | $1.75 | $5.45 |

*(Dispensing Costs have been inflated to the common point of June 30, 1999)*

Based on our cost findings, it must be concluded that the costs incurred to dispense I.V. prescriptions are not representative of the costs incurred by a general pharmacy. If the costs of I.V. services were to be included in the computation of an average or median dispensing cost that was then used to establish a reimbursement rate, the effect would be to pay approximately 96% of pharmacies an additional allowance for a service they never provided. And, for those pharmacies providing I.V. services, the marginal increase in the fee would be immaterial in relation to the cost of actually dispensing an I.V. prescription.[9] Consequently, many of the analyses which follow, exclude these providers which had dispensed I.V. prescriptions. Table 3.4 restates the measurements noted in Table 3.2 excluding pharmacies that dispensed I.V. prescriptions.

### Table 3.4  Cost Per Prescription –  Excluding I.V. Pharmacies

| | Dispensing Cost |
|---|---|
| Median Weighted by Medicaid Volume | **$5.42** |
| Median Weighted by Total Volume | $5.17 |
| Unweighted Median | $5.56 |
| Mean Weighted by Medicaid Volume | $5.64 |
| Mean Weighted by Total Volume | $5.45 |
| Unweighted Mean | $5.93 |

*(Dispensing Costs have been inflated to the common point of June 30, 1999)*

## Analysis of Pharmacy Characteristics

Responding pharmacies were categorized into various groups of interest and their dispensing costs analyzed to determine statistical significance.  These characteristics include:

---

[9] Although typical dispensing fees reimburse less than the dispensing costs of I.V. pharmacies, they are generally able to break even based on the margin allowed on ingredient cost reimbursement.



Myers and Stauffer ic
Certified Public Accountants

- Chain versus independent pharmacy affiliation.
- Pharmacy location.
- Type of pharmacy ownership.
- Total prescription volume.
- Total Medicaid volume.
- Medicaid volume as a percent of total volume.
- Provision of unit dose dispensing services.
- Provision of mail order and Internet services.

For reasons previously described, these analyses are limited to those pharmacies that did not provide I.V. services. All costs referred to in these analyses have been inflation adjusted to the common point of June 30, 1999.

One way to determine the statistical significance of differences in dispensing cost between the pharmacies classified by the above referenced characteristics is through the use of a *t*-test. The sample data may show that a certain group of pharmacies has a sample mean lower or higher than another group. Recognizing that the data only represents a sample, a *t*-test is a statistical technique that seeks to determine if the findings are strong enough that a similar relationship can be expected to exist for the entire population. The *t*-test takes into consideration the sample's size, mean, and underlying variance. Although the preference of using a weighted median as a measurement of central tendency was previously explained, a *t*-test requires the comparison of the *unweighted mean* costs.

1) Chain Versus Independent Pharmacy Affiliation

Of the 188 pharmacies in the sample that did not dispense I.V. prescriptions, 111 were independent pharmacies and 77 were chain pharmacies.

**Table 3.5 Chain Versus Independent Pharmacies**

| Type of Pharmacy | Number of Stores | Unweighted Mean Cost | Standard Deviation of Cost | Median Weighted by Medicaid Volume |
|---|---|---|---|---|
| Independent | 111 | $5.94 | $1.49 | $5.55 |
| Chain | 77 | $5.91 | $2.08 | $5.17 |

The use of a *t*-test indicates that the difference in the raw means is not statistically significant (at the 5% level of significance). This means that there is insufficient evidence in the *sample* data to support the contention that there is a chain versus independent dispensing cost differential for the population of *all* chain and independent pharmacies.


Myers and Stauffer ™
Certified Public Accountants

EXHIBIT AB



21665171

Sep 24 2008
1:13PM

# A Survey of Dispensing Costs of Pharmaceuticals in the State of Arkansas

Prepared for the

Arkansas Department of Human Services

June 2001



Myers and Stauffer LC

Certified Public Accountants

cost studies has indicated that the CPI may tend to overstate increases in dispensing cost over an extended time. This appears to be the result of increased cost containment pressures exerted on retail pharmacies by reduced reimbursement from managed care entities.

## Analysis and Findings

The dispensing costs for all pharmacies in the sample are summarized in the tables and paragraphs following. Findings for all pharmacies in the sample are presented collectively, and additionally are presented for subsets of the sample based on pharmacy characteristics.  There are several statistical measurements that may be used to express the central tendency of a distribution, the most common of which are the average, or mean, and the median (see sidebar). Findings are presented in the forms of means and medians, both raw and weighted.

In many real world settings such as this dispensing cost survey, statistical "outliers" are a common occurrence. These outlier pharmacies have dispensing costs that are not typical of the majority of pharmacies.

> **Different Measures of Central Tendency:**
>
> **Unweighted mean:** simply the average cost for each pharmacy.
>
> **Weighted mean:** the average cost of all prescriptions dispensed by pharmacies included in the sample, weighted by prescription volume.  The resulting number is the average cost for all prescriptions, rather than the average for all pharmacies as in the unweighted mean. This implies that low volume pharmacies have a smaller impact on the weighted average than high volume pharmacies. This approach, in effect, sums all costs in the sample and divides that sum by the total of all prescriptions in the sample. The weighting factor can be either total prescription volume or Medicaid prescription volume.
>
> **Median:** the value that divides a set of observations (such as dispensing cost) in half. In the case of this survey, the median is the dispensing cost such that the cost of one half of the pharmacies in the set are less than or equal to the median and the dispensing costs of the other half are greater than or equal to the median.
>
> **Weighted Median:** This is determined by finding the pharmacy observation that encompasses the middle value prescription. The implication is that one half of the prescriptions were dispensed at a cost of the weighted median or less, and one half were dispensed at the cost of the weighted median or more.
>
> Suppose, for example, that there were 1,000,000 Medicaid prescriptions dispensed by the pharmacies in the sample. If the pharmacies were arrayed in order of dispensing cost, the median weighted by Medicaid volume, is the dispensing cost of the pharmacy that dispensed the middle, or 500,000th prescription.

Medians are often preferred to means in situations where the magnitude of outlier values results in an average that does not represent what is thought of as "average" or normal in the common sense. The measurement that is the most ideally suited for determining the typical cost of dispensing prescriptions to Medicaid recipients is the **median weighted by Medicaid volume.**

For all pharmacies in the sample, findings are presented in Table 3.2.



**Table 3.2 Cost Per Prescription – All Pharmacies**

|  | Dispensing Cost |
|---|---|
| Median Weighted by Medicaid Volume | **$5.16** |
| Median Weighted by Total Volume | $4.98 |
| Unweighted Median | $5.39 |
| Mean Weighted by Medicaid Volume | $5.52 |
| Mean Weighted by Total Volume | $5.43 |
| Unweighted Mean | $6.04 |

*(Dispensing Costs have been inflated to the common point of June 30, 2001)*

Chart 3.2 is a histogram of the dispensing cost for all pharmacies in the sample. There was a large range between the highest, $47.21, and lowest, $2.11, dispensing cost observed for pharmacies in the sample. The majority of pharmacies (303), however, had dispensing costs between $3.50 and $6.00.



The most significant characteristic that affected pharmacy dispensing cost was the provision of intravenous (I.V.) solutions. Our analysis revealed significantly higher costs of dispensing associated with the 6 pharmacies in the sample that provided significant levels of this service.

In every pharmacy dispensing study where information on I.V. solution dispensing activity has been collected by Myers and Stauffer, such activity has been found to be associated with higher dispensing costs. Discussions with pharmacists providing I.V. solutions indicate that the activities and costs involved in filling I.V. prescriptions are significantly different from the costs incurred by the typical retail (or long term care) pharmacy. The reasons for this difference include:

■ Costs of special equipment for mixing and storage of I.V. solutions.



- Higher direct labor costs because most I.V. prescriptions must be mixed in the pharmacy, whereas the manual activities to fill a non-I.V. prescription are mainly limited to counting pills (or vials, etc.) and printing and affixing the label.

- A pharmacy may mix and deliver many "dispensings" of a daily I.V. solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions.

This latter factor, in particular, can have a dramatic impact on increasing a pharmacy's apparent cost per prescription.

The differences in dispensing costs that were observed for providers of I.V. services compared to those pharmacies, which did not offer I.V. services are summarized in Table 3.3.

**Table 3.3  Cost Per Prescription  - I.V. Versus non I.V. Pharmacies**

| Type of Pharmacy | Number of Pharmacies | Unweighted Mean Cost | Standard Deviation | Median Cost Weighted by Medicaid Volume |
|---|---|---|---|---|
| Pharmacies Dispensing I.V. Prescriptions (>1% of Rx Sales) | 6 | $13.46 | $16.60 | $7.38 |
| Pharmacies Not Dispensing Significant I.V. Prescriptions | 515 | $5.96 | $2.22 | **$5.08** |

*(Dispensing Costs have been inflated to the common point of June 30, 2001)*

The average percentage of I.V. prescription sales for these 6 pharmacies was 24%. Based on analyses performed in other studies, pharmacies that dispense I.V. prescriptions as a significant portion of their business can have dispensing costs far in excess of those found in a traditional pharmacy. Based on our cost findings, it must be concluded that the costs incurred to dispense I.V. prescriptions are not representative of the costs incurred by a typical pharmacy. If the costs of I.V. services were to be included in the computation of a mean or median dispensing cost that was then used to establish a reimbursement rate, the effect would be to pay approximately 98% of pharmacies an additional allowance for a service they never provided. And, for those pharmacies providing I.V. services, the marginal increase in the fee would be immaterial in relation to the cost of actually dispensing an I.V. prescription.[8]

---

[8] Although typical dispensing fees reimburse less than the dispensing costs of I.V. pharmacies, they are generally able to break even based on the margin allowed on ingredient cost reimbursement.


Myers and Stauffer LC
Certified Public Accountants

Consequently, many of the analyses that follow, exclude providers that had dispensed a significant volume of I.V. prescriptions. Table 3.4 restates the measurements noted in Table 3.2 excluding pharmacies that dispensed significant volumes of I.V. prescriptions.

**Table 3.4 Costs Per Prescription – Excluding I.V. Pharmacies**

|  | Dispensing Cost |
|---|---|
| Median Weighted by Medicaid Volume | **$5.08** |
| Median Weighted by Total Volume | $4.95 |
| Unweighted Median | $5.38 |
| Mean Weighted by Medicaid Volume | $5.42 |
| Mean Weighted by Total Volume | $5.37 |
| Unweighted Mean | $5.96 |

*(Dispensing Costs have been inflated to the common point of June 30, 2001)*

**Analysis of Pharmacy Characteristics**

Responding pharmacies were categorized into various groups of interest and their dispensing costs analyzed to determine statistical significance. These characteristics include:

- Total prescription volume
- Chain versus independent pharmacy affiliation
- Urban versus rural pharmacy location
- Type of pharmacy ownership
- Total Medicaid volume
- Medicaid volume as a percent of total volume
- Provision of unit dose dispensing services

One way to determine the statistical significance of differences in dispensing cost between the pharmacies classified by the above referenced characteristics is through the use of a *t*-test. The sample data may show that a certain group of pharmacies has a sample mean lower or higher than another group. Recognizing that the data only represents a sample, a *t*-test is a statistical technique that seeks to determine if the findings are strong enough that a similar relationship can be expected to exist for the entire population. The *t*-test takes into consideration the sample's size, mean, and underlying variance. Although the preference of using a weighted median as a measurement of central tendency was previously explained, a *t*-test requires the comparison of the *unweighted mean* costs.

Exhibit 13 provides additional statistical measures including the standard error of the mean and confidence intervals. Confidence intervals given in Exhibit 13 were calculated using appropriate statistics from the *t* distribution at the 95%


Myers and Stauffer LC
Certified Public Accountants

# EXHIBIT AC





Sep 24 2008
1:13PM

# Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the State of California

Prepared for the

California Department of Health Services

December 2007



Myers and Stauffer LC

Certified Public Accountants

## Dispensing Cost Analysis and Findings

The dispensing costs for all pharmacies in the sample are summarized in the following tables and paragraphs. Findings for all pharmacies in the sample are presented collectively, and additionally are presented for subsets of the sample based on pharmacy characteristics. There are several statistical measurements that may be used to express the central tendency of a distribution, the most common of which are the average, or mean, and the median. Findings are presented in the forms of means and medians, both raw and weighted. [29]

As is typically the case with dispensing cost surveys, statistical "outliers" are a common occurrence. These outlier pharmacies have dispensing costs that are not typical of the majority of pharmacies. Medians are sometimes preferred to averages (i.e., the arithmetic mean) in situations where the magnitude of outlier values results in an average that does not represent what is thought of as "average" or normal in the common sense.

For all pharmacies in the sample, findings are presented in Table 3.2.

### Table 3.2 Dispensing Cost Per Prescription – All Responding Pharmacies

|  | Dispensing Cost |
|---|---|
| Unweighted Average (Mean) | $13.93 |
| Average (Mean) Weighted by Medi-Cal Volume | $12.40 |
| Unweighted Median | $11.64 |
| Median Weighted by Medi-Cal Volume | $10.45 |

*(Dispensing Costs have been inflated to the common point of December 31, 2006)*

See Exhibit 10 for a histogram of the dispensing cost for all pharmacies in the sample. There was a large range between the highest and the lowest dispensing

---

[29] **Different Measures of Central Tendency:**
**Unweighted mean:** the arithmetic average cost for all pharmacies.

**Weighted mean:** the average cost of all prescriptions dispensed by pharmacies included in the sample, weighted by prescription volume. The resulting number is the average cost for all prescriptions, rather than the average for all pharmacies as in the unweighted mean. This implies that low volume pharmacies have a smaller impact on the weighted average than high volume pharmacies. This approach, in effect, sums all costs in the sample and divides that sum by the total of all prescriptions in the sample. The weighting factor can be either total prescription volume or Medicaid prescription volume.

**Median:** the value that divides a set of observations (such as dispensing cost) in half. In the case of this survey, the median is the dispensing cost such that the cost of one half of the pharmacies in the set are less than or equal to the median and the dispensing costs of the other half are greater than or equal to the median.

**Weighted Median:** this is determined by finding the pharmacy observation that encompasses the middle value prescription. The implication is that one half of the prescriptions were dispensed at a cost of the weighted median or less, and one half were dispensed at the cost of the weighted median or more. Suppose, for example, that there were 1,000,000 Medicaid prescriptions dispensed by the pharmacies in the sample. If the pharmacies were arrayed in order of dispensing cost, the median weighted by Medicaid volume, is the dispensing cost of the pharmacy that dispensed the middle, or 500,000[th] prescription.



Myers and Stauffer LLC
Certified Public Accountants

cost observed for pharmacies in the sample. However, the majority of pharmacies (82%) had dispensing costs between approximately $7 and $18.

Several pharmacies included in the cost analysis were identified as specialty pharmacies, which for purposes of this report are pharmacies that reported sales for intravenous, home infusion, enteral nutrition and/or blood factor services of 10% or more of total prescription sales.  In addition to specialty pharmacies, several pharmacies were identified as compounding pharmacies which for purposes of this report are pharmacies that that reported provision of compounding services for 10% or more of prescriptions dispensed.  (The category of pharmacies considered "compounding pharmacies" for purposes of this report excludes pharmacies previously classified as "specialty pharmacies".) The analysis revealed significantly higher cost of dispensing associated with 32 pharmacies in the sample that provided significant levels of specialty or compounding services. [30]

The difference in dispensing costs that were observed for providers of specialty services compared to those pharmacies that did not offer these specialty services is summarized in Table 3.3.

**Table 3.3  Dispensing Cost Per Prescription  - Specialty, Compounding and Other Pharmacies**

| Type of Pharmacy | Number of Pharmacies | Unweighted Average (Mean) Dispensing Cost | Standard Deviation |
|---|---|---|---|
| Specialty Pharmacies (e.g., intravenous, home infusion, enteral nutrition, blood factor products) | 18 | $95.32 | $90.93 |
| Compounding Pharmacies | 14 | $17.15 | $19.68 |
| Other Pharmacies | 1,107 | $12.57 | $5.37 |

*(Dispensing Costs have been inflated to the common point of December 31, 2006)*

---

[30] In every pharmacy dispensing study where information on intravenous solution, home infusion, enteral nutrition and blood factor product dispensing activity has been collected by Myers and Stauffer, such activity has been found to be associated with higher dispensing costs.  Discussions with pharmacists providing these services indicate that the activities and costs involved in these specialty prescriptions are significantly different from the costs incurred by the traditional retail or institutional pharmacy. The reasons for this difference include:

- Costs of special equipment for mixing and storage of specialty products.
- Higher direct labor costs because most specialty prescriptions must be prepared in the pharmacy, whereas the manual activities to fill traditional prescription are mainly limited to counting pills (or vials, etc.) and printing and affixing the label.
- There is often inconsistency in the manner in which prescriptions are counted in specialty pharmacies.  A specialty pharmacy may mix and deliver many "dispensings" of a daily intravenous, home infusion or blood factor product from a single prescription, counting it in their records as only one prescription.  This results in dispensing costs being spread over a number of prescriptions that is smaller than if the pharmacy had counted each refill as an additional prescription.

This latter factor, in particular, can have a dramatic impact on increasing a pharmacy's calculated cost per prescription.

Myers and Stauffer LC
Certified Public Accountants

Pharmacies that dispense specialty prescriptions as a significant part of their business often have dispensing costs in excess of those found in a traditional pharmacy.  The analyses summarized in Tables 3.4 and 3.5 below exclude the 32 specialty and compounding pharmacy providers.  In making this exclusion, no representation is made that the cost structure of those pharmacies is not important to understand.  However, it is reasonable to address issues relevant to those pharmacies separately from the cost structure of the vast majority of Medi-Cal pharmacy providers that provide "traditional" pharmacy services.

Table 3.4 restates the measurements noted in Table 3.2 excluding pharmacies that dispensed significant volumes of specialty and compounded prescriptions.

**Table 3.4  Dispensing Cost Per Prescription –  Excluding Specialty and Compounding Pharmacies**

| | Dispensing Cost |
|---|---|
| Unweighted Average (Mean) | $12.57 |
| Average (Mean) Weighted by Medi-Cal Volume | $10.81 |
| Unweighted Median | $11.52 |
| Median Weighted by Medi-Cal Volume | $10.27 |

*(Dispensing Costs have been inflated to the common point of December 31, 2006)*

Additional statistical measures of pharmacy dispensing cost are provided in Exhibit 11.  For measurements that refer to the urban or rural location of a pharmacy, Myers and Stauffer used the pharmacies' zip code and tables from the U.S. Census Bureau to determine if the pharmacy was located in a Metropolitan Statistical Area (MSA).  Pharmacies in an MSA were assigned an "urban" location flag; other pharmacies were assigned a "rural" location flag. A table of zip codes and their designation as urban or rural is included at Exhibit 12.

A breakdown of dispensing cost by region is included at Exhibit 13.

The relationship between total prescription volume and dispensing cost was especially pronounced.  Pharmacies were classified into meaningful groups based upon their differences in total prescription volume. Dispensing costs were analyzed based upon these volume classifications.


Myers and Stauffer LLC
Certified Public Accountants

**Table 3.5 Dispensing Cost by Pharmacy Total Annual Prescription Volume**

| Total Annual Prescription Volume of Pharmacy | Number of Stores[A] | Unweighted Average (Mean) Dispensing Cost | Average (Mean) Weighted by Medicaid Volume |
|---|---|---|---|
| 0 to 29,999 | 232 | $17.76 | $15.23 |
| 30,000 to 44,999 | 220 | $12.59 | $11.76 |
| 45,000 to 59,999 | 234 | $11.41 | $11.16 |
| 60,000 to 79,999 | 230 | $10.56 | $9.93 |
| 80,000 and Higher | 191 | $10.06 | $9.86 |

[A] Excludes 32 specialty and compounding pharmacies as previously defined for purposes of this report.

There is a significant correlation between a pharmacy's total prescription volume and the dispensing cost per prescription. This result is not surprising because many of the costs associated with a business operation, including the dispensing of prescriptions, have a fixed component that does not vary significantly with increased volume. For stores with a higher total prescription volume, these fixed costs are spread over a greater number of prescriptions resulting in lower costs per prescription. A number of relatively low volume pharmacies in the survey skew the distribution of dispensing cost and increase the measurement of the unweighted average (mean) cost of dispensing.

**Table 3.6 Statistics for Pharmacy Total Annual Prescription Volume**

| Statistic | Value [A] |
|---|---|
| Mean | 58,865 |
| Standard Deviation | 46,962 |
| 10th Percentile | 21,925 |
| 25th Percentile | 33,016 |
| Median | 51,180 |
| 75th Percentile | 72,481 |
| 90th Percentile | 95,204 |

[A] Excludes 32 specialty and compounding pharmacies as previously defined for purposes of this report.

A histogram of pharmacy total annual prescription volume and a scatter-plot of the relationship between dispensing cost per prescription and total prescription volume are included in Exhibit 14.

Other notable breakdowns of pharmacy dispensing cost include the differences in dispensing cost noted for institutional versus retail pharmacies as well as chain retail pharmacies versus independent retail pharmacies. For purposes of this report, an institutional pharmacy is one which dispensed 50% or more of


Myers and Stauffer LC
Certified Public Accountants

prescriptions reimbursed by Medi-Cal to recipients of a long-term care (LTC) facility (based on Medi-Cal claims data for the time period of January 1, 2006 to June 30, 2006).

**Table 3.7 Dispensing Cost by Pharmacy Type**

| Type of Pharmacy | Number of Stores[A] | Unweighted Average (Mean) Dispensing Cost | Average (Mean) Weighted by Medi-Cal Volume |
|---|---|---|---|
| Institutional (LTC) | 12 | $13.61 | $11.47 |
| Retail Pharmacies (i.e., not "institutional") | 1,095 | $12.56 | $10.78 |
| Chain Retail Pharmacies | 799 | $12.94 | $11.20 |
| Independent Retail Pharmacies | 296 | $11.52 | $10.27 |

[A] Excludes 32 specialty and compounding pharmacies as previously defined for purposes of this report.

