# EXHIBIT CA

RI Dept of Human Services (John Young)                    December 3, 2008

## Providence, RI

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION  )

--------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:           ) Master File No.

United States of America ex rel.    ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,     )

Inc., et al. v. Dey, Inc., et al.,  )

Civil Action No. 05-11084-PBS,      ) Hon. Patti B.

and United States of America ex     ) Saris

rel. Ven-A-Care of the Florida      )

Keys, Inc., et al. v. Boehringer    )

Ingelheim Corp., et al., Civil      )

Action No. 07-10248-PBS             )

--------------------------------X

VIDEOTAPED DEPOSITION OF

THE RHODE ISLAND DEPARTMENT OF HUMAN SERVICES

by JOHN YOUNG

Providence, Rhode Island

Wednesday, December 3, 2008

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008
                        Providence, RI

Page 54

1  order to be eligible for the federally negotiated
2  rebate arrangement, needed to offer open
3  formularies and as such were then able to claim a
4  rebate based on the units of each drug they had
5  purchased; and that the states -- each state
6  formed its own retail pricing formula that was
7  called out in their State Plan.
8      Q.  Have you ever heard the term Estimated
9  Acquisition Cost?
10     A.  I have.
11     Q.  If you look to the third paragraph --
12  excuse me, under the fourth full paragraph under
13  background there, the first sentence says,
14  "Specifically the regulations state that EAC
15  means the state Medicaid agencies, quote, best
16  estimate of what price providers generally are
17  paying for a drug." Is that your understanding
18  of what the EAC means?
19     A.  Yes.
20     Q.  If you turn to the page at the upper
21  right-hand side it will say 10.193. Do you see
22  that there?

Page 55

1      A.  I do.
2      Q.  Let me ask, have you heard of the
3  Office of Inspector General before?
4      A.  I have.
5      Q.  Are these among the reports that you
6  said were a regular practice of yours to review
7  in receiving from --
8      A.  Yes.
9      Q.  -- the federal agencies that oversaw
10  Medicaid?
11     A.  Yes.
12     Q.  On that page that I just drew your
13  attention to, 10.193, it says, "Within the
14  pharmaceutical industry, AWP means nondiscounted
15  list price. Pharmacies purchase drugs at prices
16  that are discounted significantly below AWP or
17  list price."
18         Do you have any understanding as to
19  whether Rhode Island Medicaid program abandoned
20  AWP reimbursement because it had notice that AWP
21  was not the price that pharmacies were paying for
22  drugs?

Page 56

1      A.  I was not part of that decision.  I
2  know only that they did replace AWP as their
3  basis with Wholesale Acquisition Cost.
4      Q.  If you scroll down to the fifth
5  paragraph, the last sentence in the fifth
6  paragraph on that same page says, "Recounts that
7  for the purchases that the OIG audited, 99.6
8  percent, were made at prices averaging from about
9  16 percent below AWP. These drug purchases
10  ranged from as little as .23 percent below AWP to
11  as much as 42 percent below AWP."
12         With your years of experience in Rhode
13  Island Medicaid, if you had received this OIG
14  report, would you have been comfortable
15  continuing to reimburse pharmacies at a
16  nondiscounted AWP ingredient cost rate?
17         MS. SMITH:  Objection.
18         THE WITNESS:  In principle, if I were
19  to look at this report, I would be very concerned
20  about the consistency of claims adjudication and
21  perhaps only secondarily using AWP as a price
22  basis.

Page 57

1  BY MS. RANKIN:
2      Q.  Would you consider this OIG report or
3  OIG reports in general to be reliable sources of
4  information?
5         MS. SMITH:  Objection.
6         THE WITNESS:  OIG reports were not
7  necessarily sources of information but analysis.
8  BY MS. RANKIN:
9      Q.  Would you consider them to be a
10  reliable source of analysis?
11     A.  Within the confines of their inquiry,
12  yes.
13     Q.  So if this OIG report is noting that
14  drug purchases for pharmacies tend to be as much
15  as 42 percent below AWP, would you be inclined to
16  approve a reimbursement rate for Medicaid at
17  straight AWP instead of a discount from AWP?
18     A.  Based only on what I am looking at, the
19  answer would be no.
20     Q.  Is it your understanding that AWP means
21  a nondiscounted list price?
22     A.  In general, yes.

15  (Pages 54 to 57)

e56b5548-1f6a-4f27-a21d-46b66f77af45

RI Dept of Human Services (John Young)                    December 3, 2008

Providence, RI

Page 58

1      Q.  Is it also your understanding that
2  pharmacies purchase drugs at prices that are
3  discounted significantly below AWP?
4      A.  I understand that that possibility
5  exists, which is the reason for the usual and
6  customary provision.
7      Q.  Have you ever understood AWP to be the
8  same thing as the actual acquisition cost for --
9  a pharmacy makes to purchase a drug?
10     A.  No.
11     Q.  Is it your understanding that anyone at
12 Rhode Island Medicaid has understood AWP to be
13 the same thing as actual acquisition costs to
14 pharmacies?
15        MS. BAUM:  Objection.
16        MS. SMITH:  Objection.
17        THE WITNESS:  Not that I know.
18 BY MS. RANKIN:
19     Q.  Have you ever heard AWP referred to as
20 "ain't what's paid"?
21     A.  I don't think so.
22     Q.  Does this observation in the OIG 1984

Page 59

1  report that pharmacies were not paying AWP
2  surprised you?
3      A.  No.
4      Q.  Why not?
5      A.  I think that there is a difference
6  between the contractual relationship between a
7  pharmacy and either a wholesaler, a distributor
8  or a manufacturer, and the price agreement that
9  operates for a payer.
10     Q.  So with respect to AWP, is it your
11 understanding that there could be one price --
12 strike that.  Can you explain, can you read back
13 his answer and then maybe you can we'll all
14 listen together.  If you read back his answer.
15        (Answer was read by the reporter.)
16 BY MS. RANKIN:
17     Q.  Can you explain that a little more?
18 What do you mean by contractual agreement?
19     A.  A dispensing pharmacy may have a
20 purchase arrangement with any of the entities I
21 described that provides them with volume
22 discounts, with promotional considerations, with

Page 60

1  trade accommodations, with payment privileges
2  that don't necessarily translate to a payer's
3  environment where we are trying to adjudicate an
4  individual claim for a specific prescription made
5  on a date certain.
6      Q.  Okay.  So the instances you described,
7  the discounts you just described, it sounds like
8  you're saying that those discounts, you would not
9  expect those discounts to be reflected in the
10 AWP?
11     A.  The list price would not reflect that
12 level of detail, and obviously that differs from
13 provider to provider and from time to time.
14     Q.  When you say list price, are you
15 referring to the list prices that are published
16 in the pricing compendia?
17     A.  I am.
18     Q.  AWP and WAC?
19     A.  Yes.
20     Q.  So it is your understanding that the
21 AWP and the WAC that are reported in the pricing
22 compendia do not reflect necessarily the same

Page 61

1  contract prices that are actually at issue in any
2  particular transaction?
3      A.  I'm sorry, which transaction are you
4  asking about?
5      Q.  You gave the example that there are
6  contractual arrangements between a pharmacy and a
7  wholesaler or manufacturer, correct?
8      A.  Yes.
9      Q.  And I understood you to say that there
10 may be certain prices and discounts in that
11 contractual arrangement that are not reflected in
12 the prices that are reported to the third-party
13 compendia; is that correct?
14     A.  That's correct.
15     Q.  You gave a few examples of the types of
16 discounts that you believe were not reported in
17 AWP or WAC.  I believe you said volume discounts?
18     A.  Yes.
19     Q.  Have you ever heard of a prompt pay
20 discount?
21     A.  Yes.
22     Q.  What do you understand a prompt pay

16 (Pages 58 to 61)

e56b5548-1f6a-4f27-a21d-46b66f77af45

# EXHIBIT CB

Kramer, Sandra                                     March 25, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE: PHARMACEUTICAL INDUSTRY          MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION      Civil Action:

                                        01-CV-12257-PBS

THIS DOCUMENT RELATES TO U.S.           Judge Patti B. Saris

Ex rel. Ven-A-Care of the Florida       Magistrate Judge

Keys, No. 06-CV-11337-PBS               Marianne B. Blower

                          /




        The Videotaped Deposition of SANDRA KRAMER,

        Taken at 2860 Eyde Parkway,

        East Lansing, Michigan,

        Commencing at 9:08 a.m.,

        Tuesday, March 25, 2008,

        Before Cynthia A. Chyla, CSR 0092.

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

Page 66

1      A.   As far as --
2           MR. HENDERSON:  Objection.
3      A.   I don't remember there being an official
4  definition of AWP.
5  BY MR. GABEL:
6      Q.   Would the glossary of terms in the Pharmacy
7  Manual reflect the official definition of AWP by
8  Michigan Medicaid?
9      A.   When?
10     Q.   For this page that we're looking at here.
11     A.   For the time period that's listed?
12     Q.   Yes.
13     A.   That's what's in their manual.
14     Q.   And that would be consistent with Michigan
15  Medicaid's definition of AWP; right?
16     A.   I was no longer at Michigan Medicaid at that
17  time, so it would be their policy and their
18  interpretation of how that was applied.
19     Q.   Is the interpretation that's listed here in
20  the Pharmacy Manual inconsistent with the way you
21  understand -- understood AWP to be defined when you
22  worked at Michigan Medicaid?