Several pharmacy attributes were collected on the cost survey. A summary of these attributes is provided at Exhibit 15.

## Components of Dispensing Cost

The dispensing cost of the surveyed pharmacies was broken down into the various components of overhead and labor related costs. Table 3.8 displays the means of the various cost components for pharmacies in the sample. Labor-related expenses accounted for approximately 70% of overall prescription dispensing costs.

Expenses in Table 3.8 are classified as follows:

- Owner professional labor – owner's labor costs were subject to constraints in recognition of its special circumstances as previously noted.

- Employee professional labor consists of employee pharmacists. Other labor includes the cost of delivery persons, interns, technicians, clerks and any other employee with time spent performing the prescription dispensing function of the pharmacy.

- Building and equipment expense includes depreciation, rent, building ownership costs, repairs, utilities and any other expenses related to building and equipment.


Myers and Stauffer LC
Certified Public Accountants

- Prescription-specific expense includes pharmacist-related dues and subscriptions, prescription containers and labels, prescription-specific computer expenses, prescription-specific delivery expenses (other than direct labor costs) and any other expenses that are specific to the prescription dispensing function of the pharmacy.

- Other overhead expenses consist of all other expenses that were allocated to the prescription dispensing function of the pharmacy including interest, insurance, telephone, and legal and professional fees.

**Table 3.8 Components of Prescription Dispensing Cost**

| Type of Expense | Unweighted Average (Mean) Dispensing Cost [A] | Average (Mean) Weighted by Medi-Cal Volume [A] |
|---|---|---|
| Owner Professional Labor | 1.233 | $1.444 |
| Employee Professional and Other Labor | 8.367 | $6.399 |
| Building and Equipment | 0.815 | $0.735 |
| Prescription Specific Expenses (incl. delivery) | 0.849 | $0.945 |
| Other Overhead Expenses | 1.299 | $1.286 |
| **Total** | **12.563** | **$10.809** |

[A] Excludes 32 specialty and compounding pharmacies as previously defined for purposes of this report.

A pie chart of the components of prescription dispensing cost is provided in Exhibit 16.

## Expenses Not Allocated to the Cost of Dispensing

In the following Table 3.9, measurements are provided for certain expenses that were not included in the cost of dispensing. Reasons for not including these costs were discussed previously. For all of the expenses below, average cost per prescription was calculated using a sales ratio as the basis for allocation.



Myers and Stauffer LC
Certified Public Accountants

**Table 3.9 Non-Allocated Expenses Per Prescription**

| Expense Category | Unweighted Average (Mean) Cost [A] | Average (Mean) Weighted by Medi-Cal Volume [A] |
|---|---|---|
| Bad Debts | $0.028 | $0.039 |
| Charitable Contributions | $0.012 | $0.009 |
| Advertising | $0.528 | $0.394 |

[A] Excludes 32 specialty and compounding pharmacies as previously defined for purposes of this report.



EXHIBIT AD

# Analysis of Pharmacy Dispensing Fees for the Indiana Medicaid Program

Prepared for the
Indiana Office of Medicaid Policy and Planning
Indianapolis, Indiana

August 2005



Myers and Stauffer LC

Certified Public Accountants





JDIND00270

## Inflation Factors

All allocated costs for overhead and labor were totaled and multiplied by an inflation factor.  Inflation factors are intended to reflect cost changes from the middle of the reporting period of a particular pharmacy to a common fiscal period ending June 30, 2005 (specifically from the *midpoint* of the pharmacy's fiscal year to the *midpoint* of the common fiscal period, December 31, 2004). The midpoint and terminal month indices used were taken from the U. S. Government Consumer Price Index (CPI), Urban Consumer (see Exhibit 6).  The use of inflation factors is necessary in order for pharmacy cost data from various fiscal years to be compared uniformly.

## Analysis and Findings

The dispensing costs for all pharmacies in the sample are summarized in the following tables and paragraphs.  Findings for all pharmacies in the sample are presented collectively, and additionally are presented for subsets of the sample based on pharmacy characteristics.  There are several statistical measurements that may be used to express the central tendency of a distribution, the most common of which are the average, or mean, and the median (see sidebar). Findings are presented in the forms of means and medians, both raw and weighted.

As is typically the case with dispensing cost surveys, statistical "outliers" are a common occurrence. These outlier pharmacies have dispensing costs that are not typical of the majority of pharmacies.

Medians are sometimes preferred to averages (i.e., the arithmetic mean) in situations where the magnitude of outlier values results

> *Different Measures of Central Tendency:*
>
> **Unweighted mean:** the arithmetic average cost for all pharmacies.
>
> **Weighted mean:** the average cost of all prescriptions dispensed by pharmacies included in the sample, weighted by prescription volume.  The resulting number is the average cost for all prescriptions, rather than the average for all pharmacies as in the unweighted mean. This implies that low volume pharmacies have a smaller impact on the weighted average than high volume pharmacies. This approach, in effect, sums all costs in the sample and divides that sum by the total of all prescriptions in the sample. The weighting factor can be either total prescription volume or Medicaid prescription volume.
>
> **Median:** the value that divides a set of observations (such as dispensing cost) in half. In the case of this survey, the median is the dispensing cost such that the cost of one half of the pharmacies in the set are less than or equal to the median and the dispensing costs of the other half are greater than or equal to the median.
>
> **Weighted Median:** this is determined by finding the pharmacy observation that encompasses the middle value prescription. The implication is that one half of the prescriptions were dispensed at a cost of the weighted median or less, and one half were dispensed at the cost of the weighted median or more.
>
> Suppose, for example, that there were 1,000,000 Medicaid prescriptions dispensed by the pharmacies in the sample. If the pharmacies were arrayed in order of dispensing cost, the median weighted by Medicaid volume, is the dispensing cost of the pharmacy that dispensed the middle, or $500,000^{th}$ prescription.



Myers and Stauffer ᴸᴄ

JDIND00292

in an average that does not represent what is thought of as "average" or normal in the common sense.

For all pharmacies in the sample, findings are presented in Table 3.2.

**Table 3.2 Cost Per Prescription – All Pharmacies**

|  | Dispensing Cost |
|---|---|
| Unweighted Average (Mean) | $9.53 |
| Average (Mean) Weighted by Medicaid Volume | $8.26 |
| Unweighted Median | $7.39 |
| Median Weighted by Medicaid Volume | $7.48 |

*(Dispensing Costs have been inflated to the common point of December 31, 2004)*

Chart 3.2 is a histogram of the dispensing cost for all pharmacies in the sample. There was a large range between the highest, over $300, and the lowest, $3.65, dispensing cost observed for pharmacies in the sample. The majority of pharmacies (78%), however, had dispensing costs between $5 and $10.

**Chart 3.2 Dispensing Cost by Pharmacy**



Several pharmacies included in the cost analysis were identified as specialty pharmacies, which for purposes of this report are those pharmacies where intravenous, infusion, or blood factor prescriptions constituted 4% or more of their volume of prescription sales dollars. The analysis revealed significantly higher cost of dispensing associated with 11 pharmacies in the sample that provided significant levels of these services.

In every pharmacy dispensing study where information on I.V. solution, home infusion and blood factor product dispensing activity has been collected by Myers



24

and Stauffer, such activity has been found to be associated with higher dispensing costs.  Discussions with pharmacists providing these services indicate that the activities and costs involved in these specialty prescriptions are significantly different from the costs incurred by the traditional retail or institutional pharmacy.[11]  The reasons for this difference include:

- Costs of special equipment for mixing and storage of specialty products.

- Higher direct labor costs because most specialty prescriptions must be prepared in the pharmacy, whereas the manual activities to fill traditional prescription are mainly limited to counting pills (or vials, etc.) and printing and affixing the label.

- There is often inconsistency in the manner in which prescriptions are counted in specialty pharmacies.  A specialty pharmacy may mix and deliver many "dispensings" of a daily I.V., home infusion or blood factor product from a single prescription, counting it in their records as only one prescription.  This results in dispensing costs being spread over a number of prescriptions that is smaller than if the pharmacy had counted each refill as an additional prescription.

This latter factor, in particular, can have a dramatic impact on increasing a pharmacy's calculated cost per prescription.

The difference in dispensing costs that were observed for providers of specialty services compared to those pharmacies that did not offer these specialty services is summarized in Table 3.3.

**Table 3.3  Cost Per Prescription  - Specialty Versus Other Pharmacies**

| Type of Pharmacy | Number of Pharmacies | Unweighted Average (Mean) Cost | Standard Deviation |
|---|---|---|---|
| Specialty Pharmacies (e.g., I.V. or infusion) | 11 | $65.31 | $116.72 |
| Other Pharmacies | 390 | $7.95 | $2.95 |

*(Dispensing costs have been inflated to the common point of December 31, 2004)*

Pharmacies that dispense specialty prescriptions as a significant part of their business often have dispensing costs far in excess of those found in a traditional pharmacy.  The analyses summarized in Tables 3.4 and 3.5 below exclude the 11 specialty pharmacy providers.  In making this exclusion, no representation is made that the cost structure of those pharmacies is not important to understand.  However, it is reasonable to address issues relevant to those pharmacies

---

[11] For purpose of this report, institutional pharmacies are those pharmacies where 70% or more of their prescriptions were to nursing facility residents.

Myers and Stauffer LC
Certified Public Accountants

JDIND00294

separately from the cost structure of the vast majority of Indiana Medicaid pharmacy providers that provide "traditional" pharmacy services.

Table 3.4 restates the measurements noted in Table 3.2 excluding pharmacies that dispensed significant volumes of specialty prescriptions.

**Table 3.4  Cost Per Prescription –  Excluding Specialty Pharmacies**

|  | Dispensing Cost |
|---|---|
| Unweighted Average (Mean) | $7.95 |
| Average (Mean) Weighted by Medicaid Volume | $8.07 |
| Unweighted Median | $7.30 |
| Median Weighted by Medicaid Volume | $7.19 |

*(Dispensing costs have been inflated to the common point of December 31, 2004)*

Additional statistical measures of pharmacy dispensing cost are provided in Exhibit 7.

## Analysis of Pharmacy Net Margins

To analyze pharmacy profitability, Myers and Stauffer utilized the dispensing cost survey data to directly calculate net margins for pharmacies participating in the survey.  Net margins are presented in two ways:  on a percentage basis, and on a per prescription basis.

In its most basic form, net margins on a percentage basis are the result of the following calculation:

$$\text{Percent Net Margin} = \frac{(\text{Rx Sales}) - (\text{Rx Cost of Goods}) - (\text{Rx Dispensing Related Costs})}{(\text{Rx Sales})}$$

Similarly, margins on a per prescription basis resulted from the following calculation:

$$\text{Net Margin per Rx} = \frac{(\text{Rx Sales}) - (\text{Rx Cost of Goods}) - (\text{Rx Dispensing Related Costs})}{(\text{Total Number of Rxs Dispensed})}$$

In both cases, the estimate of pharmacy net margins is exclusively associated with the prescription dispensing function of the pharmacy.  No attempt was made to quantify the profitability of the non-prescription related aspects of pharmacy operations.

The determination of prescription dispensing-related cost resulted from the cost-finding methodologies described above.  Additionally, allowable dispensing costs


Myers and Stauffer lc
Certified Public Accountants

JDIND00295

# EXHIBIT AE



EXHIBIT

Abbott 21
1-11-07

# Determination of the Cost of Dispensing Pharmaceutical Prescriptions For the Texas Vendor Drug Program

Prepared for the
Texas Health and Human Services Commission
Austin, Texas

August 2002



Myers and Stauffer LC

Certified Public Accountants



Chapter

# 1

# Executive Summary

## Introduction

Under contract to the Texas Health and Human Services Commission, Myers and Stauffer LC performed a study of the cost of dispensing prescription medications to Medicaid recipients.  This report includes a narrative of the methodologies and findings relevant to the survey of dispensing costs.

The dispensing cost study followed the methodology and used a survey instrument similar to those used by Myers and Stauffer in Medicaid pharmacy engagements in 18 other states.  A stratified random sample of Texas pharmacy providers enrolled in the Medicaid program were surveyed; 703 pharmacies filed dispensing cost surveys that could be included in the study. All data received including the dispensing cost surveys were subject to extensive desk review procedures.  Additionally, 31 pharmacies were selected for on-site field examinations to validate reported costs.

## Summary of Findings

The significant findings of the study are as follows:

- **The statewide median cost of dispensing, weighted by Medicaid volume, was $5.95.**

Table 1.1 Dispensing Cost[A] for Texas Pharmacies

| Pharmacies Included in Analysis [B] | 650 |
|---|---|
| **Weighted Median [C]** | **$5.95** |
| Weighted Mean [C] | $6.16 |
| Unweighted Mean | $6.96 |

[A] Inflated to June 30, 2002.
[B] Excludes pharmacies that dispensed intravenous, home infusion or compounded prescriptions.
[C] Weighted by Medicaid volume.

- Average dispensing cost at certain pharmacy specialties was observed to be higher than dispensing cost at "typical" retail pharmacies.  In particular we noted higher dispensing cost associated with pharmacies that provided services related to the dispensing of intravenous, home infusion and



Myers and Stauffer LC
Certified Public Accountants

compounded prescriptions.

- There was some association between dispensing cost and the urban or rural location of a pharmacy. Pharmacies in urban areas tended to have higher dispensing costs. This was noted to be particularly the case for labor related costs.

- No association was found between dispensing cost and unit-dose packaging or other measures of long term care dispensing activity; i.e., ambulatory and long term care pharmacies had similar mean costs of dispensing.

- No systematically higher costs associated with pharmacies that have a higher percentage of Medicaid prescription volume were found.

## Conclusions and Recommendations

The Commission's current pharmacy dispensing fee results in average payments that are slightly higher than the median cost of dispensing prescriptions[1]. Any overall evaluation of the adequacy of current pharmacy reimbursement rates should consider findings related to dispensing cost in tandem with an analysis of ingredient reimbursement rates and the cost pharmacies incur acquiring prescription medications. Similarly, possible modifications to reimbursement policies should consider both dispensing and acquisition cost aspects of reimbursement. Should the Commission desire to modify its current dispensing fee, several options are available:

1) Continued Use of a Variable Dispensing Fee:
The Commission currently utilizes a dispensing fee that is variable based upon the ingredient cost of the medication being dispensed (i.e. the inventory management factor). A distinct disadvantage to the variable dispensing fee is that there is little correlation between the actual cost to dispense and the cost of the medication being dispensed provided that similar medication forms are being compared (e.g. dispensing a prescription of 30 pills of a low-cost generic medication requires essentially the same commitment of resources as dispensing a prescription of 30 pills of an expensive brand-name product). Furthermore, increases in drug cost (whether due to manufacturer price increases or the introduction of new and more expensive products) causes increases in the dispensing fee at a rate that is typically higher than the rate of inflation for overhead and labor dispensing costs.

One advantage of the variable dispensing fee methodology is that dispensing fees paid for certain specialty products that require special preparation (e.g. intravenous and home infusion products) are higher on average due to the high

---

[1] While the Commission's base dispensing fee is $5.27, the actual average dispensing fee is approximately $6.10 to $6.40 with the inventory management factor add-on to the dispensing fee.


Myers and Stauffer LC
Certified Public Accountants

4

cost of the drug ingredients typically used in these prescriptions.  However, the current overall cap on the dispensing fee of $200 does appear to be out of proportion to actual dispensing costs observed.

2) Flat Rate Dispensing Fee:
Most states and private insurers use a single, flat rate dispensing fee.  These fees are administratively simple to use and are readily understood by all providers.  Should the Commission decide to set such a fee, it would be appropriate to set the fee considering the actual dispensing costs incurred in an efficient pharmacy operation.

The dispensing cost study considered several pharmacy attributes to determine if dispensing costs were significantly different based on variables of pharmacy affiliation, location, and specialty.  For many tested attributes, we did not observe statistically significant differentials in dispensing cost.  We did, however, observe systemically higher dispensing cost associated with pharmacies that specialize in dispensing intravenous and compounded prescriptions.  Several significant issues related to these pharmacy specialties are addressed in the study, and one possibility for the Commission to consider is to set multiple flat rate pharmacy dispensing fees specific to certain specialties.  We note, however, that many Medicaid pharmacy programs have successfully operated using a single dispensing fee for all pharmacy types.  A single dispensing fee must be considered in conjunction with ingredient reimbursement such that overall levels of reimbursement are sufficient to guarantee sufficient participation of various pharmacy specialties.

3) Combination of a Variable Dispensing Fee and a Flat Rate Dispensing Fee
 Alternatively, the Commission could evaluate implementing a flat rate dispensing fee to be used in "traditional" pharmacy settings, while maintaining the variable dispensing fee for use among certain pharmacy specialty types.  Such a combination would maintain the most advantageous aspects of the variable dispensing fee, yet set the reimbursement for the vast majority of "traditional" prescriptions in a manner consistent with the most widely utilized dispensing fee methodology (i.e., a flat rate).



For all pharmacies in the sample, dispensing cost findings are presented in Table 3.2.

**Table 3.2 Cost Per Prescription – All Pharmacies**

|  | Dispensing Cost[1] |
|---|---|
| Unweighted Mean | $9.12 |
| Mean Weighted by Medicaid Volume | $6.58 |
| Unweighted Median | $6.48 |
| Median Weighted by Medicaid Volume | $6.11 |

[1] Dispensing Costs have been inflated to the common point of June 30, 2002.

Chart 3.2 is a histogram of the dispensing cost for all pharmacies in the sample. There was a large range between the highest and lowest dispensing cost observed for pharmacies in the sample. The majority of pharmacies (75%), however, had dispensing costs between $4 and $8.

**Chart 3.2 Dispensing Cost by Pharmacy**



The two most significant characteristics that affected pharmacy dispensing cost were the provision of intravenous or home infusion solutions and the provision of pharmaceutical compounding services. Our analysis revealed significantly higher cost of dispensing associated with the 53 pharmacies in the sample that provided these services.

In every pharmacy dispensing study where information on intravenous solution and home infusion dispensing activity has been collected by Myers and Stauffer,



such activity has been found to be associated with higher dispensing costs. Discussions with pharmacists providing intravenous solutions indicate that the activities and costs involved in filling intravenous prescriptions are significantly different from the costs incurred by the typical retail (or long term care) pharmacy. The reasons for this difference include:

- Costs of special equipment for mixing and storage of intravenous solutions.

- Higher direct labor costs because most intravenous prescriptions must be mixed in the pharmacy, whereas the manual activities to fill a non- intravenous prescription are mainly limited to counting pills (or vials, etc.) and printing and affixing the label.

- A pharmacy may mix and deliver many "dispensings" of a daily intravenous solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions.

This latter factor, in particular, can have a dramatic impact on increasing a pharmacy's apparent cost per prescription.

Similar to the dispensing of intravenous prescriptions, the provision of complex pharmaceutical compounding services was also observed to be associated with significantly higher cost.

The differences in dispensing costs which were observed for providers of intravenous or compounding services compared to those pharmacies that did not offer these services are summarized in Table 3.3.

**Table 3.3  Cost Per Prescription  - Intravenous / Compounding Pharmacies Versus other Pharmacies**

| Type of Pharmacy | Number of Pharmacies | Unweighted Mean Cost[1] | Standard Deviation |
|---|---|---|---|
| Pharmacies Dispensing Intravenous  / Home Infusion Prescriptions | 43 | $41.75 | $72.59 |
| Pharmacies Dispensing Compounded Prescriptions (but not intravenous Rxs) | 10 | $9.13 | $5.48 |
| Pharmacies Not Dispensing Intravenous or Compounded Prescriptions | 650 | $6.96 | $2.46 |

[1] Dispensing Costs have been inflated to the common point of June 30, 2002.


Myers and Stauffer LC
Certified Public Accountants

Based on this analysis and analyses performed in other studies, pharmacies that dispense intravenous or compounded prescriptions as a significant part of their business can have dispensing costs far in excess of those found in a traditional pharmacy.  Based on our cost findings, it must be concluded that the costs incurred to dispense intravenous or compounded prescriptions are not representative of the costs incurred by a general pharmacy. If the costs of intravenous and compounding services were to be included in the computation of an mean or median dispensing cost that was then used to establish a reimbursement rate, the effect would be to pay approximately 95% of pharmacies an additional allowance for a service they never provided.  And, for those pharmacies providing intravenous services, the marginal increase in the fee would be immaterial in relation to the cost of actually dispensing an intravenous or compounded prescription.[11]

Consequently, many of the analyses that follow exclude providers that had dispensed a significant volume of intravenous or compounded prescriptions. Table 3.4 restates the measurements noted in Table 3.2 excluding pharmacies that dispensed significant volumes of intravenous or compounded prescriptions.

Additional comments regarding pharmacies that dispense intravenous or compounded prescriptions is included in Appendix D.

**Table 3.4  Cost Per Prescription –  Excluding Intravenous and Compounding Pharmacies**

|  | Dispensing Cost |
|---|---|
| Unweighted Mean | $6.96 |
| Mean Weighted by Medicaid Volume | $6.16 |
| Unweighted Median | $6.42 |
| **Median Weighted by Medicaid Volume** | **$5.95** |

[1] Dispensing Costs have been inflated to the common point of June 30, 2002.

**Analysis of Pharmacy Characteristics**

Responding pharmacies were categorized into various groups of interest and their dispensing costs analyzed to determine statistical significance.  These characteristics include:

- Total prescription volume

- Chain versus independent pharmacy affiliation

- Urban versus rural pharmacy location

---

[11] Although typical dispensing fees reimburse less than the dispensing costs of intravenous pharmacies, they are generally able to break even based on the margin allowed on ingredient cost reimbursement.  Compounding pharmacies predominantly market their services to self-pay customers and do not solicit Medicaid reimbursement for most compounding services.

Myers and Stauffer lc
Certified Public Accountants

## Appendix D. Dispensing Cost Issues for Institutional, Intravenous, Home Infusion and Compounding Pharmacies

Based on previous experience performing dispensing cost studies, Myers and Stauffer has become aware of specific concerns relating to the dispensing costs of certain pharmacy specialties.  Paramount among the concerns expressed are the dispensing costs of pharmacies that dispense prescriptions to residents of long-term care facilities, pharmacies that dispense intravenous or home infusion prescriptions, and pharmacies that provide specialty prescription compounding services.  This appendix includes a discussion of issues specific to these pharmacy types.