Page 67

1           MR. HENDERSON:  Objection.
2      A.   There is more to it.  I guess I need further
3  questions and clarification there.  Because the
4  definition that's here is just limited to First
5  DataBank, and I worked at Medicaid a long period of
6  time.
7  BY MR. GABEL:
8      Q.   Okay.  Did you understand that AWP referred
9  to prices published in pricing compendia?
10     A.   Yes.
11     Q.   Okay.  And those pricing --
12     A.   And --
13     Q.   I'm sorry.
14     A.   I'm sorry.  And also was in compendia and by
15  manufacturers.
16     Q.   By manufacturers.  What do you mean by that?
17     A.   They would also send their pricing to the
18  State of Michigan.
19     Q.   Manufacturers would send AWPs to the State
20  of Michigan?
21     A.   Yes.
22     Q.   Did Abbott ever send AWPs to the State of

Page 68

1  Michigan?
2      A.   I don't specifically remember getting Abbott
3  AWPs.
4      Q.   Which manufacturers would send their AWP to
5  Michigan?
6      A.   There were numerous.  I do not recall which
7  manufacturers sent them to me.
8      Q.   And were they required to send you their
9  AWPs?
10     A.   No, they were not.
11     Q.   Do you know why they would send AWPs to you?
12     A.   They wanted to -- us to update our pricing
13  modules.
14     Q.   Did you request the AWPs from them?
15     A.   No, I did not.
16     Q.   But to your knowledge, you don't recall
17  Abbott specifically sending any AWPs to you?
18     A.   I don't specifically recall them.  It would
19  not surprise me that they did.
20     Q.   Do you have any documentation showing Abbott
21  sending AWPs to you?
22     A.   I do not personally have that.

Page 69

1      Q.   Do you have any documentation showing any
2  manufacturer sending their AWPs to you?
3      A.   Yes.
4      Q.   Do you know if those have been produced in
5  response to Abbott's subpoena?
6      A.   I believe they were.
7      Q.   Okay.  So, the sources that you would have
8  for AWP when you worked at Michigan Medicaid would be
9  both the prices published in compendia and what
10  specific manufacturers would represent to you the AWPs
11  were?
12     A.   Yes.
13     Q.   Do you know where the manufacturers who were
14  sending their AWP -- the AWP prices to you obtained the
15  AWPs?
16     A.   No.
17     Q.   Do you know if those AWPs were taken from
18  the compendia and then sent to you by the
19  manufacturers?
20          MR. HENDERSON:  Objection.
21     A.   No.  It appeared that sometimes those
22  publications were prior to the updating of the

                              18  (Pages 66 to 69)

a2ec164a-d34e-4eff-9164-2373f4149e12

Kramer, Sandra                                    March 25, 2008

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL INDUSTRY          MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION       Civil Action:

                                         01-CV-12257-PBS

THIS DOCUMENT RELATES TO U.S.            Judge Patti B. Saris

Ex rel. Ven-A-Care of the Florida        Magistrate Judge

Keys, No. 06-CV-11337-PBS                Marianne B. Blower

                              /



        The Videotaped Deposition of SANDRA KRAMER,

        Taken at 2860 Eyde Parkway,

        East Lansing, Michigan,

        Commencing at 9:08 a.m.,

        Tuesday, March 25, 2008,

        Before Cynthia A. Chyla, CSR 0092.

Kramer, Sandra                                    March 25, 2008

Page 90

1    A.   At the time that this was written who was
2  he?
3    Q.   Yes.
4    A.   I'm uncertain.  He probably was a bureau
5  director at the time.
6    Q.   Was he --
7    A.   Management to me.
8    Q.   So someone you reported to?
9    A.   Probably not directly.
10    Q.   But he was higher on the Michigan Medicaid
11  hierarchy?
12    A.   Yes.
13    Q.   And in your memos to Mr. Smith or others
14  higher on the Michigan Medicaid hierarchy, did you
15  attempt to be as accurate as possible?
16    A.   I would try to.
17    Q.   You see the subject of this is elimination
18  of actual acquisition costs reimbursement.
19         Do you see that?
20    A.   Yes.
21    Q.   What does that refer to?
22    A.   I think it would refer to switching the

Page 91

1  reimbursement technique from AAC to EAC.
2    Q.   And that switch was actually made in 1995;
3  right?
4    A.   Yes.
5    Q.   So this is approximately three years before
6  the switch was made?
7    A.   Yes.
8    Q.   Do you know why this was being discussed in
9  1992?
10    A.   It explains here that the pharmacy
11  association's newsletter published that there was going
12  to be a change from AAC reimbursement for Michigan
13  Medicaid.
14    Q.   And it's dated -- it actually states that
15  Mr. Smith agreed to move way from actual acquisition
16  costs; is that right?
17    A.   Yeah.
18    Q.   Did you have a discussion with him regarding
19  whether he did, in fact, agree to move away from AAC?
20    A.   I don't recall.
21    Q.   Did you ever have any discussions with
22  Mr. Smith about moving away from AAC to EAC?

Page 92

1    A.   Yes.
2    Q.   Okay.  How many -- how many times did you
3  have discussions with him about that topic?
4    A.   I don't know how many times.
5    Q.   Do you recall ever discussing with him what
6  AWPs were meant to represent?
7    A.   Not really.  Not -- no.
8    Q.   You state, and I'd like to focus here on the
9  second paragraph, the last sentence of that paragraph,
10  it states:  "If such a proposal were adopted, there
11  could be tremendous cost implications for the program."
12         What did you mean by that?
13    A.   I meant that AWP minus 10 percent is --
14  would not have been what we were paying under AAC
15  reimbursement.
16    Q.   So fair to say that you thought there would
17  have to be a steeper discount off of AWP if you were
18  going to approximate AAC?
19    A.   Yes.
20    Q.   And when you say tremendous cost
21  implications, what did you mean by that phrase?
22         MR. HENDERSON:  Objection.

Page 93

1    A.   I guess I was trying to get his attention.
2  BY MR. GABEL:
3    Q.   Did you get his attention?
4    A.   I don't remember him responding.
5    Q.   Okay.  The next paragraph you say:  "As an
6  example, I have attached the direct (or acquisition
7  cost) and AWP for several new products from a major
8  generic company.  The price differentials are enormous
9  with AWP ranging from 13 percent to 500 percent above
10  acquisition cost!!!"
11         With the three exclamations, were
12  you also trying to get his attention?
13         MR. HENDERSON:  Objection.
14    A.   I think it speaks for itself.
15  BY MR. GABEL:
16    Q.   Okay.  Fair enough.
17         You state:  "The price differentials
18  are enormous --" well, actually, strike that.
19         It's fair to say that as early as
20  1992 you realized that in some instances AWPs were
21  upwards of 500 percent above acquisition costs?
22    A.   For the generic.

24  (Pages 90 to 93)

Page 94

1    Q.   For the generic specifically?
2    A.   That's what I'm referring to here.
3    Q.   Okay.  And this is what you were conveying
4  to Mr. Smith in 1992?
5    A.   Right.  In looking at this documentation
6  when I pulled it together here, too, I noted that the
7  attachment just refers to the differential between AWP
8  and -- or the spread I guess is the term we're using,
9  direct price, and direct price is not necessarily what
10  the pharmacist would have been paying.
11    Q.   Did you understand that the pharmacist could
12  be paying even less than direct price?
13    A.   At the time it may not have been my
14  understanding, but looking back at this documentation,
15  the direct price I know was not necessarily what the
16  pharmacist was paying.
17    Q.   They could have been paying lower than
18  direct price?
19    A.   Yes.
20    Q.   Okay.  And let's look at this document that
21  you attach.
22         Well, first, let me make sure.  Is

Page 95

1  this the document that you attached to the memo to
2  Mr. Smith?
3    A.   I'm thinking it is.  I'm uncertain --
4    Q.   They were produced to us back to back, so
5  that's why I was putting them together.
6    A.   Right.  I notice a lot of my documents got
7  shuffled.
8    Q.   Okay.
9    A.   So ....
10    Q.   Do you have any reason to believe that this
11  is not the document that you would have been forwarding
12  along to him?
13    A.   I think it is.  It's date stamped the 13th
14  and this was written November 30th.
15    Q.   Okay.  Thanks.
16         And you said it's date stamped
17  November 13th.  That's 1992; right?
18    A.   Correct.
19    Q.   Okay.  And this is from Geneva
20  Pharmaceuticals?
21    A.   Yes.
22    Q.   And did this come directly to you, or did

Page 96

1  you receive this from some other source?
2    A.   I don't recall exactly.  I assume if it was
3  in my possession, it came directly to me.
4    Q.   Directly to you from Geneva?
5    A.   Yeah.  Dear sir or Madam.
6    Q.   Okay.  Did you ever have any discussions
7  with Mr. Ron Hartmann, the author of this?
8    A.   I believe I have.
9    Q.   Okay.  Did you discuss in particular how AWP
10  compared to acquisition costs?
11    A.   No.
12    Q.   What were your discussions with Mr. Hartmann
13  about?
14    A.   I don't recall exactly what form, but I
15  believe he attended meetings, public meetings that were
16  held by the MSA.
17    Q.   And you see in this letter from
18  Mr. Hartmann, it lists AWP in one column and direct
19  prices in another column.  And, in fact, there -- there
20  are spreads between those two prices; correct?  And in
21  one instances -- in one instance you note that the
22  spread is approximately 500 percent; right?