### Institutional Pharmacies

The survey data supported the conclusion that there was not a statistically significant difference in dispensing cost for pharmacies that primarily serviced long-term care facilities versus pharmacies with a more traditional retail structure. It was noteworthy that these institutional pharmacies are operated in a distinctly different manner than a traditional retail pharmacy.  One primary consideration is that these pharmacies tended to be very high volume pharmacies.  As noted previously in the report, pharmacies with a high prescription volume tend to be more efficient with lower dispensing costs per prescription.

Institutional pharmacies typically provide services not offered in many retail pharmacies.  This includes a heavier reliance on delivery services and unit dose dispensing systems.   While there may be higher labor and overhead costs associated with the prescription delivery and packaging of unit dose prescriptions, there are also efficiencies associated with the "assembly line" production style of the pharmacy.  In contrast, traditional retail pharmacies dispense prescriptions "one at a time" as customers come to the store or as physician office calls are received.  The greater control over the queuing of prescription requests in an institutional pharmacy creates a significant advantage in terms of scheduling the optimal amount of labor required to perform prescription dispensing functions.

It is also noteworthy that institutional pharmacies often provide other services to nursing homes beyond the typical prescription dispensing services offered in a retail pharmacy.  This includes the services of a consultant pharmacist in the

---

[16] Myers and Stauffer tried to delineate the issue of allowing prescription sales on credit to imply that a pharmacy maintained its own accounts receivables balance as opposed to merely accepting credit cards as a form of payment.  However, there apparently was some confusion on this issue; therefore the results obtained do not appear to represent "sales on credit" in the manner intended.

Myers and Stauffer LC
Certified Public Accountants

41

long-term care facility as well as medication carts, emergency medication kits and various expanded inventory control procedures. It is also significant to note that these additional services are provided as the result of a direct contractual relationship between the institutional pharmacy and the long-term care facility. Remuneration to the pharmacies for these services is subject to the provisions of those contractual relationships. Consequently, any cost for these pharmaceutical consulting services would be reported to Medicaid via the *nursing facility cost report*. It would therefore be inappropriate to include these consulting services in a survey of the cost of *dispensing* prescription medications. To the extent that such costs could be explicitly identified, the costs associated with consultant pharmacists were not included in the analysis of dispensing cost.

**Intravenous and Home Infusion Pharmacies**
A small number of pharmacies that responded to the dispensing cost survey indicated that a significant portion of their business consisted of filling intravenous or home infusion prescriptions. In every dispensing cost survey performed by Myers and Stauffer in which data on the provision of intravenous services was collected, the provision of this service has been associated with higher dispensing costs.

There is some difficulty, however, in determining an average dispensing cost for this type of activity with any degree of stability. Reasons for this include the following:

▪ There is a significant inconsistency in the way in which pharmacies count the number of intravenous prescriptions dispensing. A pharmacy may mix and deliver many "dispensings" of a daily intravenous solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions. Alternatively, some pharmacies count each daily dispensing individually.

▪ Many pharmacies that dispense intravenous prescriptions also dispense traditional prescriptions. The task of segregating intravenous and traditional dispensing costs is made difficult by the combined approach to financial and prescription record keeping which make it difficult to isolate costs associated with the dispensing of intravenous prescriptions.

▪ Based on a review of the literature, there is also considerable variability in the labor and equipment cost inputs into various types of intravenous prescriptions.

Because of these factors, Myers and Stauffer has typically seen extreme variation in the dispensing cost calculated for pharmacies that provide intravenous prescription services. In the current survey, the dispensing cost in the 43 responding pharmacies that dispensed intravenous prescriptions ranged from approximately $6.00 to over $100. The mean dispensing cost was $41.75, but it should be noted that this mean is highly unstable (i.e. there was a very high standard deviation).



Myers and Stauffer ᴸᶜ
Certified Public Accountants

42

One of the reasons it is difficult to determine a stable average dispensing cost for pharmacies that provide intravenous prescriptions is the low number of pharmacies for which data is collected in each survey. Additionally, the proportion of intravenous prescriptions filled at each pharmacy is highly variable.

To better understand dispensing cost in these pharmacies, Myers and Stauffer performed an analysis of the dispensing cost from data collected on over 100 surveys in recent years (inflation adjusted to calendar year 2002). Data for this analysis includes pharmacies in Texas, but was also supplemented by data from other states. Although each of these pharmacies had indicated on the survey forms that they dispensed intravenous prescriptions, most of these pharmacies also dispensed traditional prescriptions as well. After calculating a cost of dispensing for each pharmacy, statistical regression techniques were used in an attempt to isolate the costs associated strictly with the dispensing of intravenous prescriptions.

Although the analysis should not be considered comprehensive, the data suggests that dispensing costs ranging from $20 to $40 per intravenous prescription would be considered typical. In addition to variable states of efficiency in these pharmacies, it should be noted that there are various levels of complexity associated with dispensing intravenous prescriptions. A pharmacy's utilization mix of dispensing various types of intravenous prescriptions can have a significant effect on dispensing cost. It is therefore possible that some pharmacies could very well have dispensing costs in excess of $40 per prescription.

Under current policies, the Health and Human Services Commission reimburses for intravenous prescriptions in a dispensing fee plus ingredient reimbursement formula similar to traditional retail prescriptions. Although dispensing costs at intravenous pharmacies appears to be in excess of the current base dispensing fee ($5.27), this reimbursement methodology has been accepted by these pharmacies likely due to the inventory management add-on to the dispensing fee (which can be significant on the expensive drugs traditionally dispensed in intravenous forms) and the margin on ingredient reimbursement which has allowed pharmacies to offset any shortfall from the base dispensing fee.

In recent years, some states have dealt with the issue of intravenous prescription reimbursement rates *in light of reduced ingredient reimbursement*. For example, the state of Utah recently adopted "revised AWPs" for certain products based on the recommendations of the United States Department of Justice and the National Association of Medicaid Fraud Control Units (NAMFCU).[17] Products with these "revised AWPs" were primarily injectable, infusion, and inhalation drugs. Subsequent to the adoption of these prices, intravenous and home infusion pharmacies alleged that the margins on ingredient reimbursement were no longer sufficient such that they could accept the typical Medicaid dispensing fee. As a result of these allegations, the state of Utah created alternate

---

[17] "Medicaid's Use of Revised Average Wholesale Price." Department of Health and Human Services, Office of the Inspector General, OEI-03-01-00010, September 2001.



43

dispensing fees primarily for home infusion pharmacies. The rates were set through a negotiated process and varied based on the perceived level of input costs required to fill the prescription. Table D.1 shows the various dispensing fee categories created by Utah Medicaid.

**Table D.1 Utah Medicaid Home Infusion Drug Categories[18]**

| Dispensing Fee Category | Level of Service | Current Dispensing Fee |
|---|---|---|
| Category 'B' or 'C' | Traditional: technician input point-of-sale; pharmacist input; fixed overhead costs | $3.90 or $4.40 |
| Category 'J' | Dispensing fee B or C plus:<br><br>Labor II factor; clinical monitoring; prefilled syringes/PB; horizontal hood; technician input | $8.90 |
| Category 'K' | Dispensing fee J plus:<br><br>Clinical monitoring; quality assurance; labor factor | $18.90 |
| Category 'L' | Dispensing fee K plus:<br><br>Replacement into individual doses such as syringe; recalculations from vial to syringe to bag; large bulk inventory costs; peer review | $22.90 |
| Category 'M' | Dispensing fee L plus:<br><br>Double gloves; gown; vertical hood; labor factor V; OSHA documentation; special handling; special storage; clean room; hazardous waste | $33.90 |

The Utah Medicaid home infusion dispensing fee methodology has the advantage that dispensing fee reimbursement is more closely tied to actual dispensing costs. It has the disadvantage that it necessitates increased complexity for the claims adjudication process. It is noteworthy to emphasize that the Utah rates were established based on a negotiated process rather than being based on a survey of actual costs and that the rates were created only because of significant cuts in ingredient reimbursement such that the margin on ingredients for intravenous prescriptions was reduced.

---

[18] Derived from Utah Medicaid State Plan Amendment documents and discussions with Utah Medicaid officials.



Myers and Stauffer Lc
Certified Public Accountants

**Compounding Pharmacies**

A small number of pharmacies that responded to the dispensing cost survey indicated that a significant portion of their business consisted of filling compounded prescriptions.  Survey data indicated that this practice was associated with statistically significant higher dispensing costs.

The observation that the practice of compounding prescriptions resulted in higher dispensing cost is not surprising given the special labor and equipment needs that are required in this type of pharmacy practice.  Preparation time for individual compounded prescriptions, though highly variable depending upon the specific task, tend to be higher than the time associated with filling "traditional" prescriptions in pre-manufactured tablet, capsule, or liquid (etc.) forms.  Additionally, the practice of pharmacy compounding does require some additional expensive equipment such as clean rooms for sterile preparation, sensitive scales, and other equipment for making special pharmaceutical dosage forms.

The practice of pharmaceutical compounding has proven to be somewhat controversial given the perception of a fine line between "compounding" and "manufacturing".  The U.S. Food and Drug Administration has imposed some limits relating to the practice and advertising of compounding services.

Despite these restrictions, the practice of compounding is appealing to many pharmacists, not only because the practice is perceived to be a return to a historical form of pharmacy practice, but also because compounding is a niche business, which, if successful, can yield high margins.  In part, these high margins are due to the promotion of compounding services primarily to cash customers, often in more affluent areas.  In some aspects, pharmacy compounding appeals to those seeking "alternative" forms of medical treatments and provides traditional medications in non-traditional forms or in a form free of dyes or other perceived allergens.

Compounding pharmacies have made only minimal attempts to promote wide acceptance of third-party coverage for compounded pharmaceuticals.  Primarily, this appears to be related to a desire to avoid reimbursement limitations that could be imposed by a broad acceptance of third party reimbursement plans and fee schedules based primarily on ingredient cost.  Compounding pharmacists seem to prefer to maintain the relatively high margins and billing simplicity associated with cash-paying customers.  Additionally, because of the potential for billing complexities associated with compounded prescriptions (which sometimes cannot be captured with ease using typical pharmacy claim forms), pharmacies have experienced difficulty in establishing acceptable standards for transmitting suitable claims data that is compatible with the electronic claims processing standards used by most third party payers.



Due to the apparent variability in the cost associated with dispensing compounded prescriptions, a single dispensing fee for compounded prescriptions may be less ideal for matching reimbursement with actual costs incurred. The primary variable that determines dispensing cost incurred by a pharmacy is the amount of professional time required to prepare a particular compounded prescription. A more limited amount of cost variability can be attributed to the special equipment needs of certain preparations. To determine the precise mix of cost inputs into the various types of compounded prescriptions would require some type of time and motion study, the cost of which may be unjustified given the relatively small volume that would be associated with compounded prescription volume.

Given these limitations, a negotiated fee or set of fees is likely to be a preferable means of setting rates for compounding services. Such a fee could be linked to specific types of prescriptions or could be linked to professional time expended with reasonable upper limits. The inclusion of certain compounding services under prior authorization protocols to determine medical necessity may also be appropriate if modifications to dispensing fees for compounding services are considered.

Myers and Stauffer LC
Certified Public Accountants

# Table of Exhibits

Exhibit 1      Texas Medicaid Pharmacy Cost Report

Exhibit 2      Texas Medicaid Pharmacy Cost Report Instructions

Exhibit 3      Initial Letter from the Texas Health and Human Services Commission
               regarding Pharmacy Cost Survey

Exhibit 4      Initial Letter from Myers and Stauffer regarding Dispensing Cost Survey
               (Independent Pharmacies)

Exhibit 5      Initial Letter from Myers and Stauffer regarding Dispensing Cost Survey
               (Chain Pharmacies)

Exhibit 6      Additional Letter from Myers and Stauffer to Encourage Survey Participation

Exhibit 7      Final Letter from Myers and Stauffer to Encourage Survey Participation

Exhibit 8      Example of a Request for Additional Information

Exhibit 9      Summary of Field Examination Findings

Exhibit 10     Calculation of Container Cost per Prescription

Exhibit 11     Table of Inflation Factors for Dispensing Cost Survey

Exhibit 12     Pharmacy Dispensing Cost Survey Data - Statistical Summary



# EXHIBIT AF

Newark, DE

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Civil Action No.

LITIGATION                       ) 01-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,  )

Inc. v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS; and     )

United States of America ex rel. )

Ven-A-Care of the Florida Keys,  )

Inc. v. Boehringer Ingelheim     )

Corp., et al., Civil Action No.  )

07-10248-PBS                     )

-------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK

December 9, 2008 - Newark, Delaware

fe441325-5b47-45a6-aaf1-578f4139d7f3

Newark, DE

Page 178

1    had a recollection of --
2        Q.  Okay.  The ingredient portion of the
3    reimbursement formula, that's intended to cover
4    the cost of acquiring the drug; is that correct?
5            MS. HEALY SMITH:  Objection.
6            THE WITNESS:  My understanding of the
7    definition of the ingredient cost is what does it
8    cost the pharmacy to purchase the drug.
9    BY MR. CYR:
10       Q.  Now, when you consider the adequacy of
11   reimbursement to a provider, you need to consider
12   both the dispensing fee and the ingredient
13   portion and the ingredient cost portion; is that
14   correct?
15       A.  Can you ask that question again?
16       Q.  If you want to evaluate the adequacy of
17   a reimbursement to a Medicaid provider for
18   dispensing a drug, you need to consider both the
19   ingredient portion, the ingredient cost portion
20   and the dispensing fee portion of the
21   reimbursement payment; is that correct?
22           MS. HEALY SMITH:  Objection.

Page 179

1            THE WITNESS:  I'm not sure I would
2    agree with how you phrased what the approach
3    would be for consideration of a provider.  I
4    would look at the total fee that the provider is
5    compensated.
6    BY MR. CYR:
7        Q.  And what would the total fee include?
8        A.  The total fee would include the
9    ingredient cost and the dispensing fee.
10       Q.  So if a dispensing fee is inadequate
11   to cover a provider's cost of dispensing, those
12   costs could be covered by the ingredient portion
13   of the reimbursement payment; is that correct?
14           MS. HEALY SMITH:  Objection.
15           THE WITNESS:  Yes.
16   BY MR. CYR:
17       Q.  Was there knowledge among state
18   Medicaid officials at this time that dispensing
19   fees paid by state Medicaid programs were not
20   adequate to cover dispensing costs for drugs?
21           MS. HEALY SMITH:  Objection.
22           THE WITNESS:  And at this time you're

Page 180

1    referring to the time that the 1994 study was
2    done?
3    BY MR. CYR:
4        Q.  That is correct.
5        A.  My recollection of 1994 was that
6    Medicaid programs were answering to legislators
7    as to why our dispensing fees were higher than
8    other commercial payors.
9        Q.  So -- but that wasn't really my
10   question.
11           The question was whether dispensing
12   fees were adequate to cover dispensing costs or
13   whether there was knowledge among Medicaid
14   providers whether dispensing fees were adequate,
15   sufficient to cover dispensing costs?
16           MS. HEALY:  Objection.
17           THE WITNESS:  My recollection is that
18   Medicaid officials realized that current
19   dispensing fees of the time were not sufficient
20   to cover the dispensing function, the cost
21   associated with the dispensing function.
22   BY MR. CYR:

Page 181

1        Q.  Was that seen as a problem by Medicaid
2    officials at the time?
3            MS. HEALY SMITH:  Objection.
4    BY MR. CYR:
5        Q.  Strike that.
6            Was that seen as a problem in terms of
7    ensuring adequate participation in the Medicaid
8    program by providers?
9            MS. HEALY SMITH:  Objection.
10           THE WITNESS:  No.
11   BY MR. CYR:
12       Q.  And was that because the -- there was a
13   margin in the ingredient portion cost of the
14   reimbursement payment?
15       A.  Yes.
16       Q.  Have you ever heard of the term cross
17   subsidization in connection with the ingredient
18   portion as a way to make up for inadequate
19   dispensing fees?
20       A.  I'm not sure that I've heard that
21   specific term but I would agree that it probably
22   applies to the situation.

fe441325-5b47-45a6-aaf1-578f4139d7f3

# EXHIBIT AG

Page 392

                IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                            STATE OF MISSOURI


STATE OF MISSOURI, EX REL.        )
JEREMIAH W. (JAY) NIXON,          )
ATTORNEY GENERAL,                 )
                                  )
            PLAINTIFFS,           )
                                  )  CASE NO.
            V.                    )  054-1216
                                  )
DEY INC, DEY LP, MERCK KGAA,      )  DIVISION NO. 31
EMD INC, WARRICK                  )
PHARMACEUTICALS CORPORATION,      )
SCHERING-PLOUGH CORPORATION,      )
AND SCHERING CORPORATION,         )
                                  )
            DEFENDANTS.           )




                VIDEO DEPOSITION OF MS. SUSAN MCCANN

                            VOLUME II

        Taken on behalf of the Defendants Warrick, Schering,

                        and Schering-Plough

                        November 7, 2007

SUSAN McCANN 11/7/2007

Page 477

1  should pay both components accurately and that the fee
2  should reflect at least the cost to dispense.
3      Q.   And that $4.00 --
4      A.   Which was 4.24 or 5.24 or 5 something at
5  the time. I don't recall. It's in one of your
6  exhibits.
7      Q.   Okay. And so you believe that $4.09 was
8  too low?
9      A.   At the time, yes.
10     Q.   Okay. Now was Missouri Medicaid using
11 the ingredient cost reimbursement to compensate for
12 the low dispensing fee?
13     MS. ADAMS:  Object to the form of the
14 question. Lack of foundation. Calls for speculation.
15     A.   There was an adjustment made by someone
16 somewhere so that when the final reimbursement
17 methodology came down to me to implement, the discount
18 off of AWP was not the same as in the survey.
19     It was less, a smaller percentage, and the
20 fee was a smaller amount, which looks to me as though
21 they were trying to balance the two.
22     MR. McDONALD:
23     Q.   They were using a higher reimbursement
24 on the ingredient portion to compensate for a lower
25 reimbursement on the dispensing fee?

Page 478

1      MS. ADAMS:  Object to the form of the
2  question. Lack of foundation. It misstates her
3  testimony. She said clearly this judgment was made by
4  someone else, somewhere else.
5      A.   I believe, in my recollection, that
6  based on pressure from the pharmacy association and
7  other forces, other lobbying groups at the Capitol,
8  that the whole idea was that for our reducing the
9  Average Wholesale Price reimbursement component to be
10 a wash.
11     So they raised the fee only to the amount of
12 4.09, which was a calculation performed by someone.
13 So that when we reduced the AWP portion, the 4.09 fee
14 would raise their ultimate reimbursement to be what it
15 was before. So there would be no ultimate change in
16 their reimbursement.
17     MR. McDONALD:
18     Q.   Okay.
19     A.   That's my recollection.
20     Q.   And that -- and that's fine. And I'm --
21 I want to ask you again. Because I want it to be
22 clear when you're talking about wash and
23 reimbursement --
24     A.   Mm-hmm.
25     Q.   -- and up and down and all that, that

Page 479

1  we're effectively communicating with each other and
2  that the jury understands this testimony, which is
3  what's important in this case.
4      And so tell me if I'm wrong. Okay? Because
5  I'm not trying to misstate your testimony.
6      But is it your belief and your understanding
7  as the pharmacist working at Missouri Medicaid that
8  Missouri Medicaid knew it was paying a higher
9  ingredient cost reimbursement than acquisition cost in
10 order to compensate for a dispensing fee that was
11 lower than what it otherwise thought it should have
12 been?
13     MS. ADAMS:  Object to the form of the
14 question. Misstates her earlier testimony. Calls for
15 speculation.
16     A.   That was my understanding.
17     (Exhibit 189, Community
18        Pharmacy and the Changing
19        Landscape of Medicaid,
20        1996, was marked for
21        identification by Mr
22        McDonald.)
23     MR. McDONALD:
24     Q.   Okay. (Mr. McDonald hands a document to
25 the witness.) Let me -- let me take the other one

Page 480

1  back.
2      A.   The 3?
3      Q.   Yeah. Let me put it back in the
4  notebook, so it doesn't get lost.
5      A.   Okay. (The witness hands a document to
6  Mr. McDonald.) And do you want this one too?
7      Q.   Just leave it there in front of you.
8      A.   Okay.
9      Q.   Ms. McCann, I've handed you what we've
10 marked as Deposition Exhibit Number 189.
11     And this is a document entitled "Community
12 Pharmacy and the Changing Landscape of Medicaid." And
13 it's dated 1996. Do you see that?
14     A.   I do.
15     Q.   Have you ever seen this before?
16     A.   I don't recall it.
17     Q.   Do you have any idea what this is?
18     A.   I know that a gentleman by the name of
19 Jim Uffmann did a -- something. This might be his
20 work. I don't know. I don't remember when that was
21 exactly.
22     Q.   And who is Mr. Uffmann?
23     A.   He was a deputy division director for a
24 while with the Division of Medical Services and then
25 he moved on to the Department of Social Services. But

23 (Pages 477 to 480)

e78f6cc9-3a6b-405d-a2d6-7ba04af0e20b

EXHIBIT AH

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY      ) MDL NO. 1456

AVERAGE WHOLESALE PRICE             )

LITIGATION                          ) CIVIL ACTION:

                                    ) 01-CV-12257-PBS

                                    ) Judge Patti B. Saris

                                    ) Magistrate Judge

                                    ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Wiberg, Cody                                    March 14, 2008

Page 354

1   know, especially on generics.  You're going to see
2   a wide range of prices, depending on how the
3   individual pharmacy wants to price their products.
4     Q.  Okay.  But as far as the Medicaid rate --
5   Medicaid recipient, they have no incentive to shop
6   around, because they're not paying.  Right?
7     A.  That's correct.
8     Q.  They just go the most convenient place and
9   get it.  It's the government that is not allowed to
10  shop around, because of the way the manufacturers
11  set up the AWPs, is that right?
12        MR. COOK:  Objection.
13    A.  Well, at the time frame we're looking at,
14  there wasn't even a co-pay, so Medicaid recipients
15  at that point were not paying out-of-pocket
16  expenses.
17  BY MR. BLACK:
18    Q.  Okay.  So there is no shopping-around
19  incentive.
20    A.  Not that I would be aware of.
21    Q.  Okay.  Is it correct that, based on your
22  knowledge, '99 -- late '99 through -- when you were

Page 355

1   through this program, Minnesota never paid a
2   thousand percent more than the actual cost?
3     A.  I don't think that we ever would have.  We
4   would have had -- if these were generically
5   available products, we would have had them on -- on
6   MAC in terms of the pharmacy program.  In terms of
7   the reimbursement to physicians, again, when I
8   started there, we were paying AWP -- flat AWP.  And
9   then we were paying AWP minus 5 percent, and then
10  we brought it in line with Medicare.  So now,
11  presumably, we are paying ASP plus 6 percent.
12    Q.  Okay.  But you would be stunned if even
13  Minnesota had paid a spread such as that.
14        MR. COOK:  Objection.
15    A.  As a pharmacy program manager, I would have
16  been quite concerned.
17  BY MR. BLACK:
18    Q.  Even if it was more than 5 -- even if it was
19  500 percent, correct?
20    A.  Yes, I would have been concerned.
21    Q.  Even if it was 200 percent.
22    A.  If we were -- if we were paying that, for

Page 356

1   products that were available generically, I would
2   be concerned if we had not aggressively MACed them,
3   yes.
4     Q.  Okay.  Knowing that I'm a dunder head, people
5   keep sending me emails, saying "ask him this."
6       I apologize.
7         MR. COOK:  I have no objection to the
8   dunder head characterization.
9         MR. BLACK:  I said it myself.
10  BY MR. BLACK:
11    Q.  Looking at one other thing, and then I may be
12  done.  I told you I'd get you out of here by 5:30,
13  so I'll give someone else some time.
14        MR. BLACK:  That's all of the questions I
15  have, thank you, sir.
16        THE WITNESS:  Great.
17          RE-EXAMINATION
18  BY MR. COOK:
19    Q.  Mr. Wiberg, I'd like to -- or Doctor Wiberg.
20  I apologize for that.  I've been calling you "Mr."
21  all day.  I would like to take you back to the
22  Zantac example you gave earlier.