Page 97

1    A.   (Nods head.)
2    Q.   Is that referring to the last drug on this
3  list?
4    A.   I would have to do the math again.
5    Q.   But overall, you see there --
6    A.   It seems to be the biggest spread.
7    Q.   Okay.  Now, in your experience as a policy
8  analyst for Michigan Medicaid, would you, when looking
9  at spreads, be more concerned about the percentage
10  differential or the dollar differential?  For instance,
11  there's a 500 percent spread on that final drug, but
12  it's less than a $20 spread when it's expressed in
13  dollars.
14         For the top drug, we see that
15  there's about $100 spread.  Would you be more concerned
16  about the dollar issue or the percentage issue?
17         MR. HENDERSON:  Objection to the
18  form.
19    A.   I would be concerned about the percentage.
20  BY MR. GABEL:
21    Q.   Percentage.  Okay.
22         Although even with a lower

25  (Pages 94 to 97)

# EXHIBIT CC

Little Rock, A

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

-------------------------------)

United States of America ex rel.) MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    ) Civil Action

Inc., Civil Action No. 06-      ) No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of   ) Honorable

the Florida Keys, Inc., v. Dey, ) Patti B. Saris

Inc., et al., Civil Action No.  )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care   )

of the Florida Keys, Inc., v.   )

Boehringer Ingelheim Corp., et  )

al., Civil Action No. 07-10248- )

PBS                             )

-------------------------------x

Page 357

1  OIG's 1984 report that discussed the acquisition
2  cost of pharmacies in Arkansas. Do you recall
3  that?
4      A.  I recall looking at a lot of documents
5  yesterday. I can't say that I specifically
6  remember that particular one, but I know we
7  looked at a lot of documents referring to
8  acquisition costs yesterday.
9      Q.  Well, just so that you don't have to
10 take my word for it, let's pull that out so you
11 can see what I'm referring to. This was -- I
12 believe was Roxane Exhibit 9. Is that the
13 number you have?
14     A.  Yes.
15     Q.  Right. And we examined Roxane Exhibit
16 9 yesterday --
17     A.  Okay. We did.
18     Q.  -- which was the report that talked
19 about the acquisition costs of pharmacies in
20 Arkansas, among other states, do you recall that?
21     A.  I do.
22     Q.  And we looked at the various ranges of

Page 358

1  acquisition costs for pharmacies in Arkansas on
2  Page 9.
3      A.  Uh-huh. Correct.
4      Q.  So now back to Roxane Exhibit 19.
5  This letter in March of 1988, the -- HCFA's
6  regional office states that the average
7  difference between AWP and what pharmacists
8  generally paid in Arkansas and Texas was 12.53
9  percent below AWP. Do you agree that this
10 document reflects that?
11     A.  Generally, it was 12.53, not on all
12 drugs. I will agree that the document says that.
13     Q.  And, in fact, that the document says
14 that the survey performed by Dallas regional
15 office excluded antibiotic drugs, generic drugs
16 and drugs that were purchased directly from the
17 manufacturer?
18     A.  So this would be strictly for brand
19 name drugs. This would not include any generics.
20     Q.  And based on what we've seen, you would
21 expect that the discounts available for
22 pharmacies, when purchasing generic drugs, are

Page 359

1  typically greater than the discounts when
2  purchasing branded drug?
3          MS. OBEREMBT:  Objection.
4      A.  I can only make that assumption based
5  on the survey findings. The survey findings
6  generally show that -- and I'd have to look at
7  the survey again, that the variance on brand is
8  not as great on the variance on generics. I
9  mean, that's common knowledge. I'd guess you'd
10 say.
11         MR. REALE:  Let me mark the next one.
12     A.  A common assumption. Excuse me. Let
13 me rephrase that.
14         [Marked Exhibit Roxane 020]
15     Q.  (By Mr. Reale) Roxane Exhibit 20 has
16 just been passed out. This is Bates Page
17 HHC011-2260 to 2268. And this is a letter from
18 the Arkansas Department of Human Services, and it
19 appears to be dated June 22nd, 1988, and it's
20 from Kenny Whitlock, Director at DHS, to Don
21 Hearn at HCFA in the regional office at Dallas,
22 Texas. This was another document, Ms. Bridges,

Page 360

1  that was produced to us by the Federal Government
2  in this lawsuit. And if you look at the first
3  paragraph of this letter, it's a response from
4  Arkansas to concerns raised by HCFA. Do you
5  agree with that?
6      A.  It's a clarification or a modification,
7  according to this.
8      Q.  And it has been your experience, hasn't
9  it, that when Arkansas has submitted Plan
10 Amendments to CMS, from time to time they may ask
11 for additional information from the State, either
12 to support certain aspects of the Plan Amendment
13 or for other aspects.
14     A.  For a State Plan Amendment, they can
15 request additional information. Is this in
16 reference to a State Plan Amendment? I don't
17 know the -- I mean, I don't know if this is in
18 reference to a State Plan Amendment. Let me
19 rephrase that.
20     Q.  Now, if you would turn to the second
21 page of the cover letter, or excuse me, of the
22 letter. And at the top, there's something that

06db8d46-1900-438e-b5fa-9bac07802652

# EXHIBIT CD

Gorospe, James Kevin                          March 19, 2008
                    Sacramento, CA

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION:

PRICE LITIGATION              ) 01-CV-12257-PBS

-----------------------------X

THIS DOCUMENT RELATES TO:     ) Judge Patti B. Saris

U.S. ex rel. Ven-A-Care of    )

the Florida Keys, Inc. v.     ) Magistrate Judge

Abbott Laboratories, Inc.,    ) Marianne B. Bowler

et al.                        )

Case No. 06-CV-11337-PBS      )

-----------------------------X

                    --oOo--

              WEDNESDAY, MARCH 19, 2008

                    --oOo--

           VIDEOTAPED DEPOSITION OF

             JAMES KEVIN GOROSPE

Reported By:  JOANIE MURAKAMI, CSR No. 5199

             Registered Merit Reporter

             Certified Realtime Reporter

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                      March 19, 2008
                    Sacramento, CA

| Page 210 |
| --- |

1   issues; is that fair?
2       A.   That's fair.
3       Q.   Did you -- so I take it you recall
4   reading this report when you took your first
5   position in DHS?
6       A.   That's correct.
7       Q.   And this report, it's titled Report by
8   the Auditor General of California.  How Medi-Cal
9   and Other Healthcare Providers Manage Their
10  Pharmaceutical Expenditures, and it's dated
11  August 1991 in the lower right-hand corner of the
12  first page.
13      A.   Uh-huh.
14      Q.   This document, obviously, if you read
15  it at DHS, it was sent to DHS at some point,
16  correct?
17      A.   That is correct.
18      Q.   And if you go to the last two pages of
19  the document, 71223 and 24, there's a letter from
20  a woman named Molly Joel Coye, who's the director
21  of DHS, to a gentleman named Kurt R. Sjoberg, S-
22  J-O-B-E-R-G, dated August 22, 1991.

| Page 211 |
| --- |

1           Do you see that letter?
2       A.   Yes.
3       Q.   And reading this letter, Ms. Coye
4   indicates that secretary Gould asked her to
5   respond to the August 1991 draft report that
6   appears earlier in the exhibit, correct?
7       A.   That is correct.
8       Q.   Okay.  If you could look at page seven
9   for me.  It's Bate Stamped 71171.  There's a
10  section there called Utilization and Price
11  Controls.
12      A.   I see it.
13      Q.   And that paragraph, it refers to two
14  United States Senate reports.
15           Do you see that?  One is titled
16  Skyrocketing Prescription Drug Prices:  Turning a
17  Bad Deal into a Fair Deal dated January of '90,
18  and then about halfway down the paragraph, it
19  refers to an August 1989 report, which we've
20  already looked at today, titled Prescription Drug
21  Prices:  Are We Getting Our Money's Worth.
22           Do you see that?

| Page 212 |
| --- |

1       A.   Yes, I do.
2       Q.   In reference to the first report, the
3   January 1990 report, the California Auditor
4   General is noting that the United States Senate
5   report in January of 1990 concluded that federal
6   and state governments pay higher prescription
7   drug prices through their Medicaid programs than
8   any other major purchasers of prescription drugs,
9   correct?
10      A.   That's the statement made.
11      Q.   And then in reference to the August
12  1989 report, which we've already looked at today,
13  the California Auditor General, again, is noting,
14  in 1991, that the earlier Senate report -- let me
15  start over.
16           This document refers to the August 1989
17  report from the US Senate which reported that
18  organizations, such as the Department of Veterans
19  Affairs, hospitals and HMOs, are negotiating
20  prices directly with manufacturers at discounts
21  of 41 to 99 percent off the published average
22  wholesale price, correct?

| Page 213 |
| --- |

1       A.   That's what it says, yes.
2       Q.   So DHS knew, no later than August of
3   1991, that certain pharmaceutical purchasers
4   received discounts of up to -- from anywhere from
5   41 to 99 percent off of the published AWP,
6   correct?
7           MR. PAUL:  Objection.  Form.  No
8   foundation to DHS.
9           MR. GOBENA:  Same objection.
10          THE WITNESS:  I would assume anybody
11  that read the report would have read this
12  passage.
13  BY MR. COLE:
14      Q.   Anyone who would have read the report
15  would have learned this information at that time,
16  correct?
17      A.   That is correct.
18      Q.   And is it your understanding, based on
19  your experience at Medi-Cal, that if a draft
20  report by the Auditor General was sent to a
21  particular department, such as DHS, that people
22  in DHS would read it and learn the information

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
Sacramento, CA

Page 394

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------x

IN RE PHARMACEUTICAL INDUSTRY)

AVERAGE WHOLESALE PRICE        )

LITIGATION                     )

_____ )

THIS DOCUMENT RELATES TO    ) MDL No. 1456

State of California, ex rel. ) Civil Action:

Ven-A-Care v. Abbott        ) 01-12258-PBS

Laboratories, Inc., et al.   )

----------------------------x

VOL. II

--oOo--

MONDAY, SEPTEMBER 22, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

J. KEVIN GOROSPE, Pharm.D.

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

Gorospe, Pharm. D., J. Kevin - Vol. II                      September 22, 2008
Sacramento, CA