Page 357

1     A.  Yes.
2     Q.  I think you said the AWP was 90 cents.
3     A.  Around there, yeah.
4     Q.  The MAC was about 25 cents, and the AAC was
5   about 6 cents, right?
6     A.  Well, the -- the actual acquisition costs for
7   the store I worked as was -- was -- was around 6
8   cents, as I recall.
9     Q.  So 25 cents is what the State Medicaid
10  Program chose to pay for that 6 cent pill, right?
11    A.  That's correct.
12    Q.  Isn't that about a 400 percent spread,
13  between 6 and 25?
14    A.  Well, again, you can't -- people don't spend
15  percentages.  They spend dollars.  And what the
16  goal was -- and I don't have a calculator handy,
17  but if you do the math, typically we're talking
18  about 60 tablets.  In a typical prescription.  So,
19  you know, the actual math is -- is they're not
20  getting huge amounts of actual dollars.  And at
21  some point, I think we reduced the MAC.  Part of --
22  well, let me just say that when I came on board at

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                        March 14, 2008

Page 358

1   the Minnesota Department of Human Services, there
2   was one pharmacist working.  We used the pharmacy
3   program manager, he was working there by himself.
4   He had three rebate analysts.  There had been more
5   pharmacists working for the Department earlier, but
6   they worked in different divisions.  In fact, there
7   wasn't a pharmacy program a year-and-a-half before
8   I started.  There was no coherent Pharmacy
9   Management Policy.  And as a result of that, we
10  made -- after I took over, we ended up making
11  massive changes.  It went from, in my opinion,
12  being a program that was not very effectively
13  managed, to being one that is very aggressively
14  managed now.
15      So -- and the other issue that we had -- I
16  mentioned earlier that my predecessor, because
17  he introduced this language that ended up getting
18  amended, took away our authority to do a lot of
19  things with -- with MACs.
20      So part of what we were trying to do, although
21  we had to accelerate when we got to 2002 and 2003,
22  we had no choice.  Part of it was to not shock the

Page 359

1   system, which had essentially been unmanaged.  So
2   we're trying to introduce these changes in a -- I
3   wouldn't say gradual, but we're trying to not hit
4   people with so many things at once that we cause
5   disruptions to service, or that, quite frankly,
6   because it's a political environment, that it
7   backfires on us, and we do have people going to the
8   legislators, saying, basically, these people over
9   at DHS are out of control, and have our authority
10  to make the changes we thought were necessary taken
11  away from us.  So we didn't always do things
12  initially as aggressively as we might have in the
13  time frame we're talking about here, 2000, 2001.
14      2002, 2003, when we're starting facing budget
15  deficits, even before then, we had started ramping
16  up and doing preferred -- you know, our own
17  internal preferred drug list for some categories.
18  But we got very, very aggressive at that point.
19  And so these days, as I mentioned earlier, we
20  increased the use of generics because of the MAC
21  program from about 50 percent when I started to 60
22  percent.  It's now up to 69 percent.  So -- you know

Page 360

1   -- anyway.
2       Q.  But in these generics MACs that you're
3   setting are shooting for a dollar amount spread --
4       A.  Right.
5       Q.  -- not necessarily for a correct percentage
6   spread, right?
7       A.  That's correct.
8       Q.  And the correct percentage could be a
9   thousand, could be 2,000, could be 1 percent,
10  depending upon the starting cost of the product,
11  right?
12      A.  Yes, we are searching for a dollar spread,
13  not a percent spread.
14      Q.  And if you go to Abbott Exhibit 19, and the
15  item that Mr. Black asked you about --
16      A.  Four up from the bottom?
17      Q.  Yeah, the $900 spread on a bag of saline?
18      A.  Uh-huh.
19      Q.  It would offend you if Minnesota Medicaid was
20  paying a $900 spread on a bag of saline, correct?
21      A.  Yes.
22      Q.  If that were a case of 100, and the spread

Page 361

1   were $9 on the bag of saline, would your answer be
2   different?
3       A.  If -- if the actual acquisition cost --
4   you're talking about the actual --
5       Q.  If the actual acquisition cost were about a
6   dollar.
7       A.  About a dollar.
8       Q.  The AWP was about $9, and the AWP minus 9
9   percent came out to about $8, such that the spread
10  was about $7.  That would be consistent with the
11  goals of the Medicaid program, correct?
12      A.  Yes.
13      Q.  And so when Mr. Black asked you these
14  questions about $900 spreads, you were answering
15  those questions based upon your belief that that
16  was $900 for one bag of saline, right?
17      A.  Correct.
18      Q.  Not for a case of 100 bags of saline, right?
19      A.  Correct.
20      Q.  Mr. Black asked you whether there had been
21  any closures of pharmacies -- oh and, by the way,
22  do you know who drafted this chart that Mr. Black

91 (Pages 358 to 361)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                          March 14, 2008

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY      ) MDL NO. 1456

AVERAGE WHOLESALE PRICE             )

LITIGATION                          ) CIVIL ACTION:

                                    ) 01-CV-12257-PBS

                                    ) Judge Patti B. Saris

                                    ) Magistrate Judge

                                    ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Henderson Legal Services, Inc.

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 170

1   considerations at the time.
2       So if you wanted to make it -- and you would
3   have three choices, basically. You could either
4   make it -- try to make it as close as you could to
5   revenue-neutral. You could try to recoup savings.
6   And therefore, you -- you're going to set the
7   dispensing fee maybe not as high as you would if
8   you were going make it revenue-neutral. Or you
9   could try to actually pay providers more money
10  then, and you would set it a little bit higher.
11  But I basically -- when this came out, and at that
12  conference I mentioned, where -- where Mr. Lup --
13  Mr. Lupinetti and I both were presenters at a
14  conference. We were talking about different
15  issues, and I was not talking about this particular
16  issue, per se. But he was talking about this
17  issue. And I did basically bring up that, you
18  know, you really have to understand how the
19  pharmacy reimbursement system works. You can't --
20  you have to understand that there's two sides of
21  the equation, that the dispensing fees are kept
22  artificially low. That if you just reduce the

Page 171

1   ingredient reimbursement to actual acquisition
2   cost, and don't do anything with the dispensing
3   fee, there's at least the possibility that you're
4   going to have access problems for patients, because
5   pharmacies at that point might drop out of the
6   system.
7       Now, there's an argument that it really
8   wouldn't much difference, because the very
9   large national pharmacy chains don't necessarily
10  make their money on the prescriptions. They make
11  the money on what you buy in the front end of the
12  store. And if they use pharmacy sales or
13  prescription sales as a loss leader, they'll still
14  sign up for Medicaid.
15  Q.  There will be a retail pharmacy, correct?
16  A.  Yeah.
17  Q.  Not a closed pharmacy like an infusion
18  pharmacy.
19  A.  No, no. So there's that argument. But
20  anyway, the argument I made is that you can't --
21  you can't look at one side of the equation. You
22  have to look at both sides of the equation. You

Page 172

1   have to understand that we know, and this is a
2   serious aspect of ain't what paid -- "ain't what's
3   paid." We know AWP, "ain't what's paid." But if we
4   move towards more transparency and we get closer to
5   reimbursing on the ingredient side at what
6   providers actually pay, then we have to look at the
7   dispensing fee side in the case of pharmacies,
8   because we've always kept that below what we think
9   the true cost of dispensing is to make up for the
10  fact that there is some money being made on the
11  ingredient side. So to the extent, again, that you
12  start paying people a dispensing fee or a total
13  reimbursement that does not even get back the cost
14  of the drugs, plus the cost of labor and the
15  computer systems and the lights and all that, you
16  could have providers stop -- you know, start
17  dropping out of Medicaid. And then this creates an
18  access issue for very poor people. So -- yeah.
19      MR. BLACK: Objection, form.
20  Nonresponsive.
21  BY MR. COOK:
22  Q.  And so would it be your understanding that if

Page 173

1   we were -- if one were to go to this ideal world in
2   which AWP actually represented acquisition costs,
3   the Medicaid programs would no longer use an AWP
4   minus a percentage.
5   A.  To the extent that -- that whatever was used,
6   revamped AWP or an ASP or an AMP, whatever you use
7   as a basis of a cost reimbursement, or -- or excuse
8   me, ingredient reimbursement to the extent that
9   that closely reflected the average actual price that
10  providers paid, then you would -- right. You would
11  no longer be taking percentages off.
12  Q.  And, in fact, are you familiar with the
13  manner in which the federal legislation has changed
14  the calculation of federal upper limits to be
15  two-and-a-half times the Average Manufacturer's
16  Price?
17  A.  If that's a recent change within the last
18  two-and-a-half years, I wouldn't know.
19  Q.  And we've already talked about Medicare
20  paying ASP plus some percentage, correct?
21  A.  6 percent, I believe it is, yep.
22  Q.  Once you learned what the actual amounts were

44  (Pages 170 to 173)

# EXHIBIT AI

Ridout, C. Benny                                    December 5, 2008
                          Raleigh, NC

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

------------------------------X

In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE          )  Master File No.

LITIGATION                       )  01-CV-12257-PBS

------------------------------X

THIS DOCUMENT RELATES TO:        )  Judge Patti B.

United States of America ex      )  Saris

rel. Ven-A-Care of the Florida   )

Keys, Inc., et al.  v.  Dey,     )

Inc., et al., Civil Action No.   )

05-11084-PBS                     )

------------------------------X


          Video Deposition of C. BENNY RIDOUT,

taken by the Defendants, at the Hilton North

Raleigh, 3415 Wake Forest Road, Boardroom, Raleigh,

North Carolina, on the 5th day of December, 2008 at

9:10 a.m., before Marisa Munoz-Vourakis, Registered

Merit Reporter, Certified Realtime Reporter and

Notary Public.

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                      December 5, 2008
                              Raleigh, NC

Page 62

1  the gap on those.  Well, they went to ASP for
2  Medicare drugs in physician's office to get rid
3  of that type thing, average selling prices, they
4  changed the methodology of pricing because of
5  that.
6      Q.  You mentioned that it was common
7  knowledge that Vancomycin had a spread, do I have
8  that correct?
9          MS. HAYES:  Objection to form.
10     A.  Yes.
11     Q.  When was it common knowledge that
12 Vancomycin had a spread?
13     A.  I don't remember the year, just like it
14 was this, but I just remember that drug was one
15 of the antibiotics.
16     Q.  Do you recall whether it was similarly
17 common knowledge that infusion products had
18 spreads?
19         MS. YAVELBERG:  Objection, form.
20         MS. HAYES:  Objection, form.
21     A.  We had no idea what the specialty
22 pharmacists were paying for that drug, what kind

Page 63

1  of deals they struck with the manufacturers, but
2  it was of their opinion of us that there was some
3  kind of spread in there because of what they were
4  able to do that a regular pharmacist couldn't do
5  at AWP.  You see, we still paid at AWP.
6      Q.  What do you mean what they could do
7  that other pharmacists couldn't?
8      A.  Infusion drugs is a whole lot more than
9  just putting a pill in a bottle.  You got to
10 prepare.  In fact, the pharmacists wanted a
11 special fee to do this under-the-hood
12 preparation, you know, also injection takes
13 longer, you got to have syringe and all the stuff
14 to do that.  Of course they were shipping that on
15 top of the cost to ship the product.
16         So if you add up all that extra cost in
17 a regular pharmacy or regular pills, you know,
18 you think well, how in the world can they afford
19 to do this and accept that same price?
20     Q.  What was your conclusion?
21     A.  That somehow they were getting some
22 kind of special deal back or discount from the

Page 64

1  manufacturers to be able to do it or something.
2  That was just my own personal feeling.  How did
3  they do it?
4      Q.  And the significance of their ability
5  to get special deals would be that they could
6  make profit on the drug ingredient cost, right?
7          MS. YAVELBERG:  Objection to form.
8          MS. HAYES:  Objection to form.
9      A.  I have no idea what profit they made or
10 what they were doing.  I just know that nobody
11 does anything for a loss.  You wouldn't stay in
12 business.
13     Q.  Let's take a couple of steps back.
14         Could you describe for the jury when
15 you talk about specialty pharmacies, what are you
16 referring to?
17     A.  Well, there's pharmaceutical companies,
18 pharmaceutical providers, excuse me, they will
19 take drugs that will require a lot of attention
20 and effort that have to be mixed and have to be
21 stored and have to be administered by a highly-
22 trained person, such as the chemotherapy drugs,

Page 65

1  some of the asthmatic drugs, some of the
2  specialty diseases.  And they will go in and say,
3  you know, here's a niche, we will carve this out
4  and we will provide this to Medicaid as a service
5  because the local pharmacists can't do that.  He
6  doesn't go into a person's home.  He doesn't send
7  a nurse out.  They have a nurse on the team that
8  will go in and administer that drug for that
9  patient.
10         So it's more involved than just
11 dispensing a drug like a regular pharmacist does.
12 So they are called specialty pharmacists.
13     Q.  So the jury understands, when you refer
14 to these specialty drugs, are they in pill form?
15     A.  No, most of the time they are there.
16     Q.  What form are they taken?
17     A.  They would either be injections or
18 infusions, inhalation drugs.
19     Q.  Could you explain to the jury what
20 infusion and inhalation are?
21     A.  Inhalation would be a drug that is
22 administered through breathing apparatus, like an

17 (Pages 62 to 65)

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                    December 5, 2008
                          Raleigh, NC

Page 1

                 UNITED STATES DISTRICT COURT

                 DISTRICT OF MASSACHUSETTS

-------------------------------X
In re:  PHARMACEUTICAL INDUSTRY )  MDL No. 1456

AVERAGE WHOLESALE PRICE         )  Master File No.

LITIGATION                      )  01-CV-12257-PBS

-------------------------------X
THIS DOCUMENT RELATES TO:       )  Judge Patti B.

United States of America ex     )  Saris

rel. Ven-A-Care of the Florida  )

Keys, Inc., et al.  v.  Dey,    )

Inc., et al., Civil Action No.  )

05-11084-PBS                    )

-------------------------------X


            Video Deposition of C. BENNY RIDOUT,

taken by the Defendants, at the Hilton North

Raleigh, 3415 Wake Forest Road, Boardroom, Raleigh,

North Carolina, on the 5th day of December, 2008 at

9:10 a.m., before Marisa Munoz-Vourakis, Registered

Merit Reporter, Certified Realtime Reporter and

Notary Public.

77907573-2dff-47a3-bd8c-719356f2d9e8

Ridout, C. Benny                                    December 5, 2008
                        Raleigh, NC

Page 70

1  years, but we did a dispensing fee survey to
2  determine what it cost for the prescription.  And
3  we did something in North Carolina that everybody
4  needs to know and understand, that our fee was a
5  little higher than some state fees, dispensing
6  fees, but I started this in North Carolina, I
7  started quite a few things in Medicaid.  It was
8  adopted in other states.  But we did not pay for
9  refills of the same drug within the same month
10  that all other states did.  I found out that was
11  abuse being done by them, especially nursing
12  homes.  They would send over prescription every
13  week and get another fee, and some of the
14  pharmacists on maintenance medication, they would
15  be taking a whole month, give them maybe a two-
16  week supply, get them to come back and they would
17  get two fees.
18       So I went in and said okay, you all,
19  I'm going to give you one fee per drug per month,
20  and that's all you are going to get.  And in
21  doing that, I went into my system and found out
22  how many refills I was paying for at that time

Page 71

1  and how much I would be taking back from the
2  pharmacists.
3       And so I tried to split part of that
4  with them, to be fair with them, and I raised the
5  fee, I think at that time 25 cents.
6       So that was based on some of the fee
7  while ours was up, and we didn't pay for those
8  refills and we never did.  Where other states
9  were paying a lot more for them in paying for
10  those.  And then, of course, a lot of those
11  states adopted it after they found out.
12       Q.  But the dispensing fee throughout the
13  '90s was something less than $6?
14       A.  Yes.
15       Q.  Did -- in home IV pharmacies, infusion
16  pharmacies, did they receive that same dispensing
17  fee as retail pharmacies did?
18       A.  Yes, anybody that participated in an
19  outpatient drug program got the same
20  reimbursement.  We took AWP minus ten off of
21  them.  They got the same fee.
22       Q.  Did these home IV pharmacies receive

Page 72

1  any sort of additional payment for the additional
2  services that you described?
3       MS. YAVELBERG:  Objection, form.
4       A.  I'm not aware what they received, but
5  some of them were eligible for some reimbursement
6  through the home health program, the third-party
7  program we had, durable medical equipment, some
8  of the pumps they had to supply and some of the
9  equipment they had to supply, they could bill
10  that through the durable medical equipment
11  program, but it didn't come through the
12  outpatient drug program.  We paid for drugs.
13       Q.  You mentioned earlier your belief that
14  given the amount of services that some of these
15  specialty pharmacies were providing, that you
16  were led to believe that they were buying drugs
17  at deeper discounts.  Do you recall that
18  testimony?
19       MS. YAVELBERG:  Objection, form.
20       MS. HAYES:  Objection, form.
21       MS. YAVELBERG:  I don't believe that
22  was his testimony.

Page 73

1       A.  I just said that I don't see how they
2  could do it for that.  I have no idea what they
3  were buying it for, what was going on.
4       Q.  Leaving aside the specifics of what
5  they were paying for it, you had an
6  understanding, am I correct, that they were
7  making profit on the drug side?
8       MS. YAVELBERG:  Objection, form.
9       A.  I had to assume that if I was taking
10  ten percent off of that price, and they were
11  providing all this service, that somehow they had
12  to be getting some kind of help from somewhere.
13  I mean, I couldn't see how they can do it with me
14  taking ten percent off of the drug cost and then
15  them providing those extra services and billed
16  for that.  That was my opinion.
17       Q.  Did you ever have any conversations
18  with anybody from IV pharmacies about that issue?
19       A.  I used to just try to discuss it with
20  them, but they didn't want to talk to me about
21  drug pricing.  In fact, I went to meetings and
22  talked to my providers and told them you know

19 (Pages 70 to 73)

77907573-2dff-47a3-bd8c-719356f2d9e8

EXHIBIT AJ

Sullivan, Harry Leo                          March 12, 2008
                    Nashville, TN

Page 1

UNITED STATES DISTRICT

FOR THE DISTRICT OF MASSACHUSETTS


--------------------------X
IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

PRICE LITIGATION            )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    )

U.S. ex rel. Ven-a-Care of  )

of the Florida Keys, Inc.   )

     v.                     )  No.06-CV-11337-PBS

ABBOTT LABORATORIES, INC.,  )

--------------------------X


     (cross captions appear on following pages)


          Deposition of HARRY LEO SULLIVAN

                    Volume I

               Nashville, Tennessee

              Tuesday, March 12, 2008

                    9:05 a.m.