Page 591

1      A.   Yes.
2      Q.   Second to the last paragraph on that
3  page the first sentence reads "It is clear and well
4  documented that pharmacy reimbursement
5  methodologies that rely on AWP and a low dispensing
6  fee overpay pharmacies for drug ingredient costs
7  and underpay them for the cost of dispensing the
8  drug."
9        Did I read that correctly?
10     A.   Yes.
11     Q.   Is that consistent with your
12  understanding of pharmacy reimbursement methodology
13  that rely on AWP?
14     A.   Yes.
15     Q.   And how long have you had that
16  understanding?
17     A.   Again, as I previously stated, the late
18  nineties.
19     Q.   If you turn to page 2, you'll see that
20  under the heading "Drug Ingredient Costs" the first
21  paragraph goes through some of the findings of the
22  Myers and Stauffer study that we talked about

Page 593

1  implemented minus 10 percent occurred before or
2  after June of 2002?
3      A.   That is correct.
4      Q.   You would agree with me, though, that
5  the rate study was referenced in the state's
6  attempts to -- in the state's communications with
7  CMS to seek approval of the AWP minus 10 percent?
8      A.   Yes.
9      Q.   The last paragraph on that page --
10        Scratch that.
11        The second to the last -- the second to
12  last paragraph in the page, last sentence, states
13  "Therefore, the Department proposed using a single
14  and differentiated rate equal to AWP minus 20
15  percent."
16        Do you understand that to mean that the
17  -- that they were not proposing to reimburse
18  generics differently?
19     A.   That is correct.
20     Q.   And then the first sentence of the
21  following paragraph states "A rate of AWP minus 20
22  percent is still significantly higher than the

Page 592

1  earlier; correct?
2      A.   Yes.
3      Q.   And in the last sentence it reads "It's
4  clear from the information that the Department's
5  current rate of AWP minus 10 percent does not
6  accurately reflect the drug acquisition costs in
7  the marketplace;" correct?
8      A.   Yes.
9      Q.   Do you agree with that statement or is
10  that consistent with your understanding at the
11  time?
12     A.   Yes.
13     Q.   The rate referenced there, AWP minus 10
14  percent, was adopted after the study was performed;
15  correct?
16     A.   I don't recall.
17     Q.   The rate of AWP minus 10 percent was --
18  didn't become effective until after the Myers and
19  Stauffer study was released; correct?
20     A.   That's correct.
21     Q.   I take it you don't recall whether the
22  specific legislation or budget proposal that

Page 594

1  pharmacy acquisition cost of generic drugs."
2        Did I read that correctly?
3      A.   Yes.
4      Q.   Is that consistent with your
5  understanding at the time?
6      A.   Yes.
7      Q.   Did you have that understanding also
8  going back to the late nineties, that AWP minus 20
9  percent is significantly higher than pharmacy
10  acquisition costs for generic drugs?
11     A.   Yes.
12     Q.   Last sentence of that paragraph or that
13  page, I guess, going over to the next page, "The
14  reimbursement of generic drugs will still be
15  significantly above pharmacy's acquisition costs."
16        And then it goes on.
17        Did I read that correctly?
18     A.   Yes.
19     Q.   Do you understand that to --
20        Withdrawn.
21        So was it your understanding to the
22  extent you recall this proposal that the

51 (Pages 591 to 594)

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
Sacramento, CA

Page 595

1  reimbursement rate of AWP minus 20 percent was made
2  knowing that reimbursement on that basis would be
3  significantly higher than acquisition costs for
4  generic drugs?
5      A.  Yes.
6      Q.  And then the -- further down on that
7  page there's a paragraph with the heading "Impact
8  on Access" that refers to stakeholder meetings.
9          Do you recall having stakeholder meetings
10 prior to this legislative proposal?
11     A.  Not that I can recall.
12     Q.  Do you recall during any discussions for
13 changing the reimbursement rate having meetings
14 with stakeholders?
15     A.  Not that I -- not that I can recall.
16     Q.  Do you have an understandingas to what
17 the document -- is referring to when it refers to a
18 "stakeholder"?
19     A.  Yes.
20     Q.  Would that be a reference to providers
21 of medical -- Medi-Cal?
22     A.  Yes, amongst others.

Page 596

1      Q.  And others might be beneficiaries, other
2  organizations that have some interest in the -- in
3  the Medi-Cal program?
4      A.  That's correct.
5      Q.  Would you agree that this paragraph
6  reflects consideration on the part of --
7          Or is it your understanding of this
8  paragraph that Medi-Cal was considering whether the
9  proposed change would affect beneficiaries' access
10 to care?
11     A.  Yes.
12     Q.  And do you recall in 2004 when rate
13 changes were discussed considering access to care
14 as a -- a policy matter?
15     A.  Yes.
16     MR. BENNETT:  I think we need to break
17 for a tape.  So --
18     MR. PAUL:  Okay.  Just to restate my
19 concern earlier with regard to this, I think I
20 stated on the record but I'm not sure I mentioned
21 that we were talking about Exhibit 52, although I'm
22 sure it's fairly obvious from the transcript, but I

Page 597

1  want to make sure that that objection's on the
2  record and while we would prevail on whatever
3  motion was required to retract this, I would ask
4  that all the testimony that was given in connection
5  with it be redacted, but, obviously, we'll take
6  that up later.
7          VIDEOGRAPHER:  This is the end of tape
8  two, volume two, of the deposition of Kevin
9  Gorospe.
10         We are off the record at 2:21 p.m.
11         (Thereupon a recess was taken at 2:21
12         p.m. and the deposition resumed at 2:31
13         p.m.)
14         VIDEOGRAPHER:  This is the beginning of
15 tape three, volume two, of the deposition of Kevin
16 Gorospe.
17         We are back on the record at 2:31 p.m.
18     MR. BENNETT:  I'd like to mark this
19 Exhibit 53, I think we're on.
20         (Exhibit Gorospe 053 was marked for
21         Identification.)
22 BY MR. BENNETT:

Page 598

1      Q.  Exhibit 53 has labeled CAAG/DHS 0084626
2  and 627.
3          Dr. Gorospe, do you recognize this
4  document?
5      A.  Yes.
6      Q.  Can you describe it for us?
7      A.  It appears to be a description of
8  Medi-Cal pharmacy reimbursement related to a
9  reimbursement proposal and various data related to
10 acquisition cost of drugs relevant to AWP, also
11 describes briefly points about the -- study of
12 Medi-Cal pharmacy reimbursement.
13     Q.  Did you draft this document?
14     A.  Not that I can recall, no.
15     Q.  Do you recall receiving a copy of the
16 document?
17     A.  Yes.
18     Q.  Do you know who would have drafted it,
19 if not yourself?
20     A.  Somebody within the Pharmacy Section.
21     Q.  And the Pharmacy Section, as you've
22 described with the previous document, encompasses

52  (Pages 595 to 598)

# EXHIBIT CE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY      )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

---------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    ) Magistrate Judge

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE ILLINOIS

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) HEALTHCARE AND

Ven-a-Care of the Florida Keys,    ) FAMILY SERVICES

Inc., v. Boehringer Ingleheim      ) by  JAMES PARKER

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) NOVEMBER 18, 2008

---------------------------------X

IL Department of Healthcare and Family Services (James Parker)                    November 18, 2008
## Springfield, IL

Page 182

1    Q.  And the reason that this budget
2  initiative was proposed was because AWP had
3  become virtually meaningless as a real number,
4  particularly for multi source drugs, correct?
5    A.  That is correct.
6    Q.  And it states, "The AWP is set by each
7  drug manufacturer and reported to the various
8  drug information services, but in actuality it is
9  no longer used by wholesalers selling to
10  pharmacies," correct?
11    A.  That is what it says.
12    Q.  And it states that, "Factors such as
13  volume discounts and rebates by wholesalers or
14  manufacturers are examples of changes that have
15  made AWP meaningless," correct?
16    A.  Correct.
17    Q.  And, in 1996, IDPA used AWP as part of
18  its reimbursement methodology, correct?
19    A.  That's correct.
20    Q.  And it continues to use AWP today?
21    A.  That is correct.
22    Q.  And in 1996 through December of 2000,

Page 183

1  it didn't use Wholesale Acquisition Cost-plus
2  method, correct?
3    A.  That is correct.
4    Q.  Now, if Illinois Medicaid understood
5  that AWP had become virtually meaningless as a
6  real number, particularly for multi source drugs,
7  why did it continue to use that benchmark as part
8  of its payment methodology?
9    A.  Because there was no viable
10  alternative.  So the best approach to Estimated
11  Acquisition Cost was to continue to try to figure
12  out the best discount off of AWP to estimate
13  acquisition cost.
14    Q.  But they understood it was virtually
15  meaningless in so doing?
16    MS. OBEREMBT:  Objection.
17    MR. LIBMAN:  Objection.  Objection to
18  form.
19  BY MR. REALE:
20    Q.  That AWP was virtually meaningless?
21    A.  Well, I --
22    MS. OBEREMBT:  Same objection.

Page 184

1    THE WITNESS:  Some people may have had
2  that opinion.  It depends on what they meant by
3  "virtually meaningless."  We certainly knew it
4  did not mean what the common understanding of the
5  words would mean.
6  BY MR. REALE:
7    Q.  Well, it -- a document from the
8  Director of the IDPA dated September 10th, 1994
9  refers to AWP as being meaningless, particularly
10  so for multi source drugs, correct?
11    A.  That is correct.
12    Q.  And at one time, Illinois Medicaid used
13  Actual Acquisition Cost to reimburse pharmacies,
14  correct?
15    A.  That is correct.
16    Q.  And there's nothing stopping Illinois
17  from continuing to use actual acquisition cost to
18  reimburse pharmacies today?
19    MR. LIBMAN:  Objection to form.
20    THE REPORTER:  You know what, I lost
21  your question.  I'm so sorry.  "There's nothing
22  stopping Illinois from using the actual..."