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 150

1  concerns on whether or not the payment for these
2  kind of therapies was, was adequate?
3     A.  Well, my opinion, particularly in the,
4  in the home health arena, was -- and during this
5  specific time period, the growth in Tennessee was
6  such of those type of providers that it wouldn't
7  -- that wouldn't -- not lead you to believe that
8  the reimbursement for Medicaid was inadequate.
9         When people are hollering and screaming
10 or you have trouble getting providers to take
11 care of your patients is when that was more
12 likely a concern.
13    Q.  Well, do you know when the home
14 infusion business really started taking off?
15    A.  Well, it certainly took off in the
16 early Nineties.  And I can't remember -- and
17 Tennessee was a little bit different because we
18 very purposely avoided expansion of home
19 community based services under the Medicaid
20 program because the vast majority of the patients
21 who would receive those services were dual
22 eligibles, which meant they had Medicaid and

Page 151

1  Medicare.  And Medicare home health was, was
2  truly exploding.  We had hundreds of providers in
3  Tennessee of home health services.  I dare say
4  there's, you know, maybe 20 now.  Because there
5  was, there was indeed a bonanza on the Medicare
6  side in Tennessee.  Other states didn't face it
7  quite as -- if they had chosen to expand or had
8  very aggressive home community-based services
9  through Medicaid, might have had a little bit
10 different policy issues.  We purely shifted to
11 Medicare, cost shifted to Medicare, with the
12 duals.  And so it wasn't maybe not as, as intense
13 on a Medicaid issue in Tennessee as it might be
14 elsewhere is what I'm saying.
15    Q.  The page starting with -- at 425 and
16 then going over to 426, there is a discussion of
17 what some states are doing in the home IV
18 reimbursement area, Minnesota indicates
19 compounding or a dispensing fee of $8 for IV
20 drugs, and then Washington indicates that they're
21 paying a compounding amount, Ohio as well.
22        Do you have an understanding of what

Page 152

1  they're talking about when they talk about a
2  compounding fee?
3     A.  Yes.
4     Q.  And what, what is that?
5     A.  Well, certain, be it -- I mean you can
6  compound IV drugs if you have the right equipment
7  and filters and hoods to keep it, make it a
8  sterile product.
9         And you can compound drugs for
10 inhalation.  If you have, again, the right
11 equipment, similar to what would be in a
12 hospital, to, to handle sterile products.
13        And you take the raw ingredient and
14 mimic whatever, generally, the brand name or the
15 innovator product was.
16    Q.  And do you know in Tennessee, either
17 before TennCare or after TennCare was paying a
18 compounding fee for IV?  Do you know if that was
19 something that was being paid?
20    A.  Ah, no.  But there's, there's ways to
21 pay it without, without having a separate -- you
22 know, I noticed on here that one form is for

Page 153

1  payment, one form is for reimbursement of
2  supplies, one form is for -- you know, they're,
3  they're making a variety to submit multiple
4  forms.  And I wouldn't -- I can't tell you a
5  specific product or specific time period, but one
6  of my strategies was in issues like this, where
7  compounding was involved, I didn't want to go
8  down the road, at least in the early Nineties, of
9  getting into paying for compounded prescriptions,
10 because that can -- that could range from a
11 sterile product all the way down to an ointment,
12 okay?
13        And, and our claims reimbursement
14 system hadn't evolved to the current NCPDP
15 sophistication of today.  So it was very hard to
16 put in a, a set compounding fee for what, what
17 products?
18        One may take a minute to make, one may
19 take an hour and a half.
20        So getting back to, to the MAC issue,
21 some, sometimes for certain products in this
22 arena, you would take that into account for the

                              39  (Pages 150 to 153)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                           Nashville, TN

Page 154

1    MAC.
2         For example, I might say, I'm not
3    paying for the tape that you use to hold the IV
4    needle into place. I'm not paying for the IV
5    needle or the tube set. I'm not going to -- I
6    don't want bills for that. I know you've got to
7    do it to administer this drug. So we're going to
8    add on the cost of this drug X, because I know
9    this, this and this always goes with it, and I
10   know there is a fixed cost for that, but I don't
11   want five bills. I want 10 different places.
12   Bill me for the drug. And I'll make sure that
13   the -- whatever the MAC is incorporates all your
14   other costs. And you have to talk with providers
15   and know what that is. I mean, you know.
16        Q.   So, in short, you would use the payment
17   for the drug itself to cross-subsidize other
18   things that might need to be paid to fairly --
19        A.   And that would include compounding.
20        Q.   And it may include nursing services
21   that were not included, things of that nature?
22        A.   (Nodding yes.)

Page 155

1         Q.   Did anyone in the federal government
2    ever tell you that you were not allowed to do
3    that?
4         A.   No.
5         Q.   And if they had told you that, what
6    would you have said?
7         A.   That I wasn't allowed to pay for
8    compounding or --
9         Q.   That you weren't allowed to use the
10   payment for the drug to cross-subsidize those
11   other services or supplies?
12        A.   If they had told me I couldn't do it,
13   what would I do?
14        Q.   Yes.
15        A.   I would have had to have found another
16   way to, to handle the billing.
17        Q.   But they never told you that.
18        A.   No.
19        Q.   Do you know if other states were doing
20   -- were adopting similar type strategies to run
21   the programs?
22        A.   No, I don't -- I mean it may be

Page 156

1    addressed in this letter. I don't know. It
2    seems to talk about different states, but I'm
3    sure there were varying levels of complexity in
4    the billing process, and what was and wasn't
5    billable and what was and wasn't included, but I
6    don't know it and I didn't discuss it with folks.
7         Q.   Have you heard the term cross-subsidy
8    or cross-subsidization in the context of pharmacy
9    reimbursement?
10        A.   No, not -- no, I haven't.
11        Q.   I'm going to show you another, another
12   -- going to mark that as another exhibit.
13             MR. TORBORG: I think this is 578.
14             (Exhibit Abbott 578 marked.)
15   BY MR. TORBORG:
16        Q.   For the record, what we have marked as
17   Exhibit 578 bears the Bates numbers HHC 002-0400
18   through 407. It's another Medicaid pharmacy
19   bulletin. This one dated January-February of
20   1988.
21             Mr. Sullivan, if I could ask you to go
22   to Bates page ending in 402. In particular the

Page 157

1    discussion on the first full paragraph about
2    Montana Medicaid. Do you see that?
3         A.   Yes.
4         Q.   Where it says, Similarly, Montana
5    Medicaid compensates for the additional time and
6    expense of dispensing compounded drugs by
7    allowing the provider's usual and customary
8    charge up to 2.5 times the cost of ingredients,
9    paren, reimbursement for other outpatient drugs
10   is a lower of AWP minus 10 percent, or the cost
11   of the drug, end paren. Do you see that?
12        A.   Yes.
13        Q.   Is that the, the type of thing that
14   Tennessee was doing?
15        A.   It's a different approach to -- yeah.
16   Make -- paying the provider for the, for the
17   compounding without -- and setting a limit on
18   what I will pay up to two and a half percent.
19   It's just a different, different twist.
20        Q.   Does it -- does this refresh your
21   recollection about any other types of approaches
22   like this that other states were using?

40  (Pages 154 to 157)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

Page 106

1  compendia were matching the actual market prices
2  as they lowered on generic drugs?
3      A.  For multi-source drugs?
4      Q.  Yes.
5      A.  I had no knowledge, and I didn't care
6  because if it was up to me, I think, as my job,
7  to find out what the net cost was to the
8  pharmacist.
9          Two things, availability, statewide, in
10  Tennessee, of the generic, and, secondly, what
11  are they paying?  I have to know that in order to
12  get back to what we were talking about earlier,
13  providing the proper incentive to dispense
14  generic for the pharmacist to do whatever
15  intervention was necessary with either the
16  patient or the physician, or both, to get the
17  generic substitution accomplished.
18      Q.  Now where would you get the information
19  that you would use in the MAC program regarding
20  what pharmacists were -- pharmacies were actually
21  paying for drugs?
22      A.  My, my system was, was not very

Page 107

1  sophisticated or very scientific, but nonetheless
2  believe it to have been very effective.
3          What I did was, I knew I had a contact
4  within the largest generic distributor in our
5  area, and one of the most -- one of the more
6  popular.  Again during this time that I, that I
7  was setting MAC prices, rather than MCOs or PBMs,
8  the, the best deal on the generic weren't coming
9  from, from big wholesalers.  They were coming
10  from generic distributors.
11          So I had contacts within this one
12  particular company who would tell me, who would
13  first of all keep me apprized any time they, they
14  were able to distribute new generic drugs, also
15  give me information if, if there was some problem
16  with an existing generic drug's availability, and
17  also tell me and give -- send me catalogs that
18  they sent to the pharmacists and then tell me
19  additionally what am I looking at for this drug
20  X, Y, Z, what does a hundred of them cost a
21  pharmacy?  I didn't look at Red Book or Blue Book
22  or First Data; I called the people that sell it.

Page 108

1          Then I took that information, and never
2  going to take at one source completely at face
3  value, then I would call three or four -- I used
4  independent pharmacists in different parts of the
5  state, and I called.  And I said, I understand,
6  and I wouldn't mention that particular
7  distributor.  They never knew where I got my
8  numbers.  The pharmacists never knew where I got
9  my numbers.  But I would say, I'm thinking, I
10  believe that you can get this new generic, or
11  whatever it is, for five dollars a hundred, and
12  I'm going to set the MAC at 7.50 a hundred.  Does
13  that give you any heartburn?  And that's the way
14  I did business.
15          These, I trusted these people,
16  obviously.  But there are three different sources
17  there who are on the front lines in a pharmacy
18  who are running a business, who they have a
19  personal stake in.  That's why I went to
20  independents.  And then the distributor, who is
21  selling.  And who over the course of that
22  interaction I never found them to be anything but

Page 109

1  honest.
2          So -- and you can, you can quickly tell
3  if you have got something set too low, the phone
4  will ring.
5          So that -- and then I just -- I built
6  in a little, 30 percent or whatever, profit to a
7  generic MAC.  But I would immediately MAC -- AWP
8  was irrelevant.  For generic drugs.
9      Q.  And did you have a practice for doing,
10  for doing this process for all generic drugs?
11      A.  Yes.
12      Q.  And you did this all by yourself.
13      A.  Yes.
14      Q.  One person?
15      A.  Yes.
16      Q.  And you had other duties as well, --
17      A.  Yes.
18      Q.  -- correct?
19      A.  Yes.
20      Q.  And tell me a little bit about --
21      A.  Of course, you know, I, when I went to
22  work there in '89 we already had a MAC program.

                              28  (Pages 106 to 109)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 114

1  entered into our system, and then paid
2  eventually.
3         Just resistance to change, I guess.
4     Q.  Did you -- did you have any involvement
5  when the MAC program was first started in
6  Tennessee?
7     A.  It preceded me.
8     Q.  And do you have any insight as to the
9  amount of labor involved to get the process
10 underway?
11    A.  It would have been significant, but not
12 anything like you started from square one today,
13 because, number one, there weren't that many
14 drugs.  Weren't that many multi-source drugs.
15 And we had a very restrictive formulary.  So even
16 if there was -- for a lot of drugs, even if there
17 was a generic alternative, even the generic
18 wasn't covered.
19    Q.  When you were the director of pharmacy
20 services, Tennessee Medicaid, from '89 through
21 2004, save the, the nine months, did you believe
22 that you had no choice but to use the AWPs and

Page 115

1  the compendia to set payment rates for generic
2  drugs?
3         MR. DRAYCOTT:  Objection.
4     A.  Had no choice.  As -- well --
5  BY MR. TORBORG:
6     Q.  When you say you had no choice, what do
7  you mean?
8     A.  That was your question, I think, you
9  had --
10    Q.  Did you believe that there was no other
11 practical alternative but to use what was in the
12 compendia --
13        MR. DRAYCOTT:  Objection.
14 BY MR. TORBORG:
15    Q.  -- to reimburse generic drugs?
16    A.  It was, it was the most expedient is
17 all I would say.  And it was going when I got
18 there, and I would say an industry standard that
19 we, that we -- a wheel we couldn't reinvent.
20    Q.  But you used a MAC program to reimburse
21 generic drugs; is that right?
22    A.  Yeah.  Now I thought you were talking

Page 116

1  about brand name in your original question.
2         I keep the two totally separate.  I
3  have never reimbursed anybody for generic based
4  on AWP.
5     Q.  So would it be fair to say that you
6  believed you had another choice to set
7  reimbursement rates for generic drugs?
8     A.  Oh, yes.
9     Q.  Apart from the compendia.
10    A.  Yes.  Yes.  I'm sorry.
11    Q.  You mentioned federal upper limits in
12 one of your previous questions.  I think we both
13 know what that's, what that's all about.
14        Did you become aware at any point
15 during your work with Tennessee that CMS
16 apparently deliberately did not establish federal
17 upper limits for intravenous and injectable drug
18 products?
19        MR. DRAYCOTT:  Objection.
20    A.  I wouldn't say that I ever knew that
21 they intentionally didn't do that, but I -- you
22 know, the -- I don't remember -- I don't remember

Page 117

1  injectables being part of the FUL, but it could
2  have been.  I, I just don't remember that.
3         Again, that's another thing that, in
4  Tennessee, and I'm sure this will vary again from
5  state to state, in Tennessee we chose, for
6  example, in a physician's office, under certain
7  settings, or home health is probably a better
8  example, certainly certain drugs and other
9  things, all of them, we wanted to run through the
10 pharmacy program.  For several reasons.  The
11 reimbursement for drugs on like a HCFA 1500 or
12 whatever the -- would have happened from a home
13 health agency to a home health division within
14 TennCare to process, those folks had no clue that
15 if -- what the difference between what was billed
16 and what should be paid should be.  So typically
17 a hundred percent of bills was paid.  So we
18 didn't want, didn't want that situation.  We
19 wanted it to certainly be fair, but wanted most
20 of those things to come through the pharmacy
21 program to control costs.
22        So in the instance of IV solutions or

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

Sullivan, Harry Leo                           March 12, 2008
                    Nashville, TN

---

Page 150

1   concerns on whether or not the payment for these
2   kind of therapies was, was adequate?
3        A.   Well, my opinion, particularly in the,
4   in the home health arena, was -- and during this
5   specific time period, the growth in Tennessee was
6   such of those type of providers that it wouldn't
7   -- that wouldn't -- not lead you to believe that
8   the reimbursement for Medicaid was inadequate.
9        When people are hollering and screaming
10  or you have trouble getting providers to take
11  care of your patients is when that was more
12  likely a concern.
13       Q.   Well, do you know when the home
14  infusion business really started taking off?
15       A.   Well, it certainly took off in the
16  early Nineties.  And I can't remember -- and
17  Tennessee was a little bit different because we
18  very purposely avoided expansion of home
19  community based services under the Medicaid
20  program because the vast majority of the patients
21  who would receive those services were dual
22  eligibles, which meant they had Medicaid and

Page 151

1   Medicare.  And Medicare home health was, was
2   truly exploding.  We had hundreds of providers in
3   Tennessee of home health services.  I dare say
4   there's, you know, maybe 20 now.  Because there
5   was, there was indeed a bonanza on the Medicare
6   side in Tennessee.  Other states didn't face it
7   quite as -- if they had chosen to expand or had
8   very aggressive home community-based services
9   through Medicaid, might have had a little bit
10  different policy issues.  We purely shifted to
11  Medicare, cost shifted to Medicare, with the
12  duals.  And so it wasn't maybe not as, as intense
13  on a Medicaid issue in Tennessee as it might be
14  elsewhere is what I'm saying.
15       Q.   The page starting with -- at 425 and
16  then going over to 426, there is a discussion of
17  what some states are doing in the home IV
18  reimbursement area, Minnesota indicates
19  compounding or a dispensing fee of $8 for IV
20  drugs, and then Washington indicates that they're
21  paying a compounding amount, Ohio as well.
22       Do you have an understanding of what

Page 152

1   they're talking about when they talk about a
2   compounding fee?
3        A.   Yes.
4        Q.   And what, what is that?
5        A.   Well, certain, be it -- I mean you can
6   compound IV drugs if you have the right equipment
7   and filters and hoods to keep it, make it a
8   sterile product.
9        And you can compound drugs for
10  inhalation.  If you have, again, the right
11  equipment, similar to what would be in a
12  hospital, to, to handle sterile products.
13       And you take the raw ingredient and
14  mimic whatever, generally, the brand name or the
15  innovator product was.
16       Q.   And do you know in Tennessee, either
17  before TennCare or after TennCare was paying a
18  compounding fee for IV?  Do you know if that was
19  something that was being paid?
20       A.   Ah, no.  But there's, there's ways to
21  pay it without, without having a separate -- you
22  know, I noticed on here that one form is for

Page 153

1   payment, one form is for reimbursement of
2   supplies, one form is for -- you know, they're,
3   they're making a variety to submit multiple
4   forms.  And I wouldn't -- I can't tell you a
5   specific product or specific time period, but one
6   of my strategies was in issues like this, where
7   compounding was involved, I didn't want to go
8   down the road, at least in the early Nineties, of
9   getting into paying for compounded prescriptions,
10  because that can -- that could range from a
11  sterile product all the way down to an ointment,
12  okay?
13       And, and our claims reimbursement
14  system hadn't evolved to the current NCPDP
15  sophistication of today.  So it was very hard to
16  put in a, a set compounding fee for what, what
17  products?
18       One may take a minute to make, one may
19  take an hour and a half.
20       So getting back to, to the MAC issue,
21  some, sometimes for certain products in this
22  arena, you would take that into account for the

39 (Pages 150 to 153)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                          March 12, 2008
                           Nashville, TN

---

Page 154

1   MAC.
2       For example, I might say, I'm not
3   paying for the tape that you use to hold the IV
4   needle into place. I'm not paying for the IV
5   needle or the tube set. I'm not going to -- I
6   don't want bills for that. I know you've got to
7   do it to administer this drug. So we're going to
8   add on the cost of this drug X, because I know
9   this, this and this always goes with it, and I
10  know there is a fixed cost for that, but I don't
11  want five bills. I want 10 different places.
12  Bill me for the drug. And I'll make sure that
13  the -- whatever the MAC is incorporates all your
14  other costs. And you have to talk with providers
15  and know what that is. I mean, you know.
16      Q.  So, in short, you would use the payment
17  for the drug itself to cross-subsidize other
18  things that might need to be paid to fairly --
19      A.  And that would include compounding.
20      Q.  And it may include nursing services
21  that were not included, things of that nature?
22      A.  (Nodding yes.)

---

Page 155

1       Q.  Did anyone in the federal government
2   ever tell you that you were not allowed to do
3   that?
4       A.  No.
5       Q.  And if they had told you that, what
6   would you have said?
7       A.  That I wasn't allowed to pay for
8   compounding or --
9       Q.  That you weren't allowed to use the
10  payment for the drug to cross-subsidize those
11  other services or supplies.
12      A.  If they had told me I couldn't do it,
13  what would I do?
14      Q.  Yeah.
15      A.  I would have had to have found another
16  way to, to handle the billing.
17      Q.  But they never told you that.
18      A.  No.
19      Q.  Do you know if other states were doing
20  -- were adopting similar type strategies to run
21  the programs?
22      A.  No, I don't -- I mean it may be

---

Page 156

1   addressed in this letter. I don't know. It
2   seems to talk about different states, but I'm
3   sure there were varying levels of complexity in
4   the billing process, and what was and wasn't
5   billable and what was and wasn't included, but I
6   don't know it and I didn't discuss it with folks.
7       Q.  Have you heard the term cross-subsidy
8   or cross-subsidization in the context of pharmacy
9   reimbursement?
10      A.  No, not -- no, I haven't.
11      Q.  I'm going to show you another, another
12  -- going to mark that as another exhibit.
13          MR. TORBORG: I think this is 578.
14          (Exhibit Abbott 578 marked.)
15  BY MR. TORBORG:
16      Q.  For the record, what we have marked as
17  Exhibit 578 bears the Bates numbers HHC 002-0400
18  through 407. It's another Medicaid pharmacy
19  bulletin. This one dated January-February of
20  1988.
21          Mr. Sullivan, if I could ask you to go
22  to Bates page ending in 402. In particular the

---

Page 157

1   discussion on the first full paragraph about
2   Montana Medicaid. Do you see that?
3       A.  Yes.
4       Q.  Where it says, Similarly, Montana
5   Medicaid compensates for the additional time and
6   expense of dispensing compounded drugs by
7   allowing the provider's usual and customary
8   charge up to 2.5 times the cost of ingredients,
9   paren, reimbursement for other outpatient drugs
10  is a lower of AWP minus 10 percent, or the cost
11  of the drug, end paren. Do you see that?
12      A.  Yes.
13      Q.  Is that the, the type of thing that
14  Tennessee was doing?
15      A.  It's a different approach to -- yeah.
16  Make -- paying the provider for the, for the
17  compounding without -- and setting a limit on
18  what I will pay up to two and a half percent.
19  It's just a different, different twist.
20      Q.  Does it -- does this refresh your
21  recollection about any other types of approaches
22  like this that other states were using?

40 (Pages 154 to 157)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 210

1      The thought process was, well, we can't
2  totally redo the capitation rates just based upon
3  drugs to the BHO, so we'll take back what little
4  bit we, we had pigeonholed in that capitation
5  rate for drugs, take that back, take back in-
6  house the whole claims processing and management
7  of those, of those few therapeutic catalogs of
8  drugs and re-enter the Medicaid drug rebate
9  program.  I could get 20-25 percent of rebates on
10 those brand name drugs and MCOs couldn't.  They
11 didn't have the same purchasing power or the
12 benefit of the Medicaid rebate contract to
13 negotiate those same discounts.
14      Then in 2000 we were going through a
15 process, a time when several of our MCOs were
16 exercising exigency clauses in their contracts.
17 We were pretty desperately looking across the
18 nation to find new MCOs to come into the plan, so
19 they would have more competition, and Blue Cross
20 isn't the only one, you know, calling the shots,
21 basically.
22      And in that process of trying to

Page 211

1  recruit new MCOs into the TennCare program, we
2  heard repeatedly from potential players that we
3  might be willing to come into TennCare and become
4  a new player, but you're spending incredible
5  amount of drugs on duals, and duals can, at that
6  time, literally step out of managed care, go see
7  a doctor who's being reimbursed by Medicare, step
8  back into managed care and get their drug filled.
9      And that doctor is not in that MCOs's
10 network, not accountable to that MCO, doesn't
11 care about that MCOs's formulary.  Makes it a
12 real difficult situation to manage.  So they
13 said, If y'all can do something about that, we'd
14 be interested.
15      Well, we agreed and recognized that,
16 and the decision was made, well, heck, we've
17 already carved out the behavioral health drugs,
18 now let's get the duals and carve that out as
19 well.  We can get the rebate again, get that back
20 into the Medicaid drug rebate program.  The duals
21 at that time were about 13 percent of the patient
22 population and they accounted for about 35

Page 212

1  percent of the drugs spent.  So it was
2  significant.
3      We are trying to get my MCOs into the
4  program.  So in July of 2000, then, the second
5  carve-out occurs, and then, finally, in 2002 we
6  took the whole program back because the MCOs
7  weren't doing a good job.  There were a bunch of
8  lawsuits.  They didn't have the purchasing power
9  or the benefit of Medicaid rebates; it just
10 didn't make sense to keep it.  So disjointed.
11 Multiple formularies, doctors hated it.  So we
12 brought it all back in in-house in July 2002.
13     Q.  When you say all, you're talking about
14 all the pharmacy claims?
15     A.  The entire -- yeah.  We contracted with
16 a PPM and, and even then, in 2003 and '4, went to
17 -- down the supplemental rebate route.
18     Q.  I would like to hand you what we have
19 marked previously as Abbott Exhibit 137, changing
20 topics a bit.
21         This is a letter dated February 16th,
22 2000, from Patrick Lupinetti for the NAMFCU drug

Page 213

1  pricing team to the pharmacy director, division
2  of health care financing in Wyoming, it appears.
3         Mr. Sullivan, if you would take a
4  glance at that and see if you recall getting a
5  similar letter while you were the director of
6  pharmacy services at TennCare.
7      A.  Okay.
8      Q.  Mr. Sullivan, do you recall receiving a
9  document like this?
10     A.  Vaguely, yes.
11     Q.  Do you recall the subject matter of
12 this letter, which refers to an investigation by
13 the Department of Justice and the National
14 Association of Medicaid Fraud Control Units to
15 develop pricing for certain drugs?  Do you recall
16 that --
17     A.  Yes.
18     Q.  -- initiative?
19     A.  Yes.
20     Q.  What do you recall about that
21 initiative?
22     A.  What it didn't -- wasn't this case

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 82

1    Q.  Is that your name there at the bottom
2  of the first column?
3    A.  Yes, it is.
4    Q.  Do you -- and you recall attending
5  meetings?
6    A.  Yes.
7    Q.  In Chicago?
8    A.  Yes.
9    Q.  And would this look like the agenda
10 under one of those meetings --
11   A.  Yes.
12   Q.  -- that you were testifying about?
13   A.  Sure.
14   Q.  And if I can direct you to the Bates
15 page ending 269, the first page of the agenda.
16 In particular there is a segment Thursday, July
17 18th, 1996 from 9:00 to 10:00 a.m.  Do you see
18 that?
19   A.  Yes.
20   Q.  Says OIG and Medicaid Dispensing Fees?
21   A.  Right.
22   Q.  Ben Jackson, OIG?