Page 185

1    MR. REALE:  Acquisition cost to
2  reimburse pharmacies today.
3    THE WITNESS:  There's nothing that
4  legally prohibits us from doing that.
5  BY MR. REALE:
6    Q.  And they did at one time?
7    A.  And we did at one time.
8    Q.  Did you talk to Mr. Hazelwood about
9  Roxane Illinois Exhibit 5 and in particular the
10  proposal in September of 1994?
11    A.  Not about this document, no.
12    (Exhibit Roxane IL 006 was marked
13  for ID)
14  BY MR. REALE:
15    Q.  Mr. Parker, you've just been handed
16  another exhibit which we've marked as Roxane
17  Illinois Exhibit 6, Bates No. AWP-IL-16734 to
18  16755.  The title of this document is
19  "Budget/System Impact Fiscal Year 1995."  Do you
20  recognize this type of document?
21    MR. LIBMAN:  Take your time to review
22  it if you need to, Mr. Parker.

47 (Pages 182 to 185)

# EXHIBIT CF

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED BY_____D

95 AUG 18 PM 3: 11

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

UNITED STATES OF AMERICA,
ex rel. Ven-A-Care of the
Florida Keys, Inc.,

         Plaintiffs,

            v.

Abbott Laboratories; ▆▆▆▆▆
▆▆▆▆▆▆▆▆▆ et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED UNDER SEAL

Case No. 95-1354-Civ-Marcus

## MEMORANDUM IN SUPPORT OF THE UNITED STATES' EX PARTE MOTION FOR AN EXTENSION OF TIME

This is an action under the qui tam provisions of the False Claims Act ("FCA") which permit a private party (called a "relator") to bring suit to recover damages allegedly suffered by the United States due to fraud. See 31 U.S.C. § 3730(b). Under the FCA, the action remains under seal for 60 days during which the United States may elect to intervene and assume primary responsibility for prosecuting the case. The 60-day period may, however, be extended upon application of the Government for good cause shown. This memorandum and accompanying declaration demonstrate why good cause exists in this case to extend the period by 90 days so that the Government may complete its investigation and make an informed decision whether to intervene.

The relator concurs with the United States that a 90 day extension is appropriate under the circumstances.

8/18/95

ABT008-0211

### FACTS

The relator, Ven-A-Care of the Florida Keys, filed this action under seal on June 23, 1995.  The Attorney General was served with the Complaint and a written disclosure of material evidence on June 26, 1995.  Thus, the sixty-day period for the government to make a decision whether to intervene began to run on that day.

The complaint alleges that defendants, various major manufacturers of home infusion pharmaceuticals published inflated wholesale prices of their respective pharmaceuticals, knowing that Medicare and Medicaid reimbursed providers based on these published wholesale prices.

Before the United States can decide whether to intervene it must, at a minimum, investigate the allegations and assess their legal and factual merit.

### LEGAL AUTHORITY

The _qui_ _tam_ provisions of the False Claims Act in pertinent part provide that:

> (2)  A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure.  The complaint shall be filed in camera, shall remain under seal for _at least_ 60 days, and shall not be served on the defendant until the court so orders.  The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

> (3)  The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2).

31 U.S.C. §§ 3730(b)(2) and (3) (emphasis added).

Congress recognized that the Government would frequently require additional time in which to make an informed decision on whether to assume control over the action, as required under the Act.  S. Rep. No. 99-345, 99th Cong., 2d Sess. 25, reprinted in 1986 U.S. Code Cong. & Ad. News 5266, 5290.

As set forth above and in the attached Declaration of Sara Strauss, the Government would like to keep the investigation under seal until it has the investigative resources to analyze the necessary documentation and conduct the necessary interviews.  Both relator and the Government agree, therefore, that more time is needed in order for the Government to make an adequately informed decision as to whether to intervene.

The United States has also moved this Court for an order keeping the complaint and material evidence under seal during the requested extension.  The sound policy reasons for keeping qui tam complaints under seal while the Government pursues its requisite investigation are also found in the legislative history:

> Keeping the qui tam complaint under seal for the initial 60-day time period is intended to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action. . . .

3

ABT008-0213

\*          \*          \*

> . . . The initial 60-day sealing of the
> allegations has the same effect as if the
> <u>qui tam</u> relator had brought his information
> to the Government and notified the
> Government of his intent to sue.  The
> Government would need an opportunity to
> study and evaluate the information in either
> situation. . .

<u>Id.</u> at 5289.  The same reasoning supports the continuing need to

keep the complaint in this action under seal pending the

Government's completion of the additional investigation and

analysis necessary in this complex case.

<u>CONCLUSION</u>

For all of the above reasons, the United States

respectfully requests that its motion for a ninety (90) day

extension of time, to and including November 26, 1995, during

which the complaint and other documents filed in this matter

remain under seal, and during which the United States may

4

ABT008-0214

evaluate its decision whether to intervene in the action, be granted.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

KENDALL COFFEY
United States Attorney
Southern District of Florida

MARK LAVINE
Assistant United States Attorney
Southern District of Florida
99 Northeast 4th Street
Miami, Florida 33132

MICHAEL F. HERTZ
JOYCE R. BRANDA
SARA STRAUSS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-1437

5

ABT008-0215     L

# EXHIBIT CG



NIGHT BOX
FILED

NOV 27 1995

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,               )
ex rel. Ven-A-Care of the               )
Florida Keys, Inc.,                     )
                                        )
                                        )  FILED UNDER SEAL
                                        )
        Plaintiffs,                     )
                                        )  Case No.95-1354-Civ-Marcus
                                        )
                                        )
        v.                              )
                                        )
                                        )
Abbott Laboratories; ████████           )
            ████████ et al.,            )
                                        )
        Defendants.                     )

UNITED STATES OF AMERICA'S MOTION FOR EXTENSION OF SEAL
ON QUI TAM COMPLAINT AND RELATED FILINGS AND FOR EXTENSION
OF THE GOVERNMENT'S EVALUATORY PERIOD

        The United States, pursuant to 31 U.S.C. § 3730(b)(3),

presents to this Court, ex parte and under seal, this motion for

an extension of time of 120 days up to and including March 26,

1996, in which to notify the Court of its decision whether to

intervene in the above-captioned False Claims Act qui tam action

11/27/95

ABT008-0199

and during which the Complaint and all other related filings shall remain under seal.

The seal on this matter is due to expire November 27, 1995. Although the government has begun investigating the allegations of Medicare fraud made by the relator, the investigation will not be complete by the November 27, 1995 deadline.  The claims stated by the Relators are extensive, include 10 named defendants, six other anticipated defendants, and alleged damages of over $2 billion.  Since a complete investigation is needed in order for the government to make an informed decision whether to intervene and take over this action pursuant to 31 U.S.C. § 3730(b)(4), the United States has made this motion, ex parte and under seal, for the Court to extend both the evaluatory period and the time during which the Complaint and all other related filings remain under seal for an additional 120 days.  The relator has no objection to this request.

The Court is respectfully referred to the Declaration of Assistant United States Attorney Mark A. Lavine, and the Proposed order filed herewith.[1]

---

[1]   The Legal Authority supporting the proposed extension is set forth in the Government's Memorandum accompanying its First Motion for an Extension of Time.  Rather than reiterating the same points, the Government respectfully refers the Court to this previously submitted memorandum.

2

ABT008-0200

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

KENDALL COFFEY
UNITED STATES ATTORNEY

By: _____
MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 536-5472 Tel.
(305) 530-7139 Fax
Fla. Bar No. 648876

_____
MICHAEL F. HERTZ
JOYCE R. BRANDA
SARA STRAUSS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-1437

3

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this 27th day of November, 1995 to:

Atlee Wampler
James Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131

_____
ASSISTANT UNITED STATES ATTORNEY

4

ABT008-0202

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,          )
ex rel. Ven-A-Care of the          )
Florida Keys, Inc.,                )
                                   )
                                   )   FILED UNDER SEAL[1]
                                   )
          Plaintiffs,              )
                                   )   C.A. No. 1354-Civ-Marcus
            v.                     )
                                   )
Abbott Laboratories;  ▓▓▓▓▓▓▓      )
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ et al.,           )
                                   )
          Defendants.              )
                                   )

DECLARATION OF MARK A. LAVINE

I, Mark A. Lavine, do state and declare as follows:

1.   I am an Assistant United States Attorney in the
United States Attorney's Office for the Southern District of
Florida.   I have been assigned responsibility for handling the
above-captioned matter together with Sara Strauss, a trial
attorney in the Commercial Litigation Branch of the United
States Department of Justice, Civil Division, Washington, D.C.

2.   This is a qui tam action against the above-named
defendants, initiated by the relator Ven-a-Care of the Florida
Keys ("Relator"), pursuant to the False Claims Act, as amended,

_____

[1]   A copy of the United States' Ex Parte Motion For An
Extension Of Time as well as the proposed order have been served
on relator's counsel.   This pleading has been filed in camera
because it contains confidential information concerning the
United States' investigatory process.   Therefore, a copy of this
pleading has not been served on relator's counsel.

ABT008-0203

31 U.S.C. § 3730. The complaint in this action was received by the United States Attorney General on June 26, 1995.

3. Atlee Wampler III, counsel for the relator, has authorized me to represent that the relator has no objection to this proposed extension.