Page 83

1    A.  Right.
2    Q.  Do you recall anything about Mr.
3  Jackson's presentation at this meeting?
4    A.  Ah, just that I remember that OIG did
5  do a study and that, that the net result was, you
6  know, AWP is not what anybody pays for drugs,
7  which is -- you know, and that's oversimplifying
8  it.  I'm sure there was more detail, and they
9  quantified, and probably I, I -- I want to say
10 distinguished between different retail settings
11 what discounts were.  But, yeah, I remember it.
12   Q.  So does it look like at least on this
13 meeting the subject of the difference between AWP
14 acquisition costs was discussed?
15   A.  Yes, but to go back to a previous
16 question, you know, I could have -- I feel like
17 all 50, 51, counting the District of Columbia,
18 pharmacy directors could have sat there and
19 watched this presentation and then at the end of
20 the day gone to dinner and I don't think we would
21 have talked about, Gee, did you know nobody was
22 paying full AWP?  I don't think that was --

Page 84

1    Q.  Now why do you say that?
2    A.  Because it's known.
3    Q.  Okay.
4    A.  Because it's been known ever since you
5  walked into a drugstore.
6    Q.  And it's something you have known since
7  1989?
8    A.  Yeah.  Well, even before.
9    Q.  And you believe it's well known
10 throughout the industry?
11   A.  Absolutely.
12     MR. DRAYCOTT:  Objection.
13   A.  I do.
14 BY MR. TORBORG:
15   Q.  And you said absolutely was your
16 answer.
17   A.  Yes.
18   Q.  And what do you base that statement on?
19   A.  Well, I just don't think anybody who is
20 in a position to either purchase prescription
21 drugs to dispense or reimburse for them after
22 they have been dispensed could be in those

Page 85

1  depositions without knowing that.  It's, it's un
2  -- inconceivable to me.
3    Q.  When you, when you use or hear the term
4  of a wholesale price, what does it mean to you?
5     MR. DRAYCOTT:  Objection.
6    A.  It means some published figure,
7  supposedly provided to someone like Blue Book,
8  Red Book, First DataBank, by the manufacturer.
9  BY MR. TORBORG:
10   Q.  And from your experience in
11 interactions with others in the pharmaceutical
12 industry, including state Medicaid pharmacy
13 administrators, do you believe it is well
14 established in the industry that the term
15 "average wholesale price" refers to published
16 drug prices contained in magazines like Red Book
17 and Blue Book?
18     MR. DRAYCOTT:  Objection.
19   A.  Yes.
20 BY MR. TORBORG:
21   Q.  Do you believe it would be fair for
22 anyone to suggest that it is not established --

                                    22  (Pages 82 to 85)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                         Nashville, TN

Page 86

1  it is not well established that AWP does not
2  refer to those prices?
3      MR. DRAYCOTT:  Objection.
4      A.  I'd like you to say that -- get one of
5  those negatives or something.
6  BY MR. TORBORG:
7      Q.  Yeah.  Okay.  Would it be fair for
8  anyone to suggest that it is not well established
9  that the term AWP refers to prices published in
10 Red Book, Blue Book or similar price listings?
11     MR. DRAYCOTT:  Objection.
12     A.  If you're asking would I think that
13 everybody at my level would have known that AWP
14 prices were published in these books?
15 BY MR. TORBORG:
16     Q.  Let me, let me strike that and try
17 again.
18     A.  Okay.
19     Q.  You believe it's well established in
20 the industry, from your interactions, that the
21 term average wholesale price means prices
22 published in Red Book, Blue Book and similar

Page 87

1  price listings?
2      MR. DRAYCOTT:  Objection.
3  BY MR. TORBORG:
4      Q.  Correct?
5      A.  Yes.
6      Q.  I would like to hand you a document
7  we've marked previously as Exhibit 19.  And I'll
8  hand you a copy of -- we have the previously
9  marked exhibits in these orange binders, and I'll
10 hand you the ones that I would like to ask you
11 about to the extent we cover them.  Is the
12 initial complaint that was filed by the United
13 States in a case against Abbott.  I take it you
14 have never seen that before.
15     A.  No.
16     Q.  I would like to ask you to go to
17 Paragraph 42.  It's on page 14 of the complaint.
18     A.  Okay.
19     Q.  It says there AWP is used to refer to
20 the price at which a pharmaceutical firm or
21 wholesaler sells a drug to a retail customer, it
22 then administers it to a patient.  Do you see

Page 88

1  that?
2      A.  Yes.
3      Q.  Do you agree that AWP is referred to,
4  is used to refer to the price at which a
5  pharmaceutical firm or wholesaler sells a drug to
6  a retail customer?
7      A.  No.
8          MR. DRAYCOTT:  Objection.
9      A.  No.
10 BY MR. TORBORG:
11     Q.  And why not?
12     A.  Well, it's, it's just a, a starting
13 point or a benchmark from which the final, as
14 this says, price at which it is first of all sold
15 to the wholesaler, and then sold from the
16 wholesaler to the pharmacy, and then sold from
17 the pharmacy to the patient.  There are steps of
18 discounts and profits involved in each of those
19 steps.
20     Q.  Okay.  If we go to the next sentence,
21 WAC is used to refer to the price at which a
22 pharmaceutical firm typically sells a drug to

Page 89

1  wholesalers who would then resell it to a retail
2  customer.  Do you see that?
3      A.  Um-hum.
4      Q.  Do you agree with that?
5      A.  Is retail customer in both these
6  sentences defined by being a pharmacy?  Is that a
7  pharmacy?  I mean --
8      Q.  I'm going to ask you.
9      A.  None of these places sell to what I
10 would call retail customers.  That's against the
11 law.
12     Q.  Go to Paragraph 3 of the complaint,
13 page 2.
14     A.  Okay.  I don't mean to --
15     Q.  I don't want to testify about this.
16     A.  -- gum things up.  Okay.
17     Q.  Do you see there it says, Within the
18 time frames detailed below, Abbott engaged in a
19 fraudulent scheme that caused the Medicare and
20 Medicaid programs to pay excessive reimbursement
21 to Abbott's customers, e.g., pharmacies,
22 physicians, hospitals, home health agencies,

23  (Pages 86 to 89)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                        Nashville, TN

Page 98

1  -- if, if actual acquisition costs is being used
2  as a reimbursement methodology, it still does not
3  get to net cost.
4      Q.  During the entirety of the time that
5  you were the director of pharmacy services for
6  Tennessee Medicaid, did you believe that the AWPs
7  in the compendia were a reliable source of
8  information regarding what pharmacies or
9  physicians actually paid for drugs?
10     A.  No.
11     Q.  And from your interactions with other
12  state pharmacy administrators, in your view did
13  other state pharmacy administrators believe that
14  AWPs were a reliable source for what pharmacies
15  and physicians actually paid for drugs?
16         MR. DRAYCOTT:  Objection.
17     A.  Again, I don't ever remember such a
18  specific discussion with, with those peers,
19  because it just wouldn't come up.  I -- everybody
20  knows the sky's blue.  I mean it is that basic to
21  me.  I couldn't imagine some -- one of your peers
22  in that situation sitting down and saying, Hey,

Page 99

1  Did you know pharmacists really aren't paying
2  AWP?
3  BY MR. TORBORG:
4      Q.  So just as the sky, just as everyone
5  knows the sky is blue, you think your peers knew
6  that average wholesale prices did not represent a
7  reliable source of the prices at which physicians
8  and pharmacies actually paid for drugs.
9      A.  That's correct.
10     Q.  During the entirety of the time that
11  you were the director of pharmacy services for
12  Tennessee, did you believe that the AWPs and the
13  compendia approximated what pharmacies or
14  physicians actually paid for drugs?
15         MR. DRAYCOTT:  Objection.
16     A.  No.
17         No.
18         And "approximate" is kind of a hard
19  term.  Well, I mean I guess you could say AWP
20  minus 22 approximates what their AWP, but I don't
21  know how you would define approximate.  But --
22  BY MR. TORBORG:

Page 100

1      Q.  Would that be --
2      A.  -- the way I would look at it, I would
3  answer no.
4      Q.  During the entirety of the time that
5  you were the director of pharmacy services for
6  Tennessee Medicaid, did you believe that there
7  was some consistent percentage by which average
8  wholesale prices exceeded actual acquisition
9  costs?
10     A.  Um --
11     Q.  Did you -- let me ask it a different
12  way.
13         Did you believe that you could shave
14  20, 30 percent off of it and get to a reliable
15  number of what pharmacies and physicians actually
16  paid for drugs?
17     A.  Well, it would, it would depend on -- I
18  mean, are we talking brand or generic?
19     Q.  Both right now.  Would you draw a
20  distinction?
21     A.  Oh, yeah.  Yeah.
22     Q.  All right.

Page 101

1      A.  The generic drugs, you know, you could
2  pay AWP minus 80 percent and still the pharmacist
3  make money for some, I assume.
4         But AWP minus 25 might be below cost
5  for a brand name drug for a rural pharmacy that
6  has a very small volume.  Okay?  So there is,
7  there is a difference between brand and generic.
8         In Tennessee, it wasn't as pronounced
9  because, you know, what I did as part of my job,
10  as soon as a drug became multi-source, and after
11  OBRA '90, as soon as that drug, the multi-source
12  version of a drug was cheaper than the brand name
13  net-net of Medicaid rebates, we MACed it.  So AWP
14  wasn't an issue on the generic side.
15     Q.  And why did you --
16     A.  But to say 20-30 percent, use that
17  number, you would have to distinguish between
18  brand and generic.
19     Q.  Would it be fair to say, Mr. Sullivan,
20  that during the entirety of the time that you
21  were the director of pharmacy services for the
22  State of Tennessee that you knew that the AWPs

26 (Pages 98 to 101)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                           March 12, 2008
                  Nashville, TN

                  UNITED STATES DISTRICT

            FOR THE DISTRICT OF MASSACHUSETTS


        --------------------------X

        IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

        INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

        PRICE LITIGATION            )  01-CV-12257-PBS

        THIS DOCUMENT RELATES TO    )

        U.S. ex rel. Ven-a-Care of  )

        of the Florida Keys, Inc.   )

            v.                      )  No.06-CV-11337-PBS

        ABBOTT LABORATORIES, INC.,  )

        --------------------------X


           (cross captions appear on following pages)


              Deposition of HARRY LEO SULLIVAN

                      Volume I

                 Nashville, Tennessee

                Tuesday, March 12, 2008

                     9:05 a.m.

Sullivan, Harry Leo                                    March 12, 2008
                         Nashville, TN

Page 82

1    Q.  Is that your name there at the bottom
2  of the first column?
3    A.  Yes, it is.
4    Q.  Do you -- and you recall attending
5  meetings?
6    A.  Yes.
7    Q.  In Chicago?
8    A.  Yes.
9    Q.  And would this look like the agenda
10 under one of those meetings --
11   A.  Yes.
12   Q.  -- that you were testifying about?
13   A.  Sure.
14   Q.  And if I can direct you to the Bates
15 page ending 269, the first page of the agenda.
16 In particular there is a segment Thursday, July
17 18th, 1996 from 9:00 to 10:00 a.m.  Do you see
18 that?
19   A.  Yes.
20   Q.  Says OIG and Medicaid Dispensing Fees?
21   A.  Right.
22   Q.  Ben Jackson, OIG?

Page 83

1    A.  Right.
2    Q.  Do you recall anything about Mr.
3  Jackson's presentation at this meeting?
4    A.  Ah, just that I remember that OIG did
5  do a study and that, that the net result was, you
6  know, AWP is not what anybody pays for drugs,
7  which is -- you know, and that's oversimplifying
8  it.  I'm sure there was more detail, and they
9  quantified, and probably I, I -- I want to say
10 distinguished between different retail settings
11 what discounts were.  But, yeah, I remember it.
12   Q.  So does it look like at least on this
13 meeting the subject of the difference between AWP
14 acquisition costs was discussed?
15   A.  Yes, but to go back to a previous
16 question, you know, I could have -- I feel like
17 all 50, 51, counting the District of Columbia,
18 pharmacy directors could have sat there and
19 watched this presentation and then at the end of
20 the day gone to dinner and I don't think we would
21 have talked about, Gee, did you know nobody was
22 paying full AWP?  I don't think that was --

Page 84

1    Q.  Now why do you say that?
2    A.  Because it's known.
3    Q.  Okay.
4    A.  Because it's been known ever since you
5  walked into a drugstore.
6    Q.  And it's something you have known since
7  1989?
8    A.  Yeah.  Well, even before.
9    Q.  And you believe it's well known
10 throughout the industry?
11   A.  Absolutely.
12     MR. DRAYCOTT:  Objection.
13   A.  I do.
14 BY MR. TORBORG:
15   Q.  And you said absolutely was your
16 answer.
17   A.  Yes.
18   Q.  And what do you base that statement on?
19   A.  Well, I just don't think anybody who is
20 in a position to either purchase prescription
21 drugs to dispense or reimburse for them after
22 they have been dispensed could be in those

Page 85

1  depositions without knowing that.  It's, it's un
2  -- inconceivable to me.
3    Q.  When you, when you use or hear the term
4  of a wholesale price, what does it mean to you?
5     MR. DRAYCOTT:  Objection.
6    A.  It means some published figure,
7  supposedly provided to someone like Blue Book,
8  Red Book, First DataBank, by the manufacturer.
9  BY MR. TORBORG:
10   Q.  And from your experience in
11 interactions with others in the pharmaceutical
12 industry, including state Medicaid pharmacy
13 administrators, do you believe it is well
14 established in the industry that the term
15 "average wholesale price" refers to published
16 drug prices contained in magazines like Red Book
17 and Blue Book?
18     MR. DRAYCOTT:  Objection.
19   A.  Yes.
20 BY MR. TORBORG:
21   Q.  Do you believe it would be fair for
22 anyone to suggest that it is not established --

22  (Pages 82 to 85)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                            Nashville, TN

Page 86

1    it is not well established that AWP does not
2    refer to those prices?
3         MR. DRAYCOTT:  Objection.
4         A.  I'd like you to say that -- get one of
5    those negatives or something.
6    BY MR. TORBORG:
7         Q.  Yeah.  Okay.  Would it be fair for
8    anyone to suggest that it is not well established
9    that the term AWP refers to prices published in
10   Red Book, Blue Book or similar price listings?
11        MR. DRAYCOTT:  Objection.
12        A.  If you're asking would I think that
13   everybody at my level would have known that AWP
14   prices were published in these books?
15   BY MR. TORBORG:
16        Q.  Let me, let me strike that and try
17   again.
18        A.  Okay.
19        Q.  You believe it's well established in
20   the industry, from your interactions, that the
21   term average wholesale price means prices
22   published in Red Book, Blue Book and similar

Page 87

1    price listings?
2         MR. DRAYCOTT:  Objection.
3    BY MR. TORBORG:
4         Q.  Correct?
5         A.  Yes.
6         Q.  I would like to hand you a document
7    we've marked previously as Exhibit 19.  And I'll
8    hand you a copy of -- we have the previously
9    marked exhibits in these orange binders, and I'll
10   hand you the ones that I would like to ask you
11   about to the extent we cover them.  Is the
12   initial complaint that was filed by the United
13   States in a case against Abbott.  I take it you
14   have never seen that before.
15        A.  No.
16        Q.  I would like to ask you to go to
17   Paragraph 42.  It's on page 14 of the complaint.
18        A.  Okay.
19        Q.  It says there AWP is used to refer to
20   the price at which a pharmaceutical firm or
21   wholesaler sells a drug to a retail customer, it
22   then administers it to a patient.  Do you see

Page 88

1    that?
2         A.  Yes.
3         Q.  Do you agree that AWP is referred to,
4    is used to refer to the price at which a
5    pharmaceutical firm or wholesaler sells a drug to
6    a retail customer?
7         A.  No.
8         MR. DRAYCOTT:  Objection.
9         A.  No.
10   BY MR. TORBORG:
11        Q.  And why not?
12        A.  Well, it's, it's just a, a starting
13   point or a benchmark from which the final, as
14   this says, price at which it is first of all sold
15   to the wholesaler, and then sold from the
16   wholesaler to the pharmacy, and then sold from
17   the pharmacy to the patient.  There are steps of
18   discounts and profits involved in each of those
19   steps.
20        Q.  Okay.  If we go to the next sentence,
21   WAC is used to refer to the price at which a
22   pharmaceutical firm typically sells a drug to

Page 89

1    wholesalers who would then resell it to a retail
2    customer.  Do you see that?
3         A.  Um-hum.
4         Q.  Do you agree with that?
5         A.  Is retail customer in both these
6    sentences defined by being a pharmacy?  Is that a
7    pharmacy?  I mean --
8         Q.  I'm going to ask you.
9         A.  None of these places sell to what I
10   would call retail customers.  That's against the
11   law.
12        Q.  Go to Paragraph 3 of the complaint,
13   page 2.
14        A.  Okay.  I don't mean to --
15        Q.  I don't want to testify about this.
16        A.  -- gum things up.  Okay.
17        Q.  Do you see there it says, Within the
18   time frames detailed below, Abbott engaged in a
19   fraudulent scheme that caused the Medicare and
20   Medicaid programs to pay excessive reimbursement
21   to Abbott's customers, e.g., pharmacies,
22   physicians, hospitals, home health agencies,

23  (Pages 86 to 89)

0c585b6a-88d2-47d8-bc26-289a064ea87e

# EXHIBIT AK

Reid, Robert Paul                        December 15, 2008
                    Columbus, OH

Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - ) MDL No. 1456

IN RE: PHARMACEUTICAL INDUSTRY    ) Master File No.

AVERAGE WHOLESALE PRICE LITIGATION) 01-12257-PBS

--------------------------------)

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel.  ) Saris

Ven-A-Care of the Florida Keys,   )

Inc, et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS     )

--------------------------------


             VIDEOTAPED DEPOSITION OF ROBERT PAUL REID

                      Monday, December 15, 2008

                      9:59 o'clock a.m.

                      Jones Day

                      325 John H. McConnell Boulevard

                      Suite 600

                      Columbus, Ohio 43215

                 SHAYNA M. GRIFFIN

            REGISTERED PROFESSIONAL REPORTER

Reid, Robert Paul                                    December 15, 2008
                          Columbus, OH

Page 158

1     A.  Well, I think we took into
2  consideration -- let's take the example of
3  Phenergan 12 and a half milligram that we used
4  earlier.  We would try to determine how much
5  pharmacies were paying for each version of that
6  from the various generic companies, and we put
7  them on a grid and picked the one price that was
8  available 65 percent of the time.
9     Q.  Let me back up a little bit.
10        Where did you get the -- those prices
11  from?
12    A.  First DataBank, mostly.
13    Q.  For the generic drugs?
14    A.  Well, they would give us -- they
15  would give us a starting point -- when they sent
16  their monthly reports to us, they would give us a
17  starting point of WAC plus seven for the -- I
18  think it was whatever -- whatever the going rate
19  was at the time.  We wouldn't necessarily use
20  those prices, but they would be ones that we
21  would put in that grid to determine which one was
22  the 65th percentile.  Very complicated.

Page 159

1     Q.  Which other prices would you use?
2     A.  Oh, we would call pharmacies and ask
3  them. Pharmacies would call us and volunteer
4  information. And we, in more recent times, were
5  using the MAC prices that were set by other
6  states, all of which were public record.
7     Q.  Which pharmacies would you call?
8     A.  I would call my own, which was
9  Northland Pharmacy, in Columbus.  I would call
10  Cline's Pharmacy in Akron.  And there was a rural
11  store that I called, which has since gone out of
12  business, just to get a feel for what was going
13  on in the market, the dynamics of the
14  marketplace.
15    Q.  And they would provide you with a
16  price at which they actually purchased the drug?
17    A.  Yes.
18    Q.  And those are the prices that you
19  would then put in your grid?
20    A.  Yes.  Sometimes a pharmacy would
21  object to the price that we had set and they
22  would send an invoice as documentation of what

Page 160

1  they were really paying for a product.  And they
2  would encourage us to raise our allowable.  A lot
3  of times there was a lot of other information on
4  that invoice that we would use.
5     Q.  What other information?
6     A.  Well, prices of other drugs.
7     Q.  Okay.
8     A.  Sometimes, you know, stores would
9  black out everything except they would only
10  answer the question.  But other times they would
11  send an invoice -- a copy of an invoice that gave
12  us a lot of information.
13    Q.  And some pharmacies actually called
14  to volunteer this information to you?
15    A.  Once in a while I would get a call --
16  understandably, not very often -- you're paying
17  too much.  And they would be representing
18  themselves as a taxpayer.
19    Q.  So the prices that you used to set
20  the MAC amount, those were based on actual prices
21  that you got from pharmacies; correct?
22    A.  Right.