4. The False Claims Act, 31 U.S.C. § 3730(b)(2), requires the Government to elect whether to intervene in the qui tam action within sixty days of its receipt of the Complaint and the qui tam plaintiff's material evidence in support of the Complaint. The Government has sought and been granted one extension of this seal period which expires on November 26, 1995. The government, however, is not yet prepared to make an informed decision and thus requests an additional 120 days.

5. Analysis by the United States of the relator's allegations requires independent investigation of the factual basis for the allegations. These allegations are being investigated by the Office of Inspector General of the Department of Health and Human Services ("IG").

6. As specified in my last declaration, the relator has named multiple defendants and effectively made hundreds of allegations. Because of the multiple number of defendants, including ten of the largest pharmaceutical companies in the world (plus six more which the Relators intend to add to the suit), the number of allegedly inflated pharmaceutical drugs that are the subject of the qui tam action, and alleged damages of $2 billion, the government will need substantial time and

2

resources to properly investigate this matter.   During the
ninety day extension period the assigned attorneys have
contacted numerous officials at the Health Care Financing
Association ("HCFA") and met with those individuals responsible
for establishing reimbursement policies for pharmaceuticals to
discuss the merits of the allegations.   In addition, we have
been working with the IG to craft an appropriate subpoena to
issue to the named defendants and several other entities
involved in the distribution of injectable drugs.   I anticipate
that the government will issue these subpoenas within the next
three weeks.   After the subpoenas are issued, the defendants
will require a period of time to comply with the requests, and
the government will need time to review the documentation before
it can make an educated intervention decision.   We hope to have
completed these tasks within the next 120 days.

 I declare under penalty of perjury that the foregoing is
true and correct.

 EXECUTED this $\underline{27^{th}}$ day of November, 1995,

<br>

                     _____
                     MARK A. LAVINE

3

ABT008-0205

# EXHIBIT CH



FILED by _____ D.C.

MAY 10 1996

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,       )
ex rel. Ven-A-Care of the       )
Florida Keys, Inc.,             )    C.A. No. 95-1354-Civ-Marcus
                                )
                                )    **FILED UNDER SEAL**
                                )
                                )
          Plaintiffs,           )
                                )
                                )
                                )
               v.               )
                                )
                                )    **UNITED STATES OF AMERICA'S**
                                )    **MOTION FOR EXTENSION OF**
Abbott Laboratories; ▓▓▓▓       )    **SEAL ON QUI TAM COMPLAINT**
           ▓▓▓▓▓▓▓▓ et al.,     )    **AND RELATED FILINGS AND FOR**
                                )    **EXTENSION OF THE**
                                )    **GOVERNMENT'S EVALUATORY**
          Defendants.           )    **PERIOD AND MEMORANDUM OF**
_____  )    **LAW**

        The United States, pursuant to 31 U.S.C. § 3730(b)(3),

presents to this Court, ex parte and under seal, this motion for

an extension of time of 120 days up to and including July 24,

1996, in which to notify the Court of its decision whether to

intervene in the above-captioned False Claims Act qui tam action

5/10/96

ABT008-0192

and during which the Complaint and all other related filings shall remain under seal.

The seal on this matter is due to expire March 26, 1996. Although the government has begun investigating the allegations of Medicare fraud made by the relator, the investigation will not be complete by the March 26, 1996 deadline. The claims stated by the Relators are extensive, include 10 named defendants, six other anticipated defendants, and alleged damages of over $2 billion. Since a complete investigation is needed in order for the government to make an informed decision whether to intervene and take over this action pursuant to 31 U.S.C. § 3730(b)(4), the United States has made this motion, ex parte and under seal, for the Court to extend both the evaluatory period and the time during which the Complaint and all other related filings remain under seal for an additional 120 days. The relator has no objection to this request.

The Court is respectfully referred to the Declaration of Assistant United States Attorney Mark A. Lavine, and the Proposed order filed herewith.[1]

---

[1]  The Legal Authority supporting the proposed extension is set forth in the Government's Memorandum accompanying its First Motion for an Extension of Time.  Rather than reiterating the same points, the Government respectfully refers the Court to this previously submitted memorandum.

2

ABT008-0193

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

KENDALL COFFEY
UNITED STATES ATTORNEY

By:

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 536-5472 Tel.
(305) 530-7139 Fax
Fla. Bar No. 648876

MICHAEL F. HERTZ
JOYCE R. BRANDA
MICHAEL THEIS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-1437

3

ABT008-0194

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this _____ day of March, 1996 to:

Atlee Wampler
James Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131

_____
ASSISTANT UNITED STATES ATTORNEY

4

ABT008-0195        L

# EXHIBIT CI

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,        )
ex rel. Ven-A-Care of the        )
Florida Keys, Inc.,              )    Case No. 95-1354-Civ-Marcus
                                 )
                                 )
                                 )    **FILED UNDER SEAL**
                                 )
                                 )
        Plaintiffs,              )
                                 )
                                 )
                                 )
        v.                       )
                                 )
                                 )    UNITED STATES OF AMERICA'S
                                 )    MOTION FOR EXTENSION OF
Abbott Laboratories;             )    SEAL ON QUI TAM COMPLAINT
                    et al.,      )    AND RELATED FILINGS AND FOR
                                 )    EXTENSION OF THE
                                 )    GOVERNMENT'S EVALUATORY
        Defendants.              )    PERIOD AND MEMORANDUM OF
                                 )    LAW AND REQUEST FOR STATUS
                                      CONFERENCE

        The United States, pursuant to 31 U.S.C. § 3730(b)(3),

presents to this Court, ex parte and under seal, this motion for

an extension of time of 120 days up to and including November 21,

1996, in which to notify the Court of its decision whether to

intervene in the above-captioned False Claims Act qui tam action

7/24/96

ABT008-0180

and during which the Complaint and all other related filings
shall remain under seal.

The seal on this matter is due to expire July 24, 1996.
Although the government has been actively investigating the
allegations of Medicare fraud made by the relator, the
investigation will not be complete by the July 24, 1996 deadline.
The claims stated by the Relator are extensive, include 10 named
defendants, six other anticipated defendants, and alleged damages
of over $2 billion.  Since a complete investigation is needed in
order for the government to make an informed decision whether to
intervene and take over this action pursuant to 31 U.S.C. §
3730(b)(4), the United States has made this motion, ex parte and
under seal, for the Court to extend both the evaluatory period
and the time during which the Complaint and all other related
filings remain under seal for an additional 120 days.

The Relator desires to appear before the Court at a status
conference at the Court's earliest convenience regarding the
extension of the seal, and subject to the status conference with
the Court has no objection to the extension.

2

ABT008-0181

The Court is respectfully referred to the Declaration of Assistant United States Attorney Mark A. Lavine, and the Proposed order filed herewith.[1]

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

KENDALL COFFEY
UNITED STATES ATTORNEY

By: _____
MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 536-5472 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

_____
MICHAEL F. HERTZ
JOYCE R. BRANDA
MICHAEL THEIS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-1437

_____

[1]   The Legal Authority supporting the proposed extension is set forth in the Government's Memorandum accompanying its First Motion for an Extension of Time.  Rather than reiterating the same points, the Government respectfully refers the Court to this previously submitted memorandum.

3

ABT008-0182

### CERTIFICATE OF SERVICE

IS HEREBY certified that a true and correct copy of the egoing was mailed this ___24ᵗʰ___ day of July, 1996 to:

lee Wampler, III
mes J. Breen
mpler, Buchanan and Breen
17 Brickell Ave.
iami, FL  33131

_____
ASSISTANT UNITED STATES ATTORNEY

4

ABT008-0183

EXHIBIT CJ



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,          )
ex rel. Ven-A-Care of the          )
Florida Keys, Inc.,                )    Case No. 95-1354-Civ-Marcus
                                   )
                                   )
                                   )    **FILED UNDER SEAL**
                                   )
                                   )
          Plaintiffs,              )
                                   )
                                   )
                                   )
          v.                       )
                                   )
                                   )    **UNITED STATES OF AMERICA'S**
                                   )    **MOTION FOR EXTENSION OF**
Abbott Laboratories;               )    **SEAL ON QUI TAM COMPLAINT**
                          , et al., )   **AND RELATED FILINGS AND FOR**
                                   )    **EXTENSION OF THE**
                                   )    **GOVERNMENT'S EVALUATORY**
          Defendants.              )    **PERIOD THROUGH MARCH 21,**
_____)    **1997 AND MEMORANDUM OF LAW**

    The United States, pursuant to 31 U.S.C. § 3730(b)(3),

presents to this Court, ex parte and under seal, this motion for

an extension of time of 120 days up to and including March 21,

1997, in which to notify the Court of its decision whether to

intervene in the above-captioned False Claims Act qui tam action

11/21/96

ABT008-0165

and during which the Complaint and all other related filings
shall remain under seal.

The seal on this matter is due to expire November 21, 1996.
Although the government has been actively investigating the
allegations of Medicare fraud made by the relator, the
investigation will not be complete by the November 21, 1996
deadline.  The claims stated by the Relator are extensive,
include 10 named defendants, six other anticipated defendants,
and alleged damages of over $2 billion.  Since a complete
investigation is needed in order for the government to make an
informed decision whether to intervene and take over this action
pursuant to 31 U.S.C. § 3730(b)(4), the United States has made
this motion, ex parte and under seal, for the Court to extend
both the evaluatory period and the time during which the
Complaint and all other related filings remain under seal for an
additional 120 days.

The Relator has no objection to the requested relief.

The Court is respectfully referred to the Declaration of
Assistant United States Attorney Mark A. Lavine and the proposed
order filed herewith.[1]

---

[1]  The Legal Authority supporting the proposed extension is
set forth in the Government's Memorandum accompanying its First
Motion for an Extension of Time.  Rather than reiterating the
same points, the Government respectfully refers the Court to this
previously submitted memorandum.