Page 161

1     Q.  They are not based on --
2     A.  Well, partly, yeah.
3     Q.  What else were they based on?
4     A.  Well, we would take the First
5  DataBank price into consideration, although
6  rarely use it on the grid, unless it was
7  reasonable, comparable.
8     Q.  So if the First DataBank price was
9  not comparable to the other prices, you wouldn't
10  use it?
11    A.  No.  I would consider it to be an
12  outlier.
13    Q.  If it was an outlier, it wouldn't
14  even go into the 65th percentile calculation?
15        MS. GEOPPINGER:  Object to the form of
16  the question.
17        You can answer.
18    A.  Yes.
19    Q.  And you did all this by yourself?
20    A.  I did it all by myself up until 2001.
21    Q.  Now, it says here that --
22        MS. GEOPPINGER:  What are we looking

41  (Pages 158 to 161)

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                              December 15, 2008
                        Columbus, OH

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - ) MDL No. 1456

IN RE: PHARMACEUTICAL INDUSTRY    ) Master File No.

AVERAGE WHOLESALE PRICE LITIGATION) 01-12257-PBS

--------------------------------)

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel.  ) Saris

Ven-A-Care of the Florida Keys,   )

Inc, et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS     )

--------------------------------


            VIDEOTAPED DEPOSITION OF ROBERT PAUL REID

                     Monday, December 15, 2008

                     9:59 o'clock a.m.

                     Jones Day

                     325 John H. McConnell Boulevard

                     Suite 600

                     Columbus, Ohio 43215

                 SHAYNA M. GRIFFIN

            REGISTERED PROFESSIONAL REPORTER

Reid, Robert Paul                                    December 15, 2008
                        Columbus, OH

Page 98

1  publication -- a subscription to that
2  publication?
3      A.  I'm not sure that it was necessary to
4  have a subscription.  I think it was distributed.
5  I don't know who the sponsor was.
6      Q.  Do you recall any subscriptions to
7  periodicals the department had relating to
8  Medicaid pharmacy issues?
9      A.  Well, First DataBank was -- had a
10  contract with the State to provide all kinds of
11  information.
12     Q.  Now, we've talked about this, some of
13  the meetings that you attended with other state
14  Medicaid personnel; right?
15     A.  Right.
16     Q.  The PTAG, the various meetings of the
17  association -- I'm sorry.  What was it again,
18  AMPAA?
19     A.  Yes.
20     Q.  You had a LISTSERV?
21     A.  A.&&&LISTSERV, yes.
22     Q.  Would you agree with me, Mr. Reid,

Page 99

1  that the state pharmacy personnel from around the
2  country were pretty well connected?
3          MS. GEOPPINGER:  Object to the form of
4  the question.
5          You can answer.
6      A.  I would say they were pretty well
7  connected.
8      Q.  Mr. Reid, you indicated previously
9  that you had an understanding that this case had
10  something to do with average wholesale price;
11  right?
12     A.  Right.
13     Q.  And you're familiar with that term?
14     A.  I am.
15     Q.  Okay.  And what does the term
16  "average wholesale price" mean to you?
17         MS. GEOPPINGER:  I'm going to object to
18  the form of the question to the extent that I
19  think he already stated that.
20         But go ahead.  You can answer it again.
21     A.  Well, I think it was a baseline price
22  that wholesalers used to determine how much they

Page 100

1  were going to charge for their products.
2      Q.  When you -- when you would use or
3  hear the term "average wholesale price," would it
4  be referring to prices contained in First
5  DataBank --
6      A.  They had -- one of their data
7  elements was AWP.
8      Q.  Where would you go to find AWP if you
9  wanted to know what --
10     A.  Red Book, Blue Book.  They were
11  publications that were available to the
12  pharmacies.
13     Q.  And I assume you've used the term
14  "average wholesale price" with your colleagues in
15  other states --
16     A.  Yes.
17     Q.  -- right?
18         And from those interactions, is it your
19  view that the term "average wholesale price" is
20  well understood in the industry to mean prices
21  published in Red Book, Blue Book, First DataBank?
22         MS. GEOPPINGER:  Object to the form of

Page 101

1  the question.
2          You can answer.
3      A.  Yes.
4          MR. HENDERSON:  Can we agree that an
5  objection by Ms. Geoppinger is also an objection
6  by me?
7          MR. TORBORG:  That would be fine.
8          MR. HENDERSON:  And vice versa?
9          MS. GEOPPINGER:  Fair enough.
10 BY MR. TORBORG:
11     Q.  Now, are you also familiar with the
12  term "actual acquisition cost"?
13     A.  Yes, AAC.
14     Q.  AAC.
15     A.  Uh-huh.
16     Q.  How did you become familiar with that
17  term?
18     A.  I think we used that term to try to
19  determine what pharmacies actually paid for their
20  products.
21     Q.  Why wouldn't you just use the average
22  wholesale price?

26 (Pages 98 to 101)

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

af69f64b-a1fb-4f21-a237-a09d2632bad5

# EXHIBIT AL

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                        Tallahassee, FL

Page 1

                    UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

--------------------------------X 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:         )

U.S. ex rel. Ven-A-Care of the    ) Judge Patti B.

Florida Keys, Inc., v. Abbott     ) Saris

Laboratories, Inc., No.           )

06-CV-11337-PBS; U.S. ex rel.     ) Magistrate Judge

Ven-A-Care of the Florida Keys,   ) Marianne Bowler

Inc. v. Abbott Laboratories, Inc.,)

No. 07-CV-11618-PBS; U.S. ex rel. )

Ven-A-Care of the Florida Keys,   )  DEPOSITION OF

Inc. v. Dey, Inc., et al., No.    )   JERRY WELLS

05-11084-PBS; U.S. ex rel.        )

Ven-A-Care of the Florida Keys,   ) DECMEBER 15, 2008

Inc., et al. v. Boehringer        )  TALLAHASSEE, FL

Ingelheim Corp., et al., No.      )

07-10248-PBS                      )

--------------------------------X

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
Tallahassee, FL

Page 226

1      MR. COOK: Jim, do not interrupt the
2   witness when he's about to give his answer.
3      MR. BREEN: Well, I think he needs to
4   hear the question because I think it's chopped
5   up, and I think I can get it read back any time I
6   want.
7      But if you don't want to read it back,
8   I object to that.
9      MR. COOK: I will ask the question --
10      MR. BREEN: I think it's improper.
11      MR. COOK: -- again. I'll ask the
12   question again.
13   BY MR. COOK:
14      Q.  If the -- is that consistent; that is,
15   this distribution, consistent with your
16   understanding of the way generic drugs have been
17   priced in the marketplace going back in the mid-
18   1990s?
19      MS. ST. PETER-GRIFFITH: Object to
20   form.
21      MR. BREEN: Objection, form.
22      MS. WALLACE: Objection, form.

Page 227

1      THE WITNESS: If I understand your
2   question, I think the answer is yes to that.
3   BY MR. COOK:
4      Q.  And it has been your understanding that
5   this is the way generic drug prices were priced
6   in the 1990s, correct?
7      MS. ST. PETER-GRIFFITH: Object to the
8   form.
9      MS. WALLACE: Objection to form.
10      (Simultaneous conversation
11   interrupted by the court reporter.)
12   BY MR. COOK:
13      Q.  That is, you had that understanding in
14   the 1990s?
15      A.  In the late '90s, yes.
16      Q.  And you obtained that understanding
17   from, in part, the review of invoice prices that
18   the OIG conducted, correct?
19      MS. ST. PETER-GRIFFITH: Object to the
20   form.
21      MS. WALLACE: Objection to form.
22      THE WITNESS: I don't know the answer

Page 228

1   to that.  I think I came to that conclusion from
2   other sources because I don't think I focused on
3   the generic data from the OIG report.
4   BY MR. COOK:
5      Q.  Upon coming to that conclusion, what
6   steps did you take to change the reimbursement
7   methodologies at Florida Medicaid?
8      A.  As I mentioned, when this information
9   became available, we were focused very heavily on
10   brand name drugs and implementing a preferred
11   drug list and contracting for supplemental
12   rebates, which was all brand name product
13   related, and we were not focusing on generic
14   products at that time, and it was kind of an all-
15   consuming exercise.  We later on implemented some
16   more broadly-based state MAC pricing to address
17   some of the generic issues, but the dollars where
18   we got the most return for our effort were on
19   brand name drugs.
20      Q.  When you implement a MAC in Florida, do
21   you attempt to estimate precisely what it is that
22   providers are paying for that product or do you

Page 229

1   try to set the MAC at a point somewhat above the
2   acquisition cost of providers?
3      MS. WALLACE: Mr. Cook, could you
4   please provide a time frame for that as since
5   retired?
6      MR. COOK: Absolutely.
7   BY MR. COOK:
8      Q.  When you were working for the state
9   Medicaid program, you had personal responsibility
10   for establishing, to some degree, the dollar
11   amount for various state MACs, correct?
12      MS. ST. PETER-GRIFFITH: Object to the
13   form.
14      THE WITNESS: That's correct.
15   BY MR. COOK:
16      Q.  And that was true from 1992 to 2007,
17   correct?
18      MS. ST. PETER-GRIFFITH: Object to the
19   form.
20      THE WITNESS: That is correct.
21   BY MR. COOK:
22      Q.  When you established those MACs, were

58  (Pages 226 to 229)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry      PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
Tallahassee, FL

Page 230

1  you trying to set the MAC at exactly the
2  acquisition cost of providers or at some point
3  above or below the acquisition cost for
4  providers?
5      A.  We would not have tried to set
6  acquisition or the reimbursement level below
7  acquisition cost.  We would try to set the
8  reimbursement level at a point where 95 percent
9  of the providers could purchase the drug at or
10  below that price.
11      Q.  Now, the dispensing fee in Florida has
12  remained the same in Florida, of course, from
13  1986 until 2007, correct?
14      A.  That's correct.
15          MS. ST. PETER-GRIFFITH:  Object to the
16  form.
17  BY MR. COOK:
18      Q.  And that's primarily relevant to the
19  retail pharmacy, correct?
20          MS. WALLACE:  Objection to form.
21          MS. ST. PETER-GRIFFITH:  Object to the
22  form.

Page 231

1          THE WITNESS:  No.
2  BY MR. COOK:
3      Q.  I can ask that in a better way.  That
4  same -- while that same -- forget it.
5          Costs have gone up at the retail
6  pharmacy from 1986 to 2007, correct?
7      A.  I'm sure they have.
8      Q.  In setting state MACs, do you make an
9  effort to set the ingredient costs at a point
10  where the total reimbursement, the ingredient
11  cost plus the dispensing fee, covers pharmacies'
12  costs for dispensing that product?
13          MS. ST. PETER-GRIFFITH:  Object to the
14  form.
15          MS. WALLACE:  Objection to form.
16          THE WITNESS:  No.
17  BY MR. COOK:
18      Q.  What is your goal in setting the MAC?
19      A.  I just stated that, I think, but I'll
20  restate it.  The goal of setting a MAC price is
21  to set the price as low as you can set it where
22  somewhere in the neighborhood of 95 percent of

Page 232

1  providers can purchase the product at or below
2  that price.
3      Q.  I'm not a statistician, so I don't know
4  that I can frame this right.  Do you know what
5  sort of --
6      A.  And I wouldn't know whether you did or
7  not, so that's okay.
8      Q.  Do you know what sort of variance there
9  tends to be in the amount that providers pay for
10  these products?  That is, when you're hitting the
11  95 percent level where 95 percent of providers
12  can purchase it, do you have a feel for how wide
13  the variation can be below that 95th percentage
14  point?
15      A.  Well, yes, because we would look
16  something like your histogram for AWP discounts
17  almost.  We looked at invoices and catalogs and
18  set state MAC prices when we were doing that
19  internally.  And I would usually email that
20  information to Walgreens or Wal-Mart or CVS and
21  to a half of dozen independents or to the Florida
22  Pharmacy Association and say, I'm looking at

Page 233

1  these pricing levels on these drugs, give me some
2  feedback, can you buy them at that level, this is
3  what we think it ought to be.
4      Q.  Uh-huh.
5      A.  And if I set it too low, they'd scream
6  a lot.  If I set it too high, they'd say, well,
7  that looks fine, we can just barely make it.
8      Q.  Have you gone through that process for
9  the infusion and IV drugs listed in the complaint
10  in this case?
11      A.  No.
12      Q.  So those are still being paid based
13  upon --
14      A.  They are being paid based upon the
15  provisions of the Deficit Reduction Act of 2005
16  at this point, which mandated the State of
17  Florida adopting those -- that pricing logic
18  based on manufacturer rebate levels to calculate
19  the average manufacturer price.
20      Q.  And that's at 250 percent of the
21  average manufacturer's price, correct?
22      A.  That's correct.

59 (Pages 230 to 233)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry          PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                              Tallahassee, FL

                    UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

        --------------------------------X

        In Re: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

        AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

        --------------------------------X 01-CV-12257-PBS

        THIS DOCUMENT RELATES TO:         )

        U.S. ex rel. Ven-A-Care of the    ) Judge Patti B.

        Florida Keys, Inc., v. Abbott     ) Saris

        Laboratories, Inc., No.           )

        06-CV-11337-PBS; U.S. ex rel.     ) Magistrate Judge

        Ven-A-Care of the Florida Keys,   ) Marianne Bowler

        Inc. v. Abbott Laboratories, Inc.,)

        No. 07-CV-11618-PBS; U.S. ex rel. )

        Ven-A-Care of the Florida Keys,   ) DEPOSITION OF

        Inc. v. Dey, Inc., et al., No.    )  JERRY WELLS

        05-11084-PBS; U.S. ex rel.        )

        Ven-A-Care of the Florida Keys,   ) DECMEBER 15, 2008

        Inc., et al. v. Boehringer        )  TALLAHASSEE, FL

        Ingelheim Corp., et al., No.      )

        07-10248-PBS                      )

        --------------------------------X

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry          PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                            Tallahassee, FL

Page 206

1   for single source brands.
2       Q.   And for innovator multisource products,
3   what was the discount they were able to receive?
4       A.   It was 43.41 percent.
5       Q.   What are innovator multisource
6   products?
7       A.   That is a product whose patent has
8   expired but is still marketed by the original NDA
9   applicant.
10      Q.   Do you have an expectation for what the
11  discounts from AWP would be for noninnovator
12  multisource products?
13      A.   Because those manufacturers and
14  suppliers tend to overstate their AWPs, you can
15  see 80 or 90 percent in some cases.
16      Q.   And you've known that since at least
17  1995, right?
18          MS. ST. PETER-GRIFFITH:  Object to the
19  form.
20          MS. WALLACE:  Objection to form.
21          MR. BREEN:  Objection, form.
22          THE WITNESS:  I don't know that I know

Page 207

1   that to that extent in 1995.  Certainly in 2001 I
2   knew that.
3   BY MR. COOK:
4       Q.   The sentence after you discussed the
5   discounts from single source brands and innovator
6   multisource products reads, quote, "These are
7   predictable, confirm the ability of closed shop
8   pharmacies to negotiate pricing concessions from
9   pharmaceutical manufacturers that may not be
10  available to community-based pharmacies," closed
11  quote.
12          Do you see that?
13      A.   Yes.
14      Q.   That was true in 2001, correct?
15          MS. ST. PETER-GRIFFITH:  Object to
16  form.
17          MS. WALLACE:  Objection, form.
18          THE WITNESS:  I believed it to be true.
19  That's why I put it in the letter.
20  BY MR. COOK:
21      Q.   And that was the same phenomenon that
22  you had observed in 1998 with the Legislative

Page 208

1   Proposal Analysis we looked at, right?
2           MS. ST. PETER-GRIFFITH:  Object to the
3   form.
4           THE WITNESS:  That was a little
5   different issue, but it would still apply.
6   BY MR. COOK:
7       Q.   And that was the same issues that you
8   saw discussed in response to the 1996 Florida-
9   specific report about pricing for IV drugs and IV
10  fluids, correct?
11          MS. ST. PETER-GRIFFITH:  Object to the
12  form.
13          THE WITNESS:  That was a presumption
14  that we had made in the 1996 period.
15  BY MR. COOK:
16      Q.   Other than the meeting in Richmond in
17  September of 1995, have you had discussions with
18  anybody from HCFA about the deeper level of
19  discounts that are available to purchasers of IV
20  fluids and IV drugs via the pharmacy market?
21      A.   Very likely I have.
22      Q.   Is it fair to say you don't recall the

Page 209

1   specifics of those conversations from years ago,
2   correct?
3           MS. ST. PETER-GRIFFITH:  Object to the
4   form.
5           THE WITNESS:  Right.  I have
6   conversations with lots of people, or I did when
7   I was working.
8   BY MR. COOK:
9       Q.   Do you recall what the reaction of
10  anybody from HCFA was to you describing these
11  deeper discounts for home IV pharmacies?
12      A.   I don't recall reactions.
13      Q.   Do you recall how far back those
14  conversations with individuals at HCFA go?
15      A.   No.
16      Q.   Have you discussed that issue with
17  anyone from other state Medicaid programs?
18      A.   Yes.
19      Q.   Do you recall who in other state
20  Medicaid programs you have had specific levels of
21  conversation with?
22      A.   I don't recall specific instances, but

53 (Pages 206 to 209)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry          PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                              Tallahassee, FL

Page 222

1  rebate statute, but I know that they do discount
2  those drugs more heavily after the patent has
3  expired.
4      Q. And that would be consistent with what
5  you understand from competition in the free
6  market, correct?
7          MS. ST. PETER-GRIFFITH: Object to the
8  form.
9          MS. WALLACE: Objection, form.
10         THE WITNESS: I think I can answer yes
11  to that.
12  BY MR. COOK:
13     Q. Right. The histogram that appears on
14  Page 9, the distribution of some very steeply
15  discounted products, and then a mode there at the
16  15 to 20 percent range but a smaller one at the
17  far left, is that consistent with your
18  understanding of the distribution of transaction
19  prices as compared to AWP for generic products?
20         MR. BREEN: Objection to form.
21         THE WITNESS: No. That specific bar of
22  the graph at the 20 percent level is a little

Page 223

1  strange looking to me. I would want to look
2  closer at the data.
3  BY MR. COOK:
4      Q. And when this chart refers to multiple
5  source drugs with the federal upper limit, those
6  are drugs that have, is it your understanding, at
7  least three generic competitors in the
8  marketplace?
9          MS. ST. PETER-GRIFFITH: Object to
10  form.
11         THE WITNESS: At least three marketers.
12  It could be the innovator plus two generic.
13  BY MR. COOK:
14     Q. Leaving aside the far left side of the
15  graph that is 10 to 20 percent discount.
16     A. Uh-huh.
17     Q. The right side of the graph with the
18  increasing number of discounts all the way up to
19  more than 90 percent off, is that consistent with
20  your understanding of how deeply discounted
21  generic products tend to be in the marketplace?
22     A. That looks like a more normal

Page 224

1  distribution curve for discounts.
2      Q. And when you talk about manufacturers
3  inflating the average wholesale price, would you
4  agree with me that this indicates that virtually
5  all of the average wholesale prices for the
6  generic drugs that are represented in this graph
7  are at least four times greater than the average
8  acquisition cost for those products?
9          MS. ST. PETER-GRIFFITH: Object to the
10  form.
11         MS. WALLACE: Objection, form.
12         THE WITNESS: I can't do the math that
13  quickly, but I would agree that they are higher.
14  BY MR. COOK:
15     Q. The outlier would the generic drug that
16  is sold somewhere close to AWP, not the generic
17  drug that's sold for five cents on the dollar,
18  right?
19         MS. ST. PETER-GRIFFITH: Object to the
20  form.
21         MS. WALLACE: Objection to form.
22         THE WITNESS: I would agree.

Page 225

1  BY MR. COOK:
2      Q. And is that consistent with your
3  understanding of the way generic drugs are priced
4  in the marketplace?
5      A. I think --
6          MS. ST. PETER-GRIFFITH: Object to the
7  form.
8          MS. WALLACE: Objection to form.
9          THE WITNESS: -- so.
10         MS. ST. PETER-GRIFFITH: Counsel, can
11  we get a time period you're talking about?
12  BY MR. COOK:
13     Q. That's been your understanding of the
14  way generic drugs have been priced in the
15  marketplace since at least the mid-1990's,
16  correct?
17         MR. BREEN: Objection to form.
18         MS. WALLACE: Objection to form.
19         MS. ST. PETER-GRIFFITH: Object to
20  form.
21         MR. BREEN: Can we read the whole
22  question back?