2

ABT008-0166

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

By:

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 536-5472 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

MICHAEL F. HERTZ
JOYCE R. BRANDA
MICHAEL THEIS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-1437

3

ABT008-0167

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this _2l st_ day of November, 1996 to:

Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131

_[signature]_

ASSISTANT UNITED STATES ATTORNEY

4

ABT008-0168          L

# EXHIBIT CK



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,   )
ex rel. Ven-A-Care of the   )
Florida Keys, Inc.,         )       Case No. 95-1354-Civ-Marcus
                            )
                            )
                            )       **FILED UNDER SEAL**
                            )
                            )
           Plaintiffs,      )
                            )
                            )
                            )
           v.               )
                            )
                            )       **UNITED STATES'S MOTION FOR**
                            )       **EXTENSION OF SEAL ON QUI**
Abbott Laboratories; ▮▮▮▮   )       **TAM COMPLAINT THROUGH MAY**
         ▮▮▮▮▮▮▮▮▮▮, et al., )      **21, 1997 AND FOR PARTIAL**
                            )       **LIFTING OF THE SEAL AND**
           Defendants.      )       **MEMORANDUM OF LAW**
_____)

     The United States, pursuant to 31 U.S.C. § 3730(b)(3),

presents to this Court, ex parte and under seal, this motion for

an extension of time of 60 days up to and including May 21, 1997,

in which to notify the Court of its decision whether to intervene

in the above-captioned False Claims Act qui tam action, during

which the Complaint and all other related filings shall remain

3/24/97

ABT008-0154

under seal, and for a partial lifting of the seal in order to disclose these proceedings to the Defendants.

The Plaintiff in this action has now filed an Amended Complaint.  The Amended Complaint is 105 pages in length, has dropped five of the originally named defendants, has added five new defendants, and has substantially expanded the allegations upon which the case is based.

The Court previously extended the seal in this matter through March 21, 1996 based upon the government's need for additional time to investigate this complicated and difficult case.  The filing of the amended complaint which adds several new defendants, thereby triggering a new 60-day evaluatory period for the government, has compelled the United States to make this motion, ex parte and under seal, for the Court to extend both the evaluatory period and the time during which the Complaint and all other related filings remain under seal for an additional 60 days.  As this process draws to a close, leave is also sought to discuss the allegations with the defendants, to identify the Relator to the Defendants and/or to provide a copy of the Complaint or Amended Complaint to the Defendants.

The Relator has no objection to the requested relief.

2

ABT008-0155

The Court is respectfully referred to the Declaration of Assistant United States Attorney Mark A. Lavine and the proposed order filed herewith.[1]

                              Respectfully submitted,

                              FRANK W. HUNGER
                              Assistant Attorney General

                              WILLIAM A. KEEFER
                              UNITED STATES ATTORNEY

                    By:       _____
                              MARK A. LAVINE
                              Assistant U.S. Attorney
                              99 N.E. 4th Street
                              Miami, FL  33132
                              (305) 536-5472 Tel.
                              (305) 536-4101 Fax
                              Fla. Bar No. 648876

                              _____
                              MICHAEL F. HERTZ
                              JOYCE R. BRANDA
                              REED STEPHENS
                              Civil Division
                              Commercial Litigation Branch
                              P.O. Box 261
                              Ben Franklin Station
                              Washington, D.C.  20044
                              (202) 616-1437

---

[1]   The Legal Authority supporting the proposed extension is set forth in the Government's Memorandum accompanying its First Motion for an Extension of Time.  Rather than reiterating the same points, the Government respectfully refers the Court to this previously submitted memorandum.

3

ABT008-0156          L

# EXHIBIT CL

NIGHT BOX
FILED

OCT 1 7 1997

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DIVISION OF FLORIDA

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA, )
ex rel. Ven-A-Care of the )
Florida Keys, Inc., )
                   )    Case No. 95-1354-Civ-Marcus
                   )
                   )    FILED UNDER SEAL
                   )
                   )
        Plaintiffs, )
                   )
                   )
                   )    **UNITED STATES' UNOPPOSED**
                   )    **MOTION FOR EXTENSION OF**
        v.            )    **SEAL ON QUI TAM COMPLAINT**
                   )    **THROUGH JANUARY 15, 1998 AND**
Abbott Laboratories; ▓▓▓▓▓▓▓ )    **FOR PARTIAL LIFTING OF THE**
▓▓▓▓▓▓▓▓▓▓ , et al., )    **SEAL AND MEMORANDUM OF**
                   )    **LAW**
        Defendants. )
_____ )

      The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte

and under seal, this motion for an extension of time of 90 days up to and including January 15,

1998, in which to notify the Court of its decision whether to intervene in the above-captioned

False Claims Act qui tam action, during which the Complaint and all other related filings shall

remain under seal, and for a partial lifting of the seal in order to disclose these proceedings to

the additional Defendants named in the Second Amended Complaint.

      Since the Court's previous Order granting an extension of the seal, the United States

has been diligently investigating the allegations set forth in the relator's Second Amended

10/17/97

ABT008-0339

Complaint, filed in August 1997. During this period, the Office of Inspector General of the Department of Health and Human Services ██████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████ the government has begun to make its initial contacts with counsel for each of the defendants. Each defendant has indicated that, although they will be able to commence production on or before the October 31 return date, an extension of time to complete the production of documents will be necessary. The government expects to begin receiving responsive documents beginning on the subpoena return date and continuing throughout the remainder of the period covered by the requested extension. The documents sought by the government ████████████████████ are critical to the government's assessment of whether to intervene in this qui tam matter. The partial lifting of the seal with respect to the additional Defendants named in the Second Amended Complaint is consistent with the Court's previous Order which partially lifted the seal with respect to the first sixteen Defendants named by relator in its earlier pleading.

The Relator has no objection to the requested relief.[1]

---

[1] The Legal Authority supporting the proposed extension is set forth in the Government's Memorandum accompanying its First Motion for an Extension of Time. Rather than reiterating the same points, the Government respectfully refers the Court to this previously submitted memorandum.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By:

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 961-9003 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

MICHAEL F. HERTZ
JOYCE R. BRANDA
REED STEPHENS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 307-0404

ABT008-0341

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this _17ᵗʰ_ day of October, 1997 to:

Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131

_____
ASSISTANT UNITED STATES ATTORNEY

ext5.mot October 17, 1997

ABT008-0342

# EXHIBIT CM

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, )
ex rel. Ven-A-Care of the )
Florida Keys, Inc., )            Case No. 95-1354-Civ-Kehoe
                               )
                               )
                               )            FILED UNDER SEAL
                               )
                               )
         Plaintiffs,           )
                               )
                               )
                               )            UNITED STATES' UNOPPOSED
              v.               )            APPLICATION FOR EXTENSION
Abbott Laboratories; ▇▇▇▇      )            OF SEAL ON QUI TAM
         ▇▇▇▇▇▇▇▇, et al.,     )            COMPLAINT
                               )
                               )
         Defendants.           )
_____)

NIGHT BOX
FILED

JAN · 5 1998

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte

and under seal, this application for an extension of time of 90 days up to and including April

15, 1998, in which to notify the Court of its decision whether to intervene in the above-

captioned False Claims Act qui tam action, during which the Complaint and all other related

filings shall remain under seal.

Since the Court's previous Order granting an extension of the seal, the United States

has been diligently investigating the allegations set forth in the relator's Second Amended

Complaint, filed in August 1997. During this period, the Office of Inspector General of the

Department of Health and Human Services ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



ABT008-1118

stated that it did not object to a further extension of the time to intervene but did not commit to

a specific number of days for the extension.  After discussions with relator's counsel,

however, relator has agreed to the ninety day extension requested in the instant motion.[2]

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By:

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 961-9003 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

MICHAEL F. HERTZ
JOYCE R. BRANDA
T. REED STEPHENS
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 307-0404

---

[2] The Legal Authority supporting the proposed extension is set forth in the Government's
Memorandum accompanying its First Motion for an Extension of Time.  Rather than reiterating
the same points, the Government respectfully refers the Court to this previously submitted
memorandum.

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this _15ᵗʰ_ day of January, 1998 to:

Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131

_Neil O. Levine_
ASSISTANT UNITED STATES ATTORNEY

January 15, 1998

ABT008-1120          L

# EXHIBIT CN

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,      )
ex rel. Ven-A-Care of the      )
Florida Keys, Inc.,            )
                               )      Case No. 95-1354-Civ-Kehoe
          Plaintiffs,          )
                               )
                               )      **UNITED STATES' UNOPPOSED**
          v.                   )      **APPLICATION FOR EXTENSION OF**
                               )      **TIME TO ELECT WHETHER TO**
                               )      **INTERVENE IN QUI TAM ACTION**
Abbott Laboratories;           )      **AND MEMORANDUM OF LAW**
          et al.,              )
                               )
          Defendants.          )
_____)

          The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte

and under seal, this application for an extension of time of one hundred fifty (150) days up to and

including April 23, 1999, in which to notify the Court of its decision whether to intervene in the

above-captioned False Claims Act qui tam action, during which the Complaint and all other

related filings shall remain under seal.[1]

_____

   [1] *The Legal Authority supporting the proposed extension is set forth in the Government's
Memorandum accompanying its First Application for an Extension of Time. Rather than
reiterating the same points, the Government respectfully refers the Court to this previously
submitted memorandum.*

11/17/98

ABT008-1061

Since counsel for the United States appeared before the Court in March 1998, the United States has been diligently investigating the allegations set forth in the relator's Second Amended Complaint, filed in August 1997. Twenty-four defendants and two other subpoenaed non-parties have continued to provide documents over the course of the past several months. Counsel for the United States has pressed defendants to state that all responsive documents have been produced yet defendants continue to produce additional documents. The United States has also incurred considerable expense creating an electronic database for storage and review of the thousands of documents.