57 (Pages 222 to 225)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

Wells, Jerry          PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                              Tallahassee, FL

Page 338

H I G H L Y   C O N F I D E N T I A L
1
2 customary charge.  That remains in the Federal
3 Code of Federal Regulations today.
4 BY MR. COOK:
5     Q.  The 1987 article that Mr. Breen
6 referred you to where you referred to AWP as a
7 sticker price, you said that the sticker price
8 analogy doesn't apply to generics, right?
9         MS. ST. PETER-GRIFFITH:  Objection to
10 form.
11        MR. BREEN:  Objection to form.
12        THE WITNESS:  At this point that would
13 not be an appropriate analogy to use for generic
14 products.
15 BY MR. COOK:
16     Q.  And you said that it didn't apply to
17 generics because the pricing of generics is all
18 over the place, right?
19     A.  It is now, and probably was even, to
20 some extent, at that point.
21     Q.  And just so I can nail down the
22 distinction you're drawing here, are you drawing

Page 340

H I G H L Y   C O N F I D E N T I A L
1
2 form.
3        MS. WALLACE:  Object to form.
4        THE WITNESS:  I don't know that that
5 article said that.  There was a letter from Ven-
6 a-Care that mentioned that AWP was a joke.
7        AWP was a pricing reference point that
8 is a reasonable indicator of approximate cost for
9 brand name drugs.  It is no longer a reasonable
10 indicator for generic drugs and I don't know when
11 that diversion occurred.  At one point it
12 probably was a reasonable indicator for generic
13 drugs.
14 BY MR. COOK:
15     Q.  Certainly by 1990 it was no longer a
16 reasonable indicator of price for generic drugs,
17 correct?
18        MS. WALLACE:  Object to form.
19        MS. ST. PETER-GRIFFITH:  Object to the
20 form.
21        MR. BREEN:  Object to form.
22        THE WITNESS:  I think that by 1990 that

Page 339

H I G H L Y   C O N F I D E N T I A L
1
2 a distinction between brands and generics in the
3 sense that the relationship between published
4 prices and acquisition prices for generics are
5 not -- do not bear a predictable relationship?
6        MR. BREEN:  Object to the form.
7        MS. WALLACE:  Objection, form.
8        THE WITNESS:  The analogy for the
9 automobile window sticker that I used was
10 specifically related to brand name drugs in the
11 mid to late 1980s.
12 BY MR. COOK:
13     Q.  In the article, there are quotes
14 referring to AWP as, quote, "meaningless" and,
15 quote, "a joke."
16        MS. ST. PETER-GRIFFITH:  Object to
17 form.
18        MR. BREEN:  Objection to form.
19 BY MR. COOK:
20     Q.  Would that be a better characterization
21 for AWP with respect to generics?
22        MS. ST. PETER-GRIFFITH:  Object to

Page 341

H I G H L Y   C O N F I D E N T I A L
1
2 would be a valid statement.
3        MR. COOK:  I don't have any more
4 questions.
5        MS. ST. PETER-GRIFFITH:  I have nothing
6 further.
7        MR. COOK:  I think we're done.  Thank
8 you very much.
9        MR. YOUNG:  Mr. Wells, just one or two
10 question to follow up.
11
12        EXAMINATION
13 BY MR. YOUNG:
14     Q.  Mr. Wells, just to follow up on some of
15 the questions Mr. Cook was just asking you, when
16 you were talking about average prices in response
17 to questions by Mr. Breen, were you responding
18 with respect to branded drugs as well?
19        MS. ST. PETER-GRIFFITH:  Object to the
20 form.
21        THE WITNESS:  I don't recall the
22 context of the question.

86  (Pages 338 to 341)

812a0173-a18d-4a8c-ab7c-e36f57f53cf3

EXHIBIT AM

Lincoln, NE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Dey, Inc., et. al., Civil )

Action No. 05-11084-PBS; and United)

States of America, ex. rel.        ) December 2, 2008

Ven-a-Care of the Florida Keys,    ) 8:57 a.m.

Inc., v. Boehringer Ingleheim      )

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) VOLUME I

----------------------------------X

Deposition of THE NEBRASKA DEPT. OF HEALTH AND HUMAN

SERVICES by GARY CHELOHA, taken by Defendants, pursuant

to Notice, held at the Cornhusker Hotel, Lincoln, Nebraska,

before Shana W. Spencer, a Certified Shorthand Reporter

and Notary Public of the State of Nebraska.

Lincoln, NE

Page 126

1   drugs in Nebraska had to be able to obtain prices
2   -- or drugs at that price?
3       A.   The pharmacies -- the concern -- No. 1,
4   if they could not buy it at that price, they
5   would let us know.  They're a very vocal group,
6   and they're actually dispensing the medications.
7   I mean, they just -- they would let us know.
8       Q.   So in order to avoid having complaints
9   or comments from pharmacists, you would, before
10  implementing a certain price, try to ascertain
11  whether or not those prices were reasonable?
12      A.   Yes.  That's correct.
13      Q.   Okay.  Would you also -- you said that
14  pharmacists were a vocal group.  Would you
15  receive letters and other -- phone calls you
16  mentioned, but letters and correspondence like
17  that?
18      A.   Yes.  We received written
19  correspondence as well.
20      Q.   Have you -- would you save those, or
21  what would you do with that correspondence?
22      A.   If they were saved, I did not come

Page 127

1   across any of them in my review of all of those
2   files.  So they were saved for some length of
3   time, because we're always subject to audit.  And
4   -- but they -- I didn't find any in the records
5   that I went through.
6       Q.   Okay.  And is it accurate to say that
7   the complaints and comments by pharmacists and
8   other providers were taken into consideration by
9   Nebraska Medicaid?
10      A.   Yes, they were.  Yes.  That's correct.
11      Q.   So that's one of the pieces we talked
12  about that kind of plays a role in setting
13  reimbursement?
14      A.   Yes.
15      Q.   And would you agree that if there was a
16  federal upper limit in place that is used as a
17  price for a particular claim, that average
18  wholesale price is not a factor in the payment of
19  that claim; it's paid at FUL?
20      MR. MAO:  Objection.  Form.
21      THE WITNESS:  It's possible that an EAC
22  could be lower than the FUL, depending -- on an

Page 128

1   NDC-by-NDC basis.
2       Q.   (BY MS. LORENZO)  If the claim was
3   actually paid out at the FUL, it was paid out at
4   the level that was set by CMS or by Nebraska
5   Medicaid?
6       A.   That's correct.
7       Q.   So you don't have to refer back to it,
8   but back on 904, it says the next kind of factor
9   in product costs is the state MAC, or SMAC?
10      A.   Yes.
11      Q.   So could you describe to me your
12  understanding of what a state MAC is?
13      A.   Yes.  A state MAC is a price set by the
14  Department for almost all -- I mean, almost
15  entirely for generic drugs.  It's a way to set an
16  upper limit on the cost portion of the
17  calculation which is determined by the -- by the
18  State.
19      Q.   To your knowledge, how long has
20  Nebraska been setting state MAC?
21      A.   I'm sorry.  I don't know the begin
22  date.  I'm sorry.  I don't know for sure.

Page 129

1       Q.   Okay.  Well, we'll probably look at
2   some documents to get a sense of that.  But could
3   you tell me, at least today, how does the State
4   determine what drugs to set state MACs for?
5       A.   Okay.  Because the database is between
6   the current FULs and state maximum allowable
7   cost, as new generic versions of drugs become
8   available, we concentrate on those.  And when --
9   generally, when the six-month period of
10  exclusivity for the first generic is past, we
11  determine the state maximum allowable cost,
12  although sometimes it can be done immediately.
13  And we look at the availability of the product
14  and the pricing and the net pricing as much as
15  possible to see whether it's cost effective to
16  move the market share to the generic version
17  versus the brand.
18      Q.   Okay.  And so that's for drugs that are
19  currently entering into the generic market.  I
20  guess, previously, before -- or when Nebraska
21  first implemented its MAC, how did it kind of
22  determine what drugs to take MACs on?

33 (Pages 126 to 129)

d98d776d-741f-454c-8c46-8fdf11028000

Lincoln, NE

Page 130

1      A.   The same general process, looking at
2   the availability and the difference between the
3   price of the brand and the generic.  We would
4   receive recommendations or information from
5   providers, from Pace, mailings from the drug
6   companies about the availability of their generic
7   version of a brand name.  Really, from any
8   source, we would consider, and we'd look at the
9   product for determining its MAC.
10     Q.   And once you determined -- I guess,
11  let's start currently.  Once you determined that
12  there's a particular drug that you'd like to set
13  a maximum allowable cost for, how do you go about
14  setting that actual price?
15     A.   Ask for a recommendation from Pace
16  Alliance.  We'll also call pharmacies to
17  determine the range of costs or range of
18  recommended -- recommendations for SMAC pricing.
19     Q.   Okay.  So if you find out from Mr.
20  Woods at Pace that, for a particular prescription
21  drug, that he can purchase it for, say, 50 cents
22  for that particular dosage, I mean, do you use

Page 131

1   that figure?  Or is there a calculation involved
2   in taking that number and turning it into a MAC?
3      A.   Into an actual SMAC price?
4      Q.   Uh-huh.
5      A.   There is no set formula, and he doesn't
6   provide us -- I think he has -- I believe he has
7   confidentiality agreements for the actual price
8   that the Alliance members can purchase the drug
9   for.  So -- and we rely mostly on the Pace
10  recommendations.
11     Q.   So he'll give you kind of a range, and
12  you'll --
13     A.   He'll generally quote a specific price.
14  He'll say 8 cents, 10 cents.  I recommend this
15  for the SMAC price on it.
16     Q.   And do you know -- you said that
17  there's some confidentiality provisions as far as
18  what they're actually paying.  Do you know if he
19  bills in some percentage or a few cents here or
20  there to make sure that other people can get that
21  or to account for profit or anything like that?
22     A.   All I would know for sure is that it's

Page 132

1   more than the contract price, but I don't know
2   whether he uses a specific formula or how he
3   specifically determines that.  He -- from time to
4   time, on a very limited basis, he and I have
5   discussed -- how will I say it -- the price that
6   the pharmacies pay.  And then I would -- when I
7   was doing it, I made a determination of where to
8   set the MAC price, at something above that.
9      Q.   And did you have a formula, or you were
10  just -- it was a case-by-case basis for --
11     A.   Generally, a case -- it was a case-by-
12  case basis.  I did not have a set formula.
13     Q.   And I'm assuming that the -- you said
14  that Pace is a purchasing organization that has
15  pharmacies in Nebraska, and those pharmacies are
16  participants in the Medicaid program?
17     A.   Yes.
18     Q.   Do you have a sense of how many
19  pharmacies obtain their drugs from Pace?
20     A.   I don't anymore.
21     Q.   Okay.
22     A.   It's -- when I was with the pharmacists

Page 133

1   association, I don't know that I could tell you
2   the number even then.  It's not what it was 20
3   years ago, and I do -- I'm sorry.  I don't know
4   the number in Nebraska.
5      Q.   Okay.  Is it a large percentage, small?
6   I mean, do you remember?
7      A.   I would -- it's a small percentage.
8      Q.   Small.  Okay.  And so I think we had
9   kind of narrowed that -- our previous
10  conversation to the current time period.  Is that
11  the similar process that has always taken place
12  as far as the setting of the actual rates that
13  were paid?
14     A.   I'm sorry.  I missed the first part of
15  what you said.  Is that the --
16     Q.   Has that always been the practice in
17  setting the particular prices for state MACs, or
18  has that changed over time?
19     A.   Many years ago, we had access to the
20  McKesson catalog.  And also, there was a
21  wholesaler in Lincoln, Lincoln Drug Company, and
22  we had access to their catalog information.  And

34  (Pages 130 to 133)

# EXHIBIT AN

# FAX TRANSMISSION

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
### OFFICE OF COUNSEL TO THE INSPECTOR GENERAL
330 Independence Ave., S.W., Room 5527
Washington, D.C. 20201
(202) 619-2078
Direct: (202) 205-9508
Fax: (202) 205-0604

| | | | |
|---|---|---|---|
| **To:** | Bob Niemann<br>Larry Reed<br>HCFA | **Date:** | April 27, 1999 |
| **Fax #:** | (410) 786-0681<br>(410) 786-8534 | **Pages:** | 4, including this cover sheet. |
| **From:** | Mary E. Riordan<br>(202) 619-2678 | | |

**COMMENTS:**

Bob and Larry - Attached is the letter from Pete Stark that I mentioned to each of you.
Bob, I will send the other information by separate fax. Thanks!  Mary



EXHIBIT
Abbott · 136
4.25.07 mlm
PENGAD 800-631-6989

HHC001-0743        F

Apr-27-09  11:22am   From-DHHS                           2022050604                    T-624   P.02/04   F-581

# UNITED STATES DEPARTMENT OF JUSTICE
## CIVIL DIVISION
## COMMERCIAL LITIGATION BRANCH
## CIVIL FRAUD SECTION

## *FACSIMILE TRANSMISSION RECORD*



**DATE:** April 26, 1999

**FAX NO.:** (202) 205-0604

**TO:** Mary Riordan

HHS-OIG

**TELE:** (202) 619-2678

**FROM:** T Reed Stephens

| **(Regular Mail)** | **(Overnight Mail)** |
|---|---|
| P.O. Box 261 | 601 D Street, N.W. |
| Ben Franklin Station | Room _____, FHB |
| Washington, D.C. 20044 | Washington, D.C. 20004 |

TELE: (202) 307-0404

FAX: (202) 505-7797 ←
(202) 616-3085
(202) 514-0280
(202) 514-7361

**NOTE:** letter from Congressman Stark to HCFA administrator last week. Stark is not aware of the qui tam but apparently is aware of our contacts with First DataBank. TRS

**PAGES:** 3

(Including this cover sheet)

HHC001-0744

Apr-27-99  11:22am  From-DHHS                           2022050604                    T-624   P.09/04   F-581

# COMMITTEE ON WAYS AND MEANS

## U.S. HOUSE OF REPRESENTATIVES
### WASHINGTON, DC 20615

#### SUBCOMMITTEE ON HEALTH

April 21, 1999

The Honorable Nancy-Ann Min DeParle
Administrator, Health Care Financing Administration
200 Independence Avenue SW
Washington DC   20201

Dear Administrator DeParle:

I urge you to take a simple and easy step to counteract an ongoing fraudulent practice by some pharmaceutical manufacturers that is costing Medicare and Medicaid hundreds of millions of dollars in excessive reimbursement payments.  It is my understanding that HCFA and various anti-fraud units of the government have been working with a company known as First Data Bank to make available more accurate drug pricing information.  If my understanding is correct, I request that you immediately issue written guidance to the States' Medicaid Programs approving their use of First Data Bank's agreed reporting of more accurate prices in calculating reimbursement amounts for certain injection, infusion and inhalation drugs and biologicals.  I also request that you take similar action to insure that the Medicare carriers have access to and use the more accurate First Data Bank prices for the drugs and biologicals in question.

We have been working together for a long time to make sure that the amounts paid for prescription drugs by the Medicare, Medicaid and other Federally funded programs, are not excessive, particularly in light of the applicable laws and regulations which require that reimbursements be reasonable and based upon the acquisition cost of the drug.  Although I do not know the specifics, I am aware of the existence of a joint enforcement team comprised of representatives of the Department of Justice, the HHS Office of Inspector General, HCFA, and the National Association of Medical Fraud Control Units that is dedicated to resolving a severe problem resulting from inflated and misleading price information about the above referenced drugs and biologicals.

I now understand that a positive result of these combined efforts has been an agreement whereby First Data Bank, the private entity that gathers and reports drug prices to all of the States' Medicaid programs, will take appropriate steps to insure that the reported prices for the prescription drugs in question more closely reflect truthful and actual prices rather than prices that have been

HHC001-0745

Apr-27-99  11:22am   From-DHHS                2022050604          T-624   P.04/04   F-581

The Honorable Nancy-Ann Min DeParle
April 20, 1999
Page 2

falsely inflated in order to cause the Medicare and Medicaid programs to pay
exorbitant reimbursement in excess of that provided by law.  I have also been
advised that the State Medicaid Agencies look to HCFA for approval of their
prescription drug reimbursement plans and, accordingly, have sought HCFA's
approval of their proposed use of the more accurate prices as part of their
prescription drug reimbursement plans.

I am disappointed to learn that HCFA has not yet provided the States'
Medicaid programs with written guidance that will facilitate the receipt and
use of more accurate and truthful prices, rather than the falsely inflated
prices, in estimating acquisition costs for reimbursement purposes.  This long
overdue correction should save Medicaid and Medicare hundreds of millions of
dollars and go a long way toward insuring that scarce health care dollars are
efficiently used to provide the programs' beneficiaries with the care that they
need.  As I understand it, every day we delay wastes more money.  It will also
be of great help to the Joint Enforcement Team's efforts to put an end to the
unreasonably high reimbursement for the drugs that have been the subject of
this gross price manipulation and gouging of the federal programs that you
supervise.

I strongly urge you to provide the written direction to the State Medicaid
Programs to facilitate the rapid implementation of the Joint Enforcement
Team's recommendation to use the First Data Bank prices.  I also urge you to
provide similar guidance to the Medicare carriers.

In the event that you believe that a more formal inquiry by Congress will
facilitate a resolution to this very serious problem, please let me know.  Your
attention and action is vital in stopping this hemorrhage of Medicare and
Medicaid program dollars.

Thank you for your help.

Sincerely,

Pete Stark
Ranking Democrat

FPS/vj

HHC001-0746        L

# EXHIBIT AO

F15



State of New York
### OFFICE OF THE ATTORNEY GENERAL
### MEDICAID FRAUD CONTROL UNIT
Special Projects Division, One Blue Hill Plaza PO Box 1747,  Suite 1037
Pearl River, NY 10965-8747
(914) 732-7550   Fax: (914) 732-7557

ELIOT SPITZER
Attorney General

JOSÉ MALDONADO
Deputy Attorney General

PATRICK E. LUPINETTI
Director, Special Projects Division

February 16, 2000

Pharmacy Director
Division of Health Care Financing
6101 Yellowstone Road
Room 259B
Cheyenne, WY 82002

Dear Medicaid Pharmacy Director:

As you may be aware, a current national investigation by State and federal agencies has revealed a pattern of misrepresentations by some drug manufacturers of the average wholesale prices and wholesale acquisition costs of certain of their products.  As a result of these misrepresentations, Medicaid and Medicare have substantially overpaid for these drugs and will continue to do so until corrective measures are implemented.  To that end, First DataBank, Inc. ("FDB") has been cooperating with representatives of the State Medicaid Fraud Control Units in the development of procedures that will improve the accuracy and validity of the information provided to the States.

We believe we have reached an agreement that will effect immediate and significant reform of the process, as the initial phase of an overall effort to ensure that Medicaid drug prices are based on true information.  Indeed, the substance of this proposal has already been outlined to State Pharmacy Directors, particularly at your July 1999 national conference, in a presentation in which Assistant United States Attorney Reed Stephens, HHS-OIG Associate Counsel Mary Riordan, Maryland MFCU Director Carolyn McElroy and most State Pharmacy Directors participated. We consequently write to inform you of the substance of the procedures FDB will adopt and the effect you may anticipate from it, as well as to solicit your comments or suggestions, which should be submitted to the us at the above address by March 6, 2000.

Stated briefly, under the impending change to current procedures, FDB will base the average wholesale prices it reports on market prices, rather than the prices identified by



EXHIBIT

Abbott 137
4.25.07 mkw

manufacturers. Additionally, FDB will no longer report a price for a product unless its manufacturer has certified the completeness and accuracy of the pricing information submitted. We are enclosing for your review a copy of the market price survey that will be used initially and a draft letter from FDB enunciating the specific terms of the revised pricing procedure. This revised procedure does not change the existing terms of the company's contract with your state, but merely provides an improved means for FDB to provide more accurate information to the States. More importantly, in view of the Medicaid program's legal obligation to reimburse true provider acquisition costs, such an effort by the States to ensure that payment is based on actual prices is mandatory. Consequently, no current legal commitment or program regulations are being altered. On the contrary, it is the goal of the revised reporting process to ensure compliance with *existing* laws and contracts. FDB is implementing these changes on a voluntary basis and without any additional charges to the States or their agents during the existing terms of the applicable contracts.

It is also important to note that the drug price misrepresentations that have occurred, and that will be corrected through FDB, relate to only a limited number of medications, generally infusion, inhalation and injectable products. Thus, while total Medicaid expenditures for the drugs in question are quite substantial, the price of most drugs will be unaffected by the revised procedure.

Nonetheless, we anticipate that the more accurate price information will result in a significant reduction in reimbursement for the affected drugs, and you will in all likelihood receive initial complaints or objections about lowered Medicaid payments. Accordingly, we wish to emphasize the following facts:

1) The revised First Data reporting process does not involve any changes in statutes, regulations, program rules or contractual terms. Any resulting reduction in prices will be the result of First Data more effectively performing the task it is already required to perform.

2) As a result, there is no basis for a contention that any individual state is answerable for diminished Medicaid payments -- no provider can rationally criticize a single state agency for a change in pricing when the SSA has taken no action to cause it.

3) Since no reduction in payment will occur unless real world pricing justifies it, the revised procedure is not only fair to providers, but an altogether appropriate shift from reliance on false to true information.

4) If providers concede that reimbursements exceed acquisition costs but maintain that the surplus is necessary to cover ancillary costs of the drug's administration, *e.g.*, nursing or incidental supply expenses, their argument runs expressly counter to law. Under Medicaid Program requirements, reimbursement is dependent on the acquisition cost of the *drugs,* not the overhead costs involved in dispensing them.

5) Finally, it cannot be overemphasized that in view of the clear evidence we possess that certain current AWP and WAC data is grossly inaccurate for certain drugs, a

modification of existing practices is mandatory.   No entity charged with implementation or enforcement of Medicaid program rules can responsibly countenance a reimbursement system that violates the statutory obligation to reimburse provider acquisition costs.

We encourage you to communicate this information to your fiscal intermediaries, so that they will also be prepared for the anticipated changes.   Ultimately, it is our intention that continuation of our inquiry will result in fundamental changes regarding the reporting of pharmaceutical prices and a consequent reduction in the cost of drugs to government health care programs.  One such change we envision as a necessary component to any negotiated resolution with a manufacturer is the obligation to certify that the prices it reports to First Data reflect true wholesale prices.

Thank you for your attention to this matter, and we look forward to your response. The State Medicaid Fraud Control Units have already made numerous contacts with their corresponding State Pharmacy Directors, and we will undoubtedly continue to solicit information and input from you as our investigation develops

Very truly yours,

Patrick E. Lupinetti
For the NAMFCU Drug Pricing Team:

L. Timothy Terry, Director Nevada MFCU,
    President NAMFCU
Kerry O'Brien, Director Maine MFCU
David Waterbury, Director Washington MFCU
Thomas F. Staffa, Assistant Deputy
    Attorney General, New York MFCU

cc: State MFCU Directors