As set forth in the Declaration of T. Reed Stephens ("Stephens Declaration") accompanying the instant application, the United States has pursued a non-stop agenda of meetings and telephone conferences with numerous parties in an effort to meet the November 23rd intervention deadline. The meetings with the defendants and the state Medicaid entities described herein were authorized by the orders partially lifting the seal on the *qui tam* complaint. Nine face-to-face meetings lasting hours in duration each have been conducted with defense counsel. Many other meetings in at least five states have taken place among counsel for the United States and the representatives of the 47 state Medicaid Fraud Control Units actively participating in the assessment of this qui tam matter. See Stephens Declaration and Declaration of Carolyn McElroy, Director Maryland Medicaid Fraud Control Unit, accompanying the instant Application for Extension of Time.

Despite this activity, plaintiff's counsel has been able to meet, to date, with counsel for only ten of the 24 defendants. The first sixty days of the requested extension will permit counsel for the United States to have initial substantive meetings with the remaining 14 defendants and

- 2 -

ABT008-1062

continue to meet with counsel for the first ten. The final 90 days of the requested extension will be devoted to completing any settlement negotiations. Thus far, plaintiff is engaged in earnest settlement talks with one of the defendants.

Counsel for the United States has kept the relator's representatives actively involved in the investigation so there would be no question from relator's perspective as to whether the United States has been "dragging its feet" over these past months. Relator agrees that the five month extension will allow the United States and the State representatives to complete its investigation.

In addition to the reasons set forth in the Stephens Declaration, additional good cause exists for the five month extension. As set forth in the accompanying Declaration of David Honig, Assistant Attorney General for the State of Florida ("The Honig Declaration"), the State of Florida has been

## CONCLUSION

For the foregoing reasons and those set forth in the accompanying declarations, plaintiff

- 3 -

ABT008-1063

respectfully requests that the Court grant the instant request for a five month (150) extension of
time in which to elect to intervene — during which this qui tam matter will remain under seal.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By: _____
MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 961-9303 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

By: _____
MICHAEL F. HERTZ
JOYCE R. BRANDA
T. REED STEPHENS
GEORGE VITELLI
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 307-0404

November 17, 1998

- 4 -

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing Motion for

Extension of Time (without the attached declarations) was mailed this ___17th___ day of November,

1998 to:


Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131


ASSISTANT UNITED STATES ATTORNEY

- 5 -

ABT008-1065

EXHIBIT CO

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED

APR 22 1999

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA,          )
ex rel. Ven-A-Care of the          )
Florida Keys, Inc.,                )          Case No. 95-1354-Civ-Gold
                                   )
          Plaintiffs,              )
                                   )          **UNITED STATES' UNOPPOSED**
               v.                  )          **APPLICATION FOR EXTENSION**
                                   )          **OF TIME TO ELECT WHETHER TO**
                                   )          **INTERVENE IN QUI TAM ACTION**
Abbott Laboratories;               )
                     et al.,       )
                                   )
          Defendants.              )
_____)


          The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte

and under seal, this application for an extension of time of one hundred twenty (120) days up to

and including August 26, 1999, in which to notify the Court of its decision whether to intervene in

the above-captioned False Claims Act qui tam action, during which the Complaint and all other

related filings shall remain under seal.[1]

_____

          [1] The Legal Authority supporting the proposed extension is set forth in the Government's
Memorandum accompanying its First Motion for an Extension of Time. Rather than reiterating
the same points, the Government respectfully refers the Court to this previously submitted
memorandum.

Since the previous extension of the seal, the United States has been diligently investigating the allegations set forth in the relator's Second Amended Complaint. Twenty-four defendants and two other subpoenaed non-parties have continued to provide documents over the course of the past several months. Counsel for the United States has pressed defendants to state that all responsive documents have been produced yet defendants continue to produce additional documents. The United States has also incurred considerable expense creating an electronic database for storage and review of the thousands of documents.

As set forth in the Declaration of T. Reed Stephens ("Stephens Declaration") accompanying the instant motion, the United States has pursued a non-stop agenda of meetings, witness interviews, and telephone conferences with numerous parties in an effort to meet the April 23rd intervention deadline. The meetings with the defendants and the affected state Medicaid entities described herein were authorized by the Orders partially lifting the seal on the qui tam complaint. Seven more face-to-face meetings lasting hours in duration each have been conducted with defense counsel. Many other meetings and witness interviews in at least four states have taken place among counsel for the United States and the representatives of the 47 state Medicaid Fraud Control Units actively participating in the assessment of this qui tam matter. See Stephens Declaration, Accompanying the Instant Motion for Extension of Time.

Despite this activity, plaintiff's counsel has been able to meet, to date, with counsel for only eleven of the 24 defendants. The first 60 days of the requested extension will permit counsel for the United States to (1) continue its witness interviews, (2) continue its current settlement negotiations with defendants, (3) pursue additional efforts to mitigate the damages allegedly

- 2 -

ABT008-1035

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing Motion for

Extension of Time was mailed this **23** day of April, 1999 to:

Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL 33131

ASSISTANT UNITED STATES ATTORNEY

April **23**, 1999

ABT008-1036        L

# EXHIBIT CP

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED BY _____ D.C.
TAKE

CASE NO. 95-1354-CIV-GOLD

99 AUG 26  PM 3: 29

MENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. Ven-A-Care of the Florida Keys, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Abbott Laboratories; ████████ ████████, et al., <br><br> Defendants. | UNITED STATES' UNOPPOSED APPLICATION FOR EXTENSION OF TIME TO ELECT WHETHER TO INTERVENE IN QUI TAM ACTION |

The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte and under seal, this application for an extension of time of ninety (90) days up to and including November 24, 1999, in which to notify the Court of its decision whether to intervene in the above-captioned False Claims Act qui tam action, during which the Complaint and all other related filings shall remain under seal.[1]

---

[1] The Legal Authority supporting the proposed extension is set forth in the Government's Memorandum accompanying its First Motion for an Extension of Time. Rather than reiterating the same points, the Government respectfully refers the Court to this previously submitted memorandum.

ABT008-1020

Since the previous extension of the seal, the United States has continued to diligently investigate the allegations set forth in the relator's Second Amended Complaint and aggressively pursue settlement discussions with a large number of the twenty-four defendants. At this point, the United States has reached a tentative settlement with one defendant (subject to approval by appropriate government officials), is in advanced settlement negotiations with three other defendants and is engaging in serious settlement discussions with an additional four defendants. In addition, a potential resolution of the relator's case against two other defendants is also at hand. Discussions have also been initiated with another nine defendants. In sum, the government is well advanced in its attempts to resolve the qui tam allegations against 10 of the defendants and has made progress in this regard as to an additional 9 defendants. And, the government intends to initiate discussions with the final five defendants within the next 30 days.

The United States submits that the pre-litigation settlement of the allegations of the complaint against as many defendants as possible is especially desirable in a case of this magnitude and complexity. The additional extension of time, at a minimum, should allow the more advanced negotiations to come to fruition and allow the other negotiations to advance to a point where a appraisal can be made as to whether a settlement is likely. At that point, it is hoped that a decision on intervention can be made with the expectation that actual litigation will be necessary with respect to only a small minority of the 24 defendants.

As set forth in the Declaration of Mark A. Lavine ("Lavine Declaration") accompanying the instant motion, the United States has continued its non-stop agenda of meetings, witness interviews, and telephone conferences with numerous parties in an effort to meet the August 26th intervention deadline. The meetings with the defendants and the affected state Medicaid entities

- 2 -

ABT008-1021

described herein were authorized by the Orders partially lifting the seal on the <u>qui tam</u> complaint.
Seven more face-to-face meetings lasting hours in duration each have been conducted with
defense counsel.  Many other meetings and witness interviews have taken place among counsel
for the United States and the representatives of the 47 state Medicaid Fraud Control Units
actively participating in the assessment of this <u>qui tam</u> matter.  <u>See</u> Lavine Declaration, ¶¶5, 6,
and 7.

As a result of this activity, plaintiff's counsel has been able to meet or commence
discussions , to date, with counsel for 19 of the 24 defendants.  The requested extension will
permit counsel for the United States to (1) continue its witness interviews, (2) continue its current
settlement negotiations with defendants, (3) pursue additional efforts to mitigate the damages
allegedly suffered by the Medicare and Medicaid programs, (4) have initial substantive meetings
with the remaining 5 defendants, and (5) push for additional compliance with the agency
subpoenas served on the defendants.  The United States intends to place particular emphasis on
completing any settlement negotiations that may result in a narrowing of the participants in this
extensive <u>qui tam</u> matter.

Counsel for the United States has kept the relator's representatives actively involved in the
investigation so there would be no question from relator's perspective as to whether the United
States has been moving expeditiously over these past months. Relator agrees that a  ninety (90)
day extension will allow the United States and the State representatives to complete this
investigation.[2]

--------------------------------------------------

[2]      As set forth in the United States' previous request for an extension, the State of
Florida

ABT008-1022

## CONCLUSION

For the foregoing reasons and those set forth in the accompanying declaration, plaintiff respectfully requests that the Court grant the instant request for a ninety (90) day extension of time in which to elect to intervene — during which this qui tam matter will remain under seal.

Respectfully submitted,

DAVID W. OGDEN
ASSISTANT ATTORNEY GENERAL

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By: _____

MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9003 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

By: _____

MICHAEL F. HERTZ
JOYCE R. BRANDA
T. REED STEPHENS
GEORGE C. VITELLI
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
(202) 307-0404

August 26, 1999

ABT008-1023